Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9         Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  One Bowling Green

14                  New York, NY  10004

15

16                  October 2, 2023

17                  2:13 PM

18

19

20

21  B E F O R E :

22  HON MARTIN GLENN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: JONATHAN

1    HEARING re HYBRID CONFIRMATION HEARING.

2

3    HEARING re Hybrid Hearing RE: CEL token Settlement under

4    Bankruptcy Rule 9019, if applicable.

5

6    HEARING re Hybrid Hearing RE: Debtor's Amended Motion for

7    Entry of an Order Authorizing the Debtors to Redact and File

8    Under Seal Certain Confidential Information (Doc## 3644,

9    3635)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND ELLIS LLP

 4        Attorneys for the Debtors

 5        300 North La Salle Drive

 6        Chicago, IL 60654

 7

 8   BY:  CHRIS KOENIG

 9

10   KIRKLAND & ELLIS LLP

11        Attorneys for the Debtors

12        601 Lexington Avenue

13        New York, NY 10022

14

15   BY:  ELIZABETH HELEN JONES

16

17   WHITE CASE LLP

18        Attorneys for the Official Committee

19        of Unsecured Creditors

20        555 South Flower Street, Suite 2700

21        Los Angeles, CA 90071

22

23   BY:  AARON COLODNY

24

25
```

**Page 4**

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         One Bowling Green

4         New York, NY 10004

5

6    BY:  SHARA CLAIRE CORNELL

7

8    OFFIT KURMAN

9         Attorneys for Ad Hoc Group of Earn Account Holders

10        590 Madison Avenue

11        New York, NY 10022

12

13   BY:  JOYCE A. KUHNS

14

15   MCCARTER ENGLISH, LLP

16        Attorneys for Ad Hoc Group of Borrowers

17        245 Park Avenue

18        New York, NY 10167

19

20   BY:  DAVID J. ADLER

21

22

23

24

25

1   TROUTMAN PEPPER HAMILTON SANDERS LLP

2       Attorneys for Ad Hoc Group of Withhold Account Holders

3       4000 Town Center, Suite 1800

4       Southfield, MI 48075

5

6   BY:  DEBORAH KOVSKY-APAP

7

8   DANIEL FRISHBERG

9       Pro Se

10      284 Monroe Drive

11      Mountain View, CA 94040

12

13  VENABLE LLP

14      Attorneys for Ignat Tuganov

15      151 West 42nd Street

16      New York, New York 10003

17

18  BY:  JEFFREY S. SABIN

19

20  VICTOR UBIERNA DE LAS HERAS

21      Pro Se

22      Calle Casillas 9

23      Burgos, 09002

24

25

Page 6

1    QUINN EMANUEL URQUHART & SULLIVAN LLP

2         Attorneys for Pharos Fund SP of Pharos Master SPC and

3         Pharos USD Fund SP of Pharos Master SPC

4         51 Madison Avenue, 22nd Floor

5         New York, New York 10010

6

7    BY:  VICTOR NOSKOV

8

9    KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

10        Attorneys for Brendan White

11        500 Fifth Avenue

12        New York, NY 10110

13

14   BY:  BARRY R. KLEINER

15

16   KIRKLAND & ELLIS LLP

17        Attorneys for the Debtors

18        1301 Pennsylvania Avenue NW

19        Washington, DC, DC 20004

20

21   BY:  T.J. MCCARRICK

22

23

24

25

1    DIMITRY KIRSANOV

2        Pro Se

3        4430 West Heidel Road

4        Mequon, WI 53092

5

6    ALSO PRESENT TELEPHONICALLY:

7    ARTUR ABREU

8    YOHANNES AFEWORK

9    KATHERINE AIZPURU

10   ANDREA AMULIC

11   JASMINE ARMAND

12   DAVID BARSE

13   CHRIS BECIN

14   JEFFREY BERNSTEIN

15   PAUL BREUDER

16   GRACE C. BRIER

17   NURALDEEN BRIFKANI

18   JOHAN BRONGE

19   JUDSON BROWN

20   STUART S. BROWN

21   MARK BRUH

22   VITOR CUNHA

23   SANTOS CACERES

24   ANDREW CARTY

25   ROY CARVER

Page 8

1   FRANK CHAIR

2   RICKIE CHANG

3   JEFFREY CHUBAK

4   GEOFFREY CIRKEL

5   CHRISTOPHER J. COCO

6   KEVIN COFSKY

7   LAFAYETTE A. COOK

8   KAREN CORDRY

9   CARL J. COTE

10   CAMERON CREWS

11   OONA ESTELLE CRUSELL

12   DAVID J. DALHART

13   KENNETH DARSCHEWSKI

14   CURT L. DELL

15   THOMAS DIFIORE

16   SHENAYA DIAS

17   TRISTAN DIAZ

18   SIMON DIXON

19   AMY DONAHUE

20   SHARON DOW

21   SCOTT DUFFY

22   JOHN PETER DZARAN

23   SIMON ELIMELECH

24   BEN EADES

25   JANELLE ECKHARDT

Page 9

1    CONSTANTINE ECONOMIDES

2    KEN EHRLER

3    JAMES ENGEL

4    DAVID AVERY FAHEY

5    FLORENCE FLANNIGAN

6    SEAN T. FLYNN

7    BRADLEY H. FOREMAN

8    DANIEL FRISHBERG

9    MAX GALKA

10   REBECCA GALLAGHER

11   JASLEIGH GEARY

12   JOANNE GELFAND

13   DARIUS GHEORGHE

14   BRADLEY GIARDIELLO

15   JAMIE GILBERT

16   JAMES I. GLASSER

17   MATTHEW J. GOLD

18   RAMON GONZALES

19   TODD GORDON

20   KATHRYN GUNDERSEN

21   CAROLYN GURLAND

22   CAMERON GUTHRIE

23   MIRA HAQQANI

24   YI HE

25   GABRIELA HENSLEY

Page 10

```
1    IMMANUEL HERRMANN
2    SAMUEL P. HERSHEY
3    KAITLYN A. HITTELMAN
4    KYLE HOLZHAUER
5    MITCHELL HURLEY
6    JASON IOVINE
7    ROBERTO JACOBS
8    MICHAEL JAOUDE
9    STIG JELLESTAD
10   KATHERINE JOHNSON
11   MIKE JOHNSON
12   GREG KACZKOWSKI
13   DAN KAPLAN
14   BRIAN P. KARPUK
15   YARA KASS-GERGI
16   RAVI KAZA
17   TRAVIS KEENEY
18   THOMAS S. KESSLER
19   DIMITRY KIRSANOV
20   MATTHEW KLEIN
21   BARRY R. KLEINER
22   UMBER KOHLI
23   DEBORAH KOVSKY-APAP
24   KATHRYN KUETHMAN
25   ROSS KWASTENIET
```

Page 11

1   CHRISTOPHER E. LACKEY

2   JOSEPH LALIA

3   DAN LATONA

4   JEAN-PHILIPPE LATREILLE

5   TYLER NATHANIAL LAYNE

6   JOE LEHRFELD

7   BRIAN S. LENNON

8   MARK S. LEONARD

9   NOEL A. LEONARD

10  ESTHER LEVINE

11  MARK LINDSAY

12  JASON LU

13  JESSE LUND

14  SERBAN LUPU

15  DAVE KURMAR MALHOTRA

16  KEVIN M. MANUS

17  CHASE MARSH

18  BRIAN S. MASUMOTO

19  T.J. MCCARRICK

20  KEITH MCCORMACK

21  VIK MECHANDA

22  MOHSIN MEGHJI

23  ERIK MENDELSON

24  ALEX MICHAELS

25  LAYLA MILLIGAN

1    MICHAEL D. MORRIS

2    JASON A. NAGI

3    LEIGH NATHANSON

4    HENRY SEIJI NEWMAN

5    KEITH NOYES

6    JARNO OBERG

7    CHRISTOPHER PAGNANELLI

8    MILIN PATEL

9    JOHN PATOUHAS

10   JEFF PATTON

11   GREGORY F. PESCE

12   KHAI PHAM

13   RYAN PHAN

14   RICHARD PHILIPS

15   CATHERINE PHUNG

16   LALANA PUNDISTO

17   JOHN P. REDING

18   ANNEMARIE V. REILLY

19   MARK ROBINSON

20   AUSTIN ROCKWOOD

21   ILUSION RODRIGUEZ

22   JONATHAN RODRIGUEZ

23   JOE ROSELIUS

24   ANDREW RUDOLPH

25   JOSEPH E. SARACHEK

1  THERESE SCHEUER

2  JAVIER SCHIFFRIN

3  DAVID SCHNEIDER

4  NOAH M. SCHOTTENSTEIN

5  SAMUEL SCHREIBERG

6  WILLIAM D. SCHROEDER

7  DAVID SENES

8  ALEX SHLIVKO

9  MATTHEW W. SILVERMAN

10  MATTHEW SMART

11  DON SMITH

12  CHRISTOPHER S. SONTCHI

13  KATHERINE STADLER

14  GEORGE STANBURY

15  MICHAEL STANLEY

16  COURTNEY BURKS STEADMAN

17  DAN STEEFEL

18  MICHAEL SWEET

19  LUCY THOMSON

20  JEFFREY S. TOROSIAN

21  DAVID TURETSKY

22  ELVIN TURNER

23  WILLIAM MATTHEW UPTEGROVE

24  MELISSA L. VAN ECK

25  EZRA VAZQUEZ-D'AMICO

1    VETON VEJSELI

2    DANIELLE WALKER

3    CAROLINE WARREN

4    JOSHUA WEEDMAN

5    KATIE WICK

6    ZACHARY WILDES

7    KEITH WOFFORD

8    ANDREW YOON

9    BRYAN YOUNG

10   KAILA ZAHARIS

11   TANZILA ZOMO

12   YIYUE CHEN

13   DEBORAH FRANKEL

14   ROBERT M. KAUFMANN

15   RAKESH PATEL

16   MARSHALL WEST

17   RICK ARCHER

18   HUSSAM BATSHON

19   SOMA BISWAS

20   RAYN CHEN

21   BEN CLARKE

22   DREW DUFFY

23   PAUL L. FABSIK

24   SCOTT FLAHERTY

25   CHRISTOPHER GASTELU

1   UDAY GORREPATI

2   DAVID KAHN

3   VEN KAZ

4   DIETRICH KNAUTH

5   LEONIE C. KOCH

6   MIKE LEGGE

7   KAREN LEUNG

8   JAMES J. NANI

9   MACIEJ PROCZEK

10   JONATHAN RANDLES

11   CRAIG RASILE

12   TIMONTHY REILLY

13   CAROLINE SALLS

14   DAVID SHAFER

15   PETER J. SPROFERA

16   VINCE SULLIVAN

17   ZACHARY ZABIB

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  All right, please be seated.  Good

3    afternoon, everyone.  Mr. Koenig.

4            MR. KOENIG:  Good afternoon, Your Honor.  Deanna,

5    could you please make my colleague Jeremy Young a cohost for

6    sharing privileges?

7            CLERK:  All right, Mr. Young is a cohost.

8            MR. KOENIG:  Thank you so much.  For the record,

9    Chris Koenig, Kirkland & Ellis, for Celsius.  Your Honor, it

10   is such a pleasure to be here at the commencement of the

11   confirmation hearing.  We're here seeking confirmation of

12   our modified Chapter 11 plan that's been overwhelmingly

13   accepted by our accountholders.

14           This plan is the culmination of over a year of

15   working collaboratively with all of our stakeholders from

16   the Committee, formal ad hoc groups, regulators, and other

17   governmental parties, as well as individual accountholders.

18   Simply put, it's time to confirm the plan so that we can get

19   out of bankruptcy and promptly make distributions to our

20   accountholders and other creditors.

21           Before getting into what's next, I want to take a

22   minute to walk through how we got here because context is so

23   important.  We filed a presentation at Docket No. 3630.

24   Your Honor, do you have a copy of that presentation?

25           THE COURT:  It's up on the screen.

1              MR. KOENIG:   Okay.   Wonderful.   I'm going to start

2    on Slide 4.   So these cases were filed in July of 2022.

3    Today, on the eve of confirmation that has such overwhelming

4    support, it's easy to forget just how challenging the early

5    stages of the case was.   We filed for Chapter 11 in the

6    midst of an industry-wide crypto winter that depressed

7    prices across the board.   The pause had happened just a

8    month prior to filing.

9              State and federal regulators and other

10   governmental agencies were actively investigating Celsius'

11   prepetition business model for, among other things, alleged

12   unregistered offerings of securities, money transmitter

13   license issues, and securities fraud.   That's not the way

14   that anybody draws up the playbook for a Chapter 11 case.

15             So the early days of these cases continued to be

16   difficult and uncertain.   U.S. Trustee filed a motion to

17   appoint an examiner.   Regulators routinely appeared at

18   hearings and told Your Honor about their concerns with our

19   business model.   Accountholders filed motions trying to

20   regain access to the cryptocurrency that they deposited on

21   Celsius platform.   So what did Celsius do in light of all of

22   these challenges?

23             At the direction of our independent and newly

24   appointed special committee of the board of directors, we

25   decided that the only path forward was full engagement and

Page 18

1    full transparency.  We did not object to the appointment of

2    the examiner.  Rather, we consented to her appointment and

3    we fully cooperated with her investigation.  We provided

4    over 230,000 documents and she conducted 34 total interviews

5    with 26 current or former employees.

6         Around the same time, the special committee told

7    Mr. Mashinsky that he could either resign or be fired and he

8    resigned.  We engaged with regulators and other governmental

9    agencies about their concerns regarding our business model.

10   We reached historic, consensual resolutions with each of

11   those regulators.  None of the regulators are objecting to

12   the plan today, and that's because of those agreements.

13        I think that's truly remarkable, given where these

14   cases started.  It seemed in the early hearings of the case,

15   there was a revolving door of regulators who wanted to make

16   sure Your Honor understood their frustrations about our lack

17   of engagement.  We fixed that.  We were so pleased to be

18   able to work with them to be able to fully resolve their

19   issues on the plan.

20        At Your Honor's suggestion early in the case, we

21   established email and phone lines where Celsius creditors

22   can easily write in and ask questions.  We responded to well

23   over 1,000 emails to creditors during these cases.  At some

24   point, we just stopped counting.  Perhaps most importantly,

25   we decided to fully engage with the Committee, individual

Page 19

1    creditors, and groups of creditors, to find consensus

2    wherever possible, even if it meant making very large

3    concessions in order to reach an agreement and drive the

4    cases forward.

5            The Committee is the natural statutory portal to

6    the Debtors.  Their goal is to be a fiduciary for unsecured

7    creditors and to provide a check on the Debtor in

8    Possession.  In most cases, the Committee is the Debtor's

9    principal adversary.  At the beginning of these cases, it

10   certainly went that way.  The Committee objected to many of

11   our initial motions, insisted on wide-ranging consent

12   rights, and the Committee also objected to our first

13   exclusivity motion.

14           What the early days of the case taught us was that

15   the only way to get out of bankruptcy was by truly building

16   consensus and working with all stakeholders and not fighting

17   over every last little thing.  These cases are very

18   expensive and we certainly could have fought over every last

19   little thing and asked Your Honor to make rulings on every

20   legal issue, but that would've been costly, would've led to

21   delay, and also uncertainty in developing our transaction.

22           So building consensus meant that the Debtors had

23   to really embrace the Committee and the accountholders that

24   they represent and work together, and that meant making

25   significant concessions to the Committee.  We agreed to a

Page 20

1    very short first extension of exclusivity with the

2    Committee, even though we thought that the facts and

3    circumstances of these cases certainly warranted a much

4    longer one.

5           We agreed to wide-ranging consent rights for the

6    Committee on cash management, security stipulation, bidding

7    procedures, and other key orders.  We truly invited the

8    Committee in and gave them co-equal consent rights over key

9    decisions in the case, from the decision to announce a

10   stalking horse to picking a winner of the auction and giving

11   them broad consent rights over all of the documents

12   underlying the plan.

13          Perhaps most importantly, we agreed to turn over

14   claims and causes of action to a litigation administrator

15   that would pursue that litigation post-emergence on behalf

16   of creditors.  In many Chapter 11 cases, the Debtor and the

17   Committee fight over exactly that issue, who is going to

18   bring claims and causes of action of the estate, and Your

19   Honor may have -- you know, in other cases, may have had to

20   rule on the STN standard and whether it was the Debtors or

21   the Committee that would bring those cases.

22          That did not happen here.  Earlier this year, we

23   entered into a stipulation with the Committee to put those

24   claims against former insiders aside and allow the

25   Committee's designee, a litigation administrator, to pursue

Page 21

1    those claims for the benefit of accountholders.  Simply put,

2    we could have fought about everything and instead, we made

3    the intentional and conscious decision to truly work with

4    the Committee and try to get out of bankruptcy.

5            These Committee members in particular have

6    dedicated an inordinate amount of their own personal time

7    and efforts to this case to try to get the best effort --

8    the best outcome for creditors.  I know that there are folks

9    on social media who think it's very easy to second guess the

10   Committee members, but their dedication of their own time,

11   all of which is totally unpaid, and their fervent and honest

12   desire to get to the right answer for accountholders is

13   without question.

14           So I want to thank Mr. Colodny.  I want to thank

15   his clients for being able to work so constructively with us

16   to get to this point.  We simply wouldn't be here without

17   them and without being able to work so constructively with

18   them.  Even though we often disagreed on key issues, we were

19   able to work together to get to resolutions that allowed us

20   to move these cases forward.

21           So, getting back to the timeline on the slide.  So

22   the way that I think about these cases is really in two

23   stages.  In the first stage, we needed to get the business

24   operating safely in bankruptcy, start cooperating with all

25   the different investigations, and get our new management

Page 22

1    team in place with Mr. Ferraro as our new interim CEO.  And

2    we had some key legal issues that we had to resolve before

3    we could work towards actually developing a transaction to

4    get out of bankruptcy.

5            We had to have the Earn trial in trial in December

6    to resolve the dispute over who owned the cryptocurrency in

7    the Earn accounts, the Debtors or the accountholders.  Given

8    how many active pro se accountholders were arguing that the

9    crypto belonged to them, there was no alternative.  We had

10   to have a judicial resolution.  We could not have done it

11   consensually.  And we litigated with Custody and Withhold

12   about their ownership rights as well.

13           Flipping to the next slide on the developments in

14   this calendar year, January and December were probably the

15   key turning point in the cases.  We litigated Earn, Custody,

16   and Withhold.  We obtained the Court's ruling on the Earn

17   dispute and we got the final examiner's report.  All of

18   these items shed light on key issues and frankly set the

19   framework for the rest of the cases.

20           So that moved the cases into phase two and allowed

21   us to move forward and focus on developing a transaction

22   that would maximize the value of Celsius' business so that

23   we can get out of bankruptcy.  And during stage two, we kept

24   resolving issues and building consensus wherever possible.

25           In the early portion of 2023 we reached

Page 23

1    settlements with both the Custody and Withhold ad hoc groups

2    to resolve key questions about the applicability of

3    preferences and defenses for those accountholders.  The

4    preference portion of that Custody and Withhold trial would

5    have been very interesting academically, but it would have

6    been expensive, risky, and would have delayed the

7    development of any transaction.

8              And so we've worked to pay out cryptocurrency to

9    those accountholders that participated in the settlements.

10   As Mr. Ferraro has regularly reported in his updates to the

11   Court, we've now distributed almost $80 million in crypto to

12   folks that have participated in those settlements.

13   Critically, we reached a deal with Series B investors.  This

14   was perhaps the most complex and challenging dispute of the

15   case.

16             Series B were seeking priority over all

17   accountholders.  They said that they had the right to the

18   value of CNL and subsidiaries including mining and GK8.

19   After the Court ruled that the customers did not have

20   contractual claims against every legal entity, the Debtors

21   and the Committee advanced numerous alternative theories

22   from constructive fraudulent transfer to intercompany

23   claims, substantive consolidation, and even a class claim on

24   behalf of all accountholders.

25             Simply put, these cases would not -- we would not

Page 24

1    we standing here today if we not -- had resolved that

2    litigation.  We would still be fighting with the Series B

3    holders.  Because of that settlement, we're able to take the

4    value of GK8 mining and CNL, and in our view, rightly

5    distribute the value of those legal entities to

6    accountholders and other creditors under the plan instead of

7    the Series B.  Can we turn to Slide 11.

8            So these settlements cleared the way for us to

9    develop and pursue a value maximizing transaction.  The

10   sales and marketing process was long and involved, but it

11   was wildly successful.  We started in March and we named

12   NovaWulf as a stalking horse bidder.  That transaction

13   wasn't perfect, but it was a good starting point and it

14   generated real competitive tension among other bidders.

15           We got numerous additional bids.  We named two

16   additional qualified bidders and we had a month long

17   auction.  The auction lasted longer than any of us would

18   have liked, but it was wildly successful, as I said.  We

19   generated hundreds of millions of dollars of additional

20   value for the transaction through the competitive tension of

21   the auction process and through lower fees and extra

22   contributions by Fahrenheit to the transaction.

23           And the particularly unique part of Celsius'

24   business is that we have not only liquid cryptocurrency but

25   real illiquid assets, too, most notably the mining business.

Page 25

1    Celsius' mining business is already one of the largest in

2    the country and we also have other illiquid assets too.  We

3    have causes of action relating to historic relationships and

4    investments in a variety of other cryptocurrency businesses.

5           So maximizing value means not only distributing

6    the liquid cryptocurrency that we have, but ensuring that

7    accountholders can realize the full value of the illiquid

8    assets as well, the mining business in particular.  Selling

9    the mining grades for the scrap that they are outside of the

10   mining company would be particularly value destructive.

11          So what we were focused on in phase two and stage

12   two of the cases was we wanted to find an excellent partner

13   with a proven track record in crypto and finance generally.

14   We found that partner in Fahrenheit who has demonstrated

15   experience in key areas of managing cryptocurrency, Bitcoin

16   mining, staking, and risk management generally.  More

17   specifically U.S. Bitcoin is already one of the largest and

18   most successful Bitcoin mining operators in the country.

19   They will run Newco's mining operations.

20          Proof Group will lead Newco's staking efforts and

21   contribute intellectual property with respect to staking and

22   assist Newco in developing its own staking business.  And

23   Fahrenheit is going to work to list the equity of Newco on

24   NASDAQ to provide creditors with the maximum liquidity

25   possible for the stock.

1              So we're very excited about Fahrenheit and what

2       they have to offer.  We believe that they will maximize the

3       value of Newco for the benefit of the accountholders.  And

4       Fahrenheit believes in the business.  They have agreed to

5       invest up to $50 million of their own money in the business,

6       right alongside accountholders.  They are putting their

7       money where their mouth is.

8              So after we announced the Fahrenheit transaction

9       in late May, we worked to build additional consensus.  In

10      mid-July, we met with the Earn and Borrow ad hoc groups for

11      three days in mediation before Judge Wiles.  We reached an

12      agreement on the terms of amendments to the plan that would

13      gain the approval of those ad hoc groups and resolve the

14      intercreditor disputes between Earn and Borrow.

15             Once that was completed, that meant that we had

16      agreements with each ad hoc group for each of the Debtors'

17      programs:  Earn, Custody, Borrow, and Withhold.  And before

18      turning to the objections, I just really briefly want to

19      talk about the orderly winddown.  Experience in these cases,

20      has taught us that it's important to have a backup plan.  We

21      believe that the Newco plan is executable and we maximize

22      value, but we don't know exactly what the future holds.

23             We hope to be able to get out of bankruptcy by the

24      end of this year, but we thought it prudent to set up a

25      backup plan so that if we have to pivot for any reason, we

Page 27

1    are ready to do so.

2            So, with that very long winded opening, that

3    brings us to today.  I'm not going to go through all of

4    these slides.  I don't want to go through all these slides,

5    but can we do Slide 15?

6            So these are folks that filed formal and informal

7    objections.  Looked at the list of the parties that are

8    going to speak this afternoon and what's notable is how many

9    are speaking in support of the plan, and in looking at some

10   of the names, a couple of months ago, you might have thought

11   that they would have been on the other side of the ledger.

12           So we're pleased to have driven so much consensus.

13   But turning to the objectors, as we set forth in our brief,

14   we think we've resolved nearly all of the objections that

15   have been filed.  We made adjustments and clarifications to

16   the release and exculpation provisions to incorporate all

17   the comments that we received from the U.S. Trustee.

18           We are now resolved with the SEC and the state

19   regulators and we also resolved many of the reservations of

20   rights and other limited objections that were filed through

21   agreed language in the modified plan or in the confirmation

22   order.  So only a few objections remain.  This is just an

23   opening, but I'll just briefly walk through a couple of the

24   key ones now.

25           First, there were a number of borrowers that filed

Page 28

1    letters -- retail borrowers who objected to the plan on the

2    basis that they believe their plan treatment is

3    inappropriate.  They are arguing that they own the

4    cryptocurrency that was deposited to support their loan.

5    But the Borrow terms of use are very clear on this issue,

6    just as the Earn terms of use were.  Celsius holds legal

7    title to those cryptocurrency assets and we can use,

8    dispose, or hypothecate those assets as Celsius sees fit.

9    The borrowers don't own the collateral, we do.

10           They are unsecured creditors.  What the borrowers

11   do have is a right of setoff because they have claims

12   against Celsius for the return of the cryptocurrency they

13   deposited and Celsius has a claim against them for the

14   repayment of the loan principal.  And that's exactly how the

15   Chapter 11 plan is structured.  Borrowers have a right of

16   setoff.

17           And notably, this treatment was accepted by

18   borrowers in over 96 percent in dollar amount and 98 percent

19   in number.  And they also have some additional rights that

20   they achieve through the mediated settlement that we reached

21   with the Borrower Ad Hoc Group.  Most importantly, they have

22   the option to repay the principal balance of their loan.

23   They will receive a like amount of cryptocurrency back in

24   the amount of the principal balance.

25           Now, why that's important, Your Honor, is tax

Page 29

1    reasons, frankly.  If they have a low basis in the

2    cryptocurrency they deposited, receiving a like amount back

3    is a much better tax outcome for them than if they were to

4    have those claims set off.  It might be otherwise

5    economically the same, but obviously, if we can structure a

6    transaction to save taxes for our accountholders, we're

7    happy to do so.

8             We also agreed to work constructively with

9    borrowers who want to take advantage of this option but

10   might need financing.  So to the extent they identify a

11   third party lender who would come in and give them financing

12   to make this principal repayment, we will cooperate to the

13   extent we can and with the lender to make sure that this

14   transaction can go through.

15            So this is all consistent with the borrower's

16   legal rights under the borrower terms of use, which means

17   that the best interest test is satisfied with respect to

18   them.  For that reason, these objections by these retail

19   borrowers should be overruled.

20            Pharos objected on two discrete issues, the

21   absolute priority rule and the best interest test.  On the

22   absolute priority rule, they complained the Series B holders

23   who are equity holders are receiving a distribution under

24   the plan when creditors are not being paid in full.  To be

25   clear, the Series B holders -- this is only those that did

Page 30

1    not affirmatively participate in settlement that Your Honor

2    ordered earlier this year.  This is just for them to receive

3    their pro rata share of the million dollars that you

4    approved.

5              Pharos says that this violates absolute priority,

6    but this Court approved settlement resolved an issue of

7    priority, too.  The Series B holders argued that they were

8    ahead of creditors and the whole reason we entered into the

9    settlement was to resolve this very important issue.

10             And notably, I think Your Honor has dealt with

11   this issue at least adjacently in the Dewey and LeBoeuf

12   case.  In that case, there was a settlement that was entered

13   into among the partners and some objecting party said that

14   it was a sub rosa plan and it violated absolute priority.

15             And there, you found that you can -- that a

16   absolute priority can be diverged from if there is a good

17   reason to do so.  And here we think that there's a very good

18   reason to do so.  It resolved another priority dispute.  And

19   had we not done so, the Series B may have been entitled to

20   up to $600 million of assets.

21             Second, they raised the best interest test.  They

22   argue that the liquidation analysis to be presented doesn't

23   demonstrate that holders of general unsecured claims like

24   them are receiving under the plan as much as they would in a

25   Chapter 7 liquidation.  But as part of making an argument,

1      they argue that Newco is actually completely valueless, even

2      though it's being seeded with $450 million of liquid

3      currency, Newco will run and operate a mining business where

4      the Debtors submitted a valuation that has a midpoint value

5      of $565 million and other liquid assets that a separate

6      valuation report valued in the hundreds of millions of

7      dollars.

8              Their objection says that we've submitted no

9      evidence, but actually, there's over $1.2 billion of assets

10     that Newco is going to be seeded with and we've submitted

11     two separate expert reports to prove that point and we will

12     certainly submit them for cross examination this week to

13     prove the point in Court.

14             Moving on to the next point.  A few individuals

15     objected to the emergence incentive plan that is embedded in

16     our chapter 11 plan.  I want to acknowledge, I know that

17     executive compensation is understandably a hot button issue

18     for accountholders who were defrauded.  They just want to

19     get out of bankruptcy.  We do, too.  But this management

20     team was not the ones that defrauded the accountholders.

21     That management team is gone.  Those former insiders are

22     gone.

23             We're under new management who has been working

24     around the clock to make sure that our systems are ready to

25     make distributions of over $2 billion of cryptocurrency

Page 32

1    that's required negotiating agreements with Coinbase and

2    PayPal, coordinating with them to make sure that all the

3    distributions can go off without a hitch and preparing for

4    Celsius' own distributions of custody under the plan.

5    Celsius and the distribution agents need to make over

6    400,000 distributions of liquid cryptocurrency on the

7    effective date.

8             Accountholders will want that to be done in a very

9    short period of time, and it's only thanks to the continued

10   efforts of the company's management team that this will even

11   be possible.  So as an initial matter, the plan included

12   this incentive plan as part of its terms.  The plan was

13   voted on.  The classes of accountholders who objected to

14   this term voted to accept the plan.  It is binding on the

15   rest of the class so long as it meets best interests, which

16   it does.

17            This is a payment of up to $2.6 million.  The

18   difference between a Chapter 7 liquidation and the plan is

19   well over 100 times that amount and the payment isn't going

20   to be made by the Debtors, either.  It's going to be made by

21   the post effective date Debtors and only after the plan

22   administrator verifies that the metrics have been met.  That

23   was a change that we made at the suggestion of the U.S.

24   Trustee to help resolve their issues with the emergence

25   incentive plan.

1          So we think the requirements of the Bankruptcy

2     Code for payment of executive bonuses don't even apply for

3     these reasons.  But even if they apply, the evidence will

4     demonstrate that EIP easily meets those requirements.  The

5     evidence will show the management team is paid well under

6     market and in fact will continue to be paid under market

7     even after the EIP is paid.

8          And the management team's contributions are far in

9     excess of their typical job duties.  Frankly, we could not

10    be here without the efforts of these executives and we need

11    to make sure that we properly incentivize them so we can

12    maximize value and promptly return cryptocurrency to

13    creditors.

14         The only other significant objections on this list

15    are largely on CEL token.  I believe that Mr. Colodny will

16    be covering that.  It's the Committee's expert on the

17    valuation of CEL token that is really at the heart of this

18    issue.  There are a few other objections that were covered

19    in the Committee's brief but not the Debtors' brief so I'll

20    defer to Mr. Colodny there as well.  This is just an opening

21    statement.  We filed a 150-page brief which not sure if Your

22    Honor has fully read yet.

23         THE COURT:  I have now.

24         MR. KOENIG:  So --

25         THE COURT:  We had a hearing last week.  I hadn't

Page 34

1    been all the way through it, but I have now.

2              MR. KOENIG:  So the brief walkthrough is required

3    in some more detail.  I'm not going to belabor the point.  I

4    know we have a lot of folks to speak.  So unless Your Honor

5    has any questions for me, I'll conclude my remarks by saying

6    we're excited to present our case to confirm the plan.

7    We're going to work to get out of bankruptcy and make

8    distributions to our accountholders.  I'll cede the lectern

9    to my colleague, Elizabeth Jones, who's going to be

10   presenting on the voting results and going to be outlining

11   the witnesses that you're going to hear from this week.

12             THE COURT:  Thank you.

13             MR. KOENIG:  Thank you.

14             THE COURT:  Ms. Jones?

15             MS. JONES:  Good afternoon, Your Honor.  Elizabeth

16   Jones of Kirkland & Ellis on behalf of the Debtors.  If we

17   could start now on Slide 26, which walks through the voting

18   results.  The next two slides, Your Honor, demonstrate the

19   voting results that we filed in Mr. Brian Karpuk's

20   declaration at Docket No. 3560 then was subsequently amended

21   at Docket No. 3574.

22             Your Honor, as demonstrated in the voting results,

23   the plan has been overwhelmingly accepted by accountholders

24   in both number and amount.  Classes 2, 4, 5, 6A, 7, 10, and

25   14 out of our 17 classes voted to accept and while Classes 8

Page 35

1   and 9 may have voted to reject the plan and we have a few

2   other deemed to reject, as my colleague, Mr. Koenig noted,

3   we can and do think that the plan should be confirmed as we

4   set forth in our papers.

5           Your Honor, if I may --

6           THE COURT:  There's no one junior to those

7   rejecting classes that are receiving anything under the

8   plan?

9           MS. JONES:  Not on behalf of their status as an

10   interest holder, but on behalf of the settlement in Series

11   B.

12           Your Honor, if I may also provide just a few other

13   statistics to demonstrate how successful this solicitation

14   process was.  The Debtors distributed approximately 380,000

15   ballots and received approximately 80,000 in return, giving

16   us a little bit more than a 20 percent return rate.  In

17   comparison to two of the recently filed crypto cases, in

18   Voyager, they had about a 5 to 6 percent return rate and in

19   BlockFi, they had approximately a 10 percent return rate.

20   Both of those had ballots returned anywhere between 35 and

21   65 thousand ballots.

22           Your Honor, what's even more impressive here is

23   that out of those 80,000 ballots that were returned, we had

24   $3 billion worth of those claims out of approximately $5

25   billion in claims; $2.55 billion of that came from holders

Page 36

1    in our Earn class.

2          So Your Honor, what that demonstrates here is that

3    there has been a lot of participation.  We know the ballot

4    was complicated.  It was not an easy check box and yet we

5    were very, very fortunate that we had 80,000 individuals

6    willing to walk through that and demonstrate their support

7    for the plan.

8          In addition, Your Honor, and a few other important

9    statistics, we had roughly only 515 parties opt out of the

10   third-party releases and we have only a little bit over

11   1,700 individuals opt out of the class claim settlement.  We

12   had 30,000 proofs of claim filed, so to have only 1,700 of

13   them opt out and elect to continue pursuing that is a huge

14   success from our view.

15         So Your Honor, we would just like to conclude our

16   opening by introducing the witnesses that we will hear from

17   over the next few days in addition to Mr. Karpuk from

18   Stretto.  So Your Honor, we have also filed declarations on

19   behalf of six other witnesses.

20         First, we'll have Mr. Christopher Ferraro, whose

21   declaration was filed at Docket No. 3581.  He is the

22   Debtors' interim chief executive officer, the Debtors' chief

23   financial officer, and the Debtors' chief restructuring

24   officer.  He will be providing evidence in support of

25   certain of the 1129 factors as well as a number of other

Page 37

1    items that we address through our brief.

2              Your Honor, we will also hear from Mr. Robert

3    Compagna, who is a managing director at Alvarez & Marsal.

4    His declaration was filed today -- or was filed last week at

5    Docket No. 3582 and a supplemental declaration was filed

6    shortly before this hearing at Docket No. 3653.  He will

7    also provide evidence in support of certain of the 1129

8    factors as well as the best interest test.

9              Next, Your Honor, we have Mr. Ryan Kielty, who's a

10   partner of Centerview Partners LLC.  His declaration was

11   filed at Docket No. 3592.  He will provide evidence in

12   support of the mining valuation.  You could turn to slide --

13   perfect, than, you, 29.

14             Next, Your Honor, we have Mr. Steven Kokinos,

15   whose declaration was filed at Docket No. 3591.  He is the

16   proposed chief executive officer of Newco and a member of

17   the Fahrenheit Group who was our plan -- and is our plan

18   sponsor.  He will provide evidence in support of the

19   proposed Fahrenheit go forward business plan.

20             Next, Your Honor, we have Ms. Allison Hoeinghaus

21   who has filed a declaration at Docket No. 3586.  She is also

22   a managing director at Alvarez & Marsal and she will provide

23   evidence in support of the Debtors' emerge incentive plan.

24             Finally, Your Honor, we have Mr. Joel Cohen who

25   filed a declaration at Docket No. 3588.  He is a managing

1   director at Stout Risius Ross LLC and he will provide

2   evidence in support of the Debtors' valuation of certain

3   liquid and illiquid assets.

4           So Your Honor, as my colleague, Mr. Koenig noted,

5   we filed a large brief in support of our argument and we

6   will hear from the witnesses in the next few days on the

7   factual basis as to why we think the plan can and should be

8   confirmed.

9           We're here today as a result of a lot of hard work

10  and consensus building in the last 14, 15 months and we

11  stand here ready today both to prove our case in chief,

12  confirm the Chapter 11 plan, and hopefully conclude these

13  chapter 11 cases.

14          THE COURT:  Thank you very much.  Mr. Colodny.

15          MR. COLODNY:  Good afternoon, Your Honor.  Aaron

16  Colodny from White & Case on behalf of the Official

17  Committee of Unsecured Creditors.  Could my colleague Mr.

18  Dowdy be made a cohost to share our presentation?

19          CLERK:  Yes, just give me one moment, please.

20          MR. COLODNY:  Thank you.  While you're doing that,

21  Your Honor, I know I always am batting second to Mr. Koenig

22  here.  We come at this from a slightly different

23  perspective, and so while I may repeat some of the things he

24  said, I made an effort to keep my opening remarks shorter

25  for Your Honor.

