Re: In re Celsius Network LLC, et al., Case No. 22-10964 (MG) – Written request to make myself available for cross-examination at the Confirmation Hearing on October 4, 2023 (and/or later Confirmation hearing dates), for the permittance of the entry of my objection into evidence, as well as request to submit additional exhibits to my submitted Objection to the plan

Dear Chief Judge Glenn,

I wasn't sure if I heard correctly, but I was in attendance at yesterday's hearing on October 3, 2023, and thought I heard a reference to my submission of an objection, and how it could not be admitted if I wasn't available for cross-examination during the hearings. I have been able to borrow an external microphone to allow me to participate in the Celsius Confirmation Hearings in order to make myself available, in the hopes of allowing my objections to be entered into the evidence for the case. I don't know if there is anything else I need to do, but I am making myself available for whatever else is necessary also, and I ask that you please let me know during the hearing and allow me to do whatever is required of me to have my objections be considered, and that you please consider the admission of my Objection submission (Document 3658) through these actions.

I would also like to add exhibits to my original submission, as I didn't understand how they worked and failed to include them in my original submission as a result. I have attached my exhibits to this document for your consideration.

Sincerely,

Cathy Lau
Pro Se Creditor
October 4, 2023

**EXHIBIT A: Court Filing Doc 1931 "ORDER AUTHORIZING THE DEBTORS TO CREDIT FLARE TOKENS TO ELIGIBLE ACCOUNT HOLDERS" dated January 24, 2023**

Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Flare is required to comply with the Flare Agreement, including distributing Flare Tokens to the Debtors in connection with any Flare airdrop as provided in the Flare Agreement.

3. The Debtors are authorized to credit the accounts of those account holders that held XRP on the XRP Snapshot with the amount of Flare Tokens to which those account holders are entitled based on eligibility determined as of the XRP Snapshot in accordance with the Distribution Scheme as set forth in the Flare Agreement, *provided* that if the Debtors credit such accounts in accordance with the Flare Agreement, Flare must comply with its obligations under the Flare Agreement, including the distribution of 150 million Flare Tokens directly to the Debtors.

4. Prior to confirmation of a chapter 11 plan in any of these cases, the Debtors shall promptly inform the Committee's counsel if the Debtors determine that additional Flare Tokens are expected to be distributed to the Debtors following entry of this Order. The Debtors shall provide notice to the Committee's counsel of efforts to facilitate an equitable distribution among account holders of any Flare Tokens that are received by the Debtors following entry of this Order.

5. Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange

**EXHIBIT B: Custody FAQ from Celsius's Support Network Site showing treatment of non-US-based Celsius Creditors**
https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ

### How will this change affect US-based Accredited Investors?

Accredited Investors will continue to earn rewards through their Earn account as they always have.

As with US-based non-accredited investors, their Celsius accounts will be divided into Custody and Earn accounts.

Unlike US-based non-accredited investors, US-based Accredited Investors may freely move their coins between their Custody and Earn accounts. They will be able to add coins to their Earn account if they wish.

Only coins in the Custody account can be used with other Celsius products such as Swap and Loans. As always, the availability of these features is still determined by your current location.

For more information on how to become an Accredited Investor, check out our FAQ.

### How will this change affect users outside of the US?

There will be no change to services offered by Celsius to users outside of the US. Earning along with all other Celsius products will remain the same for the time being.

**EXHIBIT C: CoinTelegraph article showing the amount of lost Bitcoin in Celsius's ~$2-billion hole**



The latest report shows that the company has net liabilities worth $6.6 billion and total assets under management at $3.8 billion. While in its bankruptcy filing, the firm has shown around $4.3 billion in assets against $5.5 billion in liabilities, representing a $1.2 billion deficit.

The coin report also noted that of the total 100,669 Bitcoin  deposited by investors, the company has lost 62,853 BTC and currently holds only 37,926 BTC. Wrapped Bitcoin (WBTC) currently represents 64% of the company's BTC debt.

The company filed for Chapter 11 bankruptcy on July 14 after it became one of the many crypto lenders to perish in the wake of crypto contagion caused by the now-defunct Terra-USD collapse, which was aggravated further after the crypto market collapse.

*Related: Celsius lawyers claim users gave up legal rights to their crypto*

Simon Dixon, a crypto entrepreneur with a keen interest in the Celsius case who had said that the actual balance gap of the crypto lender is $3 billion against its claims of $1.2 billion, took to Twitter to point to the new findings. He said that people were upset when he showed the gaps and the fact that Celsius was misleading and "making up numbers."

