Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC, et al.,

8

9          Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    October 4, 2023

17                    9:05 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

Page 2

1    HEARING re HYBRID CONFIRMATION HEARING

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    WHITE & CASE LLP

 4          Attorneys for the Official

 5          Committee of Unsecured Creditors

 6          1221 Avenue of the Americas

 7          New York, NY 10020

 8

 9    BY:  AARON COLODNY

10          KEITH WOFFARD

11          JOSHUA WEEDMAN

12

13    KIRKLAND & ELLIS LLP

14          Attorneys for the Debtors

15          601 Lexington Avenue

16          New York, NY 10022

17

18    BY:  CHRIS KOENIG

19          ELIZABETH JONES

20          T.J. MCCARRICK

21          GRACE BRIER

22          JEREMY YOUNG

23

24

25
```

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        201 Varick Street, Suite 1006

4        New York, NY 10014

5

6   BY:  SHARA CORNELL

7        MARK BRUH

8        BRIAN MASUMOTO

9

10   QUINN EMANUEL URQUHART & SULLIVAN, LLP

11        Attorneys for Pharos Fund SP of Pharos Master SPC and

12        Pharos USD Fund SP of Pharos Master SPC

13        51 Madison Avenue 22nd Floor

14        New York, NY 10010

15

16   BY:  VICTOR NOSKOV

17

18   VENABLE LLP

19        Attorneys for Ignat Tuganov

20        151 West 42nd Street

21        New York, NY 10036

22

23   BY:  JEFFREY S. SABIN

24

25

1   PRO SE CREDITORS

2   RICHARD PHILLIPS

3   SHARON DOW

4   VICTOR UBIERNA DE LAS HERAS

5   DANIEL FRISHBERG

6   ARTUR ABREU

7   MIKE JOHNSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3    WITNESSES:              DIRECT:   CROSS:    REDIRECT: RECROSS:

4    MAXWELL GALKA          11

5    ROBERT CAMPAGNA

6

7    EXHIBITS:                                           PAGE:

8    UCC Exhibit 231                                     10

9    UCC Exhibit 228                                     20

10   UCC Exhibit 18                                      25

11   UCC Exhibits 16 & 17                                28

12   UCC Exhibit 70                                      29

13   UCC Exhibit 74                                      30

14   UCC Exhibit 75                                      31

15   UCC Exhibit 80                                      31

16   UCC Exhibit 82                                      32

17   UCC Exhibit 83                                      33

18   UCC Exhibit 84                                      35

19   UCC Exhibit 87                                      34

20   UCC Exhibit 229                                     41

21   Exhibit 46                                          117

22   Exhibit 7                                           121

23   Exhibit A                                           123

24

25

Page 7

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Morning.  All

4     right, Mr. Colodny.

5              MR. COLODNY:  Hi, Your Honor.  Aaron Colodny of

6     White & Case on behalf of the Official Committee of

7     Unsecured Creditors.  Our first witness this morning is

8     going to be Mr. Galka, but before I get to that, last night,

9     we filed a revised exhibit list which is at Docket No. 3702.

10    It includes a new exhibit marked as UCC 231 which is a

11    transcript of this proceedings in the matter of the United

12    States of America v. Roni Cohen-Pavon.  And that's Case No.

13    23-CR-000347.

14             And in that transcript, which I have copies for

15    Your Honor here, and be made available on our FTP site, and

16    I believe I sent a copy to your chambers last night, Mr.

17    Cohen-Pavon, who is the former chief revenue officer of the

18    Debtors enters a plea of guilty for certain charges against

19    him and testifies under oath.  And if it's ok with the

20    Court, if I can approach and give Your Honor --

21             THE COURT:  Sure.

22             MR. COLODNY:  -- a copy of the --

23             THE COURT:  Thank you.

24             MR. COLODNY:  If it's okay with Your Honor, I'd

25    like to read one paragraph of that into the record.

Page 8

1          THE COURT:  Sure.

2          MR. COLODNY:  So that paragraph begins on Page 38

3    at Line 17.

4          THE COURT:  Just wait.  Wait 'til I get there.  Go

5    ahead.

6          MR. COLODNY:  This is Mr. Cohen-Pavon testifying

7    and he says, "In October of 2021, I became responsible for

8    overseeing and approving Celsius' market purchases of CEL

9    token.  Beginning in 2019, Celsius publicly told CEL market

10   participants that the company was purchasing a certain

11   amount of CEL in the market to fund the interest payment

12   that it owned to Celsius' clients" --

13         THE COURT:  It owed.  I think you may have misread

14   -- just read that sentence again.

15         MR. COLODNY:  Says, "Beginning in 2019, Celsius

16   publicly told CEL market participants that the company was

17   purchasing a certain amount of CEL in the market to fund the

18   interest payments that it owned to Celsius' clients.  From

19   October 21 through December 31, 2021, I oversaw and at times

20   directly ordered a pattern of CEL token purchases in excess

21   of what the company needed to buy to meet its interest

22   obligations.

23         "I knew and understood that the purpose of these

24   excess purchases was at least in part to increase the price

25   of the CEL token, prevent the price of the CEL token from

Page 9

1    dropping, and all to create the appearance of a more liquid

2    market in CEL token trading, all of which were intended to,

3    at least in part, to induce additional CEL purchases by the

4    public at prices that likely did not reflect the true market

5    price.

6            "I communicated with other Celsius employees by

7    either email and telephone about these access purchases,

8    including the purpose behind the purchases at the time

9    agreed to order excess purchases based on the -- based on

10   agreement with orders from these other individuals.

11   Throughout this time," and then the Court stops him and I

12   will jump down to Paragraph 20.  The defendant --

13           THE COURT:  Line 20.

14           MR. COLODNY:  Line 20.  The defendant continues.

15   " I communicated with other Celsius employees by either

16   email and telephone about these excess purchases including

17   the purpose behind the purchases, and at times agreed to

18   order excess purchases based on agreement or orders from

19   these other individuals.  Throughout this time period, I

20   believe that the CEL token qualified as a security under the

21   relevant laws and regulation."

22           Your Honor, we would ask that UCC Exhibit 231 be

23   admitted into evidence.

24           THE COURT:  Any objections?  All right, UCC 231 --

25           MR. DAVIS:  I object, Your Honor.  There has been

Page 10

1    no opportunity to cross examine Roni Cohen-Pavon.

2              MR. COLODNY:  So Your Honor, last night we reached

3    out to Mr. Cohen-Pavon's counsel who confirmed that he is

4    unavailable and I believe that since this is a statement

5    against interest, the plea would be admissible under rule --

6    Federal Rule of Evidence 8033.

7              THE COURT:  One second.

8              MR. COLODNY:  804(b)(3) is unavailability, Your

9    Honor, as well.

10             THE COURT:  Okay.  Objection's overruled.  Exhibit

11   UCC 231 is admitted in evidence.

12             (UCC 231 Admitted Into Evidence)

13             MR. COLODNY:  Thank you, Your Honor.  I'll pass

14   the podium to my partner Joshua Weedman.

15             THE COURT:  Okay.

16             MR. WEEDMAN:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. WEEDMAN:  Joshua Weedman of White & Case on

19   behalf of the Committee.  Committee would like to call Max

20   Galka as our next witness.

21             THE COURT:  Okay.  Come on up.  Hi.

22             MR. GALKA:  Hi.

23             CLERK:  Raise your right hand, please.  Do you

24   solemnly swear or affirm that al the testimony you are about

25   to give before this Court is truth (indiscernible)?

Page 11

```
 1              THE WITNESS:  Yes, I do.
 2              MR. WEEDMAN:  And Your Honor, with permission, I
 3    have a binder for the Court --
 4              THE COURT:  Please.
 5              MR. WEEDMAN: -- witness.
 6              THE COURT:  Thank you.  Thank you.
 7                   DIRECT EXAMINATION OF MAX GALKA
 8    BY MR. WEEDMAN:
 9    Q    Good morning, Mr. Galka.
10    A    Good morning.
11    Q    Mr. Galka, what is your current employment?
12    A    I am the chief executive officer of Elementus.
13    Q    And what is Elementus?
14    A    Elements is a blockchain analytics and forensics
15    company.  We work with government agencies, financial
16    institutions, and a variety of other kind of parties to help
17    them understand what's actually happening on the blockchain.
18    Q    Does Elementus have any other specialties?
19    A    Well, we work with -- I work with government.  What we
20    focus on is helping them to trace the funds from illicit
21    activity which could be ransomware, dark net markets, or
22    other types of illegal activity on the blockchain and help
23    them find where the money goes.  When it comes to financial
24    institutions, our focus is mainly on helping them to
25    understand risk and identify market opportunities.
```

1    Q    Mr. Galka, could you please provide the Court with your

2    educational background?

3    A    Sure.  I graduated with a degree in finance from the

4    Wharton School of Business, a degree in computer science and

5    engineering from the University of Pennsylvania Engineering

6    School.  And I also taught data science as an adjunct

7    lecturer at the University of Pennsylvania.

8    Q    And Mr. Galka, do you have any experience with trading

9    in financial instruments?

10   A    Yes, I do.

11   Q    Could you please explain what that is?

12   A    Sure.  For nine years, I worked as a trader on Wall

13   Street at both Deutsche Bank and Credit Suisse, where I

14   traded a variety of different fixed income instruments

15   ranging from structured products, mortgage backed

16   securities, to insurance linked derivatives.

17   Q    Do you have as part of your experience in trading

18   financial instruments any experience with trading in

19   dislocated markets?

20   A    Yes, I have a great deal of experience trading

21   dislocated markets.

22   Q    And could you please explain for the Court what a

23   dislocated market is?

24   A    Sure.  Well, a dislocated market usually starts off

25   with some sort of shock to the market which could be a shock

Page 13

```
 1    to the supply and demand.  It could be a market rumor.  It
 2    could be a policy change on behalf of government.  But it's
 3    some sort of shock that sets the market price off in a
 4    trajectory that diverges from the underlying intrinsic
 5    value.
 6    Q    And Mr. Galka, could I please direct your attention to
 7    Tab 3 in the binder in front of you?
 8    A    Sure.
 9    Q    This is a document marked UCC Exhibit 228 with a docket
10    number of 3580.  Mr. Galka, do you recognize this as your
11    first declaration in this matter?
12    A    Yes, I do.
13    Q    And if you turn to Page 4 of this first declaration, do
14    you recognize that as your signature?
15    A    Yes.
16    Q    And Mr. Galka, do you see that your first declaration
17    attaches your expert report, which is in your binder as
18    Exhibit 2 that you prepared on September 22nd, 2023?
19    A    Yes.
20    Q    And your expert report from September 22nd contains two
21    primary opinions; is that right?
22    A    Yes, that's right.
23    Q    Can you briefly summarize for the Court your first
24    opinion set forth in your September 22nd expert report
25    regarding the company's prepetition purchases of the CEL
```

1    token?

2    A    Sure.  The opinion is that the company went into the

3    market and purchased more CEL token than what they had

4    announced as their stated policy, which had the effect of

5    artificially boosting the price for -- well, for the

6    duration of Celsius' existence.

7    Q    And sir, does your expert report also contain any

8    opinion as to the market price of CEL token calculated in

9    the petition date price notice?

10   A    Yes, it does.

11   Q    First of all, do you know what the market price for CEL

12   token was as of the date of the petition?

13   A    Yes, it was 81 cents.

14   Q    And what is the opinion that you are offering as to the

15   validity of that price?

16   A    In my opinion, that price has effectively zero

17   significance with respect to the actual intrinsic value of

18   the token, that the market had become dislocated.

19   Q    Could you please briefly explain why you believe it has

20   zero value?

21   A    Sure.  Well, I would say that at the time of the pause,

22   that was when the market for CEL token became dislocated.

23   You had a number of different factors at play.  Suddenly

24   about 40 percent of the supply of CEL token, which was

25   controlled by customers of Celsius, were suddenly locked up

Page 15

1    on their platform.  So those tokens were for all intents and

2    purposes excluded from the market.  So all that remained was

3    about 5 percent of the existing supply of CEL.  The pause

4    itself started a number of rumors swirling about the future

5    of Celsius and the potential for bankruptcy.  And after that

6    point, the market for CEL token became completely dislocated

7    from its intrinsic value.  And that's very clearly visible

8    just by looking at the volatility of the price between the

9    pause and the petition date.

10          THE COURT:  The second time in expressing your

11   opinion, you referred to intrinsic value.  Can you --

12          THE WITNESS:  Yes.

13          THE COURT:  -- explain what that is?

14          THE WITNESS:  Sure.  I would say that in this

15   discussion, if we're talking about the price of an asset, I

16   will either be talking about one of two things, the market

17   price, which is the price at which it's trading on different

18   trading venues, and the intrinsic value, which represents

19   the value of the asset separate and distinct from the market

20   price.  What is the actual value of this object?

21          THE COURT:  Go ahead.

22   BY MR. WEEDMAN:

23   Q    And Mr. Galka, just to follow up on the Court's

24   question, do -- are the market price on the intrinsic value

25   inherently linked in any way?

1    A    Well, for the most part, the market price is the

2    market's perception of what the intrinsic value is.  There's

3    no objective number to put on the intrinsic value in those

4    cases.  So it represents a reasonable, reliable estimate in

5    most cases when the market is trading under normal

6    conditions.  When a market becomes dislocated, what the

7    dislocated refers to is the dislocation of the market price

8    from the intrinsic value.  So in this case, the 81 cents was

9    a dislocated market price which really was not connected in

10   any way to the intrinsic value of the token.

11   Q    In addition to the dislocating factors that you just

12   discussed after the pause, were there any external shocks to

13   the economic system that might have affected the price of

14   CEL token around this time?

15   A    Yes.  Just as the backdrop, this was a crypto industry

16   that was in the middle of a bit of a panic.  The price of

17   Bitcoin had fallen more than 50 percent in the prior few

18   months.  There were a number of other crypto firms that had

19   already declared bankruptcy in the few months prior to that.

20   So the entire industry was a bit skittish and was worried

21   about what was going to be the next shoe to drop.  So this

22   was not coming out of nowhere.

23   Q    And Mr. Galka, after the pause, was the full supply of

24   CEL token available to be freely traded?

25   A    No, it was not.

1    Q    What percentage was locked up or what percentage was

2    available?

3    A    Well, if I were to break down the supply of CEL into

4    three buckets, what was owned by the company and its

5    treasury, what was owned by Celsius customers but sitting on

6    the Celsius platform, and what was owned by Celsius

7    customers but was outside of the Celsius platform, those

8    numbers would be about 55 percent of the supply of tokens

9    was in Celsius' treasury.  About 40 percent was on Celsius

10   owned by its customers, and about 5 percent was out there

11   outside of the Celsius platform.  So at the time of the

12   pause, that 40 percent that was owned by customers but was

13   sitting on Celsius became locked up.

14   Q    And does it matter, Mr. Galka, that only 5 percent of

15   the CEL token supply could be actively traded after the

16   pause?

17   A    Yes, it does.

18   Q    Could you please explain why?

19   A    Sure.  Well, there are a number of different reasons

20   why that would be conducive to a dislocated market.  I would

21   say the first one is that it's likely to think that some

22   percentage, if not a very large percentage, of those Celsius

23   customers that had their tokens sitting on the Celsius

24   exchange would have withdrawn them and attempted to sell

25   them during this period.  But once they became locked up,

Page 18

1     that completely removed the supply that -- the majority of

2     the supply out of the equation, which allowed the market to

3     be more free floating.  You -- it also has the impact of,

4     for anyone who has a short position that they're looking to

5     cover, there's a limited amount of CEL out there for them to

6     buy back.  So it increased the potential for a short

7     squeeze.  And just generally speaking, when you disrupt the

8     supply or the demand of a market to that degree, that's

9     undoubtedly going to have consequences and act as a real

10    shock to that market.

11    Q    Mr. Galka, does the market data that you've reviewed

12    support your conclusion that the CEL token market was

13    dislocated?

14    A    Yes, it does.

15    Q    And so based on what you just testified, is it your

16    opinion that the market price of CEL token is not a reliable

17    indicator of the value of the CEL token after the pause?

18    A    Yes, it is.

19    Q    Finally, Mr. Galka, with respect to your expert report

20    and your first declaration, you just referenced something

21    called a short squeeze.  Can you explain for the Court what

22    a short squeeze is?

23    A    Sure.  A short squeeze is a market condition in which

24    for some asset there is a large short open position, which

25    means there are people who are short the asset and at some

1    point, will need to go into the market to buy it back and

2    cover that short.  And the squeeze part usually starts with

3    some kind of upward shock to the price at which time anyone

4    who has a short on will need to either post margin or will

5    need to buy the security or asset back.

6        For those that do end up buying it back to cover their

7    short, that will drive the price higher.  And it creates

8    this cycle of increasing price that self-perpetuates.  And

9    what you also have sometimes is third parties that come in

10   from the outside to buy the price for the explicit purpose

11   of driving it up to sell it to the short coverers once they

12   buy their shorts back/

13   Q    Mr. Galka, what is the relevance of a short squeeze

14   here?

15   A    Well, there were discussions taking place on social

16   media after the time of the pause about a short squeeze.  I

17   believe there was a coordinated effort to effect a short

18   squeeze on the market.  From the data that we saw, there

19   were short positions put on after the pause and some of

20   those shorts look like they had to cover at prices far above

21   where they shorted it, so it looks like there was to some

22   degree short squeeze activity happening after the pause.

23       All that said, I would say that, you know, my

24   perspective is that anything after the pause is essentially

25   irrelevant for, with respect to looking at the intrinsic

1   value of the token.  So the fact that there was a short

2   squeeze, there were shorts, and that they were squeezed and

3   that the price moved around is really evidence that bolsters

4   and supports that conclusion.

5   Q    Mr. Galka, do you understand that your expert report

6   and your first declaration are being offered today as your

7   direct testimony under oath?

8   A    Yes, I do.

9            MR. WEEDMAN:  Your Honor, at this time, we would

10  offer evidence Exhibit UCC 228 and the initial first

11  declaration of Mr. Galka along with certain reliance

12  exhibits which are not yet into evidence which I can list

13  for Your Honor.

14           THE COURT:  Just a moment.  Any objections to the

15  Court admitting in evidence Exhibit 228, Mr. Galka's initial

16  report?  It's in evidence.

17           (UCC 228 Admitted Into Evidence)

18           MR. WEEDMAN:  And Your Honor, we offer Exhibits 16

19  to 26, 52 to 53 --

20           THE COURT:  Oh, 16 to 26 --.

21           MR. WEEDMAN:  52 to 53, 57 to 58, 65 to 68, 70, 74

22  to 75, 80, 82 to 84, and 87.

23           THE COURT:  Just briefly, are these in the binder?

24           MR. WEEDMAN:  They're not, Your Honor, but I have

25  a copy.

```
 1                THE COURT:  -- see them.

 2                MR. WEEDMAN:  And Your Honor, we're offering these

 3      as reliance materials for Mr. Galka.  And to be clear, Your

 4      Honor, they're also cited in his reports.

 5                THE COURT:  I understand, but I do want to see

 6      them.

 7                MR. COLODNY:  Your Honor, some of them are Excel

 8      sheets.

 9                THE COURT:  Mr. Galka, in preparing your report

10      which has just been admitted into evidence, did you rely on

11      the exhibits that have just been described, Exhibit 16 to

12      26, 52 and 53, 57 and 58, 65 through 68, 70, 74 through 75,

13      80, 82 through 84, and 87?

14                THE WITNESS:  Are these the exhibits here in my

15      binder?  Are those the --

16                THE COURT:  Did you put a copy in the binder

17      before the witness?

18                MR. WEEDMAN:  Your Honor, permission to approach?

19                THE COURT:  Yeah, please.  Yeah.  So the first

20      groups were 16 to 26.  I want you to confirm whether these

21      were materials you relied on preparing your report, which

22      has been admitted exhibit -- as Exhibit UCC 228; 16 through

23      26 is the first group.

24                THE WITNESS:  Yes, Your Honor.  I'm going through

25      them.
```

1            THE COURT:  Okay.

2            THE WITNESS:  Your Honor, I have not finished

3    going through these yet, but just --

4            THE COURT:  Take your time.

5            THE WITNESS:  -- having gone through the first

6    few, I can say that, I'm familiar with all the material in

7    here, but none of this did I rely on for my report from what

8    I've seen so far.

9            THE COURT:  I think he just undercut the basis for

10   your admitting them in evidence.  He's just testified he did

11   not rely on them.

12           MR. WEEDMAN:  Your Honor, if I may, these are

13   exhibits that are cited as reliance materials in the report

14   and for --

15           THE COURT:  The witnesses just testified he didn't

16   rely on them.  Would you like to take him through it?

17           MR. WEEDMAN:  Yeah, sure.

18           THE COURT:  If they're not -- if he didn't rely on

19   them, they don't come into evidence unless you establish a

20   separate foundation for each and every one of them.

21           MR. WEEDMAN:  Your Honor, if -- actually come back

22   to this on redirect to the extent --

23           THE COURT:  No.  If you don't want to admit the

24   evidence, then you go on to your next subject.  If you're

25   going -- if you're going to seek to admit them, you're going

Page 23

1    to do it now.

2             THE WITNESS:  Your Honor, may I speak freely?

3             THE COURT:  No.  Wait one --

4             THE WITNESS:  Sure.

5    BY MR. WEEDMAN:

6    Q    Mr. Galka, can I turn your direction to your report,

7    which is in Tab 3 in the binder in front of you, the spiral

8    binder in front of you?

9    A    Yes.

10   Q    And if you turn to Page 47 of the expert report, you

11   see that there's a list of materials relied upon?

12   A    Yes, I do.

13   Q    And Mr. Galka, does this refresh your recollection that

14   there were materials that you relied upon in preparing your

15   expert report?

16   A    Yes, it does.  Allow me to finish going through these,

17   please.

18           MR. KIRSANOV:  Your Honor, I object.  The witness

19   already indicated that he did not rely on the exhibits.

20           THE COURT:  The examination is still going on.

21   You'll have a chance on cross examination, if you wish to

22   examine.  Your objection is overruled.

23           Mr. Weedman, I would note that Exhibit B to his

24   report, list of materials relied upon, has Bates numbers, no

25   exhibit numbers.  There are no Bates numbers on the -- at

1    least, I've started to go through the exhibits in the binder

2    and I don't see Bates numbers on them.

3              MR. WEEDMAN:  One moment, Your Honor.  Your Honor,

4    I believe all the ones that were -- that have Bates numbers

5    on them have already been admitted to evidence and this

6    exercise that we're trying to admit the ones that are not

7    Bates numbered but were still relied upon or cited to.

8              THE COURT:  I'm at a complete loss.

9              MR. McCARRICK:  Your Honor, I think just to --

10   T.J. McCarrick, Kirkland & Ellis, on behalf of the Debtors.

11   Just to clear up the record a little bit with respect to the

12   Bates stamp reliance materials that are on the UCC's exhibit

13   list, those were moved into evidence following Mr. Ferraro's

14   direct examination.

15             I believe what the Committee is now attempting to

16   do is to admit additional non-Bates stamp reliance materials

17   that appear on page -- I guess pages, between 37 and 60 of

18   Mr. Galka's report.  And what might be helpful is just to

19   use those pages and tick through the exhibits in the binder

20   to confirm whether or not Mr. Galka relied upon them.  But

21   that's for the Committee.

22   BY MR. WEEDMAN:

23   Q    Mr. Galka, can I direct your attention to Tab 18 in the

24   big binder in front of you?

25   A    Sure.  And you see that this is a article about -- from

Page 25

1    Reuters titled "Bitcoin stabilizes after heavy losses, but

2    pessimism reigns in crypto markets."

3    A     Yes.

4    Q     And Mr. Galka, do you recall reviewing this in

5    preparation of your expert report?

6    A     Yes, I do.

7    Q     And was this something that you relied upon in

8    preparation of your expert report?

9    A     Yes, it was.

10             THE COURT:  That's Exhibit 18 -- Tab 18, UCC 18?

11             MR. WEEDMAN:  Correct, Your Honor.

12             THE COURT:  Any objections to UCC 18?  It's in

13   evidence.

14             (UCC 18 Admitted Into Evidence)

15   BY MR. WEEDMAN:

16   Q     Mr. Galka, can I --

17             THE COURT:  Let's -- we are going to take a brief

18   recess.  You better get your act together.

19             MR. WEEDMAN:  Thank you, Your Honor.

20             THE COURT:  Okay?  This -- you know, this ought to

21   be -- it ought to go smoothly.  Am I correct that everything

22   listed as a reliance material in Exhibit B to his report is

23   not among -- and you're saying they're already in evidence

24   and they're not among the exhibits that you're now seeking

25   to admit?  Do you understand my question?

1        MR. WEEDMAN:  I did not understand your question,

2   sir.

3        THE COURT:  I'm looking at Pages 47 through the

4   top of 56 of the report.

5        MR. WEEDMAN:  Yes.

6        THE COURT:  And it lists Bates numbers.  You're

7   representing those have already been in evidence?

8        MR. WEEDMAN:  I believe that those with Bates

9   numbers have -- were admitted into evidence after Mr.

10  Ferraro's --

11       THE COURT:  And that doesn't include anything that

12  you now are trying to admit?

13       MR. WEEDMAN:  That's correct, Your Honor.

14       THE COURT:  Are any of the exhibits which you're

15  seeking to admit, 16 to 26, 52 and 53, 57 and 58, 65, 68,

16  70, 74 and 75, 80, 82 to 84, and 87; are they listed in his

17  report?

18       MR. WEEDMAN:  They are, Your Honor.

19       THE COURT:  They are.

20       MR. WEEDMAN:  Throughout the report, the footnotes

21  and -- sorry.  The issue, Your Honor, we're having right now

22  is they're not cross referenced with the exhibit number that

23  we are -- that is on the UCC exhibit list.  And so that's

24  just the challenge when we're trying to walk through and tie

25  them.  But I appreciate Your Honor's suggestion for a short

Page 27

1    recess.  I think we can organize this very, very quickly.

2              THE COURT:  I'll be back on the bench at five to

3    ten.

4              MR. WEEDMAN:  Thank you, Your Honor.

5              (Recess)

6              CLERK:  All rise.

7              AUTOMATED VOICE:  Recording in progress.

8              THE COURT:  All right, everybody please be seated.

9    Mr. Galka, you're still under oath.  Mr. Weedman.

10             MR. WEEDMAN:  Thank you, Your Honor.

11   BY MR. WEEDMAN:

12   Q    Mr. Galka, when we broke, we were talking about certain

13   exhibits and whether or not you relied on them.  Can I ask

14   you, sir, do you still have your report in front of you?

15   A    Yes, I do.

16   Q    Can I ask you to turn to Page 27 of your report,

17   please?

18   A    Sure.

19   Q    And sir, do you see here that you're discussing certain

20   Slack messages?

21   A    Yes, I do.

22   Q    Okay.  And you see there is a Footnote 50 relating to

23   Etherscan transaction data?

24   A    Mm hmm.

25   Q    And can I ask you, sir, to please turn to, in your big

Page 28

1    binder, Tab 16 and 17?  You see --

2    A    -- got it.

3    Q    This reference is Excel data that's on the USB.

4    A    Sixteen through eighteen in the binder?

5    Q    Sixteen and seventeen.  The reference to Etherscan

6    data.

7    A    Yes.

8    Q    And is this the Etherscan data that you relied on in

9    Footnote 50 of your report?

10   A    Yes, it is.

11            MR. WEEDMAN:  Your Honor, I would offer Exhibits

12   16 and 17 into evidence.

13            THE COURT:  Any objections?  Sixteen and seventeen

14   are admitted.

15            (Exhibits 16 and 17 Admitted Into Evidence)

16   BY MR. WEEDMAN:

17   Q    Mr. Galka, on the same page, Footnote 51, do you see a

18   reference to -- the same page of your report, sorry, on Page

19   27.

20   A    Yes.

21   Q    Do you see a reference to Mashinsky trades corrected

22   XLSX?

23   A    Yes, I do.

24   Q    And do you see his XLSX, a reference to Excel data?

25   A    Yes, that's an Excel spreadsheet.

Page 29

```
 1   Q    And can I turn your attention to UCC Exhibit 70 in your

 2   big binder?

 3               THE COURT:  I'm sorry, which one?

 4               MR. WEEDMAN:  Seventy, sir.

 5               MR. COLODNY:  These ones aren't going to be in the

 6   binder, Your Honor, because they're exhibits that are in the

 7   --

 8               MR. WEEDMAN:  These are in the -- on the data

 9   files, the FTP file.

10               THE COURT:  Okay.

11   BY MR. WEEDMAN:

12   Q    And Mr. Galka, do you understand that the Excel data

13   for the Mashinsky trades which is on UCC Exhibit 70 is the

14   data that you relied upon in Footnote 51?

15   A    Yes.

16               MR. WEEDMAN:  Your Honor, I'd offer exhibit -- UCC

17   Exhibit 70 into evidence.

18               THE COURT:  It's in evidence.

19               (UCC Exhibit 70 Admitted Into Evidence)

20   BY MR. WEEDMAN:

21   Q    Mr. Galka, can I ask you to turn to Page 17 of your

22   report, please?

23   A    Yes.

24   Q    And sir, do you see in Footnote 32, there's a reference

25   to Celsius CEL OTC transactions and then an Excel suffix
```

1     there?

2     A     Yes, I do.

3     Q     And is that -- that's also a reference to an Excel data

4     sheet?

5     A     Yes, it is.

6     Q     And sir in Tab 74, UCC Exhibit 74, which is also data

7     which is on the FTP site, can you confirm that you relied

8     upon the data in that Excel chart in your reference to

9     Footnote 32?

10    A     Yes, I can.  Yes.

11              THE COURT:  So that's 74?

12              MR. WEEDMAN:  That's correct, Your Honor, and we

13    would offer that into evidence.

14              THE COURT:  All right, it's in evidence.

15              (UCC Exhibit 74 Admitted Into Evidence)

16    BY MR. WEEDMAN:

17    Q     And Mr. Galka, can you please turn to Page 13?

18    A     Yeah.  I got it.

19    Q     And do you see on Page 13, there is a Footnote 28

20    referencing Excel data for CEL token burn data?

21    A     Yes.

22    Q     And in UCC Exhibit 75, again on the FTP data site,

23    there is an Excel chart.  Can you please confirm that you

24    relied upon this CEL token burn data in UCC Exhibit 75 as

25    referenced in Footnote 28 of your report?

Page 31

1    A    Yes, confirmed.

2              MR. WEEDMAN:  Your Honor, we would offer UCC

3    Exhibit 75.

4              THE COURT:  All right, it's in evidence.

5              (UCC Exhibit 75 Admitted Into Evidence)

6    BY MR. WEEDMAN:

7    Q    Mr. Galka, will you please turn to Page 14 of your

8    report?

9    A    Okay.

10   Q    Footnote 30, there's a reference to an Excel chart, the

11   FREEZE report.  Do you see that?

12   A    Yes, I do.

13   Q    And that is on data which is UCC Exhibit No. 80.  Can

14   you confirm that the Excel chart in UCC Exhibit 80 is

15   something that you relied upon as reference to Footnote 30

16   of your report?

17   A    Yes, confirmed.

18             MR. WEEDMAN:  Your Honor, we would offer footnote

19   -- or, I'm sorry, we would offer UCC Exhibit 80 into

20   evidence.

21             THE COURT:  All right, it's admitted into

22   evidence.

23             (UCC Exhibit 80 Admitted Into Evidence)

24   BY MR. WEEDMAN:

25   Q    Mr. Galka, can you please turn to Page 10 of your

Page 32

1   report?

2   A    Yes.

3   Q    And do you see, sir, in Footnote 20 there's a reference

4   to Celsius magic-wallets.csv?  do you see that?

5   A    Yes, I do.

6   Q    And the data for that Celsius Magic Wallets is

7   reflected in UCC Exhibit 82.  Can you please confirm that

8   this is something that you relied upon in the preparation of

9   your expert report as reflected here?

10  A    Confirmed.

11          MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 82.

12          THE COURT:  All right, 82 is in evidence.

13          (UCC Exhibit 82 Admitted Into Evidence)

14  BY MR. WEEDMAN:

15  Q    Just a few more.  Can you please, Mr. Galka, turn to

16  Page 20 of your report?

17  A    Okay.

18  Q    And you see in Footnote 39 there is a reference to two

19  Excel charts for Celsius On-Chain Buybacks and Celsius

20  Weekly CEL Buybacks and Rewards.  Do you see that?

21  A    Yes, I do.

22  Q    And that data is included in UCC Exhibit 33 at FTP.

23  Can you please confirm that this is data upon which you

24  relied in preparing your report?

25  A    Yeah, confirmed.

Page 33

```
 1              MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 83

 2    into evidence.

 3              THE COURT:  All right, 33 is in evidence.

 4              MR. WEEDMAN:  And -- Your Honor, that was UCC 83.

 5    I'm not sure if I misspoke.

 6              THE COURT:  Oh, 83.  I'm sorry.  I misspoke.

 7    Okay, 83 is in evidence.

 8              (UCC Exhibit 83 Admitted Into Evidence)

 9    BY MR. WEEDMAN:

10    Q    And Mr. Galka, on the same page, the prior footnote

11    there is a reference to an Excel chart, Celsius Weekly CEL

12    Buybacks and Rewards.  Do you see that?

13    A    Yes, I do.

14    Q    And that data is included in UCC Exhibit 84.  Can you

15    please confirm that this is data upon which you relied in

16    preparing your report?

17    A    Yeah, confirmed.

18              MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 84

19    into evidence.

20              THE COURT:  All right, it's in evidence.

21              (UCC Exhibit 84 Admitted Into Evidence)

22    BY MR. WEEDMAN:

23    Q    Finally, Mr. Galka, can I have you turn to Page 23 of

24    your report?

25    A    Yes.
```

Page 34

1    Q    And you see in Footnote 43 there's a reference to OTC

2    transactions data UnMasked, UCC request, September 2023.

3    You see that?

4    A    Yes, I do.

5    Q    And that's also a reference to Excel data?

6    A    Yes.

7    Q    And can you please -- and that data is included on the

8    FTP for UCC Exhibit 87.  Can you please confirm that this

9    data is something upon which you relied on preparing your

10   expert report?

11   A    Confirmed.

12            MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 87

13   into evidence.

14            THE COURT:  All right, it's in evidence.

15            (UCC Exhibit 87 Admitted Into Evidence)

16   BY MR. WEEDMAN:

17   Q    Thank you, Mr. Galka.

18            MR. WEEDMAN:  Thank you, Your Honor, for your

19   indulgence.

20            THE COURT:  So you're not moving the rest in or --

21            MR. WEEDMAN:  That's all for now.

22            THE COURT:  All right.  Just, let me just go over

23   to make sure that my records are the same as yours.  My

24   records show that Exhibits 16, 17, and 18 have been admitted

25   in evidence.  And then exhibits -- UCC Exhibits 70, 74, 75,

1    80, 82, 83, 84, and 87 are in evidence.

2              MR. WEEDMAN:  That's correct, Your Honor.  May I?

3              THE COURT:  All right.  Go ahead.

4    BY MR. WEEDMAN:

5    Q    Now, Mr. Galka, I'd like to direct your attention to

6    Tab 4 in the small binder in front of you and this is UCC

7    Exhibit 229 with the docket number of 3659.

8    A    Okay.

9    Q    And Mr. Galka, is this second declaration that you

10   offered in this matter?  And it starts at the fourth page of

11   this.  Page 4 of 10 --

12   A    Yeah.

13   Q    -- on the banner at the top.

14   A    Yeah.  Yes, it is.

15   Q    Okay.  And Mr. Galka, if you turn to the last page of

16   this declaration, is that your signature?

17   A    Yes, it is.

18   Q    And Mr. Galka, why did you offer an additional second

19   declaration?

20   A    Well, after the first declaration, I had opined that

21   the price of 81 cents, the market price at the time of 81

22   cents, was not an accurate reflection of the intrinsic

23   value.  My opinion is that there is no reliable way of

24   putting a market price on it.  So I did not, but it was my

25   understanding that Your Honor wished to see a market price

Page 36

 1   which --

 2           THE COURT:  Well, I want to know the --

 3           THE WITNESS:  -- the value --

 4           THE COURT:  -- whether you had -- what I wanted --

 5   no, I know there's no market --

 6           THE WITNESS:  Yeah, sorry.

 7           THE COURT:  But my question that I had asked was

 8   whether you have an opinion about what the value of the CEL

 9   token was at the petition date.

10           THE WITNESS:  Yes.  I misspoke saying market price

11   and what I meant to say was the value.  Pardon me.  So I --

12   that was the substance of this second addition to my

13   opinion.  I still was not able to put a market price on it,

14   but I did give some additional context as to how I see the

15   intrinsic value.

16   BY MR. WEEDMAN:

17   Q    And --

18   A    Assuming --

19   Q    Can you explain for the Court why you were not able to

20   put a market price on the value of CEL token on the petition

21   date?

22   A    And apologies, when I misspoke when I said market

23   price.  I really meant intrinsic value.  Yes, I can.  Well,

24   there are really only two ways of getting to a -- to the

25   value of an asset.  One would be looking at the market price

Page 37

1  when the market is functioning under normal conditions.

2  Short of that, would be using some sort of model to

3  calculate a market price.  Now, when valuing most

4  traditional financial assets, what you're really -- what

5  you're really valuing is a series of future cashflows which

6  you're discounting back to the present, and that represents

7  the intrinsic value.

8      In this case, with the CEL token, there are no

9  cashflows.  So it doesn't really fit into any kind of

10  traditional asset valuation model.  The market or the

11  intrinsic value, I would not say is zero.  Certainly, I

12  think there are arguments for why it could have some

13  intrinsic value.  There is an argument that it could have

14  like a -- something of a meme coin intrinsic value to it

15  where people are trading it as some kind of like a

16  collectible.

17      There's, I imagine, some potential for it to

18  hypothetically have some value, if there is a hypothetical

19  entity that emerges from the restructuring that uses this

20  token and -- within its platform as a utility token.  I

21  could see an argument, if someone feels strongly that that's

22  going to be the case.  I could see an argument for that

23  having value.  In my opinion -- well, both of those factors

24  are well, really impossible to quantify and in my opinion,

25  de minimis.

1          So if I were asked to place a value on to this asset

2     and I were trading this token at the time of the petition

3     date, I would decline to put a price on it.

4               THE COURT:  If you knew with the petition date

5     that the Debtor is going to be liquidated, will never --

6     will not exist.

7               THE WITNESS:  Yes.

8               THE COURT:  What -- do you have a view of

9     hypothetically what the value of that would be, if you knew

10    at the petition date, no chance?

11              THE WITNESS:  Yeah, I think, the reality is, I

12    think in almost all circumstances, I would see the value as

13    being zero, Your Honor.

14              THE COURT:  So, you know, there are Chapter 11

15    debtors whose stock continues to trade over the over the

16    counter market, for example, at a petition date but it's a

17    guess or expectation that this debtor may reorganize and

18    equity will have some value, unknown at that time.  Okay.

19    Do you agree with that or -- I mean, it's a speculation, an

20    estimate whether you think this debtor can reorganize and

21    that there will be some equity now.

22              THE WITNESS:  Yes.  Yes.

23              THE COURT:  What about the situation with

24    something like the CEL token?

25              THE WITNESS:  Well, you know, utility tokens can

Page 39

```
 1    take any shape or form and there are -- it's really just up

 2    to your imagination what they can be used for.  In this case

 3    with the Celsius platform gone, I mean, the -- a utility

 4    token like this really has no real function outside of

 5    Celsius.  You know, as to whether or not this token could

 6    have a function in, like, a restructured entity that emerges

 7    from the restructuring, I mean, I can imagine hypothetically

 8    scenarios where it does, but I'm at that point, sort of

 9    grasping at straws.

10             THE COURT:  Okay.

11             THE WITNESS:  Yeah.

12    BY MR. WEEDMAN:

13    Q    And Mr. Galka, in coming to your conclusion that the

14    value of the CEL token would be de minimis at the petition

15    date, did you look at any historical pricing data?

16    A    Yes, I did.

17    Q    And do you have a view as to whether or not any

18    historical pricing data has any indicative value in coming

19    to a valuation of the CEL token at the time of the petition?

20    A    Well, I think there's a little bit you can infer from

21    the market pricing history.  At the time of the pause, the

22    price was around 35 1/2.  I think that's the last time the

23    market price really has any -- carries any information

24    regarding the intrinsic value, because after that, the

25    market became dislocated.  That being said, I think that is
```

Page 40

1    an upper bound even at the time of the pause and certainly

2    at the time of the petition, a significant upper bound.  IN

3    that month period between the pause and the petition, there

4    was a lot of news that came out.  None of it, as I recall,

5    was positive.  So, in my opinion, yeah, the 35 1/2

6    represents some sort of upper bound on what the price was at

7    the time of petition, but I think that that's an extremely

8    high upper bound and that more likely the prices -- the

9    value, excuse me, was something closer to zero.

10   Q    And Mr. Galka, the price at the time of the pause, do

11   you think that that's indicative of the price at the time of

12   the petition?

13   A    No.

14   Q    And why is that?

15   A    Well, because in that month that it passed, all the

16   information, all the news that came out about Celsius was --

17   I don't mean to make a absolute statement, but predominantly

18   negative.  So, if 35 1/2 represented an upper bound on the

19   intrinsic value at the time of the pause, then that is

20   certainly an upper bound at the time of the petition.  I

21   would expect the value to be substantially lower.

22   Q    And Mr. Galka, do you understand that the testimony set

23   forth in your declaration which is Exhibit UCC 229, Docket

24   3659 is being offered as your direct testimony under oath in

25   Court today?

Page 41

1    A    Yes, I do.

2              MR. WEEDMAN:  Your Honor, we would offer into

3    evidence UCC Exhibit 229, Docket No. 3659 into evidence.

4              THE COURT:   Any objections?  All right, it's

5    admitted into evidence.

6              (UCC Exhibit 229 Admitted Into Evidence)

7    BY MR. WEEDMAN:

8    Q    Mr. Galka, one final question.  We just heard some

9    reference to utility tokens.  Can you describe what you

10   understand the utility token to be?

11   A    Yes.  A utility token is a token that has some kind of

12   function within the platform for which it was designed.  So

13   for example, on Celsius, I believe that the CEL token could

14   be used to make interest payments on loans that you had

15   taken out and you get some kind of discounted interest rate

16   if you pay with CEL.

17        Conversely, if you have your assets sitting there and

18   earning interest, you can elect to earn the interest in CEL

19   and get a boosted rate.  And I believe depending on the

20   amount of CEL that you held on the platform, it unlocked

21   various features within the website.  So a utility token has

22   a function within the ecosystem for which it was designed,

23   but outside of that, it's just a ledger of transactions.

24   Q    And in your opinion, is there any way to put any

25   quantification to the value of a utility token?

Page 42

1   A    Hard to say, in the general sense, because utility

2   tokens can be anything we want them to be.  But generally

3   speaking, no.  I am not familiar with any methodology for

4   valuing utility token.

5            MR. WEEDMAN:  Thank you, Mr. Galka  I pass the

6   witness, Your Honor.

7            THE COURT:  All right, thank you.  Anybody in the

8   courtroom wish to cross examine?

9            MR. KIRSANOV:  Dimitry Kirsanov, pro se --

10           THE COURT:  Just a second.  Is there anyone in the

11   courtroom who wishes to cross examine?  All right.  Mr.

12   Kirsanov, on Zoom.

13           MR. KIRSANOV:  Thank you, Your Honor.

14                 CROSS EXAMINATION OF MAX GALKA

15   BY MR. KIRSANOV:

16   Q    Good morning, Mr. Galka.

17   A    Good morning, Mr. Kirsanov.

18   Q    You've never been employed by a competitor of Celsius,

19   have you?

20   A    No.

21   Q    You haven't invested in any competitor of Celsius, have

22   you?

23   A    No, I have not.

24   Q    You've never been involved with FTX or Alameda

25   Research, is that correct?

1   A    Well, Alameda Research participated in a fundraising

2   round of ours in our Series A fundraising, so if -- to the

3   extent being involved with includes that, then yes.

4   Q    What is your opinion of the price of CEL token on

5   bankruptcy day?

6              MR. WEEDMAN:  Objection.

7              THE COURT: Sustained.

8   BY MR. KIRSANOV:

9   Q    So the deciding -- I'm sorry.  So the decision

10  regarding the price of CEL token on bankruptcy day is your

11  own assessment?

12             MR. WEEDMAN:  Objection.

13             THE COURT:  Let me ask you.  You're asking for his

14  opinion on the value of the CEL token as of the petition

15  date; is that correct, Mr. Kirsanov?

16             MR. KIRSANOV:  That's correct.

17             THE COURT:  All right.  Are you able to answer

18  that?

19             THE WITNESS:  Sorry.  Could you repeat the

20  question, please, Mr. Kirsanov?

21  BY MR. KIRSANOV:

22  Q    So the decision regarding the price of CEL token on

23  bankruptcy day is your own assessment?

24             THE COURT:  Let me ask this.  Do you have an

25  opinion about the value of the CEL token at the petition

1    date?

2             THE WITNESS:  Yes.  I would say that it is de

3    minimis, very close to zero, but I do not have a number that

4    I can put on it.

5    BY MR. KIRSANOV:

6    Q    Do you not have an exact, precise opinion for the

7    bankruptcy day evaluation?  Correct?

8    A    Well, I have a precise opinion.  I do not have a

9    precise number, if that's your question.

10   Q    Mr. Galka, you did not extensively study the Celsius

11   wallet structure, did you?

12   A    Yes, I did, as a matter of fact.

13   Q    You did?  Okay.  You were not provided with information

14   about Celsius that regular creditors couldn't access, were

15   you?

16            MR. McCARRICK:  Object to form.

17            THE COURT:  Sustained.

18   BY MR. KIRSANOV:

19   Q    You have no knowledge of any technical issues related

20   to Celsius wallets, do you?

21   A    Could you be more specific, please?

22   Q    Were there any technical issues that you were aware of

23   with Celsius wallets?

24   A    Could you please be more specific what you mean by

25   technical issues?

Page 45

1   Q    Any technical issues with Celsius wallets.

2            MR. McCARRICK:  Objection.

3            THE COURT:  Sustained.  You're going to have to

4   make your questions more specific and clear.

5            MR. KIRSANOV:  Yes, Your Honor.

6   BY MR. KIRSANOV:

7   Q    Were you aware of any technical issues related to

8   Celsius custody wallets?

9            THE COURT:   What do you mean by technical issues,

10  Mr. Kirsanov?

11           MR. KIRSANOV:  I'd like to actually put in Exhibit

12  4 and if I may request permission for the witness to have a

13  copy.

14           MR. WEEDMAN:  Your Honor, we would object.  We

15  haven't received any exhibits.

16           THE COURT:  Mr. Kirsanov, did you post exhibits

17  last night?

18           MR. KIRSANOV:  Yes, I did.

19           THE COURT:  Okay.  Does somebody have them?

20           MR. McCARRICK:  Yeah, I think -- the Debtors have

21  a copy, Your Honor.  Give us a second.

22           THE COURT:  Okay.  I got Mr. Davis' list of

23  exhibits, but I did not see Mr. Kirsanov's.  But Mr.

24  Kirsanov, if you'll hold on, one of the Debtors' counsel is

25  going to hand the exhibit to the witness.

Page 46

```
 1               MR. KIRSANOV:  I appreciate that.  Thank you.

 2               THE COURT:  All right.  Go ahead, Mr. Kirsanov.  I

 3       think the witness has it.  I have a copy of it and so do

 4       other counsel.

 5       BY MR. KIRSANOV:

 6       Q    Mr. Galka, does this appear to be the Celsius app?

 7       A    Bear with me just one moment, please, Mr. Kirsanov.

 8               THE COURT:  Which are -- you're referring to

 9       Exhibit 4 in your little packet?

10               MR. KIRSANOV:  Correct.  Yes, sir.

11               THE COURT:  Yeah, that's labeled, "Example of

12       inability to transfer funds ahead of freeze April 19, 2022."

13       That's the date on it.  It's Page 3 of 6 of ECF 3694.

14       BY MR. KIRSANOV:

15       A    Okay, I have it in front of me, Mr. Kirsanov.   Would

16       you mind repeating your question?

17       Q    Absolutely.  Does this appear to be the Celsius app?

18       A    Yes, it does.

19       Q    Does this appear to be a Celsius transfer?

20               MR. WEEDMAN:  Objection, Your Honor.  I think this

21       is outside of the scope of anything that this witness --

22               THE COURT:  Overruled.

23       BY MR. KIRSANOV:

24       A    Well, it appears to be a pending transfer.  It says you

25       will transfer.  So, yes, it seems like a transfer that has
```

 1    not yet been effected.

 2    Q    Does this appear that the wallet has funding?

 3    A    Yeah, from what I can make out, yes, it does look like

 4    the wallet does have these --

 5    Q    -- why would the wallet show that I am unable to

 6    transfer zero funds?

 7              MR. McCARRICK:  Objection.  Lacks personal

 8    knowledge.

 9              THE COURT:  Sustained.

10    BY MR. KIRSANOV:

11    Q    Can you find the orange message at the top?

12              MR. WEEDMAN:  Objection, Your Honor.

13    (indiscernible).

14              THE COURT:  I don't know what the -- what is your

15    question, Mr. Kirsanov?

16              MR. KIRSANOV:  I'm trying to ask if he can define

17    that orange message in the top of the --

18              THE COURT:  -- you can't transfer zero funds?  Is

19    that what you're --

20              MR. KIRSANOV: Correct.

21              THE COURT:  Do you have any idea what that is

22              THE WITNESS:  No, I do not.

23    BY MR. KIRSANOV:

24    Q    I also like you to refer to Exhibit 6 at this point.

25              THE COURT:  Exhibit 6 is Page 5 of 6 of ECF 3694.

Page 48

1    Go ahead, Mr. Kirsanov.

2    BY MR. KIRSANOV:

3    Q    Okay.  Does this also appear to be the Celsius app?

4    A    Yes, it does.

5    Q    Does this appear to be a Celsius transfer?

6    A    Yes, it looks like a transfer that has -- is pending

7    confirmation.

8    Q    Does this appear -- does -- excuse me.  Does this

9    appear that the wallet has funding?

10   A    Yes, it does.

11   Q    What is the message in orange, error -- the error

12   message contradictory?

13           MR. McCARRICK:  Objection.

14           THE COURT:  Sustained.

15   BY MR. KIRSANOV:

16   Q    There's a clear explanation for why the wallet is

17   showing insufficient funds, isn't there?

18           MR. McCARRICK:  Objection.

19           THE COURT:   Sustained.

20   BY MR. KIRSANOV:

21   Q    Do you have any idea why it indicates the funds are not

22   available, Mr. Galka?

23           MR. WEEDMAN:  Objection, Your Honor.

24           THE COURT:  Overruled.

25   BY MR. KIRSANOV:

Page 49

```
 1    A    Well, I can read the message.  I see that the amount,

 2    it says not enough funds, 100,000 CEL requested and only

 3    271,585 cell is available, which of course doesn't make a

 4    whole lot of sense.  All that being said, I don't know why

 5    this message came up, if that's your question./

 6              MR. KIRSANOV:  Your Honor, could I enter these

 7    exhibits into evidence?

 8              MR. McCARRICK:  Objection.

 9              THE COURT:  Sustained.  There's no foundation for

10    these documents having been laid.

11    BY MR. KIRSANOV:

12    Q    When was the Custody wallet created?

13              MR. WEEDMAN:  Objection, Your Honor.

14              THE COURT:  Overruled.  You can answer if you

15    know.

16    BY MR. KIRSANOV:

17    A    I don't know.

18    Q    Based on your written testimony, you indicated it was

19    created in April of 2022; it this information accurate?

20    A    Yeah, if it's in my written testimony, then yes, that

21    is accurate.

22              THE COURT:  May I ask you, Mr. Kirsanov, what

23    paragraph of his written testimony are you referring to?

24              MR. KIRSANOV:  I do not have that exactly offhand,

25    but it was in his written testimony.
```

Page 50

1              THE COURT:  Was it in the original testimony or

2       this, the more recent supplemental declaration?

3              MR. KIRSANOV:  I believe -- I'm not sure about

4       that, Your Honor.

5              MR. COLODNY:  Your Honor, it's on Paragraph 61

6       (inaudible).

7              THE COURT:  Of the original?

8              MR. COLODNY:  The original.

9              THE COURT:  Just give me a minute.

10             MR. COLODNY:  (indiscernible).

11             THE COURT:  Yes.  Do you have your original report

12      in front of you, Paragraph 61?

13             THE WITNESS:  Yes, I do.  It's on Page 12.  Go

14      ahead with your questions, Mr. Kirsanov.

15      BY MR. KIRSANOV:

16      Q    Are you familiar with the Blonstein declaration, Mr.

17      Galka?

18      A    No, I am not.

19             MR. KIRSANOV:  Can Mr. Galka please be provided my

20      Exhibit 2?

21             THE COURT:  Mr. Kirsanov --

22             CLERK:  Yeah, we could ask --

23             THE COURT:  If you'll wait, we'll see if we can

24      find it.  You reference it on the first page of your filing,

25      Page 1 of 6.  Exhibit 2 is ECF 1531, but we don't have all

Page 51

1    of these in the courtroom.  Someone is trying to see whether

2    they can locate it.

3              MR. McCARRICK:  Can we make Mr. Young a cohost?

4              THE COURT:  Yes, you can.

5              CLERK:  Just pull it up --

6              MR. McCARRICK:  And Mr. Young, if you could --

7              CLERK:  (indiscernible).

8              MR. McCARRICK:  Thank you.

9              THE COURT:  Deanna, you can make Mr. Young a

10   cohost.  We'll put it up on the screen.

11             CLERK:  Okay.

12             THE COURT:  Thank you very much.

13             CLERK:  Just one moment.

14             MR. KIRSANOV:  Thank you.

15             CLERK:  Okay, he is a cohost.

16             MR. McCARRICK:  Okay.  Mr. Young, could you

17   display Docket No. 1531?

18             MR. YOUNG:  1531?

19             MR. McCARRICK:  Yes, sir.

20             MR. YOUNG:  -- second.

21             THE COURT:  Sure.  Fine.

22             MR. McCARRICK:  Apologies for the delay.  It

23   should be shared on screen now.

24             MR. KIRSANOV:  Thank you.

25             THE COURT:  All right, so on the screen in the

Page 52

1    courtroom, I don't know whether you can see it or not, is

2    exhibit -- the Blonstein declaration, ECF 1531.

3            MR. KIRSANOV:  If you could scroll down to Page 8,

4    please.

5    BY MR. KIRSANOV:

6    Q    Mr. Galka, is this document dated June 6th of 2022?

7    A    Yeah, that that's the date that I see at the top of the

8    chart right there.

9    Q    Was this before Celsius froze?

10   A    Yes, it is.

11   Q    In this document, are there adequate amounts of CEL

12   token under assets to meet the liabilities of Custody and

13   Withhold?

14           MR. WEEDMAN:  Objection.

15           THE COURT:  Sustained.

16   BY MR. KIRSANOV:

17   Q    In this document, there are not an adequate number of

18   CEL tokens under assets to meet the liabilities of Custody

19   and the Withhold, are there?

20           MR. WEEDMAN:  Objection, Your Honor.

21           THE COURT:  Sustained.

22   BY MR. KIRSANOV:

23   Q    Mr. Galka, how many CEL are shown there under assets?

24   A    The number that I see there is -- appears to be

25   1,184,948.  Although I would say that this is a document

1    that I have not seen before, so I'm just reading what is --

2    what I see appearing on the screen.

3    Q    Thank you, Mr. Galka.  Could you tell me what it says

4    under liabilities for CEL and under Withhold for CEL?

5    A    Yeah, liabilities I see negative one million, nine

6    hundred -- or excuse me, ninety-seven thousand, one, seven,

7    four, and Withhold, I see 402,804.

8    Q    Mr. Galka, does -- do the assets reflect lower than

9    the liabilities?

10              MR. WEEDMAN:  Objection, Your Honor.

11              THE COURT:  Sustained.

12   BY MR. KIRSANOV:

13   Q    Mr. Galka, would it be safe to say the liabilities are

14   1.5 million or thereabouts?

15              MR. WEEDMAN:  Objection, Your Honor.

16              THE COURT:  Sustained.  I don't -- you know, I

17   don't understand what you're asking.

18              MR. KIRSANOV:  I'm trying to ask if effectively

19   the assets held were less than the liabilities.

20              MR. WEEDMAN:  Your Honor --

21              THE COURT:  First off, this document is not in

22   evidence.  That's number one.  I'm permitting you to cross

23   examine from it.  Have you seen this document before?

24              THE WITNESS:  No, I have not, Your Honor.

25              THE COURT:  Let's move on.  The document is not in

Page 54

1   evidence.  The witness has not seen it before.  I've permit

2   you to cross examine from this document, but it's not in

3   evidence.

4           MR. KIRSANOV:  Can I submit it into evidence?

5           THE COURT:  No.  You can't.  Let's move along.

6           MR. KIRSANOV:  All right, I'm going to move along.

7   BY MR. KIRSANOV:

8   Q    Mr. Galka, CEL token did not have a price after

9   bankruptcy, did it?

10  A    Well, it did have a market price, yes, and it does to

11  this day.

12  Q    Okay.  CEL token is not actively traded today, is it?

13  A    Yes.  In fact, I believe it is to some degree.

14  Q    The price of CEL token one after bankruptcy was not --

15  A    Sorry, Mr. Kirsanov, did you have a question?

16  Q    Yes.  What was the price of CEL token one month after

17  bankruptcy?

18  A    Oh, I don't have that number off the top of my head.

19  Q    Was there a price of CEL token on December 20th, 2022?

20          MR. WEEDMAN:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. KIRSANOV:

23  Q    What is the price of sale today?

24  A    I don't know the price of it.  I think last I checked

25  it was something in the ballpark of maybe 10 cents, but I --

Page 55

```
 1    Q    Thank you, Mr. Galka.  I -- you answered the question.

 2    Did the price of CEL token exceed $1 after the bankruptcy

 3    day?

 4    A    Yes, I believe it did.

 5    Q    Did the price of CEL token exceed $2?

 6    A    Yes, I believe it did.

 7    Q    Did it exceed $3?

 8    A    It may have.  I don't recall what it reached at a peak,

 9    but I do recall it being above $2.  It may have gone higher

10    than that.

11    Q    Did it surprise you that the CEL token rose in price

12    following bankruptcy?

13    A    Well, I would say yes to the extent that had you asked

14    me to speculate ahead of time whether the price would go up

15    or go down, I certainly would have chosen down.  That being

16    said, in a dislocated market like this --

17    Q    Mr. Galka, thank you.

18              THE COURT:  Don't interrupt the witness when he's

19    answering.  Did you finish your answer?

20              THE WITNESS:  Just to finish out the last piece,

21    in a dislocated market like that, much like the GameStop

22    stock, very crazy things can happen.  So it was not all

23    altogether shocking to see the price go up after bankruptcy.

24    BY MR. KIRSANOV:

25    Q    Thank you, Mr. Galka.  Would it be important to
```

Page 56

1   determine the price of an asset following a bankruptcy?

2   A    I'm sorry.  What's the question, Mr. Kirsanov?

3   Q    Would it be important to determine the price of an

4   asset following a bankruptcy?

5          MR. WEEDMAN:  Objection, Your Honor.

6          THE COURT:  Overruled.

7   BY MR. KIRSANOV:

8   A    Is it important.  I don't feel that I'm qualified to

9   answer whether -- the importance of determining the price.

10  Q    Well, Mr. Galka, if there's a bankruptcy and you have

11  an asset, you do want to determine the price of that asset;

12  is that correct?

13  A    Well, it's my understanding that the Court wishes to

14  know the value of the asset, not necessarily the market

15  price.

16  Q    Would it be important to determine the price of that

17  asset a month after bankruptcy?

18  A    I don't know, Mr. Kirsanov.

19  Q    Do you have an analysis on the price of CEL post-

20  bankruptcy?

21  A    Do I have an analysis?  I've seen the price of it post-

22  bankruptcy.  I don't recall any explicit analyses.

23  Q    Does your pricing opinion apply on the price of CEL

24  token after the bankruptcy filing day?

25          MR. McCARRICK:  Objection.

1           THE COURT:  Sustained.  He doesn't give an opinion

2    about the price.  Any more questions, Mr. Kirsanov?

3           MR. KIRSANOV:  Yes, sir.

4           THE COURT:  Let's move along.

5    BY MR. KIRSANOV:

6    Q    You were not aware that the proposed Chapter 11 plan

7    has the CEL token settlement at 25 cents, were you?

8    A    I have heard that number mentioned but I'm not familiar

9    with the details.

10   Q    You were not aware that the CEL Custody token deposit

11   claims are excluded in the CEL token settlement, were you?

12   A    No, I do not believe so.

13   Q    You are not aware that the Custody CEL tokens found in

14   the Custody program have been ruled on to be owned by the

15   creditor, were you?

16          MR. KIRSANOV:  Exhibit 3, please?  May I request

17   permission for the witness to see that?

18          THE COURT:  All right, Mr. Kirsanov, what he's

19   described as Exhibit 3 is Page 2 of 6 of ECF Docket No.

20   3694.  It's "CEL token price since bankruptcy, trading

21   view," is what it's labeled.

22   BY MR. KIRSANOV:

23   Q    Mr. Galka, are you familiar with a chart such as this?

24   A    Yes, this looks like a candlestick chart.

25   Q    Would you consider the crypto market volatile?

1    A    Sure.  Compared to traditional financial markets, yes,

2    absolutely.

3    Q    You answered my next question.  Thank you.  Was the CEL

4    token volatile prior to the freeze date?

5    A    Compared to traditional financial assets, yes.

6    Q    Was the CEL token volatile -- excuse me.  Was the CEL

7    token volatile prior to the bankruptcy date?

8    A    Was it volatile?  Well, if we're comparing to

9    traditional financial markets such as the S&P500 or the

10   market for government treasuries, I would say --

11   Q    Respectfully --

12            THE COURT:  Don't interrupt, Mr. Kirsanov.  He

13   hadn't finished his answer.

14   BY MR. KIRSANOV:

15   A    Yeah, I would say that that all cryptocurrencies are

16   volatile, if that's the measure.

17   Q    Was the CEL token volatile a month after bankruptcy?

18   A    Yes.

19   Q    Does the CEL token continue to be volatile?

20   A    Over what time horizon?

21   Q    Since bankruptcy day.

22   A    I can't say.  I can say that it was volatile in the

23   period shortly after the petition date, but I have not

24   examined the volatility in the entire period since then.

25   Q    In this exhibit, does the CEL token appear to be over

1   $5 after the bankruptcy filing?

2   A    Yeah, it looks like one of the intraday prices did

3   exceed $5, yes.

4   Q    This would suggest a higher intrinsic value than the

5   bankruptcy filing value of 81 cents, correct?

6            MR. McCARRICK:  Objection.  It's not in evidence.

7            THE COURT:  Sustained.

8   BY MR. KIRSANOV:

9   Q    You stated that you assist others in finding market

10  opportunities; is that accurate?

11  A    Yeah, that's correct.

12  Q    For a CEL token holder, not on Celsius at the date of

13  bankruptcy, this would have presented a selling opportunity,

14  wouldn't it?

15           MR. McCARRICK:  Objection.

16           THE COURT:  Sustained.

17  BY MR. KIRSANOV:

18  Q    Did you make an assessment to determine if I had

19  financially participated in the short squeeze?

20  A    I'm sorry.  Could you repeat that one, please?

21  Q    Did you make an assessment to determine if I had

22  financially participated in the short squeeze?

23  A    You in particular, Mr. Kirsanov?

24  Q    Correct.

25  A    No, not to my knowledge.

Page 60

 1            MR. KIRSANOV:  Your Honor, may I enter any of

 2    these into evidence?

 3            MR. McCARRICK:  Objection.

 4            THE COURT:  Sustained --

 5            MR. McCARRICK:  No --

 6            THE COURT:  There's no foundation.

 7            MR. KIRSANOV:  Okay.  Thank you for your testimony

 8    today, Mr. Galka.  Your Honor, I have no further questions.

 9    Thank you.

10            THE COURT:  Thank you, Mr. Kirsanov.  Anybody else

11    wish to cross examine?

12            MR. DAVIS:  Yes, Your Honor.

13            THE COURT:  Mr. Davis.

14            MR. DAVIS:  Thank you, Judge.

15    BY MR. DAVIS:

16    Q    Good morning, Mr. Galka.

17    A    Good morning, Mr. Davis.

18    Q    Would you say that when preparing your expert report,

19    it was created and submitted in a professional manner, free

20    of any bias, undue influence, or undisclosed conflicts?

21    A    Yes, I would.

22    Q    Are you sure about that, as you are about all of the

23    conclusions and statements you made in your report to date,

24    meaning both your expert report and your supplemental

25    declaration?

Page 61

1        MR. McCARRICK: Objection.

2        MR. WEEDMAN:  Objection.

3        THE COURT:  Sustained.

4   BY MR. DAVIS:

5   Q    You have stated prior here today about Alameda Research

6   invested in your company.  How much was that investment?

7   A    I don't recall the dollar figure.  It was less than 1

8   percent of the company at the time.  We were raising our

9   Series A which was about a $12 million fundraise.  They put

10  in about $200,000.  To date, we've raised about close to $27

11  million, so it's a fairly small portion of the investment.

12  I said $200,000; I don't know that that's necessarily the

13  exact number, but something in that ballpark.

14  Q    Could it have been $500,000?

15  A    No, it was not $500,000.

16  Q    Okay.  Did you disclose the Alameda Research

17  relationship to the examiner and the UCC before you were

18  engaged?

19  A    Yes.  Yeah, this was disclosed in a document, I believe

20  the document was filed in October, but this was disclosed

21  prior to that.

22  Q    Are you aware of Alameda Research's relationship with

23  FTX?

24  A    Well, I'm aware that the two organizations have a very

25  close relationship.  I don't know specifically what that

Page 62

1   relationship is, whether one is the parent and the child or

2   -- but yes, I'm aware that they are closely affiliated.

3   Q    Do you know that Sam Bankman-Fried owns both entities?

4   A    I don't know the ownership structure of those two

5   entities.

6   Q    Seeing that Alameda Research gave you capital

7   investment, does Alameda Research have any influence,

8   control, or input in how you operate your company or conduct

9   your research?

10  A    No.

11  Q    Have you ever had any communications with Sam Bankman-

12  Fried in the two years?

13  A    No. I've never had any communications with Sam Bankman-

14  Fried.

15  Q    How much stock options or debt instruments in your

16  company does Alameda Research or FTX possess?

17  A    Zero.

18  Q    Are there any board members or officers of your company

19  that were selected or appointed by Alameda Research or FTX?

20  A    No.

21  Q    Did you know of a company called Cherokee Acquisitions?

22  A    Yes.

23  Q    Are you aware that Cherokee Acquisitions has been

24  involved in buying and selling Celsius (indiscernible) at

25  significant discount, 20 to 30 cents on the dollar since

Page 63

1    August 2022?

2    A    No --

3              MR. McCARRICK:   Objection.

4    BY MR. DAVIS:

5    Q    Does your company or your company's board of directors

6    have any relationship with Cherokee Acquisitions?

7    A    Well, I -- if we're talking about organizational

8    structure, I'm not sure.  The owner of Cherokee Acquisitions

9    was an investor in our -- one of our early rounds.  So, yes,

10   there is a relationship but I don't know if it's, the entity

11   that participated was Cherokee or if it was just him in his

12   personal capacity, as I sit here.

13   Q    You know an individual by the name of Vladimir

14   Jelisavcic?

15   A    Yes.

16   Q    J-E-L-I-S-A-V-C-I-C, for the record.

17   A    Yes.  Yes.

18   Q    Is Vladimir Jelisavcic an investor, shareholder, or

19   board member of Elementus

20   A    Yeah, he was one of our early investors.

21   Q    So he's on your board?

22   A    No, he's not on our board.

23   Q    Was he ever on your board?

24   A    Yes.  I believe it was early on for a short while.

25   Q    What time period?

Page 64

```
 1   A    I don't recall, as I sit here.  He participated in our

 2   friends and family round, which was a very small early round

 3   that we had raised before we had built the product, which I

 4   believe was back in, I think --

 5   Q    -- a year?

 6   A    I'm sorry?

 7            THE COURT:  Can you tell him the year?

 8   BY MR. DAVIS:

 9   Q    Can you give us a timeframe.  Year.

10   A    The year was 2018 when we closed that round.  I don't

11   recall --

12   Q    So --

13            THE COURT:  Mr. Davis, allow the witness to answer

14   questions before you ask your next question.

15            MR. DAVIS:  Sorry, Judge.

16            THE COURT:  Mr. Galka, had you finished your

17   answer?

18   BY MR. DAVIS:

19   A    I'm sorry, could you repeat the question again, Mr.

20   Davis?

21   Q    Is mister -- what time period was Vladimir Jelisavcic

22   on your board?

23   A    I really don't recall.  It was -- yeah, I really don't

24   recall.  It was 2018, was when we closed that round.  I

25   don't recall the board movements.
```

Page 65

1    Q    -- fall, summer, spring of 2018?

2    A    I believe it was spring of 2018 was when we closed that

3    fundraising round and when we formed the company, so that

4    would have been around the time that he joined the board.  I

5    don't recall.  The makeup of the board had shifted several

6    times after that.  It's been several years since he has been

7    on the board; although, don't recall the exact date.

8    Q    Was he the founder of Cherokee?

9    A    Was he the founder of Cherokee?  Yes, I --

10   Q    Correct.

11   A    -- believe so.

12   Q    Did you or Elementus purposely create a false and

13   overly negative representation of Celsius' bankruptcy

14   situation to encourage creditors to sell their Celsius claim

15   to Cherokee Acquisitions at deflated prices to Vladimir

16   Jelisavcic as a board member and apparently have a financial

17   interest?

18            MR. McCARRICK:  Objection.

19            THE COURT:  Sustained.  Mr. Davis, if you want to

20   ask --

21            MR. DAVIS:  Understood, Your Honor.

22            THE COURT:  -- questions, they better be

23   appropriate and not compound.

24            MR. DAVIS:  I'll move on.

25            THE COURT:  Do you have any more questions?

1           MR. DAVIS:  Yes, I do.

2    BY MR. DAVIS:

3    Q    Are you familiar with Shoba Pillay?

4    A    I'm sorry, who?

5           THE COURT: Shoba Pillay.

6    BY MR. DAVIS:

7    A    No.

8    Q    The examiner.

9           THE COURT: She was the examiner in Celsius.

10          THE WITNESS:  Yeah, I --

11          THE COURT:  -- partner at Jenner and Block --

12          THE WITNESS:  Okay.  Okay.  The name didn't ring a

13   bell, but yes, I understand now who she is.

14   BY MR. DAVIS:

15   Q    Did you provide information to Shoba Pillay for the

16   examiner's final report?

17   A    Yes, I believe we did.

18   Q    Does the information you provided in the examiner

19   report match the information you provided both in the Max

20   Galka expert report and the Max Galka supplemental

21   declaration?

22   A    I would assume so, although I have not reviewed it

23   recently to check.  I don't know what has changed in that

24   time, so I can't say that definitively.

25   Q    Mr. Galka, can lien tokens have value?

Page 67

1    A     Lien tokens.  Yeah, I would say so.

2    Q     Can they have significant value?

3    A     Yes, sure.  There are examples where they can have

4    significant value.

5    Q     Do you know the value of Dogecoin?  For example, the

6    market cap of Dogecoin, which is entirely a new coin, do you

7    know what the market cap of Dogecoin is, which has zero

8    utility?

9    A     No, not offhand.  I know I'm fully fairly familiar with

10   Dogecoin. That one is a very popular one in this ecosystem.

11   Elon Musk has tweeted about it several times.  I know that

12   the value is quite substantial.

13   Q     Does 8.5 billion -- does 8.5 billion market cap sound

14   about what it is today?

15             MR. WEEDMAN:  Objection.

16             THE COURT:  Sustained.

17   BY MR. DAVIS:

18   Q     Mr. Galka, can you describe what action would someone

19   have needed to take in order to short CEL token on FTX?

20             MR. McCARRICK:  Objection.

21             MR. WEEDMAN:  Objection.

22             THE COURT:  Sustained.

23   BY MR. DAVIS:

24   Q     With your expert trading background, are you familiar

25   with how short selling an asset can lower the market price

Page 68

1    value of a particular asset?

2    A    Yes.

3    Q    In your investigations and analysis for the expert

4    report, did you or are you aware about the moment of the

5    pause on June 12th, 2022 the amount of open short positions

6    against CEL token on FTX exploded from 8 million short

7    positions to over 20 million short positions?

8              MR. McCARRICK:  Objection.

9              THE COURT:  Sustained.

10   BY MR. DAVIS:

11   Q    Are you aware that --

12             THE COURT:  You're not -- Mr. Davis.  You can't

13   testify now.  If you want to ask questions, you can ask

14   questions.

15             MR. DAVIS:  Sure.

16   BY MR. DAVIS:

17   Q    Mr. Galka, can you turn to -- can you please turn to

18   and read from Page 47 of your report, No. 156?

19             THE COURT:  I'm sorry, which page, Mr. Davis?

20             MR. DAVIS:  Forty-seven, Your Honor.  Item No.

21   156.

22             MR. McCARRICK:  I think that's the docket where

23   the --

24   BY MR. DAVIS:

25   Q    Yeah, 47 of 83.

Page 69

```
 1    A      So this would be numbered Page 409?

 2    Q      It's the docket number, yes, numbered Page 40.

 3    A      Yeah.  Okay.

 4           THE COURT:  Go ahead.  Ask your question.

 5    BY MR. DAVIS:

 6    Q    Mr. Galka, in your explanation of a short squeeze, you

 7    say it is a condition that triggers rapidly rising prices

 8    when a coin or a token has a significant number of short

 9    sellers, meaning it's being heavily shorted and lots of

10    investors are betting it will go down.  Can you tell us what

11    happens when those short sellers are wrong and the price

12    begins to rise?

13    A    I'm sorry.  Could you repeat the question, please?

14    Q    Mr. Galka, in your explanation of a short squeeze, you

15    say it is a condition that triggers a rapidly rising prices

16    when a coin or token has a significant number of short

17    sellers.

18           THE COURT:  It actually says, "in a stock or other

19    tradeable security."  So if you're going --

20           MR. DAVIS:  I mean --

21           THE COURT:  -- from his report, read it

22    accurately.

23           MR. DAVIS:  Sure.

24    BY MR. DAVIS:

25    Q    Mr. Galka, in your explanation of a short squeeze, you
```

Page 70

1    say a short squeeze is a condition that triggers rapidly

2    rising prices in a stock or other tradable security.

3    A    Yes.

4    Q    Can you tell us what happens when those short sellers

5    are wrong and the price begins to rise?

6    A    What happens in a typical short squeeze?

7    Q    Correct.

8    A    Well, I think a lot of different things can happen.  So

9    we're talking hypotheticals here.  But if we're kind of

10   talking about the prototypical short squeeze such as

11   GameStop, what would happen as the price begins to rise is

12   that people with a short position need to post margin

13   because to cover the liability of the position that's moving

14   against them.

15       At some point, people run out of money to be able to

16   post margins, so they're forced to go into the market to buy

17   the asset back and cover their short, which drives the price

18   up and creates more pressure for the additional people that

19   have the open short positions.  You quite commonly will see

20   other market participants come in, deliberately trying to

21   push the price up, seeing an opportunity to profit by

22   squeezing out these shorts and the price can go up extremely

23   high in some cases.

24   Q    Thank you.  In order to short an asset, do you borrow

25   that asset from an exchange?

1    A    Well, yeah.  Typically when you're shorting an asset,

2    you are borrowing it from somebody who owns the asset and in

3    exchange, you are giving them some sort of collateral,

4    usually cash.  And then you sell that asset into the market

5    and later you buy it back, hopefully at a lower price.

6    Q    What happens when you sell the asset into the market?

7          MR. McCARRICK:  Objection.

8    MR. DAVIS:

9    Q    Does the price go down?

10         THE COURT:  If you can answer it, go ahead.

11   BY MR. DAVIS:

12   A    It could.

13         THE COURT:  Mr. Davis --

14   BY MR. DAVIS:

15   Q    -- then you buy back that asset?

16         THE COURT:  Mr. Davis, I'm giving you another ten

17   minutes and then --

18         MR. DAVIS:  Okay.

19         THE COURT:  -- your examination is over.

20         MR. DAVIS:  Okay.

21         THE COURT:  Go ahead.

22   BY MR. DAVIS:

23   Q    Would you agree that the term funding rate in this

24   context refers to the amount of money it costs to keep a

25   leverage trading position open?

1            MR. WEEDMAN:  Objection.

2            THE COURT:  Sustained.

3            MR. DAVIS:  One second, Your Honor.

4    BY MR. DAVIS:

5    Q    Did you and your team receive the discovery from

6    FTX.org, the product of a subpoena that was issued by this

7    Court?

8    A    Yes, we did receive the -- a series of documents

9    produced from FTX.  Yes.

10   Q    One (audio glitch), Mr. Galka.  Mr. Galka, please turn

11   to Page 72 of your expert report titled, "Analysis of

12   Company CEL purchases, data versus rewards, and other

13   transactions."

14   A    Mr. Davis, this is numbered Page 64?  Is that right?

15   Q    Yes, Page 72 of your report.

16           MR. WEEDMAN:  -- 72 on --

17           THE COURT:  Yes.

18           THE WITNESS:  Yeah.  Okay.

19           THE COURT:  Page 64 of the numbered page, the

20   bottom of the page.

21           MR. WEEDMAN:  Thank you, Your Honor.

22   BY MR. DAVIS:

23   A    Okay, Mr. Davis, I have it open.

24   Q    Mr. Galka, on Page 72 of your report, it indicates that

25   during the period January 2020 to April 2021, the company

Page 73

1   was a net seller of about 23 million CEL tokens, meaning the

2   company sold 23 million more CEL tokens than it purchased.

3   Is that correct?

4           MR. WEEDMAN:  Objection.

5           THE COURT:  Sustained.

6   BY MR. DAVIS:

7   Q   Please turn to page 19 of your report.

8           THE COURT:  Which page number are you using, at

9   the top or the bottom?

10          MR. DAVIS:  The top.

11  BY MR. DAVIS:

12  A   Okay.  I have it open.

13  Q   Are you aware that during the same exact period from

14  January 2020 to April 2021 where your report shows on Page

15  19 Figure 3 that CEL token rose in price from 15 cents to

16  over $6?

17          MR. WEEDMAN:  Objection.

18          THE COURT:  Overruled.

19  BY MR. DAVIS:

20  A   Yes, I -- that -- I don't see the price at its lowest

21  point, but yeah, it goes from something that's -- looks like

22  a matter of cents up to what appears to be in the ballpark

23  of $8.

24  Q   Do you have any explanation for how the price of CEL

25  token could rise from -- by over 4,000 percent from the

Page 74

1    period of January 2020 to April 2021, in a period where

2    Celsius was selling an additional 23 million CEL tokens?

3              MR. WEEDMAN:  Objection, Your Honor.

4              THE COURT:  Sustained.

5    BY MR. DAVIS:

6    Q    Mr. Galka, additionally, can you confirm that your

7    report shows on Page 72 between May 2021 to July 2022, the

8    company purchased a net 25 million XSL (audio glitch)?

9              MR. WEEDMAN:  Objection, Your Honor.

10             THE COURT:  Overruled.  He's referring to Page 72

11   of 83.  There's a column for company buybacks.  If you're

12   able to answer the question, go ahead.

13   BY MR. DAVIS:

14   A    Yeah, I'm sorry, what was the question, Mr. Davis?

15   Q    Can you confirm that your report shows on Page 72

16   between May 2021 through July 2022, the company purchased a

17   net 25 million excess CEL tokens?

18   A    So this is Page 72, numbered at the top?

19   Q    72 of 83, correct.

20   A    Yeah, and I'm sorry, could you repeat the question

21   again?  The number you mentioned, I didn't see here.

22             THE COURT:  It doesn't show --

23             MR. DAVIS:  (indiscernible).

24             THE COURT:  -- and it requires the map.

25             MR. DAVIS:  It's his expert report, Judge.  I

Page 75

```
 1   thought he was --

 2            THE COURT:  Mr. Davis -- are you able to answer

 3   the question, Mr. Galka?

 4            MR. GALKA:  I didn't follow the question, Your

 5   Honor.

 6            THE COURT:  He wants to know -- what's the date

 7   range you're asking about?  Mr. Davis, what date range are

 8   you asking about their purchase?

 9            MR. DAVIS:  Oh, I'm sorry, May 2021 to July 2022.

10            THE WITNESS:  Okay.  And your question is?

11            THE COURT:  He wants to know how many they -- how

12   many they repurchased, the company bought back during that

13   period, May '21 to July '22.

14            THE WITNESS:  Yeah, I see the numbers here.  I'm

15   not so good at arithmetic to be able to sum those up in my

16   head.

17            THE COURT:  Ask your next question, Mr. Davis.

18   BY MR. DAVIS:

19   Q    Mr. Galka, in your opinion, do changes in the price of

20   major assets like Bitcoin and Ethereum affect smaller assets

21   like CEL token?

22            THE COURT:  You're going to have to ask your

23   questions more slowly, Mr. Davis.  I have a hard time

24   following.

25            MR. DAVIS:  Sure.  Sorry.
```

Page 76

1    BY MR. DAVIS:

2    Q    Mr. Galka, in your opinion, do changes in the price of

3    major assets like Bitcoin and Ethereum affect smaller assets

4    like CEL token?

5    A    Yes, certainly there's some correlation between them.

6    Yes.

7    Q    Do you take into consideration the price movements of

8    major assets like Bitcoin and Ethereum and how they may

9    affect smaller assets like CEL token?

10   A    No, not directly.

11   Q    Mr. Galka, you said the market became dislocated at the

12   time of the pause and that a lot of volatility occurred

13   between the pause and the petition date.

14   A    Yes, that's right.

15   Q    Isn't it true that crypto markets are extremely

16   volatile?

17   A    Sure, relative to traditional financial markets, yeah,

18   absolutely.

19   Q    What's the volume of CEL token on June 11th, 2022, the

20   day before the pause?

21   A    Sorry.  Could you repeat the question please, Mr.

22   Davis?

23   Q    What was the volume of CEL token on June 11th, 2022,

24   the day before the pause?

25   A    I don't number -- don't know that number off the top of

Page 77

1    my head.

2    Q    What was the volume of CEL token on the date of the

3    pause?

4    A    I don't know the volume numbers off the top of my head,

5    Mr. Davis.

6    Q    Okay.  Is it correct that your report indicates at the

7    bottom of Page 72 that Celsius' net CEL token position was

8    only 1.8 million CEL tokens or 0.28 percent of the total 693

9    million CEL token supply from January 2020 to July 2022?

10   A    Pardon, I'm not following.

11          THE COURT:  I don't see that in the chart.  Is

12   there some place that you're pointing to on the chart, Mr.

13   Davis?

14          MR. DAVIS:  Yes, Your Honor.  Bottom right, 1.886.

15          THE COURT:  What's your question?

16   BY MR. DAVIS:

17   Q    Is it correct that your report indicates at the bottom

18   of Page 72 that Celsius' net CEL token position was only 1.8

19   million CEL tokens or 0.2 percent of the total 693 million

20   CEL token supply from January 2020 to July 2022?

21   A    No, I would say that the net position was substantially

22   larger than that.

23   Q    Why do you have this 1.8 million number on your

24   document?

25   A    I'm sorry, I don't understand the question, Mr. Davis.

1    Are you wondering about --

2    Q    What does -- on the bottom right of Page 72, what does

3    this 1.8 million number represent?

4    A    That represents the difference between the company

5    buybacks minus the interest and the net OTC.

6    Q    Is it your testimony that Celsius manipulated the

7    entire CEL token market by purchasing a net 1.8 million CEL

8    tokens, as reflected on the bottom right of your -- of Page

9    72 on your report?

10   A    I'm sorry, can you -- could you repeat the question,

11   please?

12   Q    It is their testimony that Celsius manipulated the

13   entire CEL token market by purchasing a net 1.8 million CEL

14   tokens?

15   A    No --

16   Q    Over the 31-month period of January 2020 to July 2022.

17   A    No.  No, I would say that -- well, manipulation, I

18   don't know the legal definition of manipulation, so I would

19   rather not use that term as part of my testimony.

20   Q    I'm --

21           THE COURT:  -- Mr. Davis, do not interrupt.

22   BY MR. DAVIS:

23   A    The -- my first opinion was with respect to Celsius'

24   buying activity and how it affected the market price.  I

25   would say that out of all the different opinions that I've

1    put here that one is really kind of the, just really the

2    backdrop because at the time of the pause, the market became

3    dislocated what.  What I intended to demonstrate was that

4    the price of CEL token was never really a reliable indicator

5    of its underlying value.  That being said, the arguments and

6    all the other opinions with respect to the price on the

7    petition date really does not depend on that first opinion.

8              THE COURT:  Thank you, Mr. Davis.  Your time is

9    up.

10             MR. DAVIS:  Your Honor --

11             THE COURT:  -- take a recess --

12             MR. DAVIS:  -- few more questions.

13             THE COURT:  -- until 11:15.  We'll resume at

14   11:15.  If there's anybody else on Zoom who wishes to

15   examine, I will recognize you then.

16             MR. WEEDMAN:  Your Honor, could you instruct Mr.

17   Galka --

18             THE COURT:  Yeah, don't talk to anybody --

19             THE WITNESS:  Okay.

20             THE COURT:  -- about your testimony.

21             THE WITNESS:  Okay, Your Honor.  Yeah.

22             (Recess)

23             CLERK:  All rise.

24             AUTOMATED VOICE:  Recording in progress.

25             THE COURT:  Please be seated.  All right.  We're

1    back on the record and Mr. Galka, you're still under oath.

2              THE WITNESS:  Okay.

3              THE COURT:  Does anybody else wish to cross

4    examine Mr. Galka?

5              MR. ABREU:  Yes, Artur Abreu, pro se creditor.

6              THE COURT:  Mr. Abreu, go ahead.

7    BY MR. ABREU:

8    Q    Good morning, Mr. Galka.

9    A    Good morning, Mr. Abreu.

10   Q    In your declaration, you said you have 15 years of

11   experience, which includes trading complex derivatives at

12   Credit Suisse, Deutsche Bank, and nine years of experience

13   trading financial instruments.  This is correct?

14   A    Yes.  Yes, that's correct.

15   Q    You also found the Elementus (indiscernible) company

16   that specializes in reading blockchain data?

17   A    Yes, that's correct.

18   Q    Is it fair for me to conclude that you have a

19   significant or are comfortable speaking, even if just in a

20   broader sense, about concepts of cryptocurrency derivatives,

21   in the case of derivatives from crypto exchanges?

22   A    Conceptually, sure.  I can't speak to the specifics,

23   derivatives that various exchanges had or how the mechanics

24   work, but conceptually, certainly, yeah.

25   Q    We have an understanding of perpetual products provided

Page 81

1    by most (indiscernible)?

2            MR. McCARRICK:  Objection.  I couldn't understand.

3            THE COURT:  Could you just ask that again, slowly?

4    I had trouble understanding.

5    BY MR. ABREU:

6    Q    Do you have understanding of perpetual projects which

7    is a derivative provided by crypto exchanges, by most crypto

8    exchanges?

9    A    Perpetual swaps?  Is that what you're referring to?

10   Q    Perpetual products which includes perpetuals positions

11   there are -- that don't have a closing date.

12           THE COURT:  Mr. Abreu, I'm having difficulty

13   understanding what you're asking.

14           MR. ABREU:  Yeah.  Okay, I will give -- can I give

15   the context of my question?

16           THE COURT:  Sure, go ahead.

17           MR. ABREU:  So my question is that there was

18   significant positions on the derivative sites of CEL token

19   which influenced the price.  And I'm just trying to

20   understand --

21           THE COURT:  Let me ask, do you agree with that

22   much of the question, that trading derivatives with CEL

23   token influenced the price.

24           THE WITNESS:  I --

25           THE COURT:  -- that was the question.

Page 82

```
 1    BY MR. ABREU:

 2    A    Yeah, I -- it would not be surprising if it did.  I

 3    would not say conclusively that it did.  I don't know that

 4    it did, but it's certainly possible.

 5    Q    Did you -- so let me go back to your declaration.

 6              MR. ABREU:  I'm going to refer, Judge, by the

 7    document page, so the PDF number.

 8              THE COURT:  Okay.

 9              MR. ABREU:  Which, give me just one moment to --

10              THE COURT:  Sure.

11              MR. ABREU:  -- look at mine as well. S

12    BY MR. ABREU:

13    Q    So on Page 25 of your expert report --

14              THE COURT:  Are you talking about the supplemental

15    expert report?

16              MR. ABREU:  No, no, no.  The expert report, not

17    the supplemental.  Docket No. 3580.

18    BY MR. ABREU:

19    Q    So an eight -- in the eight-point analysis of data from

20    FTX --

21    A    Okay.  Yes, I have it open.

22    Q    Okay.  So under the eight, analysis of data from FTX.

23    on the sub-point which is 90, I understand that certain

24    creditors and other parties in these cases have indicated

25    that there were significant short positions open on FTX
```

Page 83

```
 1    exchange in the picture from before the pause to after the

 2    petition date.  The FTX Debtors also produced information

 3    showing borrowing positions on the FTX exchange from May

 4    2022 to the petition date, as well information with respect

 5    to the accounts that placed those short positions.

 6            THE COURT:  Okay --

 7    BY MR. ABREU:

 8    Q    -- which are discussed in further detail in this

 9    report.  Where in this report --

10            THE COURT:  Just stop for a second.

11            MR. ABREU:  Sorry.

12            THE COURT:  You had a lot of information that's

13    not in evidence, and I want to see whether Mr. Galka -- do

14    you know the information that Mr. Abreu is referring to?

15            THE WITNESS:  Yeah, so I'm looking at No. 90 and

16    I'm hearing you read out what's there at No. 90 about the

17    short position opened on FTX.  Yes, that I'm familiar with.

18            THE COURT:  Okay.

19            THE WITNESS:  And that the FTX Debtors, they

20    produced information with respect to borrow positions on the

21    exchange.  I'm familiar with that information as well.

22            THE COURT:  Go ahead, Mr. Abreu.

23    BY MR. ABREU:

24    Q    Yeah, but in this point, you say, "which are discussed

25    further in detail in this report."  What are you referring
```

Page 84

1    that is in detail in this report?

2    A    As I sit here, I don't recall where it's discussed in

3    further detail.  I'm looking just to -- scanning through the

4    pages.  I see it mentioned here in 97 --

5              THE COURT:  What 97?

6              THE WITNESS:  But I --

7              THE COURT:  Paragraph No. 97?

8              THE WITNESS:  Yes, Paragraph No. 97, just right on

9    the next page.  In short, I don't know all the specific

10    places where it's referred to in the report.

11    BY MR. ABREU:

12    Q    At no point in this report do you provide any data that

13    was subpoenaed by FTX relating to the short positions,

14    correct?

15    A    That sounds correct, yes.

16    Q    Why not?

17    A    Why -- I don't have an answer for that one.

18    Q    But didn't you just say that you're going to report in

19    detail in this document, but you did not provide such

20    detailed information?

21    A    Well, the last clause of Paragraph 9 says, "which are

22    discussed further in further detail in this report."  So I -

23    - there are other places in the report where this is

24    discussed in more detail, but your question was about the

25    underlying data which does not appear in the report.

Page 85

1   Q    So you're basically saying that you do not provide any

2   detail, correct?

3   A    No, I'm saying that I do not believe that the

4   underlying full data is in the report, but there is -- it's

5   discussed in further detail, as it's mentioned here.

6   Q    Is it fair to say that you should have mentioned that

7   because you do report about the price (indiscernible) CEL

8   but never produced the short information that you got that

9   data from?  Would be a fair assessment that you should have

10   provided?

11   A    I'm sorry, could you repeat the question, please, Mr.

12   Abreu?

13   Q    Will it be a fair assessment that if you are mentioning

14   the price of CEL or at least showing the charged positions

15   and that you -- that you have that data from subpoena,

16   shouldn't been inserted here on this document?  I said it --

17   go ahead.  Go ahead.

18   A    Your question is about whether the raw data should have

19   been included in the document?  I --

20   Q    Yes.

21   A    -- can't answer that one.  I don't know.

22   Q    Because you just replied to me that the derivatives or

23   the perpetuals do have an impact in price, but you do not

24   provide any information about that, correct?

25        MR. WEEDMAN:  Objection, Your Honor.  Think that

Page 86

1    misstates his prior testimony.

2              THE COURT:  He can answer the question.

3    BY MR. ABREU:

4    A    Yeah.  What you're referring to right now is the

5    underlying data that we received from FTX and that we

6    examined for the opinion written here.  That underlying

7    data, the full data set, I do not believe is in the report.

8    What the clause that you referenced here says is that --

9              THE COURT:  Where are you reading from?

10             THE WITNESS:  This is Paragraph 90 at the very

11   end, the last --

12   BY MR. ABREU:

13   Q    Are the -- Paragraph 90?

14   A    Yes.

15             THE COURT:  Go ahead.

16   BY MR. ABREU:

17   A    Which was the one I believe that you were referring to,

18   where it ends --

19   Q    Okay.

20   A    -- by saying, "as well as information with respect to

21   the accounts that placed those short positions which are

22   discussed in further detail in the report."  Nowhere in

23   there does it say --

24   Q    So --

25   A    -- anything about providing the full underlying data

Page 87

1    that we examined.

2    Q    Okay, so where is the information respective to these

3    accounts?

4             MR. WEEDMAN:  Objection, Your Honor.   Asked and

5    answered.

6             THE COURT:  Sustained.

7             MR. ABREU:  Okay.  Can you -- Mr. Otis put an

8    exhibit, one of letters to the Court.  It's Docket 2882.

9    Could the Court provide this to Mr. Galka?

10            THE COURT:  One of the counsel is bringing that up

11   now, Mr. Abreu, so you just have to wait for a minute.

12   Okay?

13            MR. ABREU:  Of course.  Thank you.  Thank you.

14            THE WITNESS:  Thank you.

15            THE COURT:  All right, so a copy of ECF 2882 has

16   been provided to the witness and to me, and I believe other

17   counsel have it as well.  Go ahead, Mr. Abreu.

18   BY MR. ABREU:

19   Q    Could you go to Page 10 of the PDF?

20            THE COURT:  Ten of 37?

21            MR. ABREU:  Exactly.

22   BY MR. ABREU:

23   A    Okay, I have it open here.

24   Q    So this is the data that I took from FTX.  They

25   provided also short position data before they went bankrupt.

1    The data that you received a subpoena, can you confirm if

2    this data here which is also from FTX, I do make some

3    treatments on Excel, but can you speak to the general

4    understanding and what you recollect from the data that you

5    got from FTX, if those charts which have a time stamp, which

6    is (indiscernible) time, if you recall seeing, for example,

7    the reported landing of CEL which can be perceived as the

8    short condition?  Can you recall these values or with that

9    data that you received?

10                MR. WEEDMAN:  Objection, Your Honor.

11                THE COURT:  Let me ask you first.  Have you seen

12    before now the data that's on Page 10 of 37 of ECF 2882?

13                THE WITNESS:  Well, it appears to show the short

14    position --

15                THE COURT:  What I want to -- have you seen it

16    before?

17                THE WITNESS:  No, I have not.

18    BY MR. ABREU:

19    Q    You have not?

20    A    This particular table, no.  I have not seen it before.

21    Q    I'm not referring to a particular table, but the values

22    on the table.

23                THE COURT:  I'm not going to have him interpreting

24    a document he hasn't seen before.

25                MR. ABREU:  Is, just the values, that they should

Page 89

1   match those that he received from the subpoena, so should be

2   straightforward.

3                MR. McCARRICK:  Objection.

4                MR. WEEDMAN:  Objection, Your Honor.

5                THE COURT:  Sustained.

6                MR. ABREU:  Okay, can you move to the Page 9 of 37

7   of the same documents.

8                THE COURT:  Nine of 37.

9                MR. ABREU:  Yes.

10  BY MR. ABREU:

11  Q    So this first picture shows the funding rights of

12  perpetuals.  Can you see it, Mr. Galka?

13  A    Yes, I can.

14  Q    Do you see the -- on June 11th, the funding rate of FTX

15  -- and you can correct me if this is wrong -- was as

16  reported by, I believe it's CoinGecko -- sorry.  If you look

17  on the Page 8, I took the link where it is coming from.

18  It's from CoinGlass.  And this refers to the funding rate of

19  the derivatives between 20 -- 31 of May to July 12th.  So

20  but I didn't make a question.  Mr. Galka, do you see that

21  funding, that negative 1.77?

22                MR. WEEDMAN:  Objection, Your Honor.

23                MR. McCARRICK:  Object to foundation.

24                THE COURT:  Sustained.  Have you seen this chart

25  before?

1            THE WITNESS:  No, I have not, Your Honor.

2    BY MR. ABREU:

3    Q    From the data that you got subpoenaed from FTX,

4    (indiscernible) to the funding right from the derivatives

5    products?

6    A    You're asking me to recall the -- all the different

7    columns and -- that we received in the data from FTX?

8    Offhand I --

9    Q    Yes --

10   A    I don't recall.

11   Q    Around this date, so we're talking June 11.  So this is

12   before the pause.

13           THE COURT:  Mr. Abreu --

14   BY MR. ABREU:

15   Q    Do you recall --

16           THE COURT:  Mr. Abreu.

17           MR. ABREU:  Yes.

18           THE COURT:  You can't use -- if he hasn't seen it

19   and it's not in evidence, I don't know where these charts

20   came from or what it is, so I'm sustaining the objection to

21   the questions about it.  It may be that -- well, I don't

22   know what it is.

23           MR. ABREU:  The picture, it's on the previous

24   page, it shows the source.

25           THE COURT:  That is not getting it into evidence.

Page 91

1    Your statement about it is not the foundation that's

2    required in order to introduce this into evidence.

3              MR. ABREU:  Thank you.  Thank you, Your Honor.  So

4    I will rephrase it.

5    BY MR. ABREU:

6    Q    Mr. Galka, did you ever spotted any unusual funding

7    rates on the perpetuals or derivatives from FTX, from your

8    data that you requested that were open and were affecting

9    the price before the pause, so before June 13th?

10   A    Sorry, can you repeat the question one more time,

11   please?

12   Q    From the data that you received from FTX, did you

13   receive data pertaining to the derivatives that they -- that

14   they had on the products of sale which you say that

15   influence also the price or could influence the price?

16   A    Yes.  We looked at data regarding the derivatives, if

17   that's your question.

18   Q    Was there an unusual short and negative funding right,

19   which means that there is an imbalance towards the short

20   side before the pause?

21   A    Well, I'll -- speaking generally, we examined this data

22   very, very closely and we did not identify anything unusual

23   in the data.

24   Q    So in your report, you talk between the June 13 until

25   the petition date.  Let me just go back to one of your

Page 92

1    pictures.  So back to Mr. Galka's expert reports.  On Page

2    22 of the PDF, did you see the Figure 6 of Page 22 of Mr.

3    Galka expert report.

4              THE COURT:  Is this the supplemental report?

5              MR. ABREU:  No, no.  Every time that I refer to

6    the expert report, I'm referring to the first one and not

7    the supplement.

8              THE COURT:  I have it open I see on Page 22 Figure

9    9, customer employee --

10             MR. WEEDMAN:  Your Honor, sorry, it's Tab 3, if

11   you look at 22 of 83 at the top.

12             THE COURT:  All right.

13             MR. ABREU:  Okay, it's Figure 6.

14             THE COURT:  Okay.  I'm there.  Go ahead.

15             THE WITNESS:  Yeah.

16             THE COURT:  Ask your question.

17   BY MR. ABREU:

18   Q    So, Mr. Galka, you start by mentioning or showing here

19   the candles, which is the price starting on June 13,

20   correct?

21   A    Yes, that's correct.

22   Q    But as you (indiscernible) stated, the price of

23   perpetuals can have a significant impact on the price, yet

24   you do not put some extra days before there's this timeline.

25   Is there a reason for this?

Page 93

1    A    I'm sorry, could you repeat -- please repeat the

2    question, Mr. Abreu?

3    Q    Why haven't you added some days before June 13 on this

4    chart, as you understand when you are dealing with market

5    moving events, as you refer, there usually information that

6    gets leaked.  The company can stop making communications.

7    They can (indiscernible) can sell their assets and this

8    usually has already an effect on the price.  All right?

9    Isn't that a fair assessment?

10              MR. McCARRICK:  Objection.

11              THE COURT:  Sustained.  Let me ask you this, Mr.

12   Galka.

13              THE WITNESS:  Yes, Your Honor.

14              THE COURT:  Why didn't you include in Figure 6 on

15   Page 22 of 83 any date for the period before June 13th,

16   2022?

17              THE WITNESS:  Sure.  Well, what this chart is

18   really supposed to show is the dislocation of the market.

19   So it was at the time of the pause that the dislocation

20   really began, and this chart this chart with these

21   candlesticks demonstrates just the extreme volatility that

22   the price took between those two periods.

23              THE COURT:  Did you examine volatility for a

24   period -- for some period before June 13th, 2022?

25              THE WITNESS:  Yes, we did examine that, yes.

1           THE COURT:  And what, if any, conclusions did you

2    draw -- over what period did you look at, and what, if any,

3    conclusions did you draw?

4           THE WITNESS:  I believe we looked all the way back

5    to the beginning of 2022, possibly a bit further back.  The

6    volatility until very close to the pause date was fairly in

7    line with other crypto assets.  There is a chart elsewhere

8    in this opinion that shows the volatility over time compared

9    to Bitcoin and Ethereum.  In the period leading up to the

10   pause, that was when rumors were already starting to

11   circulate regarding the potential insolvency of Celsius, so

12   I would say that -- if we're being technical, I would say

13   that the market started to be come dislocated shortly before

14   the pause.  It was really at the pause was when the

15   dislocation became extremely exacerbated, but as I recall,

16   it was maybe a week or two before that market was showing

17   signs of dislocation.

18           MR. ABREU:  Judge, can I say that --

19           THE COURT:  Ask the question, Mr. Abreu.  Ask your

20   next question.

21   BY MR. ABREU:

22   Q    What data do you -- do you provide on this report that

23   shows that before June 13th the price was not dislocated?

24           THE COURT:  That's not what he just said.

25           MR. ABREU:  It's a question, because he said --

1              THE COURT:  Do you have anything in your report

2     showing what, if any, volatility there was prior to June

3     13th, 2022?

4              THE WITNESS:  Yes.  Allow me to just thumb through

5     here and find the chart that speaks to this.

6     BY MR. ABREU:

7     A     So, Mr. Abreu, if you flip to Page 44 of 83, or the

8     numbered page 37 -- at the top, you see --

9     Q     Page 44 of the PDF?  Okay, I'm there.

10    A     Yes.  Yep, so Figure 12 at the top of the PDF shows the

11    volatility of daily price appreciation in CEL increased

12    post-pause.  So, you'll see three charts in there.  There is

13    a chart showing Bitcoin and what its daily volatility looks

14    like, and it's a -- on the same scale, it's fairly constant

15    across the timeline.  Same with Ether.  And CEL also looks

16    very similar until you get until around sometime what

17    appears to be early to mid-May, and you can see there that

18    the fluctuations start to grow.

19    Q     So, you're referring that there is dislocation between

20    before -- the price you previously stated before, right?

21    And you can see on this, on your graphic -- so, on June 1

22    until July 1, it's very difficult to understand or to

23    correlate here what you're referring to, because it's very

24    important to understand if there was already price

25    dislocation before what you stated, because --

Page 96

1          THE COURT:  You're going to have to leave your

2     editorial comments out.  You can ask questions, but you're

3     not testifying.

4          MR. ABREU:  Of course, Your Honor.  I'm sorry.

5     Q    Do you believe on this table it's easy to understand if

6     there was CEL price dislocation before June 13th?

7     A     Well, so, in my opinion, if there was dislocation

8     prior to that, that would really only add -- bolster the

9     opinion that I'm making here that the market prices were not

10    reliable as any kind of indicator of the intrinsic value.

11    So, as far as when the dislocation officially began, I don't

12    see that as being relevant to any of my opinions.  If you

13    look at the chart, just to finish what it is we're looking

14    at here, the red line that goes vertical in the CEL, that

15    was the date of the pause and you can see very clearly just

16    eyeballing it how the volatility went to very extreme levels

17    shortly after the pause.

18    Q    So, volatility means that it can go up and down,

19    right?  It can go to a very large number and a very low

20    number.

21    A    Yes.

22    Q    But --

23    A    Yes.

24    Q    The question -- let me rephrase it.  So, in the table

25    that you showed previously -- the graph.  Let me go back to

Page 97

1     it.  You start on June 13, but that doesn't show the

2     previous price, which can influence the interpretation or

3     the overall picture of the dislocation.  Because if you see

4     the price was maybe near 81 cents, it went down to your 35

5     cents that you (indiscernible) the two.  That'd be a fair

6     value -- fair market value at the time.

7                    MR. WEEDMAN:  Objection.

8                    MR. ABREU:  And then --

9                    THE COURT:  Sustained.

10                   MR. ABREU:  Apologies.

11    BY MR. ABREU:

12    Q    The graph that you showed does not show the previous

13    days, which I think is important to paint a picture.

14                   MR. WEEDMAN:  Objection.

15                   THE COURT:  Sustained.  Mr. Abreu, just ask

16    questions.

17    BY MR. ABREU:

18    Q    Okay.  Let's go to your report again, Page 19 of the

19    PDF.  On the Figure 3, do you see this table -- this graph

20    which shows the CEL price, correct?

21    A    Yes.

22    Q    You (indiscernible) let me state this is the CEL price

23    performance, so you basically are taking the first price it

24    was traded, then you put the chart and you put those

25    (indiscernible) and create this chart, correct?  It's purely

1    based on the price.

2    A    Yes, this is a time series of the CEL token price.

3    Q    Why didn't you compare with similar tokens like VGX?

4    Because out of context, this doesn't say much --

5              MR. WEEDMAN:  Objection.

6              THE COURT:  Sustained.  Why didn't you compare --

7              MR. ABREU:  Why does --

8              THE COURT:  Why didn't you compare it to other CEL

9    tokens -- other tokens, not only CEL?

10             MR. ABREU:  Judge, can I just say --

11             THE COURT:  Stop, Mr. Abreu.  I asked the

12   question.

13             MR. ABREU:  Yes, sir.

14             THE COURT:  I'd like an answer.

15             THE WITNESS:  On this one?  Well, Your Honor, this

16   chart was provided just for context to give a picture of

17   what the CEL price -- the token price looked like over time.

18   I don't believe this chart itself was meant to articulate

19   any kind of specific argument.

20             THE COURT:  Thank you.  I would ask you to look at

21   Pages 44 of 83.  We just looked at 45 of 83 and 46 of 83.

22   We looked -- you explained your chart for CEL on Page 44.

23             THE WITNESS:  Mm-hm.

24             THE COURT:  Your chart on Page 45 deals with

25   trading volume.  Does that -- and I see the spike in May in

1    trading volume.

2              THE WITNESS:  Mm-hm.

3              THE COURT:  And what, if any -- what conclusions

4    do you draw from the spikes in trading volume?

5              THE WITNESS:  Oh, sure.  I can explain this in

6    more detail, Your Honor.  When a market becomes dislocated,

7    there are certain hallmarks that are almost always the case.

8    One is that you will see extreme volatility -- GameStop --

9    you would see the same.  So, this was -- that's what's

10   illustrated by the data in Figure 12, and there we compared

11   it to Bitcoin and Ethereum, just as a point of reference

12   that the amount of volatility that's taken place here, even

13   in the context of cryptocurrency, was quite extreme.  So,

14   just eyeballing that, you can see that something was going

15   on funny around the time of the pause and afterward.

16              The trading volume -- typically, during a market

17   dislocation, the trading volume could increase or it could

18   decrease, but usually you will see some sort of change

19   because the market starts operating in a different manner.

20   GameStop, the volume went up enormously and that was the

21   case here, was that at around the time of the pause, the

22   volume -- daily trading volume of CEL token increased

23   enormously from the period before, and in the last chart,

24   what we're looking at is the bid ask spread.

25              THE COURT:  Which is on Page 46 of 83.

Page 100

1          THE WITNESS:  Yes, thank you, Your Honor.  That's

2     right.  So, Figure 14.  What this shows is a third indicator

3     examining the period leading up to the pause, and the period

4     afterward.  Bid ask spread is a measure of the liquidity of

5     an asset.  So, that's the difference between where the

6     market is going to buy it versus where the market is willing

7     to sell it.  So, in a dislocated market where there's a lot

8     of information asymmetry and people don't really know where

9     to -- you know, where the market really is, you will

10    typically see a widening of the bid offer spreads.  People

11    are nervous and are scared, and liquidity decreases

12    substantially, which is consistent with what you see here.

13          THE COURT:  Thank you.  Go ahead, Mr. Abreu.

14    BY MR. ABREU:

15    Q    So, Mr. Galka, in this chart that you just referred,

16    the trading volume of CEL token pre and post pause -- which

17    volume are you referring to?  Is it the spot, includes

18    perpetuals, just perpetuals?  What type of volume are you

19    referring to here?

20    A    This was the trading volume on FTX, which was the

21    trading venue that had the largest amount of volume.

22    Q    That was not my question.  My question -- is this

23    volume referring to spot CEL, which is the real underlying

24    asset, or was it referring to the perpetuals process, which

25    is a derivative which you said can influence the price?

Page 101

1    A     It's referring to the spot trading volume on FTX.

2    Q     Do you know if the perpetuals volumes usually exceed

3    the volume of the underlying spot?

4    A     I don't know, Mr. Abreu.

5    Q     Do you know if there were millions in volumes --

6    millions of dollars in volumes traded on the perpetuals side

7    when it comes to CEL token?

8              MR. MCCARRICK:  Objection.

9              THE COURT:  Sustained.

10   BY MR. ABREU:

11   Q     Were you aware of any data that shows that the volume

12   was significant on the perpetuals (indiscernible)?

13   A     No, Mr. Abreu.

14   Q     You are -- you are experienced in derivatives, right?

15   A     Yes, that's right.

16   Q     So, why would you not include any volume about the

17   perpetuals and derivatives when it comes to this volume

18   (indiscernible) of CEL which you just referred to as an

19   (indiscernible) price?

20   A     Well, these three charts, Mr. Abreu, were meant to

21   illustrate in clear graphical format that at the time of the

22   pause, something changed with this market, that this market

23   is no longer trading under normal conditions.  So, these are

24   the three indicators that we selected to make that point.

25   We could have selected a number of other indicators, but in

Page 102

```
 1    my opinion, these three indicators make the point clear

 2    enough.

 3              THE COURT:  Mr. Abreu, on my watch it's 11:47.

 4    I'm giving you another thirteen minutes, until 12:00 noon --

 5              MR. ABREU:  Okay.

 6              THE COURT:  -- for cross-examination.

 7              MR. ABREU:  Roger that.  I will move on.  And let

 8    me just -- give me one minute here.

 9    BY MR. ABREU:

10    Q    When it came -- when it comes to the market maker of

11    CEL, which was Wintermute, you say that you are not -- let

12    me just go to it.  So, on Page 23 of the PDF, of your expert

13    report, on Point 75, you say, "We analyzed Celsius..." --

14    I'm going to quote.  "We analyzed Celsius's market-making

15    agreement with Winternote and then compared historical

16    spreads of the market-making agreement.  The guidance in

17    this agreement was to maintain 1 percent to 5 percent.

18    Elementus was unable to verify the desired spread -- that

19    desired spread was maintained or enforced during the

20    lifetime of the Wintermute market activities -- market

21    agreement."  Did you receive any data of Wintermute and

22    their market-making agreements?

23    A    Could you repeat the question, please?

24    Q    Did you receive data of Wintermute about their market-

25    making agreement and their bids and -- their bid spreads?
```

Page 103

```
 1              MR. WEEDMAN:  Objection.

 2              MR. ABREU:  Because you --

 3              THE COURT:  Overruled.

 4   BY MR. ABREU:

 5   A    Well, we received the market-making agreement itself.

 6   Is there -- I'm sorry if I don't understand your question,

 7   Mr. Abreu.  Is --

 8   Q    It says you were unable to verify.  What do you mean by

 9   this?  So, was that insufficient?

10   A    Well, we analyzed the agreement and the summary of what

11   we found in there was what's written here, that the guidance

12   in the agreement was to maintain spreads of 1 percent to 5

13   percent as far as the bid offer spread.  We were not able to

14   verify whether those numbers were maintained or not.

15   Q    In your experience, do you -- would it be fair to say

16   that market-makers use -- make heavy use of derivatives in

17   order to maintain a price and fight volatility?  Is that a

18   fair assessment?

19   A    Speaking generically, I would not say that as a general

20   matter, no.  No.

21   Q    Let's say that Wintermute used derivatives in order to

22   fight -- in order to maintain -- to control volatility on

23   CEL.

24   A    I don't know.  I do not see any reason why they would

25   have, but I also don't know that they didn't.
```

1    Q    In your view, do derivatives -- are derivatives

2    important to keep a neutral hedge, meaning that you don't

3    have -- you're not overexposed to a strategy?

4    A    Well, a market-maker like Wintermute, they -- the

5    market-maker agreement, the reason they were out there, was

6    to provide liquidity for participants who wanted to buy or

7    sell the token.  So, if they were making markets in just the

8    token, I do not see off the top of my head any reason why

9    they would trade anything other than the token.  I can

10   imagine some hypothetical scenarios in which they might also

11   be trading the derivatives, but based on my knowledge, I see

12   no reason why they would have, necessarily.

13   Q    It's fair to assume Wintermute being the market-maker,

14   they will have significant volumes when it comes to the

15   trading of CEL.

16   A    The token or derivatives?

17   Q    Both.  You can go -- each one.

18   A    Well, certainly if they were making markets for the

19   token, I would expect them to have substantial trading

20   volume for the token.  I can't speak to trading volume of

21   derivatives.

22   Q    Okay.  Let's go to Page 28 of your expert opinion,

23   Figure 8.  Tell me when you're there.

24   A    Okay, I have it open.

25   Q    So, where it says "Celsius Total Net OTC Transactions"

Page 105

1  with a dollar sign, and this section (indiscernible) says

2  "OTC Sales", does that refer to the OTC desk sales of CEL to

3  potential investors, users, in an OTC desk?

4  A    I'm sorry, can you -- could you please repeat the

5  question?

6  Q    Did the OTC --

7            THE COURT:  Tell me what it is you're

8  communicating in Figure 8 in the column "OTC Sales".

9            THE WITNESS:  Yeah, those were sales of the CEL

10  token in terms of dollar amounts by the OTC desk.

11  BY MR. ABREU:

12  Q    So, is it fair to assume that Celsius received liquid

13  crypto or unstable form -- unstable coin forms of

14  (indiscernible) VTC portions of CEL which netted $351

15  million?  Is that a fair assessment?

16            MR. WEEDMAN:  Objection, Your Honor.

17  (indiscernible)

18            THE COURT:  Overruled.  Can you answer the

19  question?

20  BY MR. ABREU:

21  A    Yeah, could you repeat the question, please, Mr. Abreu?

22  Q    Is it a fair assessment that the OTC desk of Celsius

23  sold in a total amount of sale over $350 million?

24  A    Yes.  The OTC desk sold $351 million of CEL.

25            THE COURT:  In a three-year period.

Page 106

1              THE WITNESS:  In the three-year period, yes.

2      Thank you, Your Honor.

3      BY MR. ABREU:

4      Q    Is that -- and below, where it says "Celsius Total Net

5      OTC Transactions", that cardinal which refers to the units

6      of sale, the OTC sales is basically what you -- so, both in

7      terms of CEL units, correct?

8      A    Yes, that's correct.

9      Q    Would it be a fair assumption in order to figure out

10     the average costs that OTC users (indiscernible) to Celsius

11     to buy their token -- would it be a fair calculation to get

12     this 351 million and divide by the total units of CEL sold

13     in this three-year period (indiscernible) average cost for a

14     CEL buyer?

15     A    Yes.

16     Q    So, do you know what is the average?

17     A    Well, I (indiscernible) and running some back-of-the-

18     envelope arithmetic, it looks like it's somewhere in the

19     ballpark of between 3.5 and 4 dollars.

20     THE COURT:  Averaged over the three years.

21     A    Yeah, around -- yes, averaged over the three years.

22     Q    Exactly, around 3 -- 73 percent.  Would you, by reading

23     this -- this data, would you say that because of the prices

24     in 2021 there was a large number of (indiscernible)

25     transactions by dollar amount that would increase

Page 107

1    significantly the average price cost to these OTC buyers?

2    So basically doing 270 divided by 53.

3    A    Your question is whether the average price in 2021 was

4    larger than the average price for the other years?

5    Q    Yes, and it benefited from the increased market cap of

6    BTC.  They were reaching higher prices as well.

7    A    So, could you please restate the question, please?

8    Q    I'm just saying it's a fair assessment that from 2021

9    the CEL purchase price also correlated with the Bitcoin

10   price.  The market was -- the market cap had increased.

11           MR. WEEDMAN:  Objection, Your Honor.

12   (indiscernible)

13           THE COURT:  Overruled.  If you're able to answer

14   it, please do.  If you can't, just tell us.

15   BY MR. ABREU:

16   A    Yeah, I -- pardon me, Mr. Abreu.  I don't understand

17   the question.

18   A    Do you think the CEL price benefited from the

19   appreciation of Bitcoin in 2021?

20   A    Yes, probably.

21   A    Okay.  Just for context, the average cost here is 5.09.

22           THE COURT:  You can't testify, Mr. Abreu.

23           MR. ABREU:  Apologies.  I'll (indiscernible) what

24   I just said.

25   BY MR. ABREU:

Page 108

1          Q    Does the OTC buys reflect the buybacks from

2     the company on that same table?

3     A    Does it reflect the buybacks from the company?  There

4     is some overlap, but not necessarily.

5     Q    Does this include the interest buybacks or just the OTC

6     purchase by the company?  Does it include the interest --

7     the interest, as I understand, you refer it to the year that

8     CEL -- that Celsius network was provided to users.

9     A    Yes, that's correct.

10    Q    So, the OTC buys here include that -- that

11    (indiscernible) the interest, or it does not?

12    A    No, this is explicitly buys from the OTC desk.

13    Q    So, you -- so, we can conclude that Celsius overall on

14    this graph made 150 -- 160 million by selling CEL.

15    A    No, I would not draw that conclusion, if that's your

16    question.

17    Q    Okay.

18              THE COURT:  You don't know whether these reflect

19    buys and sells by people in the market or whether they're

20    Celsius.  It doesn't show that.

21              THE WITNESS:  No, it does not show that.  This is

22    strictly buys and sells by the OTC desk.  Your question, Mr.

23    Abreu, was with respect to how much money they made, and I

24    would say that the 160 number doesn't represent profit.

25    BY MR. ABREU:

Page 109

1    Q    Okay, so let me rephrase it.  The value only reflects

2    the net amount from the OTC sales and buys, correct?

3    A    Yes, that's right.

4              THE COURT:  Two more minutes.

5              MR. ABREU:  Okay.

6    BY MR. ABREU:

7    Q    So, in Page 5 of the document, Exhibit 1, did you

8    create this table?

9              THE COURT:  I'm sorry, what page are you referring

10   to?

11             MR. ABREU:  Page 5 of this same document.

12             THE COURT:  Okay.

13             MR. ABREU:  Exhibit 1.

14             THE COURT:  That's fine.

15   BY MR. ABREU:

16   A    Yes, my team and I created this table.  That's correct.

17   Q    You mention seven insiders who have 98 million worth of

18   CEL.  Correct?

19   A    Yes, that's correct.

20   Q    Did you tally other insiders and officers, including

21   former officers and former insiders and their composition of

22   CEL in this calculation or you just did it for the seven

23   insiders?

24   A    Could you please repeat the question, Mr. Abreu?

25   Q    Besides the seven insiders, did you tally other

Page 110

1    insiders or officers and/or former officers and insiders?

2    A    I believe the answer is no.  I believe this is the

3    extent of the insiders that we examined.

4    THE COURT:  Finish up (indiscernible) Mr. Abreu.

5    Q    Did you ever -- yeah.  Did you ever -- the letters

6    mention before that 81 cents will dilute creditors.  Did you

7    calculate the dilution?

8              MR. MCCARRICK:  Objection.

9              THE COURT:  I don't understand your question, Mr.

10   Abreu.

11             MR. ABREU:  I'm going to move to another question.

12             THE COURT:  No, you're not.

13             MR. ABREU:  Did you ever --

14             THE COURT:  Your time is up.  I'll let you ask one

15   more question.

16   BY MR. ABREU:

17   Q    Do you believe there is significant -- there is a

18   significant number of creditors that are employees which

19   receive CEL that are in similar amounts of the seven

20   insiders?

21             MR. MCCARRICK:  Objection, foundation.  He

22   testified he didn't tally it.

23             THE COURT:  Do you know the information about the

24   amount of CEL that other employees other than the seven

25   received?

1          THE WITNESS:  I'm not aware.  As far as I know,

2     these are the only insiders that we have this kind of

3     information for.

4          THE COURT:  Thank you very much for your

5     questions, Mr. Abreu.  Is there anybody else who wishes to

6     cross-examine?

7          MR. FRISHBERG:  Yes, Your Honor, I do.  Daniel

8     Frishberg, pro se.

9          THE COURT:  Go ahead, Mr. Frishberg.

10    BY MR. FRISHBERG:

11    Q    I have just literally one question.  Would you say that

12    it is more likely than not that the CEL token had a fair

13    value of zero or close to zero at the (indiscernible) date?

14    A    Yes, I would agree with that.

15         MR. FRISHBERG:  Thank you.  That's all.  Thank

16    you, Judge.

17         THE COURT:  Thank you, Mr. Frishberg.  Anybody

18    else wish to cross-examine?

19         UNKNOWN:  Your Honor, I just have a statement that

20    will take ten seconds.

21         THE COURT:  Nope.  Nope.  Is there anybody else

22    who has not been heard who wishes to cross examine?

23         MR. IOVINE:  Yes, Your Honor.  Jason Iovine, pro

24    se creditor.

25         THE COURT:  Go ahead, Mr. Iovine.

Page 112

BY MR. IOVINE:

Q    (indiscernible) this witness can answer this question
or if he did anything, but was there any calculation done on
the distributions if CEL token was at 81 cents?

A    Not that I'm aware of, Mr. -- I understand that it
certainly impacts how the proceeds are distributed, so I
fully appreciate, you know, the importance of this number.
For my analysis, I did not look at any of the circumstances
with any of the creditors or the distributions.  I
restricted my focus on my understanding and interpretation
of the data with respect to what the price was at the time
of the petition.

MR. IOVINE:  Okay, thank you.  That's all I had.

THE COURT:  All right, anybody else wish to be
heard who wishes to cross-examine?  Any redirect?

MR. WEEDMAN:  No, Your Honor.

THE COURT:  Any other examination from anyone in
the courtroom?  All right, you're excused.  Thank you very
much for your testimony.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  So, are there any other witnesses that
we're going to hear from today?

MS. BRIER:  Yes, Your Honor.  Debtor defendants
call Robert Campagna to the stand.

THE COURT:  Okay.  Do you have --

1              UNKNOWN:   (indiscernible)

2              THE COURT:  I'm sorry?  Go ahead and call Mr.

3    Campagna.

4              MS. BRIER:  Thank you, Your Honor.

5              UNKNOWN:   (indiscernible)

6              MS. BRIER:  Good afternoon, Your Honor.  Grace

7    Brier, Kirkland & Ellis, on behalf of debtors and we call

8    Mr. Campagna to the stand.

9              THE COURT:  Thank you very much.  If you would

10   raise your right hand.  You'll be sworn, Mr. Campagna.

11             THE WITNESS:  Certainly.

12             CLERK:  Do you solemnly swear or affirm that any

13   testimony you're about to give before this court is the

14   truth (indiscernible)

15             THE WITNESS:  Yes, I do.

16             THE COURT:  Thank you very much.  Please have a

17   seat.  Ms. Brier.

18             MS. BRIER:  May I approach with the exhibit

19   binders?

20             THE COURT:  Absolutely.

21             MS. BRIER:  (indiscernible)

22             THE COURT:  Thank you.

23             THE WITNESS:  Thanks.

24             THE COURT:  Thank you.

25             UNKNOWN:  Is my mic still on?

Page 114

1          THE COURT:  Yes, it is.

2          UNKNOWN:  I don't under --

3          THE COURT:  Please mute yourself.  Ms. Brier, go

4    ahead.

5          MS. BRIER:  Thank you, Your Honor.

6            DIRECT EXAMINATION OF ROBERT CAMPAGNA

7    BY MS. BRIER:

8    Q    Good afternoon.  Could you please reintroduce yourself

9    to the court?

10   A    Yes.  I'm Robert Campagna.  I'm the Managing Director

11   in the restructuring practice of Alvarez & Marsal.

12   Q    And can you give a brief summary of your professional

13   background?

14   A    Sure.  I've been working at Alvarez & Marsal for 20-

15   plus years and in the restructuring space for over 25.

16   Primarily for those 25 years I focused on nothing but

17   helping large debtor side companies through large

18   restructurings, much like this one.

19   Q    Mr. Campagna, are you certified as a restructuring

20   advisor?

21   A    I'm a certified insolvency and restructuring advisor

22   and I'm also -- well, inactive -- I'm a CPA.

23   Q    Now, how did you first become involved in this case,

24   this Celsius restructuring, Chapter 11?

25   A    The debtors reached out in late June of 2022, post-

1   pause, looking for financial assistance and assistance, you

2   know, with the severity of the situation they were facing.

3   Q    Can you summarize the type of work that you've done in

4   this restructuring matter?

5   A    Much like in most matters, much of our work is focused

6   on liquidity and cashflow forecasting, cash management,

7   expense reductions, reducing the size of the workforce,

8   extending the runway by cutting costs, and then associated

9   more directly with the restructuring, getting ready for a

10  bankruptcy filing and the recording required in bankruptcy

11  and to get out of bankruptcy.

12  Q    And turning to the matter and the hearing here today,

13  can you explain what work you were asked to do with relation

14  to this hearing specifically?

15  A    Yes.  With respect to the confirmation hearing, I was

16  specifically tasked with looking at the best interests test,

17  performing liquidation analysis, and then certain other

18  matters related to the confirmation of the plan.

19  Q    And did you include the conclusions of the work that

20  you did and the analyses behind it in your declaration that

21  you submitted to the Court?

22  A    I did.

23  Q    That declaration -- if you'd open your binder, please,

24  to Tab 46 and take a look at that.

25  A    Okay.

Page 116

1   Q    If you could please flip to the last page of that

2   document, Page 27, and confirm that that's your signature.

3   A    Yes, that's my electronic signature.

4   Q    And is this a true and accurate copy of the declaration

5   you submitted in this matter?

6   A    It is.

7   Q    Do you adopt this declaration as your testimony here

8   under oath today?

9   A    Yes, I do.

10  Q    Now, now that that's in evidence, I'd like to highlight

11  a couple points from it today live for the court --

12  THE COURT:  Well, it's in evidence if you offer it.

13  Q    Your Honor, thank you for reminding me.  Move to admit

14  Exhibit 46 into evidence, Your Honor.

15       THE COURT:  Any objections?  All right, Exhibit 46

16  is in evidence.

17       (Exhibit 46 Admitted Into Evidence)

18  Q    Thank you.  Now I'd like to highlight a couple points

19  from your testimony before the Court here today, and did you

20  prepare any slides to assist with your testimony?

21  A    We did.  We prepared a demonstrative.

22  Q    We'll flash that up in a second.  Mr. Campagna, can you

23  please turn to Exhibit 7 in your binder, just the first tab

24  there?

25  A    Okay.

Page 117

1    Q    What is Exhibit 7?

2    A    Exhibit 7 looks to be a copy of the liquidation

3    analysis that was part of the disclosure statement.

4    Q    What was your involvement in that liquidation analysis?

5    A    I led the team that assisted the debtors in preparing

6    this analysis.

7    Q    And Mr. Young, if you could please turn the screen on

8    to Page 2 of the demonstrative exhibits, and Your Honor,

9    we'd mark this as Demonstrative Exhibit 2 for purposes of

10   this hearing.  We filed it on the docket last night.

11            THE COURT:  Thank you.

12   Q    Mr. Campagna, can you explain what this slide is

13   showing us here?

14   A    This is a summary of the distribution waterfall, and it

15   shows a distributable value under the plan scenarios, which

16   are the two left scenarios, which are NewCo, primary path,

17   and if there were a pivot to the orderly winddown path

18   compared to a liquidation analysis, the liquidation analysis

19   that we just referred to in the right column, assuming it

20   converts into Chapter 7.  I would note the two first columns

21   -- NewCo is quite obvious.  That's the NewCo transaction

22   with Fahrenheit.  While named the orderly winddown, Path 2

23   is really a -- still has the company merging with a public

24   mining entity, so lots of effort to go into that.

25   Q    And the numbers in that liquidation column -- what do

1    those represent?

2    A    Those are -- it's a summary of numbers found in the

3    liquidation analysis that we just referred to.

4    Q    Now, I don't want to go through every line item, but

5    I'd like to focus on one or two of them, starting with

6    mining.  We heard some testimony about that $565 million

7    number earlier this week.  Can you describe what the

8    difference is between that number and the $424 million in

9    the orderly winddown column?

10   A    Sure.  565 was the midpoint of the center evaluation,

11   which you heard testimony on yesterday, so that simply is

12   the value they assessed -- the going concern value they

13   assessed related to the mining value under the Fahrenheit

14   proposal.  Fahrenheit brings a lot of things to the table.

15   They were our number one choice, our number one bidder, so

16   obviously they present the most valuable solution for the

17   company.

18        Very specifically, if you look at the orderly winddown

19   exhibit, which was also part of the disclosure statement, we

20   highlighted things like $100 million of coupons to purchase

21   rigs in the future, caps on buildout costs of 395,000 per

22   megawatt, perpetual free lease on software that manages the

23   energy usage of the rigs and things like that, so losing

24   Fahrenheit is a -- would be a significant blow to the

25   company, not that some of those things couldn't be replaced,

1     but we have no definitive agreements in place at the moment

2     that equate to something similar.  So, as we move from the

3     NewCo transaction to the public miner/orderly winddown, we

4     assess the 25 percent discount on the value from the center

5     revaluation.

6     Q    Now, we talked about those first two columns.  Let's

7     talk about the last column, that $88 million number.  Can

8     you explain what that number represents?

9     A    Yes.  Specifically with mining, that represents an

10    estimate of what we believe we could sell the fixed assets

11    for, the mining rigs and the mining facilities.  The company

12    has a Midland, Texas mining site which is composed of four

13    separate units in close proximity.

14    Q    And there have been some objections filed regarding the

15    assumptions that you made underlying that $88 million

16    number.  Can you explain some of the assumptions you made

17    underlying that number and how they relate to the orderly

18    winddown?

19    A    Sure.  We looked at an asset-by-asset listing of all

20    the company's rigs by rig type, met with a management team,

21    who has extensive knowledge of what the prices paid for

22    these rigs were, what they could buy them for now.  Has some

23    insights into what they sell for in the used market.  Most

24    of these rigs are one to two years old.  Similar to a three-

25    year-old laptop, they lose their value pretty quickly, and

Page 120

1   the market's flooded with them at the moment.  There's more

2   rigs than there are ability to -- than there are plugs to

3   get these units up and running, which is why, you know,

4   80,000 of the debtor's 120 are up and running today.

5   We also -- Mr. Kielty yesterday also mentioned -- we had

6   looked at sales of rigs early on in these cases and he

7   summarized those yesterday in the range of 350 to 550

8   dollars per rig is where the offers were that we had

9   received, and some of those we had executed upon.  The

10  analysis behind this has an average rig price of about $640.

11  So, higher than the high end of Mr. Kielty's range.

12  Q    I'd like to focus next on the recovery percentage

13  numbers at the bottom there.  Can you explain what those

14  are?

15  A    Yes.  Those are the recovery percentages to -- we would

16  refer to them as the remaining claims classes, but as you

17  get to the middle of this page, it has distributable value

18  and then distributions to certain claims.  Administrative

19  claimants get 100 cents, so we show that -- we show those

20  values that are above the -- sort of what the remaining

21  claims are and the average recovery to the rest of the

22  group.  But at the end of the day, those are the recovery

23  percentages to creditors under each of the three scenarios.

24  So, 67 percent recovery between cryptocurrency and then an

25  asset value of distributable assets in the NewCo plan and

1    then in the liquidation, that number is 47 -- that

2    percentage is 47.4 percent recovery.

3    Q    And Mr. Campagna, when you assessed these numbers that

4    we're looking at here, what conclusions did that lead you to

5    reach?

6    A    These conclusions -- these numbers lead me to believe

7    that this meets the best interests test by class as laid out

8    in the plan.

9    Q    And Your Honor, I'd move to admit Exhibit 7, the

10   liquidation analysis that Mr. Campagna (indiscernible)

11            THE COURT:  All right, any objections?  All right,

12   Exhibit 7 -- Celsius Exhibit 7 is admitted into evidence.

13            (Exhibit 7 admitted into evidence)

14   BY MS. BRIER:

15   Q    And Mr. Campagna, if you could turn to the second to

16   last tab in your -- in your binder there and let me know

17   when you're there.

18   A    I'm there.

19   Q    Can you let me know what that is?

20   A    This is the supplemental affidavit or just a

21   declaration that I filed related to confirmation.

22   Q    And Your Honor, for purposes of the record, Debtors

23   have premarked this as Exhibit 70.  Mr. Campagna, can you

24   please turn to the last page of that document?

25   A    Yes.

Page 122

```
 1    Q    Is that your signature there?

 2    A    It is my electronic signature, yes.

 3    Q    And do you adopt that document under oath as your

 4    testimony here today?

 5    A    I do.

 6    Q    Your Honor, I will move to admit that into evidence

 7    this time on my own accord.

 8         THE COURT:  Hearing no objections, it's admitted.

 9    Q    Thank you, Your Honor.  Mr. Campagna, what is the

10    subject matter of your supplemental declaration?

11    A    The supplemental declaration was in response to

12    questions the Court raised last week, looking at the CEL

13    token group as an individual class.  The CEL token holders

14    in the plan as it's laid out today are in several classes.

15    They're in the one-order group; they're in the earn group;

16    they're in the custody group; they're elsewhere.  So, this

17    was looking at the CEL token group as a group individually.

18    Q    And Mr. Young, if you could please show Demonstrative

19    1, which is contained in Mr. Campagna's declaration that is

20    now Exhibit 70.  Mr. Campagna, can you --

21         THE COURT:  This is the diagram -- Exhibit A on

22    Page 5 and 6?

23         MS. BRIER:  Exactly, Your Honor.  Yes, and we also

24    used a demonstrative exhibit, but it's the exact same thing

25    (indiscernible)
```

Page 123

1         THE COURT:  It's in evidence.

2         (Exhibit A admitted into evidence)

3         MS. BRIER:  Thank you, Your Honor.

4  BY MS. BRIER:

5  Q    Mr. Campagna, can you at high level explain what this

6  is showing?

7  A    Sure.  This shows the recovery value to CEL token

8  holders in dollars under the plan, under the two scenarios

9  of the plan, and under the liquidation analysis.  For the

10 liquidation analysis, which is the red dotted line, it shows

11 what CEL token creditors would receive under a increasing

12 level of assessed value of the -- or assessed price of the

13 CEL token.  For the plan classes or for the two plan

14 scenarios, the dark blue line represents the NewCo line.

15 It's fixed, 25 cent price.  It's probably -- looks like

16 about $44 million of recovery value.  And then the orderly

17 winddown plan, it's the lighter blue line, horizontal --

18 roughly $41 million of recovery.  And you can see where the

19 red line intersects those two lines; that's where the best

20 interests test would exactly be met, where the creditors --

21 under the plan for the 25 percent value would receive the

22 same recovery as under a liquidation at different -- at that

23 price point, which is 34 cents under the orderly winddown

24 and 36 cents under the NewCo scenario.

25 Q    And have you reviewed the supplemental declaration of

Page 124

1    Mr. Galka and were you in the courtroom during his

2    testimony?

3    A    I did and I was, yes.

4    Q    And how does his valuation of CEL token fit within this

5    analysis that you've performed?

6    A    At negligible to zero value.  This says there's no

7    issue with the best interests test as it results -- as it

8    relates to the CEL token holders.

9    Q    Thank you, Mr. Campagna.

10            MS. BRIER:  I'll pass the witness at this time.

11            THE COURT:  Let me -- I just -- why don't you put

12   that chart back up.

13            MS. BRIER:  Absolutely.

14            THE COURT:  The demonstrative.

15            MS. BRIER:  Mr. Young, if you could put that back

16   up, that'd be excellent.

17            THE COURT:  Looking at that chart, how much do CEL

18   holders -- in a liquidation analysis in a Chapter 7 --

19            THE WITNESS:  Mm-hm.

20            THE COURT:  -- best interests test, how much do

21   the CEL holders -- what allowed (indiscernible) would they

22   be entitled to receive in a liquidation?

23            THE WITNESS:  That's a good question.  I would

24   turn to the attorneys.  I don't quite know what happens in a

25   liquidation under the plan.  I know it's fixed at 25 cents

1    and my understanding is based on Mr. Galka's testimony today

2    at a near-zero value.  I think we would -- I think that's

3    where we would be leaning as a debtor's side.

4         THE COURT:  From this chart, am I supposed to be

5    able to determine whether 25 cents would satisfy the best

6    interests test?

7         THE WITNESS:  Yes.  So, if you look across the

8    bottom axis, zero is increasing to 81.  If you pick the

9    point where it's roughly 25 cents and, you know, go directly

10   up to intersect that red line, it would say the value is --

11   it's well below the dark blue and the light blue lines, so

12   they're getting far less.

13        THE COURT:  All right.  Cross --

14        THE WITNESS:  And we did this on dollars as

15   opposed to percents because as you increase the size of the

16   denominator, it's somewhat circular.

17        THE COURT:  Cross-examination.

18        MS. BRIER:  Thank you, Your Honor.

19        THE COURT:  Thank you very much.

20        MR. KIRSANOV:  Yes, hello, Your Honor.  Dimitry

21   Kirsanov, pro se.

22        THE COURT:  Go ahead, Mr. Kirsanov.

23        MR. KIRSANOV:  Hello, Mr. Campagna.

24        THE WITNESS:  Hi.

25        CROSS EXAMINATION OF ROBERT CAMPAGNA

Page 126

```
 1    BY MR. KIRSAOV:

 2    Q    Can you explain what the best interests are in

 3    comparison to a Chapter 7 versus an 11?

 4    A    I don't follow the question.

 5    Q    What does a Chapter 11 plan have to meet that a Chapter

 6    7 plan wouldn't?

 7              MS. BRIER:  Objection.

 8              THE COURT:  Sustained.  What is your

 9    understanding, Mr. Campagna, about -- what is the best

10    interests test?

11              THE WITNESS:  The best interests test states that

12    creditors under the plan can receive no less than they would

13    receive under a Chapter -- actually, it's the inverse.

14    Under a Chapter 7 -- whatever the creditors receive under a

15    Chapter 7, they at least have to receive that amount under

16    the Chapter 11 plan.

17              THE COURT:  Ask your next question.

18    BY MR. KIRSAOV:

19    Q    Are you aware the CEL token holders in the custody

20    class rejected the CEL custody settlement?

21    A    No, I'm not.

22    Q    Are you aware that the deactivation date pricing for

23    custody CEL holders is 25 cents?

24    A    No, I'm not.

25    Q    (indiscernible) bankruptcy values, CEL is valued at 81
```

Page 127

1   cents.  Is that correct?

2          MS. BRIER:  Objection, Your Honor.

3          THE COURT:  Sustained.

4   BY MR. KIRSAOV:

5   Q    Is the liquidation analysis for pure custody 100

6   percent?

7   A    I don't follow that.

8   Q    So, in a Chapter 7 case for pure custody, is the

9   liquidation value 100 percent?

10          MS. BRIER:  Objection.

11          THE COURT:  Sustained.

12   BY MR. KIRSAOV:

13   Q    Wouldn't the plan currently fail the best interests

14   tests as it assigns 25-cent deactivation day value to the

15   CEL custody holder?

16   A    I don't believe it does, no.

17   Q    Isn't 25 cents less than 81 cents?

18          THE COURT:  Mr. Kirsanov, yes, 25 cents is less

19   than 81 cents, but that's not meaningful.  Ask your next

20   question or I'm going to end your examination.

21          MR. KIRSANOV:  Yes, sir.

22   BY MR. KIRSAOV:

23   Q    What is the liquidation analysis for general custody,

24   sir?

25   A    What is the percentage recovery under the liquidation

Page 128

1    for general custody?

2    Q     Correct.

3    A     72.5 percent.

4    Q     And 72.5 percent of 81 exceeds 25 cents; is that

5    correct?

6    A     I don't follow the question.

7    Q     If CEL token is valued at 81 cents and it has a

8    liquidation in the custody class of 72.5 percent --

9            THE COURT:  Mr. Kirsanov, it doesn't have a value

10   of 81 cents.

11           MR. KIRSANOV:  Well, the bankruptcy filing value

12   is 81 cents.

13           THE COURT:  No, sir.  At the petition date, it was

14   trading at 81 cents.

15           MR. KIRSANOV:  Correct, so --

16           THE COURT:  The testimony is that that was not the

17   value, the intrinsic value of the CEL token.  Ask your next

18   question or I'll end your examination.

19   BY MR. KIRSAOV:

20           Q     Are you aware that CEL token holders can un-

21   accept their in-kind distributions in Hawaii for a rejecting

22   class in the first 90 days?

23           MS. BRIER:  Objection, Your Honor.

24           THE COURT:  Sustained.  It's beyond the scope of

25   the direct.  He's not testified about Hawaii or anyplace

```
 1    else.

 2    BY MR. KIRSAOV:

 3    Q    And what is the liquidation analysis for pure custody,

 4    sir?

 5              MS. BRIER:  Objection.  Asked and answered.

 6              THE COURT:  Overruled.  Go ahead.  If you can,

 7    answer.

 8    BY MR. KIRSAOV:

 9    A    I believe pure custody is the withdrawable custody

10    claims today and it's 100 cents, and it's -- it's in-kind,

11    I'd say --

12    Q    (indiscernible)

13              THE COURT:  Let him finish his answer, Mr.

14    Kirsanov.

15    BY MR. KIRSAOV:

16    A    The custody -- all the custody numbers are proposed to

17    be in-kind, so we're actually giving the coin back, so

18    that's why we're giving all the coin back for the pure

19    custody, 100 percent of whatever that is, and under the with

20    -- the general custody, we're giving 72.5 percent of the

21    coins back.  That's what the plan calls for.

22    Q    Sir, could I refer to the disclosure statement?

23    A    I don't have that in front of me.

24              THE COURT:  What is it that you want from the

25    disclosure statement?
```

Page 130

1          MR. KIRSANOV:  I'd like to go to the deactivation

2     date cryptocurrency conversion table.

3          MS. BRIER:  Was that included on your -- we'll

4     grab that.

5          THE COURT:  You're going to have to wait, Mr.

6     Kirsanov.  All right, while they're looking for that, at

7     around 2:00 p.m. there will be an emergency test from FEMA,

8     and therefore you need to -- when we're back here at 2

9     o'clock, before that you need to turn off the volume or turn

10    off your cell phone so that we do not hear the FEMA

11    emergency alert.  Thank you, Deanna, my courtroom deputy.

12         UNKNOWN:  Your Honor, I don't think turning off

13    the volume does it --

14         THE COURT:  Well, then, you've got to turn off

15    your phone.  I think that's probably -- and I'd better do

16    that, too, when I come back from lunch.  Were you able to --

17         THE WITNESS:  I have a binder with several

18    documents in front of me and one is titled "Disclosure

19    Statements".

20         THE COURT:  Okay, he has the disclosure statement

21    in front of him, Mr. Kirsanov.  Ask your question.

22         MR. KIRSANOV:  Could you locate the --

23         THE COURT:  (indiscernible) page number --

24         MR. KIRSANOV:  Yes, sir.  In Section 84, the

25    deactivation date cryptocurrency conversion table, could you

Page 131

1    go there, sir?

2                THE WITNESS:  What page is that?

3                THE COURT:  Can somebody help out?

4                MS. BRIER:  Sure.  Mr. Kirsanov, what version of

5    the disclosure statement are you looking at and what --

6                MR. KIRSANOV:  It is the one you --

7                MS. BRIER:  Are you referring to (indiscernible)

8                MR. KIRSANOV:  It is the one that Kirkland filed

9    on 9/27, which adjusted the language from -- that the

10   debtors and UCC would determine a value to 25 cents --

11               MR. KOENIG:  Your Honor --

12               THE COURT:  Mr. Koenig.

13               MR. KOENIG:  It's Chris Koenig from Kirkland &

14   Ellis for Celsius.  I think what Mr. Kirsanov is referring

15   to is a revised version of the Chapter 11 plan, not the

16   disclosure statement.  That's what was filed on September

17   27th.  We have that language.

18               MS. BRIER:  He has the language and I think what

19   he filed, so I can put that up.

20               MR. KOENIG:  We should give that to the witness.

21               MS. BRIER:  Yes.

22               MR. KIRSANOV:  Thank you.

23               THE WITNESS:  So, I understand there may have been

24   something filed in respect to the plan.  This is -- I have

25   not looked at this.  The document dated 10 --

Page 132

1              MR. KIRSANOV:  Yes, sir -- do you have that

2     document in front of you, sir?

3              THE WITNESS:  I have a document in front of me.

4              MR. KIRSANOV:  Does it include the deactivation

5     date cryptocurrency conversion table?

6              THE WITNESS:  I see a table.  It's not titled, but

7     -- a table of numbers, coin types.

8              MS. BRIER:  Your Honor, for purposes of the

9     record, we'd just note that this contains excerpts from a

10    much larger document.

11             THE COURT:  Yes.

12             MS. BRIER:  And it's not entirely clear --

13             THE COURT:  So, what we're looking at is something

14    Mr. Kirsanov filed as ECF-3688.  It's three pages long.  It

15    contains excerpts from various documents and places.  Did

16    you ask your question, Mr. Kirsanov, and we'll see whether

17    the witness has the information needed to be able to

18    respond.

19             MR. KIRSANOV:  Yes -- yes, sir.

20    BY MR. KIRSAOV:

21    Q    Are you aware that the deactivation price for CEL token

22    in the custody class is 25 cents?

23    A    No, I'm not.

24    Q    Do you see the amendment on Section 84 on deactivation

25    date cryptocurrency conversion table?

Page 133

1   A    I do.

2   Q    You do.  Could you read out the section that it says 25

3   cents, please?

4            MS. BRIER:  Objection, Your Honor.

5            THE COURT:  Sustained.  I don't know what you're

6   referring to, Mr. Kirsanov.

7            MR. KIRSANOV:  So, on the deactivation date

8   cryptocurrency conversion table, it says that the

9   deactivation date cryptocurrency table shall provide that

10  CEL token is priced at 25 cents if the bankruptcy court

11  approves the CEL token settlement.

12           THE COURT:  That's what the plan provides; that's

13  correct.

14           MR. KIRSANOV:  Correct.  I'm --

15           THE COURT:  That's not liquidation value.  That is

16  what the plan provides.

17  BY MR. KIRSAOV:

18  Q    Is the liquidation value of CEL token in a Chapter 7 81

19  cents?

20           MS. BRIER:  Objection.

21           THE COURT:  Sustained.

22           MR. KIRSANOV:  What is the liquidation value of

23  the CEL token under Chapter 7?

24           MS. BRIER:  Objection.

25           THE COURT:  Do you know, Mr. Campagna?

Page 134

1              THE WITNESS:  I believe we're prevent -- the

2      company is unable to sell CEL tokens, so we value it at zero

3      from an asset side.  What the claim is I leave up to the

4      Court and others.

5      BY MR. KIRSAOV:

6      Q    Under Chapter 7, are all claims dollarized?

7              THE COURT:  I didn't understand your question.

8              MS. BRIER:  Objection.

9              THE COURT:  Ask it again.

10     BY MR. KIRSAOV:

11     Q    If it goes to Chapter 7, are all claims and all classes

12     dollarized?

13             MS. BRIER:  Objection.

14             THE COURT:  Sustained.

15     BY MR. KIRSAOV:

16     Q    How does -- how is Chapter 7 dollarized?

17             MS. BRIER:  Objection.

18             THE COURT:  Sustained.

19     BY MR. KIRSAOV:

20     Q    How is Chapter 7 dollarized for the individual

21     creditors?

22             MS. BRIER:  Objection.

23             THE COURT:  Sustained.

24     BY MR. KIRSAOV:

25     Q    Sir, the liquidation analysis of pure custody is 100

Page 135

1   percent; is that correct?

2            MS. BRIER:  Objection.

3            THE COURT:  Sustained.

4            THE WITNESS:  I believe that --

5   BY MR. KIRSAOV:

6   Q    Sir, the -- what is the analysis for pure custody

7   holders of CEL token?

8            MS. BRIER:  Objection.

9   BY MR. KIRSAOV:

10  A    Which analysis?  Under what --

11  Q    Chapter 7.

12  A    Under Chapter 7, what is the recovery we've associated

13  with pure custody?

14  Q    Correct.

15  A    It's 100 percent.  We would still propose to give the

16  coins back --

17           THE COURT:  (indiscernible) give an in-kind.

18           THE WITNESS:  We've give an in-kind distribution,

19  exactly.

20           THE COURT:  (indiscernible) was in custody.

21           THE WITNESS:  So, pure custody would be given

22  their coins back.

23  BY MR. KIRSAOV:

24  Q    After 90 days, does the plan not call for 25 cents?

25           MS. BRIER:  Objection.

Page 136

1                    THE COURT:  Sustained.

2     BY MR. KIRSAOV:

3     Q    What does the plan call after 90 days if CEL custody

4     holders do not withdraw their assets?

5                    MS. BRIER:  Objection.

6                    THE COURT:  Sustained.  This witness is testifying

7     about the distributions under different scenarios, including

8     liquidation value.

9                    MR. KIRSANOV:  Yes, Your Honor, and my point is in

10    comparison to a Chapter 11, a CEL token holder would obtain

11    more in the pure custody and custody class under a Chapter 7

12    than a Chapter 11.  Thus, it does not meet the best

13    interests clause.

14                   MS. BRIER:  Objection.

15                   THE COURT:  I hear your argument.  I don't think

16    it's right, but I hear your argument.  Ask your next

17    question.  Ten more minutes and I'm cutting you off.

18                   MR. KIRSANOV:  Your Honor, one second, please.

19    BY MR. KIRSAOV:

20    Q    Sir, can you refer to Page 48?  That indicates the CEL

21    token settlement on Section 2.

22                   THE COURT:  48 of what?

23                   MR. KIRSANOV:  Docket 3577, the one filed on 9/27,

24    which is the one that should be in front of you, sir.

25                   MS. BRIER:  Your Honor, there's an excerpt of this

Page 137

1    in that same document he filed, Docket No. 3688.

2            THE COURT:  All right.  Do you have it in front of

3    you, Mr. Campagna?

4            THE WITNESS:  I'm sorry, which docket number was

5    it?  3688?

6            MR. KIRSANOV:  3577.

7            MS. BRIER:  And for purposes of the record,

8    there's --

9            THE COURT:  It's on Page 2 of 3 (indiscernible)

10           MS. BRIER:  -- excerpt of 3577 contained in his

11   filing on Page -- Docket No. 3688.

12   BY MR. KIRSAOV:

13   Q    Could you read out what is highlighted there, sir?

14           MS. BRIER:  Objection, Your Honor.

15           THE WITNESS:  It's an excerpt of Document 1192.

16   Page 17 of 22?  Is that what we're looking at?

17           MR. KIRSANOV:  It should be under the CEL token

18   settlement --

19           THE COURT:  No, it's on Page 2 of his three-page

20   document under CEL token settlement.

21           THE WITNESS:  Okay.

22           THE COURT:  He's highlighted some --

23           THE WITNESS:  Yes, I see that now.

24   BY MR. KIRSAOV:

25   Q    Could you read out the highlighted section, please?

Page 138

1              MS. BRIER:  Objection.

2              THE COURT:   I'll read the whole excerpt of it.

3              MR. KIRSANOV:  Yes, sir.

4              THE COURT:  "Except as provided in Article

5      3(b)(17), all CEL token deposit claims other than custody

6      claims that are CEL token deposit claims shall be valued at

7      25 cents per CEL token (i.e., one CEL token equals a 25-cent

8      CEL token deposit claim), and shall otherwise receive the

9      treatment associated with the program in which they were

10     deployed."  What's your question?

11             MR. KIRSANOV:  My concern is that --

12             THE COURT:  I don't want your concern.  I want a

13     question.

14             MR. KIRSANOV:  Okay.  Yes, sir.  One second,

15     please.

16             MS. BRIER:  Your Honor, just for purposes of the

17     record, we'd object to the admission of this document.

18             THE COURT:  It's not in evidence.

19             MS. BRIER:  Thank you.

20             THE COURT:  What's your question?

21     BY MR. KIRSAOV:

22     Q    What would the CEL custody holder obtain in a Chapter 7

23     liquidation?

24     A    I think that requires a legal determination, but I

25     believe the testimony you heard today is it's valued at

Page 139

1    worth -- at zero.  We are attempting to give back the coin,

2    the token itself, so folks are welcome to the tokens that

3    are in custody.  I would -- if your question is, "What do

4    people who can't take the tokens get?", I assume we would

5    sell them for zero or not sell the CEL token and ascribe a

6    zero to it and pass the value on for any remaining points.

7    Q    Wouldn't that fail the best interests test?

8            MS. BRIER:  Objection.

9    BY MR. KIRSAOV:

10   A    No, it would show that you'd do much worse under a

11   liquidation under the current plan where you're being given

12   25-cent value.

13   Q    The CEL token under Chapter 7 -- is that dollarized?

14           MS. BRIER:  Objection.

15           THE COURT:  Sustained.

16   BY MR. KIRSAOV:

17   Q    What is the CEL token worth under -- excuse me.  What

18   is the dollar amount for CEL token under Chapter 7?

19           MS. BRIER:  Objection.

20           THE COURT:  Sustained.

21   BY MR. KIRSAOV:

22   Q    Under Chapter 7, how much is a CEL token worth?

23           MS. BRIER:  Objection.

24           THE COURT:  Sustained.

25           MR. KIRSANOV:  One moment, Your Honor.

Page 140

```
 1                THE COURT:  One more question, Mr. Kirsanov.

 2                MR. KIRSANOV:  One moment, Your Honor.

 3                THE COURT:  All right, the examination has

 4   concluded.  We're going to -- before anybody leaves, we're

 5   going to take our lunch break, but before doing that --

 6                MR. SHEIK:  Judge, I have cross.

 7                THE COURT:  Stop.  Anybody else who has not been

 8   heard so far who wishes to cross-examine Mr. Campagna,

 9   please identify yourself now.

10                MR. SHEIK:  (indiscernible) pro se -- I mean,

11   cross-examiner.

12                MR. DAVIS:  Otis Davis, cross-examination.

13   Creditor.

14                THE COURT:  Okay.  Mr. Davis, Mr. Sheik.  Anybody

15   else on Zoom?

16                MR. ABREU:  Artur Abreu.  One question.

17                UNKNOWN:  (indiscernible)

18                THE COURT:  One at a time.  Stop.

19                MR. ABREU:  Artur Abreu, just to make two

20   questions, sir.

21                THE COURT:  Nope.

22                MR. ABREU:  One question?

23                THE COURT:  You've already questioned, Mr. Abreu.

24   No more questions.

25                MR. BRONGE:  (indiscernible)
```

Page 141

```
 1               THE COURT:  Mr. (indiscernible)

 2               MR. BRONGE:  (indiscernible), pro se creditor.

 3               THE COURT:  Okay, I'm not -- I want to just get

 4     the names now.  Mr. Bronge.  Who else?  I have Mr. Davis,

 5     Mr. Sheik, Mr. Bronge.  Anybody else who has not been heard?

 6               MR. PHILLIPS:  Yes, Your Honor.

 7               THE COURT:  Who is that?

 8               MR. PHILLIPS:  Richard Phillips, pro se.  I only

 9     have a few questions.

10               MS. DOW:  Yes, Your Honor.  Sharon Dow, pro se.

11     Thank you.

12               MR. UBIERNA:  Victor Ubierna, pro so.

13               MR. FRISHBERG:  Daniel Frishberg, pro se.

14     (indiscernible)

15               THE COURT:  Hold on.  Mr. Frishberg, you asked a

16     question already.  You said you had one question.  You've

17     examined --

18               MR. FRISHBERG:  I did not -- I did not examine

19     (indiscernible) --

20               THE COURT:  Okay, you didn't.  That's right.

21     You're correct.  Okay, Mr. Frishberg.

22               MR. FRISHBERG:  Thank you.

23               THE COURT:  I apologize, Mr. Frishberg.  Who else?

24               MR. ABREU:  Judge, I also did not examine this

25     witness.
```

Page 142

```
 1              THE COURT:  Okay, Mr. Abreu.  Anybody else?

 2              MR. UBIERNA:  Victor Ubierna, pro se

 3    (indiscernible)

 4              THE COURT:  I have you, Mr. Ubierna.  What I have

 5    so far is Mr. Davis, Mr. Sheik, Mr. Bronge, Mr. Phillips,

 6    Ms. Dow, Mr. Ubierna, Mr. Frishberg, Mr. Abreu.  Anyone else

 7    on Zoom?

 8              MR. JOHNSON:  Michael Johnson, pro se.

 9              THE COURT:  Hold on.

10              MS. BRIER:  Your Honor, Sharon Dow I think also

11    was on the list.

12              THE COURT:  Yeah, I have her.

13              MS. BRIER:  Okay, great.

14              THE COURT:  I have her down.

15              MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

16    Emanuel, for Pharos.

17              THE COURT:  All right.  All right, ten people have

18    indicated that they wish to cross-examine after lunch.

19    We're breaking until 2 o'clock.  We're going to go in the

20    following order:  Mr. Davis, Mr. Sheik, Mr. Bronge, Mr.

21    Phillips, Ms. Dow, Mr. Ubierna, Mr. Frishberg, Mr. Abreu,

22    Mr. Johnson and Mr. Noskov.  We're recessed until 2 o'clock.

23              BAILIFF:  All rise.

24              (Recess)

25              THE COURT:  Please be seated.  All right, court's
```

1    back in session.  Mr. Campagna, you're still under oath.

2    We'll begin with the cross-examination by Mr. Davis.

3              MR. DAVIS:  Give me one second, Your Honor.

4              THE COURT:  Go ahead, Mr. Davis.

5              MR. DAVIS:  Your Honor, (indiscernible) --

6              THE COURT:  I'm sorry, I can't hear you.  I'm not

7    able to hear you.

8              MR. DAVIS:  (indiscernible)

9              THE COURT:  We're not able to hear you, Mr. Davis.

10             MR. DAVIS:  Can you hear me now, Judge?

11             THE COURT:  Yes, I can hear you now.

12             MR. DAVIS:  I'm sorry.  Your Honor, I think that

13   the limiting of my time for cross-examination to seventeen

14   minutes with respect to Expert Witness Mr. Galka is

15   prejudicial to my rights as a creditor.

16             THE COURT:  Mr. Davis --

17             MR. DAVIS:  And also to the other --

18             THE COURT:  Mr. Davis, you're cutting in and out.

19   What kind of microphone are you using?

20             MR. DAVIS:  I'm using my headphones, Judge.

21             THE COURT:  You're cutting in and out.

22             MR. DAVIS:  (indiscernible) headphones that I was

23   using before.  I'm not using anything different --

24             THE COURT:  You're going to need to fix your

25   sound, Mr. Davis.

Page 144

```
 1                MR. DAVIS:  Is it any better now?

 2                THE COURT:  Only slightly.

 3                MR. DAVIS:  I'll connect and reconnect.

 4                THE COURT:  Please begin.  We can't hear you if

 5     you're --

 6                MR. DAVIS:  (indiscernible)

 7                THE COURT:  We can't hear you if you're speaking.

 8                MR. DAVIS:  I'm speaking now.  I disconnected and

 9     reconnected.  Thank you.  Your Honor, I think about the

10     limiting of my time for cross-examination to seventeen

11     minutes with respect to the expert witness Mr. Galka is

12     prejudicial to my rights as a creditor, and also the other

13     36,000 CEL token creditors in this case.  And being that I

14     was not allowed to finish my cross-examination --

15                THE COURT:  Mr. Davis --

16                MR. DAVIS:  I would like to --

17                THE COURT:  Mr. Davis, ask your questions or I'm

18     going to cut you off.

19     BY MR. DAVIS:

20     Q    Mr. Campagna, are you familiar with the claim filed by

21     the debtors in (indiscernible) bankruptcy related to CEL

22     token?

23     A    No, I'm not.

24     Q    Mr. Campagna, have you conducted an analysis of the CEL

25     token OTC transactions from 2020 to 2022?
```

Page 145

1    A    No, I have not.

2    Q    Do you know if Celsius sold CEL token from its treasury

3    from 2018 to 2022?

4              MS. BRIER:  Objection.

5              THE COURT:  Overruled.

6    BY MR. DAVIS:

7    A    I do not.

8    Q    Mr. Campagna, are you aware of any parties

9    (indiscernible) CEL token on FTX in 2022?

10   A    No.

11   Q    Do you agree that Celsius did not purchase and CEL

12   token from the market after the pause?

13   A    I don't have a view on that topic.

14   Q    Can you please turn to Page 71 of the Max Galka report.

15             THE COURT:  I'm sorry, of what?  I can't -- I

16   didn't hear you.

17             MR. DAVIS:  Of the Max Galka report.

18             THE COURT:  His initial report or his second

19   report?

20             MR. DAVIS:  His initial report.

21             THE WITNESS:  What page?

22             MR. DAVIS:  71.

23             THE WITNESS:  Okay.

24   BY MR. DAVIS:

25   Q    On Page 71 of the Galka report, in the Difference

1    column, it shows a dollar value of 15.9 million in income

2    for the month of December 2020, correct?

3    A    Mine shows text message strings or something.

4    Q    It's in the right column, in the Difference column all

5    the way to the right.

6    A    (indiscernible)

7    Q    For the month of December 2020.

8    A    I do not see that.  Page 71 --

9         THE COURT:  Which exhibit number are you looking

10   at?

11        MR. DAVIS:  It's on Docket 3580.

12        MR. COLODNY:  Page 71 at the top (indiscernible)

13        MR. DAVIS:  71 at the top.  71 of 83.

14        THE WITNESS:  Yeah, there's no ribbon on this

15   document.  Wait -- okay, there was an expert report, then

16   there's --

17        MR. COLODNY:  (indiscernible) 63 on the bottom.

18        THE WITNESS:  Okay, we have it.

19        THE COURT:  Go ahead.

20   BY MR. DAVIS:

21   Q    On Page 71 of the Galka report, in the Difference

22   column, it shows a dollar value of 15.9 million in income

23   for the month of December 2020, correct?

24   A    I see a difference of -15,911,247.00 reading this page.

25   Q    On Page 72 of the Galka report, in the Difference

Page 147

1    column, it shows that in the month of December 2020, the

2    company sold a net 6.5 million CEL tokens, correct?

3    A    I'm not familiar with this report.  Do you want to tell

4    me the column you'd like me to read to you again?

5    Q    Sure.  Page 72 --

6                 THE COURT:  Have you -- excuse me.  Have you

7    reviewed this before?

8                 THE WITNESS:  No, I haven't.

9                 THE COURT:  Okay.

10   BY MR. DAVIS:

11   Q    Okay, can you turn to Page 19 in the Max Galka report?

12                MS. BRIER:  Objection, Your Honor.  Foundation as

13   to this witness's knowledge --

14                THE COURT:  Well, let's see what Page 19 is and

15   then we'll see.  This is Page 19 of 83?

16                MR. DAVIS:  Correct, 19 of 83.

17                THE WITNESS:  Okay.

18   BY MR. DAVIS:

19   Q    In the Max Galka report on Page 19, it also shows that

20   the price of CEL token dramatically increased during that

21   same period of December 2020.  Is that correct?

22                MS. BRIER:  Objection.

23                THE COURT:  Are you familiar with this report?

24                THE WITNESS:  I am not.

25                MS. BRIER:  Objection.

Page 148

1           THE COURT:  Objection sustained.

2    BY MR. DAVIS:

3    Q    Was most of the CEL token trading volume conducted by

4    the company denominated in Bitcoin, Ethereum, or Dollar

5    (indiscernible)

6           MS. BRIER:  Objection.

7           THE COURT:  Sustained.

8           MR. DAVIS:  (indiscernible)

9           THE COURT:  The examination of this witness has to

10   be within the scope of his direct examination.  Cross-

11   examination within the scope of his direct.

12          MR. DAVIS:  I'm finished.

13          THE COURT:  You're finished?  Okay.

14          MR. DAVIS:  Yes, I said that two minutes ago.  I'm

15   finished.

16          THE COURT:  Mr. Sheik.

17          MR. SHEIK:  Thank you, Your Honor.  The questions

18   that I have to ask are general in nature.  May I proceed?

19          THE COURT:  Yes, go ahead.

20   BY MR. SHEIK:

21   Q    Okay, thank you.  Mr. Campagna, A&M was responsible for

22   auditing and determining the value of the debtor's assets

23   that made up the estate.  Is that correct?

24   A    No, that's not correct.

25   Q    How would you describe the nature of your engagement

Page 149

1    with the debtors?

2    A    First, Alvarez & Marsal is not an audit firm.  We don't

3    conduct audits.  We're not an accounting firm.  We're

4    financial advisors for --

5              THE COURT:  Just describe what your engagement is.

6              THE WITNESS:  We were engaged to assist the

7    company with liquidity, liquidity management and reporting

8    requirements pursuant to the bankruptcy code and entering

9    and exiting Chapter 11.

10   BY MR. SHEIK:

11   Q    Okay, and -- but were you -- did A&M provide the Court

12   and, you know, all the parties involved the financial

13   documents that you had prepared to basically value the

14   property of the debtors, such as DNO?

15   A    The debtors provided all the financial information.  We

16   assisted the debtors with some of that information.

17   Q    Assisted how?

18   A    Assisted in compiling the data that existed from the

19   company's systems, spreadsheets, wherever we could find it.

20   Q    Okay.  Now, when it comes to the determination of the

21   value of the liquid assets in CNL and what they were worth,

22   what according to you was the final number?

23   A    I did not conduct evaluation of any assets.  I believe

24   the assets you're referring to were valued by Stout.  They

25   presented their report yesterday, and their witness.

Page 150

```
 1   Q    I see.  But to your knowledge, you know, and per the

 2   Campagna declaration, I believe, that one of the reports had

 3   mentioned that it was valued at around $9.8 billion.  Is

 4   that correct?

 5             MS. BRIER:  Objection.

 6   BY MR. SHEIK:

 7   A    I am not familiar with a 9.8 -- was that a billion-

 8   dollar figure?

 9   Q    Correct, yes.  I did mention billion, yes.

10   A    I'm not aware of that figure.

11   Q    Okay.  Now, if there was a valuation on any of the

12   properties or the assets of the debtors, when it comes to

13   crypto or liquid crypto, would they be, you know, based on

14   petition date pricing?

15             MS. BRIER:  Objection.

16             THE COURT:  Do you know?

17             THE WITNESS:  I don't conduct values --

18   valuations.  I don't know.

19             THE COURT:  He doesn't know.  Go ahead, ask your

20   next question.

21             MR. SHEIK:  Okay, sure.

22   BY MR. SHEIK:

23   Q    So, now I understand, you know, yesterday Mr. Kielty

24   had provided, you know, the value based on -- as of March

25   2023, the value of the assets in CNL were marked at $3.5
```

Page 151

1    billion.  Are you aware of this?

2              MS. BRIER:  Objection.  Misstates testimony.

3              THE COURT:  Sustained.

4              MR. SHEIK:  Okay.  I'm going to skip ahead, then.

5    BY MR. SHEIK:

6    Q    Okay, so Mr. Campagna, what was the size of the hole,

7    according to you -- and just to add to it, the -- publicly,

8    what was reported by Reuters, Bloomberg, Associated Press

9    and whatnot -- the size of the hole was about $1.2 billion.

10   Is that correct according to what your understanding is?

11             THE COURT:  Mr. Sheik, I don't understand your

12   question.

13             MR. SHEIK:  Your Honor, the reason I ask that

14   question is because what's publicly reported was $4 billion,

15   but when you look at any of the documents that we've been --

16   you know, the true value of the size of the hole was 1.2

17   billion.  So, I just --

18             THE COURT:  Mr. Sheik, I do not understand your

19   question.  If you --

20             MR. SHEIK:  Oh.

21             THE COURT:  If you want to refer to specific

22   documents, we'll see whether that's proper, but in the form

23   that you've asked it, it's not a proper question.

24             MR. SHEIK:  I see what you're saying.  Okay, then.

25   I'll try to rephrase that.

Page 152

```
1   BY MR. SHEIK:

2   Q    So, according to you, Mr. Campagna, what was the size

3   of the whole in this bankruptcy?

4             MS. BRIER:  Objection.

5             THE COURT:  You -- do you understand the question?

6             THE WITNESS:  I don't.

7             THE COURT:  Ask your next question.

8             THE WITNESS:  Okay.

9   BY MR. SHEIK:

10  Q    Is the size of the hole $1.2 billion?

11            MS. BRIER:  Objection.

12            THE COURT:  When you're referring to the size of

13  the hole, what are you referring to, Mr. Sheik?

14            MR. SHEIK:  The insolvency and that whether, you

15  know -- why we came into this situation in the first place.

16            THE COURT:  I still don't understand your

17  question.  The debtor -- the debtor is insolvent; I

18  understand.  It's liabilities exceed its assets.

19            MR. SHEIK:  Right.  And you know, then we have a

20  CNL that was once valued at $9.8 billion and I'm just -- I'm

21  trying to get a sense of -- because there's been a lot of

22  misinformation.  I just wanted to ask the right people the

23  right questions just to get the -- you know, an expert

24  analysis or at least an opinion on the matter, Your Honor.

25            THE COURT:  Ask another question.
```

BY MR. SHEIK:

Q    Okay.  When it comes to the value of the illiquid

crypto assets in CNL post adjustments, which as per Mr.

Kielty yesterday was determined to be $3.2 billion, would

you say that more than sufficiently covers the $1.2 billion

shortfall that we have in this insolvency?

MS. BRIER:  Objection, Your Honor.  Misstates

testimony.

THE COURT:  Sustained.

MR. SHEIK:  Okay.  I'm trying to gather -- Judge,

if you -- Your Honor, if you'd give me just a second, I'll

try and skip over.

THE COURT:  Okay, go ahead.

MR. SHEIK:  Thank you.

BY MR. SHEIK:

Q    So, Mr. Campagna, is -- did A&M provide the final

report, or at least in the last few months, the monthly

reports which have, you know, full disclosure on the type of

liquid crypto --

(Alarms sounding.)

THE COURT:  You didn't follow the rules.  Please

close it off.

MR. SHEIK:  Judge, if I may, this is one of my

proudest achievements as actually representing Bloomberg's

assets to actually install an e-notification, which just

Page 154

1    went off, many, many years ago.

2              THE COURT:  Okay.  It's the US Trustee.  Who

3    else's phone is going off?  Somebody else has their phone

4    turned on.

5              MR. SHEIK:  I'm not in New York anymore, so I

6    don't think --

7              THE COURT:  (indiscernible) -- I'm not going to do

8    it.

9              (Alarms sounding, crosstalk.)

10             THE COURT:  This is not a complicated instruction

11   to follow, (indiscernible)

12             MR. SHEIK:  I hope it's -- I hope it's not me.

13             THE COURT:  I'm just surprised they didn't go off

14   simultaneously.

15             UNKNOWN:  I know, they didn't.

16             THE COURT:  All right, we're -- let's get

17   (indiscernible)

18             MR. SHEIK:  Okay, I think we're -- okay, sounds

19   good.

20             THE COURT:  Mr. Sheik, why don't you go ahead.

21   BY MR. SHEIK:

22   Q    Sure, I'll repeat the question.  So, Mr. Campagna, was

23   -- I believe that A&M has been providing us with the monthly

24   report of the -- month-end reports of all assets that were

25   either in CNL or, you know, that basically give us a full

Page 155

1  understanding of the contents of the illiquid crypto that

2  was in CNL.  Is that correct?

3  A    I don't think that's correct.

4  Q    Where did I go wrong?

5  A    I think the debtors provide you with --

6           MS. BRIER:  Objection.

7  BY MR. SHEIK:

8  A    -- financial information.  I don't know that A&M is

9  providing any reports to the public.

10  Q    I'm sorry, I couldn't quite hear you.  It was a bit

11  muffled.

12  A    I don't think that A&M is providing those reports.  The

13  debtors may be providing reports.  If you want to show me

14  one, I'm happy to look.

15  Q    I see, and forgive me for misspeaking and you're right;

16  it is the debtors that are providing those reports.  But did

17  your team or staff have any, you know, play in creating

18  those reports?

19  A    I think we assisted with getting them in the proper

20  format, but the company obviously has a CFO and a controller

21  and a whole finance chain that's responsible for the data in

22  those reports.

23  Q    Okay.  And so, was A&M responsible for verifying any of

24  the numbers in those reports at all, or no?

25  A    No.

Page 156

1    Q    Okay.  Now -- and this is just an opinion-based

2    question.  What is your opinion on why this case has taken a

3    direction that would result in a much smaller recovery to

4    creditors, given that the $3.2 billion petition date priced

5    illiquid assets that currently, you know, were in CNL as of,

6    you know, March 2023?  And based on what you see, is the

7    going forward plan for recovery for creditors?

8              MS. BRIER:  Objection.

9              THE COURT:  Mr. Sheik, one of the problems is your

10   question was loaded with a lot of assumptions that are not

11   in evidence.  If you want to -- if you believe it is and you

12   want to point to the documents, I'll certainly permit you to

13   do it.

14             MR. SHEIK:  Sure.

15             THE COURT:  I'm sustaining the --

16             MR. SHEIK:  I -- and forgive me, Judge, I don't

17   have that exact docket number.  That's my mistake.  Lesson

18   learned.  Okay, then I'll conclude, you know, with my final

19   question.

20   BY MR. SHEIK:

21   Q    So, Mr. Campagna, do you have any comments or any

22   remarks to share on what your opinion on this recovery is

23   for creditors?  Do you believe that, you know, based on your

24   estimate of, you know, the reality of the numerations, is

25   that fair according to you or not?

1    A    I think the recoveries are as they were laid out in the

2    demonstrative that was shared earlier in this -- in this

3    testimony.  67-cent recovery for NewCo, and 47.4 percent

4    under a liquidation scenario.

5    Q    And I missed that last part.  I'm sorry.  You're a bit

6    far away --

7    A    47.4 --

8    Q    Sorry, go ahead.

9    A    47.4 percent recovery under a liquidation, Chapter 7

10   liquidation.

11   Q    I see.  Okay.  Do you think that there's any potential

12   for a full recovery or no?

13            MS. BRIER:  Objection.

14            THE COURT:  Do you have an answer to the question?

15            THE WITNESS:  No, I don't.

16            MR. SHEIK:  Thank you, Mr. Campagna.  Your Honor,

17   I appreciate you giving me the time.  Thank you.

18            THE COURT:  Okay, Mr. Sheik.  Mr. Bronge.

19            MR. BRONGE:  Yes, good afternoon.  Can you hear

20   me?

21            THE COURT:  Yes.

22            THE WITNESS:  Yes.

23   BY MR. BRONGE:

24   Q    Yes, good afternoon, Mr. Campagna.  I would like to

25   start with looking at your declaration, which I understand

1    is the Debtor Item 46, Docket No. 3582 and Page 4 of 27, and

2    that would be Item 11 there.

3    A    What page are you on?

4    Q    4 of 27 --

5    MR. BRONGE:  Page 4 --

6              THE COURT:  Paragraph 11, which is at the bottom

7    of Page 4, carries over to Page 5.

8              THE WITNESS:  Okay.

9              MR. BRONGE:  Okay --

10             THE COURT:  Just give him a chance to read it, Mr.

11   Bronge, and then you can ask your question, okay?

12             MR. BRONGE:  Okay.

13             THE WITNESS:  Okay, I'm familiar with the

14   paragraph.

15   BY MR. BRONGE:

16   Q    Okay.  So, in the beginning here, you say:  "I believe

17   that valid business, legal and factual reasons justify a

18   separate classification."  Now, in relation to the status of

19   collateral, what legal basis did your belief -- what did you

20   base those beliefs on?

21             MS. BRIER:  Objection.

22             THE COURT:  Sustained.  I -- I'm not sure what

23   you're asking, Mr. Bronge.  Why don't you try again and

24   clarify.

25             MR. BRONGE:  Yeah, okay.  So, (indiscernible) the

Page 159

1    belief that there are valid legal reasons for these

2    classifications, and I would like to know what he bases that

3    belief on.  What legal, factual things did he base his

4    beliefs on?

5              THE COURT:  It's the first part of --

6              MR. BRONGE:  The first -- yeah.  Yes, exactly.

7              THE COURT:  (indiscernible) base your belief.

8    THE WITNESS:  Right.  I was guided by legal counsel of the

9    debtors on some of these points when it comes down to legal

10   rights, but the classification scheme treated different

11   creditors -- put different creditors into different classes

12   based on whether they were customer claims and what specific

13   type of customer claims; whether they were general unsecured

14   creditors, trade creditors institutional debtholders and the

15   like.  So that's how the classification scheme was done.

16   Q    Yes.  So I understand you yourself have been advised by

17   your legal advisor what (indiscernible) for instance the

18   collateral will have.  Therefore, you believe that is

19   correct.  Am I correct in that?

20   A    Yes.

21   Q    So you have not made your own analysis of that?

22   A    Say that again, pleases?

23   Q    You have not made your own analysis of that -- the

24   legal status of the different accounts or collateral.

25   A    I didn't form a legal view, but I on my own can

Page 160

1   understand that a general unsecured creditor of a trade

2   claim has different rights than a depositor on the Celsius

3   platform.  So maybe it's a small-l legal analysis on my

4   part, but I was guided by legal counsel on the finer points.

5   Q    Okay.  So let me (indiscernible) it's the legal counsel

6   that has that opinion.  Now let me then move to a different

7   document.  I would like to use Debtor Exhibit 69, which I

8   think that's from yesterday as Docket Number 3293.

9           MS. BRIER:  Mr. young, can you please pull up

10   Debtor's Exhibit 69?

11           THE COURT:  Hold on, Mr. Bronge.  We're getting

12   that.

13           MS. BRIER:  And can we please make Mr. Young a co-

14   host on the Zoom?  Thank you.

15           MR. BRONGE:  Your Honor, may I ask you a

16   procedural question in the meantime?

17           THE COURT:  Sure.  Go ahead.

18           MR. BRONGE:  In order for these documents to

19   become into evidence, should I ask for that, or are they

20   already there?

21           THE COURT:  I'm trying to look through my notes.

22   Does anybody know?  Is Exhibit 69 in evidence?

23           MS. BRIER:  Bob's declaration is in.  I think a

24   portion is --

25           THE COURT:  I'm sorry, I didn't --

Page 161

1          MS. BRIER:  69 is in evidence as of yesterday.

2          THE COURT:  All right.  It's in evidence, so you

3    can go ahead and ask questions about it.

4          MR. BRONGE:  Thank you.  Do we have that

5    available?

6          THE COURT:  It's not up on the screen yet.

7    Deanna, can you give them permission to share the screen?

8          CLERK:  Yes.  Is that Jeremy Young?

9          THE COURT:  Yes.

10          MR. BRONGE:  So before we start that, in the

11    meantime I can ask him on the classification --

12          THE COURT:  Hold on.  It will be on the screen in

13    just a moment.

14          CLERK:  He has permission.  He can share.

15          MR. BRONGE:  Okay.  We can stay with the previous

16    document just for one more question.

17    BY MR. BRONGE:

18    Q    In your liquidation analysis, you have used the same

19    classification as you did -- as you stated in this paragraph

20    we just read.  Is that correct?

21    A    That's correct.

22    Q    Now then I draw your attention to item -- sorry, Page

23    18, Item 25 in this document that we just have up.  And this

24    document is an agreement between Celsius and different

25    governmental entities (indiscernible) some kind of

Page 162

1  settlement.  Can you read that paragraph, pleases?

2  A    Yes, I'm reading it.  Do you want me to read it out

3  loud?

4           THE COURT:  I just want to be sure that we're all

5  on the same place.  So...

6           MR. BRONGE:  Yes.  It's Item -- I can read it on--

7           THE COURT:  Exhibit 69, Paragraph 25, which reads,

8  "Congress used a broad definition of security in the

9  Securities Act and Exchange Act.  Security encompasses a

10  wide range of investments."  Is that the paragraph you are

11  referring to?

12           MR. BRONGE:  Yes, correct.

13           THE COURT:  Okay.  All right.  It's up on the

14  screen, and the witness can see that as well.  Go ahead with

15  your questions.

16  BY MR. BRONGE:

17  Q    Okay.  So I would like to understand if you have done

18  an analysis on the liquidation considering the Earn interest

19  program as a security.

20  A    No, I have not.

21  Q    Would you agree that if that is done, they would

22  subordinate the (indiscernible) program?

23           MS. BRIER:  Objection.

24           THE COURT:  Calls for a legal conclusion.

25  Objection sustained.

1    BY MR. BRONGE:

2    A    Would you agree to this paragraph stating that Earn

3    interest is a security?

4             MS. BRIER:   Objection, calls for a legal

5    conclusion.

6             THE COURT:   Sustained.

7    BY MR. BRONGE:

8    Q    Okay.  So if I read this paragraph, I can see that it

9    says Celsius offered and sold CEL and the Earn interest

10   program as securities.  Is that a correct sentence I just

11   read?

12   A    That's what it says on the page in front of me.

13   Q    So if that would be true, would the liquidation

14   analysis make a difference for me as a borrower recovery?

15            MS. BRIER:   Objection.  Calls for a legal

16   conclusion.

17            THE COURT:   Overruled.

18   BY MR. BRONGE:

19   Q    So can we answer?

20   A    Can you restate the question, please?

21   Q    Yes.  So if that last sentence is true, would the

22   recovery for the borrower in a liquidation be different?

23   A    Yes.  In a liquidation, it would be different.

24   Q    Yes.  So the borrower would receive a better recovery.

25   A    Very small.  Very nominal in a liquidation, yes.

Page 164

1   Q     Okay.  That is actually all I needed to know.  So me

2   being a borrower would then receive a better recover in a

3   liquidation.

4   A     In liquidation compared to itself, yes.

5   Q     Compared to CEL and Earn.  That's correct, yes.

6   A     Yeah.

7   Q     And compared to --

8             THE COURT:  I'm going to stop -- hold on.  Hold on

9   for a second, Mr. Bronge.  I am serious about this.  If

10  everybody -- anybody in this room still has their phone on

11  and it goes off, you're going to be out of the hearing for

12  the rest of the hearing today.  All right?  Everybody was

13  warned this morning repeatedly.  And I've tried to make

14  light of the fact that several phones went off this

15  afternoon.  But that's the end of it.  If somebody else's

16  phone goes off, you're out of here.

17            Go ahead, Mr. Bronge.

18            MR. BRONGE:  Okay.  Thank you.  I don't have any

19  further questions.

20            MR. SABIN:  Your Honor, the first questions were

21  hypotheticals I raised -- and this is Jeff Sabin for the

22  record for Ignat Tuganov.  He's getting into an area where I

23  believe he's running counter to an order you've entered

24  approving the class proof of claim which otherwise contains

25  a provision that otherwise says there is no 510(b)

Page 165

 1    subordination of Earn.

 2              THE COURT:  I'm going to let him ask his questions

 3    and...

 4              MS. SABIN:  I just wanted to make sure.  Thank

 5    you.

 6              THE COURT:  You can make your arguments.  Go

 7    ahead, Mr. Bronge.  Go ahead.

 8              MR. BRONGE:  Yes.  In this -- in this case, I will

 9    say I've opted out of those settlements.  And so I'm

10    pursuing this.  And I'm just following what the documents

11    say and I just --

12              THE COURT:  Just ask your questions, Mr. Bronge.

13    Go ahead.

14              MR. BRONGE:  Yeah.  This is the question I asked,

15    and I got the answer.  So I'm satisfied.  I'm finished.

16              THE COURT:  Okay.  All right.

17              MR. BRONGE:  Thank you.

18              THE COURT:  Thank you, Mr. Bronge.  Mr. Phillips,

19    you are next.

20              MR. PHILLIPS:  Thank you, Your Honor.

21    BY MR. PHILLIPS:

22    Q    Mr. Campagna, how are you doing today?

23    A    I'm doing well, thank you.

24    Q    All right.

25              MR. PHILLIPS:  I'm going to need some assistance

Page 166

1    in the courtroom with -- I believe it was Debtor's Exhibit

2    47, which had the consolidated liquidation waterfall.  And

3    then also my amended set of exhibits that I submitted on the

4    docket.  I wanted to (indiscernible) a couple of things.

5            MS. BRIER:  Can you please let us know the docket

6    IDs that you're referring to?

7            MR. PHILLIPS:  The Docket ID of what I submitted?

8    Hang on.

9            MS. BRIER:  No, sorry.  The documents you want us

10   to have available for the witness right now.

11           MR. PHILLIPS:  One is the -- I mean, his original

12   declaration, 3482.  You have what I got from Mr.

13   (indiscernible), Exhibit 47, includes the consolidated

14   liquidation waterfall, which I believe you've used in your

15   examination earlier.

16           MS. BRIER:  I don't know that that is in evidence,

17   but we will get it pulled up while I get your exhibits to

18   the witness.  And your exhibits are filed at Docket 3676, is

19   that correct?

20           MR. PHILLIPS:  I would have to double-check on

21   that honestly.  But in particular it's the first one I was

22   going to ask about, the (indiscernible).

23           MS. BRIER:  All right.  Okay.  I just want to be

24   sure that the witness has in front of him what you want him

25   to have in front of him.  So we'll give him what we have,

Page 167

1    and you can -- we'll find more if we need it.

2              MR. PHILLIPS:  Fair enough.

3              THE COURT:  All right.  Go ahead, Mr. Phillips.

4              MR. PHILLIPS:  Okay.

5    BY MR. PHILLIPS:

6    Q    In Paragraph 56 of your original declaration, Docket

7    3582, you refer to newco being (indiscernible) at

8    (indiscernible) billion dollars of value, correct?

9    A    Correct.

10   Q    And in (indiscernible) and Alvarez and Marsal's

11   opinion, is that a (indiscernible) value?

12   A    That's what the valuation estimates provided by the

13   other experts would indicate.

14   Q    And which expert in particular provided that?

15   A    The billion 248 is made up of the mining valuation from

16   Centerview.  The illiquid asset valuation originally

17   provided by Stout, and then $450 million of seed capital, of

18   liquid crypto with a $15 million deduction, which is a

19   nuance in the valuation.  And that sums to $1.2 billion,

20   which -- $1.248 billion, which I believe is the number

21   you're citing.

22   Q    And so if I could go to the mining forecast from my --

23   the exhibits.

24   A    Which page?

25              THE COURT:  Which portion of your exhibit, Mr.

Page 168

1    Phillips?

2             MR. PHILLIPS:  It's...

3             THE WITNESS:  I have a ten-page exhibit.

4             MR. PHILLIPS:  Yeah, hang on.  It's the first one,

5    (indiscernible) Exhibit E of disclosure statement.

6             THE COURT:  Okay.

7             THE WITNESS:  Okay.

8    BY MR. PHILLIPS:

9    Q    Do you recognize this?

10   A    Generally recognize this,  yes.

11   Q    Do you have any opinion as to the reasonableness of

12   this forecast?

13   A    I don't.  This was the opinion of Centerview and Ryan

14   Kielty, who testified to this yesterday.

15   Q    Okay.  And so when you used the number in the

16   consolidated liquidation waterfall in Exhibit 47 of 565,

17   that was totally reliant on Centerview and you just accepted

18   their number.

19   A    Without following through to that exhibit you just

20   referenced, the 565 was their number and I did rely on it.

21   Q    Okay.

22   A    I was going to say if you want to direct me to that

23   exhibit again.  You mentioned an exhibit that I didn't

24   follow, but...

25   Q    That was the Exhibit 47, Consolidated Liquidation

Page 169

1    Waterfall.  Debtor's Exhibit 47, Consolidated Liquidation

2    Waterfall.  Page 7 of exhibit -- in the draft that I have,

3    it's Page 7 of the (indiscernible).

4    A    Okay.  I don't have that document in front of me.

5         MS. BRIER:  Mr. Phillips, did you notice that

6    document as one you plan to use?

7         MR. PHILLIPS:  I did not.  I thought that I could

8    (indiscernible).

9         THE COURT:  Celsius Exhibit 7, which is in --

10        MS. BRIER:  I think he's saying 47.

11        THE COURT:  Just a second.  Celsius Exhibit 7,

12   which is in the witness book at Page 7 as Consolidated

13   Debtor Liquidation Waterfall.  Is that what you're referring

14   to, Mr. Phillips?

15        MR. PHILLIPS:  Hang on a second.  No.  Actually,

16   yes.  I apologize.  Yes.  I have it under a different

17   exhibit number, which was 47.  (indiscernible) 259 of 332.

18        THE COURT:  It's part of Exhibit 7 at Page 7 is

19   Consolidated Debtor Liquidation Waterfall.  It comes from

20   Page 269 of 332, ECFE document number 2902.  That's what

21   you're referring to, Mr. Phillips?

22        MR. PHILLIPS:  Yes.

23        THE COURT:  Okay.  All right.  Everybody's got it

24   in front of them.  Go ahead.

25   BY MR. PHILLIPS:

1    Q    All right.  So the 565 you relied on Centerview for,

2    correct?

3    A    That's correct.

4    Q    And you have no opinion as to the reasonableness of it

5    or not?

6    A    Wasn't a subject of my analysis.

7    Q    Okay.  And then when you did the liquidation, you

8    estimated recovery at 16 percent, correct, as the midpoint.

9    A    I think it's math that was backed into.  We actually

10   calculated the 88 million to the right and calculated what

11   that recovery estimate would be.

12   Q    Which was essentially -- correct me if I'm wrong, but

13   that was essentially determined as a fire sale of the mining

14   rigs themselves.  Is that correct?

15   A    It was a sale process of the rigs under Chapter 7

16   liquidation run by a trustee.  I don't know that I would use

17   the word fire sale, but it was a sale over a condensed

18   timeframe.

19   Q    But do not envision the sale by a trustee of, for

20   example, a site as a whole site, just like Celsius purchased

21   --

22   A    That's correct.  That's correct.  Sorry for

23   interrupting you.

24   Q    If the liquidation was performed as the sale of a site-

25   by-site liquidation, for example, would you expect that the

```
 1    value would be higher than your predicted value here?

 2    A    It could be.

 3    Q    You'd have an estimate by how much?

 4    A    I would rely on something else that Mr. Kielty

 5    mentioned yesterday.  The company had received one bid for

 6    mining in total.  That would have provided $175 million of

 7    value to the estate.  That bid was a mix of cash and notes

 8    to the company and required the potential buyer to raise

 9    $275 million of cash on their own before they could execute

10    the deal.  And it was indicated that that seemed highly

11    unlikely and the debtors didn't really consider it.  That

12    would be a going concern -- that would be a sale of the

13    entire business, you know, would have been.

14    Q    And I believe the timing of that bid was in December of

15    2022 if I'm correct.

16    A    That timing sounds about right.

17    Q    And would you agree that conditions now are different

18    than in December of 2022, which was about a month after FTX

19    failed?

20    A    They are different every day it seems, yes.

21    Q    Would you agree that conditions and valuations of

22    mining companies overall are higher today than they were in

23    December of 2022?

24    A    I don't know that to be the case.

25    Q    So if you used -- is it reasonable to have used a
```

Page 172

1    different valuation method for the recovery -- the estimated

2    liquidation value if you would have done either a site-by-

3    site or sale of the mining company as a whole?

4    A    I think the approach we took was reasonable.

5    Q    Are there other reasonable approaches that would have

6    led to a higher value?

7    A    There are other approaches and, you know, others could

8    have landed at other conclusions.  And those conclusions

9    could be higher.

10   Q    Thank you.  Going next to my amended exhibits -- the

11   next one, Disclosure statement, Weighted Distribution, and

12   Election Example.  Have you seen this before?

13             THE COURT:  I'm sorry, which page were you at, Mr.

14   Phillips?

15             MR. PHILLIPS:  The next page of my amended

16   exhibits.

17             THE COURT:  What is it headed?

18             MR. PHILLIPS:  Disclosure Statement, Weighted

19   Distribution, Election Example.

20             THE COURT:  Okay.  Page 5 of 10 from ECF 3698.

21             MR. PHILLIPS:  I'm sorry, I don't have that

22   docket.  I have it as Page 54 of the disclosure statement

23   here.

24             THE COURT:  I have your document in front of me.

25   At the top of that page, it has Docket 3698.  And it's Page

 1    5 of 10.  Below that is the heading Disclosure statement,

 2    Weighted Distribution, Election Example.

 3            MR. PHILLIPS:  That sounds correct, Your Honor.

 4            THE COURT:  Go on with the questions.

 5    BY MR. PHILLIPS:

 6    Q    Have you seen this before?

 7    A    I am not familiar with where this is located, but -- so

 8    I'm not intimately familiar with the schedule.

 9    Q    Okay.  And so are you knowledgeable of the whole

10    disclosure statement or only certain parts?

11    A    Disclosure statement is a big document.  I'm generally

12    knowledgeable of many parts, but this chart is not standing

13    out.

14    Q    So you and/or Alvarez & Marsal did not prepare this

15    chart at all?

16    A    It's possible we prepared it.  I don't know who

17    prepared this chart.

18    Q    That's the question I'm trying to get answered.  But

19    you have no knowledge of --

20            THE COURT:  All you can do is ask questions and

21    the witness can answer them.  So let's ask another question.

22            MR. PHILLIPS:  Fair enough.  And I'm finished with

23    my cross-examination, Your Honor.  Thank you so much, Mr.

24    Campagna.

25            THE WITNESS:  Thank you.

1           THE COURT:  Thank you very much, Mr. Phillips.

2           Ms. Dow?

3           MS. DOW:  Yes.  Good afternoon.  In regards to

4    exhibits, would you please go back to the best interest test

5    exhibits that was shared earlier I guess this morning your

6    time.

7           MS. BRIER:  That would be Exhibit 70.  And, Mr.

8    Young, if you could pull that up on the screen.  Mr.

9    Campagna, that's also in your binder as the last tab and the

10   second-to-last tab, too.

11          MS. DOW:  Thank you for assisting with that.

12   BY MS. DOW:

13   A    I'm sorry, what document did you ask for?  You asked

14   for the best interest test?  What's pulled up now is --

15   Q    The best interest test.  It was the chart with the

16   three columns comparing the different disposition scenarios.

17   A    The demonstrative from this morning.

18          MS. BRIER:  The demonstrative from this morning.

19   Mr. Young, that's at Page 5 on the document that you are

20   displaying.  Thank you.

21          THE COURT:  All right.  Just so that the record is

22   clear, what we have up on the screen is docket number 3697.

23          MS. DOW:  Yes, Mr. Campagna, you are correct.

24          THE COURT:  Page 5 of 6.  CEL Token Liquidation

25   Break-Even Values.  I just want to make sure we have a clear

Page 175

1    -- that's now what we're looking at?

2              MS. DOW:  No, Your Honor, sir.

3              MS. BRIER:  They show the same thing.  3653 and

4    3697 both have this chart.  And we'll put up 3697, which is

5    the exact one we showed this morning.  And it's Page 5 of 6

6    of 3697.

7              THE COURT:  THE COURT:  All right.  So what I have

8    open in front of me is ECF 3653, Page 5 of 6, Exhibit A is

9    the chart -- it shows a chart -- that's what we're looking

10   at?

11             MS. DOW:  Correct.  It's not what's currently on

12   screen.

13             THE COURT:  Go ahead.

14             THE WITNESS:  It's 6 of 6 from the stack she's

15   looking for I believe, not 5 of 6.

16             THE COURT:  We're not at the same place then.

17             MS. DOW:  There we go.  Okay, yes.  The plan and

18   the liquidation recovery waterfall.  Thank you.

19             THE COURT:  Just stop for a second because I want

20   to make sure we have a clear record on what we're looking

21   at.  I believe what we're looking at is Page 6 of 6 of ECF

22   Docket Number 3697, Plan and Liquidation Recovery Waterfall.

23   I believe that's the chart that's on the screen now.

24             MS. BRIER:  Thank you, Your Honor.

25             THE COURT:  Go ahead, Ms. Dow.

```
1              MS. DOW:  Yes, thank you.

2    BY MS. DOW:

3    Q    Thank you.  Mr. -- good afternoon, Mr. Campagna.  Am I

4    saying the name incorrectly?

5    A    Campagna.  It's close enough.

6    Q    I apologize --

7    A    No problem.  No problem.

8    Q    -- for the pronunciation.  So I believe you perhaps had

9    mentioned before that you and your organization did not

10   originate all of the numbers in this comparison, is that

11   correct?

12   A    That's correct.

13   Q    Okay.  And so for the purpose of a liquidation recovery

14   waterfall or a best interest test, what is the typical

15   accredited procedure requirements for vetting the numbers in

16   the analysis?

17   A    Specifically for the liquidation analysis?

18   Q    I'm sorry, I didn't hear the first word you said.

19   A    Specifically for the liquidation analysis is the basis

20   for your question?

21   Q    For any of the comparatives, the liquidation, the

22   orderly winddown, or the newco.

23   A    We rely heavily on the company's books and records and

24   market analysis in this case, the cryptocurrency.  And most

25   of the illiquid assets were valued by a third-party
```

Page 177

1    valuation firm.  Again, the mining value, at least in the

2    newco column, was valued by a reputable investment bank.

3    Those are the biggest -- that represents the biggest numbers

4    on the page here.  And some of the other numbers come from a

5    variety of financial analysis, the plan and the like.  So a

6    lot of this was based on third-party valuation of assets and

7    the valuation of the mining business by an investment bank.

8    Q    And then what level are you required to vet those

9    numbers and verify?

10   A    I don't think there's any requirement.  But again,

11   they're third-party, reputable firms that were in the

12   courtroom yesterday available for questioning.  And, you

13   know, their reports were submitted.

14   Q    Sure.  And what accreditation standard is this work

15   product produced under?

16   A    Say that again, please.

17   Q    What accreditation standard is the work product

18   produced under?

19   A    I'm not aware of an accreditation standard.

20   Q    Okay.  So in valuation of the liquidation or any parts

21   of this, you're saying there has not been an accreditation

22   standard applied?

23   A    I'm not aware of an accreditation standard for

24   performing a liquidation analysis.  But as far as

25   accreditation standards applicable to doing business

1    valuations and doing asset valuations, you'd have to speak

2    to those firms.  I don't do either.

3    Q    Okay.  All right.  So -- okay.  So when comparing a

4    liquidation or comparing assets to generate a comparative

5    recovery, in looking at -- and then doing the best interest

6    chart, what -- do you feel that in your professional

7    opinion, do the projections hold a healthy degree of

8    conservatism?

9              MS. BRIER:  Objection.

10             THE COURT:  Sustained.

11   BY MS. DOW:

12   Q    Okay.  I'm going to switch gears here.  Perhaps you

13   could share with us what experience and how many bitcoin

14   mining business models you have produced or those that put

15   input into this recovery waterfall has produced.

16             MS. BRIER:  Objection.

17             THE COURT:  Overruled.

18   BY MS. DOW:

19   A    I personally have not worked on another crypto or

20   bitcoin mining company.  I can't speak to the firms of Stout

21   or Centerview, who prepared the valuation components I think

22   you're referring to.

23   Q    Okay.  All right.  Can you speak to what the drivers to

24   determine the mining, in particular -- in the liquidation

25   valuation, is there any operating period or immediate

Page 179

1    liquidation?

2    A    In this analysis, the $88 million is reflective of a

3    sale of the assets on a non-operating basis.

4    Q    Okay.  So immediately after effective date?

5    A    Right.

6    Q    Okay.  All right.

7    A    The plan fails after trying newco and then trying to

8    come out with a public mining vehicle with a smaller goal

9    than the newco.  And if we fail on both of those, then yes,

10   it was presumed that this goes to an asset sale type

11   liquidation.

12   Q    You said a smaller -- I didn't hear one -- it's a

13   smaller what?

14   A    A smaller footprint.  NewCo is doing more than bitcoin

15   mining.  They're doing staking and other services.  So NewCo

16   has a bigger mandate than what you see here in the middle

17   column with a public mining company being stood up.  We're

18   still trying to harvest the value of the public miner and

19   get that in folks' hands, get the equity security in folks'

20   hands.  And you're winding down the rest of the operation.

21   If we can't do NewCo and we can't do a standalone public

22   mining entity, there's not a lot of steps left.  So in this

23   analysis, it's shown as an asset sale type of liquidation.

24   Q    Okay.  Through the course of the analysis, what

25   criteria did you have line of sight to on how the drivers

1     were set for the different disposition analyses, the

2     liquidation (indiscernible) the NewCo?

3     A     I'm not sure I follow the question.

4     Q     So what criteria was set, for example, if the primary

5     business model of the liquidation is for immediate asset

6     sale on the individual unit or site?  What line of sight do

7     you have as compared to the valuation criteria, drivers to

8     the public?  Public miner and orderly winddown versus the

9     NewCo.

10    A     I'm not sure I can directly answer the question, but

11    again, the NewCo valuation was done by a third party firm.

12    We took a 25 percent discount off of that for a variety of

13    reasons in orderly winddown, public miner column.  And then

14    in the asset liquidation, we spoke with the company's mining

15    team who have purchased these rigs new.  They've seen the

16    marketplace for what they're valued at now.  And we did a

17    buildup on a rig-type by rig-type basis that sort of arrived

18    at the $88 million along with sale of the physical

19    facilities that they own.  And the data point to back that

20    up, that was about an average price of $640 per rig as a

21    component of the $88 million.  And based on some sale

22    transactions that were presented to the debtors earlier in

23    the case, the range for rigs was about $350 to $550 I

24    believe was what you heard yesterday from testimony.  So it

25    felt like we were in the right zip code.  And again, I could

Page 181

1    also benchmark it with the one offer that would have

2    resulted in $175 million of value for all the mining

3    business, which also had a lot of things the buyer needed to

4    do before they could actually follow through that in the

5    opinion of our investment bankers was not likely to happen

6    and wasn't deemed to even be a valid bid.

7         So that would say 175 at the top end if you're lucky

8    enough to really close that bid along the lines of what we

9    saw before.  And we have an $88 million on an asset-by-asset

10   basis.

11   Q    Okay.

12             THE COURT:  Let me ask you -- hold on, Ms. Dow.

13   I'll let you ask additional questions.  But I just want to

14   make sure I understand something.  So (indiscernible) this

15   was a demonstrative.  Just in the NewCo column first, were

16   any of those numbers derived by A&M or were those inputs all

17   from other valuations or other analyses by other experts?

18             THE WITNESS:  So if you look at that NewCo column,

19   the numbers that came from third-party firms.  A big chunk

20   of the liquid cryptocurrency, so the $2.6 billion right on

21   the top, we had Stout look at that.  Again, a big piece of

22   that is Ethereum and bitcoin.  Very easy to value.  So I

23   don't want to overstate the level of valuation work that's

24   required there.

25             But then there are some alt coins in there that

Page 182

1    required some more substantive valuation by Stout.  The

2    mining 565 came from our investment banker.  And Ryan Kielty

3    was here yesterday to speak to that number.  And then the

4    illiquid assets, the vast majority if not all of that 283,

5    and the same in the other columns, came from a Stout

6    valuation.  So the vast majority of this came from third-

7    party valuations.

8              THE COURT:  And what about the adjustments, the

9    downward -- the deductions.  Where did they come from?

10             THE WITNESS:  The distributions to claims?  That -

11   -

12             THE COURT:  You know, less post-emergence costs to

13   estate, litigation trust funding...

14             THE WITNESS:  Perfect.  Yes.

15             THE COURT:  See capital.  Just walk me through.

16   I'm just trying to understand where the numbers in this

17   demonstrative came from.

18             THE WITNESS:  Sure.

19             THE COURT:  With the work of Alvarez & Marsal,

20   which were essentially inputs that were given to you.

21             THE WITNESS:  Sure.  So the liquid cryptocurrency

22   is based on the coin-by-coin analysis that the company

23   supplied to Stout and Stout then valued.  The post-emergence

24   cost to the estate, these were estimates that we at Alvarez

25   & Marsal helped the company put together.  So we definitely

Page 183

1    were driving these costs.  And under the NewCo scenario,

2    what you're really looking at is six to 12 months of

3    operating expenses to get the distribution out.  We hope to

4    do it in six months.  We budgeted for a little longer.  So

5    six to 12 months of real work to get the distribution out

6    and you can get to the distribution perhaps around 14 months

7    out for unclaimed -- people don't show up for the recovery

8    and it redistributes.  So that's sort of the operating cost

9    behind that.  And then some fees to wind down these entities

10   over a couple of years.

11         In the orderly winddown public miner, the

12   presumption there is a five-year winddown plan where the

13   plan administrator tries to harvest the most value for the

14   illiquid assets, the litigation, and the like.  But it's a

15   longer-term plan with some more dollars behind it.

16         THE COURT:  Are those A&M numbers or are those the

17   numbers that were given to you?

18         THE WITNESS:  About half of that is an A&M number.

19   Maybe $100 million of that is an A&M number.  $60 million

20   was reflected in the bid from the backup bidder for their

21   fees associated with that transaction.  And then finally the

22   liquidation, again, is a number A&M helped derive.  It's

23   about fifty-fifty.  About 80 million is --

24         THE COURT:  That's the $159 million?

25         THE WITNESS:  Yes.  It's about $80 million of

Page 184

1    operating costs to take care of the liquidation on an

2    expedited basis, and then $80 million, three percent fee to

3    a Chapter 7 trustee.

4              THE COURT:  Without going through the explanation

5    at this point, are there other numbers in this demonstrative

6    that are inputs from A&M as opposed to information you got

7    from others?

8              THE WITNESS:  Well, the next two lines are

9    specifically in the plan.  Litigation trust funding of $50

10   million, seed capital to NewCo of 50.  Under the current

11   proposal with Fahrenheit, we put a $50 million because the

12   mining business would need some capital.

13             Beyond that, the answer is no until you get to the

14   claims where we did -- obviously we had been helping the

15   company assess claims, but most of these numbers are books

16   and records numbers as the claim process -- the claims

17   reconciliation process continues.

18             THE COURT:  Thanks very much.  Okay.  Go ahead,

19   Ms. Dow, with your questions.

20             MS. DOW:  Thank you, Your Honor.

21   BY MS. DOW:

22   Q    Okay.  So I believe what I heard is that this page has

23   a mix of parties that have inputted to it and that your

24   organization, A&M, are largely involved in the derivation of

25   the second and third column.  Did I hear that correctly?

Page 185

1    A    I think that's fair.

2    Q    And so with some involvement with calculating and

3    analyzing some of the deductions (indiscernible).

4    A    Yes, that's right.

5    Q    Okay.  Thank you for that.  So when you did work on the

6    analysis of the mining operation, did (indiscernible) going

7    concern business model or orderly winddown business model

8    inputs (indiscernible)?

9    A    You're talking about the underlying forecast that was

10   supplied to Centerview to conduct their business valuation?

11   Q    Yes.  And whatever numbers you utilized as inputs to

12   the orderly winddown.

13   A    We just used the $565 million valuation from Centerview

14   and discounted it by 25 percent.

15   Q    Okay.

16   A    And that's (indiscernible).

17   Q    And did you do any tests on the 565 beyond the --

18   before doing mathematical adjustment?

19   A    I think we've been through this.  That was the expert

20   opinion of Centerview in their valuation that was provided.

21   So no, we didn't do anything beyond that.

22   Q    So no verification of quality of revenues to verify the

23   input data.

24   A    Not done by me.

25   Q    Okay.  And again could you go through how you derived

Page 186

1    the 25 percent discount to get us from the NewCo so the

2    winddown?  What is the math or procedure behind that?

3    A    I believe I did.

4    Q    Could you summarize that again?  I'm sorry.

5    A    Sure.  We pointed to a couple of factors.  One, in the

6    NewCo the $565 million presupposes that Fahrenheit and U.S.

7    Bitcoin is running the operation.  That was important -- an

8    important component of the valuation was knowing who the

9    operator was, and it was the Debtor and UCC's first choice

10   operator.  So inherently if you're going to your second

11   choice operator, you probably think they're going to do a

12   slightly -- not quite as good of a job.  Could be a great

13   second choice bidder, but likely not going to do quite as

14   good or you'd rather go with your first choice.  So that's a

15   piece of it.

16       U.S. Bitcoin also put several -- U.S. Bitcoin and

17   Fahrenheit also put several items very specifically into the

18   terms of the deal that is inked and signed and ready to be -

19   - ready to go.  There was $100 million of credits for future

20   purchases of rigs.  So $100 million in discounts.  There was

21   a cap placed on buildout costs where they capped buildout

22   costs at $395,000 per megawatt.  So if construction costs

23   run higher than that, it's on them.  That was deemed

24   valuable.  And they were also supplying software to all our

25   rigs that will help regulate the power usage, when they turn

1    on, when they turn off, and keep them running efficiently.

2    So those three items, we can soft circle those.

3        I mentioned one very specifically with $100 million.

4    Big numbers that also helped us guide to a 25 percent

5    discount.  So that's largely how we assessed the 25 percent

6    from NewCo to orderly winddown/public miner.

7    Q    Thank you for that.  So could you -- two questions

8    about inputs to the orderly winddown numbers.  IN orderly

9    winddown did you consider what would the capital infusion

10   required in order to fully electrify and energize the idle

11   assets and over what period of time?

12   A    Yeah, I'm not the best person to speak to the

13   underlying forecast for mining.  I think that was the

14   subject of Mr. Ferrara's discussion yesterday.  But I do

15   believe it had -- the 565 presumes $50 million of capital to

16   fund it upfront, which is why you see a deduction on the

17   very next line.  There's a little bit of semantics with the

18   -- but it presupposes they have $50 million in capital to

19   start with.  And it does include some rig replacement and

20   other capital costs along the way.  But again, Mr. Ferrara

21   would be a better person to speak to on the details there.

22   Q    Okay, thank you for that.  So you don't have line of

23   sight of what the additional capital to energize the site,

24   just for some of the in-service costs?

25   A    There were some costs that energized sites built in.

Page 188

1    There was a projected buildout of certain items in the

2    underlying business plan that, again, I'm not fully familiar

3    with those details.

4    Q    All right.  So did you offer support to the mining

5    valuation?

6    A    No, we don't -- my firm doesn't do valuation work on

7    that level.

8    Q    Okay.  On that level.  You mean actively producing

9    valuation analysis?

10   A    I mean we have a division that does some valuation

11   work, but we don't have experience in the crypto-mining

12   space.  And we're not asked to value -- provide any

13   assistance with respect to valuation of the mining assets.

14   Q    Okay, thank you.  How about the backup bids for the

15   orderly winddown?  What kind of review or input did that

16   have on the numbers there?

17   A    I think what I've already stated is sort of the breadth

18   of my knowledge on the backup bids.  You know, moving from

19   our first bidder to our second bidder was part of the reason

20   for the decrease in the valuation that you see on the mining

21   business.  But again, our investment banker was collecting

22   the backup bids as well as the primary bids and performed

23   all the assessments on those bids.

24   Q    So thank you for that.  And so the orderly winddown is

25   materially based on the work of others, yet you've done some

Page 189

1   analysis and added to it, such as the discount.  And you're

2   discounting total value, or are you discounting the

3   productivity of the assets to generate revenue?

4           MS. BRIER:  Objection.

5           THE COURT:  Overruled.

6   BY MS. DOW:

7   A    565 times 75 percent equals 424.  I'm just discounting

8   the number.

9   Q    Okay.  So in the event of the criteria supporting your

10  underlying numbers, did you look at and verify your inputs

11  that were given to you, if there perhaps might be any

12  irregularities in the assumptions that are flawed versus,

13  you know, industry standards?

14  A    In applying a 25 percent discount to 565?  I'm not sure

15  I follow.  I did not do the valuation of the 565, so I am

16  not aware of the firm that did do that analysis used.

17  Q    Okay.  I apologize, I didn't mean to speak over you.

18  A    That's okay.

19  Q    Sorry about that.  But if you are in fact using a

20  discount through the revenue or overall valuation, shouldn't

21  there be an understanding of the key assumptions --

22          THE COURT:  He's explained what he's done.  Just

23  move along with the examination.

24          MS. DOW:  Okay.

25  BY MS. DOW:

Page 190

1   Q    So if in fact irregularities are found in the

2   underlying assumption, whether it's the assumptions driving

3   the 25 percent discount or others, where does that put this

4   analysis in the range of high degree of conservatism?

5              MS. BRIER:  Objection.

6              THE COURT:  Sustained.  Let's move along.

7              MS. DOW:  Okay.  So, Your Honor, I'm trying to

8   voice tactfully a question on the line of probing my concern

9   area, which is around the assumptions of the productivity of

10  the assets and creating their primary --

11             THE COURT:  He's explained where the numbers have

12  come from.  You already asked about that.

13             MS. DOW:  Thank you, Your Honor.  What I'm trying

14  to understand is how if there is a flaw, since this is a

15  single number and not a range, which is often used, how that

16  --

17             THE WITNESS:  He has indicated which experts did

18  valuations and what he relied on.  Move on with your

19  examination.  If you had questions about the other

20  valuations, you should have asked it of them.  Let's go.

21  BY MS. DOW:

22  Q    So on the orderly winddown piece that you valued, I

23  heard you speak about I think it was the Bricks.  What was

24  the findings or your review and your use of that into rollup

25  numbers here of the other two?

Page 191

```
 1   A    I'm sorry, was that the Brick?  Was that what you just
 2   said?
 3   Q    I think that's the colloquial name for the bid that you
 4   were mentioning just a few moments ago.
 5   A    Yes.
 6   Q    But there were other -- I believe two other bids.
 7   Could you please share how they impacted the calculations,
 8   the review of those impacting the calculations.
 9   A    I think I mentioned the backup bidder, which, yes, was
10   the Brick Group.  Their cost structure is built into the
11   second line on this chart, the less post-emergence costs to
12   the estate.  So part of that 163 of expense relates to costs
13   associated with that backup bid, which is our signed-up
14   backup bidder.
15        As far as other backup bids, I did not look at any
16   other backup bids.  I am not aware of what they are or what
17   the impact would be.
18   Q    Okay.  Thank you.  And then finally for the use of this
19   overall analysis, if -- how does a change in either three of
20   these columns perhaps impact the best interest test?
21             MS. BRIER:  Objection.
22   BY MS. DOW:
23   A    Mathematically?  More asset recoveries make the bottom
24   number higher.  The percents go up.  As does less
25   distributions to claims.  I don't -- that's the way the math
```

Page 192

1   would work.  If NewCo goes up, you increase the gap that you

2   need to hit to have an issue with the best interest test.

3   Q    Could you repeat that again?  I'm sorry, it was

4   muffled.

5   A    If you increase the values under the NewCo column, then

6   the positive numbers, the value of these assets

7   (indiscernible) everything else constant, you would increase

8   the gap of room or the cushion you have before there's any

9   issue with the best interest test.

10  Q    And what about the other way, if for some reason the

11  value of large operation is significantly less, like 20, 30,

12  40 percent in practicality?

13  A    Maybe not directly answering your question, but if you

14  increase -- left everything else the same and increased the

15  asset values on the liquidation, that would decrease the

16  cushion between NewCo and liquidation value and decrease the

17  cushion we currently have on the best interest test.

18  Q    Okay.

19         THE COURT:  Let's finish up, Ms. Dow.

20  BY MS. DOW:

21  A    I don't recall the specifics on -- you know, there were

22  some other points in that question, but I didn't really

23  follow the specifics.

24  Q    Okay.  So the cushion would be decreased if the left

25  two column's numbers were overstated currently and come out

Page 193

1    lower or the cushion would also increase --

2              THE COURT:  Ms. Dow, finish up.  Now.

3              MS. DOW:  (indiscernible), did I hear that

4    (indiscernible)?

5              THE COURT:  Ms. Dow, finish up now.

6              MS. DOW:  Thank you.  I was just asking for

7    clarification on -- on the (indiscernible).

8              THE COURT:  Ms. Dow, it's math.  Go on.  If you

9    have any more questions, ask them now.

10             MS. DOW:  Thank you, Your Honor.

11             THE COURT:  All right.  We'll take a recess until

12   3:30.

13             (Recess)

14             THE COURT:  All right, please be seated.  Next up

15   is Mr. Ubierna.

16             And you're still under oath.

17             Go ahead, Mr. Ubierna.

18   BY MR. UBIERNA:

19   Q    Good afternoon, Mr. Campagna. Are you familiar with the

20   EIP part of the plan?

21   A    Yes, I generally am.

22   Q    What role, if any, has Celsius employees or directors

23   in drafting the EIP?

24   A    I'm sorry, was that what role have the directors and

25   officers had in the EIP?

Page 194

1    Q    In drafting the EIP, yes.

2    A    I don't know that they drafted it, but they certainly

3    reviewed it and approved it before it made its way into what

4    was filed on the docket once upon a time into the plan.

5    Q    Okay.  Have you been involved in drafting the Emergency

6    Incentive Plan (indiscernible) targets?

7    A    Yes, I have.

8    Q    How have you established the targets?

9    A    Well, this is a very unusual situation.  In a typical

10   situation, typical business, you have revenue targets and

11   EBITDA targets.  It's a little bit easier to talk about what

12   is target performance, what's exceeding performance and the

13   like.  Here, the path forward is to do a couple of things,

14   but primarily to get liquid crypto returned to customers as

15   quickly as possible.  So we tried to drive targets around

16   with those goals in mind and get the mining business as

17   operational and get as many rigs profitably in action as

18   quickly as possible to drive that business to approved

19   cashflow performance as quickly as possible and set it up

20   for success as part of -- well, now in this part of NewCo.

21   And that's what the mining metrics were designed to do as

22   well.

23   Q    Ballots were sent in late August.  And today it's

24   October 4th.  How -- would you consider easy getting a plan

25   approved by October 31?

Page 195

1    A     I've never used the word easy.  So that counts on

2    things that are out of my control and out of our control.

3    Maybe except for one person on the room's control.  So

4    that's really our hope.  And it looks better maybe -- maybe

5    it looks better now than it did a couple of months ago.  I

6    don't know.

7    Q     What has happened recently with Celsius Mawson site?

8    A     I'm sorry, say that again?

9    Q     What has happened recently with Celsius Mawson site?

10   A     I'm sorry...

11        MS. BRIER:  Mawson.  I think he's saying Mawson.

12   Yes.

13        THE WITNESS:  Mawson.  Okay.

14   BY MR. UBIERNA:

15   A     Yes.  I'm probably not the most up-to-speed on all the

16   folks you could have asked that, but I know the Mawson rigs

17   are offline or going offline.  And we would look to redeploy

18   them.

19   Q     Okay.  How does disclosure impact the EIP rewards?

20   A     So if you look -- one of the performance metrics is

21   rigs -- I forget the terminology.  Rigs online, rigs hashing

22   profitably.  I know there was a threshold target.  I don't

23   know if I have the data point in my declaration.  I'm just

24   looking to see if I have that data point.  There's a target

25   performance and -- and threshold and a target.  One was as

Page 196

1    of August 31st, a company needs to have over 85,000 rigs

2    online.  I might have the number wrong.  They did achieve

3    that portion of the milestone.  But the target for September

4    30th was higher than where the online rigs ended couple days

5    ago.  So based on the math, the math isn't in their favor at

6    this time for the second half of that opportunity.

7    Q    Okay.  How is it that four months target for the

8    (indiscernible) is measured?

9    A    That one has been met.  It was a long time coming.  We

10   need certain easements from folks who are economically

11   motivated to help.  I think that performance target actually

12   helped get that completed and get in excess of 10,000 rigs

13   up and running.

14   Q    Okay.  The performance target says completed and

15   operational.  How is that measured?

16   A    That was -- I'm (indiscernible) the specifics, but I

17   believe it had to be energized, we had to have control of

18   the facility and it had to be energized and ready to go.

19   And it was all of those things.

20   Q    Okay.  Does it have any numerical target that

21   (indiscernible) performance target (indiscernible) --

22   A    That I don't --

23   Q    -- completed and operational?

24   A    Apologies for speaking over you.  I don't

25   (indiscernible) a numerical target.  It was more those

Page 197

1    qualitative factors that I just mentioned that needed to

2    move forward.  Get through the easement issue, get the --

3    which then allowed us to energize the facility and get it

4    operational.

5    Q    Okay.  Going back to the 95,000 mining rigs.  Will they

6    needed to be vetted for the metric to be monthly or weekly

7    average for it to be not so easily abused?

8    A    There's a whole bunch of different ways to set this up.

9    And we had many weeks of negotiations with the Unsecured

10   Creditors' Committee to set the targets where they are.  And

11   this is where we landed.

12   Q    Are the mining metrics difficult to meet in your

13   opinion?

14   A    Well, one of them met, one is 50 percent met.  And I

15   think there's a third one that I'm -- again, as a memory

16   test I'm not remembering it offhand.  So I know they haven't

17   met all of them.  And it doesn't look like they will meet

18   all of them.  So they seem sufficient.

19   Q    Okay.  Have this target been made more difficult

20   because of previous failures by Celsius management?

21   Yeah, I don't know how to answer that.

22   A    Okay.  I don't have any more questions.

23          MR. UBIERNA:  Thank you, Your Honor.

24          THE COURT:  Thank you very much, Mr. Ubierna.

25          Mr. Frishberg?

1            MR. FRISHBERG:  Hi.  Thank you, Your Honor.  I

2     just have a very brief question.

3     BY MR. FRISHBERG:

4     Q    I believe  you covered part of this earlier.  Has there

5     been any offers or have there been any offers to buy all the

6     CEL tokens in the event of a liquidation?

7     A    Not that I'm aware of.  I haven't heard of any.

8     Q    Okay.  If Celsius was to go into, as some have

9     suggested, a Chapter 7 liquidation, how would they sell the

10    CEL tokens?

11    A    I don't think they would.  I think the SEC's regulatory

12    bodies have prevented the company from selling the CEL

13    tokens.  So I do not think they would be sold.

14    Q    So the CEL tokens for the company have no value.

15    A    Correct.

16    Q    Would that be accurate?

17    A    Under a liquidation analysis, we have zero value

18    reflected for them in the liquidation column.

19    Q    Those are the questions.

20            THE COURT:  Thank you very much, Mr. Frishberg.

21            Mr. Abreu?

22    BY MR. ABREU:

23    Q    Hello, Mr. Campagna.  Were you here when Mr. Galka was

24    speaking?

25    A    For part, yes.  Not all of his testimony, no.

Page 199

 1   Q    Okay.  So could you -- I'm just going to mention -- I'm

 2   going just to use his expert report and your supplement

 3   statement, your supplement declaration.  That's -- so let's

 4   open the document 3580, which is Mr. Galka's expert report.

 5   A    I have that in front of me.

 6   Q    Let's go to Page 28 of the PDF.  On figure 8.

 7   A    Okay.

 8   Q    Where it says Celsius Annual (indiscernible)

 9   Transactions.  Do you recall --

10             THE COURT:  What page are you on, Mr. Abreu?

11             MR. ABREU:  Twenty-eight.  It's that table of

12   Celsius Annual --

13             THE COURT:  That's fine.  I just needed to turn to

14   it.  Go ahead.

15   BY MR. ABREU:

16   Q    Do you recall when Mr. Galka said it was fair to assess

17   the average price of CEL purchase by buyers through the

18   company by taking the -- for example, the 2021 dollar value

19   and then dividing by the 2021 number of CEL tokens?  Do you

20   recall that?

21             MR. WEEDMAN:  Objection, Your Honor.

22             MS. BRIER:  Objection.

23             MR. WEEDMAN:  I think that misstates Mr. Galka's -

24   -

25             THE COURT:  Sustained.  Ask your next question,

Page 200

1    Mr. Abreu.

2    BY MR. ABREU:

3    Q    Are you familiar with tax harvesting?

4            THE COURT:  I couldn't hear you, Mr. Abreu.  Just

5    --

6    BY MR. ABREU:

7    Q    Mr. Campagna, are you familiar with tax harvesting?

8    A    No, I'm not.

9    Q    Have you ever filed your taxes in a year that you have

10   capital gains?

11   A    Yes.

12   Q    Have you ever held or traded cryptocurrencies?

13   A    I have not.

14           MR. ABREU:  Judge, could I just explain what tax

15   harvesting is?

16           THE COURT:  No.  Just ask your questions.

17           MR. ABREU:  Okay.

18   BY MR. ABREU:

19   Q    Are you aware if cryptocurrencies are subject to

20   capital gains in the U.S.?

21           THE COURT:  I'm sorry, I couldn't hear your

22   question.

23   BY MR. ABREU:

24   Q    Are you aware if cryptocurrencies in U.S. are subject

25   to capital gains?

```
 1              THE COURT:  Subject to capital gains.
 2   BY MR. ABREU:
 3   A    I'm certainly no tax advisor, but I have heard that.
 4   I'm not aware of them from anything other than generally
 5   being around the cases and hearing things.
 6   Q    In a case of (indiscernible) or CEL, which both for
 7   example at $5 (indiscernible) the company, do you believe
 8   there might be a greater recovery if he gets (indiscernible)
 9   his asset that he bought?
10              THE COURT:  I don't understand your question, Mr.
11   Abreu.
12              MR. ABREU:  My question is to the matter that if
13   there is a distribution of CEL tokens, OTC buyers can choose
14   to sell it in the market at any point and have a value that
15   they can harvest against their capital gains, which is
16   higher than what would be proposed -- what is said on the
17   (indiscernible).
18              THE COURT:  Your question is beyond the scope of
19   the direct examination and I won't permit it.  It's also
20   beyond the expertise that he has been using in this case.
21              MR. ABREU:  Okay.
22   BY MR. ABREU:
23   Q    (indiscernible) that the proposed reorg plan already
24   excludes parties who might violate securities laws and are
25   subject to litigation in the case of CEL token.
```

```
 1              MS. BRIER:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3    BY MR. ABREU:

 4    Q    Does the company intend to pursue any value creation

 5    for CEL token?

 6              MS. BRIER:  Objection.

 7              THE COURT:  Sustained.

 8    BY MR. ABREU:

 9    Q    Are you aware if the current reorg plan has any

10    (indiscernible) or CEL token besides liquidating or just

11    settling on the proposed price?

12              MS. BRIER:  Objection.

13              THE COURT:  Could you ask your question again?

14    I'm not sure I followed it.

15    BY MR. ABREU:

16    Q    Are you aware if the current reorg plan has any use

17    case for CEL token on the reorganization?

18    A    As part of NewCo?

19    Q    Yes.

20    A    I'm not aware of any.

21    Q    Do you understand that -- let me rephrase it.  If there

22    is -- if there is no plan for continuing any sort of value

23    for CEL on reorg, if that will eliminate any issues with

24    security concerns?  Just if you are aware, if you have any

25    understanding of this.
```

Page 203

```
 1              MS. BRIER:  Objection.

 2              THE COURT:  You can answer the question.

 3     BY MR. ABREU:

 4     A    No.  I have no knowledge of that topic.

 5              MR. ABREU:  Just one question for you, Judge,

 6     about our proceeding.  Just my final question.  In the

 7     matter of Mr. Galka's witness statements, if you recall I

 8     ask him why he did not provide any data from FTX, which they

 9     subpoenaed.  And I believe it's not sealed.  Would you

10     inclined to approve a motion to release that data?  Because

11     I believe there might be sufficient information that an

12     expert witness could shed some doubts on what Mr. Galka has

13     reported here today.

14              THE COURT:  I don't have a motion in front of me,

15     Mr. Abreu.  If you make a motion, I'll decide the motion.

16              MR. ABREU:  Thank you.  That's all for me.

17              THE COURT:  Thank you very much, Mr. Abreu.

18              All right, Mr. Johnson.

19              MR. JOHNSON:  Okay.  Hearing me?

20              THE COURT:  Yes, we can.

21              MR. JOHNSON:  Okay.  Good afternoon, everybody.

22     BY MR. JOHNSON:

23     Q    Good afternoon, Mr. Campagna.  I want to -- I will not

24     ask you questions about (indiscernible) CEL token so you

25     will be happy, okay?  Okay.  So I know you have 25 years'
```

Page 204

```
 1   experience in this (indiscernible) business, right?

 2   A    I have 25 years' experience working with distressed

 3   companies, yes.

 4   Q    Yes.  So how many years you have experience in crypto

 5   business advising?

 6   A    Including this one, since June of 2022.  So this is the

 7   first one.

 8   Q    Okay.  So how many years you have experience in bitcoin

 9   mining?

10   A    Again, this is the first engagement involving bitcoin

11   or bitcoin money, crypto or bitcoin mining.

12   Q    Okay.  So in the last 25 years were you advising this

13   bankruptcy case, how many unsecured (indiscernible),

14   unsecured creditor maximally you have seen in one bankruptcy

15   case?

16   A    I'm sorry, I did not pick up all of that question.

17   Q    In the 25 years in your experience for the bankruptcy

18   case (indiscernible) many of unsecured creditor, right?  So

19   in those bankruptcy case, maximally in one case, how many

20   unsecured creditors you ever see?

21   A    I understand the question.  The answer is I'm not sure.

22   But I would think less than 100,000 in any of those cases.

23   Q    (indiscernible)?

24   A    You're asking about the number of creditors, number of

25   unsecured creditors in those cases?
```

Page 205

```
 1    Q    Yes.

 2    A    Yeah.  I don't have a precise answer.  But I would

 3    estimate it at less than 100,000.

 4    Q    Less than 100,000.  So in our case, we have nearly one

 5    million unsecured creditors, right?  Do you know?

 6    A    I don't know, but that number sounds high.

 7    Q    Okay.  And for unsecured creditor committee, the seven

 8    member of unsecured creditor committee members is not

 9    elected by our unsecured creditors.  They are appointed by

10    U.S. Trustee.  You know that?

11              MS. BRIER:  Objection.

12              THE COURT:  Sustained.

13    BY MR. JOHNSON:

14    Q    Okay.  Back to my questions.  So I want to ask you

15    about the exhibit number 47.  Okay.  Do you see that?

16    A    No, I don't have that.  Exhibit 37 you mentioned?

17    Q    Forty-seven.

18    A    Forty-seven.

19    Q    And 48.

20              MS. BRIER:  Mr. Johnson, did you put exhibits on

21    the record last night that you intend to enter?

22              MR. JOHNSON:  That's debtor -- creditor --

23    debtor's 47 (indiscernible) Celsius Liquidation Analysis.

24    And Debtor 48, Celsius Liquidation Analysis Supporting data.

25              MR. COLODNY:  Your Honor, I believe this would be
```

Page 206

1    the exhibit that Mr. Phillips asked about before.

2              THE COURT:  I'm sorry, I can't hear you.

3              MS. BRIER:  I think they're talking -- yeah.

4              MR. COLODNY:  Your Honor, I believe this is the

5    exhibit Mr. Phillips asked about, which is Celsius Exhibit 7

6    in your binder in front of you.  And it's Page 269 at the

7    top.  It's in the skinny --

8              MS. BRIER:  Your Honor, I think a couple of -- I

9    think a couple of these questioners have been referencing

10   Exhibit 47, which is a large Excel that is on Debtor's

11   exhibit list that underlies his analysis.  So they may be

12   referencing that.  We have it available.  It's a very large

13   Excel that's on the exhibit list.

14             THE COURT:  You had to post your exhibits last

15   night by 5:00 if you wanted to use them in cross-

16   examination.

17             MR. JOHNSON:  No, that's not my -- that's not my--

18             THE COURT:  Ask your next question, Mr. Johnson.

19             MR. JOHNSON:  I mean the exhibit in the

20   (indiscernible) 3699 and filed by another (indiscernible)

21   the -- let me see.  (indiscernible) document for today's

22   hearing.  But there is cross-examination.  I want to use

23   that document.  I think it's -- Your Honor, you have seen

24   that document.

25             THE COURT:  You have to file any documents you

Page 207

1    wish to use in cross-examination by last night.  You did

2    not.  Go on with your examination if you have any.

3            MR. JOHNSON:  Is that document (indiscernible) --

4            THE COURT:  Don't argue with me, Mr. Johnson.  If

5    you have a question, ask your question of the witness.

6            MR. JOHNSON:  Okay.  So for the exhibit Debtor 47,

7    48, 49 --

8            THE COURT:  Mr. Johnson, you can't ask about that

9    exhibit.  You didn't send it last night.  Ask your next

10   question.  Do you have another question to ask?

11   BY MR. JOHNSON:

12   Q    Okay.  Mr. Campagna, for the (indiscernible) being

13   done, you mentioned on your own statement on Page 25,

14   Paragraph 68.

15   A    Page 25, Paragraph 68?

16   Q    Yes.

17   A    Okay.  I'm there.  I'm just going to read that

18   paragraph.

19   Q    That (indiscernible) you mentioned it is likely that

20   (indiscernible) trustee will be liquidating the assets on a

21   much shorter timeframe (indiscernible) values, right?

22   (indiscernible)?

23           MS. BRIER:  Your Honor, can he repeat that

24   question?  I'm not sure I understood it.

25           THE COURT:  Mr. Johnson, we're having a hard time

Page 208

1    understanding your questions.  Can you just repeat it,

2    please?

3              MR. JOHNSON:  Okay.  Under Paragraph 68, Mr.

4    Campagna mentioned that (indiscernible) Chapter 7 trustee

5    would liquidate the assets on a much shorter timeframe.  Is

6    that what you said?

7              THE COURT:  That's what it says.  What's your

8    question?

9    BY MR. JOHNSON:

10   Q    Okay.  You mentioned that you don't have any experience

11   in the liquidation (indiscernible) of crypto business and

12   (indiscernible) bitcoin mining business.  Then why you can

13   have such -- you make such statement that is likely it's a

14   shorter liquidation timeframe for Chapter 7 trustee?  Why?

15   If you don't have experience, why can say that?

16   A    I think the answer is I have experience in Chater 11

17   cases when they come to the end of a plan out for a vote.

18   If the answer is no and we have, you know, two paths under

19   which -- a yes vote is a yes vote for a NewCo.  Or in the

20   alternative, if NewCo can't be completed, a standalone

21   public mining company and a winddown of the platform

22   business.   If we're unable to enact either of those,

23   there's not a lot of other places to go other than selling

24   assets and trying to return fiat cash to people as quickly

25   as possible, and that's what the estimates underlying the

Page 209

1    liquidation analysis show.

2    Q    Why are trustee 7 (indiscernible) trustee cannot hire

3    another manager to do the actual same things for the other

4    wind down?

5    A    To do the same thing that the --

6              THE COURT:  I'm going to object to the question

7    myself.  This is a matter of law as to what a Chapter 7

8    trustee must do.  Ask your next question.

9              MR. JOHNSON:  Okay.

10             BY MR. JOHNSON:

11             Q    So back to today's your demonstration.  We

12   can see your doc 367.  Today your demonstration, Page 6 of

13   6.

14             MS. BRIER:  Can you repeat the docket number?  I

15   just didn't catch that.

16             MR. JOHNSON:  Today, you're fine.

17             THE COURT:  Could you just repeat where we're

18   supposed to be looking?

19             MR. JOHNSON:  Yes, there you have a chart.  You

20   have a -- it's a (indiscernible) workflow.

21             THE COURT:  Mr. Johnson, I'm sorry, I can't follow

22   you.  What is it that you want the witness to look at?

23             MR. JOHNSON:  I want to ask him a question about

24   the different figure on the wind down and NewCo and

25   (indiscernible)

Page 210

1                 THE COURT:  And is there a specific page in the

2     exhibit that you want him to look at and that you want me to

3     look at?

4                 MR. JOHNSON:  Yes, Page 6 of 6.

5                 THE WITNESS:  It's the last page of that dec

6     altogether.  I think it's this one again.

7                 MR. JOHNSON:  The plan and liquidation require

8     one, four.

9                 THE COURT:  All right.  Go ahead with your

10    question.

11                MR. JOHNSON:  Okay.

12    BY MR. JOHNSON:

13    Q    We can see there is a huge difference for the post

14    emergency coast to the estate between the three sides,

15    especially for the order being done.  We can see there are

16    not much more difference between these two sides.  You can

17    have nearly 90 million U.S. dollar difference for that cost.

18    Why that --

19                THE COURT:  What's your question?

20    BY MR. JOHNSON:

21    Q         Why have such huge difference -- 116,000,075.

22    What's the difference?  Why so big difference?

23    A    Are you on the second line of the schedule?

24    Q    Yes.

25    A    Okay.  Under the NewCo scenario, the work that needs to

1    be done is to get the initial crypto distribution out and

2    perhaps a second distribution out.  The initial crypto

3    distribution isn't always all going to go out in one slug.

4    There will be multiple with reserves and other mechanics.

5    It'll take some time.  So we've estimated the cost of

6    maintaining employees and some infrastructure for 6 to 12

7    months.  That's what the $75 million represents.  In the

8    public minor column, that is an orderly wind down scheduled

9    for five years.  So it's a greater time frame, which results

10   in increased expenses.  And 60 million of those expenses,

11   roughly, are fees associated with the backup bidder --

12   included in the backup bidder term sheet.  So roughly, 60

13   million of fees to the backup bidder to run this process and

14   do a lot of the work behind the scenes.  And the rest is

15   costs of keeping folks around to drive to higher recoveries

16   on some of the illiquid assets and the like.  And then in a

17   liquidation column, it's approximately $80 million of costs

18   to run a Chapter 7 liquidation and have some employees and

19   pay some fees for selling assets and things of the like.

20   And $80 million, which I understand is a statutory rate of

21   sorts.  I don't know that it always has to be the 3 percent,

22   but 3 percent of distributable proceeds to a Chapter 7

23   trustee, which is the second 80 million.  So 80 million of

24   real cost, 80 million to the Chapter 7 trustee is

25   160,000,000 -- the 159 that you see there.  That's the math

Page 212

1    on that at a high level.

2    Q    But why you put two quite a different time frame

3    between NewCo and other wind down?

4    A    Because under the NewCo scenario, NewCo is taking all

5    those illiquid assets and managing them themselves on the

6    new platform and they're expected to have income generation

7    of their own that will offset the costs of liquidating those

8    assets.  Under the orderly wind down, there is no NewCo.

9    There's a standalone mining company that's public on its own

10   and someone has to, you know, bear the costs of winding down

11   the remaining assets.  NewCo will do that as part of the

12   transaction for 5 years, 7 years, 10 years, however long it

13   takes.  It's their choice.  In the middle column, we've

14   estimated that to take 4 to 5 years and be done by this plan

15   administrator and the cost would be borne by the wind down

16   entity here.

17   Q    The older wind down cannot generate extra profit during

18   that period, but the new code can get extra money --

19   A    Correct.  Sorry.

20   Q    -- from extra business, is that what you mean?

21   A    Yes, that's what I mean.

22   Q    But your estimation is based on the estimation of a new

23   code business model, right?

24   A    Sorry, say that again.

25   Q    So your estimation is based on the new code estimation?

Page 213

1    A    Yes.  Mr. Kokinos is in charge of the NewCo business

2    plan.  I know he had an exhibit and a declaration as well,

3    so I can't really speak to that.  But NewCo plans to have

4    income generating activities separate and apart from mining.

5    Q    Okay.  So let's go to the nuclear business model that

6    is also your only document is doc 2902 -- the plan.

7              MS. BRIER:  Sorry.  Did you say --

8              THE COURT:  Sorry, Mr. Johnson, I couldn't

9    understand you.

10              MR. JOHNSON:  I mean we can go to the record.  Let

11    me see.  Wait a moment, please.  Okay.  That's Exhibit E of

12    disclosure statement.

13              MS. BRIER:  Exhibit E of the disclosure statement;

14    is that what you're looking for?

15              MR. JOHNSON:  Yes.

16              MS. BRIER:  And which version of the disclosure

17    statement are you talking about?  What docket number are you

18    looking at?

19              MR. JOHNSON:  Docket 2902.

20              MS. BRIER:  Okay.  I believe that's an older

21    version of the disclosure statement, but -- and did you put

22    that on the docket last night?  We can pull it up if that

23    would be helpful.  I don't know that we -- it's an older

24    version we can have someone send it to Mr. Young and show

25    it, but I don't -- we didn't have advanced notice for that.

```
 1              THE COURT:  Well, what's your next question?  You
 2     didn't send in -- you didn't file on the docket the
 3     documents you want to use in cross examination today.  I'm
 4     giving you leeway.
 5              MR. JOHNSON:  Your Honor, I'm --
 6              THE COURT:  You've got to bring your examination
 7     to an end.
 8              MR. JOHNSON:  Your Honor, another cross-
 9     examination creditor has been serving such exhibit.
10              THE COURT:  Mr. Johnson, if you have another
11     question, ask it or your examination is over.
12              MR. JOHNSON:  Okay.
13     BY MR. JOHNSON:
14     Q    Mr. Campagna, my question is based on the -- do we know
15     the hash rate?  Do we know Bitcoin Hash rate?
16     A    The answer is no, I don't.  I'm not a Bitcoin mining
17     person.
18     Q    Okay.  The data is advanced modeling (indiscernible) is
19     a nuclear analysis --
20              THE COURT:  All right.  Mr. Johnson, this is
21     beyond the scope of the direct.  Your examination is over.
22     We have one more person who wanted to cross examiner who's
23     in the courtroom.  Come on up.  You're not really going to
24     go through all of that, are you?
25              MR. NOSKOV:  Wasn't sure how this is all going to
```

1    go so --

2              THE COURT:  Just make your appearance.

3              MR. NOSKOV:  Victor Noskov, Quinn Emanuel for

4    Pharaoh's fund.

5              MS. BRIER:  And, Your Honor -- sorry to interrupt,

6    but just for purposes of the record, Mr. Noskov is appearing

7    on behalf of Pharaohs.  He filed a 2019 that indicated he's

8    also appearing on behalf of Nexus, another creditor in this

9    case.  Pharaohs is advancing an objection that liquidation

10   would be better than the plan because of the NewCo equity.

11   Just for the record, Nexus advisors has -- and -- or its

12   affiliates have voted for the plan and have selected equity

13   as opposed to liquid crypto.  So we wanted to notify the

14   court of that fact and reserve rights of course.

15             THE COURT:  You're suggesting Mr. Noskov has a

16   conflict?

17             MS. BRIER:  We're just notifying the court of the

18   fact and reserving rights to seek discovery on that.

19             THE COURT:  Okay.

20             MS. BRIER:  We don't know much at this point.

21             THE COURT:  Go ahead, Mr. Noskov.

22             MR. NOSKOV:  Sure.  Your Honor, I have a couple of

23   binders.  May I bring them up to the court and hand to the

24   witness?

25             THE COURT:  Sure.  You have copies for other

Page 216

```
 1    counsel?

 2             MR. NOSKOV:  All of these are --

 3             THE COURT:  If you don't, you're not using them.

 4             MR. NOSKOV:  I'm not going to be using all of

 5    them.

 6             THE COURT:  Do you have copies for other counsel,

 7    the committee --

 8             MR. NOSKOV:  These are all --

 9             THE COURT:  -- and for the debtor?

10             MR. NOSKOV:  These are all exhibits.  These are

11    all debtor exhibits and I --

12             THE COURT:  Did you post last night a list of --

13             MR. NOSKOV:  Of course, Your Honor.

14             THE COURT:  Go ahead.

15             MR. NOSKOV:  Your Honor, these should all be

16    familiar to the witness and to the parties.

17             THE COURT:  We'll see.  Go ahead.

18    BY MR. NOSKOV:

19    Q        Mr. Campagna, it's been a long day.

20    A    How are you?

21    Q    I'm well.  How are you?

22    A    Good, thanks.

23    Q    You're not a lawyer, right, Mr. Campagna?

24    A    That's correct.

25    Q    But in your declaration, you opine as to the factors
```

1    for confirmation of a Chapter 11 plan, correct?

2    A    I believe I opined on certain factors, yes, that's

3    true.

4    Q    One of those is the best interest of creditors test,

5    correct?

6    A    Yes, it is.

7    Q    And the best interest of creditors test is that under a

8    Chapter 11 plan, the creditors have to get at least as much

9    in distributions as under a Chapter 7 plan, correct?

10   A    Correct.

11   Q    So what you're comparing is really the distributions

12   that go out to creditors in those two scenarios, correct?

13   A    Distributions or recoveries, yes.

14   Q    Sure.

15              MR. NOSKOV:  And could we pull up the

16   demonstrative that the debtors have been using and others

17   have used, filed on docket 3697?

18              MS. BRIER:  Are you asking Mr. Young to pull that

19   up?

20              MR. NOSKOV:  Yeah, if you could.  I have copies if

21   needed, but I figured we could just --

22              MS. BRIER:  Just want to be clear.  Yes.

23              THE COURT:  All right.  I'd like a copy.

24              MS. BRIER:  Thank you.

25              MR. NOSKOV:  Sure.  (indiscernible).

1                MAN 1:  I just really think a second.

2                MR. NOSKOV:  Sure.  Would you like a copy?

3                MAN 2:  This one?

4                MR. NOSKOV:  Yes.

5                MAN 2:  I'm good.  Go ahead.  I'll just take it.

6        Okay.

7        BY MR. NOSKOV:

8        Q    So, Mr. Campagna, this is what you went through with

9        your counsel in your direct examination and shows the three

10       scenarios, the NewCo scenario, the orderly wind down

11       scenario, and the liquidation scenario, correct?

12       A    That's correct.

13       Q    And these three scenarios are what you compared in

14       opining, that the best interest of creditors test was

15       complied with by the debtors, correct?

16       A    Yes.

17       Q    Now, let's take a look at what composes the value that

18       you came up with in terms of the value of the NewCo.  So

19       that's just the first column.

20       A    Okay.

21       Q    We've been having and that is the mining business,

22       right, which is valued at 565,000,000?

23       A    That's correct.

24       Q    The illiquid assets, other, 283,000,000?

25       A    Correct.

1    Q    And the seed capital, 450,000,000, correct?

2    A    Right.  And there's a nuance there where 50 of the seed

3    capital was included in the mining valuations.  That's the

4    $50 million deduction you see in that same section, but yes.

5    Q    And the seed capital, is that cash?

6    A    Crypto.

7    Q    That's Crypto.  What kind of Crypto?  Is that,

8    Ethereum?

9    A    It'll be BTC and/or Ethereum.  I think it's the choice

10   of -- Fahrenheit's choice.

11   Q    Hasn't been decided yet?

12   A    Correct.

13   Q    But it's not going to be -- it could be Bitcoin?

14   A    I believe so.

15   Q    Now, the numbers that you have here, right, the

16   $565,000,000 number for the mining business.  You testified

17   earlier that that was a number that you took from the center

18   view analysis of the valuation of the mining business,

19   correct?

20   A    That's correct.

21   Q    And you've reviewed the valuation analysis provided by

22   Mr. Kielty, correct?

23   A    I likely read the one page from the disclosure

24   statement exhibit -- two page.

25   Q    Have you read Mr. Kielty's declaration?

Page 220

1    A     I don't believe I have.

2    Q     Okay.  Are you aware that the number -- the

3    $565,000,000 valuation is a valuation of the net asset value

4    of the mining business?

5    A     I'm not aware of what type of valuation it is, but I

6    would -- yeah.

7    Q     You're not aware whether it's a market valuation or a

8    net asset valuation?

9    A     Mr. Kielty yesterday testified that it was based on

10   market comps and discounted cash flow analysis.  So it seems

11   as though it's a going concern valuation of the entity.

12   Q     Could we pull up or could you turn in your binder to

13   Exhibit 45, which is Ryan Kielty's declaration, please?

14   A     I'm sorry, which (indiscernible)?

15   Q     It's 45.

16   A     Just going to have to make space here.

17   Q     If you could turn to Paragraph 13 when you get there.

18         MS. BRIER:  And, Your Honor --  go ahead.

19   BY MR. NOSKOV:

20   A     Okay.  I'm on Paragraph 13.

21   Q     You see the second sentence says, these estimates --

22   let's start in the first sentence.  The mining valuation

23   analysis was prepared solely to assist the debtors in

24   formulating the plan and to analyze implied relative

25   recoveries to creditors thereunder; you see that there?

Page 221

1   A    I do.

2   Q    These estimates do not purport to reflect or constitute

3   appraisals, liquidation values, or estimates of the actual

4   market value that may be realized through the sale of any

5   securities in NewCo; you see that there?

6   A    I do.

7   Q    Did -- were you aware before reading that sentence that

8   the analysis was not meant to reflect any market value that

9   may be realized through the sale of any securities in NewCo?

10  A    I was not aware of any comment on securities.

11  Q    The securities in NewCo, that's referencing the NewCo

12  shares, correct?

13  A    I don't know what it's referencing.

14  Q    Upon the formation of NewCo, there will be NewCo common

15  stock that will be distributed to creditors through the

16  plan?

17  A    Yes.

18  Q    And so, is it your understanding that the analysis of -

19  - the mining valuation analysis was supposed to value the

20  shares, the common stock of NewCo that was supposed to be

21  distributed under the plan?

22  A    It's not my understanding, but it'd be a better

23  question for Mr. Kielty.

24  Q    But is it -- but, no -- well, I agree that you've

25  testified earlier --

Page 222

```
 1                 THE COURT:  Just ask him questions.

 2    BY MR. NOSKOV:

 3    Q         You testified earlier that you did not do the

 4    mining valuation analysis, correct?

 5    A     That's correct.

 6    Q     You accepted the analysis and you imported that into

 7    your analysis of the total value of NewCo, correct?

 8    A     As a line item in the NewCo column, yes.

 9    Q     That's right.  But you were not aware at the time that

10    that line item represented not a market valuation but a net

11    asset valuation of the mining business?

12                 MR. WEEDMAN:  Objection, Your Honor.

13                 THE COURT:  Overruled.

14    BY MR. NOSKOV:

15    A     Where does it say net asset value of mining?

16    Q     Well, let's try an easier way.  Do you have your --

17                 THE COURT:  Does it say net asset value?  He asked

18    you -- you asked him a question.  He asked you a question

19    back.  It was a fair question in light of your question.

20                 MR. NOSKOV:  Sure, of course.

21                 THE COURT:  Are you representing that it's --

22                 MR. NOSKOV:  I can flip to that.  I thought it'd

23    be easier to point him to his own declaration, which has

24    been admitted into evidence where he says the same thing,

25    but I can --
```

Page 223

```
 1            THE COURT:  Let's move on.  Ask your next

 2   question.

 3   BY MR. NOSKOV:

 4       Q    Could we --

 5            THE COURT:  Ask your next question.

 6   BY MR. NOSKOV:

 7   Q         Apologies, Mr. Campagna.  I would like to just

 8   point you to your own declaration, Exhibit 46 in the binder

 9   there or if you have it separately.

10   A         I'll go with yours to keep it in one place here.

11   Okay.  I'm there.

12   Q    Paragraph 56 of your declaration, please.

13   A    Okay.

14   Q    To prepare this liquidation analysis, the debtors, with

15   the assistance of their advisor, estimated proceeds, costs

16   and resulting recoveries, in either the event that the

17   plaintiffs confirmed and consummated, or in the event the

18   plan is converted to a liquidation under Chapter 7 of the

19   Bankruptcy Code.  The debtors, supported by their advisors

20   estimated creditor recoveries under the NewCo transactions,

21   including on account of NewCo common stock based on the net

22   asset value of NewCo, which is approximated to be 1.248

23   billion and consists of the following components, and it

24   goes on.  You see there where it says net asset value of

25   NewCo?
```

Page 224

1    A    I do.

2    Q    Correct.  Was your analysis of NewCo supposed to be a

3    market value analysis of NewCo or a net asset value analysis

4    of NewCo?

5    A    My analysis wasn't meant to be anything in particular.

6    But the mathematics behind the 1,000,000,248 is a market

7    valuation of mining for 565,000,000 that was conducted by

8    Centerview.  283,000,000 of illiquid assets valued by Stout

9    $450,000,000 of liquid crypto.  We simply did the math.

10   It's 1 billion, 248.  It's a combination of assets and a

11   market valuation.

12   Q    And you mentioned Stout did the valuation of the liquid

13   assets, who did the valuation of the seed capital?

14   A    It's a numerical figure in the Fahrenheit Agreement.

15   We just need to give them 450,000,000 of liquid crypto at

16   closing.  It's market based.

17   Q    It's market based for the crypto standalone?

18           THE COURT:  I don't know what you mean by

19   standalone.

20           THE WITNESS:  Yeah.  I don't either.

21           MR. NOSKOV:  I can rephrase, Your Honor.

22   BY MR. NOSKOV:

23   Q        It's the value of those crypto assets that are not

24   valued as part of a NewCo business that will be formed under

25   the plan.  They were valued separately, correct?

Page 225

1    A        Yeah.  I'd say that one's less of a value, more of

2    a transfer from what would otherwise be liquid crypto going

3    to creditors at Emergence to shift a portion to NewCo based

4    on, you know, whatever the price is on that day, divided by

5    the Bitcoin price.  If we're giving them all BTC, which we

6    won't, I don't think that would be their suggestion, but

7    it's just going to be math on that day and hand them that

8    appropriate number of coins.

9    Q    Understood.  And that amount, in your mathematical

10   exercise of adding it up, is not discounted by any amount.

11   You're attributing 100 percent of that value to the

12   Enterprise value?

13   A    That's right.

14   Q    And same with the $565,000,000 in value you got from

15   another advisor as well, from Centerview, you're not

16   discounting that amount when you put it together with the

17   other assets, are you?

18   A    No.  In the NewCo column it was based upon ownership

19   under the proposed plan of reorganization by the Fahrenheit

20   Group and that asset being run by U.S. Bitcoin, so, no,

21   there's no discount to that.

22   Q    Right.  And then same with the liquid assets, you took

23   the number that staff came up with on a standalone number

24   for those assets, you added it together and you -- and that

25   became part of your net asset value of 1.248 billion,

Page 226

1    correct?

2    A    Largely.  I think we made an adjustment to two items.

3    Two items as a result of additional information we had that

4    Stout didn't have.

5    Q    What were those two items?

6             THE COURT:  What were those adjustments?

7             THE WITNESS:  One related to a loan from a party

8    called EFH, who we've since initiated significant litigation

9    with, and it called into question the collectability of that

10   loan.  So we marked it down from -- I can look at the Stout

11   number, it's in their expert report.  I don't remember

12   positively, but I believe we marked it down from 196,000,000

13   to something south of 50 million in both the NewCo and the

14   early wind down column.  And that became the starting point

15   for the liquidation.  And similarly, we discounted the

16   number they had calculated for StakeHound due to litigation

17   that was -- it may have been somewhat ongoing, but we had

18   new facts and circumstances that led us to just discount it

19   a bit more.  And again, whatever that discount is, it's

20   consistent in NewCo and orderly wind down, and then, you

21   know, the liquidation discount would have been applied from

22   there.  So the methodology is consistent, but you'll see

23   differences from Stout.

24   BY MR. NOSKOV:

25   Q    And we're talking about Centerview.  We're talking

Page 227

1    about Stout in terms of what A&M did in coming up with the

2    1.248 million number.  You did not adjust the sum of these

3    numbers other than the adjustment you just talked about for

4    any other reason.  You simply took the standalone value of

5    the mining business, the liquid assets, and the seed

6    capital, and you added it together to get to 1.248 million

7    minus the $50 million of seed, correct?

8    A    That is right, yes.

9    Q    And there's no other advisor that the debtors have that

10   is valuing the market value of that NewCo all as one, as a

11   conglomerate?

12   A    No.

13   Q    In your job as -- and your experience at A&M over the

14   years, are you aware of the concept of a hold code discount?

15   A    No, I'm not.

16   Q    You're not aware of a concept that sometimes the sum of

17   all parts isn't valued by the market as highly as those

18   parts valued separately?

19   A    No, I'm not.

20   Q    And so, you didn't consider whether that could be the

21   case with these particular assets when you put them together

22   into NewCo?

23   A    That sounds like it's moving into business valuation,

24   and that's not my expertise.

25   Q    I'm not asking to be clear about the valuation of the

Page 228

```
 1    mining business itself, which Centerview conducted.  I'm

 2    asking about the value of distributions that will ultimately

 3    go to creditors --

 4                 THE COURT:  Ask your question.

 5    BY MR. NOSKOV:

 6    Q    -- of the estate.

 7                 THE COURT:  Ask a question.

 8    BY MR. NOSKOV:

 9    Q    So my question is, who was put into -- in charge by the

10    debtors then, if it wasn't A&M to value -- the total value

11    of the distributions that will go to creditors upon

12    confirmation of the plan?

13    A    The value was described as the sum of those parts that

14    you just mentioned.

15    Q    And to --

16    A    It's not marked as a business valuation of NewCo's

17    equity.  It's marked, at least on this page, as

18    distributable liquid assets/net asset value.

19    Q    And I believe I heard you correctly, you did not apply

20    any discount based on an analysis that may have concluded

21    that when you combined these types of assets, the overall

22    value of the stock on the market would go down, you didn't

23    do that analysis?

24                 MS. BRIER:  Objection, Your Honor.  Asked and

25    answered.
```

```
 1                    THE COURT:  Overruled.

 2    BY MR. NOSKOV:

 3    A    I did not do that analysis, nor is it analysis I would

 4    be -- it wouldn't fall to me that analysis.

 5    Q    Did you analyze, as part of your evaluation of the

 6    NewCo value, any comparable companies that are a combination

 7    of these types of assets?

 8                    MS. BRIER:  Objection.

 9    BY MR. NOSKOV:

10    A    I didn't -- yeah -- I didn't connect evaluation of

11    NewCo.

12    Q    But you did provide a value that would be distributable

13    to creditors on account of the newly formed NewCo entity,

14    correct?

15    A    We provided the numbers that are on this page for folks

16    to decide, make their own decisions.

17    Q    So as part of that analysis of the net asset

18    value/distributable -- the total -- apologies.  As part of

19    that analysis of the total distributable value to creditors,

20    you did not analyze any comparable companies that combined

21    these types of assets all into one?

22                    MS. BRIER:  Objection.

23                    THE COURT:  Overruled.

24    BY MR. NOSKOV:

25    A    I did not.
```

```
 1   Q    To receive a distribution in NewCo stock, a creditor

 2   who receives that stock would have to be able to sell the

 3   stock, correct?

 4   A    Say your question again.

 5   Q    In order to receive any value from the stock that a

 6   creditor receives, that creditor would have to be able to

 7   monetize the stock somehow, correct?

 8           MS. BRIER:  Objection.

 9           THE COURT:  Overruled.

10   BY MR. NOSKOV:

11   A    They may be able to take a margin loan on it.  I don't

12   know how to answer that question.  There may be other ways

13   to monetize the asset without selling it and taking --

14   losing ownership.

15   Q    Let me be a little bit more general.  A creditor has to

16   find someone else that would be willing to attribute value

17   to that asset in order to gain some value from it for the

18   creditor, correct?

19   A    I'm not quite sure I follow that question.  It seems to

20   be going into, is there a market?  And I just can't speak to

21   markets, I'm not -- it seems like an investment banker type

22   thing.

23   Q    You didn't analyze what the market would be for NewCo

24   shares, did you?

25   A    I did not.
```

Page 231

1    Q    And yet the distribution under the plan, part of that

2    distribution is the stock of the NewCo, correct?

3    A    That's correct.

4    Q    So without assessing the value of the NewCo stock as it

5    could be sold on the market, you still applied in your

6    declaration that the best interest of creditor test is

7    satisfied, correct?

8    A    That's right.

9    Q    And that's without any analysis of what the NewCo

10   common stock is actually worth to the creditors as a

11   distribution?

12   A    It's based on an assessment that it has a mining

13   business worth 565,000,000, illiquid assets valued at

14   283,000,000, and seed capital with a market rate of a net

15   400 million.

16   Q    And then it's all packaged together, correct?

17   A    That's right.

18   Q    There's a common stock that is going to be listed on

19   Nasdaq, correct?

20   A    It's my understanding.

21   Q    And then that common stock will have a price that can

22   be sold or traded by the creditor that receives that stock,

23   correct?

24   A    That's right.

25   Q    And the value that they will receive in return, you did

1    not do an analysis of that value at all?

2    A    Right.  It could be higher; it could be lower.  That's

3    right.  We didn't analyze it.

4    Q    Did you come up with a range of how much higher, how

5    much lower it could be?

6    A    I did not.

7    Q    And did you consider what the profile of any purchaser

8    of such a stock could be from any creditor that received

9    such stock?

10   A    I did not.

11   Q    Can we go to Exhibit three, please?  Which is the --

12   it's in my binder.  It's the debtor's disclosure statement.

13   I've heard earlier maybe the wrong version of the debtor's

14   disclosure statement, but it is a Celsius Three Exhibit so -

15   -

16   A    Yeah, this is -- this looks like the very first --

17           MR. MCCARRICK:  For the record, parts have been

18   updated, so you could pull that from the docket if you want

19   the most updated, but we can work with this one.

20           MR. NOSKOV:  If we go to page --

21           MR. COLODNY:   What's the number?

22           MR. NOSKOV:  Docket number 2902.

23           MR. COLODNY:   What page?

24           MR. NOSKOV:  0627.

25           THE COURT:  What page?

Page 233

```
 1              MR. COLODNY:  June 27?

 2              MR. NOSKOV:  Yes.  Page 210 out of 332.

 3              MR. COLODNY:  Your Honor, I believe this document

 4   he's referring to is two versions still.

 5              THE WITNESS:  It is.

 6              THE COURT:  It is what?

 7              MR. COLODNY:  Two versions (indiscernible)  from

 8   the operative disclosure statement?

 9              THE WITNESS:  I think there's a fourth that was

10   the solicitation version.

11              THE COURT:  Are you objecting?

12              MR. COLODNY:  I am objecting, yes.

13              THE COURT:  Sustained.

14   BY MR. NOSKOV:

15   Q   Your Honor, the debtors submitted this Celsius Exhibit

16   3 in this proceeding.

17              THE COURT:  Is it admitted in evidence?

18              MS. BRIER:  It's not, Your Honor.  Parts of it

19   are.  Exhibits to it that have not changed since that

20   disclosure statement was filed are in evidence.  The entire

21   document is not in evidence.

22              MR. NOSKOV:  Sure.  Your Honor, I'm not offering

23   it into evidence.  I'd just like to show it to the witness

24   to see if he is -- just to use it for cross.

25              THE COURT:  We'll see.  What page?
```

Page 234

```
 1              MR. NOSKOV:  Page 210.

 2              THE WITNESS:  I'm on Page 210.

 3    BY MR. NOSKOV:

 4    Q        You see the subtitle 16?

 5    A    Yes.

 6    Q    It's titled the liquid trading market for the NewCo

 7    common stock may not develop, and the trading price for the

 8    NewCo common stock may be depressed or volatile following

 9    the effective date; see that?

10    A    I do.

11    Q    You disagree with that?

12    A    No.  That's certainly a risk.

13    Q    And you see -- if you read further down, the second

14    sentence of that paragraph says, accordingly, there can be

15    no assurance that an active trading market for the NewCo

16    common stock -- I think there's a typo -- will develop.  Nor

17    can any assurance be given as to the liquidity or prices at

18    which securities might be traded; you see that?

19    A    I do.

20    Q    Do you disagree with that?

21    A    No, we're certainly not giving any assurance or

22    guarantees.

23    Q    And so, when you talk about distributions to creditors

24    on account of stock distributed under the plan, you have no

25    idea what the value of that stock or the price at which it
```

Page 235

```
 1    would be traded is, do you?
 2    A    That's why we relied on market valuations and asset
 3    valuations.  We don't know where the stock will trade.
 4    Q    Market valuations, per your testimony, of the
 5    individual component parts of the NewCo, not the entire,
 6    enterprise, correct?
 7    A    That's correct.
 8    Q    You mentioned earlier that this is your first case
 9    dealing with crypto, correct?
10    A    That's right.
11    Q    So on what basis did you determine that combining
12    potentially different crypto assets like Ethereum and
13    Bitcoin, that the fact that those two are being combined in
14    a new enterprise shouldn't result or should result in a
15    discount?
16    A    I'm not sure how to answer that question.
17    Q    You did not consider whether a discount to the separate
18    parts of each of these items, the mining, the liquid assets,
19    and the seed capital should be discounted?  You didn't
20    consider the possibility that should be part of your
21    analysis, correct?
22    A    Right, I didn't consider the possibility of a premium
23    or discount, correct.
24    Q    So how are you qualified to determine how those assets
25    should be added together as part of one enterprise and how
```

1    that enterprise should be valued?

2    A    I feel qualified to do that math.  That's it.

3    (indiscernible)

4    Q    So that's all you've done?  You just typed in the

5    numbers into a calculator?

6    A    No, we did a lot of work behind the scenes on those

7    numbers, but at the end of the day, we added those four

8    components together and put it out there for the world to

9    see and make a determination.

10   Q    But as a standalone enterprise --

11           THE COURT:  With risk factors included?

12           THE WITNESS:  Right.  Risk factors included.

13   BY MR. NOSKOV:

14   Q    Risk factors included as to the individual pieces,

15   correct?

16   A    To a whole list of risk factors.  But the one that you

17   just mentioned, with respect to where NewCo stock may trade.

18   Q    Do -- I'm sorry -- you applied a discount based on

19   those risk factors to the total amount once you added that

20   together?

21   A    No.  We did not place a discount for risks or any

22   premium for opportunities that NewCo would trade higher.

23   Q    And without any experience in the crypto world, would

24   you have passed --

25           THE COURT:  Ask your next question.  You've

1   already asked that.

2   BY MR. NOSKOV:

3   Q   I just want to get a little bit deeper.  And this is

4   not to probe your view of the reasonableness or not

5   reasonableness of the mining valuation analysis, but I'd

6   like you to take a look at Exhibit 45, Mr. Kielty's

7   declaration.

8   A   Okay.  I'm at 45.

9   Q   And you based your value again, I'm sorry to repeat

10  myself, on the analysis that Centerview conducted in this

11  case, correct?

12          MS. BRIER:  Your Honor, at this point, if he had--

13          THE COURT:  Sustained.

14          MS. BRIER:  -- questions for Mr. Kielty, should

15  have asked him yesterday.

16          THE COURT:  Ask new questions and move on.

17  BY MR. NOSKOV:

18  Q   If you turn to Paragraph 11 of Mr. Kielty's

19  declaration.  Let me know when you're there.

20  A   I'm there.  Sorry.

21          MS. BRIER:  Paragraph 11.

22  BY MR. NOSKOV:

23  Q   You see, the third sentence of Paragraph 11 says, the

24  mining valuation analysis is, among other things, based on

25  the information and financial projections provided by the

Page 238

 1   debtor's management and certain other publicly available

 2   information, correct?

 3   A    That's what it says.

 4   Q    So that valuation was based on the financial

 5   projections, at least, in part?

 6   A    Correct.

 7   Q    Let's turn to the financial projections.  And again, I

 8   don't want to probe the reasonableness of this.  This isn't

 9   the point of this questioning.  Exhibit 32 is the financial

10   projections.  If you could turn to that's.  And when you get

11   there that's the mining business plan.

12   A    I'm there.

13   Q    If you could go to slide three.  Sorry, it's actually

14   slide two.  It's third in the, you know, PDF.  Slide two.

15   A    Okay.

16   Q    And this is the five-year projections, correct?

17   A    No audible response.

18   Q    But first of all, have you seen this document?  Have

19   you ever reviewed the financial projections?

20   A    I've seen versions of this document.  I don't know if

21   I've seen the final version before.

22   Q    Well, you're generally (indiscernible) with the

23   financial projections of the company?

24   A    No, not really.  Not of the mining business.  Mr.

25   Ferarro spoke to the mining projections a bit yesterday.

Page 239

1    Q    Earlier, you were speaking in a lot of detail about the

2    various mining operations of the debtors.  Is that not part

3    of your mandate to kind of know what's going on with the

4    business and what the projections are?

5              MS. BRIER:  Objection.

6    BY MR. NOSKOV:

7    A    I know generally what's going on with the business.

8    This is a five-year projection based upon changing Bitcoin

9    prices in the future, changing hash rates.  A lot of true

10   expertise that I don't feel that I'm the best person to

11   address.

12   Q    Can we take a look at -- you see the date September 23,

13   September 24, September 25?

14   A    I do.

15   Q    Under September 25, that's 2025.  If you look down that

16   list, you see the BTC price there?

17   A    I do.

18   Q    That's 90,587, correct?

19   A    I'm sorry, maybe I'm not looking in the right place.

20   Oh, yes, I see it.  Sorry, I was looking a couple of lines

21   down.

22   Q    So the projection under this business plan, the five-

23   year projection, is that in two years the Bitcoin price

24   would be 90,000?

25              MS. BRIER:  Your Honor, I renew my objection that

Page 240

1    these questions are better asked if Mr. Kielty.

2              THE COURT:  Sustained.

3              MR. NOSKOV:  Your Honor --

4              THE COURT:  No, you can't dig into this.  This is

5    not this witness's document.  He is not giving an opinion on

6    what's in this document.

7              MR. NOSKOV:  This is relevant to the convict to

8    how he --

9              THE COURT:  Ask the question that's relevant to

10   the cross examination of this witness.  This is not.

11   Objection is sustained.

12   BY MR. NOSKOV:

13   Q    Mr. Campagna, do you think that the nature of a

14   business and financial projections underlying that business

15   affect how that business can be combined with another

16   business all in one enterprise?

17   A    That's a bit of a complex question, but there's

18   uncertainties in any business as to how a combination will

19   turn out.

20   Q    Would you agree that the value of the crypto business,

21   including the NewCo which you looked at the value of, would

22   depend on the value of the underlying cryptocurrency?

23   A    I mean, to some degree, yes, but --

24   Q    And would you agree that there is a relationship

25   between the value of Bitcoin and the value of Ethereum?

Page 241

1    A    There is.

2    Q    And is that relationship linear?

3    A    I don't know.

4    Q    You can't opine on whether if Bitcoin goes up, Ethereum

5    goes down or vice versa?

6    A    I can't opine on how they move for one versus the

7    other.  I think generally they would move in a similar

8    direction.

9    Q    Your view is that they would move in similar direction?

10   A    Push -- yeah.

11         MS. BRIER:  Objection.

12   BY MR. NOSKOV:

13   Q    And so, you didn't think that --

14         THE COURT:  Why is this examination within the

15   scope of the direct?  You're asking him about an evaluation

16   done by different experts which he used in his analysis.

17         MS. BRIER:  And, Your Honor, I don't -- sorry.

18         THE COURT:  Mr. Kielty's cross examination was the

19   time to do this, not now.

20         MR. NOSKOV:  May I answer?

21         THE COURT:  No.  Move on.

22         MS. BRIER:  And, Your Honor, I'd also note for

23   purposes of the record, that Exhibit 32 is not in evidence

24   that he was asking about.

25   BY MR. NOSKOV:

1    Q    Mr. Campagna, are you aware that generally, with the

2    options offered to creditors under the plan and the choices

3    they could have made with regard to their distributions?

4    A    I know there were a lot of them.  I'm familiar with

5    some of them.

6    Q    Are you aware that the creditors, when voting on the

7    plan in certain classes, had the choice to either get the

8    default distribution ratio to get a distribution that had

9    more new stock and less liquid crypto, and then another

10   choice to get more liquid crypto and less new stock?

11   A    Yes, I'm familiar with that provision.

12   Q    Are you familiar with the outcomes of how that -- those

13   determinations and votes by creditors went under the

14   liquidation now under the plan?

15   A    Yes, generally.

16   Q    Would it surprise you that significantly more creditors

17   elected the crypto weighted option?

18   A    Say that again.

19   Q    Would it surprise you, Mr. Campagna, that significantly

20   more creditors elected the crypto weighted option?

21   A    I know that more creditors chose that option.  I don't

22   know.  I wouldn't use the word surprise.

23   Q    You know for a fact that that is true?

24   A    I know that that -- that's the way that vote, yes.

25   That's the way that election -- there's more liquid crypto -

1    - more selected, more liquid crypto than equity.

2    Q    And those creditors that selected more liquid crypto,

3    that liquid crypto was distributed to them at a 30 percent

4    discount, correct?

5    A    There's a 30 percent, yes.  Depends which way you go on

6    that mechanism.  But there's a 30 percent premium on the

7    liquid crypto versus the equity.

8    Q    Let's make it easier.  It's quite a bit complicated.

9    If we look at just at the Exhibit 3 again.  We don't need to

10   move it into evidence.  We can just look at it as a

11   demonstrative to show how this mechanism works.  Exhibit 3

12   at Page 43.

13            THE COURT:  43 of 332 or --

14            THE WITNESS:  One second.

15            THE COURT:  There are page numbers at the top and

16   bottom.

17            MR. NOSKOV:  Yeah.  No.  I'm sorry, Your Honor.

18            THE WITNESS:  It's 54 of 332, I think.

19            MR. NOSKOV:  It's 54 on the top.  If you're

20   looking at 54 --

21            THE COURT:  All right.  54 of 332 of Celsius

22   Exhibit 3.

23   BY MR. NOSKOV:

24   Q    Are you there?

25   A    Yes, I am.

Page 244

1   Q    You see the table there?

2   A    I do.

3   Q    So this is a table that provides an example for

4   outcomes of a holder of general claims in the amount of

5   10,000, just to make it easy for us, correct?

6   A    Correct.

7   Q    So you see the no election default, you get just a

8   little over 36 percent of liquid cryptocurrency, or I

9   apologize, you get 3,642 in liquid cryptocurrency and 3,328

10  in new common stock?

11  A    Right.  That's what it says.

12  Q    Right.  And then if you elect the -- and the total

13  recovery percentage is estimated below that, or those two

14  numbers are added up to give you 6,970, right?

15  A    That's what's on the page, yes.

16  Q    And this is the debtor's view of the value of the

17  stock, you know, of the distribution of the stock and the

18  crypto together.  So you're getting $0.69 on the dollar?

19  A    That's right.

20          MS. BRIER:  Objection.

21  BY MR. NOSKOV:

22  Q    The next column is the NewCo common stock weighted

23  distribution election.  And that one gives you a premium on

24  if you elect more new common stock, correct?

25  A    Yeah, I'd have to do the math, but it looks like that's

Page 245

1    what it's doing, yes.

2    Q    And so, the value, according to the debtors comes out

3    below to 7,516.  With the debtor's valuation of the new

4    common stock, you're getting a better deal here for

5    creditors, correct?

6    A    Yes.

7    Q    And the next one is the liquid cryptocurrency weighted

8    distribution election.  And that's where you choose more

9    liquid crypto, but you get less common stock, correct?

10   A    Correct.

11   Q    And that's where there's a 30 percent discount,

12   correct?

13   A    Yeah.  Without doing the math to calculate those

14   numbers, directionally, it's moving that way, yes.

15   Q    And according to the debtors, that provides the

16   smallest of the three values at 6,424, correct?

17   A    According to this page, yes.

18   Q    And yet, as you've testified, you know for a fact that

19   creditors chose the third option over the other two.  More

20   creditors chose the third option than the other two?

21   A    That's correct.

22   Q    So in terms of the market participants that have

23   actually acted and have spoken with their wallets --

24            THE COURT:  You're putting a lot into that

25   question that there's nothing in the record for.  I'm going

Page 246

1    to sustain even before you go on, frame a new question.

2    BY MR. NOSKOV:

3    Q    Let's go back to the -- no, let's stay here.  And so,

4    the creditors who chose the crypto heavy distribution,

5    voluntarily chose a 30 percent haircut on the new stock

6    value, correct?

7    A    That's the mathematical deal, yes.

8    Q    Don't you agree that that's market evidence that

9    creditors don't value NewCo stock as high as the debtors do?

10                MS. BRIER:  Objection.

11                MR. COLODNY:  Objection.  Calls for speculation.

12                THE COURT:  Sustained.

13   BY MR. NOSKOV:

14   Q    When valuing NewCo, did you consider the outcome of

15   this vote by creditors?

16   A    I didn't value NewCo.

17   Q    When you came up with the total distributable value of

18   NewCo, did you consider this vote by creditors?

19   A    The vote hadn't been completed, no.

20   Q    If you could go back, would you?

21                MS. BRIER:  Objection.

22                THE COURT:  Overruled.

23                BY MR. NOSKOV:

24   A    I would do the math the same way we did it in the

25   disclosure state.  No, I wouldn't have changed it.

Page 247

1   Q    This evidence of the vote wouldn't affect the way that

2   you value the total distributable value?

3   A    No.  It doesn't affect the valuation of mining, doesn't

4   affect the asset valuation done by Stout, and it doesn't

5   affect 450,000,000 illiquid cryptos -- 450,000,000 illiquid

6   crypto.

7   Q    Let's just shift quickly to plan B.  There's an orderly

8   wind down option, correct?

9   A    Correct.

10  Q    In your declaration, you state that the orderly wind

11  down process would take five years, correct?

12  A    We allotted five years for that administrator to wind

13  down the assets, maximize value, yes.

14  Q    Is the five year number is just the underlying

15  assumption for how long that'll take?

16  A    That's right.

17  Q    And how did you arrive at the five-year number?

18  A    Some input from the bidders.  I feel like that's what

19  folks were indicating on the inbound side was it be a four-

20  to-five-year process.  But, you know, as we look at this,

21  these wind downs go for quite some time.  I think the bulk

22  of the work is in the early years, but they go on for quite

23  some time.  And these are very unusual illiquid assets.  And

24  the thought was some of them it just makes sense to hold

25  onto.  And that may be what the plan administrator wants to

Page 248

1    do.  So we just gave them time to work it out.

2    Q    So was it based on comparables to other similar wind

3    downs?

4    A    It was just an estimate we came up with.  I don't know

5    that we looked at a lot of similar wind downs, but, you

6    know, I do know -- there's not similar wind downs that I've

7    experienced.  A lot of the wind downs are -- here's a bucket

8    of money, a million dollars to go to a basket of unsecured

9    creditors, figure out the claims, distribute, start closing

10   up the entities.  Maybe you have a miscellaneous asset or

11   two to sell.  Those can be done in a couple of years.  But

12   the estate keeps going for four years -- four or five years,

13   it seems, before they finally get closed up and the case is

14   closed.  So that's sort of the methodology we applied here.

15   We just thought that the operational time frame here to

16   maximize value of these crypto assets, and these

17   investments, and private equity type investments in a

18   variety of crypto entities, debt securities and crypto

19   entities, it would just take more time.  So we had the

20   operational phase a bit longer.

21   Q    None of this analysis is in your declaration, however,

22   correct?

23   A    It (indiscernible) the expense component, but no.

24   Q    Did you analyze when distributions would be made to

25   holders throughout this five-year period?

1   A     At a high level.

2   Q     And where is that in your declaration?

3   A     Not sure if it's in the declaration, I have to check,

4   but it's definitely in the disclosure statement.   There was

5   a chart on Page 11 or 12 that showed timing of

6   distributions.

7   Q     And did you discount the distributions based on the

8   time value of money in that --

9   A     No, we didn't.

10  Q     A dollar today is worth more than a dollar tomorrow, is

11  it not?

12  A     It is.

13  Q     Yet you valued a dollar distributed in five years, the

14  same as a dollar distributed in one?

15  A     A big piece of the value to be distributed, even in the

16  orderly wind down is the equity value of the mining

17  business.   So that's virtually unchanged between the two

18  analyses and the concept on some of these other assets, if

19  you hold them to (indiscernible) you'll get more.   So we

20  didn't project getting more and we didn't project the

21  discounted cash flow of bringing back the sums.   And our

22  comparative point was everything happening in NewCo upfront.

23  So we just -- that's the way we left the analysis.

24  Q     Those are two separate things.   You're talking about

25  the growth of the value of the asset.   I'm talking about

Page 250

 1   just the value -- the discount over time that you would

 2   apply to any asset you're not getting today, but are getting

 3   tomorrow?

 4   A    Agree.  But as Bitcoin rises, right, the value of all

 5   these assets rise as well.  We didn't forecast an increasing

 6   BTC price over time that could have an upward impact on the

 7   value the assets.  But I agree with you, all things being

 8   consistent, a dollar today is worth more than a dollar

 9   tomorrow.

10   Q    And so, without applying that discount, the

11   distribution of the total sum of dollars is overstated in

12   your analysis, correct?

13   A    I don't know that it is.  There would be increasing

14   values as well.  You'd stake Ethereum, the company would

15   have assets that they could invest for periods of time.  So

16   I think there's puts and takes.

17   Q    Those are value increasing strategies, though.  That's

18   not a discounted analysis of distributions to creditors, is

19   it?

20   A    That's a value accredited concept, correct.  It's not -

21   - but if we were sitting on a billion dollars of crypto that

22   was waiting to be distributed, perhaps they would stake it

23   and try and earn a return or, you know, do something low

24   risk and have a return.  We don't have that return in here

25   either, but, you know.

Page 251

1   Q    But if you're telling a creditor you're going to get

2   $1,000, the first question is when; is that not right?

3              THE COURT:  Hold on.

4   BY MR. NOSKOV:

5   Q    Chapter 7 liquidation, however, is not five years

6   according to your analysis, you assumed six months, correct?

7   A    Yeah, we assumed that the assets would be liquidated

8   and largely distributed in six months.  It would have a tail

9   as well, but, you know, nominal work for a period of time,

10  one person, you know, continuing to try and wind up the

11  entities.  But we did forecast that the bulk of the assets

12  and distributions would be made in six months.

13  Q    And a dollar in 6 months is worth more than a dollar in

14  12 months, correct?

15             THE COURT:  Hold on.

16  BY MR. NOSKOV:

17  Q    You mentioned during earlier testimony that the

18  distributions in the NewCo scenario may not occur for 6 to

19  12 months; did I hear that right?

20  A    The -- I think you did hear about right.  We're trying

21  to distribute two things, BTC, as quickly as possible.  We

22  still are finalizing our arrangements with PayPal, Coinbase

23  and the like.  So until those are done, there's going to be

24  no distributions that can be made.  We have to get the

25  confirmation.  We have to also, on the public miner, there's

Page 252

1    also an SEC process that's running.  So yeah, it'll take --

2    we're hoping to start by the end of the year and do it

3    quickly, but there's no guarantee as to when it'll start.

4    And once it starts, whatever the amount of crypto we have to

5    distribute, some portions will be held back for claims

6    reserves and the like, and there'll be another distribution

7    down the road, so it'll take a little while.

8    Q    But like the orderly wind down analysis of

9    distributions, you didn't discount the distributions under

10   the NewCo scenario either, did you?

11   A    No, we didn't.

12   Q    I know you're not a lawyer, but for the Chapter 7

13   liquidation analysis that you did, did you consider whether

14   the mining assets could be sold as a going concern?

15   A    Not in the analysis.  We looked at it.  I think I

16   discussed it earlier as part of this testimony.  There was a

17   bid in the $175,000,000 range that had a lot of outs and a

18   lot of things the buyer had to do before it would even

19   become executable, including raising 275,000,000 to then

20   have 175 go to the debtors in the form of some cash and some

21   debt.  And I know our investment banker viewed the

22   likelihood of them being able to raise the 275 as very

23   slight, and it wasn't (indiscernible).

24   Q    And I believe that was also in an earlier testimony

25   that that process took place in December 2002; is that

Page 253

1    right?

2    A    December time frame sounds right.

3    Q    And the market conditions are completely different back

4    then, correct?

5    A    Markets are always different.  Yeah, they were

6    different.

7    Q    Did you consider what that sale would look like in

8    today's market?

9    A    I did not.

10   Q    The reason you took the orderly wind down scenario

11   takes five years is because in your view, that's the best

12   way to maximize value of the assets, correct?

13   A    I think extending the runway from six months, if it's

14   six months to something like two years, you have to go to at

15   least two years.  Whether it's two years, three years, four

16   years, five years.  It's a bit of semantics, but I think the

17   bulk of the activity, in my opinion, would be done in the

18   first two to three years, but we have the estate loan for

19   five years and you don't really wind down.

20   Q    And if that's the best way to maximize value for

21   creditors you're not suggesting that a Chapter 7 trustee

22   wouldn't want to maximize value for creditors, are you?

23   A    No, I'm not suggesting that.

24   Q    You're not suggesting that such a Chapter 7 liquidation

25   could move quarterly?

1           THE COURT:  Move on.  Let's go.

2   BY MR. NOSKOV:

3   Q    Can we just flip back to the demonstrative again that

4   we looked at at the beginning that -- it's  debtor's

5   demonstrative?

6   A    Sure.

7           MS. BRIER:  Can you clarify for the record which

8   demonstrative?

9           MR. NOSKOV:  Demonstrative one, I believe that you

10  used.  It's Page 6 of 6, docket 3697.

11          MS. BRIER:  Got it.

12          MR. NOSKOV:  It's the second page, but I think you

13  used the first.

14          MS. BRIER:  Got it.

15  BY MR. NOSKOV:

16  Q    We've talked about the various inputs you considered

17  and didn't consider in coming up with your total

18  distributable value number here, correct?

19  A    Yeah, we've talked a lot.

20  Q    And the values, if we just -- just to recap for the

21  NewCo is 3.352 billion in total distributable value?

22  A    That's correct.

23  Q    For the (indiscernible) orderly wind down, that's

24  3.123, correct?

25  A    Yes.

1    Q    And for the liquidation, it's 2.716, correct?

2    A    Correct.

3    Q    Even with all of the assumptions that you made and I

4    asked you about, correct, that's the difference between the

5    three scenarios?

6    A    Those are based on the assumptions we discussed.

7    Q    And changes in those assumptions would move those

8    numbers and swing them one way or the other under the

9    different scenarios, correct?

10   A    Yes.

11          MAN 1:  Form.

12          THE COURT:  Which part of moving ahead do you not

13   understand?

14          MR. NOSKOV:  I'm winding down, Your Honor.  Just

15   the last question.

16   BY MR. NOSKOV:

17   Q    The liquidation scenario in terms of net liquid

18   cryptocurrency that's distributed, the largest amount is

19   under liquidation scenario, correct?

20   A    Mathematically, yes, because it's not seeding another

21   company with 450,000,000 of liquid crypto that then lands in

22   their net distributable asset line, and it's not funding a

23   litigation trust for 50 million, which may be another

24   deficiency in the liquidation column is -- the first two

25   columns have zero recovery for litigation.  But we are

Page 256

1    funding a $50 million trust.  We didn't want to guess, but I

2    would say the best path to recovery on litigation proceeds

3    is going to be under the NewCo and you were going to wind

4    down public minor scenarios and not by a Chapter 7 trustee

5    who's probably going to have a shorter timeline in mind.

6    Q    With all those inputs, it's true that the liquidation

7    scenario provides for a net liquid cryptocurrency

8    distribution that's higher than the other two scenarios?

9    A    Yeah.  2.444 is bigger than the other two numbers.

10   Q    And the orderly wind down also provides more than the

11   NewCo, despite having some of those features like the

12   litigation trust funding and the seed capital for a new

13   entity, correct?

14   A    Again, it's all about seeding capital to NewCo, which

15   should be dollar for dollar -- improve NewCo.

16   Q    Thank you.

17              THE COURT:  Redirect?

18              MS. BRIER:  Yes, Your Honor.

19                REDIRECT EXAMINATION OF ROBERT CAMPAGNA

20   BY MS. BRIER:

21   Q    Mr. Campagna --

22              THE COURT:  Just make your appearance.

23              MS. BRIER:  Grace Brier, Kirkland and Ellis

24   on behalf of debtors.

25   BY MS. BRIER:

Page 257

1   Q    Mr. Campagna, to your knowledge, has Pharaohs ever

2   offered a view on the value of NewCo?

3   A    No.

4          MS. BRIER:  And, Mr. Young, if you could put up

5   that demonstrative we were just looking at, it's Page 6 of

6   6.  It's the second page of the Demonstrative exhibit.  And

7   zoom in on that recovery percentage number at the bottom,

8   please.  There.

9   BY MS. BRIER:

10  Q    Mr. Campagna, what are the recovery percentage --

11  percentages in each scenario here?

12  A    67 percent recovery under the NewCo path, 61.2 percent

13  under the public minor/orderly wind down path, and 47.4

14  percent under the liquidation path.

15  Q    And based on your 25 years of experience in

16  restructuring, can you provide some context as to the

17  difference between those percentages in the NewCo and

18  orderly wind down scenario versus the liquidation scenario?

19  A    The fact that they're significantly higher.  What else?

20  You're looking for something else?

21  Q    That's perfect.  And were you ever presented with any

22  adjustment based on a discount rate or anything else that

23  would make an outcome determinative difference under the

24  best interest test?

25  A    No.

Page 258

```
 1              MS. BRIER:  Thank you, Honor.

 2              THE COURT:  All right.  And the committee rest?

 3              MR. COLODNY:  Yes.

 4              THE COURT:  Has the debtor rested?

 5              MR. MCCARRICK:  We have -- we have a couple of

 6    housekeeping matters.

 7              THE COURT:  Okay.  In terms of witnesses, debtor,

 8    have any other witnesses?

 9              MR. MCCARRICK:  No other witnesses, Your Honor.

10    T.J. McCarrick, for Kirkland & Ellis on behalf of the

11    debtors.

12              MAN 1:  Am I free?

13              MR. MCCARRICK:  No other witnesses.

14              THE COURT:  Yeah, I think you.

15              MAN 1:  Thank you very much.

16              THE COURT:  Why are you rushing off the state?

17              MR. MCCARRICK:  We also have some housekeeping as

18    well.

19              THE COURT:  Okay.  All right.  So let's take up

20    the housekeeping.

21              MR. MCCARRICK:  Just following up on Your Honors

22    guidance from yesterday, the Debtors intend to submit in the

23    next 24 to 48 hours a list of exhibits that were admitted

24    into evidence, at least in the Debtors case in chief.  I

25    assume the committee will take care of their own.
```

Page 259

1         THE COURT:  It would be nice to get one list.  You

2    actually can talk to each other and submit a combined list.

3         MR. MCCARRICK:  We'd be glad to do that.  We also

4    intend to submit at that time a list of the docket numbers

5    that we would ask Your Honor to take judicial notice of.  I

6    could read them into the record now, but I'm sure you don't

7    be reading those numbers at you.  It'll be everything that's

8    referenced in the proposed confirmation order.

9         THE COURT:  Okay.  When I say okay, we'll see

10   whether --

11        MR. MCCARRICK:  Understood.  You'll be able to

12   determine whether or not you will take judicial notice, but

13   I think that's all the Debtors have.

14        THE COURT:  Okay.

15        MR. COLODNY:  Your Honor, we have --

16        THE COURT:  Mr. Colodny?

17        MR. COLODNY:  Aaron Colodny, from White & Case, on

18   behalf of the official committee of unsecured creditors.

19   Court Reporter definitely --

20        THE COURT:  Karen knows everybody.

21        MR. COLODNY:  In our exhibit list, we have a

22   number of YouTube clips of AMAs and other marketing material

23   from Celsius.  These were pulled from public Internet

24   sources, and we would ask that Your Honor take judicial

25   notice of them.  I'm happy to read the different numbers.

Page 260

1   We put them in our FTP site in two different ways.  One was

2   the full YouTube video, and the second was a clip of the

3   part that's cited so that if people have --

4            THE COURT:  They're going to want to spend the

5   rest of their life watching YouTube videos, they can just

6   watch the clips that you want to introduce?

7            MR. COLODNY:  Correct.  And so, we'd like to admit

8   those into evidence, Your Honor.  And I'm happy to read

9   those.

10           THE COURT:  It probably would be better if you

11  submit it in writing and what it is, rather than reading

12  them into the record now.  How long a list is it?

13           MR. COLODNY:  It is -- it's two ranges and one

14  document in our exhibit list.

15           THE COURT:  Have you conferred with other parties

16  about whether anybody has any objections to them?

17           MR. COLODNY:  I have not, Your Honor.

18           THE COURT:  Okay.  Mr. McCarrick, do you want to

19  be heard?

20           MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

21  on behalf of the debtors.  I would note, Your Honor, that

22  the objection deadline to the exhibits listed on the

23  parties' respective exhibits list has passed.  So to the

24  extent Your Honor wanted to move these for admission, I

25  think everyone missed their shot.

Page 261

```
 1              THE COURT:  I'd like to have a written list.  You
 2   can give it to me tomorrow morning, if that's convenient.
 3              MR. COLODNY:  Your Honor, if I could propose why
 4   don't we put these on the list we'll submit with the debtors
 5   --
 6              THE COURT:  That would be great.
 7              MR. COLODNY:  -- and we'll flag them for you or
 8   who wants to have them.
 9              THE COURT:  Okay.  These -- there were no
10   objections to any of these?
11              MR. COLODNY:  There were no objections made.
12              THE COURT:  All right.
13              MR. COLODNY:  We'll flag that these ones have not
14   been admitted into evidence --
15              THE COURT:  Okay.
16              MR. COLODNY:  -- and we'll submit reason for
17   (indiscernible)
18              THE COURT:  Okay.  Any other housekeeping matters?
19              MR. COLODNY:  I don't believe so, Your Honor.
20              THE COURT:  Thank you.  Mr. Koenig?
21              MR. KOENIG:  Good afternoon, Your Honor.  Chris
22   Koenig, Kirkland & Ellis for the debtor.  The only
23   housekeeping matter I had was it seems like this is the end
24   of the confirmation trial for this week.  We do have an
25   omnibus hearing tomorrow.  We're scheduled to resume the
```

Page 262

1    confirmation hearing the week of October the 16th with

2    anybody's case opposing confirmation --

3             THE COURT:  Right.  And that they have a deadline

4    for submitting direct testimony.

5             MR. KOENIG:  Correct.  And their exhibits that

6    they would use during --

7             THE COURT:  Right.

8             MR. KOENIG:  -- that case.  We wanted to

9    understand what Your Honor was thinking as far as closing

10   argument timing.  If you wanted post-trial briefing.  We

11   obviously all submitted briefing in advance of the

12   confirmation hearing.  Frankly, I think that we could

13   probably handle it during closing argument, but if Your

14   Honor preferred post-trial briefing --

15            THE COURT:  What I would like is proposed findings

16   of fact, conclusions of law is what I would like.  I don't

17   think I need any more briefs.  Let me put it this way.  If

18   there are issues that have either come up so far or in the

19   remainder of the case come up and you wish to brief them,

20   ask me when we get to the end, okay?

21            MR. KOENIG:  Understood.

22            THE COURT:  The briefs -- your brief, in

23   particular, is quite comprehensive, let me put it that way.

24            MR. KOENIG:  I think that's a compliment, Your

25   Honor.  I'm not sure, but --

Page 263

1            THE COURT:  It wasn't intended to be disparaged.

2    It was very comprehensive.

3            MR. KOENIG:  Okay.  And so, Your Honor believes

4    that we would have closing arguments whenever the objecting

5    parties conclude their case in chief the week of the 16th,

6    we would schedule closing argument.

7            THE COURT:  We'll schedule closing argument.  I

8    usually -- in lengthier matters, I usually schedule closing

9    arguments.  Well, is anybody ordering a transcript?

10           MR. KOENIG:  Is anybody ordering a transcript?

11           THE COURT:  Transcript, yes.

12           MR. KOENIG:  We've been ordering transcripts of

13   the proceedings this week, yes.

14           THE COURT:  Okay.  So, you know, when the

15   transcripts are completed, they'll be filed on the docket.

16   And so, usually when I get your proposed findings of fact

17   and conclusions of law, it ought to reference, you know,

18   page numbers in the transcript.  And if they're, you know, I

19   haven't heard all the evidence yet.  Obviously, the

20   objectors have an opportunity to do that.  So I'd want

21   counter proposals, proposed findings and fact, conclusions

22   law from them as well.  I typically will schedule closing

23   argument for probably no more than a week after all of

24   that's done.  So I, you know, I want to see the proposed

25   finding conclusions and we'll be able to check them against

Page 264

1    the transcripts and then we'll have closing argument.

2              MR. KOENIG:  Great.  So you would like --

3              THE COURT:  But I have to put a caveat in all of

4    this.  The caveat is, I'm scheduled to start a trial on

5    November 1st that I think is supposed to last 15 or 20 days.

6    I don't -- it is -- it's a length, you know, it may not

7    happen, but it's scheduled to happen.  This isn't going to

8    wait till the end of the trial, let's put it that way.  I'm

9    not going to wait until the end of the trial to hear

10   argument in this.  I just can't give you a date and time

11   when we'll be scheduled.

12             MR. KOENIG:  Understood.  Is there a deadline that

13   Your Honor --

14             THE COURT:  Are you getting daily transcripts?

15   What are you getting?

16             MR. KOENIG:  We've been ordering the transcripts

17   every day on whatever the maximum rush possible is.

18             THE COURT:  Right.  Okay.

19             MR. KOENIG:  The -- so would -- does Your Honor

20   have a deadline in mind for the parties, including the

21   supporters and the objectors to submit findings of fact or

22   conclusions of law, or would Your Honor like to take some

23   time to consider that?

24             THE COURT:  How quickly will you get ready to

25   submit your proposed findings of fact?

1          MR. KOENIG:  I think it'll depend on how lengthy

2     the evidence is the week of October the 16th.  If it's

3     short, I imagine we'll be able to move quite quickly because

4     we can use the week in the interim to work on --

5          THE COURT:  Sure.

6          MR. KOENIG:  -- the proposed findings back from

7     the case that you heard this week.

8          THE COURT:  That's fine.  We'll take it up early.

9     I think you'll have a better sense of it when you see what

10    written direct is offered --

11         MR. KOENIG:  Agreed.

12         THE COURT:  -- in support of objections.  Let me

13    also raise a couple of things while we're talking about it.

14    There are a number of open confirmation issues where I've

15    been told the discussions are ongoing.

16         MR. KOENIG:  For example, the ADR procedures?

17         THE COURT:  Right.  The ADR procedures, you know,

18    I think the U.S. Trustee has indicated that there may be

19    some additional discussions between the debtor and the U.S.

20    Trustee with respect to some of the remaining issues.  So I

21    really do hope that you'll use the time off from trial.  I

22    know where you're going to be, but you're part of it.  I say

23    that because the NCBJ is meeting in Austin, Texas next week.

24    And I know that Mr. Koenig is on one of the panels.  I'm on

25    a different panel, but I know he's on a panel.  So unless

 1      he's backed out, I think I know where he's going to.

 2              MR. KOENIG:  No, Your Honor.

 3              THE COURT:  Some of you may be there as well.

 4      I'll see you there.  So I hope you will continue, you know,

 5      I raised the issue about the consumer privacy ombudsman for

 6      one.  I hope you'll be able to work that out.

 7              MR. KOENIG:  Understood, Your Honor.

 8              THE COURT:  None of that seemed insurmountable to

 9      me.

10              MR. KOENIG:  No.  We saw that she filed her

11      proposed direct testimony the other day, so that --

12              THE COURT:  She did not under oath, but she --

13              MR. KOENIG:  -- should speed things along and we

14      can do housekeeping there and make sure that --

15              THE COURT:  I do want to -- I raised this issue

16      during the hearing.  I haven't decided at all, but I'm

17      uncomfortable about approving releases when I don't know

18      who's getting released.  I've made that point.  You may be

19      able to convince me that I don't have to know that, but

20      usually I do.

21              MR. KOENIG:  Yeah.  Your Honor, what I would say

22      is the plan includes categories of released parties, which

23      is very common in large Chapter 11 cases.  If one of the

24      things Your Honor is concerned about is one of the items in

25      the releases are current employees as of a certain date --

Page 267

```
 1                THE COURT:  Yeah.

 2                MR. KOENIG:  If that information --

 3                THE COURT:  Well you'll provide me with a list of

 4      the current employees.

 5                MR. KOENIG:  We would be more than happy to submit

 6      that list --

 7                THE COURT:  I think --

 8                MR. KOENIG:  -- if that helps give some comfort.

 9                THE COURT:  Well, it may give some comfort to the

10      U.S. Trustee that's had objections to the releases.  If they

11      know who it is you're proposing to give releases to.

12                THE COURT:  We would be happy to do that.

13                THE COURT:  Okay.  You know, some of the other

14      categories may not quite lend themselves to that.  I

15      understand.

16                MR. KOENIG:  Yes.  We'll confer with the U.S.

17      Trustee and see if there's some additional meat that we can

18      put on the bones to make sure that the record is clear.  And

19      as you said, there are some categories that I think it will

20      be difficult --

21                THE COURT:  Sure.

22                MR. KOENIG:  -- to do, but we will do what we can.

23      We'll confer with the U.S. Trustee on that.

24                THE COURT:  But, you know, from time to time I've

25      seen some of this happens in bankruptcy court and some
```

Page 268

1    happens in non-bankruptcy courts where people say, I got a

2    release, but their name isn't anywhere near it.  And then

3    their issues, do they fit in a particular category, or not

4    fit in a particular category --

5              MR. KOENIG:  Understood.

6              THE COURT:  -- and I'm trying to avoid as much

7    uncertainty as possible.  I'm not saying I'm approving the

8    releases or disapproving the releases, but I just -- okay.

9    Keep talking among yourselves and see --

10             MR. KOENIG:  We certainly will.  We'll use the

11   time off.

12             THE COURT:  All right.  So I guess -- are you

13   going to be here tomorrow?

14             MR. KOENIG:  I plan on it, Your Honor.

15             THE COURT:  I will be.

16             MR. KOENIG:  All right.  Let me just make sure

17   that we don't have anything else housekeeping wise.

18             THE COURT:  Go up to the microphone.  Wait.  Pull

19   a microphone so you don't have to hobble over there.

20             MS. CORNELL:  As of right now, the scheduling for

21   tomorrow consists of the confirmation hearing continuing at

22   9:00 and the omnibus starting at 10:00.  Do you -- are you

23   prepared to begin at 10:00 tomorrow for all matters?

24             THE COURT:  Wouldn't that be nice?

25             MS. CORNELL:  I just want to make sure that we're

```
 1    prepared at the right time, sorry.

 2               THE COURT:  I don't see any reason to start at

 3    9:00 tomorrow, okay?  We'll start at 10:00 tomorrow.

 4               MS. CORNELL:  Thank you.

 5               MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

 6    Emanuel for Pharaohs.  At the last hearing you asked me

 7    whether we would be submitting affirmative evidence --

 8               THE COURT:  I did.

 9               MR. NOSKOV:  -- in connection with our case, and I

10    reserved on the question.  I just want to say that, yes, we

11    will.  Just to the extent the court --

12               THE COURT:  And, you know, and I read to you from

13    the procedures order that I had entered, and shortly after

14    that, one of my law clerks pointed out to me the schedule

15    for submitting expert testimony, which was earlier than

16    that, but I said on the record what deadline I was setting.

17    So we'll follow that.  So you're not out of time.  Let's put

18    it that way.

19               MR. NOSKOV:  Thank you very much, Your Honor.

20               MR. MCCARRICK:  T.J. McCarrick, Kirland & Ellis,

21    on behalf of debtors.  So long as we reserve the right to

22    take a deposition or discovery from any expert that they

23    might offer (indiscernible).

24               THE COURT:  You can take depositions next week if

25    you'd like to.
```

Page 270

1           MR. MCCARRICK:  Thank you.

2           MR. NOSKOV:  Thank you, Your Honor.

3           THE COURT:  How many witnesses do you expect to --

4           MR. NOSKOV:  At this point, we expect just one.

5           THE COURT:  One.  All right.  Anybody else have

6   anything they want to raise for now?

7           MR. KIRSANOV:  Your Honor, Dimitry Kirsanov, pro

8   se.

9           THE COURT:  Yes.

10          MR. KIRKSANOV:  I would like to bring to the

11  court's attention we have an update from the Ripple case.

12  An appeals court yesterday rejected that CC's appeal.

13          THE COURT:  No, actually, what happened is the

14  District Court refused to certify it for immediate appeal.

15  To have an immediate appeal is at least a two-step process.

16  One, the District Court has to certify it, and then the

17  Circuit has to decide whether to accept it.  So I'm aware

18  that the District Judge, Judge Torres, declined to certify

19  it.  She found that it was mixed questions of fact and law

20  and therefore not entitled, so I'm aware of that, Mr.

21  Kirsanov.

22          MR. KIRSANOV:  Thank you, Your Honor.

23          THE COURT:  Thank you.  Anything else anybody has?

24  See you at 10:00 tomorrow for some of you at lease.

25          MS. LAU:  Hello?

1              THE COURT:  Yes?

2              MS. LAU:  Sorry.  This is Cathy Lau.  I think that

3       you mentioned me yesterday.  I don't know if you're

4       referring to somebody else, but I was the one who submitted

5       the objection, and you said that if I couldn't come, then,

6       like, everyone has to vote to accept it, so I came, I guess.

7       I put my -- I submitted my thing too late.  So I guess

8       nobody knew that I was here because I announced it at the

9       start of the meeting.

10             MR. KOENIG:  Your Honor, Chris Koenig, Kirkland &

11      Ellis.  And I'll try to jump in and see if I can help

12      explain here.  Here's what I think happened.  Ms. Lau

13      submitted to us a letter before the objection deadline.  I

14      don't believe it was ever filed on the docket.  I don't know

15      if you can hear me.  And what we did in our confirmation

16      brief and reply in support of objections we responded to Ms.

17      Lau.  We treated her as timely.  We had -- your chambers

18      reached out to us and said that letter was never actually

19      docketed.  Can we have a copy of it?  We provided that copy

20      to change --

21             THE COURT:  I consider it to be timely.  You've

22      addressed it.  And so, Ms. Lau, your objection is pending

23      before the court.

24             MS. LAU:  Thank you so much.

25             THE COURT:  Okay.  Thank you.  And --

Page 272

1          MS. LAU:  Does that mean I get to do anything with

2     it or --

3          THE COURT:  Well, when we resume, anyone who is

4     opposing confirmation of the plan has an opportunity to

5     submit evidence or argument on it.  So I should comment.  I

6     appreciate -- because look, there have been numerous

7     letters, emails, all sorts of things, some of which may or

8     may not be objections, but the debtor has cataloged them and

9     treated them as objections, and the court will treat them as

10    objections as well, so they won't be denied because they

11    weren't filed on the docket by the deadline.

12         MS. LAU:  Thank you so much.

13         MR. KOENIG:  Thank you, Judge.

14         THE COURT:  Thank you.

15         (Whereupon these proceedings were concluded at

16    5:20 PM)

17

18

19

20

21

22

23

24

25

Page 273

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 6, 2023

[& - 18]                                                                    Page 1

| & | | | |
|---|---|---|---|

**&**   3:3,13 4:10
6:11 7:6 10:18
24:10 113:7
114:11,14
131:13 149:2
173:14 182:19
182:25 258:10
259:17 260:20
261:22 269:20
271:10

**0**

**0.2**   77:19
**0.28**   77:8
**0.69**   244:18
**000347**   7:13
**0627**   232:24

**1**

**1**   50:25 55:2
61:7 95:21,22
102:17 103:12
109:7,13
122:19 218:1
224:10 255:11
258:12,15
**1,000**   251:2
**1,000,000,248**
224:6
**1,184,948**
52:25
**1.2**   151:9,16
152:10 153:5
167:19
**1.248**   167:20
223:22 225:25
227:2,6

**1.5**   53:14
**1.77**   89:21
**1.8**   77:8,18,23
78:3,7,13
**1.886.**   77:14
**1/2**   39:22 40:5
40:18
**10**   6:8 31:25
35:11 54:25
87:19 88:12
131:25 172:20
173:1 212:12
**10,000**   196:12
244:5
**100**   118:20
120:19 127:5,9
129:10,19
134:25 135:15
183:19 186:19
186:20 187:3
225:11
**100,000**   49:2
204:22 205:3,4
**10004**   1:14
**10010**   4:14
**10014**   4:4
**10020**   3:7
**10022**   3:16
**10036**   4:21
**1006**   4:3
**10:00**   268:22
268:23 269:3
270:24
**11**   6:4 38:14
57:6 90:11
114:24 126:3,5
126:16 131:15

136:10,12
149:9 158:2,6
208:16 217:1,8
237:18,21,23
249:5 266:23
**11501**   273:23
**116,000,075**
210:21
**117**   6:21
**1192**   137:15
**11:15**   79:13,14
**11:47**   102:3
**11th**   76:19,23
89:14
**12**   50:13 61:9
95:10 99:10
183:2,5 211:6
249:5 251:14
251:19
**120**   120:4
**121**   6:22
**12151**   273:7
**1221**   3:6
**123**   6:23
**12:00**   102:4
**12th**   68:5
89:19
**13**   30:17,19
91:24 92:19
93:3 97:1
220:17,20
**13th**   91:9
93:15,24 94:23
95:3 96:6
**14**   31:7 100:2
183:6

**15**   73:15 80:10
167:18 264:5
**15,911,247.00**
146:24
**15.9**   146:1,22
**150**   108:14
**151**   4:20
**1531**   50:25
51:17,18 52:2
**156**   68:18,21
**159**   183:24
211:25
**16**   6:11 20:18
20:20 21:11,20
21:22 26:15
28:1,12,15
34:24 170:8
234:4
**160**   108:14,24
**160,000,000**
211:25
**163**   191:12
**16th**   262:1
263:5 265:2
**17**   6:11 8:3
28:1,12,15
29:21 34:24
137:16 138:5
**175**   171:6
181:2,7 252:20
**175,000,000**
252:17
**18**   6:10 24:23
25:10,10,10,12
25:14 34:24
161:23

**[19 - 3]**                                                                      Page 2

**19**   46:12 73:7
73:15 97:18
147:11,14,15
147:16,19
**196,000,000**
226:12
**1st**   264:5

## 2

**2**   13:18 50:20
50:25 55:5,9
57:19 117:8,9
117:22 130:8
136:21 137:9
137:19 142:19
142:22 218:3,5
**2.444**   256:9
**2.6**   181:20
**2.716**   255:1
**20**   6:9 9:12,13
9:14 32:3,16
62:25 68:7
89:19 114:14
192:11 264:5
**200,000**   61:10
61:12
**2002**   252:25
**201**   4:3
**2018**   64:10,24
65:1,2 145:3
**2019**   8:9,15
215:7
**2020**   72:25
73:14 74:1
77:9,20 78:16
144:25 146:2,7
146:23 147:1
147:21

**2021**   8:7,19
72:25 73:14
74:1,7,16 75:9
106:24 107:3,8
107:19 199:18
199:19
**2022**   46:12
49:19 52:6
54:19 63:1
68:5 74:7,16
75:9 76:19,23
77:9,20 78:16
83:4 93:16,24
94:5 95:3
114:25 144:25
145:3,9 171:15
171:18,23
204:6
**2023**   1:16
13:18 34:2
150:25 156:6
273:25
**2025**   239:15
**20th**   54:19
**21**   8:19 75:13
**210**   233:2
234:1,2
**22**   75:13 92:2,2
92:8,11 93:15
137:16
**22-10964**   1:3
**228**   6:9 13:9
20:10,15,17
21:22
**229**   6:20 35:7
40:23 41:3,6

**22nd**   4:13
13:18,20,24
**23**   7:13 33:23
73:1,2 74:2
102:12 239:12
**231**   6:8 7:10
9:22,24 10:11
10:12
**24**   239:13
258:23
**248**   167:15
224:10
**25**   6:10 57:7
74:8,17 82:13
114:15,16
119:4 123:15
123:21 124:25
125:5,9 126:23
127:14,17,18
128:4 131:10
132:22 133:2
133:10 135:24
138:7,7 139:12
161:23 162:7
180:12 185:14
186:1 187:4,5
189:14 190:3
203:25 204:2
204:12,17
207:13,15
239:13,15
257:15
**259**   169:17
**26**   20:19,20
21:12,20,23
26:15

**269**   169:20
206:6
**27**   27:16 28:19
61:10 116:2
158:1,4 233:1
**270**   107:2
**271,585**   49:3
**275**   171:9
252:22
**275,000,000**
252:19
**27th**   131:17
**28**   6:11 30:19
30:25 104:22
199:6
**283**   182:4
**283,000,000**
218:24 224:8
231:14
**2882**   87:8,15
88:12
**29**   6:12
**2902**   169:20
213:6,19
232:22
**2:00**   130:7

## 3

**3**   10:8 13:7
23:7 46:13
55:7 57:16,19
73:15 92:10
97:19 106:22
137:9 138:5
211:21,22
233:16 243:9
243:11,22

**[3,328 - 54]**

Page 3

| | | | |
|---|---|---|---|
| **3,328** 244:9 | **3577** 136:23 | 151:14 158:1,4 | 257:13 |
| **3,642** 244:9 | 137:6,10 | 158:5,7 212:14 | **48** 136:20,22 |
| **3.123** 254:24 | **3580** 13:10 | **4,000** 73:25 | 205:19,24 |
| **3.2** 153:4 156:4 | 82:17 146:11 | **40** 14:24 17:9 | 207:7 258:23 |
| **3.352** 254:21 | 199:4 | 17:12 69:2 | **49** 207:7 |
| **3.5** 106:19 | **3582** 158:1 | 192:12 | **4th** 194:24 |
| 150:25 | 167:7 | **400** 231:15 | **5** |
| **30** 6:13 31:10 | **36** 123:24 | **402,804** 53:7 | **5** 15:3 17:10,14 |
| 31:15 62:25 | 244:8 | **409** 69:1 | 47:25 59:1,3 |
| 192:11 243:3,5 | **36,000** 144:13 | **41** 6:20 123:18 | 102:17 103:12 |
| 243:6 245:11 | **3653** 175:3,8 | **424** 118:8 | 109:7,11 |
| 246:5 | **3659** 35:7 | 189:7 | 122:22 158:7 |
| **300** 273:22 | 40:24 41:3 | **42nd** 4:20 | 172:20 173:1 |
| **30th** 196:4 | **367** 209:12 | **43** 34:1 243:12 | 174:19,24 |
| **31** 6:14,15 8:19 | **3676** 166:18 | 243:13 | 175:5,8,15 |
| 78:16 89:19 | **3688** 132:14 | **44** 95:7,9 98:21 | 201:7 212:12 |
| 194:25 | 137:1,5,11 | 98:22 123:16 | 212:14 |
| **31st** 196:1 | **3694** 46:13 | **45** 98:21,24 | **5.09.** 107:21 |
| **32** 6:16 29:24 | 47:25 57:20 | 220:13,15 | **50** 16:17 27:22 |
| 30:9 238:9 | **3697** 174:22 | 237:6,8 | 28:9 184:9,10 |
| 241:23 | 175:4,4,6,22 | **450** 167:17 | 184:11 187:15 |
| **3293** 160:8 | 217:17 254:10 | **450,000,000** | 187:18 197:14 |
| **33** 6:17 32:22 | **3698** 172:20,25 | 219:1 224:9,15 | 219:2,4 226:13 |
| 33:3 | **3699** 206:20 | 247:5,5 255:21 | 227:7 255:23 |
| **330** 273:21 | **37** 24:17 87:20 | **46** 6:21 98:21 | 256:1 |
| **332** 169:17,20 | 88:12 89:6,8 | 99:25 115:24 | **500,000** 61:14 |
| 233:2 243:13 | 95:8 205:16 | 116:14,15,17 | 61:15 |
| 243:18,21 | **3702** 7:9 | 158:1 223:8 | **51** 4:13 28:17 |
| **34** 6:19 123:23 | **38** 8:2 | **47** 23:10 26:3 | 29:14 |
| **3482** 166:12 | **39** 32:18 | 68:18,25 121:1 | **510** 164:25 |
| **35** 6:18 39:22 | **395,000** 118:21 | 166:2,13 | **52** 20:19,21 |
| 40:5,18 97:4 | 186:22 | 168:16,25 | 21:12 26:15 |
| **350** 105:23 | **3:30** 193:12 | 169:1,10,17 | **53** 20:19,21 |
| 120:7 180:23 | **4** | 205:15,23 | 21:12 26:15 |
| **351** 105:14,24 | **4** 1:16 13:13 | 206:10 207:6 | 107:2 |
| 106:12 | 35:6,11 45:12 | **47.4** 121:2 | **54** 172:22 |
| | 46:9 106:19 | 157:3,7,9 | 243:18,19,20 |

243:21
**55**   17:8
**550**   120:7
180:23
**56**   26:4 167:6
223:12
**565**   118:6,10
168:16,20
170:1 182:2
185:13,17
186:6 187:15
189:7,14,15
**565,000,000**
218:22 219:16
220:3 224:7
225:14 231:13
**57**   20:21 21:12
26:15
**58**   20:21 21:12
26:15
**5:00**   206:15
**5:20**   272:16

**6**

**6**   46:13 47:24
47:25,25 50:25
57:19 73:16
92:2,13 93:14
122:22 174:24
175:5,8,14,14
175:15,21,21
209:12,13
210:4,4 211:6
251:13,18
254:10,10
257:5,6 273:25
**6,424**   245:16

**6,970**   244:14
**6.5**   147:2
**60**   24:17
183:19 211:10
211:12
**601**   3:15
**61**   50:5,12
**61.2**   257:12
**63**   146:17
**64**   72:14,19
**640**   120:10
180:20
**65**   20:21 21:12
26:15
**67**   120:24
157:3 257:12
**68**   20:21 21:12
26:15 207:14
207:15 208:3
**69**   160:7,10,22
161:1 162:7
**693**   77:8,19
**6th**   52:6

**7**

**7**   6:22 116:23
117:1,2,20
121:9,12,12,13
124:18 126:3,6
126:14,15
127:8 133:18
133:23 134:6
134:11,16,20
135:11,12
136:11 138:22
139:13,18,22
157:9 169:2,3
169:9,11,12,18

169:18 170:15
184:3 198:9
206:5 208:4,14
209:2,7 211:18
211:22,24
212:12 217:9
223:18 251:5
252:12 253:21
253:24 256:4
**7,516**   245:3
**70**   6:12 20:21
21:12 26:16
29:1,13,17,19
34:25 121:23
122:20 174:7
**71**   145:14,22
145:25 146:8
146:12,13,13
146:21
**72**   72:11,15,16
72:24 74:7,10
74:15,18,19
77:7,18 78:2,9
146:25 147:5
**72.5**   128:3,4,8
129:20
**73**   106:22
**74**   6:13 20:21
21:12 26:16
30:6,6,11,15
34:25
**75**   6:14 20:22
21:12 26:16
30:22,24 31:3
31:5 34:25
102:13 189:7
211:7

**8**

**8**   52:3 68:6
73:23 89:17
104:23 105:8
199:6
**8.5**   67:13,13
**80**   6:15 20:22
21:13 26:16
31:13,14,19,23
35:1 183:23,25
184:2 211:17
211:20,23,23
211:24
**80,000**   120:4
**8033**   10:6
**804**   10:8
**81**   14:13 16:8
35:21,21 59:5
97:4 110:6
112:4 125:8
126:25 127:17
127:19 128:4,7
128:10,12,14
133:18
**82**   6:16 20:22
21:13 26:16
32:7,11,12,13
35:1
**83**   6:17 33:1,4
33:6,7,8 35:1
68:25 74:11,19
92:11 93:15
95:7 98:21,21
98:21 99:25
146:13 147:15
147:16

| | | | |
|---|---|---|---|
| **84**  6:18 20:22 | 154:23 155:8 | 94:21,25 95:6 | **accepted** |
| 21:13 26:16 | 155:12,23 | 95:7 96:4 97:8 | 168:17 222:6 |
| 33:14,18,21 | 181:16 183:16 | 97:10,11,15,17 | **access**   9:7 |
| 35:1 130:24 | 183:18,19,22 | 98:7,10,11,13 | 44:14 |
| 132:24 | 184:6,24 227:1 | 100:13,14 | **accord**   122:7 |
| **85,000**   196:1 | 227:13 228:10 | 101:4,10,13,20 | **account**   223:21 |
| **87**  6:19 20:22 | **aaron**   3:9 7:5 | 102:3,5,7,9 | 229:13 234:24 |
| 21:13 26:16 | 259:17 | 103:2,4,7 | **accounting** |
| 34:8,12,15 | **ability**   120:2 | 105:11,20,21 | 149:3 |
| 35:1 | **able**   36:13,19 | 106:3 107:15 | **accounts**   83:5 |
| **88**   119:7,15 | 43:17 70:15 | 107:16,22,23 | 86:21 87:3 |
| 170:10 179:2 | 74:12 75:2,15 | 107:25 108:23 | 159:24 |
| 180:18,21 | 103:13 107:13 | 108:25 109:5,6 | **accreditation** |
| 181:9 | 125:5 130:16 | 109:11,13,15 | 177:14,17,19 |
| **9** | 132:17 143:7,9 | 109:24 110:4 | 177:21,23,25 |
| | 230:2,6,11 | 110:10,11,13 | **accredited** |
| **9**   84:21 89:6 | 252:22 259:11 | 110:16 111:5 | 176:15 250:20 |
| 92:9 | 263:25 265:3 | 140:16,16,19 | **accurate**   35:22 |
| **9.8**   150:3,7 | 266:6,19 | 140:19,22,23 | 49:19,21 59:10 |
| 152:20 | **above**   19:20 | 141:24 142:1,6 | 116:4 198:16 |
| **9/27**   131:9 | 55:9 120:20 | 142:21 198:21 | 273:4 |
| 136:23 | **abreu**   5:6 80:5 | 198:22 199:10 | **accurately** |
| **90**   82:23 83:15 | 80:5,6,7,9 81:5 | 199:11,15 | 69:22 |
| 83:16 86:10,13 | 81:12,14,17 | 200:1,2,4,6,14 | **achieve**   196:2 |
| 128:22 135:24 | 82:1,6,9,11,12 | 200:17,18,23 | **achievements** |
| 136:3 210:17 | 82:16,18 83:7 | 201:2,11,12,21 | 153:24 |
| **90,000**   239:24 | 83:11,14,22,23 | 201:22 202:3,8 | **acquisitions** |
| **90,587**   239:18 | 84:11 85:12 | 202:15 203:3,5 | 62:21,23 63:6 |
| **95,000**   197:5 | 86:3,12,16 | 203:15,16,17 | 63:8 65:15 |
| **97**   84:4,5,7,8 | 87:7,11,13,17 | **absolute**   40:17 | **act**   18:9 25:18 |
| **98**   109:17 | 87:18,21,22 | **absolutely** | 162:9,9 |
| **9:00**   268:22 | 88:18,25 89:6 | 46:17 58:2 | **acted**   245:23 |
| 269:3 | 89:9,10 90:2 | 76:18 113:20 | **action**   67:18 |
| **9:05**   1:17 | 90:13,14,16,17 | 124:13 | 194:17 |
| **a** | 90:23 91:3,5 | **abused**   197:7 | **active**   234:15 |
| | 92:5,13,17 | **accept**   128:21 | **actively**   17:15 |
| **a&m**   148:21 | 93:2 94:18,19 | 270:17 271:6 | 54:12 188:8 |
| 149:11 153:16 | | | |

activities
    102:20 213:4
activity  11:21
    11:22 19:22
    78:24 253:17
actual  14:17
    15:20 209:3
    221:3
actually  11:17
    22:21 45:11
    69:18 126:13
    129:17 153:24
    153:25 164:1
    169:15 170:9
    181:4 196:11
    231:10 238:13
    245:23 259:2
    270:13 271:18
add  96:8 151:7
added  93:3
    189:1 225:24
    227:6 235:25
    236:7,19
    244:14
adding  225:10
addition  16:11
    36:12
additional  9:3
    24:16 35:18
    36:14 70:18
    74:2 181:13
    187:23 226:3
    265:19 267:17
additionally
    74:6
address  239:11

addressed
    271:22
adequate
    52:11,17
adjunct  12:6
adjust  227:2
adjusted  131:9
adjustment
    185:18 226:2
    227:3 257:22
adjustments
    153:3 182:8
    226:6
administrative
    120:18
administrator
    183:13 212:15
    247:12,25
admissible
    10:5
admission
    138:17 260:24
admit  22:23,25
    24:6,16 25:25
    26:12,15
    116:13 121:9
    122:6 260:7
admitted  9:23
    10:11,12 20:17
    21:10,22 24:5
    25:14 26:9
    28:14,15 29:19
    30:15 31:5,21
    31:23 32:13
    33:8,21 34:15
    34:24 41:5,6
    116:17 121:12

121:13 122:8
    123:2 222:24
    233:17 258:23
    261:14
admitting
    20:15 22:10
adopt  116:7
    122:3
adr  265:16,17
advance
    262:11
advanced
    213:25 214:18
advancing
    215:9
advised  159:16
advising  204:5
    204:12
advisor  114:20
    114:21 159:17
    201:3 223:15
    225:15 227:9
advisors  149:4
    215:11 223:19
affect  75:20
    76:3,9 240:15
    247:1,3,4,5
affected  16:13
    78:24
affecting  91:8
affidavit
    121:20
affiliated  62:2
affiliates
    215:12
affirm  10:24
    113:12

affirmative
    269:7
afternoon
    113:6 114:8
    157:19,24
    164:15 174:3
    176:3 193:19
    203:21,23
    261:21
afterward
    99:15 100:4
agencies  11:15
ago  148:14
    154:1 191:4
    195:5 196:5
agree  38:19
    71:23 81:21
    111:14 145:11
    162:21 163:2
    171:17,21
    221:24 240:20
    240:24 246:8
    250:4,7
agreed  9:9,17
    265:11
agreement
    9:10,18 102:15
    102:16,17,21
    102:25 103:5
    103:10,12
    104:5 161:24
    224:14
agreements
    102:22 119:1
ahead  8:5
    15:21 35:3
    46:2,12 48:1

50:14 55:14
69:4 71:10,21
74:12 80:6
81:16 83:22
85:17,17 86:15
87:17 92:14
100:13 111:9
111:25 113:2
114:4 125:22
129:6 143:4
146:19 148:19
150:19 151:4
153:13 154:20
157:8 160:17
161:3 162:14
164:17 165:7,7
165:13 167:3
169:24 175:13
175:25 184:18
193:17 199:14
210:9 215:21
216:14,17
218:5 220:18
255:12
**al**   1:7 10:24
**alameda**   42:24
43:1 61:5,16
61:22 62:6,7
62:16,19
**alarms**   153:20
154:9
**alert**   130:11
**allotted**   247:12
**allow**   23:16
64:13 95:4
**allowed**   18:2
124:21 144:14

197:3
**alt**   181:25
**alternative**
208:20
**altogether**
55:23 210:6
**alvarez**   114:11
114:14 149:2
167:10 173:14
182:19,24
**amas**   259:22
**amended**   166:3
172:10,15
**amendment**
132:24
**america**   7:12
**americas**   3:6
**amount**   8:11
8:17 18:5
41:20 49:1
68:5 71:24
99:12 100:21
105:23 106:25
109:2 110:24
126:15 139:18
225:9,10,16
236:19 244:4
252:4 255:18
**amounts**   52:11
105:10 110:19
**analyses**   56:22
115:20 180:1
181:17 249:18
**analysis**   56:19
56:21 68:3
72:11 82:19,22
112:8 115:17

117:3,4,6,18
117:18 118:3
120:10 121:10
123:9,10 124:5
124:18 127:5
127:23 129:3
134:25 135:6
135:10 144:24
152:24 159:21
159:23 160:3
161:18 162:18
163:14 170:6
176:16,17,19
176:24 177:5
177:24 179:2
179:23,24
182:22 185:6
188:9 189:1,16
190:4 191:19
198:17 205:23
205:24 206:11
209:1 214:19
219:18,21
220:10,23
221:8,18,19
222:4,6,7
223:14 224:2,3
224:3,5 228:20
228:23 229:3,3
229:4,17,19
231:9 232:1
235:21 237:5
237:10,24
241:16 248:21
249:23 250:12
250:18 251:6
252:8,13,15

**analytics**   11:14
**analyze**   220:24
229:5,20
230:23 232:3
248:24
**analyzed**
102:13,14
103:10
**analyzing**
185:3
**announced**
14:4 271:8
**annual**   199:8
199:12
**answer**   43:17
49:14 55:19
56:9 58:13
64:13,17 71:10
74:12 75:2
84:17 85:21
86:2 98:14
105:18 107:13
110:2 112:2
129:7,13
157:14 163:19
165:15 173:21
180:10 184:13
197:21 203:2
204:21 205:2
208:16,18
214:16 230:12
235:16 241:20
**answered**   55:1
58:3 87:5
129:5 173:18
228:25

**answering**
  55:19 192:13
**anybody**   42:7
  60:10 79:14,18
  80:3 111:5,17
  111:21 112:14
  140:4,7,14
  141:5 142:1
  160:22 164:10
  260:16 263:9
  263:10 270:5
  270:23
**anybody's**
  262:2
**anymore**   154:5
**anyplace**
  128:25
**apart**   213:4
**apologies**
  36:22 51:22
  97:10 107:23
  196:24 223:7
  229:18
**apologize**
  141:23 169:16
  176:6 189:17
  244:9
**app**   46:6,17
  48:3
**apparently**
  65:16
**appeal**   270:12
  270:14,15
**appeals**   270:12
**appear**   24:17
  46:6,17,19
  47:2 48:3,5,8,9

  58:25 84:25
**appearance**
  9:1 215:2
  256:22
**appearing**   53:2
  215:6,8
**appears**   46:24
  52:24 73:22
  88:13 95:17
**applicable**
  177:25
**applied**   177:22
  226:21 231:5
  236:18 248:14
**apply**   56:23
  228:19 250:2
**applying**
  189:14 250:10
**appointed**
  62:19 205:9
**appraisals**
  221:3
**appreciate**
  26:25 46:1
  112:7 157:17
  272:6
**appreciation**
  95:11 107:19
**approach**   7:20
  21:18 113:18
  172:4
**approaches**
  172:5,7
**appropriate**
  65:23 225:8
**approve**
  203:10

**approved**
  194:3,18,25
**approves**
  133:11
**approving**   8:8
  164:24 266:17
  268:7
**approximated**
  223:22
**approximately**
  211:17
**april**   46:12
  49:19 72:25
  73:14 74:1
**area**   164:22
  190:9
**argue**   207:4
**argument**
  37:13,21,22
  98:19 136:15
  136:16 262:10
  262:13 263:6,7
  263:23 264:1
  264:10 272:5
**arguments**
  37:12 79:5
  165:6 263:4,9
**arithmetic**
  75:15 106:18
**arrangements**
  251:22
**arrive**   247:17
**arrived**   180:17
**article**   24:25
  138:4
**articulate**
  98:18

**artificially**
  14:5
**artur**   5:6 80:5
  140:16,19
**ascribe**   139:5
**asked**   36:7
  38:1 55:13
  87:4 98:11
  115:13 129:5
  141:15 151:23
  165:14 174:13
  188:12 190:12
  190:20 195:16
  206:1,5 222:17
  222:18,18
  228:24 237:1
  237:15 240:1
  255:4 269:6
**asking**   43:13
  53:17 75:7,8
  81:13 90:6
  158:23 193:6
  204:24 217:18
  227:25 228:2
  241:15,24
**assess**   119:4
  184:15 199:16
**assessed**
  118:12,13
  121:3 123:12
  123:12 187:5
**assessing**   231:4
**assessment**
  43:11,23 59:18
  59:21 85:9,13
  93:9 103:18
  105:15,22

107:8 231:12
**assessments**
188:23
**asset** 15:15,19
18:24,25 19:5
36:25 37:10
38:1 56:1,4,11
56:11,14,17
67:25 68:1
70:17,24,25
71:1,2,4,6,15
100:5,24
119:19,19
120:25 134:3
167:16 178:1
179:10,23
180:5,14 181:9
181:9 191:23
192:15 201:9
220:3,8 222:11
222:15,17
223:22,24
224:3 225:20
225:25 228:18
229:17 230:13
230:17 235:2
247:4 248:10
249:25 250:2
255:22
**assets** 37:4
41:17 52:12,18
52:23 53:8,19
58:5 75:20,20
76:3,3,8,9 93:7
94:7 119:10
120:25 136:4
148:22 149:21

149:23,24
150:12,25
152:18 153:3
153:25 154:24
156:5 176:25
177:6 178:4
179:3 182:4
183:14 187:11
188:13 189:3
190:10 192:6
207:20 208:5
208:24 211:16
211:19 212:5,8
212:11 218:24
224:8,10,13,23
225:17,22,24
227:5,21
228:18,21
229:7,21
231:13 235:12
235:18,24
247:13,23
248:16 249:18
250:5,7,15
251:7,11
252:14 253:12
**assigns** 127:14
**assist** 59:9
116:20 149:6
220:23
**assistance**
115:1,1 165:25
188:13 223:15
**assisted** 117:5
149:16,17,18
155:19

**assisting**
174:11
**associated**
115:8 135:12
138:9 151:8
183:21 191:13
211:11
**assume** 66:22
104:13 105:12
139:4 258:25
**assumed** 251:6
251:7
**assuming**
36:18 117:19
**assumption**
106:9 190:2
247:15
**assumptions**
119:15,16
156:10 189:12
189:21 190:2,9
255:3,6,7
**assurance**
234:15,17,21
**asymmetry**
100:8
**attaches** 13:17
**attempted**
17:24
**attempting**
24:15 139:1
**attention** 13:6
24:23 29:1
35:5 161:22
270:11
**attorneys** 3:4
3:14 4:2,11,19

124:24
**attribute**
230:16
**attributing**
225:11
**audible** 238:17
**audio** 72:10
74:8
**audit** 149:2
**auditing**
148:22
**audits** 149:3
**august** 63:1
194:23 196:1
**austin** 265:23
**automated**
27:7 79:24
**available** 7:15
16:24 17:2
48:22 49:3
161:5 166:10
177:12 206:12
238:1
**avenue** 3:6,15
4:13
**average** 106:10
106:13,16
107:1,3,4,21
120:10,21
180:20 197:7
199:17
**averaged**
106:20,21
**avoid** 268:6
**aware** 44:22
45:7 57:6,10
57:13 61:22,24

62:2,23 68:4
68:11 73:13
101:11 111:1
112:5 126:19
126:22 128:20
132:21 145:8
150:10 151:1
177:19,23
189:16 191:16
198:7 200:19
200:24 201:4
202:9,16,20,24
220:2,5,7
221:7,10 222:9
227:14,16
242:1,6 270:17
270:20
**axis** 125:8

**b**

**b** 1:21 10:8
23:23 25:22
138:5 164:25
247:7
**back** 18:6 19:1
19:5,6,12
22:21 27:2
37:6 64:4
70:17 71:5,15
75:12 80:1
82:5 91:25
92:1 94:4,5
96:25 106:17
124:12,15
129:17,18,21
130:8,16
135:16,22
139:1 143:1

174:4 180:19
197:5 205:14
209:11 222:19
246:3,20
249:21 252:5
253:3 254:3
265:6
**backdrop**
16:15 79:2
**backed** 12:15
170:9 266:1
**background**
12:2 67:24
114:13
**backup** 183:20
188:14,18,22
191:9,13,14,15
191:16 211:11
211:12,13
**bailiff** 142:23
**ballots** 194:23
**ballpark** 54:25
61:13 73:22
106:19
**bank** 12:13
80:12 177:2,7
**banker** 182:2
188:21 230:21
252:21
**bankers** 181:5
**bankman** 62:3
62:11,13
**bankrupt**
87:25
**bankruptcy**
1:1,12,23 15:5
16:19 43:5,10

43:23 44:7
54:9,14,17
55:2,12,23
56:1,4,10,17
56:20,22,24
57:20 58:7,17
58:21 59:1,5
59:13 65:13
115:10,10,11
126:25 128:11
133:10 144:21
149:8 152:3
204:13,14,17
204:19 223:19
267:25 268:1
**banner** 35:13
**base** 158:20
159:3,7
**based** 9:9,9,18
18:15 49:18
98:1 104:11
125:1 150:13
150:24 156:1,6
156:23 159:12
177:6 180:21
182:22 188:25
196:5 212:22
212:25 214:14
220:9 223:21
224:16,17
225:3,18
228:20 231:12
236:18 237:9
237:24 238:4
239:8 248:2
249:7 255:6
257:15,22

**bases** 159:2
**basically** 85:1
97:23 106:6
107:2 149:13
154:25
**basis** 22:9
158:19 176:19
179:3 180:17
181:10 184:2
235:11
**basket** 248:8
**bates** 23:24,25
24:2,4,7,12,16
26:6,8
**bear** 46:7
212:10
**began** 93:20
96:11
**beginning** 8:9
8:15 94:5
158:16 254:4
**begins** 8:2
69:12 70:5,11
**behalf** 7:6
10:19 13:2
24:10 113:7
215:7,8 256:24
258:10 259:18
260:21 269:21
**belief** 158:19
159:1,3,7
**beliefs** 158:20
159:4
**believe** 7:16
9:20 10:4
14:19 19:17
24:4,15 26:8

41:13,19 50:3
54:13 55:4,6
57:12 61:19
63:24 64:4
65:2,11 66:17
85:3 86:7,17
87:16 89:16
94:4 96:5
98:18 110:2,2
110:17 119:10
121:6 127:16
129:9 134:1
135:4 138:25
149:23 150:2
154:23 156:11
156:23 158:16
159:18 164:23
166:1,14
167:20 171:14
175:15,21,23
176:8 180:24
184:22 186:3
187:15 191:6
196:17 198:4
201:7 203:9,11
205:25 206:4
213:20 217:2
219:14 220:1
226:12 228:19
233:3 252:24
254:9 261:19
271:14
**believes** 263:3
**bell** 66:13
**bench** 27:2
**benchmark**
181:1

**benefited**
107:5,18
**best** 115:16
121:7 123:19
124:7,20 125:5
126:2,9,11
127:13 136:12
139:7 174:4,14
174:15 176:14
178:5 187:12
191:20 192:2,9
192:17 217:4,7
218:14 231:6
239:10 253:11
253:20 256:2
257:24
**better** 25:18
65:22 130:15
144:1 163:24
164:2 187:21
195:4,5 215:10
221:22 240:1
245:4 260:10
265:9
**betting** 69:10
**beyond** 128:24
184:13 185:17
185:21 201:18
201:20 214:21
**bias** 60:20
**bid** 99:24
100:4,10
102:25 103:13
171:5,7,14
181:6,8 183:20
191:3,13
252:17

**bidder** 118:15
183:20 186:13
188:19,19
191:9,14
211:11,12,13
**bidders** 247:18
**bids** 102:25
188:14,18,22
188:22,23
191:6,15,16
**big** 24:24 27:25
29:2 173:11
181:19,21
187:4 210:22
249:15
**bigger** 179:16
256:9
**biggest** 177:3,3
**billion** 67:13
67:13 150:3,7
150:9 151:1,9
151:14,17
152:10,20
153:4,5 156:4
167:8,15,19,20
181:20 223:23
224:10 225:25
250:21 254:21
**binder** 11:3
13:7,17 20:23
21:15,16 23:7
23:8 24:1,19
24:24 28:1,4
29:2,6 35:6
115:23 116:23
121:16 130:17
174:9 206:6

220:12 223:8
232:12
**binders** 113:19
215:23
**bit** 16:16,20
24:11 39:20
94:5 155:10
157:5 187:17
194:11 226:19
230:15 237:3
238:25 240:17
243:8 248:20
253:16
**bitcoin** 16:17
25:1 75:20
76:3,8 94:9
95:13 99:11
107:9,19 148:4
178:13,20
179:14 181:22
186:7,16,16
204:8,10,11,11
208:12 214:15
214:16 219:13
225:5,20
235:13 239:8
239:23 240:25
241:4 250:4
**block** 66:11
**blockchain**
11:14,17,22
80:16
**blonstein**
50:16 52:2
**bloomberg**
151:8

**bloomberg's**
153:24
**blow** 118:24
**blue** 123:14,17
125:11,11
**board** 62:18
63:5,19,21,22
63:23 64:22,25
65:4,5,7,16
**bob's** 160:23
**bodies** 198:12
**bolster** 96:8
**bolsters** 20:3
**bones** 267:18
**book** 169:12
**books** 176:23
184:15
**boosted** 41:19
**boosting** 14:5
**borne** 212:15
**borrow** 70:24
83:20
**borrower**
163:14,22,24
164:2
**borrowing**
71:2 83:3
**bottom** 72:20
73:9 77:7,14
77:17 78:2,8
120:13 125:8
146:17 158:6
191:23 243:16
257:7
**bought** 75:12
201:9

**bound** 40:1,2,6
40:8,18,20
**bowling** 1:13
**breadth**
188:17
**break** 17:3
140:5 174:25
**breaking**
142:19
**brian** 4:8
**brick** 191:1,10
**bricks** 190:23
**brief** 25:17
114:12 198:2
262:19,22
271:16
**briefing**
262:10,11,14
**briefly** 13:23
14:19 20:23
**briefs** 262:17
262:22
**brier** 3:21
112:23 113:4,6
113:7,17,18,21
114:3,5,7
121:14 122:23
123:3,4 124:10
124:13,15
125:18 126:7
127:2,10
128:23 129:5
130:3 131:4,7
131:18,21
132:8,12 133:4
133:20,24
134:8,13,17,22

135:2,8,25
136:5,14,25
137:7,10,14
138:1,16,19
139:8,14,19,23
142:10,13
145:4 147:12
147:22,25
148:6 150:5,15
151:2 152:4,11
153:7 155:6
156:8 157:13
158:21 160:9
160:13,23
161:1 162:23
163:4,15 166:5
166:9,16,23
169:5,10 174:7
174:18 175:3
175:24 178:9
178:16 189:4
190:5 191:21
195:11 199:22
202:1,6,12
203:1 205:11
205:20 206:3,8
207:23 209:14
213:7,13,16,20
215:5,17,20
217:18,22,24
220:18 228:24
229:8,22 230:8
233:18 237:12
237:14,21
239:5,25
241:11,17,22
244:20 246:10

246:21 254:7
254:11,14
256:18,20,23
256:23,25
257:4,9 258:1
**bring** 214:6
215:23 270:10
**bringing** 87:10
249:21
**brings** 118:14
**broad** 162:8
**broader** 80:20
**broke** 27:12
**bronge** 140:25
141:2,4,5
142:5,20
157:18,19,23
158:5,9,11,12
158:15,23,25
159:6 160:11
160:15,18
161:4,10,15,17
162:6,12,16
163:1,7,18
164:9,17,18
165:7,8,12,14
165:17,18
**bruh** 4:7
**btc** 107:6 219:9
225:5 239:16
250:6 251:21
**bucket** 248:7
**buckets** 17:4
**budgeted**
183:4
**buildout**
118:21 186:21

186:21 188:1
**buildup** 180:17
**built** 64:3
187:25 191:10
**bulk** 247:21
251:11 253:17
**bunch** 197:8
**burn** 30:20,24
**business** 12:4
158:17 171:13
177:7,25
178:14 180:5
181:3 184:12
185:7,7,10
188:2,21
194:10,16,18
204:1,5 208:11
208:12,22
212:20,23
213:1,5 218:21
219:16,18
220:4 222:11
224:24 227:5
227:23 228:1
228:16 231:13
238:11,24
239:4,7,22
240:14,14,15
240:16,18,20
249:17
**buy** 8:21 18:6
19:1,5,10,12
70:16 71:5,15
100:6 104:6
106:11 119:22
198:5

**buybacks**
32:19,20 33:12
74:11 78:5
108:1,3,5
**buyer** 106:14
171:8 181:3
252:18
**buyers** 107:1
199:17 201:13
**buying** 19:6
62:24 78:24
**buys** 108:1,10
108:12,19,22
109:2

**c**

**c** 3:1 7:1 63:16
63:16 273:1,1
**calculate** 37:3
110:7 245:13
**calculated** 14:8
170:10,10
226:16
**calculating**
185:2
**calculation**
106:11 109:22
112:3
**calculations**
191:7,8
**calculator**
236:5
**call** 10:19
112:24 113:2,7
135:24 136:3
**called** 18:21
62:21 226:8,9

**calls** 129:21
162:24 163:4
163:15 246:11
**campagna** 6:5
112:24 113:3,8
113:10 114:6
114:10,19
116:22 117:12
121:3,10,15,23
122:9,20 123:5
124:9 125:23
125:25 126:9
133:25 137:3
140:8 143:1
144:20,24
145:8 148:21
150:2 151:6
152:2 153:16
154:22 156:21
157:16,24
165:22 173:24
174:9,23 176:3
176:5 193:19
198:23 200:7
203:23 207:12
208:4 214:14
216:19,23
218:8 223:7
240:13 242:1
242:19 256:19
256:21 257:1
257:10
**campagna's**
122:19
**candles** 92:19
**candlestick**
57:24

**candlesticks**
93:21
**can't** 178:20
179:21,21
206:2 207:8
208:20
**cap** 67:6,7,13
107:5,10
186:21
**capacity** 63:12
**capital** 62:6
167:17 182:15
184:10,12
187:9,15,18,20
187:23 200:10
200:20,25
201:1,15 219:1
219:3,5 224:13
227:6 231:14
235:19 256:12
256:14
**capped** 186:21
**caps** 118:21
**cardinal** 106:5
**care** 184:1
258:25
**carries** 39:23
158:7
**case** 1:3 3:3 7:6
7:12 10:18
16:8 37:8,22
39:2 80:21
99:7,21 114:23
127:8 144:13
156:2 165:8
171:24 176:24
180:23 201:6

| | | | |
|---|---|---|---|
| 201:20,25 | **cel**  8:8,9,11,16 | 100:23 101:7 | **celsius**  1:7 8:8 |
| 202:17 204:13 | 8:17,20,25,25 | 101:18 102:11 | 8:9,12,15,18 |
| 204:15,18,19 | 9:2,3,20 13:25 | 103:23 104:15 | 9:6,15 14:6,25 |
| 204:19 205:4 | 14:3,8,11,22 | 105:2,9,14,24 | 15:5 17:5,6,6,7 |
| 215:9 227:21 | 14:24 15:3,6 | 106:7,12,14 | 17:9,9,11,13 |
| 235:8 237:11 | 16:14,24 17:3 | 107:9,18 108:8 | 17:22,23 29:25 |
| 248:13 258:24 | 17:15 18:5,12 | 108:14 109:18 | 32:4,6,19,19 |
| 259:17 262:2,8 | 18:16,17 29:25 | 109:22 110:19 | 33:11 39:3,5 |
| 262:19 263:5 | 30:20,24 32:20 | 110:24 111:12 | 40:16 41:13 |
| 265:7 269:9 | 33:11 36:8,20 | 112:4 122:12 | 42:18,21 44:10 |
| 270:11 | 37:8 38:24 | 122:13,17 | 44:14,20,23 |
| **cases**  16:4,5 | 39:14,19 41:13 | 123:7,11,13 | 45:1,8 46:6,17 |
| 70:23 82:24 | 41:16,18,20 | 124:4,8,17,21 | 46:19 48:3,5 |
| 120:6 201:5 | 43:4,10,14,22 | 126:19,20,23 | 52:9 59:12 |
| 204:22,25 | 43:25 49:2 | 126:25 127:15 | 62:24 65:13,14 |
| 208:17 266:23 | 52:11,18,23 | 128:7,17,20 | 66:9 74:2 77:7 |
| **cash**  71:4 | 53:4,4 54:8,12 | 132:21 133:10 | 77:18 78:6,12 |
| 115:6 171:7,9 | 54:14,16,19 | 133:11,18,23 | 78:23 94:11 |
| 208:24 219:5 | 55:2,5,11 | 134:2 135:7 | 102:13 104:25 |
| 220:10 249:21 | 56:19,23 57:7 | 136:3,10,20 | 105:12,22 |
| 252:20 | 57:10,11,13,20 | 137:17,20 | 106:4,10 108:8 |
| **cashflow**  115:6 | 58:3,6,6,17,19 | 138:5,6,7,7,8 | 108:13,20 |
| 194:19 | 58:25 59:12 | 138:22 139:5 | 114:24 121:12 |
| **cashflows**  37:5 | 67:19 68:6 | 139:13,17,18 | 131:14 145:2 |
| 37:9 | 72:12 73:1,2 | 139:22 144:13 | 145:11 160:2 |
| **cataloged** | 73:15,24 74:2 | 144:21,24 | 161:24 163:9 |
| 272:8 | 74:17 75:21 | 145:2,9,11 | 169:9,11 |
| **catch**  209:15 | 76:4,9,19,23 | 147:2,20 148:3 | 170:20 193:22 |
| **categories** | 77:2,7,8,9,18 | 163:9 164:5 | 195:7,9 197:20 |
| 266:22 267:14 | 77:19,20 78:7 | 174:24 198:6 | 198:8 199:8,12 |
| 267:19 | 78:7,13,13 | 198:10,12,14 | 205:23,24 |
| **category**  268:3 | 79:4 81:18,22 | 199:17,19 | 206:5 232:14 |
| 268:4 | 85:7,14 88:7 | 201:6,13,25 | 233:15 243:21 |
| **cathy**  271:2 | 95:11,15 96:6 | 202:5,10,17,23 | 259:23 |
| **caveat**  264:3,4 | 96:14 97:20,22 | 203:24 | **celsius's** |
| **cc's**  270:12 | 98:2,8,9,17,22 | **cell**  49:3 | 102:14 |
| | 99:22 100:16 | 130:10 | |

cent  123:15
127:14 138:7
139:12 157:3
center  118:10
119:4 219:17
centerview
167:16 168:13
168:17 170:1
178:21 185:10
185:13,20
224:8 225:15
226:25 228:1
237:10
cents  14:13
16:8 35:21,22
54:25 57:7
59:5 62:25
73:15,22 97:4
97:5 110:6
112:4 120:19
123:23,24
124:25 125:5,9
126:23 127:1
127:17,17,18
127:19 128:4,7
128:10,12,14
129:10 131:10
132:22 133:3
133:10,19
135:24 138:7
certain  7:18
8:10,17 20:11
27:12,19 82:23
99:7 115:17
120:18 173:10
188:1 196:10
217:2 238:1

242:7 266:25
certainly  37:11
40:1,20 55:15
76:5 80:24
82:4 104:18
112:6 113:11
156:12 194:2
201:3 234:12
234:21 268:10
certified
114:19,21
273:3
certify  270:14
270:16,18
cfo  155:20
chain  32:19
155:21
challenge
26:24
chambers  7:16
271:17
chance  23:21
38:10 158:10
change  13:2
99:18 191:19
271:20
changed  66:23
101:22 233:19
246:25
changes  75:19
76:2 255:7
changing
239:8,9
chapter  38:14
57:6 114:24
117:20 124:18
126:3,5,5,13

126:14,15,16
127:8 131:15
133:18,23
134:6,11,16,20
135:11,12
136:10,11,12
138:22 139:13
139:18,22
149:9 157:9
170:15 184:3
198:9 208:4,14
209:7 211:18
211:22,24
217:1,8,9
223:18 251:5
252:12 253:21
253:24 256:4
266:23
charge  213:1
228:9
charged  85:14
charges  7:18
chart  30:8,23
31:10,14 33:11
52:8 57:23,24
77:11,12 89:24
93:4,17,20,20
94:7 95:5,13
96:13 97:24,25
98:16,18,22,24
99:23 100:15
124:12,17
125:4 173:12
173:15,17
174:15 175:4,9
175:9,23 178:6
191:11 209:19

249:5
charts  32:19
88:5 90:19
95:12 101:20
chater  208:16
check  66:23
166:20 249:3
263:25
checked  54:24
cherokee  62:21
62:23 63:6,8
63:11 65:8,9
65:15
chief  7:17
11:12 258:24
263:5
child  62:1
choice  118:15
186:9,11,13,14
212:13 219:9
219:10 242:7
242:10
choices  242:2
choose  201:13
245:8
chose  242:21
245:19,20
246:4,5
chosen  55:15
chris  3:18
131:13 261:21
271:10
chunk  181:19
circle  187:2
circuit  270:17
circular  125:16

| | | | |
|---|---|---|---|
| circulate 94:11 | classification | closer 40:9 | collectible |
| circumstances | 158:18 159:10 | closing 81:11 | 37:16 |
| 38:12 112:8 | 159:15 161:11 | 224:16 248:9 | collecting |
| 226:18 | 161:19 | 262:9,13 263:4 | 188:21 |
| cited 21:4 | classifications | 263:6,7,8,22 | colloquial |
| 22:13 24:7 | 159:2 | 264:1 | 191:3 |
| 260:3 | clause 84:21 | cnl 149:21 | colodny 3:9 7:4 |
| citing 167:21 | 86:8 136:13 | 150:25 152:20 | 7:5,5,22,24 8:2 |
| claim 65:14 | clear 21:3 | 153:3 154:25 | 8:6,15 9:14 |
| 134:3 138:8 | 24:11 45:4 | 155:2 156:5 | 10:2,8,13 21:7 |
| 144:20 160:2 | 48:16 101:21 | coast 210:14 | 29:5 50:5,8,10 |
| 164:24 184:16 | 102:1 132:12 | code 149:8 | 146:12,17 |
| claimants | 174:22,25 | 180:25 212:18 | 205:25 206:4 |
| 120:19 | 175:20 217:22 | 212:23,25 | 232:21,23 |
| claims 57:11 | 227:25 267:18 | 223:19 227:14 | 233:1,3,7,12 |
| 120:16,18,21 | clearly 15:7 | cohen 7:12,17 | 246:11 258:3 |
| 129:10 134:6 | 96:15 | 8:6 10:1,3 | 259:15,16,17 |
| 134:11 138:5,6 | clerk 7:2 10:23 | cohost 51:3,10 | 259:17,21 |
| 138:6 159:12 | 27:6 50:22 | 51:15 | 260:7,13,17 |
| 159:13 182:10 | 51:5,7,11,13 | coin 37:14 67:6 | 261:3,7,11,13 |
| 184:14,15,16 | 51:15 79:23 | 69:8,16 105:13 | 261:16,19 |
| 191:25 244:4 | 113:12 161:8 | 129:17,18 | column 74:11 |
| 248:9 252:5 | 161:14 | 132:7 139:1 | 105:8 117:19 |
| clarification | clerks 269:14 | 182:22,22 | 117:25 118:9 |
| 193:7 | clients 8:12,18 | coinbase | 119:7 146:1,4 |
| clarify 158:24 | clip 260:2 | 251:22 | 146:4,22 147:1 |
| 254:7 | clips 259:22 | coingecko | 147:4 177:2 |
| class 121:7 | 260:6 | 89:16 | 179:17 180:13 |
| 122:13 126:20 | close 44:3 | coinglass 89:18 | 181:15,18 |
| 128:8,22 | 61:10,25 94:6 | coins 129:21 | 184:25 192:5 |
| 132:22 136:11 | 111:13 119:13 | 135:16,22 | 198:18 211:8 |
| 164:24 | 153:22 176:5 | 181:25 225:8 | 211:17 212:13 |
| classes 120:16 | 181:8 | collateral 71:3 | 218:19 222:8 |
| 122:14 123:13 | closed 64:10,24 | 158:19 159:18 | 225:18 226:14 |
| 134:11 159:11 | 65:2 248:13,14 | 159:24 | 244:22 255:24 |
| 242:7 | closely 62:2 | collectability | columns 90:7 |
| | 91:22 | 226:9 | 117:20 119:6 |

174:16 182:5
191:20 255:25

**column's**
192:25

**combination**
224:10 229:6
240:18

**combined**
228:21 229:20
235:13 240:15
259:2

**combining**
235:11

**come**   10:21
19:9 22:19,21
70:20 94:13
130:16 177:4
179:8 182:9
190:12 192:25
208:17 214:23
232:4 262:18
262:19 271:5

**comes**   11:23
101:7,17
102:10 104:14
149:20 150:12
153:2 159:9
169:19 245:2

**comfort**   267:8
267:9

**comfortable**
80:19

**coming**   16:22
39:13,18 89:17
196:9 227:1
254:17

**comment**
221:10 272:5

**comments**   96:2
156:21

**committee**   3:5
7:6 10:19,19
24:15,21
197:10 205:7,8
216:7 258:2,25
259:18

**common**
221:14,20
223:21 231:10
231:18,21
234:7,8,16
244:10,22,24
245:4,9 266:23

**commonly**
70:19

**communicated**
9:6,15

**communicati...**
105:8

**communicati...**
62:11,13 93:6

**companies**
114:17 171:22
204:3 229:6,20

**company**   8:10
8:16,21 11:15
14:2 17:4 61:6
61:8 62:8,16
62:18,21 63:5
65:3 72:12,25
73:2 74:8,11
74:16 75:12
78:4 80:15

93:6 108:2,3,6
117:23 118:17
118:25 119:11
134:2 147:2
148:4 149:7
155:20 171:5,8
172:3 178:20
179:17 182:22
182:25 184:15
196:1 198:12
198:14 199:18
201:7 202:4
208:21 212:9
238:23 250:14
255:21

**company's**
13:25 63:5
119:20 149:19

**company's**
176:23 180:14

**comparable**
229:6,20

**comparables**
248:2

**comparative**
178:4 249:22

**comparatives**
176:21

**compare**   98:3
98:6,8

**compared**   58:1
58:5 94:8
99:10 102:15
117:18 164:4,5
164:7 180:7
218:13

**comparing**
58:8 174:16
178:3,4 217:11

**comparison**
126:3 136:10
176:10

**competitor**
42:18,21

**compiling**
149:18

**complete**   24:8

**completed**
196:12,14,23
208:20 246:19
263:15

**completely**
15:6 18:1
253:3

**complex**   80:11
240:17

**complicated**
154:10 243:8

**complied**
218:15

**compliment**
262:24

**component**
180:21 186:8
235:5 248:23

**components**
178:21 223:23
236:8

**composed**
119:12

**composes**
218:17

composition
109:21
compound
65:23
comprehensive
262:23 263:2
comps 220:10
computer 12:4
concept 227:14
227:16 249:18
250:20
concepts 80:20
conceptually
80:22,24
concern 118:12
138:11,12
171:12 185:7
190:8 220:11
252:14
concerned
266:24
concerns
202:24
conclude 80:18
108:13 156:18
263:5
concluded
140:4 228:20
272:15
conclusion
18:12 20:4
39:13 108:15
162:24 163:5
163:16
conclusions
60:23 94:1,3
99:3 115:19

121:4,6 172:8
172:8 262:16
263:17,21,25
264:22
conclusively
82:3
condensed
170:17
condition
18:23 69:7,15
70:1 88:8
conditions
16:6 37:1
101:23 171:17
171:21 253:3
conducive
17:20
conduct 62:8
149:3,23
150:17 185:10
conducted
144:24 148:3
224:7 228:1
237:10
confer 267:16
267:23
conferred
260:15
confirm 21:20
24:20 30:7,23
31:14 32:7,23
33:15 34:8
74:6,15 88:1
116:2
confirmation
2:1 48:7
115:15,18

121:21 217:1
228:12 251:25
259:8 261:24
262:1,2,12
265:14 268:21
271:15 272:4
confirmed 10:3
31:1,17 32:10
32:25 33:17
34:11 223:17
conflict 215:16
conflicts 60:20
conglomerate
227:11
congress 162:8
connect 144:3
229:10
connected 16:9
connection
269:9
consequences
18:9
conservatism
178:8 190:4
consider 57:25
171:11 187:9
194:24 227:20
232:7 235:17
235:20,22
246:14,18
252:13 253:7
254:17 264:23
271:21
consideration
76:7
considered
254:16

considering
162:18
consistent
100:12 226:20
226:22 250:8
consists 223:23
268:21
consolidated
166:2,13
168:16,25
169:1,12,19
constant 95:14
192:7
constitute
221:2
construction
186:22
consumer
266:5
consummated
223:17
contain 14:7
contained
122:19 137:10
contains 13:20
132:9,15
164:24
contents 155:1
context 36:14
71:24 81:15
98:4,16 99:13
107:21 257:16
continue 58:19
266:4
continues 9:14
38:15 184:17

**continuing**
202:22 251:10
268:21
**contradictory**
48:12
**control** 62:8
103:22 195:2,2
195:3 196:17
**controlled**
14:25
**controller**
155:20
**convenient**
261:2
**conversely**
41:17
**conversion**
130:2,25 132:5
132:25 133:8
**converted**
223:18
**converts**
117:20
**convict** 240:7
**convince**
266:19
**coordinated**
19:17
**copies** 7:14
215:25 216:6
217:20
**copy** 7:16,22
20:25 21:16
45:13,21 46:3
87:15 116:4
117:2 217:23
218:2 271:19

271:19
**cornell** 4:6
268:20,25
269:4
**correct** 25:11
25:21 26:13
30:12 35:2
42:25 43:15,16
44:7 46:10
47:20 56:12
59:5,11,24
65:10 70:7
73:3 74:19
77:6,17 80:13
80:14,17 84:14
84:15 85:2,24
89:15 92:20,21
97:20,25 106:7
106:8 108:9
109:2,16,18,19
127:1 128:2,5
128:15 133:13
133:14 135:1
135:14 141:21
146:2,23 147:2
147:16,21
148:23,24
150:4,9 151:10
155:2,3 159:19
159:19 161:20
161:21 162:12
163:10 164:5
166:19 167:8,9
170:2,3,8,12
170:14,22,22
171:15 173:3
174:23 175:11

176:11,12
198:15 212:19
216:24 217:1,5
217:9,10,12
218:11,12,15
218:23,25
219:1,12,19,20
219:22 221:12
222:4,5,7
224:2,25 226:1
227:7 229:14
230:3,7,18
231:2,3,7,16
231:19,23
235:6,7,9,21
235:23 236:15
237:11 238:2,6
238:16 239:18
243:4 244:5,6
244:24 245:5,9
245:10,12,16
245:21 246:6
247:8,9,11
248:22 250:12
250:20 251:6
251:14 253:4
253:12 254:18
254:22,24
255:1,2,4,9,19
256:13 260:7
262:5
**corrected**
28:21
**correctly**
184:25 228:19
**correlate** 95:23

**correlated**
107:9
**correlation**
76:5
**cost** 106:13
107:1,21
182:24 183:8
191:10 210:17
211:5,24
212:15
**costs** 71:24
106:10 115:8
118:21 182:12
183:1 184:1
186:21,22,22
187:20,24,25
191:11,12
211:15,17
212:7,10
223:15
**couldn't**
118:25 155:10
200:4,21
**counsel** 10:3
45:24 46:4
87:10,17 159:8
160:4,5 216:1
216:6 218:9
**counter** 38:16
164:23 263:21
**country** 273:21
**counts** 195:1
**couple** 116:11
116:18 166:4
183:10 186:5
194:13 195:5
196:4 206:8,9

| | | | |
|---|---|---|---|
| 215:22 239:20 | 44:17 45:3,9 | 87:20 88:11,15 | 130:5,14,20,23 |
| 248:11 258:5 | 45:16,19,22 | 88:23 89:5,8 | 131:3,12 |
| 265:13 | 46:2,8,11,22 | 89:24 90:13,16 | 132:11,13 |
| **coupons** | 47:9,14,18,21 | 90:18,25 92:4 | 133:5,10,12,15 |
| 118:20 | 47:25 48:14,19 | 92:8,12,14,16 | 133:21,25 |
| **course** 49:3 | 48:24 49:9,14 | 93:11,14,23 | 134:4,7,9,14 |
| 87:13 96:4 | 49:22 50:1,7,9 | 94:1,19,24 | 134:18,23 |
| 179:24 215:14 | 50:11,21,23 | 95:1 96:1 97:9 | 135:3,17,20 |
| 216:13 222:20 | 51:4,9,12,21 | 97:15 98:6,8 | 136:1,6,15,22 |
| **court** 1:1,12 | 51:25 52:15,21 | 98:11,14,20,24 | 137:2,9,19,22 |
| 7:3,20,21,23 | 53:11,16,21,25 | 99:3,25 100:13 | 138:2,4,12,18 |
| 8:1,4,13 9:11 | 54:5,21 55:18 | 101:9 102:3,6 | 138:20 139:15 |
| 9:13,24 10:7 | 56:6,13 57:1,4 | 103:3 105:7,18 | 139:20,24 |
| 10:10,15,17,21 | 57:18 58:12 | 105:25 106:20 | 140:1,3,7,14 |
| 10:25 11:3,4,6 | 59:7,16 60:4,6 | 107:13,22 | 140:18,21,23 |
| 12:1,22 13:23 | 60:10,13 61:3 | 108:18 109:4,9 | 141:1,3,7,15 |
| 15:10,13,21 | 64:7,13,16 | 109:12,14 | 141:20,23 |
| 18:21 20:14,15 | 65:19,22,25 | 110:4,9,12,14 | 142:1,4,9,12 |
| 20:20,23 21:1 | 66:5,9,11 | 110:23 111:4,9 | 142:14,17,25 |
| 21:5,9,16,19 | 67:16,22 68:9 | 111:17,21,25 | 143:4,6,9,11 |
| 22:1,4,9,15,18 | 68:12,19 69:4 | 112:14,17,21 | 143:16,18,21 |
| 22:23 23:3,20 | 69:18,21 71:10 | 112:25 113:2,9 | 143:24 144:2,4 |
| 24:8 25:10,12 | 71:13,16,19,21 | 113:13,16,20 | 144:7,15,17 |
| 25:17,20 26:3 | 72:2,7,17,19 | 113:22,24 | 145:5,15,18 |
| 26:6,11,14,19 | 73:5,8,18 74:4 | 114:1,3,9 | 146:9,19 147:6 |
| 27:2,8 28:13 | 74:10,22,24 | 115:21 116:11 | 147:9,14,23 |
| 29:3,10,18 | 75:2,6,11,17 | 116:12,15,19 | 148:1,7,9,13 |
| 30:11,14 31:4 | 75:22 77:11,15 | 117:11 121:11 | 148:16,19 |
| 31:21 32:12 | 78:21 79:8,11 | 122:8,12,21 | 149:5,11 |
| 33:3,6,20 | 79:13,18,20,25 | 123:1 124:11 | 150:16,19 |
| 34:14,20,22 | 80:3,6 81:3,12 | 124:14,17,20 | 151:3,11,18,21 |
| 35:3 36:2,4,7 | 81:16,21,25 | 125:4,13,17,19 | 152:5,7,12,16 |
| 36:19 38:4,8 | 82:8,10,14 | 125:22 126:8 | 152:25 153:9 |
| 38:14,23 39:10 | 83:6,10,12,18 | 126:17 127:3 | 153:13,21 |
| 40:25 41:4 | 83:22 84:5,7 | 127:11,18 | 154:2,7,10,13 |
| 42:7,10 43:7 | 86:2,9,15 87:6 | 128:9,13,16,24 | 154:16,20 |
| 43:13,17,24 | 87:8,9,10,15 | 129:6,13,24 | 156:9,15 |

| | | | |
|---|---|---|---|
| 157:14,18,21 | 210:19 213:8 | 267:25 268:6 | **creation** 202:4 |
| 158:6,10,22 | 214:1,6,10,20 | 268:12,15,18 | **credit** 12:13 |
| 159:5,7 160:11 | 215:2,14,15,17 | 268:24 269:2,8 | 80:12 |
| 160:17,21,25 | 215:19,21,23 | 269:11,12,24 | **creditor** 57:15 |
| 161:2,6,9,12 | 215:25 216:3,6 | 270:3,5,9,12 | 80:5 111:24 |
| 162:4,7,13,24 | 216:9,12,14,17 | 270:13,14,16 | 140:13 141:2 |
| 163:6,17 164:8 | 217:23 222:1 | 270:23 271:1 | 143:15 144:12 |
| 165:2,6,12,16 | 222:13,17,21 | 271:21,23,25 | 160:1 204:14 |
| 165:18 167:3 | 223:1,5 224:18 | 272:3,9,14 | 204:18 205:7,8 |
| 167:25 168:6 | 226:6 228:4,7 | **court's** 15:23 | 205:22 214:9 |
| 169:9,11,18,23 | 229:1,23 230:9 | 142:25 270:11 | 215:8 223:20 |
| 172:13,17,20 | 232:25 233:6 | **courtroom** | 230:1,6,6,15 |
| 172:24 173:4 | 233:11,13,17 | 42:8,11 51:1 | 230:18 231:6 |
| 173:20 174:1 | 233:25 236:11 | 52:1 112:18 | 231:22 232:8 |
| 174:21,24 | 236:25 237:13 | 124:1 130:11 | 251:1 |
| 175:7,7,13,16 | 237:16 240:2,4 | 166:1 177:12 | **creditors** 3:5 |
| 175:19,25 | 240:9 241:14 | 214:23 | 5:1 7:7 44:14 |
| 178:10,17 | 241:18,21 | **courts** 268:1 | 65:14 82:24 |
| 181:12 182:8 | 243:13,15,21 | **cover** 18:5 19:2 | 110:6,18 112:9 |
| 182:12,15,19 | 245:24 246:12 | 19:6,20 70:13 | 120:23 123:11 |
| 183:16,24 | 246:22 251:3 | 70:17 | 123:20 126:12 |
| 184:4,18 189:5 | 251:15 254:1 | **covered** 198:4 | 126:14 134:21 |
| 189:22 190:6 | 255:12 256:17 | **coverers** 19:11 | 144:13 156:4,7 |
| 190:11 192:19 | 256:22 258:2,4 | **covers** 153:5 | 156:23 159:11 |
| 193:2,5,8,11 | 258:7,14,16,19 | **cpa** 114:22 | 159:11,14,14 |
| 193:14 197:24 | 259:1,9,14,16 | **cr** 7:13 | 204:20,24,25 |
| 198:20 199:10 | 259:19,20 | **crazy** 55:22 | 205:5,9 217:4 |
| 199:13,25 | 260:4,10,15,18 | **create** 9:1 | 217:7,8,12 |
| 200:4,16,21 | 261:1,6,9,12 | 65:12 97:25 | 218:14 220:25 |
| 201:1,10,18 | 261:15,18,20 | 109:8 | 221:15 225:3 |
| 202:2,7,13 | 262:3,7,15,22 | **created** 49:12 | 228:3,11 |
| 203:2,14,17,20 | 263:1,7,11,14 | 49:19 60:19 | 229:13,19 |
| 205:12 206:2 | 264:3,14,18,24 | 109:16 | 231:10 234:23 |
| 206:14,18,25 | 265:5,8,12,17 | **creates** 19:7 | 242:2,6,13,16 |
| 207:4,8,25 | 266:3,8,12,15 | 70:18 | 242:20,21 |
| 208:7 209:6,17 | 267:1,3,7,9,12 | **creating** | 243:2 245:5,19 |
| 209:21 210:1,9 | 267:13,21,24 | 155:17 190:10 | 245:20 246:4,9 |

246:15,18
248:9 250:18
253:21,22
259:18
**creditors'**
197:10
**credits** 186:19
**criteria** 179:25
180:4,7 189:9
**cross** 6:3 10:1
23:21 26:22
42:8,11,14
53:22 54:2
60:11 80:3
102:6 111:6,18
111:22 112:15
125:13,17,25
140:6,8,11,12
142:18 143:2
143:13 144:10
144:14 148:10
173:23 206:15
206:22 207:1
214:3,8,22
233:24 240:10
241:18
**crosstalk** 154:9
**crypto** 16:15
16:18 25:2
57:25 76:15
80:21 81:7,7
94:7 105:13
150:13,13
153:3,19 155:1
167:18 178:19
188:11 194:14
204:4,11

208:11 211:1,2
215:13 219:6,7
219:7 224:9,15
224:17,23
225:2 235:9,12
236:23 240:20
242:9,10,17,20
242:25 243:1,2
243:3,7 244:18
245:9 246:4
247:6 248:16
248:18,18
250:21 252:4
255:21
**cryptocurren...**
58:15 200:12
200:19,24
**cryptocurrency**
80:20 99:13
120:24 130:2
130:25 132:5
132:25 133:8,9
176:24 181:20
182:21 240:22
244:8,9 245:7
255:18 256:7
**cryptos** 247:5
**current** 11:11
139:11 184:10
202:9,16
266:25 267:4
**currently**
127:13 156:5
175:11 192:17
192:25
**cushion** 192:8
192:16,17,24

193:1
**custody** 45:8
49:12 52:12,18
57:10,13,14
122:16 126:19
126:20,23
127:5,8,15,23
128:1,8 129:3
129:9,9,16,16
129:19,20
132:22 134:25
135:6,13,20,21
136:3,11,11
138:5,22 139:3
**customer** 92:9
159:12,13
**customers**
14:25 17:5,7
17:10,12,23
194:14
**cut** 144:18
**cutting** 115:8
136:17 143:18
143:21
**cycle** 19:8

**d**

**d** 6:1 7:1
**daily** 95:11,13
99:22 264:14
**daniel** 5:5
111:7 141:13
**dark** 11:21
123:14 125:11
**data** 12:6
18:11 19:18
27:23 28:3,6,8
28:24 29:8,12

29:14 30:3,6,8
30:20,20,22,24
31:13 32:6,22
32:23 33:14,15
34:2,5,7,9
39:15,18 72:12
80:16 82:19,22
84:12,25 85:4
85:9,15,18
86:5,7,7,25
87:24,25 88:1
88:2,4,9,12
90:3,7 91:8,12
91:13,16,21,23
94:22 99:10
101:11 102:21
102:24 106:23
112:11 149:18
155:21 180:19
185:23 195:23
195:24 203:8
203:10 205:24
214:18
**date** 14:9,12
15:9 36:9,21
38:3,4,10,16
39:15 43:15
44:1 46:13
52:7 58:4,7,23
59:12 60:23
61:10 65:7
75:6,7 76:13
77:2 79:7
81:11 83:2,4
90:11 91:25
93:15 94:6
96:15 111:13

126:22 128:13
130:2,25 132:5
132:25 133:7,9
150:14 156:4
179:4 234:9
239:12 264:10
266:25 273:25
**dated** 52:6
131:25
**davis** 9:25
45:22 60:12,13
60:14,15,17
61:4 63:4 64:8
64:13,15,18,20
65:19,21,24
66:1,2,6,14
67:17,23 68:10
68:12,15,16,19
68:20,24 69:5
69:20,23,24
71:8,11,13,14
71:16,18,20,22
72:3,4,14,22
72:23 73:6,10
73:11,19 74:5
74:13,14,23,25
75:2,7,9,17,18
75:23,25 76:1
76:22 77:5,13
77:14,16,25
78:21,22 79:8
79:10,12
140:12,12,14
141:4 142:5,20
143:2,3,4,5,8,9
143:10,12,16
143:17,18,20

143:22,25
144:1,3,6,8,15
144:16,17,19
145:6,17,20,22
145:24 146:11
146:13,20
147:10,16,18
148:2,8,12,14
**day** 43:5,10,23
44:7 54:11
55:3 56:24
58:21 76:20,24
120:22 127:14
171:20 216:19
225:4,7 236:7
264:17 266:11
**days** 92:24
93:3 97:13
128:22 135:24
136:3 196:4
264:5
**de** 5:4 37:25
39:14 44:2
**deactivation**
126:22 127:14
130:1,25 132:4
132:21,24
133:7,9
**deadline**
260:22 262:3
264:12,20
269:16 271:13
272:11
**deal** 12:20
171:10 186:18
245:4 246:7

**dealing** 93:4
235:9
**deals** 98:24
**deanna** 51:9
130:11 161:7
**debt** 62:15
248:18 252:21
**debtholders**
159:14
**debtor** 38:5,17
38:20 112:23
114:17 152:17
152:17 158:1
160:7 169:13
169:19 186:9
205:22,24
207:6 216:9,11
258:4,7 261:22
265:19 272:8
**debtor's** 120:4
125:3 148:22
232:12,13
238:1 244:16
245:3 254:4
**debtors** 1:9
3:14 7:18
24:10 38:15
45:20,24 83:2
83:19 113:7
114:25 117:5
121:22 131:10
144:21 149:1
149:14,15,16
150:12 155:5
155:13,16
159:9 171:11
180:22 217:16

218:15 220:23
223:14,19
227:9 228:10
233:15 239:2
245:2,15 246:9
252:20 256:24
258:11,22,24
259:13 260:21
261:4 269:21
**debtor's**
160:10 166:1
169:1 205:23
206:10
**dec** 210:5
**december** 8:19
54:19 146:2,7
146:23 147:1
147:21 171:14
171:18,23
252:25 253:2
**decide** 203:15
229:16 270:17
**decided** 219:11
266:16
**deciding** 43:9
**decision** 43:9
43:22
**decisions**
229:16
**declaration**
13:11,13,16
18:20 20:6,11
35:9,16,19,20
40:23 50:2,16
52:2 60:25
66:21 80:10
82:5 115:20,23

116:4,7 121:21
122:10,11,19
123:25 150:2
157:25 160:23
166:12 167:6
195:23 199:3
213:2 216:25
219:25 220:13
222:23 223:8
223:12 231:6
237:7,19
247:10 248:21
249:2,3
**declared** 16:19
**decline** 38:3
**declined**
270:18
**decrease** 99:18
188:20 192:15
192:16
**decreased**
192:24
**decreases**
100:11
**deduction**
167:18 187:16
219:4
**deductions**
182:9 185:3
**deemed** 181:6
186:23
**deeper** 237:3
**default** 242:8
244:7
**defendant** 9:12
9:14

**defendants**
112:23
**deficiency**
255:24
**define** 47:16
**definitely**
182:25 249:4
259:19
**definition**
78:18 162:8
**definitive**
119:1
**definitively**
66:24
**deflated** 65:15
**degree** 12:3,4
18:8 19:22
54:13 178:7
190:4 240:23
**delay** 51:22
**deliberately**
70:20
**demand** 13:1
18:8
**demonstrate**
79:3
**demonstrates**
93:21
**demonstration**
209:11,12
**demonstrative**
116:21 117:8,9
122:18,24
124:14 157:2
174:17,18
181:15 182:17
184:5 217:16

243:11 254:3,5
254:8,9 257:5
257:6
**denied** 272:10
**denominated**
148:4
**denominator**
125:16
**department**
4:1
**depend** 79:7
240:22 265:1
**depending**
41:19
**depends** 243:5
**deployed**
138:10
**deposit** 57:10
138:5,6,8
**deposition**
269:22
**depositions**
269:24
**depositor**
160:2
**depressed**
234:8
**deputy** 130:11
**derivation**
184:24
**derivative** 81:7
81:18 100:25
**derivatives**
12:16 80:11,20
80:21,23 81:22
85:22 89:19
90:4 91:7,13

91:16 101:14
101:17 103:16
103:21 104:1,1
104:11,16,21
**derive** 183:22
**derived** 181:16
185:25
**describe** 41:9
67:18 118:7
148:25 149:5
**described**
21:11 57:19
228:13
**designed** 41:12
41:22 194:21
**desired** 102:18
102:19
**desk** 105:2,3
105:10,22,24
108:12,22
**despite** 256:11
**detail** 83:8,25
84:1,3,19,22
84:24 85:2,5
86:22 99:6
239:1
**detailed** 84:20
**details** 57:9
187:21 188:3
**determination**
138:24 149:20
236:9
**determinations**
242:13
**determinative**
257:23

determine 56:1
  56:3,11,16
  59:18,21 125:5
  131:10 178:24
  235:11,24
  259:12
determined
  153:4 170:13
determining
  56:9 148:22
deutsche 12:13
  80:12
develop 234:7
  234:16
diagram
  122:21
didn't 98:6,8
  103:25 110:22
  134:7 141:20
  145:16 153:21
  154:13,15
  159:25 160:25
  168:23 171:11
  176:18 179:12
  185:21 189:17
  192:22 207:9
difference 78:4
  100:5 118:8
  145:25 146:4
  146:21,24,25
  163:14 210:13
  210:16,17,21
  210:22,22
  255:4 257:17
  257:23
differences
  226:23

different 12:14
  14:23 15:17
  17:19 70:8
  78:25 90:6
  99:19 123:22
  136:7 143:23
  159:10,11,11
  159:24 160:2,6
  161:24 163:22
  163:23 169:16
  171:17,20
  172:1 174:16
  180:1 197:8
  209:24 212:2
  235:12 241:16
  253:3,5,6
  255:9 259:25
  260:1 265:25
difficult 95:22
  197:12,19
  267:20
difficulty
  81:12
dig 240:4
dilute 110:6
dilution 110:7
dimitry 42:9
  125:20 270:7
direct 6:3 11:7
  13:6 20:7
  24:14,23 35:5
  40:24 114:6
  128:25 148:10
  148:11 168:22
  201:19 214:21
  218:9 241:15
  262:4 265:10

266:11
direction 23:6
  156:3 241:8,9
directionally
  245:14
directly 8:20
  76:10 115:9
  125:9 180:10
  192:13
director
  114:10
directors 63:5
  193:22,24
disagree
  234:11,20
disapproving
  268:8
disclose 61:16
disclosed 61:19
  61:20
disclosure
  117:3 118:19
  129:22,25
  130:18,20
  131:5,16
  153:18 168:5
  172:11,18,22
  173:1,10,11
  195:19 213:12
  213:13,16,21
  219:23 232:12
  232:14 233:8
  233:20 246:25
  249:4
disconnected
  144:8

discount 62:25
  119:4 180:12
  186:1 187:5
  189:1,14,20
  190:3 225:21
  226:18,19,21
  227:14 228:20
  235:15,17,23
  236:18,21
  243:4 245:11
  249:7 250:1,10
  252:9 257:22
discounted
  41:15 185:14
  220:10 225:10
  226:15 235:19
  249:21 250:18
discounting
  37:6 189:2,2,7
  225:16
discounts
  186:20
discovery 72:5
  215:18 269:22
discussed
  16:12 83:8,24
  84:2,22,24
  85:5 86:22
  252:16 255:6
discussing
  27:19
discussion
  15:15 187:14
discussions
  19:15 265:15
  265:19

**dislocated**
12:19,21,23,24
14:18,22 15:6
16:6,7,9 17:20
18:13 39:25
55:16,21 76:11
79:3 94:13,23
99:6 100:7
**dislocating**
16:11
**dislocation**
16:7 93:18,19
94:15,17 95:19
95:25 96:6,7
96:11 97:3
99:17
**disparaged**
263:1
**display**  51:17
**displaying**
174:20
**disposition**
174:16 180:1
**disrupt**  18:7
**distinct**  15:19
**distressed**
204:2
**distributable**
117:15 120:17
120:25 211:22
228:18 229:12
229:18,19
246:17 247:2
254:18,21
255:22
**distribute**
248:9 251:21

252:5
**distributed**
112:6 221:15
221:21 234:24
243:3 249:13
249:14,15
250:22 251:8
255:18
**distribution**
117:14 135:18
172:11,19
173:2 183:3,5
183:6 201:13
211:1,2,3
230:1 231:1,2
231:11 242:8,8
244:17,23
245:8 246:4
250:11 252:6
256:8
**distributions**
112:4,9 120:18
128:21 136:7
182:10 191:25
217:9,11,13
228:2,11
234:23 242:3
248:24 249:6,7
250:18 251:12
251:18,24
252:9,9
**district**  1:2
270:14,16,18
**diverges**  13:4
**divide**  106:12
**divided**  107:2
225:4

**dividing**
199:19
**division**  188:10
**dno**  149:14
**doc**  209:12
213:6
**docket**  7:9 13:9
35:7 40:23
41:3 51:17
57:19 68:22
69:2 82:17
87:8 117:10
136:23 137:1,4
137:11 146:11
156:17 158:1
160:8 166:4,5
166:7,18 167:6
172:22,25
174:22 175:22
194:4 209:14
213:17,19,22
214:2 217:17
232:18,22
254:10 259:4
263:15 271:14
272:11
**docketed**
271:19
**document**  13:9
52:6,11,17,25
53:21,23,25
54:2 61:19,20
77:24 82:7
84:19 85:16,19
88:24 109:7,11
116:2 121:24
122:3 131:25

132:2,3,10
137:1,15,20
138:17 146:15
160:7 161:16
161:23,24
169:4,6,20
172:24 173:11
174:13,19
199:4 206:21
206:23,24
207:3 213:6
233:3,21
238:18,20
240:5,6 260:14
**documents**
49:10 72:8
89:7 130:18
132:15 149:13
151:15,22
156:12 160:18
165:10 166:9
206:25 214:3
**doesn't**  97:1
98:4 108:20,24
128:9 150:19
188:6 197:17
**dogecoin**  67:5
67:6,7,10
**doing**  107:2
140:5 165:22
165:23 177:25
178:1,5 179:14
179:15 185:18
245:1,13
**dollar**  61:7
62:25 105:1,10
106:25 139:18

146:1,22 148:4
150:8 199:18
210:17 244:18
249:10,10,13
249:14 250:8,8
251:13,13
256:15,15
**dollarized**
134:6,12,16,20
139:13
**dollars** 101:6
106:19 120:8
123:8 125:14
167:8 183:15
248:8 250:11
250:21
**don't** 96:11
98:18 100:8
101:4 103:6,24
103:25 104:2
107:16 108:18
110:9 114:2
118:4 124:11
124:24 126:4
127:7,16 128:6
129:23 130:12
133:5 136:15
138:12 145:13
149:2 150:17
150:18 151:11
152:6,16 154:6
154:20 155:3,8
155:12 156:16
157:15 158:23
164:18 166:16
168:13 169:4
170:16 171:24

172:21 173:16
177:10 178:2
181:23 183:7
187:22 188:6
188:11 191:25
192:21 194:2
195:6,22
196:22,24
197:21,22
198:11 201:10
203:14 205:2,6
205:16 207:4
208:10,15
**dotted** 123:10
**double** 166:20
**doubts** 203:12
**dow** 5:3 141:10
141:10 142:6
142:10,21
174:2,3,11,12
174:23 175:2
175:11,17,25
176:1,2 178:11
178:18 181:12
184:19,20,21
189:6,24,25
190:7,13,21
191:22 192:19
192:20 193:2,3
193:5,6,8,10
**downs** 247:21
248:3,5,6,7
**downward**
182:9
**draft** 169:2
**drafted** 194:2

**drafting**
193:23 194:1,5
**dramatically**
147:20
**draw** 94:2,3
99:4 108:15
161:22
**drive** 19:7
194:15,18
211:15
**drivers** 178:23
179:25 180:7
**drives** 70:17
**driving** 19:11
183:1 190:2
**drop** 16:21
**dropping** 9:1
**due** 226:16
**duration** 14:6

**e**

**e** 1:21,21 3:1,1
6:1 7:1,1 63:16
153:25 168:5
213:11,13
273:1
**earlier** 118:7
157:2 166:15
174:5 180:22
198:4 219:17
221:25 222:3
232:13 235:8
239:1 251:17
252:16,24
269:15
**early** 63:9,20
63:24 64:2
95:17 120:6

226:14 247:22
265:8
**earn** 41:18
122:15 162:18
163:2,9 164:5
165:1 250:23
**earning** 41:18
**easement**
197:2
**easements**
196:10
**easier** 194:11
222:16,23
243:8
**easily** 197:7
**easy** 96:5
181:22 194:24
195:1 244:5
**ebitda** 194:11
**ecf** 46:13 47:25
50:25 52:2
57:19 87:15
88:12 132:14
172:20 175:8
175:21
**ecfe** 169:20
**economic**
16:13
**economically**
196:10
**ecosystem**
41:22 67:10
**ecro** 1:25
**editorial** 96:2
**educational**
12:2

effect 14:4
19:17 93:8
effected 47:1
effective 179:4
234:9
effectively
14:16 53:18
efficiently
187:1
effort 19:17
117:24
efh 226:8
eight 82:19,19
82:22 199:11
eighteen 28:4
eip 193:20,23
193:25 194:1
195:19
either 9:7,15
15:16 19:4
154:25 172:2
178:2 191:19
208:22 223:16
224:20 242:7
250:25 252:10
262:18
elect 41:18
244:12,24
elected 205:9
242:17,20
election 172:12
172:19 173:2
242:25 244:7
244:23 245:8
electrify
187:10

electronic
116:3 122:2
elements 11:14
elementus
11:12,13,18
63:19 65:12
80:15 102:18
eliminate
202:23
elizabeth 3:19
ellis 3:13 24:10
113:7 131:14
256:23 258:10
260:20 261:22
269:20 271:11
elon 67:11
else's 154:3
else's 164:15
email 9:7,16
emails 272:7
emanuel 4:10
142:16 215:3
269:6
emergence
182:12,23
191:11 225:3
emergency
130:7,11 194:5
210:14
emerges 37:19
39:6
employed
42:18
employee 92:9
employees 9:6
9:15 110:18,24
193:22 211:6

211:18 266:25
267:4
employment
11:11
enact 208:22
encompasses
162:9
encourage
65:14
ended 196:4
ends 86:18
energize
187:10,23
197:3
energized
187:25 196:17
196:18
energy 118:23
enforced
102:19
engaged 61:18
149:6
engagement
148:25 149:5
204:10
engineering
12:5,5
enormously
99:20,23
enter 49:6 60:1
205:21
entered 164:23
269:13
entering 149:8
enterprise
225:12 235:6
235:14,25

236:1,10
240:16
enters 7:18
entire 16:20
58:24 78:7,13
171:13 233:20
235:5
entirely 67:6
132:12
entities 62:3,5
161:25 183:9
248:10,18,19
251:11
entitled 124:22
270:20
entity 37:19
39:6 63:10
117:24 179:22
212:16 220:11
229:13 256:13
envelope
106:18
envision
170:19
equals 138:7
189:7
equate 119:2
equation 18:2
equity 38:18
38:21 179:19
215:10,12
228:17 243:1,7
248:17 249:16
error 48:11,11
especially
210:15

**essentially**
19:24 170:12
170:13 182:20
**establish** 22:19
**established**
194:8
**estate** 148:23
171:7 182:13
182:24 191:12
210:14 228:6
248:12 253:18
**estimate** 16:4
38:20 119:10
156:24 170:11
171:3 205:3
248:4
**estimated**
170:8 172:1
211:5 212:14
223:15,20
244:13
**estimates**
167:12 182:24
208:25 220:21
221:2,3
**estimation**
212:22,22,25
212:25
**et** 1:7
**ether** 95:15
**ethereum**
75:20 76:3,8
94:9 99:11
148:4 181:22
219:8,9 235:12
240:25 241:4
250:14

**etherscan**
27:23 28:5,8
**evaluation**
44:7 118:10
149:23 229:5
229:10 241:15
**event** 189:9
198:6 223:16
223:17
**events** 93:5
**everybody**
27:8 164:10,12
203:21 259:20
**everybody's**
169:23
**evidence** 9:23
10:6,11,12
20:3,10,12,15
20:16,17 21:10
22:10,19,24
24:5,13 25:13
25:14,23 26:7
26:9 28:12,15
29:17,18,19
30:13,14,15
31:4,5,20,22
31:23 32:12,13
33:2,3,7,8,19
33:20,21 34:13
34:14,15,25
35:1 41:3,3,5,6
49:7 53:22
54:1,3,4 59:6
60:2 83:13
90:19,25 91:2
116:10,12,14
116:16,17

121:12,13
122:6 123:1,2
138:18 156:11
160:19,22
161:1,2 166:16
222:24 233:17
233:20,21,23
241:23 243:10
246:8 247:1
258:24 260:8
261:14 263:19
265:2 269:7
272:5
**exacerbated**
94:15
**exact** 44:6
61:13 65:7
73:13 122:24
156:17 175:5
**exactly** 49:24
87:21 106:22
122:23 123:20
135:19 159:6
**examination**
11:7 23:20,21
24:14 42:14
71:19 102:6
112:17 114:6
125:17,25
127:20 128:18
140:3,12 143:2
143:13 144:10
144:14 148:9
148:10,11
166:15 173:23
189:23 190:19
201:19 206:16

206:22 207:1,2
214:3,6,9,11
214:21 218:9
240:10 241:14
241:18 256:19
**examine** 10:1
23:22 42:8,11
53:23 54:2
60:11 79:15
80:4 93:23,25
111:6,18,22
112:15 140:8
141:18,24
142:18
**examined**
58:24 86:6
87:1 91:21
110:3 141:17
**examiner**
61:17 66:8,9
66:18 140:11
214:22
**examiner's**
66:16
**examining**
100:3
**example** 38:16
41:13 46:11
67:5 88:6
170:20,25
172:12,19
173:2 180:4
199:18 201:7
244:3 265:16
**examples** 67:3
**exceed** 55:2,5,7
59:3 101:2

152:18
**exceeding**
194:12
**exceeds** 128:4
**excel** 21:7 28:3
28:24,25 29:12
29:25 30:3,8
30:20,23 31:10
31:14 32:19
33:11 34:5
88:3 206:10,13
**excellent**
124:16
**except** 138:4
195:3
**excerpt** 136:25
137:10,15
138:2
**excerpts** 132:9
132:15
**excess** 8:20,24
9:9,16,18
74:17 196:12
**exchange**
17:24 70:25
71:3 83:1,3,21
162:9
**exchanges**
80:21,23 81:7
81:8
**excluded** 15:2
57:11
**excludes**
201:24
**excuse** 40:9
48:8 53:6 58:6
139:17 147:6

**excused** 112:18
**executable**
252:19
**execute** 171:9
**executed** 120:9
**executive**
11:12
**exercise** 24:6
225:10
**exhibit** 6:8,9
6:10,12,13,14
6:15,16,17,18
6:19,20,21,22
6:23 7:9,10
9:22 10:10
13:9,18 20:10
20:15 21:11,22
21:22 23:23,25
24:12 25:10,22
26:22,23 29:1
29:13,16,17,19
30:6,15,22,24
31:3,5,13,14
31:19,23 32:7
32:11,13,22
33:1,8,14,18
33:21 34:8,12
34:15 35:7
40:23 41:3,6
45:11,25 46:9
47:24,25 50:20
50:25 52:2
57:16,19 58:25
87:8 109:7,13
113:18 116:14
116:15,17,23
117:1,2,9

118:19 121:9
121:12,12,13
121:23 122:20
122:21,24
123:2 146:9
160:7,10,22
162:7 166:1,13
167:25 168:3,5
168:16,19,23
168:23,25
169:1,2,9,11
169:17,18
174:7 175:8
205:15,16
206:1,5,5,10
206:11,13,19
207:6,9 210:2
213:2,11,13
214:9 219:24
220:13 223:8
232:11,14
233:15 237:6
238:9 241:23
243:9,11,22
257:6 259:21
260:14
**exhibits** 6:7,11
20:12,18 21:11
21:14 22:13
23:19 24:1,19
25:24 26:14
27:13 28:11,15
29:6 34:24,25
34:25 45:15,16
45:23 49:7
117:8 166:3,17
166:18 167:23

172:10,16
174:4,5 205:20
206:14 216:10
216:11 233:19
258:23 260:22
260:23 262:5
**exist** 38:6
**existed** 149:18
**existence** 14:6
**existing** 15:3
**exiting** 149:9
**expect** 40:21
104:19 170:25
270:3,4
**expectation**
38:17
**expected** 212:6
**expedited**
184:2
**expense** 115:7
191:12 248:23
**expenses** 183:3
211:10,10
**experience**
12:8,17,18,20
80:11,12
103:15 178:13
188:11 204:1,2
204:4,8,17
208:10,15,16
227:13 236:23
257:15
**experienced**
101:14 248:7
**expert** 13:17
13:20,24 14:7
18:19 20:5

23:10,15 25:5
25:8 32:9
34:10 60:18,24
66:20 67:24
68:3 72:11
74:25 82:13,15
82:16 92:1,3,6
102:12 104:22
143:14 144:11
146:15 152:23
167:14 185:19
199:2,4 203:12
226:11 269:15
269:22
**expertise**
201:20 227:24
239:10
**experts** 167:13
181:17 190:17
241:16
**explain** 12:11
12:22 14:19
15:13 17:18
18:21 36:19
99:5 115:13
117:12 119:8
119:16 120:13
123:5 126:2
200:14 271:12
**explained**
98:22 189:22
190:11
**explanation**
48:16 69:6,14
69:25 73:24
184:4

**explicit** 19:10
56:22
**explicitly**
108:12
**exploded** 68:6
**expressing**
15:10
**extending**
115:8 253:13
**extensive**
119:21
**extensively**
44:10
**extent** 22:22
43:3 55:13
110:3 260:24
269:11
**external** 16:12
**extra** 92:24
212:17,18,20
**extreme** 93:21
96:16 99:8,13
**extremely** 40:7
70:22 76:15
94:15
**eyeballing**
96:16 99:14

**f**

**f** 1:21 273:1
**facilities**
119:11 180:19
**facility** 196:18
197:3
**facing** 115:2
**fact** 20:1 44:12
54:13 164:14
189:19 190:1

215:14,18
235:13 242:23
245:18 257:19
262:16 263:16
263:21 264:21
264:25 270:19
**factors** 14:23
16:11 37:23
186:5 197:1
216:25 217:2
236:11,12,14
236:16,19
**facts** 226:18
**factual** 158:17
159:3
**fahrenheit**
117:22 118:13
118:14,24
184:11 186:6
186:17 224:14
225:19
**fahrenheit's**
219:10
**fail** 127:13
139:7 179:9
**failed** 171:19
**fails** 179:7
**failures** 197:20
**fair** 80:18 85:6
85:9,13 93:9
97:5,6 103:15
103:18 104:13
105:12,15,22
106:9,11 107:8
111:12 156:25
167:2 173:22
185:1 199:16

222:19
**fairly** 61:11
67:9 94:6
95:14
**fall** 65:1 229:4
**fallen** 16:17
**false** 65:12
**familiar** 22:6
42:3 50:16
57:8,23 66:3
67:9,24 83:17
83:21 144:20
147:3,23 150:7
158:13 173:7,8
188:2 193:19
200:3,7 216:16
242:4,11,12
**family** 64:2
**far** 19:20 22:8
96:11 103:13
111:1 125:12
140:8 142:5
157:6 177:24
191:15 262:9
262:18
**favor** 196:5
**features** 41:21
256:11
**federal** 10:6
**fee** 184:2
**feel** 56:8 178:6
236:2 239:10
247:18
**feels** 37:21
**fees** 183:9,21
211:11,13,19

felt  180:25
fema  130:7,10
ferarro  238:25
ferrara  187:20
ferrara's
  187:14
ferraro's  24:13
  26:10
fiat  208:24
fifty  183:23,23
fight  103:17,22
figure  61:7
  73:15 92:2,8
  92:13 93:14
  95:10 97:19
  99:10 100:2
  104:23 105:8
  106:9 150:8,10
  199:6 209:24
  224:14 248:9
figured  217:21
file  29:9 206:25
  214:2
filed  7:9 61:20
  117:10 119:14
  121:21 131:8
  131:16,19,24
  132:14 136:23
  137:1 144:20
  166:18 194:4
  200:9 206:20
  215:7 217:17
  233:20 263:15
  266:10 271:14
  272:11
files  29:9

filing  50:24
  56:24 59:1,5
  115:10 128:11
  137:11
final  41:8
  66:16 149:22
  153:16 156:18
  203:6 238:21
finalizing
  251:22
finally  18:19
  33:23 183:21
  191:18 248:13
finance  12:3
  155:21
financial  11:15
  11:23 12:9,18
  37:4 58:1,5,9
  65:16 76:17
  80:13 115:1
  149:4,12,15
  155:8 177:5
  237:25 238:4,7
  238:9,19,23
  240:14
financially
  59:19,22
find  11:23
  47:11 50:24
  95:5 149:19
  167:1 230:16
finding  59:9
  263:25
findings
  190:24 262:15
  263:16,21
  264:21,25

265:6
fine  51:21
  109:14 199:13
  209:16 265:8
finer  160:4
finish  23:16
  55:19,20 96:13
  110:4 129:13
  144:14 192:19
  193:2,5
finished  22:2
  58:13 64:16
  148:12,13,15
  165:15 173:22
fire  170:13,17
firm  149:2,3
  177:1 180:11
  188:6 189:16
firms  16:18
  177:11 178:2
  178:20 181:19
first  7:7 13:11
  13:13,16,23
  14:11 17:21
  18:20 20:6,10
  21:19,23 22:5
  35:20 50:24
  53:21 78:23
  79:7 88:11
  89:11 92:6
  97:23 114:23
  116:23 117:20
  119:6 128:22
  149:2 152:15
  159:5,6 164:20
  166:21 168:4
  176:18 181:15

186:9,14
  188:19 204:7
  204:10 218:19
  220:22 232:16
  235:8 238:18
  251:2 253:18
  254:13 255:24
fit  37:9 124:4
  268:3,4
five  27:2
  183:12 211:9
  238:16 239:8
  239:22 247:11
  247:12,14,17
  247:20 248:12
  248:25 249:13
  251:5 253:11
  253:16,19
fix  143:24
fixed  12:14
  119:10 123:15
  124:25
flag  261:7,13
flash  116:22
flaw  190:14
flawed  189:12
flip  95:7 116:1
  222:22 254:3
floating  18:3
flooded  120:1
floor  4:13
flow  220:10
  249:21
fluctuations
  95:18
focus  11:20,24
  112:10 118:5

120:12
**focused**  114:16
115:5
**folks**  139:2
195:16 196:10
211:15 229:15
247:19
**folks'**  179:19
179:19
**follow**  15:23
75:4 126:4
127:7 128:6
153:21 154:11
168:24 180:3
181:4 189:15
192:23 209:21
230:19 269:17
**followed**
202:14
**following**
24:13 55:12
56:1,4 75:24
77:10 142:20
165:10 168:19
223:23 234:8
258:21
**footnote**  27:22
28:9,17 29:14
29:24 30:9,19
30:25 31:10,15
31:18 32:3,18
33:10 34:1
**footnotes**
26:20
**footprint**
179:14

**forced**  70:16
**forecast**
167:22 168:12
185:9 187:13
250:5 251:11
**forecasting**
115:6
**foregoing**
273:3
**forensics**  11:14
**forget**  195:21
**forgive**  155:15
156:16
**form**  39:1
44:16 105:13
151:22 159:25
252:20 255:11
**format**  101:21
155:20
**formation**
221:14
**formed**  65:3
224:24 229:13
**former**  7:17
109:21,21
110:1
**forms**  105:13
**formulating**
220:24
**forth**  13:24
40:23
**forty**  68:20
205:17,18
**forward**  156:7
194:13 197:2
**found**  57:13
80:15 103:11

118:2 190:1
270:19
**foundation**
22:20 49:9
60:6 89:23
91:1 110:21
147:12
**founder**  65:8,9
**four**  53:7
119:12 196:7
210:8 236:7
247:19 248:12
248:12 253:15
**fourth**  35:10
233:9
**frame**  211:9
212:2 246:1
248:15 253:2
**frankly**  262:12
**free**  18:3 60:19
118:22 258:12
**freely**  16:24
23:2
**freeze**  31:11
46:12 58:4
**fried**  62:3,12
62:14
**friends**  64:2
**frishberg**  5:5
111:7,8,9,10
111:15,17
141:13,13,15
141:18,21,22
141:23 142:6
142:21 197:25
198:1,3,20

**front**  13:7 23:7
23:8 24:24
27:14 35:6
46:15 50:12
129:23 130:18
130:21 132:2,3
136:24 137:2
163:12 166:24
166:25 169:4
169:24 172:24
175:8 199:5
203:14 206:6
**froze**  52:9
**ftp**  7:15 29:9
30:7,22 32:22
34:8 260:1
**ftx**  42:24 61:23
62:16,19 67:19
68:6 72:9
82:20,22,25
83:2,3,17,19
84:13 86:5
87:24 88:2,5
89:14 90:3,7
91:7,12 100:20
101:1 145:9
171:18 203:8
**ftx.org**  72:6
**full**  16:23 85:4
86:7,25 153:18
154:25 157:12
260:2
**fully**  67:9
112:7 187:10
188:2
**function**  39:4,6
41:12,22

**functioning**
37:1
**fund** 4:11,12
8:11,17 187:16
215:4
**funding** 47:2
48:9 71:23
89:11,14,18,21
90:4 91:6,18
182:13 184:9
255:22 256:1
256:12
**fundraise** 61:9
**fundraising**
43:1,2 65:3
**funds** 11:20
46:12 47:6,18
48:17,21 49:2
**funny** 99:15
**further** 60:8
83:8,25 84:3
84:22,22 85:5
86:22 94:5
164:19 234:13
**future** 15:4
37:5 118:21
186:19 239:9

**g**

**g** 7:1
**gain** 230:17
**gains** 200:10
200:20,25
201:1,15
**galka** 6:4 7:8
10:20,22 11:7
11:9,11 12:1,8
13:6,10,16

15:23 16:23
17:14 18:11,19
19:13 20:5,11
21:3,9 23:6,13
24:20,23 25:4
25:16 27:9,12
28:17 29:12,21
30:17 31:7,25
32:15 33:10,23
34:17 35:5,9
35:15,18 39:13
40:10,22 41:8
42:5,14,16
44:10 46:6
48:22 50:17,19
52:6,23 53:3,8
53:13 54:8
55:1,17,25
56:10 57:23
60:8,16 64:16
66:20,20,25
67:18 68:17
69:6,14,25
72:10,10,24
74:6 75:3,4,19
76:2,11 79:17
80:1,4,8 83:13
87:9 89:12,20
91:6 92:3,18
93:12 100:15
124:1 143:14
144:11 145:14
145:17,25
146:21,25
147:11,19
198:23 199:16
203:12

**galka's** 20:15
24:18 92:1
125:1
**galka's** 199:4
199:23 203:7
**gamestop**
55:21 70:11
99:8,20
**gap** 192:1,8
**gather** 153:10
**gears** 178:12
**general** 42:1
88:3 103:19
127:23 128:1
129:20 148:18
159:13 160:1
230:15 244:4
**generally** 18:7
42:2 91:21
168:10 173:11
193:21 201:4
238:22 239:7
241:7 242:1,15
**generate** 178:4
189:3 212:17
**generating**
213:4
**generation**
212:6
**generically**
103:19
**getting** 36:24
90:25 115:9
125:12 155:19
160:11 164:22
194:24 244:18
245:4 249:20

250:2,2 264:14
264:15 266:18
**give** 7:20 10:25
36:14 45:21
50:9 57:1 64:9
81:14,14 82:9
98:16 102:8
113:13 114:12
131:20 135:15
135:17,18
139:1 143:3
153:11 154:25
158:10 161:7
166:25 224:15
244:14 261:2
264:10 267:8,9
267:11
**given** 135:21
139:11 156:4
182:20 183:17
189:11 234:17
**gives** 244:23
**giving** 71:3,16
102:4 129:17
129:18,20
157:17 214:4
225:5 234:21
240:5
**glad** 259:3
**glenn** 1:22
**glitch** 72:10
74:8
**go** 8:4 15:21
19:1 22:24
24:1 25:21
34:22 35:3
46:2 48:1

| | | | |
|---|---|---|---|
| 50:13 55:14,15 | 215:21 216:14 | 164:8,11 165:2 | **grab**   130:4 |
| 55:23 69:4,10 | 216:17 217:12 | 165:25 166:22 | **grace**   3:21 |
| 70:16,22 71:9 | 218:5 220:18 | 168:22 171:12 | 113:6 256:23 |
| 71:10,21 74:12 | 223:10 228:3 | 172:10 178:12 | **graduated** |
| 80:6 81:16 | 228:11,22 | 184:4 185:6 | 12:3 |
| 82:5 83:22 | 232:11,20 | 186:10,11,13 | **graph**   96:25 |
| 85:17,17 86:15 | 238:13 243:5 | 195:17 197:5 | 97:12,19 |
| 87:17,19 91:25 | 246:1,3,20 | 199:1,2 207:17 | 108:14 |
| 92:14 96:18,19 | 247:21,22 | 209:6 211:3 | **graphic**   95:21 |
| 96:25 97:18 | 248:8 252:20 | 214:23,25 | **graphical** |
| 100:13 102:12 | 253:14 254:1 | 216:4 219:13 | 101:21 |
| 104:17,22 | 268:18 | 220:11,16 | **grasping**   39:9 |
| 111:9,25 113:2 | **goal**   179:8 | 225:2,7 230:20 | **great**   12:20 |
| 114:3 117:24 | **goals**   194:16 | 231:18 239:3,7 | 142:13 186:12 |
| 118:4 125:9,22 | **goes**   11:23 | 245:25 248:12 | 261:6 264:2 |
| 129:6 130:1 | 73:21 96:14 | 251:1,23 | **greater**   201:8 |
| 131:1 142:19 | 134:11 164:11 | 252:14 256:3,3 | 211:9 |
| 143:4 146:19 | 164:16 179:10 | 256:5 260:4 | **green**   1:13 |
| 148:19 150:19 | 192:1 223:24 | 264:7,9 265:22 | **group**   21:23 |
| 153:13 154:13 | 241:4,5 | 266:1 268:13 | 120:22 122:13 |
| 154:20 155:4 | **going**   7:8 16:21 | **good**   10:16,17 | 122:15,15,16 |
| 157:8 160:17 | 18:9 21:24 | 11:9,10 42:16 | 122:17,17 |
| 161:3 162:14 | 22:3,25,25,25 | 42:17 60:16,17 | 191:10 225:20 |
| 164:17 165:6,7 | 23:16,20 25:17 | 75:15 80:8,9 | **groups**   21:20 |
| 165:13 167:3 | 29:5 37:22 | 113:6 114:8 | **grow**   95:18 |
| 167:22 169:24 | 38:5 45:3,25 | 124:23 154:19 | **growth**   249:25 |
| 173:4 174:4 | 54:6 69:19 | 157:19,24 | **guarantee** |
| 175:13,17,25 | 75:22 82:6 | 174:3 176:3 | 252:3 |
| 184:18 185:25 | 84:18 88:23 | 186:12,14 | **guarantees** |
| 186:14,19 | 96:1 99:14 | 193:19 203:21 | 234:22 |
| 190:20 191:24 | 100:6 102:14 | 203:23 216:22 | **guess**   24:17 |
| 193:8,17 | 110:11 112:22 | 218:5 261:21 | 38:17 174:5 |
| 196:18 198:8 | 118:12 127:20 | **government** | 256:1 268:12 |
| 199:6,14 207:2 | 130:5 140:4,5 | 11:15,19 13:2 | 271:6,7 |
| 208:23 210:9 | 142:19 143:24 | 58:10 | **guidance** |
| 211:3 213:5,10 | 144:18 151:4 | **governmental** | 102:16 103:11 |
| 214:24 215:1 | 154:3,7 156:7 | 161:25 | 258:22 |

guide  187:4
guided  159:8
160:4
guilty  7:18

**h**

haircut  246:5
half  183:18
196:6
hallmarks  99:7
hand  10:23
45:25 113:10
215:23 225:7
handle  262:13
hands  179:19
179:20
hang  166:8
168:4 169:15
happen  55:22
70:8,11 181:5
264:7,7
happened
195:7,9 270:13
271:12
happening
11:17 19:22
249:22
happens  69:11
70:4,6 71:6
124:24 267:25
268:1
happy  155:14
203:25 259:25
260:8 267:5,12
hard  42:1
75:23 207:25
harvest  179:18
183:13 201:15

harvesting
200:3,7,15
hash  214:15,15
239:9
hashing  195:21
haven't  147:8
197:16 198:7
hawaii  128:21
128:25
head  54:18
75:16 77:1,4
104:8
headed  172:17
heading  173:1
headphones
143:20,22
healthy  178:7
hear  112:22
130:10 136:15
136:16 143:6,7
143:9,10,11
144:4,7 145:16
155:10 157:19
176:18 179:12
184:25 193:3
200:4,21 206:2
251:19,20
264:9 271:15
heard  41:8
57:8 111:22
112:15 118:6
118:11 138:25
140:8 141:5
180:24 184:22
190:23 198:7
201:3 228:19
232:13 260:19

263:19 265:7
hearing  2:1,1
83:16 115:12
115:14,15
117:10 122:8
164:11,12
201:5 203:19
206:22 261:25
262:1,12
266:16 268:21
269:6
heavily  69:9
176:23
heavy  25:1
103:16 246:4
hedge  104:2
held  41:20
53:19 200:12
252:5
hello  125:20,23
198:23 270:25
help  11:16,22
131:3 186:25
196:11 271:11
helped  182:25
183:22 187:4
196:12
helpful  24:18
213:23
helping  11:20
11:24 114:17
184:14
helps  267:8
heras  5:4
he's  164:22,23
169:10 189:22
189:22 190:11

195:11
hi  7:5 10:21,22
125:24 198:1
high  40:8
70:23 120:11
123:5 190:4
205:6 212:1
246:9 249:1
higher  19:7
55:9 59:4
107:6 120:11
171:1,22 172:6
172:9 186:23
191:24 196:4
201:16 211:15
232:2,4 236:22
256:8 257:19
highlight
116:10,18
highlighted
118:20 137:13
137:22,25
highly  171:10
227:17
hire  209:2
historical
39:15,18
102:15
history  39:21
hit  192:2
hm  98:23 99:2
124:19
hmm  27:24
hobble  268:19
hold  45:24
141:15 142:9
160:11 161:12

164:8,8 178:7
181:12 227:14
247:24 249:19
251:3,15
**holder** 59:12
127:15 136:10
138:22 244:4
**holders** 122:13
123:8 124:8,18
124:21 126:19
126:23 128:20
135:7 136:4
248:25
**hole** 151:6,9,16
152:10,13
**hon** 1:22
**honestly**
166:21
**honor** 7:5,15
7:20,24 9:22
9:25 10:2,9,13
10:16 11:2
20:9,13,18,24
21:2,4,7,18,24
22:2,12,21
23:2,18 24:3,3
24:9 25:11,19
26:13,18,21
27:4,10 28:11
29:6,16 30:12
31:2,18 32:11
33:1,4,18
34:12,18 35:2
35:25 38:13
41:2 42:6,13
45:5,14,21
46:20 47:12

48:23 49:6,13
50:4,5 52:20
53:10,15,20,24
54:20 56:5
60:1,8,12
65:21 68:20
72:3,21 74:3,9
75:5 77:14
79:10,16,21
85:25 87:4
88:10 89:4,22
90:1 91:3
92:10 93:13
96:4 98:15
99:6 100:1
105:16 106:2
107:11 111:7
111:19,23
112:16,20,23
113:4,6 114:5
116:13,14
117:8 121:9,22
122:6,9,23
123:3 125:18
125:20 127:2
128:23 130:12
131:11 132:8
133:4 136:9,18
136:25 137:14
138:16 139:25
140:2 141:6,10
142:10,15
143:3,5,12
144:9 147:12
148:17 151:13
152:24 153:7
153:11 157:16

160:15 164:20
165:20 173:3
173:23 175:2
175:24 184:20
190:7,13
193:10 197:23
198:1 199:21
202:1 205:25
206:4,8,23
207:23 214:5,8
215:5,22
216:13,15
220:18 222:12
224:21 228:24
233:3,15,18,22
237:12 239:25
240:3 241:17
241:22 243:17
255:14 256:18
258:1,9 259:5
259:15,24
260:8,17,21,24
261:3,19,21
262:9,14,25
263:3 264:13
264:19,22
266:2,7,21,24
268:14 269:5
269:19 270:2,7
270:22 271:10
**honor's** 26:25
**honors** 258:21
**hope** 154:12,12
183:3 195:4
265:21 266:4,6
**hopefully** 71:5

**hoping** 252:2
**horizon** 58:20
**horizontal**
123:17
**host** 160:14
**hours** 258:23
**housekeeping**
258:6,17,20
261:18,23
266:14 268:17
**huge** 210:13,21
**hundred** 53:6
**hybrid** 2:1
**hyde** 2:25
273:3,8
**hypothetical**
37:18 104:10
**hypothetically**
37:18 38:9
39:7
**hypotheticals**
70:9 164:21

**i**

**i.e.** 138:7
**idea** 47:21
48:21 234:25
**identify** 11:25
91:22 140:9
**idle** 187:10
**ids** 166:6
**ignat** 4:19
164:22
**illegal** 11:22
**illicit** 11:20
**illiquid** 153:2
155:1 156:5
167:16 176:25

182:4 183:14
211:16 212:5
218:24 224:8
231:13 247:5,5
247:23
**illustrate**
101:21
**illustrated**
99:10
**imagination**
39:2
**imagine** 37:17
39:7 104:10
265:3
**imbalance**
91:19
**immediate**
178:25 180:5
270:14,15
**immediately**
179:4
**impact** 18:3
85:23 92:23
191:17,20
195:19 250:6
**impacted**
191:7
**impacting**
191:8
**impacts** 112:6
**implied** 220:24
**importance**
56:9 112:7
**important**
55:25 56:3,8
56:16 95:24
97:13 104:2

186:7,8
**imported**
222:6
**impossible**
37:24
**improve**
256:15
**inability** 46:12
**inactive** 114:22
**inaudible** 50:6
**inbound**
247:19
**incentive** 194:6
**inclined**
203:10
**include** 26:11
93:14 101:16
108:5,6,10
115:19 132:4
187:19
**included** 32:22
33:14 34:7
85:19 130:3
211:12 219:3
236:11,12,14
**includes** 7:10
43:3 80:11
81:10 100:17
166:13 266:22
**including** 9:8
9:16 109:20
136:7 204:6
223:21 240:21
252:19 264:20
**income** 12:14
146:1,22 212:6
213:4

**incorrectly**
176:4
**increase** 8:24
99:17 106:25
125:15 192:1,5
192:7,14 193:1
**increased** 18:6
95:11 99:22
107:5,10
147:20 192:14
211:10
**increasing**
19:8 123:11
125:8 250:5,13
250:17
**indicate**
167:13
**indicated**
23:19 49:18
82:24 142:18
171:10 190:17
215:7 265:18
**indicates** 48:21
72:24 77:6,17
136:20
**indicating**
247:19
**indicative**
39:18 40:11
**indicator**
18:17 79:4
96:10 100:2
**indicators**
101:24,25
102:1
**indiscernible**
10:25 47:13

50:10 51:7
62:24 74:23
80:15 81:1
85:7 88:6 90:4
92:22 93:7
97:5,22,25
101:12,18,19
105:1,14,17
106:10,13,17
106:24 107:12
107:23 108:11
110:4 111:13
112:2 113:1,5
113:14,21
121:10 122:25
124:21 126:25
129:12 130:23
131:7 135:17
135:20 137:9
140:10,17,25
141:1,2,14,19
142:3 143:5,8
143:22 144:6
144:21 145:9
146:6,12,17
148:5,8 154:7
154:11,17
158:25 159:7
159:17 160:5
161:25 162:22
166:4,13,22
167:7,8,10,11
168:5 169:3,8
169:17 180:2
181:14 185:3,6
185:8,16 192:7
193:3,4,7

194:6 196:8,16
196:21,21,25
199:8 201:6,7
201:8,17,23
202:10 203:24
204:1,13,18,23
205:23 206:20
206:20,21
207:3,12,19,20
207:21,22
208:4,11,12
209:2,20,25
214:18 217:25
220:14 233:7
236:3 238:22
248:23 249:19
252:23 254:23
261:17 269:23
**individual**
63:13 122:13
134:20 180:6
235:5 236:14
**individually**
122:17
**individuals**
9:10,19
**induce** 9:3
**indulgence**
34:19
**industry** 16:15
16:20 189:13
**infer** 39:20
**influence**
60:20 62:7
91:15,15 97:2
100:25

**influenced**
81:19,23
**information**
39:23 40:16
44:13 49:19
66:15,18,19
83:2,4,12,14
83:20,21 84:20
85:8,24 86:20
87:2 93:5
100:8 110:23
111:3 132:17
149:15,16
155:8 184:6
203:11 226:3
237:25 238:2
267:2
**infrastructure**
211:6
**infusion** 187:9
**inherently**
15:25 186:10
**initial** 20:10,15
145:18,20
211:1,2
**initiated** 226:8
**inked** 186:18
**input** 62:8
178:15 185:23
188:15 247:18
**inputs** 181:16
182:20 184:6
185:8,11 187:8
189:10 254:16
256:6
**inputted**
184:23

**inserted** 85:16
**insiders** 109:17
109:20,21,23
109:25 110:1,1
110:3,20 111:2
**insights** 119:23
**insolvency**
94:11 114:21
152:14 153:6
**insolvent**
152:17
**install** 153:25
**instance**
159:17
**institutional**
159:14
**institutions**
11:16,24
**instruct** 79:16
**instruction**
154:10
**instruments**
12:9,14,18
62:15 80:13
**insufficient**
48:17 103:9
**insurance**
12:16
**insurmounta...**
266:8
**intend** 202:4
205:21 258:22
259:4
**intended** 9:2
79:3 263:1
**intents** 15:1

**interest** 8:11
8:18,21 10:5
41:14,15,18,18
65:17 78:5
108:5,6,7,11
162:18 163:3,9
174:4,14,15
176:14 178:5
191:20 192:2,9
192:17 217:4,7
218:14 231:6
257:24
**interests**
115:16 121:7
123:20 124:7
124:20 125:6
126:2,10,11
127:13 136:13
139:7
**interim** 265:4
**internet**
259:23
**interpretation**
97:2 112:10
**interpreting**
88:23
**interrupt**
55:18 58:12
78:21 215:5
**interrupting**
170:23
**intersect**
125:10
**intersects**
123:19
**intimately**
173:8

**intraday** 59:2
**intrinsic** 13:4
  14:17 15:7,11
  15:18,24 16:2
  16:3,8,10
  19:25 35:22
  36:15,23 37:7
  37:11,13,14
  39:24 40:19
  59:4 96:10
  128:17
**introduce** 91:2
  260:6
**inverse** 126:13
**invest** 250:15
**invested** 42:21
  61:6
**investigations**
  68:3
**investment**
  61:6,11 62:7
  177:2,7 181:5
  182:2 188:21
  230:21 252:21
**investments**
  162:10 248:17
  248:17
**investor** 63:9
  63:18
**investors** 63:20
  69:10 105:3
**involved** 42:24
  43:3 62:24
  114:23 149:12
  184:24 194:5
**involvement**
  117:4 185:2

**involving**
  204:10
**iovine** 111:23
  111:23,25
  112:1,13
**irregularities**
  189:12 190:1
**irrelevant**
  19:25
**isn't** 196:5
**issue** 26:21
  124:7 192:2,9
  197:2 266:5,15
**issued** 72:6
**issues** 44:19,22
  44:25 45:1,7,9
  202:23 262:18
  265:14,20
  268:3
**it'd** 221:22
  222:22
**it'll** 211:5
  219:9 252:1,3
  252:7 259:7
  265:1
**item** 68:20
  118:4 158:1,2
  161:22,23
  162:6 222:8,10
**items** 186:17
  187:2 188:1
  226:2,3,5
  235:18 266:24
**it's** 160:3,5
  161:2,6 162:6
  162:13 166:21
  168:2,4 169:3

169:18 170:9
172:25 173:16
175:5,11,14
176:5 179:12
179:23 183:14
183:22,25
186:23 190:2
193:8 194:11
194:23 199:11
201:19 203:9
206:6,7,12,23
208:13
**i'll** 181:13
  203:15
**i'm** 160:21,25
  162:2 164:8
  165:2,9,10,15
  165:15,23,25
  170:12 171:15
  172:13,21
  173:8,11,18,22
  174:13 176:18
  177:19,23
  178:12 180:3
  180:10 182:16
  186:4 187:12
  188:2 189:7,14
  190:7,13 191:1
  192:3 193:24
  195:8,10,15,23
  196:16 197:15
  197:16 198:7
  199:1,1 200:8
  200:21 201:3,4
  202:14,20
  204:16,21
  206:2 207:17

207:17,24
**i've** 164:13
  165:9 188:17
  195:1

**j**

**j** 63:16
**january** 72:25
  73:14 74:1
  77:9,20 78:16
**jason** 111:23
**jeff** 164:21
**jeffrey** 4:23
**jelisavcic**
  63:14,18 64:21
  65:16
**jenner** 66:11
**jeremy** 3:22
  161:8
**job** 186:12
  227:13
**johnson** 5:7
  142:8,8,22
  203:18,19,21
  203:22 205:13
  205:20,22
  206:17,18,19
  207:3,4,6,8,11
  207:25 208:3,9
  209:9,10,16,19
  209:21,23
  210:4,7,11,12
  210:20 213:8
  213:10,15,19
  214:5,8,10,12
  214:13,20
**joined** 65:4

jones 3:19
joshua 3:11
  10:14,18
judge 1:23
  60:14 64:15
  74:25 82:6
  94:18 98:10
  111:16 140:6
  141:24 143:10
  143:20 153:10
  153:23 156:16
  200:14 203:5
  270:18,18
  272:13
judicial 259:5
  259:12,24
july 74:7,16
  75:9,13 77:9
  77:20 78:16
  89:19 95:22
jump 9:12
  271:11
june 52:6 68:5
  76:19,23 89:14
  90:11 91:9,24
  92:19 93:3,15
  93:24 94:23
  95:2,21 96:6
  97:1 114:25
  204:6 233:1
justice 4:1
justify 158:17

k

karen 1:25
  259:20
keep 71:24
  104:2 187:1

223:10 268:9
keeping 211:15
keeps 248:12
keith 3:10
key 189:21
kielty 120:5
  150:23 153:4
  168:14 171:4
  182:2 219:22
  220:9 221:23
  237:14 240:1
kielty's 120:11
  219:25 220:13
  237:6,18
  241:18
kind 11:16
  19:3 37:9,15
  41:11,15 70:9
  79:1 96:10
  98:19 111:2
  128:21 129:10
  129:17 135:17
  135:18 143:19
  161:25 188:15
  219:7 239:3
kirkland 3:13
  24:10 113:7
  131:8,13
  256:23 258:10
  260:20 261:22
  271:10
kirksanov
  270:10
kirland 269:20
kirsanov 23:18
  42:9,9,12,13
  42:15,17 43:8

43:15,16,20,21
44:5,18 45:5,6
45:10,11,16,18
45:24 46:1,2,5
46:7,10,14,15
46:23 47:10,15
47:16,20,23
48:1,2,15,20
48:25 49:6,11
49:16,22,24
50:3,14,15,19
50:21 51:14,24
52:3,5,16,22
53:12,18 54:4
54:6,7,15,22
55:24 56:2,7
56:18 57:2,3,5
57:16,18,22
58:12,14 59:8
59:17,23 60:1
60:7,10 125:20
125:21,22,23
127:18,21
128:9,11,15
129:14 130:1,6
130:21,22,24
131:4,6,8,14
131:22 132:1,4
132:14,16,19
133:6,7,14,22
136:9,18,23
137:6,17 138:3
138:11,14
139:25 140:1,2
270:7,7,21,22
kirsanov's
  45:23

kirsaov 126:1
  126:18 127:4
  127:12,22
  128:19 129:2,8
  129:15 132:20
  133:17 134:5
  134:10,15,19
  134:24 135:5,9
  135:23 136:2
  136:19 137:12
  137:24 138:21
  139:9,16,21
knew 8:23 38:4
  38:9 271:8
know 14:11
  19:23 25:20
  36:2,5 38:14
  38:25 39:5
  47:14 49:4,15
  49:17 52:1
  53:16 54:24
  56:14,18 61:12
  61:25 62:3,4
  62:21 63:10,13
  66:23 67:5,7,9
  67:11 75:6,11
  76:25 77:4
  78:18 82:3
  83:14 84:9
  85:21 90:19,22
  100:8,9 101:2
  101:4,5 103:24
  103:25 106:16
  108:18 110:23
  111:1 112:7
  115:2 120:3
  121:16,19

124:24,25
125:9 133:5,25
145:2 149:12
150:1,13,16,18
150:19,23,24
151:16 152:15
152:19,23
153:18 154:15
154:25 155:8
155:17 156:5,6
156:18,23,24
159:2 160:22
164:1 166:5,16
170:16 171:13
171:24 172:7
173:16 177:13
182:12 188:18
189:13 192:21
194:2 195:6,16
195:22,23
197:16,21
203:25 205:5,6
205:10 208:18
211:21 212:10
213:2,23
214:14,15
215:20 221:13
224:18 225:4
226:21 230:12
235:3 237:19
238:14,20
239:3,7 241:3
242:4,21,22,23
242:24 244:17
245:18 247:20
248:4,6,6
250:13,23,25

251:9,10
252:12,21
263:14,17,18
263:24 264:6
265:17,22,24
265:25 266:1,4
266:17,19
267:11,13,24
269:12 271:3
271:14
**knowing** 186:8
**knowledge**
44:19 47:8
59:25 104:11
119:21 147:13
150:1 173:19
188:18 203:4
257:1
**knowledgeable**
173:9,12
**knows** 259:20
**koenig** 3:18
131:11,12,13
131:13,20
261:20,21,22
262:5,8,21,24
263:3,10,12
264:2,12,16,19
265:1,6,11,16
265:24 266:2,7
266:10,13,21
267:2,5,8,16
267:22 268:5
268:10,14,16
271:10,10
272:13

**kokinos** 213:1

**l**

**l** 63:16 160:3
**labeled** 46:11
57:21
**lacks** 47:7
**laid** 49:10
121:7 122:14
157:1
**landed** 172:8
197:11
**landing** 88:7
**lands** 255:21
**language** 131:9
131:17,18
**laptop** 119:25
**large** 17:22
18:24 96:19
106:24 114:17
114:17 192:11
206:10,12
266:23
**largely** 184:24
187:5 226:2
251:8
**larger** 77:22
107:4 132:10
**largest** 100:21
255:18
**las** 5:4
**late** 114:25
194:23 271:7
**lau** 270:25
271:2,2,12,17
271:22,24
272:1,12

**law** 209:7
262:16 263:17
263:22 264:22
269:14 270:19
**laws** 9:21
201:24
**lawyer** 216:23
252:12
**lead** 121:4,6
**leading** 94:9
100:3
**leaked** 93:6
**leaning** 125:3
**learned** 156:18
**lease** 118:22
270:24
**leave** 96:1
134:3
**leaves** 140:4
**lecturer** 12:7
**led** 117:5 172:6
226:18
**ledanski** 2:25
273:3,8
**ledger** 41:23
**leeway** 214:4
**left** 117:16
179:22 192:14
192:24 249:23
**legal** 78:18
138:24 158:17
158:19 159:1,3
159:8,9,17,24
159:25 160:3,4
160:5 162:24
163:4,15
273:20

**lend**  267:14
**length**  264:6
**lengthier**  263:8
**lengthy**  265:1
**lesson**  156:17
**letter**  271:13
  271:18
**letters**  87:8
  110:5 272:7
**let's**  173:21
  190:6,20
  192:19 199:3,6
**level**  123:5,12
  177:8 181:23
  188:7,8 212:1
  249:1
**levels**  96:16
**leverage**  71:25
**lexington**  3:15
**liabilities**
  52:12,18 53:4
  53:5,9,13,19
  152:18
**liability**  70:13
**lien**  66:25 67:1
**life**  260:5
**lifetime**  102:20
**light**  125:11
  164:14 222:19
**lighter**  123:17
**likelihood**
  252:22
**likely**  9:4 17:21
  40:8 111:12
  181:5 186:13
  207:19 208:13
  219:23

**limited**  18:5
**limiting**  143:13
  144:10
**line**  8:3 9:13,14
  94:7 96:14
  118:4 123:10
  123:14,14,17
  123:19 125:10
  179:25 180:6
  187:17,22
  190:8 191:11
  210:23 222:8
  222:10 255:22
**linear**  241:2
**lines**  123:19
  125:11 181:8
  184:8 239:20
**link**  89:17
**linked**  12:16
  15:25
**liquid**  9:1
  105:12 149:21
  150:13 153:19
  167:18 181:20
  182:21 194:14
  215:13 224:9
  224:12,15
  225:2,22 227:5
  228:18 234:6
  235:18 242:9
  242:10,25
  243:1,2,3,7
  244:8,9 245:7
  245:9 255:17
  255:21 256:7
**liquidate**  208:5

**liquidated**  38:5
  251:7
**liquidating**
  202:10 207:20
  212:7
**liquidation**
  115:17 117:2,4
  117:18,18,25
  118:3 121:1,10
  123:9,10,22
  124:18,22,25
  127:5,9,23,25
  128:8 129:3
  133:15,18,22
  134:25 136:8
  138:23 139:11
  157:4,9,10
  161:18 162:18
  163:13,22,23
  163:25 164:3,4
  166:2,14
  168:16,25
  169:1,13,19
  170:7,16,24,25
  172:2 174:24
  175:18,22
  176:13,17,19
  176:21 177:20
  177:24 178:4
  178:24 179:1
  179:11,23
  180:2,5,14
  183:22 184:1
  192:15,16
  198:6,9,17,18
  205:23,24
  208:11,14

  209:1 210:7
  211:17,18
  215:9 218:11
  221:3 223:14
  223:18 226:15
  226:21 242:14
  251:5 252:13
  253:24 255:1
  255:17,19,24
  256:6 257:14
  257:18
**liquidity**  100:4
  100:11 104:6
  115:6 149:7,7
  234:17
**list**  7:9 20:12
  23:11,24 24:13
  26:23 45:22
  142:11 206:11
  206:13 216:12
  236:16 239:16
  258:23 259:1,2
  259:4,21
  260:12,14,23
  261:1,4 267:3
  267:6
**listed**  25:22
  26:16 231:18
  260:22
**listing**  119:19
**lists**  26:6
**literally**  111:11
**litigation**
  182:13 183:14
  184:9 201:25
  226:8,16
  255:23,25

256:2,12
**little**  24:11
39:20 46:9
183:4 187:17
194:11 230:15
237:3 244:8
252:7
**live**  116:11
**llc**  1:7
**llp**  3:3,13 4:10
4:18
**loaded**  156:10
**loan**  226:7,10
230:11 253:18
**loans**  41:14
**locate**  51:2
130:22
**located**  173:7
**locked**  14:25
17:1,13,25
**long**  132:14
196:9 212:12
216:19 247:15
260:12 269:21
**longer**  101:23
183:4,15
248:20
**look**  19:20
39:15 47:3
82:11 89:16
92:11 94:2
96:13 98:20
112:8 115:24
118:18 125:7
151:15 155:14
160:21 181:18
181:21 189:10

191:15 195:17
195:20 197:17
209:22 210:2,3
218:17 226:10
237:6 239:12
239:15 243:9
243:10 247:20
253:7 272:6
**looked**  91:16
94:4 98:17,21
98:22 119:19
120:6 131:25
240:21 248:5
252:15 254:4
**looking**  15:8
18:4 19:25
26:3 36:25
83:15 84:3
96:13 99:24
115:1,16 121:4
122:12,17
124:17 130:6
131:5 132:13
137:16 146:9
157:25 175:1,9
175:15,20,21
178:5 183:2
195:24 209:18
213:14,18
239:19,20
243:20 257:5
257:20
**looks**  19:21
48:6 57:24
59:2 73:21
95:13,15
106:18 117:2

123:15 195:4,5
232:16 244:25
**lose**  119:25
**losing**  118:23
230:14
**loss**  24:8
**losses**  25:1
**lot**  40:4 49:4
70:8 76:12
83:12 100:7
118:14 152:21
156:10 177:6
179:22 181:3
208:23 211:14
236:6 239:1,9
242:4 245:24
248:5,7 252:17
252:18 254:19
**lots**  69:9
117:24
**loud**  162:3
**low**  96:19
250:23
**lower**  40:21
53:8 67:25
71:5 193:1
232:2,5
**lowest**  73:20
**lucky**  181:7
**lunch**  130:16
140:5 142:18

**m**

**made**  7:15
60:23 108:14
108:23 119:15
119:16 148:23
159:21,23

167:15 194:3
197:19 226:2
242:3 248:24
251:12,24
255:3 261:11
266:18
**madison**  4:13
**magic**  32:4,6
**maintain**
102:17 103:12
103:17,22
**maintained**
102:19 103:14
**maintaining**
211:6
**major**  75:20
76:3,8
**majority**  18:1
182:4,6
**make**  34:23
40:17 41:14
45:4 47:3 49:2
51:3,9 59:18
59:21 88:2
89:20 101:24
102:1 103:16
140:19 160:13
163:14 164:13
165:4,6 174:25
175:20 181:14
191:23 203:15
208:13 215:2
220:16 229:16
236:9 243:8
244:5 256:22
257:23 266:14
267:18 268:16

[make - matters]                                                    Page 45

268:25
**maker** 102:10
104:4,5,13
**makers** 103:16
**makes** 247:24
**makeup** 65:5
**making** 93:6
96:9 102:14,16
102:22,25
103:5 104:7,18
**man** 218:1,3,5
255:11 258:12
258:15
**management**
115:6 119:20
149:7 197:20
238:1
**manager** 209:3
**manages**
118:22
**managing**
114:10 212:5
**mandate**
179:16 239:3
**manipulated**
78:6,12
**manipulation**
78:17,18
**manner** 60:19
99:19
**map** 74:24
**march** 150:24
156:6
**margin** 19:4
70:12 230:11
**margins** 70:16

**mark** 4:7 117:9
**marked** 7:10
13:9 150:25
226:10,12
228:16,17
**market** 8:8,9
8:11,16,17 9:2
9:4 11:25
12:23,24,25
13:1,3 14:3,8
14:11,18,22
15:2,6,16,19
15:24 16:1,5,6
16:7,9 17:20
18:2,8,10,11
18:12,16,23
19:1,18 35:21
35:24,25 36:5
36:10,13,20,22
36:25 37:1,3
37:10 38:16
39:21,23,25
54:10 55:16,21
56:14 57:25
58:10 59:9
67:6,7,13,25
70:16,20 71:4
71:6 76:11
78:7,13,24
79:2 93:4,18
94:13,16 96:9
97:6 99:6,16
99:19 100:6,6
100:7,9 101:22
101:22 102:10
102:14,16,20
102:20,22,24

103:5,16 104:4
104:5,13 107:5
107:10,10
108:19 119:23
145:12 176:24
201:14 220:7
220:10 221:4,8
222:10 224:3,6
224:11,16,17
227:10,17
228:22 230:20
230:23 231:5
231:14 234:6
234:15 235:2,4
245:22 246:8
253:3,8
**market's** 16:2
120:1
**marketing**
259:22
**marketplace**
180:16
**markets** 11:21
12:19,21 25:2
58:1,9 76:15
76:17 104:7,18
230:21 253:5
**marsal** 114:11
114:14 149:2
173:14 182:19
182:25
**marsal's**
167:10
**martin** 1:22
**mashinsky**
28:21 29:13

**master** 4:11,12
**masumoto** 4:8
**match** 66:19
89:1
**material** 22:6
25:22 259:22
**materially**
188:25
**materials** 21:3
21:21 22:13
23:11,14,24
24:12,16
**math** 170:9
186:2 191:25
193:8 196:5,5
211:25 224:9
225:7 236:2
244:25 245:13
246:24
**mathematical**
185:18 225:9
246:7
**mathematica...**
191:23 255:20
**mathematics**
224:6
**matter** 1:5
7:11 13:11
17:14 35:10
44:12 73:22
103:20 115:4
115:12 116:5
122:10 152:24
201:12 203:7
209:7 261:23
**matters** 115:5
115:18 258:6

261:18 263:8
268:23
**mawson** 195:7
195:9,11,11,13
195:16
**max** 10:19 11:7
42:14 66:19,20
145:14,17
147:11,19
**maximally**
204:14,19
**maximize**
247:13 248:16
253:12,20,22
**maximum**
264:17
**maxwell** 6:4
**mccarrick** 3:20
24:9,10 44:16
45:2,20 47:7
48:13,18 49:8
51:3,6,8,16,19
51:22 56:25
59:6,15 60:3,5
61:1 63:3
65:18 67:20
68:8,22 71:7
81:2 89:3,23
93:10 101:8
110:8,21
232:17 258:5,9
258:10,13,17
258:21 259:3
259:11 260:18
260:20,20
269:20,20
270:1

**mean** 38:19
39:3,7 40:17
44:24 45:9
69:20 103:8
140:10 166:11
188:8,10
189:17 206:19
212:20,21
213:10 224:18
240:23 272:1
**meaning** 60:24
69:9 73:1
104:2
**meaningful**
127:19
**means** 18:25
91:19 96:18
**meant** 36:11
36:23 98:18
101:20 221:8
224:5
**measure** 58:16
100:4
**measured**
196:8,15
**meat** 267:17
**mechanics**
80:23 211:4
**mechanism**
243:6,11
**media** 19:16
**meet** 8:21
52:12,18 126:5
136:12 197:12
197:17
**meeting** 265:23
271:9

**meets** 121:7
**megawatt**
118:22 186:22
**member** 63:19
65:16 205:8
**members**
62:18 205:8
**meme** 37:14
**memory**
197:15
**mention**
109:17 110:6
150:9 199:1
**mentioned**
57:8 74:21
84:4 85:5,6
120:5 150:3
168:23 171:5
176:9 187:3
191:9 197:1
205:16 207:13
207:19 208:4
208:10 224:12
228:14 235:8
236:17 251:17
271:3
**mentioning**
85:13 92:18
191:4
**merging**
117:23
**message** 47:11
47:17 48:11,12
49:1,5 146:3
**messages** 27:20
**met** 119:20
123:20 196:9

197:14,14,17
**method** 172:1
**methodology**
42:3 226:22
248:14
**metric** 197:6
**metrics** 194:21
195:20 197:12
**mg** 1:3
**mic** 113:25
**michael** 142:8
**microphone**
143:19 268:18
268:19
**mid** 95:17
**middle** 16:16
120:17 179:16
212:13
**midland**
119:12
**midpoint**
118:10 170:8
**mike** 5:7
**milestone**
196:3
**million** 53:5,14
61:9,11 68:6,7
73:1,2 74:2,8
74:17 77:8,9
77:19,19,23
78:3,7,13
105:15,23,24
106:12 108:14
109:17 118:6,8
118:20 119:7
119:15 123:16
123:18 146:1

146:22 147:2
167:17,18
170:10 171:6,9
179:2 180:18
180:21 181:2,9
183:19,19,23
183:24,25
184:2,10,11
185:13 186:6
186:19,20
187:3,15,18
205:5 210:17
211:7,10,13,17
211:20,23,23
211:24 219:4
226:13 227:2,6
227:7 231:15
248:8 255:23
256:1
**millions** 101:5
101:6
**mind** 46:16
194:16 256:5
264:20
**mine** 82:11
146:3
**mineola** 273:23
**miner** 119:3
179:18 180:8
180:13 183:11
187:6 251:25
**minimis** 37:25
39:14 44:3
**mining** 117:24
118:6,13 119:9
119:11,11,12
167:15,22

170:13 171:6
171:22 172:3
177:1,7 178:14
178:20,24
179:8,15,17,22
180:14 181:2
182:2 184:12
185:6 187:13
188:4,11,13,20
194:16,21
197:5,12 204:9
204:11 208:12
208:21 212:9
213:4 214:16
218:21 219:3
219:16,18
220:4,22
221:19 222:4
222:11,15
224:7 227:5
228:1 231:12
235:18 237:5
237:24 238:11
238:24,25
239:2 247:3
249:16 252:14
**minor** 211:8
256:4 257:13
**minus** 78:5
227:7
**minute** 50:9
87:11 102:8
**minutes** 71:17
102:4 109:4
136:17 143:14
144:11 148:14

**miscellaneous**
248:10
**misinformati...**
152:22
**misread** 8:13
**missed** 157:5
260:25
**misspeaking**
155:15
**misspoke** 33:5
33:6 36:10,22
**misstates** 86:1
151:2 153:7
199:23
**mistake** 156:17
**mister** 64:21
**mix** 171:7
184:23
**mixed** 270:19
**mm** 27:24
98:23 99:2
124:19
**model** 37:2,10
180:5 185:7,7
212:23 213:5
**modeling**
214:18
**models** 178:14
**moment** 20:14
24:3 46:7
51:13 68:4
82:9 119:1
120:1 139:25
140:2 161:13
213:11
**moments** 191:4

**monetize** 230:7
230:13
**money** 11:23
70:15 71:24
108:23 204:11
212:18 248:8
249:8
**month** 40:3,15
54:16 56:17
58:17 78:16
146:2,7,23
147:1 154:24
171:18
**monthly**
153:17 154:23
197:6
**months** 16:18
16:19 153:17
183:2,4,5,6
195:5 196:7
211:7 251:6,8
251:12,13,14
251:19 253:13
253:14
**morning** 7:3,7
10:16,17 11:9
11:10 42:16,17
60:16,17 80:8
80:9 164:13
174:5,17,18
175:5 261:2
**mortgage**
12:15
**motion** 203:10
203:14,15,15
**motivated**
196:11

**move** 53:25
54:5,6 57:4
65:24 89:6
102:7 110:11
116:13 119:2
121:9 122:6
160:6 189:23
190:6,18 197:2
223:1 237:16
241:6,7,9,21
243:10 253:25
254:1 255:7
260:24 265:3
**moved** 20:3
24:13
**movements**
64:25 76:7
**moving** 34:20
70:13 93:5
188:18 227:23
245:14 255:12
**muffled** 155:11
192:4
**multiple** 211:4
**musk** 67:11
**mute** 114:3

**n**

**n** 3:1 6:1 7:1
273:1
**name** 63:13
66:12 176:4
191:3 268:2
**named** 117:22
**names** 141:4
**nasdaq** 231:19
**nature** 148:18
148:25 240:13

**ncbj** 265:23
**near** 97:4
125:2 268:2
**nearly** 205:4
210:17
**necessarily**
56:14 61:12
104:12 108:4
**need** 19:1,4,5
70:12 130:8,9
143:24 165:25
167:1 184:12
192:2 196:10
224:15 243:9
262:17
**needed** 8:21
67:19 132:17
164:1 181:3
197:1,6 199:13
217:21
**needs** 196:1
210:25
**negative** 40:18
53:5 65:13
89:21 91:18
**negligible**
124:6
**negotiations**
197:9
**nervous**
100:11
**net** 11:21 73:1
74:8,17 77:7
77:18,21 78:5
78:7,13 104:25
106:4 109:2
147:2 220:3,8

222:10,15,17
223:21,24
224:3 225:25
228:18 229:17
231:14 255:17
255:22 256:7
**netted** 105:14
**network** 1:7
108:8
**neutral** 104:2
**never** 38:5
42:18,24 62:13
79:4 85:8
195:1 271:18
**new** 1:2,14 3:7
3:16 4:4,14,21
7:10 67:6
154:5 180:15
212:6,18,22,25
226:18 235:14
237:16 242:9
242:10 244:10
244:24 245:3
246:1,5 256:12
**newco** 117:16
117:21,21
119:3 120:25
123:14,24
157:3 167:7
176:22 177:2
179:7,9,14,15
179:21 180:2,9
180:11 181:15
181:18 183:1
184:10 186:1,6
187:6 192:1,5
192:16 194:20

202:18 208:19
208:20 209:24
210:25 212:3,4
212:4,8,11
213:1,3 215:10
218:10,18
221:5,9,11,11
221:14,14,20
222:7,8 223:20
223:21,22,25
224:2,3,4,24
225:3,18
226:13,20
227:10,22
229:6,11,13
230:1,23 231:2
231:4,9 234:6
234:8,15 235:5
236:17,22
240:21 244:22
246:9,14,16,18
249:22 251:18
252:10 254:21
256:3,11,14,15
257:2,12,17
**newco's** 228:16
**newly** 229:13
**news** 40:4,16
**nexus** 215:8,11
**nice** 259:1
268:24
**night** 7:8,16
10:2 45:17
117:10 205:21
206:15 207:1,9
213:22 216:12

nine 12:12 53:5
80:12 89:8
ninety 53:6
nominal
163:25 251:9
non 24:16
179:3 268:1
noon 102:4
nope 111:21,21
140:21
normal 16:5
37:1 101:23
noskov 4:16
142:15,15,22
214:25 215:3,3
215:6,15,21,22
216:2,4,8,10
216:13,15,18
217:15,20,25
218:2,4,7
220:19 222:2
222:14,20,22
223:3,6 224:21
224:22 226:24
228:5,8 229:2
229:9,24
230:10 232:20
232:22,24
233:2,14,22
234:1,3 236:13
237:2,17,22
239:6 240:3,7
240:12 241:12
241:20,25
243:17,19,23
244:21 246:2
246:13,23

251:4,16 254:2
254:9,12,15
255:14,16
269:5,5,9,19
270:2,4
note 23:23
117:20 132:9
241:22 260:21
notes 160:21
171:7
notice 14:9
169:5 213:25
259:5,12,25
notification
153:25
notify 215:13
notifying
215:17
november
264:5
nuance 167:19
219:2
nuclear 213:5
214:19
number 13:10
14:23 15:4
16:3,18 17:19
26:22 35:7
44:3,9 52:17
52:24 53:22
54:18 57:8
61:13 69:2,8
69:16 73:8
74:21 76:25,25
77:23 78:3
82:7 96:19,20
101:25 106:24

108:24 110:18
112:7 118:7,8
118:15,15
119:7,8,16,17
121:1 130:23
137:4 146:9
149:22 156:17
160:8 167:20
168:15,18,20
169:17,20
174:22 175:22
182:3 183:18
183:19,22
189:8 190:15
191:24 196:2
199:19 204:24
204:24 205:6
205:15 209:14
213:17 219:16
219:17 220:2
225:8,23,23
226:11,16
227:2 232:21
232:22 247:14
247:17 254:18
257:7 259:22
265:14
numbered 24:7
69:1,2 72:14
72:19 74:18
95:8
numbers 17:8
23:24,25,25
24:2,4 26:6,9
75:14 77:4
103:14 117:25
118:2 120:13

121:3,6 129:16
132:7 155:24
176:10,15
177:3,4,9
181:16,19
182:16 183:16
183:17 184:5
184:15,16
185:11 187:4,8
188:16 189:10
190:11,25
192:6,25
219:15 227:3
229:15 236:5,7
243:15 244:14
245:14 255:8
256:9 259:4,7
259:25 263:18
numerations
156:24
numerical
196:20,25
224:14
numerous
272:6
ny 1:14 3:7,16
4:4,14,21
273:23

**o**

o 1:21 7:1
273:1
o'clock 130:9
142:19,22
oath 7:19 20:7
27:9 40:24
80:1 116:8
122:3 143:1

193:16 266:12
**object** 9:25
  15:20 23:18
  44:16 45:14
  89:23 138:17
  209:6
**objecting**
  233:11,12
  263:4
**objection**
  23:22 43:6,12
  45:2 46:20
  47:7,12 48:13
  48:18,23 49:8
  49:13 52:14,20
  53:10,15 54:20
  56:5,25 59:6
  59:15 60:3
  61:1,2 63:3
  65:18 67:15,20
  67:21 68:8
  71:7 72:1 73:4
  73:17 74:3,9
  81:2 85:25
  87:4 88:10
  89:3,4,22
  90:20 93:10
  97:7,14 98:5
  101:8 103:1
  105:16 107:11
  110:8,21 126:7
  127:2,10
  128:23 129:5
  133:4,20,24
  134:8,13,17,22
  135:2,8,25
  136:5,14

137:14 138:1
139:8,14,19,23
145:4 147:12
147:22,25
148:1,6 150:5
150:15 151:2
152:4,11 153:7
155:6 156:8
157:13 158:21
162:23,25
163:4,15 178:9
178:16 189:4
190:5 191:21
199:21,22
202:1,6,12
203:1 205:11
215:9 222:12
228:24 229:8
229:22 230:8
239:5,25
240:11 241:11
244:20 246:10
246:11,21
260:22 271:5
271:13,22
**objection's**
  10:10
**objections** 9:24
  20:14 25:12
  28:13 41:4
  116:15 119:14
  121:11 122:8
  260:16 261:10
  261:11 265:12
  267:10 271:16
  272:8,9,10

**objective** 16:3
**objectors**
  263:20 264:21
**obligations**
  8:22
**obtain** 136:10
  138:22
**obvious** 117:21
**obviously**
  118:16 155:20
  184:14 262:11
  263:19
**occur** 251:18
**occurred** 76:12
**october** 1:16
  8:7,19 61:20
  194:24,25
  262:1 265:2
  273:25
**offer** 20:10,18
  28:11 29:16
  30:13 31:2,18
  31:19 32:11
  33:1,18 34:12
  35:18 41:2
  100:10 103:13
  116:12 181:1
  188:4 269:23
**offered** 20:6
  35:10 40:24
  163:9 242:2
  257:2 265:10
**offering** 14:14
  21:2 233:22
**offers** 120:8
  198:5,5

**offhand** 49:24
  67:9 90:8
  197:16
**officer** 7:17
  11:12
**officers** 62:18
  109:20,21
  110:1,1 193:25
**official** 3:4 7:6
  259:18
**officially** 96:11
**offline** 195:17
  195:17
**offset** 212:7
**oh** 20:20 33:6
  54:18 75:9
  99:5 151:20
  239:20
**ok** 7:19
**okay** 7:24
  10:10,15,21
  22:1 25:20
  27:22 29:10
  31:9 32:17
  33:7 35:8,15
  38:18 39:10
  44:13 45:19,22
  46:15 48:3
  51:11,15,16
  54:12 60:7
  61:16 66:12,12
  69:3 71:18,20
  72:18,23 73:12
  75:10 77:6
  79:19,21 80:2
  81:14 82:8,21
  82:22 83:6,18

| | | | |
|---|---|---|---|
| 86:19 87:2,7 | 177:20 178:3,3 | 269:3 271:25 | **operational** |
| 87:12,23 89:6 | 178:12,23 | **old** 119:24,25 | 194:17 196:15 |
| 92:13,14 95:9 | 179:4,6,24 | 273:21 | 196:23 197:4 |
| 97:18 102:5 | 181:11 184:18 | **older** 212:17 | 248:15,20 |
| 104:22,24 | 184:22 185:5 | 213:20,23 | **operations** |
| 107:21 108:17 | 185:15,25 | **ombudsman** | 239:2 |
| 109:1,5,12 | 187:22 188:8 | 266:5 | **operative** |
| 112:13,25 | 188:14 189:9 | **omnibus** | 233:8 |
| 115:25 116:25 | 189:17,18,24 | 261:25 268:22 | **operator** 186:9 |
| 130:20 137:21 | 190:7 191:18 | **once** 17:25 | 186:10,11 |
| 138:14 140:14 | 192:18,24 | 19:11 152:20 | **opine** 216:25 |
| 141:3,20,21 | 194:5 195:13 | 194:4 236:19 | 241:4,6 |
| 142:1,13 | 195:19 196:7 | 252:4 | **opined** 35:20 |
| 145:23 146:15 | 196:14,20 | **one's** 225:1 | 217:2 |
| 146:18 147:9 | 197:5,19,22 | **ones** 24:4,6 | **opining** 218:14 |
| 147:11,17 | 198:8 199:1,7 | 29:5 261:13 | **opinion** 13:24 |
| 148:13,21 | 200:17 201:21 | **ongoing** | 14:2,8,14,16 |
| 149:11,20 | 203:19,21,25 | 226:17 265:15 | 15:11 18:16 |
| 150:11,21 | 203:25 204:8 | **online** 195:21 | 35:23 36:8,13 |
| 151:4,6,24 | 204:12 205:7 | 196:2,4 | 37:23,24 40:5 |
| 152:8 153:2,10 | 205:14,15 | **open** 18:24 | 41:24 43:4,14 |
| 153:13 154:2 | 207:6,12,17 | 68:5 70:19 | 43:25 44:6,8 |
| 154:18,18 | 208:3,10 209:9 | 71:25 72:23 | 56:23 57:1 |
| 155:23 156:1 | 210:11,25 | 73:12 82:21,25 | 75:19 76:2 |
| 156:18 157:11 | 213:5,11,20 | 87:23 91:8 | 78:23 79:7 |
| 157:18 158:8,9 | 214:12,18 | 92:8 104:24 | 86:6 94:8 96:7 |
| 158:11,12,13 | 215:19 218:6 | 115:23 175:8 | 96:9 102:1 |
| 158:16,25 | 218:20 220:2 | 199:4 265:14 | 104:22 152:24 |
| 160:5 161:15 | 220:20 223:11 | **opened** 83:17 | 156:1,2,22 |
| 162:13,17 | 223:13 237:8 | **operate** 62:8 | 160:6 167:11 |
| 163:8 164:1,18 | 238:15 258:7 | **operating** | 168:11,13 |
| 165:16 166:23 | 258:19 259:9,9 | 99:19 178:25 | 170:4 178:7 |
| 167:4 168:6,7 | 259:14 260:18 | 179:3 183:3,8 | 181:5 185:20 |
| 168:15,21 | 261:9,15,18 | 184:1 | 197:13 240:5 |
| 169:4,23 170:7 | 262:20 263:3 | **operation** | 253:17 |
| 172:20 173:9 | 263:14 264:18 | 179:20 185:6 | **opinions** 13:21 |
| 175:17 176:13 | 267:13 268:8 | 186:7 192:11 | 78:25 79:6 |

[opinions - page]

Page 52

96:12
**opportunities**
11:25 59:10
236:22
**opportunity**
10:1 59:13
70:21 196:6
263:20 272:4
**opposed**
125:15 184:6
215:13
**opposing** 262:2
272:4
**opted** 165:9
**option** 242:17
242:20,21
245:19,20
247:8
**options** 62:15
242:2
**orange** 47:11
47:17 48:11
**order** 9:9,18
67:19 70:24
91:2 103:17,21
103:22 106:9
122:15 142:20
160:18 164:23
187:10 210:15
230:5,17 259:8
269:13
**ordered** 8:20
**ordering** 263:9
263:10,12
264:16
**orderly** 117:17
117:22 118:9

118:18 119:3
119:17 123:16
123:23 176:22
180:8,13
183:11 185:7
185:12 187:6,8
187:8 188:15
188:24 190:22
211:8 212:8
218:10 226:20
247:7,10
249:16 252:8
253:10 254:23
256:10 257:13
257:18
**orders** 9:10,18
**organization**
176:9 184:24
**organizational**
63:7
**organizations**
61:24
**organize** 27:1
**original** 50:1,7
50:8,11 166:11
167:6
**originally**
167:16
**originate**
176:10
**otc** 29:25 34:1
78:5 104:25
105:2,2,3,6,8
105:10,22,24
106:5,6,10
107:1 108:1,5
108:10,12,22

109:2 144:25
201:13
**otis** 87:7
140:12
**ought** 25:20,21
263:17
**outcome**
246:14 257:23
**outcomes**
242:12 244:4
**outs** 252:17
**outside** 17:7,11
19:10 39:4
41:23 46:21
**overall** 97:3
108:13 171:22
189:20 191:19
228:21
**overexposed**
104:3
**overlap** 108:4
**overly** 65:13
**overruled**
10:10 23:22
46:22 48:24
49:14 56:6
73:18 74:10
103:3 105:18
107:13 129:6
145:5 163:17
178:17 189:5
222:13 229:1
229:23 230:9
246:22
**oversaw** 8:19
**overseeing** 8:8

**overstate**
181:23
**overstated**
192:25 250:11
**owed** 8:13
**own** 43:11,23
122:7 159:21
159:23,25
171:9 180:19
207:13 212:7,9
222:23 223:8
229:16 258:25
**owned** 8:12,18
17:4,5,6,10,12
57:14
**owner** 63:8
**ownership**
62:4 225:18
230:14
**owns** 62:3 71:2

**p**

**p** 3:1,1 7:1
**p.m.** 130:7
**packaged**
231:16
**packet** 46:9
**page** 6:7 8:2
13:13 23:10
24:17 27:16
28:17,18,18
29:21 30:17,19
31:7,25 32:16
33:10,23 35:10
35:11,15 46:13
47:25 50:13,24
50:25 52:3
57:19 68:18,19

[page - pause]                                                        Page 53

| | | | |
|---|---|---|---|
| 69:1,2 72:11 | 209:12 210:1,4 | **part** 8:24 9:3 | 264:20 266:22 |
| 72:14,15,19,19 | 210:5 219:23 | 12:17 16:1 | **partner** 10:14 |
| 72:20,24 73:7 | 219:24 228:17 | 19:2 78:19 | 66:11 |
| 73:8,14 74:7 | 229:15 232:20 | 117:3 118:19 | **parts** 173:10 |
| 74:10,15,18 | 232:23,25 | 157:5 159:5 | 173:12 177:20 |
| 77:7,18 78:2,8 | 233:2,25 234:1 | 160:4 169:18 | 227:17,18 |
| 82:7,13 84:9 | 234:2 243:12 | 188:19 191:12 | 228:13 232:17 |
| 87:19 88:12 | 243:15 244:15 | 193:20 194:20 | 233:18 235:5 |
| 89:6,17 90:24 | 245:17 249:5 | 194:20 198:4 | 235:18 |
| 92:1,2,8 93:15 | 254:10,12 | 198:25 202:18 | **party** 176:25 |
| 95:7,8,9 97:18 | 257:5,6 263:18 | 212:11 224:24 | 177:6,11 |
| 98:22,24 99:25 | **pages** 24:17,19 | 225:25 229:5 | 180:11 181:19 |
| 102:12 104:22 | 26:3 84:4 | 229:17,18 | 182:7 226:7 |
| 109:7,9,11 | 98:21 132:14 | 231:1 235:20 | **pass** 10:13 42:5 |
| 116:1,2 117:8 | **paid** 119:21 | 235:25 238:5 | 124:10 139:6 |
| 120:17 121:24 | **paint** 97:13 | 239:2 252:16 | **passed** 40:15 |
| 122:22 130:23 | **panel** 265:25 | 255:12 260:3 | 236:24 260:23 |
| 131:2 136:20 | 265:25 | 265:22 | **path** 117:16,17 |
| 137:9,11,16,19 | **panels** 265:24 | **participants** | 117:22 194:13 |
| 137:19 145:14 | **panic** 16:16 | 8:10,16 70:20 | 256:2 257:12 |
| 145:21,25 | **paragraph** | 104:6 245:22 | 257:13,14 |
| 146:8,12,21,24 | 7:25 8:2 9:12 | **participated** | **paths** 208:18 |
| 146:25 147:5 | 49:23 50:5,12 | 43:1 59:19,22 | **pattern** 8:20 |
| 147:11,14,15 | 84:7,8,21 | 63:11 64:1 | **pause** 14:21 |
| 147:19 158:1,3 | 86:10,13 158:6 | **particular** | 15:3,9 16:12 |
| 158:5,7,7 | 158:14 161:19 | 59:23 68:1 | 16:23 17:12,16 |
| 161:22 163:12 | 162:1,7,10 | 88:20,21 | 18:17 19:16,19 |
| 167:24 168:3 | 163:2,8 167:6 | 166:21 167:14 | 19:22,24 39:21 |
| 169:2,3,12,18 | 207:14,15,18 | 178:24 224:5 | 40:1,3,10,19 |
| 169:20 172:13 | 208:3 220:17 | 227:21 262:23 | 68:5 76:12,13 |
| 172:15,20,22 | 220:20 223:12 | 268:3,4 | 76:20,24 77:3 |
| 172:25,25 | 234:14 237:18 | **parties** 11:16 | 79:2 83:1 |
| 174:19,24 | 237:21,23 | 19:9 82:24 | 90:12 91:9,20 |
| 175:5,8,21 | **pardon** 36:11 | 145:8 149:12 | 93:19 94:6,10 |
| 177:4 184:22 | 77:10 107:16 | 184:23 201:24 | 94:14,14 95:12 |
| 199:6,10 206:6 | **parent** 62:1 | 216:16 260:15 | 96:15,17 99:15 |
| 207:13,15 | | 260:23 263:5 | 99:21 100:3,16 |

101:22 115:1
145:12
**pavon** 7:12,17
8:6 10:1
**pavon's** 10:3
**pay** 41:16
211:19
**payment** 8:11
**payments** 8:18
41:14
**paypal** 251:22
**pdf** 82:7 87:19
92:2 95:9,10
97:19 102:12
199:6 238:14
**peak** 55:8
**pending** 46:24
48:6 271:22
**pennsylvania**
12:5,7
**people** 18:25
37:15 70:12,15
70:18 100:8,10
108:19 139:4
142:17 152:22
183:7 208:24
260:3 268:1
**perceived** 88:7
**percent** 14:24
15:3 16:17
17:8,9,10,12
17:14 61:8
73:25 77:8,19
102:17,17
103:12,13
106:22 119:4
120:24 121:2

123:21 127:6,9
128:3,4,8
129:19,20
135:1,15 157:3
157:9 170:8
180:12 184:2
185:14 186:1
187:4,5 189:7
189:14 190:3
192:12 197:14
211:21,22
225:11 243:3,5
243:6 244:8
245:11 246:5
257:12,12,14
**percentage**
17:1,1,22,22
120:12 121:2
127:25 244:13
257:7,10
**percentages**
120:15,23
257:11,17
**percents**
125:15 191:24
**perception**
16:2
**perfect** 182:14
257:21
**performance**
97:23 194:12
194:12,19
195:20,25
196:11,14,21
**performed**
124:5 170:24
188:22

**performing**
115:17 177:24
**period** 9:19
17:25 40:3
58:23,24 63:25
64:21 72:25
73:13 74:1,1
75:13 78:16
93:15,24,24
94:2,9 99:23
100:3,3 105:25
106:1,13
147:21 178:25
187:11 212:18
248:25 251:9
**periods** 93:22
250:15
**permission**
11:2 21:18
45:12 57:17
161:7,14
**permit** 54:1
156:12 201:19
**permitting**
53:22
**perpetual**
80:25 81:6,9
81:10 118:22
**perpetuals**
81:10 85:23
89:12 91:7
92:23 100:18
100:18,24
101:2,6,12,17
**perpetuates**
19:8

**person** 187:12
187:21 195:3
214:17,22
239:10 251:10
**personal** 47:7
63:12
**personally**
178:19
**perspective**
19:24
**pertaining**
91:13
**pessimism** 25:2
**petition** 14:9
14:12 15:9
36:9,20 38:2,4
38:10,16 39:14
39:19 40:2,3,7
40:12,20 43:14
43:25 58:23
76:13 79:7
83:2,4 91:25
112:12 128:13
150:14 156:4
**pharaoh's**
215:4
**pharaohs**
215:7,9 257:1
269:6
**pharos** 4:11,11
4:12,12 142:16
**phase** 248:20
**phillips** 5:2
141:6,8,8
142:5,21
165:18,20,21
165:25 166:7

166:11,20
167:2,3,4,5
168:1,2,4,8
169:5,7,14,15
169:21,22,25
172:14,15,18
172:21 173:3,5
173:22 174:1
206:1,5
**phone**   130:10
130:15 154:3,3
164:10,16
**phones**   164:14
**physical**
180:18
**pick**   125:8
204:16
**picture**   83:1
89:11 90:23
97:3,13 98:16
**pictures**   92:1
**piece**   55:20
181:21 186:15
190:22 249:15
**pieces**   236:14
**pillay**   66:3,5
66:15
**pivot**   117:17
**place**   19:15
38:1 77:12
99:12 119:1
152:15 162:5
175:16 223:10
236:21 239:19
252:25
**placed**   83:5
86:21 186:21

**places**   84:10,23
132:15 208:23
**plaintiffs**
223:17
**plan**   57:6
115:18 117:15
120:25 121:8
122:14 123:8,9
123:13,13,17
123:21 124:25
126:5,6,12,16
127:13 129:21
131:15,24
133:12,16
135:24 136:3
139:11 156:7
169:6 175:17
175:22 177:5
179:7 183:12
183:13,15
184:9 188:2
193:20 194:4,6
194:24 201:23
202:9,16,22
208:17 210:7
212:14 213:2,6
215:10,12
217:1,8,9
220:24 221:16
221:21 223:18
224:25 225:19
228:12 231:1
234:24 238:11
239:22 242:2,7
242:14 247:7
247:25 266:22
268:14 272:4

**plans**   213:3
**platform**   15:1
17:6,7,11
37:20 39:3
41:12,20 160:3
208:21 212:6
**play**   14:23
155:17
**plea**   7:18 10:5
**please**   7:3
10:23 11:4
12:1,11,22
13:6 14:19
17:18 21:19
23:17 27:8,17
27:25 29:22
30:17,23 31:7
31:25 32:7,15
32:23 33:15
34:7,8 43:20
44:21,24 46:7
50:19 52:4
57:16 59:20
68:17 69:13
72:10 73:7
76:21 78:11
79:25 85:11
91:11 93:1
102:23 105:4
105:21 107:7,7
107:14 109:24
113:16 114:3,8
115:23 116:1
116:23 117:7
121:24 122:18
133:3 136:18
137:25 138:15

140:9 142:25
144:4 145:14
153:21 160:9
160:13 163:20
166:5 174:4
177:16 191:7
193:14 208:2
213:11 220:13
223:12 232:11
257:8
**pleases**   159:22
162:1
**plugs**   120:2
**plus**   114:15
**pm**   272:16
**podium**   10:14
**point**   15:6 19:1
39:8 47:24
70:15 73:21
82:19,23 83:24
84:12 99:11
101:24 102:1
102:13 123:23
125:9 136:9
156:12 180:19
184:5 195:23
195:24 201:14
215:20 222:23
223:8 226:14
237:12 238:9
249:22 266:18
270:4
**pointed**   186:5
269:14
**pointing**   77:12
**points**   116:11
116:18 139:6

159:9 160:4
192:22
policy  13:2
14:4
popular  67:10
portion  61:11
160:24 167:25
196:3 225:3
portions
105:14 252:5
position  18:4
18:24 70:12,13
71:25 77:7,18
77:21 83:17
87:25 88:14
positions  19:19
68:5,7,7 70:19
81:10,18 82:25
83:3,5,20
84:13 85:14
86:21
positive  40:5
192:6
positively
226:12
possess  62:16
possibility
235:20,22
possible  82:4
173:16 194:15
194:18,19
208:25 251:21
264:17 268:7
possibly  94:5
post  19:4 45:16
56:19,21 70:12
70:16 95:12

100:16 114:25
153:3 182:12
182:23 191:11
206:14 210:13
216:12 262:10
262:14
potential  15:5
18:6 37:17
94:11 105:3
157:11 171:8
potentially
235:12
power  186:25
practicality
192:12
practice
114:11
pre  100:16
precise  44:6,8
44:9 205:2
predicted
171:1
predominantly
40:17
preferred
262:14
prejudicial
143:15 144:12
premarked
121:23
premium
235:22 236:22
243:6 244:23
preparation
25:5,8 32:8
prepare  116:20
173:14 223:14

prepared
13:18 116:21
149:13 173:16
173:17 178:21
220:23 268:23
269:1
preparing  21:9
21:21 23:14
32:24 33:16
34:9 60:18
117:5
prepetition
13:25
present  37:6
118:16
presented
59:13 149:25
180:22 257:21
press  151:8
pressure  70:18
presumed
179:10
presumes
187:15
presumption
183:12
presupposes
186:6 187:18
pretty  119:25
prevent  8:25
134:1
prevented
198:12
previous  90:23
97:2,12 161:15
197:20

previously
95:20 96:25
price  8:24,25
9:5 13:3 14:5,8
14:9,11,15,16
15:8,15,17,17
15:20,24 16:1
16:7,9,13,16
18:16 19:3,7,8
19:10 20:3
35:21,21,24,25
36:10,13,20,23
36:25 37:3
38:3 39:22,23
40:6,10,11
43:4,10,22
54:8,10,14,16
54:19,23,24
55:2,5,11,14
55:23 56:1,3,9
56:11,15,16,19
56:21,23 57:2
57:20 67:25
69:11 70:5,11
70:17,21,22
71:5,9 73:15
73:20,24 75:19
76:2,7 78:24
79:4,6 81:19
81:23 85:7,14
85:23 91:9,15
91:15 92:19,22
92:23 93:8,22
94:23 95:11,20
95:24 96:6
97:2,4,20,22
97:23 98:1,2

98:17,17
100:25 101:19
103:17 107:1,3
107:4,9,10,18
112:11 120:10
123:12,15,23
132:21 147:20
180:20 199:17
202:11 225:4,5
231:21 234:7
234:25 239:16
239:23 250:6
**priced** 133:10
156:4
**prices** 9:4
19:20 40:8
59:2 65:15
69:7,15 70:2
96:9 106:23
107:6 119:21
234:17 239:9
**pricing** 39:15
39:18,21 56:23
126:22 150:14
**primarily**
114:16 194:14
**primary** 13:21
117:16 180:4
188:22 190:10
**prior** 16:17,19
33:10 58:4,7
61:5,21 86:1
95:2 96:8
**privacy** 266:5
**private** 248:17
**pro** 5:1 42:9
80:5 111:8,23

125:21 140:10
141:2,8,10,12
141:13 142:2,8
270:7
**probably**
107:20 123:15
130:15 186:11
195:15 256:5
260:10 262:13
263:23
**probe** 237:4
238:8
**probing** 190:8
**problem** 176:7
176:7
**problems**
156:9
**procedural**
160:16
**procedure**
176:15 186:2
**procedures**
265:16,17
269:13
**proceed** 148:18
**proceeding**
203:6 233:16
**proceedings**
7:11 263:13
272:15 273:4
**proceeds** 112:6
211:22 223:15
256:2
**process** 100:24
170:15 184:16
184:17 211:13
247:11,20

252:1,25
270:15
**produced** 72:9
83:2,20 85:8
177:15,18
178:14,15
**producing**
188:8
**product** 64:3
72:6 177:15,17
**productivity**
189:3 190:9
**products** 12:15
80:25 81:10
90:5 91:14
**professional**
60:19 114:12
178:6
**profile** 232:7
**profit** 70:21
108:24 212:17
**profitably**
194:17 195:22
**program** 57:14
138:9 162:19
162:22 163:10
**progress** 27:7
79:24
**project** 249:20
249:20
**projected**
188:1
**projection**
239:8,22,23
**projections**
178:7 237:25
238:5,7,10,16

238:19,23,25
239:4 240:14
**projects** 81:6
**pronunciation**
176:8
**proof** 164:24
**proper** 151:22
151:23 155:19
**properties**
150:12
**property**
149:14
**proposal**
118:14 184:11
**proposals**
263:21
**propose**
135:15 261:3
**proposed** 57:6
129:16 201:16
201:23 202:11
225:19 259:8
262:15 263:16
263:21,24
264:25 265:6
266:11
**proposing**
267:11
**prototypical**
70:10
**proudest**
153:24
**provide** 12:1
66:15 84:12,19
85:1,24 87:9
94:22 104:6
133:9 149:11

153:16 155:5
188:12 203:8
229:12 257:16
267:3
**provided** 44:13
50:19 66:18,19
80:25 81:7
85:10 87:16,25
98:16 108:8
138:4 149:15
150:24 167:12
167:14,17
171:6 185:20
219:21 229:15
237:25 271:19
**provides**
133:12,16
244:3 245:15
256:7,10
**providing**
86:25 154:23
155:9,12,13,16
**provision**
164:25 242:11
**proximity**
119:13
**public** 9:4
117:23 119:3
155:9 179:8,17
179:18,21
180:8,8,13
183:11 187:6
208:21 211:8
212:9 251:25
256:4 257:13
259:23

**publicly** 8:9,16
151:7,14 238:1
**pull** 51:5 160:9
174:8 213:22
217:15,18
220:12 232:18
268:18
**pulled** 166:17
174:14 259:23
**purchase** 75:8
107:9 108:6
118:20 145:11
199:17
**purchased**
14:3 73:2 74:8
74:16 170:20
180:15
**purchaser**
232:7
**purchases** 8:8
8:20,24 9:3,7,8
9:9,16,17,18
13:25 72:12
186:20
**purchasing**
8:10,17 78:7
78:13
**pure** 127:5,8
129:3,9,18
134:25 135:6
135:13,21
136:11
**purely** 97:25
**purport** 221:2
**purpose** 8:23
9:8,17 19:10
176:13

**purposely**
65:12
**purposes** 15:2
117:9 121:22
132:8 137:7
138:16 215:6
241:23
**pursuant**
149:8
**pursue** 202:4
**pursuing**
165:10
**push** 70:21
241:10
**put** 16:3 19:19
21:16 36:13,20
38:3 41:24
44:4 45:11
51:10 61:9
79:1 87:7
92:24 97:24,24
124:11,15
131:19 159:11
175:4 178:14
182:25 184:11
186:16,17
190:3 205:20
212:2 213:21
225:16 227:21
228:9 236:8
257:4 260:1
261:4 262:17
262:23 264:3,8
267:18 269:17
271:7
**puts** 250:16

**putting** 35:24
245:24

**q**

**qualified** 9:20
56:8 235:24
236:2
**qualitative**
197:1
**quality** 185:22
**quantification**
41:25
**quantify** 37:24
**quarterly**
253:25
**question** 15:24
25:25 26:1
36:7 41:8
43:20 44:9
46:16 47:15
49:5 54:15
55:1 56:2 58:3
64:14,19 69:4
69:13 74:12,14
74:20 75:3,4
75:10,17 76:21
77:15,25 78:10
81:15,17,22,25
84:24 85:11,18
86:2 89:20
91:10,17 92:16
93:2 94:19,20
94:25 96:24
98:12 100:22
100:22 102:23
103:6 105:5,19
105:21 107:3,7
107:17 108:16

108:22 109:24
110:9,11,15
111:11 112:2
124:23 126:4
126:17 127:20
128:6,18
130:21 132:16
134:7 136:17
138:10,13,20
139:3 140:1,16
140:22 141:16
141:16 150:20
151:12,14,19
151:23 152:5,7
152:17,25
154:22 156:2
156:10,19
157:14 158:11
160:16 161:16
163:20 165:14
173:18,21
176:20 180:3
180:10 190:8
192:13,22
198:2 199:25
200:22 201:10
201:12,18
202:13 203:2,5
203:6 204:16
204:21 206:18
207:5,5,10,10
207:24 208:8
209:6,8,23
210:10,19
214:1,11,14
221:23 222:18
222:18,19,19

223:2,5 226:9
228:4,7,9
230:4,12,19
235:16 236:25
240:9,17
245:25 246:1
251:2 255:15
269:10
**questioned**
  140:23
**questioners**
  206:9
**questioning**
  177:12 238:9
**questions** 45:4
  50:14 57:2
  60:8 64:14
  65:22,25 68:13
  68:14 75:23
  79:12 90:21
  96:2 97:16
  111:5 122:12
  140:20,24
  141:9 144:17
  148:17 152:23
  161:3 162:15
  164:19,20
  165:2,12 173:4
  173:20 181:13
  184:19 187:7
  190:19 193:9
  197:22 198:19
  200:16 203:24
  205:14 208:1
  222:1 237:14
  237:16 240:1
  270:19

**quickly** 27:1
  119:25 194:15
  194:18,19
  208:24 247:7
  251:21 252:3
  264:24 265:3
**quinn** 4:10
  142:15 215:3
  269:5
**quite** 67:12
  70:19 99:13
  117:21 124:24
  155:10 186:12
  186:13 212:2
  230:19 243:8
  247:21,22
  262:23 265:3
  267:14
**quote** 102:14

**r**

**r** 1:21 3:1 7:1
  273:1
**raise** 10:23
  113:10 171:8
  252:22 265:13
  270:6
**raised** 61:10
  64:3 122:12
  164:21 266:5
  266:15
**raising** 61:8
  252:19
**range** 75:7,7
  120:7,11
  162:10 180:23
  190:4,15 232:4
  252:17

**ranges** 260:13
**ranging** 12:15
**ransomware**
  11:21
**rapidly** 69:7,15
  70:1
**rate** 41:15,19
  71:23 89:14,18
  211:20 214:15
  214:15 231:14
  257:22
**rates** 91:7
  239:9
**rather** 78:19
  186:14 260:11
**ratio** 242:8
**raw** 85:18
**reach** 121:5
**reached** 10:2
  55:8 114:25
  271:18
**reaching** 107:6
**read** 7:25 8:14
  49:1 68:18
  69:21 83:16
  133:2 137:13
  137:25 138:2
  147:4 158:10
  161:20 162:1,2
  162:6 163:8,11
  207:17 219:23
  219:25 234:13
  259:6,25 260:8
  269:12
**reading** 53:1
  80:16 86:9
  106:22 146:24

162:2 221:7
259:7 260:11
**reads**  162:7
**ready**  115:9
186:18,19
196:18 264:24
**real**  18:9 39:4
100:23 183:5
211:24
**reality**  38:11
156:24
**realized**  221:4
221:9
**really**  16:9
20:3 36:23,24
37:4,5,9,24
39:1,4,23
64:23,23 79:1
79:1,4,7 93:18
93:20 94:14
96:8 100:8,9
117:23 171:11
181:8 183:2
192:22 195:4
213:3 214:23
217:11 218:1
238:24 253:19
265:21
**reason**  92:25
103:24 104:5,8
104:12 151:13
188:19 192:10
227:4 253:10
261:16 269:2
**reasonable**
16:4 171:25
172:4,5

**reasonableness**
168:11 170:4
237:4,5 238:8
**reasons**  17:19
158:17 159:1
180:13
**recall**  25:4
40:4 55:8,9
56:22 61:7
64:1,11,23,24
64:25 65:5,7
84:2 88:6,8
90:6,10,15
94:15 192:21
199:9,16,20
203:7
**recap**  254:20
**receive**  72:5,8
91:13 102:21
102:24 110:19
123:11,21
124:22 126:12
126:13,14,15
138:8 163:24
164:2 230:1,5
231:25
**received**  45:15
86:5 88:1,9
89:1 90:7
91:12 103:5
105:12 110:25
120:9 171:5
232:8
**receives**  230:2
230:6 231:22
**recent**  50:2

**recently**  66:23
195:7,9
**recess**  25:18
27:1,5 79:11
79:22 142:24
193:11,13
**recessed**
142:22
**recognize**
13:10,14 79:15
168:9,10
**recollect**  88:4
**recollection**
23:13
**reconciliation**
184:17
**reconnect**
144:3
**reconnected**
144:9
**record**  7:25
24:11 63:16
80:1 121:22
132:9 137:7
138:17 164:22
174:21 175:20
205:21 213:10
215:6,11
232:17 241:23
245:25 254:7
259:6 260:12
267:18 269:16
273:4
**recording**  27:7
79:24 115:10
**records**  34:23
34:24 176:23

184:16
**recover**  164:2
**recoveries**
157:1 191:23
211:15 217:13
220:25 223:16
223:20
**recovery**
120:12,15,21
120:22,24
121:2 123:7,16
123:18,22
127:25 135:12
156:3,7,22
157:3,9,12
163:14,22,24
170:8,11 172:1
175:18,22
176:13 178:5
178:15 183:7
201:8 244:13
255:25 256:2
257:7,10,12
**recross**  6:3
**red**  96:14
123:10,19
125:10
**redeploy**
195:17
**redirect**  6:3
22:22 112:15
256:17,19
**redistributes**
183:8
**reducing**  115:7
**reductions**
115:7

**refer** 47:24
82:6 92:5 93:5
105:2 108:7
120:16 129:22
136:20 151:21
167:7
**reference** 28:3
28:5,18,21,24
29:24 30:3,8
31:10,15 32:3
32:18 33:11
34:1,5 41:9
50:24 99:11
263:17
**referenced**
18:20 26:22
30:25 86:8
168:20 259:8
**referencing**
30:20 206:9,12
221:11,13
**referred** 15:11
84:10 100:15
101:18 117:19
118:3
**referring** 46:8
49:23 74:10
81:9 83:14,25
86:4,17 88:21
92:6 95:19,23
100:17,19,23
100:24 101:1
109:9 131:7,14
133:6 149:24
152:12,13
162:11 166:6
169:13,21

178:22 233:4
271:4
**refers** 16:7
71:24 89:18
106:5
**reflect** 9:4 53:8
108:1,3,18
221:2,8
**reflected** 32:7
32:9 78:8
183:20 198:18
**reflection**
35:22
**reflective**
179:2
**reflects** 109:1
**refresh** 23:13
**refused** 270:14
**regard** 242:3
**regarding**
13:25 39:24
43:10,22 91:16
94:11 119:14
**regards** 174:3
**regular** 44:14
**regulate**
186:25
**regulation**
9:21
**regulatory**
198:11
**reigns** 25:2
**reintroduce**
114:8
**rejected**
126:20 270:12

**rejecting**
128:21
**relate** 119:17
**related** 44:19
45:7 115:18
118:13 121:21
144:21 226:7
**relates** 124:8
191:12
**relating** 27:22
84:13
**relation** 115:13
158:18
**relationship**
61:17,22,25
62:1 63:6,10
240:24 241:2
**relative** 76:17
220:24
**release** 203:10
268:2
**released**
266:18,22
**releases** 266:17
266:25 267:10
267:11 268:8,8
**relevance**
19:13
**relevant** 9:21
96:12 240:7,9
**reliable** 16:4
18:16 35:23
79:4 96:10
**reliance** 20:11
21:3 22:13
24:12,16 25:22

**reliant** 168:17
**relied** 21:21
23:11,14,24
24:7,20 25:7
27:13 28:8
29:14 30:7,24
31:15 32:8,24
33:15 34:9
170:1 190:18
235:2
**rely** 21:10 22:7
22:11,16,18
23:19 168:20
171:4 176:23
**remainder**
262:19
**remained** 15:2
**remaining**
120:16,20
139:6 212:11
265:20
**remarks**
156:22
**remember**
226:11
**remembering**
197:16
**reminding**
116:13
**removed** 18:1
**renew** 239:25
**reorg** 201:23
202:9,16,23
**reorganization**
202:17 225:19
**reorganize**
38:17,20

**repeat** 43:19
59:20 64:19
69:13 74:20
76:21 78:10
85:11 91:10
93:1,1 102:23
105:4,21
109:24 154:22
192:3 207:23
208:1 209:14
209:17 237:9
**repeatedly**
164:13
**repeating**
46:16
**rephrase** 91:4
96:24 109:1
151:25 202:21
224:21
**replaced**
118:25
**replacement**
187:19
**replied** 85:22
**reply** 271:16
**report** 13:17
13:20,24 14:7
18:19 20:5,16
21:9,21 22:7
22:13 23:6,10
23:15,24 24:18
25:5,8,22 26:4
26:17,20 27:14
27:16 28:9,18
29:22 30:25
31:8,11,16
32:1,9,16,24

33:16,24 34:10
50:11 60:18,23
60:24 66:16,19
66:20 68:4,18
69:21 72:11,15
72:24 73:7,14
74:7,15,25
77:6,17 78:9
82:13,15,16
83:9,9,25 84:1
84:10,12,18,22
84:23,25 85:4
85:7 86:7,22
91:24 92:3,4,6
94:22 95:1
97:18 102:13
145:14,17,18
145:19,20,25
146:15,21,25
147:3,11,19,23
149:25 153:17
154:24 199:2,4
226:11
**reported** 88:7
89:16 151:8,14
203:13
**reporter**
259:19
**reporting**
149:7
**reports** 21:4
92:1 150:2
153:18 154:24
155:9,12,13,16
155:18,22,24
177:13

**represent** 78:3
108:24 118:1
**representation**
65:13
**represented**
40:18 222:10
**representing**
26:7 153:24
222:21
**represents**
15:18 16:4
37:6 40:6 78:4
119:8,9 123:14
177:3 211:7
**repurchased**
75:12
**reputable**
177:2,11
**request** 34:2
45:12 57:16
**requested** 49:2
91:8
**require** 210:7
**required** 91:2
115:10 171:8
177:8 181:24
182:1 187:10
**requirement**
177:10
**requirements**
149:8 176:15
**requires** 74:24
138:24
**research** 42:25
43:1 61:5,16
62:6,7,9,16,19

**research's**
61:22
**reserve** 215:14
269:21
**reserved**
269:10
**reserves** 211:4
252:6
**reserving**
215:18
**respect** 14:17
18:19 19:25
24:11 78:23
79:6 83:4,20
86:20 108:23
112:11 115:15
131:24 143:14
144:11 188:13
236:17 265:20
**respectfully**
58:11
**respective** 87:2
260:23
**respond**
132:18
**responded**
271:16
**response**
122:11 238:17
**responsible** 8:7
148:21 155:21
155:23
**rest** 34:20
120:21 164:12
179:20 211:14
258:2 260:5

restate   107:7
  163:20
rested   258:4
restricted
  112:10
restructured
  39:6
restructuring
  37:19 39:7
  114:11,15,19
  114:21,24
  115:4,9 257:16
restructurings
  114:18
result   156:3
  226:3 235:14
  235:14
resulted   181:2
resulting
  223:16
results   124:7
  211:9
resume   79:13
  261:25 272:3
return   208:24
  231:25 250:23
  250:24,24
returned
  194:14
reuters   25:1
  151:8
revaluation
  119:5
revenue   7:17
  189:3,20
  194:10

revenues
  185:22
review   188:15
  190:24 191:8
reviewed   18:11
  66:22 123:25
  147:7 194:3
  219:21 238:19
reviewing   25:4
revised   7:9
  131:15
rewards   32:20
  33:12 72:12
  195:19
ribbon   146:14
richard   5:2
  141:8
rig   119:20
  120:8,10
  180:17,17,20
  187:19
right   7:4 9:24
  10:23 13:21,22
  26:21 27:8
  30:14 31:4,21
  32:12 33:3,20
  34:14,22 35:3
  41:4 42:7,11
  43:17 46:2
  51:25 52:8
  54:6 57:18
  72:14 76:14
  77:14 78:2,8
  79:25 84:8
  86:4 87:15
  90:4 91:18
  92:12 93:8

  95:20 96:19
  100:2 101:14
  101:15 109:3
  112:14,18
  113:10 116:15
  117:19 121:11
  121:11 125:13
  130:6 136:16
  137:2 140:3
  141:20 142:17
  142:17,25
  146:4,5 152:19
  152:22,23
  154:16 155:15
  159:8 161:2
  162:13 164:12
  165:16,24
  166:10,23
  167:3 169:23
  170:1,10
  171:16 174:21
  175:7 178:3,23
  179:5,6 180:25
  181:20 185:4
  188:4 193:11
  193:14 203:18
  204:1,18 205:5
  207:21 210:9
  212:23 214:20
  216:23 217:23
  218:22 219:2
  219:15 222:9
  225:13,22
  227:8 231:8,17
  231:24 232:2,3
  235:10,22
  236:12 239:19

  243:21 244:11
  244:12,14,19
  247:16 250:4
  251:2,19,20
  253:1,2 258:2
  258:19 261:12
  262:3,7 264:18
  265:17 268:12
  268:16,20
  269:1,21 270:5
rights   89:11
  143:15 144:12
  159:10 160:2
  215:14,18
rigs   118:21,23
  119:11,20,22
  119:24 120:2,6
  170:14,15
  180:15,23
  186:20,25
  194:17 195:16
  195:21,21,21
  196:1,4,12
  197:5
ring   66:12
ripple   270:11
rise   7:2 27:6
  69:12 70:5,11
  73:25 79:23
  142:23 250:5
rises   250:4
rising   69:7,15
  70:2
risk   11:25
  234:12 236:11
  236:12,14,16
  236:19 250:24

risks 236:21
road 252:7
  273:21
robert 6:5
  112:24 114:6
  114:10 125:25
  256:19
roger 102:7
role 193:22,24
rollup 190:24
roni 7:12 10:1
room 164:10
  192:8
room's 195:3
rose 55:11
  73:15
roughly 123:18
  125:9 211:11
  211:12
round 43:2
  64:2,2,10,24
  65:3
rounds 63:9
rule 10:5,6
ruled 57:14
rules 153:21
rumor 13:1
rumors 15:4
  94:10
run 70:15
  170:16 186:23
  211:13,18
  225:20
running
  106:17 120:3,4
  164:23 186:7
  187:1 196:13

252:1
runway 115:8
  253:13
rush 264:17
rushing 258:16
ryan 168:13
  182:2 220:13

s

s 3:1 4:23 7:1
  63:16 82:11
s&p500 58:9
sabin 4:23
  164:20,21
  165:4
safe 53:13
sale 54:23
  91:14 105:23
  106:6 170:13
  170:15,17,17
  170:19,24
  171:12 172:3
  179:3,10,23
  180:6,18,21
  221:4,9 253:7
sales 105:2,2,8
  105:9 106:6
  109:2 120:6
sam 62:3,11,13
satisfied
  165:15 231:7
satisfy 125:5
saw 19:18
  181:9 266:10
saying 25:23
  36:10 85:1,3
  86:20 107:8
  151:24 169:10

176:4 177:21
  195:11 268:7
says 8:7,15
  46:24 49:2
  53:3 69:18
  84:21 86:8
  103:8 104:25
  105:1 106:4
  124:6 133:2,8
  163:9,12
  164:25 196:14
  199:8 208:7
  220:21 222:24
  223:24 234:14
  237:23 238:3
  244:11
scale 95:14
scanning 84:3
scared 100:11
scenario
  123:24 157:4
  183:1 210:25
  212:4 218:10
  218:11,11
  251:18 252:10
  253:10 255:17
  255:19 256:7
  257:11,18,18
scenarios 39:8
  104:10 117:15
  117:16 120:23
  123:8,14 136:7
  174:16 217:12
  218:10,13
  255:5,9 256:4
  256:8

scenes 211:14
  236:6
schedule 173:8
  210:23 263:6,7
  263:8,22
  269:14
scheduled
  211:8 261:25
  264:4,7,11
scheduling
  268:20
scheme 159:10
  159:15
school 12:4,6
science 12:4,6
scope 46:21
  128:24 148:10
  148:11 201:18
  214:21 241:15
screen 51:10
  51:23,25 53:2
  117:7 161:6,7
  161:12 162:14
  174:8,22
  175:12,23
scroll 52:3
se 5:1 42:9
  80:5 111:8,24
  125:21 140:10
  141:2,8,10,13
  142:2,8 270:8
sealed 203:9
seat 113:17
seated 7:3 27:8
  79:25 142:25
  193:14

sec 252:1
second 10:7
15:10 35:9,18
36:12 42:10
45:21 51:20
72:3 83:10
116:22 121:15
136:18 138:14
143:3 145:18
153:11 164:9
169:11,15
174:10 175:19
184:25 186:10
186:13 188:19
191:11 196:6
210:23 211:2
211:23 218:1
220:21 234:13
243:14 254:12
257:6 260:2
seconds 111:20
section 105:1
130:24 132:24
133:2 136:21
137:25 219:4
securities
12:16 162:9
163:10 201:24
221:5,9,10,11
234:18 248:18
security 9:20
19:5 69:19
70:2 162:8,9
162:19 163:3
179:19 202:24
sec's 198:11

see 13:16 21:1
21:5 23:11
24:2,25 27:19
27:22 28:1,17
28:21,24 29:24
30:19 31:11
32:3,4,18,20
33:12 34:1,3
35:25 36:14
37:21,22 38:12
45:23 49:1
50:23 51:1
52:1,7,24 53:2
53:5,7 55:23
57:17 70:19
73:20 74:21
75:14 77:11
83:13 84:4
89:12,14,20
92:2,8 95:8,12
95:17,21 96:12
96:15 97:3,19
98:25 99:8,9
99:14,18
100:10,12
103:24 104:8
104:11 123:18
132:6,16,24
137:23 146:8
146:24 147:14
147:15 150:1
151:22,24
155:15 156:6
157:11 162:14
163:8 179:16
182:15 187:16
188:20 195:24

204:20 205:15
206:21 209:12
210:13,15
211:25 213:11
216:17 219:4
220:21,25
221:5 223:24
226:22 233:24
233:25 234:4,9
234:13,18
236:9 237:23
239:12,16,20
244:1,7 259:9
263:24 265:9
266:4 267:17
268:9 269:2
270:24 271:11
seed 167:17
184:10 219:1,2
219:5 224:13
227:5,7 231:14
235:19 256:12
seeding 255:20
256:14
seeing 62:6
70:21 88:6
seek 22:25
215:18
seeking 25:24
26:15
seem 197:18
seemed 171:10
266:8
seems 46:25
171:20 220:10
230:19,21
248:13 261:23

seen 22:8 53:1
53:23 54:1
56:21 88:11,15
88:20,24 89:24
90:18 172:12
173:6 180:15
204:14 206:23
238:18,20,21
267:25
selected 62:19
101:24,25
215:12 243:1,2
self 19:8
sell 17:24
19:11 65:14
71:4,6 93:7
100:7 104:7
119:10,23
134:2 139:5,5
198:9 201:14
230:2 248:11
seller 73:1
sellers 69:9,11
69:17 70:4
selling 59:13
62:24 67:25
74:2 108:14
198:12 208:23
211:19 230:13
sells 108:19,22
semantics
187:17 253:16
send 207:9
213:24 214:2
sense 42:1 49:4
80:20 152:21
247:24 265:9

sent  7:16
  194:23
sentence  8:14
  163:10,21
  220:21,22
  221:7 234:14
  237:23
separate  15:19
  22:20 119:13
  158:18 213:4
  235:17 249:24
separately
  223:9 224:25
  227:18
september
  13:18,20,24
  34:2 131:16
  196:3 239:12
  239:13,13,15
series  37:5
  43:2 61:9 72:8
  98:2
serious  164:9
service  187:24
services  179:15
serving  214:9
session  143:1
set  13:24 40:22
  86:7 166:3
  180:1,4 194:19
  197:8,10
sets  13:3
setting  269:16
settlement  57:7
  57:11 126:20
  133:11 136:21
  137:18,20

162:1
settlements
  165:9
settling  202:11
seven  53:6,6
  68:20 109:17
  109:22,25
  110:19,24
  205:7,17,18
seventeen  28:5
  28:13 143:13
  144:10
seventy  29:4
several  65:5,6
  67:11 122:14
  130:17 164:14
  186:16,17
severity  115:2
shape  39:1
shara  4:6
share  156:22
  161:7,14
  178:13 191:7
shared  51:23
  157:2 174:5
shareholder
  63:18
shares  221:12
  221:20 230:24
sharon  5:3
  141:10 142:10
shed  203:12
sheet  30:4
  211:12
sheets  21:8
sheik  140:6,10
  140:14 141:5

142:5,20
  148:16,17,20
  149:10 150:6
  150:21,22
  151:4,5,11,13
  151:18,20,24
  152:1,9,13,14
  152:19 153:1
  153:10,14,15
  153:23 154:5
  154:12,18,20
  154:21 155:7
  156:9,14,16,20
  157:16,18
she's  175:14
shift  225:3
  247:7
shifted  65:5
shoba  66:3,5
  66:15
shock  12:25,25
  13:3 18:10
  19:3
shocking  55:23
shocks  16:12
shoe  16:21
short  18:4,6,21
  18:22,23,24,25
  19:2,4,7,11,13
  19:16,17,19,22
  20:1 26:25
  37:2 59:19,22
  63:24 67:19,25
  68:5,6,7 69:6,8
  69:11,14,16,25
  70:1,4,6,10,12
  70:17,19,24

82:25 83:5,17
  84:9,13 85:8
  86:21 87:25
  88:8,13 91:18
  91:19 265:3
shorted  19:21
  69:9
shorter  207:21
  208:5,14 256:5
shortfall  153:6
shorting  71:1
shortly  58:23
  94:13 96:17
  269:13
shorts  19:12,20
  20:2 70:22
shot  260:25
shouldn't
  189:20
show  34:24
  47:5 74:22
  88:13 93:18
  97:1,12 108:20
  108:21 120:19
  120:19 122:18
  139:10 155:13
  175:3 183:7
  209:1 213:24
  233:23 243:11
showed  96:25
  97:12 175:5
  249:5
showing  48:17
  83:3 85:14
  92:18 94:16
  95:2,13 117:13
  123:6

**shown** 52:23
179:23
**shows** 73:14
74:7,15 89:11
90:24 94:8,23
95:10 97:20
100:2 101:11
117:15 123:7
123:10 146:1,3
146:22 147:1
147:19 175:9
218:9
**side** 91:20
101:6 114:17
125:3 134:3
247:19
**sides** 210:14,16
**sight** 179:25
180:6 187:23
**sign** 105:1
**signature**
13:14 35:16
116:2,3 122:1
122:2 273:7
**signed** 186:18
191:13
**significance**
14:17
**significant**
40:2 62:25
67:2,4 69:8,16
80:19 81:18
82:25 92:23
101:12 104:14
110:17,18
118:24 226:8

**significantly**
107:1 192:11
242:16,19
257:19
**signs** 94:17
**similar** 95:16
98:3 110:19
119:2,24 241:7
241:9 248:2,5
248:6
**similarly**
226:15
**simply** 118:11
224:9 227:4
**simultaneously**
154:14
**single** 190:15
**sir** 14:7 26:2
27:14,19,25
29:4,24 30:6
32:3 46:10
51:19 57:3
98:13 127:21
127:24 128:13
129:4,22
130:24 131:1
132:1,2,19
134:25 135:6
136:20,24
137:13 138:3
138:14 140:20
175:2
**sit** 63:12 64:1
84:2
**site** 7:15 30:7
30:22 119:12
170:20,20,24

170:25 172:2,3
180:6 187:23
195:7,9 260:1
**sites** 81:18
187:25
**sitting** 17:5,13
17:23 41:17
250:21
**situation** 38:23
65:14 115:2
152:15 194:9
194:10
**six** 183:2,4,5
251:6,8,12
253:13,14
**sixteen** 28:4,5
28:13
**size** 115:7
125:15 151:6,9
151:16 152:2
152:10,12
**skinny** 206:7
**skip** 151:4
153:12
**skittish** 16:20
**slack** 27:20
**slide** 117:12
238:13,14,14
**slides** 116:20
**slight** 252:23
**slightly** 144:2
186:12
**slowly** 75:23
81:3
**slug** 211:3
**small** 35:6
61:11 64:2

160:3 163:25
**smaller** 75:20
76:3,9 156:3
179:8,12,13,14
**smallest**
245:16
**smoothly**
25:21
**social** 19:15
**soft** 187:2
**software**
118:22 186:24
**sold** 73:2
105:23,24
106:12 145:2
147:2 163:9
198:13 231:5
231:22 252:14
**solely** 220:23
**solemnly** 10:24
113:12
**solicitation**
233:10
**solution**
118:16
**solutions**
273:20
**somebody**
45:19 71:2
131:3 154:3
164:15 271:4
**somewhat**
125:16 226:17
**sonya** 2:25
273:3,8
**sorry** 26:21
28:18 29:3

31:19 33:6
36:6 43:9,19
54:15 56:2
59:20 64:6,15
64:19 66:4
68:19 69:13
74:14,20 75:9
75:25 76:21
77:25 78:10
83:11 85:11
89:16 91:10
92:10 93:1
96:4 103:6
105:4 109:9
113:2 137:4
143:6,12
145:15 155:10
157:5,8 160:25
161:22 166:9
170:22 172:13
172:21 174:13
176:18 186:4
189:19 191:1
192:3 193:24
195:8,10
200:21 204:16
206:2 209:21
212:19,24
213:7,8 215:5
220:14 236:18
237:9,20
238:13 239:19
239:20 241:17
243:17 269:1
271:2
**sort**  12:25 13:3
37:2 39:8 40:6

71:3 99:18
120:20 180:17
183:8 188:17
202:22 248:14
**sorts**  211:21
272:7
**sound**  67:13
143:25
**sounding**
153:20 154:9
**sounds**  84:15
154:18 171:16
173:3 205:6
227:23 253:2
**source**  90:24
**sources**  259:24
**south**  226:13
**southern**  1:2
**sp**  4:11,12
**space**  114:15
188:12 220:16
**spc**  4:11,12
**speak**  23:2
80:22 88:3
104:20 178:1
178:20,23
182:3 187:12
187:21 189:17
190:23 213:3
230:20
**speaking**  18:7
42:3 80:19
91:21 103:19
144:7,8 196:24
198:24 239:1
**speaks**  95:5

**specializes**
80:16
**specialties**
11:18
**specific**  44:21
44:24 45:4
84:9 98:19
151:21 159:12
210:1
**specifically**
61:25 115:14
115:16 118:18
119:9 176:17
176:19 184:9
186:17 187:3
**specifics**  80:22
192:21,23
196:16
**speculate**
55:14
**speculation**
38:19 246:11
**speed**  195:15
266:13
**spend**  260:4
**spike**  98:25
**spikes**  99:4
**spiral**  23:7
**spoke**  180:14
238:25
**spoken**  245:23
**spot**  100:17,23
101:1,3
**spotted**  91:6
**spread**  99:24
100:4 102:18
102:19 103:13

**spreads**  100:10
102:16,25
103:12
**spreadsheet**
28:25
**spreadsheets**
149:19
**spring**  65:1,2
**squeeze**  18:7
18:21,22,23
19:2,13,16,18
19:22 20:2
59:19,22 69:6
69:14,25 70:1
70:6,10
**squeezed**  20:2
**squeezing**
70:22
**stabilizes**  25:1
**stack**  175:14
**staff**  155:17
225:23
**stake**  250:14
250:22
**stakehound**
226:16
**staking**  179:15
**stamp**  24:12,16
88:5
**stand**  112:24
113:8
**standalone**
179:21 208:20
212:9 224:17
224:19 225:23
227:4 236:10

**standard**
177:14,17,19
177:22,23
**standards**
177:25 189:13
**standing**
173:12
**start** 92:18
95:18 97:1
157:25 161:10
187:19 220:22
248:9 252:2,3
264:4 269:2,3
271:9
**started** 15:4
24:1 94:13
**starting** 92:19
94:10 118:5
226:14 268:22
**starts** 12:24
19:2 35:10
99:19 252:4
**state** 97:22
246:25 247:10
258:16
**stated** 14:4
59:9 61:5
92:22 95:20,25
161:19 188:17
**statement** 10:4
40:17 91:1
111:19 117:3
118:19 129:22
129:25 130:20
131:5,16 168:5
172:11,18,22
173:1,10,11

199:3 207:13
208:13 213:12
213:13,17,21
219:24 232:12
232:14 233:8
233:20 249:4
**statements**
60:23 130:19
203:7
**states** 1:1,12
4:1 7:12
126:11
**stating** 163:2
**status** 158:18
159:24
**statutory**
211:20
**stay** 161:15
246:3
**step** 270:15
**steps** 179:22
**stock** 38:15
55:22 62:15
69:18 70:2
221:15,20
223:21 228:22
230:1,2,3,5,7
231:2,4,10,18
231:21,22
232:8,9 234:7
234:8,16,24,25
235:3 236:17
242:9,10
244:10,17,17
244:22,24
245:4,9 246:5
246:9

**stood** 179:17
**stop** 83:10 93:6
98:11 140:7,18
164:8 175:19
**stops** 9:11
**stout** 149:24
167:17 178:20
181:21 182:1,5
182:23,23
224:8,12 226:4
226:10,23
227:1 247:4
**straightforw...**
89:2
**strategies**
250:17
**strategy** 104:3
**straws** 39:9
**street** 4:3,20
12:13
**strictly** 108:22
**strings** 146:3
**strongly** 37:21
**structure**
44:11 62:4
63:8 191:10
**structured**
12:15
**study** 44:10
**sub** 82:23
**subject** 22:24
122:10 170:6
187:14 200:19
200:24 201:1
201:25
**submit** 54:4
258:22 259:2,4

260:11 261:4
261:16 264:21
264:25 267:5
272:5
**submitted**
60:19 115:21
116:5 166:3,7
177:13 233:15
262:11 271:4,7
271:13
**submitting**
262:4 269:7,15
**subordinate**
162:22
**subordination**
165:1
**subpoena** 72:6
85:15 88:1
89:1
**subpoenaed**
84:13 90:3
203:9
**substance**
36:12
**substantial**
67:12 104:19
**substantially**
40:21 77:21
100:12
**substantive**
182:1
**subtitle** 234:4
**success** 194:20
**suddenly** 14:23
14:25
**sufficient**
197:18 203:11

**sufficiently**
153:5
**suffix** 29:25
**suggest** 59:4
**suggested**
198:9
**suggesting**
215:15 253:21
253:23,24
**suggestion**
26:25 225:6
**suisse** 12:13
80:12
**suite** 4:3
273:22
**sullivan** 4:10
**sum** 75:15
227:2,16
228:13 250:11
**summarize**
13:23 115:3
186:4
**summarized**
120:7
**summary**
103:10 114:12
117:14 118:2
**summer** 65:1
**sums** 167:19
249:21
**supplement**
92:7 199:2,3
**supplemental**
50:2 60:24
66:20 82:14,17
92:4 121:20
122:10,11

123:25
**supplied**
182:23 185:10
**supply** 13:1
14:24 15:3
16:23 17:3,8
17:15 18:1,2,8
77:9,20
**supplying**
186:24
**support** 18:12
188:4 265:12
271:16
**supported**
223:19
**supporters**
264:21
**supporting**
189:9 205:24
**supports** 20:4
**supposed**
93:18 125:4
209:18 221:19
221:20 224:2
264:5
**sure** 7:21 8:1
12:3,12,24
13:8 14:2,21
15:14 17:19
18:23 22:17
23:4 24:25
27:18 33:5
34:23 50:3
51:21 58:1
60:22 63:8
67:3 68:15
69:23 75:25

76:17 80:22
81:16 82:10
93:17 99:5
114:14 118:10
119:19 123:7
131:4 147:5
150:21 154:22
156:14 158:22
160:17 162:4
165:4 166:24
174:25 175:20
177:14 180:3
180:10 181:14
182:18,21
186:5 189:14
202:14 204:21
207:24 214:25
215:22,25
217:14,25
218:2 222:20
230:19 233:22
235:16 249:3
254:6 259:6
262:25 265:5
266:14 267:18
267:21 268:16
268:25
**surprise** 55:11
242:16,19,22
**surprised**
154:13
**surprising**
82:2
**sustain** 246:1
**sustained** 43:7
44:17 45:3
47:9 48:14,19

49:9 52:15,21
53:11,16 54:21
57:1 59:7,16
60:4 61:3
65:19 67:16,22
68:9 72:2 73:5
74:4 87:6 89:5
89:24 93:11
97:9,15 98:6
101:9 126:8
127:3,11
128:24 133:5
133:21 134:14
134:18,23
135:3 136:1,6
139:15,20,24
148:1,7 151:3
153:9 158:22
162:25 163:6
178:10 190:6
199:25 202:2,7
205:12 233:13
237:13 240:2
240:11 246:12
**sustaining**
90:20 156:15
**swaps** 81:9
**swear** 10:24
113:12
**swing** 255:8
**swirling** 15:4
**switch** 178:12
**sworn** 113:10
**system** 16:13
**systems** 149:19

| t | 269:22,24 | team   72:5 | 218:14 231:6 |
|---|---|---|---|
| **t**   273:1,1 | **taken**   41:15 | 109:16 117:5 | 257:24 |
| **t.j.**   3:20 24:10 | 99:12 156:2 | 119:20 155:17 | **testified**   18:15 |
| 258:10 260:20 | **takes**   212:13 | 180:15 | 22:10,15 |
| 269:20 | 250:16 253:11 | **technical**   44:19 | 110:22 128:25 |
| **tab**   13:7 23:7 | **talk**   79:18 | 44:22,25 45:1 | 168:14 219:16 |
| 24:23 25:10 | 91:24 119:7 | 45:7,9 94:12 | 220:9 221:25 |
| 28:1 30:6 35:6 | 194:11 234:23 | **telephone**   9:7 | 222:3 245:18 |
| 92:10 115:24 | 259:2 | 9:16 | **testifies**   7:19 |
| 116:23 121:16 | **talked**   119:6 | **tell**   53:3 64:7 | **testify**   68:13 |
| 174:9,10 | 227:3 254:16 | 69:10 70:4 | 107:22 |
| **table**   88:20,21 | 254:19 | 104:23 105:7 | **testifying**   8:6 |
| 88:22 96:5,24 | **talking**   15:15 | 107:14 147:3 | 96:3 136:6 |
| 97:19 108:2 | 15:16 27:12 | **telling**   251:1 | **testimony** |
| 109:8,16 | 63:7 70:9,10 | **ten**   27:3 71:16 | 10:24 20:7 |
| 118:14 130:2 | 82:14 90:11 | 87:20 111:20 | 40:22,24 49:18 |
| 130:25 132:5,6 | 185:9 206:3 | 136:17 142:17 | 49:20,23,25 |
| 132:7,25 133:8 | 213:17 226:25 | 168:3 | 50:1 60:7 78:6 |
| 133:9 199:11 | 226:25 249:24 | **term**   71:23 | 78:12,19 79:20 |
| 244:1,3 | 249:25 265:13 | 78:19 183:15 | 86:1 112:19 |
| **tactfully**   190:8 | 268:9 | 211:12 | 113:13 116:7 |
| **tail**   251:8 | **tally**   109:20,25 | **terminology** | 116:19,20 |
| **take**   22:4,16 | 110:22 | 195:21 | 118:6,11 122:4 |
| 25:17 39:1 | **target**   194:12 | **terms**   105:10 | 124:2 125:1 |
| 67:19 76:7 | 195:22,24,25 | 106:7 186:18 | 128:16 138:25 |
| 79:11 111:20 | 196:3,7,11,14 | 218:18 227:1 | 151:2 153:8 |
| 115:24 139:4 | 196:20,21,25 | 245:22 255:17 | 157:3 180:24 |
| 140:5 184:1 | 197:19 | 258:7 | 198:25 235:4 |
| 193:11 211:5 | **targets**   194:6,8 | **test**   115:16 | 251:17 252:16 |
| 212:14 218:5 | 194:10,11,15 | 121:7 123:20 | 252:24 262:4 |
| 218:17 230:11 | 197:10 | 124:7,20 125:6 | 266:11 269:15 |
| 237:6 239:12 | **tasked**   115:16 | 126:10,11 | **tests**   127:14 |
| 247:11,15 | **taught**   12:6 | 130:7 139:7 | 185:17 |
| 248:19 252:1,7 | **tax**   200:3,7,14 | 174:4,14,15 | **texas**   119:12 |
| 258:19,25 | 201:3 | 176:14 191:20 | 265:23 |
| 259:5,12,24 | **taxes**   200:9 | 192:2,9,17 | **text**   146:3 |
| 264:22 265:8 | | 197:16 217:4,7 | |

[thank - think]                                                    Page 72

**thank**   7:23
  10:13 11:6,6
  25:19 27:4,10
  34:17,18 42:5
  42:7,13 46:1
  51:8,12,14,24
  53:3 55:1,17
  55:25 58:3
  60:7,9,10,14
  70:24 72:21
  79:8 87:13,13
  87:14 91:3,3
  98:20 100:1,13
  106:2 111:4,15
  111:15,17
  112:13,18,20
  113:4,9,16,22
  113:24 114:5
  116:13,18
  117:11 122:9
  123:3 124:9
  125:18,19
  130:11 131:22
  138:19 141:11
  141:22 144:9
  148:17,21
  153:14 157:16
  157:17 160:14
  161:4 164:18
  165:4,17,18,20
  165:23 172:10
  173:23,25
  174:1,11,20
  175:18,24
  176:1,3 184:20
  185:5 187:7,22
  188:14,24

  190:13 191:18
  193:6,10
  197:23,24
  198:1,20
  203:16,17
  217:24 256:16
  258:1,15
  261:20 269:4
  269:19 270:1,2
  270:22,23
  271:24,25
  272:12,13,14
**thanks**   113:23
  184:18 216:22
**that'd**   97:5
  124:16
**that's**   99:9
  100:1,5 101:15
  108:9,15 109:3
  109:16 111:15
  112:13 116:2,3
  116:10 117:21
  123:19 125:2
  127:19 129:21
  130:15 131:16
  133:12,12
  141:20 148:24
  151:22 155:3
  155:21 156:17
  159:15 160:8
  161:21 163:12
  164:5,15
  167:12 169:20
  170:3,22,22
  173:18 174:9
  174:19 175:1,9
  175:23,23

  176:12 181:23
  183:8,24 185:1
  185:4,16
  186:14 187:5
  189:18 191:3
  191:25 194:21
  195:4 199:3,13
  203:16 205:22
  206:13,17,17
  208:7
**thereabouts**
  53:14
**thereunder**
  220:25
**there's**   177:10
  179:22 187:17
  192:8 195:24
  197:8,15
**they're**   177:11
  179:15 180:16
  186:11 206:3
**they've**   180:15
**thing**   122:24
  175:3 209:5
  222:24 230:22
  271:7
**things**   15:16
  55:22 70:8
  118:14,20,23
  118:25 159:3
  166:4 181:3
  194:13 195:2
  196:19 201:5
  209:3 211:19
  237:24 249:24
  250:7 251:21
  252:18 265:13

  266:13,24
  272:7
**think**   8:13
  17:21 22:9
  24:9 27:1
  37:12 38:11,12
  38:20 39:20,22
  39:25 40:7,11
  45:20 46:3,20
  54:24 64:4
  68:22 70:8
  85:25 97:13
  107:18 125:2,2
  130:12,15
  131:14,18
  136:15 138:24
  142:10 143:12
  144:9 154:6,18
  155:3,5,12,19
  157:1,11 160:8
  160:23 169:10
  170:9 172:4
  177:10 178:21
  185:1,19
  186:11 187:13
  188:17 190:23
  191:3,9 195:11
  196:11 197:15
  198:11,11,13
  199:23 204:22
  206:3,8,9,23
  208:16 210:6
  218:1 219:9
  225:6 226:2
  233:9 234:16
  240:13 241:7
  241:13 243:18

247:21 250:16
251:20 252:15
253:13,16
254:12 258:14
259:13 260:25
262:12,17,24
264:5 265:1,9
265:18 266:1
267:7,19 271:2
271:12
**thinking** 262:9
**third** 19:9
100:2 176:25
177:6,11
180:11 181:19
182:6 184:25
197:15 237:23
238:14 245:19
245:20
**thirteen** 102:4
**thought** 75:1
169:7 222:22
247:24 248:15
**thousand** 53:6
**three** 17:4
95:12 101:20
101:24 102:1
105:25 106:1
106:13,20,21
119:24 120:23
132:14 137:19
174:16 184:2
187:2 191:19
210:14 218:9
218:13 232:11
232:14 238:13
245:16 253:15

253:18 255:5
**threshold**
195:22,25
**thumb** 95:4
**tick** 24:19
**tie** 26:24
**till** 264:8
**time** 9:8,11,19
14:21 15:10
16:14 17:11
19:3,16 20:9
22:4 35:21
38:2,18 39:19
39:21,22 40:1
40:2,7,10,11
40:19,20 55:14
58:20 61:8
63:25 64:21
65:4 66:24
75:23 76:12
79:2,8 88:5,6
91:10 92:5
93:19 94:8
97:6 98:2,17
99:15,21
101:21 110:14
112:11 122:7
124:10 140:18
143:13 144:10
157:17 174:6
187:11 194:4
196:6,9 207:25
211:5,9 212:2
222:9 241:19
247:21,23
248:1,15,19
249:8 250:1,6

250:15 251:9
253:2 259:4
264:10,23
265:21 267:24
267:24 268:11
269:1,17
**timeframe**
64:9 170:18
207:21 208:5
208:14
**timeline** 92:24
95:15 256:5
**timely** 271:17
271:21
**times** 8:19 9:17
65:6 67:11
189:7
**timing** 171:14
171:16 249:5
262:10
**titled** 25:1
72:11 130:18
132:6 234:6
**today** 20:6
40:25 54:12,23
60:8 61:5
67:14 112:22
115:12 116:8
116:11,19
120:4 122:4,14
125:1 129:10
138:25 164:12
165:22 171:22
194:23 203:13
209:12,16
214:3 249:10
250:2,8

**today's** 209:11
253:8
**today's** 206:21
**together** 25:18
182:25 225:16
225:24 227:6
227:21 231:16
235:25 236:8
236:20 244:18
**token** 8:9,20,25
8:25 9:2,20
14:1,3,8,12,18
14:22,24 15:6
16:10,14,24
17:15 18:12,16
18:17 20:1
30:20,24 36:9
36:20 37:8,20
37:20 38:2,24
39:4,5,14,19
41:10,11,11,13
41:21,25 42:4
43:4,10,14,22
43:25 52:12
54:8,12,14,16
54:19 55:2,5
55:11 56:24
57:7,10,11,20
58:4,6,7,17,19
58:25 59:12
67:19 68:6
69:8,16 73:15
73:25 75:21
76:4,9,19,23
77:2,7,9,18,20
78:7,13 79:4
81:18,23 98:2

98:17 99:22
100:16 101:7
104:7,8,9,16
104:19,20
105:10 106:11
111:12 112:4
122:13,13,17
123:7,11,13
124:4,8 126:19
128:7,17,20
132:21 133:10
133:11,18,23
135:7 136:10
136:21 137:17
137:20 138:5,6
138:7,7,8
139:2,5,13,17
139:18,22
144:13,22,25
145:2,9,12
147:20 148:3
174:24 201:25
202:5,10,17
203:24
**tokens**   15:1
17:8,23 38:25
41:9 42:2
52:18 57:13
66:25 67:1
73:1,2 74:2,17
77:8,19 78:8
78:14 98:3,9,9
134:2 139:2,4
147:2 198:6,10
198:13,14
199:19 201:13

**told**   8:9,16
265:15
**tomorrow**
249:10 250:3,9
261:2,25
268:13,21,23
269:3,3 270:24
**took**   87:24
89:17 93:22
172:4 180:12
219:17 225:22
227:4 252:25
253:10
**top**   26:4 35:13
47:11,17 52:7
54:18 73:9,10
74:18 76:25
77:4 92:11
95:8,10 104:8
146:12,13
172:25 181:7
181:21 206:7
243:15,19
**topic**   145:13
203:4
**torres**   270:18
**total**   77:8,19
104:25 105:23
106:4,12 171:6
189:2 222:7
228:10 229:18
229:19 236:19
244:12 246:17
247:2 250:11
254:17,21
**totally**   168:17

**towards**   91:19
**trace**   11:20
**tradable**   70:2
**trade**   38:15
104:9 159:14
160:1 235:3
236:17,22
**tradeable**
69:19
**traded**   12:14
16:24 17:15
54:12 97:24
101:6 200:12
231:22 234:18
235:1
**trader**   12:12
**trades**   28:21
29:13
**trading**   9:2
12:8,17,18,20
15:17,18 16:5
37:15 38:2
57:20 67:24
71:25 80:11,13
81:22 98:25
99:1,4,16,17
99:22 100:16
100:20,21
101:1,23
104:11,15,19
104:20 128:14
148:3 234:6,7
234:15
**traditional**
37:4,10 58:1,5
58:9 76:17

**trajectory**   13:4
**transaction**
27:23 117:21
119:3 183:21
212:12
**transactions**
29:25 34:2
41:23 72:13
104:25 106:5
106:25 144:25
180:22 199:9
223:20
**transcribed**
2:25
**transcript**   7:11
7:14 263:9,10
263:11,18
273:4
**transcripts**
263:12,15
264:1,14,16
**transfer**   46:12
46:19,24,25,25
47:6,18 48:5,6
225:2
**treasuries**
58:10
**treasury**   17:5,9
145:2
**treat**   272:9
**treated**   159:10
271:17 272:9
**treatment**
138:9
**treatments**
88:3

**trial** 261:24 262:10,14 264:4,8,9 265:21
**tried** 164:13 194:15
**tries** 183:13
**triggers** 69:7 69:15 70:1
**trouble** 81:4
**true** 9:4 76:15 116:4 151:16 163:13,21 217:3 239:9 242:23 256:6 273:4
**trust** 182:13 184:9 255:23 256:1,12
**trustee** 4:2 154:2 170:16 170:19 184:3 205:10 207:20 208:4,14 209:2 209:2,8 211:23 211:24 253:21 256:4 265:18 265:20 267:10 267:17,23
**truth** 10:25 113:14
**try** 151:25 153:12 158:23 222:16 250:23 251:10 271:11
**trying** 24:6 26:12,24 47:16

51:1 53:18 70:20 81:19 152:21 153:10 160:21 173:18 179:7,7,18 182:16 190:7 190:13 208:24 251:20 268:6
**tuganov** 4:19 164:22
**turn** 13:13 23:6,10 27:16 27:25 29:1,21 30:17 31:7,25 32:15 33:23 35:15 68:17,17 72:10 73:7 116:23 117:7 121:15,24 124:24 130:9,9 130:14 145:14 147:11 186:25 187:1 199:13 220:12,17 237:18 238:7 238:10 240:19
**turned** 154:4
**turning** 115:12 130:12
**tweeted** 67:11
**twenty** 199:11
**two** 13:20 15:16 32:18 36:24 61:24 62:4,12 93:22 94:16 97:5 109:4 117:16

117:20 118:5 119:6,24 123:8 123:13,19 140:19 148:14 184:8 187:7 190:25 191:6 192:25 208:18 210:16 212:2 217:12 219:24 226:2,3,5 233:4,7 235:13 238:14,14 239:23 244:13 245:19,20 248:11 249:17 249:24 251:21 253:14,15,15 253:18 255:24 256:8,9 260:1 260:13 270:15
**type** 100:18 115:3 119:20 153:18 159:13 179:10,23 180:17,17 220:5 230:21 248:17
**typed** 236:4
**types** 11:22 132:7 228:21 229:7,21
**typical** 70:6 176:14 194:9 194:10
**typically** 71:1 99:16 100:10 263:22

**typo** 234:16

**u**

**u.s.** 1:23 4:2 186:6,16,16 200:20,24 205:10 210:17 225:20 265:18 265:19 267:10 267:16,23
**ubierna** 5:4 141:12,12 142:2,2,4,6,21 193:15,17,18 195:14 197:23 197:24
**ucc** 6:8,9,10,11 6:12,13,14,15 6:16,17,18,19 6:20 7:10 9:22 9:24 10:11,12 13:9 20:10,17 21:22 25:10,12 25:14 26:23 29:1,13,16,19 30:6,15,22,24 31:2,5,13,14 31:19,23 32:7 32:11,13,22 33:1,4,8,14,18 33:21 34:2,8 34:12,15,25 35:6 40:23 41:3,6 61:17 131:10
**ucc's** 24:12
**ucc's** 186:9

| | | | |
|---|---|---|---|
| **ultimately** | 135:12 136:7 | **understand** | 264:12 266:7 |
| 228:2 | 136:11 137:17 | 11:17,25 20:5 | 268:5 |
| **un** 128:20 | 137:20 139:10 | 21:5 25:25 | **undisclosed** |
| **unable** 47:5 | 139:11,13,17 | 26:1 29:12 | 60:20 |
| 102:18 103:8 | 139:18,22 | 40:22 41:10 | **undoubtedly** |
| 134:2 208:22 | 143:1 157:4,9 | 53:17 66:13 | 18:9 |
| **unavailability** | 169:16 170:15 | 77:25 81:2,20 | **undue** 60:20 |
| 10:8 | 177:15,18 | 82:23 93:4 | **unit** 180:6 |
| **unavailable** | 183:1 184:10 | 95:22,24 96:5 | **united** 1:1,12 |
| 10:4 | 192:5 193:16 | 103:6 107:16 | 4:1 7:11 |
| **uncertainties** | 198:17 208:3 | 108:7 110:9 | **units** 106:5,7 |
| 240:18 | 208:18 210:25 | 112:5 131:23 | 106:12 119:13 |
| **uncertainty** | 212:4,8 217:7 | 134:7 150:23 | 120:3 |
| 268:7 | 217:9 221:21 | 151:11,18 | **university** 12:5 |
| **unchanged** | 223:18,20 | 152:5,16,18 | 12:7 |
| 249:17 | 224:24 225:19 | 157:25 159:16 | **unknown** |
| **unclaimed** | 231:1 234:24 | 160:1 162:17 | 38:18 111:19 |
| 183:7 | 239:15,22 | 181:14 182:16 | 113:1,5,25 |
| **uncomfortable** | 242:2,13,14 | 190:14 201:10 | 114:2 130:12 |
| 266:17 | 252:9 255:8,19 | 202:21 204:21 | 140:17 154:15 |
| **under** 7:19 | 256:3 257:12 | 211:20 213:9 | **unlocked** 41:20 |
| 9:20 10:5 16:5 | 257:13,14,23 | 255:13 262:9 | **unmasked** 34:2 |
| 20:7 27:9 37:1 | 266:12 | 267:15 | **unsecured** 3:5 |
| 40:24 52:12,18 | **undercut** 22:9 | **understanding** | 7:7 159:13 |
| 52:23 53:4,4 | **underlies** | 35:25 56:13 | 160:1 197:9 |
| 80:1 82:22 | 206:11 | 80:25 81:4,6 | 204:13,14,18 |
| 101:23 114:2 | **underlying** | 81:13 88:4 | 204:20,25 |
| 116:8 117:15 | 13:4 79:5 | 112:10 125:1 | 205:5,7,8,9 |
| 118:13 120:23 | 84:25 85:4 | 126:9 151:10 | 248:8 259:18 |
| 122:3 123:8,8 | 86:5,6,25 | 155:1 189:21 | **unstable** |
| 123:9,11,21,22 | 100:23 101:3 | 202:25 208:1 | 105:13,13 |
| 123:23,24 | 119:15,17 | 221:18,22 | **unusual** 91:6 |
| 124:25 126:12 | 185:9 187:13 | 231:20 | 91:18,22 194:9 |
| 126:13,14,14 | 188:2 189:10 | **understood** | 247:23 |
| 126:15 127:25 | 190:2 208:25 | 8:23 65:21 | **update** 270:11 |
| 129:19 133:23 | 240:14,22 | 207:24 225:9 | **updated** |
| 134:6 135:10 | 247:14 | 259:11 262:21 | 232:18,19 |

**upfront** 187:16
249:22
**upper** 40:1,2,6
40:8,18,20
**upward** 19:3
250:6
**urquhart** 4:10
**usage** 118:23
186:25
**usb** 28:3
**usd** 4:12
**use** 24:19
78:19 90:18
103:16,16
160:7 169:6
170:16 190:24
191:18 199:2
202:16 206:15
206:22 207:1
214:3 233:24
242:22 262:6
265:4,21
268:10
**used** 39:2
41:14 103:21
119:23 122:24
161:18 162:8
166:14 168:15
171:25,25
185:13 189:16
190:15 195:1
217:17 241:16
254:10,13
**users** 105:3
106:10 108:8
**uses** 37:19

**using** 37:2 73:8
143:19,20,23
143:23 189:19
201:20 216:3,4
217:16
**usually** 12:24
19:2 71:4 93:5
93:8 99:18
101:2 263:8,8
263:16 266:20
**utility** 37:20
38:25 39:3
41:9,10,11,21
41:25 42:1,4
67:8
**utilized** 185:11

**v**

**v** 7:12 63:16
**valid** 158:17
159:1 181:6
**validity** 14:15
**valuable**
118:16 186:24
**valuation**
37:10 39:19
124:4 150:11
167:12,15,16
167:19 172:1
177:1,6,7,20
178:21,25
180:7,11
181:23 182:1,6
185:10,13,20
186:8 188:5,6
188:9,10,13,20
189:15,20
219:18,21

220:3,3,5,7,8
220:11,22
221:19 222:4
222:10,11
224:7,11,12,13
227:23,25
228:16 237:5
237:24 238:4
245:3 247:3,4
**valuations**
150:18 171:21
178:1,1 181:17
182:7 190:18
190:20 219:3
235:2,3,4
**value** 13:5
14:17,20 15:7
15:11,18,19,20
15:24 16:2,3,8
16:10 18:17
20:1 35:23
36:3,8,11,15
36:20,23,25
37:7,11,13,14
37:18,23 38:1
38:9,12,18
39:14,18,24
40:9,19,21
41:25 43:14,25
56:14 59:4,5
66:25 67:2,4,5
67:12 68:1
79:5 96:10
97:6,6 109:1
111:13 117:15
118:12,12,13
119:4,25

120:17,25
123:7,12,16,21
124:6 125:2,10
127:9,14 128:9
128:11,17,17
131:10 133:15
133:18,22
134:2 136:8
139:6,12 146:1
146:22 148:22
149:13,21
150:24,25
151:16 153:2
167:8,11 171:1
171:1,7 172:2
172:6 177:1
179:18 181:2
181:22 183:13
188:12 189:2
192:6,11,16
198:14,17
199:18 201:14
202:4,22
218:17,18
220:3 221:4,8
221:19 222:7
222:15,17
223:22,24
224:3,3,23
225:1,11,12,14
225:25 227:4
227:10 228:2
228:10,10,13
228:18,22
229:6,12,18,19
230:5,16,17
231:4,25 232:1

234:25 237:9
240:20,21,22
240:25,25
244:16 245:2
246:6,9,16,17
247:2,2,13
248:16 249:8
249:15,16,25
250:1,4,7,17
250:20 253:12
253:20,22
254:18,21
257:2
**valued** 126:25
128:7 138:6,25
149:24 150:3
152:20 176:25
177:2 180:16
182:23 190:22
218:22 224:8
224:24,25
227:17,18
231:13 236:1
249:13
**values** 88:8,21
88:25 120:20
126:25 150:17
174:25 192:5
192:15 207:21
221:3 245:16
250:14 254:20
**valuing** 37:3,5
42:4 227:10
246:14
**varick** 4:3
**variety** 11:16
12:14 177:5

180:12 248:18
**various** 41:21
80:23 132:15
239:2 254:16
**vast** 182:4,6
**vehicle** 179:8
**venable** 4:18
**venue** 100:21
**venues** 15:18
**verification**
185:22
**verify** 102:18
103:8,14 177:9
185:22 189:10
**verifying**
155:23
**veritext** 273:20
**versa** 241:5
**version** 131:4
131:15 213:16
213:21,24
232:13 233:10
238:21
**versions** 233:4
233:7 238:20
**versus** 72:12
100:6 126:3
180:8 189:12
241:6 243:7
257:18
**vertical** 96:14
**vet** 177:8
**vetted** 197:6
**vetting** 176:15
**vgx** 98:3
**vice** 241:5

**victor** 4:16 5:4
141:12 142:2
142:15 215:3
269:5
**video** 260:2
**videos** 260:5
**view** 38:8
39:17 57:21
104:1 145:13
159:25 219:18
237:4 241:9
244:16 253:11
257:2
**viewed** 252:21
**violate** 201:24
**virtually**
249:17
**visible** 15:7
**vladimir** 63:13
63:18 64:21
65:15
**voice** 27:7
79:24 190:8
**volatile** 57:25
58:4,6,7,8,16
58:17,19,22
76:16 234:8
**volatility** 15:8
58:24 76:12
93:21,23 94:6
94:8 95:2,11
95:13 96:16,18
99:8,12 103:17
103:22
**volume** 76:19
76:23 77:2,4
98:25 99:1,4

99:16,17,20,22
99:22 100:16
100:17,18,20
100:21,23
101:1,3,11,16
101:17 104:20
104:20 130:9
130:13 148:3
**volumes** 101:2
101:5,6 104:14
**voluntarily**
246:5
**vote** 208:17,19
208:19 242:24
246:15,18,19
247:1 271:6
**voted** 215:12
**votes** 242:13
**voting** 242:6
**vtc** 105:14

| **w** |
|---|

**wait** 8:4,4 23:3
50:23 87:11
130:5 146:15
213:11 264:8,9
268:18
**waiting** 250:22
**walk** 26:24
182:15
**wall** 12:12
**wallet** 44:11
47:2,4,5 48:9
48:16 49:12
**wallets** 32:6
44:20,23 45:1
45:8 245:23

| | | | |
|---|---|---|---|
| **wallets.csv** | **wasn't** 170:6 | **weedman** 3:11 | **week** 94:16 |
| 32:4 | 181:6 | 10:14,16,18,18 | 118:7 122:12 |
| **want** 21:5,20 | **watch** 102:3 | 11:2,5,8 15:22 | 261:24 262:1 |
| 22:23 36:2 | 260:6 | 20:9,18,21,24 | 263:5,13,23 |
| 42:2 56:11 | **watching** | 21:2,18 22:12 | 265:2,4,7,23 |
| 65:19 68:13 | 260:5 | 22:17,21 23:5 | 269:24 |
| 83:13 88:15 | **waterfall** | 23:23 24:3,22 | **weekly** 32:20 |
| 118:4 129:24 | 117:14 166:2 | 25:11,15,19 | 33:11 197:6 |
| 138:12,12 | 166:14 168:16 | 26:1,5,8,13,18 | **weeks** 197:9 |
| 141:3 147:3 | 169:1,2,13,19 | 26:20 27:4,9 | **weighted** |
| 151:21 155:13 | 175:18,22 | 27:10,11 28:11 | 172:11,18 |
| 156:11,12 | 176:14 178:15 | 28:16 29:4,8 | 173:2 242:17 |
| 162:2,4 166:9 | **way** 15:25 | 29:11,16,20 | 242:20 244:22 |
| 166:23,24 | 16:10 35:23 | 30:12,16 31:2 | 245:7 |
| 168:22 174:25 | 41:24 94:4 | 31:6,18,24 | **welcome** 139:2 |
| 175:19 181:13 | 146:5 187:20 | 32:11,14 33:1 | **went** 14:2 |
| 181:23 203:23 | 191:25 192:10 | 33:4,9,18,22 | 87:25 96:16 |
| 205:14 206:22 | 194:3 222:16 | 34:12,16,18,21 | 97:4 99:20 |
| 209:22,23 | 242:24,25 | 35:2,4 36:16 | 154:1 164:14 |
| 210:2,2 214:3 | 243:5 245:14 | 39:12 41:2,7 | 218:8 242:13 |
| 217:22 232:18 | 246:24 247:1 | 42:5 43:6,12 | **west** 4:20 |
| 237:3 238:8 | 249:23 253:12 | 45:14 46:20 | **we'll** 166:25 |
| 253:22 256:1 | 253:20 255:8 | 47:12 48:23 | 167:1 175:4 |
| 260:4,6,18 | 262:17,23 | 49:13 52:14,20 | 193:11 |
| 263:20,24 | 264:8 269:18 | 53:10,15,20 | **we're** 160:11 |
| 266:15 268:25 | **ways** 36:24 | 54:20 56:5 | 162:4 175:1,9 |
| 269:10 270:6 | 197:8 230:12 | 61:2 67:15,21 | 175:16,20,21 |
| **wanted** 36:4 | 260:1 | 72:1,16,21 | 179:17 188:12 |
| 104:6 152:22 | **we've** 61:10 | 73:4,17 74:3,9 | 207:25 |
| 165:4 166:4 | 135:12,18 | 79:16 85:25 | **we've** 185:19 |
| 206:15 214:22 | 151:15 211:5 | 87:4 88:10 | **wharton** 12:4 |
| 215:13 260:24 | 212:13 218:21 | 89:4,22 92:10 | **whatnot** 151:9 |
| 262:8,10 | 226:8 254:16 | 97:7,14 98:5 | **what's** 174:14 |
| **wants** 75:6,11 | 254:19 263:12 | 103:1 105:16 | 175:11 194:12 |
| 247:25 261:8 | 264:16 | 107:11 112:16 | 208:7 |
| **warned** 164:13 | **website** 41:21 | 199:21,23 | **white** 3:3 7:6 |
| | | 222:12 | 10:18 259:17 |

| | | | |
|---|---|---|---|
| **wide**  162:10 | **wise**  268:17 | 84:6,8 86:10 | 203:7,12 207:5 |
| **widening** | **wish**  23:21 | 87:14,16 88:13 | 209:22 210:5 |
| 100:10 | 42:8 60:11 | 88:17 90:1 | 215:24 216:16 |
| **willing**  100:6 | 80:3 111:18 | 92:15 93:13,17 | 224:20 226:7 |
| 230:16 | 112:14 142:18 | 93:25 94:4 | 233:5,9,23 |
| **wind**  183:9 | 207:1 262:19 | 95:4 98:15,23 | 234:2 236:12 |
| 209:4,24 211:8 | **wished**  35:25 | 99:2,5 100:1 | 240:10 243:14 |
| 212:3,8,15,17 | **wishes**  42:11 | 105:9 106:1 | 243:18 |
| 218:10 226:14 | 56:13 79:14 | 108:21 111:1 | **witness's** |
| 226:20 247:8 | 111:5,22 | 112:2,20 | 147:13 240:5 |
| 247:10,12,21 | 112:15 140:8 | 113:11,15,23 | **witnesses**  6:3 |
| 248:2,5,6,7 | **withdraw** | 124:10,19,23 | 22:15 112:21 |
| 249:16 251:10 | 136:4 | 125:7,14,24 | 258:7,8,9,13 |
| 252:8 253:10 | **withdrawable** | 126:11 130:17 | 270:3 |
| 253:19 254:23 | 129:9 | 131:2,20,23 | **woffard**  3:10 |
| 256:3,10 | **withdrawn** | 132:3,6,17 | **wondering** |
| 257:13,18 | 17:24 | 134:1 135:4,18 | 78:1 |
| **winddown** | **withhold**  52:13 | 135:21 136:6 | **won't**  201:19 |
| 117:17,22 | 52:19 53:4,7 | 137:4,15,21,23 | **word**  170:17 |
| 118:9,18 119:3 | **witness**  7:7 | 141:25 143:14 | 176:18 195:1 |
| 119:18 123:17 | 10:20 11:1,5 | 144:11 145:21 | 242:22 |
| 123:23 176:22 | 15:12,14 21:14 | 145:23 146:14 | **work**  11:15,19 |
| 180:8,13 | 21:17,24 22:2 | 146:18 147:8 | 11:19 80:24 |
| 183:11,12 | 22:5 23:2,4,18 | 147:17,24 | 115:3,5,13,19 |
| 185:7,12 186:2 | 36:3,6,10 38:7 | 148:9 149:6,25 | 177:14,17 |
| 187:6,8,9 | 38:11,22,25 | 150:17 152:6,8 | 181:23 182:19 |
| 188:15,24 | 39:11 42:6 | 157:15,22 | 183:5 185:5 |
| 190:22 208:21 | 43:19 44:2 | 158:8,13 159:8 | 188:6,11,25 |
| **winding** | 45:12,25 46:3 | 162:14 166:10 | 192:1 210:25 |
| 179:20 212:10 | 46:21 47:22 | 166:18,24 | 211:14 232:19 |
| 255:14 | 50:13 53:24 | 168:3,7 169:12 | 236:6 247:22 |
| **wintermute** | 54:1 55:18,20 | 173:21,25 | 248:1 251:9 |
| 102:11,20,21 | 57:17 64:13 | 175:14 181:18 | 265:4 266:6 |
| 102:24 103:21 | 66:10,12 72:18 | 182:10,14,18 | **worked**  12:12 |
| 104:4,13 | 75:10,14 79:19 | 182:21 183:18 | 178:19 |
| **winternote** | 79:21 80:2 | 183:25 184:8 | **workflow** |
| 102:15 | 81:24 83:15,19 | 190:17 195:13 | 209:20 |

**workforce**
 115:7
**working**
 114:14 204:2
**works**  243:11
**world**  236:8,23
**worried**  16:20
**worse**  139:10
**worth**  109:17
 139:1,17,22
 149:21 231:10
 231:13 249:10
 250:8 251:13
**wouldn't**  126:6
 127:13 139:7
**writing**  260:11
**written**  49:18
 49:20,23,25
 86:6 103:11
 261:1 265:10
**wrong**  69:11
 70:5 89:15
 155:4 170:12
 196:2 232:13

**x**

**x**  1:4,10 6:1
**xlsx**  28:22,24
**xsl**  74:8

**y**

**yeah**  21:19,19
 22:17 30:18
 32:25 33:17
 35:12,14 36:6
 38:11 39:11
 40:5 45:20
 46:11 47:3

49:20 50:22
52:7 53:5
58:15 59:2,11
61:19 63:20
64:23 66:10
67:1 68:25
69:3 71:1
72:18 73:21
74:14,20 75:14
76:17 79:18,21
80:24 81:14
82:2 83:15,24
86:4 92:15
105:9,21
106:21 107:16
110:5 142:12
146:14 158:25
159:6 164:6
165:14 168:4
187:12 197:21
205:2 206:3
217:20 220:6
224:20 225:1
229:10 232:16
241:10 243:17
244:25 245:13
251:7 252:1
253:5 254:19
256:9 258:14
266:21 267:1
**year**  64:5,7,9
 64:10 105:25
 106:1,13 108:7
 119:25 183:12
 200:9 238:16
 239:8,23
 247:14,17,20

248:25 252:2
**years**  12:12
 62:12 65:6
 80:10,12
 106:20,21
 107:4 114:15
 114:16 119:24
 154:1 183:10
 204:4,8,12,17
 211:9 212:12
 212:12,12,14
 227:14 239:23
 247:11,12,22
 248:11,12,12
 249:13 251:5
 253:11,14,15
 253:15,15,16
 253:16,18,19
 257:15
**years'**  203:25
 204:2
**yep**  95:10
**yesterday**
 118:11 120:5,7
 149:25 150:23
 153:4 160:8
 161:1 168:14
 171:5 177:12
 180:24 182:3
 187:14 220:9
 237:15 238:25
 258:22 270:12
 271:3
**york**  1:2,14 3:7
 3:16 4:4,14,21
 154:5

**young**  3:22
 51:3,6,9,16,18
 51:20 117:7
 122:18 124:15
 160:9,13 161:8
 174:8,19
 213:24 217:18
 257:4
**youtube**
 259:22 260:2,5
**you'd**  171:3
 178:1 186:14
**you're**  164:11
 164:16 166:6
 167:21 169:13
 169:21 177:21
 178:22 179:20
 181:7 183:2
 185:9 186:10
 189:1 193:16
 204:24
**you've**  115:3
 130:14 141:16
 151:23 164:23
 166:14 188:25

**z**

**zero**  14:16,20
 37:11 38:13
 40:9 44:3 47:6
 47:18 62:17
 67:7 111:13,13
 124:6 125:2,8
 134:2 139:1,5
 139:6 198:17
 255:25
**zip**  180:25

**[zoom - zoom]**

**zoom**   42:12
79:14  140:15
142:7  160:14
257:7