**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:                                                    )  **Chapter 11**

**CELSIUS NETWORK LLC, _et al.,_**          ) **Case No. 22-10964 (MG)**

                                   **Debtors.**      ) **Jointly Administered**

_____)

# SUPPLEMENTAL SUBMISSION POST
# HEARING OF OTIS DAVIS

I, Otis Davis, am over 18 years of age and understand the obligations of an oath and submit the following Affidavit Post Hearing as I am a creditor in this Celsius bankruptcy Chapter 11 case.

### CEL TOKEN AND EARN ACCOUNTS BEING A SECURITY

I  wholeheartedly agree with the Judge's series of questions below that says in sum and substance that, **if CEL token is a security, wouldn't that make the Earn accounts a security**?  Aaron Colodny disagrees that it wouldn't make the Earn accounts a security, we CEL token creditors agree that it would; and therefore, we submit to this Court that **neither CEL token nor the Earn accounts are securities**.

The colloquy between the Judge and Aaron Colodny is quoted below, which took place at the CEL Token Hearing on October 2, 2023, starting on page 52:

"THE COURT:   Let me just stop you there for a minute.  In the SEC's complaint against Mashinsky and Celsius, the complaint takes the position that the Earn accounts under the Howey Test were securities.

"MR. COLODNY:  Correct.

"THE COURT:  If the Earn accounts were securities and the CEL

token was a security, wouldn't they both be subordinated and

essentially be in the same class for distribution?

"MR. COLODNY:  I don't agree with that, your Honor."

Counsel to the UCC, Mr. Colodny, does not have to agree with your

Honor, but that is the position of the SEC and what Ms. Scheuer from

the SEC is asking this Court to rule on, specifically whether the entire

Celsius Earn account is a security, and Aaron Colodny is doing the

same exact thing by asking this Court to rule on whether CEL token is

a security, which is the exact position of the SEC.  Mr. Colodny simply

does not understand that a ruling could well be that the entire Earn

account is a security, and the Earn account includes CEL token,

which is what the SEC is arguing to this Court.

## Failure To Disclose Conflicts

The only expert witness brought to testify on the value of CEL token,

was Max Galka, whose testimony should be stricken and report

excluded from consideration due to the fact that Galka and the

attorneys along with the UCC failed to disclose the severe conflict of interest that Galka's company has with these proceedings. Galka's company Elementus is funded by Alameda Research, a wholly owned subsidiary and controlled company of Sam Bankman-Fried and FTX, who is currently being sued for $2 billion by this Celsius bankruptcy estate.

As if this was not a glaring omission of conflict, one of the board members of Elementus is the founder of a company called Cherokee Acquisitions, which has been systematically buying up claims in this estate for well below market value and has reportedly done over $300 million dollars in Celsius claims transactions.  If these conflicts of interest were disclosed to the UCC or to the attorneys for this matter and not further disclosed to the Court or other parties, then this would amount to a fraud on the Court for which the party should be held accountable.

Galka did testify that he was not able to come up with the value of the CEL Token on the Petition date.  So basically the $1,000 an hour

spent on this report, which should never have been proffered, was not only a waste of money, since there was no conclusion, but also should amount to the funds being returned to the bankruptcy estate because of the undisclosed conflicts of interest.

Shockingly and surprisingly, even to your Honor, Mr. Galka was unwilling and unable to provide a precise value for CEL token on the Petition date, even though he was informed by your Honor at the hearing held on Thursday, September 28, 2023, through his attorneys, that you, Aaron Colodny, "Better find out an answer."   Mr. Galka apparently did not have any methodology or skill set to come up with a value but did admit that the market value of the CEL token on the Petition date was not $0.81.

Since this supposed expert who appeared to be conflicted out because of a member of his board of directors buying up undervalued claims in this matter after this expert made sure to undervalue them, it is logical that his testimony should not be considered at all in determining the value of the CEL token on the Petition date.  This is by his own admission.

## DISLOCATION EVENTS

After Mr. Galka brought up "dislocation" in his testimony, we agreed that a dislocation in the market can affect what would be a fair market value for CEL token, and going back just one month prior to the $60 billion collapse of TerraLuna, we see what is the most significant dislocation of all in cryptocurrency history.

