**Hearing Date:  October 24, 2023 at 10:00 a.m.**
**Objection Deadline:  October 16, 2023 at 4:00 p.m.**

**ERVIN COHEN & JESSUP LLP**
David Tarlow, Esq.
  dtarlow@ecjlaw.com
William Christopher Manderson, Esq. (admitted *pro hac vice*)
  cmanderson@ecjlaw.com
Chase A. Stone, Esq. (admitted *pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325

*Attorneys for Simon Dixon and BNK To The*
*Future (BF)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**AMENDED NOTICE AND AMENDED APPLICATION OF BNK TO THE FUTURE (BF) PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF PROFESSIONAL FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION**

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE NOTICE**, that on October 2, 2023, BNK To The Future ("<u>BF</u>") and its CEO Simon Dixon ("<u>Mr. Dixon</u>") (together, the "<u>Applicants</u>") timely filed its *Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4)) For Allowance Of Payment Of Professional Fees And Expenses Incurred In Making A Substantial Contribution* (the "<u>Application</u>") with the *Declaration Of Simon Dixon In Support Of Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) for Allowance Of Payment Of Professional Fees And Expenses Incurred in Making a Substantial Contribution* filed concurrently therewith (the "<u>Dixon Decl.</u>" or "<u>Dixon Declaration</u>").

**PLEASE TAKE NOTICE**, that on October 12, 2023, Applicants filed this *Amended Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4)) For Allowance Of Payment Of Professional Fees And Expenses Incurred In Making A Substantial Contribution* (the "<u>Application</u>") which incorporates, by reference, the Dixon Declaration filed on October 2, 2023 (the "<u>Amended Application</u>"), which is appended to this Amended Notice..

**PLEASE TAKE NOTICE** that, a hearing on this Application, as amended, and being filed concurrently with this Amended Notice, is scheduled to be heard before the Honorable Martin Glenn, Chief Judge of the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), in Room 523, One Bowling Green, New York, New York 10004, on **October 24, 2023 at 10:00 a.m. (prevailing Eastern Time)** (the "<u>Hearing</u>").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will take place in a hybrid fashion both in person and via Zoom for Government.  Those wishing to participate in the Hearing in person may appear before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408.

Those wishing to appear remotely at the Hearing, whether making a "live" or "listen only"
appearance before the Court, need to make an electronic appearance (an "eCourtAppearance")
through the Court's website at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  When
making an eCourtAppearance, parties must specify whether they are making a "live" or "listen
only" appearance. eCourtAppearances need to be made by **4:00 p.m., prevailing Eastern Time,
the business day before the hearing (i.e., on October 23, 2023).**

      **PLEASE TAKE FURTHER NOTICE** that due to the large number of expected
participants in the Hearing and the Court's security requirements for participating in a Zoom for
Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m.,
prevailing Eastern Time on October 24, 2023, **must connect to the Hearing beginning at 10:00
a.m., prevailing Eastern Time on October 24, 2023.**  When parties sign in to Zoom for
Government and add their names, they must type in the first and last name that will be used to
identify them at the Hearing.  Parties that type in only their first name, a nickname, or initials
will not be admitted into the Hearing.  When seeking to connect for either audio or video
participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the
order in which you seek to connect. Court personnel will admit each person to the Hearing from
the Waiting Room after confirming the person's name (and telephone number, if a telephone is
used to connect) with their eCourtAppearance.  Because of the large number of expected
participants, you may experience a delay in the Waiting Room before you are admitted to the
Hearing.

      **PLEASE TAKE FURTHER NOTICE** that any responses or objections to the
Application, as amended, (each, an "Objection") shall: (a) be in writing; (b) conform to the
Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of

New York, all General Orders applicable to Chapter 11 cases in the United States Bankruptcy

Court for the Southern District of New York, and pursuant to this Court's *Second Amended Final*

*Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and*

*(II) Granting Related Relief* [Docket No. 2560], and that *Notice Of Further Revised Schedule*

*For Substantial Contribution Applications* [Docket No. 3498]; and (c) be filed with the

Bankruptcy Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered

users of the Court's electronic filing system, and in accordance with General Order M-399; and

(d) be served so as to be actually received no later than October 16, 2023 at 4:00 p.m. (the

"Objection Deadline") on (i) the entities on the Master Service List available on the case website

of the above-captioned debtors and debtors in possession, including affiliates, (the "Debtors") at

https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the

subject matter of the Application, including Ervin Cohen & Jessup LLP, counsel to the

Applicants, at 9401 Wilshire Boulevard, Twelfth Floor, Beverly Hills, California 90212-2974,

Attn: William Christopher Manderson, Esq. (*pro hac vice*) (cmanderson@ecjlaw.com); and the

Office of the United States Trustee for the Southern District of New York (Region 2), U.S.

Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attn:

Shara Cornell, Esq. (shara.cornell@usdoj.gov).

      **PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are

timely filed, served, and received will be considered at the Hearing.  Failure to file a timely

Objection may result in entry of a final order granting the Application.

      **PLEASE TAKE FURTHER NOTICE** that if no Objections or other responses are

timely filed and served with respect to the Application, as amended, BF may, on or after the

Objection Deadline, submit to the Bankruptcy Court an Order substantially in the form appended

to the Application as amended **Exhibit A,** which order the Bankruptcy Court may enter without further notice or opportunity to be heard.

       **PLEASE TAKE FURTHER NOTICE** that the hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates in open court at the Hearing.

       **PLEASE TAKE FURTHER NOTICE** that copies of the Application, as amended, and other pleadings filed in these Chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius. You may also obtain copies of the Application and other pleadings filed in these Chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

DATED:   October 12, 2023
Beverly Hills, California

                             Respectfully submitted,


                             By:          /s/ William Christopher Manderson
                             William Christopher Manderson, Esq. (*pro hac vice*)
                               cmanderson@ecjlaw.com
                             David Tarlow, Esq.
                               dtarlow@ecjlaw.com
                             Chase A. Stone, Esq. (*pro hac vice*)
                               cstone@ecjlaw.com
                             9401 Wilshire Boulevard, Twelfth Floor
                             Beverly Hills, California 90212-2974
                             Telephone: (310) 273-6333
                             Facsimile: (310) 859-2325

                             *Attorneys for Simon Dixon and BNK To The Future (BF)*

**AMENDED APPLICATION OF BNK TO THE FUTURE (BF) PURSUANT TO 11 U.S.C.
§§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE AND PAYMENT OF
PROFESSIONAL FEES AND EXPENSES INCURRED
IN MAKING A SUBSTANTIAL CONTRIBUTION**

Simon Dixon ("Mr. Dixon"), representing BNK To The Future ("BF"), as CEO, by and

through its undersigned counsel Ervin Cohen & Jessup LLP ("ECJ"), hereby files this amended

*Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4)) For Allowance Of Payment*

*Of Professional Fees And Expenses Incurred In Making A Substantial Contribution* (the

"Amended Application"), which incorporates by reference that *Declaration Of Simon Dixon In*

*Support Of Application Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) for Allowance Of*

*Payment Of Professional Fees And Expenses Incurred in Making a Substantial Contribution*

filed on October 2, 2023 (the "Dixon Decl. or "Dixon Declaration"), and states as follows:

**CALCULATION OF FEE AMOUNTS REQUESTED**

1.      As a threshold matter, through the underlying Application filed on October 2,

2023, Mr. Dixon, by and through BF, sought to illustrate that BF incurred *significant* fees while

participating in these proceedings, of which BF has not sought any reimbursement whatsoever.

2.      After the Application was filed, Mr. Dixon, by and through BF, became aware of

some confusion regarding the fees and expenses requested therein, as well as how these amounts

were derived from the services rendered by Brown Rudnick LLP ("BR"), DBK Financial

Services Limited ("DBK"), and Ervin Cohen & Jessup LLP ("ECJ") on behalf of BF.

3.      To that end, Paragraph 43 of the Application, in the table entitled *Substantial*

*Contribution Fees Requested.  Actual Amounts Incurred As Compared To Amounts Requested*

*After Voluntary Reduction Through This Application*, states, in the third column on the right

(under the row entitled "Basis"), three different amounts under the column labeled "Basis."

4.      Paragraph 43 did not specify that Mr. Dixon, by and through BF, had also

retained the services of the law firm Cooley LLP ("Cooley"), and a strategic financial

consultancy service, Add then Multiply Limited ("ATM"). These professionals, and their

services, were not discussed extensively because the Application **does not request**

**reimbursement** in any amounts for Cooley or ATM's fees and/or expenses.

5. The following amended table clarifies the details discussed *supra*:

| Amended Table: Fees Requested Through October 2, 2023 And Reductions (%) | | | |
|---|---|---|---|
| **FIRM** | **ACTUAL FEES** | **REDUCTION (%)** | **AMOUNT TO OCT. 2 (WITH REDUCTION)** |
| BR | $445,377.00 | 50% by BF | $222,688.50 |
| *Cooley* | *$824.010.25* | *100% by BF* | *$0* |
| *ATM* | *$23,000.00* | *100% by BF* | *$0* |
| ECJ | $239,306.00 | 6% by ECJ | $225,000.00[2] |
| DBK | $118,068.00 | 50% by BF | $59,034.00 |
| **Total:** | $1,641,961.25 | - | **$506,722.50** |

6. As a courtesy, ECJ has voluntarily agreed to reduce its fees through October 2,

2023 by $14,306.00, from $239,306.00 to $225,000.00. The reduction represents removing a

timekeeper entry of $7,800.00, and a further discount of roughly $6,500.00, totaling $14,306.00.

