# CELSIUS EX. 81

RICHARD PHILLIPS (*In pro per*)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re:* | **Case No. 22-10964 (MG)** |
| CELSIUS NETWORK LLC, *et al.*[1] | **Chapter 11** |
| Debtor. | **(Jointly Administered)** |

## DECLARATION OF RICHARD PHILLIPS IN
## SUPPORT OF HIS LIMITED OBJECTION AND
## RESERVATION OF RIGHTS TO DEBTORS' CHAPTER 11 PLAN

I, Richard Phillips, hereby declare under penalty of perjury that the following is true and

correct to the best of my knowledge, information and belief.

1.      I am a Creditor in the Celsius bankruptcy with claims in both the Custody and

Earn classes. I am a member of the Custody Settlement.

### QUALIFICATIONS

2.      I am a semi-retired investment banker with over 20 years of experience. My

investment banking career began with Houlihan Lokey Howard & Zukin ("Houlihan") in 1999.

My work experience at Houlihan included valuations, fairness opinions, restructuring, and

mergers & acquisitions. After Houlihan, I was employed as a Managing Director at CIT Group

in mergers & acquisitions and leveraged finance. Afterwards, I was a partner and Chief

Executive Officer of Janes Capital Partners ("Janes"), a registered broker-dealer specializing in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

mergers & acquisitions in the aerospace & defense industry. After retiring from Janes, I was associated with FocalPoint Partners LLC until their acquisition by B. Riley in July 2022.

3.      I have passed several FINRA exams, including the Series 7, 24 and 63, which qualify me to act as an investment banker, the principal of a broker-dealer and sell securities. My FINRA registrations are all currently inactive. My FINRA Brokercheck record is devoid of any negative disclosures.

4.      I earned a B.S. degree in Applied Physics from the California Institute of Technology ("Caltech"). I also received a M.B.A from the University of California Los Angeles ("UCLA") Anderson Graduate School of Management, where I was named a Williams Fellow and received the Weston Award in Finance.

## BOARD AND BOARD OBSERVER PROCESS

5.      I was interviewed as a candidate for the NewCo Board ("Board") and was not appointed to the Board. While I was of course disappointed, I was not offended and did not suffer from "sour grapes" as claimed in *The Official Committee of Unsecured Creditors' (I) Joinder to the Debtors' Confirmation Brief and (II) Statement in Support of Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization* [Docket No. 3605] ("W&C Response"). To the contrary, when I was informed that I had not been selected, I asked Mr. Colodny of White & Case ("W&C") for feedback on how I could be a better candidate in future Board processes.

6.      When I read the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] ("Plan Supplement"), which was filed late on Friday September I became outraged that the Board did not contain a single creditor other than the two co-chairs of the UCC, who I always assumed would be appointed to the Board. The attorneys from both the Debtor and Creditor had consistently claimed on multiple occasions in both hearings before this Court and on Twitter

town halls with the creditor community that NewCo would be creditor owned and creditor controlled. It became obvious that the "open process" mentioned in W&C Response was nothing but a sham, in my educated opinion, to appease the creditor community. W&C and Perella Weinberg Partners ("PWP") had always intended to guide the UCC to appoint their candidates to the Board. In fact, Mr. Pesce began having conversations with prospective NewCo directors on or about July 18th [2]. Mr. Wofford even had a two (2) hour meeting with a prospective director candidate on or about August 30th [3].

7.       There were also meetings among W&C and the three Committee Members who submitted their names as Board candidates, Messrs. DiFiore, Duffy and Noyes, starting on or about July 24th, to discuss "litigation and NewCo board, selections, strategy." Importantly, this meeting also clearly shows that the three Committee Members did not recuse themselves from the pertinent parts of the process from the outset, and merely recused themselves for the voting formality on their own candidacies.

8.       The Plan Supplement also indicated that the UCC had non-sensically divided their six candidate appointees into two groups, "two prepetition creditors" and "four independent directors." This made no sense to me, as the Committee was given the right to appoint six candidates, four unilaterally and two with the consent of Fahrenheit, "which shall not

---

[2] Per *Notice Of Twelfth Monthly Statement Of White & Case LLP For Interim Compensation And Reimbursement Of Expenses As Counsel For The Official Committee Of Unsecured Creditors For The Period From July 1, 2023 Through July 31, 2023* [Docket No. 3426]

[3] Per *Notice Of Thirteenth Monthly Statement Of White & Case LLP For Interim Compensation And Reimbursement Of Expenses As Counsel For The Official Committee Of Unsecured Creditors For The Period From August 1, 2023 Through August 31, 2023* [Docket No. 3709]

unreasonably be withheld." In discussions with UCC members and as Mr. Robinson testified, they picked the "four best qualified directors" as that was in the interest of the future NewCo equity shareholders. W&C and PWP had clearly confused the UCC members on their fiduciary duties by conflating their actual fiduciary duty to the creditors of the Debtor with that of the NewCo shareholders who would largely be the same creditors only at the initial emergence from Chapter 11. In my opinion, it was clearly the UCC's fiduciary duty to appoint four directors who were qualified and would **best represent creditor interests** to the NewCo Board. This duty includes taking into account the directors skills in the key business operations, at scale Bitcoin mining and Ethereum staking experience, ability to contribute to the company's overall success, and overall governance skills. The additional two appointees should have the same requirements but would be slightly constrained by the requirement to receive the mutual consent of Fahrenheit.

