Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:     (202) 389-5200

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL
LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Initial Debtors and Debtors in
Possession*

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 819-8200
Facsimile:     (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:    (312) 881-5400
Facsimile:     (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:    (213) 620-7700
Facsimile:     (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:    (305) 371-2700
Facsimile:     (305) 358-5744

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**THE DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS'**
**JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF HUSSEIN FARAJ**

The Debtors and the Official Committee of Unsecured Creditors (the "**Committee**") in the above-captioned Chapter 11 cases (collectively, the "**Chapter 11 Cases**") move (this "**Motion**") for entry of an order, substantially in the form attached hereto as **Exhibit A**, under Rules 403 and 702 of the Federal Rules of Evidence, made applicable here by Rule 9017 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), excluding evidence and testimony of Hussein Faraj related to the opinions set forth in his CEL Token Valuation report, which has been requested to be admitted into evidence by Mr. Otis Davis and other *pro se* creditors. *See, e.g.*, *Request to Submit Expert Report of Hussein Faraj* [Dkt. No. 3752] (the "**Faraj Report**").[2]

## PRELIMINARY STATEMENT

1.     The Debtors and the Committee seek to exclude the purported expert testimony of Mr. Faraj as his report does not meet the standard of reliability required under the Supreme Court's *Daubert* decision and its progeny.

2.     *First*, Mr. Faraj is not qualified to offer an expert opinion on the value of a distressed cryptocurrency asset.  Mr. Faraj has no education, experience, or training in finance or valuation.  He does not trade, and has not traded, cryptocurrency.  Rather, his recent business focuses on the research and development of decentralized networks.  Other than in the context of that research and development, he has never written a valuation report concerning cryptocurrency or any other financial instrument.

---

[2] Page number citations to the Faraj Report refer to the page numbers on the docket stamped legend at the top of each page.

3.      *Second*, Mr. Faraj's report is not reliable.  The 172-page expert report was prepared in less than 72 hours and generated almost entirely using artificial intelligence.  Mr. Faraj cannot identify the sources that the artificial intelligence tool relied on, nor could he check those unknown sources.  Moreover, Mr. Faraj's haste and use of artificial intelligence resulted in glaring inconsistencies and errors in his report.  For instance, he states that the period from June 9, 2022 to June 12, 2022 is the "most representative of CEL's fair value in the least manipulated market conditions."  Faraj Report at 95.  However, he does not include those dates in the period he uses to determine the "fair value" of the CEL Token.  To Mr. Faraj, his statement regarding information critical to his "fair value" opinion was just a "typo."

4.      Mr. Faraj also does not employ a reliable or generally-accepted method to value the CEL Token.  Rather, he invents his own method that has never been tested or peer-reviewed.  Mr. Faraj admits that the 20-day time-period he selected to examine was a "random number."  Unsurprisingly, Mr. Faraj's report contains no internal citations to support his opinions or methodology.  The sources he does reference include a 200-page list of web sources that he admits he never reviewed and publicly available trading data.

5.      *Finally*, Mr. Faraj's testimony will not assist the Court in determining the value of CEL Token on July 13, 2022—the Petition Date.  Mr. Faraj's lack of familiarity with Celsius or CEL Token is clear.  Throughout his report, Mr. Faraj confuses the "Pause" or "Freeze" date with the Petition Date.  However, at his deposition, Mr. Faraj was clear that his opinion on the "fair value" of CEL Token is for the period before the Pause.  Mr. Faraj disregards all market prices following the Pause because he agrees with the Committee's expert, Max Galka, that the market became dislocated following the Pause and that the market price was not a remotely accurate indicator of the value of CEL Token.  Mr. Faraj admits that he does not have an opinion as to the

3

value of the CEL Token on the Petition Date. But, when asked at his deposition, he testified that the value of CEL Token on the Petition Date would be significantly less than his purported $0.71 "fair value." In fact, Mr. Faraj testified that CEL Token had no intrinsic value as of the Petition Date. And although he believes it had speculative value as of that date, he made no effort to quantify that speculative value. Because the issue before the Court is the value of CEL Token as of the ***Petition Date***, Mr. Faraj's "fair value" opinion is irrelevant.

6.      This is a bench trial, not a jury trial. In bench trials, courts often admit dubious expert testimony, such as that offered by Mr. Faraj, and allocate it appropriate weight in light of the credibility and methodology employed by the expert witness. Nevertheless, the Debtors and Committee file this Motion today to flag significant issues related to the qualification, reliability, and relevance of Mr. Faraj's report, streamline Mr. Faraj's potential testimony, and demonstrate that, if admitted, Mr. Faraj's testimony should be granted no weight.

## RELEVANT FACTS

7.      On August 24, 2023, the Court filed a *Notice of Discovery Schedule for Confirmation Hearing* [Dkt. No. 3356] (the "**Discovery Schedule**") setting various deadlines related to the hearing on confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor* Affiliates [Docket No. 3577] (as modified from time to time, the "**Plan**"). The Discovery Schedule established September 1, 2023 as the deadline for parties to disclose any expert witnesses. [Dkt. No. 3356]. It likewise established September 22, 2023 as the deadline for expert reports to be submitted and September 29, 2023, as the deadline for rebuttal expert reports. *Id.*

8.      The Committee identified Max Galka as its expert witness on September 1, 2023 and served the Expert Report of Max Galka on all objecting parties on or about September 22, 2023. On September 27, 2023, the Committee filed a declaration from Mr. Galka that adopted his

expert report as his direct testimony under oath. *Declaration of Maxwell Galka on Behalf of the Official Committee of Unsecured Creditors in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtors Affiliates* [Dkt. No. 3580]. On October 2, 2023, the Committee requested permission to submit an additional declaration of Mr. Galka to respond to the Court's direct question regarding Mr. Galka's opinion of the value of the CEL Token on the Petition Date and to provide all parties with the opportunity to review his written direct testimony prior to his live cross-examination. [Dkt. No. 3646]. The Court approved that request. [Dkt. No. 3659].

9.    At the hearing regarding the confirmation of the Plan, the Court indicated that it would allow creditors opposing confirmation of the Plan to submit expert testimony by October 11, 2023. On October 10, 2023, *pro se* creditor Otis Davis filed a request to admit the expert report of Hussein Faraj [Dkt. No. 3752]. Attached to his request was the 172-page Faraj Report. Also included in Mr. Davis's request is a letter from Mr. Faraj stating his intent to testify at the confirmation hearing. [Dkt. No. 3752 at 5]. Other creditors have filed letters asking the Court to consider Mr. Faraj's report.

10.    Mr. Faraj is located in Australia. He has cooperated with the Debtors and Committee's discovery requests. On October 13, 2023 and October 14, 2023, despite significant time differences, the Committee and the Debtors took the depositions of Mr. Faraj and his assistants, Luay Mohsen and Karrar Hamidy.

## **ARGUMENT**

11.    Rule 702 of the Federal Rules of Evidence ("**Rule 702**"), made applicable to these proceedings by Rule 9017 of the Federal Rules of Bankruptcy Procedure, provides that expert testimony may be given by a qualified witness "if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Under *Daubert* and its progeny, trial judges act as "gatekeepers" to exclude unreliable and irrelevant expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). Rule 702 applies to both scientific and non-scientific technical and other specialized expert testimony. *Id*. The party offering an expert witness bears the burden of proving that the proffered expert testimony satisfies the requirements of Rule 702 and *Daubert*. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). In applying the *Daubert* standard to interpret whether expert testimony is admissible under Rule 702, a court should consider three principal factors: (1) qualification, (2) reliability, and (3) fit. *See Calhoun v. Yamaha Motor Corp., USA*, 350 F.3d 316, 321 (3d Cir. 2003). Mr. Faraj's report falls short on all three counts.

## I.    Mr. Faraj Is Not Qualified to Opine on the Value of CEL Token.

12.    First, Mr. Faraj is not qualified. In determining whether an expert has sufficient qualifications to testify, courts in the Second Circuit look at "the totality of the witness' qualifications in order to ensure that the expert is proffering opinions within the confines of his or her expertise." *Napolitano v. Synthes, Inc.,* 2014 U.S. Dist. LEXIS 204087, at *3 (D. Conn. Apr. 9, 2014). Mr. Faraj's background, education, and experience is not in finance or valuation, and accordingly, the valuation opinion he offers is not within the confines of his expertise.

13.    Mr. Faraj does not have a degree in finance, business, accounting, or economics. Faraj Dep. Tr. at 188:20-189:7.[3] He has no certifications in financial modeling or valuation and has never worked for a valuation firm. *Id.* at 189:11-189:20. Prior to preparing the Faraj Report,

---

[3] The "**Faraj Deposition Transcript**" is the transcript of the deposition of Hussein Faraj taken on October 13 and 14, 2023. Excerpts of the Faraj Deposition Transcript are attached to this Motion as **Exhibit B**.

Mr. Faraj had never engaged in a formal valuation analysis of any kind regarding an asset, digital or otherwise. *Id.* at 190:19-24 ("Q: Fair to say, sir, that the expert report in this case is the first formal document you ever, in your life, have authored providing a formal valuation analysis? A: It is.")  Mr. Faraj's only relevant experience is preparing research and development documents regarding various cryptocurrencies for the purposes of training his business's artificial intelligence tools. *Id.* at 184:3-185:20.  That experience is insufficient to qualify him as a valuation expert. According to the Second Circuit, where the purported expert witness lacks qualifications, any further *Daubert* analysis is "almost superfluous." *Zaremba v. GMC,* 360 F.3d 355, 360 (2d. Cir. 2004).

## II.    The Faraj Report Is Unreliable.

14.    The Faraj Report does not meet the standards of reliability expected of expert testimony.  The factors for evaluating the reliability of expert testimony are (1) whether the theory and technique can (and has been) tested, (2) whether the theory or technique has been subjected to peer review or published, (3) the known or potential error rate, in the case of a scientific technique, (4) the existence and maintenance of standards controlling the technique's operation, and (5) whether the technique enjoys general acceptance. *Nachimovsky v. Nike, Inc.,* 2022 U.S. Dist. LEXIS 57909, at *9-10 (E.D.N.Y. Mar. 28, 2022) (citing *Daubert*, 509 U.S. at 593-94).  *Kumho* extended this reliability analysis to technical experts, noting that "the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho,* 526 U.S. at 149.

15.    The Faraj Report is unreliable for five reasons. ***First***, Mr. Faraj has openly acknowledged that the method by which he calculates a "fair value" for CEL Token is entirely of his own invention, neither widely used in the cryptocurrency field nor peer-reviewed or tested.

Q: And was it one of these four or five methods that you used to determine that or did you come up with your own method?

A: No, I came up – so I utilized all these values to come up with the – what I believe was the best value approach.  And that was my method.  So very clear that was my method that I came up with.

Q: And has that – is that method widely adopted to value cryptocurrency?

A: No, it's not, at all.

Q: Is it peer tested?

A: It has not been peer tested, no.

Faraj Dep. Tr. at 70:23-71:13.

16.    ***Second,*** as Mr. Faraj publicly admitted, his 172-page report was prepared in 72 hours.  *See* Ex. C (UCC Ex. 281) ("I haven't had much time to follow the issues with cel.  If we had known earlier, we would have written the report much earlier. We completed the entire assessment within 72 hours.  In reality, this is usually a 6 to 8 week job."); Faraj Dep. Tr. at 246:5-249:10.  The metadata for the Faraj Report reveals that the document was only edited for a total of nine hours, which Mr. Faraj's testimony confirms.  *Id.* at 135:25; 250:12-251:10.  Mr. Faraj admits that if he had more than 72 hours, he would have considered a variety of other factors in his analysis and prepared a more "comprehensive" report.  *Id.* at 248:16-24 ("Q: So just to be clear, if it was going to be comprehensive, 72 hours was not enough to generate this report, right? A: If it was going to be completely comprehensive, 72 hours is nowhere near enough. Q: Okay. And you just listed a whole host of factors and additional items that you would go through if you had more than 72 hours, correct? A: That's correct.").

17.    ***Third,*** the reason Mr. Faraj was able to prepare this entire report in 72 hours is because he did not actually draft this report— an artificial intelligence ("**AI**") tool did.  *Id.* at 47:20-23 (Q: Did you use any artificial intelligence tools to help you draft this report? A: Of course I did.").  Mr. Faraj testified that the entirety of this report was generated in the first instance using AI: he created the framework that he wanted the AI tool to consider, the AI tool generated the report, and he went back to review the AI tool's output and made certain unspecified adjustments.

8

*Id.* at 241:9-242:10. The District Court for the Southern District of New York has recently highlighted the significant issues with relying on AI in the legal context. Specifically in *Mata v. Avianca, Inc.,* the Court sanctioned a law firm that used the AI tool ChatGPT to draft a legal brief which included fake citations provided by that AI tool. *Mata v. Avianca, Inc.,* 2023 U.S. Dist. LEXIS 108263, at *1-2 (S.D.N.Y. Jun. 22, 2023).

