# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Dan Latona
To Call Writer Directly:
+1 312 862 3445
dan.latona@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

October 16, 2023

**By eFile & E-mail**

Hon. Martin Glenn
Chief United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
One Bowling Green, Courtroom 523
New York, NY 10004-1408

Re:    *In re Celsius Network LLC*, No. 22-10964 (MG) – Response to Letter Filed
by Tom Anusic

Dear Chief Judge Glenn:

The Debtors write in response to the letter filed by Tom Anusic on October 10, 2023 [Docket No. 3744] (the "Anusic Letter") to provide the Court with relevant background information regarding Mr. Anusic's allegations.[1]  In his letter, Mr. Anusic alleges that the Plan does not meet the "fair and equitable" requirement of section 1129 of the Bankruptcy Code and that the Plan's proposal to equitably subordinate Other CEL Token Claims violates section 510(c) of the Bankruptcy Code.  *See* Anusic Letter at 1, 5.  Mr. Anusic further requests that the Court require the Debtors to either (i) include in the Plan "claims" allegedly arising from the Debtors' prepetition liquidation of his loan supported by CEL Tokens, (ii) "waive[]" the outstanding Retail Advance Obligations of Mr. Anusic and his company, HR National Pty Ltd ("HR National"), or (iii) pay Mr. Anusic $1.44 million in cash for his "missed opportunity cost" or allow a claim in the same amount in the Plan, among other relief requested.[2]  None of the requested relief is warranted

---

[1]    Capitalized terms used but not defined in this letter shall have the meaning ascribed to them in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (including all the exhibits attached thereto and as may be supplemented or amended, or modified from time to time, the "Plan") or the Anusic Letter, as applicable.

[2]    Mr. Anusic also filed two proofs of claim, one on December 27, 2022, in the amount of $260,000 (Claim No. 17176) and another on February 7, 2023, amending the first one for an unliquidated amount (Claim

# KIRKLAND & ELLIS LLP

Hon. Martin Glenn
October 16, 2023
Page 2

under the facts and circumstances of these Chapter 11 Cases, although Mr. Anusic is free to pursue allowance of a claim on account of his allegations given that he timely opted out of the Account Holder Class Claim Settlement.

Mr. Anusic and HR National purchased CEL Tokens from the Debtors and subsequently took out loans from the Debtors (and received the cash proceeds of those loans) using those CEL Tokens as collateral. Those CEL-backed loans were subsequently liquidated pursuant to the applicable Loan Terms and Conditions when the price of the CEL Tokens decreased such that the aggregate value of the collateral relative to the principal amount of the loan was insufficient to maintain the required loan-to-value ("LTV") ratios for those loans.

Specifically, in February 2021, Mr. Anusic entered into two subscription agreements to purchase an aggregate amount of 61,026 CEL Tokens for $260,000 and transferred approximately 40,757 CEL Tokens to the Borrow Program to serve as collateral for a $60,000 loan in USDC (the "Anusic CEL Loan"). In January and February 2022, Mr. Anusic transferred approximately 29,072 additional CEL Tokens to the Borrow Program to support the Anusic CEL Loan. On May 11, 2022, when the prevailing price of CEL Token fluctuated to approximately $1.01/CEL,[3] the LTV ratio of the Anusic CEL Loan, supported by approximately 69,829 CEL Tokens, increased to approximately 84.6 percent. In accordance with the Loan Terms and Conditions, Celsius Networks Lending LLC ("Lending") liquidated the Anusic CEL Loan, retained approximately 60,891 of the total 69,829 CEL Tokens that Mr. Anusic transferred to the Borrow Program to cover the $60,000 outstanding principal, the $49.86 interest, and the $1801.50 liquidation fee provided in the Loan Terms and Conditions,[4] and returned the remaining CEL Tokens to Mr. Anusic's account in the Earn Program.

Also in February 2021, HR National entered into two subscription agreements[5] to purchase 128,572 CEL Tokens for $540,000 and transferred approximately 93,658 CEL Tokens to the Borrow Program to serve as collateral for a $140,000 loan in USDC (the "HR National CEL

---

No. 23726). On December 27, 2022, HR National also filed two proofs of claim, with Claim No. 17810 amending Claim No. 17809, and both for an unliquidated amount.

[3] The Debtors' quotation of the market prices of the CEL Tokens at various points in time in this letter should not be construed as their acknowledgement that such market prices reflect the proper value of the CEL Tokens.

[4] See Loan Terms and Conditions, version 9 at 9, Liquidation of Collateral ("You understand and acknowledge that any Liquidation Event may cause Celsius to incur costs and expenses . . . [a]ny such costs and expenses shall be deducted from the liquidated Collateral, up to a cap of three percent (3%) of the Fiat value of the liquidated Collateral."); Loan Terms and Conditions, version 8 at 9, Liquidation of Collateral (same).

[5] All four subscription agreements entered into by Mr. Anusic and HR National (collectively, the "Subscription Agreements") are identical, and an example is attached hereto as **Exhibit A**.

