Johan Bronge

*Pro Se*

2023-10-15

**United States Bankruptcy Court Southern District of New York**

Re: Chapter 11 Case No. [22-10964 (MG)]

Exhibit list

Johan Bronge submits the following updated list of exhibits upon which he may rely at the hearing, reserving the right to identify additional exhibits, including but not limited to rebuttal and impeachment exhibits, prior to the conclusion of the hearing.

Updated Exhibit list:

| Exhibit No. | Document Description | Mark | Offer | Obj | Admit | W/D | Dkt. |
|---|---|---|---|---|---|---|---|
| 1 | DECLARATION OF ALEX MASHINSKY, CHIEF EXECUTIVE OFFICER OF CELSIUS NETWORK LLC, PROVIDING TERMS OF USE DATING BACK TO FEBRUARY 18, 2018 (pages 1-13, remaining pages are in Debtor's list of exhibits, Celsius Ex 3 38) | | | | | | 393 |
| 2 | DEBTORS' MOTION SEEKING ENTRY OF AN ORDER (I) AUTHORIZING (A) THE TRANSFER OF CRYPTOCURRENCY ASSETS SERVING AS COLLATERAL ON ACCOUNT OF INSTITUTIONAL LOANS IN THE ORDINARY COURSE OF BUSINESS AND (B) THE EXERCISE OF THE DEBTORS' RIGHTS AND REMEDIES PROVIDED UNDER EACH MASTER LENDING AGREEMENT AND (II) GRANTING RELATED RELIEF | | | | | | 1818 |
| 3 | NOTICE OF CONSENSUAL RESOLUTIONS OF GOVERNMENT INVESTIGATIONS | | | | | | 3293 |
| 4 | ASSETS BY COIN TYPE | | | | | | 3343 |
| 5 | NOTICE OF FILING OF REVISED TABLE OF AUTHORITIES OF THE DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES | | | | | | 3609 |
| 6 | Johan Bronge's response to Debtor's MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES | | | | | | 3641 |
| 7 | PEOPLE VS. MASHINSKY INDEX NO. 450040/2023 DECISION AUG 4/2023, 2023 N.Y SLIP OP.50826 N.Y. SUP CT 2023 | | | | | | https://casetext.com/case/people-v-mashinsky |
| 8 | COMPLAINT FOR DECLARATORY JUDGMENT | | | | | | 2001 |
| 9 | OBJECTION TO MOTION DISCLOSURE STATEMENT FILED BY EDUARDO J. GLAS ON BEHALF OF GREGORY KIESER | | | | | | 3154 |
| 10 | SEC STATEMENT OF FACTS | | | | | | https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-133.pdf |

Creditor is producing copies of the Exhibits to the Debtors and the UCC.

The Debtors also request that judicial notice be taken of the following:

*Final report of Shoba Pillay, examiner, docket 1956*

Johan Bronge reserve the right to request that judicial notice be taken of additional docket entries as necessary.

Sincerely,

Johan Bronge

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |
| | **Re Docket No:  301** |

**DECLARATION OF ALEX MASHINSKY,**
**CHIEF EXECUTIVE OFFICER OF CELSIUS NETWORK LLC,**
**PROVIDING TERMS OF USE DATING BACK TO FEBRUARY 18, 2018**

I, Alex Mashinsky, Chief Executive Officer of Celsius Network LLC (together with the

above captioned debtors and debtors in possession, the "Debtors"), and certain of its Debtor and

non-Debtor affiliates (collectively, with the Debtors, "Celsius"), hereby declare under penalty of

perjury:

1.     I am generally familiar with the Debtors' day-to-day operations, business and

financial affairs, and books and records.  Except as otherwise indicated, all facts in this declaration

(this "Declaration") are based upon my discussions with other members of Celsius' management

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030.

team and advisors, and my review of relevant documents and information concerning Celsius'
terms of use that were provided to me in connection with this Declaration.  While I am generally
familiar with Celsius' terms and conditions and Terms of Use (as defined herein), I do not have
independent knowledge regarding when the exhibits attached hereto were published or provided
to customers or how the terms and conditions for each product differ from each other.  Based on
the good faith efforts of employees of the Debtors across several functional offices to provide a
comprehensive response to the Court, attached hereto are the copies of Celsius' "terms of use" that
the Debtors have been able to compile.  The Debtors' employees are continuing to review the
Debtors' records and documents to ensure that the Court is provided with as complete and
comprehensive a record as reasonably possible based on the good faith efforts of the Debtors'
employees.  To the extent that any other copies of the Debtors' "terms of use" not attached hereto
are discovered, the Debtors will file a supplemental declaration.[2]  I am over the age of 18 and
authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could
and would testify competently to the facts set forth in this declaration.

2.      On August 1, 2022, the Honorable Martin Glenn, Chief United States Bankruptcy
Judge for the United States Bankruptcy Court for the Southern District of New York (the "Court"),
entered the *Order that Debtors File Terms of Use* [Docket No. 301] (the "Terms of Use Order")

> direct[ing] that, on or before August 8, 2022, Debtors' counsel shall
> file a pleading on ECF attaching as exhibits each version of the
> Debtors' Terms of Use that have been in effect since February 1,
> 2018.  Please indicate the time period that each version of the Terms
> of Use was in effect and whether the Debtors provided its customers
> and counter parties with a copy of each new version of the Terms of
> Use when changes were made.

---

[2]     Other draft versions of the Terms of Use may be in existence.  For the avoidance of doubt, to the extent employees
of the Debtors could not verify that such drafts were published and in effect, those drafts are not included in this
Declaration.

3.     Celsius offered a number of different products on its platform, the majority of which had its own Terms of Use (as defined herein).  While it appears to me that the Court was asking only about those Terms of Use that were referenced in paragraph 5 of the *Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 23] dated July 14, 2022 in the Terms of Use Order, this Declaration describes the Terms of Use that have been in effect across a number of products since Celsius was formed to be as complete as reasonably possible under the circumstances.

4.     I am aware that between February 1, 2018, through April 14, 2022, the Debtors adopted various terms governing the use of the Debtors' platform (collectively, the "Terms of Use").  I have been informed that these Terms of Use cover the following categories: (a) the general Terms of Use (the "General Terms of Use") governing any use of the Debtors' platform, the various versions of which are outlined below and attached hereto as **Exhibits A-1– 8**; (b) the Celsius Loan Terms and Conditions (the "Loan Terms of Use"), which govern Celsius' retail lending programs for users outside the United Kingdom, the various versions of which are outlined below and attached hereto as **Exhibits B-1–9**; (c) the Celsius Sale and Repurchase Terms and Conditions (the "SAR Terms of Use"), which govern Celsius' sales and repurchase programs for users located in the United Kingdom, the various versions of which are outlined below and attached hereto as **Exhibits C-1–3**; (d) the Earn in CEL Terms of Use (the "Earn in CEL Terms of Use"), which govern Debtors' program rewarding users for entering into loans with CEL Tokens, the version of which is outlined below and attached hereto as **Exhibit D**; (e) the ACH Payment Terms of Use (the "ACH Payment Terms of Use"), which govern customers' use of Debtors' ACH payment service, the version of which is outlined below and attached hereto as **Exhibit E**; (f) the SWAP Beta Terms of Use (the "SWAP Payment Terms of Use"), which govern

customers' use of the Debtors' SWAP service, the various versions of which are outlined below and attached hereto as **Exhibit F**; and (g) the Celsius General Promo Terms and Conditions (the "Promo Terms of Use"), which governed the various promotional offers, referral, and other bonuses offered by the Debtors, the version of which is outlined below and attached hereto as **Exhibit G**.

5.     Several of the Terms of Use reference:  (a) the Celsius Privacy Policy (the "Privacy Policy"), which outlines the Debtors' practices with respect to collecting, using, and disclosing customer information; and (b) the Celsius Risk Disclosure (the "Risk Disclosure"), which outlines the risks involved in holding, trading, and using digital assets generally, as well as the use of the services offered by the Debtors.  For the Court's reference, the current versions of the Privacy Policy and Risk Disclosure are attached hereto as **Exhibits H** and **I**, respectively.

**A.    The General Terms of Use**

6.     Attached hereto as **Exhibit A-1** is a copy of the Terms of Service in effect from on or around February 1, 2018 to March 4, 2020 (the "Terms of Use Version 1").[3]

7.     Attached hereto as **Exhibit A-2** is a copy of the Celsius Network Terms of Use in effect from on or around March 5, 2020 to May 4, 2020 (the "Terms of Use Version 2").

8.     Attached hereto as **Exhibit A-3** is a copy of the Celsius Network Terms of Use in effect from on or around May 5, 2020 to June 14, 2020 (the "Terms of Use Version 3").

9.     Attached hereto as **Exhibit A-4** is a copy of the Celsius Network Terms of Use in effect from on or around June 15, 2020 to September 29, 2020 (the "Terms of Use Version 4").

---

[3]    On February 16, 2018, a Terms of Use was published specifically governing users' general use and access to the Debtors' website (the "Website Terms of Use").  The Website Terms of Use are attached hereto as **Exhibit J**. The Website Terms of Use were replaced by the Terms of Use Version 2 (defined herein) when they went effective.

Changes to the Terms of Use Version 4 were implemented primarily to include New York and Washington as states in which Celsius accounts were available.

10.     Attached hereto as **Exhibit A-5** is a copy of the Terms of Use in effect from on or around September 30, 2020 to July 21, 2021 (the "Terms of Use Version 5").

11.     Attached hereto as **Exhibit A-6** is a copy of the Terms of Use in effect from on or around July 22, 2021 to August 2, 2021 (the "Terms of Use Version 6").  The Terms of Use Version 6 were implemented in response to, among other things, significant changes that were made as a result of a change of the legal entity where the majority of Debtors' cryptocurrencies were held—moving those cryptocurrencies from being held by Celsius Network Limited in the United Kingdom to being held by Celsius Network LLC in the United States.  Existing customers and counter parties were advised of the updated Terms of Use Version 6 via email on the date the Terms of Use Version 6 went into effect.[4]

12.     Attached hereto as **Exhibit A-7** is a copy of the Terms of Use in effect from on or around August 3, 2021 to April 13, 2022 (the "Terms of Use Version 7").  The Terms of Use Version 7 essentially corrected typographical errors in the Terms of Use Version 7.

13.     Attached hereto as **Exhibit A-8** is a copy of the Terms of Use in effect from on or around April 14, 2022 to date (the "Terms of Use Version 8").  The Terms of Use Version 8 were implemented in response to, among other things, significant changes in the services offered to customers in the United States, including the Custody Service.  New customers and counter parties in the United States were advised of the Terms of Use Version 8 via email on the date the Terms of Use Version 8 went into effect and were requested to consent to the Terms of Use Version 8 prior to using the Debtors' platform.[5]

---

[4]     An example email has been attached hereto as **Exhibit K**.
[5]     An example email has been attached hereto as **Exhibit L**.

14.     In addition to the specific above-stated notifications, Celsius typically advised existing users of updates to the Terms of Use via email and other official Celsius channels, such as its blog.  All new customers were required to view, agree to, and accept Celsius' then effective Terms of Use at the time of account creation.  In addition, when the General Terms of Use were published, Celsius often sent push notifications to existing users, who were prompted to review, agree to, and accept the updated General Terms of Use before accessing their existing accounts.

**B.      The Loan Terms of Use**

15.     Attached hereto as **Exhibit B-1** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Network Limited to retail borrowers that participated in the Celsius Loan program (the "Borrow Program") in effect from on or around October 17, 2019 to January 14, 2020 (the "Loan Terms of Use Version 1").  The Loan Terms of Use Version 1 was not applicable to Celsius users, generally.  Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 1.  The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

16.     Attached hereto as **Exhibit B-2** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around January 15, 2020 to January 16, 2020 (the "Loan Terms of Use Version 2").  The Loan Terms of Use Version 2 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 2.  The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

6

17.     Attached hereto as **Exhibit B-3** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around January 16, 2020 to January 16, 2020 (the "<u>Loan Terms of Use Version 3</u>"). The Loan Terms of Use Version 3 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 3. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

18.     Attached hereto as **Exhibit B-4** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around January 16, 2020 to May 4, 2020 (the "<u>Loan Terms of Use Version 4</u>"). The Loan Terms of Use Version 4 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 4. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

19.     Attached hereto as **Exhibit B-5** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around May 5, 2020 to May 5, 2020 (the "<u>Loan Terms of Use Version 5</u>"). The Loan Terms of Use Version 5 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 5. The

user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

20.     Attached hereto as **Exhibit B-6** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around May 5, 2020 to December 7, 2020 (the "Loan Terms of Use Version 6"). The Loan Terms of Use Version 6 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 6. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

21.     Attached hereto as **Exhibit B-7** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around December 8, 2020 to June 26, 2021 (the "Loan Terms of Use Version 7"). The Loan Terms of Use Version 7 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view, agree to, and affirmatively accept the then effective Loan Terms of Use Version 7. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

22.     Attached hereto as **Exhibit B-8** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Lending LLC to retail borrowers that participated the Borrow Program in effect from on or around June 27, 2021 to October 18, 2021 (the "Loan Terms of Use Version 8"). The Loan Terms of Use Version 8 was not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower was required to view,

agree to, and affirmatively accept the then effective Loan Terms of Use Version 8. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.

23.    Attached hereto as **Exhibit B-9** is a copy of the Celsius Loan Terms and Conditions provided by Celsius Lending LLC to retail borrowers that participated in the Borrow Program in effect from on or around October 19, 2021 to date (the "Loan Terms of Use Version 9"). The Loan Terms of Use Version 9 is not applicable to Celsius users, generally. Rather, to conclude a loan application under the Borrow Program, a user-borrower is required to view, agree to, and affirmatively accept the Loan Terms of Use Version 9. The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of application process for the subject loan.

## C.    The SAR Terms of Use

24.    Attached hereto as **Exhibit C-1** is a copy of the Celsius Sale And Repurchase Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers in the United Kingdom that participated in the Borrow Program in effect from on or around December 10, 2020 to December 22, 2020 (the "SAR Terms of Use Version 1"). The SAR Terms of Use Version 1 was not applicable to Celsius users, generally. Rather, to conclude a sale and repurchase application under the Borrow Program, a user-seller in the United Kingdom was required to view, agree to, and affirmatively accept the then effective SAR Terms of Use Version 1. The user-seller's sale and repurchase arrangement was governed by the version of the Celsius Sale And Repurchase Terms and Conditions agreed to at the conclusion of the application process for the subject sale and repurchase arrangement.

25.    Attached hereto as **Exhibit C-2** is a copy of the Celsius Sale And Repurchase Terms and Conditions provided by Celsius Networks Lending LLC to retail borrowers in the

United Kingdom that participated in the Borrow Program in effect from on or around December 23, 2020 to October 27, 2021 (the "SAR Terms of Use Version 2"). The SAR Terms of Use Version 2 was not applicable to Celsius users, generally. Rather, to conclude a sale and repurchase application under the Borrow Program, a user-seller in the United Kingdom was required to view, agree to, and affirmatively accept the then effective SAR Terms of Use Version 2. The user-seller's sale and repurchase arrangement was governed by the version of the Celsius Sale And Repurchase Terms and Conditions agreed to at the conclusion of the application process for the subject sale and repurchase arrangement.

26.     Attached hereto as **Exhibit C-3** is a copy of the Celsius Sale And Repurchase Terms and Conditions provided by Celsius Lending LLC retail borrowers in the United Kingdom that participated in the Borrow Program in effect from on or around October 28, 2021 to date (the "SAR Terms of Use Version 3"). The SAR Terms of Use Version 3 are not applicable to Celsius users, generally. Rather, to conclude a sale and repurchase application under the Borrow Program, a user-seller in the United Kingdom is required to view, agree to, and affirmatively accept the SAR Terms of Use Version 3. The user-seller's sale and repurchase arrangement was governed by the version of the Celsius Sale And Repurchase Terms and Conditions agreed to at the conclusion of the application process for the subject sale and repurchase arrangement.

**D.     The Earn in CEL Terms of Use**

27.     Attached hereto as **Exhibit D** is a copy of the Earn in CEL Terms of Use provided by Celsius Network LLC to users of the Earn in CEL program (the "Earn in CEL Program") in effect from on or around January 13, 2022 to date. The Earn in CEL Terms of Use were not applicable to Celsius users, generally. Rather, the Earn in CEL Terms of Use were applicable to only those customers and counter parties that qualified as accredited users and wanted to use the Earn in CEL Program for the first time on or after January 13, 2022. Prior to using the Earn in

10

CEL Program on or after January 13, 2022, new qualifying customers and counter parties were required to view, agree to, and affirmatively accept the Earn in CEL Terms of Use prior to using the Earn in CEL Program.

**E.    The ACH Payment Terms of Use**

28.    Attached hereto as **Exhibit E** is a copy of the ACH Payment Terms of Use provided by Celsius Network LLC to users of Debtors' ACH payment service (the "ACH Payment Service") in effect from on or around May 12, 2022 to date (the "ACH Payment Terms of Use").  The ACH Payment Terms of Use were not applicable to Celsius users, generally.  Rather, to utilize the ACH Payment Service, users were required to view, agree to, and affirmatively accept the then effective ACH Payment Terms of Use.[6]

**F.    The SWAP Beta Terms of Use**

29.    Attached hereto as **Exhibit F** is a copy of the SWAP Beta Terms of Use provided by Celsius Network LLC to users of the Debtors' SWAP Payment Program (the "SWAP Service") in effect from on or around October 21, 2021 to date.  New and existing customers and counter parties that sought to utilize the SWAP Service were required to view, agree to, and affirmatively accept the SWAP Beta Terms of Use prior to using the SWAP Service.

**G.    The Celsius General Promo Terms and Conditions**

30.    Attached hereto as **Exhibit G** is a copy of the current version of the Celsius General Promo Terms and Conditions (the "Promo Terms") provided by Celsius Network LLC and its affiliates to users seeking to utilize the various promotional offers, referral and other bonuses offered by the Debtors (the "Promos").  New and existing customers and counter parties that sought to obtain the Promos were subject to the Promo Terms.

---

[6]    A beta version of the ACH Payment Service went live on or around April 8, 2022.  A beta version of the ACH Payment Terms of Use was available prior to May 12, 2022.

**H.      The Privacy Policy**

31.      Attached hereto as **<u>Exhibit H</u>** is a copy of the Privacy Policy that is currently in effect.

**I.      The Risk Disclosure**

32.      Attached hereto as **<u>Exhibit I</u>** is a copy of the Risk Disclosure that is currently in effect.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  August 8, 2022

/s/ *Alex Mashinsky*
Name:  Alex Mashinsky
Title:    Chief Executive Officer
Celsius Network LLC

Hearing Date:  January 24, 2023 at 10:00 a.m. (prevailing Eastern Time)
Objection Date:  January 17, 2023 at 4:00 p.m. (prevailing Eastern Time)

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and*
*Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF HEARING ON**
**DEBTORS' MOTION SEEKING**
**ENTRY OF AN ORDER (I) AUTHORIZING**
**(A) THE TRANSFER OF CRYPTOCURRENCY**
**ASSETS SERVING AS COLLATERAL ON ACCOUNT**
**OF INSTITUTIONAL LOANS IN THE ORDINARY COURSE**
**OF BUSINESS AND (B) THE EXERCISE OF THE DEBTORS'**
**RIGHTS AND REMEDIES PROVIDED UNDER EACH MASTER**
**LENDING AGREEMENT AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on the *Debtors' Motion Seeking Entry of an*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

*Order (I) Authorizing (A) the Transfer of Cryptocurrency Assets Serving as Collateral on Account*
*of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors'*
*Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related*
*Relief* (the "Motion") will be held on **January 24, 2023, at 10:00 a.m., prevailing Eastern Time**
(the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.  In
accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted
remotely using Zoom for Government.  Parties wishing to appear at the Hearing, whether making
a "live" or "listen only" appearance before the Court, need to make an electronic appearance
(an "eCourtAppearance") through the Court's website at https://ecf.nysb.uscourts.gov/cgi-
bin/nysbAppearances.pl.  Electronic appearances (eCourtAppearances) need to be made by
**4:00 p.m., prevailing Eastern Time, the business day before the hearing (i.e., on January 23,**
**2023)**.

 **PLEASE TAKE FURTHER NOTICE** that due to the large number of expected
participants in the Hearing and the Court's security requirements for participating in a Zoom for
Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m.,
prevailing Eastern Time on January 24, 2023 must connect to the Hearing beginning at 9:00 a.m.,
prevailing Eastern Time on January 24, 2023. When parties sign in to Zoom for Government and
add their names, they must type in the first and last name that will be used to identify them at the
Hearing.  Parties that type in only their first name, a nickname or initials will not be admitted into
the Hearing.  When seeking to connect for either audio or video participation in a Zoom for
Government Hearing, you will first enter a "Waiting Room," in the order in which you seek to
connect.  Court personnel will admit each person to the Hearing from the Waiting Room after
confirming the person's name (and telephone number, if a telephone is used to connect) with their

2

eCourtAppearance.  Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov; and (d) be served in accordance with the *Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief,* [Docket No. 1181] (the "Case Management Order") by **January 17, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

PLEASE TAKE FURTHER NOTICE that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings

3

filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in

accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

4

New York, New York
Dated: January 3, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jsussberg@kirkland.com

    - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Initial Debtors and*
*Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and*
*Debtors in Possession*

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Initial Debtors and*
*Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### DEBTORS' MOTION SEEKING
### ENTRY OF AN ORDER (I) AUTHORIZING
### (A) THE TRANSFER OF CRYPTOCURRENCY
### ASSETS SERVING AS COLLATERAL ON ACCOUNT
### OF INSTITUTIONAL LOANS IN THE ORDINARY COURSE
### OF BUSINESS AND (B) THE EXERCISE OF THE DEBTORS'
### RIGHTS AND REMEDIES PROVIDED UNDER EACH MASTER
### LENDING AGREEMENT AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state

the following in support of this motion (this "Motion"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

## Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"):  (a) authorizing the Debtors to, consistent with past practice and in the

ordinary course of business, (i) transfer cryptocurrency assets serving as collateral on account of

loans to institutional customers upon repayment of each loan, (ii) exercise their rights provided

under each Master Lending Agreement (each a "MLA") to apply cryptocurrency assets serving as

collateral on account of institutional loans at the prevailing market price to the balance of such

outstanding loans, including principal and any accrued interest, or, in the alternative, to sell such

collateral and retain the proceeds, and close out such loans, (iii) exercise other rights and remedies

provided for under the MLAs, including, but not limited to, netting, setoff, and amending terms

through the mutual assent of the parties, and (iv) engage in other ordinary course of business

transactions necessary to manage the Debtors' lending positions, including, but not limited to,

entry into workout agreements and acceptance of partial repayment in the form of digital assets,

cash, or equity; and (b) granting related relief.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York

(the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Amended Standing Order of Reference* from the United States District Court for the Southern

District of New York, entered February 1, 2012. The Debtors confirm their consent to the Court

entering a final order in connection with this Motion to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 363(c)(1), 541, 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), rules 6003(b), 6004(a), and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 9013-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

## Background

5.      The Debtors, together with their non-Debtor affiliates (collectively, "Celsius"), are one of the largest and most sophisticated cryptocurrency-based finance platforms in the world and provide financial services to institutional, corporate, and retail clients across more than 100 countries.  Celsius was created in 2017 to be one of the first cryptocurrency platforms to which users could transfer their crypto assets and (a) earn rewards on crypto assets and/or (b) take loans using those transferred crypto assets as collateral.  Headquartered in Hoboken, New Jersey, Celsius has more than 1.7 million registered users and approximately 300,000 active users with account balances greater than $100.

6.      On July 13, 2022 (the "Petition Date"), each of the Initial Debtors[2] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22].  The Initial Debtors commenced these chapter 11 cases to provide Celsius an opportunity to stabilize its business and consummate a comprehensive restructuring transaction that maximizes value for stakeholders.

---

[2]    The "Initial Debtors" include, collectively: Celsius Network LLC, Celsius KeyFi LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius Network Inc., Celsius Network Limited, Celsius Networks Lending LLC, and Celsius US Holding LLC.

7.      On December 7, 2022, each of the GK8 Debtors[3] filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description of the facts and circumstances of the chapter 11 cases of the GK8 Debtors is set forth in the *Declaration of Christopher Ferraro, Director and Chief Financial Officer of the GK8 Ltd., in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 1629].

8.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53, 1648]. On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors for the Initial Debtors [Docket No. 241] (the "Committee"). On September 29, 2022, the Court entered an order appointing an examiner for the Initial Debtors [Docket No. 923].

## Institutional Lending Program

9.      Prior to the Petition Date, Celsius engaged in bespoke lending and borrowing relationships with institutional clients arranged on an "over the counter," or "OTC," basis and governed by master loan agreements and term sheets setting forth the detailed terms of any specific transaction. In exchange for furnishing the loan, institutional customers provided Celsius with various forms of cryptocurrency assets as collateral for each transaction. Upon the repayment in full of each loan, these assets would then be returned to the customer. In the months prior to the Petition Date, the Debtors closed out the majority of their institutional loan portfolio, reducing total outstanding loan obligations by more than $800 million and the total number of outstanding

---

[3]      The "GK8 Debtors" include, collectively: GK8 Ltd., GK8 UK Limited, and GK8 USA LLC.

loans by more than two hundred.  As of the date hereof, the Debtors have approximately fourteen institutional borrowers with approximately $115 million of aggregate outstanding obligations collateralized by approximately $16 million in cryptocurrency assets.  In light of recent events in the cryptocurrency industry, the Debtors have determined, as an exercise of their reasonable business judgment, that they require the flexibility to take all actions necessary to maximize the value of their institutional loan portfolio.  For clarity, the Debtors request such relief only with respect to their institutional loan portfolio; retail loans provided to Borrow program customers will be unaffected.

### Basis for Relief

10.    The relief requested in this Motion relates solely to the ordinary course conduct of the Debtors' business within the meaning of section 363(c)(1) of the Bankruptcy Code.  Pursuant to the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] (the "Final Cash Management Order"), institutional customers may transfer cryptocurrency assets to the Debtors in repayment of loans issued prior to the Petition Date.  Final Cash Management Order ¶ 5.  The Debtors, however, are not permitted to transfer any cryptocurrency assets to a loan counterparty or otherwise allow "the buying, selling, trading, or withdrawal of Cryptocurrency" in connection with the institutional lending program absent further order of the Court.  *Id.* ¶¶ 5, 6.

11.    The Final Cash Management Order does not, however, bar the Debtors' exercise of their rights under the MLAs to conduct margin calls with respect to institutional loans, to request repayment of matured amounts due under such loans, or to declare counterparties in default if they

5

fail to comply with those demands. The exercise of these rights will not be meaningful unless the Debtors can take action to enforce them. Thus, the Debtors seek entry of an order authorizing the Debtors to exercise their rights under the MLAs, including upon full repayment, to release the cryptocurrency serving as collateral on account of each outstanding institutional loan to which it is a party, to close out the loans and offset the value of collateral against the outstanding balance of such loans, or, in the alternative, to sell such collateral and retain the proceeds, and to utilize any other remedies available to them under the MLAs, including, but not limited to, netting, setoff, and acceptance of partial repayment. At this time, the Debtors are planning only to take such action with respect to undercollateralized institutional loans as necessary to protect estate property, but seek authority to take action as requested herein in order to proactively manage the institutional loan book and protect this estate property on a go-forward basis. Recent events in the cryptocurrency industry underscore the Debtors' need to be proactive, not reactive. The Debtors' exercise of these rights, consistent with prepetition practice, fits squarely within the meaning of ordinary course conduct.

I.    **The Debtors Exercise of Their Rights and Remedies as Provided Under Each MLA Should Be Authorized in Accordance with Section 363(c)(1) of the Bankruptcy Code.**

12.    Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business providing, in relevant part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

13.    As a threshold matter, the Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Under the majority of

6

the MLAs, title to any cryptocurrency assets serving as collateral on account of institutional loans was transferred to the Debtors prepetition and therefore constitutes property of the Debtors' estates in accordance with section 541(a) of the Bankruptcy Code.[4]

14.      Section 363 of the Bankruptcy Code is designed to strike a balance between allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets. *See In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). Accordingly, a debtor in possession may use, sell, or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. *See Lavigne*, 114 F.3d at 384; *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796–97 (Bankr. D. Del. 2007) ("Thus, whether notice and a hearing are required depends on whether a transaction is 'in the ordinary course of business.'"); *In re Chernicky Coal Co.*, 67 B.R. 828, 834 (Bankr. W.D. Penn. 1986) (holding that bankruptcy court approval was not required for a transaction in which the debtor "did nothing post-petition that it did not do pre-petition in the ordinary course of its regular business activities"). Stated differently, creditors are not given the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the [debtor's] chapter 11 status, not the particular transactions themselves." *See In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983). The ordinary course of business standard is intended to provide a debtor in possession with the flexibility required to run its business and quickly respond to changes in the business environment. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992).

---

[4]      In certain of the MLAs, the Debtors purported to grant a security interest in the collateral and the agreements are silent as to the transfer of title. The Debtors reserve all rights with respect to the transfer of title under the MLAs.

15.     To determine whether a transaction is in the ordinary course of business under section 363 of the Bankruptcy Code, courts in the Second Circuit apply a two-part test, the objective horizontal test and the subjective vertical test. *See, e.g.*, *Lavigne*, 114 F.3d at 384–85 (citing *Roth Am.*, 975 F.2d at 952-53). The horizontal test is a factual analysis that requires a determination as to whether the transaction in question is of the sort commonly undertaken by companies in the relevant industry. *See Lavigne*, 114 F.3d at 384–85. The vertical test is an analysis conducted from the perspective of a hypothetical creditor to determine whether the transaction subjects such creditor to a level of economic risk of a nature different from what it accepted when entered into a contract with the debtors. *Id*. In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to the debtor's postpetition conduct. *See, e.g.*, *Nellson Nutraceutical*, 369 B.R. at 797. Here, the Debtors' exercise of their rights and remedies under the MLAs to manage their institutional loan portfolio satisfies both the horizontal and vertical tests and is an exercise of their sound business judgment intended to maximize the value of their estates.

**A.    The Debtors Should Be Authorized to Transfer Cryptocurrency Assets Serving as Collateral on Account of Outstanding Institutional Loans to Each Respective Loan Counterparty.**

16.     The release of the cryptocurrency assets serving as collateral upon repayment of the Debtors' outstanding institutional loans satisfies both the horizontal test and vertical test. With respect to the horizontal test, the creation of a security interest in, or retention of, collateral is a fundamental component of all secured lending transactions. As part of that practice, a lender will typically release its security interest in, or otherwise return, the underlying collateral once a loan has matured and been paid off. Thus, it is reasonably expected that a cryptocurrency platform, such as the Debtors', which provides secured loans to customers would retain collateral in the form of digital assets to secure the provision of such loans. Therefore, the Debtors' ordinary course

8

practice of retaining and releasing cryptocurrency assets that serve as collateral to institutional loans satisfies the horizontal test. The vertical test is similarly satisfied because a hypothetical reasonable creditor would realize a depletion in its exposure to economic risk upon the return of the cryptocurrency assets serving as collateral to its outstanding institutional loan. In the alternative, if the status quo is maintained and the Debtors continue to hold the collateral, the loan counterparties would be exposed to economic risk given the tumultuous state of the cryptocurrency market.

**B.    The Debtors Should Be Authorized to Apply the Cryptocurrency Assets Serving as Collateral on Account of Each Outstanding Institutional Loan to the Balance of Such Loan.**

17.    A lender's ability to close out a secured loan and either apply the value of that collateral at the prevailing market price to the outstanding balance of that loan or to sell such collateral and retain the proceeds is the linchpin of a secured transaction. Thus, the exercise of this right in the event of a failure to repay the matured and presently payable amounts under a loan satisfies the horizontal test. With respect to the vertical test, the ability to apply the value of collateral against an outstanding loan balance is intended to ameliorate losses from the non-payment of loans. A hypothetical creditor would expect the Debtors to use such remedies to offset the potential loss accruing from uncollectible loans. Therefore, the Debtors' exercise of its rights to either apply cryptocurrency assets held as collateral to matured and payable amounts of principal and interest due under institutional loans, or to sell that collateral and retain the proceeds, and subsequently close out such loans, is appropriate under the vertical test.

**C.    The Debtors Should be Authorized to Engage in All Other Ordinary Course Transactions Necessary to Collect Amounts Outstanding From Institutional Loan Counterparties.**

18.    Utilizing workout agreements and acceptance of partial repayment by lenders are crucial means to compensate for actual and potential non-performance by lending counterparties.

Because these methods of reducing risk are frequently used by lenders in the Debtors' line of business, the Debtors' use of such methods satisfies the horizontal test. As for the vertical test, a hypothetical creditor would expect the Debtors to use any and all means to limit the losses from non-performing loans and collect the maximum amount possible from such counterparties. Therefore, the Debtors' use of methods including, but not limited to, entry into workout agreements and acceptance of partial repayment is appropriate under both the horizontal and vertical tests.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

19.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

20.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief

sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Motion Practice

21.    This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Local Rule 9013-1(a).

## Notice

22.    The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

23.    No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter the Order, granting the relief

requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated: January 3, 2023

/s/ Joshua A. Sussberg
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          jsussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          patrick.nash@kirkland.com
                ross.kwasteniet@kirkland.com
                chris.koenig@kirkland.com
                dan.latona@kirkland.com

*Counsel to the Initial Debtors and Debtors in Possession*

*Proposed Counsel to the GK8 Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|   |   |   |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER (I) AUTHORIZING
### (A) THE TRANSFER OF CRYPTOCURRENCY
### ASSETS SERVING AS COLLATERAL ON ACCOUNT
### OF INSTITUTIONAL LOANS IN THE ORDINARY COURSE
### OF BUSINESS AND (B) THE EXERCISE OF THE DEBTORS'
### RIGHTS AND REMEDIES PROVIDED UNDER EACH MASTER
### LENDING AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") seeking entry of an order (this "Order"), (a) authorizing the Debtors to, consistent with past practice and in the ordinary course of business, (i) transfer cryptocurrency assets serving as collateral on account of loans to institutional customers upon repayment of each loan, (ii) exercise their rights provided under each Master Lending Agreement (each a "MLA") to apply cryptocurrency assets serving as collateral on account of institutional loans at the prevailing market price to the balance of such outstanding loans, including principal and any accrued interest, or, in the alternative, to sell such collateral and retain the proceeds, and close out such loans, (iii) exercise other rights and remedies provided for under the MLAs, including, but not limited to,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

netting, setoff, and amendment of terms through the mutual assent of the parties and (iv) engage in other ordinary course of business transactions necessary to manage the Debtors' lending positions, including, but not limited to, entry into workout agreements and acceptance of partial repayment in the form of digital assets, cash, or equity and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these chapter 11 cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing (if any) before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing (if any) establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to transfer cryptocurrency assets serving as collateral on account of each outstanding institutional loan to the respective loan counterparty, whether currently held or

received in the future, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further notice and hearing.

3.    Notwithstanding section 552 of the Bankruptcy Code, upon exercise of the Debtors' preexisting rights to issue margin calls to each institutional loan to each loan counterparty and accept any related cryptocurrency assets transferred to satisfy such margin call, the transferred cryptocurrency assets shall be security for the applicable institutional loan.

4.    Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to apply any payments made by institutional loan counterparties to the balance of existing loans, including principal and any accrued interest, or, in the alternative, to sell such collateral and retain the proceeds, and close out such loans, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further notice and hearing.

5.    Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to exercise all other remedies available to them under the MLAs, including, but not limited to, netting, setoff, and amending terms through the mutual assent of the parties, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further notice and hearing; *provided* that the Debtors shall not enter into any agreement or amendment to an agreement with an institutional loan counterparty without Committee consent (email shall suffice).

6.    Pursuant to section 363(c)(1) of the Bankruptcy Code, the Debtors are authorized, but not directed, to engage in all other ordinary course of business transactions necessary to manage the institutional loan portfolio, including, but not limited to, entry into workout agreements and acceptance of partial payment in the form of digital assets, cash or equity, on a postpetition basis consistent with prepetition practices and in the ordinary course of business without further

notice or hearing; *provided* that the Debtors shall not enter into any agreement or amendment to an agreement with an institutional loan counterparty without Committee consent (email shall suffice).

7.      Notwithstanding anything to the contrary herein, any amounts received from loan counterparties in connection with the relief requested herein are subject to the applicable provisions of the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152] and any other order of the Court relating to the subject matter hereof.

8.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

9.      Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the validity of any particular claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy

Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens. Any payment made pursuant to this Order is not intended and should not be construed as an admission as the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

10.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or are otherwise deemed waived.

11.    Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

12.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

13.    The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

14.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**NOTICE OF CONSENSUAL RESOLUTIONS OF GOVERNMENT INVESTIGATIONS**

        **PLEASE TAKE NOTICE** that on July 13, 2023, the above-captioned debtors and debtors

in possession (collectively, the "Debtors") issued a press release [Docket No. 3016] (the "Press

Release") announcing consensual resolutions of the investigations of the United States Department

of Justice (the "DOJ"), the Securities and Exchange Commission (the "SEC"), the Federal Trade

Commission ("FTC"), and the United States Commodity Futures Trading Commission ("CFTC")

(collectively, the "Investigations").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius
Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks
Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8
USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors'
service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

PLEASE TAKE FURTHER NOTICE that the non-prosecution agreement entered between the Debtors and the DOJ is attached hereto as **Exhibit A** (the "DOJ Non-Prosecution Agreement").

PLEASE TAKE FURTHER NOTICE that the SEC's complaint against Celsius Network Limited is attached hereto as **Exhibit B-1**.[2]  The SEC and Celsius Network Limited have agreed to the entry of a consent order for the resolution of the SEC's action against the Debtors, which remains subject to approval in the SEC Case (the "SEC Consent Order").[3]  The proposed SEC Consent Order is attached hereto as **Exhibit B-2**.

PLEASE TAKE FURTHER NOTICE that the CFTC's complaint against Celsius Network LLC (the "CFTC Complaint") is attached hereto as **Exhibit C-1**.[4]  On July 17, 2023, a consent order for final judgment was entered in the CFTC Case [CFTC Case Docket No. 11], which is attached hereto as **Exhibit C-2**.

PLEASE TAKE FURTHER NOTICE that the FTC Complaint against certain of the Debtors is attached hereto as **Exhibit D-1**.[5]  The FTC and the Debtors have reached a settlement resolving the FTC's Action against the Debtors.  On July 26, 2023, the Debtors and the FTC filed the *Joint Stipulation and Agreed Order Between the Federal Trade Commission and the Debtors to Enter Into Stipulated Order in the District Court* [Docket No. 3095] (the "FTC Joint Stipulation

---

[2]    *SEC v. Celsius Network Ltd.*, No. 1:23-cv-6009 (PAC) (S.D.N.Y. July 13, 2023) (the "SEC Case").

[3]    The SEC Consent Order was attached as an exhibit to the *Plaintiff's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited* [SEC Docket No. 6].

[4]    *CFTC v. Celsius Network LLC*, No. 1:23-06008 (ER) (S.D.N.Y. July 13, 2023) (the "CFTC Case").

[5]    *FTC v. Celsius Network Inc.*, No. 1:23-cv-6009 (DLC) (S.D.N.Y. July 13, 2023) (the "FTC Case").

2

<u>and Agreed Order</u>") requesting the Bankruptcy Court's approval of the stipulated order.[6]  The FTC

Joint Stipulation and Agreed Order is attached hereto as **Exhibit D-2**.  Additionally, the FTC and

the Debtor defendants in the FTC Case filed a joint motion in the FTC Case to stay the FTC's

action against the Corporate Defendants pending the Bankruptcy Court's approval of the parties'

proposed consent order (the "<u>FTC Joint Motion</u>") [FTC Case Docket No. 3].[7]  The FTC Joint

Motion is attached hereto as **Exhibit D-3**.  On July 20, 2023, the FTC Joint Motion was granted

in the FTC Case [FTC Case Docket No. 18].  On August 14, 2023, the Bankruptcy Court approved

the Debtors' stipulated order with the FTC [Docket No. 3289].

**PLEASE TAKE FURTHER NOTICE** that copies of the DOJ Non-Prosecution

Agreement, the SEC Complaint, the SEC Consent Order, the CFTC Complaint, the CFTC Consent

Order, the FTC Complaint, the FTC Joint Motion, the FTC Joint Stipulation and Agreed Order,

the Press Release and all other pleadings filed in these chapter 11 cases may be obtained free of

charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain

copies of all pleadings filed in these chapter 11 cases by visiting the Court's website at

http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

---

[6]    Capitalized terms used but notherwise defined herein shall have the meanings acribed to them in the Joint Stipulation and Agreed Order.  The Stipulated Order is attached to the Joint Stipulation and Agreed Order as <u>Exhibit 1</u>.

[7]    The Corprorate Defendants include Debtors Celsius Network Inc., Celsius Network LLC, Celsius Network Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC and non-Debtors Celsius US LLC and Celsius Management Corp.

New York, New York
Dated: August 14, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:            joshua.sussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:            patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

**Exhibit A**

**DOJ Non-Prosecution Agreement**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 29, 2023

Asheesh Goel, Esq.
Mark Filip, Esq.
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

     **Re:**   **Celsius Network LLC**

Dear Counsel:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will not criminally prosecute Celsius Network LLC, Celsius Network Limited, and their affiliated entities listed as debtors in the Chapter 11 bankruptcy Case No. 22-10964 (MG) (together, "Celsius") for any crimes (except for criminal tax violations, as to which this Office cannot and does not make any agreement) related to a scheme to defraud investors in Celsius by (1) making false and misleading statements about the degree of risk to which those investors' funds were exposed through Celsius's yield-generating activities, and (2) manipulating the market price and volume of CEL to give investors the impression that CEL was more valuable and liquid than it actually was, during the period from approximately 2018 to June 2022. This conduct is described more fully in the Statement of Facts attached hereto as Exhibit A and incorporated herein by reference.

Moreover, if Celsius fully complies with the understandings specified in this agreement, no information provided by or on behalf of Celsius or any testimony given by any then-current employees at the request of this Office (or any other information directly or indirectly derived therefrom) will be used against Celsius in any criminal tax prosecution. This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to Celsius and not to any other identities or individuals except as set forth herein. Celsius expressly understands that the protections provided to Celsius by this agreement shall not apply to any successor entities, whether the successor's interest arises through a merger or plan of reorganization, unless and until such successor formally adopts and executes this Agreement. The protections arising from this Agreement will not apply to any purchasers of all or substantially all of the assets of Celsius, unless such purchaser enters into a written agreement, on terms acceptable to this Office, agreeing in substance to undertake all obligations set forth in the Continuing Obligation to Cooperate paragraphs.

2023.02.10

### Continuing Obligation to Cooperate

Celsius acknowledges and understands that the cooperation it has provided to date in connection with a criminal investigation by this Office, and its pledge of continuing cooperation, are important and material factors underlying this Office's decision to enter this Agreement. Specifically, Celsius acknowledges and understands that for a period of many months at the beginning of this Office's investigation, Celsius's cooperation was insufficient to earn credit based on the factors set forth in the Principles of Federal Prosecution of Business Organizations (Justice Manual § 9-28.000 *et seq*.). After this Office brought, among other things, Celsius's failure to make timely disclosure of relevant facts, including its slow pace of document production and non-production of relevant documents, to the attention of the Special Committee in or about February 2023, the Special Committee effected a change of counsel, and Celsius's cooperation dramatically improved.

It is understood that Celsius shall cooperate fully with this Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts until the date upon which all investigations and prosecutions arising out of such conduct are concluded. At the request of this Office, Celsius shall also cooperate fully with other United States law enforcement and regulatory authorities and agencies in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and any other conduct under investigation by this Office. Celsius's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine. It is further understood that Celsius shall commit no crimes whatsoever. Moreover, any assistance Celsius may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators.

### Acceptance of Responsibility

It is understood that Celsius accepts and acknowledges as true the facts set forth in the Statement of Facts attached as Exhibit A.

### Restitution and Remedial Obligations

Celsius acknowledges and understands that this Office will not impose a fine, nor seek forfeiture of Celsius's assets to provide for restitution of the victims of the fraud described in Exhibit A, in light of Celsius's remedial efforts to maximize recovery for victims in connection with the bankruptcy proceedings.

### Additional Obligations

It is understood that, should Celsius commit any crimes subsequent to the date of signing of this Agreement, or should it be determined that Celsius has given false, incomplete, or misleading testimony or information, or should Celsius otherwise violate any provision of this Agreement, Celsius shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. The running of the

2023.02.10

statute of limitations with respect to any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement shall be tolled from the date hereof until the aforementioned period of cooperation has expired. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any such prosecution that is not time-barred on the date that this Agreement is signed, to the extent set forth above.

It is understood that if it is determined that Celsius has committed any crime after signing this Agreement or has given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this Agreement; (a) all statements made by Celsius to this Office, the SEC, the CFTC, or other designated law enforcement agents, and any testimony given by any then current officer, agent or employee of Celsius before a grand jury or other tribunal; whether prior to or subsequent to the signing of this agreement, and any leads from such statements or testimony shall be admissible in evidence. in any criminal proceeding brought against Celsius; and (b) Celsius shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting or regulatory authority other than this Office. This Office will, however, bring the cooperation and remedial actions of Celsius to the attention of other prosecuting offices or regulatory authorities, if requested by Celsius.

This Agreement supersedes any prior understandings, promises, or conditions between this Office and Celsius. No additional understandings, promises, or conditions have been entered into

Page 4

other than those set forth in this Agreement, and none will be entered into unless in writing and
signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By: _____

Adam Hobson
Allison Nichols
Noah Solowiejczyk
Assistant United States Attorney
(212) 637-2366

APPROVED: _____

Daniel Gitner
Chief, Criminal Division

AGREED AND CONSENTED TO:

_____      _____
Christopher Ferraro                                          DATE
Interim Chief Executive Officer,
Chief Restructuring Officer, Chief
Financial Officer,
Celsius Network LLC

APPROVED:

_____      7-11-23
Asheesh Goel, Esq.                                          _____
Mark Filip, Esq.                                                   DATE
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
Attorneys for Celsius Network LLC

2023.02.10

Page 4

other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

By:    _____

Adam Hobson
Allison Nichols
Noah Solowiejczyk
Assistant United States Attorney
(212) 637-2366

APPROVED:

_____

Daniel Gitner
Chief, Criminal Division

AGREED AND CONSENTED TO:

_____          7-10-23
Christopher Ferraro                          DATE
Interim Chief Executive Officer,
Chief Restructuring Officer, Chief
Financial Officer,
Celsius Network LLC

APPROVED:

_____          _____
Asheesh Goel, Esq.                          DATE
Mark Filip, Esq.
Zachary Brez, Esq.
Robert Allen, Esq.
Allison Lullo, Esq.
Kirkland & Ellis LLP
Attorneys for Celsius Network LLC

2023.02.10

**Exhibit B-1**

**SEC Complaint**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** |  |
| **Plaintiff,** |  |
| **v.** | **Civil Action No.** 1:23-cv-6005 |
| **CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY,** | **Jury Trial Demanded** |
| **Defendants.** |  |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

### SUMMARY OF ACTION

1.      From March 2018 through June 2022, Defendants Celsius Network Limited ("Celsius") and its founder and CEO Alexander "Alex" Mashinsky ("Mashinsky") raised billions of dollars from investors through unregistered and fraudulent offers and sales of crypto asset securities.  Defendants falsely promised investors a safe investment with high returns through its "Earn Interest Program," they misled investors about the financial success of Celsius's business, and they fraudulently manipulated the price of Celsius's own crypto asset security—the so-called "CEL" token.  Defendants' scheme unraveled in June 2022, leaving investors unable to withdraw billions of dollars in crypto assets from Celsius's online platform.  Celsius filed for bankruptcy a month later, stating that the company's liabilities exceeded its assets by approximately $1.2 billion.

2.      Mashinsky founded Celsius in 2018.  The company claimed it was an alternative to traditional financial institutions and would provide investors who held crypto assets "financial freedom" and "economic opportunity."  Defendants promoted the Celsius platform as offering

safe investment opportunities for retail investors to earn interest on their crypto assets, and the company claimed to generate revenue by lending and investing crypto assets.

3.      Celsius marketed two core investment opportunities to investors.  First, Celsius offered and sold its own crypto asset security, CEL.  Defendants promised high "earning rates" to investors who purchased CEL and marketed CEL as an investment in the success of Celsius itself.  Second, Celsius offered an Earn Interest Program whereby investors tendered their crypto assets to Celsius in exchange for interest payments.  Defendants promised investors in the Earn Interest Program returns as high as 17%.  Defendants never filed a registration statement for their offers and sales of the Earn Interest Program, however, and no exemption from registration was available.

4.      Defendants made numerous false and misleading statements to induce investors to purchase CEL and invest in the Earn Interest Program.  Among other false representations, Defendants misrepresented Celsius's central business model and the risks to investors by claiming that Celsius did not make uncollateralized loans, the company did not engage in risky trading, and the interest paid to investors represented 80% of the company's revenue.

5.      None of these claims was true.  Celsius could not consistently generate the revenue needed to make the required interest payments to investors with respect to the Earn Interest Program.  The company engaged in risky trading practices and made uncollateralized loans to try to generate the necessary revenue, putting the entire Celsius enterprise at grave risk. Celsius was unsuccessful and, as a result, frequently paid much more than 80% of its revenue to satisfy the company's interest payment obligations—a business practice that was hidden from investors, unsustainable, and ultimately led to the company's collapse.

6.      Defendants also misrepresented Celsius's financial success to make the company

appear more profitable and stable than it was (and, therefore, CEL to be a more attractive and

safe investment than it really was). For example, Defendants claimed that the company raised

$50 million from its so-called initial coin offering ("ICO") of CEL. In reality, Celsius raised less

than 65% of the amount it had been trying to raise. To make up the shortfall, Mashinsky secretly

sought to purchase the unsold $18 million in CEL himself through an undisclosed transaction

with Celsius. Defendants never consummated the deal, however, and, contrary to Mashinsky's

representation to the public, the outstanding CEL remained unsold.

7.      Defendants also falsely claimed that Celsius had 1 million active users on

Celsius's platform. It did not. Celsius's own internal data—which was regularly shared with

Mashinsky—showed that the company only had approximately 500,000 users who had ever

deposited crypto assets on the company's platform and that many were no longer active users.

8.      In addition, Defendants falsely stated that Celsius had not experienced any

institutional loan defaults. In fact, Celsius and Mashinsky knew that the company had

experienced defaults by institutional borrowers totaling hundreds of millions of dollars.

9.      Defendants also misrepresented the safety of investor assets deposited on

Celsius's platform. Defendants claimed that Celsius had received approval from state and

federal regulators for its business even though they knew the company had not. Defendants also

falsely portrayed investor assets as being insured, knowing the company had no such insurance.

10.     In addition to making numerous false statements about Celsius's business,

Defendants also manipulated the market for CEL. Defendants publicly touted a "buy back"

program whereby Celsius purchased the amount of CEL needed to make interest payments to

investors. In reality, Celsius bought, at Mashinsky's direction, millions of dollars of additional

CEL to bolster the price of CEL and induce investors to buy it. Defendants timed their CEL

3

purchases to have the greatest market impact. At the same time, Celsius and Mashinsky reaped millions of dollars in profits for themselves from sales of CEL.

11. By 2022, Celsius's business was unsustainable, and it became clear internally that the company would fail. One employee called Celsius a "sinking ship," while another wrote that "there is no hope . . . there is no plan" and that Celsius's business model "is fundamentally broken." On May 21, 2022, a Celsius executive candidly acknowledged in an internal message: "We don't have any profitable services."

12. A report that circulated among Celsius's executives, including Mashinsky, reached the same conclusion. The report began: "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints. The current business model is not financially sustainable." In fact, Celsius had incurred losses of more than $800 million in 2021 and an additional $165 million during the first quarter of 2022.

13. Even though they knew that Celsius was failing, Defendants continued to tell the investing public a very different story. In May 2022, Celsius claimed that it "abides by robust risk management frameworks," that "[a]ll user funds are safe," and that it "continue[s] to be open for business as usual." Mashinsky asserted that "Celsius has not experienced any significant losses and funds are safe." On June 10, 2022, Mashinsky sought to reassure investors further by claiming that Celsius has "billions in liquidity." Two days later, however, Celsius stopped allowing investors to withdraw crypto assets from its platform, and the company filed for bankruptcy the next month.

14. By engaging in the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. §§ 78i(a)(2), 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5]. Defendants will continue to violate the federal securities laws unless they are

restrained and enjoined by this Court.

<u>**JURISDICTION AND VENUE**</u>

15.    The SEC brings this action pursuant to Sections 20 and 22 of the Securities Act [15

U.S.C. §§ 77t, 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)]

to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint, and transactions, acts, practices, and courses of business of similar

purport and object. The SEC also seeks against Mashinsky civil penalties, disgorgement of his ill-

gotten gains plus prejudgment interest, an officer and director bar, and a conduct-based injunction

that prohibits him from (i) participating, directly or indirectly, in the purchase, offer, or sale of any

crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to

induce the purchase, offer, or sale of any crypto asset securities by others.

16.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),

78u(e), 78aa], and 28 U.S.C. § 1331.

17.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391.

18.    Defendants, directly and indirectly, made use of the mails, and the means and

instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and

courses of business alleged in this Complaint.

19.    Certain of the transactions, acts, practices, and courses of business constituting

violations of the Securities Act and the Exchange Act occurred in this District. For example,

Defendants made materially false and misleading statements in this District regarding CEL and the

Earn Interest Program, and Defendants offered and sold CEL and the Earn Interest Program to

investors who reside in this District. Investors in the United States, including this District, were able

to invest in the various investment opportunities available on the Celsius platform through Celsius's

website and mobile application. In addition, Mashinsky resides in this District, and he and Celsius

regularly conducted business in this District.

## **DEFENDANTS**

20. Celsius Network Ltd. is a United Kingdom registered company that served as the

primary company involved with most investor services and activities related to CEL and the Earn

Interest Program. The company's principal place of business is Hoboken, New Jersey, and it

regularly conducted business in New York, NY. Celsius is the parent of various operating

subsidiary companies, including U.S. entities. Celsius is itself the subsidiary of Celsius Network

Inc., a Delaware corporation that is the holding company for all Celsius entities.

21. Alexander "Alex" Mashinsky, age 57, is the Co-Founder and former Chief

Executive Officer of Celsius. Mashinsky resides in New York, NY, where he ran Celsius and

frequently conducted business on its behalf until he was asked to resign from the company and

did so on September 27, 2022. Mashinsky has an 83.7% equity stake in Celsius Network Inc.,

which is the majority owner of Celsius.

## **BACKGROUND ON SECURITIES OFFERINGS**

22. Congress enacted the Securities Act nearly a century ago to regulate the offer and

sale of securities. In contrast to the commercial principle of *caveat emptor*, Congress established

a regime of full and fair disclosure, requiring those who offer and sell securities to the investing

public to provide sufficient and accurate information to allow investors to make informed

decisions before they invest.

23.     Sections 5(a) and 5(c) of the Securities Act require issuers of securities like Celsius to register offers and sales of those securities with the SEC when they offer and sell securities to the public.  Registration statements relating to an offering of securities provide investors with important information about the issuer and the offering, including financial and managerial information, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

24.     The Securities Act and Exchange Act also contain anti-fraud provisions to prevent fraudulent conduct in the offer, sale, and purchase of securities.  Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair dealing in securities transactions.

25.     Congress used a broad definition of "security" in the Securities Act and Exchange Act.  A "security" encompasses a wide range of investments, including investment contracts. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  In this case, Celsius offered and sold CEL and the Earn Interest Program as securities.

## BACKGROUND ON CRYPTO ASSETS

26.     The term "crypto asset" generally refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

27.     A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally

recorded data packages.  The system relies on cryptographic techniques for secure recording of transactions.

28.     Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger.  Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

29.     A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

30.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:  The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

## FACTS

**I.     Mashinsky Launches Celsius and Claims to Provide "Financial Freedom" and "Economic Opportunity" to Investors**

31.     Mashinsky and another individual founded Celsius in 2018.

32.     Mashinsky marketed Celsius as an alternative to traditional financial institutions—a place for retail investors to earn interest on their crypto assets invested on Celsius's platform.  Celsius and Mashinsky publicized that investors could "unbank" themselves and enjoy "financial freedom" as part of the Celsius community.

33.     Celsius promoted itself as an altruistic organization and referred to its investors as "Celsians."  Celsius stated in a blog post:  "Can we really bring unprecedented financial freedom, economic opportunity and income equality to everyone in the world?  We are Celsius.

8

We dream big."

34.    Mashinsky was the CEO, public face, and primary promoter of Celsius.

35.    Mashinsky frequently spoke about and on behalf of Celsius on social media

platforms like Twitter, in interviews, podcasts, live television appearances, and in articles

circulated on the internet.

36.    Inside Celsius, Mashinsky actively participated in discussions regarding all

aspects of the company's business and also dictated many of the company's business decisions.

37.    Mashinsky was also a member of Celsius's Executive Committee ("EXCO"),

Risk Committee, Asset-Liability Committee ("ALCO"), Investment Committee, and

Deployment Committee.  Each of these committees met regularly to discuss certain high-level

aspects of Celsius's business, strategy, and financial condition.

38.    Since being founded in 2018, Celsius grew quickly in terms of headcount, assets

on its balance sheet, and number of users.  From 2018 to 2022, the company went from having

only a handful of employees to approximately 900 employees.  From 2018 until November 2021,

Celsius went from having $49.8 million of assets to having $28.6 billion of assets on its balance

sheet.  By March 2022, Celsius had approximately 285,000 active users.

## II.    Celsius's Core Investments:  the CEL Token and Earn Interest Program

### A.    Celsius Offers and Sells CEL

39.    In March 2018, Celsius conducted an offer and sale of its own crypto asset

security in a so-called "ICO."  Celsius created and called the crypto asset security "CEL."

40.    Celsius initially offered CEL at $0.30 per token with a cap of $50 million to be

raised from the sale of CEL.

41.    All CEL tokens were fungible with each other, meaning that buying one unit of

9

one CEL token did not entitle investors to any separately managed accounts.  Instead, all CEL

tokens changed in price together, such that an investor's returns were directly proportional to the

amount of CEL purchased.

42.     Accredited investors in the United States could purchase and sell CEL directly

from and to Celsius through the company's over-the-counter desk ("OTC").  Investors were later

able to buy and sell CEL on the secondary market through various crypto asset trading platforms,

and they did so.

43.     According to Celsius's OTC Policies and Procedures, "To comply with CEL

tokens status as a security with the SEC, all US purchases via OTC must be locked for 1-year

within their wallet immediately after settlement."

44.     The price of CEL fluctuated significantly over time, ranging from a low of $0.03

per token in January 2019 to a high of $8.02 per token in June 2021.

45.     Since the founding of Celsius, CEL played a critical role in the company.  In a

March 2018 white paper, Celsius described CEL as "the backbone of the Celsius Network."

CEL was a token that unlocked discounts and features on Celsius's platform, such that the

greater the number of people who wanted to use the platform, the higher the demand would be

for CEL.

46.     On March 8, 2018, Mashinsky further explained in a livestreamed event:  "We are

focused on enabling the community, on creating a large community because everything we do is

measured by the [CEL] token."  Mashinsky went on to say:  "The token price goes up, our entire

compensation is the token. So our job is to do everything we can to increase the price of the

token as long as it's in the best interest of the community."

47.     Mashinsky also publicly described the price of CEL as a measure "of the

10

profitability or how well is Celsius doing." In other words, the price of CEL would increase when Celsius successfully attracted more users, and the price of CEL would decrease when the demand for Celsius's investment services declined.

48.     Consistent with their public statements, Mashinsky and others at Celsius viewed CEL as comparable to stock in a public company. Mashinsky wrote in an internal message that he wanted "to be able to talk about CEL just like public companies talk about their stock."

49.     The fortunes of CEL purchasers were tied to one another, as well as to Celsius's and Mashinsky's fortunes with respect to CEL. Mashinsky and other Celsius executives received CEL as part of the ICO and as part of their compensation. Celsius's founders were allocated over 100 million CEL, and compensation for Mashinsky and Celsius's employees was partially tied to the price of CEL, with bonuses triggering when CEL reached certain price thresholds. As a result, the better CEL performed, the more Mashinsky and Celsius employees benefitted financially as well.

50.     In fact, Celsius was the largest holder of CEL, and the company controlled over half the supply of available CEL through its corporate Treasury. After Celsius, Mashinsky was the second largest holder of CEL.

51.     Celsius controlled how funds received from the sale of CEL were used. Celsius pooled proceeds from the sale of CEL, both in the ICO and in later CEL sales, for general use in its business, including funding the development of its infrastructure and related capital costs.

52.     Celsius and Mashinsky publicly promoted CEL as an investment on which investors could profit based on Celsius's efforts. The company's white paper touted that investors could earn interest and rewards by purchasing CEL. Celsius and Mashinsky also marketed CEL as a profitable asset growing in value. On Twitter, they advertised the percentage

11

price increase in CEL. Celsius also publicized whenever CEL was listed on a new crypto asset trading platform where it could be traded for other assets.

53.     Celsius also publicized the profitability of CEL based on its management team's efforts—tying CEL's price to Celsius's success. The white paper highlighted the management team's entrepreneurial experience and success in creating profitable businesses.

54.     Mashinsky similarly publicly emphasized the profitability of CEL based on the efforts of Celsius and its management team, saying in a January 12, 2022 livestream event:

> We believe that the token has not shown its full potential yet. A lot of it is on us . . . we are launching big things this year, and obviously these things are going to have major, major impact on the price of CEL.

55.     Celsius and Mashinsky also publicly touted how much investors could earn by investing in CEL (e.g., "CEL is earning 5.25% APR"). They also encouraged investors to purchase and hold onto CEL with the expectation that its value would increase, using marketing phrases like "HODL" (an acronym used in the crypto industry meaning "hold on for dear life") and "to the moon" (a reference to a rising price).

56.     Celsius also touted on its website the "higher earning rates" investors could earn:



57.     Mashinsky also regularly highlighted the financial performance of CEL, including tweeting links to performance charts and news articles, while noting the increase in CEL's price.

58.     For example, in June 2020, Mashinsky tweeted that CEL had increased in value by 364% during the last three months and it was at an all-time high.  In December 2021, Mashinsky tweeted:  "CEL Rallies by 15% Following Celsius Network's Latest Award."  He included a link to an article touting the increase in the price of CEL during that month.

59.     In other words, Defendants told investors they would earn returns as a result of the company's efforts by the price of CEL increasing and through interest payments.

**B.    Celsius's Earn Interest Program**

60.     From around June 2018 until it paused withdrawals in June 2022, Celsius offered and sold interests in the Earn Interest Program to investors in the United States and elsewhere.

61.     To invest in the Earn Interest Program, investors tendered crypto assets to Celsius in exchange for Celsius's promise to provide investors periodic interest payments proportional to their investments in the program.  Celsius called these interest payments "rewards."

62.     The crypto assets tendered to Celsius through the Earn Interest Program were not subject to a lock-up period and investors could retrieve their assets from Celsius on demand.

63.     The investor assets tendered to Celsius through the Earn Interest Program were for the company's general use in its business, which produced income for Celsius and which Celsius indicated would generate returns for its investors.

64.     Celsius pooled the assets received from investors in the Earn Interest Program together with other Celsius assets and exercised full discretion and control over how the pooled assets were used.  Celsius deployed the assets it received through the Earn Interest Program into the same revenue-generating activities (e.g., lending), and the company paid returns to investors

13

in the Earn Interest Program on a *pro rata* basis on their investment.

65.     The Terms of Use for Celsius provided the following:

ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE
SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACOUNT
. . . AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD ITS
DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.

66.     Celsius's Terms of Use also contained the following disclosure:

We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise
dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible
Digital Assets with counterparties, and we will use our best commercial and
operational efforts to prevent losses.

67.     Celsius marketed the Earn Interest Program to U.S. investors through general

solicitations on the company's website, mobile application, and on social media sites.

68.     Celsius publicized that investing in the Earn Interest Program was easy and a

passive way for investors to earn returns.

69.     In response to a CNBC reporter's question about whether it was "difficult" for a

"regular investor" to invest in the Earn Interest Program, Mashinsky stated:  "No, it's pretty

simple.  You download the Celsius Network app or you can also register on our website.  And

you have to move over your crypto assets.  We only accept crypto assets.  And you earn yield

automatically."  Mashinsky went on to say:  "You don't have to do anything.  All you do is you

put the assets in and every Monday you get yield in your account.  You don't have to do

[anything], we do all the hard work."

70.     Celsius promoted the Earn Interest Program as a profit-making opportunity,

including emails with phrases like "Pour Yourself a Cup of Profits" and "Profits in your Pocket."

71.     Mashinsky also marketed the Earn Interest Program through frequent social media

postings on his Twitter account and in livestreamed personal appearances.

14

72.    On its website, Celsius promised investors returns of up to 17% on the crypto

assets they invested in the Earn Interest Program:



73.    Celsius specifically invited investors to expect that any profits earned would come

from Celsius's efforts, stating on its website:  "The Celsius finance team generates returns for

our community by lending out our community's digital assets to institutional and retail

borrowers.  We aim to return up to 80% of the revenues made from lending out our community's

assets back to our community on a weekly basis.  Due to the rate of returns we can achieve in the

lending market change nearly every day [sic], we adjust the rates that our community earns on

their digital assets on a weekly basis."

74.    Celsius also wrote on its website:  "Weekly rewards are calculated every Friday at

05:00:00 UTC, according to prices at that moment.  That means that our rates change on a

weekly basis depending on the current market conditions."

75.    Celsius emphasized on its website that up to 80% of the company's revenue is paid back to investors:



76.    Mashinsky elaborated on the concept that investor returns would come from Celsius's managerial and entrepreneurial efforts in an online interview with Forbes on May 4, 2020, that was posted to Celsius's website:  "Celsius Network goes out to find the best yield for your asset with the lowest risk and then delivers 80% of the value created back to the user[.]" Mashinsky went on to say:  "I turn back the majority of my profits to my depositors" and "we share 80% of these revenues with our customers."

77.    Mashinsky similarly stated in an interview posted on YouTube on April 13, 2022: "[W]e give most of the profits or most of the yield back to the community.  So Celsius, as an example, has paid the community over $1 billion in yield."

78.    In other words, the more revenue Celsius generated from investor funds though its managerial efforts, the greater the returns would be for investors in the Earn Interest Program.

79.    Celsius accepted crypto assets from any investor willing to sign up for the Earn Interest Program.

16

80. The high returns Celsius promised made the Earn Interest Program attractive to retail investors. In a March 18, 2020 interview with Cointelegraph, Mashinsky noted that "about 90% of the deposits come from the retail clients."

81. The value of crypto assets that investors invested in the Earn Interest Program is staggering. As of August 22, 2021, Earn Interest Program balances equaled more than $13 billion.

82. Celsius and Mashinsky never filed a registration statement or had one in effect with the SEC for their offers and sales of securities through the Earn Interest Program.

83. Celsius's public disclosures regarding the Earn Interest Program contained limited or inadequate information about Celsius's operations, financial condition, liquidity, and other factors relevant in considering whether to invest in the Earn Interest Program.

## III. Defendants Defrauded Investors Who Invested in CEL or in the Earn Interest Program

84. Celsius told the investing public that it generated revenue to pay investors by lending the "community's assets to safe institutions looking to borrow coins." Celsius also emphasized that its Earn Interest Program was a way for retail investors to obtain "high yield at a low risk."

85. The reality was much different. Celsius and Mashinsky deployed investor assets in a variety of ways—many of which were much riskier than institutional lending—including directional trading (trading that bets on the value of an asset or security going up or down), providing liquidity on certain so-called DeFi platforms, staking crypto assets with respect to certain blockchain protocols, and funding crypto asset mining activities.

86. Celsius needed and relied upon revenue generated from these activities to fund interest payments to investors in the Earn Interest Program and to generate income for the

17

company such that the riskier these activities, the riskier the Earn Interest Program investment became to unknowing investors.

87.     At the same time, Celsius and Mashinsky engaged in a concerted campaign to persuade investors to purchase CEL and invest in the Earn Interest Program.

88.     Celsius and Mashinsky frequently posted information on social media sites such as Twitter, Facebook, and Instagram, as well as on other online platforms like LinkedIn.

89.     Mashinsky also communicated regularly with the investing public through weekly livestreamed events called "Ask Mashinsky Anything" ("AMAs").  Each of these so-called AMA events was viewed, on average, by a thousand to several thousand individuals.

90.     Celsius would then upload a recording of each AMA episode onto YouTube, where an additional ten to fifteen thousand viewers, on average, watched the AMA.

91.     Mashinsky began regularly holding these AMAs in April 2020, and they continued until June 2022.

92.     Celsius and Mashinsky marketed the AMAs extensively on social media channels, and Mashinsky and others at Celsius viewed these episodes as a key way to obtain and retain investors in CEL and the Earn Interest Program.

93.     The AMAs were effective at reaching a large audience, but they also frequently included false or misleading statements, including many of the statements discussed below.

94.     By around May 2021, Mashinsky's public misrepresentations about CEL and the Earn Interest Program were so pervasive and, as Celsius employees recognized, so problematic that Celsius put in place a process to remove certain statements from the AMA episodes before they were posted on Celsius's YouTube channel.  This editing process (the "AMA Editing Process") occurred, however, only after the videos had aired live.

18

95.     Celsius did not publicly correct the false or misleading statements for those who watched the live AMAs, nor did it disclose that this editing process existed.  In addition, the AMA Editing Process was limited to contemporaneous AMAs produced and livestreamed by Celsius.  The company did not have the ability to edit other statements Mashinsky made to the public via third parties, including Twitter Spaces or news outlets.

96.     Although Mashinsky was not directly involved in the AMA Editing Process, he was aware that it existed, and Celsius employees told him that certain statements he made during the AMAs were not accurate.

**A.     Defendants Misrepresented Celsius's Central Business Model and the Risks to Investors**

97.     Celsius and Mashinsky repeatedly promoted Celsius as a community-based company focused on a simple and safe business model.  In reality, their representations about core aspects of Celsius's business were materially false and misleading.

**1.     Celsius and Mashinsky Falsely Represented That Celsius Did Not Make Uncollateralized Loans with Investor Assets**

98.     A central tenet of Celsius's promotion of its business was that it did not make uncollateralized loans when deploying investor funds from the Earn Interest Program.  Celsius and Mashinsky made this representation frequently and in numerous different outlets.  For example, in a November 26, 2019 livestreamed event, Mashinsky said:  "I can tell you there are other lenders in the market who lend with no collateral or lend to anybody.  Good.  Good for them.  We will never do that."

99.     Mashinsky made the same false claim in a March 13, 2020 "Crypto Market Commentary with Alex Mashinsky" video:  "Credit goes to the Finance Department, Credit Risk

19

management for not lending to risky institutions or risky hedge funds. We stick with the highest

quality, we don't do non-collateralized loans, we always have collateral."

100. In an April 14, 2020 video, Mashinsky similarly stated: "For us, I mean, we are –

there are crazy guys out there that lend with no collateral. We don't do that, so, we have very

tight controls."

101. Mashinsky also reiterated the point in a July 17, 2020 AMA: "Celsius does not

do non-collateralized loans" because "that would be taking too much risk on [customers']

behalf."

102. Mashinsky continued making similar false statements through 2022. In a January

7, 2022 interview with RealVision Finance, Mashinsky stated: "We don't do uncollateralized

lending . . . . Obviously, we only do asset backed lending." Mashinsky reiterated in an April 13,

2022 interview with CNBC: "[W]e do not offer any non-collateralized loans."

103. In reality, despite the numerous public assurances to the contrary, Celsius made

many uncollateralized institutional loans totaling millions of dollars. In fact, in November 2019,

Celsius had more than $17 million in uncollateralized institutional loans.

104. Throughout 2020, the percentage of Celsius's institutional loan book that was

uncollateralized consistently increased. It went from 16.27% in the first quarter to 26.4% in the

second quarter. By the third quarter, 28.4% of Celsius's institutional loans were

uncollateralized, and by the fourth quarter the percentage had increased to 31.33%.

105. By the second quarter of 2021, the percentage of uncollateralized institutional

loans held by Celsius had ballooned to 38%. These loans totaled approximately $531 million in

value.

106.    By 2022, Celsius's uncollateralized institutional loans ranged from $1.3 billion to $1.96 billion in value and accounted for 34-48% of the company's entire institutional loan portfolio.

107.    Mashinsky knew that Celsius had uncollateralized loans throughout this time period—including when he was publicly stating otherwise.  For example, beginning in 2020, Celsius's Risk Committee, of which Mashinsky was a member, held regular weekly or bi-weekly meetings in which high-level Celsius executives reviewed the loan portfolio, including the percentages of the portfolio that were uncollateralized.

108.    In addition to the information discussed at regular Risk Committee meetings, there were internal discussions about the falsity of Mashinsky's public statements regarding collateralized loans.  In an exchange on the messaging application Slack, a Celsius executive told a senior employee at the company:  "I just told [Mashinsky] that the number [of unsecured loans] is increasing and the overall ratio of collateral with institutions is going down. . . . I will talk to him.  I said this numerous times."  The executive's message was prompted by a false statement Mashinsky had made about the company's loan portfolio in a November 6, 2020 AMA.

109.    By the spring of 2021, Celsius executives identified false statements about collateralized loans as part of the AMA Editing Process.  The AMA Editing Process began just after an April 30, 2021 AMA in which a Celsius employee falsely stated, "So I would say a majority of our loans, almost 100% of them are fully collateralized, with other assets right."  A Celsius executive later told Mashinsky in an email, "I think the april 30th AMA video needs to be removed until the changes have been made," citing this misrepresentation.

110.    Nevertheless, two weeks later, at a May 14, 2021 AMA, Mashinsky echoed the April 30 misstatement by saying:  "These loans are collateralized.  This means the institutions

21

give Celsius assets or dollars to hold onto before we give out the digital assets. This protects the community and keeps them whole."

111.    Mashinsky's May 14 statement was deleted as part of the AMA Editing Process, at the direction of a Celsius executive. That executive recognized the falsity of Mashinsky's public statement and noted: "It is crucial to: delete this section of the AMA, AND remove the curated video explanation from EVERYPLACE on the internet."

112.    Mashinsky continued making similar false statements up until the time that Celsius halted withdrawals in 2022, despite having regularly attended Risk Committee meetings that discussed the large number and percentage of Celsius's unsecured institutional loans.

### 2.    Celsius and Mashinsky Falsely Represented That Celsius Did Not Engage in Directional Trading

113.    Additionally, Mashinsky and Celsius made several false statements regarding the company's trading activities. As an example, Mashinsky tweeted on September 29, 2020, "Celsius does not trade or take long or short positions with customer coins."

114.    In reality, Celsius engaged in risky directional trading (trading that bets on the value of an asset or security going up or down) that led to large undisclosed losses for the company.

115.    For instance, in 2019, Mashinsky shorted the crypto asset Bitcoin (BTC) on behalf of Celsius and using Celsius investor funds. A senior executive at Celsius ultimately unwound the positions, which resulted in a $15 million loss for the company. It also, in part, led Celsius to create a "Recovery Committee," which contemplated liquidating or selling Celsius to cover the loss. Celsius's financial condition only stabilized after a $20 million capital raise in August 2020.

22

116.    In 2021, Mashinsky and Celsius continued falsely to represent that the company did not engage in directional trading.  For example, in a July 31, 2021 interview with a crypto asset news outlet, Mashinsky said:  "Celsius does not bet on assets.  It's not like we invest in Bitcoin and hope it's going to go up.  Our job is to create yield, to create interest."

117.    Contrary to Mashinsky's statement, Celsius was engaged in directional trading in Bitcoin (BTC) and another crypto asset called Ether (ETH), sometimes following instructions provided by Mashinsky himself.

118.    As an internal Celsius document dated February 2, 2022 explained:  "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo, ALCO, and R[isk] C[ommittee] and there is extensive supporting evidence."

119.    A Celsius employee even told Mashinsky in a private message on January 24, 2022:  "Hi Alex – on our call last evening, I agreed with reducing the directional trades, but we've effectively replaced them with another set of directional trades, so I want to share with you that I have concerns with the approach we're taking."

120.    Despite Mashinsky's knowledge of and involvement in directional trading, he continued falsely to state publicly that Celsius did not engage in directional trading.  For instance, Mashinsky stated in a December 31, 2021 AMA:  "We don't trade. We only earn yield on top of—we stick to—we don't trade around positions.  We don't buy and sell Bitcoin.  We don't do any of those things that people think will do better than the index."

121.    In response to that statement, a Celsius executive noted internally that Mashinsky's statement that the company does not engage in directional trading was "false."

122.    In an April 13, 2022 CNBC interview, Mashinsky again falsely stated:  "We are what you call a delta-neutral strategy . . . .  Celsius doesn't bet on the market going up or down."

123.    One of Celsius's Account Managers made a similar false statement in a May 27, 2022 AMA.  A Celsius executive responded internally:  "This is untrue and misrepresents material risk factors associated with yield accounts."

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had No Leverage

124.    Celsius and Mashinsky also falsely stated that the company had no leverage.  In general, leverage is a ratio used to measure the amount of debt a company has relative to its capital.  Mashinsky compared Celsius favorably to banks, which he characterized as having significant leverage.

125.    At least one Celsius executive attempted to get Mashinsky to stop saying that the company did not have leverage.  The executive told Mashinsky to avoid making such statements and provided Mashinsky with data demonstrating that Celsius had leverage in similar ratios as banks.

126.    Nevertheless, Mashinsky continued to state publicly that Celsius did not have leverage.  For example, in a February 22, 2022, Twitter Spaces interview, Mashinsky stated:

> Oh, yeah, we don't have leverage . . . . Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet.  And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties.  So it's maybe again, instead of 1.0, it's 1.2 or something like that.

127.    Mashinsky's statement was identified by Celsius employees as part of the AMA Editing Process as among "a selection of recent misrepresentations made by Alex [Mashinsky] and other Celsius reps on Twitter Spaces AMAs."

128.    As late as May 27, 2022, just weeks before Celsius halted investor withdrawals, Mashinsky falsely claimed that "we don't offer any leverage, and we don't let you even if you want to inside our app."  This statement was also identified as "incorrect" as part of the AMA Editing Process.

### 4.    Celsius and Mashinsky Falsely Represented That 80% of Celsius's Revenue Is Returned to Investors

129.    Celsius and Mashinsky repeatedly represented that Celsius paid 80% of its revenue back to investors.

130.    Beginning as early as March 7, 2019, Mashinsky made this promise in an interview with NASDAQ:  "Celsius network enables you to lend them to someone else, and you get to keep 80%."

131.    From March 2019 through early 2022, Celsius and Mashinsky consistently stated that Celsius gave 80% of the company's revenue back to investors in the form of interest.

132.    For example, on September 19, 2019, Celsius tweeted:  "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments."

133.    Mashinsky made the same claim in an AMA on May 15, 2020:  "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day."

134.    Celsius reiterated the claim as well in a tweet on April 27, 2021:  "How is it possible that we offer up to 7% APY on crypto, asks @CNBC.  The answer is simple:  we give 80% of our revenue back to the community.  #UnbankYourself."

135.    These representations were false.  Celsius paid investors in the Earn Interest Program an interest rate that was rarely, if ever, tied to the revenue received by the company or

25

its performance. Prior to July 2021, Celsius did not even have a formal policy on setting the interest rates paid to Earn Interest Program investors.

136.   Mashinsky and other executives at Celsius feared losing investors as a result of the company lowering the interest rates it paid participants in the Earn Interest Program. As a result, Celsius largely set its interest rates in order to attract and retain investors rather than the basing them on the returns it was able to receive from its business activities.

137.   Contrary to Defendants' many representations that 80% of revenue is paid to investors, Celsius consistently paid out *more* in interest than the company generated in revenue.

138.   Despite the publicized growth of the company, Celsius did not experience a meaningful period of profitability during the 2018 through 2022 time period.

139.   This fact was well-known to Celsius executives, including Mashinsky. For example, in February 2021, Celsius's CFO sent Mashinsky a financial document showing that for 2020, Celsius paid out $45.7 million in interest (called "rewards") but generated only $42.7 million in income. In other words, more than 100% of Celsius's revenue in 2020 went to pay purported interest to investors.

140.   In 2021, Celsius paid 23% more in interest to investors in the Earn Interest Program than it generated in revenue.

141.   Mashinsky and Celsius's senior leadership were aware that the company's payout ratio was above 100%, with one executive noting Celsius was "basically using user balances to pay user rewards."

142.   In July 2021, Celsius implemented a formal policy on setting interest rates. Even under that policy, however, the interest rate that Celsius paid to investors in the Earn Interest Program was not directly tied to the company's revenue.

143.     Mashinsky knew of the policy and that the purported interest payments to investors in the Earn Interest Program did not represent 80% of the company's revenue.

144.     Even after the formal policy was instituted, and in the face of clear information about the disparity between revenue earned and interest payouts, Mashinsky continued to claim falsely that the company was paying 80% of its revenue back to investors.

145.     Celsius's unsustainable and undisclosed practice of paying more than 80% of its revenue back to investors had the effect of making the company's operations appear more stable and profitable than they really were.

**B.     Defendants Misrepresented Celsius's Financial Success**

146.     From the time of the CEL ICO in March 2018 until days before Celsius halted customer withdrawals off its platform, Celsius and Mashinsky publicly misrepresented significant financial events and the financial condition of the company.

**1.     Celsius and Mashinsky Falsely Represented the Amount Raised by the CEL ICO**

147.     Celsius falsely stated on numerous occasions that the CEL ICO was fully subscribed at $50 million, when in fact only approximately $32 million had been sold.

148.     Even before the ICO had closed, Celsius began falsely to claim success, announcing in March 2018:  "We're excited to announce that we've raised over $42 million of our $50 million hard cap."

149.     Mashinsky falsely claimed in a May 17, 2018 YouTube interview that the CEL ICO was fully subscribed:  "We just closed our [ICO] round about a month ago, we raised $50 million."  In a July 25, 2018 Coin Central interview, Mashinsky similarly claimed:  "[I]t's funny because our ICO raised over $50 million."

27

150. These misrepresentations continued until March 2019, when Mashinsky falsely stated in a March 13, 2019 YouTube video: "We did an ICO, we raised $52 million in March."

151. The fact that the CEL ICO fell short of its goal of $50 million and raised only $32 million was well-known to Mashinsky and other Celsius executives at the time they made the misrepresentations.

152. Indeed, Celsius and Mashinsky sought to conceal the fact that the CEL ICO was not fully funded at $50 million. On March 29, 2018, shortly after the CEL ICO closed, Mashinsky agreed to purchase the 117 million unsold CEL (worth $18 million) himself, entering into a token sale agreement with Celsius through a company in his name called AM Ventures Holdings, Inc.

153. The token sale agreement between Celsius and Mashinsky and the sale of CEL to Mashinsky were not disclosed to investors and Mashinsky continued to state publicly that Celsius had raised $50 million. In addition, the sale was never completed, Mashinsky never purchased the CEL or provided the $18 million to Celsius, and the unsold CEL remained in Celsius's possession.

154. Celsius employees were aware that the representations about the ICO being fully funded were false, and that Celsius investors would care about this misrepresentation.

155. In a March 1, 2019 internal communication, a Celsius employee stated: "The public believes that the ICO was fully funded and all tokens purchased. If they find out now that there were unsold they will be upset."

156. Likewise, in a June 3, 2020 Slack exchange, Celsius employees discussed whether the unsold CEL should be moved back into the Celsius Treasury where it would be visible to Celsius investors. When asked whether Celsius investors would care, one of the employees

28

responded: "Yes, they would absolutely care . . . ou[r] 117M from old ICO stake into the Treasury would change the whole structure of how the ICO was designed—the community would be very angry."

157.    At least one Celsius executive admonished Mashinsky, telling him to stop misrepresenting the amount of CEL sold during the ICO.  In an attempt to prevent Mashinsky from making a misrepresentation about a different capital raise, the executive wrote to Mashinsky on July 23, 2020:  "This mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did.)."  The executive wrote about Mashinsky's false statements to another executive:  "I need your help in making sure he [Mashinsky] doesn't continue saying wrong things.  This has gotten us into trouble time and time again and it's not healthy."

### 2.    Celsius and Mashinsky Falsely Represented the Number of Active Users on Celsius's Platform

158.    Celsius and Mashinsky falsely touted the number of users on the company's platform as another indicator of Celsius's purported success.

159.    Celsius generated, and Mashinsky received, internal data on a weekly basis that showed the number of investors using Celsius's platform.  According to Celsius's own data, in July 2021, the cumulative number of users who had invested crypto assets with Celsius since the Earn Interest Program launched three years earlier was between 200,000 and 300,000 users.

160.    Despite the company's own data, Mashinsky stated in a July 31, 2021 interview with a crypto asset news outlet:  "Today, there are 50 or so companies that are copying what Celsius has created, which is great. . . . But Celsius is by far the largest leader, with over US$15 billion in assets, and close to a million customers are earning yield on our platform."

161.    In an April 13, 2022 interview with CNBC, Mashinsky falsely claimed:  "We aggregate 1.7 million users, right, pool them together . . . ."

29

162.     In a May 13, 2022 AMA, Mashinsky again falsely stated: "We have millions of customers . . . ."

163.     An internal report dated May 28, 2022 that Mashinsky received showed that, contrary to his representations, only about 500,000 users had ever invested crypto assets with Celsius.

164.     Celsius employees marked Mashinsky's May 13, 2022 statement regarding the number of investors for removal as part of the AMA Editing Process because it was false.

### 3.     Celsius and Mashinsky Falsely Represented That Celsius Had Not Experienced Any Loan Defaults

165.     In 2021 and 2022, Mashinsky also falsely represented that Celsius had not experienced any defaults on the loans made by the company. At the time he made these statements, Mashinsky and other Celsius executives knew the statements were false.

166.     For example, Mashinsky stated in a July 31, 2021 interview with an online news outlet: "So, in Celsius we have 350 institutional counterparties. None of them defaulted on a loan. . . . We had thousands of margin calls but none of our counterparties has defaulted."

167.     Similarly, in an October 15, 2021 AMA, Mashinsky said: "[A]mazingly after four years, we've never had an institution who took a loan from us that did not pay back . . . ."

168.     Mashinsky repeated the false representation again in a November 12, 2021 AMA: "In four years we have not had a single institution default either not pay the interest or not return the collateral or the . . . coins that we lent them."

169.     In a January 7, 2022 Real Vision interview, Mashinsky reiterated: "We had tens of thousands of margin calls but not a single counterparty defaulted, uh, on their loans. So, we only lend to really responsible institutions."

170. Mashinsky knew before making these statements that Celsius had experienced defaults by institutional borrowers totaling millions of dollars.

171. In February 2021, Mashinsky and a Celsius executive discussed over email the default involving an institutional borrower, with Mashinsky commenting: "It used to be a $3m problem now it is a $17m problem . . . . We were supposed to get 200 BTC back. Never happened."

172. In 2021, a Celsius executive asked Mashinsky to stop saying that Celsius never had an institutional loan default because such statements were not accurate.

173. The fact that Celsius had experienced institutional defaults was also discussed at Celsius's internal ALCO meetings, which Mashinsky regularly attended. At a July 14, 2021 ALCO meeting, for example, the company identified "bad debts," including failed loans to two institutional borrowers.

174. As of June 23, 2022, the net value of Celsius's loan defaults was approximately $208 million.

### 4. Celsius and Mashinsky Falsely Represented Celsius's Financial Condition During the Spring 2022 Crypto Asset Crash

175. Between May 7 and 9, 2022, certain crypto assets offered by another company experienced a sharp decline in value.

176. At that time, Celsius sought to reassure its investors by making a number of public statements about the company's healthy financial condition.

177. On May 11, 2022, Celsius released the following statement on Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe. We continue to be open for business as usual."

31

178.    On the same day, Mashinsky similarly tweeted that "Celsius has not experienced any significant losses and all funds are safe."

179.    In reality, Celsius was in dire financial shape even before May 2022.  Contrary to the company's and Mashinsky's public statements of reassurance, Mashinsky and other company executives were communicating internally about the significant financial losses Celsius was experiencing.

180.    On April 26, 2022, Mashinsky and two other senior executives at Celsius communicated internally about the significant financial losses Celsius was suffering.

181.    One of the senior executives stated:  "While none of us want to incur any more large losses, we are hemorrhaging $7.5mm pre-tax losses each week.  We need to figure out how to scale up our deployment efforts."

182.    On May 2, 2022, Mashinsky and other senior executives attended a Celsius Board meeting in which they discussed Celsius's significant financial losses and struggling business model.  The presentation for that meeting showed overall pre-tax losses of $811 million for 2021 and $165 million in losses in the first quarter of 2022.

183.    On May 9, 2022, just two days before Celsius and Mashinsky released their reassuring statements on Twitter, a Celsius executive called the company a "sinking ship."

184.    On May 12 and 25, 2022, that same Celsius executive wrote in Slack exchanges that "there is no hope . . . there is no plan," and that Celsius's business model "is fundamentally broken."

185.    Another employee bluntly stated in an internal message on May 21, 2022:  "We don't have any profitable services."

186.     Mashinsky knew Celsius's continued viability was in doubt.  A Celsius executive told Mashinsky in a May 25, 2022 message:  "[W]e will continue to dig a deeper hole for many months – and the asset/liability gap is much more severe now with lower balances."

187.     Despite understanding that Celsius's financial condition was bleak, Celsius and Mashinsky continued falsely describing the company as having a strong financial condition and outlook.

188.     On June 1, 2022, Mashinsky participated in an interview segment titled, "What's up with Celsius?" and again made several statements that sought to reassure Celsius's investors. Mashinsky stated:

> Yes, so not just that they [investors' assets] are safe, but we provided anyone that wanted to withdraw, partially or fully, there were no problems. . . .  No other exposure that I know . . . . Celsius continues to do what it did for the last five years. . . . Our community is resilient.  We have billions of dollars in liquidity.

189.     On June 7, 2022, Celsius posted a blog post entitled, "Damn the Torpedoes, Full Speed Ahead."  In this blog, Celsius referenced "misinformation and confusion" around Celsius, and claimed that the company "remain[s] deeply optimistic about the future."

190.     Just days before the June 7 blog post, however, a "business outlook" presentation was circulated among Celsius executives, including Mashinsky, that reflected Celsius's true financial state and grim future outlook.

191.     The presentation started out:  "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints.  The current business model is not financially sustainable."

192.     The presentation also noted the need for a $1 billion capital raise.

193.     On June 10, 2022, Mashinsky continued to reassure investors in an AMA: "Celsius has billions in liquidity, right, and we provide immediate access [to] anyone who needs

access to it, to the liquidity. That includes institutions and people that want to get their loans

back and people who are taking loans."

194.    Contrary to Mashinsky's assurances, Celsius's own historical liquidity model

showed significant liquidity issues with Ether (ETH) and Bitcoin (BTC).

195.    In the days leading up to the June 10 AMA, including on the very same day,

Mashinsky and another Celsius executive actively discussed last resort options to save the

company. These options included possibly selling Celsius to another large crypto company or

getting a high interest rate loan from that company.

196.    When Mashinsky expressed hesitation about engaging with the other company,

the Celsius executive responded: "Don't think we have that luxury."

197.    Mashinsky privately acknowledged, "CEL continues to crash. If we don't do

anything we will have massive withdrawals."

198.    Two days after Mashinsky's June 10 AMA, Celsius halted customer withdrawals

from its platform.

**C.    Defendants Misrepresented the Safety of Customer Assets on Celsius's Platform**

199.    Celsius and Mashinsky also made many false representations regarding the

overall safety of assets deposited by investors on the company's platform, examples of which

appear below.

**1.    Celsius and Mashinsky Falsely Touted Celsius's Regulatory Compliance**

200.    In 2021 and 2022, Mashinsky falsely touted Celsius's regulatory compliance to

reassure investors that investing in CEL and the Earn Interest Program was safe.

201.    For example, during a December 1, 2021 interview with KITCO News in Florida, Mashinsky misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."

202.    In a December 12, 2021 article with Barron's Online, Mashinsky was quoted as saying:  "The regulators looked into us and said these guys know what they're doing."

203.    On April 15, 2022, Mashinsky made another statement on regulatory compliance in an AMA:  "Here's clarity from different regulators, both from states and federal regulators, telling you the user that there's no issue, there's no legal issues at least with what Celsius provides."

204.    Mashinsky had no basis to make these statements.

205.    In fact, in May 2021, several state securities regulators contacted Celsius regarding concerns about the unregistered securities offering of the Earn Interest Program.

206.    These regulatory activities were known within Celsius.  An October 7, 2021 email from a senior Celsius executive to all Celsius employees, including Mashinsky, even explained that Celsius had received requests for information from several state regulators.

### 2.    Celsius and Mashinsky Misrepresented That Investors' Assets Were Insured

207.    Celsius and Mashinsky also misled investors by assuring them assets invested with Celsius were safe by falsely telling investors that their assets were insured.

208.    In an April 8, 2022 AMA, Mashinsky stated:  "The highest insurance in the industry right? 750 million, right? . . . highest level security, highest level insurance, together with Celsius highest yield in the market, and that's like win-win for everybody."

209.    Contrary to Mashinsky's statement, Celsius did not have an insurance policy for investors' crypto assets.

210.     In fact, the FAQs on the Celsius website in this time period stated, "Celsius does not have an insurance policy. Fireblocks, our custodian, provides insurance on digital assets held by Celsius. However, we generate interest rewards by deploying assets. When these assets are out of Celsius's control, they can't be insured by such insurance."

211.     The Celsius Terms of Use, as of April 8, 2022, further stated: "[Y]our Celsius Account is not a checking or savings account, and it is not covered by insurance against losses."

## IV.     Defendants Manipulated the Market for CEL to Inflate the Value of Celsius and Induce Others to Buy CEL

### A.     As Part of an Ongoing "Buy Back" Program, Celsius and Mashinsky Purportedly Bought CEL to Fund Interest Payments to Investors

212.     Celsius and Mashinsky undertook a secret plan to increase artificially CEL's market price by buying more CEL than they were admitting publicly.

213.     In the summer of 2018, Celsius began purchasing CEL on the secondary market and used CEL it purchased to pay interest (or rewards) to investors who chose to earn their rewards in CEL. In the AMAs and other public statements, Celsius and Mashinsky regularly described Celsius's CEL purchases as being tied specifically to CEL rewards payments.

214.     For example, Mashinsky stated: "[J]ust in 2021, we purchased $421 million worth of CEL token . . . Obviously most of this is . . . to pay the community, to pay the people who earn in CEL."

215.     In another example, Mashinsky stated: "[T]he piece of how much we buy CEL has nothing to do with Celsius. Celsius does not decide how many CEL tokens to buy, and then how many of them to burn [i.e., retire from circulation]. You guys decide."

216.     In reality, Celsius's CEL purchases greatly exceeded the purchases needed to make interest payments to investors, which Celsius and Mashinsky concealed from investors.

36

**B. Celsius, at Mashinsky's Direction, Bought More CEL to Support the Price of CEL and Induce Additional Purchases of CEL**

217. By the end of October 2019, the price of CEL had dropped to $0.05 per token, which was well below the $0.30 per token price from the ICO in early 2018.

218. Celsius, at Mashinsky's direction, took action to support the price of CEL. Specifically, Celsius and Mashinsky wanted the CEL price to mirror Celsius's user and deposit activity. In other words, if Celsius was growing in terms of users and deposits, then Celsius and Mashinsky wanted the price of CEL also to be increasing.

219. Internally, Mashinsky was vocal about his desire for Celsius to do everything in its power to boost the price of CEL.

220. In EXCO meetings, for example, Mashinsky frequently stated that Celsius had to get the price of CEL up.

221. In one email, Mashinsky remarked that "[o]ur job is to protect CEL" and "the only way we loose [sic] if CEL price drops a lot and people get nervous and keep selling. We can protect against that scenario."

222. In November 2019, Celsius disclosed that it was performing a discrete buyback (that was limited in amount) outside the purchases the company needed to pay interest.

223. In 2020, however, Celsius had developed a plan focused on increasing the price of CEL by expanding buybacks that the company did not disclose publicly.

224. An internal memo stated as its "Main Thesis" to increase the price of CEL, "[w]e rise and fall with CEL" and that "[t]he more customer[s] use CEL & the more it's worth, the more worth we can extract out of it (for example using it for interest payments instead of our [c]ash)."

37

225. The internal memo described a plan to raise the price of CEL. The plan included "[v]alue based repurchase examples" in which Celsius would repurchase certain percentages of the CEL it sold via OTC "on a case to case basis dependent on our Cash Needs." The memo also detailed a plan that would give "value to CEL" through Celsius's increased trading activity:

- The more CEL we sell OTC
- The more CEL we can repurchase
- The more attractive CEL markets look like
- The more CEL buy orders we receive
- In the end: The more our Treasury is worth
- The less # of CEL we need to sell for the same $ value we want to raise with these OTC sales

226. Significantly, the memo noted that implementing the proposed plan would cause "Official CEL Buybacks" (i.e., the ones that had previously been publicly disclosed) to "lose relevance" because "[e]very OTC sale of CEL is a potential 'Buyback like situation[s].'"

227. Through the OTC desk, Celsius account holders could sell their CEL back to Celsius or purchase additional CEL. Because these transactions occurred on the Celsius platform, they were only reflected in internal records and not on the blockchain or to other users of the Celsius platform.

228. In a May 14, 2020 email regarding "CEL OTC," Mashinsky provided specific instructions about the company buying additional CEL more quickly if the price of CEL fell lower.

229. In response to Mashinsky's request, a Celsius employee proposed an approach that included keeping some of the proceeds from OTC sales for profit for Celsius, while using the remainder of the proceeds to support the price of CEL and replenish the company's Treasury. Under this proposal, Celsius would sell CEL via the non-public OTC desk, and use the proceeds to turn around and repurchase CEL via public means and boost its price. This plan also served,

as a Celsius employee wrote, to "support[] the CEL price[,] to stabilize CEL and make it even more attractive for even more OTC buyer."

230.    Celsius's expansion of CEL purchases was significant both in terms of volume and dollars.  Throughout 2020 and 2021, Celsius purchased far more CEL than was needed to pay interest and far more than the additional buybacks it disclosed.  The company purchased over $700 million worth of CEL (gross) but only used $160 million worth of CEL for interest payments and to burn (i.e., retire from circulation).

231.    In fact, from May 2019 through July 2022, less than 50% of Celsius's purchases of CEL on crypto asset platforms was used to fund interest payments to investors or burn.  That percentage decreases when Celsius's OTC purchases are included.

232.    A Celsius employee regularly updated Mashinsky on the market for CEL and Celsius's purchases and sales of CEL, but neither the company nor Mashinsky disclosed the full extent and nature of these additional buybacks of CEL to investors.

233.    For example, on December 10, 2021, a Celsius employee informed Mashinsky that in 2021, Celsius purchased 23 million CEL over what was needed to pay investors— comprising nearly half of the company's CEL net purchases for the year.  Nevertheless, Mashinsky continued stating publicly that Celsius's purchases of CEL were determined by the amount of rewards the company owed to investors.

234.    In addition to engaging in undisclosed purchases, Celsius strategically structured and timed its CEL purchases to have the greatest impact on the market.

235.    First, Celsius conducted its CEL transactions such that its purchases of CEL were primarily through crypto asset trading platforms where the fact that CEL was actively being purchased would be visible.  At the same time, Celsius concealed most of its sales through OTC

transactions via the Celsius platform that did not result in visible blockchain transactions. This reflected Mashinsky's belief that buying in the market increased demand for CEL.

236. Second, Celsius timed purchases of CEL to coincide with AMAs or news announcements, and the company sized its CEL purchases to maximize the price impact on CEL. As one Celsius employee described the process: "when we start buying actively with good size & good timing we (the FED of CEL) made a huge positive impact."

237. Celsius also went to great lengths to protect the price of CEL from falling. Among other things, the company used bots to monitor the price and utilized resting orders to prevent the price from dropping below certain thresholds.

238. The plan to boost the price of CEL by Celsius and Mashinsky had the desired impact. As Celsius increased its CEL purchases, the price of CEL increased. From January 3, 2020 to December 31, 2021, CEL's price rose from $0.15 to $4.37. This represented a 2,900% increase in the price of the crypto asset.

239. Senior Celsius employees, including Mashinsky, knew that Celsius bought CEL in excess of interest payments to affect the price of CEL and attract more CEL buyers and Earn Interest Program investors.

240. For example, in an email chain that included Mashinsky, a Celsius executive explained that "a big part of" Celsius's CEL purchases was "supporting the CEL market." Another Celsius employee similarly noted that Celsius purchasing CEL "supports the CEL price to stabilize CEL and make it even more attractive for even more OTC buyer[s]" and that "the more CEL drops the more we buy it back." The Celsius employee also stated that "the higher" the price of CEL "the more people understand Celsius is a legit company and will get customers."

40

241. Internally, Mashinsky directly expressed his desire to raise the price of CEL. On October 30, 2021, in an internal message with a Celsius employee, Mashinsky stated: "Every day we have all time record new users joining Celsius yet CEL [p]rice is going down." He went on to write: "The price will not take care of itself if everyone will just get scared and sell."

242. The employee was equally direct in response: "We're not just sitting and watching the price. We're on it all week . . . . The issue is that people are selling and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions (~$8M a week and even more until February 2020) just to keep it where it is. This week we spent 'only' $4M (on top of the rewards) and the price is still going down."

243. Mashinsky understood that increasing the price of CEL was vital to attracting more investors. He persisted in trying to develop strategies to inflate the price of CEL and wrote to a Celsius employee on October 30, 2021: "Everyone knows what these tokens are and want to buy them because they think price is going up. . . . You saw that none of our announcements which had fundamentals like Burn or funding or investment in mining moved CEL so we need to change our tackticks [sic]."

244. Others within Celsius also recognized that Celsius and Mashinsky were trying to prop up CEL. As one employee succinctly stated in a Whatsapp message on December 21, 2021: "we artificially create CEL volume."

245. Artificially increasing the value of CEL helped Celsius and Mashinsky mask the company's financial difficulties and other failures. For example, on August 10, 2021, Celsius estimated its net equity position as approximately $1.02 billion when it included the CEL in its Treasury in the calculation. Without the CEL in the company's Treasury, Celsius's net equity position was negative $789 million—a swing of nearly $1.8 billion.

41

C. **Celsius and Mashinsky Concealed the Extent and Purpose of Celsius's Buybacks**

246.     Despite public assurances of transparency, Celsius and Mashinsky concealed the company's plan of artificially boosting the price of CEL.

247.     As one Celsius employee stated in March 2021:  "The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."

248.     Another employee described one instance of Celsius buying CEL this way:  "It's like FBI.  The job we do is not to be noticed."

249.     At times, when Celsius was unable to make CEL purchases itself to boost the price, Mashinsky used his own accounts to purchase CEL in consultation with Celsius's traders. In one such instance, an employee told Mashinsky, "you saved the day."

250.     Mashinsky knew the value of CEL was, as one employee stated, "fake" and was actually based on Celsius spending millions of dollars to maintain its price.

251.     Nevertheless, Mashinsky continued falsely to inform the investing public that Celsius's CEL purchases were to pay interest.

252.     Mashinsky made false statements such as Celsius's CEL purchases were "to pay the community" and Celsius buys CEL based on "how many people chose to earn in CEL."

253.     Mashinsky also falsely claimed in a March 19, 2021 AMA:  "It really comes down to how many buyers versus how many sellers. . . . So we obviously want CEL token to go higher in price but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that."

254.     Celsius's and Mashinsky's false statements led investors to believe incorrectly that the market reflected the fair price of CEL.  It did not.

42

**D.    Celsius and Mashinsky Benefited from the Artificially Inflated CEL Price**

255.    Celsius and Mashinsky benefited financially from the inflated price of CEL.

256.    First, with an inflated price of CEL, Celsius was able to portray Celsius's financial position favorably, using the Treasury's CEL holdings as a growing asset on the company's balance sheet to offset its significant liabilities.

257.    Second, Celsius also traded strategically to reap profits from the inflated prices it created.  In at least some circumstances, Celsius bought through crypto asset trading platforms only 25-50% of the CEL it needed for OTC sales and, as one employee stated in an internal message, "put the other 50-75% into our pocket as Cash."  In other words, Celsius kept the proceeds from sales at inflated prices as profit.  Celsius was thus able simultaneously to sell additional CEL at a higher price and inflate its own value as a company.

258.    Third, Mashinsky was the largest holder of CEL other than Celsius, and he personally profited from its artificially inflated price.

259.    Like other CEL holders in the Earn Interest Program, Mashinsky earned weekly interest in CEL, which only increased as the price of CEL went up.

260.    Moreover, Mashinsky withdrew and sold large amounts of CEL, despite regularly assuring investors that he was only buying CEL.  In fact, Mashinsky was selling CEL at the same time he encouraged investors to "HODL," or "hold on for dear life," their own CEL.

261.    For example, Mashinsky tweeted on December 10, 2020:  "[j]ust bought 35,000 @CelsiusNetwork CEL Token on @UniswapProtocol at $2.19."  In other words, Mashinsky publicly disclosed that he had purchased approximately $75,000 in CEL.

262.    Mashinsky did not tweet, however, that in the same month he sold approximately 1.2 million CEL tokens totaling approximately $4.6 million.

43

263.     In fact, Mashinsky appears to have publicized the single instance in which he bought CEL in December 2020, while he quietly sold CEL numerous times during the month.

264.     Available records indicate that from 2018 through May 2022, Mashinsky withdrew over 86 million CEL worth over $200 million from his accounts on Celsius's platform. Mashinsky later sold many of these tokens.

## V.     Celsius's Collapse

265.     By January 2022, the company's financial condition was dire.

266.     Despite increasing prices for crypto assets in 2021 and the fact that Celsius received a capital infusion of approximately $700 million in late 2021, the company was struggling financially as a result of its failing business model and growing expenses.

267.     In total, Celsius incurred pre-tax losses of approximately $811 million in 2021.

268.     In early 2022, Celsius executives identified core actions for the company to take to improve its condition, including reducing Earn Interest Program interest rates and eliminating riskier deployment activities.

269.     Mashinsky was aware of the company's poor financial condition, and he acknowledged in a May 20, 2022 email to a senior executive at the company "that the current business model is not sustainable and that our capital position is making things worse."

270.     By the end of the first quarter of 2022, Celsius had incurred additional pre-tax losses of approximately $165 million.

271.     Between May 7 and May 9, 2022, the Terraform Labs crypto asset called UST started rapidly losing value, which caused its companion crypto asset, LUNA, to fall from a value of approximately $80 to pennies by May 12, 2022.

272.     Celsius incurred $17.8 million in direct losses associated with the collapse of UST

and Luna and also experienced increased withdrawal requests from investors on the Celsius platform, resulting in a serious liquidity problem for the company.

273.    In May 2022 alone, net withdrawals from Celsius totaled $1.8 billion.

274.    During the last two weeks of May 2022, Mashinsky withdrew a large percentage of his Bitcoin (BTC), Ether (ETH), and the crypto asset known as USDC held in accounts at Celsius, totaling approximately $8 million.

275.    Specifically, Mashinsky withdrew approximately 90% of the combined Bitcoin (BTC) and Wrapped Bitcoin, 81% of the Ether (ETH), and nearly 100% of all non-CEL related crypto assets that he held at Celsius.

276.    By comparison, Mashinsky withdrew approximately 3% of the CEL tokens in his accounts during that same period, totaling approximately $2 million.

277.    During this time period, Celsius's total liabilities, including Celsius's CEL Treasury, exceeded its total assets by approximately $1 billion.

278.    Privately, a number of senior leaders of the company expressed grave concerns about Celsius's viability and understood the company was facing an existential crisis.  As one Celsius executive stated privately:  "I'm sorry – why aren't we talking about the elephant in the room. [S]urvival? [L]iquidity[.] [H]ow many days we have left[.]"

279.    On June 12, 2022, after failed attempts to secure additional capital and in the face of a renewed wave of withdrawals, Celsius halted all customer withdrawals, transfers, and swaps.

280.    On July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

281.    At the time Celsius filed for bankruptcy, the company had approximately $1.2 billion more in liabilities than assets on its balance sheet.

45

## TOLLING AGREEMENTS

282.    In March and May 2023, Celsius signed tolling agreements with the SEC for the period February 22, 2023 through August 21, 2023.  In April 2023, Mashinsky signed a tolling agreement with the SEC for the period March 13, 2023 through June 11, 2023.

283.    Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted, or brought by . . . the [SEC] . . . arising out of the [SEC's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended. . . ."

284.    Each tolling agreement further provides that Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against All Defendants)

285.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

286.    Defendants, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

287.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C.

§ 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and (3)]
(Against All Defendants)**

288.  Paragraphs 1 through 284 are realleged and incorporated herein by reference.

289.  Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

290.  By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act
and Rules 10b-5(a), (b), and (c) thereunder
[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]
(Against All Defendants)**

291.  Paragraphs 1 through 284 are realleged and incorporated by reference herein.

292.  Defendants, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to

47

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaged in acts, practices, or a course of

business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or

prospective purchasers of securities.

293.     By engaging in the conduct described above, Defendants violated, and unless

enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15

U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## COUNT IV – FRAUD

### Violations of Section 9(a)(2) of the Exchange Act
### [15 U.S.C. § 78i(a)(2)]
### (Against All Defendants)

294.     Paragraphs 1 through 284 are realleged and incorporated herein by reference.

295.     By virtue of the foregoing, Defendants, directly or indirectly, by use of the means or

instrumentalities of interstate commerce or the facilities of a national securities exchange or the

mail, effected, alone or with one or more persons, a series of transactions in a security registered on

a national securities exchange, a security not so registered, or in connection with a security-based

swap or security-based swap agreement with respect to such security creating actual or apparent

active trading in such security, or raising or depressing the price of such security, for the purpose of

inducing the purchase or sale of such security by others.

296.     By engaging in the conduct described above, Defendants violated, and unless

enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## COUNT V – UNREGISTERED OFFERS AND SALES OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]
### (Against All Defendants)

297.     Paragraphs 1 through 284 are realleged and incorporated by reference herein.

298.     By virtue of the foregoing, without a registration statement in effect as to the Earn Interest Program, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

299.     By engaging in the conduct described herein, Defendant Celsius violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

The SEC respectfully requests that the Court enter a Final Judgment:

1.     Finding that Defendants committed the violations alleged in this Complaint;

2.     Permanently restraining and enjoining Defendants from engaging in conduct in violation of the following provisions:  Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

3.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(e) of the
Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.
§ 78u(d)(2)], from acting as an officer or director of any issuer that has securities registered
pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section
15(d) of the Exchange Act;

4.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(b) of the
Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15
U.S.C. §§ 78u(d)(1) and 78u(d)(5)], from (i) participating, directly or indirectly, in the purchase,
offer, or sale of any crypto asset securities, or (ii) engaging in activities for the purposes of
inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by
others;

5.      Ordering Defendant Mashinsky to disgorge all ill-gotten gains in the form of any
benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay
prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C.
§§ 78u(d)(3), (5), (7)];

6.      Ordering Defendant Mashinsky to pay civil penalties pursuant to Section 20(d) of
the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C.
§ 78u(d)] in an amount to be determined by the Court; and

7.      Ordering such other relief as this Court deems just, equitable, and appropriate in
connection with the enforcement of the federal securities laws and for the protection of investors.

# JURY TRIAL DEMAND

The SEC demands a trial by jury as to all issues that may be so tried.

Dated: July 13, 2023                     Respectfully submitted,

                                         /s/ Harry B. Roback
                                         Harry B. Roback*
                                         Securities and Exchange Commission
                                         950 East Paces Ferry Road, NE, Suite 900
                                         Atlanta, GA 30326
                                         Tel: (404) 942-0690
                                         robackh@sec.gov

                                         James P. Connor*
                                         Securities and Exchange Commission
                                         100 F Street NE
                                         Washington, DC 20549
                                         Tel: (202) 551-8394
                                         connorja@sec.gov

                                         Attorneys for Plaintiff

*Pending admission pro hac vice

Of Counsel
Stacy L. Bogert
Pei Y. Chung
Randall D. Friedland
Christian J. Ascunce

Securities and Exchange
Commission

## **Exhibit B-2**

**SEC Consent Order**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY, <br><br> Defendants. | Civil Action No. <u>1:23-cv-6005</u> |

## FINAL JUDGMENT AS TO DEFENDANT CELSIUS NETWORK LIMITED

The Securities and Exchange Commission having filed a Complaint and Defendant
Celsius Network Limited ("Celsius" or "Defendant") having entered a general appearance;
consented to the Court's jurisdiction over Defendant and the subject matter of this action;
consented to entry of this Final Judgment; waived findings of fact and conclusions of law; and
waived any right to appeal from this Final Judgment:

I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is
permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the
Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5
promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of
interstate commerce, or of the mails, or of any facility of any national securities exchange, in
connection with the purchase or sale of any security:

(a)     to employ any device, scheme, or artifice to defraud;

1

(b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)    to employ any device, scheme, or artifice to defraud;

(b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

2

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

(a)     Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

(b)     Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

(c)     Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination

3

under Section 8 of the Securities Act [15 U.S.C. § 77h].

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

IV.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)], by directly or indirectly, using any means or instrumentalities of interstate commerce, or the mails, or of any facility of a national securities exchange:

(a)　For the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security:

　　i.　to effect any transaction in such security which involves no change in the beneficial ownership thereof, or

　　ii.　to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or

　　iii.　to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at

4

substantially the same time, and at substantially the same price, for the

purchase of such security, has been or will be entered by or for the same or

different parties; or

(b)     To effect, alone or with one or more other persons, a series of transactions in any

security registered on a national securities exchange, any security not so

registered, or in connection with any security-based swap or security-based swap

agreement with respect to such security creating actual or apparent active trading

in such security, or raising or depressing the price of such security, for the

purpose of inducing the purchase or sale of such security by others.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in

Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who

receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's

officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or

participation with Defendant or with anyone described in (a).

## V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is

incorporated herein with the same force and effect as if fully set forth herein, and that Defendant

shall comply with all of the undertakings and agreements set forth therein.

## VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain

jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## VII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.


Dated:_____, 2023          _____

UNITED STATES DISTRICT JUDGE

**Exhibit C-1**

**CFTC Complaint**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>             Plaintiff,<br><br>    v.<br><br>CELSIUS NETWORK, LLC and ALEXANDER MASHINSKY,<br><br>             Defendants. | Case No. 1:23-cv-6008<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its undersigned attorneys, hereby alleges as follows:

## I.    <u>SUMMARY</u>

1.    Beginning in 2018 and continuing through at least June 2022 (the "Relevant Period"), Celsius Network, LLC (together with its parent and related entities, "Celsius") and Alexander Mashinsky ("Mashinsky"), one of its founders and chief executive officer ("CEO"), (together "Defendants") engaged in a scheme to defraud hundreds of thousands of customers by mispresenting the safety and profitability of its digital asset-based finance platform.

2.    Defendants, via publicly available videos, blog posts, livestreams and postings on social media and their website, touted Celsius as a "safe" alternative for customers' digital asset commodities, akin to a traditional bank. Defendants not only promised customers that their deposited digital asset commodities would be safe with Celsius, but also promised customers high yield interest payments on these deposits.

3.    Based on Defendants' promises of high yield interest payments and bank-like investment safety, Celsius received deposits from customers totaling approximately $20 billion.

1

During the same time, Defendants engaged in a pattern of making misleading and false statements to induce customers to deposit and not withdraw their digital asset commodities from the Celsius platform.

4.    In order to meet the returns promised to its customers, Celsius engaged in increasingly risky investment strategies, including the extension of millions of dollars in uncollateralized loans and millions of dollars in unregulated, risky decentralized finance agreements.

5.    As the value of digital assets fell precipitously market-wide, Defendants' risky bets on uncollateralized loans and unregulated decentralized finance agreements caused Celsius to suffer losses totaling hundreds of millions of dollars, losses that had long preceded market-wide decline.

6.    Despite suffering devasting losses, Defendants continued to promote the safety and viability of Celsius, and failed to disclose these losses to customers. Even worse, despite its worsening financial position, Defendants continued to solicit new customers with the same misrepresentations that digital asset commodities deposited with Celsius were safe and would earn customers high yield returns.

7.    By May 2022, Celsius's risky investment strategies were losing millions of dollars and customers were withdrawing their digital asset commodities at an accelerated pace. These factors, among others, caused Celsius's liabilities to exceed its diminishing assets by hundreds of millions of dollars.

8.    Again, Defendants continued to falsely assure customers that Celsius was in a financially secure position, that its customers' digital asset commodities were safe and that Celsius had sufficient funds to meet its customers' withdrawal requests.

9.      In a video aired on May 13, 2022, Mashinsky described the company's condition
as such:

> Celsius is stronger than ever. We have billions of dollars in liquidity.
> Anyone who needed to withdraw their funds, got their funds back. Anyone
> who wanted to come in and earn or take a loan or anything else got served.
> We're open for business and we continue to do what Celsius does best: serve
> the community, protect the community, make sure your assets are there
> when you need them.

10.      On June 12, 2022, Celsius froze customer withdrawals. A month later, on July 13,
2022, Celsius filed for bankruptcy, revealing that its liabilities exceeded its assets by more than
one billion dollars.

11.      In addition to the Defendants' fraudulent conduct, Celsius operated a commodity
pool ("Celsius Pool") in which Celsius pooled customer assets for the purpose of trading
commodity interests, such as, but not limited to, futures contracts, for the benefit of Celsius's
customers ("pool participants"). Celsius acted as an unregistered commodity pool operator
("CPO") of the Celsius Pool by soliciting, accepting, and receiving assets for the purpose of trading
commodity interests; and Mashinsky operated as an unregistered associated person ("AP") of that
CPO by soliciting members of the public to contribute to the Celsius Pool. Celsius also failed to
provide prospective pool participants with pool disclosure documents.

12.      Through this conduct and the conduct further described herein, Defendants violated
Sections 4k(2), 4m(1), 4$o$(1)(A)-(B) and 6(c)(1) of the Commodity Exchange Act (the "Act" or
"CEA"), 7 U.S.C. §§ 6k(2), 6m(1), 6$o$(1)(A)-(B) and 9(1), and Commission Regulations
("Regulations") 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).
Mashinsky, as a controlling person of Celsius, is liable for each of Celsius's violations. In addition,
Mashinsky directly violated 7 U.S.C. § 6k(2) by failing to register as an AP of a CPO.

3

13.     Accordingly,  the CFTC brings  this action pursuant  to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin  Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition,  the CFTC seeks civil  monetary  penalties and remedial ancillary  relief, including,  but not limited to, trading and registration bans, disgorgement,  restitution, pre- and post-judgment  interest, and such other relief as the Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

14.     This Court has jurisdiction  over this action under 28 U.S.C. § 1331 (federal question jurisdiction)  and 28 U.S.C. § 1345 (district  courts have original  jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes  the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging,  or is about to engage in any act or practice constituting  a violation  of any provision  of the CEA or any rule, regulation,  or order thereunder.

15.     Venue properly lies with this Court pursuant  to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants transacted business  in the Southern  District  of New York and engaged in acts and practices in violation  of the Act and Regulations  within  this District. Mashinsky  also resides in New York, New York.

## III.     PARTIES

## A.      The CFTC

16.     Plaintiff  **Commodity Futures Trading  Commission** is the independent  federal regulatory  agency charged by Congress with the administration  and enforcement  of the Commodity  Exchange Act ("CEA") and Regulations  promulgated  thereunder.  The Commission

maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

**B.**     **Defendants**

17.     **Celsius Network, LLC** (together with its parent and related entities, "Celsius") is a Delaware limited liability company with its principal office in Hoboken, New Jersey. Celsius conducted its business on the internet through a website accessible to the general public at https://www.celsius.network and which was also accessible to the general public through Celsius' proprietary mobile device application.    Celsius is currently in chapter 11 bankruptcy in the U.S. Bankruptcy Court in the Southern District of New York, Case No. 22-10964 (MG).   None of the Celsius entities have ever been registered with the Commission in any capacity.

18.     **Alex Mashinsky** ("Mashinsky") is a co-founder and the former chief executive officer of Celsius. Mashinsky controlled Celsius through his position as CEO and as the largest equity stakeholder in Celsius.  Mashinsky resides in New York, New York.  Mashinsky has never been registered with the Commission in any capacity.

## IV.     STATUTORY BACKGROUND AND LEGAL FRAMEWORK

19.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

20.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights. Digital assets include virtual currencies, such as Bitcoin (BTC), Ether (ETH), USD Coin (USDC), and Tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value. Certain digital assets are "commodities," including Bitcoin, Ether, USDC, Tether, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

21.     In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including Bitcoin and Ether futures and options, by boards of trade designated by the Commission, including the Chicago Mercantile Exchange ("CME") and Chicago Board Options Exchange ("CBOE").

22.     Section 6c(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

23.     CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2022), promulgated pursuant to the authority in CEA Section 6(c)(1), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1)     Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

> (2)     Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or

(3)     Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

24.     Section 13c(b) of the Act, 7 U.S.C. § 13c(b) provides that "any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations or orders issued pursuant to this Act may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."

25.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), provide that each "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his [or her] employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

## V.     FACTS

### A.     The Founding of Celsius

26.     The idea for Celsius was conceived by Mashinsky and another individual in the summer of 2017 during the digital asset boom.

27.     Mashinsky first envisioned Celsius as a peer-to-peer lending network that would allow users to borrow tokens from or lend tokens to other users, with loans managed on the blockchain by smart contracts.

28.     Before Celsius opened for business, Mashinsky had changed the original business model from a lending facility to a "simple app that would accept your coins and we would deploy them for you . . . ."

7

29.     Under this model, Celsius's customers would allow Celsius to pool their digital assets and deploy these pooled assets to generate revenue for Celsius which would be returned to the customers in the form of weekly interest payments or "rewards."

30.     Starting in September 2017, Mashinsky began marketing Celsius through various social media sites, conferences and crypto industry events.

31.     In October 2017, Mashinsky began to pre-sell what would later become the "CEL" token, Celsius's native currency, in private offerings to international and accredited customers.

32.     These pre-sales, as well as an anticipated initial coin offering, would provide Celsius with the initial capital needed to fund its business operations.

33.     In March 2018, Celsius launched its platform and in June 2018, Celsius released its mobile application.

34.     Celsius claimed it was different from traditional financial institutions because it was "democratized" and "[b]uilt on the belief that financial services should only do what is in the best interests of the community."

**B.    Celsius's Business Entities**

35.     Celsius Network Inc. was incorporated in Delaware on February 8, 2018, by Mashinsky.

36.     On February 9, 2018, Celsius Network Inc. incorporated Celsius Network Limited as a United Kingdom private limited company. Celsius Network Limited was the entity that interacted with customers through the summer of 2021.

37.     Today, Celsius Network Limited operates as the holding company for roughly twenty directly or indirectly owned subsidiaries. Celsius Network, Inc. owns approximately 60% of Celsius Network Limited, and outside investors own the other approximately 40%.

38.     In October 2020, Celsius Mining LLC was incorporated as a limited liability company in Delaware.

39.     In June 2021, Celsius Network LLC was incorporated as a limited liability company in Delaware and moved its corporate headquarters from the United Kingdom to New Jersey.

40.     In August 2021, Celsius transferred all of its customer accounts from Celsius Network Limited to Celsius Network LLC.

## C.     **Celsius Products and Services**

41.     According to Mashinsky, Celsius was one of the first digital asset platforms that allowed customers to transfer digital assets, including digital asset commodities such as Bitcoin, Ether, USDC, Tether, and others, to a platform and then earn rewards on the transferred assets and/or take loans using the transferred assets as collateral.

42.     Celsius allowed customers to deposit their digital asset, including digital asset commodities, with Celsius in exchange for annual percentage yield ("APY") payments ranging from 4.5 to 17 percent.

43.     To generate the income to pay its customers the promised APYs, customers' digital asset commodities would be pooled and deployed by Celsius as loans to institutional and retail customers and for other revenue generating activities, including, but not limited to, the trading of futures contracts. For this trading, Celsius operated the Celsius Pool and was not registered as a CPO. Additionally, Mashinsky did not register as an AP of a CPO, despite soliciting members of the general public to contribute to the Celsius Pool.

44.     In addition, Celsius, while acting as CPO of the Celsius Pool, failed to provide pool disclosure documents as required by Regulation 4.21, 17 C.F.R. § 4.21 (2022), including but not

limited to documents providing or describing required cautionary statements, risk disclosures, fees and expenses incurred, past performance disclosures, and others.

45.    Celsius also offered customers custodial, lending and brokerage services relating to the numerous digital assets, including digital asset commodities, it accepted from customers.

46.    Celsius used the returns it received on its asset deployment to pay customers their "rewards" and kept the remaining money, when there was any, as profits for the company. If, however, Celsius failed to profitably deploy its customers' assets in investments that earned more than the interest owed to its customers, Celsius lost money.

47.    Additionally, to the extent that Celsius invested customers' assets in long-term illiquid ventures, Celsius needed to retain sufficient capital to meet the demand for withdrawals.

48.    To increase its revenue streams, aside from retail and institutional lending, Celsius also engaged in DeFi lending, staking, Bitcoin mining and custodial services.

**D.    The "Earn" Program**

49.    Celsius's most popular product was the "Earn" Program, which allowed customers who transferred certain digital assets, including the digital asset commodities described herein, to Celsius to earn rewards, referred to as yield, on their deposited assets.

50.    Celsius promoted the Earn Program by promising some of the highest yields in the market, as much as 17% per year and describing the program as the "safest place for your crypto."

51.    Mashinsky explained that the rates were "subject to change on a weekly basis as they are calculated by the weekly demand for each coin combined with our promise that up to 80% of our profits are returned to the depositors."

52.    Mashinsky described the Earn Program as "sleep to earn," where customers merely deposited their digital assets, including but not limited to digital asset commodities, and let Celsius

do all the work to generate returns. As Mashinsky explained, "you don't have to do anything, you just go to sleep, and every Monday we pay you yield."

53.    Celsius portrayed the Earn program as low risk due to the fact that Celsius only provided loans to reputable counterparties that pledged "over 100% collateral" to acquire loans from Celsius.

54.    Celsius encouraged its customers to earn rewards in CEL, by offering higher reward rates for CEL than other digital assets.

**E.    Unsustainable Business Model**

55.    Starting in mid-2020, with digital asset values soaring and Celsius offering higher reward rates than anyone else in the market, Celsius experienced positive growth indicated by the number of users on the platform, assets under management and the price of the CEL token.

56.    Despite the outward signs of success, Celsius was unable to generate sufficient returns from its asset deployments to cover the high rewards it was offering to its customers.

57.    Celsius began to operate close to, or under, net interest margin ("NIM"), which Celsius calculated by measuring the difference between the yield that Celsius earned on its deployed assets relative to the cost of those same assets.

58.    From the outset, Celsius offered some of the highest reward rates in the industry, and promised its customers that they would "always receive a minimum of at least 5% annual interest on any lent crypto currencies."

59.    In 2020, Mashinsky posted to Twitter that "[t]he best rates to earn interest are on @CelsiusNetwork" and that, with Celsius, people can "earn the highest yield in the industry."

60.    Customers began receiving rewards in the third quarter of 2018 and within months, Celsius dramatically increased the reward rates for Bitcoin, Ether and Litecoin deposits.

61.     Prior to July 1, 2021, Celsius did not have a formal policy for setting reward rates, and decisions were made regarding rates to address Mashinsky's concern that unless Celsius offered the highest in the industry, customers would choose a competing lending platform.

62.     Celsius kept the reward rates high despite the fact that it was unable to generate sufficient yield on its asset deployment to pays its customers the rates it promised.

63.     It was clear to some Celsius employees, at least as early as 2019, that the company may not have enough cash to meet its business expenses.

64.     Other Celsius employees believed that with reward rates as high as they were, the return on asset deployment would never be sufficient to keep a positive NIM.

65.     By December 29, 2021, Mashinsky continued to prioritize moving Celsius's NIM "to positive territory" but his solution was not to lower reward rates or slow customer growth, but rather to deploy Celsius's assets in riskier investments to chase higher yields.

**F.    Mounting Losses, Withdrawals and "The Pause"**

66.     As the digital asset market began to cool in the summer of 2021, Celsius began to suffer large financial losses and limited opportunities to deploy its remaining assets.

67.     Despite the fact that Celsius was losing money on its asset deployments and finding it difficult to access new revenue streams, Mashinsky refused to lower reward rates for fear customers would leave the Celsius platform.

68.     As customer reward obligations mounted, Celsius was unable to generate sufficient revenue to meet these obligations. This problem was made worse by the fact that Celsius bought CEL on the open market to pay customer rewards, but then was unable to deploy the CEL to earn any additional income and had outlaid Bitcoin and other digital asset commodities to purchase the CEL.

69.    Dating back to 2020, Celsius had also used customer assets to fund operational expenses and rewards, failed to adequately track or reconcile customer assets and liabilities on a digital asset by digital asset basis, and been unable to recognize a significant shortfall in customer deposited digital asset commodities.

70.    In 2021, Celsius's reward obligations to customers exceeded net revenue by approximately $1 billion and by $380 million in the first half of 2022.

71.    At the same time, Celsius was also incurring significant losses from deployments dating back to at least 2019. In total, by May 2022, Celsius had suffered over $1.7 billion in total losses.

72.    By June 2022, Celsius began to use new deposits made by customers to make payments to existing customers.

73.    Based on the precarious state of the digital asset markets, beginning in May 2022, concerns arose that Celsius may not be able to cover its customers deposits.

74.    Between June 10 and 12, 2022, Celsius received $428.3 million in withdrawal requests, but was unable to meet these requests.

75.    On June 12, 2022, Celsius announced that it was pausing all customer withdrawals, referred to in bankruptcy filings as "The Pause."

### G.    **Defendants' Materially Misrepresentations**

76.    From the moment it began accepting customers funds, Defendants engaged in an aggressive and often misleading advertising campaign to find new customers and retain the customers who had already deposited their digital asset commodities with Celsius.

77.    Despite the fact that Celsius was having difficulty generating revenue to meet the rewards earned by its growing customer base and was unable to effectively deploy its assets, Defendants always painted a picture of a company that was safe and prosperous. This was false.

78.    Mashinsky regularly misrepresented the safety and profitability of Celsius in his tweets and "Ask Mashinsky Anything" videos ("AMA") that were typically live-streamed every Friday afternoon beginning in 2020.

79.    Mashinsky, and guests, discussed a wide variety of topics each week during the AMAs that often included the CEL token, reward rates, new products and services, and updates on the number of new customers and how certain assets were performing.

80.    Celsius was aware that Mashinsky was making false and misleading statements during his AMA's and other appearances so often that a team of employees were tasked with editing AMA's after they were aired to delete problematic statements; emails were circulated documenting Mashinsky's misstatements during these broadcasts, when he said them and why they were false. Mashinsky was repeatedly told not to say certain statements, but continued to do so.

81.    Defendants repeatedly represented to its customers and investing public that Celsius was better than a bank and often used the hashtag "unbank yourself" in its public communications.

14

82.     Defendants promised "financial freedom through crypto" and claimed to provide fair interest rates, no fees and instantaneous transactions, things a traditional bank could not provide.

83.     Celsius stated that wealth for all could be created through its business model described as such in a since-deleted blog post:

> [t]he Celsius business model is structured to do the exact opposite of what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest.

84.     In his public statements, Mashinsky also repeatedly talked about the level of trust and transparency Celsius customers enjoyed.  For example:

> a)  We have seen time and time again that customers choose Celsius for yield and loans because they trust us, and our goal is to always act in their best interests and consistently deliver industry-leading transparency.

> b)  Celsius was built to act in the best interest of the community, and we have consistently delivered honest, transparent, and rewarding financial services

> c)  Our relationships with our 230,000 community members are built on trust, because they count on us to act in their best interests . . . we're providing additional transparency into our business, which remains one of the industry's most reliable, secure and rewarding platforms for putting unparalleled economic freedom into the hands of the people

85.     Despite Mashinsky's claims of trust and transparency, Defendants, from the beginning of its existence, repeatedly misrepresented the health and safety of the company.

**H.    Defendants Repeatedly Lied about the Amount Raised in Celsius's Initial Coin Offering**

86.     Celsius's public initial coin offering ("ICO") took place in March 2018.  An ICO is the digital asset industry's equivalent of an initial public offering (IPO). A company seeking to raise money to create a new coin, app, or service can launch an ICO as a way to raise funds.

87. Although Celsius publicly represented that its ICO had raised $50 million, in fact, ICO sales only reached $32.8 million.

88. On May 17, 2018, Mashinsky gave an interview from Blockchain Week in New York that appeared on YouTube. In the interview Mashinsky responded to a question about how the Celsius ICO did and he responded, "We raised $50 million."

89. In an article published by CoinCentral on November 11, 2018, Mashinsky again stated "[o]ur ICO (Initial Coin Offering) raised over $50 million."

90. This statement was untrue, and Mashinsky knew it was false. The ICO only raised $32.8 million. Celsius employees often discussed how Mashinsky continuously publicly misrepresented the amount raised by the ICO and that they needed to make sure Mashinsky did not continue to say the "wrong things" about Celsius' funding because "[t]his mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did)." By misrepresenting the value of the ICO, Defendants mislead the public about the financial standing of Celsius and made the ICO appear more successful than it was in reality.

## I.    Defendants Routinely Misrepresented the Profits Distributed to Customers

91. Defendants routinely stated that Celsius returned most of their revenue to its customers. At times, Defendants represented that Celsius gave up to 80 percent of its revenue to its customers.

92. This claim was repeated in marketing materials and during Mashinsky's AMAs.

93. For example, on March 19, 2019, Celsius posted to Twitter, "Our model is simple, we give 80% back to the community. Banks keep 80% to themselves. It's not like there is a complicated algorithm that nobody knows about."

94.     On September 19, 2019, Celsius replied to a tweet explaining, "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments. Your bank could pay you the same rates, they just prefer to keep the profits for themselves. #UnbankYourself."

95.     On October 11, 2021, Mashinsky gave an interview posted to YouTube on the Paul Barron Network channel. In a written caption accompanying the video, Celsius is described as "a crypto platform with over 1 million users that earns you up to 17% yield on your crypto, rewards you every week and lets you borrow cash at the lowest rates. Up to 80% of Celsius revenue is paid back to the community as weekly rewards on crypto."

96.     During the October 11th interview, Mashinsky stated that banks "make tremendous amount of yield, they just choose to give 100 percent of that, or almost 100 percent of that to their shareholders and Celsius chooses to create the same yield and give a very large chunk of that to its customers." Mashinsky claimed that unlike a bank that shares its revenue or yield on its loans with its owners, Celsius shared most of the yield it earned with its customers.

97.     Mashinsky continued to repeat the claim that Celsius shared "most" of its yield revenue with customers. During an interview with CNBC posted to YouTube on April 13, 2022, Mashinsky said that unlike banks who make profits from using customers' money and keep it for themselves, Celsius "give[s] most of the profit or most of the yield back to the community. So Celsius as an example paid the community over $1 billion in yield and this is the kind of yield you cannot get from banks."

98.     Despite claiming that it gave 80% of its revenue to its customers, Celsius never set customer reward rates based on its loan yield or other asset deployment revenue, a practice of which Mashinsky had knowledge.

17

99. In response to regulatory inquiries in June and July 2021, Celsius described its rate-setting process as involving a multitude of factors, but indicated that "a customer's return is not determined by reference (or linked) to Celsius's generation of revenues from crypto assets received from customers."

100. Despite this admission to regulators, Defendants falsely claimed repeatedly that Celsius returned 80% of its revenue to customers.

## J.  Defendants Misrepresented the Number of Active Celsius Users

101. In order to have a sufficient amount of deployable assets, Celsius needed a steady stream of customer deposits to sustain its growth. Mashinsky was the main promoter of Celsius and constantly used social media and other forms of outreach to solicit new customers.

102. If Celsius failed to earn revenue from its deployed assets or had assets in long term obligations, the only remaining revenue stream available for new deployments was new customer deposits.

103. In a blog post on March 12, 2019, Mashinsky explained: "The more people that deposit, the more profits there are to distribute to the community, and THAT is a sustainable and scalable promise."

104. Aware that new customers were the key to sustained growth and more deposits, Mashinsky repeatedly and knowingly exaggerated the number of active Celsius's customers, making Celsius appear significantly more popular than it actually was.

105. In a YouTube interview on November 17, 2021, for example, Mashinsky, stated "we have a million and a half customers…they hold over 25 billion dollars' worth of digital currencies…."

106. In another YouTube interview on June 1, 2022, Mashinsky claimed: "we have a community of almost two million people…."

107. While Celsius had approximately 1.7 million registered users as of July 2022, in reality, most of them were not active customers, a fact Mashinsky did not disclose.

108. From 2019 through 2022, roughly two-thirds of registered U.S. Celsius users held less than one dollar's worth of digital assets in their Celsius accounts. For example, by June 17, 2022, Celsius had 584,192 registered U.S. users; of those, 386,294 (66%) had an account balance of less than one dollar.

109. Defendants misrepresentations of the true number of active customers was misleading to customers, making it appear that Celsius was more successful and more widely used than it actually was.

**K.** **Defendants Mislead Customers About Celsius' Regulatory Compliance**

110. By 2021, Defendants were aware that regulators in several states, were investigating the business activities of Celsius and that these regulators had either directed Celsius to stop illegal activities in their states or had indicated their states' intention to seek such an order.

111. Despite this fact, in a December 3, 2021, YouTube interview, Mashinsky falsely claimed that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything…."

112. In an interview from April 2022, Mashinsky said that "We are monitored by eight different agencies. Companies like us are following all the rules, A to Z, seven days a week."

113. In an April 15, 2022 AMA, Mashinsky, after explaining the level of customer concern over governmental interest in Celsius, said "There's clarity from different regulators, both

from states and federal regulators, [I am] telling you the user that there's no issue, there's no legal

issues as least with what Celsius provides."

114.    Following this AMA, Mashinsky also stated on April 18, 2022 that "we have an

agreement with the SEC and state regulators."

115.    Despite being aware of numerous investigations, cease and desist orders, and

regulatory uncertainty surrounding Celsius's business activities, Mashinsky knowingly made the

above false statements to assuage customer concerns, prevent withdrawals and entice new

customer deposits under the veil of regulatory certainty.

## L.    Defendants Lied About the Safety of Customers' Assets

116.    In order to entice customers to deposit their digital asset commodities with Celsius,

Mashinsky repeatedly and misleadingly said that customer deposits with Celsius were as safe, if

not safer, than money deposited in a traditional bank.

117.    Celsius's internal "Brand Guidelines" suggested to marketing personnel that they

use specific language to describe the security Celsius customers could expect, such as, "We're for

anyone who's ever looked at their mattress and wondered if it could do a better job of keeping

their money safe."

118.    On its website, and in other communications with its customers, Celsius said that

"our top priority is keeping your assets secure."

119.    In a March 7, 2019, interview at the NASDAQ MarketSite in Times Square,

Mashinsky claimed that money deposited with Celsius was "as safe as it is with the bank, which

is the alternative, it's just that [Celsius] network is always acting in your best interest."

120.    Beginning as early as March 2020, Mashinsky repeatedly claimed that Celsius's risk

management team avoided risky investments and instead obtained high yield at low risk. On the Celsius

YouTube channel, in a video titled "How Celsius Earns Yield," Mashinsky explained, "Celsius generates a certain amount of profit by lending assets . . . the key is to get high yield at a low risk."

121.    During an AMA on October 1, 2021, Mashinsky said, "Our number one priority is keeping the funds that we're lending out safe and we would rather . . . lend large scale to a counterparty . . . than to risk earning a ridiculously high yield lending to a shady character."

122.    Mashinsky further misled customers by promising that Celsius would take full responsibility for safeguarding customer assets, including from any shortfalls or loss of value caused by Celsius's use or "deployment" of customers' digital asset commodities.

123.    In his December 10, 2021, AMA, Mashinsky declared that "Celsius takes full responsibility if anything goes bad" and claimed that if "something bad happens with the Celsius deployment … Celsius [is] standing behind it."

124.    Even as uncertainty gripped the crypto market, on May 11, 2022, both Celsius and Mashinsky posted to Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe. We continue to be open for business as usual."

125.    Despite these assurances of safety, Defendants knew that Celsius was never as safe as a traditional bank, and as its financial position became more dire, Celsius increasingly engaged in riskier investments with its customers' money.

**M.    Defendant Falsely Claimed that all Loans Made by Celsius Were Fully Collateralized**

126.    Defendants made numerous representations to their customers and potential customers about the importance of collateralized loans.

127.    Defendants told their customers that Celsius did not "do non-collateralized loans . . . Celsius will not do that because that would be taking too much risk on your behalf." Non-

collateralized loans are problematic because if the borrower defaults on the loan, a lender, such as Celsius, has no collateral to retain or liquidate to offset the loss on the loan.

128.    On April 4, 2020, Mashinsky posted to Twitter, "We only do asset backed lending so always have 200% collateral."

129.    In a July 17, 2020 AMA, Mashinsky stated that "Celsius does not do non-collateralized loans" because "that would be taking too much risk on [customers'] behalf."

130.    In a November 6, 2020 AMA, Mashinsky said, "We do not do unsecured lending."

131.    In an April 30, 2021 AMA Mashinsky said, "A run on the bank cannot happen at Celsius because Celsius never lends more than what it has …we always have enough coins and enough collateral and so on to return all the assets to all of our users."

132.    As late as April 2022, Mashinsky continued to repeat the claim that Celsius did not have non-collateralized loans, "On the institutional side, we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer any non-collateralized loans."

133.    In reality, Celsius had numerous positions that were either not fully collateralized or had no collateral at all and Defendants were aware of these facts.

134.    In 2020, Celsius made almost $10 million in uncollateralized loans. In 2021, that number ballooned to at least $203 million, and in the first half of 2022, Celsius made at least $394 million in uncollateralized loans.  In fact, in a Board meeting in May 2022 which Mashinsky attended, it was reported that only twenty percent (20%) of institutional loans by Celsius were fully collateralized and valued at $643 million while forty-seven (47%) were unsecured and were valued at $1.492 billion dollars.

135.    From 2020 through June 2022, Celsius made over 100 uncollateralized loans to at least 19 different counterparties.

## N.    Mashinsky Misrepresented the Extent and Risk of Celsius's Decentralized Finance Risk

136.    Traditionally, in a centralized finance system, money is held by banks and similar institutions, who facilitate the movement of money between parties for a fee.

137.    With decentralized finance ("DeFi"), digital asset transactions, including loans and payments, can be enabled in a peer-to-peer approach. There is no centralized exchange that holds custody over assets, no involvement of institutional intermediaries such as a futures commission merchant, and users rely on a smart contract-based approach to execute transactions on a blockchain.

138.    DeFi transactions are complex and risky. While transactions on DeFi are usually over-collateralized by digital assets, if the market value of the collateral falls below a threshold prescribed in the smart contract, the DeFi protocols will automatically liquidate the collateral and close the loan. This can result in a significant loss of value for the borrower. DeFi protocols are also risky because they are susceptible to hackers.

139.    Mashinsky personally acknowledged that DeFi posed risks, but assured customers, in a December 3, 2021, YouTube interview, that "Celsius… helps people navigate in a safe way into [the DeFi] environment… because Celsius already did the homework and figured out what's safe."

140.    Mashinsky's statements that Celsius had figured out a safe way to deploy assets via DeFi were false. In reality, at the time of his statements, Celsius had already suffered numerous losses with DeFi transactions.

141.    In August 2020, Celsius engaged a company for the purpose of handling Celsius's DeFi investments. That company placed $500 million worth of Celsius's investor assets in risky DeFi deployments that resulted in losses of at least tens of millions of dollars.

142.    In June 2021, Celsius also lost access to 35,000 Ether worth tens of millions of dollars on a third-party service. Celsius never recovered those assets and Mashinsky failed to disclose this loss to Celsius's customers.

143.    Additionally, in December 2021, Celsius lost Bitcoin, then valued at approximately $50 million, to a hack to a DeFi protocol.

144.    Despite these loses and increasing exposure to DeFi protocols, Mashinsky continued to play down Celsius's use of DeFi. In a June 1, 2022, YouTube interview, Mashinsky stated: "Celsius continues to do what it did for the last five years. Again, most of our business, I would say 90% of our business, has nothing to do with DeFi." This was untrue.

145.    By the spring of 2022, DeFi had grown to become Celsius's single largest deployment category. As of May 25, 2022, Celsius had deployed nearly 30% of its customers' digital assets into DeFi activities, compared to only about 11% in retail lending and 12% in institutional lending.

146.    Celsius's use of DeFi protocols as its primary asset deployment vehicle was in direct contradiction to Mashinsky's repeated claims that customers' assets were deployed in high yield, low risk investments.

**O.    Defendant Misrepresented the Risk Profile of Institutional Partners**

147.    During his promotion of Celsius, Mashinsky repeatedly told customers and potential customers that Celsius only worked with credible and reputable counterparties.

148.    In his November 6, 2020, AMA, Mashinsky stated that Celsius "only lend[s] to the first-tier institutions, first tier exchanges…."

149.    Again, on April 13, 2022, Mashinsky falsely claimed that Celsius dealt only with "very credible" institutional counterparties.

24

150.    As a way to exemplify the quality and safety of the counterparties Celsius dealt with, in an AMA on November 12, 2021, Mashinsky stated that "In four years we have not had a single institution default either not pay the interest or not return the collateral or the long coins that we lend to them." Mashinsky further proclaimed on July 9, 2021, in a video posted on the Paul Barron Network YouTube channel, that Celsius had "Zero loans that went into default with any of our counterparties. . ."

151.    These statements were false. By early 2021, at least two companies defaulted on loans that Celsius had made to them. For example, by letter dated February 9, 2021, Celsius demanded repayment on a digital asset lending agreement entered into on December 3, 2019 and which Celsius contended that the counter party was in breach and defaulted on the loan. If not resolved, Celsius threatened formal legal action.

152.    In email written by Mashinsky to Celsius's Chief Revenue Officer, Mashinsky acknowledged the default of one of the companies noted above in paragraph 150. He stated "[i]t used to be a $3m problem now it is a $17m problem," and "[w]e were suppose to get 200 BTC back. Never happened." This default was also the subject of discussion at an Assets and Liabilities Committee meeting held on July 14, 2021 and at which Mashinsky was present.

153.    Yet, in a November 12, 2021 AMA YouTube video Mashinsky claimed "[w]e have not had a single institution default …". He did not disclose that by then, at least two institutional loan counterparties had defaulted on their agreements. The Celsius team tasked with edited out Mashinsky's false statements noted that his claim about no defaults needed to be removed.

**P.      Defendants Misrepresented that Celsius Did Not Engage in Directional Trading**

154.    From the outset, Celsius claimed to engage in a delta neutral trading strategy, meaning Celsius did not trade long or short positions to earn yield, but rather sought to capture difference in prices between products and exchanges. Delta neutral trading strategies are generally regarded as less risky, since positions are relatively insensitive to market movements and volatility. Mashinsky explained that traditional banks engaged in this type of trading all the time, but unlike Celsius who returned money to its customers, banks kept this money for themselves.

155.    In a Tweet dated September 29, 2020, Mashinsky wrote "Celsius does not trade or take long or short positions with customer coins."

156.    Mashinsky again described Celsius's trading strategy in a CBNC interview on April 13, 2022 saying "We are what's called a delta neutral strategy meaning. . .Celsius doesn't bet on the market going up or down, our job is just to take advantage of difference in prices between, for example, future and spot or one exchange and another and we take or grab that difference."

157.    Despite Mashinsky's false claims, Celsius routinely engaged in directional trading, a practice of which Mashinsky was aware.

158.    Within Celsius, directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including Mashinsky.

**Q.      Defendant Falsely Claimed Celsius Was Less Leveraged Than It Actually Was In Comparison to Traditional Banks Regarding Leveraged Trading**

159.      Mashinsky routinely said that Celsius was safer than a bank because banks were highly leveraged and Celsius was not.

160.      For example, in a May 7, 2021 AMA, Mashinsky said "And you will see that they are, their leverage is a 100 times greater than Celsius not ten times greater, 150 to 1 leverage. 0.23% leverage 0.23 versus five zero. Okay, so how many orders of magnitude are we talking about that's, you know, what is it 44.3 orders of magnitude, something like that 2.3 orders of magnitude.! That's the real risk, it's not, it's not Celsius before I went under leverage."

161.      In a February 22, 2022 Twitter Spaces broadcast Mashinsky explained: "Oh, yeah, we don't have leverage. It's not like we can go to the Fed and borrow money or, or borrow money from other banks like banks do every day. All right. So it's a completely different system. Banks are leveraged on average, either 10 times or 20 times depending on the balance sheet. And Celsius doesn't have any leverage, right? I mean, we, we have a little bit of leverage, because we sometimes lend out the collateral we get from third parties. So it's maybe again, instead of 1.0, it's 1.2 or something like that."

162.      Even though he claimed that Celsius did not have leverage akin to a bank, Mashinsky knew otherwise but falsely misrepresented this fact to customers and potential customers. Mashinsky had been told by Celsius senior management that his statements about Celsius's leverage were false and that Mashinsky should cease from making these misrepresentations to the public.

**R.      In Promoting the Sale of CEL, Mashinsky Would Tout His Buying of CEL Without Disclosing that He was Selling More Than He was Buying**

163.     To entice customers to accept CEL through the earn program, Celsius offered its highest rates and Mashinsky constantly promoted CEL.

164.     In AMAs and other public appearances, Mashinsky promoted CEL by touting his purchases of the tokens and as importantly, that he was holding the token since its value was increasing.

165.     In reality, Mashinsky was selling more CEL than he was buying, or simply just selling the CEL he was supposedly holding. This trading was never disclosed to the public.

166.     For example, during AMAs on October 15, 2021 and December 31, 2021, Mashinsky implored his customers to "HODL" CEL, but failed to disclose that he actually sold CEL during those months.

167.     He repeated this pattern multiple times during the Relevant Period, and what might be at one of the most opportunistic times, he did so in May 2022. In an AMA on May 13, 2022, Mashinsky stated "I'm holding, I didn't sell." But in May 2022, Mashinsky had sold approximately $2 million worth of CEL.

**S.      Mashinsky Lied to the Public about Celsius's Financial Condition Leading Up to "The Pause"**

168.     Starting in May 2022, based upon their concerns regarding the safety of their assets, Celsius customers began withdrawing hundreds of millions of dollars worth of digital assets, including, but not limited to, digital asset commodities, each day, culminating on May 12, 2002 when customers withdrew over half a billion dollars from the Celsius platform in just one day.

169.    Despite the record number of withdrawals and the fact Celsius's liabilities far exceeded its depleting assets, Mashinsky continued to solicit new customers and falsely represent that Celsius was strong and had the ability to meet the customer demands.

170.    As previously described, Mashinsky continued to implore Celsius's customer to hold on to their CEL tokens, despite the fact that he was selling his own CEL tokens and withdrawing his assets from the platform.

171.    During an AMA on May 13, 2022, Mashinsky stated that "Celsius is stronger than ever, we have billions of dollars in liquidity... and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

172.    On May 16, 2022, in an interview posted on YouTube Mashinsky again proclaimed that Celsius was "standing strong" and that Celsius was "ready with the liquidity."

173.    These statements by Mashinsky, made to assure Celsius's customers and entice new customers, were false and misleading.

174.    By May 13, 2022, Celsius had total assets of less than $12 billion and total liabilities of more than $12.75 billion, resulting in net assets of negative $820 million.

175.    Between May 9, 2022 and May 24, 2022, Celsius customers withdrew over $1.4 billion in assets.

176.    With customers withdrawing assets at a record pace, Mashinsky continued to solicit new customers in a desperate bid to gather assets to provide liquidity to the struggling platform.

177.    During a May 27, 2022 AMA, Mashinsky offered a referral reward for customers stating, "You'll get $50 in crypto for each completed referral. Your friend will get a $50 referral reward too."

178.    Mashinsky continued his solicitation of new customers on May 29, 2022, when he tweeted, "These are hard times for many…. I will personally give one of the new @CelsiusNetwork users $1000 this week if you show you opened an account and started #HODLing [sic] to build your #FinancialFreedom."

179.    During May and June of 2022, Celsius added almost two thousand new users and $900 million of digital assets to the Celsius platform.

180.    Into June 2022, Mashinsky continued to falsely represent that Celsius had the necessary liquidity to meet customers withdrawals and that its customers' assets were safe.

181.    On June 1, 2022, in response to the hypothetical customer question "are our funds safe at Celsius?" Mashinsky responded, "yes, so not just that they're safe… we provided anyone who wanted to withdraw partially or fully, there were no problems." But, by May 25, 2022, Celsius had les than $11 billion in assets and $11.9 billion in liabilities.

182.    On a June 10, 2022 AMA, Mashinsky claimed that "Celsius has billions in liquidity" and that "anyone what want to withdraw has no problem…."

183.    Between June 10 and June 12, 2022, Celsius customers withdrew over $672 million in digital assets.

184.    On June 12, 2002 Celsius paused withdrawals in order to "stabilize liquidity." Celsius filed for bankruptcy on July 13, 2022 at which time it had over $4.7 billion in user liabilities and only $1.75 billion in digital assets.

## VI.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT ONE

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) and
### Regulation 180.1(a)(1)-(3), 17 C.F.R. 180.1(a)(1)-(3) (2022) (Fraud)

185.    The allegations set forth in paragraphs 1 through 184 are re-alleged and

incorporated herein by reference.

> Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for
> any person, directly or indirectly, to:
> use or employ, or attempt to use or employ, in connection with any
> swap, or a contract of sale of any commodity in interstate commerce,
> or for future delivery on or subject to the rules of any registered
> entity, any manipulative or deceptive device or contrivance, in
> contravention of such rules and regulations as the Commission shall
> promulgate . . . .

186.    Regulation 180.1, 17 C.F.R. § 180.1(a), provides:

> It shall be unlawful for any person, directly or indirectly, in
> connection with any swap, or contract of sale of any commodity in
> interstate commerce, or contract for future delivery on or subject to
> the rules of any registered entity, to intentionally or recklessly: (1)
> Use or employ, or attempt to use or employ, any manipulative
> device, scheme, or artifice to defraud; (2) make, or attempt to make,
> any untrue or misleading statement of a material fact or to omit to
> state a material fact necessary in order to make the statements made
> not untrue or misleading; [or] (3) engage, or attempt to engage, in
> any act, practice, or course of business, which operates or would
> operate as a fraud or deceit upon any person.

187.    During the Relevant Period, Defendants intentionally or recklessly, in connection

with any swap, or contract of sale of any commodity in interstate commerce, or contract for future

delivery on or subject to the rules of any registered entity, directly or indirectly:  used or

employed, or attempted to use or employ, a scheme or artifice to defraud; made, or attempted to

make, untrue or misleading statements of a material fact or omitted to state a material fact

necessary in order to make the statements made not untrue or misleading; and/or engaged, or

attempted to engage, in acts, practices, or courses of business that operated or would operate as a fraud or deceit on any person, including, but not limited to, Celsius customers.

188.    As a result of the foregoing conduct, Defendants' fraudulent conduct violated Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

189.    Defendants are directly liable for their actions in violation of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)(3), 17 C.F.R. § 180.1(a)(1)-(3).

190.    Defendant Mashinsky directly or indirectly controlled Celsius did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) committed by.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as control person for each of Celsius' violations of Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

191.    The acts and omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2022), Celsius liable as principals for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius, constituting violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

192.    Each and every use or employment or attempted use or employment of a scheme or artifice to defraud; or act of making or attempting to make untrue or misleading statements of a material fact or omitting to state a material fact necessary in order to make the statements not untrue or misleading; and act of engaging, or attempting to engage, in the acts, practices, or courses of business that operated or would have operated as a fraud or deceit on any person, including

32

Celsius customers, is alleged as a separate and distinct violation of Section 6(c)(1) of the CEA, 7

U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT TWO

**Violation of Section 4$o$(1)(A)-(B) of the Act, 7 U.S.C. § 6$o$(1)(A)-(B)**
**(Fraud and Deceit by CPOs and APs of CPOs)**

193.    Paragraphs 1 through 192 are re-alleged and incorporated herein by reference.

194.    Section 1a(10) of the Act, 7 U.S.C. § 1a(10)(A), defines a commodity pool, in

relevant part, as:

> any investment trust, syndicate, or similar form of enterprise
> operated for the purpose of trading in commodity interests,
> including any –
>
> (I) commodity for future delivery, security futures product, or swap . . . .

195.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a commodity pool

operator, in relevant part, as any person:

> engaged in a business that is of the nature of a commodity pool,
> investment trust, syndicate, or similar form of enterprise, and who, in
> connection therewith, solicits, accepts, or receives from others, funds,
> securities, or property, either directly or through capital contributions,
> the sale of stock or other forms of securities, or otherwise, for the
> purpose of trading in commodity interests, including any—
>
> (I) commodity for future delivery, security futures product, or
> swap . . . .

196.    By reason of the foregoing, during the Relevant Period, Celsius engaged in a

business, for compensation or profit, that is of the nature of a commodity pool, investment trust,

syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or

received from others, funds, securities, or property, either directly or through capital contributions,

the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity

interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

197.    During the Relevant Period, Celsius was not registered with the Commission as a CPO.

198.    Regulation 1.3, 17 C.F.R. § 1.3 (2022), defines an associated person of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

199.    By reason of the foregoing, during the Relevant Period, Defendant Mashinsky was associated with a CPO as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool, or the supervision of any person or persons so engaged. Therefore, Defendant Mashinsky was an AP of a CPO as defined by 17 C.F.R. § 1.3.

200.    During the Relevant Period, Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

201.    7 U.S.C. § 6o(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any client or participant or prospective client or participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant.

202.    By reason of the foregoing, Celsius, through use of the mails or any means or instrumentality of interstate commerce: knowingly or recklessly employed devices, schemes or artifices to defraud its customers ("pool participants") and prospective pool participants, or (2)

engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon

pool participants or prospective pool participants.

203.   By reason of the foregoing, Celsius violated 7 U.S.C. § 6*o*(1).

204.   The acts or omissions of Mashinsky and other officers, employees, or agents acting

for Celsius described in this Complaint were done within the scope of their office, employment,

or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius

is liable as principal for each act, omission, or failure of Mashinsky and the other officers,

employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6*o*(1).

205.   Defendant Mashinsky directly or indirectly controlled Celsius and did not act in

good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C.

§ 6*o*(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is

also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6*o*(1).

206.   Each misrepresentation and omission of material fact, including those specifically

alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1).

## COUNT THREE

### Violation of Sections 4k(2) and 4m(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1)
### (Failure To Register as a CPO and AP of a CPO)

207.   Paragraphs 1 through 206 are re-alleged and incorporated herein by reference.

208.   Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall

be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or

any means or instrumentality of interstate commerce in connection with his business as such . . .

[CPO] . . . ."

209.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2) states that it shall

be:

> unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent . . . in any capacity that involves
>
> > (i)    the solicitation of funds, securities, or property for a participation in a commodity pool or
> >
> > (ii)    the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an [AP] of such [CPO] . . . .

210.    By reason of the foregoing, Celsius engaged in a business, for compensation or profit, that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests; therefore, Celsius acted as a CPO, as defined by 7 U.S.C. § 1a(11).

211.    Celsius, while using the mails or means of interstate commerce in connection with its business as a CPO, was not registered with the Commission as a CPO.

212.    By reason of the foregoing, Celsius acted as an unregistered CPO in violation of 7 U.S.C. § 6m(1).

213.    By reason of the foregoing, Defendant Mashinsky associated with a CPO (as defined by 7 U.S.C. § 1a(11)) as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or the

supervision of persons so engaged; therefore, Defendant Mashinsky acted as an AP of a CPO as defined by 17 C.F.R. § 1.3.

214.    Defendant Mashinsky was not registered with the Commission as an AP of a CPO.

215.    By reason of the foregoing, Defendant Mashinsky acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).

216.    The acts or omissions of Mashinsky and other officers, employees, or agents acting for Celsius described in this Complaint were done within the scope of their office, employment, or agency with Celsius. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Celsius is liable as principal for each act, omission, or failure of Mashinsky and the other officers, employees, or agents acting for Celsius constituting violations of 7 U.S.C. § 6k(2).

217.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 7 U.S.C. § 6m(1) committed by Celsius. Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 7 U.S.C. § 6m(1).

218.    Each instance that Celsius acted as a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

219.    Each instance that Defendant Mashinsky acted as an AP of a CPO but failed to register with the Commission as such is alleged as a separate and distinct violation.

### COUNT FOUR

**Violation of Regulation 4.21, 17 C.F.R. § 4.21 (2022)**
**(Failure to Provide Pool Disclosure Documents)**

220.    Paragraphs 1 through 219 are re-alleged and incorporated herein by reference.

221.    17 C.F.R. § 4.21(a)(1) provides that:

> each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

222.    By reason of the foregoing, Celsius was required to be registered with the Commission as a CPO, but failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2022).

223.    By reason of the foregoing, Celsius violated 17 C.F.R. § 4.21.

224.    Defendant Mashinsky directly or indirectly controlled Celsius and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting violations of 17 C.F.R. § 4.21 committed by Celsius.  Therefore, pursuant to 7 U.S.C. § 13c(b), Defendant Mashinsky is also liable as a control person for each of Celsius's violations of 17 C.F.R. § 4.2.

225.    Each failure to furnish the required disclosure documents to prospective pool participants and pool participants, including those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VII.    RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.    An order finding that Defendants, collectively and through their officers, employees and agents, violated 4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

B.    An order of permanent injunction prohibiting Defendants and any other person or

entity associated with them, from engaging in conduct described above, in violation of Sections

4k(2), 4m(1), 4o(1)(A)-(B), 6(c)(1), of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and

Regulations 4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

  C. An order of permanent injunction prohibiting Defendants and any of their affiliates,

agents, servants, employees, successors, assigns, attorneys and persons in active concert or

participation with Defendants, from directly or indirectly:

   (i) trading on or subject to the rules of any registered entity (as that term is

defined in Section la of the Act, 7 U.S.C. § la(40));

   (ii) entering into any transactions involving "commodity interests" (as that term

is defined in Commission Regulation 1.3, 17 C.F.R. § 1.3 (2022)), or digital assets

that are commodities, as that term is described herein, for Defendants' own

accounts or for any account in which they have a direct or indirect interest;

   (iii) having any commodity interests or digital assets commodities traded on

Defendants' behalf;

   (iv) controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account involving

commodity interests or digital assets that are commodities, as that term is described

herein;

   (v) soliciting, receiving, or accepting any funds from any person for the purpose

of purchasing or selling any commodity interests or digital asset commodities;

   (vi) applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022);

(vii) acting as a principal (as that term is defined in Commission Regulation

3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any

person registered, exempted from registration or required to be registered with the

Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third-party transferee and/or successors

thereof, to disgorge to any officer appointed or directed by the Court all benefits received

including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees

derived, directly or indirectly, from acts or practices which constitute violations of the Act as

described herein, including pre-judgment and post-judgment interest;

E.    An order directing Defendants and any successors thereof, to rescind, pursuant to

such procedures as the Court may order, all contracts and agreements, whether implied or express,

entered into between, with, or among Defendants and any customer or investor whose funds were

received by Defendants a result of the acts and practices that constituted violations of the Act, as

described herein;

F.    An order requiring Defendants to make full restitution by making whole each and

every customer or investor whose funds were received or utilized by them in violation of the

provisions of the Act as described herein, including pre-judgment interest;

G.    An order directing Defendants to pay civil monetary penalties, to be assessed by the

Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C.

§ 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment

Act Improvements Act of 2015, Pub. L. 114–74, 129 Stat. 584, Title VII, Section 701, *see*

Commission Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act, as

described herein;

H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2); and

I.    Such other and further relief as the Court deems proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.

Dated: July 13, 2023                    Commodity Futures Trading Commission

                                        By its attorneys:

                                        */s/ Jonah McCarthy*
                                        Jonah McCarthy
                                        S.D.N.Y. Bar No. JM1977
                                        Chief Trial Attorney
                                        *jmccarthy@cftc.gov*

                                        Jason Gizzarelli  (*Pro Hac Vice to be filed*)
                                        Senior Trial Attorney
                                        *jgizzarelli@cftc.gov*

                                        Traci L. Rodriguez (*Pro Hac Vice to be filed*)
                                        Chief Trial Attorney
                                        *trodriguez@cftc.gov*

                                        Paul Hayeck (*Pro Hac Vice to be filed*)
                                        Deputy Director
                                        *phayeck@cftc.gov*

                                        Commodity Futures Trading Commission
                                        1121 21st, Street, N.W.
                                        Washington, D.C. 20581
                                        (202) 418-5000
                                        (202) 418-5521(fax)

                                        *Attorneys for Plaintiff*
                                        *Commodity Futures Trading Commission*

**Exhibit C-2**

**CFTC Consent Order**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

          Plaintiff,

v.

CELSIUS NETWORK, LLC and ALEXANDER
MASHINSKY,

          Defendants.

Case No. 1:23-cv-6008

## CONSENT ORDER OF PERMANENT INJUNCTION
## AGAINST DEFENDANT CELSIUS NETWORK, LLC

On July 13, 2023, Plaintiff Commodity Futures Trading Commission (the "Commission")

filed a four count Complaint against Celsius Network, LLC, ("Celsius") and Alexander

Mashinsky ("Mashinsky") seeking a civil monetary penalty, and injunctive and other relief for

violations of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 1-26 and

Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2022).

## I.

## CONSENT AND AGREEMENT

In order to dispose of all the allegations and issues raised in the Complaint and effect a

full and final settlement of any alleged violation of the Act or Regulations referenced above

without a trial on the merits or any further judicial proceedings, Celsius, without admitting or

denying any of the allegations of the Complaint:

1. Consents to the entry of this Consent Order of Permanent Injunction Against Defendant Celsius Network, LLC. ("Order");

2. Affirms that Celsius has read and agreed to this Order voluntarily, and that no promise or threat has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Order, other than as set forth specifically herein;

3. Acknowledges service of the summons, Complaint and this Order;

4. Admits jurisdiction of this Court over it and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13-a 1;

5. Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6. Admits that venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13-a 1;

7. Waives:

   a) all claims which it may possess under the Equal Access to Justice Act, 5 U.S.C §504 and 28 U.S.C. §2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2022), relating to, or arising from, this action;

   b) Any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as

amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

    c)    any claim of double jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief; and

    d)    Any and all rights of appeal from this Order;

8.    Agrees that the Commission is the prevailing party in this action for purposes of the waiver of any and all rights under the Equal Access to Justice Act and the Small Business Regulatory Enforcement Act of 1996 specified in Paragraph 7;

9.    Consents to the continued jurisdiction of this Court over it for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action;

10.    Agrees that it will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

11.    Agrees that neither it nor any of its agents or employees under its authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendant's and/or its agents' and/or employees': (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission not a party. Defendant shall comply

with this agreement, and shall undertake all steps necessary to ensure that all of its agents and/or

employees under its authority or control understand and comply with this agreement.

        12.    Consents to the entry of this Consent Order without admitting or denying

the allegations of the Complaint, except as to jurisdiction and venue, which it admits; and

        13.    Agrees that no provision of this Consent Order shall in any way limit or

impair the ability of any other person or entity to seek any legal or equitable remedy against

Defendant in any other proceeding.

## II.

## PERMANENT INJUNCTION

        Pursuant to 7 U.S.C. § 13a-1, Celsius is permanently restrained, enjoined and prohibited

from directly or indirectly engaging in conduct in violation of Sections 4k(2), 4m(1), 4o(1)(A)-

(B), and 6(c)(1) of the Act, 7 U.S.C. §§ 6k(2), 6m(1), 6o(1)(A)-(B), 9(1), and Regulations

4.21(a)(1) and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.21(a)(1), 180.1(a)(1)-(3) (2022).

## III.

## MISCELLANEOUS PROVISIONS

        A.    AMENDMENTS AND SEVERABILITY.  Nothing shall serve to amend

or modify this Order in any respect whatsoever, unless:  (i) reduced in writing; (ii) signed by all

parties; and (iii) approved by order of the Court.  If any provision of this Order or the application

of any provision or circumstances is held invalid, the remainder of this Order shall not be

affected by the holding.

        B.    SUCCESSORS AND ASSIGNS. This Order shall be binding on Celsius

and any Celsius company which is presently a debtor-in-possession participating in Bankruptcy

Case No.22-10964 (MG) before the United States Bankruptcy Court, Southern District of New York.

      C.     JURISDICTION. This Court shall retain jurisdiction of this matter to ensure compliance with this Order and for all other purposes related to this action, provided however, that nothing in this Order affects the exclusive jurisdiction of the Bankruptcy Court, Southern District of New York, with respect to matters related to the administration of the Celsius bankruptcy estate, including determination of the priority of distribution on any claims, as defined in section 101(5) of the Bankruptcy Code, arising from this Order.

      D.     COOPERATION. Celsius shall cooperate fully with the Commission in this proceeding and in any investigation, litigation or any proceeding commenced by the Commission related to this proceeding by, among other things: (a) responding promptly, completely, and truthfully to any inquiries or requests for information; (b) authenticating documents; and (c) testifying completely and truthfully.

      E.     INADMISSIBLE IN OTHER PROCEEDINGS. Except with respect to a proceeding brought by the Commission, this Order is for purposes of this proceeding only and shall not be admissible as evidence in any form or for any purpose in any judicial or administrative proceeding other than to enforce its terms; provided that Celsius does not consent to the use of this Order as the sole basis for any proceeding brought by the Commission other than a proceeding brought to enforce the terms of this Order and provided further that, nothing in this Order shall be construed to confer any rights on any third parties or inure to the benefit of any third parties.

      There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Consent Order of Permanent Injunction Against Defendant Celsius.

CONSENTED TO BY:

*Jonah C. McCarthy*
_____

Jonah McCarthy
Jason Gizzarelli
Traci Rodriguez
Paul Hayeck
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5395

_____

Mark Filip
Asheesh Goel
Zachary S. Brez
Robert W. Allen
Allison Lullo
Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212)390-4060
_____

Date: __July 12, 2023__

Date: __July 14, 2023__

Done and Ordered this 17th day of July, 2023.

_____

Edgardo Ramos, U.S.D.J.
_____

United States District Court Judge

**Exhibit D-1**

**FTC Complaint**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

CELSIUS NETWORK INC., a corporation,
CELSIUS NETWORK LLC, a limited liability
company, CELSIUS NETWORKS LENDING
LLC, a limited liability company, CELSIUS
LENDING LLC, a limited liability company,
CELSIUS KEYFI LLC, a limited liability
company, CELSIUS MINING LLC, a limited
liability company, CELSIUS US HOLDING LLC,
a limited liability company; CELSIUS US LLC, a
limited liability company; CELSIUS
MANAGEMENT CORP., a corporation;

ALEXANDER MASHINSKY, individually and
as an officer of Celsius Network Inc., Celsius
Network LLC, Celsius Networks Lending LLC,
Celsius Lending LLC, Celsius KeyFi LLC,
Celsius Mining LLC, and Celsius US Holding
LLC;

SHLOMI DANIEL LEON, individually and as an
officer of Celsius Network Inc., Celsius Network
LLC, Celsius Networks Lending LLC, Celsius
Lending LLC, Celsius KeyFi LLC, Celsius
Mining LLC, Celsius US Holding LLC; and

HANOCH "NUKE" GOLDSTEIN, individually
and as an officer of Celsius Network LLC and
Celsius Lending LLC,

     Defendants.

**Case No. 1:23-cv-6009**

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 5(a), 13(b) and 19 of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b) and 57b, and the Gramm-Leach-Bliley

Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.*, which authorize the FTC to seek, and the Court to

order, monetary relief, preliminary and permanent injunctive relief, and other relief for

Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and

in violation of the GLB Act. Defendants' violations are in connection with the marketing and

sale of cryptocurrency lending and custody services.

## SUMMARY OF CASE

2.      Celsius[1] is a cryptocurrency company that marketed and sold crypto-based

financial services to consumers. Celsius's products included interest-bearing cryptocurrency

accounts, cryptocurrency-secured loans, and over-the-counter cryptocurrency sales, among other

services.

3.      From at least 2019 until June 2022, Defendants duped consumers, many of whom

were inexperienced with cryptocurrency, into transferring their cryptocurrency assets onto the

Celsius platform. Defendants promised consumers that Celsius was "safer" than a bank or other

traditional financial institution and misrepresented that their deposits were safe because Celsius

earned profits at "no risk" to consumers by making secured crypto loans to other exchanges.

Defendants guaranteed that if consumers transferred cryptocurrency to Celsius, they would

---

[1] Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius US LLC, and Celsius Management Corp. are collectively referred to herein as "Celsius."

continue to own it, and they could withdraw it "at any time" because Celsius had "billions of dollars in liquidity" and maintained sufficient reserves to meet customer obligations.

4. In reality, Defendants squandered consumer deposits, including by engaging in uncollateralized and undercollateralized lending despite their promises to the contrary. Defendants also failed to keep track of how much consumers had deposited and what Celsius's liabilities were. They failed to maintain enough liquid cryptocurrency to allow all customers to withdraw their crypto on demand. Defendants concealed these facts from the public and falsely touted Celsius as a safe alternative to banking—even though it was anything but.

5. Defendants made other misrepresentations to market Celsius's services, too. In addition to misrepresenting Celsius's ability to satisfy obligations to customers, Defendants falsely advertised that a $750 million insurance policy covered consumers' assets. And, Defendants enticed consumers to deposit their cryptocurrency into Celsius's "Earn" program by claiming that consumers could earn "up to 17%" or "up to 18.63% APY" on deposits. In truth, more than 99% of Celsius's consumers earned APY far lower than 17%, with the average Celsius consumer receiving only about 5.611% APY.

6. Throughout Celsius's operation, Defendants assured consumers Celsius was safe and stable. Then, on June 12, 2022, just five days after promising consumers that it "ha[d] the reserves (and more than enough ETH) to meet obligations," Defendants unexpectedly and unilaterally halted all withdrawals from and transfers on the platform, leaving hundreds of thousands of consumers without access to approximately $4.7 billion dollars' worth of crypto.

7. On July 13, 2022, Celsius Network LLC and certain of its affiliates declared bankruptcy. The cases are pending in the U.S. Bankruptcy Court for the Southern District of

2

New York and are being jointly administered under Case No. 22-10964, *In re Celsius Network LLC.*

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.      The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the GLB Act, which prohibits any person from using a false, fictitious, or fraudulent statement to obtain or attempt to obtain the customer information of a financial institution from a customer of a financial institution.

## DEFENDANTS

11.      Defendant Celsius Network Inc. ("CNI") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNI transacts or has transacted business in this District and throughout the United States. CNI is the parent company for entities that operate the Celsius Network platform; CNI's subsidiaries include Defendants Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp.,

and Celsius KeyFi LLC. At times relevant to this Complaint, acting alone or in concert with others, CNI has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

12.     Defendant Celsius Network LLC ("CNLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

13.     Defendant Celsius Networks Lending LLC ("CNLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CNLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CNLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

14.     Defendant Celsius Lending LLC ("CLLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CLLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CLLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

4

15.     Defendant Celsius Mining LLC ("CMLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CMLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

16.     Defendant Celsius US Holding LLC ("CUSHLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSHLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSHLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

17.     Defendant Celsius US LLC ("CUSLLC") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CUSLLC transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, CUSLLC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

18.     Defendant Celsius Management Corp. ("CMC") is a Delaware corporation with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. CMC transacts or has transacted business in this District and throughout the United States. At times

5

relevant to this Complaint, acting alone or in concert with others, CMC has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

19.     Defendant Celsius KeyFi LLC ("KeyFi") is a Delaware limited liability company with its principal place of business at 50 Harrison Street, Suite 209F, Hoboken, NJ 07030. KeyFi transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, KeyFi has advertised, marketed, distributed, or sold cryptocurrency financial services to consumers throughout the United States.

20.     Defendant Alexander Mashinsky ("Mr. Mashinsky") is a co-founder of Celsius. He has served as a director of Celsius Network Inc. He was the Chief Executive Officer of Celsius Network LLC from its inception until September 27, 2022. He also served as CEO of Celsius US Holding LLC, Celsius Lending LLC, Celsius Networks Lending LLC, and Celsius Network Inc., as well as Executive Chairman of the Board for Celsius Mining LLC and Secretary of Celsius Network, Inc. He was also a director of Celsius KeyFi LLC, Celsius Mining LLC, Celsius Network LLC, Celsius Lending LLC, Celsius US Holding LLC, and Celsius Networks Lending LLC from their inception until September 27, 2022. Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Celsius, including the acts and practices set forth in this Complaint. Mr. Mashinsky has served on various committees within Celsius including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets and Obligations Committee, Investment Committee, and Deployment Committee. He had a heavy hand in Celsius's marketing efforts. He routinely made false, misleading, and/or unsubstantiated

6

statements regarding Celsius's products and services in weekly marketing videos displayed on

Celsius's official YouTube channel, as well as on his personal Twitter account. He was also

personally involved in the decision to freeze withdrawals, swaps, and transfers from the Celsius

platform. Mr. Mashinsky resides in this District and, in connection with the matters alleged

herein, transacts or has transacted business in this District and throughout the United States.

21.     Defendant Shlomi Daniel Leon ("Mr. Leon") is a co-founder of Celsius. He is a

director of Celsius Network Inc. He served as the Chief Strategy Officer of Celsius Network

LLC until October 4, 2022. He has also served as Chief Operating Officer for Celsius Network

LLC, CSO of Celsius Lending LLC, President of Celsius Mining LLC, and COO of Celsius

Network Inc. He has served as a director of Celsius KeyFi LLC, Celsius Lending LLC, Celsius

Mining LLC, Celsius Network LLC, Celsius Networks Lending LLC, and Celsius US Holding

LLC. Acting alone or in concert with others, he has formulated, directed, controlled, had the

authority to control, or participated in the acts and practices of Celsius, including the acts and

practices set forth in this Complaint. He has served on numerous committees within Celsius,

including the Executive Committee, Assets and Liability Committee, Risk Committee, Assets

and Obligations Committee, and Investment Committee. Mr. Leon was involved in and oversaw

the crafting of advertisements about Celsius's products and services, and participated in the

decision to freeze withdrawals, swaps, and transfers from the Celsius platform. Mr. Leon, in

connection with the matters alleged herein, transacts or has transacted business in this District

and throughout the United States.

22.     Defendant Hanoch "Nuke" Goldstein ("Mr. Goldstein") is a co-founder of

Celsius. He served as Chief Technology Officer of Celsius Network LLC and Celsius Lending

LLC until March 21, 2022, and served as President of Labs for Celsius Network LLC. Acting

alone or in concert with others, he has formulated, directed, controlled, had the authority to

control, or participated in the acts and practices of Celsius, including the acts and practices set

forth in this Complaint. He has served on the Executive Committee and Risk Committee. Mr.

Goldstein actively participated in Celsius's marketing, appearing in advertising videos displayed

on Celsius's official YouTube channel. Mr. Goldstein resides in Florida and, in connection with

the matters alleged herein, transacts or has transacted business in this District and throughout the

United States.

## **COMMON ENTERPRISE**

23.     Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks

Lending LLC, Celsius US Holding LLC, Celsius Mining LLC, Celsius Lending LLC, Celsius

US LLC, Celsius Management Corp., and Celsius KeyFi LLC (collectively, "Corporate

Defendants") have operated as a common enterprise while engaging in the deceptive and unfair

acts and practices and other violations of law alleged below. Corporate Defendants have

conducted the business practices described below through an interrelated network of companies

that have common ownership, officers, managers, business functions, employees, and office

locations, and that commingled funds and property, including digital assets. Because these

Corporate Defendants have operated as a common enterprise, each of them is liable for the acts

and practices alleged below.

**COMMERCE**

24.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**BACKGROUND ON CRYPTOCURRENCY**

25.     Cryptocurrencies are digital assets that exist on a technology called a blockchain, a type of electronic ledger.

26.      There are thousands of different cryptocurrencies, sometimes called "coins" or "tokens," in existence today. Common cryptocurrencies include Bitcoin (BTC) and Ethereum (ETH). Most cryptocurrencies are not issued or created by any government or centralized banking institution.

27.     Cryptocurrency companies have invested heavily in marketing in recent years. For example, one cryptocurrency exchange announced a $100 million advertising campaign in 2021, and another spent $20 million for an advertising spot in the 2022 U.S. Super Bowl. Cryptocurrency ads often feature popular celebrities and well-known athletes. These advertising efforts have been successful: Roughly three-quarters of those who have ever invested in, traded, or used cryptocurrency say they did so for the first time within the past five years.

28.     As consumer interest in cryptocurrency has risen, so have scams and frauds involving cryptocurrencies. Since 2021, consumers have reported over $1.6 billion dollars' worth of losses to cryptocurrency-related scams. And 2022 saw the total collapse of certain cryptocurrencies, including so-called stablecoins, and popular cryptocurrency exchanges.

9

## DEFENDANTS' BUSINESS ACTIVITIES

29.     Founded in 2017, Celsius is a cryptocurrency financial services provider that has marketed a variety of cryptocurrency products and services to consumers. In 2018, Celsius launched the Celsius mobile app and issued its own proprietary cryptocurrency, the CEL token.

30.     Celsius has marketed a number of financial services that consumers are accustomed to encountering in the traditional financial marketplace, including interest-bearing accounts, personal loans, and currency exchanges. Celsius's services have included an Earn program that promises "rewards" (annual percentage yield or "APY") on deposits of cryptocurrency assets; a Borrow program that allows customers to take out loans secured by their crypto deposits; a Custody program that allows customers to store their crypto on the Celsius platform without earning yield; and other services that allow customers to exchange ("swap") cryptocurrency, buy cryptocurrency, or transfer assets to other Celsius users. Celsius also operates a Bitcoin mining enterprise.

31.     Since at least 2019, Defendants have promoted Celsius as a cryptocurrency-based alternative to banks—a safer place to store assets than a bank, and which supposedly always acted in its "depositors'" "best interests."  Mr. Mashinsky made many of these representations independently. Defendants have used slogans like "Banks are not your friends" and "Unbank Yourself" to position Celsius favorably relative to banks. Defendants repeatedly asserted that banks could not be trusted with consumers' hard-earned money, while Celsius was "telling you the truth" and "being transparent all the time." (Mr. Mashinsky personally made these statements in a 2021 AMA, accompanied by Mr. Goldstein.) Defendants also claimed that Celsius was a better place for consumers to store their assets because "we have less risk, we have much less

10

risk" than banks. Mr. Mashinsky even told consumers that "a run on the bank"—referring to a scenario in which mass consumer withdrawals deplete a bank's available capital and cause it to collapse—"cannot happen at Celsius."

32.     Defendants relied on digital advertising and social media to market Celsius's products and services and persuade consumers to deposit their cryptocurrency onto the Celsius platform. One of Celsius's most prominent advertising channels was its collection of "Ask Mashinsky Anything" ("AMA") videos, in which Mr. Mashinsky (and other Celsius employees, including Mr. Leon and Mr. Goldstein) advertised Celsius's products, responded to viewer questions, discussed the crypto market, and touted Celsius's purported superiority over other financial institutions and crypto companies. As of June 2022, Mr. Mashinsky had recorded 179 AMA episodes, many of which were an hour or more long and each of which was seen by thousands of viewers. Many of the AMAs were posted on Celsius's website and on its YouTube channel, where they remain accessible for public viewing today. Mr. Mashinsky, Mr. Goldstein, and Mr. Leon also used their own personal social media accounts to promote and market Celsius's products and services.

## I.     Defendants have misrepresented Celsius's products and services.

33.     Defendants have made a number of misrepresentations about the benefits of using Celsius services and the safety of consumer funds. Specifically, Defendants have claimed that: (1) Celsius did not make unsecured loans; (2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations; (3) consumers could withdraw the cryptocurrency they deposited at any time; (4) Celsius maintained a $750 million insurance policy for consumer deposits; and (5) consumers could earn "up to 17% APY" and "up to 18.63% APY." Each of

these claims was false or unsubstantiated at the time it was made.

**A.     Defendants claimed that Celsius did not make unsecured loans.**

34.     According to Defendants, one reason Celsius was safer than a traditional bank

was because Celsius could supposedly earn yield "without taking any risk . . . or taking minimal

risk." Defendants claimed Celsius earned this no-risk revenue by lending out deposited

cryptocurrency via secured loans to highly vetted counterparties at favorable interest rates.

According to Defendants, the loans to third parties were low- or no-risk because they were

secured by cryptocurrency or other assets held by Celsius, which Celsius could liquidate if the

borrower were to default. Defendants promised consumers that their deposits would be lent out

only via "100% collateral" and denied engaging in "unsecured" lending to generate revenue.

35.     In a 2020 AMA, Mr. Mashinsky, accompanied by Mr. Leon, claimed that Celsius

did not "do non-collateralized loans . . . because that would be taking too much risk on your

behalf." In fact, in July 2020, Celsius had approximately $160,000,000 in unsecured loans.

36.     In a 2021 AMA, Mr. Mashinsky told viewers that "we only do asset back[ed]

lending meaning you have to give us an asset like crypto or things that we accept." Yet as of

August 2021, nearly half of Celsius's institutional lending portfolio (over $700 million) was

unsecured.

37.     In another 2021 AMA, Mr. Mashinsky falsely claimed that "we don't treat

businesses or individuals differently" in issuing loans, meaning that both businesses and

individuals were required to post collateral. Internally, Celsius employees complained that "we

absolutely do" treat institutional counterparties differently from individuals, because Celsius

made unsecured institutional loans. Yet only two weeks later, Mr. Mashinsky and another AMA

12

guest both claimed, again, that Celsius made all its institutional counterparties post collateral.

38.     In a 2021 AMA, a Celsius employee claimed that "the majority of our loans, almost 100% of them are fully collateralized, with other assets." And in April 2022, Mr. Mashinsky told a CNBC reporter that "we do not offer any non-collateralized loans." In fact, Celsius had over $1.2 billion uncollateralized loans outstanding.

39.     Consumers believed Celsius. Multiple consumers have told the bankruptcy court that they relied on Defendants' promises that "all loans are overcollateralized." As one consumer told the Bankruptcy Court, "I initially signed up with Celsius due to the advertised fact that you could earn interest in crypto with minimal risk through over-collateralized loans . . . The advertising campaigns, weekly AMAs, website, and interviews all are adamant that our funds are used in over-collateralized loans to generate yield for the depositors."

40.     Contrary to its representations to consumers, Celsius routinely made unsecured loans that gave Celsius no ability to seize collateral should the counterparty default.

41.     By June 2022, Celsius had lost over $60 million due to unsecured and under-secured lending.

42.     Internally, Celsius employees acknowledged that the promises that Celsius made only collateralized loans were false, and that Mr. Mashinsky was a "liar" for claiming that "we do not do unsecured lending." Yet Defendants continued to misrepresent how Celsius earned revenue and concealed its actual practices from the public.

13

### B. Defendants assured customers that Celsius maintained sufficient reserves to meet customer obligations.

43.     Defendants promised consumers that Celsius would always have sufficient liquid crypto reserves to meet customer obligations.

44.     Defendants told consumers that the assets on its balance sheet guaranteed the safety of customer deposits and availability of withdrawals. For example, in 2021, Mr. Mashinsky claimed that because "Celsius has over two billion dollars on its balance sheet . . . there is no safer place to give your coins to loan." Goldstein, who also appeared in the video, nodded in agreement. Mr. Mashinsky also told consumers that Celsius always had "enough liquidity on the sidelines . . . enough liquidity on hand" to satisfy consumer obligations. In 2022, Mr. Leon helped craft a blog post falsely stating that Celsius had more than enough reserves to meet its obligations.

45.     Consumers believed Celsius. Dozens of consumers have stated that Celsius's representations about its crypto reserves were an important factor in their decision to deposit crypto with Celsius. As one consumer put it, "[Mr. Mashinsky] reiterated time and time again on Twitter and on these AMAs that the company was over collateralized and that should anything go wrong they have more than enough money to make all depositors whole." Another consumer spent "100+ hours listening to Mr. Mashinsky and the communication of the company . . . every week for over a year: The worst thing that can happen is that everyone gets their coins back,' 'we have 2 billion dollars on our balance sheet so there is zero risk in depositing your crypto on Celsius . . . ."

46.     In fact, Celsius did not maintain sufficient liquid cryptocurrency reserves to satisfy consumer obligations. Rather than maintaining "enough liquidity on hand" to ensure that

14

all consumers could withdraw their crypto deposits if needed, Defendants maintained only a small capital reserve that would have allowed a fraction of its customers to withdraw their crypto within one week.

**C.    Defendants promised consumers that they could withdraw "at any time."**

47.    Between at least 2019 and June 2022, Defendants claimed that customers could withdraw their deposited cryptocurrency "at any time." Defendants claimed that customers would "always" have access to their cryptocurrency deposits and could withdraw them "whenever."

48.    Celsius's website and blog promised consumers that they could "Access your coins whenever, keep them safe forever" and "withdraw your crypto at any time":



15

49.     Defendants' marketing emails also promised that consumers could withdraw at will, promising in one: "Deposit any amount of crypto and feel good knowing you can withdraw at anytime without fees or penalties!"

50.     Defendants amplified these promises of on-demand withdrawals in Mr. Mashinsky's weekly AMA videos. Over and over, Mr. Mashinsky promised that anyone who deposited cryptocurrency with Celsius could "always" retrieve those deposits. According to Mr. Mashinsky, the "big benefit" of Celsius was that "you can withdraw at any time." He promised viewers that, "With Celsius, you can withdraw as much as you want as often as you want. No limits." Mr. Mashinsky even encouraged consumers to test Celsius by "pull[ing] out any assets you want five minutes after you put them in because you change your mind." In a 2021 tweet, he promised that "All coins are returned to their owners even in the case of bankruptcy."

51.     Consumers believed Celsius. Defendants told consumers "in plain English dozens (if not hundreds) of times that we would be able to withdraw OUR crypto whenever we wanted to," and consumers listened. One consumer told the bankruptcy court, "I chose to park my crypto there because I could withdraw at any time versus [a competitor] where they lock up your crypto . . . . [W]atch the AMA videos and you will see why we all believed."

52.     In fact, contrary to its promises, consumers could not "withdraw at any time" because Celsius did not maintain sufficient liquidity to allow everyone to withdraw on demand.

53.     Much of Defendants' assets, like Bitcoin mining equipment and stock in Bitcoin mining companies, could not quickly be converted into cryptocurrency for withdrawals. Other assets, like Celsius's proprietary CEL token, were highly volatile and illiquid, without a guaranteed market for sale.

54.     In addition, many of Celsius's deployment strategies required digital assets to be posted as collateral, "staked" (i.e., posted on the Ethereum blockchain to validate transactions, meaning that it could not be accessed for lengthy periods), or otherwise locked up and inaccessible to Celsius for significant periods of time. This meant that, even where Celsius *owned* assets equivalent to the assets consumers sought to withdraw, those assets might not be available for withdrawals. To access these illiquid cryptocurrency assets, Celsius was required to "unwind" transactions with institutional counterparties—a process that could take several days.

55.     Further, although Celsius promised consumers that it had crypto available for them to withdraw, in fact, Defendants did not even know what Celsius owned and what it owed. Defendants did not track Celsius's available assets or its consumer liabilities.

56.     Until 2021, Celsius did not use any system for monitoring movement of cryptocurrency assets to and from its platform. Nor did Celsius have any policy or procedure for ensuring that Celsius had assets available to satisfy consumer demands. In mid-2021, Celsius began using spreadsheets to track its assets and liabilities (most of which were consumer deposits). Celsius employees updated the spreadsheets manually. There was no standard process for updating the spreadsheets at regular intervals and no system for ensuring their accuracy. As a result, the spreadsheets were often inaccurate and frequently overstated Celsius's assets.

57.     Internally, Celsius employees acknowledged that its own internal financial statements were inadequate and could not be trusted, yet Defendants continued to assert that Celsius could satisfy consumer withdrawals.

**D. Defendants claimed consumers' crypto deposits were insured.**

58.     In 2022, Defendants also advertised that it had $750 million of insurance on consumer deposits.

59.     Defendants acquired GK8 LLC, a company that specialized in custody solutions for digital assets. In multiple AMAs, Mr. Mashinsky promised consumers that GK8 had a $750 million insurance policy for deposited crypto assets, which would benefit Celsius customers. He told consumers that GK8 was "the only one in the world, as far as I know, that has [a] $750 million insurance policy from Aon." He also told consumers that GK8 offered "$750 million insurance per client," and on another AMA on April 22, 2022, a Celsius employee told viewers that GK8 offered "$750 million dollars of insurance per account."

60.     In or around June 2022, Defendants updated Celsius's website to advertise "$750M in insurance."

61.     Consumers believed Celsius. For example, in Celsius's bankruptcy proceedings, one consumer stated in a sworn declaration that he considered the claim of $750 million in insurance when deciding to keep his assets on the Celsius platform in 2022.

62.     In fact, neither Celsius nor its former subsidiary GK8 purchased or maintained a $750 million insurance policy.

**E. Defendants advertised that Earn accounts could yield "Up to 17% APY."**

63.     Defendants also misled consumers by marketing high yields on cryptocurrency deposits. Celsius's primary product was its "Earn" program, which Celsius marketed as an interest-bearing deposit account. Defendants promised consumers that they would earn significant "rewards" (annual percentage yield or "APY") in exchange for depositing

18

cryptocurrency with Celsius. Once consumers transferred cryptocurrencies onto the Celsius platform, rewards appeared weekly as a deposit into the users' Earn account balance.

64.     Defendants posted yield rates for different cryptocurrencies on its website, highlighting the rates in prominent text. For example, in early 2022 Celsius declared on its homepage that consumers could "Earn up to **17% APY** on your crypto":



65.     In spring 2022, Defendants boosted Celsius's advertised rewards to over 18%:

66.     Despite Defendants' promises, over 99% of Celsius customers never earned APY of 17%. In fact, the median APY was around 4.9% and the average was only about 5.611%. During the periods that Celsius advertised APY up to 17% or more, less than 1% of Celsius customers actually earned rewards of 17%.

67.     Unbeknownst to consumers, Celsius did not offer the promised APY on the best known and most-used cryptocurrencies, Bitcoin and Ether. APYs of 17% and 18.63% were available only on a handful of lesser-known cryptocurrencies, sometimes called "alt-coins," even though the majority of Celsius users deposited Bitcoin and Ether, not alt-coins.

68.     Further, the highest promised APYs were available only to customers who were enrolled in Celsius's CEL Loyalty Program—a program that required users to purchase a certain amount of Celsius's own CEL token, which had limited use outside of the Celsius platform.

## II.     Celsius used its misrepresentations to entice consumers to hand over their financial information.

69.     Celsius has used the misrepresentations set forth above to obtain or attempt to obtain consumers' sensitive personal and financial information.

70.      To use Celsius's products and services, consumers had to sign up for a Celsius account and provide personal information like social security number and a copy of a government-issued identification. Only after registering could consumers transfer cryptocurrency from their own digital wallet into their Celsius account and gain access to various services. In many instances, Celsius obtained consumers' bank account information, and when consumers transferred cryptocurrency to the Celsius platform, Celsius gained access to identifying information for the wallet from which the cryptocurrency was sent.

III.    **Defendants misappropriated consumers' cryptocurrency deposits.**

71.    As soon as consumers deposited their assets into the Earn program, rather than ensuring the cryptocurrency would remain "yours legally" and "safe forever," as promised, Defendants took title to consumers' cryptocurrency and then transferred deposits into Celsius's pooled omnibus account, without any way to trace coins back to the consumer who deposited them, having deposits insured, maintaining reserves, or taking any step to keep them "safe forever." Celsius then used consumers' cryptocurrency to pay its bills, to fund ongoing operations, to pay rewards to other Earn consumers, and to stake or pledge as collateral. Celsius also used these coins to make high-risk investments and, admittedly, "lost too many times."

72.    Without title to their deposits, consumers became unsecured creditors, with no greater claim to their cryptocurrency than Celsius's landlords or service providers with unpaid bills. Additionally, consumers who deposited cryptocurrency into the Earn program lost the right to demand return of their cryptocurrency in-kind: those consumers now own just an IOU from Celsius, not the underlying coins, and thus—if they get paid back at all—risk receiving something different than what they deposited.

73.    Consumers had no reason to anticipate that Celsius would take legal ownership of their property. Indeed, Celsius told consumers the opposite: that deposits of crypto were "yours legally." Mr. Mashinsky claimed that, "Whatever you put in, if you put in one Bitcoin you will be withdrawing one Bitcoin. . . . It's always your Bitcoin. Always your Ether. Always your CEL token." As one consumer put it, "Celsius has stated on multiple occasions 'your coins' when referring to Celsius'[s] depositors['] crypto assets. . . . Myself and any other users were under the impression, from these verbal statements, that users' coins remained theirs . . . ."

21

74. Because Defendants spent consumers' cryptocurrency for their own purposes and never maintained adequate liquidity to satisfy consumers' withdrawal requests, consumers often were unable to withdraw their assets when needed. In many instances, consumers reported being unable to withdraw their funds for days or even weeks—in direct contradiction to Celsius's widely touted claim that consumers could always withdraw "at any time." For example, in 2020, one consumer complained online about difficulties withdrawing, concluding: "10 working days have passed and no luck." Another consumer posted that their withdrawal request had been pending for 4 days, and someone responded that theirs had been pending for 6.

75. Celsius's failure to satisfy consumers' withdrawal requests intensified in early 2022. By April 2022, high-level Celsius employees expressed concern that Celsius lacked sufficient liquidity to meet customer demands. By May, Celsius was insolvent. Celsius's top executives, including Mr. Mashinsky, Mr. Leon, and Mr. Goldstein, were aware that Celsius's "capital sits near zero" and that Celsius was having trouble satisfying customer withdrawal requests. Celsius customers seeking to withdraw their deposited cryptocurrency faced significant delays as Celsius employees scrambled to unwind agreements with counterparties and retrieve coins that Celsius had deployed. Consumers were harmed when they could not access the cryptocurrency deposits they had entrusted to Celsius—including life savings, college funds, and money saved for retirement.

76. Yet Defendants concealed these financial realities from consumers, insisted that Celsius was stronger than ever, and doubled down on their promises that deposited assets were "safe" and consumers could withdraw cryptocurrency deposits on demand.

77. For example, on May 11, 2022, Mr. Mashinsky tweeted that "all funds are safe."

22

78.     On May 13, 2022, Mr. Mashinsky told AMA viewers that "Celsius is stronger than ever, we have billions of dollars in liquidity . . . and we continue to do what Celsius does best – serve the community, protect the community, make sure your assets are there when you need them."

79.     On May 27, 2022, Mr. Mashinsky told AMA viewers that it was "business as usual" at Celsius. The next day, Mr. Goldstein tweeted that "the Celsius community, company, and staff are strong as always . . . ."

80.     Defendants encouraged consumers to leave their deposits on the platform. In an early June AMA, Mr. Mashinsky urged consumers to "HODL," meaning "hold on for dear life" (and leave your assets on the platform). He promised that Celsius had "figured out how to make money for all of us while you HODL."

81.     Defendants also continued to solicit *new* customers based on its misleading claims of financial stability. Consumers created thousands of new accounts in May 2022 and deposited millions of dollars' worth of new cryptocurrency with Celsius.

82.     In a blog post published June 7, 2022, on Celsius's official blog, which Mr. Leon helped craft, Defendants bragged, "Damn the torpedoes, full speed ahead." In the post, Defendants promised consumers that "Celsius continues to process withdrawals without delay. We have not had any issues meeting withdrawal requests." Celsius also claimed that "Celsius has the reserves (and more than enough ETH) to meet obligations." These statements were false, but Mr. Leon and Mr. Goldstein retweeted the June 7, 2022 blog post from their personal Twitter accounts.

83.     On June 10, 2022, Mr. Mashinsky claimed in an AMA that "Celsius has billions in liquidity . . . and we provide immediate access to everybody, anyone who needs access to it." He further stated that "Anyone who wants to withdraw has no problem, right."

84.     On June 11, 2022, he tweeted that the idea that Celsius was having trouble processing withdrawals was "FUD [Fear, Uncertainty, and Doubt] and misinformation." He went on to challenge his followers to find "even one person who has a problem withdrawing from Celsius." One incredulous consumer emailed Celsius in response to this tweet: "I found it ironic to dare the media to 'find one person who could not withdraw.' As a reminder, I have had issues for weeks that are still not resolved and which have prohibited me to withdraw my funds!"

85.     Then, on June 12, despite all of Defendants' promises that Celsius had "billions in liquidity" and provided "immediate access to everybody," Defendants chose to shut down consumers' ability to withdraw funds from the platform completely.

86.     Users who had pending withdrawal requests had their requests denied, and no new withdrawal requests were honored. Users with crypto-secured loans could not access their collateral (even if they paid off their loans entirely) or transfer funds within the platform to avoid margin calls or liquidation.

87.     Although Defendants claimed the freeze was a temporary measure intended to "stabilize liquidity," Defendants never resumed withdrawals. Instead, Celsius filed for bankruptcy on July 13, 2022. At that point, Celsius had over $4.7 billion in user liabilities. As one consumer lamented in a letter to the bankruptcy court, "I should have the opportunity to make appropriate fund transfers (all held by Celsius) to pay off the loan principle in kind (my

24

collateral, BTC). This was the agreement. However, because ALL my assets held with Celsius
are frozen, hostage, it leaves me with no options that I can trust. They have seized everything."

88.     Consumers were surprised and devastated by these harsh and unexpected
developments. Consumers responded to Celsius's decision to freeze their accounts by begging
Celsius to restore access to life savings and assets that they expected to be able to live off of
based on Defendants' representations.

89.     One customer wrote to Celsius, "Why was there no warning about this? We've
been told until now that everything was ok and whoever says otherwise is a hater spreading
misinformation. Now, without warning, I no longer have access to money I depend on, with no
idea when/if that changes."

90.     Another wrote: "You told the entire community that we could withdraw
whenever. My life savings are on that account."

91.     Tellingly, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein each withdrew significant
sums of crypto from Celsius in April and May 2022 before freezing consumers' accounts. Privy
to the information that Celsius was headed for insolvency, these insiders acted upon this fact to
protect their assets while simultaneously lying to customers to prevent them from being able to
do the same. For example, as of April 4, 2022, Celsius did not have enough liquid assets to meet
its expected obligations. On April 13, Mr. Leon withdrew $2,200,000 of USDC. Mr. Leon also
transferred 8,000,000 CEL tokens to an account owned by a limited partnership that he
controlled. That same day, Mr. Leon's limited partnership posted 7,373,272 CEL tokens as
collateral and received a $4 million USD loan. On May 14, 2022, members of the risk team
described the liquidity crisis facing Celsius as "existential" and the measures they were taking to

25

increase liquidity as "only buying [Celsius] time." On May 15, 2022, Mr. Mashinsky withdrew BTC, ETH, and USDC worth $1,089,137. On May 27, 2022, Celsius triggered a reduced liquidity stress test, and on that same day, Mr. Mashinsky, via a company that he controlled, withdrew substantially all of his non-CEL token cryptocurrency—worth $5,120,317. On May 31, 2022, Mr. Mashinsky complained to employees that they had had "two weeks in a raw [sic] of slow/delayed withdrawals." But that same day, CEL tokens with a value of $2,027,339 were transferred into an account controlled by Mr. Mashinsky, and Mr. Leon withdrew BTC with a value of $423,376 without delay.

92. But unlike these insiders, most consumers had no idea what was going on. Consumers had no expectation that Celsius would not only take title to their deposits, but would then use those deposits in a manner that risked consumers' ability to access their cryptocurrency later, including by failing to insure deposits or maintain sufficient reserves. Consumers, instead, could rely only on Defendants' promises that their cryptocurrency remained "yours legally," that their deposits were "safe," and that Defendants would "make sure your assets are there when you need them." In a June 1st interview, Mr. Mashinsky claimed, "not just that they [customers' coins] are safe but we provided anyone who wanted to withdraw partially or fully, there were no problems"—a blatant falsehood. Insiders were able to withdraw all of their coins pre-freeze while many consumers were left emptyhanded.

93. Even after Celsius halted withdrawals, deposits continued. Consumers deposited nearly $20 million in cryptocurrency onto the Celsius platform in the two weeks following the shutdown of withdrawals.

\* \* \*

94.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the FTC. Among other things, Celsius's website still contains many of the misrepresentations set forth above. It still advertises APY up to 17% and claims that consumers should "trust" Celsius as an alternative to a bank. The official Celsius subreddit also advertises "up to 17% AOY on crypto." The website still links to YouTube videos containing misleading statements by Mr. Mashinsky and others marketing Celsius as a safe place to store cryptocurrency deposits. And consumers' funds are still frozen. Before leaving Celsius, Mr. Mashinsky proposed simply re-starting a new cryptocurrency custody venture that would put consumers' crypto deposits back in his hands. Further, Defendants engaged in the unlawful acts and practices above repeatedly over a period of at least three years. And, Mr. Mashinsky, Mr. Leon, and Mr. Goldstein maintain the means, ability, and incentive to resume their unlawful conduct.

## **VIOLATIONS OF THE FTC ACT**

95.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

96.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

97.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

27

## Count I

## Deception

98.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of products and services offered through Celsius, including through the means described in Paragraphs 33 to 68 above, Defendants have represented, directly or indirectly, expressly or by implication, that:

(1) Celsius did not make unsecured loans;

(2) Celsius maintained sufficient liquid crypto assets to satisfy its consumer obligations;

(3) consumers could withdraw the cryptocurrency they deposited at any time;

(4) Celsius maintained a $750 million insurance policy for consumer deposits; and

(5) consumers could earn "up to 17% APY" and "up to 18.63% APY."

99.     The representations set forth in Paragraph 98 were false, misleading, or not substantiated at the time the representations were made.

100.     Therefore, the making of the representations as set forth in Paragraph 98 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

## Unfairly Misappropriating Consumers' Cryptocurrency Deposits

101.     In numerous instances, Defendants have misappropriated consumers' cryptocurrency deposits.

102.    Defendants' actions cause or are likely to cause substantial injury to consumers

that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing

benefits to consumers or competition.

103.    Therefore, Defendants' acts or practices as set forth in Paragraphs 101 and 102

constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

### VIOLATIONS OF THE GRAMM-LEACH-BLILEY ACT

104.    Section 521 of the GLB Act, 15 U.S.C. § 6821, became effective on November

12, 1999, and remains in full force and effect. Section 521(a)(2) of the GLB Act, 15 U.S.C. §

6821(a), prohibits any person from "obtain[ing] or attempt[ing] to obtain . . . customer

information of a financial institution relating to another person . . . by making a false, fictitious,

or fraudulent statement or representation to a customer of a financial institution."

105.    The GLB Act defines "customer" to mean "with respect to a financial institution,

any person (or authorized representative of a person) to whom the financial institution provides a

product or service, including that of acting as a fiduciary." 15 U.S.C. § 6827(1). The GLB Act

defines "customer information of a financial institution" as "any information maintained by or

for a financial institution which is derived from the relationship between the financial institution

and a customer of a financial institution and is identified with the customer." 15 U.S.C. §

6827(2).

106.    Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a), empowers the FTC to

enforce Section 521 of the GLB Act "in the same manner and with the same power and authority

as the [FTC] has under the Fair Debt Collection Practices Act [FDCPA] . . . to enforce

compliance with such Act."

107. Section 814(a) of the FDCPA, in turn, makes a violation of the FDCPA an unfair

or deceptive act or practice in violation of the FTC Act. 15 U.S.C. § 1692l(a). Section 814(a) of

the FDCPA further provides that all of the functions and powers of the FTC under the FTC Act

are available to the FTC to enforce compliance by any person with the FDCPA, including the

power to enforce provisions of the FDCPA in the same manner as if the violation had been a

violation of an FTC trade regulation rule.

108. Thus, pursuant to Section 522(a) of the GLB Act, the FTC may enforce Section

521 of the GLB Act in the same manner as if a violation of the GLB Act were a violation of an

FTC trade regulation rule.

109. Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to grant such

relief as the Court finds necessary to redress injury to consumers resulting from violations of

FTC trade regulation rules. Accordingly, Section 19 of the FTC Act, 15 U.S.C. § 57b, also

authorizes this Court to grant such relief as the Court finds necessary to redress injury to

consumers resulting from violations of the GLB Act. This relief may include, and is not limited

to, rescission or reformation of contracts, and the refund of money or return of property.

## Count III

### Use of False, Fictitious, or Fraudulent Statements to Obtain or Attempt to Obtain Customers' Customer Information of a Financial Institution

110. In numerous instances in connection with the advertising, marketing, promotion,

offering for sale, or sale of products and services offered through Celsius, Defendants have made

false, fictitious, or fraudulent statements or representations to customers of financial institutions

to obtain or attempt to obtain customer information of a financial institution. The customer

information of a financial institution that Defendants obtain or attempt to obtain includes

30

consumers' bank account numbers and cryptocurrency wallet addresses.

111.    Defendants have obtained or attempted to obtain the customer information of a financial institution by soliciting consumer deposits onto the Celsius platform via representations to customers of financial institutions, directly or indirectly, expressly or by implication, that consumers could withdraw their cryptocurrency at any time, that Defendants maintained sufficient liquidity reserves to satisfy all consumer obligations, that customer deposits were insured, that Celsius did not engage in unsecured lending, that Celsius offered APY up to 17%, and that consumers retained ownership of their deposited cryptocurrency.

112.    Defendants' representations set forth in Paragraphs 110 and 111 above were false, fictitious, or fraudulent within the meaning of Section 521 of the GLB Act.

113.    Therefore, Defendants' acts and practices set forth in Paragraphs 110 to 112 above violate Section 521 of the GLB Act, 15 U.S.C. § 6821, and constitute deceptive acts and practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

114.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the GLB Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and the GLB Act by Defendants;

31

B.      Grant preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of consumer injury during the pendency of this action and to preserve the possibility

of effective final relief;

C.      Award monetary and other relief within the Court's power to grant; and

D.      Award any additional relief as the Court determines to be just and proper.


                                        Respectfully submitted,


Dated: July 13, 2023                    ___/s/ Katherine M. Aizpuru_____
                                        KATHERINE M. AIZPURU (Bar No. 5305990)
                                        STEPHANIE LIEBNER (*pro hac vice* forthcoming)
                                        KATHERINE WORTHMAN (*pro hac vice*
                                        forthcoming)
                                        Federal Trade Commission
                                        600 Pennsylvania Avenue NW
                                        Mail Stop: CC 6316
                                        Washington, D.C. 20580
                                        kaizpuru@ftc.gov
                                        sliebner@ftc.gov
                                        kworthman@ftc.gov
                                        202-876-5673

                                        *Attorneys for Plaintiff Federal Trade Commission*

**Exhibit D-2**

**FTC Joint Stipulation and Agreed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>In re:</td><td>)</td><td>Chapter 11</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>CELSIUS NETWORK LLC, <em>et al.</em>,[1]</td><td>)</td><td>Case No. 22-10964 (MG)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Debtors.</td><td>)</td><td>(Jointly Administered)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## JOINT STIPULATION AND AGREED ORDER
## BETWEEN THE FEDERAL TRADE COMMISSION AND THE
## DEBTORS TO ENTER INTO STIPULATED ORDER IN THE DISTRICT COURT

This stipulation (this "Stipulation and Agreed Order") is entered into by and among the above-captioned debtors and debtors in possession (collectively, the "Debtors") and the U.S. Federal Trade Commission (the "FTC" and, together with the Debtors, the "Parties").

**WHEREAS,** on July 13, 2022, each of the Initial Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code");

**WHEREAS**, the Parties have entered into, and the Bankruptcy Court has approved, four stipulations to extend the deadline for the FTC to file a nondischargeability complaint, through and including August 14, 2023 [Docket Nos. 1296, 2485, 2705, 2976];

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956) (collectively, the "Initial Debtors"); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**WHEREAS**, on January 10, 2023, the FTC timely filed an unliquidated, contingent proof of claim for monetary relief arising from Debtors' alleged violations of the Federal Trade Commission Act and the Gramm-Leach-Bliley Act, Claim No. 21697;

**WHEREAS**, on July 13, 2023, the FTC commenced an action (the "FTC Action")[2] against Debtors Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC (collectively the "Debtor Defendants"), and non-Debtors Celsius US LLC and Celsius Management Corp. (collectively the "Non-Debtor Defendants," and together with the Debtor Defendants, the "Corporate Defendants," as that term is defined in **Exhibit 1**, attached hereto), and Alex Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein (together with the Corporate Defendants, the "FTC Defendants") for a permanent injunction, monetary relief, and other relief pursuant to the Federal Trade Commission Act and the Gramm-Leach-Bliley Act in the United States District Court for the Southern District of New York (the "District Court");

**WHEREAS**, on July 13, 2023, the Parties filed the *Joint Motion for Stay as to Corporate Defendants* [FTC Action Docket No. 3] (the "Stay Motion"), representing that the FTC and the Corporate Defendants have reached a settlement resolving the FTC Action vis-à-vis the Corporate Defendants and requesting that the District Court stay the FTC Action as to the Corporate Defendants until the earlier of (i) 45 days or (ii) the approval by the Bankruptcy Court for the Corporate Defendants to enter into the *Stipulated Order for Permanent Injunction, Monetary Judgment and Other Relief Against Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius Us Holding*

---

[2]    *Federal Trade Commission v. Celsius Network Inc. et al*, Case No. 1:23-cv-06009-DLC (S.D.N.Y July 13, 2023) (the "FTC Action Docket").

*LLC, Celsius Us LLC, and Celsius Management Corp*, attached to the Stay Motion as <u>Exhibit A</u> and attached hereto as **<u>Exhibit 1</u>** (the "<u>Stipulated Order</u>");[3]

**WHEREAS**, on July 20, 2023, the District Court granted the Stay Motion and directed the FTC and the Corporate Defendants to file, on or before August 28, 2023, a motion in the District Court seeking entry of the Stipulated Order or otherwise notify the District Court of the status of the effort to seek the Bankruptcy Court's approval for the Debtor Defendants to enter into the Stipulated Order [FTC Action Docket No. 18];

**WHEREAS**, pursuant to the Stipulated Order, the Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary;

**WHEREAS**, pursuant to the Stipulated Order, the Corporate Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, whether acting directly or indirectly and in connection with promoting or offering for sale any product or service, are permanently restrained and enjoined from (i) misrepresenting the benefits or other material facts about the FTC Defendants' products or services, (ii) obtaining customer financial information by false, fictitious, or fraudulent representations, (iii) violating the Gramm-Leach-Bliley Act, and (iv) disclosing

---

[3]   The following description of the Stipulated Order in the recitals is provided for illustrative purpose only and is qualified in its entirety by reference to the Stipulated Order.  In the event of any inconsistency between these recitals and the Stipulated Order, the Stipulated Order controls in all respects.  Furthermore, these recitals shall not be used to construe or interpret the terms of the Stipulated Order or intent of the Parties.

3

Nonpublic Personal Information about a consumer without the consumer's Express Informed Consent;[4]

**WHEREAS**, pursuant to the Stipulated Order, judgment in the amount of $4,720,000,000 (the "Monetary Judgment") is (i) entered in favor of the FTC against Corporate Defendants, jointly and severally among the Corporate Defendants and with any other FTC Defendants to the extent subsequently ordered, and (ii) suspended as to the Debtors unless these chapter 11 cases are closed, dismissed, or otherwise concluded without the Debtors' estates being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code, as more fully set forth in the Stipulated Order;

**WHEREAS**, pursuant to the Stipulated Order, the Debtor Defendants agree that the Monetary Judgment is not dischargeable in these chapter 11 cases and will not object to the allowance of a general unsecured claim by the FTC in these chapter 11 cases in the amount of the Monetary Judgment ($4,720,000,000), which claim shall not be allowed unless and until the conditions for lifting the suspension of the Monetary Judgment, as set forth herein and in the Stipulated Order, have been met;

**WHEREAS**, pursuant to the Stipulated Order, the Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of the Stipulated Order, shall comply with certain obligations with respect to (i) customer information, (ii) cooperation with the FTC, (iii) acknowledgement of the Stipulated Order, (iv) compliance reporting, (v) recordkeeping, and (vi) compliance monitoring;

---

[4] "Nonpublic Personal Information" and "Express Informed Consent" shall have the meaning ascribed to them in the Stipulated Order.

WHEREAS, upon entry of the Stipulated Order, and only if the suspension of the Monetary Judgment is lifted, the Corporate Defendants will relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to the Stipulated Order and may not seek the return of any assets;

WHEREAS, the Stipulated Order does not (i) restrain or enjoin the deposit, exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor Defendants and being administered in accordance with the Bankruptcy Code and orders of the Bankruptcy Court, (ii) create a contingent liability against the Debtor Defendants, or (iii) preclude the full distribution of assets held by the Debtor Defendants in these chapter 11 cases to allowed claims;

WHEREAS, the Debtors, in the sound exercise of their business judgment, have determined that the consensual resolution of the FTC Action with respect to the Debtor Defendants via the Stipulated Order reduces ongoing litigation and regulatory uncertainties, maximizes return for all stakeholders, and is in the best interest of the estates; and

WHEREAS, in light of the agreement set forth in the Stipulated Order, the Parties now jointly submit this Stipulation and Agreed Order and respectfully request the Court's approval.

IT IS THEREFORE STIPULATED AND AGREED, AND UPON BANKRUPTCY COURT APPROVAL HEREOF, IT IS HEREBY ORDERED THAT:

1.      The Debtors are authorized and directed to enter into the Stipulated Order, attached hereto as **Exhibit 1**, and perform, execute, and deliver all documents, and take all actions necessary, to immediately continue and fully implement the settlement embodied in the Stipulated Order in accordance with the terms, conditions, and agreements set forth or provided for therein. The Stipulated Order addresses and extinguishes the FTC claim described in Claim No. 21697.

5

2.    The FTC's Monetary Judgment in the amount of $4,720,000,000 shall constitute a general unsecured claim against the Debtors that is nondischargeable pursuant to sections 523 and 1141 of the Bankruptcy Code; *provided* that the Monetary Judgment shall be suspended against the Debtors and will not be an allowed claim and shall not receive any distributions in these chapter 11 cases, in each case, so long as the Debtors comply with the applicable requirements set forth in the Stipulated Order for such suspended Monetary Judgment.

3.    Notwithstanding anything to the contrary in the Stipulated Order, the Monetary Judgment shall be suspended against the Debtors and shall not be an allowed claim or paid by the Debtors so long as the Debtors comply with the requirements set forth in the Stipulated Order. The FTC shall be entitled to enforce collection of the Monetary Judgment against the Corporate Defendants if the suspension is lifted pursuant to the conditions set forth in the Stipulated Order.

4.    Notwithstanding anything to the contrary in the Stipulated Order, nothing in this Order constitutes a finding that any claim asserted against the Debtors by the FTC, other than the general unsecured claim arising from the Monetary Judgment in the amount of $4,720,000,000, is nondischargeable pursuant to sections 523 and 1141 of the Bankruptcy Code.

5.    For the avoidance of doubt and as stated in the Stipulated Order, the Monetary Judgment and other terms of the Stipulated Order apply only to Corporate Defendants.

6.    With respect to the Monetary Judgment, the notice requirements under Bankruptcy Rule 6004(a) are hereby waived.

7.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Stipulation and Agreed Order are immediately effective and enforceable upon its entry.

8.      This Stipulation and Agreed Order shall bind the Debtor Defendants, their estates, and any successors or assigns, including without limitation any trustee, liquidating trustee, litigation administrator, or other estate representative.

9.      The Bankruptcy Court retains jurisdiction with respect to any disputes arising from or any other actions to interpret, administer, or enforce the terms and provisions of this Stipulation and Agreed Order, and the Parties hereby consent to such jurisdiction to resolve any disputes or controversies arising from or related to the implementation of this Stipulation and Agreed Order; *provided* that any disputes or controversies arising from or related to the implementation of the Stipulated Order should be submitted to the District Court.

**IT IS SO ORDERED.**

Dated:  August 14, 2023
       New York, New York

**/s/ Martin Glenn**
MARTIN GLENN
Chief United States Bankruptcy Judge

7

**IN WITNESS WHEREOF**, the Parties, by their respective authorized counsel, have

executed this Stipulation and Agreed Order as of the date written below:

New York, New York
Dated: July 26, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL**
**LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200
Email:        patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*


*/s/ Katherine Aizpuru*

**FEDERAL TRADE COMMISSION**
Katherine Johnson (admitted *pro hac vice*)
Katherine Aizpuru
Stephanie Liebner
600 Pennsylvania Ave., N.W.
Mail Stop CC-9528
Washington, District of Columbia 20580
Telephone:        (202) 326-2185 (Johnson)
Telephone:        (202) 326-2870 (Aizpuru)
Facsimile:        (202) 326-3197
Email:        kjohnson3@ftc.gov
        kaizpuru@ftc.gov

*Counsel for the Federal Trade Commission*

8

**Exhibit 1**

**Stipulated Order**

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>CELSIUS NETWORK INC., a corporation, CELSIUS NETWORK LLC, a limited liability company, CELSIUS NETWORKS LENDING LLC, a limited liability company, CELSIUS LENDING LLC, a limited liability company, CELSIUS KEYFI LLC, a limited liability company, CELSIUS MINING LLC, a limited liability company, CELSIUS US HOLDING LLC, a limited liability company; CELSIUS US LLC, a limited liability company; CELSIUS MANAGEMENT CORP., a corporation;<br><br>ALEXANDER MASHINSKY, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC;<br><br>SHLOMI DANIEL LEON, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC; and<br><br>HANOCH "NUKE" GOLDSTEIN, individually and as an officer of Celsius Network LLC and Celsius Lending LLC,<br><br>Defendants. | Case No. 1:23-cv-6009<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT AND OTHER RELIEF AGAINST CELSIUS NETWORK INC., CELSIUS NETWORK LLC, CELSIUS NETWORKS LENDING LLC, CELSIUS LENDING LLC, CELSIUS KEYFI LLC, CELSIUS MINING LLC, CELSIUS US HOLDING LLC, CELSIUS US LLC, and CELSIUS MANAGEMENT CORP.** |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint

for Permanent Injunction, Monetary Relief, and Other Relief ("Complaint"), for a permanent

injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b), 19, and

16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, and the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.* Corporate Defendants have waived service of the summons and the Complaint.

Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US LLC (collectively, "Debtor Defendants") have filed petitions for relief under Chapter 11 of the Bankruptcy Code. *See In re Celsius Network LLC et al.*, No. 22-10964(MG) (Bankr. S.D.N.Y.) ("Bankruptcy Case").[1]

The Commission and Corporate Defendants stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.     This Court has jurisdiction over this matter.

2.     The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the marketing and sale of cryptocurrency lending and custody services.  The Complaint further charges that Defendants obtained customer information of a financial institution relating to another person by making

---

[1] On July 13, 2022, the Debtor Defendants each filed a Chapter 11 voluntary petition.  *See In re Celsius KeyFi LLC*, Case No. 22-10967; *In re Celsius Lending LLC*, Case No. 22-10970; *In re Celsius Mining LLC*, Case No. 22-10968; *In re Celsius Network Inc.*, Case No. 22-10965; *In re Celsius Networks Lending LLC*, Case No. 10969; and *In re Celsius US Holding LLC*, Case No. 22-10971.  The Bankruptcy Court entered an order on July 19, 2022, jointly administering these cases under the main case for Celsius Network, LLC, Case No. 22-10964. Dkt. 53.  Accordingly, "Bankruptcy Case" refers to the jointly administered cases for all Debtor Defendants, as well as each case for each Debtor Defendant.

1

false, fictitious, or fraudulent statements, in violation of Section 521 of the GLB Act, 15 U.S.C. § 6821.

3.      Only for purposes of this action, Corporate Defendants admit the facts necessary to establish jurisdiction and as otherwise specifically stated in this Order. Corporate Defendants further admit the facts set forth on pages 107-109 of the Debtors' Disclosure Statement filed on June 27, 2023 in the Bankruptcy Case, Dkt. 2902.

4.      Corporate Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.      Corporate Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6.      Entry of this Order is in the public interest.

7.      The Commission's prosecution of this action, including entry of a money judgment and the enforcement of a judgment (other than a money judgment) obtained in this action are actions to enforce the Commission's police or regulatory powers. As a result, if the Debtor Defendants' bankruptcies are pending as of the date of entry of this Order, these actions are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.      **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.      In any communication that is solely visual or solely audible, the disclosure

2

must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable

3

members of that group.

B.      "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

      1.      "**Corporate Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, and Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp., and their successors and assigns.

      2.      "**Debtor Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC.

      3.      "**Non-Debtor Defendants**" means Celsius US LLC and Celsius Management Corp.

      4.      "**Individual Defendants**" means Alexander Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein.

C.      "**Express Informed Consent**" means an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent. Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent.  Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent.

4

D.      **"Nonpublic Personal Information"** means:

      1.    Any information that Defendants obtain about a consumer in connection with providing a product or service to that consumer; or

      2.    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available.

<h2 style="text-align:center">ORDER</h2>

<h3 style="text-align:center">I.     BAN</h3>

IT IS ORDERED that Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary.

<h3 style="text-align:center">II.    PROHIBITION AGAINST MISREPRESENTATIONS</h3>

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A.     the benefits of Defendants' products or services, including the existence or amount of any rewards that consumers can expect to earn; or

B.     any other material fact about Defendants' products or services, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its

performance, efficacy, nature, or central characteristics.

## III.    INJUNCTION RELATING TO OBTAINING CUSTOMER FINANCIAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants and Corporate Defendants'
officers, agents, employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, whether acting directly or indirectly
are hereby permanently restrained and enjoined from:

A.      Obtaining or attempting to obtain customer information of a financial institution
(including bank account routing number, account number, log-in credentials, private keys, or
other cryptocurrency wallet information) from a consumer by making false, fictitious, or
fraudulent representations to any consumer or financial institution; or

B.      Violating the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809, §§ 6821-6827,
a copy of which is attached as **ATTACHMENT A.**

## IV.    PROHIBITION AGAINST IMPROPER DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,
agents, employees, and attorneys, and all other persons in active concert or participation with any
of them, who receive actual notice of this Order, whether acting directly or indirectly, are
permanently restrained and enjoined from disclosing to any other person any Nonpublic Personal
Information about a consumer unless Corporate Defendants have obtained the consumer's
Express Informed Consent to disclose that Nonpublic Personal Information to that person.

## V.      ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit,
exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor

Defendants and being administered in accordance with the United States Bankruptcy Code and orders of the court in the Bankruptcy Case. For the avoidance of doubt, Part VI.C-D, below, does not create a contingent liability against the Debtor Defendants and does not preclude the full distribution of assets held by the Debtor Defendants in the Bankruptcy Case.

## VI. JUDGMENT FOR MONETARY RELIEF AND ITS SUSPENSION

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of $4,720,000,000 is entered in favor of the Commission against Corporate Defendants, jointly and severally, as monetary relief. The liability of Corporate Defendants shall be joint and several with any other Defendants to the extent subsequently ordered.

B.     The judgment is suspended as to Corporate Defendants subject to the subsections below.

C.     The suspension of the judgment as to the Non-Debtor Defendants is expressly premised upon the truthfulness, accuracy, and completeness of:

1.     The Financial Statement of Corporate Defendant Celsius Management Corp. signed on July 7, 2023, including attachments;

2.     The Financial Statement of Corporate Defendant Celsius US LLC signed on July 7, 2023, including attachments; and

3.     The Declaration of Christopher Ferraro signed on July 6, 2023, and sent by email from Corporate Debtors' counsel, Rich Cunningham, to Commission counsel Katherine Aizpuru on July 6, 2023.

D.     The suspension will be lifted as to Non-Debtor Defendants if, upon motion by the Commission or the Commission, the Court finds that a Non-Debtor Defendant failed to disclose

7

any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations identified above. The suspension will be lifted as to Corporate Defendants if the Bankruptcy Case is closed, dismissed, or otherwise concluded, in each case, without the estate(s) being fully administered, including any distributions to creditors, in accordance with the Bankruptcy Code.

E.      If the suspension of the judgment is lifted, the judgment becomes immediately due as to Corporate Defendants in the amount specified in Subsection A above (which the parties stipulate only for purposes of this Section represents the consumer injury), less any payment previously made pursuant to this Section, plus interest computed from the date of entry of this Order.

## VII.   ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Corporate Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Corporate Defendants acknowledge that their Taxpayer Identification Numbers

(Social Security Numbers or Employer Identification Numbers), which Corporate Defendants

must submit to the Commission, may be used for collecting and reporting on any delinquent

amount arising out of this Order, in accordance with 31 U.S.C. §7701.

E.     Payment must be made by electronic fund transfer in accordance with instructions

provided by a representative of the Commission.

F.     All money received by the Commission pursuant to this Order may be deposited

into a fund administered by the Commission or its designee to be used for consumer relief, such

as redress and any attendant expenses for the administration of any redress fund.  If a

representative of the Commission decides that direct redress to consumers is wholly or partially

impracticable or money remains after such redress is completed, the Commission may apply any

remaining money for such related relief (including consumer information remedies) as it

determines to be reasonably related to Corporate Defendants' practices alleged in the Complaint.

Any money not used for relief is to be deposited to the U.S. Treasury.  Corporate Defendants

have no right to challenge any actions the Commission or its representatives may take pursuant

to this Subsection.

G.     The Debtor Defendants agree that the monetary judgment ordered by Section

VI.A is not dischargeable in the Bankruptcy Case.

H.     The Debtor Defendants will not object to allowance of the FTC claim in the

Bankruptcy Case as a general unsecured claim in the amount of $4,720,000,000.

## VIII.   CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,

agents, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order are permanently restrained and enjoined from directly or indirectly:

A.      failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, Corporate Defendants must provide it, in the form prescribed by the Commission, within 14 days;

B.      disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the marketing and sale of cryptocurrency services; and

C.      failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## IX.      COOPERATION

IT IS FURTHER ORDERED that Corporate Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or occurrences that are the subject of the Complaint. Corporate Defendants must provide truthful and complete information, evidence, and testimony. Corporate Defendants must cause Corporate Defendants' officers, employees, representatives, or agents to appear for

10

interviews, discovery, hearings, trials, and any other proceedings that a Commission

representative may reasonably request upon 5 days' written notice, or other reasonable notice, at

such places and times as a Commission representative may designate, without the service of a

subpoena.

## X.    ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Corporate Defendants obtain acknowledgments of

receipt of this Order:

A.    Each Defendant, within 7 days of entry of this Order, must submit to the

Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For 20 years after entry of this Order, each Corporate Defendant must deliver a

copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2)

all employees having managerial responsibilities for conduct related to the subject matter of the

Order and all agents and representatives who participate in conduct related to the subject matter

of the Order; and (3) any business entity resulting from any change in structure as set forth in the

Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order

for current personnel.  For all others, delivery must occur before they assume their

responsibilities.

C.    From each individual or entity to which a Corporate Defendant delivered a copy

of this Order, that Corporate Defendant must obtain, within 30 days, a signed and dated

acknowledgment of receipt of this Order.

## XI.    COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Corporate Defendants make timely submissions to the

Commission:

A.    One year after entry of this Order, each Corporate Defendant must submit a

11

compliance report, sworn under penalty of perjury, that: (1) identifies the primary physical,

postal, and email address and telephone number, as designated points of contact, which

representatives of the Commission may use to communicate with Corporate Defendant; (2)

identifies all of that Corporate Defendant's businesses by all of their names, telephone numbers,

and physical, postal, email, and Internet addresses; (3) describes the activities of each business,

including the goods and services offered, the means of advertising, marketing, and sales, and the

involvement of any other Defendant; (4) describes in detail whether and how that Corporate

Defendant is in compliance with each Section of this Order; and (5) provides a copy of each

Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the

Commission.

B.      For 20 years after entry of this Order, each Corporate Defendant must submit a

compliance notice, sworn under penalty of perjury, within 14 days of any change in the

following: (1) any designated point of contact; or (2) the structure of any Corporate Defendant or

any entity that Corporate Defendant has any ownership interest in or controls directly or

indirectly that may affect compliance obligations arising under this Order, including: creation,

merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any

acts or practices subject to this Order; *provided, however,* that Corporate Defendants need not

submit a compliance notice associated with the administration of the Debtor Defendants'

bankruptcy estates in the Bankruptcy Case.

C.      Each Corporate Defendant must submit to the Commission notice of the filing of

any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such

Corporate Defendant within 14 days of its filing.

D.      Any submission to the Commission required by this Order to be sworn under

penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by

concluding: "I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.  Executed on:  _____" and supplying the date, signatory's

full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,

Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC  20580.  The subject line must begin:  FTC v. Celsius Network Inc., *et al.*, No.

2223137.

## XII.   RECORDKEEPING

IT IS FURTHER ORDERED that Corporate Defendants must create certain records for

20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate

Defendants  must create and retain the following records:

A.    accounting records showing the revenues from all goods or services sold;

B.    personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position;

dates of service; and (if applicable) the reason for termination;

C.    records of all consumer complaints and refund requests, whether received directly

or indirectly, such as through a third party, and any response;

D.    all records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission; and

E.    a copy of each unique advertisement or other marketing material.

13

## XIII.  COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Corporate Defendants'

compliance with this Order:

A.      Within 14 days of receipt of a written request from a representative of the

Commission, each Corporate Defendant must:  submit additional compliance reports or other

requested information, which must be sworn under penalty of perjury; appear for depositions;

and produce documents for inspection and copying.  The Commission is also authorized to

obtain discovery, without further leave of court, using any of the procedures prescribed by

Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45,

and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate

directly with each Corporate Defendant.  Each Corporate Defendant must permit representatives

of the Commission to interview any employee or other person affiliated with any Corporate

Defendant who has agreed to such an interview.  The person interviewed may have counsel

present.

C.      The Commission may use all other lawful means, including posing, through its

representatives as consumers, suppliers, or other individuals or entities, to Corporate Defendants

or any individual or entity affiliated with Corporate Defendants, without the necessity of

identification or prior notice.  Nothing in this Order limits the Commission's lawful use of

compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

14

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this ___ day of _____, 2023.**

_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**  FEDERAL TRADE COMMISSION

*Katherine M. Aizpuru*                          Date:  July 12, 2023
_____                               _____
Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov

16

**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and CELSIUS MANAGEMENT CORP.

_____     Date: _____

Richard H. Cunningham
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com

COUNSEL

_____     Date: _____

Christopher Ferraro, as an officer of Celsius
Network LLC, on behalf of Celsius Network
LLC and the other Corporate Defendants

# Attachment A

lines broker or agent, insurance consultant, limited insurance representative, and any other individual or entity that sells, solicits, or negotiates policies of insurance or offers advice, counsel, opinions or services related to insurance.

### (6) Insurer

The term "insurer" has the meaning as in section 313(e)(2)(B) of title 31.

### (7) Principal place of business

The term "principal place of business" means the State in which an insurance producer maintains the headquarters of the insurance producer and, in the case of a business entity, where high-level officers of the entity direct, control, and coordinate the business activities of the business entity.

### (8) Principal place of residence

The term "principal place of residence" means the State in which an insurance producer resides for the greatest number of days during a calendar year.

### (9) State

The term "State" includes any State, the District of Columbia, any territory of the United States, and Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

### (10) State law

#### (A) In general

The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.

#### (B) Laws applicable in the District of Columbia

A law of the United States applicable only to or within the District of Columbia shall be treated as a State law rather than a law of the United States.

(Pub. L. 106–102, title III, § 334, as added Pub. L. 114–1, title II, § 202(a), Jan. 12, 2015, 129 Stat. 27.)

#### Editorial Notes

##### Prior Provisions

Provisions similar to this section were contained in section 6766 of this title, prior to the general amendment of this subchapter by Pub. L. 114–1.

A prior section 6764, Pub. L. 106–102, title III, § 334, Nov. 12, 1999, 113 Stat. 1433, related to coordination with other regulators, prior to the general amendment of this subchapter by Pub. L. 114–1. See section 6761 of this title.

A prior section 6765, Pub. L. 106–102, title III, § 335, Nov. 12, 1999, 113 Stat. 1433, which related to judicial review, was omitted in the general amendment of this subchapter by Pub. L. 114–1. See section 6762 of this title.

A prior section 6766, Pub. L. 106–102, title III, § 336, Nov. 12, 1999, 113 Stat. 1433, which related to definitions, was omitted in the general amendment of this subchapter by Pub. L. 114–1.

### SUBCHAPTER IV—RENTAL CAR AGENCY INSURANCE ACTIVITIES

### § 6781. Standard of regulation for motor vehicle rentals

#### (a) Protection against retroactive application of regulatory and legal action

Except as provided in subsection (b), during the 3-year period beginning on November 12, 1999, it shall be a presumption that no State law imposes any licensing, appointment, or education requirements on any person who solicits the purchase of or sells insurance connected with, and incidental to, the lease or rental of a motor vehicle.

#### (b) Preeminence of State insurance law

No provision of this section shall be construed as altering the validity, interpretation, construction, or effect of—

(1) any State statute;

(2) the prospective application of any court judgment interpreting or applying any State statute; or

(3) the prospective application of any final State regulation, order, bulletin, or other statutorily authorized interpretation or action,

which, by its specific terms, expressly regulates or exempts from regulation any person who solicits the purchase of or sells insurance connected with, and incidental to, the short-term lease or rental of a motor vehicle.

#### (c) Scope of application

This section shall apply with respect to—

(1) the lease or rental of a motor vehicle for a total period of 90 consecutive days or less; and

(2) insurance which is provided in connection with, and incidentally to, such lease or rental for a period of consecutive days not exceeding the lease or rental period.

#### (d) Motor vehicle defined

For purposes of this section, the term "motor vehicle" has the same meaning as in section 13102 of title 49.

(Pub. L. 106–102, title III, § 341, Nov. 12, 1999, 113 Stat. 1434.)

### CHAPTER 94—PRIVACY

#### SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

Sec.
6801. Protection of nonpublic personal information.
6802. Obligations with respect to disclosures of personal information.
6803. Disclosure of institution privacy policy.
6804. Rulemaking.
6805. Enforcement.
6806. Relation to other provisions.
6807. Relation to State laws.
6808. Study of information sharing among financial affiliates.
6809. Definitions.

#### SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

6821. Privacy protection for customer information of financial institutions.
6822. Administrative enforcement.

Sec.
6823.    Criminal penalty.
6824.    Relation to State laws.
6825.    Agency guidance.
6826.    Reports.
6827.    Definitions.

SUBCHAPTER I—DISCLOSURE OF
NONPUBLIC PERSONAL INFORMATION

§ 6801. Protection of nonpublic personal information

**(a) Privacy obligation policy**

It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

**(b) Financial institutions safeguards**

In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title, other than the Bureau of Consumer Financial Protection, shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and

(3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

(Pub. L. 106–102, title V, § 501, Nov. 12, 1999, 113 Stat. 1436; Pub. L. 111–203, title X, § 1093(1), July 21, 2010, 124 Stat. 2095.)

**Editorial Notes**

AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 inserted '', other than the Bureau of Consumer Financial Protection,'' after ''section 6805(a) of this title'' in introductory provisions.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

EFFECTIVE DATE

Pub. L. 106–102, title V, § 510, Nov. 12, 1999, 113 Stat. 1445, provided that: ''This subtitle [subtitle A (§§ 501–510) of title V of Pub. L. 106–102, enacting this subchapter and amending section 1681s of this title] shall take effect 6 months after the date on which rules are required to be prescribed under section 504(a)(3) [15 U.S.C. 6804(a)(3)], except—

''(1) to the extent that a later date is specified in the rules prescribed under section 504; and

''(2) that sections 504 [15 U.S.C. 6804] and 506 [enacting section 6806 of this title and amending section 1681s of this title] shall be effective upon enactment [Nov. 12, 1999].''

§ 6802. Obligations with respect to disclosures of personal information

**(a) Notice requirements**

Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

**(b) Opt out**

**(1) In general**

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party;

(B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

**(2) Exception**

This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, including marketing of the financial institution's own products or services, or financial products or services offered pursuant to joint agreements between two or more financial institutions that comply with the requirements imposed by the regulations prescribed under section 6804 of this title, if the financial institution fully discloses the providing of such information and enters into a contractual agreement with the third party that requires the third party to maintain the confidentiality of such information.

**(c) Limits on reuse of information**

Except as otherwise provided in this subchapter, a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution.

**(d) Limitations on the sharing of account number information for marketing purposes**

A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other

marketing through electronic mail to the consumer.

**(e) General exceptions**

Subsections (a) and (b) shall not prohibit the disclosure of nonpublic personal information—

(1) as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—

(A) servicing or processing a financial product or service requested or authorized by the consumer;

(B) maintaining or servicing the consumer's account with the financial institution, or with another entity as part of a private label credit card program or other extension of credit on behalf of such entity; or

(C) a proposed or actual securitization, secondary market sale (including sales of servicing rights), or similar transaction related to a transaction of the consumer;

(2) with the consent or at the direction of the consumer;

(3)(A) to protect the confidentiality or security of the financial institution's records pertaining to the consumer, the service or product, or the transaction therein; (B) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability; (C) for required institutional risk control, or for resolving customer disputes or inquiries; (D) to persons holding a legal or beneficial interest relating to the consumer; or (E) to persons acting in a fiduciary or representative capacity on behalf of the consumer;

(4) to provide information to insurance rate advisory organizations, guaranty funds or agencies, applicable rating agencies of the financial institution, persons assessing the institution's compliance with industry standards, and the institution's attorneys, accountants, and auditors;

(5) to the extent specifically permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [12 U.S.C. 3401 et seq.], to law enforcement agencies (including the Bureau of Consumer Financial Protection[1] a Federal functional regulator, the Secretary of the Treasury with respect to subchapter II of chapter 53 of title 31, and chapter 2 of title I of Public Law 91–508 (12 U.S.C. 1951–1959), a State insurance authority, or the Federal Trade Commission), self-regulatory organizations, or for an investigation on a matter related to public safety;

(6)(A) to a consumer reporting agency in accordance with the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], or (B) from a consumer report reported by a consumer reporting agency;

(7) in connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the disclosure of nonpublic personal information concerns solely consumers of such business or unit; or

(8) to comply with Federal, State, or local laws, rules, and other applicable legal require-

---

[1] So in original. Probably should be followed by a comma.

ments; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

(Pub. L. 106–102, title V, § 502, Nov. 12, 1999, 113 Stat. 1437; Pub. L. 111–203, title X, § 1093(2), July 21, 2010, 124 Stat. 2095.)

Editorial Notes

REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a) and (c), was in the original ''this subtitle'', meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Right to Financial Privacy Act of 1978, referred to in subsec. (e)(5), is title XI of Pub. L. 95–630, Nov. 10, 1978, 92 Stat. 3697, which is classified generally to chapter 35 (§ 3401 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 3401 of Title 12 and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(5), is chapter 2 (§§ 121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§ 1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 to the Code, see Tables.

The Fair Credit Reporting Act, referred to in subsec. (e)(6)(A), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

AMENDMENTS

2010—Subsec. (e)(5). Pub. L. 111–203 inserted ''the Bureau of Consumer Financial Protection'' after ''(including''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

**§ 6803. Disclosure of institution privacy policy**

**(a) Disclosure required**

At the time of establishing a customer relationship with a consumer and not less than annually during the continuation of such relationship, a financial institution shall provide a clear and conspicuous disclosure to such consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, of such financial institution's policies and practices with respect to—

(1) disclosing nonpublic personal information to affiliates and nonaffiliated third parties, consistent with section 6802 of this title, including the categories of information that may be disclosed;

(2) disclosing nonpublic personal information of persons who have ceased to be customers of the financial institution; and

(3) protecting the nonpublic personal information of consumers.

**(b) Regulations**

Disclosures required by subsection (a) shall be made in accordance with the regulations prescribed under section 6804 of this title.

**(c) Information to be included**

The disclosure required by subsection (a) shall include—

(1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties, other than agents of the institution, consistent with section 6802 of this title, and including—

(A) the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided pursuant to section 6802(e) of this title; and

(B) the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution;

(2) the categories of nonpublic personal information that are collected by the financial institution;

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information in accordance with section 6801 of this title; and

(4) the disclosures required, if any, under section 1681a(d)(2)(A)(iii) of this title.

**(d) Exemption for certified public accountants**

**(1) In general**

The disclosure requirements of subsection (a) do not apply to any person, to the extent that the person is—

(A) a certified public accountant;

(B) certified or licensed for such purpose by a State; and

(C) subject to any provision of law, rule, or regulation issued by a legislative or regulatory body of the State, including rules of professional conduct or ethics, that prohibits disclosure of nonpublic personal information without the knowing and expressed consent of the consumer.

**(2) Limitation**

Nothing in this subsection shall be construed to exempt or otherwise exclude any financial institution that is affiliated or becomes affiliated with a certified public accountant described in paragraph (1) from any provision of this section.

**(3) Definitions**

For purposes of this subsection, the term ''State'' means any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, or the Northern Mariana Islands.

**(e) Model forms**

**(1) In general**

The agencies referred to in section 6804(a)(1) of this title shall jointly develop a model form

which may be used, at the option of the financial institution, for the provision of disclosures under this section.

**(2) Format**

A model form developed under paragraph (1) shall—

(A) be comprehensible to consumers, with a clear format and design;

(B) provide for clear and conspicuous disclosures;

(C) enable consumers easily to identify the sharing practices of a financial institution and to compare privacy practices among financial institutions; and

(D) be succinct, and use an easily readable type font.

**(3) Timing**

A model form required to be developed by this subsection shall be issued in proposed form for public comment not later than 180 days after October 13, 2006.

**(4) Safe harbor**

Any financial institution that elects to provide the model form developed by the agencies under this subsection shall be deemed to be in compliance with the disclosures required under this section.

**(f) Exception to annual notice requirement**

A financial institution that—

(1) provides nonpublic personal information only in accordance with the provisions of subsection (b)(2) or (e) of section 6802 of this title or regulations prescribed under section 6804(b) of this title, and

(2) has not changed its policies and practices with regard to disclosing nonpublic personal information from the policies and practices that were disclosed in the most recent disclosure sent to consumers in accordance with this section,

shall not be required to provide an annual disclosure under this section until such time as the financial institution fails to comply with any criteria described in paragraph (1) or (2).

(Pub. L. 106–102, title V, § 503, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 109–351, title VI, § 609, title VII, § 728, Oct. 13, 2006, 120 Stat. 1983, 2003; Pub. L. 114–94, div. G, title LXXV, § 75001, Dec. 4, 2015, 129 Stat. 1787.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (f). Pub. L. 114–94 added subsec. (f).

2006—Pub. L. 109–351 designated concluding provisions of subsec. (a) as (b), inserted heading, substituted ''Disclosures required by subsection (a)'' for ''Such disclosures'', redesignated former subsec. (b) as (c), and added subsecs. (d) and (e).

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## §6804. Rulemaking

### (a) Regulatory authority

#### (1) Rulemaking

##### (A) In general

Except as provided in subparagraph (C), the Bureau of Consumer Financial Protection and the Securities and Exchange Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to their respective jurisdiction under section 6805 of this title (and notwithstanding subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]), except that the Bureau of Consumer Financial Protection shall not have authority to prescribe regulations with respect to the standards under section 6801 of this title.

##### (B) CFTC

The Commodity Futures Trading Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to the jurisdiction of the Commodity Futures Trading Commission under section 7b–2 of title 7.

##### (C) Federal Trade Commission authority

Notwithstanding the authority of the Bureau of Consumer Financial Protection under subparagraph (A), the Federal Trade Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to any financial institution that is a person described in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)].

##### (D) Rule of construction

Nothing in this paragraph shall be construed to alter, affect, or otherwise limit the authority of a State insurance authority to adopt regulations to carry out this subchapter.

#### (2) Coordination, consistency, and comparability

Each of the agencies authorized under paragraph (1) to prescribe regulations shall consult and coordinate with the other such agencies and, as appropriate, and with[1] representatives of State insurance authorities designated by the National Association of Insurance Commissioners, for the purpose of assuring, to the extent possible, that the regulations prescribed by each such agency are consistent and comparable with the regulations prescribed by the other such agencies.

#### (3) Procedures and deadline

Such regulations shall be prescribed in accordance with applicable requirements of title 5.

[1] So in original. Probably should be ''and, as appropriate, with''.

### (b) Authority to grant exceptions

The regulations prescribed under subsection (a) may include such additional exceptions to subsections (a) through (d) of section 6802 of this title as are deemed consistent with the purposes of this subchapter.

(Pub. L. 106–102, title V, §504, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 111–203, title X, §1093(3), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### References in Text

This subchapter, referred to in subsecs. (a)(1) and (b), was in the original ''this subtitle'', meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Consumer Financial Protection Act of 2010, referred to in subsec. (a)(1)(A), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitle B (§§1021–1029A) of the Act is classified generally to part B (§5511 et seq.) of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitle B to the Code, see Tables.

##### Amendments

2010—Subsec. (a)(1), (2). Pub. L. 111–203, §1093(3)(A), added pars. (1) and (2) and struck out former pars. (1) and (2) which related, respectively, to rulemaking by the Federal banking agencies, the National Credit Union Administration, the Secretary of the Treasury, the Securities and Exchange Commission, and the Federal Trade Commission, and consultation and coordination among these agencies and authorities to assure consistency and comparability of regulations.

Subsec. (a)(3). Pub. L. 111–203, §1093(3)(B), struck out ''and shall be issued in final form not later than 6 months after November 12, 1999'' after ''title 5''.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## §6805. Enforcement

### (a) In general

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:

(1) Under section 1818 of title 12, by the appropriate Federal banking agency, as defined in section 1813(q) of title 12, in the case of—

(A) national banks, Federal branches and Federal agencies of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agen-

cies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], and bank holding companies and their nonbank subsidiaries or affiliates (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), insured State branches of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers); and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, and any subsidiaries of such savings associations (except brokers, dealers, persons providing insurance, investment companies, and investment advisers).

(2) Under the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Board of the National Credit Union Administration with respect to any federally insured credit union, and any subsidiaries of such an entity.

(3) Under the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.], by the Securities and Exchange Commission with respect to any broker or dealer.

(4) Under the Investment Company Act of 1940 [15 U.S.C. 80a–1 et seq.], by the Securities and Exchange Commission with respect to investment companies.

(5) Under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.], by the Securities and Exchange Commission with respect to investment advisers registered with the Commission under such Act.

(6) Under State insurance law, in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 6701 of this title.

(7) Under the Federal Trade Commission Act [15 U.S.C. 41 et seq.], by the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under paragraphs (1) through (6) of this subsection.

(8) Under subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau of Consumer Financial Protection, in the case of any financial institution and other covered person or service provider that is subject to the jurisdiction of the Bureau and any person subject to this subchapter, but not with respect to the standards under section 6801 of this title.

**(b) Enforcement of section 6801**

**(1) In general**

Except as provided in paragraph (2), the agencies and authorities described in subsection (a), other than the Bureau of Consumer Financial Protection, shall implement the standards prescribed under section 6801(b) of this title in the same manner, to the extent practicable, as standards prescribed pursuant to section 1831p–1(a) of title 12 are implemented pursuant to such section.

**(2) Exception**

The agencies and authorities described in paragraphs (3), (4), (5), (6), and (7) of subsection (a) shall implement the standards prescribed under section 6801(b) of this title by rule with respect to the financial institutions and other persons subject to their respective jurisdictions under subsection (a).

**(c) Absence of State action**

If a State insurance authority fails to adopt regulations to carry out this subchapter, such State shall not be eligible to override, pursuant to section 1831x(g)(2)(B)(iii) of title 12, the insurance customer protection regulations prescribed by a Federal banking agency under section 1831x(a) of title 12.

**(d) Definitions**

The terms used in subsection (a)(1) that are not defined in this subchapter or otherwise defined in section 1813(s) of title 12 shall have the same meaning as given in section 3101 of title 12.

(Pub. L. 106–102, title V, §505, Nov. 12, 1999, 113 Stat. 1440; Pub. L. 111–203, title X, §1093(4), (5), July 21, 2010, 124 Stat. 2096, 2097.)

### Editorial Notes

#### REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsec. (a), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§1021–1029A) and E (§§1051–1058) of the Act are classified generally to parts B (§5511 et seq.) and E (§5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

This subchapter, referred to in subsecs. (a), (c), and (d), was in the original "this subtitle", meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (a)(1)(B), is classified to subchapter I (§601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (a)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (a)(3), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§78a et seq.) of this title. For complete classification of this Act to the Code, see section 78a of this title and Tables.

The Investment Company Act of 1940, referred to in subsec. (a)(4), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, which is classified generally to subchapter I (§80a–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80a–51 of this title and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (a)(5), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§80b–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80b–20 of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (a)(7), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

#### AMENDMENTS

2010—Subsec. (a). Pub. L. 111–203, § 1093(4)(A), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:" for "This subchapter and the regulations prescribed thereunder shall be enforced by the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:".

Subsec. (a)(1). Pub. L. 111–203, § 1093(4)(B)(i), inserted "by the appropriate Federal banking agency, as defined in section 1813(q) of title 12," before "in the case of—".

Subsec. (a)(1)(A). Pub. L. 111–203, § 1093(4)(B)(ii), struck out ", by the Office of the Comptroller of the Currency" before semicolon at end.

Subsec. (a)(1)(B). Pub. L. 111–203, § 1093(4)(B)(iii), struck out ", by the Board of Governors of the Federal Reserve System" before semicolon at end.

Subsec. (a)(1)(C). Pub. L. 111–203, § 1093(4)(B)(iv), struck out ", by the Board of Directors of the Federal Deposit Insurance Corporation" before "; and".

Subsec. (a)(1)(D). Pub. L. 111–203, § 1093(4)(B)(v), struck out ", by the Director of the Office of Thrift Supervision" before period at end.

Subsec. (a)(8). Pub. L. 111–203, § 1093(4)(C), added par. (8).

Subsec. (b)(1). Pub. L. 111–203, § 1093(5), inserted ", other than the Bureau of Consumer Financial Protection," before "shall implement the standards".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### § 6806. Relation to other provisions

Except for the amendments made by subsections (a) and (b), nothing in this chapter shall be construed to modify, limit, or supersede the operation of the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], and no inference shall be drawn on the basis of the provisions of this chapter regarding whether information is transaction or experience information under section 603 of such Act [15 U.S.C. 1681a].

(Pub. L. 106–102, title V, § 506(c), Nov. 12, 1999, 113 Stat. 1442.)

#### Editorial Notes

##### REFERENCES IN TEXT

Amendments made by subsections (a) and (b), referred to in text, means amendments made by section 506(a) and (b) of Pub. L. 106–102, which amended section 1681s of this title.

This chapter, referred to in text, was in the original "this title", meaning title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, as amended, which enacted this chapter and amended section 1681s of this title. For

complete classification of title V to the Code, see Tables.

The Fair Credit Reporting Act, referred to in text, is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, as amended, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

### § 6807. Relation to State laws

#### (a) In general

This subchapter and the amendments made by this subchapter shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

#### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter and the amendments made by this subchapter, as determined by the Bureau of Consumer Financial Protection, after consultation with the agency or authority with jurisdiction under section 6805(a) of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, § 507, Nov. 12, 1999, 113 Stat. 1442; Pub. L. 111–203, title X, § 1093(6), July 21, 2010, 124 Stat. 2097.)

#### Editorial Notes

##### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

##### AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 substituted "Bureau of Consumer Financial Protection" for "Federal Trade Commission".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### § 6808. Study of information sharing among financial affiliates

#### (a) In general

The Secretary of the Treasury, in conjunction with the Federal functional regulators and the Federal Trade Commission, shall conduct a study of information sharing practices among financial institutions and their affiliates. Such study shall include—

(1) the purposes for the sharing of confidential customer information with affiliates or with nonaffiliated third parties;

(2) the extent and adequacy of security protections for such information;

(3) the potential risks for customer privacy of such sharing of information;

(4) the potential benefits for financial institutions and affiliates of such sharing of information;

(5) the potential benefits for customers of such sharing of information;

(6) the adequacy of existing laws to protect customer privacy;

(7) the adequacy of financial institution privacy policy and privacy rights disclosure under existing law;

(8) the feasibility of different approaches, including opt-out and opt-in, to permit customers to direct that confidential information not be shared with affiliates and nonaffiliated third parties; and

(9) the feasibility of restricting sharing of information for specific uses or of permitting customers to direct the uses for which information may be shared.

**(b) Consultation**

The Secretary shall consult with representatives of State insurance authorities designated by the National Association of Insurance Commissioners, and also with financial services industry, consumer organizations and privacy groups, and other representatives of the general public, in formulating and conducting the study required by subsection (a).

**(c) Report**

On or before January 1, 2002, the Secretary shall submit a report to the Congress containing the findings and conclusions of the study required under subsection (a), together with such recommendations for legislative or administrative action as may be appropriate.

(Pub. L. 106–102, title V, §508, Nov. 12, 1999, 113 Stat. 1442.)

## § 6809. Definitions

As used in this subchapter:

**(1) Federal banking agency**

The term ''Federal banking agency'' has the same meaning as given in section 1813 of title 12.

**(2) Federal functional regulator**

The term ''Federal functional regulator'' means—

(A) the Board of Governors of the Federal Reserve System;

(B) the Office of the Comptroller of the Currency;

(C) the Board of Directors of the Federal Deposit Insurance Corporation;

(D) the Director of the Office of Thrift Supervision;

(E) the National Credit Union Administration Board; and

(F) the Securities and Exchange Commission.

**(3) Financial institution**

**(A) In general**

The term ''financial institution'' means any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12.

**(B) Persons subject to CFTC regulation**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.].

**(C) Farm credit institutions**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(D) Other secondary market institutions**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include institutions chartered by Congress specifically to engage in transactions described in section 6802(e)(1)(C) of this title, as long as such institutions do not sell or transfer nonpublic personal information to a nonaffiliated third party.

**(4) Nonpublic personal information**

(A) The term ''nonpublic personal information'' means personally identifiable financial information—

(i) provided by a consumer to a financial institution;

(ii) resulting from any transaction with the consumer or any service performed for the consumer; or

(iii) otherwise obtained by the financial institution.

(B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.

(C) Notwithstanding subparagraph (B), such term—

(i) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information; but

(ii) shall not include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived without using any nonpublic personal information.

**(5) Nonaffiliated third party**

The term ''nonaffiliated third party'' means any entity that is not an affiliate of, or related by common ownership or affiliated by corporate control with, the financial institution, but does not include a joint employee of such institution.

**(6) Affiliate**

The term ''affiliate'' means any company that controls, is controlled by, or is under common control with another company.

**(7) Necessary to effect, administer, or enforce**

The term ''as necessary to effect, administer, or enforce the transaction'' means—

(A) the disclosure is required, or is a usual, appropriate, or acceptable method, to carry out the transaction or the product or service business of which the transaction is a part, and record or service or maintain the consumer's account in the ordinary course of providing the financial service or financial product, or to administer or service benefits or claims relating to the transaction or the product or service business of which it is a part, and includes—

(i) providing the consumer or the consumer's agent or broker with a confirmation, statement, or other record of the transaction, or information on the status or value of the financial service or financial product; and

(ii) the accrual or recognition of incentives or bonuses associated with the transaction that are provided by the financial institution or any other party;

(B) the disclosure is required, or is one of the lawful or appropriate methods, to enforce the rights of the financial institution or of other persons engaged in carrying out the financial transaction, or providing the product or service;

(C) the disclosure is required, or is a usual, appropriate, or acceptable method, for insurance underwriting at the consumer's request or for reinsurance purposes, or for any of the following purposes as they relate to a consumer's insurance: Account administration, reporting, investigating, or preventing fraud or material misrepresentation, processing premium payments, processing insurance claims, administering insurance benefits (including utilization review activities), participating in research projects, or as otherwise required or specifically permitted by Federal or State law; or

(D) the disclosure is required, or is a usual, appropriate, or acceptable method, in connection with—

(i) the authorization, settlement, billing, processing, clearing, transferring, reconciling, or collection of amounts charged, debited, or otherwise paid using a debit, credit or other payment card, check, or account number, or by other payment means;

(ii) the transfer of receivables, accounts or interests therein; or

(iii) the audit of debit, credit or other payment information.

### (8) State insurance authority

The term "State insurance authority" means, in the case of any person engaged in providing insurance, the State insurance authority of the State in which the person is domiciled.

### (9) Consumer

The term "consumer" means an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes, and also means the legal representative of such an individual.

### (10) Joint agreement

The term "joint agreement" means a formal written contract pursuant to which two or more financial institutions jointly offer, endorse, or sponsor a financial product or service, and as may be further defined in the regulations prescribed under section 6804 of this title.

### (11) Customer relationship

The term "time of establishing a customer relationship" shall be defined by the regulations prescribed under section 6804 of this title, and shall, in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer.

(Pub. L. 106–102, title V, § 509, Nov. 12, 1999, 113 Stat. 1443.)

#### EDITORIAL NOTES

##### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Commodity Exchange Act, referred to in par. (3)(B), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (3)(C), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

### SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

## § 6821. Privacy protection for customer information of financial institutions

### (a) Prohibition on obtaining customer information by false pretenses

It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person—

(1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;

(2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or

(3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

### (b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses

It shall be a violation of this subchapter to request a person to obtain customer information

of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a).

### (c) Nonapplicability to law enforcement agencies

No provision of this section shall be construed so as to prevent any action by a law enforcement agency, or any officer, employee, or agent of such agency, to obtain customer information of a financial institution in connection with the performance of the official duties of the agency.

### (d) Nonapplicability to financial institutions in certain cases

No provision of this section shall be construed so as to prevent any financial institution, or any officer, employee, or agent of a financial institution, from obtaining customer information of such financial institution in the course of—

(1) testing the security procedures or systems of such institution for maintaining the confidentiality of customer information;

(2) investigating allegations of misconduct or negligence on the part of any officer, employee, or agent of the financial institution; or

(3) recovering customer information of the financial institution which was obtained or received by another person in any manner described in subsection (a) or (b).

### (e) Nonapplicability to insurance institutions for investigation of insurance fraud

No provision of this section shall be construed so as to prevent any insurance institution, or any officer, employee, or agency of an insurance institution, from obtaining information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order.

### (f) Nonapplicability to certain types of customer information of financial institutions

No provision of this section shall be construed so as to prevent any person from obtaining customer information of a financial institution that otherwise is available as a public record filed pursuant to the securities laws (as defined in section 78c(a)(47) of this title).

### (g) Nonapplicability to collection of child support judgments

No provision of this section shall be construed to prevent any State-licensed private investigator, or any officer, employee, or agent of such private investigator, from obtaining customer information of a financial institution, to the extent reasonably necessary to collect child support from a person adjudged to have been delinquent in his or her obligations by a Federal or State court, and to the extent that such action by a State-licensed private investigator is not unlawful under any other Federal or State law or regulation, and has been authorized by an order or judgment of a court of competent jurisdiction.

(Pub. L. 106–102, title V, § 521, Nov. 12, 1999, 113 Stat. 1446.)

## § 6822. Administrative enforcement

### (a) Enforcement by Federal Trade Commission

Except as provided in subsection (b), compliance with this subchapter shall be enforced by the Federal Trade Commission in the same manner and with the same power and authority as the Commission has under the Fair Debt Collection Practices Act [15 U.S.C. 1692 et seq.] to enforce compliance with such Act.

### (b) Enforcement by other agencies in certain cases

#### (1) In general

Compliance with this subchapter shall be enforced under—

(A) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], in the case of—

(i) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

(ii) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], by the Board;

(iii) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System and national nonmember banks) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation; and

(iv) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, by the Director of the Office of Thrift Supervision; and

(B) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union.

#### (2) Violations of this subchapter treated as violations of other laws

For the purpose of the exercise by any agency referred to in paragraph (1) of its powers under any Act referred to in that paragraph, a violation of this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in paragraph (1), each of the agencies referred to in that paragraph may exercise, for the purpose of enforcing compliance with this subchapter, any other authority conferred on such agency by law.

(Pub. L. 106–102, title V, § 522, Nov. 12, 1999, 113 Stat. 1447.)

### Editorial Notes

#### REFERENCES IN TEXT

The Fair Debt Collection Practices Act, referred to in subsec. (a), is title VIII of Pub. L. 90–321, as added by

Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874, as amended, which is classified generally to subchapter V (§ 1692 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (b)(1)(A)(ii), is classified to subchapter I (§ 601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§ 611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (b)(1)(B), is act June 26, 1934, ch. 750, 48 Stat. 1216, as amended, which is classified generally to chapter 14 (§ 1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

#### Statutory Notes and Related Subsidiaries

##### TRANSFER OF FUNCTIONS

Functions vested in Administrator of National Credit Union Administration transferred and vested in National Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

### § 6823. Criminal penalty

#### (a) In general

Whoever knowingly and intentionally violates, or knowingly and intentionally attempts to violate, section 6821 of this title shall be fined in accordance with title 18 or imprisoned for not more than 5 years, or both.

#### (b) Enhanced penalty for aggravated cases

Whoever violates, or attempts to violate, section 6821 of this title while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, imprisoned for not more than 10 years, or both.

(Pub. L. 106–102, title V, § 523, Nov. 12, 1999, 113 Stat. 1448.)

### § 6824. Relation to State laws

#### (a) In general

This subchapter shall not be construed as superseding, altering, or affecting the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that such statutes, regulations, orders, or interpretations are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

#### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter as determined by the Federal Trade Commission, after consultation with the agency or authority with jurisdiction under section 6822 of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, § 524, Nov. 12, 1999, 113 Stat. 1448.)

### § 6825. Agency guidance

In furtherance about the objectives of this subchapter, each Federal banking agency (as defined in section 1813(z) of title 12), the National Credit Union Administration, and the Securities and Exchange Commission or self-regulatory organizations, as appropriate, shall review regulations and guidelines applicable to financial institutions under their respective jurisdictions and shall prescribe such revisions to such regulations and guidelines as may be necessary to ensure that such financial institutions have policies, procedures, and controls in place to prevent the unauthorized disclosure of customer financial information and to deter and detect activities proscribed under section 6821 of this title.

(Pub. L. 106–102, title V, § 525, Nov. 12, 1999, 113 Stat. 1448.)

### § 6826. Reports

#### (a) Report to the Congress

Before the end of the 18-month period beginning on November 12, 1999, the Comptroller General, in consultation with the Federal Trade Commission, Federal banking agencies, the National Credit Union Administration, the Securities and Exchange Commission, appropriate Federal law enforcement agencies, and appropriate State insurance regulators, shall submit to the Congress a report on the following:

(1) The efficacy and adequacy of the remedies provided in this subchapter in addressing attempts to obtain financial information by fraudulent means or by false pretenses.

(2) Any recommendations for additional legislative or regulatory action to address threats to the privacy of financial information created by attempts to obtain information by fraudulent means or false pretenses.

#### (b) Annual report by administering agencies

The Federal Trade Commission and the Attorney General shall submit to Congress an annual report on number and disposition of all enforcement actions taken pursuant to this subchapter.

(Pub. L. 106–102, title V, § 526, Nov. 12, 1999, 113 Stat. 1448.)

### § 6827. Definitions

For purposes of this subchapter, the following definitions shall apply:

#### (1) Customer

The term "customer" means, with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary.

#### (2) Customer information of a financial institution

The term "customer information of a financial institution" means any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer.

**(3) Document**

The term ''document'' means any information in any form.

**(4) Financial institution**

**(A) In general**

The term ''financial institution'' means any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution.

**(B) Certain financial institutions specifically included**

The term ''financial institution'' includes any depository institution (as defined in section 461(b)(1)(A) of title 12), any broker or dealer, any investment adviser or investment company, any insurance company, any loan or finance company, any credit card issuer or operator of a credit card system, and any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (as defined in section 1681a(p) of this title).

**(C) Securities institutions**

For purposes of subparagraph (B)—

(i) the terms ''broker'' and ''dealer'' have the same meanings as given in section 78c of this title;

(ii) the term ''investment adviser'' has the same meaning as given in section 80b–2(a)(11) of this title; and

(iii) the term ''investment company'' has the same meaning as given in section 80a–3 of this title.

**(D) Certain persons and entities specifically excluded**

The term ''financial institution'' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.] and does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(E) Further definition by regulation**

The Federal Trade Commission, after consultation with Federal banking agencies and the Securities and Exchange Commission, may prescribe regulations clarifying or describing the types of institutions which shall be treated as financial institutions for purposes of this subchapter.

(Pub. L. 106–102, title V, § 527, Nov. 12, 1999, 113 Stat. 1449.)

Editorial Notes

REFERENCES IN TEXT

The Commodity Exchange Act, referred to in par. (4)(D), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (4)(D), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

CHAPTER 95—MICROENTERPRISE TECHNICAL ASSISTANCE AND CAPACITY BUILDING PROGRAM

Sec.
6901.    Definitions.
6902.    Establishment of program.
6903.    Uses of assistance.
6904.    Qualified organizations.
6905.    Allocation of assistance; subgrants.
6906.    Matching requirements.
6907.    Applications for assistance.
6908.    Recordkeeping.
6909.    Authorization.
6910.    Implementation.

**§ 6901. Definitions**

For purposes of this chapter, the following definitions shall apply:

**(1) Administration**

The term ''Administration'' means the Small Business Administration.

**(2) Administrator**

The term ''Administrator'' means the Administrator of the Small Business Administration.

**(3) Capacity building services**

The term ''capacity building services'' means services provided to an organization that is, or that is in the process of becoming, a microenterprise development organization or program, for the purpose of enhancing its ability to provide training and services to disadvantaged entrepreneurs.

**(4) Collaborative**

The term ''collaborative'' means 2 or more nonprofit entities that agree to act jointly as a qualified organization under this chapter.

**(5) Disadvantaged entrepreneur**

The term ''disadvantaged entrepreneur'' means a microentrepreneur that is—

(A) a low-income person;

(B) a very low-income person; or

(C) an entrepreneur that lacks adequate access to capital or other resources essential for business success, or is economically disadvantaged, as determined by the Administrator.

**(6) Indian tribe**

The term ''Indian tribe'' has the meaning given the term in section 4702 of title 12.

**(7) Intermediary**

The term ''intermediary'' means a private, nonprofit entity that seeks to serve microenterprise development organizations and programs as authorized under section 6904 of this title.

**(8) Low-income person**

The term ''low-income person'' has the meaning given the term in section 4702 of title 12.

**Exhibit D-3**

**FTC Joint Motion**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

CELSIUS NETWORK INC., et al.,

    Defendants.

**Case No. 1:23-cv-6009**

---

## JOINT MOTION FOR STAY AS TO CORPORATE DEFENDANTS

Plaintiff Federal Trade Commission ("FTC" or "Commission") and Defendants Celsius
Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC,
Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and
Celsius Management Corp. (collectively, "Corporate Defendants," and together with the FTC,
the "Parties"), by and through undersigned counsel, have reached an agreement resolving this
matter vis-à-vis the Corporate Defendants.  As a result, the Parties respectfully move this Court
to stay this action as to the Corporate Defendants for 45 days or until they obtain Bankruptcy
Court approval of the settlement agreement between them, whichever is earlier. Should the
Bankruptcy Court approve the settlement within 45 days, the FTC and Corporate Defendants will
file a separate motion in this Court seeking entry of the Stipulated Order for Permanent
Injunction, Monetary Judgment, and Other Relief ("Stipulated Order", attached as **EXHIBIT A**).

## BACKGROUND

On July 13, 2023, the FTC filed a Complaint pursuant to Sections 13(b) and 19 of the
Federal Trade Commission Act, 15 U.S.C. § 53(b) and 57b, and the Gramm-Leach-Bliley Act,
15 U.S.C. §§ 6821 *et seq.*, alleging that the Defendants engaged in unfair and deceptive business

1

practices in violation of the FTC Act; and violated the GLB Act by using false, fraudulent, or

fictitious statements to obtaining, or attempting to obtain, consumers' financial information. The

FTC seeks a permanent injunction to prevent continuation of the conduct at issue and to prevent

similar and related conduct in the future, as well as monetary redress. The Corporate Defendants

have reached a settlement with the FTC, as set forth in the Stipulated Order.

Seven of the nine Corporate Defendants[1] filed voluntary petitions under Chapter 11 of

the U.S. Bankruptcy Code on July 13, 2022. The cases are being jointly administered under *In re*

*Celsius Network LLC*, No. 22-10964(MG) (Bankr. S.D.N.Y.).

## ARGUMENT

The Corporate Defendants have reached a settlement with the FTC that will resolve this

litigation as to the Corporate Defendants. However, because seven of the Corporate Defendants

are in bankruptcy proceedings, those Corporate Defendants must obtain approval of the

settlement by the Bankruptcy Court under Bankruptcy Rule 9019. The Corporate Defendants and

the FTC intend to file a joint motion or stipulation in the Bankruptcy Court by no later than July

21, 2023, seeking approval of the Stipulated Order as to the Corporate Defendants with active

bankruptcy proceedings.

To allow the Bankruptcy Court time to consider the motion and, in its discretion, hold a

hearing, the FTC and the Corporate Defendants request that the Court stay this action as to the

Corporate Defendants for 45 days or until the Bankruptcy Court approves the Stipulated Order,

whichever is earlier. Should the Bankruptcy Court approve the settlement within 45 days, the

FTC and Corporate Defendants will file a separate motion seeking entry of the Stipulated Order

---

[1] The Corporate Defendants that filed for bankruptcy are Celsius Network Inc., Celsius Network
LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius
Mining LLC, and Celsius US Holding LLC.

by this Court.


Dated: July 13, 2023

Respectfully submitted,

**FOR PLAINTIFF:** FEDERAL TRADE COMMISSION

 _/s/ Katherine M. Aizpuru_____
Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov


**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and CELSIUS MANAGEMENT CORP.

   _/s/ Richard H. Cunningham_____
Richard H. Cunningham
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com

## <u>CERTIFICATION</u>

The undersigned hereby certifies that all counsel whose /s/ signature appears on the

forgoing document have consented to the use of their /s/ signature.

Dated: July 13, 2023                              */s/ Katherine M. Aizpuru*
                                                  Katherine M. Aizpuru
                                                  Counsel for Plaintiff

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | Case No. 1:23-cv-6009 |
| v. | **STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT AND OTHER RELIEF AGAINST CELSIUS NETWORK INC., CELSIUS NETWORK LLC, CELSIUS NETWORKS LENDING LLC, CELSIUS LENDING LLC, CELSIUS KEYFI LLC, CELSIUS MINING LLC, CELSIUS US HOLDING LLC, CELSIUS US LLC, and CELSIUS MANAGEMENT CORP.** |
| CELSIUS NETWORK INC., a corporation, CELSIUS NETWORK LLC, a limited liability company, CELSIUS NETWORKS LENDING LLC, a limited liability company, CELSIUS LENDING LLC, a limited liability company, CELSIUS KEYFI LLC, a limited liability company, CELSIUS MINING LLC, a limited liability company, CELSIUS US HOLDING LLC, a limited liability company; CELSIUS US LLC, a limited liability company; CELSIUS MANAGEMENT CORP., a corporation; | |
| ALEXANDER MASHINSKY, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC; | |
| SHLOMI DANIEL LEON, individually and as an officer of Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC; and | |
| HANOCH "NUKE" GOLDSTEIN, individually and as an officer of Celsius Network LLC and Celsius Lending LLC, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint

for Permanent Injunction, Monetary Relief, and Other Relief ("Complaint"), for a permanent

injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b), 19, and

16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), and 57b, and

the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. §§ 6821 *et seq.* Corporate Defendants

have waived service of the summons and the Complaint.

Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending

LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US LLC

(collectively, "Debtor Defendants") have filed petitions for relief under Chapter 11 of the

Bankruptcy Code. *See In re Celsius Network LLC et al.*, No. 22-10964(MG) (Bankr. S.D.N.Y.)

("Bankruptcy Case").[1]

The Commission and Corporate Defendants stipulate to the entry of this Stipulated Order

for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters

in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1.     This Court has jurisdiction over this matter.

2.     The Complaint charges that Defendants participated in deceptive and unfair acts

or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in the marketing and sale of

cryptocurrency lending and custody services. The Complaint further charges that Defendants

obtained customer information of a financial institution relating to another person by making

---

[1] On July 13, 2022, the Debtor Defendants each filed a Chapter 11 voluntary petition. *See In re Celsius KeyFi LLC*, Case No. 22-10967; *In re Celsius Lending LLC*, Case No. 22-10970; *In re Celsius Mining LLC*, Case No. 22-10968; *In re Celsius Network Inc.*, Case No. 22-10965; *In re Celsius Networks Lending LLC*, Case No. 10969; and *In re Celsius US Holding LLC*, Case No. 22-10971. The Bankruptcy Court entered an order on July 19, 2022, jointly administering these cases under the main case for Celsius Network, LLC, Case No. 22-10964. Dkt. 53. Accordingly, "Bankruptcy Case" refers to the jointly administered cases for all Debtor Defendants, as well as each case for each Debtor Defendant.

false, fictitious, or fraudulent statements, in violation of Section 521 of the GLB Act, 15 U.S.C. § 6821.

3.     Only for purposes of this action, Corporate Defendants admit the facts necessary to establish jurisdiction and as otherwise specifically stated in this Order.  Corporate Defendants further admit the facts set forth on pages 107-109 of the Debtors' Disclosure Statement filed on June 27, 2023 in the Bankruptcy Case, Dkt. 2902.

4.     Corporate Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.     Corporate Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

6.     Entry of this Order is in the public interest.

7.     The Commission's prosecution of this action, including entry of a money judgment and the enforcement of a judgment (other than a money judgment) obtained in this action are actions to enforce the Commission's police or regulatory powers. As a result, if the Debtor Defendants' bankruptcies are pending as of the date of entry of this Order, these actions are excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4).

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.     In any communication that is solely visual or solely audible, the disclosure

2

must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable

3

members of that group.

B. "**Defendants**" means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

     1. "**Corporate Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius Keyfi LLC, and Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, Celsius Management Corp., and their successors and assigns.

     2. "**Debtor Defendants**" means Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, and Celsius US Holding LLC.

     3. "**Non-Debtor Defendants**" means Celsius US LLC and Celsius Management Corp.

     4. "**Individual Defendants**" means Alexander Mashinsky, Shlomi Daniel Leon, and Hanoch "Nuke" Goldstein.

C. "**Express Informed Consent**" means an affirmative act communicating unambiguous assent made after receiving and in close proximity to a Clear and Conspicuous disclosure of all information material to the provision of consent. Assent obtained through any practice or user interface that has the effect of subverting or impairing consumer autonomy, decision-making, or choice, including using text that is not easily legible or disclosing material terms behind a hyperlink, dropdown icon, tooltip, or other similar interface, does not constitute Express Informed Consent.  Acceptance of a general or broad terms of use or similar document that contains descriptions of agreement by the individual along with other, unrelated information, does not constitute Express Informed Consent.

4

D.      **"Nonpublic Personal Information"** means:

      1.      Any information that Defendants obtain about a consumer in connection with providing a product or service to that consumer; or

      2.      Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any Nonpublic Personal Information that is not publicly available.

## ORDER

## I.      BAN

IT IS ORDERED that Corporate Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering, or distributing, or assisting in the advertising, marketing, promoting, offering, or distributing of any product or service that can be used to deposit, exchange, invest, or withdraw assets, whether directly or through an intermediary.

## II.      PROHIBITION AGAINST MISREPRESENTATIONS

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any product or service are permanently restrained and enjoined from misrepresenting or assisting others in misrepresenting, expressly or by implication:

A.      the benefits of Defendants' products or services, including the existence or amount of any rewards that consumers can expect to earn; or

B.      any other material fact about Defendants' products or services, such as the total costs; any material restrictions, limitations, or conditions; or any material aspect of its

performance, efficacy, nature, or central characteristics.

## III.  INJUNCTION RELATING TO OBTAINING CUSTOMER FINANCIAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants and Corporate Defendants'
officers, agents, employees, and attorneys, and all other persons in active concert or participation
with any of them, who receive actual notice of this Order, whether acting directly or indirectly
are hereby permanently restrained and enjoined from:

A.     Obtaining or attempting to obtain customer information of a financial institution
(including bank account routing number, account number, log-in credentials, private keys, or
other cryptocurrency wallet information) from a consumer by making false, fictitious, or
fraudulent representations to any consumer or financial institution; or

B.     Violating the Gramm-Leach-Bliley Act, 15 U.S.C. §§ 6801-6809, §§ 6821-6827,
a copy of which is attached as **ATTACHMENT A.**

## IV.   PROHIBITION AGAINST IMPROPER DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,
agents, employees, and attorneys, and all other persons in active concert or participation with any
of them, who receive actual notice of this Order, whether acting directly or indirectly, are
permanently restrained and enjoined from disclosing to any other person any Nonpublic Personal
Information about a consumer unless Corporate Defendants have obtained the consumer's
Express Informed Consent to disclose that Nonpublic Personal Information to that person.

## V.     ORDERS OF BANKRUPTCY COURT

IT IS FURTHER ORDERED that this Order does not restrain or enjoin the deposit,
exchange, distribution, investment, or withdrawal of assets owned or held by the Debtor

6

Defendants and being administered in accordance with the United States Bankruptcy Code and

orders of the court in the Bankruptcy Case. For the avoidance of doubt, Part VI.C-D, below, does

not create a contingent liability against the Debtor Defendants and does not preclude the full

distribution of assets held by the Debtor Defendants in the Bankruptcy Case.

## VI.   JUDGMENT FOR MONETARY RELIEF AND ITS SUSPENSION

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of $4,720,000,000 is entered in favor of the Commission

against Corporate Defendants, jointly and severally, as monetary relief. The liability of

Corporate Defendants shall be joint and several with any other Defendants to the extent

subsequently ordered.

B.     The judgment is suspended as to Corporate Defendants subject to the subsections

below.

C.     The suspension of the judgment as to the Non-Debtor Defendants is expressly

premised upon the truthfulness, accuracy, and completeness of:

1.     The Financial Statement of Corporate Defendant Celsius Management

Corp. signed on July 7, 2023, including attachments;

2.     The Financial Statement of Corporate Defendant Celsius US LLC signed

on July 7, 2023, including attachments; and

3.     The Declaration of Christopher Ferraro signed on July 6, 2023, and sent

by email from Corporate Debtors' counsel, Rich Cunningham, to Commission

counsel Katherine Aizpuru on July 6, 2023.

D.     The suspension will be lifted as to Non-Debtor Defendants if, upon motion by the

Commission or the Commission, the Court finds that a Non-Debtor Defendant failed to disclose

any material asset, materially misstated the value of any asset, or made any other material

misstatement or omission in the financial representations identified above. The suspension will

be lifted as to Corporate Defendants if the Bankruptcy Case is closed, dismissed, or otherwise

concluded, in each case, without the estate(s) being fully administered, including any

distributions to creditors, in accordance with the Bankruptcy Code.

E.      If the suspension of the judgment is lifted, the judgment becomes immediately

due as to Corporate Defendants in the amount specified in Subsection A above (which the parties

stipulate only for purposes of this Section represents the consumer injury), less any payment

previously made pursuant to this Section, plus interest computed from the date of entry of this

Order.

## VII.   ADDITIONAL MONETARY PROVISIONS

IT IS FURTHER ORDERED that:

A.      Corporate Defendants relinquish dominion and all legal and equitable right, title,

and interest in all assets transferred pursuant to this Order and may not seek the return of any

assets.

B.      The facts alleged in the Complaint will be taken as true, without further proof, in

any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to

enforce its rights to any payment or monetary judgment pursuant to this Order, such as a

nondischargeability complaint in any bankruptcy case.

C.      The facts alleged in the Complaint establish all elements necessary to sustain an

action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C.

§ 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

D.      Corporate Defendants acknowledge that their Taxpayer Identification Numbers

8

(Social Security Numbers or Employer Identification Numbers), which Corporate Defendants

must submit to the Commission, may be used for collecting and reporting on any delinquent

amount arising out of this Order, in accordance with 31 U.S.C. §7701.

E.      Payment must be made by electronic fund transfer in accordance with instructions

provided by a representative of the Commission.

F.      All money received by the Commission pursuant to this Order may be deposited

into a fund administered by the Commission or its designee to be used for consumer relief, such

as redress and any attendant expenses for the administration of any redress fund.  If a

representative of the Commission decides that direct redress to consumers is wholly or partially

impracticable or money remains after such redress is completed, the Commission may apply any

remaining money for such related relief (including consumer information remedies) as it

determines to be reasonably related to Corporate Defendants' practices alleged in the Complaint.

Any money not used for relief is to be deposited to the U.S. Treasury.  Corporate Defendants

have no right to challenge any actions the Commission or its representatives may take pursuant

to this Subsection.

G.      The Debtor Defendants agree that the monetary judgment ordered by Section

VI.A is not dischargeable in the Bankruptcy Case.

H.      The Debtor Defendants will not object to allowance of the FTC claim in the

Bankruptcy Case as a general unsecured claim in the amount of $4,720,000,000.

## VIII.   CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers,

agents, employees, and attorneys, and all other persons in active concert or participation with any

of them, who receive actual notice of this Order are permanently restrained and enjoined from directly or indirectly:

A.     failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, Corporate Defendants must provide it, in the form prescribed by the Commission, within 14 days;

B.     disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Defendant obtained prior to entry of this Order in connection with the marketing and sale of cryptocurrency services; and

C.     failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

Provided, however, that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## IX.    COOPERATION

IT IS FURTHER ORDERED that Corporate Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or occurrences that are the subject of the Complaint. Corporate Defendants must provide truthful and complete information, evidence, and testimony. Corporate Defendants must cause Corporate Defendants' officers, employees, representatives, or agents to appear for

10

interviews, discovery, hearings, trials, and any other proceedings that a Commission

representative may reasonably request upon 5 days' written notice, or other reasonable notice, at

such places and times as a Commission representative may designate, without the service of a

subpoena.

## X.     ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Corporate Defendants obtain acknowledgments of

receipt of this Order:

A.     Each Defendant, within 7 days of entry of this Order, must submit to the

Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.     For 20 years after entry of this Order, each Corporate Defendant must deliver a

copy of this Order to:  (1) all principals, officers, directors, and LLC managers and members; (2)

all employees having managerial responsibilities for conduct related to the subject matter of the

Order and all agents and representatives who participate in conduct related to the subject matter

of the Order; and (3) any business entity resulting from any change in structure as set forth in the

Section titled Compliance Reporting.  Delivery must occur within 7 days of entry of this Order

for current personnel.  For all others, delivery must occur before they assume their

responsibilities.

C.     From each individual or entity to which a Corporate Defendant delivered a copy

of this Order, that Corporate Defendant must obtain, within 30 days, a signed and dated

acknowledgment of receipt of this Order.

## XI.     COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Corporate Defendants make timely submissions to the

Commission:

A.     One year after entry of this Order, each Corporate Defendant must submit a

11

compliance report, sworn under penalty of perjury, that:  (1) identifies the primary physical,

postal, and email address and telephone number, as designated points of contact, which

representatives of the Commission may use to communicate with Corporate Defendant; (2)

identifies all of that Corporate Defendant's businesses by all of their names, telephone numbers,

and physical, postal, email, and Internet addresses; (3) describes the activities of each business,

including the goods and services offered, the means of advertising, marketing, and sales, and the

involvement of any other Defendant; (4) describes in detail whether and how that Corporate

Defendant is in compliance with each Section of this Order; and (5) provides a copy of each

Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the

Commission.

B.    For 20 years after entry of this Order, each Corporate Defendant must submit a

compliance notice, sworn under penalty of perjury, within 14 days of any change in the

following: (1) any designated point of contact; or (2) the structure of any Corporate Defendant or

any entity that Corporate Defendant has any ownership interest in or controls directly or

indirectly that may affect compliance obligations arising under this Order, including:  creation,

merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any

acts or practices subject to this Order; *provided, however,* that Corporate Defendants need not

submit a compliance notice associated with the administration of the Debtor Defendants'

bankruptcy estates in the Bankruptcy Case.

C.    Each Corporate Defendant must submit to the Commission notice of the filing of

any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such

Corporate Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under

12

penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by

concluding: "I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's

full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all

submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or

sent by overnight courier (not the U.S. Postal Service) to:  Associate Director for Enforcement,

Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW,

Washington, DC  20580.  The subject line must begin:  FTC v. Celsius Network Inc., *et al.*, No.

2223137.

## XII.    RECORDKEEPING

IT IS FURTHER ORDERED that Corporate Defendants must create certain records for

20 years after entry of the Order, and retain each such record for 5 years.  Specifically, Corporate

Defendants  must create and retain the following records:

A.    accounting records showing the revenues from all goods or services sold;

B.    personnel records showing, for each person providing services, whether as an

employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position;

dates of service; and (if applicable) the reason for termination;

C.    records of all consumer complaints and refund requests, whether received directly

or indirectly, such as through a third party, and any response;

D.    all records necessary to demonstrate full compliance with each provision of this

Order, including all submissions to the Commission; and

E.    a copy of each unique advertisement or other marketing material.

13

## XIII.   COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Corporate Defendants'

compliance with this Order:

A.      Within 14 days of receipt of a written request from a representative of the

Commission, each Corporate Defendant must:  submit additional compliance reports or other

requested information, which must be sworn under penalty of perjury; appear for depositions;

and produce documents for inspection and copying.  The Commission is also authorized to

obtain discovery, without further leave of court, using any of the procedures prescribed by

Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45,

and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate

directly with each Corporate Defendant.  Each Corporate Defendant must permit representatives

of the Commission to interview any employee or other person affiliated with any Corporate

Defendant who has agreed to such an interview.  The person interviewed may have counsel

present.

C.      The Commission may use all other lawful means, including posing, through its

representatives as consumers, suppliers, or other individuals or entities, to Corporate Defendants

or any individual or entity affiliated with Corporate Defendants, without the necessity of

identification or prior notice.  Nothing in this Order limits the Commission's lawful use of

compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XIV.   RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for

purposes of construction, modification, and enforcement of this Order.

**SO ORDERED this ___ day of _____, 2023.**

_____

UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:** FEDERAL TRADE COMMISSION


*Katherine M. Aizpuru*                          Date: July 12, 2023
Katherine M. Aizpuru
Stephanie E. Liebner
Katherine Worthman
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue NW
Mail Stop: CC 6316
Washington, D.C. 20580
202-876-5673
kaizpuru@ftc.gov;
sliebner@ftc.gov;
kworthman@ftc.gov

**FOR CORPORATE DEFENDANTS:** CELSIUS NETWORK INC.; CELSIUS NETWORK LLC; CELSIUS NETWORKS LENDING LLC; CELSIUS LENDING LLC; CELSIUS KEYFI LLC; CELSIUS MINING LLC; CELSIUS US HOLDING LLC; CELSIUS US LLC; and CELSIUS MANAGEMENT CORP.


_____    Date: _____
Richard H. Cunningham                                      7/11/23
Robert W. Allen
Hanaa Kaloti
Kirkland & Ellis LLP
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
202-389-5000
rich.cunningham@kirkland.com;
bob.allen@kirkland.com;
hanna.kaloti@kirkland.com

COUNSEL


_____    Date: _____
Christopher Ferraro, as an officer of Celsius           July 11, 2023
Network LLC, on behalf of Celsius Network
LLC and the other Corporate Defendants


17

# Attachment A

lines broker or agent, insurance consultant, limited insurance representative, and any other individual or entity that sells, solicits, or negotiates policies of insurance or offers advice, counsel, opinions or services related to insurance.

### (6) Insurer

The term ''insurer'' has the meaning as in section 313(e)(2)(B) of title 31.

### (7) Principal place of business

The term ''principal place of business'' means the State in which an insurance producer maintains the headquarters of the insurance producer and, in the case of a business entity, where high-level officers of the entity direct, control, and coordinate the business activities of the business entity.

### (8) Principal place of residence

The term ''principal place of residence'' means the State in which an insurance producer resides for the greatest number of days during a calendar year.

### (9) State

The term ''State'' includes any State, the District of Columbia, any territory of the United States, and Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, and the Northern Mariana Islands.

### (10) State law

#### (A) In general

The term ''State law'' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State.

#### (B) Laws applicable in the District of Columbia

A law of the United States applicable only to or within the District of Columbia shall be treated as a State law rather than a law of the United States.

(Pub. L. 106–102, title III, § 334, as added Pub. L. 114–1, title II, § 202(a), Jan. 12, 2015, 129 Stat. 27.)

#### Editorial Notes

##### Prior Provisions

Provisions similar to this section were contained in section 6766 of this title, prior to the general amendment of this subchapter by Pub. L. 114–1.

A prior section 6764, Pub. L. 106–102, title III, § 334, Nov. 12, 1999, 113 Stat. 1433, related to coordination with other regulators, prior to the general amendment of this subchapter by Pub. L. 114–1. See section 6761 of this title.

A prior section 6765, Pub. L. 106–102, title III, § 335, Nov. 12, 1999, 113 Stat. 1433, which related to judicial review, was omitted in the general amendment of this subchapter by Pub. L. 114–1. See section 6762 of this title.

A prior section 6766, Pub. L. 106–102, title III, § 336, Nov. 12, 1999, 113 Stat. 1433, which related to definitions, was omitted in the general amendment of this subchapter by Pub. L. 114–1.

## SUBCHAPTER IV—RENTAL CAR AGENCY INSURANCE ACTIVITIES

### § 6781. Standard of regulation for motor vehicle rentals

#### (a) Protection against retroactive application of regulatory and legal action

Except as provided in subsection (b), during the 3-year period beginning on November 12, 1999, it shall be a presumption that no State law imposes any licensing, appointment, or education requirements on any person who solicits the purchase of or sells insurance connected with, and incidental to, the lease or rental of a motor vehicle.

#### (b) Preeminence of State insurance law

No provision of this section shall be construed as altering the validity, interpretation, construction, or effect of—

(1) any State statute;

(2) the prospective application of any court judgment interpreting or applying any State statute; or

(3) the prospective application of any final State regulation, order, bulletin, or other statutorily authorized interpretation or action,

which, by its specific terms, expressly regulates or exempts from regulation any person who solicits the purchase of or sells insurance connected with, and incidental to, the short-term lease or rental of a motor vehicle.

#### (c) Scope of application

This section shall apply with respect to—

(1) the lease or rental of a motor vehicle for a total period of 90 consecutive days or less; and

(2) insurance which is provided in connection with, and incidentally to, such lease or rental for a period of consecutive days not exceeding the lease or rental period.

#### (d) Motor vehicle defined

For purposes of this section, the term ''motor vehicle'' has the same meaning as in section 13102 of title 49.

(Pub. L. 106–102, title III, § 341, Nov. 12, 1999, 113 Stat. 1434.)

## CHAPTER 94—PRIVACY

### SUBCHAPTER I—DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION

| Sec. | |
|---|---|
| 6801. | Protection of nonpublic personal information. |
| 6802. | Obligations with respect to disclosures of personal information. |
| 6803. | Disclosure of institution privacy policy. |
| 6804. | Rulemaking. |
| 6805. | Enforcement. |
| 6806. | Relation to other provisions. |
| 6807. | Relation to State laws. |
| 6808. | Study of information sharing among financial affiliates. |
| 6809. | Definitions. |

### SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

| 6821. | Privacy protection for customer information of financial institutions. |
| 6822. | Administrative enforcement. |

Sec.
6823.    Criminal penalty.
6824.    Relation to State laws.
6825.    Agency guidance.
6826.    Reports.
6827.    Definitions.

SUBCHAPTER I—DISCLOSURE OF
NONPUBLIC PERSONAL INFORMATION

## § 6801. Protection of nonpublic personal information

### (a) Privacy obligation policy

It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

### (b) Financial institutions safeguards

In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title, other than the Bureau of Consumer Financial Protection, shall establish appropriate standards for the financial institutions subject to their jurisdiction relating to administrative, technical, and physical safeguards—

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and

(3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

(Pub. L. 106–102, title V, § 501, Nov. 12, 1999, 113 Stat. 1436; Pub. L. 111–203, title X, § 1093(1), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### Amendments

2010—Subsec. (b). Pub. L. 111–203 inserted '', other than the Bureau of Consumer Financial Protection,'' after ''section 6805(a) of this title'' in introductory provisions.

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

##### Effective Date

Pub. L. 106–102, title V, § 510, Nov. 12, 1999, 113 Stat. 1445, provided that: ''This subtitle [subtitle A (§§ 501–510) of title V of Pub. L. 106–102, enacting this subchapter and amending section 1681s of this title] shall take effect 6 months after the date on which rules are required to be prescribed under section 504(a)(3) [15 U.S.C. 6804(a)(3)], except—

''(1) to the extent that a later date is specified in the rules prescribed under section 504; and

''(2) that sections 504 [15 U.S.C. 6804] and 506 [enacting section 6806 of this title and amending section 1681s of this title] shall be effective upon enactment [Nov. 12, 1999].''

## § 6802. Obligations with respect to disclosures of personal information

### (a) Notice requirements

Except as otherwise provided in this subchapter, a financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title.

### (b) Opt out

#### (1) In general

A financial institution may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) such financial institution clearly and conspicuously discloses to the consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, that such information may be disclosed to such third party;

(B) the consumer is given the opportunity, before the time that such information is initially disclosed, to direct that such information not be disclosed to such third party; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

#### (2) Exception

This subsection shall not prevent a financial institution from providing nonpublic personal information to a nonaffiliated third party to perform services for or functions on behalf of the financial institution, including marketing of the financial institution's own products or services, or financial products or services offered pursuant to joint agreements between two or more financial institutions that comply with the requirements imposed by the regulations prescribed under section 6804 of this title, if the financial institution fully discloses the providing of such information and enters into a contractual agreement with the third party that requires the third party to maintain the confidentiality of such information.

### (c) Limits on reuse of information

Except as otherwise provided in this subchapter, a nonaffiliated third party that receives from a financial institution nonpublic personal information under this section shall not, directly or through an affiliate of such receiving third party, disclose such information to any other person that is a nonaffiliated third party of both the financial institution and such receiving third party, unless such disclosure would be lawful if made directly to such other person by the financial institution.

### (d) Limitations on the sharing of account number information for marketing purposes

A financial institution shall not disclose, other than to a consumer reporting agency, an account number or similar form of access number or access code for a credit card account, deposit account, or transaction account of a consumer to any nonaffiliated third party for use in telemarketing, direct mail marketing, or other

marketing through electronic mail to the consumer.

**(e) General exceptions**

Subsections (a) and (b) shall not prohibit the disclosure of nonpublic personal information—

(1) as necessary to effect, administer, or enforce a transaction requested or authorized by the consumer, or in connection with—

(A) servicing or processing a financial product or service requested or authorized by the consumer;

(B) maintaining or servicing the consumer's account with the financial institution, or with another entity as part of a private label credit card program or other extension of credit on behalf of such entity; or

(C) a proposed or actual securitization, secondary market sale (including sales of servicing rights), or similar transaction related to a transaction of the consumer;

(2) with the consent or at the direction of the consumer;

(3)(A) to protect the confidentiality or security of the financial institution's records pertaining to the consumer, the service or product, or the transaction therein; (B) to protect against or prevent actual or potential fraud, unauthorized transactions, claims, or other liability; (C) for required institutional risk control, or for resolving customer disputes or inquiries; (D) to persons holding a legal or beneficial interest relating to the consumer; or (E) to persons acting in a fiduciary or representative capacity on behalf of the consumer;

(4) to provide information to insurance rate advisory organizations, guaranty funds or agencies, applicable rating agencies of the financial institution, persons assessing the institution's compliance with industry standards, and the institution's attorneys, accountants, and auditors;

(5) to the extent specifically permitted or required under other provisions of law and in accordance with the Right to Financial Privacy Act of 1978 [12 U.S.C. 3401 et seq.], to law enforcement agencies (including the Bureau of Consumer Financial Protection[1] a Federal functional regulator, the Secretary of the Treasury with respect to subchapter II of chapter 53 of title 31, and chapter 2 of title I of Public Law 91–508 (12 U.S.C. 1951–1959), a State insurance authority, or the Federal Trade Commission), self-regulatory organizations, or for an investigation on a matter related to public safety;

(6)(A) to a consumer reporting agency in accordance with the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], or (B) from a consumer report reported by a consumer reporting agency;

(7) in connection with a proposed or actual sale, merger, transfer, or exchange of all or a portion of a business or operating unit if the disclosure of nonpublic personal information concerns solely consumers of such business or unit; or

(8) to comply with Federal, State, or local laws, rules, and other applicable legal requirements; to comply with a properly authorized civil, criminal, or regulatory investigation or subpoena or summons by Federal, State, or local authorities; or to respond to judicial process or government regulatory authorities having jurisdiction over the financial institution for examination, compliance, or other purposes as authorized by law.

(Pub. L. 106–102, title V, § 502, Nov. 12, 1999, 113 Stat. 1437; Pub. L. 111–203, title X, § 1093(2), July 21, 2010, 124 Stat. 2095.)

### Editorial Notes

#### REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a) and (c), was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Right to Financial Privacy Act of 1978, referred to in subsec. (e)(5), is title XI of Pub. L. 95–630, Nov. 10, 1978, 92 Stat. 3697, which is classified generally to chapter 35 (§ 3401 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 3401 of Title 12 and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(5), is chapter 2 (§§ 121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§ 1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 to the Code, see Tables.

The Fair Credit Reporting Act, referred to in subsec. (e)(6)(A), is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, § 601, Oct. 26, 1970, 84 Stat. 1127, which is classified generally to subchapter III (§ 1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

#### AMENDMENTS

2010—Subsec. (e)(5). Pub. L. 111–203 inserted "the Bureau of Consumer Financial Protection" after "(including".

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6803. Disclosure of institution privacy policy

**(a) Disclosure required**

At the time of establishing a customer relationship with a consumer and not less than annually during the continuation of such relationship, a financial institution shall provide a clear and conspicuous disclosure to such consumer, in writing or in electronic form or other form permitted by the regulations prescribed under section 6804 of this title, of such financial institution's policies and practices with respect to—

(1) disclosing nonpublic personal information to affiliates and nonaffiliated third parties, consistent with section 6802 of this title, including the categories of information that may be disclosed;

(2) disclosing nonpublic personal information of persons who have ceased to be customers of the financial institution; and

---

[1] So in original. Probably should be followed by a comma.

(3) protecting the nonpublic personal information of consumers.

**(b) Regulations**

Disclosures required by subsection (a) shall be made in accordance with the regulations prescribed under section 6804 of this title.

**(c) Information to be included**

The disclosure required by subsection (a) shall include—

(1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties, other than agents of the institution, consistent with section 6802 of this title, and including—

(A) the categories of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided pursuant to section 6802(e) of this title; and

(B) the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution;

(2) the categories of nonpublic personal information that are collected by the financial institution;

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information in accordance with section 6801 of this title; and

(4) the disclosures required, if any, under section 1681a(d)(2)(A)(iii) of this title.

**(d) Exemption for certified public accountants**

**(1) In general**

The disclosure requirements of subsection (a) do not apply to any person, to the extent that the person is—

(A) a certified public accountant;

(B) certified or licensed for such purpose by a State; and

(C) subject to any provision of law, rule, or regulation issued by a legislative or regulatory body of the State, including rules of professional conduct or ethics, that prohibits disclosure of nonpublic personal information without the knowing and expressed consent of the consumer.

**(2) Limitation**

Nothing in this subsection shall be construed to exempt or otherwise exclude any financial institution that is affiliated or becomes affiliated with a certified public accountant described in paragraph (1) from any provision of this section.

**(3) Definitions**

For purposes of this subsection, the term ''State'' means any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, the Trust Territory of the Pacific Islands, the Virgin Islands, or the Northern Mariana Islands.

**(e) Model forms**

**(1) In general**

The agencies referred to in section 6804(a)(1) of this title shall jointly develop a model form which may be used, at the option of the financial institution, for the provision of disclosures under this section.

**(2) Format**

A model form developed under paragraph (1) shall—

(A) be comprehensible to consumers, with a clear format and design;

(B) provide for clear and conspicuous disclosures;

(C) enable consumers easily to identify the sharing practices of a financial institution and to compare privacy practices among financial institutions; and

(D) be succinct, and use an easily readable type font.

**(3) Timing**

A model form required to be developed by this subsection shall be issued in proposed form for public comment not later than 180 days after October 13, 2006.

**(4) Safe harbor**

Any financial institution that elects to provide the model form developed by the agencies under this subsection shall be deemed to be in compliance with the disclosures required under this section.

**(f) Exception to annual notice requirement**

A financial institution that—

(1) provides nonpublic personal information only in accordance with the provisions of subsection (b)(2) or (e) of section 6802 of this title or regulations prescribed under section 6804(b) of this title, and

(2) has not changed its policies and practices with regard to disclosing nonpublic personal information from the policies and practices that were disclosed in the most recent disclosure sent to consumers in accordance with this section,

shall not be required to provide an annual disclosure under this section until such time as the financial institution fails to comply with any criteria described in paragraph (1) or (2).

(Pub. L. 106–102, title V, §503, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 109–351, title VI, §609, title VII, §728, Oct. 13, 2006, 120 Stat. 1983, 2003; Pub. L. 114–94, div. G, title LXXV, §75001, Dec. 4, 2015, 129 Stat. 1787.)

**Editorial Notes**

AMENDMENTS

2015—Subsec. (f). Pub. L. 114–94 added subsec. (f).

2006—Pub. L. 109–351 designated concluding provisions of subsec. (a) as (b), inserted heading, substituted ''Disclosures required by subsection (a)'' for ''Such disclosures'', redesignated former subsec. (b) as (c), and added subsecs. (d) and (e).

**Executive Documents**

TERMINATION OF TRUST TERRITORY OF THE PACIFIC ISLANDS

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## § 6804. Rulemaking

### (a) Regulatory authority

#### (1) Rulemaking

##### (A) In general

Except as provided in subparagraph (C), the Bureau of Consumer Financial Protection and the Securities and Exchange Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to their respective jurisdiction under section 6805 of this title (and notwithstanding subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.]), except that the Bureau of Consumer Financial Protection shall not have authority to prescribe regulations with respect to the standards under section 6801 of this title.

##### (B) CFTC

The Commodity Futures Trading Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to financial institutions and other persons subject to the jurisdiction of the Commodity Futures Trading Commission under section 7b–2 of title 7.

##### (C) Federal Trade Commission authority

Notwithstanding the authority of the Bureau of Consumer Financial Protection under subparagraph (A), the Federal Trade Commission shall have authority to prescribe such regulations as may be necessary to carry out the purposes of this subchapter with respect to any financial institution that is a person described in section 1029(a) of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5519(a)].

##### (D) Rule of construction

Nothing in this paragraph shall be construed to alter, affect, or otherwise limit the authority of a State insurance authority to adopt regulations to carry out this subchapter.

#### (2) Coordination, consistency, and comparability

Each of the agencies authorized under paragraph (1) to prescribe regulations shall consult and coordinate with the other such agencies and, as appropriate, and with[1] representatives of State insurance authorities designated by the National Association of Insurance Commissioners, for the purpose of assuring, to the extent possible, that the regulations prescribed by each such agency are consistent and comparable with the regulations prescribed by the other such agencies.

#### (3) Procedures and deadline

Such regulations shall be prescribed in accordance with applicable requirements of title 5.

[1] So in original. Probably should be ''and, as appropriate, with''.

### (b) Authority to grant exceptions

The regulations prescribed under subsection (a) may include such additional exceptions to subsections (a) through (d) of section 6802 of this title as are deemed consistent with the purposes of this subchapter.

(Pub. L. 106–102, title V, § 504, Nov. 12, 1999, 113 Stat. 1439; Pub. L. 111–203, title X, § 1093(3), July 21, 2010, 124 Stat. 2095.)

#### Editorial Notes

##### REFERENCES IN TEXT

This subchapter, referred to in subsecs. (a)(1) and (b), was in the original ''this subtitle'', meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Consumer Financial Protection Act of 2010, referred to in subsec. (a)(1)(A), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitle B (§§ 1021–1029A) of the Act is classified generally to part B (§ 5511 et seq.) of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitle B to the Code, see Tables.

##### AMENDMENTS

2010—Subsec. (a)(1), (2). Pub. L. 111–203, § 1093(3)(A), added pars. (1) and (2) and struck out former pars. (1) and (2) which related, respectively, to rulemaking by the Federal banking agencies, the National Credit Union Administration, the Secretary of the Treasury, the Securities and Exchange Commission, and the Federal Trade Commission, and consultation and coordination among these agencies and authorities to assure consistency and comparability of regulations.

Subsec. (a)(3). Pub. L. 111–203, § 1093(3)(B), struck out ''and shall be issued in final form not later than 6 months after November 12, 1999'' after ''title 5''.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6805. Enforcement

### (a) In general

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:

(1) Under section 1818 of title 12, by the appropriate Federal banking agency, as defined in section 1813(q) of title 12, in the case of—

(A) national banks, Federal branches and Federal agencies of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agen-

cies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], and bank holding companies and their nonbank subsidiaries or affiliates (except brokers, dealers, persons providing insurance, investment companies, and investment advisers);

(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), insured State branches of foreign banks, and any subsidiaries of such entities (except brokers, dealers, persons providing insurance, investment companies, and investment advisers); and

(D) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, and any subsidiaries of such savings associations (except brokers, dealers, persons providing insurance, investment companies, and investment advisers).

(2) Under the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Board of the National Credit Union Administration with respect to any federally insured credit union, and any subsidiaries of such an entity.

(3) Under the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.], by the Securities and Exchange Commission with respect to any broker or dealer.

(4) Under the Investment Company Act of 1940 [15 U.S.C. 80a–1 et seq.], by the Securities and Exchange Commission with respect to investment companies.

(5) Under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.], by the Securities and Exchange Commission with respect to investment advisers registered with the Commission under such Act.

(6) Under State insurance law, in the case of any person engaged in providing insurance, by the applicable State insurance authority of the State in which the person is domiciled, subject to section 6701 of this title.

(7) Under the Federal Trade Commission Act [15 U.S.C. 41 et seq.], by the Federal Trade Commission for any other financial institution or other person that is not subject to the jurisdiction of any agency or authority under paragraphs (1) through (6) of this subsection.

(8) Under subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau of Consumer Financial Protection, in the case of any financial institution and other covered person or service provider that is subject to the jurisdiction of the Bureau and any person subject to this subchapter, but not with respect to the standards under section 6801 of this title.

**(b) Enforcement of section 6801**

**(1) In general**

Except as provided in paragraph (2), the agencies and authorities described in subsection (a), other than the Bureau of Consumer Financial Protection, shall implement the standards prescribed under section 6801(b) of this title in the same manner, to the extent practicable, as standards prescribed pursuant to section 1831p–1(a) of title 12 are implemented pursuant to such section.

**(2) Exception**

The agencies and authorities described in paragraphs (3), (4), (5), (6), and (7) of subsection (a) shall implement the standards prescribed under section 6801(b) of this title by rule with respect to the financial institutions and other persons subject to their respective jurisdictions under subsection (a).

**(c) Absence of State action**

If a State insurance authority fails to adopt regulations to carry out this subchapter, such State shall not be eligible to override, pursuant to section 1831x(g)(2)(B)(iii) of title 12, the insurance customer protection regulations prescribed by a Federal banking agency under section 1831x(a) of title 12.

**(d) Definitions**

The terms used in subsection (a)(1) that are not defined in this subchapter or otherwise defined in section 1813(s) of title 12 shall have the same meaning as given in section 3101 of title 12.

(Pub. L. 106–102, title V, §505, Nov. 12, 1999, 113 Stat. 1440; Pub. L. 111–203, title X, §1093(4), (5), July 21, 2010, 124 Stat. 2096, 2097.)

### Editorial Notes

#### REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsec. (a), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§1021–1029A) and E (§§1051–1058) of the Act are classified generally to parts B (§5511 et seq.) and E (§5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

This subchapter, referred to in subsecs. (a), (c), and (d), was in the original "this subtitle", meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (a)(1)(B), is classified to subchapter I (§601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (a)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (a)(3), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§78a et seq.) of this title. For complete classification of this Act to the Code, see section 78a of this title and Tables.

The Investment Company Act of 1940, referred to in subsec. (a)(4), is title I of act Aug. 22, 1940, ch. 686, 54 Stat. 789, which is classified generally to subchapter I (§80a–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80a–51 of this title and Tables.

The Investment Advisers Act of 1940, referred to in subsec. (a)(5), is title II of act Aug. 22, 1940, ch. 686, 54 Stat. 847, which is classified generally to subchapter II (§80b–1 et seq.) of chapter 2D of this title. For complete classification of this Act to the Code, see section 80b–20 of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (a)(7), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

### AMENDMENTS

2010—Subsec. (a). Pub. L. 111–203, §1093(4)(A), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, this subchapter and the regulations prescribed thereunder shall be enforced by the Bureau of Consumer Financial Protection, the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:" for "This subchapter and the regulations prescribed thereunder shall be enforced by the Federal functional regulators, the State insurance authorities, and the Federal Trade Commission with respect to financial institutions and other persons subject to their jurisdiction under applicable law, as follows:".

Subsec. (a)(1). Pub. L. 111–203, §1093(4)(B)(i), inserted "by the appropriate Federal banking agency, as defined in section 1813(q) of title 12," before "in the case of—".

Subsec. (a)(1)(A). Pub. L. 111–203, §1093(4)(B)(ii), struck out ", by the Office of the Comptroller of the Currency" before semicolon at end.

Subsec. (a)(1)(B). Pub. L. 111–203, §1093(4)(B)(iii), struck out ", by the Board of Governors of the Federal Reserve System" before semicolon at end.

Subsec. (a)(1)(C). Pub. L. 111–203, §1093(4)(B)(iv), struck out ", by the Board of Directors of the Federal Deposit Insurance Corporation" before "; and".

Subsec. (a)(1)(D). Pub. L. 111–203, §1093(4)(B)(v), struck out ", by the Director of the Office of Thrift Supervision" before period at end.

Subsec. (a)(8). Pub. L. 111–203, §1093(4)(C), added par. (8).

Subsec. (b)(1). Pub. L. 111–203, §1093(5), inserted ", other than the Bureau of Consumer Financial Protection," before "shall implement the standards".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6806. Relation to other provisions

Except for the amendments made by subsections (a) and (b), nothing in this chapter shall be construed to modify, limit, or supersede the operation of the Fair Credit Reporting Act [15 U.S.C. 1681 et seq.], and no inference shall be drawn on the basis of the provisions of this chapter regarding whether information is transaction or experience information under section 603 of such Act [15 U.S.C. 1681a].

(Pub. L. 106–102, title V, §506(c), Nov. 12, 1999, 113 Stat. 1442.)

### Editorial Notes

#### REFERENCES IN TEXT

Amendments made by subsections (a) and (b), referred to in text, means amendments made by section 506(a) and (b) of Pub. L. 106–102, which amended section 1681s of this title.

This chapter, referred to in text, was in the original "this title", meaning title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, as amended, which enacted this chapter and amended section 1681s of this title. For

complete classification of title V to the Code, see Tables.

The Fair Credit Reporting Act, referred to in text, is title VI of Pub. L. 90–321, as added by Pub. L. 91–508, title VI, §601, Oct. 26, 1970, 84 Stat. 1127, as amended, which is classified generally to subchapter III (§1681 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

## § 6807. Relation to State laws

### (a) In general

This subchapter and the amendments made by this subchapter shall not be construed as superseding, altering, or affecting any statute, regulation, order, or interpretation in effect in any State, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter and the amendments made by this subchapter, as determined by the Bureau of Consumer Financial Protection, after consultation with the agency or authority with jurisdiction under section 6805(a) of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, §507, Nov. 12, 1999, 113 Stat. 1442; Pub. L. 111–203, title X, §1093(6), July 21, 2010, 124 Stat. 2097.)

### Editorial Notes

#### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

#### AMENDMENTS

2010—Subsec. (b). Pub. L. 111–203 substituted "Bureau of Consumer Financial Protection" for "Federal Trade Commission".

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## § 6808. Study of information sharing among financial affiliates

### (a) In general

The Secretary of the Treasury, in conjunction with the Federal functional regulators and the Federal Trade Commission, shall conduct a study of information sharing practices among financial institutions and their affiliates. Such study shall include—

(1) the purposes for the sharing of confidential customer information with affiliates or with nonaffiliated third parties;

(2) the extent and adequacy of security protections for such information;

(3) the potential risks for customer privacy of such sharing of information;

(4) the potential benefits for financial institutions and affiliates of such sharing of information;

(5) the potential benefits for customers of such sharing of information;

(6) the adequacy of existing laws to protect customer privacy;

(7) the adequacy of financial institution privacy policy and privacy rights disclosure under existing law;

(8) the feasibility of different approaches, including opt-out and opt-in, to permit customers to direct that confidential information not be shared with affiliates and nonaffiliated third parties; and

(9) the feasibility of restricting sharing of information for specific uses or of permitting customers to direct the uses for which information may be shared.

**(b) Consultation**

The Secretary shall consult with representatives of State insurance authorities designated by the National Association of Insurance Commissioners, and also with financial services industry, consumer organizations and privacy groups, and other representatives of the general public, in formulating and conducting the study required by subsection (a).

**(c) Report**

On or before January 1, 2002, the Secretary shall submit a report to the Congress containing the findings and conclusions of the study required under subsection (a), together with such recommendations for legislative or administrative action as may be appropriate.

(Pub. L. 106–102, title V, § 508, Nov. 12, 1999, 113 Stat. 1442.)

## § 6809. Definitions

As used in this subchapter:

**(1) Federal banking agency**

The term ''Federal banking agency'' has the same meaning as given in section 1813 of title 12.

**(2) Federal functional regulator**

The term ''Federal functional regulator'' means—

(A) the Board of Governors of the Federal Reserve System;

(B) the Office of the Comptroller of the Currency;

(C) the Board of Directors of the Federal Deposit Insurance Corporation;

(D) the Director of the Office of Thrift Supervision;

(E) the National Credit Union Administration Board; and

(F) the Securities and Exchange Commission.

**(3) Financial institution**

**(A) In general**

The term ''financial institution'' means any institution the business of which is engaging in financial activities as described in section 1843(k) of title 12.

**(B) Persons subject to CFTC regulation**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.].

**(C) Farm credit institutions**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(D) Other secondary market institutions**

Notwithstanding subparagraph (A), the term ''financial institution'' does not include institutions chartered by Congress specifically to engage in transactions described in section 6802(e)(1)(C) of this title, as long as such institutions do not sell or transfer nonpublic personal information to a nonaffiliated third party.

**(4) Nonpublic personal information**

(A) The term ''nonpublic personal information'' means personally identifiable financial information—

(i) provided by a consumer to a financial institution;

(ii) resulting from any transaction with the consumer or any service performed for the consumer; or

(iii) otherwise obtained by the financial institution.

(B) Such term does not include publicly available information, as such term is defined by the regulations prescribed under section 6804 of this title.

(C) Notwithstanding subparagraph (B), such term—

(i) shall include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any nonpublic personal information other than publicly available information; but

(ii) shall not include any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived without using any nonpublic personal information.

**(5) Nonaffiliated third party**

The term ''nonaffiliated third party'' means any entity that is not an affiliate of, or related by common ownership or affiliated by corporate control with, the financial institution, but does not include a joint employee of such institution.

**(6) Affiliate**

The term ''affiliate'' means any company that controls, is controlled by, or is under common control with another company.

**(7) Necessary to effect, administer, or enforce**

The term ''as necessary to effect, administer, or enforce the transaction'' means—

(A) the disclosure is required, or is a usual, appropriate, or acceptable method, to carry out the transaction or the product or service business of which the transaction is a part, and record or service or maintain the consumer's account in the ordinary course of providing the financial service or financial product, or to administer or service benefits or claims relating to the transaction or the product or service business of which it is a part, and includes—

(i) providing the consumer or the consumer's agent or broker with a confirmation, statement, or other record of the transaction, or information on the status or value of the financial service or financial product; and

(ii) the accrual or recognition of incentives or bonuses associated with the transaction that are provided by the financial institution or any other party;

(B) the disclosure is required, or is one of the lawful or appropriate methods, to enforce the rights of the financial institution or of other persons engaged in carrying out the financial transaction, or providing the product or service;

(C) the disclosure is required, or is a usual, appropriate, or acceptable method, for insurance underwriting at the consumer's request or for reinsurance purposes, or for any of the following purposes as they relate to a consumer's insurance: Account administration, reporting, investigating, or preventing fraud or material misrepresentation, processing premium payments, processing insurance claims, administering insurance benefits (including utilization review activities), participating in research projects, or as otherwise required or specifically permitted by Federal or State law; or

(D) the disclosure is required, or is a usual, appropriate, or acceptable method, in connection with—

(i) the authorization, settlement, billing, processing, clearing, transferring, reconciling, or collection of amounts charged, debited, or otherwise paid using a debit, credit or other payment card, check, or account number, or by other payment means;

(ii) the transfer of receivables, accounts or interests therein; or

(iii) the audit of debit, credit or other payment information.

**(8) State insurance authority**

The term "State insurance authority" means, in the case of any person engaged in providing insurance, the State insurance authority of the State in which the person is domiciled.

**(9) Consumer**

The term "consumer" means an individual who obtains, from a financial institution, financial products or services which are to be used primarily for personal, family, or household purposes, and also means the legal representative of such an individual.

**(10) Joint agreement**

The term "joint agreement" means a formal written contract pursuant to which two or more financial institutions jointly offer, endorse, or sponsor a financial product or service, and as may be further defined in the regulations prescribed under section 6804 of this title.

**(11) Customer relationship**

The term "time of establishing a customer relationship" shall be defined by the regulations prescribed under section 6804 of this title, and shall, in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer.

(Pub. L. 106–102, title V, § 509, Nov. 12, 1999, 113 Stat. 1443.)

### Editorial Notes

#### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this subtitle", meaning subtitle A (§§ 501–510) of title V of Pub. L. 106–102, Nov. 12, 1999, 113 Stat. 1436, which is classified principally to this subchapter. For complete classification of subtitle A to the Code, see Tables.

The Commodity Exchange Act, referred to in par. (3)(B), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (3)(C), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

## SUBCHAPTER II—FRAUDULENT ACCESS TO FINANCIAL INFORMATION

### § 6821. Privacy protection for customer information of financial institutions

**(a) Prohibition on obtaining customer information by false pretenses**

It shall be a violation of this subchapter for any person to obtain or attempt to obtain, or cause to be disclosed or attempt to cause to be disclosed to any person, customer information of a financial institution relating to another person—

(1) by making a false, fictitious, or fraudulent statement or representation to an officer, employee, or agent of a financial institution;

(2) by making a false, fictitious, or fraudulent statement or representation to a customer of a financial institution; or

(3) by providing any document to an officer, employee, or agent of a financial institution, knowing that the document is forged, counterfeit, lost, or stolen, was fraudulently obtained, or contains a false, fictitious, or fraudulent statement or representation.

**(b) Prohibition on solicitation of a person to obtain customer information from financial institution under false pretenses**

It shall be a violation of this subchapter to request a person to obtain customer information

of a financial institution, knowing that the person will obtain, or attempt to obtain, the information from the institution in any manner described in subsection (a).

### (c) Nonapplicability to law enforcement agencies

No provision of this section shall be construed so as to prevent any action by a law enforcement agency, or any officer, employee, or agent of such agency, to obtain customer information of a financial institution in connection with the performance of the official duties of the agency.

### (d) Nonapplicability to financial institutions in certain cases

No provision of this section shall be construed so as to prevent any financial institution, or any officer, employee, or agent of a financial institution, from obtaining customer information of such financial institution in the course of—

(1) testing the security procedures or systems of such institution for maintaining the confidentiality of customer information;

(2) investigating allegations of misconduct or negligence on the part of any officer, employee, or agent of the financial institution; or

(3) recovering customer information of the financial institution which was obtained or received by another person in any manner described in subsection (a) or (b).

### (e) Nonapplicability to insurance institutions for investigation of insurance fraud

No provision of this section shall be construed so as to prevent any insurance institution, or any officer, employee, or agency of an insurance institution, from obtaining information as part of an insurance investigation into criminal activity, fraud, material misrepresentation, or material nondisclosure that is authorized for such institution under State law, regulation, interpretation, or order.

### (f) Nonapplicability to certain types of customer information of financial institutions

No provision of this section shall be construed so as to prevent any person from obtaining customer information of a financial institution that otherwise is available as a public record filed pursuant to the securities laws (as defined in section 78c(a)(47) of this title).

### (g) Nonapplicability to collection of child support judgments

No provision of this section shall be construed to prevent any State-licensed private investigator, or any officer, employee, or agent of such private investigator, from obtaining customer information of a financial institution, to the extent reasonably necessary to collect child support from a person adjudged to have been delinquent in his or her obligations by a Federal or State court, and to the extent that such action by a State-licensed private investigator is not unlawful under any other Federal or State law or regulation, and has been authorized by an order or judgment of a court of competent jurisdiction.

(Pub. L. 106–102, title V, § 521, Nov. 12, 1999, 113 Stat. 1446.)

## § 6822. Administrative enforcement

### (a) Enforcement by Federal Trade Commission

Except as provided in subsection (b), compliance with this subchapter shall be enforced by the Federal Trade Commission in the same manner and with the same power and authority as the Commission has under the Fair Debt Collection Practices Act [15 U.S.C. 1692 et seq.] to enforce compliance with such Act.

### (b) Enforcement by other agencies in certain cases

#### (1) In general

Compliance with this subchapter shall be enforced under—

(A) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], in the case of—

(i) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

(ii) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.], by the Board;

(iii) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System and national nonmember banks) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation; and

(iv) savings associations the deposits of which are insured by the Federal Deposit Insurance Corporation, by the Director of the Office of Thrift Supervision; and

(B) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union.

#### (2) Violations of this subchapter treated as violations of other laws

For the purpose of the exercise by any agency referred to in paragraph (1) of its powers under any Act referred to in that paragraph, a violation of this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in paragraph (1), each of the agencies referred to in that paragraph may exercise, for the purpose of enforcing compliance with this subchapter, any other authority conferred on such agency by law.

(Pub. L. 106–102, title V, § 522, Nov. 12, 1999, 113 Stat. 1447.)

### Editorial Notes

#### References in Text

The Fair Debt Collection Practices Act, referred to in subsec. (a), is title VIII of Pub. L. 90–321, as added by

Pub. L. 95–109, Sept. 20, 1977, 91 Stat. 874, as amended, which is classified generally to subchapter V (§ 1692 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

Section 25 of the Federal Reserve Act, referred to in subsec. (b)(1)(A)(ii), is classified to subchapter I (§ 601 et seq.) of chapter 6 of Title 12, Banks and Banking. Section 25A of the Federal Reserve Act is classified to subchapter II (§ 611 et seq.) of chapter 6 of Title 12.

The Federal Credit Union Act, referred to in subsec. (b)(1)(B), is act June 26, 1934, ch. 750, 48 Stat. 1216, as amended, which is classified generally to chapter 14 (§ 1751 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

#### Statutory Notes and Related Subsidiaries

##### Transfer of Functions

Functions vested in Administrator of National Credit Union Administration transferred and vested in National Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

### § 6823. Criminal penalty

#### (a) In general

Whoever knowingly and intentionally violates, or knowingly and intentionally attempts to violate, section 6821 of this title shall be fined in accordance with title 18 or imprisoned for not more than 5 years, or both.

#### (b) Enhanced penalty for aggravated cases

Whoever violates, or attempts to violate, section 6821 of this title while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, imprisoned for not more than 10 years, or both.

(Pub. L. 106–102, title V, § 523, Nov. 12, 1999, 113 Stat. 1448.)

### § 6824. Relation to State laws

#### (a) In general

This subchapter shall not be construed as superseding, altering, or affecting the statutes, regulations, orders, or interpretations in effect in any State, except to the extent that such statutes, regulations, orders, or interpretations are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency.

#### (b) Greater protection under State law

For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this subchapter if the protection such statute, regulation, order, or interpretation affords any person is greater than the protection provided under this subchapter as determined by the Federal Trade Commission, after consultation with the agency or authority with jurisdiction under section 6822 of this title of either the person that initiated the complaint or that is the subject of the complaint, on its own motion or upon the petition of any interested party.

(Pub. L. 106–102, title V, § 524, Nov. 12, 1999, 113 Stat. 1448.)

### § 6825. Agency guidance

In furtherance of the objectives of this subchapter, each Federal banking agency (as defined in section 1813(z) of title 12), the National Credit Union Administration, and the Securities and Exchange Commission or self-regulatory organizations, as appropriate, shall review regulations and guidelines applicable to financial institutions under their respective jurisdictions and shall prescribe such revisions to such regulations and guidelines as may be necessary to ensure that such financial institutions have policies, procedures, and controls in place to prevent the unauthorized disclosure of customer financial information and to deter and detect activities proscribed under section 6821 of this title.

(Pub. L. 106–102, title V, § 525, Nov. 12, 1999, 113 Stat. 1448.)

### § 6826. Reports

#### (a) Report to the Congress

Before the end of the 18-month period beginning on November 12, 1999, the Comptroller General, in consultation with the Federal Trade Commission, Federal banking agencies, the National Credit Union Administration, the Securities and Exchange Commission, appropriate Federal law enforcement agencies, and appropriate State insurance regulators, shall submit to the Congress a report on the following:

(1) The efficacy and adequacy of the remedies provided in this subchapter in addressing attempts to obtain financial information by fraudulent means or by false pretenses.

(2) Any recommendations for additional legislative or regulatory action to address threats to the privacy of financial information created by attempts to obtain information by fraudulent means or false pretenses.

#### (b) Annual report by administering agencies

The Federal Trade Commission and the Attorney General shall submit to Congress an annual report on number and disposition of all enforcement actions taken pursuant to this subchapter.

(Pub. L. 106–102, title V, § 526, Nov. 12, 1999, 113 Stat. 1448.)

### § 6827. Definitions

For purposes of this subchapter, the following definitions shall apply:

#### (1) Customer

The term "customer" means, with respect to a financial institution, any person (or authorized representative of a person) to whom the financial institution provides a product or service, including that of acting as a fiduciary.

#### (2) Customer information of a financial institution

The term "customer information of a financial institution" means any information maintained by or for a financial institution which is derived from the relationship between the financial institution and a customer of the financial institution and is identified with the customer.

**(3) Document**

The term ''document'' means any information in any form.

**(4) Financial institution**

**(A) In general**

The term ''financial institution'' means any institution engaged in the business of providing financial services to customers who maintain a credit, deposit, trust, or other financial account or relationship with the institution.

**(B) Certain financial institutions specifically included**

The term ''financial institution'' includes any depository institution (as defined in section 461(b)(1)(A) of title 12), any broker or dealer, any investment adviser or investment company, any insurance company, any loan or finance company, any credit card issuer or operator of a credit card system, and any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis (as defined in section 1681a(p) of this title).

**(C) Securities institutions**

For purposes of subparagraph (B)—

(i) the terms ''broker'' and ''dealer'' have the same meanings as given in section 78c of this title;

(ii) the term ''investment adviser'' has the same meaning as given in section 80b–2(a)(11) of this title; and

(iii) the term ''investment company'' has the same meaning as given in section 80a–3 of this title.

**(D) Certain persons and entities specifically excluded**

The term ''financial institution'' does not include any person or entity with respect to any financial activity that is subject to the jurisdiction of the Commodity Futures Trading Commission under the Commodity Exchange Act [7 U.S.C. 1 et seq.] and does not include the Federal Agricultural Mortgage Corporation or any entity chartered and operating under the Farm Credit Act of 1971 [12 U.S.C. 2001 et seq.].

**(E) Further definition by regulation**

The Federal Trade Commission, after consultation with Federal banking agencies and the Securities and Exchange Commission, may prescribe regulations clarifying or describing the types of institutions which shall be treated as financial institutions for purposes of this subchapter.

(Pub. L. 106–102, title V, § 527, Nov. 12, 1999, 113 Stat. 1449.)

**Editorial Notes**

REFERENCES IN TEXT

The Commodity Exchange Act, referred to in par. (4)(D), is act Sept. 21, 1922, ch. 369, 42 Stat. 998, as amended, which is classified generally to chapter 1 (§ 1 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 1 of Title 7 and Tables.

The Farm Credit Act of 1971, referred to in par. (4)(D), is Pub. L. 92–181, Dec. 10, 1971, 85 Stat. 583, as amended, which is classified generally to chapter 23 (§ 2001 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see Short Title note set out under section 2001 of Title 12 and Tables.

**CHAPTER 95—MICROENTERPRISE TECHNICAL ASSISTANCE AND CAPACITY BUILDING PROGRAM**

| Sec. | |
|---|---|
| 6901. | Definitions. |
| 6902. | Establishment of program. |
| 6903. | Uses of assistance. |
| 6904. | Qualified organizations. |
| 6905. | Allocation of assistance; subgrants. |
| 6906. | Matching requirements. |
| 6907. | Applications for assistance. |
| 6908. | Recordkeeping. |
| 6909. | Authorization. |
| 6910. | Implementation. |

**§ 6901. Definitions**

For purposes of this chapter, the following definitions shall apply:

**(1) Administration**

The term ''Administration'' means the Small Business Administration.

**(2) Administrator**

The term ''Administrator'' means the Administrator of the Small Business Administration.

**(3) Capacity building services**

The term ''capacity building services'' means services provided to an organization that is, or that is in the process of becoming, a microenterprise development organization or program, for the purpose of enhancing its ability to provide training and services to disadvantaged entrepreneurs.

**(4) Collaborative**

The term ''collaborative'' means 2 or more nonprofit entities that agree to act jointly as a qualified organization under this chapter.

**(5) Disadvantaged entrepreneur**

The term ''disadvantaged entrepreneur'' means a microentrepreneur that is—

(A) a low-income person;

(B) a very low-income person; or

(C) an entrepreneur that lacks adequate access to capital or other resources essential for business success, or is economically disadvantaged, as determined by the Administrator.

**(6) Indian tribe**

The term ''Indian tribe'' has the meaning given the term in section 4702 of title 12.

**(7) Intermediary**

The term ''intermediary'' means a private, nonprofit entity that seeks to serve microenterprise development organizations and programs as authorized under section 6904 of this title.

**(8) Low-income person**

The term ''low-income person'' has the meaning given in section 4702 of title 12.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

CELSIUS NETWORK INC., et al.,

     Defendants.

**Case No. 1:23-cv-6009**

## [PROPOSED] ORDER STAYING ACTION
## AS TO CORPORATE DEFENDANTS FOR 45 DAYS

The Court having considered the joint motion filed by the Federal Trade Commission ("FTC") and Corporate Defendants Celsius Network Inc., Celsius Network LLC, Celsius Networks Lending LLC, Celsius Lending LLC, Celsius KeyFi LLC, Celsius Mining LLC, Celsius US Holding LLC, Celsius US LLC, and Celsius Management Corp. (collectively, "Corporate Defendants") to stay this action for up to 45 days to permit the parties to seek approval of their settlement ("Stipulated Order") in *In re Celsius Network LLC*, No. 22-10964(MG) (Bankr. S.D.N.Y.), it is hereby ORDERED that:

1.     The motion is GRANTED.

2.     The above-captioned action is stayed as to Corporate Defendants until August 28, 2023 or until the Bankruptcy Court approves the Stipulated Order, whichever is earlier.

3.     On or before August 28, 2023, the FTC and the Corporate Defendants shall file a motion seeking entry of the Stipulated Order or otherwise notify the Court of the status of the effort to seek Bankruptcy Court approval.

IT IS SO ORDERED.

Date: _____

_____

UNITED STATES DISTRICT JUDGE

**Celsius Network**

**Weekly Cash Flow Forecast - CONSOLIDATED DEBTORS**

*Dated: August 8, 2023*

*($000s)*

| | Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period End Date: | 4-Aug-23 | 11-Aug-23 | 18-Aug-23 | 25-Aug-23 | 1-Sep-23 | 8-Sep-23 | 15-Sep-23 | 22-Sep-23 | 29-Sep-23 | 6-Oct-23 | 13-Oct-23 | 20-Oct-23 | 27-Oct-23 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Other Receipts[1] | | $ 102 | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ -- | $ 102 |
| BTC Sales | | 1,459 | 2,499 | 2,499 | 2,499 | 2,499 | 2,759 | 2,863 | 2,863 | 2,863 | 2,978 | 3,132 | 3,132 | 3,132 | 35,178 |
| **Total Receipts** | | **1,561** | **2,499** | **2,499** | **2,499** | **2,499** | **2,759** | **2,863** | **2,863** | **2,863** | **2,978** | **3,132** | **3,132** | **3,132** | **35,280** |
| **OPERATING DISBURSEMENTS** | | | | | | | | | | | | | | | |
| Payroll | | (93) | (122) | (108) | (30) | (30) | (872) | (30) | (108) | (30) | (1,223) | (30) | (108) | (30) | (2,813) |
| Hosting[2] | | -- | (1,825) | (8,262) | (1,098) | -- | -- | (7,952) | -- | (375) | -- | (8,317) | -- | (375) | (28,204) |
| Other Operating Disbursements | | (1,367) | (670) | (935) | (285) | (1,757) | (1,370) | (935) | (1,028) | (878) | (1,963) | (1,028) | (953) | (1,085) | (14,253) |
| **Total Operating Disbursements** | | **(1,460)** | **(2,617)** | **(9,304)** | **(1,413)** | **(1,787)** | **(2,241)** | **(8,917)** | **(1,136)** | **(1,283)** | **(3,186)** | **(9,375)** | **(1,061)** | **(1,490)** | **(45,270)** |
| **Operating Cash Flow** | | **101** | **(118)** | **(6,806)** | **1,086** | **712** | **517** | **(6,054)** | **1,727** | **1,580** | **(208)** | **(6,243)** | **2,072** | **1,642** | **(9,991)** |
| **NON-OPERATING ACTIVITIES** | | | | | | | | | | | | | | | |
| Capital Expenditures[3] | | -- | -- | (2,300) | (6,088) | -- | -- | -- | (700) | (6,134) | -- | -- | -- | -- | (15,223) |
| Restructuring Activities | | (7,382) | (2,263) | (4,500) | (4,650) | (8,324) | (377) | (5,907) | (157) | (1,297) | (13,597) | (1,107) | -- | (5,000) | (54,559) |
| **Total Restructuring Activities** | | **(7,382)** | **(2,263)** | **(6,800)** | **(10,738)** | **(8,324)** | **(377)** | **(5,907)** | **(857)** | **(7,431)** | **(13,597)** | **(1,107)** | **--** | **(5,000)** | **(69,782)** |
| **Net Cash Flow** | | **(7,282)** | **(2,381)** | **(13,606)** | **(9,652)** | **(7,612)** | **141** | **(11,961)** | **871** | **(5,851)** | **(13,804)** | **(7,350)** | **2,072** | **(3,358)** | **(79,773)** |
| **LIQUIDITY SCHEDULE** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | 139,483 | 132,201 | 129,820 | 116,214 | 106,562 | 98,950 | 99,091 | 87,130 | 88,001 | 82,150 | 68,346 | 60,996 | 63,068 | 139,483 |
| Net Cash Flow | | (7,282) | (2,381) | (13,606) | (9,652) | (7,612) | 141 | (11,961) | 871 | (5,851) | (13,804) | (7,350) | 2,072 | (3,358) | (79,773) |
| **Ending Cash Balance** | | **132,201** | **129,820** | **116,214** | **106,562** | **98,950** | **99,091** | **87,130** | **88,001** | **82,150** | **68,346** | **60,996** | **63,068** | **59,710** | **59,710** |
| Minimum Cash Balance | | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) | (20,000) |
| **Baseline Liquidity** | | **$ 112,201** | **$ 109,820** | **$ 96,214** | **$ 86,562** | **$ 78,950** | **$ 79,091** | **$ 67,130** | **$ 68,001** | **$ 62,150** | **$ 48,346** | **$ 40,996** | **$ 43,068** | **$ 39,710** | **$ 39,710** |

**Notes:**
[1] Includes interest earned on interest-bearing bank accounts
[2] Includes mining related hosting costs
[3] Includes S&U taxes

**Celsius Network**

Assets by Coin Type as of July 28, 2023
*(USD, $MMs)*

| Coin Type | Celsius Network Limited (UK) | Celsius Network LLC (US) | Celsius Network Finance | Celsius Network EU UAB (LT) | Celsius OTC | Celsius Mining LLC | Custody Assets | Total Coins in Possession | DeFi(1)(2) | Staking(2) | Loans | Exchanges & Trusts | Other Assets | Total Coin Assets | Total Coin Liabilities |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEL | $ 65.5 | $ 48.1 | $ 0.0 | $ 0.0 | $ 2.6 | $ - | $ 0.2 | $ 116.4 | $ - | $ - | $ - | $ - | $ - | $ 116.4 | $ 49.5 |
| ETH** | 0.2 | 1.2 | 0.0 | 0.2 | 0.0 | - | 49.4 | 51.1 | 89.3 | 1,505.1 | 12.5 | 0.0 | - | 1,657.9 | 1,943.2 |
| stETH** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| WBTC* | - | 0.0 | - | - | - | - | 0.0 | 0.0 | 0.0 | - | 5.4 | - | - | 5.5 | 3.2 |
| BTC* | 1,018.6 | 13.5 | - | - | - | 4.8 | 64.2 | 1,101.10 | - | - | 16.6 | - | 0.7 | 1,118.4 | 3,056.1 |
| USDC | 4.1 | 3.4 | 0.0 | - | - | - | 19.7 | 27.1 | 0.0 | - | 229.9 | - | 0.0 | 257.0 | 926.1 |
| MATIC | 0.0 | 1.1 | - | - | - | - | 3.2 | 4.3 | 0.0 | 33.0 | 3.3 | - | 10.2 | 50.8 | 174.5 |
| USDT ERC20 | 0.0 | 0.1 | 0.0 | - | - | - | 0.9 | 1.0 | - | - | 47.2 | - | - | 48.2 | 120.5 |
| ADA | 0.0 | 0.0 | 0.0 | 0.0 | - | - | 1.6 | 1.579 | - | 0.9 | 3.2 | - | 0.2 | 5.9 | 81.1 |
| LINK | 0.1 | 0.0 | - | - | 0.0 | - | 2.3 | 2.4 | 0.0 | - | 0.1 | - | - | 2.5 | 72.8 |
| WETH** | - | 0.2 | - | - | - | - | - | 0.2 | 0.0 | - | - | - | - | 0.2 | - |
| GUSD | - | 0.0 | - | - | - | - | 2.3 | 2.3 | 0.0 | - | 10.8 | - | - | 13.1 | 84.3 |
| DOT | 3.3 | 0.0 | 0.0 | - | 0.0 | - | 0.6 | 3.9 | 1.2 | 0.4 | 0.7 | - | - | 6.1 | 24.9 |
| LTC | - | 1.8 | - | - | - | - | 1.0 | 2.8 | - | - | 7.6 | - | - | 10.5 | 39.0 |
| FTT | - | 0.0 | - | - | - | - | - | 0.0 | - | - | - | 0.0 | - | 0.0 | (0.0) |
| MCDAI | 0.0 | 0.0 | 0.0 | - | 0.0 | - | 0.3 | 0.3 | 0.0 | - | 8.8 | - | - | 9.1 | 4.4 |
| AAVE | - | 0.0 | 0.0 | - | - | - | 0.2 | 0.2 | 0.0 | - | 0.4 | - | - | 0.7 | 9.1 |
| TGBP | 10.1 | 0.0 | - | - | - | - | 0.1 | 10.2 | - | - | - | - | - | 10.2 | 9.5 |
| BCH | - | 0.1 | - | - | - | - | 0.2 | 0.2 | - | - | - | - | - | 0.2 | 12.3 |
| UNI | - | 1.0 | 0.0 | - | 0.0 | - | 0.2 | 1.2 | 0.0 | - | 1.6 | - | - | 2.8 | 11.0 |
| SOL | 0.0 | 0.0 | - | - | - | - | 1.1 | 1.1 | - | - | 2.0 | - | 0.0 | 3.1 | 23.2 |
| XLM | 2.2 | 0.0 | 0.0 | - | 0.0 | - | 0.4 | 2.7 | - | - | - | 0.0 | - | 2.7 | 15.6 |
| BNB | - | 0.1 | - | 0.0 | - | - | 0.0 | 0.2 | - | - | 1.3 | - | - | 1.5 | 20.1 |
| EOS | 1.1 | 0.0 | 0.0 | - | - | - | 0.0 | 1.2 | - | - | 1.0 | - | - | 2.1 | 3.2 |
| SRM | 0.2 | - | - | - | - | - | - | 0.2 | - | - | - | 0.3 | - | 0.5 | (0.0) |
| **Top 25 Subtotal** | **$ 1,105.6** | **$ 70.7** | **$ 0.0** | **$ 0.2** | **$ 2.6** | **$ 4.8** | **$ 147.8** | **$ 1,331.7** | **$ 90.5** | **$ 1,539.4** | **$ 352.4** | **$ 0.3** | **$ 11.1** | **$ 3,325.5** | **$ 6,683.5** |
| Other Coins | 8.1 | 2.2 | 0.0 | 1.7 | 0.0 | 0.4 | 5.7 | 18.2 | 0.9 | 0.3 | 11.9 | 0.1 | 0.8 | 32.0 | 261.0 |
| **Total Coin Value** | **$ 1,113.7** | **$ 72.9** | **$ 0.0** | **$ 1.9** | **$ 2.6** | **$ 5.2** | **$ 153.5** | **$ 1,349.8** | **$ 91.4** | **$ 1,539.7** | **$ 364.3** | **$ 0.4** | **$ 11.9** | **$ 3,357.5** | **$ 6,944.5** |

| | |
|---|---|
| Net Coin Position | $ (3,587.0) |
| Net USD-Denominated Assets / (Liabilities) | 1,288.3 |
| Reserves | (463.1) |
| **Equity** | **$ (2,761.9)** |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Memo: BTC Equiv.* | $ 1,018.6 | $ 13.5 | $ - | $ - | $ - | $ 4.8 | $ 64.2 | $ 1,101.1 | $ 0.0 | $ - | $ 22.0 | $ - | $ 0.7 | $ 1,123.9 | $ 3,059.3 |
| Memo: ETH Equiv.** | 0.2 | 1.4 | 0.0 | 0.2 | 0.0 | - | 49.4 | 51.3 | 89.3 | 1,505.1 | 12.5 | 0.0 | - | 1,658.1 | 1,943.2 |
| Memo: Stablecoins | 4.1 | 3.8 | 0.0 | 0.1 | 0.0 | 0.0 | 23.7 | 32.1 | 0.0 | - | 301.0 | - | 0.0 | 333.1 | 1,186.7 |

(1) DeFi is primarily comprised of deployed coins, but a portion of coins remain unemployed within the DeFi workspace on Fireblocks

(2) DeFi / Staking assets may not represent direct exposure to the underlying coins; these assets include rights to receive the underlying coins or a synthetic representation of the underlying coins

**Celsius Network**

Assets by Coin Type as of July 28, 2023
(# of coins in 000s)

| Coin Type | Coins in Celsius' Possession | | | | | | | | Deployed Coins | | | | | Total Coin Assets | Total Coin Liabilities |
| | Held at Fireblocks | | | | | | | | | | | | | | |
| | Celsius Network Limited (UK) | Celsius Network LLC (US) | Celsius Network Finance | Celsius Network EU UAB (LT) | Celsius OTC | Celsius Mining LLC | Custody Assets | Total Coins in Possession | DeFi[1][2] | Staking[2] | Loans | Exchanges & Trusts | Other Assets | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CEL | 370,998 | 272,842 | 0 | 0 | 15,003 | - | 917 | 659,761 | - | - | - | - | - | 659,761 | 280,631 |
| ETH** | 0 | 1 | 0 | 0 | 0 | - | 26 | 27 | 48 | 801 | 7 | 0 | - | 883 | 1,034 |
| stETH** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| WBTC* | - | - | - | - | - | - | 0 | 0 | 0 | - | 0 | - | - | 0 | 0 |
| BTC* | 35 | 0 | - | - | - | 0 | 2 | 37 | - | - | 1 | - | 0 | 38 | 104 |
| USDC | 4,065 | 3,354 | 2 | - | - | - | 19,680 | 27,101 | 15 | - | 229,730 | - | 10 | 256,856 | 925,520 |
| MATIC | 48 | 1,571 | - | - | - | - | 4,416 | 6,035 | 1 | 46,258 | 4,567 | - | 14,302 | 71,163 | 244,463 |
| USDT ERC20 | 1 | 61 | 0 | - | - | - | 894 | 957 | - | - | 47,187 | - | - | 48,144 | 120,386 |
| ADA | 0 | 4 | 0 | 0 | - | - | 5,052 | 5,056 | - | 2,992 | 10,161 | - | 535 | 18,744 | 259,556 |
| LINK | 14 | 4 | - | - | 0 | - | 296 | 314 | 0 | - | 7 | - | - | 321 | 9,345 |
| WETH** | - | 0 | - | - | - | - | - | 0 | 0 | - | - | - | - | 0 | - |
| GUSD | - | 3 | - | - | - | - | 2,317 | 2,319 | 1 | - | 10,822 | - | - | 13,143 | 84,243 |
| DOT | 639 | 1 | 0 | - | 0 | - | 108 | 747 | 222 | 79 | 127 | - | - | 1,174 | 4,753 |
| LTC | - | 20 | - | - | - | - | 11 | 31 | - | - | 84 | - | - | 115 | 428 |
| FIT | - | 0 | - | - | - | - | 0 | 0 | - | - | - | 0 | - | 0 | (0) |
| MCDAI | 0 | 17 | 0 | - | 0 | - | 272 | 290 | 4 | - | 8,802 | - | - | 9,096 | 4,351 |
| AAVE | - | 0 | 0 | - | - | - | 3 | 3 | 0 | - | 6 | - | - | 9 | 125 |
| TGBP | 7,898 | 0 | - | - | - | - | 51 | 7,949 | - | - | - | - | - | 7,949 | 7,419 |
| BCH | - | 0 | - | - | - | - | 1 | 1 | - | - | - | - | - | 1 | 51 |
| UNI | - | 162 | 0 | - | 0 | - | 30 | 192 | 0 | - | 271 | - | - | 463 | 1,812 |
| SOL | 0 | 0 | - | - | - | - | 44 | 45 | - | - | 80 | - | 0 | 125 | 920 |
| XLM | 14,095 | 1 | 1 | - | 0 | - | 2,542 | 16,638 | - | - | - | 1 | - | 16,640 | 97,539 |
| BNB | - | 0 | - | 0 | - | - | 0 | 1 | - | - | 6 | - | - | 6 | 83 |
| EOS | 1,479 | 0 | 0 | - | - | - | 58 | 1,536 | - | - | 1,303 | - | - | 2,840 | 4,237 |
| SRM | 2,019 | - | - | - | - | - | - | 2,019 | - | - | - | - | 3,548 | 5,567 | (0) |
| **Top 25 Subtotal** | **401,291** | **278,040** | **3** | **1** | **15,003** | **0** | **36,722** | **731,060** | **290** | **50,130** | **313,159** | **3,549** | **14,847** | **1,113,035** | **2,047,000** |
| Other Coins | 8,316,824 | 9,033 | 1 | 1,365 | 0 | 439 | 6,273 | 8,333,935 | 2,660 | 37,794 | 14,322 | 8 | 10,254 | 8,398,972 | 611,236 |
| **Total Coin Quantity** | **8,718,115** | **287,073** | **4** | **1,366** | **15,003** | **439** | **42,995** | **9,064,995** | **2,950** | **87,923** | **327,481** | **3,557** | **25,102** | **9,512,007** | **2,658,236** |
| | | | | | | | | | | | | | | | |
| Memo: BTC Equiv.* | 35 | 0 | - | - | - | 0 | 2 | 37 | 0 | - | 1 | - | 0 | 38 | 104 |
| Memo: ETH Equiv.** | 0 | 1 | 0 | 0 | 0 | - | 26 | 27 | 48 | 801 | 7 | 0 | - | 883 | 1,034 |
| Memo: Stablecoins | 4,068 | 3,833 | 2 | 74 | 0 | 439 | 23,646 | 32,063 | 781 | - | 300,783 | - | 10 | 333,636 | 1,185,967 |

(1) DeFi is primarily comprised of deployed coins, but a portion of coins remain undeployed within the DeFi workspace on Fireblocks

(2) DeFi / Staking assets may not represent direct exposure to the underlying coins; these assets include rights to receive the underlying coins or a synthetic representation of the underlying coins

**Celsius Network**

## Mining Activity Summary, May - July 2023

|  | Coin Recap |
|---|---|
| **BTC ROLL FORWARD (NET)** | |
| Beginning Balance | 238.55 |
| Mined BTC | 1,042.34 |
| Sold BTC | (1,185.00) |
| **Ending Balance** | **95.90** |

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### NOTICE OF FILING OF REVISED
### TABLE OF AUTHORITIES OF THE DEBTORS' MEMORANDUM OF
### LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF
### REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE** that on September 27, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* [Docket No. 3604] (the "Memorandum").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

PLEASE TAKE FURTHER NOTICE that the Debtors indicated in footnote 2 of the Memorandum that the Table of Authorities included in the Memorandum was not yet complete, and that the Debtors would file a revised Memorandum on the docket as soon as possible showing a redline reflecting that the Table of Authorities is the only change. *See* Memorandum fn.2.

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file a revised *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto*, attached hereto as **Exhibit A** (the "Revised Memorandum"), which includes a finalized Table of Authorities.

PLEASE TAKE FURTHER NOTICE THAT a comparison between the Memorandum and the Revised Memorandum is attached hereto as **Exhibit B**.

PLEASE TAKE FURTHER NOTICE THAT copies of the Memorandum, Revised Memorandum, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated:  September 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:       (312) 862-2200
Email:            patrick.nash@kirkland.com
                   ross.kwasteniet@kirkland.com
                   chris.koenig@kirkland.com
                   dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Revised Memorandum**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT
## OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF CELSIUS NETWORK LLC AND ITS
## DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................2

Background ...............................................................................................................9

I.       Solicitation and Notification Process............................................................9

II.      The Restructuring Transactions. ...............................................................14

III.     The Objections. ...........................................................................................19

Argument ...............................................................................................................21

IV.      The Plan, as Modified, Satisfies the Requirements of Section 1127 of the
         Bankruptcy Code and Bankruptcy Rule 3019. ...........................................21

V.       The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code................25

A.       The Plan Complies with the Applicable Provisions of the Bankruptcy Code
         (§ 1129(a)(1))...............................................................................................26

B.       The Plan Satisfies the Classification Requirements of Section 1122 of the
         Bankruptcy Code. ........................................................................................26

C.       The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the
         Bankruptcy Code. ........................................................................................30

D.       The Plan Complies With the Discretionary Provisions of Section 1123(b) of the
         Bankruptcy Code. ........................................................................................36

         1.       The Debtor Release Is Appropriate and Complies With the Bankruptcy
                  Code. ................................................................................................38

         2.       The Third-Party Release Is Wholly Consensual and Should Be Approved. .........43

         3.       The Exculpation Provision Is Appropriate and Complies With the
                  Bankruptcy Code. .............................................................................52

         4.       The Injunction Provision Is Appropriate and Complies With the
                  Bankruptcy Code. .............................................................................60

         5.       The CEL Token Settlement, the Account Holder Avoidance Action
                  Settlement, and the Retail Borrower Settlement Comply With the
                  Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors'
                  Good Business Judgment.....................................................................61

E.  The Plan Complies With Section 1123(d) of the Bankruptcy Code. .................................79

F.  The Debtors Complied With the Applicable Provisions of the Bankruptcy Code
(§ 1129(a)(2)). .................................................................................................................83

    1.  The Debtors Complied With Section 1125 of the Bankruptcy Code. ....................84

    2.  The Debtors Complied With Section 1126 of the Bankruptcy Code. ....................85

G.  The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law
(§ 1129(a)(3)). .................................................................................................................90

H.  The Plan Provides That the Debtors' Payment of Professional Fees and Expenses
Are Subject to Court Approval (§ 1129(a)(4)). ..............................................................93

I.  The Debtors Disclosed All Necessary Information Regarding Directors, Officers,
and Insiders (§ 1129(a)(5)). ...........................................................................................94

J.  The Plan Does Not Require the Approval of a Governmental Regulatory
Commission (§ 1129(a)(6)). ...........................................................................................95

K.  The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). .................95

L.  The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8))
of the Bankruptcy Code. ...............................................................................................102

M.  The Plan Provides for Payment in Full of All Allowed Priority Claims
(§ 1129(a)(9)). ...............................................................................................................104

N.  At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(§ 1129(a)(10)). .............................................................................................................105

O.  The Plan Is Feasible (§ 1129(a)(11)). ............................................................................106

P.  All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). ....................................111

Q.  All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ........................112

R.  Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply
to the Plan. ....................................................................................................................112

S.  The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the
Bankruptcy Code. .........................................................................................................113

    1.  The Plan Does Not Unfairly Discriminate with Respect to Rejecting
Classes (§ 1129(b)(1)). .......................................................................................114

    2.  The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§
1129(b)(2)). .........................................................................................................120

                                                                                                                 **Page**

T.      The Debtors Complied With Section 1129(d) of the Bankruptcy Code. .........................124

VI.     Good Cause Exists to Waive the Stay of the Confirmation Order. .................................124

VII.    The Debtors' Replies to Remaining Objections. ...........................................................125

A.      The Emergence Incentive Plan Should Be Approved as Part of the Plan. .....................125

        1.      The Emergence Incentive Plan Complies With Section 503(c) of the
                Bankruptcy Code. ...............................................................................................128

B.      The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections
        Related to Loans Should Be Overruled. .......................................................................132

        1.      Plan Treatment of the Institutional Borrowers and Retail Borrowers is
                Appropriate. .........................................................................................................133

Conclusion ............................................................................................................................139

# TABLE OF AUTHORITIES[2]

Page(s)

## Cases

*In re 20 Bayard Views, LLC*,
  445 B.R. 83 (Bankr. E.D.N.Y. 2011)....................................................................114

*In re 203 N. LaSalle St. Ltd. P'ship.*,
  190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
  526 U.S. 434 (1999)............................................................................................113

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y. 1993)......................................................... *passim*

*In re A.H. Robins Co.*,
  88 B.R. 742 (Bankr. E.D. Va. 1988).....................................................................21

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007).................................................39, 43, 90, 95

*In re Adelphia Commc'ns Corp.*,
  No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952]...........56

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
  855 F.3d 459 (2d Cir. 2017)..................................................................................65

*In re Aegean Marine Petroleum Network, Inc*.,
  No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019)..................................124

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re
  Chateaugay Corp.)*,
  89 F.3d 942 (2d Cir. 1996)...........................................................................27, 136

*In re Aleris Int'l, Inc.*,
  No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010).............21

*In re Almatis, B.V.*,
  No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444]............55

*In re Ambanc La Mesa Ltd. P'ship*,
  115 F.3d 650 (9th Cir. 1997) ..............................................................................114

---

[2]    [Resolved.]

*In re Ampex Corp.*,
No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] .............................56

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013)...............................................................................21, 24

*In re Answers Holdings, Inc.*,
No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017)....................................................50, 56

*In re Avaya Inc.*,
No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017)....................................................50, 56

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021)..............................................................................46, 47

*In re Avianca Holdings S.A.*,
No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) ............................................................49

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ............................................................................114

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*,
701 F.2d 1071 (2d Cir. 1983).............................................................................................90

*In re Bally Total Fitness of Greater N.Y., Inc.*,
No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ................. *passim*

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)....................................................................................................95, 120

*In re Barneys N.Y. Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) ......................................................124

*In re Barneys New York Inc.*,
No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020) ......................................................45, 50

*In re BCBG Max Azria Global Holdings, LLC*,
No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) ...................................................50, 56

*In re BearingPoint, Inc.*,
453 B.R. 486 (Bankr. S.D.N.Y. 2011)...................................................................................55

*In re BearingPoint, Inc.*,
No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009).........................................................43

*In re Best Prods. Co.*,
177 B.R. 791 (S.D.N.Y. 1995)..............................................................................................24

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) .................................................................................27, 136

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ...................................................................113

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................................115

*In re Cajun Elec. Power Co-op., Inc.*,
    150 F.3d 503 (5th Cir. 1998) ...............................................................................83

*In re Calpine Corp.*,
    No. 05-60200 (BRL) .............................................................................................44

*In re Capmark Fin. Grp., Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) .....................................................................66

*In re Captran Creditors' Trust*,
    128 B.R. 469 (M.D. Fla. 1991) ............................................................................53

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ...........................................................21, 90

*In re Cengage Learning, Inc.*,
    No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] ..........57

*In re Cenveo, Inc.*,
    No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] ...................55, 56

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................................39

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) ...................................................................44

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................................44

*In re China Fishery Grp. Ltd.*,
    No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022) ...........................................49

*Complaint for Declaratory Judgment*
    [Adv. No. 23-01007, Docket No. 2001] ................................................................77

*In re Crabtree & Evelyn, Ltd.*,
    No. 09-14267 (BRL), 2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14. 2010) ..........43

*In re DBSD N. Am., Inc.*,
    419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-
    10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part,*
    *rev'd in part*, 634 F.3d 79 (2d Cir. 2011) .......................................................55, 109

*In re Deluxe Media*,
    No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) ................................. *passim*

*In re Dewey & LeBoeuf, LLP*,
    478 B.R. 628 (Bankr. S.D.N.Y. 2012) ...........................................................123

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) .......................................................... *passim*

*In re DJK Residential, LLC*,
    No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497]..............................57

*In re Dow Corning Corp.*,
    237 B.R. 374 (Bankr. E.D. Mich. 1999) .........................................................21

*In re Drexel Burnham*,
    960 F.2d 285 (2d Cir. 1992)..................................................................52, 60

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ...........................................................61

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .......................................................... *passim*

*In re Eastman Kodak Co.*,
    No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] ........................55

*In re Eddington Thread Mfg. Co.*,
    181 B.R. 826 (Bankr. E.D. Pa. 1995) .........................................................106

*In re Enron Corp.*,
    326 B.R. 497 (S.D.N.Y. 2005)...........................................................52, 55, 56

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...........................................................120

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ........................................................113

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993)...............................................................26, 136

*In re Frontier Communications Corp.*,
  No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) ........................................54

*In re Fullbeauty Brands Holdings Corp.*,
  No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019) ....................................50, 56

*In re Garrett Motion*,
  No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021) .................................49, 54

*In re Gaston & Snow*,
  Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
  1996) .......................................................................................................................89

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................43, 44, 115

*In re Glob. Home Prods., LLC*,
  369 B.R. 778 (Bankr. D. Del. 2007) .....................................................................128

*In re Global A&T Electronics Ltd.*,
  No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51] ...................56, 59

*In re Granite Broad. Corp.*,
  369 B.R. 120 (Bankr. S.D.N.Y. 2007) .............................................................55, 120

*In re Great Bay Hotel & Casino, Inc.*,
  251 B.R. 213 (Bankr. D.N.J. 2000) ......................................................................114

*In re Hawker Beechcraft, Inc.*,
  479 B.R. 308 (Bankr. S.D.N.Y. 2012) ..................................................................128

*In re Health Diagnostic Lab., Inc.*,
  551 B.R. 218 (Bankr. E.D. Va. 2016) .....................................................................53

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
  Enters., Ltd. II)*,
  994 F.2d 1160 (5th Cir. 1993) .......................................................................25, 106

*In re Heritage Org., L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007).............................................................27, 136

*In re Hollander Sleep Products, LLC*,
  No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019).................................. *passim*

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) .....................................................................110

*In re Ion Media Networks, Inc.*,
   419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...........................................................118, 121

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) .........................................................26, 27, 136

*In re Jartran, Inc.*,
   44 B.R. 331 (Bankr. N.D. Ill. 1984) ........................................................................56

*In re Jason Industries*,
   No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020) .........................................50

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
   *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988).......................................................114

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
   843 F.2d 636 (2d Cir. 1988)....................................................25, 89, 106, 114

*Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*,
   374 B.R. 516 (S.D.N.Y. 2007).................................................................................61

*In re Key3Media Grp. Inc.*,
   336 B.R. 87 (Bankr. D. Del. 2005) .........................................................................66

*In re Lakeland Tours, LLC*,
   No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) ........................................50

*In re Lapworth*,
   No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998)..............83

*In re LATAM Airlines Group S.A.*,
   No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)
   ..............................................................................................49, 54, 58, 59

*In re Lear Corp.*,
   2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) ..............................................44

*In re Legend Parent Inc.*,
   No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014)..........................................................50

*In re Lehman Bros. Holdings. Inc.*,
   422 B.R. 407 (Bankr. S.D.N.Y. 2010) ..................................................................133

*In re Leslie Fay Companies, Inc.*,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..................................................................110

*In re Lightsquared Inc.*,
    513 B.R. 56 (Bankr. S.D.N.Y. 2014)..............................................................26, 136

*In re LSC Communications, Inc.*,
    No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021)....................................49, 54

*In re Lumileds*,
    No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022)....................................49, 54

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)...............................................................43, 44, 47

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)............................................................... *passim*

*In re MPM Silicones*,
    2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014)............................................44

*Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*,
    169 B.R. 669 (Bankr. D. Ariz. 1994)...............................................................106

*In re Nellson Nutraceutical, Inc.*,
    369 B.R. 787 (Bankr. D. Del. 2007) ...............................................................128

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015).............................................................39, 60

*In re Nine West Holdings, Inc.*,
    No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019)..................................... *passim*

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984).......................................................................................90

*O'Connell v. Packles (In re Hilsen)*,
    404 B.R. 58 (Bankr. E.D.N.Y. 2009).................................................................61

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006).........................................................39, 43, 57

*Osborn ex rel. Osborn v. Kemp*,
    991 A.2d 1153 (Del. 2010) ...........................................................................133

*In re Philippine Airlines, Inc.*,
    No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) ........................................49

*In re Pisces Energy, LLC*,
  Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880 (Bankr. S.D.
  Tex. Dec. 21, 2009)..................................................................................................21

*In re Prudential Energy Co.*,
  58 B.R. 857 (Bankr. S.D.N.Y. 1986)....................................................................107, 110

*In re Purofied Down Prods. Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993)...............................................................................61

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)...................................................................................53

*In re Reader's Digest Ass'n, Inc.*,
  No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010)..................................26, 114, 115, 136

*In re Repurchase Corp.*,
  332 B.R. 336 (Bankr. N.D. Ill. 2005) ..................................................................107

*In re Res. Cap., LLC*,
  No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] ..........................55

*In re Revlon, Inc.*,
  No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) ......................................................49, 54

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
  461 F.3d 251 (2d Cir. 2006).....................................................................................65

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016).....................................................................26

*In re Sabine Oil & Gas Corp.*,
  No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) ...................................................45, 50

*In re Sea Trail Corp.*,
  No. 11-07370-8, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012)................................114

*In re Seabras 1 USA, LLC*,
  No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020).........................................50, 55, 56, 57

*SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network
  Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*,
  23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6]............................................................. *passim*

*In re Sentinel Mgmt. Grp., Inc.*,
  398 B.R. 281 (Bankr. N.D. Ill. 2008) ....................................................................21, 24

*In re Simplot*,
   No. 06-00002 (TLM), 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007) .........................25

*In re Soup Kitchen Int'l., Inc.*,
   506 B.R. 29 (Bankr. E.D.N.Y. 2014) ........................................................................66

*In re Specialty Equip. Cos.*,
   3 F.3d 1043 (7th Cir. 1993) ....................................................................................43

*In re Spiegel, Inc.*,
   No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006),
   *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28,
   2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008) ...........................................................43

*In re SunEdison, Inc.*,
   575 B.R. 220 (Bankr. S.D.N.Y. 2017) ....................................................................114

*In re SunEdison, Inc.*,
   No. 16-10992 (SMB), 576 B.R. 453 (Bankr. S.D.N.Y. 2017) ......................................44

*In re Sungard Availability Services Capital, Inc.*,
   No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019) ................................50, 56, 58

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S.
   Truck Co.)*,
   800 F.2d 581 (6th Cir. 1986) ................................................................................107

*In re Texaco Inc.*,
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) ....................................................60, 89, 107

*In re Toy & Sports Warehouse, Inc.*,
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) ......................................................................90

*In re Tricom, S.A.*,
   No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009) ...............................................46

*United States v. Mashinsky et al.*,
   23-cr-00347-UA (S.D.N.Y. 2023) ............................................................................64

*In re Uno Rest. Holdings Corp.*,
   No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) .................................................55

*In re Windstream Holdings, Inc.*,
   No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) ...............................*passim*

*In re Winn-Dixie Stores, Inc.*,
   356 B.R. 239 (Bankr. M.D. Fla. 2006) ....................................................................52

*In re Worldcom, Inc.,*
   2003 WL 23861928 ............................................................ *passim*

*In re Young Broad. Inc.,*
   430 B.R. 99 (Bankr. S.D.N.Y. 2010) ................................................ 107

*In re Zenith Elecs. Corp.,*
   241 B.R. 92 (Bankr. D. Del. 1999) ............................................ 56, 113

**Statutes**

11 U.S.C. § 502(a) .................................................................... 85

11 U.S.C. § 510(b) .......................................................... *passim*

11 U.S.C. § 541(a)(1) ............................................................... 133

11 U.S.C. § 547(b) .................................................................... 76

11 U.S.C. § 726 ..................................................................... 101

11 U.S.C. § 1122(a) ..................................................... 26, 135, 136

11 U.S.C. § 1122(b) .................................................................. 29

11 U.S.C. § 1123(a)(1) ............................................................... 30

11 U.S.C. § 1123(a)(2) ............................................................... 30

11 U.S.C. § 1123(a)(3) ............................................................... 31

11 U.S.C. § 1123(a)(4) ............................................................... 31

11 U.S.C. § 1123(a)(5) ........................................................... 31, 34

11 U.S.C. § 1123(a)(6) ............................................................... 35

11 U.S.C. § 1123(a)(7) ............................................................... 35

11 U.S.C. § 1123(b)(1)–(3) .......................................................... 36

11 U.S.C. § 1123(b)(6) ............................................................... 36

11 U.S.C. § 1123(d) ....................................................... 79, 80, 82

11 U.S.C. § 1126(a) ....................................................... 84, 85

11 U.S.C. § 1126(f) .................................................................. 84

11 U.S.C. § 1126(g) ............................................................................................84

11 U.S.C. § 1127(a) ............................................................................................21

11 U.S.C. § 1129(a)(1) ........................................................................................25

11 U.S.C. § 1129(a)(2) ........................................................................................82

11 U.S.C. § 1129(a)(3) ..........................................................................53, 89, 92

11 U.S.C. § 1129(a)(4) ........................................................................................92

11 U.S.C. § 1129(a)(5)(A)(i) ..............................................................................93

11 U.S.C. § 1129(a)(5)(A)(ii) .............................................................................93

11 U.S.C. § 1129(a)(5)(B) ..................................................................................93

11 U.S.C. § 1129(a)(6) ........................................................................................94

11 U.S.C. § 1129(a)(7)(A) ..................................................................................95

11 U.S.C. § 1129(a)(8) ......................................................................................102

11 U.S.C. § 1129(a)(9)(A) ................................................................................103

11 U.S.C. § 1129(a)(9)(B) ................................................................................104

11 U.S.C. § 1129(a)(9)(C) ................................................................................104

11 U.S.C. § 1129(a)(10) ....................................................................................105

11 U.S.C. § 1129(a)(11) ..........................................................................106, 107

11 U.S.C. § 1129(a)(12) ....................................................................................111

11 U.S.C. § 1129(a)(14) ....................................................................................112

11 U.S.C. § 1129(a)(15) ....................................................................................112

11 U.S.C. § 1129(a)(16) ....................................................................................112

11 U.S.C. § 1129(b) ..................................................................................102, 113

11 U.S.C. § 1129(b)(1) ............................................................113, 114, 135

11 U.S.C. § 1129(b)(2)(B)(i) ............................................................................120

11 U.S.C. § 1129(b)(2)(B)(ii) ...........................................................................120

11 U.S.C. § 1129(b)(2)(C)(ii) ..................................................................120

15 U.S.C. § 77e ....................................................................................123

28 U.S.C. § 1930 ...................................................................................111

Bankrtupcy Code § 1123 .........................................................................80

Bankrtupcy Code § 1125(a) ....................................................................84

Bankrtupcy Code § 1126 ...........................................................12, 85, 88

Bankrtupcy Code § 1129(a) ....................................................................25

Bankrtupcy Code § 1129(b) ....................................................................25

Bankrtupcy Code § 1141 .........................................................................18

Bankrtupcy Code § 365(a) .......................................................................80

Bankrtupcy Code § 501 .....................................................................85, 88

Bankrtupcy Code § 523 .....................................................................18, 23

Bankruptcy Code .................................................................................9, 14

Bankruptcy Code § 105(a) .......................................................................32

Bankruptcy Code § 365 ...........................................................................79

Bankruptcy Code § 502 ...............................................................63, 85, 88

Bankruptcy Code § 502(b) .......................................................................70

Bankruptcy Code § 503(c) ................................................................ *passim*

Bankruptcy Code § 547(c)(2) ..................................................................72

Bankruptcy Code § 1102 .........................................................................10

Bankruptcy Code § 1107(a) .....................................................................10

Bankruptcy Code § 1108 .........................................................................10

Bankruptcy Code § 1109 ....................................................................18, 96

Bankruptcy Code § 1111 ....................................................................85, 88

Bankruptcy Code § 1122 ...................................................21, 25, 26, 136

**Page**

Bankruptcy Code § 1123 ...................................................................................21, 25, 26

Bankruptcy Code § 1123(b)(3)(A)..................................................................... *passim*

Bankruptcy Code § 1125 ...............................................................................................83, 84

Bankruptcy Code § 1125(b).........................................................................................84

Bankruptcy Code § 1125(c).........................................................................................84

Bankruptcy Code § 1127 .............................................................................20, 21, 24

Bankruptcy Code § 1127(a) .......................................................................................21

Bankruptcy Code § 1129 .............................................................................................25

Bankruptcy Code § 1129(a)(9) .........................................................................104, 105

Bankruptcy Code § 1146(a) .......................................................................................34

Bloomberg Law, September 15, 2023, https://news.bloomberglaw.com/ip-
law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud..................................64

**Rules**

Fed. R. Bankr. P. 302 ....................................................................................................124

Fed. R. Bankr. P. 1015(b) ...........................................................................................10

Fed. R. Bankr. P. 3018(a) ...................................................................................86, 88

Fed. R. Bankr. P. 3019 .............................................................................20, 21, 24

Fed. R. Bankr. P. 6004(h) ...........................................................................................124

Fed. R. Bankr. P. 6006(d) ...........................................................................................124

Fed. R. Bankr. P. 9019 .................................................................................60, 61, 70

**Other Authorities**

The New York Times (International Edition) (August 25, 2023) ...................................11

The New York Times (National Edition) (August 25, 2023) .......................................11

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Memorandum")[3] in support of confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be further modified, amended, or supplemented from time to time, the "Plan").[4] In support of this Memorandum and Confirmation of the Plan, the Debtors have also filed contemporaneously herewith the following declarations:  (a) *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3581] (the "Ferraro Declaration"); (b) *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3582] (the "Campagna Declaration"); (c) *Declaration of Ryan Kielty in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3592] (the "Kielty Declaration"); (d) *Declaration of Joel E. Cohen, Managing Director of Stout Risius Ross, LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3588] (the "Cohen Declaration"); (e) *Declaration of Steve Kokinos in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its*

---

[3]    Capitalized terms not immediately defined have the meaning ascribed to them elsewhere in this Memorandum, the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the objection tracker attached as **Exhibit A** hereto (the "Objection Tracker").

[4]    For the avoidance of doubt, citations to Plan provisions shall refer to the location of the Article or Section in the Plan filed contemporaneously herewith at [Docket No. 3577], unless otherwise noted.  Further, to the extent any of the provisions of the Plan copied in this Memorandum are inconsistent with the Plan filed at Docket No. 3577, the Plan filed at docket No. 3577 shall control.

*Debtor Affiliates* [Docket No. 3591] (the "<u>Fahrenheit Declaration</u>"); and (f) *Declaration of Allison*

*Hoeinghaus in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius*

*Network LLC and Its Debtor Affiliates* [Docket No. 3586] (the "<u>Hoeinghaus Declaration</u>").

## **<u>Preliminary Statement</u>**

1.      These Chapter 11 Cases were filed in July 2022 in response to dire and unexpected

circumstances for Celsius' business.  During an industry-wide "crypto winter," the combination of

a "run on the bank" by Celsius' Account Holders and increasing regulatory scrutiny forced Celsius

to first pause all withdrawals, and then file for bankruptcy.  The early days of these Chapter 11

Cases were challenging and uncertain.  A dark cloud hung over the Debtors because of their former

management team's prepetition actions and statements.  State and federal regulators routinely

complained about Celsius' prepetition business practices and lack of engagement.  And the

Debtors' Account Holders, many of whom invested in cryptocurrency in large part because it is

decentralized and outside of traditional governmental and financial regulations, were surprised to

find themselves in the most centralized proceeding possible:  a chapter 11 case.

2.      Amidst this storm, the Debtors, led by their newly-appointed Special Committee,

charted a path forward based on the guiding principles of full transparency and engagement with

all stakeholders.  Early in these Chapter 11 Cases, the Debtors consented to the appointment of the

Examiner to investigate the Debtors' prepetition actions.  The Debtors cooperated with the

Examiner and various investigations by state and federal regulators, as well as the Committee.

Mr. Mashinsky resigned after the Special Committee directed that he either resign or be

terminated.   In addition to cooperating with the many investigations into the Debtors' prepetition

conduct, the Debtors and their advisors also engaged with the Committee, various ad hoc groups

of creditors, and individual Account Holders to resolve key legal issues, drive these Chapter 11

2

Cases forward, and try to maximize the value of the Debtors' assets for their stakeholders and emerge from bankruptcy as promptly as possible.

3.     The nearly fully consensual Plan is the culmination of over a year of the Debtors' engagement with their creditors, and the Debtors are pleased to report that, after tabulating more than 80,000 votes submitted by creditors holding approximately $3 billion in Claims, over 95% of voting Account Holders by both number and dollar amount voted in support of the Plan, including over 99% of Earn creditors.  This level of creditor participation and support for the Plan is simply unprecedented in large chapter 11 cases, particularly considering how contentious these cases were in their early stages.  The level of support that the Plan has now garnered from the Debtors' creditors demonstrates the broad consensus that has been built over time, particularly as these chapter 11 cases near their conclusion.   The Plan includes agreed settlements with each ad hoc group of Account Holders (Earn, Custody, Retail Borrower, and Withhold) and a resolution of the CEL Token valuation dispute.  If the Plan is confirmed, the Debtors will work to promptly implement this value-maximizing transaction.  There are only a handful of unresolved Objections to confirmation of the Plan, none of which have merit, and which should be overruled.

4.     ***First***, several Retail Borrowers have objected to their treatment under the Plan. These borrowers argue that the cryptocurrency that they deposited as "collateral" is their property, and that they should receive 100% of that cryptocurrency under the Plan.  As an initial matter, their fellow borrowers do not agree.  The Plan includes the mediated settlement of the issues relating to retail loans that was negotiated between the Debtors, the Committee, and the Retail Borrower Ad Hoc Group during a three-day mediation before the Honorable Michael E. Wiles. And over 96% of Retail Borrowers who voted on the Plan voted to accept their treatment as unsecured creditors—and Retail Borrowers also have an additional right of setoff or repayment of

3

the principal balance as detailed in the Plan and Disclosure Statement, and priority in making the Liquid Cryptocurrency Weighted Election. That is, because the class of retail borrowers voted to accept the Plan, dissenting borrowers are bound by the class vote. Moreover, the Loan Terms of Use include language that is substantially similar to the Terms of Use governing the Earn Program, and this Court ruled that the Terms of Use provide that the cryptocurrency in Earn Accounts belongs to Celsius, not the Account Holder. Accordingly, the retail loan treatment in the Plan is in line with Retail Borrowers' legal rights and should be approved.

5.    **Second**, a large institutional unsecured creditor (Pharos) argues that the Plan fails because (a) the Series B Settlement provides a recovery to the Series B Holders who had not previously participated in the Court-approved settlement, when unsecured creditors are not being paid in full, and (b) the "best interests" test is not satisfied because the Debtors' estimates for the Orderly Wind Down are actually the proper estimates for a chapter 7 fire sale, and the NewCo equity has no value. Both arguments are without merit and should be overruled. As to the first point, the Series B Settlement was separately approved by the Court, which resolved a material dispute that the Series B Holders were structurally senior to the creditors of Celsius Network LLC and entitled to be paid ahead of creditors. These equity holders are receiving this distribution as part of this prior authorized settlement of disputed legal issues—not purely on account of their equity position—and Pharos should have objected to the Series B Settlement if it believed that the settlement was inappropriate.

6.    As to the second point, the "best interests test" requires that creditors receive as much under a chapter 11 plan as they would under a chapter 7 liquidation. The Debtors have demonstrated through the Liquidation Analysis that Holders of Claims in Class 8 receive 19.6% and that Holders of Claims in Class 9 receive 29.5% more under the Plan than a

chapter 7 liquidation.  Pharos' objection ignores the significant loss of value that would occur under a chapter 7 liquidation, and the total lack of negotiating power that the chapter 7 trustee would have with counterparties that are aware that the trustee is tasked with liquidating assets quickly.  Additionally, although Pharos argues that the equity of NewCo is worthless, NewCo is being seeded with $450 million of capital, will receive the Debtors' mining assets (valued at a midpoint of $565 million) and other illiquid assets (valued at $283 million), and NewCo will have no debt.  Even under extremely bearish assumptions, the NewCo equity has enormous value that cannot be simply brushed aside, and the evidence at the Confirmation Hearing will demonstrate that the best interests test is satisfied.

7.    ***Third***, the CEL Token Settlement is reasonable and should be approved.  The Plan was overwhelmingly approved by CEL Token Holders:  of the CEL Token holders who voted, over 98% by number and 95% by dollar amount voted to accept the Plan.  The CEL Token Settlement is a reasonable settlement of the contested issues relating to CEL Token that have been hotly contested throughout these Chapter 11 Cases, and avoids requiring that the Court rule on whether CEL Token is a security, or have a lengthy trial on the proper value of CEL Token given the alleged manipulation of the price of the token that took place prepetition.  The Debtors and the Committee have worked tirelessly to try to consensually resolve this issue and are pleased that the CEL Token Settlement has received nearly unanimous support from those that voted on the Plan. The Debtors and the Committee entered into settlement agreements with several large CEL Token holders, and the group of CEL Token holders overwhelmingly voted to accept the Plan, which includes the CEL Token Settlement.

8.    Only one party filed a formal objection to the CEL Token valuation—Otis Davis— and he fails to challenge the legal theories for why CEL should be valued at zero if the CEL Token

Settlement is not approved.  Instead, he admits that Celsius' prepetition actions inflated the CEL Token price between the Pause and the Petition Date from approximately $0.20 to approximately $0.81—which does not support Mr. Davis' argument that CEL Token should be valued at the Petition Date price of approximately $0.81.  To the contrary, the prepetition market manipulation perpetrated by Celsius' former management team (which Mr. Davis readily admits) is a key reason why the Debtors and the Committee proposed the settlement of $0.25 as a fair resolution of this complex dispute.  The Debtors believe that the CEL Token Settlement is appropriate and reasonable, and provides holders of CEL Token with a meaningful recovery instead of $0.00, which it could be if CEL Token is an equity security of Celsius or a now-worthless utility token. The Debtors believe that the overwhelming support that the CEL Token Settlement has garnered is further evidence that it is fair and reasonable, and Mr. Davis' lone resistance should not prevent the settlement from being approved.

9.     **Fourth**, several objectors argue that the Employee Incentive Plan should not be approved as part of the Plan.  But the Plan, which incorporates the Employee Incentive Plan, was overwhelmingly accepted by creditors entitled to vote, including by each class of account holders who filed objections on this issue.  Accordingly, the Employee Incentive Plan should be approved as accepted by the affected creditor classes; the Plan is a global settlement, and the Court need not examine each component of the Plan when the classes that the objectors are in voted to accept the Plan.  Moreover, these payments (if the metrics are satisfied) would be made by the Post-Effective Date Debtors, not a chapter 11 debtor, and so the Bankruptcy Code's restrictions on executive payments do not apply.  Even if the Court applies a higher standard in evaluating the propriety of the Employee Incentive Plan, it is reasonable and should be approved.  The KEIP Motion was filed with these incentive metrics six months ago, and the applicable insiders have worked in good faith

6

to reach the metrics, all of which inures to the benefit of account holders.  The tireless work of these executives is why the Debtors are well positioned to promptly make distributions of Liquid Cryptocurrency under the Plan, and the mining executives' efforts to obtain new hosting for machines after the rejection of the hosting contract by Core Scientific has led to material improvements in the value of the mining business.  The evidence at the Confirmation Hearing will demonstrate that the Employee Incentive Program is reasonable and should be approved.

10.     ***Lastly***, the Debtors believe they have resolved all issues with governmental parties. As to the SEC's limited objection regarding Coinbase, the Debtors have filed a revised form of agreement with Coinbase that clarifies that the Post-Effective Date Debtors will not be using the types of services referenced in the SEC's objection.  Additionally, the Debtors have received various comments from the U.S. Trustee regarding the Plan, all of which have been included in the modified version of the Plan filed contemporaneously herewith, and the Debtors are not aware of any outstanding request from the U.S. Trustee.  And no regulator has objected to the Plan on the basis that any regulatory approval is needed to confirm or consummate the Plan.[5]

11.     The remaining objections have either been resolved or should be overruled for the reasons set forth further below.

12.     As described in detail herein and in the Disclosure Statement, the Restructuring Transactions set forth in the Plan provide the Debtors and their creditors with the best possible

---

[5]     For the avoidance of doubt, there are still certain regulatory approvals that need to be obtained the Plan to become effective.  Most notably, a Form 10 must become effective with the SEC for the NewCo Stock to be able to trade. The Debtors submitted a letter to the SEC in July 2023 seeking "preclearance" of the NewCo providing audited historical financial statements for only the Mining company in the Form 10 because the Debtors' records for their retail and investing businesses are insufficient to be audited for purposes of the Form 10.   For those reasons, the Debtors are seeking approval from the SEC to exclude those historical audited financials from the Form 10, and those discussions with the SEC remain ongoing as of the date hereof.  Once the Form 10 is finalized and filed, a 60-day waiting period must conclude before the Form 10 can become effective, which is a condition precedent to the Effective Date of the Plan.

recovery and a smooth conclusion to these Chapter 11 Cases.  As described in the Disclosure Statement, pursuant to the NewCo Transaction, the Fahrenheit-created NewCo will purchase certain assets of the Debtors, including the mining business, and in return convey 100% of the equity in NewCo to creditors.  On the Effective Date, NewCo will become a public company with its stock intended to be listed on NASDAQ.  The NewCo Transaction is, in effect, a full-scale reorganization sponsored by the Fahrenheit Group, as well as the potential to toggle to the Orderly Wind Down if necessary.  The NewCo Transaction is a full-scale reorganization that recognizes and seizes on the long-term promise and potential of cryptocurrency, while the Orderly Wind Down is a "Plan B" alternative to the NewCo Transaction that includes a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets.  If the NewCo Transaction cannot be completed for any reason, the Debtors can elect to pivot to the Orderly Wind Down.  No matter what transaction is ultimately pursued, however, the Debtors' creditors will receive significant value: under either transaction, the Plan provides that the Debtors will distribute at least $2.03 billion of cryptocurrency to their creditors, subject to the fluctuations in cryptocurrency prices.

13.    As contemplated by the NewCo Transactions, U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), one of the largest and most successful Bitcoin mining operators, will run NewCo's mining operations.  US Bitcoin will assist NewCo with energizing NewCo's existing fleet of miners and de-risking the build out and operation of NewCo's Bitcoin mining business.  Proof Group Capital Management LLC will lead NewCo's staking efforts— contributing its staking intellectual property to NewCo and assisting NewCo in developing and growing its staking infrastructure.  Fahrenheit intends to promptly list the equity of NewCo on NASDAQ to provide creditors receiving NewCo stock under the Plan with liquidity for the stock.

14.     The Orderly Wind Down allows the Debtors, in a manner consistent with their fiduciary duties, to quickly pivot from the NewCo Transactions, without the need to restart the plan process and propose and solicit a new chapter 11 plan, in the event the NewCo Transactions cannot be consummated.   The Orderly Wind provides for (a) the establishment of a pure play standalone mining company, (b) a timely monetization of the Debtors' illiquid assets, and (c) an orderly wind down of the Debtors' estates.   Like under the NewCo Transaction, creditors will receive recoveries in the form of an immediate distributions of BTC or ETH and Litigation Proceeds.   Instead of NewCo Common Stock, however, creditors will receive the value of the standalone mining business and proceeds from the liquidation of the Debtors' illiquid assets.

15.     The terms of the Plan are overwhelmingly supported by the Debtors' creditors and provide for a clear pathway to emergence.   The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.   The Debtors are aware, however, that there are risks to implementing the NewCo Transaction, and the Debtors and the Committee believe that it is in the best interests of all stakeholders to also prepare for a scenario where the NewCo Transaction cannot be completed.   Regardless of which transaction is ultimately implemented, the Plan provides Holders of Claims with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

16.     As set forth below, the Plan satisfies the required elements of the Bankruptcy Code and should be confirmed.

## **Background**

### I.    **Solicitation and Notification Process.**

17.     On July 13, 2022, eight Celsius entities each filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Debtors") with the United States Bankruptcy Court for the

Southern District of New York (the "Court"). On December 7, 2022, three additional entities—

GK8 Ltd., GK8 UK Limited, and GK8 USA LLC—each filed voluntary petitions under chapter 11

of the Bankruptcy Code in the Court (such debtors, "GK8" and, together with the Initial Debtors,

the "Debtors"). The Debtors continue to operate their businesses and manage their properties as

debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[6]  These

Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53 and 1648]. On July 27, 2022,

the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an

official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code

(the "Committee") [Docket No. 241]. On September 29, 2022, the Court entered an order directing

the appointment of an examiner [Docket No. 920]. On April 4, 2023, the Court entered an order

discharging the examiner [Docket No. 2364].

18. On August 17, 2023, the Court entered the *Order (I) Approving the Adequacy of
the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with
Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the
Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect
Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees
and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement
Order") approving the Disclosure Statement. The Disclosure Statement Order also approved,
among other things, the Solicitation Deadline, Voting Record Date, Voting Deadline,

---

[6]   A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the
Debtors' Chapter 11 Cases is set forth in greater detail in the *Declaration of Robert Campagna, Managing
Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions*
[Docket No. 22] (the "First Day Declaration").

Confirmation Brief Deadline, Plan Objection Deadline, Plan Objection Reply Deadline, 3018 Motion Objection Deadline, Publication Deadline, Plan Supplement Filing Deadline, and the deadline to file the Voting Report, and approving the forms and manner of the Confirmation Hearing Notice, the Non-Voting Status Notices, the Ballots, the Publication Notice, and the Solicitation and Voting Procedures (each as defined in the Disclosure Statement Order). The Debtors complied with the procedures approved by the Disclosure Statement Order.

19.    On August 17, 2023, the Debtors commenced solicitation on the Plan.  By the Solicitation Deadline of August 25, 2023, the Debtors caused their Solicitation Agent, Stretto,[7] to distribute the Solicitation Package (as defined in the Disclosure Statement Order), which included a cover letter, the Plan, the Disclosure Statement and all exhibits thereto, the Confirmation Hearing Notice, and the applicable Ballot, to Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date, via electronic mail and/or first-class mail in either paper or electronic format (*i.e.*, USB flash drive format).  The Debtors also caused a "push" notification to be delivered to Holders of Claims in the Account Holder Voting Classes through the Debtors' mobile application linking such Holders to the Solicitation Agent's online voting portal and the Confirmation Hearing Notice, which informed the recipients of, among other things: (a) the date and time set for the hearing to consider confirmation of the Plan; (b) the manner in which a copy of the Plan and Disclosure Statement can be obtained without a fee through the Debtors' restructuring website or for a fee at the Court's PACER website; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.  Finally, the Debtors caused the Publication Notice to be published in *The New York Times (National Edition)* and *The New York*

---

[7]    Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

*Times (International Edition)* on August 25, 2023, and every Wednesday in September starting on

September 6, 2023 on *CoinDesk* (CoinDesk.com).[8]

20.     The deadline for all Holders of Claims and Interests entitled to vote on the Plan to

cast their ballots was September 22, 2023, at 4:00 p.m. (prevailing Eastern Time) and the deadline

to file objections to confirmation of the Plan was September 22, 2023, at 4:00 p.m. (prevailing

Eastern Time).[9]   On September 27, 2023, the Debtors filed the *Amended Declaration of Brian*

*Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation of Votes*

*and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of Celsius*

*Network LLC and Its Debtor Affiliates* [Docket No. 3574] (the "Voting Report"),[10] which is

summarized below in detail.

21.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only

Holders of Claims in Impaired Classes entitled to receive or retain property on account of such

Claims were permitted to vote to accept or reject the Plan.[11]   Holders of Claims and Interests were

not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders

were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy

Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan

---

[8]     *See Affidavits of Publication* [Docket Nos. 3367, 3368, 3507, 3598].

[9]     *See* Disclosure Statement Order, Art. III.A.f, ¶ 23(a).   The Debtors agreed to extend the deadline to object to
confirmation of the Plan for the U.S. Trustee to September 24, 2023, at 12:00 p.m. (prevailing Eastern Time).
*See* [Docket No. 3530].

[10]    On September 25, 2023, the Debtors timely filed the *Declaration of Brian Karpuk, Managing Director of Stretto,
Inc. on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting the
Joint Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560].   On September
27, 2023, the Debtors filed an amended Voting Report with minor corrections.   For the avoidance of doubt,
references to the Voting Report in this Memorandum refer to the Voting Report filed at Docket No. [3574].

[11]    *See* 11 U.S.C. § 1126.

(in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).[12]

22.    Based upon the Voting Report, approximately 95% of Holders of Claims and Interests that voted on the Plan in Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14 (the "Voting Classes") voted to accept the Plan:

| | | Count | % | Dollars | % |
|---|---|---|---|---|---|
| **Class 2 (Retail Borrower Deposit Claims)** | | | | | |
| | Accept: | 4,215 | 98.83% | $220,581,222.65 | 96.33% |
| | Reject: | 50 | 1.17% | $8,410,803.02 | 3.67% |
| **Class 4 (Convenience Claims)** | | | | | |
| | Accept: | 38,248 | 98.25% | $59,269,958.86 | 98.69% |
| | Reject: | 681 | 1.75% | $784,185.09 | 1.31% |
| **Class 5 (General Earn Claims)** | | | | | |
| | Accept: | 38,734 | 99.35% | $2,418,402,994.19 | 99.28% |
| | Reject: | 254 | 0.65% | $17,495,733.72 | 0.72% |
| **Class 6A (General Custody Claims)** | | | | | |
| | Accept: | 2,896 | 99.51% | $87,378,989.97 | 98.78% |
| | Deemed to Accept: | 2,973 | | $52,451,991.14 | |
| | Reject: | 29 | 0.49% | $1,722,936.80 | 1.22% |
| **Class 7 (Withhold Claims)** | | | | | |
| | Accept: | 654 | 98.79% | $5,386,520.24 | 82.56% |
| | Reject: | 8 | 1.21% | $1,138,215.57 | 17.44% |
| **Class 8 (Unsecured Loan Claims)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 2 | 100.00% | $82,782,261.00 | 100.00% |
| **Class 9 (General Unsecured Claims - Consolidated Debtors)** | | | | | |
| | Accept: | 20 | 74.07% | $6,375,927.86 | 99.56% |
| | Reject: | 7 | 25.93% | $28,436.05 | 0.44% |
| **Class 9 (General Unsecured Claims - Celsius Mining LLC)** | | | | | |
| | Accept: | 1 | 50.00% | $140,000.00 | 2.58% |
| | Reject: | 1 | 50.00% | $5,284,333.82 | 97.42% |
| **Class 9 (General Unsecured Claims - Celsius Network Inc.)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 1 | 100.00% | $3,325.00 | 100.00% |

---

[12]    *See* Disclosure Statement Order ¶ 16(a).

| Class 10 (State Regulatory Claims) | | | | |
|---|---|---|---|---|
| Accept: | 1 | 100.00% | $29,843,334.00 | 100.00% |
| Reject: | 0 | 0.00% | $0.00 | 0.00% |
| Class 14 (Series B Preferred Interests) | | | | |
| | Count | % | Shares | % |
| Accept: | 7 | 98.34% | 29,585 | 98.34% |
| Reject: | 1 | 12.50% | 500 | 1.66% |

23.     The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on October 2, 2023, at 2:00 p.m. (prevailing Eastern Time).  Concurrently with this Memorandum, the Debtors have submitted the proposed *Order Confirming the Modified Joint Plan of Celsius Network LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order").

## II.    The Restructuring Transactions.

24.     The terms of the Plan provide a clear pathway to emergence. The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.

25.     Certain key terms of the Plan include:[13]

- **Retail Borrower Deposit Claims**.[14]  Each Holder of an Allowed Retail Borrower Deposit Claim shall receive:

  Repayment Election:  If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail

---

[13]    Each description of the Plan or the Disclosure Statement herein is qualified in its entirety by the terms of the Plan and the Disclosure Statement, as applicable.

[14]    In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment).  Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

*or*

Set Off Treatment:  If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

*plus*

(ii) On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock). Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **Convenience Claims**.  Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

- **General Earn Claims**.  Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Custody Claims**.[15]  For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order:  Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in the Disclosure Statement, one of two treatments:

  Treatment A:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim provided that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.

  Treatment B:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Court following notice and a hearing.  To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

  For Custody Settlement Participants:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; provided that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; provided, further, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan.

- **Withdrawable Custody Claims**.  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed

---

[15]  Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, **not** a percentage of the value of their General Custody Claims as of the Petition Date.

Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

- **Withhold Claims**.[16] Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

  Treatment A:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  Treatment B:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

  For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

- **Unsecured Loan Claims**.  Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

---

[16] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

- **General Unsecured Claims**.  Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in the Disclosure Statement.

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (d) the Illiquid Recovery Rights.

- **State Regulatory Claims**. Each Holder of an Allowed State Regulatory Claim shall be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided*, *further*, that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code. For the avoidance of doubt, the State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

- ***De Minimis* Claims**.  All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

- **Series B Preferred Interests**.  Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order.

- **Section 510(b) Claims**.[17]  Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

---

[17] The Confirmation Order provides that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any.  The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims.  The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

- **Equitably Subordinated Claims**. Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the litigation of the subordination of the Equitably Subordinated Claims. For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order. Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

### III.    The Objections.

26.    The Debtors received twelve formal objections to the Plan, twelve letters (largely from *pro se* creditors), and two reservations of rights that the Debtors are treating as objections to the Plan (collectively, the "Objections"), as summarized and defined in the objection chart attached hereto as **Exhibit A** (the "Objection Tracker"). The Debtors also received informal comments from numerous counterparties, including the U.S. Trustee, regulators and other governmental parties, ad hoc groups, and individual creditors, among others.

27.    The Debtors have worked with objecting parties to resolve as many Objections as possible, and as of the date hereof, the Debtors have resolved the majority of Objections.[18] The Objections have been resolved by stipulating to or including certain language in the Confirmation Order, and/or the amended Plan, as more fully set forth in the Objection Tracker.

28.    Compared to the objections that the Debtors received in the past with respect to other motions filed in these Chapter 11 Cases, including the nearly thirty objections to the Debtors'

---

[18]    The unresolved Objections are as follows:  the 168 Trading Objection, the Pharos Objection, the Bronge Objection, the Schoenau Objection, the Davis Objection, the Ubierna de las Heras Objection, the Securities Plaintiffs Objection, the Schneider Objection, the Phillips Objection, the Cassidy Letter, the First Bohon Letter, the Second Bohon Letter, the First Keeney Letter, the Second Keeney Letter, the First Windom Letter, the Johantgen Letter, the Abruzese Letter, the Truss Letter, the 3541 Letter, the Second Windom Letter, and the Lau Letter.

motion to establish that Earn assets are property of the Debtors' Estates,[19] or the fifteen formal

objections and over twenty letter objections to the approval of the Debtors' Disclosure Statement,[20]

the limited number of Objections to the Confirmation of the Plan is a testament to the Debtors'

efforts—and success—in building consensus since the outset of these Chapter 11 Cases.

29.    Notwithstanding the Objections, the Plan has overwhelming support from the

Holders of Claims and Interests who were entitled to vote.  The transactions contemplated by the

Plan represent a significant achievement for the Debtors and are the direct result of a thorough

marketing process and extensive engagement with many diverse stakeholders.  The Debtors

strongly believe that the Plan represents the best available alternative for all of their stakeholders.

The transactions embodied in the Plan will maximize the value of the Estates and maximize

recoveries to Holders of Claims and Interests.  That the Plan has overwhelming support of the

Debtors' creditor base is a significant achievement and sends the important message that the Plan

can provide a clear path to emergence.

30.    The Debtors continue to work to resolve all outstanding Objections in advance of

the Confirmation Hearing.  To the extent the Debtors are unable to consensually resolve such

Objections prior to the Confirmation Hearing, the Debtors request that the Court overrule such

Objections.  A detailed response to each of the outstanding Objections is set forth in Section VII

of this Memorandum and the Objection Tracker.

---

[19]    *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling") at 13.

[20]    *See Debtors' Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225], Exh. A.

<u>**Argument**</u>

31.    This Memorandum is divided into three parts.  ***First***, the Debtors submit that the amended Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and, therefore the Debtors do not need to resolicit the Plan.  ***Second***, the Debtors present their case in chief that the Plan satisfies all of the applicable requirements of the Bankruptcy Code by a preponderance of the evidence and, accordingly, request that the Court confirm the Plan.  ***Finally***, throughout this Memorandum and in the third part, the Debtors address the Objections and why they should be overruled.

32.    For the reasons set forth herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Court find that the Debtors have satisfied their burden and confirm the Plan.

**IV.    The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.**

33.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[21]  Further, section 1127(a) provides that when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[22]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[23]  Courts

---

[21]    11 U.S.C. § 1127(a).

[22]    *Id.*

[23]    Fed. R. Bankr. P. 3019.

interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated,[24] unless such affected creditors consent to the treatment.[25]

34.    On September 27, 2023, the Debtors filed an amended Plan [Docket No. 3577], which incorporates and reflects certain revisions.  The modifications to the Plan are not material changes.    Rather, they are either modifications to resolve objections to the Plan or permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.  All Holders of Claims and Interests entitled to vote on the Plan are receiving the same recovery under the Plan as amended and filed at [Docket No. 3319].

35.    The Debtors have made the following non-material modifications to the Plan (ordered as they appear in the Plan):

---

[24]    *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013) (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("[N]onmaterial modifications . . . do not require resolicitation of the respective impaired classes of creditors and equity security holders.").

[25]    *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31–32 (Bankr. D. Del. May 13, 2010) (finding that plan modifications that did not adversely affect any creditor other than consenting parties did not require resolicitation); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Pisces Energy, LLC*, Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880, at *10 (Bankr. S.D. Tex. Dec. 21, 2009) (finding that plan modifications that only modified the rights of expressly consenting parties-in-interest did not require resolicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

- ***Deactivation Date Timing and Interaction with CEL Token Settlement***.  The Plan now clarifies the Deactivation Date.  Lastly, the Deactivation Date Cryptocurrency Conversion Table will provide that CEL Token is $0.25.

- ***Distribution Cryptocurrency Conversion Table***.  The Plan now clarifies the application of the Distribution Cryptocurrency Conversion Table, the time period in which such tables must be filed, and how Cryptocurrency prices in such tables will be set following the Effective Date.

- ***Equitably Subordinated Claims***.  The Plan now reflects that litigation regarding the subordination of the Equitably Subordinated Claims is stayed pursuant to the Equitable Subordination Stay Order [Docket No. 3450].

- ***Exculpated Parties***.  The Plan now clarifies that current *and former* financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals are included in the definition of "Exculpated Parties."

- ***Released Parties and Releasing Parties***.  At the request of the SEC, the Plan now clarifies that Holders of *De Minimis* Claims, Section 510(b) Claims, or Other Interests shall not be Released Parties or Releasing Parties unless such parties opt into the Plan's releases.

- ***Withdrawal Preference Exposure***.  In response to an informal request from a stakeholder, the Plan now clarifies that the Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.  Additionally, the Plan clarifies that the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with Account Holders to settle their Withdrawal Preference Exposure.

- ***State Regulatory Claims***.  As a result of negotiations with Holders of State Regulatory Claims, the Plan now clarifies that State Regulatory Claims shall be suspended and shall not receive any distribution so long as the Debtors' Plan becomes effective and is fully administered.  The State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.  In addition, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan regardless of whether or how such Holders have voted on the Plan.

- ***Account Holder Avoidance Action Settlement***.  The Plan now clarifies that the Account Holder Avoidance Action Settlement releases Avoidance Actions against any Account Holder who is not an Excluded Party and who (i) (a) has Withdrawal Preference Exposure less than *or equal to* $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan and that such Holders will receive a 100% recovery on their Allowed General Custody Claim.

- ***Distribution Mechanics***.  The Plan now clarifies that the Debtors will not be the Distribution Agent for distributions to Withhold Claim Holders.  In addition, the Debtors may elect in their reasonable discretion to make distributions in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

- ***NewCo Common Stock***.  The Plan now clarifies that the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor be issued into a trust or similar structure to be held until it is fully and finally distributed to Holders of Allowed Claims as provided in the Plan and in the Transaction Steps Memorandum.  Additionally, pursuant to discussions with the SEC, the Plan now clarifies that only NewCo Common Stock issued in satisfaction, settlement, release, and discharge of Allowed Claims will be issues in reliance upon section 1145.

- ***EIP Awards***.  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Plan Administrator may distribute the EIP Awards after confirming to Committee counsel that the applicable metrics have been satisfied.  The Plan now also clarifies that the KEIP Motion shall be deemed withdrawn with prejudice upon the Effective Date.

- ***Institutional Loans***.  In response to 168 Trading's Objection, the Plan now clarifies that Institutional Loans will be assumed and assigned to NewCo to the extent such Institutional Loans are not Executory Contracts included on the Schedule of Rejected Contracts.

- ***Undeliverable Distributions and Unclaimed Property***.  The Plan now clarifies that Unclaimed Distributions which remain undeliverable for a period of one year after *the first date on which such distributions are open for a particular Holder*, shall revert to the Post-Effective Date Debtors.

- ***Releases and Exculpations***.

  o  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Debtor Release, Third-Party Release, and Exculpation do not release or exculpate any claim or cause of action against any of the Debtors advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).  Further, following negotiations with the U.S. Trustee, the scope of the exculpation provision was narrowed.

  o  As a result of negotiations with the SEC, the Plan now clarifies that only Releasing Parties are restricted from commencing or pursuing a Claim or Cause of Action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties without the Bankruptcy Court's approval and that such restriction applies only to (i) core claims arising from or relating to these Chapter 11 Cases or (ii) Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, Third-Party Release, or Exculpation contained in the Plan.  Further, the Plan now clarifies that the Bankruptcy Court retains sole and exclusive jurisdiction to adjudicate whether a colorable Claim or Cause of Action exists.

- ***Additional Provisions Regarding Governmental Units***.  As a result of continued negotiations with Governmental Units, the Plan now clarifies (i) the NewCo Assets are transferred free and clear or all Claims and Interests arising before the Effective Date, (ii) Governmental Units may exercise their police and regulatory powers against NewCo regarding any post-Effective Date

violations, and (iii) the Debtors and their successors and assigns, other than NewCo, shall not offer or sell securities or provide banking or money services.

- ***Ministerial Edits***.  The Debtors made formatting and grammatical updates where appropriate.

36.    Therefore, the modifications are immaterial or have been consented to after negotiations among consenting parties.  Thus, they comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.[26]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

## V.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

37.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[27]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable nonbankruptcy law.

---

[26]  *See AMR Corp.*, 502 B.R. at 46 (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment."); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. at 301 ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications.  The rules applicable to such modifications should be read and interpreted consistent to that end.") (citations omitted).

[27]  *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (internal footnote omitted).

### A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

38.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[28]   The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[29]   As explained below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as well as other applicable provisions.[30]

### B. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

39.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[31]

---

[28]    11 U.S.C. § 1129(a)(1).

[29]    S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan." (citations omitted)); *In re Simplot*, No. 06-00002 (TLM), 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization).

[30]    *See* Campagna Decl. ¶¶ 10–14.

[31]    11 U.S.C. § 1122(a).

40.     The substantial similarity requirement does not mean that claims or interests within a particular class must be identical or that all similarly situated claims receive the same treatment under a plan.[32]   Indeed, as one court in this district has stated, "a majority of both cases and commentators have rejected the concept that all creditors of equal rank must receive equal treatment."[33]   Courts generally will approve placement of similar claims in different classes, provided that a "rational" or "reasonable" basis exists for doing so.[34]   Recognizing this flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[35]   Courts have identified several grounds justifying the separate classification of claims, including where members of a

---

[32]   *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *In re Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[33]   *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

[34]   *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25-123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[35]   *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

27

particular class possess different legal rights[36] and where the debtors have valid business reasons for separate classification.[37]

41.    The Plan's classification of Claims and Interests, as set forth in Article III therein, satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seventeen (17) separate Classes, with the Claims and Interests in each Class either differing legally and factually from those in other Classes or being grouped separately based on other relevant criteria.  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.    Class 1:  Other Secured Claims;

b.    Class 2:  Retail Borrower Deposit Claims;

c.    Class 3:  Other Priority Claims;

d.    Class 4:  Convenience Claims;

e.    Class 5:  General Earn Claims;

f.    Class 6A:  General Custody Claims;

g.    Class 6B:  Withdrawable Custody Claims;

h.    Class 7:  Withhold Claims;

i.    Class 8:  Unsecured Loan Claims;

j.    Class 9:  General Unsecured Claims;

k.    Class 10:  State Regulatory Claims;

l.    Class 11:  De Minimis Claims;

m.    Class 12:  Intercompany Claims;

---

[36]    *See In re Drexel*, 138 B.R. at 715.

[37]    *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly-situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, WL 2779438, at *3.

n.      Class 13:  Intercompany Interests;

o.      Class 14:  Series B Preferred Interests;

p.      Class 15:  Other Interests;

q.      Class 16:  Section 510(b) Claims; and

r.      Class 17:  Equitably Subordinated Claims.

42.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies Claims and Interests because each Holder of such Claims or Interests may hold or have held rights in the Debtors' Estates legally dissimilar to the rights that Holder of Claims or Interests in other classes may hold or have held or because substantial administrative convenience resulted from such classification. For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).

43.     Account Holder Claims are classified into separate Classes because Account Holders participated in differing Celsius programs with varying rights and obligations, and invested in different products and services pursuant to different contractual terms.  For instance, as has been documented extensively throughout these Chapter 11 Cases, cryptocurrency in Earn Accounts is different than cryptocurrency in Custody Accounts.  As the Court found, pursuant to the applicable Terms of Use, cryptocurrency in the Earn Program belongs to the Debtors' Estates,

whereas cryptocurrency in the Custody Program belongs to customers.[38]  Accordingly, General

Earn Claims are classified separately from Custody Claims under the Plan.  In addition, Withhold

Claims were subject to no Terms of Use at all.  Convenience Claims are classified differently from

other Account Holder Claims because these Claims are so small in amount and large in number as

to make otherwise dealing with them (by classifying them as General Earn Claims, for instance)

burdensome.[39]  General Unsecured Claims are classified differently from other unsecured Claims

because they are structurally different than Administrative Claims, Priority Tax Claims, Other

Priority Claims, Intercompany Claims, Convenience Claims, General Earn Claims, Custody

Claims, Withhold Claims, Retail Borrower Deposit Claims, Unsecured Loan Claims, Section

510(b) Claims, State Regulatory Claims, or Equitably Subordinated Claims, and are comprised

primarily of obligations of the Debtors arising in the ordinary course of business.  Accordingly,

the Debtors respectfully submit that the Plan satisfies section 1122(a) of the Bankruptcy Code.

44.    *Pro se* creditor Johan Bronge ("Mr. Bronge") objects to the Plan on the basis that,

among other things, Retail Borrowers are classified and treated differently from Institutional

Borrowers.[40]  This argument is misguided and should be overruled as further set forth in the

Debtors' response to the Bronge Objection and the several other letters filed regarding similar

issues, *infra* in Section VII of this Memorandum.

C.    **The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.**

45.    Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every

---

[38]    *See* Earn Ruling at 30 (holding that assets in Earn Accounts are property of the Debtors' Estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[39]    *See also* 11 U.S.C. § 1122(b).

[40]    *See generally* Bronge Obj.

chapter 11 plan must satisfy. As detailed below, the Debtors respectfully submit that the Plan satisfies each of these requirements.[41]

46.    ***Designation of Classes of Claims and Interests (§ 1123(a)(1))***. Section 1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions, classes of claims and interests subject to section 1122 of the Bankruptcy Code.[42] Article III of the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(1) of the Bankruptcy Code, and no party has asserted otherwise.

47.    ***Specification of Unimpaired Classes (§ 1123(a)(2))***. Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."[43] Article III.A of the Plan identifies Classes 1, 3, and 6B as Unimpaired and preserves optionality for the Debtors to render Classes 12 and 13 Unimpaired. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

48.    ***Treatment of Impaired Classes (§ 1123(a)(3))***. Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[44] Article III.A of the Plan identifies Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 as Impaired and preserves optionality for the Debtors to render Classes 12

---

[41]    *See* Campagna Decl. ¶¶ 10–33.

[42]    11 U.S.C. § 1123(a)(1).

[43]    11 U.S.C. § 1123(a)(2).

[44]    11 U.S.C. § 1123(a)(3).

and 13 Impaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

49.    ***Equal Treatment Within Classes (§ 1123(a)(4))***.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[45]    Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment.[46] Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

50.    ***Means for Implementation (§ 1123(a)(5))***.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[47]    The Plan satisfies this requirement because Article IV of the Plan provides for, among other provisions, the following means by which the Plan will be implemented:

    a.    Substantive consolidation of the Initial Consolidated Debtors and Celsius Lending LLC and Celsius Networks Lending LLC;[48]

---

[45]    11 U.S.C. § 1123(a)(4).

[46]    *See* Campagna Decl. ¶ 17.

[47]    11 U.S.C. § 1123(a)(5).

[48]    The substantive consolidation of Celsius Network Limited and Celsius Network LLC was previously approved by order of the Court.  *See* [Docket No. 3074].  The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate the Initial Consolidated Debtors with Celsius Lending LLC and Celsius Networks Lending LLC on the same terms, effective as of the Effective Date.

b.      the CEL Token Settlement;[49]

c.      the Account Holder Avoidance Action Settlement;[50]

d.      the Custody Settlement;[51]

e.      the Withhold Settlement;[52]

f.      the Series B Settlement;[53]

g.      the Retail Borrower Settlement;[54]

h.      the Class Claim Settlement;[55]

i.      the consummation of either the NewCo Transaction or the Orderly Wind Down in accordance with the Transaction Steps Memorandum;

j.      the appointment of the Plan Administrator as the sole director and sole officer of the Post-Effective Date Debtors, and who will administer the Post-Effective Date Debtors' estates as further described in the Plan Administrator Agreement;

k.      in the event the NewCo Transaction is consummated, the transfer of assets to NewCo and vesting of assets in the Post-Effective Date Debtors;

l.      in the event the NewCo Transaction is consummated, the issuance and distribution of NewCo Common Stock;

---

[49]   The Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and resubordination.  *See* Plan, Art. IV.B.2.

[50]   The Plan shall effectuate the Account Holder Avoidance Action Settlement.  *See* Plan, Art. IV.B.3.

[51]   The Custody Settlement was previously approved by the Court.  *See* [Docket No. 2291].

[52]   The Withhold Settlement was previously approved by the Court.  *See* [Docket No. 2509].

[53]   The Series B Settlement was previously approved by the Court.  *See* [Docket No. 3074].

[54]   The Plan shall effectuate the Retail Borrower Settlement.  *See* Plan, Art. IV.B.7.

[55]   The Plan shall effectuate the Class Claim Settlement.  *See* Plan, Art. IV.B.8.  The Class Claim Settlement has been approved by the Court [Docket No. 3288], and Account Holders (except with respect to Custody Claims) had an opportunity to opt out of the Class Claim Settlement when voting on the Plan.  As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes opted out of the Class Claim Settlement.  *See* Voting Report ¶ 18.

m.    in the event the Orderly Wind Down is consummated, the funding of distributions from the Wind-Down Assets, which are all of the Debtors' assets and which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement;

n.    in the event the Orderly Wind Down is consummated, the appointment of a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet;

o.    regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the appointment of a Litigation Administrator to prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans;

p.    regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of a segregated Litigation Recovery Account funded with the Initial Litigation Amount and controlled by the Litigation Administrator(s);

q.    regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of the Litigation Oversight Committee;

r.    the contribution of Contributed Claims;

s.    the cancellation of all notes, instruments, certificates, and other documents;

t.    the authorization, approval, and ratification of all actions contemplated by the Plan without any further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable;

u.    the creation of the NewCo Board and the appointment of such directors in accordance with the terms of the Plan;

v.    the adoption and implementation of the Emergence Incentive Plan and the grant of awards thereunder by the

Debtors or Post-Effective Date Debtors on the Effective
Date in connection with Consummation;

w.    to the extent the Debtors are required to use the Celsius
platform to make distributions of Cryptocurrency, the
adoption and implementation of the Emergence Retention
Plan and the grant of awards thereunder by the Debtors,
Post-Effective Date Debtors, Plan Administrator, and/or
NewCo, as applicable;

x.    the application of section 1146(a) of the Bankruptcy Code to
any transfers of property under the Plan (including the
Restructuring Transactions) or pursuant to certain other
actions; and

y.    the preservation of Causes of Action by the Post-Effective
Date Debtors and the enforcement thereof by the Litigation
Administrator(s) (with respect to Recovery Causes of
Action) or the Plan Administrator (with respect to all other
Causes of Action).

51.    The precise terms governing the execution of these transactions are set forth in
greater detail in the applicable Definitive Documents or forms of agreements included in the Plan
Supplement.    Accordingly, the Debtors respectfully submit that the Plan, together with the
documents and forms of agreement included in the Plan Supplement,[56] satisfies section 1123(a)(5)
of the Bankruptcy Code.

52.    ***Issuance of Non-Voting Securities (§ 1123(a)(6))***.    Section 1123(a)(6) of the
Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of
non-voting equity securities and an appropriate division of voting power among the classes of
securities in the reorganized debtor's corporate charter.[57]    Here, the New Organizational

---

[56]    The Plan Supplement was filed on July 28, 2023 [Docket No. 3115] (the "First Plan Supplement"), August 13,
2023 [Docket No. 3273], September 8, 2023 [Docket No. 3444] (the "Third Plan Supplement"), September 15,
2023 [Docket No. 3483], September 23, 2023 [Docket No. 3550], and September 27, 2023 [Docket No. 3583].

[57]    11 U.S.C. § 1123(a)(6).

Documents prohibit the issuance of non-voting securities.[58]  Accordingly, the Debtors respectfully

submit that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code[, and no party has asserted

otherwise].

53.    ***Directors and Officers (§ 1123(a)(7))***.  Section 1123(a)(7) of the Bankruptcy Code

requires that plan provisions with respect to the manner of selecting of any director, officer, or

trustee, or any other successor thereto, be "consistent with the interests of creditors and equity

security holders and with public policy."[59]  The Plan identifies the manner in which members of

NewCo's New Board will be selected, and the identities of such new members have been

disclosed.[60]  The identities of the Plan Administrator, Litigation Administrator, and members of

the Litigation Oversight Committee have also been disclosed.[61]  The selection of the initial

directors of NewCo was, is, and will be consistent with the interests of Holders of Claims and

Interests and public policy.  Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy

Code.

54.    The Phillips Objection argues that the Committee has improperly nominated and

advocated for certain directors.  The Committee is responding to the Phillips Objection and the

Debtors incorporate the Committee's arguments made in such response by reference.

**D.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the
Bankruptcy Code.**

55.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions

that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the

---

[58]    *See* Third Plan Supp., Exh. A ¶ 5.

[59]    11 U.S.C. § 1123(a)(7).

[60]    *See* Plan, Art. IV.D.7; Third Plan Supp., Exh. B.

[61]    *See* Plan, Art. IV.F., Art. IV.G, Third Plan Supp., Exh. F, Exh. G.

Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11 of the Bankruptcy Code.[62]

56.    The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Pursuant to Article III of the Plan, Classes 1, 3, and 6B are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes.  On the other hand, Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[63]  Classes 12 and 13 are either Impaired or Unimpaired, based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as

---

[62]    11 U.S.C. § 1123(b)(1)–(3), (6).

[63]    *Id.*

applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

57.      Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.[64]  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(b) of the Bankruptcy Code.

**1.      The Debtor Release Is Appropriate and Complies With the Bankruptcy Code.**

58.      Article VIII.C of the Plan provides for releases by the Debtors of claims and causes of action against the Released Parties[65] (the "<u>Debtor Release</u>").  The Debtors will release the Released Parties from any and all claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these

---

[64]      *See* Ferraro Decl. ¶ 10.

[65]      Pursuant to the Plan, "<u>Released Parties</u>" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party.  Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided, further,* that, notwithstanding anything to the contrary in the Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided, further,* that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.  For the avoidance of doubt, any Holder of a State Regulatory Claim, *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.  *See* Plan, Art. I.A.206. The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

Chapter 11 Cases and related implementation of the Plan and related documents, **with several**
**important exceptions**.  For example, the Debtors are not proposing to release (a) any Cause of
Action included in the Schedule of Retained Causes of Action or any Cause of Action under the
Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and
Mr. Cohen-Pavon, among others), (b) any Avoidance Action not released pursuant to the Account
Holder Avoidance Action Settlement, or (c) any claims or causes of action against any of the
Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to
timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No.
22-10943 (Bankr. S.D.N.Y.) (MEW).[66]

59.    For the reasons discussed herein, the Debtor Release is the product of arm's-length
negotiations, was critical to obtaining support for the Plan from various constituencies, and is in
the best interests of the Estates.  Indeed, the Debtor Release was negotiated in connection with the
other terms of the Plan and is an indispensable component to achieving final resolution of potential
disputes, in exceedingly complex Chapter 11 Cases, that would otherwise extend and negatively
affect these Chapter 11 Cases and the recoveries available to Account Holders and other creditors.

60.    It is well-settled that a debtor is authorized to settle or release its claims in a
chapter 11 plan.[67]  Such releases are granted by courts in the Second Circuit where they are in the
"best interests of the estate."[68]  In determining whether such a release is within the best interests
of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each]

---

[66]  *See* Plan, Art. VIII.C.

[67]  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor
may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's
release of its own claims is permissible).

[68]  *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's
plan, courts consider whether such releases are in the best interest of the estate." (citation omitted)).

dispute" and "the settlement need not be the best that the debtor could have obtained."[69] Under this standard, the "court should instead 'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[70] Courts in the Second Circuit consider the following factors to determine whether a settlement is within the range of reasonableness: (a) the balance between the claim's possibility of success and the settlement's benefits; (b) the likelihood of complex and protracted litigation, including attendant expense, inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties support the settlement; (e) the nature and breadth of releases; (f) the competency and experience of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement; and (g) the extent to which the settlement is the product of arm's-length bargaining.[71]

61.     Here, the Debtor Release is a vital component of the Plan, particularly for Account Holders, and constitutes a sound exercise of the Debtors' business judgment. The Released Parties played an integral role in the development of the Plan and have expended significant time and resources resolving the complex issues in these Chapter 11 Cases to enable the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as quickly as possible. Over the course of the past year, as the Debtors, the Committee, various ad hoc groups, the Series B Holders, and *pro se* creditors negotiated multiple settlements and litigated numerous legal issues, many of which were questions of first impression, it became apparent that the Debtor Release would be an important part of providing closure to these challenging Chapter 11 Cases and a necessary condition of the consummation of the Restructuring Transactions embodied in the

---

[69]    *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[70]    *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

[71]    *Id.* (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

Plan.[72]  Without the Debtor Release, the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Plan, and the Debtor Release provides finality to parties in interest.  Losing the participation of the Released Parties on the eve of confirmation would threaten the viability of the Plan, including eliminating the Debtors' ability to make in-kind distributions and hindering the Debtors' chances of success in consummating the NewCo Transaction.

62.      The Debtor Release was also developed following extensive investigations and is supported by the Committee.  Specifically, during these Chapter 11 Cases, there were numerous investigations into the conduct of the Debtors and their current and former officers, directors, and employees, including internal investigations led by the Special Committee, an investigation by the Committee, an investigation by the Examiner resulting in a lengthy public report, and numerous investigations by state and federal governmental entities.  All of those investigations were considered and taken into account in forming the Debtor Release, and the Schedule of Excluded Parties that includes individuals who the Debtors or the Committee determined should not be released.  That is, the robust process run by the Debtors in close consultation with the Committee further demonstrates that the Debtor Release is appropriate and reasonable.

63.      Significantly, the Debtor Release includes releases granted pursuant to the Account Holder Avoidance Action Settlement.  In other words, the Debtor Release allows the Debtors to release Account Holders from potential preference actions if the Account Holders accept the Account Holder Avoidance Action Settlement, and therefore provides closure and comfort to Account Holders, who have consistently expressed concern over preference actions and for whom these Chapter 11 Cases have been particularly challenging.  In addition, Account Holders who

---

[72]   *See* Ferraro Decl. ¶ 15.

enter into the Account Holder Avoidance Action Settlement will receive expedited distributions because their distributions will not be held back while any preference litigation remains unresolved.  In consideration for releasing Account Holders from potential preference actions, the Debtors will receive mutual releases from potential claims and causes of action against the Debtors and, if applicable, payments from Account Holders to settle their Withdrawal Preference Exposure.[73]  Specifically, Account Holders with a Withdrawal Preference Exposure of more than $100,000 are required to make a payment to the Debtors of 27.5% of their total Withdrawal Preference Exposure no later than fourteen days prior to the anticipated Effective Date of the Plan.[74]  Such payments will benefit the creditor body as a whole because they will increase the amount available for distribution to creditors from the Debtors' Estates without the need for costly and uncertain litigation.

64.    In consideration for the Debtor Release generally, the Debtors and their Estates will receive mutual releases from potential claims and causes of action of each Releasing Party.[75] Simply put, the Debtors do not believe that the benefits that could be obtained by pursuing causes of action against any of the Released Parties would justify the risk, expense, and delay of pursuing any such causes of action as compared to the results and benefits achieved under the Plan.  The Debtor Release avoids further delay in consummating the Plan following a challenging year after

---

[73]  *See generally* Plan, Art. IV.B.3.

[74]  *See id.*

[75]  Pursuant to the Plan, "Releasing Party" means each of the following, solely in its capacity as such: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). *See* Plan, Art. I.A.202.  The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

the Petition Date, and therefore the inclusion of the Debtor Release is worthwhile and inures to the

benefit of all the Debtors' stakeholders. For these reasons, the Debtors' agreement to provide the

Debtor Release constitutes a sound exercise of the Debtors' business judgment.[76] Accordingly,

there is ample justification for providing the Debtor Release, and it should be approved.

65.    The Debtors have modified the Debtor Release in response to the Ubierna

Objection and informal comments from the U.S. Trustee. Specifically, the Debtors have added a

paragraph to the Debtor Release (and the Exculpation provision) stating that "[n]otwithstanding

anything contained [in the Plan] to the contrary, nothing in the Plan or Confirmation Order shall

release or exculpate any claims or causes of action against any of the Debtors' advisors arising out

of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim

against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.)

(MEW)."[77]

## 2. The Third-Party Release Is Wholly Consensual and Should Be Approved.

66.    Article VIII.D of the Plan includes a consensual third-party release among the

Debtors and the Releasing Parties[78] (the "Third-Party Release"). Courts in the Second Circuit have

explained that a *consensual* third-party release may be approved with the consent of the affected

---

[76]    *See* Ferraro Decl. ¶ 18.

[77]    *See* Plan, Art. VIII.C, VIII.E.

[78]    Pursuant to the Plan, "Releasing Parties" means each of the following, solely in its capacity as such: (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f). For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

party.[79]  Consistent with this instruction, courts in this jurisdiction have held that "[r]eleases can

be granted by consent and that consent can be established by a vote in favor of the plan, at least

where the consequences are plainly and unambiguously expressed to the voting creditor,"[80] and

regularly approve third party releases such as those contained in the Plan on the grounds that such

releases are consensual.[81]  Courts generally agree that an affirmative vote to accept a plan that

contains a third-party release constitutes an express consent to such release.[82]

67.     Here, the Third-Party Release under the Plan provides, in sum, that the Releasing

Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not

affirmatively opt out of the Plan's release provisions, will release the Released Parties from any

---

[79]   *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Adelphia*, 368 B.R. at 268 ("The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible, and the *Metromedia* court did not quarrel with that view." (citation and footnote omitted)); *In re Spiegel, Inc.*, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (holding that nondebtor releases are tolerated if the creditors consent (citing *Metromedia*, 416 F.3d at 142)), *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008); *In re Oneida*, 351 B.R. at 94 (approving consensual release provisions (citing *Metromedia*, 416 F.3d at 142)).

[80]   *See, e.g.*, *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) Hr'g Tr. 62:16-19; *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (granting third-party release with respect to affected parties that consented to the releases by voting in favor of the plan); *In re Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan. 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and, therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties); *In re Lear Corp.*, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible); *In re Calpine Corp.*, No. 05-60200 (BRL), WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).

[81]   *See In re Chassix Holdings, Inc.,* 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases."); *In re MPM Silicones*, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (citing *Metromedia*, 416 F.3d at 141)*; see also Genco*, 513 B.R. at 271*; In re Chemtura Corp.,* 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010).

[82]   *E.g.*, *In re SunEdison, Inc.*, No. 16-10992 (SMB), 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (collecting cases).

and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, *with several important exceptions*. For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[83]

68.    Sensitive to the fact that the majority of the Debtors' creditors are Account Holders with limited prior exposure to chapter 11, the Debtors included a robust and clear explanation of releases in the Disclosure Statement. Ten pages long, the explanation on releases (and exculpations and injunctions) starts with first principles about what a release means in plain English, and includes an exact duplication of this provision, among others, in conspicuous, bold-faced type. The Confirmation Hearing Notice, Ballots, and other Solicitation Package materials distributed to Holders of Claims and Interests entitled to vote on the Plan also included an exact duplication of the release, and the Ballots clearly informed Holders of Claims and Interests entitled to vote on the Plan of the steps they should take if they decided to opt out of the Third-Party Release. Holders who abstained from voting or voted to reject the Plan therefore had the opportunity to opt out of the Third-Party Release. In addition, Holders of Claims presumed to accept the Plan received a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot, which also reproduced the release in full and provided instructions for opting out of the Third-Party Release. As a settlement with the SEC, the Debtors also agreed to revise the Plan to

---

[83]    *See* Plan, Art. VIII.D.

have the release be "opt in" for classes deemed to reject the Plan. As a result, Holders of Claims and Interests deemed to reject the Plan received a Non-Voting Notice for Holders Deemed to Reject, which also reproduced the release in full and provided instructions for opting into the Third-Party Release.

69.    As such, affected parties were on notice of the Third-Party Release. By voting to accept the Plan or opting into the Third-Party Release, these parties have unambiguously consented to the releases and such releases are clearly consensual. Courts in this District have approved third-party releases as consensual where a plan provided for a third-party release, but the affected parties were afforded the opportunity to opt out of providing such release.[84] In *Ditech*, this Court held that "parties that did not return a ballot and failed to opt-out of the Third Party Releases are deemed to consent to the Third Party Releases."[85] The opt-out mechanism is therefore sufficient to demonstrate consent.[86] The Notice of Non-Voting Status and Ballots clearly explained the process by which a creditor must opt out or opt in to the Third-Party Release and the implications for failing to abide by these instructions. Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is

---

[84]    *See e.g. In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1359] ¶ MM (approving third-party release that contained opt out); *In re Tricom, S.A.*, No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009), Order Confirming First Modified Second Amended Prepackaged Joint Chapter 11 Plan of Reorganization For Tricom S.A. and its Affiliated Debtors (As Modified) [Docket No. 568] ¶ K (approving, as consensual, third-party releases where voting parties were afforded the option to opt out).

[85]    *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019).

[86]    *See In re Avianca*, 632 B.R. 124, 136–37 (Bankr. S.D.N.Y. 2021).

sufficient to demonstrate cause.[87]  Finally, the Third-Party Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.

70.     In addition, as set forth in the Voting Report, 0.13% (504) in number, which is equivalent to 2.31% ($110,836,665.39), of Holders of Claims or Interests in the Voting Classes affirmatively opted out of the Third-Party Release.[88]  Furthermore, 1.78% (9) in number, which is equivalent to 0.09% ($36,871.63) in dollar amount, of Holders of Unimpaired, Unclassified, and Disputed Claims who received the Non-Voting Packages affirmatively opted out of the Third-Party Release, while 0.26% (567) in number, which is equivalent to 0.31% ($914.70) in dollar amount, of Holders of Impaired Claims or Interests who received the Non-Voting Packages opted into the Third-Party Release.[89]

71.     The U.S. Trustee Objection argues that the releases are "over broad" without providing further specifics,[90] merely repeating by incorporation its objection to the Disclosure Statement,[91] where it misinterpreted the releases in the Plan as nonconsensual third-party releases and argued that the Debtors fail to comply with the (inapplicable) legal standard for nonconsensual releases set forth in *Metromedia* and *Purdue Pharmaceuticals*.  As the Debtors emphasized above and in their omnibus reply to objections to the Disclosure Statement,[92] which is incorporated herein

---

[87]  *See id.* at 137.

[88]  *See* Voting Report ¶ 19.

[89]  *See id.*

[90]  *See* U.S. Trustee Obj. at 1–2.  The Ubierna de las Heras Objection makes the same general argument.  *See* Ubierna de las Heras Objection at 2.

[91]  *See Objection of the United States Trustee to Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3182] (the "U.S. Trustee DS Objection").

[92]  *See Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225].

by reference, the Third-Party Releases are consensual, providing for a typical "opt out" mechanism (other than with respect to those parties who are "deemed to reject" and must opt in to the third-party releases)[93] for all creditors that are presumed to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan, which is sufficient to demonstrate consent and is consistent with this Court's previous rulings approving third-party releases.[94] In the Second Circuit, where third-party releases are consensual, such as these are here, after proper notice and absent objection, "courts generally approve them unless they are truly overreaching on their face."[95]

a.    **The Released Parties Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

72.    Further, the Third-Party Release is an important component of the Plan and represents the result of a complicated, yearlong effort among multiple diverse constituencies to bring these Chapter 11 Cases to closure. As with the Debtor Release, each Released Party has made a substantial contribution to the development of the NewCo Transaction and the Orderly Wind Down justifying their release.

73.    The Released Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release, including, among other things, the following: (a) the Special Committee has been instrumental in advancing investigations into the Debtors' prepetition conduct and cooperating with similar third-party investigations; (b)

---

[93]    The Notice of Non-Voting Status and Ballots sent to such creditors **clearly** explained the process by which a creditor had to opt out or opt in to the third-party releases and the implications for failing to abide by these instructions. Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is sufficient to demonstrate consent. *See In re Avianca*, 632 B.R. at 137.

[94]    *See In re Avianca Holdings S.A.*, 632 B.R. at 136–37 ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure . . . . the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.").

[95]    *See id.* at 133. The Debtors respond to the remaining Objections to the Third-Party Release in the Objection Tracker.

the Committee has avidly represented the interests of the large body of unsecured creditors, namely

Account Holders, from the day that it was appointed in July 2022,[96] and has been fully engaged in

essentially *all* of the major developments, settlements, and litigations of these Chapter 11 Cases;

(c) the Retail Borrower Ad Hoc Group and its members and the Earn Ad Hoc Group and its

members participated in a three-day mediation in July 2023 before the Honorable Judge Michael

E. Wiles of the United States Bankruptcy Court for the Southern District of New York to resolve

outstanding issues regarding the treatment of Earn creditors and Borrow creditors, ultimately

leading to the amendment of the Plan and revised treatment of General Earn Claims and Retail

Borrower Deposit Claims, as well as the Class Claim Settlement, which inured to the benefit of all

Account Holders; (d) the Initial Series B Preferred Holders and their Related Parties are Released

Parties because of their participation in the negotiation of the Series B Settlement, one of the last

issues resolved in these Chapter 11 Cases before commencing solicitation of the Plan[97]; (e) the

majority of the foregoing parties were also instrumental in guiding the negotiation of the Plan, the

selection of the Stalking Horse Bidder, and the Auction.  As Bidders, the Plan Sponsor (the

Fahrenheit Group) and the BRIC Parties were core participants who made the Auction, as well as

the subsequent finalization of the Restructuring Transactions and the Backup Bid, the success that

it was; (f) Christopher Ferraro is a Released Party in acknowledgement of the significant

responsibility he has taken on—and extraordinary leadership he has provided—in the past year as

the Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of

the Debtors in a tumultuous environment; (g) finally, significant work will remain once the Plan

is Confirmed and the Restructuring Transactions must be implemented.  The Distribution Agent,

---

[96]  *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 241].

[97]  *See* Series B Settlement Order [Docket No. 3074].

the Plan Administrator, the Litigation Administrator, and (in the event the NewCo Transaction is consummated) NewCo and its directors and officers, will have crucial roles and take on significant responsibility to ensure that everything contemplated by the Plan occurs. Although these Entities will only begin their work after Confirmation, their contributions will be critical to the success of the Plan.

74.    Without the substantial contributions and concessions by the Released Parties, the Debtors' value-maximizing restructuring contemplated by the Plan would not be possible. The Released Parties share the common goal of effectuating a successful reorganization. Courts in this district have approved third-party releases under similar circumstances.[98]

> **b.    The Debtors' and Other Released Parties' Respective Officers, Directors, Advisors, and Other Representatives and Agents Have Made Substantial Contributions to the Debtors' Restructuring Efforts.**

75.    Finally, the remaining Released Parties include the Released Parties' current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, any Releasing Party, and, pursuant to the Schedule of Released and Exculpated

---

[98]    *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re LATAM Airlines Group S.A.*, WL 2541298 at *48 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022); *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Jason Industries*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020); *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020); *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016); *In re Legend Parent Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014).

Parties filed as part of the Plan Supplement,[99] each individual who was employed by the Debtors

on the date the Disclosure Statement Order was entered[100] to the extent that each such employee

is not:  (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his

or her role with the Debtors, in which case any release provided by the Plan shall be null and void

with respect to such employee and all statutes of limitations shall be tolled during such time;

(2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.

76.    Although the majority of the Debtors' operations have been paused since the

Petition Date, the Debtors' employees have been instrumental in pushing these Chapter 11 Cases

forward——no small feat considering that the Debtors have also experienced significant reductions

in force.  As a general matter, the employees have provided the Debtors' advisors their extensive

industry knowledge, which was crucial in light of the novel legal and factual issues raised by

cryptocurrency.  Further, employees proved instrumental in the resolution and litigation of the core

issues of these Chapter 11 Cases, including the briefing and trials related to Earn, Custody, and

Withhold assets, and the negotiation of the related settlements, among other issues, by providing

the Debtors' advisors their deep understanding of Company operations.  Throughout the weeks'-

long Auction process, the employees also worked with the Debtors' advisors to evaluate and

improve the Bids.  Finally, the consummation of the NewCo Transaction or the Orderly Wind

Down cannot occur without the efforts of the Debtors' employees, and as such, these employees

have made and will continue to make indispensable contributions to the successful reorganization

of the Debtors.

---

[99]    *See* First Plan Supp., Exh. A.

[100]    The Disclosure Statement Order [Docket No. 3337] was entered on August 17, 2023.

77.     Ultimately, the Third-Party Release is reasonable under the circumstances of these Chapter 11 Cases and follows well-established precedent in this district regarding opt-out provisions and scope.  Accordingly, the Debtors respectfully submit that the Court should approve the Third-Party Release.[101]

### 3.     The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code.

78.     Article VIII.F of the Plan sets forth an exculpation provision exculpating the Exculpated Parties[102] from enumerated claims (the "Exculpation") between the Petition Date and the Effective Date arising in relation to the Chapter 11 Cases.  Furthermore, the Exculpated Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.  Notably, following the U.S. Trustee's objection to the Disclosure Statement, and to address the U.S. Trustee's argument that the Exculpation provision should be expressly limited to acts or omissions during these Chapter 11 Cases, the Debtors modified the Exculpation provision to make clearer that it applies solely to actions taken from the

---

[101]     *See* Ferraro Decl. ¶ 25.

[102]     Pursuant to the Plan, "Exculpated Party" means, each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.  *See* Plan, Art. I.A.110.

Petition Date through the Effective Date.[103]   The Debtors also removed the "release" language from the Exculpation provision to address comments from the U.S. Trustee.

79.    Courts in the Second Circuit evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.[104]   Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[105]   A bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[106]   Once the court makes this good-faith finding, it is appropriate to provide a standard of care for the parties involved in the negotiation and formulation of that chapter 11 plan.[107]   Exculpation provisions, therefore, prevent future collateral attacks against a court's good-faith finding.

---

[103]    *See* Plan, Art. VIII.E.

[104]    *See In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Enron Corp.*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. Oct 31, 2003) (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *see also In re Drexel Burnham*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where the beneficiaries made significant contributions and expected an exculpation provision would be included in the plan).

[105]    *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to:  how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[106]    11 U.S.C. § 1129(a)(3).

[107]    *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'" (citation omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties.").

80.     Here, the Exculpation provision is an integral part of the Plan and satisfies the governing standards in the Second Circuit.  The Exculpation provision provides necessary and customary protections to those parties in interest (whether Estate fiduciaries or otherwise) whose efforts were, and continue to be, vital to formulating and implementing the Plan, which has garnered overwhelming support from the Debtors' voting creditors, including Account Holders. As noted throughout this Memorandum, these Chapter 11 Cases have been extraordinarily complex due to their nearly unprecedented nature, involving as they have novel legal and factual cryptocurrency-related issues, challenging settlement negotiations, and a variety of stakeholders, including vocal *pro se* creditors, with different and competing interests.

81.     The Plan and the Restructuring Transactions contemplated therein are the product of a year's-long legal and business process.  First—before they could contemplate the contours of a reimagined, regulatorily compliant cryptocurrency company—the Debtors and their stakeholders had to resolve threshold issues to determine who owned the cryptocurrency assets in the Debtors' possession and what the Debtors would ultimately be able to distribute to their creditors.  In the second phase of the Chapter 11 Cases, the Debtors negotiated the foundational elements of their envisioned reorganization by entering, first, into an agreement with NovaWulf to sponsor the Debtors' reorganization as the Stalking Horse Bidder and, second, conducting a competitive Auction process and secure improved Bids.[108]  Once the core aspects of the Restructuring Transactions with the Fahrenheit Group as Plan Sponsor were finalized, the Debtors focused on reaching consensual resolutions of contentious issues with other stakeholders such as the Series B Holders, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group.  In parallel, the Debtors cooperated with federal criminal and civil investigations into the Debtors' prepetition conduct, and

---

[108]     *See* Kielty Decl. ¶¶ 7–8.

the Debtors worked closely with government regulators to ensure that any contemplated cryptocurrency reorganization could be fully compliant. Finally, throughout these Chapter 11 Cases, the Debtors also worked hard to gain the trust of their creditor body; the voting results speak to the Debtors' success on that point. In light of the complex nature of these Chapter 11 Cases, it should not be controversial to state that the protections afforded by the Exculpation provision are necessary here, and that they should apply for the full life of these Chapter 11 Cases. Ultimately, the Exculpation provision provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring.

82.     In the Second Circuit, exculpation provisions that cover non-estate fiduciaries are approved regularly.[109]   In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating

---

[109]   *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re Frontier Communications Corp.*, No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re LATAM Airlines Group S.A.*, WL 2541298 at *49 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the chapter 11 cases . . . or the filing of the Restructuring Support Agreement and related prepetition transactions"); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010), [Docket No. 559] (approving exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with, or arising out of, the chapter 11 cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan…the Plan, [or] the Disclosure Statement"); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of controlling shareholder as well as estate fiduciaries); *In re Enron Corp.*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the chapter 11 cases").

the plan and bringing it to fruition, and whether the provision is integral to the plan.[110]   Where a

court finds that a plan has been proposed in good faith and meets the other requirements of

confirmation, approval of an exculpation provision is appropriate.[111]

83.    Here, the Debtors propose to exculpate the Exculpated Parties, which include

non-Estate fiduciaries, because the contributions and concessions of the Exculpated Parties have

made the Plan possible.   Such exculpation provisions are routinely approved in plans of

reorganization in cases similar to these Chapter 11 Cases,[112] which could not have progressed as

---

[110]    *E.g.*, *In re BearingPoint, Inc*., 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc*., WL 23861928, at *28 (Bankr. S.D.N.Y. 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[111]    *See In re WorldCom, Inc*., WL 23861928, at *28.

[112]    *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Mar. 28, 2017) [Docket No. 39]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *In re Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading up to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtors' restructuring, including, without limitation, the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] (same).

productively absent the significant contributions of the Exculpated Parties.[113]    Their concerted

efforts were instrumental to the restructuring process and the Plan's overwhelming support from

the vast majority of the Debtors' voting creditors and key stakeholders.

84.    The failure to include exculpation provisions in chapter 11 plans would chill the

critical participation of the management and advisors to debtors in possession as well as essential

creditor groups and equity holders working to formulate and negotiate consensual chapter 11 plans.

In light of the bankruptcy policy in favor of consensual chapter 11 plans and the negotiations that

create them, it stands to reason that exculpation provisions are essential to the process and should

be approved.[114]    Further, in light of the carve out for actions or omissions that are the result of bad

faith, actual fraud, willful misconduct, or gross negligence, the standard of care established by the

Exculpation is entirely consistent with and appropriate under applicable law and as a matter of

public policy.[115]

85.    The Debtors respectfully submit that the Court has an ample record before it to

conclude that the Exculpated Parties are entitled to the Exculpation proposed in the Plan and that

the protections afforded therein are reasonable and appropriate.    In short, the Exculpation

represents an integral piece of the overall settlement embodied in the Plan and is the product of

---

[113]    *See* Ferraro Decl. ¶ 28.

[114]    *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization).

[115]    *See, e.g.*, *In re Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision the extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC*, No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

good-faith, arms'-length negotiations, and significant sacrifice by the non-Debtor Exculpated Parties.  The Exculpated Parties played a critical role in formulating the Plan, and the Exculpation provision played a role in bringing these parties to the table.  Failure to include the Exculpation provision could have deterred the Exculpated Parties from collaborating with the Debtors to develop a fully consensual restructuring.[116]  The scope of the Exculpation provision is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring between the Petition Date and the Effective Date, and ultimately inures to the benefit of only those parties that have made similar contributions to the Debtors' restructuring.  Moreover, the scope of the Exculpation itself and the composition of the Exculpated Parties are entirely consistent with established practice in this and other jurisdictions.[117]

86.    As noted with respect to the Debtor Release, the Debtors modified the Debtor Release and the Exculpation provision to provide that the Debtors' advisors would not be released or exculpated with respect to any claims or causes of action relating to the filing of the Debtors' claim in the *Voyager* matter.[118]  The U.S. Trustee Objection repeats the arguments made in its objection to the Disclosure Statement, primarily that the Exculpation provision is "over broad and contain[s] prospective parties and activities."[119]  As the Debtors explained in their omnibus reply

---

[116]    *See, e.g.*, Ferraro Decl., ¶¶ 26–28.

[117]    *See, e.g.*, *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019).

[118]    *See* Plan, Art. VIII.C, VIII.E.

[119]    *See* U.S. Trustee Obj. at 2.  The Ubierna de las Heras Objection makes the same argument.  *See* Ubierna de las Heras Obj. at 2, 6.

to objections to the Disclosure Statement, however, other courts in this district have overruled similar U.S. Trustee objections and approved exculpation provisions that included non-estate fiduciaries.[120]

87.    The U.S. Trustee (repeating by incorporation its prior arguments) and Ubierna de las Heras also argue that the Exculpation provision should include an opt-out mechanism.[121] Neither the U.S. Trustee nor Ubierna de las Heras provide precedent or legal authority for this provision. The entire purpose of an Exculpation provision is to protect parties who acted in good faith during chapter 11 cases under bankruptcy court supervision. There is no basis for an opt out provision for an exculpation, and the U.S. Trustee and Mr. Ubierna de las Heras offer none.

88.    Similarly, the U.S. Trustee's prior request that the Plan's Exculpation provision should carve out claims for legal malpractice must also be overruled.[122] The U.S. Trustee argues that release of claims based on legal malpractice is prohibited by the New York Rules of Professional Conduct.[123] But, as the *LATAM Airlines* court held, there is "no merit" to this U.S. Trustee request because the New York Rules of Professional Conduct "ha[ve] no bearing on the standard of care established" in an exculpation provision.[124]

---

[120]    *See In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("The Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision. They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases . . . the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries . . . based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court").

[121]    *See* U.S. Trustee DS Obj. at 23, Ubierna de las Heras Obj. at 6.

[122]    *See* U.S. Trustee DS Obj. at 26.

[123]    *See id.*

[124]    *LATAM Airlines,* No. 20-11254 (JLG), 2022 WL 2206829, at *50.

89.     Ultimately, exculpation provisions serve an important purpose—they protect deserving parties from other parties who failed to timely assert their rights and who, instead, could attempt to reopen settled litigation through back door methods and thwart the finality and closure provided by the Plan in resolving these Chapter 11 Cases.[125]   In light of the foregoing, the Debtors submit that the Exculpation provision is reasonable and appropriate under the circumstances of these Chapter 11 Cases and respectfully request that the Court approve the Exculpation set forth in Article VIII.F of the Plan.[126]

### 4.     The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.

90.     Pursuant to section 524(a), the injunction provision set forth in Article VIII.G of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions.  In part, the Injunction Provision permanently enjoins all Entities from commencing or continuing any action against the Debtors, the Post-Effective Date Debtors, the Released Parties, or the Exculpated Parties on account of, in connection with, or with respect to any such Claims, Interests, Causes of Action, or liabilities discharged, released, settled, compromised, or exculpated under the Plan.  The Injunction Provision is thus a key provision of the Plan because it is necessary to preserve and enforce the discharge provisions in the Plan, the Debtor Release, the Third-Party Release, and the Exculpation that are central to the Plan and is narrowly tailored

---

[125]   *See In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) Confirmation Hr'g Tr. 116:8-117:8 ("So, I actually think 1125(e) can well apply to third parties who aren't necessarily fiduciaries as long as they're participating in the exchange.  Now here, the people who really participated all sort of are releasing each other, but I guess I appreciate your point that this probably doesn't add anything but I don't think it adds anything in a bad way, either.  I think it's consistent with the statute and the case law and, again, it's to prevent strike suits.  It's to not give anyone a back door and particularly given the fact that the releases themselves say, "to the extent permitted by applicable law", you know, that's a potential loophole that the exculpation closes. . . It's basically to protect that finding that this was good faith so you can't go back and sue some third party who said, you know, you didn't act in good faith, because it's already been found.").

[126]   The remaining Objection to the Exculpation provision is the Phillips Objection, to which the Committee is responding.  The Debtors incorporate the Committee's response by reference.

to achieve that purpose.[127]   As such, to the extent the Court finds that the Plan's exculpation and

release provisions are appropriate, the Court should approve the Injunction Provision.[128]

> ### 5.   The CEL Token Settlement, the Account Holder Avoidance Action Settlement, and the Retail Borrower Settlement Comply With the Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors' Good Business Judgment.

91.   Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may

provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."[129]   The Plan provides for the general settlement of all Claims, Interests, Causes of Action,

and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.   The

Plan also provides for approval of the CEL Token Settlement, the Account Holder Avoidance

Action Settlement, and the Retail Borrower Settlement.   A settlement approved through a plan

must be "fair and equitable, and in the best interests of the estate."[130]   It is within the discretion of

---

[127]   *See In re Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[128]   *See Ferraro Decl. ¶ 30.*

[129]   11 U.S.C. § 1123(b)(3)(A).   *See, e.g., In re Ditech*, 606 B.R. at 622 ("A chapter 11 plan may 'provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate.'") (citations omitted); *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'") (citation omitted); *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (recognizing inapplicability of section 1123(b)(3)(A) as authority to settle creditor's claim in plan but considering settlement under Bankruptcy Rule 9019 standards).

[130]   *In re Ditech*, 606 B.R. at 623; *see also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).

the court to determine whether a settlement satisfies those standards.[131]   The court should "accord

proper deference to a debtor's business judgment" when making its determination.[132]

92.     The Second Circuit weighs the following "*Iridium*" factors in determining whether

a proposed settlement is "fair and equitable":

    a.  the balance between the litigation's possibility of success and the
        settlement's future benefits;

    b.  the likelihood of complex and protracted litigation, with its attendant
        expense, inconvenience, and delay, including the difficulty in
        collecting on the judgment;

    c.  the paramount interests of the creditors, including each affected
        class's relative benefits and the degree to which creditors either do
        not object to or affirmatively support the proposed settlement;

    d.  whether other parties in interest support the settlement;

    e.  the competency and experience of counsel supporting, and the
        experience and knowledge of the bankruptcy court judge reviewing,
        the settlement;

    f.  the nature and breadth of releases to be obtained by officers and
        directors; and

    g.  the extent to which the settlement is the product of arm's-length
        bargaining.[133]

93.     Here, the CEL Token Settlement, the Account Holder Avoidance Action

Settlement, the Retail Borrower Settlement, and the general settlement of claims and controversies

---

[131]   *See, e.g.*, *In re Ditech*, 606 B.R. at 623 ("The determination of whether a settlement meets those standards is within the discretion of the court."); *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted); *see also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'") (citations omitted)).

[132]   *In re Ditech*, 606 B.R. at 623.

[133]   *Id.* at 623–24 (*citing Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

are fair and equitable and an exercise of the Debtors' good business judgment and should therefore be approved.

### a.    The CEL Token Settlement Should Be Approved.

94.    The Debtors and the Committee previously briefed the basis for approving the CEL Token Settlement and the application of the *Iridium* factors thereto in the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431] (the "Debtors' CEL Token Brief") and the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues With Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] (the "Committee's CEL Token Brief" and together with the Debtors' CEL Token Brief, the "CEL Token Briefs"), respectively, and such briefs are incorporated herein by reference.  This section supplements the arguments contained in the CEL Token Briefs by briefly reiterating how the *Iridium* factors support approval of the CEL Token Settlement addressing the voting results and the two objections filed to the settlement, which reinforce the Debtors' and the Committee's position and further demonstrate that the CEL Token Settlement should be approved.[134]

95.    The CEL Token Settlement proposed by the Plan provides that all Claims and Causes of Action arising out of or related to the CEL Token for, among other things, recharacterization and subordination, will be settled pursuant to the following terms:  (i) first, except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token, and shall otherwise receive the treatment associated with the program in which they were deployed; and (ii) second, all Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or

---

[134]    *See generally* Davis Obj.; Lau Letter (arguing that a $0.25 valuation of CEL Token is unfair).

Article III.B.17 of the Plan, as applicable.[135]  In addition, the settlement of issues relating to CEL

Token in the Plan includes that all Other CEL Token Claims are classified as Class 15

Section 510(b) Claims (which will not receive any distribution under the Plan).[136]  The *Iridium*

factors weigh in favor of approving the CEL Token Settlement.

96.    ***First***, the *Iridium* factor weighing the balance between a litigation's possibility of

success and the settlement's future benefits weighs heavily in favor of approving the CEL Token

Settlement.  Certain Holders of CEL Token believe that the proper value of CEL Token is its

apparent market price of $0.81 per CEL Token on the Petition Date.[137]  In comparison, the Debtors

and the Committee strongly believe that the value of CEL Token on the Petition Date is not

appropriate due to, among other things, market manipulation of the CEL Token price, and believe

that CEL Token may be worth as little as $0.00.  For example, the price of CEL was extensively

manipulated by Celsius' prepetition management.[138]  As the Debtors described in the Disclosure

Statement,[139] federal prosecutors charged Alexander Mashinsky, the Debtors' founder and former

---

[135]    *See* Plan, Art. IV.B.2.

[136]    *Id.*  "Other CEL Token Claim" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token.  *Id.*, Art I.A.166.

[137]    *See* CEL Token Brief ¶¶ 8–15 (summarizing the CEL Token valuation disputes, including those in connection with the motions filed by creditors Santos Caceres and Sean StJohn and approval of the Disclosure Statement).

[138]    *See, e.g.*, *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435] (the "Ferraro CEL Token Declaration") ¶ 22 (confirming that "Celsius' buyback strategies included placing standing purchase orders to protect the price of CEL Token from decreasing in the event that market prices dropped," that "Celsius also coordinated buybacks to occur contemporaneously with Celsius' 'Ask Mashinsky Anything' online Q&A sessions to increase consumer confidence and demand," and that "[i]n total, Celsius repurchased over 195 million CEL Tokens for over $540 million"); *id.* ¶ 26 (concluding that "[i]t is difficult to determine the true value of CEL Token, if any, at any given time, due to the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token").

[139]    *See, e.g.*, Disclosure Statement, Art. III.LL.1.

chief executive officer, and Roni Cohen-Pavon, the former chief revenue officer, with conspiracy,
securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token.
[140] Specifically, federal prosecutors assert that Mr. Mashinsky and Mr. Cohen-Pavon manipulated
the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.[141]
On September 15, 2023, Mr. Cohen-Pavon pleaded guilty to four counts, including fraud,
manipulation of securities prices, and conspiracy.[142]

97.    In addition, because the CEL Token was marketed as a "utility token" for the
Celsius platform, it has no go-forward utility because the Celsius platform will be retired following
the Debtors' emergence from chapter 11 and the completion of distributions,[143] and in any case,
the Debtors are unable to return CEL Token to Account Holders under applicable law.[144] Strong
arguments also exist that CEL Token is an equity security of the Debtors,[145] which would result in

---

[140]  *See Indictment*, *United States v. Mashinsky et al.*, 23-cr-00347-UA (S.D.N.Y. 2023) [ECF No. 1] ¶¶ 78–89; *see also id*, ¶¶ 48–71 (presenting the "CEL manipulation scheme").  As part of the non-prosecution agreement with the federal prosecutors and for the purposes of the prosecution of Mr. Mashinsky and Mr. Cohen-Pavon, Celsius accepted and acknowledged as true a set of facts, including that "the rise in value of the CEL [T]oken was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL [T]oken by taking steps to artificially support the price of CEL." *SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*, 23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] ¶ 11.

[141]  *See id.*

[142]  *See* Bob Van Voris, "Celsius Executive Pleads Guilty, Cooperates Against Mashinsky," Bloomberg Law, September 15, 2023, https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud.

[143]  *See* Ferraro CEL Token Decl. ¶ 26.

[144]  *See* Aug. 14, 2023 Hr'g Tr. 71: 6–12 (The Court: "without a going concern, the CEL Token, it can't be issued.  It can't—you know, Celsius won't exist.").

[145]  *See* Celsius Network, Celsius Network AMA–Ask Mashinsky Anything!, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at 44:40.  *See also* Committee CEL Token Brief ¶¶ 75–76 (analyzing why CEL represents "an interest in the Debtors").

zero recovery on account of CEL Token Deposit Claims pursuant to the absolute priority rule, and

zero recovery on account of Other CEL Token Claims.[146]

98.     Despite these arguments, however, the value of CEL Token remains an open and

disputed issue.  Absent a settlement, the Debtors would likely need to conduct a valuation trial that

would be time-consuming, costly, and there is no certainty that the Debtors would succeed in their

arguments, as further explained below.  This valuation trial could delay distributions to creditors

and lead to a longer stay in chapter 11, which would further increase costs to the Debtors that

would likely far exceed any savings as a result of a judgment valuing CEL Token at $0.00.  The

CEL Token Settlement provides a reasonable compromise that avoids this protracted litigation and

guarantees that Holders of CEL Tokens will receive some recovery on account of their CEL Token

Deposit Claims.[147]   The certainty of the value of CEL Token at this stage in the Chapter 11 Cases

far outweighs the potential benefit to the Debtors' estates of succeeding at trial after months of

costly litigation.

99.     **Second**, the likelihood of complex and protracted litigation also weighs heavily in

favor of the CEL Token Settlement.  The Debtors, the Committee, and various *pro se* creditors are

scheduled to hold, as part of the Confirmation Hearing, a hearing on the valuation of CEL Token

commencing on October 16, 2023.  Valuation is notoriously time-intensive and expensive to

litigate even under straightforward circumstances, and a trial regarding the value of CEL Token

would be particularly complex, in part because what is often the most reliable indicator of value—

---

[146]  *See* 11 U.S.C. § 510(b); the Second Circuit broadly construes section 510(b) of the Bankruptcy Code to
subordinate all claims with a causal connection to the purchase of a security.  *See Rombro v. Dufrayne (In re
Med. Diversified, Inc.)*, 461 F.3d 251, 255–59 (2d Cir. 2006); *Adler v. Lehman Bros. Holdings (In re Lehman
Bros. Holdings)*, 855 F.3d 459, 471 (2d Cir. 2017).

[147]  *See* August 14, 2023 Hr'g Tr. at 55:16–19 (The Court: "if somehow the [CEL Token Settlement was not accepted]
and the Court conducts the valuation and concludes that the petition date, the value of the CEL token was zero,
that would determine what the recovery in the plan would be.").

market price—is no longer reliable due to market manipulation.  The CEL Token Settlement provides an elegant solution that would obviate extensive, expense, inconvenience, and delay attendant with litigation.

100.  ***Third***, the paramount interests of creditors weigh in favor of the CEL Token Settlement because the settlement provides benefits to the Debtors' Estates and, by extension, unsecured creditors.  Notwithstanding objections by a few vocal holders of CEL Token, courts have repeatedly held that even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole."[148]  As discussed above, litigation concerning the value of CEL Token would require the services of specialized experts and would be highly time- and cost-intensive.  While the overwhelming majority (approximately 247,000 out of approximately 259,000, or approximately 95.4%) of accounts that hold CEL Tokens have fewer than 1,000 CEL, only 12 accounts have more than 1,000,000 CEL Tokens.[149] Given the relatively fixed amount of assets available for distribution to creditors, any increase in recovery by one sub-group will necessarily decrease the recoveries by all other creditors. Therefore, as an attempt to avoid the costly CEL Token valuation that would provide meaningful upside only for a small group of creditors, the CEL Token Settlement is in the collective interests of the entire creditor body.

---

[148]  *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

[149]  *See Debtors' CEL Token Brief* ¶ 34.

67

101.    ***Fourth***, creditors and other parties in interest, most notably the Committee, support the CEL Token Settlement.  Following the filing of the CEL Token Briefs, the Debtors completed solicitation of the Plan.  Holders of CEL Token Claims were not separately classified under the Plan, but the Debtors tabulated the votes of CEL Token Holders within each Class to evaluate whether Holders of CEL Token accepted the CEL Token Settlement.  Holders of CEL Token that voted on the Plan overwhelmingly accepted the Plan—98.71% of voting CEL Token Holders in the Voting Classes that submitted Ballots voted to approve the Plan.[150]  These results confirm that the fourth *Iridium* factor (regarding the breadth of support for the settlement) weighs heavily in favor of approving the CEL Token Settlement and bolster the Debtors' and Committee's determination that settling all CEL Token issues as proposed is in the best interests of creditor (in satisfaction of the third *Iridium* factor).[151]

102.    ***Fifth***, the Debtors' and the Committee's counsel expended significant time and effort over the course of the previous year to investigate issues related to CEL Token and arrive at the CEL Token Settlement, including through discussions with parties in interest represented by sophisticated counsel as well as *pro se* creditors.  The ultimate terms of the CEL Token Settlement, as reflected in the Plan ($0.25/CEL, which represents a $0.05/CEL increase from the initial terms) were the result of arms'-length negotiation with certain Holders of CEL Token Deposit Claims.

103.    Only two creditors objected to the CEL Token Settlement.  These creditors believe that CEL Token's proper value is its apparent market price of $0.81 per CEL Token on the Petition Date, or even a higher price, and argue that it is inequitable for CEL Token to receive less than the Petition Date price when all other cryptocurrencies are being valued at their Petition Date prices.

---

[150]    *See* Voting Report ¶ 26.

[151]    *See* Debtors' CEL Token Brief ¶¶ 32–35.

The objections do not even attempt to address the legal arguments set forth in the CEL Token Briefs, which emphasize that CEL Token is potentially entirely valueless as an equity security and/or a utility token with no go-forward utility, and instead argue about the true value of CEL Token. Even further, the objectors' arguments support approval of the CEL Token Settlement by demonstrating the difficulty of ascertaining the true value of CEL Token as of the Petition Date.[152]

104.    The Davis Objection primarily argues that the price of CEL Token was manipulated downwards due to an alleged "naked short" orchestrated by FTX.[153]  While some of Mr. Davis' arguments are plausible on their face (*e.g.*, the Committee has been investigating potential claims against FTX on behalf of the Estates, and the Debtors filed a proof of claim to preserve any such claims), others are completely baseless conspiracies (*e.g.*, the unhinged and unsupported assertion that Christopher Ferraro intentionally facilitated any FTX price manipulation or was orchestrating a coup to unseat Alex Mashinsky as Chief Executive Officer).  Although Mr. Davis references certain internal Slack chats that he argues support his arguments, he is completely misrepresenting those documents, which do not actually bear any resemblance to his gross mischaracterization and misreading of those documents.

105.    While the Davis Objection references downward price pressure, he acknowledges that the price was manipulated upwards between the Pause and the Petition Date.[154]  None of this supports adopting the market price as of the Petition Date as the value of CEL Token.  In fact, the

---

[152] For the avoidance of doubt, the Debtors dispute the allegations in the Davis Objection and will present argument and evidence at the Confirmation Hearing refuting such allegations as appropriate.  In short, the Davis Objection misconstrues certain documents inadvertently produced to Mr. Davis as relevant and damning based solely on their unintentional production.

[153] *See* Davis Obj. at 2–7.

[154] *See id.* at 1–2 ("The vast majority of the **upwards price** action of CEL token between the pause and petition date was due to roughly 15 million illegal naked short positions being closed on FTX"; "doing so pushed the price [of CEL] up from $0.20 to $0.81") (emphasis added; citation omitted)).

Davis Objection illustrates that the value of the CEL Token is highly uncertain and a ripe issue for settlement to avoid value destructive litigation. Indeed, this price manipulation between the Pause and the Petition Date (from approximately $0.20 to approximately $0.81) is one of the key reasons why the Debtors believe that the CEL Token Settlement at $0.25 is reasonable and should be approved.

106.    Ms. Lau's letter also argues that the initial coin offering price is not fair because most creditors did not get to purchase CEL Token at that price.[155] Ms. Lau's proposed solution—that the Debtors value CEL Token at the price at which an individual creditor purchased it[156]—is infeasible and inequitable, given that no other cryptocurrency is valued at the price at the time of purchase or deposit; all cryptocurrencies are being valued at their Petition Date price except for CEL Token, due to the various unique issues and facts associated with the token. In addition to the logistics of tracking what each Holder paid, the Debtors would need to reconcile subsequent CEL Token transactions.

107.    Further, when a claim is disputed, section 502(b) of the Bankruptcy Code provides that its value should be determined as of the filing of the debtor's petition. The arguments in the Lau Letter, however, support an even lower valuation of CEL Token than Petition Date prices. For example, the Lau Letter references purchasing CEL "because [she] believed in Celsius" (suggesting that Ms. Lau viewed CEL Token as reflective of the Debtors' value, like an equity security) and also that "[she] needed [her] CEL [T]okens to maintain [her] platinum status that would allow [her] to maximize [her] earnings through staking," which made purchasing CEL Token "worth it" (ascribing value to the utility aspect of CEL Token, which no longer existed as

---

[155]    Lau Letter at 1.

[156]    *See id.* at 2.

of the Petition Date).[157]   While these arguments support the position that CEL Token should be worth *nothing*, they also demonstrate why the Debtors and Committee determined to offer some consideration to CEL Token victims under the Plan.

108.   Ultimately, the voting results confirm overwhelming support for avoiding a lengthy trial regarding the value of CEL Token, while the objections to the settlement seek to litigate the substance of the issue, rather than challenging the reasonableness of settling it.   For the reasons set forth herein and in the CEL Token Briefs, the CEL Token Settlement satisfies the *Iridium* factors and should be approved pursuant to Bankruptcy Rule 9019 and section 1123(b)(3)(A) of the Bankruptcy Code.

109.   Accordingly, the CEL Token Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.

b.   **The Account Holder Avoidance Action Settlement Should Be Approved.**

110.   The Account Holder Avoidance Action Settlement proposed by the amended Plan provides that the Debtor Release contained in Article VIII.C of the Plan shall also release Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure less than or equal to $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan; and

- any Account Holder who is not an Excluded Party who (i) has Withdrawal Preference Exposure of more than $100,000, (ii) votes in favor of the Plan, (iii) does not opt out of the releases under the Plan, and (iv) provides the Debtors or the Litigation Administrator, as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5% of

---

[157]   *See id.* at 1–2.

such Account Holder's Withdrawal Preference Exposure no later than
14 days prior to the anticipated Effective Date of the Plan.[158]

The Plan clarifies, however, that (a) Avoidance Actions against ADR-Ineligible Potential

Defendants and Excluded Parties are not included in the Account Holder Avoidance Action

Settlement and are expressly preserved for prosecution by the Litigation Administrator(s) after the

Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims shall be

released if such Account Holder with a *De Minimis* Claim otherwise complies with the

requirements set forth above other than voting in favor of the Plan (as such Account Holders are

not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any

Custody Settlement Participant with Withdrawal Preference Exposure at or under $100,000 shall

receive a 100% recovery on their Allowed General Custody Claim.  On September 18, 2023, the

Debtors also filed the *Notice Regarding Calculation of Withdrawal Preference Exposure*

[Docket No. 3488] expressly providing, among other things, that Account Holders with a

Withdrawal Preference Exposure of exactly $100,000 will receive the same treatment under the

Account Holder Avoidance Action Settlement as Account Holders with a Withdrawal Preference

Exposure under $100,000.[159]  As with the CEL Token Settlement, here, too, the *Iridium* factors

weigh in favor of approving both components of the Account Holder Avoidance Action

Settlement.

---

[158]  *See* Plan, Art. IV.B.3.

[159]  The Notice also offered creditors the opportunity to request a recalculation of their Withdrawal Preference
Exposure if they believed that their Withdrawal Preference Exposure was incorrectly calculated because they
transferred cryptocurrency between multiple accounts that they controlled, to spouses or partners, and other
similar situations, and if they entered into the Account Holder Avoidance Action Settlement.  The Notice
instructed creditors to submit requests for recalculation of Withdrawal Preference Exposure by the Voting
Deadline, and explained that the Debtors would make commercially reasonable efforts to respond by the date of
the Confirmation Hearing.  After the Notice was filed and before the Voting Deadline, the Debtors responded to
approximately three dozen such requests.

111.    **First**, the balance between the uncertain probability of success the Debtors could have litigating Avoidance Actions and the settlement's benefits weighs heavily in favor of approving the Account Holder Avoidance Action Settlement.  Given the thousands of Account Holders against whom the Debtors have potential Avoidance Actions, litigation against individual Account Holders would require extensive time, expense, inconvenience, and delay.  The Litigation Administrator would need to establish the existence of preferences as to each individual Account Holder and litigate each Account Holder's various defenses, including the safe harbor defense of section 546(e) and the ordinary course of business defense of section 547(c)(2) of the Bankruptcy Code.  Such litigation would undoubtedly be protracted and would deplete the resources available to the Litigation Administrator(s).  Indeed, the Debtors and the Committee reached the Custody Settlement and the Withhold Settlement with the Custody and Withhold Ad Hoc Groups in part because all parties recognized that, without a consensual resolution, the ensuing preference litigation would be too complicated and value destructive.[160]

112.    **Second**, the Account Holder Avoidance Action Settlement provides substantial benefits to individual Account Holders, as explained above, as well as the entire creditor body. Throughout the course of these Chapter 11 Cases, Account Holders repeatedly raised the issue of Avoidance Actions, and therefore the settlement provides necessary finality to these concerns. Further, the settlement protects and maximizes the value of the Debtors' Estates by providing a clear mechanism whereby property can be recovered and providing the Litigation Administrator clearer direction as to which Avoidance Actions to pursue.  Accordingly, the Account Holder

---

[160]    *See Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148] ¶¶ 36–42 (analyzing the *Iridium* factors with respect to the Custody Settlement); *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334] ¶¶ 35–41 (same with respect to the Withhold Settlement).

73

Avoidance Action Settlement strikes the appropriate balance between the aggressive pursuit of Avoidance Actions and the efficient deployment of the Litigation Administrator's resources.

113. **Fourth**, as the voting results show, 18,080 Holders of Account Claims in the eligible Voting Classes with a total Withdrawal Preference Exposure of $831,188,879.79 elected to participate in the Account Holder Avoidance Action Settlement.[161] Furthermore, 211 Holders of Account Claims in Class 11 (*De Minimis* Claims) with a total Withdrawal Preference Exposure of $6,117,025.48 opted into the Third-Party Release, which means that such Holders fulfilled the conditions to participate in the Account Holder Avoidance Action Settlement.[162]

114. **Fifth**, the Debtors and the Committee were each represented by competent counsel in the negotiations of the Account Holder Avoidance Action Settlement, and the concerns of the Account Holders were considered throughout the process. **Finally**, entry into the Account Holder Avoidance Action Settlement was optional for Account Holders, thereby providing them the opportunity to evaluate for themselves the risks and benefits of the settlement versus the potential for litigation.

115. In line with the prominence the issue of Avoidance Actions has in the creditor body, the Debtors received several Objections addressing the Account Holder Avoidance Action Settlement. The Cassidy Letter and the First Bohon Letter both argued that "a clause should be added to the settlement that allows custody holders to forfeit any value amount they choose to bring their settlement under the $100,000 threshold."[163] Although the Debtors understand Account Holders' frustration at the threat of preference actions, the Debtors are acting in the best interests

---

[161] *See* Voting Report ¶ 24.

[162] *Id.*

[163] *See* Cassidy Letter at 1, First Bohon Letter at 1.

of the Estates and in accordance with the Bankruptcy Code, which provides that debtors can avoid potential preference actions in the ninety-day period before the Petition Date. This Court has itself so noted.[164] Further, the Debtors are not required to set any threshold under which Avoidance Actions are automatically released and could have decided to retain the option of pursuing all Avoidance Action, no matter the Withdrawal Preference Exposure. The Debtors, however, chose to expressly include a threshold for the purpose of settling with Account Holders and to alleviate Account Holders' concerns. The Debtors sympathize with the concerns expressed in the Cassidy Letter and the First Bohon Letter, but believe the $100,000 threshold is appropriate, fair, and reasonable.

116. The Second Bohon Letter largely repeated the concerns expressed in the First Bohon Letter but also disputed the calculation of Withdrawal Preference Exposure, stating that non-accredited investors were not able to make deposits to Earn Accounts after the creation of Custody Accounts and were thereby prejudiced because deposits to Custody Accounts do not affect Withdrawal Preference Exposure.[165] The Debtors' calculation of Withdrawal Preference Exposure, however, is wholly in line with this Court's rulings in these Chapter 11 Cases, which provide that Earn Accounts are the Debtors' property and Custody Accounts are customers' property,[166] and accordingly, deposits to Earn Accounts would decrease Withdrawal Preference Exposure by increasing assets that are property of the Estates and deposits to Custody Accounts

---

[164]    *See* March 8 Hr'g Tr. 37:6–7, 18–25 ("There's been a lot of concern about the potential for clawback actions…Under the bankruptcy law, you know, to some extent the Debtors and the committee and other professionals, they have to follow the law.").

[165]    *See* Second Bohon Letter at 1.

[166]    *See* Earn Ruling at 28 (holding that assets in Earn Accounts are property of the Debtors' estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

can have no effect on Withdrawal Preference Exposure because they merely remain the Custody Holder's property despite being deposited onto the Debtors' platform.  The Debtors have, however, modified the Plan in response to comments from counsel to certain potential preference defendants to clarify that the Debtors' calculation of Withdrawal Preference Exposure is not binding on any defendant in an Avoidance Action.[167]  Therefore, the objections in the Cassidy Letter, First Bohon Letter, and Second Bohon Letter should be overruled.

117.    The First Keeney Letter also objected to the calculation of the Withdrawal Preference Exposure, arguing (1) that it was unfair and unreasonable that withdrawal of loan principal increases an Account Holder's Withdrawal Preference Exposure and (2) that it makes no sense that preferential transfers are valued at the time of the transfer while creditors' Claims are valued as of the Petition Date.  Respectfully, there can be no real dispute about the propriety of counting loan principal payments as preferential transfers—a loan is a transfer of property from the lender, here the Debtors, to a borrower.   Moreover, a preference must be valued at the time of the transfer, in the ninety days before the Petition Date, because such a transfer is only a preference if it occurs before the Petition Date; accordingly, it cannot be valued as of the Petition Date.[168]

118.    Accordingly, the Account Holder Avoidance Action Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[169]

---

[167]    *See* Plan, Art. I.B.270.

[168]    *See* 11 U.S.C. § 547(b).

[169]    *See* Ferraro Decl. ¶ 13.

### c.    The Retail Borrower Settlement Should Be Approved.

119.    The Retail Borrower Settlement was the result of months of negotiation between the Debtors, the Committee, and the Retail Borrower Ad Hoc Group concluding in three days of mediation with the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York. The Retail Borrower Settlement proposed by the Plan provides the following primary terms: (a) in addition to the Set Off Treatment, Holders of Retail Borrower Deposit Claims have the option to repay their Retail Advance Obligations (the "Retail Advance Obligation Repayment Election") before the Effective Date in exchange for an equivalent amount of cryptocurrency; and (b) priority in electing a preference to exchange the NewCo Equity for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency Weighted Distribution Election) made by such Holders under the Plan.[170]  In addition, under the Retail Borrower Settlement, the Earn Ad Hoc Group and the Borrower Ad Hoc Group would each have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.

120.    The Settlement is appropriate under the Iridium factors. ***First***, the balance between the uncertain probability of success of litigation and the settlement's benefits weighs heavily in favor of approving the Retail Borrower Settlement. In February 2023, the Retail Borrower Ad Hoc Group commenced an adversary proceeding seeking a declaratory judgment that digital assets transferred to the Borrow Program are not property of the Debtors' estates and alleging deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, breach of contract, and unjust enrichment, among other things.[171]  Following

---

[170]    *See* Plan, Art. IV.B.7.

[171]    *See generally Complaint for Declaratory Judgment* [Adv. No. 23-01007, Docket No. 2001].

the mediation with Judge Wiles, the Retail Borrower Ad Hoc Group executed a settlement term sheet that embodied the Retail Borrower Settlement and stayed all deadlines in the adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[172]    The Debtors believe that they would prevail in any such adversary proceeding because the Loan Terms and Conditions provide (as further discussed in the Debtors' detailed response to Objections regarding the Retail Borrower Settlement in Section VII of this Memorandum)—unambiguously in every version and in multiple places—that Retail Borrowers transferred title of their collateral to the Debtors.  Inherent uncertainty, however, exists with respect to litigating the Retail Borrower Ad Hoc Group's adversary proceeding and other claims related to the Borrow Program, and any such litigation would require extensive delay and expense.  The litigation regarding the issue of title and ownership with respect to assets in the Earn Program[173] and the Custody Program spanned months and required multi-day trials that occurred at great expense to the Debtors' estates.  Furthermore, any litigation with the Retail Borrower Ad Hoc Group at this point in these Chapter 11 Cases would be detrimental to the successful consummation of the Plan because such litigation would inevitably delay distributions to Holders of Retail Borrower Deposit Claims.  On the other hand, approving the Retail Borrower Settlement would ensure that Retail Borrowers receive their distributions and the certainty of finality and would help expedite the consummation of the Plan.  Accordingly, the uncertain probability of success to be expected in litigating the various Claims related to the Borrow Program compared to the benefits provided by the Retail Borrower Settlement weighs in favor of its approval.

---

[172]    *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064], Exh. B at 4.

[173]    *See Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (setting forth the discovery, pleading, and hearing schedule to determine the title of digital assets transferred to the Earn Program).

121.    **Second**, as discussed earlier, the Retail Borrower Settlement provides improved treatment for all Retail Borrowers regardless of whether they make the Retail Advance Obligation Repayment Election and benefits the entire creditor body by avoiding the costly and time-consuming litigation related to the Borrow Program.  **Third**, the Committee and the Retail Borrower Ad Hoc Group support the Retail Borrower Settlement.  **Fourth**, the Debtors, the Committee, and the Retail Borrower Ad Hoc Group were each represented by competent counsel in the negotiations of the Retail Borrower Settlement, including in the mediation.  **Finally**, the Retail Borrower Settlement is the product of arm's-length, multi-party negotiations and a mediation.

122.    The Bronge Objection and several other letters filed regarding similar issues argue that the Retail Borrower Settlement should not be approved.  This argument is misguided and should be overruled as further set forth in the Debtors' response, *infra* in Section VII of this Memorandum.

123.    Accordingly, the Retail Borrower Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[174]

**E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code.**

124.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[175]

---

[174]    *See* Ferarro Decl. ¶ 32.

[175]    11 U.S.C. § 1123(d).

79

125.    The Plan provides primarily for the deemed rejection of all Executory Contracts and Unexpired Leases, but also provides for the assumption of certain Executory Contracts and Unexpired Leases.  Specifically, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date, (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down, or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.[176]

126.    Article V.A also provides, however, that pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Court order approving the rejection, assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired as provided for in the Plan, effective as of the Effective Date unless otherwise specified.  The Debtors, or the Post-Effective Date Debtors, as applicable, will satisfy all cure amounts in accordance with section 1123(d) of the Bankruptcy Code.  Article V.C provides that the Debtors, or the Post-Effective Date Debtors, as applicable, shall pay cure amounts on the Effective Date or as soon as reasonably practicable thereafter, unless otherwise provided in the Plan.  Article V.C also provides that any counterparty to an Executory Contract or Unexpired

---

[176]   *See* Plan, Art. V.A.

Lease that fails to object timely to the cure amount will be deemed to have assented to the cure amount. Article V.D of the Plan provides that Institutional Loans, to the extent they are Executory Contracts, will be assumed and assigned to NewCo and/or its subsidiaries, and that all such Institutional Loans and obligations thereunder shall remain in full force and effect.

127.    In response to the provisions in Article V.D of the Plan, the Debtors received an Objection from 168 Trading, which is party to the August 20, 2021 Master Loan Agreement with Celsius Network Ltd. as the lender and 168 Trading as the borrower (the "MLA"), pursuant to which 168 Trading delivered to the Debtors USDC 3 million in exchange for 126,582.28 of cryptocurrency Polkadot (DOT) (the "Collateral"). The MLA was listed on the *Debtors' Notice of (I) Executory Contracts and Unexpired Leases to Be Rejected by the Debtors Pursuant to the Plan and (II) Related Procedures in Connection Therewith* [Docket No. 3454]. 168 Trading objects to the rejection of the MLA because it argues that the MLA is an Institutional Loan which cannot be rejected pursuant to Article V.D of the Plan.[177] The Debtors have revised Article V.D of the Plan to clarify that, to the extent any contracts relating to Institutional Loans are Executory Contracts, the Debtors will be deemed to have assumed them under the Plan unless such Executory Contracts are on the Schedule of Rejected Contracts.[178] In that case, such Executory Contracts will be rejected. Accordingly, 168 Trading's arguments fail.

128.    The core of 168 Trading's Objection, however, has to do more with the terms of the MLA than the terms of the Plan: 168 Trading objects to the Plan to the extent the Debtors seek

---

[177]   *See generally* 168 Trading Obj.

[178]   *See* Plan, Art. V.D ("Notwithstanding anything in the Plan to the contrary, to the extent that any agreements, documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments under the Plan; *provided* **that if any such agreements, documents, or instruments are (i) Executory Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments will be rejected as set forth elsewhere in this Plan**"(emphasis added)).

to deprive 168 Trading of its right to redeem the Collateral upon repayment of the loan pursuant to the MLA[179] and "to the extent the Debtors seek to relegate 168 Trading to an unsecured creditor" in implied contravention of the MLA by treating, under Article V.B of the Plan, all claims for rejection damages as unsecured.[180]

129.    With respect to its argument regarding the classification of any rejection damages, 168 Trading's argument is premature, as the Debtors have not classified the rejection damages but merely included the MLA on a rejection notice.

130.    Further, to the extent the Debtors reject the MLA, the terms of the MLA do not provide 168 Trading any foundation for its arguments.  168 Trading is not a secured creditor and not entitled to the return of any Collateral under the MLA.  Section 4 of the MLA makes clear that upon 168 Trading's transfer of the Collateral to Celsius, 168 Trading retains no interest in the Collateral:  "The delivery of Collateral to Lender shall be on a full-title transfer basis, meaning the *Lender shall be the legal and beneficial owner of the assets posted as Collateral and the Borrower shall have no right, title or interest in those assets*" (emphasis added).[181]  Moreover, the MLA includes language similar to the language highlighted by the Court's Earn Ruling when it held that, pursuant to the Terms of Use, the Debtors have title to assets in Earn Accounts.[182]  Section 4.4.3. of the MLA provides that:

> Collateral is not, and shall not be, held by Lender on behalf of the Borrower, *and Lender shall be the sole and exclusive owner of all Digital Assets and/or Fiat Currencies posted as Collateral.  Lender may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of the Collateral to counterparties or hold them*

---

[179]    *See* 168 Trading Obj. ¶ 9.

[180]    *See id.* ¶ 10.

[181]    MLA § 4.3.

[182]    *See generally* Earn Ruling.

> *with counterparties, or otherwise exercise any ownership rights in*
> *the Collateral.* Borrower shall have no right or title in or to the
> Collateral throughout the term of this Agreement, until such time as
> the Loan Amount is fully paid up and the Collateral is returned to
> the Borrower.[183]

131.    Consistent with the plain and unambiguous language of the MLA and the Earn

Ruling, 168 Trading retains no interest in any assets transferred to Celsius under the MLA.

132.    Accordingly, the 168 Trading Objection should be overruled, and the Plan satisfies

the requirements of section 1123(d) of the Bankruptcy Code.

### F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

133.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which

requires that the proponent of a plan of reorganization comply with the applicable provisions of

the Bankruptcy Code regarding solicitation of acceptances of the Plan.[184] The legislative history

to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass

the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the

Bankruptcy Code.[185] As discussed below, the Debtors have complied with sections 1125 and 1126

of the Bankruptcy Code regarding disclosure and solicitation of the Plan.[186]

---

[183]    MLA § 4.4.3 (emphasis added).

[184]    11 U.S.C. § 1129(a)(2).

[185]    *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[186]    *See* Campagna Decl. ¶¶ 34–37.

### 1.    The Debtors Complied With Section 1125 of the Bankruptcy Code.

134.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[187] Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[188]

135.    Section 1125 of the Bankruptcy Code is satisfied here.  Before the Debtors solicited votes on the Plan, the Court entered the Disclosure Statement Order.[189]  The Court also approved the contents of the Solicitation Package provided to Holders of Claims and Interests entitled to vote on the Plan, the notices provided to Holders of Claims and Interests not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[190]  The Debtors, through their Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[191] The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.

---

[187]    *Id.*

[188]    *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obligates a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[189]    *See* [Docket No. 3337].

[190]    *See id.*

[191]    *See Affidavit of Service of Solicitation Materials* [Docket No. 3514].

Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[192]

136.    Based on the foregoing, the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.  No party has asserted otherwise.

### 2.    The Debtors Complied With Section 1126 of the Bankruptcy Code.

137.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a plan of reorganization.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[193]  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

(a)    The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . .

(f)    Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g)    Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.[194]

---

[192]    *See id.*

[193]    *See* 11 U.S.C. §§ 1126(a), (f), (g).

[194]    *Id.*

138.    Section 502 of the Bankruptcy Code, which is referenced in section 1126 as noted

above, provides that "(a) a claim or interest, proof of which is filed under section 501 of this title,

is deemed allowed, unless a party in interest…objects."[195]  Section 1111 of the Bankruptcy Code

further provides that:

> (a)    A proof of claim or interest is *deemed filed under section
> 501* of this title for any claim or interest that appears in the
> schedules filed under section 521(a)(1) or 1106(a)(2) of this
> title, except a claim or interest that is scheduled as disputed,
> contingent, or unliquidated.[196] (emphasis added)

Accordingly, as a result of the interconnections between sections 1126, 502, 501, and 1111 of the

Bankruptcy Code, scheduled claims (except those scheduled as disputed, contingent, or

unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed"

claims.

139.    As set forth in Part I of this Memorandum, in accordance with section 1125 of

the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders

of Claims in Voting Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14.[197]  The Debtors did not solicit votes

from Holders of Claims in Classes 1, 3, and 6B because Holders of such Claims are Unimpaired

and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code.  The Debtors also

did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or

17.  Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17 are deemed to reject

the Plan and thus are not entitled to vote on the Plan.  Holders of Claims in Class 12 and Interests

---

[195]    *See* 11 U.S.C. § 502(a).

[196]    *See* 11 U.S.C. § 1126(a).

[197]    Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class
6A (General Custody Claims), and Class 7 (Withhold Claims) constitute Account Holder Voting Classes.  Class
8 (Unsecured Loan Claims), Class 9 (General Unsecured Claims), Class 10 (State Regulatory Claims), and Class
14 (Series B Preferred Interests) constitute Voting Classes other than Account Holder Voting Classes.

in Class 13 are either deemed to reject or presumed to accept the Plan based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution. Thus, pursuant to section 1126 of the Bankruptcy Code, only Holders of Claims in 2, 4, 5, 6A, 7, 8, 9, 10, and 14 were entitled to vote to accept or reject the Plan.

140.    Pursuant to the Disclosure Statement Order, Holders of Account Holder Claims were entitled to vote in the amount of their Scheduled Claim unless they filed a Proof of Claim that was temporarily allowed by the Court under Bankruptcy Rule 3018(a).[198]    Holders of Account Holder Claims were required to file any motions pursuant to Bankruptcy Rule 3018(a) by the Voting Deadline.[199]    Holders of Claims in Voting Classes other than Account Holder Voting Classes were eligible to vote in the amount of their Scheduled Claims unless such Scheduled Claim was superseded by a timely filed Proof of Claim that is not subject to objection.[200]    The Class Claim Settlement Order similarly provided that each Holder would vote the scheduled amount of such Holder's Claim as authorized by the Court in accordance with the terms of the Disclosure Statement Order.[201]

141.    The Debtors requested authority to have Holders of Account Holder Claims vote in the amount of their Scheduled Claims because the Debtors and their professionals are still undergoing a claims reconciliation process and have concluded that a fair and equitable voting process is one that treats all similarly situated Account Holders equitably.[202]    Moreover, the Class

---

[198]    *See* Disclosure Statement Order ¶ 22.

[199]    *See id.*, Exh. 1 4(i)(c).

[200]    *See id.*, Exh. 1 4(ii)(1)(b).

[201]    *See* Class Claim Settlement Order, Exh. A ¶ 5.

[202]    *See* Disclosure Statement Mot. ¶ 65.

Claim Settlement will obviate the need for the Debtors to reconcile the Claims of any Account

Holders that do not opt out of the Class Claim Settlement.[203]    The Debtors' goal was, and remains,

ensuring that all Account Holders are allowed to vote the amount of their claim equal to the amount

of cryptocurrency the Debtors were obligated to return based on cryptocurrency prices on the

Petition Date, rather than duplicate or excessive recoveries simply because certain Account

Holders filed multiple claims, overstated the amounts that they were owed, or added claims for

"fraud" or "breach of contract" when other Account Holders did not.[204]    The vast majority of

Account Holders did not file proofs of claim asserting "extra" damages and are relying on the

Schedules as an accurate accounting of what they are owed by the Debtors.[205]    In addition, no

Holders of Account Holder Claims filed any motions pursuant to Bankruptcy Rule 3018(a) to

request that they vote in the amount of their Proof of Claim.

142.    As a result of the interconnections between sections 1126, 502, 501, and 1111 of

the Bankruptcy Code, as explained above, scheduled claims (except those scheduled as disputed,

contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also

"allowed" claims.    Accordingly, although Holders of Claims in Voting Classes were largely

entitled to vote in the amount of their Scheduled Claim rather than their Allowed Claim, the

Debtors satisfy the requirements of section 1126 of the Bankruptcy Code.

---

[203]    As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes elected to opt out of the Class Claim Settlement. *See* Voting Report ¶ 19.  On September 19, 2023, however, Stretto became aware that certain Holders of Class 4 (Convenience Claims) could not access the election to opt out of the Class Claim Settlement. *Id.* ¶ 18. Upon learning of this issue, Stretto immediately opened the ability to opt out of the Class Claim Settlement for Holders in Class 4 (Convenience Claims). *Id.*  Moreover, on September 25, 2023, Stretto, on behalf of the Debtors, sent an electronic correspondence to all Holders of Claims in Class 4 informing them that the Debtors extended the deadline for Holders in Class 4 (Convenience Claims) eligible to make the Class Claim Settlement Opt-Out to October 9, 2023. *Id.*

[204]    *See* Disclosure Statement Mot. ¶ 65.

[205]    *Id.*

143.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance

of a plan by classes of claims:

> A class of claims has accepted a plan if such plan has been
> accepted by creditors, other than any entity designated under
> subsection (e) of this section, that hold at least two-thirds in
> amount and more than one-half in number of the allowed
> claims of such class held by creditors, other than any entity
> designated under subsection (e) of this section, that have
> accepted or rejected such plan.

144.    As described above, the voting parties in Classes 2, 4, 5, 6A, 7, 8, 9 (at the

Consolidated Debtors), 10, and 14 entitled to vote on the Plan voted to accept the Plan in sufficient

number and in sufficient amount to constitute accepting classes under the Bankruptcy Code.[206]

Specifically, 96.33% of the amount of Claims and 98.83% of the Holders of Claims in Class 2,

who voted, voted to accept the Plan; 98.69% of the amount of Claims and 98.25% of the Holders

of Claims in Class 4, who voted, voted to accept the Plan; 99.28% of the amount of Claims and

99.35% of the Holders of Claims in Class 5, who voted, voted to accept the Plan; 98.78% of the

amount of Claims and 99.51% of the Holders of Claims in Class 6A, who voted, voted to accept

the Plan; 82.56% of the amount of Claims and 98.79% of the Holders of Claims in Class 7, who

voted, voted to accept the Plan; 99.56% of the amount of Claims and 74.07% of the Holders of

Claims in Class 9 (at the Consolidated Debtors), who voted, voted to accept the Plan; 100% of the

amount of Claims and 100% of the Holders of Claims in Class 10, who voted, voted to accept the

Plan; and 98.34% of the amount of Claims and 98.34% of the Holders of Claims in Class 14, who

voted, voted to accept the Plan.[207]    Voting parties in Classes 8 (Institutional Loan Claims) and

---

[206]    *See* Voting Report ¶ 13.

[207]    *See id.*

Class 9 (General Unsecured Claims; at Celsius Mining LLC and Celsius Network LLC), however, voted to reject the Plan.[208]

145.    Based upon the foregoing, the Debtors respectfully submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

> **G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3)).**

146.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[209]   The Second Circuit has construed this good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'"[210]   Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[211]   In the context of plans of reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[212] The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[213]

---

[208]    *See id.*

[209]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[210]    *E.g., In re Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 901-07 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." (citations and quotations omitted)).

[211]    *E.g., In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

[212]    *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[213]    *In re Adelphia*, 368 B.R. at 247.

147.    The fundamental purpose of chapter 11 is to enable a distressed business to obtain

reorganize its affairs to prevent or limit job losses and the adverse economic effects associated

with disposing of assets at liquidation value.[214]    Here, the Debtors filed for chapter 11 protection

following the most tumultuous period for the cryptocurrency industry, and chapter 11 protection

provided them with the "breathing spell" they needed to address structural and regulatory issues

and weather out the "crypto winter."    The Plan that has been proposed allows the Debtors the

axiomatic "fresh start" by providing a comprehensive restructuring that both (i) returns significant

value to creditors on the Effective Date and (ii) seeks to capitalize on the long-term promise of

cryptocurrency.

148.    The Plan is the culmination of more than a year of comprehensive efforts to resolve

key legal questions—including questions of first impression with respect to cryptocurrency—

before the Court and through consensual resolutions with key stakeholders.    ***First***, in December

2022, the Debtors held two separate trials with respect to Custody and Withhold issues and the

Earn Program.    With respect to the Custody and Withhold issues, the Court found that the assets

in the Custody Accounts were property of the Account Holders.    The Court did not determine who

owned the assets associated with Withhold Accounts.    Finally, the Court found that, regardless of

who owns the assets associated with the Custody Accounts and the Withhold Accounts, the

Debtors could maintain possession of those assets pending resolution of any Avoidance Actions.

After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold

Settlement, which are embodied in the treatment provided to Holders of Custody Claims and

Holders of Withhold Claims under the Plan.    With respect to the Earn ownership issues, the Court

---

[214]    *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start" (citations omitted)).

found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates and granted the Debtors the authority to sell stablecoins.

149.   **Second**, the Plan also reflects numerous consensual settlements with the Debtors' other creditors that were reached after extensive arm's-length negotiations among the Debtors, the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, certain individual creditors, and the Series B Holders.   These settlements fully resolve all issues between the non-Debtor parties and the Debtors relating to the Plan.

150.   The numerous settlements embodied in the Plan are compelling evidence of the Debtors' good faith in reaching consensual resolutions throughout these Chapter 11 Cases.   The good faith requirement does not require a debtor "to negotiate with all parties in interest at all times during a bankruptcy case."[215]   Rather, "a debtor need[s] to prioritize how it deals with its constituents."[216]   In light of the settlements the Debtors reached with key stakeholders over the course of the last year, the Plan "has all the hallmarks of good faith in that those who are actually in the money have made substantial concessions from their rights under the bankruptcy code."[217]

151.   **Third**, all of the Classes of Account Holder Claims have overwhelmingly voted to accept the Plan.[218]   This is a reflection of Account Holders' belief that the Plan has a proper purpose and that they are excited by the potential of the NewCo Transaction to provide upside with respect

---

[215]   *See In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), 6/25/2020 Hr'g Tr. at 106: 23–25.

[216]   *See id.* at 107: 3–4.

[217]   *See id.* at 108: 7–10.

[218]   *See* Voting Report ¶ 13.

to cryptocurrency.  The overwhelming support also shows that the Debtors have gained Account

Holders' trust, even though these Chapter 11 Cases have sometimes been contentious.

152.    Finally, as set forth herein, the Plan complies with the Bankruptcy Code and

applicable nonbankruptcy law.  Accordingly, the Debtors respectfully submit that the Plan satisfies

section 1129(a)(3) of the Bankruptcy Code.[219]

### H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).

153.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

the plan be subject to approval by the bankruptcy court as reasonable.[220]  Courts have construed

this section to require that all payments of claims to professionals, similar to the Professional Fee

Claims here, paid out of estate assets be subject to review and approval by the court as to their

reasonableness.[221]

154.    Here, all payments made or to be made by the Debtors for services rendered and

expenses incurred during the Chapter 11 Cases (*i.e.*, all Professional Fee Claims) are subject to

approval by the Court as reasonable.  In addition, Article II.B of the Plan provides that all final

requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days

after the Effective Date.  After notice and a hearing, in accordance with the procedures established

by the Bankruptcy Code and prior Court orders, the Allowed amounts of such Professional Fee

---

[219]    *See* Ferraro Decl. ¶ 33.

[220]    11 U.S.C. § 1129(a)(4).

[221]    *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *In re Drexel*, 138 B.R. at 760.

Claims shall be determined by the Court.[222]    Accordingly, the Plan fully complies with the

requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.[223]

I.    **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5))**.

155.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a

plan disclose the identity and affiliations of the proposed officers and directors of the reorganized

debtors.[224]    Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose

the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed

or retained by the reorganized debtor and the nature of any compensation for such insider.[225]

Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers

and directors be consistent with the interests of creditors and equity security holders and with

public policy.[226]    Article IV.D.7 of the Plan, the Plan Supplement, and the New Organizational

Documents provide information about the NewCo Board and the mechanism for how such

members will be chosen.    After the Effective Date, each director, officer, or manager of NewCo

shall be appointed and serve pursuant to the terms of the New Organizational Documents and

applicable laws of NewCo's jurisdiction of formation.

156.    Accordingly, the Debtors respectfully submit that the Plan satisfies section

1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.[227]

---

[222]    *See id.*

[223]    *See* Ferraro Decl. ¶ 34.

[224]    11 U.S.C. § 1129(a)(5)(A)(i).

[225]    11 U.S.C. § 1129(a)(5)(B).

[226]    11 U.S.C. § 1129(a)(5)(A)(ii).

[227]    *See* Campagna Decl. ¶¶ 38–39.

**J.      The Plan Does Not Require the Approval of a Governmental Regulatory Commission (§ 1129(a)(6)).**

157.      Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.[228] No such regulatory commission exists here. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

**K.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

158.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
> > (i)      has accepted the plan; or
> >
> > (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[229]

159.      The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate

---

[228]   11 U.S.C. § 1129(a)(6).

[229]   11 U.S.C. § 1129(a)(7)(A). *See also In re Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

against the estimated recoveries under that debtor's plan of reorganization.[230] As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.

160.   As set forth in the Disclosure Statement[231] and the Campagna Declaration, the Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates recoveries for members of each Class under the Plan (the "Liquidation Analysis").[232]   The projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of Claims and Interests in all Classes are as follows:

| Class No. | Claim or Interest | Status | Voting Rights | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 2 | Retail Borrower Deposit Claims | Impaired | Entitled to Vote | 85.6% | 83.0% | 47.4% |
| Class 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 4 | Convenience Claims | Impaired | Entitled to Vote | 70% | 70% | N/A |
| Class 5 | General Earn Claims | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| Class 6A | General Custody Claims[233] | Impaired | Entitled to Vote | 72.5% | 72.5% | 72.5% |
| Class 6B | Withdrawable Custody Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100.0% | 100.0% | 100.0% |

---

[230]   *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) of the Bankruptcy Code is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[231]   *See generally* Disclosure Statement, Exh. B.

[232]   *See* Campagna Decl. ¶ 56.

[233]   Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

| Class 7 | **Withhold Claims**[234] | Impaired | Entitled to Vote | 72.0% | 67.1% | 47.4% |
|---|---|---|---|---|---|---|
| Class 8 | **Unsecured Loan Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| Class 9 | **General Unsecured Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 37.5% |
| Class 10 | **State Regulatory Claims** | Impaired | Entitled to Vote | [0%] | [0%] | [0%] |
| Class 11 | ***De Minimis* Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| Class 12 | **Intercompany Claims** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | 47.3% |
| Class 13 | **Intercompany Interests** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | N/A |
| Class 14 | **Series B Preferred Interests** | Impaired | Entitled to Vote | 0.1% | 0.1% | 0.1% |
| Class 15 | **Other Interests** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| Class 16 | **Section 510(b) Claims**[235] | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | N/A |
| Class 17 | **Equitably Subordinated Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |

161.     The Pharos Objection asserts that the Debtors have not met the burden required by section 1129(a)(7)(A)(ii).  Pharos holds approximately $82 million of Claims, or 94% of the total value of Claims, in Class 8 (Unsecured Loan Claims).[236]  Class 8 voted to reject the Plan.[237]  Pharos asserts that the Debtors "have provided no evidence demonstrating that the value of the shares in

---

[234]   The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

[235]   The Confirmation Order will provide that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any.  The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims.  The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

[236]   *See* Pharos Obj. ¶ 1.

[237]   *See* Voting Report  ¶ 13.

the 'NewCo' exceed the value of the assets that would be distributed in chapter 7" and that the

Liquidation Analysis "appears to assign far greater value to assets in the 'Orderly Wind Down'

scenario than in a chapter 7 liquidation, even though there is no principled distinction between the

two."[238]  Pharos' arguments in support of this allegation fail for the reasons set forth below.

162.    ***First***, Pharos' argument that its projected recoveries under the Plan are not as much

as or greater than its projected recoveries under a hypothetical chapter 7 liquidation is plainly

incorrect as set forth in the calculation of recoveries included in the Disclosure Statement.[239]

Pharos asserts that "[t]he Debtors have provided no evidence to date supporting the value of the

'NewCo Common Stock Recovery,'" and, therefore, there is no basis to the projected recoveries

under the NewCo Transaction as compared to chapter 7 liquidation.[240]  The Debtors' Disclosure

Statement illustrates in the preliminary statement that creditor recoveries under the NewCo

Transaction—including on account of NewCo Common Stock—are based on the net asset value

of NewCo, which is approximated to be $1.248 billion and consists of the following components:

$450 million of cryptocurrency that will "seed" NewCo; Mining;[241] and certain illiquid assets.

---

[238]  *See* Pharos Obj. ¶ 2.

[239]  It should be noted that Pharos also appears to misunderstand or misread the Debtors' projected recoveries.  Pharos asserts that "the Debtors indicate that 6.5%–12.5% more liquid cryptocurrency would be distributed in a chapter 7 liquidation (44%–50%) than under a 'NewCo Transaction' (37.5%)" and that it therefore "follows that the Debtors can only meet their burden under section 1129(a)(7)(A)(ii) if the value of the 'NewCo Common Stock Recovery' exceeds this delta."  *See* Pharos Obj.  ¶ 17. The Debtors have made clear, however, that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.  *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash.").  The 44%–50% figure quoted by Pharos references the total estimated recovery for Unsecured Loan Claims in a chapter 7 liquidation, which would be in cash.  *See* Disclosure Statement, Exh. B at 7.

[240]  *See* Pharos Obj. ¶ 2.

[241]  "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

Notably, the Debtors and their advisors conducted a valuation of Mining, which was found to have a midpoint valuation of $565 million, as well as their illiquid assets, which were valued at $283 million—and these valuations were explained in detail in the Disclosure Statement.[242]  Similarly, Pharos' underlying sentiment—that NewCo is worthless and therefore cannot provide any real value to creditors—is flatly wrong.  NewCo has material value and the potential to become a formidable industry player right out of the gate:  it is being seeded with $450 million of cryptocurrency while not taking on any debt *and* it will receive the benefit of a business line (Mining) that has generated over $20 million of cash flow during the Debtors' time in bankruptcy and amid a prolonged industry downturn.[243]

163.    *Second*, Pharos' argument that "there is no principled distinction between" the Orderly Wind Down and chapter 7 liquidation is wholly misguided.  Considering the information and analysis provided about the Orderly Wind Down in the Plan and the Disclosure Statement, there can be no serious argument that the two scenarios are not distinct—or that the Orderly Wind Down will not provide higher recoveries.  As an initial matter, the Orderly Wind Down is expected to generate higher recoveries than a chapter 7 liquidation because the Orderly Wind Down, also known as the Backup Plan Sponsor Transaction, will include the creation of a Backup MiningCo, a pure play, publicly traded mining business that will own the assets of Mining[244] and in which creditors will receive 100% of the equity interests, with a potential management contract with

---

[242]    *See* Disclosure Statement, Art. II.B.2; *see also* Disclosure Statement, Exh. D (the Mining Valuation Analysis); Kielty Decl. ¶¶ 11–12.  The valuation of the illiquid assets factored into the Liquidation Analysis and the Orderly Wind Down as well.  *See* Disclosure Statement, Exh. B–C.

[243]    *See* Ferraro Decl. ¶ 4.

[244]    "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

GXD Labs LLC or other manager identified by the Debtors and the Committee.[245] Notably, the

Debtors still have the option of selecting a different Backup Plan Sponsor and negotiating a new

Backup Plan Sponsor Agreement—as long as those terms provide the same or higher recoveries

than the currently contemplated Backup Plan Sponsor Transaction with the BRIC.[246] Accordingly,

recoveries under the Orderly Wind Down will include more than just the proceeds to be derived

from the liquidation of assets.[247] In contrast, recoveries under a chapter 7 liquidation consist purely

of the proceeds to be derived from liquidation of assets.[248]

164.    Next, recoveries under the Orderly Wind Down are credibly higher than under a

chapter 7 liquidation because the Orderly Wind Down is envisioned to be a methodical liquidation

of assets that takes place over a longer period than would a chapter 7 liquidation and which will

be conducted by the Plan Administrator, who will likely be Christopher Ferraro,[249] the Debtors'

interim chief executive officer, chief financial officer, and chief restructuring officer, and the

Backup Plan Sponsor, presently the BRIC Parties.[250] The Orderly Wind Down is estimated to take

approximately five years (or possibly even longer), whereas a chapter 7 liquidation is expected to

be complete in approximately six months.[251] Pharos nonetheless argues that a chapter 7 trustee

---

[245] *See generally* Disclosure Statement, Exh. C.

[246] *See id.*, Art. II.B.2.

[247] *See id.*, Art. II.B.2.

[248] *See id.*, Exh. B at 2.

[249] *See* Fourth Plan Supp., Exh. I (including the Plan Administrator Agreement).

[250] The BRIC Parties are the Blockchain Recovery Investment Consortium and the BRIC Support Parties, which are parties designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement the Backup Plan Sponsor Transaction, presently contemplated to be: (i) Gemini Trust Company, LLC and (ii) Global X Digital, LLC, or an affiliate thereof. *See* Plan, Art. I.A.30–31.

[251] *See* Disclosure Statement, Art. II, Exh. B at 2–3.

could achieve the same results as the Plan Administrator in the Orderly Wind Down by "request[ing] the authority to operate a business of a debtor for a limited period of time so that it can realize any additional value from assets that may be sold as a going concern."[252]  To be clear, the only part of the Debtors' business that would be operational in a chapter 7 liquidation is Mining, and it is highly unlikely that a chapter 7 trustee would have the familiarity and technical expertise necessary to keep that business operational, let alone profitable, while conducting the chapter 7 liquidation process.  Moreover, the chapter 7 trustee would likely be someone completely unfamiliar with the Debtors, their business, or the cryptocurrency industry, which are also complex and multifaceted.  In contrast, the Plan Administrator, Christopher Ferraro (who has shepherded the Debtors through the Chapter 11 Cases), and the Backup Plan Sponsor (the BRIC Parties), have an impressive combination of industry expertise and knowledge of the Debtors' business which cannot but help ensure that the monetization of assets in the Orderly Wind Down captures the highest value possible.  Therefore, it is reasonable that the Plan Administrator and Backup Plan Sponsor would be able to monetize assets at or near market values, whereas a chapter 7 trustee would not.  Accordingly, Pharos' objection that the Debtors' projected realization for assets such as the Institutional Loans receivable, various investments, and mining assets in the Orderly Wind Down is too high compared to the projected realization in a chapter 7 liquidation should be overruled.[253]

165.   Finally, the Orderly Wind Down is distinct from a chapter 7 liquidation—and provides higher and better recoveries to creditors than a chapter 7 liquidation—because the Orderly

---

[252]   *See* Pharos Obj. ¶ 19.

[253]   *See* Pharos Obj. ¶¶ 18(a)–(c) for Pharos' complaints respecting the difference between projected realization of those assets under the Orderly Wind Down versus chapter 7 liquidation.

Wind Down contemplates the preservation and distribution of Liquid Cryptocurrency to creditors, which the Debtors recognized as a crucial concern for creditors from the outset of these Chapter 11 Cases,[254] whereas a chapter 7 trustee would be charged with monetizing assets and making distributions in cash.[255] As noted above, the Debtors have made clear that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.[256] Accordingly, because it addresses creditors' long-standing wishes to receive distributions in cryptocurrency, the Orderly Wind Down is preferable to a chapter 7 liquidation.

166.    Additionally, all Holders of Claims entitled to vote on the Plan have received the Liquidation Analysis (attached as Exhibit B to the Disclosure Statement) and have been provided ample time to consider the contents thereof. Accordingly, the Debtors respectfully submit that the Plan complies with section 1129(a)(7) of the Bankruptcy Code.[257]

**L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code.**

167.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[258] If any class of claims or

---

[254]    *See* July 18 Hr'g Tr. 15:18–25, 16:1–2 ("Certainly, undoubtedly, some percentage of [our customers], some number of them, will be interested in getting a recovery in U.S. dollars or other fiat currency…But we definitely expect that the majority are going to be interested in, you know, riding out what you've heard referred to as this crypto winter, remaining long crypto, having the opportunity to realize their recovery through and appreciation in the macro crypto market or environment").

[255]    11 U.S.C. § 726.

[256]    *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash").

[257]    *Id.*

[258]    11 U.S.C. § 1129(a)(8).

interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the claims or interests in that class.[259]

168.    Here, the Plan satisfies either the voting requirements or the cramdown requirements with respect to nearly all Classes.  The Impaired Voting Classes of Claims and Interests under the Plan in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), and Class 6A (General Custody Claims), Class 7 (Withhold Claims), Class 9 (General Unsecured Claims; at the Consolidated Debtors); Class 10 (State Regulatory Claims), Class 14 (Series B Preferred Interests) voted to accept the Plan.  Class 1 (Other Secured Claims), Class 3 (Other Priority Claims), Class 6B (Withdrawable Custody Claims) are Unimpaired and are presumed to accept the Plan.  Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) are deemed to accept or reject and are proponents of the Plan.  Such Intercompany Claims shall be Reinstated or set off, settled, addressed, distributed, addressed, converted to equity, contributed, cancelled, or released and such Intercompany Interests shall be Reinstated or set off, settled, addressed, distributed, contributed, merged, cancelled, or released consistent with the Transactions Steps Memorandum on or before the Effective Date by the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable. Class 8 (Unsecured Loan Claims) voted to reject the Plan, and Class 9 (General Unsecured Creditors) voted to reject the Plan at Celsius Mining LLC and Celsius Network Inc. (Class 9 voted to accept at the Consolidated Debtors).  Finally, Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claims), and Class 17 (Equitably Subordinated Claims) are deemed to reject the Plan.  Notwithstanding those Classes that rejected the Plan or were deemed

---

[259]    11 U.S.C. § 1129(b).

to reject the Plan, as discussed below, the Plan satisfies the cramdown requirements of section 1129(b) with respect to these Classes.

169.    Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the "cramdown" requirements of the Bankruptcy Code.[260]

**M.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

170.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments unless such holders agree to different treatment for such claim.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[261]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[262]  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority

---

[260]    *See* Campagna Decl. ¶ 42.

[261]    11 U.S.C. § 1129(a)(9)(A).

[262]    11 U.S.C. § 1129(a)(9)(B).

tax claims—must receive cash payments over a period not to exceed five years from the petition

date, the present value of which equals the allowed amount of the claim.[263]

171.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.    *First*, the Plan

satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article II.A of the Plan provides

that each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to the

amount of such Allowed Administrative Claim on the Effective Date, or as soon as reasonably

practicable thereafter, or at such other time as provided in Article II.A of the Plan.

172.    *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because

no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[264]

*Finally*, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Articles II.C and

III.B of the Plan specifically provide that Holders of Allowed Priority Tax Claims or Allowed

Other Priority Claims, respectively, shall receive treatment in a manner consistent with section

1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee.    Thus, the

Debtors respectfully submit that the Plan satisfies each of the requirements set forth in

section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.[265]

**N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

173.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an

impaired class of claims, at least one impaired class of claims must accept the plan "without

including any acceptance of the plan by any insider" as an alternative to the requirement under

---

[263]    11 U.S.C. § 1129(a)(9)(C).

[264]    *See* Plan, Art. III.B.

[265]    *See* Campagna Decl. ¶ 43.

section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[266]

174.   As set forth above, Holders of Claims in Classes 2, 4, 5, 6A, 7, 9 (at the Consolidated Debtors), and 10—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[267]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.[268]

O.     **The Plan Is Feasible (§ 1129(a)(11)).**

175.   Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[269]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; rather, a debtor must demonstrate a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization.[270]  Feasibility cannot be defeated by

---

[266]   11 U.S.C. § 1129(a)(10).

[267]   *See* Voting Report, Exh. A.

[268]    *See* Campagna Decl. ¶ 44.

[269]   11 U.S.C. § 1129(a)(11).

[270]   *See In re Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re Patrician St. Joseph Partners Ltd. P'ship)*, 169 B.R. 669, 674

"speculative prospects of failure" or the "mere prospect of financial uncertainty."[271]    As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

176.    In determining standards of feasibility, courts in this jurisdiction and others have identified the following probative factors:

    a.    the adequacy of the capital structure;

    b.    the earning power of the business;

    c.    the economic conditions;

    d.    the ability of management;

    e.    the probability of the continuation of the same management; and

    f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[272]

These factors "are neither exhaustive nor exclusive" as the determination is "fact intensive" and made on a "case by case" basis.[273]

177.    The Restructuring Transactions contemplated by the Plan have been described in detail elsewhere in this Memorandum.  In short, the Plan provides for the NewCo Transaction and, if the NewCo transaction cannot be completed, the option for the Debtors to pivot to the Orderly Wind Down.  The Debtors have structured the Restructuring Transactions to ensure that in either

---

(Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable." (citation omitted)).

[271]    *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

[272]    *See, e.g., In re WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *Drexel Burnham.*, Inc., 138 B.R. at 762–63; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

[273]    *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010).

scenario, liquidation or the further reorganization not contemplated by the Plan is highly unlikely. For the following reasons, the Plan is feasible as required by section 1129(a)(11).

178.    **First**, as set forth in the Ferraro Declaration, NewCo will be well capitalized and will carry zero debt.[274]    As part of the Plan, the Debtors will seed NewCo with $450 million in Liquid Cryptocurrency free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date.[275]    Thus, NewCo's capital structure will be more than adequate to meet NewCo's Plan obligations.

179.    **Second**, with respect to the viability of the Debtors' reorganized mining business, which will be a central feature for both NewCo under the NewCo Transaction and the pure play, publicly traded mining business in the Orderly Wind Down, the Debtors prepared Financial Projections for Mining's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028, which were attached to the Disclosure Statement as <u>Exhibit E</u>.[276] The Debtors and their advisors thoroughly analyzed the Financial Projections and the mining business's ability to meet post-Confirmation Plan obligations and to continue as a go-forward business.    As set forth in the Ferraro Declaration, the Debtors believe that these Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable reorganized business going forward.[277]

180.    Additionally, as set forth in the Ferraro Declaration, despite numerous challenges facing the Debtors' mining business at the Petition Date, including fluctuating market conditions

---

[274]    *See* Ferraro Decl. ¶ 37.

[275]    *See id.*

[276]    *See id.* ¶ 38.

[277]    *See id.*; *see also* Fahrenheit Decl. ¶ 16.

and the rejection of the Core hosting contract and defaults by counterparties, the Debtors' mining business has had positive cash flow since the Petition Date.[278] Since the Petition Date, the mining business's adjusted EBITDA on an unaudited basis since the Petition Date is approximately $24.3 million.[279] Thus, even during an extremely tumultuous period, the Debtors' mining business did not lose money.

181.    In fact, the Debtors' mining business has done more than just avoid losing money—it has led to significant positive cash flows.  The Debtors found new hosting providers and moved towards hosting their own rigs through their own proprietary sites.[280]  Based on these improvements, the Debtors' have generated over $20 million of operating cash flow since the Petition Date, even during a tumultuous period for the Bitcoin mining industry generally.[281] Further, the Debtors have improved the adjusted gross margin of the mining business through a fixed power priced hedge, new hosting agreements with improved economics, and new software on their rigs to improve efficiency.[282]

182.    ***Third***, the Debtors' Auction was highly competitive (and had to be extended repeatedly as a result) and the Debtors were able to attract multiple strategic Bids from sophisticated investors and industry professionals.[283]  Further, all of the proposals the Debtors received during the month-long Auction—those proposed by the current Plan Sponsor

---

[278]    *See* Ferraro Decl. ¶ 39.

[279]    *Id.*

[280]    *Id.* ¶ 40; *see also* Fahrenheit Decl. ¶ 16.

[281]    *See* Ferraro Decl. ¶ 43.

[282]    *See id.* ¶ 42.

[283]    *See* Kielty Decl. ¶¶ 8–9.

(the Fahrenheit Group), the former Plan Sponsor and Stalking Horse Bidder (NovaWulf), and the

current Backup Plan Sponsor (the BRIC)—are anchored by the reorganized mining business,

indicating a consensus among these sophisticated parties regarding not just the feasibility, but also

the long-term profitability, of mining. As this Court has done previously, the Court here should

look positively on the Debtors' ability to attract strategic proposals and attention for their assets.[284]

Notably, NewCo will be directed and managed by sophisticated crypto-natives and business

professionals who have significant experience with mining, the cryptocurrency market, and

corporate governance.[285]

183.    ***Fourth***, the Debtors have included extensive disclosure about the risks of NewCo

in the Disclosure Statement, including risks that the Debtors may toggle to the Orderly Wind

Down, the NewCo may not be able to achieve the projected financial results, certain regulatory

approval may not be granted, a liquid trading market for the NewCo Common Stock may not

develop and may result in a depressed or volatile trading price, and the mining business is subject

to the volatility of Bitcoin prices, utility prices, and rapidly changing technology. In other words,

this is not a case where the debtors are imagining an "overnight reversal of fortune" or otherwise

not "consider[ing] the present and future nature of the industry"—which can be fatal to feasibility

in this district.[286] Importantly, despite the risks the Debtors enumerated, the majority of creditors

---

[284]    *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 194 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010) (finding that a revenue-less debtor's reorganization plan was feasible when their FCC authorization was highly valuable and likely to appeal to a strategic partner to fund capital expenditures); Disclosure Statement, Art. VII.M.3 (describing the whole-company sale process and the Auction).

[285]    *See Third Plan Supp.* [Docket No. 3444], Exh. B (introducing the members of the board of directors of NewCo); Disclosure Statement, Exh. F at 20 (introducing the managers of NewCo); *see also* Ferraro Decl. ¶ 40; *see also* Fahrenheit Decl. ¶¶ 11-13.

[286]    *See, e.g.*, *Prudential Energy Co.*, 58 B.R. at 863. There, court found a debtor did not meet the feasibility standard when the plan imagined "an overnight reversal of fortune" as the debtor had been experiencing decreasing levels of investment in oil and gas projects prior to the bankruptcy and had no confirmed investments exiting bankruptcy.

have overwhelmingly voted to accept the Plan, indicating their confidence in the go-forward value

of the NewCo.  Thorough disclosure of risks, coupled with support by creditors, are factors calling

for the confirmation of a plan.[287]

184.    ***Fifth***, with respect to the viability of the Orderly Wind Down, the Debtors prepared

the Orderly Wind Down Analysis, attached to the Disclosure statement as <u>Exhibit C</u>, utilizing the

Valuation Report, input from the Debtors' management team and advisors, and projected results

of operations and cash flows in the period from May 31, 2023 to the assumed Wind Down Date.

The Orderly Wind Down Analysis demonstrates the Debtors' ability to meet their obligations

under the Plan even in the event of a toggle to the Orderly Wind Down.

185.    Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11) of

the Bankruptcy Code.

### P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).

186.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees

payable under section 1930 of title 28 of the United States Code, as determined by the court at the

hearing on confirmation of the plan."[288]    Article II.D of the Plan provides that the Debtors and the

Post-Effective Date Debtors, as applicable, shall pay all fees and charges due, including Plan

payments and disbursements in and outside the ordinary course of the Debtors' or the Post-

---

The court further noted that the debtors could not rely on "past experience" as "a valid barometer of future performance" and should have considered these macro effects in developing their plan.  *Id.*

[287]    *See In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (confirming a plan "when [the] debtors fully and fairly disclosed the risks associated with variances from projections, the lack of a trading market for the shares, the leveraged condition of [NewCo], the competitive conditions in the industry, and certain tax matters associated with the plan" and the debtors enjoyed "[t]he overwhelming support of the creditors, garnered after their professionals reviewed the debtors' projections" which "len[t] credence to the debtors' belief in the feasibility of the plan."); *see also In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (finding that "the best indicator of feasibility is the position of the creditors whose economic interests are at stake").

[288]    11 U.S.C. § 1129(a)(12); *see also* 28 U.S.C. § 1930.

Effective Date Debtors' business, for each quarter (including any fraction thereof) until the

Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. On and after the

Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and

payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the U.S.

Trustee. Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of

section 1129(a)(12) of the Bankruptcy Code.[289]

      **Q.**      **All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13))**.

187.      Section 1129(a)(13) of the Bankruptcy Code requires all retiree benefits to continue

post-confirmation in accordance with section 1114 of the Bankruptcy Code. To the best of the

Debtors' knowledge and belief, they do not have any retiree benefit obligations. Out of an

abundance of caution, Article IV.P of the Plan provides that, from and after the Effective Date, all

retiree benefits as defined in section 1114 of the Bankruptcy Code will continue in the ordinary

course in accordance with applicable law. Accordingly, the Debtors respectfully submit that the

Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has

asserted otherwise.[290]

      **R.**      **Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan**.

188.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic

support obligations.[291] Because the Debtors are not subject to any domestic support obligations,

the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. Likewise,

section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an

---

[289]   *See* Campagna Decl. ¶ 45.

[290]   *See id.* ¶ 46.

[291]   *See* 11 U.S.C. § 1129(a)(14).

"individual" as defined in the Bankruptcy Code.[292]  Because none of the Debtors is an "individual,"
the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the
Debtors are a commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code,
which provides that property transfers by a corporation or trust that is not a moneyed, business, or
commercial corporation or trust be made in accordance with any applicable provisions of
nonbankruptcy law, is not applicable to these Chapter 11 Cases.[293]  Accordingly, the Debtors
respectfully submit that the Plan is not subject to the requirements of sections 1129(a)(14)–(16) of
the Bankruptcy Code, and no party has asserted otherwise.

### S.    The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the Bankruptcy Code.

189.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable
requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a
plan may be confirmed so long as the requirements set forth in section 1129(b) of the
Bankruptcy Code are satisfied.[294]  To confirm a plan that has not been accepted by all impaired
classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent
must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect
to the non-accepting impaired classes.[295]

190.    As explained herein, the Debtors respectfully submit that the Plan does not
"discriminate unfairly" and is "fair and equitable."

---

[292]    11 U.S.C. § 1129(a)(15).

[293]    11 U.S.C. § 1129(a)(16).

[294]    See 11 U.S.C. § 1129(b).

[295]    See 11 U.S.C. § 1129(b)(1); In re Zenith Elecs. Corp., 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").

1.    **The Plan Does Not Unfairly Discriminate with Respect to Rejecting Classes (§ 1129(b)(1)).**

191.    The Plan does not discriminate unfairly with respect to the impaired classes that have rejected the Plan.  Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[296]  The purpose underlying the unfair discrimination requirement is to "ensure[ ] that a dissenting class will receive value equal to the value given to all other similarly situated classes."[297]  Thus, courts have adopted various tests in order to determine whether discrimination between classes of claimants is "unfair."[298]

192.    Generally, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if similarly situated claims receive materially different treatment without a reasonable basis for the disparate treatment.[299]  A plan does not unfairly discriminate where it provides different treatment to two or more classes that are

---

[296]    *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[297]    *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988); *accord In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017); *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

[298]    *In re Sea Trail Corp.*, No. 11-07370-8, 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

[299]    *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . . .").

comprised of dissimilar claims or interests.[300]  Likewise, there is no unfair discrimination if, taking

into account the particular facts and circumstances of the case, there is a reasonable basis for the

disparate treatment.[301]  In this regard, the caselaw recognizes that, by its terms, section 1129(b)(1)

of the Bankruptcy Code makes clear that not all "discrimination" is impermissible—only unfair

discrimination.[302]

193.    Courts in this Circuit consider four factors in determining whether to permit the

separate treatment of claims:  (a) whether there is a reasonable basis for discrimination; (b) whether

the debtor can consummate the plan without the discrimination; (c) whether the discrimination is

proposed in good faith; and (d) whether the degree of discrimination is proportional to its

rationale.[303]  In construing the test, leading courts and commentators have concluded that the "test

boils down to whether the proposed discrimination has a reasonable basis and is necessary for

reorganization."[304]

194.    Here, the Plan's treatment of the Impaired Classes that have rejected the Plan, are

deemed to reject the Plan, or may be deemed to reject the Plan is proper because the Plan's overall

classification scheme rests on a legally acceptable rationale and all similarly situated Claims and

---

[300]   *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, 843 F.2d 636 (2d Cir. 1988).

[301]   *In re Aztec Co.*, 107 B.R. at 590.

[302]   *See In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 118:4–7 ("Clearly, one of the areas of flexibility that Congress provided in Chapter 11 is the unfair discrimination test of 1129, recognizing implicitly in the plain language that some forms of discrimination are fair.").

[303]   *In re Genco Shipping*, 513 B.R. at 242–43 (collecting cases); *Buttonwood*, 111 B.R. at 63.

[304]   *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351 (Bankr. S.D.N.Y. 2018) (citing 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.03[3][a], at 1129–66); *In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No 758] Hr'g Tr. 112:21-23 (interpreting the *Buttonwood* test as providing a "reminder[] to the fact finder to focus his or her inquiry on the reasonable basis for discriminating").

Interests will receive substantially similar treatment. Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

195.    No unfair discrimination exists as to Impaired Class 8 (Unsecured Loan Claims) and Class 9 (General Unsecured Claims) that have rejected the Plan. Holders of Claims in Classes 8 and 9[305] are receiving the same or a very similar recovery as the other Holders of unsecured Claims, in particular Holders of Claims in Class 5 (General Earn Claims). Under either the NewCo Transaction or the Orderly Wind Down, Holders of Claims in Classes 8 and 9 will receive the exact same recovery as Holders of Claims in Class 5—67% and 61.2%, respectively.

196.    Further, Holders of Claims in Classes 8 and 9 will receive almost the same recovery as Holders of Convenience Claims in Class 4, which are receiving 70%. The Claims in the Convenience Class, while consisting of Account Holder Claims, are distinct from the unsecured Claims in Classes 8 and 9 because Class 4 was created for administrative convenience and also provides other Account Holders the ability to opt into the same treatment as Holders of Claims in the Convenience Class if such Account Holders want to reduce the aggregate value of their Claim to $5,000 in exchange for the same 70% recovery.

197.    Claims in Classes 8 and 9 are different than General Custody Claims in Class 6A, Withhold Claims in Class 7, and Retail Borrower Deposit Claims in Class 2. General Custody Claims are receiving 72.5% recovery because assets in Custody Accounts are subject to unique Terms of Use and the Court has already ruled that the assets in Custody Accounts belong to Account Holders. Moreover, the Court previously approved the Custody Settlement, which

---

[305]    Classes 8 and 9 are receiving the exact same recovery—67% under the NewCo Transaction and 61.2% under the Orderly Wind Down.

provided that Holders of General Custody Claims would receive the same opportunity to participate in the Custody Settlement under the Plan. In addition, Withhold Claims are receiving 72% in the NewCo Transaction and 67.1% in the Orderly Wind Down because assets in Withhold Account present a unique issue, were not subject to any Terms of Use, and have been litigated and negotiated at length throughout these Chapter 11 Cases, culminating in the Withhold Settlement that was approved by the Court, which also provided that non-settling Holders of Withhold Claims would have the opportunity to participate in the Withhold Settlement under the Plan.

198.    Finally, Retail Borrower Deposit Claims in Class 2 are receiving a different recovery than Claims in Classes 8 and 9 because Retail Borrower Deposit Claims, though unsecured, have different legal rights from other unsecured Claims in that they are subject to the Loan Terms and Conditions. Those Loan Terms and Conditions provide the Debtors the right to set off Retail Borrowers' obligations. Accordingly, Class 2 is projected to receive a recovery of 85.6% under the NewCo Transaction or 83% under the Orderly Wind Down on account of these setoff rights. Notably, however, the total percentage of recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim. In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or a 67% recovery on their Retail Borrower Post-Set Off Deposit Claim. The proposed recovery for Retail Borrower Post-Set Off Deposit Claims is the same as the proposed recovery for Claims in Classes 8 and 9. As with Custody Claims and Withhold Claims, the treatment of Retail Borrower Deposit Claims was heavily negotiated throughout the Chapter 11 Cases, culminating in the Retail Borrower Settlement

following a three-day mediation between the Retail Borrower Ad Hoc Group, the Debtors, the Committee, the Earn Ad Hoc Group, and certain individual creditors.

199.    Neither does unfair discrimination exist between the Classes of Account Holder Claims that are Impaired, entitled to vote, and can expect to receive a recovery, and *De Minimis* Claims in Class 11, which are Impaired, deemed to reject, and will receive no recovery.  *De Minimis* Claims are Account Holder Claims with an aggregate value equal to or less than $10.00.  *De Minimis* Claims are classified separately because of the significant administrative convenience involved in grouping together all such Claims.  Further, *De Minimis* Claims are not receiving a recovery because in most cases, the cost associated with making distributions on account of these Claims would be higher than the distributions to which such Claims would be entitled.  This is consistent with the Debtors' previous treatment of other "de minimis" claims.  For example, the Custody Withdrawal Order, which authorized the Debtors to reopen withdrawals for Custody Settlement participants, also authorized the Debtors to not permit withdrawals where the account balance was not sufficient to satisfy gas fees or transaction costs necessary to make the distribution itself.[306]  Moreover, although Holders of *De Minimis* Claims were not entitled to vote, the releases under the Plan only apply to those Holders if they affirmatively opted into them.

200.    Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given that their legal character is distinctly different from all other Claims and Interests.  The Debtors separately classified Class 12 (Intercompany Claims) from other unsecured claims and Class 13 (Intercompany Interests) from other interests based on ownership in the Plan and to preserve the option to either Reinstate, compromise, or cancel these Claims and Interests.  Such treatment will allow the Debtors greater flexibility when they are

---

[306]    *See* Custody Withdrawal Order ¶ 4.

implementing the Restructuring Transactions. Significantly, the optionality with respect to Intercompany Claims and Intercompany Interests does not affect the stakeholders' recovery under the Plan and is intended for only administrative convenience in the restructuring process. Reinstatement is merely a technical preservation of Claims and Interests necessary to preserve the Debtors' corporate structure, does not have any economic substance, and does not enable any junior creditor or interest holder to retain or recover any value under the Plan.[307]

201.    With respect to Class 16 Section 510(b) Claims, the Debtors formed Class 16 to include Holders of Claims that may be subordinated pursuant to section 510(b) of the Bankruptcy Code. The Plan's treatment of Class 16 is proper because no similarly situated class will receive more favorable treatment. Further, section 510(b) of the Bankruptcy Code requires the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a "security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise allowed under the Bankruptcy Code. Here, the classification of Class 16 comports with section 510(b) because the Section 510(b) Claims include, among others, Claims arising out of or relating to (a) CEL Token (other than CEL Token Deposit Claims), including damages arising from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on account of such a Claim, and Claims arising from the cancellation of a contract for the purchase or sale of CEL Token, and (b) the purchase or sale of preferred shares in Celsius Network Ltd or other equity interests in any Debtor.

---

[307]    *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection that reinstatement of an intercompany interest violates the absolute priority rule because "the retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

202.    With respect to Class 17 Equitably Subordinated Claims, the Debtors formed Class

17 to include Holders of Claims that may be equitably subordinated pursuant to the Plan, which

have been identified on the Schedule of Equitably Subordinated Claims.  The Plan's treatment of

Class 17 is proper because no similarly situated class will receive more favorable treatment.

203.    Accordingly, the Plan does not discriminate unfairly with respect to the Impaired

Classes that have been deemed to reject the Plan and satisfies the requirements of 1129(b)(1).

### 2.    The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§ 1129(b)(2)).

204.    For a plan to be "fair and equitable" with respect to an impaired class of unsecured

claims or interests that rejects a plan (or is deemed to reject a plan), the plan must follow the

"absolute priority" rule and satisfy the requirements of section 1129(b)(2).[308]  Generally, this

requires that an impaired rejecting class of claims or interests either be paid in full or that a class

junior to the impaired rejecting class not receive any distribution under a plan on account of its

junior claim or interest.[309]  Additionally, for a plan to be "fair and equitable," no creditor may be

paid more than what it is owed (*i.e.*, no class of creditors may receive more than 100% of its

claim).[310]

---

[308]    11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[309]    *See In re 203 N. LaSalle*, 526 U.S. at 459.

[310]    *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

205.    The Impaired rejecting Classes here are Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Loan Claims),[311] and Class 11 (*De Minimis* Claims).  Under the Plan, no Holder of a Claim or Interest junior to these Classes will receive any recovery on account of such Claim or Interest.  Although Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) may be Unimpaired, such treatment is not "on account of" such Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  Rather, Intercompany Claims and Intercompany Interests will be Unimpaired, if at all, for purposes of maintaining the prepetition organizational structure for the administrative benefit of the Post-Effective Date Debtors and such recovery has no economic substance.  Courts have recognized that such technical preservations for the purpose of corporate formalities do not violate the absolute priority rule.[312]  Moreover, as set forth in the Debtors' Disclosure Statement, no Class of Claims is receiving more than what it is owed.[313]

206.    In its Objection, Pharos asserts that the Debtors' Plan violates the absolute priority rule because, it argues, Series B Preferred Interests in Class 14 (which are junior to Class 8 Unsecured Loan Claims) are receiving a 0.1% recovery "on account of their interests" in either the NewCo Transaction or the Orderly Wind Down.[314]  These arguments have no merit.  The distributions that will be made to Holders of Series B Preferred Interests are not being made "on

---

[311]    Class 9 rejected the Plan at Celsius Mining LLC and Celsius Network LLC, and accepted the Plan at the Consolidated Debtors.

[312]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[313]    *See* Disclosure Statement, Art. III.E.

[314]    See Pharos Obj. ¶ 22.

account" of such interests themselves but pursuant to, and to implement, a settlement previously approved by the Court, *i.e.*, the Series B Settlement.

207.    Prior to the Series B Settlement, the Series B Holders argued that they were entitled to receive recoveries ahead of unsecured Account Holder Claims because Account Holders only had claims against Celsius Network LLC.[315]    Calling it a "gating question" for these Chapter 11 Cases, the Court found that customers could only assert contractual claims against Network LLC and not all Celsius entities.[316]    Importantly, however, the Court noted that there may be non-contractual claims against other Celsius entities.[317]    As a result, to address these potential non-contractual claims, the Debtors and the Committee commenced a series of related litigations, including with respect to the issues of substantive consolidation, the allowance of an intercompany claim between Celsius Network Ltd and Celsius Network LLC, and an alleged constructive transfer.    While this litigation was ongoing, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of Ultimately, however, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of the issues between the parties.    These negotiations were successful and the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders reached a global settlement and filed, on June 27, 2023, a joint motion requesting

---

[315]    *See generally Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795].

[316]    *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205].

[317]    *See id.* at 4.

entry of an order approving the same,[318] which the Court subsequently entered.[319]   The settlement

agreement expressly noted that it was "for settlement purposes only"[320] and the parties explained

in their joint motion that the $25 million cash funds (the "Settlement Funds") that would be

distributed pursuant to the Series B Settlement "ends all ongoing litigation between the parties

regarding substantive consolidation, the allowance of an intercompany claim between CNL and

LLC, and an alleged constructive transfer."[321]   Accordingly, payments to Holders of Series B

Preferred Interests are being made on account of the Series B Settlement—and the multiple

complex issues it resolves—and not purely on account of their Interests.

208.    If Pharos believed that the Series B Settlement had any potential to prejudice its

interests as a general unsecured creditor, Pharos should have objected to the Series B Settlement

Motion, but it did not.   More importantly, however, absent the Series B Settlement, if the Initial

Consenting Series B Preferred Holders had been successful in their arguments, they would

potentially be senior to Pharos in receiving distributions from certain Debtors.   A settlement of

these issues does not violate the absolute priority rule.

209.    The Debtors do not believe that the Series B Settlement deviates from the absolute

priority rule, but even if it did, as the Court opined in *Dewey & LeBoeuf*, "a court in its discretion

can approve a settlement that does not comply strictly with the absolute priority rule, as long as

---

[318]   *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899] (the "Series B Settlement Motion").

[319]   *See Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058] (the "Series B Settlement Order"); *see also Memorandum Opinion Approving the Settlement Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders* [Docket No. 3074].

[320]   *See* Series B Settlement Order, Exh. 1.

[321]   *See* Series B Settlement Mot. ¶ 1.

the settling parties can justify the divergence, and the court can 'clearly articulate the reasons for approving…a settlement that deviates from the absolute priority rule.'" This Court has already approved the Series B Settlement, and therefore any challenge to it on account of the absolute priority rule is moot.[322]

210.    Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.[323]

**T.    The Debtors Complied With Section 1129(d) of the Bankruptcy Code**.

211.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[324]    Article II.C of the Plan contemplates the full payment of all Allowed Priority Tax Claims.    Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.    Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.[325]

## VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.

212.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[326] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory

---

[322]    *In re Dewey & LeBoeuf, LLP*, 478 B.R. 628, 642 (Bankr. S.D.N.Y. 2012) (approving a settlement between a debtor law firm and many of its former partners, which included mutual releases that an ad hoc committee argued constituted a distribution that would violate the absolute priority rule).

[323]    *See* Campagna Decl. ¶¶ 48–51.

[324]    15 U.S.C. § 77e.

[325]    *See* Campagna Decl. ¶ 53.

[326]    Fed. R. Bankr. P. 3020(e).

contract or unexpired lease under section 365(f) of the Bankruptcy Code.[327]  Each rule also permits

modification of the imposed stay upon court order.[328]

213.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

proposed Confirmation Order will be effective immediately upon its entry.[329]  The restructuring

transactions contemplated by the Plan were vigorously negotiated among sophisticated parties, and

the Plan has been accepted by the Voting Class.    Further, each day the Debtors remain in

chapter 11, they incur significant administrative and professional costs—expenses that are

unnecessary in light of the overwhelming support for the Plan among the Voting Class.

Importantly, not a single creditor in a Voting Class voted to reject the Plan.    Accordingly, the

Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed

Confirmation Order may be effective immediately upon its entry.

## VII.    The Debtors' Replies to Remaining Objections.

### A.    The Emergence Incentive Plan Should Be Approved as Part of the Plan.

214.    Victor Ubierna de las Heras ("Mr. Ubierna de las Heras") objects to the Emergence

Incentive Plan because he believes it does not satisfy the requirements of section 503(c) of

the Bankruptcy Code.[330]  Mr. Ubierna de las Heras, however, is an outlier in this regard, as over

---

[327]    Fed. R. Bankr. P. 6004(h), 6006(d).

[328]    *Id.*

[329]    *See, e.g., In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Barneys N.Y. Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) (same); *In re Deluxe Ent. Servs. Grp. Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) (same); *In re Hollander Sleep Prods., LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same).

[330]    *See generally* Ubierna de las Heras Obj.

95% of the number of Claims that voted, voted to accept the Plan, including the Emergence Incentive Plan. Indeed, Mr. Ubierna de las Heras and the one additional creditor who raised concerns with the Court regarding the Emergence Incentive Plan hold claims in the Account Holder Voting Classes, which overwhelmingly voted to accept the Plan. On this basis alone the objections to the Emergence Incentive Plan should be overruled. The Debtors worked with the Committee to develop the Emergence Incentive Plan and select metrics that would challenge and incentivize the EIP Participants. The Account Holder Classes have voiced their clear support of the Plan and terms contained therein, including the Emergence Incentive Plan, and dissenters in those classes must accept this outcome. The Committee's support of the Emergence Incentive Plan, coupled with the voting results, demonstrates that creditors acting in their own interest as well as their appointed fiduciary believe the Emergence Incentive Plan is appropriate under the circumstances.

215.    The Ubierna de las Heras Objection to the Emergence Incentive Plan is premised on the alleged applicability of section 503(c) of the Bankruptcy Code and the appropriateness of the Emergence Incentive Plan under the facts and circumstances of these Chapter 11 Cases. In particular, Mr. Ubierna de las Heras asserts that the Debtors are required to satisfy section 503(c) of the Bankruptcy Code for the EIP to be in the Plan and have failed to present sufficient evidence that the Emergence Incentive Plan satisfies such requirements.

216.    The Ubierna de las Heras Objection is misplaced. As an initial matter, the payments will be made by the Post-Effective Date Debtors, not any chapter 11 debtor, and so any restriction on the Debtors under the Bankruptcy Code are inapplicable. Even if a higher standard is applied, the Emergence Incentive Plan is justified under the facts and circumstances of these Chapter 11 Cases, as the Plan allows the Post-Effective Date Debtors to compensate key members of

management who have focused their collective efforts on maximizing value for all stakeholders and providing key services related to the consummation of the Debtors' Plan. Specifically, these executives have worked tirelessly and will continue to work hard distributing Liquid Cryptocurrency to the Debtors' stakeholders, maximizing the value of the Debtors' mining operations, and maintaining security of the Debtors' platform for a period of time after the Effective Date to ensure the security of the Debtors' Liquid Cryptocurrency. The ultimate success of the Debtors' Chapter 11 Cases is heavily reliant on the continued efforts of the EIP Participants, as they possess the specific expertise, knowledge, and familiarity with the Debtors' business and operations, making them indispensable to the Debtors' Plan consummation and the obligations of the Post-Effective Date Debtors.

217.    The demands placed upon the EIP Participants have been, and will continue to be, significant in light of the facts and circumstances of these Chapter 11 Cases, especially at this critical juncture of confirming and consummating the Plan. Contrary to Mr. Ubierna de las Heras' assertion, many of the demands that the EIP Participants face go well beyond the demands of their prepetition day-to-day responsibilities. The EIP Participants' critical roles are even more challenging due to the Debtors' significantly depleted workforce. In fact, many EIP Participants assumed additional roles and responsibilities resulting from the reduction in workforce from over 900 employees in early 2022 to fewer than 150 employees today. Moreover, headcount is expected to continue to fall between now and the anticipated emergence date and the Company is preparing for further attrition due to turnover and reductions in force of approximately 33%. As such, it is vital that the Debtors boost morale among the EIP Participants and incentivize the EIP Participants to continue to meet onerous demands. Ultimately, incentivizing the EIP Participants will inure to the benefit of all stakeholders by ensuring the EIP Participants are focused on facilitating a

127

value-maximizing resolution to these Chapter 11 Cases, thus maximizing recoveries for the Debtors' stakeholders.

218.    Moreover, Mr. Ubierna de las Heras' contention that "compensation above base salary should be reviewed by the Debtors' post-confirmation Board" misses the mark.[331]   Under the Plan, NewCo will not be responsible for distributing the EIP Awards.[332]   Rather, the Plan Administrator will distribute the EIP Awards subject to his verification of the EIP Participants' satisfaction of the applicable performance metrics under the Emergence Incentive Plan.[333]

### 1.    The Emergence Incentive Plan Complies With Section 503(c) of the Bankruptcy Code.

219.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.   Thus, the Ubierna de las Heras Objection should be overruled.

220.    The Debtors maintain that section 503(c) is not the relevant standard given that the Emergence Incentive Plan was incorporated in the Plan that was accepted by Account Holder Classes.   The Emergence Incentive Plan, as its name suggests, is an incentive-based program—not a "pay-to-stay" retention plan prohibited by section 503(c)(3).

---

[331]    *See id.* at 3.

[332]    *See* Plan, Art. IV.J.2.

[333]    *See id.* ("On the Effective Date, the Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator *may* distribute the EIP Awards, ***subject to the Plan Administrator to confirming that the applicable metrics have been satisfied***, without any further action by the Debtors or the Post-Effective Date Debtors.").

221.    In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work."[334]    As evidenced by its terms, the purpose of the Emergence Incentive Plan is to incentivize the EIP Participants to maximize the value of the Post-Effective Date Debtors after emergence from chapter 11 by distributing EIP Awards subject to the satisfaction of certain metrics and subject to the discretion of the Plan Administrator.[335]    Contrary to Mr. Ubierna de las Heras' assertion that the Emergence Incentive Program's "retentive purpose is obvious from the easily achievable benchmarks,"[336] the program does not contain any retention-based components, as the EIP Participants are not merely paid for maintaining their employment for a certain time period.[337]    Rather, the Emergence Incentive Plan incentivizes the EIP Participants to rise to the challenge of consummating the Debtors' Plan.  Importantly, the metrics are not easily achievable, demonstrated by the fact that certain of the metrics have not been achieved—specifically, pursuant to the Mining Rig Metric, target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to market conditions, by September 30, 2023).[338]    As of August 31, the Debtors have only approximately 86,000 mining rigs hashing, thus falling well short of target performance.

---

[334]    *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business" (emphasis in original)); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance.").

[335]    *See* Plan, Art. IV.J.2.

[336]    *See* Ubierna de las Heras Obj. at 3.

[337]    *See* Plan, Art. IV.J.2; *cf. In re Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies'").

[338]    *See* Campagna Decl. ¶ 28.

Construction and delivery delays, disputes with mining counterparties, and the numerous financial risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point.[339]  Furthermore, when developing the Mining Metrics, the Debtors and their advisors reached agreement with the Committee to make the Mining Metrics, specifically, more challenging under the facts and circumstances of these Chapter 11 Cases in exchange for the Committee's support of the Emergence Incentive Plan.  Significantly, even despite precarious market conditions facing the cryptocurrency industry and serious challenges facing the Debtors' mining business, including the rejection of the Core hosting contract, the Debtors' mining business has maintained a positive operating cash flow since the Petition Date.[340]

222.    Furthermore, under the Liquid Cryptocurrency Distribution Metric, certain EIP Participants are incentivized to ensure sufficient Liquid Cryptocurrency is available for the initial distribution to all Holders of Allowed Claims within thirty days of the Effective Date, ensuring that the Debtors' Account Holders are able to access their distributions as expeditiously as possible.  This is no small undertaking—the Debtors anticipate that approximately 400,000 customers will be entitled to receive distributions under the Plan.  The Emergence Incentive Plan ensures that those EIP Participants are working toward the goal of maximizing the distributions to account holders who have been waiting for their cryptocurrency for over sixteen months.  As such, Mr. Ubierna de las Heras' objection to the metrics is misguided and without merit.

---

[339]    *See id.*

[340]    *See* Ferraro Decl. ¶ 43.

223.    Despite Mr. Ubierna de las Heras' assertion that "[a] CEO getting his company out of bankruptcy is just doing his job,"[341] each of the EIP Participants have assumed significant, additional responsibilities and stresses of the key roles and responsibilities as a result of these Chapter 11 Cases.  Importantly, the EIP Participants are not required to remain employed with the Debtors after the Effective Date but have agreed to do so to effectuate the Restructuring Transactions and maximize value for stakeholders.  To properly incentivize the EIP Participants to achieve these results, the Emergence Incentive Plan included specific metrics to ensure an expeditious distribution of liquid cryptocurrency.  The EIP Participants possess the skills, knowledge, and experience that are critical to the Debtors' ability to consummate the Debtors' Plan for the benefit of all stakeholders in these Chapter 11 Cases.  To receive the target EIP Award opportunity, the EIP Participants must achieve multiple performance metrics as reflected in the Plan, including, among others, confirming and consummating the Plan, achieving performance targets regarding the distribution of liquid cryptocurrency under the Plan, and, for some EIP Participants, achieving certain mining rig hashing and profit goals.[342]  As such, the Emergence Incentive Plan properly incentivizes the EIP Participants to maximize the value of the Debtors' estates.  The Emergence Incentive Plan is therefore structured to drive performance from these key parties by providing incentives to achieve targeted goals in a manner that will benefit all parties— particularly the Debtors' stakeholders—if the performance targets are achieved.  Furthermore, the overall cost of the Emergence Incentive Plan—$2.6 million—is reasonable and appropriate under the circumstances.[343]

---

[341]    *See* Ubierna de las Heras Obj. at 4.

[342]    *See* Plan, Art. IV.J.2.

[343]    *See* Hoeinghaus Decl. at ¶ 22.

224.    Moreover, implementing the Emergence Incentive Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates and stakeholders. The Emergence Incentive Plan is the result of an independent analysis undertaken by the Debtors in conjunction with market guidance from their restructuring advisor Alvarez & Marsal North America, LLC ("A&M") and the Debtors' other advisors to ensure that the Emergence Incentive Plan is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code  The Emergence Incentive Plan was subject to further review and approval from the Special Committee, none of whom are current EIP Participants.  Absent the Emergence Incentive Plan, the EIP Participants  may be  undercompensated, under-incentivized at this critical stage of the Debtors' Chapter 11 Cases, and at risk of leaving the Debtors before certain key milestones are achieved, including the distribution of a significant amount of liquid cryptocurrency.  Such incentives are an important tool for driving performance by key personnel and effectively align the interests of the EIP Participants with those of the Debtors' stakeholders.

225.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, has the support of an overwhelming number of creditors who voted to accept the Plan, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.  Thus, Mr. Ubierna de las Heras's objection should be overruled.

**B.    The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections Related to Loans Should Be Overruled.**

226.    Several creditors objected to confirmation of the Plan with respect to the treatment of the loans of the Retail Borrowers.  Specifically, as noted, Mr. Bronge filed the Bronge Objection

and several other Retail Borrowers wrote letters on this issue.[344]  As further set forth below, the

Bronge Objection and the Loan Letters should be overruled.

> **1.     Plan Treatment of the Institutional Borrowers and Retail Borrowers is Appropriate.**

227.    The Bronge Objection asserts that the Plan should provide similar treatment to both

the Retail Borrowers and Institutional Borrowers.  Specifically, Mr. Bronge asserts that Retail

Borrowers, like Institutional Borrowers, should be allowed to repay outstanding loan balances

(including interest) in exchange for the full amount of their collateral, with any such amount to be

paid in kind with "full unencumbered property rights."

> **a.     Retail Borrowers Do Not Own Their Collateral and are Instead Unsecured Creditors of the Debtors.**

228.    The Debtors' Estates consist of "all legal or equitable interests of the debtor in

property as of the commencement of the case."[345]  The Loan Terms and Conditions provide—

unambiguously in every version and in multiple places—that Retail Borrowers transferred title of

their collateral to the Debtors.  For example, the current version of the Loan Terms and Conditions

---

[344]    Prior to the Bronge Objection, Mr. Bronge also filed a *Motion for Repayment of Loans and Return of Collateral* [Docket No. 3270] (the "Bronge Motion"), which was not yet scheduled for a hearing.  There, Mr. Bronge raised similar arguments regarding the treatment of Retail Borrower Deposit Claims and sought a ruling that (a) allows him to redeem the digital assets he transferred to the Borrow Program by repaying the principal and interest of his retail loans, (b) establishes that only the outstanding balance of his retail loans is property of the Debtors' Estates and the digital assets he transferred to the Borrow program are his "encumbered property" until his repayment, and (c) requires the Plan and the Disclosure Statement to use the same definitions and terminologies as the Loan Terms and Conditions.  *See* Bronge Motion at 3–4.  The Bronge Motion and the Bronge Objection were joined by the following letters (collectively, the "Loan Letters"): the First Windom Letter [Docket No. 3533] (joining the Bronge Motion); the Abruzese Letter [Docket No. 3540] (joining the Bronge Objection); the Truss Letter [Docket No. 3541] (joining the Bronge Objection); and the Dame Letter [Docket No. 3543] (joining the Bronge Motion).  In addition, other creditors' letters raise similar arguments.  *See, e.g.*, the Second Windom Letter [Docket No. 3546] ¶ 6 (arguing that Retail Borrowers should have the same opportunity as Institutional Borrowers to repay the loan and redeem the digital assets transferred to the Borrow Program); the Johantgen Letter [Docket No. 3538] (arguing that the Plan's treatment of Retail Borrower Deposit Claims is unfair because he would receive fewer digital assets than what he transferred to the Borrow Program).

[345]    *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

provide that "Digital Assets posted as Collateral shall be the exclusive property of [Lending]," that Borrowers "grant [Lending] and any of its Affiliates the right . . . to hold the Digital Assets provided as Collateral in [Lending's] name or in another name . . . with all attendant rights of ownership . . . ," and that Borrowers "acknowledge that, with respect to Digital Assets used by Lending . . . [they] will not be able to exercise any rights of ownership."[346] When the contract is clear and unambiguous, courts will "give effect to the plain meaning of the contract's terms and provisions."[347] As a result, the digital assets Retail Borrowers transferred via the Borrow Program are property of the Debtors' Estates, just as this Court found that assets in Earn Accounts are property of the Debtors' Estates.[348]

229.    These arguments were raised in connection with the mediation between the Debtors, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and the Committee, which led to the Retail Borrower Settlement that has been incorporated into the Plan. The Retail Borrower Settlement and the Plan establish a mechanism through which the rights of the Debtors and the Holders of Retail Borrower Deposit Claims are reconciled.[349] This a value-maximizing result that avoids further litigation, which would only drain estate resources to be distributed to the Debtors' stakeholders. The broad agreement of the Holders of Retail Borrower Deposit Claims can be inferred from their overwhelming support for the Plan, as described below.

---

[346]    *See* Loan T&C version 9, "Collateral," "Consent to Celsius' Use of Your Digital Assets." *See also* Loan T&C version 8 at 6, 12; Loan T&C version 7 at 14; Loan T&C version 6 at 14; Loan T&C version 5 at 14; Loan T&C version 4 at 14; Loan T&C version 3 at 13; Loan T&C version 2 at 12; Loan T&C version 1 at 11.

[347]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[348]    *See, e.g.*, *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] at 30 (holding that "the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors").

[349]    *See* Disclosure Statement, Art. II.A.2.

        **b.**      **The Bronge Objection Misunderstands the Institutional Loan Order.**

230.     Moreover, the Bronge Objection also references the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], which was approved by the Court,[350] to argue that the Retail Borrowers should be afforded the same treatment as Institutional Borrowers. This order, however, only "authorized, but [did] not direct[]" the Debtors to exercise their rights under the Master Loan Agreements to settle the Institutional Loans. Nothing in the Institutional Loan Order requires the Debtors to return such collateral. Instead, it provided the Debtors with the authority to negotiate with Institutional Borrowers to return a portion of their collateral. Such relief was granted because the Institutional Borrowers are subject to Master Lending Agreements that provided that they retained ownership of the collateral they provided to the Debtors, unlike the Loan Terms and Conditions applicable to Retail Borrowers.

        **c.**      **Separate Classification of Retail Borrower and Institutional Borrower Claims is Appropriate Under the Bankruptcy Code.**

231.     As an initial matter, Mr. Bronge has no grounds to object to the treatment of the Retail Borrower Deposit Claims on the grounds of unfair discrimination because the Class overwhelmingly voted to accept the Plan. Section 1129(b)(1) of the Bankruptcy Code only provides an opportunity for a member of a class to object to a plan of reorganization on the grounds that the plan discriminates unfairly against that class if the class "is impaired under, and has not

---

[350] *See Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) The Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1944] (the "Institutional Loan Order").

accepted, the plan."[351]   There can be no dispute that the vote of 98.83% of the Holders of Retail

Borrower Deposit Claims in favor of the Plan constitutes anything less than an overwhelming show

of support.[352]   Because he is a member of a class that has voted to accept the Plan, Mr. Bronge is

bound to accept his treatment and the Debtors do not have to demonstrate that the class is not the

product of unfair discrimination against similarly situated creditors.

232.    Even if the Debtors were required to demonstrate that the Retail Borrower Deposit

Claims class treatment is not the product of unfair discrimination, such differences in treatment

between that class and Institutional Borrowers would be justified based on the differences in the

legal rights accruing to the Holders of each set of claims.   The classification requirement of

section 1122(a) of the Bankruptcy Code provides, in pertinent part, "[e]xcept as provided in

subsection (b) of this section, a plan may place a claim or an interest in a particular class only if

such claim or interest is substantially similar to the other claims or interests of such class."[353]

233.    Courts generally will approve placement of similar claims in different classes,

provided that a "rational" or "reasonable" basis exists for doing so.[354]   Recognizing this flexibility,

---

[351]   11 U.S.C. § 1129(b)(1).

[352]   *See* Voting Report ¶ 13.

[353]   11 U.S.C. § 1122(a).

[354]   *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25–123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[355]  Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[356] and where the debtors have valid business reasons for separate classification.[357]

234.    The Plan's classification of Retail Borrowers in Class 2, as set forth in Article III of the Plan, satisfies the requirements of section 1122 of the Bankruptcy Code because the Retail Borrowers and Institutional Borrowers have different legal rights, and the Debtors have valid business reasons for separate classification.  Specifically, Retail Borrowers initiated loans through their Celsius Accounts and all were subject to the same Loan Terms and Conditions (each as amended).  On the other hand, Celsius originated institutional loans with Institutional Borrowers on an individual basis, entering into separate master lending agreements with each Institutional Borrower.  As such, the rights of Retail Borrowers are distinct from those of Institutional Borrowers, and the fact that all Retail Borrowers are subject to the Loan Terms and Conditions serves as a valid reason for the Debtors to classify Retail Borrower Deposit Claims in their own Class.

---

[355]    *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[356]    *See Drexel*, 138 B.R. at 715.

[357]    *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, 2007 WL 2779438, at *3.

        **d.**    **The Debtors' Valuation of the Collateral Related to the Retail Borrower Claims is Appropriate.**

235.    The Bronge Objection argues that the valuation of the collateral related to the Retail Borrower Deposit Claims using a price reflecting the value of such collateral on the Petition Date for the purposes of distributions and using the current market price to determine the value of the collateral for the purposes of the Set Off Treatment evinces a "lack of fairness" because "[t]his approach may result in an unjustifiable loss of actual BTC or ETH beyond the general 'haircut' that all unsecured claimants are subjected to."[358] As an initial matter, Mr. Bronge has failed to identify any statutory basis upon which this portion of his objection rests. Further, this treatment is precisely that which was determined to be appropriate under the Retail Borrower Settlement and represents a consensual compromise concerning the various rights and obligations applicable to Retail Borrowers. Finally, the Debtors' use of different prices to value collateral for the purposes of distributions and for the purposes of setoff is valid. A distribution under the Plan is on account of a prepetition obligation of the Debtors and is therefore sensibly valued as of the Petition Date. The Set Off Treatment described in the Plan, however, contemplates a transaction occurring between the Debtors and the relevant Retail Borrowers as of the Effective Date of the Plan and therefore appropriately uses market valuation to account for the value of the collateral at the time of that transaction.[359]

        **e.**    **The Terminology Used by the Debtors in the Plan and Retail Borrower Settlement is Appropriate.**

236.    Last, Mr. Bronge objects to the Debtors' use of terminology describing the Retail

---

[358]   *See* Bronge Obj., "Valuation of Collateral."

[359]   *See* Disclosure Statement, Art. II.A.2.

Borrower Settlement and related provisions in the Plan.[360]  Mr. Bronge cites no provisions of the

Bankruptcy Code, nor any case law, that requires the Plan definitions to conform to a particular

contract.  Accordingly, the Bronge Objection and the Loan Letters should be overruled.

237.    The remaining Objections, to the extent not discussed in the body of the

Memorandum, are addressed in the Objection Tracker attached hereto as **Exhibit A**.

### **Conclusion**

238.    For all of the reasons set forth herein and in the Ferraro Declaration, the Campagna

Declaration, the Kielty Declaration, the Cohen Declaration, the Fahrenheit Declaration, and the

Hoeinghaus Declaration, Debtors respectfully request that the Court confirm the Plan as fully

satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed

Confirmation Order, and granting such other and further relief as is just and proper.


[*Remainder of page intentionally left blank*]

---

[360]    *See* Bronge Obj., "Terminology."

New York, New York
Dated: September 27, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
          ross.kwasteniet@kirkland.com
          chris.koenig@kirkland.com
          dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Objection Tracker**

**Exhibit B**

**Redline**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT**
**OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF CELSIUS NETWORK LLC AND ITS**
**DEBTOR AFFILIATES AND OMNIBUS REPLY TO OBJECTIONS THERETO**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS[2]

                                                           **Page**

Preliminary Statement ........................................................................... 2

Background ............................................................................................ 9

I.      Solicitation and Notification Process. ............................................ 9

II.     The Restructuring Transactions. ................................................... 14

III.    The Objections. ............................................................................. 19

Argument .............................................................................................. 21

IV.   The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. ............................. 21

V.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ........ 25

A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)). ............................................................... 26

B.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code. ............................................................... 26

C.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code. ............................................................... 30

D.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code. ............................................................... 36

        1.    The Debtor Release Is Appropriate and Complies With the Bankruptcy Code. ............................................................... 38

        2.    The Third-Party Release Is Wholly Consensual and Should Be Approved. ...... 43

        3.    The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code. ............................................................... 52

        4.    The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code. ............................................................... 60

        5.    The CEL Token Settlement, the Account Holder Avoidance Action Settlement, and the Retail Borrower Settlement Comply With the

---

[2]   [Resolved.]

Page

Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors' Good Business Judgment. ................................................................. 61

E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code. ............ 79

F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)). ........................................................................... 83

      1.    The Debtors Complied With Section 1125 of the Bankruptcy Code. ...... 84

      2.    The Debtors Complied With Section 1126 of the Bankruptcy Code. ...... 85

G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3)). ..................................................................... 90

H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)). ........................ 93

I.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)). ......................................................... 94

J.    The Plan Does Not Require the Approval of a Governmental Regulatory Commission (§ 1129(a)(6)). ................................................................. 95

K.    The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)). ... 95

L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code. ................................................................... 102

M.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)). ................................................................................. 104

N.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)). ............................................................................... 105

O.    The Plan Is Feasible (§ 1129(a)(11)). .................................................. 106

P.    All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)). .................. 111

Q.    All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)). ....... 112

R.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. ............................................................................... 112

S.    The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the Bankruptcy Code. ............................................................................ 113

ii

Page

1.      The Plan Does Not Unfairly Discriminate with Respect to Rejecting
        Classes (§ 1129(b)(1))........................................................................114

2.      The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§
        1129(b)(2))........................................................................................120

T.      The Debtors Complied With Section 1129(d) of the Bankruptcy Code.................124

VI.     Good Cause Exists to Waive the Stay of the Confirmation Order.........................124

VII.    The Debtors' Replies to Remaining Objections...............................................125

A.      The Emergence Incentive Plan Should Be Approved as Part of the Plan.................125

1.      The Emergence Incentive Plan Complies With Section 503(c) of the
        Bankruptcy Code...............................................................................128

B.      The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections
        Related to Loans Should Be Overruled.........................................................132

1.      Plan Treatment of the Institutional Borrowers and Retail Borrowers is
        Appropriate......................................................................................133

Conclusion........................................................................................................139

# TABLE OF AUTHORITIES[2]

**Page(s)**

**Cases**

*In re 20 Bayard Views, LLC*,
   445 B.R. 83 (Bankr. E.D.N.Y. 2011) ............................................................. 114

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*,
   526 U.S. 434 (1999) ......................................................................................... 113

*In re 500 Fifth Ave. Assocs.*,
   148 B.R. 1010 (Bankr. S.D.N.Y. 1993) ................................................... *passim*

*In re A.H. Robins Co.*,
   88 B.R. 742 (Bankr. E.D. Va. 1988) ................................................................. 21

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................ 39, 43, 90, 95

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] ......... 56

*Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*,
   855 F.3d 459 (2d Cir. 2017) ............................................................................... 65

*In re Aegean Marine Petroleum Network, Inc.*,
   No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) ............................... 124

*Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re
   Chateaugay Corp.)*,
   89 F.3d 942 (2d Cir. 1996) ......................................................................... 27, 136

*In re Aleris Int'l, Inc.*,
   No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ........... 21

*In re Almatis, B.V.*,
   No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] ........ 55

*In re Ambanc La Mesa Ltd. P'ship*,
   115 F.3d 650 (9th Cir. 1997) ........................................................................... 114

[2] This Table of Authorities is not yet complete. The Debtors are continuing to finalize the Table of Authorities and will file a revised Memorandum on the docket as soon as possible showing a redline reflecting that the Table of Authorities is the only change.

*In re Ampex Corp.*,
No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] ...... 56

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013) .......................................... 21, 24

*In re Answers Holdings, Inc.*,
No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) ........................ 50, 56

*In re Avaya Inc.*,
No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) ........................ 50, 56

*In re Avianca Holdings S.A.*,
632 B.R. 124 (Bankr. S.D.N.Y. 2021) ....................................... 46, 47

*In re Avianca Holdings S.A.*,
No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021) ........................... 49

*In re Avianca,*
632 B.R. 124 (Bankr. S.D.N.Y. 2021) 46, 47

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..................................... 114

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc.
Corp.)*,
701 F.2d 1071 (2d Cir. 1983) ............................................... 90

*In re Bally Total Fitness of Greater N.Y., Inc.*,
No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ....... *passim*

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) ...................................................... 95, 120

*In re Barneys N.Y. Inc.*,
No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) .......................... 124

*In re Barneys New York Inc.*,
No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020) ........................... 45, 50

*In re BCBG Max Azria Global Holdings, LLC*,
No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) ......................... 50, 56

*In re BearingPoint, Inc.*,
453 B.R. 486 (Bankr. S.D.N.Y. 2011) ....................................... 55

*In re BearingPoint, Inc.*,
No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) .......................... 43

*In re Best Prods. Co.*,
    177 B.R. 791 (S.D.N.Y. 1995) ................................................................ 24

*Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*,
    21 F.3d 477 (2d Cir. 1994) ........................................................... 27, 136

*In re Bowles*,
    48 B.R. 502 (Bankr. E.D. Va. 1985) ...................................................... 113

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018) ................................................... 115

*In re Cajun Elec. Power Co-op., Inc.*,
    150 F.3d 503 (5th Cir. 1998) .................................................................. 83

*In re Calpine Corp.*,
    No. 05-60200 (BRL) ............................................................................... 44

*In re Capmark Fin. Grp., Inc.*,
    438 B.R. 471 (Bankr. D. Del. 2010) ....................................................... 66

*In re Captran Creditors' Trust*,
    128 B.R. 469 (M.D. Fla. 1991) ............................................................... 53

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ................................................ 21, 90

*In re Cengage Learning, Inc.*,
    No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] ........ 57

*In re Cenveo, Inc.*,
    No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] .......... 55, 56

*In re Charter Commc'ns*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................... 39

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) ...................................................... 44

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) .................................................... 44

*In re China Fishery Grp. Ltd.*,
    No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022) ............................ 49

*Complaint for Declaratory Judgment*
    [Adv. No. 23-01007, Docket No. 2001] .................................................. 77

*In re Crabtree & Evelyn, Ltd.*,
No. 09-14267 (BRL), 2010 WL 3638369 (Bankr. S.D.N.Y. Jan. 14. 2010) .... 43

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009), *aff'd, In re DBSD N. Am., Inc.*, No.
09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part,
rev'd in part*, 634 F.3d 79 (2d Cir. 2011) .... 55, 109

*In re Deluxe Media*,
No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) .... *passim*

*In re Dewey & LeBoeuf, LLP*,
478 B.R. 628 (Bankr. S.D.N.Y. 2012) .... 123

*In re Ditech Holding Corp.*,
606 B.R. 544 (Bankr. S.D.N.Y. 2019) .... *passim*

*In re DJK Residential, LLC*,
No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] .... 57

*In re Dow Corning Corp.*,
237 B.R. 374 (Bankr. E.D. Mich. 1999) .... 21

*In re Drexel Burnham*,
960 F.2d 285 (2d Cir. 1992) .... 52, 60

*In re Drexel Burnham Lambert Grp., Inc.*,
134 B.R. 493 (Bankr. S.D.N.Y. 1991) .... 61

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992) .... *passim*

*In re Eastman Kodak Co.*,
No. 12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] .... 55

*In re Eddington Thread Mfg. Co.*,
181 B.R. 826 (Bankr. E.D. Pa. 1995) .... 106

*In re Enron Corp.*,
326 B.R. 497 (S.D.N.Y. 2005) .... 52, 55, 56

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) .... 120

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) .... 113

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
   10 F.3d 944 (2d Cir. 1993) ................................................26, 136

*In re Frontier Communications Corp.*,
   No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020) ...............54

*In re Fullbeauty Brands Holdings Corp.*,
   No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019) ............50, 56

*In re Garrett Motion*,
   No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021) ..........49, 54

*In re Gaston & Snow*,
   Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421 (S.D.N.Y. Dec. 4,
   1996) ................................................................................89

*In re Genco Shipping & Trading Ltd.*,
   513 B.R. 233 (Bankr. S.D.N.Y. 2014) ..................43, 44, 115

*In re Genco Shipping*,
   513 B.R. ..................................................................115

*In re Glob. Home Prods., LLC*,
   369 B.R. 778 (Bankr. D. Del. 2007) ..................................128

*In re Global A&T Electronics Ltd.*,
   Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) ..........59

*In re Global A&T Electronics Ltd.*,
   No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51] ......56, 59

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007) ..............................55, 120

*In re Great Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ..................................114

*In re Hawker Beechcraft, Inc.*,
   479 B.R. 308 (Bankr. S.D.N.Y. 2012) ..............................128

*In re Health Diagnostic Lab., Inc.*,
   551 B.R. 218 (Bankr. E.D. Va. 2016) ................................53

*Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
   Enters., Ltd. II)*,
   994 F.2d 1160 (5th Cir. 1993) ....................................25, 106

*In re Heritage Org., L.L.C.*,
    375 B.R. 230 (Bankr. N.D. Tex. 2007) ............................................ 27, 136

*In re Hollander Sleep Products, LLC*,
    No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) ............... *passim*

*In re Indianapolis Downs, LLC.*,
    486 B.R. 286 (Bankr. D. Del. 2013) ............................................ 110

*In re Ion Media Networks, Inc.*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...................................... 118, 121

*In re Ionosphere Clubs*,
    98 B.R. ............................................................................................ 136

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) .................................... 26, 27, 136

*In re Jartran, Inc.*,
    44 B.R. 331 (Bankr. N.D. Ill. 1984) ............................................ 56

*In re Jason Industries*,
    No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020) ............... 50

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
    *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988) ............................ 114

*Kane v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*),
    843 F.2d 636 (2d Cir. 1988) ...................................... 25, 89, 106, 114

*Kenton Cty. Bondholders Comm. v. Delta Air Lines* (*In re Delta Air Lines*),
    374 B.R. 516 (S.D.N.Y. 2007) ............................................ 61

*In re Key3Media Grp. Inc.*,
    336 B.R. 87 (Bankr. D. Del. 2005) ............................................ 66

*In re Lakeland Tours, LLC*,
    No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020) ............... 50

*In re Lapworth*,
    No. 97-34529 (DWS), 1998 WL 767456 (Bankr. E.D. Pa. Nov. 2, 1998) ...... 83

*In re LATAM Airlines Group S.A.*,
    No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022)
    ............................................................................ 49, 54, 58, 59

*In re Lear Corp.*,
  2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009) ............................................ 44

*In re Legend Parent Inc.*,
  No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014) ...................................................... 50

*In re Lehman Bros. Holdings. Inc.*,
  422 B.R. 407 (Bankr. S.D.N.Y. 2010) .............................................................. 133

*In re Leslie Fay Companies, Inc.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) .............................................................. 110

*In re Lightsquared Inc.*,
  513 B.R. 56 (Bankr. S.D.N.Y. 2014) ........................................................... 26, 136

*In re LSC Communications, Inc.*,
  No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021) ..................................... 49, 54

*In re Lumileds*,
  No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022) ..................................... 49, 54

*In re Metromedia Fiber Network, Inc.*,
  416 F.3d 136 (2d Cir. 2005) ............................................................... 43, 44, 47

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium*
  *Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) .......................................................... *passim*

*In re MPM Silicones*,
  2014 WL 4436335 (Bankr. S.D.N.Y. Sept. 9, 2014) ...................................... 44

*Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship (In re*
  *Patrician St. Joseph Partners Ltd. P'ship)*,
  169 B.R. 669 (Bankr. D. Ariz. 1994) .............................................................. 106

*In re Nellson Nutraceutical, Inc.*,
  369 B.R. 787 (Bankr. D. Del. 2007) ............................................................... 128

*In re NII Holdings, Inc.*,
  536 B.R. 61 (Bankr. S.D.N.Y. 2015) ........................................................... 39, 60

*In re Nine West Holdings, Inc.*,
  No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) ...................................... *passim*

*NLRB v. Bildisco & Bildisco*,
  465 U.S. 513 (1984) ...................................................................................... 90

Page

*O'Connell v. Packles (In re Hilsen)*,
  404 B.R. 58 (Bankr. E.D.N.Y. 2009) ................................................................. 61

*In re Oneida Ltd.*,
  351 B.R. 79 (Bankr. S.D.N.Y. 2006) ..................................................... 39, 43, 57

*Osborn ex rel. Osborn v. Kemp*,
  991 A.2d 1153 (Del. 2010) ................................................................................ 133

*In re Philippine Airlines, Inc.*,
  No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) ..................................... 49

*In re Pisces Energy, LLC*,
  Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880 (Bankr. S.D.
  Tex. Dec. 21, 2009) ............................................................................................. 21

*In re Prudential Energy Co.*,
  58 B.R. 857 (Bankr. S.D.N.Y. 1986) ......................................................... 107, 110

*In re Purofied Down Prods. Corp.*,
  150 B.R. 519 (S.D.N.Y. 1993) ............................................................................ 61

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ............................................................................... 53

*In re Reader's Digest Ass'n, Inc.*,
  No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) .............. 26, 114, 115, 136

*In re Repurchase Corp.*,
  332 B.R. 336 (Bankr. N.D. Ill. 2005) ............................................................... 107

*In re Res. Cap., LLC*,
  No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] ...... 55

*In re Revlon, Inc.*,
  No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023) ................................. 49, 54

*Rombro v. Dufrayne (In re Med. Diversified, Inc.)*,
  461 F.3d 251 (2d Cir. 2006) ............................................................................... 65

*In re Sabine Oil & Gas Corp.*,
  555 B.R. 180 (Bankr. S.D.N.Y. 2016) ................................................................. 26

*In re Sabine Oil & Gas Corp.*,
  No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) ................................. 45, 50

*In re Sea Trail Corp.*,
  No. 11-07370-8, 2012 WL 5247175 (Bankr. E.D.N.C. Oct. 23, 2012) ............ 114

*In re Seabras 1 USA, LLC,*
   No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) .................... 50, 55, 56, 57

*SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network*
   *Limited,* Exh. A, *SEC v. Celsius Network Limited et al.,*
   23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] .................... *passim*

*In re Sentinel Mgmt. Grp., Inc.,*
   398 B.R. 281 (Bankr. N.D. Ill. 2008) .................... 21, 24

*In re Simplot,*
   No. 06-00002 (TLM), 2007 WL 2479664 (Bankr. D. Idaho Aug. 28, 2007) .................... 25

*In re Soup Kitchen Int'l., Inc.,*
   506 B.R. 29 (Bankr. E.D.N.Y. 2014) .................... 66

*In re Specialty Equip. Cos.,*
   3 F.3d 1043 (7th Cir. 1993) .................... 43

*In re Spiegel, Inc.,*
   No. 03-11540 (BRL), 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006),
   *appeal dismissed,* No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28,
   2007), *aff'd,* 269 F. App'x 56 (2d Cir. 2008) .................... 43

*In re SunEdison, Inc.,*
   575 B.R. 220 (Bankr. S.D.N.Y. 2017) .................... 114

*In re SunEdison, Inc.,*
   No. 16-10992 (SMB), 576 B.R. 453 (Bankr. S.D.N.Y. 2017) .................... 44

*In re Sungard Availability Services Capital, Inc.,*
   No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019) .................... 50, 56, 58

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S.*
   *Truck Co.*),
   800 F.2d 581 (6th Cir. 1986) .................... 107

*In re Texaco Inc.,*
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) .................... 60, 89, 107

*In re Toy & Sports Warehouse, Inc.,*
   37 B.R. 141 (Bankr. S.D.N.Y. 1984) .................... 90

*In re Tricom, S.A.,*
   No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009) .................... 46

Page

*United States v. Mashinsky et al.*,
  23-cr-00347-UA (S.D.N.Y. 2023) ........................................................ 64

*In re Uno Rest. Holdings Corp.*,
  No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010) ........................... 55

*In re Windstream Holdings, Inc.*,
  No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) ................... *passim*

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ............................................... 52

*In re Worldcom, Inc.*,
  2003 WL 23861928 ................................................................ *passim*

*In re Young Broad. Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010) ................................................ 107

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) ............................................. 56, 113

**Statutes**

11 U.S.C. § 502(a) .................................................................... 85

11 U.S.C. § 510(b) ............................................................... *passim*

11 U.S.C. § 541(a)(1) ................................................................ 133

11 U.S.C. § 547(b) ..................................................................... 76

11 U.S.C. § 726 ....................................................................... 101

11 U.S.C. § 1122(a) ........................................................ 26, 135, 136

11 U.S.C. § 1122(b) ................................................................... 29

11 U.S.C. § 1123(a)(1) ................................................................ 30

11 U.S.C. § 1123(a)(2) ................................................................ 30

11 U.S.C. § 1123(a)(3) ................................................................ 31

11 U.S.C. § 1123(a)(4) ................................................................ 31

11 U.S.C. § 1123(a)(5) ............................................................. 31, 34

11 U.S.C. § 1123(a)(6) ................................................................ 35

| | Page |
|---|---|
| 11 U.S.C. § 1123(a)(7) | 35 |
| 11 U.S.C. § 1123(b)(1)–(3) | 36 |
| 11 U.S.C. § 1123(b)(6) | 36 |
| 11 U.S.C. § 1123(d) | 79, 80, 82 |
| ~~11 U.S.C. § 1126~~ | ~~12, 85, 88~~ |
| 11 U.S.C. § 1126(a) | 84, 85 |
| 11 U.S.C. § 1126(f) | ~~12,~~ 84 |
| 11 U.S.C. § 1126(g) | ~~12,~~ 84, ~~85~~ |
| 11 U.S.C. § 1127(a) | ~~21~~21 |
| 11 U.S.C. § 1129(a)(1) | 25 |
| 11 U.S.C. § 1129(a)(2) | 82 |
| 11 U.S.C. § 1129(a)(3) | 53, 89, 92 |
| 11 U.S.C. § 1129(a)(4) | 92 |
| 11 U.S.C. § 1129(a)(5)(A)(i) | 93 |
| 11 U.S.C. § 1129(a)(5)(A)(ii) | 93 |
| 11 U.S.C. § 1129(a)(5)(B) | 93 |
| 11 U.S.C. § 1129(a)(6) | 94 |
| 11 U.S.C. § 1129(a)(7)(A) | 95 |
| 11 U.S.C. § 1129(a)(8) | 102 |
| 11 U.S.C. § 1129(a)(9)(A) | 103 |
| 11 U.S.C. § 1129(a)(9)(B) | 104 |
| 11 U.S.C. § 1129(a)(9)(C) | 104 |
| 11 U.S.C. § 1129(a)(10) | 105 |
| 11 U.S.C. § 1129(a)(11) | 106, 107 |
| 11 U.S.C. § 1129(a)(12) | 111 |

11 U.S.C. § 1129(a)(14) ................................................................... 112

11 U.S.C. § 1129(a)(15) ................................................................... 112

11 U.S.C. § 1129(a)(16) ................................................................... 112

11 U.S.C. § 1129(b) ..................................................................... 102, 113

11 U.S.C. § 1129(b)(1) ......................................................... 113, 114, 135

11 U.S.C. § 1129(b)(2)(B)(i) ........................................................... 120

11 U.S.C. § 1129(b)(2)(B)(ii) .......................................................... 120

11 U.S.C. § 1129(b)(2)(C)(ii) .......................................................... 120

15 U.S.C. § 77e ............................................................................... 123

28 U.S.C. § 1930 ............................................................................. 111

Bankrtupcy Code § 1123 ......................................................... ~~60,~~ 80

Bankrtupcy Code § 1125(a) ............................................................ 84

Bankrtupcy Code § 1126 ......................................................... 12, 85, 88

Bankrtupcy Code § 1129(a) ............................................................ 25

Bankrtupcy Code § 1129(b) ............................................................ 25

Bankrtupcy Code § 1141 ................................................................. 18

Bankrtupcy Code § 365(a) ............................................................... 80

Bankrtupcy Code § 501 ........................................................... 85, 88

Bankrtupcy Code § 523 ............................................................. 18, 23

Bankruptcy Code ............................................................. ~~passim~~ 9, 14

Bankruptcy Code § 105(a) ............................................................... 32

Bankruptcy Code § 365 ................................................................... 79

Bankruptcy Code § 502 ......................................................... 63, 85, 88

Bankruptcy Code § 502(b) ............................................................... 70

Bankruptcy Code § 503(c) ......................................................... passim

Page

Bankruptcy Code § 547(c)(2) ........................................................... 72

Bankruptcy Code § 1102 ................................................................. 10

Bankruptcy Code § 1107(a) ............................................................. 10

Bankruptcy Code § 1108 ................................................................. 10

Bankruptcy Code § 1109 ............................................................ 18, 96

Bankruptcy Code § 1111 ......................................................... 85, 88

Bankruptcy Code § 1122 ....................................... 21, 13625, 26, 136

Bankruptcy Code § 1123 ...................................................... 21, 25, 26

Bankruptcy Code § 1123(b)(3)(A) ........................................... passim

Bankruptcy Code § 1125 ........................................................... 83, 84

Bankruptcy Code § 1125(eb) ............................................................ 84

Bankruptcy Code §§ 11265, 502, 501, and 1111 ........... 85, 88(c)    84

Bankruptcy Code § 1127 ..................................................... 20, 21, 24

Bankruptcy Code § 1127(a) ............................................................ 21

Bankruptcy Code § 1129 ................................................................. 25

Bankruptcy Code § 1129(a)(9) .................................................. 104, 105

Bankruptcy Code § 1146(a) ............................................................ 34

Bankrutpcy Code § 1125(b) ............................................................ 84

Bloomberg Law, September 15, 2023,
    https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pl
    eads-guilty-to-crypto-fraud ......................................................... 64

## Rules

Fed. R. Bankr. P. 302 .................................................................. 124

Bankruptcy RuleFed. R. Bankr. P. 1015(b) ................................... 10

Bankruptcy Rule 3018(a) ........................................................ 86, 88

Bankruptcy Rule 3019 ........................................................ 20, 21, 24

**Page**

Bankruptcy Rule 9019 .......................................................................................... 60, 61, 70

Fed. R. Bankr. P. 3018(a) .................................................................................... 124, 86, 88

Fed. R. Bankr. P. 3019 ......................................................................................... 20, 21, 24

Fed. R. Bankr. P. 6004(h) .................................................................................... 124

Fed. R. Bankr. P. 6006(d) .................................................................................... 124

Fed. R. Bankr. P. 9019 ......................................................................................... 60, 61, 70

**Other Authorities**

The New York Times (International Edition) (August 25, 2023) ........................ 11

The New York Times (National Edition) (August 25, 2023) ............................... 11

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this memorandum of law (this "Memorandum")[3] in support of confirmation of the
*Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor
Affiliates* [Docket No. 3577] (as may be further modified, amended, or supplemented from time
to time, the "Plan").[4]  In support of this Memorandum and Confirmation of the Plan, the Debtors
have also filed contemporaneously herewith the following declarations:   (a) *Declaration of
Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief
Financial Officer, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of
Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3581] (the "Ferraro Declaration");
(b) *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America,
LLC, in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius
Network LLC and Its Debtor Affiliates* [Docket No. 3582] (the "Campagna Declaration"); (c)
*Declaration of Ryan Kielty in Support of Confirmation of the Joint Chapter 11 Plan of
Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3592] (the "Kielty
Declaration"); (d) *Declaration of Joel E. Cohen, Managing Director of Stout Risius Ross, LLC,
in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network
LLC and Its Debtor Affiliates* [Docket No. 3588] (the "Cohen Declaration"); (e) *Declaration of
Steve Kokinos in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of*

---

[3]  Capitalized terms not immediately defined have the meaning ascribed to them elsewhere in this Memorandum,
the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC
and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the objection tracker attached as
**Exhibit A** hereto (the "Objection Tracker").

[4]  For the avoidance of doubt, citations to Plan provisions shall refer to the location of the Article or Section in the
Plan filed contemporaneously herewith at [Docket No. 3577], unless otherwise noted. Further, to the extent any
of the provisions of the Plan copied in this Memorandum are inconsistent with the Plan filed at Docket No.
3577, the Plan filed at docket No. 3577 shall control.

*Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3591] (the "Fahrenheit Declaration"); and (f) *Declaration of Allison Hoeinghaus in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3586] (the "Hoeinghaus Declaration").

## Preliminary Statement

1.       These Chapter 11 Cases were filed in July 2022 in response to dire and unexpected circumstances for Celsius' business. During an industry-wide "crypto winter," the combination of a "run on the bank" by Celsius' Account Holders and increasing regulatory scrutiny forced Celsius to first pause all withdrawals, and then file for bankruptcy. The early days of these Chapter 11 Cases were challenging and uncertain. A dark cloud hung over the Debtors because of their former management team's prepetition actions and statements. State and federal regulators routinely complained about Celsius' prepetition business practices and lack of engagement. And the Debtors' Account Holders, many of whom invested in cryptocurrency in large part because it is decentralized and outside of traditional governmental and financial regulations, were surprised to find themselves in the most centralized proceeding possible: a chapter 11 case.

2.       Amidst this storm, the Debtors, led by their newly-appointed Special Committee, charted a path forward based on the guiding principles of full transparency and engagement with all stakeholders. Early in these Chapter 11 Cases, the Debtors consented to the appointment of the Examiner to investigate the Debtors' prepetition actions. The Debtors cooperated with the Examiner and various investigations by state and federal regulators, as well as the Committee. Mr. Mashinsky resigned after the Special Committee directed that he either resign or be terminated.      In addition to cooperating with the many investigations into the Debtors'

2

prepetition conduct, the Debtors and their advisors also engaged with the Committee, various ad hoc groups of creditors, and individual Account Holders to resolve key legal issues, drive these Chapter 11 Cases forward, and try to maximize the value of the Debtors' assets for their stakeholders and emerge from bankruptcy as promptly as possible.

3.     The nearly fully consensual Plan is the culmination of over a year of the Debtors' engagement with their creditors, and the Debtors are pleased to report that, after tabulating more than 80,000 votes submitted by creditors holding approximately $3 billion in Claims, over 95% of voting Account Holders by both number and dollar amount voted in support of the Plan, including over 99% of Earn creditors.  This level of creditor participation and support for the Plan is simply unprecedented in large chapter 11 cases, particularly considering how contentious these cases were in their early stages.  The level of support that the Plan has now garnered from the Debtors' creditors demonstrates the broad consensus that has been built over time, particularly as these chapter 11 cases near their conclusion.    The Plan includes agreed settlements with each ad hoc group of Account Holders (Earn, Custody, Retail Borrower, and Withhold) and a resolution of the CEL Token valuation dispute.  If the Plan is confirmed, the Debtors will work to promptly implement this value-maximizing transaction.  There are only a handful of unresolved Objections to confirmation of the Plan, none of which have merit, and which should be overruled.

4.     *First*, several Retail Borrowers have objected to their treatment under the Plan. These borrowers argue that the cryptocurrency that they deposited as "collateral" is their property, and that they should receive 100% of that cryptocurrency under the Plan.  As an initial matter, their fellow borrowers do not agree.  The Plan includes the mediated settlement of the issues relating to retail loans that was negotiated between the Debtors, the Committee, and the

3

Retail Borrower Ad Hoc Group during a three-day mediation before the Honorable Michael E. Wiles.  And over 96% of Retail Borrowers who voted on the Plan voted to accept their treatment as unsecured creditors—and Retail Borrowers also have an additional right of setoff or repayment of the principal balance as detailed in the Plan and Disclosure Statement, and priority in making the Liquid Cryptocurrency Weighted Election.  That is, because the class of retail borrowers voted to accept the Plan, dissenting borrowers are bound by the class vote.  Moreover, the Loan Terms of Use include language that is substantially similar to the Terms of Use governing the Earn Program, and this Court ruled that the Terms of Use provide that the cryptocurrency in Earn Accounts belongs to Celsius, not the Account Holder.  Accordingly, the retail loan treatment in the Plan is in line with Retail Borrowers' legal rights and should be approved.

5.    ***Second***, a large institutional unsecured creditor (Pharos) argues that the Plan fails because (a) the Series B Settlement provides a recovery to the Series B Holders who had not previously participated in the Court-approved settlement, when unsecured creditors are not being paid in full, and (b) the "best interests" test is not satisfied because the Debtors' estimates for the Orderly Wind Down are actually the proper estimates for a chapter 7 fire sale, and the NewCo equity has no value.  Both arguments are without merit and should be overruled.  As to the first point, the Series B Settlement was separately approved by the Court, which resolved a material dispute that the Series B Holders were structurally senior to the creditors of Celsius Network LLC and entitled to be paid ahead of creditors.  These equity holders are receiving this distribution as part of this prior authorized settlement of disputed legal issues—not purely on account of their equity position—and Pharos should have objected to the Series B Settlement if it believed that the settlement was inappropriate.

4

6.      As to the second point, the "best interests test" requires that creditors receive as much under a chapter 11 plan as they would under a chapter 7 liquidation.  The Debtors have demonstrated through the Liquidation Analysis that Holders of Claims in Class 8 receive 19.6% and that Holders of Claims in Class 9 receive 29.5% more under the Plan than a chapter 7 liquidation.  Pharos' objection ignores the significant loss of value that would occur under a chapter 7 liquidation, and the total lack of negotiating power that the chapter 7 trustee would have with counterparties that are aware that the trustee is tasked with liquidating assets quickly.  Additionally, although Pharos argues that the equity of NewCo is worthless, NewCo is being seeded with $450 million of capital, will receive the Debtors' mining assets (valued at a midpoint of $565 million) and other illiquid assets (valued at $283 million), and NewCo will have no debt.  Even under extremely bearish assumptions, the NewCo equity has enormous value that cannot be simply brushed aside, and the evidence at the Confirmation Hearing will demonstrate that the best interests test is satisfied.

7.      ***Third***, the CEL Token Settlement is reasonable and should be approved.  The Plan was overwhelmingly approved by CEL Token Holders:  of the CEL Token holders who voted, over 98% by number and 95% by dollar amount voted to accept the Plan.  The CEL Token Settlement is a reasonable settlement of the contested issues relating to CEL Token that have been hotly contested throughout these Chapter 11 Cases, and avoids requiring that the Court rule on whether CEL Token is a security, or have a lengthy trial on the proper value of CEL Token given the alleged manipulation of the price of the token that took place prepetition.  The Debtors and the Committee have worked tirelessly to try to consensually resolve this issue and are pleased that the CEL Token Settlement has received nearly unanimous support from those that voted on the Plan.  The Debtors and the Committee entered into settlement agreements with

several large CEL Token holders, and the group of CEL Token holders overwhelmingly voted to accept the Plan, which includes the CEL Token Settlement.

8.    Only one party filed a formal objection to the CEL Token valuation—Otis Davis—and he fails to challenge the legal theories for why CEL should be valued at zero if the CEL Token Settlement is not approved.  Instead, he admits that Celsius' prepetition actions inflated the CEL Token price between the Pause and the Petition Date from approximately $0.20 to approximately $0.81—which does not support Mr. Davis' argument that CEL Token should be valued at the Petition Date price of approximately $0.81.  To the contrary, the prepetition market manipulation perpetrated by Celsius' former management team (which Mr. Davis readily admits) is a key reason why the Debtors and the Committee proposed the settlement of $0.25 as a fair resolution of this complex dispute.  The Debtors believe that the CEL Token Settlement is appropriate and reasonable, and provides holders of CEL Token with a meaningful recovery instead of $0.00, which it could be if CEL Token is an equity security of Celsius or a now-worthless utility token.  The Debtors believe that the overwhelming support that the CEL Token Settlement has garnered is further evidence that it is fair and reasonable, and Mr. Davis' lone resistance should not prevent the settlement from being approved.

9.    **Fourth**, several objectors argue that the Employee Incentive Plan should not be approved as part of the Plan.  But the Plan, which incorporates the Employee Incentive Plan, was overwhelmingly accepted by creditors entitled to vote, including by each class of account holders who filed objections on this issue.  Accordingly, the Employee Incentive Plan should be approved as accepted by the affected creditor classes; the Plan is a global settlement, and the Court need not examine each component of the Plan when the classes that the objectors are in voted to accept the Plan.  Moreover, these payments (if the metrics are satisfied) would be made

6

by the Post-Effective Date Debtors, not a chapter 11 debtor, and so the Bankruptcy Code's restrictions on executive payments do not apply. Even if the Court applies a higher standard in evaluating the propriety of the Employee Incentive Plan, it is reasonable and should be approved. The KEIP Motion was filed with these incentive metrics six months ago, and the applicable insiders have worked in good faith to reach the metrics, all of which inures to the benefit of account holders. The tireless work of these executives is why the Debtors are well positioned to promptly make distributions of Liquid Cryptocurrency under the Plan, and the mining executives' efforts to obtain new hosting for machines after the rejection of the hosting contract by Core Scientific has led to material improvements in the value of the mining business. The evidence at the Confirmation Hearing will demonstrate that the Employee Incentive Program is reasonable and should be approved.

10.    ***Lastly***, the Debtors believe they have resolved all issues with governmental parties. As to the SEC's limited objection regarding Coinbase, the Debtors have filed a revised form of agreement with Coinbase that clarifies that the Post-Effective Date Debtors will not be using the types of services referenced in the SEC's objection. Additionally, the Debtors have received various comments from the U.S. Trustee regarding the Plan, all of which have been included in the modified version of the Plan filed contemporaneously herewith, and the Debtors are not aware of any outstanding request from the U.S. Trustee. And no regulator has objected to the Plan on the basis that any regulatory approval is needed to confirm or consummate the Plan.[5]

---

[5]    For the avoidance of doubt, there are still certain regulatory approvals that need to be obtained the Plan to become effective. Most notably, a Form 10 must become effective with the SEC for the NewCo Stock to be able to trade. The Debtors submitted a letter to the SEC in July 2023 seeking "preclearance" of the NewCo providing audited historical financial statements for only the Mining company in the Form 10 because the Debtors' records for their retail and investing businesses are insufficient to be audited for purposes of the Form 10. For those reasons, the Debtors are seeking approval from the SEC to exclude those historical audited financials from the Form 10, and those discussions with the SEC remain ongoing as of the date hereof. Once the Form 10 is finalized and filed, a 60-day waiting period must conclude before the Form 10 can become effective, which is a condition precedent to the Effective Date of the Plan.

11.    The remaining objections have either been resolved or should be overruled for the reasons set forth further below.

12.    As described in detail herein and in the Disclosure Statement, the Restructuring Transactions set forth in the Plan provide the Debtors and their creditors with the best possible recovery and a smooth conclusion to these Chapter 11 Cases.  As described in the Disclosure Statement, pursuant to the NewCo Transaction, the Fahrenheit-created NewCo will purchase certain assets of the Debtors, including the mining business, and in return convey 100% of the equity in NewCo to creditors.  On the Effective Date, NewCo will become a public company with its stock intended to be listed on NASDAQ.  The NewCo Transaction is, in effect, a full-scale reorganization sponsored by the Fahrenheit Group, as well as the potential to toggle to the Orderly Wind Down if necessary.  The NewCo Transaction is a full-scale reorganization that recognizes and seizes on the long-term promise and potential of cryptocurrency, while the Orderly Wind Down is a "Plan B" alternative to the NewCo Transaction that includes a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets.  If the NewCo Transaction cannot be completed for any reason, the Debtors can elect to pivot to the Orderly Wind Down.  No matter what transaction is ultimately pursued, however, the Debtors' creditors will receive significant value: under either transaction, the Plan provides that the Debtors will distribute at least $2.03 billion of cryptocurrency to their creditors, subject to the fluctuations in cryptocurrency prices.

13.    As contemplated by the NewCo Transactions, U.S. Data Mining Group, Inc. (d/b/a US Bitcoin Corp.) ("US Bitcoin"), one of the largest and most successful Bitcoin mining operators, will run NewCo's mining operations.  US Bitcoin will assist NewCo with energizing NewCo's existing fleet of miners and de-risking the build out and operation of NewCo's Bitcoin

8

mining business.   Proof Group Capital Management LLC will lead NewCo's staking efforts—contributing its staking intellectual property to NewCo and assisting NewCo in developing and growing its staking infrastructure.   Fahrenheit intends to promptly list the equity of NewCo on NASDAQ to provide creditors receiving NewCo stock under the Plan with liquidity for the stock.

14.     The Orderly Wind Down allows the Debtors, in a manner consistent with their fiduciary duties, to quickly pivot from the NewCo Transactions, without the need to restart the plan process and propose and solicit a new chapter 11 plan, in the event the NewCo Transactions cannot be consummated.   The Orderly Wind provides for (a) the establishment of a pure play standalone mining company, (b) a timely monetization of the Debtors' illiquid assets, and (c) an orderly wind down of the Debtors' estates.   Like under the NewCo Transaction, creditors will receive recoveries in the form of an immediate distributions of BTC or ETH and Litigation Proceeds.   Instead of NewCo Common Stock, however, creditors will receive the value of the standalone mining business and proceeds from the liquidation of the Debtors' illiquid assets.

15.     The terms of the Plan are overwhelmingly supported by the Debtors' creditors and provide for a clear pathway to emergence.   The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.   The Debtors are aware, however, that there are risks to implementing the NewCo Transaction, and the Debtors and the Committee believe that it is in the best interests of all stakeholders to also prepare for a scenario where the NewCo Transaction cannot be completed. Regardless of which transaction is ultimately implemented, the Plan provides Holders of Claims

with the maximum recoveries, on the quickest timeline, and with the greatest amount of flexibility.

16.    As set forth below, the Plan satisfies the required elements of the Bankruptcy Code and should be confirmed.

## Background

### I.    Solicitation and Notification Process.

17.    On July 13, 2022, eight Celsius entities each filed voluntary petitions under chapter 11 of the Bankruptcy Code (the "Initial Debtors") with the United States Bankruptcy Court for the Southern District of New York (the "Court").    On December 7, 2022, three additional entities—GK8 Ltd., GK8 UK Limited, and GK8 USA LLC—each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Court (such debtors, "GK8" and, together with the Initial Debtors, the "Debtors").    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[6]    These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 53 and 1648].    On July 27, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 241].    On September 29, 2022, the Court entered an order directing the appointment of an examiner [Docket No. 920].    On April 4, 2023, the Court entered an order discharging the examiner [Docket No. 2364].

---

[6]    A detailed description of the Debtors and their businesses and the facts and circumstances surrounding the Debtors' Chapter 11 Cases is set forth in greater detail in the *Declaration of Robert Campagna, Managing Director of Alvarez & Marsal North America, LLC, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 22] (the "First Day Declaration").

18.     On August 17, 2023, the Court entered the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement Order") approving the Disclosure Statement.  The Disclosure Statement Order also approved, among other things, the Solicitation Deadline, Voting Record Date, Voting Deadline, Confirmation Brief Deadline, Plan Objection Deadline, Plan Objection Reply Deadline, 3018 Motion Objection Deadline, Publication Deadline, Plan Supplement Filing Deadline, and the deadline to file the Voting Report, and approving the forms and manner of the Confirmation Hearing Notice, the Non-Voting Status Notices, the Ballots, the Publication Notice, and the Solicitation and Voting Procedures (each as defined in the Disclosure Statement Order).  The Debtors complied with the procedures approved by the Disclosure Statement Order.

19.     On August 17, 2023, the Debtors commenced solicitation on the Plan.  By the Solicitation Deadline of August 25, 2023, the Debtors caused their Solicitation Agent, Stretto,[7] to distribute the Solicitation Package (as defined in the Disclosure Statement Order), which included a cover letter, the Plan, the Disclosure Statement and all exhibits thereto, the Confirmation Hearing Notice, and the applicable Ballot, to Holders of Claims and Interests entitled to vote to accept or reject the Plan as of the Voting Record Date, via electronic mail and/or first-class mail in either paper or electronic format (*i.e.*, USB flash drive format).  The

---

[7]     Stretto is the trade name of Bankruptcy Management Solutions, Inc., and its subsidiaries.

Debtors also caused a "push" notification to be delivered to Holders of Claims in the Account Holder Voting Classes through the Debtors' mobile application linking such Holders to the Solicitation Agent's online voting portal and the Confirmation Hearing Notice, which informed the recipients of, among other things:  (a) the date and time set for the hearing to consider confirmation of the Plan; (b) the manner in which a copy of the Plan and Disclosure Statement can be obtained without a fee through the Debtors' restructuring website or for a fee at the Court's PACER website; and (c) the deadline for filing objections to the Plan and the Disclosure Statement.  Finally, the Debtors caused the Publication Notice to be published in *The New York Times (National Edition)* and *The New York Times (International Edition)* on August 25, 2023, and every Wednesday in September starting on September 6, 2023 on *CoinDesk* (CoinDesk.com).[8]

20.    The deadline for all Holders of Claims and Interests entitled to vote on the Plan to cast their ballots was September 22, 2023, at 4:00 p.m. (prevailing Eastern Time) and the deadline to file objections to confirmation of the Plan was September 22, 2023, at 4:00 p.m. (prevailing Eastern Time).[9]  On September 27, 2023, the Debtors filed the *Amended Declaration of Brian Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of*

---

[8]    *See Affidavits of Publication* [Docket Nos. 3367, 3368, 3507, 3598].

[9]    *See* Disclosure Statement Order, Art. III.A.f, ¶ 23(a).  The Debtors agreed to extend the deadline to object to confirmation of the Plan for the U.S. Trustee to September 24, 2023, at 12:00 p.m. (prevailing Eastern Time). *See* [Docket No. 3530].

*Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3574] (the "Voting Report"),[10]

which is summarized below in detail.

21.    In compliance with the Bankruptcy Code and the Disclosure Statement Order,

only Holders of Claims in Impaired Classes entitled to receive or retain property on account of

such Claims were permitted to vote to accept or reject the Plan.[11]    Holders of Claims and

Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case

such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the

Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution

under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant

to section 1126(g) of the Bankruptcy Code).[12]

22.    Based upon the Voting Report, approximately 95% of Holders of Claims and

Interests that voted on the Plan in Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14 (the "Voting Classes")

voted to accept the Plan:

|  |  | Count | % | Dollars | % |
|---|---|---|---|---|---|
| **Class 2 (Retail Borrower Deposit Claims)** | | | | | |
|  | Accept: | 4,215 | 98.83% | $220,581,222.65 | 96.33% |
|  | Reject: | 50 | 1.17% | $8,410,803.02 | 3.67% |
| **Class 4 (Convenience Claims)** | | | | | |
|  | Accept: | 38,248 | 98.25% | $59,269,958.86 | 98.69% |
|  | Reject: | 681 | 1.75% | $784,185.09 | 1.31% |
| **Class 5 (General Earn Claims)** | | | | | |
|  | Accept: | 38,734 | 99.35% | $2,418,402,994.19 | 99.28% |

---

[10]    On September 25, 2023, the Debtors timely filed the *Declaration of Brian Karpuk, Managing Director of Stretto, Inc. on Behalf of Stretto Regarding Solicitation of Votes and Tabulation of Ballots Accepting and Rejecting the Joint Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560].  On September 27, 2023, the Debtors filed an amended Voting Report with minor corrections.  For the avoidance of doubt, references to the Voting Report in this Memorandum refer to the Voting Report filed at Docket No. [3574].

[11]    *See* 11 U.S.C. § 1126.

[12]    *See* Disclosure Statement Order ¶ 16(a).

| | | Count | % | Shares | % |
|---|---|---|---|---|---|
| | Reject: | 254 | 0.65% | $17,495,733.72 | 0.72% |
| **Class 6A (General Custody Claims)** | | | | | |
| | Accept: | 2,896 | 99.51% | $87,378,989.97 | 98.78% |
| | Deemed to Accept: | 2,973 | | $52,451,991.14 | |
| | Reject: | 29 | 0.49% | $1,722,936.80 | 1.22% |
| **Class 7 (Withhold Claims)** | | | | | |
| | Accept: | 654 | 98.79% | $5,386,520.24 | 82.56% |
| | Reject: | 8 | 1.21% | $1,138,215.57 | 17.44% |
| **Class 8 (Unsecured Loan Claims)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 2 | 100.00% | $82,782,261.00 | 100.00% |
| **Class 9 (General Unsecured Claims - Consolidated Debtors)** | | | | | |
| | Accept: | 20 | 74.07% | $6,375,927.86 | 99.56% |
| | Reject: | 7 | 25.93% | $28,436.05 | 0.44% |
| **Class 9 (General Unsecured Claims - Celsius Mining LLC)** | | | | | |
| | Accept: | 1 | 50.00% | $140,000.00 | 2.58% |
| | Reject: | 1 | 50.00% | $5,284,333.82 | 97.42% |
| **Class 9 (General Unsecured Claims - Celsius Network Inc.)** | | | | | |
| | Accept: | 0 | 0.00% | $0.00 | 0.00% |
| | Reject: | 1 | 100.00% | $3,325.00 | 100.00% |
| **Class 10 (State Regulatory Claims)** | | | | | |
| | Accept: | 1 | 100.00% | $29,843,334.00 | 100.00% |
| | Reject: | 0 | 0.00% | $0.00 | 0.00% |
| **Class 14 (Series B Preferred Interests)** | | | | | |
| | | **Count** | **%** | **Shares** | **%** |
| | Accept: | 7 | 98.34% | 29,585 | 98.34% |
| | Reject: | 1 | 12.50% | 500 | 1.66% |

23.     The hearing on confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on October 2, 2023, at 2:00 p.m. (prevailing Eastern Time). Concurrently with this Memorandum, the Debtors have submitted the proposed *Order Confirming the Modified Joint Plan of Celsius Network LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order").

## II.     The Restructuring Transactions.

24.     The terms of the Plan provide a clear pathway to emergence. The NewCo Transaction results in the creation of a new, ambitious Cryptocurrency company that will be

owned by customers, file public reports with the SEC to ensure transparency, and importantly, fully comply with all applicable regulations.

25.     Certain key terms of the Plan include:[13]

- **Retail Borrower Deposit Claims**.[14]  Each Holder of an Allowed Retail Borrower Deposit Claim shall receive:

  Repayment Election:  If the Retail Borrower, (1) makes the Retail Advance Obligation Repayment Election and (2) actually repays all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive an amount of BTC or ETH (at the Retail Borrower's election) equal to the Retail Advance Obligation Repayment Amount;

  *or*

  Set Off Treatment:  If the Retail Borrower (1) does not make the Retail Advance Obligation Repayment Election or (2) fails to repay all or a portion of its Retail Advance Obligations in accordance with the Retail Advance Obligation Repayment Instructions by the Retail Advance Obligation Repayment Deadline, such Retail Borrower shall receive the Set Off Treatment on account of any Retail Advance Obligations it has not repaid in accordance with (i) above;

  *plus*

  (ii) On account of the Retail Borrower Post-Set Off Claim, if any, subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, its Pro Rata amount of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).  Any Liquid Cryptocurrency Weighted Distribution Election on account of a Retail Borrower Post-Set Off Claim shall be given priority over all other such elections.

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of

---

[13]     Each description of the Plan or the Disclosure Statement herein is qualified in its entirety by the terms of the Plan and the Disclosure Statement, as applicable.

[14]     In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a (a) 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or (b) a 67.0% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the General Earn Claim treatment).  Thus, the total percentage recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.

(a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **Convenience Claims**.  Each Holder of an Allowed Convenience Claim shall receive Liquid Cryptocurrency in an amount that provides a 70% recovery (calculated in accordance with the Distribution Cryptocurrency Conversion Table) on account of such Convenience Claim.

- **General Earn Claims**.  Subject to a redistribution of consideration to accommodate Unsecured Claim Distribution Mix Elections, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Earn Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Custody Claims**.[15]  For Holders of Allowed General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order:  Each such Holder of an Allowed General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in the Disclosure Statement, one of two treatments:

  Treatment A:  (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim provided that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3. of the Plan.

  Treatment B:  The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim.  The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Court following notice and a hearing.  To the extent no such action is brought and no settlement is reached in the time period set forth in

---

[15] Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim.  Any such Allowed General Custody Claim will be subject to the ADR Procedures.

For Custody Settlement Participants:  Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; provided that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; provided, further, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan.

- **Withdrawable Custody Claims**.  Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal Order.  For the avoidance of doubt, any Holder of an Allowed Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

- **Withhold Claims**.[16]  Each Holder of an Allowed Withhold Claim that is not an Equitably Subordinated Claim shall receive the following treatment, as applicable:

Treatment A:  If Class 7 votes to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall receive (a) a distribution of Liquid Cryptocurrency equal to 15% of the value of such Holder's Withhold Distribution Claim, calculated in accordance with the Conversion Procedure (as defined and described in the Disclosure Statement), and (b) the remaining 85% of the value of such Holder's Allowed Withhold Distribution Claim shall be satisfied with a Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

Treatment B:  If Class 7 does not vote to accept the Plan described herein, each such Holder of an Allowed Withhold Claim shall be satisfied with a Pro Rata

---

[16] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

17

share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

In the event that the Debtors pursue the Orderly Wind Down, the above Treatment A and Treatment B shall remain, but the Unsecured Claim Distribution Consideration shall consist of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

For the avoidance of doubt, any former Holder of an Allowed Withhold Claim that participated in the Withhold Settlement no longer has a Withhold Claim and has an Earn Claim in accordance with the terms of the Withhold Settlement.

- **Unsecured Loan Claims**. Each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of the Unsecured Claim Distribution Consideration (*i.e.*, Liquid Cryptocurrency, Litigation Proceeds, and NewCo Common Stock).

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Unsecured Loan Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

- **General Unsecured Claims**. Each Holder of an Allowed General Unsecured Claim shall receive a combination of (a) Liquid Cryptocurrency or Cash, (b) Litigation Proceeds, and (c) NewCo Common Stock sufficient to provide a recovery of the same percentage as the Class 5 (General Earn Claim) recovery set forth in the Disclosure Statement.

  In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount (or an equivalent amount of Cash), (b) the Backup MiningCo Common Stock, (c) the Litigation Proceeds, and (d) the Illiquid Recovery Rights.

- **State Regulatory Claims**. Each Holder of an Allowed State Regulatory Claim shall be entitled to the same recovery as a Holder of a General Unsecured Claim; *provided* that notwithstanding the foregoing, all State Regulatory Claims shall be suspended against the Debtors and will not be Allowed Claims and shall not receive any distributions in these Chapter 11 Cases, in each case, so long as the Debtors' Plan becomes effective and is fully administered as proposed; *provided*, *further*, that the suspension in the foregoing proviso shall be lifted as to the Debtors if the Chapter 11 Cases are closed, dismissed, or otherwise concluded, in each case, without the Estate(s) being fully administered, including any distributions to creditors, in accordance with the Plan and the Bankruptcy Code.

18

For the avoidance of doubt, the State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.

- ***De Minimis* Claims**.  All *De Minimis* Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

- **Series B Preferred Interests**.  Each Holder of an Allowed Series B Preferred Interest shall receive its Pro Rata share of the Series B Settlement Consideration, to the extent not already received pursuant to any order approving the Series B Settlement Order.

- **Section 510(b) Claims**.[17]   Holders of Allowed Section 510(b) Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect.

- **Equitably Subordinated Claims**.  Holders of Equitably Subordinated Claims shall not receive any distribution on account of such Claims, which will be cancelled, released, and extinguished as of the Effective Date (except as otherwise provided herein), and will be of no further force or effect, unless otherwise ordered by the Bankruptcy Court following the resolution of the litigation of the subordination of the Equitably Subordinated Claims. For the avoidance of doubt, the litigation regarding the Equitably Subordinated Claims is stayed by the Equitable Subordination Stay Order. Holders of Equitably Subordinated Claims need not object to the Plan to preserve all of their rights to contest the proposed classification and equitable subordination of their Claims at the appropriate time; a schedule for this litigation will be set by the Bankruptcy Court or agreement of the parties once the stay in the Equitable Subordination Stay Order ends.

### III.    The Objections.

26.    The Debtors received twelve formal objections to the Plan, twelve letters (largely from *pro se* creditors), and two reservations of rights that the Debtors are treating as objections to the Plan (collectively, the "Objections"), as summarized and defined in the objection chart

---

[17]    The Confirmation Order provides that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any. The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims. The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

19

attached hereto as **Exhibit A** (the "Objection Tracker").  The Debtors also received informal comments from numerous counterparties, including the U.S. Trustee, regulators and other governmental parties, ad hoc groups, and individual creditors, among others.

27.     The Debtors have worked with objecting parties to resolve as many Objections as possible, and as of the date hereof, the Debtors have resolved the majority of Objections.[18]  The Objections have been resolved by stipulating to or including certain language in the Confirmation Order, and/or the amended Plan, as more fully set forth in the Objection Tracker.

28.     Compared to the objections that the Debtors received in the past with respect to other motions filed in these Chapter 11 Cases, including the nearly thirty objections to the Debtors' motion to establish that Earn assets are property of the Debtors' Estates,[19] or the fifteen formal objections and over twenty letter objections to the approval of the Debtors' Disclosure Statement,[20]  the limited number of Objections to the Confirmation of the Plan is a testament to the Debtors' efforts—and success—in building consensus since the outset of these Chapter 11 Cases.

29.     Notwithstanding the Objections, the Plan has overwhelming support from the Holders of Claims and Interests who were entitled to vote.  The transactions contemplated by the Plan represent a significant achievement for the Debtors and are the direct result of a thorough

---

[18]     The unresolved Objections are as follows:  the 168 Trading Objection, the Pharos Objection, the Bronge Objection, the Schoenau Objection, the Davis Objection, the Ubierna de las Heras Objection, the Securities Plaintiffs Objection, the Schneider Objection, the Phillips Objection, the Cassidy Letter, the First Bohon Letter, the Second Bohon Letter, the First Keeney Letter, the Second Keeney Letter, the First Windom Letter, the Johantgen Letter, the Abruzese Letter, the Truss Letter, the 3541 Letter, the Second Windom Letter, and the Lau Letter.

[19]     *See Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn Ruling") at 13.

[20]     *See Debtors' Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225], Exh. A.

marketing process and extensive engagement with many diverse stakeholders. The Debtors strongly believe that the Plan represents the best available alternative for all of their stakeholders. The transactions embodied in the Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims and Interests. That the Plan has overwhelming support of the Debtors' creditor base is a significant achievement and sends the important message that the Plan can provide a clear path to emergence.

30.     The Debtors continue to work to resolve all outstanding Objections in advance of the Confirmation Hearing. To the extent the Debtors are unable to consensually resolve such Objections prior to the Confirmation Hearing, the Debtors request that the Court overrule such Objections. A detailed response to each of the outstanding Objections is set forth in Section VII of this Memorandum and the Objection Tracker.

## Argument

31.     This Memorandum is divided into three parts. *First*, the Debtors submit that the amended Plan satisfies section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and, therefore the Debtors do not need to resolicit the Plan. *Second*, the Debtors present their case in chief that the Plan satisfies all of the applicable requirements of the Bankruptcy Code by a preponderance of the evidence and, accordingly, request that the Court confirm the Plan. *Finally*, throughout this Memorandum and in the third part, the Debtors address the Objections and why they should be overruled.

32.     For the reasons set forth herein, and in light of the evidentiary support to be offered at the Confirmation Hearing, the Debtors request that the Court find that the Debtors have satisfied their burden and confirm the Plan.

**IV.    The Plan, as Modified, Satisfies the Requirements of Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.**

21

33.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[21]  Further, section 1127(a) provides that when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[22]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[23]  Courts interpreting Bankruptcy Rule 3019 have consistently held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated,[24] unless such affected creditors consent to the treatment.[25]

---

[21]    11 U.S.C. § 1127(a).

[22]    *Id.*

[23]    Fed. R. Bankr. P. 3019.

[24]    *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013) (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("[N]onmaterial modifications . . . do not require resolicitation of the respective impaired classes of creditors and equity security holders.").

[25]    *See, e.g.*, *In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *31–32 (Bankr. D. Del. May 13, 2010) (finding that plan modifications that did not adversely affect any creditor other than consenting parties did not require resolicitation); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications"; one percent reduction of one class' distribution was not sufficiently material to require re-solicitation); *In re Pisces Energy, LLC*, Nos. 09–36591–H5–11, 09–36593–H5–11, 2009 WL 7227880, at *10 (Bankr. S.D. Tex. Dec. 21, 2009) (finding that plan modifications that only modified the rights of expressly consenting parties-in-interest did not require resolicitation); *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999) (holding that where proposed modification does not adversely impact previously accepting claimants, such claimants are deemed to accept the modified plan); *In re A.H. Robins Co.*, 88 B.R. 742, 750 (Bankr. E.D. Va. 1988) ("There have been no modifications which adversely affect the treatment of claims or interests under the Plan.  The Court concludes that the modifications do not require resolicitation of acceptances or rejections, nor do they require that holders of claims or interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.").

34.    On September 27, 2023, the Debtors filed an amended Plan [Docket No. 3577], which incorporates and reflects certain revisions.  The modifications to the Plan are not material changes.    Rather, they are either modifications to resolve objections to the Plan or permissible, technical modifications to the Plan, each of which either improve or do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.  All Holders of Claims and Interests entitled to vote on the Plan are receiving the same recovery under the Plan as amended and filed at [Docket No. 3319].

35.    The Debtors have made the following non-material modifications to the Plan (ordered as they appear in the Plan):

- ***Deactivation Date Timing and Interaction with CEL Token Settlement***.  The Plan now clarifies the Deactivation Date.  Lastly, the Deactivation Date Cryptocurrency Conversion Table will provide that CEL Token is $0.25.

- ***Distribution Cryptocurrency Conversion Table***.  The Plan now clarifies the application of the Distribution Cryptocurrency Conversion Table, the time period in which such tables must be filed, and how Cryptocurrency prices in such tables will be set following the Effective Date.

- ***Equitably Subordinated Claims***.  The Plan now reflects that litigation regarding the subordination of the Equitably Subordinated Claims is stayed pursuant to the Equitable Subordination Stay Order [Docket No. 3450].

- ***Exculpated Parties***.  The Plan now clarifies that current *and former* financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals are included in the definition of "Exculpated Parties."

- ***Released Parties and Releasing Parties***.  At the request of the SEC, the Plan now clarifies that Holders of *De Minimis* Claims, Section 510(b) Claims, or Other Interests shall not be Released Parties or Releasing Parties unless such parties opt into the Plan's releases.

- ***Withdrawal Preference Exposure***.  In response to an informal request from a stakeholder, the Plan now clarifies that the Withdrawal Preference Exposure shall not be binding on any defendant in an Avoidance Action.  Additionally, the Plan clarifies that the Debtors and the Committee (and after the Effective Date, the Litigation Administrator in consultation with the Plan Administrator) may enter into agreements with Account Holders to settle their Withdrawal Preference Exposure.

- **State Regulatory Claims**.  As a result of negotiations with Holders of State Regulatory Claims, the Plan now clarifies that State Regulatory Claims shall be suspended and shall not receive any distribution so long as the Debtors' Plan becomes effective and is fully administered.  The State Regulatory Claims shall be nondischargeable as to the Debtors pursuant to sections 523 and 1141 of the Bankruptcy Code.  In addition, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan regardless of whether or how such Holders have voted on the Plan.

- **Account Holder Avoidance Action Settlement**.  The Plan now clarifies that the Account Holder Avoidance Action Settlement releases Avoidance Actions against any Account Holder who is not an Excluded Party and who (i) (a) has Withdrawal Preference Exposure less than *or equal to* $100,000, (ii) votes in favor of the Plan, and (iii) does not opt out of the releases under the Plan and that such Holders will receive a 100% recovery on their Allowed General Custody Claim.

- **Distribution Mechanics**.  The Plan now clarifies that the Debtors will not be the Distribution Agent for distributions to Withhold Claim Holders.  In addition, the Debtors may elect in their reasonable discretion to make distributions in fiat if no Distribution Agent is reasonably available to make a Liquid Cryptocurrency distribution to any particular creditor.

- **NewCo Common Stock**.  The Plan now clarifies that the NewCo Common Stock issued on the Effective Date may, with the consent of the Committee and the Plan Sponsor be issued into a trust or similar structure to be held until it is fully and finally distributed to Holders of Allowed Claims as provided in the Plan and in the Transaction Steps Memorandum.  Additionally, pursuant to discussions with the SEC, the Plan now clarifies that only NewCo Common Stock issued in satisfaction, settlement, release, and discharge of Allowed Claims will be issues in reliance upon section 1145.

- **EIP Awards**.  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Plan Administrator may distribute the EIP Awards after confirming to Committee counsel that the applicable metrics have been satisfied.  The Plan now also clarifies that the KEIP Motion shall be deemed withdrawn with prejudice upon the Effective Date.

- **Institutional Loans**.  In response to 168 Trading's Objection, the Plan now clarifies that Institutional Loans will be assumed and assigned to NewCo to the extent such Institutional Loans are not Executory Contracts included on the Schedule of Rejected Contracts.

- **Undeliverable Distributions and Unclaimed Property**.  The Plan now clarifies that Unclaimed Distributions which remain undeliverable for a period of one year after *the first date on which such distributions are open for a particular Holder*, shall revert to the Post-Effective Date Debtors.

- **Releases and Exculpations**.

  o  As a result of negotiations with the U.S. Trustee, the Plan now clarifies that the Debtor Release, Third-Party Release, and Exculpation do not release or exculpate any claim or cause of action against any of the Debtors advisors arising out of any action

or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.).  Further, following negotiations with the U.S. Trustee, the scope of the exculpation provision was narrowed.

o   As a result of negotiations with the SEC, the Plan now clarifies that only Releasing Parties are restricted from commencing or pursuing a Claim or Cause of Action against the Debtors, the Post-Effective Date Debtors, the Exculpated Parties, or the Released Parties without the Bankruptcy Court's approval and that such restriction applies only to (i) core claims arising from or relating to these Chapter 11 Cases or (ii) Claims or Causes of Action that relate to or are reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to the Debtor Release, Third-Party Release, or Exculpation contained in the Plan.  Further, the Plan now clarifies that the Bankruptcy Court retains sole and exclusive jurisdiction to adjudicate whether a colorable Claim or Cause of Action exists.

- ***Additional Provisions Regarding Governmental Units***.  As a result of continued negotiations with Governmental Units, the Plan now clarifies (i) the NewCo Assets are transferred free and clear or all Claims and Interests arising before the Effective Date, (ii) Governmental Units may exercise their police and regulatory powers against NewCo regarding any post-Effective Date violations, and (iii) the Debtors and their successors and assigns, other than NewCo, shall not offer or sell securities or provide banking or money services.

- ***Ministerial Edits***.  The Debtors made formatting and grammatical updates where appropriate.

36.     Therefore, the modifications are immaterial or have been consented to after negotiations among consenting parties.  Thus, they comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.[26]  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

---

[26]   *See AMR Corp.*, 502 B.R. at 46 (finding that resolicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Best Prods. Co.*, 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment."); *see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. at 301 ("The Bankruptcy Code is designed to encourage consensual resolution of claims and disputes through the plan negotiation process, which includes pre-confirmation modifications.  The rules applicable to such modifications should be read and interpreted consistent to that end.") (citations omitted).

## V.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.

37.    To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[27]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable nonbankruptcy law.

### A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).

38.    Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[28]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan of reorganization, respectively.[29]  As explained below, the Plan complies

---

[27]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Savs. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.") (internal footnote omitted).

[28]    11 U.S.C. § 1129(a)(1).

[29]    S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in [section 1129(a)(1)] to mean provisions of Chapter 11 . . . such as section 1122 . . . ."); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("The legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan." (citations omitted)); *In re Simplot*, No. 06-00002 (TLM), 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (noting that the objective of section 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization).

with the requirements of sections 1122 and 1123 of the Bankruptcy Code as well as other

applicable provisions.[30]

    **B.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

    39.    The classification requirement of section 1122(a) of the Bankruptcy Code

provides, in pertinent part:

> Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim
> or interest is substantially similar to the other claims or interests of
> such class.[31]

    40.    The substantial similarity requirement does not mean that claims or interests

within a particular class must be identical or that all similarly situated claims receive the same

treatment under a plan.[32]  Indeed, as one court in this district has stated, "a majority of both cases

and commentators have rejected the concept that all creditors of equal rank must receive equal

treatment."[33]  Courts generally will approve placement of similar claims in different classes,

provided that a "rational" or "reasonable" basis exists for doing so.[34]  Recognizing this

---

[30]    *See* Campagna Decl. ¶¶ 10–14.

[31]    11 U.S.C. § 1122(a).

[32]    *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 310 (Bankr. S.D.N.Y. 2016); *In re Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims.  It does not require that similar classes be grouped together, but merely that any groups be homogenous or share some attributes." (citations omitted)).

[33]    *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

[34]    *See, e.g.*, *In re Lightsquared Inc.*, 513 B.R. 56, 82-83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25-123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational

27

flexibility, courts have long held that "the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan."[35]  Courts have identified several grounds justifying the separate classification of claims, including where members of a particular class possess different legal rights[36] and where the debtors have valid business reasons for separate classification.[37]

41.    The Plan's classification of Claims and Interests, as set forth in Article III therein, satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into seventeen (17) separate Classes, with the Claims and Interests in each Class either differing legally and factually from those in other Classes or being grouped separately based on other relevant criteria.  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

    a.    <u>Class 1</u>:  Other Secured Claims;

    b.    <u>Class 2</u>:  Retail Borrower Deposit Claims;

    c.    <u>Class 3</u>:  Other Priority Claims;

    d.    <u>Class 4</u>:  Convenience Claims;

    e.    <u>Class 5</u>:  General Earn Claims;

    f.    <u>Class 6A</u>:  General Custody Claims;

---

basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[35]   *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[36]   *See In re Drexel*, 138 B.R. at 715.

[37]   *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly-situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, WL 2779438, at *3.

g.       Class 6B:  Withdrawable Custody Claims;

h.       Class 7:  Withhold Claims;

i.       Class 8:  Unsecured Loan Claims;

j.       Class 9:  General Unsecured Claims;

k.       Class 10:  State Regulatory Claims;

l.       Class 11:  De Minimis Claims;

m.       Class 12:  Intercompany Claims;

n.       Class 13:  Intercompany Interests;

o.       Class 14:  Series B Preferred Interests;

p.       Class 15:  Other Interests;

q.       Class 16:  Section 510(b) Claims; and

r.       Class 17:  Equitably Subordinated Claims.

42.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.  Namely, the Plan separately classifies Claims and Interests because each Holder of such Claims or Interests may hold or have held rights in the Debtors' Estates legally dissimilar to the rights that Holder of Claims or Interests in other classes may hold or have held or because substantial administrative convenience resulted from such classification.  For example, Claims (rights to payment) are classified separately from Interests (representing ownership in the business).

43.    Account Holder Claims are classified into separate Classes because Account Holders participated in differing Celsius programs with varying rights and obligations, and

invested in different products and services pursuant to different contractual terms. For instance, as has been documented extensively throughout these Chapter 11 Cases, cryptocurrency in Earn Accounts is different than cryptocurrency in Custody Accounts. As the Court found, pursuant to the applicable Terms of Use, cryptocurrency in the Earn Program belongs to the Debtors' Estates, whereas cryptocurrency in the Custody Program belongs to customers.[38] Accordingly, General Earn Claims are classified separately from Custody Claims under the Plan. In addition, Withhold Claims were subject to no Terms of Use at all. Convenience Claims are classified differently from other Account Holder Claims because these Claims are so small in amount and large in number as to make otherwise dealing with them (by classifying them as General Earn Claims, for instance) burdensome.[39] General Unsecured Claims are classified differently from other unsecured Claims because they are structurally different than Administrative Claims, Priority Tax Claims, Other Priority Claims, Intercompany Claims, Convenience Claims, General Earn Claims, Custody Claims, Withhold Claims, Retail Borrower Deposit Claims, Unsecured Loan Claims, Section 510(b) Claims, State Regulatory Claims, or Equitably Subordinated Claims, and are comprised primarily of obligations of the Debtors arising in the ordinary course of business. Accordingly, the Debtors respectfully submit that the Plan satisfies section 1122(a) of the Bankruptcy Code.

44.    *Pro se* creditor Johan Bronge ("Mr. Bronge") objects to the Plan on the basis that, among other things, Retail Borrowers are classified and treated differently from Institutional

---

[38]    *See* Earn Ruling at 30 (holding that assets in Earn Accounts are property of the Debtors' Estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[39]    *See also* 11 U.S.C. § 1122(b).

Borrowers.[40]  This argument is misguided and should be overruled as further set forth in the

Debtors' response to the Bronge Objection and the several other letters filed regarding similar

issues, *infra* in Section VII of this Memorandum.

     **C.**    **The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.**

45.     Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every

chapter 11 plan must satisfy.  As detailed below, the Debtors respectfully submit that the Plan

satisfies each of these requirements.[41]

46.     ***Designation of Classes of Claims and Interests (§ 1123(a)(1))***.  Section

1123(a)(1) of the Bankruptcy Code requires that a plan designate, with specified exceptions,

classes of claims and interests subject to section 1122 of the Bankruptcy Code.[42]  Article III of

the Plan properly designates Classes of Claims and Interests and thus satisfies this requirement.

Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(1) of the

Bankruptcy Code, and no party has asserted otherwise.

47.     ***Specification of Unimpaired Classes (§ 1123(a)(2))***.  Section 1123(a)(2) of the

Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired

under the plan."[43]  Article III.A of the Plan identifies Classes 1, 3, and 6B as Unimpaired and

preserves optionality for the Debtors to render Classes 12 and 13 Unimpaired.  Accordingly, the

---

[40]    *See generally* Bronge Obj.

[41]    *See* Campagna Decl. ¶¶ 10–33.

[42]    11 U.S.C. § 1123(a)(1).

[43]    11 U.S.C. § 1123(a)(2).

Debtors respectfully submit that the Plan satisfies section 1123(a)(2) of the Bankruptcy Code, and no party has asserted otherwise.

48.     ***Treatment of Impaired Classes (§ 1123(a)(3))***.     Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."[44]  Article III.A of the Plan identifies Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 as Impaired and preserves optionality for the Debtors to render Classes 12 and 13 Impaired.  Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

49.     ***Equal Treatment Within Classes (§ 1123(a)(4))***.     Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[45]  Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment.[46]     Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

50.     ***Means for Implementation (§ 1123(a)(5))***.  Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[47]  The Plan satisfies

---

[44]   11 U.S.C. § 1123(a)(3).

[45]   11 U.S.C. § 1123(a)(4).

[46]   *See* Campagna Decl. ¶ 17.

[47]   11 U.S.C. § 1123(a)(5).

this requirement because Article IV of the Plan provides for, among other provisions, the

following means by which the Plan will be implemented:

    a.    Substantive consolidation of the Initial Consolidated Debtors and Celsius Lending LLC and Celsius Networks Lending LLC;[48]

    b.    the CEL Token Settlement;[49]

    c.    the Account Holder Avoidance Action Settlement;[50]

    d.    the Custody Settlement;[51]

    e.    the Withhold Settlement;[52]

    f.    the Series B Settlement;[53]

    g.    the Retail Borrower Settlement;[54]

    h.    the Class Claim Settlement;[55]

---

[48] The substantive consolidation of Celsius Network Limited and Celsius Network LLC was previously approved by order of the Court. *See* [Docket No. 3074]. The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, to also substantively consolidate the Initial Consolidated Debtors with Celsius Lending LLC and Celsius Networks Lending LLC on the same terms, effective as of the Effective Date.

[49] The Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and resubordination. *See* Plan, Art. IV.B.2.

[50] The Plan shall effectuate the Account Holder Avoidance Action Settlement. *See* Plan, Art. IV.B.3.

[51] The Custody Settlement was previously approved by the Court. *See* [Docket No. 2291].

[52] The Withhold Settlement was previously approved by the Court. *See* [Docket No. 2509].

[53] The Series B Settlement was previously approved by the Court. *See* [Docket No. 3074].

[54] The Plan shall effectuate the Retail Borrower Settlement. *See* Plan, Art. IV.B.7.

[55] The Plan shall effectuate the Class Claim Settlement. *See* Plan, Art. IV.B.8. The Class Claim Settlement has been approved by the Court [Docket No. 3288], and Account Holders (except with respect to Custody Claims) had an opportunity to opt out of the Class Claim Settlement when voting on the Plan. As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes opted out of the Class Claim Settlement. *See* Voting Report ¶ 18.

i.      the consummation of either the NewCo Transaction or the Orderly Wind Down in accordance with the Transaction Steps Memorandum;

j.      the appointment of the Plan Administrator as the sole director and sole officer of the Post-Effective Date Debtors, and who will administer the Post-Effective Date Debtors' estates as further described in the Plan Administrator Agreement;

k.      in the event the NewCo Transaction is consummated, the transfer of assets to NewCo and vesting of assets in the Post-Effective Date Debtors;

l.      in the event the NewCo Transaction is consummated, the issuance and distribution of NewCo Common Stock;

m.      in the event the Orderly Wind Down is consummated, the funding of distributions from the Wind-Down Assets, which are all of the Debtors' assets and which shall vest in the Post-Effective Date Debtors pursuant to the Plan Administrator Agreement;

n.      in the event the Orderly Wind Down is consummated, the appointment of a Plan Administrator on terms no worse than those contained in the Backup Plan Administrator Term Sheet;

o.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the appointment of a Litigation Administrator to prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans;

p.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of a segregated Litigation Recovery Account funded with the Initial Litigation Amount and controlled by the Litigation Administrator(s);

q.      regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, the establishment of the Litigation Oversight Committee;

r.     the contribution of Contributed Claims;

s.     the cancellation of all notes, instruments, certificates, and other documents;

t.     the authorization, approval, and ratification of all actions contemplated by the Plan without any further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable;

u.     the creation of the NewCo Board and the appointment of such directors in accordance with the terms of the Plan;

v.     the adoption and implementation of the Emergence Incentive Plan and the grant of awards thereunder by the Debtors or Post-Effective Date Debtors on the Effective Date in connection with Consummation;

w.     to the extent the Debtors are required to use the Celsius platform to make distributions of Cryptocurrency, the adoption and implementation of the Emergence Retention Plan and the grant of awards thereunder by the Debtors, Post-Effective Date Debtors, Plan Administrator, and/or NewCo, as applicable;

x.     the application of section 1146(a) of the Bankruptcy Code to any transfers of property under the Plan (including the Restructuring Transactions) or pursuant to certain other actions; and

y.     the preservation of Causes of Action by the Post-Effective Date Debtors and the enforcement thereof by the Litigation Administrator(s) (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action).

51.     The precise terms governing the execution of these transactions are set forth in greater detail in the applicable Definitive Documents or forms of agreements included in the Plan Supplement.  Accordingly, the Debtors respectfully submit that the Plan, together with the

documents and forms of agreement included in the Plan Supplement,[56] satisfies

section 1123(a)(5) of the Bankruptcy Code.

52.    ***Issuance of Non-Voting Securities (§ 1123(a)(6))***.    Section 1123(a)(6) of the

Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance

of non-voting equity securities and an appropriate division of voting power among the classes of

securities in the reorganized debtor's corporate charter.[57]    Here, the New Organizational

Documents prohibit the issuance of non-voting securities.[58]    Accordingly, the Debtors

respectfully submit that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code[, and no

party has asserted otherwise].

53.    ***Directors and Officers (§ 1123(a)(7))***.    Section 1123(a)(7) of the Bankruptcy

Code requires that plan provisions with respect to the manner of selecting of any director,

officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors

and equity security holders and with public policy."[59]    The Plan identifies the manner in which

members of NewCo's New Board will be selected, and the identities of such new members have

been disclosed.[60]    The identities of the Plan Administrator, Litigation Administrator, and

members of the Litigation Oversight Committee have also been disclosed.[61]    The selection of the

---

[56]    The Plan Supplement was filed on July 28, 2023 [Docket No. 3115] (the "First Plan Supplement"), August 13, 2023 [Docket No. 3273], September 8, 2023 [Docket No. 3444] (the "Third Plan Supplement"), September 15, 2023 [Docket No. 3483], September 23, 2023 [Docket No. 3550], and September 27, 2023 [Docket No. 3583].

[57]    11 U.S.C. § 1123(a)(6).

[58]    *See* Third Plan Supp., Exh. A ¶ 5.

[59]    11 U.S.C. § 1123(a)(7).

[60]    *See* Plan, Art. IV.D.7; Third Plan Supp., Exh. B.

[61]    *See* Plan, Art. IV.F., Art. IV.G, Third Plan Supp., Exh. F, Exh. G.

initial directors of NewCo was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy. Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code.

54.    The Phillips Objection argues that the Committee has improperly nominated and advocated for certain directors. The Committee is responding to the Phillips Objection and the Debtors incorporate the Committee's arguments made in such response by reference.

**D.    The Plan Complies With the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.**

55.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates, (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11 of the Bankruptcy Code.[62]

56.    The Plan is consistent with section 1123(b) of the Bankruptcy Code. Pursuant to Article III of the Plan, Classes 1, 3, and 6B are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the Holders of Claims within such Classes. On the other hand, Classes 2, 4, 5, 6A, 7, 8, 9, 10, 11, 14, 15, 16, and 17 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests, as applicable, within such Classes as contemplated by section 1123(b)(1) of the Bankruptcy Code.[63] Classes 12 and 13 are either

---

[62]    11 U.S.C. § 1123(b)(1)–(3), (6).

[63]    *Id.*

Impaired or Unimpaired, based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution.  In addition, and under section 1123(b)(2) of the Bankruptcy Code, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease:  (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

57.     Finally, for the reasons set forth below, the Plan's release, exculpation, and injunction provisions are consistent with section 1123(b) of the Bankruptcy Code.[64] Accordingly, the Debtors respectfully submit that the Plan satisfies section 1123(b) of the Bankruptcy Code.

### 1.     The Debtor Release Is Appropriate and Complies With the Bankruptcy Code.

58.     Article VIII.C of the Plan provides for releases by the Debtors of claims and causes of action against the Released Parties[65] (the "Debtor Release").  The Debtors will release

---

[64]     *See* Ferraro Decl. ¶ 10.

[65]     Pursuant to the Plan, "Released Parties" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the

38

the Released Parties from any and all claims and Causes of Action arising before the Effective

Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of

these Chapter 11 Cases and related implementation of the Plan and related documents, ***with***

***several important exceptions***.  For example, the Debtors are not proposing to release (a) any

Cause of Action included in the Schedule of Retained Causes of Action or any Cause of Action

under the Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and

Mr. Cohen-Pavon, among others), (b) any Avoidance Action not released pursuant to the

Account Holder Avoidance Action Settlement, or (c) any claims or causes of action against any

of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or

failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et

al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW).[66]

---

Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members; (g) any Litigation Administrator(s); (h) the Plan Sponsor and each of its members; (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members, (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party.  Notwithstanding anything to the contrary in this Plan or the Plan Supplement, including this definition of Released Parties, no Holder of a Claim or Interest that would otherwise constitute a Released Party that opts out of, or objects to, the releases contained in this Plan, nor any Excluded Party, shall constitute a "Released Party" in any capacity hereunder; *provided*, *further*, that, notwithstanding anything to the contrary in the Plan or the Plan Supplement, Avoidance Actions, including Account Holder Avoidance Actions, against Released Parties shall not be released unless (y) released pursuant to the Account Holder Avoidance Action Settlement or (z) such Avoidance Action concerns wages, salaries, salary-equivalents, or other compensation received by directors, officers, managers, or employees of the Debtors; *provided*, *further*, that Causes of Action against Released Parties listed on the Schedule of Retained Causes of Action shall not be released against any party unless specifically provided therein.  For the avoidance of doubt, any Holder of a State Regulatory Claim, *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest shall not be a Released Party in its capacity as such unless such Holder opts into becoming a Releasing Party.  *See* Plan, Art. I.A.206.  The last sentence, beginning with "For the avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors received from the SEC.

[66]   *See* Plan, Art. VIII.C.

59.    For the reasons discussed herein, the Debtor Release is the product of arm's-length negotiations, was critical to obtaining support for the Plan from various constituencies, and is in the best interests of the Estates.    Indeed, the Debtor Release was negotiated in connection with the other terms of the Plan and is an indispensable component to achieving final resolution of potential disputes, in exceedingly complex Chapter 11 Cases, that would otherwise extend and negatively affect these Chapter 11 Cases and the recoveries available to Account Holders and other creditors.

60.    It is well-settled that a debtor is authorized to settle or release its claims in a chapter 11 plan.[67]    Such releases are granted by courts in the Second Circuit where they are in the "best interests of the estate."[68]    In determining whether such a release is within the best interests of the estate, the court need not conduct a "'mini-trial' of the facts or the merits underlying [each] dispute" and "the settlement need not be the best that the debtor could have obtained."[69] Under this standard, the "court should instead 'canvass the [settled] issues [to] see whether the settlement falls below the lowest point in the range of reasonableness.'"[70]    Courts in the Second Circuit consider the following factors to determine whether a settlement is within the range of reasonableness:    (a) the balance between the claim's possibility of success and the settlement's benefits; (b) the likelihood of complex and protracted litigation, including attendant expense, inconvenience, and delay; (c) the interests of creditors; (d) whether other interested parties

---

[67]    *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) (holding the debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[68]    *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate." (citation omitted)).

[69]    *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (*quoting Adelphia*, 368 B.R. at 225).

[70]    *Id.* at 100 (*quoting Adelphia*, 368 B.R. at 225 (citation omitted)).

support the settlement; (e) the nature and breadth of releases; (f) the competency and experience

of counsel supporting, and the experience and knowledge of the judge reviewing, the settlement;

and (g) the extent to which the settlement is the product of arm's-length bargaining.[71]

61.    Here, the Debtor Release is a vital component of the Plan, particularly for

Account Holders, and constitutes a sound exercise of the Debtors' business judgment.   The

Released Parties played an integral role in the development of the Plan and have expended

significant time and resources resolving the complex issues in these Chapter 11 Cases to enable

the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as

quickly as possible. Over the course of the past year, as the Debtors, the Committee, various ad

hoc groups, the Series B Holders, and *pro se* creditors negotiated multiple settlements and

litigated numerous legal issues, many of which were questions of first impression, it became

apparent that the Debtor Release would be an important part of providing closure to these

challenging Chapter 11 Cases and a necessary condition of the consummation of the

Restructuring Transactions embodied in the Plan.[72]  Without the Debtor Release, the Debtors and

their stakeholders would not have been able to secure the substantial benefits provided by the

Plan, and the Debtor Release provides finality to parties in interest.  Losing the participation of

the Released Parties on the eve of confirmation would threaten the viability of the Plan,

including eliminating the Debtors' ability to make in-kind distributions and hindering the

Debtors' chances of success in consummating the NewCo Transaction.

---

[71]    *Id.* (citing *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

[72]    *See* Ferraro Decl. ¶ 15.

62.    The Debtor Release was also developed following extensive investigations and is

supported by the Committee.  Specifically, during these Chapter 11 Cases, there were numerous

investigations into the conduct of the Debtors and their current and former officers, directors,

and employees, including internal investigations led by the Special Committee, an investigation

by the Committee, an investigation by the Examiner resulting in a lengthy public report, and

numerous investigations by state and federal governmental entities.  All of those investigations

were considered and taken into account in forming the Debtor Release, and the Schedule of

Excluded Parties that includes individuals who the Debtors or the Committee determined should

not be released.  That is, the robust process run by the Debtors in close consultation with the

Committee further demonstrates that the Debtor Release is appropriate and reasonable.

63.    Significantly, the Debtor Release includes releases granted pursuant to the

Account Holder Avoidance Action Settlement.  In other words, the Debtor Release allows the

Debtors to release Account Holders from potential preference actions if the Account Holders

accept the Account Holder Avoidance Action Settlement, and therefore provides closure and

comfort to Account Holders, who have consistently expressed concern over preference actions

and for whom these Chapter 11 Cases have been particularly challenging.  In addition, Account

Holders who enter into the Account Holder Avoidance Action Settlement will receive expedited

distributions because their distributions will not be held back while any preference litigation

remains unresolved.  In consideration for releasing Account Holders from potential preference

actions, the Debtors will receive mutual releases from potential claims and causes of action

against the Debtors and, if applicable, payments from Account Holders to settle their Withdrawal

Preference Exposure.[73]  Specifically, Account Holders with a Withdrawal Preference Exposure

of more than $100,000 are required to make a payment to the Debtors of 27.5% of their total

Withdrawal Preference Exposure no later than fourteen days prior to the anticipated Effective

Date of the Plan.[74]  Such payments will benefit the creditor body as a whole because they will

increase the amount available for distribution to creditors from the Debtors' Estates without the

need for costly and uncertain litigation.

64.    In consideration for the Debtor Release generally, the Debtors and their Estates

will receive mutual releases from potential claims and causes of action of each Releasing Party.[75]

Simply put, the Debtors do not believe that the benefits that could be obtained by pursuing

causes of action against any of the Released Parties would justify the risk, expense, and delay of

pursuing any such causes of action as compared to the results and benefits achieved under the

Plan.  The Debtor Release avoids further delay in consummating the Plan following a

challenging year after the Petition Date, and therefore the inclusion of the Debtor Release is

worthwhile and inures to the benefit of all the Debtors' stakeholders.  For these reasons, the

Debtors' agreement to provide the Debtor Release constitutes a sound exercise of the Debtors'

---

[73]    *See generally* Plan, Art. IV.B.3.

[74]    *See id.*

[75]    Pursuant to the Plan, "Releasing Party" means each of the following, solely in its capacity as such: (a) each
Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt
out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan;
(d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the
releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not
affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan
and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each
Entity in clause (a) through clause (f).  *See* Plan, Art. I.A.202.  The last sentence, beginning with "For the
avoidance of doubt…" was included in the amended Plan in response to informal comments the Debtors
received from the SEC.

business judgment.[76]  Accordingly, there is ample justification for providing the Debtor Release, and it should be approved.

65.    The Debtors have modified the Debtor Release in response to the Ubierna Objection and informal comments from the U.S. Trustee.  Specifically, the Debtors have added a paragraph to the Debtor Release (and the Exculpation provision) stating that "[n]otwithstanding anything contained [in the Plan] to the contrary, nothing in the Plan or Confirmation Order shall release or exculpate any claims or causes of action against any of the Debtors' advisors arising out of any action or inaction relating to the Debtors filing (or failing to timely file) a proof of claim against the debtors in *Voyager Digital Holdings, Inc., et al.*, Case No. 22-10943 (Bankr. S.D.N.Y.) (MEW)."[77]

### 2.    The Third-Party Release Is Wholly Consensual and Should Be Approved.

66.    Article VIII.D of the Plan includes a consensual third-party release among the Debtors and the Releasing Parties[78] (the "Third-Party Release").  Courts in the Second Circuit have explained that a *consensual* third-party release may be approved with the consent of the affected party.[79]  Consistent with this instruction, courts in this jurisdiction have held that

---

[76]    *See* Ferraro Decl. ¶ 18.

[77]    *See* Plan, Art. VIII.C, VIII.E.

[78]    Pursuant to the Plan, "Releasing Parties" means each of the following, solely in its capacity as such:  (a) each Released Party; (b) all Holders of Claims that are presumed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (c) all Holders of Claims or Interests that vote to accept the Plan; (d) all Holders of Claims or Interests that are deemed to reject the Plan and who affirmatively opt into the releases provided by the Plan; (e) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (f) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (g) each Related Party of each Entity in clause (a) through clause (f).  For the avoidance of doubt, any Holder of a *De Minimis* Claim, Section 510(b) Claim, Equitably Subordinated Claim, or Other Interest that fails to opt into the Plan's releases shall not be a Releasing Party in its capacity as such.

[79]    *See, e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th

"[r]eleases can be granted by consent and that consent can be established by a vote in favor of the plan, at least where the consequences are plainly and unambiguously expressed to the voting creditor,"[80] and regularly approve third party releases such as those contained in the Plan on the grounds that such releases are consensual.[81]  Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to such release.[82]

67.    Here, the Third-Party Release under the Plan provides, in sum, that the Releasing Parties, including Holders of Claims and Interests who vote to accept the Plan or who do not affirmatively opt out of the Plan's release provisions, will release the Released Parties from any and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a)

---

also be tolerated if the affected creditors consent.") (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)); *In re Adelphia*, 368 B.R. at 268 ("The Seventh Circuit held in *Specialty Equipment* that consensual releases are permissible, and the *Metromedia* court did not quarrel with that view." (citation and footnote omitted)); *In re Spiegel, Inc.*, No. 03-11540 (BRL), 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (holding that nondebtor releases are tolerated if the creditors consent (citing *Metromedia*, 416 F.3d at 142)), *appeal dismissed*, No. 06-09385 (NRB), 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008); *In re Oneida*, 351 B.R. at 94 (approving consensual release provisions (citing *Metromedia*, 416 F.3d at 142)).

[80] *See, e.g.*, *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y Dec. 17, 2009) Hr'g Tr. 62:16-19; *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (granting third-party release with respect to affected parties that consented to the releases by voting in favor of the plan); *In re Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *8 (Bankr. S.D.N.Y. Jan. 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and, therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties); *In re Lear Corp.*, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible); *In re Calpine Corp.*, No. 05-60200 (BRL), WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (same).

[81] *See In re Chassix Holdings, Inc.*, 533 B.R. 64, 80 (Bankr. S.D.N.Y. 2015) ("'Consenting Creditors' should include creditors who voted in favor of the Plan . . . [s]imilarly, creditors who rejected the Plan, but who nevertheless 'opted in' to the releases, have consented to those releases."); *In re MPM Silicones*, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sept. 9, 2014) (citing *Metromedia*, 416 F.3d at 141*; see also Genco*, 513 B.R. at 271*; In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010).

[82] *E.g.*, *In re SunEdison, Inc.*, No. 16-10992 (SMB), 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (collecting cases).

the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents, ***with several important exceptions***. For example, the Releasing Parties will not release the Released Parties from (a) any Causes of Action included in the Schedule of Retained Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (b) any Avoidance Action not released pursuant to the Account Holder Avoidance Action Settlement.[83]

68.     Sensitive to the fact that the majority of the Debtors' creditors are Account Holders with limited prior exposure to chapter 11, the Debtors included a robust and clear explanation of releases in the Disclosure Statement.  Ten pages long, the explanation on releases (and exculpations and injunctions) starts with first principles about what a release means in plain English, and includes an exact duplication of this provision, among others, in conspicuous, bold-faced type.  The Confirmation Hearing Notice, Ballots, and other Solicitation Package materials distributed to Holders of Claims and Interests entitled to vote on the Plan also included an exact duplication of the release, and the Ballots clearly informed Holders of Claims and Interests entitled to vote on the Plan of the steps they should take if they decided to opt out of the Third-Party Release.  Holders who abstained from voting or voted to reject the Plan therefore had the opportunity to opt out of the Third-Party Release.  In addition, Holders of Claims presumed to accept the Plan received a Non-Voting Status Notice for Holders Deemed to Accept in lieu of a Ballot, which also reproduced the release in full and provided instructions for opting out of the Third-Party Release.  As a settlement with the SEC, the Debtors also agreed to revise

---

[83]     *See* Plan, Art. VIII.D.

the Plan to have the release be "opt in" for classes deemed to reject the Plan. As a result, Holders of Claims and Interests deemed to reject the Plan received a Non-Voting Notice for Holders Deemed to Reject, which also reproduced the release in full and provided instructions for opting into the Third-Party Release.

69.    As such, affected parties were on notice of the Third-Party Release. By voting to accept the Plan or opting into the Third-Party Release, these parties have unambiguously consented to the releases and such releases are clearly consensual. Courts in this District have approved third-party releases as consensual where a plan provided for a third-party release, but the affected parties were afforded the opportunity to opt out of providing such release.[84]   In *Ditech*, this Court held that "parties that did not return a ballot and failed to opt-out of the Third Party Releases are deemed to consent to the Third Party Releases."[85]   The opt-out mechanism is therefore sufficient to demonstrate consent.[86]   The Notice of Non-Voting Status and Ballots clearly explained the process by which a creditor must opt out or opt in to the Third-Party Release and the implications for failing to abide by these instructions. Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for

---

[84]    *See e.g. In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016), *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* [Docket No. 1359] ¶ MM (approving third-party release that contained opt out); *In re Tricom, S.A.*, No. 08-10720 (SMB) (Bankr. S.D.N.Y. Oct. 21, 2009), Order Confirming First Modified Second Amended Prepackaged Joint Chapter 11 Plan of Reorganization For Tricom S.A. and its Affiliated Debtors (As Modified) [Docket No. 568] ¶ K (approving, as consensual, third-party releases where voting parties were afforded the option to opt out).

[85]    *In re Ditech Holding Corp.*, 606 B.R. 544, 630 (Bankr. S.D.N.Y. 2019).

[86]    *See In re Avianca*, 632 B.R. 124, 136–37 (Bankr. S.D.N.Y. 2021).

granting third-party releases is sufficient to demonstrate cause.[87]    Finally, the Third-Party

Release contains a carve-out for actual fraud, willful misconduct, and gross negligence.

70.    In addition, as set forth in the Voting Report, 0.13% (504) in number, which is

equivalent to 2.31% ($110,836,665.39), of Holders of Claims or Interests in the Voting Classes

affirmatively opted out of the Third-Party Release.[88]    Furthermore, 1.78% (9) in number, which

is equivalent to 0.09% ($36,871.63) in dollar amount, of Holders of Unimpaired, Unclassified,

and Disputed Claims who received the Non-Voting Packages affirmatively opted out of the

Third-Party Release, while 0.26% (567) in number, which is equivalent to 0.31% ($914.70) in

dollar amount, of Holders of Impaired Claims or Interests who received the Non-Voting

Packages opted into the Third-Party Release.[89]

71.    The U.S. Trustee Objection argues that the releases are "over broad" without

providing further specifics,[90] merely repeating by incorporation its objection to the Disclosure

Statement,[91] where it misinterpreted the releases in the Plan as nonconsensual third-party

releases and argued that the Debtors fail to comply with the (inapplicable) legal standard for

nonconsensual releases set forth in *Metromedia* and *Purdue Pharmaceuticals*.  As the Debtors

emphasized above and in their omnibus reply to objections to the Disclosure Statement,[92] which

---

[87]    *See id.* at 137.

[88]    *See* Voting Report ¶ 19.

[89]    *See id.*

[90]    *See* U.S. Trustee Obj. at 1–2.  The Ubierna de las Heras Objection makes the same general argument.  *See* Ubierna de las Heras Objection at 2.

[91]    *See Objection of the United States Trustee to Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3182] (the "U.S. Trustee DS Objection").

[92]    *See Omnibus Reply in Support of the Adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3225].

is incorporated herein by reference, the Third-Party Releases are consensual, providing for a typical "opt out" mechanism (other than with respect to those parties who are "deemed to reject" and must opt in to the third-party releases)[93] for all creditors that are presumed to accept the Plan, voted to reject the Plan, or abstained from voting on the Plan, which is sufficient to demonstrate consent and is consistent with this Court's previous rulings approving third-party releases.[94]  In the Second Circuit, where third-party releases are consensual, such as these are here, after proper notice and absent objection, "courts generally approve them unless they are truly overreaching on their face."[95]

### a.    The Released Parties Have Made Substantial Contributions to the Debtors' Restructuring Efforts.

72.    Further, the Third-Party Release is an important component of the Plan and represents the result of a complicated, yearlong effort among multiple diverse constituencies to bring these Chapter 11 Cases to closure.  As with the Debtor Release, each Released Party has made a substantial contribution to the development of the NewCo Transaction and the Orderly Wind Down justifying their release.

73.    The Released Parties have provided substantial and necessary contributions in exchange for their respective releases under the Third-Party Release, including, among other

---

[93]    The Notice of Non-Voting Status and Ballots sent to such creditors **clearly** explained the process by which a creditor had to opt out or opt in to the third-party releases and the implications for failing to abide by these instructions.  Where an opt-out structure is "clear and a prominent explanation of the procedure is given," such mechanism for granting third-party releases is sufficient to demonstrate consent.  *See In re Avianca*, 632 B.R. at 137.

[94]    *See In re Avianca Holdings S.A.*, 632 B.R. at 136–37 ("[N]umerous cases in this district and elsewhere have approved the use of an opt-out procedure . . . . the opt-out structure is permissible provided that a clear and prominent explanation of the procedure is given as it has been here.").

[95]    *See id.* at 133.  The Debtors respond to the remaining Objections to the Third-Party Release in the Objection Tracker.

things, the following:    (a) the Special Committee has been instrumental in advancing

investigations into the Debtors' prepetition conduct and cooperating with similar third-party

investigations; (b) the Committee has avidly represented the interests of the large body of

unsecured creditors, namely Account Holders, from the day that it was appointed in July 2022,[96]

and has been fully engaged in essentially *all* of the major developments, settlements, and

litigations of these Chapter 11 Cases; (c) the Retail Borrower Ad Hoc Group and its members

and the Earn Ad Hoc Group and its members participated in a three-day mediation in July 2023

before the Honorable Judge Michael E. Wiles of the United States Bankruptcy Court for the

Southern District of New York to resolve outstanding issues regarding the treatment of Earn

creditors and Borrow creditors, ultimately leading to the amendment of the Plan and revised

treatment of General Earn Claims and Retail Borrower Deposit Claims, as well as the Class

Claim Settlement, which inured to the benefit of all Account Holders; (d) the Initial Series B

Preferred Holders and their Related Parties are Released Parties because of their participation in

the negotiation of the Series B Settlement, one of the last issues resolved in these Chapter 11

Cases before commencing solicitation of the Plan[97]; (e) the majority of the foregoing parties

were also instrumental in guiding the negotiation of the Plan, the selection of the Stalking Horse

Bidder, and the Auction.  As Bidders, the Plan Sponsor (the Fahrenheit Group) and the BRIC

Parties were core participants who made the Auction, as well as the subsequent finalization of

the Restructuring Transactions and the Backup Bid, the success that it was; (f) Christopher

Ferraro is a Released Party in acknowledgement of the significant responsibility he has taken

on—and extraordinary leadership he has provided—in the past year as the Interim Chief

---

[96]    *See* Notice of Appointment of Official Committee of Unsecured Creditors [Docket No. 241].

[97]    *See* Series B Settlement Order [Docket No. 3074].

Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors in a tumultuous environment; (g) finally, significant work will remain once the Plan is Confirmed and the Restructuring Transactions must be implemented. The Distribution Agent, the Plan Administrator, the Litigation Administrator, and (in the event the NewCo Transaction is consummated) NewCo and its directors and officers, will have crucial roles and take on significant responsibility to ensure that everything contemplated by the Plan occurs. Although these Entities will only begin their work after Confirmation, their contributions will be critical to the success of the Plan.

74.    Without the substantial contributions and concessions by the Released Parties, the Debtors' value-maximizing restructuring contemplated by the Plan would not be possible. The Released Parties share the common goal of effectuating a successful reorganization. Courts in this district have approved third-party releases under similar circumstances.[98]

        **b.**       **The Debtors' and Other Released Parties' Respective Officers, Directors, Advisors, and Other Representatives and Agents**

---

[98] *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re LATAM Airlines Group S.A.*, WL 2541298 at *48 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re China Fishery Grp. Ltd.*, No. 16-11895 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2022); *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021); *In re Avianca Holdings S.A.*, No. 20-11133 (MG) (Bankr. S.D.N.Y. Nov. 2, 2021); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Jason Industries*, No. 20-22766 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2020); *In re Lakeland Tours, LLC*, No. 20-11647 (JLG) (Bankr. S.D.N.Y. Sept. 15, 2020); *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020); *In re Barneys New York Inc.*, No. 36300 (CGM) (Bankr. S.D.N.Y. Jan. 31, 2020); *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019); *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019); *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019); *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Avaya Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017); *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017); *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017); *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016); *In re Legend Parent Inc.*, No. 14-10701 (RG) (Bankr. S.D.N.Y. 2014).

**Have Made Substantial Contributions to the Debtors'
Restructuring Efforts.**

75.     Finally, the remaining Released Parties include the Released Parties' current

financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and

other professionals, any Releasing Party, and, pursuant to the Schedule of Released and

Exculpated Parties filed as part of the Plan Supplement,[99] each individual who was employed by

the Debtors on the date the Disclosure Statement Order was entered[100] to the extent that each

such employee is not:  (1) later arrested, indicted, or found liable for bad acts or omissions in

connection with his or her role with the Debtors, in which case any release provided by the Plan

shall be null and void with respect to such employee and all statutes of limitations shall be tolled

during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of

Excluded Parties.

76.     Although the majority of the Debtors' operations have been paused since the

Petition Date, the Debtors' employees have been instrumental in pushing these Chapter 11 Cases

forward——no small feat considering that the Debtors have also experienced significant

reductions in force.  As a general matter, the employees have provided the Debtors' advisors

their extensive industry knowledge, which was crucial in light of the novel legal and factual

issues raised by cryptocurrency.  Further, employees proved instrumental in the resolution and

litigation of the core issues of these Chapter 11 Cases, including the briefing and trials related to

Earn, Custody, and Withhold assets, and the negotiation of the related settlements, among other

issues, by providing the Debtors' advisors their deep understanding of Company operations.

---

[99]    *See* First Plan Supp., Exh. A.

[100]    The Disclosure Statement Order [Docket No. 3337] was entered on August 17, 2023.

Throughout the weeks'-long Auction process, the employees also worked with the Debtors'
advisors to evaluate and improve the Bids.    Finally, the consummation of the NewCo
Transaction or the Orderly Wind Down cannot occur without the efforts of the Debtors'
employees, and as such, these employees have made and will continue to make indispensable
contributions to the successful reorganization of the Debtors.

77.    Ultimately, the Third-Party Release is reasonable under the circumstances of
these Chapter 11 Cases and follows well-established precedent in this district regarding opt-out
provisions and scope.    Accordingly, the Debtors respectfully submit that the Court should
approve the Third-Party Release.[101]

### 3.    The Exculpation Provision Is Appropriate and Complies With the Bankruptcy Code.

78.    Article VIII.F of the Plan sets forth an exculpation provision exculpating the
Exculpated Parties[102] from enumerated claims (the "Exculpation") between the Petition Date and
the Effective Date arising in relation to the Chapter 11 Cases.    Furthermore, the Exculpated
Parties are not exculpated from (a) any Causes of Action included in the Schedule of Retained
Causes of Action or any Causes of Action against an Excluded Party (including Mr. Mashinsky
and Mr. Leon, among others), or (b) any Avoidance Action not released pursuant to the Account

---

[101]    *See* Ferraro Decl. ¶ 25.

[102]    Pursuant to the Plan, "Exculpated Party" means, each of the following, solely in its capacity as such:  (a) the
Debtors; (b) the Special Committee and each of its members; (c) the Distribution Agent; (d) the Plan
Administrator; (e) the Committee and each of its members; (f) any Litigation Administrator(s); (g) the Plan
Sponsor and each of its members; (h) NewCo and its directors and officers; (i) the Retail Borrower Ad Hoc
Group and each of its members; (j) the Earn Ad Hoc Group and each of its members; (k) with respect to each of
the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers,
consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class
Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated
Parties.    Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to
exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party
shall constitute a Released Party or an Exculpated Party in any capacity hereunder.  *See* Plan, Art. I.A.110.

Holder Avoidance Action Settlement. Notably, following the U.S. Trustee's objection to the Disclosure Statement, and to address the U.S. Trustee's argument that the Exculpation provision should be expressly limited to acts or omissions during these Chapter 11 Cases, the Debtors modified the Exculpation provision to make clearer that it applies solely to actions taken from the Petition Date through the Effective Date.[103] The Debtors also removed the "release" language from the Exculpation provision to address comments from the U.S. Trustee.

79. Courts in the Second Circuit evaluate exculpation provisions based upon a number of factors, including whether the provision is integral to the plan and whether protection from liability was necessary for plan negotiations.[104] Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[105] A bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[106] Once the court makes this good-faith finding, it is

---

[103] *See* Plan, Art. VIII.E.

[104] *See In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Enron Corp.*, 326 B.R. 497, 501, 503 (S.D.N.Y. 2005) (approving an exculpation provision where it was necessary to effectuate the plan and excluded gross negligence and willful misconduct; also noting that excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. Oct 31, 2003) (approving an exculpation provision where it "was an essential element of the Plan formulation process and negotiations"); *see also In re Drexel Burnham*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 260-61 (Bankr. M.D. Fla. 2006) (approving an exculpation provision where the beneficiaries made significant contributions and expected an exculpation provision would be included in the plan).

[105] *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to: how the exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[106] 11 U.S.C. § 1129(a)(3).

appropriate to provide a standard of care for the parties involved in the negotiation and formulation of that chapter 11 plan.[107]   Exculpation provisions, therefore, prevent future collateral attacks against a court's good-faith finding.

80.    Here, the Exculpation provision is an integral part of the Plan and satisfies the governing standards in the Second Circuit.  The Exculpation provision provides necessary and customary protections to those parties in interest (whether Estate fiduciaries or otherwise) whose efforts were, and continue to be, vital to formulating and implementing the Plan, which has garnered overwhelming support from the Debtors' voting creditors, including Account Holders.  As noted throughout this Memorandum, these Chapter 11 Cases have been extraordinarily complex due to their nearly unprecedented nature, involving as they have novel legal and factual cryptocurrency-related issues, challenging settlement negotiations, and a variety of stakeholders, including vocal *pro se* creditors, with different and competing interests.

81.    The Plan and the Restructuring Transactions contemplated therein are the product of a year's-long legal and business process.  First—before they could contemplate the contours of a reimagined, regulatorily compliant cryptocurrency company—the Debtors and their stakeholders had to resolve threshold issues to determine who owned the cryptocurrency assets in the Debtors' possession and what the Debtors would ultimately be able to distribute to their creditors.  In the second phase of the Chapter 11 Cases, the Debtors negotiated the foundational elements of their envisioned reorganization by entering, first, into an agreement with NovaWulf to sponsor the Debtors' reorganization as the Stalking Horse Bidder and, second, conducting a

---

[107]    *See In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'" (citation omitted)); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3d Cir. 2000) (observing

competitive Auction process and secure improved Bids.[108]    Once the core aspects of the Restructuring Transactions with the Fahrenheit Group as Plan Sponsor were finalized, the Debtors focused on reaching consensual resolutions of contentious issues with other stakeholders such as the Series B Holders, the Retail Borrower Ad Hoc Group, and the Earn Ad Hoc Group. In parallel, the Debtors cooperated with federal criminal and civil investigations into the Debtors' prepetition conduct, and the Debtors worked closely with government regulators to ensure that any contemplated cryptocurrency reorganization could be fully compliant.    Finally, throughout these Chapter 11 Cases, the Debtors also worked hard to gain the trust of their creditor body; the voting results speak to the Debtors' success on that point.    In light of the complex nature of these Chapter 11 Cases, it should not be controversial to state that the protections afforded by the Exculpation provision are necessary here, and that they should apply for the full life of these Chapter 11 Cases.    Ultimately, the Exculpation provision provides protection to those parties that worked hand-in-hand with the Debtors and were instrumental in assuring the success of the Debtors' restructuring.

82.    In the Second Circuit, exculpation provisions that cover non-estate fiduciaries are approved regularly.[109]    In approving these provisions, courts consider a number of factors,

---

that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties.").

[108]    *See* Kielty Decl. ¶¶ 7–8.

[109]    *See, e.g.*, *In re Revlon, Inc.*, No. 22-10760 (DSJ) (Bankr. S.D.N.Y. April 3, 2023); *In re Lumileds*, No. 22-11155 (LGB) (Bankr. S.D.N.Y. Oct. 31, 2022); *In re Frontier Communications Corp.*, No. 20-22478 (RDD) (Bankr. S.D.N.Y. Aug. 27, 2020); *In re LATAM Airlines Group S.A.*, WL 2541298 at *49 (JLG) (Bankr. S.D.N.Y. June 18, 2022); *In re Garrett Motion*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. April 26, 2021); *In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. Feb. 23, 2021); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y Aug. 21, 2018) [Docket No. 685] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any cause of action for any claim related to any act or omission in connection with, relating to, or arising out of, the chapter 11 cases . . . or the filing of the Restructuring Support Agreement and related prepetition transactions"); *In re Eastman Kodak Co.*, No.

including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[110] Where a court finds that a plan has been proposed in good faith and meets the other requirements of confirmation, approval of an exculpation provision is appropriate.[111]

83.    Here, the Debtors propose to exculpate the Exculpated Parties, which include non-Estate fiduciaries, because the contributions and concessions of the Exculpated Parties have made the Plan possible.    Such exculpation provisions are routinely approved in plans of reorganization in cases similar to these Chapter 11 Cases,[112] which could not have progressed as

---

12-10202 (ALG) (Bankr. S.D.N.Y. Aug. 23, 2013), [Docket No. 4966] (overruling U.S. Trustee objection to exculpation of both estate fiduciaries and non-fiduciaries from liability for "any prepetition or postpetition act taken or omitted to be taken in connection with, or arising from or relating in any way to, the chapter 11 cases"); *In re Res. Cap., LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), [Docket No. 6066] (approving exculpation of certain prepetition lenders); *In re Almatis, B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. Sept. 20, 2010), [Docket No. 444] (approving exculpation of debtors' prepetition lenders and holders of senior secured notes for both pre- and post-petition conduct); *In re Uno Rest. Holdings Corp.*, No. 10-10209 (MG) (Bankr. S.D.N.Y. July 6, 2010), [Docket No. 559] (approving exculpation of certain prepetition lenders from liability related to acts taken, among other things, "in connection with, or arising out of, the chapter 11 cases, the formulation, dissemination, confirmation, consummation, or administration of the Plan, property to be distributed under the Plan…the Plan, [or] the Disclosure Statement"); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (exculpation of prepetition noteholders and new investors); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation of controlling shareholder as well as estate fiduciaries); *In re Enron Corp.*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the chapter 11 cases").

[110]    *E.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156 (LAK), 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, WL 23861928, at *28 (Bankr. S.D.N.Y. 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *In re Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[111]    *See In re WorldCom, Inc.*, WL 23861928, at *28.

[112]    *See, e.g.*, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020)

productively absent the significant contributions of the Exculpated Parties.[113]  Their concerted

efforts were instrumental to the restructuring process and the Plan's overwhelming support from

the vast majority of the Debtors' voting creditors and key stakeholders.

84.    The failure to include exculpation provisions in chapter 11 plans would chill the

critical participation of the management and advisors to debtors in possession as well as essential

creditor groups and equity holders working to formulate and negotiate consensual chapter 11

plans.  In light of the bankruptcy policy in favor of consensual chapter 11 plans and the

negotiations that create them, it stands to reason that exculpation provisions are essential to the

process and should be approved.[114]  Further, in light of the carve out for actions or omissions that

are the result of bad faith, actual fraud, willful misconduct, or gross negligence, the standard of

care established by the Exculpation is entirely consistent with and appropriate under applicable

law and as a matter of public policy.[115]

---

[Docket No. 2243]; *In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Fullbeauty Brands Holdings Corp.*, No. 19-22185 (RDD) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 39]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019); *In re Cenveo, Inc.*, No. 18-22178 (Bankr. S.D.N.Y. Aug. 21, 2018) [Docket No. 685]; *In re Global A&T Electronics Ltd.*, No. 17-23931 (Bankr. S.D.N.Y. Dec. 21, 2017) [Docket No. 51]; *In re Avaya, Inc.*, No. 17-10089 (SMB) (Bankr. S.D.N.Y. Nov. 28, 2017) [Docket No. 1579]; *In re BCBG Max Azria Global Holdings, LLC*, No. 17-10466 (SCC) (Bankr. S.D.N.Y. July 26, 2017) [Docket No. 591]; *In re Answers Holdings, Inc.*, No. 17-10496 (SMB) (Bankr. S.D.N.Y. Apr. 10, 2017) [Docket No. 120]; *In re Enron*, 326 B.R. at 500 (upholding exculpation provision that precluded liability for, *inter alia*, "any act taken or omitted to be taken in connection with and subsequent to the commencement of the Chapter 11 Cases"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) [Docket No. 12952] (approving exculpation for, *inter alia*, "all prepetition activities leading up to the promulgation and confirmation of this Plan," as well as for "any act or omission in connection with, or arising out of the Debtors' restructuring, including, without limitation, the negotiation and execution of this Plan, the Reorganization Cases . . . and . . . all documents ancillary thereto"); *In re Ampex Corp.*, No. 08-11094 (AJG) (Bankr. S.D.N.Y. July 31, 2008) [Docket No. 386] (same).

[113]    *See* Ferraro Decl. ¶ 28.

[114]    *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999) (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization).

[115]    *See, e.g.*, *In re Oneida*, 351 B.R. at 94 n.22 (approving exculpation provision except in cases of gross negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d]

85.    The Debtors respectfully submit that the Court has an ample record before it to conclude that the Exculpated Parties are entitled to the Exculpation proposed in the Plan and that the protections afforded therein are reasonable and appropriate.   In short, the Exculpation represents an integral piece of the overall settlement embodied in the Plan and is the product of good-faith, arms'-length negotiations, and significant sacrifice by the non-Debtor Exculpated Parties.   The Exculpated Parties played a critical role in formulating the Plan, and the Exculpation provision played a role in bringing these parties to the table.   Failure to include the Exculpation provision could have deterred the Exculpated Parties from collaborating with the Debtors to develop a fully consensual restructuring.[116]   The scope of the Exculpation provision is narrowly tailored to exclude certain acts, relates only to acts or omissions in connection with or arising out of the Debtors' restructuring between the Petition Date and the Effective Date, and ultimately inures to the benefit of only those parties that have made similar contributions to the Debtors' restructuring.   Moreover, the scope of the Exculpation itself and the composition of the Exculpated Parties are entirely consistent with established practice in this and other jurisdictions.[117]

---

negligence, willful misconduct, fraud, or criminal conduct over an objection that was raised but "not pursue[d] at the confirmation hearing" and noting that the language "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptional"); *see In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Mar. 14, 2014) [Docket No. 1225] (approving exculpation provision the extended to estate fiduciaries and non-fiduciaries that excluded gross negligence and willful misconduct); *In re DJK Residential, LLC,* No. 08-10375 (JMP), (Bankr. S.D.N.Y. May 7, 2008) [Docket No. 497] (approving an exculpation provision that excluded gross negligence and willful misconduct).

[116]    *See, e.g.*, Ferraro Decl., ¶¶ 26–28.

[117]    *See, e.g., In re Seabras 1 USA, LLC*, No. 19-14006 (SMB) (Bankr. S.D.N.Y. June 30, 2020) [Docket No. 298]; *In re Deluxe Media*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 23, 2019) [Docket No. 96]; *In re Hollander Sleep Products, LLC,* No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sep. 5, 2019) [Docket No. 356]; *In re Nine West Holdings, Inc.,* No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 5, 2019) [Docket No. 1308]; *In re Sungard Availability Services Capital, Inc.*, No. 19-22915 (RDD) (Bankr. S.D.N.Y. May. 3, 2019).

86.     As noted with respect to the Debtor Release, the Debtors modified the Debtor Release and the Exculpation provision to provide that the Debtors' advisors would not be released or exculpated with respect to any claims or causes of action relating to the filing of the Debtors' claim in the *Voyager* matter.[118]   The U.S. Trustee Objection repeats the arguments made in its objection to the Disclosure Statement, primarily that the Exculpation provision is "over broad and contain[s] prospective parties and activities."[119] As the Debtors explained in their omnibus reply to objections to the Disclosure Statement, however, other courts in this district have overruled similar U.S. Trustee objections and approved exculpation provisions that included non-estate fiduciaries.[120]

87.     The U.S. Trustee (repeating by incorporation its prior arguments) and Ubierna de las Heras also argue that the Exculpation provision should include an opt-out mechanism.[121] Neither the U.S. Trustee nor Ubierna de las Heras provide precedent or legal authority for this provision.  The entire purpose of an Exculpation provision is to protect parties who acted in good faith during chapter 11 cases under bankruptcy court supervision.  There is no basis for an opt out provision for an exculpation, and the U.S. Trustee and Mr. Ubierna de las Heras offer none.

---

[118]   *See* Plan, Art. VIII.C, VIII.E.

[119]   *See* U.S. Trustee Obj. at 2.  The Ubierna de las Heras Objection makes the same argument.  *See* Ubierna de las Heras Obj. at 2, 6.

[120]   *See In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) ("The Exculpated Parties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision.  They have been actively involved in all aspects of these Chapter 11 Cases and have made significant contributions to the success of these cases . . . the Court will extend the Exculpation clause to the Exculpated Parties who are not estate fiduciaries . . . based on the negotiation, execution, and implementation of agreements and transactions that were approved by the Court").

[121]   *See* U.S. Trustee DS Obj. at 23, Ubierna de las Heras Obj. at 6.

88.     Similarly, the U.S. Trustee's prior request that the Plan's Exculpation provision should carve out claims for legal malpractice must also be overruled.[122] The U.S. Trustee argues that release of claims based on legal malpractice is prohibited by the New York Rules of Professional Conduct.[123] But, as the *LATAM Airlines* court held, there is "no merit" to this U.S. Trustee request because the New York Rules of Professional Conduct "ha[ve] no bearing on the standard of care established" in an exculpation provision.[124]

89.     Ultimately, exculpation provisions serve an important purpose—they protect deserving parties from other parties who failed to timely assert their rights and who, instead, could attempt to reopen settled litigation through back door methods and thwart the finality and closure provided by the Plan in resolving these Chapter 11 Cases.[125] In light of the foregoing, the Debtors submit that the Exculpation provision is reasonable and appropriate under the circumstances of these Chapter 11 Cases and respectfully request that the Court approve the Exculpation set forth in Article VIII.F of the Plan.[126]

---

[122]  *See* U.S. Trustee DS Obj. at 26.

[123]  *See id.*

[124]  *LATAM Airlines,* No. 20-11254 (JLG), 2022 WL 2206829, at *50.

[125]  *See In re Global A&T Electronics Ltd.*, Case No. 17-23931 (RDD) (Bankr. S.D.N.Y. Dec. 17, 2017) Confirmation Hr'g Tr. 116:8-117:8 ("So, I actually think 1125(e) can well apply to third parties who aren't necessarily fiduciaries as long as they're participating in the exchange.  Now here, the people who really participated all sort of are releasing each other, but I guess I appreciate your point that this probably doesn't add anything but I don't think it adds anything in a bad way, either.  I think it's consistent with the statute and the case law and, again, it's to prevent strike suits.  It's to not give anyone a back door and particularly given the fact that the releases themselves say, "to the extent permitted by applicable law", you know, that's a potential loophole that the exculpation closes. . . It's basically to protect that finding that this was good faith so you can't go back and sue some third party who said, you know, you didn't act in good faith, because it's already been found.").

[126]  The remaining Objection to the Exculpation provision is the Phillips Objection, to which the Committee is responding.  The Debtors incorporate the Committee's response by reference.

### 4.    The Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.

90.    Pursuant to section 524(a), the injunction provision set forth in Article VIII.G of the Plan (the "Injunction Provision") implements the Plan's discharge, release, and exculpation provisions.  In part, the Injunction Provision permanently enjoins all Entities from commencing or continuing any action against the Debtors, the Post-Effective Date Debtors, the Released Parties, or the Exculpated Parties on account of, in connection with, or with respect to any such Claims, Interests, Causes of Action, or liabilities discharged, released, settled, compromised, or exculpated under the Plan.  The Injunction Provision is thus a key provision of the Plan because it is necessary to preserve and enforce the discharge provisions in the Plan, the Debtor Release, the Third-Party Release, and the Exculpation that are central to the Plan and is narrowly tailored to achieve that purpose.[127]  As such, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Injunction Provision.[128]

### 5.    The CEL Token Settlement, the Account Holder Avoidance Action Settlement, and the Retail Borrower Settlement Comply With the Bankruptcy Code (§ 1123(b)(3)(A)) and Are an Exercise of the Debtors' Good Business Judgment.

91.    Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[129]  The Plan provides for the general settlement of all Claims, Interests, Causes of

---

[127]    *See In re Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

[128]    *See* Ferraro Decl. ¶ 30.

[129]    11 U.S.C. § 1123(b)(3)(A).  *See, e.g., In re Ditech*, 606 B.R. at 622 ("A chapter 11 plan may 'provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate.'") (citations omitted); *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'") (citation omitted); *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (recognizing inapplicability of section 1123(b)(3)(A) as authority to settle creditor's claim in plan but considering settlement under Bankruptcy Rule 9019 standards).

Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the

Plan.  The Plan also provides for approval of the CEL Token Settlement, the Account Holder

Avoidance Action Settlement, and the Retail Borrower Settlement.   A settlement approved

through a plan must be "fair and equitable, and in the best interests of the estate."[130]  It is within

the discretion of the court to determine whether a settlement satisfies those standards.[131]   The

court should "accord proper deference to a debtor's business judgment" when making its

determination.[132]

92.     The Second Circuit weighs the following "*Iridium*" factors in determining

whether a proposed settlement is "fair and equitable":

   a.  the balance between the litigation's possibility of success and the
       settlement's future benefits;
   b.  the likelihood of complex and protracted litigation, with its
       attendant expense, inconvenience, and delay, including the
       difficulty in collecting on the judgment;
   c.  the paramount interests of the creditors, including each affected
       class's relative benefits and the degree to which creditors either do
       not object to or affirmatively support the proposed settlement;
   d.  whether other parties in interest support the settlement;
   e.  the competency and experience of counsel supporting, and the
       experience and knowledge of the bankruptcy court judge
       reviewing, the settlement;
   f.  the nature and breadth of releases to be obtained by officers and
       directors; and

---

[130] *In re Ditech*, 606 B.R. at 623; *see also In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).

[131] *See, e.g.*, *In re Ditech*, 606 B.R. at 623 ("The determination of whether a settlement meets those standards is within the discretion of the court."); *See In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("A Bankruptcy Court's decision to approve a settlement should not be overturned unless its decision is manifestly erroneous and 'a clear abuse of discretion.'") (citations omitted); *Kenton Cty. Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) ("The bankruptcy court will have abused its discretion if 'no reasonable man could agree with the decision' to approve a settlement.") (citation omitted); s*ee also O'Connell v. Packles (In re Hilsen)*, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009) ("[T]he court must make an informed and independent judgment as to whether a proposed compromise is 'fair and equitable' after apprising itself of 'all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.'" (citations omitted)).

[132] *In re Ditech*, 606 B.R. at 623.

g. the extent to which the settlement is the product of arm's-length bargaining.[133]

93.    Here, the CEL Token Settlement, the Account Holder Avoidance Action Settlement, the Retail Borrower Settlement, and the general settlement of claims and controversies are fair and equitable and an exercise of the Debtors' good business judgment and should therefore be approved.

### a.    The CEL Token Settlement Should Be Approved.

94.    The Debtors and the Committee previously briefed the basis for approving the CEL Token Settlement and the application of the *Iridium* factors thereto in the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431] (the "Debtors' CEL Token Brief") and the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues With Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] (the "Committee's CEL Token Brief" and together with the Debtors' CEL Token Brief, the "CEL Token Briefs"), respectively, and such briefs are incorporated herein by reference. This section supplements the arguments contained in the CEL Token Briefs by briefly reiterating how the *Iridium* factors support approval of the CEL Token Settlement addressing the voting results and the two objections filed to the settlement, which reinforce the Debtors' and the Committee's position and further demonstrate that the CEL Token Settlement should be approved.[134]

95.    The CEL Token Settlement proposed by the Plan provides that all Claims and Causes of Action arising out of or related to the CEL Token for, among other things,

---

[133]    *Id*. at 623–24 (*citing Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007)).

[134]    *See generally* Davis Obj.; Lau Letter (arguing that a $0.25 valuation of CEL Token is unfair).

recharacterization and subordination, will be settled pursuant to the following terms: (i) first, except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token, and shall otherwise receive the treatment associated with the program in which they were deployed; and (ii) second, all Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.[135] In addition, the settlement of issues relating to CEL Token in the Plan includes that all Other CEL Token Claims are classified as Class 15 Section 510(b) Claims (which will not receive any distribution under the Plan).[136] The *Iridium* factors weigh in favor of approving the CEL Token Settlement.

96.     **First**, the *Iridium* factor weighing the balance between a litigation's possibility of success and the settlement's future benefits weighs heavily in favor of approving the CEL Token Settlement. Certain Holders of CEL Token believe that the proper value of CEL Token is its apparent market price of $0.81 per CEL Token on the Petition Date.[137] In comparison, the Debtors and the Committee strongly believe that the value of CEL Token on the Petition Date is not appropriate due to, among other things, market manipulation of the CEL Token price, and believe that CEL Token may be worth as little as $0.00. For example, the price of CEL was extensively manipulated by Celsius' prepetition management.[138] As the Debtors described in the

---

[135]  *See* Plan, Art. IV.B.2.

[136]  *Id.* "Other CEL Token Claim" means any Claim, including any Account Holder Claim, arising out of or related to CEL Token that is not a CEL Token Deposit Claim, including (i) damages arising from the purchase or sale of CEL Token, (ii) damages for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, and (iii) Claims arising from the rescission of a contract for the purchase or sale of CEL Token. *Id.*, Art I.A.166.

[137]  *See* CEL Token Brief ¶¶ 8–15 (summarizing the CEL Token valuation disputes, including those in connection with the motions filed by creditors Santos Caceres and Sean StJohn and approval of the Disclosure Statement).

Disclosure Statement,[139] federal prosecutors charged Alexander Mashinsky, the Debtors' founder and former chief executive officer, and Roni Cohen-Pavon, the former chief revenue officer, with conspiracy, securities fraud, market manipulation, and wire fraud for their actions with respect to CEL Token. [140]  Specifically, federal prosecutors assert that Mr. Mashinsky and Mr. Cohen-Pavon manipulated the price of CEL Token while profiting from the sale of their own CEL Tokens at inflated prices.[141]  On September 15, 2023, Mr. Cohen-Pavon pleaded guilty to four counts, including fraud, manipulation of securities prices, and conspiracy.[142]

97.    In addition, because the CEL Token was marketed as a "utility token" for the Celsius platform, it has no go-forward utility because the Celsius platform will be retired following the Debtors' emergence from chapter 11 and the completion of distributions,[143] and in

---

[138]    *See, e.g.*, *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435] (the "Ferraro CEL Token Declaration") ¶ 22 (confirming that "Celsius' buyback strategies included placing standing purchase orders to protect the price of CEL Token from decreasing in the event that market prices dropped," that "Celsius also coordinated buybacks to occur contemporaneously with Celsius' 'Ask Mashinsky Anything' online Q&A sessions to increase consumer confidence and demand," and that "[i]n total, Celsius repurchased over 195 million CEL Tokens for over $540 million"); *id.* ¶ 26 (concluding that "[i]t is difficult to determine the true value of CEL Token, if any, at any given time, due to the wide variety of actions taken to regulate the supply of CEL Token and otherwise influence the price of CEL Token").

[139]    *See, e.g.*, Disclosure Statement, Art. III.LL.1.

[140]    *See Indictment*, *United States v. Mashinsky et al.*, 23-cr-00347-UA (S.D.N.Y. 2023) [ECF No. 1] ¶¶ 78–89; *see also id*, ¶¶ 48–71 (presenting the "CEL manipulation scheme").  As part of the non-prosecution agreement with the federal prosecutors and for the purposes of the prosecution of Mr. Mashinsky and Mr. Cohen-Pavon, Celsius accepted and acknowledged as true a set of facts, including that "the rise in value of the CEL [T]oken was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL [T]oken by taking steps to artificially support the price of CEL."  *SEC's Motion for Entry of Final Judgment Against Defendant Celsius Network Limited*, Exh. A, *SEC v. Celsius Network Limited et al.*, 23-cv-6005-PAC (S.D.N.Y. 2023) [ECF No. 6] ¶ 11.

[141]    *See id.*

[142]    *See* Bob Van Voris, "Celsius Executive Pleads Guilty, Cooperates Against Mashinsky," Bloomberg Law, September                                    15,                                    2023, https://news.bloomberglaw.com/ip-law/top-celsius-executive-cohen-pavon-pleads-guilty-to-crypto-fraud.

[143]    *See* Ferraro CEL Token Decl. ¶ 26.

any case, the Debtors are unable to return CEL Token to Account Holders under applicable law.[144]  Strong arguments also exist that CEL Token is an equity security of the Debtors,[145] which would result in zero recovery on account of CEL Token Deposit Claims pursuant to the absolute priority rule, and zero recovery on account of Other CEL Token Claims.[146]

98.    Despite these arguments, however, the value of CEL Token remains an open and disputed issue.  Absent a settlement, the Debtors would likely need to conduct a valuation trial that would be time-consuming, costly, and there is no certainty that the Debtors would succeed in their arguments, as further explained below.  This valuation trial could delay distributions to creditors and lead to a longer stay in chapter 11, which would further increase costs to the Debtors that would likely far exceed any savings as a result of a judgment valuing CEL Token at $0.00.  The CEL Token Settlement provides a reasonable compromise that avoids this protracted litigation and guarantees that Holders of CEL Tokens will receive some recovery on account of their CEL Token Deposit Claims.[147]  The certainty of the value of CEL Token at this stage in the Chapter 11 Cases far outweighs the potential benefit to the Debtors' estates of succeeding at trial after months of costly litigation.

---

[144]  *See* Aug. 14, 2023 Hr'g Tr. 71: 6–12 (The Court: "without a going concern, the CEL Token, it can't be issued. It can't—you know, Celsius won't exist.").

[145]  *See* Celsius Network, Celsius Network AMA–Ask Mashinsky Anything!, YouTube (Nov. 26, 2019), https://www.youtube.com/watch?v=H1n5g7uJyvQ, at 44:40.  *See also* Committee CEL Token Brief ¶¶ 75–76 (analyzing why CEL represents "an interest in the Debtors").

[146]  *See* 11 U.S.C. § 510(b); the Second Circuit broadly construes section 510(b) of the Bankruptcy Code to subordinate all claims with a causal connection to the purchase of a security.  *See Rombro v. Dufrayne (In re Med. Diversified, Inc.)*, 461 F.3d 251, 255–59 (2d Cir. 2006); *Adler v. Lehman Bros. Holdings (In re Lehman Bros. Holdings)*, 855 F.3d 459, 471 (2d Cir. 2017).

[147]  *See* August 14, 2023 Hr'g Tr. at 55:16–19 (The Court: "if somehow the [CEL Token Settlement was not accepted] and the Court conducts the valuation and concludes that the petition date, the value of the CEL token was zero, that would determine what the recovery in the plan would be.").

99.    **Second**, the likelihood of complex and protracted litigation also weighs heavily in favor of the CEL Token Settlement.  The Debtors, the Committee, and various *pro se* creditors are scheduled to hold, as part of the Confirmation Hearing, a hearing on the valuation of CEL Token commencing on October 16, 2023.  Valuation is notoriously time-intensive and expensive to litigate even under straightforward circumstances, and a trial regarding the value of CEL Token would be particularly complex, in part because what is often the most reliable indicator of value—market price—is no longer reliable due to market manipulation.  The CEL Token Settlement provides an elegant solution that would obviate extensive, expense, inconvenience, and delay attendant with litigation.

100.    **Third**, the paramount interests of creditors weigh in favor of the CEL Token Settlement because the settlement provides benefits to the Debtors' Estates and, by extension, unsecured creditors.  Notwithstanding objections by a few vocal holders of CEL Token, courts have repeatedly held that even where large claim holders oppose a settlement, it may still be approved because it is in the "best interests of the estate as a whole."[148]  As discussed above, litigation concerning the value of CEL Token would require the services of specialized experts and would be highly time- and cost-intensive.  While the overwhelming majority (approximately 247,000 out of approximately 259,000, or approximately 95.4%) of accounts that hold CEL Tokens have fewer than 1,000 CEL, only 12 accounts have more than 1,000,000 CEL Tokens.[149]

---

[148]    *In re Key3Media Grp. Inc.*, 336 B.R. 87, 97–98 (Bankr. D. Del. 2005) (stating that even when the "largest independent claimholders" object to a settlement, the objection "cannot be permitted to predominate over the best interests of the estate as a whole"); *see also In re Soup Kitchen Int'l., Inc.*, 506 B.R. 29, 44 (Bankr. E.D.N.Y. 2014) ("the overriding consideration is the [s]ettlement's benefits to the creditor body"); *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 519 (Bankr. D. Del. 2010) ("a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the . . . paramount interests of creditors, weighs in favor of settlement").

[149]    *See Debtors' CEL Token Brief* ¶ 34.

Given the relatively fixed amount of assets available for distribution to creditors, any increase in recovery by one sub-group will necessarily decrease the recoveries by all other creditors. Therefore, as an attempt to avoid the costly CEL Token valuation that would provide meaningful upside only for a small group of creditors, the CEL Token Settlement is in the collective interests of the entire creditor body.

101.    **Fourth**, creditors and other parties in interest, most notably the Committee, support the CEL Token Settlement.  Following the filing of the CEL Token Briefs, the Debtors completed solicitation of the Plan.  Holders of CEL Token Claims were not separately classified under the Plan, but the Debtors tabulated the votes of CEL Token Holders within each Class to evaluate whether Holders of CEL Token accepted the CEL Token Settlement.  Holders of CEL Token that voted on the Plan overwhelmingly accepted the Plan—98.71% of voting CEL Token Holders in the Voting Classes that submitted Ballots voted to approve the Plan.[150]  These results confirm that the fourth *Iridium* factor (regarding the breadth of support for the settlement) weighs heavily in favor of approving the CEL Token Settlement and bolster the Debtors' and Committee's determination that settling all CEL Token issues as proposed is in the best interests of creditor (in satisfaction of the third *Iridium* factor).[151]

102.    **Fifth**, the Debtors' and the Committee's counsel expended significant time and effort over the course of the previous year to investigate issues related to CEL Token and arrive at the CEL Token Settlement, including through discussions with parties in interest represented by sophisticated counsel as well as *pro se* creditors.  The ultimate terms of the CEL Token Settlement, as reflected in the Plan ($0.25/CEL, which represents a $0.05/CEL increase from the

---

[150]    *See* Voting Report ¶ 26.

[151]    *See* Debtors' CEL Token Brief ¶¶ 32–35.

initial terms) were the result of arms'-length negotiation with certain Holders of CEL Token Deposit Claims.

103.    Only two creditors objected to the CEL Token Settlement.  These creditors believe that CEL Token's proper value is its apparent market price of $0.81 per CEL Token on the Petition Date, or even a higher price, and argue that it is inequitable for CEL Token to receive less than the Petition Date price when all other cryptocurrencies are being valued at their Petition Date prices.  The objections do not even attempt to address the legal arguments set forth in the CEL Token Briefs, which emphasize that CEL Token is potentially entirely valueless as an equity security and/or a utility token with no go-forward utility, and instead argue about the true value of CEL Token.  Even further, the objectors' arguments support approval of the CEL Token Settlement by demonstrating the difficulty of ascertaining the true value of CEL Token as of the Petition Date.[152]

104.    The Davis Objection primarily argues that the price of CEL Token was manipulated downwards due to an alleged "naked short" orchestrated by FTX.[153]  While some of Mr. Davis' arguments are plausible on their face (*e.g.*, the Committee has been investigating potential claims against FTX on behalf of the Estates, and the Debtors filed a proof of claim to preserve any such claims), others are completely baseless conspiracies (*e.g.*, the unhinged and unsupported assertion that Christopher Ferraro intentionally facilitated any FTX price manipulation or was orchestrating a coup to unseat Alex Mashinsky as Chief Executive Officer).

---

[152]  For the avoidance of doubt, the Debtors dispute the allegations in the Davis Objection and will present argument and evidence at the Confirmation Hearing refuting such allegations as appropriate.  In short, the Davis Objection misconstrues certain documents inadvertently produced to Mr. Davis as relevant and damning based solely on their unintentional production.

[153]  *See* Davis Obj. at 2–7.

Although Mr. Davis references certain internal Slack chats that he argues support his arguments, he is completely misrepresenting those documents, which do not actually bear any resemblance to his gross mischaracterization and misreading of those documents.

105.    While the Davis Objection references downward price pressure, he acknowledges that the price was manipulated upwards between the Pause and the Petition Date.[154]    None of this supports adopting the market price as of the Petition Date as the value of CEL Token.  In fact, the Davis Objection illustrates that the value of the CEL Token is highly uncertain and a ripe issue for settlement to avoid value destructive litigation.  Indeed, this price manipulation between the Pause and the Petition Date (from approximately $0.20 to approximately $0.81) is one of the key reasons why the Debtors believe that the CEL Token Settlement at $0.25 is reasonable and should be approved.

106.    Ms. Lau's letter also argues that the initial coin offering price is not fair because most creditors did not get to purchase CEL Token at that price.[155]    Ms. Lau's proposed solution—that the Debtors value CEL Token at the price at which an individual creditor purchased it[156]—is infeasible and inequitable, given that no other cryptocurrency is valued at the price at the time of purchase or deposit; all cryptocurrencies are being valued at their Petition Date price except for CEL Token, due to the various unique issues and facts associated with the token.  In addition to the logistics of tracking what each Holder paid, the Debtors would need to reconcile subsequent CEL Token transactions.

---

[154]    *See id*. at 1–2 ("The vast majority of the ***upwards price*** action of CEL token between the pause and petition date was due to roughly 15 million illegal naked short positions being closed on FTX"; "doing so pushed the price [of CEL] up from $0.20 to $0.81") (emphasis added; citation omitted)).

[155]    Lau Letter at 1.

[156]    *See id*. at 2.

107.    Further, when a claim is disputed, section 502(b) of the Bankruptcy Code provides that its value should be determined as of the filing of the debtor's petition.   The arguments in the Lau Letter, however, support an even lower valuation of CEL Token than Petition Date prices.   For example, the Lau Letter references purchasing CEL "because [she] believed in Celsius" (suggesting that Ms. Lau viewed CEL Token as reflective of the Debtors' value, like an equity security) and also that "[she] needed [her] CEL [T]okens to maintain [her] platinum status that would allow [her] to maximize [her] earnings through staking," which made purchasing CEL Token "worth it" (ascribing value to the utility aspect of CEL Token, which no longer existed as of the Petition Date).[157]   While these arguments support the position that CEL Token should be worth *nothing*, they also demonstrate why the Debtors and Committee determined to offer some consideration to CEL Token victims under the Plan.

108.    Ultimately, the voting results confirm overwhelming support for avoiding a lengthy trial regarding the value of CEL Token, while the objections to the settlement seek to litigate the substance of the issue, rather than challenging the reasonableness of settling it.   For the reasons set forth herein and in the CEL Token Briefs, the CEL Token Settlement satisfies the *Iridium* factors and should be approved pursuant to Bankruptcy Rule 9019 and section 1123(b)(3)(A) of the Bankruptcy Code.

109.    Accordingly, the CEL Token Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.

---

[157]    *See id.* at 1–2.

72

**b.      The Account Holder Avoidance Action Settlement Should Be
Approved.**

110.    The Account Holder Avoidance Action Settlement proposed by the amended Plan

provides that the Debtor Release contained in Article VIII.C of the Plan shall also release

Avoidance Actions against:

- any Account Holder who is not an Excluded Party who (i) has
  Withdrawal Preference Exposure less than or equal to $100,000,
  (ii) votes in favor of the Plan, and (iii) does not opt out of the
  releases under the Plan; and

- any Account Holder who is not an Excluded Party who (i) has
  Withdrawal Preference Exposure of more than $100,000, (ii) votes
  in favor of the Plan, (iii) does not opt out of the releases under the
  Plan, and (iv) provides the Debtors or the Litigation Administrator,
  as applicable, with a Cash, Bitcoin, or ETH payment equal to 27.5%
  of such Account Holder's Withdrawal Preference Exposure no later
  than 14 days prior to the anticipated Effective Date of the Plan.[158]

The Plan clarifies, however, that (a) Avoidance Actions against ADR-Ineligible Potential

Defendants and Excluded Parties are not included in the Account Holder Avoidance Action

Settlement and are expressly preserved for prosecution by the Litigation Administrator(s) after

the Effective Date, (b) Avoidance Actions against Account Holders with *De Minimis* Claims

shall be released if such Account Holder with a *De Minimis* Claim otherwise complies with the

requirements set forth above other than voting in favor of the Plan (as such Account Holders are

not entitled to vote), and (c) as a result of the Account Holder Avoidance Action Release, any

Custody Settlement Participant with Withdrawal Preference Exposure at or under $100,000 shall

receive a 100% recovery on their Allowed General Custody Claim.  On September 18, 2023, the

Debtors also filed the *Notice Regarding Calculation of Withdrawal Preference Exposure*

[Docket No. 3488] expressly providing, among other things, that Account Holders with a

---

[158]    *See* Plan, Art. IV.B.3.

Withdrawal Preference Exposure of exactly $100,000 will receive the same treatment under the Account Holder Avoidance Action Settlement as Account Holders with a Withdrawal Preference Exposure under $100,000.[159]   As with the CEL Token Settlement, here, too, the *Iridium* factors weigh in favor of approving both components of the Account Holder Avoidance Action Settlement.

111.   **First**, the balance between the uncertain probability of success the Debtors could have litigating Avoidance Actions and the settlement's benefits weighs heavily in favor of approving the Account Holder Avoidance Action Settlement.   Given the thousands of Account Holders against whom the Debtors have potential Avoidance Actions, litigation against individual Account Holders would require extensive time, expense, inconvenience, and delay. The Litigation Administrator would need to establish the existence of preferences as to each individual Account Holder and litigate each Account Holder's various defenses, including the safe harbor defense of section 546(e) and the ordinary course of business defense of section 547(c)(2) of the Bankruptcy Code.   Such litigation would undoubtedly be protracted and would deplete the resources available to the Litigation Administrator(s).   Indeed, the Debtors and the Committee reached the Custody Settlement and the Withhold Settlement with the Custody and Withhold Ad Hoc Groups in part because all parties recognized that, without a consensual resolution, the ensuing preference litigation would be too complicated and value destructive.[160]

---

[159] The Notice also offered creditors the opportunity to request a recalculation of their Withdrawal Preference Exposure if they believed that their Withdrawal Preference Exposure was incorrectly calculated because they transferred cryptocurrency between multiple accounts that they controlled, to spouses or partners, and other similar situations, and if they entered into the Account Holder Avoidance Action Settlement.   The Notice instructed creditors to submit requests for recalculation of Withdrawal Preference Exposure by the Voting Deadline, and explained that the Debtors would make commercially reasonable efforts to respond by the date of the Confirmation Hearing.   After the Notice was filed and before the Voting Deadline, the Debtors responded to approximately three dozen such requests.

[160] *See Joint Motion for Entry of an Order (I) Approving (A) the Settlement by and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief*

74

112.  **Second**, the Account Holder Avoidance Action Settlement provides substantial benefits to individual Account Holders, as explained above, as well as the entire creditor body. Throughout the course of these Chapter 11 Cases, Account Holders repeatedly raised the issue of Avoidance Actions, and therefore the settlement provides necessary finality to these concerns. Further, the settlement protects and maximizes the value of the Debtors' Estates by providing a clear mechanism whereby property can be recovered and providing the Litigation Administrator clearer direction as to which Avoidance Actions to pursue. Accordingly, the Account Holder Avoidance Action Settlement strikes the appropriate balance between the aggressive pursuit of Avoidance Actions and the efficient deployment of the Litigation Administrator's resources.

113.  **Fourth**, as the voting results show, 18,080 Holders of Account Claims in the eligible Voting Classes with a total Withdrawal Preference Exposure of $831,188,879.79 elected to participate in the Account Holder Avoidance Action Settlement.[161] Furthermore, 211 Holders of Account Claims in Class 11 (*De Minimis* Claims) with a total Withdrawal Preference Exposure of $6,117,025.48 opted into the Third-Party Release, which means that such Holders fulfilled the conditions to participate in the Account Holder Avoidance Action Settlement.[162]

114.  **Fifth**, the Debtors and the Committee were each represented by competent counsel in the negotiations of the Account Holder Avoidance Action Settlement, and the concerns of the Account Holders were considered throughout the process. **Finally**, entry into the

---

*Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2148] ¶¶ 36–42 (analyzing the *Iridium* factors with respect to the Custody Settlement); *Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Withhold Ad Hoc Group and (II) Granting Related Relief* [Docket No. 2334] ¶¶ 35–41 (same with respect to the Withhold Settlement).

[161]  *See* Voting Report ¶ 24.

[162]  *Id.*

Account Holder Avoidance Action Settlement was optional for Account Holders, thereby providing them the opportunity to evaluate for themselves the risks and benefits of the settlement versus the potential for litigation.

115.    In line with the prominence the issue of Avoidance Actions has in the creditor body, the Debtors received several Objections addressing the Account Holder Avoidance Action Settlement.  The Cassidy Letter and the First Bohon Letter both argued that "a clause should be added to the settlement that allows custody holders to forfeit any value amount they choose to bring their settlement under the $100,000 threshold."[163]  Although the Debtors understand Account Holders' frustration at the threat of preference actions, the Debtors are acting in the best interests of the Estates and in accordance with the Bankruptcy Code, which provides that debtors can avoid potential preference actions in the ninety-day period before the Petition Date.  This Court has itself so noted.[164]  Further, the Debtors are not required to set any threshold under which Avoidance Actions are automatically released and could have decided to retain the option of pursuing all Avoidance Action, no matter the Withdrawal Preference Exposure.  The Debtors, however, chose to expressly include a threshold for the purpose of settling with Account Holders and to alleviate Account Holders' concerns.   The Debtors sympathize with the concerns expressed in the Cassidy Letter and the First Bohon Letter, but believe the $100,000 threshold is appropriate, fair, and reasonable.

116.    The Second Bohon Letter largely repeated the concerns expressed in the First Bohon Letter but also disputed the calculation of Withdrawal Preference Exposure, stating that

---

[163]    *See* Cassidy Letter at 1, First Bohon Letter at 1.

[164]    *See* March 8 Hr'g Tr. 37:6–7, 18–25 ("There's been a lot of concern about the potential for clawback actions…Under the bankruptcy law, you know, to some extent the Debtors and the committee and other professionals, they have to follow the law.").

non-accredited investors were not able to make deposits to Earn Accounts after the creation of Custody Accounts and were thereby prejudiced because deposits to Custody Accounts do not affect Withdrawal Preference Exposure.[165]   The Debtors' calculation of Withdrawal Preference Exposure, however, is wholly in line with this Court's rulings in these Chapter 11 Cases, which provide that Earn Accounts are the Debtors' property and Custody Accounts are customers' property,[166] and accordingly, deposits to Earn Accounts would decrease Withdrawal Preference Exposure by increasing assets that are property of the Estates and deposits to Custody Accounts can have no effect on Withdrawal Preference Exposure because they merely remain the Custody Holder's property despite being deposited onto the Debtors' platform.   The Debtors have, however, modified the Plan in response to comments from counsel to certain potential preference defendants to clarify that the Debtors' calculation of Withdrawal Preference Exposure is not binding on any defendant in an Avoidance Action.[167]   Therefore, the objections in the Cassidy Letter, First Bohon Letter, and Second Bohon Letter should be overruled.

117.    The First Keeney Letter also objected to the calculation of the Withdrawal Preference Exposure, arguing (1) that it was unfair and unreasonable that withdrawal of loan principal increases an Account Holder's Withdrawal Preference Exposure and (2) that it makes no sense that preferential transfers are valued at the time of the transfer while creditors' Claims are valued as of the Petition Date.   Respectfully, there can be no real dispute about the propriety of counting loan principal payments as preferential transfers—a loan is a transfer of property

---

[165]  *See* Second Bohon Letter at 1.

[166]  *See* Earn Ruling at 28 (holding that assets in Earn Accounts are property of the Debtors' estates); Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684] (ruling from the bench that assets in Custody Accounts are not property of the Debtors' estates).

[167]  *See* Plan, Art. I.B.270.

from the lender, here the Debtors, to a borrower.   Moreover, a preference must be valued at the
time of the transfer, in the ninety days before the Petition Date, because such a transfer is only a
preference if it occurs before the Petition Date; accordingly, it cannot be valued as of the Petition
Date.[168]

118.    Accordingly, the Account Holder Avoidance Action Settlement complies with
section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business
judgment, and should be approved.[169]

### c.    The Retail Borrower Settlement Should Be Approved.

119.    The Retail Borrower Settlement was the result of months of negotiation between
the Debtors, the Committee, and the Retail Borrower Ad Hoc Group concluding in three days of
mediation with the Honorable Michael E. Wiles, United States Bankruptcy Judge for the
Southern District of New York.   The Retail Borrower Settlement proposed by the Plan provides
the following primary terms:   (a) in addition to the Set Off Treatment, Holders of Retail
Borrower Deposit Claims have the option to repay their Retail Advance Obligations (the "Retail
Advance Obligation Repayment Election") before the Effective Date in exchange for an
equivalent amount of cryptocurrency; and (b) priority in electing a preference to exchange the
NewCo Equity for Liquid Cryptocurrency at a 30% discount (*i.e.*, the Liquid Cryptocurrency
Weighted Distribution Election) made by such Holders under the Plan.[170]   In addition, under the
Retail Borrower Settlement, the Earn Ad Hoc Group and the Borrower Ad Hoc Group would

---

[168]   *See* 11 U.S.C. § 547(b).

[169]   *See* Ferraro Decl. ¶ 13.

[170]   *See* Plan, Art. IV.B.7.

each have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee.

120.    The Settlement is appropriate under the Iridium factors.   ***First***, the balance between the uncertain probability of success of litigation and the settlement's benefits weighs heavily in favor of approving the Retail Borrower Settlement.   In February 2023, the Retail Borrower Ad Hoc Group commenced an adversary proceeding seeking a declaratory judgment that digital assets transferred to the Borrow Program are not property of the Debtors' estates and alleging deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, breach of contract, and unjust enrichment, among other things.[171] Following the mediation with Judge Wiles, the Retail Borrower Ad Hoc Group executed a settlement term sheet that embodied the Retail Borrower Settlement and stayed all deadlines in the adversary proceeding, which will be dismissed with prejudice on the Effective Date of the Plan.[172]   The Debtors believe that they would prevail in any such adversary proceeding because the Loan Terms and Conditions provide (as further discussed in the Debtors' detailed response to Objections regarding the Retail Borrower Settlement in Section VII of this Memorandum)—unambiguously in every version and in multiple places—that Retail Borrowers transferred title of their collateral to the Debtors.   Inherent uncertainty, however, exists with respect to litigating the Retail Borrower Ad Hoc Group's adversary proceeding and other claims related to the Borrow Program, and any such litigation would require extensive delay and expense.   The litigation regarding the issue of title and ownership with respect to assets in the

---

[171]   *See generally Complaint for Declaratory Judgment* [Adv. No. 23-01007, Docket No. 2001].

[172]   *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064],

Earn Program[173] and the Custody Program spanned months and required multi-day trials that occurred at great expense to the Debtors' estates.  Furthermore, any litigation with the Retail Borrower Ad Hoc Group at this point in these Chapter 11 Cases would be detrimental to the successful consummation of the Plan because such litigation would inevitably delay distributions to Holders of Retail Borrower Deposit Claims.  On the other hand, approving the Retail Borrower Settlement would ensure that Retail Borrowers receive their distributions and the certainty of finality and would help expedite the consummation of the Plan.  Accordingly, the uncertain probability of success to be expected in litigating the various Claims related to the Borrow Program compared to the benefits provided by the Retail Borrower Settlement weighs in favor of its approval.

121.    *Second*, as discussed earlier, the Retail Borrower Settlement provides improved treatment for all Retail Borrowers regardless of whether they make the Retail Advance Obligation Repayment Election and benefits the entire creditor body by avoiding the costly and time-consuming litigation related to the Borrow Program.  *Third*, the Committee and the Retail Borrower Ad Hoc Group support the Retail Borrower Settlement.  *Fourth*, the Debtors, the Committee, and the Retail Borrower Ad Hoc Group were each represented by competent counsel in the negotiations of the Retail Borrower Settlement, including in the mediation.  *Finally*, the Retail Borrower Settlement is the product of arm's-length, multi-party negotiations and a mediation.

---

*Committee with Respect to the Committee's Class Claim and (II) Granting Related Relief* [Docket No. 3064], Exh. B at 4.

[173]    *See Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program Assets and the Sale of Certain Stablecoins* [Docket No. 1324] (setting forth the discovery, pleading, and hearing schedule to determine the title of digital assets transferred to the Earn Program).

122.    The Bronge Objection and several other letters filed regarding similar issues argue that the Retail Borrower Settlement should not be approved.  This argument is misguided and should be overruled as further set forth in the Debtors' response, *infra* in Section VII of this Memorandum.

123.    Accordingly, the Retail Borrower Settlement complies with section 1123(b)(3)(A) of the Bankruptcy Code, is a sound exercise of the Debtors' business judgment, and should be approved.[174]

### E.    The Plan Complies With Section 1123(d) of the Bankruptcy Code.

124.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law."[175]

125.    The Plan provides primarily for the deemed rejection of all Executory Contracts and Unexpired Leases, but also provides for the assumption of certain Executory Contracts and Unexpired Leases.  Specifically, Article V.A of the Plan provides for the deemed rejection of all Executory Contracts and Unexpired Leases without the need for any further notice to, or action, order, or approval of the Court, as of the Effective Date under section 365 of the Bankruptcy Code unless such Executory Contract and/or Unexpired Lease (a) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement, (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date, (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another

---

[174]    *See* Ferarro Decl. ¶ 32.

[175]    11 U.S.C. § 1123(d).

third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down, or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.[176]

126.    Article V.A also provides, however, that pursuant to sections 365(a) and 1123 of the Bankruptcy Code, entry of the Confirmation Order shall constitute a Court order approving the rejection, assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired as provided for in the Plan, effective as of the Effective Date unless otherwise specified.  The Debtors, or the Post-Effective Date Debtors, as applicable, will satisfy all cure amounts in accordance with section 1123(d) of the Bankruptcy Code.  Article V.C provides that the Debtors, or the Post-Effective Date Debtors, as applicable, shall pay cure amounts on the Effective Date or as soon as reasonably practicable thereafter, unless otherwise provided in the Plan.  Article V.C also provides that any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the cure amount will be deemed to have assented to the cure amount.  Article V.D of the Plan provides that Institutional Loans, to the extent they are Executory Contracts, will be assumed and assigned to NewCo and/or its subsidiaries, and that all such Institutional Loans and obligations thereunder shall remain in full force and effect.

127.    In response to the provisions in Article V.D of the Plan, the Debtors received an Objection from 168 Trading, which is party to the August 20, 2021 Master Loan Agreement with Celsius Network Ltd. as the lender and 168 Trading as the borrower (the "MLA"), pursuant to which 168 Trading delivered to the Debtors USDC 3 million in exchange for 126,582.28 of

---

[176]    *See* Plan, Art. V.A.

cryptocurrency Polkadot (DOT) (the "Collateral").  The MLA was listed on the *Debtors' Notice*
*of (I) Executory Contracts and Unexpired Leases to Be Rejected by the Debtors Pursuant to the*
*Plan and (II) Related Procedures in Connection Therewith* [Docket No. 3454].  168 Trading
objects to the rejection of the MLA because it argues that the MLA is an Institutional Loan
which cannot be rejected pursuant to Article V.D of the Plan.[177]  The Debtors have revised
Article V.D of the Plan to clarify that, to the extent any contracts relating to Institutional Loans
are Executory Contracts, the Debtors will be deemed to have assumed them under the Plan
unless such Executory Contracts are on the Schedule of Rejected Contracts.[178]  In that case, such
Executory Contracts will be rejected.  Accordingly, 168 Trading's arguments fail.

128.    The core of 168 Trading's Objection, however, has to do more with the terms of
the MLA than the terms of the Plan:  168 Trading objects to the Plan to the extent the Debtors
seek to deprive 168 Trading of its right to redeem the Collateral upon repayment of the loan
pursuant to the MLA[179] and "to the extent the Debtors seek to relegate 168 Trading to an
unsecured creditor" in implied contravention of the MLA by treating, under Article V.B of the
Plan, all claims for rejection damages as unsecured.[180]

---

[177]    *See generally* 168 Trading Obj.

[178]    *See* Plan, Art. V.D ("Notwithstanding anything in the Plan to the contrary, to the extent that any agreements,
documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtors shall be deemed
to have assumed and assigned to NewCo and/or its subsidiaries all such agreements, documents, and instruments
under the Plan; *provided* **that if any such agreements, documents, or instruments are (i) Executory**
**Contracts and (ii) on the Schedule of Rejected Contracts, such agreements, documents, or instruments**
**will be rejected as set forth elsewhere in this Plan**"(emphasis added)).

[179]    *See* 168 Trading Obj. ¶ 9.

[180]    *See id.* ¶ 10.

129.    With respect to its argument regarding the classification of any rejection damages,
168 Trading's argument is premature, as the Debtors have not classified the rejection damages
but merely included the MLA on a rejection notice.

130.    Further, to the extent the Debtors reject the MLA, the terms of the MLA do not
provide 168 Trading any foundation for its arguments.  168 Trading is not a secured creditor and
not entitled to the return of any Collateral under the MLA.  Section 4 of the MLA makes clear
that upon 168 Trading's transfer of the Collateral to Celsius, 168 Trading retains no interest in
the Collateral:   "The delivery of Collateral to Lender shall be on a full-title transfer basis,
meaning the *Lender shall be the legal and beneficial owner of the assets posted as Collateral
and the Borrower shall have no right, title or interest in those assets*" (emphasis added).[181]
Moreover, the MLA includes language similar to the language highlighted by the Court's Earn
Ruling when it held that, pursuant to the Terms of Use, the Debtors have title to assets in Earn
Accounts.[182]  Section 4.4.3. of the MLA provides that:

> Collateral is not, and shall not be, held by Lender on behalf of the
> Borrower, *and Lender shall be the sole and exclusive owner of all
> Digital Assets and/or Fiat Currencies posted as Collateral.
> Lender may lend, sell, pledge, hypothecate, assign, invest, use,
> commingle or otherwise dispose of the Collateral to counterparties
> or hold them with counterparties, or otherwise exercise any
> ownership rights in the Collateral.*  Borrower shall have no right or
> title in or to the Collateral throughout the term of this Agreement,
> until such time as the Loan Amount is fully paid up and the
> Collateral is returned to the Borrower.[183]

---

[181]    MLA § 4.3.

[182]    *See generally* Earn Ruling.

[183]    MLA § 4.4.3 (emphasis added).

131.    Consistent with the plain and unambiguous language of the MLA and the Earn Ruling, 168 Trading retains no interest in any assets transferred to Celsius under the MLA.

132.    Accordingly, the 168 Trading Objection should be overruled, and the Plan satisfies the requirements of section 1123(d) of the Bankruptcy Code.

### F.    The Debtors Complied With the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).

133.    The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code regarding solicitation of acceptances of the Plan.[184]  The legislative history to section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[185]  As discussed below, the Debtors have complied with sections 1125 and 1126 of the Bankruptcy Code regarding disclosure and solicitation of the Plan.[186]

### 1.    The Debtors Complied With Section 1125 of the Bankruptcy Code.

134.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[187]

---

[184]  11 U.S.C. § 1129(a)(2).

[185]  *In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, 2003 WL 23861928 at *49 (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[186]  *See* Campagna Decl. ¶¶ 34–37.

[187]  *Id*.

Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding the debtor's condition so they may make an informed decision whether to approve or reject a plan.[188]

135.    Section 1125 of the Bankruptcy Code is satisfied here.    Before the Debtors solicited votes on the Plan, the Court entered the Disclosure Statement Order.[189]    The Court also approved the contents of the Solicitation Package provided to Holders of Claims and Interests entitled to vote on the Plan, the notices provided to Holders of Claims and Interests not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan.[190]    The Debtors, through their Solicitation Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[191]    The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.    Here, the Debtors caused the same Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.[192]

136.    Based on the foregoing, the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.    No party has asserted otherwise.

---

[188]    *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (finding that section 1125 of the Bankruptcy Code obligates a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[189]    *See* [Docket No. 3337].

[190]    *See id.*

[191]    *See Affidavit of Service of Solicitation Materials* [Docket No. 3514].

[192]    *See id.*

## 2. The Debtors Complied With Section 1126 of the Bankruptcy Code.

137. Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

a plan of reorganization. Specifically, under section 1126 of the Bankruptcy Code, only holders

of allowed claims and allowed interests in impaired classes of claims or interests that will

receive or retain property under a plan on account of such claims or interests may vote to accept

or reject such plan.[193] Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502
>         of [the Bankruptcy Code] may accept or reject a plan. . . .

> (f)     Notwithstanding any other provision of this section, a class
>         that is not impaired under a plan, and each holder of a
>         claim or interest of such class, are conclusively presumed
>         to have accepted the plan, and solicitation of acceptances
>         with respect to such class from the holders of claims or
>         interests of such class is not required.

> (g)     Notwithstanding any other provision of this section, a class
>         is deemed not to have accepted a plan if such plan provides
>         that the claims or interests of such class do not entitle the
>         holders of such claims or interests to receive or retain any
>         property under the plan on account of such claims or
>         interests.[194]

138. Section 502 of the Bankruptcy Code, which is referenced in section 1126 as noted

above, provides that "(a) a claim or interest, proof of which is filed under section 501 of this title,

is deemed allowed, unless a party in interest…objects."[195] Section 1111 of the Bankruptcy Code

further provides that:

> (a)     A proof of claim or interest is *deemed filed under section
>         501* of this title for any claim or interest that appears in the
>         schedules filed under section 521(a)(1) or 1106(a)(2) of this

---

[193]   *See* 11 U.S.C. §§ 1126(a), (f), (g).

[194]   *Id*.

> title, except a claim or interest that is scheduled as
> disputed, contingent, or unliquidated.[196] (emphasis added)

Accordingly, as a result of the interconnections between sections 1126, 502, 501, and 1111 of the Bankruptcy Code, scheduled claims (except those scheduled as disputed, contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed" claims.

139.    As set forth in Part I of this Memorandum, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Voting Classes 2, 4, 5, 6A, 7, 8, 9, 10, and 14.[197]    The Debtors did not solicit votes from Holders of Claims in Classes 1, 3, and 6B because Holders of such Claims are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code. The Debtors also did not solicit votes from Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17. Holders of Claims or Interests, as applicable, in Classes 11, 15, 16, or 17 are deemed to reject the Plan and thus are not entitled to vote on the Plan. Holders of Claims in Class 12 and Interests in Class 13 are either deemed to reject or presumed to accept the Plan based on whether the Debtors determine to Reinstate, compromise, or cancel such Claims or Interests without distribution. Thus, pursuant to section 1126 of the Bankruptcy Code, only Holders of Claims in 2, 4, 5, 6A, 7, 8, 9, 10, and 14 were entitled to vote to accept or reject the Plan.

---

[195]    *See* 11 U.S.C. § 502(a).

[196]    *See* 11 U.S.C. § 1126(a).

[197]    Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims), Class 5 (General Earn Claims), Class 6A (General Custody Claims), and Class 7 (Withhold Claims) constitute Account Holder Voting Classes.  Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Claims), Class 10 (State Regulatory Claims), and Class 14 (Series B Preferred Interests) constitute Voting Classes other than Account Holder Voting Classes.

140.    Pursuant to the Disclosure Statement Order, Holders of Account Holder Claims were entitled to vote in the amount of their Scheduled Claim unless they filed a Proof of Claim that was temporarily allowed by the Court under Bankruptcy Rule 3018(a).[198]    Holders of Account Holder Claims were required to file any motions pursuant to Bankruptcy Rule 3018(a) by the Voting Deadline.[199]    Holders of Claims in Voting Classes other than Account Holder Voting Classes were eligible to vote in the amount of their Scheduled Claims unless such Scheduled Claim was superseded by a timely filed Proof of Claim that is not subject to objection.[200]    The Class Claim Settlement Order similarly provided that each Holder would vote the scheduled amount of such Holder's Claim as authorized by the Court in accordance with the terms of the Disclosure Statement Order.[201]

141.    The Debtors requested authority to have Holders of Account Holder Claims vote in the amount of their Scheduled Claims because the Debtors and their professionals are still undergoing a claims reconciliation process and have concluded that a fair and equitable voting process is one that treats all similarly situated Account Holders equitably.[202]    Moreover, the Class Claim Settlement will obviate the need for the Debtors to reconcile the Claims of any Account Holders that do not opt out of the Class Claim Settlement.[203]    The Debtors' goal was,

---

[198]    *See* Disclosure Statement Order ¶ 22.

[199]    *See id.*, Exh. 1 4(i)(c).

[200]    *See id.*, Exh. 1 4(ii)(1)(b).

[201]    *See* Class Claim Settlement Order, Exh. A ¶ 5.

[202]    *See* Disclosure Statement Mot. ¶ 65.

[203]    As of the Voting Deadline, 0.46% (1,735) in number, which is equivalent to 1.06% ($48,566,326.54) in dollar amount, of Holders of Account Holder Claims in the eligible Voting Classes elected to opt out of the Class Claim Settlement.  *See* Voting Report ¶ 19.  On September 19, 2023, however, Stretto became aware that certain Holders of Class 4 (Convenience Claims) could not access the election to opt out of the Class Claim Settlement.  *Id.* ¶ 18.  Upon learning of this issue, Stretto immediately opened the ability to opt out of the Class

and remains, ensuring that all Account Holders are allowed to vote the amount of their claim equal to the amount of cryptocurrency the Debtors were obligated to return based on cryptocurrency prices on the Petition Date, rather than duplicate or excessive recoveries simply because certain Account Holders filed multiple claims, overstated the amounts that they were owed, or added claims for "fraud" or "breach of contract" when other Account Holders did not.[204]   The vast majority of Account Holders did not file proofs of claim asserting "extra" damages and are relying on the Schedules as an accurate accounting of what they are owed by the Debtors.[205]   In addition, no Holders of Account Holder Claims filed any motions pursuant to Bankruptcy Rule 3018(a) to request that they vote in the amount of their Proof of Claim.

142.    As a result of the interconnections between sections 1126, 502, 501, and 1111 of the Bankruptcy Code, as explained above, scheduled claims (except those scheduled as disputed, contingent, or unliquidated) are considered filed proofs of claims or interests and are therefore also "allowed" claims.  Accordingly, although Holders of Claims in Voting Classes were largely entitled to vote in the amount of their Scheduled Claim rather than their Allowed Claim, the Debtors satisfy the requirements of section 1126 of the Bankruptcy Code.

143.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least

---

Claim Settlement for Holders in Class 4 (Convenience Claims).  *Id.*  Moreover, on September 25, 2023, Stretto, on behalf of the Debtors, sent an electronic correspondence to all Holders of Claims in Class 4 informing them that the Debtors extended the deadline for Holders in Class 4 (Convenience Claims) eligible to make the Class Claim Settlement Opt-Out to October 9, 2023.  *Id.*

[204]   *See* Disclosure Statement Mot. ¶ 65.

[205]   *Id.*

> two-thirds in amount and more than one-half in number of
> the allowed claims of such class held by creditors, other
> than any entity designated under subsection (e) of this
> section, that have accepted or rejected such plan.

144.    As described above, the voting parties in Classes 2, 4, 5, 6A, 7, 8, 9 (at the

Consolidated Debtors), 10, and 14 entitled to vote on the Plan voted to accept the Plan in

sufficient number and in sufficient amount to constitute accepting classes under the Bankruptcy

Code.[206]  Specifically, 96.33% of the amount of Claims and 98.83% of the Holders of Claims in

Class 2, who voted, voted to accept the Plan; 98.69% of the amount of Claims and 98.25% of the

Holders of Claims in Class 4, who voted, voted to accept the Plan; 99.28% of the amount of

Claims and 99.35% of the Holders of Claims in Class 5, who voted, voted to accept the Plan;

98.78% of the amount of Claims and 99.51% of the Holders of Claims in Class 6A, who voted,

voted to accept the Plan; 82.56% of the amount of Claims and 98.79% of the Holders of Claims

in Class 7, who voted, voted to accept the Plan; 99.56% of the amount of Claims and 74.07% of

the Holders of Claims in Class 9 (at the Consolidated Debtors), who voted, voted to accept the

Plan; 100% of the amount of Claims and 100% of the Holders of Claims in Class 10, who voted,

voted to accept the Plan; and 98.34% of the amount of Claims and 98.34% of the Holders of

Claims in Class 14, who voted, voted to accept the Plan.[207]  Voting parties in Classes 8

(Institutional Loan Claims) and Class 9 (General Unsecured Claims; at Celsius Mining LLC and

Celsius Network LLC), however, voted to reject the Plan.[208]

---

[206]  *See* Voting Report ¶ 13.

[207]  *See id.*

[208]  *See id.*

145.    Based upon the foregoing, the Debtors respectfully submit that they satisfy the requirements of section 1129(a)(2) of the Bankruptcy Code.

**G.    The Plan Was Proposed in Good Faith and Not by Any Means Forbidden by Law (§ 1129(a)(3)).**

146.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[209]    The Second Circuit has construed this good faith standard as requiring a showing that "the plan was proposed with 'honesty and good intentions' and 'with a basis for expecting that a reorganization can be effected.'"[210]    Additionally, courts generally hold that "good faith" should be evaluated in light of the totality of the circumstances surrounding confirmation.[211]    In the context of plans of reorganization, "a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[212] The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.[213]

147.    The fundamental purpose of chapter 11 is to enable a distressed business to obtain reorganize its affairs to prevent or limit job losses and the adverse economic effects associated with disposing of assets at liquidation value.[214]    Here, the Debtors filed for chapter 11 protection

---

[209]    11 U.S.C. § 1129(a)(3); *see also In re Gaston & Snow*, Nos. 93-8517 (JGK), 93-8628 (JGK), 1996 WL 694421, at *9 (S.D.N.Y. Dec. 4, 1996).

[210]    *E.g.*, *In re Johns-Manville*, 843 F.2d at 649 (citations omitted); *see also In re Texaco, Inc.*, 84 B.R. 893, 901-07 (Bankr. S.D.N.Y. 1988), *appeal dismissed*, 92 B.R. 38 (S.D.N.Y. 1998) ("[I]n the context of a Chapter 11 reorganization . . . a plan is considered proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." (citations and quotations omitted)).

[211]    *E.g.*, *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) (collecting cases).

[212]    *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (citations omitted).

[213]    *In re Adelphia*, 368 B.R. at 247.

[214]    *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start" (citations omitted)).

following the most tumultuous period for the cryptocurrency industry, and chapter 11 protection provided them with the "breathing spell" they needed to address structural and regulatory issues and weather out the "crypto winter."  The Plan that has been proposed allows the Debtors the axiomatic "fresh start" by providing a comprehensive restructuring that both (i) returns significant value to creditors on the Effective Date and (ii) seeks to capitalize on the long-term promise of cryptocurrency.

148.    The Plan is the culmination of more than a year of comprehensive efforts to resolve key legal questions—including questions of first impression with respect to cryptocurrency—before the Court and through consensual resolutions with key stakeholders. *First*, in December 2022, the Debtors held two separate trials with respect to Custody and Withhold issues and the Earn Program.  With respect to the Custody and Withhold issues, the Court found that the assets in the Custody Accounts were property of the Account Holders.  The Court did not determine who owned the assets associated with Withhold Accounts.  Finally, the Court found that, regardless of who owns the assets associated with the Custody Accounts and the Withhold Accounts, the Debtors could maintain possession of those assets pending resolution of any Avoidance Actions.  After these rulings were issued, the Debtors entered into the Custody Settlement and the Withhold Settlement, which are embodied in the treatment provided to Holders of Custody Claims and Holders of Withhold Claims under the Plan.  With respect to the Earn ownership issues, the Court found that the assets transferred onto the Celsius platform by Account Holders for participation in the Earn Program are property of the Debtors' Estates and granted the Debtors the authority to sell stablecoins.

149.    *Second*, the Plan also reflects numerous consensual settlements with the Debtors' other creditors that were reached after extensive arm's-length negotiations among the Debtors,

the Committee, the Earn Ad Hoc Group, the Retail Borrower Ad Hoc Group, certain individual

creditors, and the Series B Holders.   These settlements fully resolve all issues between the

non-Debtor parties and the Debtors relating to the Plan.

150.    The numerous settlements embodied in the Plan are compelling evidence of the

Debtors' good faith in reaching consensual resolutions throughout these Chapter 11 Cases.  The

good faith requirement does not require a debtor "to negotiate with all parties in interest at all

times during a bankruptcy case."[215]   Rather, "a debtor need[s] to prioritize how it deals with its

constituents."[216]   In light of the settlements the Debtors reached with key stakeholders over the

course of the last year, the Plan "has all the hallmarks of good faith in that those who are actually

in the money have made substantial concessions from their rights under the bankruptcy code."[217]

151.    **_Third_**, all of the Classes of Account Holder Claims have overwhelmingly voted to

accept the Plan.[218]   This is a reflection of Account Holders' belief that the Plan has a proper

purpose and that they are excited by the potential of the NewCo Transaction to provide upside

with respect to cryptocurrency.   The overwhelming support also shows that the Debtors have

gained Account Holders' trust, even though these Chapter 11 Cases have sometimes been

contentious.

---

[215]    *See In re Windstream Holdings, Inc.*, No. 19-22312 (RDD), 6/25/2020 Hr'g Tr. at 106: 23–25.

[216]    *See id.* at 107: 3–4.

[217]    *See id.* at 108: 7–10.

[218]    *See* Voting Report ¶ 13.

152.    Finally, as set forth herein, the Plan complies with the Bankruptcy Code and applicable nonbankruptcy law.   Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(3) of the Bankruptcy Code.[219]

**H.    The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

153.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan be subject to approval by the bankruptcy court as reasonable.[220]   Courts have construed this section to require that all payments of claims to professionals, similar to the Professional Fee Claims here, paid out of estate assets be subject to review and approval by the court as to their reasonableness.[221]

154.    Here, all payments made or to be made by the Debtors for services rendered and expenses incurred during the Chapter 11 Cases (*i.e.*, all Professional Fee Claims) are subject to approval by the Court as reasonable.  In addition, Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days after the Effective Date.   After notice and a hearing, in accordance with the procedures established by the Bankruptcy Code and prior Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.[222]   Accordingly, the Plan fully

---

[219]    *See* Ferraro Decl. ¶ 33.

[220]    11 U.S.C. § 1129(a)(4).

[221]    *See, e.g.*, *In re Worldcom, Inc.*, 2003 WL 23861928, at *54; *In re Drexel*, 138 B.R. at 760.

[222]    *See id.*

complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.[223]

**I.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (§ 1129(a)(5)).**

155.    Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[224]  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[225]  Additionally, the Bankruptcy Code provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[226]  Article IV.D.7 of the Plan, the Plan Supplement, and the New Organizational Documents provide information about the NewCo Board and the mechanism for how such members will be chosen.  After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

156.    Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.[227]

---

[223]  *See* Ferraro Decl. ¶ 34.

[224]  11 U.S.C. § 1129(a)(5)(A)(i).

[225]  11 U.S.C. § 1129(a)(5)(B).

[226]  11 U.S.C. § 1129(a)(5)(A)(ii).

[227]  *See* Campagna Decl. ¶¶ 38–39.

**J.      The Plan Does Not Require the Approval of a Governmental Regulatory Commission (§ 1129(a)(6)).**

157.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the Plan.[228]    No such regulatory commission exists here.    Accordingly, the Debtors respectfully submit that the Plan satisfies section 1129(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

**K.      The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).**

158.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)      each holder of a claim or interest of such class—
>
> (i)      has accepted the plan; or
>
> (ii)      will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .[229]

159.    The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's

---

[228]    11 U.S.C. § 1129(a)(6).

[229]    11 U.S.C. § 1129(a)(7)(A).    *See also In re Adelphia*, 368 B.R. at 252 ("In determining whether the best interests standard is met, the court must measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7.").

estate against the estimated recoveries under that debtor's plan of reorganization.[230]

As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to

holders of non-accepting impaired claims or interests.

160.    As set forth in the Disclosure Statement[231] and the Campagna Declaration, the

Debtors, with the assistance of their advisors, prepared a liquidation analysis that estimates

recoveries for members of each Class under the Plan (the "Liquidation Analysis").[232]    The

projected recoveries under the Plan and the results of the Liquidation Analysis for Holders of

Claims and Interests in all Classes are as follows:

| Class No. | Claim or Interest | Status | Voting Rights | Estimated NewCo Transaction Recovery Under Plan | Projected Orderly Wind Down Recovery Under the Plan | Estimated Recovery Under Chapter 7 Liquidation |
|---|---|---|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| Class 2 | Retail Borrower Deposit | | | | | |

---

[230]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Adelphia*, 368 B.R. at 251 (stating that section 1129(a)(7) of the Bankruptcy Code is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[231]    *See generally* Disclosure Statement, Exh. B.

[232]    *See* Campagna Decl. ¶ 56.

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Claims** | Impaired | Entitled to Vote | 85.6% | 83.0% | 47.4% |
| **Class 3** | **Other Priority Claims** | Unimpaired | Not Entitled to Vote (Presumed to Accept) | N/A | N/A | N/A |
| **Class 4** | **Convenience Claims** | Impaired | Entitled to Vote | 70% | 70% | N/A |
| **Class 5** | **General Earn Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| **Class 6A** | **General Custody Claims**[233] | Impaired | Entitled to Vote | 72.5% | 72.5% | 72.5% |
| **Class 6B** | **Withdrawable Custody Claims** | Unimpaired | Not Entitled to Vote (Presumed to Accept) | 100.0% | 100.0% | 100.0% |
| **Class 7** | **Withhold Claims**[234] | Impaired | Entitled to Vote | 72.0% | 67.1% | 47.4% |
| **Class 8** | **Unsecured Loan Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 47.4% |
| **Class 9** | **General Unsecured Claims** | Impaired | Entitled to Vote | 67.0% | 61.2% | 37.5% |
| **Class 10** | **State Regulatory Claims** | Impaired | Entitled to Vote | [0%] | [0%] | [0%] |
| **Class 11** | ***De Minimis* Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| **Class 12** | **Intercompany Claims** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | 47.3% |
| **Class 13** | **Intercompany Interests** | Impaired / Unimpaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) | N/A | N/A | N/A |
| **Class 14** | **Series B Preferred Interests** | Impaired | Entitled to Vote | 0.1% | 0.1% | 0.1% |
| **Class 15** | **Other Interests** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |
| **Class 16** | **Section 510(b) Claims**[235] | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A | N/A |
| **Class 17** | **Equitably Subordinated Claims** | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% | 0% | 0% |

---

[233] Holders of General Custody Claims are receiving a percentage of their Cryptocurrency coins, ***not*** a percentage of the value of their General Custody Claims as of the Petition Date.

[234] The recovery percentages in the NewCo Transaction and the Orderly Wind Down assume that Class 7 votes to accept the Plan.

[235] The Confirmation Order will provide that, notwithstanding anything to the contrary in the Plan, any Claims that are proposed to be cancelled without distribution under the Plan shall be preserved solely to the extent of, and any recovery on account thereof under the Plan shall be limited solely to, the Debtors' available insurance, if any. The Debtors, however, do not believe any of the Debtors' insurance will be available in respect of such Claims. The rights of the Debtors, the Committee, and all other parties in interest under section 1109 of the Bankruptcy Code are reserved with respect to such Claims and any applicable insurance and the entitlement of such Claims to the Debtors' insurance (if any).

161.    The Pharos Objection asserts that the Debtors have not met the burden required by section 1129(a)(7)(A)(ii).  Pharos holds approximately $82 million of Claims, or 94% of the total value of Claims, in Class 8 (Unsecured Loan Claims).[236]  Class 8 voted to reject the Plan.[237] Pharos asserts that the Debtors "have provided no evidence demonstrating that the value of the shares in the 'NewCo' exceed the value of the assets that would be distributed in chapter 7" and that the Liquidation Analysis "appears to assign far greater value to assets in the 'Orderly Wind Down' scenario than in a chapter 7 liquidation, even though there is no principled distinction between the two."[238]  Pharos' arguments in support of this allegation fail for the reasons set forth below.

162.    ***First***, Pharos' argument that its projected recoveries under the Plan are not as much as or greater than its projected recoveries under a hypothetical chapter 7 liquidation is plainly incorrect as set forth in the calculation of recoveries included in the Disclosure Statement.[239]  Pharos asserts that "[t]he Debtors have provided no evidence to date supporting the value of the 'NewCo Common Stock Recovery,'" and, therefore, there is no basis to the

---

[236]    *See* Pharos Obj. ¶ 1.

[237]    *See* Voting Report ¶ 13.

[238]    *See* Pharos Obj. ¶ 2.

[239]    It should be noted that Pharos also appears to misunderstand or misread the Debtors' projected recoveries. Pharos asserts that "the Debtors indicate that 6.5%–12.5% more liquid cryptocurrency would be distributed in a chapter 7 liquidation (44%–50%) than under a 'NewCo Transaction' (37.5%)" and that it therefore "follows that the Debtors can only meet their burden under section 1129(a)(7)(A)(ii) if the value of the 'NewCo Common Stock Recovery' exceeds this delta."  *See* Pharos Obj.  ¶ 17. The Debtors have made clear, however, that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.  *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash.").  The 44%–50% figure quoted by Pharos references the total estimated recovery for Unsecured Loan Claims in a chapter 7 liquidation, which would be in cash.  *See* Disclosure Statement, Exh. B at 7.

projected recoveries under the NewCo Transaction as compared to chapter 7 liquidation.[240]  The

Debtors' Disclosure Statement illustrates in the preliminary statement that creditor recoveries

under the NewCo Transaction—including on account of NewCo Common Stock—are based on

the net asset value of NewCo, which is approximated to be $1.248 billion and consists of the

following components:  $450 million of cryptocurrency that will "seed" NewCo; Mining;[241] and

certain illiquid assets.  Notably, the Debtors and their advisors conducted a valuation of Mining,

which was found to have a midpoint valuation of $565 million, as well as their illiquid assets,

which were valued at $283 million—and these valuations were explained in detail in the

Disclosure Statement.[242]  Similarly, Pharos' underlying sentiment—that NewCo is worthless and

therefore cannot provide any real value to creditors—is flatly wrong.  NewCo has material value

and the potential to become a formidable industry player right out of the gate:  it is being seeded

with $450 million of cryptocurrency while not taking on any debt *and* it will receive the benefit

of a business line (Mining) that has generated over $20 million of cash flow during the Debtors'

time in bankruptcy and amid a prolonged industry downturn.[243]

163.    **Second**, Pharos' argument that "there is no principled distinction between" the

Orderly Wind Down and chapter 7 liquidation is wholly misguided.  Considering the information

and analysis provided about the Orderly Wind Down in the Plan and the Disclosure Statement,

---

[240]    *See* Pharos Obj. ¶ 2.

[241]    "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

[242]    *See* Disclosure Statement, Art. II.B.2; *see also* Disclosure Statement, Exh. D (the Mining Valuation Analysis); Kielty Decl. ¶¶ 11–12.  The valuation of the illiquid assets factored into the Liquidation Analysis and the Orderly Wind Down as well.  *See* Disclosure Statement, Exh. B–C.

[243]    *See* Ferraro Decl. ¶ 4.

there can be no serious argument that the two scenarios are not distinct—or that the Orderly Wind Down will not provide higher recoveries.  As an initial matter, the Orderly Wind Down is expected to generate higher recoveries than a chapter 7 liquidation because the Orderly Wind Down, also known as the Backup Plan Sponsor Transaction, will include the creation of a Backup MiningCo, a pure play, publicly traded mining business that will own the assets of Mining[244] and in which creditors will receive 100% of the equity interests, with a potential management contract with GXD Labs LLC or other manager identified by the Debtors and the Committee.[245]  Notably, the Debtors still have the option of selecting a different Backup Plan Sponsor and negotiating a new Backup Plan Sponsor Agreement—as long as those terms provide the same or higher recoveries than the currently contemplated Backup Plan Sponsor Transaction with the BRIC.[246]  Accordingly, recoveries under the Orderly Wind Down will include more than just the proceeds to be derived from the liquidation of assets.[247]  In contrast, recoveries under a chapter 7 liquidation consist purely of the proceeds to be derived from liquidation of assets.[248]

164.    Next, recoveries under the Orderly Wind Down are credibly higher than under a chapter 7 liquidation because the Orderly Wind Down is envisioned to be a methodical liquidation of assets that takes place over a longer period than would a chapter 7 liquidation and

---

[244]    "Mining" refers to Debtor Celsius Mining LLC, its non-Debtor subsidiary Celsius Mining IL Ltd., and any assets associated with the operation of the business of Celsius Mining LLC and Celsius Mining IL Ltd.  *See* Plan, Art. I.A.158.

[245]    *See generally* Disclosure Statement, Exh. C.

[246]    *See id.*, Art. II.B.2.

[247]    *See id.*, Art. II.B.2.

[248]    *See id.*, Exh. B at 2.

which will be conducted by the Plan Administrator, who will likely be Christopher Ferraro,[249] the

Debtors' interim chief executive officer, chief financial officer, and chief restructuring officer,

and the Backup Plan Sponsor, presently the BRIC Parties.[250]    The Orderly Wind Down is

estimated to take approximately five years (or possibly even longer), whereas a chapter 7

liquidation is expected to be complete in approximately six months.[251]    Pharos nonetheless

argues that a chapter 7 trustee could achieve the same results as the Plan Administrator in the

Orderly Wind Down by "request[ing] the authority to operate a business of a debtor for a limited

period of time so that it can realize any additional value from assets that may be sold as a going

concern."[252]    To be clear, the only part of the Debtors' business that would be operational in a

chapter 7 liquidation is Mining, and it is highly unlikely that a chapter 7 trustee would have the

familiarity and technical expertise necessary to keep that business operational, let alone

profitable, while conducting the chapter 7 liquidation process.    Moreover, the chapter 7 trustee

would likely be someone completely unfamiliar with the Debtors, their business, or the

cryptocurrency industry, which are also complex and multifaceted.    In contrast, the Plan

Administrator, Christopher Ferraro (who has shepherded the Debtors through the Chapter 11

Cases), and the Backup Plan Sponsor (the BRIC Parties), have an impressive combination of

industry expertise and knowledge of the Debtors' business which cannot but help ensure that the

monetization of assets in the Orderly Wind Down captures the highest value possible.

---

[249]    *See* Fourth Plan Supp., Exh. I (including the Plan Administrator Agreement).

[250]    The BRIC Parties are the Blockchain Recovery Investment Consortium and the BRIC Support Parties, which are parties designated by the BRIC and agreed by the Debtors and the Committee to work with the BRIC to implement the Backup Plan Sponsor Transaction, presently contemplated to be:  (i) Gemini Trust Company, LLC and (ii) Global X Digital, LLC, or an affiliate thereof.  *See* Plan, Art. I.A.30–31.

[251]    *See* Disclosure Statement, Art. II, Exh. B at 2–3.

[252]    *See* Pharos Obj. ¶ 19.

Therefore, it is reasonable that the Plan Administrator and Backup Plan Sponsor would be able to monetize assets at or near market values, whereas a chapter 7 trustee would not.  Accordingly, Pharos' objection that the Debtors' projected realization for assets such as the Institutional Loans receivable, various investments, and mining assets in the Orderly Wind Down is too high compared to the projected realization in a chapter 7 liquidation should be overruled.[253]

165.   Finally, the Orderly Wind Down is distinct from a chapter 7 liquidation—and provides higher and better recoveries to creditors than a chapter 7 liquidation—because the Orderly Wind Down contemplates the preservation and distribution of Liquid Cryptocurrency to creditors, which the Debtors recognized as a crucial concern for creditors from the outset of these Chapter 11 Cases,[254] whereas a chapter 7 trustee would be charged with monetizing assets and making distributions in cash.[255]  As noted above, the Debtors have made clear that they will not be making any distributions of Liquid Cryptocurrency in a chapter 7 liquidation and that all distributions under a chapter 7 liquidation will consist of cash.[256]  Accordingly, because it addresses creditors' long-standing wishes to receive distributions in cryptocurrency, the Orderly Wind Down is preferable to a chapter 7 liquidation.

---

[253] *See* Pharos Obj. ¶¶ 18(a)–(c) for Pharos' complaints respecting the difference between projected realization of those assets under the Orderly Wind Down versus chapter 7 liquidation.

[254] *See* July 18 Hr'g Tr. 15:18–25, 16:1–2 ("Certainly, undoubtedly, some percentage of [our customers], some number of them, will be interested in getting a recovery in U.S. dollars or other fiat currency…But we definitely expect that the majority are going to be interested in, you know, riding out what you've heard referred to as this crypto winter, remaining long crypto, having the opportunity to realize their recovery through and appreciation in the macro crypto market or environment").

[255] 11 U.S.C. § 726.

[256] *See* Disclosure Statement, Art. III.D ("Finally, all distributions in a chapter 7 liquidation would be made in Cash").

166.    Additionally, all Holders of Claims entitled to vote on the Plan have received the

Liquidation Analysis (attached as <u>Exhibit B</u> to the Disclosure Statement) and have been provided

ample time to consider the contents thereof.   Accordingly, the Debtors respectfully submit that

the Plan complies with section 1129(a)(7) of the Bankruptcy Code.[257]

**L.    The Plan Can Be Confirmed Notwithstanding the Requirements of (§ 1129(a)(8)) of the Bankruptcy Code.**

167.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests must either accept a plan or be unimpaired under a plan.[258]   If any class of claims or

interests rejects the plan, the plan must satisfy the "cramdown" requirements with respect to the

claims or interests in that class.[259]

168.    Here, the Plan satisfies either the voting requirements or the cramdown

requirements with respect to nearly all Classes.   The Impaired Voting Classes of Claims and

Interests under the Plan in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience

Claims), Class 5 (General Earn Claims), and Class 6A (General Custody Claims), Class 7

(Withhold Claims), Class 9 (General Unsecured Claims; at the Consolidated Debtors); Class 10

(State Regulatory Claims), Class 14 (Series B Preferred Interests) voted to accept the Plan.  Class

1 (Other Secured Claims), Class 3 (Other Priority Claims), Class 6B (Withdrawable Custody

Claims) are Unimpaired and are presumed to accept the Plan.   Class 12 (Intercompany Claims)

and Class 13 (Intercompany Interests) are deemed to accept or reject and are proponents of the

Plan.   Such Intercompany Claims shall be Reinstated or set off, settled, addressed, distributed,

---

[257]   *Id*.

[258]   11 U.S.C. § 1129(a)(8).

[259]   11 U.S.C. § 1129(b).

addressed, converted to equity, contributed, cancelled, or released and such Intercompany Interests shall be Reinstated or set off, settled, addressed, distributed, contributed, merged, cancelled, or released consistent with the Transactions Steps Memorandum on or before the Effective Date by the Debtors, NewCo and/or its subsidiaries, or the Post-Effective Date Debtors, as applicable.  Class 8 (Unsecured Loan Claims) voted to reject the Plan, and Class 9 (General Unsecured Creditors) voted to reject the Plan at Celsius Mining LLC and Celsius Network Inc. (Class 9 voted to accept at the Consolidated Debtors).  Finally, Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claims), and Class 17 (Equitably Subordinated Claims) are deemed to reject the Plan.  Notwithstanding those Classes that rejected the Plan or were deemed to reject the Plan, as discussed below, the Plan satisfies the cramdown requirements of section 1129(b) with respect to these Classes.

169.    Therefore, the Plan satisfies section 1129(a)(8) or otherwise satisfies the "cramdown" requirements of the Bankruptcy Code.[260]

**M.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9))**.

170.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments unless such holders agree to different treatment for such claim. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to

---

[260]    *See* Campagna Decl. ¶ 42.

the allowed amount of such claims.[261]   Section 1129(a)(9)(B) of the Bankruptcy Code requires

that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the

Bankruptcy Code—generally domestic support obligations, wage, employee benefit, and deposit

claims entitled to priority—must receive deferred cash payments of a value, as of the effective

date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan),

or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if

such class has not accepted the plan).[262]   Finally, section 1129(a)(9)(C) of the Bankruptcy Code

provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy

Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five

years from the petition date, the present value of which equals the allowed amount of the

claim.[263]

171.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.   ***First***, the Plan

satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article II.A of the Plan provides

that each Holder of an Allowed Administrative Claim will receive an amount of Cash equal to

the amount of such Allowed Administrative Claim on the Effective Date, or as soon as

reasonably practicable thereafter, or at such other time as provided in Article II.A of the Plan.

172.    ***Second***, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because

no Holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[264]

***Finally***, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Articles II.C

---

[261]   11 U.S.C. § 1129(a)(9)(A).

[262]   11 U.S.C. § 1129(a)(9)(B).

[263]   11 U.S.C. § 1129(a)(9)(C).

[264]   *See* Plan, Art. III.B.

and III.B of the Plan specifically provide that Holders of Allowed Priority Tax Claims or Allowed Other Priority Claims, respectively, shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, as agreed by the Debtors and the Committee.  Thus, the Debtors respectfully submit that the Plan satisfies each of the requirements set forth in section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.[265]

       **N.**    **At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).**

173.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan "without including any acceptance of the plan by any insider" as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[266]

174.    As set forth above, Holders of Claims in Classes 2, 4, 5, 6A, 7, 9 (at the Consolidated Debtors), and 10—which are Impaired Classes under the Plan—overwhelmingly voted to accept the Plan independent of any insiders' votes.[267]  Thus, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.[268]

---

[265]  *See* Campagna Decl. ¶ 43.

[266]  11 U.S.C. § 1129(a)(10).

[267]  *See* Voting Report, Exh. A.

[268]  *See* Campagna Decl. ¶ 44.

### O.    The Plan Is Feasible (§ 1129(a)(11)).

175.    Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[269]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed; rather, a debtor must demonstrate a reasonable assurance that consummation of the plan will not likely be followed by a further need for financial reorganization.[270]  Feasibility cannot be defeated by "speculative prospects of failure" or the "mere prospect of financial uncertainty."[271]  As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

176.    In determining standards of feasibility, courts in this jurisdiction and others have identified the following probative factors:

a.    the adequacy of the capital structure;

b.    the earning power of the business;

c.    the economic conditions;

---

[269]    11 U.S.C. § 1129(a)(11).

[270]    *See In re Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed."); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required." (citation omitted)); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 833 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan"); *Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners Ltd. P'ship* (*In re Patrician St. Joseph Partners Ltd. P'ship*), 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable." (citation omitted)).

[271]    *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

    d.    the ability of management;

    e.    the probability of the continuation of the same management; and

    f.    any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[272]

These factors "are neither exhaustive nor exclusive" as the determination is "fact intensive" and made on a "case by case" basis.[273]

177.    The Restructuring Transactions contemplated by the Plan have been described in detail elsewhere in this Memorandum.  In short, the Plan provides for the NewCo Transaction and, if the NewCo transaction cannot be completed, the option for the Debtors to pivot to the Orderly Wind Down.  The Debtors have structured the Restructuring Transactions to ensure that in either scenario, liquidation or the further reorganization not contemplated by the Plan is highly unlikely.  For the following reasons, the Plan is feasible as required by section 1129(a)(11).

178.    *First*, as set forth in the Ferraro Declaration, NewCo will be well capitalized and will carry zero debt.[274]  As part of the Plan, the Debtors will seed NewCo with $450 million in Liquid Cryptocurrency free and clear of any Liens, Claims, Interests, charges, or encumbrances on the Effective Date.[275]  Thus, NewCo's capital structure will be more than adequate to meet NewCo's Plan obligations.

---

[272]    *See, e.g.*, *In re WorldCom*, 2003 WL 23861928, at *58; *Texaco*, 84 B.R. at 910; *Drexel Burnham*., Inc., 138 B.R. at 762–63; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.* (*In re U.S. Truck Co.*), 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

[273]    *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010).

[274]    *See* Ferraro Decl. ¶ 37.

[275]    *See id.*

179. **Second**, with respect to the viability of the Debtors' reorganized mining business, which will be a central feature for both NewCo under the NewCo Transaction and the pure play, publicly traded mining business in the Orderly Wind Down, the Debtors prepared Financial Projections for Mining's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028, which were attached to the Disclosure Statement as <u>Exhibit E</u>.[276] The Debtors and their advisors thoroughly analyzed the Financial Projections and the mining business's ability to meet post-Confirmation Plan obligations and to continue as a go-forward business. As set forth in the Ferraro Declaration, the Debtors believe that these Financial Projections demonstrate the Debtors' ability to meet their obligations under the Plan and to have a viable reorganized business going forward.[277]

180. Additionally, as set forth in the Ferraro Declaration, despite numerous challenges facing the Debtors' mining business at the Petition Date, including fluctuating market conditions and the rejection of the Core hosting contract and defaults by counterparties, the Debtors' mining business has had positive cash flow since the Petition Date.[278] Since the Petition Date, the mining business's adjusted EBITDA on an unaudited basis since the Petition Date is approximately $24.3 million.[279] Thus, even during an extremely tumultuous period, the Debtors' mining business did not lose money.

181. In fact, the Debtors' mining business has done more than just avoid losing money—it has led to significant positive cash flows. The Debtors found new hosting providers

---

[276] *See id.* ¶ 38.

[277] *See id.*; *see also* Fahrenheit Decl. ¶ 16.

[278] *See* Ferraro Decl. ¶ 39.

[279] *Id.*

and moved towards hosting their own rigs through their own proprietary sites.[280]  Based on these improvements, the Debtors' have generated over $20 million of operating cash flow since the Petition Date, even during a tumultuous period for the Bitcoin mining industry generally.[281] Further, the Debtors have improved the adjusted gross margin of the mining business through a fixed power priced hedge, new hosting agreements with improved economics, and new software on their rigs to improve efficiency.[282]

182.    **Third**, the Debtors' Auction was highly competitive (and had to be extended repeatedly as a result) and the Debtors were able to attract multiple strategic Bids from sophisticated investors and industry professionals.[283]  Further, all of the proposals the Debtors received during the month-long Auction—those proposed by the current Plan Sponsor (the Fahrenheit Group), the former Plan Sponsor and Stalking Horse Bidder (NovaWulf), and the current Backup Plan Sponsor (the BRIC)—are anchored by the reorganized mining business, indicating a consensus among these sophisticated parties regarding not just the feasibility, but also the long-term profitability, of mining.  As this Court has done previously, the Court here should look positively on the Debtors' ability to attract strategic proposals and attention for their assets.[284]  Notably, NewCo will be directed and managed by sophisticated crypto-natives and

---

[280]    *Id.* ¶ 40; *see also* Fahrenheit Decl. ¶ 16.

[281]    *See* Ferraro Decl. ¶ 43.

[282]    *See id.* ¶ 42.

[283]    *See* Kielty Decl. ¶¶ 8–9.

[284]    *See In re DBSD N. Am., Inc.*, 419 B.R. 179, 194 (Bankr. S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff'd in part, rev'd in part on other grounds*, 627 F.3d 496 (2d Cir. 2010) (finding that a revenue-less debtor's reorganization plan was feasible when their FCC authorization was highly valuable and likely to appeal to a strategic partner to fund capital expenditures); Disclosure Statement, Art. VII.M.3 (describing the whole-company sale process and the Auction).

business professionals who have significant experience with mining, the cryptocurrency market, and corporate governance.[285]

183.    ***Fourth***, the Debtors have included extensive disclosure about the risks of NewCo in the Disclosure Statement, including risks that the Debtors may toggle to the Orderly Wind Down, the NewCo may not be able to achieve the projected financial results, certain regulatory approval may not be granted, a liquid trading market for the NewCo Common Stock may not develop and may result in a depressed or volatile trading price, and the mining business is subject to the volatility of Bitcoin prices, utility prices, and rapidly changing technology.   In other words, this is not a case where the debtors are imagining an "overnight reversal of fortune" or otherwise not "consider[ing] the present and future nature of the industry"—which can be fatal to feasibility in this district.[286]   Importantly, despite the risks the Debtors enumerated, the majority of creditors have overwhelmingly voted to accept the Plan, indicating their confidence in the go-forward value of the NewCo.   Thorough disclosure of risks, coupled with support by creditors, are factors calling for the confirmation of a plan.[287]

---

[285] *See Third Plan Supp.* [Docket No. 3444], Exh. B (introducing the members of the board of directors of NewCo); Disclosure Statement, Exh. F at 20 (introducing the managers of NewCo); *see also* Ferraro Decl. ¶ 40; *see also* Fahrenheit Decl. ¶¶ 11-13.

[286] *See, e.g.*, *Prudential Energy Co.*, 58 B.R. at 863.   There, court found a debtor did not meet the feasibility standard when the plan imagined "an overnight reversal of fortune" as the debtor had been experiencing decreasing levels of investment in oil and gas projects prior to the bankruptcy and had no confirmed investments exiting bankruptcy.   The court further noted that the debtors could not rely on "past experience" as "a valid barometer of future performance" and should have considered these macro effects in developing their plan.   *Id.*

[287] *See In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997) (confirming a plan "when [the] debtors fully and fairly disclosed the risks associated with variances from projections, the lack of a trading market for the shares, the leveraged condition of [NewCo], the competitive conditions in the industry, and certain tax matters associated with the plan" and the debtors enjoyed "[t]he overwhelming support of the creditors, garnered after their professionals reviewed the debtors' projections" which "len[t] credence to the debtors' belief in the feasibility of the plan."); *see also In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (finding that "the best indicator of feasibility is the position of the creditors whose economic interests are at stake").

184.    **Fifth**, with respect to the viability of the Orderly Wind Down, the Debtors
prepared the Orderly Wind Down Analysis, attached to the Disclosure statement as <u>Exhibit C</u>,
utilizing the Valuation Report, input from the Debtors' management team and advisors, and
projected results of operations and cash flows in the period from May 31, 2023 to the assumed
Wind Down Date.  The Orderly Wind Down Analysis demonstrates the Debtors' ability to meet
their obligations under the Plan even in the event of a toggle to the Orderly Wind Down.

185.    Thus, the Debtors respectfully submit that the Plan satisfies section 1129(a)(11)
of the Bankruptcy Code.

**P.      All Statutory Fees Have Been or Will Be Paid (§ 1129(a)(12)).**

186.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees
payable under section 1930 of title 28 of the United States Code, as determined by the court at
the hearing on confirmation of the plan."[288]   Article II.D of the Plan provides that the Debtors
and the Post-Effective Date Debtors, as applicable, shall pay all fees and charges due, including
Plan payments and disbursements in and outside the ordinary course of the Debtors' or the
Post-Effective Date Debtors' business, for each quarter (including any fraction thereof) until the
Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  On and after the
Effective Date, the Post-Effective Date Debtors shall pay any and all such fees when due and
payable, and shall file with the Court quarterly reports in a form reasonably acceptable to the
U.S. Trustee.    Accordingly, the Debtors respectfully submit that the Plan satisfies the
requirements of section 1129(a)(12) of the Bankruptcy Code.[289]

**Q.      All Retiree Benefits Will Continue Post-Confirmation (§ 1129(a)(13)).**

---

[288]   11 U.S.C. § 1129(a)(12); *see also* 28 U.S.C. § 1930.

[289]   *See* Campagna Decl. ¶ 45.

187.   Section 1129(a)(13) of the Bankruptcy Code requires all retiree benefits to continue post-confirmation in accordance with section 1114 of the Bankruptcy Code.  To the best of the Debtors' knowledge and belief, they do not have any retiree benefit obligations.  Out of an abundance of caution, Article IV.P of the Plan provides that, from and after the Effective Date, all retiree benefits as defined in section 1114 of the Bankruptcy Code will continue in the ordinary course in accordance with applicable law.  Accordingly, the Debtors respectfully submit that the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.[290]

**R.    Sections 1129(a)(14) Through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan**.

188.   Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.[291]  Because the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.[292]  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. Finally, each of the Debtors are a commercial corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any

---

[290]   *See id*. ¶ 46.

[291]   *See* 11 U.S.C. § 1129(a)(14).

[292]   11 U.S.C. § 1129(a)(15).

applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.[293]

Accordingly, the Debtors respectfully submit that the Plan is not subject to the requirements of

sections 1129(a)(14)–(16) of the Bankruptcy Code, and no party has asserted otherwise.

### S. The Plan Satisfies the "Cramdown" Requirements (11 U.S.C. § 1129(b)) of the Bankruptcy Code.

189.    Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable

requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8), a

plan may be confirmed so long as the requirements set forth in section 1129(b) of the

Bankruptcy Code are satisfied.[294]   To confirm a plan that has not been accepted by all impaired

classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent

must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect

to the non-accepting impaired classes.[295]

190.    As explained herein, the Debtors respectfully submit that the Plan does not

"discriminate unfairly" and is "fair and equitable."

### 1. The Plan Does Not Unfairly Discriminate with Respect to Rejecting Classes (§ 1129(b)(1)).

191.    The Plan does not discriminate unfairly with respect to the impaired classes that

have rejected the Plan.   Although the Bankruptcy Code does not provide a standard for

determining when "unfair discrimination" exists, courts typically examine the facts and

circumstances of the particular case to make the determination.[296]   The purpose underlying the

---

[293]    11 U.S.C. § 1129(a)(16).

[294]    *See* 11 U.S.C. § 1129(b).

[295]    *See* 11 U.S.C. § 1129(b)(1); *In re Zenith Elecs. Corp.*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'").

[296]    *See In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a

unfair discrimination requirement is to "ensure[ ] that a dissenting class will receive value equal

to the value given to all other similarly situated classes."[297]  Thus, courts have adopted various

tests in order to determine whether discrimination between classes of claimants is "unfair."[298]

192.    Generally, courts have held that a plan unfairly discriminates in violation of

section 1129(b) of the Bankruptcy Code only if similarly situated claims receive materially

different treatment without a reasonable basis for the disparate treatment.[299]  A plan does not

unfairly discriminate where it provides different treatment to two or more classes that are

comprised of dissimilar claims or interests.[300]  Likewise, there is no unfair discrimination if,

taking into account the particular facts and circumstances of the case, there is a reasonable basis

for the disparate treatment.[301]  In this regard, the caselaw recognizes that, by its terms, section

---

*Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"); *see also In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."); *see also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[297]  *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sum nom.*, 843 F.2d 636 (2d Cir. 1988); *accord In re SunEdison, Inc.*, 575 B.R. 220 (Bankr. S.D.N.Y. 2017); *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011).

[298]  *In re Sea Trail Corp.*, No. 11-07370-8, 2012 WL 5247175, at *7 (Bankr. E.D.N.C. Oct. 23, 2012) ("Courts have developed different tests for determining whether a reorganization plan unfairly discriminates against a class in violation of Section 1129(b)(1). . . . These tests range from a rigid, mechanical approach in which almost any form of discriminatory treatment violates Section 1129(b)(1) to a broad, flexible one in which the outcome depends heavily on the facts and circumstances of each case.").

[299]  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 228 (Bankr. D.N.J. 2000) (noting that one of the "the hallmarks of the various tests" is "whether there is a reasonable basis for the discrimination . . . .").

[300]  *See In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 655 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987); *aff'd sub nom.*, 843 F.2d 636 (2d Cir. 1988).

[301]  *In re Aztec Co.*, 107 B.R. at 590.

1129(b)(1) of the Bankruptcy Code makes clear that not all "discrimination" is impermissible—only unfair discrimination.[302]

193.    Courts in this Circuit consider four factors in determining whether to permit the separate treatment of claims:  (a) whether there is a reasonable basis for discrimination; (b) whether the debtor can consummate the plan without the discrimination; (c) whether the discrimination is proposed in good faith; and (d) whether the degree of discrimination is proportional to its rationale.[303]    In construing the test, leading courts and commentators have concluded that the "test boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization."[304]

194.    Here, the Plan's treatment of the Impaired Classes that have rejected the Plan, are deemed to reject the Plan, or may be deemed to reject the Plan is proper because the Plan's overall classification scheme rests on a legally acceptable rationale and all similarly situated Claims and Interests will receive substantially similar treatment.  Claims in the Classes that are deemed to reject or may be deemed to reject are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests.

195.    No unfair discrimination exists as to Impaired Class 8 (Unsecured Loan Claims) and Class 9 (General Unsecured Claims) that have rejected the Plan.  Holders of Claims in

---

[302]    *See In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No. 758] Hr'g Tr. 118:4–7 ("Clearly, one of the areas of flexibility that Congress provided in Chapter 11 is the unfair discrimination test of 1129, recognizing implicitly in the plain language that some forms of discrimination are fair.").

[303]    *In re Genco Shipping*, 513 B.R. at 242–43 (collecting cases); *Buttonwood*, 111 B.R. at 63.

[304]    *In re Breitburn Energy Partners LP*, 582 B.R. 321, 351 (Bankr. S.D.N.Y. 2018) (citing 7 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 1129.03[3][a], at 1129–66); *In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) [Docket No 758] Hr'g Tr. 112:21-23 (interpreting the *Buttonwood* test as providing a "reminder[] to the fact finder to focus his or her inquiry on the reasonable basis for discriminating").

118

Classes 8 and 9[305] are receiving the same or a very similar recovery as the other Holders of

unsecured Claims, in particular Holders of Claims in Class 5 (General Earn Claims).  Under

either the NewCo Transaction or the Orderly Wind Down, Holders of Claims in Classes 8 and 9

will receive the exact same recovery as Holders of Claims in Class 5—67% and 61.2%,

respectively.

196.    Further, Holders of Claims in Classes 8 and 9 will receive almost the same

recovery as Holders of Convenience Claims in Class 4, which are receiving 70%.  The Claims in

the Convenience Class, while consisting of Account Holder Claims, are distinct from the

unsecured Claims in Classes 8 and 9 because Class 4 was created for administrative convenience

and also provides other Account Holders the ability to opt into the same treatment as Holders of

Claims in the Convenience Class if such Account Holders want to reduce the aggregate value of

their Claim to $5,000 in exchange for the same 70% recovery.

197.    Claims in Classes 8 and 9 are different than General Custody Claims in Class 6A,

Withhold Claims in Class 7, and Retail Borrower Deposit Claims in Class 2.  General Custody

Claims are receiving 72.5% recovery because assets in Custody Accounts are subject to unique

Terms of Use and the Court has already ruled that the assets in Custody Accounts belong to

Account Holders.  Moreover, the Court previously approved the Custody Settlement, which

provided that Holders of General Custody Claims would receive the same opportunity to

participate in the Custody Settlement under the Plan.  In addition, Withhold Claims are receiving

72% in the NewCo Transaction and 67.1% in the Orderly Wind Down because assets in

Withhold Account present a unique issue, were not subject to any Terms of Use, and have been

---

[305]    Classes 8 and 9 are receiving the exact same recovery—67% under the NewCo Transaction and 61.2% under
the Orderly Wind Down.

litigated and negotiated at length throughout these Chapter 11 Cases, culminating in the Withhold Settlement that was approved by the Court, which also provided that non-settling Holders of Withhold Claims would have the opportunity to participate in the Withhold Settlement under the Plan.

198.    Finally, Retail Borrower Deposit Claims in Class 2 are receiving a different recovery than Claims in Classes 8 and 9 because Retail Borrower Deposit Claims, though unsecured, have different legal rights from other unsecured Claims in that they are subject to the Loan Terms and Conditions.  Those Loan Terms and Conditions provide the Debtors the right to set off Retail Borrowers' obligations.  Accordingly, Class 2 is projected to receive a recovery of 85.6% under the NewCo Transaction or 83% under the Orderly Wind Down on account of these setoff rights.  Notably, however, the total percentage of recovery for any Holder of a Retail Borrower Deposit Claim will vary depending on the size and treatment of such Holder's Retail Borrower Post-Set Off Deposit Claim.  In either the NewCo Transaction or the Orderly Wind Down, Holders of Retail Borrower Deposit Claims will receive a 100% recovery on their Retail Advance Obligations and either a 70% recovery on their Retail Borrower Post-Set Off Deposit Claims (if such Claims receive the Convenience Claim treatment) or a 67% recovery on their Retail Borrower Post-Set Off Deposit Claim.  The proposed recovery for Retail Borrower Post-Set Off Deposit Claims is the same as the proposed recovery for Claims in Classes 8 and 9. As with Custody Claims and Withhold Claims, the treatment of Retail Borrower Deposit Claims was heavily negotiated throughout the Chapter 11 Cases, culminating in the Retail Borrower Settlement following a three-day mediation between the Retail Borrower Ad Hoc Group, the Debtors, the Committee, the Earn Ad Hoc Group, and certain individual creditors.

199.    Neither does unfair discrimination exist between the Classes of Account Holder
Claims that are Impaired, entitled to vote, and can expect to receive a recovery, and *De Minimis*
Claims in Class 11, which are Impaired, deemed to reject, and will receive no recovery.  *De
Minimis* Claims are Account Holder Claims with an aggregate value equal to or less than $10.00.
*De Minimis* Claims are classified separately because of the significant administrative
convenience involved in grouping together all such Claims.  Further, *De Minimis* Claims are not
receiving a recovery because in most cases, the cost associated with making distributions on
account of these Claims would be higher than the distributions to which such Claims would be
entitled.  This is consistent with the Debtors' previous treatment of other "de minimis" claims.
For example, the Custody Withdrawal Order, which authorized the Debtors to reopen
withdrawals for Custody Settlement participants, also authorized the Debtors to not permit
withdrawals where the account balance was not sufficient to satisfy gas fees or transaction costs
necessary to make the distribution itself.[306]  Moreover, although Holders of *De Minimis* Claims
were not entitled to vote, the releases under the Plan only apply to those Holders if they
affirmatively opted into them.

200.    Claims in the Classes that are deemed to reject or may be deemed to reject are not
similarly situated to any other Classes, given that their legal character is distinctly different from
all other Claims and Interests.  The Debtors separately classified Class 12 (Intercompany Claims)
from other unsecured claims and Class 13 (Intercompany Interests) from other interests based on
ownership in the Plan and to preserve the option to either Reinstate, compromise, or cancel these
Claims and Interests.  Such treatment will allow the Debtors greater flexibility when they are

---

[306]    *See* Custody Withdrawal Order ¶ 4.

implementing the Restructuring Transactions.    Significantly, the optionality with respect to

Intercompany Claims and Intercompany Interests does not affect the stakeholders' recovery

under the Plan and is intended for only administrative convenience in the restructuring process.

Reinstatement is merely a technical preservation of Claims and Interests necessary to preserve

the Debtors' corporate structure, does not have any economic substance, and does not enable any

junior creditor or interest holder to retain or recover any value under the Plan.[307]

201.    With respect to Class 16 Section 510(b) Claims, the Debtors formed Class 16 to

include Holders of Claims that may be subordinated pursuant to section 510(b) of the

Bankruptcy Code.  The Plan's treatment of Class 16 is proper because no similarly situated class

will receive more favorable treatment.  Further, section 510(b) of the Bankruptcy Code requires

the subordination of any claim that (a) arises from the cancellation of a purchase or sale of a

"security" in a debtor or a debtor's affiliate, (b) seeks damages arising from the purchase or sale

of such a security, or (c) seeks reimbursement or contribution on account of a claim otherwise

allowed under the Bankruptcy Code.  Here, the classification of Class 16 comports with section

510(b) because the Section 510(b) Claims include, among others, Claims arising out of or

relating to (a) CEL Token (other than CEL Token Deposit Claims), including damages arising

from the purchase or sale of CEL Token, certain damages for reimbursement or contribution on

account of such a Claim, and Claims arising from the cancellation of a contract for the purchase

or sale of CEL Token, and (b) the purchase or sale of preferred shares in Celsius Network Ltd or

other equity interests in any Debtor.

---

[307]    *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 600–01 (Bankr. S.D.N.Y. 2009) (overruling an objection
that reinstatement of an intercompany interest violates the absolute priority rule because "the retention of
intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to
maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

202.    With respect to Class 17 Equitably Subordinated Claims, the Debtors formed

Class 17 to include Holders of Claims that may be equitably subordinated pursuant to the Plan,

which have been identified on the Schedule of Equitably Subordinated Claims.  The Plan's

treatment of Class 17 is proper because no similarly situated class will receive more favorable

treatment.

203.    Accordingly, the Plan does not discriminate unfairly with respect to the Impaired

Classes that have been deemed to reject the Plan and satisfies the requirements of 1129(b)(1).

### 2.    The Plan Is Fair and Equitable with Respect to the Rejecting Classes (§ 1129(b)(2)).

204.    For a plan to be "fair and equitable" with respect to an impaired class of

unsecured claims or interests that rejects a plan (or is deemed to reject a plan), the plan must

follow the "absolute priority" rule and satisfy the requirements of section 1129(b)(2).[308]

Generally, this requires that an impaired rejecting class of claims or interests either be paid in

full or that a class junior to the impaired rejecting class not receive any distribution under a plan

on account of its junior claim or interest.[309]  Additionally, for a plan to be "fair and equitable," no

creditor may be paid more than what it is owed (*i.e.*, no class of creditors may receive more than

100% of its claim).[310]

---

[308]    11 U.S.C. § 1129(b)(2)(B)(ii); 11 U.S.C. § 1129(b)(2)(C)(ii); *see also 203 N. LaSalle*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[309]    *See In re 203 N. LaSalle*, 526 U.S. at 459.

[310]    *See* 7 Collier on Bankruptcy ¶1129.03[4][a]; *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

205.    The Impaired rejecting Classes here are Class 8 (Unsecured Loan Claims),

Class 9 (General Unsecured Loan Claims),[311] and Class 11 (*De Minimis* Claims).   Under the

Plan, no Holder of a Claim or Interest junior to these Classes will receive any recovery on

account of such Claim or Interest.   Although Class 12 (Intercompany Claims) and Class 13

(Intercompany Interests) may be Unimpaired, such treatment is not "on account of" such

Intercompany Claims or Intercompany Interests within the meaning of section 1129(b)(2)(B)(ii)

of the Bankruptcy Code.   Rather, Intercompany Claims and Intercompany Interests will be

Unimpaired, if at all, for purposes of maintaining the prepetition organizational structure for the

administrative benefit of the Post-Effective Date Debtors and such recovery has no economic

substance.   Courts have recognized that such technical preservations for the purpose of corporate

formalities do not violate the absolute priority rule.[312]   Moreover, as set forth in the Debtors'

Disclosure Statement, no Class of Claims is receiving more than what it is owed.[313]

206.    In its Objection, Pharos asserts that the Debtors' Plan violates the absolute

priority rule because, it argues, Series B Preferred Interests in Class 14 (which are junior to Class

8 Unsecured Loan Claims) are receiving a 0.1% recovery "on account of their interests" in either

the NewCo Transaction or the Orderly Wind Down.[314]   These arguments have no merit.   The

distributions that will be made to Holders of Series B Preferred Interests are not being made "on

---

[311]    Class 9 rejected the Plan at Celsius Mining LLC and Celsius Network LLC, and accepted the Plan at the Consolidated Debtors.

[312]    *See In re ION Media Networks, Inc.*, 419 B.R. 585, 661 (Bankr. S.D.N.Y. 2009) ("This technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any junior creditor or interest holder to retain or recover any value under the Plan.").

[313]    *See* Disclosure Statement, Art. III.E.

[314]    See Pharos Obj. ¶ 22.

account" of such interests themselves but pursuant to, and to implement, a settlement previously approved by the Court, *i.e.*, the Series B Settlement.

207.    Prior to the Series B Settlement, the Series B Holders argued that they were entitled to receive recoveries ahead of unsecured Account Holder Claims because Account Holders only had claims against Celsius Network LLC.[315]    Calling it a "gating question" for these Chapter 11 Cases, the Court found that customers could only assert contractual claims against Network LLC and not all Celsius entities.[316]    Importantly, however, the Court noted that there may be non-contractual claims against other Celsius entities.[317]    As a result, to address these potential non-contractual claims, the Debtors and the Committee commenced a series of related litigations, including with respect to the issues of substantive consolidation, the allowance of an intercompany claim between Celsius Network Ltd and Celsius Network LLC, and an alleged constructive transfer.    While this litigation was ongoing, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of Ultimately, however, the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders engaged in negotiations in an attempt to settle some or all of the issues between the parties.    These negotiations were successful and the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders reached a global settlement and filed, on June 27, 2023, a joint motion requesting entry of an order approving the same,[318]

---

[315]    *See generally Series B Preferred Holders' Opening Brief on the Issue of Which Debtors Are Liable to Customers Under the Terms of Use* [Docket No. 1795].

[316]    *See Memorandum Opinion Regarding Which Debtor Entities Have Liability for Customer Claims Under the Terms of Use* [Docket No. 2205].

[317]    *See id.* at 4.

[318]    *See Joint Motion for Entry of an Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899]

which the Court subsequently entered.[319]   The settlement agreement expressly noted that it was

"for settlement purposes only"[320] and the parties explained in their joint motion that the $25

million cash funds (the "Settlement Funds") that would be distributed pursuant to the Series B

Settlement "ends all ongoing litigation between the parties regarding substantive consolidation,

the allowance of an intercompany claim between CNL and LLC, and an alleged constructive

transfer."[321]   Accordingly, payments to Holders of Series B Preferred Interests are being made on

account of the Series B Settlement—and the multiple complex issues it resolves—and not purely

on account of their Interests.

208.    If Pharos believed that the Series B Settlement had any potential to prejudice its

interests as a general unsecured creditor, Pharos should have objected to the Series B Settlement

Motion, but it did not.  More importantly, however, absent the Series B Settlement, if the Initial

Consenting Series B Preferred Holders had been successful in their arguments, they would

potentially be senior to Pharos in receiving distributions from certain Debtors.  A settlement of

these issues does not violate the absolute priority rule.

209.    The Debtors do not believe that the Series B Settlement deviates from the

absolute priority rule, but even if it did, as the Court opined in *Dewey & LeBoeuf*, "a court in its

discretion can approve a settlement that does not comply strictly with the absolute priority rule,

---

*and the Initial Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 2899] (the "Series B Settlement Motion").

[319]   *See Order (I) Approving the Settlement by and Among the Debtors, the Committee, and the Consenting Series B Preferred Holders and (II) Granting Related Relief* [Docket No. 3058] (the "Series B Settlement Order"); *see also Memorandum Opinion Approving the Settlement Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders* [Docket No. 3074].

[320]   *See* Series B Settlement Order, Exh. 1.

[321]   *See* Series B Settlement Mot. ¶ 1.

as long as the settling parties can justify the divergence, and the court can 'clearly articulate the reasons for approving…a settlement that deviates from the absolute priority rule.'"  This Court has already approved the Series B Settlement, and therefore any challenge to it on account of the absolute priority rule is moot.[322]

210.    Accordingly, the Plan is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.[323]

**T.    The Debtors Complied With Section 1129(d) of the Bankruptcy Code**.

211.    The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[324]  Article II.C of the Plan contemplates the full payment of all Allowed Priority Tax Claims.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code, and no party has asserted otherwise.[325]

## VI.    Good Cause Exists to Waive the Stay of the Confirmation Order.

212.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[326]  Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an

---

[322]    *In re Dewey & LeBoeuf, LLP*, 478 B.R. 628, 642 (Bankr. S.D.N.Y. 2012) (approving a settlement between a debtor law firm and many of its former partners, which included mutual releases that an ad hoc committee argued constituted a distribution that would violate the absolute priority rule).

[323]    *See* Campagna Decl. ¶¶ 48–51.

[324]    15 U.S.C. § 77e.

[325]    *See* Campagna Decl. ¶ 53.

[326]    Fed. R. Bankr. P. 3020(e).

executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.[327]  Each rule

also permits modification of the imposed stay upon court order.[328]

213.    The Debtors submit that good cause exists for waiving and eliminating any stay of

the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the

proposed Confirmation Order will be effective immediately upon its entry.[329]  The restructuring

transactions contemplated by the Plan were vigorously negotiated among sophisticated parties,

and the Plan has been accepted by the Voting Class.  Further, each day the Debtors remain in

chapter 11, they incur significant administrative and professional costs—expenses that are

unnecessary in light of the overwhelming support for the Plan among the Voting Class.

Importantly, not a single creditor in a Voting Class voted to reject the Plan.  Accordingly, the

Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the proposed

Confirmation Order may be effective immediately upon its entry.

## VII.    The Debtors' Replies to Remaining Objections.

### A.    The Emergence Incentive Plan Should Be Approved as Part of the Plan.

214.    Victor Ubierna de las Heras ("Mr. Ubierna de las Heras") objects to the

Emergence Incentive Plan because he believes it does not satisfy the requirements of section

503(c) of the Bankruptcy Code.[330]  Mr. Ubierna de las Heras, however, is an outlier in this

---

[327]    Fed. R. Bankr. P. 6004(h), 6006(d).

[328]    *Id.*

[329]    *See, e.g.*, *In re Windstream Holdings, Inc.,* No. 19-22312 (RDD) (Bankr. S.D.N.Y. June. 26, 2020) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Barneys N.Y. Inc.*, No. 19-36300 (CGM) (Bankr. S.D.N.Y., Feb. 5, 2020) (same); *In re Deluxe Ent. Servs. Grp. Inc.*, No. 19-23774 (RDD) (Bankr. S.D.N.Y. Oct. 25, 2019) (same); *In re Hollander Sleep Prods., LLC*, No. 19-11608 (MEW) (Bankr. S.D.N.Y. Sept. 5, 2019) (same); *In re Aegean Marine Petroleum Network, Inc.*, No. 18-13374 (MEW) (Bankr. S.D.N.Y. March 29, 2019) (same); *In re Nine West Holdings, Inc.*, No. 18-10947 (SCC) (Bankr. S.D.N.Y. Feb. 27, 2019) (same).

[330]    *See generally* Ubierna de las Heras Obj.

regard, as over 95% of the number of Claims that voted, voted to accept the Plan, including the

Emergence Incentive Plan.  Indeed, Mr. Ubierna de las Heras and the one additional creditor who

raised concerns with the Court regarding the Emergence Incentive Plan hold claims in the

Account Holder Voting Classes, which overwhelmingly voted to accept the Plan.  On this basis

alone the objections to the Emergence Incentive Plan should be overruled.  The Debtors worked

with the Committee to develop the Emergence Incentive Plan and select metrics that would

challenge and incentivize the EIP Participants.  The Account Holder Classes have voiced their

clear support of the Plan and terms contained therein, including the Emergence Incentive Plan,

and dissenters in those classes must accept this outcome.  The Committee's support of the

Emergence Incentive Plan, coupled with the voting results, demonstrates that creditors acting in

their own interest as well as their appointed fiduciary believe the Emergence Incentive Plan is

appropriate under the circumstances.

215.    The Ubierna de las Heras Objection to the Emergence Incentive Plan is premised

on the alleged applicability of section 503(c) of the Bankruptcy Code and the appropriateness of

the Emergence Incentive Plan under the facts and circumstances of these Chapter 11 Cases.  In

particular, Mr. Ubierna de las Heras asserts that the Debtors are required to satisfy section 503(c)

of the Bankruptcy Code for the EIP to be in the Plan and have failed to present sufficient

evidence that the Emergence Incentive Plan satisfies such requirements.

216.    The Ubierna de las Heras Objection is misplaced.  As an initial matter, the

payments will be made by the Post-Effective Date Debtors, not any chapter 11 debtor, and so any

restriction on the Debtors under the Bankruptcy Code are inapplicable.  Even if a higher standard

is applied, the Emergence Incentive Plan is justified under the facts and circumstances of these

Chapter 11 Cases, as the Plan allows the Post-Effective Date Debtors to compensate key

members of management who have focused their collective efforts on maximizing value for all stakeholders and providing key services related to the consummation of the Debtors' Plan. Specifically, these executives have worked tirelessly and will continue to work hard distributing Liquid Cryptocurrency to the Debtors' stakeholders, maximizing the value of the Debtors' mining operations, and maintaining security of the Debtors' platform for a period of time after the Effective Date to ensure the security of the Debtors' Liquid Cryptocurrency. The ultimate success of the Debtors' Chapter 11 Cases is heavily reliant on the continued efforts of the EIP Participants, as they possess the specific expertise, knowledge, and familiarity with the Debtors' business and operations, making them indispensable to the Debtors' Plan consummation and the obligations of the Post-Effective Date Debtors.

217.    The demands placed upon the EIP Participants have been, and will continue to be, significant in light of the facts and circumstances of these Chapter 11 Cases, especially at this critical juncture of confirming and consummating the Plan. Contrary to Mr. Ubierna de las Heras' assertion, many of the demands that the EIP Participants face go well beyond the demands of their prepetition day-to-day responsibilities. The EIP Participants' critical roles are even more challenging due to the Debtors' significantly depleted workforce. In fact, many EIP Participants assumed additional roles and responsibilities resulting from the reduction in workforce from over 900 employees in early 2022 to fewer than 150 employees today. Moreover, headcount is expected to continue to fall between now and the anticipated emergence date and the Company is preparing for further attrition due to turnover and reductions in force of approximately 33%. As such, it is vital that the Debtors boost morale among the EIP Participants and incentivize the EIP Participants to continue to meet onerous demands. Ultimately, incentivizing the EIP Participants will inure to the benefit of all stakeholders by

ensuring the EIP Participants are focused on facilitating a value-maximizing resolution to these Chapter 11 Cases, thus maximizing recoveries for the Debtors' stakeholders.

218.    Moreover, Mr. Ubierna de las Heras' contention that "compensation above base salary should be reviewed by the Debtors' post-confirmation Board" misses the mark.[331]    Under the Plan, NewCo will not be responsible for distributing the EIP Awards.[332]    Rather, the Plan Administrator will distribute the EIP Awards subject to his verification of the EIP Participants' satisfaction of the applicable performance metrics under the Emergence Incentive Plan.[333]

### 1.    The Emergence Incentive Plan Complies With Section 503(c) of the Bankruptcy Code.

219.    Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.    Thus, the Ubierna de las Heras Objection should be overruled.

220.    The Debtors maintain that section 503(c) is not the relevant standard given that the Emergence Incentive Plan was incorporated in the Plan that was accepted by Account Holder Classes.    The Emergence Incentive Plan, as its name suggests, is an incentive-based program—not a "pay-to-stay" retention plan prohibited by section 503(c)(3).

---

[331]    *See id.* at 3.

[332]    *See* Plan, Art. IV.J.2.

[333]    *See id.* ("On the Effective Date, the Emergence Incentive Plan shall be effective, the KEIP Motion shall be deemed withdrawn with prejudice, and the Plan Administrator *may* distribute the EIP Awards, ***subject to the Plan Administrator to confirming that the applicable metrics have been satisfied***, without any further action by the Debtors or the Post-Effective Date Debtors.").

221.    In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work."[334]    As evidenced by its terms, the purpose of the Emergence Incentive Plan is to incentivize the EIP Participants to maximize the value of the Post-Effective Date Debtors after emergence from chapter 11 by distributing EIP Awards subject to the satisfaction of certain metrics and subject to the discretion of the Plan Administrator.[335]    Contrary to Mr. Ubierna de las Heras' assertion that the Emergence Incentive Program's "retentive purpose is obvious from the easily achievable benchmarks,"[336] the program does not contain any retention-based components, as the EIP Participants are not merely paid for maintaining their employment for a certain time period.[337]    Rather, the Emergence Incentive Plan incentivizes the EIP Participants to rise to the challenge of consummating the Debtors' Plan.  Importantly, the metrics are not easily achievable, demonstrated by the fact that certain of the metrics have not been achieved—specifically, pursuant to the Mining Rig Metric, target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable, to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to market conditions, by September 30, 2023).[338]    As of August 31, the Debtors have only approximately 86,000 mining rigs hashing, thus falling well short of

---

[334]    *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(1) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business" (emphasis in original)); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance.").

[335]    *See* Plan, Art. IV.J.2.

[336]    *See* Ubierna de las Heras Obj. at 3.

[337]    *See* Plan, Art. IV.J.2; *cf. In re Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies'").

[338]    *See* Campagna Decl. ¶ 28.

target performance.  Construction and delivery delays, disputes with mining counterparties, and the numerous financial risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point.[339] Furthermore, when developing the Mining Metrics, the Debtors and their advisors reached agreement with the Committee to make the Mining Metrics, specifically, more challenging under the facts and circumstances of these Chapter 11 Cases in exchange for the Committee's support of the Emergence Incentive Plan.  Significantly, even despite precarious market conditions facing the cryptocurrency industry and serious challenges facing the Debtors' mining business, including the rejection of the Core hosting contract, the Debtors' mining business has maintained a positive operating cash flow since the Petition Date.[340]

222.    Furthermore, under the Liquid Cryptocurrency Distribution Metric, certain EIP Participants are incentivized to ensure sufficient Liquid Cryptocurrency is available for the initial distribution to all Holders of Allowed Claims within thirty days of the Effective Date, ensuring that the Debtors' Account Holders are able to access their distributions as expeditiously as possible.  This is no small undertaking—the Debtors anticipate that approximately 400,000 customers will be entitled to receive distributions under the Plan.  The Emergence Incentive Plan ensures that those EIP Participants are working toward the goal of maximizing the distributions to account holders who have been waiting for their cryptocurrency for over sixteen months.  As such, Mr. Ubierna de las Heras' objection to the metrics is misguided and without merit.

---

[339]    *See id.*

[340]    *See* Ferraro Decl. ¶ 43.

223.    Despite Mr. Ubierna de las Heras' assertion that "[a] CEO getting his company

out of bankruptcy is just doing his job,"[341] each of the EIP Participants have assumed significant,

additional responsibilities and stresses of the key roles and responsibilities as a result of these

Chapter 11 Cases.  Importantly, the EIP Participants are not required to remain employed with

the Debtors after the Effective Date but have agreed to do so to effectuate the Restructuring

Transactions and maximize value for stakeholders.  To properly incentivize the EIP Participants

to achieve these results, the Emergence Incentive Plan included specific metrics to ensure an

expeditious distribution of liquid cryptocurrency.    The EIP Participants possess the skills,

knowledge, and experience that are critical to the Debtors' ability to consummate the Debtors'

Plan for the benefit of all stakeholders in these Chapter 11 Cases.  To receive the target EIP

Award opportunity, the EIP Participants must achieve multiple performance metrics as reflected

in the Plan, including, among others, confirming and consummating the Plan, achieving

performance targets regarding the distribution of liquid cryptocurrency under the Plan, and, for

some EIP Participants, achieving certain mining rig hashing and profit goals.[342]    As such,

the Emergence Incentive Plan properly incentivizes the EIP Participants to maximize the value

of the Debtors' estates.    The Emergence Incentive Plan is therefore structured to drive

performance from these key parties by providing incentives to achieve targeted goals in a manner

that will benefit all parties—particularly the Debtors' stakeholders—if the performance targets

are achieved.  Furthermore, the overall cost of the Emergence Incentive Plan—$2.6 million—is

reasonable and appropriate under the circumstances.[343]

---

[341]    *See* Ubierna de las Heras Obj. at 4.

[342]    *See* Plan, Art. IV.J.2.

[343]    *See* Hoeinghaus Decl. at ¶ 22.

224.     Moreover, implementing the Emergence Incentive Plan is a sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates and stakeholders.  The Emergence Incentive Plan is the result of an independent analysis undertaken by the Debtors in conjunction with market guidance from their restructuring advisor Alvarez & Marsal North America, LLC ("A&M") and the Debtors' other advisors to ensure that the Emergence Incentive Plan is market-based, consistent with competitive practices, and compliant with the Bankruptcy Code  The Emergence Incentive Plan was subject to further review and approval from the Special Committee, none of whom are current EIP Participants. Absent the Emergence Incentive Plan, the EIP Participants may be undercompensated, under-incentivized at this critical stage of the Debtors' Chapter 11 Cases, and at risk of leaving the Debtors before certain key milestones are achieved, including the distribution of a significant amount of liquid cryptocurrency.  Such incentives are an important tool for driving performance by key personnel and effectively align the interests of the EIP Participants with those of the Debtors' stakeholders.

225.     Accordingly, the Emergence Incentive Plan, with its focus on driving value after emergence from these Chapter 11 Cases, has the support of an overwhelming number of creditors who voted to accept the Plan, is a proper exercise of the Debtors' business judgment, is justified by the facts and circumstances of these Chapter 11 Cases, and satisfies the requirements of section 503(c) of the Bankruptcy Code.  Thus, Mr. Ubierna de las Heras's objection should be overruled.

**B.     The Debtors' Treatment of Retail Borrowers Is Appropriate and Objections Related to Loans Should Be Overruled.**

226.     Several creditors objected to confirmation of the Plan with respect to the treatment of the loans of the Retail Borrowers.  Specifically, as noted, Mr. Bronge filed the

135

Bronge Objection and several other Retail Borrowers wrote letters on this issue.[344]  As further set

forth below, the Bronge Objection and the Loan Letters should be overruled.

> **1.    Plan Treatment of the Institutional Borrowers and Retail Borrowers is Appropriate.**

227.    The Bronge Objection asserts that the Plan should provide similar treatment to

both the Retail Borrowers and Institutional Borrowers.  Specifically, Mr. Bronge asserts that

Retail Borrowers, like Institutional Borrowers, should be allowed to repay outstanding loan

balances (including interest) in exchange for the full amount of their collateral, with any such

amount to be paid in kind with "full unencumbered property rights."

> **a.    Retail Borrowers Do Not Own Their Collateral and are Instead Unsecured Creditors of the Debtors.**

228.    The Debtors' Estates consist of "all legal or equitable interests of the debtor in

property as of the commencement of the case."[345]    The Loan Terms and Conditions

provide—unambiguously in every version and in multiple places—that Retail Borrowers

transferred title of their collateral to the Debtors.  For example, the current version of the Loan

---

[344] Prior to the Bronge Objection, Mr. Bronge also filed a *Motion for Repayment of Loans and Return of Collateral* [Docket No. 3270] (the "Bronge Motion"), which was not yet scheduled for a hearing.  There, Mr. Bronge raised similar arguments regarding the treatment of Retail Borrower Deposit Claims and sought a ruling that (a) allows him to redeem the digital assets he transferred to the Borrow Program by repaying the principal and interest of his retail loans, (b) establishes that only the outstanding balance of his retail loans is property of the Debtors' Estates and the digital assets he transferred to the Borrow program are his "encumbered property" until his repayment, and (c) requires the Plan and the Disclosure Statement to use the same definitions and terminologies as the Loan Terms and Conditions.  *See* Bronge Motion at 3–4.  The Bronge Motion and the Bronge Objection were joined by the following letters (collectively, the "Loan Letters"): the First Windom Letter [Docket No. 3533] (joining the Bronge Motion); the Abruzese Letter [Docket No. 3540] (joining the Bronge Objection); the Truss Letter [Docket No. 3541] (joining the Bronge Objection); and the Dame Letter [Docket No. 3543] (joining the Bronge Motion).  In addition, other creditors' letters raise similar arguments. *See, e.g.*, the Second Windom Letter [Docket No. 3546] ¶ 6 (arguing that Retail Borrowers should have the same opportunity as Institutional Borrowers to repay the loan and redeem the digital assets transferred to the Borrow Program); the Johantgen Letter [Docket No. 3538] (arguing that the Plan's treatment of Retail Borrower Deposit Claims is unfair because he would receive fewer digital assets than what he transferred to the Borrow Program).

[345] *In re Lehman Bros. Holdings. Inc.*, 422 B.R. 407, 418 (Bankr. S.D.N.Y. 2010) (emphasis removed) (citing 11 U.S.C. § 541(a)(1)).

Terms and Conditions provide that "Digital Assets posted as Collateral shall be the exclusive property of [Lending]," that Borrowers "grant [Lending] and any of its Affiliates the right . . . to hold the Digital Assets provided as Collateral in [Lending's] name or in another name . . . with all attendant rights of ownership . . . ," and that Borrowers "acknowledge that, with respect to Digital Assets used by Lending . . . [they] will not be able to exercise any rights of ownership."[346] When the contract is clear and unambiguous, courts will "give effect to the plain meaning of the contract's terms and provisions."[347] As a result, the digital assets Retail Borrowers transferred via the Borrow Program are property of the Debtors' Estates, just as this Court found that assets in Earn Accounts are property of the Debtors' Estates.[348]

229.   These arguments were raised in connection with the mediation between the Debtors, the Retail Borrower Ad Hoc Group, the Earn Ad Hoc Group, and the Committee, which led to the Retail Borrower Settlement that has been incorporated into the Plan. The Retail Borrower Settlement and the Plan establish a mechanism through which the rights of the Debtors and the Holders of Retail Borrower Deposit Claims are reconciled.[349] This a value-maximizing result that avoids further litigation, which would only drain estate resources to be distributed to the Debtors' stakeholders. The broad agreement of the Holders of Retail Borrower Deposit Claims can be inferred from their overwhelming support for the Plan, as described below.

---

[346]   *See* Loan T&C version 9, "Collateral," "Consent to Celsius' Use of Your Digital Assets." *See also* Loan T&C version 8 at 6, 12; Loan T&C version 7 at 14; Loan T&C version 6 at 14; Loan T&C version 5 at 14; Loan T&C version 4 at 14; Loan T&C version 3 at 13; Loan T&C version 2 at 12; Loan T&C version 1 at 11.

[347]   *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[348]   *See, e.g.*, *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] at 30 (holding that "the Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Accounts Holders to the Debtors").

[349]   *See* Disclosure Statement, Art. II.A.2.

137

> **b.    The Bronge Objection Misunderstands the Institutional Loan Order.**

230.    Moreover, the Bronge Objection also references the *Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818], which was approved by the Court,[350] to argue that the Retail Borrowers should be afforded the same treatment as Institutional Borrowers. This order, however, only "authorized, but [did] not direct[]" the Debtors to exercise their rights under the Master Loan Agreements to settle the Institutional Loans.  Nothing in the Institutional Loan Order requires the Debtors to return such collateral.  Instead, it provided the Debtors with the authority to negotiate with Institutional Borrowers to return a portion of their collateral.  Such relief was granted because the Institutional Borrowers are subject to Master Lending Agreements that provided that they retained ownership of the collateral they provided to the Debtors, unlike the Loan Terms and Conditions applicable to Retail Borrowers.

> **c.    Separate Classification of Retail Borrower and Institutional Borrower Claims is Appropriate Under the Bankruptcy Code.**

---

[350]    *See Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) The Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1944] (the "Institutional Loan Order").

138

231.    As an initial matter, Mr. Bronge has no grounds to object to the treatment of the Retail Borrower Deposit Claims on the grounds of unfair discrimination because the Class overwhelmingly voted to accept the Plan.  Section 1129(b)(1) of the Bankruptcy Code only provides an opportunity for a member of a class to object to a plan of reorganization on the grounds that the plan discriminates unfairly against that class if the class "is impaired under, and has not accepted, the plan."[351]  There can be no dispute that the vote of 98.83% of the Holders of Retail Borrower Deposit Claims in favor of the Plan constitutes anything less than an overwhelming show of support.[352]  Because he is a member of a class that has voted to accept the Plan, Mr. Bronge is bound to accept his treatment and the Debtors do not have to demonstrate that the class is not the product of unfair discrimination against similarly situated creditors.

232.    Even if the Debtors were required to demonstrate that the Retail Borrower Deposit Claims class treatment is not the product of unfair discrimination, such differences in treatment between that class and Institutional Borrowers would be justified based on the differences in the legal rights accruing to the Holders of each set of claims.  The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[353]

---

[351]    11 U.S.C. § 1129(b)(1).

[352]    *See* Voting Report ¶ 13.

[353]    11 U.S.C. § 1122(a).

233.    Courts generally will approve placement of similar claims in different classes,

provided that a "rational" or "reasonable" basis exists for doing so.[354]  Recognizing this

flexibility, courts have long held that "the only express prohibition on separate classification is

that it may not be done to gerrymander an affirmative vote on a reorganization plan."[355]  Courts

have identified several grounds justifying the separate classification of claims, including where

members of a particular class possess different legal rights[356] and where the debtors have valid

business reasons for separate classification.[357]

234.    The Plan's classification of Retail Borrowers in Class 2, as set forth in Article III

of the Plan, satisfies the requirements of section 1122 of the Bankruptcy Code because the Retail

Borrowers and Institutional Borrowers have different legal rights, and the Debtors have valid

business reasons for separate classification.  Specifically, Retail Borrowers initiated loans

through their Celsius Accounts and all were subject to the same Loan Terms and Conditions

(each as amended).  On the other hand, Celsius originated institutional loans with Institutional

---

[354]    *See, e.g., In re Lightsquared Inc.*, 513 B.R. 56, 82–83 (Bankr. S.D.N.Y. 2014) ("Courts that have considered the issue [of classification], including the Court of Appeals for the Second Circuit as well as numerous courts in this District, have concluded that the separate classification of otherwise substantially similar claims and interests is appropriate so long as the plan proponent can articulate a 'reasonable' (or 'rational') justification for separate classification." (collecting cases)); *In re Reader's Digest Ass'n, Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2010) Hr'g Tr. 122:25–123:4 (approving a plan of reorganization where the debtor provided a reasonable basis for differing classification of general unsecured claims); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding separate classification appropriate because classification scheme and "discriminatory terms of the Plan attacked by [plan opponents] ha[d] a rational basis"); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) ("[T]he proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case"); *In re Ionosphere Clubs*, 98 B.R. at 177–78 (same).

[355]    *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. 2007); *see also Bos. Post Rd. Ltd. P'ship v. FDIC (In re Bos. Post Rd. Ltd. P'ship)*, 21 F.3d 477, 481 (2d Cir. 1994) (holding that similar claims may be separately classified unless the sole purpose of separate classification is to engineer an assenting impaired class).

[356]    *See Drexel*, 138 B.R. at 715.

[357]    *See Aetna Cas. & Sur. Co. v. Clerk, U.S. Bankr. Ct., New York, N.Y. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) (approving separate classification of similarly situated claims where supported by credible proof to justify separate classification of unsecured claims); *In re Bally Total Fitness*, 2007 WL 2779438, at *3.

Borrowers on an individual basis, entering into separate master lending agreements with each Institutional Borrower.  As such, the rights of Retail Borrowers are distinct from those of Institutional Borrowers, and the fact that all Retail Borrowers are subject to the Loan Terms and Conditions serves as a valid reason for the Debtors to classify Retail Borrower Deposit Claims in their own Class.

> **d.    The Debtors' Valuation of the Collateral Related to the Retail Borrower Claims is Appropriate.**

235.    The Bronge Objection argues that the valuation of the collateral related to the Retail Borrower Deposit Claims using a price reflecting the value of such collateral on the Petition Date for the purposes of distributions and using the current market price to determine the value of the collateral for the purposes of the Set Off Treatment evinces a "lack of fairness" because "[t]his approach may result in an unjustifiable loss of actual BTC or ETH beyond the general 'haircut' that all unsecured claimants are subjected to."[358]  As an initial matter, Mr. Bronge has failed to identify any statutory basis upon which this portion of his objection rests. Further, this treatment is precisely that which was determined to be appropriate under the Retail Borrower Settlement and represents a consensual compromise concerning the various rights and obligations applicable to Retail Borrowers.  Finally, the Debtors' use of different prices to value collateral for the purposes of distributions and for the purposes of setoff is valid.  A distribution under the Plan is on account of a prepetition obligation of the Debtors and is therefore sensibly valued as of the Petition Date.  The Set Off Treatment described in the Plan, however, contemplates a transaction occurring between the Debtors and the relevant Retail Borrowers as

---

[358]    *See* Bronge Obj., "Valuation of Collateral."

of the Effective Date of the Plan and therefore appropriately uses market valuation to account for

the value of the collateral at the time of that transaction.[359]

> **e.    The Terminology Used by the Debtors in the Plan and Retail Borrower Settlement is Appropriate.**

236.    Last, Mr. Bronge objects to the Debtors' use of terminology describing the Retail

Borrower Settlement and related provisions in the Plan.[360]  Mr. Bronge cites no provisions of the

Bankruptcy Code, nor any case law, that requires the Plan definitions to conform to a particular

contract.  Accordingly, the Bronge Objection and the Loan Letters should be overruled.

237.    The remaining Objections, to the extent not discussed in the body of the

Memorandum, are addressed in the Objection Tracker attached hereto as **Exhibit A**.

## Conclusion

238.    For all of the reasons set forth herein and in the Ferraro Declaration, the

Campagna Declaration, the Kielty Declaration, the Cohen Declaration, the Fahrenheit

Declaration, and the Hoeinghaus Declaration, Debtors respectfully request that the Court confirm

the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering

the proposed Confirmation Order, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

---

[359]  *See* Disclosure Statement, Art. II.A.2.

[360]  *See* Bronge Obj., "Terminology."

New York, New York
Dated: September 27, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_

## Exhibit A

**Objection Tracker**

Johan Bronge
*Pro se*
29 September 2023

**United States Bankruptcy Court Southern District of New York Re: Chapter 11 Case No. [22-10964 (MG)**

Johan Bronge's response to Debtor's MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

Introduction.

The Debtor has filed a memorandum of law in support of confirmation of the Celsius Chapter 11 Reorganization plan. Among other objections filed against confirming the plan the Debtor has responded to my objection (Bronge objection) and motion (Bronge motion).

Below follows my response to the Debtor.

Chapter VII, B, e, item 236

I stand firm in my objection to the altered terminology. I do not have a 'Retail Borrower Deposit Claim' nor do I have a 'Retail Borrower Advance Obligation'. I have claim on my Collateral and I have an obligation to return Principal and interest on a Loan for which the Collateral is serving as security. This is unambiguously clear in the TOS and all other documents and verbal communication in this matter. This distinction is important and the Debtor should not be allowed to change the terminology without at least providing an adequate rational. This is especially important since the terms used in the TOS and all other documents and verbal communication, imbues certain attributes to the Collateral and Loan and these are lost in the new terms. The argument that provisions in Bankruptcy law and/or case law is needed to disallow such change of definitions is borderline absurd and should be thrown out. To allow this is similar to allow to define wine as water. Both are liquids but associated with very different qualities.

Chapter VII, B, a, item 228

The Debtor completely ignore and fails to acknowledge and address the references and evidence I have included in support for the Collateral being my encumbered property during the Loan duration. This is disingenuous at best and arrogant and insulting at worst and I urge the Court to compel the Debtor to properly answer the points in my motion and objection.

The Debtor cites items in version 9 of the Loan TOS which is misleading as my arguments for ownership refers to version 7 of the Loan TOS that is controlling my first Loan (31904) see docket 393 page 6, Loan Terms of Use. Here it unambiguously states, in all versions of TOS "*The user-borrower's loan was governed by the version of the Celsius Loan Terms and Conditions agreed to at the conclusion of the application process for the subject loan.*"
When reading version 7 of the Loan TOS it is unambiguously clear that there were no transfer of ownership title of Collateral.

The paragraph, *Consent to Celsius' Use of Your Digital Assets* in version 7 of Loan TOS is the only place I can find where any mention of property rights are mentioned. Here it states "*...to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:*
*(a) You may not be able to exercise **certain** rights of ownership...*" *(bold emphases mine)*

I here argue that this paragraph, just by it's name (...*Celsius' Use of **Your** Digital Assets...*) demonstrates that Celsius is <u>only using my assets not owning them</u>. Additionally, it does not state that ownership title is transferred and it explicitly states that I may not be able to exercise **certain** rights of ownership. This makes it clear that I still hold ownership title but I may not exercise some property rights such title give me during the Loan duration.
This paragraph must be seen in it's context and it's purpose was only to enable Celsius use of the Collateral, to the extent agreed, **as if** it was Celsius property. Collateralized Loan Agreements have been around for centuries and are not commonly used to transfer ownership title of assets. They fulfill the function of allowing, to a varying degree, use of an asset without transferring title while the asset functions as a security for certain obligations as agreed. The Celsius Loan Agreement TOS was not intended to transfer property ownership title. **If** it's purpose was to transfer property title, it would explicitly so state. Incidentally, in another jurisdiction it did transfer ownership title. It was then appropriately called a Sale and Repurchase Agreement (docket 393 page 981)and the corresponding paragraph to "*Consent to Celsius' Use of Your Digital Assets*" is called "*Title Transfer of Tendered Assets*". Here it explicitly and unambiguously states that there is a transfer of ownership title taking place.

There are numerous examples in Sale and Repurchase Agreement how the wording should be in order to unambiguously transfer property ownership title. I will give one example and contrast it to how the corresponding wording is in the Loan Agreement TOS (version 7);
In the Sale and Repurchase Agreement (docket 393, page 985), Provision of Tendered Assets, item c) "*...Tendered Assets are transferred to Celsius UK on a*

*complete title transfer basis and shall become the property of Celsius UK absolutely."*
In the Loan Agreement version 7 (docket 393, page 862), Collateral item c)
*"...Collateral shall be subject to a pledge for Celsius' benefit, in accordance with the terms herein. You will not be able to withdraw, transfer or transact any of the Digital Assets which are posted as Collateral."*

Let me also draw the Courts attention to item H in my motion. Here I specifically quote the Second Revised Disclosure Statement (page 79);
Quote: "Coin **pledged as security** for repayment of a loan in the event of a borrower's default. Will include any initial **collateral posted as security**, as well as any additional collateral provided in response to margin calls." (my bold emphasis) Even this definition supports my arguments regarding ownership and title status of collateral.

The distinction between title and property rights is crucial in legal agreements like collateralized loans. The borrower can still be the legal owner (holder of title) of the asset while providing agreed property rights to the lender during the collateralized Loan period.

Based on the above and the arguments in my motion and objection, it is absolutely, unambiguously clear that no Collateral ownership title of my Loan (31904) has been transferred to the Debtor. Furthermore, as argued in my motion, the same should be considered for my other three loans. Even though the wording in later TOS (version 8 and 9) allows for transfer of all property rights during the Loan period, it still do not, explicitly or generally, transfer ownership title.


Chapter VII, B, b, item 230-234

Even though, as argued above, it is obvious that ownership title of Retail Loan Collateral resides with the borrower (at the minimum for version 7 and arguably also for subsequent versions), I would like to state the following;

In so far as the Debtor do not provide the MLA's for the Institutional Loans the statement that they are different in regard to ownership status of the collateral is unsubstantiated and can be deemed hearsay. This is especially so as in the *"Debtors' Motion Seeking Entry of an Order (I) Authorizing (A) The Transfer of Cryptocurrency Assets Serving as Collateral on Account of Institutional Loans in the Ordinary Course of Business and (B) the Exercise of the Debtors' Rights and Remedies Provided Under Each Master Lending Agreement and (II) Granting Related Relief* [Docket No. 1818]", the Debtor states in item I, 13 *"...Under the majority of the MLAs, title to any cryptocurrency assets serving as collateral on account of institutional loans was transferred to the Debtors prepetition and therefore constitutes property of the Debtors' estates in accordance with section 541(a) of the Bankruptcy Code"*.

Of additional interest here is the footnote (4) that states *"In certain of the MLAs,*

*the Debtors purported to grant a security interest in the collateral and the
agreements are silent as to the transfer of title. The Debtors reserve all rights with
respect to the transfer of title under the MLAs"*

If the Debtor are to have any credibility in this matter I urge the court to compel
The Debtor to produce these MLA's for scrutiny and enable the Court and
Borrowers to compare them to the Retail Loan TOS.

The first assertion by the Debtor that I have "...no grounds to object to the
treatment of the Retail Borrower Deposit Claims on the grounds of unfair
discrimination because the Class overwhelmingly voted to accept the Plan" is
outright wrong. The plan is not confirmed and therefore now is the time to object
to unfair treatment. I would like to ask the Debtor to explain how and on what
basis I do not have fair grounds to object. Until the plan is confirmed the Debtor
absolutely have to demonstrate that the class is not the product of unfair
discrimination against similarly situated creditors. Why would otherwise a
confirmation hearing be held?

I would also here state that I am receiving unfair treatment, not only in relation to
the Institutional Borrowers, but also in relation to other asset classes. I am
convinced I conclusively have shown that I hold ownership title to my Collateral
and therefore the Collateral is not part of the bankruptcy estate, only the principal
and outstanding interest is. Therefore, unless I am allowed to fulfill and follow the
Loan contract, paying back the principal and outstanding interest, my Retail
Collateral should be in it's own class. This class should have priority over all other
classes, except Custody, and at a minimum, all excess Collateral should be
released, in kind without any 'haircut' after a set-off treatment, or the full Collateral,
in kind, is returned upon payment of principal and interest.

I again request the Debtor to show the MLAs in question so it can be determined
what the legal differences are. It is inappropriate for the Debtor to just state this as
a fact without showing any supporting evidence.

Chapter VII, B, d, item 235

Firstly, I want to make it clear that my argument regarding valuation of Collateral is
only relevant if it for some reason is determined that I do not hold title over my
Collateral.
Secondly, the Retail Borrower Settlement is irrelevant to my argument as I was not
privy to these negotiations, neither have I signed or condoned this settlement.
With these items clarified, I start by reiterating my arguments from the objection. I
also do not consider the Debtor argument that I need statutory basis to object to
unfair treatment valid. Laws can not regulate or encompass all possible cases and
therefore each particular case should be judged on it's merit. Here it is obvious that
the Petition USD valuation of Collateral assets is done at the bottom of a bear
market and in all likelihood, the market will give a higher USD value of the same
assets at a future date. This will reduce the percentage of the assets returned,
even though it may retain the same USD value. The opposite obviously applies if

market prices fall below the Petition price but here the Debtor has guarded themselves so they are never required to return more than 100% of the Petition value in USD. This is unfair by any standards, all the risk is on one side and all possible upside on the other. I still argue that the only fair way to treat this dollarization of claims is to use a uniform price across all valuations, set-offs and/or pay backs.

Furthermore, in regards to BTC, that is legal tender and a commodity, ideally no dollarization of the claim should be done. The percentage recovery should be applied directly on the BTC claim without passing through the USD.

This argument regarding valuation would be applicable to all BTC claims, Collateral or not.


Conclusion

I have meticulously countered the Debtor's points, citing specific references and highlighting the inconsistencies in their arguments. Their failure to directly address my concerns and provide essential documentation demonstrates a lack of serious engagement by the Debtor. I am especially concerned that the Debtor does not seem to acknowledge that there is a separation between ownership title and property rights.

I urge the Court to thoroughly evaluate my objections and recognizing the validity of my arguments. The approval of my motion is vital for upholding fairness and justice in this case.


Sincerely

Johan Bronge

*Pro se creditor*

INDEX NO. 450040/2023

NYSCEF DOC. NO. 16    22-10964-mg    Doc 3831    Filed 10/16/23    Entered 10/16/23 16:47:57    Main Document    RECEIVED NYSCEF: 08/04/2023
Pg 606 of 663

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 49M

---------------------------------------------------------------------------X

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK | **INDEX NO.**  450040/2023 |
| Plaintiff, | **MOTION DATE**  05/02/2023 |
| - v - | **MOTION SEQ. NO.**  001 |
| ALEX MASHINSKY, | **DECISION + ORDER ON MOTION** |
| Defendant. | |

---------------------------------------------------------------------------X

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 12, 13, 14, 15
were read on this motion to/for _____ DISMISS _____.

  The New York State Attorney General (NYAG) commences this action on behalf of the People of the State of New York against defendant Alex Mashinsky (Mashinsky) based on an alleged scheme by Mashinsky to defraud investors by inducing them, through false and misleading statements, to deposit their digital assets with his now-bankrupt company, Celsius Network LLC (Celsius) (NYSCEF # 7 – the Complaint or AC). Mashinsky moves pursuant to CPLR 3211(a)(7) and (10) for an order dismissing the Complaint (NYSCEF # 12). NYAG opposes the motion. For the following reasons, Mashinsky's motion is denied.

**Background[1]**

*Celsius Network and its "Earn" Program*

  Founded in March 2017, Celsius is a cryptocurrency lending company that offers customers a variety of cryptocurrency-related products and services (AC ¶¶ 1, 17, 19-20, 21). Mashinsky is Celsius's co-founder, majority owner, and former Chief Executive Officer (CEO), and as alleged, he had access to and control over Celsius's overall operations, trading, and corporate strategy (*id.* ¶¶ 13, 17, 19).

  Celsius's flagship product was its "Earn" program (AC ¶ 22). To access Celsius's product offerings (including the "Earn" program), customers created a Celsius account, digitally signed Celsius's user agreement, and acknowledged its terms of use (*id.* ¶ 20). After creating an account, Celsius users could deposit

---

[1] The following facts are drawn from the Complaint and are assumed true for purposes of this motion.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**   **Page 1 of 25**
**Motion No. 001**

1 of 25

INDEX NO. 450040/2023

NYSCEF DOC. NO. 16    22-10964-mg    Doc 3831    Filed 10/16/23    Entered 10/16/23 16:47:57    Main Document    RECEIVED NYSCEF: 08/04/2023
Pg 607 of 663

existing cryptocurrencies from their own digital wallets into earned interest accounts (EIAs) (*id.* ¶¶ 21-22). Users would then obtain returns from Celsius through a "sleep to earn" model tied to the EIAs (*id.* ¶ 24). Specifically, Celsius pooled the digital assets deposited in the EIAs and invested them in various revenue-generating activities to deliver returns for investors (*id.* ¶¶ 23-24).[2] The yield rates for EIAs changed on a weekly basis and were, according to Mashinsky, "calculated by the weekly demand for [cryptocurrencies] combined with [Celsius's] promise that up to 80% of [its] profits are returned to the depositors" (*id.* ¶ 22). At least 26,390 New York residents registered as users of Celsius and 4,000 of those users were enrolled in EIAs (*id.* ¶ 25).

### *Mashinsky's Representations Concerning Celsius's Business*

Mashinsky acted as Celsius's primary promoter and spokesman across several types of forums, including YouTube, Twitter, and various cryptocurrency conferences (AC ¶ 26). As is relevant here, one of Mashinsky's primary mediums for promoting Celsius was his weekly "Ask Mashinsky Anything" (AMA) segments that were conducted at his New York City apartment (*id.*). During these segments, Mashinsky reviewed and responded to viewers' questions in real time (*id.*). Recordings of the AMA segments were then posted on both YouTube and Celsius's website (*id.* ¶ 27). The videos also often included links to Celsius's website and app so that viewers could invest with Celsius (*id.* ¶ 30).

NYAG alleges that, in promoting Celsius between 2019 and 2022, Mashinsky repeatedly misled the public about various aspects of the company's business model and operations (*see* AC ¶¶ 34-38, 40-43, 47-51, 52-60, 70-79, 94-95). The court provides a brief recitation of certain alleged instances of misrepresentations and omissions recounted in the Complaint:

- Mashinsky repeatedly represented that cryptocurrencies deposited with Celsius would be as safe as any asset deposited with banks or securities broker-dealers (AC ¶¶ 35-37). Unlike those institutions, however, Celsius did not have access to deposit or investor insurance, nor was Celsius subject to the same regulatory oversight as these other institutional entities (*id.* ¶¶ 36, 38).

- Mashinsky indicated that Celsius had a userbase of two million people who had earned yields (AC ¶¶ 41-42). But when he made that statement, approximately two-thirds of Celsius's users held less than a dollar's worth of cryptocurrency in their accounts (*id.* ¶ 43). As one Celsius employee indicated, although Celsius had "1.8mm registered users," "many of [them] have not transferred assets and therefore would not have earned yield (*id.* ¶ 42).

---

[2] Celsius allegedly advertised return rates as high as 17% per year on deposits (AC ¶ 22).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX Motion No. 001**    **Page 2 of 25**

2 of 25

- Mashinsky purportedly claimed in blogposts and interviews between 2019 and 2022 that Celsius would generate yields by making collateralized loans to reputable institutions and cryptocurrency exchanges (AC ¶¶ 44, 47). He further represented that Celsius did not engage in unsecured lending (*id.* ¶¶ 47-50). Yet between 2020 and 2022 Celsius increased its exposure to uncollateralized loans (*id.* ¶¶ 46, 51). In 2020 Celsius made almost $10 million in uncollateralized loans and by May 2022, uncollateralized loans made up 35% of Celsius's portfolio (*see id.* ¶ 51).

- In March 2018, Celsius launched its CEL token—which it viewed as the "backbone" of the Celsius platform—and offered it for sale to investors through an initial coin offering (AC ¶¶ 107, 108). For his part, Mashinsky promoted the CEL token and its value but did not disclose that Celsius was spending millions of dollars to support the token (*id.* ¶¶ 108-109). And despite publicly claiming that he was not a seller of the CEL token, Mashinsky purportedly sold 2.8 million in 2021 (worth $16 million) and 25 million in CEL tokens in 2022 (worth $68.7 million), thereby benefiting from his promotion of the CEL token's value (*id.* ¶¶ 109-11).

- As Celsius's EIAs drew the attention of securities regulators, Mashinsky claimed that none of them had identified any issues despite the existence of multiple active and continuing investigations (AC ¶¶ 112-115). Mashinsky also purportedly misrepresented that Celsius was registered with the Securities and Exchange Commission (SEC) (*id.* ¶ 116).

The above-alleged misrepresentations and omissions were not the only types made by Mashinsky concerning Celsius. In fact, the Complaint avers that Mashinsky also purportedly misrepresented the nature of Celsius's investment and deployment strategies, as well as the resulting losses that the company had sustained. Among other statements, Mashinsky asserted that Celsius did not engage in risky strategies with users' assets, and that the company would generate high yields through low-risk investments (*see* AC ¶ 45). But Mashinsky would later affirm that he knew that Celsius's trading business was "volatile, risk based, capital intensive and unprofitable" (*id.* ¶ 46). For instance, Mashinsky claimed that Celsius's exposure in the "high-risk" decentralized finance (DeFi) market was minimal,[3] yet Celsius had deployed nearly 30% of its investors' digital assets into DeFi activities by spring 2022 (AC ¶¶ 53-60). Mashinsky also purportedly downplayed the losses that Celsius experienced on the DeFi market (*id.* ¶¶ 55-58).

Moreover, although he represented that Celsius only lent assets to institutional counterparties, Mashinsky allegedly failed to disclose that Celsius also engaged with high-risk counterparties that resulted in losses to the company (AC

---

[3] The term DeFi refers to financial services that operate on a blockchain, pursuant to certain predetermined rules, without the involvement of an institutional intermediary such as a bank or broker (AC ¶ 53).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY     Page 3 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**

3 of 25

¶¶ 61-79). Among other things, Mashinsky did not disclose that Celsius took loans from Equities First Holdings, which were collateralized with investor cryptocurrency, or that, after its repayment of the loan, Celsius was unable to reobtain approximately $500 million worth of its collateral (*see id.* ¶¶ 62-63).[4] Instead, Mashinsky represented that Celsius never had an institution not return collateral that was lent to it (*id.* ¶ 63).

Meanwhile, Mashinsky represented that Celsius did not engage in directional and proprietary trading of assets such as Bitcoin (AC ¶¶ 65-66). Yet Mashinsky seemingly did not disclose that, as Bitcoin prices began dropping in or around January 2022, he directed Celsius employees to sell large amounts of Bitcoin in a practice that conflicted with the "delta-neutral" trading strategy relayed to the public (*see id.* ¶¶ 67-68). This decision to "trad[e] around the hedges" was notable because, when Bitcoin prices recovered, Celsius was forced to cover its short position and incur losses (*see id.* ¶¶ 67, 69).

### *Mashinsky's Representations Concerning Celsius's Exposure to the Cryptocurrency Crash of May and June 2022*

Beginning in May 2022, following the collapse of the Terra and Luna stablecoins created by Terraform Labs,[5] the cryptocurrency market experienced a crash (the Crash) (AC ¶¶ 74, 80). The values of nearly all digital assets fell, erasing tens of billions of dollars in cryptocurrency market capitalization (*id.* ¶ 80). With the cryptocurrency market in turmoil, Mashinsky allegedly misled investors about the safety of cryptocurrency assets held at Celsius in an effort to assuage investor concerns (*see* AC ¶¶ 81-83). Specifically, after Celsius investors withdrew over half a billion dollars from the platform in or around May 12, 2022, Mashinsky stated that Celsius was "stronger than ever" and had "billions of dollars in liquidity" (*id.*). In realty, Celsius was insolvent: it had total assets of less than $12 billion and total liabilities of more than $12.75 billion (an approximately $820 million negative delta) (*id.* ¶¶ 84-85). Also, during this same time, customer withdrawals caused Celsius to experience losses of over $1.4 billion in assets (*id.* ¶ 85).

In an effort to mitigate this undisclosed liquidity crises, Mashinsky solicited new investors by offering a bonus for joining Celsius, resulting in the company adding $900 million worth of cryptocurrency and two thousand new investors (*id.* ¶¶ 86-88). While doing so, Mashinsky downplayed Celsius's exposure to the Crash (AC ¶ 90-93). For example, even though Celsius suffered losses from the collapse of Terra and Luna, Mashinsky claimed during a June 1, 2022, YouTube interview that Celsius experienced "very small losses" (*id.* ¶¶ 90-91, 93). Mashinsky purportedly did not disclose that Celsius lost almost $18 million in its investment of $935

---

[4] Celsius also purportedly loaned a billion dollars to Alameda Research Ltd. (Alameda), who Mashinsky viewed as a risky counterparty (AC ¶¶ 70-72). By November 2022, Alameda filed for bankruptcy (*id.* ¶ 73).

[5] Terraform Labs created the Anchor Protocol, a DeFi protocol promising 20% yields on deposits (*id.* ¶ 75). Celsius allegedly deposited investor assets on the Anchor Protocol despite Mashinsky acknowledging its risk (*id.* ¶¶ 75, 78).

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**                                                              **Page 4 of 25**

4 of 25

million worth of investor's assets into Terra (*id.* ¶ 92). Mashinsky similarly downplayed the exposure suffered by Celsius through its investment activities with other entities severely impacted by the Crash (*id.* ¶¶ 93-95).

### Mashinsky's Representations About Celsius's Financial Health After the Crash

In an AMA conducted on June 1, 2022, Mashinsky continued to downplay Celsius's insolvency issues, stating that Celsius's investors' funds were safe and that "anyone who wanted to withdraw partially or fully" could do so (AC ¶¶ 96-97). Mashinsky doubled down on this position on June 10, 2022, when he stated that Celsius had billions in liquidity and that there would be no limits on withdrawals (*id.* ¶ 98). Yet, just days prior to making these statements, Celsius allegedly had less than $11 billion in total assets and $11.9 billion in total liabilities (*id.* ¶¶ 97, 104). Moreover, for four out of the prior six weeks, Celsius was experiencing negative weekly gross revenue, and thus it was paying EIA investors more in interest than it was generating in income (*id.* ¶ 102). As alleged, Mashinsky never disclosed any of this information during his interviews (*id.* ¶¶ 101, 104).

On June 12, 2022, Celsius paused investor withdrawals in an effort to stabilize its liquidity and operations and to preserve and protect assets (AC ¶ 100). This pause came after investors had withdrawn over $672 million in cryptocurrency between June 10 and June 12, 2022 (*id.* ¶ 105). The next day, on July 13, 2023, Celsius filed for bankruptcy with over $4.7 billion in investor liabilities and only $1.75 billion in cryptocurrency assets (*id.*).

### Mashinsky's Purported Failure to Register as a Securities and Commodities Broker-Dealer or Salesperson

The Complaint avers that, despite promoting EIAs through AMAs, interviews, and website postings, Mashinsky never filed a registration statement with NYAG prior to engaging in such conduct (AC ¶¶117-123). The Complaint further states that, despite offering various cryptocurrencies for sale on behalf of Celsius through commodity contracts, Mashinsky failed to register with NYAG as a commodity broker-dealer and salesperson (*id.* ¶¶126-128).

### Legal Standards

CPLR 3211(a)(7) provides that a party may move for judgment dismissing one or more causes of action when a pleading "fails to state a cause of action" (CPLR 3211 [a] [7]). On a motion to dismiss pursuant to CPLR 3211(a)(7), the court "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord [the non-movant] the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (*Whitebox Concentrated Convertible Arb. Partners, L.P. v Superior Well Servs., Inc.*, 20 NY3d 59, 63 [2012] [internal quotation omitted]; *accord Pavich v*

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001
Page 5 of 25

5 of 25

*Pavich*, 189 AD3d 548, 549 [1st Dept 2020]). "[W]hether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (*Phillips S. Beach LLC v ZC Specialty Ins. Co.*, 55 AD3d 493, 497 [1st Dept 2008], *lv denied* 12 NY3d 713 [2009]). However, the court need not accept "conclusory allegations of fact or law not supported by allegations of specific fact" (*Wilson v Tully*, 243 AD2d 229, 234 [1st Dept 1998]).

Under CPLR 3211(a)(10), a party may move to dismiss on the basis that "the court should not proceed in the absence of" a necessary party (CPLR 3211 [a] [10]). CPLR 1001(a), in turn, defines necessary parties as either "[p]ersons [or entities] who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or [persons or entities] who might be inequitably affected by a judgment in the action." And as set forth in CPLR 1003, "[n]on-joinder of a party who should be joined under section 1001 is a ground for dismissal of an action without prejudice unless the court allows the action to proceed without that party under the provisions of [CPLR 1001(b)]."

## Discussion

NYAG's Complaint advances seven causes of action against Mashinsky under the Martin Act and Executive Law § 63(12). Specifically, NYAG alleges (1) violations of Sections 352, 353, and 352-c(1) of the Martin Act (Counts I & II); (2) a violation of the Martin Act's registration requirements under General Business Law § 359-e (Count III); and (3) various claims for repeated and persistent fraud and/or illegality under Executive law § 63(12), all of which are premised on Mashinsky's alleged violations of the Martin Act (Counts IV-VII) (*see* AC ¶¶ 132-51).

Mashinsky now moves to dismiss (NYSCEF # 12). In his moving papers, Mashinsky advances six primary bases for dismissal (NYSCEF # 13 – MOL at 6). *First*, Mashinsky contends that the EIAs are not securities under the Martin Act (*id.* at 6-9). *Second*, Mashinsky avers that none of his alleged misstatements are "related" to the "issuance, exchange, purchase, or other enumerated actions taken with securities or commodities" under the Martin Act (*id.* at 9-11). *Third*, Mashinsky argues that the Martin Act fraud claims fail because, *inter alia*, the alleged fraud is not pleaded with particularity and, in any event, none of the alleged fraud is actionable (*id.* at 11-19). *Fourth*, Mashinsky maintains that NYAG fails to establish that that Mashinsky is a securities or commodities dealer or salesperson (*id.* at 19-21). *Fifth*, Mashinsky argues that NYAG's Executive Law § 63(12) claims fail for the same reasons as the Martin Act claims (*id.* at 23). *Finally*, Mashinsky contends that NYAG has failed to name Celsius as a necessary party (*id.* at 21-23).

Below, the court addresses each of Mashinsky's bases for dismissal.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**

**Page 6 of 25**

6 of 25

## I.    Are Earned Interest Accounts Securities Under the Martin Act?

The Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (General Business Law (GBL) § 352-c[1]). The statute, in turn, defines "securities" as, among other things, "any stocks, bonds, notes, evidences of interest or indebtedness or other securities . . . ." (*id.* § 352[1]).

Courts in New York apply a two-fold analysis to determine whether a transaction constitutes a security under the Martin Act. Courts will first assess whether a transaction falls within the definition of a security that is enumerated in the statute's definitional section (*People ex rel. Schneiderman v Bank of New York Mellon Corp.*, 40 Misc3d 1232[A], at *3 [Sup Ct, NY County, Aug. 5, 2013]. If , like here, the transaction does not fall within one of the statute's enumerated categories, courts will then determine whether the transaction falls within the definition of the general term "security" (*id.*) To do so, the Court of Appeals has directed courts in this state to consider "as persuasive authority the decisions of the United States Supreme Court and other Federal courts construing the Federal Blue Sky Laws" (*see All Seasons Resorts, Inc. v Abrams*, 68 NY2d 81, 87 [1986]). One such federal test that the Court of Appeals has endorsed for "determining whether a given interest is a security" is the one articulated by the U.S. Supreme Court in *SEC v W.J. Howey Co.* (328 US 293 [1946]) (*All Seasons Resorts*, 68 NY2d at 92).

Under *Howey*, an offering (such as an investment contract) is a security where there is (1) an investment of money, (2) in a common enterprise, and (3) an expectation of profits derived solely from the efforts of others (*People v First Meridian Planning Corp.*, 86 NY2d 608, 618-619 [1995], quoting *Howey*, 328 U.S. at 299). This test "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" (*SEC v Edwards*, 540 U.S. 389, 393 [2004]; *Reves v Ernst & Young*, 494 US 56, 61 [1990]).

Mashinsky argues that NYAG fails to establish that EIAs are securities under the Martin Act (MOL at 6-7). Although Mashinsky does not seriously dispute that the allegations concerning EIAs in the Complaint satisfy the first prong of the *Howey* test, he contends that NYAG does not plausibly allege that Celsius's users invested money in a common enterprise or with the expectation of obtaining profits (*id.* 6-8; NYSCEF # 15 – Reply at 3-6). As explained, the court disagrees.

### A. Common Enterprise

With regard to the "common enterprise" prong of the *Howey* test, Mashinsky argues that NYAG fails to allege "horizontal commonality," i.e., "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

Page 7 of 25

7 of 25

assets, usually combined with the pro-rata distribution of profits" (MOL at 7, quoting *U.S. Sec. & Exch. Comm'n v Kik Interactive*, 492 F Supp 3d 169, 178 [SD NY 2020]). In response, NYAG argues that New York courts have endorsed a "broad vertical commonality" test that only requires the fortunes of investors to be linked to the efforts of a promoter or third party (NYSCEF # 14 – Opp at 5).

Most courts that have considered the "common enterprise" prong of the *Howey* test have found that it is satisfied "by a showing of so called 'horizontal commonality', i.e. 'the pooling of investment funds, shared profits, and shared losses'" (*Mount Lucas Assocs., Inc. v MG Refining and Marketing, Inc.*, 250 AD2d 245, 252 [1st Dept 1998], quoting *SEC v Life Partners, Inc.*, 87 F3d 536, 543 [DC Cir 1996]; *Revak v SEC Realty Corp.*, 18 F3d 81, 88 [2d Cir 1994]; *see also SEC v SG Ltd.*, 265 F3d 42, 49 [1st Cir 2001]; *Wals v Fox Hills Dev. Corp.*, 24 F3d 1016, 1018 [7th Cir 1994]). But "horizontal commonality" is not the only way to satisfy *Howey*'s common enterprise prong. Indeed, federal courts have recognized that a common enterprise may also be established by a showing of vertical commonality (*see Revak*, 18 F3d at 87 [collecting cases]).

One type of vertical commonality recognized by federal courts is "strict" vertical commonality, which requires that "the fortunes of investors be tied to the *fortunes* of the promoter" (*see Friel v Dapper Labs, Inc.*, – F Supp 3d –, 2023 WL 2162747, at \*10 & n.10 [SD NY Feb. 22, 2023] [emphasis in original]; *SEC v NAC Found., LLC*, 512 F Supp 3d 988 [ND Cal 2021], citing *Hocking v Dubois*, 885 F2d 1449, 1459 [9th Cir 1989] ["a common enterprise exists where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.'"]). Meanwhile, certain other federal courts have also permitted parties to establish a common enterprise through the less restrictive "broad vertical commonality" test, which only requires a showing that "the fortunate of investors are tied to the *efforts* of the promoter (*Friel*, 2023 WL 2162747 at \*10 [emphasis added]; *see e.g. Matter of Living Benefits Asset Mgmt., L.L.C.*, 916 F3d 528, 536 [5th Cir 2019] ["This circuit . . . applies so-called broad vertical commonality, under which a common enterprise exists when 'the fortuity of the investments collectively is essentially dependent upon promoter expertise.'"]; *SEC v ETS Payphones, Inc.*, 408 F3d 727, 732 [11th Cir 2005] [endorsing "broad vertical commonality" test]).[6] Notably, as is relevant here, the New York Court of Appeals has endorsed the "broad vertical commonality" test in its opinion in *People v First Meridian Planning Corp.* (86 NY2d at 618-21).

In *First Meridian*, defendants were charged with, among other crimes, fraud in the sale of securities related to a scheme to encourage investments into numismatic coin portfolios, art portfolios, and condominiums (*id.* at 614).

---

[6] At the federal level, there is a circuit split over the viability of using "broad vertical commonality" to establish a "common enterprise" (*see Matter of Living Benefits*, 916 F3d at 536 [noting that "the meaning of 'common enterprise' in *Howey*'s second prong" is "controversial" among circuits]; *Friel*, 2023 WL 2162747 at \*10 ["[a]lthough other Circuits accept broad vertical commonality as a viable theory, in *Revak*, the Second Circuit explicitly rejected its application"]).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**                                            **Page 8 of 25**

8 of 25

Defendants subsequently moved to dismiss the indictment on various grounds, including that the sale of numismatic coins did not constitute a sale of securities, and their motion was granted (*id.* at 615). The Third Department reversed (*People v First Meridian Planning Corp.*, 201 AD2d 145, 151-53 [3d Dept 1994]). In addressing the second prong of the *Howey* test, the court first surveyed the various theories of "commonality" that federal courts have recognized, including "horizontal commonality," "strict vertical commonality," and "broad vertical commonality" (*id.* at 152). The court then determined that, although the facts of the case did not support a finding of either "horizontal commonality" or "strict vertical commonality," the state had established a common enterprise under *Howey* by showing that "the fortunes of the investor [were] linked to the efforts of the promoter," i.e., "broad vertical commonality" (*id.* at 152-53). As the Third Department explained, it reached this conclusion because "application of the 'broad' vertical commonality approach [was] consistent with the liberal interpretation to be given to the Martin Act to give effect to its remedial purpose" (*id.*).

In affirming this decision, the Court of Appeals essentially adopted the "broad vertical commonality" test upon which Third Department relied (86 NY2d at 618-621). Specifically, echoing the Third Department, the Court reiterated that, under the second *Howey* prong, "[i]t is not required that the investor acquires a share in a common fund. Rather, the common enterprise factor can be established by proof *that 'the fortunes of all investors are inextricably tied to the efficacy [of those seeking the investment or a third party]*" (*id.* at 620, quoting *SEC v Koscot Interplanetary*, 497 F2d 473, 479 [5th Cir 1974] [emphasis added]). Thus, following the *First Meridian* decision, New York courts may now analyze the existence of a "common enterprise" through evidence of "broad vertical commonality" (*see Bank of New York Mellon*, 40 Misc 3d 1232[A] at *11 n.14 [acknowledging that the Court of Appeals endorsed broad vertical commonality]; *State v Justin*, 3 Misc 3d 973, 990 [Sup Ct, Erie County, 2003] ["New York State courts . . . have adopted a less restrictive criterion of 'broadly vertical commonality'"]).

Here, the court concludes that NYAG pleaded a "common enterprise" under *Howey* by establishing "broad vertical commonality." As alleged, Celsius's investors could transfer cryptocurrency from their own digital wallets into EIAs (AC ¶¶ 21, 23). Celsius's investors deposited their assets with the understanding that they would earn returns at rates that were updated on a weekly basis based on (1) "weekly demand" for a particular cryptocurrency and, notably, (2) Celsius's "promise that up to 80% of [its] profits are returned to [] depositors" (*id.* ¶ 22). Therefore, any interest earned from the EIAs would be derived from Celsius's "work to generate returns"—the so-called "sleep to earn" model (*id.* ¶¶ 24, 44). Indeed, as NYAG alleges, Celsius pooled its investors' digital assets together and then, "acting in [investors'] best interest," used the pooled assets in various revenue-generating activities, including collateralized loans to institutions and retail investors (*see id.* ¶¶ 23. 32, 35, 44). These facts, accepted as true, plausibly establish that Celsius's investors' fortunes (namely, the returns expected from their EIAs) were

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**            **Page 9 of 25**
**Motion No. 001**

9 of 25

"inextricably tied to the efficacy" of Celsius's efforts to generate profits through its investment activities (*see SEC v Gordon*, 2021 WL 5086556, at \*4-5 [ND Tex Nov. 1, 2021, No. 3:21-CV-1642-B] [concluding that complaint established "broad vertical commonality" where investors would benefit from defendants' ability to generate profits based on its investment and refinancing activities in connection with rental properties]; *SEC v ETS Payphones, Inc.*, 408 F3d 727, 732 [11th Cir 2005] [concluding that "common enterprise" existed where investors depended on defendant's ability to develop business to realize profits]).[7]

In arguing that NYAG fails to plead a "common enterprise," Mashinsky chiefly relies on the Sixth Circuit's unpublished decision in *Cooper v King* (114 F3d 1186 [Table] [6th Cir May 9, 1997]). To the extent that the central holding in *Cooper* was not abrogated by the U.S. Supreme Court's decision in *SEC v Edwards* (*see* 540 US at 396-97 [reversing 11th Circuit decision concluding that a payphone sale-and-leaseback arrangement was not a security under *Howey*]), Mashinsky's reliance on this case is ultimately unavailing. Notably, the *Cooper* court couched its analysis entirely on the basis of "horizontal commonality," not "vertical commonality" (*Cooper*, 114 F3d 1186 [Table] at \*2). But courts that have since considered these types of investment transactions under the lens of "vertical commonality" have concluded that they do amount to a "common enterprise" under *Howey* (*see ETS Payphones, Inc.*, 408 F3d at 732; *see also Justin*, 3 Misc 3d at 990-91 [concluding that "sale/leaseback transaction[]" constituted a "common enterprise" under *Howey*]). Thus, if, as Mashinsky suggests, EIAs are analogous to the transactions set forth in *Cooper*, the weight of authority confirms that they do involve a "common enterprise."

In short, NYAG sufficiently pleads a "common enterprise" under *Howey*.

## B. Expectation of Profits

Turning to third *Howey* prong, Mashinsky argues that there was "no expectation [that Celsius investors] would share in Celsius's profits" because investors only received "a predetermined interest rate" (MOL at 8). NYAG counters that courts have rejected Mashinsky's position (Opp. at 7).

---

[7] As NYAG notes (Opp. at 4-5), the Court of Appeals at one point also accepted the broader "investment definition" set forth in *Matter of Waldstein* (160 Misc 763, 767 [Sup Ct, Albany County, 1936]) as another way to determine whether an offering or transaction is a security (*see All Seasons*, 68 NY2d at 94). Under *Waldstein*, "any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term" (*Waldstein*, 160 Misc at 767). It is ultimately unclear whether the *Waldstein* approach is still accepted in this state after the *First Meridian* decision, although at least two courts (including the Third Department) continue to cite *Waldstein* (in addition to *Howey*) as one of the "securities law test[s] recognized in New York" (*see People v Van Zandt*, 43 Misc 3d 563, 573 [Sup Ct, Bronx County, 2014]; *Xerox Corp. v New York State Tax Appeals Tribunal*, 110 AD3d 1262, 1267 [3d Dept 2013])). Assuming, without deciding, that the *Waldstein* test is an accepted approach, the EIAs satisfy this test because the EIAs allowed Celsius to finance the collateralized loans it offered as part of its profit-generating efforts.

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY                    Page 10 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

10 of 25

As noted above, under the third *Howey* prong, investors must have been "led to expect profits solely from the efforts of the promoter" (*United States v Leonard*, 529 F3d 83, 88 [2d Cir 2008], quoting *Howey*, 328 US at 299]). "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment'" (*SEC v Telegram Grp. Inc.*, 448 F Supp 3d 352, 371 [SD NY 2020], quoting *Howey*, 328 US at 301]. The term "profits" in turn refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest" (*Edwards*, 540 US at 394; *see also Warfield v Alaniz*, 569 F3d 1015, 1024 [9th Cir 2009] [concluding that an annuity amount paid at a "fixed rate" amounted to profit for purposes of establishing an expectation of profit within the meaning of *Howey*]; *SEC v Infinity Grp. Co.*, 212 F3d 180, 189 [3d Cir 2000] ["the definition of security does not turn on whether the investor receives a variable or fixed rate of return"]).

When assessing whether expectations of profits were derived "solely from the efforts of the promoter," courts shall construe the term "solely" "realistically," not "literally" (*First Meridian*, 86 NY2d at 620; *People v Sala*, 258 AD2d 182, 194 [3d Dept 1999]). To that end, the Court of Appeals has instructed that the third prong the *Howey* test is met "if the promoter's (or third person's) efforts are 'the undeniably significant ones, those essential managerial efforts, which affect the failure or success of the enterprise'" (*First Meridian*, 86 NY2d at 620-621, quoting *SEC v Turner Enters.*, 474 F2d 476, 482 [9th Cir 1973]).

Here, the court has little trouble concluding that the Complaint's allegations concerning EIAs satisfy the third prong of the *Howey* test. According to the Complaint, the primary draw of EIAs (as promoted by both Mashinsky and Celsius) were their yield rates (AC ¶ 22). Specifically, as noted above, Mashinsky highlighted in blog posts that investors would realize return rates that were calculated based on weekly demand on coins combined with Celsius's promise to share up to 80% of its profits with investors (*id.*). Mashinsky further represented in online interviews that upon depositing virtual currencies with Celsius, investors could expect that "every Monday [Celsius would] pay you yield" from its investment and lending activities (*see id.* ¶¶ 24, 32, 35, 37, 44). And a notable aspect of EIAs, as also promoted by Mashinsky, was that it had a "sleep to earn" model, meaning that investors did not have to take any action to derive a return from their deposit of cryptocurrencies (*id.* ¶ 24). The totality of these allegations, accepted as true, support a conclusion that a reasonable investor depositing digital assets with EIAs would have expected to obtain profits solely from the efforts of Celsius's investment activities (*see SEC v Terraform Labs Pte. Ltd.*, – F Supp 3d –, 2023 WL 4858299, at *14-15 [SD NY July 31, 2023] [concluding that third prong of *Howey* sufficiently alleged where "defendants' embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins"]; *SEC v NAC Found., LLC*, 512 F Supp 3d 988, 996-997 [ND Cal 2021] [concluding that third prong of *Howey*

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**                    **Page 11 of 25**
**Motion No. 001**

11 of 25

sufficiently alleged where investors expected to derive a profit from defendants' efforts to encourage widespread adoption of a new and novel cryptocurrency]).

To avoid this conclusion, Mashinsky argues that, because Celsius's investors received "a predetermined interest rate," they had "no expectation they would share Celsius's profits" (MOL at 8). As a preliminary matter, this contention is plainly belied by the allegations of the Complaint, which allege, and also support a reasonable inference, that the EIA model was built around the idea that depositors would obtain returns that were, at least in part, premised on Celsius's profits and thus its efforts to obtain those profits (*see* AC ¶¶ 22, 24, 32).[8] At any rate, insofar as Mashinsky insinuates that any "predetermined interest rate" associated with EIAs undercuts investors' expectancy of profits for purpose of the third *Howey* prong, his contention has been firmly rejected by federal courts[9] (*see Edwards*, 540 US at 396-397 [holding that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws"]; *Infinity Grp. Co.*, 212 F3d at 189 [observing the same]).

In sum, NYAG sufficiently alleged that the EIAs satisfy the third prong of the *Howey* Test. NYAG has therefore pleaded that Celsius's EIAs are securities for purposes of the Martin Act.

## II.    Does the Complaint Sufficiently Alleges Claims "Related To" or "In Connection With" Securities or Commodities?

Mashinsky maintains that the Complaint fails to allege (1) the existence of any securities or commodities, (2) that any of the alleged misstatements relate to the "issuance, exchange, sale, promotion, negotiation, advertisement, investment advice or distribution" of securities or commodities, or (3) that the alleged misstatements induced Celsius investors to buy or sell securities (*see* MOL at 9-11).

As a preliminary matter, Mashinsky's contention that EIAs are not securities fails for the reasons already articulated in this decision (*see supra*, Discussion § I).

---

[8] As a result, the analysis in *First Citizens Fed. Sav. & Loan Ass'n v Worthen Bank & Tr. Co.*, cited by Mashinsky has no persuasive value to this court given its markedly different factual scenario (*see* 919 F2d 510 [9th Cir 1990] [explaining that plaintiff was nothing more than a "secured lender" that received a fixed interest rate that was "not dependent on the managerial or entrepreneurial skills" of defendant]).

[9] For these same reasons, Mashinsky's reliance on cases such as *Banco Espanol de Credito v Sec. Pac. Nat. Bank.*, *Resolution Tr. Corp. v Stone*, and *Am. Fletcher Mortg. Co., Inc. v U.S. Steel Credit Corp.*—all of which preceded *Edwards*—is entirely misplaced (*Banco Espanol*, 763 F Supp 36, 44 [SD NY 1991] ["plaintiffs had no expectation of capital appreciation from the monies placed in the loans; the rate of return consisted solely of the repayment of the principal plus a fixed rate of interest"]; *Resolution Tr. Corp.*, 998 F2d 1534, 1540 [10th Cir 1993] [declining to recognize that enhanced automobile receivables were securities because, in part, plaintiff only alleged that it received fixed interest payments]; *Am. Fletcher Mortg.*, 635 F2d 1247, 1254 [7th Cir 1980] [concluding that loan was not a security, in part, because it was "not premised upon a reasonable expectation of profits" given that it bore interest at a "fixed rate above prime"). Not only did each of these cases seemingly reason that "fixed" returns necessarily preclude a finding that an investment involved a reasonable expectation of profit, but, in any event, each case also involved entirely distinguishable factual situations from the case at hand.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**                    **Page 12 of 25**
**Motion No. 001**

12 of 25

INDEX NO. 450040/2023

NYSCEF DOC. NO. 16    22-10964-mg    Doc 3831    Filed 10/16/23    Entered 10/16/23 16:47:57    Main Document    RECEIVED NYSCEF: 08/04/2023
Pg 618 of 663

With regard to commodities, NYAG avers that CEL tokens, which are, as alleged, "Celsius's proprietary [cryptocurrency] token, held on Celsius's books," constitute commodities (AC ¶¶ 6, 103). The court agrees. Under the Martin Act commodities are defined as "any commodity dealt in on any exchange within the United States of America or the delivery of which is contemplated by transfer of negotiable documents of title" (GBL § 352 [1]), as well as "any foreign currency, and any other good, article, or material" (*id.* § 359-e [14]). Courts, in turn, have acknowledged that cryptocurrencies are a type of commodity under the definitions set forth the Martin Act and the Commodities Exchange Act, respectively (*see James v iFinex Inc.*, 185 AD3d 22 [1st Dept 2020]; *CFTC v McDonnell*, 287 F Supp 3d 213, 228 [ED NY 2018]). Accordingly, the court concludes that the Complaint also contains allegations concerning commodities.

Similarly falling flat is Mashinsky's contention that none of his alleged misstatements " 'relate to' or 'were engaged in to induce or promote' the issuance, exchange, purchase, sale or other action of a security or commodity" (MOL at 10). To reiterate, the Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (GBL § 352-c [1]). Such conduct is prohibited "regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted" (*id.*). Here, the facts alleged in the Complaint place Mashinsky's conduct squarely within the ambit of these proscriptions. For instance, the Complaint contains sufficient details regarding Mashinsky's alleged misstatements and their purported targeting of new and existing Celsius investors (*see* AC ¶¶ 26, 29-30, 34-35, 41-42, 46, 58, 81, 84-88). And those facts, if accepted as true, support a reasonable inference that Mashinsky's alleged misrepresentations induced or promoted investors to deposit assets into Celsius's EIAs, to keep their assets with Celsius as part of the "Earn" program, and/or to invest into Celsius's CEL Token (*see id.* ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-111). All told, the Complaint plausibly alleges fraudulent or misleading practices by Mashinsky (through his promotion and marketing efforts) that are "related to" the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities.

The above notwithstanding, Mashinsky points to *Chadbourne & Parke LLP v Troice*, 571 US 377 [2014]—a case that, among other issues, interpreted the "in connection with" language contained in Section 10(b) of the Securities Exchange Act—to aver that the fraudulent conduct under the Martin Act must lead to the buying and selling of securities (*id.*).[10] This contention fails for multiple reasons.

---

[10] Specifically, in *Troice*, the U.S. Supreme Court concluded that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security'" when determining whether a private right of action is precluded by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1)(A) (*see* 571 US at 387).

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY                    Page 13 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

13 of 25

*First*, as explained above, there are sufficient allegations alleged to support a plausible inference that Mashinsky's alleged misstatements induced or promoted new investors to deposit assets in Celsius's EIAs. *Second*, as noted by NYAG, the Martin Act does not require investors to take any specific action so long as a defendant has engaged in fraudulent conduct when "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities (GBL § 352-c [1]; *see State v Sonifer Realty Corp.*, 212 AD2d 366, 367 [1st Dept 1995] ["A false representation may be illegal 'regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted'"]). *Finally*, even if the *Troice* court's interpretation of the "in connection with" language in the Exchange Act had any bearing on how to interpret the Martin Act, courts applying *Troice* have held that the alleged securities fraud "must be of the type that is material to someone other  than the fraudster to buy, sell, or hold a covered security" (*see Zweiman v AXA Equitable Life Ins. Co.*, 146 F Supp 3d 536, 550 [SD NY 2015]), and this can include "inducement to action or forbearance" (*O'Donnell v AXA Equitable Life Ins. Co.* , 887 F3d 124 [2d Cir 2018]). Thus, even after applying these standards to the case at bar, the court would still conclude that the Complaint sufficiently alleges misstatements and omissions that were "in connection with" investment decisions by both Celsius's current and prospective investors (*see id.* ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-11).

At bottom, NYAG sufficiently pleads allegations "related to" securities and commodities under the Martin Act.

## III.    Does the Complaint Sufficiently Allege Fraud and Damages under the Martin Act?

Mashinsky essentially advances three challenges to the alleged misrepresentations and omissions in the Complaint. *First*, Mashinsky maintains that NYAG failed to plead fraud with particularity, and, in any event, none of the representations alleged by NYAG were material to investors (MOL at 11-14, 16-19). *Second*, he contends that certain alleged misrepresentations are non-actionable fraud by hindsight (*id.* at 14-15). *Finally*, he avers that the Complaint fails to allege damages (*id.* at 16). The court addresses each of these contentions in turn.

### A. Particularity of Allegations and Materiality of Misstatements

It is well established that the Martin Act "should be liberally construed to give effect to its remedial purpose of protecting the public from fraudulent exploitation in the offer and sale of securities" (*People ex rel. Schneiderman v Barclays Cap., Inc.*, 47 Misc 3d 862, 868 [Sup Ct, NY County, 2015] [internal quotations omitted]). For this reason, the terms "fraud" and "fraudulent practices" are given broad meaning and will encompass "all deceitful practices, even acts 'not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public" (*People v Lexington

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**    **Page 14 of 25**
**Motion No. 001**

14 of 25

*Sixty-First Assocs.*, 38 NY2d 588, 595 [1976], citing *People v Federated Radio Corp.*, 244 NY 33, 38-39 [1926]).

To sufficiently plead Martin Act fraud, NYAG must allege that the purported fraud or fraudulent practice involved misrepresentations and/or omissions or concealments of material facts (*see Barclays*, 47 Misc 3d at 869; *see also Greenberg*, 95 AD3d at 483 [explaining that "an essential element of the Attorney General's Martin Act claims is that the alleged fraudulent transactions be material, i.e., that they have more than a trivial effect on net income or shareholder equity"]). NYAG, however, is not required to plead "scienter or intent to defraud" (*see Greenberg*, 95 AD3d at 483). Nor must NYAG plead reliance on the part of any investor to obtain relief (*see People by Schneiderman v Credit Suisse Secs. (USA) LLC*, 31 NY3d 622, 632 [2018], citing *Sonifer Realty Corp.*, 212 AD2d at 367). Even so, pursuant to CPLR 3016(b), NYAG must plead the pertinent elements of a Martin Act fraud claim with particularity (*see People v Katz*, 84 AD2d 381, 385 [1st Dept 1982]; *Barclays*, 47 Misc 3d at 869 n.7; *see also People ex rel. Cuomo v Charles Schwab & Co., Inc.*, 33 Misc 3d 1221[A], at *5 [Sup Ct, NY County, Oct. 24, 2011] [noting that CPLR 3016(b) applies "with equal force" to NYAG]. This requires "facts sufficient to permit a reasonable inference of the alleged conduct" (*Charles Schwab*, 33 Misc 3d 1221[A] at *3, *5 quoting *Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 492 [2008]).

With regard to materiality under the Martin Act, New York courts have adopted the objective standard articulated by federal courts construing federal securities law (*see State v Rachmani Corp.*, 71 NY2d 718, 726-727 [1988]). The test for materiality is whether defendant's representations or omissions, "taken together and in context, would have [misled] a reasonable investor about the nature of the investment" (*Bank of New York Mellon*, 40 Misc3d 1232[A] at *11). In other words, "there must be a substantial likelihood that the [misrepresentation or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (*TSC Indus., Inc. v Northway, Inc.*, 426 US 438, 449 [1976]; *accord Rachmani*, 71 NY2d at 727). As part of this assessment, courts will presume that a reasonable investor has "knowledge of information that has already been disclosed or is readily available (*Rachmani*, 71 NY2d at 727).

At the outset, NYAG has alleged Martin Act fraud with particularity. The Complaint provides a thorough recitation of purported misstatements made by Mashinsky, including the date such misstatements were made, the context of those statements, and the general audience of those statements (*see e.g.* AC ¶¶ 35-38, 47, 50-51, 81-85). The Complaint further provides context demonstrating how those misstatements and omissions were purportedly false. Put succinctly, the Complaint's allegations plainly set forth facts that are "sufficient to permit a reasonable inference of alleged fraud" (*Charles Schwab*, 33 Misc3d 1221[A] at *5, quoting *Pludeman*, 10 NY3d at 492).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX Motion No. 001**    **Page 15 of 25**

15 of 25

In challenging the issue of materiality, Mashinsky points to four categories of alleged misstatements: (1) Mashinsky's comparison of Celsius to banks and broker-dealers, (2) Mashinsky's representations concerning the size of Celsius's user base, (3) Mashinsky's statements concerning Celsius's alleged compliance with state regulators, and (4) Mashinsky's representations about Celsius's investment strategies (MOL at 12-14). In essence, Mashinsky avers that these statements are immaterial because they are nonactionable puffery, insufficiently vague or speculative, and/or mere generalizations (*id.*). The court disagrees. NYAG's allegations concerning Mashinsky's purported misrepresentations and omissions, if accepted as true for purposes of this motion, support a conclusion that a reasonable investor would have viewed them as material to an investment decision. This is the case whether analyzing the alleged misrepresentations collectively or as discussed below, if considering each category of representations on its own.

To start, NYAG sufficiently alleges that the statements concerning the safety of Celsius's deposits are material. As pleaded, Mashinsky repeatedly represented that investors' assets would be safe as if deposited "with the bank," and that Celsius would "act in [these investors'] best interest (AC ¶¶ 35-36). He further averred that Celsius's "only difference" to institutional broker-dealers was that "Celsius gives 80% of [its profit] to the depositor, to the user," and that Celsius would "take full responsibility for safeguarding investor assets" (*id.* ¶¶ 37, 39). These purported statements did not merely, as Mashinsky suggest, offer opinions about the safety of Celsius's deposits that could not be proven false. To the contrary, even if investors did know about the unregulated nature of Celsius's operations, Mashinsky's statements essentially cast Celsius as an entity that was on equal footing with institutional banks and broker-dealers in terms of the rigors of its protection of assets and the likelihood that investors could be made whole in times of crisis. As a result, the Complaint supports a reasonable inference that Mashinsky's statements altered the total mix of information available to investors about the safety of investing with Celsius (*see Woods v Maytag Co.*, 807 F Supp 2d 112, 123 [ED NY 2011] [concluding that false statement regarding the safety of a product made in response to customer question, which in turn induced the product's purchase, did not constitute mere "puffery"). None of the cases cited by Mashinsky support a different conclusion (*Bader v Siegel*, 238 AD2d 272, 272 [1st Dept 1997] [defendant's statements concerning a "promise" to "demonstrate the 'strategies, tactics and formulations'" during self-improvement classes did not amount to anything more than an opinion]; *Paladino v Adelphi Univ.*, 89 AD2d 85, 87 [2d Dept 1982] [no fraudulent misrepresentation where alleged statements only concerned the "quality or comparative quality" of education that students would receive]).

Mashinsky's contention that his statements about Celsius's investors base and its regulatory compliance are insufficiently vague or "not 'sufficiently specific'" is likewise devoid of merit. Regarding Celsius's user base, the crux of NYAG's fraud allegations is that Mashinsky represented (or at least insinuated) that "'two million people' had earned yield," even though many of Celsius's users had not yet

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY    Page 16 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

16 of 25

INDEX NO. 450040/2023

NYSCEF DOC. NO. 16    22-10964-mg    Doc 3831    Filed 10/16/23    Entered 10/16/23 16:47:57    Main Document    RECEIVED NYSCEF: 08/04/2023

Pg 622 of 663

transferred assets and earned yields (AC ¶¶ 40-43). When properly contextualized, these alleged statements did not, as Mashinsky suggests, amount to "speculative assumptions" about some future occurrence that may impact Celsius. Rather, they addressed Celsius's current state of user engagement and success using EIAs, which could have certainly impacted the investment decisions of current and prospective investors to deposit assets (*cf. People v Exxon Mobil Corp.*, 65 Misc 3d 1233[A], at *20 [Sup Ct, NY County, 2019] [concluding that alleged misstatements made in 2014 concerning greenhouse gas costs that may potentially be incurred by 2030 and 2040 were too speculative to be considered material to a reasonable investor]). As for Mashinsky's alleged statements concerning regulatory compliance (AC ¶¶ 112-15), the Complaint provides sufficient details of alleged misstatements concerning regulatory approval and compliance that supports a reasonable inference of materiality to survive a motion to dismiss.

The final category of alleged misrepresentations on which Mashinsky focuses are those concerning Celsius's deployment strategies. Contrary to Mashinsky's position, these statements are not "mere 'generalizations'" about Celsius (MOL at 13-14). Instead, according to the Complaint, Mashinsky repeatedly assured investors that Celsius was engaged in investment strategies that seemingly minimized any risk to the company and its investors (*see* AC ¶¶ 45, 47, 50, 54-55, 58, 61, 74, 76, 78). This included representations that Celsius (1) would pay yields without taking risk and would avoid deploying assets into risky areas (such as DeFi), (2) only made loans that were collateralized and to reputable counterparties, and (3) avoided taking large positions in Terra and the Anchor Protocol (*id.* ¶¶ 45, 47, 54, 58, 61, 70-72, 74). As alleged, many of Mashinsky's representations proved to be contrary to Celsius's actual practices at the time his statements were made (*see id.* ¶¶ 44-79). Nor were the consequences of Celsius's actual deployment strategies, including its financial exposure arising from its investment strategies, apparent or otherwise discernable from Mashinsky's representations (*id.*). Altogether, the misrepresentations concerning Celsius's deployment strategies detailed in the Complaint, when considered collectively and with context, would have, as alleged, altered the total mix of information available made available to investors (*see McMahan & Co. v Wherehouse Entertainment, Inc.*, 900 F2d 576, 579 [2d Cir 1990] [explaining, for determining materiality, that the "central issue" is "whether defendants' representations, taken together and in context, would have mislead a reasonable investor"]).

In short, accepting the allegations in the Complaint as true and drawing all reasonable inferences in NYAG's favor, the court concludes that NYAG has sufficiently pleaded material misrepresentations and omissions and has done so with particularity. Mashinsky's motion, at most, raises issues of fact concerning materiality. But this only underscores why dismissal is inappropriate at this time (*see People ex rel. Cuomo v Merkin*, 26 Misc3d 1237[A] at *4 [Sup Ct, NY County, Feb. 8, 2010] ["Materiality is a mixed question of fact and law. Therefore, it is inappropriate for resolution at the motion to dismiss stage"]).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**    **Page 17 of 25**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**

17 of 25

### B. Nature of Certain of Mashinsky's Alleged Misstatements

In addition to the above contentions, Mashinsky further avers that certain of his alleged misstatements constitute non-actionable fraud in hindsight (MOL at 14-15). It is true that courts will not permit allegations of fraud by hindsight to support a claim for fraud (*see Novak v Kasaks*, 216 F3d 300, 309 [2d Cir 2000]). In other words, NYAG must allege in the Complaint alleged misrepresentations were "false when made" (*Zutty v Rey Select Broad Market Prime Fund, L.P.*, 33 Misc 3d 1226[A], at *10 [Sup Ct, NY County, Apr. 15, 2011]). NYAG has done so here.

According to the Complaint, Celsius was experiencing a liquidity crisis following the Crash (*see* AC ¶¶ 84-85, 97). Specifically, by at least May 13, 2022, Celsius's total liabilities exceeded its assets, and this continued to be the case going into June 2022 (*id.* ¶¶ 84, 97, 105). Moreover, between May 9, 2022, and May 24, 2022, customer withdrawals caused Celsius to experience a net loss of over $1.4 billion in assets, all while the company was experiencing losses as a result of its deployment of investors' assets (*id.* ¶¶ 85, 102). Despite Celsius's financial conditions at the time, Mashinsky repeatedly assured investors that their "assets are there when [they] need them," Celsius was "ready with the liquidity," and the company was not exposed to any of the "huge damage" caused by the Crash (*id.* ¶¶ 82-84, 89-91, 93). Mashinsky went so far as to claim in the days immediately preceding Celsius's freezing of withdrawals that "Celsius has billions in liquidity," which was in stark contrast to Celsius's actual financial condition at the time (*id.* ¶¶ 98, 102, 104). The allegations in the Complaint, do not, as Mashinsky claims, paint a picture of an individual who merely failed to anticipate mass withdrawals (MOL at 15). Instead, the allegations, accepted as true, depict an individual actively misrepresenting the financial condition of his company to keep it afloat. NYAG sufficiently alleges statements that fraudulent at the time they were made, rather than fraud by hindsight.[11]

### C. Basis for NYAG's Claims for Damages against Mashinsky

Finally, Mashinsky avers that NYAG cannot seek money damages or restitution because the Complaint fails to allege an injury to any New York resident, or any unfair gains to Mashinsky (MOL at 16; Reply at 8-9). NYAG responds that Mashinsky would be liable under the Martin Act for damages to all EIA investors based on his fraudulent conduct made within or from New York (Opp. at 17).

---

[11] Mashinsky also contends that NYAG's allegations concerning Celsius's investment with Alameda is fraud by hindsight. Although a closer call, the court is inclined to permit NYAG's allegations concerning Celsius's loans to Alameda to proceed. To be sure, the nexus between Mashinsky's knowledge of the riskiness of investing with Alameda and Alameda's eventual bankruptcy is, at best, tenuous (*see* AC ¶¶ 71-73). However, these allegations, when coupled with other allegations concerning Celsius's deployment strategies, tends to support the fraudulent nature of Mashinsky's representations (*see id.* ¶¶ 45, 47, 54, 58, 61, 70-72, 74).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**          **Page 18 of 25**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**

18 of 25

It is well established that NYAG has authority to recover on behalf of non-New York residents (*see People ex rel. Cuomo v H & R Block, Inc.*, 58 AD3d 415, 417 [1st Dept 2009]; *Charles Schwab*, 33 Misc 3d 1221[A] at *6). Indeed, "so long as there is a nexus between a securities transaction and New York, the Martin Act applies" (*Charles Schwab*, 33 Misc 3d 1221[A] at * 6). Here, with respect to the nature of the injury, the Complaint alleges that many Celsius investors were impacted by the eventual bankruptcy of the platform, and it further alleges that these victims would have included New York residents as well (*see* AC ¶¶ 8-9, 25). The Complaint further supports a reasonable inference that the harm suffered by investors flowed, at least in part, from Mashinsky's alleged misrepresentations made in New York concerning Celsius's overall financial health and investment safety (*see id.* ¶¶ 9, 26, 80-105, 132-38). Accordingly, this basis for dismissal is denied.

Mashinsky otherwise avers that NYAG "ignore[s] undisputable principles of law requiring supporting allegations for monetary damages claims" (Reply at 8). But as NYAG avers, although restitution and damages are available under the Martin Act, "[p]roof of actual damages, injury or reliance [is] not a required element for liability to accrue" (*see People v Greenberg*, 2010 WL 4732745, at *34-35 [Sup Ct, NY County, Oct. 21, 2010], *affd* 95 AD3d 474 [1st Dept 2012] [denying motion for summary judgment dismissing complaint on basis that NYAG was unable to establish any damages or reliance]). To be sure, while Martin Act liability does not hinge on proof of damages, NYAG will need to establish damages to obtain the relief identified in the Complaint (*see generally State v McLeod*, 12 Misc 3d 1157[A], at *20 [Sup Ct, NY County, Feb. 9, 2006] [concluding that "hearing [was] necessary on the amount of restitution" that defendant must pay in connection with Martin Act claim]). Nonetheless, the fact that NYAG has not made a specific showing of damages in its Complaint does not preclude its ability to pursue the monetary remedies it otherwise identifies as part of its allegations and causes of action (*see McLeod*, 12 Misc 3d 1157[A] at *20 [rejecting argument that state was unable to seek money damages because "they were not specified in the complaint"]).[12]

Stated succinctly, the court declines to dismiss NYAG's Martin Act claims to the extent they seek monetary damages.

---

[12] *Cohen v Brown, Harris, Stevens, Inc.* is not to the contrary (64 NY2d 728 [1984]). In *Brown*, plaintiffs advanced a fraud cause of action that was premised, in part, on defendants alleged failure to comply with the Martin Act's disclosure provisions (*id.* at 731). The Court of Appeals concluded that this claim was properly dismissed because plaintiffs were unable to establish how they suffered any injury because of defendants' failure to comply with the disclosure provisions (*id.*). This case does not, as Mashinsky claims, establish that a Martin Act fraud claim brought by NYAG, which otherwise does not require allegations of scienter or reliance, must be dismissed for failure to specify an amount of damages.

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY                    Page 19 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

19 of 25

In conclusion, as the foregoing makes clear, NYAG has sufficiently stated a claim for securities fraud and damages under the Martin Act. Mashinsky's motion to dismiss NYAG's Martin Act fraud claims is denied.

## IV.   Does the Complaint Sufficiently Allege a Failure to Register Claim under the Martin Act?

NYAG alleges several causes of action concerning Mashinsky's purported failure to register as a dealer or salesperson of securities and/or commodities, as required under the Martin Act (AC ¶¶ 139-40, 149-50). Mashinsky argues that, in addition to failing to adequately allege a security under the Martin Act that is subject to Section 359-e, NYAG has failed to allege that Mashinsky acted as a dealer or salesperson of a security or commodity (MOL at 19). Specifically, Mashinsky avers that the Complaint does not allege that Mashinsky sold any of the EIAs for his "own account," engaged with investors to open or transfer yields to EIAs or acted as a salesperson for Celsius (id. at 20; Reply at 9). Mashinsky also avers that NYAG fails to identify any commodity that Mashinsky promoted or sold as a purported dealer or otherwise establish how he acted as a commodities dealer or salesperson (MOL at 20-21).

Section 359-e of the Martin Act requires certain persons and entities, such as dealers and salespersons, to register before transacting in the business of securities or commodities in New York (see GBL § 359-e). The Martin Act defines a "dealer" as "any person, firm, association or corporation" that "buy[s] or sell[s] securities from or to the public within or from this state for his or its own account, through a broker or otherwise" (id. § 359-e [1] [a]). Similarly, the Act defines a salesperson as "every person employed by a broker or dealer" as defined by Section 359-e (id. § 359-e [1] [c]). Failure to comply with Section 359-e is "deemed a violation of and a fraudulent practice within the meaning of" the Martin Act (id. § 359-e [12]).

Here, accepting the allegations in the Complaint as true, the court concludes that NYAG has stated a claim under Section 359-e of the Martin Act. As a preliminary matter, for the reasons previously explained in connection with NYAG's Martin Act fraud claims, the Complaint sufficiently alleges that EIAs are securities and that CEL tokens are commodities (see supra, Discussion §§ I & II). The Complaint otherwise alleges sufficient facts to support a conclusion that that Celsius was a dealer of securities and/or commodities for purposes of the Martin Act (see AC ¶¶ 20-22, 24-25, 29, 107-109, 121). Finally, the Complaint sets forth sufficient allegations that, if accepted as true, indicate that Mashinsky operated as a salesperson of securities and commodities, particularly given his promotion of Celsius's EIAs and CEL tokens (see id. ¶¶ 24, 26, 29, 34-35, 41, 44, 86-88, 107-111).

To be clear, the burden will remain on NYAG to actually prove that Mashinsky is a salesperson and/or dealer under the Martin Act for purposes of *his* alleged failure to register. And whether NYAG will be able to do so has yet to be

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**                                                     **Page 20 of 25**
**Motion No. 001**

20 of 25

determined. However, accepting the Complaint's allegations as true and after drawing all reasonable inferences in NYAG's favor, the court cannot conclude at the motion to dismiss stage that that the facts alleged do not fit with any cognizable legal theory under Section 359-e (CPLR 3211 [a] [7]). Mashinsky's motion to dismiss NYAG's Martin Act failure-to-register claim is denied.

## V.    Does the Complaint Sufficiently Allege Executive Law § 63(12) Claims?

Mashinsky argues that NYAG's Executive Law claims should be dismissed for the same reasons supporting dismissal of NYAG's Martin Act claims (MOL at 23). As this argument acknowledges, NYAG's Executive Law § 63(12) claims are premised on the same conduct underlying the Martin Act claims. These claims therefore stand and fall together (*see People v Greenberg*, 95 AD3d 474, 482-483 [1st Dept 2012]; *accord People by Schneiderman v Trump Entrepreneur Initiative LLC*, 137 AD3d 409, 417-418 [1st Dept 2016] ["the language of § 63(12) parallels the language of the Martin Act"]). Hence, for the same reasons articulated in this court's analysis of NYAG's Martin Act claims, Mashinsky's motion to dismiss the Executive Law § 63(12) claims (Counts IV-VII) is denied in its entirety.

## VI.    Is Celsius a Necessary Party?

Mashinsky's final basis for dismissal is that the Complaint fails to name Celsius as a necessary party (MOL at 21-23; Reply at 10-12). On this point Mashinsky states the Complaint has several categories of allegations that are "inextricably tied to Celsius" and thus, by failing to include Celsius as a party, NYAG has "deprived [it] of its right to be heard concerning critical aspects of its business" (MOL at 22).

A plaintiff generally has the right to decide the persons or entities it joins as parties to its action (*Serov ex rel. Serova v Kerzner Intern. Resorts, Inc.*, 52 Misc 3d 1214[A], at *9 [Sup Ct, NY County, July 26, 2016]). Nevertheless, certain parties are deemed necessary under CPLR 1001(a), namely persons or entities (1) "who ought to be parties if complete relief is to be accorded between the persons who are parties to the action," or (2) "who might be inequitably affected by a judgment in the action" (*27th St. Block Ass'n v Dorm. Auth. of State of New York*, 302 AD2d 155, 160 [1st Dept 2002] [internal quotations omitted]). The purpose of CPLR 1001(a) is "not merely to provide a procedural convenience but to implement a requisite of due process—the opportunity to be heard before one's rights or interests are adversely affected" (*Martin v Ronan*, 47 NY2d 486, 490 [1979]).

In assessing the issue of complete relief, courts will consider whether the relief sought against a defendant relies on, in part or in whole, an adjudication of the liability of and/or harm caused by the nonparty sought to be joined (*see Almah LLC v AIG Employee Servs, Inc.*, 159 AD3d 532, 532 [1st Dept 2018] [holding that complete relief could be accorded "between plaintiff and [defendant], without joining

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY    Page 21 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

21 of 25

NYSCEF DOC. NO. 16    22-10964-mg    Doc 3831    Filed 10/16/23    Entered 10/16/23 16:47:57    Main Document    RECEIVED NYSCEF: 08/04/2023
Pg 627 of 663

INDEX NO. 450040/2023

[nonparty]" because "[defendant's] liability, if any, will be limited to any damage that it caused during its tenancy; it will not be liable for damage that [nonparty] may have caused during its earlier tenancy"]; *Interstate Fire & Cas. v Aspen Ins UK Ltd.*, 2019 WL 5547026, at *3 [Sup Ct, NY County, Oct. 28, 2019] [explaining that complete relief could be accorded where "[p]laintiff determined that [insurers'] policies would not cover [] liability in the Underlying Action, whereas plaintiff concluded that [defendant] was the insurer during the relevant time period]). And with regard to whether a non-party would be "inequitably affected by a judgment," courts have held that the "possibility that a judgment rendered without [the omitted party] could have an adverse practical effect [on that omitted party] is enough to indicate joinder" (*27th St. Block*, 302 AD2d at 160, quoting *Hitchock v Boyack*, 256 Ad2d 842, 844 [3d Dept 1998]).

Here, Mashinsky fails to establish, at this juncture, that the court would be unable to accord complete relief between the parties without Celsius being named as a party, or that Celsius would be inequitably affected by a judgment in this action. Regarding the complete relief factor, NYAG has chosen to institute an action solely against Mashinsky stemming from his alleged misconduct and, in doing so, NYAG has necessarily cabined the requested relief to target only Mashinsky (AC ¶ 11 and Prayer for Relief).[13] Thus, whether Celsius is liable for any harm (if at all) has no bearing on the relief NYAG would be able to obtain (*see Almah LLC*, 159 AD3d at 532; *see also Signature Bank v Faibish*, 142 AD3d 1069, 1070 [2d Dept 2016] [concluding that nonparty corporations in bankruptcy were not necessary parties, even where plaintiff alleged that defendants used conglomerate of entities and several banking institutions to induce plaintiff to enter into a loan with the nonparty corporations who, in turn, defaulted on the loan]).

Mashinsky's position that Celsius would be inequitably affected by a judgment in this action is similarly unavailing. It is true that issues concerning Celsius's deployment and operational activities, as well as what happened at Celsius before and after the Crash, would be addressed in determining Mashinsky's liability. But courts are regularly able to adjudicate such interconnected factual and legal issues without requiring that all relevant parties be named to the action (as reflected in the somewhat analogous context of joint and several tortfeasor liability) (*see e.g. Serov*, 52 Misc 3d 1214[A] at *9, [explaining that "joint and several tortfeasors are permissive, not indispensable parties whose rights will be "inequitably affected" by entry of judgment:]; *see generally* Vincent C. Alexander, Practice Commentaries C1001:1 [noting that joinder typically not required in the context of joint and several tortfeasors "because a plaintiff's judgment against one of

---

[13] Mashinsky's contention that NYAG's pursuit of "restitution of all amounts or assets obtained from investors" inherently makes Celsius a necessary party (*see* MOL at 22-23) ignores the fact that NYAG's remedy of restitution is targeted at solely Mashinsky.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**    **Page 22 of 25**
**Motion No. 001**

22 of 25

several tortfeasors cannot be undone by other suits, the defendant does not face double liability, and the other tortfeasors will not be inequitably affected"]).

Regarding the contention that several categories of NYAG's allegations are "inextricably tied to Celsius," the only issue identified by Mashinsky that could potentially have an adverse impact on Celsius is whether Celsius qualifies as a broker-dealer for purposes of a determining whether *Mashinsky* (not Celsius) violated Section 359-e of the Martin Act. But on this point, Mashinsky does not explain beyond speculation how, if at all, Celsius will be bound (either legally or practically) by any findings in this case in a future proceeding, particularly given both parties' apparent acknowledgment that neither collateral estoppel nor issue preclusion would be at issue (*see generally Strough v Incorporated Vill. of West Hampton Dunes*, 78 AD3d 1037, 1039-1040 [2d Dept 2010] ["In order to invoke [collateral estoppel], two requirements must be met: (1) the identical issue must have been necessarily decided in the prior action and must be decisive in the present action, and (2) the party who is precluded from relitigating the issue must have had a full and fair opportunity to contest the matter in the prior action"]). Simply put, there is no indication on the current record of even a "mere possibility" that a judgment in this action would adversely impact Celsius.

None of the cases cited by Mashinsky support a contrary conclusion. In *City of New York v Long Island Airports Limousine Serv. Corp.*, for example, the Court of Appeals concluded that plaintiff failed to join the New York State Commissioner of Transportation as a necessary party because the issues raised in the case essentially challenged the Commissioner's power to regulate transportation into large metropolitan areas (48 NY2d 469, 475-76 [1979]). Likewise, in *Fatone v Board of Elections of County of Rensselaer*, the court concluded that two candidates for elected office were necessary parties to a proceeding initiated pursuant to Election Law §16-102 because, although petitioner was only challenging the designation of one candidate on a designating petition for an upcoming election, she claimed that the petition was, in general, "permeated with fraud" (218 AD2d 913, 913-14 [3d Dept 1995]). As the court recognized, these allegations, if sustained, would have "invalidated" the entire designating petition naming candidates for office and, in turn, impacted *all* candidates listed therein (including the nonparty candidates) (*id.*).[14] Contrary to Mashinsky's assertion, these cases do not present "analogous situations" to the case at hand (MOL at 22). Rather, in both cases, unlike here, the legal determinations that would have been rendered by the court would necessarily implicate the legal rights or powers of a nonparty.

---

[14] Although the First Department in *New Delhi Tel. Ltd v Nielsen Holdings N.V.* did conclude that an entity was a necessary party because its conduct was "at issue in every cause action," a key determination was that plaintiff alleged that the nonparty was "defendants' joint venture," and it was this joint venture that engaged in the fraudulent conduct at issue in plaintiff's complaint (111 AD3d 437, 437 [1st Dept 2013]). Here, by contrast, NYAG's allegations are focused on Mashinsky's misconduct. While NYAG alleges Mashinsky was acting to promote Celsius, it is ultimately his alleged misrepresentations and omissions that are at issue in this dispute.

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX                    Page 23 of 25
Motion No. 001

23 of 25

Even if, however, the court did conclude that Celsius were a necessary party, it would still not dismiss this action. As both parties observe, because Celsius is subject to an automatic stay in its bankruptcy proceedings, it cannot be joined in this action (*see D.E. Shaw Composite Holdings, L.L.C. v Terraform Power, LLC*, 2018 WL 731802, at *4 [Sup Ct, NY County, Feb. 6, 2018]). CPLR 1001(b) provides that, in such circumstances, courts may "allow the action to proceed in such nonparty's absence" after considering the following five factors: "(1) whether plaintiff has another remedy if the action is dismissed for nonjoinder; (2) the prejudice which may accrue from nonjoinder to the defendant or to the nonjoined party; (3) whether and by whom prejudice might have been avoided or may in the future be avoided; (4) the feasibility of a protective provision; and (5) whether an effective judgment may be rendered in the absence of the nonjoined person" (*L-3 Comm'cns Corp. v SafeNet, Inc.*, 45 AD3d 1, 10-11 [1st Dept 2007]). When weighing these factors, courts "should be guided by the principle that dismissal for failure to join a necessary party should eventuate only as a 'last resort'" (*id.* at 11, citing *Saratoga Cty Chamber of Commerce, Inc v Pataki*, 100 NY2d 801, 821 [2003]).

Each of these five factors weigh in favor of allowing NYAG's case to proceed. As to the first factor, by virtue of the automatic stay in bankruptcy, dismissal of this action would effectively and indefinitely preclude NYAG from exercising her "broad regulatory and remedial powers to prevent fraudulent securities practices" under the Martin Act (*see generally Assured Guar. (UK) Ltd v J.P. Morgan Inv. Mgmt. Inc.*, 18 NY3d 341, 350 [2011]).

Turning to the second and third factors, the prejudice to either Mashinsky or Celsius is minimal. To start, the relief granted in these proceedings will be premised solely on a determination of Mashinsky's liability (if any) and will not depend on Celsius's liability (if any). Furthermore, as explained above, any rulings from these proceedings will be nonbinding on Celsius, and Mashinsky otherwise fails to articulate any non-speculative prejudice to Celsius's rights if it were not joined. For its part, although it is currently subject to an automatic stay, Celsius could also take steps to avoid any *possibility* of prejudice by seeking authorization to intervene in this action (*see 27th St. Block*, 302 AD2d at 163 [explaining that, although petitioner was aware of non-party's role and bears the responsibility of any prejudice that might result by not joining that party, that nonparty was also "obviously aware of the proceeding, could have avoided any prejudice by seeking intervention, although not required to do so"]; *L-3 Comm'cns*, 45 AD3d at 13 ["Courts have routinely recognized that the ability of a nonjoined party to intervene in an action to avoid prejudice is a compelling factor in determining whether to dismiss a case for failure to join a necessary party"]).

Regarding the fourth factor, although neither party addresses whether there are feasible protections that the court could implement to protect Celsius's interests, the court is nevertheless confident that it will be able to craft orders and judgments to protect against any potential prejudice to a nonparty. Finally, in

450040/2023    THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY    Page 24 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

24 of 25

weighing the fifth factor, the court reiterates that it will be able to accord complete relief amongst the parties even in Celsius's absence from these proceedings.

In summary, there is no basis to view Celsius as a necessary party under CPLR 1001(a). But even if it were, the circumstances of this case do not warrant dismissal. Mashinsky's motion to dismiss pursuant to CPLR 3211(a)(10) is denied.

## Conclusion

For the foregoing reasons, it is

ORDERED that defendant's motion to dismiss is denied; and it is further

ORDERED that within 30 days of the e-filing of this order, defendant shall file an answer to the complaint (NYSCEF # 7); and it is further

ORDERED that a preliminary conference shall be held via Microsoft Teams on September 27, 2023, at 10:30 a.m. or at such other time that the parties shall set with the court's law clerk.

This constitutes the Decision and Order of the court.

| 08/04/2023 | | MARGARET A. CHAN, J.S.C. |
| --- | --- | --- |
| DATE | | |

| CHECK ONE: | | CASE DISPOSED | | | X | NON-FINAL DISPOSITION | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | GRANTED | X | DENIED | | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | | FIDUCIARY APPOINTMENT | | REFERENCE |

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY         Page 25 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

25 of 25

David J. Adler
McCARTER & ENGLISH, LLP
825 8th Avenue
Worldwide Plaza
New York, New York 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
E-mail: dadler@mccarter.com
*Attorneys for Ad Hoc Group of Borrowers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.,*[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |
| AD HOC GROUP OF BORROWERS, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 23-_____ (MG) |
| CELSIUS NETWORK LLC; CELSIUS KEYFI LLC; CELSIUS LENDING LLC; CELSIUS MINING LLC; CESIUS NETWORK INC.; CELSIUS NETWORK LIMITED; CELSIUS NETWORKS LENDING LLC; AND CELSIUS US HOLDING LLC, | |
| Defendants. | |

## COMPLAINT FOR DECLARATORY JUDGMENT

The Ad Hoc Group of Borrowers (the "**Ad Hoc Group**"),[2] by and through its attorneys,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The members of the Ad Hoc Group (collectively, the "**Borrowers**") are set forth in certain statements (the "**Rule 2019 Statements**") filed by McCarter & English, LLP (the "**McCarter Firm**") from time to time pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). On or about January 23, 2023, the McCarter Firm filed the *First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [ECF Doc. #

McCarter & English, LLP, files this complaint (the "**Complaint**") against the debtors and

debtors in possession (collectively, the "**Debtors**" or "**Celsius**") in the above-captioned chapter

11 cases (collectively, the "**Chapter 11 Cases**") and allege and state:

## PRELIMINARY STATEMENT[3]

1.      Prior to the Petition Date, the Debtors offered a series of crypto currency

programs, including an "earn" account and a "borrow" account.  Each account was governed by

certain agreements (collectively, the "**Account Agreements**").[4]

2.      With respect to the borrow program, a Celsius customer could become a

"borrower" by entering into an agreement with Celsius (a "**Loan Agreement**") pursuant to

which she/he would receive either fiat currency or stablecoins in exchange for posting his/her

cryptocurrency as collateral with Celsius (the "**Collateral**").[5]  When a loan was issued (the

"**Loans**"), Celsius provided the borrower with a Truth in Lending Act Statement ("**TILA**

**Statement**") which detailed the cost of the loan (principal and interest payments to be made)

under the terms of the loan. Once the Loans were repaid, the Debtors were obligated under the

Loan Agreement to release the Collateral to the Borrower.

3.      Unlike the Earn program, the Loan Agreement did not transfer title to the

cryptocurrency to Celsius.  This was explained on February 10, 2020 by Aliza Landes, then Vice

---

1920], which is the most recent Rule 2019 Statement identifying the members of the Ad Hoc Group.  Additional
members continue to join the Ad Hoc Group on an ongoing basis, and the McCarter Firm will file additional Rule
2019 Statements as necessary to comply with Bankruptcy Rule 2019.

[3] Capitalized terms used but not otherwise defined in this Summary of Action have the meanings ascribed to such
terms below.  References to "ECF Doc. #. ___" refer to documents filed on the main docket for the jointly
administered Chapter 11 Cases under Case Number 21-10964 (MG).

[4] The Loan Agreements are set forth in the Declaration of Alex Mashinsky dated August 10, 2023 (ECF Doc. #393)
and is incorporated herein by reference.

[5] "Fiat" currency refers to legal tender issued by a government that is not backed by any commodities, such as gold
or silver.

2

President of Retail Lending, who described taking a retail loan as "you're not going into debt, you're just borrowing against something you own." Celsius Network AMA – Ask Aliza Anything!, YouTube (February 10, 2020), https://www.youtube.com/watch?v=RIfECR1Ghhk

4.      Through this Complaint, the Ad Hoc Group seeks a judgment declaring that:

a.      the Collateral is not property of the estate, it should be returned to the Borrowers;

b.      the Debtors should be compelled to provide an accounting and turnover the Collateral;

c.      the Loan Agreements are consumer credit transactions under the Truth in Lending Act and are entitled to the protection afforded to such transactions under section 363(o) of title 11 of the United States Code (the "**Bankruptcy Code**");

d.      the Debtors engaged in deceptive trade practices;

e.      the Debtors committed consumer fraud;

f.      the Debtors violated consumer finance laws, licensing requirements and/or governmental regulations which render the Loans void and unenforceable;

g.      the Debtors committed fraud in the inducement and/or made certain misrepresentations to the Borrowers which render the Loans void and unenforceable;

h.      the Debtors breached the Loan Agreements; and/or

i.      the Debtors have been unjustly enriched by the Collateral.

## THE PARTIES

5.      Plaintiff, is the Ad Hoc Group, which consists of all Borrowers represented by the McCarter Firm.  The McCarter Firm periodically identifies the Borrowers it represents by filing Rule 2019 Statements.  *See* ECF Doc. # 1920, *5-11.

3

6.      The Defendants are the Debtors in the above-captioned Chapter 11 Cases.  The

Debtors' names and addresses are set forth in each of their respective voluntary petitions for

chapter 11 relief.  The corporate organization of the Debtors, as well as their jurisdictions of

formation, are set forth in **Exhibit A** to the *Declaration of Alex Mashinsky, Chief Executive*

*Officer of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed

on July 14, 2022 (ECF Doc. # 23) (the "First Day Declaration").

## JURISDICTION AND VENUE

7.      This adversary proceeding arises in and relates to the Chapter 11 Cases pending

before the United States Bankruptcy Court for the Southern District of New York (the

"Bankruptcy Court") under chapter 11 of the Bankruptcy Code.

8.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.  The adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(A), (G), (K) and/or (O).

9.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory predicates for the relief requested herein are sections 105, 363 and

541 of the Bankruptcy Code and Bankruptcy Rules 7001(1) and 7001(9).

## FACTUAL ALLEGATIONS

**A.      PROCEDURAL HISTORY**

11.     On or about March 2018, the Debtors launched their "crypto asset-based finance

platform" (the "**Celsius Platform**").  ECF Doc. # 1411, p. 7.

12.     On or about June 12, 2022, the Debtors froze the ability of the Borrowers to

withdraw any funds from their accounts on the Celsius Platform.

13.     On or about July 15, 2022 (the "**Petition Date**"), each of the Debtors filed a

4

voluntary petition in relief with the Bankruptcy Court.

14.    Since the Petition Date, the Debtors have continued to operate their businesses
and manage their affairs as debtors and debtors in possession pursuant to sections 1107(a) and
1108 of the Bankruptcy Code.

15.    The Debtors also filed the *Declaration of Alex Mashinsky, Chief Executive Officer
of Celsius Network LLC, in Support of Chapter 11 Petitions and First Day Motions* (ECF Doc. #
23) (the "**Mashinsky First Day Declaration**") on the Petition Date.  The Ad Hoc Group
incorporates by reference the factual admissions set forth in the Mashinsky First Day Declaration
as if fully set forth at length herein.

16.    On or about August 8, 2022, the Debtors filed the *Declaration of Alex Mashinsky,
Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to
February 18, 2018* (ECF Doc. # 393) (the "**Mashinsky Declaration Regarding Account
Terms**"), which purports to include true and correct copies of the Loan Agreements with the
Debtors, including, without limitation, the General Terms of Use (the "**General Terms**") and the
Celsius Loan Terms and Conditions (the "**Loan Terms**") as **Exhibits A** and **B**, respectively.
The Ad Hoc Group incorporates by reference the terms of the Loan Terms and other factual
admissions set forth in the Mashinsky Declaration Regarding Account Terms as if fully set forth
at length herein.

17.    On September 14, 2022, the Bankruptcy Court held a hearing and entered the
*Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy
Code* (ECF Doc. # 820) (the "**Order Appointing Examiner**").  The Ad Hoc Group incorporates
by reference the Order Appointing Examiner, as well as all statements and admissions made
during the presentation of the Order Appointing Examiner to the Court at the hearing on

5

September 14, 2022, as if fully set forth at length herein.

18.     On September 29, 2022, the Bankruptcy Court entered the *Order Approving the Appointment of Chapter 11 Examiner*, which appointed Shoba Pillay (the "**Examiner**") as the Chapter 11 Examiner of the Debtors' bankruptcy estates.  ECF Doc. #  923.

19.     On November 19, 2022, the Examiner issued the *Interim Report of Shoba Pillay, Examiner* (ECF Doc. # 1411) (the "**Interim Examiner Report**").  The Ad Hoc Group incorporates by reference all statements contained in the Interim Examiner Report as if fully set forth at length herein.

20.     On January 4, 2023, the Bankruptcy Court filed the *Memorandum Opinion and Order Regarding Ownership of Earn Account Assets* (ECF Doc. # 1822) (the "**Opinion Regarding Ownership of Earn Accounts**").  The Ad Hoc Group incorporates by reference all legal and factual findings articulated in the Opinion Regarding Ownership of Earn Accounts and the hearing held in connection therewith as if fully set forth at length herein.

21.     On January 31, 2023, the Examiner issued the *Final Report of Shoba Pillay, Examiner* (ECF Doc. # 1956) (the "**Final Examiner's Report**").  The Ad Hoc Group incorporates by reference all statements contained in the Final Examiner's Report as if fully set forth at length herein.

**B.     FACTUAL HISTORY**

22.     Through the Celsius Platform, the Debtors provided financial services and generated revenue through, among other things, cryptocurrency trading, lending and borrowing, as well as by engaging in proprietary trading.

23.     As of the Petition Date, the Debtors offered three types of deposit accounts on the Celsius Platform: 1) an Earn Account; 2) a Custody Account; and 3) a Withhold Account

6

(collectively, the "**Deposit Accounts**").  ECF Doc. # 1141, pp. 7-13.

24.     The Debtors also offered a borrow program to their customers which allowed
Borrowers to post cryptocurrency assets as security in exchange for a loan in fiat currency or
stablecoin.

25.     Prior to the Petition Date, each of the Borrowers entered into the Loan
Agreements with the Debtors.

26.     Upon information and belief, "[a]s of July 13, 2022, Lending had approximately
23,000 outstanding loans to retail borrowers in the aggregate amount of approximately $411
million backed by Collateral with a market value of approximately $765.5 million in digital
assets."  *See* ECF Doc. # 23, ¶ 55.

27.     Celsius promoted and advertised its services, using social media.  In particular,
Mr. Alex Mashinsky would host weekly AMAs (Ask Mashinsky Anything) ("**AMAs**") on
youtube.com.[6]  The AMAs are replete with repeated misrepresentations concerning the financial
stability of Celsius, the risks associated with depositing cryptocurrency at Celsius,  its regulatory
compliance, its transparency and ownership of the cryptocurrency assets, including the
ownership of the Collateral on the Celsius Platform.

28.     Among other things, the following false representations were made during the
AMAs:

**A.  Representations concerning Regulation Compliance**

- On October 10, 2020, Mashinsky replied to a tweet: "We are ready for all outcomes. We
  registered with the SEC in 2018 so we won't have the issues others have."

- During a media interview in December 2020, Mashinsky stated, "Celsius from day one,
  one of the first things we did . . . was register with the SEC . . . ."

---

[6] Celsius has hundreds of these marketing videos on its Youtube.com channel.  *See*
https://www.youtube.com/@CelsiusNetwork/videos

7

- In December 2021, Mashinsky was quoted in Barron's as stating, "The regulators looked into us and said these guys know what they're doing."

- In an AMA from December 3, 2021, Mashinsky represented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything…."

**B.  Representations concerning The Safety Of Its Business Model**

- [t]he Celsius business model is structured to do the exact opposite of what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset backed loans at an average of 9% interest.

- Mashinsky publicly claimed in an April 22, 2022 AMA that "what Celsius does best, better than anybody else, is go out to market and earn yield on these assets."

- Mashinsky claimed on April 13, 2022 "[o]n the institutional side, we have very credible counterparties that have billions of dollars on their balance sheet and for those, we have undercollateralized but we don't offer any non-collateralized loans."

**C.  Representations concerning Celsius' Financial Stability**

- A run on the bank cannot happen at Celsius because Celsius never lends more than what it has …we always have enough coins and enough collateral and so on to return all the assets to all of our users. Celsius, Expansion in Asia with Special Guest Lennis Lai (OkEx) - Celsius AMA, YouTube (April 30, 2021), https://www.youtube.com/watch?v=LaIfR4BuIno.

- Celsius takes full responsibility if anything goes bad we take full responsibility that's part of why we raised it 750 million and now we have over two billion dollars on our balance sheet again more than anybody else." Celsius AMA 10th December 2021, YouTube (December 10, 2021), https://www.youtube.com/watch?v=X304U3isWzg.

**D.  Representations concerning Bankruptcy of Celsius**

- On March 25, 2021, Mashinsky, posted on Twitter, in reply to a Twitter user who asked what would happen to their coins in the event of Celsius's bankruptcy, that "all coins are returned to their owners even in the case of bankruptcy."

8



**E. Representations concerning Ownership of Cryptocurrency**

- In a November 26, 2019 AMA, Mr. Mashinsky stated "[t]hese are your coins, not our coins. Whatever you put in, if you put in one Bitcoin, you will be withdrawing one Bitcoin . . . It's always your Bitcoin. Always your Ether. Always your CEL Token." https://www.youtube.com/watch?v=H1n5g7uJyvQ

- On February 10, 2020, Aliza Landes, the Vice President of Retail Lending, described taking a retail loan as "you're not going into debt, you're just borrowing against something you own." Celsius, Celsius Network AMA – Ask Aliza Anything!, YouTube (February 10, 2020), https://www.youtube.com/watch?v=RIfECR1Ghhk

- On July 24, 2020, Mr. Mashinsky stated:
  [W]hen you give us bitcoin it's not like it's ours, right? It's yours legally. It is still your bitcoin. The only thing we do is when you lend us your bitcoin, we lend them to people who pay us interest. When they return them, it goes back to the wallet and it's still yours from that wallet.  Celsius Network AMA with Alex Mashinsky and HFN's Roni Cohen-Pavon, YouTube (July 24, 2020), https://www.youtube.com/watch?v=kC-89USzxaM.

29.    As detailed at length in the Final Examiner's Report, Celsius knew that the

representations identified above were false.   *See* Examiner's Report, Part II, Article VI,G at pp.

256-67 entitled "*Celsius did not Correct Its Misleading and Inaccurate Statements*" ("the

Examiner found **no** evidence that anyone at Celsius suggested or executed on a process of

correcting or retracting inaccurate and misleading statements that Celsius's employees identified

and removed (or attempted to remove) between May 2021 and June 2022.")(emphasis supplied).

9

30.     In reasonable reliance upon the Debtors' misrepresentations, each Borrower
entered into a Loan Agreement in exchange for pledging their collateral to Celsius.

31.     The Debtors agreed to return the Collateral to the Borrowers' Deposit Accounts,
once the Loans were repaid.  *See*, ECF Doc # 393, at pp. 684, 698, 729, 760, 793, 827, 861 and
896 ("Within ten (10) days of your full repayment of the [outstanding Loan Amount or Principal
amount and all outstanding Obligations], Celsius shall release all remaining collateral to your
Celsius Account.").

32.     The Debtors' obligation to return the Collateral to the Borrowers did not vary
based on whether the account of the Borrower.   Instead, the Loan Terms define "Account" as
"your account with Celsius set up and maintained pursuant to the Network Terms."  ECF Doc. #
393, at pp. 681, 695, 726, 757, 790, 824, 858 and 892.  Similarly, the General Terms define the
phrase "Celsius Account" as "a User's designated user account on the Celsius website or mobile
application…"  ECF Doc. # 393, at pp. 274, 401 and 526.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to Bankruptcy Rule 7001(9)
### that Collateral is Not Property of the Estate)

33.     The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if
fully set forth at length herein.

34.     The Collateral is not property of the Debtors' estates.

35.     The Loan Agreements did not transfer title to Celsius.  Rather, under the Loan
Agreement, the Borrowers consented to Celsius's use of the Collateral during the loan period.

36.     The Debtors repeatedly represented that the Collateral was the property of the
Borrower.

37.     For example, during weekly livestream conversations, the Debtors' co-founder

10

and majority owner, Alex Mashinsky, repeatedly represented to each of the Borrowers that the

Collateral "are your coins, not our coins." ECF Doc. # 1956, p. 10.

38.      Based on the foregoing and the facts incorporated herein by reference, the Ad Hoc

Group is entitled to a judgment declaring that the Collateral is not property of the Debtors'

bankruptcy estates pursuant to section 541(d) of the Bankruptcy Code.

## SECOND CLAIM FOR RELIEF
### (Accounting and Turnover of Collateral)

39.      The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

fully set forth at length herein.

40.      To the extent the Debtors hold any interest in the Collateral, such interest is

limited to the outstanding balance of the Borrowers' Loans with the Debtors.

41.      The Loan Terms make clear that the Debtors only hold possession, not ownership,

of the Collateral.  ECF Doc. #  393, pp. 736, 768, 801, 835, 869 and 886 (Debtors "shall have

actual possession of, and a first priority security interest in the collateral" only).

42.      As a pledgee or a secured lienholder, the Debtors do not own the Collateral.

43.      Based on the foregoing and the facts incorporated herein by reference, the Ad Hoc

Group is entitled to a judgment compelling the Debtors to provide an accounting and turnover of

the Collateral.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to Bankruptcy Rule 7001(9) that the Loans
### are Entitled to the Protections under 11 U.S.C § 363(o))

44.      The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

fully set forth at length herein.

45.      The Borrowers are consumers.

46.      The Debtors extended the Loans to consumer Borrowers primarily for personal,

ME1 44133161v.1

family or household purposes.

47.    In connection with the Loans, the Borrowers were provided with TILA

Statements.

48.    Based on the foregoing and the facts incorporated herein by reference, the Loans

constitute consumer credit transactions and are entitled to the protections under Section 363(o) of

the Bankruptcy Code.

## FOURTH CLAIM FOR RELIEF
### (Deceptive Trade Practices)

49.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

fully set forth at length herein.

50.    Each of the Debtors is a person.

51.    Each of the Debtors misrepresented material facts concerning the transfer of the

Collateral to the Celsius Platform.

52.    As set forth above, the Debtors' co-founder and majority owner, Alex Mashinsky,

repeatedly represented to each of the Borrowers that the Collateral "are your coins, not our

coins."  ECF Doc. # 1956, p. 10.

53.    The Debtors also represented that they would only possess, not own, the

Collateral once such assets were transferred to the Celsius Platform for the loan program.  ECF

Doc. # 393, pp. 736, 768, 801, 835, 869 and 886 (Debtors "shall have actual possession of, and a

first priority security interest in the Collateral" only); *see also* ECF Doc. # 393, pp. 690 705-06,

903 (identifying Debtors' rights as "pledgee").

54.    The Debtors further made false and misleading claims as set forth above and

detailed in the Final Examiner's Report.   Among other things, those false and misleading claims

related to:

12

a.    their financial health;

b.    their compliance with applicable laws and regulations;

c.    their ability to meet obligations;

d.    their ability to safeguard customer assets; and

e.    their revenue sources; and

f.    the price of the CEL token.

55.    The Debtors engaged in deceptive trade practices by, among other things: (1) advertising goods or services with intent not to sell them as advertised; and (2) engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding, including, without limitation, the Debtors' purported rights regarding the Collateral.

56.    As a direct and proximate result of these deceptive trade practices, the Borrowers suffered harm, including monetary damages, attorneys' fees and litigation costs.

## FIFTH CLAIM FOR RELIEF
### (Consumer Fraud)

57.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein.

58.    Each of the Debtors is a person.

59.    Each of the Borrowers is a consumer

60.    Each of the Debtors misrepresented material facts concerning the "borrow" program and the borrower's rights in the Collateral.

61.    For example, during weekly livestream conversations, the Debtors' co-founder and majority owner, Alex Mashinsky, repeatedly represented to each of the Borrowers that the Collateral "are your coins, not our coins."  ECF Doc. # 1956, p. 10.

62.    The Debtors also represented that they would only possess, not own, the

13

Collateral once such assets were transferred to the Celsius Platform for the loan program.  ECF

Doc.# 393, pp. 736, 768, 801, 835, 869 and 886 (Debtors "shall have actual possession of, and a

first priority security interest in the Collateral" only); *see also* ECF Doc. # 393, pp. 690 705-06,

903 (identifying Debtors' rights as "pledgee").

63.     The Debtors engaged in unlawful practices (i.e. consumer fraud) by, among other

things misrepresenting, deceiving, fraudulently stating, fraudulently promising, unfairly

endorsing, suppressing or concealing material facts concerning Celsius and the "borrow"

program, including, without limitation, false and misleading claims as detailed in the Examiner's

Report concerning, *inter alia*:

  a. the Debtors' financial health;

  b. the Debtors' compliance with applicable laws and regulations;

  c. the Debtors' ability to meet obligations;

  d. the Debtors' ability to safeguard customer assets; and

  e. the Debtors' revenue sources; and

  f. the price of the CEL token.

64.     The Debtors made these misrepresentations of material facts and/or actively

concealed these material facts in connection with inducing consumers to open or maintain

accounts on the Celsius Platform.

65.     The Debtors made these misrepresentations with the intent of inducing reasonable

consumers, such as the Borrowers, to rely on such misrepresentations.

66.     The Borrowers reasonably relied upon the Debtors' misrepresentations, to their

detriment.

67.     As a direct and proximate result of these unlawful practices, the Borrowers

14

suffered harm, including monetary damages, attorneys' fees and the costs of litigation.

## SIXTH CLAIM FOR RELIEF
### (Unlawful Provision of Money Services)

68.     The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein.

69.     The Debtors advertised and held themselves out as providing money services through, among other things, websites such as https://celsius.network.com.

70.     The Debtors engaged in the business of money transmission.

71.     The Debtors offered and originated Loans without required money transmitter licenses from state and federal authorities.

72.     The Borrowers are natural people.

73.     The Debtors qualify as financial institutions by the nature of their business.

74.     The Borrowers established Deposit Accounts on the Celsius Platform for personal, family or household purposes.

75.     The Borrowers transferred funds into their respective Deposit Accounts through an electronic terminal or computer.

76.     The Borrowers properly instructed the Debtors to transfer funds from their respective Deposit Accounts through an electronic terminal or computer.

77.     Upon information and belief, the Debtors failed to honor any requests to withdraw funds from the Deposit Accounts on or after June 12, 2022.

78.     The Debtors willfully violated federal and state money transmitter laws.

## SEVENTH CLAIM FOR RELIEF
### (Fraudulent Misrepresentations)

79.     The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

15

fully set forth at length herein.

80.    The Debtors had a duty to communicate information to the Borrowers in an

accurate and truthful manner.

81.    As detailed in the Final Examiner's Report, the Debtors made factual

representations to the Borrowers regarding the Celsius Platform and their respective accounts

thereon, including, without limitation, false and misleading claims about, *inter alia*:

      a.  the Debtors' financial health;

      b.  the Debtors' compliance with applicable laws and regulations;

      c.  the Debtors' ability to meet obligations;

      d.  the Debtors' ability to safeguard customer assets;

      e.  the Debtors' revenue sources; and

      f.  the price of the CEL token.

82.    Each of these representations were material to the Borrowers' decision to transfer

the Collateral to the Celsius Platform.

83.    Each of the Debtors' representations of material fact were false, as the Debtors

intentionally and knowingly mischaracterized how the Collateral would be handled on the

Celsius Platform, among other things.

84.    The Debtors:

      a.   knew that their representations of material fact were false and misleading at

          the time that they represented the information to the Borrowers

      b.  misrepresented the material facts with reckless indifference to their truth;

          and/or

      c.  should have known that their representations of material facts were false and

16

misleading at the time that they represented the information to the Borrowers.

85.    The Debtors intentionally communicated the inaccurate information to the

Borrowers for the purpose of inducing the Borrowers to rely on those misrepresentations.

86.    The Borrowers justifiably relied upon the Debtors' misrepresentations of material

facts to their detriment.

87.    The Borrowers' reliance on the Debtors' misrepresentations of material fact was

reasonable.

88.    But for the Debtors' fraudulent representations, the Borrowers would not have

entered the Loan Agreements.

89.    As a direct and proximate result of the Debtors' misrepresentations of material

fact, the Borrowers suffered harm, including, but not limited to, monetary damages totaling not

less than the value of the Collateral.

## EIGHTH  CLAIM FOR RELIEF
### (Declaratory Judgment Pursuant to Bankruptcy Rule 7001(9)
### that the Loan Agreements are not Enforceable)

90.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

fully set forth at length herein.

91.    The Borrowers are individual consumers.

92.    The Borrowers' Loans are consumer loans.

93.    The Debtors did not hold the required licenses from the appropriate state and

federal agencies to engage in the business of making consumer loans.

94.    The Debtors failed to comply with the state and federal regulations regarding

disclosure concerning the terms of the Borrowers' Loans with the Debtors.

95.    The Debtors breached the Loan Agreements by, among other things, engaging in

17

the fraudulent conduct described above and as detailed in the Final Examiner's Report.

96.    The Debtors repeatedly misrepresented information to the Borrowers, including, without limitation, how Celsius would treat the Collateral on its platform.

97.    The Debtors knowingly misrepresented facts to the Borrowers to induce the borrowers to enter the Loan Agreements.

98.    But for the Debtors' conduct, the Borrowers would not have entered into the Loan Agreements.

99.    As a result of the Debtors' conduct and in accordance with various consumer protection statutes, the Borrowers' Loans are void and unenforceable.

**NINTH CLAIM FOR RELIEF**
**(Declaratory Judgment that the Loans are Void and**
**Unenforceable Due to Fraudulent Inducement)**

100.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein.

101.    As set forth in the Final Examiner's Report, the Debtors made numerous representations concerning the Debtors' financial health, the Debtors' compliance with applicable laws and regulations, the Debtors' ability to meet obligations, the Debtors' ability to safeguard customer assets and the Debtors' revenue sources.

102.    Those representations were false.

103.    As detailed in the Final Examiner's Report, the Debtors were aware of the falsity of these statements.

104.    The Borrowers reasonably relied upon the Debtors' fraudulent misrepresentations when entering into the Loan Agreements.

105.    The Borrowers have been harmed by the Debtors' unlawful, unfair, fraudulent

ME1 44133161v.1

and unconscionable behavior.

106.    As a result, the Borrowers are entitled to have the Loan Agreements rescinded.

### TENTH CLAIM FOR RELIEF
### (Breach of Contract)

107.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if fully set forth at length herein.

108.    To the extent that the Loan Agreements constitute binding contracts, the Debtors were obligated to fulfill both the express and implied terms thereof.

109.    The Debtors materially breached the express and implied terms of the Loan Agreements by, among other things, misrepresenting how the Collateral would be treated by the Debtors on the Celsius Platform.

110.    Additionally, since at least June 12, 2022, the Debtors have prevented the Borrowers from recovering their Collateral, even though the Loan Terms provide, "[b]oth you and/or Celsius may, for any or no reason, terminate the Loan within thirty (30) days prior notice in writing to the other party.".ECF Doc. # 323, p. 895.

111.    Had the Debtors permitted the Borrowers to repay or refinance their Loans, then each of the Borrowers would have been entitled to the release of their Collateral.  ECF Doc. # 323, p. 896.

112.    As a result of the Debtors' material breaches of the Loan Agreements, the Borrowers suffered significant harms, including, but not limited to, monetary damages in an amount not less than the value of the , attorneys' fees and litigation costs.

### ELEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

113.    The Ad Hoc Group repeats and realleges each of the foregoing paragraphs as if

ME1 44133161v.1

fully set forth at length herein.

114.    To the extent that the Collateral is property of the Debtors' bankruptcy estates, the

Debtors' bankruptcy estates have been unjustly enriched.

115.    The Debtors repeatedly represented that the Collateral was the property of the

Borrowers.

116.    In reliance on the Debtors' representations, the Borrowers transferred the

Collateral onto the Celsius Platform.

117.    To the extent the Collateral is determined to be property of the Debtors'

bankruptcy estates, the transfers of the Collateral to the Debtors enriched the Debtors'

bankruptcy estates by the value of the Collateral.

118.    To the extent the Borrowers cannot withdraw the Collateral from Celsius, the

transfers of the Collateral impoverished the Borrowers by the value of the Collateral.

119.    It is inequitable and unjust to permit the Debtors' bankruptcy estates to continue to

retain the Collateral.

## CONCLUSION

**WHEREFORE,** the Borrowers respectfully requests that this Court enter judgment and

award damages against the Debtors, plus pre-judgment interest, post-judgment interest, attorneys'

fees and costs of this litigation.

Dated:  February 7, 2023

**McCARTER & ENGLISH, LLP**

By:    */s/ David J. Adler*
     David J. Adler
     (A member of the Firm)
     Email: dadler@mccarter.com
     825 8th Avenue
     Worldwide Plaza
     New York, New York 10019
     Telephone: (212) 609-6847
     Facsimile: (212) 609-6921
     *Attorneys for Ad Hoc Group of Borrowers*

ME1 44133161v.1

LAW OFFICE OF EDUARDO GLAS PC
Eduardo Glas
500 E. 83rd Street, # 9H
New York, New York 10028
Tel: (917)864-1461
eglas@glasattorneys.com
Attorneys for Creditor Greg Kieser


**UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CELSIUS NETWORKS LLC et al<br><br>Debtors | Chapter 11<br><br>Case No. 22-10964 (MG)<br><br>Jointly Administered |


Greg Kieser, a creditor of the Debtors with active retail loans and liquidated retail loans,

through his attorneys, Law Office of Eduardo Glas PC, hereby objects to the Disclosure

Statement filed by the Debtors.  In support of his objections, Mr. Kieser states as follows:


I.    <u>The Plan is Unconfirmable as a matter of law because the Earn Account Claims
      should be subordinated pursuant to Section 510(b) of the Bankruptcy Code</u>

1.   The Plan proposes to treat the claims of the Earn Account Holders as receiving

distributions on parity with other unsecured creditors.  This is in error because the Earn Account

Claims should be subordinated pursuant to Section 510(b) of the Bankruptcy Code.

2.   Section 510(b) of the Bankruptcy Code provides in pertinent part:

> a claim arising from rescission of a purchase or sale of a security
> of the debtor or of an affiliate of the debtor, for damages arising
> from the purchase or sale of such a security, or for reimbursement
> or contribution allowed under section 502 on account of such a

1

> claim, shall be subordinated to all claims or interests that are senior
> to or equal the claim or interest represented by such security,
> except that if such security is common stock, such claim has the
> same priority as common stock…

11 U.S.C. § 510 (b).

3.   The purpose of this provision is to prevent investors, who essentially assumed the risk of

the entity's business failure by investing in securities, from turning their investment into general

unsecured claims against the debtor's estate.  See, e.g., In re Lehman Bros. Holdings, 513 B.R.

624, 629 (Bankr. S.D.N.Y. 2014) (discussing rationale of Section 510(b)).  Regardless of the

type of claim that is being asserted (e.g., fraud or breach of contract), "precedent requires

subordination of claims by security holders that seek to recover … for the loss in value of a

security issued by the debtor or an affiliate." In re Lehman Bros., Inc, 519 B.R. 434, 448

(S.D.N.Y. 2014) (affirming bankruptcy court decision subordinating claim based on bonds of an

affiliate of the debtor to claims of general unsecured creditors).

4.   Section 101(49) of the Code defines securities broadly, including "investment contract or

certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral

royalty or lease, if such contract or interest is required to be the subject of a registration

statement filed with the Securities and Exchange Commission under the provisions of the

Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file

such a statement." See 11 U.S.C. § 101 (49)(xii).

5.   On or about July 13, 2023, the Securities and Exchange Commission filed a complaint

against Celsius Networks Ltd. and its former CEO and founder Alexander "Alex" Mashinsky,

alleging fraudulent conduct in the solicitation of investments of unregistered securities, among

other things.  More specifically as it pertains to the Earn Accounts, the SEC alleged:  "… Celsius

offered an Earn Interest Program whereby investors tendered their crypto assets to Celsius in

2

exchange for interest payments.  Defendants promised investors in the Earn Interest Program

returns as high as 17%.  Defendants never filed a registration statement for their offers and sales

of the Earn Interest Program, however, and no exception from registration was available."   See

SEC v. Celsius Network Ltd and Alexander "Alex" Mashinsky, Docket No. 23-cv-06005

(S.D.N.Y.) [ECF # 1, Complaint (the "SEC Complaint") at ¶ 3].  As the SEC Complaint notes,

the Securities and Exchange Act defines "security" broadly, including "investment contracts

[which] … are instruments through which a person invests money in a common enterprise and

reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of

others. In this case, Celsius offered and sold CEL and the Earn Interest Program as securities."

SEC Complaint at ¶ 25.  Under the Earn Interest Program, Celsius pooled the assets received

from investors and deployed them into revenue-generating activities, paying return to investors

on a pro rata basis on their investment.  SEC Complaint at ¶ 64.  "Celsius specifically invited

investors to expect that any profits earned would come from Celsius efforts, stating on its

website: 'The Celsius finance team generates returns for our community by lending out our

communities' digital assets to institutional and retail borrowers.  We aim to return up to 80% of

the revenues made from lending out our community's assets back to our community on a weekly

basis.  Due to the rate of returns we can achieve in the lending market change nearly every day

[sic], we adjust the rates that our community earns on their digital assets on a weekly basis."

SEC Complaint at ¶ 73.

　　6.   Significantly, the Debtor entered into a Consent decree with the SEC pursuant to which,

among other things, the Debtor admitted to the allegations in the SEC Complaint, and was barred

from taking "any action or make or permit to be made any public statement denying directly or

indirectly, any allegation in the complaint or creating the impression that the complaint is

3

without factual basis..."  See Consent of Defendant Celsius Network Limited, Docket No. 23-cv-

06005 (SDNY ECF # 6-1).  Virtually the same facts were acknowledged by Celsius Network

LLC in a non-prosecution agreement signed in a criminal case with the U.S. Attorney's Office

that is annexed to the consent decree with the SEC.  Id.

    7.    As noted in the Interim Examiner Report [Doc. No. 1411], numerous jurisdictions have

found that the Earn Program was an investment contract that constituted a security.  See Interim

Report at pp. 29-31.  For example, the Cease and Desist Order issued by the State of Kentucky

provided:

> [Celsius] is offering securities in the form of investment contracts
> … [t]hese investment contracts allow passive investors to earn
> profit in the form of interest on the assets deposited with [Celsius],
> and qualify as securities under the Act … The [Earn Rewards
> Program] amounts to an investment contract because they are "an
> investment of money in a common enterprise with profits to come
> solely from the efforts of others."  See S.E.C. v. W.J. Howey Co.,
> 328 U.S. 293, 301 (1946).

See, Kentucky Cease and Desist Order, at ¶¶ 18, 20.[1]

    8.    In short, the Debtors cannot dispute that the Earn Accounts are securities for purposes of

the Bankruptcy Code.  The Earn Account Claims were acquired when investors placed their

cryptocurrencies into the Earn Rewards Program.  Thus, their securities were acquired in a

"purchase."  In re Lehman Bros. Holdings, 855 F.3d 459, 474 (2d Cir. 2017) ("purchase"

includes circumstances where a claimant received a security in exchange for value).  Equally

important, the Earn Account Claims arose from the purchase of the security since there only

needs to be "some nexus or causal relationship between the claim and the [purchase] of the

---

[1] A copy of the KY Order can be found at Celsius Network LLC 2021AH00024.pdf (ky.gov).

security." In re Enron Corp., 341 B.R. 141, 151 (Bankr. S.D.N.Y. 2006).   As such, these claims

should be subordinated under Section 510(b) because the Earn Account Claimants took the risk

that their investments could be wiped out just like any investor who invests in a hedge fund or

some other type of investment pool. Indeed, Earn Program investors were warned of such risk:

"…by engaging with Celsius you acknowledge that there is a risk that Celsius may become

unable to repay its obligations to its creditors, *in which case your digital assets may be lost, in*

*whole or in part*." See General Risk Disclosures, Risks Related to Using the Earn Service

(emphasis added), p. 1114 (ECF Doc. # 393);  see also In re Lehman Bros., Inc, 519 B.R. at 448

("The fact that the value of the [bonds] declined while [Claren Road] held them … should not

enable [Claren Road] to eviscerate the absolute priority rule, and shift to creditors the investment

risk assumed by the [bond] holders.  In short, subordination of Claren Road's claim pursuant to

section 510(b) is justified because it prevents Claren Road from converting its investment loss

into a creditor's claim.").  Therefore, these claims are being impermissibly treated as other

general unsecured claims under the Debtor's proposed plan.  This improper classification of the

Earn Account Holders' claims, a direct violation of the absolute priority rule, makes the

proposed plan unconfirmable as a matter of law.  In re American Capital Equipment, LLC, 688

F.3d 145 (3d Cir. 2012) (patent unconfirmable plan can be rejected at disclosure hearing).


    II.    The Disclosure Statement and the Plan Failed to Treat Liquidated Loans as a Class.

    9.  The proposed Plan and the Disclosure Statement includes specific discussion about the

Retail Borrower Claims, but absolutely none about the retail loans that were wrongfully

terminated by the Debtor during the so-called Pause.  This set of claimants is not classified under

any of the enumerated classes under the proposed Disclosure Statement and Plan, a fatal flaw in

these documents.  See, In re Agrokor d.d., 591 B.R. 163, 185 (Bankr. S.D.N.Y. 2018) (a

bankruptcy case must resolve the claims of *all* creditors).

10.    To the extent the liquidated retail borrowers' claims are supposed to be included among

the Earn Account Claims, this is an impermissible classification. In general, the default

provisions of these loans provided that Celsius was required to return the excess collateral after a

liquidation to the borrower's "Celsius Account." See, e.g., Loan Terms of Use [ECF # 393 at p.

914 ("Within ten (10) of your full repayment of the Principal Amount and all outstanding

obligations, Celsius shall release all remaining Collateral to your Celsius Account."). To the

extent "Celsius Account" meant "Earn Account," such accounts were illegal as unregistered

securities.  See Point I above in this objection. Thus, this set of creditors should not be included

in the same class as the General Earn Claims.  As it stands, the Disclosure Statement should be

rejected for not dealing with this set of claimants at all, and the Plan should be deemed

unconfirmable for discriminating impermissibly against them.[2]

11. Similarly, among the liquidated borrowers, there was a subset, which included Mr.

Kieser, whose loan terms provided only for the liquidation of a limited portion of the collateral to

meet the required LTV, whereas the Debtors ended liquidating 100% of the collateral and

terminating the loans.  These liquidated borrowers have claims for wrongful liquidation of their

collateral under the terms of their loan agreements and Article 9 of the Uniform Commercial

Code.[3] None of these claims are classified or even acknowledged under the proposed disclosure

statement and plan.

---

[2] The liquidated borrowers' claims cannot be considered to be part of the general unsecured
claims either because the latter specifically excludes them.  See Plan, Art. III B 9 ("For the
avoidance of doubt, no Account Holder Claims shall be General Unsecured Claims").
[3] In fact, as it applies to Mr. Kieser, the liquidation of his loans under the applicable Terms of
Use required the Debtors to liquidate his collateral only to the extent required to bring the LTV

III.    The Disclosure Statement and the Plan Fails to Treat the Active Retail Loans as
        Executory Agreements

12.    The proposed Disclosure Statement and Plan fails to classify the Retail Loan

Agreements as executory contracts that need to be assumed or rejected.  The Debtors seek to

gain the benefits of these contracts (i.e., the repayment of the loans) without having to assume

the burdens (i.e., cure and return of the Collateral).  As of the Petition Date, the Retail Loan

Agreements were contracts with obligations unperformed by the respective parties such that the

failure to perform them would constitute a material breach excusing the performance of the non-

breaching party. See In re Avianca, S.A., 618 B.R. 684, 696 (Bankr. S.D.N.Y. 2020).  Here, the

Borrowers have an obligation under their Retail Loan Agreement to post additional collateral in

the event of a margin call.  The failure to satisfy a margin call would trigger the liquidation of the

collateral and termination of the agreement.  See Gen. DataComm Indus., Inc. v. Arcara (In re

Gen. DataComm Indus., Inc.), 407 F.3d 616, 625 (3d Cir. 2005) (When parties to a contract

define a breach of one party's obligations as a terminable breach, such obligations are material

obligations).  Correspondingly, Celsius retains the obligation under the agreements to return the

collateral upon repayment of the loans.  Further evidence that the lending agreements are

executory contracts is reflected by the proposed Plan's assumption of institutional loans as

---

down to 65 percent. Instead, the Debtors liquidated **all** his collateral and terminated his loan.  Mr.
Kieser suffered great losses in the form of loss of his coins and the large tax bill that resulted
from the liquidation.  To add to the injury, the Debtors did not treat all Borrowers in the same
position as Mr. Kieser the same way.  In an arbitrary manner noted by the Examiner in this case,
some of loans with margin calls were terminated and all the collateral was liquidated while
others similarly situated were not.  See Examiner's Report at p. 326 (Section on Customer Retail
Loan Liquidations).  Also noted in the Examiner's Report was the Hobson choice that many
borrowers faced of being unable to "move crypto assets within the platform or were unwilling to
deposit crypto assets into a platform that had paused withdrawals.  These liquidations occurred
despite Celsius's promises that it would work with customers to meet margin calls and that
liquidation will be a last resort." Id.

executory contracts, given the nearly identical nature of the obligations of the retail and

institutional borrowers under their respective agreements.  See proposed Plan, Art. V.D

('[n]otwithstanding anything in the Plan to the contrary, to the extent that any agreements,

documents, or instruments relating to Institutional Loans are Executory Contracts, the Debtor

shall be deemed to have assumed…"); also, Disclosure Statement at p. 89 ("All Institutional

Loans, and any agreements … relating to such Institutional Loans are Executory Contracts that

the Debtor will assume and assign to Newco under the Plan.").

13. Should the Debtors fail to assume the Retail Loans, and should there be a confirmation of

the Plan, the Retail loans would be deemed rejected.  A rejection of a contract is deemed a

prepetition breach, and as the breaching party the Debtors would be unable to effect a setoff

against the outstanding amounts owed under the loan.  In re Pure Performance Golf, LLC, 2017

Bankr LEXIS 3295 (Bankr. M.D.Fla. 2017) (a rejection is a breach by the debtor occurring

immediately prior to the petition date and, upon rejection, the debtor is divested of all rights

under the agreement).   Given the legal consequences that result from the assumption or rejection

of the Retail Loan Agreements, the failure to classify as executory contracts in the Disclosure

Statement is a material omission.

14. Indeed, the Debtors seek to obtain full payment from the Retail Borrowers on the Retail

Loan Obligations by calling in these loans.  The proposed Plan and Disclosure Statement do not

discuss how this is to occur in accordance with the terms of these loans.  While in general any of

the parties to these agreements could terminate the loan, the Terms of Use require thirty-day

advanced notice to do so.  Neither the proposed Plan nor the Disclosure Statement indicate

whether the Debtors will follow this procedure, which appears to be the only way to terminate

the loans before their term expires.  This further cements the notion that the Retail Loan

Obligations are executory contracts that need to be assumed or rejected.  Without an assumption

of these agreements, the Debtors cannot exercise their right to termination or to trigger the setoff

contemplated under the proposed Plan.  <u>Pure Performance Golf</u>, <u>supra</u>.

IV.    <u>Reservation of Rights</u>

15. Mr. Kieser expressly reserves the right to supplement these objections at the hearing to

consider approval of the Disclosure Statement, and to assert these or any other objections in

connection with any hearing to consider confirmation of the Plan.

V.    <u>Conclusion</u>

16. For the foregoing reasons, Mr. Kieser respectfully requests that the Court direct the

Debtors to modify the Disclosure Statement to address the objections contained herein, and grant

such other and further relief as is just and proper.

Dated:  New York, New York
August 4, 2023

/s/Eduardo J. Glas
Eduardo Glas, Esq.
Law Office of Eduardo Glas PC
500 E. 83rd Street, # 9H
New York, New York 10028

Counsel for Greg Kieser

**STATEMENT OF FACTS**

**CELSIUS**

1. Celsius Network LLC is a Delaware limited liability corporation headquartered in Hoboken, New Jersey.  Celsius Network Limited is a United Kingdom corporation headquartered in London.  Celsius Network LLC and Celsius Network Limited, together with their related entities, including Celsius Network Inc., are collectively referred to as "Celsius."

2. Celsius offered a service by which holders of crypto assets could deposit those assets into a Celsius wallet and earn a percentage yield that was purportedly generated through pooling customer assets and deploying them through retail lending, institutional lending, investments, exchange trading, and other profit-seeking strategies.  Celsius investors could elect to receive the fruits of their investment in their native crypto token or, in exchange for a higher yield, in Celsius's own crypto token CEL.

3. As set forth in more detail below, from in or about 2018 up to and including in or about May 2022, Celsius participated in a scheme to defraud investors in Celsius by (1) making false and misleading statements about the degree of risk to which those investors' funds were exposed through Celsius's yield-generating activities, and (2) manipulating the market price and volume of CEL to give investors the impression that CEL was more valuable and liquid than it actually was.

4. The scheme was carried out under the supervision and at the direction of Celsius's founder and Chief Executive Officer, Alex Mashinsky.

\* \* \*

5. Celsius was founded in approximately 2018 as a crypto asset platform that allowed its customers to earn yield on their crypto assets, take loans secured by their crypto assets, and custody their crypto assets, among other services.  Celsius billed itself as the "safest place for your crypto" and urged potential customers to "unbank" themselves by depositing their crypto assets with Celsius.  At its peak in the fall of 2021, Celsius purported to hold approximately $25 billion in assets.  Many of these assets were crypto assets deposited by ordinary retail investors located in the United States and abroad, and not large institutions.

6. From its inception in 2018, Mashinsky marketed Celsius by making false and misleading statements about core aspects of Celsius's business.  Mashinsky made repeated false and misleading statements as to the safety of Celsius's yield-generating activities, the long-term sustainability of the high reward rates that Celsius paid to its customers, and the risks associated with depositing crypto assets with Celsius.  Mashinsky made these statements to convince potential customers to place their money with Celsius and to discourage existing customers from withdrawing their money from the platform and investing elsewhere.

7. Mashinsky and other Celsius executives promoted Celsius through media interviews, Twitter, Celsius's website, and weekly "Ask Mashinsky Anything" sessions, or "AMAs."  In these weekly AMAs, Mashinsky, sometimes joined by other Celsius executives, would speak in a live online broadcast directly to Celsius customers, to whom Mashinsky referred colloquially

as the Celsius "community." Celsius then posted recordings of these AMAs to Celsius's website and YouTube channel, where they continued to be available for viewing by the public.

8.   Beginning no later than 2020, Celsius employees repeatedly raised concerns about the accuracy of Mashinsky's various misrepresentations on these AMAs.  These concerns became so widespread that by 2021 employees from multiple departments began to review the AMAs after they had aired, identify Mashinsky's false statements, and, at times, edit Mashinsky's misrepresentations out of the recorded versions of the AMAs posted to the internet.  But neither Mashinsky nor Celsius ever issued corrections to notify the public and those Celsius customers who had watched the live versions of the AMAs that certain of Mashinsky's statements were false or misleading.  And even the posted versions continued to contain misrepresentations regarding Celsius.  Likewise, video and print media interviews of Mashinsky contained misrepresentations that Celsius did not correct.

9.  Mashinsky's misrepresentations about Celsius's business created a false image of Celsius as a safe and secure place for investors to earn yield on crypto assets.  In particular, and among other things, Mashinsky represented that Celsius was profitable, when in fact it was not.  Mashinsky also claimed that Celsius's investing activities generated sufficient profits to sustain the high reward rates the company had promised customers.  In fact, as Mashinsky knew, the company's investing activities did not generate sufficient income to sustain the yields that Celsius was paying to investors, requiring the firm to raid customer deposits to deliver the earnings it promised investors.  Mashinsky also lied to Celsius's existing and prospective customers about the riskiness of Celsius's deployment strategies.  Mashinsky regularly downplayed the risks to which Celsius's customers were in fact exposing themselves, including significant losses of assets.

10.  Celsius and Mashinsky also made misrepresentations about "CEL," Celsius's own native crypto token, which Celsius launched through an initial coin offering in or about 2018.  Mashinsky falsely and publicly stated on numerous occasions that the ICO had raised $50 million. Celsius employees knew that the true number raised was approximately $32 million and reported the correct figure to potential institutional investors and Celsius's auditors but neither Celsius nor Mashinsky ever corrected Mashinsky's false statement that the ICO had raised $50 million.

11.  Mashinsky touted the CEL token and the rise in CEL token's price as an indicator of Celsius's own financial health, and encouraged the public to purchase and hold CEL token.  These claims were false and misleading.  The rise in value of the CEL token was not the product of market forces but was instead attributable to the fact that Celsius executives, including Mashinsky, had orchestrated a scheme to manipulate the CEL token by taking steps to artificially support the price of CEL.  For example, although Mashinsky publicly disclosed that Celsius was purchasing CEL as part of a weekly "buyback" program to pay customer rewards, Celsius did not disclose that, in many weeks, Celsius was secretly purchasing far more CEL token than was necessary to pay those rewards.  Those excess CEL purchases were not made for the purpose of paying customer rewards or for carrying out any legitimate business activity.  Rather, their acknowledged purpose was to artificially support the price of CEL token.  At times, Celsius used its own customer deposits to fund those excess market

purchases of CEL token in order to prop up CEL's price, without disclosing this fact to Celsius's customers and contrary to the express representations that Mashinsky and the firm made publicly that CEL buybacks were funded by the profits of Celsius's lending.

12. Despite the false and misleading positive public statements by Mashinsky, Celsius had few months in which it even earned a profit, and had sustained a number of large losses from various failed deployment strategies, which were likewise not disclosed or fully disclosed to customers.

13. By 2022, Celsius was in a dire financial situation.  When the market for crypto token prices dropped in the summer of 2022 following the collapse of the Terra ecosystem, Celsius was in such a weakened financial position that it could not meet the resulting surge in investor withdrawals.  On June 12, 2022, Celsius announced that it was halting all withdrawals from the Celsius platform, leaving thousands of Celsius customers without access to more than $4 billion in investments.