Dimitry Kirsanov
*Pro Se*
**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

_____

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.,*[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

_____

The Honorable Martin Glenn
Chief Bankruptcy Judge
United States Bankruptcy Court for the Southern District of New York
Alexander Hamilton U.S. Custom House
One Bowling Green New York, NY10004

Dear Chief Judge Glenn,

Mr Kirsanov submits a transcript as the exhibit attached, as provided by Southern District

Reporters, dated 10-11-2023 from the criminal trial United States v. BANKMAN-FRIED, in

case number 1:22-cr-00673, overseen by Judge Kaplan. I would like to bring to the court's

attention the following testimony by the former CEO of Alameda Research, Caroline Ellison, on

transcript page 818 and 819, where FTX CEO Sam Bankman-Fried and Caroline Ellison

discussed selling a couple billion dollars worth of Bitcoin if it went above $20,000.

_____

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.                    1

I verify under penalty of perjury that the foregoing is true and correct.

Executed on 10/16/2023

Sincerely,

Dimitry Kirsanov, Pro Se

/s/Dimitry Kirsanov

EXHIBIT A

ATTACHED IN PAGES BELOW

NAB1BAN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                        22 CR 673 (LAK)

5   SAMUEL BANKMAN-FRIED,

6           Defendant.               Trial
    ------------------------------x
7
                                     New York, N.Y.
8                                    October 11, 2023
                                     9:35 a.m.
9

10  Before:

11
                        HON. LEWIS A. KAPLAN,
12
                                        District Judge
13
                        APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16  BY:  DANIELLE R. SASSOON
         NICOLAS ROOS
17       DANIELLE KUDLA
         SAMUEL RAYMOND
18       THANE REHN
         Assistant United States Attorneys
19
    COHEN & GRESSER, LLP
20       Attorneys for Defendant
    BY:  MARK S. COHEN
21       CHRISTIAN R. EVERDELL
         SRI K. KUEHNLENZ
22       DAVID F. LISNER

23  Also Present:
    Luke Booth, FBI
24  Kristin Allain, FBI
    Arjun Ahuja, USAO Paralegal Specialist
25  Grant Bianco, USAO Paralegal Specialist

| | |
|---|---|
| 1 | (In open court; jury not present) |
| 2 | THE COURT:    Good morning, everyone. |
| 3 | Under the heading of old business, you will have an |
| 4 | order on the defense motion for reconsideration that was filed |
| 5 | about a week or so ago probably within a very short period of |
| 6 | time. |
| 7 | With respect to the government's application to |
| 8 | exclude evidence concerning the value of the investment in |
| 9 | Anthropic, I don't propose to rule on that until the end of the |
| 10 | direct. |
| 11 | And the defense application concerning |
| 12 | cross-examination with respect to the involvement of |
| 13 | attorneys——this being on Ms. Ellison——I'm not going to rule on |
| 14 | that until the end of the direct. |
| 15 | So I think we're ready to go.  Let's get the jury. |
| 16 | And the witness. |
| 17 | (Continued on next page) |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1          (Jury present)

2          THE COURT:    Good morning, everybody.  The jurors and

3     the defendant are present, as they have been throughout.

4          Ms. Ellison, you are still under oath.

5          And Ms. Sassoon, you may continue.

6          MS. SASSOON:    Thank you, your Honor.

7      CAROLINE ELLISON, resumed.

8     DIRECT EXAMINATION

9     BY MS. SASSOON:

10    Q.    Good morning, Ms. Ellison.

11    A.    Good morning.

12    Q.    When we left off yesterday, we were talking about May of

13    2022, and I want to pick up there.

14          MS. SASSOON:    Mr. Bianco, if you could pull back up

15    Government Exhibit 49A, which we were looking at yesterday

16    afternoon.  And if you could scroll to the second page back to

17    where it talks about your worries and questions.

18    Q.    Just to be clear, the comment bubble on the side where it

19    says Sam Bankman-Fried, "Yup, and could also get worse," who

20    wrote that?

21    A.    That was written by Sam.

22    Q.    And around this time——we could take that down——in May of

23    2022, what happened around then in the cryptocurrency markets?

24    A.    There was a——an overall downturn in the cryptocurrency

25    markets, sort of precipitated by the crash of the coin Luna,

1    but spreading to other coins in crypto as well.

2    Q.    And when you say a downturn, what does that mean?

3    A.    That means the prices of all, most——or most of all

4    cryptocurrencies went down a lot.

5    Q.    So how does that affect the value of Alameda's assets?

6    A.    It made the value of our assets go down a lot, as they were

7    mostly in cryptocurrency.

8    Q.    What about Alameda's trading positions; what happened with

9    those around this time?

10    A.    Sorry.  What's the distinction between trading positions

11    and assets?

12    Q.    Apart from coins, the trading that Alameda was doing on

13    various exchanges.

14    A.    The day-to-day trading that we were doing during this time

15    was profitable.

16    Q.    And after the value of many of Alameda's cryptocurrency

17    coins went down, what kinds of conversations, if any, were you

18    having with the defendant about Alameda's assets and balances?

19    A.    He started asking for a lot more frequent updates on

20    Alameda's positions.  I was sharing balance sheets and, yeah,

21    talking about Alameda's assets and liabilities.

22    Q.    How did the downturn in the cryptocurrency market affect

23    the billions of dollars in loans that Alameda had around this

24    time from third-party lenders like Genesis?

25    A.    They started to be recalled a bit after the market

1   downturn, so mostly starting in the middle of June.

2   Q.    So in the middle of June, when lenders were recalling

3   loans, what does it mean that they were recalling loans?

4   A.    It means that they were asking Alameda to pay the loans

5   back.

6   Q.    And under the terms of the loans, was Alameda obligated to

7   repay those loans?

8   A.    Yes, we were.

9   Q.    Why is that?

10  A.    Because the majority of our loans were open-term loans,

11  meaning that the lenders could ask for them back at any time

12  and Alameda would have to repay.

13  Q.    How did you learn about Alameda's third-party lenders

14  asking for their money back?

15  A.    A variety of sources.  Some was from messages on Slack from

16  other Alameda employees, some was from being in Telegram groups

17  or in calls directly with lenders.

18  Q.    What is Telegram?

19  A.    Telegram is a messaging platform that was widely used by

20  cryptocurrency companies.

21  Q.    Was the defendant also on some of these Telegram

22  communications with Alameda's lenders in mid-June?

23  A.    Yes, he was.

24          MS. SASSOON:    Your Honor, at this time I'd ask

25  permission to approach the witness with a few printed exhibits,

1    and I have a copy for the Court and defense counsel as well.

2              THE COURT:    Yes.  Thank you.

3    Q.    Ms. Ellison, I'm handing you Government Exhibits 1647,

4    1648, 1649, and 1650, and if you could take a look at those and

5    let me know if you recognize them.

6    A.    Yes, I do.  These are all chats with employees at Genesis.

7    Q.    And are these over Telegram?

8    A.    Yes, that's right.

9    Q.    And are these some of the chats that you mentioned a moment

10   ago having with lenders about Alameda's loans in mid-June?

11   A.    Yes, that's right.

12             MS. SASSOON:    The government offers Government

13   Exhibits 1647, 1648, 1649, and 1650.

14             MR. COHEN:    Your Honor, may we be heard at the

15   sidebar.

16             THE COURT:    Okay.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2                    MR. COHEN:    Your Honor, we have no objection to all of

3          the exhibits except as to 1647, the first one.  It's a chain,

4          Telegram chain between people from the lender and other people

5          at Alameda that Ms. Ellison was not on.  So we have no

6          objection to it being offered not for its truth, but she's not

7          part of it.

8                    THE COURT:    She seems to be on it.

9                    MR. COHEN:    But she's not in the discussion tree that

10         leads up to the question.

11                   MS. SASSOON:    May I be heard.

12                   THE COURT:    Sure.

13                   MS. SASSOON:    These were taken from Ms. Ellison's

14         phone.  She's a participant in the chat group, as is the

15         defendant, and this includes discussions asking for money back,

16         which goes to the defendant's knowledge as well as to

17         subsequent actions taken by the defendant and Ms. Ellison.

18                   MR. COHEN:    If I might, that's a response on

19         relevance, not on hearsay.  There was no foundation that

20         she——we're asking for this——

21                   MS. SASSOON:    The defendant is on the chats.

22                   THE COURT:    Is any of this offered for the truth?

23                   MS. SASSOON:    She will say that she then repaid the

24         lenders the money, but the chat itself is not necessary for the

25         truth as much as its effect on the defendant and Ms. Ellison.

NAB1BAN1                    Ellison - Direct

1              THE COURT:   So why not?

2              MR. COHEN:   Would your Honor give an instruction to

3    that effect?

4              THE COURT:   I will.

5              MR. COHEN:   Okay.  Then of course.

6              THE COURT:   Okay.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:    Government Exhibits 1648, 1649, 1650 are

3    received for all purposes.  Government Exhibit 1647 is received

4    not for the truth of statements made in it but for the fact

5    that they came to the attention of Ms. Ellison and for whatever

6    relevance they have to what she thereafter did.

7          Any objection to the instruction?

8          MR. COHEN:    No, your Honor.

9          THE COURT:    Okay.  That's the limited——

10          MS. SASSOON:    Your Honor, I would add there are other

11   participants on the chat and it's relevant to what they

12   subsequently did as well.

13          THE COURT:    I amend my statement to the jury.  That's

14   correct.

15          (Government's Exhibits 1647, 1648, 1649, and 1650

16   received in evidence)

17          THE COURT:    Okay.  Go ahead.

18          MS. SASSOON:    Mr. Bianco, please publish Government

19   Exhibit 1647.

20   BY MS. SASSOON:

21   Q.    Ms. Ellison, is that a Telegram chat?

22   A.    Yes, it is.

23   Q.    And what is the date of this Telegram chat group?

24   A.    The date of these messages is on June 13, 2022.

25   Q.    And generally who is part of this group?  I see a number of

1    names at the top, but generally who are these folks?

2    A.    These are either Alameda employees or affiliates or Genesis

3    employees.

4    Q.    And were you a participant in this chat?

5    A.    Yes, I was.

6    Q.    What about the defendant?

7    A.    Yes, he is.

8    Q.    Directing your attention to the first message on June 13,

9    2022, who is Dan Gleim?

10   A.    He was an employee at Genesis.

11   Q.    Can you please read that message.

12   A.    It says, "hey, team - for USD return, we can take USDC

13   here," and gives an address, "or send to 7955."

14   Q.    What is a USD return?

15   A.    That means that he's asking for us to return some of our US

16   dollar loans from Genesis.

17   Q.    And that string of letters and numbers, what is that?

18   A.    That's a cryptocurrency address.

19            MS. SASSOON:    If we could turn to page 2, Mr. Bianco.

20   Q.    And can you read the top message from Matt Ballensweig.

21   Who is Matt Ballensweig?

22   A.    He was the head of lending at Genesis.

23   Q.    If you could read that.

24   A.    It says, "hey, guys - seeing a fair amount of continued

25   outflows from retail deposit aggregators, so to get ahead of

1    this, we're going to increase the OT loan pullback to

2    $400 million. Can you please let us know once the first batch

3    and second batch are sent. Do we have an ETA on the first

4    250 million?"

5    Q.    What is an OT loan?

6    A.    That refers to open-term loans, so these are loans that

7    Genesis could call from us at any time.

8    Q.    And what is an OT loan pullback to 400 million?

9    A.    That means they're asking in this message for us to return

10    $400 million of our open-term loans with them.

11    Q.    And was this one of the loans that Alameda was obligated to

12    repay, if asked?

13    A.    Yes, it was.

14    Q.    Taking this down, did you get similar messages from other

15    lenders around this time?

16    A.    Yes, we did.

17            MS. SASSOON:    And Mr. Bianco, if you could publish

18    Government Exhibit 1648.

19    Q.    Ms. Ellison, is this another message between you and some

20    individuals at Genesis?

21    A.    Yes, that's right.

22            MS. SASSOON:    And if you could zoom in, Mr. Bianco, on

23    Ms. Ellison's message at the bottom dated June 14, 2022.

24    Q.    Can you read that message.

25    A.    It says, "Just want to add, really appreciate you guys

NAB1BAN1          Ellison - Direct

1   working with us on this.  Unsurprisingly have been getting

2   loans called from everyone across the board but obviously want

3   to help you guys out assuming we can get all our other

4   obligations squared away."

5   Q.    And when you said "have been getting loans called from

6   everyone across the board," what are you referring to?

7   A.    I'm referring to our open-term loans with other lenders.

8   Q.    And what was happening with those?

9   A.    They were getting called in addition to the Genesis loans.

10              MS. SASSOON:    We can take that down.

11  Q.    What was your reaction to third-party lenders all asking

12  for their money back around the same time in mid-June?

13  A.    I was very stressed out, and we were talking about billions

14  of dollars, and I knew that Alameda had lost a lot of money in

15  the cryptocurrency market downturn and we didn't have the

16  liquid assets to pay all of the money back and that we would

17  have to be taking money from FTX.

18  Q.    When you say "we would have to be taking money from FTX,"

19  what do you mean?

20  A.    I mean in order to repay all of our loans, we would have to

21  borrow money using our FTX line of credit.

22  Q.    And whose funds would that be?

23  A.    That would be coming from customer funds.

24  Q.    During this time did you attempt to calculate whether

25  Alameda had the ability to repay its lenders with the money

1    that Alameda had?

2    A.    Yeah, I did.  I was regularly making updated balance sheets

3    in similar calculations.

4    Q.    And what did your calculations show about whether Alameda

5    could repay its lenders?

6    A.    They showed that we did not have enough liquid assets to

7    repay all of our lenders.

8    Q.    And why didn't Alameda have enough liquid assets to repay

9    its lenders?

10    A.    Because we had used a lot of them for loans and

11    investments, and a lot of our assets had gone down in value

12    with the cryptocurrency market downturn.

13    Q.    When you say you had used some of it for loans, I just want

14    to clarify, what loans are you talking about?

15    A.    I'm talking about loans to——to Sam, Gary, Nishad, and other

16    entities owned by Sam.

17    Q.    How would you describe your mental state when you realized

18    that Alameda had billions of dollars to repay and it didn't

19    have the money?

20          MR. COHEN:    Objection.

21          MS. SASSOON:    Your Honor, her mental state is

22    relevant.

23          THE COURT:    Why isn't it, Mr. Cohen?

24          MR. COHEN:    I thought we were talking about the mental

25    state of the defendant in this case, your Honor.

1    THE COURT:    Well, we are, of course.

2    MS. SASSOON:    Your Honor, there are charges of

3    conspiring with others.

4    THE COURT:    Do you have an answer to that, Mr. Cohen?

5    MR. COHEN:    Your Honor, other than my prior objection,

6    I have nothing further on that.

7    THE COURT:    Overruled.

8    BY MS. SASSOON:

9    Q.    Ms. Ellison, I'll ask you again:  What was your mental

10    state when you realized that Alameda had billions of dollars in

11    loans to repay and that it didn't have the money?

12    A.    I was in sort of a constant state of dread at that point.

13    I——I knew that we would have to take the money from our FTX

14    line of credit and I knew that that was money that could be

15    called at any time, and every day, I mean, I was worrying about

16    the possibility of customer withdrawals from FTX and the

17    possibility of this getting out and what would happen to people

18    that would be hurt by that.

19    Q.    When you say you would have to take money from the line of

20    credit and that could be called at any time, can you just

21    explain what you meant by that, "called at any time."

22    A.    What I mean that, when we were taking money from this FTX

23    line of credit, this was coming from FTX customers, and FTX

24    customers had the ability to withdraw their money at any time,

25    so I knew that if a large number of customers decided to

1  │  withdraw their funds all at once, that FTX wouldn't have enough

2  │  money to cover that.

3  │  Q.    At this time did you share information with the defendant

4  │  that showed that Alameda did not have the money to repay its

5  │  lenders?

6  │              MR. COHEN:    Objection.

7  │              THE COURT:    Sustained.  Form.

8  │  Q.    You just described calculating Alameda's balances, which I

9  │  believe you testified showed Alameda did not have money to

10 │  repay its lenders.

11 │  A.    Yes.

12 │  Q.    Were you sharing this information about Alameda's balances

13 │  with the defendant?

14 │  A.    Yes, I was.

15 │  Q.    What did you share with him?

16 │  A.    I shared updated balance sheets whenever he asked for them

17 │  and information about things like Alameda's account balances on

18 │  FTX, which he asked for.

19 │  Q.    So was he asking for this information?

20 │  A.    Yes.

21 │  Q.    And why were the two of you sharing this type of

22 │  information around mid-June?

23 │  A.    Because, I mean, he was my boss; he was the owner of

24 │  Alameda.  This was a time of crisis for Alameda; this was an

25 │  extremely big problem for us; it was an important thing for us

1      to be discussing.

2      Q.    What did the defendant tell you to do, if anything, when

3      you showed him Alameda's balances?

4      A.    He continued to direct me to repay loans.

5      Q.    When the defendant directed you to repay loans after

6      looking at your analysis of Alameda's balances, what did you

7      understand the defendant to be telling you to do?

8      A.    I understood that he was telling me to borrow money using

9      our FTX line of credit to repay loans when they were called.

10     Q.    And when you say you understood him to be telling you to

11     use Alameda's line of credit on FTX, can you spell out what you

12     mean.

13     A.    I understood that he was telling me to use FTX customer

14     funds to repay our loans.

15     Q.    And why was that your understanding?

16     A.    Because I had shared Alameda's balance sheet information

17     with him that showed that that was the only source of capital

18     large enough to repay all of our loans.  We also had, you know,

19     had many discussions in the past about using this FTX line of

20     credit for various Alameda purposes, including discussions

21     about using it as a——a backstop if our loans were called, so

22     I——yeah, I considered that to be the most reasonable and really

23     the only option on the table.

24     Q.    So what did you do when the defendant told you to repay its

25     lenders despite Alameda's balances?

1    A.    I continued to direct the Alameda settlement team to repay

2    lenders.

3    Q.    Using what money?

4    A.    Using FTX customer assets in addition to Alameda's other

5    liquid assets that we had.

6    Q.    Over what time period did you repay Alameda's lenders?

7    A.    A lot of it was in June, and there continued to be loan

8    recalls over the next few months as well.

9    Q.    In the course of the defendant telling you to repay these

10   loans, did you also analyze Alameda's overall balances on FTX?

11   A.    Yeah, we did.

12   Q.    Why did you do that?

13   A.    Sam asked us to put together a spreadsheet showing

14   Alameda's balances on FTX.

15   Q.    You said "Sam asked us."  Who's "us"?

16   A.    Me, Gary, and Nishad.

17          MS. SASSOON:    Mr. Bianco, if you could just pull up

18   Government Exhibit 1803.  And that's already in evidence.  And

19   this can be published.

20   Q.    Who is this?

21   A.    That's Nishad.

22          MS. SASSOON:    You can take that down.

23          And now, Mr. Bianco, can you please pull up Government

24   Exhibit 50, which is already in evidence, and which the parties

25   have stipulated is a document called Alameda Balances by FTX

1    Sub dated June 13, 2022.

2    Q.    So June 13th, is that the day of the messages from Genesis

3    asking for the loans?

4    A.    Yeah, which would be the same day.

5    Q.    And what is it that we're looking at here?

6    A.    This is a spreadsheet with a few tabs that Sam asked me,

7    Gary, and Nishad to put together.  The first two tabs both show

8    Alameda's balances on various FTX accounts that we owned.

9    Q.    And this first sheet, Sheet 1, who put this together?

10   A.    That was me.

11   Q.    And just to be clear, column C, what is that showing?

12   A.    That shows the email of the account.

13   Q.    And column A?

14   A.    That's Alameda's internal name for the account.

15            MS. SASSOON:    And Mr. Bianco, can you please highlight

16   the column marked Balances and expand the sum of this column in

17   the lower right-hand corner.

18   Q.    What did you calculate was the total balance of Alameda's

19   account on FTX?  And we can wait a moment.  We'll pull that

20   back up.

21   A.    Yeah.  In this sheet the balances add up to about negative

22   $20 billion.

23   Q.    So before Alameda had repaid its lenders, this is showing

24   Alameda already owed FTX about $20 billion?

25   A.    Yes, that's what this sheet shows, but I knew that to be

1   incorrect at the time because there was a large bug in the FTX

2   fiat balances that it wasn't accounting for.

3   Q.   Let's take a look at that.  What is the FTX fiat account?

4   A.   That's the account I think I mentioned earlier where, when

5   FTX customers would deposit like US dollars into Alameda bank

6   accounts, there would be an offsetting ledger entry in an FTX

7   account.  This was that account.  So this is to track Alameda's

8   fiat liabilities to FTX.

9              MS. SASSOON:    Mr. Bianco, can you highlight row 6 of

10  this sheet.  Sorry, row 5.

11  Q.   Is that the fiat account?

12  A.   Yes, it is.

13  Q.   And what number is being shown here for the fiat account?

14  A.   Negative 19 billion.

15  Q.   And so is that the number you said was not correct?

16  A.   That's right.

17  Q.   And how did you learn it wasn't correct?

18  A.   I was told that there was a large bug in this calculation

19  of this number by Gary during a meeting with Sam, Gary, and

20  Nishad.

21             MS. SASSOON:    And Mr. Bianco, can you highlight row 6

22  of this sheet.

23  Q.   What is the FTX account?

24  A.   That was Alameda's main trading account on FTX.

25  Q.   And how much borrowing from FTX does this show on Alameda's

1    main trading account?

2    A.    It shows about $3 billion.

3    Q.    Is that through the line of credit?

4    A.    Yes, that's right.

5    Q.    And is this before Alameda had repaid all of its lenders?

6    A.    That's right.

7    Q.    So before Alameda had repaid its lenders, how much had

8    Alameda already borrowed from FTX customers through the line of

9    credit?

10   A.    About $3 billion.

11   Q.    Let's take a look at Sheet 2.  Do you recall who put this

12   sheet together?

13   A.    I think it was Gary and/or Nishad.  I'm not sure which one.

14            MS. SASSOON:    And Mr. Bianco, if you could highlight

15   rows 13 and 14.

16   Q.    What does this show about Alameda's fiat liability?

17   A.    The first row has a similar negative 19 billion as my

18   sheet, but the second row has the correction from the bug,

19   which is about $8 billion.

20   Q.    And what does this show about the size of Alameda's

21   liability to FTX customers for their dollar deposits once the

22   bug was corrected?

23   A.    It shows that it was around negative $11 billion.

24            MS. SASSOON:    Mr. Bianco, can you highlight the

25   information in columns I and J of this sheet.

1     Q.   What does this sheet show about the total liability on all

2   of Alameda's FTX accounts once fixing the bug?

3     A.   It shows that it was around negative $10 billion.

4     Q.   And did you discuss this spreadsheet with the defendant?

5     A.   Yeah, we did.

6     Q.   And so this shows that around the time that loans are being

7   recalled, Alameda owed about $10 billion?

8                 MR. COHEN:   Objection.

9                 THE COURT:   What's the objection?

10                MR. COHEN:   Leading.

11                THE COURT:   Sustained.  Answer stricken.

12    Q.   Once the figures in this spreadsheet were calculated, what,

13  if anything, did the defendant tell you to do with respect to

14  the continuation of repaying Alameda's loans?

15    A.   He directed me to continue repaying Alameda's loans.

16    Q.   And how did you continue to repay Alameda's loans?

17    A.   By taking money from various sources, including FTX

18  customer funds as well as our other liquid assets.

19    Q.   We've talked about the customer deposits in Alameda's bank

20  accounts and the line of credit.  Which of these methods was

21  used to repay Alameda's lenders in June?

22    A.   I think it was a combination of them.

23    Q.   So were you——so was Alameda using the line of credit?

24    A.   Yes.

25    Q.   And what was the other combination of methods?

NAB1BAN1                    Ellison - Direct

1    A.    I was saying I think we also used some money in bank

2    accounts as well.

3    Q.    Government Exhibit 50 has an additional tab called Balance

4    Sheet By Liquidity.

5              MS. SASSOON:    Mr. Bianco, can you please bring up

6    Tab 3.

7    Q.    Who made this tab?

8    A.    This was made by me.

9    Q.    Why did you prepare this tab?

10   A.    Sam asked me to put together some information on our

11   balance sheet and categorize it by how liquid the assets were.

12   Q.    And around when did you prepare this?

13   A.    I think it was around the same time as the first two tabs,

14   maybe a bit later.

15   Q.    On the left-hand side, is that a balance sheet for Alameda?

16   A.    Yes, that's right.

17             MS. SASSOON:    Mr. Bianco, can you zoom in on columns D

18   and E, liquid liabilities.

19   Q.    Do you see where it says "FTX borrows, 13250"?

20   A.    Yeah.

21   Q.    First of all, what number does that represent?

22   A.    That represents 13.25 billion.

23   Q.    And 13.25 billion what?

24   A.    Dollars.

25   Q.    And what are FTX borrows that correspond to this

1    $13.25 billion number?

2    A.    That represents money that Alameda was borrowing from FTX

3    customers.

4    Q.    By the way, we saw this term "FTX borrows" here and on a

5    spreadsheet we looked at yesterday.  Why did you call money

6    being taken from customers "FTX borrows" in your spreadsheet?

7    A.    I guess I wanted to strike a balance of identifying what it

8    was, but, I mean, I didn't want to say explicitly something

9    like FTX customer money.

10   Q.    And why didn't you want to say explicitly in a spreadsheet

11   FTX customer money?

12   A.    Because Sam always directed us to be careful about what we

13   put in writing and not put things in writing that might get us

14   in legal trouble.

15   Q.    And did you consider putting something like "FTX customer

16   money" in that category?

17   A.    Yeah, I did.

18   Q.    So according to this spreadsheet, at the time that you made

19   it, around mid-June, how much money had Alameda borrowed from

20   FTX customers at that point?

21   A.    Around $13 billion.

22   Q.    I want to look at another part of this spreadsheet.

23            MS. SASSOON:    And Mr. Bianco, if you could zoom in and

24   include columns G through L, rows 3 through 10, and please

25   include the column numbers, column letters.

1    Q.    Before we look at the specific numbers here, can you

2    explain what you were analyzing.

3    A.    This was analyzing the total customer assets on FTX and how

4    much of that Alameda was borrowing and how much was left on

5    FTX.

6    Q.    Sorry.  I didn't hear what you said at the end.

7    A.    Sorry.  The last part was how much Alameda was borrowing

8    and how much was left on FTX.

9    Q.    When you say "how much was left on FTX," what do you mean?

10   A.    Like how many assets FTX still held in its bank accounts

11   and in its cryptocurrency wallet.

12   Q.    So let's take this piece by piece.

13              I want to look at column G, which starts with USD.

14   What is this column?

15   A.    That column has various fiat currencies and

16   cryptocurrencies.

17   Q.    So what is USD, for example?

18   A.    US dollars.

19   Q.    And what is BTC?

20   A.    Bitcoin.

21   Q.    What about the next column, column H, which says FTX minus

22   Alameda?

23   A.    That refers to the total customer assets that had been

24   deposited on FTX, not counting Alameda's balances.

25   Q.    And so by this time how much US dollar currency had

NAB1BAN1                    Ellison - Direct

1    customers deposited on FTX?

2    A.    This was $13 billion.

3    Q.    And what about Bitcoin?

4    A.    About $3 billion.

5    Q.    Where did you get this information for your spreadsheet?

6    A.    I asked either Gary or Nishad.  I don't remember who.

7    Q.    And why would you have asked Gary and Nishad for this

8    information?

9    A.    Because it wasn't information that I had access to, but I

10   wanted to confirm that, like, their numbers lined up with my

11   numbers for how much I thought Alameda was borrowing from FTX.

12   Q.    Let's look at column I, which says "FTX."  What are the

13   numbers in this column?

14   A.    Those are the total assets that were held by FTX at the

15   time.

16   Q.    And so at the time how much US dollars, for example, had

17   customers deposited versus how much was available for them on

18   FTX?

19   A.    They had deposited $13 billion, and only $3 billion was

20   available on FTX.

21   Q.    And what about Bitcoin?

22   A.    Bitcoin, they deposited about——they had deposited

23   $2.9 billion and it was——2.17 billion was left on FTX.

24   Q.    So taking dollars as an example, if customers had deposited

25   $13 billion and 3 billion was left, what had happened to that

NAB1BAN1                    Ellison - Direct

1   remaining $10 billion?

2   A.    The other $10 billion had been borrowed by Alameda.

3   Q.    And is that reflected in this spreadsheet?

4   A.    Yes, that's in the next column, column J.

5   Q.    And so can you explain what we're looking at with these

6   negative numbers in column J.

7   A.    So column J shows how much of each currency Alameda had

8   borrowed from FTX.

9   Q.    And so using dollars as an example again, how much US

10  dollars had Alameda borrowed at that point of FTX customer

11  money?

12  A.    $10 billion.

13  Q.    And what about Ethereum?  That's the third one listed here.

14  A.    That was $800 million.

15  Q.    Column K, do you know what those percentages are?

16  A.    Yeah.  That's showing what percentage of the total FTX

17  customer assets Alameda had borrowed.

18  Q.    So let's take the example of BRZ, which is second from the

19  bottom.  What is BRZ?

20  A.    I think a stablecoin that tracks the Brazilian *real*.

21  Q.    And how much of customers' BRZ had Alameda taken off FTX?

22  A.    This spreadsheet shows it had taken a hundred percent.

23  Q.    After you put together these numbers did you calculate how

24  much money actually remained for customers in total on the FTX

25  exchange at this point in time?

