Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9             Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    October 17, 2023

17                    9:03 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

Page 2

1    HEARING re HYBRID CONFIRMATION HEARING

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtor

 5        601 Lexington Avenue

 6        New York, NY 10022

 7

 8   BY:  GRACE BRIER

 9        T.J. MCCARRICK

10        CHRIS KOENIG

11

12   VENABLE LLP

13        Attorneys for

14        151 West 42nd Street

15        New York, NY 10036

16

17   BY:  JEFFREY S. SABIN

18

19   WHITE CASE LLP

20        Attorneys for the Official Committee of Unsecured

21        Creditors

22        555 South Flower Street, Suite 2700

23        Los Angeles, CA 90071

24

25   BY:  AARON COLODNY
```

1   WHITE CASE LLP

2       Attorneys for the Official Committee of Unsecured

3       Creditors

4       1221 Avenue of the Americas

5       New York, NY 10020

6

7   BY:  KEITH WOFFORD

8       JOSHUA WEEDMAN

9

10  UNITED STATES DEPARTMENT OF JUSTICE

11      Attorneys for the U.S. Trustee

12      Alexander Hamilton Custom House

13      One Bowling Green, Room 534

14      New York, NY 10004

15

16  BY:  MARK BRUH

17      SHARA CORNELL

18

19  SECURITIES AND EXCHANGE COMMISSION

20  Attorneys for the U.S. Securities and Exchange Commission

21  950 East Paces Ferry Road NE, Suite 900

22  Atlanta, GA 30326

23

24  BY:  ALAN MAZA

25

Page 5

1    DIMITRY KIRSANOV, Pro Se

2

3    DAVID SCHNEIDER, Pro Se

4

5    ARTUR ABREU, Pro Se

6

7    OTTO DAVIS, Pro Se

8

9    DANIEL FRISHBERG, Pro Se

10

11    CAM CREWS, Pro Se

12

13    SHARON DOW, Pro Se

14

15    ERIC MENDELSON, Pro Se

16

17    JASON LEE, Pro Se

18

19    DAVID DALHART, Pro Se

20

21    ALSO PRESENT TELEPHONICALLY:

22    CHARLES ABONCE

23    DAVID J. ADLER

24    TEMIDAYO AGANGA-WILLIAMS

25    ANDREA AMULIC

Page 6

1   JASMINE ARMAND

2   CHRIS BECIN

3   ANDREW BEHLMANN

4   DEREK BLOCHWITZ

5   KYLE BRAY

6   PAUL BREUDER

7   NURALDEEN BRIFKANI

8   JUDSON BROWN

9   KITRA CAHANA

10  ROBERT CAMPAGNA

11  RICKIE CHANG

12  ROBERT CHRISTIANSEN

13  PAOLO CIAMARONE

14  CHRISTINA CIANCARELLI

15  CHRISTOPHER J. COCO

16  KEVIN COFSKY

17  LAFAYETTE COOK

18  CARL J. COTE

19  VTOR CUNHA

20  JOSEPH D'ANTONIO

21  STEFFAN DAVIED

22  THOMAS DIFIORE

23  TRISTAN DIAZ

24  SIMON DIXON

25  SHARON DOE

Page 7

1   SCOTT DUFFY

2   JOHN PETER DZARAN

3   BEN EADES

4   JANELL ECKHARDT

5   KENNETH EHRLER

6   PAUL L. FABSIK

7   DAVID AVERY FAHEY

8   CHRIS FERRARO

9   FLORENCE FLANNIGAN

10   MAX GALKA

11   JASLEIGH GEARY

12   DARIOUS GHEORGHE

13   BRADLEY GIARDIELLO

14   MICHAEL GONZALEZ

15   MICHAEL GRAUBERT

16   ANTHONY GREENE

17   KATHRYN GUNDERSEN

18   CAROLYN GURLAND

19   CAMERON GUTHRIE

20   MIRA HAQQANI

21   SAMUEL P. HERSHEY

22   ROBERTO HERNANDEZ

23   IMMANUEL HERRMANN

24   KAITLYN A. HITTELMAN

25   LUCAS HOLCOMB

1    ROBERTO JACOBS

2    JANKO JANKOVIC

3    MICHAEL JAOUDE

4    HARSH JIVANI

5    MIKE JOHNSON

6    ELIZABETH H. JONES

7    GREG KACZKOWSKI

8    DAVID KAHN

9    DAN KAPLAN

10   YARA KASS-GERGI

11   RAVI KAZA

12   TRAVIS KEENEY

13   PHILLIP KHEZRI

14   LEA KLORANE

15   CHRIS KOENIG

16   UMBER KOHLI

17   MARIBEL L. KORDOMENOS

18   TOMAS KOSTER

19   RIKI KOULY

20   KATHRYN KUETHMAN

21   JOYCE A. KUHNS

22   CARLO KUHRT

23   ROSS M. KWASTENIET

24   CHRISPTOHER LACKEY

25   TYLER NATHANIEL LAYNE

1  JOE LEHRFELD

2  BRIAN S. LENNON

3  MARK LEONARD

4  NICOLE A. LEONARD

5  ESTHER LEVINE

6  PIETRO VINCENT LICARI

7  JOSE LOPEZ

8  DAVID LOS ARCOS CARCAMO

9  SERBAN LUPU

10  KEVIN M. MANUS

11  ANDY MARKS

12  CHASE MARSH

13  BRIAN S. MASUMOTO

14  CAROL MAUNDER

15  GEORGIA MEADOW

16  MOHSIN (MO) MEGHJI

17  BRIAN MENDIETA

18  LAYLA MILLIGA

19  KEITH NOYES

20  CAITLIN O'CONNELL

21  DONALD L. POYNTER

22  CHRISTOPHER PAGNANELLI

23  JEFF PATTON

24  BRETT A. PERRY

25  GREGORY F. PESCE

1   KHAI PHAM

2   MORGAN PHOENIX

3   KAROLINA PIASEK

4   HANS POLZMACHER

5   MACIEJ PRCZEK

6   CRAIG RASILE

7   ANNEMARIE V. REILLY

8   MARK ROBINSON

9   JONATHAN RODRIGUEZ

10   MIKE SARKISSIAN

11   JAVIER SCHIFFRIN

12   NOAH M. SCHOTTENSTEIN

13   SAM SCHREIBER

14   TOBY SEGAR

15   DAVID SENES

16   SAMI SAIKH

17   LAUREN NICOLE SICKLES

18   MATTHEW W. SILVERMAN

19   HANNA SIMSON

20   LUKE SPANGLER

21   COURTNEY BURKS STEADMAN

22   CHINGIZ SULEYMANOV

23   KEYAN TAJI

24   ELLE TOUSSI

25   DAVID TURETSKY

1    ELVIN TURNER

2    VETON VEJSELI

3    PATRICIA WALSH

4    CAROLINE WARREN

5    KATIE WICK

6    ZACHARY WILDES

7    ANDREW YOON

8    BRIAN YOUNG

9    KAILA ZAHARIS

10   JARNO BERG

11   JOEL BLOCK

12   DAKEN COLEMAN

13   ROBERT M. KAUFMANN

14   RAKESH PATEL

15   MIA COOPER

16   DREW DUFFY

17   SCOTT FLAHERTY

18   UDAY GORREPATI

19   TAYLOR HARRISON

20   DIETRICH KNAUTH

21   ALEX MCCAMMON

22   TIMOTHY REILLY

23   RYAN SCHRAMM

24   PETER J. SPROFERA

25   ZACHARY ZABIB

Page 12

1                          I N D E X

2

3    WITNESSES:              DIRECT:    CROSS:    REDIRECT: RECROSS:

4    HUSSEIN FARAJ

5    By Mr. McCarrick                  36

6    By Mr. Kirsanov                   91

7    By Mr. Davis                      96

8    By Mr. Abreu                      105

9    By Mr. Frishberg                  110

10   By Mr. Crews                      114

11   By Mr. Mendelson                  120

12   By Mr. Lu                         123

13   By Mr. Dalhart                    122

14   EXHIBITS:                                            PAGE:

15   Schneider 3 and 4                                    23

16   Schneider 5B                                         27

17   Schneider 6                                          28

18   Schneider 7 and 8                                    28

19   Schneider 9 and 10                                   29

20   Schneider 26B                                        32

21   Schneider 28A, B, and C                              33

22   Celsius 113                                          47

23   Celsius 114                                          88

24   Celsius 119                                          88

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  You may be seated.  Good morning,

4    everyone.  All right.  Anything to report over night?  Any

5    new developments?

6            MS. BRIER:  Yes, Your Honor.

7            THE COURT:  Ms. Brier.

8            MS. BRIER:  Good morning.  Grace Brier, Kirkland &

9    Ellis, on behalf of Debtor.  A couple of housekeeping items,

10   Your Honor.

11           THE COURT:  Sure.

12           MS. BRIER:  We filed an exhibit list last night at

13   5 p.m. with documents we intend to use on cross examination

14   today.  I have a copy of that for the Court.

15           THE COURT:  Could you?  Because I didn't --

16           MS. BRIER:  -- the U.S. Trustee.

17           THE COURT:  -- have a chance to look at it this

18   morning, so.

19           MR. KIRSANOV:  I would note that those exhibits

20   were filed after 5 p.m. and (indiscernible) exhibits to be

21   submitted as well.

22           THE COURT:  Who is that speaking?

23           MR. KIRSANOV:  I'm sorry, Your Honor.  That's

24   Dimitry Kirsanov, pro se creditor.

25           MS. BRIER:  Your Honor, my understanding is they

```
 1    were filed at 5:01.

 2              THE COURT:  I still couldn't hear.  Who is that --

 3              MR. KIRSANOV:  I'm sorry, that's me, Dimitry

 4    Kirsanov, pro se.

 5              THE COURT:  Okay.  Objection is overruled.  Go

 6    ahead, Ms. Brier.

 7              MS. BRIER:  Next on the list, Your Honor, is the

 8    Blonstein deposition.  We have that scheduled tentatively

 9    for noon today.

10              THE COURT:  Okay.

11              MS. BRIER:  Mr. Bronge has asked that if Court is

12    still continuing at that time that we start later.

13              THE COURT:  We'll recess by then.

14              MS. BRIER:  Excellent.  That is the current start

15    time.  There's a court reporter and everything set up.  We

16    would propose that once we have a transcript, Debtors would

17    file that on the docket on Mr. Bronge's behalf and then

18    follow up after we file that with our objections to the

19    admissibility of testimony that is inadmissible based on our

20    objections.

21              THE COURT:  All right, just give me a second.  So

22    he'll be deposed by -- and you know, you're going to examine

23    him and if there's any redirect, they'll do it as well.  And

24    then the testimony is just going to be submitted to the

25    Court?  Is that --
```

Page 15

1            MS. BRIER:  That's our proposal, Your Honor, that

2    we'd submit the transcript as his testimony on Mr. Bronge's

3    behalf, and then we'd also submit our own objections to --

4            THE COURT:  Sure

5            MS. BRIER:  -- that testimony as to what should

6    and should not be admissible.

7            THE COURT:  That's fine.  We'll do it that way.

8    So I'm not going to schedule another -- essentially, I

9    contemplate that we're going to conclude taking evidence in

10   the courtroom today, subject to completing the deposition,

11   the Faraj deposition, and that will be submitted with any

12   objections.

13           MS. BRIER:  Yes, Your Honor.  And once it -- one

14   other proposal is when we do set closing arguments, perhaps

15   if there are any outstanding evidentiary questions as to

16   those objections, we could open the record briefly and

17   resolve those, if any.

18           THE COURT:  I'm going to rule -- I'm going to rule

19   on the objections, okay.

20           MS. BRIER:  Excellent.  Even better.

21           THE COURT:  We're not going to hear any argument

22   about the objections.  I -- as I do in trial, I rule

23   promptly.

24           MS. BRIER:  Perfect.  That sounds fantastic.

25           THE COURT:  Okay.  That's -- that'll be how we do

Page 16

1    it.  When we concluded yesterday, I agreed to have Mr.

2    Schneider testify first, if he wishes to or appear first.

3    And Mr. Schneider, do you wish to be heard?

4               MR. SCHNEIDER:  Yes, I do, Your Honor.

5               THE COURT:  All right, please go ahead.

6               MR. SCHNEIDER:  Okay.  I guess what I'm going to

7    start with is just presenting my exhibits one by one for the

8    Court here.  The first exhibit I'd like to submit or present

9    is the Terms of Service, Version 8 and Schneider's Exhibit

10   22, 23 --

11              THE COURT:  It's already in evidence as Celsius

12   Exhibit 84.

13              MS. BRIER:  So, Your Honor --

14              THE COURT:  Wait a second.  No, it's not.  Hold

15   on.

16              MS. BRIER:  This is a filing that Mr. Schneider

17   made.  It was a day late, so we did not submit objections to

18   it.

19              THE COURT:  Okay.

20              MS. BRIER:  That said, we have a filing ready and

21   we are happy to go through them and say our objections as to

22   each --

23              THE COURT:  Just --

24              MS. BRIER:  -- as he walks through them.

25              THE COURT:  Just -- you can orally.

Page 17

```
 1              MS. BRIER:  Exactly.  We're happy to do that and
 2    I'm prepared to do that.
 3              THE COURT:  There's a Terms of Service in here?
 4              MS. BRIER:  So he does have the terms of service
 5    in here.  I don't think it's his Exhibit 1.  I think it's
 6    later in the filing.  Exhibit 1 is --
 7              MR. SCHNEIDER:  I --
 8              MS. BRIER:  -- "The Wealth of Nations" by Adam
 9    Smith.
10              THE COURT:  Yeah.
11              MR. SCHNEIDER:  Yeah.
12              MS. BRIER:  And we'd object to that as hearsay.
13              THE COURT:  Objection to "The Wealth of Nations"
14    Exhibit 1 is sustained.  Go ahead, Mr. Schneider.
15              MR. SCHNEIDER:  Okay, so this is my Exhibit 22 and
16    Exhibit 23A and 23B.  And essentially, this is Version 8 of
17    the Terms of Service.  And I'm just going to read the
18    highlight that I highlighted on there.
19              THE COURT:  Just hold on.  I want to make sure I
20    have them before we go there.
21              MR. SCHNEIDER:  Okay.
22              THE COURT:  Did you include this in the exhibits
23    that you submitted, Mr. Schneider?
24              MR. SCHNEIDER:  Yes, I did.  Yes.
25              MS. BRIER:  So Your Honor, I think what he
```

Page 18

1   submitted is this document.  And so it's excerpts of things

2   rather than sort of a list of what he proposed to admit.  So

3   for example, we're looking -- I think you just raised 22 --

4              MR. SCHNEIDER:  Yes.

5              MS. BRIER:  -- 23A and 23B.  They're just excerpts

6   of the Terms of Service with highlights.

7              THE COURT:  What --

8              MS. BRIER:  Our position is that those are -- the

9   Terms of Service in entirety are already in evidence and

10  that's more appropriate than excerpts.

11             THE COURT:  They are, but just point to me where

12  in --

13             MS. BRIER:  Sure.  I'm Page 22 of the filing.  And

14  I think he's referencing --

15             MR. SCHNEIDER:  That document number --

16             THE COURT:  Mr. Schneider, stop for a second.

17             MR. SCHNEIDER:  (indiscernible).

18             THE COURT:  Mr. Schneider, stop.

19             MR. SCHNEIDER:  Okay.

20             THE COURT:  Go ahead, Ms. Brier.

21             MR. SCHNEIDER:  Yes, sir.

22             MS. BRIER:  So, as I understand Mr. Schneider's

23  filing, he excerpted certain documents throughout and I

24  think that's his exhibit list.  So he's talking about

25  Exhibits 22, 23A and 23B which are on Pages 22 and 23 of

1    Docket 3780.

2                THE COURT:  And those are all part of the terms of

3    service Version 7?

4                MS. BRIER:  Yes, Your Honor.  They're all Docket

5    No. 393 which is Celsius Exhibit 38 already in evidence, so

6    our position is that's in evidence.  We have no objection,

7    of course, to that and this would just be duplicative to

8    what's already in evidence.

9                THE COURT:  All right.  So Schneider Exhibits 22,

10   23A, and 23B are from what's already in evidence as Celsius

11   Exhibit 38, so it's in evidence.  I'll permit you,

12   certainly, to refer the excerpt, but the entire document is

13   in evidence.  Go ahead, Mr. Schneider.

14               MR. SCHNEIDER:  Okay.  So the excerpt, I'd like to

15   verbalize is for Exhibit 22, it states that "You may

16   terminate any loan to Celsius at any time and request that

17   Celsius return the borrowed eligible digital assets."

18               THE COURT:  Okay, I see it.

19               MR. SCHNEIDER:  And then further -- okay, and then

20   on Exhibit 23A, Section 11 under withdrawals, it says "You

21   have a call option on all loans made to Celsius to demand

22   immediate complete or partial repayment of any loan at any

23   time."

24               THE COURT:  Okay, I see it.

25               MR. SCHNEIDER:  Okay.  And then the third exhibit,

Page 20

1    23B, it says, "For the avoidance of doubt, repayment shall

2    be in kind, i.e., in the same type of eligible digital asset

3    loaned by you."

4              THE COURT:  Okay.  I see it.

5              MR. SCHNEIDER:  So -- okay, so here's my

6    commentary on this.  Cryptocurrency is a property that

7    creditors deposited with Celsius and receiving back that

8    property is what creditors expected, agreed to, and it is

9    what Celsius is contractually obligated to return to

10   creditors upon demand. Schneider demands that his crypto

11   property be returned to him.

12             THE COURT:  You agree --

13             MR. SCHNEIDER:  I would --

14             THE COURT:  Mr. Schneider, you agree, you don't

15   get the same Bitcoin back.  You get --

16             MR. SCHNEIDER:  Yes.

17             THE COURT:  -- an equivalent amount of Bitcoin or

18   whatever the --

19             MR. SCHNEIDER:  Correct.

20             THE COURT:  -- currency is.  You don't -- it's not

21   like you're -- if you deposited Bitcoin, it's not earmarked.

22   It's not kept for safe keeping.  You have a contract right

23   to get back the same amount of Bitcoin or ether or whatever

24   you deposited.  Correct?

25             MR. SCHNEIDER:  Correct, yes.  I -- that is my

Page 21

1   understanding.  Yes, sir.

2              THE COURT:  Okay.

3              MR. SCHNEIDER:  And --

4              THE COURT:  Go ahead.

5              MR. SCHNEIDER:  Schneider demands that its crypto

6   property be returned to him in like kind, not necessarily in

7   the actual one.  Okay.  As this Court has -- as this Court

8   had contractually determined according to the terms of

9   service that the crypto that Schneider deposited is property

10  of the Debtors' estate, even so, should this Court also

11  contractually determine according to the terms of Service

12  that the debt value owed to Schneider should, in fact, be

13  returned to him in the same form if possible, in the same

14  form that he deposited with the Debtor.

15             THE COURT:  If there hadn't been a bankruptcy,

16  that might have been true.

17             MR. SCHNEIDER:  Correct.  I understand that, sir.

18  And -- but partial returns or whatever the Debtor is

19  obligated to return back to myself, is essentially what's at

20  issue here.  And indeed -- so, if possible.  And indeed, it

21  is possible because Debtor is withholding $450 million in

22  cryptocurrency to feed Newco, which effectively reduces the

23  value of crypto creditors would otherwise receive.

24             And my position is for this Court to act

25  otherwise, without just cause and due process in the face of

Page 22

1    Debtors' contractual obligations to creditors would affect

2    the unlawful and unconstitutional taking of property.

3              THE COURT:  Bankruptcy has a way of doing that.

4    Your rights as a creditor are determined along with the

5    rights of all other creditors.  So you may think you have a

6    right, absolute right to get back exactly what you put in,

7    but that's not how the bankruptcy system works.

8              MR. SCHNEIDER:  Right.  I think -- that's not

9    exactly what I'm thinking.  I understand that (audio glitch)

10   as the total amount back, I realize I won't receive the

11   total amount back, and that's not what I'm arguing here.

12   Basically, I'm arguing the recovery (indiscernible) that I

13   am due to receive back should be returned to me in crypto

14   according to the contract that Celsius is obligated to

15   uphold.

16             THE COURT:  All right.  Are there any other

17   exhibits that you wish to offer?

18             MR. SCHNEIDER:  Yes, there is, sir.

19             THE COURT:  What are they?

20             MR. SCHNEIDER:  Okay.  My next one is Exhibit 3

21   and Exhibit 4 concerning the liquidation analysis.  They're

22   two charts, a (indiscernible) and a chart.

23             MS. BRIER:  Your Honor, we have no objection to

24   these.  They're straight out of the disclosure statement.

25             THE COURT:  All right.  Schneider Exhibits 3 and 4

Page 23

1   in evidence.

2            (Schneider Exhibit 3 and 4 entered into evidence)

3            MS. BRIER:  And I guess with the caveat that they

4   are as they purport to be and are straight out of the

5   disclosure statement, I think there's some commentary under

6   it that we object to, but --

7            THE COURT:  The commentary -- when you say

8   commentary under it, I see on Page 6 of 41, that looks like

9   it's -- you're not objecting to the footnotes.  They're

10  actually part of the chart.

11           MS. BRIER:  Exactly; 6 of 41, no objection.

12  That's in my understanding straight from the disclosure

13  statement.

14           THE COURT:  Your issue is the bottom of --

15           MS. BRIER:  Exhibit 3.

16           THE COURT:  -- Exhibit 3.

17           MS. BRIER:  Has some bullets.

18           THE COURT:  Okay.  That's argument.

19           MS. BRIER:  Exactly.  Thank you.

20           THE COURT:  Go ahead, Mr. Schneider.

21           MR. SCHNEIDER:  Okay.  So in the Debtors'

22  liquidation analysis, as recovery for creditor's claim, the

23  Debtor has calculated certain recovery percent for

24  creditors.  In Exhibit 4, you can see basically at the

25  bottom of the waterfall it shows Newco plan at 67 percent

Page 24

1    recovery percent, orderly winddown is at 61.2, and

2    liquidation midpoint is 47.4 percent.

3              And I'd just like to point out with a strong

4    emphasis that the total recovery percent values in Exhibit 3

5    are, in fact, the same recovery percent values in Exhibit 4.

6    What the difference is, is that Exhibit 3 has broken down

7    that recovery, that the -- that the Debtor says, I realize

8    it's an estimate based on whatever -- depending on the

9    market.  And so basically -- and so while Exhibit 3 shows

10   the same recovery percent value as Exhibit 4, Exhibit 3

11   shows Debtor is apportioning some of that recovery value to

12   creditors in the form of common stock or equity.

13             So, while the total -- totalities of (audio

14   glitch) presented in Exhibit 3 are the same as in Exhibit 4,

15   Debtor is attempting without Schneider's consent to offering

16   value in a form different than what Debtors' obligation

17   demands.  And Debtors' obligation, again, as I'm speaking

18   of, is the Terms of Service which requires them to return --

19             THE COURT:  Mr. Schneider, once there's a

20   bankruptcy, what you get back is what's in an approved plan,

21   not what you put in originally.  That's just how bankruptcy

22   works.  It depends on the plan --

23             MR. SCHNEIDER:  Okay.

24             THE COURT:  -- being confirmed, but you just don't

25   get back what you put in when there's been a bankruptcy and

Page 25

1    they don't have it to give it back to you.  All similarly

2    situated creditors have to be treated the same.

3              MR. SCHNEIDER:  Okay.  All right.

4              THE COURT:  Go on with your next exhibit.

5              MR. SCHNEIDER:  Okay.  My next exhibit is Exhibits

6    1 and 2.

7              MS. BRIER:  Exhibits 1 and 2 are "The Wealth of

8    Nations" by Adam Smith.

9              THE COURT:  I already sustained --

10             MS. BRIER:  -- by James Madison --

11             THE COURT:  Sustained.  Objection sustained.

12             MS. BRIER:  Thank you.

13             THE COURT:  Go on with your exhibits.

14             MR. SCHNEIDER:  Okay.  First, I'd just like to

15   read the highlights on both of these new exhibits.

16             THE COURT:  I just sustained the objection.

17   They're not coming into evidence.  We're not going to hear

18   about "The Wealth of Nations."

19             MR. SCHNEIDER:  Okay, I'm sorry.  I was thinking

20   sustained meant --

21             THE COURT:  I read it when I was in college, but

22   not since, but --

23             MR. SCHNEIDER:  Okay.  Well, I'll just read the

24   comments, my commentary then.

25             THE COURT:  Move on --

1              MR. SCHNEIDER:  (indiscernible).

2              THE COURT:  -- your exhibits, Mr. Schneider.

3              MR. SCHNEIDER:  So, all right.

4              THE COURT:  What's your Exhibit 5A.

5              MR. SCHNEIDER:  My Exhibit 5 A is concerning the

6      way to distribute -- distribution election and it's -- ,

7      well, basically --

8              THE COURT:  Where does 5A come from, 5A and 5B?

9              MR. SCHNEIDER:  Okay, 5A came from (indiscernible)

10     which somebody post -- did this picture and everything like

11     that.

12             MS. BRIER:  We'd object on foundation grounds --

13             MR. SCHNEIDER:  And I just copied and pasted it.

14             THE COURT:  Objection sustained.  What about 5B?

15             MS. BRIER:  We have no objection to 5B.

16             MR. SCHNEIDER:  5B --

17             MS. BRIER:  It's already in evidence.

18             THE COURT:  All right, 5B is in evidence.  5C.

19             (Schneider Exhibit 5B entered into evidence)

20             MR. SCHNEIDER:  Okay, 5C is a workup of the

21     numbers from 5B.

22             THE COURT:  Ms. Brier?

23             MS. BRIER:  So it's hard for me to know what this

24     is.  I object to foundation.  If it's something we have in

25     evidence, maybe we wouldn't object, but I don't know what it

Page 27

1    is.

2                    THE COURT:  What is it, Mr. Schneider?  Did you

3    create it?

4                    MR. SCHNEIDER:  5C --

5                    THE COURT:  Yes, 5C.

6                    MR. SCHNEIDER:  5C, the total of the dollar amount

7    that people toggled to either equity or crypto.  And

8    basically it's totaled out here and then it comes to

9    basically a 6.1 ratio of dollars that accepted -- elected to

10   toggle to crypto as opposed to toggling to equity.

11                   THE COURT:  Did you create this chart or did it

12   come from somewhere in the evidence already?

13                   MR. SCHNEIDER:  I created it.

14                   THE COURT:  Objection sustained.

15                   MS. BRIER:  Thank you, Your Honor.

16                   THE COURT:  Exhibit 6.

17                   MS. BRIER:  Exhibit 6 is -- it appears to be a

18   section from Mr. Compagna's declaration which is already in

19   evidence.  So to the extent it's already in evidence, we

20   have no objection.

21                   THE COURT:  Does that come from Mr. Compagna's

22   declaration, Mr. Schneider?

23                   MR. SCHNEIDER:  Document 3332, I believe, Exhibit

24   7 is Compagna's.

25                   THE COURT:  All right, it's in evidence.

1          (Schneider Exhibit 6 entered into evidence)

2          MR. SCHNEIDER: I'm not sure.

3          THE COURT:  Okay, it's in evidence.  What about

4     your Exhibit 7?

5          MR. SCHNEIDER:  Excuse me?  I'm sorry?

6          THE COURT:  What is your Exhibit 7?

7          MR. SCHNEIDER:  Exhibit 7.  I believe that's what

8     we were talking about, wasn't it?

9          THE COURT:  I was still back on six.  What is

10    Exhibit 7?

11         MR. SCHNEIDER:  Okay.  Exhibit 7 is Document No.

12    3332, which actually that is disclosure statement.

13         THE COURT:  All right.  And I take it that your

14    Exhibit 8 is also from the disclosure statement?

15         MR. SCHNEIDER:  Yes, sir.

16         THE COURT:  Okay, they're in evidence.

17         (Schneider Exhibits 7 and 8 entered into evidence)

18         MR. SCHNEIDER:  And Exhibit 9 is also from the

19    disclosure statement --

20         THE COURT:  Nine --

21         MR. SCHNEIDER:  -- and Exhibit 10.

22         THE COURT:  Any disagreement, Ms. Brier?

23         MS. BRIER:  No.  I think we've already judicially

24    --

25         THE COURT:  Seven, eight, nine, and ten are in

1    evidence.  Okay.  What about Exhibit 11?

2              (Schneider Exhibits 9 and 10 entered into

3    evidence)

4              MR. SCHNEIDER:  Okay, I --

5              MS. BRIER:  Your Honor, we'd object to Exhibits

6    11, 12, and 13 ad hearsay.  They appear to be websites, but

7    it's hard for me to tell where they're coming from.  So I'd

8    also object on foundation.

9              THE COURT:  Well, let me ask, Mr. Schneider, where

10   do 11, 12, and 13 come from?

11             MR. SCHNEIDER:  Okay, let me find where that's at

12   here.  Kind of out of order in what I had anticipated.  So

13   as far as exhibit -- like, I can't put any commentary on it

14   then.  Is that correct, Your Honor?

15             THE COURT:  I'm asking where 11, 12, and 13 come

16   from.

17             MR. SCHNEIDER:  Okay, 11, 12, and 13.  Eleven come

18   -- okay, 11 comes from UK.  I don't have the link on there.

19   It comes from the UK authority government, UK.gov, which

20   shows Celsius Network Limited information that they're

21   required to file.

22             MS. BRIER:  Your Honor, I don't know the

23   foundation for this.  I -- to the extent that --

24             THE COURT:  There's no foundation.

25             MS. BRIER:  -- already in evidence --

```
 1              THE COURT:  Eleven, twelve, thirteen, objection
 2    sustained.  If they're in evidence already -- there's no
 3    foundation for it.  What about 14?
 4              MR. SCHNEIDER:  Twelve, thirteen --
 5              THE COURT:  What about 14, 15, 16, 17, 18?
 6              MS. BRIER:  Our position on all of those up to 19,
 7    which is already in evidence, is that they are more
 8    appropriately judicially noticed.  They're orders from this
 9    Court or filings from parties.
10              THE COURT:  Well, the whole filing, if you want
11    the Court to take traditional notice of it, I need to know
12    what documents those are.  I'm not going to just let this
13    in, these excerpts.
14              MR. SCHNEIDER:  Okay, so Exhibit 14 is the order
15    approving solicitation and voting procedure statement.  It's
16    your order approving solicitation and voting procedures,
17    approving the form the notices.  It's Document No. 3337.
18              THE COURT:  Give me the number again, 33 what?
19              MR. SCHNEIDER:  3337.
20              THE COURT:  All right.  The Court will take
21    judicial notice of it.
22              MS. BRIER:  I would also point out that it appears
23    the way Mr. Schneider put this together is he included in
24    brackets underneath some of the excerpted titles of the
25    docket number he's --
```

1                THE COURT:  Okay.  All right.

2                MS. BRIER:  -- referring to.

3                THE COURT:  So, with respect to 14, 15, 16, 17,

4    18, 19, 20, 21, those are from Court pleadings and the Court

5    will take judicial notice of each of them.  All right, 22.

6                MS. BRIER:  Your Honor, I believe we addressed 22,

7    23A, and 23B --

8                THE COURT:  We did.  We did.

9                MS. BRIER:  -- at the outset with Mr. Schneider.

10               THE COURT:  We already did that.  Okay.  What's

11   24?

12               MS. BRIER:  Twenty-four, I think, is similarly

13   situated to the ones we just talked about.  It looks like a

14   docket filed, Docket 2054.

15               MR. SCHNEIDER:  Yes.

16               THE COURT:  All right.  The Court will take

17   judicial notice of them.  What about 25A?  That's different.

18               MS. BRIER:  25A, would object on hearsay and

19   foundation grounds.

20               THE COURT:  Sustained.  25B.  Did we take -- did I

21   take judicial notice of this yesterday?

22               MS. BRIER:  So Your Honor, some of these I think

23   are either in evidence or have been discussed.  It's hard

24   for me to tell based on some of the excerpts which are and

25   are not in evidence, but to the extent the Court wants to

1    take judicial notice or these facts about some of these

2    items are certainly already in evidence.  So there's no

3    objection to the fact that, for example, Mr. Mashinsky was

4    subject of a complaint or --

5              THE COURT:  I'll take judicial notice of the

6    sealed indictment of Alex Mashinsky and Roni Cohen-Pavon.

7              MS. BRIER:  But a lot of that I think has already

8    been --

9              THE COURT:  Right.

10             MS. BRIER:  -- introduced in other forms.  26A

11   looks like an article, so we'd object to foundation and

12   hearsay on that.

13             THE COURT:  Objection sustained.

14             MS. BRIER:  And same with 27A --

15             THE COURT:  What about 26B?

16             MS. BRIER:  Oh, sorry.  26B.  Similarly, I think

17   this fact is already in evidence.  I don't know if this

18   exact document is, but no objection to the fact that Mr.

19   Pavon pleaded guilty.  I think, some of those documents are

20   in evidence.  I just don't know if this one is.

21             THE COURT:  Okay.  It's going to be admitted.

22   27A.

23             (Schneider Exhibit 26B entered into evidence)

24             MS. BRIER:  Object to foundation and hearsay here.

25             THE COURT:  Sustained.

Page 33

1             MS. BRIER:  Same with --

2             THE COURT:  27B?

3             MS. BRIER:  -- 27B.  27C is a tweet from Simon

4       Dixon.  Object to hearsay on that.

5             THE COURT:  Objections to 27A, B, and C are all

6       sustained.

7             MS. BRIER:  We're almost done.  28A, B, C are all

8       excerpts from the disclosure statement, so no objection to

9       those.

10            THE COURT:  Okay, 28A, B, and C.  All right,

11      they're admitted in evidence.  29A, B.

12            (Schneider Exhibits 28A, B, and C entered into

13      evidence)

14            MS. BRIER:  29A and 29B are -- appear to be a

15      Celsius Network tweet and then a number of replies and we

16      don't object to the admission of the Celsius Network tweet

17      as it's an admission as it relates to Mr. Schneider, but we

18      do object to the replies which are all hearsay.

19            THE COURT:  Which are the replies?

20            MS. BRIER:  So I think everything after the first

21      tweet is a reply from someone other than Celsius.  So

22      there's a reply from @Celsius Newco, (indiscernible).

23      There's a number of responses to the Celsius tweet from

24      others on the internet, and we'd object to those as hearsay.

25            THE COURT:  Right.  Sustained.  Objection

Page 34

1    sustained.  None of those are coming in.

2           MS. BRIER:  I think that's it.  I believe that

3    gets us through all of them.

4           THE COURT:  I think that's all of them.  All

5    right.  So we've taken care of your exhibit.  Is anything

6    you want to add, Mr. Schneider?

7           MR. SCHNEIDER:  Well, there's one other thing I'd

8    like to ask of you is to take judicial notice of my

9    objection to plan confirmation, docket number --

10          THE COURT:  It's --

11          MR. SCHNEIDER:  -- 35 --

12          THE COURT:  I have -- you know, Mr. Schneider, you

13   don't even have to raise that.  I'm considering all of all

14   of the objections to confirmation, including that.

15          MR. SCHNEIDER:  Okay.

16          THE COURT:  -- just to be clear.

17          MR. SCHNEIDER:  All right.  Thank you.

18          MS. BRIER:  And just for purposes of the record,

19   our understanding is that he did not submit a declaration or

20   testimony here today, just his argument and --

21          THE COURT:  Correct, and the exhibits.

22          MS. BRIER:  Thank you, Your Honor.

23          THE COURT:  Anything else you want to add, Mr.

24   Schneider, before we finish?

25          MR. SCHNEIDER:  No, just -- no.

1              THE COURT:  Okay.  And since he hasn't submitted a

2      declaration, there's no cross examination.

3              MS. BRIER:  No cross.

4              THE COURT:  Okay.  All right.  Let's begin with

5      Mr. Faraj.  That's next, right?

6              Yeah, let's just -- why don't you tell me what

7      we've got here.

8              MR. McCARRICK:  T.J. McCarrick, Kirkland & Ellis,

9      on behalf of the Debtors.  We have, I believe, the cross

10     examination of Mr. Faraj.  I believe Your Honor said

11     yesterday that you would consider his expert report as the

12     testimony that he is offering here, subject to cross

13     examination.  I have two binders I'm happy to hand up to the

14     Court and then proceed, unless you don't want any more

15     binders.

16             THE COURT:  I do, I do.  Absolutely.  All right,

17     Mr. Faraj, you're going to be sworn in.  If you would raise

18     your right hand.

19             CLERK:  -- solemnly swear or affirm all the

20     testimony you're about to give (indiscernible) is the truth

21     and the whole truth?

22             THE WITNESS:  I do.

23             THE COURT:  All right, thank you, Mr. Faraj.

24             MR. McCARRICK:  May I proceed?

25             THE COURT:  Where are you located, Mr. Faraj?

Page 36

```
 1              THE WITNESS:  I'm in Australia, Your Honor.

