Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' SUPPLEMENTAL MEMORANDUM OF LAW IN**
**SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR**
**AFFILIATES AND OMNIBUS REPLY TO CERTAIN OBJECTIONS THERETO**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

**Page**

Preliminary Statement..................................................................................................................1

Argument ......................................................................................................................................2

I.      The Plan Modifications Do Not Require Resolicitation. ....................................................2

II.     All Digital Assets Transferred to the Borrow Program Pursuant to Version 7 Are
Property of the Debtors' Estates. ........................................................................................8

III.    The Revised Proposed Confirmation Order Obviates the Need for the Court to
Determine Whether CEL Token Is a Security. ..................................................................13

Conclusion ...................................................................................................................................15

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this supplemental memorandum of law (this "Supplemental Brief")[2] to supplement the *Debtors' Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* [Docket No. 3604] (the "Confirmation Brief") in support of confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be further modified, amended, or supplemented from time to time, the "Plan"). The Confirmation Brief is incorporated herein by reference.

## Preliminary Statement

1. Since July 2022, the Debtors have worked tirelessly to find a value-maximizing path to exit these Chapter 11 Cases. The Debtors are now on the verge of confirming a chapter 11 plan that nearly 98% of voting Account Holders (*i.e.*, over 84,000 Account Holders) voted to accept. If the Plan is confirmed, the Debtors are positioned to emerge from chapter 11 and return billions of dollars' worth of cryptocurrency to Account Holders, along with additional value through the distribution of equity in NewCo.

2. To demonstrate that the Plan satisfies all of the requirements of the Bankruptcy Code, the Debtors filed the Confirmation Brief in advance of the Confirmation Hearing. The Confirmation Brief is a tome of a document which comprehensively addresses each confirmation requirement under the Bankruptcy Code. Throughout the course of the Confirmation Hearing, however, a small minority of creditors raised a few discrete issues that benefit from additional briefing to assist the Court in resolving those issues. More specifically: (a) one *pro se* creditor's

---

[2]    Capitalized terms not immediately defined have the meanings ascribed to them elsewhere in this Supplemental Brief, the Plan, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), or the objection tracker attached as Exhibit A to the Confirmation Brief.

filings reflected a misunderstanding regarding certain Plan modifications, requiring clarifications

regarding the interaction between the Plan and the Custody Settlement; and (b) one *pro se* creditor

raised certain arguments regarding loans issued to him under older versions of the Borrow Program

terms and conditions, which warranted additional discussion of the relevant provisions of the loan

terms and conditions.

3.    Additionally, contemporaneously herewith, the Debtors and the Committee are

jointly filing a revised proposed Confirmation Order (the "<u>Revised Proposed Confirmation

Order</u>"), which includes detailed proposed findings of fact and conclusions of law (with citations

to the record) to highlight the record of the Confirmation Hearing regarding certain other contested

issues, including compliance with the best interests test vis-à-vis Holders of CEL Token.  This

Supplemental Brief also discusses one change to the treatment of Other CEL Token Claims (*i.e.*,

CEL Token Claims that are not based on Celsius account balances) that will obviate any need for

Court to determine whether CEL Token is a security as part of confirmation.

4.    For the reasons set forth herein, in the Confirmation Brief, and in the Revised

Proposed Confirmation Order, and in light of the evidentiary support offered at the Confirmation

Hearing, the Debtors have satisfied their burden and the Court should enter the Revised Proposed

Confirmation Order, confirming the Plan.

<u>**Argument**</u>

**I.    The Plan Modifications Do Not Require Resolicitation.**

5.    The Plan has always provided that holders of Custody Claims will receive

distributions of their cryptocurrency coins in-kind because such cryptocurrency is property of the

holders of Custody Claims, unlike the cryptocurrency in the other accounts with the Debtors

(*e.g.*, Earn, Borrow, Withhold), which is the property of the Debtors.  As detailed in the Plan and

in prior filings with the Court, those in-kind distributions to Custody Claims will be made through

the Celsius platform during the ninety days after the entry of the Confirmation Order, but the Debtors cannot keep their platform open indefinitely because of the associated costs.[3] Accordingly, after this ninety-day period, the Celsius platform will no longer distribute Cryptocurrency to Holders of Custody Claims (the date of such shutdown, the "Deactivation Date"), and any distributions after the Deactivation Date will be made by a third-party Distribution Agent in BTC, ETH, or fiat currency. To facilitate these distributions, the individual Custody Claims and associated assets will be converted into BTC, ETH, or fiat currency at market prices at the time of the conversion. *See* Plan at Art I.A.84 (definition of Deactivation Date Cryptocurrency Conversion Table).

6.    On September 27, the Debtors filed a modified Plan pursuant to section 1127(a) of the Bankruptcy Code. Among other revisions, the modified Plan clarified that the conversion price for CEL Tokens in the Custody Program ("CEL Custody Claims") on the Deactivation Date will be the CEL Token Settlement value of $0.25 (or such other value the Court assigned to CEL Token following the Confirmation Hearing), instead of the market price of CEL Token at the time of such conversion. *See* Plan at Exhibit B Art. I.A.84 (reflecting revisions to the definition of Deactivation Date Cryptocurrency Conversion Table). During the confirmation hearing and throughout his

---

[3]    Previous iterations of the Plan provided that in-kind distributions of Cryptocurrency would be made up to approximately 90 days following the *Effective Date*. The Plan adjusted this approximate Deactivation Date to 90 days following *entry of the Confirmation Order*. *See Notice of Filing of Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577], Ex. B, at 8. The Debtors made this change because the Debtors were able to arrange a partner to serve as Distribution Agent for certain other distributions, which resulted in Custody Program distributions being the only distributions the *Debtors* and their successors must make. Because assets deployed in the Custody Program are not property of the Debtors' estates, the Debtors are able to distribute them prior to the Effective Date. *See Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767]. As a result, the Debtors (i) moved up the start date for distributions on account of Custody Claims and (ii) adjusted the reference point for the Deactivation Date from being the Effective Date to the Confirmation Date. This change in no way prejudices Mr. Kirsanov or any other Account Holder, as the period of time in which Custody Claim distributions will be available prior to the Deactivation Date is the same in both scenarios.

twelve[4] filings on the subject, Mr. Kirsanov objected to this post-solicitation modification because he believes it (a) requires resolicitation of the Plan and (b) causes the Plan to violate the best interests test with respect to CEL Custody Claims.

7.    At the outset, Mr. Kirsanov's Objections, other than those regarding resolicitation, are untimely, as Mr. Kirsanov did not raise any objection to the Plan until September 28, 2023 (after the objection deadline of September 22, 2023).  Moreover, contrary to some of the assertions Mr. Kirsanov has made, Mr. Kirsanov:  (a) opted into the Custody Settlement; (b) withdrew all of his CEL Tokens that were eligible to be withdrawn pursuant to the Custody Settlement;[5] (c) voted in favor of the Plan; and (d) did not opt out of the Class Claim Settlement.[6]  Mr. Kirsanov's Objection should be overruled on these facts alone because Mr. Kirsanov is not a dissenting creditor[7] and, even if he were, he could only even *theoretically* be harmed by the changes he

---

[4]    The "Objections" refer to the following nine letters:  (i) October 16, 2023 Letter from Dimitry Kirsanov [Docket No. 3834]; (ii) October 13, 2023 Letter from Dimitry Kirsanov [Docket No. 3830]; (iii) October 6, 2023 Letter from Dimitry Kirsanov [Docket No. 3741]; (iv) October 6, 2023 Letter from Dimitry Kirsanov [Docket No. 3729]; (v) October 5, 2023 Letter from Dimitry Kirsanov [Docket No. 3721]; (vi) October 5, 2023 Letter from Dimitry Kirsanov [Docket No. 3717]; (vii) October 4, 2023 Letter from Dimitry Kirsanov [Docket No. 3716]; (viii) October 3, 2023 Letter from Dimitry Kirsanov [Docket No. 3688]; (ix) September 29, 2023 Letter from Dimitry Kirsanov [Docket No. 3647]; (x) September 28, 2023 Letter from Dimitry Kirsanov [Docket No. 3629]; (xi) September 28, 2023 Letter from Dimitry Kirsanov [Docket No. 3628] and the *Objections to Debtor's [sic] Proposed Plan and Amendments After the Balloting, Best Interests and Fair and Equitable Treatment Concerns, Safety Concerns* [Docket No. 3772] (the "Formal Objection").  Mr. Kirsanov also filed an exhibit list and an evidentiary objection [Docket No. 3694].

[5]    To date, Mr. Kirsanov has withdrawn all withdrawal-eligible CEL Token from his Custody account.  On May 11, 2023, Mr. Kirsanov withdrew 25,000 CEL Token.  On May 24, 2023, Mr. Kirsanov withdrew his remaining 246,585 withdrawal-eligible CEL Token.  Mr. Kirsanov has approximately 477,000 CEL Tokens remaining in his Custody account.

[6]    Mr. Kirsanov incorrectly asserts that he rejected the Plan with respect to his General Custody Claims.  *See* Formal Objection at 3 ("Accepting the Custody Settlement also made me eligible to vote to reject the plan with my Pure Custody assets.").  Mr. Kirsanov was not eligible to reject the Plan once he accepted the Custody Settlement.  *See* Custody Settlement Term Sheet at 4 ("Each Settling Custody Account Holder must vote all of his or her Allowed Custody Claims to accept the Plan . . . .").  Mr. Kirsanov attempted to reject the Plan with respect to his Custody Claims, but his vote was deemed to accept due to his prior election to participate in the Custody Settlement.  Mr. Kirsanov was eligible to vote his *other* Claims to reject the Plan, but he chose to vote such Claims to accept the Plan.

[7]    Section 1129(a)(7) of the Bankruptcy Code requires that each creditor has either accepted the plan *or* receives at least as much under the plan as would be received under a chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7).

alleges prejudice him if he deliberately did not withdraw the remainder of his CEL Token prior to the Deactivation Date. The Debtors and the Committee have attempted to explain and correct Mr. Kirsanov's misunderstanding of the Plan and Bankruptcy Code to no avail, through multiple phone calls and e-mail exchanges since he first raised the issue at the Confirmation Hearing on September 28, 2023. To clarify the record, however, the Debtors address all of Mr. Kirsanov's Objections, which misinterpret the revisions to the Plan, the interaction between the Custody Settlement and the Plan, and the requirements of the best interests test.

8.     A debtor may modify the solicitation version of a plan pursuant to section 1127(a) of the Bankruptcy Code without resoliciting the plan so long as a modification does not "materially and adversely affect" the holders of interests and claims. *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013) (finding that re-solicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 929 n.6 (Bankr. S.D.N.Y. 1994) ("[N]onmaterial modifications . . . do not require resolicitation of the respective impaired classes of creditors and equity security holders."). Paragraphs 33 to 36 of the Confirmation Brief contain arguments regarding the modification of the Plan generally, including the applicability of section 1127(a) and Bankruptcy Rule 3019.