```
 1                  THE COURT:  They didn't use their full allotted

 2      time.

 3                  MR. COLODNY:  To ensure I don't go over, I think

 4      I'll start while they do that.

 5                  THE COURT:  That's fine, go ahead.

 6                  CLERK:  It's -- he's a cohost.  He's been a cohost

 7      for a little bit.

 8                  MR. COLODNY:  Yeah, I see it.  It's just I think

 9      he's working on trying to get it to a presentation slide

10      instead of the PowerPoint people.

11                  THE COURT:  No problem.

12                  MR. COLODNY:  I'll go a cappella, I guess.

13                  THE COURT:  Give it another minute.  I think if

14      you click from the beginning in the upper ribbon, you'll get

15      there.  Go ahead.

16                  MR. COLODNY:  All right.  On June 12th, 2022,

17      Celsius paused withdrawals to stop a run on the bank.

18      Before the pause, as will be shown in the next slide,

19      Celsius and executives repeatedly assured accountholders and

20      the public that everything was fine and all their funds were

21      safe.  On the date of the pause, everyone knew that they

22      were not.  For a month, Celsius was silent and rumors

23      flowed.  Then on July 13th, 2022, we filed Chapter 11 cases

24      before this Court with no plan for how these cases would

25      proceed.
```

1          The first day declaration painted a picture of a

2    company that was crippled by the crypto winter and had

3    invested with the wrong people.  At that time, Mr. Mashinsky

4    testified that the company had a $1.2 billion deficit.  The

5    Committee was appointed on July 27th and was tasked with

6    representing the interests of the Debtors' largest

7    constituency, the company's unsecured creditors including

8    nearly 600,000 retail holders who held the majority of the

9    claims against the Debtors.

10          Those accountholders were dispersed all over the

11   world and were without access to their funds.  Shortly

12   thereafter, it became clear that what was testified to in

13   the first day declaration was not the entire story.

14          Rather, information published by the Debtors and

15   investigations conducted by the Committee and independent

16   examiner uncovered a company rife with issues including a

17   hole in the balance sheet that began in March '21, the

18   company's repeated misrepresentations of business practices,

19   an orchestrated corporate cover up of those

20   misrepresentations, and the company's manipulation of the

21   CEL token.

22          And while Mr. Mashinsky and Mr. Leon were telling

23   accountholders that all funds are safe and damn the

24   torpedoes, full speed ahead, they were secretly withdrawing

25   tens of millions of dollars from the platform.  That is

Page 41

1    where we started, with a heavy cloud over these estates,

2    accountholders who had been deceived into entrusting their

3    hard earned assets with Celsius and a platform that was shut

4    down so that the few who were quick to withdraw would not

5    further dissipate the remaining assets to the detriment of

6    those who did not ask.

7            Upon learning all of that information, we acted

8    quickly and firmly to ensure that the bad actors were

9    removed from positions of power that they occupied with

10   control over accountholder assets.  Today, we are before

11   Your Honor with a plan that if confirmed and consummated

12   will distribute nearly $2 billion of Bitcoin and Ethereum

13   and stock in a new company to the Debtors' creditors.

14           The new equity will maximize the value of the

15   Debtors' other assets and provide creditors with the ability

16   to monetize those assets when they would like.  Importantly,

17   the plan also preserves claims against Mr. Mashinsky, Mr.

18   Leon, and others related to that wrongdoing to be prosecuted

19   after the bankruptcy case is concluded.

20           The plan includes explicit carveouts to the

21   typical Chapter 11 releases or excluded parties which

22   include all former employees, equity holders, contract

23   counter parties, promoters, advertisers of Celsius that are

24   not specifically identified as released parties.

25           Now to touch on the plan process a bit and move to

1    where we're going with this trial.  Since the beginning of

2    these cases, our Committee has had one goal, to return as

3    much value to creditors as soon as we could responsibly do

4    so.  The process has taken longer than we would like, but we

5    stand on the precipice of confirming the first

6    reorganization of a major cryptocurrency company.

7            And as Mr. Koenig explained, the path to get here

8    was not easy or rarely a straight line.  There were

9    significant and novel legal issues that needed to be

10   resolved to fairly distribute the Debtors' assets.  We

11   methodically navigated those issues before this Court, each

12   time putting accountholders as a whole first, building

13   consensus, and creating a foundation for the plan that's

14   before Your Honor today.

15           We methodically navigated -- while those issues

16   were being determined, the Committee did not stand in place.

17   Rather, we pushed the Debtors and worked cooperatively with

18   them to reorganize and rehabilitate their mining business.

19   That was not an easy task.  The mining business was in

20   disarray upon the filing and after the filing suffered

21   significant setbacks due to the financial issues of many of

22   its major counterparts.

23           As you will hear from Mr. Kielty of Centerview

24   Partners, the Debtors and the Committee ran a competitive

25   sales and auction process that took advantage of a rebound

Page 43

1    in the crypto market and renewed interest in sponsoring the

2    plan of reorganization for the Debtors.  Through the

3    auction, we were able to leverage that competitive tension

4    to bring multiple bidders to the table and drive the best

5    deal possible for creditors including the distribution of a

6    significant amount more liquid cryptocurrency than was in

7    the stocking horse bid.

8           The Debtors for their part understood that

9    creditors would own substantially all of any reorganized

10   business.  And as a part of that auction process, they

11   worked cooperatively with our clients to identify the

12   highest and best -- highest bid and best management team to

13   run the new company.  Given the history of Celsius, it was

14   of paramount importance to our clients that Newco be placed

15   in trusted hands and our clients spent many days with each

16   bidder to make the right choice for who would sponsor that

17   plan.

18          At the end of the auction, the Committee members,

19   as they've done throughout this case, acted unanimously to

20   select the Fahrenheit Group as the winning bidder.

21   Fahrenheit is a group of seasoned professionals with

22   experience in the cryptocurrency industry.  They also have

23   experience building technology companies and managing risk

24   at large financial institutions.  And as you will hear from

25   Mr. Kokinos, the proposed CEO of Newco, each of the members

Page 44

1    of Fahrenheit will be making a significant financial

2    investment in a new company which has yet to be named.

3         Fahrenheit will stand alongside accountholders

4    with aligned incentives to increase the equity value of

5    Newco for the benefit of everyone.  Now, this new company

6    will be a first of its kind business.  It will have

7    significant operations concerning two major

8    cryptocurrencies, a Bitcoin mining company, and it will also

9    stake the company's own ethereum.  I want to touch on three

10   points that guided the Committee's approach to constructing

11   this new company.  First, compliance with applicable

12   regulations.

13        We worked to color inside the lines and consult

14   with the regulators to create a compliant entity out of the

15   gates.  We were presented with many unique ideas for how to

16   reorganize and restructure the claims against the Debtors.

17   In many instances, we opted to take the conservative

18   approach to ensure that we could exit bankruptcy.  That was

19   of paramount importance to my clients.

20        Bankruptcy provides the Debtors with a fresh start

21   upon emergence.  And here, that fresh start is a competitive

22   advantage for the new company that we were unwilling to

23   compromise.  We also understood that to emerge on our

24   timeline, we had to work with regulators to ensure that they

25   were comfortable that accountholders were protected on the

Page 45

1   other side of these Chapter 11 cases.  As Mr. Koenig

2   mentioned, we've been in constructive dialogue with the

3   regulators which were led by the Debtors throughout this

4   process and the lack of any objection from regulators is a

5   reflection and validation of that approach.  It's also

6   something that differentiates these cases from any other

7   Chapter 11 case concerning a cryptocurrency company.

8         Second, we wanted to provide creditors with

9   liquidity.  We understand that creditors did not sign up to

10  own equity and many creditors need access to their

11  investments.  However, many of the investments that Celsius'

12  prepetition management made are illiquid and selling them

13  now would have resulted in a steep discount.  Putting those

14  assets in a liquidating trust would also not maximize their

15  value, as those instruments typically trade for pennies on

16  the dollar.

17        The plan currently contemplates that those

18  illiquid assets will be transferred to Newco whose equity is

19  anticipated to be listed on NASDAQ.  That unique opportunity

20  is only presented through Section 1145 exemption under the

21  Bankruptcy Code.  And as we flagged in our brief, there are

22  still regulatory approvals that need to be received for that

23  equity to be listed; however, those regulatory approvals

24  will not hold up confirmation.

25        THE COURT:  Is there an estimate of the timeline

Page 46

1    to get the securities registered?

2            MR. COLODNY:  My understanding, Your Honor, is we

3    are waiting on the SEC audit function to approve a

4    preclearance letter.  Once that preclearance letter is

5    approved, we'll then submit the Form 10 and there's a 60 day

6    waiting period, then, while the SEC reviews that Form 10.

7    But I want to flag, Your Honor, that it is customary for

8    confirmation orders to be entered with a condition precedent

9    to the plan being the receipt of regulatory approvals.

10           And if those necessary regulatory approvals are

11   not obtained, the plan provides for the mechanism to toggle

12   to the plan B.  We believe the plan B will result in lower

13   recoveries, but it will allow the Debtors to proceed with

14   distributing assets to creditors, which is --

15           THE COURT:  Is there an estimate on the time for

16   regulatory approval?

17           MR. COLODNY:  Of the --

18           THE COURT:  When?

19           MR. COLODNY:  I think we're confident it will

20   occur by the end of the year, but I don't know that we've

21   received a set estimate from the SEC at this time.

22           THE COURT:  Okay.

23           MR. COLODNY:  Third, we want to ensure that Newco

24   will be transparent and overseen by a competent and

25   accountable board of directors.  Before I proceed, Your

Page 47

1    Honor, I don't want to make any promises that we are going

2    to receive regulatory approval or emerge by the end of the

3    year.  I think the answer, to be candid, it's unclear and

4    it's dependent on whether the SEC will grant our

5    preclearance letter.

6            THE COURT:  I wasn't looking for promises.

7            MR. COLODNY:  So our third pillar, when we were

8    thinking about this new company, is we wanted to ensure that

9    Newco was transparent and overseen by a competent and

10   accountable board of directors.  Newco will be a public

11   reporting entity that will file 10Ks, 10Qs, and 8Ks of major

12   events.

13           It will be overseen by a qualified board of

14   directors, a majority of which were selected by the

15   Committee through an intensive interview process and Your

16   Honor will hear from our committee member, Major Mark

17   Robinson, regarding the board selection process and why our

18   clients believe that they have selected the best set of

19   experienced directors to oversee this new company.

20           We also heard from our constituency who wanted to

21   ensure that creditors had oversight of that board, and we

22   worked with the Earn group who identified three significant

23   prepetition creditors to act as board overseers.  Now, five

24   prepetition creditors with a significant stake in Newco will

25   have a seat at the table and that board will ensure that

Page 48

1    Newco is operated for the benefit of its shareholders who

2    will initially be creditors.

3            There were lots of debates throughout the auction

4    in these cases about how best to reorganize the Debtors'

5    assets, how to reorganize a cryptocurrency company is not

6    something you can look up in a cookbook, and we went through

7    an intensive process which has been detailed in the record

8    and will be detailed by Mr. Kielty to select the option that

9    the Committee believes and the Debtors believe is the best

10   path forward.

11           We heard loud and clear throughout these cases

12   that creditors were not interested in receiving fiat

13   currency through a liquidation under Chapter 7, and as will

14   be demonstrated by the Debtors' witnesses, the recoveries

15   provided to creditors through the plan far exceed the

16   recoveries that would be provided if the Chapter 7 Trustee

17   was appointed and liquidated the Debtors' cryptocurrency,

18   mining rigs, and illiquid assets.  And quite frankly, it's

19   not close.

20           The culmination of this entire process is an

21   overwhelming vote in favor of the plan.  With over 87,000

22   accountholders voting to accept in the amount of $2.8

23   billion which far surpasses anyone's wildest expectations,

24   and given where these cases started and the long strange

25   trip it's taken to get here, I think we all can say these

1    results are a vindication of all the hard work.

2            Now, Mr. Koenig has addressed many of the

3    objections and I want to spend the rest of my time speaking

4    about the proposed treatment of CEL token under the plan.

5    One of the questions before the Court is, what is the CEL

6    token.  The evidence will show that CEL token is a fungible

7    digital representation of ownership of a unit that was

8    issued by the Debtors.  Mr. Ferraro will explain how holders

9    of CEL token could use those tokens to pay the company

10   interest on retail loans at a discounted rate.

11           Accountholders could elect to earn and sell and

12   receive a higher rewards rate on their deposits than if they

13   if they elected to receive in the cryptocurrency the

14   deposited.  And CEL token functioned as a type of airline

15   loyalty miles, where people that held a certain amount of

16   CEL token could get access to lower rates or products that

17   the company was offering.

18           Mr. Ferraro will also testify that after the

19   pause, none of those uses continued to exist.  To be clear,

20   Celsius has no obligation at any time to redeem CEL tokens

21   or make any payment of cash on account of CEL token.  Its

22   only obligation is to return the CEL token to accountholders

23   when requested, if they have accounts in the Earn program.

24           Mr. Ferraro will also testify that Celsius

25   advertised in investor presentations and directly to the

Page 50

1    public that the value of the CEL token represented the

2    success of Celsius.  Mr. Mashinsky regularly touted the

3    value of the CEL token on his public videos and how the

4    efforts of the Celsius team to grow the business would cause

5    the CEL token to increase and used the circular flywheel

6    model to demonstrate this.

7            Put simply, CEL token was an equity or equity-like

8    security whose value rose and fell based on the efforts of

9    Celsius and Celsius' ability to go -- continue as a going

10   concern.  Now, what CEL token is, determines how it should

11   be treated under the Bankruptcy Code.  If CEL token is an

12   equity or equity-like security, it would come after all

13   unsecured claims.  Moreover, if CEL token is determined to

14   be a security, as we have argued in our pleadings, claims

15   arising on account of the purchase or sale of the CEL token

16   would be subordinated and would only recover after all

17   claims are paid in full.

18           However, because the treatment of digital assets

19   under the Bankruptcy Code is a new issue, it is the

20   Committee's position that denying any recovery to CEL token

21   holders who were lied to the same as all other

22   accountholders, would be inequitable.  I want to pause and

23   point out that all eligible accountholders could have

24   elected to earn in CEL token, and those that did so

25   knowingly took a greater risk tied to the success of Celsius

Page 51

1   than those who elected to earn in kind in the cryptocurrency

2   that they transferred to Celsius.

3             For example, those that elected to receive

4   interest in Bitcoin elected to receive a token that had a

5   value independent of Celsius.  Those that deposited Bitcoin

6   and elected to receive in CEL, elected for this riskier

7   option which had the potential for a higher return both in

8   terms of the growth of the token and the amount that they

9   received as interest.

10            But Celsius has now failed, and because there are

11  not enough assets to satisfy all claims, providing value to

12  one set of creditors decreases the amount recoveries for all

13  other creditors.  The Committee attempted to navigate this

14  delicate balance by offering a 25 cent settlement as value

15  of CEL token under the plan.  That settlement was proposed

16  through the plan and after a lot of development, the plan

17  was clear that a vote to accept the plan was a vote to

18  accept that settlement and the settlement was accepted by an

19  overwhelming amount.

20            Those voting results are a testament to the

21  reasonableness of the settlement.  Now at the last hearing,

22  Your Honor noted that the treatment for dissenting CEL token

23  holders cannot be imposed on those dissenting creditors

24  unless the Debtors demonstrate that the treatment meets the

25  best interests of creditors test.

1           In other words, the Debtors must show by a

2      preponderance of the evidence that the CEL token holders

3      receive more under this plan than they would receive in a

4      Chapter 7 liquidation.  Here, that test can mean that in

5      three ways.  As we discussed before, first, the Court could

6      find that the CEL token was the equivalent of equity or

7      should be recharacterized as equity.

8           THE COURT:  Let me just stop you there for a

9      minute.  In the SEC's complaint against Mashinsky and

10     Celsius, the complaint takes the position that the Earn

11     accounts under the Howey Test were securities.

12           MR. COLODNY:  Correct.

13           THE COURT:   If the Earn accounts were securities

14     and the CEL token was a security, wouldn't they both be

15     subordinated and essentially be in the same class for

16     distribution?

17           MR. COLODNY:  I don't agree with that, Your Honor.

18           THE COURT:  Okay, tell me why.

19           MR. COLODNY:  Because the Earn accounts are the

20     akin to a debt obligation.  Celsius has a payment obligation

21     under an Earn account to return the assets to

22     accountholders.  In every Chapter 11 case, there are

23     unsecured notes.  Unsecured notes is the first item listed

24     in the definition of security under the Bankruptcy Code, and

25     payment obligations on behalf of unsecured notes are never

Page 53

1    subordinated.  Damage claims arising from those unsecured

2    notes may be, but the payment obligations are not.

3             When I think about the CEL token, it's a security

4    inside of that security and because it's an equity interest

5    with no payment obligation on behalf of the Debtors, it

6    should be treated differently than the Earn accounts.  I

7    know it's a fine distinction, but I think it's one that's

8    incredibly important and it is one that is -- happens in

9    bankruptcy cases all the time.  I've dealt with bankruptcy

10   cases with $2.7 billion worth of payment obligations on

11   unsecured notes and it's never mentioned that those payment

12   obligations will be subordinated.

13             So I think where I was when I left off were the

14   three reasons how it can meet the best interest test.  The

15   first, as I talked about, was if it was recharacterized.

16   The second is 510(b) as you mentioned.  In both cases, the

17   plan could be confirmed if the Court makes either finding if

18   it provided no value to CEL token holders.  However, Your

19   Honor doesn't need to reach those points.

20             As Mr. Compagna will testify, you only need to

21   find by a preponderance of the evidence that the value of

22   the CEL token on the petition date was less than 34 cents to

23   determine that the best interest test is met.  And here,

24   that's clearly the case.

25             THE COURT:  The 34 cents because of what?

Page 54

1          MR. COLODNY:  Thirty-four cents because if you

2    look at 34 cents times the 47 percent recovery analysis and

3    look at the 25 cent proposed recovery times the 65 percent -

4    - 67 percent reorganization, the 67 percent reorganization

5    on the 25 cent recovery is greater than 47 on the 34

6    percent.  Sorry.

7          Now, if you consider the CEL token in terms of its

8    value being tied to Celsius and consider that Celsius by its

9    own admission was wildly insolvent as of the petition date

10   and that the Celsius platform was shut down and there was no

11   longer a use for the CEL token, the value on the CEL token

12   has to be zero or something close to it.  Mr. Galka, our

13   expert, is going to tell you that determining the specific

14   value of the CEL token at a point in time is not easy

15   endeavor for a number of reasons.

16         First, it lacks any underlying cash flows or

17   financial metrics that would support its value in a manner

18   that's traditionally applied to valuation.  The market price

19   of CEL token could be an indicator of the value; however, as

20   the evidence will show the market price, here was never an

21   accurate indication of its value as it was significantly

22   affected by Celsius' covert purchases of the token prior to

23   the petition date.

24         Celsius advertised that it was purchasing the

25   amount of CEL token it needed to pay customer rewards.  That

Page 55

1    was a business model.  It's one of the critical elements of

2    why CEL token should be a security.  The evidence will show

3    that what Celsius did not tell the public or even many of

4    its employees was that it was purchasing far more than

5    required to pay rewards to inflate the price and create the

6    perception of success for its flailing enterprise.

7           Celsius has admitted that, and I'm quoting from

8    the statement of facts that Celsius admitted was true as

9    part of its non-prosecution agreement it entered with the

10   DOJ.  The rise in the value of the CEL token was not the

11   product of market forces, but was instead attributable to

12   the fact that Celsius executives including Mashinsky had

13   orchestrated a scheme to manipulate the CEL token by taking

14   steps to artificially support the price of CEL.

15          Now, Your Honor will hear testimony from Mr.

16   Galka, our expert witness and Mr. Galka will corroborate

17   that admission and he will --

18          THE COURT:  Is that admission entitled a

19   preclusive weight in this trial?

20          MR. COLODNY:  I'm not sure, standing here today,

21   Your Honor.  But what Mr. Galka will demonstrate by the

22   evidence is that applying every assumption Celsius' favor,

23   it purchased CEL -- it's purchases of CEL token exceeded the

24   amount of CEL token it paid the customer by over $100

25   million.  And that fact led him to conclude that Celsius was

1    taking actions to affect the price of the token prepetition.

2    And the market wasn't only affected by Celsius' purchase of

3    the token.  The market was lied to as Celsius persistently

4    misrepresented its financial position and covered up those

5    lies.

6           It was not the case that some people knew and some

7    people didn't.  Some people did.  They watched the videos

8    live and then the clips were deleted.  Now, you only have to

9    look at the first pages of our presentation where Celsius

10   and executives were telling the market everything was fine,

11   while under the curtain, they've admitted they were

12   insolvent by a billion dollars.

13          Now, prior to starting Elementus, Mr. Galka traded

14   complex derivatives for over nine years.  Part of his role

15   in those positions was to identify dislocated markets or in

16   other words, markets where for the price of an asset did not

17   reflect its intrinsic value.  And Mr. Galka will testify

18   that following the date that Celsius paused withdraws based

19   on his review of market data and significant experience

20   trading dislocated markets, it is his opinion that the

21   market for CEL token was extremely dislocated and

22   thereafter, the market price was not remotely accurate

23   indication of its value.

24          Now, at the last hearing, you asked me the very

25   direct question, what will Mr. Galka say the CEL token is

Page 57

1    worth on the petition date.

2            THE COURT:  Yes, and I gave my permission earlier

3    today that a supplemental declaration can be -- I don't know

4    whether the order got entered or not.  I was not at the

5    courthouse this morning, but I was asked that question.  I

6    gather there was a request to be able to file a supplemental

7    declaration and I approved that.

8            MR. COLODNY:  Correct, Your Honor.  And the reason

9    why we want to file that supplemental declaration is we

10   understood that you want to give everybody the chance to see

11   the testimony.  So we didn't -- even though we didn't want

12   it to come out on the (indiscernible).  We wanted everyone

13   to have the opportunity.  And what Mr. Galka will testify is

14   that if asked to put a price on the CEL token on petition

15   date, he would not have quoted a price.  I think that's

16   unremarkable, and it's because he believes that the CEL

17   token had no value and there were no economics supporting

18   the value of the token on that petition date that he has

19   seen.

20           Mr. Ferraro, the CEO of the company, will

21   similarly testify that he believed the CEL token had little

22   to no value on the petition date and there is no

23   economically rational reason for the value to increase

24   between the pause and the petition date.  Now, people have

25   taken issue with that conclusion, but it should come as no

1    surprise.  In fact, well before the pause, Celsius disclosed

2    that the CEL tokens may become unusable, illiquid, and/or

3    worthless in the event that the Celsius platform ceases to

4    operate.

5         Now, that's enclosed in the risk disclosures that

6    as Your Honor found were accepted by 99 percent of all

7    accountholders.  Put simply, Your Honor, it's unremarkable

8    that a token based off of the success of a company whose

9    sole use related to the operation of the platform that

10   company ran would have no value when that platform

11   spectacularly failed.

12        In closing, these cases have been a difficult

13   journey for all accountholders.  The plan has been accepted

14   by an overwhelming amount of those accountholders and as

15   will be demonstrated throughout this week, it meets all the

16   requirements for confirmation under the Bankruptcy Code and

17   should be confirmed.

18        THE COURT:  Thank you very much, Mr. Colodny.

19        MR. COLODNY:  Thank you.

20        THE COURT:  All right.  Let me hear from the

21   United States Trustee next.

22        MS. CORNELL:  Good morning, Your Honor.

23        THE COURT:  Good afternoon, but very nice to see

24   you in the courtroom, Ms. Cornell.

25        MS. CORNELL:  Shara Cornell for the record, the

Page 59

1      Office of the United States Trustee.  Your Honor, we

2      appreciate the hard work of all the parties in these cases

3      and their engagement with our office on various issues.  We

4      have an active creditor body which began on first days,

5      continued through the 341 meeting with over 1,000 creditors

6      in attendance, up to and through this confirmation hearing.

7      But our role did not end at the 341 meeting, as is often the

8      case.  This case required more.

9              We actively managed this case which resulted in

10     among other things, an examiner, an ombudsman, and several

11     cost saving measures, and the benefit of the work product of

12     the examiner has been discussed extensively previously.

13     Also given that the Debtors' assets are cryptocurrency, cash

14     management required unique disclosures and protocols to

15     safeguard these assets which are ultimately to be

16     distributed to creditors.

17             We worked with the professionals to ensure the

18     safety of these resources for the Debtors' estate and like

19     the Debtors and the Committee and many of the professionals

20     in this case, we have been routinely contacted by creditors.

21     There was activity by various individuals that resulted in

22     referrals to certain agencies, matters that we take

23     seriously as do our sister agencies and departments.

24             Like the Committee and the Debtors and their

25     professionals, we've also been on the receiving end of toxic

Page 60

1    language and threats --

2              THE COURT:  So has the Court.

3              MS. CORNELL:  -- of course -- from creditors and

4    parties and interest.  But through all of this, our goal has

5    remained steadfast.  We moved this case along.  We're also

6    following the letter and the spirit of the law.  And we do

7    stand here today.  We're nearing the finish line.

8              With all that said, we have a few objections

9    pending to confirmation which we were -- which were agreed

10   at the disclosure statement hearing to be heard today at

11   confirmation.  And during the interim, we've engaged in many

12   discussions with the various professionals and the UST is

13   appreciative of those efforts to claw back in some respects,

14   the exculpation and release provisions.  And there really

15   was a lot of negotiating and in some instances disagreement,

16   but overall the Debtors and their professionals worked

17   diligently to include many of our concerns.

18             We still hope that our remaining issues can be

19   negotiated before the end of this confirmation proceedings.

20   While these revisions were helpful, like the temporal

21   limitation, the exculpation provision, both the exculpation

22   and release provisions are still somewhat overbroad and need

23   further revisions and clarifications on the record, which we

24   expect the Debtors to do in the next few days.

25             First, with respect to exculpation, only estate

Page 61

1    fiduciaries can and should be exculpated by the plan.  While

2    the United States Trustee believes that a proper exculpation

3    tracks 1125(e) of the code providing for a limitation of

4    liability in connection with certain good faith solicitation

5    and plan participation efforts, Courts in this District, as

6    Your Honor knows, routinely follow a Aegean Marine Petroleum

7    Network, Inc., 599 B.R. 717.  But here, the Debtors seek

8    exculpation for former and current --

9              THE COURT:  I'm not sure I agree with that

10   statement completely.  I think that judges on this Court,

11   including myself, have granted broader exculpation than that

12   decision.  So there is not uniformity among the judges on

13   our Court.

14             MS. CORNELL:  No, I would not say there's

15   uniformity, Your Honor.  No.  But it is often quoted and

16   used in this context.