Simon Dixon ✓                                                                    X



While many crypto experts are critical of Celsius' plans, the community had rallied behind the crypto lender in the hope of getting some of their funds back. The price of the native token has surged several times after the bankruptcy, thanks to a community-driven short squeeze. However, the latest findings seem to have deterred many existing account holders who are not so sure of getting their funds back.

**EXHIBIT D: Key business terms of Fahrenheit's Proposal, from Disclosure Statement**



**EXHIBIT E: Disclosure Statement Disclaimer excerpt, from Disclosure Statement**

6. *Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**EXHIBIT F: Explanations of opt-out ability from and coverage of Third Party Release, from Disclosure Statement**

    **NN.**    **Do I have to grant the releases under the Plan? Can I opt out of the releases?**

You cannot opt out of the releases under the Plan with respect to any Claims you vote to accept the Plan. By voting to accept the Plan, you are consenting to the releases. ***If you vote to accept the Plan, you cannot opt out of the releases***.

You can opt out of the releases if you are (a) a Holder of a Claim that is presumed to accept the Plan and you affirmatively opt out of the releases provided by the Plan, (b) a Holder of a Claim and you do not vote on the Plan, but you affirmatively opt out of the releases provided by the Plan, or (c) a Holder of a Claim who votes to reject the Plan and you affirmatively opt out of the releases provided by the Plan.

If you are a Holder of a Claim entitled to vote on the Plan and you (a) do not vote on the Plan or (b) vote to reject the Plan, you may affirmatively opt out of the Third-Party Release by following the instructions on your Ballot. **To opt out of the Third-Party Release, please follow the instructions on your Ballot.**

22-10964-mg    Doc 3710    Filed 10/04/23    Entered 10/04/23 16:02:53    Main Document
Pg 10 of 18

*3. Debtor Release and Third-Party Release.*

The Plan also proposes certain releases by the Debtors and the Holders of Claims and Interests, as outlined below.

As defined in the Plan, **Released Parties** means, collectively: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party. Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided, further*, that, notwithstanding anything to the contrary in this Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided, further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.

As defined in the Plan, **Releasing Parties** means, collectively: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).

The Debtor Release under the Plan provides, in sum, that the Debtor will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, **with several important exceptions**. For example, the Debtors are not proposing to release (a) any Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.

The Third-Party Release under the Plan provides, in sum, that the Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of the

4. *Third-Party Release Provision.*

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities, whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, liquidated or unliquidated, fixed or contingent, accrued or unaccrued, existing or hereafter arising, in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Post-Effective Date Debtors, that such Entity would have been legally entitled to assert in their own right or otherwise (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, amendment, or rescission of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Pause, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of, as applicable, the Plan Sponsor Agreement, the PSA Definitive Documents, the Backup Plan Sponsor Agreement, the Definitive Documents (as defined in the Backup Plan Sponsor Agreement), the Disclosure Statement, the New Organizational Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), the NewCo Transaction, the Orderly Wind Down and Backup MiningCo transaction (if applicable), or any restructuring transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the foregoing (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan,

**EXHIBIT G: Examples of the scope of the Litigation Administrator's power and direction, from Disclosure Statement**

### GG. What are Contributed Claims? Should I contribute my Contributed Claims to the Litigation Administrator?

Contributed Claims are any causes of action that Holders of Claims or Interests may have against persons or entities other than the Debtors whose prepetition acts or omission harmed such Holders in their capacity as creditors of the Debtors. These Contributed Claims include, but are not limited to, any causes of action arising out of: (a) the marketing, sale, and issuance of Cryptocurrency that at any point was held or offered on Celsius' platform; (b) the alleged misrepresentation of any of the Debtors' financial information, business operations, or related internal controls; or (c) any alleged failure to disclose, or actual or attempted cover up or obfuscation of, any of the Debtors' conduct prior to the Petition Date. For instance, a Contributed Claim may include an Account Holder's claim directly against Mr. Mashinsky alleging that Mr. Mashinsky made various public misrepresentations that fraudulently induced the Account Holder to transfer their digital assets to the Celsius platform. Contributed Claims do not, however, include (i) any derivative claims of the Debtors (*e.g.*, a claim where the principal harm was against the Debtors or another Person, which indirectly harmed the Contributed Claimant), (ii) any direct claims against the Released Parties, or (iii) any claims that cannot be assigned under applicable law.

Any Holder of a Claim or Interest can elect through their Ballot to contribute such Holder's Contributed Claims to the applicable Post-Effective Date Debtor(s) in order for the Litigation Administrator to prosecute such Causes of Action for the benefit of Holders of Claims entitled to receive Litigation Proceeds under the Plan.