Now, we know that during that period, May 7 through May 13, 2022, the price of Bitcoin and Etherum went down 25%, but the price of CEL token went down over 65%, completely out of line with the overall market.  I submit to this Cout that the fair market value of CEL token is best measured before both of these dislocation events; one being the Pause, the other being the gigantic collapse of the $60 billion crypto project TerraLuna, which the closing price of CEL token before the TerraLuna dislocation event was $2.01, which reflects the fair market price as of the closing on May 6, 2022 on www.coinmarketcap.com, which is Exhibit A.

For Mr. Galka's "dislocation" argument to have any weight, he would have to use both dislocation events and do an average price from the

TerraLuna dislocation on May 7, 2022, which means Mr. Galka would

have to use the CEL token market price of May 6, 2022, the day

before the May 7, 2022 TerraLuna dislocation, to the Celsius Pause

dislocation and tell us what that price is, which I will submit to this

Court the average price between both dislocation events is $0.8688.

## EXHIBIT A



Furthermore, Max Galka indicates, as stated above, the rationale for

his inability to give a value for CEL token is because of a market

dislocation that he perceived to take place at the Pause date, when

the value of CEL token was at $0.355.  Mr. Galka states in his

testimony that because of this market dislocation at the moment of

the Pause, that any number with respect to value after the Pause is

completely unreliable.  What I would present to this Court is that there

was a dislocation event ten times larger than what happened at the

Pause that took place between May 7, 2022 and May 13, 2022, as I

said before, which was the complete and utter implosion of the $60

billion crypto stablecoin project that was TerraLuna.

 As I stated before, during this earlier dislocation period, Bitcoin

dropped 25%, Ethereum dropped 25%, but CEL token dropped over

65%.  This in and of itself shows how CEL token had become

dislocated from the rest of the market as early as May 7, 2022.  I see

no reason why we shouldn't go with the May 6, 2022 CEL token price

of $2.01 one day prior to the TerraLuna dislocation event, just as Mr.

Galka suggested we should go with the $0.355 CEL token price

before the dislocation event of the Pause.

Your Honor, the closing price for CEL token on May 6, 2022, the day before the dislocation caused by the collapse of TerraLuna, was $2.01, according to CoinGecko (www.coingecko.com; Exhibit C). With the logic and reasoning that Max Galka indicated in his testimony to this Court, **we should be using the $2.01 May 6, 2022 dislocated value attached hereto as Exhibit A**.

How is it that an expert witness, Max Galka, can testify about one dislocation event and conveniently forget to testify about a dislocation event that's ten times larger that happened a mere four weeks prior to the Pause that shook the entire crypto world like an earthquake registering a 10.5 magnitude on the Richter scale.

The entire crypto market was dislocated, including the CEL token market, when TerraLuna collapsed in early May 2022, which was a $60 billion market cap cryptocurrency project.  This dislocation argument is not limited to the Pause but goes back to starting on May 7, 2002 when TerraLuna started to collapse and eventually collapsed over a six-day period thereafter on or around May 13, 2022.  The TerraLuna dislocation is clearly shown on page 36 of 61 of the Alex

Mashinsky Declaration, which is at Docket No. 23, which I will mark as Exhibit B.  You can clearly see the level of dislocation in red starting on May 7 to May 13, 2022 that Mr. Galka conveniently leaves out of his expert report and his testimony.

## EXHIBIT B



## EXHIBIT C



## DEBTORS' $2 BILLION CLAIM AGAINST FTX, ET AL.

Your Honor, the Debtors and the UCC don't want to talk about their $2

billion claim that they both agreed to file on behalf of Celsius' creditors

against FTX, et al., so let me talk about that $2 billion claim for them.  I

would submit the reason why they don't want to talk about this $2 billion

claim that the Debtor Celsius Network filed in the FTX bankruptcy against

FTX, et al. is because it undercuts their argument that CEL token should

not be allowed to get the Petition date price of $0.81 and should instead get

$0.00 (zero), or take the $0.25 settlement.