7. Further, ECJ's initially specified sum did not include the fees that ECJ anticipates

incurring from the filing of the Application on October 2, 2023 through the Effective Date of the

Plan, which includes responding to anticipated objections, appearing at the hearing on October

24, 2023, and advising BF on related matters. ECJ anticipates accruing approximately

**$50,000.00** in such fees.

/ / /

/ / /

/ / /

/ / /

---

[2] ECJ's requested amounts for services rendered have been reduced by $14,306.00 as a courtesy.

8.       The amended fee schedule for ECJ is provided as follows:

| *Revised Fees and Rates of Ervin Cohen & Jessup, LLP* | | | | |
|---|---|---|---|---|
| Timekeeper | Timekeeper Category | Rate | Hours | Amount |
| Chris Manderson | Attorney & Corporate Partner | $975/hr | 124.70 | $121,582.50 |
| Alex Leitch | Attorney & Corporate Associate | $695/hr | 36.50 | $25,367.50 |
| Isabelle Vidro | Attorney & Litigation Associate | $595/hr | 27.70 | $16,481.50 |
| Chase Stone | Attorney & Bankruptcy Associate | $555/hr | 74.40 | $41,292.00 |
| Sara Gardner | Attorney & Corporate Associate | $525/hr | 1.30 | $682.50 |
| Juliet White | Paralegal | $450/hr | 58.00 | $26,100.00 |
| | | | | |
| Previous Total………………………………………………………….. | | | | $239,306.00 |
| Timekeeper Reduction | | | | ($7,800.00) |
| Subtotal Through Oct. 2, 2023…………………………………………… | | | | $231,506.00 |
| Further Reduction………………………………………………………. | | | | ($6,506.00) |
| **Revised Total**……………………………………………………….. | | | | **$225,000.00** |
| *Anticipated fees from October 2, 2023 through and until Plan Effective Date, not to exceed……..* | | | | *$50,000.00* |

9.       With respect to DBK, the external fees and rates of DBK, for which partial

reimbursement is sought, are provided below:

| *Fees and Rates of DBK Financial Services, Ltd.* | | | | |
|---|---|---|---|---|
| Timekeeper | Timekeeper Category | Rate | Months | Amount |
| David Kahn | Financial services/analysis. | $10,000/month | 11.8 | $118,068.00 |
| | | | | |
| Reduction by BF……………………………………………………….. | | | | ($59,034.00) |
| **Total**…………………………………………………………………. | | | | **$59,034.00** |

10.      With respect to BR, the fees and rates of BR are provided below:

| *Fees and Rates of BR* | | |
|---|---|---|
| Timekeeper | Timekeeper Category | Rate[3] |
| Steven B. Levine | Attorney | $1,450//hr |
| William R. Baldiga | Attorney | $1,570/hr |
| Clara Krivoy | Attorney | $1,015/hr |
| Alejandro D. Fuiza | Attorney | $945/hr |
| | | |
| Subtotal……………………………………………. | | $445,377.00 |
| Reduction by BF…………………………………... | | ($222,688.50) |
| **Total**……………………………………………. | | **$222,688.50** |

---

[3]       Invoices obtained from BR do not provide hourly total for each timekeeper.  Thus, ECJ will provide such information upon request, and will work with BR to do so, if necessary.

## REVISED TOTAL AMOUNT OF FEES REQUESTED

11.     As revised through the Amended Application, the total amount of fees being

requested through the Application is $506,722.50, not including anticipated fees not to exceed

$50,000 from October 2, 2023 through and including the Effective Date of the Plan:

| FINAL FEE AMOUNTS REQUESTED | |
|---|---|
| **FIRM** | **FEES ($)** |
| BR | $222,688.50 |
| Cooley | $0 |
| ATM | $0 |
| ECJ | $225,000.00[4] |
| DBK | $59,034.00 |
| **TOTAL:** | ***$506,722.50*** |

12.     The final fee request, above, includes the voluntary reduction of all fees, between

6% (e.g., ECJ) up to 100% (e.g., Cooley).  Again, the anticipated expenses of ECJ from October

2, 2023 through the Effective Date of the Plan are not to exceed $50,000.

## EXPLANATION OF BF'S HYPOTHETICAL $3.1 MILLION FEE (PARA . 43)

13.     With respect to BF, Paragraph 43 of the Application, in the third column, states

that $3,134,389.10 represents the "total fees for both (1) actual amounts incurred, and (2) amount

of out-of-pocket fees/expenses for beneficial services rendered by Mr. Dixon for the Estate."

14.     For clarity's sake, $3.1 million is **not** being requested through the Application.

This amount was intended to *compare* the reduction of requested amounts to the actual total

costs incurred by BF on behalf of the Estate, *if* all of the fees were included (neither Mr. Dixon,

nor BF, are seeking this amount).  In other words, $3.1 million is a hypothetical estimate, which

includes the sum of **$1,641,961.25** (total of all professional fees incurred by BF, without

---

[4]     ECJ's requested fees do not include the fees that ECJ anticipates incurring from the filing of this
Application on October 2, 2023 through and including the Effective Date of the Plan, including responding to
objections, appearing at the hearing on October 24, 2023, and advising BF on these matters.

reduction); *hypothetical* charges for Mr. Dixon's services rendered on behalf of the Estate[5] totaling approximately **$1,573,933.86**; BF's 'out of pocket' expenses for services, such as technology development, "Depositors First Campaign," and other support, totaling approximately **$152,500.00**.  Consequently, the sum of $3,134,389.10 was included for purposes of comparison only.

15.    In addition, Exhibit B attached to the Dixon Declaration represented that the total hours of 'creditor support' is approximately 134 hours of recorded content on Twitter spaces. Mr. Dixon also spent in excess of 25 hours on unrecorded Twitter spaces.  Thus, the total number of hours for 'creditor support' expended by Mr. Dixon was approximately 160 hours.  For the avoidance of doubt, neither Mr. Dixon, nor BF, are seeking compensation for their personal services rendered on behalf of the Estate.  These estimates were provided for comparison *only*.

## REVISED EXPENSES WITH ITEMIZED CATEGORIES

16.    With respect to BR, the expenses requested through the Application on behalf of BR are as follows:

| *Expenses Requested—Brown Rudnick LLP* | |
| --- | --- |
| **EXPENSE** | **AMOUNT** |
| Document Production | $550.00 |
| Copies | $37.35 |
| Transportation | $26.85 |
| **TOTAL:** | **$614.20** |

/ / /

/ / /

/ / /

---

[5]    *If such fees were charged* at his normal rates for, Mr. Dixon's rates for services are as follows: consultation services (£1,200.00//hour); keynote appearances and/or speaking engagements (£10,000.00 per engagement), and creditor support (£5,000.00/hour).

17.    With respect to ECJ, the expenses requested through the Application on behalf of

ECJ, which include amounts to anticipated through the Effective Date, are as follows:

| Expenses Requested—Ervin Cohen & Jessup | |
|---|---|
| **EXPENSE** | **AMOUNT** |
| Service/Postage of Application on 10/2/23 | $15,642.01 |
| *Anticipated Expenses* | *Unknown* |
| **TOTAL (EST.)** | **$20,000.00** |

18.    With respect to DBK, the expenses requested from DBK are as follows:

| Expenses Requested—DBK | |
|---|---|
| **EXPENSE** | **AMOUNT** |
| Notary/Translation/Misc. | $368.00 |
| **TOTAL:** | **$368.00** |

19.    The Amended Application respectfully submits the total expenses requested:

| Expenses Requested | |
|---|---|
| **PROFESSIONAL** | **AMOUNT** |
| BR | $614.20 |
| Cooley | $0 |
| ATM | $0 |
| ECJ | $20,000.00 |
| DBK | $368.00 |
| **REQUESTED:** | **$20,982.20** |

## EXHIBIT "F" IS RELABELED AS EXHIBIT "E"

20.    Paragraph 4 and Paragraph 72 of the Application both provide that the responses

from creditors (approx. 400 pages)—which were appended in full to the Dixon Declaration—

were labeled as Exhibit F, though the reference should be to Exhibit E.

## ADDITIONAL EXHIBITS

21.    Attached hereto as amended **Exhibit B** is a true and correct copy of the December

12, 2022 bid submitted by BF discussed at Paragraph 81 of the Dixon Declaration.

22.    Attached hereto as amended **Exhibit C** is a true and correct copy of the Plan

Consultant Agreement discussed at Paragraph 118 of the Dixon Declaration.