9.     Mr. Robinson, on cross-examination, admitted that the Committee had Board candidates who were both creditors and qualified to be on the Board.[4] I have no idea who the Committee considered "qualified," but I do believe that I was one of the qualified candidates and that there were multiple qualified creditors who applied for the Board. The Committee interviewed nine (9) creditors, so that means at least six (6) creditors who were not Committee members were qualified enough to receive an interview. However, the Committee chose only to select Mr. DiFiore and Mr. Duffy for the Board and no other creditors. I understand why the co-chairs of the Committee were selected and have no objection, given their many hours of volunteer work on the Committee. I do not understand why no other creditors were selected to the Board.

10.     Creditors who are future shareholders of NewCo have different interests than

---

[4] *Transcript of Court Hearing on October 3 pg. 236*

shareholders who buy the stock willingly post-emergence. The creditors in this case are forced investors in NewCo, as the stock is being issued to them in a complicated proceeding, this Chapter 11 process and the resulting Plan, which for the vast majority of creditors is bewildering and a first time experience in such proceedings. It is also a first time experience for most of the Committee members. As forced investors in NewCo, creditors have a different risk-reward perspective than the willing buyers of NewCo post-emergence. They also have a different view on risk given that they are all victims of the fraud committed by Celsius, the Debtor. The Committee has and had a fiduciary duty to select a slate of candidates that were qualified and would best represent creditor interests on the Board, which is distinct and different that selecting the most qualified candidates for the Board regardless of their loyalty or alignment with creditors. In my opinion, the Committee failed in carrying out this fiduciary duty.

11.     The Committee in choosing candidates for the Board also had to deal with constrained choice in that the Board as a whole had to meet NASDAQ Diversity and Independence Rules, 5605 and 5606. Also, the Independent Directors, as defined by NASDAQ Rule 5605, had to be selected so that the required Board committees could be formed, including the Audit and Compensation Committees.

12.     Given the constraint of the NASDAQ Diversity Rules and that Mr. Genoot met the requirements to be a "diverse director," I wrote the Committee co-chairs and W&C an email pointing this out. When I wrote this, I knew that Ms. LaPuma both met the requirements of a "diverse director" and was mutually acceptable to Fahrenheit. Thus, the diversity requirement of the Board had been fulfilled, and this **constraint was removed** from the Committee's other Board selections. I also knew that Ms. LaPuma qualified as a potential Chair of the Audit Committee of the Board.

13.     Exhibit A contains the above referenced email, as well as the complete email chain. W&C in its Response Joinder, *The Official Committee Of Unsecured Creditors' (I) Joinder To The Debtors' Confirmation Brief And (Ii) Statement In Support Of Confirmation Of The Debtors' Joint Chapter 11 Plan Of Reorganization* [Docket No. 3605], used the first email in the chain out of context and included it in Mr. Robinson's declaration as Exhibit A in an attempt to smear me. Mr. Colodny's Response Joinder mentions Mr. Aidoo and his heritage. The email chain does not. I'm actually very pleased that the Board not only meets the letter of NASDAQ's Diversity Rule, but also the spirit and intent of the rule to increase the overall diversity on public company boards. Any suggestion to the contrary is absurd and defamatory.

14.     The last email in Exhibit A is very revealing. In it I state unequivocally in a contemporaneous record and prior to W&C's smear attempts: "I know you think it's all about me trying to leverage my way into the seat. But it's not. I'm truly offended by the Board composition and the lack of qualified creditor representation. Again your advice, not mine. We all agree that Scott and Tom have 100% earned their seats and that was the intent since the initial NW structure." This further undercuts the "sour grapes" argument that Mr. Colodny tries to make in the Response Joinder.

15.     That email also contains my view of the Board Observer Agreement and a question that remains unanswered to this day: "I'm still waiting for anyone on the UCC side, advisor or member, to explain the observer's duties and responsibilities. The agreement I saw provided for no or unspecified compensation and the right for NewCo to sue the observer for any number of reasons. In otherwise no upside, and high downside. **Please articulate for me the observer's duties and responsibilities**." (emphasis added). To me this is a key flaw with the Board Observer Agreements, Exhibit B of *Notice of Entry into Plan Support Agreement* [Docket

No. 3516] and Exhibit F of the *Sixth Notice of Filing of Plan Supplement* [Docket No.: 3583]

("Supplement Six"). The Board Observer Agreements were made with three other creditors and

discussed with me. The Board Observers serve no real purpose. They have no constituency that

they report to. In most companies, Board Observers represent a particular investor or set of

investors, frequently providing debt or sometimes a different class of equity. There is no such

distinct constituency here. In addition, the Board Observer Agreements do not let the observer

say anything to anyone who is not already present in the boardroom without violating their

confidentiality provisions. Furthermore, Section 1.3 of the Board Observer Agreements allow the

real Board to exclude the observers from observing any action by a simple majority vote, the

same vote required to take any action that the Board may want to keep hidden from the

observers. Thus, I do not see any true governance purpose for the observers, and apparently

neither do W&C nor the Committee co-chairs, as they have never responded to this simple

question.