18.    The use of AI presents particular reliability concerns in the instant case because the AI tool Mr. Faraj used is based on data that was last updated in January 2022, prior to the crypto winter, Celsius's pausing of all withdrawals (the "**Pause**"), and Celsius and many other cryptocurrency companies filing for chapter 11 protection. Faraj Report at 148 (containing a comparison of Celsius Network to Blockfi which includes the phrase "As of my last training data in January 2022"). Although Mr. Faraj testified that he instructed Mr. Hamidy to "pull forward" data from January 2022 to present, Mr. Hamidy testified that his role was limited to filling in volume data with respect the coins that were compared CEL Token, but could not recall updating the BlockFi data referenced above, and did not update any information with respect to the CEL Token. Faraj Dep. Tr. at 267:1-18; Hamidy Dep. Tr. at 64:2-11; 72:12-21; 93:16-24.[4]

19.    *Fourth*, the Faraj Report contains almost no citations to facts or data underlying the majority of the methods, facts, and opinions set forth therein. *See generally* Faraj Report (lacking footnotes or other citations throughout); *see also* Faraj Dep. Tr. at 239:11-20. It does not cite to any academic papers or sources for its descriptions of valuation methodologies or in support of its chosen methodology. It contains no citations to the information on the CEL Token itself, at times suggesting that it is important to consider features that CEL Token never had, such as governance rights. *See* Faraj Report at 103-104. Importantly, Mr. Faraj also confuses the Pause

---

[4] The "**Hamidy Deposition Transcript**" is the transcript of the deposition of Karrar Hamidy taken on October 14, 2023. Excerpts of the Hamidy Deposition Transcript are attached to this Motion as **Exhibit D**.

and Petition Date throughout his report.  *See, e.g.,* Faraj Report at 74 ("Factors Influencing CEL's

Value on Petition (Pause) Date").

20.    Rather than footnotes or individual citations, Mr. Faraj instead includes a

spreadsheet of trading data from CoinMarketCap, a cryptocurrency price aggregation site which

can be accessed by anyone.  He also includes a nearly 200-page list of "News feeds and data

assessed" at the end of his report.  Faraj Report at 192-378.  However, Mr. Faraj admits that he

has not personally reviewed the sources in this list.  Faraj Dep. Tr. at 235:1-8 ("Q: My question is:

For the exhibit attached to your report . . . did you or did you not, at any time, review all of the

underlying web links and source material there, yes or no? A: Did I check the source links, actually

open them up? No, I didn't.").  Mr. Faraj testified that his "team" compiled the list and that he

"trusted" them to have checked the sources properly. Faraj Dep. Tr. at 236:18-238:19.  Neither

Mr. Mohsen nor Mr. Hamidy reviewed the sources cited.  Mohsen Dep. Tr. at 92:21-93:5;[5] Hamidy

Dep. Tr. at 74:19-75:2.

21.    ***Finally,*** the Faraj Report is riddled with errors that highlight its lack of reliability.

For instance, in a section discussing the importance of using trading days with low volume—a

central assumption of Mr. Faraj's "fair value" opinion—he states: "Given the significant

disturbances post-freeze, ***the values from June 9th to June 12th might be most representative of***

***CEL's fair value in the least manipulated market conditions***."  Faraj Report at 95 (emphasis

added).  However, Mr. Faraj did not include those dates in his calculation, instead choosing to

evaluate May 21, 2022 to June 9, 2022 to calculate CEL Token's "fair value."  Faraj Report at 28,

96-97.  When confronted with this error, Mr. Faraj stated it was a "typo."  Faraj Dep. Tr. at 261:17-

---

[5] The "**Mohsen Deposition Transcript**" is the transcript of the deposition of Luay Mohsen taken on October 14,
2023.  Excerpts of the Mohsen Deposition Transcript are attached to this Motion as **Exhibit E**.

262:9.  Whether a typo or an AI generated conclusion that did not suit Mr. Faraj's "fair value" opinion, the error underscores the unreliability of the report.

### III.    The Faraj Report Does Not Assist the Trier of Fact.

22.    Finally, the Faraj Report will not assist this Court in determining the value of CEL Token on the Petition Date, nor whether the proposed $0.25 valuation under the CEL Token Settlement satisfies the best interests of creditors test.  "The requirement that expert testimony 'assist the trier of fact' goes primarily to relevance.  Relevance can be expressed as a question of 'fit' – 'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the [finder of fact] in resolving a factual dispute.'"  *In re Fosamax Prods. Liab. Litig.,* 654 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *Daubert,* 509 U.S. at 591).

23.    The Faraj Report is irrelevant to the question of CEL Token's value on the Petition Date for the simple reason that it does not offer an opinion of the value of CEL Token on the Petition Date.  Instead, the Faraj Report presents Mr. Faraj's opinion for a "fair value" of CEL Token, taking into account only the dates of May 21, 2022 to June 9, 2022.  Faraj Report at 28, 97, 109.  Mr. Faraj expressly disregarded all data after the Pause because, like Mr. Galka, he found that it "showcased significant anomalies in trading patterns" and can "skew the true market sentiment and token value."  Faraj Report at 107.  Mr. Faraj testified on numerous occasions that his report values CEL Token as of June 12, 2022 (the Pause), not July 13, 2022 (the Petition Date).  Faraj Dep. Tr. at 42:3-42:6 ("Q: The question that I asked was, the fair value analysis that you present in this report, is as of June 12, 2022, correct? A: Correct."); *Id.* at 78:6-78:9 ("Q: So let's go to – you determined that $0.71 was the fair value as of June 12, 2022, correct? A: Correct. Pre-June 12, 2022.").  When asked whether the "fair value" of the CEL Token increased or decreased between June 12, 2022 (the date of the Pause) and June 13, 2022 (the Petition Date), Mr. Faraj

testified that he believed it decreased. *Id.* at 80:3-6 ("Q: Do you believe that the fair value of the CEL Token increased or decreased between June 12, 2022 and July 13, 2022? A: No. I believe it decreased."). Further, he testified that he believed CEL Token had no intrinsic value on the Petition Date. *Id*. at 306:23 – 307:2 ("Q: And you would agree with me that's also true as of the petition date, when Celsius entered bankruptcy as of the petition date, as long as, you know, CEL is not trading and the platform is frozen, there's no intrinsic value, correct? A: I agree 100 percent."). And, although he believes it may have had some speculative value on that date, he has not attempted to quantify that speculative value. *Id.* at 307:4-9. Because the question before the Court is the value of CEL Token as of the Petition Date, and not prior to June 12, 2022, the "fair value opinion" proffered in the Faraj Report is not useful to the Court.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Committee and the Debtors request that the Court exclude the

affirmative evidence proffered by Mr. Faraj as to the value of the CEL Token on the Petition

Date.

Dated: October 16, 2023
       New York, New York

| /s/ T.J. McCarrick | /s/ Aaron Colodny |
|---|---|
| Judson Brown, P.C. (admitted *pro hac vice*) | David M. Turetsky |
| T.J. McCarrick (admitted *pro hac vice*) | Samuel P. Hershey |
| **KIRKLAND & ELLIS LLP** | Joshua D. Weedman |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **WHITE & CASE LLP** |
| 1301 Pennsylvania Avenue NW | 1221 Avenue of the Americas |
| Washington, D.C. 20004 | New York, New York 10020 |
| Telephone:    (202) 389-5000 | Telephone:    (212) 819-8200 |
| Facsimile:    (202) 389-5200 | Facsimile:    (212) 354-8113 |
| | |
| Joshua A. Sussberg, P.C. | Michael C. Andolina (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS LLP** | Gregory F. Pesce (admitted *pro hac vice*) |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Carolyn P. Gurland |
| 601 Lexington Avenue | **WHITE & CASE LLP** |
| New York, New York 10022 | 111 South Wacker Drive, Suite 5100 |
| Telephone:    (212) 446-4800 | Chicago, Illinois 60606 |
| Facsimile:    (212) 446-4900 | Telephone:    (312) 881-5400 |
| | Facsimile:    (312) 881-5450 |
| Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) | |
| Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) | Aaron Colodny (admitted *pro hac vice*) |
| Christopher S. Koenig | **WHITE & CASE LLP** |
| Dan Latona (admitted *pro hac vice*) | 555 South Flower Street, Suite 2700 |
| **KIRKLAND & ELLIS LLP** | Los Angeles, California 90071 |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Telephone:    (213) 620-7700 |
| 300 North LaSalle Street | Facsimile:    (213) 452-2329 |
| Chicago, Illinois 60654 | |
| Telephone:    (312) 862-2000 | Keith H. Wofford |
| Facsimile:    (312) 862-2200 | **WHITE & CASE LLP** |
| | Southeast Financial Center |
| *Counsel to the Initial Debtors and Debtors in Possession* | 200 South Biscayne Blvd., Suite 4900 |
| | Miami, Florida 33131 |
| | Telephone:    (305) 371-2700 |
| | Facsimile:    (305) 358-5744 |
| | |
| | *Counsel to the Official Committee of Unsecured Creditors* |

## **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[6] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER GRANTING THE DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' JOINT MOTION TO EXCLUDE THE EXPERT TESTIMONY OF HUSSEIN FARAJ

Upon consideration of the *Debtors' and Official Committee of Unsecured Creditors' Motion to Exclude the Expert Testimony of Hussein Faraj* (the "**Motion**")[7]; and adequate notice of the Motion having been given; and it appearing that no other or further notice is necessary; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having determined that consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief requested in the Motion; and after due deliberation, it is HEREBY ORDERED THAT:

1.    The Motion is GRANTED.

---

[6]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[7]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2. All parties are precluded from offering evidence or testimony from Hussein Faraj at the hearing in opposition to confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577].

3. The requirements of the Bankruptcy Rules and Local Rules, including Local Rules 9013-1 and 9018-1 are satisfied by the contents of the Motion.

4. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

5. The Debtors and the Committee are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

6. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated _____ , 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
In re:

CELSIUS NETWORK LLC, et al.,

Debtor.
-----------------------------------------X
***CONFIDENTIAL***

REMOTE VIDEOTAPED DEPOSITION OF

HUSSEIN FARAJ

VOLUME I

FRIDAY, OCTOBER 13, 2023

Reported in Stenotype by:
Cody R. Knacke, RPR, CSR No. 13691
Job No.:  1006

1   reason that we could see that that report

2   reached the valuation of $0.25.  Then we

3   saw --

4        Q.    Just so I can stop you for a

5   second.  I'm going to ask you a few

6   questions --

7        A.    I can't hear you.

8             THE STENOGRAPHER:  Counsel, we

9        can't hear you.  Counsel, we can't

10       hear at all.

11            Let's go off the record.

12            MR. MCCARRICK:  Hey, Aaron?

13            THE VIDEOGRAPHER:  The time

14       right now is 10:10 p.m.  We are off

15       the record.

16            (Recess.)

17            THE VIDEOGRAPHER:  The time

18       right now is 10:12 p.m.  We are back

19       on the record.

20            MR. COLODNY:  Thank you.

21   BY MR. COLODNY:

22        Q.    So, Mr. Faraj, I'm going to ask

23   you questions, and I know that you want to

24   discuss the whole report.  We will certainly

25   get to that.  But I'm trying to ask specific

1    questions, so we can kind of move through

2    this methodically.

3                The question that I asked was,

4    the fair value analysis that you present in

5    this report, is as of June 12, 2022; correct?

6        A.    Correct.

7        Q.    Okay.  Were you paid anything to

8    draft the report?

9        A.    I wasn't paid anything at all, or

10    promised any kind of financial return.

11        Q.    What's your interest in providing

12    this report and testifying before the court?

13        A.    I'm very passionate about this

14    industry.  I'm one of the first and

15    earliest -- when I say watch and architects,

16    I believe there wasn't many before.  I love

17    the crypto industry.  And a lot of the stuff

18    I read online and follow, I become very

19    passionate about it.  And one of the things I

20    was very passionate about is -- honestly is

21    the way meta is monetized.

22                So when I was asked the question,

23    I actually said, I'm happy to do it.  I don't

24    have any endeavors.  I don't have any

25    ambition for anything.  I'm not that type of

1    person.  So it was really just pure passion.

2         Q.    Do you have any interest in any

3    other altcoins?

4         A.    No, I don't.

5         Q.    You don't own any altcoins?

6         A.    I don't.

7               Let me just be very clear.  I did

8    massive assessments and dynamic assessments

9    on this crypto market.

10              And when you say "altcoins," we

11   have our own platform.  So as long as you're

12   speaking about anything external to our

13   platform.  Because obviously I'm CEO of the

14   NuGenesis network.  So anything to do with

15   NuGenesis network, of course I own half, I

16   own -- I'm one of the key founders of the

17   NuGenesis network.

18        Q.    Right.  So you have an interest

19   in the NuGenesis network.

20              Do you own any other

21   cryptocurrency?

22        A.    I don't at all.

23        Q.    You don't own Bitcoin?

24        A.    I don't.  When it comes to

25   crypto, when it comes to trading, I don't own

1    report do you provide an opinion on the fair

2    value of the CEL token?

3        A.    I do.

4        Q.    And what date is that opinion as

5    of?

6        A.    It's pre-June the 12th, 2022.

7        Q.    Okay.  How long did it take you

8    to draft this report?

9        A.    It took me about three days to

10   draft this report.

11       Q.    And when did you start drafting

12   the report?

13       A.    I don't -- I don't know exact

14   dates and times.  It's when the first post

15   came up on Twitter.

16       Q.    Who helped you draft this report?

17       A.    Okay.  So the information that's

18   compiled -- I'll slow down, I'm sorry.  The

19   information compiled was information that

20   we've had for a very long time.  So all the

21   data sources, the data points, we have them

22   into our smart sheets, we have them into our

23   air tables.