# KIRKLAND & ELLIS LLP

Hon. Martin Glenn
October 16, 2023
Page 3

Loan"). In April 2022, HR National transferred approximately 41,470 additional CEL Tokens to the Borrow Program to support the HR National CEL Loan. On May 11, 2022, when the prevailing price of CEL Token fluctuated to approximately $1.03/CEL such that the LTV ratio of the HR National CEL Loan exceeded 100 percent, Lending liquidated the HR National CEL Loan with the entire CEL Token balance that HR National transferred to the Borrow Program (approximately 135,126 CEL Tokens) to cover $139,415.58 of the $140,000 outstanding principal.

As of the Petition Date, Mr. Anusic has scheduled claims for approximately 3.17 BTC, 9901 CEL Tokens, and 77.6 USDC associated with the Earn Program, and approximately 25.5 BTC associated with the Borrow Program supporting a $200,000 loan. HR National has scheduled claims for approximately 10.32 BTC and 932 CEL Tokens associated with the Earn Program, and approximately 51.6 BTC associated with the Borrow Program supporting two loans with an aggregate principal of $725,000. Both Mr. Anusic and HR National voted to reject the Plan and opted out of the Third Party Release and the Class Claim Settlement on account of their respective Class 2 Retail Borrower Deposit Claims and Class 5 General Earn Claims.

The Debtors have been in contact with Mr. Anusic throughout these chapter 11 cases. In June 2023, the Debtors told Mr. Anusic through email that, while they are empathetic to his situation, they do not believe that the prepetition liquidations of the Anusic CEL Loan and the HR National CEL Loan give rise to valid claims under the Bankruptcy Code.[6] *See* 11 U.S.C. § 101(5) (defining "claim" to mean a "right to payment" and a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment").

*First*, the Subscription Agreements provide that the purchaser "represents and warrants" that it "can bear the economic risk of the investment and can afford a complete loss of the investment," and Mr. Anusic, on behalf of himself and HR National, acknowledged that he was "aware of the risks associated with buying CEL tokens and accept[ed] all of such risks" with initials on the signature pages. *See* Subscription Agreement § 5(h), signature page.

*Second*, Mr. Anusic and HR National no longer had any right to payment against the Debtors on account of the Anusic CEL Loan and the HR National CEL Loan after such loans were liquidated. Nor was the liquidation a breach by Lending under the relevant Loan Terms and Conditions, which unambiguously authorized Lending to liquidate an outstanding loan when the LTV ratio exceeded 80 percent.[7]

---

[6] *See* **Exhibit B**.

[7] *See* Loan Terms and Conditions, version 9 at 7, Margin Calls ("Regardless of whether or not a Margin Call was made, if your Collateral Value continues to drop, raising your LTV over eighty percent (80%), we may, and you

## KIRKLAND & ELLIS LLP

Hon. Martin Glenn
October 16, 2023
Page 4

    *Third*, the Debtors are actively cooperating with law enforcement and regulatory agencies with respect to certain misconduct by the Debtors' prepetition management, including the misrepresentations regarding CEL Token by Mr. Alex Mashinsky, the Debtors' former chief executive officer.  To the extent Mr. Anusic believes that he or HR National have valid claims for damages arising from the purchase of CEL Tokens, the Plan classifies such claims as Other CEL Token Claims and subordinates them pursuant to section 510(b) of the Bankruptcy Code.  *See* Plan, Art. I.230, Art. III.B.16; *see also* 11 U.S.C. § 510(b) (subordinating claims "for damages arising from the purchase or sale of [a security of the debtor]").[8]

    *Fourth*, both Mr. Anusic and HR National voted to reject the Plan and opted out of the Third Party Release and the Class Claim Settlement.  If Mr. Anusic believes that either he or HR National have valid claims arising from the liquidation of the Anusic CEL Loan and the National HR CEL Loan or the purchase and/or sale of CEL Token, he may pursue such claims with the Litigation Administrator in either the Bankruptcy Court or under the ADR Procedures.

    *Fifth*, the "fair and equitable" requirement of section 1129(b) of the Bankruptcy Code is not applicable to Mr. Anusic or HR National because the classes to which their claims belong— Class 2 and Class 5—both voted to accept the Plan.  *See* 11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims . . . that is impaired under, and *has not accepted*, the plan.") (emphasis added); *Amended Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3574] ¶ 13 (voting results).

    *Finally*, contrary to Mr. Anusic's allegations of bad faith,[9] the Debtors have communicated with Mr. Anusic on numerous occasions for over a year their position that (i) neither he nor HR National have a valid claim arising from the liquidation of Anusic CEL Loan and the HR National Loan and (ii) many of his allegations, including his speculation on the causes of the fluctuation in the price of CEL Token before the Petition Date, are not supported by the facts.  As set forth above, the Debtors' position is based on the unambiguous terms of the Subscription Agreement, the Loan

---

hereby explicitly authorize us to liquidate the Collateral and close out your Loan."); Loan Terms and Conditions, version 8 at 7, Margin Calls (same).