1  A.   Yes, I did.

2         MS. SASSOON:   Mr. Bianco, can you zoom out and zoom in

3  on columns D and E, row 13.

4  Q.   What is this?

5  A.   That's my calculation of the total amount of money that was

6  available to FTX customers at the time, so it's saying that it

7  was $6.8 billion.

8  Q.   And when you say the total amount of money available to FTX

9  customers, what do you mean by that?

10 A.   I mean the total assets that are remaining on FTX, either

11 in its bank accounts or in its cryptocurrency wallets.

12        MS. SASSOON:   If you could zoom out, Mr. Bianco.

13 Q.   We saw in column H more than $15 billion of customer money

14 that had been deposited with FTX.  What happened to all that

15 money apart from the remaining 6.8 billion?

16 A.   It had been taken by Alameda.

17 Q.   And to be clear, is this before Alameda had repaid all of

18 its lenders?

19 A.   Yes, that's right.

20        MS. SASSOON:   Mr. Bianco, within the same sheet, can

21 you display rows 16 through 40, which are at the bottom.

22        And Mr. Bianco, can you please zoom in on rows 35 and

23 36, where it says negative 3 billion, and continue to the

24 right.

25 Q.   What are these numbers?

1    A.    These were, I mean, very rough estimates, but just my

2    attempts to estimate what was the probability of enough

3    withdrawals from FTX at one time that FTX would run out of

4    money and how that would change depending on whether Alameda

5    made or lost money.

6    Q.    And did these calculations assume all the customers

7    withdrawing their money at once or something else?

8    A.    No.  This was assuming the probability of all customers

9    withdrawing at once was pretty unlikely.

10   Q.    And is that factored into your calculations?

11   A.    Yeah.

12   Q.    And so under Alameda's current circumstances when you made

13   this spreadsheet, what did you calculate was the probability of

14   not being able to satisfy FTX customer withdrawals?

15   A.    I was guessing it was 13 percent.

16   Q.    And what if Alameda went negative by another $3 billion?

17   A.    My guess was it went up to 21 percent.

18   Q.    Did you share this spreadsheet with the defendant?

19   A.    Yeah.

20   Q.    And how did you share it with him?

21   A.    I think over Signal.

22             MS. SASSOON:    If we could zoom out and take this down.

23   Q.    This spreadsheet showed about——or you testified that this

24   showed about $6.8 billion of customer assets remaining on the

25   exchange, and you testified about your calculation of odds of

1    being unable to meet customer withdrawals.  Were those facts

2    and predictions concerning to you?

3    A.    Yeah, they were extremely concerning.  I was——yeah, really

4    worried that FTX customers would try to withdraw a bunch of

5    money at once and that we wouldn't be able to process those

6    withdrawals.

7    Q.    How did the concerns you had in mid-June compare to the

8    concerns you expressed having in May 2022 when you described

9    Alameda's leveraged position in that document to the defendant?

10   A.    I mean, they were much worse at that point.  In May 2022,

11   it was more like I was concerned that if the crypto market went

12   down that we would be in a bad situation, whereas in June 2022,

13   we were in the bad situation and I was mostly concerned that if

14   anyone would find out, everything would come crashing down.

15   Q.    So why, given all that, did you proceed to use customer

16   money to repay Alameda's lenders?

17   A.    Because——I mean, because Sam told me to and because I

18   thought that if Alameda just defaulted on its loans and went

19   bankrupt right away, that would be really bad, and if we used

20   customer money, at least there was some chance that we would be

21   able to fix things somehow, that maybe Sam would be able to

22   raise money to repay our loans.

23   Q.    What was your view at the time about whether what you were

24   doing was wrong?

25   A.    Yeah, I thought it was wrong.

NAB1BAN1                    Ellison - Direct

1    Q.    And from mid-June onward what happened to the concerns you

2    were having?

3    A.    They continued.  I mean, not——not much materially really

4    changed over the next few months.  The crypto market didn't go

5    back up and we didn't find any new sources of capital, so I

6    continued to live with the constant worry of——of people finding

7    out or of FTX customers withdrawing too much money at once.

8    Q.    We looked at a chat from June 13, 2022, with Genesis.

9    Through that week of June 13, 2022, about how much money did

10   Alameda repay to its third-party lenders?

11   A.    I think it was a few billion dollars; maybe in the ballpark

12   of 5.

13   Q.    And did that include through the use of FTX customer money?

14   A.    Yeah.

15   Q.    And over the next two months or so, about how much money

16   did Alameda repay its lenders?

17   A.    It was another few billion dollars.

18   Q.    And so was that money Alameda was borrowing on top of the

19   borrows we saw from June 13th?

20              MR. COHEN:    Objection, leading.

21              THE COURT:    Sustained.  Form.

22   Q.    How did the money, the billions of dollars used to repay

23   lenders, compare to the figures we looked at from June 13,

24   2022?

25   A.    We were continuing to repay lenders and borrow more money

1    from FTX on top of the money that we were already borrowing.

2    Q.    And who made this decision to repay Alameda's lenders

3    throughout this period with FTX customer money?

4    A.    It was Sam's decision.

5    Q.    Who oversaw the process of actually making the payments to

6    the lenders?

7    A.    I mean, I——I directed the settlement team to make the

8    payments.

9    Q.    Yesterday we looked at Government Exhibit 36, NAV minus Sam

10   coins.

11          MS. SASSOON:    And Mr. Bianco, if you could pull up

12   that exhibit, the second tab called Questions.

13   Q.    Can you remind the jury when you prepared this analysis

14   that we looked at yesterday.

15   A.    I prepared this in the fall of 2021.

16   Q.    And looking at rows 30 to 32, did this analysis include

17   what might happen in a bad market event?

18   A.    Yes, it did.

19   Q.    And did you analyze what would happen if Alameda made an

20   additional $3 billion of investments?

21   A.    Yes, I did.

22   Q.    How did this hypothetical scenario of a market downturn

23   compare to what was happening now in June of 2022?

24   A.    It was pretty similar.  There was a market downturn and we

25   had in fact made several billion dollars more of investments.

1  Q.   What did your analysis here that you shared with the

2  defendant assume about how to repay loans in that circumstance?

3  A.   It assumed that we would use customer deposits on FTX to

4  repay loans if we ran out of other liquid assets.

5  Q.   We looked at this yesterday.  Your analysis here said that

6  if you made an additional $3 billion of investments——

7             MR. COHEN:   Objection.  Asked and answered.

8             MS. SASSOON:   I didn't finish the question, your

9  Honor.

10             THE COURT:   Yes, I'm quite aware of that.  Thank you.

11             MR. COHEN:   I will withdraw the objection until the

12  question is completed.  I apologize.

13  BY MS. SASSOON:

14  Q.   Where it says "P (we can't meet that)," your analysis here

15  shows a prediction that there was a hundred percent chance of

16  not being able to repay your loans.  Was that the case in June

17  2022, after these additional venture investments?

18             MR. COHEN:   Now I'll make the objection.

19             THE COURT:   Yes, sustained.

20             MS. SASSOON:   Well, I might have to reask some prior

21  questions, your Honor, to get to the new question.

22  Q.   Can you remind us what is referenced here where it says "P

23  (we can't meet that)," a hundred percent?

24             MR. COHEN:   Same objection.

25             THE COURT:   Overruled.

1    A.    This is the probability that we would be unable to repay

2    our loans if we were called——if they were called, and at the

3    time I said that in this scenario the probability would be a

4    hundred percent.

5    Q.    Can you remind us, "this scenario," what scenario is that?

6    A.    The scenario of Alameda making $3 billion of additional

7    investments and there being a large market downturn.

8    Q.    And had Alameda made additional venture investments?

9    A.    Yeah.

10    Q.    And had the market gone down?

11    A.    Yeah.

12    Q.    But you testified that you repaid the loans.  So what

13    changed?

14    A.    The main change from this scenario that I had modeled

15    previously was that FTX had had several billion dollars more of

16    customer deposits so there was a lot more money that we could

17    take from FTX to repay the loans than I had expected.

18    Q.    In your conversations with the defendant about repaying

19    lenders, did he identify any other new sources of capital for

20    repaying loans other than new FTX customer deposits?

21    A.    No.  I mean, he talked about hypothetically raising more

22    funds for FTX or something, but he didn't identify any actually

23    existing sources of capital.

24    Q.    And just to be clear, when he talked about raising money,

25    was any money raised for FTX at the time you were repaying

NAB1BAN1                    Ellison - Direct

1   these loans?

2   A.   No.

3        MS. SASSOON:    Mr. Bianco, can you publish Government

4   Exhibit 1649.

5   Q.   What is the date of these Telegram messages with Matt

6   Ballensweig?

7   A.   These are on June 18, 2022.

8   Q.   Can you remind us, who is Matt Ballensweig?

9   A.   He was the head of lending at Genesis.

10       MS. SASSOON:    Mr. Bianco, can you please highlight or

11  zoom in on the three messages at the bottom.

12  Q.   Can you please read the message from Matt Ballensweig.

13  A.   He says, "anything you guys can provide to help show a more

14  updated view of equity/balance sheet etc. would be helpful."

15  Q.   And the next message?

16  A.   "Hey there - looking to see if we can some m2m of balance

17  sheet from you guys.  Would be helpful for us to bring more

18  capital into space."

19  Q.   What did you respond?

20  A.   I said, "makes sense, will see what I can put together."

21  Q.   What's "m2m of balance sheet"?

22  A.   "m2m" stands for mark to market, so that means our balance

23  sheet with assets valued at the current market prices.

24  Q.   When you said, "will see what I can put together," what are

25  you referring to putting together?

1    A.    A balance sheet to send to Genesis.

2    Q.    What was your reaction to getting a request from Genesis on

3    June 18th for a balance sheet at that time?

4    A.    I was very stressed out.  I thought that I——it wouldn't be

5    a good idea to ignore them, and I——I wanted to reassure them

6    about Alameda's financial state, but the facts were that

7    Alameda was in a very bad situation that we were——had very

8    risky positions on and that we had been borrowing increasing

9    amounts of money from FTX customers, and I didn't want Genesis

10    to know any of that.

11    Q.    Did you discuss your concerns with the defendant?

12    A.    Yes, I did.

13    Q.    And at first where did you discuss your concerns with him?

14    A.    In a group meeting with him, Gary, and Nishad.

15    Q.    Where was that meeting?

16    A.    It was——I don't remember if it was in the office or in our

17    apartment.

18    Q.    And where were you living at that time?

19    A.    In the Bahamas.

20    Q.    And did he sometimes have work meetings in your apartment?

21    A.    Yeah.

22    Q.    What was discussed at the meeting?

23    A.    We discussed Alameda's most recent balance sheet, and I

24    asked what I should say to Genesis, and Sam gave some

25    suggestions.

NAB1BAN1                    Ellison - Direct

1    Q.    What kinds of suggestions did the defendant give you about

2    Alameda's balance sheet?

3    A.    He suggested that the people in that meeting could give our

4    personal Serum tokens to Alameda to put on the balance sheet

5    and that we could put his holdings of FTX equity in the Paper

6    Bird entity on the balance sheet.

7    Q.    If you followed the defendant's suggestions, what effect

8    would that have on the balance sheet?

9    A.    It would make our assets look larger.

10   Q.    After this meeting what did you do?

11   A.    I went back and prepared a balance sheet.

12   Q.    And did you make changes to the balance sheet?

13   A.    Not initially.  Initially I just prepared a——a——yeah,

14   normal balance sheet.

15   Q.    And what did you do then?

16   A.    I sent it to Sam and said, *This is our balance sheet, I*

17   *think it looks bad, I don't think we can send this to Genesis.*

18   *Do you agree?*  And he said, *Yeah, that sounds right*.

19   Q.    Why did you think the balance sheet looked bad and couldn't

20   send it to Genesis?

21   A.    Overall it showed that Alameda was in a very risky

22   position.  It showed that we were borrowing, you know, around

23   $10 billion from FTX, and that we had about $5 billion of loans

24   to FTX executives and to affiliated entities.

25   Q.    Just to be clear, why did you care what Genesis thought of

1    your balance sheet?

2    A.    I didn't want them to recall the rest of our loans.  I was

3    also worried that they would share the information with other

4    people in the crypto markets and that might cause more

5    widespread concern about Alameda and could even cause people to

6    start withdrawing their money from FTX.

7    Q.    And so at this time did Alameda still have some loans from

8    Genesis?

9    A.    Yeah, we did.

10   Q.    So when you shared the balance sheet with the defendant,

11   how did you share it with him?

12   A.    Over Signal.

13   Q.    And when the defendant agreed with you that the balance

14   sheet didn't look good, what happened next in the conversation?

15   A.    He suggested that I should prepare some alternative ways of

16   presenting the information and send them to him.

17   Q.    And when the defendant told you to come up with alternative

18   ways of presenting the information in your balance sheet, what

19   did you understand that to mean?

20   A.    I understood him to be directing me to come up with ways to

21   conceal the things in our balance sheet that we both thought

22   looked bad.

23   Q.    So what did you do?

24   A.    I prepared a spreadsheet with seven different alternative

25   balance sheets that we could send.

1    Q.   And what was the goal of preparing seven different balance

2    sheets?

3    A.   I wasn't sure what the best thing to send to Genesis would

4    be.  I didn't really want to be dishonest, but I also didn't

5    want them to know the truth, so I just thought I'd prepare a

6    variety of things and ask Sam what he wanted to do.

7    Q.   What kinds of alterations were you making to the balance

8    sheet in these various alternatives?

9    A.   Some were doing things like combining categories so that it

10    wasn't obvious that some of our assets were being used as

11    collateral or combining FTT with other cryptocurrencies; other

12    tabs were netting out assets against liabilities to make our

13    overall leverage and risk look lower.

14           MS. SASSOON:    Mr. Bianco, can you show the witness

15    what's been marked as Government Exhibit 44.

16    Q.   Do you recognize this?

17    A.   Yes, this is the spreadsheet I was just talking about with

18    the seven alternatives.

19           MS. SASSOON:    The government offers Government

20    Exhibit 44, which the parties have stipulated is a document

21    called Rough Balance Sheet 6/20/22, and is dated June 19, 2022.

22           MR. COHEN:    No objection.

23           THE COURT:    Received.

24           (Government's Exhibit 44 received in evidence)

25           MS. SASSOON:    Mr. Bianco, if you could bring up

1   Government Exhibit 44 for the jury.

2   BY MS. SASSOON:

3   Q.    And right now we're on the first tab called "main."  And

4   before we look at each tab, or some tabs, what is this

5   spreadsheet overall?

6   A.    This spreadsheet, the main tab is our——the sort of initial

7   balance sheet that I prepared, and then the other tabs are the

8   seven alternatives that I came up with at Sam's direction.

9   Q.    So this main tab, is this an internal version of Alameda's

10  balance sheet?

11  A.    Yes, that's right.

12  Q.    And is this the one you were concerned about sharing with

13  Genesis?

14  A.    That's right.

15            MR. COHEN:    Objection.  Leading.

16            THE COURT:    Sustained.

17  Q.    How does this tab relate to the balance sheet you were just

18  talking about?

19  A.    This is the same balance sheet I was just talking about

20  that I sent to Sam and I said I was concerned with——about

21  sharing with Genesis.

22  Q.    Where it says at the top, in column B, "all numbers in

23  millions," what does that mean?

24  A.    That means all of the numbers here are in millions.  For

25  instance, the bank balances, when it says 525, that means

1    $525 million.

2    Q.    And how, if at all, is the money that Alameda had used from

3    FTX customers that you testified about reflected on this

4    balance sheet?

5    A.    It's in the liabilities section under "exchange borrows."

6    Q.    And so for "exchange borrows," what's the total there?

7    A.    $9.9 billion.

8    Q.    And so what does that $9.9 billion represent?

9    A.    That means that Alameda had borrowed $9.9 billion from FTX

10    customers.

11    Q.    How did you feel about having $9.9 billion of money that

12    Alameda had used from FTX on your balance sheet?

13            MR. COHEN:    Objection.

14            THE COURT:    Ground?

15            Ground?

16            MR. COHEN:    Oh, I'm sorry.  Leading.

17            THE COURT:    Overruled.

18    A.    Sorry.  Could you ask the question again.

19    Q.    Yes.  How did you feel about having $9.9 billion of borrows

20    from FTX customers on Alameda's balance sheet?

21    A.    Not good.  I mean, I think it——it made it clear that

22    Alameda was in a risky situation because if customers tried to

23    withdraw those funds, then we wouldn't be able to pay them

24    back.  It also made FTX look very bad if this got out, and

25    people would be concerned about keeping their money on FTX.

1    Q.    Looking at this balance sheet, "exchange borrows" is in row

2    5, which is the row for liquid liabilities.  Why is the money

3    Alameda owes to FTX customers categorized as a liquid

4    liability?

5    A.    What I meant by that was that these were loans that could

6    be called at any time, so the open-term loans are liquid

7    liabilities because the lenders could call them at any time,

8    and similarly, the exchange borrows could be withdrawn by FTX

9    customers at any time.

10   Q.    So you referenced the open-term loans.  Is that the number

11   beneath "exchange borrows"?

12   A.    Yes, that's right, where it says "OT loans."

13   Q.    So at this point in time how much money in loans did

14   Alameda still have from third parties?

15   A.    We had $1.8 billion in open-term loans remaining and

16   $2.9 billion in fixed-term loans.

17   Q.    You mentioned fixed-term loans.  That's in row 17, which is

18   categorized as long-term liabilities.  What's the difference

19   between the liquid liabilities and the long-term?

20   A.    Long-term liabilities were liabilities that we wouldn't

21   have to ever pay back right away, so the fixed-term loans were

22   typically terms of around three months, that we would have

23   three months before we needed to pay them back.

24   Q.    On the assets side of this balance sheet, there's also

25   categories of liquid assets and long-term assets.  Why does the

NAB1BAN1                    Ellison - Direct

 1 | balance sheet distinguish between liquid assets and long-term

 2 | assets?

 3 | A.   Liquid assets were things that we could sell easily, they

 4 | were things that were, like, publicly traded on exchanges,

 5 | whereas the long-term assets were, like, private investments,

 6 | things that we would have to, you know, go out and find a buyer

 7 | for that we couldn't just sell on an exchange.

 8 |              MS. SASSOON:    Mr. Bianco, if you could highlight

 9 | column C, rows 5 through 10, which is the liquid assets, and

10 | expand the sum in the lower right-hand corner.

11 | Q.   What does this balance sheet show was the total of

12 | Alameda's liquid assets at the time?

13 | A.   It shows the total was around 7 billion, though even the

14 | liquid assets category here is including FTT, which was not

15 | actually very liquid, so 7 billion is probably an

16 | overstatement.

17 | Q.   Can you explain why $7 billion, in your view, overstated

18 | Alameda's liquid assets.

19 | A.   Because the liquid category contains $3 billion of FTT, and

20 | if you tried to sell that $3 billion of FTT, you wouldn't be

21 | able to get anything close to $3 billion, so if we wanted to

22 | use it to repay loans, we wouldn't——we wouldn't actually get

23 | $3 billion from them.

24 | Q.   So in an event that all of FTX's customers wanted to

25 | withdraw their money, what does this balance sheet show about

NAB1BAN1                    Ellison - Direct

1   whether Alameda had the money to meet those withdrawals?

2   A.   It shows that we did not.

3   Q.   And why is that?

4   A.   Because there's $9.9 billion that we're borrowing from FTX

5   and less than 7 billion——maybe more like 5 billion——of liquid

6   assets that we could use for those withdrawals.

7   Q.   I want to zoom out.

8            You'll see here that there's a liquid category for

9   assets and then there's a category called collateral, and both

10  categories have FTT.  Can you explain the difference between

11  the liquid FTT and the collateral FTT.

12  A.   Yeah.  Liquid FTT was FTT that we were just holding on

13  exchanges or in wallets.  The collateral FTT was being used to

14  collateralize our third-party loans.

15  Q.   So the assets listed here under collateral, would those

16  have been available to pay FTX customers?

17  A.   No.  Those were being held by our lenders in wallets that

18  we couldn't access.

19            MS. SASSOON:    Mr. Bianco, could you zoom out again and

20  show the entire main sheet.

21  Q.   Do you see——I want to focus now on row 17, where it says

22  "long-term assets related party loans," and it says, 4591.

23            MS. SASSOON:    And Mr. Bianco, if you could highlight

24  that.

25  Q.   First of all, 4591, what's that number?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.    That means $4.591 billion.

2    Q.    And so what does that $4½ billion number represent?

3    A.    That represents our related-party loans, so that's loans to

4    Sam, Gary, Nishad, and other entities that are related to

5    Alameda or owned by Sam.

6    Q.    And in preparing the balance sheet that Genesis had asked

7    for, how did you feel about having about $4.5 billion in

8    related-party loans on your balance sheet?

9    A.    Not good.  I thought that it made it clear that Alameda was

10   in a risky situation because these loans weren't loans that we

11   could easily call if we needed them to repay our other loans,

12   and it also might make it look like Alameda was effectively

13   giving or funneling money to FTX executives.

14   Q.    And you touched on this, but did you view these loans as

15   available assets to repay what Alameda owed FTX customers?

16   A.    No, I did not.

17   Q.    Why?

18   A.    Because I knew that they had been invested in various

19   things, meaning that the, you know, the people or entities that

20   had gotten the loans didn't have the cash on hand to repay.

21   Q.    Let's zoom out and look at the bottom.

22         What does this show about Alameda's total liabilities

23   at the time?

24   A.    It shows our total liabilities are around $15 billion.

25   Q.    And let's look at the total assets.  What are those?

1    A.    Around $21 billion.

2    Q.    What was your view on whether Alameda could actually sell

3    all the assets listed here and raise $21 billion?

4    A.    I didn't think that we would be able to do that unless

5    there was a, you know, significant change, like the

6    cryptocurrency market went up a lot.

7    Q.    And why didn't you think you could liquidate these assets

8    for $21 billion?

9    A.    Because a lot of them were not very liquid, meaning that if

10   you tried to sell a bit, the price would go down a lot; a lot

11   of them were, you know, privately held, meaning that it would

12   be somewhat hard to find buyers.

13   Q.    Looking at the bottom, what is the total NAV calculated for

14   Alameda?

15   A.    $6.1 billion.

16   Q.    And can you remind us, what is NAV?

17   A.    It stands for net asset value, so that means the total

18   value of our assets minus the total value of how much we owe.

19   Q.    So if this is showing a NAV of positive $6 billion, why

20   didn't you want to share this with Genesis?

21   A.    Because it showed that a lot of what was making up that

22   positive NAV was FTT and other illiquid assets, and it showed

23   that Alameda was very exposed to the market and borrowing a lot

24   from FTX.

25            MS. SASSOON:    We can zoom out.

1    Q.    We've looked at this main tab, which you said was the

2    internal version.  I see seven alternative tabs.  What were you

3    trying to do in each of those seven alternative tabs?

4    A.    I was trying to come up with different ways to create the

5    balance sheet so that it would look better for our lenders.

6    Q.    And whose idea was that?

7    A.    It was Sam's.

8    Q.    How did the defendant communicate that to you?

9    A.    He said something like, why don't you come up with some

10   alternative ways of presenting the information in the balance

11   sheet and send them to me.

12   Q.    Which alternative, if any, was selected to share with

13   Alameda's lenders?

14   A.    Sam said that we should use alternative 7.

15   Q.    So let's look at alternative 7.

16           MS. SASSOON:    And Mr. Bianco, if you could bring up

17   the tab labeled alternative 7.

18   Q.    Is there any line item in this alternative selected by the

19   defendant for FTX customer money or FTX borrows used by

20   Alameda?

21   A.    No, there is not.

22   Q.    Is there any line item on this alternative for

23   related-party loans of $4½ billion?

24   A.    No.

25   Q.    So in this spreadsheet what happened to the $9.9 billion

1    that Alameda owed to FTX customers?

2    A.    Some of it was netted against the related-party loans

3    number and the rest was put in the long-term loans category.

4    Q.    So you said some of the money Alameda owed FTX customers

5    was netted against the related-party loans.  Can you explain

6    what you meant by that.

7    A.    Yeah, that means that I deleted the related-party loans and

8    I also subtracted the same amount of money from the FTX borrows

9    so that our NAV would remain the same but our total assets and

10    total liabilities would both get lower.

11    Q.    And you said some of the money Alameda owed to FTX

12    customers was moved to the long-term loans category?

13    A.    Yes, that's right.

14            MS. SASSOON:    So Mr. Bianco, can you highlight that in

15    row——highlight all of row 17, please.

16    Q.    So first of all, why is the $8.2 billion in loans no longer

17    labeled "exchange borrows" or "FTX borrows"?

18    A.    Because I didn't want Genesis or others to know that

19    Alameda was borrowing a lot of money from FTX.

20    Q.    And why has that amount of money been moved from the liquid

21    liability category to a long-term loan?

22    A.    Because when it was in the liquid liabilities category, it

23    was clear from looking at our balance sheets that our balance

24    sheet——that if all of our, you know, liquid liabilities were

25    called, meaning that if all of the loans that could be called

1    immediately were called, that we wouldn't have enough assets to

2    repay them, and so moving it to long-term loans makes it look

3    like we're in a safer position.

4    Q.    You said moving it here makes it look like you're in a

5    safer position.  Was labeling the money Alameda owed to FTX

6    customers a long-term loan accurate?

7    A.    No.

8    Q.    Why not?

9    A.    I mean, because there were no official terms that I was

10    aware of for this loan, but FTX customers could try to withdraw

11    the money at any time with, you know, few restrictions.

12    Q.    What effect, if any, did moving the debt to FTX customers

13    into the long-term loan category have on conveying the risk

14    associated with that money that Alameda owed?

15    A.    It made it look like the loan was safer than it actually

16    was.

17    Q.    You've also relabeled this debt from borrows to loans.

18    Were you aware of any loan terms for this money that Alameda

19    had taken from FTX customers?

20    A.    No, I wasn't.

21    Q.    Were you aware of any customers agreeing to loan out their

22    money in this fashion?

23    A.    No.

24    Q.    You said that you——we can zoom out——that you netted this

25    number in part against the related-party loans.  Did it make

1   sense to treat the related-party loans as an offset to the

2   money that Alameda owed to FTX customers?

3   A.   No, because the loans weren't something that we could get

4   back easily so it wasn't something that we could easily use to

5   repay FTX customers if we needed to.

6   Q.   I think you said that ultimately the NAV here is the same

7   as in the main tab.  Was that your testimony?

8   A.   Yes, that's right.

9   Q.   So if the NAV of 6 billion is the same, what was the

10   overall intended effect of the changes you just talked about?

11   A.   The intended effect was to make Alameda look less risky

12   than it really was and to hide the fact that we were borrowing

13   around $10 billion from FTX customers.

14          MS. SASSOON:   Mr. Bianco, I want to compare the main

15   tab with alternative 7 from Government Exhibit 44, so can you

16   bring them up side by side.

17   Q.   We have the main tab on the left and alternative 7 on the

18   right.  How did the total liabilities compare in each of these

19   balance sheets?

20   A.   The liabilities go down from around $15 billion in the main

21   tab to around $10 billion in alternative 7.

22   Q.   And what was the intended effect of reporting overall lower

23   liabilities?

24   A.   To make Alameda look less risky.

25   Q.   It looks to me like the liquid assets are the same; is that

1     right?

2     A.     Yes, that's right.

3     Q.     What about the liquid liabilities?  How did they compare in

4     each of these?

5     A.     The liquid liabilities are much lower in alternative 7.

6     It's only $1.8 billion compared to $12 billion.

7     Q.     So if a lender looked at the alternative 7 balance sheet,

8     what's conveyed here about whether Alameda had liquid assets to

9     cover its liquid liabilities?

10                  MR. COHEN:     Objection.

11                  THE COURT:     Sustained, form.

12    Q.     In alternative 7, what is conveyed about whether Alameda

13    had the liquid assets to cover its liquid liabilities?

14    A.     Alternative 7 makes it look like we had plenty of liquid

15    assets to cover our open-term loans.

16    Q.     Was that true?

17    A.     No.

18    Q.     Why not?

19    A.     Because as you can see in the more accurate main tab, we

20    had around $12 billion of liquid liabilities and more like 3 to

21    $7 billion of liquid assets.

22    Q.     You testified that you sent this to the defendant over

23    Signal.  What, if anything, did you say when you sent this to

24    the defendant by Signal?

25    A.     I said, *Here are some alternative presentations I came up*

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    *with for the balance sheet*, and I explained roughly what I did

2    in various tabs.

3    Q.    And in substance, how did you describe what you had done in

4    alternative 7?

5    A.    I said I had netted out the exchange borrows against the

6    related-party loans and then moved the rest to the long-term

7    loans category.

8    Q.    What did the defendant say?

9    A.    He said that alternative 7 looked good and that I should

10    send that one to Genesis.

11    Q.    Once the defendant chose alternative 7, what did you do?

12    A.    I sent it to Genesis.

13    Q.    Why did you send it to Genesis?

14    A.    Because Sam directed me to; because Genesis was asking for

15    a balance sheet, and I needed to send something.

16            MS. SASSOON:    Mr. Bianco, can you publish Government

17    Exhibit 1650.

18    Q.    What's the date of this Telegram message between you and

19    Matt Ballensweig at Genesis?

20    A.    This is on June 20, 2022.

21    Q.    Looking at the first two messages, the second one says,

22    "here you go," and above that there's a link.  What is that

23    link?

24    A.    The link is to the——a Google Doc of the balance sheet that

25    I sent them.

NAB1BAN1                          Ellison - Direct

1    Q.    What did Matt Ballensweig respond?

2    A.    He said, "Thanks so much.  Appreciate it.  Just caught up

3    with Sam, by the way.  Let's keep in tight comms this week."