 2              THE COURT:  Oh.  What time is it there?

 3              THE WITNESS:  It's 12:30 and I've been watching

 4    yesterday, so yesterday, so I've been up for about 37 to 40

 5    hours straight.

 6              THE COURT:  Not a good idea.  All right.  Mr.

 7    McCarrick, go ahead.

 8              MR. McCARRICK:  All right.

 9                 CROSS EXAMINATION OF HUSSEIN FARAJ

10    BY MR. McCARRICK:

11    Q    Mr. Faraj, you've never testified as an expert before,

12    correct?

13    A    No, I haven't.

14    Q    You've never prepared a fair value analysis of any

15    digital asset, correct?

16    A    No, I haven't.

17    Q    You've never prepared a fair value analysis of any

18    financial instrument, true?

19    A    That's true.

20    Q    You've never prepared a true value analysis of any

21    digital asset, correct?

22    A    For R&D -- sorry.  For R&D yes.  For Courts, no.

23    Q    Okay, and let's just distinguish that.  When you say

24    research and development, what you're talking about is

25    training your proprietary AI model, correct?
```

Page 37

1    A    Correct.

2    Q    You've never performed a true value analysis for any

3    external third party for a cryptocurrency asset, true?

4    A    No, just for ourselves.  It's true.

5    Q    And when you're training your AI model, that's not

6    something you've opened up to the world, right?  Your AI

7    model hasn't been studied or peer tested by anyone outside

8    of your company, true?

9    A    It hasn't been studied or tested, but it was opened up

10   to the world to actually utilize it, use it, and make sure

11   it works.

12   Q    Okay.  You've never prepared a formal analysis of the

13   intrinsic value of a digital asset before, have you?

14   A    Not (indiscernible).  The only thing I do is or R&D

15   (indiscernible).

16   Q    Okay, so for the rest of my questions about whether or

17   not you prepared an analysis, I'm going to be excluding your

18   internal research and development efforts.  I'm just asking

19   whether it's for third parties or for a Court.  Is that

20   fair?

21   A    That's fair.

22   Q    Okay.  So you've never prepared a formal analysis of

23   the intrinsic value of any financial instrument, true?

24   A    True.

25   Q    You've never prepared a speculative value analysis of a

Page 38

1    digital asset, true?

2    A    True.

3    Q    You've never prepared a comps analysis of any digital

4    asset, true?

5    A    That's true.

6    Q    In fact, this is the very first case in which you're

7    offering an opinion to any external audience about the value

8    of a digital asset, fair?

9    A    For Court purposes, yes.

10   Q    Or what other purposes?

11   A    I do assessments valuation for clients that come in who

12   want to deploy a cryptocurrency or deploy a project, so I've

13   got to give them advice on all the tokenomics.  I have to go

14   very deep into economics and assessments on digital asset.

15   Q    Okay, and when you give them that assessment, are you

16   giving them a value?

17   A    I'm giving a proposition on how to obtain the value

18   depending on the tokenomics, and how the tokenomics function

19   inside the crypto space to actually derive a proposed value

20   when they go to the market and a proposed growth value when

21   they're on the market.

22   Q    So I just want --

23            THE COURT:  I just want to ask you, just speak a

24   little more slowly.  I understood you so far, but it would

25   help if you just spoke a little more slowly, okay?

1              THE WITNESS:  I will.  I'll slow down.

2              THE COURT:  All right, go ahead.

3              MR. McCARRICK:  -- Your Honor.

4    BY MR. McCARRICK:

5    Q    Mr. Faraj, I just want to make clear, have you ever

6    prepared a valuation analysis for any third party?

7    A    No.  Except property, sorry, just because your question

8    is very broad.  So when it comes to feasibility and

9    assessments by some property infrastructure, I've done a lot

10   of them.  When it comes to digital assets, no, not for a

11   third party.

12   Q    Okay, so setting aside property or real estate, you've

13   never performed a valuation analysis of a digital asset for

14   a third party, true?

15   A    Not a third party.  That's true.

16   Q    All right.  This is the first -- withdraw.  The first

17   person you've ever asked to adopt a valuation analysis that

18   you've performed of a digital asset as the judge in this

19   case, correct?

20   A    It is, an official, for Court purpose, yes.

21   Q    The first time you've ever formally addressed in a

22   public setting -- withdrawn.  The first person you've ever

23   formally addressed in a public setting to provide evaluation

24   of the digital asset is the judge in this case, correct?

25   A    Correct.

Page 40

```
 1    Q     You don't have a degree in finance, do you, sir?

 2    A     I don't have a degree in finance.

 3    Q     You don't have a degree in business, correct?

 4    A     I don't have a degree in business.  I have diplomas and

 5    I have extensive experience in multifacets of business.

 6    I've done over 7 to 10 billion dollars of contracts

 7    globally, but I don't have a degree (indiscernible).

 8    Q     You don't have a degree in economics, correct?

 9    A     I don't have a degree in economics, but I actually give

10    assistance and aid to countries and governments who require

11    assistance in regards to digital assets and likewise, and I

12    actually, again, I've got function on the ground.  I don't

13    have a qualification.

14    Q     Okay.  You don't have any degrees in valuation or

15    valuation efforts, true?

16    A     It's very true.  I've got extensive experience, like I

17    said, non-digital, that's for third parties.  For digital,

18    just because you haven't said digital space, I don't have

19    any degree for it.

20    Q     You're not a certified financial modeling and valuation

21    analysis -- analyst, are you?

22    A     Are we talking about digital space or are we talking

23    about external?  Because experience -- depends what you're

24    after.  Experience or qualification?

25    Q     Well, I asked if you're certified.  That's
```

Page 41

1   qualification, correct?

2   A    Well, certification doesn't only mean qualification

3   because if you work in an industry --

4           THE COURT:  -- speak a little more slowly.

5           THE WITNESS:  Sorry, Your Honor, I'll slow down.

6           THE COURT:  Okay?

7           THE WITNESS:  I'll go more slow.

8   BY MR. McCARRICK:

9   A    When you say certification, I mean, you can be

10  certified by your peers.  It's not -- a certification is a

11  piece of paper.  But I'll take it that you're talking about

12  university qualifications, and the answer is no.

13  Certification by peers, I've got plenty.

14  Q    Let's break it down.  First, you don't have a formal

15  certification, a la a degree from a professional

16  institution, correct?

17  A    Correct.

18  Q    Okay, and when you say you can be certified by your

19  peers, what's that look like?

20  A    So that's extensive experience that I've been in the

21  industry, especially in business and economics.  I've gotten

22  plenty of contracts.  I've negotiated a lot of large scale

23  projects.  I'm a strategic partner to over 168 global

24  companies, and some Fortune 500 companies.  I get (audio

25  glitch) negotiate deals extensively.  So again, if you want

Page 42

1    experience I have it.  If you want a piece of paper, I don't

2    have it.

3    Q    Okay.  All that experience that you just talked about,

4    none of it involved providing a valuation analysis to any of

5    those companies, individuals, or peers, true?

6    A    Not for digital assets.

7    Q    Correct, not for digital assets, right?

8    A    Correct.

9    Q    Okay.  You don't have professional accreditations as

10   evaluation professional, true?

11   A    Very true.

12   Q    You haven't taken a single course in valuing financial

13   instruments, including digital assets, true?

14   A    Now I've created the tools that we currently use

15   through research and development, but you're saying

16   (indiscernible), so you're correct.

17   Q    You've never worked at a valuation firm?

18   A    No, I haven't.

19   Q    And you've never worked at an investment bank, correct?

20   A    Correct.

21   Q    You've never worked as an investment banker, true?

22   A    True.

23   Q    Well, for ten years, you told the world that you were

24   an investment banker, didn't you?

25   A    That's true.

Page 43

1            MR. McCARRICK:  All right.  So Mr. Lopez, can we

2     display Celsius Exhibit 115, which is your LinkedIn profile

3     as of 72 hours ago.  Can we have sharing privileges --

4            THE COURT:  Deanna, can you allow --

5            MR. McCARRICK:  --for Mr. Lopez?

6            THE COURT:  -- Mr. Lopez to share, please?

7            CLERK:  All right, he's a cohost.

8            THE COURT:  Thank you very much, Deanna.

9            MR. McCARRICK:  Thanks.  And Mr. Lopez, it's

10    Celsius Exhibit 115, which is Mr. Faraj's LinkedIn profile

11    as of 72 hours ago.  Can we go to Page 2 of the PDF?

12    BY MR. McCARRICK:

13    Q    This is the document we reviewed during your

14    deposition, isn't it, Mr. Faraj?

15    A    Yes, it is.

16    Q    And can we look at Page 4 of the PDF, specifically the

17    Advantage Group Australasia entry?  You held yourself out

18    here as an investment banker at Advantage Group Australasia,

19    correct?

20    A    I did.

21    Q    And that was false, wasn't it?

22    A    No, not at the time.  I actually thought we were

23    investment bankers.  Like, if I put it down on a piece of

24    paper, look, I know a lot more now than I knew when I was

25    actually doing this job.  So in this space, especially when

Page 44

```
 1    you're doing international finance and international

 2    governance, one of the things that most people call

 3    themselves is investment bankers.  Now, you're asking, do I

 4    think it's true now; no, because I know a lot better.  I

 5    know much more now, so I would not agree that it's a true

 6    proposition.  I would call myself an investment specialist

 7    instead of an investment banker.  But at the time that this

 8    thing was done, it was true in terms of what I thought it

 9    was.

10    Q    So let me understand this.  Is it your testimony that

11    you considered yourself an investment banker because you

12    were a -- you brokered financial arrangements between

13    different government entities?

14    A    I considered myself an investment banker because I

15    didn't understand what that role actually was, and I thought

16    my role was an investment banker.  But now I know a lot

17    better and that's why when you gave me advice and I saw it -

18    - I really haven't seen that for a long time -- I actually

19    went and changed it, just as he told me to.

20    Q    Well, if you didn't know what an investment banker was,

21    why would you tell the world that's what you were?

22    A    Because that's what we perceived we were.  So in the

23    role that I was on, especially when I started, I mean, I was

24    very young when I started Advantage Group.

25    Q    Well, how did you perceive that you were an investment
```

Page 45

1    banker, if you didn't know -- let me finish the question.

2    How do you perceive that you were an investment banker if

3    you didn't know exactly what it meant to be an investment

4    banker?

5    A    Because the way it was explained to us when we were

6    very young and going in this industry --

7              THE COURT:  Mr. McCarrick --

8              THE WITNESS:  Is that our role --

9    BY MR. McCARRICK:

10   Q    Okay, and just to be clear, you changed your LinkedIn

11   profile in the past 24 hours, correct?

12   A    Yes, exactly like you told me I should.  I actually

13   agree with you.  I agree with you that it should not be an

14   investment banker and I went and changed it straightaway.

15             MR. McCARRICK:  Okay.  You can take that down, Mr.

16   Lopez.

17   BY MR. McCARRICK:

18   Q    I want to talk about your expert report.  You didn't

19   write each and every word of this report, correct?

20   A    No, I didn't.

21   Q    You used artificial intelligence to draft the report,

22   correct?

23   A    Correct.  I compiled it with artificial intelligence

24   and I basically, like I explained to you in the deposition,

25   I guided the artificial intelligence.  I gave the data.  I

1    gave it the boundaries.  I gave my evaluation reports and I

2    said to learn from my evaluation reports.  I then compiled

3    all the data utilizing artificial intelligence.

4    Q    Okay.  Mr. Faraj, isn't it true that it took you longer

5    to read the report than it took you to write it?

6    A    Very true.

7    Q    You generated this 300-plus page report in 72 hours,

8    correct?

9    A    Actually, the 300 pages -- more than 300 pages, but you

10   got about 140, 150 pages.  That was the writing side.  I

11   mean, you've got 1.5 spacing, reduce the 1.5 spacing to 1.

12   You've probably got about 90 to 100 pages and I did it

13   probably in about, yeah, three days.  About nine hours to

14   ten hours in compilation.

15   Q    Okay.  Well, leaving the font and the pages out of it,

16   it took you -- whatever's in this report -- 72 hours to

17   generate, right?

18   A    Correct, correct.  It's not all of it, 72 hours because

19   a lot of the data from page one hundred and whatever it was

20   onwards, we already had.

21             MR. McCARRICK:  All right.  Mr. Lopez, can we look

22   at Celsius Exhibit 113, which is a forensically collected

23   copy of a tweet that Mr. Faraj posted at 3:27 p.m. on

24   October 9th, 2023.  If we go to Page 2 of the PDF.  And can

25   we blow up the top?

Page 47

```
 1    BY MR. McCARRICK:

 2    Q    Mr. Faraj, this is a tweet that you issued on

 3    October  9th, 2023, correct?

 4    A    Correct.

 5    Q    And we talked about this during the deposition, right?

 6    A    We did.

 7              MR. McCARRICK:  Your Honor, at this time, we'd

 8    move Celsius Exhibit 113 into evidence.

 9              THE COURT:  Hearing no objection, it's in

10    evidence.

11              (Celsius Exhibit 113 entered into evidence)

12    BY MR. McCARRICK:

13    Q    All right, Mr. Faraj.  You write here, "I haven't had

14    much time to follow the issues with CEL."  Do you see that?

15    A    Correct.

16    Q    And that's true.  Two days before you filed your expert

17    report in this case, you hadn't had much time to follow the

18    issues with CEL, right?

19    A    That's 100 percent correct.  That's after we finished

20    doing our investigation on CEL.  So from the time we

21    finished investigating CEL post FTX collapse and the FTX

22    issue from past that, we haven't had much time.  We've been

23    restoring our network.

24    Q    All right.  And you also wrote, "We completed the

25    entire assessment within 72 hours.  In reality, this is
```

Page 48

1    usually a six- to eight-week job."  You see that?

2    A    That's correct.

3    Q    So you did a 1,000-plus hour job in 72 in this case.

4    Is that your testimony?

5    A    That's 100 percent correct.  That's my testimony.

6    Q    And you acknowledge, Mr. Faraj, that 72 hours is

7    nowhere near enough time to generate a comprehensive report,

8    true?

9    A    I acknowledge for someone else, it's not near enough,

10   but (indiscernible) to me, I can actually do it.  Without

11   artificial intelligence, without -- let me finish the

12   answer, (indiscernible).  If I wasn't utilizing artificial

13   intelligence to compile the information, compile the

14   information, then yes, it's impossible.  But with these days

15   with artificial intelligence and the utilization of

16   artificial intelligence, it's doable.  I mean you got it in

17   front of you and you've done the tests on the metadata.  So

18   the metadata has actually told you that it was nine hours.

19             THE COURT:  What AI platform do you use in

20   preparing your report.

21             THE WITNESS:  Your Honor, we used two.  So in the

22   early days, we had NAVIS which is NuGenesis Artificial

23   Validation Intelligence System.  It's an AI that was trained

24   by --

25             THE COURT:  You're going to have to go -- you're

1    going to have to speak more slowly.

2            THE WITNESS:  Sorry.  I'm going to slow down.

3    I'll sit down.  Okay.  So we had, the early information

4    which you see is in the boxes.  They were compiled a long

5    time ago.  We were investigating CEL for a different matter.

6    So when we were investigating CEL and FTX, we actually

7    compiled a lot of information about CEL.  Now, that data was

8    compiled and used through one of the systems that we

9    developed, which is NuGenesis Artificial Validation

10    Intelligence System.

11            It's the same system that caught Sam Bankman

12    (audio glitch) scam.  All right, it was the system that was

13    able to tell that Sam had created fake and synthetic coins

14    on the market.  That AI system is the same system we taught

15    how to predict the market.  So in terms of the report, about

16    200 or 150 pages, whatever it is, that information was

17    already compiled.  So that information we already had access

18    to.  Now with the news, the further access I was using Open

19    AI.

20            So utilizing the Open AI platform, I actually took

21    all the information that I had.  I taught the Open AI, and

22    you'll see, I've got a, I've got the whole data dump on how

23    we used it.  So everything that the AI was assessing was the

24    stuff I taught it.  I gave it to --

25            THE COURT:  I only asked you which platform you

Page 50