9.     Both the modified Plan and the solicitation version of the Plan [Docket No. 3319] (the "Solicitation Plan") provided that upon the Deactivation Date, a "Deactivation Date Conversion Table" would provide for conversion of Custody Claims at "applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date." Solicitation Plan, Art. I.A.83; Plan, Art. I.A.83. The Solicitation Plan also generally provided that the CEL Token Settlement would not apply to Custody Claims, which generally do not need to be valued because

they can be withdrawn in kind prior to the Deactivation Date. Solicitation Plan, Art. IV.B.2. The modified Plan clarifies that the $0.25/CEL valuation that is in the Plan as part of the CEL Token Settlement will also be applied to CEL Custody Claims upon the Deactivation Date if a Holder of a CEL Custody Claim fails to withdraw its cryptocurrency in-kind, regardless of what the market price of CEL Token is at the time the Deactivation Date Conversion Table is prepared. *See* Plan, Art. I.A.84. Mr. Kirsanov asserts that the Petition Date price of CEL Token is the proper value of CEL Token and that the above-described changes harm him and unfairly modify the Custody Settlement.

10.    In reality, the above-described modifications do not "materially and adversely" affect any Claim Holders. Mr. Kirsanov and other Holders of CEL Custody Claims were able to withdraw their CEL Tokens in accordance with the terms of the Custody Settlement before, and they will continue to be able to for ninety days following the Confirmation Date. That satisfies the best interests test. Mr. Kirsanov's Objections effectively rest on the incorrect assumption that the liquidation valuation of CEL Token is $0.81 and that he must receive 100% of that value to satisfy the best interests test.[8] The liquidation analysis plainly describes that custody recoveries are distributed ***in-kind*** at 100%, and the liquidation analysis (where it does ascribe a value to CEL Token) ascribes a value of $0.25, not the Petition Date price of $0.81 as Mr. Kirsanov asserts. *See* Disclosure Statement Ex. B ("General Custody and Withdrawable Custody Claims receive in-kind distributions of their outstanding coin balances as of the Petition Date rather than a percentage of their coins dollarized as of the Petition Date"); *see also id.* (valuing CEL Token Deposit General

---

[8]    *See* Formal Objection at 3 ("The debtor's liquidation analysis provides petition day values, as per the Cryptocurrency Conversion Rates for the tokens in question. For CEL Token in Pure Custody (100% Liquidation), the value returned must be equal or at least $0.81565 per CEL Token. For CEL in General Custody (72.5% Liquidation), the value returned must be equal or at least $0.59134625 per CEL Token. . . . The proposed $0.25 valuation is not fair and equitable across all classes, as it specifically targets the CEL Custody Holder with the most monetary loss." (internal citations omitted)).

Earn Claims at $0.25). And even if the Petition Date price were the proper measure of value, the evidence demonstrated that the value of the CEL Token was on the Petition Date was *de minimis* at best and likely worthless. *See Supplemental Declaration of Robert Campagna in Support of Confirmation of the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtors Affiliates* [Docket No. 3653] ¶ 10; *see also Committee Request to Submit Declaration to Supplement Expert Witness's Direct Testimony* [Docket No. 3659] ¶ 19. The potential issues Mr. Kirsanov raises with respect to distribution agents in Hawaii are only applicable to Account Holder Claims *other than* Custody Claims, who will receive an equivalent amount of fiat currency if a Distribution Agent cannot be arranged to distribute BTC and ETH, which also satisfies the best interests test. As the Debtors have repeatedly explained to Mr. Kirsanov, Holders of Custody Claims in Hawaii have been able to withdraw CEL Token pursuant to the Custody Settlement, and the Debtors do not anticipate any issues with such Holders continuing to withdraw all of their withdrawal-eligible tokens until the Deactivation Date.

11. As part of his Objections, Mr. Kirsanov cites an inapplicable provision of the Custody Settlement, arguing that the modifications to the Plan violate the Custody Settlement. *See* Objection at 2 ("If the debtor's estate cannot satisfy in kind distributions as they have indicated most tokens will not be distributable in Hawaii, the[n] the language in the Custody Settlement calls for a distribution in an alternative currency which conversion rate shall be determined using the value of the original digital asset as of the Petition Date in U.S. dollars . . . ."). The referenced provision reads as follows:

> In the event that the Debtors **have an insufficient amount of certain types of cryptocurrency** to make all distributions in-kind to satisfy the Shortfall Issue, the Debtors shall make distributions in alternative cryptocurrencies, which conversion rate shall be determined using the value of the original digital asset as of the Petition Date in U.S. dollars that will be converted into alternative available cryptocurrency

based on the value of such digital asset as of the date of entry of the Settlement Approval Order.

Custody Settlement at 7 n.7 (emphasis added).

12.     This provision is not applicable under the circumstances:  the Debtors have an abundance of CEL Token in treasury, so the Debtors do not have an insufficient amount of CEL Token to distribute CEL Token in-kind.  Mr. Kirsanov further argues that "Custody CEL Token Holders in Hawaii must follow this methodology with distribution from the Trustee, or any other Cryptocurrency not supported by disbursement by the debtor's estate."  Objection at 2.  This is also inaccurate, as the Debtors have been conducting Custody distributions in Hawaii since the approval of the Custody Settlement, including distributing CEL Token.

13.     Mr. Kirsanov's remaining argument is, for all practical purposes, indistinguishable from the arguments of other Holders of CEL Token who believe that the value should be more than $0.25.  The Debtors and Committee have put on extensive evidence that CEL Token was likely valueless on the Petition Date, and the deadline for Mr. Kirsanov to offer evidence has passed without him offering anything.  If the Court approves the value of $0.25 for CEL Token and finds that such value satisfies best interests under the Plan, it will satisfy best interests as to CEL Custody Claims, too.

14.     For the reasons set forth herein, Mr. Kirsanov's Objection should be overruled.

**II.     All Digital Assets Transferred to the Borrow Program Pursuant to Version 7 Are Property of the Debtors' Estates.**

15.     In his response to the Confirmation Brief [Docket No. 3641] (the "Bronge Response"), Mr. Bronge argues that version seven of the retail Loan Terms and Conditions ("Version 7"), and not versions eight and nine ("Version 8" and "Version 9," respectively),

governed the $62,000 retail loan that Mr. Bronge entered into in April 2021 (the "Bronge Loan").[9]

Mr. Bronge further asserts that the terms of Version 7 do not transfer ownership of his digital assets

to the Debtors.  *See* Bronge Response at 2; *see also* Oct. 16, 2023 Hr'g Tr. 48:12–16 ("There is no

statement of exclusivity—exclusive property to Celsius in that [Version 7], while there is in

version nine.  And there is quite a few references where it's abundantly clear that there is no legal

title transfer in [Version 7].").

16.    The Debtors do not dispute that the Bronge Loan is governed by Version 7.

Contrary to Mr. Bronge's assertion, however, Version 7 unambiguously provided that the Debtors

have title of the digital assets that a Retail Borrower transferred to the Borrow Program to support

a retail loan:

> In consideration for the Loan, you grant Celsius *the right*, subject to applicable law, without further notice to you, to hold the Digital Assets provided as Collateral *in Celsius' name* or in another name, and *to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets*, separately or together with other property, *with all attendant rights of ownership*, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.

Version 7 at 14, "Consent to Celsius' Use of Your Digital Assets" (emphasis added) (the "Grant of Ownership Clause").

17.    Similarly, version five of the General Terms of Use, which was the operative

General Terms of Use at the time Mr. Bronge agreed to Version 7 and was explicitly incorporated

by reference,[10] provides:

> [N]otwithstanding the use of expressions such as "borrow," "loan," and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, *title to the Digital Assets shall pass from you to CNL on the basis of an outright sale*, subject to your right to

---

[9]    Mr. Bronge has four outstanding retail loans as of the Petition Date.  Excluding the Bronge Loan, the other three are all governed by Version 9.

[10]    *See, e.g.*, Version 7 at 1 ("In addition, our Network Terms and Conditions . . . are incorporated into these Loan Conditions by reference."); *see also* Docket No. 393, ¶¶ 10, 21; Ex. B-7 at 858.

request at a later date the delivery of equivalent (but not identical) Digital Assets to
those sold to CNL.

General Terms of Use, Version 5 at 8, "4. Nature of e-Services – B. Loans."

18.    This language becomes more explicit in subsequent versions of the General Terms

of Use.  Specifically, version eight of the General Terms of Use provides:

> In consideration for . . . [Celsius] entering into any Loan agreement . . . you grant
> Celsius, subject to applicable law and for the duration of the period during which
> you elect to utilize the Eligible Digital Assets. . . as collateral under the Borrow
> Service . . . *all right and title to such Eligible Digital Assets*, including
> ownership rights.

General Terms of Use, Version 8 at 35, "13. Consent to Celsius' Use of Digital Assets."

19.    When the contract is clear and unambiguous, courts will "give effect to the plain

meaning of the contract's terms and provisions."[11]

20.    Mr. Bronge erroneously relies on both Version 7's inclusion of "Your" in the title

"Consent to Celsius' Use of Your Digital Assets" and "certain" in the clause "you may not be able

to exercise certain rights of ownership" as evidence that he "still hold ownership title" (*sic*) but

simply "may not exercise some [as opposed to all] property rights."  Bronge Response at 2.  Mr.

Bronge also relies on different language in Version 8 and Version 9 for his assertion that the Loan

Terms and Conditions "was not intended to transfer" title of the collateral to the Debtors.  *See*

Bronge Response at 2.

21.    Mr. Bronge's arguments are incorrect.  *First*¸ the Court held in the *Memorandum

Opinion and Order Regarding Ownership of Earn Account Assets* [Docket No. 1822] (the "Earn

Opinion") that similar language in the General Terms of Use unambiguously transferred title and

ownership of the digital assets in the Debtors' Earn Program from Account Holders to the Debtors.

---

[11]    *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).  *See* Version 7 at 34, "General" ("The
relationship between you and Celsius is governed exclusively by the laws of the State of Delaware, without regard
to its conflict of law provisions.").

*See* Earn Opinion at 41 (finding that "the language in the Terms of Use transferring all ownership interest to Celsius in the cryptocurrency assets deposited in the Earn Accounts makes it very clear that no ownership interest or lien in favor of the Account Holders was intended"); *see also* General Terms of Use Version 5, "Consent to Celsius' Use of Your Digital Assets" (including substantially similar language that Account Holders grant the Debtors "all attendant rights of ownership" and that Account Holders "may not be able to exercise certain rights of ownership").  Accordingly, the substantially similar Grant of Ownership Clause in Version 7 provides, in equally unambiguous terms, that the Debtors may exercise "all attendant rights" in collateral transferred to the Debtors.