17             Transactional parties are also exculpated in this

18   instance, but they're not limited to the specific

19   transactions that they took part in.  Indeed, the ad hoc

20   Committees, the BRIC, Fahrenheit, the class claim

21   representatives, Coinbase, PayPal, all performed specific

22   and limited acts but are being provided broad protections

23   for any and all work done in connection with these cases.

24   The fact that a party is engaged in one action before a

25   Bankruptcy Court does not entitle that party to have all of

Page 62

1    its actions within a bankruptcy case protected.

2            For example, exculpation for events, occurrences,

3    and agreements is vague and not necessarily limited under

4    Aegean.  Furthermore, we believe a temporal scope is

5    necessary and one has now  been added by the Debtors.  But

6    the scope is confusing when read with the other provisions

7    because the other provisions refer to entities that are not

8    in existence and could not have performed any of the

9    appropriately exculpated actions during the identified

10   scope.  Entities that are not in existence or could not p

11   perform the properly exculpated actions during the temporal

12   scope should be removed to avoid any confusion.

13           Second, the released parties are still over broad

14   as well.  For example, the plan administrator is a released

15   party.  The Debtors have not yet provided a factual basis or

16   a legal basis for his inclusion.  What consideration the

17   plan administrator has made to the case must be identified.

18   Evidence of valuable consideration for each party is

19   necessary.

20           Also, while the Debtors allege that various

21   parties played an important role, for example, certain ad

22   hoc committees, it is unclear as to what valuable

23   consideration those parties gave yet, and the terms like

24   other professionals as it relates to released parties is

25   also somewhat unclear.  Any party to be released should be

Page 63

1    named in the plan and not just referred to, generally

2    speaking, as other professionals.

3         Moreover, the Debtors are yet to explain how

4    claimants that have rejected the plan will be bound by these

5    release provisions.  You're not a releasing party if you

6    have rejected the plan, but you're also a releasing party if

7    you fail to vote for the plan.  This question requires

8    additional information on the record by the Debtors.

9         Lastly, the confirmation order includes a waiver

10   of Rule 3020.  Congress intended to give parties 14 days for

11   a reason and there is no basis to waive that in this case.

12   We do not want to force people or parties into expedited

13   motion practice, which is a waste of judicial resources and

14   estate money.  The most recent agenda I believe was the 29

15   responses for confirmation, which is an unusually large

16   amount of responses, and we do not want to cut off the

17   rights of these parties.

18        There are a lot of issues and I think 14 days,

19   which is the rule not the exception, should be applied in

20   these cases.  Also Your Honor, as an update, after the

21   hearing on Friday regarding the United States Trustee's

22   concerns about Committee membership, as the docket reflects,

23   we filed a supplemental notice of appointment at Docket No.

24   3631.

25        Additionally, Your Honor, United States Trustee

Page 64

1    and the Committee have been in contact over the weekend and

2    have reached a resolution in principle regarding certain of

3    the exculpation language regarding to Mr. Noyes and any

4    potential actions associated therewith.  The language is

5    currently being finalized and we hope to present that to the

6    Court later this week via the Debtor.

7            This concludes our opening remarks and we're

8    available to answer any questions from the Court or

9    otherwise.

10           THE COURT:  Thank you, Mr. Solomon.

11           MS. CORNELL:   Thank you.

12           THE COURT:  All right.  The Ad Hoc Earn Account

13   Group.

14           MS. KUHNS:  Good afternoon, Your Honor.  Joyce

15   Kuhns of Offit Kurman for the Ad Hoc Group of Earn

16   Accountholders.  This has undisputedly been a long and

17   arduous road for the Earn customers, starting with the pause

18   and subsequent revelations of a systemic fraud perpetrated

19   on them, and then navigating the intersection of two

20   seemingly disconnected worlds, the decentralized world of

21   cryptocurrency which they were used to, and the centralized

22   bankruptcy forum which they were not.

23           There were many misunderstandings at that time.

24   New legal theories had to be tested, starting with who owned

25   the customer deposited cryptocurrency.  It is no surprise

Page 65

1    that the January 4 decision determining that it was property

2    of the estate sent shockwaves through the Earn community.

3    The concept of dollarization was also concerning,

4    dollarization of crypto claims as of the petition date, and

5    at a time when Bitcoin, for example, was steadily rising in

6    value.  It led to the inevitable Earn question.  Who is

7    benefiting from the appreciation in the crypto and why isn't

8    it us?

9            These were among the concerns that led to the

10   formation of the Ad Hoc Earn Group by significant Earn

11   claimants who realized the need to come together and speak

12   with a unified voice to advance their common goals.  On

13   behalf of the Ad Hoc Group, Mr. Nagi and I would like to

14   publicly thank Brett Perry, Nicholas Farr, and Immanuel

15   Herrmann, the founders of the Ad Hoc Group and its original

16   steering committee members of which Mr. Herrmann was chair,

17   who were dedicated from the onset to two guiding principles,

18   parity among creditors and consensus building, and never

19   wavered in serving the larger Earn community even at the

20   expense of their individual interests.

21           The first test of the ad hoc's cohesiveness came

22   with a July mediation before Judge Wiles.  It also served as

23   a reality check of what could be accomplished and what could

24   not under the Bankruptcy code.  The group's acceptance of

25   certain constraints such as dollarization of crypto claims

Page 66

1    on the petition date led to a successful mediation that set

2    the treatment of Earn versus Borrower claims, led to the

3    Borrower settlement, critical milestones on the path to plan

4    confirmation among other things achieved in the mediation

5    term sheet.

6           Having had a seat at the table at the mediation,

7    the Ad Hoc and its larger constituency recognized the

8    importance of keeping a seat at the table as future

9    stockholders of Newco.  This led to intense series of

10   negotiations among the primary stakeholders, resulting in

11   the Newco -- the three Newco board observer seats being

12   designated by the Ad Hoc Earn Group and Earn designee

13   appointed to the Litigation Oversight Committee responsible

14   for prosecuting future litigation to enhance creditor

15   recoveries, and lastly, to enter into a plan support

16   agreement among the Debtors, the Committee, the Ad Hoc Earn

17   Group, certain Earn pro se claimants, the class action

18   plaintiff Mr. Tuganov, and Simon Dixon.

19          No one got everything they wanted in this case,

20   but everyone had an opportunity to be heard in this

21   courtroom and we appreciate that, Your Honor, as well as to

22   be heard outside the courtroom in an unprecedented mix of

23   media, mass emails, Twitters, telegram, Twitter spaces, town

24   halls and YouTube presentations.  The active participation

25   of creditors in this case has set a new bar for creditor

Page 67

1    engagement, enabling consensus building to occur and

2    culminating in the astounding result of almost $2.5 billion

3    in Earn claims voting to accept a plan in a crypto case.

4            No one did this alone, admittedly, but as a result

5    of the dedication of many, including the tireless efforts of

6    the Debtors' new management, the Committee, their respective

7    counsel, and their professionals, in a very complex case

8    which as you've heard had many, many active constituents and

9    novel issues.  In the end, the major stakeholders came

10   together in their commitment to deliver the best outcome

11   possible to creditors with the quickest exit achievable.

12           Now we are at the final stage.  We look forward to

13   a successful confirmation process and the long awaited start

14   of distributions, hopefully in 2023, as well as the future

15   opportunities presented to creditors as shareholders in

16   Newco.  Thank you, Your Honor for the time today on the

17   agenda.

18           THE COURT:  Thank you for your presentation.  All

19   right, counsel for the Ad Hoc Borrowers Group.

20           MR. ADLER:  Good afternoon, Your Honor.  David

21   Adler from Carter & English on behalf of the Ad Hoc Group of

22   Borrowers.  First, I want to say it's again pleasure being

23   back in this courtroom. This is only the second time that

24   I've been here since COVID started.  The first was in June,

25   maybe July.

1            But I wanted to talk a little bit about the

2    concerns of the Borrowers, and as Your Honor knows, the

3    group that I represent are the group of individuals who

4    transferred their crypto onto the Celsius platform in

5    exchange for a loan and for which they paid interest.  So

6    they paid interest.  They did not take interest out.  And

7    that was primarily a choice that they made because they

8    wanted to have some liquidity against their crypto, but they

9    didn't want to run the risk of having a disposition event

10   because many, many of the borrowers and Celsius have

11   extremely low basis.  And a disposition event would be very,

12   very bad in this case, especially for some of the higher

13   borrowers.

14           So, going back in time to March, we were happy

15   with the NovaWulf transaction because it kept the loan alive

16   and following the auction, we received thereafter a plan

17   that, in which the Debtor wanted to exercise its setoff

18   rights, which would potentially be very, very bad for the

19   Borrowers in terms of a disposition.  And that was sort of

20   the groundwork where we were when we got to the mediation.

21           So after three intensive days of mediation down

22   the hall and upstairs, the Borrowers reached -- or the

23   steering group reached a resolution on the issues in which

24   the Borrowers would pay back the loans if they could.  They

25   were given the option to do that.  As Mr. Koenig said

1    earlier, the Debtors have indicated that they'll cooperate

2    in terms of finding a new lending source, and we've spent

3    many, many, many hours since the mediation identifying new

4    sources who can provide refinancing to the Borrowers.  And

5    in exchange for that, the excess claim is essentially, is

6    treated as the Earn claim.

7           The Borrowers will get back 100 percent of their

8    principal amount in crypto if it's Bitcoin and ETH, but not

9    in the other currencies.  So from the Borrowers'

10   perspective, that was a result that they could live with.

11   Certainly, the voting reflects that the Borrowers were --

12   that the plan was acceptable to the Borrowers, and I do want

13   to say that probably the biggest issue in the mediation was

14   over the liquid crypto weighted distribution because for the

15   Borrowers that need to refinance, they need to get as much

16   crypto as possible in order that their LTVs are in the range

17   that traditional crypto lenders require.  And it's hard to

18   say that, traditional crypto lenders, but be that as it may.

19          So Your Honor, we have -- I worked consensually

20   with the Debtors and the Committee.  I want to thank Mr.

21   Koenig, Mr. Kwasteniet, Mr. Colodny, Mr. Wofford for all

22   their assistance over the last few months in trying to get

23   to an achievable plan.  We do have a couple of issues that

24   will need to be addressed at some point.  I mean, one issue

25   and I've raised it with Mr. Koenig and Mr. Colodny.  It's

Page 70

1    not a big issue, but there's -- there was supposed to be an

2    election on the ballot form for whether the Borrower wished

3    to repay or not which did not make it on the ballot.  Some

4    subsequent form of notice needs to be sent out to the

5    Borrowers so that they can make that election.

6            And there are also some timing issues that need to

7    be addressed in the plan, but I consider those minor non-

8    substantive issues in this plan.  I mean, the result that

9    was achieved at the mediation as a result of that --

10           THE COURT:  How many Borrowers are there?

11           MR. ADLER:  23,000, Your Honor.  Now, when I say

12   23,000, there are some Borrowers -- if you have Bitcoin and

13   you had ETH, you show up twice on the spreadsheet.  So when

14   you cull all those out, it's probably more like 18,000 or

15   so.  Approximately half of them are in the United States;

16   approximately half of them are international, with the

17   biggest international locations being Australia, Spain.  I

18   think actually Poland is one of the largest jurisdictions

19   and that's because the largest Borrower in this case who

20   I've never spoken to, is apparently a resident of Poland.

21   And you know, I mean, I think that that Europe and Australia

22   dominate on the borrower side of the equation.

23           So, obviously we have a couple of issues to work

24   out, but we are supportive of the plan.  The voting reflects

25   it.  There have been people, Borrowers, who have asked Your

Page 71

1    Honor for a ruling on the collateral and the only thing that

2    I would say is we would ask Your Honor to limit that ruling

3    to whether it is property of the estate or not, okay, so

4    that we're not making any rulings about any other potential

5    issues.

6            THE COURT:  Okay, thanks, Mr. Adler.

7            MR. ADLER:  Okay.  Thank you, Your Honor.  On that

8    note, I will conclude.

9            THE COURT:  Thank you.  Thank you very much.  I've

10   said this before.  I greatly appreciate what my colleague

11   Judge Wiles did in the three-day mediation.  There were lots

12   of issues that got resolved.  Essentially, it was very

13   important to us being here today.  I appreciate that.

14           All right, the Withhold Ad Hoc Group, Ms. Kovsky.

15           MS. KOVSKY-APAP:  Good afternoon, Your Honor.  Deb

16   Kovsky, Troutman Pepper, on behalf of the Withhold Ad Hoc

17   Group.  As Your Honor knows, at the outset of these cases,

18   the Withhold accountholders, including members of the

19   Withhold Ad Hoc Group were kind of a weird no man's land on

20   the Celsius platform.  They weren't in the Earn program

21   anymore and if the Debtors had been able to offer custody

22   services in their states of residence, they would have been

23   in Custody, but that wasn't the case.  So instead their

24   status was kind of ambiguous, neither fish nor fowl.

25           And the question of the status of their assets

Page 72

1    could have been litigated all the way to resolution,

2    possibly through appeals at great expense and uncertainty.

3    Instead, the Withhold Ad Hoc Group, the Debtors, and the

4    Committee found a more efficient pathway to deal with the

5    complex and novel questions regarding property of the estate

6    raised by the Withhold assets, and those discussions and

7    pathway resulted in the Withhold settlement, a compromise

8    that provided enhanced treatment for the Withhold

9    accountholders while allowing a substantial bucket of assets

10   to be treated as property of the estate.

11           And the settlement was embodied in the plan and

12   has been overwhelmingly accepted by Class 7, the Withhold

13   accountholders.  The Withhold Ad Hoc Group appreciates the

14   Debtors' and the Committee's willingness to work with us and

15   to find a compromise solution that recognize the claims of

16   the Withhold accountholders while avoiding the cost and

17   complexity of an extended litigation.

18           Withhold Ad Hoc also appreciates the Debtors and

19   the Committee working with us on our informal comments to

20   the plan which obviated the need to file a formal objection.

21   The Withhold Ad Hoc Group was concerned about the potential

22   preclusive effect that the Debtors' calculation of

23   withdrawal preference exposure under the plan might have.

24   The Debtors and Committee agreed to add clarifying language

25   that those calculations will not be binding on any defendant

Page 73

1       in a subsequent avoidance action.

2               Even more importantly, the plan as it was

3       originally solicited out appeared to give the plan

4       administrator unfettered discretion to distribute fiat

5       currency rather than cryptocurrency to accountholders.  Now,

6       we understand that the plan does provide for the retention

7       of distribution agents for the purpose of distributing

8       cryptocurrency, but those are time limited contracts and

9       there was nothing in the plan that really pushed or

10      encouraged the distribution of crypto rather than fiat.

11              And as Your Honor is well aware from the course of

12      this case, and as Mr. Colodny alluded to, many

13      accountholders feel very, very strongly about getting back

14      crypto, not fiat currency . And this is particularly true in

15      instances where there may be a delay in a claim becoming an

16      allowed claim.  So accountholders are very concerned about

17      potentially not getting the benefit of the appreciation and

18      value of crypto if the plan administrator could simply

19      distribute fiat currency at some later point in time.

20              The Debtors and the Committee agreed to language

21      requiring the plan administrator to use commercially

22      reasonable efforts to make distributions in liquid

23      cryptocurrency, rather than fiat, to the greatest extent

24      possible.  The language requires reserves on account of not

25      yet allowed claims to be held in the form of liquid

Page 74

1    cryptocurrency.  And if by the time a distribution is to be

2    made, there isn't a distribution agent around who can

3    actually distribute crypto, the plan now requires that the

4    crypto be converted to fiat as close to the distribution

5    date as possible, the idea being that this would allow the

6    amount of the fiat to mirror as closely as possible, the

7    appreciated value of the crypto that otherwise would have

8    been distributed.

9            And these changes provide important protections to

10   accountholders.  We really appreciate the constructive

11   approach taken by the estate's professionals in negotiating

12   these terms with us.

13           Finally, I wanted to say a couple of words about

14   the ADR procedures.  The Withhold Ad Hoc Group filed a

15   reservation of rights with respect to the ADR procedures in

16   connection with the disclosure statement hearing.  Since

17   then, we've had extended discussions with the Committee's

18   professionals resulting in significant modifications to the

19   proposed procedures.

20           The Committee has clarified that the procedures

21   are not binding on anyone who did not file a proof of claim

22   and revisions to the procedures which were filed as a

23   redline also make it easier and more straightforward to opt

24   out, and among other changes, make the flow of information

25   between the parties mutual rather than one sided.

1          However, as I'm sure you'll hear more from Mr.

2     Kleiner, the ADR procedures are not yet finalized and it

3     does seem a little bit odd and perhaps premature for the

4     Court to approve procedures that are still being discussed

5     and negotiated.

6          The Withhold Ad Hoc Group did not see this as a

7     basis to deny confirmation of a plan, particularly one with

8     widespread support of creditors, including the members of

9     the Withhold Ad Hoc Group themselves; however, we suggest it

10    may make more sense to defer approval of the ADR procedures

11    until they're more fully baked.  But either way, whatever

12    the Court rules, we will certainly continue to --

13          THE COURT:  Speed up the process and finalize

14    everything.

15          MS. KOVSKY-APAP:  We are absolutely working on

16    that.  We are continuing to negotiate the procedures in good

17    faith, exchanged emails today and we are working

18    expeditiously.  So, in conclusion, the Withhold Ad Hoc Group

19    believes the plan is not perfect but no plan of

20    reorganization ever is.  We do believe that it is the best

21    option under the circumstances and we are happy to join the

22    Debtors, Committee, and other ad hoc groups in supporting

23    it.

24          THE COURT:  Thank you very much, Ms. Kovsky.  All

25    right.  Next is Mr. Frishberg.

1              MR. FRISHBERG:  Thank you, Your Honor.  To start

2    off with, I think everyone will agree that I'm direct and I

3    speak my mind, so I will do so today.  I believe that in

4    confirming this plan is the best path forward for creditors

5    that we have at this time.  And I'm not saying this only

6    because I'm the PSA, I'm saying this because I truly believe

7    it, that this is the best option we have currently.

8              The Debtors, the UCC, the U.S. Trustee, numerous

9    regulators, all the professionals in this case, and more

10   have done a very, very good job thus far.  (indiscernible)

11   know, this is a very complex and unusual case.  The Debtors

12   and the UCC have stated that accountholders overwhelmingly

13   support the plan, including the visions about the EIP

14   bonuses and releases.

15             I would like to add a bit of clarity to that.

16   Something I have not heard mentioned thus far is that the

17   reason people, creditors such as myself voted for it, it was

18   the only option that was not a very bad scenario of the plan

19   getting voted down.  Customers are very openly against the

20   overly, in my opinion, broad releases to the plan, but

21   again, it is what it is, to (indiscernible) employees and as

22   well in my opinion, the unnecessary (indiscernible)

23   employees.

24             The reason they voted for it is as well as I did

25   is because they want it to be over.  An analogy that I think

Page 77

1    sums this up well, is imagine that you are (indiscernible)

2    deserted island in the middle of nowhere and then you find

3    some moldy bread, a tiny bit of mold.  You're going to eat

4    the bread since it is better than starving to death.  I know

5    I would eat the bread and it seems about 98 percent of

6    creditors chose to also eat the bread.  Though I would love

7    nothing more than to cut off the moldy parts which include

8    the EIP bonuses and a few others.  It's not an option, so I

9    voted for the plan.

10          We must (audio glitch) and we must (audio glitch).

11   This is (audio glitch) the plan being confirmed regardless

12   of the presence of the metaphorical mold, trimming off the

13   metaphorical small moldy parts would improve the plan, but

14   slightly moldy bread is better than nothing in this

15   scenario.  Thank you, Your Honor.

16          THE COURT:  Thank you very much, Mr. Frishberg.

17   All right, Mr. Sabin, you're going to argue for Mr. Tuganov?

18   Just so everybody knows, my plan is after Mr. Sabin, we have

19   three more openings in opposition to the plan.  We'll take a

20   brief recess after Mr. Sabin and before we proceed with the

21   remaining three.  Mr. Sabin, good afternoon.

22          MR. SABIN:  Thank you, Your Honor.  It's a

23   pleasure to be back here in person.  It's a pleasure to

24   hopefully soon stand here and thank many people for tireless

25   work.  I am Jeff Sabin from Venable on behalf of Ignat

Page 78

1    Tuganov, a long time Earn rewards customer, creditor, one of

2    three class representatives appointed pursuant to the now

3    final order of this Court approving the settlement of the

4    class proof of claim that among other things allowed

5    noncontract claims for all accountholders.

6         And he was also and still is a party to the plan

7    support agreement and spent the better part of his three

8    days, and I did, too, before Judge Wiles.  And you've

9    already taken notice of the benefits of that.

10         I requested ten minutes to otherwise speak to

11   support this plan, to cover matters material to confirmation

12   not covered or otherwise that I thought needed to be

13   supplemented by the very good efforts of all those who come

14   before me, be it Debtors' counsel, UCC counsel, or other

15   supporters.  I'm happy to say that if I were a contestant on

16   "Name That Tune," I can do it in two minutes.

17         But here goes.  First and most importantly, you

18   asked Mr. Colodny a question that I have a supplement to an

19   answer.  There is a provision in the order of approving the

20   class settlement agreement, now final, that otherwise waived

21   objections to otherwise trying to subordinate pursuant to

22   510(b) any of the claims of Earn customers and/or retail

23   borrower customers.

24         Secondly, I believe that that the plan as amended

25   is confirmable, not only because I have confidence that the

Page 79

1    record will establish by all of the witnesses and the

2    testimony to be educed that otherwise you can make findings

3    of fact that would be supportive of confirmation, but also

4    by the vote itself and the use of the vote in connection

5    with three settlements, not that you otherwise approved, but

6    are embedded in the plan including the retail borrower

7    settlement, which has in it as a component part not yet

8    mentioned in the record of an additional substantive

9    consolidation of several lenders in this case and several

10   debtors in this case.

11            And finally and most importantly, as you've heard,

12   Mr. Tuganov is no different than all of the other customers.

13   He is waiting and hopefully sees the light at the end of the

14   tunnel, indeed, that the PSA milestones of October 31 for

15   entry of a confirmation order and a December 31, 2023

16   effective date can be had.

17            In addition, as you heard from Mr. Colodny,

18   there's no promise that all the conditions to the effective

19   date can be done, but I think we are confident that the

20   tireless efforts will continue, not just of the Debtors and

21   the Committee and the U.S. Trustee, but the regulators

22   themselves and of course, the plan sponsor such that the

23   transparency referred to by Mr. Koenig is indeed going to be

24   helpful to satisfy those conditions.

25            And so, like so many others, it has been a long

Page 80

1    and winding road, and as the song goes, I hope that we soon

2    get to sing a different tune.  Maybe everyone can sing happy

3    or at least happier.  Thank you, Your Honor.

4            THE COURT:  Thank you very much, Mr. Sabin.  All

5    right, we are going to take -- it's 3;40.  We'll take a ten-

6    minute recess.  We'll resume at 3:50 and when we resume Mr.

7    Ubierna, you're up next, okay?  All right.

8            (Recess)

9            THE COURT:  Everybody can sit down.  All right,

10   the Court is back in session.  Mr. Ubierna, it's your turn

11   for an opening statement.

12           MR. UBIERNA DE LAS HERAS:  Good afternoon, Your

13   Honor.  Victor Ubierna, pro se creditor.  Thank you for your

14   time.  First, English is not my native language as I am from

15   Spain.  So I ask that you forgive me if I make any mistake I

16   speak in English.  During this Chapter 11 bankruptcy, I have

17   filed some objections and joinders.  Since the beginning, I

18   believe that while other people were just complaining in

19   social media, the way to be useful to others was to file

20   formal documents.

21           With regard to plan confirmation, I filed an

22   objection with Docket No. 3542.  This bankruptcy have been

23   particularly difficult for many people, so I don't object to

24   closing this difficult chapter in their lives.  I objected

25   to two items.  First, regarding the emergence incentive

Page 81

1    program, I argue that insider employees already receive

2    salaries, that they have a fiduciary duty to act in the best

3    interest of the company, and that the bar is very low for

4    these rewards.  For example, Ferraro will receive a bonus if

5    this Court confirms a plan before the end of October.  It is

6    obvious that a Chapter 11 CEO should be working to get a

7    plan confirmed.

8              Furthermore, a lot of the metrics are just what

9    they should be doing as employees.  These targets are

10   objectives that are well within the scope and scale of their

11   existing contractual obligations to the company as

12   stakeholders and creditors.  Some items haven't got

13   numerical targets and (indiscernible) and can be easily

14   abused.

15             Secondly, I also believe that the releases are too

16   broad and that creditors did not have a real chance to opt

17   out.  (audio glitch) argue that the third party releases are

18   wholly consensual; however, evidence does not point on that

19   direction.  I want to remark that a little more than 5,000

20   holders in voting classes that voted to accept the plan

21   attempted to select the third-party release opt out and were

22   not permitted to do so.  How can they argue that releases

23   are wholly consensual if 5,160 creditors are being forced

24   into them against their will?  I joined what the UST has

25   just said about the releases.

Page 82

1          Lastly, I do welcome the change that the Debtors

2     made to the release and the exculpation provision.  They

3     clarify that what happened on the failure to file a proof of

4     claim on the Voyager bankruptcy is not covered by those

5     provisions.  That is a good change in response to my

6     objection.  Thank you.  Nothing more for today, Your Honor.

7          THE COURT:  Thank you very much, Mr. Ubierna.

8     You've been a regular participant in the hearings and I

9     appreciate hearing from you.  Thank you.  All right, counsel

10    for Pharos Fund.

11         MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

12    Emanuel on behalf of Pharos.  We're here today for an

13    objection on the best interest of creditors test.  The test

14    is simple.  It's simply whether the Debtors would realize

15    more value under Chapter 7 than what they would realize

16    under the plan as proposed by the Debtors.

17         As Your Honor aptly noted with regard to the CEL

18    token valuation, the test, the burden is on the Debtors to

19    prove that the test is satisfied and as long as the plan is

20    not unanimous, and here our client has objected to the plan,

21    they have to carry that burden.

22         Our simple position is that they have not, that

23    there's insufficient evidence in support of the best

24    interest of creditors test here.  And that is for two

25    reasons.  On the one hand, in support of their plan, the

Page 83

1   Debtors submit a liquidation analysis that is severely

2   depressed.

3            THE COURT:  It usually is.

4            MR. NOSKOV:  Correct, Your Honor, but usually with

5   justification.  And in our view, the evidence this week will

6   show that the severely depressed value which is by about 80

7   to 85 percent of the plan value -- and not just compared to

8   the going concern value, but also to the orderly winddown

9   value scenario under the plan, it's -- the Chapter 7 process

10  is severely depressed.

11           I think the only real argument that is in the

12  declaration supporting such devaluation of the liquidation

13  analysis is a view that's expressed that a Chapter 7 Trustee

14  whose fiduciary duty it is to maximize value of the estate

15  for the creditors and who's empowered by the Bankruptcy Code

16  to do so would not be able to run a proper sale process of

17  these particular assets.  And we intend to probe why the

18  Debtors have arrived at that conclusion throughout this

19  week, Your Honor.

20           THE COURT:  You placed zero value on Newco.

21           MR. NOSKOV:  I can get to Newco as well, Your

22  Honor.  I'm not so sure that we place zero value.

23           THE COURT:  What value do you place on Newco?

24           MR. NOSKOV:  We -- well, I think the question,

25  Your Honor is whether the Debtors place the correct value --