By contributing a potential Contributed Claim, a Contributing Claimant (the person who contributed such Contributed Claim) is expressly forfeiting their right to receive any recovery on account of such Contributed Claim separate from their entitlement (if any) to receive a Pro Rata share of the Litigation Proceeds. The proceeds of any recovery on account of a Contributed Claim will go entirely to the Litigation Recovery Account and Contributing Claimants will only be entitled to any Litigation Proceeds they are entitled to in connection with their Allowed Claims.

The Debtors and the Committee believe that most Contributing Claimants will likely benefit from contributing their Contributed Claims due to the time and cost likely required to resolve such Causes of Action. At the same time, however, the Debtors recognize that certain potential Contributing Claimants may benefit from retaining their claims. For example, a potential Contributing Claimant who is not entitled

60

to Litigation Proceeds as a form of distribution under the Plan cannot benefit from contributing a claim. Similarly, the Litigation Administrator(s) have no obligation or duties to the Contributing Claimants independent of their entitlement to a share of the Litigation Proceeds, and the Litigation Administrator(s) may determine that pursuing a Contributed Claim does not serve the best interests of the Holders of Claims entitled to the Litigation Proceeds under the Plan as a whole. Put another way, the singular objective of the Litigation Administrator(s) is to maximize the total Litigation Proceeds and not to pursue every potential cause of action.

**KK.  Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well.  *See* Article VIII.C.1 of this Disclosure Statement entitled "NewCo and the Post-Effective Date Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases" for further discussion on this issue.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determinates that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan" for further discussion on "cramdown" under the Bankruptcy Code.

M.     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, each Post-Effective Date Debtor shall retain, and any Litigation Administrator (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action) may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan; *provided* that, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.

The Litigation Administrator(s) may pursue the Recovery Causes of Action, and the Plan Administrator may pursue all other Causes of Action, as appropriate in accordance with the best interests of the Holders of Claims entitled to receive Litigation Proceeds (as to Recovery Causes of Action) or the Post-Effective Date Debtors (as to all other Causes of Action). **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before the deadline to submit objections to Confirmation of the Plan. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Post-Effective Date Debtor, the Plan Administrator, or any Litigation Administrator, without the need for any objection or responsive pleading by the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors, the Post-Effective Date Debtors, the Plan Administrator, or the Litigation Administrator(s), as applicable, and the objecting party, such objection shall be resolved by the Bankruptcy Court. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Post-Effective Date Debtors free and clear of any Claims, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Post-Effective Date Debtors, through their authorized agents or representatives, including the Plan Administrator and the Litigation Administrator(s), shall retain and may exclusively enforce any and all such Causes of Action. The Post-Effective Date Debtors, the Plan Administrator, and the Litigation Administrator(s), as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or

**EXHIBIT H: Guest Post in CoinMarketCap by CoinPedia News about Celsius's $2-billion legal claim against FTX**

https://coinmarketcap.com/community/articles/64afb3aa7043ec2500ea9ade/







### Celsius Network's Legal Action Against FTX

Celsius Network has taken legal action by filing a $2 billion claim against FTX, a renowned cryptocurrency exchange operated by Alameda. The claim contends that certain users on the FTX platform engaged in trades with questionable motives that had a notable impact on the price of the Celsius CEL token during 2022. The CEL token experienced substantial price fluctuations, surging to $8.02 in June 2021 before plummeting to 68 cents by June 2022 following a market crash.

Apart from the claim against FTX, Celsius Network has also initiated legal proceedings against StakeHound. The lawsuit alleges that StakeHound failed to return approximately $150 million worth of tokens, including 55,000 ether, 50 million MATIC, and 66,000 DOT, to Celsius Network.

Celsius Network, led by CEO Alex Mashinsky, is a crypto lending platform that faced significant challenges leading to increased regulatory scrutiny. Investigators at the CFTC have accused the company of regulatory violations preceding its difficulties.

**EXHIBIT I: Debtors' proposed means of evaluating the Holders of CEL Token Deposit Claims' approval of their proposed CEL token valuation, from Disclosure Statement**

uncertain litigation, and expedites distributions to Account Holders.

The Debtors will evaluate the votes cast by Holders of CEL Token Deposit Claims (not including CEL Token Deposit Claims held by Equitably Subordinated Parties) and the number of Holders of CEL Token Deposit Claims that opt out of the Class Claim Settlement. Such votes will be disclosed on the Voting Report to be Filed by the Solicitation Agent. To the extent the majority of eligible Holders of CEL Token Deposit Claims vote to accept the Plan or not opt out of the Class Claim Settlement and/or the Debtors and the Committee reach an agreement with an ad hoc group of Holders of CEL Token Deposit Claims, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation. To the extent a majority of Holders of CEL Token Deposit Claims vote to reject the Plan, the Debtors will seek a determination from the Court of the relative rank and value of CEL Token on the Petition Date at Confirmation.