In addition, it would also raise questions by your Honor of what this $2

billion claim is for, which the Debtors and the UCC have refused to answer

when asked.  The $2 billion claim filed by the Debtors is for the attack that

FTX and Alameda Research launched against CEL token and Celsius,

based on what Scott Duffy, the UCC co-chair, said to me at the end of our

settlement negotiations about six weeks ago where I was about to leave

and he said hold on one minute before you disconnect from Zoom.

Everyone in the world would agree that $2 billion is more than the $1.2

billion hole in Celsius's balance sheet, so Celsius is saying, through that $2

billion filing, that FTX is responsible for more than the $1.2 billion hole in

Celsius's balance sheet by filing this $2 billion claim.  If that's not what they

are claiming, they need to simply tell this Court why they filed the $2 billion

claim in the FTX bankruptcy on behalf of all creditors.


By filing this $2 billion claim in the FTX bankruptcy against FTX, et al., the

Debtors themselves have already assessed the value of CEL token;

**Celsius and the UCC have assessed CEL token's value at $2.88 per**

**CEL token when taking into consideration the 693 million CEL token**

**supply.**  They are effectively agreeing that the damages caused by

Alameda Research (which I remind the court funded the expert report by

Elementus and Max Galka) and FTX through their manipulation of CEL

token on the FTX exchange was $2 billion, which equates to **$2.88 per**

**CEL token**.  Celsius DOES NOT have any significant outstanding balances

or claims against FTX besides the manipulation of CEL token.  I have

attached these pictures with links as Exhibits D and E showing the $2

billion claim that Celsius filed against FTX, et al.

Exhibit D

https://coingape.com/breaking-celsius-network-files-2-billion-claim-against-ftx/



EXHIBIT E

https://restructuring.ra.kroll.com/FTX/Home-ClaimInfo

| | | | | |
|---|---|---|---|---|
| 4027 | 06/29/2023 | Celsius Network Limited | FTX Products (Singapore) Pte Ltd | $2,000,000,000.00 |
| 3021 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Deep Creek Ltd | $2,000,000,000.00 |
| 3152 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LedgerPrime Digital Asset Opportunities Fund, LLC | $2,000,000,000.00 |
| 3232 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | Liquid Financial USA Inc. | $2,000,000,000.00 |
| 3262 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | Bancroft Way Ltd | $2,000,000,000.00 |
| 3306 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | FTX US Services, Inc. | $2,000,000,000.00 |
| 3350 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | FTX Services Solutions Ltd. | $2,000,000,000.00 |
| 3581 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Cedar Bay Ltd | $2,000,000,000.00 |
| 3594 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Cottonwood Grove Ltd | $2,000,000,000.00 |
| 3620 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LedgerPrime LLC | $2,000,000,000.00 |
| 3650 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LiquidEX LLC | $2,000,000,000.00 |
| 3657 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Hannam Group Inc | $2,000,000,000.00 |
| 3678 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Deck Technologies Holdings LLC | $2,000,000,000.00 |

The Examiner herself wrote in her report (Docket 1956) on page 325 of 426, **"Mr. Bolger recalled that the FTX team 'drilled into' Celsius's balance sheet.** A follow-up meeting with Mr. Bankman-Fried was scheduled, but the meeting never took place. Ultimately, no deal was finalized." **After the FTX team 'drilled into' the Celsius balance sheet**

**after receiving the company's private financial information illegally**

**without board approval or the approval of the then-CEO, then the FTX**

**team used that illegally obtained private company financial**

**information to illegally naked short CEL token, which is why the**

**Debtors and the UCC have filed a claim in the FTX bankruptcy for $2**

**billion.  If that's incorrect, the Debtors are free to state the reason for**

**their filed $2 billion claim in the FTX bankruptcy.**

Your Honor, you simply need to ask the Debtors one question:  *What is the*

*$2 billion claim for damages against FTX for if the CEL token is valued at*

*near $0.00 (zero)?*  Both White & Case and Kirkland & Ellis are devaluing

creditors' $2 billion claim, and *that's legal malpractice*; creditors can turn

around and sue these law firms of White & Case and Kirkland & Ellis for

this legal malpractice that they are engaged in.