### NOTICE

23.    Notice of the Amended Application is provided in accordance with that *Notice of Further Revised Schedule for Substantial Contributions Application* [Docket No. 3498].[6]

### CONCLUSION

**WHEREFORE**, BF, by and through its CEO, Mr. Dixon, respectfully requests that the Court: (i) approve the Application, as amended herein; (ii) enter an order substantially in the form attached hereto as amended **Exhibit A** authorizing the Debtor(s) to pay the sum of $506,722.50 for reasonable professional fees and $20,982.20 in expenses, and additional amounts for ECJ's anticipated fees not to exceed $50,000.00 in connection with the filing of the Application from October 2, 2023, through and including the Effective Date of the Plan, on account of the substantial contribution to these cases; and (iii) grant such other and further relief as may be just and proper.

DATED:    October 12, 2023
Beverly Hills, California

                                        Respectfully submitted,


                                        By:            /s/ William Christopher Manderson
                                        William Christopher Manderson, Esq. (*pro hac vice*)
                                            cmanderson@ecjlaw.com
                                        David Tarlow, Esq.
                                            dtarlow@ecjlaw.com
                                        Chase A. Stone, Esq. (*pro hac vice*)
                                            cstone@ecjlaw.com
                                        9401 Wilshire Boulevard, Twelfth Floor
                                        Beverly Hills, California 90212-2974

                                        *Attorneys for Simon Dixon and BNK To The Future (BF)*

---

[6]    Mr. Dixon presented a live stream regarding, among other things, the substantial contribution motions and updates regarding the confirmation hearings, available at: https://www.youtube.com/watch?v=AiCIk3-FOnE.

# EXHIBIT A

**ERVIN COHEN & JESSUP LLP**
David Tarlow, Esq.
  dtarlow@ecjlaw.com
William Christopher Manderson, Esq. (admitted *pro hac vice*)
  cmanderson@ecjlaw.com
Chase A. Stone, Esq. (admitted *pro hac vice*)
  cstone@ecjlaw.com
9401 Wilshire Boulevard, Twelfth Floor
Beverly Hills, California 90212-2974
Telephone: (310) 273-6333
Facsimile: (310) 859-2325

*Attorneys for Simon Dixon and BNK To The*
*Future (BF)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**ORDER GRANTING AMENDED APPLICATION OF BNK TO THE FUTURE (BF)**
**PURSUANT TO 11 U.S.C. §§ 503(b)(3)(D) AND 503(b)(4) FOR ALLOWANCE**
**AND PAYMENT OF PROFESSIONAL FEES AND EXPENSES**
<u>**INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION**</u>

Upon consideration of the *Application Of BNK To The Future (BF) Pursuant To 11*

*U.S.C. §§ 503(b)(3)(D) And 503(b)(4) For Allowance And Payment Of Professional Fees And*

*Expenses Incurred In Making A Substantial Contribution* (the "<u>Application</u>") filed on October 2,

2023 [Docket No. 3672]; and the *Declaration of Simon Dixon* in support of the Application; and

the Exhibits attached thereto; and the *Amended Application Of BNK To The Future (BF)*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Pursuant To 11 U.S.C. §§ 503(b)(3)(D) And 503(b)(4) For Allowance And Payment Of*

*Professional Fees And Expenses Incurred In Making A Substantial Contribution* (the "<u>Amended</u>

<u>Application</u>") filed on October 12, 2023; and this Court having jurisdiction to consider the

Application and the Amended Application and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant

to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Application and Amended

Application having been provided; and it appearing that no other or further notice need be

provided; and the Court having reviewed Application, the Dixon Declaration, and the Amended

Application; and after due consideration and upon all of the proceedings had before the Court,

and sufficient cause appearing therefor, it is hereby

1.     **ORDERED** that the Application, as amended, is granted; and it is further

2.     **ORDERED** that the Debtors are authorized and directed to pay the Fees and

Expenses incurred by creditor BNK To The Future ("<u>BF</u>"), by and through its CEO, and

individual creditor of the Estate, Simon Dixon ("<u>Mr. Dixon</u>") (together, the "<u>Applicants</u>"),

incurred by the Applicants from the Petition Date through and including October 2, 2023; and

anticipated fees incurred from October 2, 2023 through and including the Effective Date of the

Plan, not to exceed $50,000.00, as Administrative Expense Claims, and in the specified amounts

set forth in <u>Amended Schedule A</u> attached hereto, totaling $506,722.50 for reasonable fees

incurred, and with the anticipated fees of ECJ, the total amount of professional fees requested is

$556,722.50 and the total amount of expenses requested is $20,982.20; and it is further

3.     **ORDERED** that as soon as practicable after entry of this Order, counsel for

Applicants, Ervin Cohen & Jessup LLP ("<u>ECJ</u>") shall serve copies of all supporting billing

statements/invoices (including those of ECJ, Brown Rudnick LLP ("<u>BR</u>"), and DBK Financial

Services Ltd. ("<u>DBK</u>") to the Debtors, the Unsecured Creditors Committee, and counsel for the Office of the United States Trustee (the "<u>U.S. Trustee</u>").  Notice of the filing of an objection to Applicants' supporting billing statements/invoices must be served upon Applicants, and ECJ, by no later than fourteen (14) days following the service of such documentation upon the above-referenced parties.  If, after the expiration of the fourteen (14) days following service of the invoices/billing statements, there is no objection to any invoice, then the Debtors are authorized and directed to pay the Fees and Expenses in the amounts set forth in <u>Amended Schedule A</u> attached hereto on the later of three (3) business days after the two (2) weeks' notice period expires, or the Plan's Effective Date; and it is further

4.      **ORDERED** that any dispute arising from Applicants' billing statement/invoice (such as in relation to any entry and/or a portion of such fees and expenses) shall stay the payment of the related amounts to be paid, until the objection is resolved by stipulation and/or by this Court after notice and hearing in accordance with the relevant Rules of Federal Bankruptcy Procedure and Title 11 of the U.S. Code.  Absent an objection, the amounts set forth, as set forth in <u>Amended Schedule A</u> shall be promptly paid to Applicants by the Debtors in accordance with the deadlines specified in this Order; and it is further

5.      **ORDERED** that such payments may be made on the Effective Date of the Plan, or as soon thereafter as practicable; and it is further

6.      **ORDERED** that this Court shall retain jurisdiction with respect to all matters arising from or related to the interpretation or implementation of this Order.

Dated: October __, 2023
      New York, New York

                                          _____
                                        The Honorable Martin Glenn
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT B

Strictly Private & Confidential



Willow House,
Cricket Square, KY1-1001
Cayman Islands

**Kirkland & Ellis LLP**
**601 Lexington Avenue**
**New York**
**New York 10022**

**Attn.:**
Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com)
Ross M. Kwasteniet, P.C. (ross.kwasteniet@kirkland.com)
Steve Toth (steve.toth@kirkland.com)
Dan Latona (dan.latona@kirkland.com)

**Centerview Partners LLC**
**31 West 52nd Street**
**New York**
**New York 10019**

**Attn.:**
Marc Puntus (mpuntus@centerview.com)
Ryan Kielty (rkielty@centerview.com)
Bob Beasley (bbeasley@centerview.com)
Daniel Bendetson (dbendetson@centerview.com)

**White & Case LLP**
**111 South Wacker Drive, Suite 5100**
**Chicago**
**Illinois 60606**

**Attn.:**
Gregory F. Pesce (gregory.pesce@whitecase.com)
Gregory Warren (gregory.warren@whitecase.com)

**Perella Weinberg Partners, LP**
**767 Fifth Avenue, 5th Floor**
**New York**
**New York 10153**

**Attn.:**
Kevin Cofsky (kcofsky@pwpartners.com)
Matthew Rahmani (mrahmani@pwpartners.com)
12 December 2022

DocuSign Envelope ID: 30A9E48-DC8D-4BE9-8964-EA72C957944A

Strictly Private & Confidential

12 December 2022

BF Global and it's affiliated companies (BF) is delighted to participate in the Sale process for the Retail Platform and Other Assets ("RPOA").  As will be evident from our attached bid below, we are aiming to achieve the maximum return to all the creditors of Celsius ("the Creditors") and to recover as much as possible of the value they lost at the hands of the Debtors and through this Chapter 11 process.  In order to realize this goal, we do not believe that a sale of RPOA is the appropriate structure to achieve maximum returns particularly in current market conditions, because purchasers will by definition price the assets at a discount to their current book value and Creditors will have no way to gain access to the potential future value that the assets may realize in future, particularly if the market recovers.  We understand that there are practical reasons for taking the Sale approach, such as:

(i)     open market price discovery through a competitive auction process;
(ii)    finding suitable operational management committed to taking the business forward out of Chapter 11; and
(iii)   achieving certainty of emergence from Chapter 11.