16.     W&C continues to try and confuse creditors as to the role of the Board Observers

by combining them with the actual members of the Board. They stated in their Response Brief

that "the board members and observers include five significant prepetition creditors of the

Debtors." They failed to distinguish between the vast difference in the roles so that creditors

would believe that all five would have influence and weight in the Board decisions, even though

only the two Committee Members actually appointed to the Board would have full participation

rights and voting power on the Board.

17.     The real purpose of the Board Observer Agreements, in my opinion, was to get

the three observers and the Earn Ad Hoc to enter into the Plan Support Agreements contained in

Exhibit A *Notice of Entry into Plan Support Agreement* [Docket No. 3516], so that they would

publicly support the Plan and not raise any questions about it within the creditor community. Per

my understanding, the board observers are also expected to be compensated by NewCo. Once

again this is a non-standard practice, as in most companies where observers are present, the

investor who designates the observer and on whose behalf they are actually observing for pays

their compensation.

### Emmanuel Aidoo's Appointment to the Board

18.     As is well known to the Court, Mr. Aidoo was appointed to the Board. This

appointment was made despite the negative information that appeared in his background check,

which W&C was aware of. Per Mr. Robinson, the Committee's advisors, which included Mr.

Aidoo's current employer PWP and W&C, advised the Committee that it was not an issue. Mr.

Aidoo's tax problems are easily known to anyone who checks his FINRA Brokercheck record

("Aidoo Brokercheck"), attached as Exhibit B, which is how I learned of them after his

appointment to the Board. The question isn't whether it's an issue for W&C or PWP, but is

whether or not having a director on the Board with tax judgements and liens reflects negatively

on NewCo and could impact the attractiveness of its stock. The answer is clearly that it does

have a negative impact and the Committee's advisers should have so informed the Committee.

The whole reason that background checks are done on potential directors are to surface issues

like this prior to their appointment to the Board. If it wasn't a problem, why wasn't the negative

information along with an explanation included in Mr. Aidoo's biography in the Plan

Supplement.

19.     The Aidoo Brokercheck also reveals that Mr. Aidoo only recently became

licensed to provide investment or sell securities. He passed his first licensing exam in April 2022

and was first became registered in June 2022. Thus, he has only a little over a year of investment

banking experience. While he may have been employed by an investment bank, Credit Suisse,

for over twenty (20) years, it was not as an investment banker or even in an "Investment

Related" capacity, as indicated on the Aidoo Brokercheck. His biography included in the Plan

Supplement also details no prior Board experience, an important qualification that the

Committee was looking for in the "four independent directors," and which all three other

appointed independent directors possess.

     20.     As any investment banker, including myself knows, the industry is rife with

conflicts of interest. The true purpose of the Committee's professionals advocating for a friendly

face to be on the Board, is to ensure that PWP has the opportunity to win future investment

banking business and fees from NewCo. While this may be in PWP's interest, it certainly is not

in the interests of creditors. The Committee should not have used one of its six valuable Board

seats on Mr. Aidoo. (It's unclear from Mr. Robinson's Declaration and cross-examination, what

Mr. Aidoo's current relationship with PWP is and any intended future change to it is, as his

testimony was quite unclear on this point and he disclaimed any personal knowledge of it. By all

indications, Mr. Aidoo is currently employed as an Executive Director of PWP and advising the

Committee.) If Mr. Aidoo's advice is so valuable and important, NewCo could simply hire PWP

and/or Mr. Aidoo to provide it. In addition, investment bankers frequently provide free advice to

foster a better relationship with clients and or potential clients. Thus, NewCo and the Board

could even obtain Mr. Aidoo's advice with or without compensation and certainly did not need

to use one of its six valuable Board seats to obtain it.

     21.     Given that Mr. Aidoo is currently advising the Committee and his compensation

from PWP is based in part on the fees that PWP earns from this current bankruptcy case and the

predecessor corporation to NewCo, it is arguable whether Mr. Aidoo even qualifies as an

independent director under NASDAQ Rule 5605(a)(2)(B), which eliminates anyone who has received over $120,000 in a year during the preceding three (3) year period from being an independent director. The Committee decided to appoint "four independent directors," so Mr. Aidoo does not meet the Committee's objectives or stated purpose in selecting its director slate.

22.     In addition, Mr. Roberston claims that Mr. Aidoo has been "a champion of unsecured creditors throughout these Chapter 11 Cases."[5] Well I certainly hope so, given that PWP and Mr. Aidoo are presently being paid to advocate on behalf of creditors by the estate and stand to earn a success fee in excess of $5 million upon confirmation. However, once NewCo is in operation and the Board oversees it, Mr. Aidoo has no such loyalty. Most investment bankers loyalties lie with where they see the potential for fee income, which is most definitely not with the creditor victims of Celsius, who will no longer be a potential client.

23.     W&C and PWP counsel, Katten, have declined to make Mr. Aidoo available for deposition to further understand the facts surrounding his background and future plans with PWP.