24            So the Karrar, which is

25   Karrar Hamidy, he's the one that extracted

1   the information I needed.  And I basically

2   did the whole thing.  So a lot of the

3   information comes from extracted data that

4   we've already got in terms of aspects of coin

5   valuations and many other stuff.  They were

6   extracted.

7           So all the coin information, the

8   CEL information, the market sentiment

9   information, these were data that we already

10   had obtained from months before.

11       Q.    What was your role?  Your role

12   was to draft the report?

13       A.    I put all the report together,

14   correct.

15       Q.    And did you write the report

16   yourself?

17       A.    Well, when you say I wrote the

18   report myself, yes, I put the whole thing

19   together.

20       Q.    Did you use any artificial

21   intelligence tools to help you draft this

22   report?

23       A.    Of course I did.

24       Q.    What artificial intelligence

25   tools did you use to help you draft the

1    report?

2         A.    I used two.  I used our own

3    in-house, which is NAVIS, and I used OpenAI.

4         Q.    And did OpenAI draft the text of

5    the report?

6         A.    No.  I actually created the --

7    what, okay.

8              So the reforming of the words,

9    the word structure and the language, yes.

10   The methodology and information and

11   everything we went into it, no.  It was all

12   utilized by things that we've actually

13   developed.

14              So I basically, example, wrote

15   something, fed into it the AI, fixed the

16   language, the grammar, then put it back into

17   the report, or else there was no way I was

18   going to get it done in three days.

19        Q.    So you used AI to draft the

20   entirety of this report?

21        A.    Basically all the data points

22   that come through was us.  So if you look at

23   all the information in terms of spreadsheets,

24   analysis, that's us.  If you look at anything

25   to do with derived values, that's us.

1    So I did use the token velocity

2    model, but I have modified the token velocity

3    model to actually just look at the velocities

4    all the way through, not only during that

5    period.  I looked at the velocity of the coin

6    all the way through to the end.

7         Q.    Did you use a network value to

8    transaction ratio model to calculate the

9    value of the --

10                (Speaking simultaneously.)

11        A.    So -- yeah, yeah.  So with that,

12   what I'll -- I looked at the network, I

13   looked at the information I had, I looked at

14   how many wallets were created.  I looked

15   at how much -- the only one with the online

16   information.  --

17        Q.    I'm not -- let me be clear.

18                I'm asking about these specific

19   calculations you put in your report --

20        A.    Yep.

21        Q.    -- and you said, to do a network

22   value to transaction model you have to look

23   at the price to earnings ratio and it's

24   calculated by dividing market cap by the

25   volume of on-chain transactions.

1    Is that how you determined the

2  value of CEL?

3    A.   I didn't determine it on the

4  on-chain transactions, I looked at the

5  on-chain transactions and I extended it to

6  the offline transactions.  So I looked at the

7  network value transactions, and I looked

8  at -- that's what I'm saying.  This is

9  exactly what I have just answered before.

10    I went through -- all the way

11  from four years ago.  So I went through -- I

12  can't remember what -- the day that you guys

13  started CEL.  Even when there was no volumes

14  being reported.  So I did that ratio all the

15  way through.

16    Then I determined a boundary

17  where I was willing to utilize for a fair

18  value assessment.  So I looked at all of this

19  stuff and then I chose a methodology that I

20  thought best fits the valuation process or

21  what I believe is the best valuation process

22  to come to a fair value.

23    Q.   And was it one of these four or

24  five methods that you used to determine that

25  or did you come up with your own method?

1    A.    No, I came up -- so I utilized

2    all these values to come up with the -- what

3    I believe was the best value approach.  And

4    that was my method.  So very clear that was

5    my method that I came up with.

6    Q.    And has that -- is that method

7    widely adopted to value cryptocurrency?

8    A.    No, it's not, at all.

9    Q.    Is it peer tested?

10    A.    It has not been peer tested, no.

11    Q.    Has it been -- is it used by

12    professionals to determine the value of

13    cryptocurrency?

14    A.    I wouldn't have an answer.  I

15    would assume it would be.  I would assume, as

16    an assumption, that any single person that's

17    following, that understands the industry

18    that's going to value a coin will actually

19    understand the market dynamics and will

20    actually go through every single thing I went

21    through.  I would not assume that any person

22    would do anything other than what I did, but

23    that's my assumption.  I don't have -- I

24    can't tell you that another person would do

25    it.

1          Q.     And you assign an error rate to
2     it?
3          A.     So with the fair value
4     assessment, you can't assign an error rate
5     because what you're utilizing is information
6     to rule out things.  When you rule out
7     things, you're going to a period of time or a
8     period of assessment and then you're
9     utilizing a fair value assessment based on
10    that period.  So it's not where it's
11    Metcalfe's law or stock flow model.  It's not
12    any of the models that you're talking about
13    where you're ruling "yes" and "no" and you're
14    doing specific calculations.
15              So the way I come to the
16    examination of the values -- I'll slow down,
17    I'll slow down.  Sorry.
18                The way I come down to the
19    valuation is I look at which periods, what I
20    believe is not hyperinflated or there's
21    issues.  I then take that period and look at
22    what the market volume to -- sorry -- the
23    volume to market cap ratio is.  I then look
24    at what the dynamic market making happens in
25    the history of CEL.  So I go through from day

1  don't answer correctly, you can misinterpret

2  the way I utilized the methodology.  So if

3  you want a yes or no answer, that's not the

4  right answer.  If you want a proper answer, I

5  will answer it and explain it to you.  It's

6  up to you what you want.

7      Q.    I'm trying to walk through your

8  report, which is very difficult to

9  understand, in a way that makes sense.  Okay?

10  If you speak for 10 or 20 minutes about

11  everything that you did, it's very hard to

12  ask questions about it.  I'm going to try to

13  ask yes or no questions so that we can march

14  through this.  And I understand --

15      A.    I understand what you're asking

16  me.  I want to make sure it's very clear to

17  you.  You can ask me a yes or no question.

18  It doesn't mean the answer is yes or no.  So

19  I have to make sure you understand the

20  methodology so you don't misinterpret my

21  answer.  So you're not going to get a yes or

22  no answer if there's an open interpretation

23  to that answer.

24          So ask whatever you like, and you

25  will get the answers as I choose to answer

1    them for you to get the reasoning and the

2    answer itself.

3           All right.  So you're not going

4    to get a yes answer where it doesn't actually

5    answer the question.

6       Q.    Okay.  So let's go to -- you

7    determined that $0.71 was the fair value as

8    of June 12, 2022; correct?

9       A.    Correct.  Pre-June 12, 2022.

10      Q.    Do you believe that the value of

11   CEL token -- you understand that Celsius

12   filed for bankruptcy on July 13, 2022?

13      A.    I do.

14      Q.    Do you believe that the value of

15   CEL token increased or decreased between

16   June 12, 2022, and July 13, 2022?

17      A.    I believe that that period was

18   inflated.  I believe that the data that's

19   currently there makes no logic sense to me

20   post.  So this is why I cut out the period

21   that's anything to do with past June

22   the 12th, or actually June the 9th.

23           So I believe that those -- I'm

24   talking about my personal opinion.  I believe

25   that the data that's there has many dynamic

1    factors which manipulate the information

2    that's post June 2012 -- June 12, 2022.

3         Q.    Right.  And I'm not talking about

4    -- at this point I'm not talking about market

5    price.  What I'm talking about is value.

6              Do you think the value of the CEL

7    token increased or decreased between the

8    period of June 12, 2022, and July 13, 2022?

9         A.    Are you talking about an actual

10   on the exchange?  Let me just be very clear

11   to answer this.

12             Are you talking about --

13        Q.    No, I'm talking the value of -

14        A.    -- the price increasing, why the

15   person would believe that the value

16   increased.

17        Q.    You believe that the

18   value increased between the --

19        A.    No, no, no.  Are you asking, do I

20   personally believe it increased?  Or are you

21   asking me, did the price movement on the

22   exchanges increased?  Two different

23   questions.  Please clarify what you're

24   asking.

25        Q.    I'm asking you, in your expert

1  opinion, and I'm distinguishing market price

2  from value, because you're offering a fair

3  value opinion, do you believe that the fair

4  value of the CEL token increased or decreased

5  between June 12, 2022, and July 13, 2022?

6           A.     No.  I believe it decreased.

7           Q.     How much do you believe it

8  decreased?

9           A.     Honestly, I didn't do an

10  assessment on it.  I can do one for you.  I

11  can give you a proper answer.  Obviously --

12          Q.     No, that's okay.  You didn't look

13  at how much it decreased, but you believe it

14  decreased?

15          A.     I didn't.  100 percent I didn't

16  look into it.

17          Q.     Why do you believe that the value

18  decreased between -- when I refer to the

19  pause, it'll be June 12, 2022.

20          A.     Yeah.

21          Q.     And when I refer to the petition

22  date, it will be July 13, 2022.

23                 Why do you believe that the value

24  of the CEL token decreased between the pause

25  and the petition date?

1      A.    I think that the data that's on

2   there -- so, again, I'm going to just answer

3   this to the best of my ability without having

4   it in front of me.

5          I believe when I did an -- when I

6   did look at the actual -- and I'm talking

7   about now data, right, I'm not talking about

8   personal opinion.  I believe that when I went

9   into that period, and it was post-June --

10  June 10th, I'm sure it was June 10th -- I'll

11  double check for you just in case I'm

12  correct -- I saw that there was mass movement

13  of token where the volume became completely

14  out of whack between the volume to market

15  cap.

16          So if I remember right, we went

17  from, say, a 4 million to a 6 million or 7

18  million, whatever it was in June, as a basis,

19  and then we started getting up to numbers of

20  40, 50, 30 million.  And I personally believe

21  that that period was actually manipulated.

22  So either there was two conclusions I came

23  to.  One, there was panic selling, there's

24  enough coins not locked; or two, that the

25  market itself was not natural.

1    assume that anyone that's done the analysis

2    that I've done would come to the same

3    appreciation between the percentages and the

4    ratios.  And some coins would go up to 8

5    percent.  Some coins would go to 7 percent.

6    Some coins would go to a spread of 3 percent.

7           But again, this is something I've

8    come up with.  I've got absolutely no idea if

9    it's the common market practice used by

10   professionals in the industry.  I'll

11   answer -- I'll answer honestly if you just

12   ask me.  Don't worry.

13       Q.    So one thing I found somewhat

14   interesting.  On page -- so you used a period

15   from May 21st to June 9th.

16       A.    Yes.

17       Q.    And can you turn to page 95 of

18   the report on the top.

19           And at the end of the second

20   paragraph here, you state:  "Given the

21   significant disturbances post freeze, the

22   values from June 9th to June 12th might be

23   the most representative of CEL's fair value

24   in the least manipulated market conditions."

25           Do you see that?

1    A.    That's a mistake.  June 9th -- it

2    would have been up to June 9th.  That's just

3    a typo.

4    Q.    So you don't --

5    A.    Given -- even this --

6    (Speaking simultaneously.)

7    Q.    You don't believe that June 9th

8    through June 12th -- what did you say?

9    A.    Yeah.  No, no, no.  June 9th,

10    that's just a typo.  Remember, I had three

11    days to do this report.  This report takes

12    months to do.

13    Q.    Do you think three days was an

14    adequate amount of time to do, you know, a

15    valuation of this magnitude?

16    A.    Look, the only reason I would say

17    yes to it is because I know the industry very

18    well and I have the data points.

19    Now, is there going to be issues

20    in the report, mistakes and errors and

21    things, of course there is.  Come on, guys,

22    I'm human.  Even though I use artificial

23    intelligence, of course you're going to get

24    some mistakes in there.

25    Q.    No.  I'm amazed that you were

1    able -- I looked at the metadata for the

2    report and you edited this report for a total

3    of nine hours, which, to draft 172 pages in

4    nine hours is amazing.  Bordering on

5    impossible.

6        A.    You should see my R&D documents.

7    I would love to share my stuff with you guys.

8              But honestly, ask me whatever you

9    want.  I'm not the type -- you've got to

10   understand.  I know you're here to depose me.

11   I'm not a guy who bends rules, I don't lie, I

12   don't cheat.  Ask me whatever you want and

13   you'll get the straight answer.  And I do

14   agree with a lot of the stuff you're saying.

15   You know, I wish what you're saying was

16   correct and the industry did work the way you

17   want it to work, because it would make all

18   our lives very easy, but unfortunately, it

19   doesn't.

20       Q.    Right.  And I guess that's a

21   tension between the law and the crypto

22   industry, because here we're trying to

23   distribute, you know, value from a limited

24   pot.  And looking at the value of this token,

25   which I think you would admit, maybe you can

1            UNITED STATES BANKRUPTCY COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    IN RE:                            )
                                       )
5    CELSIUS NETWORK LLC, ET AL.,      )
                                       )
6    DEBTOR.                           )
     _____)

7

8

9

10

11                  ** CONFIDENTIAL **

12            REMOTE VIDEOTAPED DEPOSITION OF
                     HUSSEIN FARAJ
13                    VOLUME II
              SATURDAY, OCTOBER 14, 2023

14

15

16

17

     REPORTER:    DANNIELLE COPELAND
18                REGISTERED DIPLOMATE REPORTER
                  CERTIFIED REALTIME REPORTER
19

20

21      STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
                     VIDEOCONFERENCE
22

23

24

25

1    before this case, you've never prepared a formal

2    opinion on the intrinsic value of any financial

3    instrument, correct?