[8]    For the avoidance of doubt, the Plan does not propose to subordinate any account holder claim under section 510(c), other than claims of former executives, officers, and directors of the Debtors.  ]

[9]    *See, e.g.*, Anusic Letter at 5 ("I would also like to bring attention to the CEL token and how I believe the attorneys have been misleading the courts not only on it's value, but how the distribution puts those who purchased CEL at a disadvantage."); *Id.* at 1 ("As I have contacted the UCC, W&C and the Debtor and their council Kirkland multiple times to amicably settle the matter without success they claim the liquidations were 'proper' but have not answered the questions put forth to them.").

## KIRKLAND & ELLIS LLP

Hon. Martin Glenn
October 16, 2023
Page 5

Terms and Conditions, and the Bankruptcy Code.  That the Debtors disagree with Mr. Anusic's position or otherwise refuse to engage with his baseless accusations does not mean that the Debtors have acted in bad faith.  In fact, notwithstanding the Debtors' efforts to maintain an open channel of communication, Mr. Anusic repeatedly harassed associates of counsel to the Debtors with dozens of unsolicited phone calls and WhatsApp messages, after these associates provided e-mail responses to Mr. Anusic's inquiries that Mr. Anusic did not agree with.  Mr. Anusic also frequently copied members of the law enforcement, government agencies, and other attorneys at Debtors' counsels' firm not associated with this matter in an attempt to strong arm a settlement.  Throughout these chapter 11 cases, the Debtors and their counsel have worked tirelessly to provide open and timely responses to all creditor questions and requests, and Mr. Anusic's vitriolic language simply does not reflect the unprecedented level of engagement the Debtors have endeavored to maintain with all creditors, including himself.  The Debtors are focused on confirming the Plan and returning value to creditors as soon as possible and do not believe it is efficient or necessary to expend further resources responding to Mr. Anusic.

The Plan is fair and equitable, provides appropriate treatment for claims arising from the purchase of CEL Tokens and the prepetition liquidation of retail loans, and should be confirmed. Mr. Anusic is free to pursue allowance of his claims following confirmation, but his allegations are irrelevant for purposes of confirmation.

Sincerely,

*/s/ Dan Latona*

Dan Latona

**<u>Exhibit A</u>**

**Subscription Agreement**

DocuSign Envelope ID: D80E569A-2D15-4763-858C-E77EE18A06AC

[REGULATION S]



**CEL TOKEN**

**SUBSCRIPTION AGREEMENT**

Ladies and Gentlemen:

  The undersigned (the "Subscriber") understands that Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the "Company"), is offering for sale to the Subscriber for a purchase price of USDC/T [ 60,000.00 ] (the "Purchase Price"), [ 12,245.00 ] CEL Tokens ("CEL Tokens"), having the functions described on the Company's Website (collectively with the aggregate amount of CEL Tokens offered to each other subscriber of the CEL Tokens, the "Offering").

  The Subscriber acknowledges that it is not acting on the basis of any representations or warranties other than those set forth in this subscription agreement (this "Subscription Agreement") and the user Terms of Use set forth on the Company's Website as the same may be amended from time to time (the "Terms of Use") and understands that the Offering is being made without registration of the CEL Tokens under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities, "blue sky" or other similar laws of any foreign or domestic state ("State Securities Laws"), including without limitation, the jurisdiction in which the Subscriber resides.

  The Subscriber agrees as follows:

  1. <u>Subscription</u>. The Subscriber hereby tenders this subscription and applies for the purchase of the CEL Tokens for the Purchase Price.

  2. <u>Payment for CEL Tokens</u>. Payment of the Purchase Price shall be made simultaneously with the execution and delivery of this Agreement by delivery to the Company by such payment method as directed or as may otherwise be acceptable to the Company. If this subscription is not accepted or the Offering is terminated by the Company for any reason, all documents, together with the Purchase

1

Price (without interest), will be returned to the Subscriber.  If this subscription is accepted by the Company, the Company will deliver a  countersigned copy of this Agreement  confirming the CEL Token purchased by the Subscriber has been issued to the Subscriber promptly upon such acceptance.

3.      Certain Acknowledgements and Agreements of Subscriber.

(a)      The Subscriber understands and acknowledges and agrees that: (i) the Company has the unconditional right, exercisable in its sole and absolute discretion, to accept or reject this Subscription Agreement in whole or in part, (ii) the subscription is subject to prior sale, withdrawal, modification, or cancellation of the Offering by the Company, (iii) the subscription shall not be valid unless and until accepted by the Company, (iv) this Subscription Agreement shall be deemed to be accepted by the Company only when it is signed by an authorized officer of the Company on behalf of the Company, (v) Subscriber's acceptance of the Terms of Use is a condition precedent to the acceptance of the subscription, and (vi) notwithstanding anything in this Subscription Agreement to the contrary, the Company shall have no obligation to issue CEL Tokens to the Subscriber if such issuance would constitute a violation of the Securities Act or any State Securities Laws or any other laws.