4                THE COURT:    There are people who don't have any idea

5    what a Google Doc is, and it might be useful for the witness to

6    explain it now.

7                MS. SASSOON:    Thank you, your Honor.

8    Q.    Ms. Ellison, can you explain what a Google Doc is.

9    A.    Yeah.  So a Google Doc is a document or a spreadsheet

10   that's kept on your Google account, so it's accessible online,

11   and it can be shared with people and edited and commented on by

12   other people online.

13   Q.    Let's go to page 2.

14                Can you read the first message on this page from Matt

15   Ballensweig?

16   A.    It says, "hey there - so spoke with Sam and I'm sure he

17   filled you in——wouldn't be pushing you guys here if it wasn't

18   totally necessary but we want to unwind $500 million in 250

19   clips.  If you guys can show us what that's going to cost, it

20   would be helpful, but we're basically in that position where

21   this is no longer a luxury."

22   Q.    What does it mean to unwind 500 million in 250 clips?

23   A.    That meant he wanted us to repay $500 million of our loans

24   in $250 million at a time.

25   Q.    And what's your understanding, if any, of the role that the

1    balance sheet played in that request?

2    A.    I'm not aware that it played any specific role.  He told me

3    that it was because of recalls that they were getting on their

4    end.

5    Q.    Can you just explain what you mean by recalls that Genesis

6    was getting on their end.

7    A.    It meant Genesis was——the money that they were lending us,

8    they were borrowing from others, including retail lending

9    platforms, and customers were withdrawing their money from

10   those platforms, so Genesis had to have a way to fulfill those

11   withdrawals, and that's why they needed their money back from

12   us.

13   Q.    This refers to speaking with Sam.  What, if anything, did

14   the defendant tell you about his call with Matt Ballensweig?

15   A.    He told me that he talked to Matt and that Matt said that

16   Genesis really needed the money and implied that they might go

17   under or have to default on some loans if they didn't get it,

18   so he said that we should make that happen but show them a

19   reasonable price for it.

20          MS. SASSOON:    Mr. Bianco, can you show the witness

21   what's been marked as Government Exhibit 17.

22   Q.    Do you recognize this?

23   A.    Yeah.

24   Q.    What is it?

25   A.    This is the balance sheet that I ended up sending to

1    Genesis.

2                    MS. SASSOON:    The government offers Government

3    Exhibit 17, which the parties have stipulated is a document

4    called Rough Balance Sheet, June 19, 2022, dated June 19, 2022.

5                    MR. COHEN:    No objection.

6                    THE COURT:    Received.

7                    (Government's Exhibit 17 received in evidence)

8                    MS. SASSOON:    And Mr. Bianco, can you please publish

9    Government Exhibit 17.

10   BY MS. SASSOON:

11   Q.    Ms. Ellison, what is this balance sheet?

12   A.    This is the balance sheet that I sent to Matt Ballensweig

13   at Genesis.

14   Q.    And this is the document you shared via Google Docs?

15   A.    That's right.

16                   MS. SASSOON:    And Mr. Bianco, let's bring this up,

17   Government Exhibit 17, side by side with alternative 7 from

18   Government Exhibit 44.

19   Q.    Just to orient you, on the left-hand side we have

20   Government Exhibit 17, which you said was the balance sheet you

21   sent to Genesis, and on the right-hand side we have alternative

22   7.  How did these two documents compare?

23   A.    They're the same.

24   Q.    Did the balance sheet sent to Genesis identify that Alameda

25   had borrowed billions of dollars from FTX customers?

1    A.    No.

2    Q.    And how did the total liabilities on this balance sheet

3    compare to the internal version of your balance sheet?

4    A.    The total liabilities on this one are only $10 billion,

5    whereas the internal one had about $15 billion.

6    Q.    Did you consider the financial information that you sent to

7    Genesis to be dishonest?

8    A.    Yes, I did.

9             MR. COHEN:    Objection.

10            THE COURT:    Overruled.

11   A.    Yes, I did consider it to be dishonest.

12   Q.    Why?

13   A.    Because it falsely stated the amounts of our actual assets

14   and liabilities, and it——it hid the fact that we were borrowing

15   $10 billion from FTX customers and made us look much safer than

16   we actually were.

17   Q.    You just testified that you sent what you thought was a

18   dishonest balance sheet to Genesis.  When you did that, did you

19   consider what you were doing was wrong?

20   A.    Yeah, definitely.

21            THE COURT:    Let's take our morning break here.

22            (Recess)

23

24

25

1          THE COURT:  Let's get the witness.

2          Ms. Sassoon, a little repetitive.

3          MR. COHEN:  Your Honor, can we have an estimate of how

4    much longer the direct will take?

5          THE COURT:  That would be a nice thing.

6          Ms. Sassoon.

7          (Jury present)

8          THE COURT:  The defendant and the jurors all are

9    present, as they have been throughout.

10          Ms. Sassoon and Mr. Cohen, come to the sidebar.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  How much longer?

3              MS. SASSOON:  I expect to finish after the lunch break

4     but before the end of the day.

5              THE COURT:  How long do you expect to be?

6              MR. COHEN:  Certainly into tomorrow, obviously.

7     Depends on how quickly it goes or not.  I'm hoping to finish by

8     Friday at the latest.

9              THE COURT:  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  You may continue.

3    Q.  Ms. Ellison, right before the break I believe you testified

4    that you thought sending the dishonest balance sheet to Genesis

5    was wrong.

6              Do you recall that?

7    A.  Yes, I do.

8    Q.  In the course of working with the defendant, did he talk to

9    you about the ethics of lying and stealing?

10   A.  Yeah.  He said that he was a utilitarian, and he believed

11   that the ways that people tried to justify rules like don't lie

12   and don't steal within utilitarianism didn't work, and he

13   thought that the only moral rule that mattered was doing

14   whatever would maximize utility, so essentially trying to

15   create the greatest good for the greatest number of people or

16   beings.

17   Q.  What did he say about how lying or stealing fit into that?

18   A.  He said he didn't think rules like don't lie or don't steal

19   fit into that framework.

20   Q.  How, if at all, did the defendant's expressed attitude

21   about lying and stealing affect you?

22   A.  I think it made me more willing to do things like and steal

23   over time.  When I started working at Alameda, I don't think I

24   would have believed if you told me that a few years later I

25   would be sending false balance sheets to our lenders or taking

1   customer money, but over time it was something that I became

2   more comfortable with when I was working there.

3           MS. SASSOON:  At this time the government offers

4   Government Exhibit 850, which the parties have stipulated is a

5   tweet from the defendant's account.

6           MR. COHEN:  No objection.

7           THE COURT:  It's received.

8           (Government Exhibit 850 received in evidence)

9           MS. SASSOON:  Mr. Bianco, can you publish the exhibit.

10  Q.  Whose tweet is this?

11  A.  This is Sam's tweet.

12  Q.  The tweet says:  Backstopping customer assets should always

13  be primary.  Everything else is secondary.

14          What does it mean to backstop customer assets?

15  A.  It means they are to ensure there are enough funds so that

16  all customers can have their assets returned.

17  Q.  This was tweeted on June 27, 2022.  With respect to FTX

18  customer assets, what had happened in the month of June before

19  this tweet?

20  A.  Alameda had taken billions of dollars of them in order to

21  repay our lenders.

22  Q.  Did you consider this tweet misleading?

23  A.  Yeah, I did.  I didn't think it lined up with Alameda's

24  behavior at the time.

25  Q.  In June of 2022, as far as you understood it, did FTX have

1   sufficient funds to backstop customer assets?

2   A.  No, not at all.

3   Q.  Why not?

4   A.  Because Alameda had borrowed several billion dollars of

5   them.

6   Q.  Have you heard the term segregating customer assets?

7   A.  Yeah.

8   Q.  What do you understand that to mean?

9   A.  To mean keeping customer assets separate from other types

10  of assets, like things that you have on your company's balance

11  sheet.

12  Q.  Focusing for a moment on Alameda's North Dimension bank

13  account, did FTX or Alameda segregate customer assets that were

14  deposited into that Alameda bank account?

15  A.  No, we did not.  They were commingled with Alameda's own

16  funds.

17  Q.  After Alameda repaid some of its lenders in June of 2022,

18  what, if any, third-party loans did Alameda have left?

19  A.  We still had maybe a ballpark of $4 billion of third-party

20  loans at that time.

21  Q.  Who are the largest remaining lenders?

22  A.  I believe they were Genesis, BlockFi, and Voyager.

23  Q.  Do the names Ledn and Maple mean anything to you?

24  A.  Yes.  Those were other smaller lenders.

25  Q.  And those other smaller lenders, were they loaning to

NABMBAN2                          Ellison - Direct

1   Alameda after June?

2   A.   Yes, that's right.

3   Q.   Did you continue to share information with the defendant

4   about Alameda's balance sheet after June of 2022?

5   A.   Yes, I did.   I gave him regular updates.

6   Q.   And after June, did you continue to send balance sheets to

7   Alameda's remaining lenders?

8   A.   Yes, I did.

9   Q.   How often were you preparing and sending external balance

10  sheets?

11  A.   Typically, I would have done it about once a quarter.   In

12  2022, I started doing it more often, as lenders were asking for

13  more frequent updates, so I think I was sending them often,

14  once a month or more.

15  Q.   And how, if at all, was Alameda's use of FTX customer money

16  accounted for on balance sheets that you prepared for your

17  lenders after mid June of 2022?

18  A.   It was not disclosed.   Some of it was netted against

19  Alameda's related-party loans and the rest of it was put in a

20  more general loans or long-term loans category.

21  Q.   Would this be similar to what we saw in alternative 7?

22  A.   Yes, that's right.

23       MS. SASSOON:   Your Honor, permission to approach the

24  witness with a few exhibits, and I have copies for defense and

25  the Court.

1              THE COURT:  Yes.

2   Q.  I'm handing you Government Exhibits 418, 419, and 460, if

3   you can take a look and tell me if you recognize these.

4   A.  Yes, I do.

5   Q.  Generally, what are these?

6   A.  These are some of the balance sheets that I prepared and

7   sent to lenders during this time period.  So one of them is

8   from June 30 of 2022 and two are from September 30 of 2022.

9              MS. SASSOON:  The government offers Government

10  Exhibits 418, 419, and 460.

11             MR. COHEN:  No objection.

12             THE COURT:  They are received.

13             (Government Exhibits 418, 419, and 460 received in

14  evidence)

15  Q.  I am not going to review these with you line by line.  I am

16  just going to ask you a few questions.

17             Do you consider these balance sheets dishonest?

18  A.  Yes, I do.

19  Q.  How so?

20  A.  Because the money that we were borrowing from FTX is --

21  some of it is netted against the related party loans, making

22  both our assets and our liabilities look smaller than they

23  actually are, and the rest of just put in the loans category.

24  Q.  Do these balance sheets disclose Alameda's borrowing from

25  FTX customers?

NABMBAN2                              Ellison - Direct

1   A.  No, they do not.

2   Q.  Did Alameda's borrowing relationship with Genesis continue

3   past June?

4   A.  Yes, it did.

5   Q.  And what happened with some of Alameda's remaining loans

6   with Genesis?

7   A.  Some of its fixed-term loans were Genesis asked us to repay

8   them, and we did.

9   Q.  Did you discuss that with the defendant?

10  A.  Yes, I did.

11  Q.  How did you repay them?

12  A.  By taking more FTX customer assets.

13  Q.  Did you continue to prepare internal versions of Alameda's

14  balance sheet?

15  A.  Yes, I did.

16        MS. SASSOON:  Mr. Bianco, can you show the witness

17  Government Exhibit 19.

18  Q.  Is this one of those internal balance sheets?

19  A.  Yes, it is.

20        MS. SASSOON:  The government offers Government Exhibit

21  19, which the parties have stipulated is a document titled:

22  Balance sheet, 9/1/22, dated September 1, 2022.

23        THE COURT:  Received.

24        (Government Exhibit 19 received in evidence)

25        MS. SASSOON:  Mr. Bianco, if you could publish

1    Government Exhibit 19.

2    Q.  I will just ask you a few questions about this balance

3    sheet.  When is this balance sheet from?

4    A.  This is from September of 2022.

5    Q.  And was this an internal balance sheet or one that was

6    shared with third parties?

7    A.  It was internal.

8    Q.  How do you know that?

9    A.  Because it has the line FTX borrows, which isn't something

10   that I would have shared with third parties.

11   Q.  Did you share this with the defendant?

12   A.  Yeah.

13   Q.  What does this show where FTX borrows in September of 2022?

14   A.  It shows that it was about $13.7 billion.

15   Q.  So what does that mean?

16   A.  That means that Alameda was borrowing around $13.7 billion

17   from FTX customers.

18   Q.  That would be around September of 2022?

19   A.  That's right.

20   Q.  A previous balance sheet we looked at had a number of 9.9

21   billion.  How did that amount of money from FTX customers that

22   Alameda had used go up to almost $14 billion?

23   A.  Some of it was used to repay some of our remaining loans.

24   I think some more was withdrawn for our trading or for

25   collateral or for further investments.

NABMBAN2                          Ellison - Direct

1    Q.  You said this was an internal balance sheet.  In row 17 I

2    don't see a line for related-party loans.  Is that accounted

3    for anywhere on this internal balance sheet?

4    A.  Yeah.  Instead of grouping all the related party loans

5    together, I separated them out into what the loans ultimately

6    were used for, so things like buying FTX equity or investments

7    in companies like GDA.

8    Q.  If you look under liabilities it says loans, 1,740.  Is

9    that $1,740,000,000?

10   A.  Yes, that's correct.

11   Q.  What loans is that referring to?

12   A.  Those are remaining open-term loans and it has a breakdown

13   of them in the next few columns, some from BlockFi, Voyager,

14   Genesis, and others.

15   Q.  Just to be clear, did you share this internal balance sheet

16   with Alameda's lenders?

17   A.  No, I did not.

18           MS. SASSOON:  You can take that down.

19   Q.  With respect to the internal dishonest version of this

20   balance sheet that you were sharing, how did you feel about

21   sharing that information that was in the external version with

22   your lenders?

23           MR. COHEN:  Objection.  Leading.

24           THE COURT:  Sustained as to form.

25   Q.  With respect to the external balance sheet that you were

NABMBAN2                     Ellison - Direct

1  sharing with lenders, how did you feel about the information

2  that was conveyed there?

3  A.  I thought it looked better than what was on the internal

4  balance sheet, but I still felt nervous about sharing it to

5  lenders and trying to avoid sharing it when possible.  I

6  thought that even though it was dishonest, it still did make it

7  clear that Alameda had a fair amount of risk on and was

8  borrowing a fair amount of money.

9  Q.  What is Celsius?

10  A.  Celsius was a crypto lending desk that went bankrupt in the

11  summer of 2022.

12  Q.  Was Alameda borrowing money from Celsius?

13  A.  Yes, we were.

14        MS. SASSOON:  Mr. Bianco, if you can show the witness

15  Government Exhibit 189 and zoom in on the top.

16  Q.  Do you recognize this?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This was an internal Signal chat about Celsius asking for

20  some of their loans to be returned.

21        MS. SASSOON:  The government offers Government Exhibit

22  189.

23        THE COURT:  Received.

24        (Government Exhibit 189 received in evidence)

25        MS. SASSOON:  Mr. Bianco, if you could publish

NABMBAN2                            Ellison - Direct

1    Government Exhibit 189.

2    Q.   What is the title of this Signal chat group?

3    A.   Celsius loan return.

4    Q.   And the first three participants are Richard Chang,

5    Caroline Ellison.  Sam Bankman-Fried.  Who is Richard Chang?

6    A.   Richard Chang was the head of our lending at Alameda.

7    Q.   I just want to read the start of the message Mr. Chang

8    wrote:  Want to follow up on Celsius a bit internally here.

9    Celsius has now, one, provided the addresses for the loan

10   returns.

11        Do you see that?

12   A.   Yes.

13        MS. SASSOON:  If we could go to the last four messages

14   of this exhibit.

15        Mr. Bianco, if you could zoom in there.

16   Q.   Can you read what the defendant wrote.

17   A.   He said:  So I think -- we don't send balance sheet.  We

18   say we'll return loans as soon as Celsius is prepared to return

19   collateral.  Otherwise we're waiting.

20   Q.   What did you say?

21   A.   I said yep.

22   Q.   Why did you agree that you should not send the balance

23   sheet to Celsius?

24   A.   Because I didn't think we would get much benefit from

25   sending the balance sheet.  It wasn't like they were going to

1  lend us any more money.  And I wanted to send it to as few

2  people as possible.

3          MS. SASSOON:  Mr. Bianco, can you show the witness

4  what's been marked as Government Exhibit 11.

5  Q.  Do you recognize this?

6  A.  Yes, I do.

7  Q.  Is this an internal balance sheet?

8  A.  Yes, it is.

9          MS. SASSOON:  The government offers Government Exhibit

10  11, which the parties have stipulated is a document titled

11  balance sheet, 10/1/22, dated October 7, 2022.

12          MR. COHEN:  No objection.

13          THE COURT:  Received.

14          (Government Exhibit 11 received in evidence)

15          MS. SASSOON:  Mr. Bianco, if you could please bring up

16  Government Exhibit 11.

17  Q.  What's the time frame of this balance sheet?

18  A.  This was another balance sheet that was made in the fall of

19  2022.

20  Q.  Did you share this with the defendant?

21  A.  Yes, I did.

22  Q.  Just to be clear, did you also share the September internal

23  balance sheet we previously looked at with the defendant?

24  A.  Yeah.

25  Q.  The title of this document was balance sheet 10/1/2022.

1  What month is this balance sheet for?

2  A.   For October.

3  Q.   And it appears here that the amount of money owed to FTX

4  customers has not changed from September.  It's $13.7 billion.

5  Why is that?

6  A.   I think this was a mistake I made on the balance sheet.  I

7  copied over the number from the previous month and forgot to

8  update it.

9  Q.   What do you recall about the actual approximate amount of

10 Alameda's liability to FTX customers in October?

11 A.   I recall it being similar but getting a bit larger, maybe

12 14 to 15 billion.

13             MS. SASSOON:  I want to focus on some notations in the

14 spreadsheet that we have not seen before.  In the right-hand

15 corner there is the word plan, colon.  If we could zoom in on

16 that, Mr. Bianco, to the bottom.

17 Q.   What is this?

18 A.   These were notes I made from a conversation with Sam.

19 Q.   And this conversation with the defendant, what was it

20 about?

21 A.   It was initially about our balance sheet, and then we were

22 talking about potential plans to hedge some of our risk and to

23 get more capital.

24 Q.   Why, in the course of looking at the balance sheet, were

25 you discussing these types of plans?

1    A.   Because the balance sheet showed that we had a lot of risk

2    on and that we owed a lot of money to FTX customers, so in that

3    context it made sense to talk about ways to reduce that risk or

4    to get some money to repay.

5    Q.   Why did you take these notes inside the balance sheet?

6    A.   Because we were looking at the balance sheet when we were

7    having this discussion.

8    Q.   What did you mean by:  Plan, keep selling Bitcoin if

9    greater than 20K, maybe a couple B more?

10   A.   That was Sam's suggestion, that if Bitcoin went above

11   $20,000, we should sell up to a couple billion dollars worth of

12   it.

13   Q.   And what was the rationale?

14   A.   The rationale was to decrease our risk from further

15   cryptocurrency down moves.

16   Q.   It says beneath that:  FTX may raise.  What does that refer

17   to?

18   A.   That's referencing the fact that Sam said he would try to

19   raise capital by selling FTX equity.

20   Q.   By raising capital for FTX by selling equity, what does

21   that mean?

22   A.   That means he was going to try to sell shares in FTX to

23   people to get more money.

24   Q.   What kinds of people?

25   A.   To investors.  The primary one that he talked about at the

1  time was Mohammed Bin Salman, who is a Saudi prince.

2  Q.  How did raising money from people like a Saudi prince

3  relate to Alameda's balance sheet?

4  A.  If we were able to raise money, that that was money that we

5  could use to repay the money we had borrowed from FTX

6  customers, and it would put FTX in a safer position if

7  customers tried to withdraw a lot of money.

8  Q.  Can you explain that.  The money that Alameda owed to FTX

9  customers, you were discussing repaying how?

10  A.  By having FTX sell shares in the company.

11  Q.  So, for example, with money from Mohammed Bin Salman?

12  A.  That's right.

13         MS. SASSOON:  Mr. Bianco, can you show the witness

14  Government Exhibit 10.

15  Q.  What is this?

16  A.  This looks like an external balance sheet that I prepared

17  during this time, fall of 2022.

18         MS. SASSOON:  The government offers Government Exhibit

19  10, which the parties have stipulated is a document titled

20  external balance sheet, 10/1/2022, dated October 17, 2022.

21         MR. COHEN:  No objection.

22         THE COURT:  Received.

23         (Government Exhibit 10 received in evidence)

24         MS. SASSOON:  Mr. Bianco, if you can publish this,

25  please.

1   Q.  I believe you said this is an external balance sheet.  What

2   makes you say that?

3   A.  Because it doesn't include our FTX borrows on it.

4   Q.  So where, if at all, is the $13.7 billion that Alameda owed

5   to FTX customers reflected here?

6   A.  Some of it is netted against the related-party loans, I

7   believe some of it is also netted against the other crypto

8   category, and the rest is put in the long-term loans category.

9   Q.  Did you share this with the defendant?

10  A.  Yeah, I did.

11          MS. SASSOON:  Mr. Bianco, if you could bring up this

12  document, external balance sheet, 10/1/2022, side by side with

13  Government Exhibit 10.

14          THE COURT:  Before you do that, please, Ms. Ellison,

15  where is the reference to related-party loans?

16          THE WITNESS:  That's not on this balance sheet.

17          THE COURT:  You said some of the borrowings from FTX

18  customers were netted against other crypto and some was netted

19  against related-party loans, if I understood you correctly.

20          Did I understand you correctly?

21          THE WITNESS:  Yes, that's correct.  I think maybe on

22  the internal balance sheet from this month there might not be a

23  category called related-party loans because it was broken down

24  into several subcategories of that.

25          MS. SASSOON:  We can look at that.

1          THE COURT:  You were about to go there.  Is that

2    what's happening?

3          MS. SASSOON:  When your Honor is ready, I'll bring up

4    the two versions, the internal and the external, side by side.

5          THE COURT:  I'm ready.

6          MS. SASSOON:  This is the last spreadsheet.

7          THE COURT:  Microsoft's stock must be plunging.

8    Q.  On the left-hand side, just to orient you, we have

9    Government Exhibit 11, which I believe you testified was the

10   internal balance sheet, and on the right-hand side we have the

11   document titled external balance sheet, October 1, 2022.

12         Let's compare them.

13         MS. SASSOON:  Mr. Bianco, if you could highlight FTX

14   borrows 13.7 on the left-hand side.

15   Q.  Is there any similar line item on the right-hand side?

16   A.  No.

17   Q.  You said you netted in the right-hand side the money

18   Alameda owed to FTX customers against related-party loans.

19   Where is that information about related-party loans in the

20   internal version on the left-hand side?

21   A.  It's not specifically labeled as related-party loans, but

22   it's broken down into these several subcategories of FTX

23   equity, FTX US equity and so on.

24   Q.  How did these categories like K5, GDA relate to the

25   related-party loans?

1  A.  Those are all either parts of the related-party loans or

2  investment in equity securities.

3  Q.  Just to spell that out, is it your understanding that

4  related-party loans were spent on these types of investments?

5  A.  Yes.

6           MR. COHEN:  Objection.  Leading.

7           THE COURT:  Sustained.  Rephrase.

8  Q.  Can you explain how these categories under the long-term

9  column relate to the related-party loans, if at all?

10  A.  The related-party loans were used on these investments.

11  Q.  How did the total liabilities compare on the internal and

12  external version of the October balance sheet?

13  A.  On the internal version, it's 15.6 billion.  On the

14  external version, it's only 8 billion.

15  Q.  In the fall of 2022, what did you believe about Alameda's

16  ability to repay the $13 billion it had borrowed from FTX

17  customers?

18  A.  I believe that we had no way to repay it currently, and we

19  would either hope for the crypto market to go up or raise a

20  large amount of money by selling FTX equity, or something along

21  those lines.

22  Q.  Why was that your belief?

23  A.  Because from looking at these balance sheets, you can see

24  that the FTX borrows number is $13.7 billion and our liquid

25  assets are much less than that.

1   Q.  You have talked about concealing this debt from Alameda's

2   lenders.  As far as you know, was the debt FTX owed to Alameda

3   customers -- was the debt Alameda owed to FTX customers

4   disclosed to FTX's customers?

5   A.  Not as far as I know.

6   Q.  How would you describe your state of mind at this point,

7   when Alameda owes FTX customers about $14 billion?

8   A.  I was in a state of dread.  I was kind of thinking and

9   worrying, imagining every day about what might happen if people

10  try to withdraw too much money at one time.  I was imagining

11  all the FTX customers and lenders to Alameda, everyone that we

12  had worked with who would get hurt by this.

13  Q.  I want to take a step back.  You testified about

14  conversations you had with the defendant over Signal about the

15  alternative spreadsheet and repaying lenders.  Where did some

16  of those conversations take place?

17  A.  Sorry.  Can you repeat the question.

18  Q.  How did you generally communicate with the defendant about

19  the information you were going to share with Alameda's lenders,

20  for example?

21  A.  A lot of it was over Signal.  Some of it was in-person

22  conversations as well.

23  Q.  Do these Signal messages still exist?

24  A.  No.

25  Q.  Why not?

1   A.  Because Sam directed us to use the disappearing messaging

2   setting on our Signal, meaning that all messages we sent in

3   these conversations would disappear after seven days.

4   Q.  You said that the defendant directed you to use

5   disappearing messages.  Who is the us you're talking about?

6   A.  Employees at FTX and Alameda.

7   Q.  What, if anything, did the defendant tell you about putting

8   things in writing?

9   A.  He said that we should be very careful about what we put in

10  writing.  He had multiple like -- whole company meetings to

11  this effect.  He said that putting things in writing was one of

12  the primary ways that financial firms got in legal trouble.  He

13  said that we should think about the New York Times test,

14  meaning that anything we put in writing on Slack should be

15  something we are comfortable seeing on the front page of the

16  New York Times.  And he said that if we were going to have any

17  sort of sensitive conversations, we should have them either

18  over Signal with disappearing messages or in person or not at

19  all.

20  Q.  After the defendant sent those things, were you careful

21  about what you put in writing?

22  A.  Yeah, I was pretty careful.

23  Q.  How so?

24  A.  For things like Alameda taking FTX customer funds, it

25  wasn't something that I wrote about very much.  I did put the

 1   line item of FTX borrows on our internal balance sheet, though

 2   I sort of -- I debated a bit about whether I should or whether

 3   Sam would be upset about that, but I wanted to make sure that

 4   line was clear, so I put it on there, and Sam didn't raise any

 5   objections.  Besides that, I didn't have many explicit,

 6   especially written conversations about what we were doing.

 7           MS. SASSOON:  Mr. Bianco, can you show the witness

 8   what's marked as Government Exhibit 1659.

 9   Q.  Do you recognize this?

10   A.  Yeah.

11   Q.  What is this?

12   A.  This is the Signal chat between me and Sam.

13           MS. SASSOON:  The government offers Government Exhibit

14   1659.

15           MR. COHEN:  No objection.

16           THE COURT:  Received.

17           (Government Exhibit 1659 received in evidence)

18           MS. SASSOON:  Mr. Bianco, can you please publish this

19   exhibit.

20   Q.  What is this?

21   A.  This is the Signal chat between me and Sam.

22   Q.  What's the date that this was created?

23   A.  On March 5, 2021.

24   Q.  Can you read what it says beneath that.

25   A.  It says:  Sam Bankman-Fried set disappearing message time

NABMBAN2                          Ellison - Direct

1   to one week.

2   Q.  So for any messages between you and the defendant prior to

3   November of 2022, do those messages still exist?

4   A.  Not the Signal messages, no.

5   Q.  Before June of 2022, do you recall occasions when you and

6   the defendant spoke in coded terms about potential criminal

7   activity?

8   A.  Yeah, I do.

9   Q.  What comes to mind?

10  A.  One example is, when Alameda paid what I believe was a

11  large bribe to Chinese government officials to get some of our

12  exchange accounts unlocked.

13  Q.  Let's break that down a bit.

14        In 2021, did Alameda have trading accounts on

15  exchanges other than FTX?

16  A.  Yeah.  We had accounts on many and dozens of exchanges.

17  Q.  What are OKX and Huobi?

18  A.  Those were two exchanges that we had accounts on, both

19  based in China.

20  Q.  What happened to Alameda's trading accounts based on Huobi

21  and OKX in 2021?

22  A.  They were both frozen, meaning that the exchanges wouldn't

23  let us withdraw any money.  When we asked why, they told us

24  that they had been frozen as part of a Chinese government

25  investigation into money laundering.

1  Q.  Just to be clear, this investigation into money laundering,

2  was it an investigation of Alameda?

3  A.  No.  We were told it was an investigation of someone else,

4  but that person had traded with Alameda at some point.

5  Q.  Who was CEO of Alameda at the time that the trading

6  accounts were first frozen?

7  A.  It was Sam.

8  Q.  Just to be clear, what does it mean that the accounts were

9  frozen?

10 A.  It means we were unable to withdraw our money, and

11 eventually they prevented us from trading on the accounts as

12 well, though that was not immediately true.

13 Q.  About how much money was frozen?

14 A.  Around a billion dollars.

15 Q.  This $1 billion that was frozen in Alameda's accounts, was

16 that a substantial amount of Alameda's trading capital at the

17 time?