```
 1    used.  Go ahead, Mr. McCarrick.
 2              THE WITNESS:  Sorry, Your Honor.  Open AI.  Open
 3    AI.  ChatGPT-4.  Open AI.
 4    BY MR. McCARRICK:
 5    Q    Mr. Faraj, just to clear up the record, it's your
 6    testimony you used two different AI tools in preparing
 7    different part of this report, correct?
 8    A    That's correct.
 9    Q    Right?  There's the Exhibit 2 attached to your report,
10    which is a close to 200-page chart, summarizing public
11    articles, correct?
12    A    That's correct.
13    Q    And that's what you used NAVIS NuGenesis' own internal
14    platform to generate, correct?
15    A    That's correct.
16    Q    And the report itself that you generated for this case,
17    you used Open AI to do that, correct?
18    A    I didn't generate the report.  What I did is I compiled
19    the report.  There's a very big difference between the two
20    words.  But yes, that's correct.  I compiled the report
21    using ChatGPT.
22    Q    Okay.  Well, whatever you used, you agree with me, Mr.
23    Faraj, that 72 hours is nowhere near enough time to generate
24    a comprehensive report, right?
25    A    Okay, we completed the entire assessment, the
```

Page 51

1    assessment with the full valuation assessment --

2              THE COURT:  Mr. Faraj.  Mr. Faraj --

3              THE WITNESS:  Sorry, Your Honor.

4              THE COURT:  Listen to the question and just answer

5    the question.  Ask your question again.

6    BY MR. McCARRICK:

7    Q    Mr. Faraj, if it was going to be comprehensive, 72

8    hours was not enough to generate this report, true?

9    A    Correct.

10   Q    It's your testimony that you only spent eight to ten

11   hours editing this 372-page document, correct?

12   A    Five or take.  I don't want to lie to you and give you

13   the wrong answer.

14   Q    Okay.  Do you have any reason to disagree with me,

15   that's over half a page every minute?

16   A    I have no reason to disagree with you.

17   Q    Do you agree with me, sir, that there are errors in

18   your report, true?

19   A    I agree.  I agree and -- yeah.

20   Q    And in your view, it would be impossible to prepare a

21   report in 72 hours without introducing errors, correct?

22   A    That's true.

23              MR. McCARRICK:  Mr. Lopez, can we pull up Celsius

24   Exhibit 80, which is Docket No. 3752.  That's Mr. Davis'

25   request to submit Mr. Faraj's expert report and report

1    attached to it.  It should be Tab 80 in your binder, Your

2    Honor.

3              THE COURT:  Okay.

4              MR. McCARRICK:  And I want to look at Page 32 of

5    the PDF.  And let's -- you see the section there titled

6    Introduction to Tokenomics and Crypto Evaluation.

7              THE COURT:  Just tell me, are you using numbers at

8    the bottom of the page or the top of the page?

9              MR. McCARRICK:  Oh, I'm sorry, Your Honor.  So I'm

10   using the PDF page, but if you want the --

11             THE COURT:  You -- that's okay.

12             MR. McCARRICK:  I can get it for you.

13             THE COURT:  PDF page is the number at the bottom,

14   right?

15             MAN:  -- no number at the bottom.

16             THE COURT:  Well, my copy has numbers at the

17   bottom.

18             MR. McCARRICK:  There's, yeah, numbers at the

19   bottom and numbers at the top, but if you just give me one

20   second, I can get it for you, Your Honor.

21             MR. WEEDMAN:  Page 24 on the bottom.

22             THE COURT:  Thank you.

23             MR. McCARRICK:  Thank you, Mr. Weedman.

24             THE COURT:  Go ahead.

25   BY MR. McCARRICK:

Page 53

1   Q    All right.  This says, "Introduction to Tokenomics and

2   Crypto Valuation."  See that?

3   A    I do.

4   Q    And the first paragraph starts, "In the burgeoning

5   world of cryptocurrencies."  Do you see that?

6   A    I do.

7   Q    and the next paragraph repeats that first paragraph,

8   all 92 words, word for word, correct?

9   A    Correct.

10  Q    You didn't catch that error during the review, did you?

11  A    No, I didn't.

12  Q    And your testimony is that we shouldn't worry about

13  that because you didn't make any major mistakes on the

14  actual fair value analysis, correct?

15  A    No, that's what I think.  It's a copy and paste issue

16  and I take it out of the format of the AI and I pasted it

17  here.  So I go over every single thing and as you can see in

18  the -- I don't know if you've got to see the transcript of

19  the AI, but if you go through the AI information, you'll see

20  I actually review on that and copy and paste it.  So when

21  it's come here, it's just a double copy and paste by

22  accident.

23  Q    Okay.  When you were reviewing your final report, you

24  didn't catch this, did you?

25  A    I didn't.  I didn't catch it.

1    Q    All right.  It's true, sir, that you also make errors

2    in your fair value analysis as well?

3    A    You've got to open up and show it to me because I don't

4    know if it's the fair value assessment or if it's one of the

5    other paragraphs.

6    Q    Okay.  Do you agree with me that your fair value

7    assessment includes the trading data you selected for the

8    analysis, right?

9    A    Correct.

10   Q    And selecting the trading window that is most

11   representative for purposes of the fair value analysis is

12   part of your fair value analysis, right?

13   A    No, it's part of the document which says we're going to

14   do the fair value assessment on.  It's not the fair value

15   assessment.

16   Q    Well, let me understand this.  Is it your testimony

17   that determining what trading window is most representative

18   is not part of your fair value analysis?

19   A    No. What I'm saying is, it's introduction to the

20   analysis.  So it's the part where we introduce what we're

21   going to do in the analysis.  It's not the actual analysis.

22   But yes, there is a mistake there.  I acknowledge it.

23   Q    Well, it's actually what you use to select the trading

24   dates that you analyzed, right?

25   A    No.  I actually used the dates I selected.  It's what I

Page 55

1    actually wrote down by accident when I was doing the report.

2    Q    Okay.  Is it your testimony that you wrote it down by

3    accident or that the artificial intelligence wrote it down

4    by accident?

5    A    I composed through the AI.  So if you got the AI and

6    you look at AI data, you'd see that I would have given it

7    the wrong data for that period.

8    Q    Okay.  Do you agree that in conducting your fair value

9    analysis, it was essential to consider sales trading

10   history, correct?

11   A    I do.

12   Q    And selection of trading days is instrumental to

13   provide insights into an asset's true value?

14   A    It's true.

15   Q    And to make sure those insights are accurate, you have

16   to neutralize the impact of deliberate price manipulation,

17   correct?

18   A    I do.

19   Q    And it was paramount in your analysis to hone in on the

20   most stable market conditions around CEL trading, correct?

21   A    Correct.

22           MR. McCARRICK:  All right.  Mr. Lopez, can we put

23   up Exhibit 80 again, and I want to go to Page 95 of the PDF.

24           THE COURT:  Are we looking at the numbers at the

25   top or the bottom?

1          MR. McCARRICK:  So the answer, Your Honor, is, I -

2    - it's going to be page on the bottom.

3          THE COURT:  Okay.

4          MR. McCARRICK:  It should be page --

5          THE COURT:  I don't care which you use.  Just try

6    and be consistent.

7          MR. McCARRICK:  Yep.

8          MAN:  Eighty-seven.

9          MR. McCARRICK:  Yeah, 87 to 88, Your Honor.

10   That's what we're going to be looking at.

11         THE COURT:  At the top or bottom?

12         MR. McCARRICK:  We're going to be looking at --

13   give me one second.

14         THE COURT:  There's page something of 378 at the

15   top and there's something of 172 at the bottom.

16         MR. McCARRICK:  Yes.  The slip sheet with the

17   exhibit number is what's taking it off by one, so it should

18   be -- give me one second.

19         THE COURT:  Isn't there -- the Court ledger's at

20   the top and it says -- it has the ECF docket number and a

21   page of 378.

22         MR. McCARRICK:  Correct, but Your Honor, if you

23   look at Page 1, there won't be that header because it's --

24         THE COURT:  Okay, but there is here, so just tell

25   me which page to go look at.

1          MR. McCARRICK:  Understood, Your Honor.  Give me

2    one second.  Let's do it this way.  Here's what we're going

3    to do, Your Honor.

4          THE COURT:  What's the complication?

5          MR. McCARRICK:  It's just slippage by a number, is

6    what the complication is.

7          THE COURT:  Okay.  All right.  I'm there.  It's

8    Page 94 of 378.

9          MR. McCARRICK:  Thank you, Your Honor.

10          THE COURT:  That's where I am.

11          MAN:  Thank you, Your Honor.

12          MR. McCARRICK:  Thank you, Your Honor.  Take --

13    let's just take this down.  Oh, I'm sorry, it's going to be

14    Page 95 of 378 --

15          THE COURT:  Okay.

16          MR. McCARRICK:  -- what we're looking at and we're

17    looking at the second paragraph.

18          THE COURT:  Got it.

19    BY MR. McCARRICK:

20    Q    And do you see where it says, "The values from June 9th

21    to June 12th might be the most representative of CEL's share

22    value in the least manipulated market conditions."

23    A    You mean to me?  Do you want me to answer?  Sorry.

24    Q    Yes.  Do you see the last sentence --

25    A    Yes, I do, I do.  I do.

1    Q    And June 9th to 12th, you didn't use all of the trading

2    data from those dates in performing your price analysis,

3    correct?

4    A    No.  It should've -- no.  It should've been May the

5    21st to June the 9th, but that's a mistake.

6    Q    And you didn't use --

7    A     -- is correct.  Sorry.

8    Q    So you didn't use June the 10th to June the 12th,

9    correct?

10   A    No, I didn't.

11   Q    So when you say that June 9th to June 12th might be the

12   most representative sample of CEL's fair value in the least

13   manipulated market conditions, that's incorrect?

14   A    It's incorrect.  Correct.

15   Q    Okay.  Let me ask you this.  Since we pointed out these

16   errors to you during your deposition, have you gone back to

17   check for other errors?

18   A    No, I haven't.

19   Q    All right.  Sitting her today, you have no idea what

20   other errors there might be in your report, correct?

21   A    Well, I doubt there'll be.  You would have put them up

22   already and told me.  And they're not -- I don't need to

23   rely on them on my assessment.  So once we get the

24   assessment and you understand the assessment methodology,

25   most of the data that was published in (indiscernible)

1    between the petition and the pause date is not relied on.

2    But go ahead, sorry.

3    Q    Okay.  Mr. Faraj, around 1 p.m. yesterday, you publicly

4    posted a number of materials on DropBox, correct?

5    A    Correct.

6    Q    That included an artificial intelligence extraction

7    report?

8    A    Correct.

9    Q    That document reflects what you did with your

10   artificial intelligence software to generate the report in

11   this case, correct?

12   A    Yes, it is.

13            MR. McCARRICK:  All right, Mr. Lopez, can we bring

14   up Celsius Exhibit 120?  And this document is not internally

15   paginated, so --

16            THE COURT:  Okay.

17            MR. McCARRICK:  We're going to try with the PDFs.

18   If you can go to the first page.

19   BY MR. McCARRICK:

20   Q    That -- this is the artificial extraction report we

21   were just discussing, correct?

22   A    That's 100 percent correct.

23            MR. McCARRICK:  Your Honor, we'd like to move

24   Celsius Exhibit 120 into evidence.

25            THE COURT:  Hearing no objection, it's in

Page 60

1   evidence.

2   BY MR. McCARRICK:

3   Q    And Mr. Faraj, what you're doing here is providing

4   instructions to the artificial intelligence software that

5   you used, right?

6   A    Correct.

7   Q    You provide certain data or information at times,

8   correct?

9   A    Correct.

10  Q    Fair to say you can go line by line to understand where

11  or how the artificial intelligence sourced all of the

12  statements that it makes about tokenomics, right?

13  A    I did.  When they say to line to line, let me explain.

14  So it used my tokenomics report.  If you go to the first

15  page of this, I actually fed it my design and my report on

16  how we do tokenomics, and I asked it to analyze it and learn

17  my reports, so it can actually learn my style.  And then I

18  asked it to -- basically if you go to the first page, you'll

19  see.

20  Q    Okay.  We'll get to the first page in a second, but I

21  want to start by, you also use the artificial intelligence

22  software to respond to some of the Debtors' discovery

23  requests in this case, correct?

24  A    I used -- yes, correct.  I use AI to reply to a lot of

25  emails.  I'm very bad at grammar.  So I put my language and

Page 61

1    I always ask it to reply to my things.

2              MR. McCARRICK:  All right.  Mr. Lopez, can we go

3    to PDF Pages 382 and 383?

4    BY MR. McCARRICK:

5    Q    And it says, "We need to reply to the following."  Do

6    you see that, Mr. Faraj, on the left?

7    A    Yeah.

8    Q    And then it lists all of the requests that I had

9    emailed you.  Is that right?

10   A    Yep.  That's correct.  I fed it the email that you gave

11   me and I asked it to write a reply.

12   Q    And one of the things we asked to produce were

13   documents and communications including direct messages, text

14   messages, and email communications between yourself and any

15   person including but not limited to Otis Davis, correct?

16   A    Correct, in regard to the Chapter 11 proceedings.

17   Q    Okay.  You're aware that Mr. Davis testified yesterday

18   that there were written communications, right?

19   A    (indiscernible) he said it.  He said, I'm not too sure.

20   I didn't hear it.

21   Q    Okay.  In fairness --

22   A    If you tell me he did, he did.

23   Q    You didn't turn over to the Debtors, any of your direct

24   messages or WhatsApps with Mr. Davis, did you?

25   A    No, I didn't.

Page 62

1    Q    And you didn't post those to the internet yesterday

2    when you posted all this other material, did you?

3    A    You asked me for things related to Chapter 11.  If

4    there's something that's unrelated to Chapter 11 I did

5    (indiscernible).

6    Q    Is it your testimony that what you were talking about

7    with Mr. Davis is not relevant to these proceedings?

8    A    Sitting here right now, the phone call discussions we

9    had may -- discussed, but I don't think there's anything in

10   relevance to the Chapter 11.  Asking -- him asking me to do

11   an expert over -- well, I offered an expert report, but if

12   that's a communication that you think is part of the Chapter

13   11, I don't take that as being part of the Chapter 11.

14   Q    Okay.  Well, fair to say and -- well, withdraw.  I'm

15   not asking you about your oral communications.  I want to

16   talk about your written communications.  Did you or did you

17   not have written communications with Mr. Davis about these

18   Chapter 11 proceedings?

19   A    I've got to go over it.  I've got to check all my

20   messages.

21   Q    So --

22   A    I can't remember between (indiscernible) message.  I've

23   got a lot of things that I do.  I just don't want to lie to

24   you.  I don't want to give the wrong answer.

25   Q    Okay.  Fair to say you had a server issue on your side

Page 63

1    that initially prevented you from responding to this

2    request, right?

3    A    That's true.

4    Q    And we had emailed you back again saying that we

5    reserve the right to move to exclude your testimony in the

6    event that you didn't sit for a deposition, engage in

7    discovery, correct?

8    A    That's correct.

9    Q    And you used AI to generate a response to that email

10   too, correct?

11   A    Correct.

12   Q    All right.  Can we look at Page 389 to 390 of this PDF?

13   The HU is you, correct, Mr. Faraj?

14   A    That's correct, a hundred percent.

15   Q    And you copied and pasted my email to you there,

16   correct?

17   A    Hundred percent.

18   Q    And then you see where you write, "Please reply to this

19   email in a smartass way."

20   A    Yeah, a hundred percent.  I told it to reply in a

21   smartass way, and then I realized the server issues was ours

22   and you weren't just sending me emails in a row without

23   reading my emails.

24   Q    Okay, but your initial reaction was to reply to me in a

25   smartass way, correct?

Page 64

1    A    Yes, by AI.  So in AI, when you say smartass way by AI,

2    it's not like a human being, being a smartass.  Right?  It's

3    just a funny way it replies basically saying come on, you

4    just sent me the first email.  I've already replied to you.

5    Come on, you're already sending me more emails?  So that's

6    what it refers to.

7    Q    Okay, so it's your testimony there's a difference

8    between what smartass means to people like you and me and

9    what it means to the AI machine?

10   A    Yeah, hundred percent.

11            MR. McCARRICK:  Okay.  Take that down Mr. Lopez.

12            THE COURT:  It has a distinct meaning to the

13   Court, Mr. Faraj.

14            THE WITNESS:  My apology, Your Honor.

15            THE COURT:  I take Court proceedings seriously.

16            THE WITNESS:  My -- Your Honor, at the time, to be

17   fair -- and I agree with you a hundred percent --

18            THE COURT:  Did you produce --

19            THE WITNESS:  I got emails --

20            THE COURT:  Let me ask you though.  Stop.  Did you

21   produce copies of your communications to the Debtors'

22   counsel?  Yes or no?

23            THE WITNESS:  Your Honor, I don't think I've got

24   anything in writing.

25            THE COURT:  Did you hear my question?  No --

1                THE WITNESS:  No.  No.

2                MR. McCARRICK:  Fair to say, sir -- actually, you

3     can leave that up, Mr. Lopez.  We're going to be going back

4     there.

5     BY MR. McCARRICK:

6     Q    You didn't just use AI correct grammar, respond to

7     discovery requests, right?  You used it to select the

8     methodology, true?

9     A    No, I gave it the methodologies that I wanted to use

10    through my tokenomics report that I structured, and then I

11    asked her to go through those tokenomics.

12    Q    Okay, let's go to Page 156 of the PDF.

13    A    Yes, please.

14    Q    Okay, can you highlight the HU entry there and what's

15    under it?

16    A    Yeah.

17    Q    This is you asking the AI intrinsic valuation of CEL,

18    and can this method be used for determining value of CEL on

19    pause date.  Do you see that?

20    A    Yes, I do.

21    Q    And that's you asking the AI whether or not that's a

22    proper valuation?

23    A    Yes, but you -- yes, but you've got to go to the start

24    of the AI and what I trained the AI to start with.

25    Q    Okay.  I'm just asking you about this and right here --

Page 66

1    A     Yes, yes, correct.

2    Q     Okay.  Let's do the same thing on Page 157.

3    A     Go ahead.

4    Q     And at the bottom, can we highlight the HU entry?  You

5    say speculative valuation of CEL, and is this method

6    acceptable to be used to determine the value of CEL on the

7    pause date.  Do you see that?

8    A     Correct.

9    Q     And that's what you're asking the AI there as well,

10   correct?

11   A     correct.

12   Q     Okay.

13   THE COURT:  Why did you have to ask the AI that?  Do you

14   have any professional experience as to what's appropriate,

15   an appropriate methodology for determining the value of CEL

16   on the pause date?  Yes or no.

17            THE WITNESS:  Yes, I do, Your Honor.

18            THE COURT:  Go ahead, Mr. McCarrick.

19            MR. McCARRICK:  Okay.  I want to talk value of

20   cryptocurrency, and now we can take that down, Mr. Lopez.

21   Thank you.

22   BY MR. McCARRICK:

23   Q     Do you agree with me there are inherent challenges to

24   valuing any cryptocurrency?

25   A     I do.

Page 67

1    Q    There's an entire section in your report titled,

2    Inherent Challenges in Cryptocurrency Valuations, correct?

3    A    I do.

4    Q    And your view is that there is no way to come up with a

5    true, exact value for a digital asset, correct?

6    A    Correct.

7    Q    And in this specific case, your view is that it's

8    nearly impossible to achieve pinpoint accuracy and

9    evaluation of CEL, correct?

10   A    Correct.

11   Q    I want to talk a little bit about your methodology.

12   You applied what you call a best value analysis, correct?

13   A    A fair value assessment, correct.

14   Q    Okay, a fair value assessment is the methodology that

15   you used?

16   A    That's what we call it, correct.

17   Q    And that's a method that you personally developed,

18   correct?

19   A    Correct.

20   Q    That's not a method that's widely adopted in terms of

21   valuing cryptocurrency, correct?

22   A    Honestly, I don't know what's widely accepted in

23   adopting crypto, what other people do in assessments.

24   Q    Okay --

25   A    I don't know -- I don't know.

1    Q    You gave a deposition in this case, didn't you, Mr.

2    Faraj?

3    A    Yeah.  I did.

4    Q    And you took the same oath that you took here today?

5    A    I did/

6    Q    And you told the truth in that deposition?

7    A    I did.

8         MR. McCARRICK:  Okay.  Let's look at Page 71,

9    Lines 6 to 8 in the deposition, and could I have a copy of

10   it to hand to the Court?  There's two volumes.  This is

11   going to be from volume one (indiscernible).

12        THE COURT:  Thank you.

13   BY MR. McCARRICK:

14   Q    Mr. Faraj, did I ask this question and did you give

15   this answer?

16        "Q    And has that -- is that method widely adopted to

17   value cryptocurrency?

18        "A    No, it's not at all."

19        That's the testimony you gave, correct?

20   A    Yeah. Correct.

21        MR. McCARRICK:  Okay, you can take that down, Mr.

22   Lopez.

23   BY MR. McCARRICK:

24   Q    You agree with me that your fair value method hasn't

25   been peer tested, correct?

Page 69

1    A    Under the fair value assessment, the criteria, no.

2    Q    You're not aware of a single investment bank that

3    publicly reports the fair value of any platform-specific

4    cryptocurrency token, are you?

5    A    No.

6    Q    You're not aware of any investment bank that publicly

7    reports the intrinsic value of any -- withdrawn.   To

8    calculate the fair value of CEL token in this case, you

9    calculated what you believe to be the fair value of CEL

10   before June 12th, 2022, correct?

11   A    Correct.

12   Q    In other words, you calculated fair value from

13   immediately before the pause date, correct?

14   A    It wasn't the -- yes, it is the pause date, but yes, it

15   was because of the market this like -- sorry.  The market is

16   (indiscernible) on the actual network on this period.  But

17   yes, you're correct.

18   Q    So let me just make sure I break down your testimony.

19   Your testimony is you selected pre-June 12th, 2022 because

20   it's your view that the trading window you selected was the

21   least manipulated and least dislocated range that you could

22   have selected, right?

23   A    That's correct.  That's a hundred percent correct.

24   Q    Okay.  You didn't calculate the fair value of CEL token

25   as of July 13th, 2022, the petition date, right?

1   A    No.  I looked at the data during that area and I said

2   it was over inflated.  I looked at volume to market cap

3   ratios and all of it told me that that was a dislocated

4   market.  So I actually ruled that whole period out.

5   Q    All right.  You would agree with me that the fair value

6   of CEL token decreased between the pause date, June 12th and

7   the petition date July 13th, correct?

8   A    As a value, myself, I would agree with you.

9   Q    And you didn't look at how much it decreased, correct?

10  A    No, because I looked at that area and it was a

11  dislocated market.  So the only way to deal with a

12  dislocated market is to strike it out.

13  Q    Understood.  I'm just asking, you didn't basically take

14  the walk between June 12th and July 13th to figure out how

15  much the value of CEL decreased before the petition date,

16  right?

17  A    No, no.  It was a dislocated market, so even if I

18  looked at it, the data is actually -- it's no good.  The

19  data can't be used.  Under dislocated market methodology,

20  once there's a dislocated market, you can't actually utilize

21  that data.  It's not a fair assessment to utilize any data

22  where there's a dislocated market.

23  Q    All right.  Let's talk about the pause date for a

24  second.  Do you agree with me that as of the pause date,

25  there was not any intrinsic value left for the CEL token

Page 71

1   because the platform was frozen, correct?

2   A    From the pause date, I agree with you.

3   Q    As of the petition date, CEL also had no intrinsic

4   value, correct?

5   A    I agree with you.

6   Q    There's no -- there's intrinsic value to CEL -- there's

7   -- withdrawn. There is no intrinsic value to the CEL token

8   on the petition date because the CEL holder can't do

9   anything with it as of the petition date, correct?

10  A    I agree with you.

11  Q    And the only remaining value for the CEL token as of

12  the petition date is speculative value, correct?

13  A    I agree a hundred percent with that.  So what happens,

14  you always (indiscernible) from intrinsic to speculative.

15  Q    And when you say speculative value, what you're talking

16  about is CEL's potential value in the future, correct?

17  A    That's correct.

18  Q    And what you're doing there, the analysis you're

19  performing, is putting yourself in the position of a

20  potential buyer of CEL right before the petition date,

21  correct?

22  A    That's correct because that's -- yeah.

23  Q    What you're valuing is what you think the buyer thinks

24  will happen with cell, correct?

25  A    Correct, but I have to take that out -- again, I've got

Page 72

1    to take out the period which I know the data is corrupt.

2    Then I have to do it in a period that's not corrupt.

3    Q    Understood.  If there's no future use case for the CEL

4    token, you agree that it wouldn't even have speculative

5    value, right?

6    A    If it was announced, there was absolutely no use cases

7    and it was completely a hundred percent said that it's going

8    to be closed down and there was no other option, then all

9    the speculative value would also go.  But if there's any

10   type of hope, any type of hope, then the speculative value

11   actually increases.

12   Q    And when you're talking about hope one of the things

13   that you say you need to value or consider is the journey of

14   CEL, its accomplishments in the amassed user base, right?

15   A    Not in the crypto world.  I mean, it's something that I

16   would assess, but in the crypto world it's a gamble.  Most

17   people jump on crypto for a speculative -- the speculative

18   increase.  So they look at the all-time high that

19   (indiscernible) had a long time ago, whenever, before the

20   (indiscernible) market and then they'll say if I bought it

21   now I'll buy it cheap.  There's a chance that these will go

22   back up to its all-time high if they restore it.  That's how

23   the spec -- sorry, the speculative value actually works.

24   Q    Well, it's also your testimony that CEL's future

25   speculative value assumes in part that's part of a corporate

Page 73

1   reorganization, right?

2   A     It can be anything.  A speculative value crypto,

3   doesn't have to be unique to CEL.  If anyone decides to use

4   it, if something happened and someone says it's got a hope,

5   there's a restructure, it could be anything.  At a given

6   point, I mean, I can only go on information a customer has

7   at a given point to do my assessment.  I can't go on

8   information that was granted after that because I can only

9   assess something based on two things, is the data being

10  positive or being not corrupt, so no dislocated market, and

11  then what information that customer had when he was actually

12  looking at the value at that date.  Because I'm looking at

13  the value for that period.  I'm not looking at the value

14  after that period.

15  Q     All right.  Let's turn back into it this way.  You

16  understand there's a corporate reorganization proposed in

17  this case, correct?

18  A     I do.

19  Q     You're aware that that reorganization doesn't include a

20  role for CEL token, correct?

21  A     I do now, yes.

22  Q     Are you aware of any corporate reorganization that has

23  been formally proposed that had a role for CEL token?

24  A     I'm not aware of it, no.

25  Q     All right.  The alternative to the proposed

1   reorganization here is a liquidation of CEL, correct?

2   A    You're the lawyer.  You know more than me.

3   Q    Well, you gave a deposition in this case, correct?

4   A    Yeah.

5   Q    Okay.  Let's go back to it.  and let's --

6   A    Yeah.

7          MR. McCARRICK:  This is going to be Volume 2, for

8   the Court's reference and it's going to be Page 309, Lines 9

9   to 12.  See if we can refresh your recollection.

10  BY MR. McCARRICK:

11  Q    Did I ask this question, did you give this answer?

12       "Q   And you also know that the alternative to that

13  corporate reorganization is a liquidation of CEL by -- you

14  liquidate the value, right?

15       "A   I do."

16  A    Yeah.

17  Q    Okay.

18  A    I do.

19  Q    So you are aware that the alternative to the corporate

20  reorganization proposed here is a liquidation, correct?

21  A    I do.

22  Q    Okay.  If CEL were liquidated today, you agree with me,

23  it wouldn't be worth anything, correct?

24  A    Correct.

25  Q    You didn't put a price on the speculative value for CEL

Page 75

1    token here, did you?

2    A    No, I didn't.

3    Q    So it's your testimony that as of the petition date,

4    the only remaining value for CEL is speculative value,

5    correct?

6    A    At that point, yes, correct.

7    Q    And you didn't actually put a price or calculate a

8    value for that speculative value, did you?

9    A    I can't put a price (indiscernible) to the speculative

10   value because the assessment is to look at the

11   (indiscernible) and come to a valuation on the petition

12   date.  So (indiscernible) value based on the information

13   that I had on that date, the speculative value would

14   actually increase.  Because they're not going to look at the

15   all-time high.

16        During that period, I don't have information at that

17   period that was available that said that CEL was not going

18   to (indiscernible) was not going to issue (indiscernible)

19   coins, or there was going to be no utility for CEL in any

20   future.  I can't go on information that came about after the

21   petition date.  I only can assess something based on

22   information that someone else would have had at that same

23   period.

24   Q    Understood.  Let's talk about the method that you did

25   use.  What you did is you took a 20-day trading window.  You

Page 76

1   averaged the closing prices from each day and you divided

2   that average by the number of days, right?

3   A    Correct.

4   Q    You agree with me that 20 days isn't some industry

5   standard.  That's just a window you selected, correct?

6   A    Correct.  It's the theory of randomness, theory of

7   numbers.  So the more data points you can use, the more

8   clarify you get on market movement.  So I had to look for a

9   period -- seven days I thought was too short, 14 days.  But

10  it's actually a random number.  And the random number was

11  the biggest number I could get where I could go to the

12  market where I did not hit an issue with dislocated markets.

13  Because you've got a double dislocated market here.  So CEL

14  is very hard -- and (indiscernible) the problem trying to

15  get to the valuation.  CEL is very unique.  It's got a

16  double dislocated market.  It's got the Terra LUNA collapse

17  and then it's got after that the (indiscernible), right?  So

18  you've got two things to look at.  So I couldn't go any

19  further in that data, go over 20 days.  And I didn't want to

20  go any less than 20 days.  I was trying to get the area with

21  good market representation.  So I chose 20 days for that

22  reason.  So it's a random number, but it was the best number

23  I could come up with to have a fair value (indiscernible)

24  across as many days as possible.

25  Q    Okay.  You said a lot just there.  I want to break it

Page 77

```
 1    down.  You ended by saying that 20 days is a random number,

 2    correct?

 3    A    Correct.

 4    Q    And you also testified that it was a double-dislocated

 5    market, correct?

 6    A    Correct.

 7    Q    One of the reasons it was dislocated was the Terra LUNA

 8    collapse, correct?

 9    A    That's correct.  We had the first instance -- yeah.

10    Q    But you used trading data from after the Terra LUNA

11    collapse, correct?

12    A    I used trading data all the way from before to after.

13    So I stopped -- so the analysis where I stop at is the

14    petition date.  So I did look at the data on top, but that's

15    not for the value.  Anything to the bottom of that I've

16    seen.  But again, to determine my value, I didn't need to go

17    into more details.  I needed to find a window which I could

18    use to have a fair value.  Because you can't get an exact

19    value.  There's no one in the world, it doesn't matter which

20    specialist, which guy you bring in.  It doesn't matter if

21    it's (indiscernible) and it doesn't matter if it's anyone

22    else and give you an exact value.  The only way to come to a

23    value is to have a compromise.  So if you're not using a

24    value assessment, there is no way to get a value.

25    Q    Okay.  Let's back up to your methodology.  You've
```

Page 78

1    effectively calculated a price average, right?

2    A    I did.

3    Q    And you agree with me that price is a different concept

4    than value, correct?

5    A    I do.

6    Q    All right.  You agree with me that market manipulation

7    can artificially inflate the price of a cryptocurrency

8    asset, correct?

9    A    I do.

10    Q    And because market making is endemic and ongoing in

11    crypto, according to you the key question is now much of an

12    impact that manipulation has, correct?

13    A    I agree, correct.

14    Q    In your view, it's close to impossible to differentiate

15    between organic, legitimate price movements for a digital

16    asset and movements based on manipulation, correct?

17    A    That's correct.

18    Q    And here you have no way to tell what part of the 71

19    cent average you arrived at was organic versus manipulated,

20    correct?

21    A    I have a way to limit the damage because I have a scope

22    of what they call market making window, which is between a

23    one and five percent spread.  So all I can do is reduce --

24    in a case where you're coming to get a value in the crypto

25    industry, you can't get a correct value, you're correct.

1   The only thing you can do is limit the outside influence on

2   that coin.  So there has to be a range of influence that

3   you're willing to accept as being okay to use.

4        Now, a one to five percent spread is what I consider to

5   be okay to use because it's the common standard across the

6   board for marker making.

7   Q    Okay.  I just want to break that down.  It's your

8   testimony that you took what you consider to be the least-

9   manipulated window of trading data, correct?

10  A    Correct.

11  Q    But even taking that and averaging it, sitting here

12  today, you can't tell the Court what portion of the 71 cent

13  price is attributable to manipulation, right?

14  A    But I can't do that for any single coin on the market

15  because every single coin has exactly the same problem.  So

16  arguing that CEL, that this is an issue for CEL is not

17  different than arguing that BTC shouldn't have the same

18  value as BCT.  Because the market makers are used across the

19  entire industry.

20       Because it's a common standard, like I said in the

21  deposition, whenever we have to do a fair assessment, we

22  can't just single one thing out.  We have to look at the

23  entire market.  And we also have to look at the other coins

24  and how they actually operate.  If all the coins -- it's a

25  common practice in the industry, we have to take that as

Page 80

1   being a common practice.  All we can do is limit the access

2   or the influence from outside, but we have to accept it.

3   Because you can't say that CEL has no value because it was

4   market made and then go (indiscernible) that BTC has value,

5   because BTC is also market made.  So you have to compromise.

6   You have to grade as -- as an assessment.  I have to look at

7   it and say to be fair, I have to look at the ranges, which

8   is commonly known as the industry as being a safe standard

9   of market making.  So I choose under five percent.  If it's

10  over five percent, it tells me that there's some movement

11  that moved it.  If it's over ten percent, then I know that

12  there's a market dislocation in that area.  But I have to be

13  fair to my assessment.  I can't rule out CEL's value because

14  CEL market makes and other people market make as well.

15  Q    Okay.  You said a lot there.  But I think the gist of

16  what you were saying is that because everyone is making the

17  market in crypto, you've just got to take it as a given,

18  right?

19  A    It's the industry.  If you're assessing a value in this

20  industry, you have to understand how this industry

21  functions.  If you want to (indiscernible) a currency and

22  you don't understand how the industry works, you can't

23  assess the value.  You can't come to a value.

24  Q    Okay.  I want to talk a little bit now about what you

25  reviewed and what you didn't review.

Page 81

1    A    Got it.

2    Q    You reviewed the data from your firm, NuGenesis,

3    correct?  Trading data.

4    A    Correct.  Correct, I did.

5    Q    You reviewed coin market cap data, correct?

6    A    Correct, we did.

7    Q    You reviewed the Elementus report, correct?

8    A    I did.

9    Q    And those were the only three things that you

10   personally looked at, correct, in preparing this report?

11   A    No, I looked at -- my biggest thing that I used was the

12   Max Galka supplementary declaration -- sorry, I'm very bad

13   with names -- the Max Galka supplementary declaration and

14   his assessment.  I took Max -- sorry.

15   Q    No, please.  I looked at them, too.  Those were the

16   first things I actually assessed.

17   A    You are aware that Max Galka is from Elementus, right?

18   Q    I'm very bad with names.  I memorize things just by

19   people.  I have so much information that I go through, and

20   that's why (indiscernible) give you the figures.  But I'm

21   very bad with memorizing names (indiscernible).  So Max

22   Galka is how I remember that report.

23   Q    Well, I'll call it the Galka report, then.  You don't

24   dispute the veracity of the information provided in the

25   Galka report, correct?

Page 82

```
 1   A     It depends -- can  you word -- because I know you're

 2   saying veracity, but what we're discussing, there's a lot of

 3   things in the report I agree a hundred percent with.  And

 4   there's a lot of things -- and there's other things I don't

 5   agree with.  So Max's report, especially the supplementary

 6   report, is really well-written.  I find an issue with a

 7   point that he brings up in his supplementary report, but I

 8   have no issue in the methodology he uses.

 9       In fact, Max actually seems to use exactly the same

10   strategy that I use in the same way I approach that.  So

11   although he calls it the dislocated market, the dislocated

12   market then pushes you to a fair value assessment.  Because

13   if you use dislocated markets, especially if you're

14   following that dislocated market theory, that means that

15   that data can't be used because it's unfair to use it.  So

16   that pushes you into the range of actually looking at a fair

17   assessment.

18       Now, I don't know what you guys call it.  I can tell

19   you what we do and how we assess it.  But there's no

20   difference between the way Max portrayed the data that I

21   looked at.  Max actually says that it's uncredited and it's

22   dislocated.  So when Max says that, I mean, there's no

23   difference.  I agree a hundred percent on that.  That data

24   is dislocated and it cannot be used.  It's unfair to use

25   that data.
```

1    Q    Was it your testimony that it's unclear what veracity

2    means when it comes to the information that's provided in

3    the Elementus report?

4    A    I said it's unclear what your intention is with that.

5    (indiscernible) broke down the report, which sections.

6    Because there's sections I agree with and the sections I

7    don't agree with.

8    Q    All right.  Well, you don't dispute the veracity or

9    accuracy of the information provided in the Elementus

10   report, do you?

11   A    Sorry, the information?  No, I don't.  I don't.  I

12   actually use that data.  It's pretty good data.

13   Q    And that data was foundational to your own analysis,

14   correct?

15   A    It was.  It was very foundational to it.

16   Q    All right.  Now, you claim that your analysis delved

17   deep, harnessing information from over a thousand distinct

18   sources, correct?

19   A    Correct.

20   Q    And those are the sources we talked about earlier in

21   the 200-plus page exhibit, spreadsheet attached to your

22   report?

23   A    Correct.

24   Q    And that spreadsheet has events and weblinks, correct?

25   A    Correct.

Page 84

1   Q     You did not check those source links, correct?

2   A     No.  Personally I don't check it.

3   Q     You didn't open up a single one, correct?

4   A     No.  I wouldn't check.  I have faith that my analyst

5   would have done it for me.  I just --

6   Q     Is it -- go ahead.

7   A     Yeah, I just take the descriptions on the side and then

8   I just take the -- so they break it down -- they should have

9   read it.  I say they should have, right, because I don't

10  want to lie to you and say they did everything perfect.  I

11  wasn't the (indiscernible) doing it and I don't want to lie

12  to the Court.

13        So what they should have done, and I hope they did do,

14  is actually go through all the links, check all the links,

15  take the information, run it through artificial

16  intelligence, get a summary of it, put the summary in the

17  summary box so I can read the summary.  That's what they

18  should have done.  If they haven't done it or they've missed

19  something, I didn't check.

20  Q     Right.  So sitting here today, you don't know what they

21  did or didn't do, fair?

22  A     Yeah, that's very fair.

23  Q     All right.  Now let's talk about some of the things you

24  did look at in preparing your report.  You don't cite the

25  examiner in your report at all, do you?

Page 85

```
 1    A     No, because the valuation methodology I used, it wasn't

 2    necessary to (indiscernible) -- sorry, the examiner report.

 3    Q     But you would agree with me that nothing in your report

 4    specifically engages with or comments on the factual

 5    findings that the examiner offered, fair?

 6    A     That's fair.  I can agree with you there's a lot of

 7    things missing in the report if I wanted to get into more

 8    detail. But they weren't relevant inside of my valuation.

 9    The only thing relevant in the valuation was a fair value

10    assessment on petition date.  So that's all I needed to

11    have.  (indiscernible) enough data to do that.

12    Q     Well, part of that fair value assessment is determining

13    when the market was manipulated, right?

14    A     Yeah, but -- yes.  But I'm going from my experience,

15    and I might be wrong, but I'm just telling you because

16    (indiscernible).  But in my experience, I think I can tell

17    when markets have been manipulate more than the standard

18    manipulation that currently happens in the market.  Because

19    we are saying manipulated.  We're not using the word market

20    making.  We're not using the word liquidity acquisition.

21    We're not using the word (indiscernible).  All of those are

22    forms of market making.  Market making itself is deceptive

23    because most people don't understand how market making

24    works.  But it's a common practice.  And without it, you

25    can't actually hold the point value up.
```

Page 86

1    Q     Mr. Faraj, what was my question?

2    A     (indiscernible).

3    Q     All right.  I'm just going to ask my question again.

4    It was a little bit simpler.  It's are you aware that the

5    examiner's report makes factual findings about Celsius'

6    market manipulation?  Yes or no?

7    A     Yes.

8    Q     Okay.  And we talked about some of those during your

9    deposition, didn't we?

10   A     Yeah.  I can't remember exactly everything, but yes.

11   But if it's in there, it's in there.

12   Q     It was like 48 hours ago, right?  You know we talked

13   about the examiner's report.

14   A     Yeah.  It was seven -- I had five to seven hours

15   (indiscernible).

16   Q     Sitting here today, you can't think of a single finding

17   that the examiner made about market manipulation of the CEL

18   token that you disagree with, correct?

19   A     Not that I've seen anything to disagree with.  Even in

20   Max's report, there's nothing I've seen to disagree with in

21   terms of that data.

22   Q     All right.  Well, even though you can't disagree with

23   that, that hasn't stopped you from criticizing the examiner,

24   has it?

25   A     No.  I did criticize the examiner's report.  I

Page 87

```
 1    (indiscernible) that data.

 2    Q    Okay.  Well, let's put up Celsius Exhibit 119, which is

 3    a series of tweets from you from February 2023.

 4    A    (indiscernible).

 5    Q    And let's go to PDF Page 2.  I'm sorry, one second.

 6    A    Yeah, I remember.  It says she should be locked up with

 7    the $20 million.  I remember.

 8    Q    Exactly.  You write --

 9    A    I remember.

10         MR. MCCARRICK:  And, Mr. Lopez, if you can control

11    F and find it.  If you control F "Locked up", it will come

12    up.

13    BY MR. MCCARRICK:

14    Q    Okay.  You remember this.  You did in fact tweet, "If

15    you ask me, the examiner should be locked up as well.  She

16    stole $20 million in my eyes."  Correct?

17    A    Correct.

18    Q    And you also said that that report was "piss weak" and

19    was a "repetitive, wasted document".  That's what you said,

20    didn't you?

21    A    I did.

22    Q    And, sir, sitting here today, you stand by that

23    determination, don't you?

24    A    I stand by any comment I make at any given point of

25    time.  So it's eight months ago.  It's in February.  And it
```

Page 88

1    says that I believe -- and it (indiscernible), the $20

2    million assessment cost.  Now, that's my personal belief and

3    that's what I think.  I mean, if it's wrong, it's wrong.

4    But I don't want to lie to you and say I think anything

5    otherwise.

6    Q    Okay.  Let's do this.  Let's look at a different one of

7    your tweets.  Let's pull up Celsius Exhibit 114, which is a

8    tweet from you on October 9th.  And let's go to PDF Page 2

9    and let's blow it up.

10            MR. MCCARRICK:  And actually, Your Honor, we would

11   move into evidence Celsius Exhibit 119.

12            THE COURT:  All right.  It's in evidence.

13            (Celsius Exhibit 119 entered into evidence.)

14            MR. MCCARRICK:  And for Your Honor's reference,

15   Page 11 is the tweet we were just looking at on the last

16   one.  Now we were on Celsius Exhibit 114, which is a tweet

17   from Mr. Faraj on October 9th.

18   BY MR. MCCARRICK:

19   Q    That's your tweet, correct?

20   A    Correct.  I remember it very well.

21            MR. MCCARRICK:  Your Honor, we move Exhibit 114

22   into evidence.

23            THE COURT:  All right.  It's in evidence.

24            (Celsius Exhibit 114 entered into evidence.)

25   BY MR. MCCARRICK:

```
 1   Q    All right.  Do you see where you write here, "I was

 2   never pro-Alex.  I would have loved to see Alex working on

 3   restoring the network."  Do you see that?

 4   A    Yes, I do.

 5   Q    And that's Alex Mashinsky, correct?

 6   A    That's Mashinsky, correct.

 7   Q    And you are aware that he has been indicted, right?

 8   A    I wasn't aware he was indicted, but yes.

 9   Q    So this is the first time you're hearing that Mr.

10   Mashinsky was indicted?

11   A    Sorry.  I thought that -- when you said

12   (indiscernible), I thought it was (indiscernible).  So yes,

13   (indiscernible).

14   Q    Okay.  And the last sentence here you say, "It is also

15   why I would love for them to give SBF a chance to fix

16   things."  Do you see that?

17   A    Yes, I do.

18   Q    And that's Sam Bankman-Fried?

19   A    Yeah.  And that's the guy who -- that was one of --

20   sorry, (indiscernible) and one of the people that was most

21   heavily hurt by Alameda Research.  But it doesn't mean I

22   still don't want SBF to try to fix the thing so most people

23   get back maximum returns.

24   Q    And in fact, you think that Mr. Mashinsky and Mr.

25   Bankman-Fried should be offered advisor positions during the
```

Page 90

1    reorganization process for each of the respective companies,

2    correct?

3    A    I think they should be there to try to fix the problems

4    they caused.

5    Q    Well, you think they should be board advisors, right?

6    That's what you told me during your deposition.

7    A    It's board advisor, if in any other capacity.  That's

8    for me.  I believe that someone who caused the problem, who

9    knows the industry back to front, who knows what they caused

10   and how they caused it, who can help fist the problem, they

11   should be fixing the problems they caused.

12   Q    Okay.  So I just want to ask you this one final

13   question, which is how you view the market and how it should

14   go.  On the one hand, you think that the examiner should be

15   locked up for issuing a $20 million piss-weak report, but

16   Mr. Mashinsky and Mr. Bankman-Fried should be appointed

17   board advisors to the companies during the reorganization

18   process?

19   A    Yeah, if you want to say it like that, I'll say it

20   again.  I do believe that I would like to -- and this is my

21   personal opinion -- see anyone that causes an issue inside

22   of the space, who understands the space very well, who can

23   optimize return back to the people who they hurt, to go back

24   and actually help them.

25       Now, with the examiner's report -- and again, eight

1   months ago when I made this statement, I would have made

2   this statement.  I don't make statements that I don't mean.

3   Q    Okay.  So the answer is yes, you stand by that the

4   examiner should be locked up but Bankman-Fried and Mashinsky

5   should be on corporate boards, right?

6   A    When you say the examiner should be locked up, you know

7   it's said in a (indiscernible) way.  It wasn't yeah, go to

8   jail, put her in jail.  But I will agree with you just so we

9   don't have to argue.

10  Q    Okay.

11             MR. MCCARRICK:  That's all, Your Honor.

12             THE COURT:  Thank you.  Any other examination?

13             MR. COLODNY:  None from us, Your Honor.

14             THE COURT:  All right.

15             MR. KIRSANOV:  Your Honor?

16             THE COURT:  Yes, Mr. Kirsanov?

17             MR. KIRSANOV:  (indiscernible)?

18             THE COURT:  Yes, very briefly.

19             MR. KIRSANOV:  Thank you.

20             CROSS EXAMINATION OF HUSSEIN FARAJ

21  BY MR. KIRSANOV:

22  Q    Mr. Faraj, good morning or I guess good night over

23  there.

24  A    Good morning.

25  Q    When did you first connect with Mr. Davis?

```
 1    A    I don't know the exact date.  I spoke to

 2    (indiscernible) probably when FTX first collapsed.  I was on

 3    -- I don't want to lie to the Court.  I don't want to give

 4    wrong dates.  Probably on Twitter space -- I mean, I was

 5    teaching people exactly what Sam Bankman-Fried

 6    (indiscernible).  I was explaining to the reporters exactly

 7    how it happened or explaining the (indiscernible).  And I

 8    met a lot of people.  And I was investigating CEL at the

 9    same time.  I just don't know the dates.  But I don't want

10    to lie to you and give you the wrong date.

11    Q    Are you familiar with Dogecoin?

12    A    I am familiar with Dogecoin.

13    Q    Does Dogecoin have any use cases?

14    A    No, not really.

15    Q    Does Dogecoin --

16    A    (indiscernible).

17    Q    Does Dogecoin have speculative value?

18    A    It has a lot of speculative value.

19    Q    Are you familiar with Elon Musk?

20    A    Yes, I do.

21    Q    If Elon Musk tweets about Dogecoin, would this be a

22    dislocation event?