22.    ***Second***, interpreting the phrase "you may not be able to exercise ***certain*** rights of ownership" as overriding the grant of ownership rights in the collateral renders the Grant of Ownership Clause superfluous.  As the Court recognized in the Earn Opinion, "it is a bedrock principle of contract interpretation that courts should not adopt an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent possible, should seek to read contractual provisions in harmony."  Earn Op. at 42.  Accordingly, the Court should apply the plain meaning of the Grant of Ownership Clause to find that ownership of the collateral unambiguously transferred to the Debtors.

23.    ***Third***, although the Debtors included additional language in Version 8 and Version 9 pertaining to the transfer of ownership in collateral, such language is not evidence that the applicable language used in Version 7 is ambiguous.[12]  *See Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995) (holding that subsequent forms of a franchise agreement that "expressly set forth violation of the tax laws a reason for default" is not admissible as evidence

---

[12]    A comparison of the provisions concerning the grant of ownership in Version 7, Version 8, Version 9, and the General Terms of Use version 5 is attached hereto as **Exhibit A**.  A redline showing the differences between Version 9 and Version 7 is attached hereto as **Exhibit B**.

to show that the previous form, which only requires compliance with "all applicable laws," is ambiguous). The Grant of Ownership Clause is substantially consistent across Version 7, 8, and 9 in granting the Debtors "all attendant rights of ownership." *See generally* **Exhibit A**. In addition, when adding that "Digital Assets posted as Collateral shall be the exclusive property of Celsius," Version 8 and Version 9 also made specific reference to the section containing the Grant of Ownership Clause, making clear that the new language was meant to reinforce and supplement the Grant of Ownership Clause, not replace or otherwise render such clause ambiguous. *See* Version 9 at 6, "Collateral" ("[Y]ou grant Celsius your explicit consent to use such Digital Assets in accordance with Section 20 below."). Accordingly, neither the revised nor additional language in Version 8 and Version 9 are evidence that Version 7 is ambiguous or leads to a different result.

24. Furthermore, relevant case law supports the conclusion that Mr. Bronge has only a general unsecured claim against the Debtors and not a property right (equitable or otherwise) in commingled cryptocurrency transferred to the Borrow Program. In *Secured Leverage Grp. v. Bodenstein*, 558 B.R. 226, 237 (N.D. Ill. 2016), *aff'd sub nom.* 866 F.3d 775 (7th Cir. 2017), the court held that, under a similar provision in a Customer Agreement concerning foreign exchange trading that gave a trading firm "complete control over collateral funds deposited into customer accounts" despite "replete [] references to Customers' ownership of their property,'" customers did not retain equitable or legal title to property transferred to the debtor where the debtor had possession of the funds and the agreements provided that the debtor had complete control over the funds. *See id.* ("Additionally, customer hereby grants to PFGBEST the right to pledge, repledge, hypothecate, sell or purchase, invest or loan . . property of Customer held by PFGBEST as margin or security . . . paragraph 8 gave Peregrine complete control over collateral funds deposited into customer accounts."). Mr. Bronge similarly gave the Debtors complete control over his digital

assets when he transferred such assets to the Borrow Program pursuant to the language in Version 7.  Furthermore, Mr. Bronge has made no attempt to identify his specific property and trace to his specific digital assets.

25.    For the reasons set forth above, all digital assets transferred to the Borrow Program under Version 7 are property of the Debtors' estates.  Accordingly, the Retail Borrower Settlement provides appropriate treatment of the Retail Borrower Deposit Claims.  The Bronge Response should be overruled.

## III.    The Revised Proposed Confirmation Order Obviates the Need for the Court to Determine Whether CEL Token Is a Security.

26.    The issue of whether CEL Token is a security and the resulting implications of such a finding has been raised several times throughout these Chapter 11 Cases.  Each time, the relevant dispute was resolved without a definitive ruling on whether the CEL Token was a security within the meaning of the Bankruptcy Code or security laws.  The issue arose again as part of Plan confirmation,  where the Debtors and the Committee argued that the CEL Token Settlement was reasonable under the circumstances.  During the Confirmation Hearing, an attorney for the SEC requested that any ruling on the issue be limited to the facts of these Chapter 11 Cases and without preclusive effect in any SEC actions.  The Court agreed and further responded:

> I've already said I'm not—as I've gone through these mental gymnastics, it seemed to me I didn't have to reach a result—under some scenarios, I don't have to reach a result of deciding whether it is or is not a security.  Okay.  And at least my reading of Judge Rakoff's decision and Judge Torres' decision, they differ.  Not that either one is necessarily the absolute answer as applied to the CEL token, but nevertheless. I have great respect for both Judge Rakoff and Judge Torres.

> Sept. 28, 2023 Hr'g Tr. 24:7–18.

27.    As initially drafted, the Plan's proposed treatment of Other CEL Token Claims depended upon a finding that CEL Token was a security because such Claims were to be subordinated pursuant to section 510(b) of the Bankruptcy Code, which provides that:

13

[A] claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b); *see also* Plan Art. III.F (providing that Other CEL Token Claims will be subordinated pursuant to section 510(b) of the Bankruptcy Code).

28.     Such a finding, however, is not required for the Plan to be confirmed, and it is in the best interests of creditors to minimize the risk of a complicated appeal of the Revised Proposed Confirmation Order.   Accordingly, the Debtors and the Committee agreed to language in the Revised Proposed Confirmation Order that would avoid the need for the Court to decide whether the Potential Securities are securities.  The added language preserves the Other CEL Token Claims of any Holder of a Claim who (i) did not vote to accept the Plan ***and*** (ii) opted out of the Class Claim Settlement (each Holder of a Claim satisfying (i) and (ii), a "Potential CEL Token Litigant") for resolution in the Claims reconciliation process.  Nearly all of Holders of Claims either (i) voted to accept the Plan and/or (ii) did not opt out of the Class Claim Settlement (each Holder of a Claim satisfying (i) or (ii), a "Consenting Subordinated Party").[13]  The Consenting Subordinated Parties either (i) accepted the CEL Token Settlement by voting to Accept the Plan (thereby accepting subordination of their Other CEL Token Claims) or (ii) settled their Other CEL Token Claims pursuant to the Class Claim Settlement by not opting out of the Class Claim Settlement.

29.     Deferring the Other CEL Token Claims of the Potential CEL Token Litigants to the Claims reconciliation process obviates the need for a ruling regarding the classification of the

---

[13]   *See Supplemental Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3857] ("[A] total of 0.53% (2,017) in number, which is equivalent to 1.07% ($48,868,733.45) in dollar amount, of Holders of Account Holders Claims in the eligible Voting Classes made the Class Claim Settlement Opt-Out election.").

Potential Securities, minimizing the risk of a complicated appeal delaying distributions.  Upon initial review, only approximately 130 Holders of Other CEL Token Claims are Potential CEL Token Litigants.  The Potential CEL Token Litigants benefit from the proposed change by having their rights preserved for adjudication the current Plan would eliminate.  The Consenting Subordinated Parties consented to their treatment and benefit from the reduced risk of delay due to complicated appeals.  Therefore, no party in interest is materially and adversely affected by the proposed revisions, which eliminate the need for a ruling regarding the classification of the Potential Securities.  *See AMR Corp.*, 502 B.R. at 46 (finding that re-solicitation was not required where "the settlement does not materially and adversely affect" the holders of interests and claims).

## Conclusion

30.    For all of the reasons set forth herein and in the Confirmation Brief, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Revised Proposed Confirmation Order, and granting such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: October 20, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

  - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

| Grant of Ownership Clauses[1] | |
|---|---|
| **Section Title** | **Text** |
| **Loan Terms and Conditions Version 7** | |
| Collateral | (a) The Principal will only be delivered to you pursuant to your provision of Collateral in the amount of Eligible Digital Asset agreed upon between you and Celsius and deposited by you into Celsius' wallet. The amount of Collateral will be calculated based on the Fiat amount of your Loan Principal, in such a way to represent a Loan-to-Value Ratio ("LTV") as agreed upon in the Term Sheet, as of the Loan Effective Date.<br><br>(b) The LTVs offered by Celsius shall be subject to Celsius' policies, which are subject to change from time to time. We may offer or accept a range of LTVs, and we will not be obligated to match any LTV offered to or accepted by any other borrower or in relation to any previous Loan.<br><br>(c) Collateral shall be subject to a pledge for Celsius' benefit, in accordance with the terms herein. You will not be able to withdraw, transfer or transact any of the Digital Assets which are posted as Collateral. |
| Consent to Celsius' Use of Your Digital Assets | In consideration for the Loan, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, <u>with all attendant rights of ownership</u>, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:<br><br>(a) You may not be able to exercise certain rights of ownership; |

---

[1]    All underline emphasis in this **Exhibit A** is added.

|  | (b) Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and<br><br>(c) You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops, New Currency resulting from a Hard Fork (as these terms are defined in the Network Terms). |
|---|---|
| **Loan Terms and Conditions Version 8** ||
| Collateral | 1. The Principal will only be delivered to you pursuant to your provision of Collateral in the amount of Eligible Digital Asset agreed upon between you and Celsius, from your Celsius Account. The amount of Collateral will be calculated based on the Fiat amount of your Loan Principal, in such a way to represent a Loan-to-Value Ratio ("LTV") as agreed upon in the Application Form, as of the Loan Effective Date.<br><br>2. The LTVs offered by Celsius shall be subject to Celsius' policies, which are subject to change from time to time. We may offer or accept a range of LTVs, and we will not be obligated to match any LTV offered to or accepted by any other borrower or in relation to any previous Loan.<br><br>3. <u>Digital Assets posted as Collateral shall be the exclusive property of Celsius, and you grant Celsius your explicit consent to use such Digital Assets in accordance with Section 20 below</u>, for the full term during which such Digital Assets are posted as Collateral.<br><br>4. Until the Loan is repaid in full and the Collateral is released and returned to your Celsius Account, you will not be able to withdraw, transfer or transact any of the Digital Assets which are posted as Collateral. |
| Consent to Celsius' Use of Your Digital Assets | In consideration for the Loan, you grant Celsius and any of its Affiliates the right, subject to applicable laws, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, <u>with all attendant rights of ownership</u>, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at |

| | Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph: |
|---|---|
| | 1. You will not be able to exercise any rights of ownership; |
| | 2. Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and |
| | 3. You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops, New Currency resulting from a Hard Fork (as these terms are defined in the Network Terms). |

| | **Loan Terms and Conditions Version 9** | |
|---|---|---|
| Collateral | 1. The Principal will only be delivered to you pursuant to your provision of Collateral in the amount of Eligible Digital Asset agreed upon between you and Celsius, from your Celsius Account. The amount of Collateral will be calculated based on the Fiat amount of your Loan Principal, in such a way to represent a Loan-to-Value Ratio ("LTV") as agreed upon in the Application Form, as of the Loan Effective Date. |
| | 2. The LTVs offered by Celsius shall be subject to Celsius' policies, which are subject to change from time to time. We may offer or accept a range of LTVs, and we will not be obligated to match any LTV offered to or accepted by any other borrower or in relation to any previous Loan. |
| | 3. Digital Assets posted as Collateral shall be the exclusive property of Celsius, and you grant Celsius your explicit consent to use such Digital Assets in accordance with Section 20 below, for the full term during which such Digital Assets are posted as Collateral. |
| | 4. Until the Loan is repaid in full and the Collateral is released and returned to your Celsius Account, you will not be able to withdraw, transfer or transact any of the Digital Assets which are posted as Collateral. |