```
 1                THE COURT:  I understand that, but do you place

 2      any value on Newco?

 3                MR. NOSKOV:  Yes, we --

 4                THE COURT:  What value do you place on Newco?

 5                MR. NOSKOV:  We think that the value -- that the -

 6      - we don't disagree with the inherent value that the Debtors

 7      present.  We just think it should be severely discounted or

 8      discounted at all based on the several risk factors that the

 9      Debtors have themselves identified in these cases including

10      in the disclosure statement.

11                THE COURT:  So you're not disputing the value they

12      place on it, but you, you believe it should be discounted

13      from the value they placed on it?

14                MR. NOSKOV:  I believe the way that they've

15      arrived at the value, which again, will come in through

16      evidence and we will probe exactly how they did so because

17      we think the disclosure has not been sufficient, we believe

18      that that testimony will show that they did not adequately

19      discount it based on risk factors that they have identified

20      themselves and based on how creditors have spoken in

21      choosing their options under the plan.

22                So with that, Your Honor, I think that goes to the

23      Newco value.  That has nothing to do with the orderly

24      winddown scenario which the Debtors propose, which is a

25      value of $450 million for the assets, which compared to the
```

Page 85

1    liquidation value, which is about 88, is significantly

2    higher and I'm not sure why --

3              THE COURT:  But you agree, I take it, that a

4    comparator has to be the liquidation value, not the orderly

5    winddown value, the comparator for the best interest test --

6              MR. NOSKOV:  The best interest test should compare

7    what would happen in a Chapter 7, the hypothetical Chapter 7

8    proceeding, versus the winddown value or the plan value,

9    whichever one is more likely.  It's a difficult comparison

10   and we'll probe which one is really appropriate, but yes,

11   it's what would happen in a Chapter 7 value, but I don't

12   think that it's appropriate to devalue what would happen in

13   a Chapter 7 by as much as the Debtors have done here.  There

14   are tools at the behest of the Chapter 7 Trustee that --

15             THE COURT:  May I ask, do you plan to call any

16   witnesses on liquidation value?

17             MR. NOSKOV:  We ourselves are not in a position to

18   put in witnesses ourselves.  To the extent that the Court

19   would be willing to override the deadlines that have

20   occurred --

21             THE COURT:  No, I -- the deadlines are the

22   deadlines, but the deadline for those to submit direct

23   written testimony in opposition to the plan hasn't run yet.

24             MR. NOSKOV:  The deadline, I believe, Your Honor,

25   for experts has passed and our client was not in a position

Page 86

1    to do so.  To the extent that Your Honor suggests we can put

2    in affirmative evidence, we'd be glad to do so.

3              THE COURT:  Bear with me a second.  The order

4    establishing case management procedures for the confirmation

5    hearing is ECF 3478.  In Paragraph 4 on page 3, says, "On or

6    before 12 noon October 11th, 2023, all parties in interest

7    shall file and docket written direct testimony under oath

8    and copies of exhibits that they expect to offer in

9    opposition to confirmation."

10             MR. NOSKOV:  Your Honor, that that comes as a

11   surprise to me and if that's the case --

12             THE COURT:  It's on the docket.  That's been --

13   you know, this order was entered on September 15th because I

14   wanted to be sure everybody knew when they had to put in

15   evidence.

16             MR. NOSKOV:  I appreciate you pointing us to that

17   order, Your Honor, and certainly something that we will

18   consider.  But my point today is only --

19             THE COURT:  Here's what I want to know.

20             MR. NOSKOV:  Sure.

21             THE COURT:  Do you plan[ to offer evidence or

22   simply to cross examine the Debtors' witnesses -- Debtor and

23   the Committee's witnesses?

24             MR. NOSKOV:  We certainly intend to cross examine

25   the Debtors' witnesses, Your Honor.  Our client, given the

Page 87

1     situation -- and certainly I can explain what it is --

2           THE COURT:  I'm not interested in your client's

3     situation --

4           MR. NOSKOV:  -- has not, to this date, been able

5     to -- we, with the client, have not gotten to a point where

6     we can put in evidence affirmatively, but we may, Your

7     Honor.

8           THE COURT:  That's fine.  You can cross examine

9     their experts, but I just wanted to know -- October 11th was

10    the deadline for anybody in opposition to confirmation to

11    put in written evidence, and I was trying to ascertain

12    whether it's your expectation that you're going to offer

13    evidence by October 11, written evidence.

14          MR. NOSKOV:  Your Honor, if I may, may I reserve

15    on that and answer and --

16          THE COURT:  Yes.  The deadline hasn't come yet.

17          MR. NOSKOV:  Thank you very much.  Getting back to

18    regardless of affirmative evidence, which we may or may not

19    put forward, we think that on their own, the disclosures

20    that are provided by the Debtors are insufficient to support

21    the analysis that they provided.  I think on the one hand,

22    they depress value of a Chapter 7 process which actually

23    Courts have called an orderly winddown just the same as what

24    they're proposing with the orderly winddown scenario.

25          We think that the Chapter 7 Trustee is well within

Page 88

1    its power to run a sophisticated process and so that

2    discount is much too low.  And on the other side of the

3    equation, we think that appropriate discounts have not been

4    applied to the value of the Newco and the other assets that

5    would be, you know, part of the proposed plan.

6         We think that obviously the -- in some sense, the

7    best interest of creditors is mathematical and so once you

8    push one of those values up and one of them down, that the

9    Debtors do not satisfy the test under 1129(a)(7), and

10    therefore the claim should be rejected.  And we think that,

11    with just the bare conclusionary assertions that are in the

12    declaration without further backup and without our ability

13    to probe them in cross examination, the Debtors cannot

14    satisfy the test.

15         THE COURT:  Thank you.

16         MR. NOSKOV:  Thank you.

17         THE COURT:  All right.  Harrison Schoenau.  Is

18    that you, Mr. Kleiner?

19         MR. KLEINER:  Yes.  Thank you.  Thank you, Your

20    Honor.  Good afternoon.

21         THE COURT:  Go ahead, Mr. Kleiner.

22         MR. KLEINER:  Barry Kleiner from Kleinberg,

23    Kaplan, Wolff & Cohen for Harrison Schoenau.  I asked the

24    Court for five minutes of time to frame our position and I

25    very much appreciate the opportunity, but I hope to follow

1      Mr. Sabin's lead and he's much less than that.

2              To be clear, we are not objecting to the plan

3      itself.  Rather, we filed a limited response objecting

4      solely to approval of the ADR procedures as implemented in

5      the plan and as they apply to avoidance action defendants.

6      We laid out the specific items we objected to in our

7      response that was filed as Docket No. 3529 and the Debtor

8      and Committee (indiscernible).  I know that you'll read our

9      objection and the responses, so I just wish to make two

10     points today.

11             First, we are primarily here because the Committee

12     has insisted on retaining the right to (indiscernible) ADR.

13             THE COURT:  Say that again?  I'm sorry, just

14     repeat that.

15             MR. KLEINER:  Yes, so we're primarily here because

16     of the fact that the Committee has retained in the ADR

17     procedures the right to force parties into ADR even if they

18     (indiscernible).  As Ms. Kovsky noted, we have been in

19     discussion with them and the Committee, for example, has

20     agreed that parties can't be forced to offer counter, but

21     nonetheless, we're a bit troubled by the insistence that

22     even if they (audio glitch) they're forced to proceed with

23     ADR.  We're troubled that that remains a (indiscernible).

24             The other point is, (audio glitch) I want to

25     address, again, as Ms. Kovsky noted, the procedures aren't

Page 90

1    yet complete.  We have been, since the disclosure statement

2    hearing -- and I don't want to understate this.  In fact,

3    the parties have been cooperating in good faith working

4    together.  The procedures that were filed in preparation for

5    confirmation differ from those that were filed at the time

6    disclosure statement and much progress has been made, but

7    some items remain open.

8            Since the time we filed the objection and right

9    now, the parties have been in communication and we expect

10   that we'll continue to communicate and hopefully resolve

11   these issues.  But as we stand here today, it's not done yet

12   and you don't have in front of you a final (audio glitch)

13   procedures to approve.

14           So we ask two things.  One, if Your Honor is to

15   approve ADR (audio glitch), we understand why you might, you

16   don't -- you approve them without the ability to force

17   people who don't think it would be (audio glitch) to

18   participate.  And second, since the procedures still remain

19   incomplete, you would delay approval until the parties have

20   had a time to finish it.

21           I would just submit that there's really -- there's

22   no urgency to this particular issue until the effective

23   date.  It's not something that has to be done by

24   confirmation.  Obviously, we would like to, but really, this

25   is something that's only relevant when the plan is prepared

Page 91

1    to go effective because it really deals with claims

2    objections and avoidance actions which have not yet been

3    brought.  Thank you.

4              THE COURT:  All right, let me just make a couple

5    of comments on that.  One, I think I commented earlier,

6    speed it up, because assuming that the plan is confirmed, I

7    don't want to leave issues hanging out there.  Okay.  This

8    is a little different than some of the other issues, but

9    it's my goal that everything be resolved if the plan is

10   going to be confirmed.

11             Second, I'm not saying that the issues as to which

12   the ADR proceeding -- procedures would apply are identical

13   to the issues I've had in other cases, but I will just tell

14   you, I have in large Chapter 11 cases, I have approved

15   mandatory ADR procedures.  You know, the issues here may be

16   a little different.  You may have arguments why you don't

17   think it should be mandatory.  But I -- in more than one

18   large case, I have approved mandatory ADR procedures.  Just

19   saying that.

20             I may -- you know, you or somebody else may be

21   able to persuade me, well, that should -- it should be

22   different here for whatever the reason.  Now is not the time

23   to argue it.  What I would urge is, and I appreciate you

24   indicated certainly willingness to continue to do this, is

25   try to hammer out these issues in a way that's consensual.

Page 92

1    Okay?

2              MR. KLEINER:  I agree, Your Honor.  I think we

3    just didn't quite have enough time --

4              THE COURT:  And I understand that.  Okay.  All

5    right.  We have heard all of the opening statements from

6    people who requested openings.  The order that I had entered

7    with the order in which, and the time allocation -- and I

8    appreciate that everybody stuck to their time allocations.

9    Very much appreciated.

10             So I wanted to talk -- and anybody who wants to be

11   excused certainly can be.  There were issues about how

12   exhibits are going to be handled and I raised this in a

13   prior hearing, just -- I conduct public trials.  Sealing or

14   redaction has to be an absolute minimum.  And I wanted to

15   cover some of those issues, and I didn't get a chance to

16   look at over the weekend -- trust me, I was working on this

17   -- the sealing motion that was made, so I want to get a

18   better understanding.

19             So let me just make some general points on it and

20   I'm willing to hear argument, and frequently it's the U.S.

21   Trustee who rightfully, in my view, is defending what the

22   Bankruptcy Code creates as the presumption that all these

23   bankruptcy hearings are going to be public.  I appreciate

24   that.  Okay.  There are certain things, from what I've

25   looked at and talked with my clerks about, that I have less

Page 93

1    problem with that.

2            For example, the Debtor has unresolved litigation

3    claims that it's pursuing.  StakeHound, to -- just to name

4    one.  I certainly don't think that the Debtor should be

5    obligated to file exhibits on the public -- unredacted

6    exhibits on the public docket that say how they internally

7    have assessed those claims.   That's just an example.

8            So yes, there are things that should be redacted.

9    How we deal with it during the hearing is -- also can be an

10   issue.  When I've had in other cases in trial where we don't

11   -- where a witness is testifying and involves some redacted

12   documents, we've usually tried to keep the test -- they've

13   been directed, don't talk about the numbers that have been

14   redacted, talk more generally, including a cross

15   examination.

16           So yes, I have dealt with it in the past.  So I

17   would like to get a better idea.  I guess the thing -- and I

18   said this at the last hearing we had, when I heard that the

19   Debtor was proposing a link on the docket that required

20   people to sign a confidentiality agreement, that was

21   unacceptable to me.  So -- but go ahead.

22           MR. McCARRICK:  Yes, Your Honor.  The amended --

23           THE COURT:  -- identify yourself.

24           MR. McCARRICK:  I'm sorry.  T.J. McCarrick,

25   Kirkland & Ellis, on behalf of the Debtors.  The Debtors

1    filed an amended motion to seal at Docket No. 3644.  It

2    supersedes the initial --

3              THE COURT:  Okay.

4              MR. McCARRICK:  -- request for sealing at Docket

5    No. 3635.  We've substantially narrowed the scope of

6    information on the exhibit list that we seek to seal.  It's

7    only certain cells on four exhibits and candidly, Your

8    Honor, it's not even clear that those are going to be

9    offered into evidence.  So I don't expect this is going to

10   be an issue to your practical point of whether or you'll

11   have to seal the courtroom or how we address it.

12             There are four Excels and there are tabs.  So

13   Exhibit 53, it's the Coin Manual Adjustment tab and it cells

14   B15, B17, E15, to E17.  For Exhibit 55, it's the Coin Manual

15   Adjustments tab and cells B14 to B16, B101 to B103, E14 to

16   E16, and E101 to E103.  For Exhibit 56, again it's the Coin

17   Manual Adjustments tab and it cells B14 to B16, B101 to

18   B103,  E14 to E16, and E101 to E103.  And finally, it's

19   Exhibit 62, it's the Coin Manual Adjustments tab, the

20   Comments column and the CBP Illustrative Recovery tab, cells

21   K55 to K57.

22             And what we're dealing with here, Your Honor, it's

23   relating to litigation and asset recovery assessments.  And

24   so the redactions are pretty slim at this point.

25             THE COURT:  Here's what I would ask you to do.

Page 95

1    Maybe you've done it already.  Confer with the Committee and

2    the U.S. Trustee, and let's see if those parties are in

3    agreement about it, and if they are, then I'm okay with

4    sealing -- or redaction.  It's not wholesale sealing, it's

5    redacting certain cells -- subject to further order of the

6    Court so that if evidence develops in a way that I -- that,

7    you know, we have to address it, we'll address it.

8              But if the U.S. Trustee, the Committee and the

9    Debtors agree on these redactions, we go forward on that

10   basis subject to any subsequent Court ruling, which in

11   principle what you describe, I understand the reason for

12   doing that and I'm fine with it, okay.  But I want you to

13   have a discussion with the U.S. Trustee about it.

14             MR. McCARRICK:  Yes, Your Honor.

15             THE COURT:  Because what I found is they're the

16   only ones who really try to protect the public interest and

17   disclosure of what happens.  Okay.

18             MR. McCARRICK:  That's it, Your Honor.

19             THE COURT:  Okay.  I guess it was PII and --

20             MR. McCARRICK:  Yeah, the --

21             THE COURT:  The PII, I think I already said,

22   absolutely should be redacted.

23             MR. McCARRICK:  Yes.  Just, last, one housekeeping

24   matter.  To the extent that the Debtors are going to use

25   demonstratives with any of their exhibits, do you want those

Page 96

1    filed 5 p.m. the docket the day before or just use them in

2    Court?

3              THE COURT:  I would like them filed before, for

4    this reason.  Obviously, we start the evidence tomorrow.

5    The public and the media are not permitted under new

6    guidance from the Administrative Office of the Courts,

7    they're not permitted -- they're only permitted to be in the

8    courtroom or we have an overflow room if we need it, but

9    there are parties in interest who are appearing remotely and

10   so that we don't have any delays.  If you're going to use

11   demonstratives, post them the night before so that anybody

12   who wants access to it can see that.

13             Demonstratives typically are not introduced in

14   evidence.  They are -- they're illustrative for purposes of

15   testimony and used for that purpose, but it would be helpful

16   if demonstratives are filed the -- you know, by five o'clock

17   the day before they're going to be used.

18             MR. McCARRICK:  Yes, Your Honor.

19             THE COURT:  Okay?  All right.  So does anybody

20   else have any other issues either about exhibits or anything

21   else in terms of our procedures that we're going to be

22   following during the trial?  Mr. McCarrick, shouldn't have

23   sat down so quickly.

24             MR. McCARRICK:  I know.  For folks who are

25   appearing virtually who may cross examine using exhibits, I

Page 97

```
1    guess I seek the Court's guidance on how that should be

2    handled because the witness may not have a copy.  As far as

3    I can tell, there's been no exhibit list disclosed by anyone

4    other than the Committee and the Debtors.  That's just the

5    one practical question I have.

6              THE COURT:  That's true.  I would say this.  If

7    anyone who is appearing remotely, any party in interest

8    appearing remotely, who wishes to cross examine any of the

9    witnesses and wishes to use exhibits that are not already

10   marked, they should also post them on the docket by 5 p.m.

11   the day before a witness is testifying.  Okay.  So there

12   often is an exception for impeachment exhibits, but we're

13   not -- because we're doing this with remote access and --

14   look, I've appreciated, you know, at one point early in this

15   case, we had 786 people on Zoom.