You cannot file a $2 billion claim in the FTX bankruptcy on behalf of all

Celsius creditors, allege in that $2 billion claim that FTX manipulated CEL

token by naked shorting it using "God mode," and then on the other hand

say CEL token is worth $0.00 (zero) in this Celsius Chapter 11 because

you're hellbent on screwing over retail CEL token holders and asking this

Court to accept your frivolous, flip-flop arguments.  Additionally, all FTX and

Alameda Research has to do to kill their lawsuit is to use the attorneys'
positions here that the CEL token is worthless and the suit against FTX can
be extinguished, which is clearly legal malpractice.

We creditors, through our seven elected representatives on the UCC, now
six elected representatives, hired White & Case to represent the best
interests of creditors.  In this instance, the UCC and White & Case are
going against 36,000 CEL token creditors because they want 2% more
Bitcoin and Ethereum in their wallets, which is a a betrayal and malpractice.

**The Debtors, along with the UCC, decided that this $2 billion claim
against FTX for naked shorting CEL token is valid, while at the same
time the UCC and the Debtors are attempting to subordinate the basis
of that very same $2 billion claim.**

Scott Duffly, the co-chair of the UCC, told me when we finished our
settlement discussions, when I was about to leave the Zoom call, quote,
"And, Otis, before you go, we're going to need you guys' help in proving
this $2 billion claim that we and the Debtors agreed to file against FTX and

other entities because you and others in your group know much more about what happened at FTX than we do," to which I simply answered "Okay" and then left the Zoom settlement meeting.

I would once again request your Honor to direct the UCC and the Debtors to **reveal all of the information received in the FTX Subpoena**. If we are to assess the true value of CEL token, we need the evidence that was provided to the UCC by the FTX Debtors. There is value locked on FTX that belongs to all Celsius creditors derived from the open naked short positions against CEL token on FTX. The Debtors and/or the UCC cannot get damning evidence from FTX and say based on that evidence we're filing a $2 billion claim against FTX for naked shorting CEL token by illegally obtaining the company's financial records, but then turn around and say CEL token is worth $0.00 (zero) in this Celsius Chapter 11, and we are NOT turning over the evidence that we got from FTX because it will show that CEL token is worth $2.88, NOT zero, based on the $2 billion claim we filed against FTX.

*The $2.88 CEL token price is derived from the fact that Celsius has 693*

*million CEL tokens, give or take, and the Celsius claim in the FTX*

*bankruptcy is for $2 billion.  So all one has to do is multiply 693,000,000 by*

*$2.88 and that gives you the $2 billion claim value, which is what the*

**Debtors and the UCC are claiming in the FTX bankruptcy; in other**

**words, the Debtors and the UCC are claiming in the FTX bankruptcy**

**that each CEL token is worth $2.88,** but here in this Celsius Chapter 11

they're claiming that CEL token is worth $0.00 (zero), undercutting their

arguments for that $2 billion claim in the FTX bankruptcy and engaging in

legal malpractice by devaluing creditors' claim of $2 billion in the FTX

bankruptcy.


**Your Honor, they cannot have it both ways:**  The UCC and the Debtors

cannot say that CEL token is worth $2.88 in the FTX bankruptcy based on

their $2 billion claim that they filed in said bankruptcy, but then turn around

and say in this Celsius Chapter 11 CEL token is worth $0.00 (zero).  That is

not a law firm representing the best interests of its clients, the creditors.

That $2 billion claim that we have against FTX is worth much more to

creditors than the $128 million that is owed to non-insider CEL token

holders.  This is clear legal malpractice by the Debtors' counsel and the UCC's counsel, and creditors shall and will sue both law firms over this legal malpractice.

**REQUESTING THE PURGING OF THE EXPERT REPORT DUE TO THE UNDISCLOSED CONFLICTS OF INTEREST:  CHEROKEE ACQUISITIONS**

Cherokee Acquisitions has been buying a significant amount of claims in this Celsius Chapter 11 bankruptcy case.  When I questioned Mr. Galka about his relationship to Cherokee Acquisitions, he stated that Vladimir Jelisavcic, the founder and CEO of Cherokee Acquisitions, was a board member of Elementus, but that he can't remember when Vladimir Jelisavcic was on the Elementus board.  I asked Max Galka the following question and he gave me the following answer on page 60 at the October 4, 2023 hearing when I cross-examined him:

**"Q. Would you say that when preparing your expert report, it was created and submitted in a professional manner, free of any bias, undue influence, or undisclosed conflicts?"  And his answer was:  "A. Yes, I would."**

That under-oath testimony was not true, because there's a clear conflict of interest here between Max Galka, the CEO and founder of Elementus, and Vladimir Jelisavcic, the CEO and founder of Cherokee Acquisitions, who is buying up claims left and right in the Celsius Chapter 11 bankruptcy.