While we recognize the positive intent of the above practical considerations, we believe that they are inappropriate for the process at hand for the following reasons:

(i)     Price discovery is not necessary under the current circumstances because:
        a.  the RPOA consists mostly of tradeable crypto with up-to-the-minute market pricing;
        b.  we believe from our regulatory analysis that the Platform itself lacks the regulatory framework, has lost the trust of its customers and cannot continue to operate in the market post-Chapter 11; and
        c.  any other assets (that may be included), particularly, Celsius Mining, were likely purchased using Creditors' funds and therefore should be returned to Creditors at cost (or at current book value).
(ii)    Transferring operational management to a Purchaser will necessitate further losses to Creditors because under a Sale structure, it is the Creditors who will effectively be:
        a.  forced to absorb any discount to book value; and
        b.  excluded from the Purchaser's upside if the market recovers.
(iii)   A Sale process is by no means any more certain to lead to the desired emergence from Chapter 11 than an alternative plan of reorganization – recent market events attest to the truth of this; and the Debtors' insistence on a "good faith deposit" as a key to entry into the Sale process demonstrates their own insecurity in this regard.

We believe that there is a far better solution in this case.   We have dedicated significant resources to solving the above problems and to finding a creative solution using financial technology and innovation to assist Creditors to emerge from Chapter 11 with

(i)     the maximum possible recovery of value from their assets locked in at the Debtors;
(ii)    full regulatory compliance built into our structure; and
(iii)   strong creditor buy-in and support that will ensure a certain and secure emergence from Chapter 11.

Our solution is to distribute all of the RPOA to Creditors without extracting any value as a Purchaser but to provide the distribution as a service both at confirmation and on an ongoing basis.

DocuSign Envelope ID: 130A9E48-DC6D-4B59-9464-EA72C957940A

Strictly Private & Confidential

We have developed regulatory and technological solutions (details of which we provide in Appendix 3 below) designed to release the Creditors' assets from Chapter 11 as efficiently as possible and to return the maximum value to them without any third-party Purchaser needing to make their own returns from the Creditors' assets.  We believe that the best way to achieve all this is to distribute all of the assets (all of the RPOA) to the Creditors.  Our proprietary distribution mechanism relies on the BF Securities & Virtual Assets Platform which has distributed the securities of more than 100 of the largest and best-known companies in the crypto space. We have more than one hundred and fifty thousand investors contributing to  funding rounds listed on our platform valued at more than $1.7 billion. We have distributed over one million micro dividends & distributions in fiat (Eg. USD), stablecoins (Eg. USDC), proof of work cryptocurrencies (Eg. BTC), proof of stake cryptocurrencies (Eg. ETH) and virtual assets (Eg. CEL).

Our bid, therefore, is structured as a bid offer to distribute ("BOD") model designed to facilitate, manage and ensure the successful distribution of the RPOA to Creditors and to ensure (as may be appropriate, particularly in the case that Celsius Mining is included in our solution) that any future cashflow needs can reliably be financed.

We are completely committed to the process and the aims we have set out.  We commit to working together with the Debtors and the UCC and their respective advisors to put our BODS model to the best effect.

We believe that our solution will be particularly effective also in the case that Celsius Mining is included together with the RPOA and is not sold in a separate process.  We are in advanced partnership discussions with mining operators with significant expertise and scale in the mining sector who would be prepared and able to manage the asset for the benefit of the Creditors in the event that they are allowed to take their rightful possession of the asset.  Based on our discussions with such miners, we believe that our plan will lead ultimately to a much better return to Creditors than any Sale process may be able to achieve at the current time while the mining market is significantly capital-constrained with pricing at a very deep discount to fair value.

We look forward to the successful conclusion of this Chapter 11 case and to contributing with all our experience, skill and resources to returning maximum value to the Creditors who have lost so much.

Yours truly

Simon Dixon
CEO, BF Global

DocuSigned by:

CC7C264C349E42E...

12 December 2022 | 10:36:30 AM PST

DocuSign Envelope ID: 130A9E48-DC8D-4BE9-9164-EA72C957944A

Strictly Private & Confidential

**Willow House,**
**Cricket Square, KY1-1001**
**Cayman Islands**

**Kirkland & Ellis LLP**
**601 Lexington Avenue**
**New York**
**New York 10022**

**Attn.:**
Patrick J. Nash, Jr., P.C. (patrick.nash@kirkland.com)
Ross M. Kwasteniet, P.C. (ross.kwasteniet@kirkland.com)
Steve Toth (steve.toth@kirkland.com)
Dan Latona (dan.latona@kirkland.com)

**Centerview Partners LLC**
**31 West 52nd Street**
**New York**
**New York 10019**

**Attn.:**
Marc Puntus (mpuntus@centerview.com)
Ryan Kielty (rkielty@centerview.com)
Bob Beasley (bbeasley@centerview.com)
Daniel Bendetson (dbendetson@centerview.com)

**White & Case LLP**
**111 South Wacker Drive, Suite 5100**
**Chicago**
**Illinois 60606**

**Attn.:**
Gregory F. Pesce (gregory.pesce@whitecase.com)
Gregory Warren (gregory.warren@whitecase.com)

**Perella Weinberg Partners, LP**
**767 Fifth Avenue, 5th Floor**
**New York**
**New York 10153**

**Attn.:**
Kevin Cofsky (kcofsky@pwpartners.com)
Matthew Rahmani (mrahmani@pwpartners.com)
12 December 2022

DocuSign Envelope ID: 130A9E48-DC6D-4B59-9164-EA73C9572040

Strictly Private & Confidential

BF Global and its affiliated companies ("BF") are delighted to submit our offer bidding for Celsius' Retail Platform and Other Assets ("RPOA") and sponsoring a potential plan of reorganization, further to the Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets contained in Exhibit 1 of court docket 1272 dated 2 November 2022. Our bid offer is intended to be implemented through a confirmed plan of reorganization involving substantially all of Celsius' retail platform and other assets ("RPOA"). Furthermore, in the event that Celsius Mining is not sold in a separate process, we will explain how Celsius Mining can be integrated into our bid.   In structuring our bid offer to distribute ("BOD") model we have taken care to ensure that the maximum possible value may be returned to the unsecured creditors of the Debtors (the "Creditors"), not only immediately as a result of the Bid Process but also with the possibility of additional (even significant) returns in the future.  The fundamental principle underlying our BOD is maximizing the returns to unsecured creditors by enabling them to take ownership of 100% of their crypto assets and to take ownership of any other unsold investment assets (potentially including Celsius Mining, if not sold separately) that were acquired by the Debtors effectively using Creditors' funds.

We set out our BOD, as per the Process Letter provided by Centerview Partners LLC, as follows:

1. **Description of Bidder:**
   a) Bidding Entity: BF Global ("BF"), a company registered in the Cayman Islands under No *CO-344615* with registered address at Willow House, Cricket Square, Grand Cayman, KY1-1001, Cayman Islands.
   b) Majority shareholders of BF Global:

      - Simon Dixon (CEO, authorized board director, controlling shareholder and contact person for the purposes of this bid.  Contact email: simon@banktothefuture.com).

      - Bliss Dixon (authorized board director and controlling shareholder)

      - BF Global has numerous minority shareholders who together own less than 25% through a segregated portfolio company 'BF Global Investors SP'.

   c) **Authorization**: The board of directors of BF have authorized BF to submit this bid.
   d) Please see Appendix 3 for further information about BF including information about our financial capacity.

2. **Transaction Structure and Purchase Price:**  Our BOD plan proposes to reorganize the RPOA as follows:
   a) All liquid crypto assets that are held by the Debtors will be returned to the Creditors pro-rata to their claims in the form of BTC (or equivalents) and ETH (or equivalents).  The value of the returned crypto will be at current market prices, currently estimated to be approximately $2.1 billion.  See Appendix 5 for a more detailed estimation of the conversion (with estimated third-party conversion costs).
   b) The converted crypto will be held in individual custody accounts managed by BF or returned directly to the Creditors' Celsius wallets. The Creditors will be able to elect whether to withdraw their crypto, hold it in custody, trade it, stake it or invest it in a security.  The Creditors will be offered attractive commercial incentives to use their accounts for custody, staking and investment purposes.  See Appendix 5 for a more detailed description of how we envisage the distribution to custody to work, as well as a possible division of the distribution between the BF Platform and the Celsius Wallet routes.
   c) 100% of the ownership interests in unrealized and illiquid Celsius claims and assets (this would include locked-up crypto and other liquid assets such as private equity or debt) will be transferred

DocuSign Envelope ID: 30A9E48-DC8D-4B59-9964-EA72C957DA4A

Strictly Private & Confidential

to the Creditors and held by the Creditors going forward via BF's proprietary SPV mechanism (See Appendix 1 for a full description of BF's Proprietary SPV structure).  The value of such transfers will be at book value of the assets as recorded on the Celsius balance sheet reflecting the cost of these assets and any subsequent impairment (as may be relevant).  These assets will be managed to realize maximum flexibility and returns to Creditors.  A key benefit to Creditors of holding these assets on the BF Platform is that they will be able to keep clear track of their interests, swap them, trade them or convert them into crypto assets.  When these assets can be monetized or upon their maturity, the returns and proceeds will be distributed via the BF Platform to the Creditors.

d)  In the event that Celsius Mining is not sold in a separate process, the ownership interests in Celsius Mining will be transferred to the Creditors by means of BF's proprietary SPV structure.  BF is in advanced partnership discussions with mining operators with significant expertise and scale in the mining sector who are prepared and able to manage the asset for the benefit of the Creditors. See Appendix 2 for a description of how BF's proprietary SPV structure will be applied in the case that Celsius Mining is included in the RPOA.