## KEITH NOYES and COVARIO

24.     An Emergency Hearing was held before the Court on September 29th to discuss Keith Noyes membership on the Committee. Until this hearing, I was totally unaware of any issues with Covario's financial condition or Mr. Noyes participation in the Committee on behalf of Covario or himself, personally. At the hearing, it became evident that W&C had known that Covario had filed for insolvency last Fall in Switzerland and that the Committee and its counsel had not heard from Covario in approximately nine (9) months.

25.     Mr. Pesce also revealed that W&C had advocated for Mr. Noyes to be placed on

---

[5] Per ¶ 17 of *Robinson Declaration* [[Docket No. 3584]

the Committee in his personal capacity to replace the seat that Mr. Noyes was filling as

Covario's representative. This to me represents a clear violation of W&C's fiduciary duties to

the Committee and hence creditors. W&C does not, to the best of my knowledge, represent Mr.

Noyes personally. If it does, a potential conflict certainly exists between its representation of the

Committee and Mr. Noyes. It was wholly inappropriate for W&C to advocate for Mr. Noyes to

be placed on the Committee over other qualified and interested creditors. Ms. Cornell at the

hearing made it clear that the US Trustee did not consider Mr. Noyes to be an appropriate

member of the Committee absent his representation of Covario and promptly removed him from

the Committee following the Emergency Hearing in *Amended Notice Of Appointment Of Official

Committee Of Unsecured Creditors*  [Docket No. 3631]. W&C knowingly and willfully

continued to include Mr. Noyes inappropriately in Committee matters including the selection of

the Board and the Litigation Oversight Committee despite knowing these facts regarding Covario

and Mr. Noyes until he was formally removed from the Committee on September 29th.

26.     In the Plan Supplement it was also revealed that Mr. Noyes had been appointed to

the Litigation Oversight Committee ("LOC"). While it is clear that W&C knew about Mr.

Noyes' status at the time and that he was likely to be removed from the Committee based on

preliminary discussions with the US Trustee, it's unclear what the Committee knew at the time

his appointment to the LOC was made. Whether or not the Committee believed it was appointing

one its own members to Mr. Noyes seat on the LOC is a matter that I do not have any personal

knowledge of, but certainly the Committee Members do.

## The Litigation Oversight Committee Appointments

27.     Plan Supplement Six included the identities of all seven (7) members of the LOC

supplementing the list previously provided in the Plan Supplement. Mr. Noyes was one of the

identified appointees. In addition, Mr. Jindal and Mr Uzzi were also appointed to the LOC. In the

Ninth Declaration, *Ninth Declaration Of Gregory F. Pesce In Support Of The Official Committee*

*Of Unsecured Creditors' Application For Entry Of An Order Authorizing The Employment And*

*Retention Of White & Case LLP As Counsel Effective As Of July 29, 2022* [Docket No. 3590],

Mr. Pesce revealed that both Mr. Jindal and Mr. Uzzi were former partners of W&C and clients

of W&C. It also revealed that Ms. LaPuma is a current client of W&C. This is clear evidence

that W&C was trying to ensure that the Committee appointed friends of the firm to both the

Board and LOC. It's particularly disturbing when it comes to the LOC, as it's pretty evident that

W&C would like to be hired for additional work by the Litigation Trust. Instead of competing

for that work on its merits, it's clear that W&C felt the need to tilt the playing field in its favor by

ensuring that its friends, former partners and clients, were put in decision making positions

regarding their future retention. This was certainly in the best interests of W&C, but not in the

best interests of the Committee and the creditors, who are the beneficiaries of the Litigation

Trust. Thus, W&C knowingly and willfully breached its fiduciary obligations to its client, the

Committee.

### NewCo Equity Valuation

28.     The Disclosure Statement, Exhibit A of *Fourth Notice Of Filing Of Revised*

*Disclosure Statement For The Joint Chapter 11 Plan Of Reorganization Of Celsius Network Llc*

*And Its Debtor Affiliates* [Docket No. 3332], contains a valuation of NewCo NAV, $1,248mm,

and NewCo Common Stock Recovery Percentage, 29.5%, on page 28 of 830, (the "Valuation").

None of the three witnesses that the Debtor presented who testified as to the valuation took

responsibility for the entire Valuation, but only single parts. Mr. Kielty testified regarding the

mining business, Mr. Cohen regarding the illiquid assets, and Mr. Campagna testified that he

merely summed the three parts. It became clear during Mr. Campagna's cross-examination that a HoldCo or Conglomerate discount was neither considered nor included in the Valuation. It is also evident that Mr. Campagna does not possess any particular expertise in the valuation of companies, as all he did was sum three numbers, and his experience focuses on operating distressed companies.

29.     Including a HoldCo or Conglomerate discount when doing a sum of the parts valuation is industry standard practice. Typical HoldCo discounts range from 5-15%. Given the similarities here between the three parts of NewCo, namely that they are all cryptocurrency related, I estimate that a discount at the lower end of the range is appropriate. My estimate of the HoldCo or Conglomerate discount for NewCo is 7.5% or $94 million.