4         A.    Correct.

07:11:02    5         Q.    Are you aware, sitting here today, of any

6    investment bank that publicly reports the intrinsic

7    value of any platform-specific cryptocurrency token?

8         A.    I'm not.

9         Q.    All right.  Now, setting aside research and

07:11:23    10    development, before this case, you've never prepared a

11    formal opinion on the speculative value of a digital

12    asset, correct?

13         A.    Setting aside research and development, I

14    have not.

07:11:34    15         Q.    And just so I understand, when you say

16    research and development or that you've done some of

17    these analyses in the --

18              THE REPORTER:  Sorry.  Mr. Colodny dropped

19    out, it looks like.

07:11:54    20              ATTORNEY MCCARRICK:  Okay.  Let's go off

21    the record for a second.

22              THE VIDEOGRAPHER:  The time is 7:11 a.m.

23    We're off the record.

24              (RECESS TAKEN.)

07:12:34    25              THE VIDEOGRAPHER:  The time is 7:12 a.m.

1    We are on the record.

2    BY ATTORNEY MCCARRICK:

3        Q.    All right.  Mr. Faraj, before we broke, we

4    were talking about some of the financial analyses that

07:12:45  5    you've prepared and not prepared in your career, and

6    you've talked about preparing an intrinsic value

7    analysis of digital assets in the research and

8    development context.

9        What do you mean by that?

07:12:57  10        A.    Okay.  So what we do is -- and yeah, we

11    look at the currency, we look at how much in

12    circulation, we'll look at the projects, we'll look at

13    the velocity of that coin, we'll look at everything to

14    do with the trades and everything behind it.

07:13:09  15        We then look at the market -- the valuation of the

16    market -- scope of how it moves to the market.  We then

17    look at where the market is sitting, basically on

18    price.  We do that across the board on all

19    cryptocurrencies and to see if we can find patterns

07:13:21  20    between them.

21        So when we do our respective analysis on any kind

22    of coin, we first look at where the similar projects

23    are actually seated, and then we come to a formal

24    method that we believe is sufficient to utilize -- to

07:13:34  25    teach the guys for the machine-learning stage to teach

```
         1    the artificial intelligence on how to price predict.

         2          So it's a little bit different -- it's for

         3    research and development on that purpose, not for

         4    straight evaluation.

07:13:46 5          Q.     Understood.  And I think you anticipated my

         6    next question, which is going to be:  Who is the

         7    audience of the research and development efforts there;

         8    it's to train your own proprietary artificial

         9    intelligence models, correct?

07:13:59 10         A.     It's correct.  You're 100 percent correct.

        11    Yes.

        12         Q.     So when you have performed an intrinsic

        13    value analysis of a digital asset, that audience has

        14    not been for a third party or a cryptocurrency

07:14:11 15   platform, correct?

        16         A.     Correct.  100 percent correct.

        17         Q.     The same is true for any speculative

        18    analysis you've performed; the audience is not

        19    external, it's to train your AI models?

07:14:22 20        A.     100 percent correct.

        21         Q.     Okay.  So this is the first case in which

        22    you are offering an external opinion to the world on

        23    the intrinsic fair value and speculative value of a

        24    digital asset, correct?

07:14:34 25        A.     Correct.
```

1      Q.      Okay.  And just to round it out, fair to

2   say sitting here today you're not aware of a single

3   investment bank that publicly reports the speculative

4   value of any platform-specific token?

07:14:49    5      A.      I'm not.

6      Q.      Do you have a sense of why that is?

7      A.      In my line of duty or what I do, I'm

8   more -- sorry, I'm more interested in the research and

9   development side and the data analytics side.

07:15:01   10   That's -- I'm not from a financial background, and

11   that's where you're going to.  I'm not from a financial

12   background.  My background itself is not analytics, and

13   it's all for research and development.

14      Q.      Understood.  Fair to say that you've never

07:15:12   15   performed a quantity theory of money analysis on a

16   digital asset?

17      A.      I have, but not for the purpose of actually

18   valuing, just to see if it actually works.  So I looked

19   at the quantum theory of value, but that wasn't to

07:15:25   20   actually determine a value.  I was looking at it as a

21   metric when I was looking -- I was writing a book, and

22   I was looking at ways and methods to actually see if

23   you could value cryptocurrency.

24      So through research and development, I had to

07:15:36   25   actually take off what I actually thought would work in

1    the methodologies to reach a proper valuation on a

2    coin.  That's the only time I've actually practiced it.

3        Q.    Okay.  So let's break that down.

4        First thing I want to know is:  Outside the

07:15:49   5    research and development context, have you ever

6    performed a quantity theory of money analysis --

7        A.    No.

8        Q.    -- on a digital asset?

9        A.    No.

07:15:56   10        Q.    And in the research and development

11    context, the quantity theory of money analysis that you

12    have performed was -- was designed to test whether or

13    not it actually works when applied to digital assets,

14    right?

07:16:07   15        A.    Correct.  Correct.

16        Q.    And what you ultimately concluded is that

17    it doesn't work so well, at least without significant

18    adjustments?

19        A.    Correct.  Yeah.

07:16:15   20        Q.    Outside the research and development

21    context, before this case, you have never prepared a

22    comps analysis of digital assets, correct?

23        A.    Correct.

24        Q.    Before this case, outside the research and

07:16:35   25    development context, you've never prepared a comps

1    analysis of any financial instrument, correct?

2         A.    Correct.

3         Q.    And I think you had previewed this earlier,

4    you're not trained in traditional -- withdrawn.

07:16:49    5    You're not trained in traditional valuation

6    techniques, are you, Mr. Faraj?

7         A.    When you say "traditional," are you talking

8    about traditional finance?

9         Q.    Yes, sir.

07:16:58    10    A.    Yes, you're correct.

11        Q.    Okay.  So just so the record's clear, with

12   respect to traditional finance, you're not trained in

13   traditional valuation techniques, correct?

14        A.    Correct.

07:17:06    15    Q.    And when it comes to more novel finance,

16   like the cryptocurrency world, the techniques you know

17   are based on your experience, correct?

18        A.    Correct.  Through our research and

19   development arm, 100 percent correct.

07:17:22    20    Q.    Fair to say you don't have a degree in

21   finance?

22        A.    I don't.

23        Q.    You don't have a degree in business?

24        A.    I don't have a degree, no.  I've got

07:17:31    25   diplomas, but they're just really old anyway; but yeah,

1    I don't.

2        Q.    Okay.  You don't have a degree in

3    accounting?

4        A.    I don't.

07:17:40    5        Q.    You also don't have a degree in economics,

6    correct?

7        A.    I don't.

8        Q.    You're not a certified financial modeling

9    and valuation analyst, are you?

07:17:48    10        A.    I'm not.  I'm not.

11        Q.    You don't have any certifications related

12    to financial modeling or valuation, correct?

13        A.    I don't.

14        Q.    You haven't taken any courses in valuing

07:17:58    15    financial instruments, including digital assets, have

16    you?

17        A.    I have not.

18        Q.    You've never worked for a valuation firm,

19    correct?

07:18:04    20        A.    I have never.

21        Q.    And that's not what the -- the work that

22    your firm does; your firm is more research and

23    development focused?

24        A.    Correct.

07:18:11    25        Q.    You've never worked at an investment bank,

1    correct?

2        A.    I have not.

3        Q.    You're not an investment banker, correct?

4        A.    No.  I have -- I have worked in the field,

07:18:22   5    back from 2013 to 2018, but that was actually basically

6    brokering -- sorry, brokering deals between government

7    entities and among government entities and getting

8    finance for, basically, state governments and likewise.

9        But no, in your question, what you're referring

07:18:39  10    to, no, I haven't.

11        Q.    And would you agree with me that there's a

12    difference between brokering --

13        A.    Correct.

14        Q.    -- financial arrangements --

07:18:45  15        A.    Correct.

16        Q.    -- between government entities and being an

17    investment banker, right?

18        A.    100 percent.  100 percent.

19        Q.    All right.  Fair to say -- withdrawn.

07:18:54  20    Fair to say, sir, that the expert report in this

21    case is the first formal document you ever, in your

22    life, have authored providing a formal valuation

23    analysis?

24        A.    It is.

07:19:15  25        Q.    The expert report in this case is the first

```
 1   document you've ever authored providing a -- withdrawn.
 2   I already asked that one.
 3       Fair to say that the first person that has ever
 4   asked you to provide a valuation analysis of a digital
 5   asset was Mr. Abreu?
 6       A.    Is that Otis' surname?  Sorry.  I don't
 7   know the actual proper full names.
 8       Q.    No, but thank you for the clarification,
 9   and I'll -- I'll reframe my question.  I didn't know if
10   it was Artur Abreu or Otis Davis who had asked you
11   first, and so now I'll ask you the question.
12       A.    Yes.
13       Q.    The question is:  The first person in your
14   career who ever asked you to provide a valuation
15   analysis of a digital asset was Otis Davis, correct?
16       A.    To be fair, Otis never asked me to present
17   a valuation.  Otis asked me if I would be a witness to
18   matters in the CEL case on knowledge that I had.  I
19   actually volunteered to actually do the report if they
20   needed it.
21       Q.    Okay.  So Mr. Davis asked you to serve as
22   an expert witness based on your knowledge of CEL
23   issues, correct?
24       A.    On basically my knowledge of issues that I
25   was aware of, yes.
```

07:19:36
07:19:52
07:20:02
07:20:16
07:20:26

| | | |
|---|---|---|
| | 1 | got no idea.  I didn't reopen those web links to assess |
| | 2 | them. |
| | 3 | Q.    When -- when was that compiled? |
| | 4 | A.    This was compiled just after the collapse |
| 08:01:44 | 5 | of FTX. |
| | 6 | Q.    Okay.  So let me understand this. |
| | 7 | This spreadsheet that you attached to your expert |
| | 8 | report was compiled after the collapse of FTX, correct? |
| | 9 | A.    Correct. |
| 08:01:51 | 10 | Q.    It spans nearly 200 pages, correct? |
| | 11 | A.    I'm not too sure. |
| | 12 | Q.    Okay.  At the time, is it your testimony |
| | 13 | that you, Hussein Faraj, looked at the underlying |
| | 14 | source material for each and every one of those rows? |
| 08:02:13 | 15 | A.    I looked at all of the information that was |
| | 16 | given to me from all my analysts, from all the people |
| | 17 | within the company.  On every single trade, I did not |
| | 18 | compile the Smartsheet.  The Smartsheet was compiled by |
| | 19 | Karan Hamidi and a few other people. |
| 08:02:24 | 20 | So the original documents, the original places I |
| | 21 | had actually read and gone over almost -- well, not |
| | 22 | almost.  Everything. |
| | 23 | Q.    Okay.  So Mr. Faraj, my question -- I |
| | 24 | understand that you reviewed what your team gave you. |
| 08:02:36 | 25 | A.    Yeah. |

1      Q.      My question is:  For the exhibit attached

2  to your report --

3      A.      Yeah.

4      Q.      -- did you or did you not, at any time,

08:02:46   5  review all of the underlying web links and source

6  material there, yes or no?

7      A.      Did I check the source links, actually open

8  them up?  No, I didn't.

9      Q.      Okay.

08:02:57   10      A.      Did I check the descriptions within the

11  documents that were compiled for me explaining what

12  happened and all the details within it?  Yes, I did.

13      Q.      Right.  So you looked at the description of

14  what is supposedly in those web links, correct?

08:03:13   15      A.      Correct.

16      Q.      But you didn't look at the web links to

17  generate the description, correct?

18      A.      I didn't, no --

19      Q.      AI did that?

08:03:21   20      A.      -- my team --

21      Q.      Artificial intelligence did that for you?

22      A.      I'm not sure if they used artificial

23  intelligence to do that.  I wasn't the one that

24  compiled -- so I've got analysts that used to do that

08:03:31   25  for me.  And so --

|   |   |
|---|---|
|            | 1  |  Q.      Okay.  So -- |
|            | 2  |  A.      -- so yeah, in the form -- I encourage them |
|            | 3  | always to use AI.  So if they've gone and utilized AI |
|            | 4  | and taken a string and put it in there, maybe, most |
| 08:03:42   | 5  | likely, I have no idea.  But I just took the |
|            | 6  | information on those sheets, basically, that were done |
|            | 7  | by my analysts. |
|            | 8  |  Q.      Okay.  So it's your testimony that |
|            | 9  | Exhibit 2, which has these thousands of distinct |
| 08:03:52   | 10 | sources, you don't know how that was compiled? |
|            | 11 |  A.      I know who compiled it, and I have trust in |
|            | 12 | the compilation, so I -- that's the guys who compiled |
|            | 13 | it.  So I don't know -- when you say "the links," I |
|            | 14 | don't need the links.  I go to the other -- their |
| 08:04:07   | 15 | explanation after they looked at the links and |
|            | 16 | explained what actually was on it. |
|            | 17 |  Q.      Mr. Faraj, that wasn't my question. |
|            | 18 | My question was:  Do you know how Exhibit 2 to |
|            | 19 | your expert report was compiled, yes or no? |
| 08:04:17   | 20 |  A.      Yes. |
|            | 21 |  Q.      I don't need to know who; do you know how |
|            | 22 | it was compiled? |
|            | 23 |  A.      I know it was compiled by my team going |
|            | 24 | over every single content that was online available |
| 08:04:24   | 25 | that had any type of things with CEL, regardless of the |

Deposition of Faraj

Celsius Network LLC, et al.