(b)      The Subscriber further understands and acknowledges that that the CEL Tokens do not represent or confer any ownership right or stake, share, equity, ownership interest or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Subscriber, other than rights relating to the potential future provision and receipt of services from the Company, subject to the limitations and conditions contained set forth in this Subscription Agreement and the Terms of Use.

4.      Representations and Warranties of Company.  In order to induce the Subscriber to tender this subscription, the Company hereby represents and warrants to the Subscriber as follows:

(a)      Organization, Good Standing, Company Power and Qualification.  The Company is a limited liability company duly organized, validly existing and in good standing under the laws of England and Wales and has all requisite company power and authority to carry on its business as presently conducted.

(b)      Authorization.  All action on the part of the Company necessary for (i) the execution and delivery of this Subscription Agreement, (ii) the performance of all obligations of the Company under this Subscription Agreement, and (iii) the issuance and delivery of the CEL Tokens has been taken or will be taken prior to acceptance of this subscription.  This Subscription Agreement, when executed and delivered by the Company, shall constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (x) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (y) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c)      Valid Issuance of CEL Tokens.  The CEL Tokens subject to this subscription, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Subscription Agreement, will be validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under the Terms of Use, applicable federal and State Securities Laws and liens or encumbrances created by or imposed by a Subscriber.

(d)    <u>No Other Representations or Warranties</u>.  Except for the representations and warranties made by the Company in this Agreement (the "Company Representations"), neither the Company nor any other person makes any representation or warranty with respect to the Company or its business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to the Subscriber or its representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing, and Subscriber is relying solely on the Company Representations in its execution, delivery and performance of this Agreement.   Each representation and warranty herein is deemed to be made on the date of this Subscription Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the date hereof, at which time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Subscriber by such date.

5.    <u>Representations and Warranties of Subscriber</u>.  In order to induce the Company to accept this subscription, the Subscriber hereby represents and warrants to the Company as follows:

(a)    Subscriber:

(i)    is not a U.S. person[1*] as that term is defined under Regulation S ("Regulation S") promulgated under the Securities Act;

(ii)    is outside the United States* as of the date of the execution and delivery of this Subscription Agreement;

(iii)    is acquiring the CEL Tokens for its own account (and/or for the account of other non-U.S. persons*, who are outside of the United States*) and not on behalf of any U.S. person, and the sale has not been prearranged with a person in the United States;

(iv)    is not acquiring the CEL Tokens with the present intention  of "distributing" the CEL Tokens on behalf of the Company or a "distributor"* as defined in Regulation S, or any of their affiliates, in the United States or to a U.S. person under Regulation S;

(v)    acknowledges that, in addition to other restraints on transfer set forth in the Terms of Use: (x) the CEL Tokens may only be resold in accordance with the provisions of Regulation S and cannot be sold by it in the United States as part of a "distribution" (as such term is defined in the federal securities laws of the United States), and (y) cannot be sold by it to any U.S. person* until after one year and one day from the date that this Subscription Agreement has been accepted by the Company; and

(vi)    agrees not to engage in any hedging transaction with regard to the CEL Tokens.

(b)    SUBSCRIBER HAS RECEIVED, READ CAREFULLY AND UNDERSTANDS THIS SUBSCRIPTION AGREEMENT AND ALL EXHIBITS AND APPENDICES HERETO AND HAS HAD AN ADEQUATE OPPORTUNITY TO CONSULT SUBSCRIBER'S OWN ATTORNEY, ACCOUNTANT OR INVESTMENT ADVISOR WITH RESPECT TO THE INVESTMENT CONTEMPLATED HEREBY AND ITS SUITABILITY FOR SUBSCRIBER;

---

[1*] "U.S. person", "United States" and "distributor" defined in Appendix A hereto.

DocuSign Envelope ID: B89E569A-2D45-4763-858C-E7FEE18A06AC

(c)      The Company has provided the Subscriber and his, her or its representative, if any, prior to the purchase of the CEL Tokens, with the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the financial data and business of the Company and to obtain any additional information related to the financial data and business of the Company, and all such questions, if asked, have been answered satisfactorily and all such documents, if examined, have been found to be fully satisfactory.  The Subscriber is satisfied that he, she or it has received adequate information concerning all matters which he, she or it considers material to a decision to purchase the CEL Tokens;

(d)      Subscriber understands and acknowledges that (i) Subscriber must bear the economic risk of an investment in the CEL Tokens for an indefinite period of time; (ii) the CEL Tokens have not been registered under the Securities Act or any State Securities Laws and is being offered and sold in reliance upon exemptions provided in the Securities Act and State Securities Laws for transactions not involving any public offering and, therefore, the CEL Tokens may not be resold or transferred unless it is subsequently registered under the Securities Act and applicable State Securities Laws or unless an exemption from such registration is available; and (iii) Subscriber is purchasing the CEL Tokens, and any purchase of the CEL Tokens will be, for investment purposes only for Subscriber's account and not with any view toward a distribution thereof;