18 A.  Yes, it was.

19 Q.  How did the defendant react to the freezing of $1 billion,

20 approximately $1 billion of Alameda's trading capital?

21 A.  He seemed concerned and seemed to want to find ways to

22 address this problem.  He held several in-person meetings and

23 started a Signal group to discuss potential solutions.

24 Q.  Were the accounts eventually unfrozen?

25 A.  Yes, they were.

NABMBAN2                        Ellison - Direct

1    Q.  About how long did it take?

2    A.  I think almost a year.

3    Q.  What is your understanding of how the accounts were

4    unfrozen?

5    A.  My impression was that they were unfrozen by Alameda paying

6    a bribe to Chinese government officials.

7            MR. COHEN:  Move to strike.

8            MS. SASSOON:  I'll lay a foundation, your Honor.

9            THE COURT:  I am going to strike it.  And

10   notwithstanding that there was not a timely objection, I will

11   strike it.  The jury will disregard that.

12   Q.  Who were some of employees involved in the efforts to

13   unfreeze the account?

14   A.  There were several people in the meetings, including Sam,

15   me, Gary, Nishad, Constance, David Ma and Handi Yang.

16   Q.  You mentioned employees by the name of Constance, David Ma,

17   and Handi.  Why were they part of these meetings?

18   A.  They were all Chinese and had some level of connections in

19   China.

20   Q.  You said that it took about a year to unfreeze the

21   accounts.  Were there some efforts undertaken that were

22   unsuccessful?

23   A.  Yes, there were.  One is that we hired a lawyer in China

24   and had them negotiate with the Chinese government, but that

25   was unsuccessful after several months.  Another is that we used

NABMBAN2                        Ellison - Direct

1   various strategies, trading strategies, to try to move funds

2   out of our frozen accounts to other accounts.

3   Q.  What was one of those trading strategies?

4   A.  On OKX we made several accounts using the IDs of different

5   people who I believe were Thai prostitutes, and we tried to

6   basically have our main account lose money and have those other

7   accounts make money, so do very imbalanced trades between the

8   two accounts so those other accounts would be able to make

9   money and withdraw it.

10  Q.  How did you learn of the identities of these other people

11  whose accounts were used to trade?

12  A.  Ryan Salame told me about them.

13  Q.  Who is part of that conversation with Ryan Salame?

14  A.  Sam was as well.  I don't remember who else.

15  Q.  Did that work?

16  A.  No, it didn't.

17  Q.  Did there come a time when another measure to unfreeze the

18  accounts was discussed?

19  A.  Yes.  David Ma from sort -- from the early meetings had

20  been suggesting that we should try his way to unfreeze the

21  accounts.  But Sam initially said no, let's not try that yet,

22  but eventually, after enough time had passed, he changed his

23  mind and said we should try it.

24  Q.  When you said eventually he changed his mind, who are you

25  talking about?

NABMBAN2                        Ellison - Direct

1   A.  Sam.

2   Q.  Were other employees involved in these discussions where

3   David Ma suggested trying things his way?

4   A.  Yeah.  The employees that I mentioned earlier were involved

5   in the discussions.

6   Q.  And how did other employees involved in the unfreezing

7   efforts react to the suggestion of doing things David Ma's way?

8   A.  I remember Handi in particular being very upset and

9   protesting a lot and saying that she thought it was a bad idea

10  and would get us in trouble.

11  Q.  What, if any, connections did Handi have to the Chinese

12  government?

13  A.  Her father was a Chinese government official.

14  Q.  What, if anything, did the defendant do when Handi

15  expressed her opposition to trying things David Ma's way?

16  A.  At one point Handi was talking a lot and wouldn't be quiet

17  and let other people talk, even after Sam had asked her a

18  couple of times, so eventually he yelled at her to shut the

19  fuck up.

20  Q.  Had you seen the defendant react that way to employees

21  before?

22  A.  Not that often, but sometimes he would yell in sort of very

23  busy or stressful trading situations.

24  Q.  Based on what David Ma said and Handi's reaction and the

25  defendant's reaction, did you draw any conclusions about what

NABMBAN2                         Ellison - Direct

```
1    was meant by Ma's way?
2              MR. COHEN:  Objection.  Calls for speculation.
3              THE COURT:  Sustained.
4    Q.  You said that the defendant eventually changed his mind
5    about doing things Ma's way.  What, if anything, did he tell
6    you to do at that point?
7    A.  He said that we should send cryptocurrency transfers and
8    gave us the directions, or I don't remember if it was Sam or
9    David Ma in the same conversation with Sam, but one of them
10   gave us the directions of the amounts and the addresses that we
11   should send them to.
12   Q.  When you say amounts and addresses, what do you mean by
13   addresses?
14   A.  Cryptocurrency addresses, so like the address of someone's
15   cryptocurrency wallet.
16   Q.  In the context of providing you these cryptocurrency wallet
17   addresses, what did the defendant say?
18   A.  He said that Ma had found a way to get her accounts
19   unfrozen and that all we needed to do was send this money to
20   these addresses.
21   Q.  Roughly how much money did the defendant tell you to send
22   to these cryptocurrency wallet addresses?
23   A.  There were a few payments.  I don't remember the exact
24   number, but I think it was a ballpark a $100 million.
25   Q.  Around when was this?
```

NABMBAN2                        Ellison - Direct

1   A.  I think it was November of 2021.

2   Q.  Did you make the payments?

3   A.  Yes, we did.

4   Q.  When you made that payment, did you know for certain who

5   the recipient was?

6   A.  No.

7   Q.  Did you have a conclusion about who it was?

8          MR. COHEN:  Objection.

9          MS. SASSOON:  Your Honor, may we have a sidebar?

10         THE COURT:  Yeah, I think so.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. SASSOON:  Your Honor, this witness has established

3     that she engaged in criminal activity with the defendant, that

4     they spoke in coded terms, that he told her to be careful about

5     what you put in writing.  She has now described the various

6     lawful efforts or quasi lawful efforts to unfreeze the

7     accounts, the suggestion to do things Ma's way, which remained

8     coded and unexplained, the reaction of an employee -- his

9     father was a police officer -- being very upset.

10         THE COURT:  Whose father was a police officer?

11         MS. SASSOON:  Handi Yang, who is the one who the

12    defendant told her to shut the fuck up, then the defendant

13    directing her to make these payments, and I think it's pretty

14    established now that she was a trusted associate of the

15    defendant.

16         This witness also has this conduct covered in her

17    cooperation plea agreement in the immunity paragraph of her

18    plea agreement where she accepts responsibility for engaging in

19    what she believed was a bribe to the Chinese.

20         I think there is ample foundation for her to explain

21    her understanding of her own conduct, and on cross-examination

22    she can be questioned about the limits of what she actually

23    knows.

24         MR. COHEN:  Your Honor, counsel has just laid out how

25    they plan to argue these inferences from the evidentiary record

NABMBAN2                        Ellison - Direct

```
 1     that they have created, but it doesn't permit this witness to

 2     be making the kinds of speculative conclusions that have now

 3     been asked for multiple times during this testimony.

 4             THE COURT:  Well, we are dealing with an objection to

 5     a specific question.  Whatever came before pretty much came or

 6     entirely came without objection, as I remember it, but of

 7     course the record --

 8             MR. COHEN:  There have been some objections.

 9             THE COURT:  The question now is what conclusion did

10     she draw about who likely was the recipient.

11             MS. SASSOON:  There are two more documents I intend to

12     show her.  One, a document she sent to the defendant where she

13     referred to this as $150 million for the thing, and she is

14     going to explain why she called it the thing, because she

15     thought it was criminal, and another message where she is on a

16     chat with Sam Trabucco and the defendant where they are joking

17     about Handi's father putting them in jail.

18             THE COURT:  The objection to the pending question

19     about what conclusion did she reach about who was likely

20     recipient is sustained.  I am making no ruling as to what comes

21     after it.

22             MS. SASSOON:  Your Honor, do you view a question, what

23     was your understanding of the payment, or do you see those as

24     the same kind?

25             THE COURT:  I think all things considered, it's just
```

NABMBAN2                          Ellison - Direct

1    sustained.

2             MS. SASSOON:  One other thing.  Given that this is

3    being admitted under 404(b), if the defense would like a

4    limiting instruction, I just wanted to flag that.

5             MR. COHEN:  Yes.

6             THE COURT:  When you say it --

7             MS. SASSOON:  The possible bribed Chinese government.

8    We moved on this *in limine*.

9             THE COURT:  I remember, but you've all been so quiet.

10            The instruction you want in substance is that he is

11   not charged with any crime consisting in substance of payment

12   of a bribe to anyone in China and that this is offered for the

13   purpose of --

14            MS. SASSOON:  Showing a relationship of trust between

15   this witness and the defendant and evidence of possible motive.

16            THE COURT:  Any objection to that instruction?

17            MR. COHEN:  No, your Honor.

18            MS. SASSOON:  And with respect to their weighing of

19   the evidence about her testimony about coded language.

20            MR. COHEN:  That I don't think we will need a 404(b)

21   instruction.

22            THE COURT:  I think that's right.

23            (Continued on next page)

24

25

1              (In open court)

2              THE COURT:  Members of the jury, it's appropriate to

3    give you an instruction with respect to the evidence that you

4    have just been hearing about the unfreezing of the money in

5    China and some that you are about to hear.

6              The defendant is not charged in this case with any

7    crime relating to what I'll loosely refer to as a possible

8    bribe to somebody in China.  That's just not on the list of

9    charges, and you may not consider it for that purpose.  The

10   evidence is offered for more limited purposes.  It is offered

11   to demonstrate the relationship of trust and confidence between

12   the defendant and Ms. Ellison.  It is offered on the issue of

13   motive.

14             And I think I've got it all, but if I missed

15   something, anything else counsel want me to mention as to

16   proper purposes?

17             MS. SASSOON:  No, your Honor.

18             THE COURT:  Hearing nothing else, we will leave it

19   right there.  Those are the instructions.

20   Q.  Ms. Ellison, you testified about payments the defendant

21   directed you to make.  How would those relate to you?

22   A.  How was the direction relayed to me?

23   Q.  Was in person, over Signal, or some other form?

24   A.  It was over Signal.

25   Q.  Who else was part of that Signal discussion?

NABMBAN2                        Ellison - Direct

1  A.  Trabucco.  It was me, Sam, Trabucco, and I don't remember

2  if there was anyone else in the discussion.

3  Q.  When you say Trabucco, are you referring to Sam Trabucco?

4  A.  That's right.

5       MS. SASSOON:  Mr. Bianco, can you show the witness

6  Government Exhibit 1631.

7  Q.  Before I ask you about that, one question for you,

8  Ms. Ellison.  After you participated in the making of these

9  payments, did you lie to any employees of Alameda about the

10  nature of the payment?

11  A.  Yeah, I did.  I had a conversation with Ben Xie where he

12  was asking about the payment, and I reassured him and I said I

13  didn't know too much about it but I thought our legal had

14  approved it, something like that.

15  Q.  What was the nature of Ben Xie's question to you?

16  A.  I think he asked me if I was aware of the FCPA and whether

17  this was a violation of that.

18  Q.  What's the FCPA?

19  A.  The foreign --

20       MR. COHEN:  Objection.

21       MS. SASSOON:  There was no objection to the testimony.

22       THE COURT:  No.  Overruled.

23  A.  The Foreign Corrupt Practices Act.

24       THE COURT:  Just to reiterate what I said, there is no

25  charge against the defendant in this case of any violation of

1  the Foreign Corrupt Practices Act or anything else of that

2  character that I mentioned before.

3  Q.  When you told Ben Xie that this had been approved by a

4  lawyer, was that truthful?

5  A.  No.

6  Q.  Why did you lie to him?

7  A.  Because I didn't want him raising concerns about this with

8  others, and I didn't want the fact of our crime to get out.

9  Q.  I'd like to direct your attention now to Government Exhibit

10 1631.

11        Do you recognize this?

12 A.  Yeah.

13 Q.  What is this?

14 A.  This is a Signal chat between me, Sam, and Trabucco.

15        MS. SASSOON:  The government offers Government Exhibit

16 1631.

17        THE COURT:  Received.

18        (Government Exhibit 1631 received in evidence)

19        MS. SASSOON:  Mr. Bianco, can you publish this,

20 please.

21 Q.  What's the date of this first message from the defendant

22 that says, by the way, Handi is being pretty antagonistic?

23 A.  The date is January 28, 2022.

24 Q.  Who was Handi?

25 A.  Handi was a trader at Alameda who quit shortly before this.

1   Q.  Is this the same Handi that you described objecting in the

2   meeting with David Ma?

3   A.  That's right.

4   Q.  What was going on with Handi in January?

5   A.  She had quit Alameda, and she was trying to negotiate for

6   severance payments, and she seemed somewhat upset at us.  It

7   was a somewhat acrimonious conversation.

8           MS. SASSOON:  Mr. Bianco, if you can go to the next

9   page or go down to the February 1, 2022 messages.

10  Q.  Can you read what Sam Trabucco wrote on February 1, 2022.

11  A.  He said:  Did Handi's father immediately turn us in or

12  something.

13  Q.  Who is Handi's father?

14  A.  He was a Chinese government official.

15  Q.  What did the defendant respond?

16  A.  LOL.

17  Q.  What's LOL?

18  A.  It stands for laughing out loud.  He thought the comment

19  was funny.

20  Q.  Did you understand the joke?

21  A.  I don't recall if I understood it precisely at the time.  I

22  knew that -- I understood it to be referring to --

23          MR. COHEN:  Objection.  Move to strike.

24          THE COURT:  Look.  I will let it stand:  I don't

25  recall if I understood it precisely at the time.  And what the

1  witness said after that the jury will disregard.

2           MS. SASSOON:  Your Honor, I would ask to strike the

3  entirety, because she was qualifying what she just said when

4  she was interrupted.

5           THE COURT:  Then I'll strike the whole thing.

6           MS. SASSOON:  We can take that down.

7  Q.  After being named CEO of Alameda Research, did you write

8  updates about Alameda for the defendant?

9  A.  Yes, I did.

10 Q.  How often would you do that?

11 A.  It wasn't on a regular schedule, but maybe once every

12 couple of months or so.

13 Q.  For what purpose were you doing that?

14 A.  Both as a way for me to reflect on Alameda and as a way to

15 update him on what was happening and get his comments and

16 feedback.

17          MS. SASSOON:  Mr. Bianco, can you pull up Government

18 Exhibit 64 for the witness.

19 Q.  Do you recognize this?

20 A.  Yes.

21 Q.  What is this?

22 A.  This is one of those update documents that I wrote.

23          MS. SASSOON:  The government offers Government Exhibit

24 64, which the parties have stipulated is a document called

25 state of Alameda, 11/25/21, dated November 25, 2021.

1      THE COURT:  Received.

2      (Government Exhibit 64 received in evidence)

3      MS. SASSOON:  Mr. Bianco, if you could publish this

4   for the jury, please.

5   Q.  Who wrote this document?

6   A.  I wrote it.

7   Q.  And around when did you write it?

8   A.  In November of 2021.

9   Q.  Who, if anyone, did you share this with?

10  A.  With Sam.

11  Q.  Why were you sharing it with the defendant?

12  A.  To update him on major things that had happened in Alameda

13  and get his feedback.

14  Q.  Was that a general practice of yours?

15  A.  Yeah.

16      MS. SASSOON:  Mr. Bianco, if we can zoom in on the

17  section that begins notable/idiosyncratic PNL stuff.

18  Q.  What does that heading referring to?

19  A.  That refers to large things that had either be gains or

20  losses or Alameda in the past year.

21  Q.  I would like to direct your attention to the middle of this

22  list where it says negative 150M from the thing, question mark.

23  What's M?

24  A.  That means millions.  This is negative $150 million.

25  Q.  What are you referring to here that was a negative $150

NABMBAN2                        Ellison - Direct

1   million expense for Alameda?

2   A.  I was referring to our payments to get the China accounts

3   unlocked.

4   Q.  Why did you call it the thing instead of just saying the

5   payments to get the accounts unlocked?

6        MR. COHEN:  Objection to leading.  Overruled.

7   A.  Because I didn't want to put in writing that we had paid

8   what I believed were bribes to get these accounts unlocked.

9        MR. COHEN:  Objection.  Move to strike.

10       MS. SASSOON:  Your Honor, it's not being offered for

11  the truth.

12       THE COURT:  Overruled.

13       MR. COHEN:  Yes, it is, your Honor.

14       THE COURT:  Counsel, when I rule, that's the end of

15  the discussion.  Could we agree on that?

16       MR. COHEN:  Of course, your Honor.

17       THE COURT:  Thank you.

18  Q.  When you sent this to the defendant, did he ever express

19  any confusion or ask any follow-up questions about what you

20  meant by negative 150 million from the thing?

21  A.  No.

22  Q.  You said you didn't want to be more explicit in this

23  document.  What was your mindset when it came to writing about

24  the repayment of lenders using customer money?

25  A.  I wanted to be careful about what I wrote down.  I wrote

1    down things that I thought were important to be aware of on our

2    balance sheet, but I was careful about not saying in too

3    explicit language that we took money from customers to repay

4    our loans.

5    Q.   Why is that?

6    A.   Because I thought it might leak.  It could eventually be

7    used against us in a court case.

8              MS. SASSOON:  Mr. Bianco, we can take that down.

9              THE COURT:  Before you proceed, what I'm reasonably

10   confident I heard and the question to which Mr. Cohen objected

11   was:  Why did you call it the thing rather than just saying the

12   payments to get the accounts unlocked?  Am I mistaken in

13   thinking the word why was the way the question began?

14             MR. COHEN:  No, your Honor.

15             THE COURT:  Do you agree, Ms. Sassoon?

16             MS. SASSOON:  Yes.

17             THE COURT:  I'll ask the reporter to correct the

18   transcript in that respect.

19             Let's proceed.

20   Q.   I want to turn to the summer and fall of 2022.  Around then

21   what, if anything, did you and the defendant discuss about ways

22   to get more money for FTX?

23   A.   We discussed a few different ideas.  One was that FTX was

24   in the process of acquiring BlockFi, and Sam suggested that we

25   could get some of either BlockFi alone more money to Alameda or

1    get BlockFi's assets moved on to FTX.  Another idea was that of

2    raising money for FTX by selling equity.

3    Q.  What kinds of things was the defendant saying about raising

4    money for FTX through equity in the summer and fall of 2022?

5    A.  In the summer, for a few months he was saying he thought it

6    wasn't a good time and the market was still too fragile.  Then

7    later on, in the fall of 2022, he said that he was going to try

8    to start raising money.

9    Q.  How would you describe the state of your communication with

10   the defendant around this time?

11   A.  We had broken up a few months prior, so I was trying to

12   avoid spending much time with him in social contexts and avoid

13   having many one-on-one conversations with him, but we were

14   still communicating via Signal, as we had always done, and we

15   were having group meetings.

16   Q.  How would you describe your communications about Alameda's

17   business?

18   A.  I still gave him the same regular updates I had on

19   Alameda's balance sheet and our financial situation.

20           MS. SASSOON:  Mr. Bianco, can you show the witness

21   Government Exhibit 25A.  You know what, we can take that down.

22           If you could show the witness Government Exhibit 25B,

23   please.

24   Q.  Ms. Ellison, do you recognize this?

25   A.  Yeah.  This is part of a personal to-do list document that

NABMBAN2                          Ellison - Direct

1   I kept.

2   Q.  Did this include to-do list related to your

3   responsibilities at Alameda?

4   A.  Yes, it did.

5          MS. SASSOON:  The government offers Government Exhibit

6   25B.

7          THE COURT:  Received.

8          (Government Exhibit 25B received in evidence)

9          MS. SASSOON:  Mr. Bianco, if you could publish this.

10  Q.  What is this?

11  A.  This is a section of a personal to-do list document that I

12  kept.

13  Q.  I want to direct you to where it says work priorities,

14  colon.  What is this list?

15  A.  This list was a list of things that I considered top

16  priorities for my job.

17  Q.  Do you recall around when you made this list?

18  A.  Yeah.  It was around the fall of 2022.

19  Q.  At the top it says:  Hedging/getting more capital.

20          What are you referring to there?

21  A.  Those were ways of either reducing Alameda's risk or

22  getting more capital that we could use to repay our borrowers

23  from FTX.

24  Q.  Can you just explain what hedging is?

25  A.  So hedging is, if you own something, such as in this case

NABMBAN2                            Ellison - Direct

1    Alameda owned say a lot of FTT and you want to reduce your risk

2    from that, you can sell something else that is correlated with

3    that asset.  So Alameda could have sold Bitcoin because that

4    was correlated with FTT and that would mean if FTT goes down,

5    we will lose less money than we otherwise would.

6    Q.  Why were hedging and getting more capital priority for you

7    in the fall of 2022?

8    A.  Because Alameda had on a lot of risk and because we had a

9    very large quantity of borrows from FTX that we were unable to

10   repay.

11   Q.  Around August of 2022, what conversations with the

12   defendant do you recall about Alameda's hedging practices that

13   year?

14   A.  Yeah.  We had an in-person conversation in August of 2022

15   where Sam -- we initially started by talking about Alameda's

16   balance sheet, and then Sam started saying that he thought

17   Alameda should have hedged way more earlier in the year and

18   that it was a big mistake and that it was my fault and that I

19   was largely responsible for the financial situation that

20   Alameda had ended up in.

21   Q.  This conversation that you are describing, where did it

22   take place?

23   A.  It was in our apartment, in the study.

24   Q.  Why were you talking about Alameda's hedging that year and

25   whose fault it was?

1  A.  Because we were -- the conversation started by talking

2  about Alameda's financial situation, so hedging was sort of a

3  natural next step to talk about as in like how did we get into

4  that situation in the first place.

5  Q.  When you said you talked about how Alameda got into this

6  financial situation in the first place, what financial

7  situation?

8  A.  The situation where we were in a very risky position where

9  we were borrowing over $10 billion from FTX and we didn't have

10 the assets to repay that.

11 Q.  When you say you were discussing that you had borrowed $10

12 billion from FTX, just to be clear, whose funds were those?

13 A.  FTX customers.

14 Q.  How would you describe the defendant's demeanor when he

15 told you that it was a mistake not to hedge and it was your

16 fault?

17 A.  He was speaking pretty loudly and strongly.

18 Q.  How did you react?

19 A.  I got very upset, I started crying, and I had trouble

20 continuing the conversation.

21 Q.  What did he say that caused you to have trouble finishing

22 the conversation?

23 A.  That it was my fault that Alameda had gotten into that

24 situation.

25 Q.  What did you think about that accusation?

NABMBAN2                      Ellison - Direct

1   A.  I mean, I thought that I absolutely could and should have

2   done things differently, and that I could have hedged more

3   earlier in the year.  But I also thought that Sam was the one

4   who chose to make all these investments that put us in a

5   leverage position in the first place and that it wasn't

6   necessarily -- yeah.  His suggested hedging strategy was we

7   should have sold more stock market futures earlier in the year,

8   and I thought that it wasn't necessarily clear, without

9   hindsight, that getting short of the stock market was a good

10  idea.

11  Q.  At that point did you agree that the reason Alameda was in

12  this bad financial situation was because of a failure to hedge?

13  A.  I thought that hedging could have helped our situation, but

14  I felt that the fundamental reason we were in the situation was

15  that we had borrowed these billions of dollars in open-term

16  loans and used them for illiquid investments.

17  Q.  Whose decision was that?

18  A.  That was Sam's.

19  Q.  To the extent Alameda had suffered losses that year, where

20  were those losses coming from?

21  A.  They were coming from our positions in cryptocurrencies

22  like FTT, Serum, and Solana and our venture investments.

23  Q.  Who had directed those investments?

24          MR. COHEN:  Objection.  Asked and answered.

25          THE COURT:  Sustained.

NABMBAN2                                    Ellison - Direct

1    Q.   Who had directed Alameda to invest in coins like FTT,

2    Solana, and Serum?

3              MR. COHEN:  Same objection.

4              THE COURT:  Sustained.

5              MS. SASSOON:  Your Honor, I believe she testified

6    about other types of investments but not these.

7              THE COURT:  I sustained the objection.

8    Q.   After this conversation with the defendant, did Alameda put

9    on additional hedges?

10   A.   Yes, we did.

11   Q.   Does it cost money to put on hedges?

12   A.   It requires you to put up collateral, so we sold several

13   billion dollars of NASDAQ futures, and to do that we had to

14   post maybe in the ballpark of $2 billion of collateral with our

15   brokers.

16   Q.   So in order to post $2 billion of collateral to put on

17   hedges, where did that money come from?

18   A.   It came from our FTX borrowing.

19   Q.   Specifically from where?

20   A.   From FTX customers.

21   Q.   And around when was this?

22   A.   This was in the fall of 2022.

23   Q.   Let's look at the next page of this document.

24              Do you see where it says:  Things Sam is freaking out

25   about?

NABMBAN2                        Ellison - Direct

1    A.   Yeah.

2    Q.   What is this list?

3    A.   This was a list that I often kept and updated and tried to

4    note the things that Sam had seemed most upset or concerned or

5    adamant about, things he had been mentioning the most.

6    Q.   Just to be clear, in drawing the conclusion that he was

7    concerned about these things, where were you getting that

8    information?

9    A.   Because he would talk about them a lot and say that they

10   were important and we should be focusing more on them.

11   Q.   The first item here is hedging.  Is that what we just

12   talked about?

13   A.   Yes, that's right.

14   Q.   I want to direct you to where it says raising from MBS.

15   What is that?

16   A.   That's raising capital by selling shares of FTX to Mohammed

17   Bin Salman.

18   Q.   Is that the Saudi prince you mentioned earlier?

19   A.   That's right.

20   Q.   What about getting capital from BlockFi?

21   A.   That's the thing I mentioned earlier.  BlockFi was sort of

22   in the process of being acquired by FTX, and Sam mentioned that

23   we could use that relationship to get more loans or assets from

24   them.

25   Q.   Do you see where it says:  Getting regulators to crack down

NABMBAN2                        Ellison - Direct

1    on Binance.  What does that refer to?

2    A.  Sam said that he thought that was one of the best potential

3    ways for FTX to improve its market share.  He said that if

4    there was a regulatory action taken against Binance that a lot

5    of Binance customers might move to FTX and that he had been

6    hoping this would happen for a while, and various regulators

7    had been promising him that this would happen for a while, but

8    it never happened.

9    Q.  And you referred to increasing FTX market share.  Can you

10   just explain what you meant by that.

11   A.  What I mean is, getting more customers to move to FTX and,

12   therefore, making FTX more profitable and more attractive for

13   investors.

14   Q.  It says toward the bottom:  Buying SNAP and trading JGBs.

15            What is that?

16   A.  Snap is a Snapchat, which Sam was talking about wanting to

17   buy stock in or acquire around this time.  JGBs are Japanese

18   government bonds.

19   Q.  Around this time, in the fall of 2022, was the defendant

20   still involved in decisions about Alameda's trading and

21   investments?

22   A.  Yeah.  These are two examples.

23   Q.  You see the second item here, it says:  Bad PR in the next

24   six months, Alameda/FTX.

25   A.  Um-hum.

NABMBAN2                          Ellison - Direct

Q.   What does this refer to?

A.   Sam said that he was worried about bad PR or bad media or

press about the relationship between Alameda and FTX,

especially in the next six months, because in the next six

months he was hoping that FTX would get licensed to provide

futures trading in the United States.

          MS. SASSOON:  Your Honor, I can continue or I could

also break here, whatever you have in mind for a breaking time.

          THE COURT:  Give me an idea how much longer you are

going to be.

          MS. SASSOON:  Sorry.  I didn't hear your Honor.

          THE COURT:  Please give me an idea of how much longer

you are going to be.

          MS. SASSOON:  One and a half hours.

          THE COURT:  Let's break here until 1:30.

          (Luncheon recess)

NAB1BAN3                    Ellison - Direct

1                              AFTERNOON SESSION

2                                  1:34 p.m.

3              (In open court; jury not present)

4              THE COURT:    Good afternoon, everyone.  Let's get the

5     witness and get the jury.

6              (Jury present)

7              THE COURT:    Okay.  The jurors and the defendant all

8     are present, as they have been throughout.

9              The witness is reminded she's under oath.

10             Proceed, Ms. Sassoon, please.

11             MS. SASSOON:    Thank you, your Honor.

12    DIRECT EXAMINATION CONTINUED

13    BY MS. SASSOON:

14    Q.    Ms. Ellison, when we stopped for our lunch break, we were

15    talking about an item on the list called "bad PR."  So I want

16    to take a few minutes to talk about public relations more

17    generally.

18             How would you generally describe the defendant's

19    approach to public relations?

20    A.    He said that he believed in a very proactive approach to

21    public relations.  He spent a lot of time cultivating

22    relationships with reporters and on tweeting, maintaining his

23    Twitter presence.

24    Q.    As far as you know, did the defendant make any financial

25    investments in the media?

1    A.    Yes, he made a few that I'm aware of.

2    Q.    And what were those?

3    A.    I believe one was a company called Semafor; there were a

4    few that I can think of that he considered making, like VOX and

5    I think Forbes.

6    Q.    Are you familiar with a publication called The Block?

7    A.    Yes.

8    Q.    And what do you recall about The Block?

9    A.    The Block was a crypto news site that Sam expressed that he

10   thought was good and that he eventually invested in.

11   Q.    What, if anything, did the defendant say about his

12   investment in The Block?

13   A.    He said he thought it was the best crypto news

14   organization, and I think he said that they were in some amount

15   of financial trouble and he wanted to support them so they

16   could continue their reporting.