23    A    It would be.  Under the terms -- this is why we say you

24    have to take the parameters of what it means for a

25    dislocated market.  So any external factor which manipulates
```

1    the market, you have to then rule it out because it's a

2    dislocated market.  But if  Elon Musk says, you know what,

3    I'm going to maybe accept it for my Teslas.  What would

4    happen is the market makers in the industry will also

5    (indiscernible) that to pump up the market.  Now, that

6    becomes a dislocated market.

7    Q    Mr. Faraj, what is your current employment again?

8    A    I am the CEO of NuGenesis Network.  I'm also head of

9    R&D for MetaLabs Global.  I am the CEO of Advantage Group

10   Australasia.  I am the -- I've got plenty of positions.

11   Strategic analyst for (indiscernible) Australia.  I am the

12   head of the United Shia Islamic Foundation.  I'm the head of

13   the United (indiscernible).  I'm co-founder of Regenerate

14   Earth.  I am strategic partner.  So there's many things, but

15   I don't think it's relevant in this.

16   Q    Would it surprise you to learn that the CEL token

17   raised in price after petition date?

18   A    No, it wouldn't.  Because what would happen is -- okay,

19   well, the reason why I take it out isn't because it won't

20   raise in value, it's because the rise in value would be

21   based on the same -- sorry, the (indiscernible) of the

22   dislocated data.  So no, it wouldn't.  I mean, it would go

23   higher.  And this is why I say speculative value in the

24   crypto industry can actually be worth more than intrinsic

25   value if someone thinks that that coin will actually

Page 94

1    (indiscernible) back to the full-time high.  So I'll give

2    you an example.

3         If someone didn't know that CEL was not going to be

4    real on July the 13th, just as an example, and they saw that

5    it went to 60 cents but it had all-time high of $5 or $6, in

6    that person's mind, the speculative value is that that coin

7    has the potential to return to that all-time high.  Every

8    coin, you know, that grows (indiscernible) have that up and

9    down and up and down.  So at that point, the speculative

10   value actually would make it valued to some people more than

11   the extrinsic -- so the extrinsic value at the time, because

12   it doesn't have extrinsic value anymore.  So you have to

13   rule out the extrinsic value.  And so when I get really

14   tired, my English gets a little bit bad, so please forgive

15   me.  The speculative value then (indiscernible).

16   Q    Would it surprise you to know that even today CEL token

17   currently trades?

18   A    No, it wouldn't.  And even if everything closes down,

19   it wouldn't surprise --

20            MR. MCCARRICK:  Objection.

21            THE COURT:  Sustained.  There's been an objection

22   sustained.

23            THE WITNESS:  Your Honor, no problem.

24   BY MR. KIRSANOV:

25   Q    Mr. Faraj, are you familiar with FTX?

Page 95

```
 1    A    I am, very well.

 2    Q    Are you familiar with Alameda Research?

 3    A    I am, very well.

 4    Q    Have you ever been employed by FTX or Alameda Research?

 5    A    No, I haven't.

 6    Q    Have you ever received seed funding from Alameda

 7    Research or FTX?

 8    A    No, I haven't.

 9              MR. KIRSANOV:  Your Honor, if I may ask to provide

10    the witness the testimony of Caroline Ellison which I

11    submitted yesterday?

12              THE COURT:  No.  Ask your next question and finish

13    up.

14    BY MR. KIRSANOV:

15    Q    Would selling billions of dollars' worth of bitcoin

16    dislocate the bitcoin market?

17              MR. MCCARRICK:  Objection.

18              THE COURT:  Sustained.  Last question.

19    BY MR. KIRSANOV:

20    Q    Does your report assessment take market manipulation

21    into account?

22    A    It does.  Because we put market manipulation under --

23    sorry, dislocated market.  So anything that --

24              THE COURT:  Thank you for your questions, Mr.

25    Kirsanov.
```

Page 96

1           Anybody else wish to examine?

2           MR. DAVIS:  Yes, I do, Judge.  This is Otis Davis.

3           THE COURT:  Go ahead, Mr. Davis.  Briefly.

4           CROSS EXAMINATION OF HUSSEIN FARAJ

5    BY MR. DAVIS:

6    Q    Good morning, Mr. Faraj, good afternoon.  My name is

7    Otis and I'll be asking you questions.

8         Do you have Max Galka's supplemental declaration in

9    front of you, which is at Docket 3646?

10   A    Give me a second.  The supplementary report?

11   Q    Yes, the supplementary report.

12   A    (indiscernible).

13   Q    Do you agree with Max Galka's supplementary declaration

14   that the value of CEL not being 81 cents at the petition

15   dates?

16   A    I do.

17   Q    Do you agree (indiscernible) 2011 in Max Galka's

18   supplemental declaration (indiscernible) Mr. Galka claims

19   there was a dislocated market and the difficulty in

20   determining an exact value?

21   A    I do.

22   Q    Do you agree with Point 12 of the Max Galka

23   supplemental declaration?

24   A    Yes, I do.  A hundred percent.

25   Q    Do you agree with point 13?

Page 97

```
 1   A    This has two parts to it.  So I do and I don't.  I

 2   don't believe that all the parties (indiscernible) at the

 3   time.  And I know it says that a reasonable investor.  But

 4   in the crypto space, I mean, you can't assume every single

 5   person is a reasonable investor and knows everything to do

 6   with everything.  So I do believe -- that one is -- I

 7   believe it's correct in terms of the extrinsic value.  All

 8   right?  There's no issue with that.  A hundred percent

 9   correct.  But when intrinsic value ends, (indiscernible)

10   value starts.  And so I don't believe that -- you can't

11   (indiscernible) at zero.  I mean, just let's put that

12   completely aside.  It's impossible for a zero assessment

13   because that means someone (indiscernible), so it has to

14   have value.  If someone is paying for something, it has

15   value.  And again, if you think that there's a restructure

16   or something is going to happen -- we just spoke about it

17   before, then (indiscernible) value.  So I can't say that

18   having a zero or having value is there, but I can agree that

19   if someone was a sophisticated investor, they may have

20   thought at that point (indiscernible).  Most people will

21   just say (indiscernible) and, you know, no.  That's a

22   difficult one.

23   Q    How about point 14?

24           THE COURT:  I don't understand your question, Mr.

25   Davis.  Ask another question.
```

Page 98

```
 1    BY MR. DAVIS:

 2    Q    Do you agree with point 14 in the Max Galka

 3    declaration?

 4    A    The 0.35?

 5    Q    Yes.

 6    A    Okay.  This is a really good question.  Yeah, if Your

 7    Honor would allow me, I would like to answer this.  It's a

 8    very critical question, actually.  I just read --

 9              THE COURT:  I don't know what he's reading from.

10    I don't have it.

11              MR. DAVIS:  It's the Max Galka --

12              MR. MCCARRICK:  Mr. Davis, could you read point 13

13    into the record?

14              THE COURT:  Read it into the record and then you

15    can ask your question.

16              MR. DAVIS:  Give me one second, Your Honor.  My

17    computer just froze.  Give me one second.

18              THE WITNESS:  Do you want me to read it?

19              THE COURT:  Could you read it out loud, Mr. Faraj?

20              THE WITNESS:  Of course I can, Your Honor.  "After

21    the (indiscernible) approximately 94 percent of CEL tokens

22    in Celsius' possession and not able to be withdrawn, CEL

23    token supply and demand was virtually disrupted, as

24    described in my expert report.  It is in my opinion that

25    after that date, the pause in the market of CEL tokens was
```

1    severely dislocated and the movement in that token markets

2    price was not indicative of its value."  Okay, this is a

3    really, really important thing, point 14.  Because what he

4    is saying is the dislocated market means he has to move away

5    from the data that was dislocated.  The only thing that's an

6    issue is the dislocated market never finished when he says

7    it finished.  So the dislocated market actually goes and

8    never finishes all the way because you've got a double

9    dislocation.  But it actually goes up to the -- so the 10th

10   of June is still a dislocated market.  So you can't use the

11   0.355 and you can't use those (indiscernible) because you're

12   still sitting on a 20 percent volume to market cap ratio.

13   So you're sitting at 10.61 percent on the 10th of June.

14   You're sitting at 18.48 percent on the 11th of June.  So

15   you're actually still in dislocated markets.

16       So, yes, what he did was completely correct.  But he

17   actually stopped short.  He should have continued to go

18   until the dislocated market had subsided.  The dislocated

19   market has reduced on the 9th of June.  So he can't use the

20   10th, 11th, 12th, 13th, 14th, 15th, because the 10th and

21   11th are still a part of the dislocated cycle.

22       So what he's saying is true, that you can't use that

23   data.  But what he has done -- and I don't know how he's

24   missed it.  Because I read his report.  He actually knows

25   what he's talking about.  So when he goes into the

Page 100

1   dislocated markets, he has to go the whole way.  He can't

2   choose to stop when it's still under dislocation.  So the

3   10th of June and the 11th of June, you have a 10.6

4   (indiscernible) volume to market cap ratio.  That's a

5   dislocated market.  Now, the dislocated market is just a

6   (indiscernible).  It's a 4.77 percent.  Now, that's within

7   the boundaries of a one to five percent spread.

8          So if you drop down to 9th of June, you are now in the

9   safety of --

10               MR. MCCARRICK:  (indiscernible).

11               THE COURT:  Finish your answer, Mr. Faraj.

12   BY MR. DAVIS:

13   A    Sorry, yeah.  If you drop down that one to the 9th of

14   June, you're actually in the safe zone.  So if you want to

15   argue that dislocated market exists, it's true.  What Max is

16   saying is a hundred percent spot-on.  The only thing, like I

17   said, you can't stop short.  If you are arguing a dislocated

18   market, you have to take all the data.  You can't stop too

19   short because it's the lowest point.

20               THE COURT:  Three more questions, Mr. Davis.

21   Three more questions.

22   BY MR. DAVIS:

23   Q    Thank you.  How about point 15?  And I will read it

24   into the record.

25   A    That's --

Page 101

```
 1    Q     Go ahead, sir.

 2    A     I just spoke about that.  So I just read -- because I

 3    was reading the thing.  So that's the 3.55.  So I've already

 4    answered that.

 5    Q     How about point 16?  How about point 16?

 6    A     Do you want me to read it or do you want to read it

 7    into the --

 8              THE COURT:  Mr. Faraj, why don't you read it

 9    slowly?

10    BY MR. DAVIS:

11    A     I will.  "First, approximately one month passed between

12    the (indiscernible) petition date.  During the

13    (indiscernible) time, the news about Celsius was

14    overwhelmingly negative with the public questioning Celsius'

15    solvency.  Representation by the company and the future of

16    the platform, I cannot (indiscernible) an economic, rational

17    reason for the value of CEL token would have increased from

18    the pause to the petition date in response to that

19    information in proper (indiscernible) markets."

20         And the next one says, "Second, even before the pause,

21    the market for CEL token was already showing the traditional

22    indicia of the dislocated market.  There was a significant

23    information asymmetry regarding Celsius' financial condition

24    and it's --" sorry, my screen is very small, "-- provision

25    cell token transactions.  Major shock to the cryptocurrency
```

Page 102

1    market with the collapse of several other coins."

2         So what he's saying here, this is actually one of the

3    most -- I'm really glad you put this one up.  Okay.  So what

4    he's saying is that even before the pause date, there was a

5    dislocated market.  Now, what he is referring to is the 10th

6    and 11th of June.  The pause date was on the 12th.  So he

7    actually says he agrees that that's a dislocated market.  So

8    I don't know why he has actually referred to it being of

9    value.

10        If he had raised that area before, even before the

11   pause, the market for CEL token was already showing the

12   traditional indica of a dislocated market, which it is.  The

13   dislocated market starts from the 10th of June.  So you have

14   to -- if you are arguing the dislocated market methodology,

15   you have to strike out 10th, 11th, 12th (indiscernible).

16   You have to strike (indiscernible).  You can't argue it and

17   then use the same -- you can't say you have to have -- this

18   is a dislocated market, but you know what?  On the 10th of

19   June it's the cheapest point.  It's 30 cents.  So I'm going

20   to go with that and I'm going to leave it there.  You have

21   to strike it out because it still is a dislocated market.

22        He agrees here that it's a dislocated market.  So he

23   actually agrees with you on the same point.

24             THE COURT:  Two more questions, Mr. Davis.

25             MR. DAVIS:  Thank you, Judge.

Page 103

1   BY MR. DAVIS:

2   Q    How about point 18?

3   A    "My experience, when a market for an --"

4            THE COURT:  You have to read it -- stop.

5            THE WITNESS:  Sorry.

6            THE COURT:  Read it slowly into the record and

7   then I'll let you answer a question.

8   BY MR. DAVIS:

9   A    "In my experience, when a market for an asset or

10  security becomes dislocated, the market price for an asset

11  is typically above the extrinsic value of the asset.  One

12  example of this phenomenon was the GameStop short squeeze of

13  January 2021 when the GameStop stopped trade at far above

14  the intrinsic value of a dislocated market."  Yes, okay.

15  Q    Do you agree with that?

16  A    I do agree with that.  I do agree with --

17           THE COURT:  Next question, Mr. Davis.

18  BY MR. DAVIS:

19  Q    Point number 19.  Last one.

20  A    Okay.  (indiscernible) ascribe a specific value

21  (indiscernible) on petition date (indiscernible) my

22  experience trading a financial instrument, and especially

23  trading in dislocated markets, (indiscernible) a price of

24  the CEL token on the petition date, I would have declined

25  because I think the CEL token was most likely worthless at

1    the time and have seen no probable support for it being

2    worth more than zero zero at the time."

3        Okay.  There's two parts to this.  And I'll answer as

4    quick as I can, because I know (indiscernible) Your Honor

5    for the long answers.

6        You can't have a zero value.  So there's no such thing

7    -- as long as something is trading and someone is buying

8    something, there's no such thing as a zero value.  You can

9    just (indiscernible).  Anything that's being traded and

10   anything that converts from one value to another so it

11   becomes speculative cannot have a zero value.

12       And the second part (indiscernible) petition date.  He

13   is correct.  On the petition -- you can't ascribe a specific

14   value because it is a -- sorry, a dislocated market.  So the

15   only way to do it is a fair value assessment.  The only way

16   to do a fair value assessment is to strike out the entire

17   period which is dislocated.

18       Now, the issue here is if you argue this one too hard

19   and you keep saying the dislocated market, the value of CEL

20   increases the more you actually look at the dislocated

21   market.  So the fair value assessment makes a fair value

22   instead of keep going further down.  And I don't have a lot

23   of time to explain it.  But if you look at a dislocated

24   market and then you rule in a double dislocated market, the

25   value of CEL becomes much higher.  Because every single time

Page 105

1    we go away from the Terra LUNA crash, the value of CEL

2    (indiscernible).  You've got to be very careful when you're

3    (indiscernible).  So the fair value assessment is the safest

4    and fairest way for everybody.

5              THE COURT:  Thank you for your testimony.  Does

6    anybody else wish to ask any questions?

7              MR. ABREU:  Judge, Arthur Abreu, pro se creditor.

8              THE COURT:  Go ahead, Mr. Abreu.

9                   CROSS EXAMINATION OF HUSSEIN FARAJ

10   BY MR. ABREU:

11   Q    Can you open the first expert report by Mr. Galka,

12   document 3580?  It's the first expert report.

13   A    Yeah, one second.  So reports.  Okay, (indiscernible).

14   Q    And you go to Page 35 of the PDF of the document is 38,

15   figure 13, which represents the trading volume of CEL token

16   pre and post-pause dates.

17   A    Yes.

18   Q    Do you see the Y axis where it says one?

19   A    Yes, I do.

20   Q    Do you (indiscernible) the market dislocated

21   (indiscernible) volume?  So this figure refers to the volume

22   of CEL.  Do you spot where the LUNA event happened?

23   A    My screen is really, really small because I've got the

24   thing up.  So if you want to ask me a question, I'll be able

25   to answer it, but I -- my screen is really tiny.

Page 106

```
 1              MR. ABREU:  Judge, could we share it on the screen
 2    if it's possible?
 3              THE COURT:  No.
 4    BY MR. ABREU:
 5    Q    Okay.  So I will refer to this.  On this figure, you
 6    have two (indiscernible) that go over one after the 2022 May
 7    event.  Do you see those two specks?
 8    A    Yes.  I can see it, yes.
 9    Q    And then there is a (indiscernible) where the volume
10    kind of retraces to which has ben in the past, correct?
11    A    Correct.  But it's still a dislocated market because
12    you don't have enough volume on there.  So with dislocated
13    markets, if you are (indiscernible) the dislocated market --
14    and I know -- I've got to be fair on both assessments.  A
15    dislocated market isn't just --
16    Q    That's --
17              THE COURT:  Mr. Abreu, don't interrupt his answer.
18    Go ahead, Mr. Faraj.
19    BY MR. ABREU:
20    A    It's very important just because -- okay, anything that
21    happens post-petition in a dislocated market, what that
22    means is that the circulating supply is now being reduced.
23    The circulating supply being reduced therefore actually
24    changes the dynamics of the original market.  When you
25    change the dynamics of the original market, you are actually
```

Page 107

1    inside of -- you are still within what we call the

2    boundaries of a dislocated market.

3              THE COURT:  Two more questions, Mr. Abreu.

4    BY MR. ABREU:

5    Q    Are you aware at this time the supply was not

6    (indiscernible)?

7    A    Pardon?

8    Q    Are you aware if the supply of CEL was locked in this

9    period?

10   A    Even if they were locked -- and again, the fact that

11   you can't access -- the fact that the CEL can't be accessed

12   by so many people -- I think it's 294 million -- look, I

13   don't have it in front of me.  I think it's 294 million CEL

14   that was locked up.  The minute that it gets locked up, you

15   can't then look at it as a fair value assessment.  Now, you

16   can look at other assessment.  But once you lock up that

17   liquidity, it's no longer fair value.  Because there's not -

18   - look at it this way.  Let's just say the other people

19   don't believe what the first people thought and they just

20   wanted to get rid of it.  It changes the dynamic of the

21   market.  So then the dislocated market theory still applies.

22   Q    No, no, my question is related.  Do you see the

23   timeline which you offered your methodology here to

24   calculate the average price on this figure?  Can you spot it

25   through this figure?

1    A    Which figure?  I don't know what I'm looking at.

2    Q    So on the document of Mr. Galka, Page 38 of the

3    document, there is a Figure 13, correct?

4    A    Figure 13.

5    Q    38 of the document and 45 of the PDF.

6    A    Oh, sorry, 45 of the PDF.  Okay.  My apologies.  Yes.

7    Q    So do you see -- you use a methodology which goes --

8    does an average price in a period of time.  Like you say, 20

9    days.

10   A    Correct.

11   Q    Do you see a period of time here clearly in this

12   figure?

13   A    Honestly, I apologize.  I know what you want me to do.

14   My screen is too small.  I don't want to give a wrong

15   assessment.  I can't make a mistake.  So I can't see it.  I

16   can't answer your question.

17   Q    You cannot see the --

18        THE COURT:  One more question, Mr. Abreu.

19   BY MR. ABREU:

20   A    My screen is very, very small.  I can't see it.

21   Q    Okay.  Let's go to page -- of this same document, Page

22   36 of the document, which is the page -- which is the 43 of

23   the PDF.  So 36 of the document and 43 of the PDF.

24   A    I've got it.

25   Q    Do you see Paragraph 147?

1   A    Yes (indiscernible).

2   Q    So let me read it.  "The (indiscernible) shows the time

3   series of daily price returns of BTC, ETH, which is

4   Ethereum, FTT, HEX, and CEL token from the start of 2022 to

5   the petition date."

6   A    Yes, I can see that.

7   Q    So on the charts do you see the charts referring to HEX

8   and FTT?

9   A    I see BTC, Ethereum.  Okay, can you tell me is that

10  figure 12?  Which figure?  Because I can't see where it says

11  HEX.

12  Q    (indiscernible) the chart below.  So it's the following

13  page.

14  A    Yeah, I know, but BTC, Ethereum, and CEL.  Where's HEX?

15  Q    Exactly.  The report alludes to this, but it does not

16  mention anything related to this.  There are more

17  discrepancies, but for the time constraints of the Court are

18  requiring -- there are very -- there are numbers

19  inconsistent between the Galka report of things that he

20  talking that he never refers to.  So that's my point, just

21  to say that there are omissions --

22  A    I read the report -- sorry.  Can I answer that just

23  quickly?  I read the report.  The issue is even him -- no

24  one is perfect.  So even when you go through his report, I

25  mean, the supplementary report he did, he actually looks at

```
 1    the right methodology in his first report.  But it's very

 2    hard putting everything in a report.  I mean, it doesn't

 3    matter who you are and it doesn't matter how much time you

 4    have.  So there's going to be things missing.  I mean, this

 5    market -- if I was to do a proper report and I had time,

 6    this would be a 5,000 page report.  This is talking about

 7    complete market dynamics.  So -- and I'm not trying to

 8    protect anybody, but he actually done a really good job.  He

 9    just made a mistake when it came to where he ended the

10    proposition of the dislocated market.  And I don't know why

11    he made that mistake, because that's a very crucial mistake.

12    But everything else inside of here, assessments and

13    methodologies are actually really well written.

14              THE COURT:  Thank you -- Mr. Abreu, thank you for

15    your questions.

16              Does anybody else wish to examine the witness?

17              MR. FRISHBERG:  I have a couple questions, Your

18    Honor.

19              THE COURT:  Mr. Frishberg, go ahead.

20              MR. FRISHBERG:  Thank you.  I will try to be as

21    brief as I can.

22                   CROSS EXAMINATION OF HUSSEIN FARAJ

23    BY MR. FRISHBERG:

24    Q    Dogecoin is the first meme coin, correct?

25    A    I'm not sure if it's the first meme coin that ever
```

Page 111

1    existed.  I don't have that kind of knowledge.  But it was

2    created as a joke and it is a meme coin, but --

3    Q    It's the first widely-accepted meme coin?

4    A    Yeah, it's been very well adopted.

5    Q    Is one of the reasons bitcoin has so much value is

6    because it was the first widely-adopted cryptocurrency?

7    A    It wasn't -- bitcoin wasn't because it was the first

8    widely-adopted cryptocurrency.  It's because it changed the

9    status from its asset class.  And I don't mean it from a

10   financial perspective, I mean it from a functionality

11   perspective.  BTC as technology is actually very poor

12   technology.  Even Satoshi's code and even the way Satoshi

13   puts the -- the way he designs it for the complexity.  The

14   issue is not bitcoin.  Bitcoin became a store of value.  So

15   when you change something from a function of a

16   cryptocurrency or for a trade, whatever you create, and you

17   try to store a value, it actually changes the whole

18   (indiscernible) of what that currency is.  So bitcoin is a

19   different class.  Right?  So bitcoin is a store of value.

20   You can't compare it to a cryptocurrency.

21   Q    Okay.  Is one of the reasons dogecoin has such a large

22   following is because it was extensively promoted by Elon

23   Musk?

24   A    Yes and no.  To be honest with you, when we did our

25   data assessments on the (indiscernible) movement -- because,

Page 112

1    remember, I have to train neighbors.  And I know it's our

2    software and I know it's our AI, but -- okay.  So one thing

3    you've got to realize, it's not Elon musk moving the market

4    himself.  There's factors behind it.  There's a lot of

5    market makers, market manipulators, market movers.  Now,

6    what they do is they know that when Elon Musk tweets, that

7    they can actually move the market and (indiscernible) value

8    and (indiscernible) value (indiscernible).  So there's a

9    level of market manipulation in the market that goes up.

10        Is he the catalyst for the movement?  Yes.  Is he the

11   reason it's moving?  He's only one part of that whole

12   mechanism.

13            THE COURT:  Mr. Frishberg, do you have any

14   questions about the CEL token?  This is not really relevant

15   to what we're doing here.

16   BY MR. FRISHBERG:

17   Q    Is the cell token affected in the same way by Elon

18   Musk?

19   A    I am not too sure.  I haven't heard Elon Musk tweet

20   about or say something about the CEL token.  But yes, it

21   would be.  Look, it's not a matter of him tweeting.  You've

22   got to understand the dynamics of the market, right?  If you

23   own your own exchange, anyone that has -- like I said, we've

24   developed our own exchanges (indiscernible) for over a year.

25   So once you understand how they actually work, market moving

Page 113

```
 1    is -- it's not a one fit all.  So someone says something

 2    doesn't mean he moved it.  But there is then an opportunity

 3    for people in the background who have liquidity to actually

 4    move the market.  So there's a series of things.  It's very

 5    complicated to explain it in five minutes.  And I don't want

 6    Your Honor to get angry with me, so I don't want to answer

 7    too long.

 8            THE COURT:  Last two questions, Mr. Frishberg.

 9    BY MR. FRISHBERG:

10    Q    This will be the two questions.  Is Dogecoin the only

11    cryptocurrency that Tesla accepts as a payment?

12    A    I'm not aware of -- listen, I really -- ask me about

13    technology, I'll tell you whatever you want.  I don't follow

14    Elon Musk and what he accepts in terms of currencies.  I

15    mean, Dogecoin is one -- Elon Musk makes a lot of money when

16    he is tweeting or -- I can't speculate because I don't know

17    exactly how he spends his money, but I assume that he is

18    buying and selling crypto.  But that's not related --

19            THE COURT:  Mr. Frishberg, do you have any more

20    questions about CEL?

21    BY MR. FRISHBERG:

22    Q    I have one question.  Do you see CEL having any utility

23    as a currency and does anyone accept it as a payment?

24    A    It's not up to me to see it because the valuation

25    crisis it not about its future, it's about what it was at
```

Page 114

1    the petition date.  So if you ask me to value the currency

2    as of today knowing the information we have now, then it's

3    got no value unless someone wants to use it for something

4    else.  But if you ask me to value something based on a

5    petition date, I can't take the future into consideration.

6    Q    Thank you.

7              THE COURT:  Anybody else have any questions?

8              MR. CREWS:  Yes, Your Honor.  I have a few.

9              THE COURT:  Go ahead, Mr. Crews.

10             MR. CREWS:  This is Cam Crews, pro se.

11             THE COURT:  Go ahead.

12                  CROSS EXAMINATION OF HUSSEIN FARAJ

13   BY MR. CREWS:

14   Q    How are you?  In your opinion, did the Terra LUNA

15   dislocation event disproportionately affect CEL token or all

16   cryptocurrencies?

17   A    It was all cryptocurrency.  That was a major dislocated

18   event.  So what happens whenever you've got a major event --

19   you've got a major and a minor event, right?  So the CEL

20   token is what we classify as a minor event.  It's a minor

21   dislocation.  A major event is like the FTX collapse.  It's

22   like Terra LUNA collapse.  It's like any other major

23   collapse.  When you have a major event, it doesn't affect

24   one coin, it affects the entire system.

25   Q    Thank you.  In your opinion, did the Celsius pause

1    dislocation event disproportionately affect CEL token or all

2    cryptocurrencies?

3    A    Okay.  To answer honestly, I would have to look at the

4    market all the way through except sentiment follows.  So

5    what that means is to give you a safe answer without giving

6    you a wrong answer, sentiment from one collapse can follow

7    to another collapse.  So if someone (indiscernible) money on

8    Celsius, that person or someone next might panic and not

9    want to spend money or buy crypto on another platform.

10        So the rolling on effect from a dislocated market,

11   minor or major, does roll on to other platforms.

12   Q    And did the Celsius pause cause CEL tokens to be locked

13   on the Celsius platform?

14   A    So once they locked those coins, that actually changes

15   -- it's a dislocated event.  But even -- I'll give you an

16   example.  It's not just the lock.  Insider trading, insider

17   selling.  Anything that comes in earlier that people that --

18   let's just say an insider had information (indiscernible)

19   and that was used to shift the market, that becomes a

20   dislocation event.  So the only thing you can do to be fair

21   is to strike out all dislocated events.

22   Q    You accepted 95 percent of the circulating supply of

23   CEL token was locked on the Celsius platform as of the

24   pause?

25   A    Yeah, I think 245 million I think we said before.  And

1   once that happens, it becomes a dislocated market.  So

2   regardless if you -- I can't argue that later on the values

3   are proper.  Because even if I take the maximum supply

4   (indiscernible) five dollars.  So I can say that it had

5   value.  But it doesn't mean it had value under a non-

6   dislocated market value.  So once -- if you argue dislocated

7   value, you have to go to fair assessment.  You can't have

8   the (indiscernible).  So if I argue that there's a

9   dislocated market and I need to go to fair value assessment,

10  I have to go to fair value assessment.  And this is why I

11  had to use the methodology I used.  And if I argue there was

12  a dislocation, then I can argue that after the pause date,

13  after the petition, CEL value actually went up to $4.60.

14  That means was -- was CEL worth $4.60?  And you can't argue

15  that because there is a dislocated market there.  So you

16  can't pick and choose.

17  Q    And just for clarification, that number you read out,

18  that was a dollar value?

19  A    I think it was four -- I'm just saying off the top -- I

20  think it was four dollars -- when I did an assessment -- I

21  don't have it in front of me.  But when I did an assessment,

22  I realized that post-petition date, that CEL went up to two,

23  three four dollars, $4.60.  Now, that's a dislocated market.

24  So you have to wipe it out.  You can't accept it as

25  (indiscernible) assessment.

Page 117

```
 1              THE COURT:  Thank you for your questions.  Anybody

 2     else have any questions?

 3              MS. DOW:  Yes, Your Honor.  Sharon Dow, pro se

 4     creditor.

 5              THE COURT:  Go ahead, Ms. Dow.

 6              MS. DOW:  Yes, good day.  There seems to be

 7     someone else who is --

 8              THE COURT:  Yeah.  Anybody else, close your

 9     microphone please.

10              CLERK:  They've been muted, Judge.  It was Bob

11     (indiscernible).

12              THE COURT:  All right.  Cut him off.  Go ahead,

13     Ms. Dow.

14              MS. DOW:  Thank you, Your Honor.

15     BY MS. DOW:

16     Q    Mr. Faraj, so today are you sharing with us or giving

17     us all of this plethora of information as a lay witness

18     opinion or are you holding yourself out as a qualified

19     expert valuer who is in the U.S. federal courts?

20     A    I will let the Court decide.  Because I've never done

21     this in court, and I wouldn't even know how to honestly

22     answer that question you just gave me.  I can tell you that

23     I am extremely knowledgeable and you can ask me anything you

24     wanted and I'll give you the exact details that you wanted.