3

| Consent to Celsius' Use of Your Digital Assets | In consideration for the Loan, you grant Celsius and any of its Affiliates the right, subject to applicable laws, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph: |
|---|---|
| | 1. You will not be able to exercise any rights of ownership; |
| | 2. Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and |
| | 3. You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops, New Currency resulting from a Hard Fork (as these terms are defined in the Network Terms). |
| **General Terms of Use Version 5** | |
| 4. Nature of e-Services<br><br>B. Loans | In this clause 4B, notwithstanding the use of expressions such as "borrow," "loan," and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, title to the Digital Assets shall pass from you to CNL on the basis of an outright sale, subject to your right to request at a later date the delivery of equivalent (but not identical) Digital Assets to those sold to CNL. As consideration for the sale of the Digital Assets to Celsius you will receive an agreed Fiat amount from CNL, which shall act as the purchase price for the sale, along with a fee that shall be calculated by reference to such matters as the Digital Assets sold and the length of time prior to the exercise of your right to request delivery of equivalent Digital Assets. In order to exercise your right to delivery of equivalent Digital Assets to those originally sold to CNL, you must pay an agreed Fiat amount to CNL. In each case the matters expressed above shall be set out in the Loan Agreement and nothing in this clause 4B shall be taken to modify, supplement or otherwise impact the Loan Agreement between you and CNL. |

| 14. Consent to Celsius' Use of Your Digital Assets | In consideration for the rewards earned on your Celsius Wallet and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Digital Assets are available through your Celsius Wallet, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own virtual wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, <u>with all attendant rights of ownership</u>, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph: |
| | (i) <u>You may not be able to exercise certain rights of ownership</u>; |
| | (ii) Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; |
| | (iii) Celsius borrowers may default partially or entirely, which can result in partial or total loss of your Digital Assets. In that event, you authorize Celsius to use Eligible Digital Assets to absorb the losses; |
| | (iv) Celsius may use your Eligible Digital Assets as collateral to borrow other digital or fiat assets in different jurisdictions around the world. While such borrowing are for the purpose of optimizing the returns to all members, Celsius may experience losses or partial recovery of such collateral in certain situations; and |
| | (v) Celsius may lend your coins to exchanges, hedge and other counterparties, which may provide full or partial collateral for any coin or fiat loan. |
| **General Terms of Use Version 8** | |
| 4. Services | You may apply to borrow certain Fiat currencies or Stablecoins from an Affiliate of Celsius, as will be agreed between you and Celsius or its Affiliates in writing, against Eligible Digital Assets in your Celsius Account (each, a "Loan"). If |

| | |
|---|---|
| E. Borrow | approved, such application shall be subject to a separate agreement to be entered into between you and the Celsius Affiliate (the "Loan Agreement"), and Celsius or its Affiliates shall hold the Digital Assets provided as collateral under the Loan Agreement for the benefit of the Lender <u>subject to the terms hereof, including without limitation Sections 9, 10 and 13</u>. |
| 13. Consent to Celsius' Use of Digital Assets | In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, <u>for us entering into any Loan Agreement</u>, and the use of our Services, <u>you grant Celsius</u>, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, <u>or as collateral under the Borrow Service (if available to you)</u>, <u>all right and title to such Eligible Digital Assets, including ownership rights</u>, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, <u>with all attendant rights of ownership</u>, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph: <br><br> 1. <u>You will not be able to exercise rights of ownership</u>; <br><br> 2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and <br><br> 3. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws. |

**<u>Exhibit B</u>**

**Redline between Version 7 (Original) and Version 9 (Modified)**

# Celsius Loan Terms and Conditions

Celsius ~~Networks~~ Lending LLC ("we"," "our"," "us"," "Celsius"," "Lender"," or the "Company") provides the following Loan Terms and Conditions (the "Loan Conditions") that apply to our borrowers (~~each,~~ "you" or "Borrower") when you seek to initiate a transaction pursuant to which we, the Lender, will lend Fiat money or Stablecoins (as defined below) to you, and you will return Fiat money or Stablecoins to us in accordance with the terms hereof (each such transaction, a "Loan").

Each Loan is provided solely for use by you, and your application for a Loan is expressly conditioned on your consent to, and compliance with, these Loan Conditions. Please carefully review these Loan Conditions and use them to make informed decisions. By applying for a Loan, you agree to be bound by these Loan Conditions. If you do not agree to any of the provisions of these Loan Conditions you should not apply for a Loan. In addition, our ~~Network~~ Terms ~~and Conditions~~of Use (the "Network Terms"), and our Privacy Policy are incorporated into these Loan Conditions by reference.

# Definitions

Capitalized terms shall have the meanings assigned to them in these Loan Conditions, unless the context otherwise requires.

1. "Account" means your account with Celsius set up and maintained pursuant to the Network Terms.
2. "Affiliate" means an entity that owns or controls, is owned or controlled by, or is or under common control or ownership with a party, where control is defined as the direct or indirect power to direct or cause the direction of the management and policies of such party, whether through ownership of voting securities, by contract, or otherwise.
3. "App" means Celsius proprietary platform, accessible through our mobile and/or web-based applications
~~3~~4. "Collateral" means an amount in Eligible Digital Assets, as provided by the Borrower to the Lender as security for a Loan.
~~4~~5. "CEL" means Celsius' proprietary Digital Asset that is generated on the Celsius Network.
~~5.~~ 6. "Digital Asset" means a digital representation of value in which encryption techniques are ~~used~~
   used to regulate the generation of units of currency and verify the transfer of funds, operating independently from a central bank.
~~6~~7. "Eligible Digital Asset" means the types of Digital Assets we may choose to accept and support from time to time, which are subject to change in our sole discretion, based on business and regulatory considerations.
~~7~~8. "Eligible Stablecoins" means the types of Stablecoins we may choose to accept and support from time to time, which are subject to change in our sole discretion, based on business and regulatory considerations.
~~8~~9. "Fiat", when used in reference to money or currency, means any money that a recognized government declares as legal tender.
~~9. "Loan Effective Date" means the date upon which a Loan is granted.~~

10. "Loan Effective Date" means the date upon which a Loan is granted.
101. "Maturity Date" means the date stated in the Term Sheet as the date of the last repayment of the the Loan by Borrower.
112. "Obligations" means any debts, amounts owed, or liabilities incurred by you to Celsius.
123. "Principal" means the amount of a Loan granted under these Loan Conditions, as stated in the Term Sheet.
134. "Stablecoin" means a Digital Asset that is pegged to (its exchange rate is fixed to that of) a Fiat currency.

## Eligibility, Application

1. You must be a Celsius Account holder to apply for a Loan. You may apply for a Loan by providing all required information in the Loan application form available through the Account (the "Application Form"). Celsius shall have full and complete discretion whether to accept a Loan application, reject it, or offer you a Loan that is subject to different terms from those for which you applied. Approval of any Loan is subject to receipt by Celsius of any information and/or document required by Celsius.

2. A Loan is approved and is binding upon Celsius and you, only after all of the following occur:Celsius has approved your loan application, a notification of which shall be delivered to you by electronic mail or within the App.

3. Celsius shall have the right to reject any loan application in its sole discretion (provided that it shall not do so on a discriminatory basis), to the extent permitted by applicable laws. The reasons for rejecting any loan application may include, but are not limited to, regulatory limitations, business considerations, previous interactions with the person applying for a loan (e.g. any inappropriate behavior, abuse of Celsius' services, previous termination or breach of any contract between Celsius and such person, etc.) and any suspicion Celsius may have that such person is or was involved in illicit activities of any kind or breached Celsius' Network Terms. The previous approval of any loan application does not guarantee the approval of any subsequent application.

4. Celsius' services, including the lending service, may not be available in all jurisdictions. Based on regulatory requirements, which may change from time to time and based on your location or residential address (or place of business), the services may not be available to you.

(a) Celsius has notified you in writing that it has approved your application;

(b) Celsius provides you with a term sheet summarizing the commercial terms of the Loan (the "Term Sheet");

(c) Celsius receives from you a duly executed copy of the Term Sheet;

(d) Celsius receives the Collateral from you; and

(f) Celsius transfers the Principal to your designated account.

## Repayment

1. Your obligation to repay the Principal amount upon the Maturity Date or earlier, in accordance with the terms hereof, shall be denominated in the same Fiat currency borrowed by you (including where Principal is disbursed in any Stablecoin pegged to such Fiat currency), and we may allow you to repay any loan Principal in such Fiat or in Eligible Stablecoins pegged thereto. We may allow you to choose from a variety of supported repayment options, in our sole discretion, from time to time.

(a) 2.        You shall repay the amount of the Principal together with any interest and late fees due thereon upon the Maturity Date, or upon the earlier repayment or termination in accordance with the terms hereof (the "Loan Amount"), in accordance with the repayment schedule agreed in the Term Sheet.

(b) Repayment of the Loan shall be made using the same payment method as the Principal was disbursed to you – e.g. if disbursed in Stablecoins, it must be repaid in the same type of Stablecoin, and if made by bank transfer it must be repaid by bank transfer using the same Fiat currency, all unless otherwise agreed upon by Celsius in writing.

(c) Interest currencies include: USD, eligible stable coins, BTC, ETH, and CEL. Celsius may change or limit the currency types with no prior warning.

3.   If you fail to make any repayment of principal when due, in addition to any rights Celsius may have in connection with a Default Event, Celsius shall be entitled, and you hereby authorize Celsius, to:

- a). deduct from your Celsius Account any available Eligible Stablecoins to recover your repayment obligation in full or in part; and/or
- b). Liquidate the Collateral to recover your repayment obligation in full or in part, in accordance with the terms of Section 15 below.