16             And what it is demonstrated to me, is it has

17   really helped with the transparency of the bankruptcy

18   proceeding.  If there are people on Zoom who are going to

19   cross examine witnesses, they'll have to, you know, use the

20   raise hand function to be recognized to do that.  Obviously,

21   cross examination needs to be limited to the scope of the

22   direct examination that's occurred, but I want to be -- give

23   some leeway to people, particularly nonlawyers in their

24   examination.  I certainly reserve the right either to

25   sustain objections that are made or myself limit the cross
```

1    examination that can be done.

2         But it's a new world with us trying to do --

3    particularly in a case like this where there are so many

4    creditors who are not in the New York metropolitan area who

5    want to appear, and if they wish to cross examine.  So, yes,

6    I'm directing that if you're going to appear and cross

7    examine remotely, if you intend to use any exhibits, you're

8    going to need to post them as proposed cross examination

9    exhibits by 5 p.m. the day before a witness testifies, which

10   necessarily is going to require that the parties here who

11   are calling witnesses disclose the day before who the

12   witnesses are going to be for the next day.

13        MR. McCARRICK:  Yes, Your Honor.  Do you want us

14   to file that on the docket?

15        THE COURT:  I think you should, because again,

16   we've got people appearing remotely.

17        MR. McCARRICK:  Yes, Your Honor.

18        THE COURT:  And I think in response to a question

19   for clarification that the Debtors had asked, if, rather

20   than having to recall witnesses during the opposition case,

21   you know, I'm not going to limit cross examination to the

22   scope of the direct, if someone was planning on calling

23   someone as part of their main case.  There's no jury.  We'll

24   do it.  I want, to the fullest extent possible, that a

25   witness when they testify and they're done, they're done.

1    They don't have to come back.  So, okay.  Any other

2    questions, Mr. McCarrick?

3              MR. McCARRICK:  I can't promise in between here

4    and there, but thank you.

5              THE COURT:  Good exercise.  Anybody else have any

6    other issues they want to raise about how we're going to be

7    proceeding?  Mr. Koenig, who are going to hear from

8    tomorrow?  Well, I picked on you, Mr. Koenig, but if

9    somebody else -- if Mr. McCarrick wants to get up again, he

10   can.

11             MR. McCARRICK:  This has been very special for me,

12   yes, Your Honor.

13             THE COURT:  I'm sure.

14             MR. McCARRICK:  We anticipate tomorrow calling Mr.

15   Ferraro, Mr. Kokinos, potentially Mr. Kielty, Mr. Cohen.  I

16   would expect that would --

17             THE COURT:  Okay.

18             MR. McCARRICK:  -- likely be it.  Those are at

19   least four.

20             THE COURT:  So my expectation, we're going to

21   start at nine.  We'll take a recess.  We'll take one break

22   in the morning and then a lunch break and then we'll

23   continue probably until five o'clock is my expectation.  My

24   pattern has been that if a witness is almost done for the

25   day, we'll go late.  Okay, try -- so they don't have to come

1    back the next morning.  Okay?

2              MR. McCARRICK:  Thank you again, Your Honor.

3              THE COURT:  Go ahead and sit down again, Mr.

4    McCarrick.  Anybody have a question for Mr. McCarrick, if we

5    want him to come back.  All right.  I will see you all in

6    the morning, okay?

7              CLERK:  Judge, there's two parties on Zoom that

8    are -- have their hand up.

9              THE COURT:  Okay, I didn't see that.  Okay.

10             CLERK:  Yeah.

11             THE COURT:  Yes?

12             MR. KIRSANOV:  Good afternoon, Your Honor.

13   Dimitry Kirsanov, pro se creditor.  I was not listed on the

14   objections and I have concerns that involve best interest

15   and adverse amendments to the plan after the vote, ballot

16   valuation issues, and continued lack of clarity regarding

17   CEL valuation and custody in Hawaii.  I was wondering if I

18   could be heard today.

19             THE COURT:  Not in an opening statement.  I made

20   clear that the opening statements request had to be filed by

21   the deadlines that I gave.  I've heard everyone.  I

22   respected the time request that everyone had made.  I'm not

23   going to reopen -- this doesn't preclude you -- let me make

24   clear.  This does not preclude you from examining witnesses

25   on these issues.  The only thing that I did was fix a

1    specific date and time as a deadline for requests for

2    opening statements.

3            So it doesn't preclude you from raising this issue

4    during the trial, cross examining where appropriate, but no

5    more opening statements today.

6            MR. KIRSANOV:  Thank you, Your Honor.

7            THE COURT:  Okay.  Anybody else wish to be heard

8    on Zoom?

9            CLERK:  I don't see any additional hands, Judge.

10           THE COURT:  Okay.  Thank you very much.  I'll see

11   everybody in the morning.

12           (Whereupon these proceedings were concluded at

13   4:23 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 102

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7        *[signature: Sonya M. Ledanski Hyde]*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 3, 2023

**[& - 555]**                                                                                          Page 1

| & | | | |
|---|---|---|---|

**&**   3:10 6:1,16
16:9 34:16
37:3,22 38:16
67:21 88:23
93:25

| 0 |
|---|

**09002**   5:23

| 1 |
|---|

**1,000**   18:23
59:5
**1,700**   36:11,12
**1.2**   31:9 40:4
**10**   34:24 35:19
46:5,6
**100**   32:19
55:24 69:7
**10003**   5:16
**10004**   1:14 4:4
**10010**   6:5
**10022**   3:13
4:11
**10110**   6:12
**10167**   4:18
**10ks**   47:11
**10qs**   47:11
**11**   16:12 17:5
17:14 20:16
24:7 28:15
31:16 38:12,13
39:23 41:21
45:1,7 52:22
80:16 81:6
87:13 91:14
**1125**   61:3

**1129**   36:25
37:7 88:9
**1145**   45:20
**11501**   102:23
**11th**   86:6 87:9
**12**   86:6
**12151**   102:7
**12th**   39:16
**1301**   6:18
**13th**   39:23
**14**   34:25 38:10
63:10,18
**15**   27:5 38:10
**150**   33:21
**151**   5:15
**15th**   86:13
**17**   34:25
**18,000**   70:14
**1800**   5:3

| 2 |
|---|

**2**   1:16 31:25
34:24 41:12
**2.5**   67:2
**2.55**   35:25
**2.6**   32:17
**2.7**   53:10
**2.8**   48:22
**20**   35:16
**20004**   6:19
**2022**   17:2
39:16,23
**2023**   1:16
22:25 67:14
79:15 86:6
102:25
**21**   40:17

**1129**   36:25

**1129**

**22-10964**   1:3
**22nd**   6:4
**23,000**   70:11
70:12
**230,000**   18:4
**245**   4:17
**25**   51:14 54:3,5
**26**   18:5 34:17
**2700**   3:20
**27th**   40:5
**284**   5:10
**29**   37:13 63:14
**2:13**   1:17

| 3 |
|---|

**3**   35:24 80:5
86:5 102:25
**30,000**   36:12
**300**   3:5 102:22
**3020**   63:10
**31**   79:14,15
**330**   102:21
**34**   18:4 53:22
53:25 54:2,5
**341**   59:5,7
**3478**   86:5
**35**   35:20
**3529**   89:7
**3542**   80:22
**3560**   34:20
**3574**   34:21
**3581**   36:21
**3582**   37:5
**3586**   37:21
**3588**   37:25
**3591**   37:15
**3592**   37:11

**3630**   16:23
**3631**   63:24
**3635**   2:9 94:5
**3644**   2:8 94:1
**3653**   37:6
**380,000**   35:14
**3:50**   80:6

| 4 |
|---|

**4**   17:2 34:24
65:1 86:5
**40**   80:5
**400,000**   32:6
**4000**   5:3
**42nd**   5:15
**4430**   7:3
**450**   31:2 84:25
**47**   54:2,5
**48075**   5:4
**4:23**   101:13

| 5 |
|---|

**5**   34:24 35:18
35:24 96:1
97:10 98:9
**5,000**   81:19
**5,160**   81:23
**50**   26:5
**500**   6:11
**51**   6:4
**510**   53:16
78:22
**515**   36:9
**53**   94:13
**53092**   7:4
**55**   94:14
**555**   3:20

**[56 - actually]**                                              Page 2

**56**  94:16

**565**  31:5

**590**  4:10

**599**  61:7

**6**

**6**  35:18

**60**  46:5

**600**  30:20

**600,000**  40:8

**601**  3:12

**60654**  3:6

**62**  94:19

**65**  35:21 54:3

**67**  54:4,4

**6a**  34:24

**7**

**7**  30:25 32:18
  34:24 48:13,16
  52:4 72:12
  82:15 83:9,13
  85:7,7,11,13
  85:14 87:22,25
  88:9

**717**  61:7

**786**  97:15

**8**

**8**  34:25

**80**  23:11 83:6

**80,000**  35:15
  35:23 36:5

**85**  83:7

**87,000**  48:21

**88**  85:1

**8ks**  47:11

**9**

**9**  5:22 35:1

**90071**  3:21

**9019**  2:4

**94040**  5:11

**96**  28:18

**98**  28:18 77:5

**99**  58:6

**a**

**aaron**  3:23
  38:15

**ability**  41:15
  50:9 88:12
  90:16

**able**  18:18,18
  21:15,17,19
  24:3 26:23
  43:3 57:6
  71:21 83:16
  87:4 91:21

**abreu**  7:7

**absolute**  29:21
  29:22 30:5,14
  30:16 92:14

**absolutely**
  75:15 95:22

**abused**  81:14

**academically**
  23:5

**accept**  32:14
  34:25 48:22
  51:17,18 67:3
  81:20

**acceptable**
  69:12

**acceptance**
  65:24

**accepted**  16:13
  28:17 34:23
  51:18 58:6,13
  72:12

**access**  17:20
  40:11 45:10
  49:16 96:12
  97:13

**accomplished**
  65:23

**account**  4:9 5:2
  49:21 50:15
  52:21 64:12
  73:24

**accountable**
  46:25 47:10

**accountholder**
  41:10

**accountholders**
  16:13,17,20
  17:19 19:23
  21:1,12 22:7,8
  23:3,9,17,24
  24:6 25:7 26:3
  26:6 29:6
  31:18,20 32:8
  32:13 34:8,23
  39:19 40:10,23
  41:2 42:12
  44:3,25 48:22
  49:11,22 50:22
  50:23 52:22
  58:7,13,14
  64:16 71:18
  72:9,13,16

**acceptance** ... 73:5,13,16
  74:10 76:12
  78:5

**accounts**  22:7
  49:23 52:11,13
  52:19 53:6

**accurate**  54:21
  56:22 102:4

**achievable**
  67:11 69:23

**achieve**  28:20

**achieved**  66:4
  70:9

**acknowledge**
  31:16

**act**  47:23 81:2

**acted**  41:7
  43:19

**action**  20:14,18
  25:3 61:24
  66:17 73:1
  89:5

**actions**  56:1
  62:1,9,11 64:4
  91:2

**active**  22:8
  59:4 66:24
  67:8

**actively**  17:10
  59:9

**activity**  59:21

**actors**  41:8

**acts**  61:22

**actually**  22:3
  31:1,9 70:18
  74:3 87:22

ad   4:9,16 5:2
  16:16 23:1
  26:10,13,16
  28:21 61:19
  62:21 64:12,15
  65:10,13,15,21
  66:7,12,16
  67:19,21 71:14
  71:16,19 72:3
  72:13,18,21
  74:14 75:6,9
  75:18,22
add   72:24
  76:15
added   62:5
addition   36:8
  36:17 79:17
additional
  24:15,16,19
  26:9 28:19
  63:8 79:8
  101:9
additionally
  63:25
address   37:1
  89:25 94:11
  95:7,7
addressed   49:2
  69:24 70:7
adequately
  84:18
adjacently
  30:11
adjustment
  94:13
adjustments
  27:15 94:15,17

94:19
adler   4:20
  67:20,21 70:11
  71:6,7
administrative
  96:6
administrator
  20:14,25 32:22
  62:14,17 73:4
  73:18,21
admission   54:9
  55:17,18
admitted   55:7
  55:8 56:11
admittedly
  67:4
adr   74:14,15
  75:2,10 89:4
  89:12,16,17,23
  90:15 91:12,15
  91:18
advance   65:12
advanced
  23:21
advantage
  29:9 42:25
  44:22
adversary   19:9
adverse   100:15
advertised
  49:25 54:24
advertisers
  41:23
aegean   61:6
  62:4
afework   7:8

affect   56:1
affected   54:22
  56:2
affirmative
  86:2 87:18
affirmatively
  30:1 87:6
afternoon   16:3
  16:4 27:8
  34:15 38:15
  58:23 64:14
  67:20 71:15
  77:21 80:12
  88:20 100:12
agencies   17:10
  18:9 59:22,23
agenda   63:14
  67:17
agent   74:2
agents   32:5
  73:7
ago   27:10
agree   52:17
  61:9 76:2 85:3
  92:2 95:9
agreed   19:25
  20:5,13 26:4
  27:21 29:8
  60:9 72:24
  73:20 89:20
agreement
  19:3 26:12
  55:9 66:16
  78:7,20 93:20
  95:3
agreements
  18:12 26:16

32:1 62:3
ahead   30:8
  39:5,15 40:24
  88:21 93:21
  100:3
airline   49:14
aizpuru   7:9
akin   52:20
alex   11:24 13:8
aligned   44:4
alive   68:15
allege   62:20
alleged   17:11
allison   37:20
allocation   92:7
allocations
  92:8
allotted   39:1
allow   20:24
  46:13 74:5
allowed   21:19
  22:20 73:16,25
  78:4
allowing   72:9
alluded   73:12
alongside   26:6
  44:3
alternative
  22:9 23:21
alvarez   37:3,22
ambiguous
  71:24
amended   2:6
  34:20 78:24
  93:22 94:1
amendments
  26:12 100:15

amount  21:6
28:18,23,24
29:2 32:19
34:24 43:6
48:22 49:15
51:8,12,19
54:25 55:24
58:14 63:16
69:8 74:6
amulic  7:10
amy  8:19
analogy  76:25
analysis  30:22
54:2 83:1,13
87:21
andrea  7:10
andrew  7:24
12:24 14:8
angeles  3:21
annemarie
12:18
announce  20:9
announced
26:8
answer  21:12
47:3 64:8
78:19 87:15
anticipate
99:14
anticipated
45:19
anybody  17:14
87:10 92:10
96:11,19 99:5
100:4 101:7
anymore  71:21

anyone's  48:23
apap  5:6 10:23
71:15 75:15
apparently
70:20
appeals  72:2
appear  98:5,6
appeared
17:17 73:3
appearing  96:9
96:25 97:7,8
98:16
applicability
23:2
applicable  2:4
44:11
applied  54:18
63:19 88:4
apply  33:2,3
89:5 91:12
applying  55:22
appoint  17:17
appointed
17:24 40:5
48:17 66:13
78:2
appointment
18:1,2 63:23
appreciate
59:2 66:21
71:10,13 74:10
82:9 86:16
88:25 91:23
92:8,23
appreciated
74:7 92:9
97:14

appreciates
72:13,18
appreciation
65:7 73:17
appreciative
60:13
approach
44:10,18 45:5
74:11
appropriate
85:10,12 88:3
101:4
appropriately
62:9
approval  26:13
46:16 47:2
75:10 89:4
90:19
approvals
45:22,23 46:9
46:10
approve  46:3
75:4 90:13,15
90:16
approved  30:4
30:6 46:5 57:7
79:5 91:14,18
approving
78:3,19
approximately
35:14,15,19,24
70:15,16
aptly  82:17
archer  14:17
arduous  64:17
area  98:4

areas  25:15
argue  30:22
31:1 77:17
81:1,17,22
91:23
argued  30:7
50:14
arguing  22:8
28:3
argument
30:25 38:5
83:11 92:20
arguments
91:16
arising  50:15
53:1
armand  7:11
arrived  83:18
84:15
artificially
55:14
artur  7:7
ascertain
87:11
aside  20:24
asked  19:19
56:24 57:5,14
70:25 78:18
88:23 98:19
assertions
88:11
assessed  93:7
assessments
94:23
asset  56:16
94:23

**assets** 24:25
25:2,8 28:7,8
30:20 31:5,9
38:3 41:3,5,10
41:15,16 42:10
45:14,18 46:14
48:5,18 50:18
51:11 52:21
59:13,15 71:25
72:6,9 83:17
84:25 88:4
**assist** 25:22
**assistance**
69:22
**associated** 64:4
**assuming** 91:6
**assumption**
55:22
**assured** 39:19
**astounding**
67:2
**attempted**
51:13 81:21
**attendance**
59:6
**attorneys** 3:4
3:11,18 4:2,9
4:16 5:2,14 6:2
6:10,17
**attributable**
55:11
**auction** 20:10
24:17,17,21
42:25 43:3,10
43:18 48:3
68:16

**audio** 77:10,10
77:11 81:17
89:22,24 90:12
90:15,17
**audit** 46:3
**austin** 12:20
**australia** 70:17
70:21
**authorizing**
2:7
**available** 64:8
**avenue** 3:12
4:10,17 6:4,11
6:18
**avery** 9:4
**avoid** 62:12
**avoidance** 73:1
89:5 91:2
**avoiding** 72:16
**awaited** 67:13
**aware** 73:11

**b**

**b** 1:21 23:13,16
24:2,7 29:22
29:25 30:7,19
35:11 46:12,12
53:16 78:22
**b.r.** 61:7
**b101** 94:15,17
**b103** 94:15,18
**b14** 94:15,17
**b15** 94:14
**b16** 94:15,17
**b17** 94:14
**back** 21:21
28:23 29:2
60:13 67:23

68:14,24 69:7
73:13 77:23
80:10 87:17
99:1 100:1,5
**backup** 26:20
26:25 88:12
**bad** 41:8 68:12
68:18 76:18
**baked** 75:11
**balance** 28:22
28:24 40:17
51:14
**ballot** 36:3
70:2,3 100:15
**ballots** 35:15
35:20,21,23
**bank** 39:17
**bankruptcy**
1:1,12,23 2:4
16:19 19:15
21:4,24 22:4
22:23 26:23
31:19 33:1
34:7 41:19
44:18,20 45:21
50:11,19 52:24
53:9,9 58:16
61:25 62:1
64:22 65:24
80:16,22 82:4
83:15 92:22,23
97:17
**bar** 66:25 81:3
**bare** 88:11
**barry** 6:14
10:21 88:22

**barse** 7:12
**based** 50:8
56:18 58:8
84:8,19,20
**basis** 28:2 29:1
38:7 62:15,16
63:11 68:11
75:7 95:10
**batshon** 14:18
**batting** 38:21
**bear** 86:3
**becin** 7:13
**becoming**
73:15
**began** 40:17
59:4
**beginning** 19:9
39:14 42:1
80:17
**behalf** 20:15
23:24 34:16
35:9,10 36:19
38:16 52:25
53:5 65:13
67:21 71:16
77:25 82:12
93:25
**behest** 85:14
**belabor** 34:3
**believe** 26:2,21
28:2 33:15
46:12 47:18
48:9 62:4
63:14 75:20
76:3,6 78:24
80:18 81:15
84:12,14,17

[believe - calculation]                                              Page 6

85:24
**believed** 57:21
**believes** 26:4
  48:9 57:16
  61:2 75:19
**belonged** 22:9
**ben** 8:24 14:21
**benefit** 21:1
  26:3 44:5 48:1
  59:11 73:17
**benefiting** 65:7
**benefits** 78:9
**bernstein** 7:14
**best** 21:7,8
  29:17,21 30:21
  32:15 37:8
  43:4,12,12
  47:18 48:4,9
  51:25 53:14,23
  67:10 75:20
  76:4,7 81:2
  82:13,23 85:5
  85:6 88:7
  100:14
**better** 29:3
  77:4,14 78:7
  92:18 93:17
**bid** 43:7,12
**bidder** 24:12
  43:16,20
**bidders** 24:14
  24:16 43:4
**bidding** 20:6
**bids** 24:15
**big** 70:1
**biggest** 69:13
  70:17

**billion** 31:9,25
  35:24,25,25
  40:4 41:12
  48:23 53:10
  56:12 67:2
**binding** 32:14
  72:25 74:21
**biswas** 14:19
**bit** 35:16 36:10
  39:7 41:25
  68:1 75:3
  76:15 77:3
  89:21
**bitcoin** 25:15
  25:17,18 41:12
  44:8 51:4,5
  65:5 69:8
  70:12
**blockfi** 35:19
**board** 17:7,24
  46:25 47:10,13
  47:17,21,23,25
  66:11
**body** 59:4
**bonus** 81:4
**bonuses** 33:2
  76:14 77:8
**borrow** 26:10
  26:14,17 28:5
**borrower**
  28:21 29:16
  66:2,3 70:2,19
  70:22 78:23
  79:6
**borrower's**
  29:15

**borrowers**
  4:16 27:25
  28:1,9,10,15
  28:18 29:9,19
  67:19,22 68:2
  68:10,13,19,22
  68:24 69:4,7,9
  69:11,12,15
  70:5,10,12,25
**bound** 63:4
**bowling** 1:13
  4:3
**box** 36:4
**bradley** 9:7,14
**bread** 77:3,4,5
  77:6,14
**break** 99:21,22
**brendan** 6:10
**brett** 65:14
**breuder** 7:15
**brian** 10:14
  11:7,18 34:19
**bric** 61:20
**brief** 27:13
  33:19,19,21
  34:2 37:1 38:5
  45:21 77:20
**briefly** 26:18
  27:23
**brier** 7:16
**brifkani** 7:17
**bring** 20:18,21
  43:4
**brings** 27:3
**broad** 20:11
  61:22 62:13
  76:20 81:16

**broader** 61:11
**bronge** 7:18
**brought** 91:3
**brown** 7:19,20
**bruh** 7:21
**bryan** 14:9
**bucket** 72:9
**build** 26:9
**building** 19:15
  19:22 22:24
  38:10 42:12
  43:23 65:18
  67:1
**burden** 82:18
  82:21
**burgos** 5:23
**burks** 13:16
**business** 17:11
  17:19 18:9
  21:23 22:22
  24:24,25 25:1
  25:8,22 26:4,5
  31:3 37:19
  40:18 42:18,19
  43:10 44:6
  50:4 55:1
**businesses**
  25:4
**button** 31:17

**c**

**c** 3:1 7:16 15:5
  16:1 102:1,1
**ca** 3:21 5:11
**caceres** 7:23
**calculation**
  72:22

[calculations - chapter]                                                                Page 7

calculations
   72:25
calendar   22:14
call   85:15
calle   5:22
called   87:23
calling   98:11
   98:22 99:14
cameron   8:10
   9:22
candid   47:3
candidly   94:7
cappella   39:12
carl   8:9
caroline   14:3
   15:13
carolyn   9:21
carry   82:21
carter   67:21
carty   7:24
carveouts
   41:20
carver   7:25
case   1:3 3:17
   17:5,14 18:14
   18:20 19:14
   20:9 21:7
   23:15 30:12,12
   34:6 38:11,16
   41:19 43:19
   45:7 52:22
   53:24 56:6
   59:8,8,9,20
   60:5 62:1,17
   63:11 66:19,25
   67:3,7 68:12
   70:19 71:23

73:12 76:9,11
   79:9,10 86:4
   86:11 91:18
   97:15 98:3,20
   98:23
cases   17:2,15
   18:14,23 19:4
   19:8,9,17 20:3
   20:16,19,21
   21:20,22 22:15
   22:19,20 23:25
   25:12 26:19
   35:17 38:13
   39:23,24 42:2
   45:1,6 48:4,11
   48:24 53:9,10
   53:16 58:12
   59:2 61:23
   63:20 71:17
   84:9 91:13,14
   93:10
cash   20:6
   49:21 54:16
   59:13
casillas   5:22
catherine
   12:15
cause   50:4
causes   20:14
   20:18 25:3
cbp   94:20
ceases   58:3
cede   34:8
cel   2:3 33:15
   33:17 40:21
   49:4,5,6,9,14
   49:16,20,21,22

50:1,3,5,7,10
   50:11,13,15,20
   50:24 51:6,15
   51:22 52:2,6
   52:14 53:3,18
   53:22 54:7,11
   54:11,14,19,25
   55:2,10,13,14
   55:23,23,24
   56:21,25 57:14
   57:16,21 58:2
   82:17 100:17
cells   94:7,13,15
   94:17,20 95:5
celsius   1:7 16:9
   17:10,21,21
   18:21 22:22
   24:23 25:1
   28:6,8,12,13
   32:4,5 39:17
   39:19,22 41:3
   41:23 43:13
   45:11 49:20,24
   50:2,4,9,9,25
   51:2,5,10
   52:10,20 54:8
   54:8,10,22,24
   55:3,7,8,12,22
   55:25 56:2,3,9
   56:18 58:1,3
   68:4,10 71:20
cent   51:14 54:3
   54:5
center   5:3
centerview
   37:10 42:23

centralized
   64:21
cents   53:22,25
   54:1,2
ceo   22:1 43:25
   57:20 81:6
certain   2:8
   36:25 37:7
   38:2 49:15
   59:22 61:4
   62:21 64:2
   65:25 66:17
   92:24 94:7
   95:5
certainly   19:10
   19:18 20:3
   31:12 69:11
   75:12 86:17,24
   87:1 91:24
   92:11 93:4
   97:24
certified   102:3
chair   8:1 65:16
challenges
   17:22
challenging
   17:4 23:14
chance   57:10
   81:16 92:15
chang   8:2
change   32:23
   82:1,5
changes   74:9
   74:24
chapter   16:12
   17:5,14 20:16
   28:15 30:25

31:16 32:18
38:12,13 39:23
41:21 45:1,7
48:13,16 52:4
52:22 80:16,24
81:6 82:15
83:9,13 85:7,7
85:11,13,14
87:22,25 91:14
chase  11:17
check  19:7
36:4 65:23
chen  14:12,20
chicago  3:6
chief  36:22,22
36:23 37:16
38:11
choice  43:16
68:7
choosing  84:21
chose  77:6
chris  3:8 7:13
16:9
christopher
8:5 11:1 12:7
13:12 14:25
36:20
chubak  8:3
circular  50:5
circumstances
20:3 75:21
cirkel  8:4
claim  23:23
28:13 36:11,12
61:20 69:5,6
73:15,16 74:21
78:4 82:4

88:10
claimants  63:4
65:11 66:17
claims  20:14
20:18,24 21:1
23:20,23 28:11
29:4 30:23
35:24,25 40:9
41:17 44:16
50:13,14,17
51:11 53:1
65:4,25 66:2
67:3 72:15
73:25 78:5,22
91:1 93:3,7
claire  4:6
clarification
98:19
clarifications
27:15 60:23
clarified  74:20
clarify  82:3
clarifying
72:24
clarity  76:15
100:16
clarke  14:21
class  23:23
32:15 36:1,11
52:15 61:20
66:17 72:12
78:2,4,20
classes  32:13
34:24,25,25
35:7 81:20
claw  60:13

clear  28:5
29:25 40:12
48:11 49:19
51:17 89:2
94:8 100:20,24
cleared  24:8
clearly  53:24
clerk  16:7
38:19 39:6
100:7,10 101:9
clerks  92:25
click  39:14
client  82:20
85:25 86:25
87:5
client's  87:2
clients  21:15
43:11,14,15
44:19 47:18
clips  56:8
clock  31:24
close  48:19
54:12 74:4
closely  74:6
closing  58:12
80:24
cloud  41:1
cnl  23:18 24:4
coco  8:5
code  33:2
45:21 50:11,19
52:24 58:16
61:3 65:24
83:15 92:22
cofsky  8:6
cohen  6:9
37:24 88:23

99:15
cohesiveness
65:21
cohost  16:5,7
38:18 39:6,6
coin  94:13,14
94:16,19
coinbase  32:1
61:21
collaboratively
16:15
collateral  28:9
71:1
colleague  16:5
34:9 35:2 38:4
38:17 71:10
colodny  3:23
21:14 33:15,20
38:14,15,16,20
39:3,8,12,16
46:2,17,19,23
47:7 52:12,17
52:19 54:1
55:20 57:8
58:18,19 69:21
69:25 73:12
78:18 79:17
color  44:13
column  94:20
come  29:11
38:22 50:12
57:12,25 65:11