Below is a list of the **173 claims that Cherokee Acquisitions has bought to
date in the Celsius bankruptcy**, which shows a blatant conflict of interest on the
part of Max Galka in preparing his expert report.  The following are the claims
that Cherokee Acquisitions has bought to date in the Celsius Chapter 11
bankruptcy; the Cherokee Acquisitions claims are located at Docket Numbers
3723, 3700, 3695, 3690, 3689, 3684, 3683, 3657, 3505, 3494, 3493, 3490, 3469,
3463, 3462, 3442, 3391, 3381, 3350, 3348, 3346, 3324, 3323, 3278, 3260, 3231,
3207, 3204, 3203, 3191, 3190, 3189, 3109, 3108, 3103, 3102, 3097, 3096, 3072,
3071, 3054, 3053, 3052, 3050, 3047, 3046, 3039, 3033, 3022, 3021, 3012, 3008,
2989, 2986, 2985, 2972, 2961, 2957, 2956, 2953, 2950, 2946, 2940, 2932, 2931,
2928, 2927, 2912, 2911, 2910, 2857, 2854, 2833, 2830, 2829, 2822, 2818, 2814,
2810, 2809, 2798, 2794, 2792, 2790, 2789, 2784, 2777, 2771, 2752, 2749, 2743,
2741, 2737, 2732, 2729, 2728, 2704, 2677, 2676, 2645, 2609, 2592, 2587, 2582,
2559, 2558, 2549, 2543, 2524, 2440, 2426, 2525, 2392, 2391, 2360, 2345, 2255,
2204, 2153, 2141, 2113, 2095, 2077, 2075, 2027, 2009, 1966, 1957, 1890, 1889,
1881, 1856, 1838, 1808, 1696, 1678, 1664, 1663, 1642, 1600, 1598, 1415, 1365,
1233, 1180, 1171, 1170, 1154, 1147, 1075, 1074, 1061, 1034, 1033, 998, 989,
975, 968, 961, 949, 947, 946, 890, 889, 885, 884, 874, 854, 724, 710, 615, 614
and 553.

Cherokee Acquisitions has bought a whopping 173 claims to date in this Celsius Chapter 11 bankruptcy.  Just the appearance of a conflict of interest is enough to disqualify the Max Galka report, but in this case we have a blatant conflict of interest between Elementus and Cherokee Acquisitions.  **The Max Galka report should be disregarded by the Court and purged because of his undisclosed conflicts of interest.**

At the Confirmation Hearing held on October 4, 2023, on page 63, line 21, I asked Max Galka a series of questions about his Cherokee Acquisitions conflict of interest and he gave the following answers, and they are as follows:

Q        "Did you know of a company called Cherokee Acquisitions?

A        "Yes.

Q        "Are you aware that Cherokee Acquisitions has been involved in buying and selling Celsius (indiscernible) at significant discount, 20 to 30 cents on the dollar since August 2022?

A        "No –

            "MR. McCARRICK:  Objection.

" BY MR. DAVIS:

Q        "Does your company or your company's board of directors have any relationship with Cherokee Acquisitions?

A        "Well, I -- if we're talking about organizational structure, I'm not sure.  The owner of Cherokee Acquisitions was an investor in our -- one of our early rounds.  So, yes, there is a relationship but I don't know if it's the entity that participated was Cherokee or if it was just him in his personal capacity, as I sit here.

Q        "You know an individual by the name of Vladimir Jelisavcic?

A        "Yes.

Q        "J-E-L-I-S-A-V-C-I-C, for the record.

 A        "Yes.  Yes.

Q        "Is Vladimir Jelisavcic an investor, shareholder, or board member of Elementus?

A        "Yeah, he was one of our early investors.

Q        "So he's on your board?