We are highly confident in our ability to execute our plan.  The distribution of shares to creditors on our platform is our daily business.  We have executed the distribution of securities over our platform to 156,575 investors and $1,734,895,793 in value as a regulated securities business since 2015.  Our online investment platform allows for the issuance of shares and certificates to an unlimited number of investors, the ability to raise capital from a syndicate of targeted investors, the ability to perform investor relations and gain votes from shareholders, the ability to complete multiple corporate actions on the platform, the ability to pay dividends and distribute exit proceeds, the ability to invest creditor claims from Chapter 11 bankruptcy proceedings as well as to place a sell order after a one year lock-in period to be matched with other investors. We have been developing this technology for over ten years and it has been used for share distributions in many of the largest companies in crypto including Kraken, Coinbase, Robinhood, Circle, Ripple Labs, Bitfinex, and many others.  (See Appendix 3 for an overview of BF's track record and capabilities and Appendix 4 for an overview of BF's regulatory structure that underpins our capabilities).

3.  **Good Faith Deposit:**  given our BOD model essentially provides a service to Creditors and we will not purchase nor become the owners of the RPOA, it is inappropriate for us to provide a good faith deposit intended to guarantee a purchase.  Our commitment is to work together with the Debtors, the UCC and their respective advisers in order to ensure the best possible outcome for Creditors, being the most efficient, secure and certain release of Creditors' assets from Chapter 11 and the most efficient provision of ongoing services to those Creditors who wish to use them.

4.  **Purchase Agreement or Plan:**  We do not envisage using the Asset Purchase Agreement as drafted because we will not be purchasing the assets under our BOD model.  We commit, however, to working closely with the Debtors' counsel and investment bankers as well as the UCC and their counsel and investment bankers to reach definitive agreement on the reorganization and distribution of the assets to Creditors.

5.  **Financial Capacity:**   Please see Appendix 3 including a description of BF and our financial wherewithal to execute on our BOD.

6.  **Employees:**  Given our BOD model, we plan to work closely with the Debtors on the execution of a plan of reorganization regarding the RPOA.  We have no plans to retain any of the Debtors' employees beyond the assets' emergence from Chapter 11.

7.  **Approvals:**  Please see Appendix 4 containing full information about our licenses and approvals including those required for us to execute on our BOD.

8.  **Diligence:**  We require the following information to complete on our BOD:

DocuSign Envelope ID: 30A9E48-DC8D-4BF0-8464-EA72C9572040

Strictly Private & Confidential

Accurate estimates at the signing of definitive documentation subject to the actual precise information as at the confirmation of the following:

    a.  Accurate amounts of crypto held by the Debtors in earn accounts, remaining crypto held in undistributed custody and withheld accounts, and any other coin balances.

    b.  Total outstanding cash on hand.

    c.  Total outstanding administrative and other expenses due from the Chapter 11 process.

    d.  Total value of all illiquid investment assets (with breakdowns) with supporting documents (including loan book status with full retail and institutional breakdowns)

    e.  Full details of Celsius Mining assets (including purchase price and current equipment and coin inventories) and liabilities (with current carrying book value with supporting documentation)

**9.    Other Acknowledgments / Requirements as per Doc 1272**

**a)  Committed Financing:** In the event and to the extent financing may be required (this is unlikely in the case of the illiquid assets of Celsius, but highly likely in the case of Celsius Mining), we commit to provide Creditors with the opportunity to participate in a rights issue administered on the BF platform with the Creditors' funds going to the asset requiring funding.  BF is highly qualified and experienced at raising capital and distributing shares.   We have executed the distribution of securities over our platform to 156,575 investors and $1,734,895,793 in value as a regulated securities business since 2015.

**b)  As Is, Where Is**

    ●  BF has had access to the virtual data room and has had ample opportunity to study the documents therein prior to making this BOD;

    ●  BF has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making our BOD; and

    ●  We have not relied upon any written or oral statements, representations, promises, warranties, or guarantees whatsoever, whether express, implied, by operation of law, or otherwise, regarding the assets or completeness of any information provided in connection therewith or an Auction, except as expressly stated in our proposed agreements;

**c)  Compliance with Bankruptcy Code and Non-Bankruptcy Law; Acknowledgement**:  We believe that our BOD is compliant with the Bankruptcy Code and Non-Bankruptcy Law.  We acknowledge the Bidding Procedures and have endeavored to comply as completely as possible given our BOD structure with the Bidding Procedures.

**d)  Irrevocable:** Our BOD is irrevocable.

**e)  No Fees:** BF will not require any fees for the execution of the transactions resulting from our BOD. Certain third-party costs will need to be covered from Creditors' new accounts as they relate to the administration of their new accounts / wallets.  We have endeavored to keep these costs to a minimum and we set these out in Appendix 5.  Subsequent to the distribution of assets to Creditors, Participating Creditors will be charged for the use of our Platform services and offerings according to our normal BF Platform fee schedule.  Please refer to Appendix 5 for our fee schedule and incentives to be offered to Participating Creditors.

**f)  Adherence to Bidding Procedures**: By submitting our Bid, BF agrees to abide by and honor the terms of the Bidding Procedures and agrees not to submit a Bid or seek to reopen the Sale Process, or the Auction (if held), after the conclusion of the selection of the Successful Bidder.

**g)  Consent to Jurisdiction**: BF submits to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction (if

DocuSign Envelope ID: 30A9E48-DC8D-4B59-9164-E472C957944A

Strictly Private & Confidential

held), the construction and enforcement of the Bidding Procedures, the Sale documents, and the Closing, as applicable;

h) **Backup Bid**: BF is prepared to serve as a backup bidder if our bid is the next highest or otherwise best bid;

i) **Expected Closing Date**: We are confident, based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations, that the reorganization will be consummated, if selected as the Successful Bid, within a timeframe acceptable to the Debtors, after consultation with the Consultation Parties.

We believe that our BOD should be selected as **the winning bid** for the following reasons:

a. the value provided by our BOD to Creditors: our BOD puts the assets of the Creditors back in their hands at **the maximum possible value** of their crypto assets plus the full fair book value of the other assets, including Celsius Mining;

b. the value to be provided to the Debtors under the Bid: our bid offers **full recovery of the** the creditors' crypto assets held by Celsius, **plus** the opportunity for the Creditors to benefit from **the maximum future valuation upside** potential of the illiquid assets including Celsius Mining during the economic lifetime of these assets;

c. the assets and liabilities excluded from the Bid:  we have **not excluded any assets of value** from the bid (indeed we are both interested to and prepared to include the Mining assets, if not sold separately).  We have excluded CEL tokens from our BOD on the basis that they represent zero value.  Although there is currently a speculative price for these tokens in the market, the price will likely go to zero immediately upon resolution of the bankruptcy cases if the coins are released to creditors;

d. **Certainty**: We are highly confident that our BOD will lead to a confirmed plan;

e. **Execution risk**: we are highly confident in the execution of our BOD.  The distribution of securities to creditors on our platform is our daily business.  We have executed the distribution of securities over our platform to 156,575 investors and $1,734,895,793 in value as a regulated securities business since 2015.

f. **Execution Experience:** our online investment platform allows for the issuance of shares and certificates to an unlimited number of investors, the ability to raise capital from a syndicate of targeted investors, the ability to perform investor relations and gain votes from shareholders, the ability to complete multiple corporate actions on the platform, the ability to pay dividends and distribute exit proceeds, the ability to invest creditor claims from Chapter 11 bankruptcy proceedings as well as place a sell order after a one year lock-in period to be matched with other investors. We have been developing this technology for over ten years and it has been used for share distributions in many of the largest companies in crypto including Kraken, Coinbase, Robinhood, Circle, Ripple Labs, Bitfinex, and many others.

We thank the Debtors' counsel and investment bank for your careful consideration of our BOD and trust that you will select the bid that returns the best value to the Creditors of Celsius.