30.     In addition, the Disclosure Statement described a Weighted Distribution Election ("Toggle") that allowed creditors to choose more cryptocurrency or more equity in their distribution. A table describing the election is included as Exhibit C of this filing. The Toggle included an inducement for creditors to choose more equity by allowing them to purchase NewCo Equity at a 30% discount by toggling for more equity. Likewise, if they toggled to more crypto, creditors would be penalized by having to pay a 30% premium for the additional crypto. Thus, creditors were induced economically to choose more equity in their distribution. Exhibit C shows what the Debtors illustrated as the expected difference in value for a creditor with a $10,000 claim who chose either side of the Toggle or the default option. None of the Debtor's witnesses claimed responsibility for the preparation of Exhibit C. Exhibit C also implies that the Debtor excpected approximately equal numbers of creditors to choose each side of the Toggle.

31.     When the results of the balloting process were tabulated, the pertinent part of the Voting Report, *Amended Declaration Of Brian Karpuk Regarding The Solicitation And*

*Tabulation Of Votes On The Joint Chapter 11 Plan Of Reorganization Of Celsius Network LLC And Its Debtor Affiliates* [Docket No. 3574], is attached as Exhibit D with added notations for the summation for each side of the Toggle, Creditors overwhelmingly chose more crypto bey a margin of 6.19:1 over more NewCo equity. More than $1.1 billion in claims, an astounding 25% of overall unsecured claim value, toggled toward more crypto. This clearly shows that creditors, who are highly educated on NewCo and its potential value, believe that the equity in NewCo is overvalued by at least 30%.

32.    Exhibit E is a valuation that in my professional opinion accounts for these factors and shows that NewCo was overvalued in the Disclosure Statement by approximately $468 million and the recovery percentage was overstated by 11.5%. This is greater than the stated difference between the Orderly Wind Down and NewCo Valuations, which is only 5.8%.

Pursuant to 28 U.S.C. §1746. I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge, information and belief.


Dated: Los Angeles, California
October 10, 2023


/s/ _____
RICHARD PHILLIPS

Exhibit A

## RE: Board Diversity Requirements - UCC only needs ONE

| From | celbk7 <celbk7@proton.me> |
|------|---------------------------|
| To | Pesce, Gregory<gregory.pesce@whitecase.com>, Colodny, Aaron<aaron.colodny@whitecase.com>, Wofford, Keith<kwofford@whitecase.com>, Duffy, Scott (External)<ICBSolutions@proton.me>, DiFiore, Thomas (External)<tomdif@gmail.com> |
| Date | Thursday, September 14th, 2023 at 2:07 PM |

Greg,

I believe the choice of observer is now the Earn Ad Hoc's based on my interpretation of the unclear ending of yesterday's conference call.

I'm still waiting for anyone on the UCC side , advisor or member, to explain the observer's duties and responsibilities. The agreement I saw provided for no or unspecified compensation and the right for NewCo to sue the observer for any number of reasons.

In otherwise no upside, and high downside.

Please articulate for me the observer's duties and responsibilities.

I do understand your position on the Board. Your advice, not mine. If he hasn't already, I do suggest you read the email I sent last night to Aaron.

I know you think it's all about me trying to leverage my way into the seat. But it's not. I'm truly offended by the Board composition and the lack of qualified creditor representation. Again your advice, not mine. We all agree that Scott and Tom have 100% earned their seats and that was the intent since the initial NW structure.

Respectfully,

 CY / Rick

Sent from Proton Mail for iOS

On Thu, Sep 14, 2023 at 1:50 PM, Pesce, Gregory <gregory.pesce@whitecase.com> wrote:

> Thanks for sharing this with us, Rick.  As discussed - we don't plan to change the directors we selected.  We're open to the observer concept.
>
> **Gregory F. Pesce**  |  Partner
> **T**  +1 312 881 5360      **E** gregory.pesce@whitecase.com
> White & Case LLP  |  111 South Wacker Drive, Suite 5100  |  Chicago, IL 60606-4302
> **WHITE & CASE**
>
> ---
>
> **From:** celbk7 <celbk7@proton.me>
> **Date:** Thursday, Sep 14, 2023 at 3:48 PM
> **To:** Colodny, Aaron <aaron.colodny@whitecase.com>, Pesce, Gregory <gregory.pesce@whitecase.com>, Wofford, Keith <kwofford@whitecase.com>, Duffy, Scott (External) <ICBSolutions@proton.me>, DiFiore,

Thomas (External) <[tomdif@gmail.com](mailto:tomdif@gmail.com)>
**Subject:** Board Diversity Requirements - UCC only needs ONE

I've confirmed that in my lay opinion that Asher Genoot meets the definition of mixed race per NASDAQ listing rules

From Asher:
My father is Jewish and was born in Libya, North Africa but moved to Israel at a young age when the country was formed.

My mother is from Shanghai, China and converted to Judaism.

Both moved to the USA in their early adult years and met in Los Angeles.

I am a first generation American, born and raised in USA, and first generation college graduate as well.

Sent with [Proton Mail](#) secure email.

============================================================================

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by telephoning +1 212 819 8200. Please then delete the email and any copies of it. Thank you.

Our external privacy policy is available [here](#).