1     Celsius Network or otherwise, and it was compiled in a

2     fashion through Airtable and through Smartsheet.

3         Did I -- if you're trying to say did I

4     cross-reference every single thing that they did and

08:04:39   5     myself potentially going into every single link and

6     check what they've done, no.  I have the trust that the

7     analysts did the right thing.

8         Q.     Do you know what your analysts did?

9         A.     I know they -- I know what I assume they

08:04:51  10     would have done.  Do I know exactly what they did?  No,

11     I don't.

12         Q.     Have you had a single conversation with

13     them about what they did?

14         A.     In regards to compiling this?

08:05:00  15         Q.     Yes.

16         A.     I mean, we have -- so usually when -- when

17     it was compiled, yes, they would have told me what

18     they'd done.  And they'll tell me they've compiled, and

19     tell me they've got the data, and they'll tell me where

08:05:07  20     they've got the data from, and they'll show me the

21     sources.  But this is the compilation.  These are my

22     analysts that do it.

23         So my job is not to actually go over the field.

24     It's to trust that the information they give me is

08:05:19  25     accurate and correct.

1    Q.    Okay.  But you didn't independently verify

2  that, correct?

3    A.    No, I've never independently went into

4  every single link and went into -- and read every

08:05:26   5  single link.  I took what they wrote in there as being

6  the information that's necessary.

7    Q.    And sitting here today, you don't know

8  whether or not your team reviewed every single link,

9  correct?

08:05:34  10    A.    I would confidently hope -- and again, I'm

11  under oath -- that they would have -- that's what they

12  meant to do, that every single link, make sure the

13  links work, make sure the articles are correct, bring

14  those information over, compile them properly, make

08:05:51  15  sure the report that I need to read and information I

16  have is compiled accurately.

17    That's what -- again, that's what should have

18  happened, but I can't tell you that's 100 percent

19  correct unless I go back and do the check myself.

08:06:02  20    Q.    Right.  I'm not asking for your hopes and

21  wishes.  I'm asking whether or not, sitting here today,

22  you can testify that they did, in fact, review

23  everything that's in Exhibit 2.  It's fine if the

24  answer is no.

08:06:13  25    A.    I can't testify they did, and I can't

1    testify they didn't.

2        Q.    Right.  So you --

3        A.    I haven't actually approached them and get

4    the answer from them if they did or they didn't.  I

08:06:22    5    would assume that they did.

6        Q.    But sitting here today, you don't know one

7    way or another whether or not your team that compiled

8    Exhibit 2 to your report actually reviewed all of the

9    materials there, correct?

08:06:30    10        A.    Correct.

11        Q.    Okay.  Sir, there's not a single footnote

12    contained in your entire 172-page report, true?

13        A.    True.

14        Q.    Instead, you just generically cite the

08:06:54    15    table that we were just discussing, correct?

16        A.    Correct.

17        Q.    You don't tie any specific entry in that

18    table of events to specific facts or opinions in your

19    report, correct?

08:07:06    20        A.    No, not in that report.

21        Q.    Did you do it somewhere else?

22        A.    I have a secondary paper which was the one

23    that we did the analysis on Max's report, and I have

24    finding papers that were notes that were taken when we

08:07:24    25    were looking at certain articles of certain types.  I

| | |
|---|---|
| 1 | was looking at -- you know, obviously articles. |
| 2 | There's a lot of stuff I did that's not in that report. |
| 3 | There's a lot of information I did that's not in those |
| 4 | reports. |
| 08:07:34  5 | The report was -- and again, I had three days, and |
| 6 | I had to do it to the best of my ability, including |
| 7 | what I thought was accurate and what I believe is |
| 8 | correct, and that's how I drafted it. |
| 9 | And I did go over all the documents we have, and |
| 08:07:46  10 | again, I read -- I don't have time to read and go into |
| 11 | the whole granular aspect.  I read the descriptions |
| 12 | that my guys told me and my analysts said was actually |
| 13 | in each one of those.  Now, if I have to go back and |
| 14 | double-check, I can.  I personally still believe that |
| 08:08:02  15 | they would have done the right thing, but I can't give |
| 16 | you an answer. |
| 17 | Q.    Okay.  My question -- I just want to make |
| 18 | sure I understand. |
| 19 | You didn't link any of the particular events in |
| 08:08:15  20 | Exhibit 2 to your report to specific facts or opinions |
| 21 | in the report itself, true? |
| 22 | A.    True.  I thought it wasn't necessary.  My |
| 23 | valuation -- fair valuation -- the approach that I took |
| 24 | didn't require that direct link to the outcome. |
| 08:08:29  25 | Q.    Okay.  Mr. Faraj, you agree with me a |

1    substantial amount of this report was generated using

2    artificial intelligence, correct?

3        A.    I do agree.

4        Q.    In fact, the entirety of the report was

08:08:41    5    generated in the first instance using artificial

6    intelligence, correct?

7        A.    When you say "in the first instance,"

8    please clarify what you mean by that.

9        Q.    Sure.  So you didn't start with a blank

08:08:50    10   page and type out the report and then fill in gaps; you

11   created a framework that you fed into AI, and AI spit

12   out a report that you then edited, correct?

13       A.    I created the framework, the comprehensive

14   framework with what I wanted AI to look at.  I added

08:09:08    15   the data points that I wanted AI to look at, and I

16   created a 20- or 30-point structure that I wanted AI to

17   follow.  I also created the boundaries and the

18   functions that I wanted AI to actually follow in

19   regards to the report.

08:09:20    20       Then once it brought the first draft -- and it

21   only does it a couple pages at a time, by the way.  You

22   can't actually get it to do a 100-page or 200-page

23   report.  Then I had to go back in every single aspect

24   and -- and break down every granular part of that

08:09:31    25   framework and then go into each -- each issue one at a

1   time.

2       So I had to say, this is the framework, let's go

3   and look at the traditional way, let's look at if it's

4   functional, let's see if that's necessary, let's say

08:09:42   5   that this isn't necessary, we don't need it for these

6   specific reasons, and let's move on to the next one,

7   next one, next one.

8       So yes, I utilized AI to compile my report.  I do

9   it with direction and things that I feed the AI, not

08:09:54   10   the AI just generates the report.

11       Q.    Yeah, I understand that.  My question was

12   just -- it was sort of a "chicken or the egg" question,

13   whether or not you used AI to fill in gaps in a report

14   you wrote, or whether or not you created a framework

08:10:11   15   and then AI generated the report?

16       A.    Now, when you're using AI, specifically

17   when you're doing the machine learning -- or you're

18   teaching the AI in terms of the data, before the AI can

19   give you a framework and before the AI can give you

08:10:20   20   anything you also add to your framework, you have to

21   feed it the data you want it to analyze.

22       So first of all, I've got to decide all the data

23   that it needs to analyze.  I then feed it the data I

24   need it to analyze, and I feed it the conditions I want

08:10:31   25   it to -- to look at and the reason why I want it to

1    look at that condition, then I ask it to actually

2    follow a framework that I did to be able to do the

3    report.

4        Q.    The framework you're talking about, is that

08:10:41    5    written down somewhere?

6        A.    It is.

7        Q.    Can you provide that to us after the

8    deposition?

9        A.    It's on -- it's on your report, every

08:10:46    10    single paragraph.  When you go into the report, the

11    complexity of value determination in crypto space and

12    every other thing that's in there, that's the framework

13    that we discussed.  Now, in terms of the --

14        Q.    I understand -- Mr. Faraj, Mr. Faraj.

08:11:00    15        A.    Yeah.

16        Q.    I want the framework that you gave to the

17    AI.  Is that in a separate document than what's in your

18    report?

19        A.    The whole framework is there.  If you go

08:11:11    20    over the report, the framework is the topics I want it

21    to address and the --

22        Q.    Not my question.  Not my question,

23    Mr. Faraj.

24        My question, Mr. Faraj, is:  Do you have -- do you

08:11:18    25    have a separate document that is the framework that you

```
               1              A.      Yeah, whatever the date is there.

               2              Q.      Do you know when your expert report was

               3     filed?

               4              A.      Like I told you, dates and exact times, I

08:13:02       5     don't know.

               6              Q.      Okay.  You write, "I haven't much" --

               7     withdrawn.

               8              You write, "I haven't had much time to follow the

               9     issues with CEL."

08:13:12      10              Do you see that?

              11              A.      Yeah.

              12              Q.      That was true, correct?

              13              A.      That's true.

              14              Q.      You hadn't had -- two days before your

08:13:15      15     expert -- withdrawn.

              16              Two days before your expert report was filed, you

              17     hadn't -- you had not had much time to follow issues

              18     related to the CEL token, right?

              19              A.      It wasn't issues with the CEL token.  It

08:13:29      20     was issues with the CEL -- issues that happened on

              21     Twitter.  So it's the -- it's the -- it's the CEL saga.

              22              Q.      It's the what?

              23              A.      The CEL saga.  So everything that happens

              24     on Twitter space about the CEL.  So this is referring

08:13:44      25     not to the CEL issue as in the data, but it's the same
```

```
 1    thing.  It was actually referring to the CEL saga,

 2    which is everything that's actually happening with

 3    CEL -- the need for an expert witness, the need for

 4    this -- so I had no time to actually follow through.
08:13:54
 5         Q.    Okay.  It says here, "We completed the

 6    entire assessment within 72 hours.  In reality, this is

 7    usually a 6 to 8 week job."

 8         Do you see that?

 9         A.    Yeah.
08:14:04
10         Q.    So a report like this would usually take

11    you six to eight weeks, correct?

12         A.    If I was to do a complete comprehensive and

13    add every single thing to the report, that's completely

14    correct.
08:14:16
15         Q.    Okay.  So fair to say that this is not

16    complete and comprehensive in the sense that there are

17    things that you would add if you had more time?

18         A.    That's true.

19         Q.    I'm going to represent to you that six to
08:14:27
20    eight weeks is between 1,008 and 1,344 hours.

21         Do you have any reason to dispute that?

22         A.    I have no reason to dispute it.

23         Q.    Okay.  So a report like this usually would

24    take you between 1,008 and 1,344 hours, correct?
08:14:45
25         A.    Correct.
```

1    Q.    And you did it in 72 hours here, correct?

2    A.    Correct.  Of course, utilizing artificial

3  intelligence.

4    Q.    If you had not --

08:14:53    5    A.    If I had --

6    Q.    If I ask you --

7    A.    If I had --

8    Q.    Go ahead.

9    A.    If I hadn't used artificial intelligence,

08:14:58    10  it would have taken me, to do this report and break it

11  up from start to finish without the help of artificial

12  intelligence, at a minimum, six to eight weeks.  At a

13  minimum.  And then I would have had to run all the data

14  points, and again someone to read it after me and fix

08:15:15    15  the grammar and the issues inside of it.

16    So you are correct, if I was to do it without the

17  help of artificial intelligence, there was no way I

18  could have done this report in 72 hours.

19    Q.    Okay.  Well, I thought you said you use

08:15:27    20  artificial intelligence for everything.

21    A.    I do.

22    Q.    Okay.  So in what world would you not be

23  using artificial intelligence to generate this report?

24    A.    Okay.  So in the world where I'm actually

08:15:36    25  going to go through every single -- across every trade,

1    every point, every -- absolutely every single study and

2    every single methodology, then obviously I'm going to

3    have to break that down, go to every single one, break

4    it one by one, go into every retrospect and break it

08:15:55    5    all over, and then I have to -- that report wouldn't be

6    100-something pages, 200 pages.  That report would be

7    1,000-plus pages.

8        There's a lot of other stuff that you could factor

9    in when you actually go and factor in, yeah, which

08:16:06    10    works and what doesn't work.  So and again, with the

11    help of artificial intelligence and with the -- what I

12    actually submitted, 72 hours was sufficient and enough

13    to actually do it.

14        Now, if it was to be more comprehensive, 72 hours

08:16:17    15    is not enough.

16        Q.    Okay.  So just to be clear, if it was going

17    to be comprehensive, 72 hours was not enough to

18    generate this report, right?

19        A.    If it was going to be completely

08:16:28    20    comprehensive, 72 hours is nowhere next to enough.

21        Q.    Okay.  And you just listed a whole host of

22    factors and additional items that you would go through

23    if you had more than 72 hours, correct?

24        A.    That's correct.

08:16:40    25        Q.    And you weren't able to do that here,

1   correct?

2       A.      I wasn't able to actually go and actually

3   do it as a report.  So I briefly went over every single

4   retro- -- again, over what I thought retrospect, but

08:16:46   5   I've just said not -- this is no good.  I don't want to

6   use this.  I don't want to use this.  I focused on the

7   more meth- -- I'm exhausted.

8       I focused on more methodologies that were usable

9   and workable under a fair value assessment, and that's

08:17:01   10   why I used the fair value assessment.

11      Q.      Understood.  But there's other things that

12   you would do that would speak to their fair value that

13   you weren't able to do under the time constraints here?

14      A.      Yeah, the other stuff is not only when --

08:17:13   15   when you say to speak to the fair value, the other

16   stuff is actually looking at every single other

17   methodology that could have determined our value.