(e)      Subscriber is aware and acknowledges that: (i) an investment in the CEL Tokens is speculative and involves a risk of loss of the entire investment and no assurance can be given of any income from such investment; (ii) the Company has not made and cannot make any representation or warranty as to the future operations or financial condition of the Company; and (iii) there is no public market for, and there are substantial restrictions on the transferability of, the CEL Tokens and it may not be possible for Subscriber to liquidate the investment readily in case of an emergency;

(f)      Subscriber has adequate means of providing for all current and foreseeable needs and personal contingencies and has no need for liquidity in this investment;

(g)      Subscriber maintains a domicile or business at the address shown on the signature page of this Subscription Agreement, at which address Subscriber has subscribed for the CEL Tokens; and

(h)      Subscriber has evaluated the risk of investing in the CEL Tokens, and has determined that the CEL Tokens are a suitable investment for Subscriber.  Subscriber can bear the economic risk of the investment and can afford a complete loss of the investment.  In evaluating the suitability of any investment in the CEL Tokens, Subscriber has not relied upon any representations or other information (whether oral or written) other than independent investigations made by Subscriber or Subscriber's representative(s); and

(i)      Subscriber understands that the Company will rely on the accuracy and completeness of the information provided by Subscriber in this Agreement and the Terms of Use (the "Subscriber Representations").  Such information is accurate and complete.

(j)      Subscriber acknowledges that a breach by it of the Subscriber Representations will cause irreparable harm to the Company and that the remedies at law for Subscriber's breach of the Subscriber Representations under this Agreement will be inadequate.  Subscriber agrees, in the event of its breach of the Subscriber Representations, that the Company shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein: (i) to an injunction or injunctions restraining, preventing or curing any breach of the Subscriber Representations

DocuSign Envelope ID: B80E569A-2D45-4763-858C-E7EEE18A06AC

and to enforce specifically the terms and provisions hereof and thereof, without the necessity of showing economic loss and without any bond or other security being required, and (ii) to such other penalties it deems reasonable including, but not limited to, cancelling Subscriber's membership on the Company platform and/or burning or destroying any CEL Tokens held by Subscriber.

6.    <u>Survival and Indemnification</u>. All representations, warranties and covenants by Subscriber contained in this Subscription Agreement or any other documents executed and delivered in connection therewith, and including, without limitation, the indemnification contained in this <u>Section 6</u> shall survive (i) the acceptance of this Subscription Agreement by the Company, (ii) changes in the transactions, documents and instruments described herein, and (iii) the death, disability or dissolution of the Subscriber.    The Subscriber acknowledges the meaning and legal consequences of the representations, warranties and covenants in determining the Subscriber's qualification and suitability to acquire the CEL Tokens.  The Subscriber hereby agrees to indemnify, defend and hold harmless the Company, and its officers, directors, employees, agents and controlling persons, from and against any and all losses, claims, damages, liabilities, expenses (including attorneys' fees and disbursements), judgments or amounts paid in settlement of actions arising out of or resulting from the untruth of any representation herein or the breach of any warranty, covenant or acknowledgment made herein by the Subscriber.

7.    <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be deemed to have been duly given if delivered personally or sent by registered or certified mail, return receipt requested, postage prepaid, confirmed e-mail or facsimile, or overnight air courier guaranteeing next day delivery:

(a)    if to the Company, to it at the following address:

Celsius Network Limited
1 Bartholomew Lane
London, United Kingdom EC2N 2AX
Attn: Harumi Urata-Thompson
Email: OTC@celsius.network

(b)    if to the Subscriber, to the address set forth on the signature page hereto, or at such other address as either party shall have specified by notice in writing to the other.

8.    <u>Assignability</u>.  This Subscription Agreement is not assignable by the Subscriber, and may not be modified, waived or terminated except by an instrument in writing signed by the party against whom enforcement of such modifications, waiver or termination is sought.

9.    <u>Entire Agreement</u>.  This Subscription Agreement and the Terms of Use constitute the entire agreement of the Subscriber and the Company relating to the matters contained herein, superseding all prior contracts or agreements, whether oral or written.

10.    <u>Governing Law</u>.  This Subscription Agreement shall be governed and controlled as to the validity, enforcement, interpretation, construction and effect and in all other aspects by the substantive laws of the State of New York, without reference to conflicts of laws principles (except insofar as affected by the state securities or "blue sky" law of the jurisdiction in which the Offering has been made to Subscriber).

DocuSign Envelope ID: D89E569A-2D15-4763-B58C-E77EE18A06AC

11.     <u>Severability</u>.  If any provision of this Subscription Agreement or the application thereof to any circumstance shall be held invalid or unenforceable to any extent, the remainder of this Subscription Agreement and the application of such provision to other subscriptions or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

12.     <u>Headings</u>.  The headings in this Subscription Agreement are inserted for convenience only and are not intended to describe, interpret, defined, or limit the scope, extent or intent of this Subscription Agreement or any provision hereof.