17   Q.    And what, if anything, did he say about the effect that he

18   intended for his investments?

19   A.    I don't recall anything beyond him saying that he wanted to

20   support The Block.

21        MS. SASSOON:    Mr. Bianco, can you show the witness

22   Government Exhibit 1619.

23   Q.    Do you recognize this chat?

24   A.    I do.

25   Q.    What is it?

1    A.    This is a Signal chat between me, Sam, and some other

2    people.

3            MS. SASSOON:    The government offers Government

4    Exhibit 1619.

5            THE COURT:    Received.

6            MR. COHEN:    Your Honor, may we approach briefly on

7    this?

8            THE COURT:    All right.

9            (Continued on next page)

1              (At the sidebar)

2              MS. SASSOON:    We're pulling up a hard copy.

3              MR. COHEN:    You can have mine if you don't mind the

4      notes.

5              THE COURT:    I don't mind the notes.

6              MR. COHEN:    They're indecipherable.

7              Your Honor, we have no objection to the comments by

8      the defendant coming in, but the other comments I believe are

9      from someone named Will MacAskill, who is, as I understand it,

10     not a co-conspirator under the government's theory, so we would

11     ask that they not be offered for their truth and the Court give

12     an appropriate instruction.

13             THE COURT:    Do you have any problem with that?

14             MS. SASSOON:    No.

15             THE COURT:    Thank you.  Okay.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1        (In open court)

2        THE COURT:    Okay.  Members of the jury, this exhibit

3   is received.  As you will see, it's a chat.  Certain statements

4   are attributable to the defendant.  Those statements are

5   received for all purposes.  There are a couple of statements

6   attributed to somebody else.  Those statements are not received

7   for the truth of anything this other person said but rather to

8   give you only the context of the defendant's remarks.

9        Any objection to that charge?

10        MS. SASSOON:    Your Honor, there's also a message from

11   Ms. Ellison, so there are three people who sent messages in

12   this chat.

13        THE COURT:    Ah, yes.  I, not being an experienced

14   reader of chats, missed that.  The statements by Ms. Ellison

15   are received for all purposes as well.

16        MR. COHEN:    You can't be less experienced than me,

17   your Honor, but no objection.

18        THE COURT:    Oh, now we're going to have a contest in

19   the next day or two.

20        (Government's Exhibit 1619 received in evidence)

21        MS. SASSOON:    Mr. Bianco, if you can publish this

22   exhibit for the jury, Government Exhibit 1619.

23   BY MS. SASSOON:

24   Q.    Ms. Ellison, do you see this is a chat called Fellowships

25   Discussion?

1    A.    Yes, I do.

2    Q.    What's the date of it?

3    A.    January 5, 2022.

4    Q.    And are you on this chat?

5    A.    Yes, I am.

6    Q.    As well as the defendant?

7    A.    That's right.

8    Q.    And just to clarify one point, you talked earlier about

9    auto-delete policies for Signal messages, but we're looking at

10   one right now.  How do you explain that?

11   A.    Not all people in all chats had these auto-delete policies

12   so most chats relating to FTX and Alameda business did, but

13   some of our chats, especially relating to our——our

14   philanthropy, did not.

15   Q.    Can you read the defendant's first message.

16   A.    It says, "For what it's worth, February 8 to 16, Michael

17   Lewis is going to be in the Bahamas profiling us.

18   Q.    Who is Michael Lewis?

19   A.    He was a well-known financial writer.

20   Q.    And what was the defendant referring to when he said he's

21   "going to be in the Bahamas profiling us"?

22   A.    Sam had agreed to cooperate with a book that Michael Lewis

23   was writing about Sam and cryptocurrency more generally.

24   Q.    What did you write in response?

25   A.    I said, "Yes, it makes sense.  I feel like my instincts are

1    more toward under the radar, but I might just be irrationally

2    biased toward that in general."

3    Q.    What do you mean by "my instincts are more toward under the

4    radar"?

5    A.    Meant that I generally tried to avoid press and media when

6    possible.

7    Q.    Can you read the defendant's response.

8    A.    He said, "Same, except exactly the opposite."

9    Q.    As far as you know, what happened with Michael Lewis?

10    A.    He did end up writing a book about Sam.

11    Q.    And can you read the second half of the message from Will.

12    A.    It says, "But if a whole bunch of attention is going to be

13    on FTX, Sam, and EA, whatever happens, then getting ahead of

14    the game and controlling the narrative is approximately

15    necessary."

16    Q.    How did the defendant respond to that?

17    A.    He said "Yup."

18    Q.    Did Michael Lewis in fact spend time with you in the

19    Bahamas?

20    A.    Yes, he did.

21    Q.    And as far as you know, was he included in any

22    conversations with you and the defendant about Alameda's use of

23    customer funds?

24    A.    No.

25    Q.    Based on your conversations with the defendant about public

1     relations, what image of himself was the defendant cultivating?

2     A.    He was trying to cultivate an image of himself as sort of a

3     very smart, competent, somewhat eccentric founder.

4     Q.    Were you cultivating a personal image of yourself?

5     A.    Not to the same extent.  For a while I mostly tried——stayed

6     off Twitter and tried to avoid all media.  Eventually I did get

7     a Twitter once Sam Trabucco started stepping back more from the

8     company.  And Sam said he thought it was necessary for someone

9     from Alameda to be on Twitter.

10    Q.    Based on your conversations with the defendant about public

11    relations, what image was he cultivating about FTX?

12                 MR. COHEN:    Objection, relevance.

13                 MS. SASSOON:    Your Honor, this goes to

14    misrepresentations that were made to the public.

15                 THE COURT:    Sustained.

16    Q.    What, if anything, did the defendant tell you about how he

17    was trying to portray FTX publicly?

18                 MR. COHEN:    Same objection.

19                 THE COURT:    Overruled.

20    A.    He said that he wanted FTX to have the image of being a,

21    you know, exciting, innovative place to trade on, similar to

22    offshore exchanges, but also being safe, reliable, audited, and

23    highly regulated, like other US exchanges.

24    Q.    You mentioned Twitter.  What, if anything, did the

25    defendant say about his use of Twitter?

1    A.   He said it was very important and a valuable way to

2    cultivate customers and to help control the narrative around

3    FTX.

4    Q.   What was your reaction to cultivating a public image of FTX

5    as safe and reliable?

6    A.   I mean, it varied over time.  I would say particularly in

7    2022, I thought that was definitely an inaccurate image.

8    Q.   Why is that?

9    A.   Because in 2022 Alameda was borrowing around $10 billion of

10    FTX customer funds that we had no way to repay, meaning that it

11    wasn't a safe place for customers to keep their money.

12           MS. SASSOON:    Mr. Bianco, can you show the witness

13    Government Exhibit 1642.

14    Q.   Who is the person in this photograph?

15    A.   It's Sam.

16           MS. SASSOON:    Government offers Government

17    Exhibit 1642.

18           THE COURT:    Received.

19           (Government's Exhibit 1642 received in evidence)

20           MS. SASSOON:    Mr. Bianco, can you publish Government

21    Exhibit 1642.

22    BY MS. SASSOON:

23    Q.   How would you describe the defendant's personal appearance

24    throughout 2022?

25    A.   I would say he looked like he didn't put a lot of effort

1    into his personal appearance.  He dressed sort of sloppily and

2    didn't cut his hair often.

3    Q.    What, if anything, did he tell you about that?

4    A.    He said he thought his hair had been very valuable.  He

5    said ever since Jane Street, he thought he had gotten higher

6    bonuses because of his hair and that it was an important part

7    of FTX's narrative and image.

8    Q.    When you first moved to the Bahamas, what kinds of cars did

9    you and the defendant drive?

10   A.    We both got assigned luxury company cars.

11   Q.    And did that change?

12   A.    Yeah.  We both switched to driving——I believe he was

13   driving a Toyota Corolla and I had a Honda Civic.

14   Q.    What, if anything, did the defendant say to you about that?

15                MR. COHEN:    Objection.  Relevance.

16                THE COURT:    Overruled.

17   A.    He said he thought it was better for his image to be

18   driving a Toyota Corolla.

19   Q.    Are you familiar with the public statements the defendant

20   made about where he slept?

21   A.    Yeah.  I'm aware that he made statements about sleeping on

22   a beanbag in the office.

23   Q.    And when you first moved to the Bahamas, where was the

24   defendant living?

25                MR. COHEN:    Same objection.

1          THE COURT:    Overruled.

2    A.    He lived in an apartment with me and several others, though

3    it's true that he did often sleep on beanbags in the office.

4    Q.    And what, if anything, did he tell you about those

5    statements about sleeping on a beanbag?

6    A.    Nothing particular comes to mind.

7    Q.    Did there come a time when Alameda and FTX experienced what

8    you considered negative PR?

9    A.    Yeah.

10   Q.    Around when was that?

11   A.    I mean, there were many periods of time, but one in

12   particular that Sam said he was concerned about was in the fall

13   of 2022, when he said he was concerned about Alameda and FTX PR

14   because of the license that FTX was trying to get.

15   Q.    And what do you recall in particular?

16   A.    He said that, I mean, there was a Bloomberg article about

17   the relationship between Alameda and FTX that he was unhappy

18   about.

19   Q.    And what about that article did the defendant say he was

20   unhappy about?

21   A.    He said that he was unhappy about the insinuations about

22   Alameda and FTX's relationship.

23   Q.    And what do you recall about the article's insinuations

24   about FTX's and Alameda's relationship?

25   A.    It——

1        MR. COHEN:    Objection.

2        THE COURT:    Sustained.

3        MS. SASSOON:    Mr. Bianco, will you show the witness

4    Government Exhibit 908.

5    Q.    Do you recognize this?

6    A.    I do.

7    Q.    What is it?

8    A.    This is the Bloomberg article I was talking about.

9        MS. SASSOON:    Your Honor, the government offers this

10   for a nonhearsay purpose, not for its truth, and to explain the

11   subsequent actions of the defendant and Ms. Ellison.

12       MR. COHEN:    We would request a limiting instruction,

13   your Honor.

14       THE COURT:    Yes.  Members of the jury, the article,

15   Exhibit 908, is received not for the truth of the matters

16   stated but for the fact that the statements were made and to

17   explain subsequent behavior of the defendant and the witness.

18       (Government's Exhibit 908 received in evidence)

19       MS. SASSOON:    Mr. Bianco, if you could publish

20   Government Exhibit 908.

21   BY MS. SASSOON:

22   Q.    Is this the Bloomberg article you were just talking about?

23   A.    Yes, it is.

24   Q.    What is the date of this article?

25   A.    September 14, 2022.

1    Q.    What is the headline?

2    A.    It says, "Crypto Quant Shop with Ties to FTX Powers

3    Bankman-Fried's Empire."

4    Q.    And can you read the sub headline beneath that.

5    A.    It says Alameda is a——"Alameda Research is a

6    little-scrutinized power player in virtual currencies.  As its

7    influence grows, so do concerns over a potential market

8    advantage."

9    Q.    Before this article was published, did you speak to the

10    reporter?

11    A.    I did.

12    Q.    Did you generally speak to reporters about Alameda?

13    A.    No, not usually.

14    Q.    Why did you speak to this reporter?

15    A.    She was someone that I knew personally, a friend of a

16    friend, and so I thought that she might have a more favorable

17    take than most reporters.  I asked Sam whether he thought it

18    was a good idea for me to speak to her and he said yes.

19    Q.    Before you spoke to the reporter, did you discuss with

20    anyone else what you would say?

21    A.    Yeah, I wrote a Google Doc outlining some answers to

22    potential questions the reporter might ask.

23             MS. SASSOON:    If we could go to the second page of

24    this article.

25    Q.    I want to direct your attention to the bottom of the page,

1    the paragraph beginning, "Alameda is a wholly separate entity."

2          MS. SASSOON:    And Mr. Bianco, if you could zoom in.

3    And can you highlight from "'Alameda is a wholly separate

4    entity,' said Bankman-Fried, who is estimated to own more than

5    50 % of FTX."  "It sends orders and accesses customer

6    information the same way other users do, he added."  Do you see

7    that?

8    A.    Yes, I do.

9    Q.    And in your view did Alameda and FTX actually operate

10   wholly separately?

11   A.    No, I wouldn't say so.

12   Q.    Why is that?

13   A.    I mean, because Sam owned and controlled them both and

14   because there was a lot of interaction between the two

15   companies and staff who shared——who did work at both companies.

16   Q.    Let's look at the third page.

17          Let's zoom in on your quote, beginning "We're arm's

18   length."  Do you see where it says, "'We're arm's length and

19   don't get any different treatment from other market makers,'

20   said Ellison"?

21   A.    Yeah, I do.

22   Q.    And was that a misleading statement?

23   A.    Yeah, I think it was.

24   Q.    How so?

25   A.    We did in fact get different treatment from other market

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   makers in a very significant way in that we had this line of

2   credit that other market makers didn't have, and that allowed

3   us to do profitable trades and to, you know, take money in a

4   way that other market makers were not allowed to.

5   Q.   So if this was a misleading statement, why did you say it

6   to the reporter?

7   A.   Because I didn't want her or others being aware of the

8   relationship between Alameda and FTX.  I heard Sam give

9   statements on it many times and was trying to say things

10  similar to what he had said in the past.

11  Q.   How did the defendant react to this article?

12  A.   He seemed concerned about it and said that we should be

13  more careful about avoiding any bad PR about Alameda and FTX.

14  Q.   And in what way did you perceive this as bad PR?

15  A.   Because it suggests that Alameda and FTX have a close

16  relationship and that may cause conflicts of interest.

17  Q.   What do you mean by conflicts of interest?

18       MS. SASSOON:    And we can take this down.

19  A.   What I mean is that because Sam owned both FTX and Alameda,

20  he had a reason not to treat all of the traders on FTX equally.

21  Q.   And from your standpoint, were there conflicts of interest

22  between FTX and Alameda?

23  A.   Yes, there were.  I think allowing Alameda to borrow

24  billions of dollars was not——from FTX customers was not in the

25  best interest of FTX or its customers, but it was important to

1    keeping Alameda alive.

2    Q.    In the fall of 2022, what steps, if any, did the defendant

3    take to increase an appearance of separation between FTX and

4    Alameda?

5    A.    One thing he did was directed several entities that had

6    Alameda in the name to be renamed so their association with

7    Alameda wasn't obvious.

8    Q.    Can you think of any examples?

9    A.    Yeah.  I believe Alameda Ventures, Ltd. was renamed to

10   something like MacLaurin Investments; Alameda Research Ventures

11   was renamed to I think Clifton Bay Investments.

12   Q.    And what, if anything, did the defendant say about why he

13   was directing the changing of these entity names?

14   A.    He said he didn't want our venture investing to be

15   associated with Alameda.

16   Q.    And so were these entities used for venture investing?

17   A.    Yes, they were.

18   Q.    And just to be clear, where was the money coming from for

19   venture investing that went through these entities?

20   A.    It was coming from Alameda.

21   Q.    Around the time of the Bloomberg article what

22   conversations, if any, did you have with Nishad Singh and Gary

23   Wang about Alameda's status?

24   A.    We had a conversation about the idea of shutting off

25   Alameda trading, or at least stopping it from trading on FTX.

1    Q.    And what was the context of this conversation?

2    A.    Nishad sent me a message saying that he wanted to have a

3    conversation about the idea of Alameda shutting off or stopping

4    its FTX trading.  I made some notes about what I wanted to talk

5    about, and shortly afterwards we had this conversation.

6    Q.    What did Nishad explain about why he wanted to have this

7    conversation?

8    A.    He said that he was concerned and he knew that Sam was

9    concerned about the negative PR about Alameda and FTX and that

10    he was concerned about the CFTC audit which would be required

11    for FTX to get its futures license, and he thought that Alameda

12    might interfere with that.

13    Q.    So when Nishad Singh proposed a meeting, what did you do?

14    A.    First I made notes in a notebook I had of the reasons that

15    I thought that Alameda——it wouldn't make sense for Alameda to

16    stop its trading.

17            MS. SASSOON:    Mr. Bianco, can you please show the

18    witness Government Exhibit 432.

19            And if you could scroll, Mr. Bianco.

20    Q.    Do you recognize this?

21    A.    Yes, I do.  This is the notes that I took in my notebook

22    prior to entering the meeting.

23            MS. SASSOON:    The government offers Government

24    Exhibit 432.

25            THE COURT:    Received.

NAB1BAN3                    Ellison - Direct

1          (Government's Exhibit 432 received in evidence)

2          MS. SASSOON:   Okay.  If we could begin on the second

3    page of Government Exhibit 432 and publish that for the jury.

4    BY MS. SASSOON:

5    Q.   We see some handwritten notes here.  Who wrote this?

6    A.   I wrote this.

7    Q.   And where did you write this?

8    A.   It was in a notebook I had.

9    Q.   And we're going to take a closer look, but generally what

10   were you writing here?

11   A.   These were problems that I saw with turning Alameda off on

12   FTX.

13   Q.   And if you could just walk through the first few and

14   explain what those problems you perceived were.

15   A.   Yeah.  The first bullet point says "BLPs," which stood for

16   backstop liquidity providers.  So what I meant by that was that

17   Alameda acted as a backstop liquidity provider.  When there

18   were liquidations on FTX, Alameda was one of the firms that

19   would provide those liquidations, so it might be harder to

20   manage liquidations in the margin system without Alameda.

21   Q.   And let's just take one more example from this page.  Looks

22   like you wrote "Market making for shitty things."  What is

23   that?

24   A.   Yes, that's right.  That was referring to market making for

25   smaller, more illiquid markets, so the ones I listed were

1    tokenized stocks, new listings, Japan, Turkey, etc.  These were

2    all markets on FTX where there weren't many other market

3    makers.

4    Q.    Let's go to the next page.

5          Is this a continuation of your list?

6    A.    Yes, this is the last item on the list.

7    Q.    And what did you write here on the third page?

8    A.    It says, "True up funds??"

9    Q.    What does that refer to?

10   A.    That refers to the money that Alameda was borrowing at the

11   time from FTX customers.  I was saying that if Alameda shut off

12   trading on FTX or closed down its account, then FTX would just

13   be left with a giant hole in its balance sheet that it would

14   have no immediate way to fill.

15   Q.    And why did you refer to that as "True up funds"?

16   A.    I wanted to refer to the concept but not write down

17   anything very explicit along the lines of, you know, "return

18   customer money that Alameda took," because of my——my general

19   practice, as directed by Sam, of not writing problematic things

20   down explicitly.

21              MS. SASSOON:    Your Honor, can I request a sidebar.

22              THE COURT:    Yes.

23              (Continued on next page)

24

25

1          (At the sidebar)

2          MS. SASSOON:    Your Honor, given where I'm standing,

3     I've noticed several times since the lunch break that in

4     response to things the witness has said, the defendant has

5     laughed, visibly shaken his head, and scoffed, and obviously

6     I'm not communicating with the witness, but it's possible it's

7     having a visible effect on her, especially given the history of

8     this relationship, the prior attempts to intimidate her, the

9     power dynamic, their romantic relationship, and I would ask

10    that defense counsel tell him to control his visible reactions

11    to her testimony.

12         MR. COHEN:    Your Honor, this is ridiculous.  The

13    defendant is attending this trial.  If he's having any reaction

14    at all, that's for your Honor and the jury to decide.

15         I will note that the government is going out of its

16    way to present highly cumulative evidence portraying our——my

17    client as a very dirty person.  The last photograph had him

18    holding a deck of playing cards with no testimony about the

19    relevance of that, which I expected.  So if they're going to

20    keep doing this, your Honor, can we try the issues in this

21    case.

22         MS. SASSOON:    May I respond.

23         MR. COHEN:    Let me finish.

24         There's been seven photos of my client.  We stipulated

25    he had a lot of hair.  I mean, we're getting testimony about

1   his hair, we're getting testimony of him holding a deck of

2   playing cards, with no connection?

3          THE COURT:    You haven't had any testimony about his

4   holding playing cards.

5          MR. COHEN:    No, that's right, correct.

6          THE COURT:    You had a photograph in the context of

7   testimony about remarks he made about cultivating a particular

8   image, of which the photograph is arguably probative.  So

9   let's——

10          MR. COHEN:    Without any connection.

11          MS. SASSOON:    May I respond, your Honor.  Defense

12   counsel specifically asked me not to ask about the deck of

13   cards.

14          MR. COHEN:    Let me finish.  Your Honor——no, your Honor

15   goes first.

16          THE COURT:    One at a time.

17          What do you want to say?

18          MR. COHEN:    This is, what, the seventh photograph of

19   him standing there.  The one with the head of Binance was

20   probative to show connection.  Now we have seven photographs of

21   him to show his hair or with playing cards with no probative

22   evidence offered about that?  If we're going to——

23          THE COURT:    We're going to have a different view about

24   whether there's probative value.

25          MR. COHEN:    Okay.  If we're going to try the issues in

1    this case, let's try the issues in this case.  I am offended by

2    counsel's position, and the notion that someone who she

3    couldn't even pick out in the courtroom, after we stipulated to

4    this, is trying to intimidate her is ridiculous.  Let's try the

5    issues in this case, your Honor.

6              THE COURT:    Now look, she did pick him out in the

7    courtroom, first of all.  Now——

8              MS. SASSOON:    Your Honor——

9              THE COURT:    No, I don't need a response.

10             I have not looked for and therefore not seen any

11   reactions.  That's the first thing I want to be clear about.

12             Secondly, I accept that I'm dealing with honorable and

13   honest counsel all around in this case.

14             MR. COHEN:    Thank you.

15             THE COURT:    All right?  So I accept that you're

16   offended, and I accept that Ms. Sassoon has seen what she says

17   she's seen, or at least thinks so.

18             MR. COHEN:    Okay.

19             THE COURT:    I'm not going to say anything publicly,

20   certainly, and I'm not going to send the jury out now, but I

21   would ask you, Mr. Cohen, to go to your client and have a word

22   with him.  You know how best to put it.  And if he's doing

23   anything, it should stop; and if he's not, then no harm, no

24   foul.

25             MR. COHEN:    Okay.

1          THE COURT:    And I'll keep an eye on him, to the extent

2     I can, because I'm taking copious notes too.  And we'll see

3     what happens.  Okay?

4          MR. COHEN:    Your Honor, I would just ask if we come

5     back from the sidebar and I would have to counsel my client in

6     front of the jury, it may give the wrong message to the jury.

7          THE COURT:    Well, I can understand that.  You'll

8     counsel him at the break.

9          MR. COHEN:    Okay.

10          THE COURT:    And in the meantime, I'll——

11          MR. COHEN:    I will try to counsel him now, your Honor,

12     in an informal way, but I don't have——

13          THE COURT:    Look, I understand the problem, and I'm

14     sympathetic to your problem.  And let's do it that way.

15          MR. COHEN:    Thank you.

16          MS. SASSOON:    Thank you.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:   Okay.  Let's continue.

3              MS. SASSOON:   Mr. Bianco, if you could pull back up

4    Government Exhibit 432.

5    BY MS. SASSOON:

6    Q.   Ms. Ellison, we were just looking at this list you wrote

7    before your meeting with Nishad Singh.  Which, if any, of the

8    items on this list did you view as the biggest problem to

9    shutting down Alameda?

10   A.   I viewed the last one, truing up funds, as the biggest

11   problem.

12   Q.   Why?

13   A.   Because the other problems could potentially be gotten

14   around if FTX found other market makers and weren't necessarily

15   existential to FTX, whereas this one was.

16   Q.   And in your view, would it have been possible to replace

17   Alameda in the other functions described on the prior page?

18   A.   I think it would have been possible, though difficult.

19   Q.   Did you in fact meet with Nishad Singh and Gary Wang?

20   A.   Yes, I did.

21   Q.   Where was this meeting?

22   A.   It was in person in the FTX office in the Bahamas in a

23   conference room.

24   Q.   What did you discuss at this meeting with Nishad Singh and

25   Gary Wang?

1   A.   We went through the list I had created and discussed the

2   issues with Alameda turning off trading on FTX.

3   Q.   And so did you discuss the items that you wrote in your

4   notebook that we've looked at?

5   A.   Yes, that's right.

6   Q.   What, if anything, did you discuss about this last item on

7   your list, "True up funds"?

8   A.   I brought this up, and Nishad said something along the

9   lines of, *Yeah, you're right, that's a pretty big issue.  I*

10  *don't know how we would get around that one.*

11  Q.   Let's look at the first page of your notes here.  And can

12  you read what it says.

13  A.   Yeah.  It says, "Options.  1) new entity.  2) just turn

14  off.  3) do nothing."

15  Q.   And when did you write this list?

16  A.   Those were notes that I took during the meeting.

17  Q.   And can you explain these notes.

18  A.   Those were three options that we discussed during the

19  meeting.  The first one would be finding or creating a new

20  entity to perform many of these market-making functions; the

21  second one would be to just turn Alameda's trading off; and the

22  third one would be to do nothing, as in have Alameda continue

23  trading on FTX as usual.

24  Q.   And what did the three of you discuss about the viability

25  of these three options?

1    A.    I mean, we discussed I think——I think it was Gary who

2    proposed the new entity as a potential option, but I think my

3    objections were that I thought it was sort of adding more

4    dishonesty on top of what we were already doing and that it

5    didn't solve the last problem of truing up funds.

6    Q.    Why did you view a new entity as creating more dishonesty?

7    A.    Because if it was still Alameda's money or Alameda's staff

8    working for it, then it would still be sort of like Alameda

9    trading on FTX, just on a different name because we were trying

10   to hide it.

11   Q.    And what, if anything, did you discuss with Gary and Nishad

12   about option 2, just turning Alameda off?

13   A.    We discussed that it had all of the problems that I listed.

14   Q.    Meaning what?

15   A.    Meaning the problems of not having a market maker for these

16   things and the problems of not being able to true up Alameda's

17   borrows.

18   Q.    And so coming out of the meeting, where did things land?

19   A.    We landed on option 3, which was do nothing, continue as we

20   had been.

21   Q.    And when you say "do nothing, continue as we had been,"

22   what do you mean?

23   A.    I mean Alameda kept trading on FTX.

24         MS. SASSOON:    Mr. Bianco, if you could pull back up

25   Government Exhibit 25B, page 2.

1   Q.   We looked at this list before, "Things Sam is Freaking Out

2   About."  I want to direct your attention to the middle of this

3   list where it says "Alameda/Modulo relationship."

4   A.   Mm-hmm.

5   Q.   What was Modulo?

6   A.   Modulo was a crypto hedge fund that Alameda invested in at

7   Sam's direction.

8   Q.   And around when was that?

9   A.   The initial investment was in early 2022, and we continued

10  making further investments into the fall of 2022.

11  Q.   What was your view of investing in this crypto hedge fund

12  called Modulo?

13  A.   I was against it.  Yeah.

14  Q.   Why were you against it?

15  A.   Initially I was not convinced that their trading would be

16  good, and I thought that the terms we were giving them were

17  very generous, and then later on in the fall I had the

18  additional reason that Alameda didn't have any more capital and

19  any further capital was coming from FTX customers.

20  Q.   And about how much money was the defendant investing in

21  Modulo?

22  A.   It was around a few hundred million dollars, I believe.

23  Q.   Did you express your objections to the defendant?

24  A.   Yeah, I did.

25  Q.   How did he respond?

1    A.    He wrote a few Google Docs about it and——yeah, he said that

2    he wanted to go ahead with the investments anyway and that I

3    needed to do better at getting along with Modulo and working

4    together productively with them.

5                MS. SASSOON:    Mr. Bianco, can you show the witness

6    Government Exhibit 39A.

7    Q.    Do you recognize this?

8    A.    Yes, I do.

9    Q.    Who wrote this?

10    A.    Sam did.

11    Q.    And what is it generally about?

12    A.    It was a Google Doc that was sent to both people at Alameda

13    and people at Modulo about how the two companies should do a

14    better job of working together.

15                MS. SASSOON:    The government offers Government

16    Exhibit 39A.

17                MR. COHEN:    Your Honor, may we be heard briefly.

18                THE COURT:    Are you asking for another sidebar?

19                MR. COHEN:    Yes.

20                THE COURT:    Is there an objection?

21                MR. COHEN:    There is.

22                THE COURT:    What is the objection, in a word?

23                MR. COHEN:    In a word, the objection is to Nos. 1

24    through 23 on the grounds of relevance, and 403, in light of

25    the conversation we just had at sidebar.

1          THE COURT:    Let's scroll down so I can see the rest of

2    it.

3          Have I gotten to the bottom yet?

4          MS. SASSOON:    Mr. Bianco, if you can keep scrolling.

5          THE COURT:    Hold.

6          MS. SASSOON:    And I can make a proffer of relevance if

7    your Honor is interested.

8          THE COURT:    Do you want to do it there or do you want

9    to do it here?

10          MS. SASSOON:    Whatever your Honor prefers.

11          THE COURT:    Let's do it here.  And let's try to hold

12    the sidebars to a minimum from now on.

13          MR. COHEN:    Yes, your Honor.

14          MS. SASSOON:    Yes, your Honor.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:    Okay.  What's it all about?

3          MR. COHEN:    Here's my objection, your Honor.  In light

4   of the conversation we just had, what conceivable relevance is

5   it that he wrote these items, only to show that he's some sort

6   of crazy person?