25     I've done years of R&D.  R&D means I actually practice this
```

1    stuff.  I don't have a qualification, but I can guarantee

2    you nobody will know what I know.  Now, I've owned my own

3    exchanges.  I've owned my own market makers.  But I don't

4    have an answer to it because I don't know.  I'm here to give

5    evidence to help out so the judge can -- or anyone

6    understand how this thing functions.  But I don't know in

7    what term that is.

8    Q    So what is the purpose of the work product that you are

9    submitting?  Have you chosen the exact purpose of the

10   valuation?

11   A    I have.  I came down to a fair value assessment based

12   on all the stuff we just discussed.  And the fair value

13   assessment I took into consideration the dislocated market.

14   I chose a period of time which had the least affected area.

15   And then I looked at marginal spreads.  There's a good

16   spread between there.  And then I came to a fair value

17   assessment of 71 cents.

18   Q    So here and in your testimony (indiscernible) have you

19   expounded any deductions over -- based on the fact pattern

20   representing --

21             MR. MCCARRICK:  Objection.

22             THE COURT:  Sustained.  Next question.

23             MS. DOW:  And then just one more question.  But

24   give me one moment, Your Honor, please, to collect it.

25   BY MS. DOW:

Page 119

1   Q    Okay.  So, Mr. Faraj, just final confirmation here.

2   You are asking to be considered an expert valuator yet this

3   is your first time ever preparing a work product or

4   testimony and have not been through any of the typical

5   training for U.S. federal -- appearing in U.S. federal

6   court.

7   A    Okay.  Let me answer that and I'll -- and please, Your

8   Honor, excuse me for answering this.  And I thank you so

9   much for your patience today.

10       When it comes to expertise, the expertise isn't a piece

11  of paper (indiscernible).  Expertise in this industry

12  requires hands-on.  You've got to understand the dynamics of

13  this industry.  So if my expertise -- if you want to say am

14  I an expert, I do believe I am one of the biggest experts or

15  the -- whatever in English you want to say, expert in the

16  field.  I don't think anybody you're going to find is going

17  to have the information that I had.  But I can answer any

18  question you have in regards to any type of valuation in

19  crypto, and I can answer any question you have with

20  methodologies.  I can answer any question you have in

21  technology.

22       Now, is that enough to be an expert?  I would think it

23  is enough to be an expert.  But that's not up to me; that's

24  up to the judge.  So I respect whatever the judge says and

25  whatever decision he makes is his decision.

Page 120

1           MR. LICARI:  (indiscernible).

2           THE COURT:  Mr. Licari -- cut him off.  Deanna,

3    cut him off.

4           Any interruptions in this proceeding will not be

5    tolerated.

6           Ms. Dow, do you have any last questions?

7    BY MS. DOW:

8    Q    So just to clarify that you feel you are qualified in

9    the area, but you have not been qualified as an expert

10   valuator in the federal court, is that correct?

11   A    In the federal court, no.  But if you need peer

12   references or peer reviews -- I mean, you've just heard

13   today, I mean, if hearing me today is not enough to

14   understand that I am an expert in the field, then I don't

15   know what I can tell you.  I mean, it's the judge's call.

16   It's not my decision.

17   Q    Yeah.  I'm asking the questions.  Thank you very much.

18          THE COURT:  Thank you, Ms. Dow.  Anybody else have

19   any questions?

20          MR. MENDELSON:  Yes, Your Honor.  Eric Mendelson,

21   pro se.

22          THE COURT:  Go ahead, Mr. Mendelson.

23          MR. MENDELSON:  I will be very brief.  And thank

24   you for your time as usual.

25                CROSS EXAMINATION OF HUSSEIN FARAJ

1    BY MR. MENDELSON:

2    Q    Mr. Faraj, did you get paid for this report?  Did you

3    receive any compensation for it?

4    A    I didn't get paid.  I received nothing in return.  I

5    don't want anything in return.  I want to help people

6    understand this data.  More than that, I don't want anything

7    in return.

8    Q    Are you aware that Elementus was paid for their

9    valuation report?

10   A    Yes, but I don't want to comment.  The last time I

11   commented about someone making such a large, vat amount of

12   money, I got criticized.  So I really don't want to look

13   like -- and I speak my mind.  So I don't want to be in a

14   position where I'm going to say something and someone is

15   going to criticize me for it.

16   Q    All I asked was were you aware if they got paid or not.

17   A    Yes, I am aware they got paid.

18   Q    Do you enjoy working for free or providing reports for

19   free?

20            UNIDENTIFIED SPEAKER:  Objection.

21            THE COURT:  Sustained.

22   BY MR. MENDELSON:

23   Q    Okay.  Mr. Faraj, what was your motivation for

24   providing the report without...

25   A    I really love this industry.  I've been in it -- one of

Page 122

1    the first crypto architects.  I've been in this industry for

2    so long.  I've designed over 138 chains.  I've looked after

3    over 500 people.  I've trained over a hundred people on the

4    stuff that we've been discussing.  I love this industry.

5    Right?  It's not that I agree with every principal in the

6    industry, but I love this industry.

7         If there's a position that I can get and I can help

8    someone, I will be there to help them.  You can ask anyone

9    who knows me throughout this industry.

10             THE COURT:  Any last questions, Mr. Mendelson?

11   Mr. Mendelson, are you still there?

12             Anybody else wish to question the witness?

13             MR. DALHART:  I would just like to have one

14   question.  I've never participated in the past.

15             THE COURT:  Okay.  Just identify --

16             MR. DALHART:  If I am allowed to.

17             THE COURT:  Yeah.  Just identify your name,

18   please.

19             MR. DALHART:  My name is David Dalhart.

20             THE COURT:  Okay.  Go ahead, Mr. Dalhart.

21             CROSS EXAMINATION OF HUSSEIN FARAJ

22   BY MR. DALHART:

23   Q    I just have one quick -- in your opinion, would it be

24   just easier to give everyone some CEL tokens and if they

25   want to sell them, fine.  If they can't sell them, that's

Page 123

1    fine.  Would it be simple or am I just oversimplifying it.

2            UNIDENTIFIED SPEAKER:  Objection.  Objection.

3            MR. DALHART:  Oh, sorry.

4            THE COURT:  Sustained.  Any other questions, Mr.

5    Dalhart?

6            MR. DALHART:  No, thank you.  That was my only

7    question.

8            THE COURT:  Thank you, Mr. Dalhart.  Anybody else

9    wish to cross-examine?

10            MR. LU:  Hi.  My name is Jason Lu.  I am a

11    creditor.

12            THE COURT:  Go ahead, Mr. Lu.

13                CROSS EXAMINATION OF HUSSEIN FARAJ

14    BY MR. LU:

15    Q    Mr. Faraj, you just said you have designed over 138

16    chains.  Is that correct?

17    A    Designed, yes.

18    Q    And could you name of any of them?  Are any of them

19    successful or ones that we would have heard of?

20    A    We do R&D.  So we're a research and development

21    company.  And we design concepts on chains.  We're also

22    developing some of the largest infrastructure right now.  So

23    we're doing major projects including the (indiscernible),

24    we're doing (indiscernible) the -- I could send you a list.

25    We've got heaps.  I mean, when it comes to infrastructure,

Page 124

 1    the (indiscernible).

 2           THE COURT:  Let's not do advertising.  Okay, Mr.

 3    Faraj?

 4           THE WITNESS:  Sorry, Your Honor.

 5           THE COURT:  That's okay.

 6    BY MR. LU:

 7    Q    Well, I've been in this industry a long time, too.

 8    And, frankly, I've never heard of you or any of these chains

 9    that you've mentioned.  So if you're using the basis that

10    you've designed 138 chains to show that you're an expert,

11    perhaps maybe you could clarify that --

12           THE COURT:  Mr. Lu, I'm going to cut you off

13    because it's not a proper question.  I don't know where you

14    are.  Mr. Faraj is in Australia.  I don't know if you know

15    everybody all around the world.  Do you have any other

16    questions, Mr. Lu?

17           MR. LU:  No, that's it.  Thank you.

18           THE COURT:  Thank you very much.  Anybody else

19    wish to cross-examine?

20           All right.  Any recross from anybody in the

21    courtroom?

22           MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

23    on behalf of the debtors.  Nothing for the debtors.  We

24    would just like to re-note the Debtor's and the Committee's

25    joint Daubert motion, which I understand Your Honor has

Page 125

```
 1   taken under submission subject to --

 2             THE COURT:  Yeah.  We're going to talk about that

 3   in a minute and any final briefing.  I'm not going to rule

 4   from the bench on it.

 5             MR. MCCARRICK:  Understood.

 6             THE COURT:  All right. No one else in the

 7   courtroom appears to want to cross-examine.

 8             Mr. Faraj, thank you very much for your testimony.

 9   I hope you get some sleep.  I know you said you've been up

10   for a long time.  Tell me again where in Australia are you?

11             THE WITNESS:  We're in Sydney.

12             THE COURT:  Sydney, okay.  All right.  Thank you

13   very much.

14             THE WITNESS:  Thank you so much, Your Honor.  I do

15   appreciate you letting me get on the stand.  Thank you so

16   much.  I hope I helped you out.  Bye bye.

17             THE COURT:  All right.  Do the Debtor or the

18   Committee wish to call any rebuttal witnesses?

19             MR. MCCARRICK:  The Debtors do not, Your Honor.

20             THE COURT:  All right.  So all parties have rested

21   at this point. The evidence is closed.  All right.