# Interest

1. You shall pay the interest on your Loan on a monthly basis. Your interest obligations under any Loan shall be denominated in the same Fiat currency borrowed by you (including where Principal is disbursed in any Stablecoin pegged to such Fiat currency), and we may allow you to make any interest payment in the same Fiat currency, Eligible Stablecoins and other Eligible Digital Assets, such as BTC, ETH, and CEL. Celsius may change or limit the interest payment options available from time to time, with no prior notice.

(d) Unless otherwise agreed upon in writing by Celsius, any 2. Monthly payments of interest (and any other outstanding payment obligations, if applicable) shall be due and payable monthly on or before the calendar date the loan was initiated (i.e. Ifg. if the origination date was September 23rd, interest will be due on or before the 23rd of each month for the duration of the loan, or any outstanding interest repayment obligation shall be considered late).

(e) Late Repayment
(1) 3.      If you fail to make any repayment of interest when in accordance with subsection (d) abovedue, in addition to any rights Celsius may have in connection with a Default Event, Celsius may immediately liquidate the corresponding amount from your shall be entitled, and you hereby authorize Celsius, to:
   - a). Deduct from your Celsius Account any available, Eligible Digital Assets to recover your interest payment obligation in full or in part; and/or
   - b). Liquidate the Collateral to recover your payment obligation in full or in part, in accordance with the terms of Section 135 below.

4. Your failure to pay any Principal, interest, or other Obligations when due shall constitute a Default Event, and Celsius shall not be obligated to take any of the actions mentioned in Sections 3.3 or 4.3 above. The responsibility to cure any failure to timely pay your Obligations shall be solely yours.

(2) If you fail to make any repayment of Principal when due, in addition to any rights Celsius may have in connection with a Default Event, any late payment shall accrue an additional late fee of eighteen percent (18%) per annum (calculated daily) of the late payment, as valued at 12:00 am Eastern Standard Time (EST) each calendar day, that is incurred by the Borrower for each calendar day that Principal repayment is overdue.

(3) If you fail to meet your Principal repayment obligations for two or more consecutive months, in addition to any rights Celsius may have in connection with a Default Event, Celsius shall be entitled to liquidate the corresponding amount from your Collateral, in accordance with the terms of Section 13 below.

(4) If you fail to pay any payment of principal, interest, or other loan payments, Celsius will automatically deduct such payment from your Celsius wallet or collateral.

# Term

(a)1. Celsius Loans are granted for a fixed period of time to be agreed upon between Celsius and you, and indicated in the ~~Term sheet~~Application Form (the "Loan Term"), unless earlier terminated or repaid in full in accordance with the terms hereof.

(b) 2._____Celsius may offer Loan Terms of various durations for you to choose from, and may change or limit duration offerings in its sole discretion.

## Early Repayment

1.   You may request an early repayment of your Loan in full, including any outstanding interest obligation (the "Early Repayment") by notifying Celsius, or, if available, through your Account.

(a) You may request an Early Repayment by giving written notice to Celsius, stating the amount you wish to repay2. Celsius will issue to you a settlement notice, detailing the outstanding Loan AmountObligations and other relevant details. Should the amount you intend to repay not cover all of the outstanding Loan Amount, the settlement notice shall indicate any remaining amounts and the corresponding

By settling

~~repayment schedule, which Celsius shall be entitled to adjust in accordance with your Early Repayment request. By delivering any Fiat Money or Stablecoins to Celsius~~<u>your Obligations</u> following an Early Repayment request, you accept all the terms specified in Celsius' settlement notice. If you have any comments or reservations regarding such terms, please inform Celsius in writing prior to delivering any Early Repayment.

<u>3. When making any Early Repayment, you will be charged the next monthly interest payment in full (e.g. when closing your Loan after 7 months and 10 days, you will be charged the full interest amount for the 8th month).</u>

~~(b)~~<u>4.</u> In any event of Early Repayment, ~~L~~<u>l</u>iquidation of Collateral (further explained in Section 1~~3~~<u>5</u> <u>below</u>), or otherwise termination by you prior to the lapse of six (6) months of the Loan Effective Date, you will be nevertheless obligated to pay Celsius the interest for the full first six (6) month period. ~~If the Loan is repaid in full or terminated, such six (6) months' interest shall immediately be due and payable, and if you make a partial Early Repayment, the outstanding amounts left outstanding shall be recalculated in such a way that the interest to be paid by you until Maturity Date shall amount to no less than six (6) months' interest.~~

~~(c)~~<u>5.</u> Celsius may request an Early Repayment by giving written notice to you, stating the amount it wishes you to repay. Upon such Celsius' request, you shall have thirty (30) days to make the Early Repayment as requested, or otherwise<u>,</u> Celsius will be entitled to ~~liquidate the corresponding portion of your Collateral to cover for the Fiat amount requested~~<u>terminate your Loan with immediate effect</u>.

~~(d) A~~<u>6. Should you make a</u> full Early Repayment ~~shall be followed by~~<u>of your Loan in accordance with the terms hereof,</u> Celsius<u>'</u> <u>shall</u> release the Collateral to your Celsius Account, within ten (10) days of your full repayment. Upon Celsius' release of the Collateral, the Loan shall be immediately and automatically terminated.

## Termination

~~(a)~~<u>1.</u> Both you and/or Celsius may, for any or no reason, terminate the Loan with thirty (30) days prior notice in writing to the other party.

~~(b)~~<u>2.</u> Celsius may, upon the occurrence of a Default Event ~~under Section 12 or 13 below~~, terminate the Loan with immediate effect.

~~(c)~~<u>3.</u> Once the Loan is terminated, <u>the Principal amount and</u> all outstanding ~~Loan Amount~~<u>Obligations</u> shall become immediately due and payable. Should you fail to repay the full outstanding ~~Loan A~~<u>a</u>mount<u>s</u> within seven (7) days, Celsius shall be entitled to liquidate the ~~corresponding amount from your~~ Collateral, in accordance with the terms of Section 1~~3~~<u>5</u> below.

~~(d) Within ten (10) days of your full repayment of the outstanding Loan Amount, Celsius shall release all remaining Collateral to your Celsius Account.~~

(e) If the Loan reaches its Maturity date, then the entire outstanding Loan Amount shall immediately become due and payable. Shortly after Borrower's repayment of the full amount, Celsius shall release any remaining Collateral to the Borrower's Celsius Account, and the Loan shall be immediately and automatically terminated.

## Currencies

1. Loan Principal disbursements are made in United States Dollars (USD) Fiat money currency, or in Eligible Stablecoins. Loans shall be secured at all times by Eligible Digital Assets posted as Collateral. You may not use CEL as Loan Collateral. Celsius may change or limit the types of Digital Assets it accepts or supports at any time and without notice, provided that such changes or limitations will not affect outstanding Loans that were made prior to the date of such changes or limitations will not be changed to the material detriment of the Borrower.

2. Currency Exchange Risk. If Borrower's settlement currency is not the USD, you agree and acknowledge that you will bear any and all risks associated with the exchange, settlement, or fluctuation of currency associated with currency exchange risk. You waive and release

Lender and its subsidiaries from any potential claims arising out of the currency exchange risk.

## Collateral

(a)1. The Principal will only be delivered to you pursuant to your provision of Collateral in the amount of Eligible Digital Asset agreed upon between you and Celsius and deposited by, from your into Celsius' wallet. Account. The amount of Collateral will be calculated based on the Fiat amount of your Loan Principal, in such a way to represent a Loan-to-Value Ratio ("LTV") as agreed upon in the Term SheetApplication Form, as of the Loan Effective Date.

(b)2. The LTVs offered by Celsius shall be subject to Celsius' policies, which are subject to change from time to time. We may offer or accept a range of LTVs, and we will not be obligated to match any LTV offered to or accepted by any other borrower or in relation to any previous Loan.

3.   Digital Assets posted as Collateral shall be the exclusive property of Celsius, and you grant Celsius your explicit consent to use such Digital Assets in accordance with Section 20 below, for the full term during which such Digital Assets are posted as Collateral.

(c) 4. Until the Loan is repaid in full and the Collateral shall be subject to a pledge foris released and returned to your Celsius' benefit, in accordance with the terms herein. Account, Yyou will not be able to withdraw, transfer or transact any of the Digital Assets which are posted as Collateral.

## Return of Collateral

Within ten (10) days of your full repayment of the Principal amount and all outstanding Obligations, Celsius shall release all remaining Collateral to your Celsius Account.

## Margin Calls

(a)1. At all times throughout the Loan Term, you must maintain an LTV no higher than that stated in the Term SheetApplication Form. Should the Fiat value of your Collateral (the "Collateral Value") decrease (e.g. where the

Digital Asset posted as Collateral decrease in Fiat value), making your LTV rise, Celsius may require you to ~~add Collateral~~take the necessary actions to decrease your LTV back to its original level ("Margin Call").

~~(b)~~2. A Margin Call shall be initiated by Celsius by contacting you and requiring you to perform one of the actions below within the ~~deadline~~timeframe mentioned in the Margin Call:

~~i○~~ a). Furnish additional Eligible Digital Assets of the same type as posted by you as Collateral (the "Additional Collateral"); or

~~ii○~~ b). Repay Celsius a portion of your Loan Amount as Celsius instructs you~~, or~~.

~~iii. Authorize Celsius to liquidate the necessary amount of your Collateral.~~

~~(c) In the event that you do not add the required collateral per Celsius' instructions and within the scheduled time frame, you agree Celsius may charge a higher interest rate ("Margin Call Fee") for period in which you are in default on their margin call status. Celsius has the right to charge a default Margin Call Fee that would equal .03% of the value of the margin call per calendar day in default. At Celsius' discretion, this Margin Call Fee will be deducted from your wallet balance or your loan collateral.~~

~~(d) Any failure by you to furnish additional Collateral, and/or to make the required repayments, and/or authorize Celsius to liquidate the necessary amount of the Collateral within the deadline provided~~ 3. Any failure by you to comply with the Margin Call requirement within the timeframe mentioned in the Margin Call shall constitute a Default Event, and Celsius shall be authorized to exercise any of its rights related to the Collateral in whole or in part. Celsius shall further be entitled, and you hereby authorize Celsius, to take the required Additional Collateral, in full or in part, from Eligible Digital Assets available in your Celsius Account, by

providing you notice of the same. Celsius' authority as above shall not release you from complying with the Margin Call requirements, which shall be your sole responsibility.
4.  Under certain circumstances, e.g. extreme market volatility or low liquidity in the Digital Asset comprising your Collateral, Celsius may take additional measures to ensure that it can be reimbursed by your Collateral, including but not limited to shortening the timeframe of any Margin Call, take the required Additional Collateral, in full or in part, from Eligible Digital Assets available in your Celsius Account, or limiting, delaying or preventing withdrawal of such Eligible Digital Assets until the Margin Call is complied with. Celsius may provide you with notice of any such action in real time or after the fact.