78:13 84:15
87:16 99:1,25
100:5
comes  86:10

comfortable
44:25
commencem...
16:10
commented
91:5
comments
27:17 72:19
91:5 94:20
commercially
73:21
commitment
67:10
committee
3:18 16:16
17:24 18:6,25
19:5,8,10,12
19:23,25 20:2
20:6,8,17,21
20:23 21:4,5
21:10 23:21
38:17 40:5,15
42:2,16,24
43:18 47:15,16
48:9 51:13
59:19,24 63:22
64:1 65:16
66:13,16 67:6
69:20 72:4,19
72:24 73:20
74:20 75:22
79:21 89:8,11
89:16,19 95:1
95:8 97:4
committee's
20:25 33:16,19
44:10 50:20

72:14 74:17
86:23
committees
61:20 62:22
common  65:12
communicate
90:10
communicati...
90:9
community
65:2,19
compagna  37:3
53:20
companies
43:23
company  25:10
40:2,4,16
41:13 42:6
43:13 44:2,5,8
44:11,22 45:7
47:8,19 48:5
49:9,17 57:20
58:8,10 81:3
81:11
company's
32:10 40:7,18
40:20 44:9
comparator
85:4,5
compare  85:6
compared  83:7
84:25
comparison
35:17 85:9
compensation
31:17

competent
46:24 47:9
competitive
24:14,20 42:24
43:3 44:21
complained
29:22
complaining
80:18
complaint  52:9
52:10
complete  90:1
completed
26:15
completely
31:1 61:10
complex  23:14
56:14 67:7
72:5 76:11
complexity
72:17
compliance
44:11
compliant
44:14
complicated
36:4
component
79:7
compromise
44:23 72:7,15
concept  65:3
concern  50:10
83:8
concerned
72:21 73:16

concerning
44:7 45:7 65:3
concerns  17:18
18:9 60:17
63:22 65:9
68:2 100:14
concessions
19:3,25
conclude  34:5
36:15 38:12
55:25 71:8
concluded
41:19 101:12
concludes  64:7
conclusion
57:25 75:18
83:18
conclusionary
88:11
condition  46:8
conditions
79:18,24
conduct  92:13
conducted
18:4 40:15
confer  95:1
confidence
78:25
confident
46:19 79:19
confidential
2:8
confidentiality
93:20
confirm  16:18
34:6 38:12

confirmable
78:25
confirmation
2:1 16:11,11
17:3 27:21
45:24 46:8
58:16 59:6
60:9,11,19
63:9,15 66:4
67:13 75:7
78:11 79:3,15
80:21 86:4,9
87:10 90:5,24
confirmed 35:3
38:8 41:11
53:17 58:17
77:11 81:7
91:6,10
confirming
42:5 76:4
confirms 81:5
confusing 62:6
confusion
62:12
congress 63:10
connection
61:4,23 74:16
79:4
conscious 21:3
consensual
18:10 81:18,23
91:25
consensually
22:11 69:19
consensus 19:1
19:16,22 22:24
26:9 27:12

38:10 42:13
65:18 67:1
consent 19:11
20:5,8,11
consented 18:2
conservative
44:17
consider 54:7,8
70:7 86:18
consideration
62:16,18,23
consistent
29:15
consolidation
23:23 79:9
constantine
9:1
constituency
40:7 47:20
66:7
constituents
67:8
constraints
65:25
constructing
44:10
constructive
23:22 45:2
74:10
constructively
21:15,17 29:8
consult 44:13
consummated
41:11
contact 64:1
contacted
59:20

contemplates
45:17
contestant
78:15
context 16:22
61:16
continue 33:6
36:13 50:9
75:12 79:20
90:10 91:24
99:23
continued
17:15 32:9
49:19 59:5
100:16
continuing
75:16
contract 41:22
contracts 73:8
contractual
23:20 81:11
contribute
25:21
contributions
24:22 33:8
control 41:10
converted 74:4
cook 8:7
cookbook 48:6
cooperate
29:12 69:1
cooperated
18:3
cooperating
21:24 90:3
cooperatively
42:17 43:11

coordinating
32:2
copies 86:8
copy 16:24
97:2
cordry 8:8
cornell 4:6
58:22,24,25,25
60:3 61:14
64:11
corporate
40:19
correct 52:12
57:8 83:4,25
corroborate
55:16
cost 59:11
72:16
costly 19:20
cote 8:9
counsel 67:7
67:19 78:14,14
82:9
counter 41:23
89:20
counterparts
42:22
counting 18:24
country 25:2
25:18 102:21
couple 27:10
27:23 69:23
70:23 74:13
91:4
course 60:3
73:11 79:22

court 1:1,12
16:2,25 23:11
23:19 30:6
31:13 33:23,25
34:12,14 35:6
38:14 39:1,5
39:11,13,24
42:11 45:25
46:15,18,22
47:6 49:5 52:5
52:8,13,18
53:17,25 55:18
57:2 58:18,20
58:23 60:2,2
61:9,10,13,25
64:6,8,10,12
67:18 70:10
71:6,9 75:4,12
75:13,24 77:16
78:3 80:4,9,10
81:5 82:7 83:3
83:20,23 84:1
84:4,11 85:3
85:15,18,21
86:3,12,19,21
87:2,8,16
88:15,17,21,24
89:13 91:4
92:4 93:23
94:3,25 95:6
95:10,15,19,21
96:2,3,19 97:6
98:15,18 99:5
99:13,17,20
100:3,9,11,19
101:7,10

court's 22:16
97:1
courthouse
57:5
courtney 13:16
courtroom
58:24 66:21,22
67:23 94:11
96:8
courts 61:5
87:23 96:6
cover 40:19
78:11 92:15
covered 33:18
56:4 78:12
82:4
covering 33:16
covert 54:22
covid 67:24
craig 15:11
create 44:14
55:5
creates 92:22
creating 42:13
creditor 59:4
66:14,25 78:1
80:13 100:13
creditors 3:19
16:20 18:21,23
19:1,1,7 20:16
21:8 24:6
25:24 28:10
29:24 30:8
33:13 38:17
40:7 41:13,15
42:3 43:5,9
45:8,9,10

46:14 47:21,23
47:24 48:2,12
48:15 51:12,13
51:23,25 59:5
59:16,20 60:3
65:18 66:25
67:11,15 75:8
76:4,17 77:6
81:12,16,23
82:13,24 83:15
84:20 88:7
98:4
crews 8:10
crippled 40:2
critical 55:1
66:3
critically 23:13
cross 31:12
86:22,24 87:8
88:13 93:14
96:25 97:8,19
97:21,25 98:5
98:6,8,21
101:4
crusell 8:11
crypto 17:6
22:9 23:11
25:13 35:17
40:2 43:1 65:4
65:7,25 67:3
68:4,8 69:8,14
69:16,17,18
73:10,14,18
74:3,4,7
cryptocurren...
44:8

cryptocurrency
17:20 22:6
23:8 24:24
25:4,6,15 28:4
28:7,12,23
29:2 31:25
32:6 33:12
42:6 43:6,22
45:7 48:5,17
49:13 51:1
59:13 64:21,25
73:5,8,23 74:1
cull 70:14
culminating
67:2
culmination
16:14 48:20
cunha 7:22
currencies
69:9
currency 31:3
48:13 73:5,14
73:19
current 18:5
61:8
currently
45:17 64:5
76:7
curt 8:14
curtain 56:11
custody 22:11
22:15 23:1,4
26:17 32:4
71:21,23
100:17
customary
46:7

**customer** 54:25 55:24 64:25 78:1

**customers** 23:19 64:17 76:19 78:22,23 79:12

**cut** 63:16 77:7

**d**

**d** 12:1 13:6 16:1

**d'amico** 13:25

**dalhart** 8:12

**damage** 53:1

**damn** 40:23

**dan** 10:13 11:3 13:17

**daniel** 5:8 9:8

**danielle** 14:2

**darius** 9:13

**darschewski** 8:13

**data** 56:19

**date** 32:7,21 39:21 53:22 54:9,23 56:18 57:1,15,18,22 57:24 65:4 66:1 74:5 79:16,19 87:4 90:23 101:1 102:25

**dave** 11:15

**david** 4:20 7:12 8:12 9:4 13:3,7,21 15:2 15:14 67:20

**day** 40:1,13 46:5 71:11 96:1,17 97:11 98:9,11,12 99:25

**days** 17:15 19:14 26:11 36:17 38:6 43:15 59:4 60:24 63:10,18 68:21 78:8

**dc** 6:19,19

**de** 5:20 80:12

**deadline** 85:22 85:24 87:10,16 101:1

**deadlines** 85:19,21,22 100:21

**deal** 23:13 43:5 72:4 93:9

**dealing** 94:22

**deals** 91:1

**dealt** 30:10 53:9 93:16

**deanna** 16:4

**death** 77:4

**deb** 71:15

**debates** 48:3

**deborah** 5:6 10:23 14:13

**debt** 52:20

**debtor** 1:9 19:7 20:16 64:6 68:17 86:22 89:7 93:2,4,19

**debtor's** 2:6 19:8

**debtors** 2:7 3:4 3:11 6:17 19:6 19:22 20:20 22:7 23:20 26:16 31:4 32:20,21 33:19 34:16 35:14 36:22,22,23 37:23 38:2 40:6,9,14 41:13,15 42:10 42:17,24 43:2 43:8 44:16,20 45:3 46:13 48:4,9,14,17 49:8 51:24 52:1 53:5 59:13,18,19,24 60:16,24 61:7 62:5,15,20 63:3,8 66:16 67:6 69:1,20 71:21 72:3,14 72:18,22,24 73:20 75:22 76:8,11 78:14 79:10,20 82:1 82:14,16,18 83:1,18,25 84:6,9,24 85:13 86:22,25 87:20 88:9,13 93:25,25 95:9 95:24 97:4 98:19

**deceived** 41:2

**december** 22:5 22:14 79:15

**decentralized** 64:20

**decided** 17:25 18:25

**decision** 20:9 21:3 61:12 65:1

**decisions** 20:9

**declaration** 34:20 36:21 37:4,5,10,15 37:21,25 40:1 40:13 57:3,7,9 83:12 88:12

**declarations** 36:18

**decreases** 51:12

**dedicated** 21:6 65:17

**dedication** 21:10 67:5

**deemed** 35:2

**defendant** 72:25

**defendants** 89:5

**defending** 92:21

**defenses** 23:3

**defer** 33:20 75:10

**deficit** 40:4

definition
  52:24
defrauded
  31:18,20
delay  19:21
  73:15 90:19
delayed  23:6
delays  96:10
deleted  56:8
delicate  51:14
deliver  67:10
dell  8:14
demonstrate
  30:23 33:4
  34:18 35:13
  36:6 50:6
  51:24 55:21
demonstrated
  25:14 34:22
  48:14 58:15
  97:16
demonstrates
  36:2
demonstratives
  95:25 96:11,13
  96:16
deny  75:7
denying  50:20
department
  4:1
departments
  59:23
dependent
  47:4
deposited
  17:20 28:4,13
  29:2 49:14

51:5 64:25
deposits  49:12
depress  87:22
depressed  17:6
  83:2,6,10
derivatives
  56:14
describe  95:11
deserted  77:2
designated
  66:12
designee  20:25
  66:12
desire  21:12
destructive
  25:10
detail  34:3
detailed  48:7,8
determine
  53:23
determined
  42:16 50:13
determines
  50:10
determining
  54:13 65:1
detriment  41:5
devaluation
  83:12
devalue  85:12
develop  24:9
developing
  19:21 22:3,21
  25:22
development
  23:7 51:16

developments
  22:13
develops  95:6
dewey  30:11
dialogue  45:2
dias  8:16
diaz  8:17
dietrich  15:4
differ  90:5
difference
  32:18
different  21:25
  38:22 79:12
  80:2 91:8,16
  91:22
differentiates
  45:6
differently
  53:6
difficult  17:16
  58:12 80:23,24
  85:9
difiore  8:15
digital  49:7
  50:18
diligently
  60:17
dimitry  7:1
  10:19 100:13
direct  56:25
  76:2 85:22
  86:7 97:22
  98:22
directed  93:13
directing  98:6
direction  17:23
  81:19

directly  49:25
director  37:3
  37:22 38:1
directors  17:24
  46:25 47:10,14
  47:19
disagree  84:6
disagreed
  21:18
disagreement
  60:15
disarray  42:20
disclose  98:11
disclosed  58:1
  97:3
disclosure
  60:10 74:16
  84:10,17 90:1
  90:6 95:17
disclosures
  58:5 59:14
  87:19
disconnected
  64:20
discount  45:13
  84:19 88:2
discounted
  49:10 84:7,8
  84:12
discounts  88:3
discrete  29:20
discretion  73:4
discussed  52:5
  59:12 75:4
discussion
  89:19 95:13

**discussions**
60:12 72:6
74:17
**dislocated**
56:15,20,21
**dispersed**
40:10
**dispose** 28:8
**disposition**
68:9,11,19
**dispute** 22:6,17
23:14 30:18
**disputes** 26:14
**disputing**
84:11
**dissenting**
51:22,23
**dissipate** 41:5
**distinction**
53:7
**distribute** 24:5
41:12 42:10
73:4,19 74:3
**distributed**
23:11 35:14
59:16 74:8
**distributing**
25:5 46:14
73:7
**distribution**
29:23 32:5
43:5 52:16
69:14 73:7,10
74:1,2,4
**distributions**
16:19 31:25
32:3,4,6 34:8

67:14 73:22
**district** 1:2
61:5
**diverged** 30:16
**dixon** 8:18
66:18
**doc** 2:8
**docket** 16:23
34:20,21 36:21
37:5,6,11,15
37:21,25 63:22
63:23 80:22
86:7,12 89:7
93:6,19 94:1,4
96:1 97:10
98:14
**documents**
18:4 20:11
80:20 93:12
**doing** 38:20
81:9 95:12
97:13
**doj** 55:10
**dollar** 28:18
45:16
**dollarization**
65:3,4,25
**dollars** 24:19
30:3 31:7
40:25 56:12
**dominate**
70:22
**don** 13:11
**donahue** 8:19
**door** 18:15
**dow** 8:20

**dowdy** 38:18
**draws** 17:14
**drew** 14:22
**drive** 3:5 5:10
19:3 43:4
**driven** 27:12
**due** 42:21
**duffy** 8:21
14:22
**duties** 33:9
**duty** 81:2
83:14
**dzaran** 8:22

**e**

**e** 1:21,21 3:1,1
11:1 12:25
16:1,1 61:3
102:1
**e101** 94:16,18
**e103** 94:16,18
**e14** 94:15,18
**e15** 94:14
**e16** 94:16,18
**e17** 94:14
**eades** 8:24
**earlier** 20:22
30:2 57:2 69:1
91:5
**early** 17:4,15
18:14,20 19:14
22:25 97:14
**earn** 4:9 22:5,7
22:15,16 26:10
26:14,17 28:6
36:1 47:22
49:11,23 50:24
51:1 52:10,13

52:19,21 53:6
64:12,15,17
65:2,6,10,10
65:19 66:2,12
66:12,16,17
67:3 69:6
71:20 78:1,22
**earned** 41:3
**easier** 74:23
**easily** 18:22
33:4 81:13
**easy** 17:4 21:9
36:4 42:8,19
54:14
**eat** 77:3,5,6
**ecf** 86:5
**eck** 13:24
**eckhardt** 8:25
**economically**
29:5 57:23
**economics**
57:17
**economides**
9:1
**ecro** 1:25
**educed** 79:2
**effect** 72:22
**effective** 32:7
32:21 79:16,18
90:22 91:1
**efficient** 72:4
**effort** 21:7
38:24
**efforts** 21:7
25:20 32:10
33:10 50:4,8
60:13 61:5

67:5 73:22
78:13 79:20
ehrler  9:2
eip  33:4,7
76:13 77:8
either  18:7
32:20 53:17
75:11 96:20
97:24
elect  36:13
49:11
elected  49:13
50:24 51:1,3,4
51:6,6
election  70:2,5
elements  55:1
elementus
56:13
eligible  50:23
elimelech  8:23
elizabeth  3:15
34:9,15
ellis  3:3,10
6:16 16:9
34:16 93:25
elvin  13:22
email  18:21
emails  18:23
66:23 75:17
emanuel  6:1
82:12
embedded
31:15 79:6
embodied
72:11
embrace  19:23

emerge  37:23
44:23 47:2
emergence
20:15 31:15
32:24 44:21
80:25
employees  18:5
41:22 55:4
76:21,23 81:1
81:9
empowered
83:15
enabling  67:1
enclosed  58:5
encouraged
73:10
endeavor
54:15
engage  18:25
engaged  18:8
60:11 61:24
engagement
17:25 18:17
59:3 67:1
engel  9:3
english  4:15
67:21 80:14,16
enhance  66:14
enhanced  72:8
ensure  39:3
41:8 44:18,24
46:23 47:8,21
47:25 59:17
ensuring  25:6
enter  66:15
entered  20:23
30:8,12 46:8

55:9 57:4
86:13 92:6
enterprise  55:6
entire  40:13
48:20
entities  24:5
62:7,10
entitle  61:25
entitled  30:19
55:18
entity  23:20
44:14 47:11
entrusting
41:2
entry  2:7 79:15
equal  20:8
equation  70:22
88:3
equity  25:23
29:23 41:14,22
44:4 45:10,18
45:23 50:7,7
50:12,12 52:6
52:7 53:4
equivalent
52:6
erik  11:23
especially
68:12
essentially
52:15 69:5
71:12
establish  79:1
established
18:21
establishing
86:4

estate  20:18
59:18 60:25
63:14 65:2
71:3 72:5,10
83:14
estate's  74:11
estates  41:1
estelle  8:11
esther  11:10
estimate  45:25
46:15,21
eth  69:8 70:13
ethereum
41:12 44:9
europe  70:21
eve  17:3
event  58:3 68:9
68:11
events  47:12
62:2
everybody
57:10 77:18
80:9 86:14
92:8 101:11
evidence  31:9
33:3,5 36:24
37:7,11,18,23
38:2 49:6 52:2
53:21 54:20
55:2,22 62:18
81:18 82:23
83:5 84:16
86:2,15,21
87:6,11,13,13
87:18 94:9
95:6 96:4,14

exactly 20:17 26:22 28:14 84:16
examination 31:12 88:13 93:15 97:21,22 97:24 98:1,8 98:21
examine 86:22 86:24 87:8 96:25 97:8,19 98:5,7
examiner 17:17 18:2 40:16 59:10,12
examiner's 22:17
examining 100:24 101:4
example 51:3 62:2,14,21 65:5 81:4 89:19 93:2,7
exceed 48:15
exceeded 55:23
excellent 25:12
excels 94:12
exception 63:19 97:12
excess 33:9 69:5
exchange 68:5 69:5
exchanged 75:17
excited 26:1 34:6

excluded 41:21
exclusivity 19:13 20:1
exculpated 61:1,17 62:9 62:11
exculpation 27:16 60:14,21 60:21,25 61:2 61:8,11 62:2 64:3 82:2
excused 92:11
executable 26:21
executive 31:17 33:2 36:22 37:16
executives 33:10 39:19 55:12 56:10
exemption 45:20
exercise 68:17 99:5
exhibit 94:6,13 94:14,16,19 97:3
exhibits 86:8 92:12 93:5,6 94:7 95:25 96:20,25 97:9 97:12 98:7,9
exist 49:19
existence 62:8 62:10
existing 81:11

exit 44:18 67:11
expect 60:24 86:8 90:9 94:9 99:16
expectation 87:12 99:20,23
expectations 48:23
expedited 63:12
expeditiously 75:18
expense 65:20 72:2
expensive 19:18 23:6
experience 25:15 26:19 43:22,23 56:19
experienced 47:19
expert 31:11 33:16 54:13 55:16
experts 85:25 87:9
explain 49:8 63:3 87:1
explained 42:7
explicit 41:20
exposure 72:23
expressed 83:13
extended 72:17 74:17

extension 20:1
extensively 59:12
extent 29:10,13 73:23 85:18 86:1 95:24 98:24
extra 24:21
extremely 56:21 68:11
ezra 13:25

f

f 1:21 12:11 102:1
fabsik 14:23
fact 33:6 55:12 55:25 58:1 61:24 79:3 89:16 90:2
factors 36:25 37:8 84:8,19
facts 20:2 55:8
factual 38:7 62:15
fahey 9:4
fahrenheit 24:22 25:14,23 26:1,4,8 37:17 37:19 43:20,21 44:1,3 61:20
fail 63:7
failed 51:10 58:11
failure 82:3
fairly 42:10
faith 61:4 75:17 90:3

**far** 33:8 48:15
    48:23 55:4
    76:10,16 97:2
**farr** 65:14
**favor** 48:21
    55:22
**federal** 17:9
**feel** 73:13
**fees** 24:21
**fell** 50:8
**ferraro** 22:1
    23:10 36:20
    49:8,18,24
    57:20 81:4
    99:15
**fervent** 21:11
**fiat** 48:12 73:4
    73:10,14,19,23
    74:4,6
**fiduciaries**
    61:1
**fiduciary** 19:6
    81:2 83:14
**fifth** 6:11
**fight** 20:17
**fighting** 19:16
    24:2
**file** 2:7 47:11
    57:6,9 72:20
    74:21 80:19
    82:3 86:7 93:5
    98:14
**filed** 16:23
    17:2,5,16,19
    27:6,15,20,25
    33:21 34:19
    35:17 36:12,18

36:21 37:4,4,5
37:11,15,21,25
38:5 39:23
63:23 74:14,22
80:17,21 89:3
89:7 90:4,5,8
94:1 96:1,3,16
100:20
**filing** 17:8
    42:20,20
**final** 22:17
    67:12 78:3,20
    90:12
**finalize** 75:13
**finalized** 64:5
    75:2
**finally** 37:24
    74:13 79:11
    94:18
**finance** 25:13
**financial** 36:23
    42:21 43:24
    44:1 54:17
    56:4
**financing**
    29:10,11
**find** 19:1 25:12
    52:6 53:21
    72:15 77:2
**finding** 53:17
    69:2
**findings** 79:2
**fine** 39:5,20
    53:7 56:10
    87:8 95:12
**finish** 60:7
    90:20

**fired** 18:7
**firmly** 41:8
**first** 19:12 20:1
    21:23 27:25
    36:20 40:1,13
    42:5,12 44:6
    44:11 52:5,23
    53:15 54:16
    56:9 59:4
    60:25 65:21
    67:22,24 78:17
    80:14,25 89:11
**fish** 71:24
**fit** 28:8
**five** 47:23
    88:24 96:16
    99:23
**fix** 100:25
**fixed** 18:17
**flag** 46:7
**flagged** 45:21
**flaherty** 14:24
**flailing** 55:6
**flannigan** 9:5
**flipping** 22:13
**floor** 6:4
**florence** 9:5
**flow** 74:24
**flowed** 39:23
**flower** 3:20
**flows** 54:16
**flynn** 9:6
**flywheel** 50:5
**focus** 22:21
**focused** 25:11
**folks** 21:8
    23:12 27:6

34:4 96:24
**follow** 61:6
    88:25
**following**
    56:18 60:6
    68:16 96:22
**force** 63:12
    89:17 90:16
**forced** 81:23
    89:20,22
**forces** 55:11
**foregoing**
    102:3
**foreman** 9:7
**forget** 17:4
**forgive** 80:15
**form** 46:5,6
    70:2,4 73:25
**formal** 16:16
    27:6 72:20
    80:20
**formation**
    65:10
**former** 18:5
    20:24 31:21
    41:22 61:8
**forth** 27:13
    35:4
**fortunate** 36:5
**forum** 64:22
**forward** 17:25
    19:4 21:20
    22:21 37:19
    48:10 67:12
    76:4 87:19
    95:9

fought 19:18
21:2
found 25:14
30:15 58:6
72:4 95:15
foundation
42:13
founders 65:15
four 54:1 94:7
94:12 99:19
fowl 71:24
frame 88:24
framework
22:19
frank 8:1
frankel 14:13
frankly 22:18
29:1 33:9
48:18
fraud 17:13
64:18
fraudulent
23:22
frequently
92:20
fresh 44:20,21
friday 63:21
frishberg 5:8
9:8 75:25 76:1
77:16
front 90:12
frustrations
18:16
full 17:25 18:1
25:7 29:24
39:1 40:24
50:17

fullest 98:24
fully 18:3,18
18:25 33:22
75:11
function 46:3
97:20
functioned
49:14
fund 6:2,3
82:10
funds 39:20
40:11,23
fungible 49:6
further 41:5
60:23 88:12
95:5
furthermore
62:4 81:8
future 26:22
66:8,14 67:14

**g**

g 16:1
gabriela 9:25
gain 26:13
galka 9:9 54:12
55:16,16,21
56:13,17,25
57:13
gallagher 9:10
gastelu 14:25
gates 44:15
gather 57:6
geary 9:11
gelfand 9:12
general 30:23
92:19

generally
25:13,16 63:1
93:14
generated
24:14,19
geoffrey 8:4
george 13:14
gergi 10:15
getting 16:21
21:21 73:13,17
76:19 87:17
gheorghe 9:13
giardiello 9:14
gilbert 9:15
give 29:11
38:19 39:13
57:10 63:10
73:3 97:22
given 18:13
22:7 43:13
48:24 59:13
68:25 86:25
giving 20:10
35:15
gk8 23:18 24:4
glad 86:2
glasser 9:16
glenn 1:22
glitch 77:10,10
77:11 81:17
89:22,24 90:12
90:15,17
go 27:3,4 29:14
32:3 37:19
39:3,5,12,15
50:9 88:21
91:1 93:21

95:9 99:25
100:3
goal 19:6 42:2
60:4 91:9
goals 65:12
goes 78:17 80:1
84:22
going 17:1
20:17 25:23
27:3,8 31:10
32:19,20 34:3
34:7,9,10,11
42:1 47:1 50:2
54:13 68:14
77:3,17 79:23
80:5 83:8
87:12 91:10
92:12,23 94:8
94:9 95:24
96:10,17,21
97:18 98:6,8
98:10,12,21
99:6,7,20
100:23
gold 9:17
gonzales 9:18
good 16:2,4
24:13 30:16,17
34:15 38:15
58:22,23 61:4
64:14 67:20
71:15 75:16
76:10 77:21
78:13 80:12
82:5 88:20
90:3 99:5
100:12

**gordon** 9:19
**gorrepati** 15:1
**gotten** 87:5
**governmental** 16:17 17:10 18:8
**grace** 7:16
**grades** 25:9
**grant** 47:4
**granted** 61:11
**great** 72:2
**greater** 50:25 54:5
**greatest** 73:23
**greatly** 71:10
**green** 1:13 4:3
**greg** 10:12
**gregory** 12:11
**groundwork** 68:20
**group** 4:9,16 5:2 25:20 26:16 28:21 37:17 43:20,21 47:22 64:13,15 65:10,13,15 66:12,17 67:19 67:21 68:3,3 68:23 71:14,17 71:19 72:3,13 72:21 74:14 75:6,9,18
**group's** 65:24
**groups** 16:16 19:1 23:1 26:10,13 75:22

**grow** 50:4
**growth** 51:8
**guess** 21:9 39:12 93:17 95:19 97:1
**guidance** 96:6 97:1
**guided** 44:10
**guiding** 65:17
**gundersen** 9:20
**gurland** 9:21
**guthrie** 9:22

**h**

**h** 9:7
**half** 70:15,16
**hall** 68:22
**halls** 66:24
**hamilton** 5:1
**hammer** 91:25
**hand** 82:25 87:21 97:20 100:8
**handled** 92:12 97:2
**hands** 43:15 101:9
**hanging** 91:7
**happen** 20:22 85:7,11,12
**happened** 17:7 82:3
**happens** 53:8 95:17
**happier** 80:3
**happy** 29:7 68:14 75:21

78:15 80:2
**haqqani** 9:23
**hard** 38:9 41:3 49:1 59:2 69:17
**harrison** 88:17 88:23
**hawaii** 100:17
**hear** 34:11 36:16 37:2 38:6 42:23 43:24 47:16 55:15 58:20 75:1 92:20 99:7
**heard** 47:20 48:11 60:10 66:20,22 67:8 76:16 79:11,17 92:5 93:18 100:18,21 101:7
**hearing** 2:1,1,3 2:3,6,6 16:11 33:25 37:6 51:21 56:24 59:6 60:10 63:21 74:16 82:9 86:5 90:2 92:13 93:9,18
**hearings** 17:18 18:14 82:8 92:23
**heart** 33:17
**heavy** 41:1
**heidel** 7:3

**held** 40:8 49:15 73:25
**helen** 3:15
**help** 32:24
**helped** 97:17
**helpful** 60:20 79:24 96:15
**henry** 12:4
**hensley** 9:25
**heras** 5:20 80:12
**herrmann** 10:1 65:15,16
**hershey** 10:2
**higher** 49:12 51:7 68:12 85:2
**highest** 43:12 43:12
**historic** 18:10 25:3
**history** 43:13
**hitch** 32:3
**hittelman** 10:3
**hoc** 4:9,16 5:2 16:16 23:1 26:10,13,16 28:21 61:19 62:22 64:12,15 65:10,13,15 66:7,12,16 67:19,21 71:14 71:16,19 72:3 72:13,18,21 74:14 75:6,9 75:18,22

hoc's 65:21
hoeinghaus 37:20
hold 45:24
holder 35:10
holders 4:9 5:2
24:3 29:22,23
29:25 30:7,23
35:25 40:8
41:22 49:8
50:21 51:23
52:2 53:18
81:20
holds 26:22
28:6
hole 40:17
holzhauer 10:4
hon 1:22
honest 21:11
honor 16:4,9
16:24 17:18
18:16 19:19
20:19 28:25
30:1,10 33:22
34:4,15,18,22
35:5,12,22
36:2,8,15,18
37:2,9,14,20
37:24 38:4,15
38:21,25 41:11
42:14 46:2,7
47:1,16 51:22
52:17 53:19
55:15,21 57:8
58:6,7,22 59:1
61:6,15 63:20
63:25 64:14

66:21 67:16,20
68:2 69:19
70:11 71:1,2,7
71:15,17 73:11
76:1 77:15,22
80:3,13 82:6
82:11,17 83:4
83:19,22,25
84:22 85:24
86:1,10,17,25
87:7,14 88:20
90:14 92:2
93:22 94:8,22
95:14,18 96:18
98:13,17 99:12
100:2,12 101:6
honor's 18:20
hope 26:23
60:18 64:5
80:1 88:25
hopefully
38:12 67:14
77:24 79:13
90:10
horse 20:10
24:12 43:7
hot 31:17
hours 69:3
housekeeping
95:23
howey 52:11
huge 36:13
hundreds
24:19 31:6
hurley 10:5
hussam 14:18

hybrid 2:1,3,6
hyde 2:25
102:3,8
hypothecate
28:8
hypothetical
85:7

**i**

idea 74:5 93:17
ideas 44:15
identical 91:12
identified
41:24 47:22
62:9,17 84:9
84:19
identify 29:10
43:11 56:15
93:23
identifying
69:3
ignat 5:14
77:25
il 3:6
illiquid 24:25
25:2,7 38:3
45:12,18 48:18
58:2
illustrative
94:20 96:14
ilusion 12:21
imagine 77:1
immanuel 10:1
65:14
impeachment
97:12
implemented
89:4

importance
43:14 44:19
66:8
important
16:23 26:20
28:25 30:9
36:8 53:8
62:21 71:13
74:9
importantly
18:24 20:13
28:21 41:16
73:2 78:17
79:11
imposed 51:23
impressive
35:22
improve 77:13
inappropriate
28:3
incentive 31:15
32:12,25 37:23
80:25
incentives 44:4
incentivize
33:11
include 41:22
60:17 77:7
included 32:11
includes 41:20
63:9
including
23:18 40:7,16
43:5 55:12
61:11 67:5
71:18 75:8
76:13 79:6

84:9 93:14
**inclusion** 62:16
**incomplete**
90:19
**incorporate**
27:16
**increase** 44:4
50:5 57:23
**incredibly** 53:8
**independent**
17:23 40:15
51:5
**indicated** 69:1
91:24
**indication**
54:21 56:23
**indicator**
54:19
**indiscernible**
57:12 76:10,21
76:22 77:1
81:13 89:8,12