A       "No, he's not on our board.

Q       "Was he ever on your board?

A       "Yes.  I believe it was early on for a short while.

Q       "What time period?

A       "I don't recall, as I sit here.  He participated in our friends and family round, which was a very small early round that we had raised before we had built the product, which I believe was back in, I think –

Q       "– a year?

A       "I'm sorry?

                "THE COURT:  Can you tell him the year?

" BY MR. DAVIS:

Q       "Can you give us a timeframe.  Year.

A       "The year was 2018 when we closed that round.  I don't recall –

Q       "So –

                "THE COURT: Mr. Davis, allow the witness to answer questions before you ask your next question.

                "MR. DAVIS: Sorry, Judge.

                "THE COURT:  Mr. Galka, had you finished your answer?

"BY MR. DAVIS:

A       "I'm sorry, could you repeat the question again, Mr. Davis?

Q       "Is mister -- what time period was Vladimir Jelisavcic on your board?

A       "I really don't recall.  It was -- yeah, I really don't recall.  It was 2018, was when we closed that round.  I don't recall the board movements.

Q       "-- fall, summer, spring of 2018?

A   "I believe it was spring of 2018 was when we closed that fundraising round and when we formed the company, so that would have been around the time that he joined the board.  I don't recall.  The makeup of the board had shifted several times after that.  It's been several years since he has been on the board; although, don't recall the exact date.

Q   "Was he the founder of Cherokee?

 A   "Was he the founder of Cherokee?  Yes, I –

Q   "Correct.

A   "-- believe so."

The conflict of interest in Mr. Galka's testimony is damning and should have been disclosed to this Court, not the only UCC, which is a fraud on the Court. If the UCC did not notify the Court of these conflicts, they are complicit in this fraud as well. Based on Mr. Galka's conflict, I would argue that his report is biased and should not be used in this Confirmation Hearing, especially because Mr. Galka cannot provide a specific value for CEL token on the Petition date.

## REQUESTING THE PURGING OF THE EXPERT REPORT DUE TO THE UNDISCLOSED CONFLICTS OF INTEREST:  ALAMEDA RESEARCH

In October 2021, **Elementus raised capital** in their Series A funding round from **Alameda Research,** a defunct trading firm widely alleged, even by the DOJ, to have stolen billions from FTX customers with direct ties to Sam Bankman-Fried, the same Sam Bankman-Friend that is on trial facing decades in a federal prison for fraud –  as well as a litany of other charges – in the Southern District of New York.  Max Galka, the founder and CEO of Elementus, has a blatant conflict of interest here, since Mr. Galka gave testimony to this Court that Elementus raised at least $200,000 from Alameda Research in its Series A funding round.  This is the same Alameda Research that is a wholly-owned subsidiary of FTX, which Celsius filed a $2 billion claim against.

In the October 4, 2023 Confirmation Hearing, starting on page 61, line 4 I asked

Mr. Galka a series of questions and they are as follows, along with his answers:

Q        "You have stated prior here today about Alameda Research invested in your company.  How much was that investment?

A        " I don't recall the dollar figure.  It was less than 1 percent of the company at the time.  We were raising our Series A which was about a $12 million fundraise.  They put in about $200,000.  To date, we've raised about close to $27 million, so it's a fairly small portion of the investment.  I said $200,000; I don't know that that's necessarily the exact number, but something in that ballpark."

That testimony by Mr. Galka clearly establishes that he has a blatant

conflict of interest.  Max Galka makes no mention in his report about Alameda

Research or FTX using "God mode" to naked short CEL token as was reported

by John Ray III, the CEO of FTX.  The reason is that Elementus, the CEO of

which is Mr. Galka, raised capital from Alameda Research/FTX in its Series A

Funding round, and he simply left out anything having to do with Alameda

Research or FTX.  Mr. Galka simply cannot render a fair and unbiased opinion in

his report against a company which he raised capital from and which Celsius filed

a claim for $2 billion against, because Mr. Galka knows full well that Alameda

Research, along with Sam Bankman-Fried and FTX, illegally naked shorted CEL

token in order to cripple the company and send it into bankruptcy.