Yours truly

DocuSign Envelope ID: 130A9E48-DC8D-4B59-8164-EA72C9E72440

Strictly Private & Confidential



Simon Dixon
CEO, BF Global

12 December 2022 | 10:36:30 AM PST

**List of Appendices**

1. BF Proprietary SPV Structure
2. BF Proprietary SPV Structure as applied to Celsius Mining
3. About BF (including information about our financial wherewithal)
4. Licenses and Government Approvals
5. Conversion and Distribution Structure and Economics

DocuSign Envelope ID: 30A9E48-DC6D-4B59-8A64-E4F2C9F70A9A

Strictly Private & Confidential

## Appendix 1

## BF Proprietary SPV Structure

At BF we have set up over 200 Special Purpose Vehicles (SPVs) in order to hold assets for our platform investors. We use our Segregated Portfolio Company that holds both shares and for both US and non-US investors.  Our segregated portfolio structure can be used to transfer assets that will be 100% owned by Creditors - see diagram below:



The SPV will be incorporated and registered in the Cayman Islands and the SPV shares will be distributed to all creditors. The SPV would be a registered closed-ended fund which would be registered with the Cayman Islands Monetary Authority (CIMA).  According to legal advice BF has sought in the Cayman Islands, after completion of the fund registration process, the SPV will be able to distribute SPV shares to as many persons as required subject to those meeting the AML obligations imposed on the registered SPV. BF will continue to work with Cayman Islands lawyers and US lawyers with regard to the distribution process of the SPV shares in Celsius Mining and the other assets and the customization of any relevant legal documents. It is intended that BNK To The Future (wholly owned by BF), which operates the platform on www.bnktothefuture.com and is regulated by the Cayman Islands Monetary Authority as a registered person under the Securities Investment Business Act (as revised) (CIMA No. 1601784), will be the director of the registered SPV and the administration and distribution of the SPV shares will be delivered via the online platform. All US investors will be onboarded through an SEC-registered broker-dealer that we hold a minority shareholding in, through our group structure. The SPV will be required to report under FATCA any interests held by US persons in the SPV. All virtual assets will be distributed without an

Strictly Private & Confidential

SPV and held in custody with our US-regulated Trust Bank Charter integrated platform partner and British Virgin Islands (BVI) virtual assets service provider.  BF will continue to work with US counsel to ensure compliance with securities and other regulations including tax requirements regarding any distribution of securities as a part of this bid to creditors.

The key benefit to Creditors of holding their assets on the BF Platform via BF's proprietary SPV structure is that the Creditors will be able to keep clear track of their interests by means of a readily accessible dashboard and they will be able to swap their assets,, trade them and convert them into crypto assets via the platform.

DocuSign Envelope ID: 80A9E48-DC6D-4B59-8I64-E472C9E72040

Strictly Private & Confidential

## Appendix 2

## BF's Proprietary SPV Structure As May Be Applied to Celsius Mining
## (if not sold in a separate process)

The SPV will own the mining assets and the SPV will be owned by Creditors as set out below:



The SPV will be incorporated and registered in the Cayman Islands and the SPV shares will be distributed to all Creditors. The SPV will be a registered closed-ended fund registered with the Cayman Islands Monetary Authority (CIMA), as per the structure set out in Appendix 1 above.

As for the structure in Appendix 1 above, BF will be the director of the SPV.  However, in addition, and because the mining assets will need to be operated by an industry expert and because a valuable exit will ultimately need to be executed in order for Creditors to realize their value:

(i)     BF has conducted several discussions with leading mining industry operators who are qualified and willing to operate the assets on Creditors' behalf; and

(ii)    BF will manage any share trading between Creditors holding shares in the SPV according to regulation and will manage the process for any required regulatory disclosures in relation to the ongoing operation of the SPV and the ultimate exit either by way of IPO or sale to trade or financial buyers when the market has recovered sufficiently to realize full value to the Creditors.

DocuSign Envelope ID: 30A9E48-DC6D-4BE9-8464-EA72C9579440

Strictly Private & Confidential

In relation to the roles played by the mining operator and BF's role as share administrator, each of the operator and BF will receive fees and incentives of no more than 10% each.

Importantly this structure can be used to raise financing from creditors who wish to participate via a rights issue.  We believe that such funding is the best possible funding route given current market conditions both in the capital markets and in the crypto and BTC mining markets.

DocuSign Envelope ID: 130A9E48-DC8D-4BE9-8464-EA72C9F7D4A9

Strictly Private & Confidential

# Appendix 3

# About BF Global



Bnk To The Future ("BF") and its prior entities have spent over a decade building and acquiring the regulatory, compliance, legal, technical systems and companies with management teams to operate a fully online, global and scalable investment securities and lending platform.

BF offers services to two target markets:

- **Investors -** Individuals and organisations that wish to invest in securities related to crypto companies and other crypto asset investment products.
- **Clients -** Crypto companies raising capital by pooling together multiple investors into a single entity using our online investment platform[1].

Simon Dixon & Bliss Dixon founded BF in 2011. BF currently holds over $660m of assets under administration (non-discretionary) from over 7,000 investors that predominantly built their wealth in the crypto market. BF has 153,000 investors registered on the online investment platform. $170M of this 660M is attributed to Celsius that may be worth $0 after Chapter 11.

Companies owned directly or indirectly by our parent company, BF Global ("BFG"), have been regulated by the Cayman Island Monetary Authority (CIMA) as a securities business since 2015. We plan to enter into discussion with SEC/FINRA in connection with the use of the US broker dealer that we hold a 24.99% stake in ro discuss the structure of the Celsius bid through a materiality consultation. We have integrated our platform with FV Bank, who holds a Puerto Rico Bank Charter with relation to US investors making securities investments through our groupUS broker dealer, whilst completing an integration with Sprocket that holds a National Trust & Bank Charter for the custody of crypto assets.

---

[1] See some of our case study videos here.

DocuSign Envelope ID: 30A9E48-DC8D-4BE9-8964-EA72C9579440

Strictly Private & Confidential

We have additional virtual asset service provider (VASP) and retail securities licence applications pending.

Our clients consist of many of the largest companies in crypto, including:



BF has deep experience developing and operating technology to:

1.  Handle most crypto corporate actions including:

    o   Equity / convertible note / security token raising
    o   Dividend & Token distributions
    o   IPOs
    o   Acquisitions in shares, tokens or cash
    o   Share splits / rights issues
    o   SAFE / SAFT / Convertible Note conversions
    o   Liquidations
    o   Secondary trading
    o   Pre-emption rights

2.  Make best efforts to comply with global securities, anti-money laundering and transaction monitoring rules.

This has all been documented in our internal policies, procedures, audit requirements and technical documentation manuals following our counsel's advice.

DocuSign Envelope ID: 30A9E48-DC6D-4BE9-9064-EA72C9579440

Strictly Private & Confidential

Our systems and technology have been refined by completing over $1.7bn of investments in crypto securities ($138m fully online as of Dec 2021) and by managing all the corporate actions that have followed.

We have been advised by reputable counsel in the Cayman Islands, US, Australia, UK and Hong Kong in developing our systems and technology, including Carey Olsen, Cooley LLP, DLA Piper, KPMG, Brown Rudnick LLP and Simmons & Simmons.



**BF Global** is a full service Bitcoin investment banking services business that offers institutional services like M&A, Capital Raising and advisory services to sovereign countries like Bitcoin bonds.

**BF Identity** is our onboarding technology to comply with securities laws, AML and KYC laws.

**BnkToTheFuture.com** is our online investment platform for buying and selling shares, virtual assets and managing your investments.

**Retirement Plan B** is our wealth management education and automatic portfolio building service for buying Crypto, Equity and receiving yield in an asset protected structure.

DocuSign Envelope ID: 430A9E48-DC6D-4BE0-9164-EA72C957944A

Strictly Private & Confidential

**Appendix 4**

**Licenses and Government Approvals**

To achieve the goal of assisting Celsius, we have set up an intricate corporate structure to meet regulatory obligations to make a best efforts approach in complying with securities and virtual assets laws globally.



BF and its related entities currently hold licenses that enables BF to operate a fully online global virtual assets investment and securities business offering: :

- Securities Platform (Earn, Mining Rewards, Private Equity Primary & Secondary Markets)
- Virtual Assets Service Provider (VASP) Asset Trading & Custody Platform (Swaps, Staking)

The key assets that we bring to solve the difficulties Celsius faces are as follows:

1. Global and Local AML Regulation - BF Identity
2. US Securities & Exchange Commission (SEC) Registrations - BMI Capital International LLC & Securitize Markets LLC.
3. Global Regulated Securities Investment Business (SIB) Registrations
4. Global Virtual Asset Service Provider (VASP) Registrations

As part of the Celsius initiative BF contemplates issuing tokens/equity under Section 1145 of the Bankruptcy Code without registration, and intends to comply with all applicable reporting requirements thereafter.

**A.  Global and Local AML Regulation - BF Identity**

DocuSign Envelope ID: 30A9E48-DC8D-4BE9-9164-EA72C957944A

Strictly Private & Confidential

In 2018, BF launched the integrated but separate technology application BF Identity (BFID). It has been developed to comply with global securities, anti-money laundering and transaction monitoring rules specific to crypto assets and securities in various jurisdictions. The user experience is different for each country where each user signs agreements and is unique and tailored to the securities laws in the jurisdiction in which the user resides. Where a local broker is in place, users onboard with the local broker dealer using BF technology in partnership with that local broker.

This has all been documented in our policies, procedures, technical documentation manuals and audit requirements. We have engaged third party technical expertise to review all documentation and system architecture and our Chief Information Security Officer (CISO) and Compliance Officer regularly stress-test all our technology in terms of security, technical capability and compliance.

**B. US Securities & Exchange Commission (SEC) Registrations -** BMI Capital International LLC & Securitize Markets LLC

BF Global ("BFG"), our parent company, owns 24.99% of a US Broker Dealer, BMI Capital International LLC ("BMI"). BMI license the technology we have developed to onboard US investors that invest through our platform.