============================================================================

**3.58 KB**   1 embedded image

14CC9315-084B-401F-B809-603A91197B35.jpg  3.58 KB

Exhibit B

Aidoo Brokercheck

**BrokerCheck Report**

## Emmanuel Aidoo

CRD# 7449268

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 5 |
| Disclosure Events | 6 |

 Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.
For more information read our investor alert on imposters.

**About BrokerCheck®**

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- ♥ **What is included in a BrokerCheck report?**
  - ♥ BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
  - ♥ Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- ♥ **Where did this information come from?**
  - ♥ The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    - ○ information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    - ○ information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- ♥ **How current is this information?**
  - ♥ Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- ♥ **What if I want to check the background of an investment adviser firm or investment adviser representative?**
  - ♥ To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- ♥ **Are there other resources I can use to check the background of investment professionals?**
  - ♥ FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
  - ♥

**Thank you for using FINRA BrokerCheck.**

 Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

 For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources.
For more information about FINRA, visit www.finra.org.

**Emmanuel Aidoo**

CRD# 7449268

**Currently employed by and registered with the following Firm(s):**

**B** **PERELLA WEINBERG PARTNERS LP**
767 FIFTH AVENUE
NEW YORK, NY 10153
CRD# 138618
Registered with this firm since: 06/27/2022

### Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

#### Broker Qualifications

**This broker is registered with:**

- 1 Self-Regulatory Organization
- 1 U.S. state or territory

**This broker has passed:**

- 0 Principal/Supervisory Exams
- 2 General Industry/Product Exams
- 1 State Securities Law Exam

#### Registration History

**This broker was previously registered with the following securities firm(s):**

No information reported.

#### Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?  **Yes**

**The following types of disclosures have been reported:**

| Type | Count |
|------|-------|
| Judgment/Lien | 5 |

## Broker Qualifications

### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 1 SRO and is licensed in 1 U.S. state or territory through his or her employer.**

### Employment 1 of 1

Firm Name: **PERELLA WEINBERG PARTNERS LP**
Main Office Address: **767 FIFTH AVENUE**
**NEW YORK, NY 10153**
Firm CRD#: **138618**

| | SRO | Category | Status | Date |
|---|-----|----------|--------|------|
| **B** | FINRA | Investment Banking Representative | Approved | 06/27/2022 |

| | U.S. State/ Territory | Category | Status | Date |
|---|----------------------|----------|--------|------|
| **B** | New York | Agent | Approved | 06/30/2022 |

### Branch Office Locations

**PERELLA WEINBERG PARTNERS LP**
767 FIFTH AVENUE
NEW YORK, NY 10153

## Broker Qualifications

### Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 2 general industry/product exams, and 1 state securities law exam.**

#### Principal/Supervisory Exams

| Exam | Category | Date |
| --- | --- | --- |
| No information reported. | | |

#### General Industry/Product Exams

| Exam | Category | Date |
| --- | --- | --- |
| B Investment Banking Registered Representative Examination | Series 79TO | 06/25/2022 |
| B Securities Industry Essentials Examination | SIE | 04/22/2022 |

#### State Securities Law Exams

| Exam | Category | Date |
| --- | --- | --- |
| B Uniform Securities Agent State Law Examination | Series 63 | 05/20/2022 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

## Broker Qualifications

### Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

## Registration and Employment History

### Registration History

The broker previously was registered with the following firms:

| Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|
| No information reported. | | | |

### Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 12/2021 - Present | Perella Weinberg Partners LP | Executive Director | Y | New York, NY, United States |
| 08/1997 - 11/2021 | Credit Suisse | Head of Digital Asset Markets | N | New York, NY, United States |

### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

Good+ Foundation; 306 W 37th St, 8th Floor, New York, NY 10018; charity which works to dismantle multi-generational poverty by pairing tangible goods with innovative services for low-income families; member of Board of Directors, Finance Committee, and Audit Committee; began January 2020; not investment-related; The Committee Finance provides guidance and advice to the organization's CEO, VP of Finance, and VP of Development and also provides oversight on long-range financial plans, annual budgets, investment policies, and management of reserves; the primary responsibility of the Audit Committee is to provide oversight of the organization's internal controls, financial management processes, and compliance with laws and regulation, including reviewing the organization's annual Audited financials and IRS Form 990; approximately 4 to 6 hours are devoted to this activity each month, with approximately 30 minutes occurring during securities trading hours.

## Disclosure Events

**What you should know about reported disclosure events:**

1. All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

2. **Certain thresholds must be met before an event is reported to CRD, for example:**
   - A law enforcement agency must file formal charges before a broker is required to disclose a particular criminal event.
   - A customer dispute must involve allegations that a broker engaged in activity that violates certain rules or conduct governing the industry and that the activity resulted in damages of at least $5,000.
   -

3. **Disclosure events in BrokerCheck reports come from different sources:**
   - As mentioned at the beginning of this report, information contained in BrokerCheck comes from brokers, brokerage firms and regulators. When more than one of these sources reports information for the same disclosure event, all versions of the event will appear in the BrokerCheck report. The different versions will be separated by a solid line with the reporting source labeled.
   -