18      So the fair value assessment I found the most

19   appropriate, so I didn't find the need to actually go

08:17:25   20   true them, but if I had the time and ability, yes, it

21   would have been good to go through every single

22   methodology that currently exists to actually say that

23   this methodology would have been this price, this

24   methodology would have been this price, this

08:17:37   25   methodology would have been this price, this

1    methodology would have been here, based on one, two,

2    three, this is the article that came out on the 15th.

3    So I went on -- went on to the articles.  So I went to

4    the articles, I looked at the dates of the articles, I

08:17:52   5    looked at what happened during that --

6              THE REPORTER:  Okay.  I need you to slow

7    down.  I need you to slow down.

8              THE WITNESS:  Sorry.  Sorry.

9              So I was -- if I had more than 72 hours, it

08:17:56   10   would be a lot more comprehensive, yes.

11   BY ATTORNEY MCCARRICK:

12       Q.    Okay.  How long did you spend editing the

13   report, Mr. Faraj?

14       A.    I have no idea.  Probably about three, four

08:18:09   15   hours a night, probably about -- compiling the

16   information would have been the most, and then putting

17   it together after the AI -- I have no idea.  I don't

18   know.  I wouldn't say more than eight, nine hours, ten

19   hours in completion.

08:18:23   20       I wouldn't assume -- probably more.  I have no

21   idea.  I don't want to give you a wrong answer.

22       Q.    No, that's fine.  And I'm just asking for a

23   ballpark.  So you're ballparking it between eight to

24   ten hours, fair?

08:18:33   25       A.    In actual -- yeah, in actual compilation

Deposition of Faraj                                                Celsius Network LLC, et al.

1    and actually going back, I don't think it would have

2    been more than eight to ten hours straight and then the

3    revision, so you probably have another two, three hours

4    of revision to fix things that we had, and then you

08:18:45    5    would have had where I would have appointed Karan to go

6    over and get me the right data because some of the data

7    was obsolete or old, so when I look at the data and do

8    a cross, and that would have been like a couple of

9    hours.

08:18:56    10        That's all I had.  That's the time I had.

11        Q.     Understood.  Did you review each line of

12    this report?

13        A.     I did review, and I -- look, I would have

14    missed something.  I would have -- if you ask me did I

08:19:07    15    read it as comprehensively, I read it as comprehensive

16    as one can when the document is so large.

17        I also utilized artificial intelligence to

18    actually read it out to me.  So the way I did my

19    documents -- and I sent you an audio file -- I find --

08:19:20    20    I use AI for everything.  You've got to understand

21    that.  So even documents that I've written that are so

22    comprehensive, I turn them into audio files, and I

23    listen to the whole audio file.

24        Then I take notes based on the audio file that I

08:19:32    25    read, where things are actually -- you know, something

```
 1   that's wrong or incorrect, and then I make the notes to

 2   amend that, and then I go back into the document and I

 3   amend what's required.

 4        Q.    Okay.  So just to be clear, you said you

 5   reviewed it as comprehensively as you could, right?

 6        A.    Correct.

 7        Q.    And I want to break it down into audio and

 8   written.  Okay?

 9        A.    Yeah.

10        Q.    The written report, did you read every

11   single line, yes or no?

12        A.    I do think I read every single line, if

13   I -- and I read very fast.  I'm a very fast reader.

14   Did I read and miss spelling mistakes or miss something

15   in there or miss a couple of words in there or

16   something that I just oversee while reading very fast,

17   it's highly probable.

18        I'm not perfect.  So if you're asking me if I've

19   made mistakes in there and I've over -- and I've missed

20   something, it's very highly probable and I did miss

21   something.

22        Q.    Just focus on the question I'm asking.

23        The question I'm just asking is:  Did you or did

24   you not read every line of the report?

25        A.    So again, my answer is:  In my personal
```

08:19:44   5
08:19:54  10
08:20:10  15
08:20:23  20
08:20:33  25

1    opinion, I believe I did read every line.  Did I miss

2    something in there?  I might have missed something.

3         Q.    Yeah, I'm not -- that's fine.  You might

4    miss something.

08:20:43   5         I'm just asking as a factual matter, did you put

6    eyes on every word of the report?

7         A.    I did.  I did.  Like, personally, I believe

8    that I went, absolutely, on every single line.  I read

9    every single line.  It was very exhausting to read.  So

08:20:55  10    the reading took me more than it took me to actually --

11    to write.

12         So and again, you know, was I exhausted and I

13    missed something or I made a mistake somewhere?  Yes.

14    And this is why the second time I did it, instead of

08:21:06  15    reading it, I turned it into an audio file and I

16    listened to it.

17         Q.    So just to be clear, your testimony is that

18    it took you longer to read the report than it took you

19    to write the report?

08:21:15  20         A.    That's true.

21         Q.    Okay.  You've acknowledged that there are

22    certain errors in the report, fair?

23         A.    I would say there has to be errors.  With

24    72 hours, there would have to be errors in the report.

08:21:26  25    It's impossible to have that report exactly perfect

1    grammatically without accidentally copying something

2    else in there or making a small mistake somewhere.

3    It's absolutely impossible to do in 72 hours.

4        Q.    Okay.  Fair to say that during your review,

08:21:43    5    you would catch any major errors?

6        A.    I would believe I would.  And again, I read

7    it -- especially when it's so comprehensive.  If

8    there's something that I've missed, I mean, at the

9    point of exhaustion of reading it, I may have missed

08:21:54   10    something.  I don't know.  I don't want to lie to you

11    and tell you I did or I didn't.  I don't know if I did.

12        Q.    Yeah, I understand.  You just -- fair -- or

13    let's do it this way.

14        You understand that you're trying to submit this

08:22:04   15    report for the Court to evaluate, right?

16        A.    I am.  And I understand that the portions

17    that are critical in this are the portions that I hand

18    wrote myself and did all the points myself, and I'm

19    very confident that there's absolutely no issues in the

08:22:18   20    point of fair value assessment.

21        If there's issues, it would be from stuff that

22    I've taken in; as example, trading limitations.  Right?

23    I took in a paragraph explaining trading limitations.

24    I would have asked the AI, "Can you please explain

08:22:36   25    trading limitations in the course of cryptocurrency.

1    This is the data we have, can you explain it utilizing

2    this data."

3        I would have copied and pasted that from the AI

4    into the document.  So when I copied and pasted it,

08:22:44   5    it's -- there is a chance I would have made a mistake

6    it terms of the copy and paste from the AI.

7        In terms of fair value assessment, again, I find

8    it very unlikely I would have made a mistake in the

9    portions that were actually delivered in terms of value

08:22:59   10   by myself, that I actually read 100 -- you know, it

11   wasn't 100 times.  I read over, and I made sure it's

12   correct, and I analyzed it again and again.

13       Q.    Okay.  So setting aside the fair value

14   piece which you say you authored yourself, you

08:23:10   15   acknowledge that AI may have introduced errors that

16   you've copied and pasted in your report?

17       A.    Yes, I do.  That's -- with 72 hours if

18   there's errors in copy and paste, 100 percent,

19   there's -- yeah, I do, I agree.

08:23:25   20       Q.    And the reason is just given the time

21   limitations, you weren't able to go through and vet

22   every statement that was generated by the AI; there

23   just wasn't time, right?

24       A.    No, I actually -- I actually read every

08:23:35   25   single statement generated by the AI because I gave it

```
 1    what to generate.  But and again, when you're writing a
 2    report so extensive and you've got such limited time,
 3    sometimes when I read very fast, I'll miss something.
 4    So there is the chance that I missed something.
 5        And a lot of times when I take something from an
 6    AI and I would actually ask it, can you look at the
 7    data that you currently have and at what point is your
 8    data obsolete, so it would say that the data is
 9    obsolete, example, January 2022 as an example.  Right?
10        So then I would use that, I would copy and paste
11    it, but I would not want to copy and paste that last
12    part.  And then I would actually go in and check the
13    latest data to make sure the data is correct.
14        Now, there's a lot of occasions that I've done
15    papers before where I just forget to take that section
16    out.  That's what I'm talking about.  So there is times
17    when I will miss a feature of -- I've gone and asked
18    the AI something, and the AI's actually given me an
19    answer, and the part -- the bottom part of the answer
20    which shouldn't have been copied and pasted was
21    accidentally copied and pasted.
22    Q.    Okay.
23          ATTORNEY MCCARRICK:  Let's look at Faraj
24    Exhibit 1.  Again, that's your report attached to
25    Mr. Davis' submission.  And I want to look at page 31.
```

08:23:45
08:24:01
08:24:14
08:24:28
08:24:38

```
            1    Mr. Benyo, just let me know when that's up.

            2    BY ATTORNEY MCCARRICK:

            3        Q.    Okay.  Do you see the first paragraph that

            4    says -- first full paragraph that says, "In the

08:24:53    5    burgeoning world of cryptocurrencies"?

            6        A.    Yeah.

            7            ATTORNEY MCCARRICK:  And, Mr. Benyo, can

            8    you move that to the top?  And I want to put the very

            9    next paragraph right under it.  So you can blow them up

08:25:10   10    together.

           11            THE WITNESS:  Yeah.  I copied and pasted it

           12    twice.

           13    BY ATTORNEY MCCARRICK:

           14        Q.    Right.  That's exactly the same paragraph a

08:25:15   15    second time, isn't it?

           16        A.    Yes.  And what would have happened is the

           17    Control-V would have went twice.

           18        Q.    Okay.  So I understand you copied and

           19    pasted it wrong.

08:25:23   20        When you're reviewing it, you obviously didn't

           21    catch this error, correct?

           22        A.    I'm not sure how I didn't catch this error.

           23    I've read it twice.  But yeah, correct, I didn't -- I

           24    didn't catch the error.

08:25:35   25        Q.    Yeah.  You don't know how you didn't catch
```

1    this error, right?

2         A.    I didn't catch the error.  No, I didn't.

3         Q.    No.  And when -- when AI was reading your

4    report aloud to you, you didn't notice that the same 92

08:25:47    5    words were repeated back to back?

6         A.    I actually did not notice it.

7         Q.    Okay.

8         A.    And I'll explain to you very simply why,

9    because when I actually read the stuff from the AI, I

08:25:58   10    read it on the AI and I copy and paste it into the

11    report.  So every single thing that's generated I would

12    read.  But yeah, you're right, I missed that.  I'm

13    pretty sure you're going to find more than that that I

14    missed.  I mean, it's impossible not to find something

08:26:14   15    that I've missed.

16         Q.    Do you even know, sitting here today, what

17    you might have missed in your report?

18         A.    I personally -- again, I don't know exactly

19    what was missed, but I oversaw it.  So something that

08:26:20   20    is a double copy and paste to me is -- again, I missed

21    it.  I missed it.

22         I mean, if you're asking me is there other things

23    in the report that I could have missed -- if you go

24    down to the segments of valuation, like I told you,

08:26:32   25    especially where they're not a copy and paste of

```
 1    information where I actually asked the AI to do, and

 2    its data points, you will find that there's never --

 3    and I doubt that you would find -- go through it right

 4    now -- an issue.

 5        Now, if there's an issue where I've utilized AI,

 6    because obviously you can go -- I've used AI, and I've

 7    accidentally copied and pasted it twice or I've copied

 8    a part of it that I shouldn't have copied, that's going

 9    to be -- that's going to happen.  I mean, it's a

10    400-page report within 72 hours, so you're going to

11    find mistakes.

12        Q.    Okay.

13        A.    But you won't -- you won't find issues in

14    the part which, to me, matters, which is the fair

15    assessment valuation.

16        Q.    Okay.  And part of that fair assessment

17    valuation would be selecting the trading interval that

18    you're going to analyze, correct?

19        A.    The -- when you say "trading interval," the

20    data?

21        Q.    Yeah, the dates -- the dates that you would

22    use.

23        A.    Correct.  Correct.

24        Q.    And you wouldn't expect to find any errors

25    there; that's -- that's what your testimony is?
```

08:26:45 (line 5)
08:26:58 (line 10)
08:27:05 (line 15)
08:27:15 (line 20)
08:27:22 (line 25)

        1          A.     On the data -- no.  If I've got a mistake

        2   there, then it's -- I wouldn't expect it.  No.

        3                 ATTORNEY MCCARRICK:  Okay.  Mr. Benyo, you

        4   can take that down for now.

08:27:33   5   BY ATTORNEY MCCARRICK:

        6          Q.     To calculate what you claim is the fair

        7   value of the CEL token, you took closing prices from

        8   May 21st, 2022, through June 9th, 2022, and averaged

        9   them, right?

08:27:42  10          A.     Correct, I did.  And then I divided them by

       11   the days that were there.

       12          Q.     Okay.  Let's turn to page 95 of your

       13   report.

       14          A.     Yeah.  Do you want to share the screen?  I

08:27:56  15   don't have the report next to me.

       16                 ATTORNEY MCCARRICK:  Yeah.  Mr. Benyo is

       17   about to.

       18   BY ATTORNEY MCCARRICK:

       19          Q.     And you picked that May 21st-to-June 9th

08:28:04  20   period, Mr. Faraj, because you think it is the most

       21   representative or most accurate sample of trading data,

       22   correct?

       23          A.     Not the most accurate trading data.  It had

       24   the boundaries that I was looking for.  So under the

08:28:16  25   5 percent trade is what I thought would be the --

1   looking at all the dates prior and after and looking at

2   the valuation, I thought that was the most appropriate

3   time that I would have actually gone into, I would say

4   so.