13.     <u>Counterparts</u>.  This Subscription Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

14.     <u>Amendment and Modification</u>.  This Subscription Agreement may be amended or modified, or any provision hereof may be waived, provided that such amendment or waiver is set forth in writing executed by the Company and the Subscriber.  No course of dealing between or among any persons having any interest in this Subscription Agreement will be deemed effective to modify, amend or discharge any part of this Subscription Agreement or any rights or obligations of any person under or by reason of this Subscription Agreement.

15.     <u>Jurisdiction</u>.  The Subscriber hereby irrevocably consents, to the maximum extent permitted by law, that any legal action or proceeding against it by the Company, arising out of or in any manner relating to this Subscription Agreement shall be brought exclusively in either the state or federal courts located in New York, New York.  By its execution and delivery of this Subscription Agreement, the Subscriber expressly and irrevocably consents and submits to the personal jurisdiction and jurisdiction over their property of all of such courts in any such action or proceeding.  The Subscriber expressly and irrevocably waives its claims and defenses in any such action or proceeding in any of such courts based on any alleged lack of personal jurisdiction, improper venue or forum non conveniens or any similar basis to the maximum extent permitted by law.

16.     <u>Binding Effect</u>.  This Subscription Agreement shall be binding upon the Subscriber and the heirs, personal representatives, successors and permitted assigns of Subscriber (provided that this Subscription Agreement and the rights and obligations of Subscriber hereunder are not transferable or assignable by Subscriber).

[Signature Page Follows]

DocuSign Envelope ID: B80E569A-2D15-4762-B58C-E77EE18A06AC

IN WITNESS WHEREOF, the undersigned Subscriber has executed this Subscription Agreement as of the 13 day of Feb , 2021.

Thomas Luke Anusic

Subscriber's Full Legal Name

By: _____

Signature of Subscriber

Name: Tom Anusic

Title: Mr

Tom Anusic

_____

Address

Date of Execution by Subscriber

2/12/2021

_ _____

City, Country

U.S. Social Security or Taxpayer I.D. No. (if Applicable)

_ _____

Telephone Number

Email Address

**Please Check Appropriate Category**:

_X_ Individual
___ Tenants in Common
___ Joint tenants with right of survivorship
___ As custodian, trustee or agent for:

_ __ Other (*e.g.*, corporation, Company, etc.)

AGREED TO AND ACCEPTED BY:

CELSIUS NETWORK LIMITED

By:_____

Its:_____

CFO

OFFERED AMOUNT:

CEL Tokens    CEL    [ 12,245.00 ]

Total Purchase Price: USDC/T[ 60,000.00 ]

**Please Initial Each Box Below**:

__X___ I am aware of the risks associated with buying CEL tokens and accept all of such risks.

__X___ I am aware that I am not allowed to sell CEL tokens to any U.S. person until after one year and one day from the date that this Subscription Agreement has been accepted by the Company.

{S2595484; 1}

DocuSign Envelope ID: D89E569A-2D45-4762-858C-E7FEE1BA06AC

**APPENDIX A**

Pursuant to Rule 902(d), (k) and (l) of Regulation S, the terms "distributor," "U.S. person" and "United States" are defined as follows:

(a)     <u>Distributor</u>.  "Distributor" means any underwriter, dealer, or other person who participates pursuant to a contractual arrangement, in the distribution of the securities offered or sold in reliance on Regulation S.

(b)     <u>U.S. Person</u>.

    (A)     "U.S. person" means:

        (i)     Any natural person resident in the United States;

        (ii)     Any partnership or corporation organized or incorporated under the laws of the United States;

        (iii)     An estate of which any executor or administrator is a U.S. person;

        (iv)     Any trust of which any trustee is a U.S. person;

        (v)     Any agency or branch of a foreign entity located in the United States;

        (vi)     Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person; and

        (vii)     Any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the United States; and

        (viii)     Any partnership or corporation if:  (1) organized or incorporated under the laws of any foreign jurisdiction; and (2) formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act of 1933, unless it is organized or incorporated and owned, by accredited investors (as defined in Rule 501(a)) who are not natural persons, estate or trusts.

    (B)     Notwithstanding paragraph (k)(1) of Rule 902, any discretionary account or similar account (other than an estate or trust) held for the benefit or account of a non-U.S. person by a dealer or other professional fiduciary organized, incorporated, or (if an individual) resident in the United States shall not be deemed a "U.S. person".

    (C)     Notwithstanding paragraph (k)(1) of Rule 902, any estate of which any professional fiduciary acting as executor or administrator is a U.S. person shall not be deemed a U.S. person if:

        (i)     An executor or administrator or the estate who is not a U.S. person has sole or shared investment discretion with respect to the assets of the estates; and

DocuSign Envelope ID: B89E569A-2D15-4763-858C-E7FEE18A06AC

      (ii)      The estate is governed by foreign law.