7          MS. SASSOON:    I don't know how the conversation we

8   just had has bearing on this document, but the defendant, after

9   Alameda used customer money to repay its debts, continued to

10  spend——

11          THE COURT:    I'm sorry.  After?

12          MS. SASSOON:    After Alameda had borrowed customer

13  money to repay its debts, the defendant continued to pour

14  hundreds of millions of dollars into other investments,

15  including Modulo, against the objections of Caroline Ellison,

16  who, as the defense has insinuated, was responsible for

17  Alameda's financial situation.  And it also goes to knowledge

18  and intent because he's claiming he didn't know about the

19  precarious financial situation, but he was grooming Modulo as a

20  replacement for Alameda by putting money there, having

21  ownership over it, and saying on the next line, "I see myself

22  as completely aligned with Modulo."

23          MR. COHEN:    To be clear, we're just objecting to this,

24  your Honor.  And she's already elicited all the testimony she——

25          THE COURT:    The 23 enumerated paragraphs.

1         MR. COHEN:    Correct.

2         MS. SASSOON:    The defendant wrote these sentences, and

3    it does go to the dynamic between the defendant and Caroline

4    Ellison——

5         MR. COHEN:    Come on, your Honor.

6         MS. SASSOON:    ——where he's——where he's——

7         MR. COHEN:    I apologize.

8         MS. SASSOON:    ——where he's directing the type of

9    loyalty that he expects from his co-conspirator, who's

10   objecting to an investment he wants to make, and saying, *You*

11   *need to be aligned,* and, *I'm shifting away from Alameda to*

12   *Modulo.*

13        MR. COHEN:    Your Honor, I've heard the proffer.  We

14   have an additional ground of cumulativeness to all the

15   testimony she has already elicited about their relationship.

16   This, under 403, substantially outweighs any probative value of

17   these 23 items.

18        MS. SASSOON:    Your Honor, it's the heart of the case.

19        THE COURT:    Stop interrupting each other.

20        MR. COHEN:    The rest of the memo talks about points

21   counsel wants to make about the Alameda-Modulo relationship,

22   which she just elicited testimony about.  Your Honor, they

23   don't need this.

24        MS. SASSOON:    Your Honor, this is the heart of the

25   case, whether Caroline Ellison did this without his knowledge

1    or whether she was acting at his direction, and also what his

2    good-faith beliefs were about Alameda's financial situation,

3    and this document is——

4                THE COURT:    How do these 23 enumerated paragraphs go

5    to the latter?

6                MS. SASSOON:    Ms. Ellison is objecting——

7                MR. COHEN:    This is——

8                THE COURT:    Please don't interrupt each other.

9                MR. COHEN:    I apologize.

10                MS. SASSOON:    During this time, the company insiders

11    are contemplating whether Alameda is going to be replaced with

12    a new entity.  Ms. Ellison, working at Alameda, for a variety

13    of reasons doesn't want that, and the defendant instead is

14    trying to cultivate Modulo and is giving her directives in this

15    document to stop objecting, be loyal, and do what he says.

16                MR. COHEN:    And the rest of the document, your Honor,

17    is all about the Alameda-Modulo relationship, which counsel is

18    free to inquire into.  We're not objecting to that.

19                MS. SASSOON:    He wrote this during the fall of 2022.

20                THE COURT:    I'm going to allow it.

21                MR. COHEN:    Thank you.

22                (Government's Exhibit 39A received in evidence)

23                (Continued on next page)

24

25

1        (In open court)

2              THE COURT:   Now let's try to make some progress.

3              MS. SASSOON:   Mr. Bianco, if you could publish

4    Government Exhibit 39A.

5    BY MS. SASSOON:

6    Q.   Ms. Ellison, who wrote this?

7    A.   Sam wrote it.

8    Q.   And did you receive this?

9    A.   Yes, I did.

10   Q.   And what was it about?

11   A.   It was about the relationship between Alameda and Modulo.

12   Q.   And why?  What had happened before the defendant sent you

13   this document?

14   A.   I think this was after a dispute that we had over an OTC

15   trade, meaning that they had asked us to do a trade with them

16   and they hadn't been happy with the price that we had offered.

17   Q.   More generally, just to make sure I understand what you

18   mean, this is a dispute that you——that Alameda had with Modulo?

19   A.   That's right.

20   Q.   And if you could just read item No. 1 on this list.

21   A.   Says, "Being aligned and always doing whatever you think is

22   best for the company."

23             MS. SASSOON:   And if we could scroll down.  Keep

24   scrolling down.

25             Okay.  Stop.  Sorry.  Go up a little bit.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          Little bit more.  Sorry.

2          Okay.  Stop.

3     Q.   Can you just read the sentence that starts, "I, SBF."

4     A.   It says, "I, SBF, basically think both Alameda and Modulo

5     are really aligned and make reasonable, thoughtful decisions."

6          MS. SASSOON:    Okay.  And if we can scroll down a

7     little bit more.

8     Q.   Can you read item No. 7.

9     A.   It says, "SBF is aligned with Alameda plus Modulo and

10    treats 1 dollar to any as the same even though ownership

11    percentages aren't a hundred percent, and in the end I will

12    make sure that each side is fairly acknowledged and treated for

13    public goods created."

14         MS. SASSOON:    Okay.  We can take that down.

15         Mr. Bianco, can you show the witness Government

16    Exhibit 310.

17    Q.   Do you recognize this?

18    A.   Yes, this is a Slack channel called Private Ventures.

19         MS. SASSOON:    Government offers Government

20    Exhibit 310.

21         MR. COHEN:    No objection.

22         THE COURT:    Received.

23         (Government's Exhibit 310 received in evidence)

24         MS. SASSOON:    Mr. Bianco, if you could publish this

25    for the jury.

1    BY MS. SASSOON:

2    Q.    You mentioned Slack.  Was that another way employees of the

3    company communicated?

4    A.    Yes, we often had less sensitive or more routine

5    communications over Slack.

6              MS. SASSOON:    And if we could go to the next page.

7    Q.    Can you read the defendant's message on June 24, 2022.

8    A.    Yeah.  It says, "$50 million for Modulo Capital LP.  We

9    should send via Signet," and then gives an address.

10   Q.    What does it mean to send $50 million by Signet?

11   A.    Signet is a banking system that a lot of companies and

12   crypto use, so that meant send $50 million from our bank

13   account to their bank account.

14   Q.    And what had happened shortly before the defendant directed

15   a $50 million payment to Modulo?

16   A.    This is around a week after Alameda had used billions of

17   dollars of FTX customer funds to repay our loans.

18   Q.    And in your view, did Alameda have liquid funds at this

19   time to make these sorts of investments?

20   A.    No.  All of our liquid funds were coming from money we had

21   borrowed from FTX.

22   Q.    And so where did you understand the money for this

23   $50 million to Modulo was coming from?

24   A.    It was coming from Alameda, and that was ultimately coming

25   from FTX customers.

1    Q.    You discussed related-party loans throughout your

2    testimony.

3            MS. SASSOON:    You could take this down.

4    Q.    Did you continue to track intercompany loans into the fall

5    of 2022?

6    A.    Yes, I did.

7            MS. SASSOON:    Mr. Bianco, can you show the witness

8    Government Exhibit 41.

9    Q.    What is this?

10   A.    This is a spreadsheet I made to track intercompany loans.

11           MS. SASSOON:    Government offers Government Exhibit 41,

12   which is called——which the parties have stipulated is a

13   document called Intercompany Stuff, dated September 18, 2022.

14           MR. COHEN:    No objection, your Honor.

15           THE COURT:    Received.

16           (Government's Exhibit 41 received in evidence)

17           MS. SASSOON:    Mr. Bianco, can you publish this for the

18   jury.

19   BY MS. SASSOON:

20   Q.    What is this?

21   A.    This is a spreadsheet that I made to track loans that were

22   made by Alameda to related parties and entities.

23   Q.    So who are the——what are some of the names of individuals

24   that are on this list?

25   A.    The individuals include Sam Bankman-Fried, Nishad Singh,

1    Gary Wang, and Ryan Salame.

2    Q.    And what about some of these entities?

3    A.    Paper Bird was the entity that Sam used to hold his FTX

4    shares; ARV, LLC was an entity that was used to make US-based

5    venture investments.

6    Q.    And what's the total amount of these loans in column C?

7    A.    The total amount is $8.2 billion.

8    Q.    Let's go to the second tab called Transactions.

9        MS. SASSOON:    And Mr. Bianco, if you could expand

10   column C.

11   Q.    What is this tab?

12   A.    This is a tab with the——each individual loan that was made.

13   Q.    And just taking an example, can you read the entries in row

14   1.  What is this?

15   A.    You mean in spreadsheet row 2 or——

16   Q.    Yes.

17   A.    The lending entity is Alameda Research, LLC, and it was

18   being lent to Alameda Research Investments, Ltd.  The amount

19   was $100 million.  The date was September 20, 2022.  And the

20   notes say that the invest——the loan was for an investment into

21   Modulo.

22   Q.    Let's look at row 40.  And what does row 40 show about how

23   much money was loaned to Ryan Salame?

24   A.    It shows that it was around $35 million.

25   Q.    Directing your attention to rows 41 to 55, who is the

1   recipient of the loans listed here?

2   A.   Sam was.

3   Q.   And looking at row 48 as an example, it says there was a

4   loan of 20 million on October 1, 2021, that was used for GAP.

5   What is GAP?

6   A.   GAP stands for Guarding Against Pandemics.  That was Sam's

7   political lobbying organization.

8   Q.   And what did you learn about how the money to GAP was

9   spent?

10   A.   I learned that it was spent on donations to congressional

11   candidates and to political action committees.

12   Q.   Overall, in the summer and fall of 2022, what did you

13   understand about where the money was coming from to make

14   additional venture investments?

15   A.   I understood that it was coming from Alameda and that

16   Alameda's money was coming from FTX customer funds.

17   Q.   In your view, by making additional investments in the fall

18   and summer of 2022, what effect did this have on Alameda's

19   ability to repay its debt?

20          MR. COHEN:   Objection.  Asked and answered.

21          THE COURT:   Sustained.

22   Q.   Let's turn to November of 2022.

23          At a high level, what happened in November of 2022?

24   A.   Alameda's balance sheet got leaked to CoinDesk, a crypto

25   news outlet.  This caused a general market concern about

1    Alameda that increased, ultimately FTT went down a lot, and

2    people started withdrawing a lot of money from FTX, and FTX did

3    not have enough assets to meet all of those withdrawals.

4    Q.    And so what happened?

5    A.    So FTX and Alameda went bankrupt.

6              MS. SASSOON:    Let's pull up Government Exhibit 1087,

7    which is in evidence.

8    Q.    Let's start first on November 2nd, which is a Wednesday.

9    Where were you on November 2nd?

10   A.    I was on vacation in Japan.

11   Q.    And what happened on that day?

12   A.    Alameda's balance sheet was leaked to CoinDesk.

13   Q.    And when we're talking about Alameda's balance sheet

14   getting leaked, is this the internal balance sheet or a version

15   of the external balance sheet that was shared with lenders?

16   A.    This was a version of the external balance sheet that was

17   shared with lenders.

18   Q.    And what did you do when you learned that Alameda's

19   external balance sheet was leaked?

20   A.    I——I considered whether to comment for the article and

21   discussed the question in a group with Sam and others but

22   decided not to make any comment.

23   Q.    Why is that?

24   A.    I mean, most of the time by default I wouldn't comment on

25   articles, and there wasn't anything we could think of that

1    seemed like a clearly helpful comment, and I was hoping at the

2    time the news would just blow over.

3    Q.    What did the leaked balance sheet show?

4    A.    I mean, it was dishonest so it understated the true extent

5    of Alameda's risk, but it still showed that Alameda was in a

6    fairly risky position and that a lot of this——its assets were

7    FTT and other risky cryptocurrencies.

8    Q.    What happened in the days immediately following this

9    article that leaked Alameda's balance sheet?

10    A.    At first not much happened for a couple days, but then

11    concern about Alameda started to grow and eventually FTT

12    started going down and people started withdrawing money in

13    greater numbers from FTX.

14    Q.    Let's turn to Sunday, November 6th.  Where were you on that

15    day?

16    A.    At that point I was in Hong Kong, working out of the Hong

17    Kong office.

18    Q.    And that was Alameda's Hong Kong office?

19    A.    Yes, that's right.

20    Q.    How were you communicating with the defendant that day?

21    A.    Over Signal, and I know we had some phone calls during this

22    period.  I don't remember specifically if there were any on

23    that day.

24    Q.    With respect to what you described as increased FTX

25    customer withdrawals, what, if anything, was the defendant

1    telling you to do?

2    A.    He said to liquidate Alameda's positions and send the money

3    to FTX.

4    Q.    Why?

5    A.    Because——I don't think I——I don't think he specified a

6    reason, but that was our general practice when there were FTX

7    customer withdrawals.

8                   MS. SASSOON:    Mr. Bianco, can you show the witness

9    Government Exhibit 1621.

10                   And if you could zoom in a little so the witness can

11   see the top.

12   Q.    What is this?

13   A.    This is a chat between Sam, me, and Nishad.

14                   MS. SASSOON:    The government offers Government

15   Exhibit 1621.

16                   THE COURT:    Received.

17                   (Government's Exhibit 1621 received in evidence)

18                   (Continued on next page)

19

20

21

22

23

24

25

1          MS. SASSOON:  Mr. Bianco, can you publish Government

2     Exhibit 1621.

3     Q.  Do you recognize these messages between you, Nishad, and

4     the defendant?

5     A.  Yes, I do.

6     Q.  What's the date here?

7     A.  November 6, 2022.

8     Q.  You testified about auto-deletion features of Signal.  At

9     some point did you start preserving your messages in November?

10    A.  Yes, I did.

11    Q.  Why?

12    A.  Everyone else in the company was starting to preserve their

13    messages, and I think someone said that there was a legal

14    reason we should, though I don't remember who.

15         MR. COHEN:  Objection.  Move to strike.

16         THE COURT:  I will deny the motion to strike, but I

17    will receive the someone said comment simply for the fact that

18    somebody said it not for the truth of it and for the fact that

19    the witness became aware of it and to explain what she did or

20    didn't do.

21    Q.  Let's take a look at these messages.  The first message,

22    Nishad Singh wrote:  Lots of withdrawals on FTX are queuing up.

23    Net changes:  Negative 1.25 billion in the last day, negative

24    230 million in the last three hours, negative 120 million in

25    the last hour.

NABMBAN4                        Ellison - Direct

1          What do those numbers represent?

2    A.  That represents the amount of money that FTX customers had

3    withdrawn in the past day and few hours.

4    Q.  In your experience, was that typical?

5    A.  No.  Typical was a lot less than that.

6    Q.  Nishad Singh then wrote you:  Continuing so far at about

7    120 million an hour.

8          What is that referring to?

9    A.  He is saying that there were continued withdrawals, about

10   $120 million dollars' worth, in the past hour.

11   Q.  You wrote back with a sad face.  Why did you write a sad

12   face?

13   A.  I mean, I was terrified.  This was what I had been worried

14   about for the past several months and it was finally happening.

15   I thought that at this point everything about FTX and Alameda

16   was going to come out.

17   Q.  What did the defendant respond?

18   A.  He responded oof.

19   Q.  And at this point in time, what was your understanding

20   about whether Alameda or FTX could satisfy all customer

21   withdrawals if they continue to increase?

22   A.  My understanding was that we could not.

23   Q.  Why?

24   A.  Based on the most recent balance sheets.  I think the most

25   recent one we looked at, at around $14 billion that we were

1  borrowing from FTX, and more like $6 billion of liquid assets

2  that we had on hand.

3  Q.  The balance sheets we looked at also had a number of other

4  assets on the balance sheet.  Did that comfort you?

5  A.  Not really.  I mean, for one thing, in any sort of market

6  conditions, it would be hard to sell those assets quickly.  But

7  also, if people were starting to withdraw in large amounts from

8  FTX, that would be very negative news for FTX's future and,

9  therefore, would mean our FTX equity and FTT holdings would be

10  worth a lot less, if not zero.

11  Q.  Looking at the bottom here you wrote:  Ryan is asking me if

12  FTX can meet all withdrawals.  What should I say.

13         Who is Ryan?

14  A.  That's Ryan Salame.  He was an employee at FTX.

15  Q.  Why are you asking about what to say to Ryan about whether

16  FTX could meet all withdrawals?

17  A.  I mean, I knew that FTX could not meet all withdrawals, but

18  that was a fact that we had tried to conceal in the past, and I

19  was wondering whether I should continue trying to conceal it or

20  just start being honest with people about it once it was

21  becoming evident.

22         MS. SASSOON:  Can we scroll down to the defendant's

23  message that begins, maybe something like.  Stop.

24         Mr. Bianco, can you zoom in.

25  Q.  Can you read the defendant's message?

1   A.  It says:  Maybe something like we can meet a ton, though

2   it's already getting large.

3   Q.  What's IDK?

4   A.  I don't know.

5   Q.  At that point in time what did you think was the accurate

6   response to Ryan Salame's question as to whether FTX could meet

7   all withdrawals?

8   A.  I thought the accurate response was, no, we could not.

9   Q.  Did you take any public steps on November 6 in light of

10  surging customer withdrawals?

11  A.  Yes, I did.  I made tweets about Alameda's balance sheet.

12  Q.  Why on November 6 did you tweet about Alameda's balance

13  sheet?

14  A.  Sam started a group Signal chat with me and a few others

15  and said that the concern around Alameda's balance sheet had

16  been growing, and he thought that we needed to do something

17  publicly to address this concern.

18  Q.  And how did it come about that it was addressed through a

19  tweet by you?

20  A.  I think someone said that we should tweet, and Sam said, I

21  can't be the one to tweet because I don't want to be associated

22  with Alameda, and I said, I don't want to tweet but I can.

23  Q.  Why didn't you want to tweet?

24  A.  Because I knew that the purpose of such a tweet would be to

25  try to mislead people and give them false reassurance.

1          MS. SASSOON:  Mr. Bianco, can you show the witness

2    Government Exhibit 875.

3    Q.  Do you recognize this?

4    A.  Yes.  These are the tweets I made on that day.

5          MS. SASSOON:  The government offers Government Exhibit

6    875.

7          MR. COHEN:  No objection.

8          THE COURT:  Received.

9          (Government Exhibit 875 received in evidence)

10         MS. SASSOON:  Mr. Bianco, can you please publish

11   Government Exhibit 875.

12   Q.  Whose tweet is this?

13   A.  Those are my tweets.

14   Q.  What is the date of your tweet?

15   A.  November 6, 2022.

16   Q.  Can you read what you wrote.

17   A.  I said:  A few notes on the balance sheet info that has

18   been circulating recently.  That specific balance sheet is for

19   a subset of our corporate entities.  We have greater than $10

20   billion of assets that aren't reflected there.

21         The balance sheet breaks out a few of our biggest long

22   positions.  We obviously have hedges that aren't listed.  Given

23   the tightening in the crypto credit space this year, we've

24   returned most of our loans by now.

25   Q.  How is this tweet meant to reassure customers?

NABMBAN4                              Ellison - Direct

1   A.   It was meant to imply that our liabilities were less than

2   they might think because it says we return most of our loans

3   and that we had more assets than they might think and that our

4   positions were less risky than they might think.

5   Q.   Was the tweet misleading?

6   A.   Yeah, I think it was.

7   Q.   How?

8   A.   In the statement that we've returned most of our loans by

9   now, it was true that we had returned most of our loans to

10  third-party lenders, but we had done so by taking out more

11  loans from FTX.

12  Q.   And what about the statement that there is an additional

13  $10 billion of assets that were not on your balance sheet?

14  A.   Yeah.  In that statement I was meaning to refer to Sam's

15  holdings of FTX equity in the Paper Bird entity, but I think it

16  was misleading because it was a separate entity from Alameda,

17  and because when people see the number 10 billion of assets,

18  they probably wouldn't think that it was all in the same risky

19  asset of FTX's equity.

20  Q.   What was the process for drafting this tweet?

21  A.   There was some discussion in the group about different

22  ideas for what to include.  Based on those discussions, Sam

23  wrote a tweet that he said I could send.  A few other people,

24  Nishad and Ryan, both rewrote their own versions, and

25  ultimately I rewrote it in my own words and sent the tweet.

1          MS. SASSOON:  Mr. Bianco, can you show the witness

2     Government Exhibit 20.

3     Q.   What is this, Ms. Ellison?

4     A.   This is a Google Doc I made around the time with all of the

5     draft versions of the tweet.

6          MS. SASSOON:  The government offers Government Exhibit

7     20.

8          MR. COHEN:  No objection.

9          THE COURT:  Received.

10         (Government Exhibit 20 received in evidence)

11         MS. SASSOON:  Mr. Bianco, if you could publish this

12    exhibit for Ms. Ellison and the jury.

13    Q.   Can you explain the different parts of this document, what

14    it shows overall.

15    A.   Yeah.  The first part, starting with, heh, I see, and

16    ending with, see, we have already returned most of our loans,

17    is the initial tweet by Sam or the proposed tweet by Sam.

18    Below that is Nishad's proposal, Ryan's proposal, and, finally,

19    mine.

20    Q.   And you said the top has a tweet drafted by the defendant.

21    How did it end up in this document?

22    A.   I copy and pasted all of the ideas into this document when

23    I was writing my own version.

24    Q.   And why didn't you post this version drafted by the

25    defendant?

NABMBAN4                        Ellison - Direct

1   A.  Other people in the group said, and I agreed, that it

2   sounded like his writing style.

3        MS. SASSOON:  We can take that down.

4   Q.  We have been talking about November 6.  Did the defendant

5   also tweet that day?

6   A.  Yes, he did.

7        MS. SASSOON:  Mr. Bianco, can you show the witness

8   Government Exhibit 863.

9        And this is in evidence.  We can publish it.

10  Q.  Ms. Ellison, this is a tweet from November 6, 2022.  Did

11  you see it at the time?

12  A.  Yeah, I did.

13  Q.  And did you consider this tweet misleading?

14  A.  Yeah, I did.

15  Q.  In what ways was this tweet misleading?

16  A.  One thing is that it refers to FTX keeping audited

17  financials, which is true.  But as we have discussed, the

18  audited financials didn't look at FTX's customer balances,

19  which was the issue in question here.

20       Another thing is, talking about processing

21  withdrawals, it refers to problems as anti-spam checks and no

22  great capacity, when I believe the primary problem was that FTX

23  just didn't have enough assets to process all of the

24  withdrawals.

25  Q.  Did CZ, the CEO of Binance, also tweet that day?

NABMBAN4                        Ellison - Direct

```
 1    A.  Yes, he did.

 2              MS. SASSOON:  Mr. Bianco, can you show the witness

 3    Government Exhibit 874.  If you could zoom in at the top.

 4    Q.  Ms. Ellison, do you recognize this?

 5    A.  Yes, I do.

 6    Q.  What is it?

 7    A.  This is a series of tweets from CZ, the CEO of Binance.

 8              MS. SASSOON:  The government offers Government Exhibit

 9    874.

10              MR. COHEN:  No objection, your Honor.

11              THE COURT:  Received.

12              (Government Exhibit 874 received in evidence)

13              MS. SASSOON:  Mr. Bianco, can you publish this for the

14    jury.

15    Q.  Can you read the top tweet by CZ of Binance.

16    A.  It says:  As part of Binance's exit from FTX equity last

17    year, Binance received roughly $2.1 billion USD equivalent in

18    cash, BUSD and FTT.  Due to recent revelations that have came

19    to light, we have decided to liquidate any remaining FTT on our

20    books.

21    Q.  Did you see this tweet at the time?

22    A.  Yes, I did.

23    Q.  What was your reaction?

24    A.  I was very upset and stressed out by it.  I had been hoping

25    that my tweet thread would reassure people, and it seemed like
```

 1    it did for a bit, but then this tweet thread brought up --

 2    brought concerns back and made them even stronger.

 3    Q.  Can you explain why this tweet raised concerns?

 4    A.  Because CZ refers to recent revelations that have come to

 5    light and says that they are selling all of their FTTs.  So

 6    it's both very bad news for the price of FTT and also

 7    suggesting that Binance is aware of negative news about FTX and

 8    Alameda.

 9    Q.  Did you discuss this tweet with the defendant?

10    A.  Yes, we did.

11    Q.  What did you discuss?

12    A.  We discussed how to respond and decided that I should a

13    tweet in response.

14          MS. SASSOON:  Mr. Bianco, can you show the witness

15    Government Exhibit 413A.

16    Q.  Do you recognize this?

17    A.  Yes.  This is a Signal chat group I was in.

18          MS. SASSOON:  The government offers Government Exhibit

19    413A.

20          MR. COHEN:  No objection, your Honor.

21          THE COURT:  Received.

22          (Government Exhibit 413A received in evidence)

23          MS. SASSOON:  Mr. Bianco, can you publish this for the

24    jury.

25    Q.  This is a Signal chat group called Vertex with Caroline

NABMBAN4                          Ellison - Direct

1   Ellison, Sam Bankman-Fried, Sam Trabucco, and B.  Who is B?

2   A.  B was Ben Xie, who was the head of trading in Alameda.

3   Q.  Prior to November 6, 2022, what was this group chat used

4   for?

5   A.  It was used primarily for the subject of trading.  The most

6   common topics were our overall deltas, like any large trades we

7   were doing and our FTT trading.

8   Q.  When you refer to trading, are you talking about trading

9   Alameda?

10  A.  Yes, alameda's trading.

11  Q.  And the defendant was a member of that group?

12  A.  Yes, he was.

13  Q.  At the top you wrote:  I think I am going to tweet at CZ

14  that we will buy it all from him at $22.  Any objections?

15          What is the it that you're proposing buying it all for

16  $22?

17  A.  That refers to the FTT holdings that Binance had.

18  Q.  Why were you suggesting buying all of Binance's FTT for

19  $22?

20  A.  For one thing, the price of FTT had gone down when CZ had

21  tweeted, and I was hoping that tweeting would make it go back

22  up.

23          I also wanted to call his bluff in some sense because

24  I felt that if he really wanted to sell his FTT, he wouldn't

25  preannounce to the market that he was going to sell it.  He

1   would just sell it.  So I wanted to point out that his real aim

2   in that tweet, as I saw it, was not to sell his FTT, but was to

3   hurt FTX and Alameda.

4   Q.  Can you read the defendant's message in this thread.

5   A.  Yeah.  He says:  I think the main point is just to counter

6   the PR/narrative here, and Binance probably won't take us up on

7   it.  I also think, for what it's worth, that the market is more

8   likely to buy more if we tweet it, but I don't know.

9   Q.  You wrote back:  I am about to tweet.  FTT will go up.

10          Did you post a tweet?

11  A.  Yes, I did.

12  Q.  And when you tweeted, were you trying to counter a

13  PR/narrative?

14  A.  Yes, I was.

15  Q.  What narrative?

16  A.  The narrative that FTX and Alameda had serious problems and

17  were potentially insolvent.

18  Q.  In your view, at that time, was Alameda and FTX potentially

19  insolvent?

20  A.  Yeah, absolutely.

21          MS. SASSOON:  Mr. Bianco, can you please show the

22  witness Government Exhibit 876.

23  Q.  Do you recognize this tweet?

24  A.  Yeah.

25  Q.  What is it?

1   A.   That's the tweet that I made at the time offering to buy

2   the FTT from CZ at $22.

3            MS. SASSOON:   The government offers Government Exhibit

4   876.

5            MR. COHEN:   No objection.

6            THE COURT:   Received.

7            (Government Exhibit 876 received in evidence)

8            MS. SASSOON:   Mr. Bianco, can you publish this tweet

9   for the jury.

10  Q.   On what date did you tweet offering to buy Binance's FTT

11  for $22?

12  A.   This was on November 6.

13  Q.   What happened to the price of FTT after these tweets?

14  A.   It went down after CZ's tweet, it went up after my tweet,

15  and stayed around $22 for some period of time but eventually

16  went back down.

17  Q.   For a period of time did Alameda buy FTT?

18  A.   Yes, we did.

19  Q.   Did there come a time when Alameda stopped buying FTT and

20  $22?

21  A.   Yes.   There came a time where I saw that we had been buying

22  large amounts of FTT, and I said to Sam, I think it was in this

23  same chat group, something like, we've been seeing a lot of

24  selling.   Is it time to give up on defending the $22?   And he

25  said, yeah, that sounds right.

NABMBAN4                              Ellison - Direct

1    Q.  About how much money did Alameda spend buying up FTT during

2    this November of time frame?

3    A.  I don't remember exactly.  Maybe in the tens of millions of

4    dollars.  Could have been a hundred million dollars or more.

5    Q.  If Alameda had not spent that money buying FTT, how would

6    that money have been used?

7         MR. COHEN:  Objection.

8    A.  It would most likely have been sent to FTX to help process

9    customer withdrawals.

10   Q.  In your view, was FTX having trouble satisfying customer

11   withdrawals because of the price of FTT?

12   A.  No.  I wouldn't have said that that was a major factor.

13   Q.  If the price of FTT had remained at $22, in your view,

14   would FTX have been able to process all customer withdrawals?

15   A.  No, not unless something else significant changed.  The

16   customers, they weren't withdrawing FTT.  They were withdrawing

17   other currencies, so our FTT would have needed to be sold to

18   other currencies.  And whatever else was happening in the

19   market, if we tried to sell billions of dollars of FTT, it

20   would have a huge negative price impact.

21   Q.  Let's turn to November 7, which is a Monday.  Did you

22   continue to communicate with the defendant on Signal that day?

23   A.  Yes, I did.

24        MS. SASSOON:  Mr. Bianco, can you show the witness

25   Government Exhibit 406.

1   Q.  Do you recognize these chats that include you and the

2   defendant?

3   A.  Yes, I do.

4           MS. SASSOON:  The government offers Government Exhibit

5   406.

6           MR. COHEN:  No objection.

7           THE COURT:  Received.

8           (Government Exhibit 406 received in evidence)

9           MS. SASSOON:  Mr. Bianco, please publish this exhibit

10  for the jury.