22             So let's talk about proposed findings of fact and

23   conclusions of law and any additional closing briefs.  I

24   certainly have the briefs, but there have been some changes,

25   movements in the evidence, and that sort of thing.
```

Page 126

1            MR. KOENIG:  Good morning, Your Honor.  Chris

2    Koenig, Kirkland & Ellis, for the Debtors.

3            So, Your Honor, the last time we spoke about

4    briefing, you indicted you didn't want briefing.  But during

5    the colloquy yesterday you suggested maybe there were some

6    limited topics.

7            THE COURT:  Let me put it this way.  There's a lot

8    of briefing that's been done already.  You know, cases take

9    twists and turns as they go along.  If you feel there are

10   any issues that you want to address in the brief, you can.

11   But I'm not telling you which issues I want to -- I mean,

12   the one issue that's come up I think throughout multiple

13   times -- and I think you even stood and said that's a good

14   question -- was the treatment of collateral with

15   (indiscernible) I think was -- I would have to go back in my

16   notes.

17           MR. KOENIG:  Right, Mr. Bronge.

18           THE COURT:  Yes.

19           MR. KOENIG:  Whether the collateral is the

20   property of the borrowers or property of Celsius.

21           THE COURT:  Correct.

22           MR. KOENIG:  We addressed that issue in Version 9

23   in our confirmation brief.  But you raised that -- Mr.

24   Bronge raised Version 7 was not addressed in our brief.  So

25   perhaps we'll submit something just limited on that.

1              THE COURT:  I think you ought to limit --

2    obviously the briefing is very extensive.  There were

3    proposed findings of fact that were done earlier.  We now

4    have a record.  You can either take what you had submitted

5    before, and if you believe that's sufficient, add citations.

6              When is the transcript supposed to be completed?

7              MR. KOENIG:  We've been getting transcripts on a

8    rolling basis I would say every 24 hours.

9              THE COURT:  Okay.

10             MR. KOENIG:  So we will be prepared to submit

11   proposed findings of facts and conclusions of law I would

12   say by the end of this week.  Maybe it's most helpful to

13   work backwards from closing.

14             THE COURT:  Sure.

15             MR. KOENIG:  I know Your Honor has a very busy

16   schedule, especially in November.  We are already scheduled

17   to have an omnibus hearing next Tuesday the 24th.  I don't

18   know if that's too soon for Your Honor.  We would be

19   prepared to present at that hearing.  But if you would

20   rather schedule a different date before -- I think you said

21   you had a hearing in November.

22             THE COURT:  Yeah.  That's a moving target, too.

23             MR. KOENIG:  So we're happy to work with Your

24   Honor's schedule and sort of work backwards from there.

25             THE COURT:  Hold on.  Too much paper.  Just give

Page 128

1   me a moment.

2           Let me -- I must have left it on my desk.  Let me

3   just -- everybody stay seated and we'll come back in.  Okay?

4   It will just be a moment.

5           So tell me when would the Debtor and Committee be

6   prepared to submit their proposed findings of fact and

7   conclusions of law?

8           MR. KOENIG:  Your Honor, for the Debtors, we would

9   be prepared to do it by the end of this week.

10          MR. COLODNY:  Your Honor, I'm envisioning

11  submitting one joint document.

12          THE COURT:  Are you going to submit joint proposed

13  findings.

14          MR. COLODNY:  That's what I was envisioning, Your

15  Honor.  And I believe we can work on that.

16          MR. KOENIG:  Yes.

17          THE COURT:  Most beneficial.

18          MR. KOENIG:  Yes.  The Debtors and the Committee

19  will submit one joint proposal.

20          THE COURT:  And you would do whatever additional

21  briefing you're going to do all by...

22          MR. KOENIG:  Your Honor, we would submit that at

23  the same time.  I think it would be very limited, frankly.

24  We've got enough paper in this case.

25          THE COURT:  All right.  The Debtors and the

Page 129

1    Committee shall submit proposed findings of fact and

2    conclusions of law and any additional brief by Monday --

3    hold on, let me make sure that's right.  Friday, October

4    20th, 5:00 p.m.

5             Any objectors submit proposed findings of fact and

6    conclusions of law and any closing briefs by Friday, October

7    27 at 5:00 p.m.  Closing argument Monday, October 30 at 2:00

8    p.m.  I'm squeezing it in with a lot of things.

9             MR. KOENIG:  We appreciate it, Your Honor.  A

10   couple of just housekeeping questions.  For openings, you

11   issued an order and we were supposed to submit how long we

12   wanted for closing argument.  Will you be doing something

13   similar?

14            THE COURT:  I will enter it in a similar...

15            MR. KOENIG:  Okay.  The other item I would note is

16   you mentioned -- I'll just wait a moment for the siren.

17            We mentioned during openings that one of the

18   conditions precedent to emergence, not to confirmation, is

19   an SEC approval of a Form 10 registration.  We may at the

20   same -- we are continuing to discuss with the SEC.

21   Hopefully we can make some progress between now and closing

22   argument.  We may ask for a status conference just to update

23   you and the rest of the parties on this important issue at

24   the time of closing, which I think you said was the 30th.

25            THE COURT:  Okay.  So let me ask a couple other

Page 130

1    questions.  Were you able to resolve things with the

2    Consumer Privacy Ombudsman?

3            MR. KOENIG:  Not quite yet, but we're close.

4            THE COURT:  I think there were -- I don't have the

5    list in front of me, but I think there were some open issues

6    with the U.S. Trustee that you were endeavoring to resolve.

7    Has there been any progress on that?

8            MR. KOENIG:  Yes.  I believe we are now resolved.

9    I don't want to speak for the U.S. Trustee, but...

10            MR. BRUH:  I think we're still --

11            THE COURT:  You have to identify yourself, Mr.

12    Bruh.

13            MR. BRUH:  Mark Bruh for the United States

14    Trustee.  I think we're trying to schedule a follow-up call.

15    We have been exchanging information, Your Honor.  I know

16    exculpation and release are some of the issues we're

17    discussing with the Debtors and a discrete issue regarding

18    exculpation with the Committee.  And that's where we stand

19    on that.

20            THE COURT:  Are you within striking range of a

21    resolution of those issues?

22            MR. BRUH:  I hope so, Your Honor.  One of the

23    issues Your Honor did raise was the disclosure of various

24    individuals in the release provisions and --

25            THE COURT:  It's clear that there were some people

1    that ought to be specifically identified and in other

2    instances many categories, but it needs more of a

3    definition.

4             And I expressed this before.  I don't want open

5    litigation issues about who gets a release, who is getting

6    exculpated, that sort of thing.  It's got to be -- it needs

7    to be pre-cleared.

8             MR. BRUH:  We'll do our best, Your Honor.

9             THE COURT:  Okay.

10            MR. KOENIG:  We've had very productive

11   discussions.  I think we're close.

12            THE COURT:  Are there other open issues that are

13   still being discussed, negotiated?

14            MR. KOENIG:  I think it's the ADR procedures are

15   close but not final.  I'm looking at Mr. Colodny.

16            MR. COLODNY:  We're going to send them back today,

17   Your Honor.

18            MR. KOENIG:  I think that that's the other open

19   issue.

20            MR. COLODNY:  And then there are a couple changes

21   to I think litigation administrator agreements and some of

22   the other corporate documents.  So there will likely be

23   another plan supplement filed where we can include the list

24   of released parties and other (indiscernible).

25            THE COURT:  Mr. Bruh?

1          MR. BRUH:  Yes, Your Honor.  Mark Bruh for the

2     United States Trustee.  Also, the substantial contribution

3     applications --

4          THE COURT:  We'll push those off.

5          MR. BRUH:  To November 30th at the confirmation.

6     I just wanted to apprise the Court.

7          MR. KOENIG:  I think that's all that's open, Your

8     Honor.

9          CLERK:  Judge?

10          THE COURT:  Yes, Deanna.

11          CLERK:  Sorry to interrupt.  There is the SVB

12     omnibus hearing on the 30th at 2:00.  Do you want it at the

13     same time or do you want --

14          THE COURT:  Hold on.  Let me just look.  I thought

15     I had brought out a whole list of -- give me just a moment.

16          We'll move that date, Deanna.  We'll talk after.

17     We'll move the date for the SVB omnibus hearing which is

18     scheduled for 2:00 on October 30th.  We'll move that.

19          CLERK:  Okay.  Great.  Thank you.

20          THE COURT: Thank you, Deanna.  All right.

21     Anything else we need to talk about today?

22          MR. KOENIG:  Nothing from the Debtors.  Thank you,

23     Your Honor.  We'll wait for your order.

24          THE COURT:  I appreciate all the effort to get

25     this done promptly.  See you all soon.  We are adjourned.

1              (Whereupon these proceedings were concluded at

2     11:25 AM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 134

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 19, 2023

[& - 27a]                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  3:3 13:8 35:8 124:22 126:2 | **110**  12:9 **113**  12:22 46:22 47:8,11 **114**  12:10,23 88:7,16,21,24 | **14**  30:3,5,14 31:3 76:9 97:23 98:2 99:3 | **2011**  96:17 **2021**  103:13 **2022**  69:10,19 69:25 106:6 109:4 |

**&**

**&**  3:3 13:8
35:8 124:22
126:2

**0**

**0.35**  98:4
**0.355**  99:11

**1**

**1**  17:5,6,14
25:6,7 46:11
56:23 59:3
**1,000**  48:3
**1.5**  46:11,11
**10**  12:19 28:21
29:2 40:6
129:19
**10.6**  100:3
**10.61**  99:13
**100**  46:12
47:19 48:5
59:22
**10004**  1:14
4:14
**10020**  4:5
**10022**  3:6
**10036**  3:15
**105**  12:8
**10th**  58:8 99:9
99:13,20,20
100:3 102:5,13
102:15,18
**11**  19:20 29:1,6
29:10,15,17,18
61:16 62:3,4
62:10,13,13,18
88:15

**110**  12:9
**113**  12:22
46:22 47:8,11
**114**  12:10,23
88:7,16,21,24
**115**  43:2,10
**11501**  134:23
**119**  12:24 87:2
88:11,13
**11:25**  133:2
**11th**  99:14,20
99:21 100:3
102:6,15
**12**  29:6,10,15
29:17 74:9
96:22 109:10
**120**  12:11
59:14,24
**12151**  134:7
**122**  12:13
**1221**  4:4
**123**  12:12
**12:30**  36:3
**12th**  57:21
58:1,8,11
69:10,19 70:6
70:14 99:20
102:6,15
**13**  29:6,10,15
29:17 96:25
98:12 105:15
108:3,4
**138**  122:2
123:15 124:10
**13th**  69:25
70:7,14 94:4
99:20

**14**  30:3,5,14
31:3 76:9
97:23 98:2
99:3
**140**  46:10
**147**  108:25
**14th**  99:20
**15**  30:5 31:3
100:23
**150**  46:10
49:16
**151**  3:14
**156**  65:12
**157**  66:2
**15th**  99:20
**16**  30:5 31:3
101:5,5
**168**  41:23
**17**  1:16 30:5
31:3
**172**  56:15
**18**  30:5 31:4
103:2
**18.48**  99:14
**19**  30:6 31:4
103:19 134:25

**2**

**2**  25:6,7 43:11
46:24 50:9
74:7 87:5 88:8
**20**  31:4 75:25
76:4,19,20,21
77:1 87:7,16
88:1 90:15
99:12 108:8
**200**  49:16
50:10 83:21

**2011**  96:17
**2021**  103:13
**2022**  69:10,19
69:25 106:6
109:4
**2023**  1:16
46:24 47:3
87:3 134:25
**2054**  31:14
**20th**  129:4
**21**  31:4
**21st**  58:5
**22**  16:10 17:15
18:3,13,25,25
19:9,15 31:5,6
**22-10964**  1:3
**23**  12:15 16:10
18:25
**23a**  17:16 18:5
18:25 19:10,20
31:7
**23b**  17:16 18:5
18:25 19:10
20:1 31:7
**24**  31:11 45:11
52:21 127:8
**245**  115:25
**24th**  127:17
**25a**  31:17,18
**25b**  31:20
**26a**  32:10
**26b**  12:20
32:15,16,23
**27**  12:16 129:7
**2700**  3:22
**27a**  32:14,22
33:5

**27b**   33:2,3
**27c**   33:3
**28**   12:17,18
**28a**   12:21 33:7
   33:10,12
**29**   12:19
**294**   107:12,13
**29a**   33:11,14
**29b**   33:14

### 3

**3**   12:15 22:20
   22:25 23:2,15
   23:16 24:4,6,9
   24:10,14
**3.55.**   101:3
**30**   102:19
   129:7
**300**   46:7,9,9
   134:22
**30326**   4:22
**309**   74:8
**30th**   129:24
   132:5,12,18
**32**   12:20 52:4
**33**   12:21 30:18
**330**   134:21
**3332**   27:23
   28:12
**3337**   30:17,19
**35**   34:11
   105:14
**3580**   105:12
**36**   12:5 108:22
   108:23
**3646**   96:9
**37**   36:4

**372**   51:11
**3752**   51:24
**378**   56:14,21
   57:8,14
**3780**   19:1
**38**   19:5,11
   105:14 108:2,5
**382**   61:3
**383**   61:3
**389**   63:12
**390**   63:12
**393**   19:5
**3:27**   46:23

### 4

**4**   12:15 22:21
   22:25 23:2,24
   24:5,10,14
   43:16 50:3
**4.60**   116:14
**4.60.**   116:13,23
**4.77**   100:6
**40**   36:4
**41**   23:8,11
**42nd**   3:14
**43**   108:22,23
**45**   108:5,6
**450**   21:21
**47**   12:22
**47.4**   24:2
**48**   86:12

### 5

**5**   13:13,20 26:5
   94:5
**5,000**   110:6
**500**   41:24
   122:3

**534**   4:13
**555**   3:22
**5:00**   129:4,7
**5:01**   14:1
**5a**   26:4,8,8,9
**5b**   12:16 26:8
   26:14,15,16,18
   26:19,21
**5c**   26:18,20
   27:4,5,6

### 6

**6**   12:17 23:8,11
   27:16,17 28:1
   68:9 94:5
**6.1**   27:9
**60**   94:5
**601**   3:5
**61.2**   24:1
**67**   23:25

### 7

**7**   12:18 19:3
   27:24 28:4,6,7
   28:10,11,17
   40:6 126:24
**71**   68:8 78:18
   79:12 118:17
**72**   43:3,11 46:7
   46:16,18 47:25
   48:3,6 50:23
   51:7,21

### 8

**8**   12:18 16:9
   17:16 28:14,17
   68:9
**80**   51:24 52:1
   55:23

**81**   96:14
**84**   16:12
**87**   56:9
**88**   12:23,24
   56:9

### 9

**9**   12:19 28:18
   29:2 74:8
   126:22
**90**   46:12
**900**   4:21
**90071**   3:23
**91**   12:6
**92**   53:8
**94**   57:8 98:21
**95**   55:23 57:14
   115:22
**950**   4:21
**96**   12:7
**9:03**   1:17
**9th**   46:24 47:3
   57:20 58:1,5
   58:11 88:8,17
   99:19 100:8,13

### a

**aaron**   3:25
**able**   49:13
   98:22 105:24
   130:1
**abonce**   5:22
**above**   103:11
   103:13
**abreu**   5:5 12:8
   105:7,7,8,10
   106:1,4,17,19
   107:3,4 108:18

108:19 110:14
absolute 22:6
absolutely
35:16 72:6
accept 79:3
80:2 93:3
113:23 116:24
acceptable
66:6
accepted 27:9
67:22 111:3
115:22
accepts 113:11
113:14
access 49:17,18
80:1 107:11
accessed
107:11
accident 53:22
55:1,3,4
accomplishm...
72:14
account 95:21
accreditations
42:9
accuracy 67:8
83:9
accurate 55:15
134:4
achieve 67:8
acknowledge
48:6,9 54:22
acquisition
85:20
act 21:24
actual 21:7
53:14 54:21

69:16
actually 23:10
28:12 37:10
38:19 40:9,12
43:22,25 44:15
44:18 45:12
46:9 48:10,18
49:6,20 53:20
54:23,25 55:1
60:15,17 65:2
70:4,18,20
72:11,23 73:11
75:7,14 76:10
79:24 81:16
82:9,16,21
83:12 84:14
85:25 88:10
90:24 93:24,25
94:10 98:8
99:7,9,15,17
99:24 100:14
102:2,7,8,23
104:20 106:23
106:25 109:25
110:8,13
111:11,17
112:7,25 113:3
115:14 116:13
117:25
ad 29:6
adam 17:8
25:8
add 34:6,23
127:5
additional
125:23 128:20
129:2

address 126:10
addressed 31:6
39:21,23
126:22,24
adjourned
132:25
adler 5:23
administrator
131:21
admissibility
14:19
admissible
15:6
admission
33:16,17
admit 18:2
admitted 32:21
33:11
adopt 39:17
adopted 67:20
68:16 111:4,6
111:8
adopting 67:23
adr 131:14
advantage
43:17,18 44:24
93:9
advertising
124:2
advice 38:13
44:17
advisor 89:25
90:7
advisors 90:5
90:17
affect 22:1
114:15,23

115:1
affected
112:17 118:14
affects 114:24
affirm 35:19
afternoon 96:6
aganga 5:24
ago 43:3,11
49:5 72:19
86:12 87:25
91:1
agree 20:12,14
44:5 45:13,13
50:22 51:17,19
51:19 54:6
55:8 64:17
66:23 68:24
70:5,8,24 71:2
71:5,10,13
72:4 74:22
76:4 78:3,6,13
82:3,5,23 83:6
83:7 85:3,6
91:8 96:13,17
96:22,25 97:18
98:2 103:15,16
103:16 122:5
agreed 16:1
20:8
agreements
131:21
agrees 102:7
102:22,23
ahead 14:6
16:5 17:14
18:20 19:13
21:4 23:20

[ahead - argument]                                                            Page 4

36:7 39:2 50:1
52:24 59:2
66:3,18 84:6
96:3 101:1
105:8 106:18
110:19 114:9
114:11 117:5
117:12 120:22
122:20 123:12
**ai** 36:25 37:5,6
48:19,23 49:14
49:19,20,21,23
50:2,3,3,6,17
53:16,19,19
55:5,5,6 60:24
63:9 64:1,1,1,9
65:6,17,21,24
65:24 66:9,13
112:2
**aid** 40:10
**alameda** 89:21
95:2,4,6
**alan** 4:24
**alex** 11:21 32:6
89:2,2,5
**alexander** 4:12
**allow** 43:4 98:7
**allowed** 122:16
**alludes** 109:15
**alternative**
73:25 74:12,19
**amassed** 72:14
**americas** 4:4
**amount** 20:17
20:23 22:10,11
27:6 121:11

**amulic** 5:25
**analysis** 22:21
23:22 36:14,17
36:20 37:2,12
37:17,22,25
38:3 39:6,13
39:17 40:21
42:4 53:14
54:2,8,11,12
54:18,20,21,21
55:9,19 58:2
67:12 71:18
77:13 83:13,16
**analyst** 40:21
84:4 93:11
**analyze** 60:16
**analyzed** 54:24
**andrea** 5:25
**andrew** 6:3
11:7
**andy** 9:11
**angeles** 3:23
**angry** 113:6
**annemarie**
10:7
**announced**
72:6
**answer** 41:12
48:12 51:4,13
56:1 57:23
62:24 68:15
74:11 91:3
98:7 100:11
103:7 104:3
105:25 106:17
108:16 109:22
113:6 115:3,5

115:6 117:22
118:4 119:7,17
119:19,20
**answered**
101:4
**answering**
119:8
**answers** 104:5
**anthony** 7:16
**anticipated**
29:12
**anybody** 96:1
105:6 110:8,16
114:7 117:1,8
119:16 120:18
122:12 123:8
124:18,20
**anymore** 94:12
**apologies**
108:6
**apologize**
108:13
**apology** 64:14
**appear** 16:2
29:6 33:14
**appearing**
119:5
**appears** 27:17
30:22 125:7
**applications**
132:3
**applied** 67:12
**applies** 107:21
**appointed**
90:16
**apportioning**
24:11

**appreciate**
125:15 129:9
132:24
**apprise** 132:6
**approach**
82:10
**appropriate**
18:10 66:14,15
**appropriately**
30:8
**approval**
129:19
**approved**
24:20
**approving**
30:15,16,17
**approximately**
98:21 101:11
**architects**
122:1
**arcos** 9:8
**area** 70:1,10
76:20 80:12
102:10 118:14
120:9
**argue** 91:9
100:15 102:16
104:18 116:2,6
116:8,11,12,14
**arguing** 22:11
22:12 79:16,17
100:17 102:14
**argument**
15:21 23:18
34:20 129:7,12
129:22

arguments 15:14
armand 6:1
arrangements 44:12
arrived 78:19
arthur 105:7
article 32:11
articles 50:11
artificial 45:21
45:23,25 46:3
48:11,12,15,16
48:22 49:9
55:3 59:6,10
59:20 60:4,11
60:21 84:15
artificially 78:7
artur 5:5
ascribe 103:20
104:13
aside 39:12
97:12
asked 14:11
39:17 40:25
49:25 60:16,18
61:11,12 62:3
65:11 121:16
asking 29:15
37:18 44:3
62:10,10,15
65:17,21,25
66:9 70:13
96:7 119:2
120:17
assess 72:16
73:9 75:21

80:23 82:19
assessed 81:16
assessing 49:23
80:19
assessment 38:15 47:25
50:25 51:1,1
54:4,7,14,15
58:23,24,24
67:13,14 69:1
70:21 73:7
75:10 77:24
79:21 80:6,13
81:14 82:12,17
85:10,12 88:2
95:20 97:12
104:15,16,21
105:3 107:15
107:16 108:15
116:7,9,10,20
116:21,25
118:11,13,17
assessments 38:11,14 39:9
67:23 106:14
110:12 111:25
asset 20:2
36:15,21 37:3
37:13 38:1,4,8
38:14 39:13,18
39:24 67:5
78:8,16 103:9
103:10,11
111:9
asset's 55:13
assets 19:17
39:10 40:11

42:6,7,13
assistance 40:10,11
assume 97:4
113:17
assumes 72:25
asymmetry 101:23
atlanta 4:22
attached 50:9
52:1 83:21
attempting 24:15
attorneys 3:4
3:13,20 4:2,11
4:20
attributable 79:13
audience 38:7
audio 22:9
24:13 41:24
49:12
australasia 43:17,18 93:10
australia 36:1
93:11 124:14
125:10
authority 29:19
available 75:17
avenue 3:5 4:4
average 76:2
78:1,19 107:24
108:8
averaged 76:1
averaging 79:11

avery 7:7
avoidance 20:1
aware 61:17
69:2,6 73:19
73:22,24 74:19
81:17 86:4
89:7,8 107:5,8
113:12 121:8
121:16,17
axis 105:18

**b**

b 1:21 12:21
33:5,7,10,11
33:12
back 20:7,15
20:23 21:19
22:6,10,11,13
24:20,25 25:1
28:9 58:16
63:4 65:3
72:22 73:15
74:5 77:25
89:23 90:9,23
90:23 94:1
126:15 128:3
131:16
background 113:3
backwards 127:13,24
bad 60:25
81:12,18,21
94:14
bank 42:19
69:2,6
banker 42:21
42:24 43:18

44:7,11,14,16
44:20 45:1,2,4
45:14
**bankers** 43:23
44:3
**bankman**
49:11 89:18,25
90:16 91:4
92:5
**bankruptcy**
1:1,12,23
21:15 22:3,7
24:20,21,25
**base** 72:14
**based** 14:19
24:8 31:24
73:9 75:12,21
78:16 93:21
114:4 118:11
118:19
**basically** 22:12
23:24 24:9
26:7 27:8,9
45:24 60:18
64:3 70:13
**basis** 124:9
127:8
**bct** 79:18
**becin** 6:2
**behalf** 13:9
14:17 15:3
35:9 124:23
**behlmann** 6:3
**belief** 88:2
**believe** 27:23
28:7 31:6 34:2
35:9,10 69:9

88:1 90:8,20
97:2,6,7,10
107:19 119:14
127:5 128:15
130:8
**ben** 7:3 106:10
**bench** 125:4
**beneficial**
128:17
**berg** 11:10
**best** 67:12
76:22 131:8
**better** 15:20
44:4,17
**big** 50:19
**biggest** 76:11
81:11 119:14
**billion** 40:6
**billions** 95:15
**binder** 52:1
**binders** 35:13
35:15
**bit** 67:11 80:24
86:4 94:14
**bitcoin** 20:15
20:17,21,23
95:15,16 111:5
111:7,14,14,18
111:19
**blochwitz** 6:4
**block** 11:11
**blonstein** 14:8
**blow** 46:25
88:9
**board** 79:6
90:5,7,17

**boards** 91:5
**bob** 117:10
**borrowed**
19:17
**borrowers**
126:20
**bottom** 23:14
23:25 52:8,13
52:15,17,19,21
55:25 56:2,11
56:15 66:4
77:15
**bought** 72:20
**boundaries**
46:1 100:7
107:2
**bowling** 1:13
4:13
**box** 84:17
**boxes** 49:4
**brackets** 30:24
**bradley** 7:13
**bray** 6:5
**break** 41:14
69:18 76:25
79:7 84:8
**brett** 9:24
**breuder** 6:6
**brian** 9:2,13,17
11:8
**brief** 110:21
120:23 126:10
126:23,24
129:2
**briefing** 125:3
126:4,4,8
127:2 128:21

**briefly** 15:16
91:18 96:3
**briefs** 125:23
125:24 129:6
**brier** 3:8 13:6
13:7,8,8,12,16
13:25 14:6,7
14:11,14 15:1
15:5,13,20,24
16:13,16,20,24
17:1,4,8,12,25
18:5,8,13,20
18:22 19:4
22:23 23:3,11
23:15,17,19
25:7,10,12
26:12,15,17,22
26:23 27:15,17
28:22,23 29:5
29:22,25 30:6
30:22 31:2,6,9
31:12,18,22
32:7,10,14,16
32:24 33:1,3,7
33:14,20 34:2
34:18,22 35:3
**brifkani** 6:7
**bring** 59:13
77:20
**brings** 82:7
**broad** 39:8
**broke** 83:5
**broken** 24:6
**brokered**
44:12
**bronge** 14:11
126:17,24

| | | | |
|---|---|---|---|
| **bronge's** 14:17 15:2 | **calculated** 23:23 69:9,12 78:1 | **catalyst** 112:10 | 114:15,19 |
| **brought** 132:15 | **call** 19:21 44:2 | **catch** 53:10,24 53:25 | 115:1,12,23 |
| **brown** 6:8 | 44:6 62:8 | **categories** 131:2 | 116:13,14,22 |
| **bruh** 4:16 | 67:12,16 78:22 | **caught** 49:11 | 122:24 |
| 130:10,12,13 | 81:23 82:18 | **cause** 21:25 | **cel's** 57:21 |
| 130:13,22 | 107:1 120:15 | 115:12 | 58:12 71:16 |
| 131:8,25 132:1 | 125:18 130:14 | **caused** 90:4,8 | 72:24 80:13 |
| 132:1,5 | **calls** 82:11 | 90:9,10,11 | **cell** 71:24 |
| **btc** 79:17 80:4 | **cam** 5:11 | **causes** 90:21 | 101:25 112:17 |
| 80:5 109:3,9 | 114:10 | **caveat** 23:3 | **celsius** 1:7 |
| 109:14 111:11 | **cameron** 7:19 | **cel** 47:14,18,20 | 12:22,23,24 |
| **bullets** 23:17 | **campagna** 6:10 | 47:21 49:5,6,7 | 16:11 19:5,10 |
| **burgeoning** 53:4 | **cap** 70:2 81:5 | 55:20 65:17,18 | 19:16,17,21 |
| **burks** 10:21 | 99:12 100:4 | 66:5,6,15 67:9 | 20:7,9 22:14 |
| **business** 40:3,4 | **capacity** 90:7 | 69:8,9,24 70:6 | 29:20 33:15,16 |
| 40:5 41:21 | **carcamo** 9:8 | 70:15,25 71:3 | 33:21,22,23 |
| **busy** 127:15 | **care** 34:5 56:5 | 71:6,7,8,11,20 | 43:2,10 46:22 |
| **buy** 72:21 | **careful** 105:2 | 72:3,14 73:3 | 47:8,11 51:23 |
| 115:9 | **carl** 6:18 | 73:20,23 74:1 | 59:14,24 86:5 |
| **buyer** 71:20,23 | **carlo** 8:22 | 74:13,22,25 | 87:2 88:7,11 |
| **buying** 104:7 | **carol** 9:14 | 75:4,17,19 | 88:13,16,24 |
| 113:18 | **caroline** 11:4 | 76:13,15 79:16 | 98:22 101:13 |
| **bye** 125:16,16 | 95:10 | 79:16 80:3,14 | 101:14,23 |
| | **carolyn** 7:18 | 86:17 92:8 | 114:25 115:8 |
| **c** | **case** 1:3 3:19 | 93:16 94:3,16 | 115:12,13,23 |
| **c** 3:1 12:21 | 4:1 38:6 39:19 | 96:14 98:21,22 | 126:20 |
| 13:1 33:5,7,10 | 39:24 47:17 | 98:25 101:17 | **cent** 78:19 |
| 33:12 134:1,1 | 48:3 50:16 | 101:21 102:11 | 79:12 |
| **ca** 3:23 | 59:11 60:23 | 103:24,25 | **cents** 94:5 |
| **cahana** 6:9 | 67:7 68:1 69:8 | 104:19,25 | 96:14 102:19 |
| **caitlin** 9:20 | 72:3 73:17 | 105:1,15,22 | 118:17 |
| **calculate** 69:8 | 74:3 78:24 | 107:8,11,13 | **ceo** 93:8,9 |
| 69:24 75:7 | 128:24 | 109:4,14 | **certain** 18:23 |
| 107:24 | **cases** 72:6 | 112:14,20 | 23:23 60:7 |
| | 92:13 126:8 | 113:20,22 | **certainly** 19:12 32:2 125:24 |

[certification - commented]                                    Page 8

certification
  41:2,9,10,13
  41:15
certified  40:20
  40:25 41:10,18
  134:3
chains  122:2
  123:16,21
  124:8,10
challenges
  66:23 67:2
chance  13:17
  72:21 89:15
chang  6:11
change  106:25
  111:15
changed  44:19
  45:10,14 111:8
changes
  106:24 107:20
  111:17 115:14
  125:24 131:20
chapter  61:16
  62:3,4,10,12
  62:13,18
charles  5:22
chart  22:22
  23:10 27:11
  50:10 109:12
charts  22:22
  109:7,7
chase  9:12
chatgpt  50:3
  50:21
cheap  72:21
cheapest
  102:19

check  58:17
  62:19 84:1,2,4
  84:14,19
chingiz  10:22
choose  80:9
  100:2 116:16
chose  76:21
  118:14
chosen  118:9
chris  3:10 6:2
  7:8 8:15 126:1
chrisptoher
  8:24
christiansen
  6:12
christina  6:14
christopher
  6:15 9:22
ciamarone
  6:13
ciancarelli
  6:14
circulating
  106:22,23
  115:22
citations  127:5
cite  84:24
claim  23:22
  83:16
claims  96:18
clarification
  116:17
clarify  76:8
  120:8 124:11
class  111:9,19
classify  114:20

clear  34:16
  39:5 45:10
  50:5 130:25
cleared  131:7
clearly  108:11
clerk  13:2
  35:19 43:7
  117:10 132:9
  132:11,19
clients  38:11
close  50:10
  78:14 117:8
  130:3 131:11
  131:15
closed  72:8
  125:21
closes  94:18
closing  15:14
  76:1 125:23
  127:13 129:6,7
  129:12,21,24
coco  6:15
code  111:12
cofsky  6:16
cohen  32:6
cohost  43:7
coin  79:2,14,15
  81:5 93:25
  94:6,8 110:24
  110:25 111:2,3
  114:24
coins  49:13
  75:19 79:23,24
  102:1 115:14
coleman  11:12
collapse  47:21
  76:16 77:8,11

102:1 114:21
  114:22,23
  115:6,7
collapsed  92:2
collateral
  126:14,19
collect  118:24
collected  46:22
college  25:21
colloquy  126:5
colodny  3:25
  91:13 128:10
  128:14 131:15
  131:16,20
come  26:8
  27:12,21 29:10
  29:15,17 38:11
  53:21 64:3,5
  67:4 75:11
  76:23 77:22
  80:23 87:11
  126:12 128:3
comes  27:8
  29:18,19 39:8
  39:10 83:2
  115:17 119:10
  123:25
coming  25:17
  29:7 34:1
  78:24
comment
  87:24 121:10
commentary
  20:6 23:5,7,8
  25:24 29:13
commented
  121:11

[comments - correct]                                          Page 9

comments
  25:24 85:4
commission
  4:19,20
committee
  3:20 4:2
  125:18 128:5
  128:18 129:1
  130:18
committee's
  124:24
common   24:12
  79:5,20,25
  80:1 85:24
commonly
  80:8
communicati...
  62:12
communicati...
  61:13,14,18
  62:15,16,17
  64:21
compagna's
  27:18,21,24
companies
  41:24,24 42:5
  90:1,17
company   37:8
  101:15 123:21
compare
  111:20
compensation
  121:3
compilation
  46:14
compile   48:13
  48:13

compiled   45:23
  46:2 49:4,7,8
  49:17 50:18,20
complaint   32:4
complete   19:22
  110:7
completed
  47:24 50:25
  127:6
completely
  72:7 97:12
  99:16
completing
  15:10
complexity
  111:13
complicated
  113:5
complication
  57:4,6
composed   55:5
comprehensive
  48:7 50:24
  51:7
compromise
  77:23 80:5
comps   38:3
computer
  98:17
concept   78:3
concepts
  123:21
concerning
  22:21 26:5
conclude   15:9
concluded   16:1
  133:1

conclusions
  125:23 127:11
  128:7 129:2,6
condition
  101:23
conditions
  55:20 57:22
  58:13 129:18
conducting
  55:8
conference
  129:22
confirmation
  2:1 34:9,14
  119:1 126:23
  129:18 132:5
confirmed
  24:24
connect   91:25
consent   24:15
consider   35:11
  55:9 72:13
  79:4,8
consideration
  114:5 118:13
considered
  44:11,14 119:2
considering
  34:13
consistent   56:6
constraints
  109:17
consumer
  130:2
contemplate
  15:9

continued
  99:17
continuing
  14:12 129:20
contract   20:22
  22:14
contracts   40:6
  41:22
contractual
  22:1
contractually
  20:9 21:8,11
contribution
  132:2
control   87:10
  87:11
converts
  104:10
cook   6:17
cooper   11:15
copied   26:13
  63:15
copies   64:21
copy   13:14
  46:23 52:16
  53:15,20,21
  68:9
cornell   4:17
corporate
  72:25 73:16,22
  74:13,19 91:5
  131:22
correct   20:19
  20:24,25 21:17
  29:14 34:21
  36:12,15,21,25
  37:1 39:19,24

[correct - court]                                                        Page 10

| | | | |
|---|---|---|---|
| 39:25 40:3,8 | 78:20,25,25 | 18:7,11,16,18 | 56:11,14,19,19 |
| 41:1,16,17 | 79:9,10 81:3,4 | 18:20 19:2,9 | 56:24 57:4,7 |
| 42:7,8,16,19 | 81:4,5,6,7,10 | 19:18,24 20:4 | 57:10,15,18 |
| 42:20 43:19 | 81:25 83:14,18 | 20:12,14,17,20 | 59:16,25 64:12 |
| 45:11,19,22,23 | 83:19,23,24,25 | 21:2,4,7,7,10 | 64:13,15,15,18 |
| 46:8,18,18 | 84:1,3 86:18 | 21:15,24 22:3 | 64:20,25 66:13 |
| 47:3,4,15,19 | 87:16,17 88:19 | 22:16,19,25 | 66:18 68:10,12 |
| 48:2,5 50:7,8 | 88:20 89:5,6 | 23:7,14,16,18 | 79:12 84:12 |
| 50:11,12,14,15 | 90:2 97:7,9 | 23:20 24:19,24 | 88:12,23 91:12 |
| 50:17,20 51:9 | 99:16 104:13 | 25:4,9,11,13 | 91:14,16,18 |
| 51:11,21 53:8 | 106:10,11 | 25:16,21,25 | 92:3 94:21 |
| 53:9,14 54:9 | 108:3,10 | 26:2,4,8,14,18 | 95:12,18,24 |
| 55:10,17,20,21 | 110:24 120:10 | 26:22 27:2,5 | 96:3 97:24 |
| 56:22 58:3,7,9 | 123:16 126:21 | 27:11,14,16,21 | 98:9,14,19 |
| 58:14,20 59:4 | **corrupt**  72:1,2 | 27:25 28:3,6,9 | 100:11,20 |
| 59:5,8,11,21 | 73:10 | 28:13,16,20,22 | 101:8 102:24 |
| 59:22 60:6,8,9 | **cost**  88:2 | 28:25 29:9,15 | 103:4,6,17 |
| 60:23,24 61:10 | **cote**  6:18 | 29:24 30:1,5,9 | 105:5,8 106:3 |
| 61:15,16 63:7 | **counsel**  64:22 | 30:10,11,18,20 | 106:17 107:3 |
| 63:8,10,11,13 | **countries** | 30:20 31:1,3,4 | 108:18 109:17 |
| 63:14,16,25 | 40:10 | 31:4,8,10,16 | 110:14,19 |
| 65:6 66:1,8,10 | **country**  134:21 | 31:16,20,25 | 112:13 113:8 |
| 66:11 67:2,5,6 | **couple**  13:9 | 32:5,9,13,15 | 113:19 114:7,9 |
| 67:9,10,12,13 | 110:17 129:10 | 32:21,25 33:2 | 114:11 117:1,5 |
| 67:16,18,19,21 | 129:25 131:20 | 33:5,10,19,25 | 117:8,12,20,21 |
| 68:19,20,25 | **course**  19:7 | 34:4,10,12,16 | 118:22 119:6 |
| 69:10,11,13,17 | 42:12 98:20 | 34:21,23 35:1 | 120:2,10,11,18 |
| 69:23,23 70:7 | **court**  1:1,12 | 35:4,14,16,23 | 120:22 121:21 |
| 70:9 71:1,4,9 | 13:3,7,11,14 | 35:25 36:2,6 | 122:10,15,17 |
| 71:12,16,17,21 | 13:15,17,22 | 37:19 38:9,23 | 122:20 123:4,8 |
| 71:22,24,25 | 14:2,5,10,11 | 39:2,20 41:4,6 | 123:12 124:2,5 |
| 73:17,20 74:1 | 14:13,15,21,25 | 43:4,6,8 45:7 | 124:12,18 |