(d)  5.   We will generally provide a ~~deadline~~ timeframe of twelve (12) hours for you to react to a Margin Call,
but we
      shall not be obligated to do so. For example, where the market continuously drops dramatically, we may provide shorter deadlines. ~~We will attempt~~ Celsius will undertake reasonable efforts to provide you with alerts ~~when the market is very~~ regarding market volatility which may bring about such occurrences, but we may not be able to do so and assume no responsibility in this regard.

~~volatile. If~~      6.        Regardless of whether or not a Margin Call was made, if your Collateral Value continues to
drop ~~after our Margin Call~~, raising your LTV over eighty
      percent (80%), we may, and you hereby explicitly authorize us to liquidate the ~~necessary amount of~~ Collateral and close out your Loan. Celsius will undertake reasonable efforts to provide you with a Margin Call or alerts regarding market volatility which may bring about such occurrences, but we may not be able to do so and assume no responsibility in this regard.

~~your Collateral to bring the LTV down to sixty five percent (65%) until either you respond, or the~~

~~Margin Call deadline expires.~~
      (e)  7.        Regardless of positive market spikes or changes, Celsius may recalculate the ~~a~~ Additional
      Collateral ~~collateral~~ owed at the time of ~~deposit~~ your compliance with the Margin Call, however, without explicit written instructions to the contrary, the ~~b~~ Borrower will be obligated to the amount and rate at the time of the ~~initial~~ original ~~m~~ Margin ~~c~~ Call.

## Refinancing

(a) 1.       If, during the Loan Term, your LTV drops (e.g. where the Digital Asset posted as Collateral

increase in Fiat value) to under one half (1/2) of the initial LTV stated in the ~~Term Sheet~~Application Form, you will be allowed to request the refinancing of your Loan, by any of the following manners:

~~i~~○ a). Adjust your Collateral, by removing its excess to your Celsius Account; and/or

~~(to earn interest in accordance with our Network Terms); and/or~~

~~ii~~○b). Borrow additional Fiat Money or Stablecions against the same Collateral.

(Each, a "Refinancing Request").

~~(b)~~2. Celsius will NOT be obligated to accept any Refinancing Request. If Celsius approves your Refinancing Request, the conversion rate applicable to such refinancing will be the ten (10) days low rate for the applicable Virtual Asset.

~~(c)~~3. Any Refinancing Request ~~must be made in writing, and~~ will only be binding on Celsius upon Celsius' notice to you in writing of its acceptance of your request.

~~(d)~~4. Once a Refinancing Request is accepted by Celsius, you will not be able to make another Refinancing Request for a period of thirty (30) days of the refinancing.

## Loan Consolidation

1. At the Lender's discretion and approval, Borrower may request to consolidate multiple loans into a single loan in the following manner:

    a). The loans are the same collateral type;

    b). The new maturity date for the consolidated loan shall be the latest date from the loans being consolidated;

    c). Interest payments will accrue and the exchange rate will be calculated at the time of the loan consolidation.

## Default Events

1. The occurrence of any of the following events constitutes an event of default under the Loan (a "Default Event"):

    a). You fail to timely make a payment on account of ~~the Loan Amount~~ any of your outstanding payment obligations in accordance with the payment schedule agreed in the ~~Term Sheet~~ Application Form;

ii○

○   c). You breach any term of these Loan Conditions, including any of your obligations, covenants or undertakings, or any of your representations or warranties are or become untrue.

iii○          d). You breach any of your obligations in respect of the Loan, including but not limited to any obligation to pay any amount whatsoever (principal, interest or other) to Celsius in respect of the Loan Amount;

iv○

Celsius (including any obligation resulting from the Collateral);

v○   f). You do not pay any amount owed to a third party under a contract with such third party in connection with your financial debt, or such financial debt becomes due and payable before its contractual maturity;

vi○

agreement or arrangement with any of your creditors related to the restructuring of your debts, or you become subject to any process to be declared bankrupt or to appoint a curator, administrator, trustee or liquidator over your assets;

vii○          h). All or part of the Collateral is encumbered in favor of any person or entity other than Celsius,

without Celsius' prior written consent;

viii○          i). It is or becomes illegal for you to perform your obligations under the Loan, or your Account;

ix○

perform its obligations or exercise its rights under the Loan or your Account, or regulatory or legal circumstances otherwise make the continuation of the relationship hereunder risky or detrimental to Celsius, each as Celsius may reasonably determine;

x○   j). Celsius is unable to contact you (or you fail to meaningfully respond to any communications from Celsius) in accordance with your most recent instructions for providing notices; or

xi○

your business or financial position occurs during the Loan Term.; or

xii○          m). These Loan Conditions ceases to be in full force and effect, or become unenforceable, at any time and for any reason.

(b) 2.   Immediately upon Celsius becoming aware of a Default Event, Celsius may, in its sole discretion,

take any of the actions specified below:

i○   a). Terminate the Loan;

ii    ○
interest accrued and any other amount due in respect of the Loan;

iii    ○        c). Realize all or part of the Collateral in accordance with the applicable
contractual terms; and/or

iv    ○
rights and interests.

## Default Interest Rate

During any period in which a Default Event is continuing, Borrower agrees that the interest rate will be increased by two percent (2.00%) above the interest rate set forth in this Agreement (the "Default Interest Rate"), subject to Section 17 (Usury Savings Clause). During any period in which the Default Interest Rate is in effect, it shall be applicable to all amounts outstanding under this Note, including principal and all other amounts added to the Loan balance under this Note or any other document executed in connection with this Note.

## Liquidation of Collateral

(a) 1.        If Celsius liquidates any or all of your Collateral pursuant to any provision of these Loan Conditions (each, a "Liquidation Event"), a liquidation fee of three percent (3%) shall be applied to the liquidated collateral. This means that the Fiat amount to be debited to your outstanding Loan Amount shall equal ninety seven percent (97%) of the value of the liquidated collateral. shall be first used by Celsius to cover your Obligations to Celsius (including any outstanding interest payments and Loan Amounts). Provided that no additional Obligations remain outstanding, and no other issues (e.g. any dispute or other legal issues) would require, in Celsius' reasonable discretion, to maintain the remaining Collateral - Celsius shall release the remaining Collateral back to your Celsius Account.

2. You understand and acknowledge that any Liquidation Event may cause Celsius to incur costs and expenses (whether directly or indirectly), including but not limited to exchange fees, gas fees and legal expenses. Any such costs and expenses shall be deducted from the liquidated Collateral, up to a cap of three percent (3%) of the Fiat value of the liquidated Collateral. Celsius shall not be obligated to provide you with any proof of the costs and expenses incurred by it.

(b) 3.        Celsius will not be obligated to provide any notice prior to any Liquidation Event. Shortly after a After a
Liquidation Event occurs, Celsius will provide you with a notice detailing such liquidation, and the consequential status of your Loan (including any changes to the outstanding Loan Aamount, interest, etc., or the closure of your Loan, if applicable).

## Account AuthorizationCosts

In order to satisfy Borrower's obligations under this Agreement, Borrower expressly authorizes Lender to initiate an electronic funds transfer ("EFT") debit and from and credit to Borrower's designated bank account (including any subsequent designated account identified to Lender by the Borrower) in accordance with the Authorization Agreement for Electronic Funds Transfer (EFT) Payments (the "EFT Authorization") for all amounts due and owing by Borrower to Lender if there is an Event of Default for failure to make payment of principal and interest when due under this Agreement, including, without limitation, all payments to be made by Borrower. In connection with

~~such payments, Borrower further agrees to complete the EFT Authorization. Borrower authorizes Lender to resubmit any EFT debit authorized by Borrower that is returned for insufficient or uncollected funds, except as otherwise provided by NACHA – The Electronic Payment Association's EFT rules or applicable law.~~

1. To the extent permitted by law, Borrower agrees to pay <u>and reimburse Celsius for any and</u> all costs and expenses, including collection expenses, court costs, and reasonable attorneys' fees, incurred by Lender in the collection or enforcement of ~~this Agreement.~~<u>these Loan Conditions. The</u> Borrower also agrees to pay any and all withholding taxes applicable to the Collateral, including any withholding taxes on any amounts so paid and, upon written request by Lender, shall furnish Lender with evidence of payment thereof.

2. <u>Celsius has the right to offset any Obligation against any funds or obligations owed to you under any contract, and regardless of the currency of such Obligation, all amounts owed by you to Celsius must be paid to Celsius without invoking any offset or counterclaim, unless otherwise specifically authorized by these Loan Conditions.</u>

3. If Celsius must incur any additional cost to maintain or finance your Account and/or Loan pursuant to a legal or regulatory requirement, you agree to pay Celsius the amount that we certify is necessary to offset this increased cost.

## Interest Rates

1. The annual interest rate applicable to the Loan is as prescribed in the ~~Term Sheet.~~ Application Form.
   Interest rates offered by Celsius are determined by Celsius, in its sole discretion, based on the Principal amount, the LTV, market demand, and risk management (among other considerations). Interest rate information is available at https://celsius.network/borrow-dollars-using-crypto-as-collateral/~~. Interest shall be calculated by Celsius at the end of each calendar day on the basis of the actual number of days elapsed in a 365-day year~~, and may change from time to time. Interest is presented in an annual percentage, and payable monthly, such that the monthly interest payments remain fixed throughout the Term of the Loan (unless any changes to the terms of the Loan occur throughout its Term). In any event the interest rate is limited by applicable laws and regulations in such a way that the ~~agreed upon~~agreed-upon rate would not be compliant therewith, the effective interest rate shall be amended to the legal rate closest to the ~~agreed upon~~agreed-upon rate.