89:18,23
**individual**
16:17 18:25
65:20
**individuals**
31:14 36:5,11
59:21 68:3
**industry** 17:6
43:22
**inequitable**
50:22
**inevitable** 65:6
**inflate** 55:5
**informal** 27:6
72:19

**information**
2:8 40:14 41:7
63:8 74:24
94:6
**inherent** 84:6
**initial** 19:11
32:11 94:2
**initially** 48:2
**inordinate**
21:6
**inside** 44:13
53:4
**insider** 81:1
**insiders** 20:24
31:21
**insisted** 19:11
89:12
**insistence**
89:21
**insolvent** 54:9
56:12
**instance** 61:18
**instances**
44:17 60:15
73:15
**institutions**
43:24
**instruments**
45:15
**insufficient**
82:23 87:20
**intellectual**
25:21
**intend** 83:17
86:24 98:7
**intended** 63:10

**intense** 66:9
**intensive** 47:15
48:7 68:21
**intentional**
21:3
**intercompany**
23:22
**intercreditor**
26:14
**interest** 29:17
29:21 30:21
35:10 37:8
43:1 49:10
51:4,9 53:4,14
53:23 60:4
68:5,6,6 81:3
82:13,24 85:5
85:6 86:6 88:7
95:16 96:9
97:7 100:14
**interested**
48:12 87:2
**interesting**
23:5
**interests** 32:15
40:6 51:25
65:20
**interim** 22:1
36:22 60:11
**internally** 93:6
**international**
70:16,17
**intersection**
64:19
**interview**
47:15

**interviews**
18:4
**intrinsic** 56:17
**introduced**
96:13
**introducing**
36:16
**invest** 26:5
**invested** 40:3
**investigating**
17:10
**investigation**
18:3
**investigations**
21:25 40:15
**investment**
44:2
**investments**
25:4 45:11,11
**investor** 49:25
**investors** 23:13
**invited** 20:7
**involve** 100:14
**involved** 24:10
**involves** 93:11
**iovine** 10:6
**island** 77:2
**issue** 19:20
20:17 28:5
30:6,9,11
31:17 33:18
50:19 57:25
69:13,24 70:1
90:22 93:10
94:10 101:3
**issued** 49:8

**issues** 17:13
18:19 21:18
22:2,18,24
29:20 32:24
40:16 42:9,11
42:15,21 59:3
60:18 63:18
67:9 68:23
69:23 70:6,8
70:23 71:5,12
90:11 91:7,8
91:11,13,15,25
92:11,15 96:20
99:6 100:16,25
**item** 52:23
**items** 22:18
37:1 80:25
81:12 89:6
90:7

**j**

**j** 4:20 8:5,9,12
9:17 15:8,15
**jacobs** 10:7
**james** 9:3,16
15:8
**jamie** 9:15
**janelle** 8:25
**january** 22:14
65:1
**jaoude** 10:8
**jarno** 12:6
**jasleigh** 9:11
**jasmine** 7:11
**jason** 10:6
11:12 12:2
**javier** 13:2

**jean** 11:4
**jeff** 12:10
77:25
**jeffrey** 5:18
7:14 8:3 13:20
**jellestad** 10:9
**jeremy** 16:5
**jesse** 11:13
**joanne** 9:12
**job** 33:9 76:10
**joe** 11:6 12:23
**joel** 37:24
**johan** 7:18
**john** 8:22 12:9
12:17
**johnson** 10:10
10:11
**join** 75:21
**joinders** 80:17
**joined** 81:24
**jonathan** 1:25
12:22 15:10
**jones** 3:15 34:9
34:14,15,16
35:9
**joseph** 11:2
12:25
**joshua** 14:4
**journey** 58:13
**joyce** 4:13
64:14
**judge** 1:23
26:11 65:22
71:11 78:8
100:7 101:9
**judges** 61:10
61:12

**judicial** 22:10
63:13
**judson** 7:19
**july** 17:2 26:10
39:23 40:5
65:22 67:25
**june** 39:16
67:24
**junior** 35:6
**jurisdictions**
70:18
**jury** 98:23
**justice** 4:1
**justification**
83:5

**k**

**k55** 94:21
**k57** 94:21
**kaczkowski**
10:12
**kahn** 15:2
**kaila** 14:10
**kaitlyn** 10:3
**kaplan** 6:9
10:13 88:23
**karen** 8:8 15:7
**karpuk** 10:14
36:17
**karpuk's** 34:19
**kass** 10:15
**katherine** 7:9
10:10 13:13
**kathryn** 9:20
10:24
**katie** 14:5
**kaufmann**
14:14

**kaz** 15:3
**kaza** 10:16
**keeney** 10:17
**keep** 38:24
93:12
**keeping** 66:8
**keith** 11:20
12:5 14:7
**ken** 9:2
**kenneth** 8:13
**kept** 22:23
68:15
**kessler** 10:18
**kevin** 8:6 11:16
**key** 20:7,8
21:18 22:2,15
22:18 23:2
25:15 27:24
**khai** 12:12
**kielty** 37:9
42:23 48:8
99:15
**kind** 44:6 51:1
71:19,24
**kirkland** 3:3
3:10 6:16 16:9
34:16 93:25
**kirsanov** 7:1
10:19 100:12
100:13 101:6
**klein** 10:20
**kleinberg** 6:9
88:22
**kleiner** 6:14
10:21 75:2
88:18,19,21,22
88:22 89:15

92:2
**knauth** 15:4
**knew** 39:21
56:6 86:14
**know** 20:19
21:8 26:22
31:16 34:4
36:3 38:21
46:20 53:7
57:3 70:21
76:11 77:4
86:13,19 87:9
88:5 89:8
91:15,20 95:7
96:16,24 97:14
97:19 98:21
**knowingly**
50:25
**knows** 61:6
68:2 71:17
77:18
**koch** 15:5
**koenig** 3:8 16:3
16:4,8,9 17:1
33:24 34:2,13
35:2 38:4,21
42:7 45:1 49:2
68:25 69:21,25
79:23 99:7,8
**kohli** 10:22
**kokinos** 37:14
43:25 99:15
**kovsky** 5:6
10:23 71:14,15
71:16 75:15,24
89:18,25

**kuethman**
10:24
**kuhns** 4:13
64:14,15
**kurman** 4:8
64:15
**kurmar** 11:15
**kwasteniet**
10:25 69:21
**kyle** 10:4

**l**

**l** 8:14 13:24
14:23
**la** 3:5
**lack** 18:16 45:4
100:16
**lackey** 11:1
**lacks** 54:16
**lafayette** 8:7
**laid** 89:6
**lalana** 12:16
**lalia** 11:2
**land** 71:19
**language** 27:21
60:1 64:3,4
72:24 73:20,24
80:14
**large** 19:2 38:5
43:24 63:15
91:14,18
**largely** 33:15
**larger** 65:19
66:7
**largest** 25:1,17
40:6 70:18,19
**las** 5:20 80:12

**lasted** 24:17
**lastly** 63:9
66:15 82:1
**late** 26:9 99:25
**latona** 11:3
**latreille** 11:4
**law** 60:6
**layla** 11:25
**layne** 11:5
**lead** 25:20 89:1
**learning** 41:7
**leave** 91:7
**leboeuf** 30:11
**lectern** 34:8
**led** 19:20 45:3
55:25 65:6,9
66:1,2,9
**ledanski** 2:25
102:3,8
**ledger** 27:11
**leeway** 97:23
**left** 53:13
**legal** 19:20
22:2 23:20
24:5 28:6
29:16 42:9
62:16 64:24
102:20
**legge** 15:6
**lehrfeld** 11:6
**leigh** 12:3
**lender** 29:11
29:13
**lenders** 69:17
69:18 79:9
**lending** 69:2

**lennon** 11:7
**leon** 40:22
41:18
**leonard** 11:8,9
**leonie** 15:5
**letter** 46:4,4
47:5 60:6
**letters** 28:1
**leung** 15:7
**leverage** 43:3
**levine** 11:10
**lexington** 3:12
**liability** 61:4
**license** 17:13
**lied** 50:21 56:3
**lies** 56:5
**light** 17:21
22:18 79:13
**liked** 24:18
**likely** 85:9
99:18
**limit** 71:2
97:25 98:21
**limitation**
60:21 61:3
**limited** 27:20
61:18,22 62:3
73:8 89:3
97:21
**lindsay** 11:11
**line** 42:8 60:7
**lines** 18:21
44:13
**link** 93:19
**liquid** 24:24
25:6 31:2,5
32:6 38:3 43:6

69:14 73:22,25
**liquidated**
   48:17
**liquidating**
   45:14
**liquidation**
   30:22,25 32:18
   48:13 52:4
   83:1,12 85:1,4
   85:16
**liquidity** 25:24
   45:9 68:8
**list** 25:23 27:7
   33:14 94:6
   97:3
**listed** 45:19,23
   52:23 100:13
**litigated** 22:11
   22:15 72:1
**litigation** 20:14
   20:15,25 24:2
   66:13,14 72:17
   93:2 94:23
**little** 19:17,19
   35:16 36:10
   39:7 57:21
   68:1 75:3
   81:19 91:8,16
**live** 56:8 69:10
**lives** 80:24
**llc** 1:7 37:10
   38:1
**llp** 3:3,10,17
   4:15 5:1,13 6:1
   6:16
**loan** 28:4,14,22
   68:5,15

**loans** 49:10
   68:24
**locations** 70:17
**long** 24:10,16
   27:2 32:15
   48:24 64:16
   67:13 78:1
   79:25 82:19
**longer** 20:4
   24:17 42:4
   54:11
**look** 48:6 54:2
   54:3 56:9
   67:12 92:16
   97:14
**looked** 27:7
   92:25
**looking** 27:9
   47:6
**los** 3:21
**lot** 34:4 36:3
   38:9 51:16
   60:15 63:18
   81:8
**lots** 48:3 71:11
**loud** 48:11
**love** 77:6
**low** 29:1 68:11
   81:3 88:2
**lower** 24:21
   46:12 49:16
**loyalty** 49:15
**ltvs** 69:16
**lu** 11:12
**lucy** 13:19
**lunch** 99:22

**lund** 11:13
**lupu** 11:14

**m**

**m** 11:16 13:4
   14:14
**maciej** 15:9
**made** 21:2
   27:15 32:20,20
   32:23 38:18,24
   45:12 62:17
   68:7 74:2 82:2
   90:6 92:17
   97:25 100:19
   100:22
**madison** 4:10
   6:4
**main** 98:23
**major** 42:6,22
   44:7 47:11,16
   67:9
**majority** 40:8
   47:14
**make** 16:5,19
   18:15 19:19
   29:12,13 31:24
   31:25 32:2,5
   33:11 34:7
   43:16 47:1
   49:21 70:3,5
   73:22 74:23,24
   75:10 79:2
   80:15 89:9
   91:4 92:19
   100:23
**makes** 53:17
**making** 19:2
   19:24 30:25

44:1 71:4
**malhotra**
   11:15
**man's** 71:19
**managed** 59:9
**management**
   20:6 21:25
   25:16 31:19,21
   31:23 32:10
   33:5,8 43:12
   45:12 59:14
   67:6 86:4
**managing**
   25:15 37:3,22
   37:25 43:23
**mandatory**
   91:15,17,18
**manipulate**
   55:13
**manipulation**
   40:20
**manner** 54:17
**manual** 94:13
   94:14,17,19
**manus** 11:16
**march** 24:11
   40:17 68:14
**marine** 61:6
**mark** 7:21 11:8
   11:11 12:19
   47:16
**marked** 97:10
**market** 33:6,6
   43:1 54:18,20
   55:11 56:2,3
   56:10,19,21,22

marketing
  24:10
markets  56:15
  56:16,20
marsal  37:3,22
marsh  11:17
marshall  14:16
martin  1:22
mashinsky
  18:7 40:3,22
  41:17 50:2
  52:9 55:12
mass  66:23
master  6:2,3
masumoto
  11:18
material  78:11
mathematical
  88:7
matter  1:5
  32:11 95:24
matters  59:22
  78:11
matthew  9:17
  10:20 13:9,10
  13:23
max  9:9
maximize
  22:22 26:2,21
  33:12 41:14
  45:14 83:14
maximizing
  24:9 25:5
maximum
  25:24
mccarrick  6:21
  11:19 93:22,24

93:24 94:4
95:14,18,20,23
96:18,22,24
98:13,17 99:2
99:3,9,11,14
99:18 100:2,4
100:4
mccarter  4:15
mccormack
  11:20
mean  52:4
  69:24 70:8,21
means  25:5
  29:16
meant  19:2,22
  19:24 26:15
measures
  59:11
mechanda
  11:21
mechanism
  46:11
media  21:9
  66:23 80:19
  96:5
mediated
  28:20
mediation
  26:11 65:22
  66:1,4,6 68:20
  68:21 69:3,13
  70:9 71:11
meet  53:14
meeting  59:5,7
meets  32:15
  33:4 51:24
  58:15

meghji  11:22
melissa  13:24
member  37:16
  47:16
members  21:5
  21:10 43:18,25
  65:16 71:18
  75:8
membership
  63:22
mendelson
  11:23
mentioned
  45:2 53:11,16
  76:16 79:8
mequon  7:4
met  26:10
  32:22 53:23
metaphorical
  77:12,13
methodically
  42:11,15
metrics  32:22
  54:17 81:8
metropolitan
  98:4
mg  1:3
mi  5:4
michael  10:8
  12:1 13:15,18
michaels  11:24
mid  26:10
middle  77:2
midpoint  31:4
midst  17:6
mike  10:11
  15:6

miles  49:15
milestones
  66:3 79:14
milin  12:8
milligan  11:25
million  23:11
  26:5 30:3,20
  31:2,5 32:17
  55:25 84:25
millions  24:19
  31:6 40:25
mind  76:3
mineola  102:23
minimum
  92:14
mining  23:18
  24:4,25 25:1,8
  25:9,10,16,18
  25:19 31:3
  37:12 42:18,19
  44:8 48:18
minor  70:7
minute  16:22
  39:13 52:9
  80:6
minutes  78:10
  78:16 88:24
mira  9:23
mirror  74:6
misrepresent...
  40:18,20
misrepresented
  56:4
mistake  80:15
misundersta...
  64:23

mitchell 10:5
mix 66:22
model 17:11,19
  18:9 50:6 55:1
modifications
  74:18
modified 16:12
  27:21
mohsin 11:22
mold 77:3,12
moldy 77:3,7
  77:13,14
moment 38:19
monetize 41:16
money 17:12
  26:5,7 63:14
monroe 5:10
month 17:8
  24:16 39:22
months 27:10
  38:10 69:22
morning 57:5
  58:22 99:22
  100:1,6 101:11
morris 12:1
motion 2:6
  17:16 19:13
  63:13 92:17
  94:1
motions 17:19
  19:11
mountain 5:11
mouth 26:7
move 21:20
  22:21 41:25
moved 22:20
  60:5

moving 31:14
multiple 43:4
mutual 74:25

**n**

n 3:1 16:1
  102:1
nagi 12:2 65:13
name 78:16
  93:3
named 24:11
  24:15 44:2
  63:1
names 27:10
nani 15:8
narrowed 94:5
nasdaq 25:24
  45:19
nathanial 11:5
nathanson
  12:3
native 80:14
natural 19:5
navigate 51:13
navigated
  42:11,15
navigating
  64:19
nearing 60:7
nearly 27:14
  40:8 41:12
necessarily
  62:3 98:10
necessary
  46:10 62:5,19
need 29:10
  32:5 33:10
  45:10,22 53:19

53:20 60:22
  65:11 69:15,15
  69:24 70:6
  72:20 96:8
  98:8
needed 21:23
  42:9 54:25
  78:12
needs 70:4
  97:21
negotiate
  75:16
negotiated
  60:19 75:5
negotiating
  32:1 60:15
  74:11
negotiations
  66:10
neither 71:24
network 1:7
  61:7
never 52:25
  53:11 54:20
  65:18 70:20
new 1:2,14
  3:13 4:4,11,18
  5:16,16 6:5,5
  6:12 21:25
  22:1 31:23
  41:13,14 43:13
  44:2,5,11,22
  47:8,19 50:19
  64:24 66:25
  67:6 69:2,3
  96:5 98:2,4

newco 25:22
  25:23 26:3,21
  31:1,3,10
  37:16 43:14,25
  44:5 45:18
  46:23 47:9,10
  47:24 48:1
  66:9,11,11
  67:16 83:20,21
  83:23 84:2,4
  84:23 88:4
newco's 25:19
  25:20
newly 17:23
newman 12:4
nice 58:23
nicholas 65:14
night 96:11
nine 56:14
  99:21
noah 13:4
noel 11:9
non 55:9 70:7
noncontract
  78:5
nonlawyers
  97:23
noon 86:6
north 3:5
noskov 6:7
  82:11,11 83:4
  83:21,24 84:3
  84:5,14 85:6
  85:17,24 86:10
  86:16,20,24
  87:4,14,17
  88:16

notable 27:8
notably 24:25
  28:17 30:10
note 71:8
noted 35:2
  38:4 51:22
  82:17 89:18,25
notes 52:23,23
  52:25 53:2,11
notice 63:23
  70:4 78:9
novawulf
  24:12 68:15
novel 42:9 67:9
  72:5
noyes 12:5
  64:3
number 27:25
  28:19 34:24
  36:25 54:15
numbers 93:13
numerical
  81:13
numerous
  23:21 24:15
  76:8
nuraldeen 7:17
nw 6:18
ny 1:14 3:13
  4:4,11,18 6:12
  102:23

o

o 1:21 16:1
  102:1
o'clock 96:16
  99:23

oath 86:7
oberg 12:6
object 18:1
  80:23
objected 19:10
  19:12 28:1
  29:20 31:15
  32:13 80:24
  82:20 89:6
objecting
  18:11 30:13
  89:2,3
objection 31:8
  45:4 72:20
  80:22 82:6,13
  89:9 90:8
objections
  26:18 27:7,14
  27:20,22 29:18
  33:14,18 49:3
  60:8 78:21
  80:17 91:2
  97:25 100:14
objectives
  81:10
objectors
  27:13
obligated 93:5
obligation
  49:20,22 52:20
  52:20 53:5
obligations
  52:25 53:2,10
  53:12 81:11
observer 66:11
obtained 22:16
  46:11

obviated 72:20
obvious 81:6
obviously 29:5
  70:23 88:6
  90:24 96:4
  97:20
occupied 41:9
occur 46:20
  67:1
occurred 85:20
  97:22
occurrences
  62:2
october 1:16
  79:14 81:5
  86:6 87:9,13
  102:25
odd 75:3
offer 26:2
  71:21 86:8,21
  87:12 89:20
offered 94:9
offering 49:17
  51:14
offerings 17:12
office 59:1,3
  96:6
officer 36:22
  36:23,24 37:16
official 3:18
  38:16
offit 4:8 64:15
okay 17:1
  46:22 52:18
  71:3,6,7 80:7
  91:7 92:1,4,24
  94:3 95:3,12

95:17,19 96:19
97:11 99:1,17
99:25 100:1,6
100:9,9 101:7
101:10
old 102:21
ombudsman
  59:10
once 26:15
  46:4 88:7
ones 27:24
  31:20 95:16
onset 65:17
oona 8:11
open 90:7
opening 27:2
  27:23 33:20
  36:16 38:24
  64:7 80:11
  92:5 100:19,20
  101:2,5
openings 77:19
  92:6
openly 76:19
operate 31:3
  58:4
operated 48:1
operating
  21:24
operation 58:9
operations
  25:19 44:7
operators
  25:18
opinion 56:20
  76:20,22

**opportunities**
  67:15
**opportunity**
  45:19 57:13
  66:20 88:25
**opposition**
  77:19 85:23
  86:9 87:10
  98:20
**opt** 36:9,11,13
  74:23 81:16,21
**opted** 44:17
**option** 28:22
  29:9 48:8 51:7
  68:25 75:21
  76:7,18 77:8
**options** 84:21
**orchestrated**
  40:19 55:13
**order** 2:7 19:3
  27:22 57:4
  63:9 69:16
  78:3,19 79:15
  86:3,13,17
  92:6,7 95:5
**ordered** 30:2
**orderly** 26:19
  83:8 84:23
  85:4 87:23,24
**orders** 20:7
  46:8
**original** 65:15
**originally** 73:3
**outcome** 21:8
  29:3 67:10
**outlining** 34:10

**outset** 71:17
**outside** 25:9
  66:22
**overall** 60:16
**overbroad**
  60:22
**overflow** 96:8
**overly** 76:20
**override** 85:19
**overruled**
  29:19
**oversee** 47:19
**overseen** 46:24
  47:9,13
**overseers**
  47:23
**oversight**
  47:21 66:13
**overwhelming**
  17:3 48:21
  51:19 58:14
**overwhelmin...**
  16:12 34:23
  72:12 76:12
**own** 21:6,10
  25:22 26:5
  28:3,9 32:4
  43:9 44:9
  45:10 54:9
  87:19
**owned** 22:6
  64:24
**ownership**
  22:12 49:7

**p**

**p** 3:1,1 10:2,14
  12:17 16:1
  62:10
**p.c.** 6:9
**p.m.** 96:1
  97:10 98:9
**page** 33:21
  86:5
**pages** 56:9
**pagnanelli**
  12:7
**paid** 29:24
  33:5,6,7 50:17
  55:24 68:5,6
**painted** 40:1
**papers** 35:4
**paragraph**
  86:5
**paramount**
  43:14 44:19
**parity** 65:18
**park** 4:17
**part** 24:23
  30:25 32:12
  43:8,10 55:9
  56:14 61:19
  78:7 79:7 88:5
  98:23
**participant**
  82:8
**participate**
  30:1 90:18
**participated**
  23:9,12
**participation**
  36:3 61:5

66:24
**particular** 21:5
  25:8 83:17
  90:22
**particularly**
  24:23 25:10
  73:14 75:7
  80:23 97:23
  98:3
**parties** 16:17
  27:7 36:9
  41:21,23,24
  59:2 60:4
  61:17 62:13,21
  62:23,24 63:10
  63:12,17 74:25
  86:6 89:17,20
  90:3,9,19 95:2
  96:9 98:10
  100:7
**partner** 25:12
  25:14 37:10
**partners** 30:13
  37:10 42:24
**parts** 77:7,13
**party** 29:11
  30:13 36:10
  61:24,25 62:15
  62:18,25 63:5
  63:6 78:6
  81:17,21 97:7
**passed** 85:25
**past** 93:16
**patel** 12:8
  14:15
**path** 17:25
  42:7 48:10

66:3 76:4
**pathway** 72:4
72:7
**patouhas** 12:9
**pattern** 99:24
**patton** 12:10
**paul** 7:15
14:23
**pause** 17:7
39:18,21 49:19
50:22 57:24
58:1 64:17
**paused** 39:17
56:18
**pay** 23:8 49:9
54:25 55:5
68:24
**payment** 32:17
32:19 33:2
49:21 52:20,25
53:2,5,10,11
**paypal** 32:2
61:21
**pending** 60:9
**pennies** 45:15
**pennsylvania**
6:18
**people** 39:10
40:3 49:15
56:6,7,7 57:24
63:12 70:25
76:17 77:24
80:18,23 90:17
92:6 93:20
97:15,18,23
98:16

**pepper** 5:1
71:16
**percent** 28:18
28:18 35:16,18
35:19 54:2,3,4
54:4,6 58:6
69:7 77:5 83:7
**perception**
55:6
**perfect** 24:13
37:13 75:19
**perform** 62:11
**performed**
61:21 62:8
**period** 32:9
46:6
**permission**
57:2
**permitted**
81:22 96:5,7,7
**perpetrated**
64:18
**perry** 65:14
**persistently**
56:3
**person** 77:23
**personal** 21:6
**perspective**
38:23 69:10
**persuade**
91:21
**pesce** 12:11
**peter** 8:22
15:15
**petition** 53:22
54:9,23 57:1
57:14,18,22,24

65:4 66:1
**petroleum** 61:6
**pham** 12:12
**phan** 12:13
**pharos** 6:2,2,3
6:3 29:20 30:5
82:10,12
**phase** 22:20
25:11
**philippe** 11:4
**philips** 12:14
**phone** 18:21
**phung** 12:15
**picked** 99:8
**picking** 20:10
**picture** 40:1
**pii** 95:19,21
**pillar** 47:7
**pivot** 26:25
**place** 22:1
42:16 83:22,23
83:25 84:1,4
84:12
**placed** 43:14
83:20 84:13
**plaintiff** 66:18
**plan** 16:12,14
16:18 18:12,19
20:12 24:6
26:12,20,21,25
27:9,21 28:1,2
28:15 29:24
30:14,24 31:15
31:16 32:4,11
32:12,12,14,18
32:21,25 34:6
34:23 35:1,3,8

36:7 37:17,17
37:19,23 38:7
38:12 39:24
41:11,17,20,25
42:13 43:2,17
45:17 46:9,11
46:12,12 48:15
48:21 49:4
51:15,16,16,17
52:3 53:17
58:13 61:1,5
62:14,17 63:1
63:4,6,7 66:3
66:15 67:3
68:16 69:12,23
70:7,8,24
72:11,20,23
73:2,3,6,9,18
73:21 74:3
75:7,19,19
76:4,13,18,20
77:9,11,13,18
77:19 78:6,11
78:24 79:6,22
80:21 81:5,7
81:20 82:16,19
82:20,25 83:7
83:9 84:21
85:8,15,23
86:21 88:5
89:2,5 90:25
91:6,9 100:15
**planning** 98:22
**platform** 17:21
40:25 41:3
54:10 58:3,9
58:10 68:4

71:20
**playbook**
17:14
**played** 62:21
**pleadings**
50:14
**please** 16:2,5
38:19
**pleased** 18:17
27:12
**pleasure** 16:10
67:22 77:23,23
**pm** 1:17
101:13
**point** 18:24
21:16 22:15
24:13 31:11,13
31:14 34:3
50:23 54:14
69:24 73:19
81:18 86:18
87:5 89:24
94:10,24 97:14
**pointing** 86:16
**points** 44:10
53:19 89:10
92:19
**poland** 70:18
70:20
**portal** 19:5
**portion** 22:25
23:4
**position** 50:20
52:10 56:4
82:22 85:17,25
88:24

**positions** 41:9
56:15
**possession**
19:8
**possible** 19:2
22:24 25:25
32:11 43:5
67:11 69:16
73:24 74:5,6
98:24
**possibly** 72:2
**post** 20:15
32:21 96:11
97:10 98:8
**potential** 51:7
64:4 71:4
72:21
**potentially**
68:18 73:17
99:15
**power** 41:9
88:1
**powerpoint**
39:10
**practical** 94:10
97:5
**practice** 63:13
**practices** 40:18
**precedent** 46:8
**precipice** 42:5
**preclearance**
46:4,4 47:5
**preclude**
100:23,24
101:3
**preclusive**
55:19 72:22

**preference**
23:4 72:23
**preferences**
23:3
**premature**
75:3
**preparation**
90:4
**prepared**
90:25
**preparing** 32:3
**prepetition**
17:11 45:12
47:23,24 56:1
**preponderance**
52:2 53:21
**presence** 77:12
**present** 7:6
34:6 64:5 84:7
**presentation**
16:23,24 38:18
39:9 56:9
67:18
**presentations**
49:25 66:24
**presented**
30:22 44:15
45:20 67:15
**presenting**
34:10
**preserves**
41:17
**presumption**
92:22
**pretty** 94:24
**previously**
59:12

**price** 54:18,20
55:5,14 56:1
56:16,22 57:14
57:15
**prices** 17:7
**primarily** 68:7
89:11,15
**primary** 66:10
**principal** 19:9
28:14,22,24
29:12 69:8
**principle** 64:2
95:11
**principles**
65:17
**prior** 17:8
54:22 56:13
92:13
**priority** 23:16
29:21,22 30:5
30:7,14,16,18
**privileges** 16:6
**pro** 5:9,21 7:2
22:8 30:3
66:17 80:13
100:13
**probably**
22:14 69:13
70:14 99:23
**probe** 83:17
84:16 85:10
88:13
**problem** 39:11
93:1
**procedures**
20:7 74:14,15
74:19,20,22

75:2,4,10,16
86:4 89:4,17
89:25 90:4,13
90:18 91:12,15
91:18 96:21
**proceed** 39:25
46:13,25 77:20
89:22
**proceeding**
85:8 91:12
97:18 99:7
**proceedings**
60:19 101:12
102:4
**process** 24:10
24:21 35:14
41:25 42:4,25
43:10 45:4
47:15,17 48:7
48:20 67:13
75:13 83:9,16
87:22 88:1
**proczek** 15:9
**product** 55:11
59:11
**products** 49:16
**professionals**
43:21 59:17,19
59:25 60:12,16
62:24 63:2
67:7 74:11,18
76:9
**program** 49:23
71:20 81:1
**programs**
26:17

**progress** 90:6
**promise** 79:18
99:3
**promises** 47:1
47:6
**promoters**
41:23
**promptly**
16:19 33:12
**proof** 25:20
74:21 78:4
82:3
**proofs** 36:12
**proper** 61:2
83:16
**properly** 33:11
62:11
**property** 25:21
65:1 71:3 72:5
72:10
**propose** 84:24
**proposed**
37:16,19 43:25
49:4 51:15
54:3 74:19
82:16 88:5
98:8
**proposing**
87:24 93:19
**prosecuted**
41:18
**prosecuting**
66:14
**prosecution**
55:9
**protect** 95:16

**protected**
44:25 62:1
**protections**
61:22 74:9
**protocols**
59:14
**prove** 31:11,13
38:11 82:19
**proven** 25:13
**provide** 19:7
25:24 35:12
37:7,11,18,22
38:1 41:15
45:8 69:4 73:6
74:9
**provided** 18:3
48:15,16 53:18
61:22 62:15
72:8 87:20,21
**provides** 44:20
46:11
**providing**
36:24 51:11
61:3
**provision**
60:21 78:19
82:2
**provisions**
27:16 60:14,22
62:6,7 63:5
82:5
**prudent** 26:24
**psa** 76:6 79:14
**public** 39:20
47:10 50:1,3
55:3 92:13,23
93:5,6 95:16

96:5
**publicly** 65:14
**published**
40:14
**pundisto** 12:16
**purchase**
50:15 56:2
**purchased**
55:23
**purchases**
54:22 55:23
**purchasing**
54:24 55:4
**purpose** 73:7
96:15
**purposes** 96:14
**pursuant** 78:2
78:21
**pursue** 20:15
20:25 24:9
**pursuing** 36:13
93:3
**push** 88:8
**pushed** 42:17
73:9
**put** 16:18
20:23 21:1
23:25 50:7
57:14 58:7
85:18 86:1,14
87:6,11,19
**putting** 26:6
42:12 45:13

| q |
| --- |

**qualified** 24:16
47:13

**question**  21:13
  56:25 57:5
  63:7 65:6
  71:25 78:18
  83:24 97:5
  98:18 100:4
**questions**
  18:22 23:2
  34:5 49:5 64:8
  72:5 99:2
**quick**  41:4
**quickest**  67:11
**quickly**  41:8
  96:23
**quinn**  6:1
  82:11
**quite**  48:18
  92:3
**quoted**  57:15
  61:15
**quoting**  55:7

**r**

**r**  1:21 3:1 6:14
  10:21 16:1
  102:1
**raise**  97:20
  99:6
**raised**  30:21
  69:25 72:6
  92:12
**raising**  101:3
**rakesh**  14:15
**ramon**  9:18
**ran**  42:24
  58:10
**randles**  15:10

**range**  69:16
**ranging**  19:11
  20:5
**rarely**  42:8
**rasile**  15:11
**rata**  30:3
**rate**  35:16,18
  35:19 49:10,12
**rates**  49:16
**rather**  18:2
  40:14 42:17
  73:5,10,23
  74:25 89:3
  98:19
**rational**  57:23
**ravi**  10:16
**rayn**  14:20
**reach**  19:3
  53:19
**reached**  18:10
  22:25 23:13
  26:11 28:20
  64:2 68:22,23
**read**  33:22
  62:6 89:8
**ready**  27:1
  31:24 38:11
**real**  24:14,25
  81:16 83:11