In the October 4, 2023 hearing transcript, at page 61, line 16, I further went on to

ask Mr. Galka a series of questions about disclosing his Alameda Research/FTX

conflict to the Examiner and the UCC, and he answered "Yes."  But nowhere

does Mr. Galka say that he disclosed this conflict to the Court, which is what he

should have done in his written filing.  Max Galka failed to disclose his conflict

with Alameda Research/FTX to the Court, and for that reason, his biased report

should be discarded.  Failure to notify the Court of this conflict is fraud on the

Court, and if Mr. Glka notified the UCC, as he indicated in his testimony on

October 4, 2023 of his conflict and the UCC and their attorneys White & Case did

not notify the Court, then the UCC and their attorneys White & Case are also

complicit in this fraud on the Court.

## PRIOR VALUATION AGREEMENT CEL

## TOKENS IN CUSTODY

Your Honor, I am a dissenting member of the CEL Token Custody Class, as

reflected on the balloting.

THERE HAS BEEN A SETTLEMENT AND AGREED-UPON VALUATION

BY THE UCC and the Debtors Dated March 20, 2023, located at ([Docket

2271](#)) titled "**NOTICE OF FILING OF CUSTODY SETTLEMENT AGREEMENT AND

CUSTODY AD HOC GROUP LETTER.**"  **The valuation in this Settlement

Agreement was the Petition date value of $0.81 for CEL token.**

I myself have 34,876 CEL tokens in my Celsius Custody account.  The CEL

token holders in the Custody class by a monetary majority voted to reject

the $0.25 settlement offered by the UCC and the Debtors.  Furthermore,

the $0.25 CEL token Settlement indicates that that settlement does not

apply to the Custody class.  The CEL tokens in my Custody account have

to have at least a 72.5% valuation to meet the "best interests" test.  At the

Debtors' proposed $0.25 value, this does not meet my best interests.  The

Debtors did not clarify if my liquidated CEL token loans that went into

custody is "pure" Custody or "dirty" Custody.

Since my Custody CEL is valued at $0.25 deactivation pricing, as a

dissenting member, I did not consent to the change memorialized in the

Modified Plan (Docket 3577) on page 109 of 193, and I hereby present this

case to your Honor as a CEL Token Custody holder.

The UCC and the Debtors cannot renege on their settlement with CEL

token Custody holders and unilaterally retroactively reduce their CEL token

claims down to $0.25.  Furthermore, how can the UCC and the Debtors

attempt to pay different classes of creditors a different value for their CEL

token?  That is not equitable.  If the CEL token Custody settlement was

based upon an $0.81 Petition date price, it would be unacceptable to

change that $0.81 Petition date price; it would be even further out of line to

pay other creditors lower than $0.81 when a settlement based on the

Petition date price of CEL token had already been reached.

My Custody CEL token is worth 72.5% since I have clawback exposure.

When we do the math, 72.5% of $0.81 is $0.58725.  The Debtors and the

UCC are trying to force me as a CEL token Custody holder to take a $0.25

settlement that they offered CEL token holders in Earn; but Custody

holders have already settled with the UCC and the Debtors, so they cannot

force that $0.25 settlement on me, when at minimum they're required to

give me $0.58725, which would meet the "best interests" test.

I will also adopt all of Dimitry Kirsanov's letters and objections in their

entirety to this Court, which are located at Docket Numbers 3729, 3721,

3717, 3716, 3694, 3688, 3647, 3629 and 3628.

Your Honor, it has been determined that Custody holders own their assets

and are entitled to a 72.5% liquidation value at bankruptcy.  The UCC and

the Debtors are forcing an eventual $0.25 deactivation value on Custody

holders as the deactivation valuation.   This goes against the "best interests"

clause in Chapter 11 versus Chapter 7 in the Custody class.   As liquidation

of CEL in Custody is valued at 72.5%, this is 0.58725 of $0.81, which is far

higher than the proposed Chapter 11 clause, which does not meet the "best

interests" test.   I will emphasize that all aspects of the Plan – from

confirmation to the deactivation date – must meet or exceed the best

interests of a creditor.