Bnk To The Future Capital ("BF Cap") is also a minority shareholder in Securitize Markets LLC, a registered US Broker Dealer and Alternative Trading System ("ATS"). BMI also has a partnership with Securitize to allow US investors to buy and sell secondary securities from other investors through their broker dealer using the BF platform. BMI and Securitize stand ready to engage FINRA to discuss how US Broker Dealers are utilising our platform to allow US accredited investors (Regulation D private placements) and non-US accredited investors to buy securities after a one-year lock-in period on our secondary market before our secondary market is opened to US investors.

State Registrations
BMI Capital International LLC

DocuSign Envelope ID: 30A9E48-DC8D-4BE9-9164-EA72C9579440

Strictly Private & Confidential



Securitize Markets LLC



DocuSign Envelope ID: 30A9E48-DC9D-4B59-9J64-EA72C9579440

Strictly Private & Confidential

### C. Non-US Regulated Securities Investment Business (SIB) Registrations

The SEC and US state regulators continue to aggressively regulate the cryptocurrency space. Companies like BlockFi, Nexo and Celsius were under investigation or have settled with the SEC and state regulators prior to filing Chapter 11. The SEC and state regulators have also indicated they consider Earn Services to be security offerings. In order to offer financial services where crypto assets may be deemed securities, we believe a bidder would need to be a regulated US Broker Dealer, as well as a Securities and Investment Business (SIB) for non-US investors. In order to issue shares and allow investors to sell them after a fixed lock-in period an ATS partnership or registration with the SEC/FINRA would be needed for US investors.

BF has been regulated under the Securities Investment Business Act of the Cayman Islands ("SIB Act") since 2015 in connection with its activities arranging deals in "securities", and since 2020 the definition of "securities" under the SIB Act has included virtual assets that represent, are convertible into, or are a derivative of, any of the traditional securities listed in the definition.

In El Salvador, the first country to make Bitcoin legal tender, BF Global has also agreed to acquire SYS Valores, a registered broker dealer and member of its country's stock exchange. This will allow non-US retail investors to buy and sell securities on the BF platform. This broker dealer was originally established by and acquired from CitiBank in El Salvador.

BF also has pending applications for retail securities businesses in Mauritius.

### D. Non-US Virtual Asset Service Provider (VASP) Registrations

BF segregates all virtual assets custody services from its platform for extra investor protection in the British Virgin Islands and complies with all AML requirements whilst they introduce  their new Virtual Asset Service Provider (VASP) regime which commenced on December 1, 2022.

### E. US National Bank & Trust Charter Integration

In relation to the custody of US crypto-assets, BF cooperates with a fully licensed trust bank in the United States to hold creditor crypto-assets which we are actively integrating into our platform.

DocuSign Envelope ID: 030A9E48-DC8D-4B59-9164-EA72C957944A

Strictly Private & Confidential

We have one completed integration with FV Bank and are working on another with Sprocket



ensuring all US virtual assets are held in custody compliant with US requirements.

Strictly Private & Confidential

Appendix 5

**Conversion and distribution Structure and Economics**

1. **BF Estimate of Current Crypto Holdings and Conversion to BTC and equivalents and ETH and equivalents**

   a. **Current Crypto Prices (as at 12:30 pm Eastern, 11 December 2022)**

   | BTC | 17,175 | 0.00% |
   |---|---|---|
   | wBTC | 17,141 | 0.20% |
   | ETH | 1,275 | 0.00% |
   | stETH (Lido) | 1,255 | 1.57% |
   | Stable Coins | 1 | 0.00% |
   | CEL | 0.67 | 0.00% |

   b. **Estimated Current Crypto Holdings at Celsius (as per 11 November 2022 data provided by Celsius)**

   | | Number | Current $ Value |
   |---|---|---|
   | BTC | 12,689 | 217,926,979 |
   | wBTC | 20,938 | 358,900,733 |
   | ETH | 371,887 | 474,155,951 |
   | stETH | 405,508 | 508,913,042 |
   | Stable Coins | 341,864,839 | 341,864,839 |
   | CEL | 280,247,104 | 186,868,769 |
   | **Total** | | **2,088,630,313** |

   c. **BF Proposed Conversion Mechanism**
      i. Distribute coins belonging to Celsius Custody and Withheld account holders as per Court decision of 8 December 2022.
      ii. Remaining BTC, wBTC, ETH and stETH to be retained with wBTC, ETH and stETH being stakeable. However, based on Creditor feedback wBTC could be converted into ETH for better staking returns. Stable Coins to be converted to ETH to maximize stakeable yield.
      iii. Although CEL tokens are traded on liquid exchanges, the supply held in Celsius treasury is so great and the fundamentals so poor that upon release of such treasury CEL, the CEL token price will crash to zero. Furthermore, there is significant regulatory liability attaching to the CEL tokens. We therefore propose that the CEL tokens be excluded from the distribution and the CEL in treasury be voided (i.e. $186.8 million) as unrealizable.
      iv. Conversion of Stable Coins to ETH has implied spread cost. Assuming a conversion spread of up to 10bps, estimated holdings would therefore become the following (after Custody and Withheld accounts have been distributed):

   | | Number | Current $ Value |
   |---|---|---|
   | BTC | 12,689 | 217,926,979 |
   | wBTC | 20,938 | 358,900,733 |
   | ETH | 639,748 | 815,678,925 |
   | stETH | 405,508 | 508,913,042 |
   | Stable Coins | - | - |
   | CEL | - | - |
   | **Total** | | **1,901,419,680** |

2. **Distribution Mechanism**

DocuSign Envelope ID: 430A9E48-DC8D-4B59-9864-EA72C9572D40

Strictly Private & Confidential

    a. Distribution of BTC and stakeable wBTC, ETH and stETH to account holders with small claims unlikely to be invested (for sake of demonstration we have estimated this to be claims < $10,000) via Celsius wallets.

    b. Distribution of BTC and stakeable wBTC, ETH and stETH to account holders with large claimes deemed likely to invest (i.e. claims > $10,000) via the BF Platform.

| Creditor Group | # Accounts | Distribution Ratio | # BTC | #wBTC | #ETH | #stETH |
|---|---|---|---|---|---|---|
| Earn Accounts <$10k Claim | 539,882 | 8.83% | 1,120 | 1,848 | 56,468 | 35,792 |
| Earn Accounts >$10k Claim | 56,782 | 75.55% | 9,586 | 15,818 | 483,304 | 306,345 |
| Collateral | 12,124 | 15.63% | 1,983 | 3,272 | 99,977 | 63,371 |
| Total Distribution | 608,788 | 100.00% | 12,689 | 20,938 | 639,748 | 405,508 |

    c. Distribution of non-crypto assets via the BF Platform using BF's proprietary SPV structure:

| Non-Crypto Assets | Accounts | Distribution Ratio | $ Value | % Value |
|---|---|---|---|---|
| Other Investments | 654,811 | 100% | 206,000,000 | 21% |
| Net Loan Recovery | 654,811 | 100% | 158,000,000 | 16% |
| Mining | 654,811 | 100% | 612,000,000 | 63% |
| Total Value Distributed | | | 976,000,000 | 100% |

    d. Total value of coins distributed to Custody and Withheld accounts: **$218,958,810**

    e. Total value of coins distributed: **$1,901,419,680**

    f. Total value of other assets distribution: **$976,000,000**

    g. Total value of coins and assets distributed to Earn and Collateral: **$2,877,419,680**

    h. Total value of distribution: **$3,096,720,354**

3. **A note about Retail Collateral**: There are 12,124 retail loan accounts holding approximately $411 million in outstanding loans. Collateral claims associated with such loans totals $793 million covered by remaining collateral of approximately $297 million. Lost collateral is therefore $496 million which is greater than the total amount of loans outstanding. We believe that the loan customers are unlikely to want to repay their loans and realize a net loss of $114 million. While the estates could pursue repayment it is likely that a significant proportion of these loans will prove unrecoverable and together with the time cost and legal costs it may be preferred to simply forgive the loans in exchange for the collateral in hand. In such an eventuality the collateral would be distributed to Earn customer accounts.

4. **A note about Other Assets (expanding point 2. f. above):**
    Estimated book value of Other Assets includes:

    a. Mining - $612,000,000

    b. Net Loan Recovery - $158,000,000

    c. Other Investments - $206,000,000

    The Creditors' interests in loan recoveries and other investments will need to be managed and administered on their behalf. The key benefit to Creditors of holding such assets on the BF Platform via BF's proprietary SPV structure is that the Creditors will be able to keep clear track of their interests by means of a readily accessible dashboard and they will be able to swap their assets, trade them or convert them into crypto assets via the platform.

    Mining assets will need both operational management and administrative management which can be achieved via BF's structure outlined in Appendix 2. Again, the key advantage of holding the mining assets in such a structure is that the Creditors will be able to keep clear track of their interests in the mining assets by means of BF's readily accessible dashboard and they will be able to swap their assets, trade them or convert them into crypto through the platform.