4. **There are different statuses and dispositions for disclosure events:**
   - A disclosure event may have a status of *pending, on appeal,* or *final*.
     - A "pending" event involves allegations that have not been proven or formally adjudicated.
     - An event that is "on appeal" involves allegations that have been adjudicated but are currently being appealed.
     - A "final" event has been concluded and its resolution is not subject to change.
   - A final event generally has a disposition of *adjudicated, settled or otherwise resolved*.
     - An "adjudicated" matter includes a disposition by (1) a court of law in a criminal or civil matter, or (2) an administrative panel in an action brought by a regulator that is contested by the party charged with some alleged wrongdoing.
     - A "settled" matter generally involves an agreement by the parties to resolve the matter. Please note that brokers and brokerage firms may choose to settle customer disputes or regulatory matters for business or other reasons.
     - A "resolved" matter usually involves no payment to the customer and no finding of wrongdoing on the part of the individual broker. Such matters generally involve customer disputes.

**For your convenience, below is a matrix of the number and status of disclosure events involving this broker. Further information regarding these events can be found in the subsequent pages of this report. You also may wish to contact the broker to obtain further information regarding these events.**

|               | Pending | Final | On Appeal |
|---------------|---------|-------|-----------|
| Judgment/Lien | 5       | N/A   | N/A       |

**Disclosure Event Details**

When evaluating this information, please keep in mind that a disclosure event may be pending or involve allegations that are contested and have not been resolved or proven. The matter may, in the end, be withdrawn, dismissed, resolved in favor of the broker, or concluded through a negotiated settlement for certain business reasons (e.g., to maintain customer relationships or to limit the litigation costs associated with disputing the allegations) with no admission or finding of wrongdoing.

This report provides the information exactly as it was reported to CRD and therefore some of the specific data fields contained in the report may be blank if the information was not provided to CRD.

| Judgment / Lien | |
|---|---|
| This type of disclosure event involves an unsatisfied and outstanding judgments or liens against the broker. | |
| **Disclosure 1 of 5** | |
| Reporting Source: | Broker |
| Judgment/Lien Holder: | Emmanuel Aidoo |
| Judgment/Lien Amount: | $25,379.71 |
| Judgment/Lien Type: | Tax |
| Date Filed with Court: | 11/19/2018 |
| Date Individual Learned: | 09/01/2020 |
| Type of Court: | County Court |
| Name of Court: | Office of the County Clerk, Bergen, Hackensack, NJ |
| Location of Court: | Bergen County, Hackensack, NJ |
| Docket/Case #: | 18081866 |
| Judgment/Lien Outstanding? | Yes |
| Broker Statement | Mr. Aidoo has a payment arrangement in place with the IRS to repay all tax, penalties, and interest. |

| **Disclosure 2 of 5** | |
|---|---|
| Reporting Source: | Broker |
| Judgment/Lien Holder: | Emmanuel Aidoo |
| Judgment/Lien Amount: | $47,267.89 |
| Judgment/Lien Type: | Tax |

| | |
|---|---|
| **Date Filed with Court:** | 09/01/2015 |
| **Date Individual Learned:** | 09/01/2020 |
| **Type of Court:** | County Court |
| **Name of Court:** | Office of the County Clerk, Bergen, Hackensack, NJ |
| **Location of Court:** | Bergen County, Hackensack, NJ |
| **Docket/Case #:** | BK2039PG887 |
| **Judgment/Lien Outstanding?** | Yes |
| **Broker Statement** | Mr. Aidoo has a payment arrangement in place with the IRS to repay all tax, penalties, and interest. |

**Disclosure 3 of 5**

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Judgment/Lien Holder:** | Emmanuel Aidoo |
| **Judgment/Lien Amount:** | $64,434.12 |
| **Judgment/Lien Type:** | Tax |
| **Date Filed with Court:** | 10/22/2018 |
| **Date Individual Learned:** | 09/01/2020 |
| **Type of Court:** | County Court |
| **Name of Court:** | Office of the County Clerk, Bergen, Hackensack, NJ |
| **Location of Court:** | Bergen County, Hackensack, NJ |
| **Docket/Case #:** | 18075075 |
| **Judgment/Lien Outstanding?** | Yes |
| **Broker Statement** | Mr. Aidoo has a payment arrangement in place with the IRS to repay all tax, penalties, and interest. |

**Disclosure 4 of 5**

| | |
|---|---|
| **Reporting Source:** | Broker |
| **Judgment/Lien Holder:** | Emmanuel Aidoo |
| **Judgment/Lien Amount:** | $15,113.68 |
| **Judgment/Lien Type:** | Tax |