08:28:26   5        Q.    Okay.  And that would also be a period

6   where there is the least amount of market manipulation,

7   correct?

8        A.    Based on the data that's there, what I

9   would say would be the least amount of an inflation

08:28:37   10   during this period.

11        Q.    Okay.  Page 95 of your report.

12        A.    Yeah.

13        Q.    Do you see where it says --

14             ATTORNEY MCCARRICK:   And, Mr. Benyo, can we

08:28:45   15   blow it up?

16   BY ATTORNEY MCCARRICK:

17        Q.    "The values from June 9th to June 12th

18   might be the most" -- "most representative of CEL's

19   fair value"?

08:28:52   20        A.    Yes.  We went over that in the earlier

21   deposition.  That's just a typo.  That's just a --

22   that's just -- and again, that's a typo that should

23   have said from May to June.  So that's a typo there.

24        Q.    Well, it's not just a typo, sir.  Right?

08:29:07   25   I mean, the paragraph 6 -- you do a few paragraphs

1   explaining why the period leading up to June 13th is

2   indicative of a more stable market condition.

3       Do you see that?

4       A.    Yeah.  It's a typo because I would have

08:29:21  5   used the same thing when I went over, so that would

6   have been stuck in my head.  It shouldn't have been

7   stuck in my head.  Should have been the dates that I

8   was discussing.  That's all it is.  It's a mistake that

9   was there, and it was carried on to other paragraphs.

08:29:36  10      Q.    Okay.  So this is another example of an

11  error in your report, correct?

12      A.    Yeah.  Out of 400 pages if you only find a

13  few pages, I'll be very happy, so --

14      Q.    Okay.  Well, Mr. Faraj, Mr. Faraj, I'm just

08:29:46  15  asking if this is another error, yes or no?

16      A.    Yes, it's an error.  It's an error.

17      Q.    Okay.  And this is an error in the part of

18  the fair value part of your report, correct?

19      A.    No.  The fair value part of the report is

08:29:56  20  where we look at the dates between May the 21st and

21  June the 9th.  So once we go into the valuation of that

22  segment, that's the segment of the fair -- the fair

23  value assessment.  The fair value assessment is that

24  period where you go into there.  That's the -- that's

08:30:09  25  the information I'm talking about.

1       Q.      Okay.  So -- so when it says here that the

2   values from June 9th to June 12th might be the most

3   representative of CEL's fair value, it's your testimony

4   that's not the fair value analysis?

08:30:25  5       A.      No.  The fair value analysis is May the

6   21st -- I'm sorry, May the 21st to June the 9th.

7       Q.      Okay.  But do you agree that selecting the

8   period that is going to be the most representative for

9   purposes of fair value is part of your fair value

08:30:41  10  analysis?

11      A.      Yes, it is.

12      Q.      Okay.

13      A.      But this is not the part of the report

14  which actually does that.  This is a different part of

08:30:47  15  the report.  So if you go to the fair value assessment

16  and you go to the comparison on the last pages of the

17  report where I also do a cross-analysis comparison with

18  other cryptocurrencies, including those coins, that

19  would be the fair value assessment section.

08:31:02  20      Q.      All right.  This is not a small error; you

21  would agree with that?

22      A.      I -- no, I wouldn't agree with that.  I

23  think it's a small error.  It's three days, and

24  obviously this report is extensive.  So actually having

08:31:12  25  that, to me, is just a small error.  If I had more time

1    to go over it and fix it, yes, I -- I should have seen

2    it.  But just to me it's just -- it's a small error

3    that happened in a report that was compiled in three

4    days.

08:31:23    5         Q.    Well, sir, in your view, neutralizing the

6    impact of suspected deliberate price manipulation is

7    paramount to achieving a fair valuation, right?

8         A.    It is, but this section here wasn't taken

9    into consideration when we did the fair value

08:31:37   10    assessment because we did not look at the dates between

11    June 9th and June 13th.  We looked at the dates between

12    May the 21st and June the 9th, so those are very

13    different dates and approach that we looked at.

14         So if you said do I -- if I did look at this as

08:31:47   15    the fair value dates and I took that as my assessment,

16    then yes, it would be a huge mistake, but it wasn't.

17    It was a section of a report which has an error inside

18    the dates.  That's literally all it is.

19         Q.    Do you know how that error was introduced?

08:32:01   20         A.    Probably when I wrote it, I probably just

21    in my head at the time instead of putting, you know,

22    May to June the 9th, I've just gone June the 9th, June

23    the 10th.

24         And it also could have been when I put the

08:32:14   25    boundaries to the artificial intelligence, that the

1    boundaries I gave it were basically copied and pasted

2    by accident, you know, probably instead of saying, you

3    know, look at June this to June that, can you write

4    this report based on one, two, three, and these are the

08:32:25    5    dates I want you to look at.

6        So it could have been -- I will actually

7    cross-reference that with the data I have and give you

8    an answer, but it could have been a couple of things

9    that caused it.

08:32:33    10        ATTORNEY MCCARRICK:  Okay.  Why don't we

11    take a ten-minute break, if that works.

12        THE WITNESS:  It's 11:30, and I've been up

13    for almost 30-something hours, so if we can just finish

14    it in one go, it would be much easier for me, if it's

08:32:47    15    possible.

16        ATTORNEY MCCARRICK:  Yeah, I need a bio

17    break, but we can go through the end after it.

18        THE WITNESS:  Please, because I'm really

19    exhausted.  You've got no idea.  I've been up since

08:32:57    20    yesterday.  I thought this deposition was going to be

21    in the morning.  So spending the time on this -- I'm

22    actually exhausted.

23        ATTORNEY MCCARRICK:  Well, the

24    correspondence on that is clear.  And trust me, we've

08:33:04    25    been up late too.  If you want to offer testimony

```
          1   through report, you've got to sit in the chair.  So we

          2   can go off the record.

          3              THE WITNESS:  Not a problem.

          4              THE VIDEOGRAPHER:  The time is 8:33 a.m.

08:33:11  5   Eastern.  This is the end of Media Number 1.  We're off

          6   the record.

          7              (RECESS TAKEN.)

          8              THE VIDEOGRAPHER:  The time is 8:42 a.m.,

          9   Eastern.  This is the start of Media Number 2.  We're

08:42:24 10   on the record.

         11   BY ATTORNEY MCCARRICK:

         12        Q.    Okay.  Before I turn to another topic,

         13   Mr. Faraj, I want to look at Faraj Exhibit 1, which

         14   again is your report.  And what I would like to look at

08:42:38 15   is page 148.

         16        A.    Can you please put it up on display?  I

         17   don't have it in front of me.

         18              ATTORNEY MCCARRICK:  And can we look at the

         19   BlockFi section, the token entry.

08:42:53 20              THE WITNESS:  Yeah.

         21   BY ATTORNEY MCCARRICK:

         22        Q.    You recall Mr. Colodny asking you about

         23   this last night, right, where it refers to, "As of my

         24   last training data in January 2022," right?

08:43:01 25        A.    Yeah, I did.
```

1          Q.      And it says, "As of my last training data,"

2     that refers to the AI training data, correct?

3          A.      That's correct.

4          Q.      And the last date of the AI training data

08:43:12   5     was January 2022, correct?

6          A.      That's correct.

7          Q.      And you testified last night that you had

8     Mr. Hamidi pull forward that training data to make sure

9     it's current, correct?

08:43:23  10          A.      That was his role, correct.

11          Q.      Do you know if he did that?

12          A.      Yeah.  He was -- yeah.  Yeah, he did it.

13     Did I miss one?  Yeah.  Looks like he missed one.

14          Q.      Well, so what I'm just asking is, as a

08:43:34  15     factual matter, did Mr. -- did Mr. Hamidi actually pull

16     forward data from January 2022 to the present?

17          A.      Yes, he should have.  Yes -- well, he did.

18     He sent me over the data saying he did.

19          Q.      Okay.  All right.

08:43:51  20          ATTORNEY MCCARRICK:  You can take down that

21     screenshot, Mr. Benyo.  Thank you.

22     BY ATTORNEY MCCARRICK:

23          Q.      I want to talk a little bit about the

24     underlying source material for your report, and I'm

08:44:00  25     going to talk about what you did consider and what you

           1   didn't consider.

           2        You reviewed the data relied upon in the Elementus

           3   Galka report, correct?

           4        A.     I did.

08:44:11   5        Q.     You don't dispute the veracity of the

           6   information provided in the Elementus report, right?

           7        A.     I don't.

           8        Q.     You don't dispute the accuracy of the

           9   information provided in the Elementus report, right?

08:44:24  10        A.     I have no way to dispute it, no.

          11        Q.     In fact, you --

          12        A.     I wouldn't know if it's factual.

          13        Q.     In fact, you relied on much of Elementus'

          14   data as foundational for your own analysis, right?

08:44:36  15        A.     That's correct.

          16        Q.     All right.  You already talked about the

          17   1,000 distinct sources that we -- that you relied upon

          18   in generating this report, right?

          19        A.     Yeah.

08:44:49  20        Q.     Those thousands of sources are reflected in

          21   that big chart we talked about, which is Exhibit 2 to

          22   your report?

          23        A.     The big chart, all the pages that we've got

          24   down, the sources of information about the trading

08:45:01  25   history, yeah, all of -- all of those.

1    is the person who -- actually, Alameda Research that

2    caused -- that's the major issues, and I still stand by

3    I would like Sam Bankman-Fried to be one of the people

4    involved in restoring their networks because unless you

09:25:37    5    knew the business design in the outweigh and how you

6    actually had it, you have a harder chance to repair a

7    network.  So I actually believe this wholeheartedly.

8         Q.    Got it.  So on the one hand, the Examiner

9    should be locked up, but Sam Bankman-Fried and Alex

09:25:54   10    Mashinsky should be part of the corporate

11    reorganizations of the companies they were part of?

12         A.    No, there's a difference in a corporate

13    reorganization and a holding.  So if someone was to put

14    them back in a position of power, that would be insane.

09:26:05   15    That's insanity.

16         If someone was to utilize them to hold, to advise

17    and be on the board there, to explain what they did and

18    how they believe is the best way to go forward and to

19    take that into consideration, that is what I'm

09:26:17   20    referring to --

21         Q.    Okay.

22         A.    -- but to give someone -- yeah.

23         Q.    Okay.  So -- so, again, it's your testimony

24    Examiner should be locked up for a $20 million report

09:26:29   25    that you call piss weak, Mr. Mashinsky and

1    Mr. Bankman-Fried should be board advisors as the

2    companies -- to the companies that are being

3    reorganized?

4         A.    Yes.  During the reorganization stage I

09:26:41    5    believe that someone who has caused the problem should

6    be part of the process to fix the problem, and

7    that's -- I stand by that.  I actually 100 percent

8    support that statement.

9         Q.    Okay.

09:26:50    10            ATTORNEY MCCARRICK:  We can take that down.

11   BY ATTORNEY MCCARRICK:

12        Q.    All right.  I want to talk a little bit

13   about your -- just your framework for valuation.

14        A.    Go ahead.

09:27:03    15        Q.    And I want to talk about specific dates.

16        There's intrinsic value, which you talked about

17   with Mr. Colodny last night, correct?

18        A.    Correct.

19        Q.    You would agree with me that after the

09:27:12    20   pause date, there was not any intrinsic value left of

21   the CEL token because the platform was frozen?

22        A.    I would agree with that.

23        Q.    And you would agree with me that's also

24   true as of the petition date; when Celsius entered

09:27:26    25   bankruptcy as of the petition date, as long as, you

                1    know, CEL is not trading and the platform is frozen,

                2    there's no intrinsic value, correct?

                3         A.     I agree 100 percent.

                4         Q.     The only remaining value, in your view, is

09:27:36        5    the speculative value of CEL, correct?

                6         A.     Correct.  Correct.

                7         Q.     And you didn't put a price on that

                8    speculative value, correct?

                9         A.     I didn't, no.

09:27:43       10         Q.     And when you say "speculative value," what

               11    you're talking about is CEL's potential, correct?

               12         A.     Correct.

               13         Q.     And what you're talking about there is -- I

               14    believe you refer to it as a phoenix rising from the

09:27:54       15    ashes in your report?

               16         A.     Yeah, that's -- yeah, that's correct.

               17         Q.     And you talk about a metamorphosis of CEL,

               18    right?

               19         A.     Well, an uprise of the -- so you've got to

09:28:01       20    learn from your past.  So you've got to actually look

               21    at -- from my perspective, if CEL itself was to look at

               22    methods and methodologies to improve, they were to do a

               23    reorg and they were to issue CEL again in a much

               24    better -- sorry, a much better form or a much better

09:28:19       25    method, yes, there would be a lot of people that would

1    say, "I want to be a part of this."

2         Q.    Okay.  That speculative value is not based

3    on the value of CEL as CEL existed, it was about

4    reissuing CEL or tooling CEL on a different platform,

09:28:46   5    right?

6         A.    The -- okay.  So you get a higher rate of

7    speculation of value of return if you're to improve

8    your technology, so that's why in one part of the

9    report I talk about if they were to enact a better

09:28:54  10    technology for base.  But if they were also willing to

11    return to the original, even in the ERC20, and

12    resort -- and sort out the problems with the

13    governance, the -- obviously, the -- the rates they

14    were giving, and restructure the business in itself, it

09:29:10  15    would still have speculative value because there still

16    would be a use case for that CEL.