(D)      Notwithstanding paragraph (k)(1) of Rule 902, any trust of which any professional fiduciary acting as trustee is a U.S. person shall not be deemed a U.S. person if a trustee who is not a U.S. person has sole or shared investment discretion with respect to the trust assets, and no beneficiary of the trust (and no settlor if the trust is revocable) is a U.S. person.

(E)      Notwithstanding paragraph (k)(1) of Rule 902, an employee benefit plan established and administered in accordance with the law of a country other than the United States and customary practices and documentation of such country shall not be deemed a U.S. person.

(F)      Notwithstanding paragraph (o)(1) of Rule 902, any agency or branch of a U.S. person located outside the United States shall not be deemed a "U.S. person" if:

      (i)      The agency or branch operates for valid business reasons; and

      (ii)      The agency or branch is engaged in the business of insurance or banking and is subject to substantive insurance or banking regulation, respectively, in the jurisdiction where located.

(G)      The International Monetary Fund, the International Bank for Reconstruction and Development, the Inter-American Development Bank, the Asian Development Bank, the African Development Bank, the United Nations, and their agencies, affiliates and pension plans, any other similar international organizations, their agencies, affiliates and pension plans shall not be deemed "U.S. persons".

(c)      <u>United States</u>.  "United States" means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia.

**<u>Exhibit B</u>**

**Debtors' Communication with Mr. Anusic**

| | |
|---|---|
| **From:** | Latona, Dan |
| **To:** | Tom Anusic; Wirtz, Alison; Koenig, Chris |
| **Cc:** | Colodny, Aaron |
| **Subject:** | RE: FW: CLUG and OTC Adhoc |
| **Date:** | Saturday, June 3, 2023 12:41:00 PM |
| **Attachments:** | EAS |

I'm adding Aaron back to the chain and removing Tom D.

Tom,

We reviewed the transaction history with respect to your liquidated loan. Based on that review and the borrow terms and conditions, your loan was properly liquidated at 100% LTV on 5/11/22. Accordingly, we do not believe there is a contractual basis for your liquidated loan claim.

We understand your situation and empathize, but we have a number of challenges and concerns regarding your proposal, both legal and practical, and aren't in a position to incorporate into the plan. Most importantly, the Debtors do not have enough cryptocurrency to repay all creditors in full.

We encourage you to seek counsel familiar with the chapter 11 process to discuss your situation.

Thanks.

**Dan Latona**

-----------------------------------------------------
**KIRKLAND &amp; ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 3445
**F** +1 312 862 2200
-----------------------------------------------------

dan.latona@kirkland.com

**From:** Tom Anusic ███████████████████ ;
**Sent:** Friday, June 2, 2023 10:21 PM
**To:** █████████████ ; Wirtz, Alison &lt;alison.wirtz@kirkland.com&gt;; Koenig, Chris &lt;chris.koenig@kirkland.com&gt;; Latona, Dan &lt;dan.latona@kirkland.com&gt;
**Subject:** FW: FW: CLUG and OTC Adhoc
**Importance:** High

**This message is from an EXTERNAL SENDER**
Be cautious, particularly with links and attachments.

Also why I agree returning CEL is probably not feasible, working out the "damages" absolutely is. We could have a brief cut-off date for everyone who wants to claim CEL losses (Proving their OTC reg s form or their trades in Uniswap/liquid etc) excluding user interest paid, insiders, staff, traders.

As mentioned below there is potential $40m USD in OTC which we can **clawback** (Our group alone only has a total of $5m in damages for CEL liquidations which might not seem like much but represents **the entire life savings of a group of people**) the leftover $35m clawed back and us forfeiting our rights to sue for Fraud could be a net positive for earn getting MORE money retrieved than the tiny amount of dilution to allow CEL liquidated holders who opt in to be settled.

It's simple not fair for us to pay off our loans twice, or those who were 100% wiped receive nothing as we also sent our USDT to Celsius just like an earn depositor.

**From:** Colodny, Aaron &lt;aaron.colodny@whitecase.com&gt;
**Sent:** Saturday, 3 June 2023 4:18 AM
**To:** Cam Crews ████████████████████ ;; Tom Anusic ████████████████████ ;
**Cc:** Latona, Dan &lt;dan.latona@kirkland.com&gt;
**Subject:** RE: FW: CLUG and OTC Adhoc

Hi Cam,

I am copying Dan from K&amp;E so that he is aware of your comments and my response.  Based on my conversations with the Debtors, I understand that they cannot (and will not) distribute CEL token as part of the plan or otherwise.

I am happy to discuss the plan and case with you if you would like to set up a time next week.

- Aaron

**Aaron Colodny**  | Partner
**T**  +1 213 620 7706   **M**  +1 412 860 5095
**Short Dial** *8 014 7706

**From:** Cam Crews ████████████████████ ;

**Sent:** Wednesday, May 31, 2023 11:31 PM
**To:** Tom Anusic █████████████████████████;
**Cc:** Colodny, Aaron &lt;aaron.colodny@whitecase.com&gt;;
**Subject:** Re: FW: CLUG and OTC Adhoc

Hi Aaron,

I agree with Tom it would be far more fair to distribute compensation using platform cost basis for CEL, which steers the majority of recoveries towards real victims rather than beneficiaries of fraud. A proper solution should recognize CEL token was used to both defraud and unjustly enrich.