11  Q.  What was small group chat?

12  A.  It was a chat that Sam made around this time to discuss our

13  capital situation and potential fundraising.

14  Q.  What's the date of this excerpt from small group chat?

15  A.  November 7, 2022.

16  Q.  Do you see the defendant's message beginning, so right now,

17  and ending with, so that's roughly 1 to $2 billion left?

18  A.  Yes.

19  Q.  What is this list?

20  A.  That's a list of liquid assets that FTX and Alameda had.

21  Q.  What does this show about the amount of liquid assets that

22  FTX and Alameda had left?

23  A.  It showed, according to this list, that it was around 1 to

24  $2 billion.

25  Q.  You wrote:  I think Alameda can get more than that by

1  scraping stuff together and closing our remaining positions.

2            Do you see that?

3  A.   Yes.

4  Q.   Why would Alameda do that?

5  A.   Because Alameda was the one who had borrowed all this money

6  from FTX, so we were doing what we could to repay it.

7  Q.   Were these positions you described scraping together

8  positions that were on the FTX exchange, or elsewhere?

9  A.   No.  These were positions that were elsewhere.

10 Q.   These were not assets on FTX.

11 A.   No.

12 Q.   Let's continue down.

13           MS. SASSOON:  Mr. Bianco, if you can scroll down more.

14 Stop there.

15           I apologize.  Please scroll back up to the first table

16 and stop there.

17 Q.   Do you see this table sent by the defendant?

18 A.   Yes, I do.

19 Q.   What does the table show?

20 A.   It was a table of Alameda and FTX's liquid assets that he

21 thought we could access on a week time scale.

22 Q.   It says total 3.9.  What does that mean?

23 A.   That means the total is $3.9 billion that we could get

24 within a week.

25 Q.   Just to be clear, where it says, does this look right on a

1    week time scale, what does that mean?

2    A.   That means these were things that I thought we could close

3    or sell or access within the next week.

4          MS. SASSOON:  Let scroll down.

5    Q.   You wrote:  Seems ballpark reasonable to me.

6          Why did these numbers seem ballpark reasonable to you?

7    A.   Because they were based on numbers that I had given him and

8    we have been discussing together about Alameda's balance sheet.

9    Q.   If Alameda and FTX could in fact access $3.9 billion on a

10   week time scale, would that have been enough for all FTX

11   customers?

12   A.   No, not nearly enough.

13   Q.   Let's look at this next chart.

14         Do you see the same total, 3.9 billion?

15   A.   Yes, I do.

16   Q.   There are two additional rows at the bottom.  It says cust

17   assets, question mark, 12.  Difference, 8.1.

18         What is cust assets, question mark, 12?

19   A.   That means that there were around $12 billion of customer

20   holdings on the exchange.

21   Q.   Where it says difference, 8.1, what's that?

22   A.   That's the difference between the amount of liquid assets

23   that we had and the amount that customers had and were entitled

24   to withdraw.

25   Q.   Is that 12 minus 3.9?

1    A.  Yes, that's right.

2    Q.  I just want to clarify this $8.1 billion number.  Is that

3    the total amount of money Alameda had borrowed from FTX

4    customers, or something else?

5    A.  No.  The total amount of money was higher, but we had

6    repaid some of it, and we had the potential to repay more of

7    it.

8    Q.  Is this $8.1 billion number only what Alameda owed for FTX

9    customer dollar deposits?

10   A.  No.  It included both the fiat liabilities and crypto

11   liabilities.

12   Q.  Had you known the rough size of this difference between

13   customer holdings and what was available for customers prior to

14   November 7?

15   A.  Yeah, I had.

16   Q.  How?

17   A.  For instance, in the most recent balance sheet we talked

18   about, the balance sheet stated that we were borrowing $14

19   billion from FTX and that we had around $6 billion in liquid

20   assets.  The difference in those is $8 billion, which is the

21   same as we see here.

22   Q.  And is that a spreadsheet that you had shared with the

23   defendant?

24   A.  Yes, it is.

25          MS. SASSOON:  Mr. Bianco, can you please show the

NABMBAN4                          Ellison - Direct

1   witness Government Exhibit 480D.

2   Q.  Do you recognize these chats?

3   A.  Yeah.

4   Q.  Who are the participants in these chats?

5   A.  This is a chat between me and Sam.

6              MS. SASSOON:  The government offers Government Exhibit

7   480D.

8              THE COURT:  D as in David?

9              MS. SASSOON:  Yes.

10             MR. COHEN:  No objection.

11             THE COURT:  Received.

12             (Government Exhibit 480D received in evidence)

13             MR. COHEN:  Your Honor, one thing, if I can just

14   consult with Ms. Sassoon for just a moment.

15             THE COURT:  Yes.

16             MR. COHEN:  OK.  We are fine, your Honor.  Thank you.

17             MS. SASSOON:  Mr. Bianco, if you could publish 480D.

18  Q.  Who are these messages between?

19  A.  These are messages between me and Sam.

20  Q.  Where it says at the top, by the way, if things got a lot

21  worse, I don't think I am going to handle it well, who wrote

22  that?

23  A.  That was me.

24  Q.  And the next message in black, who wrote that?

25  A.  That was also me.

NABMBAN4                        Ellison - Direct

1   Q.  It says:  This was such a bad prediction.  This is the best

2   mood I've been in in like a year, to be honest.

3           The responses in blue, who wrote those?

4   A.  Those were written by Sam.

5   Q.  What did Sam write?

6   A.  He said:  Wow, huh, congrats?  Because shit's exciting.

7   Q.  What did you write back?

8   A.  I said:  I think I just had an increasing dread of this day

9   that was weighing on me for a long time, and now that it's

10  actually happening, it just feels great to get it over with one

11  way or another.

12  Q.  Did you write these messages around the time that FTX

13  customer withdrawals were surging?

14  A.  Yes.  That's right.

15          MR. COHEN:  I'm sorry.  Do we have a specific date for

16  this chat?

17          THE COURT:  Let's do that, if we can.

18          MS. SASSOON:  Your Honor, because this is a

19  screenshot, there is no date on the message itself.

20  Q.  But, Ms. Ellison, do you recall around when you wrote this?

21  A.  My recollection is that it was around November 7.

22  Q.  At this point in time were you aware of the shortfall in

23  customer funds on the FTX exchange?

24  A.  Yes, I was.

25  Q.  In light of that, why are you saying that this is the best

NABMBAN4                          Ellison - Direct

1   mood you've been in in a year?

2   A.  I mean, yeah.  To be clear, that was overall the worst week

3   of my life.  I had a lot of mood swings during that week and a

4   lot of different feelings.  But one of the feelings I had was

5   an overwhelming feeling of relief because, as I said, this had

6   been something that I had been dreading for so long, for the

7   past several months.  It's something that had been in my mind

8   every day, worrying about what would happen when the truth

9   finally came out.  And I felt a sense of relief that I didn't

10  have to lie anymore, that I could start taking responsibility

11  and being honest about what I had done, even though I obviously

12  felt indescribably bad about all of the people that were harmed

13  and the people that lost their money, the employees that lost

14  their jobs, people that trusted us that we had betrayed.

15  Q.  Why were you sharing this with the defendant?

16  A.  Because I didn't feel like there was anyone else I could

17  talk to about these feelings because I had been -- this had

18  been something I had been trying to keep secret for the past

19  several months.

20  Q.  When you say it was something you were trying to keep

21  secret, did that include from the defendant?

22  A.  No.  I mean, the -- Alameda taking FTX customer funds was

23  something that I had been trying to keep secret, and I didn't

24  share my feelings much with the defendant about this prior to

25  this that I can recall.

NABMBAN4                        Ellison - Direct

1    Q.  With respect to keeping the use of customer funds secret,

2    who were you keeping that secret from?

3    A.  From the public.

4    Q.  What about -- I just want to be clear.  Were you keeping

5    that from the defendant?

6    A.  No.  It was something we discussed frequently.

7              MS. SASSOON:  We can take that down.

8              Mr. Bianco, can you show the witness Government

9    Exhibit 407.

10   Q.  Is this another excerpt from small group chat?

11   A.  Yes, it is.

12             MS. SASSOON:  The government offers Government Exhibit

13   407.

14             THE COURT:  Received.

15             (Government Exhibit 407 received in evidence)

16             MS. SASSOON:  Mr. Bianco, can you publish this.

17   Q.  The first message on November 7, 2022 here says:  Current

18   status.docx.

19             What is that?

20   A.  That's a link to a document that Sam was sending in this

21   chat.

22   Q.  Is this an example of how you would share documents with

23   the defendant over Signal?

24   A.  Yeah.  More often it would be a Google Doc and, as I said,

25   this might be a Word document, but, yes, we would often share

1    documents over Signal.

2    Q.   Beneath that it says:  Potential to-dos:  1.  Reach out to

3    Briger, Dustin, Silverlake, Sequoia, and Apollo when they wake

4    up.

5            Who were those entities or people?

6    A.   Those were all investors or potential investors in FTX.

7    Q.   What did the defendant say for the reason for reaching out

8    to these folks.

9    A.   To get an emergency infusion of capital, basically to see

10   if we could sell any stock in FTX very quickly at a big

11   discount so that we could use the funds to process more

12   customer withdrawals.

13           MS. SASSOON:  Mr. Bianco, can you show the witness

14   Government Exhibit 21.

15   Q.   Do you recognize this?

16   A.   Yeah, I do.

17   Q.   Who wrote this?

18   A.   Sam wrote this.

19           MS. SASSOON:  The government offers Government Exhibit

20   21, which the parties have stipulated is a document called

21   sources, dated November 6, 2022.

22           THE COURT:  Received.

23           (Government Exhibit 21 received in evidence)

24           MS. SASSOON:  Mr. Bianco, can you publish that.

25   Q.   Who wrote this document?

NABMBAN4                          Ellison - Direct

1   A.   It was written by Sam.

2   Q.   And around when did he receive it?

3   A.   In -- during that week in November of 2022.

4   Q.   And this list 1 to 14, what is that?

5   A.   Those were potential investors in FTX that Sam or others

6   were going to reach out to.

7        MS. SASSOON:  Let's go to the bottom half of this

8   list.  I apologize.  The bottom half of this document.

9   Q.   Do you see where it says current status?

10  A.   Yeah.

11  Q.   I'd like to focus your attention on number 6.  Can you read

12  item number 6.

13  A.   Yeah.  It says:  That means:  1.  We have roughly enough to

14  process current withdrawals.  2.  We have another two to three

15  billion of liquidity this week.  3.  That would mean enough to

16  process one-third of remaining client assets.

17  Q.   With that number 3, what does that mean?

18  A.   That means that out of the $12 billion of client assets on

19  the exchange, FTX only had one-third of that, so $4 billion

20  available to process their withdrawals.

21       MS. SASSOON:  Let's go to the bottom of this document,

22  where it says potential to-dos.

23  Q.   This list here, 1 through 4, does that resemble what we saw

24  in small group chat?

25  A.   Yeah, it does.

NABMBAN4                              Ellison - Direct

1    Q.   What does it mean to halt withdrawals?

2    A.   It means to stop FTX customers from continuing to withdraw

3    their funds.

4    Q.   Did that happen on November 6 or November 7 of 2022?

5    A.   No, I don't think so.

6    Q.   What about number 2, send a confident tweet thread?

7    A.   Yeah.  Sam did do that.

8              MS. SASSOON:  Let's take a look at Government Exhibit

9    866.

10   Q.   I'll focus your attention on number 2:  FTX has enough to

11   cover all client holdings.  We don't investigate client assets,

12   even in treasuries.

13             On November 7, 2022, was that true?

14   A.   No, it was not.

15   Q.   And why not?

16   A.   Because it says that FTX has enough to cover all client

17   holdings, but, as we have just been seeing from internal

18   documents, FTX only had $4 billion to cover $12 billion of

19   client holdings, and FTX didn't invest assets itself directly;

20   it loaned them to Alameda, who invested them in assets that

21   were much riskier than treasuries.

22   Q.   Then it says:  We have been processing all withdrawals and

23   will continue to be.

24             What do you understand about FTX's ability to process

25   all withdrawals?

NABMBAN4                        Ellison - Direct

1    A.   I understood that FTX did not have the ability to process

2    all or even half of its withdrawals.

3    Q.   Do you recall customers of FTX tweeting around this time?

4    A.   Yeah, I do.

5              MS. SASSOON:  Mr. Bianco, if you could show the

6    witness Government Exhibit 408.

7    Q.   Do you recognize these messages from small group chat?

8    A.   Yeah, I do.

9              MS. SASSOON:  The government offers Government Exhibit

10   408.

11             THE COURT:  Received.

12             (Government Exhibit 408 received in evidence)

13             MS. SASSOON:  Mr. Bianco, if you could publish this.

14   Q.   Ms. Ellison, do you recall getting a message from Ryan

15   Salame on November 7, 2022 with a link to

16   Twitter.com/moonoverlord?

17   A.   Yeah, I do.

18             MS. SASSOON:  The government also offers Government

19   Exhibit 871, which is a tweet, according to the parties'

20   stipulation, a retweet.

21             Mr. Bianco, if we could pull that up just for the

22   Court and the witness.  Page 4.

23             MR. COHEN:  No objection, your Honor.

24             THE COURT:  871 is received.

25             (Government Exhibit 871 received in evidence)

1          MS. SASSOON:  Mr. Bianco, can you pull up Government

2     Exhibit 871 alongside Government Exhibit 408.

3     Q.  Can you read the tweet by moon over lord?

4     A.  It says:  Can't wait for my FTX airdrop for not moving any

5     of my funds.

6     Q.  And at the top what does it say here?

7     A.  It says:  SBF retweeted.

8     Q.  What does it mean to retweet?

9     A.  It means to republish someone else's tweet so that it

10    appears on your own timeline and your followers will see it.

11    Q.  Just to be clear, if you retweet something, it would be

12    published on your own Twitter page?

13    A.  Yes, that's right.

14    Q.  What's the date of that?

15    A.  November 7, 2022.

16    Q.  Was this around the time you were having discussions with

17    the defendant about discouraging customers from withdrawing

18    their funds from FTX?

19    A.  Yeah.

20         MS. SASSOON:  You can take that down.

21    Q.  While customer withdrawals were increasing, what was going

22    on with Alameda's lenders?

23    A.  Alameda's lenders also started recalling their loans.

24    Q.  And these are the remaining lenders from after June?

25         MR. COHEN:  Objection.

```
 1            THE COURT:  What's the objection?

 2            MR. COHEN:  Vague.

 3   Q.  In November of 2022, did Alameda still have lenders?

 4   A.  Yes, we did.  We still had around $2 billion of loans from

 5   third parties left.

 6   Q.  And I think you said they started recalling those loans.

 7   What was your reaction to that?

 8   A.  I mean, I wasn't sure what to do.  I wanted to honor our

 9   obligations to our lenders, but I also wanted to honor our

10   obligations to FTX customers, and I wasn't sure how to balance

11   those.

12            MS. SASSOON:  Mr. Bianco, can you please show the

13   witness Government Exhibits 410A and 410B.

14   Q.  Do you recognize these?

15   A.  Yeah.  These are more excerpts and small group chat.

16            MS. SASSOON:  The government offers Government

17   Exhibits 410A and 410B.

18            MR. COHEN:  No objection.

19            THE COURT:  Received.

20            (Government Exhibits 410A and 410B received in

21   evidence)

22            MS. SASSOON:  Mr. Bianco, if you could first publish

23   410A.

24   Q.  Do you see your message here from November 8, 2022 asking

25   any opinion on whether Alameda should try and return loans that
```

1    are being called?

2    A.   Yeah.

3    Q.   There is a response from Ramnik Arora.  Who is he?

4    A.   He was the head of ventures and investor relations at FTX.

5    Q.   What did he respond to your question?

6         MR. COHEN:  Your Honor, might we have a limiting

7    instruction as to Mr. Arora?

8         THE COURT:  Any objection?

9         MS. SASSOON:  Your Honor, he is also an agent of the

10   defendants because he was an employee.  This would be

11   admissible under 801(d)(2)(D).

12        THE COURT:  Why not, Mr. Cohen?

13        MR. COHEN:  Your Honor, this is not within the scope

14   of the agency as it has been defined in this case, so we would

15   ask for the limiting instruction just as to that individual.

16        THE COURT:  Denied.

17   Q.   Ms. Ellison, can you read Ramnik Arora's response to your

18   question?

19   A.   He said:  Probably not.  That would put FTX commerce at a

20   disadvantage to non-FTX commerce, right.  Could be totally

21   wrong.

22   Q.   Let's take a look now at Government Exhibit 410B.  This is

23   a little later that day.  What did you write at 9:49 a.m.?

24   A.   I said:  On second thought, how bad is it to process loan

25   recalls in the next few hours.  I kind of just want to do it

NABMBAN4                          Ellison - Direct

1   because we have the capital, and lenders are freaking out, and

2   it seems like it will be another few hours at least, and it

3   will be easier to make them happy and calm them down now, but

4   if it's bad, I cannot.

5   Q.  What did Sam respond?

6   A.  Sam said:  Which lenders?  Can certainly do it for all the

7   smaller ones.  Would prefer not to do it for BlockFi yet.

8   Q.  Why did you ask if it was bad to start repaying the

9   lenders?

10  A.  Because I wasn't sure if it would be illegal or just a bad

11  idea for other reasons, so I wanted to get others' opinions.

12  Q.  After the defendant said, can certainly do it for all the

13  smaller ones, did you in fact repay some of your lenders?

14  A.  We did start to repay some of our lenders.

15  Q.  What effect, if any, did repaying the lenders have on the

16  money available to pay for FTX customer withdrawals?

17  A.  It meant that there was less money available for FTX

18  customers.

19          MS. SASSOON:  Mr. Bianco, can you please show the

20  witness Government Exhibit 412.

21  Q.  Do you recognize this excerpt from small group chat?

22  A.  Yes, I do.

23          MS. SASSOON:  The government offers Government Exhibit

24  412.

25          MR. COHEN:  No objection.

1          THE COURT:  Received.

2          (Government Exhibit 412 received in evidence)

3          MS. SASSOON:  Mr. Bianco, if you could publish this.

4    Q.  Can you read the message you sent on November 8, 2022.

5    A.  Yeah.  It says:  Multiple people internally asking me

6    whether they should continue to make statements to external

7    parties, like Alameda is solvent.  Should I suggest they stall

8    instead?  Just stall in responding to their messages, or what?

9    Q.  At that point did you consider Alameda to be solvent?

10   A.  No.

11   Q.  Why?

12   A.  Because we had debts to FTX that were much larger than what

13   we could realistically repay.

14   Q.  Why are you asking in small group chat what you should say

15   about whether Alameda was solvent?

16   A.  I mean, in the past I had, at Sam's direction, made

17   misleading statements to lenders about Alameda's financial

18   health.  I wasn't sure -- I wasn't sure whether it was wise to

19   tell people the truth here, but I also thought it didn't really

20   make much sense to continue lying, so I wasn't sure what to

21   say.

22   Q.  Were there any favorable developments for FTX later on

23   November 8?

24   A.  Yes.  Sam and CZ, the CEO of Binance, worked out a

25   tentative deal whereby Binance would acquire FTX and spend

1   enough money on the acquisition to backstop all FTX customer

2   assets.

3   Q.   What was your reaction to that?

4   A.   I was extremely relieved.  If the deal went through, it

5   would mean that all of FTX customers would get their money

6   back, which would be more than I was hoping for at the time.

7   Q.   What happened to the deal with Binance?

8   A.   It fell through when CZ backed out of it.

9   Q.   How soon after the deal had been announced did it fall

10  apart?

11  A.   It was pretty soon.  I think it was within a day.

12  Q.   After that, was FTX able to keep up with customer

13  withdrawals?

14  A.   No, it wasn't.

15  Q.   And was Alameda able to repay its lenders in full?

16  A.   No.

17  Q.   What happened on November 11, 2022?

18  A.   I believe that was the day that FTX and Alameda declared

19  bankruptcy.

20  Q.   And at the time that Alameda and FTX declared bankruptcy,

21  about how much money did Alameda still owe its lenders?

22  A.   Its third-party lenders, do you mean?

23  Q.   Yes.

24  A.   Maybe in the ballpark of a billion dollars.

25  Q.   Did there come a time after Alameda and FTX declared

NABMBAN4                        Ellison - Direct

1   bankruptcy that you began meeting with federal prosecutors and

2   special agents with the FBI?

3   A.   Yes, I did.

4   Q.   Around when was that?

5   A.   I think it was in December of 2022.

6   Q.   And had you been arrested for any crimes at that point?

7   A.   No.

8   Q.   What happened before you came to meet with the government?

9   A.   The FBI searched my parents' house where I was staying and

10  took my phone, computer, and other electronic devices, as well

11  as my journal.

12  Q.   Did those electronics contain some of the documents we

13  looked at today?

14  A.   Yes, they did.

15  Q.   Did that journal contain some of those handwritten notes we

16  looked at today?

17  A.   That's right.

18  Q.   When you met with the government, what kind of information

19  did you provide?

20  A.   I provided a lot of the information I've talked about here.

21  I told them about what happened and the crimes that we had

22  committed and who had been involved.

23        MS. SASSOON:  Your Honor, I'm not going to wrap up

24  within the next 15 minutes.  I just wanted to check in when you

25  think it's appropriate to take a break, if you would like to.

1            THE COURT:  How much longer?

2            MS. SASSOON:  Perhaps 25, 30 minutes.

3            THE COURT:  We will take our break here.

4       3:30, folks.

5            (Recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2              THE COURT:    The defendant and the jurors all are

3      present.

4              You may continue, Ms. Sassoon.

5              MS. SASSOON:    Thank you.

6      BY MS. SASSOON:

7      Q.    We were discussing the time that you started meeting with

8      the government.  Prior to that, in the final weeks before

9      Alameda and FTX declared bankruptcy, did there come a time

10     where you shared with other people what had happened with FTX

11     customer money?

12     A.    Yes, I did.  I had a——an all hands meeting of all the staff

13     at Alameda where I told them what had happened.

14             MS. SASSOON:    Mr. Bianco, if you could show the

15     witness Government Exhibit 414A.

16     Q.    Do you recognize this?

17     A.    Yeah, this is another excerpt from the small group chat.

18             MS. SASSOON:    Government offers Government

19     Exhibit 414A.

20             MR. COHEN:    No objection, your Honor.

21             THE COURT:    It's received.

22             (Government's Exhibit 414A received in evidence)

23             MS. SASSOON:    Mr. Bianco, please publish this exhibit

24     to the jury.

25     BY MS. SASSOON:

1    Q.   This is a small group chat dated November 9, 2022, and you

2    wrote, "Thinking about what to tell people at Alameda all

3    hands.  Right now I'm thinking a vibe of Alameda is probably

4    going to wind down, if you don't want to stay or take some time

5    off, no pressure, if you do want to help with stuff like making

6    sure our lenders get repaid, it's super appreciated.  Does that

7    seem right?"

8            What's an Alameda all hands?

9    A.   These were meetings that we generally had once every two

10   weeks where the whole staff of the company was invited to

11   attend the meeting.

12   Q.   And the defendant wrote back, "And maybe something about

13   there being a future of some sort for those who are excited,

14   but that you can't know for sure what it is."

15            Why were you seeking the defendant's input about what

16   to say at the meeting?

17   A.   Because I generally sought his input on important decisions

18   at Alameda, and I thought, like, what to tell Alameda employees

19   about what was happening was one of those important decisions.

20   Q.   And at that meeting did you end up sharing with your

21   employees what had happened over the course of 2022?

22            MR. COHEN:    Your Honor, I believe one of the jurors

23   has his hand raised.

24            THE COURT:    Yes, sir.

25            JUROR:    The monitor is not working.

1    THE COURT:   Let's get the monitors working.  Thanks

2   for telling us.

3    Is it just one of the monitors or all of them?

4    JUROR:   Just one.

5    THE COURT:   Just one.  Okay.

6    (Pause)

7    THE DEPUTY CLERK:   I'll have to call AV, Judge, and

8   they can share for now.

9    THE COURT:   Can you share with somebody on one side

10   till we get it fixed?

11    MS. SASSOON:   And I'll limit the remaining exhibits,

12   your Honor.

13    THE COURT:   Good.

14   BY MS. SASSOON:

15   Q.   At that all hands——did the all hands meeting happen?

16   A.   Yes, it did.

17   Q.   And at that meeting did you share with your employees what

18   had happened over the course of 2022?

19   A.   Yes, I did.

20   Q.   I want to turn——

21    MR. COHEN:   Your Honor, for the reasons we discussed

22   at the sidebar yesterday, we would object to the testimony

23   about this meeting as hearsay.

24    THE COURT:   My understanding is that this is what the

25   witness said at the meeting, right?  That's what you're

1  eliciting?

2              MS. SASSOON:    Yes, your Honor.

3              THE COURT:    How is that hearsay?

4              MR. COHEN:    Well, I didn't want to wait until the

5  testimony was already in, your Honor.  Could we just talk

6  briefly at the sidebar.

7              MS. SASSOON:    I don't intend any further questions

8  about this.  I don't know if that affects a sidebar.

9              MR. COHEN:    If there are no further questions on this,

10  then that's fine.

11             THE COURT:    Okay.  Let's go.

12  BY MS. SASSOON:

13  Q.    Turning back to your meetings with the government, did you

14  describe during those meetings your role in committing fraud on

15  customers of FTX?

16  A.    Yes, I did.

17  Q.    Did you discuss other crimes you had committed?

18  A.    Yes.

19  Q.    And did you talk about the people that you had committed

20  crimes with?

21  A.    Yes, I did.

22  Q.    Did you tell the government about lies that you had told?

23  A.    Yes, I did.

24  Q.    Why did you provide all of this information about your

25  crimes and other people's crimes and your own lies to the

1  government?

2  A.    It was as part of the process to get a cooperation

3  agreement with the government.  I was hoping to get an

4  agreement because I was hoping it would lead to a more lenient

5  sentence for my crimes, and I also wanted to be honest and to

6  take responsibility for what I had done.

7  Q.    In your meetings with the government did you describe your

8  personal relationship with the defendant?

9  A.    Yes, I did.

10 Q.    And over the course of your on-again, off-again romantic

11 relationship with the defendant, did you share personal

12 writings with him?

13 A.    Yes, I did.

14 Q.    What kinds of things did you write to him about?

15 A.    We both wrote each other Google Docs at various times with

16 our thoughts on our relationship and our feelings.

17 Q.    And at a very general level, what kinds of feelings did you

18 share in these Google Docs?

19 A.    I often shared feelings about being unhappy with our

20 relationship.

21 Q.    And what about any professional concerns?

22 A.    Yeah, I also shared feelings about the intersection of our

23 personal and professional relationship and how our relationship

24 affected me at work.

25 Q.    And at a very general level, what did you write about how

1    the relationship affected you at work?

2                    MR. COHEN:    Objection.

3                    THE COURT:    Ground.

4                    MR. COHEN:    Relevance.

5                    MS. SASSOON:    Your Honor, I expect that this is going

6    to be inquired about on cross-examination.

7                    THE COURT:    What do you say to that, Mr. Cohen?

8                    MR. COHEN:    It may well, your Honor, but this question

9    just posed has an appropriate objection to it.

10                   THE COURT:    Overruled.

11   A.    Sorry.  Could you repeat the question.

12   Q.    I believe I asked:  What sorts of professional concerns did

13   you have that you shared with the defendant?

14   A.    Yeah.  I shared concerns about our personal and

15   professional relationships affecting each other.  For instance,

16   if I messed——if I messed something up at work and Sam gave me

17   negative feedback on that, that would affect our personal

18   relationship as well and sort of vice versa.

19   Q.    And how did that make you feel?

20   A.    It——it made me feel bad.  I mean, it made me feel like sort

21   of a——an unequal partner in our relationship.

22   Q.    Did you ultimately plead guilty to a cooperation agreement?

23   A.    Yes, I did.

24   Q.    And how many crimes did you plead guilty to?

25   A.    I believe it was seven counts.

1    MS. SASSOON:    Mr. Bianco, can you show the witness

2    Government Exhibit 3550-079.

3    Q.    Do you recognize this document, Ms. Ellison?

4    A.    Yes, I do.  This is my cooperation agreement with the

5    government.

6    MS. SASSOON:    The government offers Government

7    Exhibit 3550-079.

8    MR. COHEN:    No objection.

9    THE COURT:    Received.

10    (Government's Exhibit 3550-079 received in evidence)

11    MS. SASSOON:    And Mr. Bianco, if you could publish the

12    last page of this agreement.

13    And publish this.

14    BY MS. SASSOON:

15    Q.    Did you sign this on December 19, 2022?

16    A.    Yes, I did.

17    Q.    And before you signed it did you review it with your

18    attorney?

19    A.    Yes.

20    Q.    And after you signed it did you plead guilty to seven

21    crimes?

22    A.    Yes, I did.

23    Q.    And why did you plead guilty to the crimes in your

24    cooperation agreement?

25    A.    Because I believe I am guilty and because it was part of

1 | the terms of the cooperation agreement.

2 |         MS. SASSOON:    And if we could go back to the first

3 | page.

4 | Q.    Under this agreement you pleaded guilty to wire fraud and

5 | wire fraud conspiracy on customers of FTX, as well as

6 | commodities fraud conspiracy.  Does that relate to what you've

7 | described in your testimony about Alameda using FTX customer

8 | money?

9 | A.    Yes, it does.

10 | Q.    And under this agreement you pleaded guilty to wire fraud

11 | and wire fraud conspiracy against Alameda's lenders.  What does

12 | that relate to?