| 74:3,20,23,24 | 15:4,7,18,21 | 47:9 48:19,25 | 125:2,6,12,17 |
| 75:5,6 76:3,5,6 | 15:25 16:5,8 | 49:25 51:2,4 | 125:20 126:7 |
| 77:2,3,5,6,8,9 | 16:11,14,19,23 | 52:3,7,11,13 | 126:18,21 |
| 77:11 78:4,8 | 16:25 17:3,10 | 52:16,22,24 | 127:1,9,14,22 |
| 78:12,13,16,17 | 17:13,19,22 | 55:24 56:3,5 | 127:25 128:12 |

128:17,20,25
129:14,25
130:4,11,20,25
131:9,12,25
132:4,6,10,14
132:20,24
**court's**  74:8
**courtney**  10:21
**courtroom**
15:10 124:21
125:7
**courts**  36:22
117:19
**craig**  10:6
**crash**  105:1
**create**  27:3,11
111:16
**created**  27:13
42:14 49:13
111:2
**creditor**  13:24
22:4 105:7
117:4 123:11
**creditor's**
23:22
**creditors**  3:21
4:3 20:7,8,10
21:23 22:1,5
23:24 24:12
25:2
**crews**  5:11
12:10 114:8,9
114:10,10,13
**crisis**  113:25
**criteria**  69:1
**critical**  98:8

**criticize**  86:25
121:15
**criticized**
121:12
**criticizing**
86:23
**cross**  12:3
13:13 35:2,3,9
35:12 36:9
91:20 96:4
105:9 110:22
114:12 120:25
122:21 123:9
123:13 124:19
125:7
**crucial**  110:11
**crypto**  20:10
21:5,9,23
22:13 27:7,10
38:19 52:6
53:2 67:23
72:15,16,17
73:2 78:11,24
80:17 93:24
97:4 113:18
115:9 119:19
122:1
**cryptocurren...**
53:5 114:16
115:2
**cryptocurrency**
20:6 21:22
37:3 38:12
66:20,24 67:2
67:21 68:17
69:4 78:7
101:25 111:6,8

111:16,20
113:11 114:17
**cunha**  6:19
**currencies**
113:14
**currency**  20:20
80:21 111:18
113:23 114:1
**current**  14:14
93:7
**currently**
42:14 85:18
94:17
**custom**  4:12
**customer**  73:6
73:11
**cut**  117:12
120:2,3 124:12
**cycle**  99:21

**d**

**d**  12:1 13:1
**d'antonio**  6:20
**daily**  109:3
**daken**  11:12
**dalhart**  5:19
12:13 122:13
122:16,19,19
122:20,22
123:3,5,6,8
**damage**  78:21
**dan**  8:9
**daniel**  5:9
**darious**  7:12
**data**  45:25
46:3,19 49:7
49:22 54:7
55:6,7 58:2,25

60:7 70:1,18
70:19,21,21
72:1 73:9 76:7
76:19 77:10,12
77:14 79:9
81:2,3,5 82:15
82:20,23,25
83:12,12,13
85:11 86:21
87:1 93:22
99:5,23 100:18
111:25 121:6
**date**  59:1 65:19
66:7,16 69:13
69:14,25 70:6
70:7,15,23,24
71:2,3,8,9,12
71:20 73:12
75:3,12,13,21
77:14 85:10
92:1,10 93:17
98:25 101:12
101:18 102:4,6
103:21,24
104:12 109:5
114:1,5 116:12
116:22 127:20
132:16,17
134:25
**dates**  54:24,25
58:2 92:4,9
96:15 105:16
**daubert**
124:25
**david**  5:3,19
5:23 7:7 8:8
9:8 10:15,25

122:19
davied 6:21
davis 5:7 12:7
51:24 61:15,17
61:24 62:7,17
91:25 96:2,2,3
96:5 97:25
98:1,11,12,16
100:12,20,22
101:10 102:24
102:25 103:1,8
103:17,18
day 16:17
75:25 76:1
117:6
days 46:13
47:16 48:14,22
55:12 76:2,4,9
76:9,19,20,21
76:24 77:1
108:9
deal 70:11
deals 41:25
deanna 43:4,8
120:2 132:10
132:16,20
debt 21:12
debtor 1:9 3:4
13:9 21:14,18
21:21 23:23
24:7,11,15
125:17 128:5
debtor's
124:24
debtors 14:16
21:10 22:1
23:21 24:16,17

35:9 60:22
61:23 64:21
124:23,23
125:19 126:2
128:8,18,25
130:17 132:22
deceptive
85:22
decide 117:20
decides 73:3
decision
119:25,25
120:16
declaration
27:18,22 34:19
35:2 81:12,13
96:8,13,18,23
98:3
declined
103:24
decreased 70:6
70:9,15
deductions
118:19
deep 38:14
83:17
definition
131:3
degree 40:1,2,3
40:4,7,8,9,19
41:15
degrees 40:14
deliberate
55:16
delved 83:16
demand 19:21
20:10 98:23

demands 20:10
21:5 24:17
department
4:10
depending
24:8 38:18
depends 24:22
40:23 82:1
deploy 38:12
38:12
deposed 14:22
deposited 20:7
20:21,24 21:9
21:14
deposition
14:8 15:10,11
43:14 45:24
47:5 58:16
63:6 68:1,6,9
74:3 79:21
86:9 90:6
derek 6:4
derive 38:19
described
98:24
descriptions
84:7
design 60:15
123:21
designed 122:2
123:15,17
124:10
designs 111:13
desk 128:2
detail 85:8
details 77:17
117:24

determination
87:23
determine
21:11 66:6
77:16
determined
21:8 22:4
determining
54:17 65:18
66:15 85:12
96:20
developed 49:9
67:17 112:24
developing
123:22
development
36:24 37:18
42:15 123:20
developments
13:5
diaz 6:23
dietrich 11:20
difference 24:6
50:19 64:7
82:20,23
different 24:16
31:17 44:13
49:5 50:6,7
78:3 79:17
88:6 111:19
127:20
differentiate
78:14
difficult 97:22
difficulty
96:19

difiore 6:22
digital 19:17
  20:2 36:15,21
  37:13 38:1,3,8
  38:14 39:10,13
  39:18,24 40:11
  40:17,17,18,22
  42:6,7,13 67:5
  78:15
dimitry 5:1
  13:24 14:3
diplomas 40:4
direct 12:3
  61:13,23
disagree 51:14
  51:16 86:18,19
  86:20,22
disagreement
  28:22
disclosure
  22:24 23:5,12
  28:12,14,19
  33:8 130:23
discovery
  60:22 63:7
  65:7
discrepancies
  109:17
discrete 130:17
discuss 129:20
discussed
  31:23 62:9
  118:12 131:13
discussing
  59:21 82:2
  122:4 130:17

discussions
  62:8 131:11
dislocate 95:16
dislocated
  69:21 70:3,11
  70:12,17,19,20
  70:22 73:10
  76:12,13,16
  77:4,7 82:11
  82:11,13,14,22
  82:24 92:25
  93:2,6,22
  95:23 96:19
  99:1,4,5,6,7,10
  99:15,18,18,21
  100:1,5,5,15
  100:17 101:22
  102:5,7,12,13
  102:14,18,21
  102:22 103:10
  103:14,23
  104:14,17,19
  104:20,23,24
  105:20 106:11
  106:12,13,15
  106:21 107:2
  107:21 110:10
  114:17 115:10
  115:15,21
  116:1,6,6,9,15
  116:23 118:13
dislocation
  80:12 92:22
  99:9 100:2
  114:15,21
  115:1,20
  116:12

display 43:2
disproportio...
  114:15 115:1
dispute 81:24
  83:8
disrupted
  98:23
distinct 64:12
  83:17
distinguish
  36:23
distribute 26:6
distribution
  26:6
district 1:2
divided 76:1
dixon 6:24
  33:4
doable 48:16
docket 14:17
  19:1,4 30:25
  31:14,14 34:9
  51:24 56:20
  96:9
document 18:1
  18:15 19:12
  27:23 28:11
  30:17 32:18
  43:13 51:11
  54:13 59:9,14
  87:19 105:12
  105:14 108:2,3
  108:5,21,22,23
  128:11
documents
  13:13 18:23
  30:12 32:19

61:13 131:22
doe 6:25
dogecoin 92:11
  92:12,13,15,17
  92:21 110:24
  111:21 113:10
  113:15
doing 22:3
  43:25 44:1
  47:20 55:1
  60:3 71:18
  84:11 112:15
  123:23,24
  129:12
dollar 27:6
  116:18
dollars 27:9
  40:6 95:15
  116:4,20,23
donald 9:21
double 53:21
  76:13,16 77:4
  99:8 104:24
doubt 20:1
  58:21
dow 5:13 117:3
  117:3,5,6,13
  117:14,15
  118:23,25
  120:6,7,18
draft 45:21
drew 11:16
drop 100:8,13
dropbox 59:4
due 21:25
  22:13

| | | | |
|---|---|---|---|
| **duffy**  7:1 11:16 | **effort**  132:24 | 64:19 | **equivalent** |
| **dump**  49:22 | **efforts**  37:18 | **emergence** | 20:17 |
| **duplicative** | 40:15 | 129:18 | **eric**  5:15 |
| 19:7 | **ehrler**  7:5 | **emphasis**  24:4 | 120:20 |
| **dynamic** | **eight**  28:25 | **employed**  95:4 | **error**  53:10 |
| 107:20 | 48:1 51:10 | **employment** | **errors**  51:17 |
| **dynamics** | 87:25 90:25 | 93:7 | 51:21 54:1 |
| 106:24,25 | **eighty**  56:8 | **endeavoring** | 58:16,17,20 |
| 110:7 112:22 | **either**  27:7 | 130:6 | **especially** |
| 119:12 | 31:23 127:4 | **ended**  77:1 | 41:21 43:25 |
| **dzaran**  7:2 | **elected**  27:9 | 110:9 | 44:23 82:5,13 |
| **e** | **election**  26:6 | **endemic**  78:10 | 103:22 127:16 |
| **e**  1:21,21 3:1,1 | **elementus**  81:7 | **ends**  97:9 | **essential**  55:9 |
| 12:1 13:1,1 | 81:17 83:3,9 | **engage**  63:6 | **essentially** |
| 134:1 | 121:8 | **engages**  85:4 | 15:8 17:16 |
| **eades**  7:3 | **eleven**  29:17 | **english**  94:14 | 21:19 |
| **earlier**  83:20 | 30:1 | 119:15 | **estate**  21:10 |
| 115:17 127:3 | **eligible**  19:17 | **enjoy**  121:18 | 39:12 |
| **early**  48:22 | 20:2 | **enter**  129:14 | **esther**  9:5 |
| 49:3 | **elizabeth**  8:6 | **entered**  23:2 | **estimate**  24:8 |
| **earmarked** | **elle**  10:24 | 26:19 28:1,17 | **eth**  109:3 |
| 20:21 | **ellis**  3:3 13:9 | 29:2 32:23 | **ether**  20:23 |
| **earth**  93:14 | 35:8 124:22 | 33:12 47:11 | **ethereum** |
| **easier**  122:24 | 126:2 | 88:13,24 | 109:4,9,14 |
| **east**  4:21 | **ellison**  95:10 | **entire**  19:12 | **evaluation** |
| **ecf**  56:20 | **elon**  92:19,21 | 47:25 50:25 | 39:23 42:10 |
| **eckhardt**  7:4 | 93:2 111:22 | 67:1 79:19,23 | 46:1,2 52:6 |
| **economic** | 112:3,6,17,19 | 104:16 114:24 | 67:9 |
| 101:16 | 113:14,15 | **entirety**  18:9 | **event**  63:6 |
| **economics** | **elvin**  11:1 | **entities**  44:13 | 92:22 105:22 |
| 38:14 40:8,9 | **email**  61:10,14 | **entry**  43:17 | 106:7 114:15 |
| 41:21 | 63:9,15,19 | 65:14 66:4 | 114:18,18,19 |
| **ecro**  1:25 | 64:4 | **envisioning** | 114:20,21,23 |
| **editing**  51:11 | **emailed**  61:9 | 128:10,14 | 115:1,15,20 |
| **effect**  115:10 | 63:4 | **equity**  24:12 | **events**  83:24 |
| **effectively** | **emails**  60:25 | 27:7,10 | 115:21 |
| 21:22 78:1 | 63:22,23 64:5 | | |

everybody
  105:4 124:15
  128:3
evidence 15:9
  16:11 18:9
  19:5,6,8,10,11
  19:13 23:1,2
  25:17 26:17,18
  26:19,25 27:12
  27:19,19,25
  28:1,3,16,17
  29:1,3,25 30:2
  30:7 31:23,25
  32:2,17,20,23
  33:11,13 47:8
  47:10,11 59:24
  60:1 88:11,12
  88:13,22,23,24
  118:5 125:21
  125:25
evidentiary
  15:15
exact 32:18
  67:5 77:18,22
  92:1 96:20
  117:24 118:9
exactly 17:1
  22:6,9 23:11
  23:19 45:3,12
  79:15 82:9
  86:10 87:8
  92:5,6 109:15
  113:17
examination
  13:13 35:2,10
  35:13 36:9
  91:12,20 96:4

  105:9 110:22
  114:12 120:25
  122:21 123:13
examine 14:22
  96:1 110:16
  123:9 124:19
  125:7
examiner
  84:25 85:2,5
  86:17,23 87:15
  90:14 91:4,6
examiner's
  86:5,13,25
  90:25
example 18:3
  32:3 94:2,4
  103:12 115:16
excellent 14:14
  15:20
except 39:7
  115:4
excerpt 19:12
  19:14
excerpted
  18:23 30:24
excerpts 18:1,5
  18:10 30:13
  31:24 33:8
exchange 4:19
  4:20 112:23
exchanges
  112:24 118:3
exchanging
  130:15
exclude 63:5
excluding
  37:17

exculpated
  131:6
exculpation
  130:16,18
excuse 28:5
  119:8
exhibit 13:12
  16:8,9,12 17:5
  17:6,14,15,16
  18:24 19:5,11
  19:15,20,25
  22:20,21 23:2
  23:15,16,24
  24:4,5,6,9,10
  24:10,14,14
  25:4,5 26:4,5
  26:19 27:16,17
  27:23 28:1,4,6
  28:7,10,11,14
  28:18,21 29:1
  29:13 30:14
  32:23 34:5
  43:2,10 46:22
  47:8,11 50:9
  51:24 55:23
  56:17 59:14,24
  83:21 87:2
  88:7,11,13,16
  88:21,24
exhibits 12:14
  13:19,20 16:7
  17:22 18:25
  19:9 22:17,25
  25:5,7,13,15
  26:2 28:17
  29:2,5 33:12
  34:21

existed 111:1
exists 100:15
expected 20:8
experience
  40:5,16,23,24
  41:20 42:1,3
  66:14 85:14,16
  103:3,9,22
expert 35:11
  36:11 45:18
  47:16 51:25
  62:11,11 98:24
  105:11,12
  117:19 119:2
  119:14,15,22
  119:23 120:9
  120:14 124:10
expertise
  119:10,10,11
  119:13
experts 119:14
explain 60:13
  104:23 113:5
explained 45:5
  45:24
explaining
  92:6,7
expounded
  118:19
expressed
  131:4
extensive 40:5
  40:16 41:20
  127:2
extensively
  41:25 111:22

extent 27:19
29:23 31:25
external 37:3
38:7 40:23
92:25
extraction 59:6
59:20
extremely
117:23
extrinsic 94:11
94:11,12,13
97:7 103:11
eyes 87:16

**f**

f 1:21 9:25
87:11,11 134:1
fabsik 7:6
face 21:25
fact 21:12 24:5
32:3,17,18
38:6 82:9
87:14 89:24
107:10,11
118:19 125:22
127:3 128:6
129:1,5
factor 92:25
factors 112:4
facts 32:1
127:11
factual 85:4
86:5
fahey 7:7
fair 36:14,17
37:20,21 38:8
53:14 54:2,4,6
54:11,12,14,14

54:18 55:8
58:12 60:10
62:14,25 64:17
65:2 67:13,14
68:24 69:1,3,8
69:9,12,24
70:5,21 76:23
77:18 79:21
80:7,13 82:12
82:16 84:21,22
85:5,6,9,12
104:15,16,21
104:21 105:3
106:14 107:15
107:17 115:20
116:7,9,10
118:11,12,16
fairest 105:4
fairness 61:21
faith 84:4
fake 49:13
false 43:21
familiar 92:11
92:12,19 94:25
95:2
fantastic 15:24
far 29:13 38:24
103:13
faraj 12:4
15:11 35:5,10
35:17,23,25
36:9,11 39:5
43:14 46:4,23
47:2,13 48:6
50:5,23 51:2,2
51:7 59:3 60:3
61:6 63:13

64:13 68:2,14
86:1 88:17
91:20,22 93:7
94:25 96:4,6
98:19 100:11
101:8 105:9
106:18 110:22
114:12 117:16
119:1 120:25
121:2,23
122:21 123:13
123:15 124:3
124:14 125:8
faraj's 43:10
51:25
feasibility 39:8
february 87:3
87:25
fed 60:15 61:10
federal 117:19
119:5,5 120:10
120:11
feed 21:22
feel 120:8
126:9
ferraro 7:8
ferry 4:21
field 119:16
120:14
figure 70:14
105:15,21
106:5 107:24
107:25 108:1,3
108:4,12
109:10,10
figures 81:20

file 14:17,18
29:21
filed 13:12,20
14:1 31:14
47:16 131:23
filing 16:16,20
17:6 18:13,23
30:10
filings 30:9
final 53:23
90:12 119:1
125:3 131:15
finance 40:1,2
44:1
financial 36:18
37:23 40:20
42:12 44:12
101:23 103:22
111:10
find 29:11
77:17 82:6
87:11 119:16
finding 86:16
findings 85:5
86:5 125:22
127:3,11 128:6
128:13 129:1,5
fine 15:7
122:25 123:1
finish 34:24
45:1 48:11
95:12 100:11
finished 47:19
47:21 99:6,7
finishes 99:8
firm 42:17
81:2

**first** 16:2,2,8
25:14 33:20
38:6 39:16,16
39:21,22 41:14
53:4,7 59:18
60:14,18,20
64:4 77:9
81:16 89:9
91:25 92:2
101:11 105:11
105:12 107:19
110:1,24,25
111:3,6,7
119:3 122:1
**fist** 90:10
**fit** 113:1
**five** 51:12
78:23 79:4
80:9,10 86:14
100:7 113:5
116:4
**fix** 89:15,22
90:3
**fixing** 90:11
**flaherty** 11:17
**flannigan** 7:9
**florence** 7:9
**flower** 3:22
**follow** 14:18
47:14,17
113:13 115:6
130:14
**following** 61:5
82:14 109:12
111:22
**follows** 115:4

**font** 46:15
**footnotes** 23:9
**foregoing**
134:3
**forensically**
46:22
**forgive** 94:14
**form** 21:13,14
24:12,16 30:17
129:19
**formal** 37:12
37:22 41:14
**formally** 39:21
39:23 73:23
**format** 53:16
**forms** 32:10
85:22
**fortune** 41:24
**foundation**
26:12,24 29:8
29:23,24 30:3
31:19 32:11,24
93:12
**foundational**
83:13,15
**founder** 93:13
**four** 31:12
116:19,20,23
**frankly** 124:8
128:23
**free** 121:18,19
**friday** 129:3,6
**fried** 89:18,25
90:16 91:4
92:5
**frishberg** 5:9
12:9 110:17,19

110:20,23
112:13,16
113:8,9,19,21
**front** 48:17
90:9 96:9
107:13 116:21
130:5
**froze** 98:17
**frozen** 71:1
**ftt** 109:4,8
**ftx** 47:21,21
49:6 92:2
94:25 95:4,7
114:21
**full** 51:1 94:1
**function** 38:18
40:12 111:15
**functionality**
111:10
**functions**
80:21 118:6
**funding** 95:6
**funny** 64:3
**further** 19:19
49:18 76:19
104:22
**future** 71:16
72:3,24 75:20
101:15 113:25
114:5

**g**

**g** 13:1
**ga** 4:22
**galka** 7:10
81:12,13,17,22
81:23,25 96:18
96:22 98:2,11

105:11 108:2
109:19
**galka's** 96:8,13
96:17
**gamble** 72:16
**gamestop**
103:12,13
**geary** 7:11
**generate** 46:17
48:7 50:14,18
50:23 51:8
59:10 63:9
**generated** 46:2
50:16
**georgia** 9:15
**gergi** 8:10
**getting** 127:7
131:5
**gheorghe** 7:12
**giardiello** 7:13
**gist** 80:15
**give** 14:21 25:1
30:18 35:20
38:13,15 40:9
51:12 52:19
56:13,18 57:1
62:24 68:14
74:11 77:22
81:20 89:15
92:3,10 94:1
96:10 98:16,17
108:14 115:5
115:15 117:24
118:4,24
122:24 127:25
132:15

**given**  55:6 73:5
73:7 80:17
87:24
**giving**  38:16,17
115:5 117:16
**glad**  102:3
**glenn**  1:22
**glitch**  22:9
24:14 41:25
49:12
**global**  41:23
93:9
**globally**  40:7
**go**  14:5 16:5,21
17:14,20 18:20
19:13 21:4
23:20 25:4,13
36:7 38:13,20
39:2 41:7
43:11 46:24
48:25 50:1
52:24 53:17,19
55:23 56:25
59:2,18 60:10
60:14,18 61:2
62:19 65:11,12
65:23 66:3,18
72:9,21 73:6,7
74:5 75:20
76:11,18,19,20
77:16 80:4
81:19 84:6,14
87:5 88:8
90:14,23 91:7
93:22 96:3
99:17 100:1
101:1 102:20

105:1,8,14
106:6,18
108:21 109:24
110:19 114:9
114:11 116:7,9
116:10 117:5
117:12 120:22
122:20 123:12
126:9,15
**goes**  99:7,9,25
108:7 112:9
**going**  14:22,24
15:8,9,18,18
15:21 16:6
17:17 25:17
30:12 32:21
35:17 37:17
45:6 48:25
49:1,2 51:7
54:13,21 56:2
56:10,12 57:2
57:13 59:17
65:3,3 68:11
72:7 74:7,8
75:14,17,18,19
85:14 86:3
93:3 94:3
97:16 102:19
102:20 104:22
110:4 119:16
119:16 121:14
121:15 124:12
125:2,3 128:12
128:21 131:16
**gonzalez**  7:14
**good**  13:3,8
36:6 70:18

76:21 83:12
91:22,22,24
96:6,6 98:6
110:8 117:6
118:15 126:1
126:13
**gorrepati**
11:18
**gotten**  41:21
**governance**
44:2
**government**
29:19 44:13
**governments**
40:10
**grace**  3:8 13:8
**grade**  80:6
**grammar**
60:25 65:6
**granted**  73:8
**graubert**  7:15
**great**  132:19
**green**  1:13
4:13
**greene**  7:16
**greg**  8:7
**gregory**  9:25
**ground**  40:12
**grounds**  26:12
31:19
**group**  43:17,18
44:24 93:9
**grows**  94:8
**growth**  38:20
**guarantee**
118:1

**guess**  16:6 23:3
91:22
**guided**  45:25
**guilty**  32:19
**gundersen**
7:17
**gurland**  7:18
**guthrie**  7:19
**guy**  77:20
89:19
**guys**  82:18

**h**

**h**  8:6
**half**  51:15
**hamilton**  4:12
**hand**  35:13,18
68:10 90:14
**hands**  119:12
**hanna**  10:19
**hans**  10:4
**happen**  71:24
93:4,18 97:16
**happened**  73:4
92:7 105:22
**happens**  71:13
85:18 106:21
114:18 116:1
**happy**  16:21
17:1 35:13
127:23
**haqqani**  7:20
**hard**  26:23
29:7 31:23
76:14 104:18
110:2
**harnessing**
83:17

| | | | |
|---|---|---|---|
| **harrison** 11:19 | **high** 72:18,22 | 52:9,20 56:1,9 | **house** 4:12 |
| **harsh** 8:4 | 75:15 94:1,5,7 | 56:22 57:1,3,9 | **housekeeping** |
| **he'll** 14:22 | **higher** 93:23 | 57:11,12 59:23 | 13:9 129:10 |
| **head** 93:8,12 | 104:25 | 64:14,16,23 | **hu** 63:13 65:14 |
| 93:12 | **highlight** 17:18 | 66:17 88:10,21 | 66:4 |
| **header** 56:23 | 65:14 66:4 | 91:11,13,15 | **human** 64:2 |
| **heaps** 123:25 | **highlighted** | 94:23 95:9 | **hundred** 46:19 |
| **hear** 14:2 | 17:18 | 98:7,16,20 | 63:14,17,20 |
| 15:21 25:17 | **highlights** 18:6 | 104:4 110:18 | 64:10,17 69:23 |
| 61:20 64:25 | 25:15 | 113:6 114:8 | 71:13 72:7 |
| **heard** 16:3 | **history** 55:10 | 117:3,14 | 82:3,23 96:24 |
| 112:19 120:12 | **hit** 76:12 | 118:24 119:8 | 97:8 100:16 |
| 123:19 124:8 | **hittelman** 7:24 | 120:20 124:4 | 122:3 |
| **hearing** 2:1,1 | **holcomb** 7:25 | 124:25 125:14 | **hurt** 89:21 |
| 47:9 59:25 | **hold** 16:14 | 125:19 126:1,3 | 90:23 |
| 89:9 120:13 | 17:19 85:25 | 127:15,18 | **hussein** 12:4 |
| 127:17,19,21 | 127:25 129:3 | 128:8,10,15,22 | 36:9 91:20 |
| 132:12,17 | 132:14 | 129:9 130:15 | 96:4 105:9 |
| **hearsay** 17:12 | **holder** 71:8 | 130:22,23 | 110:22 114:12 |
| 29:6 31:18 | **holding** 117:18 | 131:8,17 132:1 | 120:25 122:21 |
| 32:12,24 33:4 | **hon** 1:22 | 132:8,23 | 123:13 |
| 33:18,24 | **hone** 55:19 | **honor's** 88:14 | **hybrid** 2:1 |
| **heavily** 89:21 | **honest** 111:24 | 127:24 | **hyde** 2:25 |
| **held** 43:17 | **honestly** 67:22 | **hope** 72:10,10 | 134:3,8 |
| **help** 38:25 | 108:13 115:3 | 72:12 73:4 | **i** |
| 90:10,24 118:5 | 117:21 | 84:13 125:9,16 | |
| 121:5 122:7,8 | **honor** 13:6,10 | 130:22 | **i.e.** 20:2 |
| **helped** 125:16 | 13:23,25 14:7 | **hopefully** | **idea** 36:6 58:19 |
| **helpful** 127:12 | 15:1,13 16:4 | 129:21 | **identified** |
| **hernandez** | 16:13 17:25 | **hour** 48:3 | 131:1 |
| 7:22 | 19:4 22:23 | **hours** 36:5 | **identify** 122:15 |
| **herrmann** 7:23 | 27:15 29:5,14 | 43:3,11 45:11 | 122:17 130:11 |
| **hershey** 7:21 | 29:22 31:6,22 | 46:7,13,14,16 | **immanuel** 7:23 |
| **hex** 109:4,7,11 | 34:22 35:10 | 46:18 47:25 | **immediate** |
| 109:14 | 36:1 39:3 41:5 | 48:6,18 50:23 | 19:22 |
| **hi** 123:10 | 47:7 48:21 | 51:8,11,21 | **immediately** |
| | 50:2 51:3 52:2 | 86:12,14 127:8 | 69:13 |

**impact**  55:16
  78:12
**important**  99:3
  106:20 129:23
**impossible**
  48:14 51:20
  67:8 78:14
  97:12
**inadmissible**
  14:19
**include**  17:22
  73:19 131:23
**included**  30:23
  59:6
**includes**  54:7
**including**
  34:14 42:13
  61:13,15
  123:23
**inconsistent**
  109:19
**incorrect**  58:13
  58:14
**increase**  72:18
  75:14
**increased**
  101:17
**increases**  72:11
  104:20
**indica**  102:12
**indicative**  99:2
**indicia**  101:22
**indicted**  89:7,8
  89:10 126:4
**indictment**
  32:6

**indiscernible**
  13:20 18:17
  22:12,22 26:1
  26:9 33:22
  35:20 37:14,15
  40:7 42:16
  48:10,12 58:25
  61:19 62:5,22
  68:11 69:16
  71:14 72:19,20
  75:9,11,12,18
  75:18 76:14,17
  76:23 77:21
  80:4,21 81:20
  81:21 83:5
  84:11 85:2,11
  85:16,21 86:2
  86:15 87:1,4
  88:1 89:12,12
  89:13,20 91:7
  91:17 92:2,6,7
  92:16 93:5,11
  93:13,21 94:1
  94:8,15 96:12
  96:17,18 97:2
  97:9,11,13,17
  97:20,21 98:21
  99:11 100:4,6
  100:10 101:12
  101:13,16,19
  102:15,16
  103:20,21,21
  103:23 104:4,9
  104:12 105:2,3
  105:13,20,21
  106:6,9,13
  107:6 109:1,2

  109:12 111:18
  111:25 112:7,8
  112:8,24 115:7
  115:18 116:4,8
  116:25 117:11
  118:18 119:11
  120:1 123:23
  123:24 124:1
  126:15 131:24
**individuals**
  42:5 130:24
**industry**  41:3
  41:21 45:6
  76:4 78:25
  79:19,25 80:8
  80:19,20,20,22
  90:9 93:4,24
  119:11,13
  121:25 122:1,4
  122:6,6,9
  124:7
**inflate**  78:7
**inflated**  70:2
**influence**  79:1
  79:2 80:2
**information**
  29:20 48:13,14
  49:3,7,16,17
  49:21 53:19
  60:7 73:6,8,11
  75:12,16,20,22
  81:19,24 83:2
  83:9,11,17
  84:15 101:19
  101:23 114:2
  115:18 117:17
  119:17 130:15

**infrastructure**
  39:9 123:22,25
**inherent**  66:23
  67:2
**initial**  63:24
**initially**  63:1
**inside**  38:19
  85:8 90:21
  107:1 110:12
**insider**  115:16
  115:16,18
**insights**  55:13
  55:15
**instance**  77:9
**instances**
  131:2
**institution**
  41:16
**instructions**
  60:4
**instrument**
  36:18 37:23
  103:22
**instrumental**
  55:12
**instruments**
  42:13
**intelligence**
  45:21,23,25
  46:3 48:11,13
  48:15,16,23
  49:10 55:3
  59:6,10 60:4
  60:11,21 84:16
**intend**  13:13
**intention**  83:4

**internal** 37:18
50:13
**internally**
59:14
**international**
44:1,1
**internet** 33:24
62:1
**interrupt**
106:17 132:11
**interruptions**
120:4
**intrinsic** 37:13
37:23 65:17
69:7 70:25
71:3,6,7,14
93:24 97:9
103:14
**introduce**
54:20
**introduced**
32:10
**introducing**
51:21
**introduction**
52:6 53:1
54:19
**investigating**
47:21 49:5,6
92:8
**investigation**
47:20
**investment**
42:19,21,24
43:18,23 44:3
44:6,7,11,14
44:16,20,25

45:2,3,14 69:2
69:6
**investor** 97:3,5
97:19
**involved** 42:4
**islamic** 93:12
**issue** 21:20
23:14 47:22
53:15 62:25
75:18 76:12
79:16 82:6,8
90:21 97:8
99:6 104:18
109:23 111:14
126:12,22
129:23 130:17
131:19
**issued** 47:2
129:11
**issues** 47:14,18
63:21 126:10
126:11 130:5
130:16,21,23
131:5,12
**issuing** 90:15
**item** 129:15
**items** 13:9 32:2

**j**

**j** 5:23 6:15,18
11:24
**jacobs** 8:1
**jail** 91:8,8
**james** 25:10
**janell** 7:4
**janko** 8:2
**jankovic** 8:2

**january**
103:13
**jaoude** 8:3
**jarno** 11:10
**jasleigh** 7:11
**jasmine** 6:1
**jason** 5:17
123:10
**javier** 10:11
**jeff** 9:23
**jeffrey** 3:17
**jivani** 8:4
**job** 43:25 48:1
48:3 110:8
**joe** 9:1
**joel** 11:11
**john** 7:2
**johnson** 8:5
**joint** 124:25
128:11,12,19
**joke** 111:2
**jonathan** 10:9
**jones** 8:6
**jose** 9:7
**joseph** 6:20
**joshua** 4:8
**journey** 72:13
**joyce** 8:21
**judge** 1:23
39:18,24 96:2
102:25 105:7
106:1 117:10
118:5 119:24
119:24 132:9
**judge's** 120:15
**judicial** 30:21
31:5,17,21

32:1,5 34:8
**judicially**
28:23 30:8
**judson** 6:8
**july** 69:25 70:7
70:14 94:4
**jump** 72:17
**june** 57:20,21
58:1,5,8,8,11
58:11 69:10,19
70:6,14 99:10
99:13,14,19
100:3,3,8,14
102:6,13,19
**justice** 4:10

**k**

**kaczkowski**
8:7
**kahn** 8:8
**kaila** 11:9
**kaitlyn** 7:24
**kaplan** 8:9
**karen** 1:25
**karolina** 10:3
**kass** 8:10
**kathryn** 7:17
8:20
**katie** 11:5
**kaufmann**
11:13
**kaza** 8:11
**keeney** 8:12
**keep** 104:19,22
**keeping** 20:22
**keith** 4:7 9:19
**kenneth** 7:5

kept 20:22
kevin 6:16 9:10
key 78:11
keyan 10:23
khai 10:1
khezri 8:13
kind 20:2 21:6
  29:12 106:10
  111:1
kirkland 3:3
  13:8 35:8
  124:22 126:2
kirsanov 5:1
  12:6 13:19,23
  13:24 14:3,4
  91:15,16,17,19
  91:21 94:24
  95:9,14,19,25
kitra 6:9
klorane 8:14
knauth 11:20
knew 43:24
know 14:22
  26:23,25 29:22
  30:11 32:17,20
  34:12 43:24
  44:4,5,16,20
  45:1,3 53:18
  54:4 67:22,25
  67:25 72:1
  74:2,12 80:11
  82:1,18 84:20
  86:12 91:6
  92:1,9 93:2
  94:3,8,16 97:3
  97:21 98:9
  99:23 102:8,18

104:4 106:14
108:1,13
109:14 110:10
112:1,2,6
113:16 117:21
118:2,2,4,6
120:15 124:13
124:14,14
125:9 126:8
127:15,18
130:15
knowing 114:2
knowledge
  111:1
knowledgeable
  117:23
known 80:8
knows 90:9,9
  97:5 99:24
  122:9
koenig 3:10
  8:15 126:1,2
  126:17,19,22
  127:7,10,15,23
  128:8,16,18,22
  129:9,15 130:3
  130:8 131:10
  131:14,18
  132:7,22
kohli 8:16
kordomenos
  8:17
koster 8:18
kouly 8:19
kuethman 8:20
kuhns 8:21

kuhrt 8:22
kwasteniet
  8:23
kyle 6:5

**l**

l 7:6 8:17 9:21
la 41:15
lackey 8:24
lafayette 6:17
language 60:25
large 41:22
  111:21 121:11
largest 123:22
late 16:17
lauren 10:17
law 125:23
  127:11 128:7
  129:2,6
lawyer 74:2
lay 117:17
layla 9:18
layne 8:25
lea 8:14
learn 46:2
  60:16,17 93:16
leave 65:3
  102:20
leaving 46:15
ledanski 2:25
  134:3,8
ledger's 56:19
lee 5:17
left 61:6 70:25
  128:2
legal 134:20
legitimate
  78:15

lehrfeld 9:1
lennon 9:2
leonard 9:3,4
letting 125:15
level 112:9
levine 9:5
lexington 3:5
licari 9:6 120:1
  120:2
lie 51:12 62:23
  84:10,11 88:4
  92:3,10
likely 103:25
  131:22
likewise 40:11
limit 78:21
  79:1 80:1
  127:1
limited 29:20
  61:15 126:6,25
  128:23
line 60:10,10
  60:13,13
lines 68:9 74:8
link 29:18
linkedin 43:2
  43:10 45:10
links 84:1,14
  84:14
liquidate 74:14
liquidated
  74:22
liquidation
  22:21 23:22
  24:2 74:1,13
  74:20

**liquidity** 85:20
107:17 113:3
**list** 13:12 14:7
18:2,24 123:24
130:5 131:23
132:15
**listen** 51:4
113:12
**lists** 61:8
**litigation** 131:5
131:21
**little** 38:24,25
41:4 67:11
80:24 86:4
94:14
**llc** 1:7
**llp** 3:3,12,19
4:1
**loan** 19:16,22
**loaned** 20:3
**loans** 19:21
**located** 35:25
**lock** 107:16
115:16
**locked** 87:6,11
87:15 90:15
91:4,6 107:8
107:10,14,14
115:12,14,23
**long** 44:18 49:4
72:19 104:5,7
113:7 122:2
124:7 125:10
129:11
**longer** 46:4
107:17

**look** 13:17
41:19 43:16,24
46:21 52:4
55:6 56:23,25
63:12 68:8
70:9 72:18
75:10,14 76:8
76:18 77:14
79:22,23 80:6
80:7 84:24
88:6 104:20,23
107:12,15,16
107:18 112:21
115:3 121:12
132:14
**looked** 70:1,2
70:10,18 81:10
81:11,15 82:21
118:15 122:2
**looking** 18:3
55:24 56:10,12
57:16,17 73:12
73:12,13 82:16
88:15 108:1
131:15
**looks** 23:8
31:13 32:11
109:25
**lopez** 9:7 43:1
43:5,6,9 45:16
46:21 51:23
55:22 59:13
61:2 64:11
65:3 66:20
68:22 87:10
**los** 3:23 9:8

**lot** 32:7 39:9
41:22 43:24
44:4,16 46:19
49:7 60:24
62:23 76:25
80:15 82:2,4
85:6 92:8,18
104:22 112:4
113:15 126:7
129:8
**loud** 98:19
**love** 89:15
121:25 122:4,6
**loved** 89:2
**lowest** 100:19
**lu** 12:12 123:10
123:10,12,14
124:6,12,16,17
**lucas** 7:25
**luke** 10:20
**luna** 76:16
77:7,10 105:1
105:22 114:14
114:22
**lupu** 9:9

---

**m**

---

**m** 8:23 9:10
10:12 11:13
**machine** 64:9
**maciej** 10:5
**made** 16:17
19:21 80:4,5
86:17 91:1,1
110:9,11
**madison** 25:10
**major** 53:13
101:25 114:17

114:18,19,21
114:22,23
115:11 123:23
**make** 17:19
37:10 39:5
53:13 54:1
55:15 69:18
80:14 87:24
91:2 94:10
108:15 129:3
129:21
**makers** 79:18
93:4 112:5
118:3
**makes** 60:12
80:14 86:5
104:21 113:15
119:25
**making** 78:10
78:22 79:6
80:9,16 85:20
85:22,22,23
121:11
**man** 52:15
56:8 57:11
**manipulate**
85:17
**manipulated**
57:22 58:13
69:21 78:19
79:9 85:13,19
**manipulates**
92:25
**manipulation**
55:16 78:6,12
78:16 79:13
85:18 86:6,17

95:20,22 112:9
**manipulators**
 112:5
**manus** 9:10
**marginal**
 118:15
**maribel** 8:17
**mark** 4:16 9:3
 10:8 130:13
 132:1
**marker** 79:6
**market** 24:9
 38:20,21 49:14
 49:15 55:20
 57:22 58:13
 69:15,15 70:2
 70:4,11,12,17
 70:19,20,22
 72:20 73:10
 76:8,12,13,16
 76:21 77:5
 78:6,10,22
 79:14,18,23
 80:4,5,9,12,14
 80:14,17 81:5
 82:11,12,14
 85:13,18,19,22
 85:22,23 86:6
 86:17 90:13
 92:25 93:1,2,4
 93:5,6 95:16
 95:20,22,23
 96:19 98:25
 99:4,6,7,10,12
 99:18,19 100:4
 100:5,5,15,18
 101:21,22

102:1,5,7,11
 102:12,13,14
 102:18,21,22
 103:3,9,10,14
 104:14,19,21
 104:24,24
 105:20 106:11
 106:13,15,21
 106:24,25
 107:2,21,21
 110:5,7,10
 112:3,5,5,5,7,9
 112:9,22,25
 113:4 115:4,10
 115:19 116:1,6
 116:9,15,23
 118:3,13
**markets** 76:12
 82:13 85:17
 99:1,15 100:1
 101:19 103:23
 106:13
**marks** 9:11
**marsh** 9:12
**martin** 1:22
**mashinsky**
 32:3,6 89:5,6
 89:10,24 90:16
 91:4
**masumoto**
 9:13
**material** 62:2
**materials** 59:4
**matter** 1:5
 49:5 77:19,20
 77:21 110:3,3
 112:21

**matthew** 10:18
**maunder** 9:14
**max** 7:10 81:12
 81:13,14,17,21
 82:9,20,21,22
 96:8,13,17,22
 98:2,11 100:15
**max's** 82:5
 86:20
**maximum**
 89:23 116:3
**maza** 4:24
**mccammon**
 11:21
**mccarrick** 3:9
 12:5 35:8,8,24
 36:7,8,10 39:3
 39:4 41:8 43:1
 43:5,9,12 45:7
 45:9,15,17
 46:21 47:1,7
 47:12 50:1,4
 51:6,23 52:4,9
 52:12,18,23,25
 55:22 56:1,4,7
 56:9,12,16,22
 57:1,5,9,12,16
 57:19 59:13,17
 59:19,23 60:2
 61:2,4 64:11
 65:2,5 66:18
 66:19,22 68:8
 68:13,21,23
 74:7,10 87:10
 87:13 88:10,14
 88:18,21,25
 91:11 94:20

95:17 98:12
 100:10 118:21
 124:22,22
 125:5,19
**meadow** 9:15
**mean** 41:2,9
 44:23 46:11
 48:16 57:23
 72:15 73:6
 82:22 88:3
 89:21 91:2
 92:4 93:22
 97:4,11 109:25
 110:2,4 111:9
 111:10 113:2
 113:15 116:5
 120:12,13,15
 123:25 126:11
**meaning** 64:12
**means** 64:8,9
 82:14 83:2
 92:24 97:13
 99:4 106:22
 115:5 116:14
 117:25
**meant** 25:20
 45:3
**mechanism**
 112:12
**meghji** 9:16
**meme** 110:24
 110:25 111:2,3
**memorize**
 81:18
**memorizing**
 81:21

mendelson
5:15 12:11
120:20,20,22
120:23 121:1
121:22 122:10
122:11
mendieta 9:17
mention
109:16
mentioned
124:9 129:16
129:17
message 62:22
messages 61:13
61:14,24 62:20
met 92:8
metadata
48:17,18
metalabs 93:9
method 65:18
66:5 67:17,20
68:16,24 75:24
methodologies
65:9 110:13
119:20
methodology
58:24 65:8
66:15 67:11,14
70:19 77:25
82:8 85:1
102:14 107:23
108:7 110:1
116:11
mg 1:3
mia 11:15
michael 7:14
7:15 8:3

microphone
117:9
midpoint 24:2
mike 8:5 10:10
milliga 9:18
million 21:21
87:7,16 88:2
90:15 107:12
107:13 115:25
mind 94:6
121:13
mineola 134:23
minor 114:19
114:20,20
115:11
minute 51:15
107:14 125:3
minutes 113:5
mira 7:20
missed 84:18
99:24
missing 85:7
110:4
mistake 54:22
58:5 108:15
110:9,11,11
mistakes 53:13
mo 9:16
model 36:25
37:5,7
modeling
40:20
mohsin 9:16
moment
118:24 128:1,4
129:16 132:15

monday 129:2
129:7
money 113:15
113:17 115:7,9
121:12
month 101:11
months 87:25
91:1
morgan 10:2
morning 13:3
13:8,18 91:22
91:24 96:6
126:1
motion 124:25
motivation
121:23
move 25:25
47:8 59:23
63:5 88:11,21
99:4 112:7
113:4 132:16
132:17,18
moved 80:11
113:2
movement
76:8 80:10
99:1 111:25
112:10
movements
78:15,16
125:25
movers 112:5
moving 112:3
112:11,25
127:22
multifacets
40:5

multiple
126:12
musk 92:19,21
93:2 111:23
112:3,6,18,19
113:14,15
muted 117:10

**n**

n 3:1 12:1 13:1
134:1
name 96:6
122:17,19
123:10,18
names 81:13
81:18,21
nathaniel 8:25
nations 17:8,13
25:8,18
navis 48:22
50:13
ne 4:21
near 48:7,9
50:23
nearly 67:8
necessarily
21:6
necessary 85:2
need 30:11
58:22 61:5
72:13 77:16
116:9 120:11
132:21
needed 77:17
85:10
needs 131:2,6
negative
101:14

negotiate
    41:25
negotiated
    41:22 131:13
neighbors
    112:1
network  1:7
    29:20 33:15,16
    47:23 69:16
    89:3 93:8
neutralize
    55:16
never  36:11,14
    36:17,20 37:2
    37:12,22,25
    38:3 39:13
    42:17,19,21
    89:2 99:6,8
    109:20 117:20
    122:14 124:8
new  1:2,14 3:6
    3:15 4:5,14
    13:5 25:15
newco  21:22
    23:25 33:22
news  49:18
    101:13