~~Interest payments will be made in accepted currencies: USD, accepted Stable Coins, BTC, ETH or CEL. Any other Eligible Digital Asset used to pay interest will require liquidation and are therefore subject to the same terms and conditions applicable to liquidations in section 13. Celsius reserves the right to change acceptable interest payment currencies at any time and without prior notice. Updates will be published on the Celsius Website in the Loan section.~~

2. Discounts for interest payments paid in CEL are subject to change without prior notice, ~~the~~and may not be available to all Borrowers. The rates and benefits are published on the Celsius website: https://celsius.network/cel-token-explained/

## ~~Usury Savings Clause~~

~~It is the intent of Lender and Borrower to comply at all times with~~ ~~applicable usury laws. If at any time such laws would render usurious any amounts called for under this Agreement or any of the other Related Agreement, then it is Borrower's and Lender's express intention that such excess amount be immediately credited on the principal balance of the Loan (or, if this Loan has been fully paid, refunded by Lender to Borrower, and Borrower shall accept such refund), and the provisions hereof and thereof be immediately deemed to be reformed and the amounts thereafter collectible hereunder~~

reduced to comply with the then applicable laws, without the necessity of the execution of any further documents, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder. To the extent permitted by law, any such crediting or refund shall not cure or waive any default by Borrower under this Agreement or any of the other Related Documents. If at any time following any such reduction in the interest rate payable by Borrower, there remains unpaid any principal amounts of Loans due under this Agreement and the maximum interest rate permitted by applicable law is increased or eliminated, then the interest rate payable hereunder shall be readjusted, to the extent permitted by applicable law, so that the total dollar amount of interest payable hereunder shall be equal to the dollar amount of interest which would have been paid by Borrower without giving effect to the reduction in interest resulting from compliance with the applicable usury laws theretofore in effect. Borrower agrees, however, that in determining whether or not any interest payable with respect to a Loan under this Agreement or any of the other Related Documents is usurious, any non-principal payment (except payments specifically stated in this Agreement or in any other Related Document to be interest), including, without limitation, prepayment fees and late charges, shall be deemed to the extent permitted by law, to be an expense, fee, premium or penalty rather than interest.

## Borrower's Representations

You hereby represent and warrant to us that, as of the Loan Effective Date and throughout the Loan Term:

(a)1. You are the sole owner of all Digital Assets used in connection with the Loan (including the Collateral and any Margin Call depositdelivery);

(b) 2.     You are the sole beneficial owner of the Celsius Account, digital wallet and/or bank account
to which the Principal is delivered;

(c) You are the sole beneficial owner of the Account;

(d)3. You represent and warrant that all Digital Assets used in connection with the Loan are not owned, controlled, or received byfrom, or are held for or on behalf of, any individual or legal entity subject to any sanctions, embargos or trading restrictions administered or enforced by the United States.any national or international government or organization;

(e)4. You are validly authorized to carry out transactions using such Digital Assets, and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity;

(f)5. All Digital Assets used in connection with the Loan are, and will continue to be for the duration of the Term, free from any claims, indebtedness, liens, or third-party interests;

6. There are no actions, suits, litigation or proceedings, at law or in equity, pending by or against Borrower before any court, administrative agency, or arbitrator, which might affect these Conditions, the Loan or the Collateral;

7. Borrower is not subject to any laws or regulations that limit its ability to borrow funds, incur debt or grant Lender the rights granted hereunder, or which may otherwise render all or any portion of these Conditions unlawful, invalid or unenforceable;

8.  Neither Borrower, any of its affiliates nor any of their respective officers, directors, brokers, employees, or agents: (i) has violated any anti-terrorism, anti-money laundering or counter-terrorism financing, anti-bribery or anti-corruption laws or regulations of any jurisdiction; (ii) has engaged in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of prohibited offenses designated by the Organization for Economic Co-operation and Development's Financial Action Task Force on Money Laundering; (iii) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the UK HM Treasury's Office for Financial Sanctions Implementation, the EU Service for Foreign Policy Instruments, or other national, multinational or international organization ("Sanction Lists"), or resides, is organized or chartered, or has a place of business in a country or territory subject to any Sanction List or embargo programs; (iv) is publicly identified as prohibited from doing business with the United States or the United Kingdom under any applicable law, order or regulation; (v) conducts any business or engages in making or receiving any contribution of goods, services or money to or for the benefit of any person described in clauses (iii) or (iv) above; (vi) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any anti-terrorism law; or (vii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any anti-terrorism law.

9. All Digital Assets used in connection with the Loan were obtained by you lawfully and from a legitimate source, and are not the proceeds of any illicit activities by you or any other person.

~~(g)~~10. All information provided by you in connection with the Loan or with your Account is true, complete, accurate and not misleading;

~~(h)~~11. The Loan is requested, and you will only use the Principal, for lawful purposes ~~.~~ and in full compliance with all laws and regulations applicable to you in any jurisdiction. Without derogation from the generality of the above, you represent and warrant that you shall not, and shall not allow any third party to, use any Principal for any fraudulent scheme, tax evasion, money laundering or financing of terror, market manipulation, wash trading, insider trading or any other misconduct;

## ~~Conditions to Lender's Obligations~~

12. Borrower acknowledges that Lender is not, and does not act in the capacity of, Borrower's agent, advisor or loan broker, did not and will not provide Borrower with any professional advice (including financial, legal or tax advice), and Borrower did not rely on Lender when assessing the appropriateness of any Loan to Borrower and its financial circumstances and needs.

13. Borrower shall not use the Principal, or any other funds or assets it may obtain from Lender in connection with any Loan, to engage in any:

   ○   a). transaction on a leveraged, margined, or financed basis, unless entered into in accordance with all applicable laws and regulations, including, where applicable, on a regulated market (e.g. securities or commodities exchange);

   ○   b). commodities transaction, including the purchase of any Digital Asset or any derivative thereof, unless Borrower obtains actual delivery of the underlying within the period of time prescribed in the applicable rules and regulations applicable to Borrower;

   ○   c). purchase of Digital Assets on or via the Celsius platform, including from third party fiat onramp providers whose services are offered on the Celsius platform, including

but not limited to using Celsius' in-app 'swap' feature, where applicable. Borrower acknowledges that any transaction not in compliance with its representations in this Section 18.1.13 shall constitute a breach of these Loan Conditions, are strictly prohibited and discouraged by Lender, and will be at the sole risk and liability of Borrower.

# Conditions to Lender's Obligations.

Lender's obligation to advance funds or release Digital Currency used as Collateral under ~~this Agreement~~ these

Loan Conditions shall be subject to the satisfaction of all of the conditions set forth in ~~this Agreement and the~~ these Loan

Conditions and the additional documents provided by or executed by Borrower in connection with

the Loan ("Related Documents"), including, without limitation, the following specific conditions

precedent:

~~(a)~~1. Related Documents. Borrower shall electronically execute all Related Documents, in form and substance acceptable to Lender.

~~(b)~~2. Representations and Warranties. ~~The~~Borrower's representations and warranties set forth in ~~this Agreement~~these Loan Conditions and the other Related Documents are true and correct in all material respects~~; provided, however, that those representations and warranties expressly referring to another specific date shall be true and correct in all material respects as of such date~~ as of the date of their making and throughout the Term.

~~(c) No Event of~~          3.          No Default Event. There shall not exist at the time of the advance, and after giving effect
thereto, a condition which would constitute an ~~Event of~~ Default Event under ~~this Agreement~~these Loan Conditions.

4. Collateral. Borrower shall have the Digital Asset to be posted as Collateral available in Borrower's Celsius Account (or otherwise add such Digital Assets thereto prior to the provision of the Loan principal), free and clear of any third party claims, interests or charges.

~~(d) Collateral. Borrower shall have deposited the Collateral into Lender's Digital Asset Depository Account provided for in the Financial Terms ("Depository Account") and such transaction has been mined in a block after which at least five other blocks have been mined. Borrower agrees that Lender may, for its own account, pledge and repledge from time to time, without notice to the Borrower, either separately or in common with other such cryptocurrency, any or all of the Collateral held in the Depository Account and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar cryptocurrency.~~

~~(e) Priority. Lender shall have actual possession of, and a first priority security interest in the Collateral.~~

~~(f)~~ 5.          Notwithstanding the above, Borrower's failure to meet any of the conditions set forth in ~~the~~ this
Section ~~above~~20 shall not provide any basis for Borrower to contest the enforceability of the Loan.

~~(g) Additional conditions for New York Borrowers:~~

1. These additional or differing terms ("NY Terms") are only applicable for accounts opened or operated in New York in relation to the third-party account operated by Prime Trust, LLC ("PT"), a Nevada trust company.

2. These NY Terms apply to you immediately upon the opening of a PT Account and operate as a binding contract between Celsius and you. These NY Terms also operate in addition to the PT Custodial Account Agreement and PT Privacy Policy that you have or will enter into with PT. By using the Services, you are deemed to have accepted both Celsius Terms of Use, PT Terms, and NY Terms.

3. Collateral. Borrower shall have transferred the Collateral into Lender's digital asset depository account at Prime Trust LLC ("PT" or the " Depository "), (such account or any other account at the Depository to which Lender may transfer the Collateral, the " Depository Account "). Borrower agrees that Lender may, for its own account, pledge, repledge, borrow against, without notice to the Borrower, either separately or in common with other such cryptocurrency, any or all of the Collateral and that Lender may do so without retaining in its possession or control for delivery, a like amount of similar Collateral. The parties agree that the holding of cryptocurrencies through the Depository constitutes the use of reasonable care with respect to the custody and preservation of the Collateral.

## Consent to Celsius' Use of Your Digital Assets

In consideration for the Loan, you grant Celsius and any of its Affiliates the right, subject to applicable laws, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:

(a)1. You maywill not be able to exercise certainany rights of ownership;

(b)2. Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and

(c)3. You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops, New Currency resulting from a Hard Fork (as these terms are defined in the Network Terms).

## Pledge Agreement

Borrower hereby pledges in favor of Celsius and its Affiliates any and all assets regardless of their form or kind that currently are (or which may be in the future) held in Borrower's Celsius Account(s)

as collateral for any present or future claims, including any interest, commissions, fees or other charges, that Celsius may have against the Borrower, including as a result of third-party claims related to the Borrower's Account (the "Right of Pledge"). The Right of Pledge granted to Celsius hereunder shall extend to any and all present or future interest, dividends, proceeds, subscription rights or any other matured rights deriving from, or appurtenant to, the pledged assets. The Right of Pledge shall extend in particular to:

(a)1. Any and all assets currently or subsequently held in Borrower's Account;

(b)2. Any and all assets, claims, cash or other objects and rights that have been (or which may be in the future) deposited transferred in or credited to Borrower's Account. In the event the pledged assets are replaced by other assets, the latter shall also be subject to the Right of Pledge without further action.

Borrower authorizes Celsius to carry out all formalities that may be necessary for Celsius to exercise its rights as pledgee, including its registration in public records, and undertakes to assist Celsius in doing so, upon Celsius' reasonable request. The Right of Pledge shall remain valid independently of any other present or future security interests or guarantees held by Celsius, and shall only expire upon Celsius' reimbursement in full by Borrower. Celsius shall be entitled to realize all or part of the pledged assets without having to serve formal notice.

## Conversion Rates

AnyUnless otherwise provided herein, any conversion between a Digital Asset and another Digital Asset or Fiat currency shall be made by us in accordance with the rates and prices applicable at the actual time of conversion. Applicable rates are indexed to those used by industry leadingindustry-leading platforms, as we may choose to use from time to time, in our sole discretion. We currently use rates provided by BitGo - http://www.bitgo.com/ , CMC Markets - https://coinmarketcap.com/ , and our own rates as determined by our liquidity providers. We may change these rate sources at any time and without giving prior notice or updating these Loan Conditions, and you shall not have any claims regarding our choice of rate sources or rates made available by any third party.