**reality**  65:23
**realize**  25:7
  82:14,15
**realized**  65:11
**really**  19:23
  21:22 26:18
  33:17 60:14
  73:9 74:10

85:10 90:21,24
  91:1 95:16
  97:17
**reason**  26:25
  29:18 30:8,17
  30:18 57:8,23
  63:11 76:17,24
  91:22 95:11
  96:4
**reasonable**
  73:22
**reasonableness**
  51:21
**reasons**  29:1
  33:3 53:14
  54:15 82:25
**rebecca**  9:10
**rebound**  42:25
**recall**  98:20
**receipt**  46:9
**receive**  28:23
  30:2 47:2
  49:12,13 51:3
  51:4,6 52:3,3
  81:1,4
**received**  27:17
  35:15 45:22
  46:21 51:9
  68:16
**receiving**  29:2
  29:23 30:24
  35:7 48:12
  59:25
**recent**  63:14
**recently**  35:17
**recess**  77:20
  80:6,8 99:21

**recharacteriz...**
  52:7 53:15
**recognize**
  72:15
**recognized**
  66:7 97:20
**record**  16:8
  25:13 48:7
  58:25 60:23
  63:8 79:1,8
  102:4
**recover**  50:16
**recoveries**
  46:13 48:14,16
  51:12 66:15
**recovery**  50:20
  54:2,3,5 94:20
  94:23
**redact**  2:7
**redacted**  93:8
  93:11,14 95:22
**redacting**  95:5
**redaction**
  92:14 95:4
**redactions**
  94:24 95:9
**redeem**  49:20
**reding**  12:17
**redline**  74:23
**refer**  62:7
**referrals**  59:22
**referred**  63:1
  79:23
**refinance**
  69:15
**refinancing**
  69:4

reflect 56:17
reflection 45:5
reflects 63:22
  69:11 70:24
regain 17:20
regard 80:21
  82:17
regarding 18:9
  47:17 63:21
  64:2,3 72:5
  80:25 100:16
regardless
  77:11 87:18
registered 46:1
regular 82:8
regularly
  23:10 50:2
regulations
  44:12
regulators
  16:16 17:9,17
  18:8,11,11,15
  27:19 44:14,24
  45:3,4 76:9
  79:21
regulatory
  45:22,23 46:9
  46:10,16 47:2
rehabilitate
  42:18
reilly 12:18
  15:12
reject 35:1,2
rejected 63:4,6
  88:10
rejecting 35:7

related 41:18
  58:9
relates 62:24
relating 25:3
  94:23
relationships
  25:3
release 27:16
  60:14,22 63:5
  81:21 82:2
released 41:24
  62:13,14,24,25
releases 36:10
  41:21 76:14,20
  81:15,17,22,25
releasing 63:5
  63:6
relevant 90:25
remain 27:22
  90:7,18
remained 60:5
remaining 41:5
  60:18 77:21
remains 89:23
remark 81:19
remarkable
  18:13
remarks 34:5
  38:24 64:7
remote 97:13
remotely 56:22
  96:9 97:7,8
  98:7,16
removed 41:9
  62:12
renewed 43:1

reopen 100:23
reorganization
  42:6 43:2 54:4
  54:4 75:20
reorganize
  42:18 44:16
  48:4,5
reorganized
  43:9
repay 28:22
  70:3
repayment
  28:14 29:12
repeat 38:23
  89:14
repeated 40:18
repeatedly
  39:19
report 22:17
  31:6
reported 23:10
reporting
  47:11
reports 31:11
represent
  19:24 68:3
representation
  49:7
representatives
  61:21 78:2
represented
  50:1
representing
  40:6
request 57:6
  94:4 100:20,22

requested
  49:23 78:10
  92:6
requests 101:1
require 69:17
  98:10
required 32:1
  34:2 55:5 59:8
  59:14 93:19
requirements
  33:1,4 58:16
requires 63:7
  73:24 74:3
requiring
  73:21
reservation
  74:15
reservations
  27:19
reserve 87:14
  97:24
reserves 73:24
residence
  71:22
resident 70:20
resign 18:7
resigned 18:8
resolution
  22:10 64:2
  68:23 72:1
resolutions
  18:10 21:19
resolve 18:18
  22:2,6 23:2
  26:13 30:9
  32:24 90:10

**resolved** 24:1
27:14,18,19
30:6,18 42:10
71:12 91:9
**resolving**
22:24
**resources**
59:18 63:13
**respect** 25:21
29:17 60:25
74:15
**respected**
100:22
**respective** 67:6
**respects** 60:13
**responded**
18:22
**response** 82:5
89:3,7 98:18
**responses**
63:15,16 89:9
**responsible**
66:13
**responsibly**
42:3
**rest** 22:19
32:15 49:3
**restructure**
44:16
**restructuring**
36:23
**result** 38:9
46:12 67:2,4
69:10 70:8,9
**resulted** 45:13
59:9,21 72:7

**resulting** 66:10
74:18
**results** 34:10
34:18,19,22
49:1 51:20
**resume** 80:6,6
**retail** 28:1
29:18 40:8
49:10 78:22
79:6
**retained** 89:16
**retaining**
89:12
**retention** 73:6
**return** 28:12
33:12 35:15,16
35:18,19 42:2
49:22 51:7
52:21
**returned** 35:20
35:23
**revelations**
64:18
**review** 56:19
**reviews** 46:6
**revisions** 60:20
60:23 74:22
**revolving**
18:15
**rewards** 49:12
54:25 55:5
78:1 81:4
**ribbon** 39:14
**richard** 12:14
**rick** 14:17
**rickie** 8:2

**rife** 40:16
**right** 16:2,7
21:12 23:17
26:6 28:11,15
39:16 43:16
58:20 64:12
67:19 71:14
75:25 77:17
80:5,7,9 82:9
88:17 89:12,17
90:8 91:4 92:5
96:19 97:24
100:5
**rightfully**
92:21
**rightly** 24:4
**rights** 19:12
20:5,8,11
22:12 27:20
28:19 29:16
63:17 68:18
74:15
**rigs** 48:18
**rise** 55:10
**rising** 65:5
**risius** 38:1
**risk** 25:16
43:23 50:25
58:5 68:9 84:8
84:19
**riskier** 51:6
**risky** 23:6
**road** 7:3 64:17
80:1 102:21
**robert** 14:14
37:2

**roberto** 10:7
**robinson** 12:19
47:17
**rockwood**
12:20
**rodriguez**
12:21,22
**role** 56:14 59:7
62:21
**room** 96:8
**rosa** 30:14
**rose** 50:8
**roselius** 12:23
**ross** 10:25 38:1
**roughly** 36:9
**routinely**
17:17 59:20
61:6
**roy** 7:25
**rudolph** 12:24
**rule** 2:4 20:20
29:21,22 63:10
63:19
**ruled** 23:19
**rules** 75:12
**ruling** 22:16
71:1,2 95:10
**rulings** 19:19
71:4
**rumors** 39:22
**run** 25:19 31:3
39:17 43:13
68:9 83:16
85:23 88:1
**ryan** 12:13
37:9

| s | | | |
|---|---|---|---|
| **s**  3:1 5:18 7:20 10:18 11:7,8 11:18 13:12,20 16:1 | **says**  30:5 31:8 86:5 | **seated**  16:2 | **seems**  77:5 |
| **sabin**  5:18 77:17,18,20,21 77:22,25 80:4 | **scale**  81:10 | **seats**  66:11 | **seen**  57:19 |
| **sabin's**  89:1 | **scenario**  76:18 77:15 83:9 84:24 87:24 | **sec**  27:18 46:3 46:6,21 47:4 | **sees**  28:8 79:13 |
| **safe**  39:21 40:23 | **scheme**  55:13 | **sec's**  52:9 | **seiji**  12:4 |
| **safeguard**  59:15 | **scheuer**  13:1 | **second**  21:9 30:21 38:21 45:8 53:16 62:13 67:23 86:3 90:18 91:11 | **select**  43:20 48:8 81:21 |
| **safely**  21:24 | **schiffrin**  13:2 | | **selected**  47:14 47:18 |
| **safety**  59:18 | **schneider**  13:3 | | **selection**  47:17 |
| **salaries**  81:2 | **schoenau**  88:17,23 | **secondly**  78:24 81:15 | **sell**  49:11 |
| **sale**  50:15 83:16 | **schottenstein**  13:4 | **secretly**  40:24 | **selling**  25:8 45:12 |
| **sales**  24:10 42:25 | **schreiberg**  13:5 | **section**  45:20 | **senes**  13:7 |
| **salle**  3:5 | **schroeder**  13:6 | **securities**  17:12,13 46:1 52:11,13 | **sense**  75:10 88:6 |
| **salls**  15:13 | **scope**  62:4,6,10 62:12 81:10 94:5 97:21 98:22 | **security**  20:6 50:8,12,14 52:14,24 53:3 53:4 55:2 | **sent**  65:2 70:4 |
| **samuel**  10:2 13:5 | **scott**  8:21 14:24 | | **separate**  31:5 31:11 |
| **sanders**  5:1 | **scrap**  25:9 | **see**  39:8 57:10 58:23 75:6 95:2 96:12 100:5,9 101:9 101:10 | **september**  86:13 |
| **santos**  7:23 | **screen**  16:25 | | **serban**  11:14 |
| **sarachek**  12:25 | **se**  5:9,21 7:2 22:8 66:17 80:13 100:13 | | **series**  23:13,16 24:2,7 29:22 29:25 30:7,19 35:10 66:9 |
| **sat**  96:23 | **seal**  2:8 94:1,6 94:11 | **seeded**  31:2,10 | **seriously**  59:23 |
| **satisfied**  29:17 82:19 | **sealing**  92:13 92:17 94:4 95:4,4 | **seek**  61:7 94:6 97:1 | **served**  65:22 |
| **satisfy**  51:11 79:24 88:9,14 | **sean**  9:6 | **seeking**  16:11 23:16 | **services**  71:22 |
| **save**  29:6 | **seasoned**  43:21 | **seem**  75:3 | **serving**  65:19 |
| **saving**  59:11 | **seat**  47:25 66:6 66:8 | **seemed**  18:14 | **session**  80:10 |
| **saying**  34:5 76:5,6 91:11 91:19 | | **seemingly**  64:20 | **set**  22:18 26:24 27:13 29:4 35:4 46:21 47:18 51:12 66:1,25 |
| | | | **setbacks**  42:21 |

setoff  28:11,16
  68:17
settlement  2:3
  24:3 28:20
  30:1,6,9,12
  35:10 36:11
  51:14,15,18,18
  51:21 66:3
  72:7,11 78:3
  78:20 79:7
settlements
  23:1,9,12 24:8
  79:5
several  59:10
  79:9,9 84:8
severely  83:1,6
  83:10 84:7
shafer  15:14
shara  4:6
  58:25
share  30:3
  38:18
shareholders
  48:1 67:15
sharing  16:6
sharon  8:20
shed  22:18
sheet  40:17
  66:5
shenaya  8:16
shlivko  13:8
shockwaves
  65:2
short  20:1 32:9
shorter  38:24
shortly  37:6
  40:11

show  33:5 49:6
  52:1 54:20
  55:2 70:13
  83:6 84:18
shown  39:18
shut  41:3 54:10
side  27:11 45:1
  70:22 88:2
sided  74:25
sign  45:9 93:20
signature
  102:7
significant
  19:25 33:14
  42:9,21 43:6
  44:1,7 47:22
  47:24 56:19
  65:10 74:18
significantly
  54:21 85:1
silent  39:22
silverman  13:9
similarly  57:21
simon  8:18,23
  66:18
simple  82:14
  82:22
simply  16:18
  21:1,16 23:25
  50:7 58:7
  73:18 82:14
  86:22
sing  80:2,2
sister  59:23
sit  80:9 100:3
situation  87:1
  87:3

six  36:19
slide  17:2
  21:21 22:13
  24:7 27:5
  34:17 37:12
  39:9,18
slides  27:4,4
  34:18
slightly  38:22
  77:14
slim  94:24
small  77:13
smart  13:10
smith  13:11
social  21:9
  80:19
sole  58:9
solely  89:4
solicitation
  35:13 61:4
solicited  73:3
solomon  64:10
solution  72:15
solutions
  102:20
soma  14:19
somebody
  91:20 99:9
somewhat
  60:22 62:25
song  80:1
sontchi  13:12
sonya  2:25
  102:3,8
soon  42:3
  77:24 80:1

sophisticated
  88:1
sorry  54:6
  89:13 93:24
sort  68:19
source  69:2
sources  69:4
south  3:20
southern  1:2
southfield  5:4
sp  6:2,3
spaces  66:23
spain  70:17
  80:15
spc  6:2,3
speak  27:8
  34:4 65:11
  76:3 78:10
  80:16
speaking  27:9
  49:3 63:2
special  17:24
  18:6 99:11
specific  54:13
  61:18,21 89:6
  101:1
specifically
  25:17 41:24
spectacularly
  58:11
speed  40:24
  75:13 91:6
spend  49:3
spent  43:15
  69:2 78:7
spirit  60:6

spoken  70:20
  84:20
sponsor  37:18
  43:16 79:22
sponsoring
  43:1
spreadsheet
  70:13
sprofera  15:15
stadler  13:13
stage  21:23
  22:23 25:11
  67:12
stages  17:5
  21:23
stake  44:9
  47:24
stakeholders
  16:15 19:16
  66:10 67:9
  81:12
stakehound
  93:3
staking  25:16
  25:20,21,22
stalking  20:10
  24:12
stanbury  13:14
stand  38:11
  42:5,16 44:3
  60:7 77:24
  90:11
standard  20:20
standing  24:1
  55:20
stanley  13:15

start  17:1
  21:24 34:17
  39:4 44:20,21
  67:13 76:1
  96:4 99:21
started  18:14
  24:11 41:1
  48:24 67:24
starting  24:13
  56:13 64:17,24
starving  77:4
state  17:9
  27:18
stated  76:12
statement
  33:21 55:8
  60:10 61:10
  74:16 80:11
  84:10 90:1,6
  100:19
statements
  92:5 100:20
  101:2,5
states  1:1,12
  4:1 58:21 59:1
  61:2 63:21,25
  70:15 71:22
statistics  35:13
  36:9
status  35:9
  71:24,25
statutory  19:5
steadfast  60:5
steadily  65:5
steadman
  13:16

steefel  13:17
steep  45:13
steering  65:16
  68:23
steps  55:14
steven  37:14
stig  10:9
stipulation
  20:6,23
stn  20:20
stock  25:25
  41:13
stockholders
  66:9
stocking  43:7
stop  39:17 52:8
stopped  18:24
story  40:13
stout  38:1
straight  42:8
straightforw...
  74:23
strange  48:24
street  3:20
  5:15
stretto  36:18
strongly  73:13
structure  29:5
structured
  28:15
stuart  7:20
stuck  92:8
sub  30:14
subject  95:5,10
submit  31:12
  46:5 83:1
  85:22 90:21

submitted  31:4
  31:8,10
subordinate
  78:21
subordinated
  50:16 52:15
  53:1,12
subsequent
  64:18 70:4
  73:1 95:10
subsequently
  34:20
subsidiaries
  23:18
substantial
  72:9
substantially
  43:9 94:5
substantive
  23:23 70:8
  79:8
success  36:14
  50:2,25 55:6
  58:8
successful
  24:11,18 25:18
  35:13 66:1
  67:13
suffered  42:20
sufficient
  84:17
suggest  75:9
suggestion
  18:20 32:23
suggests  86:1
suite  3:20 5:3
  102:22

**sullivan** 6:1
15:16
**sums** 77:1
**supersedes**
94:2
**supplement**
78:18
**supplemental**
37:5 57:3,6,9
63:23
**supplemented**
78:13
**support** 17:4
27:9 28:4 36:6
36:24 37:7,12
37:18,23 38:2
38:5 54:17
55:14 66:15
75:8 76:13
78:7,11 82:23
82:25 87:20
**supporters**
78:15
**supporting**
57:17 75:22
83:12
**supportive**
70:24 79:3
**supposed** 70:1
**sure** 18:16
29:13 31:24
32:2 33:11,21
55:20 61:9
75:1 83:22
85:2 86:14,20
99:13

**surpasses**
48:23
**surprise** 58:1
64:25 86:11
**sustain** 97:25
**sweet** 13:18
**systemic** 64:18
**systems** 31:24

**t**

**t** 9:6 102:1,1
**t.j.** 6:21 11:19
93:24
**tab** 94:13,15
94:17,19,20
**table** 43:4
47:25 66:6,8
**tabs** 94:12
**take** 16:21 24:3
29:9 44:17
59:22 68:6
77:19 80:5,5
85:3 99:21,21
**taken** 42:4
48:25 57:25
74:11 78:9
**takes** 52:10
**talk** 26:19 68:1
92:10 93:13,14
**talked** 53:15
92:25
**tanzila** 14:11
**targets** 81:9,13
**task** 42:19
**tasked** 40:5
**taught** 19:14
26:20

**tax** 28:25 29:3
**taxes** 29:6
**team** 22:1
31:20,21 32:10
33:5 43:12
50:4
**team's** 33:8
**technology**
43:23
**telegram** 66:23
**telephonically**
7:6
**tell** 52:18 54:13
55:3 91:13
97:3
**telling** 40:22
56:10
**temporal** 60:20
62:4,11
**ten** 78:10 80:5
**tens** 40:25
**tension** 24:14
24:20 43:3
**term** 32:14
66:5
**terms** 26:12
28:5,6 29:16
32:12 51:8
54:7 62:23
68:19 69:2
74:12 96:21
**test** 29:17,21
30:21 37:8
51:25 52:4,11
53:14,23 65:21
82:13,13,18,19
82:24 85:5,6

88:9,14 93:12
**testament**
51:20
**tested** 64:24
**testified** 40:4
40:12
**testifies** 98:9
**testify** 49:18,24
53:20 56:17
57:13,21 98:25
**testifying**
93:11 97:11
**testimony**
55:15 57:11
79:2 84:18
85:23 86:7
96:15
**thank** 16:8
21:14,14 34:12
34:13 38:14,20
58:18,19 64:10
64:11 65:14
67:16,18 69:20
71:7,9,9 75:24
76:1 77:15,16
77:22,24 80:3
80:4,13 82:6,7
82:9 87:17
88:15,16,19,19
91:3 99:4
100:2 101:6,10
**thanks** 32:9
71:6
**theories** 23:21
64:24
**therese** 13:1

therewith   64:4
thing   19:17,19
    71:1 93:17
    100:25
things   17:11
    38:23 59:10
    66:4 78:4
    90:14 92:24
    93:8
think   18:13
    21:9,22 27:14
    30:10,17 33:1
    35:3 38:7 39:3
    39:8,13 46:19
    47:3 48:25
    53:3,7,13
    57:15 61:10
    63:18 70:18,21
    76:2,25 79:19
    83:11,24 84:5
    84:7,17,22
    85:12 87:19,21
    87:25 88:3,6
    88:10 90:17
    91:5,17 92:2
    93:4 95:21
    98:15,18
thinking   47:8
third   29:11
    36:10 46:23
    47:7 81:17,21
thirty   54:1
thomas   8:15
    10:18
thomson   13:19
thought   20:2
    26:24 27:10

78:12
thousand
    35:21
threats   60:1
three   26:11
    44:9 47:22
    52:5 53:14
    66:11 68:21
    71:11 77:19,21
    78:2,7 79:5
tied   50:25 54:8
time   16:18
    18:6 21:6,10
    32:9 39:2 40:3
    42:12 46:15,21
    49:3,20 53:9
    54:14 64:23
    65:5 67:16,23
    68:14 73:8,19
    74:1 76:5 78:1
    80:14 88:24
    90:5,8,20
    91:22 92:3,7,8
    100:22 101:1
timeline   21:21
    44:24 45:25
times   32:19
    54:2,3
timing   70:6
timonthy
    15:12
tiny   77:3
tireless   67:5
    77:24 79:20
title   28:7
today   17:3
    18:12 24:1

27:3 37:4 38:9
    38:11 41:10
    42:14 55:20
    57:3 60:7,10
    67:16 71:13
    75:17 76:3
    82:6,12 86:18
    89:10 90:11
    100:18 101:5
todd   9:19
together   19:24
    21:19 65:11
    67:10 90:4
toggle   46:11
token   2:3
    33:15,17 40:21
    49:4,6,6,9,14
    49:16,21,22
    50:1,3,5,7,10
    50:11,13,15,20
    50:24 51:4,8
    51:15,22 52:2
    52:6,14 53:3
    53:18,22 54:7
    54:11,11,14,19
    54:22,25 55:2
    55:10,13,23,24
    56:1,3,21,25
    57:14,17,18,21
    58:8 82:18
tokens   49:9,20
    58:2
told   17:18 18:6
tomorrow   96:4
    99:8,14
took   42:25
    50:25 61:19

tools   85:14
torosian   13:20
torpedoes
    40:24
total   18:4
totally   21:11
touch   41:25
    44:9
touted   50:2
towards   22:3
town   5:3 66:23
toxic   59:25
track   25:13
tracks   61:3
trade   45:15
traded   56:13
trading   56:20
traditional
    69:17,18
traditionally
    54:18
transaction
    19:21 22:3,21
    23:7 24:9,12
    24:20,22 26:8
    29:6,14 68:15
transactional
    61:17
transactions
    61:19
transcribed
    2:25
transcript
    102:4
transfer   23:22
transferred
    45:18 51:2

68:4
**transmitter**
17:12
**transparency**
18:1 79:23
97:17
**transparent**
46:24 47:9
**travis** 10:17
**treated** 50:11
53:6 69:6
72:10
**treatment** 28:2
28:17 49:4
50:18 51:22,24
66:2 72:8
**trial** 22:5,5
23:4 42:1
55:19 93:10
96:22 101:4
**trials** 92:13
**tried** 93:12
**trimming**
77:12
**trip** 48:25
**tristan** 8:17
**troubled** 89:21
89:23
**troutman** 5:1
71:16
**true** 55:8 73:14
97:6 102:4
**truly** 18:13
19:15 20:7
21:3 76:6
**trust** 45:14
92:16

**trusted** 43:15
**trustee** 4:2
17:16 27:17
32:24 48:16
58:21 59:1
61:2 63:25
76:8 79:21
83:13 85:14
87:25 92:21
95:2,8,13
**trustee's** 63:21
**try** 21:4,7
91:25 95:16
99:25
**trying** 17:19
39:9 69:22
78:21 87:11
98:2
**tuganov** 5:14
66:18 77:17
78:1 79:12
**tune** 78:16
80:2
**tunnel** 79:14
**turetsky** 13:21
**turn** 20:13
24:7 37:12
80:10
**turner** 13:22
**turning** 22:15
26:18 27:13
**twice** 70:13
**twitter** 66:23
**twitters** 66:23
**two** 21:22
22:20,23 24:15
25:11,12 29:20

31:11 34:18
35:17 44:7
64:19 65:17
78:16 80:25
82:24 89:9
90:14 100:7
**tyler** 11:5
**type** 49:14
**typical** 33:9
41:21
**typically** 45:15
96:13

**u**

**u.s.** 1:23 4:2
17:16 25:17
27:17 32:23
76:8 79:21
92:20 95:2,8
95:13
**ubierna** 5:20
80:7,10,12,13
82:7
**ucc** 76:8,12
78:14
**uday** 15:1
**ultimately**
59:15
**umber** 10:22
**unacceptable**
93:21
**unanimous**
82:20
**unanimously**
43:19
**uncertain**
17:16

**uncertainty**
19:21 72:2
**unclear** 47:3
62:22,25
**uncovered**
40:16
**under** 2:3,8
24:6 29:16,23
30:24 31:23
32:4 33:5,6
35:7 45:20
48:13 49:4
50:11,19 51:15
52:3,11,21,24
56:11 58:16
62:3 65:24
72:23 75:21
82:15,16 83:9
84:21 86:7
88:9 96:5
**underlying**
20:12 54:16
**understand**
45:9 73:6 84:1
90:15 92:4
95:11
**understanda...**
31:17
**understanding**
46:2 92:18
**understate**
90:2
**understood**
18:16 43:8
44:23 57:10
**undisputedly**
64:16

unfettered
  73:4
unified  65:12
uniformity
  61:12,15
unique  24:23
  44:15 45:19
  59:14
unit  49:7
united  1:1,12
  4:1 58:21 59:1
  61:2 63:21,25
  70:15
unnecessary
  76:22
unpaid  21:11
unprecedented
  66:22
unredacted
  93:5
unregistered
  17:12
unremarkable
  57:16 58:7
unresolved
  93:2
unsecured  3:19
  19:6 28:10
  30:23 38:17
  40:7 50:13
  52:23,23,25
  53:1,11
unusable  58:2
unusual  76:11
unusually
  63:15

unwilling
  44:22
update  63:20
updates  23:10
upper  39:14
upstairs  68:22
uptegrove
  13:23
urge  91:23
urgency  90:22
urquhart  6:1
usd  6:3
use  28:5,6,7
  29:16 39:1
  49:9 54:11
  58:9 73:21
  79:4 95:24
  96:1,10 97:9
  97:19 98:7
used  50:5
  61:16 64:21
  96:15,17
useful  80:19
uses  49:19
using  96:25
ust  60:12 81:24
usually  83:3,4
  93:12

v

v  12:18
vague  62:3
validation  45:5
valuable  62:18
  62:22
valuation  31:4
  31:6 33:17
  37:12 38:2

54:18 82:18
  100:16,17
value  22:22
  23:18 24:4,5,9
  24:20 25:5,7
  25:10 26:3,22
  31:4 33:12
  41:14 42:3
  44:4 45:15
  50:1,3,8 51:5
  51:11,14 53:18
  53:21 54:8,11
  54:14,17,19,21
  55:10 56:17,23
  57:17,18,22,23
  58:10 65:6
  73:18 74:7
  82:15 83:6,7,8
  83:9,14,20,22
  83:23,25 84:2
  84:4,5,6,11,13
  84:15,23,25
  85:1,4,5,8,8,11
  85:16 87:22
  88:4
valued  31:6
valueless  31:1
values  88:8
van  13:24
variety  25:4
various  59:3
  59:21 60:12
  62:20
vazquez  13:25
vejseli  14:1
ven  15:3

venable  5:13
  77:25
verifies  32:22
veritext  102:20
versus  66:2
  85:8
veton  14:1
victor  5:20 6:7
  80:13 82:11
videos  50:3
  56:7
view  5:11 24:4
  36:14 83:5,13
  92:21
vik  11:21
vince  15:16
vindication
  49:1
violated  30:14
violates  30:5
virtually  96:25
visions  76:13
vitor  7:22
voice  65:12
vote  48:21
  51:17,17 63:7
  79:4,4 100:15
voted  32:13,14
  34:25 35:1
  76:17,19,24
  77:9 81:20
voting  34:10
  34:17,19,22
  48:22 51:20
  67:3 69:11
  70:24 81:20

**voyager** 35:18
82:4

**w**

**w** 13:9
**waiting** 46:3,6
79:13
**waive** 63:11
**waived** 78:20
**waiver** 63:9
**walk** 16:22
27:23 36:6
**walker** 14:2
**walks** 34:17
**walkthrough**
34:2
**want** 16:21
21:14,14 26:18
27:4 29:9
31:16,18 32:8
44:9 46:7,23
47:1 49:3
50:22 57:9,10
57:11 63:12,16
67:22 68:9
69:12,20 76:25
81:19 86:19
89:24 90:2
91:7 92:17
95:12,25 97:22
98:5,13,24
99:6 100:5
**wanted** 18:15
25:12 45:8
47:8,20 57:12
66:19 68:1,8
68:17 74:13
86:14 87:9

92:10,14
**wants** 92:10
96:12 99:9
**warranted**
20:3
**warren** 14:3
**washington**
6:19
**waste** 63:13
**watched** 56:7
**wavered** 65:19
**way** 17:13
19:10,15 21:22
24:8 34:1 72:1
75:11 80:19
84:14 91:25
95:6
**ways** 52:5
**we've** 23:8,11
27:14 31:8,10
45:2 46:20
59:25 60:11
69:2 74:17
93:12 94:5
98:16
**weedman** 14:4
**week** 31:12
33:25 34:11
37:4 58:15
64:6 83:5,19
**weekend** 64:1
92:16
**weight** 55:19
**weighted** 69:14
**weird** 71:19
**welcome** 82:1

**went** 19:10
48:6
**west** 5:15 7:3
14:16
**whichever**
85:9
**white** 3:17 6:10
38:16
**wholesale** 95:4
**wholly** 81:18
81:23
**wi** 7:4
**wick** 14:5
**wide** 17:6
19:11 20:5
**widespread**
75:8
**wildes** 14:6
**wildest** 48:23
**wildly** 24:11
24:18 54:9
**wiles** 26:11
65:22 71:11
78:8
**william** 13:6
13:23
**willing** 36:6
85:19 92:20
**willingness**
72:14 91:24
**winddown**
26:19 83:8
84:24 85:5,8
87:23,24
**winded** 27:2
**winding** 80:1

**winner** 20:10
**winning** 43:20
**winter** 17:6
40:2
**wish** 89:9 98:5
101:7
**wished** 70:2
**wishes** 97:8,9
**withdraw** 41:4
**withdrawal**
72:23
**withdrawals**
39:17
**withdrawing**
40:24
**withdraws**
56:18
**withhold** 5:2
22:11,16 23:1
23:4 26:17
71:14,16,18,19
72:3,6,7,8,12
72:13,16,18,21
74:14 75:6,9
75:18
**witness** 55:16
93:11 97:2,11
98:9,25 99:24
**witnesses**
34:11 36:16,19
38:6 48:14
79:1 85:16,18
86:22,23,25
97:9,19 98:11
98:12,20
100:24

| | | |
|---|---|---|
| **wofford** 14:7 | **write** 18:22 | **zomo** 14:11 |
| 69:21 | **written** 85:23 | **zoom** 97:15,18 |
| **wolff** 6:9 88:23 | 86:7 87:11,13 | 100:7 101:8 |
| **wonderful** | **wrong** 40:3 | |
| 17:1 | **wrongdoing** | |
| **wondering** | 41:18 | |
| 100:17 | **x** | |
| **words** 52:1 | **x** 1:4,10 | |
| 56:16 74:13 | **y** | |
| **work** 18:18 | **yara** 10:15 | |
| 19:24 21:3,15 | **yeah** 39:8 | |
| 21:17,19 22:3 | 95:20 100:10 | |
| 25:23 29:8 | **year** 16:14 | |
| 34:7 38:9 | 20:22 22:14 | |
| 44:24 49:1 | 26:24 30:2 | |
| 59:2,11 61:23 | 46:20 47:3 | |
| 70:23 72:14 | **years** 56:14 | |
| 77:25 | **yi** 9:24 | |
| **worked** 23:8 | **yiyue** 14:12 | |
| 26:9 42:17 | **yohannes** 7:8 | |
| 43:11 44:13 | **yoon** 14:8 | |
| 47:22 59:17 | **york** 1:2,14 | |
| 60:16 69:19 | 3:13 4:4,11,18 | |
| **working** 16:15 | 5:16,16 6:5,5 | |
| 19:16 31:23 | 6:12 98:4 | |
| 39:9 72:19 | **young** 14:9 | |
| 75:15,17 81:6 | 16:5,7 | |
| 90:3 92:16 | **youtube** 66:24 | |
| **world** 40:11 | **z** | |
| 64:20 98:2 | **zabib** 15:17 | |
| **worlds** 64:20 | **zachary** 14:6 | |
| **worth** 35:24 | 15:17 | |
| 53:10 57:1 | **zaharis** 14:10 | |
| **worthless** 58:3 | **zero** 54:12 | |
| **would've** 19:20 | 83:20,22 | |
| 19:20 | | |