Your Honor, I accepted the Custody Settlement, and the Custody

Settlement [Doc 2291-1] calls for the following:  "For the avoidance of any

doubt, any Holder of an Allowed Custody Claim that abstains from voting or

votes to reject the Plan and has only Pure Custody Assets or Transferred

Custody Assets, but was prevented from receiving his or her Custody

Assets under the Withdrawal Order as a result of an outstanding obligation

owed to the Debtors through the Debtors' Borrow Program, shall receive

his or her Custody Assets in accordance with the treatment of allowed

Deposit Claims under the Plan and otherwise consistent with the Court's

findings in the Withdrawal Order."

I will quote from the **FOURTH NOTICE OF FILING OF REVISED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES** dated August 17, 2023 which is at Docket No. 3332, page 546 of 830, quote, "Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, **other than Custody Claims that are CEL Token Deposit Claims**, shall be valued at $0.25/CEL Token (i.e., 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed," end quote, which I have attached hereto as Exhibit F.  And then without giving notice, unbeknownst to the Custody class, the Debtors filed a document titled "**NOTICE OF FILING OF MODIFIED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES,**" dated September 27, 2023, which is at Docket No. 3577, and which I have attached as Exhibit G.  This Modified Plan was filed after the vote, and the Debtors have inserted the following language in Exhibit G, quote, "which table shall contain applicable cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date," meaning they don't want to honor the settlement made with CEL token Custody holders.  The value on this proposed date CANNOT be less than Petition date prices.  This is clearly

not in my best interests and fails the "best interests" test.  Deactivation date

prices must meet or exceed the value of Petition date prices, and $0.25

doesn't meet or exceed that value; similarly just like assets that dropped in

value, such as Matic that dropped from $0.609 to now trading at $0.5179

as of writing, the Debtors and the UCC cannot give me less than Petition

date value in comparison for my CEL tokens held in Custody.

These changes were made by the Debtors after the balloting, meaning

after the vote.  The Debtors and the UCC cannot settle with CEL token

Custody holders and then unilaterally change their mind by modifying the

Plan simply because it fits their settlement narrative of $0.25 to CEL token

holders in the Earn class.

# EXHIBIT F

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI thereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    CEL Token Settlement.

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.2 of the Plan and this Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.

The Debtors will evaluate the votes cast by Holders of CEL Token Deposit Claims (not including CEL Token Deposit Claims held by Equitably Subordinated Parties) and the number of Holders of CEL Token Deposit Claims that opt out of the Class Claim Settlement.  Such votes will be disclosed on the Voting Report to be Filed by the Solicitation Agent.  To the extent the majority of eligible Holders of CEL Token Deposit Claims vote to accept the Plan or not opt out of the Class Claim Settlement and/or the Debtors and the Committee reach an agreement with an ad hoc group of Holders of CEL Token Deposit Claims, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation.  To the extent a majority of Holders of CEL Token Deposit Claims vote to reject the Plan, the Debtors will seek a determination from the Court of the relative rank and value of CEL Token on the Petition Date at Confirmation.

# EXHIBIT G

84.    83.  "*Deactivation Date Cryptocurrency Conversion Table*" means the conversion table the Distribution Agent shall use to calculate the ~~amount of Cash or Cryptocurrency to distribute to a~~Claims of Holders of ~~an~~ Allowed Custody Claims ~~or Withhold Claim~~ that did not retrieve ~~its~~their Plan distribution from the Celsius platform by the Deactivation Date in Cash and Liquid Cryptocurrency, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date.  Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court.  For the avoidance of doubt, following the Deactivation Date, such Claims shall be subject to further conversion pursuant to any applicable Distribution Cryptocurrency Conversion Table in connection with subsequent distributions.

85.    84.  "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan.

8

**MEME COINS**

Even meme coins – which Mr. Galka suggested that CEL token could have been a meme coin after the Pause – can hold tremendous market value to this very day.  **Dogecoin, a meme coin, has a $8.6 billion market cap,** which I have marked as Exhibit H, with a powerful and active community; the community created the value, just like the community in Celsius created the value in CEL token.   An example of that community is me still fighting tooth and nail with the UCC and the Debtors to protect it.

EXHIBIT H

https://coinmarketcap.com/currencies/dogecoin/



Respectfully Signed,

Otis Davis, *Pro Se*

10/10/2023

*/s/Otis Davis*