5. **Costs Associated with Distribution**

Strictly Private & Confidential

| Third Party Distribution Costs | Estimated Amount / Units | Estimated Unit Cost | Estimated Cost |
|---|---|---|---|
| Conversion spread | 341,864,839 | 0.1% | 341,865 |
| KYC ($3/account) | 56,782 | 3 | 170,346 |
| Wallet Screening ($10k/60k screens) | 2 | 10,000 | 20,000 |
| US Custody Set Up + year 1 | 56,782 | 5 | 283,910 |
| Non US Custody / Year | 1 | 105,000 | 105,000 |
| Securities Set Up | 6 | 2,000 | 12,000 |
| Crypto Withdrawal | 56,782 | 25 | 1,419,550 |
| **Total** | | | **2,352,671** |

Additional third-party costs associated with setting up securities account would be incurred for KYC verification at $3/account and would depend upon the total amount of shareholders (this could amount up to approximately an additional $1.6 million for all six hundred thousand accounts).

6. **Returns and Incentives to be Offered to Creditors who Elect to Invest with BF**

| Investment Returns / Rewards | | Amount / Units | Reward / Unit | | Return to Creditor |
|---|---|---|---|---|---|
| Staking | $ | 1,271,810,392 | 4.05% | $ | 51,508,321 |
| Wealth Management | | 10,000 | 1,000 | $ | 10,000,000 |
| Portfolio Builder Set-Up | | 10,000 | 1,000 | $ | 10,000,000 |
| **Total** | | | | **$** | **71,508,321** |

BF is willing to offer discounts of two of its core services to those that transfer their funds over to us - our Retirement Plan B online wealth management program and our Retirement Plan B portfolio builder services for those that want to diversify and build a portfolio in the Bitcoin and crypto sector. Assuming 56,782 Earn account holders elect to stake their available coins and 10,000 elect to utilize Wealth Management and Portfolio Builder discounts offered by BF, the total value to the creditors will be approximately **$71.5 million**

7. **Benefit to BF**:
BF will not require any fees for the execution of the transactions resulting from our BOD. Certain third-party costs will need to be covered (see point 4 above) from Creditor's accounts as they relate to the administration of their new accounts / wallets.  Subsequent to the distribution of assets to Creditors, Participating Creditors will be charged for the use of our Platform services and offerings according to our normal BF Platform fee schedule.   Our fee schedule is available via this link:  fee schedule.

# EXHIBIT C

DocuSign Envelope ID: 0812199B-B4A3-431E-9DBC-BCE0241AC845

## Plan Consultation Agreement

This agreement (this "Agreement"), dated as of March 10, 2023, sets forth the terms and conditions of the relationship between BF Global ("Plan Consultation Party") and Celsius Network Limited (collectively with its direct and indirect subsidiaries, the "Company"). The Company and Plan Consultation Party are collectively referred to herein as the "Parties," and each individually as a "Party." Simon Dixon shall be the Plan Consultation Party's designee under this Agreement.

The Company and Plan Consultation Party have entered into this Agreement for the purpose of discussing the Company's chapter 11 plan (the "Plan") and ways to maximize the return of value to the Celsius community.

For good and adequate consideration, the receipt and adequacy of which are hereby acknowledged, the Company and Plan Consultation Party hereby agree as follows:

1. <u>Consultation</u>.  Plan Consultation Party agrees to consult with the Company in a time and manner convenient to Plan Consultation Party, regarding matters related to the restructuring of the Company, all as provided for herein.  During the term of this Agreement, Plan Consultation Party shall not hold himself out to be an officer or employee of the Company.  Plan Consultation Party will not be required to devote any particular amount of time or expend any particular effort, it being understood that this Agreement is wholly voluntary.  Plan Consultation Party may, to the extent deemed appropriate by the Company, attend internal and external working group sessions regarding the Plan, including with NovaWulf as the proposed Plan sponsor, the official committee of unsecured creditors, and any other parties the Company deems appropriate.  For the avoidance of doubt, nothing shall obligate the Company to involve Plan Consultation Party in any discussions regarding the Plan or any sale process, or to follow through with any of Plan Consultation Party's ideas for the Company.  The Company also shall have no obligation hereunder to provide any information or access to the Company's systems, premises, assets, or other property to Plan Consultation Party.

2. <u>Term</u>.  This Agreement shall commence as of March 1, 2023 and shall continue until the earlier of (a) the Company or Plan Consultation Party terminates this Agreement, in their respective sole discretion, by giving written notice or (b) the effective date of a plan of reorganization in the Company's chapter 11 cases.

3. <u>No Employment Status</u>.  Nothing in this Agreement is intended to, or shall be deemed or construed to, create any partnership, agency, joint venture, or employment relationship between or among Plan Consultation Party, on the one hand, and the Company or any of its affiliates, or any of their respective officers, directors, partners, principals, owners, members, employees, agents, or representatives (collectively, the "Company Parties"), on the other hand.

4. <u>No Compensation or Benefits</u>.  Plan Consultation Party shall not be eligible to receive compensation or benefits for any of the services provided hereunder.  Plan Consultation Party will not be eligible to participate in any benefit plans or programs that any of the Company Parties offer to any employees, including medical/dental/vision insurance, prescription drug insurance coverage, life insurance, disability insurance, accident insurance, paid time off,

DocuSign Envelope ID: 0812199B-B4A3-431F-9DBC-BGD0244AC845

pension, retirement, social security, savings, 401(k), unemployment, workers' compensation, security, or reimbursements (collectively, all of the foregoing, "<u>Benefits</u>").

5. <u>Limits of Authority</u>.  Plan Consultation Party has no right or authority, express or implied, to act on behalf of, assume, or create any obligation or responsibility, or otherwise bind or render any decisions on behalf, of the Company or any of its affiliates in any way.  Plan Consultation Party shall not make any contrary representation to any third Party.

6. <u>Confidentiality</u>.  Pursuant to this Agreement, the Company may, but is not obligated to, provide Plan Consultation Party with confidential information.



7. [Reserved].

8. <u>Miscellaneous</u>.  This Agreement contains the entire agreement and understanding of the Parties regarding the specific subject matter hereof, and the terms and conditions of this Agreement may be modified only in an agreement signed by Plan Consultation Party and an officer of the Company.  Except with respect to such specific matters, all other agreements, waivers, defenses, claims, rights to seek indemnification, or other similar foregoing shall remain unaffected.  Plan Consultation Party acknowledges and agrees that no promises or representations, oral or written, have been made by the Company or any of its affiliates or representatives regarding the subject matter hereof other than those promises and

DocuSign Envelope ID: 0812199B-B4A3-431E-9DBC-BCF0241AC845

representations expressly stated herein, and that Plan Consultation Party has not relied on any other promises or representations in executing this Agreement. The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive such Party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. The Company and Plan Consultation Party shall meet and confer regarding any purported breach of, and prior to either Party declaring a breach of, this Agreement. If any provision of this Agreement is determined to be unenforceable as a matter of law, a reviewing court of competent jurisdiction or arbitrator shall have the authority to "blue pencil," or otherwise modify, such provision so as to render it enforceable while maintaining the parties' original intent (as reflected herein) to the maximum extent possible. Each provision of this Agreement is severable from the other provisions hereof, and if one or more provisions hereof is declared invalid, the remaining provisions shall nevertheless remain in full force and effect. Neither the Company nor the Plan Consultation Party may assign their respective rights and obligations under this Agreement, and any purported assignment by such Party will be null and void. This Agreement may be executed in counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument. Facsimile, PDF, and other true and accurate copies of this Agreement shall have the same force and effect as originals hereof.

9. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. Any dispute relating hereto shall be heard in the United States Bankruptcy Court for the Southern District of New York, and the Parties agree to jurisdiction and venue therein.

10. <u>Waiver of Jury Trial</u>. Each Party, by this Agreement, hereby waives, to the fullest extent permitted by law, any right to trial by jury of any claim, demand, action, or cause of action (a) arising under this Agreement or (b) in any way connected with or related or incidental to the dealings of the Parties hereto in respect of this Agreement, whether now existing or hereafter arising, and whether in contract, tort, equity, or otherwise. The Parties each hereby agree and consent that any such claim, demand, action, or cause of action shall be decided by court trial without a jury and that the Parties may file an original counterpart of a copy of this Agreement with any court as written evidence of the consent of the Parties to the waiver of their right to trial by jury.

11. <u>Survival</u>. For the avoidance of doubt, <u>Sections 6</u>,    <u>8</u>, <u>9</u>, <u>10</u>, and <u>11</u> of this Agreement and any defined terms used therein shall survive any termination of this Agreement.

*            *            *

Celsius Network Limited

By: _____          3/10/2023
    _____          _____
    Name: Chris Ferraro                         Date
    Title:  Chief Restructuring Officer, CFO
    and Interim CEO


    _____          10 March 2023 | 09:39:49 AM PST
    _____          _____
Name: Simon Dixon                               Date
Title:    CEO

          BF Global