2022 FINRA. All rights reserved. Report about Emmanuel Aidoo

| | |
|---|---|
| **Date Filed with Court:** | 01/06/2021 |
| **Date Individual Learned:** | 02/14/2022 |
| **Type of Court:** | County Court |
| **Name of Court:** | Office of the County Clerk, Bergen, Hackensack, NJ |
| **Location of Court:** | Bergen County, Hackensack, NJ |
| **Docket/Case #:** | BK3899PG581 |
| **Judgment/Lien Outstanding?** | Yes |
| **Broker Statement** | Mr. Aidoo has a payment arrangement in place with the IRS to repay all tax, penalties, and interest. |

| **Disclosure 5 of 5** | |
|---|---|
| **Reporting Source:** | Broker |
| **Judgment/Lien Holder:** | Emmanuel Aidoo |
| **Judgment/Lien Amount:** | $9,706.45 |
| **Judgment/Lien Type:** | Tax |
| **Date Filed with Court:** | 12/17/2018 |
| **Date Individual Learned:** | 09/01/2020 |
| **Type of Court:** | County Court |
| **Name of Court:** | Office of the County Clerk, Bergen, Hackensack, NJ |
| **Location of Court:** | Bergen County, Hackensack, NJ |
| **Docket/Case #:** | 18088174 |
| **Judgment/Lien Outstanding?** | Yes |
| **Broker Statement** | Mr. Aidoo has a payment arrangement in place with the IRS to repay all tax, penalties, and interest. |

## End of Report

This page is intentionally left blank.

Exhibit C

Disclosure Statement Weighted Distribution Election Example

A side-by-side comparison of the three different treatment outcomes for a Holder of a General Earn

---

[59]    Please review Item 6 on your Ballot to make the Liquid Cryptocurrency Weighted Distribution Election.

[60]    For purposes of this example, you do not hold any other Claims.

[61]    This 50% reduction is for illustrative purposes only and is not based on any specific assumption with respect to all Unsecured Claim Distribution Mix Elections.

[62]    This amount is calculated as follows:  (a) $2,954*50% = $1,477; and (b) $1,477*70% = $1,034.

54

---

Claim[63] in the amount of $10,000 based on a 67.0% recovery is shown below:

| | No Election (Default) | NewCo Common Stock Weighted Distribution Election[64] | Liquid Cryptocurrency Weighted Distribution Election[65] |
|---|---|---|---|
| Liquid Cryptocurrency | $3,748 | $1,874 | $4,782 |
| NewCo Common Stock | $2,954 | $5,390 | $1,477 |
| Litigation Proceeds | The right to receive a share of the Litigation Proceeds | | |
| **Total Recovery:** | **$6,702** | **$7,264** | **$6,259** |
| **% of Recovery Change:** | **N/A** | **Increase of ~8%** | **Decrease of ~7%** |

### Unsecured Claim Distribution Mix Elections

    The Debtors' ability to accommodate Holders' specified preferences will ultimately depend on what elections all Holders make on their Ballots.  The Debtors will use reasonable efforts to redistribute the consideration provided to Holders to satisfy the aggregate Unsecured Claim Distribution Mix but cannot guarantee that Holders will receive what they requested.

Exhibit D

Weighted Distribution Election Ballot Results from Tabulation of Votes

### C.     **Weighted Distribution Election**[8]

15.     Stretto examined each valid Account Holder Ballot submitted by Holders of Account Holder Claims eligible to make either the NewCo Common Stock Weighted Distribution Election or the Liquid Cryptocurrency Weighted Distribution Election, which consisted of Holders of a Class 2 (Retail Borrower Deposit Claims), Class 5 (General Earn Claims), and Class 7 (Withhold Claims) Claims.  Based on this review, 4.88% (418) in number, which is equivalent to 4.48% ($15,683,669.91) in dollar amount, of Holders of Class 2 (Retail Borrower Deposit Claims) Claims made the NewCo Common Stock Weighted Distribution Election.  4.20% (3,601) in number, which is equivalent to 4.29% ($163,851,968.75) in dollar amount, of Holders of Class 5

(General Earn Claims) Claims made the NewCo Common Stock Weighted Distribution Election. 4.10% (59) in number, which is equivalent to 1.37% ($153,960.34) in dollar amount, of Holders of Class 7 (Withhold Claims) Claims made the NewCo Common Stock Weighted Distribution Election.

16.     On the other hand, 26.46% (2,267) in number, which is equivalent to 42.59% ($148,938,980.87) in dollar amount, of Holders of Class 2 (Retail Borrower Deposit Claims) Claims made the Liquid Cryptocurrency Weighted Distribution Election.  18.67% (16,011) in number, which is equivalent to 25.11% ($960,018,704.02) in dollar amount, of Holders of Class 5 (General Earn Claims) Claims made the Liquid Cryptocurrency Weighted Distribution Election. 19.39% (279) in number, which is equivalent to 28.21% ($3,173,615.89) in dollar amount, of Holders of Class 7 (Withhold Claims) Claims made the Liquid Cryptocurrency Weighted Distribution Election.

Totals: More Crypto - $1,112,131,300.78     (Summation of numbers above)

More Equity  -   $179,689,599.00

Exhibit E

**NewCo Equity Valuation ($ millions)**

Mining per PWP after $50mm
capitalization adjustment                            515

Staking at Book Value                               450

Illiquid Assets per Stout                           283

Total                                    $    1,248

Adjustments:

  HoldCo / Conglomerate Discount @7.5%                  (94)

  Initial Market Indication @30%                       (374)

Total Adjustments:                                  (468)

| **Adjusted NewCo Equity Valuation** | **$ 780** |
|---|---|

Total Unsecured Claims                              4,225

| **NewCo Common Stock Recovery %** | **18.5%** |
|---|---|

Change in NewCo Stock Recovery %                    -11.0%