17         But if they said that there would be no more

18    future use case for the CEL and the CEL becomes dead

19    there and then, then there's also no speculative --

09:29:23  20    sorry, speculative value for CEL.

21         Q.    Okay.  I think I understand.

22         So what you're saying is if there's no future use

23    case for the CEL, the CEL doesn't have even speculative

24    value?

09:29:32  25         A.    Correct.

**EXHIBIT C**



**EXHIBIT D**

```
  05:59   2            UNITED STATES BANKRUPTCY COURT
                        SOUTHERN DISTRICT OF NEW YORK
          3

          4    In re:

          5

               CELSIUS NETWORK LLC, et        Case No.
          6    al.,                           22-10964 (MG)

          7

               Debtor.
          8

          9


         10              *** CONFIDENTIAL ***

         11        VIDEO-RECORDED DEPOSITION OF
                          KARRAR HAMIDY
         12
                  Zoom Recorded Videoconference
         13                 10/14/2023
                          7:12 a.m. (EDT)
         14
```

         24    REPORTED BY:  AMANDA GORRONO, CLR
               CLR NO. 052005-01
         25    JOB NO. 1011

|       | 1  | KARRAR HAMIDY |
|-------|----|---------------|
| 08:27 | 2  | there starting at "Token"? |
| 08:27 | 3  | A.    Which one? |
| 08:27 | 4  | Q.    Where it starts, where the first |
| 08:27 | 5  | bolded word is "Token."  It's the |
| 08:27 | 6  | second-to-last bullet. |
| 08:27 | 7  | A.    Okay.  So the second-to-last one |
| 08:27 | 8  | "Token:  As of my last training data in |
| 08:27 | 9  | January 2022, BlockFi does not have a |
| 08:27 | 10 | native cryptocurrency token like CEL. |
| 08:27 | 11 | However, they do have their proprietary |
| 08:28 | 12 | BlockFi Interest Account." |
| 08:28 | 13 | Q.    Thank you so much. |
| 08:28 | 14 | What is your understanding as to |
| 08:28 | 15 | what it means, that the last training |
| 08:28 | 16 | occurred in January 2022? |
| 08:28 | 17 | A.    I'm not too sure. |
| 08:28 | 18 | Q.    Okay.  Then to ask a different |
| 08:28 | 19 | question, would Mr. Faraj ever ask you to |
| 08:28 | 20 | update data other than what you just |
| 08:28 | 21 | pulled up on CoinMarketCap? |
| 08:28 | 22 | A.    Not on this report, no. |
| 08:28 | 23 | Q.    Okay. |
| 08:28 | 24 | A.    This report the only thing I |
| 08:28 | 25 | found was just that CoinMarketCap. |

1          KARRAR HAMIDY

08:28    2      Q.    Do you recall if he's ever asked

08:28    3   you to update data regarding BlockFi?

08:28    4      A.    In this report?  Or in general?

08:28    5      Q.    In general.

08:28    6      A.    BlockFi, I can't recall

08:28    7   specifically.  We've collected so much

08:28    8   data about different tokens, I'm not sure.

08:29    9   Possibly.

08:29   10      Q.    Okay.

08:29   11      A.    I can't recall.

08:29   12         MS. SIMSON:  Let's see.  Let's

08:29   13         go to -- just one second.  If you

08:29   14         wouldn't mind going to Page 108 that

08:29   15         would be great.

08:29   16         (Tech complies.)

08:29   17   BY MS. SIMSON:

08:29   18      Q.    Okay.  So when you -- Mr. Faraj

08:29   19   asked you to pull data on CEL token and

08:30   20   other tokens, did he tell you to use

08:30   21   CoinMarketCap?

08:30   22      A.    Yes.

08:30   23      Q.    Okay.  Did he ever ask you to

08:30   24   use any other websites in connection with

08:30   25   this report?

1        KARRAR HAMIDY

08:30    2        A.    No.  No.  Not that I can recall.

08:30    3        Q.    Okay.  So is the CoinMarketCap

08:30    4    described here, the one that you've been

08:30    5    referencing?

08:30    6        A.    Sorry?

08:30    7        Q.    Is the CoinMarketCap described

08:30    8    here in the blue text, the CoinMarketCap

08:30    9    that you've been representing --

08:30   10    describing?

08:30   11        A.    I'm assuming.  I haven't gone

08:30   12    through the report.  So I didn't actually

08:30   13    read the report through.  But, yeah, I

08:30   14    would say so.

08:30   15        Q.    Okay.  What is CoinMarketCap?

08:30   16        A.    CoinMarketCap is a

08:30   17    cryptocurrency or token website that

08:30   18    states how much a coin is at, what its

08:30   19    trading at and the circulation amount of

08:30   20    the coin.  Information about the coin or

08:31   21    the token.

08:31   22        Q.    Okay.  Why did Mr. Faraj select

08:31   23    CoinMarketCap for this report, if you

08:31   24    know?

08:31   25        A.    I wouldn't know.  I would assume

```
            1              KARRAR HAMIDY
08:38       2        A.    That's all good.
08:38       3        Q.    This, the data that Mr. Faraj
08:38       4    asked you to pull, if you go to where at
08:38       5    the bottom of the page it says
08:38       6    "Comparison"?
08:38       7        A.    Yes.
08:38       8        Q.    Okay.  Great.
08:38       9        A.    You go to the next page --
08:38      10        Q.    Okay.
08:38      11        A.    -- of that.  He's talked coin
08:39      12    here.  It says, "Coins in Circulation."
08:39      13        Q.    Okay.
08:39      14        A.    And that's the amount.  That's
08:39      15    all I took.  That's all -- all the
08:39      16    information I put it in there, and it just
08:39      17    goes through all the other tokens.  That's
08:39      18    it.
08:39      19        Q.    Okay.  So you pulled -- just to
08:39      20    make sure I'm understanding your testimony
08:39      21    correctly is you just pulled the number of
08:39      22    coins in circulation for various
08:39      23    cryptocurrencies?
08:39      24        A.    That is correct.
08:39      25        Q.    And nothing else?
```

```
              1              KARRAR HAMIDY
08:39    2        A.     Nothing else.
08:39    3        Q.     Okay.  So nothing about the
08:39    4   valuation of different cryptocurrencies?
08:39    5        A.     No.  No, no, no, just the
08:39    6   circulation.
08:39    7        Q.     And I -- to ask this question a
08:39    8   different way, are you aware or do you
08:39    9   know who would have pulled any other
08:39   10   financial data in connection with this
08:39   11   report?
08:39   12        A.     I would assume it would be
08:39   13   Mr. Faraj, but I'm not sure.
08:39   14        Q.     Okay.  Let's see.  When pulling
08:40   15   this information, is this something you'd
08:40   16   ever done?
08:40   17              MS. SIMSON:  Strike that.
08:40   18   BY MS. SIMSON:
08:40   19        Q.     Had you ever pulled information
08:40   20   like this in connection with any other
08:40   21   projects for Mr. Faraj?
08:40   22        A.     There was pulled a lot of
08:40   23   information, but not in specific to that,
08:40   24   not like that, no.
08:40   25        Q.     Uh-huh.
```

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | KARRAR HAMIDY                                 |
| 08:40 | 2  | Did you ever pull updated                     |
| 08:40 | 3  | trading data from January 2022 for this       |
| 08:40 | 4  | report?                                       |
| 08:40 | 5  | A.    No.  Training data?                      |
| 08:40 | 6  | Q.    Uh-huh.                                  |
| 08:40 | 7  | A.    Can you please clarify?                  |
| 08:40 | 8  | Q.    Do you have --                           |
| 08:40 | 9  | A.    What do you mean by "training"?          |
| 08:40 | 10 | Q.    I guess, I'm sorry.  Trading             |
| 08:40 | 11 | data.                                         |
| 08:40 | 12 | A.    Oh, trading data, no.  Not that          |
| 08:40 | 13 | I can recall at least.                         |
| 08:40 | 14 | Q.    That would not have been within          |
| 08:41 | 15 | the scope of what you'd been asked to do?      |
| 08:41 | 16 | A.    No.  Like I said, the only thing         |
| 08:41 | 17 | I have done for this report was just the       |
| 08:41 | 18 | coins in circulation and just put them in.     |
| 08:41 | 19 | That's it.                                    |
| 08:41 | 20 | Q.    Okay.  Do you know if anyone             |
| 08:41 | 21 | else worked on this report other than you      |
| 08:41 | 22 | and Mr. Faraj?                                 |
| 08:41 | 23 | A.    Not that I know of.                      |
| 08:42 | 24 | MS. SIMSON:  Okay.  Let's see.                 |
| 08:41 | 25 | I think we've only been going for              |

**EXHIBIT E**

1

2          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF NEW YORK
3
           ----------------------------------------X
4          In re:

5          CELSIUS NETWORK LLC, et al.,

6          Debtor.
           ----------------------------------------X
7                      ***CONFIDENTIAL***

8

9            REMOTE VIDEOTAPED DEPOSITION OF LUAY MOHSEN

10

11                    Saturday, October 14, 2023

12                          7:20 a.m.

13

14

15

16

17

18

19         Reported by:
           LISA M. MURACO
20         JOB NO. 1010

21

22

23

24

25

1                       LUAY MOHSEN

2          A.    Sure.

3                (Exhibit 2, Data Sheet, marked for

4          identification.)

09:16   5          A.    So you don't want me to check with

6       Hus if that was already given?

7          Q.    You can check with him.

8                We actually found a version of it

9       that has been given.  I think you might have

09:16  10       the version that you did your cross-check on

11       that we don't have.  But we have another

12       version without some of that highlighting, if

13       that makes sense.

14          A.    I will be more than happy to do it.

09:16  15       I just want to check the e-mail.

16          Q.    And we can do that at a break.  You

17       don't have to do that now.

18          A.    Okay, yeah, yeah, yeah.  Easy.

19          Q.    Excellent.  Okay.

09:16  20                So can we please turn to what is

21       page 12 of the paginated report and page 19 of

22       the PDF.  And that would be Exhibit 1 that we

23       were just looking at on the screen.

24                And I'm looking at page 19, page 19,

09:17  25       not 194.  Thanks.

|         |    | LUAY MOHSEN |
|---------|----|-------------|
|         | 1  | |
|         | 2  | Okay.  So there's a section here |
|         | 3  | called Note on Information Utilized. |
|         | 4  | And the sentence says (as read): |
| 09:17   | 5  | Given the comprehensive nature of the expert |
|         | 6  | report of Max Galka and the abundant data |
|         | 7  | presented within, we've made a deliberate |
|         | 8  | choice in our assessment approach. |
|         | 9  | Do you see that? |
| 09:17   | 10 | A.    Yup. |
|         | 11 | Q.    And it says (as read):  To avoid |
|         | 12 | redundancy and to streamline our analysis, |
|         | 13 | certain data elements from Max Galka's report |
|         | 14 | have not been reiterated in our assessment. |
| 09:18   | 15 | Do you see that? |
|         | 16 | A.    Yup. |
|         | 17 | Q.    And as I understand it, you have not |
|         | 18 | seen or reviewed the expert report of Max |
|         | 19 | Galka; is that correct? |
| 09:18   | 20 | A.    No, I haven't.  Correct.  I haven't. |
|         | 21 | Q.    The next paragraph says (as read): |
|         | 22 | For an accurate and comprehensive determination |
|         | 23 | of a fair value, our analysis delved deep, |
|         | 24 | harnessing from over 1,000 distinct sources. |
| 09:18   | 25 | Do you see that? |

1                    LUAY MOHSEN

2          A.    Yup.

3          Q.    And how many of those sources have

4    you reviewed?

09:18  5          A.    I have -- none.

6          Q.    Okay.

7                And do you know what those sources

8    are?

9          A.    Not really sure.

09:18  10          Q.    Okay.

11                So if you have never reviewed

12    Mr. Galka's expert report, I would understand

13    that it must be the case that you don't have

14    any opinion, one way or the other, about his

09:19  15    conclusions.

16                Is that fair?

17          A.    That's fair.

18          Q.    Are you -- have you ever heard

19    creditors in the Celsius bankruptcy say that

09:19  20    the appropriate valuation for CEL token is

21    $0.81?

22          A.    No, I haven't.

23          Q.    Okay.

24                Would you agree that $0.81 is higher

09:19  25    than the valuation that you reached at $0.71?

1                    LUAY MOHSEN

2          A.    From an -- yeah, it is higher.  I --

3    well, it is higher, but it doesn't -- it

4    doesn't dawn to me that it's a very big

09:20    5    difference.  $0.10 is not -- I mean, I might be

6    wrong, but I don't think $0.10 is a dig

7    difference.

8               But it is higher, definitely.

9          Q.    Are you putting forward an opinion

09:20   10    that CEL token should be valued at $0.81?

11          A.    No, no.

12               But I'm just kind of -- sorry.

13    Yeah.

14          Q.    Do you any of the other valuations

09:20   15    that have been suggested or posited by Celsius

16    creditors or experts in the Celsius bankruptcy?

17          A.    No, I haven't.  I have no idea, no

18    background.

19          Q.    Let's take a look at page 80 of the

09:20   20    PDF, which is paginated page 3 or 73 of

21    Exhibit 1.

22               Mr. Mohsen, based on your

23    description earlier of the pages you've

24    reviewed, my understanding is you have not seen

09:21   25    this page before.