One mechanism to go about this could be to compel abandonment of CEL token by the estate. All holders can get their CEL tokens back 1:1 plus damages distributed amongst them based upon their cost basis. Using damages rather than a 7/13/22 balance snapshot also potentially opens the door to help those with liquidated CEL-backed loans who would otherwise stand to receive nothing for the CEL that has been deducted from their collateral.

Prior to the in-kind distribution, all creditors can be provided the option of converting their other claims into CEL at 20¢ (or really whatever price) which would finally provide a path to monetize the CEL reserves for the benefit of creditors. Anyone who refuses the opportunity to acquire CEL at 20¢ can't credibly argue it's worth more.

The conversion facility would provide all account holders equal access to liquid CEL. And if the offer were somehow fully subscribed, it would capture tens of millions of dollars of value for other account holders who would then get a larger share of the remaining assets through the discharge of the liabilities of customers who had opted in. Any remaining CEL tokens can then be sent to the null address, which &quot;burns&quot; them.

We know many of the funds used for CEL price manipulation came directly from CEL OTC buyers with the majority of proceeds from these sales being used to buy back CEL in the market (the &quot;OTC flywheel&quot; identified by the examiner).  In April 2022, when Dean Tappen informed Chris Ferraro over Slack that the top 5-6 employees were cashing out $40M of CEL using the OTC desk; the committee should ask itself who was effectively on the other side of those OTC trades?

Employees granted themselves $85.5M in CEL bonuses (weighted towards senior management) when the token held $1.5, $3, and $5 price levels.  Every cent of those employee CEL bonuses should be clawed back because the token only reached those price targets due to Celsius's fraudulent manipulation of the CEL price. CEL OTC buyers should participate in these particular recoveries proportional to the extent CEL OTC proceeds were misused by Celsius for this manipulation.

Cheers,

Cam

------- Original Message -------
On Wednesday, May 31st, 2023 at 11:20 PM, Tom Anusic ████████████████████████████;
wrote:
Hi Aaron,

I don't know how to articulate our story in the most simple form, however have attached a

document we sent to Whitecase a long time ago.

Also a recent email to Greg below.

The level of emotional devastation is so high it can't be put in words, some members lost their house, others their life savings, and we were all victims of listening to Alex and Co and dozens of breaches and no communication which if the company had replied, not automatically sucked extra collateral without permission or enabled the promised swaps feature for those of us who didn't have USDT accessible in our markets would have avoided the losses.

I understand the committee is concerned with all creditors and cautious about diluting the pie, But if we could get approval for equity/dollarized entry price of loss or forgiveness of loans that were taken out for OTC purchases of CEL this would put us on an even playing field for the re-org. Some guys lost everything.. they don't have any earn claim left or any collateral after the liquidation.

You mentioned that we bore the risk of buying CEL, did depositors not also bear the risk of depositing? EARN Creditors will at least be getting a significant portion of their initial investment back, How does been defrauded in a case like this disqualify CEL liquated losses not getting a pay out as well? I don't understand that logic. It seems unfair and quite frankly extremely cruel.

We are all in this together and if the situation was reversed, I would be glad to give up a tiny percent of my equity payout for the most harmed victims of CEL who were absolutely destroyed. You said you will be chasing Harumi, Alex, Daniel etc for the benefit of EARN creditors – why can't it also be for the benefit of us? A lot of the Fraud happened to specifically pump the OTC desk. I think it's fair and reasonable for CEL liquidated or OTC sales to have an option to opt-in to an earn claim for our losses as well and we can help with evidence.

Please request this from the committee I've also posted an attachment with our losses one of our NZ victims wrote up.

Cheers

Tom

**From:** Tom Anusic
**Sent:** Tuesday, 21 March 2023 10:39 AM
**To:** Pesce, Gregory &lt;gregory.pesce@whitecase.com&gt;
**Subject:** CLUG and OTC Adhoc

Hi Greg,

Thank you so much for taking the call with us, if you could kindly get back to us soon.

Just to summarize:

- Claim forms already filed for OTC and CEL Liquidated losses (By weighted average loss)
- Seeking acceptance of Claims and the option to have losses setoff against existing loans, returned in full, or dollarized amounts added to earn claims
- OTC purchases were never received (USDT/C should be returned in full with one of the options above) Cam articulated this to you quite clearly

Not approving the losses will substantially harm our group far higher than others (especially if petition date is used) as we could effectively get zero back in many cases and were the highest defrauded group in the bankruptcy. (We are also earn and loan holders and wanted to be treated the same)

We feel our position is sound, and ask is fair and reasonable. It's a small group who suffered the most and won't effect the overall payments to everyone (4.5m is tiny in the scheme of things) but will dramatically harm our families lives who have lost

Attachments:
    image001.gif (7091 Bytes)