13 | A.    That relates to what I testified about regarding the false

14 | balance sheets that we provided to lenders.

15 | Q.    And when you say "we," who do you mean?

16 | A.    Sam and me.

17 | Q.    You also pleaded guilty to securities fraud conspiracy.

18 | What does that relate to?

19 | A.    That relates to the investors in FTX.

20 | Q.    And in what ways did you participate in a conspiracy to

21 | defraud the investors in FTX?

22 | A.    I was aware that FTX was not disclosing Alameda's borrowing

23 | and line of credit to FTX investors, and I made false

24 | statements on, you know, Twitter and in this Bloomberg article

25 | that I knew FTX investors were one of the audiences of those

1     statements.

2     Q.    Were you directly involved in communicating directly with

3     FTX's equity investors in 2021?

4     A.    No.

5     Q.    You testified some time ago about an FTX audit.  Were you

6     aware of any other information that was being concealed from

7     FTX's auditors besides customer balances?

8                    MR. COHEN:    Objection, leading.

9                    THE COURT:    Rephrase.

10    Q.    What, if anything, did you learn about information that was

11    concealed from FTX's auditors?

12    A.    I learned that FTX had loaned money that it had raised from

13    investors totaling $1.6 billion to Alameda and that that had

14    been concealed from FTX's auditors.

15    Q.    Did you discuss with the defendant that $1.6 billion of FTX

16    investor money had been transferred to Alameda?

17    A.    Yes, I did.

18    Q.    And in what forum was that discussed?

19    A.    We discussed it over Signal and in in-person conversations.

20    Q.    And what, if anything, were you told about why $1.6 billion

21    of FTX investor money had been transferred to Alameda?

22    A.    That it would be useful for Alameda's trading.

23    Q.    And what, if anything, did you learn about how this

24    $1.6 billion of FTX investor money transferred to Alameda, how

25    it was accounted for in FTX's records?

1    A.    So there was money that was transferred from FTX's bank

2    accounts to Alameda's bank accounts, and then to offset that,

3    there were negative ledger entries in Alameda's main account on

4    FTX, but then there were also, offsetting to that, positive

5    ledger entries in a subaccount that Alameda had on FTX.

6    Q.    And what did you understand was the purpose of these

7    offsetting entries?

8    A.    I was told that it was for FTX auditing purposes.

9              THE COURT:    Where did you get this information from?

10             THE WITNESS:    I believe it was Nishad Singh who told

11   me this, your Honor.

12   Q.    And was this——

13             MR. COHEN:    Objection.

14             THE COURT:    Ground?

15             MR. COHEN:    Speculation.

16             MS. SASSOON:    Your Honor——

17             THE COURT:    What's the speculation?

18             MR. COHEN:    I think she just said she believes, she

19   didn't know.

20             MS. SASSOON:    Your Honor, this is admissible under

21   801(d)(2)(E).

22             THE COURT:    I believe this is Wednesday.

23             MR. COHEN:    I didn't hear your Honor.

24             THE COURT:    I believe this is Wednesday.  That's not

25   speculation.

1          MR. COHEN:    Okay.  All right.

2          THE COURT:    Overruled.

3          MR. COHEN:    Your Honor, withdrawn.

4          THE WITNESS:    Yes, sorry.  I recall that it was Nishad

5    Singh who told me.  I'm sorry if I misspoke.

6    BY MS. SASSOON:

7    Q.    And when you were looking into the accounting for this FTX

8    investor money, did you discuss that with the defendant?

9    A.    Yes, I did.

10   Q.    Were you aware of any FTX losses that——

11         THE COURT:    I'm sorry.  You discussed it with the

12   defendant.  What did he say?

13         THE WITNESS:    We discussed——it was a discussion where

14   we were trying to reconcile Alameda's and FTX's records.  Sam

15   was present as well as me and people from FTX, and we all went

16   over our versions of what had happened and eventually agreed

17   on——that we all were on the same page about what had happened.

18         THE COURT:    Thank you.

19   BY MS. SASSOON:

20   Q.    And did Alameda ultimately repay to FTX the FTX investor

21   money that had been transferred to Alameda?

22   A.    We repaid some of it but not all.

23   Q.    What, if any, other information were you aware of that was

24   concealed from FTX investors?

25   A.    I was aware that in 2021, FTX suffered a large loss——around

1   $800 million——from the malfunctioning of its margin system and

2   that this loss was——Alameda took on this loss and it wasn't

3   disclosed to FTX investors.

4   Q.   And this loss, did it pertain to particular cryptocurrency?

5                MR. COHEN:   Objection.  Lack of foundation.

6                THE COURT:   Sustained.

7   Q.   Ms. Ellison, did there come a time when the defendant

8   discussed with you any losses that were concealed from FTX

9   investors?

10  A.   Yes, the loss that I was just talking about was one that I

11  discussed with Sam.

12  Q.   And can you describe what you learned about this loss.

13               THE COURT:   From Sam.

14               MS. SASSOON:   From Sam.

15  A.   From Sam, I learned that FTX had——that there had been a

16  trader on FTX who had taken a large position in BTMX and

17  withdrawn Bitcoin and other, more liquid currencies from FTX,

18  and that he said that Alameda would have to take on the BTMX

19  and try to sell it, which we did, but ended up selling it at a

20  very large loss.

21  Q.   What, if anything, did the defendant say about why Alameda

22  had to take on this $800 million loss?

23  A.   He said that he didn't want it on FTX's balance sheet.

24  Q.   And did he say why?

25  A.   I don't recall if he said specifically.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NAB1BAN5                    Ellison - Direct

1    Q.    Did he say anything about FTX investors?

2    A.    I don't recall.

3    Q.    And you mentioned the coin BTMX.  Were there any other

4    cryptocurrencies involved in this $800 million loss?

5    A.    Yeah, the customer on FTX was also trading MobileCoin, and

6    some of the losses came from that as well.

7    Q.    Did this incident occur prior to the defendant raising

8    additional investor funds in late 2021?

9    A.    Yes, it did.

10   Q.    While you worked at FTX what was the value of your account

11   on FTX around its peak?

12   A.    I think at its peak it was close to a billion dollars.

13   Q.    And what happened to that account?

14   A.    Well, the billion dollars was coming from the

15   cryptocurrencies FTT and Serum, which then went down a lot and

16   became worthless or almost worthless.

17   Q.    Ms. Ellison, have you been sentenced?

18   A.    No, not yet.

19   Q.    What's your understanding of the maximum sentence that you

20   are facing?

21   A.    It's——the maximum is 110 years in prison.

22   Q.    And what's your understanding of whether there will be a

23   financial component to your sentence?

24   A.    Yeah, my understanding is that there will also be a fine

25   and I will have to make restitution to the victims of the

1    crimes.

2    Q.    What's your understanding of what you are required to do

3    under the cooperation agreement?

4    A.    My understanding is that the requirements are that I assist

5    the government with this investigation and provide truthful

6    information, that I testify in court if asked and testify

7    truthfully, and that I refrain from committing any further

8    crimes.

9    Q.    What's your understanding of what the government will do if

10   you fulfill those obligations?

11   A.    The government will write a letter to the judge at my

12   sentencing outlining the crimes that I've committed and

13   discussed with them and also the cooperation and assistance

14   that I've given.

15   Q.    As far as you understand it, does the outcome of this trial

16   have any bearing on whether the government will submit that

17   letter?

18   A.    My understanding is that it does not.

19   Q.    Have you been promised what sentence you will receive?

20   A.    No, I haven't been promised any sentence.

21   Q.    What's your understanding of who will decide your sentence?

22   A.    The judge.

23              MS. SASSOON:    One moment, your Honor.

24              THE COURT:    Yes.

25              MS. SASSOON:    No further questions, your Honor.


SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT:    Thank you.

2         Mr. Cohen.

3         MR. COHEN:    Thank you, your Honor.

4  CROSS EXAMINATION

5  BY MR. COHEN:

6  Q.    Maybe just a few questions.

7  A.    Okay.

8  Q.    Good afternoon, Ms. Ellison.

9  A.    Good afternoon.

10  Q.    I'd like to talk about some terms that you used during your

11  testimony.  I want to see if I understand them.

12  A.    Okay.

13  Q.    You spoke a lot about something called the fiat@ account.

14  Do you recall that, ma'am?

15  A.    Yes, that's right.

16  Q.    And you also spoke a lot about something called the info@

17  account.

18  A.    Yeah.

19  Q.    I just want to make sure I understand the difference here.

20         Now the fiat@ account was an account that, well, that

21  related to bank accounts that Alameda had where it was

22  accepting fiat or dollars from customers, correct?

23  A.    That's correct.

24  Q.    Okay.  And I believe you referred either to the Alameda

25  bank accounts or accounts for an entity called North Dimension?

1    A.    That's right.

2    Q.    So if I understand this correctly, fiat is just another

3    word for dollars, correct?

4    A.    Dollars, or other currency, like euros.

5    Q.    Euros, British pounds, but for our purposes, let's just

6    talk dollars; is that fair?

7    A.    Yeah.

8    Q.    Okay.  So a customer could wire dollars into this bank

9    account that Alameda had; that's correct?

10   A.    That's my understanding, yes.

11   Q.    All right.  Now at the same time this bank account had

12   other dollars in it as well, for example, from Alameda's

13   revenues.

14   A.    That's right.

15   Q.    From Alameda's profits.

16   A.    That's right.

17   Q.    You mentioned that Alameda traded on other exchanges,

18   correct?

19   A.    That's correct.

20   Q.    So if it received transfers from those exchanges, in

21   dollars, some of those dollars might wind up in the account.

22   A.    That's right.

23   Q.    Okay.  And I take it these dollars weren't labeled,

24   correct?

25   A.    That's right.

1   Q.   So if customer Alice sent in a dollar and customer Bob sent

2   in a dollar and there was dollars from revenues and profits,

3   they were all just in one account.

4   A.   That's right.

5   Q.   Okay.  Now when dollars came out of the fiat account, they

6   came out to pay withdrawals to customers, correct?

7   A.   That's right.

8   Q.   Or they could come out, for example, to pay Alameda's rent

9   or its payroll.

10  A.   That's correct.

11  Q.   Or for its investments.

12  A.   That's right.

13  Q.   And again, those dollars also were not labeled; dollars are

14  dollars, right?

15  A.   Mm-hmm, that's right.

16  Q.   Okay.  Now I want to focus this next question on the period

17  before 2022.  I have a feeling we'll talk a lot about 2022

18  tomorrow, but——

19  A.   Mm-hmm.

20  Q.   Is it fair to say that before that period of time you did

21  not track how these dollars went out and where they were going

22  to in terms of whether they were going to a customer or to pay

23  the payroll or to pay the rent?

24  A.   I mean, we did have a transfer tracking system for all of

25  the transfers that went out of our accounts.

1    Q.    Okay.  Fair enough.  Fair enough.

2                Okay.  So that was the fiat@ account.  So it actually

3    was——really what we're talking about is the bank account, and

4    then there was a separate way to track it, or separate ledger

5    adjustment called FTX/.com, correct?

6                MS. SASSOON:    Objection, form.

7                THE COURT:    Sustained.

8    Q.    Okay.  Let me try again.

9                What did the FTX/.com refer to?

10   A.    Sorry.  You said FTX/.com?

11   Q.    Underscore.  Excuse me.

12   A.    Underscore.com?

13   Q.    I'm sorry.  FTX_fiat, what did that refer to?

14   A.    That was Alameda's internal labeling of the fiat@ftx.com

15   account.

16   Q.    The account we were just talking about.

17   A.    Yes.

18   Q.    Okay.  Now let me try to talk now about the info@ account,

19   okay?  That was the account that Alameda had on the exchange,

20   on the FTX exchange?

21               THE COURT:    I'm sorry.  I just want to make sure I got

22   the last point.

23               FTX_fiat?  You talked about that, yes?

24               THE WITNESS:    Yeah.  I was saying that was the same

25   account as the fiat@ftx.com account.

1   THE COURT:   I thought I understood, and now I'm

2   thoroughly confused.

3   THE WITNESS:   Sorry, your Honor.

4   MR. COHEN:   Your Honor, if I might, I think I know

5   where your Honor is going.

6   THE COURT:   Yes, okay.

7   BY MR. COHEN:

8   Q.   There are two things going on here, I believe, Ms. Ellison.

9   Correct me if I'm wrong.  One is the bank account itself, and

10  we've been calling it today the fiat@ account; is that correct?

11  A.   When I use——when I say fiat@ account, I'm thinking of the

12  account on the FTX website and not a bank account.

13  Q.   Okay.  Okay.  And then there's also the ledger entry which

14  you were just describing to his Honor.

15  MS. SASSOON:   Objection, your Honor.  This is

16  confusing.  She just said that that was a ledger entry.

17  MR. COHEN:   That's not what she said.

18  THE COURT:   I have a thought.

19  MR. COHEN:   Okay.

20  THE COURT:   It's been a long day.

21  MR. COHEN:   Okay.

22  THE COURT:   I have the feeling that if we broke now

23  and started in the morning, Mr. Cohen, you'd be happier,

24  everyone would be fresher, and this could get sorted out

25  overnight, right?

1          MR. COHEN:    Yes.  I would appreciate that.  I could

2     tell stories from my legal career, but I don't think anyone

3     would be interested.

4          THE COURT:    No, we'd all be interested but we're all

5     going to be asleep by then.  Not because of the stories but——

6          MR. COHEN:    Well, maybe.

7          THE COURT:    No, no, on the occasion of.

8     Okay.  Let's do that.

9          MR. COHEN:    Okay.  Thank you.

10          THE COURT:    Folks, 9:30 tomorrow morning.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2                    THE COURT:    Okay, folks.  Be seated.

3                    I think we have two open items of business that may

4     affect the cross, right?  We have this controversy about

5     mention of Anthropic and Mr. Cohen's letter of October 10th, to

6     which I think I have an answer for you.

7                    The witness is out of the room.

8                    Let me address a question to the government.  I

9     understand the point about mention of Anthropic.  Suppose that

10    the defendant had otherwise admissible evidence, fully

11    admissible, not about Anthropic or any other specific

12    investment but about what their letter of the 10th refers to as

13    the portfolio nature of venture capital investing.  What would

14    be the government's position about that?

15                   MS. SASSOON:    So I think there are two distinct issues

16    here.  One is pre-collapse and one is post-collapse.  I think

17    anything about the portfolio post-collapse is totally

18    irrelevant.  If we're talking about pre-collapse, there was

19    some testimony that these venture investments were speculative

20    and risky, and I think that's what the defense wants to

21    address.  I think from the government's standpoint, it was

22    appropriate to elicit that information because the defense has

23    claimed a variety of the defendant——

24                   THE COURT:    But it's in already, so nobody's saying it

25    wasn't.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MS. SASSOON:    So I think that goes to the defendant's

2     knowledge and his intent.  But the core issue here is whether

3     he misappropriated the money, and whether he put it into a

4     government bond or a venture portfolio, it's still fraud.  And

5     so we think there's limited to no relevance to any evidence

6     that they want to bring in about how they could have shot the

7     moon with one of these investments.

8           THE COURT:    So your position is even a general

9     discussion of a portfolio nature or portfolio approach to

10    venture capital investing would be irrelevant.

11          MS. SASSOON:    One moment.

12          Yes, so we think that the safety or riskiness of the

13    investments is ultimately not relevant to the misappropriation.

14    On this question about the portfolio, I don't understand the

15    proffered relevance by the defense, but if they explain it now,

16    I would ask for an opportunity to respond.

17          THE COURT:    Well, that's your cue, Mr. Cohen.

18          MR. COHEN:    Thank you, your Honor.

19          A couple of things.  The government has put on

20    evidence that one of the ways in which the loans from FTX to

21    Alameda were invested was in a series of venture investments,

22    which it has gone out of its way to describe as speculative and

23    risky.  We had extensive testimony, including from today's

24    witness——yesterday and today——about her view of the riskiness

25    around making such investments, and the government is——although

1    they claim it's not part of their case, they're doing it an

2    awful lot, Judge, and they're clearly trying to argue to the

3    jury that the fact that the investments were, in their view,

4    risky is itself proof of the crime.  And the only way to rebut

5    that, your Honor, is for us to be able to proffer evidence,

6    either through cross-examination or otherwise, on a couple of

7    levels.  One is that, as your Honor described it, the

8    portfolio——this venture investing is a portfolio approach.  You

9    buy in ten startups; if two hit, you're doing great.  If one of

10   them was, you know, Facebook, you'd——

11                THE COURT:    It depends how much you put in the bad

12   ones——

13                MR. COHEN:    Correct.

14                THE COURT:    ——and what the return on the good ones

15   were, and how much you put in the good ones.

16                MR. COHEN:    Correct.  And here——

17                THE COURT:    So it could be a disaster venture, or not.

18                MR. COHEN:    Correct.  But here, just to give your

19   Honor context, the Anthropic investment was a $93 million

20   investment that the trustee in bankruptcy sold for a hundred

21   million and is today worth a billion dollars.

22                THE COURT:    Publicly traded?

23                MS. SASSOON:    No, your Honor.  This is a private

24   valuation, which, if you take this case as just one example,

25   it's highly misleading about whether you could actually

1    liquidate for that amount of money.  And this is part of the

2    concern about Anthropic specifically.  It has the potential to

3    create a misleading impression with the jury about the nature

4    of this portfolio, which perhaps in hindsight, you could make

5    these arguments, but has no bearing on the fact that it was a

6    gamble at the time that these investments were being made.

7              MR. COHEN:    So then why are they arguing that these

8    investments were risky and illiquid and so forth and trying to

9    suggest they were improper if it's not related to the crime?

10   Why are we having hours of testimony?

11             THE COURT:    The crime charged is that he took the

12   money.

13             MR. COHEN:    Right.

14             THE COURT:    That's the crime.

15             MR. COHEN:    Right.

16             THE COURT:    And what he did with it afterward doesn't

17   matter.  This is like saying that if I break into the Federal

18   Reserve Bank, make off with a million bucks, spend it all on

19   Powerball tickets and happen to win, it was okay.

20             MR. COHEN:    Your Honor, they're offering evidence

21   exactly on your Honor's hypothetical.  They are offering

22   evidence that you used the money for Powerball as proof of the

23   crime.

24             THE COURT:    No, I don't see it that way.  I mean, the

25   crime is the misappropriation.  That's it, it's finished, the

1    minute the misappropriation happens, whether it's used wisely,

2    foolishly, or whatever, and that's my view.  I certainly would

3    never have let in the Anthropic because letting in the

4    Anthropic is kind of like trying to prove that you're a good

5    guy by looking around the room, picking your three best

6    friends, and asking them what kind of a guy you are, and

7    ignoring everybody else.  Right?  That doesn't work.  You don't

8    get to pick your friends and do it that way.  It's just

9    unrepresentative.  It's meaningless.  So——

10           MR. COHEN:    But that takes us back to the more narrow

11   point about whether or not we can elicit the nature of venture

12   investing.

13           THE COURT:    Well, it does take us back to that.  And

14   so far as that is concerned, it might be one thing if you had a

15   qualified witness to talk about that.  I'm not saying that

16   would be admissible.  I have my doubts about that.  But I can't

17   see how eliciting anything from Ms. Ellison on

18   cross-examination on this subject possibly overcomes all the

19   barriers to relevance and admissibility, and maybe you can

20   enlighten me on that.

21           MR. COHEN:    Well, they have elicited this testimony

22   from Ms. Ellison.  They have elicited from her that she viewed

23   the venture investments as risky investments, with the

24   implication that the defendant should not have made them and

25   that they were reckless, the defendant was reckless for making

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

NAB1BAN5

1    them, and one way to rebut that is to show they were part of a

2    portfolio approach to venture investing, which is very common.

3             THE COURT:    Which might or might not have paid off.

4             MR. COHEN:    Right.

5             THE COURT:    And she had her opinion.

6             MR. COHEN:    And if the witness doesn't know about the

7    portfolio theory of venture investing, then we are bound by the

8    answer.

9             MS. SASSOON:    Your Honor, that testimony was admitted

10   for a proper purpose, which is to show the defendant's

11   knowledge of the misappropriation.  One——

12            THE COURT:    And her state of mind at various points.

13            MS. SASSOON:    Her state of mind and the fact that the

14   money was not just sitting in a bank account ready to be

15   provided to customers, it had been misappropriated and spent on

16   other things, and there were discussions with the defendant

17   establishing that he knew that it was being spent on other

18   things and that this put them in a position of having to use

19   customer money for other expenses, which is exactly what

20   happened.  And the fact that in 2021 she's warning the

21   defendant about these investments is inextricably linked to

22   what happened in June when they don't have the money and they

23   have to use customer funds, and it goes to his knowledge about

24   the use of funds to repay the loans because he knows that the

25   money is tied up in illiquid venture investments.

1          THE COURT:    Yes.  The government's motion on this

2    point is granted, period.  I'm not ruling now on the question

3    of whether somewhere down the road you want to proffer a

4    witness on this.  I'll cross that bridge if, as, and when I get

5    to it.

6          MR. COHEN:    Understood, your Honor.

7          THE COURT:    Okay.  Now the other issue is the

8    application by the defense with respect to auto-deletion, where

9    the witness said that she had been told, or the employees

10   generally had been told, that the defendant told people

11   generally to set auto-deletion on some of these messaging

12   accounts and had some other comments that she attributed to

13   him.  How about that one, or have we really covered that

14   already?  Mr. Cohen?

15         MR. COHEN:    I'm sorry, your Honor.  I apologize.  I

16   didn't hear you.  I'm sorry.

17         THE COURT:    I said how about that, or have we covered

18   this already?

19         MR. COHEN:    Well, I think it is covered in the letter,

20   and the testimony was elicited today about the involvement of

21   counsel, and we would like to be able to ask it——

22         THE COURT:    And what was said about the involvement of

23   counsel——

24         MR. COHEN:    Well, the——

25         THE COURT:    ——on the subject of auto-deletion?

1          MR. COHEN:    On the subject of auto-deletion was opened

2    up by the witness.

3          THE COURT:    That's not what you said.

4          MR. COHEN:    Right.  That's fair.  That's fair, your

5    Honor.  That's fair, your Honor.

6          THE COURT:    Nobody, to my recollection——correct me if

7    I'm wrong——nobody said one word on the direct about counsel

8    even being aware that there were settings to auto-deletion.  Am

9    I wrong?

10          MR. COHEN:    You are not wrong, your Honor, but we

11   believe if we ask this question on cross-examination, we will

12   get a different answer.  And we should be entitled to probe it.

13          MR. ROOS:    So, your Honor, I think the government is

14   guided by your Honor's October 1st order on this, outlining

15   both the potential probative nature of the involvement of

16   counsel but also the risk of prejudice, confusion.  On page 9

17   of your Honor's order, you outlined particular things that were

18   important, including specificity around the involvement of

19   counsel, what they knew, what they blessed, specificity about

20   the topics and their involvement, and I think in order for

21   there to be any relevant and nonprejudicial basis to ask the

22   question of Ms. Ellison, there at first needs to be a proffer

23   of what exactly this was.  Was it just there's some indication

24   that lawyers were involved in retention policies generally or

25   is it something more specific, like some particular lawyer, who

1   we'll name and we have specifics about their involvement, said

2   on this date, it's okay to use an auto-delete Signal messaging

3   system.  And so I think before we venture down this road, we

4   need a little more from the defense.

5               THE COURT:    Well, there's also——and then I'll give

6   Mr. Cohen an opportunity to respond——there is also the

7   question, quite important in this context, as to what, if

8   anything, the defendant knew about it——the "it" being whatever

9   counsel's role was, if any, and what the lawyers knew about it,

10  because it's reasonably clear that probably something like 502

11  out of the Fortune 500 companies have record retention policies

12  that are written by major law firms for them, or at least

13  blessed by major law firms, and that's of no relevance at all

14  in this context, where there is evidence that somebody, with

15  the intent to make sure there was no evidence, saw to it that

16  documents disappeared, or that a policy was adopted that would

17  get rid of them every 30 days, for the purpose of avoiding the

18  perpetuation of evidence, which is something of which there is

19  evidence so far.  Now of course it's not binding on the

20  defense, but there is evidence.

21              MR. ROOS:    And your Honor, if I can just make one more

22  point on that.  I think the other issue is going to be, is

23  there an admissible nonhearsay purpose for the question to

24  Ms. Ellison.  And to play this out, if the defense asks

25  Ms. Ellison, *Did the defendant ever tell you there was a lawyer*

1  *blessing of an auto-delete policy,* that seems to be for its

2  truth, and there's real questions about its accuracy and

3  legitimacy.  And so I don't know that Ms. Ellison——what the

4  answer would be, but I think there needs to be at least a

5  little more investigation here before they're allowed to spring

6  it on the witness.

7            THE COURT:    The last word for the evening on this?

8            MR. COHEN:    Yes, your Honor.  I have a suggestion for

9  the Court to think about overnight.  We could take that

10  testimony outside the presence of the jury and the Court could

11  then have a further record to make any ruling.

12            MR. ROOS:    I don't know.  If they don't have a basis

13  to ask the question now, then they get a test run outside the

14  presence of the jury.

15            MR. COHEN:    We believe that she will say that lawyers

16  were involved in the records——excuse me——auto-deletion policy.

17  Now we don't have access to her like the government does, so we

18  haven't had a chance to interview her beforehand, but we

19  believe she will say that.  If she doesn't say that, we're

20  bound by her answer.  So——

21            THE COURT:    And are you willing to broaden that to say

22  that she would say that lawyers were involved in consulting on

23  the use of the auto-deletion policy and that lawyers were aware

24  that the reason that the direction was given to do that by

25  whoever gave the direction was to ensure that evidence

1  disappeared every 30 days?

2              MR. COHEN:    Well, I don't think——I don't know what she

3  would say.  I would be fine stopping at the question yes or no

4  if she knew that lawyers were involved in the policy.

5              THE COURT:    All right.  I will think about it.  But

6  this is a problematic subject, and we all have been aware of

7  that for a long time.

8              Okay.  Thank you.

9              MR. COHEN:    Challenging, your Honor.  Not problematic,

10  challenging.

11              THE COURT:    I'd have said problematic more than

12  challenging.

13              MS. SASSOON:    Quickly, your Honor?

14              THE COURT:    Yes.

15              MS. SASSOON:    Defense provided us I believe Monday

16  evening with a list of exhibits that it may use for

17  cross-examination to which we are likely to have hearsay

18  objections.  And I'm mindful of trying to minimize sidebars, so

19  I wanted to inquire about how the Court would like to address

20  that.  Perhaps come in ten minutes early tomorrow to hash some

21  of this out?  I'm weary of filing a late-evening letter.

22              THE COURT:    No, no, no, no, no.  We're having a

23  moratorium on late-evening letters.

24              Look, I have a binder 3 inches thick, which I'm sure

25  is what you're referring to, and the best way of dealing with

1    it is probably going to be one at a time, but if somebody has a

2    better idea, I'll consider it.

3              MR. COHEN:    Your Honor, we can try to confer with the

4    government.  Just for your Honor's benefit, much of the binder

5    is material we might use in impeachment and we're not seeking

6    to offer.  I think the disputes will be about a relatively

7    limited set of documents, which we can talk to the government

8    about tonight again and see if we can work something out.

9              THE COURT:    Well, I urge you to do that, and I'm

10   grateful for the clarification from you.  And as I said at the

11   sidebar before, I know I'm dealing with some very fine lawyers

12   here and, you know, people get a little tense once in a while.

13   It happens.  But it's all in good faith.

14             Good night.

15             (Adjourned to October 12, 2023, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examinationof :                          Page

3     CAROLINE ELLISON

4    Direct By Ms. Sassoon.............        752

5    Cross By Mr. Cohen ................       943

6                    GOVERNMENT EXHIBITS

7    Exhibit No.               Received

8    1647, 1648, 1649, and 1650 ............   758

9    44 ......................                 787

10   17 ......................                 803

11   850 ....................                 808

12   418, 419, and 460 ................        811

13   19 ......................                 812

14   189 ....................                 815

15   11 ......................                 817

16   10 ......................                 820

17   1659 ....................                 826

18   1631 ....................                 839

19   64 ......................                 842

20   25B ....................                 846

21   1619 ....................                 858

22   1642 ....................                 862

23   908 ....................                 865

24   432 ....................                 871

25   310 ....................                 887

1                              GOVERNMENT EXHIBITS

2      Exhibit No.                        Received

3      39A . . . . . . . . . . . . . . . . . . . . . 885

4      41 . . . . . . . . . . . . . . . . . . . . . 889

5      1621 . . . . . . . . . . . . . . . . . . . .              894

6      875 . . . . . . . . . . . . . . . . . . . .               899

7      20 . . . . . . . . . . . . . . . . . . . . .              901

8      874 . . . . . . . . . . . . . . . . . . . .               903

9      413A . . . . . . . . . . . . . . . . . . . .              904

10     876 . . . . . . . . . . . . . . . . . . .                 907

11     406 . . . . . . . . . . . . . . . . . . . .               909

12     480D . . . . . . . . . . . . . . . . . . . .              913

13     407 . . . . . . . . . . . . . . . . . . . .               916

14     21 . . . . . . . . . . . . . . . . . . . . .              917

15     408 . . . . . . . . . . . . . . . . . . . .               920

16     871 . . . . . . . . . . . . . . . . . . . .               920

17     410A and 410B . . . . . . . . . . . . . . . .             922

18     412 . . . . . . . . . . . . . . . . . . . .               925

19     414A . . . . . . . . . . . . . . . . . . . .              929

20     3550-079 . . . . . . . . . . . . . . . . . .              935

21

22

23

24

25