nicole  9:4
    10:17
night  13:4,12
    91:22
nine  28:20,25
    46:13 48:18
noah  10:12
non  40:17
    116:5

noon  14:9
note  13:19
    124:24 129:15
notes  126:16
notice  30:11,21
    31:5,17,21
    32:1,5 34:8
noticed  30:8
notices  30:17
november
    127:16,21
    132:5
noyes  9:19
nugenesis
    48:22 49:9
    50:13 81:2
    93:8
number  18:15
    30:18,25 33:15
    33:23 34:9
    52:13,15 56:17
    56:20 57:5
    59:4 76:2,10
    76:10,11,22,22
    77:1 103:19
    116:17
numbers  26:21
    52:7,16,18,19
    55:24 76:7
    109:18
nuraldeen  6:7
ny  1:14 3:6,15
    4:5,14 134:23

o

o  1:21 13:1
    134:1

o'connell  9:20
oath  68:4
object  17:12
    23:6 26:12,24
    26:25 29:5,8
    31:18 32:11,24
    33:4,16,18,24
objecting  23:9
objection  14:5
    17:13 19:6
    22:23 23:11
    25:11,16 26:14
    26:15 27:14,20
    30:1 32:3,13
    32:18 33:8,25
    34:9 47:9
    59:25 94:20,21
    95:17 118:21
    121:20 123:2,2
objections
    14:18,20 15:3
    15:12,16,19,22
    16:17,21 33:5
    34:14
objectors
    129:5
obligated  20:9
    21:19 22:14
obligation
    24:16,17
obligations
    22:1
obtain  38:17
obviously
    127:2
october  1:16
    46:24 47:3

88:8,17 129:3
    129:6,7 132:18
    134:25
offer  22:17
offered  62:11
    85:5 89:25
    107:23
offering  24:15
    35:12 38:7
official  3:20
    4:2 39:20
oh  32:16 36:2
    52:9 57:13
    108:6 123:3
okay  14:5,10
    15:19,25 16:6
    16:19 17:15,21
    18:19 19:14,18
    19:19,24,25
    20:4,5 21:2,7
    22:20 23:18,21
    24:23 25:3,5
    25:14,19,23
    26:9,20 28:3
    28:11,16 29:1
    29:4,11,17,18
    30:14 31:1,10
    32:21 33:10
    34:15 35:1,4
    36:23 37:12,16
    37:22 38:15,25
    39:12 40:14
    41:6,18 42:3,9
    45:10,15 46:4
    46:15 49:3
    50:22,25 51:14
    52:3,11 53:23

54:6 55:2,8
56:3,24 57:7
57:15 58:15
59:3,16 60:20
61:17,21 62:14
62:25 63:24
64:7,11 65:12
65:14,25 66:2
66:12,19 67:14
67:24 68:8,21
69:24 74:5,17
74:22 76:25
77:25 79:3,5,7
80:15,24 86:8
87:2,14 88:6
89:14 90:12
91:3,10 93:18
98:6 99:2
102:3 103:14
103:20 104:3
105:13 106:5
106:20 108:6
108:21 109:9
111:21 112:2
115:3 119:1,7
121:23 122:15
122:20 124:2,5
125:12 127:9
128:3 129:15
129:25 131:9
132:19
**old** 134:21
**ombudsman**
130:2
**omissions**
109:21

**omnibus**
127:17 132:12
132:17
**once** 14:16
15:13 24:19
58:23 70:20
107:16 112:25
115:14 116:1,6
**ones** 31:13
123:19
**ongoing** 78:10
**onwards** 46:20
**open** 15:16
49:18,20,21
50:2,2,3,17
54:3 84:3
105:11 130:5
131:4,12,18
132:7
**opened** 37:6,9
**openings**
129:10,17
**operate** 79:24
**opinion** 38:7
90:21 98:24
114:14,25
117:18 122:23
**opportunity**
113:2
**opposed** 27:10
**optimize** 90:23
**option** 19:21
72:8
**oral** 62:15
**orally** 16:25
**order** 29:12
30:14,16

129:11 132:23
**orderly** 24:1
**orders** 30:8
**organic** 78:15
78:19
**original** 106:24
106:25
**originally**
24:21
**otis** 61:15 96:2
96:7
**otto** 5:7
**ought** 127:1
131:1
**outset** 31:9
**outside** 37:7
79:1 80:2
**outstanding**
15:15
**overruled** 14:5
**oversimplify...**
123:1
**overwhelmin...**
101:14
**owed** 21:12
**own** 15:3 50:13
83:13 112:23
112:23,24
118:2,3
**owned** 118:2,3

|       **p**       |
**p** 3:1,1 7:21
13:1
**p.m.** 13:13,20
46:23 59:3
129:4,7,8

**paces** 4:21
**page** 12:14
18:13 23:8
43:11,16 46:7
46:19,24 50:10
51:11,15 52:4
52:8,8,10,13
52:21 55:23
56:2,4,14,21
56:23,25 57:8
57:14 59:18
60:15,18,20
63:12 65:12
66:2 68:8 74:8
83:21 87:5
88:8,15 105:14
108:2,21,21,22
109:13 110:6
**pages** 18:25
46:9,9,10,12
46:15 49:16
61:3
**paginated**
59:15
**pagnanelli**
9:22
**paid** 121:2,4,8
121:16,17
**panic** 115:8
**paolo** 6:13
**paper** 41:11
42:1 43:24
119:11 127:25
128:24
**paragraph**
53:4,7,7 57:17
108:25

**paragraphs**
54:5
**parameters**
92:24
**paramount**
55:19
**pardon** 107:7
**part** 19:2 23:10
50:7 54:12,13
54:18,20 62:12
62:13 72:25,25
78:18 85:12
99:21 104:12
112:11
**partial** 19:22
21:18
**participated**
122:14
**parties** 30:9
37:19 40:17
97:2 125:20
129:23 131:24
**partner** 41:23
93:14
**parts** 97:1
104:3
**party** 37:3 39:6
39:11,14,15
**passed** 101:11
**past** 45:11
47:22 106:10
122:14
**paste** 53:15,20
53:21
**pasted** 26:13
53:16 63:15

**patel** 11:14
**patience** 119:9
**patricia** 11:3
**pattern** 118:19
**patton** 9:23
**paul** 6:6 7:6
**pause** 59:1
65:19 66:7,16
69:13,14 70:6
70:23,24 71:2
98:25 101:18
101:20 102:4,6
102:11 105:16
114:25 115:12
115:24 116:12
**pavon** 32:6,19
**paying** 97:14
**payment**
113:11,23
**pdf** 43:11,16
46:24 52:5,10
52:13 55:23
61:3 63:12
65:12 87:5
88:8 105:14
108:5,6,23,23
**pdfs** 59:17
**peer** 37:7
68:25 120:11
120:12
**peers** 41:10,13
41:19 42:5
**people** 27:7
44:2 64:8
67:23 72:17
80:14 81:19
85:23 89:20,22

90:23 92:5,8
94:10 97:20
107:12,18,19
113:3 115:17
121:5 122:3,3
130:25
**perceive** 44:25
45:2
**perceived**
44:22
**percent** 23:23
23:25 24:1,2,4
24:5,10 47:19
48:5 59:22
63:14,17,20
64:10,17 69:23
71:13 72:7
78:23 79:4
80:9,10,11
82:3,23 96:24
97:8 98:21
99:12,13,14
100:6,7,16
115:22
**perfect** 15:24
84:10 109:24
**performed**
37:2 39:13,18
**performing**
58:2 71:19
**period** 55:7
69:16 70:4
72:1,2 73:13
73:14 75:16,17
75:23 76:9
104:17 107:9
108:8,11

118:14
**permit** 19:11
**perry** 9:24
**person** 39:17
39:22 61:15
97:5 115:8
**person's** 94:6
**personal** 88:2
90:21
**personally**
67:17 81:10
84:2
**perspective**
111:10,11
**pesce** 9:25
**peter** 7:2 11:24
**petition** 59:1
69:25 70:7,15
71:3,8,9,12,20
75:3,11,21
77:14 85:10
93:17 96:14
101:12,18
103:21,24
104:12,13
106:21 109:5
114:1,5 116:13
116:22
**pham** 10:1
**phenomenon**
103:12
**phillip** 8:13
**phoenix** 10:2
**phone** 62:8
**piasek** 10:3
**pick** 116:16

picture 26:10
piece 41:11
  42:1 43:23
  119:10
pietro 9:6
pinpoint 67:8
piss 87:18
  90:15
plan 23:25
  24:20,22 34:9
  131:23
platform 48:19
  49:20,25 50:14
  69:3 71:1
  101:16 115:9
  115:13,23
platforms 243
  115:11
pleaded 32:19
pleadings 31:4
please 16:5
  43:6 63:18
  65:13 81:15
  94:14 117:9
  118:24 119:7
  122:18
plenty 41:13
  41:22 93:10
plethora
  117:17
plus 46:7 48:3
  83:21
point 18:11
  24:3 30:22
  73:6,7 75:6
  82:7 85:25
  87:24 94:9

96:22,25 97:20
97:23 98:2,12
99:3 100:19,23
101:5,5 102:19
102:23 103:2
103:19 109:20
125:21
pointed 58:15
points 76:7
polzmacher
  10:4
poor 111:11
portion 79:12
portrayed
  82:20
position 18:8
  19:6 21:24
  30:6 71:19
  121:14 122:7
positions 89:25
  93:10
positive 73:10
possession
  98:22
possible 21:13
  21:20,21 76:24
  106:2
post 26:10
  47:21 62:1
  105:16 106:21
  116:22
posted 46:23
  59:4 62:2
potential 71:16
  71:20 94:7
poynter 9:21

practice 79:25
  80:1 85:24
  117:25
prczek 10:5
pre 69:19
  105:16 131:7
precedent
  129:18
predict 49:15
prepare 51:20
prepared 17:2
  36:14,17,20
  37:12,17,22,25
  38:3 39:6
  127:10,19
  128:6,9
preparing
  48:20 50:6
  81:10 84:24
  119:3
present 5:21
  16:8 127:19
presented
  24:14
presenting
  16:7
pretty 83:12
prevented 63:1
price 55:16
  58:2 74:25
  75:7,9 78:1,3,7
  78:15 79:13
  93:17 99:2
  103:10,23
  107:24 108:8
  109:3

prices 76:1
principal
  122:5
privacy 130:2
privileges 43:3
pro 5:1,3,5,7,9
  5:11,13,15,17
  5:19 13:24
  14:4 89:2
  105:7 114:10
  117:3 120:21
probable 104:1
probably
  46:12,13 92:2
  92:4
problem 76:14
  79:15 90:8,10
  94:23
problems 90:3
  90:11
procedure
  30:15
procedures
  30:16 131:14
proceed 35:14
  35:24
proceeding
  120:4
proceedings
  61:16 62:7,18
  64:15 133:1
  134:4
process 21:25
  90:1,18
produce 61:12
  64:18,21

product 118:8
  119:3
productive
  131:10
professional
  41:15 42:9,10
  66:14
profile 43:2,10
  45:11
progress
  129:21 130:7
project 38:12
projects 41:23
  123:23
promoted
  111:22
promptly
  15:23 132:25
proper 65:22
  101:19 110:5
  116:3 124:13
property 20:6
  20:8,11 21:6,9
  22:2 39:7,9,12
  126:20,20
proposal 15:1
  15:14 128:19
propose 14:16
proposed 18:2
  38:19,20 73:16
  73:23,25 74:20
  125:22 127:3
  127:11 128:6
  128:12 129:1,5
proposition
  38:17 44:6
  110:10

proprietary
  36:25
protect 110:8
provide 39:23
  55:13 60:7
  95:9
provided 81:24
  83:2,9
providing 42:4
  60:3 121:18,24
provision
  101:24
provisions
  130:24
public 39:22
  39:23 50:10
  101:14
publicly 59:3
  69:3,6
published
  58:25
pull 51:23 88:7
pump 93:5
purport 23:4
purpose 39:20
  118:8,9
purposes 34:18
  38:9,10 54:11
push 132:4
pushes 82:12
  82:16
put 22:6 24:21
  24:25 29:13
  30:23 43:23
  55:22 58:21
  60:25 74:25
  75:7,9 84:16

87:2 91:8
  95:22 97:11
  102:3 126:7
puts 111:13
putting 71:19
  110:2

q

qualification
  40:13,24 41:1
  41:2 118:1
qualifications
  41:12
qualified
  117:18 120:8,9
question 39:7
  45:1 51:4,5,5
  64:25 68:14
  74:11 78:11
  86:1,3 90:13
  95:12,18 97:24
  97:25 98:6,8
  98:15 103:7,17
  105:24 107:22
  108:16,18
  113:22 117:22
  118:22,23
  119:18,19,20
  122:12,14
  123:7 124:13
  126:14
questioning
  101:14
questions
  15:15 37:16
  95:24 96:7
  100:20,21
  102:24 105:6

107:3 110:15
  110:17 112:14
  113:8,10,20
  114:7 117:1,2
  120:6,17,19
  122:10 123:4
  124:16 129:10
  130:1
quick 104:4
  122:23
quickly 109:23
quite 130:3

r

r 1:21 3:1 13:1
  134:1
r&d 36:22,22
  37:14 93:9
  117:25,25
  123:20
raise 34:13
  35:17 93:20
  130:23
raised 18:3
  93:17 102:10
  126:23,24
rakesh 11:14
random 76:10
  76:10,22 77:1
randomness
  76:6
range 69:21
  79:2 82:16
  130:20
ranges 80:7
rasile 10:6
rather 18:2
  127:20

ratio  27:9
99:12 100:4
rational
101:16
ratios  70:3
ravi  8:11
reaction  63:24
read  17:17
25:15,21,23
46:5 84:9,17
98:8,12,14,18
98:19 99:24
100:23 101:2,6
101:6,8 103:4
103:6 109:2,22
109:23 116:17
reading  63:23
98:9 101:3
ready  16:20
real  39:12 94:4
reality  47:25
realize  22:10
24:7 112:3
realized  63:21
116:22
really  44:18
82:6 92:14
94:13 98:6
99:3,3 102:3
105:23,23,25
110:8,13
112:14 113:12
121:12,25
reason  51:14
51:16 76:22
93:19 101:17
112:11

reasonable
97:3,5
reasons  77:7
111:5,21
rebuttal
125:18
receive  21:23
22:10,13 121:3
received  95:6
121:4
receiving  20:7
recess  14:13
recollection
74:9
record  15:16
34:18 50:5
98:13,14
100:24 103:6
127:4 134:4
recovery  22:12
23:22,23 24:1
24:4,5,7,10,11
recross  12:3
124:20
redirect  12:3
14:23
reduce  46:11
78:23
reduced  99:19
106:22,23
reduces  21:22
refer  19:12
106:5
reference  74:8
88:14
references
120:12

referencing
18:14
referred  102:8
referring  31:2
102:5 109:7
refers  64:6
105:21 109:20
reflects  59:9
refresh  74:9
regard  61:16
regarding
101:23 130:17
regardless
116:2
regards  40:11
119:18
regenerate
93:13
registration
129:19
reilly  10:7
11:22
related  62:3
107:22 109:16
113:18
relates  33:17
release  130:16
130:24 131:5
released
131:24
relevance
62:10
relevant  62:7
85:8,9 93:15
112:14
relied  59:1

rely  58:23
remaining
71:11 75:4
remember
62:22 81:22
86:10 87:6,7,9
87:14 88:20
112:1
reorganization
73:1,16,19,22
74:1,13,20
90:1,17
repayment
19:22 20:1
repeats  53:7
repetitive
87:19
replied  64:4
replies  33:15
33:18,19 64:3
reply  33:21,22
60:24 61:1,5
61:11 63:18,20
63:24
report  13:4
35:11 45:18,19
45:21 46:5,7
46:16 47:17
48:7,20 49:15
50:7,9,16,18
50:19,20,24
51:8,18,21,25
51:25 53:23
55:1 58:20
59:7,10,20
60:14,15 62:11
65:10 67:1

81:7,10,22,23
81:25 82:3,5,6
82:7 83:3,5,10
83:22 84:24,25
85:2,3,7 86:5
86:13,20,25
87:18 90:15,25
95:20 96:10,11
98:24 99:24
105:11,12
109:15,19,22
109:23,24,25
110:1,2,5,6
121:2,9,24
**reporter**  14:15
**reporters**  92:6
**reports**  46:1,2
60:17 69:3,7
105:13 121:18
**representation**
76:21 101:15
**representative**
54:11,17 57:21
58:12
**representing**
118:20
**represents**
105:15
**request**  19:16
51:25 63:2
**requests**  60:23
61:8 65:7
**require**  40:10
**required**  29:21
**requires**  24:18
119:12

**requiring**
109:18
**research**  36:24
37:18 42:15
89:21 95:2,4,7
123:20
**reserve**  63:5
**resolution**
130:21
**resolve**  15:17
130:1,6
**resolved**  130:8
**respect**  31:3
119:24
**respective**  90:1
**respond**  60:22
65:6
**responding**
63:1
**response**  63:9
101:18
**responses**
33:23
**rest**  37:16
129:23
**rested**  125:20
**restore**  72:22
**restoring**
47:23 89:3
**restructure**
73:5 97:15
**retraces**
106:10
**return**  19:17
20:9 21:19
24:18 90:23
94:7 121:4,5,7

**returned**  20:11
21:6,13 22:13
**returns**  21:18
89:23 109:3
**review**  53:10
53:20 80:25
**reviewed**  43:13
80:25 81:2,5,7
**reviewing**
53:23
**reviews**  120:12
**rickie**  6:11
**rid**  107:20
**right**  13:4
14:21 16:5
19:9 20:22
22:6,6,8,16,25
25:3 26:3,18
27:25 28:13
30:20 31:1,5
31:16 32:9
33:10,25 34:5
34:17 35:4,5
35:16,18,23
36:6,8 37:6
39:2,16 42:7
43:1,7 46:17
46:21 47:5,13
47:18,24 49:12
50:9,24 52:14
53:1 54:1,8,12
54:24 55:22
57:7 58:19
59:13 60:5,12
61:2,9,18 62:8
63:2,5,12 64:2
65:7,25 69:22

69:25 70:5,16
70:23 71:20
72:5,14 73:1
73:15,25 74:14
76:2,17 78:1,6
79:13 80:18
81:17 83:8,16
84:9,20,23
85:13 86:3,12
86:22 88:12,23
89:1,7 90:5
91:5,14 97:8
110:1 111:19
112:22 114:19
117:12 122:5
123:22 124:20
125:6,12,17,20
125:21 126:17
128:25 129:3
132:20
**rights**  22:4,5
**riki**  8:19
**rise**  13:2 93:20
**road**  4:21
134:21
**robert**  6:10,12
11:13
**roberto**  7:22
8:1
**robinson**  10:8
**rodriguez**  10:9
**role**  44:15,16
44:23 45:8
73:20,23
**roll**  115:11
**rolling**  115:10
127:8

roni   32:6
room   4:13
ross   8:23
row   63:22
rule   15:18,18
   15:22 80:13
   93:1 94:13
   104:24 125:3
ruled   70:4
run   84:15
ryan   11:23

**s**

s   3:1,17 9:2,13
   13:1
sabin   3:17
safe   20:22 80:8
   100:14 115:5
safest   105:3
safety   100:9
saikh   10:16
sales   55:9
sam   10:13
   49:11,13 89:18
   92:5
sami   10:16
sample   58:12
samuel   7:21
sarkissian
   10:10
satoshi   111:12
satoshi's
   111:12
saw   44:17 94:4
saying   42:15
   54:19 63:4
   64:3 77:1
   80:16 82:2

85:19 99:4,22
100:16 102:2,4
104:19 116:19
says   19:20 20:1
   24:7 53:1
   54:13 56:20
   57:20 61:5
   73:4 82:21,22
   87:6 88:1 93:2
   97:3 99:6
   101:20 102:7
   105:18 109:10
   113:1 119:24
sbf   89:15,22
scale   41:22
scam   49:12
schedule   15:8
   127:16,20,24
   130:14
scheduled   14:8
   127:16 132:18
schiffrin   10:11
schneider   5:3
   12:15,16,17,18
   12:19,20,21
   16:2,3,4,6,16
   17:7,11,14,15
   17:21,23,24
   18:4,15,16,17
   18:18,19,21
   19:9,13,14,19
   19:25 20:5,10
   20:13,14,16,19
   20:25 21:3,5,5
   21:9,12,17
   22:8,18,20,25
   23:2,20,21

24:19,23 25:3
25:5,14,19,23
26:1,2,3,5,9,13
26:16,19,20
27:2,4,6,13,22
27:23 28:1,2,5
28:7,11,15,17
28:18,21 29:2
29:4,9,11,17
30:4,14,19,23
31:9,15 32:23
33:12,17 34:6
34:7,11,12,15
34:17,24,25
schneider's
   16:9 18:22
   24:15
schottenstein
   10:12
schramm
   11:23
schreiber
   10:13
scope   78:21
scott   7:1 11:17
screen   101:24
   105:23,25
   106:1 108:14
   108:20
se   5:1,3,5,7,9
   5:11,13,15,17
   5:19 13:24
   14:4 105:7
   114:10 117:3
   120:21
sealed   32:6

seated   13:3
   128:3
sec   129:19,20
second   14:21
   16:14 18:16
   52:20 56:13,18
   57:2,17 60:20
   70:24 87:5
   96:10 98:16,17
   101:20 104:12
   105:13
section   19:20
   27:18 52:5
   67:1
sections   83:5,6
   83:6
securities   4:19
   4:20
security
   103:10
see   19:18,24
   20:4 23:8,24
   47:14 48:1
   49:4,22 52:5
   53:2,5,17,18
   53:19 55:6
   57:20,24 60:19
   61:6 63:18
   65:19 66:7
   74:9 89:1,2,3
   89:16 90:21
   105:18 106:7,8
   107:22 108:7
   108:11,15,17
   108:20,25
   109:6,7,9,10
   113:22,24

132:25
seed 95:6
seems 82:9
117:6
seen 44:18
77:16 86:19,20
104:1
segar 10:14
select 54:23
65:7
selected 54:7
54:25 69:19,20
69:22 76:5
selecting 54:10
selection 55:12
sell 122:25,25
selling 95:15
113:18 115:17
send 123:24
131:16
sending 63:22
64:5
senes 10:15
sent 64:4
sentence 57:24
89:14
sentiment
115:4,6
serban 9:9
series 87:3
109:3 113:4
seriously 64:15
server 62:25
63:21
service 16:9
17:3,4,17 18:6
18:9 19:3 21:9

21:11 24:18
set 14:15 15:14
setting 39:12
39:22,23
seven 28:25
56:8 76:9
86:14,14
several 102:1
severely 99:1
shara 4:17
share 43:6
57:21 106:1
sharing 43:3
117:16
sharon 5:13
6:25 117:3
sheet 56:16
shia 93:12
shift 115:19
shock 101:25
short 76:9
99:17 100:17
100:19 103:12
should've 58:4
58:4
show 54:3
124:10
showing
101:21 102:11
shows 23:25
24:9,11 29:20
109:2
sickles 10:17
side 46:10
62:25 84:7
signature
134:7

significant
101:22
silverman
10:18
similar 129:13
129:14
similarly 25:1
31:12 32:16
simon 6:24
33:3
simple 123:1
simpler 86:4
simson 10:19
single 42:12
53:17 69:2
79:14,15,22
84:3 86:16
97:4 104:25
sir 18:21 21:1
21:17 22:18
28:15 40:1
51:17 54:1
65:2 87:22
101:1
siren 129:16
sit 49:3 63:6
sitting 58:19
62:8 79:11
84:20 86:16
87:22 99:12,13
99:14
situated 25:2
31:13
six 28:9 48:1
sleep 125:9
slip 56:16

slippage 57:5
slow 39:1 41:5
41:7 49:2
slowly 38:24
38:25 41:4
49:1 101:9
103:6
small 101:24
105:23 108:14
108:20
smartass 63:19
63:21,25 64:1
64:2,8
smith 17:9
25:8
software 59:10
60:4,22 112:2
solemnly 35:19
solicitation
30:15,16
solutions
134:20
solvency
101:15
somebody
26:10
sonya 2:25
134:3,8
soon 127:18
132:25
sophisticated
97:19
sorry 13:23
14:3 25:19
28:5 32:16
36:22 39:7
41:5 49:2 50:2

51:3 52:9
57:13,23 58:7
59:2 69:15
72:23 81:12,14
83:11 85:2
87:5 89:11,20
93:21 95:23
100:13 101:24
103:5 104:14
108:6 109:22
123:3 124:4
132:11
**sort** 18:2
125:25 127:24
131:6
**sounds** 15:24
**source** 84:1
**sourced** 60:11
**sources** 83:18
83:20
**south** 3:22
**southern** 1:2
**space** 38:19
40:18,22 43:25
90:22,22 92:4
97:4
**spacing** 46:11
46:11
**spangler** 10:20
**speak** 38:23
41:4 49:1
121:13 130:9
**speaker** 121:20
123:2
**speaking** 13:22
24:17

**spec** 72:23
**specialist** 44:6
77:20
**specific** 67:7
69:3 103:20
104:13
**specifically**
43:16 85:4
131:1
**specks** 106:7
**speculate**
113:16
**speculative**
37:25 66:5
71:12,14,15
72:4,9,10,17
72:17,23,25
73:2 74:25
75:4,8,9,13
92:17,18 93:23
94:6,9,15
104:11
**spend** 115:9
**spends** 113:17
**spent** 51:10
**spoke** 38:25
92:1 97:16
101:2 126:3
**spot** 100:16
105:22 107:24
**spread** 78:23
79:4 100:7
118:16
**spreads** 118:15
**spreadsheet**
83:21,24

**sprofera** 11:24
**squeeze** 103:12
**squeezing**
129:8
**stable** 55:20
**stand** 87:22,24
91:3 125:15
130:18
**standard** 76:5
79:5,20 80:8
85:17
**start** 14:12,14
16:7 60:21
65:23,24 109:4
**started** 44:23
44:24
**starts** 53:4
97:10 102:13
**statement**
22:24 23:5,13
28:12,14,19
30:15 33:8
91:1,2
**statements**
60:12 91:2
**states** 1:1,12
4:10 19:15
130:13 132:2
**status** 111:9
129:22
**stay** 128:3
**steadman**
10:21
**steffan** 6:21
**stock** 24:12
**stole** 87:16

**stood** 126:13
**stop** 18:16,18
64:20 77:13
100:2,17,18
103:4
**stopped** 77:13
86:23 99:17
103:13
**store** 111:14,17
111:19
**straight** 22:24
23:4,12 36:5
**straightaway**
45:14
**strategic** 41:23
93:11,14
**strategy** 82:10
**street** 3:14,22
**strike** 70:12
102:15,16,21
104:16 115:21
**striking** 130:20
**strong** 24:3
**structured**
65:10
**studied** 37:7,9
**stuff** 49:24
118:1,12 122:4
**style** 60:17
**subject** 15:10
32:4 35:12
125:1
**submission**
125:1
**submit** 15:2,3
16:8,17 34:19
51:25 126:25

127:10 128:6
128:12,19,22
129:1,5,11
**submitted**
13:21 14:24
15:11 17:23
18:1 35:1
95:11 127:4
**submitting**
118:9 128:11
**subsided** 99:18
**substantial**
132:2
**successful**
123:19
**sufficient**
127:5
**suggested**
126:5
**suite** 3:22 4:21
134:22
**suleymanov**
10:22
**summarizing**
50:10
**summary**
84:16,16,17,17
**supplement**
131:23
**supplemental**
96:8,18,23
**supplementary**
81:12,13 82:5
82:7 96:10,11
96:13 109:25
**supply** 98:23
106:22,23

107:5,8 115:22
116:3
**support** 104:1
**supposed**
127:6 129:11
**sure** 13:11 15:4
17:19 18:13
28:2 37:10
55:15 61:19
69:18 110:25
112:19 127:14
129:3
**surprise** 93:16
94:16,19
**sustained**
17:14 25:9,11
25:11,16,20
26:14 27:14
30:2 31:20
32:13,25 33:6
33:25 34:1
94:21,22 95:18
118:22 121:21
123:4
**svb** 132:11,17
**swear** 35:19
**sworn** 35:17
**sydney** 125:11
125:12
**synthetic** 49:13
**system** 22:7
48:23 49:10,11
49:12,14,14
114:24
**systems** 49:8

| **t** |
|---|

**t** 134:1,1
**t.j.** 3:9 35:8
124:22
**tab** 52:1
**taji** 10:23
**take** 28:13
30:11,20 31:5
31:16,20,21
32:1,5 34:8
41:11 45:15
51:12 53:16
57:12,13 62:13
64:11,15 66:20
68:21 70:13
71:25 72:1
79:25 80:17
84:7,8,15
92:24 93:19
95:20 100:18
114:5 116:3
126:8 127:4
**taken** 34:5
42:12 125:1
**talk** 45:18
62:16 66:19
67:11 70:23
75:24 80:24
84:23 125:2,22
132:16,21
**talked** 31:13
42:3 47:5
83:20 86:8,12
**talking** 18:24
28:8 36:24
40:22,22 41:11
62:6 71:15

72:12 99:25
109:20 110:6
**target** 127:22
**taught** 49:14
49:21,24
**taylor** 11:19
**teaching** 92:5
**technology**
111:11,12
113:13 119:21
**telephonically**
5:21
**tell** 29:7 31:24
35:6 44:21
49:13 52:7
56:24 61:22
78:18 79:12
82:18 85:16
109:9 113:13
117:22 120:15
125:10 128:5
**telling** 85:15
126:11
**tells** 80:10
**temidayo** 5:24
**ten** 28:25 42:23
46:14 51:10
80:11
**tentatively**
14:8
**term** 118:7
**terminate**
19:16
**terms** 16:9
17:3,4,17 18:6
18:9 19:2 21:8
21:11 24:18

| | | | |
|---|---|---|---|
| 44:8 49:15 | 100:23 102:25 | 32:7,16,19 | **three**  46:13 |
| 67:20 86:21 | 105:5 110:14 | 33:20 34:2,4 | 81:9 100:20,21 |
| 92:23 97:7 | 110:14,20 | 44:4 53:15 | 116:23 |
| 113:14 | 114:6,25 117:1 | 62:9,12 64:23 | **time**  14:12,15 |
| **terra**  76:16 | 117:14 119:8 | 71:23 80:15 | 19:16,23 36:2 |
| 77:7,10 105:1 | 120:17,18,23 | 85:16 86:16 | 39:21 43:22 |
| 114:14,22 | 123:6,8 124:17 | 88:3,4 89:24 | 44:7,18 47:7 |
| **tesla**  113:11 | 124:18 125:8 | 90:3,5,14 | 47:14,17,20,22 |
| **teslas**  93:3 | 125:12,14,15 | 93:15 97:15 | 48:7 49:5 |
| **tested**  37:7,9 | 132:19,20,22 | 103:25 107:12 | 50:23 64:16 |
| 68:25 | **thanks**  43:9 | 107:13 115:25 | 72:18,19,22 |
| **testified**  36:11 | **theory**  76:6,6 | 115:25 116:19 | 75:15 87:25 |
| 61:17 77:4 | 82:14 107:21 | 116:20 119:16 | 89:9 92:9 94:1 |
| **testify**  16:2 | **thing**  34:7 | 119:22 126:12 | 94:5,7,11 97:3 |
| **testimony** | 37:14 44:8 | 126:13,15 | 101:13 104:1,2 |
| 14:19,24 15:2 | 53:17 66:2 | 127:1,20 | 104:23,25 |
| 15:5 34:20 | 79:1,22 81:11 | 128:23 129:24 | 107:5 108:8,11 |
| 35:12,20 44:10 | 85:9 89:22 | 130:4,5,10,14 | 109:2,17 110:3 |
| 48:4,5 50:6 | 99:3,5 100:16 | 131:11,14,18 | 110:5 118:14 |
| 51:10 53:12 | 101:3 104:6,8 | 131:21 132:7 | 119:3 120:24 |
| 54:16 55:2 | 105:24 112:2 | **thinking**  22:9 | 121:10 124:7 |
| 62:6 63:5 64:7 | 115:20 118:6 | 25:19 | 125:10 126:3 |
| 68:19 69:18,19 | 125:25 131:6 | **thinks**  71:23 | 128:23 129:24 |
| 72:24 75:3 | **things**  18:1 | 93:25 | 132:13 |
| 79:8 83:1 | 44:2 61:1,12 | **third**  19:25 | **timeline** |
| 95:10 105:5 | 62:3,23 72:12 | 37:3,19 39:6 | 107:23 |
| 118:18 119:4 | 73:9 76:18 | 39:11,14,15 | **times**  60:7 |
| 125:8 | 81:9,16,18 | 40:17 | 126:13 |
| **tests**  48:17 | 82:3,4,4 84:23 | **thirteen**  30:1,4 | **timothy**  11:22 |
| **text**  61:13 | 85:7 89:16 | **thomas**  6:22 | **tiny**  105:25 |
| **thank**  23:19 | 93:14 109:19 | **thought**  43:22 | **tired**  94:14 |
| 25:12 27:15 | 110:4 113:4 | 44:8,15 76:9 | **titled**  52:5 67:1 |
| 34:17,22 35:23 | 129:8 130:1 | 89:11,12 97:20 | **titles**  30:24 |
| 43:8 52:22,23 | **think**  17:5,5,25 | 107:19 132:14 | **toby**  10:14 |
| 57:9,11,12 | 18:3,14,24 | **thousand** | **today**  13:14 |
| 66:21 68:12 | 22:5,8 23:5 | 83:17 | 14:9 15:10 |
| 91:12,19 95:24 | 28:23 31:12,22 | | 34:20 58:19 |

68:4 74:22
79:12 84:20
86:16 87:22
94:16 114:2
117:16 119:9
120:13,13
131:16 132:21
**together** 30:23
**toggle** 27:10
**toggled** 27:7
**toggling** 27:10
**token** 69:4,8,24
70:6,25 71:7
71:11 72:4
73:20,23 75:1
86:18 93:16
94:16 98:23
99:1 101:17,21
101:25 102:11
103:24,25
105:15 109:4
112:14,17,20
114:15,20
115:1,23
**tokenomics**
38:13,18,18
52:6 53:1
60:12,14,16
65:10,11
**tokens** 98:21
98:25 115:12
122:24
**told** 42:23
44:19 45:12
48:18 58:22
63:20 68:6
70:3 90:6

**tolerated** 120:5
**tomas** 8:18
**took** 46:4,5,16
49:20 68:4,4
75:25 79:8
81:14 118:13
**tools** 42:14
50:6
**top** 46:25 52:8
52:19 55:25
56:11,15,20
77:14 116:19
**topics** 126:6
**total** 22:10,11
24:4,13 27:6
**totaled** 27:8
**totalities** 24:13
**toussi** 10:24
**trade** 103:13
111:16
**traded** 104:9
**trades** 94:17
**trading** 54:7
54:10,17,23
55:9,12,20
58:1 69:20
75:25 77:10,12
79:9 81:3
103:22,23
104:7 105:15
115:16
**traditional**
30:11 101:21
102:12
**train** 112:1
**trained** 48:23
65:24 122:3

**training** 36:25
37:5 119:5
**transactions**
101:25
**transcribed**
2:25
**transcript**
14:16 15:2
53:18 127:6
134:4
**transcripts**
127:7
**travis** 8:12
**treated** 25:2
**treatment**
126:14
**trial** 15:22
**tristan** 6:23
**true** 21:16
36:18,19,20
37:2,3,4,8,23
37:24 38:1,2,4
38:5 39:14,15
40:15,16 42:5
42:10,11,13,21
42:22,25 44:4
44:5,8 46:4,6
47:16 48:8
51:8,18,22
54:1 55:13,14
63:3 65:8 67:5
99:22 100:15
134:4
**trustee** 4:11
13:16 130:6,9
130:14 132:2

**truth** 35:20,21
68:6
**try** 56:5 59:17
89:22 90:3
110:20 111:17
**trying** 76:14,20
110:7 130:14
**tuesday** 127:17
**turetsky** 10:25
**turn** 61:23
73:15
**turner** 11:1
**turns** 126:9
**tweet** 33:3,15
33:16,21,23
46:23 47:2
87:14 88:8,15
88:16,19
112:19
**tweeting**
112:21 113:16
**tweets** 87:3
88:7 92:21
112:6
**twelve** 30:1,4
**twenty** 31:12
**twists** 126:9
**twitter** 92:4
**two** 22:22
35:13 47:16
48:21 50:6,19
68:10 73:9
76:18 97:1
102:24 104:3
106:6,7 107:3
113:8,10
116:22

tyler 8:25
type 20:2 72:10
72:10 119:18
typical 119:4
typically
103:11

u

u.s. 1:23 4:11
4:20 13:16
117:19 119:5,5
130:6,9
uday 11:18
uk 29:18,19
uk.gov 29:19
umber 8:16
unclear 83:1,4
unconstitutio...
22:2
uncredited
82:21
under 19:20
23:5,8 65:15
69:1 70:19
80:9 92:23
95:22 100:2
116:5 125:1
underneath
30:24
understand
18:22 21:17
22:9 44:10,15
54:16 58:24
60:10 73:16
80:20,22 85:23
97:24 112:22
112:25 118:6
119:12 120:14

121:6 124:25
understanding
13:25 21:1
23:12 34:19
understands
90:22
understood
38:24 57:1
70:13 72:3
75:24 125:5
unfair 82:15
82:24
unidentified
121:20 123:2
unique 73:3
76:15
united 1:1,12
4:10 93:12,13
130:13 132:2
university
41:12
unlawful 22:2
unrelated 62:4
unsecured 3:20
4:2
update 129:22
uphold 22:15
use 13:13
37:10 42:14
48:19 54:23
56:5 58:1,6,8
60:21,24 65:6
65:9 72:3,6
73:3 75:25
76:7 77:18
79:3,5 82:9,10
82:13,15,24

83:12 92:13
99:10,11,19,22
102:17 108:7
114:3 116:11
used 45:21
48:21 49:8,23
50:1,6,13,17
50:22 54:25
60:5,14,24
63:9 65:7,18
66:6 67:15
70:19 77:10,12
79:18 81:11
82:15,24 85:1
115:19 116:11
user 72:14
uses 82:8
using 49:18
50:21 52:7,10
77:23 85:19,20
85:21 124:9
usual 120:24
usually 48:1
utility 75:19
113:22
utilization
48:15
utilize 37:10
70:20,21
utilizing 46:3
48:12 49:20

v

v 10:7
validation
48:23 49:9
valuation
38:11 39:6,13

39:17 40:14,15
40:20 42:4,17
51:1 53:2
65:17,22 66:5
75:11 76:15
85:1,8,9
113:24 118:10
119:18 121:9
valuations
67:2
valuator 119:2
120:10
value 21:12,23
24:10,11,16
36:14,17,20
37:2,13,23,25
38:7,16,17,19
38:20 53:14
54:2,4,6,11,12
54:14,14,18
55:8,13 57:22
58:12 65:18
66:6,15,19
67:5,12,13,14
68:17,24 69:1
69:3,7,8,9,12
69:24 70:5,8
70:15,25 71:4
71:6,7,11,12
71:15,16 72:5
72:9,10,13,23
72:25 73:2,12
73:13,13 74:14
74:25 75:4,4,8
75:8,10,12,13
76:23 77:15,16
77:18,19,22,23

77:24,24 78:4
78:24,25 79:18
80:3,4,13,19
80:23,23 82:12
85:9,12,25
92:17,18 93:20
93:20,23,25
94:6,10,11,12
94:13,15 96:14
96:20 97:7,9
97:10,14,15,17
97:18 99:2
101:17 102:9
103:11,14,20
104:6,8,10,11
104:14,15,16
104:19,21,21
104:25 105:1,3
107:15,17
111:5,14,17,19
112:7,8 114:1
114:3,4 116:5
116:5,6,7,9,10
116:13,18
118:11,12,16
**valued**  94:10
**valuer**  117:19
**values**  24:4,5
  57:20 116:2
**valuing**  42:12
  66:24 67:21
  71:23
**various**  130:23
**vat**  121:11
**vejseli**  11:2
**venable**  3:12

**veracity**  81:24
  82:2 83:1,8
**verbalize**
  19:15
**veritext**  134:20
**version**  16:9
  17:16 19:3
  126:22,24
**versus**  78:19
**veton**  11:2
**view**  51:20
  67:4,7 69:20
  78:14 90:13
**vincent**  9:6
**virtually**  98:23
**volume**  68:11
  70:2 74:7
  99:12 100:4
  105:15,21,21
  106:9,12
**volumes**  68:10
**voting**  30:15
  30:16
**vtor**  6:19

**w**

**w**  10:18
**wait**  16:14
  129:16 132:23
**walk**  70:14
**walks**  16:24
**walsh**  11:3
**want**  17:19
  30:10 34:6,23
  35:14 38:12,22
  38:23 39:5
  41:25 42:1
  45:18 51:12

52:4,10 55:23
57:23 60:21
62:15,23,24
66:19 67:11
76:19,25 79:7
80:21,24 84:10
84:11 88:4
89:22 90:12,19
92:3,3,9 98:18
100:14 101:6,6
105:24 108:13
108:14 113:5,6
113:13 115:9
119:13,15
121:5,5,6,10
121:12,13
122:25 125:7
126:4,10,11
130:9 131:4
132:12,13
**wanted**  65:9
  85:7 107:20
  117:24,24
  129:12 132:6
**wants**  31:25
  114:3
**warren**  11:4
**wasted**  87:19
**watching**  36:3
**waterfall**  23:25
**way**  15:7 22:3
  26:6 30:23
  45:5 57:2
  63:19,21,25
  64:1,3 67:4
  70:11 73:15
  77:12,22,24

78:18,21 82:10
82:20 91:7
99:8 100:1
104:15,15
105:4 107:18
111:12,13
112:17 115:4
126:7
**we've**  28:23
  34:5 35:7
  47:22 112:23
  122:4 123:25
  127:7 128:24
  131:10
**weak**  87:18
  90:15
**wealth**  17:8,13
  25:7,18
**weblinks**  83:24
**websites**  29:6
**weedman**  4:8
  52:21,23
**week**  48:1
  127:12 128:9
**went**  44:19
  45:14 94:5
  116:13,22
**west**  3:14
**whatever's**
  46:16
**whatsapps**
  61:24
**white**  3:19 4:1
**wick**  11:5
**widely**  67:20
  67:22 68:16
  111:3,6,8

wildes 11:6
williams 5:24
willing 79:3
winddown
24:1
window 54:10
54:17 69:20
75:25 76:5
77:17 78:22
79:9
wipe 116:24
wish 16:3
22:17 96:1
105:6 110:16
122:12 123:9
124:19 125:18
wishes 16:2
withdraw
39:16 62:14
withdrawals
19:20
withdrawn
39:22 69:7
71:7 98:22
withholding
21:21
witness 35:22
36:1,3 39:1
41:5,7 45:8
48:21 49:2
50:2 51:3
64:14,16,19,23
65:1 66:17
94:23 95:10
98:18,20 103:5
110:16 117:17
122:12 124:4

125:11,14
witnesses 12:3
125:18
wofford 4:7
word 45:19
53:8,8 82:1
85:19,20,21
words 50:20
53:8 69:12
work 41:3
112:25 118:8
119:3 127:13
127:23,24
128:15
worked 42:17
42:19,21
working 89:2
121:18
works 22:7
24:22 37:11
72:23 80:22
85:24
workup 26:20
world 37:6,10
42:23 44:21
53:5 72:15,16
77:19 124:15
worry 53:12
worth 74:23
93:24 95:15
104:2 116:14
worthless
103:25
write 45:19
46:5 47:13
61:11 63:18
87:8 89:1

writing 46:10
64:24
written 61:18
62:16,17 82:6
110:13
wrong 51:13
55:7 62:24
85:15 88:3,3
92:4,10 108:14
115:6
wrote 47:24
55:1,2,3

x

x 1:4,10 12:1

y

y 105:18
yara 8:10
yeah 17:10,11
35:6 46:13
51:19 52:18
56:9 61:7
63:20 64:10
65:16 68:3,20
71:22 74:4,6
74:16 77:9
84:7,22 85:14
86:10,14 87:6
89:19 90:19
91:7 98:6
100:13 105:13
109:14 111:4
115:25 117:8
120:17 122:17
125:2 127:22
year 112:24

years 42:23
117:25
yep 56:7 61:10
yesterday 16:1
31:21 35:11
36:4,4 59:3
61:17 62:1
95:11 126:5
yoon 11:7
york 1:2,14 3:6
3:15 4:5,14
young 11:8
44:24 45:6

z

zabib 11:25
zachary 11:6
11:25
zaharis 11:9
zero 97:11,12
97:18 104:2,2
104:6,8,11
zone 100:14