## Taxes

It is your sole responsibility to determine what, if any, taxes apply to the payments you make or receive, and to collect, report, and remit the correct tax to the appropriate tax authority. We may deduct or make any tax withholdings or filings that we are required by law to make, but we are not responsible for determining whether taxes apply to your Loan, or for collecting, reporting, or remitting any taxes arising from any Loan, its payment or repayment. You are responsible for complying with applicable laws. You agree that Celsius is not responsible for determining whether or which laws may apply to your transactions, including tax law.

## Indemnification and Limitation of Liability; Attorney's Fees and Costs for Lawsuits.

You agree to indemnify and hold harmless Celsius and its employees, managers, partners, and Affiliates from any losses, damages, suits, and expenses, of any kind, including reasonable attorneys' fees, that we incur in connection with or arising out of your use of the Principal, or our activities in connection with the Loan, and for your violation of any law, regulation, order or other legal mandate, or the rights of a third party, or any act or omission by you or any person acting on your behalf in connection with the Loan, regardless of whether the specific use was expressly authorized by you. You agree to comply with applicable law and not to use the Principal for any transaction or activity that is illegal or violates applicable laws, regulations or rules. Please note, your agreement to comply includes any and all applicable laws and regulations of the United States, as well as of your place of residency and any law applicable to you.

We are not liable to you for claims, costs, losses or damages caused by an event that is beyond our reasonable control (e.g. the acts or omissions of third parties, natural disasters, emergency conditions, government actions, equipment or communications malfunction). We are not liable for special, incidental, exemplary, punitive or consequential losses or damages of any kind. Except for any set off setoff permitted by applicable law, any Obligations of ours may be satisfied solely from the assets of Celsius. Without limiting the generality of the foregoing, in no event shall you have any recourse, whether by set off setoff or otherwise, with respect to our Obligations, to or against any assets of any person or entity other than Celsius for Celsius' Obligations, including, without limitation, any member, Affiliate, investor, employee, officer, agent or advisor of Celsius.

Celsius reserves the right to withhold or delay the withdrawal of funds or assets belonging to you if you fail to comply with the Loan Conditions. Our total, aggregate liability to you for any claim is limited to the face value of the applicable item or transaction, or the actual value of any funds not properly credited or debited.

## General

(a) If, at any time, a provision of these Loan Conditions are declared unlawful, invalid or unenforceable in any manner with respect to the laws of any applicable jurisdiction, the lawfulness, validity and enforceability of the remaining provisions of these Loan Conditions shall not be affected thereby. The parties shall replace the unlawful, invalid or unenforceable provision with a provision that is as consistent with the original intent and content as possible.

(b) If, at any time, Celsius is required by any applicable law, regulation or order from a competent court or governmental authority to make a deduction or withholding on an Obligation or Collateral,

# Miscellaneous

1. Transferable Record. Borrower expressly agrees that these Loan Conditions constitute a "transferable record" as defined in applicable law relating to electronic transactions and that it may be created, authenticated, stored, transmitted and transferred in a manner consistent with and permitted by such applicable law.

2. Lender's Affiliates. Any and all rights and obligations of Lender under these Loan Conditions may be exercised or executed by Lender or any of its affiliated entities (which includes, for the avoidance of doubt, any entity that directly or indirectly controls, or is controlled by, or is under common control with, Borrower, including affiliated entities of such Lender's affiliated entities (each, a "Lender's Affiliate"). Without limitation to the foregoing, Lender's Affiliates may receive, hold, act as owners and exercise any rights in connection with any Collateral, make and receive payments due hereunder, act to enforce legal rights of Lender hereunder and require Borrower to perform any of its obligations hereunder. Lender shall not be required to inform Borrower of any such action taken or to be taken by any Lender's Affiliate. The Parties explicitly agree that each and any of Lender's Affiliates shall be regarded as third party beneficiaries to these Loan Conditions, for all intents and purposes, and expressly warrant not to bring any claim to the contrary.

3. Bankruptcy. The rights and priorities set forth in these Loan Conditions shall remain binding irrespective of the terms of any plan of reorganization in any proceeding commenced by or against Borrower under any provision of the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute (the "Bankruptcy Code") or under any other federal, state or foreign bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief, and all converted or succeeding cases in respect thereof or other provisions of the Bankruptcy Code or any similar federal or state statute.

4. Usury Savings Clause. It is the intent of Lender and Borrower to comply at all times with applicable usury laws. If at any time such laws would render usurious any amounts called for under these Loan Conditions or any Related Document, then it is Borrower's and Lender's express intention that such excess amount be immediately credited on the principal balance of the Loan (or, if this Loan has been fully paid, refunded by Lender to Borrower, and Borrower shall accept such refund), and the provisions hereof and thereof be immediately deemed to be reformed and the amounts thereafter collectible hereunder reduced to comply with the then applicable laws, without the necessity of the execution of any further documents, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder. To the extent permitted by law, any such crediting or refund shall not cure or waive any default by Borrower under these Loan Conditions or any of the other Related Documents. If at any time following any such reduction in the interest rate payable by Borrower, there remains unpaid any Principal due under these Loan Conditions and the maximum interest rate permitted by applicable law is increased or eliminated, then the interest rate payable hereunder shall be readjusted, to the extent permitted by applicable law, so that the total dollar amount of interest payable hereunder shall be equal to the dollar amount of interest which would have been paid by Borrower without giving effect to the reduction in interest resulting from compliance with the applicable usury laws theretofore in effect. Borrower agrees, however, that in determining whether or not any interest payable

with respect to a Loan under these Loan Conditions or any of the other Related Documents is usurious, any non-principal payment (except payments specifically stated in these Loan Conditions or in any other Related Document to be interest), including, without limitation, prepayment fees and late charges, shall be deemed to the extent permitted by law, to be an expense, fee, premium or penalty rather than interest.

5.  USA Patriot Act Notice. Lender hereby notifies Borrower that, pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it may be required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Act.

6. Truth in Lending Act Disclosures. Borrower, if a U.S. person or otherwise required to pay taxes in the U.S., acknowledges that it has been provided with the requisite Truth-in-Lending disclosure statement, in accordance with the Federal Truth in Lending Act.

7.  Military Lending Act. The Military Lending Act (MLA), 10 U.S.C. § 987, provides protections for certain members of the US Armed Forces and their dependents ("Covered Borrowers"), inter alia relating to extensions of consumer credit. The provisions of this section apply to Covered Borrowers. In general, the cost of consumer credit for Covered Borrowers may not exceed an annual percentage rate of thirty-six percent (36%). This rate must include, as applicable to the credit transaction or account: (i) the costs associated with credit insurance premiums; (ii) fees for ancillary products sold in connection with the credit transaction; (iii) any application fee charged (other than certain application fees for specified credit transactions or accounts); and (iv) any participation fee charged (other than certain participation fees for a credit card account).

## General

1. Assignment. Borrower shall not have the right to assign Borrower's rights under these Loan Conditions or any interest therein, without the prior written consent of Lender. All representations, warranties, covenants and agreements by or on behalf of Borrower contained in these Loan Conditions or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.

2. Caption Headings. Caption headings in these Loan Conditions and the Related Documents are for convenience purposes only and are not to be used to interpret or define the provisions of these Loan Conditions or the Related Documents.

3.  No Waiver. No behavior by either party hereto shall be deemed to constitute a waiver of any rights according to these Loan Conditions, and/or a waiver of or consent to any breach or default in respect of any of the terms hereof, or a change, invalidation or addition to any term, unless expressly made in writing.

4. Amendment. No alteration, amendment, modification, termination, discharge or waiver of any provision of these Loan Conditions or any other Related Document, or consent to any departure by either party therefrom, shall be effective unless given in writing and signed by both parties

5.  Severability. If any part or parts of these Loan Conditions shall be held unenforceable for any reason, the remainder of these Loan Conditions shall continue in full force and effect. If any

you agree to pay whatever additional amount is necessary such that, once the deduction or withholding is taken into account, Celsius will actually receive the total amount that we would have received if that deduction or withholding had not been made.

(c) Celsius has the right to offset any Obligation against any funds or obligations owed to you under any contract, and regardless of the currency of such Obligation, all amounts owed by you to Celsius must be paid to Celsius without invoking any offset or counterclaim, unless otherwise specifically authorized by these Loan Conditions.

(d) If Celsius must incur any additional cost to maintain or finance your Account and/or Loan pursuant to a legal or regulatory requirement, you agree to pay Celsius the amount that we certify is necessary to offset this increased cost.

(e) The relationship between you and Celsius is governed exclusively by the laws of the State of Delaware, without regard to its conflict of law provisions. Any dispute arising out of, or related to, your Account, Loan, or relationship with Celsius must be brought exclusively in the courts located in Dover, Delaware; however, Celsius may bring equitable relief or collections actions in any applicable jurisdiction.

provision of these Loan Conditions is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

6. Notice. Any notice required or otherwise given pursuant to these Loan Conditions shall be in writing and sent to the electronic mail address listed in the preamble to the Agreement (unless otherwise required by applicable law in which case it will be mailed certified return receipt requested, postage prepaid, or delivered by overnight delivery service. Either party may change such addresses from time to time by providing notice as set forth above.

7. Counting of Days. Except where otherwise specifically provided, any reference in these Loan Conditions to a period of "days" means calendar days and not business days.

8. Governing Law; Acceptable Forums; Waiver of Jury Trial. THESE LOAN CONDITIONS WILL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS. BORROWER UNDERSTANDS THAT BORROWER'S ACCEPTANCE OF THE APPLICABILITY OF DELAWARE LAW AND VENUE ARE A MATERIAL FACTOR IN LENDER'S WILLINGNESS TO ENTER INTO THESE LOAN CONDITIONS. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of these Loan Conditions, shall, if Lender so elects, be instituted in any court sitting in Delaware. Borrower agrees that the above courts are convenient to it, and submits to the jurisdiction of such courts and waives any and all objections to jurisdiction or venue. Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to these Loan Conditions or any Related Document or the transactions contemplated hereby or thereby (whether based on contract, tort or any other theory).

9. Waiver of Class Action. To the extent permissible by law, the parties hereto irrevocably agree that all claims must be brought in a party's individual capacity, and not as a plaintiff or class member in any purported class, collective action, or representative proceeding.

10. Counterparts; Electronic Acceptance. these Loan Conditions and any signed agreement or instrument entered into in connection with these Loan Conditions, and any amendments hereto or thereto, may be executed in one or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine

or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No Party shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.