**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

## SEVENTH NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Plan Supplement").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on September 27, 2023, the Debtors filed the *Sixth Notice of Filing of Plan Supplement* [Docket No. 3583] (the "Sixth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Seventh Plan Supplement" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, and the Sixth Plan Supplement, the "Plan Supplement")[3], which includes the following documents:

| Exhibit | Document |
|---------|----------|
| A | Schedule of Retained Causes of Action |
| A-1 | (Redline) Schedule of Retained Causes of Action |
| B | ADR Procedures |
| B-1 | (Redline) ADR Procedures |
| C | ADR Valuation Form |
| D | Litigation Administrator Agreement |
| D-1 | (Redline) Litigation Administrator Agreement |
| E | Plan Administrator Agreement |
| E-1 | (Redline) Plan Administrator Agreement |
| F | Paxos Agreement |
| F-1 | (Redline) Paxos Agreement |
| G | Coinbase Agreement |
| G-1 | (Redline) Coinbase Agreement |
| H | Schedule of Released and Exculpated Parties |
| H-1 | (Redline) Schedule of Released and Exculpated Parties |
| I | Registration Rights Agreement |
| J | U.S. Bitcoin Management Agreement |

---

[3]    **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, and the Sixth Plan Supplement.

| J-1 | (Redline) U.S. Bitcoin Management Agreement |
| K | Proof Group IP License |
| K-1 | (Redline) Proof Group IP License |
| L | U.S. Bitcoin Cedarvale Interim Services Agreement |
| L-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |
| M | PayPal Distribution Services Agreement |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Sponsor Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re: Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

*[Rest of page intentionally left blank]*

New York, New York
Dated: October 20, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Annex 1**

I.    ***Notice of Filing of Plan Supplement* [Docket No. 3115].**

<u>Exhibit</u>        <u>Document</u>

A         Schedule of Released and Exculpated Parties

B         ADR Procedures

II.    ***Second Notice of Filing of Plan Supplement* [Docket No. 3273].**

<u>Exhibit</u>        <u>Document</u>

A         Schedule of Retained Causes of Action

B         Schedule of Equitably Subordinated Claims

C         Schedule of Excluded Parties

III.    ***Third Notice of Filing of Plan Supplement* [Docket No. 3444].**

<u>Exhibit</u>        <u>Document</u>

A         New Organizational Documents

B         Identities of the members of the New Board of NewCo

C         Schedule of Rejected Executory Contracts and Unexpired Leases

D         Schedule of Assumed Executory Contracts and Unexpired Leases

E         Litigation Administrator Agreements

F         Identity of Litigation Administrator

G         Identities of Litigation Oversight Committee Members

H         Employee Transition Services Agreement

I         Plan Administrator Budget

J         ADR Procedures (Redline at Exhibit J-1)

K         Schedule of Retained Causes of Action (Redline at Exhibit K-1)

**IV.**    ***Fourth Notice of Filing of Plan Supplement*** **[Docket No. 3483].**

| Exhibit | Document |
|---|---|
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) NewCo Organizational Documents |

**V.**    ***Fifth Notice of Filing of Plan Supplement*** **[Docket No. 3550].**

| Exhibit | Document |
|---|---|
| A | Identities of the members of the New Board of NewCo |
| A-1 | (Redline) Identities of the members of the New Board of NewCo |

**VI.**    ***Sixth Notice of Filing of Plan Supplement*** **[Docket No. 3583].**

| **Exhibit** | **Document** |
| --- | --- |
| A | Identities of Litigation Oversight Committee Members |
| A-1 | (Redline) Identities of Litigation Oversight Committee Members |
| B | Coinbase Prime Brokerage Agreement |
| B-1 | (Redline) Coinbase Prime Brokerage Agreement |
| C | Litigation Administrator Agreement |
| C-1 | (Redline) Litigation Administrator Agreement |
| D | Plan Administrator Agreement |
| D-1 | (Redline) Plan Administrator Agreement |
| E | Schedule of Excluded Parties |
| E-1 | (Redline) Schedule of Excluded Parties |
| F | Board Observer Agreement |
| G | Identities of the Board Observers |
| H | NewCo Board Terms |

## <u>Exhibit A</u>

**Schedule of Retained Causes of Action**

**Exhibit A**

**Schedule of Retained Causes of Action**

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan;** ***provided that*, notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein**."

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity**."

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I.    Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on Schedule 1 attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) arising from or relating to CEL Token, including claims arising from actions or inactions affecting the price of CEL Token and claims arising from the distribution of CEL Token to former employees, insiders of the Debtors, or other third parties; (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.    Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.    Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan, including account holders and all other parties, for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.    Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any

claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.    Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws. For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.    Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.    Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

## VIII.    Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of adversarial

proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members,  equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

## IX.    Claims Related to Accounts Receivable and Accounts Payable

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

## X.    Claims Related to Contracts and Leases

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover

actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.*, Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct<br>Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494–497, 526 |
| Celsius Network Limited | Equities First Holdings, LLC | - | - | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | EZ Blockchain Services, LLC | - | - | Breach of contract, turnover |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric* | U.S. Bankruptcy Court for the | Breach of contract |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| | | *Ventures Group SARL,* Case No. 22-10964 (MG) | Southern District of New York | |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.,* Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.,* Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent inducement |
| Celsius Mining LLC Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc. Luna Squares LLC Cosmos Infrastructure LLC | - | - | Breach of contract, bad faith, willful misconduct |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br><br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (mg) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |
| Celsius Network Limited<br>Celsius Network LLC | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) | U.S. Bankruptcy Court for the Southern District of New York | Prepetition preferential transfers and related claims |
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |

## **Exhibit A-1**

**(Redline) Schedule of Retained Causes of Action**

## Exhibit A

### Schedule of Retained Causes of Action

Article IV.M of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. ~~3222~~3577] (as may be amended, modified, revised, or supplemented from time to time, the "**Plan**")[1] provides that: "each Post-Effective Date Debtor shall retain [and] may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action. **The rights of the Litigation Administrator(s) and the Plan Administrator to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in** <u>**Article VIII**</u> **of the Plan;** *provided that*, **notwithstanding anything to the contrary in this Plan, Causes of Action included in the Schedule of Retained Causes of Action shall not be released pursuant to the Plan (even as to Released Parties) unless specifically provided therein.**"

Article IV.M of the Plan further provides that: "**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Plan Administrator, or any Litigation Administrator will not pursue any and all available Causes of Action against it. The Debtors and the Post-Effective Date Debtors (on behalf of themselves, the Plan Administrator, and the Litigation Administrator(s)) expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**"

Without limiting the generality of Article IV.M of the Plan, the Debtors identify the following types of Causes of Action that are expressly preserved by the Debtors and the Post-Effective Date Debtors after the Effective Date, solely to the extent such Causes of Action are not otherwise specifically released, settled, compromised, transferred, or assigned under the Plan or any other order of the Court.

The Debtors expressly reserve the right to alter, modify, amend, remove, augment, or supplement this Schedule of Retained Causes of Action at any time with additional Retained Causes of Action. Failure to include any Retained Cause of Action herein at any time shall not be a bar and shall not have any impact on the Post-Effective Date Debtors' and Litigation Administrators' rights to bring any Retained Cause of Action not otherwise released pursuant to the Plan.

## I. Claims Against Third-Parties

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against all Persons or Entities that are not Released Parties, including Causes of Action that are (a) listed on <u>Schedule 1</u> attached hereto; (b) based upon any contract or quasi-contract theory of liability or recovery; (c) based upon any tort theory of liability or recovery, including, without limitation, tortious interference with existing contracts, tortious interference with contractual or

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the Plan.

business relations, conversion, theft, embezzlement, conspiracy, unfair competition, misappropriation of trade secrets, self-dealing, fraud, negligence, gross negligence, willful misconduct, breach of warranty, misappropriation, or misrepresentation; (d) based upon any other legal or equitable theory of liability or recovery arising under federal, state, or other statutory or common law or otherwise, including, without limitation, breach of fiduciary duty, breach of the duty of care, breach of the duty of good faith and fair dealing, breach of the duty of loyalty, breach of the duty of candor, breach of the duty of oversight, or breach of any other duty, or aiding and abetting any such breaches of duty; (e) arising under sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (f) for avoidance, fraudulent transfer, and similar Causes of Action pursuant to the Bankruptcy Code, state or other federal statutes, or common law; (g) for recharacterization, subordination, or disallowance of any Claim, or for setoff, counterclaim, recoupment; (h) arising from or relating to CEL Token, including claims arising from actions or inactions ~~taken to~~ affecting the price ~~or other matters related the CEL token~~ of CEL Token and claims arising from the distribution of CEL Token to former employees, insiders of the Debtors, or other third parties; (i) arising from or relating to the failure to properly oversee and govern the Debtors' operations and finances, operational mismanagement, expenditures of company funds for personal use (including, but not limited to, self-dealing, kickbacks, and embezzlement), theft of company or customer property, improper and excessive compensation, improper and excessive benefits, improper dealings with companies owned or controlled by the Debtors' former equity holders (direct or indirect), officers, directors, members, managers, employees or agents, financial and accounting mismanagement and/or impropriety, or violations of employment agreements, company agreements, or other company policies; or (j) those claims and causes of action identified in the Complaint attached to the *Notice of Filing of Revised Proposed Complaint of the Official Committee of Unsecured Creditors* [Docket No. 2349].

## II.    Contributed Claims

The Debtors and the Post-Effective Date Debtors expressly reserve all Contributed Claims, subject to the procedures identified in Articles IV.G and IV.O of the Plan and the ballots, which such Contributed Claims shall have been irrevocably contributed to the Post-Effective Date Debtors.

## III.    Promoter Claims

Unless otherwise specifically released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against ~~public~~ promoters, marketers, and advertisers of the Debtors who are not Released Parties as defined in the Plan, including account holders and all other parties, for, among other things, false or deceptive marketing or advertising, false inducement of the Debtors' account holders, misleading or fraudulent claims, aiding and abetting breaches of fiduciary duty, and other claims or causes of action relating to any oral or written statements made in connection with the Debtors' platform or services.

## IV.    Claims Against Professional Persons

Unless they are Released Parties or otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against any outside attorneys, financial advisors, investment bankers, auditors, or other professional persons for any claims or causes of action, including, without limitation, negligence, malpractice, fraud, misrepresentation, and aiding and abetting breaches of fiduciary duty in connection with services rendered to the Debtors.

## V.    Avoidance Actions

Unless otherwise released by the Plan, including pursuant to the Account Holder Avoidance Action Settlement, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action that may be brought by or on behalf of the Debtors, the Post-Effective Date Debtors, their Estates, or other authorized parties in interest to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 502, 510, 542, 544, 545, 547 through and including 553 of the Bankruptcy Code, and section 724(a) of the Bankruptcy Code, or under similar or related state or federal statutes or common law, including preference and fraudulent transfer laws.  For the avoidance of doubt, all avoidance actions against entities that are not Account Holders or avoidance actions against Account Holders who are not acting in their capacity as Account Holders (*e.g.* as a lender) are not released and expressly preserved under the Plan irrespective of whether such entity is a Releasing Party as such term is defined in the Plan.

## VI.    Claims Related to Insurance Policies

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts and insurance policies to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such contract or policy is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, or any other matters.

## VII.    Claims Related to Tax Refunds

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against federal, state, local, or international taxing authorities based in whole or in part upon any and all tax obligations, tax credits, refunds, offsets, or other claims to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, including, without limitation, against or related to all federal, state, local, or international taxing authorities that owe or that may in the future owe money related to tax obligations, tax credits, refunds, offsets, or other claims to the Debtors or the Post-Effective Date Debtors, regardless of whether such entity is specifically identified herein.

**VIII.   Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, Including Adversary Proceedings**

The Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, any adversary proceeding in these chapter 11 cases or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such Entity is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, but not limited to, any claims against the Excluded Parties or any directors, officers, employees, managers, investment committee members, executive committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, or other professionals and/or advisors, or any other persons or entities affiliated with the Excluded Parties, or any of their respective Related Parties.

**IX.    Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action against or related to all vendors, suppliers of goods and services, or similar Entities that owe or that may in the future owe money to the Debtors or Post-Effective Debtors, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors or Wind Down Debtors, as applicable, owe money to them.

**X.     Claims Related to Contracts and Leases**

Unless otherwise released pursuant to the Plan, the Debtors and the Post-Effective Date Debtors expressly reserve all Causes of Action based in whole or in part upon any and all contracts and leases to which any Debtor or Post-Effective Date Debtor is a party or pursuant to which any Debtor or Post-Effective Date Debtor has any rights whatsoever, regardless of whether such Entity is expressly identified in the Plan, this Plan Supplement, or any amendments thereto, including without limitation all contracts and leases that are rejected by the Debtors, assumed pursuant to the Plan, or were previously assumed by the Debtors. The claims and Causes of Actions reserved include, without limitation, claims and Causes of Action against vendors, suppliers of goods or services, customers, landlords, utilities, promoters, banks, or any other parties, unless such claims or Causes of Action were previously released through the Plan or separate written agreement executed by the Debtors for, among other things: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) breach of contract, wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or

rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; (i) and unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**Schedule 1**

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Akshay Nayak | - | - | Current judgment entered against CNL in UK |
| Celsius Network Limited | Amber Technologies Limited | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | BadgerDAO and Cloudflare, Inc. | - | - | Gross negligence regarding security of Badger platform |
| Celsius Network Limited | Bancor | - | - | Damages claim |
| Celsius Network Limited | B-Brick, Inc. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Beowulf Energy LLC | - | - | Breach of contract, negligence, turnover, and related claims arising from hosting agreements |
| Celsius Network Limited | Blockchain Access UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Mining LLC | Core Scientific Inc. | *In re Core Scientific, et al.*, Case No. 22-90341 (DRJ) | U.S. Bankruptcy Court for the Southern District of Texas | Breach of contract, intentional misconduct Proofs of Claim Nos. 379, 425, 428, 434, 436, 439, 469, 494–497, 526 |
| Celsius Network Limited | Equities First Holdings, LLC | - | - | Breach of contract, commercial loan default action, failure to return collateral, bad faith |
| Celsius Network Limited | EZ Blockchain Services, LLC | - | - | Breach of contract, turnover |
| Celsius Network Limited | Fabric Ventures Group SARL | *Celsius Network Limited v. Fabric* | U.S. Bankruptcy Court for the | Breach of contract |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| | | *Ventures Group SARL*, Case No. 22-10964 (MG) | Southern District of New York | |
| Celsius Network Limited | Fireblocks Inc. | - | - | Negligence, breach of contract |
| Celsius Network Limited | FTX Trading Ltd. | *In re FTX Trading Ltd.*, Case No. 22-11068 (JD) | U.S. Bankruptcy Court for the District of Delaware | Proofs of Claim Nos. 3752, 3938 |
| Celsius Network Limited | HDR Global Trading Limited t/a BitMEX | - | - | Negligence, fraud, market manipulation |
| Celsius Network Limited | Into the Block Corp | - | - | Gross negligence |
| Celsius Network Limited | Iterative OTC, LLC | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Jason Stone and KeyFi Inc | *Celsius Network Limited & Celsius KeyFi LLC v. Jason Stone & KeyFi Inc.*, Case No. 22-01139 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Conversion, breach of contract, breach of fiduciary duties, turnover |
| Celsius Network Limited | Liquidity Technologies Ltd. t/a CoinFLEX | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Mambu Tech B.V. | - | - | Breach of contract, fraudulent inducement |
| Celsius Mining LLC Celsius US Holding LLC (holder of note) | Mawson Infrastructure Group Inc. Luna Squares LLC Cosmos Infrastructure LLC | - | - | Breach of contract, bad faith, willful misconduct |
| Celsius Mining LLC | Nektar ACS Corp. | - | - | Breach of contract |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| Celsius Network Limited | Profluent Trading UK Ltd. | - | - | Breach of contract, commercial loan default action |
| Celsius Network Limited | Reliz Limited | - | - | Breach of contract, commercial loan default action<br><br>Collection of arbitration award in favor of Celsius |
| Celsius Mining LLC | Rhodium Enterprises, Inc. | - | - | Breach of SAFE note |
| Celsius Mining LLC | Sabre56 Corp. | - | - | Breach of contract |
| Celsius Network Limited | StakeHound SA | *Celsius Network Ltd. v. StakeHound SA*, Case No. 23-01138 (mg) | U.S. Bankruptcy Court for the Southern District of New York | Violation of the automatic stay, turnover, breach of contract, gross negligence |
| Celsius Network Limited | Tether International Ltd. | - | - | Breach of contract, liquidation of collateral at an improper discount to market |
| Celsius Network Limited | Three Arrows Capital | *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) | U.S. Bankruptcy Court for the Southern District of New York | Loan default, insolvency proceeding |
| Celsius Network Limited<br>Celsius Network LLC | Voyager Digital Holdings, Inc. | *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) | U.S. Bankruptcy Court for the Southern District of New York | Prepetition preferential transfers and related claims |
| Celsius Network Limited | Wintermute Trading Ltd. | - | - | Breach of contract, commercial loan default action |
| ~~Celsius Network LLC~~ | ~~Bradley Condit~~ | ~~*Bradley Condit v. Celsius Network LLC & Yaron Shalem*, Case No. 22-cv-05452 (CS)~~ | ~~U.S. District Court for the Southern District of New York~~ | ~~Wrongful termination~~ |

| Debtor | Defendant | Case Name & Number (if filed) | Court (if filed) | Nature of Action |
|---|---|---|---|---|
| ~~Celsius Network LLC~~ | ~~Walter Johnson~~ | ~~-~~ | ~~-~~ | ~~Wrongful termination~~ |

## Exhibit B

**ADR Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

### ARTICLE I.

### <u>PREAMBLE</u>

The ADR Procedures[2] are designed to promote the efficient resolution of certain disputed prepetition claims against the Debtors and claims held by the Debtors, including preference actions.  Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not filed a proof of claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate, and they permit those who do not wish to participate to opt out.

The ADR Procedures provide persons or entities holding disputed claims the opportunity to participate in a streamlined process with the goal of reducing administrative costs that detract from all stakeholders' recoveries and allowing for quicker distributions on account of claims against the Debtors' estates and the entities against which the Debtors hold claims.  The ADR Procedures facilitate this by establishing a standard methodology for informal and formal negotiations, fostering settlement and liquidation of Participating Claims.

Importantly, the Plan provides that disputed claims will not receive a distribution until all disputes with respect to any such claim are resolved, including all Recovery Causes of Action. *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* at Art. VII(J), *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) [ECF No. 3577].  The Debtors and the Committee believe that these ADR Procedures provide creditors and the Litigation Administrator the ability to efficiently resolve disputed claims

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used herein shall have the meaning set forth in Article II "Defined Terms" below.  Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

to maximize recoveries, reduce administrative expenses, and provide creditors with distributions quicker than in the traditional claims resolution process.

## 1.1. **Overview**

Celsius was founded in 2017 and was one of the first platforms that would allow users to transfer their digital assets and (a) earn rewards on such digital assets and/or (b) take loans using those transferred digital assets as collateral.

Celsius's primary operations consisted of: (a) financial services through which retail and institutional users could (i) earn rewards on digital assets they transferred to Celsius, (ii) securely store and access digital assets, (iii) borrow fiat currency supported by digital assets transferred to Celsius, and (iv) send and receive cryptocurrency using Celsius's CelPay services; and (b) bitcoin mining.

The Participating Claims are (1) unliquidated, disputed and/or contingent prepetition claims asserted against one or more Debtors or (2) ADR-Eligible Claims held by the Debtors' estates against third parties, including creditors of the Debtors. Prosecution of the Participating Claims against the Debtors outside of the Bankruptcy Court is currently stayed by the Debtors' Chapter 11 Cases or the Plan and Confirmation Order.

Most of the potential Participating Claims will be disputed by the Litigation Administrator and will have to be resolved by settlement or litigation. Litigating each independent Participating Claim in a multitude of separate individual actions, however, could result in a significant consumption of limited resources (judicial, the Litigation Administrator's, and the Participating Claimants'). The cost and delay associated with ordinary litigation procedures would not be in the best interests of any Party involved. The ADR Procedures are designed to facilitate and incentivize settlement and an efficient resolution of Participating Claims.

## 1.2. **Summary of Procedures**

The ADR Procedures consist of five sequential steps: (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure. For the avoidance of any doubt, nothing in the ADR Procedures shall alter, amend, or otherwise modify the terms of the Debtors' Insurance Policies.

The Initial Assessment Procedure is intended to provide a mechanism for the Litigation Administrator, Participating Claimants, and Third Party Participants, if any, to evaluate and consensually resolve Participating Claims and any of the Litigation Administrator's related claims and causes of action prior to mediation. Under the Initial Assessment Procedure, after receiving notification of their inclusion in the ADR Procedures, Participating Claimants will provide such information to the Litigation Administrator as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim. Upon receipt, the Litigation Administrator will determine if the Participating Claim is Disputed or gives rise to any related potential causes of action against such Participating Claimant and/or Third Parties and, to the extent applicable, invite such Third Parties to participate in the ADR Procedures. The Litigation Administrator and Third Party Participants, if any, then have the opportunity to review the documents and information

provided by the Participating Claimants to fully assess the validity and extent of any claims and/or damages relating to the Participating Claim.  The Participating Claimant may also make reasonable requests for information from the Litigation Administrator regarding their claim.  With respect to Account Holder Avoidance Actions, the Litigation Administrator may make one or more reasonable requests for information that will assist in the evaluation of an Action.

The Settlement Offer Exchange Procedure is intended to provide the Litigation Administrator, the Participating Claimants, and the Third Party Participants, if any, the opportunity to exchange written settlement offers and engage in informal settlement negotiations after they have evaluated the Participating Claim, and certain of the Litigation Administrator's related causes of action.  If the Parties are unable to resolve the Participating Claim during this process, they may proceed to Mediation.

The Mediation Procedure is intended to provide a more formal mechanism for amicable resolution of Participating Claims and any of the Litigation Administrator's related causes of action other than Excluded Claims.  The Mediation Procedure is based upon generally accepted mediation procedures of professional alternative dispute resolution organizations.  Participating Claimants shall be responsible for fifty (50%) percent of the costs and fees of the mediator, absent prior written agreement.[3]  If Third Parties participate in the Mediation Procedure, the costs and fees of the mediator shall be equally divided among the Parties.

The Optional Binding Arbitration Procedure is intended to provide a formal binding mechanism for resolution of Participating Claims and any of the Litigation Administrator's related causes of action (other than Excluded Claims) simultaneously through joint binding arbitration. The Optional Binding Arbitration Procedure is voluntary and shall only be initiated if all Parties agree to participate.  Unless the Parties agree otherwise, all costs and fees of the arbitrator shall be equally divided among all participants to the arbitration.[4]

## DEFINED TERMS

Capitalized terms used herein without further definition, and variations thereof, shall have the meanings set forth below unless the context otherwise requires.

1.3.    **"ADR-Eligible Potential Defendants"** means any potential Avoidance Action defendant that is not an ADR-Ineligible Potential Defendant.

1.4.    **"ADR Initiation Package"** has the meaning set forth in Section 3.1.

1.5.    **"ADR Organization List"** has the meaning set forth in Section 2.4.

1.6.    **"ADR Procedures"** mean the alternative dispute resolution procedures as set forth

---

[3] The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant.  In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

[4] The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant.  In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

herein.

1.7. **"Appointed ADR Organization"** means the Approved ADR Organization appointed to conduct either a mediation or arbitration for the Parties.

1.8. **"Approved ADR Organizations"** means those alternative dispute resolution organizations and individuals on the ADR Organization List or consented to by the Parties.

1.9. **"Assessment Period"** has the meaning set forth in Section 3.4.

1.10. **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

1.11. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over these Chapter 11 Cases.

1.12. **"Chapter 11 Cases"** means the cases commenced under Chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Celsius Network LLC, et. al.,* Chapter 11 Case No. 22-10964 (MG), Jointly Administered.

1.13. **"Days" or "days"** means calendar days unless otherwise defined herein. Days shall be counted as prescribed by Rule 9006 of the Federal Rules of Bankruptcy Procedure.

1.14. **"Excluded Claim"** means (a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants (as defined in the Plan); and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

1.15. **"General Unliquidated Disputed Claim"** means a Participating Claim to the extent that the claim shall be treated as an unliquidated and/or disputed claim filed in these Chapter 11 Cases.

1.16. **"Insurance Order"** means the *Final Order (I) Authorizing the Debtors to (A) Pay their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain their Surety Bond Program and (II) Granting Related Relief* [ECF No. 524], entered in the Chapter 11 Cases.

1.17. **"Insurance Policy"** means an insurance policy that has been issued at any time to or provides coverage to the Debtors and/or all agreements, documents or instruments relating thereto and/or any agreements with third-party administrators.

1.18. **"Insurer"** means any company or other entity that issued or entered into an Insurance Policy with, or that affords coverage to, the Debtors for a Participating Claim.

1.19.    "**Liquidated Allowed Claim**" means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to an allowed unsecured claim or claims to be paid on the terms set forth in the Plan.

1.20.    "**Litigation Administrator**" shall have the meaning ascribed to such term in the Plan.

1.21.    "**Local Rules**" means the Local Bankruptcy Rules for the Southern District of New York.

1.22.    "**Mediation Notice**" has the meaning set forth in Section 4.5.

1.23.    "**Participating Claim**" means (i) any disputed, unliquidated, or contingent prepetition claim, other than Excluded Claims, evidenced by a timely filed proof of claim and that is selected by the Litigation Administrator, in their sole discretion, for resolution through the ADR Procedures, or (ii) any Causes of Action (as defined in the Plan) the Estates may have against ADR-Eligible Potential Defendants; provided, subject to the limitations set forth below, that the Litigation Administrator may designate any claims (other than Excluded Claims) of creditors or other entities that are subject to the jurisdiction of the Bankruptcy Court for resolution through the ADR Procedures if the Litigation Administrator believes that, based on the nature of the potential claims, the ADR Procedures have a reasonable chance of successfully resolving the claims and the potential benefits outweigh the costs of participation.  Notwithstanding the foregoing, any disputed postpetition administrative expenses, and any claims or counterclaims asserted by the Litigation Administrator other than Excluded Claims may be submitted to the ADR Procedures by agreement of the Litigation Administrator and the applicable claimant or by further order of the Bankruptcy Court.

1.24.    "**Participating Claimant**" means any person or entity asserting a Participating Claim.

1.25.    "**Party or Parties**" means, one or more of, a Participating Claim, the Litigation Administrator, the relevant Participating Claimant, and any relevant Third Party Participants (if applicable).

1.26.    "**Plan**" means the chapter 11 plan confirmed in these Chapter 11 Cases, including all schedules and exhibits thereto, and the documents set forth in the Plan Supplement, as may be modified, amended, or supplemented from time to time.

1.27.    "**Primary Parties**" means, with respect to a Participating Claim, the Litigation Administrator and the relevant Participating Claimant.

1.28.    "**Settlement Offer Exchange Procedure**" has the meaning set forth in the preamble of Section 4.

1.29.    "**Settlement Offer Period**" has the meaning set forth in Section 3.4.

1.30.    "**Settlement Offer Period Closing**" has the meaning set forth in Section 4.4.

1.31.    **<u>Settlement Offer Period Notice</u>**" has the meaning set forth in Section 4.4.

1.32.    "**<u>Third Party</u>**" means any person or entity that the Litigation Administrator or Participating Claimant has or may have a claim against relating to any Participating Claim.

1.33.    "**<u>Third Party Evaluation Period</u>**" has the meaning set forth in Section 3.3.

1.34.    "**<u>Third Party Participant</u>**" means any Third Party that agrees to participate in the ADR Procedures by returning a signed Third Party Participation Agreement.

1.35.    "**<u>Third Party Participation Agreement</u>**" means any written agreement between the Litigation Administrator and any Third Party Participant who accepts an invitation to participate in the ADR Procedures for a Participating Claim.

1.36.    "**<u>Third Party Payable Claim</u>**" means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to receive partial or full satisfaction of the Participating Claim directly from a Third Party Participant.

1.37.    "**<u>Valuation Form</u>**" means a form requesting such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related causes of action, substantially in the form attached hereto as **<u>Exhibit 1</u>**.

1.38.    "**<u>Valuation Information</u>**" means the Participating Claimant's proof of claim and Valuation Form, and any other documents or information relating to the Participating Claim provided to the Litigation Administrator.

# ARTICLE II.

## ADMINISTRATION

### 2.1. **Administrators.**

Subject to the terms hereof, the administration of the ADR Procedures will be coordinated by the Litigation Administrator and their counsel.

### 2.2. **No Modification of the Insurance Policies or the Insurance Order.**

Notwithstanding anything to the contrary in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing, (i) nothing shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the Insurance Policies and the terms and conditions thereof and coverage or services provided thereby, (b) the rights, defenses or obligations of any Insurer, (c) any rights or obligations of the Debtors arising out of or under any Insurance Policy, or (d) the Insurance Order; (ii) to the extent of a conflict between the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing on the one hand, and any Insurance Policy that could provide coverage or services for a Participating Claim on the other hand, the terms of the Insurance Policy shall control, and nothing in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing shall excuse, or in any way alter, the Debtors' performance under the Insurance Policies; (iii) for all issues relating to insurance coverage and claims handling services, the provisions, terms, conditions, and limitations of the Insurance Policies shall control the payment of claims covered by any Insurance Policies; (iv) the failure of any Insurer to respond to any notice provided in accordance with the ADR Procedures does not relieve the Debtors of their obligations, if any, to provide an Insurer with further information and/or notices required by any applicable Insurance Policy; (v) nothing shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the ADR Procedures; (vi) nothing imposes a good faith obligation on any Insurer that does not otherwise exist under applicable law or the Insurance Policies; and (vii) Insurers shall retain all rights, claims and defenses to challenge any award pursuant to binding arbitration undertaken pursuant to the ADR Procedures that alters the terms and conditions of any Insurance Policy, and under no circumstances shall an Insurer be deemed a party to any binding arbitration unless it determines in its sole discretion that it is permitted to participate under applicable law and elects to do so.

Notwithstanding any other provision of these ADR Procedures, the rights, obligations and defenses of any Insurers under any applicable surety bond, surety collateral agreement, surety credit agreement, or surety indemnity agreement relating to the Debtors or the Participating Claims are fully preserved, unchanged and unimpaired.

### 2.3. **Option to Utilize Professionals.**

The Litigation Administrator is specifically authorized to retain professionals to assist in evaluating the merits of each Participating Claim, in placing a dollar amount on each Participating Claim, and in settling or otherwise resolving the Participating Claims pursuant to the ADR Procedures.

2.4.    **Employment of Mediation and Arbitration Organizations**.

Attached as Annex A to these ADR Procedures is a list of Approved ADR Organizations (the "**ADR Organization List**"), which the Litigation Administrator may amend by providing notice to the Participating Claimant of an amended list of Approved ADR Organizations. Subject to the conditions set forth elsewhere herein, the Litigation Administrator shall retain an Approved ADR Organization to conduct the Mediation Procedure or the Optional Binding Arbitration Procedure. Effort will be made to conduct any Mediation Procedures in a location that is convenient for the Litigation Administrator, the Participating Claimants, and, as applicable, Third Party Participants, or via videoconference, at the election of any Party.

2.5.    **Participation in the ADR Procedures**.

All Participating Claims shall be subject to the provisions of these ADR Procedures, subject to Section 2.11 or 2.12 below. *Participation in the ADR Procedures shall in no way alter the consequences, if any, of a Participating Claimant not having filed timely a proof of claim in these Chapter 11 Cases against any of the Debtors; failure to file a proof of claim may result in disallowance of such Participating Claimant's claims against the Debtors, provided that, except as otherwise set forth in the Plan, the disallowance of any claim against the Debtors' estates shall occur after notice and a hearing before the Bankruptcy Court. Participation in the ADR Procedures shall in no way affect the Litigation Administrator's ability to object to any Participating Claim, or oppose any motion for relief from the automatic stay or from any injunction contained in the Plan, that is not resolved through the ADR Procedures.*

Pursuant to these ADR Procedures, and absent a consensual resolution among the Parties prior to mediation, the Litigation Administrator shall be required to submit to mediation regarding any pending counterclaims or causes of action asserted by the Litigation Administrator related to the Participating Claim that are not Excluded Claims; *provided* that if the Parties enter mediation, all Claims and Causes of Action shall be put before the mediator for potential resolution, in full or in part.

No Party shall be required to employ counsel to participate in the ADR Procedures, including to participate in mediation or arbitration pursuant to the ADR Procedures.

2.6.    **Effect of ADR Procedures on Pending Matters and Applicable Statutes of Limitations**.

Inclusion of any Participating Claim in the ADR Procedures shall automatically stay all proceedings before the Bankruptcy Court, including but not limited to, discovery (other than discovery conducted pursuant to these ADR Procedures), motions for relief from the stay or any injunction contained in the Plan, pretrial hearing dates, and trial schedules related to the Participating Claims. Such stay shall automatically terminate thirty (30) days after any Participating Claim is removed from the ADR Procedures. Upon the written consent of the Holder of a Participating Claim (which consent shall be included on the Valuation Form), the applicable statute of limitations shall be tolled until the later of (1) 15 days after the termination of such ADR Procedures by either party or (2) the statute of limitations date.

2.7.    **Acceptance of Settlement Offers.**

The Litigation Administrator shall have authority to settle or compromise all Participating Claims and Causes of Action against Third Party Participants subject to the terms of the Plan.

2.8.    **Extensions.**

All deadlines established by the ADR Procedures with respect to any particular Participating Claim may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant, with notice to any Third Party Participants.

2.9.    **Service and Notices.**

To facilitate the timely completion of the ADR Procedures, all service and written notice required herein, with the exception of the ADR Initiation Package (unless the Litigation Administrator does not have a mailing address for the applicable Participating Claimant), may be done via email. The Parties shall exchange email addresses at their earliest convenience. If any Party does not wish to accept service via email, the Party shall notify all other Parties of such preference in writing with a mailing address which shall be used for service in connection with these ADR Procedures. Upon the other Parties' receipt of such notice, email service upon such Party shall no longer be valid.

2.10.    **Confidentiality and Non-Admissibility.**

Any settlement discussions by and between the Parties or positions taken by them during compliance with the ADR Procedures shall remain confidential and shall not be admitted as evidence in any subsequent proceeding or context, including, but not limited to, litigation of a Participating Claim, pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules and are expressly determined by the provisions herein not to be admissions by any Party. Notwithstanding the foregoing, if a Party alleges another Party has failed to participate in good faith in the ADR Procedures or disputes that a settlement had been previously reached, then settlement discussions may be used or admitted as evidence in any subsequent proceeding solely with respect to those matters. Only with the consent of the Litigation Administrator, or as permitted by an order entered by the Bankruptcy Court, Participating Claimants, including ADR-Eligible Potential Defendants, may share information obtained during the process and settlement discussions by and between the parties and positions taken by them with other Participating Claimants, including ADR-Eligible Potential Defendants, who are similarly situated and who agree to be bound by the terms of an appropriate protective order.

2.11.    **Failure to Comply with the ADR Procedures.**

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Bankruptcy Court may, after notice and a hearing, grant any remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees, other fees, and costs to the other party. The Litigation Administrator shall also participate in the ADR Procedures in good faith. For the avoidance of doubt, (i) the election to opt out of the ADR Procedures, (ii) the failure of an ADR-Eligible Potential Defendant to make an offer or counter-offer to settle a Cause of

Action, or (iii) the failure to extend, or seek to extend, applicable statute of limitations shall not be considered bad faith or a basis to move the Bankruptcy Court for remedies.

2.12.    **Participating Claimant Opt Out Option**.

A Participating Claimant may, at any time prior to the selection of a mediator, serve a written election (email sufficient), which will be effective upon receipt by the Litigation Administrator, for exclusion from the ADR Procedures; *provided*, *however*, that the Litigation Administrator may file a motion with the Bankruptcy Court opposing such exclusion. Other than with respect to the optional Binding Arbitration Procedure, a Participating Claimant may not opt out following the selection of a mediator without further order of the Bankruptcy Court. For the avoidance of doubt, if a Participating Claimant serves a written election for exclusion from the ADR Procedures in accordance with this Section 2.12, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

2.13.    **Insurer Notice**.

In the event that an Insurance Policy requires that the Debtors to provide notice to an Insurer of a Participating Claim, the Debtors shall provide notice to the applicable Insurer(s) (i) by serving a copy of the corresponding ADR Initiation Package on the Insurer when it is served on the Participating Claimant and (ii) at any time during the ADR process, when the notice requirements of the Insurance Policy are triggered. If the Insurer elects, subject to the terms of the Insurance Policy, at any time to exercise its right to control the defense or settlement of a Participating Claim, the Insurer may elect to either (i) work with the Litigation Administrator, in accordance with the terms of the Insurance Policy, to resolve the Participating Claim within these ADR Procedures, or (ii) remove the Participating Claim from the ADR Procedures; *provided* that the Insurer remove the Participating Claim from the ADR Procedures within the later of (i) the time required by applicable state law or the applicable Insurance Policy for responses to claim notices, or (ii) forty-five (45) days after the Insurer receives notice of the Participating Claim.

## ARTICLE III.

## INITIAL ASSESSMENT PROCEDURE

Subject to the provisions set forth herein, the Initial Assessment Procedure is designed to foster inclusion of all appropriate Third Parties and to allow the Litigation Administrator and any Third Party Participant to evaluate fully the Participating Claim and the Litigation Administrator's related causes of action other than Excluded Claims, in an expedited manner to facilitate meaningful settlement negotiations.

3.1.    **The Litigation Administrator Shall Provide Notice**.

The Litigation Administrator shall initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently filed proof of claim or amended proof of claim or, if no such address is available, the email address of such Participating Claimant as provided in the Debtors' books and records, if applicable, as well

as upon any counsel of record, notice of the ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form (the "**ADR Initiation Package**"). The ADR Initiation Package shall include a description of any claims and objections held by the Litigation Administrator against a Participating Claimant. For transferred claims, the Litigation Administrator also shall serve a copy of the ADR Initiation Package on the transferee identified in the notice of transfer of claim filed with the Bankruptcy Court. If a claim is transferred after the Litigation Administrator's service of the ADR Initiation Package on the Participating Claimant, such subsequent transferee shall be bound by the ADR Procedures without further order of the Bankruptcy Court.

3.2.    **The Parties Shall Provide Relevant Information**.

Unless otherwise agreed by the Litigation Administrator, each Participating Claimant, shall provide to the Litigation Administrator such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related claims or causes of action. To ensure optimum efficiency and uniformity of treatment, such information shall be provided pursuant to a standardized Valuation Form, *provided* that, should the Litigation Administrator determine, in their sole discretion, that a standard Valuation Form is not applicable to a particular Participating Claim, the Litigation Administrator shall have the authority to revise, consistent with the ADR Procedures, the Valuation Form as the Litigation Administrator deems appropriate for such claim. All completed Valuation Forms and accompanying documents must be served on the Litigation Administrator with a copy of the Participating Claimant's proof of claim, if any, within thirty (30) days after service of the Valuation Form on such Participating Claimant. Where the Litigation Administrator has no objections to the Participating Claimant's claim other than under section 502(d), the Litigation Administrator may make one or more reasonable requests for information from any Party that relates to an Account Holder Avoidance Action. A Participating Claimant's provision of the Valuation Form and related documentation, or information and related documentation relating to an Account Holder Avoidance Action, does not prohibit, or diminish in any respect, the Participating Claimant's rights to assert that responsive material is privileged and not subject to disclosure.

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Participating Claimant may make one or more reasonable requests for information to the Litigation Administrator to assist in potential defenses. The material or written response must be provided no more than 14 days after the request is made. The Litigation Administrator's provision of information and related documentation does not prohibit, or diminish in any respect, the Litigation Administrator's rights to assert that responsive material that is identified as potentially privileged is privileged and not subject to disclosure.

3.3.    **Determination of Third Party Participation**.

Upon receipt of the Valuation Form, the Litigation Administrator shall have thirty (30) days (the "**Third Party Evaluation Period**"), to evaluate whether the Participating Claim gives rise to potential causes of action by the Litigation Administrator against any Third Parties or if the inclusion of any Third Parties would be beneficial to the ADR process (*e.g.* parties that may also be liable or insurance companies). Prior to the close of the Third Party Evaluation Period, the

Litigation Administrator may make one or more reasonable requests for supplementation or clarification of the information supplied in the Valuation Information to assist in determining if the Participating Claim gives rise to any related causes of action against Third Parties as provided for in Section 3.4. Should the Litigation Administrator determine that it would be beneficial to invite Third Parties to be included in the ADR process for a Participating Claim, they shall have the right, but not the duty, to invite any and all applicable Third Parties to participate in the ADR Procedures. Should the Litigation Administrator elect to invite any Third Parties to participate, the invitation to participate shall include a Third Party Participation Agreement, and notice that, if any Third Party wishes to participate in the ADR Procedures with respect to the applicable Participating Claim, it must agree in writing within fifteen (15) days of receipt. Receipt of such invitation shall be deemed, and thus the time to respond shall begin, one business day following the date the invitation was sent.

If a Third Party accepts the Litigation Administrator's invitation to participate in the ADR Procedures, the Litigation Administrator shall immediately notify the Participating Claimant of: (i) their election to extend a Third Party invitation and the Third Party's acceptance thereof and (ii) the revised end date for the Third Party Evaluation Period. The invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement within fifteen (15) days of receipt; *provided that* if the Primary Parties agree to extend the time to respond, the invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement by the agreed upon date within the extended Third Party Evaluation Period. Prior to the close of the Third Party Evaluation Period, if the Litigation Administrator determines that they will not extend an invitation to one or more Third Party to participate in the ADR process, the Parties may, but are not required to, proceed directly to the Assessment Period (as defined below). Upon receipt of a signed Third Party Participation Agreement, the Litigation Administrator shall provide the Valuation Information to such Third Party Participant. Unless previously agreed otherwise, in writing by the Litigation Administrator, by participating in the ADR Procedures, the Third Party Participant submits to the jurisdiction of the Bankruptcy Court to determine all claims related to the Participating Claim, including counterclaims or related causes of action against Third Parties, other than any Excluded Claims. At all times throughout the ADR Procedures, all Valuation Information and other information exchanged by the Parties, shall be considered information exchanged in compromise negotiations governed by Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.

3.4.    **Evaluation of Participating Claims and Related Causes of Action.**

Upon the close of the Third Party Evaluation Period, the Litigation Administrator and any Third Party Participants shall have thirty (30) days (the "**Assessment Period**") to evaluate each Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant based upon all relevant factors under the traditional principles of liability and damages under non-bankruptcy law. The Litigation Administrator and any Third Party Participants shall review all materials submitted and in such review shall not be bound by the rules governing the admission of evidence in courts of law. Prior to the close of the Assessment Period, the Litigation Administrator and each Third Party Participant may request additional information from the Participating Claimant following the procedure described in Section 3.5 below. Within seven (7) days of the close of the Assessment

Period or such earlier date within the Assessment Period, the Litigation Administrator shall provide written notice to the Participating Claimant and any Third Party Participants that the Assessment Period has ended and that the sixty (60) day informal settlement negotiation period (the "**Settlement Offer Period**") has begun (the "**Settlement Offer Period Notice**").   The Settlement Offer Period Notice shall include notice of the applicable deadlines set forth in the Settlement Offer Exchange Procedure below.

All oversight mechanisms of the Litigation Administrator established in the Plan shall be binding on the Litigation Administrator under these ADR Procedures.

3.5.    **Requests for Additional Information.**

The Litigation Administrator and any Third Party Participants may make one or more reasonable requests for supplementation or clarification of information supplied in the Valuation Form to assist in a good faith evaluation of the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant.  The material or a written response must be provided no more than 14 days after the request is made.  The Assessment Period shall be tolled once the supplemental request is made and extended until thirty (30) days after the date the Participating Claimant serves a written response to any initial request for supplemental information upon all participating Parties (subsequent requests for additional information shall not extend the Third Party Evaluation Period or Assessment Period, unless otherwise agreed by the Parties).

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Participating Claimant may make one or more reasonable requests for supplementation or clarification of information supplied by the Litigation Administrator pursuant to section 3.2 to assist in a good faith evaluation of the Cause of Action, any known or reasonably knowable affirmative defenses, and any related causes of action.

**ARTICLE IV.**

**SETTLEMENT OFFER EXCHANGE PROCEDURE**

Subject to the provisions set forth herein, the Settlement Offer Exchange Procedure is designed to allow the Parties to attempt to consensually settle the Participating Claim, and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants, by exchanging written settlement offers and engaging in informal negotiations.

4.1.    **Exchange of Written Settlement Offers.**

Within seven (7) days of service of the Settlement Offer Period Notice, the Litigation Administrator and/or any Third Party shall make good faith offers of settlement based upon their evaluation of the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants.  Third Party Participant settlement offers may be for all or a portion of the damages asserted in a Participating Claim and, at the Third Party Participants' discretion, may cover both the Litigation Administrator's causes of action against the Third Party Participant and the Participating Claimants' direct causes of action against the Third Party Participant, if any.  Third Party Participant settlement offers shall be served

on the Litigation Administrator and the Participating Claimant. If a Third Party Participant determines that it has no liability to any Party, it shall provide a concise statement explaining such determination, rather than a good faith offer of settlement. If no Third Party is participating in the ADR Procedures for a particular Participating Claim or if there is no Third Party settlement offer provided, the Litigation Administrator shall make a good faith offer of settlement based upon their evaluation of the Participating Claim and/or any Causes of Action that are subject to these ADR Procedures.

The only permitted responses to a settlement offer are: acceptance of the settlement offer or rejection of the settlement offer coupled with a counteroffer, if any, served to all applicable Parties within seven (7) days of receipt of such offer. All written settlement offers and counteroffers by any Party shall remain open for seven (7) days and may be accepted within seven (7) days of receipt. Thereafter the Parties may exchange written counteroffers until such time as they have entered into a settlement agreement or reached an impasse.

4.2.    **Informal Negotiations.**

The Parties shall use reasonable efforts to resolve consensually the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants during the Settlement Offer Period and are encouraged to schedule settlement conferences or telephonic settlement conferences with each other at mutually convenient times.

4.3.    **Settlement.**

The Parties have significant leeway to structure settlement agreements to include providing Participating Claimants with the right to receive any combination of Liquidated Allowed Claims and Third Party Payable Claims as well as waivers of the Litigation Administrator's and/or a Participating Claimant's causes of action.[5]   For the avoidance of doubt, the Litigation Administrator shall be provided the ability to resolve and settle claims against creditors. In many instances, settlements may require proportional division of settlement amounts between multiple Participating Claimants or specific damages within a single Participating Claim, and nothing herein shall prevent the Parties from structuring partial settlements accordingly.

The Litigation Administrator may, at any given time, if they believe it economically beneficial and administratively convenient, offer to settle the Participating Claim for amounts approximating the cost of administering such claims in lieu of incurring the cost and expense thereof. Nothing herein shall limit the ability of a Participating Claimant and the Litigation Administrator to settle a Participating Claim by mutual consent at any time.

---

[5] Under no circumstances may the Participating Claimant and the Third Party Participant enter into a settlement agreement involving the Litigation Administrator causes of action against the Third Party Participant without the written consent of the Litigation Administrator.

4.4.    **Close of Settlement Offer Period.**

Unless the Parties have agreed to extend the Settlement Offer Period, the Settlement Offer Period shall close sixty (60) days from the service of the Settlement Offer Period Notice (the "**Settlement Offer Period Closing**").

Upon the Settlement Offer Period Closing, the Litigation Administrator and/or any Third Party Participant may seek disallowance of the Participating Claim before the Bankruptcy Court or pursue such Cause of Action.

(a)    If the Litigation Administrator rejects the Participating Claim, they shall so advise the Participating Claimant, and any Third Party Participants, and provide a statement specifying the basis for such rejection. Upon such rejection by the Litigation Administrator, the Participating Claim shall be removed from the ADR Procedures and treated as a Disputed Claim and shall be resolved in accordance with the Plan. Upon such rejection by the Litigation Administrator, the Litigation Administrator reserves their rights to file an objection or take any other such action with respect to such Participating Claims in accordance with the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

(b)    If a Third Party Participant rejects any liability relating to a Participating Claim, the Third Party Participant shall no longer participate in the ADR Procedures for such Participating Claim. If the Litigation Administrator does not reject the Participating Claim, however, the Litigation Administrator, the Participating Claimant, and any remaining Third Party Participants may proceed with the ADR Procedures without the rejecting Third Party Participant.

4.5.    **Initiation of the Mediation Procedure.**

If the ADR Procedures have not been terminated in accordance with Section 4.4 hereof, the Litigation Administrator shall have fifteen (15) days from the Settlement Offer Period Closing to initiate the Mediation Procedure by notifying the Participating Claimant and any Third Party Participants that such Parties have fifteen (15) days from service of such notice to select an Approved ADR Organization and notify the Litigation Administrator of such appointment (the "**Mediation Notice**"). The Litigation Administrator shall include a current copy of the list of Approved ADR Organizations in the Mediation Notice.

## ARTICLE V.

## MEDIATION PROCEDURE

Upon consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participants, if any, may be referred to mediation at any time after entry of these ADR Procedures. Unless the Parties agree otherwise and absent prior written agreement, if there is no Third Party Participant, the Litigation Administrator and the Participating Claimant shall each be responsible for fifty (50%) percent of

the applicable mediation costs.[6]  Unless the Parties agree otherwise and absent prior written agreement, if one or more Third Parties are participating, the Litigation Administrator, the Participating Claimant and the Third Party Participants shall divide the costs and fees of the mediator evenly among them.  The Litigation Administrator, the Participating Claimant and the Third Party Participants shall make appropriate arrangements with the mediator for the payment of the mediator's estimated fees and costs.  The Litigation Administrator's share of any costs and fees shall be paid in the ordinary course of the Litigation Administrator's business.

### 5.1.    **Appointment of a Mediator.**

Upon the Litigation Administrator's service of the Mediation Notice, the Litigation Administrator, the Participating Claimant and any Third Party Participants shall make a good faith effort to identify a mutually agreeable ADR Organization from the list of Approved ADR Organizations.  For the avoidance of doubt, except as set forth in Section 5.2, no Party may refuse to use all of the listed Approved ADR Organization.  If after fifteen (15) days from the service of the Mediation Notice an Approved ADR Organization has not been selected, the Litigation Administrator shall have the right to select any Approved ADR Organization.  Promptly after the Approved ADR Organization has been selected, the Litigation Administrator shall notify the Appointed ADR Organization of its selection and refer the matter to the Appointed ADR Organization for mediation.  Thereafter, if the selected ADR Organization is an organization and not an individual, the Parties and the Approved ADR Organization shall work in good faith to select the individual mediator at the Approved ADR Organization.  If an individual mediator has not been selected after fifteen (15) days from the selection of the aforementioned organization the Litigation Administrator shall have the right to select a mediator.

### 5.2.    **ADR Organization Procedures.**

Upon referral of the Participating Claim to mediation, the Appointed ADR Organization shall (i) follow its procedures with respect to the appointment of a mediator who resides in, or is familiar with the law of, the state or other relevant jurisdiction governing the Participating Claim, and (ii) provide notice to the Litigation Administrator, Participating Claimant, and Third Party Participants, if any, of such appointment.  The mediation shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party. Regardless of any rules or procedures of the Appointed ADR Organization to the contrary, (i) no person shall serve as a mediator unless he or she has been trained in mediation in a recognized program such as those of the American Arbitration Association or has equivalent practical experience in the field of mediation or is otherwise agreeable to the Parties, (ii) any person who serves as a mediator shall be an impartial, neutral person, (iii) no person shall serve as a mediator if he or she has any financial or personal interest in the proceedings or, except where otherwise agreed by the Parties, in any related matters, and (iv) upon appointment, the respective mediator shall disclose any circumstances likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties.  If the respective mediator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such mediator

---

[6] Mediation Costs include only those costs and fees associated with retaining a mediator.  The Litigation Administrator shall not be responsible for any of the Participating Claimants' costs or any Third Party Participants' costs associated with the mediation, if any, or any attorneys' fees other than the Litigation Administrator's attorneys' fees.

and another mediator will be chosen in a manner consistent with the ADR Procedures.  A person serving as a mediator shall not testify as a witness or be subject to any discovery in any subsequent proceeding concerning the same or any other Participating Claim.

      5.3.   **Conducting the Mediation.**

Mediation of Participating Claims shall be handled by the Appointed ADR Organization in the order received to the extent practicable.  Any Party may be represented by legal counsel, although the participation of legal counsel shall not be required for the conduct of the mediation. The mediator shall meet with the Parties or their respective legal representatives, individually and jointly for a conference or series of conferences as determined by the mediator.  The Participating Claimant, the Litigation Administrator, and Third Party Participants, if any, or their respective authorized representatives, must be present at the conference.  The mediator may review the Participating Claim and/or Cause of Action, the positions of the Parties, the prior negotiations between the Parties, all correspondence between the Parties during the Settlement Offer Period, and such additional information as the Parties may wish to submit, to aid a fair and equitable settlement.  At least seven (7) days prior to the mediation conference, the Parties shall each submit to the mediator a concise confidential statement outlining each party's position on settlement value, which shall not be shared with the other Parties to the mediation and shall be deemed to be privileged as compromise and settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.  The mediator may, without court order, modify any or all of the procedures related to written submissions.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

      5.4.   **Conclusion of Mediation/Mediated Settlement.**

The mediator will work with the Parties toward reaching an acceptable, reasonable offer of settlement.  The mediator shall not have the authority to impose a settlement upon the Parties.  The Parties shall make reasonable efforts to commence mediation within thirty (30) days after appointment of a mediator.  Unless otherwise agreed by the Parties, the mediation process will terminate not later than six (6) months after the date of referral to the Appointed ADR Organization.  If the Parties do not agree to extend the mediation process or otherwise resolve the Participating Claim or Cause of Action, and all participating Parties have not agreed in writing (email being sufficient) to participate in binding arbitration, the ADR Procedures shall automatically terminate, and the Participating Claim (if any) shall become a Disputed Claim and be treated in accordance with the Plan.  All settlement methods available during the Settlement Offer Exchange Period as described above in Section 5.3 shall be available during mediation.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

## ARTICLE VI.

## OPTIONAL BINDING ARBITRATION PROCEDURE

Upon written consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim may be referred to binding arbitration at any time after entry of these ADR Procedures.  Unless the Parties agree otherwise, the Participating Claimant, the Litigation Administrator and the Third Party Participants shall divide the costs of binding arbitration evenly among them.  The Participating Claimant, the Litigation Administrator, and Third Party Participants shall make appropriate arrangements with the Appointed ADR Organization for direct payment of their portions of the estimated costs.

6.1.    **Consent of the Parties.**

Any Party may request in writing that the others consent to the Optional Binding Arbitration Procedure, which request shall also be consented to by the requesting Party; *provided* that such a request shall be deemed rejected if the other Parties do not accept such request within ten (10) days.  Such request shall include consent to appoint one or more of the Approved ADR Organizations as the Appointed ADR Organization.  In the event all Parties consent to binding arbitration, and selection of the Appointed ADR Organization, the Litigation Administrator shall refer the Participating Claim, and their related causes of action against the Participating Claimant and any Third Party Participants, to the Appointed ADR Organization within seven (7) days of such consent.  Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual arbitrator at the Approved ADR Organization within thirty (30) days after the referral to arbitration.  Such proceedings shall be commenced, to the extent practicable, within thirty (30) days after the date the arbitrator is appointed.  The arbitration shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.

6.2.    **Appointment of Arbitrators.**

All arbitration proceedings shall be administered by one of the Approved ADR Organizations.  Arbitrators shall be appointed to particular matters by the Appointed ADR Organization pursuant to its rules and procedures, provided however, that (i) any person who serves as an arbitrator shall be an impartial, neutral person, (ii) no person shall serve as an arbitrator if he/she has any financial or personal interest in the proceedings or, except when otherwise agreed by the Parties, in any related matters, and (iii) upon accepting an appointment, the respective arbitrator shall disclose any circumstance likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties.  If the respective arbitrator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such arbitrator, and another arbitrator will be chosen in a manner consistent with the ADR Procedures.

6.3.    **Applicable Law and Procedure.**

The arbitration shall be conducted in accordance with applicable law, which shall be presumed to be the Federal Arbitration Act, Title 9, United States Code, unless the Bankruptcy Court determines on motion of any Party that another jurisdiction's law relating to arbitration

should govern the proceeding. The arbitration shall be conducted pursuant to the applicable rules and procedures of the American Arbitration Association, or of the corresponding provisions of the Appointed ADR Organization's rules and procedures, if another organization is selected.

### 6.4.    **Arbitration Administrative Expenses.**

The costs and arbitration fees shall be split equally between the parties. The Litigation Administrator's share of any costs and arbitration fees shall be paid in the ordinary course of the Litigation Administrator's business; *provided*, *however*, that the arbitrator shall in his or her sole discretion assess fees and costs against any Party for delaying or abusing the arbitration procedures set forth herein to the extent so provided in the applicable organization's applicable rules.

### 6.5.    **Arbitration Award.**

The amount of the award shall be within the discretion of the arbitrator; *provided* that the arbitrator may not award the Participating Claimant a claim in excess of the amount of the Participating Claimant's claim as set forth in the Participating Claimant's proof of claim or, if not liquated therein, in the Participating Claimant's Valuation Form. The Arbitrator shall specify if any awarded claim, or any portion thereof, is to be treated as a Liquidated Allowed Claim or Third Party Payable Claim. No Party shall have the right to appeal an arbitration award except on the grounds set forth in Section 10 of the Federal Arbitration Act. The reference to Local Rule 9019-1 and specifically Section 9(B)(1) of the *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings* are not applicable, and there shall be no right to a trial *de novo*. Any award shall be subject to further oversight by the Bankruptcy Court pursuant to the Plan, including any distribution of proceeds. Under no circumstances may any Participating Claimant seek to enforce any arbitration award against the Litigation Administrator without further order of the Bankruptcy Court.

## ARTICLE VII.

## CLAIM SATISFACTION PROCEDURE

All settled Participating Claims will result in the Participating Claimant receiving an Allowed Claim (and not a judgment against the Debtors or the Litigation Administrator) to the extent such Participating Claimant holds a Disputed Claim against the Estate or payment of an amount to the Post-Effective Date Debtors to be distributed to Holders of Claims entitled to receive Litigation Proceeds. Each Allowed Claim shall be treated in accordance with the Plan.[7]

---

[7] Nothing herein shall modify or enhance, in any way, the Litigation Administrator's general duty to maximize the value of the estate or require the Litigation Administrator to prosecute potential causes of action against Third Parties if they do not believe it to be in the best interests of the estate.

## ARTICLE VIII.

### Retention of Jurisdiction

The Bankruptcy Court shall have sole and exclusive jurisdiction to resolve any dispute arising from the interpretation, and enforcement of, the ADR Procedures.

**<u>Annex A</u>**

**ADR Organization List[1]**

1. JAMS ADR

2. Phillip Shefferly

3. Judith K. Fitzgerald

4. Melanie Cyganowski

5. Kevin Carey

6. Ira Herman

7. Ralph Mabey

---

[1] Subject to further review and material change by the Litigation Administrator and Litigation Oversight Committee through the Effective Date, including as a result of discussions with Participating Claimants.

**<u>Exhibit B-1</u>**

**(Redline) ADR Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ALTERNATIVE DISPUTE RESOLUTION PROCEDURES

## ARTICLE I.

## <u>PREAMBLE</u>

The ADR Procedures[22] are designed to promote the efficient resolution of certain disputed prepetition claims against the Debtors and claims held by the Debtors, including preference actions.  Although the ADR Procedures encourage voluntary participation by Third Parties, they do not compel parties that have not filed a proof of claim or otherwise subjected themselves to the jurisdiction of the Bankruptcy Court to participate, and they permit those who do not wish to participate to opt out.

The ADR Procedures provide persons or entities holding disputed claims the opportunity to participate in a streamlined process with the goal of reducing administrative costs that detract from all stakeholders' recoveries and allowing for quicker distributions on account of claims against the Debtors' estates and the entities against which the Debtors hold claims.  The ADR Procedures facilitate this by establishing a standard methodology for informal and formal negotiations, fostering settlement and liquidation of Participating Claims.

Importantly, the Plan provides that disputed claims will not receive a distribution until all disputes with respect to any such claim are resolved , including all Recovery Causes of Action. *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* at  Art. VII(B J) , *In re Celsius Network LLC, et al.*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.  [DATE] ) [ECF No. [●] 3577].  The Debtors and the Committee believe that these ADR Procedures provide creditors and the Litigation Administrator the ability to efficiently resolve

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[22] Capitalized terms used herein shall have the meaning set forth in Article II "Defined Terms" below.  Capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

disputed claims to maximize recoveries, reduce administrative expenses, and provide creditors with distributions quicker than in the traditional claims resolution process.

## 1.1. **Overview**

Celsius was founded in 2017 and was one of the first platforms that would allow users to transfer their digital assets and (a) earn rewards on such digital assets and/or (b) take loans using those transferred digital assets as collateral.

Celsius's primary operations consisted of: (a) financial services through which retail and institutional users could (i) earn rewards on digital assets they transferred to Celsius, (ii) securely store and access digital assets, (iii) borrow fiat currency supported by digital assets transferred to Celsius, and (iv) send and receive cryptocurrency using Celsius's CelPay services; and (b) bitcoin mining.

The Participating Claims are (1) unliquidated, disputed and/or contingent prepetition claims asserted against one or more Debtors or (2) ADR-Eligible Claims held by the Debtors' estates against third parties, including creditors of the Debtors. Prosecution of the Participating Claims against the Debtors outside of the Bankruptcy Court is currently stayed by the Debtors' Chapter 11 Cases or the Plan and Confirmation Order.

Most of the potential Participating Claims will be disputed by the Litigation Administrator and will have to be resolved by settlement or litigation. Litigating each independent Participating Claim in a multitude of separate individual actions, however, could result in a significant consumption of limited resources (judicial, the Litigation Administrator's, and the Participating Claimants'). The cost and delay associated with ordinary litigation procedures would not be in the best interests of any Party involved. The ADR Procedures are designed to facilitate and incentivize settlement and an efficient resolution of Participating Claims.

## 1.2. **Summary of Procedures**

The ADR Procedures consist of five sequential steps: (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure. For the avoidance of any doubt, nothing in the ADR Procedures shall alter, amend, or otherwise modify the terms of the Debtors' Insurance Policies.

The Initial Assessment Procedure is intended to provide a mechanism for the Litigation Administrator, Participating Claimants, and Third Party Participants, if any, to evaluate and consensually resolve Participating Claims and any of the Litigation Administrator's related claims and causes of action prior to mediation. Under the Initial Assessment Procedure, after receiving notification of their inclusion in the ADR Procedures, Participating Claimants will provide such information to the Litigation Administrator as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim. Upon receipt, the Litigation Administrator will determine if the Participating Claim is Disputed or gives rise to any related potential causes of action against such Participating Claimant and/or Third Parties and, to the extent applicable, invite such Third Parties to participate in the ADR Procedures. The

161180480v1

Litigation Administrator and Third Party Participants, if any, then have the opportunity to review the documents and information provided by the Participating Claimants to fully assess the validity and extent of any claims and/or damages relating to the Participating Claim. The Participating Claimant may also make reasonable requests for information from the Litigation Administrator regarding their claim. With respect to Account Holder Avoidance Actions, the Litigation Administrator may make one or more reasonable requests for information from any Party shall be limited to the subject matters set forth on Annex A to these procedures.[3]that will assist in the evaluation of an Account Holder Avoidance Action.

The Settlement Offer Exchange Procedure is intended to provide the Litigation Administrator, the Participating Claimants, and the Third Party Participants, if any, the opportunity to exchange written settlement offers and engage in informal settlement negotiations after they have evaluated the Participating Claim, and certain of the Litigation Administrator's related causes of action. If the Parties are unable to resolve the Participating Claim during this process, they may proceed to Mediation.

The Mediation Procedure is intended to provide a more formal mechanism for amicable resolution of Participating Claims and any of the Litigation Administrator's related causes of action other than Excluded Claims. The Mediation Procedure is based upon generally accepted mediation procedures of professional alternative dispute resolution organizations. Participating Claimants shall be responsible for fifty (50%) percent of the costs and fees of the mediator, absent prior written agreement.[43] If Third Parties participate in the Mediation Procedure, the costs and fees of the mediator shall be equally divided among the Parties.

The Optional Binding Arbitration Procedure is intended to provide a formal binding mechanism for resolution of Participating Claims and any of the Litigation Administrator's related causes of action (other than Excluded Claims) simultaneously through joint binding arbitration. The Optional Binding Arbitration Procedure is voluntary and shall only be initiated if all Parties agree to participate. Unless the Parties agree otherwise, all costs and fees of the arbitrator shall be equally divided among all participants to the arbitration.[4]

## DEFINED TERMS

Capitalized terms used herein without further definition, and variations thereof, shall have the meanings set forth below unless the context otherwise requires.

1.3.    **"ADR-Eligible Potential Defendants"** means any potential Avoidance Action defendant that is not an ADR-Ineligible Potential Defendant.

---

[3]  **[NTD**: A set of common information requests to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]

[43]  The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant. In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

[4]   The Participating Claimant's own costs, including attorneys' fees, if any, shall be borne by the Participating Claimant. In no event shall the Litigation Administrator be responsible for any costs incurred by any entity other than the Litigation Administrator or the Approved ADR Organization.

161180480v1

1.4.    **"ADR Initiation Package"** has the meaning set forth in Section 3.1.

1.5.    **"ADR Organization List"** has the meaning set forth in Section 2.4.

1.6.    **"ADR Procedures"** mean the alternative dispute resolution procedures as set forth herein.

1.7.    **"Appointed ADR Organization"** means the Approved ADR Organization appointed to conduct either a mediation or arbitration for the Parties.

1.8.    **"Approved ADR Organizations"** means those alternative dispute resolution organizations and individuals on the ADR Organization List or consented to by the Parties.[5]

1.9.    **"Assessment Period"** has the meaning set forth in Section 3.4.

1.10.    **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

1.11.    **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over these Chapter 11 Cases.

1.12.    **"Chapter 11 Cases"** means the cases commenced under Chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as *In re Celsius Network LLC, et. al.,* Chapter 11 Case No. 22-10964 (MG), Jointly Administered.

1.13.    **"Days"** or **"days"** means calendar days unless otherwise defined herein.  Days shall be counted as prescribed by Rule 9006 of the Federal Rules of Bankruptcy Procedure.

1.14.    **"Excluded Claim"** means (a) claims for which the automatic stay under section 362 of the Bankruptcy Code was modified by prior order of the Bankruptcy Court to allow for litigation of the claim to proceed in another forum, (b) tax claims, (c) claims where there is a judgment entered or settlement already agreed to and signed by all applicable parties, including the Class Claim Settlement, (d) any declaratory judgment actions or any other actions regarding insurance coverage issues; (e) any Avoidance Action claims against ADR-Ineligible Potential Defendants (as defined in the Plan); and (f) claims subject to a separate order of the Bankruptcy Court providing for arbitration or mediation.

1.15.    **"General Unliquidated Disputed Claim"** means a Participating Claim to the extent that the claim shall be treated as an unliquidated and/or disputed claim filed in these Chapter 11 Cases.

1.16.    **"Insurance Order"** means the *Final Order (I) Authorizing the Debtors to (A) Pay their Obligations under Prepetition Insurance Policies, (B) Continue to Pay Certain*

---

[5] **[NTD: The list of Approved ADR Organizations, including specific individual mediators, to be negotiated by the Litigation Administrator and parties negotiating the ADR Procedures.]**

161180480v1

*Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, and (D) Maintain their Surety Bond Program and (II) Granting Related Relief* [ECF No. 524], entered in the Chapter 11 Cases.

      1.17.    **"Insurance Policy"** means an insurance policy that has been issued at any time to or provides coverage to the Debtors and/or all agreements, documents or instruments relating thereto and/or any agreements with third-party administrators.

      1.18.    **"Insurer"** means any company or other entity that issued or entered into an Insurance Policy with, or that affords coverage to, the Debtors for a Participating Claim.

      1.19.    **"Liquidated Allowed Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to an allowed unsecured claim or claims to be paid on the terms set forth in the Plan.

      1.20.    **"Litigation Administrator"** shall have the meaning ascribed to such term in the Plan.

      1.21.    **"Local Rules"** means the Local Bankruptcy Rules for the Southern District of New York.

      1.22.    **"Mediation Notice"** has the meaning set forth in Section 4.5.

      1.23.    **"Participating Claim"** means (i) any disputed, unliquidated, or contingent prepetition claim, other than Excluded Claims, evidenced by a timely filed proof of claim and that is selected by the Litigation Administrator, in their sole discretion, for resolution through the ADR Procedures, or (ii) any Causes of Action (as defined in the Plan) the Estates may have against ADR-Eligible Potential Defendants; <u>provided</u>, subject to the limitations set forth below, that the Litigation Administrator may designate any claims (other than Excluded Claims) of creditors or other entities that are subject to the jurisdiction of the Bankruptcy Court for resolution through the ADR Procedures if the Litigation Administrator believes that, based on the nature of the potential claims, the ADR Procedures have a reasonable chance of successfully resolving the claims and the potential benefits outweigh the costs of participation. Notwithstanding the foregoing, any disputed postpetition administrative expenses, and any claims or counterclaims asserted by the Litigation Administrator other than Excluded Claims may be submitted to the ADR Procedures by agreement of the Litigation Administrator and the applicable claimant or by further order of the Bankruptcy Court.

      1.24.    **"Participating Claimant"** means any person or entity asserting a Participating Claim.

      1.25.    **"Party or Parties"** means, one or more of, a Participating Claim, the Litigation Administrator, the relevant Participating Claimant, and any relevant Third Party Participants (if applicable).

      1.26.    **"Plan"** means the chapter 11 plan confirmed in these Chapter 11 Cases, including all schedules and exhibits thereto, and the documents set forth in the Plan Supplement, as may be

161180480v1

modified, amended, or supplemented from time to time.

1.27. **"Primary Parties"** means, with respect to a Participating Claim, the Litigation Administrator and the relevant Participating Claimant.

1.28. **"Settlement Offer Exchange Procedure"** has the meaning set forth in the preamble of Section 4.

1.29. **"Settlement Offer Period"** has the meaning set forth in Section 3.4.

1.30. **"Settlement Offer Period Closing"** has the meaning set forth in Section 4.4.

1.31. **"Settlement Offer Period Notice"** has the meaning set forth in Section 4.4.

1.32. **"Third Party"** means any person or entity that the Litigation Administrator or Participating Claimant has or may have a claim against relating to any Participating Claim.

1.33. **"Third Party Evaluation Period"** has the meaning set forth in Section 3.3.

1.34. **"Third Party Participant"** means any Third Party that agrees to participate in the ADR Procedures by returning a signed Third Party Participation Agreement.

1.35. **"Third Party Participation Agreement"** means any written agreement between the Litigation Administrator and any Third Party Participant who accepts an invitation to participate in the ADR Procedures for a Participating Claim.

1.36. **"Third Party Payable Claim"** means a Participating Claim to the extent that the claim has been resolved through the ADR Procedures in a manner that entitles the Participating Claimant to receive partial or full satisfaction of the Participating Claim directly from a Third Party Participant.

1.37. **"Valuation Form"** means a form requesting such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related causes of action, substantially in the form attached hereto as **Exhibit 1**.

1.38. **"Valuation Information"** means the Participating Claimant's proof of claim and Valuation Form, and any other documents or information relating to the Participating Claim provided to the Litigation Administrator.

# ARTICLE II.

## ADMINISTRATION

### 2.1.    __Administrators__.

Subject to the terms hereof, the administration of the ADR Procedures will be coordinated by the Litigation Administrator and their counsel.

### 2.2.    __No Modification of the Insurance Policies or the Insurance Order__.

Notwithstanding anything to the contrary in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing, (i) nothing shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the Insurance Policies and the terms and conditions thereof and coverage or services provided thereby, (b) the rights, defenses or obligations of any Insurer, (c) any rights or obligations of the Debtors arising out of or under any Insurance Policy, or (d) the Insurance Order; (ii) to the extent of a conflict between the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing on the one hand, and any Insurance Policy that could provide coverage or services for a Participating Claim on the other hand, the terms of the Insurance Policy shall control, and nothing in the ADR Procedures, any Third Party Participation Agreement or any other form or document related to any of the foregoing shall excuse, or in any way alter, the Debtors' performance under the Insurance Policies; (iii) for all issues relating to insurance coverage and claims handling services, the provisions, terms, conditions, and limitations of the Insurance Policies shall control the payment of claims covered by any Insurance Policies; (iv) the failure of any Insurer to respond to any notice provided in accordance with the ADR Procedures does not relieve the Debtors of their obligations, if any, to provide an Insurer with further information and/or notices required by any applicable Insurance Policy; (v) nothing shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the ADR Procedures; (vi) nothing imposes a good faith obligation on any Insurer that does not otherwise exist under applicable law or the Insurance Policies; and (vii) Insurers shall retain all rights, claims and defenses to challenge any award pursuant to binding arbitration undertaken pursuant to the ADR Procedures that alters the terms and conditions of any Insurance Policy, and under no circumstances shall an Insurer be deemed a party to any binding arbitration unless it determines in its sole discretion that it is permitted to participate under applicable law and elects to do so.

Notwithstanding any other provision of these ADR Procedures, the rights, obligations and defenses of any Insurers under any applicable surety bond, surety collateral agreement, surety credit agreement, or surety indemnity agreement relating to the Debtors or the Participating Claims are fully preserved, unchanged and unimpaired.

### 2.3.    __Option to Utilize Professionals__.

The Litigation Administrator is specifically authorized to retain professionals to assist in evaluating the merits of each Participating Claim, in placing a dollar amount on each

Participating Claim, and in settling or otherwise resolving the Participating Claims pursuant to the ADR Procedures.

2.4.    **Employment of Mediation and Arbitration Organizations.**

Attached as Annex A to these ADR Procedures is a list of Approved ADR Organizations (the "**ADR Organization List**"), which the Litigation Administrator may amend by providing notice to the Participating Claimant of an amended list of Approved ADR Organizations. Subject to the conditions set forth elsewhere herein, the Litigation Administrator shall retain an Approved ADR Organization to conduct the Mediation Procedure or the Optional Binding Arbitration Procedure. Effort will be made to conduct any Mediation Procedures in a location that is convenient for the Litigation Administrator, the Participating Claimants, and, as applicable, Third Party Participants, or via videoconference, at the election of any Party.

2.5.    **Participation in the ADR Procedures.**

All Participating Claims shall be subject to the provisions of these ADR Procedures, subject to Section 2.11 or 2.12 below. ***Participation in the ADR Procedures shall in no way alter the consequences, if any, of a Participating Claimant not having filed timely a proof of claim in these Chapter 11 Cases against any of the Debtors; failure to file a proof of claim may result in disallowance of such Participating Claimant's claims against the Debtors, provided that, except as otherwise set forth in the Plan, the disallowance of any claim against the Debtors' estates shall occur after notice and a hearing before the Bankruptcy Court. Participation in the ADR Procedures shall in no way affect the Litigation Administrator's ability to object to any Participating Claim, or oppose any motion for relief from the automatic stay or from any injunction contained in the Plan, that is not resolved through the ADR Procedures.***

Pursuant to these ADR Procedures, and absent a consensual resolution among the Parties prior to mediation, the Litigation Administrator shall be required to submit to mediation regarding any pending counterclaims or causes of action asserted by the Litigation Administrator related to the Participating Claim that are not Excluded Claims; *provided* that if the Parties enter mediation, all Claims and Causes of Action shall be put before the mediator for potential resolution, in full or in part.

No Party shall be required to employ counsel to participate in the ADR Procedures, including to participate in mediation or arbitration pursuant to the ADR Procedures.

2.6.    **Effect of ADR Procedures on Pending Matters and Applicable Statutes of Limitations.**

Inclusion of any Participating Claim in the ADR Procedures shall automatically stay all proceedings before the Bankruptcy Court, including but not limited to, discovery (other than discovery conducted pursuant to these ADR Procedures), motions for relief from the stay or any injunction contained in the Plan, pretrial hearing dates, and trial schedules related to the Participating Claims. Such stay shall automatically terminate thirty (30) days after any Participating Claim is removed from the ADR Procedures. Upon the written consent of the Holder of a Participating Claim (which consent shall be included on the Valuation Form), the

applicable statute of limitations shall be tolled until the later of (1)15 days after the termination of such ADR Procedures by either party or (2) the statute of limitations date.

2.7.    **Acceptance of Settlement Offers.**

The Litigation Administrator shall have authority to settle or compromise all Participating Claims and Causes of Action against Third Party Participants subject to the terms of the Plan.

2.8.    **Extensions.**

All deadlines established by the ADR Procedures with respect to any particular Participating Claim may be extended by written agreement of the Litigation Administrator and the applicable Participating Claimant, with notice to any Third Party Participants.

2.9.    **Service and Notices.**

To facilitate the timely completion of the ADR Procedures, all service and written notice required herein, with the exception of the ADR Initiation Package (unless the Litigation Administrator does not have a mailing address for the applicable Participating Claimant), may be done via email.  The Parties shall exchange email addresses at their earliest convenience.  If any Party does not wish to accept service via email, the Party shall notify all other Parties of such preference in writing with a mailing address which shall be used for service in connection with these ADR Procedures.  Upon the other Parties' receipt of such notice, email service upon such Party shall no longer be valid.

2.10.    **Confidentiality and Non-Admissibility.**

Any settlement discussions by and between the Parties or positions taken by them during compliance with the ADR Procedures shall remain confidential and shall not be admitted as evidence in any subsequent proceeding or context, including, but not limited to, litigation of a Participating Claim, pursuant to Rule 408 of the Federal Rules of Evidence and all similar rules and are expressly determined by the provisions herein not to be admissions by any Party. Notwithstanding the foregoing, if a Party alleges another Party has failed to participate in good faith in the ADR Procedures or disputes that a settlement had been previously reached, then settlement discussions may be used or admitted as evidence in any subsequent proceeding solely with respect to those matters.  WithOnly with the consent of the Litigation Administrator, or as permitted by an order entered by the Bankruptcy Court, Participating Claimants, including ADR-Eligible Potential Defendants, may share information obtained during the process and settlement discussions by and between the parties and positions taken by them with other Participating Claimants, including ADR-Eligible Potential Defendants, who are similarly situated and who agree to be bound by the terms of an appropriate protective order.

2.11.    **Failure to Comply with the ADR Procedures.**

If a Participating Claimant fails to comply with the ADR Procedures, negotiate in good faith, or cooperate as may be necessary to effectuate the ADR Procedures, the Bankruptcy Court may, after notice and a hearing, grant any remedy deemed just and appropriate under the

circumstances, including, without limitation, awarding attorneys' fees, other fees, and costs to the other party.  The Litigation Administrator shall also participate in the ADR Procedures in good faith.  For the avoidance of doubt, (i) the election to opt out of the ADR Procedures, (ii) the failure of an ADR-Eligible Potential Defendant to make an offer or counter-offer to settle a Cause of Action, or (iii) the failure to extend, or seek to extend, applicable statute of limitations shall not be considered bad faith or a basis to move the Bankruptcy Court for remedies.

2.12.   **Participating Claimant Opt Out Option**.

A Participating Claimant may, at any time prior to the selection of a mediator, serve a written election (email sufficient), which will be effective upon receipt by the Litigation Administrator, for exclusion from the ADR Procedures; *provided*, *however*, that the Litigation Administrator may file a motion with the Bankruptcy Court opposing such exclusion.  Other than with respect to the optional Binding Arbitration Procedure, a Participating Claimant may not opt out following the selection of a mediator without further order of the Bankruptcy Court.  For the avoidance of doubt, if a Participating Claimant serves a written election for exclusion from the ADR Procedures in accordance with this Section 2.12, such claim shall not be subject to the ADR Procedures absent entry of an order of the Bankruptcy Court, and in no event may the Bankruptcy Court order such Participating Claimant to attend binding arbitration.

2.13.   **Insurer Notice**.

In the event that an Insurance Policy requires that the Debtors to provide notice to an Insurer of a Participating Claim, the Debtors shall provide notice to the applicable Insurer(s) (i) by serving a copy of the corresponding ADR Initiation Package on the Insurer when it is served on the Participating Claimant and (ii) at any time during the ADR process, when the notice requirements of the Insurance Policy are triggered.  If the Insurer elects, subject to the terms of the Insurance Policy, at any time to exercise its right to control the defense or settlement of a Participating Claim, the Insurer may elect to either (i) work with the Litigation Administrator, in accordance with the terms of the Insurance Policy, to resolve the Participating Claim within these ADR Procedures, or (ii) remove the Participating Claim from the ADR Procedures; *provided* that the Insurer remove the Participating Claim from the ADR Procedures within the later of (i) the time required by applicable state law or the applicable Insurance Policy for responses to claim notices, or (ii) forty-five (45) days after the Insurer receives notice of the Participating Claim.

**ARTICLE III.**

**INITIAL ASSESSMENT PROCEDURE**

Subject to the provisions set forth herein, the Initial Assessment Procedure is designed to foster inclusion of all appropriate Third Parties and to allow the Litigation Administrator and any Third Party Participant to evaluate fully the Participating Claim and the Litigation Administrator's related causes of action other than Excluded Claims, in an expedited manner to facilitate meaningful settlement negotiations.

### 3.1. __The Litigation Administrator Shall Provide Notice.__

The Litigation Administrator shall initiate the ADR Procedures by serving upon each selected Participating Claimant, at the address listed on the Participating Claimant's most recently filed proof of claim or amended proof of claim or, if no such address is available, the email address of such Participating Claimant, as provided in the Debtors' books and records, if applicable, as well as upon any counsel of record, notice of the ADR Procedures and their selection as a Participating Claimant, together with a copy of the ADR Procedures and a Valuation Form (the "__ADR Initiation Package__"). The ADR Initiation Package shall include a description of any claims and objections held by the Litigation Administrator against a Participating Claimant. For transferred claims, the Litigation Administrator also shall serve a copy of the ADR Initiation Package on the transferee identified in the notice of transfer of claim filed with the Bankruptcy Court. If a claim is transferred after the Litigation Administrator's service of the ADR Initiation Package on the Participating Claimant, such subsequent transferee shall be bound by the ADR Procedures without further order of the Bankruptcy Court.

### 3.2. __The Parties Shall Provide Relevant Information.__

Unless otherwise agreed by the Litigation Administrator, each Participating Claimant, shall provide to the Litigation Administrator such information as may be reasonably necessary to permit the Litigation Administrator's evaluation of the Participating Claim or related claims or causes of action. To ensure optimum efficiency and uniformity of treatment, such information shall be provided pursuant to a standardized Valuation Form, *provided* that, should the Litigation Administrator determine, in their sole discretion, that a standard Valuation Form is not applicable to a particular Participating Claim, the Litigation Administrator shall have the authority to revise, consistent with the ADR Procedures, the Valuation Form as the Litigation Administrator deems appropriate for such claim. All completed Valuation Forms and accompanying documents must be served on the Litigation Administrator with a copy of the Participating Claimant's proof of claim, if any, within thirty (30) days after service of the Valuation Form on such Participating Claimant. Where the Litigation Administrator has no objections to the Participating Claimant's claim other than under section 502(d), the Litigation Administrator may make one or more reasonable requests for information from any Party that relates to an Account Holder Avoidance Action. A Participating Claimant's provision of the Valuation Form and related documentation, or information and related documentation relating to an Account Holder Avoidance Action, does not prohibit, or diminish in any respect, the Participating Claimant's rights to assert that responsive material is privileged and not subject to disclosure. Where the Litigation Administrator has no objections to the Participating Claimant's claim other than under section 502(d), the Litigation Administrator shall be limited to the information request listed on Annex A to these procedures.

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Litigation Administrator shall provide to the Participating Claimant such information listed on Annex A hereto that is requested by the Participating Claimant may make one or more reasonable requests for information to the Litigation Administrator to assist in potential defenses. The material or written response must be provided no more than 14 days after the request is made. The Litigation Administrator's provision of information and related documentation does not prohibit, or diminish in any respect,

the Litigation Administrator's rights to assert that responsive material that is identified as potentially privileged is privileged and not subject to disclosure.

3.3.    **Determination of Third Party Participation.**

Upon receipt of the Valuation Form, the Litigation Administrator shall have thirty (30) days (the "**Third Party Evaluation Period**"), to evaluate whether the Participating Claim gives rise to potential causes of action by the Litigation Administrator against any Third Parties or if the inclusion of any Third Parties would be beneficial to the ADR process (*e.g.* parties that may also be liable or insurance companies). Prior to the close of the Third Party Evaluation Period, the Litigation Administrator may make one or more reasonable requests for supplementation or clarification of the information supplied in the Valuation Information to assist in determining if the Participating Claim gives rise to any related causes of action against Third Parties as provided for in Section 3.4. Should the Litigation Administrator determine that it would be beneficial to invite Third Parties to be included in the ADR process for a Participating Claim, they shall have the right, but not the duty, to invite any and all applicable Third Parties to participate in the ADR Procedures. Should the Litigation Administrator elect to invite any Third Parties to participate, the invitation to participate shall include a Third Party Participation Agreement, and notice that, if any Third Party wishes to participate in the ADR Procedures with respect to the applicable Participating Claim, it must agree in writing within fifteen (15) days of receipt. Receipt of such invitation shall be deemed, and thus the time to respond shall begin, one business day following the date the invitation was sent.

If a Third Party accepts the Litigation Administrator's invitation to participate in the ADR Procedures, the Litigation Administrator shall immediately notify the Participating Claimant of: (i) their election to extend a Third Party invitation and the Third Party's acceptance thereof and (ii) the revised end date for the Third Party Evaluation Period. The invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement within fifteen (15) days of receipt; *provided that* if the Primary Parties agree to extend the time to respond, the invitation for a Third Party to participate in the ADR Procedures shall expire and be deemed rejected if a Third Party has not returned a signed Third Party Participation Agreement by the agreed upon date within the extended Third Party Evaluation Period. Prior to the close of the Third Party Evaluation Period, if the Litigation Administrator determines that they will not extend an invitation to one or more Third Party to participate in the ADR process, the Parties may, but are not required to, proceed directly to the Assessment Period (as defined below). Upon receipt of a signed Third Party Participation Agreement, the Litigation Administrator shall provide the Valuation Information to such Third Party Participant. Unless previously agreed otherwise, in writing, by the Litigation Administrator, by participating in the ADR Procedures, the Third Party Participant submits to the jurisdiction of the Bankruptcy Court to determine all claims related to the Participating Claim, including counterclaims or related causes of action against Third Parties, other than any Excluded Claims. At all times throughout the ADR Procedures, all Valuation Information and other information exchanged by the Parties, shall be considered information exchanged in compromise negotiations governed by Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.

3.4.    **Evaluation of Participating Claims and Related Causes of Action.**

Upon the close of the Third Party Evaluation Period, the Litigation Administrator and any Third Party Participants shall have thirty (30) days (the "**Assessment Period**") to evaluate each Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant based upon all relevant factors under the traditional principles of liability and damages under non-bankruptcy law. The Litigation Administrator and any Third Party Participants shall review all materials submitted and in such review shall not be bound by the rules governing the admission of evidence in courts of law. Prior to the close of the Assessment Period, the Litigation Administrator and each Third Party Participant may request additional information from the Participating Claimant following the procedure described in Section 3.5 below. Within seven (7) days of the close of the Assessment Period or such earlier date within the Assessment Period, the Litigation Administrator shall provide written notice to the Participating Claimant and any Third Party Participants that the Assessment Period has ended and that the sixty (60) day informal settlement negotiation period (the "**Settlement Offer Period**") has begun (the "**Settlement Offer Period Notice**"). The Settlement Offer Period Notice shall include notice of the applicable deadlines set forth in the Settlement Offer Exchange Procedure below.

All oversight mechanisms of the Litigation Administrator established in the Plan shall be binding on the Litigation Administrator under these ADR Procedures.

3.5.    **Requests for Additional Information.**

The Litigation Administrator and any Third Party Participants may make one or more reasonable requests for supplementation or clarification of information supplied in the Valuation ~~Information~~Form to assist in a good faith evaluation of the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participant. The material or a written response must be provided no more than 14 days after the request is made. The Assessment Period shall be tolled once the supplemental request is made and extended until thirty (30) days after the date the Participating Claimant serves a written response to any initial request for supplemental information upon all participating Parties (subsequent requests for additional information shall not extend the Third Party Evaluation Period or Assessment Period, unless otherwise agreed by the Parties).

If the Participating Claimant is an ADR-Eligible Potential Defendant participating in the ADR Procedures with respect to a Cause of Action, the Participating Claimant may make one or more reasonable requests for supplementation or clarification of information supplied by the Litigation Administrator pursuant to section 3.2 to assist in a good faith evaluation of the Cause of Action, any known or reasonably knowable affirmative defenses, and any related causes of action.

## ARTICLE IV.

## SETTLEMENT OFFER EXCHANGE PROCEDURE

Subject to the provisions set forth herein, the Settlement Offer Exchange Procedure is designed to allow the Parties to attempt to consensually settle the Participating Claim, and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants, by exchanging written settlement offers and engaging in informal negotiations.

4.1.    **Exchange of Written Settlement Offers.**

Within seven (7) days of service of the Settlement Offer Period Notice, the Litigation Administrator and/or any Third Party shall make good faith offers of settlement based upon their evaluation of the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants.  Third Party Participant settlement offers may be for all or a portion of the damages asserted in a Participating Claim and, at the Third Party Participants' discretion, may cover both the Litigation Administrator's causes of action against the Third Party Participant and the Participating Claimants' direct causes of action against the Third Party Participant, if any.  Third Party Participant settlement offers shall be served on the Litigation Administrator and the Participating Claimant.  If a Third Party Participant determines that it has no liability to any Party, it shall provide a concise statement explaining such determination, rather than a good faith offer of settlement.  If no Third Party is participating in the ADR Procedures for a particular Participating Claim or if there is no Third Party settlement offer provided, the Litigation Administrator shall make a good faith offer of settlement based upon their evaluation of the Participating Claim and/or any Causes of Action that are subject to these ADR Procedures.

The only permitted responses to a settlement offer are: acceptance of the settlement offer or rejection of the settlement offer coupled with a counteroffer, if any, served to all applicable Parties within seven (7) days of receipt of such offer.  All written settlement offers and counteroffers by any Party shall remain open for seven (7) days and may be accepted within seven (7) days of receipt.  Thereafter the Parties may exchange written counteroffers until such time as they have entered into a settlement agreement or reached an impasse.

4.2.    **Informal Negotiations.**

The Parties shall use reasonable efforts to resolve consensually the Participating Claim and/or the Litigation Administrator's Causes of Action against the Participating Claimant and any Third Party Participants during the Settlement Offer Period and are encouraged to schedule settlement conferences or telephonic settlement conferences with each other at mutually convenient times.

4.3.    **Settlement.**

The Parties have significant leeway to structure settlement agreements to include providing Participating Claimants with the right to receive any combination of Liquidated Allowed Claims and Third Party Payable Claims as well as waivers of the Litigation

Administrator's and/or a Participating Claimant's causes of action.[61]  For the avoidance of doubt, the Litigation Administrator shall be provided the ability to resolve and settle claims against creditors.  In many instances, settlements may require proportional division of settlement amounts between multiple Participating Claimants or specific damages within a single Participating Claim, and nothing herein shall prevent the Parties from structuring partial settlements accordingly.

The Litigation Administrator may, at any given time, if they believe it economically beneficial and administratively convenient, offer to settle the Participating Claim for amounts approximating the cost of administering such claims in lieu of incurring the cost and expense thereof.  Nothing herein shall limit the ability of a Participating Claimant and the Litigation Administrator to settle a Participating Claim by mutual consent at any time.

### 4.4.    **Close of Settlement Offer Period.**

Unless the Parties have agreed to extend the Settlement Offer Period, the Settlement Offer Period shall close sixty (60) days from the service of the Settlement Offer Period Notice (the "**Settlement Offer Period Closing**").

Upon the Settlement Offer Period Closing, the Litigation Administrator and/or any Third Party Participant may seek disallowance of the Participating Claim before the Bankruptcy Court or pursue such Cause of Action.

(a)    If the Litigation Administrator rejects the Participating Claim, they shall so advise the Participating Claimant, and any Third Party Participants, and provide a statement specifying the basis for such rejection.  Upon such rejection by the Litigation Administrator, the Participating Claim shall be removed from the ADR Procedures and treated as a Disputed Claim and shall be resolved in accordance with the Plan.  Upon such rejection by the Litigation Administrator, the Litigation Administrator reserves their rights to file an objection or take any other such action with respect to such Participating Claims in accordance with the Bankruptcy Code, Bankruptcy Rules, or Local Rules.

(b)    If a Third Party Participant rejects any liability relating to a Participating Claim, the Third Party Participant shall no longer participate in the ADR Procedures for such Participating Claim. If the Litigation Administrator does not reject the Participating Claim, however, the Litigation Administrator, the Participating Claimant, and any remaining Third Party Participants may proceed with the ADR Procedures without the rejecting Third Party Participant.

### 4.5.    **Initiation of the Mediation Procedure.**

If the ADR Procedures have not been terminated in accordance with Section 4.4 hereof, the Litigation Administrator shall have fifteen (15) days from the Settlement Offer Period Closing to initiate the Mediation Procedure by notifying the Participating Claimant and any

---

[61] Under no circumstances may the Participating Claimant and the Third Party Participant enter into a settlement agreement involving the Litigation Administrator causes of action against the Third Party Participant without the written consent of the Litigation Administrator.

Third Party Participants that such Parties have fifteen (15) days from service of such notice to select an Approved ADR Organization[7] and notify the Litigation Administrator of such appointment (the "**Mediation Notice**").  The Litigation Administrator shall include a current copy of the list of Approved ADR Organizations in the Mediation Notice.

## ARTICLE V.

## MEDIATION PROCEDURE

Upon consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim and the Litigation Administrator's related causes of action against the Participating Claimant and any Third Party Participants, if any, may be referred to mediation at any time after entry of these ADR Procedures.  Unless the Parties agree otherwise and absent prior written agreement, if there is no Third Party Participant, the Litigation Administrator and the Participating Claimant shall each be responsible for fifty (50%) percent of the applicable mediation costs.[82]  Unless the Parties agree otherwise and absent prior written agreement, if one or more Third Parties are participating, the Litigation Administrator, the Participating Claimant and the Third Party Participants shall divide the costs and fees of the mediator evenly among them.  The Litigation Administrator, the Participating Claimant and the Third Party Participants shall make appropriate arrangements with the mediator for the payment of the mediator's estimated fees and costs.  The Litigation Administrator's share of any costs and fees shall be paid in the ordinary course of the Litigation Administrator's business.

5.1.    **Appointment of a Mediator.**

Upon the Litigation Administrator's service of the Mediation Notice, the Litigation Administrator, the Participating Claimant and any Third Party Participants shall make a good faith effort to identify a mutually agreeable ADR Organization from the list of Approved ADR Organizations.  For the avoidance of doubt, except as set forth in Section 5.2, no Party may refuse to use ~~any~~all of the listed Approved ADR Organization.  If after fifteen (15) days from the service of the Mediation Notice an Approved ADR Organization has not been selected, the Litigation Administrator shall have the right to select any Approved ADR Organization. Promptly after the Approved ADR Organization has been selected, the Litigation Administrator shall notify the Appointed ADR Organization of its selection and refer the matter to the Appointed ADR Organization for mediation.  Thereafter, if the selected ADR Organization is an organization and not an individual, the Parties and the Approved ADR Organization shall work in good faith to select the individual mediator at the Approved ADR Organization.  If an individual mediator has not been selected after fifteen (15) days from the selection of the aforementioned organization the Litigation Administrator shall have the right to select a mediator.

---

[7]

[82] Mediation Costs include only those costs and fees associated with retaining a mediator.  The Litigation Administrator shall not be responsible for any of the Participating Claimants' costs or any Third Party Participants' costs associated with the mediation, if any, or any attorneys' fees other than the Litigation Administrator's attorneys' fees.

5.2.    **ADR Organization Procedures.**

Upon referral of the Participating Claim to mediation, the Appointed ADR Organization shall (i) follow its procedures with respect to the appointment of a mediator who resides in, or is familiar with the law of, the state or other relevant jurisdiction governing the Participating Claim, and (ii) provide notice to the Litigation Administrator, Participating Claimant, and Third Party Participants, if any, of such appointment.    The mediation shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.    Regardless of any rules or procedures of the Appointed ADR Organization to the contrary, (i) no person shall serve as a mediator unless he or she has been trained in mediation in a recognized program such as those of the American Arbitration Association or has equivalent practical experience in the field of mediation or is otherwise agreeable to the Parties, (ii) any person who serves as a mediator shall be an impartial, neutral person, (iii) no person shall serve as a mediator if he or she has any financial or personal interest in the proceedings or, except where otherwise agreed by the Parties, in any related matters, and (iv) upon appointment, the respective mediator shall disclose any circumstances likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties.    If the respective mediator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such mediator and another mediator will be chosen in a manner consistent with the ADR Procedures.    A person serving as a mediator shall not testify as a witness or be subject to any discovery in any subsequent proceeding concerning the same or any other Participating Claim.

5.3.    **Conducting the Mediation.**

Mediation of Participating Claims shall be handled by the Appointed ADR Organization in the order received to the extent practicable.    Any Party may be represented by legal counsel, although the participation of legal counsel shall not be required for the conduct of the mediation. The mediator shall meet with the Parties or their respective legal representatives, individually and jointly for a conference or series of conferences as determined by the mediator. The Participating Claimant, the Litigation Administrator, and Third Party Participants, if any, or their respective authorized representatives, must be present at the conference.    The mediator may review the Participating Claim and/or Cause of Action, the positions of the Parties, the prior negotiations between the Parties, all correspondence between the Parties during the Settlement Offer Period, and such additional information as the Parties may wish to submit, to aid a fair and equitable settlement.    At least seven (7) days prior to the mediation conference, the Parties shall each submit to the mediator a concise confidential statement outlining each party's position on settlement value, which shall not be shared with the other Parties to the mediation and shall be deemed to be privileged as compromise and settlement negotiations pursuant to Rule 408 of the Federal Rules of Evidence and Local Rule 9019-1.    The mediator may, without court order, modify any or all of the procedures related to written submissions.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

5.4.    **Conclusion of Mediation/Mediated Settlement.**

The mediator will work with the Parties toward reaching an acceptable, reasonable offer of settlement. The mediator shall not have the authority to impose a settlement upon the Parties. The Parties shall make reasonable efforts to commence mediation within thirty (30) days after appointment of a mediator. Unless otherwise agreed by the Parties, the mediation process will terminate not later than six (6) months after the date of referral to the Appointed ADR Organization. If the Parties do not agree to extend the mediation process or otherwise resolve the Participating Claim or Cause of Action, and all participating Parties have not agreed in writing (email being sufficient) to participate in binding arbitration, the ADR Procedures shall automatically terminate, and the Participating Claim (if any) shall become a Disputed Claim and be treated in accordance with the Plan. All settlement methods available during the Settlement Offer Exchange Period as described above in Section 5.3 shall be available during mediation.

With the consent of the Litigation Administrator, or as directed by the Court, Participating Claimants who are ADR-Eligible Potential Defendants may elect to have similar Causes of Action mediated jointly and/or in consolidated sessions.

## ARTICLE VI.

## OPTIONAL BINDING ARBITRATION PROCEDURE

Upon written consent of the Participating Claimant, the Litigation Administrator, and any Third Party Participants, the Participating Claim may be referred to binding arbitration at any time after entry of these ADR Procedures. Unless the Parties agree otherwise, the Participating Claimant, the Litigation Administrator and the Third Party Participants shall divide the costs of binding arbitration evenly among them. The Participating Claimant, the Litigation Administrator, and Third Party Participants shall make appropriate arrangements with the Appointed ADR Organization for direct payment of their portions of the estimated costs.

6.1.    **Consent of the Parties.**

Any Party may request in writing that the others consent to the Optional Binding Arbitration Procedure, which request shall also be consented to by the requesting Party; *provided* that such a request shall be deemed rejected if the other Parties do not accept such request within ten (10) days. Such request shall include consent to appoint one or more of the Approved ADR Organizations as the Appointed ADR Organization. In the event all Parties consent to binding arbitration, and selection of the Appointed ADR Organization, the Litigation Administrator shall refer the Participating Claim, and their related causes of action against the Participating Claimant and any Third Party Participants, to the Appointed ADR Organization within seven (7) days of such consent. Thereafter, the Parties and the Approved ADR Organization shall work in good faith to select the individual arbitrator at the Approved ADR Organization within thirty (30) days after the referral to arbitration. Such proceedings shall be commenced, to the extent practicable, within thirty (30) days after the date the arbitrator is appointed. The arbitration shall be conducted at such location as is mutually agreed by the Parties, or via electronic remote means at the election of any Party.

6.2.    **Appointment of Arbitrators.**

All arbitration proceedings shall be administered by one of the Approved ADR Organizations. Arbitrators shall be appointed to particular matters by the Appointed ADR Organization pursuant to its rules and procedures, provided however, that (i) any person who serves as an arbitrator shall be an impartial, neutral person, (ii) no person shall serve as an arbitrator if he/she has any financial or personal interest in the proceedings or, except when otherwise agreed by the Parties, in any related matters, and (iii) upon accepting an appointment, the respective arbitrator shall disclose any circumstance likely to create a reasonable inference of bias or prevent a prompt hearing or conference with the Parties. If the respective arbitrator discloses circumstances likely to create a reasonable inference of bias, a Party may object to the appointment of such arbitrator, and another arbitrator will be chosen in a manner consistent with the ADR Procedures.

6.3.    **Applicable Law and Procedure.**

The arbitration shall be conducted in accordance with applicable law, which shall be presumed to be the Federal Arbitration Act, Title 9, United States Code, unless the Bankruptcy Court determines on motion of any Party that another jurisdiction's law relating to arbitration should govern the proceeding. The arbitration shall be conducted pursuant to the applicable rules and procedures of the American Arbitration Association, or of the corresponding provisions of the Appointed ADR Organization's rules and procedures, if another organization is selected.

6.4.    **Arbitration Administrative Expenses.**

The costs and arbitration fees shall be split equally between the parties. The Litigation Administrator's share of any costs and arbitration fees shall be paid in the ordinary course of the Litigation Administrator's business; *provided*, *however*, that the arbitrator shall in his or her sole discretion assess fees and costs against any Party for delaying or abusing the arbitration procedures set forth herein to the extent so provided in the applicable organization's applicable rules.

6.5.    **Arbitration Award.**

The amount of the award shall be within the discretion of the arbitrator; *provided* that the arbitrator may not award the Participating Claimant a claim in excess of the amount of the Participating Claimant's claim as set forth in the Participating Claimant's proof of claim or, if not liquated therein, in the Participating Claimant's Valuation Form. The Arbitrator shall specify if any awarded claim, or any portion thereof, is to be treated as a Liquidated Allowed Claim or Third Party Payable Claim. No Party shall have the right to appeal an arbitration award except on the grounds set forth in Section 10 of the Federal Arbitration Act. The reference to Local Rule 9019-1 and specifically Section 9(B)(1) of the *Procedures Governing Mediation of Matters and the Use of Early Neutral Evaluation and Mediation/Voluntary Arbitration in Bankruptcy Cases and Adversary Proceedings* are not applicable, and there shall be no right to a trial *de novo*. Any award shall be subject to further oversight by the Bankruptcy Court pursuant to the Plan, including any distribution of proceeds. Under no circumstances may any Participating

Claimant seek to enforce any arbitration award against the Litigation Administrator without further order of the Bankruptcy Court.

## ARTICLE VII.

## <u>CLAIM SATISFACTION PROCEDURE</u>

All settled Participating Claims will result in the Participating Claimant receiving an Allowed Claim (and not a judgment against the Debtors or the Litigation Administrator) to the extent such Participating Claimant holds a Disputed Claim against the Estate or payment of an amount to the Post-Effective Date Debtors to be distributed to Holders of Claims entitled to receive Litigation Proceeds. Each Allowed Claim shall be treated in accordance with the Plan.[93]

## ARTICLE VIII.

## <u>Retention of Jurisdiction</u>

The Bankruptcy Court shall have sole and exclusive jurisdiction to resolve any dispute arising from the interpretation, and enforcement of, the ADR Procedures.

---

[93] Nothing herein shall modify or enhance, in any way, the Litigation Administrator's general duty to maximize the value of the estate or require the Litigation Administrator to prosecute potential causes of action against Third Parties if they do not believe it to be in the best interests of the estate.

**Annex A**

**ADR Organization List[1]**

1. JAMS ADR
2. Phillip Shefferly
3. Judith K. Fitzgerald
4. Melanie Cyganowski
5. Kevin Carey
6. Ira Herman
7. Ralph Mabey

---

[1] Subject to further review and material change by the Litigation Administrator and Litigation Oversight Committee through the Effective Date, including as a result of discussions with Participating Claimants.

161180480v1

**<u>Exhibit C</u>**

**ADR Valuation Form**

Participating Claimant: _____

Total Amount of Claim (type of digital asset and amount): _____

Proof of Claim No.: _____

# VALUATION FORM

**This form must be fully and properly completed, signed by the Participating Claimant[1] and returned with all required attachments to the Litigation Administrator, Attention: Mohsin Y. Meghji (Celsius_Litigation_Admin@m3-partners.com), or as otherwise specified by the Litigation Administrator in writing, _and_ [INSERT LAW FIRM TO BE RETAINED BY LITIGATION ADMINISTRATOR], so as to be received on or before [RESPONSE DATE TO BE INSERTED WHEN SERVED].  Any questions about this form should be directed to the parties listed immediately above.**

Note:  By completing this Valuation Form, you agree that all settlement demands and offers between you and the Debtors shall be treated as inadmissible offers of compromise pursuant to Federal Rule of Evidence 408.

## <u>SECTION I</u>

Full name of Participating Claimant: _____

Street Address: _____

City: _____ State: _____ Zip: _____

Telephone Number: _____ Fax Number: _____

Email Address: _____

Employee ID # (if Participating Claimant worked for a Debtor):_____

Full name of Participating Claimant's attorney (if applicable):_____

Law Firm:_____

Street Address: _____

City: _____ State: _____ Zip: _____

Attorney's Telephone No.: _____ Attorney's Fax No.: _____

Attorney's Email Address: _____

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the ADR Procedures filed in the chapter 11 cases of Celsius Network LLC and its debtor-affiliates, as the same may be amended, modified, or supplemented from time to time. This Valuation Form remains subject to review and material change by the Litigation Administrator and Litigation Oversight Committee through the Effective Date of the Plan, including as a result of discussions with Participating Claimants.

<u>Note</u>:  If you provide attorney information, future communication concerning your claim will be sent only to your attorney via email.  Otherwise, such communication will be sent to the email address listed above, unless you specify otherwise in writing here:  _____

SECTION II

This Valuation Form is designed to provide the Litigation Administrator with sufficient information to fully evaluate your claim, determine if any Third Parties should be included in the ADR Procedures for your claim, and facilitate meaningful settlement discussions. The following requests are a nonexclusive list of the categories of information we believe will be most useful in evaluating your claim. You are encouraged, however, to supply any and all information you believe is relevant to your claim and damage calculations. If you have filed more than one proof of claim, please provide a separate Valuation Form for each proof of claim if appropriate.

Description of claim: _____

_____

_____

_____

Does the claim involve any of the following (if any, check all that apply):

☐ deposit withdrawal request        ☐ employment-related issues        ☐ contract/terms of use

☐ damages related to misrepresentation of the Debtors

☐ Withdrawal Preference Exposure

Date of event giving rise to claim (if applicable): _____[2]

Estimation of your claim (in dollars and digital asset) as of the Petition Date (i.e., July 13, 2022) or the Participating Claimants' Withdrawal Preference Exposure if different than the amount asserted by the Debtors/Litigation Administrator:

Please describe in detail:[3]_____

_____

_____

**Settlement Demand.**  Amount of Participating Claimant's settlement demand, in a definite dollar amount and/or digital asset, not to exceed that stated in the Participating Claimant's proof of claim or the amount of their Withdrawal Preference Exposure $_____ // _____.

=================================================================

---

[2] To the extent the Claim concerns Withdrawal Preference Exposure, claimant can include "N/A."

[3] Participating Claimants may attached an Annex explaining in detail the amount of their claim or Withdrawal Preference Exposure.

<u>SECTION III</u>

Please provide responses to each of the following questions that are applicable to your claim in the space provided.  If you believe a question is not applicable, please indicate such belief below. If there is not sufficient space for your response below, please attached additional sheets with numbered statements corresponding to the numbers below.

**For each document request and only to the extent not previously provided to the Litigation Administrator**, please either include a copy of all responsive documents with your completed Valuation Form, or contact the Litigation Administrator, in advance of submitting this Valuation Form, to arrange a mutually agreeable time and place for the Litigation Administrator's inspection and copying of such documents.

1.      Please provide all documents that provide evidence or otherwise relate to your claim, including but not limited to: (a) contracts; (b) deposit/withdrawal request/transactions; (c) written communications; and (f) any related document that you believe supports your claim.

2.      Please provide any and all history of account balance, account transactions, photographs, graphic representations, and visual recordings of any kind that provide evidence of or otherwise relate to the proof of claim or the claim described therein.

3.      If your claim is the result of your termination by one of the Debtors, please list the following:

      a. all unemployment benefits you have received since the date of such status:

      _____
      _____
      _____

      b. all sources of income since the termination:

      _____
      _____
      _____

      c. each employment position you have held with any other employer since the date of your termination. Additionally, for each position, please provide:

          i.   dates of employment;

          ii.  names and addresses of employer;

          iii. all wages received to date;

          iv.  benefits received; and

          v.   reason for leaving, if any.

_____

_____

_____

If applicable, execute and return together with this response an authorization for the Debtors to obtain information from each employer identified.

4.      To the extent you are asserting a claim, please (a) quantify the damage you are seeking in dollars; (b) explain (with as much specificity as you can) how you determined such amount; (c) identify and produce (only to the extent not previously provided to the Debtors) all documents concerning, referring to, reflecting, regarding, or relating to such quantification and (d) identify all                 persons                 with                 knowledge                 thereof.

_____

_____

_____

5.      To the extent you are asserting a claim, please state whether you have made any attempt to mitigate the damages you claim.  If so, state (with as much specificity as you can) what you have done to mitigate your damages; identify all persons with knowledge thereof; and identify all documents concerning, referring to, reflecting, regarding, or relating to your attempts to mitigate your damages.

_____

_____

_____

6.      Please identify, to the extent you are aware, any insurance policies presently in effect or in effect at any time relevant to the claim, including (only to the extent not previously provided to the Debtors) all correspondence or other documents evidencing or relating to any communication between you and any insurance companies.  Additionally, please state whether you have made any insurance claims related to the claim and, if so, identify the insurance company and the insurance policy (include policy number and effective dates); describe the claim; state the claim number; state the amount of the claim and the amount which was paid thereon; identify all persons with knowledge thereof; and identify and produce (only to the extent not previously provided to the Debtors) all documents concerning, referring to, reflecting, regarding,                 or                 relating                 to                 the                 claim.

_____

_____

_____

7.      Please state whether any money has been paid or whether anything is payable from any third party for the damages listed in your answers to these questions and, if so, please state the amounts paid or payable, the name and business address of the person or entity who paid or owes said amounts, and which of those third parties have a claim or right of subrogation or other form of                 recovery                 or                 recoupment.

_____

_____

_____

8.      If you have filed a proof of claim against multiple Debtors based on the same underlying liability, provide the proof of claim number and state (with as much specificity as you can) the basis      for      your      claim      against      each      individual      Debtor.

_____

_____

_____

**Statement**

I have read the responses of this document and, pursuant to 18 U.S.C. § 1621 and 28 U.S.C. § 1746, I affirm and declare under penalties of perjury that the information in my responses is true and correct, and do not omit any facts necessary so that my responses are not misleading, and my responses are true to my own knowledge, except as to the matters that are stated on information and belief and as to those matters, believe them to be true.  Pursuant to 18 U.S.C. § 1621 and 28 U.S.C. § 1746, I affirm and declare under penalties of perjury that I have complied fully with the document requests set forth in this document.

I agree to toll the applicable statute of limitations with respect to <u>any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes or common law, including fraudulent transfer laws until the later of  (1) 15 days after the termination of the ADR Procedures or (2) the statute of limitations date.</u>


_____

Signature of Participating Claimant


_____

Name of Participating Claimant (please print)

## **Exhibit D**

**Litigation Administrator Agreement**

*DRAFT*

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), and [Mohsin Y. Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

### RECITALS

WHEREAS, each Debtor other than the GK8 Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (such cases, the "Chapter 11 Cases"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions", and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

# ARTICLE I
# DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

# ARTICLE II
# ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1    Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)    The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claim Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)    The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)    The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)    The Litigation Administrator agrees to administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement.

(e)    The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)    Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claim Holder shall be binding and conclusive on all Claim Holders even if such Claim Holders have different or conflicting interests.

(g)    The Litigation Oversight Committee shall designate three (3) members to serve on a subcommittee, the ("Avoidance Action Oversight Subcommittee").  The Earn Ad Hoc

Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action Oversight Subcommittee, subject to the consent of the Committee (as defined in the Plan). The Avoidance Action Oversight Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the settlement and prosecution of, Avoidance Actions against non-Insider (or former Insider) individual Account Holders for prepetition transfers of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date. The Litigation Oversight Committee, the Litigation Administrator, and the Avoidance Action Oversight Subcommittee shall agree on a process for resolving the settlement and prosecution of Avoidance Actions described in this subsection. For the avoidance of doubt, the Avoidance Action Oversight Subcommittee shall be subject to the same fiduciary duties as the Litigation Oversight Committee.

2.2    Removal of Litigation Oversight Committee Members.

(a)    A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

(b)    To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

For purposes of this Agreement:

(i)    "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of written notice specifying such failure in reasonable detail; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's disclosure of information in violation of Section 2.9; (iv) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (v) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder; (vi) a Person's breach of fiduciary duties; or (vii) an unresolved conflict of interest which cannot be obviated by appointment of a substitute with respect to claims that are the subject of a conflict determination made by the Litigation Oversight Committee pursuant to Section 2.8; and

(ii)    "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties hereunder for three (3)

3

consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

2.3     The Post-Emergence Claims.

(a)     From and after the Effective Date, the Litigation Administrator shall have access to copies of the Debtors', the Estates', the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, all in compliance with applicable law. From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Litigation Administrator shall have access to any relevant documents, information or personnel reasonably related to the Litigation Administrator's responsibilities under the Plan and this Agreement, and the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved.

(b)     The Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)     The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any

reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.

(d)    To the extent requested by the Litigation Administrator, the Debtors shall cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims. Without limiting the foregoing, the Celsius Professionals shall provide the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Disputed Claims, the Recovery Causes of Action, and the Contributed Claims.    Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants). The Celsius Professionals shall be reimbursed from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals directly connected with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof.

2.4    Privileges.

(a)    The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "Privileges") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "Privilege Parties") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "Privileged Information").    The Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a

privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Parties.

(b)     The foregoing shall vest the Privileges concerning the Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claim Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Privileged Information.

(c)     The Privilege Parties agree to take all necessary actions to provide to the Litigation Administrator without the necessity of a subpoena all Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity directly related to action taken pursuant to this provision.  The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Privileged Information, and no such person may object to the production to the Litigation Administrator of such Privileged Information on the basis of a Privilege held by a Privilege Party.  Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Privileged Information shall be produced solely to the Litigation Administrator or as required by law.  For the avoidance of doubt, this Subsection is subject in all respects to Section 2.4(a) of this Agreement.

(d)     Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Privileged Information between the Privilege Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)     If a Privilege Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

(f)     Notwithstanding anything to the contrary contained in Section 2.4, for the avoidance of doubt, no Privilege or Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent access to any Privileged

6

Information to the extent that such Privileged Information also directly or indirectly relates to Post-Emergence Claims.

2.5    <u>Payment of Fees and Expenses</u>.    The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan ("<u>Litigation Administrator Professionals</u>"), and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate.    The Litigation Administrator has the right and authority, without further approval from the Bankruptcy Court or any other party, to engage Litigation Administrator Professionals, including without limitation one or more attorneys, to handle specific litigations or to represent the Litigation Administrator in a general capacity, in furtherance of the Litigation Administrator's duties.    The Litigation Oversight Committee shall exercise oversight and may give direction with respect to the initiation or settlement of litigation to the extent specifically provided in the Plan, but shall not control the selection, compensation or supervision of counsel, which shall be reserved to the Litigation Administrator.    All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid solely from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors.    For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the Claim Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.    For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

2.6    <u>Nature and Purpose of the Litigation Administrator</u>.

(a)    <u>Purpose</u>.    The Litigation Administrator is empowered, subject to the terms and conditions of this Agreement, to implement the Plan with respect to all Debtors on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders.    The Litigation Administrator shall (i) prosecute all Post-Emergence Claims, resolve all Post-Emergence Claims, monetize the Post-Emergence Claims, and distribute the Litigation Proceeds in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with the Plan, Confirmation Order, and this Agreement, without the objective of continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement.    The Responsibilites of the Litigation Administrator shall include: (a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or

7

beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Agreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of this Agreement;

(b)     Relationship.  Subject to Section 4.10, the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claim Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claim Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall be as conferred upon them by the Plan, the Confirmation Order and this Agreement. Pursuant to Article IV.G.6 of the Plan, the Litigation Administrator and Litigation Oversight Committee shall each act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account.  For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

(c)     No Waiver of Claims.  In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Disputed Claims or Interests after the Effective Date. No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto.  The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7     Appointment as Representative.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims.  Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the

extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claim Holders or settle or otherwise dispose of Post-Emergence Claims.  Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claim Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.8    <u>Conflicts of Interest</u>. Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement.  Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator.  Until such time as the circumstances giving rise to such conflict of interest are remedied, the Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any claims that are the subject of a conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

2.9    <u>Confidentiality</u>.  The Litigation Administrator and the Members shall, during the period that the Litigation Administrator and the Members serve as Litigation Administrator or Member, whichever is applicable, under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's or Member's removal or resignation hereunder, whichever is applicable, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator or Member may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator or the Members have become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials) or the Members' capacity as Member, until (a) such information is made public other than by disclosure by the Litigation Administrator, any Members, or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator or Member is required by law to disclose such information (in which case the Litigation Administrator or Member shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); (c) the Litigation Administrator or Member obtains a waiver of confidentiality from the applicable Person; or (d) the Litigation Administrator is reasonably advised by the Litigation Administrator Professionals to disclose the type of information described in Section 2.9 herein to the extent that it is done in the performance of the Litigation Administrator's responsibilities under this Agreement.

# ARTICLE III
## INTERESTS

3.1    <u>Interests.</u>  The Claim Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    <u>Interests Beneficial Only</u>.  The entitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claim Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3    <u>Registry of Post-Emergence Claims.</u>

(a)    The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "<u>Registrar</u>"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)    The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claim Holders (the "<u>Claim Holder Register</u>"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claim Holder Register shall be made available to Claim Holders at the office of the Litigation Administrator or such other location as the Litigation Administrator reasonably shall specify upon three (3) Business Days' written notice to the Litigation Administrator.

3.4    <u>Effect of Death, Incapacity or Bankruptcy</u>.  The death, incapacity or bankruptcy of any Claim Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claim or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claim Holders under this Agreement.

3.5    <u>Change of Address</u>.  Any Claim Holders may, after the Effective Date, select an alternative distribution address by providing written notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar. Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6    <u>Standing</u>.  No Claim Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR

4.1     Role of the Litigation Administrator.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment and maintenance of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in good faith in the interests of all Claim Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts in its reasonable judgment and discretion to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2     Power to Contract.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3     Ultimate Right to Act Based on Advice of Counsel or Other Professionals.  Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4     [RESERVED]

4.5     Authority to Prosecute and Settle Post-Emergence Claims.

(a)    Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall have sole authority to prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than an amount determined by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)    To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."  Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim.  For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    <u>Liquidation of Post-Emergence Claims.</u>  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.  The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim Holders, *provided*, *however*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination).  Pursuant to

an agreed-upon budget in accordance with Section 4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

    4.7    <u>Distributions</u>.

        (a)    After the Litigation Proceeds are received by the Litigation Administrator, the Litigation Administrator shall make periodic distributions of the Litigation Proceeds (net of the costs of obtaining such Litigation Proceeds) to the Claim Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement as the Litigation Administrator shall determine, in consultation with the Litigation Oversight Committee, after (i) funding any reserves deemed necessary or appropriate by the Litigation Administrator and (ii) maintaining such funding in the Litigation Recovery Account in accordance with the Plan and as deemed necessary or appropriate by the Litigation Administrator.

        (b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent or committed to be spent by the Litigation Administrator(s) or reasonably determined by the Litigation Administrator to be maintained as an expense reserve in the proper performance of its responsibilities hereunder, the funds in the Litigation Recovery Account Pro Rata to the Claim Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

        (c)    The Litigation Administrator shall make distributions to Claim Holders at the last-known address for each such Claim Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date.  Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer or ACH payment from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "<u>Litigation Administrator Account</u>"), the option of which shall be in the sole discretion of the Litigation Administrator.  If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the

terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred. Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)     The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement. The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)     The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim. In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)     The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)     The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Allowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution. Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Wind-Down Process set forth in Section 9.1 of this Agreement.

(h)     Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 180 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby

against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 240 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have been negotiated within 180 days after the date the check was mailed or otherwise delivered to the Holder.

(i)      Subject to Sections 4.8, 4.10 and 4.11 hereof, and the provisions of this Section 4.7, any non-Cash property made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim Holders pursuant to the reporting obligations provided in Section 4.13 of this Agreement.   If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property.  Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)      Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day, and the 180-day limit described in Section 4.7(h) above shall be similarly extended to the next Business Day if it would otherwise occur on a date that is not a Business Day.

4.8    Management of Post-Emergence Claims.

(a)      Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement.  No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)      In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement,

the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) to the extent expressly required herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9     <u>Investment of Cash</u>.  The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act or money market funds containing only such U.S. Government securities; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses, subject in all cases to Section 2.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.5).

4.10     <u>Additional Powers of the Litigation Administrator.</u>  In addition to any and all of the powers specifically enumerated above, and subject to the retained jurisdiction of the Bankruptcy Court, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee, shall be empowered to:

(a)     take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)     make distributions to Claim Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)     hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claim Holders (including any Litigation Proceeds);

(d)     perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the

Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.3 hereof;

(e)    protect and enforce the rights of the Post-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)    subject to Section 2.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)    make all payments relating to the administration of the Litigation Recovery Account;

(i)    expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning as promptly as is reasonably practicable after the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)    obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)    (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)    request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m)    investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to

or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n)     without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o)     execute offsets or assert counterclaims against Claim Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p)     subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)     retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and (ii) prepare and file any tax returns or informational returns for the Litigation Recovery Account as may be required;

(r)     take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)     take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)     liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)     take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)     (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to

them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided* that the Litigation Administrator shall work in good faith with the Plan Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement.

4.11    <u>Limitations on Power and Authority of the Litigation Administrator</u>. The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would reasonably be expected to make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claim Holders or assign the Debtors', Post-Effective Date Debtors', or Claim Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee to the extent provided in Section 2.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    <u>Books and Records</u>. The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation

Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements for the Litigation Recovery Account.  Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    Reports.

(a)    Financial and Status Reports.  The fiscal year of the Litigation Recovery Account shall be the calendar year.  Within 90 days after the end of each calendar year during the existence of the Litigation Recovery Account, within 45 days after the end of each calendar quarter during the existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claim Holders appearing in the Claim Holder Register as of the end of such period or such date of closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claim Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claim Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate by the Litigation Administrator, in its reasonable judgment, to be disclosed by it.  In addition, the Litigation Administrator shall make available unaudited financial statements to each Claim Holder on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court).  The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claim Holder.  The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claim Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claim Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

    (b)   <u>Annual Plan and Budget</u>.  If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

**ARTICLE V**
**LITIGATION RECOVERY ACCOUNT**

    5.1   <u>Establishment of Litigation Recovery Account</u>.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such Claims, and (d) fund the Litigation Administrator Expenses.  The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, and Litigation Administrator Expenses have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired. Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claim Holders in accordance with the Plan and this Agreement. The Litigation Oversight Committee may authorize reserving amounts for obligations and expenses expected to be payable.

    5.2   <u>Cash in the Litigation Recovery Account</u>.  Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Post-Effective Date Debtors for the benefit of Claim Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan.  Cash shall be either (x) held in an interest-bearing account or (y) invested in interest-bearing obligations of the type described in Section 4.9, and having (in either case) a maturity date of not more than 30 days.  All such Cash or investments shall be held at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import.  Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

    5.3   <u>Distributions After Allowance of Disputed Claims or Disputed Interests</u>.  At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so

21

retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter. The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

5.4    <u>Distributions After Disallowance of Disputed Claims</u>.  If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1    <u>Independent Litigation Administrator</u>.  The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2    <u>Litigation Administrator's Term of Service, Compensation and Reimbursement</u>.

(a)    <u>Term of Service</u>.  The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)    <u>Compensation</u>.  The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on <u>Exhibit B</u> hereto (the "<u>Litigation Administrator Compensation</u>").  The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.  Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; *provided*, *however*, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)    <u>Expenses</u>.  The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator

22

hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Administrator Expenses" and, together with the Litigation Administrator Compensation, the "Litigation Administrator Fees").

(d)    Payment.  The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.  The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3    Resignation.  The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claim Holders); *provided, however*, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claim Holders.  Such resignation shall become effective on the earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment.  Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein.  Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claim Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.  Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 2.2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a

Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided*, *however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claim Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided*, *however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder. For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)     During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee, in consultation with the Litigation Administrator, shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator"). The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided*, *however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses. Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)     To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6     Effect of Resignation or Removal. The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to

24

the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator. In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator. Notwithstanding anything to the contrary contained in this Agreement, any Litigation Administrator who is removed or resigns pursuant to this Agreement shall retain its right to coverage under any applicable insurance policies and indemnification in accordance with Article VII for its acts or omissions occurring prior to such removal or resignation.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

7.1    <u>No Further Liability</u>.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless determined by a final judgment of a court of competent jurisdiction to arise out of such Person's own fraud, willful misconduct or gross negligence.  Unless so arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator. Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.  None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.  Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given.  Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions determined by a final judgment of a court of competent jurisdiction to have arisen out of such Person's fraud, willful misconduct or gross negligence.  Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) will conclusively be deemed not to constitute fraud,

willful misconduct or gross negligence. No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such termination, amendment, modification or repeal. Notwithstanding the foregoing, in no event shall the Litigation Administrator have any liability under any circumstances for any acts or omissions taken by it at the direction of the Litigation Oversight Committee.

7.2     Indemnification of the Litigation Administrator and Litigation Oversight Committee.

(a)     From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "Litigation Administrator Agreement Indemnified Party," and collectively, the "Litigation Administrator Agreement Indemnified Parties") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in

26

Section 4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party that expressly waives such benefits.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    <u>Litigation Administrator Liabilities</u>. All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law. No liability of the Litigation Administrator will be payable in whole or in part by any Claim Holders individually or in the Claim Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claim Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    <u>Limitation of Liability</u>. None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5    Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    Treatment of Post-Emergence Claims.  For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claim Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)    The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2    Withholding of Taxes. The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claim Holders for all purposes of this Agreement.

(a)    The Litigation Administrator shall be authorized to collect such tax information from the Claim Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claim Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claim Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claim Holders that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Claim Holder, the Litigation Administrator shall make such distribution to which the Claim Holders is entitled, without interest; and, *provided*, *further*, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claim Holder fails

28

to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution.

(c)    In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claim Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    Valuation.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

## ARTICLE IX
## TERMINATION OF THE AGREEMENT

9.1    Termination.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or (with the approval of the Litigation Oversight Committee) abandoned all Post-Emergence Claims, (b) all objections to the Disputed Claims have been resolved, and (c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim Holders is likely to exceed the value of consideration available for distribution and provided that clause (c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "Wind-Down Process").  Such date upon which

the Litigation Recovery Account shall finally be closed shall be referred to herein as the "Termination Date."

9.2    Continuance of the Litigation Administrator for Winding Up.  During the Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed.  During the Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.5 hereof.  Upon distribution of all the Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.3 hereof.  At the Litigation Administrator's discretion, but subject in all cases to Section 2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder).  Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claim Holders as provided herein, the Post-Emergence Claims shall be cancelled.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1    No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claim Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Section 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No amendment, supplement or waiver of or to this Agreement shall adversely affect the interests, rights or treatment of the Litigation Administrator without the prior written consent of the Litigation Administrator.

10.3    No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    <u>Jurisdiction</u>.  Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims.  Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.  Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).  Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    <u>Severability</u>.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)    If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway, 19th Floor
New York, New York 10019
Attn: Celsius Litigation Administrator, Mohsin Y. Meghji
Email: Celsius_Litigation_Admin@m3-partners.com

With a copy to:

White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
      sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

        (ii)     If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

(iii)    if to any Claim Holders, to the last known address of such Claim Holders, according to the Litigation Administrator's records;

(iv)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

11.5    Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    Plan and Confirmation Order.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7    Entire Agreement.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8    Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9    Meanings of Other Terms.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the

corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement.  The term "including" shall mean "including, without limitation."

11.10   <u>Successors in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.3 hereto.  The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.3 hereto.  For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11   <u>Limitations</u>.  Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.  The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12   <u>Further Assurances</u>.  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14   <u>Authority</u>.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a

legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]


[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

[Signature Page to Litigation Administrator Agreement]

## <u>EXHIBIT A</u>

### Initial Members of the Litigation Oversight Committee

1. Mark Robinson

2. Gerard Uzzi

3. Vik Jindal

4. Deirdre O'Connor

5. Cameron Crews, designated by the Earn Ad Hoc Group

6. David Adler, designated by the Retail Borrower Ad Hoc Group

7. A Person or Entity selected in accordance with the Confirmation Order.

## <u>EXHIBIT B</u>

### Compensation of Litigation Administrator

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action.  Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

## Exhibit D-1

**(Redline) Litigation Administrator Agreement**

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), and [Mohsin Y. Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, each Debtor other than the GK8 Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (such cases, the "Chapter 11 Cases"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions," and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

# ARTICLE II
## ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1     Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)     The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claim Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)     The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)     The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)     The Litigation Administrator agrees to administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement.

(e)     The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)     Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claim Holder shall be binding and conclusive on all Claim Holders even if such Claim Holders have different or conflicting interests.

(g)     The Litigation Oversight Committee shall designate three (3) members to serve on a subcommittee, the ("Avoidance Action Oversight Subcommittee").  The Earn Ad Hoc

Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action Oversight Subcommittee, subject to the consent of the Committee (as defined in the Plan). The Avoidance Action Oversight Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the settlement and prosecution of, Avoidance Actions against non-Insider (or former Insider) individual Account Holders for prepetition transfers of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date. The Litigation Oversight Committee, the Litigation Administrator, and the Avoidance Action Oversight Subcommittee shall agree on a process for resolving the settlement and prosecution of Avoidance Actions described in this subsection. For the avoidance of doubt, the Avoidance Action Oversight Subcommittee shall be subject to the same fiduciary duties as the Litigation Oversight Committee.

2.2    <u>Removal of Litigation Oversight Committee Members.</u>

(a)    A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

(b)    To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

For purposes of this Agreement:

(i)    "Cause" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of written notice specifying such failure in reasonable detail; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's disclosure of information in violation of Section 2.9; (iv) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (ivv) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder, or; (vvi) a Person's breach of fiduciary duties; or (vii) an unresolved conflict of interest which cannot be obviated by appointment of a substitute with respect to claims that are the subject of a conflict determination made by the Litigation Oversight Committee pursuant to Section 2.8; and

(ii)    "Disability" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties

3

hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

    2.3    <u>The Post-Emergence Claims</u>.

    (a)    From and after the Effective Date, the Litigation Administrator shall have access to copies of the Debtors', the Estates', the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, all in compliance with applicable law.  From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Litigation Administrator shall have access to any relevant documents, information or personnel reasonably related to the Litigation Administrator's responsibilities under the Plan and this Agreement, and the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved.

    (b)    The Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

    (c)    The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall

reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.

(d)    To the extent requested by the Litigation Administrator, the Debtors shall cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims. Without limiting the foregoing, the Celsius Professionals shall provide the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Disputed Claims, the Recovery Causes of Action, and the Contributed Claims.    Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).    The Celsius Professionals shall be reimbursed from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals in~~~~directly connect~~ioned~~ with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof.

2.4    <u>Privileges</u>.

(a)    The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "<u>Privileges</u>") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "<u>Privilege Parties</u>") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "<u>Privileged Information</u>").  The Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Parties.

(b)    The foregoing shall vest the Privileges concerning the Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claim Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Privileged Information.

(c)    The Privilege Parties agree to take all necessary actions to provide to the Litigation Administrator without the necessity of a subpoena all Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity ~~that takes~~directly related to action taken pursuant to this provision.  The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Privileged Information, and no such person may object to the production to the Litigation Administrator of such Privileged Information on the basis of a Privilege held by a Privilege Party.  Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Privileged Information shall be produced solely to the Litigation Administrator or as required by law.  For the avoidance of doubt, this Subsection is subject in all respects to Section 2.4(a) of this Agreement.

(d)    Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Privileged Information between the Privilege Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section 2.4, for the avoidance of doubt, no Privilege or Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent access to any Privileged Information to the extent that such Privileged Information also directly or indirectly relates to Post-Emergence Claims.

2.5    <u>Payment of Fees and Expenses</u>.  The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan ("<u>Litigation Administrator Professionals</u>"), and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate~~, including contingency fee arrangements, with such retention and compensation being subject to the approval of the Litigation Oversight Committee (if appointed)~~. <u>The Litigation Administrator has the right and authority, without further approval from the Bankruptcy Court or any other party, to engage Litigation Administrator Professionals, including without limitation one or more attorneys, to handle specific litigations or to represent the Litigation Administrator in a general capacity, in furtherance of the Litigation Administrator's duties.  The Litigation Oversight Committee shall exercise oversight and may give direction with respect to the initiation or settlement of litigation to the extent specifically provided in the Plan, but shall not control the selection, compensation or supervision of counsel, which shall be reserved to the Litigation Administrator</u>.  All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid solely from the Litigation Recovery Account, and solely be the obligation of the Post-Effective Date Debtors.  For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the Claim Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.  For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

2.6    <u>Nature and Purpose of the Litigation Administrator</u>.

(a)    <u>Purpose</u>.  The Litigation Administrator is empowered, subject to the terms and conditions of this Agreement, to implement the Plan with respect to all Debtors on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders.  The Litigation Administrator shall (i) prosecute all Post-Emergence Claims, resolve all Post-Emergence Claims, monetize the Post-Emergence Claims, and distribute the Litigation Proceeds in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with the Plan, Confirmation Order, and this Agreement, without the objective of continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement. The Responsibilites of the Litigation Administrator shall include: (a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Agreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of this Agreement;

(b)    <u>Relationship</u>.  Subject to Section 4.10, the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claim Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claim Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall ~~not be deemed a principal and agency relationship, and their rights shall be limited to those~~<u>be as</u> conferred upon them by the Plan, the Confirmation Order and this Agreement. <u>Pursuant to Article IV.G.6 of the Plan, the Litigation Administrator and Litigation Oversight Committee shall each act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account.</u>  For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an

agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

(c)    No Waiver of Claims.    In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Disputed Claims or Interests after the Effective Date.  No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto.    The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7    Appointment as Representative.    Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims.    Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claim Holders or settle or otherwise dispose of Post-Emergence Claims.  Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claim Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.8    Conflicts of Interest. Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement.  Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator.  The Until such time as the circumstances giving rise to such conflict of interest are remedied, the Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any claims that are the subject of a conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and

9

necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

2.9    Confidentiality.  The Litigation Administrator and the Members shall, during the period that the Litigation Administrator and the Members serve as Litigation Administrator or Member, whichever is applicable, under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's or Member's removal or resignation hereunder, whichever is applicable, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator or Member may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator or the Members have become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials) or the Members' capacity as Member, until (a) such information is made public other than by disclosure by the Litigation Administrator, any Members, or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator or Member is required by law to disclose such information (in which case the Litigation Administrator or Member shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); (c) the Litigation Administrator or Member obtains a waiver of confidentiality from the applicable Person; or (d) the Litigation Administrator is reasonably advised by the Litigation Administrator Professionals to disclose the type of information described in Section 2.9 herein to the extent that it is done in the performance of the Litigation Administrator's responsibilities under this Agreement.

### ARTICLE III
### INTERESTS

3.1    Interests.  The Claim Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    Interests Beneficial Only.  The entitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claim Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3    Registry of Post-Emergence Claims.

(a)    The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "Registrar"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)    The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to

time and acceptable to the Litigation Administrator, a registry of the Claim Holders (the "Claim Holder Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe. The Claim Holder Register shall be made available to Claim Holders at the office of the Litigation Administrator or such other location as the Litigation Administrator reasonably shall specify upon three (3) Business Days' written notice to the Litigation Administrator.

3.4    Effect of Death, Incapacity or Bankruptcy. The death, incapacity or bankruptcy of any Claim Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claim or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claim Holders under this Agreement.

3.5    Change of Address. Any Claim Holders may, after the Effective Date, select an alternative distribution address by providing written notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address. Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar. Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6    Standing. No Claim Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR

4.1    Role of the Litigation Administrator. In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment and maintenance of the Litigation Recovery Account. All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court. In all circumstances, the Litigation Administrator shall act in good faith in the best interests of all

Claim Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts in its reasonable judgment and discretion to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2     Power to Contract.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3     Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4     [RESERVED]

4.5     Authority to Prosecute and Settle Post-Emergence Claims.

(a)     Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall have sole authority to prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than an amount determined by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)     To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."    Without limiting the

12

foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim. For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    Liquidation of Post-Emergence Claims.  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.   The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim Holders, *provided*, *however*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination). Pursuant to an agreed-upon budget in accordance with Section 4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

4.7    Distributions.

(a)    After the Litigation Proceeds are received by the Litigation Administrator, the Litigation Administrator shall make periodic distributions of the Litigation Proceeds (net of the costs of obtaining such Litigation Proceeds) to the Claim Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement after~~as the Litigation Administrator shall determine, in consultation with the Litigation Oversight Committee, after (i)~~ funding any reserves deemed necessary or appropriate by the Litigation Administrator and, (ii) maintaining such funding in the Litigation Recovery Account in accordance with the Plan, funding and as deemed necessary or appropriate by the Litigation Recovery AccountAdministrator.

(b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a)4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent or committed to be spent by the Litigation Administrator(s) or reasonably determined by the Litigation Administrator to be maintained as an expense reserve in the proper performance of its responsibilities hereunder, the funds in the Litigation Recovery Account Pro Rata to the

13

Claim Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

(c)     The Litigation Administrator shall make distributions to Claim Holders at the last-known address for each such Claim Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date.  Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer <u>or ACH payment</u> from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "<u>Litigation Administrator Account</u>"), the option of which shall be in the sole discretion of the Litigation Administrator.  If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)     The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement.  The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)     The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim.  In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that

14

the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)    The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)    The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Allowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution. Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Wind-Down Process set forth in Section 9.1 of this Agreement.

(h)    Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 180 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator. In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim. No later than ~~180~~240 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator. For the avoidance of doubt, such list shall not include the Holders of any checks that have ~~not~~ been negotiated within 180 days after the date the check was mailed or otherwise delivered to the Holder.

(i)    Subject to Sections 4.8, 4.10 and 4.11 hereof, and the provisions of this Section 4.7, any non-Cash property made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator. Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim Holders pursuant to the

reporting obligations provided in Section 4.13 of this Agreement. If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property. Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)    Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day, and the 180-day limit described in Section 4.7(h) above shall be similarly extended to the next Business Day if it would otherwise occur on a date that is not a Business Day.

4.8    Management of Post-Emergence Claims.

(a)    Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement. No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)    In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) as set forth to the extent expressly required herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9    Investment of Cash. The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation

Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act or money market funds containing only such U.S. Government securities; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses, subject in all cases to Section 2.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.5).

4.10    Additional Powers of the Litigation Administrator.  In addition to any and all of the powers specifically enumerated above, and except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee (if appointed) as provided in this Agreement, shall be empowered to:

(a)    take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)    make distributions to Claim Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)    hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claim Holders (including any Litigation Proceeds);

(d)    perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.3 hereof;

(e)    protect and enforce the rights of the Post-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)      subject to Section 2.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)      make all payments relating to the administration of the Litigation Recovery Account;

(i)      expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning ~~at~~as promptly as is reasonably practicable after the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)      obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)      (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)      request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m)      investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n)      without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o)      execute offsets or assert counterclaims against Claim Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the

Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p)    subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)    retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and (ii) prepare and file any tax returns or informational returns for the Litigation Recovery Account as may be required;

(r)    take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)    take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)    liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)    take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)    (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided* that the Litigation Administrator shall work in good faith with the Plan

Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement.

4.11    <u>Limitations on Power and Authority of the Litigation Administrator</u>.    The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would <u>reasonably be expected to</u> make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claim Holders or assign the Debtors', Post-Effective Date Debtors', or Claim Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee ~~as~~<u>to the extent</u> provided in Section 2.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    <u>Books and Records</u>.    The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements for the Litigation Recovery Account.  Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing

any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    Reports.

(a)    Financial and Status Reports.  The fiscal year of the Litigation Recovery Account shall be the calendar year.  Within 90 days after the end of each calendar year during the existence of the Litigation Recovery Account, within 45 days after the end of each calendar quarter during the existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claim Holders appearing in the Claim Holder Register as of the end of such period or such date of closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claim Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claim Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate ~~to be disclosed~~ by the Litigation Administrator, in its reasonable judgment, to be disclosed by it.  In addition, the Litigation Administrator shall ~~provide~~make available unaudited financial statements to each Claim Holder~~s~~ on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court).  The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claim Holder.  The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claim Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claim Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)    Annual Plan and Budget.  If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

## ARTICLE V
## LITIGATION RECOVERY ACCOUNT

5.1    <u>Establishment of Litigation Recovery Account</u>.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such Claims, and (d) fund the Litigation Administrator Expenses.  The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, ~~and~~ Allowed Secured Claims, and Litigation Administrator Expenses have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired. Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claim Holders in accordance with the Plan and this Agreement. The Litigation Oversight Committee may authorize reserving amounts for obligations and expenses expected to be payable.

5.2    <u>Cash in the Litigation Recovery Account</u>.  Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Post-Effective Date Debtors for the benefit of Claim Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan.  Cash shall be either (x) held in an interest-bearing account or (y) invested in interest-bearing obligations ~~issued by the U.S. government and guaranteed by the U.S. government~~of the type described in Section 4.9, and having (in either case) a maturity date of not more than 30 days. All such Cash or investments shall be held at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import.  Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

5.3    <u>Distributions After Allowance of Disputed Claims or Disputed Interests</u>.  At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter.  The balance of any Cash

thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

5.4     Distributions After Disallowance of Disputed Claims.  If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

# ARTICLE VI
# THE LITIGATION ADMINISTRATOR GENERALLY

6.1     Independent Litigation Administrator.  The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2     Litigation Administrator's Term of Service, Compensation and Reimbursement.

(a)     Term of Service.  The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)     Compensation.  The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on Exhibit B hereto (the "Litigation Administrator Compensation").  The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.  Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; provided, however, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)     Expenses.  The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Administrator Expenses" and, together with the Litigation Administrator Compensation, the "Litigation Administrator Fees").

23

(d)    Payment.  The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.  The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3    Resignation.  The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claim Holders); *provided, however*, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claim Holders.  Such resignation shall become effective on the earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment.  Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein.  Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claim Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause ~~or without Cause~~ (as defined in Section 2.2(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.  Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 2.2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided*, *however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated

24

a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claim Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided*, *however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder. For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)     During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee, in consultation with the Litigation Administrator, shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator"). The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided*, *however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses. Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)     To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6     Effect of Resignation or Removal. The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator. In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or

any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator. Notwithstanding anything to the contrary contained in this Agreement, any Litigation Administrator who is removed or resigns pursuant to this Agreement shall retain its right to coverage under any applicable insurance policies and indemnification in accordance with Article VII for its acts or omissions occurring prior to such removal or resignation.

6.7  Confidentiality.    The Litigation Administrator shall, during the period that the Litigation Administrator serves as Litigation Administrator under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's removal or resignation hereunder, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator has become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials), until (a) such information is made public other than by disclosure by the Litigation Administrator or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator is required by law to disclose such information (in which case the Litigation Administrator shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); or (c) the Litigation Administrator obtains a waiver of confidentiality from the applicable Person.

**ARTICLE VII**
**LIABILITY AND INDEMNIFICATION**

7.1    No Further Liability.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless arisingdetermined by a final judgment of a court of competent jurisdiction to arise out of such Person's own fraud, willful misconduct or gross negligence.   Unless so arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator.   Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.   None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their

representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given. Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions determined by a final judgment of a court of competent jurisdiction to have arising out of such Person's fraud, willful misconduct or gross negligence. Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) and, in the case of the Litigation Administrator, with the additional express approval of the Litigation Oversight Committee will conclusively be deemed not to constitute fraud, willful misconduct or gross negligence. No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such termination, amendment, modification or repeal. Notwithstanding the foregoing, in no event shall the Litigation Administrator have any liability under any circumstances for any acts or omissions taken by it at the direction of the Litigation Oversight Committee.

7.2    Indemnification of the Litigation Administrator and Litigation Oversight Committee.

(a)    From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "Litigation Administrator Agreement Indemnified Party," and collectively, the "Litigation Administrator Agreement Indemnified Parties") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a

threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in Section 4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party that expressly waives such benefits.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    <u>Litigation Administrator Liabilities</u>. All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and

applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law.  No liability of the Litigation Administrator will be payable in whole or in part by any Claim Holders individually or in the Claim Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claim Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    <u>Limitation of Liability</u>.    None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5    <u>Burden of Proof</u>.    In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    <u>Treatment of Post-Emergence Claims</u>.    For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claim Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)    The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2    <u>Withholding of Taxes</u>. The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claim Holders for all purposes of this Agreement.

(a)    The Litigation Administrator shall be authorized to collect such tax information from the Claim Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claim Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claim Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claim Holders that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Claim Holder, the Litigation Administrator shall make such distribution to which the Claim Holders is entitled, without interest; and, *provided*, *further*, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claim Holder fails to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution.

(c)    In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claim Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    <u>Valuation</u>.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

### ARTICLE IX
### TERMINATION OF THE AGREEMENT

9.1    <u>Termination</u>.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or (with the approval of the Litigation Oversight Committee) abandoned all Post-Emergence Claims, (b) all objections to the Disputed Claims have been resolved, and (c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines

that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator. If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim Holders is likely to exceed the value of consideration available for distribution and provided that clause (c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "Wind-Down Process"). Such date upon which the Litigation Recovery Account shall finally be closed shall be referred to herein as the "Termination Date."

9.2     Continuance of the Litigation Administrator for Winding Up. During the Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed. During the Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.5 hereof. Upon distribution of all the Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.3 hereof. At the Litigation Administrator's discretion, but subject in all cases to Section 2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder). Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claim Holders as provided herein, the Post-Emergence Claims shall be cancelled.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1     No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claim Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Section 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e)

be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No amendment, supplement or waiver of or to this Agreement shall adversely affect the interests, rights or treatment of the Litigation Administrator without the prior written consent of the Litigation Administrator.

10.3    10.2 No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

11.1    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    Jurisdiction.    Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims.    Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.    Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).    Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    Severability.    In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is

held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)    If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway
, 19th Floor
New York, NYNew York 10019
Attn: [Celsius Litigation Administrator, Mohsin Y. Meghji]
Email: mmeghjiCelsius_Litigation_Admin@m3-partners.com

With a copy to:

White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

        (ii)     If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
        ross.kwasteniet@kirkland.com
        chris.koenig@kirkland.com
        dan.latona@kirkland.com

        (iii)    if to any Claim Holders, to the last known address of such Claim Holders, according to the Litigation Administrator's records;

        (iv)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

    11.5    Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    Plan and Confirmation Order.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7    Entire Agreement.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8    Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9    Meanings of Other Terms.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement.  The term "including" shall mean "including, without limitation."

11.10    Successors in Interest.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.3 hereto.  The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.3 hereto.  For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11   _Limitations_.   Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.  The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12   _Further Assurances_.   From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13   _Counterparts_.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.   A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14   _Authority_.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

## EXHIBIT A

### Initial Members of the Litigation Oversight Committee

1.  Mark Robinson

~~2. Keith Noyes~~

2.  ~~3.~~ Gerard Uzzi

3.  ~~4.~~ Vik Jindal

~~5. One (1) additional individual to be designated by the Committee~~

4.  Deirdre O'Connor

5.  ~~6. One (1) individual to be~~ Cameron Crews, designated by the Earn Ad Hoc Group~~, subject to the consent of the Committee~~

6.  ~~7. One (1) individual to be~~ David Adler, designated by the Retail Borrower Ad Hoc Group~~, subject to the consent of the Committee~~

7.  A Person or Entity selected in accordance with the Confirmation Order.

**EXHIBIT B**

**Compensation of Litigation Administrator**

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

~~"Net Litigation Recoveries" means gross proceeds from Post-Emergence Claims less out-of-pocket expenses (without deducting contingency counsel fees or fees and expense relating to administration of the Agreement).~~

Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action.  Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

**<u>Exhibit E</u>**

**Plan Administrator Agreement**

*[DRAFT]*

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Section 8 hereof, dated as of [●], by and among (a) Celsius Network LLC, on behalf of itself and its debtor subsidiaries (collectively, the "Debtors" or the "Post-Effective Date Debtors," as applicable), (b) Christopher Ferraro, who shall constitute (and is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, unless and until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator"), and (c) the Committee (together with the Debtors and the Plan Administrator, the "Parties"), sets forth the Plan Administrator's rights, powers, and obligations in connection with the Plan pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.    Appointment.  Effective as of the Effective Date (as defined in the Plan), the Plan Administrator will be appointed to act as the Plan Administrator under the Plan for the purpose of effectuating the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, the Confirmation Order, and the Wind-Down Procedures, if applicable (collectively, the "Plan Documents"). As set forth in the Plan Documents, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors, the Debtors' officers, directors, managers, members, shareholders, and the Debtors' Estates from and following the Effective Date.

2.    Scope of Services.  The Plan Administrator shall provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Plan Documents and to make certain distributions under the Plan. Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator shall perform the following services for the Post-Effective Date Debtors' Estates in its role as Plan Administrator for all purposes of the Plan (as such services may be further described in the Plan Documents or additional tasks required to be performed by the Plan Administrator as described in the Plan Documents):

(a)    make (or arrange for a Distribution Agent to make) the distributions contemplated by the Plan;

(b)    administer the Special Committee D&O Liability Insurance Policies;

(c)    evaluate in his discretion whether each of the EIP Participants have met the applicable metrics under the Emergence Incentive Plan and authorize and distribute any payments under the Emergence Incentive Plan to the extent earned; *provided* that the Plan Administrator may consult with counsel and other advisors in interpreting the applicable provisions of the Plan and Confirmation Order and determining whether the applicable metrics have been met pursuant to the terms of the Emergence Incentive Plan;

(d)       cooperate with the Litigation Administrator with respect to its duties, as set forth in the Plan Documents and the Litigation Administrator Agreement;

(e)       prosecute any Causes of Action that vest in the Post-Effective Date Debtors and are not otherwise delegated to the Litigation Administrator pursuant to the Plan or delegated to the Litigation Administrator in writing by the Plan Administrator and the Litigation Administrator;

(f)       to the extent not duplicative with the responsibilities of any Litigation Administrator, marshal, market for sale, and wind down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(g)       to the extent not duplicative with the responsibilities of any Litigation Administrator, recover and compel turnover of the Debtors' property in accordance with the Plan;

(h)       manage the Plan Administrator Budget or Wind-Down Budget, as applicable, and pay the Wind-Down Expenses, if any;

(i)       to the extent not duplicative with the responsibilities of any Litigation Administrator, abandon any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(j)       prepare and file post-Effective Date operating reports (including the month in which the Effective Date occurs);

(k)       file appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(l)       at the appropriate time, file a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Post-Effective Date Debtors under the applicable laws of their respective states of incorporation or formation (as applicable);

(m)       be responsible for the ongoing administration of the Chapter 11 Cases and all actions related to the closing of the Chapter 11 Cases;

(n)       retain such professionals as are reasonably necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations;

(o)       cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby;

2

(p)    to the extent not duplicative with the responsibilities of any Litigation Administrator, take such actions as are necessary and reasonable to carry out the purposes of the Plan, including winding down the Debtors' business affairs; and

(q)    implement the Orderly Wind Down, if applicable, and only if the Orderly Wind Down is approved by the Bankruptcy Court.

3.    Reporting. The Plan Administrator shall provide quarterly reports, commencing on the date that is the three-month anniversary of the Effective Date, to the Litigation Administrator and the Litigation Oversight Committee with respect to the assets of the Post-Effective Date Debtors, the receipts and expenditures of the Post-Effective Date Debtors, and information regarding the remaining tasks to be completed to close the Debtors' estates and the estimated time until completion of the Plan Administrator's duties under the Plan and this Agreement.

4.    Remaining Cash. To the extent that the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator, the Plan Administrator shall coordinate with the Litigation Administrator to distribute such Cash or other property Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. If such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated; provided that the Litigation Administrator or any other interested party may petition the Bankruptcy Court, upon notice and hearing, to order the Plan Administrator to distribute remaining Cash or assets to Holders of Claims entitled to receive Litigation Proceeds at an earlier date.

5.    Timing and Fees.

(a)    The Plan Administrator will commence its responsibilities on the Effective Date.

(b)    The Post-Effective Date Debtors shall pay the Plan Administrator's compensation and reimburse the Plan Administrator's expenses as set forth herein as such amounts come due without the need for Bankruptcy Court approval.

(c)    [The Plan Administrator's compensation shall be based upon an initial term of up to twelve months, to be paid as follows: $200,000 per month for the first [three] months following the Effective Date and $100,000 per month for the fourth through twelfth months following the Effective Date.  The [Litigation Administrator] shall have the authority, in consultation with the Plan Administrator, to reduce the initial term to less than 12 months, but at the conclusion of any such shortened term, the $1,000,000 completion fee described

below shall become immediately due and payable absent fraud, gross negligence, or willful misconduct by the Plan Administrator.

(d)    The Plan Administrator's compensation shall be payable from the Post Effective Date Debtors' Assets on a monthly basis in advance not later than the first business day of each month.

(e)    In addition, so long as the initial revesting of Unclaimed Distributions pursuant to the Plan has occurred, at the one year anniversary of the Effective Date (or such earlier date selected to end the initial term by the Litigation Administrator), the Plan Administrator shall receive a substantial completion bonus in the amount of $1,000,000, which shall be payable from the Post-Effective Date Debtors' Assets. From the period starting six months after the Effective Date to the one-year anniversary of the Effective Date, the Plan Administrator shall consult with the Litigation Administrator and the Litigation Oversight Committee regarding the potential selection of a successor Plan Administrator (whose compensation shall be the subject of agreement between such successor Plan Administrator, the Litigation Administrator, and the Litigation Oversight Committee, or, if no such agreement is reached, by order of the Bankruptcy Court).  Alternatively, subject to agreement among the Plan Administrator and the Litigation Administrator, the Plan Administrator may at any time delegate the Plan Administrator's remaining work streams to the Litigation Administrator, subject to the oversight of the Litigation Oversight Committee.][1]

(f)    In addition to the foregoing, the Plan Administrator shall be entitled to reimbursement of actual, reasonable, out-of-pocket and direct expenses incurred in connection with the services to be provided under this Agreement and/or the Plan Documents, as applicable.

(g)    The Plan Administrator may retain any professionals reasonably necessary to the Plan Administrator, and any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Post-Effective Date Debtors' Assets in accordance with the terms of this Agreement and the terms of the applicable professional's engagement letter.

6.    Relationship of the Parties.  The Parties intend that an independent contractor relationship shall be created by this Agreement.  The Plan Administrator shall not be entitled to receive from the Debtors or Post-Effective Date Debtors or their Estates any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.  Notwithstanding the foregoing, as stated by the Plan, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

7.    D&O Liability Insurance.  The Post-Effective Date Debtors shall purchase director and officer liability insurance ("D&O Insurance") that will cover the Plan Administrator with respect

---

[1]    [**NTD**: The Plan Administrator's compensation, including the conditions to and amounts of the substantial completion bonus and the completion bonus, remain subject to discussion among the proposed Plan Sponsor, the Debtors, and the Committee.]

to carrying out the Plan Administrator's duties in an amount and on terms reasonably acceptable to the Plan Administrator.

8.    <u>Confidentiality</u>.  The Plan Administrator shall treat confidentially all information not publicly available that is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

9.    <u>Indemnity</u>.  The Post-Effective Date Debtors shall indemnify and defend the Plan Administrator and all professionals engaged by the Plan Administrator from and against any and all claims, liability, loss, costs, damage, or expense (including reasonable attorneys' fees) (collectively, "<u>Damages</u>") asserted against it by reason of or arising out of or related to this Agreement or performance under this Agreement or any related transactions that are taken or omitted to be taken as set forth in this Agreement; <u>provided</u> that there shall be no obligation to indemnify or defend the Plan Administrator or its professionals on account of damages that are determined to have arisen primarily from the Plan Administrator's or such professional's gross negligence or willful misconduct, or from the Plan Administrator's breach of the terms of this Agreement or the Plan; <u>provided</u>, <u>further</u>, that no indemnification shall be provided for any distribution agent engaged by the Plan Administrator to the extent such indemnification is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  The indemnification established hereunder shall not be effective unless the Plan Administrator provides notice to the Litigation Administrator and its counsel of any demand for indemnification within 60 days of the Plan Administrator's knowledge of any such indemnifiable claim or expense.

10.    <u>Exculpation</u>.  The Plan Administrator and any professional engaged by the Plan Administrator shall not be liable for any act or omission in connection with the discharge by the Plan Administrator or such professional of the powers and duties conferred upon the Plan Administrator by the Plan, this Agreement, any Final Order, or applicable law, except to the extent that such liability is due to an act or omission that is determined, in a Final Order, to be due to the Plan Administrator's or such professional's gross negligence or willful misconduct; <u>provided</u>, that no exculpation shall be provided for any distribution agent engaged by the Plan Administrator to the extent such exculpation is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  Nothing contained in this <u>Section 10</u> shall preclude or impair any Holder of an Allowed Claim from bringing an action in the Bankruptcy Court against the Plan Administrator to compel the Plan Administrator to make the distributions contemplated by the Plan on account of such Allowed Claim.

11.    <u>Termination; Effect of Termination</u>.

        (a)    This Agreement shall terminate automatically after all of the Chapter 11 Cases have been closed and all payments have been made under the Plan (including the Plan Administrator's compensation and reimbursement).

        (b)    The Plan Administrator may resign its duties at any time upon thirty (30) days' written notice to the Bankruptcy Court and the Notice Parties, <u>provided that</u> such resignation shall only become effective upon the appointment of a permanent or interim successor Plan

Administrator, who shall be selected by the Plan Administrator, and who shall be reasonably acceptable to the Litigation Oversight Committee or who is otherwise approved by the Bankruptcy Court in the absence of the Litigation Oversight Committee's agreement. Upon the appointment of a successor Plan Administrator, such successor shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order, and all responsibilities of the predecessor Plan Administrator shall be terminated.

(c)    The Plan Administrator may be terminated by the Bankruptcy Court for cause shown after notice and a hearing. If the Bankruptcy Court terminates the Plan Administrator, the Bankruptcy Court shall appoint a permanent or interim successor Plan Administrator, who shall immediately become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order.

(d)    This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided in Section 11(a), the Bankruptcy Court shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

(e)    Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

12.    Effectiveness.  This Agreement shall be effective upon the Effective Date.

13.    Notice.  All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

To the Post-Effective Date Debtors:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn:   Ron Deutsch
E-mail: legal@celsius.network

with copy to:        Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:   Patrick J. Nash, P.C.; Ross Kwasteniet, P.C.;
Christopher S. Koenig; Dan Latona
E-mail: patrick.nash@kirkland.com
       ross.kwasteniet@kirkland.com
       chris.koenig@kirkland.com
       dan.latona@kirkland.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua Sussberg, P.C.
E-mail: joshua.sussberg@kirkland.com

To the Plan Administrator:   Christopher Ferraro
E-mail: [TO COME]

To the Litigation Oversight Committee:

[TO COME]

14.   <u>Miscellaneous</u>.

(a)   <u>Sections 8</u>, <u>9</u>, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

(b)   In the event of an inconsistency between this Agreement and the Plan Documents, the terms of the Plan Documents shall control in all respects.

(c)   If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)   Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)   This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof.  In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and

each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)     This Agreement and the Plan Documents encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof. This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

(g)     This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

8

THE DEBTORS:

CELSIUS NETWORK LLC, ON BEHALF
OF ITSELF AND ITS AFFILIATED
DEBTORS


By:_____
Name: Ron Deutsch
Title: General Counsel

THE PLAN ADMINISTRATOR:

CHRISTOPHER FERRARO


By:_____
Name: Christopher Ferraro

*Signature Page to Plan Administrator Agreement*

THE COMMITTEE:

___, ON BEHALF OF THE COMMITTEE
OF UNSECURED CREDITORS


By:_____
Name:
Title:

**<u>Exhibit E-1</u>**

**(Redline) Plan Administrator Agreement**

[DRAFT]

## PLAN ADMINISTRATOR AGREEMENT

This PLAN ADMINISTRATOR AGREEMENT (this "Agreement"), which shall constitute the "Plan Administrator Agreement" under, as defined in, and for all purposes of the Plan, unless and until it is replaced by an agreement with a successor "Plan Administrator" appointed under the Plan pursuant to Section 8 hereof, dated as of [●], by and among (a) Celsius Network LLC, on behalf of itself and its debtor subsidiaries (collectively, the "Debtors" or the "Post-Effective Date Debtors," as applicable), (b) Christopher Ferraro, who shall constitute (and is deemed designated) the "Plan Administrator" under, as defined in, and for all purposes of the Plan, unless and until the Plan Administrator ceases to be the "Plan Administrator" hereunder (the "Plan Administrator"), and (c) the Committee (together with the Debtors and the Plan Administrator, the "Parties"), sets forth the Plan Administrator's rights, powers, and obligations in connection with the Plan pursuant to the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

1.    Appointment.  Effective as of the Effective Date (as defined in the Plan), the Plan Administrator will be appointed to act as the Plan Administrator under the Plan for the purpose of effectuating the Plan, subject to the terms and conditions set forth in this Agreement, the Plan, the Confirmation Order, and the Wind-Down Procedures, if applicable (collectively, the "Plan Documents").  As set forth in the Plan Documents, the Plan Administrator shall succeed to such powers as would have been applicable to the Debtors, the Debtors' officers, directors, managers, members, shareholders, and the Debtors' Estates from and following the Effective Date.

2.    Scope of Services.  The Plan Administrator shall provide post-Effective Date administration, wind down, dissolution, and liquidation services that are necessary, required, desirable, or advisable to effectuate the Plan Documents and to make certain distributions under the Plan.  Without limiting the provisions of the Plan applicable to the Plan Administrator, the Plan Administrator shall perform the following services for the Post-Effective Date Debtors' Estates in its role as Plan Administrator for all purposes of the Plan (as such services may be further described in the Plan Documents or additional tasks required to be performed by the Plan Administrator as described in the Plan Documents):

(a)    make (or arrange for a Distribution Agent to make) the distributions contemplated by the Plan;

(b)    administer the Special Committee D&O Liability Insurance Policies;

(c)    evaluate in his discretion whether each of the EIP Participants have met the applicable metrics under the Emergence Incentive Plan and authorize and distribute any payments under the Emergence Incentive Plan to the extent earned; *provided* that the Plan Administrator may consult with counsel and other advisors in interpreting the applicable provisions of the Plan and Confirmation Order and determining whether the applicable metrics have been met pursuant to the terms of the Emergence Incentive Plan;

(d)    ~~(c)~~ cooperate with the Litigation Administrator with respect to its duties, as set forth in the Plan Documents and the Litigation Administrator Agreement;

(e)    ~~(d)~~ prosecute any Causes of Action that vest in the Post-Effective Date Debtors and are not otherwise delegated to the Litigation Administrator pursuant to the Plan or delegated to the Litigation Administrator in writing by the Plan Administrator and the Litigation Administrator;

(f)    ~~(e)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, marshal, market for sale, and wind down the Debtors' assets (other than the NewCo Assets in the event the NewCo Transaction is consummated);

(g)    ~~(f)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, recover and compel turnover of the Debtors' property in accordance with the Plan;

(h)    ~~(g)~~ manage the Plan Administrator Budget or Wind-Down Budget, as applicable, and pay the Wind-Down Expenses, if any;

(i)    ~~(h)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, abandon any Post-Effective Date Debtors' Assets that cannot be sold or otherwise disposed of for value and where a distribution to Holders of Allowed Claims or Interests would not be feasible or cost-effective in the Plan Administrator's reasonable judgment;

(j)    ~~(i)~~ prepare and file post-Effective Date operating reports (including the month in which the Effective Date occurs);

(k)    ~~(j)~~ file appropriate tax returns in the exercise of the Plan Administrator's fiduciary obligations, including, as appropriate, requesting an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws, pursuant to section 505(b) of the Bankruptcy Code;

(l)    ~~(k)~~ at the appropriate time, file a certificate of dissolution, together with all other necessary corporate and company documents, to effect the dissolution of the Post-Effective Date Debtors under the applicable laws of their respective states of incorporation or formation (as applicable);

(m)    ~~(l)~~ be responsible for the ongoing administration of the Chapter 11 Cases and all actions related to the closing of the Chapter 11 Cases;

(n)    ~~(m)~~ retain such professionals as are reasonably necessary and appropriate in furtherance of the Plan Administrator's fiduciary obligations;

(o)    ~~(n)~~ cause the Post-Effective Date Debtors to comply with, and abide by, the terms of the NewCo Transaction and any other documents contemplated thereby;

2

(p)    ~~(o)~~ to the extent not duplicative with the responsibilities of any Litigation Administrator, take such actions as are necessary and reasonable to carry out the purposes of the Plan, including winding down the Debtors' business affairs; and

(q)    ~~(p)~~ implement the Orderly Wind Down, if applicable, and only if the Orderly Wind Down is approved by the Bankruptcy Court.

3.    <u>Reporting</u>. The Plan Administrator shall provide quarterly reports, commencing on the date that is the three-month anniversary of the Effective Date, to the Litigation Administrator and the Litigation Oversight Committee with respect to the assets of the Post-Effective Date Debtors, the receipts and expenditures of the Post-Effective Date Debtors, and information regarding the remaining tasks to be completed to close the Debtors' estates and the estimated time until completion of the Plan Administrator's duties under the Plan and this Agreement.

4.    <u>Remaining Cash</u>. To the extent that the Post-Effective Date Debtors have any Cash or other property remaining after the Chapter 11 Cases have been closed and all payments have been made under the Plan (including all payments on account of Allowed Claims and the Plan Administrator's compensation and reimbursement) and the conclusion of all litigation being pursued by the Litigation Administrator, the Plan Administrator shall coordinate with the Litigation Administrator to distribute such Cash or other property Pro Rata to the Holders of Claims entitled to receive Litigation Proceeds, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. If such distributions are, in the Plan Administrator's reasonable judgment, infeasible to distribute Pro Rata or for any other reason such distributions cannot be effectuated, the Plan Administrator may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of the Judicial Code in the event an Orderly Wind Down is consummated; <u>provided that</u> the Litigation Administrator or any other interested party may petition the Bankruptcy Court, upon notice and hearing, to order the Plan Administrator to distribute remaining Cash or assets to Holders of Claims entitled to receive Litigation Proceeds at an earlier date.

5.    <u>Timing and Fees</u>.

(a)    The Plan Administrator will commence its responsibilities on the Effective Date.

(b)    The Post-Effective Date Debtors shall pay the Plan Administrator's compensation and reimburse the Plan Administrator's expenses as set forth herein as such amounts come due without the need for Bankruptcy Court approval.

(c)    [The Plan Administrator's compensation shall be based upon an initial term of up to twelve months, to be paid as follows: $200,000 per month for the first [three] months following the Effective Date and $100,000 per month for the fourth through twelfth months following the Effective Date. The [Litigation Administrator] shall have the authority, in consultation with the Plan Administrator, to reduce the initial term to less than 12 months, but at the conclusion of any such shortened term, the $1,000,000 completion fee described below shall

become immediately due and payable absent fraud, gross negligence, or willful misconduct by the Plan Administrator.

(d)    The Plan Administrator's compensation shall be payable from the Post Effective Date Debtors' Assets on a monthly basis in advance not later than the first business day of each month.

(e)    In addition, so long as the initial revesting of Unclaimed Distributions pursuant to the Plan has occurred, at the one year anniversary of the Effective Date (or such earlier date selected to end the initial term by the Litigation Administrator), the Plan Administrator shall receive a substantial completion bonus in the amount of $1,000,000, which shall be payable from the Post-Effective Date Debtors' Assets. From the period starting six months after the Effective Date to the one-year anniversary of the Effective Date, the Plan Administrator shall consult with the Litigation Administrator and the Litigation Oversight Committee regarding the potential selection of a successor Plan Administrator (whose compensation shall be the subject of agreement between such successor Plan Administrator, the Litigation Administrator, and the Litigation Oversight Committee, or, if no such agreement is reached, by order of the Bankruptcy Court).  Alternatively, subject to agreement among the Plan Administrator and the Litigation Administrator, the Plan Administrator may at any time delegate the Plan Administrator's remaining work streams to the Litigation Administrator, subject to the oversight of the Litigation Oversight Committee.][1]

(f)    In addition to the foregoing, the Plan Administrator shall be entitled to reimbursement of actual, reasonable, out-of-pocket and direct expenses incurred in connection with the services to be provided under this Agreement and/or the Plan Documents, as applicable.

(g)    The Plan Administrator may retain any professionals reasonably necessary to the Plan Administrator, and any professionals retained by the Plan Administrator pursuant to the terms of this Agreement shall be paid as set forth in the applicable professional's engagement letter, which shall be payable from the Post-Effective Date Debtors' Assets in accordance with the terms of this Agreement and the terms of the applicable professional's engagement letter.

---

[1]    [**NTD**: The Plan Administrator's compensation, including the conditions to and amounts of the substantial completion bonus and the completion bonus, remain subject to discussion among the proposed Plan Sponsor, the Debtors, and the Committee.]

6.      Relationship of the Parties.    The Parties intend that an independent contractor relationship shall be created by this Agreement.  The Plan Administrator shall not be entitled to receive from the Debtors or Post-Effective Date Debtors or their Estates any vacation pay, sick leave, retirement, pension, or social security benefits, workers' compensation, disability, unemployment insurance benefits, or any other employee benefits.    Notwithstanding the foregoing, as stated by the Plan, the Plan Administrator shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that will receive distributions pursuant to Plan.

7.      D&O Liability Insurance.  The Post-Effective Date Debtors shall purchase director and officer liability insurance ("D&O Insurance") that will cover the Plan Administrator with respect to carrying out the Plan Administrator's duties in an amount and on terms reasonably acceptable to the Plan Administrator.

8.      Confidentiality.  The Plan Administrator shall treat confidentially all information not publicly available that is received by the Plan Administrator in connection with this engagement or that is developed during this engagement, and the Plan Administrator shall not disclose such information except as required by a court order or other legal process.

9.      Indemnity.  The Post-Effective Date Debtors shall indemnify and defend the Plan Administrator and all professionals engaged by the Plan Administrator from and against any and all claims, liability, loss, costs, damage, or expense (including reasonable attorneys' fees) (collectively, "Damages") asserted against it by reason of or arising out of or related to this Agreement or performance under this Agreement or any related transactions that are taken or omitted to be taken as set forth in this Agreement; provided that there shall be no obligation to indemnify or defend the Plan Administrator or its professionals on account of damages that are determined to have arisen primarily from the Plan Administrator's or such professional's gross negligence or willful misconduct, or from the Plan Administrator's breach of the terms of this Agreement or the Plan; provided, further, that no indemnification shall be provided for any distribution agent engaged by the Plan Administrator to the extent such indemnification is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  The indemnification established hereunder shall not be effective unless the Plan Administrator provides notice to the Litigation Administrator and its counsel of any demand for indemnification within 60 days of the Plan Administrator's knowledge of any such indemnifiable claim or expense.

10.     Exculpation.  The Plan Administrator and any professional engaged by the Plan Administrator shall not be liable for any act or omission in connection with the discharge by the Plan Administrator or such professional of the powers and duties conferred upon the Plan Administrator by the Plan, this Agreement, any Final Order, or applicable law, except to the extent that such liability is due to an act or omission that is determined, in a Final Order, to be due to the Plan Administrator's or such professional's gross negligence or willful misconduct; provided, that no exculpation shall be provided for any distribution agent engaged by the Plan Administrator to the extent such exculpation is not provided for under the terms of engagement between the Plan Administrator and such distribution agent.  Nothing contained in this Section 10 shall preclude or impair any Holder of an Allowed Claim from bringing an action in the

5

Bankruptcy Court against the Plan Administrator to compel the Plan Administrator to make the distributions contemplated by the Plan on account of such Allowed Claim.

11.    Termination; Effect of Termination.

(a)    This Agreement shall terminate automatically after all of the Chapter 11 Cases have been closed and all payments have been made under the Plan (including the Plan Administrator's compensation and reimbursement).

(b)    The Plan Administrator may resign its duties at any time upon thirty (30) days' written notice to the Bankruptcy Court and the Notice Parties, provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, who shall be selected by the Plan Administrator, and who shall be reasonably acceptable to the Litigation Oversight Committee or who is otherwise approved by the Bankruptcy Court in the absence of the Litigation Oversight Committee's agreement.  Upon the appointment of a successor Plan Administrator, such successor shall become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order, and all responsibilities of the predecessor Plan Administrator shall be terminated.

(c)    The Plan Administrator may be terminated by the Bankruptcy Court for cause shown after notice and a hearing.  If the Bankruptcy Court terminates the Plan Administrator, the Bankruptcy Court shall appoint a permanent or interim successor Plan Administrator, who shall immediately become fully vested with all of the rights, powers, duties, and obligations of the predecessor Plan Administrator pursuant to this Agreement, the Plan, and the Confirmation Order.

(d)    This Agreement may be terminated for cause shown pursuant to a Final Order entered by the Bankruptcy Court after notice and a hearing; provided that in the event that this Agreement is terminated before its automatic termination as provided in Section 11(a), the Bankruptcy Court shall appoint a successor Plan Administrator to fill the vacancy left by the termination of this Agreement.

(e)    Upon termination of this Agreement or resignation of the Plan Administrator, the Plan Administrator shall be entitled to all fees and expenses accrued to that date pursuant to this Agreement, including any travel or related expenses incurred in returning from the location of the services being provided under this Agreement prior to the termination date or resignation date.

6

12.   Effectiveness.  This Agreement shall be effective upon the Effective Date.

13.   Notice.  All invoices, notices, requests, demands, and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given:  (a) when personally delivered; (b) when sent by electronic mail (with hard copy to follow) during a Business Day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day); (c) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid); or (d) three (3) Business Days following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands, and communications to the Parties hereto shall be sent to the addresses indicated below:

To the Post-Effective Date Debtors:
c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn:   Ron Deutsch
E-mail:        legal@celsius.network

with copy to:        Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:   Patrick J. Nash, P.C.; Ross Kwasteniet, P.C.;
Christopher S. Koenig; Dan Latona
E-mail:        patrick.nash@kirkland.com
 ross.kwasteniet@kirkland.com
 chris.koenig@kirkland.com
 dan.latona@kirkland.com

- and -

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua Sussberg, P.C.
E-mail:        joshua.sussberg@kirkland.com

To the Plan Administrator:   Christopher Ferraro
E-mail:        [TO COME]

To the Litigation Oversight Committee:

[TO COME]

7

14.    <u>Miscellaneous</u>.

(a)    <u>Sections 8</u>, <u>9</u>, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

(b)    In the event of an inconsistency between this Agreement and the Plan Documents, the terms of the Plan Documents shall control in all respects.

(c)    If any portion of this Agreement shall be determined to be invalid or unenforceable, the remainder of this Agreement shall be valid and enforceable to the maximum extent provided by applicable law.

(d)    Neither this Agreement nor any of the rights, interests, or obligations under this Agreement shall be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party.

(e)    This Agreement is governed by and shall be construed in accordance with the laws of the State of New York without regard to choice of law or principles thereof.  In any court proceeding arising out of or related to this Agreement, each of the Parties hereby waive any right to trial by jury.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of any proceeding arising from or related to this Agreement, and each of the Parties agrees not to commence any action, suit, or proceedings relating thereto except in the Bankruptcy Court.

(f)    This Agreement and the Plan Documents encompass all of the terms and conditions between the Debtors and the Plan Administrator concerning the subject matter hereof.  This Agreement may not be amended or modified in any respect except in a writing signed by each of the Parties.

(g)    This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same Agreement.  A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission (.pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGES FOLLOW]

8

THE DEBTORS:

CELSIUS NETWORK LLC, ON BEHALF
OF ITSELF AND ITS AFFILIATED
DEBTORS


By:_____
Name: Ron Deutsch
Title: General Counsel

THE PLAN ADMINISTRATOR:

CHRISTOPHER FERRARO

By:_____
Name: Christopher Ferraro

THE COMMITTEE:

___, ON BEHALF OF THE COMMITTEE
OF UNSECURED CREDITORS


By:_____
Name:
Title:

**<u>Exhibit F</u>**

**Paxos Agreement**

DRAFT

## CUSTODIAL SERVICES AGREEMENT

**THIS CUSTODIAL SERVICES AGREEMENT** (this "**Agreement**") is made and entered into effect on October 17, 2023 (the "**Effective Date**") by and among Celsius Network LLC, a Delaware limited liability company, Celsius Network Limited, a company incorporated under the laws of the United Kingdom, Celsius Lending LLC, a Delaware limited liability company, Celsius EU UAB, a company incorporated under the laws of Lithuania, and, subject to the Confirmation Order, Celsius Networks Lending LLC, a Delaware limited liability company (together, with each of their successors and assigns as permitted hereunder, "**Client**"), and Paxos Trust Company, LLC, a New York limited purpose trust company ("**Paxos**") and together with Client, the "**Parties**" and each, a "**Party**").

**WHEREAS**, Paxos is a regulated financial institution (licensed as a New York limited purpose trust company) that provides custody services for certain Digital Assets (the "**Custodial Services**");

**WHEREAS**, Client and certain of its affiliates are debtors-in-possession under title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and on July 13, 2022, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") captioned as Case Number 22-10964 (MG) (the "**Case**");

**WHEREAS**, on August 9, 2023, Client filed a revised proposed Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (as such may be amended or supplemented hereafter, and further subject to and as may hereafter be approved by the Court, the "**Plan**");

**WHEREAS**, Client desires to obtain access to and use the Custodial Services to hold Digital Assets on its behalf or on behalf of its creditors who may become entitled to receive distributions of Digital Assets from Client's assets in accordance with the orders of the Court and any approved Plan, and on behalf of its customers that the Court has determined own certain custodial Digital Assets currently held by Client on behalf of such customers (such creditors and custodial customers collectively the "**End Users**"); and

**WHEREAS**, Client has, contemporaneous with execution of this Agreement, entered into a separate agreement with PayPal, Inc. ("**PayPal**") whereby Client agrees to utilize the services of PayPal for the transfer and distribution of certain Digital Assets and/or Fiat currency to End Users.

**NOW THEREFORE**, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows.

1.    **APPOINTMENT**

1.1.    Subject to approval of the Court, Client hereby appoints Paxos as custodian of the Digital Assets held under this Agreement. Paxos hereby accepts such appointment and agrees to establish on its books, pursuant to the terms of this Agreement a custody account or accounts for the receipt, safekeeping and maintenance of the Digital Assets (together, the "**Custody Account**").

1.2.    **Acceptance of Digital Assets.** Paxos will accept those Digital Assets into custody as set forth in clause 1 of Schedule 1, or as may otherwise be mutually agreed by the Parties from time to time, and will hold such Digital Assets in registered form in Client's name; provided, however, that Paxos

may refuse custody of any Digital Asset at its sole discretion, acting reasonably, if the acceptance thereof may violate applicable law or the terms of this Agreement or pose a material risk to either Client or Paxos.  In the event that Paxos refuses custody of any Digital Asset, Paxos shall provide Client with a written explanation of the reasons for such refusal (to the extent permissible under applicable law or regulatory guidance) and shall reasonably cooperate with and assist Client to find legally compliant alternative solutions for such rejected Digital Assets.

1.3.    **Designation of Accounts.** The Custody Account will be in the name of Client, in each case as set forth in Schedule 1 and as Client may reasonably designate to Paxos in writing. Paxos shall segregate via subledgering, the Custody Account and all Client provided Digital Assets from the proprietary property of Paxos and the Digital Assets of other clients.

1.4.    **Status of Custodian**. Paxos Trust Company, LLC is a limited liability company and limited purpose trust chartered and regulated by the New York State Department of Financial Services. As a limited purpose trust company licensed by the New York State Department of Financial Services, Custodian is a trust company and bank under §100 of the New York Banking Law. The address of Paxos is 450 Lexington Ave., #3952, New York, NY 10017.

1.5.    **Effectiveness of Agreement; Subject to Court Approval**. Notwithstanding anything to the contrary herein, this Agreement shall be subject to, and shall be effective immediately upon, order of the Court authorizing the Client to enter into this Agreement, subject to any conditions imposed by the Court in such order, that are agreed upon by Paxos, provided that such order shall not have been stayed (or if such order is stayed, then upon the earliest of expiration or termination of such stay).

2.    **CUSTODY ACCOUNT PROCEDURES**

2.1.    **Credits to the Custody Account.** Paxos is not obligated to credit any Digital Assets to the Custody Account before Paxos actually receives such Digital Assets by final settlement.

2.2.    **Debits to the Custody Account**. If Paxos receives any Instruction (pursuant to Section 3 below) that would result in the delivery of Digital Assets exceeding the credit to the Custody Account for that Digital Asset, Paxos may, in its sole and absolute discretion, not act on such Instruction until sufficient Digital Assets are available in the Custody Account or request a revised Instruction from the Client.

2.3.    **Investment in Digital Assets**. Except as otherwise set forth in Section 12.3, Client shall bear the sole risk and expense associated with any loss of value of Digital Assets and with any loss of use of any Digital Asset that becomes orphaned by virtue of any Fork or failure of the blockchain underlying such Digital Asset.

3.    **INSTRUCTIONS**

3.1.    **Authorized Persons**. Client shall designate persons authorized to act on its behalf in the performance of any act, discretion or duty under this Agreement ("**Authorized Persons**") in a form reasonably acceptable to Paxos, an example of which is attached hereto as Schedule 2, which shall include the contact information, title and specimen signature of such persons. If at any time there are no Authorized Persons designated by Client, the officers of Client designated by the Court to act on behalf of Client shall be deemed Authorized Persons hereunder. Paxos is entitled to rely and act upon Instructions of any Authorized Person unless or until Paxos (i) receives written notice of any change thereto from Client and (ii) has a reasonable time to note and implement such change.

3.2.    **Instruction**. Paxos may act upon and rely upon any Instruction received from, or reasonably believed by Paxos to be from, an Authorized Person, subject to compliance with the validation procedures set forth in Schedule 1. The validation procedures are designed only to verify the source of the Instruction and not to detect errors in the content of that Instruction or to prevent duplicate Instructions. Client agrees that Paxos is not responsible for any errors made by or on behalf of Client (other than by Paxos) or any errors resulting, directly or indirectly, from fraud or the duplication of any Instruction by or on behalf of Client.

3.3.    **Rejection of Instruction**. Paxos may decide not to act on an Instruction where it reasonably doubts such Instruction's contents, authorization, origination or compliance with any procedures in place, and Paxos covenants to promptly notify Client of its decision in such instance.

3.4.    **Cut-Off Times**. Paxos is only obligated to act on Instructions during normal business hours on days in which Paxos and the applicable financial markets are open for business in the ordinary course.

4.    **ANTI-MONEY LAUNDERING COMPLIANCE AND CIP; SANCTIONS SCREENING**

4.1.    **Paxos Requirements.** Client transactions will be subject to Paxos ongoing due diligence requirements, including know your client (KYC) procedures and monitoring, including sanctions screening, customer risk rating and engaging in customer due diligence and enhanced due diligence as appropriate and in accordance with Paxos' regulatory obligations.  Client agrees to cooperate in connection with any such regulatory requirements and provide any information reasonably requested by Paxos that may be required for Paxos' compliance with its regulatory obligations.

4.2.    **AML and KYC.** In the event that Client submits an Instruction to Paxos to transfer Digital Assets from the Custody Account to a Digital Asset wallet address other than the PayPal Distribution Account, Paxos may require that, Client confirm to Paxos that it has performed (or that PayPal has performed on Client's behalf) appropriate anti-money laundering (AML) and know your client (KYC) reviews as required by applicable law and consistent with international money transmitter policies with respect to the End Users and wallet addresses included in such Instruction. Client will provide Paxos evidence of such AML and KYC reviews as reasonably requested by Paxos. Notwithstanding the foregoing, Client shall be entitled to rely upon PayPal's AML and KYC

3

services with respect to distributions made through the PayPal Distribution Account, and Client shall not be required to maintain separate AML or KYC programs for such distributions.

5. **PERFORMANCE BY PAXOS**

5.1.    **Custodial Duties Requiring Instructions.** Upon receipt of a specific Instruction, Paxos shall carry out the following applicable actions requested and authorized by such Instruction:

    i.    Receive, deliver or dispose of any Digital Assets, except as otherwise specifically provided for in this Agreement;

    ii.    Carry out any action affecting Digital Assets and the Custody Account; provided, however, that (a) each instance shall be subject to the prior approval and agreement of Paxos and (b) all instructions regarding Forked Currencies are subject to Section 7; and

    iii.    Transfer Digital Assets to the PayPal Distribution Account, except as otherwise specifically provided for in this Agreement.

5.2.    **Non-Discretionary Custodial Duties**. Absent a contrary Instruction, Paxos shall be permitted, and is hereby authorized and directed by Client, to carry out any of the following actions without any further Instructions or approval by or on behalf of Client:

    i.    In Client's name or on its behalf, sign any affidavits, certificates of ownership and other certificates and documents relating to Digital Assets which may be required (a) to obtain any Digital Assets or (b) by any tax or regulatory authority having jurisdiction over the Digital Assets and the Custody Account;

    ii.    Notify Client of notices, circulars, reports and announcements that require discretionary action, in each case, which Paxos has received in the course of acting in the capacity of custodian of any Digital Assets held on Client's behalf; and

    iii.    Attend to all non-discretionary matters in connection with anything provided in this Section 5.2 or any Instruction.

5.3.    **Reporting**. Paxos will provide Client with access, via SFTP server, to a daily reconciliation file identifying the Digital Assets in the Custody Account and setting forth all transactions in the Custody Account.

6. **TAX STATUS / WITHHOLDING STATUS**

6.1.    **Information.** The Parties will comply with applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable taxing authorities) in respect of the reporting and payment of any Taxes resulting from this Agreement (if any). Each Party will cooperate with the other Party to provide all available information as reasonably requested from

4

time to time, as may be necessary or proper to fulfill their respective obligations under applicable law (if any).

6.2.    **Payment.** If any Taxes become payable with respect to any payment to be made to either Party, the other Party may withhold the amount of such Taxes from such payment to such Party and pay such withheld amounts over to the applicable governmental body in accordance with the requirements of applicable laws. Any amount so withheld and paid over shall be treated as having been paid to the Party in respect of which such withholding was made. Each Party (or, if applicable, its regarded owner for U.S. federal income tax purposes) shall deliver an IRS Form W-9 to the other Party.

6.3.    **Tax Relief.** In the event Client requests, whether in its Instruction or other written agreement, that Paxos provide tax relief and Paxos agrees to provide such services, Paxos shall apply for appropriate tax relief (either by way of reduced tax rates at the time of an income payment or retrospective tax relief as is available in certain markets and as agreed from time to time); provided that the provision of any such tax relief shall require Client to provide to Paxos such documentation and information as to Client or its underlying beneficial owner as is reasonably necessary to secure such tax relief. In no event shall Paxos be responsible or liable for any Taxes resulting from the inability to secure tax relief, or for the failure of Client or any beneficial owner thereof to obtain the benefit of any credits, on the basis of foreign taxes withheld against income.

## 7.    DIGITAL CURRENCY FORKS

7.1.    **Fork Rights.** In the event of a Fork, Paxos retains the right, in its sole discretion, to determine whether or not to support (or cease supporting) each Forked Currency entirely, provided that Paxos will provide notice to Client of such determination promptly following such determination.

7.2.    **Unsupported Forked Currency.** In the event that Paxos determines, in its sole discretion, to not support any Forked Currency, Paxos shall distribute the unsupported Forked Currency to Client in a commercially reasonable manner within (i) ten (10) days from the last day of support by Paxos for such Forked Currency; provided that such ten (10)-day period may be extended by an additional twenty (20) days (to up to thirty (30) total days) from the last day of support by Paxos for such Forked Currency so long as Paxos continues to support such Forked Currency for such thirty (30)-day period in a manner that is sufficient to enable Paxos to return such Forked Currency to Client; or (ii) such other period as may be agreed between the Parties. Client acknowledges that there may be a delay between a Fork and the distribution of an unsupported Forked Currency to Client. Client agrees that Paxos will not be liable for any loss in value of the unsupported Forked Currency during such transfer period.

7.3.    **Support of Forked Currency.** In the event that Paxos opts to support both Forked Currencies and Client does not instruct Paxos otherwise, then both Forked Currencies become Digital Assets subject in all respects to this Agreement, including, without limitation, any fees charged by Paxos relating hereto.

8.      **TRANSFER; FLUCTUATION IN VALUE OF DIGITAL ASSETS**

8.1.    **Transfer.** Client, in its sole discretion, may transfer Digital Assets, including to PayPal's account on the Exchange (the "**PayPal Distribution Account**"), for purposes of distributing the Digital Assets to End Users by providing an Instruction as described herein. Client acknowledges that there may be a delay, which shall be no longer than twenty-hour (24) hours, between Paxos' receipt of a valid Instruction to transfer Digital Assets and the availability of such Digital Assets in the PayPal Distribution Account.

8.2.    **Value Fluctuation.** Client understands that the value of the Digital Assets and any unsupported Forked Currency can fluctuate substantially, which may result in a significant or total loss of the value of the Digital Assets or the unsupported Forked Currency held by Paxos on Client's behalf. Subject to Section 12.3 and solely with respect to any loss due to the fluctuation of the value of the Digital Assets or the unsupported Forked Currency, Client agrees that Paxos will not be liable for such loss in value of the Digital Assets or unsupported Forked Currency at any time.

8.3.    **Digital Assets Supported by Paxos.** Client understands that Paxos only supports specific types of Digital Assets (including those listed on Schedule 1) and that Paxos does not provide Custodial Services or any other services with respect to unsupported Digital Assets. In the event that Paxos determines to cease to support any a specific type of Digital Asset previously accepted for custody under this Agreement (other than as provided above in the case of a Fork), Paxos shall, wherever possible and permissible under applicable law or the direction of its regulators, provide Client reasonable written notice in advance of such change in supported Digital Asset types, and shall provide reasonable cooperation and assistance in order to facilitate moving any affected Digital Assets within Paxos' custody to a third party custodian at Client's sole discretion at Client's cost, subject to Paxos compliance with applicable law and the direction of its regulators.

9.      **REPRESENTATIONS AND WARRANTIES**

9.1.    **General.** Each party hereto represents and warrants to the other party, as of the date of this Agreement, that:

i.      It is duly organized and in good standing in its jurisdiction of formation;

ii.     It has the requisite power and authority to execute this Agreement and to perform its obligations hereunder;

iii.    It has taken all necessary action to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby;

iv.     This Agreement, when executed and delivered, will be its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or other similar laws;

v.    Any consent, authorization or Instruction required in connection with its execution and performance of this Agreement has been provided by any relevant third party;

vi.    Any act reasonably required by any relevant governmental or other authority to be done in connection with its execution and performance of this Agreement has been or will be done (and will be renewed if necessary); and

vii.    Neither the execution nor performance of this Agreement by such party will materially breach any applicable law, regulation, contract or other requirement to which such party is bound.

9.2.    **Client.** In addition to the general representations set forth in Section 9.1, Client also represents, warrants and covenants to Paxos that:

i.    It has the requisite power and authority to deposit the Digital Assets in the Custody Account;

ii.    There is no claim pending, or to Client's knowledge, threatened, and no encumbrance or other lien, in each case, that may adversely affect any delivery of Digital Assets made in accordance with this Agreement;

iii.    Where it acts as an agent on behalf of any of its End Users, whether or not expressly identified to Paxos from time to time, any such End Users shall not be customers or indirect customers of Paxos by virtue of the Custodial Services provided hereunder; and

iv.    It has not relied on any oral or written representation or warranties made by Paxos or any other person on Paxos's behalf, other than those explicitly set forth in Section 9.1.

9.3.    **Paxos.** In addition to the general representations set forth in Section 9.1, Paxos also represents, warrants and covenants to Client that Paxos has implemented and will maintain a reasonable information security program in accordance with the Security Addendum attached hereto.

10.    **SCOPE OF RESPONSIBILITY**

10.1.    **Standard of Care.** Paxos shall exercise the due care of a professional custodian, in accordance with applicable industry standards within the State of New York.

10.2.    **Limitations on Paxos' Responsibility.**

i.    **General.** Paxos shall only be responsible for the performance of those duties as are expressly set forth herein, including the performance of any Instruction given in accordance with this Agreement. Paxos shall have no implied duties or obligations whatsoever.

7

ii.     **No Liability for Third Parties.** Paxos is not responsible for the acts, omissions, defaults or insolvency of any third party, including, but not limited to PayPal.

iii.    **Performance Subject to Laws.** Client understands and agrees that Paxos' performance of this Agreement is subject to the relevant local laws, regulations, decrees, orders and government acts.

iv.     **Preventing Performance.** Paxos will not be responsible for any failure to perform any of its obligations if such performance is prevented, hindered or delayed by a Force Majeure Event. In such case, Paxos's obligations will be suspended for so long as the Force Majeure Event continues. In the event that a Force Majeure Event suspends Paxos's performance of any of its obligations for a duration that exceeds thirty (30) days, Client shall have the right, upon written notice to Paxos, to immediately terminate this Agreement.

v.      **Validity of Digital Assets.** Paxos shall exercise reasonable care in receiving Digital Assets but does not warrant or guarantee the authenticity, value or validity of any Digital Asset received by Paxos.

vi.     **Capacity of Custodian.** Paxos is not acting under this Agreement as an investment manager, nor as an investment, legal or tax adviser to Client, and Paxos' duty is solely to act as a custodian in accordance with the terms of this Agreement.

vii.    **Forwarded Information.** Paxos is not responsible for the form, accuracy or content of any notice, circular, report, announcement or other material provided under Section 5.2(ii) of this Agreement not prepared by Paxos.

## 11.    SUBROGATION

To the extent permissible by law or regulation and upon Client's written request, Client shall be subrogated to the rights of Paxos with respect to any claim for any loss, damage or claim suffered by Client, in each case, to the extent that Paxos fails to pursue any such claim or Client is not made whole in respect of such loss, damage or claim. Notwithstanding any other provision hereof, in no event is Paxos obliged to bring suit in its own name or to allow suit to be brought in its name.

## 12.    INDEMNITY; LIABILITY

12.1.   **Indemnity to Paxos.** Client agrees to indemnify Paxos, its parent companies, subsidiaries and affiliates, its and their respective directors, officers, employees, representatives, agents and consultants (the "**Paxos Indemnified Parties**") and to defend and hold the Paxos Indemnified Parties harmless from all losses, damages, reasonable and documented costs and expenses (including reasonable and documented legal fees), and liabilities for any third-party claims, demands or actions (each, a "**Loss**"), incurred by the Paxos Indemnified Parties to the extent resulting from (i) Client's or any End User's actions or inaction in connection with this Agreement, or (ii) an Instruction given by Client, an Authorized Person or on which Paxos is entitled to rely

8

hereunder, except in each case (i) and (ii) with respect to the extent of any such Loss resulting from Paxos or any such Paxos Indemnified Party's failure to comply with federal or state laws and regulations applicable to it, failure to execute valid and clear Instructions, self-dealing, breach of fiduciary duty (if any) or actions or omissions to act arising out of mistake or misconduct (including but not limited to negligence, willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts).

12.2.    **Client's Direct Liability.** The disclosure by Client to Paxos that Client has entered into this Agreement as the agent or representative of another person shall not relieve Client of any of its obligations under this Agreement, including Section 12.1.

12.3.    **Limitation of Liability.**

i.    EXCEPT AS PROVIDED IN SECTION 12.3(ii), (A) IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE LESSER OF (Y) THE REPLACEMENT OF ANY FUNDS OR DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AND (Z) THE MARKET VALUE OF THE DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AT THE TIME SUCH PARTY REASONABLY SHOULD HAVE BEEN AWARE OF SUCH LOSS OR DAMAGE.

ii.    <u>Exceptions</u>.  The exclusions and limitations in Section 12.3(i) shall not apply to:

(a)    Losses arising out of or relating to Paxos' gross negligence or more culpable conduct, including any fraud, willful misconduct or intentional wrongful acts;

(b)    Losses arising from a Party's indemnification obligations hereunder;

(c)    A Party's failure to comply with federal or state laws and regulations applicable to it;

(d)    Paxos' failure to properly execute the Custodial Services, including without limitation the failure to correctly execute valid and clear Instructions and/or the failure to safekeep the Digital Assets (each failure an "**Error**"), provided that in such case the Loss shall be limited to the notional value of the Digital Assets at 12:01 a.m. Prevailing Eastern Time on the date of such Error; or

9

(e)    Losses for death, bodily injury, or damage to real or tangible personal property arising out of or relating to a Party's negligent or more culpable acts or omissions.

## 13.    INFORMATION

13.1.    Each of Paxos and Client agrees that during the term of this Agreement and for a period of two (2) years thereafter, it will maintain any confidential and proprietary information disclosed to it by the other party hereto ("**Confidential Information**") in a confidential manner using the same care it uses to protect the confidentiality of its own confidential information, and will not use for its own benefit or otherwise the Confidential Information of the other party except (i) as expressly authorized by this Agreement and to the extent necessary for performance of this Agreement or (ii) upon the prior written consent of the other party; provided, however, that each of Paxos and Client may disclose any such confidential or proprietary information of the other party to those of its affiliates and its and their respective officers, directors, employees, agents (including attorneys and financial advisors), and contractors, in each case, who need to know such information for purposes of this Agreement and who are bound by confidentiality obligations consistent with the terms hereof. Notwithstanding the foregoing, Confidential Information shall not include information that was (i) publicly available prior to disclosure by such disclosing party, (ii) already in the receiving party's possession and not subject to an obligation of confidentiality, (iii) obtained by the receiving party from a third party without restriction on disclosure or (iv) entirely independently developed by the receiving party without reference to any Confidential Information of the disclosing party.

13.2.    If, at any time, the receiving party is required by law or regulation to make any disclosure of any of the Confidential Information, by subpoena, judicial or administrative order or otherwise, the receiving party shall (to the extent permissible and practicable under the circumstances) give prompt prior written notice of such requirement to the disclosing party and permit the disclosing party to intervene in any relevant proceedings to protect its interests in the Confidential Information, and provide reasonable cooperation and assistance to the disclosing party in seeking to obtain such protection, at the disclosing party's sole expense. Notwithstanding the foregoing, Paxos may disclose Client's Confidential Information to Paxos' regulators without any notice thereof.

13.3.    Notwithstanding the foregoing, Client agrees that Paxos' governing regulatory authority, the New York Department of Financial Services ("**DFS**"), shall have the right to examine all books, records and information of Client as maintained by Paxos to the extent relating to the services provided by Paxos hereunder.

## 14.    ADVERTISING

Neither Client nor Paxos shall display the name, trademark, or service mark of the other without the prior written approval of the other. Client shall not advertise or promote the services provided by Paxos hereunder without Paxos's prior written consent.

## 15.    TERMINATION

10

15.1.    **Termination for Convenience**. Either Party may terminate this Agreement in whole or in part, with or without cause, by giving not less than six (6) months prior written notice to the other Party.

15.2.    **Termination for Cause**. Without prejudice to any accrued rights and remedies under this Agreement, either Party may terminate this Agreement immediately by giving written notice to the other Party if the other party commits any material breach of any of its obligations under this Agreement and, in the case of any breach which is capable of remedy, fails to remedy such breach within fourteen (14) days of delivery of a written notice specifying such breach (or such longer period as the notice may specify).

15.3.    **Termination for Regulatory Reasons**.  Either Party may terminate this Agreement in the event such Party is required to terminate at the direction of applicable governmental regulators pursuant to a valid court order or other binding document setting forth such termination requirement.

15.4.    **Effect of Property.** Upon termination of this Agreement for any reason and subject to Paxos's compliance with applicable law, Paxos shall deliver the Digital Assets as instructed by Client or any Authorized Person in writing. If by the termination date Client or any Authorized Person has not given instructions to Paxos regarding where to deliver any Digital Assets, Paxos will continue to safekeep such Digital Assets until Client or any Authorized Person provides such written Instructions to effect a free delivery of such and Client shall be liable to pay monthly storage fees in the amount of the monthly storage fee then in effect until all Digital Assets are delivered to Client. However, Paxos will provide no other services with respect to any such Digital Assets following termination. Notwithstanding termination of this Agreement or any Instruction, Paxos may retain sufficient Digital Assets to close out or complete any transaction that was in process prior to such termination or to pay any amounts otherwise outstanding hereunder.

15.5.    **Surviving Terms**. The rights and obligations contained in Sections 9, 11, 15, 16, 17 and 18 of this Agreement shall survive the termination of this Agreement.

16.    **GOVERNING LAW AND JURISDICTION**

16.1.    **Governing Law.** This Agreement is solely and exclusively governed, construed and enforced in accordance with the laws of the State of New York (without regard to the conflicts of law provisions thereof).

16.2.    **Jurisdiction.** Both parties submit to personal jurisdiction in the federal and state courts located in New York City, State of New York, and further agree that any and all claims and controversies arising out of this Agreement that cannot be amicably resolved by the parties shall be brought solely and exclusively in the Court if subject matter jurisdiction lies therein, and otherwise if the Court lacks such jurisdiction in a court having subject matter jurisdiction located in New York City, State of New York.

16.3.    **Venue.** Each party hereto waives any objection it may have at any time, to the laying of venue of any actions or proceedings brought in an inconvenient forum and further waives the rights to object that such court does not have jurisdiction over such parties.

16.4.    **Sovereign Immunity.** Client and Paxos each irrevocably waives, with respect to itself and its revenues and Digital Assets, all immunity on the ground of sovereignty or similar grounds in respect of its obligations under this Agreement.

17.    **MISCELLANEOUS**

17.1.    **Entire Agreement; Amendments.** This Agreement consists exclusively of this document together with the schedules hereto. Except as specified in this Agreement, the Agreement may only be modified by written agreement of Client and Paxos.

17.2.    **Severability.** If any provision of this Agreement is or becomes illegal, invalid, or unenforceable under any applicable law, the remaining provisions shall remain in full force and effect (as shall that provision under any other law).

17.3.    **Waiver of Rights.** No failure or delay of Client or Paxos in exercising any right or remedy under this Agreement shall constitute a waiver of that right. Any waiver of any right will be limited to the specific instance. The exclusion or omission of any provision or term from this Agreement shall not be deemed to be a waiver of any right or remedy Client or Paxos may have under applicable law.

17.4.    **Assignment.** No party may assign or transfer any of its rights or obligations under this Agreement without the other's prior written consent, which consent will not be unreasonably withheld or delayed; provided; however, that Client may make such assignment or transfer without Paxos's consent to an entity in which Client has sole ownership interest or a successor entity in the event of Client's dissolution or otherwise winding down of Client entity.

17.5.    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including, without limitation, any reorganized Client.

17.6.    **Headings.** Titles to Sections of the Agreement are included for convenience of reference only and shall be disregarded in construing the language contained in this Agreement.

17.7.    **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

18.    **DEFINITIONS AND INTERPRETATION.**

For purposes of this Agreement and any exhibit or schedule hereto, the following terms shall have the meanings ascribed to them below:

12

18.1.    "**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, which blockchains include the digital token blockchains set forth in Schedule 1 together with any additional blockchains supported from time to time by Paxos, in each case where such tokens are held from time to time held for Client under the terms of this Agreement.

18.2.    "**Exchange**" means the virtual crypto-currency exchange operated by Paxos.

18.3.    "**Force Majeure Event**" means any event due to any cause beyond the reasonable control of Paxos, such as restrictions on convertibility or transferability, requisitions, involuntary transfers, unavailability of communications system, sabotage, fire, flood, explosion, acts of God, civil commotion, pandemics, strikes or industrial action of any kind, riots, insurrection, war or acts of government.

18.4.    "**Fork**" means an event in which (i) a blockchain underlying a Digital Asset has been changed in a way that makes it incompatible with respect to future transactions and blocks with the unchanged version of the blockchain, (ii) a material population of miners or validators, as applicable, and/or users of the such Digital Asset accept the changes, and (iii) the two resulting blockchains have not been merged together in a timely manner.

18.5.    "**Forked Currency**" means the resulting branches of a blockchain that has undergone a Fork.

18.6.    "**Instruction**" means any instruction, limitation, approval, consent or notice provided hereunder.

18.7.    "**Taxes**" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities, including, without limitation, additions to tax, penalties and interest imposed on or in respect of (i) Digital Assets, (ii) the transactions effected under this Agreement or (iii) Client; *provided*, however, that "Taxes" do not include income or franchise taxes imposed on or measured by the net income of Paxos or its agents.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties, including, subject to the Confirmation Order, Celsius Networks Lending LLC, hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized.

CELSIUS NETWORK LLC

By:_____

Name:_____

Title:_____

CELSIUS NETWORK LTD

By:_____

Name:_____

Title:_____

CELSIUS LENDING LLC

By:_____

Name:_____

Title:_____

CELSIUS NETWORKS LENDING LLC

By:_____

Name:_____

Title:_____

CELSIUS EU UAB

By:_____

Name:_____

Title:_____


PAXOS TRUST COMPANY, LLC

By:_____

Name:_____

Title:_____

**SCHEDULE 1**
**DIGITAL ASSETS, WITHDRAWAL**

●    <u>Digital Assets</u>: Bitcoin (BTC), Ethereum (ETH)

●    <u>Withdrawing or Transferring Digital Assets and Unsupported Forked Currencies</u>. In order to withdraw or transfer Digital Assets or unsupported Forked Currencies from the Custody Account to the PayPal Distribution Account, an Authorized Person designated by Client must sign a written Instruction specifying the amount and destination of the withdrawal or transfer, as well as such other details as Paxos may reasonably request. The written instructions must be delivered to the following email address or such other address as may be notified by Paxos to Client from time to time: info@paxos.com.

     A.    Following receipt of the Instruction requesting withdrawal or transfer, Paxos will verify the instructions by calling two other Authorized Persons at the contact numbers provided by Client.

     B.    If the withdrawal or transfer Instruction is verified in accordance with this Schedule 1, Paxos shall transfer the Digital Assets or unsupported Forked Currencies as specified therein.

●    <u>Timing; Size</u>. Generally, delivery of Digital Assets to a destination specified by Client will be completed within twelve (12) business hours (i.e., 9AM to 5PM EST) of Paxos' receipt of such Instruction. The Parties agree that withdrawal or transfer of the Digital Assets from the Custody Account to the PayPal Distribution Account will happen in tranches of not less than approximately $7 worth of Digital Asset per Digital Asset; provided that the exact value of each tranche may vary due to the nature of the Digital Assets being transferred.

●    <u>Authentication of Other Instructions</u>. Paxos may rely on the signature of an Authorized Person for any Instructions other than Instructions to withdraw or transfer Digital Assets or unsupported Forked Currencies.

16

**SCHEDULE 2**
**FORM OF INSTRUCTION**

1. An Authorized Person will provide Instructions to Paxos in accordance with procedures to be mutually agreed upon by the Parties prior to the deposit of any funds into the PayPal Distribution Account (the "**Procedure**"). Paxos will enable authorized third parties to submit Instructions through an API upon written approval from an Authorized Person in accordance with the Procedure.

2. With the exception of Instructions received by previously authorized third parties via API in accordance with Section 1 of this Schedule 2, all Instructions, including those for the (i) withdrawal or transfer of digital assets, (ii) addition  or removal of authorized End Users or authorized third parties, and (iii) addition or removal of whitelisted addresses, in each case will be validated by Paxos in accordance with the Procedure.

SECURITY ADDENDUM

This Security Addendum is incorporated into and made a part of that certain Custodial Services Agreement (the "**Agreement**") between Paxos Trust Company ("**Paxos**") and the Client set forth in the Agreement (herein the "**Customer**").

## 1.     Introduction

**Purpose**. Paxos is committed to maintaining customer trust. The purpose of this Security Addendum is to describe the security program for the Paxos services as more fully described in the Agreement (the "**Services**"). This Security Addendum describes the minimum security standards that Paxos shall maintain in order to protect its customers' data from unauthorized use, access, disclosure, theft, or manipulation. As security threats shift and evolve, Paxos continues to update its security program and strategy to help protect its customers' data. Paxos reserves the right to update this Security Addendum from time to time; *provided, however*, any update will not materially reduce the overall protections set forth in this Security Addendum.

**Services Covered**. This Security Addendum describes the organizational, administrative, technical, and physical controls, as well as third party security audit certifications that are applicable to the Services more fully described in the Agreement.

## 2.     Security Governance

**Security Program**. Paxos's information security program is centrally managed and includes operational, administrative, technical, and physical safeguards reasonably designed to protect the confidentiality, integrity, and availability of sensitive data, including customer data, and is aligned to    the ISO 27001 information security management systems standard. Paxos employs numerous defense-in-depth strategies to secure information assets, utilizing industry guidelines from    ISO. Paxos's Chief Information Security Officer (CISO) meets on a regular basis with executive management and the Paxos Board of Directors to discuss security risks, issues, and company-wide security initiatives. Internal information security policies and standards are reviewed, assessed, and updated on at least an annual basis, and are made available to all Paxos employees.

**Security Policy Governance**. Paxos has controls in place to maintain the confidentiality of customer data in accordance with the Agreement. All Paxos employees and contract personnel are bound by Paxos's internal policies regarding maintaining confidentiality of customer data.

**Security Compliance**. Paxos has obtained System and Organization Controls (SOC) certifications where applicable and is periodically evaluating other areas for additional certifications. The certification reports are shared upon request with Paxos's customers and prospects (subject to appropriate and binding contractual confidentiality provisions).

## 3.     Third Party Security

**Vendor Agreements**. Paxos secures agreements with its third-party service providers that impose obligations of confidentiality and/or security practices and commitments, as appropriate and applicable.

18

**Vendor Assessments**. Paxos may use affiliates and third-party vendors to provide the Services. Paxos carries out a risk-based assessment of prospective vendors before working with those vendors to validate that prospective vendors meet Paxos's security requirements. Paxos periodically reviews each vendor in light of Paxos's security and business continuity standards, including the type of access and classification of data being accessed (if any), controls necessary to protect data, and legal/regulatory requirements. Paxos ensures that customer data is returned to Paxos from its vendors and/or deleted at the end of a vendor relationship.

4.      **People Operations**

**Employee On-Boarding**. Paxos carries out background checks on individuals joining Paxos in accordance with applicable local laws. Paxos currently verifies the individual's education and previous employment. Where local labor law or statutory regulations permit, Paxos conducts criminal and, in certain instances, credit background checks on its employees, contractors, and consulting agencies.

5.      **Data Security**

**Data Lifecycle Security**. At any point during or after the term of a customer's agreement(s) with Paxos, and upon a customer's reasonable, written request, Paxos will delete customer data. Paxos will ensure such data is deleted in accordance with Paxos's data records retention policy and in accordance with applicable laws. Paxos may retain backup records of customer data (i) as required by law (or its own data retention policy, as applicable, to the extent such policy is compliant with all applicable laws), and (ii) in secured form. Paper assets are shredded to P-7/Level 6 security standards. Hardware and associated data assets are destroyed in accordance with      ISO 27001 Annex A 7.14    . After wiping, sanitized hardware awaiting shredding and certificate of disposal is locked in a depot dedicated to Paxos cold-storage.

**Data Encryption**. Client data and transaction records are encrypted both at rest and in transit. Paxos has implemented mature data encryption protocols and standards to ensure that its encryption is supported by a defined key management process that is reviewed against current best practices. All data is encrypted in transit, including all traffic to and from Paxos servers.

**Data Backups**. Paxos performs regular backups of Paxos account information, customer data calls,     and other critical data using third-party cloud storage solutions. Backup data are retained redundantly across availability zones and are encrypted in transit and at rest.

6.      **Identity and Access Management**

**Logical Access Provisioning and De-provisioning**. To minimize the risk of data exposure, Paxos follows the principles of least privilege through a team-based access-control model when provisioning system access. Paxos personnel are authorized to access customer data based on their job function, role and responsibilities, and such access requires approval of the employee's manager. Access rights to production environments are reviewed according to a risk-based approach. An employee's access to customer data is promptly removed upon termination of their employment. In order to access the production environment, an authorized user must have a unique username and password, multi-factor authentication and be connected to Paxos's Virtual Private Network (VPN). Before an engineer is granted access to the production environment, access must

be approved and requested by management with a sixty (60) day waiting period and the engineer . Paxos logs high risk actions and changes in the production environment. Paxos leverages automation to identify any deviation from internal technical standards that could indicate anomalous/unauthorized activity to raise an alert within minutes of a configuration change. Paxos personnel who leave the company, no longer work with Paxos, or change business roles have their access privileges revoked or modified within a predetermined timeframe.

**Authentication Mechanisms**. Paxos enforces authentication requirements across all Paxos systems, including password requirements (e.g. password length, complexity, history, limitations on retries, and use of a password manager) and multi-factor authentication (MFA) requirements. All credentials are encrypted in transit, and hashed at rest. Paxos strives to ensure that authentication requirements and implementations meet or exceed current best practices for authentication, based on the current threat landscape.

**Remote Access**. Remote access to the Paxos network by authorized personnel is encrypted and requires multifactor authentication (MFA) for remote access, including X509 certificate and username/password login credentials. For production infrastructure access, use of VPN is also enforced. Paxos's network follows zero trust principles; any non-Paxos devices that may access the network have no privileged access and must rely on strong identity controls to access Paxos resources. Paxos office networks are treated as untrusted by default. While WPA-PSK encryption is required to access office wifi, devices on this network are not automatically granted access to corporate or production systems. Users that wish to have corporate email on their mobile devices must allow regular posture checks and on their device      . Rooted devices are not permitted. Company-owned computers are managed and kept up-to-date with the latest operating system, antivirus, and productivity software updates. All hard drives are encrypted. Upon return and prior to reissuance of an authorized laptop, the laptop must be completely wiped.

## 7.    **Physical & Environmental Security**

**Physical Site Security**. Any data centers that host the Services are strictly controlled both at the perimeter and at building ingress points by professional security staff utilizing video surveillance, intrusion detection systems, and other electronic means. Authorized staff must pass two-factor authentication a minimum of two times to access data center floors. All visitors and contractors are required to present identification and are signed in and continually escorted by authorized staff. These facilities are designed to withstand adverse weather and other reasonably predictable natural conditions. Each data center has redundant electrical power systems that are available twenty-four (24) hours a day, seven (7) days a week. Uninterruptible power supplies and on-site generators are available to provide back-up power in the event of an electrical failure. In addition, Paxos office spaces have a physical security program that manages visitors, building entrances, CCTVs (closed circuit television), and overall office security. Physical security audits are performed annually.

## 8.    **Corporate Security**

**Security Awareness Training**. All personnel must complete the Paxos security and privacy training, which covers Paxos security policies, security best practices, and privacy principles. All personnel must refresh their training at least annually. Paxos's security and privacy teams regularly

communicate emerging data privacy requirements and security threats and trends to personnel. Personnel have avenues for reporting incidents or suspicious activity.

## 9.    DevOps Security

**Change Management**. Paxos has built a production environment designed with strict controls, which includes a formal change management process to manage changes to software, applications and system software that will be deployed within the production environment.  New (or changes made to existing) products, services and features ("**Changes**") are deployed in a development environment that closely mirrors the production environment. Before Changes are deployed in the production environment, they are peer reviewed and automated security, functional, and unit testing is performed. Customer data is not used outside of the production environment unless required for troubleshooting issues where real data is relevant and, even then, the data is first obfuscated to prevent exposure of personal data, or to the extent the data is needed for operations such as regulatory production. Prior to high-risk Changes being made, an assessment is carried out to consider the impact and risk of a requested change, evidence acknowledging applicable testing for the change, approval of deployment into production by appropriate approver(s), and roll back procedures. After all tests are passed, and peer reviews completed, Changes are deployed to the production environment. All Changes deployed in the production environment must be indexed and documented using a formal and auditable system of record. The production environment is closely monitored for anomalous conditions that may suggest unexpected activity or potential security threats. When a vulnerability is identified, the criticality will be evaluated and the service affected will be isolated, patched or upgraded as necessary according to vulnerability management requirements.

## 10.    Cryptography, Encryption & Key Management

**Key Storage.** Paxos maintains private keys on behalf of its customers either on secure servers or in offline (or "cold") storage whereby Paxos encrypts and shards the wallet key materials then stores and manages them in secure, geographically distributed locations.

## 11.    Systems Monitoring & Logging

**Logging**. Paxos's production environment network activity is monitored and centrally logged. All logs are maintained in an instantly-queryable state for at least ninety (90) days before being moved to archival storage in accordance with Paxos's data retention policy. All logs are stored in such a manner as to assure that a stored record is immutable and non-tamperable, or where the log storage facility cannot provide such guarantees, a durable audit record of any attempts to modify or tamper with data. Security-relevant logs must be retained for a retention period of seven (7) years. Any given 24-hour period retained in archival storage must be queryable within a reasonable amount of time (e.g. within a business day) for the duration of the retention period.

**Security Monitoring**. Intrusion detection rules are configured to alert on suspicious activity in production services. Paxos is responsible for all security monitoring. All production systems are instrumented with appropriate detection and response tooling relative to the nature of the system and Paxos follows its security incident response plan.

## 12.    Threat & Vulnerability Management

**Vulnerability Scanning**. Paxos employs security best practices to ensure that the Services are secured, updates to its primary services do not introduce new vulnerabilities, and that new services have been sufficiently analyzed for and defended from potential vulnerabilities. Paxos supplements its day-to-day security practices, including architecture reviews, with regular vulnerability assessments and audits, including (1) automated scans of all code and applications where possible to identify vulnerabilities before ever being introduced to Paxos's environment; (2) once services are deployed, implementing continuous monitoring to promptly assess and react to any potential vulnerabilities; and (3) regular evaluation by independent third parties. Critical software patches are evaluated, tested and applied proactively.

**Penetration Testing**. Paxos performs penetration tests and engages independent third-party entities to conduct application-level penetration tests on an annual basis at minimum. Results of penetration tests are prioritized, triaged and remediated promptly by Paxos's security team according to established SLAs.

## 13.    Security Incident Management

**Incident Communication**. Paxos will promptly investigate all security incidents and to the extent that is permitted by applicable law, promptly (and not later than within 48    hours of such incident) notify its customers of a security incident that impacts its customer data.

## 14.    Business Continuity & Disaster Recovery

**Business Continuity Planning**. Business continuity is included as part of Paxos's security policy. The Paxos production network has been designed to be recoverable and/or replaceable and runs on multiple servers with load balancing and failover provisions. Instances can be spun up as needed if one fails. Data is backed up to alternate data centers. Data centers are located in geographically diverse locations to ensure redundancy in the case of a catastrophic event.

## Exhibit F-1

**(Redline) Paxos Agreement**

## CUSTODIAL SERVICES AGREEMENT

**THIS CUSTODIAL SERVICES AGREEMENT** (this "**Agreement**") is made and entered into effect on ~~September~~ October 17, 2023 (the "**Effective Date**") by and ~~between [~~among Celsius Network LLC~~]~~, a Delaware limited liability company, Celsius Network Limited, a company incorporated under the laws of the United Kingdom, Celsius Lending LLC, a Delaware limited liability company, Celsius EU UAB, a company incorporated under the laws of Lithuania, and, subject to the Confirmation Order, Celsius Networks Lending LLC, a Delaware limited liability company (together, with each of their successors and assigns as permitted hereunder, "**Client**"), and Paxos Trust Company, LLC, a New York limited purpose trust company ("**Paxos**") and together with Client, the "**Parties**" and each, a "**Party**").

**WHEREAS**, Paxos is a regulated financial institution (licensed as a New York limited purpose trust company) that provides custody services for certain Digital Assets (the "**Custodial Services**");

**WHEREAS**, Client and certain of its affiliates are debtors-in-possession under title 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and on July 13, 2022, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") captioned as Case Number 22-10964 (MG) (the "**Case**");

**WHEREAS**, on August 9, 2023, Client filed a revised proposed Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (as such may be amended or supplemented hereafter, and further subject to and as may hereafter be approved by the Court, the "**Plan**");

**WHEREAS**, Client desires to obtain access to and use the Custodial Services to hold Digital Assets on its behalf or on behalf of its creditors who may become entitled to receive distributions of Digital Assets from Client's assets in accordance with the orders of the Court and any approved Plan, and on behalf of its customers that the Court has determined own certain custodial Digital Assets currently held by Client on behalf of such customers (such creditors and custodial customers collectively the "**End Users**"); and

**WHEREAS**, Client has, contemporaneous with execution of this Agreement, entered into a separate agreement with PayPal, Inc. ("**PayPal**") whereby Client agrees to utilize the services of PayPal for the transfer and distribution of certain Digital Assets and/or Fiat currency to End Users.

**NOW THEREFORE**, in consideration of the mutual promises and covenants herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    **APPOINTMENT**

1.1.    Subject to approval of the Court, Client hereby appoints Paxos as custodian of the Digital Assets held under this Agreement. Paxos hereby accepts such appointment and agrees to establish on its books, pursuant to the terms of this Agreement a custody account or accounts for the receipt, safekeeping and maintenance of the Digital Assets (together, the "**Custody Account**").

1.2.    **Acceptance of Digital Assets.** Paxos will accept those Digital Assets into custody as set forth in clause 1 of Schedule 1, or as may otherwise be mutually agreed by the Parties from time to time,

and will hold such Digital Assets in registered form in Client's name; provided, however, that Paxos may refuse custody of any Digital Asset at its sole discretion, acting reasonably, if the acceptance thereof may violate applicable law or the terms of this Agreement or pose a material risk to either Client or Paxos.  In the event that Paxos refuses custody of any Digital Asset, Paxos shall provide Client with a written explanation of the reasons for such refusal (to the extent permissible under applicable law or regulatory guidance) and shall reasonably cooperate with and assist Client to find legally compliant alternative solutions for such rejected Digital Assets.

1.3.    **Designation of Accounts.** The Custody Account will be in the name of Client, in each case as set forth in Schedule 1 and as Client may reasonably designate to Paxos in writing. Paxos shall segregate via subledgering, the Custody Account and all Client provided Digital Assets from the proprietary property of Paxos and the Digital Assets of other clients.

1.4.    **Status of Custodian**. Paxos Trust Company, LLC is a limited liability company and limited purpose trust chartered and regulated by the New York State Department of Financial Services. As a limited purpose trust company licensed by the New York State Department of Financial Services, Custodian is a trust company and bank under §100 of the New York Banking Law. The address of Paxos is 450 Lexington Ave., #3952, New York, NY 10017.

1.5.    **Effectiveness of Agreement; Subject to Court Approval**. Notwithstanding anything to the contrary herein, this Agreement shall be subject to, and shall be effective immediately upon, order of the Court authorizing the Client to enter into this Agreement, subject to any conditions imposed by the Court in such order, that are agreed upon by Paxos, provided that such order shall not have been stayed (or if such order is stayed, then upon the earliest of expiration or termination of such stay).

2.    **CUSTODY ACCOUNT PROCEDURES**

2.1.    **Credits to the Custody Account.** Paxos is not obligated to credit any Digital Assets to the Custody Account before Paxos actually receives such Digital Assets by final settlement.

2.2.    **Debits to the Custody Account**. If Paxos receives any Instruction (pursuant to Section 3 below) that would result in the delivery of Digital Assets exceeding the credit to the Custody Account for that Digital Asset, Paxos may, in its sole and absolute discretion, not act on such Instruction until sufficient Digital Assets are available in the Custody Account or request a revised Instruction from the Client.

2.3.    **Investment in Digital Assets**. Except as otherwise set forth in Section 12.3, Client shall bear the sole risk and expense associated with any loss of value of Digital Assets and with any loss of use of any Digital Asset that becomes orphaned by virtue of any Fork or failure of the blockchain underlying such Digital Asset.

3.    **INSTRUCTIONS**

3.1.   **Authorized Persons**. Client shall designate persons authorized to act on its behalf in the performance of any act, discretion or duty under this Agreement ("**Authorized Persons**") in a form reasonably acceptable to Paxos, an example of which is attached hereto as Schedule 2, which shall include the contact information, title and specimen signature of such persons. If at any time there are no Authorized Persons designated by Client, the officers of Client designated by the Court to act on behalf of Client shall be deemed Authorized Persons hereunder. Paxos is entitled to rely and act upon Instructions of any Authorized Person unless or until Paxos (i) receives written notice of any change thereto from Client and (ii) has a reasonable time to note and implement such change.

3.2.   **Instruction**. Paxos may act upon and rely upon any Instruction received from, or reasonably believed by Paxos to be from, an Authorized Person, subject to compliance with the validation procedures set forth in Schedule 1. The validation procedures are designed only to verify the source of the Instruction and not to detect errors in the content of that Instruction or to prevent duplicate Instructions. Client agrees that Paxos is not responsible for any errors made by or on behalf of Client (other than by Paxos) or any errors resulting, directly or indirectly, from fraud or the duplication of any Instruction by or on behalf of Client.

3.3.   **Rejection of Instruction**. Paxos may decide not to act on an Instruction where it reasonably doubts such Instruction's contents, authorization, origination or compliance with any procedures in place, and Paxos covenants to promptly notify Client of its decision in such instance.

3.4.   **Cut-Off Times**. Paxos is only obligated to act on Instructions during normal business hours on days in which Paxos and the applicable financial markets are open for business in the ordinary course.

4.    **ANTI-MONEY LAUNDERING COMPLIANCE AND CIP; SANCTIONS SCREENING**

4.1.   **Paxos Requirements.** Client transactions will be subject to Paxos ongoing due diligence requirements, including know your client (KYC) procedures and monitoring, including sanctions screening, customer risk rating and engaging in customer due diligence and enhanced due diligence as appropriate and in accordance with Paxos' regulatory obligations. Client agrees to cooperate in connection with any such regulatory requirements and provide any information reasonably requested by Paxos that may be required for Paxos' compliance with its regulatory obligations.

4.2.   **AML and KYC.** In the event that Client submits an Instruction to Paxos to transfer Digital Assets from the Custody Account to a Digital Asset wallet address other than the PayPal Distribution Account, Paxos may require that, Client confirm to Paxos that it has performed (or that PayPal has performed on Client's behalf) appropriate anti-money laundering (AML) and know your client (KYC) reviews as required by applicable law and consistent with international money transmitter policies with respect to the End Users and wallet addresses included in such

Instruction. Client will provide Paxos evidence of such AML and KYC reviews as reasonably requested by Paxos.  Notwithstanding the foregoing, Client shall be entitled to rely upon PayPal's AML and KYC services with respect to distributions made through the PayPal Distribution Account, and Client shall not be required to maintain separate AML or KYC programs for such distributions.

5.    **PERFORMANCE BY PAXOS**

5.1.    **Custodial Duties Requiring Instructions.** Upon receipt of a specific Instruction, Paxos shall carry out the following applicable actions requested and authorized by such Instruction:

    i.    Receive, deliver or dispose of any Digital Assets, except as otherwise specifically provided for in this Agreement;

    ii.    Carry out any action affecting Digital Assets and the Custody Account; provided, however, that (a) each instance shall be subject to the prior approval and agreement of Paxos and (b) all instructions regarding Forked Currencies are subject to Section 7; and

    iii.    Transfer Digital Assets to the PayPal Distribution Account, except as otherwise specifically provided for in this Agreement.

5.2.    **Non-Discretionary Custodial Duties**. Absent a contrary Instruction, Paxos shall be permitted, and is hereby authorized and directed by Client, to carry out any of the following actions without any further Instructions or approval by or on behalf of Client:

    i.    In Client's name or on its behalf, sign any affidavits, certificates of ownership and other certificates and documents relating to Digital Assets which may be required (a) to obtain any Digital Assets or (b) by any tax or regulatory authority having jurisdiction over the Digital Assets and the Custody Account;

    ii.    Notify Client of notices, circulars, reports and announcements that require discretionary action, in each case, which Paxos has received in the course of acting in the capacity of custodian of any Digital Assets held on Client's behalf; and

    iii.    Attend to all non-discretionary matters in connection with anything provided in this Section 5.2 or any Instruction.

5.3.    **Reporting**. Paxos will provide Client with access, via SFTP server, to a daily reconciliation file identifying the Digital Assets in the Custody Account and setting forth all transactions in the Custody Account.

6.    **TAX STATUS / WITHHOLDING STATUS**

6.1.    **Information.** The Parties will comply with applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable taxing authorities) in respect of the reporting and payment of any Taxes resulting from this Agreement (if any). Each Party will cooperate with the other Party to provide all available information as reasonably requested from time to time, as may be necessary or proper to fulfill their respective obligations under applicable law (if any).

6.2.    **Payment.** If any Taxes become payable with respect to any payment to be made to either Party, the other Party may withhold the amount of such Taxes from such payment to such Party and pay such withheld amounts over to the applicable governmental body in accordance with the requirements of applicable laws. Any amount so withheld and paid over shall be treated as having been paid to the Party in respect of which such withholding was made. Each Party (or, if applicable, its regarded owner for U.S. federal income tax purposes) shall deliver an IRS Form W-9 to the other Party.

6.3.    **Tax Relief.** In the event Client requests, whether in its Instruction or other written agreement, that Paxos provide tax relief and Paxos agrees to provide such services, Paxos shall apply for appropriate tax relief (either by way of reduced tax rates at the time of an income payment or retrospective tax relief as is available in certain markets and as agreed from time to time); provided that the provision of any such tax relief shall require Client to provide to Paxos such documentation and information as to Client or its underlying beneficial owner as is reasonably necessary to secure such tax relief. In no event shall Paxos be responsible or liable for any Taxes resulting from the inability to secure tax relief, or for the failure of Client or any beneficial owner thereof to obtain the benefit of any credits, on the basis of foreign taxes withheld against income.

7.    **DIGITAL CURRENCY FORKS**

7.1.    **Fork Rights.** In the event of a Fork, Paxos retains the right, in its sole discretion, to determine whether or not to support (or cease supporting) each Forked Currency entirely, provided that Paxos will provide notice to Client of such determination promptly following such determination.

7.2.    **Unsupported Forked Currency.** In the event that Paxos determines, in its sole discretion, to not support any Forked Currency, Paxos shall distribute the unsupported Forked Currency to Client in a commercially reasonable manner within (i) ten (10) days from the last day of support by Paxos for such Forked Currency; provided that such ten (10)-day period may be extended by an additional twenty (20) days (to up to thirty (30) total days) from the last day of support by Paxos for such Forked Currency so long as Paxos continues to support such Forked Currency for such thirty (30)-day period in a manner that is sufficient to enable Paxos to return such Forked Currency to Client; or (ii) such other period as may be agreed between the Parties. Client acknowledges that there may be a delay between a Fork and the distribution of an unsupported

Forked Currency to Client. Client agrees that Paxos will not be liable for any loss in value of the unsupported Forked Currency during such transfer period.

7.3.  **Support of Forked Currency.** In the event that Paxos opts to support both Forked Currencies and Client does not instruct Paxos otherwise, then both Forked Currencies become Digital Assets subject in all respects to this Agreement, including, without limitation, any fees charged by Paxos relating hereto.

8.      **TRANSFER; FLUCTUATION IN VALUE OF DIGITAL ASSETS**

8.1.  **Transfer.** Client, in its sole discretion, may transfer Digital Assets, including to PayPal's account on the Exchange (the "**PayPal Distribution Account**"), for purposes of distributing the Digital Assets to End Users by providing an Instruction as described herein. Client acknowledges that there may be a delay, which shall be no longer than twenty-hour (24) hours, between Paxos' receipt of a valid Instruction to transfer Digital Assets and the availability of such Digital Assets in the PayPal Distribution Account.

8.2.  **Value Fluctuation.** Client understands that the value of the Digital Assets and any unsupported Forked Currency can fluctuate substantially, which may result in a significant or total loss of the value of the Digital Assets or the unsupported Forked Currency held by Paxos on Client's behalf. Subject to Section 12.3 and solely with respect to any loss due to the fluctuation of the value of the Digital Assets or the unsupported Forked Currency, Client agrees that Paxos will not be liable for such loss in value of the Digital Assets or unsupported Forked Currency at any time.

8.3.  **Digital Assets Supported by Paxos.** Client understands that Paxos only supports specific types of Digital Assets (including those listed on Schedule 1) and that Paxos does not provide Custodial Services or any other services with respect to unsupported Digital Assets.  In the event that Paxos determines to cease to support any a specific type of Digital Asset previously accepted for custody under this Agreement (other than as provided above in the case of a Fork), Paxos shall, wherever possible and permissible under applicable law or the direction of its regulators, provide Client reasonable written notice in advance of such change in supported Digital Asset types, and shall provide reasonable cooperation and assistance in order to facilitate moving any affected Digital Assets within Paxos' custody to a third party custodian at Client's sole discretion at Client's cost, subject to Paxos compliance with applicable law and the direction of its regulators.

9.      **REPRESENTATIONS AND WARRANTIES**

9.1.  **General.** Each party hereto represents and warrants to the other party, as of the date of this Agreement, that:

        i.        It is duly organized and in good standing in its jurisdiction of formation;

ii.     It has the requisite power and authority to execute this Agreement and to perform its obligations hereunder;

iii.    It has taken all necessary action to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby;

iv.     This Agreement, when executed and delivered, will be its legal, valid and binding obligation, enforceable against it in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or other similar laws;

v.      Any consent, authorization or Instruction required in connection with its execution and performance of this Agreement has been provided by any relevant third party;

vi.     Any act reasonably required by any relevant governmental or other authority to be done in connection with its execution and performance of this Agreement has been or will be done (and will be renewed if necessary); and

vii.    Neither the execution nor performance of this Agreement by such party will materially breach any applicable law, regulation, contract or other requirement to which such party is bound.

9.2.    **Client.** In addition to the general representations set forth in Section 9.1, Client also represents, warrants and covenants to Paxos that:

i.      It has the requisite power and authority to deposit the Digital Assets in the Custody Account;

ii.     There is no claim pending, or to Client's knowledge, threatened, and no encumbrance or other lien, in each case, that may adversely affect any delivery of Digital Assets made in accordance with this Agreement;

iii.    Where it acts as an agent on behalf of any of its End Users, whether or not expressly identified to Paxos from time to time, any such End Users shall not be customers or indirect customers of Paxos by virtue of the Custodial Services provided hereunder; and

iv.     It has not relied on any oral or written representation or warranties made by Paxos or any other person on Paxos's behalf, other than those explicitly set forth in Section 9.1.

9.3.    **Paxos**. In addition to the general representations set forth in Section 9.1, Paxos also represents, warrants and covenants to Client that Paxos has implemented and will maintain a reasonable information security program in accordance with the Security Addendum attached hereto.

10.     **SCOPE OF RESPONSIBILITY**

10.1.   **Standard of Care.** Paxos shall exercise the due care of a professional custodian, in accordance with applicable industry standards within the State of New York.

10.2.   **Limitations on Paxos' Responsibility.**

i.      **General.** Paxos shall only be responsible for the performance of those duties as are expressly set forth herein, including the performance of any Instruction given in accordance with this Agreement. Paxos shall have no implied duties or obligations whatsoever.

ii.     **No Liability for Third Parties.** Paxos is not responsible for the acts, omissions, defaults or insolvency of any third party, including, but not limited to PayPal.

iii.    **Performance Subject to Laws.** Client understands and agrees that Paxos' performance of this Agreement is subject to the relevant local laws, regulations, decrees, orders and government acts.

iv.     **Preventing Performance.** Paxos will not be responsible for any failure to perform any of its obligations if such performance is prevented, hindered or delayed by a Force Majeure Event. In such case, Paxos's obligations will be suspended for so long as the Force Majeure Event continues. In the event that a Force Majeure Event suspends Paxos's performance of any of its obligations for a duration that exceeds thirty (30) days, Client shall have the right, upon written notice to Paxos, to immediately terminate this Agreement.

v.      **Validity of Digital Assets.** Paxos shall exercise reasonable care in receiving Digital Assets but does not warrant or guarantee the authenticity, value or validity of any Digital Asset received by Paxos.

vi.     **Capacity of Custodian.** Paxos is not acting under this Agreement as an investment manager, nor as an investment, legal or tax adviser to Client, and Paxos' duty is solely to act as a custodian in accordance with the terms of this Agreement.

vii.    **Forwarded Information.** Paxos is not responsible for the form, accuracy or content of any notice, circular, report, announcement or other material provided under Section 5.2(ii) of this Agreement not prepared by Paxos.

11.     **SUBROGATION**

To the extent permissible by law or regulation and upon Client's written request, Client shall be subrogated to the rights of Paxos with respect to any claim for any loss, damage or claim suffered by Client, in each case, to the extent that Paxos fails to pursue any such claim or Client is not made whole in respect of such loss, damage or claim. Notwithstanding any other provision

hereof, in no event is Paxos obliged to bring suit in its own name or to allow suit to be brought in its name.

12.     **INDEMNITY; LIABILITY**

12.1.   **Indemnity to Paxos.** Client agrees to indemnify Paxos, its parent companies, subsidiaries and affiliates, its and their respective directors, officers, employees, representatives, agents and consultants (the "**Paxos Indemnified Parties**") and to defend and hold the Paxos Indemnified Parties harmless from all losses, damages, reasonable and documented costs and expenses (including reasonable and documented legal fees), and liabilities for any third-party claims, demands or actions (each, a "**Loss**"), incurred by the Paxos Indemnified Parties to the extent resulting from (i) Client's or any End User's actions or inaction in connection with this Agreement, or (ii) an Instruction given by Client, an Authorized Person or on which Paxos is entitled to rely hereunder, except in each case (i) and (ii) with respect to the extent of any such Loss resulting from Paxos or any such Paxos Indemnified Party's failure to comply with federal or state laws and regulations applicable to it, failure to execute valid and clear Instructions, self-dealing, breach of fiduciary duty (if any) or actions or omissions to act arising out of mistake or misconduct (including but not limited to negligence, willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts).

12.2.   **Client's Direct Liability.** The disclosure by Client to Paxos that Client has entered into this Agreement as the agent or representative of another person shall not relieve Client of any of its obligations under this Agreement, including Section 12.1.

12.3.   **Limitation of Liability.**

        i.      EXCEPT AS PROVIDED IN SECTION 12.3(ii), (A) IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE, OR PROFIT OR LOSS OF DATA OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (B) IN NO EVENT WILL EITHER PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, EXCEED THE LESSER OF (Y) THE REPLACEMENT OF ANY FUNDS OR DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AND (Z) THE MARKET VALUE OF THE DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AT THE TIME SUCH PARTY REASONABLY SHOULD HAVE BEEN AWARE OF SUCH LOSS OR DAMAGE.

        ii.     <u>Exceptions</u>.  The exclusions and limitations in Section 12.3(i) shall not apply to:

(a)    Losses arising out of or relating to Paxos' gross negligence or more culpable conduct, including any fraud, willful misconduct or intentional wrongful acts;

(b)    Losses arising from a Party's indemnification obligations hereunder;

(c)    A Party's failure to comply with federal or state laws and regulations applicable to it;

(d)    Paxos' failure to properly execute the Custodial Services, including without limitation the failure to correctly execute valid and clear Instructions and/or the failure to safekeep the Digital Assets (each failure an "**Error**"), provided that in such case the Loss shall be limited to the notional value of the Digital Assets at 12:01 a.m. Prevailing Eastern Time on the date of such Error; or

(e)    Losses for death, bodily injury, or damage to real or tangible personal property arising out of or relating to a Party's negligent or more culpable acts or omissions.

13.    **INFORMATION**

13.1.    Each of Paxos and Client agrees that during the term of this Agreement and for a period of two (2) years thereafter, it will maintain any confidential and proprietary information disclosed to it by the other party hereto ("**Confidential Information**") in a confidential manner using the same care it uses to protect the confidentiality of its own confidential information, and will not use for its own benefit or otherwise the Confidential Information of the other party except (i) as expressly authorized by this Agreement and to the extent necessary for performance of this Agreement or (ii) upon the prior written consent of the other party; provided, however, that each of Paxos and Client may disclose any such confidential or proprietary information of the other party to those of its affiliates and its and their respective officers, directors, employees, agents (including attorneys and financial advisors), and contractors, in each case, who need to know such information for purposes of this Agreement and who are bound by confidentiality obligations consistent with the terms hereof. Notwithstanding the foregoing, Confidential Information shall not include information that was (i) publicly available prior to disclosure by such disclosing party, (ii) already in the receiving party's possession and not subject to an obligation of confidentiality, (iii) obtained by the receiving party from a third party without restriction on disclosure or (iv) entirely independently developed by the receiving party without reference to any Confidential Information of the disclosing party.

13.2.    If, at any time, the receiving party is required by law or regulation to make any disclosure of any of the Confidential Information, by subpoena, judicial or administrative order or otherwise, the receiving party shall (to the extent permissible and practicable under the circumstances) give prompt prior written notice of such requirement to the disclosing party and permit the disclosing party to intervene in any relevant proceedings to protect its interests in the Confidential Information, and provide reasonable cooperation and assistance to the disclosing party in seeking to obtain such protection, at the disclosing party's sole expense. Notwithstanding the foregoing,

Paxos may disclose Client's Confidential Information to Paxos' regulators without any notice thereof.

13.3.   Notwithstanding the foregoing, Client agrees that Paxos' governing regulatory authority, the New York Department of Financial Services ("**DFS**"), shall have the right to examine all books, records and information of Client as maintained by Paxos to the extent relating to the services provided by Paxos hereunder.

## 14.   ADVERTISING

Neither Client nor Paxos shall display the name, trademark, or service mark of the other without the prior written approval of the other. Client shall not advertise or promote the services provided by Paxos hereunder without Paxos's prior written consent.

## 15.   TERMINATION

15.1.   **Termination for Convenience**. Either Party may terminate this Agreement in whole or in part, with or without cause, by giving not less than six (6) months prior written notice to the other Party.

15.2.   **Termination for Cause**. Without prejudice to any accrued rights and remedies under this Agreement, either Party may terminate this Agreement immediately by giving written notice to the other Party if the other party commits any material breach of any of its obligations under this Agreement and, in the case of any breach which is capable of remedy, fails to remedy such breach within fourteen (14) days of delivery of a written notice specifying such breach (or such longer period as the notice may specify).

15.3.   **Termination for Regulatory Reasons**.  Either Party may terminate this Agreement in the event such Party is required to terminate at the direction of applicable governmental regulators pursuant to a valid court order or other binding document setting forth such termination requirement.

15.4.   **Effect of Property.** Upon termination of this Agreement for any reason and subject to Paxos's compliance with applicable law, Paxos shall deliver the Digital Assets as instructed by Client or any Authorized Person in writing. If by the termination date Client or any Authorized Person has not given instructions to Paxos regarding where to deliver any Digital Assets, Paxos will continue to safekeep such Digital Assets until Client or any Authorized Person provides such written Instructions to effect a free delivery of such and Client shall be liable to pay monthly storage fees in the amount of the monthly storage fee then in effect until all Digital Assets are delivered to Client. However, Paxos will provide no other services with respect to any such Digital Assets following termination. Notwithstanding termination of this Agreement or any Instruction, Paxos may retain sufficient Digital Assets to close out or complete any transaction that was in process prior to such termination or to pay any amounts otherwise outstanding hereunder.

11

15.5.    **Surviving Terms**. [The rights and obligations contained in Sections 9, 11, 15, 16, 17 and 18 of this Agreement shall survive the termination of this Agreement.]¹

16.    **GOVERNING LAW AND JURISDICTION**

16.1.    **Governing Law.** This Agreement is solely and exclusively governed, construed and enforced in accordance with the laws of the State of New York (without regard to the conflicts of law provisions thereof).

16.2.    **Jurisdiction.** Both parties submit to personal jurisdiction in the federal and state courts located in New York City, State of New York, and further agree that any and all claims and controversies arising out of this Agreement that cannot be amicably resolved by the parties shall be brought solely and exclusively in the Court if subject matter jurisdiction lies therein, and otherwise if the Court lacks such jurisdiction in a court having subject matter jurisdiction located in New York City, State of New York.

16.3.    **Venue.** Each party hereto waives any objection it may have at any time, to the laying of venue of any actions or proceedings brought in an inconvenient forum and further waives the rights to object that such court does not have jurisdiction over such parties.

16.4.    **Sovereign Immunity.** Client and Paxos each irrevocably waives, with respect to itself and its revenues and Digital Assets, all immunity on the ground of sovereignty or similar grounds in respect of its obligations under this Agreement.

17.    **MISCELLANEOUS**

17.1.    **Entire Agreement; Amendments.** This Agreement consists exclusively of this document together with the schedules hereto. Except as specified in this Agreement, the Agreement may only be modified by written agreement of Client and Paxos.

17.2.    **Severability.** If any provision of this Agreement is or becomes illegal, invalid, or unenforceable under any applicable law, the remaining provisions shall remain in full force and effect (as shall that provision under any other law).

17.3.    **Waiver of Rights.** No failure or delay of Client or Paxos in exercising any right or remedy under this Agreement shall constitute a waiver of that right. Any waiver of any right will be limited to the specific instance. The exclusion or omission of any provision or term from this Agreement shall not be deemed to be a waiver of any right or remedy Client or Paxos may have under applicable law.

---

¹ Note to Draft: To be updated.

17.4.   **Assignment.** No party may assign or transfer any of its rights or obligations under this Agreement without the other's prior written consent, which consent will not be unreasonably withheld or delayed; provided; however, that Client may make such assignment or transfer without Paxos's consent to an entity in which Client has sole ownership interest or a successor entity in the event of Client's dissolution or otherwise winding down of Client entity.

17.5.   **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, including, without limitation, any reorganized Client.

17.6.   **Headings.** Titles to Sections of the Agreement are included for convenience of reference only and shall be disregarded in construing the language contained in this Agreement.

17.7.   **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.

18.   **DEFINITIONS AND INTERPRETATION.**

For purposes of this Agreement and any exhibit or schedule hereto, the following terms shall have the meanings ascribed to them below:

18.1.   "**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, which blockchains include the digital token blockchains set forth in Schedule 1 together with any additional blockchains supported from time to time by Paxos, in each case where such tokens are held from time to time held for Client under the terms of this Agreement.

18.2.   "**Exchange**" means the virtual crypto-currency exchange operated by Paxos.

18.3.   "**Force Majeure Event**" means any event due to any cause beyond the reasonable control of Paxos, such as restrictions on convertibility or transferability, requisitions, involuntary transfers, unavailability of communications system, sabotage, fire, flood, explosion, acts of God, civil commotion, pandemics, strikes or industrial action of any kind, riots, insurrection, war or acts of government.

18.4.   "**Fork**" means an event in which (i) a blockchain underlying a Digital Asset has been changed in a way that makes it incompatible with respect to future transactions and blocks with the unchanged version of the blockchain, (ii) a material population of miners or validators, as applicable, and/or users of the such Digital Asset accept the changes, and (iii) the two resulting blockchains have not been merged together in a timely manner.

18.5.   "**Forked Currency**" means the resulting branches of a blockchain that has undergone a Fork.

18.6.   "**Instruction**" means any instruction, limitation, approval, consent or notice provided hereunder.

18.7.   "**Taxes**" means all taxes, levies, imposts, charges, assessments, deductions, withholdings and related liabilities, including, without limitation, additions to tax, penalties and interest imposed on or in respect of (i) Digital Assets, (ii) the transactions effected under this Agreement or (iii) Client; *provided*, however, that "Taxes" do not include income or franchise taxes imposed on or measured by the net income of Paxos or its agents.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties, including, subject to the Confirmation Order, Celsius Networks Lending LLC, hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized.


[CELSIUS NETWORK LLC]

By:_____

Name:_____

Title:_____


CELSIUS NETWORK LTD

By:_____

Name:_____

Title:_____


CELSIUS LENDING LLC

By:_____

Name:_____

Title:_____


CELSIUS NETWORKS LENDING LLC

By:_____

Name:_____

Title:_____

CELSIUS EU UAB

By:_____

Name:_____

Title:_____


PAXOS TRUST COMPANY, LLC

By:_____

Name:_____

Title:_____

**SCHEDULE 1**
**DIGITAL ASSETS, WITHDRAWAL**

●    <u>Digital Assets</u>: Bitcoin (BTC), Ethereum (ETH)

●    <u>Withdrawing or Transferring Digital Assets and Unsupported Forked Currencies</u>. In order to withdraw or transfer Digital Assets or unsupported Forked Currencies from the Custody Account to the PayPal Distribution Account, an Authorized Person designated by Client must sign a written Instruction specifying the amount and destination of the withdrawal or transfer, as well as such other details as Paxos may reasonably request. The written instructions must be delivered to the following email address or such other address as may be notified by Paxos to Client from time to time: info@paxos.com.

    A.    Following receipt of the Instruction requesting withdrawal or transfer, Paxos will verify the instructions by calling two other Authorized Persons at the contact numbers provided by Client.

    B.    If the withdrawal or transfer Instruction is verified in accordance with this Schedule 1, Paxos shall transfer the Digital Assets or unsupported Forked Currencies as specified therein.

●    <u>Timing; Size</u>. Generally, delivery of Digital Assets to a destination specified by Client will be completed within twelve (12) business hours (i.e., 9AM to 5PM EST) of Paxos' receipt of such Instruction. The Parties agree that withdrawal or transfer of the Digital Assets from the Custody Account to the PayPal Distribution Account will happen in tranches of not less than approximately $[●]²7  worth of Digital Asset per Digital Asset; provided that the exact value of each tranche may vary due to the nature of the Digital Assets being transferred.

●    <u>Authentication of Other Instructions</u>. Paxos may rely on the signature of an Authorized Person for any Instructions other than Instructions to withdraw or transfer Digital Assets or unsupported Forked Currencies.

---

² Note to Draft: Parties to discuss.

17

**SCHEDULE 2**
**FORM OF INSTRUCTION**

1. An Authorized Person will provide Instructions to Paxos in accordance with procedures to be mutually agreed upon by the Parties prior to the deposit of any funds into the PayPal Distribution Account (the "**Procedure**"). Paxos will enable authorized third parties to submit Instructions through an API upon written approval from an Authorized Person in accordance with the Procedure. [To be added]

2. With the exception of Instructions received by previously authorized third parties via API in accordance with Section 1 of this Schedule 2, all Instructions, including those for the (i) withdrawal or transfer of digital assets, (ii) addition  or removal of authorized End Users or authorized third parties, and (iii) addition or removal of whitelisted addresses, in each case will be validated by Paxos in accordance with the Procedure.

18

# SECURITY ADDENDUM

[To be added]

This Security Addendum is incorporated into and made a part of that certain Custodial Services Agreement (the "**Agreement**") between Paxos Trust Company ("**Paxos**") and the Client set forth in the Agreement (herein the "**Customer**").

## 1.    Introduction

**Purpose**. Paxos is committed to maintaining customer trust. The purpose of this Security Addendum is to describe the security program for the Paxos services as more fully described in the Agreement (the "**Services**"). This Security Addendum describes the minimum security standards that Paxos shall maintain in order to protect its customers' data from unauthorized use, access, disclosure, theft, or manipulation. As security threats shift and evolve, Paxos continues to update its security program and strategy to help protect its customers' data. Paxos reserves the right to update this Security Addendum from time to time; *provided, however*, any update will not materially reduce the overall protections set forth in this Security Addendum.

**Services Covered**. This Security Addendum describes the organizational, administrative, technical, and physical controls, as well as third party security audit certifications that are applicable to the Services more fully described in the Agreement.

## 2.    Security Governance

**Security Program**. Paxos's information security program is centrally managed and includes operational, administrative, technical, and physical safeguards reasonably designed to protect the confidentiality, integrity, and availability of sensitive data, including customer data, and is aligned to   the ISO 27001 information security management systems standard. Paxos employs numerous defense-in-depth strategies to secure information assets, utilizing industry guidelines from     ISO. Paxos's Chief Information Security Officer (CISO) meets on a regular basis with executive management and the Paxos Board of Directors to discuss security risks, issues, and company-wide security initiatives. Internal information security policies and standards are reviewed, assessed, and updated on at least an annual basis, and are made available to all Paxos employees.

**Security Policy Governance**. Paxos has controls in place to maintain the confidentiality of customer data in accordance with the Agreement. All Paxos employees and contract personnel are bound by Paxos's internal policies regarding maintaining confidentiality of customer data.

**Security Compliance**. Paxos has obtained System and Organization Controls (SOC) certifications where applicable and is periodically evaluating other areas for additional certifications. The certification reports are shared upon request with Paxos's customers and prospects (subject to appropriate and binding contractual confidentiality provisions).

## 3.    Third Party Security

**Vendor Agreements**. Paxos secures agreements with its third-party service providers that impose obligations of confidentiality and/or security practices and commitments, as appropriate and applicable.

**Vendor Assessments**. Paxos may use affiliates and third-party vendors to provide the Services. Paxos carries out a risk-based assessment of prospective vendors before working with those vendors to validate that prospective vendors meet Paxos's security requirements. Paxos periodically reviews each vendor in light of Paxos's security and business continuity standards, including the type of access and classification of data being accessed (if any), controls necessary to protect data, and legal/regulatory requirements. Paxos ensures that customer data is returned to Paxos from its vendors and/or deleted at the end of a vendor relationship.

**4.    People Operations**

**Employee On-Boarding**. Paxos carries out background checks on individuals joining Paxos in accordance with applicable local laws. Paxos currently verifies the individual's education and previous employment. Where local labor law or statutory regulations permit, Paxos conducts criminal and, in certain instances, credit background checks on its employees, contractors, and consulting agencies.

**5.    Data Security**

**Data Lifecycle Security**. At any point during or after the term of a customer's agreement(s) with Paxos, and upon a customer's reasonable, written request, Paxos will delete customer data. Paxos will ensure such data is deleted in accordance with Paxos's data records retention policy and in accordance with applicable laws. Paxos may retain backup records of customer data (i) as required by law (or its own data retention policy, as applicable, to the extent such policy is compliant with all applicable laws), and (ii) in secured form. Paper assets are shredded to P-7/Level 6 security standards. Hardware and associated data assets are destroyed in accordance with    ISO 27001 Annex A 7.14    . After wiping, sanitized hardware awaiting shredding and certificate of disposal is locked in a depot dedicated to Paxos cold-storage.

**Data Encryption**. Client data and transaction records are encrypted both at rest and in transit. Paxos has implemented mature data encryption protocols and standards to ensure that its encryption is supported by a defined key management process that is reviewed against current best practices. All data is encrypted in transit, including all traffic to and from Paxos servers.

**Data Backups**. Paxos performs regular backups of Paxos account information, customer data calls,    and other critical data using third-party cloud storage solutions. Backup data are retained redundantly across availability zones and are encrypted in transit and at rest.

**6.    Identity and Access Management**

**Logical Access Provisioning and De-provisioning**. To minimize the risk of data exposure, Paxos follows the principles of least privilege through a team-based access-control model when provisioning system access. Paxos personnel are authorized to access customer data based on their job function, role and responsibilities, and such access requires approval of the employee's manager. Access rights to production environments are reviewed according to a risk-based

approach. An employee's access to customer data is promptly removed upon termination of their employment. In order to access the production environment, an authorized user must have a unique username and password, multi-factor authentication and be connected to Paxos's Virtual Private Network (VPN). Before an engineer is granted access to the production environment, access must be approved and requested by management with a sixty (60) day waiting period and the engineer    . Paxos logs high risk actions and changes in the production environment. Paxos leverages automation to identify any deviation from internal technical standards that could indicate anomalous/unauthorized activity to raise an alert within minutes of a configuration change. Paxos personnel who leave the company, no longer work with Paxos, or change business roles have their access privileges revoked or modified within a predetermined timeframe.

**Authentication Mechanisms**. Paxos enforces authentication requirements across all Paxos systems, including password requirements (e.g. password length, complexity, history, limitations on retries, and use of a password manager) and multi-factor authentication (MFA) requirements. All credentials are encrypted in transit, and hashed at rest. Paxos strives to ensure that authentication requirements and implementations meet or exceed current best practices for authentication, based on the current threat landscape.

**Remote Access**. Remote access to the Paxos network by authorized personnel is encrypted and requires multifactor authentication (MFA) for remote access, including X509 certificate and username/password login credentials. For production infrastructure access, use of VPN is also enforced. Paxos's network follows zero trust principles; any non-Paxos devices that may access the network have no privileged access and must rely on strong identity controls to access Paxos resources.    Paxos office networks are treated as untrusted by default. While WPA-PSK encryption is required to access office wifi, devices on this network are not automatically granted access to corporate or production systems. Users that wish to have corporate email on their mobile devices must allow regular posture checks and on their device    . Rooted devices are not permitted. Company-owned computers are managed and kept up-to-date with the latest operating system, antivirus, and productivity software updates. All hard drives are encrypted. Upon return and prior to reissuance of an authorized laptop, the laptop must be completely wiped.

**7.     Physical & Environmental Security**

**Physical Site Security**. Any data centers that host the Services are strictly controlled both at the perimeter and at building ingress points by professional security staff utilizing video surveillance, intrusion detection systems, and other electronic means. Authorized staff must pass two-factor authentication a minimum of two times to access data center floors. All visitors and contractors are required to present identification and are signed in and continually escorted by authorized staff. These facilities are designed to withstand adverse weather and other reasonably predictable natural conditions. Each data center has redundant electrical power systems that are available twenty-four (24) hours a day, seven (7) days a week. Uninterruptible power supplies and on-site generators are available to provide back-up power in the event of an electrical failure. In addition, Paxos office spaces have a physical security program that manages visitors, building entrances, CCTVs (closed circuit television), and overall office security. Physical security audits are performed annually.

## 8.    Corporate Security

**Security Awareness Training**. All personnel must complete the Paxos security and privacy training, which covers Paxos security policies, security best practices, and privacy principles. All personnel must refresh their training at least annually. Paxos's security and privacy teams regularly communicate emerging data privacy requirements and security threats and trends to personnel. Personnel have avenues for reporting incidents or suspicious activity.

## 9.    DevOps Security

**Change Management**. Paxos has built a production environment designed with strict controls, which includes a formal change management process to manage changes to software, applications and system software that will be deployed within the production environment. New (or changes made to existing) products, services and features ("**Changes**") are deployed in a development environment that closely mirrors the production environment. Before Changes are deployed in the production environment, they are peer reviewed and automated security, functional, and unit testing is performed. Customer data is not used outside of the production environment unless required for troubleshooting issues where real data is relevant and, even then, the data is first obfuscated to prevent exposure of personal data, or to the extent the data is needed for operations such as regulatory production. Prior to high-risk Changes being made, an assessment is carried out to consider the impact and risk of a requested change, evidence acknowledging applicable testing for the change, approval of deployment into production by appropriate approver(s), and roll back procedures. After all tests are passed, and peer reviews completed, Changes are deployed to the production environment. All Changes deployed in the production environment must be indexed and documented using a formal and auditable system of record. The production environment is closely monitored for anomalous conditions that may suggest unexpected activity or potential security threats. When a vulnerability is identified, the criticality will be evaluated and the service affected will be isolated, patched or upgraded as necessary according to vulnerability management requirements.

## 10.    Cryptography, Encryption & Key Management

**Key Storage.** Paxos maintains private keys on behalf of its customers either on secure servers or in offline (or "cold") storage whereby Paxos encrypts and shards the wallet key materials then stores and manages them in secure, geographically distributed locations.

## 11.    Systems Monitoring & Logging

**Logging**. Paxos's production environment network activity is monitored and centrally logged. All logs are maintained in an instantly-queryable state for at least ninety (90) days before being moved to archival storage in accordance with Paxos's data retention policy. All logs are stored in such a manner as to assure that a stored record is immutable and non-tamperable, or where the log storage facility cannot provide such guarantees, a durable audit record of any attempts to modify or tamper with data. Security-relevant logs must be retained for a retention period of seven (7) years. Any given 24-hour period retained in archival storage must be queryable within a reasonable amount of time (e.g. within a business day) for the duration of the retention period.

**Security Monitoring**. Intrusion detection rules are configured to alert on suspicious activity in production services. Paxos is responsible for all security monitoring. All production systems are instrumented with appropriate detection and response tooling relative to the nature of the system and Paxos follows its security incident response plan.

## 12.    Threat & Vulnerability Management

**Vulnerability Scanning**. Paxos employs security best practices to ensure that the Services are secured, updates to its primary services do not introduce new vulnerabilities, and that new services have been sufficiently analyzed for and defended from potential vulnerabilities. Paxos supplements its day-to-day security practices, including architecture reviews, with regular vulnerability assessments and audits, including (1) automated scans of all code and applications where possible to identify vulnerabilities before ever being introduced to Paxos's environment; (2) once services are deployed, implementing continuous monitoring to promptly assess and react to any potential vulnerabilities; and (3) regular evaluation by independent third parties. Critical software patches are evaluated, tested and applied proactively.

**Penetration Testing**. Paxos performs penetration tests and engages independent third-party entities to conduct application-level penetration tests on an annual basis at minimum. Results of penetration tests are prioritized, triaged and remediated promptly by Paxos's security team according to established SLAs.

## 13.    Security Incident Management

**Incident Communication**. Paxos will promptly investigate all security incidents and to the extent that is permitted by applicable law, promptly (and not later than within 48        hours of such incident) notify its customers of a security incident that impacts its customer data.

## 14.    Business Continuity & Disaster Recovery

**Business Continuity Planning**. Business continuity is included as part of Paxos's security policy. The Paxos production network has been designed to be recoverable and/or replaceable and runs on multiple servers with load balancing and failover provisions. Instances can be spun up as needed if one fails. Data is backed up to alternate data centers. Data centers are located in geographically diverse locations to ensure redundancy in the case of a catastrophic event.

**<u>Exhibit G</u>**

**Coinbase Agreements**

DRAFT

## COINBASE PRIME AGREEMENT

### General Terms and Conditions

## 1.     Introduction

This agreement (including, the Coinbase Custody Custodial Services Agreement attached hereto as Exhibit A (the "Custody Agreement"), the Coinbase Master Trading Agreement attached hereto as Exhibit B (the "MTA"), and all other exhibits, addenda and supplements attached hereto or referenced herein, collectively, the "Coinbase Prime Agreement"), is entered into by and among Celsius Network LLC, a Delaware limited liability company, Celsius Network Limited, a company incorporated under the laws of the United Kingdom, Celsius Lending LLC, a Delaware limited liability company, Celsius EU UAB, a company incorporated under the laws of Lithuania, and, subject to the Confirmation Order, Celsius Networks Lending LLC, a Delaware limited liability company (together, with each of their successors and assigns as permitted hereunder "Client"), and Coinbase, Inc. ("Coinbase"), on behalf of itself and as agent for Coinbase, Coinbase Custody Trust Company, LLC ("Coinbase Custody"), and, as applicable, Coinbase Credit, Inc. ("Coinbase Credit," and collectively with Coinbase and Coinbase Custody, the "Coinbase Entities"). This Coinbase Prime Agreement sets forth the terms and conditions pursuant to which the Coinbase Entities will open and maintain the prime account (the "Prime Account") for Client and provide services relating to custody, trade execution, lending or post-trade credit (if applicable), and other services (collectively, the "Prime Services") for certain digital assets ("Digital Assets") as set forth herein. Client and the Coinbase Entities (individually or collectively, as the context requires) may also be referred to as a "Party". Capitalized terms not defined in these General Terms and Conditions (the "General Terms") shall have the meanings assigned to them in the respective exhibit, addendum or supplement. In the event of a conflict between these General Terms and any exhibit, addendum or supplement hereto, then the document governing the specific relevant Prime Service shall control in respect of such Prime Service.

Notwithstanding anything to the contrary in this Coinbase Prime Agreement, the Distribution Addendum, or any confidential side letter between the Parties, Celsius shall not (a) utilize any digital asset trading for selling and/or buying Digital Assets, lending, or post-trade credit services with Coinbase or (b) transfer any digital assets pursuant to this Coinbase Prime Agreement other than, in the case of (b), to facilitate (i) the custodial services as set forth in Exhibit A to this Coinbase Prime Agreement, (ii) distribution services as set forth in the Addendum to this Coinbase Prime Agreement, and (iii) transfers between Celsius-owned accounts and wallets.

## 2.     Conflicts of Interest Acknowledgement

Client acknowledges that the Coinbase Entities may have actual or potential conflicts of interest in connection with providing the Prime Services including that (i) Orders (as such term is defined in the MTA) may be routed to Coinbase's exchange platform where Orders may be executed against other Coinbase customers or with Coinbase acting as principal, (ii) the beneficial identity of the purchaser or seller with respect to an Order is unknown and therefore may inadvertently be another Coinbase client, (iii) Coinbase does not engage in front-running, but is aware of Orders or imminent Orders and may execute a trade for its own inventory (or the account of an affiliate) while in possession of that knowledge and (iv) Coinbase may act in a principal capacity with

respect to certain Orders (*e.g.*, to fill residual Order size) when a portion of an Order may be below the minimum size accepted by the Connected Trading Venues (as defined in the MTA). As a result of these and other conflicts, the Coinbase Entities may have an incentive to favor their own interests and the interests of their affiliates over a particular Client's interests and has in place certain policies and procedures in place that are designed to mitigate such conflicts.

**3.      Account Statements**

Client authorizes Coinbase to combine information regarding all Prime Services activities into a single statement. Coinbase will provide Client with an electronic account statement every month, at a minimum. Each account statement will identify the amount of cash and each Digital Asset in Client's Prime Account at the end of the period and set forth all Prime Account activity during that period.

**4.      Client Instructions**

4.1     In a written notice to Coinbase, Client may designate persons and/or entities authorized to act on behalf of Client with respect to the Prime Account (the "Authorized Representative"). Upon such designation, Coinbase may rely on the validity of such appointment until such time as Coinbase receives Instructions from Client revoking such appointment or designating a new Authorized Representative.

4.2     The Coinbase Entities may act upon instructions received from Client or Client's Authorized Representative ("Instructions"). When taking action upon Instructions, the applicable Coinbase Entity shall act in a reasonable manner, and in conformance with the following: (a) Instructions shall continue in full force and effect until executed, cancelled or superseded; (b) if any Instructions are ambiguous, the applicable Coinbase Entity shall refuse to execute such Instructions until any such ambiguity has been resolved to the Coinbase Entity's satisfaction; (c) the Coinbase Entities may refuse to execute Instructions if in the applicable Coinbase Entity's opinion such Instructions are outside the scope of its obligations under this Coinbase Prime Agreement or are contrary to any applicable laws, rules and regulations; and (d) the Coinbase Entities may rely on any Instructions, notice or other communication believed by it in good faith to be given by Client or Client's Authorized Representative. Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability with respect to, any and all Claims and Losses arising out of or relating to inaccurate or ambiguous Instructions.

4.3     Coinbase will comply with the Client's Instructions to stake, stack or vote the Client's Digital Assets to the extent the applicable Coinbase Entity supports proof of stake validation, proof of transfer validation, or voting for such Digital Assets. The Coinbase Entities may, in their sole discretion, decide whether or not to support (or cease supporting) staking services or stacking or voting for a Digital Asset.

**5.      Representations, Warranties, and Additional Covenants**

Client represents, warrants, and covenants that:

2

5.1    Client is currently under supervision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") following the filing of voluntary bankruptcy (collectively, the "Chapter 11 Cases") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

5.2    Subject to the Bankruptcy Code, any orders of the Bankruptcy Court, and the Bankruptcy Court's approval of Client's entry into this Coinbase Prime Agreement, Client has the full power, authority, and capacity to enter into this Coinbase Prime Agreement and to engage in transactions with respect to all Digital Assets relating to the Prime Services;

5.3    Except as disclosed to the Coinbase Entities, Client, to the best of its knowledge, is and shall remain in full material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Client operates or otherwise uses the Prime Services, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including AML Laws, USA PATRIOT Act and Bank Secrecy Act requirements, and other anti-terrorism statutes, regulations, and conventions of the United States or other international jurisdictions;

5.4    Except as disclosed to the Coinbase Entities, Client is and shall remain materially in good standing with all relevant government agencies, departments, regulatory, and supervisory bodies in all relevant jurisdictions in which Client does business, and Client will promptly notify Coinbase if Client ceases to be in good standing with any regulatory authority;

5.5    Client shall promptly provide information as the Coinbase Entities may reasonably request in from time to time regarding: (a) Client's policies, procedures, and activities which relate to the Prime Services, and (b) Client's use of the Prime Services, in each case to the extent reasonably necessary for the Coinbase Entities to comply with any applicable laws, rules, and regulations (including money laundering statutes, regulations and conventions of the United States or other jurisdictions), or the guidance or direction of, or request from, any regulatory authority or financial institution;

5.6    Client's use of the Prime Services shall be for commercial, business purposes only, limited to activities disclosed in the due diligence information submitted to Coinbase, and shall not include any personal, family or household purposes. Client shall promptly notify Coinbase in writing in the event it intends to use the Prime Services in connection with any business activities not previously disclosed to Coinbase. Coinbase may, in its sole discretion, prohibit Client from using the Prime Services in connection with any business activities not previously disclosed;

5.7    Client's Authorized Representatives have the (a) full power, authority and capacity to access and use the Prime Services and (b) appropriate sophistication, expertise, and knowledge necessary to understand the nature and risks, and make informed decisions, in respect of Digital Assets and the Prime Services;

5.8    Client either owns or possess lawful authorization to transact with all Digital Assets involved in any Custody Transactions;

3

5.9    This Coinbase Prime Agreement is Client's legal, valid, and binding obligation, enforceable against it in accordance with its terms; and

5.10    Unless Client advises Coinbase to the contrary in writing, at all times, none of Client's assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility and prohibited transaction sections of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), the prohibited transaction provisions of the Internal Revenue Code of 1986, as amended, or any federal, state, local or non-U.S. law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, and Client shall immediately provide Coinbase with a written notice in the event that Client becomes aware that Client is in breach of the foregoing.

Coinbase, on behalf of itself and each other Coinbase Entity, represents, warrants, and covenants that:

5.11    It possesses and will maintain, all licenses, registrations, authorizations and approvals required by any applicable government agency or regulatory authority for it to operate its business and provide the Prime Services;

5.12    It has the full power, authority, and capacity to enter into and be bound by this Coinbase Prime Agreement; and

5.13    This Coinbase Prime Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

## 6.    No Investment Advice or Brokerage

6.1    Client assumes responsibility for each transaction in or for its Prime Account. Client understands and agrees that none of the Coinbase Entities are an SEC/FINRA registered broker-dealer or investment adviser to Client in any respect, and the Coinbase Entities have no liability, obligation, or responsibility whatsoever for Client decisions relating to the Prime Services. Client should consult its own legal, tax, investment and accounting professionals.

6.2    While the Coinbase Entities may make certain general information available to Client, the Coinbase Entities are not providing and will not provide Client with any investment, legal, tax or accounting advice regarding Client's specific situation. Client is solely responsible, and shall not rely on the Coinbase Entities, for determining whether any investment, investment strategy, or transaction involving Digital Assets is appropriate for Client based on Client's investment objectives, financial circumstances, risk tolerance, and tax consequences. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever regarding any Client decision to enter into in any transaction with respect to any Digital Asset.

4

**7.      Opt-In to Article 8 of the Uniform Commercial Code**

Client Assets in the Trading Balance and Vault Balance will be treated as "financial assets" under Article 8 of the New York Uniform Commercial Code ("Article 8"). Coinbase and Coinbase Custody are "securities intermediaries," the Trading Balance and Vault Balance are each "securities accounts," and Client is an "entitlement holder" under Article 8. This Agreement sets forth how the Coinbase Entities will satisfy their Article 8 duties. Treating Client Assets in the Trading Balance and Vault Balance as financial assets under Article 8 does not determine the characterization or treatment of the cash and Digital Assets under any other law or rule. New York will be the securities intermediary's jurisdiction with respect to Coinbase and Coinbase Custody, and New York law will govern all issues addressed in Article 2(1) of the Hague Securities Convention. Coinbase and Coinbase Custody will credit the Client with any payments or distributions on any Client Assets it holds for Client's Trading Balance and Vault Balance. Coinbase and Coinbase Custody will comply with Client's Instructions with respect to Client Assets in Client's Trading Balance or Vault Balance, subject to the terms of the MTA or Custody Agreement, as applicable, and related Coinbase rules, including the Coinbase Trading Rules (as such term is defined in the MTA).

**8.      General Use, Security and Prohibited Use**

8.1     *Prime Site and Content*. During the term of this Coinbase Prime Agreement, the Coinbase Entities hereby grant Client a limited, nonexclusive, non-transferable, non-sublicensable, revocable and royalty-free license, subject to the terms of this Coinbase Prime Agreement, to access and use the Coinbase Prime Site accessible at prime.coinbase.com ("Coinbase Prime Site") and related content, materials, and information (collectively, the "Content") solely for Client's internal business use and other purposes as permitted by Coinbase in writing from time to time. Any other use of the Coinbase Prime Site or Content is hereby prohibited. All other right, title, and interest (including all copyright, trademark, patent, trade secrets, and all other intellectual property rights) in the Coinbase Prime Site, Content, and Prime Services is and will remain the exclusive property of the Coinbase Entities and their licensors. Client shall not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Prime Services or Content, in whole or in part. "Coinbase," "Coinbase Prime," "prime.coinbase.com," and all logos related to the Prime Services or displayed on the Coinbase Prime Site are either trademarks or registered marks of the Coinbase Entities or their licensors. Client may not copy, imitate or use them without Coinbase's prior written consent. The license granted under this Section 8.1 will automatically terminate upon termination of this Coinbase Prime Agreement, or the suspension or termination of Client's access to the Coinbase Prime Site or Prime Services.

8.2     *Unauthorized Users.* Client shall not permit any person or entity that is not the Client or an Authorized Representative (each, an "Unauthorized User") to access, connect to, and/or use Client's Prime Account. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, and Client shall be fully responsible and liable for, any and all Claims and Losses arising out of or relating to the acts and omissions of any Unauthorized User in respect of the Prime Services, Prime Account, and/or the Prime Site.

Client shall notify Coinbase immediately if Client believes or becomes aware that an Unauthorized User has accessed, connected to, or used Client's Prime Account.

8.3   *Password Security; Contact Information*. Client is fully responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys, YubiKeys, other security or confirmation information or hardware, and any other codes that Client uses to access the Prime Account and Prime Services. Client agrees to keep Client's email address and telephone number up to date in Client's Prime Account in order to receive any notices or alerts that the Coinbase Entities may send to Client. Client shall be fully responsible for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, any Losses that Client may sustain due to compromise of Prime Account login credentials. In the event Client believes Client's Prime Account information has been compromised, Client must contact Coinbase immediately.

8.4   *Prohibited Use*. Client shall not engage in any of the following activities with its use of the Prime Services:

8.4.1   *Unlawful Activity*. Activity that would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information;

8.4.2   *Abusive Activity*. Actions that impose an unreasonable or disproportionately large load on Coinbase's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to Coinbase systems that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to Coinbase systems, other Coinbase accounts, computer systems or networks connected to Coinbase systems, Coinbase Site, through password mining or any other means; use Coinbase Account information of another party to access or use the Coinbase systems, except in the case of specific Clients and/or applications which are specifically authorized by a Client to access such Client's Coinbase Account and information; or transfer Client's account access or rights to Client's account to a third party, unless by operation of law or with the express permission of Coinbase; and

8.4.3   *Fraud*. Activity which operates to defraud Coinbase or any other person or entity.

8.5   *Computer Viruses*. The Coinbase Entities shall not have any liability, obligation, or responsibility whatsoever for any damage or interruptions caused by any computer viruses, spyware, scareware, Trojan horses, worms or other malware that may affect Client's computer or other equipment, or any phishing, spoofing or other attack, unless such damage or interruption directly resulted from the Coinbase Entities' gross negligence, fraud, or willful misconduct. Client agrees to access and use its Prime Account through the

6

Coinbase Prime Site to review any Orders, deposits or withdrawals or required actions to confirm the authenticity of any communication or notice from the Coinbase Entities.

**9.    Taxes**

9.1    *Taxes*. Except as otherwise expressly stated herein or required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities), Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, the payment of any and all present and future tariffs, duties or taxes (including withholding taxes, transfer taxes, stamp taxes, documentary taxes, value added taxes, personal property taxes and all similar costs) imposed or levied by any government or governmental agency (collectively, "Taxes") and any related Claims and Losses or the accounting or reporting of income or other Taxes arising from or relating to any transactions Client conducts through the Prime Services; *provided, however*, that for the avoidance of doubt, if any applicable legal requirement imposes information reporting or similar obligations with respect to the matters governed by this Agreement, the Coinbase Entities shall comply in full with any such requirements that apply to them and Client shall comply in full with any such requirements that apply to it.  The Client and the Coinbase Entities shall each file any and all Tax returns, reports, and disclosures required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities).

9.2    *Withholding Tax*. Except as required by applicable law, each payment under this Coinbase Prime Agreement or collateral deliverable by Client to any Coinbase Entities shall be made, and the value of any collateral or margin shall be calculated, without withholding or deducting of any Taxes. If any Taxes are required to be withheld or deducted, Client (a) authorizes the Coinbase Entities to effect such withholding or deduction and remit such Taxes to the relevant taxing authorities and (b) shall pay such additional amounts or deliver such further collateral as necessary to ensure that the actual net amount received by the Coinbase Entities is equal to the amount that the Coinbase Entities would have received had no such withholding or deduction been required; *provided, however*, that the Coinbase Entities shall reasonably cooperate with Client to minimize or eliminate any such withholding or deduction requirements to the extent permitted by applicable Law. Client agrees that the Coinbase Entities may disclose any information with respect to Client Assets, the Prime Account, Custodial Accounts, Trading Accounts, and transactions required by any applicable taxing authority or other governmental entity. The Client agrees that the Coinbase Entities may withhold or deduct Taxes as may be required by applicable law. From time to time, Coinbase Entities and the Client may request from the other tax documentation or certification of the Coinbase Entities' or Client's (as applicable) taxpayer status as required by applicable law, and any failure by the Coinbase Entities or Client (as applicable) to comply with this request in the time frame identified may result in withholding and/or remission of taxes to a tax authority as required by applicable law.

7

**10.    Prime Services Fees**

10.1    Client agrees to pay all commissions and fees in connection with the Orders and Prime Services on a timely basis as set forth in the fee schedule agreed between the parties. If agreed by Client and Coinbase in writing, Client authorizes the Coinbase Entities to pay themselves for fees and commissions relating to the Trading Account and Custodial Account by deducting fees from the Vault Balance or Trading Balance, as applicable, to satisfy Client's fees owed.

10.2    Client acknowledges that Coinbase's fees may include but are not limited to: (a) bank wire fees to deposit and/or withdraw Client Cash; (b) internal transfers from its Vault Balance to its Trading Balance; and (c) external withdrawals of Client Assets. Client further acknowledges that Coinbase Custody will charge fees for any balance of Digital Assets that Client keeps in the Vault Balance.

**11.    Confidentiality**

11.1    Client and Coinbase Entities each agree that with respect to any non-public, confidential or proprietary information of the other Party, including the existence and terms of this Coinbase Prime Agreement and information relating to the other party's business operations or business relationships (including the Coinbase Entities' fees), and any arbitration pursuant to Section 22 (collectively, "Confidential Information"), it (a) will not disclose such Confidential Information except to such party's officers, directors, agents, employees and professional advisors who need to know the Confidential Information for the purpose of assisting in the performance of this Coinbase Prime Agreement and who are informed of, and agree to be bound by obligations of confidentiality no less restrictive than those set forth herein and (b) will protect such Confidential Information from unauthorized use and disclosure. Each Party shall use any Confidential Information that it receives solely for purposes of (i) exercising its rights and performing its duties under the Coinbase Prime Agreement and (ii) complying with any applicable laws, rules and regulations; *provided* that, the Coinbase Entities may use Confidential Information for (1) risk management; and (2) to develop, enhance and market their products and services. Confidential Information shall not include any (w) information that is or becomes generally publicly available through no fault of the recipient; (x) information that the recipient obtains from a third party (other than in connection with this Coinbase Prime Agreement) that, to the recipient's best knowledge, is not bound by a confidentiality agreement prohibiting such disclosure; (y) information that is independently developed or acquired by the recipient without the use of Confidential Information provided by the disclosing party; or (z) disclosure with the prior written consent of the disclosing Party.

11.2    Notwithstanding the foregoing, each Party may disclose Confidential Information of the other Party to the extent required by a court of competent jurisdiction or governmental authority or otherwise required by law; *provided, however*, the Party making such required disclosure shall first notify the other Party (to the extent legally permissible) and shall afford the other Party a reasonable opportunity to seek confidential treatment if it wishes to do so and will consider in good faith reasonable and timely requests for redaction. For purposes of this Section 11, no Affiliate (as defined below) of Coinbase shall be considered

a third party of any Coinbase Entity, and the Coinbase Entities may freely share Client's Confidential Information among each other and with such affiliates. All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of the receiving Party shall be and remain the property of the disclosing Party and shall be promptly returned to the disclosing Party or destroyed, each upon the disclosing Party's request; *provided, however*, notwithstanding the foregoing, the receiving Party may retain one (1) copy of Confidential Information if (a) required by law or regulation; or (b) retained pursuant to an established document retention policy.

"Affiliate" means, with respect to any specified legal entity, any other legal entity that, directly or indirectly, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, such specified legal entity. As used in this definition, the concept of control refers to the beneficial ownership by one legal entity of the majority of the voting power of another legal entity.

## 12.    Market Data

Client agrees that its use of data made available to it through the Trading Platform's application programming interface(s), which may include the prices and quantities of orders and transactions executed on Trading Platform (collectively "Market Data"), is subject to the Market Data Terms of Use, as amended and updated from time to time at *https://www.coinbase.com/legal/market_data* or a successor website.

## 13.    Recording of Conversations

For compliance and monitoring purposes, Client authorizes each Coinbase Entity at its sole discretion to record conversations between such Coinbase Entity and Client or its Authorized Representatives relating to this Coinbase Prime Agreement, the Prime Account and the Prime Services;

## 14.    Security and Business Continuity

The Coinbase Entities have implemented and will maintain a reasonable information security program in accordance with security terms as disclosed to Client.

## 15.    Acknowledgement of Risks

Client hereby acknowledges, that: (i) Digital Assets are not legal tender, are not backed by any government, and are not subject to protections afforded by the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation; (ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and/or value of Digital Assets; (iii) transactions in Digital Assets are irreversible, and, accordingly, Digital Assets lost due to fraudulent or accidental transactions may not be recoverable; (iv) certain Digital Assets transactions will be deemed to be made when recorded on a public blockchain ledger, which is not necessarily the date or time that Client initiates the transaction or such transaction enters the pool; (v) the value of Digital Assets may be derived from the continued willingness of market participants to exchange any government issued currency

("<u>Fiat Currency</u>") for Digital Assets, which may result in the permanent and total loss of value of a Digital Asset should the market for that Digital Asset disappear; (vi) the volatility of the value of Digital Assets relative to Fiat Currency may result in significant losses; (vii) Digital Assets may be susceptible to an increased risk of fraud or cyber-attack; (viii) the nature of Digital Assets means that any technological difficulties experienced by a Coinbase Entity may prevent the access or use of Client Digital Assets; and (ix) any bond or trust account maintained by Coinbase Entities for the benefit of its customers may not be sufficient to cover all losses (including Losses) incurred by customers.

## 16.    Operation of Digital Asset Protocols

16.1    The Coinbase Entities do not own or control the underlying software protocols which govern the operation of Digital Assets. Generally, the underlying software protocols and, if applicable, related smart contracts (referred to collectively as "<u>Protocols</u>" for purposes of this Section 16) are open source and anyone can use, copy, modify or distribute them. By using the Prime Services, Client acknowledges and agrees that (i) the Coinbase Entities make no guarantee of the functionality, security, or availability of underlying Protocols; (ii) some underlying Protocols are subject to consensus-based proof of stake validation methods which may allow, by virtue of their governance systems, changes to the associated blockchain or digital ledger ("<u>Governance Modifiable Blockchains</u>"), and that any Client transactions validated on such Governance Modifiable Blockchains may be affected accordingly; and (iii) the underlying Protocols are subject to sudden changes in operating rules (a/k/a "forks"), and that such forks may materially affect the value, function, and/or even the name of the Digital Assets. In the event of a fork, Client agrees that the Coinbase Entities may temporarily suspend Prime Services (with or without notice to Client) and that the Coinbase Entities may, in their sole discretion, determine whether or not to support (or cease supporting) either branch of the forked protocol entirely. In the event that Coinbase decides not to support (or ceases supporting) either branch of a forked protocol, Coinbase will use reasonable efforts to notify Client in advance wherever reasonably practicable to do so. Client agrees that the Coinbase Entities shall have no liability, obligation or responsibility whatsoever arising out of or relating to the operation of Protocols, transactions affected by Governance Modifiable Blockchains, or an unsupported branch of a forked protocol and, accordingly, Client acknowledges and assumes the risk of the same. The Coinbase Entities shall use commercially reasonable efforts to timely select at least one of the forked protocol branches to support and will identify such selection in a notice reasonably in advance of such fork (to the extent practicable) to provide Client the opportunity to arrange for the transfer of the relevant Digital Assets, which the Coinbase Entities shall use commercially reasonable efforts to accomplish in advance of such fork. With respect to a forked protocol branch that the Coinbase Entities choose not to support, upon Client's request, the Coinbase Entities will use commercially reasonable efforts to deliver the relevant Digital Assets from such forked protocol branch to Client, including any credentials, keys, or other information sufficient to gain control over such Digital Assets through other means within a commercially reasonable period of time.

16.2    Unless specifically communicated by the Coinbase Entities through a written public statement on the Coinbase website, the Coinbase Entities do not support airdrops, metacoins, colored coins, side chains, or other derivative, enhanced or forked protocols,

tokens or coins, which supplement or interact with a Digital Asset (collectively, "Advanced Protocols") in connection with the Prime Services. The Prime Services are not configured to detect, process and/or secure Advanced Protocol transactions and neither Client nor the Coinbase Entities will be able to retrieve any unsupported Advanced Protocol. Coinbase shall have no liability, obligation or responsibility whatsoever in respect to Advanced Protocols.

## 17.    Set-off

Upon the occurrence of a default or an event of default under, an agreement with a Coinbase Entity (including an "Event of Default" as such term is defined in the PTC Agreement (in each case, at maturity, upon acceleration or otherwise)) or the occurrence of an event that constitutes "Cause" (as defined below) (each, a "Setoff Event"), each Coinbase Entity may set off and net the amounts due from it or any of its affiliates to Client and from Client to it or any other Coinbase Entity, so that a single payment (the "Net Payment") shall be immediately due and payable by the Client or the Coinbase Entity to the other (subject to the other provisions hereof and of any agreement with a Coinbase Entity). If any amounts cannot be included within the Net Payment, such amounts shall be excluded but may still be netted against any other similarly excluded amounts. Upon the occurrence of a Setoff Event, each Coinbase Entity may also set off and net any Net Payment or any other obligation owed to the Client by any Coinbase Entity against (i) any or all collateral or margin posted by any Coinbase Entity to Client (or the U.S. dollar value thereof, determined by Coinbase in its sole discretion on the basis of a recent price at which the relevant Digital Asset was sold to customers on the Trading Platform); and (ii) any Net Payment, unpaid trade credits or any other obligation owed by Client to any Coinbase Entity (in each case, whether matured or unmatured, fixed or contingent, or liquidated or unliquidated). Client agrees that in the exercise of setoff rights or secured party remedies, the Coinbase Entities may value Client Digital Assets using the same valuation methods and processes that are otherwise used when a Coinbase customer sells an asset on the Trading Platform (as such term is defined in the MTA) or any other commercially reasonable valuation method as determined by Coinbase in its sole discretion. For the avoidance of doubt and notwithstanding anything to the contrary, the Coinbase Entities shall not be permitted to set off against, liquidate or apply any assets or amounts in Client's Vault Balance.

## 18.    Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE PRIME SERVICES AND THE COINBASE WEBSITE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND, AND THE COINBASE ENTITIES HEREBY SPECIFICALLY DISCLAIM ALL WARRANTIES WITH RESPECT TO THE PRIME SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES AND/OR CONDITIONS OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. THE COINBASE ENTITIES DO NOT WARRANT THAT THE PRIME SERVICES, INCLUDING ACCESS TO AND USE OF THE COINBASE WEBSITES, OR ANY OF THE CONTENT CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, COMPATIBLE WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, SECURE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE.

## 19.    Indemnification

19.1    Client shall defend and indemnify and hold harmless each Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to Client's breach of this Coinbase Prime Agreement, Client's violation of any law, rule or regulation, or rights of any third party, or Client's gross negligence, fraud or willful misconduct, unless such Claims or Losses arise out of or relate to Coinbase's gross negligence, fraud, willful misconduct. This obligation will survive any termination of this Coinbase Prime Agreement.

19.2    Coinbase shall defend and indemnify and hold harmless Client, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to any (i) violation, misappropriation, or infringement upon any United States patent, copyright, trademark, trade secret or other intellectual property right of a third party or (ii) violation of applicable law, rule or regulation, or rights of any third party, or Coinbase's gross negligence, fraud or willful misconduct unless such Claims or Losses arise out of or relate to Client's gross negligence, fraud, willful misconduct, or breach of this Coinbase Prime Agreement. This obligation will survive any termination of this Coinbase Prime Agreement.

Each Party's (the "Indemnitor") indemnification obligation under Section 18 of this Coinbase Prime Agreement shall apply only if the other Party (the "Indemnitee") does the following: (a) notifies the Indemnitor promptly in writing, not later than thirty (30) days after the Indemnitee receives notice of the Claim (or sooner if required by applicable law); (b) gives the Indemnitor sole control of the defense and any settlement negotiations (subject to the below); and (c) gives the Indemnitor the information, authority, and assistance such Indemnitor needs to defend against or settle the Claim.

No Party providing indemnification pursuant to this Section 19 shall accept any settlement of any Claims or Losses if such settlement imposes any financial or non-financial liabilities, obligations, or restrictions on, or requires an admission of guilt or wrong-doing from, any party indemnified pursuant to this Section 19, without such party's prior written consent.

19.3    For the purposes of this Coinbase Prime Agreement:

(a)    "Claim" means any action, suit, litigation, demand, charge, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental, regulatory or administrative body or any arbitrator or arbitration panel; and

(b)    "Losses" means any liabilities, damages, diminution in value, payments, obligations, losses, interest, costs and expenses, security or other remediation costs (including any regulatory investigation or third party subpoena costs, reasonable

12

attorneys' fees, court costs, expert witness fees, and other expenses relating to investigating or defending any Claim); fines, taxes, fees, restitution, or penalties imposed by any governmental, regulatory or administrative body, interest on and additions to tax with respect to, or resulting from, Taxes imposed on Client's assets, cash, other property, or any income or gains derived therefrom; and judgments (at law or in equity) or awards of any nature.

## 20.    Limitation of Liability

The Coinbase Prime Agreement shall be subject to a limitation of liability as agreed between the Parties.

## 21.    Privacy

Except as set forth herein, the Coinbase Entities shall use and disclose Client's and its Authorized Representatives' non-public personal information in accordance with the Coinbase Privacy Policy, as set forth at *https://www.coinbase.com/legal/privacy* or a successor website, and as amended and updated from time to time.

## 22.    Arbitration

22.1    Subject to the jurisdiction of the Bankruptcy Court, any Claim arising out of or relating to this Coinbase Prime Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including any determination of the scope or applicability of the agreement to arbitrate as set forth in this Section 22, shall be determined by arbitration in the state of New York or another mutually agreeable location, before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the award of the arbitrator (the "Award") shall be accompanied by a reasoned opinion. Judgment on the Award may be entered in any court having jurisdiction. This Coinbase Prime Agreement shall not preclude the Parties from seeking provisional relief, including injunctive relief, in any court of competent jurisdiction. Seeking any such provisional relief shall not be deemed to be a waiver of such party's right to compel arbitration. The Parties expressly waive their right to a jury trial to the extent permitted by applicable law.

22.2    In any arbitration arising out of or related to this Coinbase Prime Agreement, the arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees.

22.3    The Parties acknowledge that this Coinbase Prime Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision herein with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Coinbase Prime Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).

23.    **Term, Termination and Suspension**

This Coinbase Prime Agreement is effective as of the entry of the Confirmation Order and shall remain in effect until terminated by Coinbase or Client as follows:

(a)    Either Party may terminate this Coinbase Prime Agreement in its entirety for any reason and without Cause by providing at least 90 days' prior written notice to the other party; *provided, however*, Client's termination of this Coinbase Prime Agreement shall not be effective until Client has fully satisfied its obligations hereunder. Notwithstanding the foregoing, the Coinbase Entities acknowledge that the Custodial Services are critical to the Client and shall use its reasonable efforts to continue to offer such Custodial Services to the Client for a least one-hundred and eighty (180) days following any termination of this Coinbase Prime Agreement at a rate that is twice the rate applicable during the term.

(b)    Regardless of any other provision of this Coinbase Prime Agreement, the Coinbase Entities may, in their sole discretion, suspend, restrict or terminate the Client's Prime Services, including by suspending, restricting or closing the Client's Prime Account and/or any associated Trading Account, Custodial Account or any credit account (as applicable), for Cause, at any time and without prior notice to the Client.

"Cause" shall mean: (i) Client materially breaches any provision of this Coinbase Prime Agreement and fails to cure such breach within ten (10) days following notice by the Coinbase Entities to the Client of the occurrence of such breach; (ii) the Bankruptcy Court enters an order, or Client or any of its debtor-affiliates in the Chapter 11 Cases (each, a "Debtor" and collectively, the "Debtors") files or supports an application, motion, or request for an order,    that has the effect of amending, vacating, reversing, supplementing, or modifying the  this Coinbase Prime Agreement or the provisions of the Confirmation Order concerning this Coinbase Prime Agreement (the "**Approval Provisions**") in a manner that a Coinbase Entity determines in its reasonable discretion is materially adverse to a Coinbase Entity; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; (iv) after its entry, the Approval Provisions ceases to be in full force and effect; (v) termination is required pursuant to a facially valid subpoena, court order or binding order of a government authority; (vi) Client's Prime Account is subject to any pending litigation, investigation or government proceeding and/or Coinbase reasonably perceives a materially heightened risk of legal regulatory non-compliance by the Coinbase Entities associated with Client's use of Prime Services; or (vii) Coinbase acting in a commercially reasonable manner suspects Client of attempting to circumvent Coinbase's controls or uses the Prime Services in a manner Coinbase otherwise deems inappropriate or potentially harmful to itself or third parties.

In the event that the Bankruptcy Court does not enter a Confirmation Order containing the Approval Provisions by December 31, 2023 in form and substance reasonably satisfactory to Coinbase, this Coinbase Prime Agreement shall be null and void without any further action by either party.

(c)    Client acknowledges that the Coinbase Entities' decision to take certain actions, including suspending, restricting or terminating Client's Prime Account or Prime

14

Services, may be based on confidential criteria that are essential to Coinbase's risk management and security practices and agrees that the Coinbase Entities are under no obligation to disclose the details of its risk management and security practices to Client.

## 24.    Severability

If any provision or condition of this Coinbase Prime Agreement shall be held invalid or unenforceable, the remainder of this Coinbase Prime Agreement shall continue in full force and effect.

## 25.    Waiver

Any waivers of rights by the Parties under this Coinbase Prime Agreement must be in writing and signed by such Party or Parties. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other similar circumstances. A Party's failure to insist on strict compliance with this Coinbase Prime Agreement or any other course of conduct by such Party shall not be considered a waiver of their rights under this Coinbase Prime Agreement.

## 26.    Survival

All provisions of this Coinbase Prime Agreement which by their nature extend beyond the expiration or termination of this Coinbase Prime Agreement shall survive the termination or expiration of this Coinbase Prime Agreement.

## 27.    Governing Law

This Coinbase Prime Agreement, Client's Prime Account, and the Prime Services will be governed by and construed in accordance with the laws of the State of New York, excluding its conflicts of laws principles, except to the extent such state law is preempted by federal law.

## 28.    Force Majeure

The Coinbase Entities shall not be liable for delays, suspension of operations, whether temporary or permanent, failure in performance, or interruption of service which result directly or indirectly from any cause or condition beyond the reasonable control of the Coinbase Entities, including any act of God; embargo; natural disaster; act of civil or military authorities; act of terrorists; terrorist related hacking, government restrictions; any ruling by any Connected Trading Venue, exchange or market; market volatility or disruptions in order trading on any Connected Trading Venue, exchange or market; suspension of trading; civil disturbance; war; strike or other labor dispute; fire; severe weather; interruption in telecommunications, Internet services, or network provider services; failure of equipment and/or software; failure of computer or other electronic or mechanical equipment or communication lines; outbreaks of infectious disease (other than COVID-19) or any other public health crises, including quarantine or other employee restrictions; acts or omissions of any Connected Trading Venue; or any other catastrophe or other occurrence which is beyond the reasonable control of the Coinbase Entities (each, a "Force Majeure Event"); *provided, however,* that this Section 28 shall only apply for so long as such delay or prevention is

15

occurring; *provided further*, that should such delay or prevention remain ongoing for fifteen (15) days, Client may request withdrawal of the USD equivalent of any assets then held in a Digital Asset Wallet or Fiat Wallet so long as such delay or suspension does not affect the transfer or settlement of USD.

**29.    Entire Agreement; Headings**

This Coinbase Prime Agreement, together with all exhibits, addenda and supplements attached hereto or referenced herein, comprise the entire understanding between Client and the Coinbase Entities as to the Prime Services and supersedes all prior discussions, agreements and understandings, including any previous version of this Coinbase Prime Agreement, and the Custodial Services Agreement between Client and any Coinbase Entity, including all exhibits, addenda, policies, and supplements attached thereto or referenced therein. Section headings in this Coinbase Prime Agreement are for convenience only and shall not govern the meaning or interpretation of any provision of this Coinbase Prime Agreement.

**30.    Amendments**

Any modification or addition to this Coinbase Prime Agreement must be in writing and either (a) signed by a duly authorized representative of each party, or (b) accepted and agreed to by Client.

**31.    Assignment**

Any assignment of Client's rights and/or licenses granted under this Coinbase Prime Agreement without obtaining the prior written consent (not to be unreasonably withheld) of Coinbase shall be null and void. Coinbase reserves the right to assign its rights under this Coinbase Prime Agreement without restriction, including to any of the Coinbase Entities or their affiliates or subsidiaries, or to any successor in interest of any business associated with the Prime Services, such affiliate, subsidiary or successor, an ("Assignee"), *provided* that Coinbase shall notify Client within a reasonable amount of time prior to such assignment and that Client shall be entitled to terminate this Coinbase Prime Agreement with immediate effect following such assignment; *provided further*, that any such Assignee has the operational capacity and all necessary legal and/or regulatory approvals, licenses and permissions to provide the Prime Services to Client, and that the security measures utilized by such Assignee shall be equivalent to those employed by Coinbase.

**32.    Electronic Delivery of Communications**

Client agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that the Coinbase Entities provide in connection with Client's Prime Account and Client's use of Prime Services. Communications include: (a) terms of use and policies Client agrees to, including updates to policies or the Coinbase Prime Agreement, (b) Prime Account details, including transaction receipts, confirmations, records of deposits, withdrawals or transaction information, (c) legal, regulatory and tax disclosures or statements the Coinbase Entities may be required to make available to Client and (d) responses to claims or customer support inquiries filed in connection with Client's Prime Account.

Coinbase will provide these Communications to Client by posting them on the Prime Site, emailing them to Client at the primary email address on file with Coinbase, communicating to Client via instant chat, and/or through other means of electronic communication. The Client agrees that electronically delivered Communications may be accepted and agreed to by Client through the Prime Services interface. Furthermore, the Parties consent to the use of electronic signatures in connection with Client's use of the Prime Services.

## 33.    Notice and Contacts

33.1    All notices required or permitted to be given hereunder shall be in writing delivered to the Party at its address specified below via an overnight mailing company of national reputation. Any Party that changes its notice address must notify the other Party promptly of such change.

If to any Coinbase Entity:

> Legal Department Coinbase, Inc.
> 248 3rd St, #434
> Oakland, CA 94607
> legal@coinbase.com

If to Client, the address specified in its signature block on the Execution Page.

33.2    In the event of any market operations, connectivity, or erroneous trade issues that require immediate attention including any unauthorized access to Client's Prime Account, please contact:

To Coinbase: support@coinbase.com.

To Client: the email address specified in its signature block on the Execution Page.

It is solely Client's responsibility to provide Coinbase with a true, accurate and complete contact information including any e-mail address, and to keep such information up to date. Client understands and agrees that if Coinbase sends Client an electronic Communication but Client does not receive it because Client's primary email address on file is incorrect, out of date, blocked by Client's service provider, or Client is otherwise unable to receive electronic Communications, Coinbase will be deemed to have provided the Communication to Client. Client may update Client's information via Client's Prime Account and visiting settings or by providing a notice to Coinbase as prescribed above.

33.3    To see more information about our regulators, licenses, and contact information for feedback, questions or complaints, please visit *https://www.coinbase.com/legal/licenses*.

## 34.    Client

To the extent Client is a natural person over 18 years of age, if Coinbase receives legal documentation confirming Client's death or other information leading Coinbase to believe Client is deceased, Coinbase will freeze Client's Prime Account ("Freeze Period"). During the Freeze

Period, no transactions may be completed until: (i) Client's designated fiduciary has opened a new Prime Account, as further described below, and the entirety of Client's Prime Account has been transferred to such new Prime Account, or (ii) Client has received proof in a form satisfactory to Coinbase that Client is not deceased. If Coinbase has reason to believe Client is deceased but Coinbase does not have proof of Client's death in a form satisfactory to Coinbase, Client authorizes Coinbase to make inquiries, whether directly or through third parties, that Coinbase considers necessary to ascertain whether Client is deceased. Upon receipt by Coinbase of proof satisfactory to Coinbase that Client is deceased, the fiduciary Client designated in a valid will or similar testamentary document will be required to open a new Prime Account. If Client has not designated a fiduciary, then Coinbase reserves the right to (i) treat as Client's fiduciary any person entitled to inherit Client's Prime Account, as determined by Coinbase upon receipt and review of the documentation Coinbase, in its sole and absolute discretion, deems necessary or appropriate, including (but not limited to) a will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over Client's estate. In the event Coinbase determines, in its sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, Coinbase reserves the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to Client's Prime Account. Pursuant to the above, the opening of a new Prime Account by a designated fiduciary is mandatory following the death of Client, and Client hereby agrees that its fiduciary shall be required to open a new Prime Account and provide required account opening information to gain access to the contents of Client's Prime Account.

## 35.   Counterparts

This Coinbase Prime Agreement may be executed in one or more counterparts, including by facsimile or email of .pdf signatures or DocuSign (or similar electronic signature software), each of which shall be deemed to be an original document, but all such separate counterparts shall constitute only one and the same Coinbase Prime Agreement.

*[Signatures on following page]*

**IN WITNESS WHEREOF**, the Parties, including, subject to the Confirmation Order, Celsius Networks Lending LLC, have caused this Coinbase Prime Agreement, including the Custody Agreement and MTA and the Distribution Addendum, to be duly executed and delivered as of the date below.

**COINBASE, INC. For itself and as agent for the Coinbase Entities**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**CELSIUS NETWORK LLC:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

**CELSIUS NETWORK LTD:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:**_____

**CELSIUS LENDING LLC:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

**CELSIUS NETWORKS LENDING LLC:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

**CELSIUS EU UAB:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

*[Signature Page to Coinbase - Prime Agreement]*

**EXHIBIT A**
**to the Coinbase Prime Agreement**

**COINBASE CUSTODY CUSTODIAL SERVICES AGREEMENT**

This Custody Agreement is entered into between Client and Coinbase Custody and forms a part of the Coinbase Prime Agreement between the Client and the Coinbase Entities. Capitalized terms used in this Custody Agreement that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Agreement.

**1.    Custodial Services.**

Coinbase Custody shall provide Client with a segregated custody account controlled and secured by Coinbase Custody ("Custodial Account") to store certain Digital Assets supported by Coinbase Custody, on Client's behalf ("Custodial Services"). Coinbase Custody is a fiduciary under § 100 of the New York Banking Law and a qualified custodian for purposes of Rule 206(4)-2(d)(6) under the Investment Advisers Act of 1940, as amended, and is licensed to custody Client's Digital Assets in trust on Client's behalf. Digital Assets in Client's Custodial Account shall (i) be segregated from the assets held by Coinbase Custody as principal and the assets of other customers of Coinbase Custody, (ii) not be treated as general assets of Coinbase Custody, and except as otherwise provided herein, Coinbase Custody shall have no right, title or interest in such Digital Assets, (iii) constitute custodial assets and Client's property. In addition, Coinbase Custody shall maintain adequate capital and reserves to the extent required by applicable law and shall not, directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Digital Assets in the Custodial Account.

**2.    Custodial Account.**

2.1    *In General.* The Custodial Services shall permit the Client (i) to hold its Vault Balance in its Custodial Account and transfer Digital Assets to and from its Trading Balance, (ii) to deposit supported Digital Assets from a public blockchain address controlled by Client into its Custodial Account, (iii) withdraw supported Digital Assets from its Custodial Account to a public blockchain address controlled by Client and (iv) certain additional services as may be agreed to between the Client and Coinbase Custody from time to time. Each such deposit or withdrawal shall be referred to as a "Custody Transaction" and shall conform to Instructions provided by Client through the Coinbase Prime Site. Client shall only withdraw or deposit Digital Assets to public blockchain addresses and accounts owned by Client or an address for which Client has conducted the necessary Know Your Customer ("KYC") and anti-money laundering ("AML") due diligence. Digital Assets shall be held in Client's Custodial Account in accordance with the terms of this Custody Agreement and shall not be commingled with other clients' Digital Assets. **Coinbase Custody reserves the right to refuse to process or to cancel any pending Custody Transaction to comply with applicable law or in response to a subpoena, court order or other binding government order, or to enforce transaction, threshold and condition limits, or if Coinbase Custody reasonably believes that the Custody Transaction may violate or facilitate the violation of an applicable law, regulation or rule of a governmental authority or self-regulatory organization.**

2.2   *Digital Asset Deposits and Withdrawals.* Coinbase Custody will process supported Digital Asset Custody Transaction according to the Instruction received from Client or Client's Authorized Representatives, and Coinbase Custody does not guarantee the identity of any user, receiver, requestee or other party. Client must verify all deposit and withdrawal information prior to submitting Instructions to Coinbase Custody regarding a Custody Transaction. Coinbase Custody shall have no liability, obligation, or responsibility whatsoever for Client Digital Asset transfers sent or received pursuant to inaccurate Instructions or received from a wrong party. Coinbase Custody reserves the right to charge network fees (including miner fees) to process a Custody Transaction on Client's behalf. Coinbase Custody will calculate the network fee, if any, in its sole and absolute discretion, although Coinbase Custody will always notify Client of the network fee at or before the time Client authorizes the Custody Transaction. Coinbase Custody reserves the right to delay any Custody Transaction if it perceives a risk of fraud or illegal activity.

2.3   *Digital Asset Storage and Transmission Delays.* Coinbase Custody requires up to twenty-four (24) hours between any request to withdraw Digital Assets from Client's Custodial Account and submission of Client's withdrawal to the applicable Digital Asset network. Since Coinbase Custody securely stores all Digital Asset private keys in offline storage, it may be necessary to retrieve certain information from offline storage in order to facilitate a withdrawal in accordance with Client's Instructions, which may delay the initiation or crediting of such withdrawal. Client acknowledges and agrees that a Custody Transaction may be delayed, and that Digital Assets shall not be deposited or withdrawn upon less than twenty-four (24) hours' notice initiated from Client's Custodial Account. The time of such request shall be the time such notice is transmitted from Client's Custodial Account. Except as specified, Coinbase Custody makes no representations or warranties with respect to the availability and/or accessibility of (1) the Digital Assets, (2) a Custody Transaction, (3) the Custodial Account, or (4) the Custodial Services. Except as specified, while Coinbase Custody will make reasonable efforts to process Client initiated deposits in a timely manner, Coinbase Custody makes no representations or warranties regarding the amount of time needed to complete processing as such processing is dependent upon many factors outside of Coinbase Custody's control.

2.4   *Supported Digital Assets.* The Custodial Services are available only in connection with those Digital Assets that Coinbase Custody, in its sole discretion, decides to support, which may change from time to time. Prior to initiating a deposit of Digital Asset to Coinbase Custody, Client must confirm that Coinbase Custody offers Custodial Services for that specific Digital Asset. By initiating a deposit of any Digital Asset to a Custodial Account, Client attests that Client has confirmed that the Digital Asset being transferred is a supported Digital Asset offered by Coinbase Custody. Under no circumstances should Client attempt to use the Custodial Services to deposit or store Digital Assets in any forms that are not supported by Coinbase Custody. Depositing or attempting to deposit Digital Assets that are not supported by Coinbase Custody may result in such Digital Asset being irretrievable by Client and Coinbase Custody. Client shall be fully responsible and liable, and Coinbase Custody shall have no liability, obligation, or responsibility whatsoever, regarding any unsupported Digital Asset sent or attempted to be sent to it, or regarding any attempt to use the Custodial Services for Digital Assets that Coinbase Custody does not support. Digital Assets supported by Coinbase Custody shall be listed on the Coinbase

22

Prime Site. Coinbase Custody recommends that Client deposit a small amount of supported Digital Asset as a test prior to initiating a deposit of a significant amount of supported Digital Asset. Coinbase Custody shall provide Client with thirty (30) days' written notice before ceasing to support a Digital Asset, unless Coinbase Custody is required to cease such support by court order, statute, law, rule (including a self-regulatory organization rule), regulation, code, or other similar requirement.

2.5    *Use of the Custodial Services.* Client acknowledges and agrees that Coinbase Custody may monitor use of the Custodial Account and the Custodial Services and the resulting information may be utilized, reviewed, retained and or disclosed by Coinbase Custody for its internal purposes or in accordance with the rules of any applicable legal, regulatory or self-regulatory organization or as otherwise may be required to comply with relevant law, sanctions programs, legal process or government request.

2.6    *Independent Verification.* If Client is subject to Rule 206(4)-2 under the Investment Advisers Act of 1940, Coinbase Custody shall, upon written request, provide Client's authorized independent public accountant confirmation of or access to information sufficient to confirm (i) Client's Digital Assets as of the date of an examination conducted pursuant to Rule 206(4)-2(a)(4), and (ii) Client's Digital Assets are held either in a separate account under Client's name or in accounts under Client's name as agent or trustee for Client's clients.

2.7    *Third Party Payments.* The Custodial Services are not intended to facilitate third party payments of any kind. As such, Coinbase Custody has no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that Client may purchase or sell to or from a third party (including other users of Custodial Services) involving Digital Assets that Client intends to store, or have stored, in Client's Custodial Account.

2.8    *Termination, and Cancellation.* If Coinbase Custody closes Client's Custodial Account or terminates Client's use of the Custodial Services, Client will be permitted to withdraw Digital Assets associated with Client's Custodial Account for a period of up to ninety (90) days following the date of deactivation or cancellation to the extent not prohibited (i) under applicable law, including applicable sanctions programs, or (ii) by a facially valid subpoena, court order, or binding order of a government authority.

**3.    Coinbase Custody Obligations**

3.1    *Bookkeeping.* Coinbase Custody shall keep timely and accurate records as to the deposit, disbursement, investment and reinvestment of the Digital Assets, as required by applicable law and in accordance with Coinbase Custody's internal document retention policies.

3.2    *Insurance.* Coinbase Custody shall obtain and maintain, at its sole expense, insurance coverage in such types and amounts as shall be commercially reasonable for the Custodial Services provided hereunder. Upon Client's written request and in accordance with Coinbase Custody policies, procedures, any confidentiality obligation and any applicable

23

law, Coinbase Custody might provide the Client reasonable evidence detailing the nature and amount of such insurance coverage.

**4.**     **Additional Matters**

In addition to any additional service providers that may be described in an addendum or attachment hereto, Client acknowledges and agrees that the Custodial Services may be provided from time to time by, through or with the assistance of affiliates of, or vendors to, Coinbase Custody. Client shall receive notice of any material change in the entities that provide the Custodial Services.

*[Remainder of page intentionally left blank]*

**EXHIBIT B**
**to the Coinbase Prime Agreement**

## <u>COINBASE MASTER TRADING AGREEMENT</u>

Client should carefully consider whether trading or holding Digital Assets is suitable for its purpose, including in relation to Client's knowledge of Digital Assets and Digital Asset markets and Client's financial condition. All investments involve risk, and the past performance of a financial product does not guarantee future results or returns.

This Master Trading Agreement ("<u>MTA</u>") sets forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform ("<u>Trading Platform</u>") and forms a part of the Coinbase Prime Agreement between Client and the Coinbase Entities. Pursuant to this MTA, Coinbase shall open a Trading Account for the Client on the Trading Platform consisting of linked accounts at Coinbase and Coinbase Custody, each accessible via the Trading Platform ("<u>Trading Account</u>"). The Trading Platform shall provide Client with access to trade execution and automated trade routing services and Coinbase Execution Services (as defined below) to enable Clients to submit orders ("<u>Orders</u>") to purchase and sell specified Digital Assets in accordance with this MTA and the Coinbase Trading Rules set forth at *https://www.coinbase.com/legal/trading_rules* or a successor website (as amended and updated from time to time, the "<u>Coinbase Trading Rules</u>") (such services, the "<u>Trading Services</u>"). Capitalized terms used in this MTA that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime Agreement.

**1.      Order Routing and Connected Trading Venue**

1.1     The Trading Platform operates a trade execution service through which Client may submit Orders to purchase or sell Digital Assets. After Client submits an Order, the Trading Platform will automatically route the Order (or a portion of the Order) to one of the trading venues to which the Trading Platform has established connections (each such venue, a "<u>Connected Trading Venue</u>"). Each Order will be sent, processed and settled at each Connected Trading Venue to which it is routed. Once an Order to purchase Digital Assets has been placed, the associated Client Assets (as defined below) used to fund the Order will be placed on hold and will generally not be eligible for other use or withdrawal.

1.2     With each Connected Trading Venue, Coinbase shall establish an account in its name, or in its name for the benefit of clients, to trade on behalf of its clients, and the establishment of a Trading Account will not cause Client to have a direct legal relationship, or account with, any Connected Trading Venue. The Trading Platform will not intentionally match the buy and sell orders of its clients against each other and will not intentionally settle Orders against or otherwise trade with Coinbase's principal funds. Client acknowledges that Coinbase and its other clients may trade in their own interests on the Connected Trading Venues and could, therefore, be the counterparty to a Client Order on a Connected Trading Venue.

1.3     Client acknowledges that Coinbase has sole discretion to determine the Connected Trading Venues with which it will establish connections. Coinbase will direct Orders to the

Connected Trading Venues on an automated basis and generally will not manually route orders. In designing algorithms that determine an Order's routing logic, Coinbase considers a variety of factors relating to the Order and the Connected Trading Venues, including the speed of execution, whether the venue is able to consummate off-chain transactions, the availability of efficient and reliable systems, the level of service provided, and the cost of executing orders. Coinbase may receive cash payments or other financial incentives (such as reciprocal business arrangements) from Connected Trading Venues.

1.4     Coinbase makes no representation or warranty of any kind regarding any Connected Trading Venue, including as to its financial condition, data, security or quality of its execution services, and shall have no liability, obligation, or responsibility whatsoever for the selection or performance of any Connected Trading Venue. Digital Assets may trade at different prices on different trading venues, and other Connected Trading Venues and/or trading venues not used by Coinbase may offer better prices and/or lower costs than the Connected Trading Venue used to execute Client's Order.

1.5     Coinbase acts in an agency capacity for purposes of certain Orders, and may also act in a principal capacity for certain other Orders, as specified in the Coinbase Trading Rules. In the Request For Quotation ("RFQ") service, Coinbase may act as principal to fill Orders by providing indicative firm pricing in accordance with a variety of market factors, at its sole discretion. Each Client should independently evaluate whether such services are appropriate given its own investing profile and sophistication, among other considerations.

## 2.     Client Trading Balance and Vault Balance

2.1     For purposes of this MTA, Client's Digital Assets are referred to as "Client Digital Assets," Client's cash is referred to as "Client Cash," and Client Digital Assets and Client Cash are together referred to as "Client Assets."

2.2     Within the Trading Platform, Coinbase provides access to two types of accounts with balances relating to Client Assets: (1) the "Trading Balance" (as described below in Section 2.3) and (2) the "Vault Balance" (as described below in Section 2.5). The Trading Account provides a record of both the Trading Balance and the Vault Balance. Client determines the allocation of its Client Digital Assets between the Trading Balance and the Vault Balance. Maintenance of the Vault Balance shall be subject to the terms of the Custody Agreement; *provided, however*, Client's Trading Balance is separate from any Digital Assets Client maintains directly with Coinbase Custody.

2.3     Client Digital Assets credited to the Trading Balance are immediately available to Client for purposes of submitting an Order. Coinbase holds Digital Assets credited to the Trading Balance in one of three ways: (i) in omnibus hot wallets (each, an "Omnibus Hot Wallet"); (ii) in omnibus cold wallets (each, an "Omnibus Cold Wallet"); and (iii) in Coinbase's accounts with the Connected Trading Venues ("Coinbase Connected Trading Venue Digital Asset Balance"). Client agrees that Coinbase has sole discretion in determining the allocation of Digital Assets credited to the Trading Balance. Because Digital Assets credited to the Trading Balance are held on an omnibus basis and because of the nature of certain Digital Assets, Client does not have an identifiable claim to any particular Digital

Asset. Instead, Client's Trading Balance represents an entitlement to a *pro rata* share of the Digital Assets Coinbase has allocated to the Omnibus Hot Wallets, Omnibus Cold Wallets and Coinbase Connected Trading Venue Digital Asset Balance. Coinbase relies on the Connected Trading Venues for the Coinbase Connected Trading Venue Digital Asset Balance, and Client has no contractual relationship with the Connected Trading Venues with respect to Digital Assets credited to the Trading Balance.

2.4    Client may maintain Client Cash in the Trading Balance but not in the Vault Balance. Coinbase holds Client Cash credited to the Trading Balance in one of two ways: (i) in one or more omnibus accounts in Coinbase's name for the benefit of customers at one or more U.S. insured depository institutions (each, an "FBO account") and (ii) in Coinbase's omnibus accounts at Connected Trading Venues. Coinbase will title the FBO accounts it maintains with U.S. depository institutions and maintain records of Client's interest in a manner designed to enable receipt of Federal Deposit Insurance Corporation ("FDIC") deposit insurance, where applicable and up to the deposit insurance limits applicable under FDIC regulations and guidance, on Client Cash for the Client's benefit on a pass-through basis. Coinbase does not guarantee that pass-through FDIC deposit insurance will apply to Client Cash, since such insurance is dependent in part on compliance of the depository institutions. Coinbase may also title its accounts at some or all Connected Trading Venues and maintain records of Client interests in those accounts in a manner consistent with FDIC requirements for pass-through deposit insurance, but availability of pass-through deposit insurance, up to the deposit insurance limits applicable under FDIC regulations and guidance, is also dependent on the actions of the Connected Trading Venues and any depository institutions they use, which may not be structured to provide pass-through deposit insurance. FDIC insurance applies to cash deposits at banks and other insured depository institutions in the event of a failure of that institution, and does not apply to any Coinbase Entity or to any Digital Asset held by a Coinbase Entity on Client's behalf. Client Cash is immediately available to Client for purposes of submitting an Order, unless a restriction applies.

2.5    At Client's election, all or a portion of Client Digital Assets may also be allocated to the Vault Balance which is held in a Custodial Account in Client's name at Coinbase Custody pursuant to the Custody Agreement. Such Vault Balance will be divided between segregated hot storage in Client's name ("Hot Vault Balance") and segregated cold storage in Client's name ("Cold Vault Balance"). Client shall have sole discretion to allocate Digital Assets between the Hot Vault Balance and Cold Vault Balance. Digital Assets in the Hot Vault Balance may be transferred immediately to Client's Trading Balance unless a restriction applies. A transfer of Digital Assets in the Cold Vault Balance to Client's Trading Balance will be subject to Coinbase Custody's standard cold storage withdrawal procedures. Client hereby appoints Coinbase as Client's agent for purposes of instructing Coinbase Custody to transfer Client Digital Assets between Client's Vault Balance and Client's Trading Balance. Client agrees that an Instruction to Coinbase to settle an Order to or from Client's Vault Balance constitutes authorization to Coinbase to transfer Client Digital Assets to or from Client's Vault Balance as necessary or appropriate to consummate such settlement.

2.6    In all circumstances and consistent with laws and regulations applicable to Coinbase, Coinbase will keep an internal ledger that specifies the Client Assets credited to Client's Trading Balance and enables Coinbase and its auditors and regulators to identify Client and the Client Assets.

2.7    Coinbase treats all Client Assets as custodial assets held for the benefit of Client. No Client Assets credited to the Trading Balance shall be considered to be the property of, or loaned to, Coinbase, except as provided in any loan agreement between Client and any Coinbase Entity. Neither Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity.

**3.    Role of Coinbase Custody**

3.1    To facilitate the Trading Services, Coinbase may at its sole discretion maintain portions of the Omnibus Hot Wallet and the Omnibus Cold Wallet in one or more custodial FBO accounts with its affiliate, Coinbase Custody. In such circumstances, although the Omnibus Hot Wallet and the Omnibus Cold Wallet are held in Coinbase's FBO accounts with Coinbase Custody, Client's legal relationship for purposes of Digital Assets held in the Omnibus Hot Wallet and the Omnibus Cold Wallet will not be, directly or indirectly, with Coinbase Custody and the terms, conditions and agreements relating to those wallets are to be governed by this MTA.

3.2    Client Digital Assets held in the Hot Vault Balance and Cold Vault Balance are maintained directly between Client and Coinbase Custody in Client's name and are subject to the terms of the Client's Custody Agreement.

**4.    Cash and Digital Asset Deposits and Withdrawals**

4.1    To deposit Client Cash, Client must initiate a transfer from a linked bank account, a wire transfer, a SWIFT transfer, a Silvergate Exchange Network deposit or other form of electronic payment approved by Coinbase from time to time to Coinbase's bank account, the instructions for which are available on the Coinbase Prime Site. Coinbase will credit the Trading Balance with Client Cash once the associated cash is delivered to Coinbase.

4.2    To withdraw Client Cash, Client may also initiate a withdrawal of Client Cash from the Trading Balance at any time using the withdrawal function on the Trading Platform.

4.3    To deposit Client Digital Assets, Clients may transfer Client Digital Assets directly to the Omnibus Hot Wallet or Omnibus Cold Wallet, the instructions for which are available on the Coinbase Prime Site. Client may transfer funds to and among its Hot Vault Balance or Cold Vault Balance. When Client transfers Digital Assets to Coinbase or Coinbase Custody, it delivers custody and control of the Digital Assets to Coinbase, Coinbase Custody or Coinbase's designee, as applicable. Client represents and warrants that any Digital Asset so transferred shall be free and clear of all liens, claims and encumbrances.

4.4    To withdraw Client Digital Assets, Client must provide applicable Instructions via the Coinbase Prime Site ("Withdrawal Transfer"). Once Client has initiated a Withdrawal

Transfer, the associated Client Digital Assets will be in a pending state and will not be included in the Client's Trading Balance or Vault Balance. Client acknowledges that Coinbase may not be able to reverse a Withdrawal Transfer once initiated. Client may withdraw Client Digital Assets at any time, subject to delays for Digital Assets held in Cold Vault Balance, and any applicable account restrictions.

4.5     Client must verify all transaction information prior to submitting withdrawal Instructions to Coinbase, as Coinbase cannot and does not guarantee the identity of the wallet owner or bank account to which Client is sending Client Digital Assets or Client Cash, as applicable. Coinbase shall have no liability, obligation, or responsibility whatsoever for Client Cash or Client Digital Asset transfers sent to or received from an incorrect party or sent or received via inaccurate Instructions.

## 5.    Disruption to Trading Platform

5.1     Client acknowledges that electronic facilities and systems such as the Trading Platform are vulnerable to disruption, delay or failure and, consequently, such facilities and systems may be unavailable to Client as a result of foreseeable and unforeseeable events. Client understands and agrees that Coinbase does not guarantee uninterrupted access to the Trading Platform or all features of the Trading Services. Client acknowledges that although Coinbase will attempt to provide notice of any scheduled or unscheduled unavailability that would result in Client being unable to access the Trading Platform or the Trading Services, Coinbase cannot guarantee advanced notice to Client.

5.2     Coinbase may, in its sole discretion, take any of the following actions, and in the case of clause (i), shall use reasonable efforts to provide Client with as much prior notice as is practicable: (i) halt or suspend Trading Services, including trading on the Trading Platform or the trading of any Digital Assets or currency, or (ii) impose limits on the amount or size of Client's Orders. Coinbase shall have no liability, obligation, or responsibility to Client as a result of making any changes to or suspending the Trading Platform.

## 6.    Coinbase Trading Rules and Order Types

6.1     Client agrees to comply with the Coinbase Trading Rules in effect at the time of any Order. Client agrees to review and become familiar with the terms of the various types of Orders (each an "Order Type") available through the Trading Service. A detailed description of the terms of all Orders is contained in the Coinbase Trading Rules. Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time and without prior notice to Client, and Client acknowledges that it is solely responsible for ensuring knowledge of applicable Order Types and Coinbase Trading Rules prior to placing an Order.

6.2     Coinbase may modify the terms of, or cancel, any Order executed on Trading Platform if Coinbase determines in its sole reasonable discretion that the Order was clearly erroneous according to the Coinbase Trading Rules. Coinbase shall have no liability, obligation, or responsibility to Client as a result of exercising its rights under this Section 6.

**7.      Coinbase Supported Digital Assets**

Coinbase determines in its sole discretion which Digital Assets to support for use with the Trading Services, as specified on the Coinbase Prime Site. Not all Digital Assets supported for Custodial Services are also supported for Trading Services.

**8.      Coinbase Execution Services**

8.1     At Coinbase's sole discretion, Client may elect to submit Orders to Coinbase Execution Services ("CES"), a Trading Service through which CES personnel will execute Orders on behalf of Client. CES will execute Orders by using automated trade routing services through Client's Prime Account or by filling Orders on Coinbase's over-the-counter ("OTC") trading service ("OTC Services"). Coinbase has sole and absolute discretion to accept or reject any Order. Coinbase and Client may communicate regarding Instructions related to Orders on a mutually agreed communication medium, including instant messaging, email, and telephone.

8.2     CES brokers Orders on a commercially reasonable basis as Client's agent and may exercise discretion in executing Orders. Client must pre-fund its Trading Balance prior to submitting Orders. By electing to use CES, Client agrees that it is authorizing CES personnel to access its Prime Account to initiate and execute Orders. Client acknowledges that CES personnel will retain access to the Client Prime Account until Client provides Coinbase with Instructions to terminate such access. Absent express written agreement between the Parties, Coinbase will accept Orders only from Authorized Representatives that are designated in the Client's Prime Account as having trading authority with respect to the Prime Account.

8.3     For OTC Services, CES personnel will confirm the terms of an Order (which terms shall include asset, quantity, price, settlement timing and fees) with Client prior to executing the Order. Coinbase has policies and procedures in place that are reasonably designed to prevent the disclosure of any Client identity to its OTC counterparty. Coinbase may, in its sole and absolute discretion, accept the following statements (or similar or analogous statements) as Client's final and binding agreement to the terms of an Order: "done," "I buy," "bought," "I sell," or "sold." A completed, executed and settled Order will be reflected in Client's Prime Account.

8.4     For Orders fulfilled via OTC Services ("OTC Orders"), each of Client's and its OTC counterparty's confirmations of the terms of the OTC Order deems such OTC Order as binding and final, and thereby executed. Client's failure to timely settle an executed OTC Order in accordance with the settlement terms will constitute a default under the Coinbase Prime Agreement. Upon Client's default of an OTC Order:

Without prior notice to Client, Coinbase shall have the right to: (i) transfer Client Assets from Client's Trading Balance to Coinbase to settle the OTC Order subject to default, and/or (ii) liquidate or cancel outstanding OTC Orders (including OTC Orders that have been submitted or are in the process of being fulfilled).

30

If the above actions are not sufficient to satisfy all obligations of Client to Coinbase in respect of OTC Orders subject to default, Coinbase shall have the right to liquidate any and all of Client's assets and positions held with Coinbase or Coinbase Custody, including the Trading Balance and Vault Balance in Client's Custodial Account, to cover any Losses incurred by Client's failure to settle the OTC Order. In connection with liquidating such assets, Client authorizes Coinbase, in Coinbase's sole discretion, to liquidate any of Client's Digital Assets in a commercially reasonable sale at the market price that otherwise applies to such Digital Assets at the time of liquidation, without regard to whether Client would recognize a gain or loss on such sale or would recognize a greater or lesser gain or loss if different Digital Assets were sold. Client understands that the value of Digital Assets may rise or fall quickly, and Coinbase has no obligation to liquidate Client's Digital Assets at a time that provides the best price for Client. Client agrees that Digital Assets held in its Trading Balance and the Vault Balance in Client's Custodial Account are of a kind or type customarily sold on recognized markets, subject to standard price quotations and may decline speedily in value. Client agrees that if Coinbase exercises its setoff rights or secured party remedies against Client's Digital Assets, that Coinbase may value such Digital Assets using the same valuation method and same process that is otherwise used when Digital Assets are sold on the Trading Platform or any other commercially reasonable valuation method. A sale by Coinbase of Client's Digital Assets, without notice, at a private sale using the valuation and method described above shall be a commercially reasonable method of disposition.

## 9.    Determination of Suitability; All Risks Not Disclosed

Coinbase's provision of the Trading Services is neither a recommendation that Client enter into a particular Order nor a representation that any product described on the Trading Platform is suitable or appropriate for Client. Many of the Trading Services described on Trading Platform involve significant risks, and Client should not use the Trading Services unless it has fully understood all such risks and has independently determined that such Orders are appropriate. Any discussion of the risks contained in this MTA or on the Trading Platform should not be considered to be a disclosure of all risks or a complete discussion of the applicable risks.

## 10.    Characterization of Trading Services; Not a Registered Broker-Dealer or Investment Adviser

Client understands and acknowledges that no transactions executed in connection with Client's Trading Account or the Trading Services are securities transactions, and Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws. Coinbase is not acting as a fiduciary in respect of Client (including in connection with its rights under this MTA) and does not have any responsibility under the standards governing the conduct of broker-dealers, fiduciaries, investment advisers or investment managers. Client agrees and acknowledges that any information or advice provided by Coinbase or any other Coinbase Entity does not and will not serve as the basis of any investment decision by Client.

31

## 11.    Coinbase Corporate Accounts

Coinbase and its affiliates may transact through Trading Accounts on the Trading Platform ("Coinbase Corporate Accounts") for purposes including inventory management, to facilitate Client Orders, and for other corporate purposes. To the extent that a Coinbase Corporate Account transacts on the Trading Platform, the Coinbase Corporate Account (i) will not have any special priority vis-a-vis Client Orders and will be subject to the Coinbase Trading Rules, (ii) will trade only on Market Data available to all Clients, and (iii) will not access any non-public data of other Clients. Coinbase's internal ledger will indicate the amount of each Digital Asset held for each client and each such Coinbase Corporate Account.

## 12.    Term, Termination and Suspension

12.1    Regardless of any other provision of this MTA, Coinbase has the sole discretion to decline to provide Trading Services to Client and may, in its sole discretion, suspend, restrict or terminate the Client's Trading Services, including by suspending, restricting or closing the Client's Trading Account, in accordance with the General Terms.

12.2    If Client is subject to termination, Client agrees to transfer any Client Assets off the Trading Platform within thirty (30) days of receipt of the termination notice unless such transfer is otherwise prohibited (i) under applicable law, including any sanctions programs, or (ii) by a facially valid subpoena or court order. Client agrees to promptly provide Coinbase with Instructions as to where its Client Assets should be transferred, and agrees that failure to do so within thirty (30) days of receipt of notice of termination may result in Client Assets being transferred to the Client's linked bank account or Digital Asset wallet on file, in each case subject to off-set for any outstanding obligations to any Coinbase Entity in accordance with the General Terms. Final disbursement of assets may be delayed until any remaining obligations or indebtedness have been satisfied. Client is responsible for all debits, costs, commissions, and losses arising from any actions Coinbase must take to liquidate or close transactions in the Client's Trading Account.

## 13.    Unclaimed Property

If Coinbase is holding Client Assets in the Trading Balance, has no record of Client's use of the Trading Services for an extended period, and is otherwise unable to contact Client, Coinbase may be required under applicable laws, rules or regulations to report these assets as unclaimed property and to deliver such unclaimed property to the applicable authority. Coinbase may deduct a dormancy fee or other administrative charge from such unclaimed funds, as permitted by applicable laws, rules or regulations.

## COINBASE DISTRIBUTION ADDENDUM
to the Coinbase Prime Agreement

This Coinbase Distribution Addendum ("Distribution Addendum") is incorporated into and made a part of that certain Coinbase Prime Agreement (the "Agreement") between Coinbase, Inc. ("CB Inc.") and Coinbase Custody Trust Company, LLC ("CB Custody") (for purposes of this Distribution Addendum, CB Inc. and CB Custody are collectively referred to herein as, "Coinbase") and the Client set forth in the Agreement (together with Coinbase, the "Parties", and each, a "Party"). The Parties reserve the right to update this Distribution Addendum from time to time pursuant to Section 30 of the Agreement; *provided, however*, any update will not materially reduce the overall Distribution Services (as defined below) set forth in this Distribution Addendum.

1.      **Purpose; Conflicts.**

**Purpose**. The purpose of this Distribution Addendum is to describe the distribution and related custody services Coinbase is willing to offer to Client to distribute certain cryptocurrencies and provide related custody services to certain Claimants. During the Term, and subject to the terms and conditions of this Agreement, including this Distribution Addendum, Client appoints Coinbase as a non-exclusive worldwide custodian and distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.

**Conflicts**. Except as set forth in this Distribution Addendum, Custody Services will be provided in accordance with Exhibit A to the Agreement. To the extent the terms of Exhibit A to the Agreement conflict with the terms of this Distribution Addendum with respect to this Distribution Addendum, any Distribution Services provided hereunder or any Custody Services related thereto, the terms of this Distribution Addendum will control.

2.      **Distributions to Claimants.**

**Services**. Pursuant to the process described in Schedule 1 hereto, Client may provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution under this Distribution Addendum, a "Distribution"). Each such Instruction shall be provided in accordance with the terms set forth in the Agreement. CB Custody shall, directly or through one of its affiliates, including the In-Transit Account or any other internal ledger account, make Distributions as set forth in Schedule 1 hereto and in accordance with Instructions provided by Client (the "Distribution Services"). Coinbase shall provide such Distribution Services from the Celsius Custody Account (as defined below) in accordance with the terms and conditions of this Distribution Addendum, including those detailed in Schedule 1 hereto. Client agrees that CB Custody may act on an Instruction by transferring the relevant Supported Cryptocurrency to CB Inc. with instructions that CB Inc. credit such Supported Cryptocurrency to an account on the books and records of CB Inc. (the "In-Transit Account") in the name of Client, and further distribute such Supported Cryptocurrency to Claimants. CB Inc. may, for operational purposes, reflect the In-Transit Account as either an "Institutional Prime Exchange Account" or a "Retail Exchange Account." Such account shall be subject to the terms and conditions of this Agreement, except that such account can only be used, and the only instruction that Client may provide in

33

respect of such account is a standing instruction, to perform the Distribution Services pursuant the Instructions; provided however that the modality of accessing and using such Retail Exchange Account, where it differs from such Institutional Prime Exchange Account, shall be communicated to Client in a timely fashion.

**Instructions for Distribution.** If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a Supported Jurisdiction, all Distributions to that Claimant shall be in the form of the applicable Supported Cryptocurrency. If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a jurisdiction that is not a Supported Jurisdiction, Coinbase shall (i) provide prompt notice to Client that such Instruction cannot be followed as provided and (ii) not act on such Instruction until Client, in its sole and absolute discretion, provides revised Instructions. No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. If Coinbase rejects Client's Instructions for any reason, fails to make or cannot make a Distribution as set forth in Client's Instructions for any Claimant, Coinbase shall provide prompt notice to Client that such Instruction is not followed and Client reserves the right, in its sole and absolute discretion, to use another service provider to make Distributions to such Claimant.

**Indemnification and Applicable Law**. Section 19 of the Agreement shall apply to any actions Coinbase takes pursuant to Instructions from Client, and Client shall defend and indemnify and hold harmless Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses arising out of or relating to Coinbase's compliance with any Instruction by Client.  Coinbase reserves the right to refuse to process or to cancel any Client Instructions if Coinbase reasonably determines that such refusal or cancellation is necessary to comply with applicable law or regulations, or in response to a subpoena, court order or other binding government order, or if Coinbase reasonably believes that compliance with the Instruction may violate, facilitate the violation of, or is inconsistent with an applicable law, regulation or rule of a governmental authority or self-regulatory organization. Coinbase further reserves the right to refuse to process or to cancel any Client Instructions regarding Distributions to Claimants unless such Claimants have met the requirements of Coinbase's AML and KYC processes, as the same may be modified by Coinbase from time to time.

**Supported Jurisdictions**. Supported Jurisdictions are set forth in Schedule 2 hereto.

3.    **Custody Account**

**Appointment as Custodian**. Subject to approval of the Bankruptcy Court, Client hereby appoints Coinbase as a custodian for Claimants for Distributions contemplated under this Distribution Addendum (any such custodian selected in Client's sole and absolute discretion, a "Custodian"). Coinbase hereby accepts such appointment.  CB Custody agrees to establish on its books, pursuant to the terms of this Distribution Addendum a Custodial Account, as defined in Exhibit A of the Agreement, for the receipt, safekeeping and maintenance of the Digital Assets (the "Celsius Custody Account").  For the avoidance of doubt, Client is not required to use Coinbase as a Custodian or for any custodian services related to this Distribution Addendum and Client may, in its sole and absolute discretion, elect to use Coinbase and/or any other third party as a Custodian.

34

If Client so elects to use Coinbase as a Custodian, then Coinbase shall use the Celsius Custody Account at Coinbase which shall be held open for the duration of the Term of this Distribution Addendum (the "Custody Services"), unless terminated earlier in accordance with Section 23 of the Agreement.

**Acceptance of Digital Assets**. Coinbase will accept those Digital Assets into custody as set forth in this Section 3, or as may otherwise be mutually agreed by the Parties from time to time, and will hold such Digital Assets in registered form in Client's name.

**Designation of Accounts**. The Celsius Custody Account will be held on behalf of Client, in accordance with the Agreement.

**Account Process**. Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to make a Distribution and provide information to Coinbase on all such Claimants as set forth in Schedule 1 hereto, including to identify which custody account should be used for such Distribution. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution, and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim.

**Obligations to Client**.  For the avoidance of doubt, Coinbase's obligations arising under the Agreement and this Distribution Addendum are solely to Client, and Coinbase shall have no obligations to any Claimant absent a separate agreement established between Coinbase and such Claimant.

## 4.    Marketing

**Rights to Celsius Brand Use**. Client grants Coinbase a limited, revocable right to use the name "Celsius" during the Term to identify that Coinbase is an officially authorized service provider for making Distributions to Claimants.

**Review Rights**. Client shall have the right to approve any and all communications related to the Distribution Services before it is made available in any way to any Claimant, which approval shall not be unreasonably withheld. Coinbase shall consider in good faith any feedback from Client regarding the communications and use best efforts to, in a timely manner, make any changes requested by Client that Coinbase deems, in its reasonable discretion, to be appropriate.  Coinbase shall have the right to approve any and all communications related to the Distribution Services before it is made available in any way to any Claimant, which approval shall not be unreasonably withheld. Client shall consider in good faith any feedback from Coinbase regarding the communications and use best efforts to, in a timely manner, make any changes requested by Coinbase that Client deems, in its reasonable discretion, to be appropriate.

**Governing Terms**. Except as set forth in this Distribution Addendum, all activities by Claimants shall be governed by the Coinbase TOS. In the event of any conflict now, or that may hereinafter arise, between the Agreement, this Distribution Addendum, and any current or future versions of the Coinbase TOS, the Agreement, including this Distribution Addendum, shall govern. For the avoidance of any doubt, Client shall not be responsible for Claimants' compliance with the

35

Coinbase TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants.

**5.      Term**

**Term**. Unless terminated earlier in accordance with Section 23 of the Agreement, this Distribution Addendum is effective as of the entry of the Confirmation Order and shall remain in force for a period of one (1) year thereafter referred to herein as the "Term."

**Account Support Term**. Notwithstanding the above Term of this Distribution Addendum, and unless terminated earlier in accordance with Section 23 of the Agreement, with respect to each New Crypto Account, Coinbase shall support Distributions for each New Crypto Account for the three hundred sixty five (365) day period beginning on the first deposit of Supported Cryptocurrency into such New Crypto Account.

**6.      RESERVED**

**7.      Definitions**

**"Claimant"** means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan).

**"Confirmation Order"** has the meaning set forth in the Reorganization Plan.

**"Disclosure Statement Approval Date"** means date of the Bankruptcy Court (as defined in the Agreement) order approving the Disclosure Statement (as defined in the Reorganization Plan).

**"New Crypto Account"** means a Coinbase Crypto Account that (i) (a) was created on or subsequent to the Disclosure Statement Approval Date or (b) was a Coinbase Account prior to the Disclosure Statement Approval Date; and (ii) has received one or more Distributions of Supported Cryptocurrency under the Reorganization Plan.

**"Coinbase Account"** means a customer account at Coinbase, which may or may not have successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities.

**"Coinbase Crypto Account"** means a Coinbase Account that has successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities.

**"Coinbase TOS"** means Coinbase's standard and cryptocurrency terms and conditions applicable to any particular Coinbase Account, as revised from time to time.

**"Digital Assets"** means any digital tokens represented on a decentralized cryptographic blockchain, where such tokens are held from time to time held for Client under the terms of this Distribution Addendum.

**"Reorganization Plan"** means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, In re Celsius Network LLC, No. 22-10964 (MG) (Bankr. S.D.N.Y.

36

Mar. 31, 2023), ECF No. 3222, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms.

**"Reside"** means, with respect to any Claimant, such Claimant's principal residence as determined by Coinbase through the AML/KYC information that such Claimant provides to Coinbase.

**"Supported Jurisdiction"** means each jurisdiction in which Coinbase holds all licenses and registrations necessary to engage in the activities contemplated in this Agreement with respect to Supported Cryptocurrency in such jurisdiction, which are listed in Schedule 2. Coinbase may add jurisdictions to or remove jurisdictions from the definition of Supported Jurisdiction by updating Schedule 2, which can be done by providing written notice to Client (email will suffice).

**"Supported Cryptocurrency"** means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the preceding 12-month period. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless Coinbase notifies Client in writing that Coinbase has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency.

## Schedule 1 to Coinbase Distribution Addendum

## <u>Distribution Services</u>

Account Creation:

> All retail creditors must create a CB Inc. retail account to ensure CB Inc. can complete transfers to the respective creditor.

> All institutional creditors (the "<u>Institutional Creditors</u>") shall establish a Coinbase prime institutional account.

> Existing Coinbase retail accounts and existing Coinbase institutional accounts can be used by eligible creditors.

> All creditors will be subject to and must complete the Coinbase AML/KYC onboarding requirements prior to Coinbase making any transfer.

> The Celsius Estate will provide documentation detailing each creditor's email address, and quantity of assets (as well as other mutually agreed information, which will be hashed if such information is Personally Identifiable Information) to be distributed with legal authorization for Coinbase to have access to the relevant exchange account at Coinbase and to perform these functions on their behalf.  Except to the extent required to confirm such documentation has not been altered since its generation by Celsius using confirmation methods mutually agreed by the Parties, Coinbase shall have no obligation to verify such information provided by Celsius, and shall have no liability for the accuracy of any such information or for having followed any instruction.  For the avoidance of doubt, where within Coinbase's records the hashed version of the date of birth of a creditor does not match with the hashed version of the email address of the same creditor, Coinbase may not proceed with the distribution until the Parties have clarified the correctness of the creditor's information.

Distribution Process:

> Coinbase will create a script to support the transfer of assets via API.

> Coinbase will also create a script that will perform validation checks to match Celsius creditors to Coinbase customers, as well as error handling.

> Before running the script, this information will also be reconciled against the hashed Personally Identifiable Information provided by the Celsius Estate.

> Coinbase will notify Celsius when distributions to all creditors are completed.

**Schedule 2 to Coinbase Distribution Addendum**

**<u>Supported Jurisdictions</u>**

As provided by Coinbase from time to time.

## COINBASE SUPPORTED COUNTRIES FOR DISTRIBUTION

| | | |
|---|---|---|
| Canada | Iceland | United Arab Emirates |
| Mexico | Ireland | Yemen |
| Argentina | Isle of Man | Zambia |
| Bolivia | Italy | Zimbabwe |
| Brazil | Jersey | Australia |
| Cayman Islands | Latvia | Hong Kong |
| Chile | Liechtenstein | India |
| Colombia | Lithuania | Indonesia |
| Costa Rica | Luxembourg | Japan |
| Dominican Republic | Malta | Kazakhstan |
| Ecuador | Monaco | Mongolia |
| El Salvador | Netherlands | Nepal |
| Guatemala | Norway | New Zealand |
| Jamaica | Poland | Pakistan |
| Panama | Portugal | Philippines |
| Peru | Romania | Singapore |
| Saint Kitts and Nevis | San Marino | Sri Lanka |
| Saint Martin (French part) | Slovakia | Taiwan |
| Saint Maarten (Dutch part) | Slovenia | |
| Uruguay | Spain | |
| Venezuela | Sweden | |
| British Virgin Islands | Switzerland | |
| Albania | United Kingdom | |
| Andorra | Azerbaijan | |
| Austria | Benin | |
| Belgium | Burkina Faso | |
| Bulgaria | Cameroon | |
| Croatia | Curaçao | |
| Cyprus | Georgia | |
| Czechia | Ghana | |
| Denmark | Jordan | |
| Estonia | Kenya | |
| Faroe Islands | Kuwait | |
| Finland | Madagascar | |
| France | Mali | |
| Germany | Nigeria | |
| Gibraltar | Serbia | |
| Greece | Seychelles | |
| Guernsey | South Africa | |
| Hungary | Togo | |
| | Tunisia | |
| | Turkey | |
| | Uganda | |
| | Ukraine | |

**<u>Exhibit G-1</u>**

**(Redline) Coinbase Agreements**

DRAFT

# COINBASE PRIME ~~BROKER~~ AGREEMENT

## General Terms and Conditions

### 1.    Introduction

This agreement (including, the Coinbase Custody Custodial Services Agreement attached hereto as Exhibit A (the "Custody Agreement"), the Coinbase Master Trading Agreement attached hereto as Exhibit B (the "MTA"), and all other exhibits, addenda and supplements attached hereto or referenced herein, collectively, the "Coinbase Prime ~~Broker~~ Agreement"), is entered into by and ~~between~~ among Celsius Network LLC, (a Delaware limited liability company, Celsius Network Limited, a company incorporated under the laws of the United Kingdom, Celsius Lending LLC, a Delaware limited liability company, Celsius EU UAB, a company incorporated under the laws of Lithuania, and, subject to the Confirmation Order, Celsius Networks Lending LLC, a Delaware limited liability company (together, with each of their successors and assigns as permitted hereunder "Client"), and Coinbase, Inc. ("Coinbase"), on behalf of itself and as agent for Coinbase, Coinbase Custody Trust Company, LLC ("Coinbase Custody"), and, as applicable, Coinbase Credit, Inc. ("Coinbase Credit," and collectively with Coinbase and Coinbase Custody, the "Coinbase Entities"). This Coinbase Prime ~~Broker~~ Agreement sets forth the terms and conditions pursuant to which the Coinbase Entities will open and maintain the prime ~~broker~~ account (the "Prime ~~Broker~~ Account") for Client and provide services relating to custody, trade execution, lending or post-trade credit (if applicable), and other services (collectively, the "Prime ~~Broker~~ Services") for certain digital assets ("Digital Assets") as set forth herein. Client and the Coinbase Entities (individually or collectively, as the context requires) may also be referred to as a "Party". Capitalized terms not defined in these General Terms and Conditions (the "General Terms") shall have the meanings assigned to them in the respective exhibit, addendum or supplement. In the event of a conflict between these General Terms and any exhibit, addendum or supplement hereto, then the document governing the specific relevant Prime ~~Broker~~ Service shall control in respect of such Prime ~~Broker~~ Service.

Notwithstanding anything to the contrary in this Coinbase Prime ~~Broker~~ Agreement, the Distribution Addendum, or any confidential side letter between the Parties, Celsius shall not (a) utilize any digital asset trading for selling and/or buying Digital Assets, ~~brokerage,~~ lending, or post-trade credit services with Coinbase or (b) transfer any digital assets pursuant to this Coinbase Prime ~~Broker~~ Agreement other than, in the case of (b), to facilitate (i) the custodial services as set forth in Exhibit A to this Coinbase Prime ~~Broker~~ Agreement, (ii) distribution services as set forth in the Addendum to this Coinbase Prime ~~Broker~~ Agreement, and (iii) transfers between Celsius-owned accounts and wallets.

### 2.    Conflicts of Interest Acknowledgement

Client acknowledges that the Coinbase Entities may have actual or potential conflicts of interest in connection with providing the Prime ~~Broker~~ Services including that (i) Orders (as such term is defined in the MTA) may be routed to Coinbase's exchange platform where Orders may be executed against other Coinbase customers or with Coinbase acting as principal, (ii) the beneficial identity of the purchaser or seller with respect to an Order is unknown and therefore may inadvertently be another Coinbase client, (iii) Coinbase does not engage in front-running,

but is aware of Orders or imminent Orders and may execute a trade for its own inventory (or the account of an affiliate) while in possession of that knowledge and (iv) Coinbase may act in a principal capacity with respect to certain Orders (*e.g.*, to fill residual Order size) when a portion of an Order may be below the minimum size accepted by the Connected Trading Venues (as defined in the MTA). As a result of these and other conflicts, the Coinbase Entities may have an incentive to favor their own interests and the interests of their affiliates over a particular Client's interests and has in place certain policies and procedures in place that are designed to mitigate such conflicts.

**3.    Account Statements**

Client authorizes Coinbase to combine information regarding all Prime ~~Broker~~ Services activities into a single statement. Coinbase will provide Client with an electronic account statement every month, at a minimum. Each account statement will identify the amount of cash and each Digital Asset in Client's Prime ~~Broker~~ Account at the end of the period and set forth all Prime ~~Broker~~ Account activity during that period.

**4.    Client Instructions**

4.1    In a written notice to Coinbase, Client may designate persons and/or entities authorized to act on behalf of Client with respect to the Prime ~~Broker~~ Account (the "Authorized Representative"). Upon such designation, Coinbase may rely on the validity of such appointment until such time as Coinbase receives Instructions from Client revoking such appointment or designating a new Authorized Representative.

4.2    The Coinbase Entities may act upon instructions received from Client or Client's Authorized Representative ("Instructions"). When taking action upon Instructions, the applicable Coinbase Entity shall act in a reasonable manner, and in conformance with the following: (a) Instructions shall continue in full force and effect until executed, cancelled or superseded; (b) if any Instructions are ambiguous, the applicable Coinbase Entity shall refuse to execute such Instructions until any such ambiguity has been resolved to the Coinbase Entity's satisfaction; (c) the Coinbase Entities may refuse to execute Instructions if in the applicable Coinbase Entity's opinion such Instructions are outside the scope of its obligations under this Coinbase Prime ~~Broker~~ Agreement or are contrary to any applicable laws, rules and regulations; and (d) the Coinbase Entities may rely on any Instructions, notice or other communication believed by it in good faith to be given by Client or Client's Authorized Representative. Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability with respect to, any and all Claims and Losses arising out of or relating to inaccurate or ambiguous Instructions.

4.3    Coinbase will comply with the Client's Instructions to stake, stack or vote the Client's Digital Assets to the extent the applicable Coinbase Entity supports proof of stake validation, proof of transfer validation, or voting for such Digital Assets. The Coinbase Entities may, in their sole discretion, decide whether or not to support (or cease supporting) staking services or stacking or voting for a Digital Asset.

**5.      Representations, Warranties, and Additional Covenants**

Client represents, warrants, and covenants that:

5.1      Client is currently under supervision of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") following the filing of voluntary bankruptcy (collectively, the "Chapter 11 Cases") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

5.2      Subject to the Bankruptcy Code, any orders of the Bankruptcy Court, and the Bankruptcy Court's approval of Client's entry into this Coinbase Prime ~~Broker~~ Agreement, Client has the full power, authority, and capacity to enter into this Coinbase Prime ~~Broker~~ Agreement and to engage in transactions with respect to all Digital Assets relating to the Prime ~~Broker~~ Services;

5.3      Except as disclosed to the Coinbase Entities, Client, to the best of its knowledge, is and shall remain in full material compliance with all applicable laws, rules, and regulations in each jurisdiction in which Client operates or otherwise uses the Prime ~~Broker~~ Services, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including AML Laws, USA PATRIOT Act and Bank Secrecy Act requirements, and other anti-terrorism statutes, regulations, and conventions of the United States or other international jurisdictions;

5.4      Except as disclosed to the Coinbase Entities, Client is and shall remain materially in good standing with all relevant government agencies, departments, regulatory, and supervisory bodies in all relevant jurisdictions in which Client does business, and Client will promptly notify Coinbase if Client ceases to be in good standing with any regulatory authority;

5.5      Client shall promptly provide information as the Coinbase Entities may reasonably request in from time to time regarding: (a) Client's policies, procedures, and activities which relate to the Prime ~~Broker~~ Services, and (b) Client's use of the Prime ~~Broker~~ Services, in each case to the extent reasonably necessary for the Coinbase Entities to comply with any applicable laws, rules, and regulations (including money laundering statutes, regulations and conventions of the United States or other jurisdictions), or the guidance or direction of, or request from, any regulatory authority or financial institution;

5.6      Client's use of the Prime ~~Broker~~ Services shall be for commercial, business purposes only, limited to activities disclosed in the due diligence information submitted to Coinbase, and shall not include any personal, family or household purposes. Client shall promptly notify Coinbase in writing in the event it intends to use the Prime ~~Broker~~ Services in connection with any business activities not previously disclosed to Coinbase. Coinbase may, in its sole discretion, prohibit Client from using the Prime ~~Broker~~ Services in connection with any business activities not previously disclosed;

5.7      Client's Authorized Representatives have the (a) full power, authority and capacity to access and use the Prime ~~Broker~~ Services and (b) appropriate sophistication, expertise,

and knowledge necessary to understand the nature and risks, and make informed decisions, in respect of Digital Assets and the Prime ~~Broker~~ Services;

5.8    Client either owns or possess lawful authorization to transact with all Digital Assets involved in any Custody Transactions;

5.9    This Coinbase Prime ~~Broker~~ Agreement is Client's legal, valid, and binding obligation, enforceable against it in accordance with its terms; and

5.10    Unless Client advises Coinbase to the contrary in writing, at all times, none of Client's assets constitute, directly or indirectly, plan assets subject to the fiduciary responsibility and prohibited transaction sections of the Employment Retirement Income Security Act of 1974, as amended ("ERISA"), the prohibited transaction provisions of the Internal Revenue Code of 1986, as amended, or any federal, state, local or non-U.S. law that is similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended, and Client shall immediately provide Coinbase with a written notice in the event that Client becomes aware that Client is in breach of the foregoing.

Coinbase, on behalf of itself and each other Coinbase Entity, represents, warrants, and covenants that:

5.11    It possesses and will maintain, all licenses, registrations, authorizations and approvals required by any applicable government agency or regulatory authority for it to operate its business and provide the Prime ~~Broker~~ Services;

5.12    It has the full power, authority, and capacity to enter into and be bound by this Coinbase Prime ~~Broker~~ Agreement; and

5.13    This Coinbase Prime ~~Broker~~ Agreement is its legal, valid and binding obligation, enforceable against it in accordance with its terms.

**6.    No Investment Advice or Brokerage**

6.1    Client assumes responsibility for each transaction in or for its Prime ~~Broker~~ Account. Client understands and agrees that none of the Coinbase Entities are an SEC/FINRA registered broker-dealer or investment adviser to Client in any respect, and the Coinbase Entities have no liability, obligation, or responsibility whatsoever for Client decisions relating to the Prime ~~Broker~~ Services. Client should consult its own legal, tax, investment and accounting professionals.

6.2    While the Coinbase Entities may make certain general information available to Client, the Coinbase Entities are not providing and will not provide Client with any investment, legal, tax or accounting advice regarding Client's specific situation. Client is solely responsible, and shall not rely on the Coinbase Entities, for determining whether any investment, investment strategy, or transaction involving Digital Assets is appropriate for Client based on Client's investment objectives, financial circumstances, risk tolerance, and tax consequences. The Coinbase Entities shall have no liability, obligation, or

4

responsibility whatsoever regarding any Client decision to enter into in any transaction with respect to any Digital Asset.

**7.    Opt-In to Article 8 of the Uniform Commercial Code**

Client Assets in the Trading Balance and Vault Balance will be treated as "financial assets" under Article 8 of the New York Uniform Commercial Code ("Article 8"). Coinbase and Coinbase Custody are "securities intermediaries," the Trading Balance and Vault Balance are each "securities accounts," and Client is an "entitlement holder" under Article 8. This Agreement sets forth how the Coinbase Entities will satisfy their Article 8 duties. Treating Client Assets in the Trading Balance and Vault Balance as financial assets under Article 8 does not determine the characterization or treatment of the cash and Digital Assets under any other law or rule. New York will be the securities intermediary's jurisdiction with respect to Coinbase and Coinbase Custody, and New York law will govern all issues addressed in Article 2(1) of the Hague Securities Convention. Coinbase and Coinbase Custody will credit the Client with any payments or distributions on any Client Assets it holds for Client's Trading Balance and Vault Balance. Coinbase and Coinbase Custody will comply with Client's Instructions with respect to Client Assets in Client's Trading Balance or Vault Balance, subject to the terms of the MTA or Custody Agreement, as applicable, and related Coinbase rules, including the Coinbase Trading Rules (as such term is defined in the MTA).

**8.    General Use, Security and Prohibited Use**

8.1    *Prime ~~Broker~~ Site and Content*. During the term of this Coinbase Prime ~~Broker~~ Agreement, the Coinbase Entities hereby grant Client a limited, nonexclusive, non-transferable, non-sublicensable, revocable and royalty-free license, subject to the terms of this Coinbase Prime ~~Broker~~ Agreement, to access and use the Coinbase Prime ~~Broker~~ Site accessible at prime.coinbase.com ("Coinbase Prime ~~Broker~~ Site") and related content, materials, and information (collectively, the "Content") solely for Client's internal business use and other purposes as permitted by Coinbase in writing from time to time. Any other use of the Coinbase Prime ~~Broker~~ Site or Content is hereby prohibited. All other right, title, and interest (including all copyright, trademark, patent, trade secrets, and all other intellectual property rights) in the Coinbase Prime ~~Broker~~ Site, Content, and Prime ~~Broker~~ Services is and will remain the exclusive property of the Coinbase Entities and their licensors. Client shall not copy, transmit, distribute, sell, license, reverse engineer, modify, publish, or participate in the transfer or sale of, create derivative works from, or in any other way exploit any of the Prime ~~Broker~~ Services or Content, in whole or in part. "Coinbase," "Coinbase Prime," "prime.coinbase.com," and all logos related to the Prime ~~Broker~~ Services or displayed on the Coinbase Prime ~~Broker~~ Site are either trademarks or registered marks of the Coinbase Entities or their licensors. Client may not copy, imitate or use them without Coinbase's prior written consent. The license granted under this Section 8.1 will automatically terminate upon termination of this Coinbase Prime ~~Broker~~ Agreement, or the suspension or termination of Client's access to the Coinbase Prime ~~Broker~~ Site or Prime ~~Broker~~ Services.

8.2    *Unauthorized Users.* Client shall not permit any person or entity that is not the Client or an Authorized Representative (each, an "Unauthorized User") to access, connect to,

5

and/or use Client's Prime ~~Broker~~ Account. The Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, and Client shall be fully responsible and liable for, any and all Claims and Losses arising out of or relating to the acts and omissions of any Unauthorized User in respect of the Prime ~~Broker~~ Services, Prime ~~Broker~~ Account, and/or the Prime ~~Broker~~ Site. Client shall notify Coinbase immediately if Client believes or becomes aware that an Unauthorized User has accessed, connected to, or used Client's Prime ~~Broker~~ Account.

8.3    *Password Security; Contact Information*. Client is fully responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), API keys, YubiKeys, other security or confirmation information or hardware, and any other codes that Client uses to access the Prime ~~Broker~~ Account and Prime ~~Broker~~ Services. Client agrees to keep Client's email address and telephone number up to date in Client's Prime ~~Broker~~ Account in order to receive any notices or alerts that the Coinbase Entities may send to Client. Client shall be fully responsible for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, any Losses that Client may sustain due to compromise of Prime ~~Broker~~ Account login credentials. In the event Client believes Client's Prime ~~Broker~~ Account information has been compromised, Client must contact Coinbase immediately.

8.4    *Prohibited Use*. Client shall not engage in any of the following activities with its use of the Prime ~~Broker~~ Services:

8.4.1    *Unlawful Activity*. Activity that would violate, or assist in violation of, any law, statute, ordinance, or regulation, sanctions programs administered in the countries where Coinbase conducts business, including but not limited to the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), or which would involve proceeds of any unlawful activity; publish, distribute or disseminate any unlawful material or information;

8.4.2    *Abusive Activity*. Actions that impose an unreasonable or disproportionately large load on Coinbase's infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data, or information; transmit or upload any material to Coinbase systems that contains viruses, trojan horses, worms, or any other harmful or deleterious programs; attempt to gain unauthorized access to Coinbase systems, other Coinbase accounts, computer systems or networks connected to Coinbase systems, Coinbase Site, through password mining or any other means; use Coinbase Account information of another party to access or use the Coinbase systems, except in the case of specific Clients and/or applications which are specifically authorized by a Client to access such Client's Coinbase Account and information; or transfer Client's account access or rights to Client's account to a third party, unless by operation of law or with the express permission of Coinbase; and

8.4.3    *Fraud*. Activity which operates to defraud Coinbase or any other person or entity.

8.5    *Computer Viruses.* The Coinbase Entities shall not have any liability, obligation, or responsibility whatsoever for any damage or interruptions caused by any computer viruses, spyware, scareware, Trojan horses, worms or other malware that may affect Client's computer or other equipment, or any phishing, spoofing or other attack, unless such damage or interruption directly resulted from the Coinbase Entities' gross negligence, fraud, or willful misconduct. Client agrees to access and use its Prime ~~Broker~~ Account through the Coinbase Prime ~~Broker~~ Site to review any Orders, deposits or withdrawals or required actions to confirm the authenticity of any communication or notice from the Coinbase Entities.

## 9.    Taxes

9.1    *Taxes.* Except as otherwise expressly stated herein or required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities), Client shall be fully responsible and liable for, and the Coinbase Entities shall have no liability, obligation, or responsibility whatsoever for, the payment of any and all present and future tariffs, duties or taxes (including withholding taxes, transfer taxes, stamp taxes, documentary taxes, value added taxes, personal property taxes and all similar costs) imposed or levied by any government or governmental agency (collectively, "Taxes") and any related Claims and Losses or the accounting or reporting of income or other Taxes arising from or relating to any transactions Client conducts through the Prime ~~Broker~~ Services; *provided, however*, that for the avoidance of doubt, if any applicable legal requirement imposes information reporting or similar obligations with respect to the matters governed by this Agreement, the Coinbase Entities shall comply in full with any such requirements that apply to them and Client shall comply in full with any such requirements that apply to it.  The Client and the Coinbase Entities shall each file any and all Tax returns, reports, and disclosures required by applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable Taxing authorities).

9.2    *Withholding Tax.* Except as required by applicable law, each payment under this Coinbase Prime ~~Broker~~ Agreement or collateral deliverable by Client to any Coinbase Entities shall be made, and the value of any collateral or margin shall be calculated, without withholding or deducting of any Taxes. If any Taxes are required to be withheld or deducted, Client (a) authorizes the Coinbase Entities to effect such withholding or deduction and remit such Taxes to the relevant taxing authorities and (b) shall pay such additional amounts or deliver such further collateral as necessary to ensure that the actual net amount received by the Coinbase Entities is equal to the amount that the Coinbase Entities would have received had no such withholding or deduction been required; *provided, however*, that the Coinbase Entities shall reasonably cooperate with Client to minimize or eliminate any such withholding or deduction requirements to the extent permitted by applicable Law. Client agrees that the Coinbase Entities may disclose any information with respect to Client Assets, the Prime ~~Broker~~ Account, Custodial Accounts, Trading Accounts, and transactions required by any applicable taxing authority or other governmental entity. The Client agrees that the Coinbase Entities may withhold or deduct Taxes as may be required by applicable law. From time to time, Coinbase Entities and the Client may request from the other tax documentation or certification of

the Coinbase Entities' or Client's (as applicable) taxpayer status as required by applicable law, and any failure by the Coinbase Entities or Client (as applicable) to comply with this request in the time frame identified may result in withholding and/or remission of taxes to a tax authority as required by applicable law.

**10.    Prime ~~Broker~~ Services Fees**

10.1    Client agrees to pay all commissions and fees in connection with the Orders and Prime ~~Broker~~ Services on a timely basis as set forth in the fee schedule agreed between the parties. If agreed by Client and Coinbase in writing, Client authorizes the Coinbase Entities to pay themselves for fees and commissions relating to the Trading Account and Custodial Account by deducting fees from the Vault Balance or Trading Balance, as applicable, to satisfy Client's fees owed.

10.2    Client acknowledges that Coinbase's fees may include but are not limited to: (a) bank wire fees to deposit and/or withdraw Client Cash; (b) internal transfers from its Vault Balance to its Trading Balance; and (c) external withdrawals of Client Assets. Client further acknowledges that Coinbase Custody will charge fees for any balance of Digital Assets that Client keeps in the Vault Balance.

**11.    Confidentiality**

11.1    Client and Coinbase Entities each agree that with respect to any non-public, confidential or proprietary information of the other Party, including the existence and terms of this Coinbase Prime ~~Broker~~ Agreement and information relating to the other party's business operations or business relationships (including the Coinbase Entities' fees), and any arbitration pursuant to Section 22 (collectively, "<u>Confidential Information</u>"), it (a) will not disclose such Confidential Information except to such party's officers, directors, agents, employees and professional advisors who need to know the Confidential Information for the purpose of assisting in the performance of this Coinbase Prime ~~Broker~~ Agreement and who are informed of, and agree to be bound by obligations of confidentiality no less restrictive than those set forth herein and (b) will protect such Confidential Information from unauthorized use and disclosure. Each Party shall use any Confidential Information that it receives solely for purposes of (i) exercising its rights and performing its duties under the Coinbase Prime ~~Broker~~ Agreement and (ii) complying with any applicable laws, rules and regulations; *provided* that, the Coinbase Entities may use Confidential Information for (1) risk management; and (2) to develop, enhance and market their products and services. Confidential Information shall not include any (w) information that is or becomes generally publicly available through no fault of the recipient; (x) information that the recipient obtains from a third party (other than in connection with this Coinbase Prime ~~Broker~~ Agreement) that, to the recipient's best knowledge, is not bound by a confidentiality agreement prohibiting such disclosure; (y) information that is independently developed or acquired by the recipient without the use of Confidential Information provided by the disclosing party; or (z) disclosure with the prior written consent of the disclosing Party.

11.2    Notwithstanding the foregoing, each Party may disclose Confidential Information of the other Party to the extent required by a court of competent jurisdiction or governmental authority or otherwise required by law; *provided, however*, the Party making such required disclosure shall first notify the other Party (to the extent legally permissible) and shall afford the other Party a reasonable opportunity to seek confidential treatment if it wishes to do so and will consider in good faith reasonable and timely requests for redaction. For purposes of this Section 11, no Affiliate (as defined below) of Coinbase shall be considered a third party of any Coinbase Entity, and the Coinbase Entities may freely share Client's Confidential Information among each other and with such affiliates. All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of the receiving Party shall be and remain the property of the disclosing Party and shall be promptly returned to the disclosing Party or destroyed, each upon the disclosing Party's request; *provided, however*, notwithstanding the foregoing, the receiving Party may retain one (1) copy of Confidential Information if (a) required by law or regulation; or (b) retained pursuant to an established document retention policy.

"Affiliate" means, with respect to any specified legal entity, any other legal entity that, directly or indirectly, through one or more intermediaries, owns or controls, is owned or controlled by, or is under common ownership or control with, such specified legal entity. As used in this definition, the concept of control refers to the beneficial ownership by one legal entity of the majority of the voting power of another legal entity.

## 12.    Market Data

Client agrees that its use of data made available to it through the Trading Platform's application programming interface(s), which may include the prices and quantities of orders and transactions executed on Trading Platform (collectively "Market Data"), is subject to the Market Data Terms of Use, as amended and updated from time to time at *https://www.coinbase.com/legal/market_data* or a successor website.

## 13.    Recording of Conversations

For compliance and monitoring purposes, Client authorizes each Coinbase Entity at its sole discretion to record conversations between such Coinbase Entity and Client or its Authorized Representatives relating to this Coinbase Prime ~~Broker~~ Agreement, the Prime ~~Broker~~ Account and the Prime ~~Broker~~ Services;

## 14.    Security and Business Continuity

The Coinbase Entities have implemented and will maintain a reasonable information security program in accordance with security terms as disclosed to Client.

## 15.    Acknowledgement of Risks

Client hereby acknowledges, that: (i) Digital Assets are not legal tender, are not backed by any government, and are not subject to protections afforded by the Federal Deposit Insurance Corporation or Securities Investor Protection Corporation; (ii) Legislative and regulatory changes

9

or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and/or value of Digital Assets; (iii) transactions in Digital Assets are irreversible, and, accordingly, Digital Assets lost due to fraudulent or accidental transactions may not be recoverable; (iv) certain Digital Assets transactions will be deemed to be made when recorded on a public blockchain ledger, which is not necessarily the date or time that Client initiates the transaction or such transaction enters the pool; (v) the value of Digital Assets may be derived from the continued willingness of market participants to exchange any government issued currency ("Fiat Currency") for Digital Assets, which may result in the permanent and total loss of value of a Digital Asset should the market for that Digital Asset disappear; (vi) the volatility of the value of Digital Assets relative to Fiat Currency may result in significant losses; (vii) Digital Assets may be susceptible to an increased risk of fraud or cyber-attack; (viii) the nature of Digital Assets means that any technological difficulties experienced by a Coinbase Entity may prevent the access or use of Client Digital Assets; and (ix) any bond or trust account maintained by Coinbase Entities for the benefit of its customers may not be sufficient to cover all losses (including Losses) incurred by customers.

**16.     Operation of Digital Asset Protocols**

16.1     The Coinbase Entities do not own or control the underlying software protocols which govern the operation of Digital Assets. Generally, the underlying software protocols and, if applicable, related smart contracts (referred to collectively as "Protocols" for purposes of this Section 16) are open source and anyone can use, copy, modify or distribute them. By using the Prime ~~Broker~~ Services, Client acknowledges and agrees that (i) the Coinbase Entities make no guarantee of the functionality, security, or availability of underlying Protocols; (ii) some underlying Protocols are subject to consensus-based proof of stake validation methods which may allow, by virtue of their governance systems, changes to the associated blockchain or digital ledger ("Governance Modifiable Blockchains"), and that any Client transactions validated on such Governance Modifiable Blockchains may be affected accordingly; and (iii) the underlying Protocols are subject to sudden changes in operating rules (a/k/a "forks"), and that such forks may materially affect the value, function, and/or even the name of the Digital Assets. In the event of a fork, Client agrees that the Coinbase Entities may temporarily suspend Prime ~~Broker~~ Services (with or without notice to Client) and that the Coinbase Entities may, in their sole discretion, determine whether or not to support (or cease supporting) either branch of the forked protocol entirely. In the event that Coinbase decides not to support (or ceases supporting) either branch of a forked protocol, Coinbase will use reasonable efforts to notify Client in advance wherever reasonably practicable to do so. Client agrees that the Coinbase Entities shall have no liability, obligation or responsibility whatsoever arising out of or relating to the operation of Protocols, transactions affected by Governance Modifiable Blockchains, or an unsupported branch of a forked protocol and, accordingly, Client acknowledges and assumes the risk of the same. The Coinbase Entities shall use commercially reasonable efforts to timely select at least one of the forked protocol branches to support and will identify such selection in a notice reasonably in advance of such fork (to the extent practicable) to provide Client the opportunity to arrange for the transfer of the relevant Digital Assets, which the Coinbase Entities shall use commercially reasonable efforts to accomplish in advance of such fork. With respect to a forked protocol branch that the Coinbase Entities choose not to support, upon Client's

10

request, the Coinbase Entities will use commercially reasonable efforts to deliver the relevant Digital Assets from such forked protocol branch to Client, including any credentials, keys, or other information sufficient to gain control over such Digital Assets through other means within a commercially reasonable period of time.

16.2    Unless specifically communicated by the Coinbase Entities through a written public statement on the Coinbase website, the Coinbase Entities do not support airdrops, metacoins, colored coins, side chains, or other derivative, enhanced or forked protocols, tokens or coins, which supplement or interact with a Digital Asset (collectively, "Advanced Protocols") in connection with the Prime ~~Broker~~ Services. The Prime ~~Broker~~ Services are not configured to detect, process and/or secure Advanced Protocol transactions and neither Client nor the Coinbase Entities will be able to retrieve any unsupported Advanced Protocol. Coinbase shall have no liability, obligation or responsibility whatsoever in respect to Advanced Protocols.

## 17.    Set-off

Upon the occurrence of a default or an event of default under, an agreement with a Coinbase Entity (including an "Event of Default" as such term is defined in the PTC Agreement (in each case, at maturity, upon acceleration or otherwise)) or the occurrence of an event that constitutes "Cause" (as defined below) (each, a "Setoff Event"), each Coinbase Entity may set off and net the amounts due from it or any of its affiliates to Client and from Client to any other Coinbase Entity, so that a single payment (the "Net Payment") shall be immediately due and payable by the Client or the Coinbase Entity to the other (subject to the other provisions hereof and of any agreement with a Coinbase Entity). If any amounts cannot be included within the Net Payment, such amounts shall be excluded but may still be netted against any other similarly excluded amounts. Upon the occurrence of a Setoff Event, each Coinbase Entity may also set off and net any Net Payment or any other obligation owed to the Client by any Coinbase Entity against (i) any or all collateral or margin posted by any Coinbase Entity to Client (or the U.S. dollar value thereof, determined by Coinbase in its sole discretion on the basis of a recent price at which the relevant Digital Asset was sold to customers on the Trading Platform); and (ii) any Net Payment, unpaid trade credits or any other obligation owed by Client to any Coinbase Entity (in each case, whether matured or unmatured, fixed or contingent, or liquidated or unliquidated). Client agrees that in the exercise of setoff rights or secured party remedies, the Coinbase Entities may value Client Digital Assets using the same valuation methods and processes that are otherwise used when a Coinbase customer sells an asset on the Trading Platform (as such term is defined in the MTA) or any other commercially reasonable valuation method as determined by Coinbase in its sole discretion. For the avoidance of doubt and notwithstanding anything to the contrary, the Coinbase Entities shall not be permitted to set off against, liquidate or apply any assets or amounts in Client's Vault Balance.

## 18.    Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE PRIME ~~BROKER~~ SERVICES AND THE COINBASE WEBSITE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS WITHOUT ANY WARRANTY OF ANY KIND, AND THE COINBASE ENTITIES HEREBY SPECIFICALLY DISCLAIM ALL WARRANTIES WITH

11

RESPECT TO THE PRIME ~~BROKER~~ SERVICES, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING THE IMPLIED WARRANTIES AND/OR CONDITIONS OF TITLE, MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. THE COINBASE ENTITIES DO NOT WARRANT THAT THE PRIME ~~BROKER~~ SERVICES, INCLUDING ACCESS TO AND USE OF THE COINBASE WEBSITES, OR ANY OF THE CONTENT CONTAINED THEREIN, WILL BE CONTINUOUS, UNINTERRUPTED, TIMELY, COMPATIBLE WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, SECURE, COMPLETE, FREE OF HARMFUL CODE OR ERROR-FREE.

**19.    Indemnification**

19.1    Client shall defend and indemnify and hold harmless each Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to Client's breach of this Coinbase Prime ~~Broker~~ Agreement, Client's violation of any law, rule or regulation, or rights of any third party, or Client's gross negligence, fraud or willful misconduct, unless such Claims or Losses arise out of or relate to Coinbase's gross negligence, fraud, willful misconduct. This obligation will survive any termination of this Coinbase Prime ~~Broker~~ Agreement.

19.2    Coinbase shall defend and indemnify and hold harmless Client, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses to the extent arising out of or relating to any (i) violation, misappropriation, or infringement upon any United States patent, copyright, trademark, trade secret or other intellectual property right of a third party or (ii) violation of applicable law, rule or regulation, or rights of any third party, or Coinbase's gross negligence, fraud or willful misconduct unless such Claims or Losses arise out of or relate to Client's gross negligence, fraud, willful misconduct, or breach of this Coinbase Prime ~~Broker~~ Agreement. This obligation will survive any termination of this Coinbase Prime ~~Broker~~ Agreement.

Each Party's (the "Indemnitor") indemnification obligation under Section 18 of this Coinbase Prime ~~Broker~~ Agreement shall apply only if the other Party (the "Indemnitee") does the following: (a) notifies the Indemnitor promptly in writing, not later than thirty (30) days after the Indemnitee receives notice of the Claim (or sooner if required by applicable law); (b) gives the Indemnitor sole control of the defense and any settlement negotiations (subject to the below); and (c) gives the Indemnitor the information, authority, and assistance such Indemnitor needs to defend against or settle the Claim.

No Party providing indemnification pursuant to this Section 19 shall accept any settlement of any Claims or Losses if such settlement imposes any financial or non-financial liabilities, obligations, or restrictions on, or requires an admission of guilt or wrong-doing from, any party indemnified pursuant to this Section 19, without such party's prior written consent.

12

19.3    For the purposes of this Coinbase Prime ~~Broker~~ Agreement:

   (a)    "Claim" means any action, suit, litigation, demand, charge, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving, any court or other governmental, regulatory or administrative body or any arbitrator or arbitration panel; and

   (b)    "Losses" means any liabilities, damages, diminution in value, payments, obligations, losses, interest, costs and expenses, security or other remediation costs (including any regulatory investigation or third party subpoena costs, reasonable attorneys' fees, court costs, expert witness fees, and other expenses relating to investigating or defending any Claim); fines, taxes, fees, restitution, or penalties imposed by any governmental, regulatory or administrative body, interest on and additions to tax with respect to, or resulting from, Taxes imposed on Client's assets, cash, other property, or any income or gains derived therefrom; and judgments (at law or in equity) or awards of any nature.

## 20.    Limitation of Liability

The Coinbase Prime ~~Broker~~ Agreement shall be subject to a limitation of liability as agreed between the Parties.

## 21.    Privacy

Except as set forth herein, the Coinbase Entities shall use and disclose Client's and its Authorized Representatives' non-public personal information in accordance with the Coinbase Privacy Policy, as set forth at *https://www.coinbase.com/legal/privacy* or a successor website, and as amended and updated from time to time.

## 22.    Arbitration

22.1    Subject to the jurisdiction of the Bankruptcy Court, any Claim arising out of or relating to this Coinbase Prime ~~Broker~~ Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including any determination of the scope or applicability of the agreement to arbitrate as set forth in this Section 22, shall be determined by arbitration in the state of New York or another mutually agreeable location, before one neutral arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, and the award of the arbitrator (the "Award") shall be accompanied by a reasoned opinion. Judgment on the Award may be entered in any court having jurisdiction. This Coinbase Prime ~~Broker~~ Agreement shall not preclude the Parties from seeking provisional relief, including injunctive relief, in any court of competent jurisdiction. Seeking any such provisional relief shall not be deemed to be a waiver of such party's right to compel arbitration. The Parties expressly waive their right to a jury trial to the extent permitted by applicable law.

22.2    In any arbitration arising out of or related to this Coinbase Prime Broker Agreement, the arbitrator shall award to the prevailing party, if any, as determined by the arbitrator, all of its costs and fees. "Costs and fees" mean all reasonable pre-award expenses of the arbitration, including the arbitrator's fees, administrative fees, travel expenses, out-of-pocket expenses such as copying and telephone, court costs, witness fees, and attorneys' fees.

22.3    The Parties acknowledge that this Coinbase Prime Broker Agreement evidences a transaction involving interstate commerce. Notwithstanding the provision herein with respect to applicable substantive law, any arbitration conducted pursuant to the terms of this Coinbase Prime Broker Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).

## 23.    Term, Termination and Suspension

This Coinbase Prime Broker Agreement is effective as of the entry of the Confirmation Order and shall remain in effect until terminated by Coinbase or Client as follows:

(a)    Either Party may terminate this Coinbase Prime Broker Agreement in its entirety for any reason and without Cause by providing at least 90 days' prior written notice to the other party; *provided, however*, Client's termination of this Coinbase Prime Broker Agreement shall not be effective until Client has fully satisfied its obligations hereunder. Notwithstanding the foregoing, the Coinbase Entities acknowledge that the Custodial Services are critical to the Client and shall use its reasonable efforts to continue to offer such Custodial Services to the Client for a least one-hundred and eighty (180) days following any termination of this Coinbase Prime Broker Agreement at a rate that is twice the rate applicable during the term.

(b)    Regardless of any other provision of this Coinbase Prime Broker Agreement, the Coinbase Entities may, in their sole discretion, suspend, restrict or terminate the Client's Prime Broker Services, including by suspending, restricting or closing the Client's Prime Broker Account and/or any associated Trading Account, Custodial Account or any credit account (as applicable), for Cause, at any time and without prior notice to the Client.

"Cause" shall mean: (i) Client materially breaches any provision of this Coinbase Prime Broker Agreement and fails to cure such breach within ten (10) days following notice by the Coinbase Entities to the Client of the occurrence of such breach; (ii) the Bankruptcy Court enters an order, or Client or any of its debtor-affiliates in the Chapter 11 Cases (each, a "Debtor" and collectively, the "Debtors") files or supports an application, motion, or request for an order,   that has the effect of amending, vacating, reversing, supplementing, or modifying the  this Coinbase Prime Broker Agreement or the provisions of the Confirmation Order concerning this Coinbase Prime Broker Agreement (the **"Approval Provisions"**) in a manner that a Coinbase Entity determines in its reasonable discretion is materially adverse to a Coinbase Entity; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; (iv) after its

entry, the Approval Provisions ceases to be in full force and effect; (v) termination is required pursuant to a facially valid subpoena, court order or binding order of a government authority; (vi) Client's Prime ~~Broker~~ Account is subject to any pending litigation, investigation or government proceeding and/or Coinbase reasonably perceives a materially heightened risk of legal regulatory non-compliance by the Coinbase Entities associated with Client's use of Prime ~~Broker~~ Services; or (vii) Coinbase acting in a commercially reasonable manner suspects Client of attempting to circumvent Coinbase's controls or uses the Prime ~~Broker~~ Services in a manner Coinbase otherwise deems inappropriate or potentially harmful to itself or third parties.

In the event that the Bankruptcy Court does not enter a Confirmation Order containing the Approval Provisions by ~~[~~December 31, 2023~~]~~ in form and substance reasonably satisfactory to Coinbase, this Coinbase Prime ~~Broker~~ Agreement shall be null and void without any further action by either party.

(c)      Client acknowledges that the Coinbase Entities' decision to take certain actions, including suspending, restricting or terminating Client's Prime ~~Broker~~ Account or Prime ~~Broker~~ Services, may be based on confidential criteria that are essential to Coinbase's risk management and security practices and agrees that the Coinbase Entities are under no obligation to disclose the details of its risk management and security practices to Client.

## 24.    Severability

If any provision or condition of this Coinbase Prime ~~Broker~~ Agreement shall be held invalid or unenforceable, the remainder of this Coinbase Prime ~~Broker~~ Agreement shall continue in full force and effect.

## 25.    Waiver

Any waivers of rights by the Parties under this Coinbase Prime ~~Broker~~ Agreement must be in writing and signed by such Party or Parties. A waiver will apply only to the particular circumstance giving rise to the waiver and will not be considered a continuing waiver in other similar circumstances. A Party's failure to insist on strict compliance with this Coinbase Prime ~~Broker~~ Agreement or any other course of conduct by such Party shall not be considered a waiver of their rights under this Coinbase Prime ~~Broker~~ Agreement.

## 26.    Survival

All provisions of this Coinbase Prime ~~Broker~~ Agreement which by their nature extend beyond the expiration or termination of this Coinbase Prime ~~Broker~~ Agreement shall survive the termination or expiration of this Coinbase Prime ~~Broker~~ Agreement.

## 27.    Governing Law

This Coinbase Prime ~~Broker~~ Agreement, Client's Prime ~~Broker~~ Account, and the Prime ~~Broker~~ Services will be governed by and construed in accordance with the laws of the State of New

York, excluding its conflicts of laws principles, except to the extent such state law is preempted by federal law.

## 28.    Force Majeure

The Coinbase Entities shall not be liable for delays, suspension of operations, whether temporary or permanent, failure in performance, or interruption of service which result directly or indirectly from any cause or condition beyond the reasonable control of the Coinbase Entities, including any act of God; embargo; natural disaster; act of civil or military authorities; act of terrorists; terrorist related hacking, government restrictions; any ruling by any Connected Trading Venue, exchange or market; market volatility or disruptions in order trading on any Connected Trading Venue, exchange or market; suspension of trading; civil disturbance; war; strike or other labor dispute; fire; severe weather; interruption in telecommunications, Internet services, or network provider services; failure of equipment and/or software; failure of computer or other electronic or mechanical equipment or communication lines; outbreaks of infectious disease (other than COVID-19) or any other public health crises, including quarantine or other employee restrictions; acts or omissions of any Connected Trading Venue; or any other catastrophe or other occurrence which is beyond the reasonable control of the Coinbase Entities (each, a "Force Majeure Event"); *provided, however*, that this Section 28 shall only apply for so long as such delay or prevention is occurring; *provided further*, that should such delay or prevention remain ongoing for fifteen (15) days, Client may request withdrawal of the USD equivalent of any assets then held in a Digital Asset Wallet or Fiat Wallet so long as such delay or suspension does not affect the transfer or settlement of USD.

## 29.    Entire Agreement; Headings

This Coinbase Prime ~~Broker~~ Agreement, together with all exhibits, addenda and supplements attached hereto or referenced herein, comprise the entire understanding between Client and the Coinbase Entities as to the Prime ~~Broker~~ Services and supersedes all prior discussions, agreements and understandings, including any previous version of this Coinbase Prime ~~Broker~~ Agreement, and the Custodial Services Agreement between Client and any Coinbase Entity, including all exhibits, addenda, policies, and supplements attached thereto or referenced therein. Section headings in this Coinbase Prime ~~Broker~~ Agreement are for convenience only and shall not govern the meaning or interpretation of any provision of this Coinbase Prime ~~Broker~~ Agreement.

## 30.    Amendments

Any modification or addition to this Coinbase Prime ~~Broker~~ Agreement must be in writing and either (a) signed by a duly authorized representative of each party, or (b) accepted and agreed to by Client.

## 31.    Assignment

Any assignment of Client's rights and/or licenses granted under this Coinbase Prime ~~Broker~~ Agreement without obtaining the prior written consent (not to be unreasonably withheld) of Coinbase shall be null and void. Coinbase reserves the right to assign its rights under this Coinbase Prime ~~Broker~~ Agreement without restriction, including to any of the Coinbase Entities

or their affiliates or subsidiaries, or to any successor in interest of any business associated with the Prime ~~Broker~~ Services, such affiliate, subsidiary or successor, an ("Assignee"), *provided* that Coinbase shall notify Client within a reasonable amount of time prior to such assignment and that Client shall be entitled to terminate this Coinbase Prime ~~Broker~~ Agreement with immediate effect following such assignment; *provided further*, that any such Assignee has the operational capacity and all necessary legal and/or regulatory approvals, licenses and permissions to provide the Prime ~~Broker~~ Services to Client, and that the security measures utilized by such Assignee shall be equivalent to those employed by Coinbase.

## 32.    Electronic Delivery of Communications

Client agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures (collectively, "Communications") that the Coinbase Entities provide in connection with Client's Prime ~~Broker~~ Account and Client's use of Prime ~~Broker~~ Services. Communications include: (a) terms of use and policies Client agrees to, including updates to policies or the Coinbase Prime ~~Broker~~ Agreement, (b) Prime ~~Broker~~ Account details, including transaction receipts, confirmations, records of deposits, withdrawals or transaction information, (c) legal, regulatory and tax disclosures or statements the Coinbase Entities may be required to make available to Client and (d) responses to claims or customer support inquiries filed in connection with Client's Prime ~~Broker~~ Account.

Coinbase will provide these Communications to Client by posting them on the Prime ~~Broker~~ Site, emailing them to Client at the primary email address on file with Coinbase, communicating to Client via instant chat, and/or through other means of electronic communication. The Client agrees that electronically delivered Communications may be accepted and agreed to by Client through the Prime ~~Broker~~ Services interface. Furthermore, the Parties consent to the use of electronic signatures in connection with Client's use of the Prime ~~Broker~~ Services.

## 33.    Notice and Contacts

33.1    All notices required or permitted to be given hereunder shall be in writing delivered to the Party at its address specified below via an overnight mailing company of national reputation. Any Party that changes its notice address must notify the other Party promptly of such change.

If to any Coinbase Entity:

Legal Department Coinbase, Inc.
248 3rd St, #434
Oakland, CA 94607
legal@coinbase.com

If to Client, the address specified in its signature block on the Execution Page.

33.2    In the event of any market operations, connectivity, or erroneous trade issues that require immediate attention including any unauthorized access to Client's Prime ~~Broker~~ Account, please contact:

17

To Coinbase: support@coinbase.com.

To Client: the email address specified in its signature block on the Execution Page.

It is solely Client's responsibility to provide Coinbase with a true, accurate and complete contact information including any e-mail address, and to keep such information up to date. Client understands and agrees that if Coinbase sends Client an electronic Communication but Client does not receive it because Client's primary email address on file is incorrect, out of date, blocked by Client's service provider, or Client is otherwise unable to receive electronic Communications, Coinbase will be deemed to have provided the Communication to Client. Client may update Client's information via Client's Prime ~~Broker~~ Account and visiting settings or by providing a notice to Coinbase as prescribed above.

33.3    To see more information about our regulators, licenses, and contact information for feedback, questions or complaints, please visit *https://www.coinbase.com/legal/licenses*.

## 34.    Client

To the extent Client is a natural person over 18 years of age, if Coinbase receives legal documentation confirming Client's death or other information leading Coinbase to believe Client is deceased, Coinbase will freeze Client's Prime ~~Broker~~ Account ("Freeze Period"). During the Freeze Period, no transactions may be completed until: (i) Client's designated fiduciary has opened a new Prime ~~Broker~~ Account, as further described below, and the entirety of Client's Prime ~~Broker~~ Account has been transferred to such new Prime ~~Broker~~ Account, or (ii) Client has received proof in a form satisfactory to Coinbase that Client is not deceased. If Coinbase has reason to believe Client is deceased but Coinbase does not have proof of Client's death in a form satisfactory to Coinbase, Client authorizes Coinbase to make inquiries, whether directly or through third parties, that Coinbase considers necessary to ascertain whether Client is deceased. Upon receipt by Coinbase of proof satisfactory to Coinbase that Client is deceased, the fiduciary Client designated in a valid will or similar testamentary document will be required to open a new Prime ~~Broker~~ Account. If Client has not designated a fiduciary, then Coinbase reserves the right to (i) treat as Client's fiduciary any person entitled to inherit Client's Prime ~~Broker~~ Account, as determined by Coinbase upon receipt and review of the documentation Coinbase, in its sole and absolute discretion, deems necessary or appropriate, including (but not limited to) a will, a living trust or a Small Estate Affidavit, or (ii) require an order designating a fiduciary from a court having competent jurisdiction over Client's estate. In the event Coinbase determines, in its sole and absolute discretion, that there is uncertainty regarding the validity of the fiduciary designation, Coinbase reserves the right to require an order resolving such issue from a court of competent jurisdiction before taking any action relating to Client's Prime ~~Broker~~ Account. Pursuant to the above, the opening of a new Prime ~~Broker~~ Account by a designated fiduciary is mandatory following the death of Client, and Client hereby agrees that its fiduciary shall be required to open a new Prime ~~Broker~~ Account and provide required account opening information to gain access to the contents of Client's Prime ~~Broker~~ Account.

## 35.    Counterparts

18

This Coinbase Prime ~~Broker~~ Agreement may be executed in one or more counterparts, including by facsimile or email of .pdf signatures or DocuSign (or similar electronic signature software), each of which shall be deemed to be an original document, but all such separate counterparts shall constitute only one and the same Coinbase Prime ~~Broker~~ Agreement.

*[Signatures on following page]*

**IN WITNESS WHEREOF**, the Parties, including, subject to the Confirmation Order, Celsius Networks Lending LLC, have caused this Coinbase Prime ~~Broker~~ Agreement, including the Custody Agreement and MTA and the Distribution Addendum, to be duly executed and delivered as of the date below.

**COINBASE, INC. For itself and as agent for the Coinbase Entities**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**~~CLIENT~~CELSIUS NETWORK LLC:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

**CELSIUS NETWORK LTD:**

**By:** _____

**Name:** _____

**Title:** _____

**Date:** _____

**Address:** _____

_____

**E-Mail:** _____

*[Signature Page to Coinbase - Prime Agreement]*

**CELSIUS LENDING LLC:**

      **By:** _____

      **Name:** _____

      **Title:** _____

      **Date:** _____

      **Address:** _____

      _____

      **E-Mail:** _____

**CELSIUS NETWORKS LENDING LLC:**

      **By:** _____

      **Name:** _____

      **Title:** _____

      **Date:** _____

      **Address:** _____

      _____

      **E-Mail:** _____

**CELSIUS EU UAB:**

      **By:** _____

      **Name:** _____

      **Title:** _____

      **Date:** _____

      **Address:** _____

      _____

      **E-Mail:** _____

## EXHIBIT A
### to the Coinbase Prime ~~Broker~~ Agreement

### COINBASE CUSTODY CUSTODIAL SERVICES AGREEMENT

This Custody Agreement is entered into between Client and Coinbase Custody and forms a part of the Coinbase Prime ~~Broker~~ Agreement between the Client and the Coinbase Entities. Capitalized terms used in this Custody Agreement that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime ~~Broker~~ Agreement.

**1.    Custodial Services.**

Coinbase Custody shall provide Client with a segregated custody account controlled and secured by Coinbase Custody ("Custodial Account") to store certain Digital Assets supported by Coinbase Custody, on Client's behalf ("Custodial Services"). Coinbase Custody is a fiduciary under § 100 of the New York Banking Law and a qualified custodian for purposes of Rule 206(4)-2(d)(6) under the Investment Advisers Act of 1940, as amended, and is licensed to custody Client's Digital Assets in trust on Client's behalf. Digital Assets in Client's Custodial Account shall (i) be segregated from the assets held by Coinbase Custody as principal and the assets of other customers of Coinbase Custody, (ii) not be treated as general assets of Coinbase Custody, and except as otherwise provided herein, Coinbase Custody shall have no right, title or interest in such Digital Assets, (iii) constitute custodial assets and Client's property. In addition, Coinbase Custody shall maintain adequate capital and reserves to the extent required by applicable law and shall not, directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Digital Assets in the Custodial Account.

**2.    Custodial Account.**

2.1    *In General.* The Custodial Services shall permit the Client (i) to hold its Vault Balance in its Custodial Account and transfer Digital Assets to and from its Trading Balance, (ii) to deposit supported Digital Assets from a public blockchain address controlled by Client into its Custodial Account, (iii) withdraw supported Digital Assets from its Custodial Account to a public blockchain address controlled by Client and (iv) certain additional services as may be agreed to between the Client and Coinbase Custody from time to time. Each such deposit or withdrawal shall be referred to as a "Custody Transaction" and shall conform to Instructions provided by Client through the Coinbase Prime ~~Broker~~ Site. Client shall only withdraw or deposit Digital Assets to public blockchain addresses and accounts owned by Client or an address for which Client has conducted the necessary Know Your Customer ("KYC") and anti-money laundering ("AML") due diligence. Digital Assets shall be held in Client's Custodial Account in accordance with the terms of this Custody Agreement and shall not be commingled with other clients' Digital Assets. **Coinbase Custody reserves the right to refuse to process or to cancel any pending Custody Transaction to comply with applicable law or in response to a subpoena, court order or other binding government order, or to enforce transaction, threshold and condition limits, or if Coinbase Custody reasonably believes that the Custody Transaction may violate or facilitate the violation of an**

~~Coinbase 2022 US Version 2.0~~

**applicable law, regulation or rule of a governmental authority or self-regulatory organization.**

2.2    *Digital Asset Deposits and Withdrawals.* Coinbase Custody will process supported Digital Asset Custody Transaction according to the Instruction received from Client or Client's Authorized Representatives, and Coinbase Custody does not guarantee the identity of any user, receiver, requestee or other party. Client must verify all deposit and withdrawal information prior to submitting Instructions to Coinbase Custody regarding a Custody Transaction. Coinbase Custody shall have no liability, obligation, or responsibility whatsoever for Client Digital Asset transfers sent or received pursuant to inaccurate Instructions or received from a wrong party. Coinbase Custody reserves the right to charge network fees (including miner fees) to process a Custody Transaction on Client's behalf. Coinbase Custody will calculate the network fee, if any, in its sole and absolute discretion, although Coinbase Custody will always notify Client of the network fee at or before the time Client authorizes the Custody Transaction. Coinbase Custody reserves the right to delay any Custody Transaction if it perceives a risk of fraud or illegal activity.

2.3    *Digital Asset Storage and Transmission Delays.* Coinbase Custody requires up to twenty-four (24) hours between any request to withdraw Digital Assets from Client's Custodial Account and submission of Client's withdrawal to the applicable Digital Asset network. Since Coinbase Custody securely stores all Digital Asset private keys in offline storage, it may be necessary to retrieve certain information from offline storage in order to facilitate a withdrawal in accordance with Client's Instructions, which may delay the initiation or crediting of such withdrawal. Client acknowledges and agrees that a Custody Transaction may be delayed, and that Digital Assets shall not be deposited or withdrawn upon less than twenty-four (24) hours' notice initiated from Client's Custodial Account. The time of such request shall be the time such notice is transmitted from Client's Custodial Account. Except as specified, Coinbase Custody makes no representations or warranties with respect to the availability and/or accessibility of (1) the Digital Assets, (2) a Custody Transaction, (3) the Custodial Account, or (4) the Custodial Services. Except as specified, while Coinbase Custody will make reasonable efforts to process Client initiated deposits in a timely manner, Coinbase Custody makes no representations or warranties regarding the amount of time needed to complete processing as such processing is dependent upon many factors outside of Coinbase Custody's control.

2.4    *Supported Digital Assets.* The Custodial Services are available only in connection with those Digital Assets that Coinbase Custody, in its sole discretion, decides to support, which may change from time to time. Prior to initiating a deposit of Digital Asset to Coinbase Custody, Client must confirm that Coinbase Custody offers Custodial Services for that specific Digital Asset. By initiating a deposit of any Digital Asset to a Custodial Account, Client attests that Client has confirmed that the Digital Asset being transferred is a supported Digital Asset offered by Coinbase Custody. Under no circumstances should Client attempt to use the Custodial Services to deposit or store Digital Assets in any forms that are not supported by Coinbase Custody. Depositing or attempting to

23

deposit Digital Assets that are not supported by Coinbase Custody may result in such Digital Asset being irretrievable by Client and Coinbase Custody. Client shall be fully responsible and liable, and Coinbase Custody shall have no liability, obligation, or responsibility whatsoever, regarding any unsupported Digital Asset sent or attempted to be sent to it, or regarding any attempt to use the Custodial Services for Digital Assets that Coinbase Custody does not support. Digital Assets supported by Coinbase Custody shall be listed on the Coinbase Prime ~~Broker~~ Site. Coinbase Custody recommends that Client deposit a small amount of supported Digital Asset as a test prior to initiating a deposit of a significant amount of supported Digital Asset. Coinbase Custody shall provide Client with thirty (30) days' written notice before ceasing to support a Digital Asset, unless Coinbase Custody is required to cease such support by court order, statute, law, rule (including a self-regulatory organization rule), regulation, code, or other similar requirement.

2.5    *Use of the Custodial Services.* Client acknowledges and agrees that Coinbase Custody may monitor use of the Custodial Account and the Custodial Services and the resulting information may be utilized, reviewed, retained and or disclosed by Coinbase Custody for its internal purposes or in accordance with the rules of any applicable legal, regulatory or self-regulatory organization or as otherwise may be required to comply with relevant law, sanctions programs, legal process or government request.

2.6    *Independent Verification.* If Client is subject to Rule 206(4)-2 under the Investment Advisers Act of 1940, Coinbase Custody shall, upon written request, provide Client's authorized independent public accountant confirmation of or access to information sufficient to confirm (i) Client's Digital Assets as of the date of an examination conducted pursuant to Rule 206(4)-2(a)(4), and (ii) Client's Digital Assets are held either in a separate account under Client's name or in accounts under Client's name as agent or trustee for Client's clients.

2.7    *Third Party Payments.* The Custodial Services are not intended to facilitate third party payments of any kind. As such, Coinbase Custody has no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that Client may purchase or sell to or from a third party (including other users of Custodial Services) involving Digital Assets that Client intends to store, or have stored, in Client's Custodial Account.

2.8    *Termination, and Cancellation.* If Coinbase Custody closes Client's Custodial Account or terminates Client's use of the Custodial Services, Client will be permitted to withdraw Digital Assets associated with Client's Custodial Account for a period of up to ninety (90) days following the date of deactivation or cancellation to the extent not prohibited (i) under applicable law, including applicable sanctions programs, or (ii) by a facially valid subpoena, court order, or binding order of a government authority.

~~Coinbase 2022 US Version 2.0~~

3.      **Coinbase Custody Obligations**

3.1     *Bookkeeping*. Coinbase Custody shall keep timely and accurate records as to the deposit, disbursement, investment and reinvestment of the Digital Assets, as required by applicable law and in accordance with Coinbase Custody's internal document retention policies.

3.2     *Insurance.* Coinbase Custody shall obtain and maintain, at its sole expense, insurance coverage in such types and amounts as shall be commercially reasonable for the Custodial Services provided hereunder. Upon Client's written request and in accordance with Coinbase Custody policies, procedures, any confidentiality obligation and any applicable law, Coinbase Custody might provide the Client reasonable evidence detailing the nature and amount of such insurance coverage.

4.      **Additional Matters**

In addition to any additional service providers that may be described in an addendum or attachment hereto, Client acknowledges and agrees that the Custodial Services may be provided from time to time by, through or with the assistance of affiliates of, or vendors to, Coinbase Custody. Client shall receive notice of any material change in the entities that provide the Custodial Services.

*[Remainder of page intentionally left blank]*

25

**EXHIBIT B**
**to the Coinbase Prime ~~Broker~~ Agreement**

**COINBASE MASTER TRADING AGREEMENT**

Client should carefully consider whether trading or holding Digital Assets is suitable for its purpose, including in relation to Client's knowledge of Digital Assets and Digital Asset markets and Client's financial condition. All investments involve risk, and the past performance of a financial product does not guarantee future results or returns.

This Master Trading Agreement ("MTA") sets forth the terms and conditions for clients to trade Digital Assets through the Coinbase prime broker execution platform ("Trading Platform") and forms a part of the Coinbase Prime ~~Broker~~ Agreement between Client and the Coinbase Entities. Pursuant to this MTA, Coinbase shall open a Trading Account for the Client on the Trading Platform consisting of linked accounts at Coinbase and Coinbase Custody, each accessible via the Trading Platform ("Trading Account"). The Trading Platform shall provide Client with access to trade execution and automated trade routing services and Coinbase Execution Services (as defined below) to enable Clients to submit orders ("Orders") to purchase and sell specified Digital Assets in accordance with this MTA and the Coinbase Trading Rules set forth at *https://www.coinbase.com/legal/trading_rules* or a successor website (as amended and updated from time to time, the "Coinbase Trading Rules") (such services, the "Trading Services"). Capitalized terms used in this MTA that are not defined herein shall have the meanings assigned to them in the other parts of the Coinbase Prime ~~Broker~~ Agreement.

**1.    Order Routing and Connected Trading Venue**

1.1    The Trading Platform operates a trade execution service through which Client may submit Orders to purchase or sell Digital Assets. After Client submits an Order, the Trading Platform will automatically route the Order (or a portion of the Order) to one of the trading venues to which the Trading Platform has established connections (each such venue, a "Connected Trading Venue"). Each Order will be sent, processed and settled at each Connected Trading Venue to which it is routed. Once an Order to purchase Digital Assets has been placed, the associated Client Assets (as defined below) used to fund the Order will be placed on hold and will generally not be eligible for other use or withdrawal.

1.2    With each Connected Trading Venue, Coinbase shall establish an account in its name, or in its name for the benefit of clients, to trade on behalf of its clients, and the establishment of a Trading Account will not cause Client to have a direct legal relationship, or account with, any Connected Trading Venue. The Trading Platform will not intentionally match the buy and sell orders of its clients against each other and will not intentionally settle Orders against or otherwise trade with Coinbase's principal funds. Client acknowledges that Coinbase and its other clients may trade in their own interests

26

on the Connected Trading Venues and could, therefore, be the counterparty to a Client Order on a Connected Trading Venue.

1.3    Client acknowledges that Coinbase has sole discretion to determine the Connected Trading Venues with which it will establish connections. Coinbase will direct Orders to the Connected Trading Venues on an automated basis and generally will not manually route orders. In designing algorithms that determine an Order's routing logic, Coinbase considers a variety of factors relating to the Order and the Connected Trading Venues, including the speed of execution, whether the venue is able to consummate off-chain transactions, the availability of efficient and reliable systems, the level of service provided, and the cost of executing orders. Coinbase may receive cash payments or other financial incentives (such as reciprocal business arrangements) from Connected Trading Venues.

1.4    Coinbase makes no representation or warranty of any kind regarding any Connected Trading Venue, including as to its financial condition, data, security or quality of its execution services, and shall have no liability, obligation, or responsibility whatsoever for the selection or performance of any Connected Trading Venue. Digital Assets may trade at different prices on different trading venues, and other Connected Trading Venues and/or trading venues not used by Coinbase may offer better prices and/or lower costs than the Connected Trading Venue used to execute Client's Order.

1.5    Coinbase acts in an agency capacity for purposes of certain Orders, and may also act in a principal capacity for certain other Orders, as specified in the Coinbase Trading Rules. In the Request For Quotation ("RFQ") service, Coinbase may act as principal to fill Orders by providing indicative firm pricing in accordance with a variety of market factors, at its sole discretion. Each Client should independently evaluate whether such services are appropriate given its own investing profile and sophistication, among other considerations.

## 2.    Client Trading Balance and Vault Balance

2.1    For purposes of this MTA, Client's Digital Assets are referred to as "Client Digital Assets," Client's cash is referred to as "Client Cash," and Client Digital Assets and Client Cash are together referred to as "Client Assets."

2.2    Within the Trading Platform, Coinbase provides access to two types of accounts with balances relating to Client Assets: (1) the "Trading Balance" (as described below in Section 2.3) and (2) the "Vault Balance" (as described below in Section 2.5). The Trading Account provides a record of both the Trading Balance and the Vault Balance. Client determines the allocation of its Client Digital Assets between the Trading Balance and the Vault Balance. Maintenance of the Vault Balance shall be subject to the terms of the Custody Agreement; *provided, however*, Client's Trading Balance is separate from any Digital Assets Client maintains directly with Coinbase Custody.

27

2.3    Client Digital Assets credited to the Trading Balance are immediately available to Client for purposes of submitting an Order. Coinbase holds Digital Assets credited to the Trading Balance in one of three ways: (i) in omnibus hot wallets (each, an "Omnibus Hot Wallet"); (ii) in omnibus cold wallets (each, an "Omnibus Cold Wallet"); and (iii) in Coinbase's accounts with the Connected Trading Venues ("Coinbase Connected Trading Venue Digital Asset Balance"). Client agrees that Coinbase has sole discretion in determining the allocation of Digital Assets credited to the Trading Balance. Because Digital Assets credited to the Trading Balance are held on an omnibus basis and because of the nature of certain Digital Assets, Client does not have an identifiable claim to any particular Digital Asset. Instead, Client's Trading Balance represents an entitlement to a *pro rata* share of the Digital Assets Coinbase has allocated to the Omnibus Hot Wallets, Omnibus Cold Wallets and Coinbase Connected Trading Venue Digital Asset Balance. Coinbase relies on the Connected Trading Venues for the Coinbase Connected Trading Venue Digital Asset Balance, and Client has no contractual relationship with the Connected Trading Venues with respect to Digital Assets credited to the Trading Balance.

2.4    Client may maintain Client Cash in the Trading Balance but not in the Vault Balance. Coinbase holds Client Cash credited to the Trading Balance in one of two ways: (i) in one or more omnibus accounts in Coinbase's name for the benefit of customers at one or more U.S. insured depository institutions (each, an "FBO account") and (ii) in Coinbase's omnibus accounts at Connected Trading Venues. Coinbase will title the FBO accounts it maintains with U.S. depository institutions and maintain records of Client's interest in a manner designed to enable receipt of Federal Deposit Insurance Corporation ("FDIC") deposit insurance, where applicable and up to the deposit insurance limits applicable under FDIC regulations and guidance, on Client Cash for the Client's benefit on a pass-through basis. Coinbase does not guarantee that pass-through FDIC deposit insurance will apply to Client Cash, since such insurance is dependent in part on compliance of the depository institutions. Coinbase may also title its accounts at some or all Connected Trading Venues and maintain records of Client interests in those accounts in a manner consistent with FDIC requirements for pass-through deposit insurance, but availability of pass-through deposit insurance, up to the deposit insurance limits applicable under FDIC regulations and guidance, is also dependent on the actions of the Connected Trading Venues and any depository institutions they use, which may not be structured to provide pass-through deposit insurance. FDIC insurance applies to cash deposits at banks and other insured depository institutions in the event of a failure of that institution, and does not apply to any Coinbase Entity or to any Digital Asset held by a Coinbase Entity on Client's behalf. Client Cash is immediately available to Client for purposes of submitting an Order, unless a restriction applies.

2.5    At Client's election, all or a portion of Client Digital Assets may also be allocated to the Vault Balance which is held in a Custodial Account in Client's name at Coinbase Custody pursuant to the Custody Agreement. Such Vault Balance will be divided between segregated hot storage in Client's name ("Hot Vault Balance") and segregated cold storage in Client's name ("Cold Vault Balance"). Client shall have sole discretion to

28

allocate Digital Assets between the Hot Vault Balance and Cold Vault Balance. Digital Assets in the Hot Vault Balance may be transferred immediately to Client's Trading Balance unless a restriction applies. A transfer of Digital Assets in the Cold Vault Balance to Client's Trading Balance will be subject to Coinbase Custody's standard cold storage withdrawal procedures. Client hereby appoints Coinbase as Client's agent for purposes of instructing Coinbase Custody to transfer Client Digital Assets between Client's Vault Balance and Client's Trading Balance. Client agrees that an Instruction to Coinbase to settle an Order to or from Client's Vault Balance constitutes authorization to Coinbase to transfer Client Digital Assets to or from Client's Vault Balance as necessary or appropriate to consummate such settlement.

2.6    In all circumstances and consistent with laws and regulations applicable to Coinbase, Coinbase will keep an internal ledger that specifies the Client Assets credited to Client's Trading Balance and enables Coinbase and its auditors and regulators to identify Client and the Client Assets.

2.7    Coinbase treats all Client Assets as custodial assets held for the benefit of Client. No Client Assets credited to the Trading Balance shall be considered to be the property of, or loaned to, Coinbase, except as provided in any loan agreement between Client and any Coinbase Entity. Neither Coinbase nor any Coinbase Entity will sell, transfer, loan, rehypothecate or otherwise alienate Client's Assets credited to Client's Trading Balance unless instructed by Client pursuant to an agreement between Client and a Coinbase Entity.

**3.    Role of Coinbase Custody**

3.1    To facilitate the Trading Services, Coinbase may at its sole discretion maintain portions of the Omnibus Hot Wallet and the Omnibus Cold Wallet in one or more custodial FBO accounts with its affiliate, Coinbase Custody. In such circumstances, although the Omnibus Hot Wallet and the Omnibus Cold Wallet are held in Coinbase's FBO accounts with Coinbase Custody, Client's legal relationship for purposes of Digital Assets held in the Omnibus Hot Wallet and the Omnibus Cold Wallet will not be, directly or indirectly, with Coinbase Custody and the terms, conditions and agreements relating to those wallets are to be governed by this MTA.

3.2    Client Digital Assets held in the Hot Vault Balance and Cold Vault Balance are maintained directly between Client and Coinbase Custody in Client's name and are subject to the terms of the Client's Custody Agreement.

**4.    Cash and Digital Asset Deposits and Withdrawals**

4.1    To deposit Client Cash, Client must initiate a transfer from a linked bank account, a wire transfer, a SWIFT transfer, a Silvergate Exchange Network deposit or other form of electronic payment approved by Coinbase from time to time to Coinbase's bank account, the instructions for which are available on the Coinbase Prime ~~Broker~~ Site. Coinbase will

29

credit the Trading Balance with Client Cash once the associated cash is delivered to Coinbase.

4.2    To withdraw Client Cash, Client may also initiate a withdrawal of Client Cash from the Trading Balance at any time using the withdrawal function on the Trading Platform.

4.3    To deposit Client Digital Assets, Clients may transfer Client Digital Assets directly to the Omnibus Hot Wallet or Omnibus Cold Wallet, the instructions for which are available on the Coinbase Prime ~~Broker~~ Site. Client may transfer funds to and among its Hot Vault Balance or Cold Vault Balance. When Client transfers Digital Assets to Coinbase or Coinbase Custody, it delivers custody and control of the Digital Assets to Coinbase, Coinbase Custody or Coinbase's designee, as applicable. Client represents and warrants that any Digital Asset so transferred shall be free and clear of all liens, claims and encumbrances.

4.4    To withdraw Client Digital Assets, Client must provide applicable Instructions via the Coinbase Prime ~~Broker~~ Site ("Withdrawal Transfer"). Once Client has initiated a Withdrawal Transfer, the associated Client Digital Assets will be in a pending state and will not be included in the Client's Trading Balance or Vault Balance. Client acknowledges that Coinbase may not be able to reverse a Withdrawal Transfer once initiated. Client may withdraw Client Digital Assets at any time, subject to delays for Digital Assets held in Cold Vault Balance, and any applicable account restrictions.

4.5    Client must verify all transaction information prior to submitting withdrawal Instructions to Coinbase, as Coinbase cannot and does not guarantee the identity of the wallet owner or bank account to which Client is sending Client Digital Assets or Client Cash, as applicable. Coinbase shall have no liability, obligation, or responsibility whatsoever for Client Cash or Client Digital Asset transfers sent to or received from an incorrect party or sent or received via inaccurate Instructions.

## 5.    Disruption to Trading Platform

5.1    Client acknowledges that electronic facilities and systems such as the Trading Platform are vulnerable to disruption, delay or failure and, consequently, such facilities and systems may be unavailable to Client as a result of foreseeable and unforeseeable events. Client understands and agrees that Coinbase does not guarantee uninterrupted access to the Trading Platform or all features of the Trading Services. Client acknowledges that although Coinbase will attempt to provide notice of any scheduled or unscheduled unavailability that would result in Client being unable to access the Trading Platform or the Trading Services, Coinbase cannot guarantee advanced notice to Client.

5.2    Coinbase may, in its sole discretion, take any of the following actions, and in the case of clause (i), shall use reasonable efforts to provide Client with as much prior notice as is practicable: (i) halt or suspend Trading Services, including trading on the Trading Platform or the trading of any Digital Assets or currency, or (ii) impose limits on the amount or size of Client's Orders. Coinbase shall have no liability, obligation, or

30

responsibility to Client as a result of making any changes to or suspending the Trading Platform.

**6.     Coinbase Trading Rules and Order Types**

6.1     Client agrees to comply with the Coinbase Trading Rules in effect at the time of any Order. Client agrees to review and become familiar with the terms of the various types of Orders (each an "Order Type") available through the Trading Service. A detailed description of the terms of all Orders is contained in the Coinbase Trading Rules. Coinbase reserves the right to modify the terms of any Order Type and the Coinbase Trading Rules at any time and without prior notice to Client, and Client acknowledges that it is solely responsible for ensuring knowledge of applicable Order Types and Coinbase Trading Rules prior to placing an Order.

6.2     Coinbase may modify the terms of, or cancel, any Order executed on Trading Platform if Coinbase determines in its sole reasonable discretion that the Order was clearly erroneous according to the Coinbase Trading Rules. Coinbase shall have no liability, obligation, or responsibility to Client as a result of exercising its rights under this Section 6.

**7.     Coinbase Supported Digital Assets**

Coinbase determines in its sole discretion which Digital Assets to support for use with the Trading Services, as specified on the Coinbase Prime ~~Broker~~ Site. Not all Digital Assets supported for Custodial Services are also supported for Trading Services.

**8.     Coinbase Execution Services**

8.1     At Coinbase's sole discretion, Client may elect to submit Orders to Coinbase Execution Services ("CES"), a Trading Service through which CES personnel will execute Orders on behalf of Client. CES will execute Orders by using automated trade routing services through Client's Prime ~~Broker~~ Account or by filling Orders on Coinbase's over-the-counter ("OTC") trading service ("OTC Services"). Coinbase has sole and absolute discretion to accept or reject any Order. Coinbase and Client may communicate regarding Instructions related to Orders on a mutually agreed communication medium, including instant messaging, email, and telephone.

8.2     CES brokers Orders on a commercially reasonable basis as Client's agent and may exercise discretion in executing Orders. Client must pre-fund its Trading Balance prior to submitting Orders. By electing to use CES, Client agrees that it is authorizing CES personnel to access its Prime ~~Broker~~ Account to initiate and execute Orders. Client acknowledges that CES personnel will retain access to the Client Prime ~~Broker~~ Account until Client provides Coinbase with Instructions to terminate such access. Absent express written agreement between the Parties, Coinbase will accept Orders only from Authorized Representatives that are designated in the Client's Prime ~~Broker~~ Account as having trading authority with respect to the Prime ~~Broker~~ Account.

31

8.3     For OTC Services, CES personnel will confirm the terms of an Order (which terms shall include asset, quantity, price, settlement timing and fees) with Client prior to executing the Order. Coinbase has policies and procedures in place that are reasonably designed to prevent the disclosure of any Client identity to its OTC counterparty. Coinbase may, in its sole and absolute discretion, accept the following statements (or similar or analogous statements) as Client's final and binding agreement to the terms of an Order: "done," "I buy," "bought," "I sell," or "sold." A completed, executed and settled Order will be reflected in Client's Prime ~~Broker~~ Account.

8.4     For Orders fulfilled via OTC Services ("OTC Orders"), each of Client's and its OTC counterparty's confirmations of the terms of the OTC Order deems such OTC Order as binding and final, and thereby executed. Client's failure to timely settle an executed OTC Order in accordance with the settlement terms will constitute a default under the Coinbase Prime ~~Brokerage~~ Agreement. Upon Client's default of an OTC Order:

Without prior notice to Client, Coinbase shall have the right to: (i) transfer Client Assets from Client's Trading Balance to Coinbase to settle the OTC Order subject to default, and/or (ii) liquidate or cancel outstanding OTC Orders (including OTC Orders that have been submitted or are in the process of being fulfilled).

If the above actions are not sufficient to satisfy all obligations of Client to Coinbase in respect of OTC Orders subject to default, Coinbase shall have the right to liquidate any and all of Client's assets and positions held with Coinbase or Coinbase Custody, including the Trading Balance and Vault Balance in Client's Custodial Account, to cover any Losses incurred by Client's failure to settle the OTC Order. In connection with liquidating such assets, Client authorizes Coinbase, in Coinbase's sole discretion, to liquidate any of Client's Digital Assets in a commercially reasonable sale at the market price that otherwise applies to such Digital Assets at the time of liquidation, without regard to whether Client would recognize a gain or loss on such sale or would recognize a greater or lesser gain or loss if different Digital Assets were sold. Client understands that the value of Digital Assets may rise or fall quickly, and Coinbase has no obligation to liquidate Client's Digital Assets at a time that provides the best price for Client. Client agrees that Digital Assets held in its Trading Balance and the Vault Balance in Client's Custodial Account are of a kind or type customarily sold on recognized markets, subject to standard price quotations and may decline speedily in value. Client agrees that if Coinbase exercises its setoff rights or secured party remedies against Client's Digital Assets, that Coinbase may value such Digital Assets using the same valuation method and same process that is otherwise used when Digital Assets are sold on the Trading Platform or any other commercially reasonable valuation method. A sale by Coinbase of Client's Digital Assets, without notice, at a private sale using the valuation and method described above shall be a commercially reasonable method of disposition.

## 9.     Determination of Suitability; All Risks Not Disclosed

Coinbase's provision of the Trading Services is neither a recommendation that Client enter into a particular Order nor a representation that any product described on the Trading Platform is

32

suitable or appropriate for Client. Many of the Trading Services described on Trading Platform involve significant risks, and Client should not use the Trading Services unless it has fully understood all such risks and has independently determined that such Orders are appropriate. Any discussion of the risks contained in this MTA or on the Trading Platform should not be considered to be a disclosure of all risks or a complete discussion of the applicable risks.

**10.    Characterization of Trading Services; Not a Registered Broker-Dealer or Investment Adviser**

Client understands and acknowledges that no transactions executed in connection with Client's Trading Account or the Trading Services are securities transactions, and Coinbase is not registered with the U.S. Securities and Exchange Commission as a broker-dealer or an investment adviser or licensed under any state securities laws. Coinbase is not acting as a fiduciary in respect of Client (including in connection with its rights under this MTA) and does not have any responsibility under the standards governing the conduct of broker-dealers, fiduciaries, investment advisers or investment managers. Client agrees and acknowledges that any information or advice provided by Coinbase or any other Coinbase Entity does not and will not serve as the basis of any investment decision by Client.

**11.    Coinbase Corporate Accounts**

Coinbase and its affiliates may transact through Trading Accounts on the Trading Platform ("Coinbase Corporate Accounts") for purposes including inventory management, to facilitate Client Orders, and for other corporate purposes. To the extent that a Coinbase Corporate Account transacts on the Trading Platform, the Coinbase Corporate Account (i) will not have any special priority vis-a-vis Client Orders and will be subject to the Coinbase Trading Rules, (ii) will trade only on Market Data available to all Clients, and (iii) will not access any non-public data of other Clients. Coinbase's internal ledger will indicate the amount of each Digital Asset held for each client and each such Coinbase Corporate Account.

**12.    Term, Termination and Suspension**

12.1    Regardless of any other provision of this MTA, Coinbase has the sole discretion to decline to provide Trading Services to Client and may, in its sole discretion, suspend, restrict or terminate the Client's Trading Services, including by suspending, restricting or closing the Client's Trading Account, in accordance with the General Terms.

12.2    If Client is subject to termination, Client agrees to transfer any Client Assets off the Trading Platform within thirty (30) days of receipt of the termination notice unless such transfer is otherwise prohibited (i) under applicable law, including any sanctions programs, or (ii) by a facially valid subpoena or court order. Client agrees to promptly provide Coinbase with Instructions as to where its Client Assets should be transferred, and agrees that failure to do so within thirty (30) days of receipt of notice of termination may result in Client Assets being transferred to the Client's linked bank account or Digital Asset wallet on file, in each case subject to off-set for any outstanding obligations to any Coinbase Entity in accordance with the General Terms. Final disbursement of

33

assets may be delayed until any remaining obligations or indebtedness have been satisfied. Client is responsible for all debits, costs, commissions, and losses arising from any actions Coinbase must take to liquidate or close transactions in the Client's Trading Account.

**13.    Unclaimed Property**

If Coinbase is holding Client Assets in the Trading Balance, has no record of Client's use of the Trading Services for an extended period, and is otherwise unable to contact Client, Coinbase may be required under applicable laws, rules or regulations to report these assets as unclaimed property and to deliver such unclaimed property to the applicable authority. Coinbase may deduct a dormancy fee or other administrative charge from such unclaimed funds, as permitted by applicable laws, rules or regulations.

Coinbase 2022 US Version 2.0

## COINBASE DISTRIBUTION ADDENDUM
### to the Coinbase Prime Agreement

This Coinbase Distribution Addendum ("Distribution Addendum") is incorporated into and made a part of that certain Coinbase Prime Agreement (the "Agreement") between Coinbase, Inc. ("CB Inc.") and Coinbase Custody Trust Company, LLC ("CB Custody") (for purposes of this Distribution Addendum, CB Inc. and CB Custody are collectively referred to herein as, "Coinbase") and the Client set forth in the Agreement (together with Coinbase, the "**Parties**", and each, a "**Party**"). The Parties reserve the right to update this Distribution Addendum from time to time pursuant to Section 30 of the Agreement; *provided, however*, any update will not materially reduce the overall Distribution Services (as defined below) set forth in this Distribution Addendum.

**14.**    **Purpose; Conflicts.**

**Purpose**. The purpose of this Distribution Addendum is to describe the distribution and related custody services Coinbase is willing to offer to Client to distribute certain cryptocurrencies and provide related custody services to certain Claimants. During the Term, and subject to the terms and conditions of this Agreement, including this Distribution Addendum, Client appoints Coinbase as a non-exclusive worldwide custodian and distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.

**Conflicts**. Except as set forth in this Distribution Addendum, Custody Services will be provided in accordance with Exhibit A to the Agreement. To the extent the terms of Exhibit A to the Agreement conflict with the terms of this Distribution Addendum with respect to this Distribution Addendum, any Distribution Services provided hereunder or any Custody Services related thereto, the terms of this Distribution Addendum will control.

**15.**    **Distributions to Claimants.**

**Services**. Pursuant to the process described in Schedule 1 hereto, Client may provide CB Custody with written instructions ("Instructions") to distribute to one or more Claimants a portion or all of, the payment owed to such Claimant(s) under the Reorganization Plan (each such distribution under this Distribution Addendum, a "Distribution").  Each such Instruction shall be provided in accordance with the terms set forth in the Agreement.  CB Custody shall, directly or through one of its affiliates, including the In-Transit Account or any other internal ledger account, make Distributions as set forth in Schedule 1 hereto and in accordance with Instructions provided by Client (the "Distribution Services"). Coinbase shall provide such Distribution Services from the Celsius Custody Account (as defined below) in accordance with the terms and conditions of this Distribution Addendum, including those detailed in Schedule 1 hereto.  Client agrees that CB Custody may act on an Instruction by transferring the relevant Supported Cryptocurrency to CB Inc. with instructions that CB Inc. credit such Supported Cryptocurrency to an account on the books and records of CB Inc. (the "In-Transit Account") in the name of Client, and further distribute such Supported Cryptocurrency to Claimants.  CB Inc.

35

may, for operational purposes, reflect the In-Transit Account as either an "Institutional Prime Exchange Account" or a "Retail Exchange Account." Such account shall be subject to the terms and conditions of this Agreement, except that such account can only be used, and the only instruction that Client may provide in respect of such account is a standing instruction, to perform the Distribution Services pursuant the Instructions; provided however that the modality of accessing and using such Retail Exchange Account, where it differs from such Institutional Prime Exchange Account, shall be communicated to Client in a timely fashion.

**Instructions for Distribution.** If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a Supported Jurisdiction, all Distributions to that Claimant shall be in the form of the applicable Supported Cryptocurrency. If the Instructions from Client state that a certain Claimant's Distribution shall be in the form of Supported Cryptocurrency and such Claimant Resides in a jurisdiction that is not a Supported Jurisdiction, Coinbase shall (i) provide prompt notice to Client that such Instruction cannot be followed as provided and (ii) not act on such Instruction until Client, in its sole and absolute discretion, provides revised Instructions. No Distributions shall be made to Claimants who Reside in a jurisdiction that is not a Supported Jurisdiction. If Coinbase rejects Client's Instructions for any reason, fails to make or cannot make a Distribution as set forth in Client's Instructions for any Claimant, Coinbase shall provide prompt notice to Client that such Instruction is not followed and Client reserves the right, in its sole and absolute discretion, to use another service provider to make Distributions to such Claimant.

**Indemnification and Applicable Law.** Section 19 of the Agreement shall apply to any actions Coinbase takes pursuant to Instructions from Client, and Client shall defend and indemnify and hold harmless Coinbase, its affiliates, and their respective officers, directors, agents, employees and representatives from and against any and all Claims and Losses arising out of or relating to Coinbase's compliance with any Instruction by Client. Coinbase reserves the right to refuse to process or to cancel any Client Instructions if Coinbase reasonably determines that such refusal or cancellation is necessary to comply with applicable law or regulations, or in response to a subpoena, court order or other binding government order, or if Coinbase reasonably believes that compliance with the Instruction may violate, facilitate the violation of, or is inconsistent with an applicable law, regulation or rule of a governmental authority or self-regulatory organization. Coinbase further reserves the right to refuse to process or to cancel any Client Instructions regarding Distributions to Claimants unless such Claimants have met the requirements of Coinbase's AML and KYC processes, as the same may be modified by Coinbase from time to time.

**Supported Jurisdictions.** Supported Jurisdictions are set forth in Schedule 2 hereto.

**16.    Custody Account**

**Appointment as Custodian.** Subject to approval of the Bankruptcy Court, Client hereby appoints Coinbase as a custodian for Claimants for Distributions contemplated under this Distribution Addendum (any such custodian selected in Client's sole and absolute discretion, a "Custodian"). Coinbase hereby accepts such appointment. CB Custody agrees to establish on its books, pursuant to the terms of this Distribution Addendum a Custodial Account, as defined in

36

Exhibit A of the Agreement, for the receipt, safekeeping and maintenance of the Digital Assets (the "Celsius Custody Account").  For the avoidance of doubt, Client is not required to use Coinbase as a Custodian or for any custodian services related to this Distribution Addendum and Client may, in its sole and absolute discretion, elect to use Coinbase and/or any other third party as a Custodian. If Client so elects to use Coinbase as a Custodian, then Coinbase shall use the Celsius Custody Account at Coinbase which shall be held open for the duration of the Term of this Distribution Addendum (the "Custody Services"), unless terminated earlier in accordance with Section 23 of the Agreement.

**Acceptance of Digital Assets**. Coinbase will accept those Digital Assets into custody as set forth in this Section 3, or as may otherwise be mutually agreed by the Parties from time to time, and will hold such Digital Assets in registered form in Client's name.

**Designation of Accounts**. The Celsius Custody Account will be held on behalf of Client, in accordance with the Agreement.

**Account Process**. Client shall identify for Coinbase all Claimants for which Client wishes to use Coinbase to make a Distribution and provide information to Coinbase on all such Claimants as set forth in Schedule 1 hereto, including to identify which custody account should be used for such Distribution. Client shall notify Claimants that they may be eligible to receive Distributions in respect of their Claim (as defined in the Reorganization Plan) through Coinbase. Client shall ensure all Digital Assets to be distributed are made available in the applicable Celsius Custody Account prior to any Distribution, and will inform Coinbase that Claimants may be eligible to receive Distributions in respect of their Claim.

**Obligations to Client**.  For the avoidance of doubt, Coinbase's obligations arising under the Agreement and this Distribution Addendum are solely to Client, and Coinbase shall have no obligations to any Claimant absent a separate agreement established between Coinbase and such Claimant.

## 17.    Marketing

**Rights to Celsius Brand Use**. Client grants Coinbase a limited, revocable right to use the name "Celsius" during the Term to identify that Coinbase is an officially authorized service provider for making Distributions to Claimants.

**Review Rights**. Client shall have the right to approve any and all communications related to the Distribution Services before it is made available in any way to any Claimant, which approval shall not be unreasonably withheld. Coinbase shall consider in good faith any feedback from Client regarding the communications and use best efforts to, in a timely manner, make any changes requested by Client that Coinbase deems, in its reasonable discretion, to be appropriate. Coinbase shall have the right to approve any and all communications related to the Distribution Services before it is made available in any way to any Claimant, which approval shall not be unreasonably withheld. Client shall consider in good faith any feedback from Coinbase regarding

37

Coinbase 2022 US Version 2.0

the communications and use best efforts to, in a timely manner, make any changes requested by Coinbase that Client deems, in its reasonable discretion, to be appropriate.

**Governing Terms**. Except as set forth in this Distribution Addendum, all activities by Claimants shall be governed by the Coinbase TOS. In the event of any conflict now, or that may hereinafter arise, between the Agreement, this Distribution Addendum, and any current or future versions of the Coinbase TOS, the Agreement, including this Distribution Addendum, shall govern. For the avoidance of any doubt, Client shall not be responsible for Claimants' compliance with the Coinbase TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants.

## 18.    Term

**Term**. Unless terminated earlier in accordance with Section 23 of the Agreement, this Distribution Addendum is effective as of the entry of the Confirmation Order and shall remain in force for a period of one (1) year thereafter referred to herein as the "Term."

**Account Support Term**. Notwithstanding the above Term of this Distribution Addendum, and unless terminated earlier in accordance with Section 23 of the Agreement, with respect to each New Crypto Account, Coinbase shall support Distributions for each New Crypto Account for the three hundred sixty five (365) day period beginning on the first deposit of Supported Cryptocurrency into such New Crypto Account.

## 19.    RESERVED

## 20.    Definitions

**"Claimant"** means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan).

**"Confirmation Order"** has the meaning set forth in the Reorganization Plan.

**"Disclosure Statement Approval Date"** means date of the Bankruptcy Court (as defined in the Agreement) order approving the Disclosure Statement (as defined in the Reorganization Plan).

**"New Crypto Account"** means a Coinbase Crypto Account that (i) (a) was created on or subsequent to the Disclosure Statement Approval Date or (b) was a Coinbase Account prior to the Disclosure Statement Approval Date; and (ii) has received one or more Distributions of Supported Cryptocurrency under the Reorganization Plan.

**"Coinbase Account"** means a customer account at Coinbase, which may or may not have successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities.

**"Coinbase Crypto Account"** means a Coinbase Account that has successfully completed Coinbase's onboarding process to be provisioned for cryptocurrency activities.

38

**"Coinbase TOS"** means Coinbase's standard and cryptocurrency terms and conditions applicable to any particular Coinbase Account, as revised from time to time.

"**Digital Assets**" means any digital tokens represented on a decentralized cryptographic blockchain, where such tokens are held from time to time held for Client under the terms of this Distribution Addendum.

**"Reorganization Plan"** means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, In re Celsius Network LLC, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 31, 2023), ECF No. 3222, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms.

**"Reside"** means, with respect to any Claimant, such Claimant's principal residence as determined by Coinbase through the AML/KYC information that such Claimant provides to Coinbase.

**"Supported Jurisdiction"** means each jurisdiction in which Coinbase holds all licenses and registrations necessary to engage in the activities contemplated in this Agreement with respect to Supported Cryptocurrency in such jurisdiction, which are listed in Schedule 2. Coinbase may add jurisdictions to or remove jurisdictions from the definition of Supported Jurisdiction by updating Schedule 2, which can be done by providing written notice to Client (email will suffice).

**"Supported Cryptocurrency"** means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the preceding 12-month period. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless Coinbase notifies Client in writing that Coinbase has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency.

39

**Schedule 1 to Coinbase Distribution Addendum**

**Distribution Services**

Account Creation:

All retail creditors must create a CB Inc. retail account to ensure CB Inc. can complete transfers to the respective creditor.

All institutional creditors (the "Institutional Creditors") shall establish a Coinbase prime institutional account.

Existing Coinbase retail accounts and existing Coinbase institutional accounts can be used by eligible creditors.

All creditors will be subject to and must complete the Coinbase AML/KYC onboarding requirements prior to Coinbase making any transfer.

The Celsius Estate will provide documentation detailing each creditor's email address, and quantity of assets (as well as other mutually agreed information, which will be hashed if such information is Personally Identifiable Information) to be distributed with legal authorization for Coinbase to have access to the relevant exchange account at Coinbase and to perform these functions on their behalf.  Except to the extent required to confirm such documentation has not been altered since its generation by Celsius using confirmation methods mutually agreed by the Parties, Coinbase shall have no obligation to verify such information provided by Celsius, and shall have no liability for the accuracy of any such information or for having followed any instruction.  For the avoidance of doubt, where within Coinbase's records the hashed version of the date of birth of a creditor does not match with the hashed version of the email address of the same creditor, Coinbase may not proceed with the distribution until the Parties have clarified the correctness of the creditor's information.

Distribution Process:

Coinbase will create a script to support the transfer of assets via API.

Coinbase will also create a script that will perform validation checks to match Celsius creditors to Coinbase customers, as well as error handling.

Before running the script, this information will also be reconciled against the hashed Personally Identifiable Information provided by the Celsius Estate.

Coinbase will notify Celsius when distributions to all creditors are completed.

40

Coinbase 2022 US Version 2.0

**Schedule 2 to Coinbase Distribution Addendum**

**Supported Jurisdictions**

As provided by Coinbase from time to time.

41

## COINBASE SUPPORTED COUNTRIES FOR DISTRIBUTION

| | | |
|---|---|---|
| Canada | Iceland | United Arab Emirates |
| Mexico | Ireland | Yemen |
| Argentina | Isle of Man | Zambia |
| Bolivia | Italy | Zimbabwe |
| Brazil | Jersey | Australia |
| Cayman Islands | Latvia | Hong Kong |
| Chile | Liechtenstein | India |
| Colombia | Lithuania | Indonesia |
| Costa Rica | Luxembourg | Japan |
| Dominican Republic | Malta | Kazakhstan |
| Ecuador | Monaco | Mongolia |
| El Salvador | Netherlands | Nepal |
| Guatemala | Norway | New Zealand |
| Jamaica | Poland | Pakistan |
| Panama | Portugal | Philippines |
| Peru | Romania | Singapore |
| Saint Kitts and Nevis | San Marino | Sri Lanka |
| Saint Martin (French part) | Slovakia | Taiwan |
| Saint Maarten (Dutch part) | Slovenia | |
| Uruguay | Spain | |
| Venezuela | Sweden | |
| British Virgin Islands | Switzerland | |
| Albania | United Kingdom | |
| Andorra | Azerbaijan | |
| Austria | Benin | |
| Belgium | Burkina Faso | |
| Bulgaria | Cameroon | |
| Croatia | Curaçao | |
| Cyprus | Georgia | |
| Czechia | Ghana | |
| Denmark | Jordan | |
| Estonia | Kenya | |
| Faroe Islands | Kuwait | |
| Finland | Madagascar | |
| France | Mali | |
| Germany | Nigeria | |
| Gibraltar | Serbia | |
| Greece | Seychelles | |
| Guernsey | South Africa | |
| Hungary | Togo | |
| | Tunisia | |
| | Turkey | |
| | Uganda | |
| | Ukraine | |

## Exhibit H

**Schedule of Released and Exculpated Parties**

## Schedule of Released Parties

Pursuant to the Plan, the following parties shall be Released Parties and shall receive the benefit of the releases provided in the Plan, in addition to the Released Parties specifically enumerated in the Plan.[1] **For the avoidance of doubt, no Releasing Party shall be permitted to assert any Released Claim against any Released Parties after the Plan is confirmed.** If any Holder of a Claim or Interest opts out of the Plan's third-party release provisions pursuant to the opt-out procedures approved by the Court, such Holder shall not be a Releasing Party.

| | **ADDITIONAL RELEASED AND EXCULPATED PARTIES** |
|---|---|
| 1. | Each individual who is employed by the Debtors on the date the Disclosure Statement Order is entered to the extent that each such employee is not (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.  The identities of these individuals will be attached to the final version of the Confirmation Order.  For the avoidance of doubt, Tal Bentov shall be a Released Party. |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as the same may be amended, modified, revised, or supplemented from time to time, the "Plan").

**Exhibit H-1**

**(Redline) Schedule of Released and Exculpated Parties**

*[Different first page link-to-previous setting changed from on in original to off in modified.].*

~~PRIVILEGED & CONFIDENTIAL~~
~~ATTORNEY WORK PRODUCT~~

## Schedule of Released Parties

Pursuant to the Plan, the following parties shall be Released Parties and shall receive the benefit of the releases provided in the Plan, in addition to the Released Parties specifically enumerated in the Plan.[1]  **For the avoidance of doubt, no Releasing Party shall be permitted to assert any Released Claim against any Released Parties after the Plan is confirmed.**  If any Holder of a Claim or Interest opts out of the Plan's third-party release provisions pursuant to the opt-out procedures approved by the Court, such Holder shall not be a Releasing Party.

| | ADDITIONAL RELEASED AND EXCULPATED PARTIES |
|---|---|
| 1. | Each individual who is employed by the Debtors on the date the Disclosure Statement Order is entered to the extent that each such employee is not (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties.  The identities of these individuals will be attached to the final version of the Confirmation Order.  For the avoidance of doubt, Tal Bentov shall be a Released Party. |

---

[1]    Capitalized terms used herein but not defined shall have the meanings given to such terms in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and ~~its~~Its Debtor Affiliates* [Docket No. ~~2807~~3577] (as the same may be amended, modified, revised, or supplemented from time to time, the "Plan").

*[Different first page link-to-previous setting changed from on in original to off in modified.].*

**<u>Exhibit I</u>**

**Registration Rights Agreement**

## INVESTORS' AND REGISTRATION RIGHTS AGREEMENT

This Investors' and Registration Rights Agreement (this "***Agreement***"), dated as of [●], is entered into by and among [NewCo, Inc.], a Delaware corporation (the "***Company***"), and [Fahrenheit, LLC], a Delaware limited liability company ("***Fahrenheit***" and, together with the Company, the "***Parties***").

**WHEREAS**, on July 13, 2022, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") commenced cases under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, supplemented or otherwise modified from time to time, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***");

**WHEREAS**, on August 15, 2023, the Debtors filed their fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* (as may be further revised, amended, or modified in accordance with its terms, and together with all exhibits, supplements, appendices, and schedules, the "***Plan***");

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan;

**WHEREAS,** pursuant to the Plan, Fahrenheit and the Company entered into that certain Plan Sponsor Contribution Agreement, dated as of [●] (the "***Contribution Agreement***"), pursuant to which, among other things, Fahrenheit agreed to purchase a total of $50,000,000 worth of shares of the Company's Class A common stock, par value $[●] per share (as further defined below, the "***Class A Common Stock***"), from the Company and/or in secondary market purchases (as such term is defined in the Contribution Agreement, the "***Plan Sponsor Shares***");

**WHEREAS,** pursuant to the Plan, the Company and Fahrenheit entered into that certain Warrant Agreements, dated as of [●] (the "***Warrant Agreement***"), pursuant to which, among other things, Fahrenheit received warrants to purchase shares of Class A Common Stock (the "***Warrant Shares***");

**WHEREAS,** pursuant to the Plan, Fahrenheit and the Company entered into that certain [Restricted Stock Agreement], dated as of [●] (the "***Restricted Stock Agreement***"]), pursuant to which, among other things, Fahrenheit agreed to purchase shares of Class A Common Stock from the Company subject to certain terms and conditions (the "***Restricted Stock Agreement Shares***" and, with the Plan Sponsor Shares and the Warrant Shares, the "***Initial Shares***");

**WHEREAS,** the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement all contemplate that the Parties will enter into a registration rights agreement; and

**WHEREAS,** the Parties are entering into this Agreement in furtherance of the aforementioned provisions of the Plan, the Contribution Agreement, the Warrant Agreements and the Restricted Stock Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements

1

set forth herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each party hereto, the Parties hereby agree as follows:

1.    <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings indicated:

"***Affiliate***" means, with respect to any specified Person, a Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such specified Person.[1]

"***Automatic Shelf Registration Statement***" means an "automatic shelf registration statement" as defined under Rule 405.

"***Board***" means the board of directors of the Company.

"***Business Day***" means any day other than a Saturday, Sunday, any federal holiday or any other day on which banking institutions in the State of New York are authorized or required to be closed by law or governmental action.

"***Class A Common Stock***" means the Company's Class A common stock, par value $[●] per share, and any other equity interests of the Company or equity interests in any successor of the Company issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"***Commission***" means the Securities and Exchange Commission or any other federal agency then administering the Securities Act or Exchange Act.

"***Company Securities***" means any equity interest of any class or series in the Company.

"***Controls***," "***Controlled by***" and "***under common Control with***" mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Effective Date***" means the time and date that a Registration Statement is first declared effective by the Commission or otherwise becomes effective.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Fahrenheit Management Agreement***" means that certain Management Agreement, dated as of [●], by and between the Company and Fahrenheit.

---

[1] NTD: TBD if there are specific Affiliates we want to add in for Fahrenheit specifically.

2

Pg 320 of 521

"*FINRA*" means the Financial Industry Regulatory Authority.

"*Holder*" means (a) Fahrenheit, unless and until Fahrenheit ceases to hold any Registrable Securities; and (b) any holder of Registrable Securities to whom registration rights conferred by this Agreement have been transferred in compliance with <u>Section 9(e)</u> hereof; *provided*, that any Person referenced in clause (b) of this definition shall be a Holder only if such Person agrees in writing to be bound by and subject to the terms and conditions set forth in this Agreement.

"*Material Adverse Change*" means (a) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or in the over-the-counter market in the United States; (b) the declaration of a banking moratorium or any suspension of payments in respect of banks in the United States; (c) a material outbreak or escalation of armed hostilities or other international or national calamity involving the United States or the declaration by the United States of a national emergency or war or a change in national or international financial, political or economic conditions; or (d) any event, change, circumstance or effect that is or is reasonably likely to be materially adverse to the business, properties, assets, liabilities, condition (financial or otherwise), operations, results of operations or prospects of the Company and its subsidiaries taken as a whole.

"*Person*" means an individual, corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited partnership, limited liability company, joint stock company, estate, trust, government (or an agency or subdivision thereof) or other entity of any kind.

"*Proceeding*" means any action, claim, suit, proceeding or investigation (including a preliminary investigation or partial proceeding, such as a deposition) pending or, to the knowledge of the Company, threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including a prospectus that includes any information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A, Rule 430B or Rule 430C promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by such Registration Statement and all other amendments and supplements to such Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means the Shares; *provided*, *however*, that Registrable Securities shall not include:  (a) any Shares that have been registered under the Securities Act and disposed of pursuant to an effective Registration Statement or otherwise transferred to a Person who is not entitled to the registration rights and other rights hereunder; (b) any Shares that have been sold or transferred by the Holder thereof pursuant to Rule 144 (or any similar provision then in force under the Securities Act) and the transferee thereof does not receive "restricted securities" as defined in Rule 144, as a

3

result of which the legend on any certificate or book-entry notation, as the case may be, representing such Registrable Security restricting transfer of such Registrable Security has been removed; (c) any Shares that are eligible for resale without restriction (including any limitation thereunder on volume or manner of sale) and without the need for current public information pursuant to any provision of Rule 144 (or any similar provision then in force under the Securities Act); and (d) any Shares that cease to be outstanding (whether as a result of repurchase and cancellation, conversion or otherwise).

"*Registration Statement*" means a registration statement of the Company in the form required to register under the Securities Act, the Exchange Act or other applicable law for the resale of the Registrable Securities in accordance with the intended plan of distribution of each Holder included therein, and including any Prospectus, amendments and supplements to each such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act.

"*Rule 405*" means Rule 405 promulgated by the Commission pursuant to the Securities Act.

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act.

"*Rule 430A*" means Rule 430A promulgated by the Commission pursuant to the Securities Act.

"*Rule 430B*" means Rule 430B promulgated by the Commission pursuant to the Securities Act.

"*Rule 430C*" means Rule 430C promulgated by the Commission pursuant to the Securities Act.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Selling Expenses*" means all underwriting discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder in connection with such sale (except as set forth in Section 5).

"*Shares*" means the shares of Class A Common Stock now held or hereafter acquired by the Holders, including without limitation the Initial Shares and any other shares of Class A Common Stock held by the Holders as of the date hereof, and any other equity interests of the Company or equity interests in any successor of the Company

4

issued in respect of such shares by reason of or in connection with any stock dividend, stock split, combination, reorganization, recapitalization, conversion to another type of entity or similar event involving a change in the capital structure of the Company.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission on Form S-3 (or any successor form or other appropriate form under the Securities Act) for an offering to be made on a continuous or delayed basis pursuant to Rule 415 (or any similar rule that may be adopted by the Commission) or, if the Company is not then eligible to file on Form S-3, on Form S-1 or any other appropriate form under the Securities Act, or any successor rule that may be adopted by the Commission, and all amendments and supplements to such Registration Statement (including post-effective amendments), covering the Registrable Securities, as applicable.

"*Trading Market*" means the principal national securities exchange on which Registrable Securities are listed.

"*Underwritten Offering*" means an underwritten offering of Class A Common Stock for cash (whether a Requested Underwritten Offering or in connection with a public offering of Class A Common Stock by the Company, stockholders or both), excluding an offering relating solely to an employee benefit plan, an offering relating to a transaction on Form S-4 or Form S-8 or an offering on any registration statement form that does not permit secondary sales.

"*VWAP*" means, as of a specified date and in respect of Registrable Securities, the volume weighted average price for such security on the Trading Market for the five trading days immediately preceding, but excluding, such date.

"*WKSI*" means a "well-known seasoned issuer" as defined under Rule 405.

Unless the context requires otherwise: (a) any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (b) references to Sections refer to sections of this Agreement; (c) the terms "include," "includes," "including" and words of like import shall be deemed to be followed by the words "without limitation"; (d) the terms "hereof," "hereto," "herein" or "hereunder" refer to this Agreement as a whole and not to any particular provision of this Agreement; (e) the term "or" is not exclusive and shall have the inclusive meaning of "and/or"; (f) defined terms herein will apply equally to both the singular and plural forms and derivative forms of defined terms will have correlative meanings; (g) references to any law or statute shall include all rules and regulations promulgated thereunder, and references to any law or statute shall be construed as including any legal and statutory provisions consolidating, amending, succeeding or replacing the applicable law or statute; (h) references to any Person include such Person's successors and permitted assigns; and (i) references to "days" are to calendar days unless otherwise indicated.

5

2.      Registration.

(a)      Initial Shelf Registration Statement.

(i)      Notwithstanding anything to the contrary contained in this Agreement, as soon as practicable following the first date of the Company's eligibility to file a Registration Statement on Form S-3 (but no later than 30 days following such date), the Company shall use reasonable best efforts to file with the Commission a Shelf Registration Statement on Form S-3 (as such Registration Statement may be amended from time to time, the "***Initial Shelf Registration Statement***"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall have timely requested inclusion therein of some or all of its Registrable Securities by written notice to the Company. The Company shall use its reasonable best efforts to have the Initial Shelf Registration Statement declared effective by the Commission as soon as reasonably practicable after the Company files the Initial Shelf Registration Statement but no later than the fifth Business Day following the date on which the Commission informs the Company that it does not intend to review the Initial Shelf Registration Statement or the fifth Business Day following the resolution or clearance of all Commission comments to the Initial Shelf Registration Statement, as applicable.

(ii)      The Company shall use reasonable best efforts to keep the Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the date on which all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "***Initial Shelf Expiration Date***").

(iii)      Until the Initial Shelf Expiration Date, the Company shall file any supplements or post-effective amendments required to be filed by applicable law so that (A) the Initial Shelf Registration Statement does not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein not misleading and (B) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K.

(b)      Demand Registration.

(i)      Subject to the provisions of Section 2(b)(x), Fahrenheit shall have the option and right, exercisable by delivering a written notice to the Company (a "***Demand Notice***"), to require the Company to, pursuant to the terms of and subject to the limitations contained in this Agreement, prepare and file with the Commission a Registration Statement registering the offering and sale of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice, which may include sales on a delayed or continuous basis pursuant to Rule 415 on a Shelf Registration Statement (a "***Demand Registration***").  The Demand Notice must set forth the number of Registrable Securities that Fahrenheit and other Holders, as applicable, intend to include in such Demand Registration and the intended timing and method of disposition thereof.  Notwithstanding anything to the contrary herein, in no event shall the Company be required to effectuate a Demand Registration unless the Registrable

6

Securities of the Holders to be included therein after compliance with Section 22(b)(ii) and Section 2(b)(x): (i) have an aggregate value of at least $[15] million based on the VWAP or (ii) represent at least [15%] of the Registrable Securities eligible for registration in accordance with Section 2(b)(x) (the "**Minimum Amount**")[2] as of the date of the Demand Notice.

(ii)     Within [five] Business Days (or if the Registration Statement will be a Shelf Registration Statement, within [two] Business Days) after the receipt of the Demand Notice, the Company shall give written notice of such Demand Notice to all Holders and, within [30] days after receipt of the Demand Notice (except if the Company is not then eligible to register for offer and resale the Registrable Securities on Form S-3, in which case, within [90] days thereof), shall, subject to the limitations of this Section 2(b), file a Registration Statement in accordance with the terms and conditions of, and the intended timing and method of disposition described in, the Demand Notice, which Registration Statement shall cover all of the Registrable Securities eligible for registration in accordance with Section 2(b)(x) that the Holders shall in writing request to be included in the Demand Registration (such request to be given to the Company within three Business Days (or if the Registration Statement will be a Shelf Registration Statement, within [one] Business Day) after receipt of notice of the Demand Notice given by the Company pursuant to this Section 2(b)(ii)).  The Company shall use reasonable best efforts to cause such Registration Statement to become, as soon as reasonably practicable after the filing thereof, and remain continuously, effective under the Securities Act until the earlier of (A) 180 days (or three years if a Shelf Registration Statement is requested) after the Effective Date of such Registration Statement or (B) the date on which all Registrable Securities covered by such Registration Statement have been sold or otherwise disposed of or such Shares are no longer Registrable Securities (the "**Effectiveness Period**"); *provided*, *however*, that such period shall be extended for a period of time equal to the period the Holders refrain from selling any securities included in such Registration Statement at the request of an underwriter of the Company or the Company pursuant to this Agreement.

(iii)     Subject to the other limitations contained in this Agreement, the Company is not obligated hereunder to effect (A) a Demand Registration within 90 days after the closing of any Requested Underwritten Offering, (B) more than a total of [four] Demand Registrations, and (C) a subsequent Demand Registration pursuant to a Demand Notice if a Registration Statement covering all of the Registrable Securities held by the Holders shall have become and remains effective under the Securities Act and is sufficient to permit offers and sales of the number and type of Registrable Securities on the terms and conditions specified in the Demand Notice in accordance with the intended timing and method of disposition thereof specified in the Demand Notice; *provided*, that a demand for a Shelf Registration Statement shall not count against the number of allowable Demand Registrations for subclause (B) of this paragraph.  No Demand Registration shall be deemed to have occurred for purposes of this Section 2(b)(iii) if the Registration Statement relating thereto does not become effective or is not maintained

---

[2] NTD: Business team to discuss Minimum Amount thresholds.

effective for its entire Effectiveness Period, in which case Fahrenheit shall be entitled to an additional Demand Registration in lieu thereof. Further, a Demand Registration shall not constitute a Demand Registration for purposes of this Section 2(a)(iii) if, as a result of Section 2(b)(vi), there is included in the Demand Registration less than the Minimum Amount of Registrable Securities.

(iv)    A Holder may withdraw all or any portion of its Registrable Securities included in a Demand Registration from such Demand Registration at any time prior to the effectiveness of the applicable Registration Statement.  Upon receipt of a notice from Fahrenheit that Fahrenheit (and/or other applicable Holders) are withdrawing all of their Registrable Securities from the Demand Registration such that the remaining amount of Registrable Securities to be included in the Demand Registration is below the Minimum Amount, the Company shall cease all efforts to secure effectiveness of the applicable Registration Statement.  Such registration nonetheless shall be deemed a Demand Registration for purposes of Section 2(b)(iii) unless (A) Fahrenheit shall have paid or reimbursed the Company for all reasonable and documented out-of-pocket fees and expenses incurred by the Company in connection with the withdrawn registration of such Registrable Securities (based on the number of securities Fahrenheit sought to register, as compared to the total number of securities included in such Demand Registration) or (B) the withdrawal is made following the occurrence of a Material Adverse Change or pursuant to the Company's request for suspension pursuant to Section 3(o).

(v)    The Company may include in any such Demand Registration other Company Securities for sale for its own account or for the account of any other Person, subject to Section 2(b)(vi) and Section 2(e)(iii).

(vi)    In the case of a Demand Registration not being underwritten, if Fahrenheit advises the Company that in its reasonable opinion the aggregate number of securities requested to be included in such registration exceeds the number that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the securities offered or the market for the securities offered, the Company shall include in such Demand Registration only that number of securities that, in the reasonable opinion of Fahrenheit, will not have such adverse effect, with such number to be allocated as follows: (A) first, pro-rata among all Holders (including Fahrenheit) that have requested to participate in such Demand Registration based on the relative number of Registrable Securities then held by each such Holder, (B) second, if there remains availability for additional securities to be included in such Demand Registration, to the Company, and (C) third, if there remains availability for additional securities to be included in such Demand Registration following the allocation provided in clauses (A) and (B) above, to any other holders of Company Securities entitled to participate in such Demand Registration, if applicable, based on the relative number of Company Securities such holder is entitled to include in such Demand Registration.

(vii)    Subject to the limitations contained in this Agreement, the Company shall effect any Demand Registration on such appropriate registration form of the Commission (A) as shall be selected by the Company and (B) as shall permit the

8

disposition of the Registrable Securities in accordance with the intended method of disposition specified in the Demand Notice; *provided*, that if the Company becomes, and is at the time of its receipt of a Demand Notice, a WKSI, the Demand Registration for any offering and selling of Registrable Securities shall be effected pursuant to an Automatic Shelf Registration Statement, which shall be on Form S-3 (if available to the Company. If at any time a Registration Statement on Form S-3 is effective and a Holder provides written notice to the Company that it intends to effect an offering of all or part of the Registrable Securities included on such Registration Statement, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable such offering to take place.

(viii)    Without limiting Section 3, in connection with any Demand Registration pursuant to and in accordance with this Section 2(b), the Company shall (A) promptly prepare and file or cause to be prepared and filed (1) such additional forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary or advisable to register or qualify the Registrable Securities subject to such Demand Registration, including under the securities laws of such jurisdictions as the Holders shall reasonably request; *provided*, *however*, that no such qualification shall be required in any jurisdiction where, as a result thereof, the Company would become subject to general service of process or to taxation or qualification to do business in such jurisdiction solely as a result of such registration and (2) such forms, amendments, supplements, Prospectuses, certificates, letters, opinions and other documents as may be necessary to apply for listing or to list the Registrable Securities subject to such Demand Registration on the Trading Market and (B) do any and all other acts and things that may be reasonably necessary or appropriate or reasonably requested by the Holders to enable the Holders to consummate a public sale of such Registrable Securities in accordance with the intended timing and method of distribution thereof.

(ix)    In the event a Holder transfers Registrable Securities included on a Registration Statement and such Registrable Securities remain Registrable Securities following such transfer, at the request such Holder, the Company shall amend or supplement such Registration Statement as may be necessary in order to enable the transferee of such Registrable Securities to offer and sell such Registrable Securities pursuant to such Registration Statement; *provided*, that in no event shall the Company be required to file a post-effective amendment to the Registration Statement unless (A) such Registration Statement includes only Registrable Securities held by the Holder, Affiliates of the Holder or transferees of the Holder or (B) the Company has received written consent therefor from each other Holder for whom Registrable Securities have been registered on (but not yet sold under) such Registration Statement, other than the Holder, Affiliates of the Holder or transferees of the Holder.

(x)    Fahrenheit's option and right with respect to Demand Registrations set forth in this Section 2(b) shall apply to the Registrable Securities as follows: (A) with respect to the Plan Sponsor Shares, immediately upon the earlier to occur of the expiration of the Lock-Up Period (as such term is defined in the Plan Sponsor Contribution Agreement) or, with respect to such Plan Sponsor Shares as shall have

9

vested thereupon, the commencement of the Unlock Period (as such term is defined in the Plan Sponsor Contribution Agreement); (B) with respect to the Restricted Stock Agreement Shares, immediately upon the vesting of the Restricted Stock Agreement Shares in accordance with the terms of the Restricted Stock Agreement; (C) with respect to the Warrant Shares, immediately upon the Exercise Period Commencement Date (as such term is defined in the Warrant Agreements); and (D) with respect to such Shares that Fahrenheit may acquire after the date hereof, upon the earliest to occur of the events set forth in subclauses (A), (B) or (C) of this Section 2(b)(x) following the acquisition of such Shares.[3]

(c)    Requested Underwritten Offering.  If Fahrenheit[4] is able to effectuate a Demand Registration pursuant to the terms of Section 2(b) (or has previously effectuated a Demand Registration pursuant to Section 2(b) but has not engaged in an Underwritten Offering in respect of such Demand Registration) Fahrenheit shall have the option and right, exercisable by delivering written notice to the Company of its intention to distribute Registrable Securities that are then not otherwise subject to restrictions on transfer other than those provided by applicable securities law by means of an Underwritten Offering (an "***Underwritten Offering Notice***"), to require the Company, pursuant to the terms of and subject to the limitations of this Agreement, to effectuate a distribution of any or all of its and other Holders' Registrable Securities by means of an Underwritten Offering pursuant to a new Demand Registration or pursuant to an effective Registration Statement covering such Registrable Securities (a "***Requested Underwritten Offering***"); *provided*, that if the Requested Underwritten Offering is pursuant to a new Demand Registration, then the Registrable Securities requested to be included in such Requested Underwritten Offering equal or exceed the Minimum Amount.  The Underwritten Offering Notice must set forth the number of Registrable Securities that are intended to be included in such Requested Underwritten Offering.  The Company shall propose three or more nationally prominent firms of investment bankers reasonably acceptable to Fahrenheit to act as the managing underwriter or managing underwriters in connection with such Underwritten Offering from which Fahrenheit shall select the managing underwriter or managing underwriters. Fahrenheit, in connection with any other Holder participating in such Underwritten Offering, shall determine the pricing of the Registrable Securities offered pursuant to any Requested Underwritten Offering and the applicable underwriting discounts and commissions and determine the timing of any such Requested Underwritten Offering. Notwithstanding the foregoing, the Company is not obligated to effect more than a total of [three] Requested Underwritten Offerings, but in no more than (x) two within 90 days after the closing of an Underwritten Offering and (y) two within any 12-month period. Any Requested Underwritten Offering (other than the first Requested Underwritten Offering made in respect of a prior Demand Registration) shall constitute a Demand Registration of Fahrenheit for purposes of Section 2(b)(iii) (it being understood that if requested concurrently with a  Demand Registration then, together, such Demand Registration and Requested Underwritten Offering shall count as

---

[3] NTD: Conform definitions/usage among the various agreements as required.  Currently 1 RSA and multiple Warrant Agreement are contemplated (add back in applicable if that changes).

[4] NTD: Intention is to limit the demand right to Fahrenheit, but to allow all Holders to participate pro rata.

one Demand Registration); *provided*, *however*, that a Requested Underwritten Offering shall not constitute a Demand Registration of Fahrenheit for purposes of Section 2(b)(iii) if, as a result of Section 2(e)(iii)(A), the Requested Underwritten Offering includes less than the lesser of (i) Registrable Securities having a VWAP measured on the effective date of the related Registration Statement of $[●] million and (ii) [two-thirds] of the number of Registrable Securities set forth in the applicable Underwritten Offering Notice.

(d)    Block Trades. Notwithstanding anything contained in this Section 2, in the event a sale of Registrable Securities is an underwritten transaction requiring the involvement of the Company but not involving (i) any "road show" or (ii) a lock-up agreement of more than [45] days to which the Company is a party, and which is commonly known as a "block trade" (a "**Block Trade**"), (1) the requesting Holder or Holders shall (A) give at least [three] Business Day prior notice in writing of such transaction to the Company (B) with respect to any Block Trade, identify the potential underwriter in such notice with contact information for such underwriter; and (2) the Company shall cooperate with such requesting Holder or Holders to the extent it is reasonably able and shall not be required to give notice thereof to other Holders or permit their participation therein unless reasonably practicable. Any Block Trade shall be for at least $[2,000,000] in expected gross proceeds. The Company shall not be required to effectuate more than [three] Block Trades in any 90-day period. For the avoidance of doubt, a Block Trade shall not constitute a Requested Underwritten Offering.

(e)    Piggyback Registration and Piggyback Underwritten Offering.

(i)    If the Company shall, at any time, propose to file a registration statement under the Securities Act with respect to an offering of Class A Common Stock (other than a registration statement on Form S-4 or Form S-8 filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan and other than a Demand Registration), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least five Business Days, except if the registration statement will be a Shelf Registration Statement, at least three Business Days, before) the anticipated filing date (the "**Piggyback Registration Notice**"). The Piggyback Registration Notice shall offer all Holders the opportunity to include for registration in such registration statement the number of Registrable Securities as they may request in writing (a "**Piggyback Registration**"). The Company shall use commercially reasonable efforts to include in each such Piggyback Registration such Registrable Securities for which the Company has received written requests for inclusion therein within [ten] Business Days or, if the Piggyback Registration will be on a Shelf Registration Statement, within [five] Business Day, after sending the Piggyback Registration Notice. Each Holder shall be permitted to withdraw all or part of such Holder's Registrable Securities from a Piggyback Registration by giving written notice to the Company of its request to withdraw; *provided*, that (A) such request must be made in writing and delivered prior to the effectiveness of such Registration Statement and (B) such withdrawal shall be irrevocable and, after making such withdrawal, such Holder shall no longer have any right to include Registrable Securities in the Piggyback Registration as to which such withdrawal was made. Notwithstanding anything to the contrary in this Section 2(e)(i), if the Underwritten Offering pursuant to this Section 2(e)(i) is a "bought deal" (other than a

11

variable price reoffer) or Overnight Underwritten Offering and the Managing Underwriter advises the Company that the giving of notice pursuant to this Section 2(e)(i) would have an adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Offering, no such notice shall be required. Any withdrawing Holder shall continue to have the right to include any Registrable Securities in any subsequent Registration Statement as may be filed by the Company with respect to offerings of Class A Common Stock, all upon the terms and conditions set forth herein.

(ii)      If the Company shall, at any time, propose to conduct an Underwritten Offering (including a Requested Underwritten Offering), whether or not for its own account, then the Company shall promptly notify all Holders of such proposal reasonably in advance of (and in any event at least [ten] Business Days, except if the Underwritten Offering will be made pursuant to a Shelf Registration Statement, at least [five] Business Days, before) the commencement of such Underwritten Offering, which notice shall set forth the principal terms and conditions of the issuance, including the proposed offering price or range of offering prices (if known), the anticipated filing date of the related Registration Statement (if applicable) and the number of shares of Class A Common Stock that are proposed to be registered (the "***Underwritten Offering Piggyback Notice***").  Receipt of any Underwritten Offering Piggyback Notice required to be provided in this Section 2(e)(ii) to Holders shall be kept confidential by the Holder until such proposed Underwritten Offering is (A) publicly announced or (B) such Holder receives notice that such proposed Underwritten Offering has been abandoned, which such notice shall be provided as reasonably practicable by the Company. The Underwritten Offering Piggyback Notice shall offer the Holders the opportunity to include in such Underwritten Offering (and any related registration of Company Securities, if applicable) the number of Registrable Securities as they may request in writing (an "***Underwritten Piggyback Offering***"); *provided*, *however*, that in the event that the Company proposes to effectuate the subject Underwritten Offering pursuant to an effective Shelf Registration Statement other than an Automatic Shelf Registration Statement, only Registrable Securities of Holders that are subject to an effective Shelf Registration Statement may be included in such Underwritten Piggyback Offering, unless the Company is then able to file an Automatic Shelf Registration Statement and, in the reasonable judgment of the Company, the filing of the Automatic Shelf Registration Statement including Registrable Securities of Holders that are not otherwise included in an effective Shelf Registration Statement would not have any material adverse effect on the price, timing or distribution of the Class A Common Stock in such Underwritten Piggyback Offering.  The Company shall use commercially reasonable efforts to include in each such Underwritten Piggyback Offering such Registrable Securities for which the Company has received written requests for inclusion therein within [ten] Business Days or, if such Underwritten Piggyback Offering will be made pursuant to a Shelf Registration Statement, within [five] Business Day after sending the Underwritten Offering Piggyback Notice.  Each Holder shall be permitted to withdraw all or part of its Registrable Securities from an Underwritten Piggyback Offering at any time prior to the effectiveness of the applicable Registration Statement, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

12

22-10964-mg   Doc 3869   Filed 10/20/23   Entered 10/20/23 20:47:53   Main Document
Pg 330 of 521

(iii)     If the managing underwriter or managing underwriters of an Underwritten Offering advise the Company and the Holders that, in their reasonable opinion, the inclusion of all of the Registrable Securities requested for inclusion in the subject Underwritten Offering (and any related registration, if applicable) (and any other Class A Common Stock proposed to be included in such Underwritten Offering) exceeds the number of shares of Class A Common Stock that can be included without being likely to have a significant adverse effect on the price, timing or distribution of the Company Securities offered or the market for the Company Securities offered, the Company shall include in such Underwritten Offering (and any related registration, if applicable) only that number of shares of Class A Common Stock proposed to be included in such Underwritten Offering (and any related registration, if applicable) that, in the reasonable opinion of the managing underwriter or managing underwriters, will not have such significant adverse effect, with such number of shares of Class A Common Stock to be allocated as follows: (A) in the case of a Requested Underwritten Offering, (1) first, pro-rata among all Holders (including Fahrenheit) that have requested to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, (2) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to the Company, and (3) third, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, to any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of shares of Class A Common Stock then held by each such holder; and (B) in the case of any other Underwritten Offerings, (x) first, to the Company, (y) second, if there remains availability for additional shares of Class A Common Stock to be included in such Underwritten Offering, pro-rata among all Holders desiring to include Registrable Securities in such Underwritten Offering based on the relative number of Registrable Securities then held by each such Holder, and (z) third, if there remains availability for additional shares of Class A Common Stock to be included in such registration, pro-rata among any other holders of Class A Common Stock entitled to participate in such Underwritten Offering, if applicable, based on the relative number of Class A Common Stock then held by each such holder.  If any Holder disapproves of the terms of any such Underwritten Offering, such Holder may elect to withdraw therefrom by written notice to the Company and the managing underwriter(s) delivered on or prior to the time of the commencement of such Underwritten Offering.  Any Registrable Securities withdrawn from such Underwritten Offering shall be excluded and withdrawn from the registration, and such Holder shall continue to have the right to include any Registrable Securities in any subsequent Underwritten Offerings, all upon the terms and conditions set forth herein.

(iv)     The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 2(e) at any time in its sole discretion whether or not any Holder has elected to include Registrable Securities in such Registration Statement.  The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 5.

3.     Registration and Underwritten Offering Procedures.  The procedures to be followed by the Company and each Holder electing to sell Registrable Securities in a

Registration Statement pursuant to this Agreement, and the respective rights and obligations of the Company and such Holder, with respect to the preparation, filing and effectiveness of such Registration Statement and the effectuation of any Underwritten Offering, are as follows:

(a)     In connection with a Demand Registration, the Company will, at least [five] Business Days prior to the anticipated filing of the Registration Statement and any related Prospectus or any amendment or supplement thereto (other than, after effectiveness of the Registration Statement, any filing made under the Exchange Act that is incorporated by reference into the Registration Statement) (for purposes of this subsection, supplements and amendments shall not be deemed to include any filing that the Company is required to make pursuant to the Exchange Act or any amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), (i) furnish to such Holders and the representatives of such Holders copies of all such documents prior to filing and (ii) provide such Holders and the representatives of such Holders the opportunity to (A) review and comment on such documents and (B) object to any information pertaining to such Holder and its plan of distribution that is contained therein, and, in either such case, the Company shall use commercially reasonable efforts to address any changes reasonably requested by such Holder prior to the filing of the Registration Statement.

(b)     In connection with a Piggyback Registration, Underwritten Piggyback Offering or a Requested Underwritten Offering, the Company will, at least [five] Business Days (or in the case of a Shelf Registration Statement or an offering that will be made pursuant to a Shelf Registration Statement, at least [three] Business Day) prior to the anticipated filing of any initial Registration Statement that identifies the Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name the applicable Holders and provide information with respect thereto), as applicable, furnish to such Holders copies of any such Registration Statement or related Prospectus or amendment or supplement thereto that identify such Holders and any related Prospectus or any amendment or supplement thereto (other than amendments and supplements that do not materially alter the previous disclosure or do nothing more than name such Holders and provide information with respect thereto).  The Company will also use commercially reasonable efforts to address in each such document when so filed with the Commission such comments as such Holders reasonably shall propose prior to the filing thereof.

(c)     The Company will use commercially reasonable efforts to, as promptly as reasonably practicable, (i) prepare and file with the Commission such amendments, including post-effective amendments, and supplements to each Registration Statement as may be necessary under applicable law to keep such Registration Statement continuously effective with respect to the disposition of all Registrable Securities covered thereby for its Effectiveness Period and, subject to the limitations contained in this Agreement, prepare and file with the Commission such additional Registration Statements in order to register for resale under the Securities Act all of the Registrable Securities held by the applicable Holders; (ii) cause the related Prospectus to be amended or supplemented by any required prospectus supplement and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond to any comments received from the Commission with respect to each Registration Statement and, as promptly as reasonably practicable, provide such Holders true and complete copies of all correspondence from and to the

14

Commission relating to such Registration Statement that pertains to such Holders as a selling stockholders but not any comments that would result in the disclosure to such Holders of material and non-public information concerning the Company; and (iv) cause such Registrable Securities to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable such Holders to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof.

(d)    The Company will comply in all material respects with the provisions of the Securities Act and the Exchange Act with respect to the Registration Statement and the disposition of all Registrable Securities covered by a Registration Statement.

(e)    The Company will notify such Holders who are included in a Registration Statement as promptly as reasonably practicable: (i)(A) when a Prospectus or any prospectus supplement or post-effective amendment to a Registration Statement in which such Holder is included has been filed; (B) when the Commission notifies the Company whether there will be a "review" of the applicable Registration Statement and when the Commission comments in writing on such Registration Statement (in which case the Company shall provide true and complete copies thereof and all written responses thereto to each of such Holders that pertain to such Holders as selling stockholders); and (C) with respect to each applicable Registration Statement or any post-effective amendment thereto, when the same has been declared effective; (ii) of any request by the Commission or any other federal or state governmental authority for amendments or supplements to such Registration Statement or Prospectus or for additional information that pertains to such Holders as sellers of Registrable Securities; (iii) of the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement covering any or all of the Registrable Securities or the initiation of any Proceedings for that purpose; (iv) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose; and (v) of the occurrence (but not the details) of any event or passage of time that makes any statement made in such Registration Statement or Prospectus or any document incorporated or deemed to be incorporated therein by reference untrue in any material respect or that requires any revisions to such Registration Statement, Prospectus or other documents so that, in the case of such Registration Statement or the Prospectus, as the case may be, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided*, *however*, that no notice by the Company shall be required pursuant to this clause (v) in the event that the Company either promptly files a prospectus supplement to update the Prospectus or a Form 8-K or other appropriate Exchange Act report that is incorporated by reference into the Registration Statement, which, in either case, contains the requisite information that results in such Registration Statement no longer containing any untrue statement of material fact or omitting to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f)    The Company will use commercially reasonable efforts to avoid the issuance of or, if issued, obtain the withdrawal of (i) any order suspending the effectiveness of a Registration Statement, or (ii) any suspension of the qualification (or exemption from

15

qualification) of any of the Registrable Securities for sale in any jurisdiction, as promptly as reasonably practicable, or if any such order or suspension is made effective during any Blackout Period or Suspension Period, as promptly as reasonably practicable after such Blackout Period or Suspension Period ends.

(g)     During the Effectiveness Period, the Company will furnish to each such Holder, without charge, at least one conformed copy of each Registration Statement and each amendment thereto and all exhibits to the extent requested by such Holder (including those incorporated by reference) as promptly as reasonably practical after the filing of such documents with the Commission; *provided*, that the Company will not have any obligation to provide any document pursuant to this clause that is available on the Commission's EDGAR system.

(h)     The Company will as promptly as reasonably practical deliver to each Holder, without charge, as many copies of each Prospectus (including each form of prospectus) authorized by the Company for use and each amendment or supplement thereto as such Holder may reasonably request during the Effectiveness Period. Subject to the terms of this Agreement, including Section 9(b), the Company consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any amendment or supplement thereto.

(i)     The Company will cooperate with such Holders to facilitate the timely preparation and delivery of certificates (or book-entry shares) representing Registrable Securities to be delivered to a transferee pursuant to a Registration Statement, which certificates (or book-entry shares) shall be free of all restrictive legends indicating that the Registrable Securities are unregistered or unqualified for resale under the Securities Act, Exchange Act or other applicable securities laws, and to enable such Registrable Securities to be in such denominations and registered in such names as any such Holder may request in writing.  In connection therewith, if required by the Company's transfer agent, the Company will promptly, after the Effective Date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to, and maintained with, its transfer agent, together with any other authorizations, certificates and directions required by the transfer agent that authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the applicable Holder of such Registrable Securities under the Registration Statement.

(j)     Upon the occurrence of any event contemplated by Section 3(e)(v), as promptly as reasonably practicable, the Company will prepare a supplement or amendment, including a post-effective amendment, if required by applicable law, to the affected Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, and file any other required document so that, as thereafter delivered, no Registration Statement nor any Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(k)     With respect to Underwritten Offerings, subject to the right of a Holder to withdraw such Holder's Registrable Securities from an Underwritten Offering in accordance

16

with the terms of this Agreement, (i) the right of any Holder to include such Holder's Registrable Securities in an Underwritten Offering shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein, (ii) each Holder participating in such Underwritten Offering severally agrees to enter into and execute an underwriting agreement in customary form and sell such Holder's Registrable Securities on the basis provided in any underwriting arrangement approved by the Persons entitled to select the managing underwriter hereunder and (iii) each Holder participating in such Underwritten Offering severally agrees to complete and execute all questionnaires, powers of attorney, indemnities, and other documents customarily and reasonably required under the terms of such underwriting arrangement. Any such underwriting agreement to be entered into among the Company, managing underwriter of such offering and each Holder participating in such Underwritten Offering shall contain representations and warranties by such Holders and such other terms and provisions as are customarily contained in underwriting agreements with respect to secondary distributions on the part of selling stockholders. All of the representations and warranties by, and the other agreements on the part of, the Company to, and for the benefit of, the underwriter of such offering, included in each such underwriting agreement shall also be made to, and for the benefit of, such Holder participating in such Underwritten Offering, and any or all of the conditions precedent to the obligations of such underwriter under such underwriting agreement shall be conditions precedent to the obligations of such Holders. No Holder shall be required in any such underwriting agreement to make any representations or warranties to, or agreements with, the Company or the underwriter other than representations, warranties or agreements regarding such Holder, such Holder's Registrable Securities, such Holder's intended method of distribution and any other representations required by applicable law or reasonably required by the underwriter or the Company.  The Company hereby agrees that, in connection with any Underwritten Offering in accordance with the terms hereof, it will negotiate in good faith and execute all indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangement, including using commercially reasonable efforts to procure customary legal opinions and auditor "comfort" letters.

(l)     For a reasonable period of time prior to the filing of any Registration Statement and throughout the Effectiveness Period, the Company will make available, upon reasonable notice at the Company's principal place of business or such other reasonable place as determined by the Company in its discretion, for inspection during normal business hours by a representative of the selling Holders, the managing underwriter and any attorneys or accountants retained by the selling Holders or managing underwriter, all such financial and other information and books and records of the Company, and cause the officers, employees, counsel and independent certified public accountants of the Company to respond to such inquiries, as shall be reasonably necessary (and in the case of counsel, not violate an attorney-client privilege in such counsel's reasonable belief) to conduct a reasonable investigation within the meaning of Section 11 of the Securities Act; *provided*, *however*, that any information that is not generally publicly available at the time of delivery of such information shall be kept confidential by such Persons unless disclosure of such information is required by court or administrative order or, in the opinion of counsel to such Person, applicable law, in which case, such Person shall be required to give the Company written notice of the proposed disclosure prior to such disclosure and, if requested by the Company, assist the Company in seeking to prevent or limit the proposed disclosure.

17

(m)    In connection with any Requested Underwritten Offering, the Company will use commercially reasonable efforts to cause appropriate officers and employees to be available, on a customary basis and upon reasonable notice, to meet with prospective investors in presentations, meetings and road shows.

(n)    Each Holder agrees to furnish to the Company any other information regarding the Holder and the distribution of such securities as the Company reasonably determines is required to be included in any Registration Statement or any Prospectus or prospectus supplement relating to an Underwritten Offering.

(o)    Notwithstanding any other provision of this Agreement, the Company shall not be required to file a Registration Statement (or any amendment thereto) or effect a Requested Underwritten Offering (or, if the Company has filed a Shelf Registration Statement and has included Registrable Securities therein, the Company shall be entitled to suspend the offer and sale of Registrable Securities pursuant to such Registration Statement) for a period of up to [60] days if (i) the Board determines that a postponement is in the best interest of the Company and its stockholders generally due to a pending transaction involving the Company (including a pending securities offering by the Company), (ii) the Board determines such registration would render the Company unable to comply with applicable securities laws or (iii) the Board determines such registration would require disclosure of material information that the Company has a bona fide business purpose for preserving as confidential (any such period, a "***Blackout Period***"); *provided*, *however*, that in no event shall any Blackout Period together with any Suspension Period exceed an aggregate of 120 days in any 12-month period.  In the event that a Registration Statement withdrawn pursuant to this <u>Section 3(o)</u> relates to a Demand Registration pursuant, then Fahrenheit shall be entitled to withdraw the Demand Registration and, if such request is withdrawn, it shall not count against the limits imposed pursuant to <u>Section 2(b)(iii)</u>.  In effecting a Blackout Period, the Company shall not disclose any material non-public information that is the basis for such Blackout Period to a Holder without the express written consent of such Holder.

(p)    In connection with an Underwritten Offering, the Company shall use commercially reasonable efforts to provide to each Holder named as a selling stockholder in any Registration Statement a copy of any auditor "comfort" letters and customary legal opinions, in each case that have been provided to the managing underwriter in connection with the Underwritten Offering, not later than the Business Day prior to the effective date of such Registration Statement.

(q)    In connection with any Underwritten Offering made pursuant to a Registration Statement filed pursuant to <u>Section 2</u>, if requested by the managing underwriter in an Underwritten Offering, each Holder shall execute a customary "lock-up" agreement with the underwriters of such Underwritten Offering containing a lock-up period equal to the shorter of (i) the shortest number of days that a director of the Company or "executive officer" (as defined under Section 16 of the Exchange Act) of the Company contractually agrees with the underwriters of such Underwritten Offering not to sell any Company Securities following such Underwritten Offering and (ii) [90] days from the date of the execution of the underwriting agreement with respect to such Underwritten Offering.  Notwithstanding the foregoing, any discretionary waiver or termination of this lock-up provision by the Company or the underwriters

18

with respect to any of the Holders shall apply to the other Holders as well, pro rata based upon the number of shares subject to such obligations.

(r)    Notwithstanding anything to the contrary in this Agreement, any Holder may make a written election (an "***Opt-Out Election***") to no longer receive from the Company any Demand Notice, Piggyback Registration Notice or Underwritten Offering Piggyback Notice (each, a "***Covered Notice***"), and, following receipt of such Opt-Out Election, the Company shall not be required to, and shall not, deliver any such Covered Notice to such Holder from the date of receipt of such Opt-Out Election and such Holder shall have no right to participate in any Registration Statement or Underwritten Offering as to which such Covered Notices pertain. An Opt-Out Election shall remain in effect until it has been revoked in writing and received by the Company. A Holder who previously has given the Company an Opt-Out election may revoke such election at any time in writing, and there shall be no limit on the ability of a Holder to issue and revoke subsequent Opt-Out Elections.

4.    <u>No Inconsistent Agreements; Additional Rights</u>**.**  The Company shall not hereafter enter into, and is not currently a party to, any agreement with respect to its securities that is inconsistent in any material respect with the rights granted to the Holders by this Agreement. The Company shall not, prior to the termination of this Agreement, grant any registration rights that are superior to, conflict with, or would otherwise prevent the Company from performing, the rights granted to the Holders hereby.

5.    <u>Registration Expenses</u>.  All Registration Expenses incident to the Parties' performance of or compliance with their respective obligations under this Agreement or otherwise in connection with any Demand Registration, Requested Underwritten Offering, Piggyback Registration or Underwritten Piggyback Offering (in each case, excluding any Selling Expenses) shall be borne by the Company, whether or not any Registrable Securities are sold pursuant to a Registration Statement or whether or not a Registration Statement is filed or becomes effective.  "***Registration Expenses***" means all expenses incurred in connection with registrations, filings or qualifications pursuant to <u>Section 2</u> and <u>Section 3</u>, (i) registration and filing fees (including fees and expenses (A) with respect to filings required to be made with the Trading Market, (B) in compliance with applicable state securities or "Blue Sky" laws and (C) with respect to filings with FINRA), (ii) printing expenses (including expenses of printing certificates for Company Securities and of printing Prospectuses if the printing of Prospectuses is reasonably requested by a Holder of Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel, auditors and accountants, (v) Securities Act liability insurance, if the Company so desires such insurance, (vi) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement, (vii) all expenses relating to marketing the sale of the Registrable Securities, including expenses related to conducting a "road show" and (viii) reasonable and documented fees and expenses of one counsel to the Holders reasonably acceptable to the Company and selected by the Holders that hold a majority of the Registrable Securities to be included in such filing in connection with the filing or amendment of any Registration Statement or Prospectus hereunder. In addition, the Company shall be responsible for all of its expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including expenses payable to third parties and all salaries and expenses of their officers and employees performing legal or

19

accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on the Trading Market.

6.    <u>Indemnification</u>.

(a)    The Company shall indemnify and hold harmless each Holder, its Affiliates and each of their respective officers and directors and any agent thereof (collectively, "***Holder Indemnified Persons***"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, joint or several, costs (including reasonable costs of preparation and reasonable attorneys' fees) and expenses, judgments, fines, penalties, interest, settlements or other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which any Holder Indemnified Person may be involved, or is threatened to be involved, as a party or otherwise, under the Securities Act or otherwise (collectively, "***Losses***"), as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any Registration Statement under which any Registrable Securities were registered, in any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if the Company authorized the use of such preliminary prospectus prior to the Effective Date), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current); *provided*, *however*, that the Company shall not be liable to any Holder Indemnified Person to the extent that any such claim arises out of, is based upon or results from an untrue or alleged untrue statement or omission or alleged omission made in such Registration Statement, such preliminary, summary or final prospectus or free writing prospectus or such amendment or supplement, in reliance upon and in conformity with written information furnished to the Company by or on behalf of such Holder Indemnified Person, in its capacity as such, or any underwriter specifically for use in the preparation thereof.  The Company shall notify the Holders promptly of the institution, threat or assertion of any Proceeding of which the Company is aware in connection with the transactions contemplated by this Agreement.  This indemnity shall be in addition to any liability the Company may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder Indemnified Person or any Indemnified Party and shall survive the transfer of such securities by such Holder.  Notwithstanding anything to the contrary herein, this <u>Section 6</u> shall survive any termination or expiration of this Agreement indefinitely.

(b)    In connection with any Registration Statement in which a Holder participates, such Holder, solely in its capacity as such, shall, severally and not jointly,

20

indemnify and hold harmless the Company, its Affiliates and each of their respective officers, directors and any agent thereof, to the fullest extent permitted by applicable law, from and against any and all Losses as incurred, arising out of or relating to any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, in any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), or arising out of, based upon or resulting from the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements made therein not misleading, in the case of the Registration Statement, or arising out of, based upon or resulting from the omission to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in the case of any preliminary prospectus (if used prior to the Effective Date of such Registration Statement), or in any summary or final prospectus or free writing prospectus (if such free writing prospectus was authorized for use by the Company) or in any amendment or supplement thereto (if used during the period the Company is required to keep the Registration Statement current), but only to the extent that the same are made in reliance and in conformity with information relating to the Holder furnished in writing to the Company by such Holder, solely in its capacity as such, expressly for use therein.  This indemnity shall be in addition to any liability such Holder may otherwise have and shall remain in full force and effect regardless of any investigation made by or on behalf of the Company or any Indemnified Party (as defined below). In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder from the sale of the Registrable Securities giving rise to such indemnification obligation.

(c)       Any Person entitled to indemnification hereunder (each, an "*__Indemnified Party__*") shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification and (ii) unless in such Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and indemnifying party may exist with respect to such claim or there may be reasonable defenses available to the Indemnified Party that are different from, or additional to, those available to the indemnifying party, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the Indemnified Party.  If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the Indemnified Party without its consent (but such consent may not be unreasonably withheld, delayed or conditioned).  An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (in addition to any local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless, in the reasonable judgment of any Indemnified Party, there may be one or more legal or equitable defenses available to such Indemnified Party that are in addition to, or may conflict with, those available to another Indemnified Party with respect to such claim.  Failure to give prompt written notice as provided in clause (i) above shall not release the indemnifying party from its obligations hereunder.

(d)       If the indemnification provided for in this <u>Section 6</u> is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any Losses referred to herein, the indemnifying party, in lieu of indemnifying such Indemnified Party

21

thereunder, shall, to the extent permitted by applicable law, contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the indemnifying party, on the one hand, and of the Indemnified Party, on the other hand, in connection with the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact that resulted in such Losses, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the Indemnified Party shall be determined by a court of law by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party or by the Indemnified Party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or alleged statement or omission or alleged omission; *provided*, that in no event shall any contribution by a Holder hereunder exceed the net proceeds from the offering received by such Holder.

7.  Facilitation of Sales Pursuant to Section 4(a)(7), Rule 144 and Rule 144A.[5]

(a)  The Company will provide reasonable access to management for confirmatory due diligence meetings, as the Holders may reasonably request, to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act.

(b)  To the extent is shall be required to do so under the Exchange Act, the Company shall timely file the reports required to be filed by it under the Exchange Act or the Securities Act (including the reports under Sections 13 and 15(d) of the Exchange Act referred to in subparagraph (c)(1) of Rule 144) and shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable the Holders to sell Registrable Securities without registration under the Securities Act pursuant to Rule 144, Rule 144A or Section 4(a)(7) of the Securities Act.  Upon the request of any Holder in connection with such Holder's sale pursuant to Rule 144 the Company shall deliver to such Holder a written statement as to whether it has complied with the applicable requirements.

8.  Voting.  At any time during which the Fahrenheit Management Agreement is in full force and effect, Fahrenheit in its capacity as stockholder or proxy holder of the Company, irrevocably and unconditionally agrees that, at any meeting of the stockholders of the Company (whether annual or special and whether or not an adjourned or postponed meeting, however called and including any adjournment or postponement thereof) and in connection with any written consent of stockholders of the Company: (i) Fahrenheit shall cause to be voted at such meeting (or validly execute and return and cause such consent to be granted with respect to) all of such Initial Shares (including those obtained by dividends, stock splits, and similar transactions with respect to the Initial Shares, but not, for the avoidance of doubt, including shares of Common Stock otherwise acquired by Fahrenheit) owned as of the record date for such meeting (or the date that any written consent is executed by Fahrenheit)(the "***Covered Shares***") in accordance with the recommendations of the board of directors of the Company and (ii) Fahrenheit shall not commit any act that restricts its legal power, authority and right to vote all of

---

[5] NTD: To discuss facilitation as this is expected to be an important source of liquidity Fahrenheit (in particular, 4(a)(7) and Rule 144A sales).

the Covered Shares to vote (or execute and return an action by written consent) then beneficially owned by it or otherwise prevent or disable it from performing any of its obligations under this Section 8. Without limiting the generality of the foregoing, except for this Agreement, Fahrenheit shall not (A) enter into any voting agreement with any person with respect to any of the Covered Shares, (B) grant any person other than the Company or its designees any proxy (revocable or irrevocable) or power of attorney with respect to any of the Covered Shares, (C) deposit any of the Covered Shares in a voting trust or otherwise enter into any agreement or arrangement with any person (other than the Company) limiting or affecting its legal power, authority or right to vote the Covered Shares in accordance with this Section 8, (D) acquire, offer or propose to acquire or solicit an offer to sell any securities of the Company, [(E)(1) except as permitted by the Fahrenheit Management Agreement, make, engage in, or in any way participate in any "solicitation" of "proxies" (as such terms are used in the rules of the Securities and Exchange Commission promulgated under Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but without regard to the exclusion set forth in Rule 14a-1(l)(2)(iv) promulgated under the Exchange Act or any consents to vote, call or seek to call a meeting of stockholders or otherwise seek to influence the timing of any meeting of stockholders, or (2) seek the removal of any member of the board of directors or otherwise seek representation on the board of directives in any manner (in each case other than with respect to the Class B Directors (as such term is defined in the Company's certificate of incorporation) or as otherwise contemplated in the Fahrenheit Management Agreement),  (F) form, join or in any way participate in a "group" (as defined in Section 13(d)(3) of the Exchange Act) or otherwise act in concert with any other Person with respect to any securities of the Company or any actions prohibited by this Section 8] or (G) disclose publicly any intention to take any action prohibited by this Section 8. Fahrenheit hereby grants the Company an irrevocable proxy to vote all shares of Class A Common Stock owned by it in accordance with this Section 8, *provided*, *however*, that such irrevocable proxy shall terminate and be of no further force or effect immediately upon the termination or expiration of the Fahrenheit Management Agreement.

9.   Miscellaneous.

(a)   Remedies.  In the event of actual or potential breach by the Company of any of its obligations under this Agreement, each Holder, in addition to being entitled to exercise all rights granted by applicable law and under this Agreement, including recovery of damages, will be entitled to specific performance of its rights under this Agreement.  The Company agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and further agrees that, in the event of any action for specific performance in respect of such breach, it shall waive the defense that a remedy at law would be adequate.

(b)   Discontinued Disposition.  Upon receipt of a notice from the Company of the occurrence of any event of the kind described in clauses (ii) through (v) of Section 3(e) (provided that the Company shall not disclose any material non-public information that is the basis for such notice to the Holder without the express written consent of the Holder), each Holder will forthwith discontinue disposition of any applicable Registrable Securities under the applicable Registration Statement until such Holder's receipt of the copies of the supplemental Prospectus or amended Registration Statement as contemplated by Section 3(j) or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed,

23

and, in either case, has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus or Registration Statement (a "***Suspension Period***").  The Company may provide appropriate stop orders to enforce the provisions of this Section 9(b).

(c)    <u>Amendments and Waivers</u>.  No provision of this Agreement may be waived or amended except in a written instrument signed by the Company, Fahrenheit and Holders that hold a majority of the Registrable Securities as of the date of such waiver or amendment, *provided*, *however*, that any waiver or amendment that would have a disproportionate adverse effect on a Holder relative to the other Holders shall further require the consent of such Holder.  The Company shall provide prior notice to all Holders of any proposed waiver or amendment.  No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any Party to exercise any right hereunder in any manner impair the exercise of any such right.

(d)    <u>Notices</u>.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (i) the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Section 9(d) prior to 5:00 p.m. in the time zone of the receiving party on a Business Day, (ii) the Business Day after the date of transmission, if such notice or communication is delivered via facsimile or electronic mail as specified in this Agreement later than 5:00 p.m. in the time zone of the receiving party on any date and earlier than 11:59 p.m. in the time zone of the receiving party on such date, (iii) the Business Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) upon actual receipt by the Party to whom such notice is required to be given.  The address for such notices and communications shall be as follows:

|  |  |
|---|---|
| If to the Company: | [NewCo, Inc.] |
|  | [●] |
|  | Attention: [●] |
|  | E-mail: [●] |
|  |  |
|  | With copy to: |
|  |  |
|  | [●] |
|  | Attention:  [●] |
|  | E-mail: [●] |
|  |  |
| If to Fahrenheit | [●] |
|  | E-mail: [●] |
|  | Attention: [●] |
|  |  |
|  | Brown Rudnick LLP |
|  | 7 Times Square, |
|  | New York, NY 10036 |

24

Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

If to any Holder other than
Fahrenheit

To the address set forth for such Holder in the joinder
agreement in the form set forth in Exhibit A hereto.

    (e)    Successors and Assigns; Transfer of Registration Rights.

    (i)    This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective heirs, executors, administrators, successors, legal representatives and permitted assigns. Except as provided in Section 9(e)(ii), this Agreement, and any rights or obligations hereunder, may not be assigned without the prior written consent of the Company and Fahrenheit. The Company may not assign its rights or obligations hereunder without the prior written consent of Fahrenheit.

    (ii)    Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee; *provided* that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws and the Company's certificate of incorporation and bylaws then in effect; (b) such transferee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement substantially in the form set forth in Exhibit A hereto and delivers it to the Company as promptly as reasonably practicable; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee and identifying the Registrable Securities with respect to which such rights are being Transferred and provide the amount of any other capital stock of the Company beneficially owned by such transferee; *provided, however*, that (i) [except with respect to an Affiliate of Fahrenheit,][6] any rights assigned hereunder shall apply only in respect of Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement. Following a Transfer in accordance with this Section 9(e), the Company shall update the applicable prospectus to include the transferee as a selling holder thereunder promptly upon the receipt of the required information from such transferee.

    (f)    No Third-Party Beneficiaries. Nothing in this Agreement, whether express or implied, shall be construed to give any Person, other than the Parties or their respective successors and permitted assigns and any Indemnified Party, any legal or equitable right, remedy, claim or benefit under or in respect of this Agreement.

    (g)    Execution and Counterparts. This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and

---

[6] NTD: Affiliates TBD. We can further limit this to identified Affiliates if required.

all of which taken together shall constitute one and the same Agreement.  In the event that any signature is delivered by facsimile or electronic mail transmission, such signature shall create a valid binding obligation of the Party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such signature delivered by facsimile or electronic mail transmission were the original thereof.

(h)    Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.  Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

(i)    Cumulative Remedies.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(j)    Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, illegal, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions set forth herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and the Parties shall use their reasonable efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such term, provision, covenant or restriction.  It is hereby stipulated and declared to be the intention of the Parties that they would have executed the remaining terms, provisions, covenants and restrictions without including any of such that may be hereafter declared invalid, illegal, void or unenforceable.

(k)    Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior contracts or agreements with respect to the subject matter hereof and the matters addressed or governed hereby, whether oral or written.

(l)    Termination.  Except for Section 8 (which shall terminate upon the termination or expiration of the Fahrenheit Management Agreement) and Section 6, this Agreement shall terminate as to any Holder when all Registrable Securities held by such Holder

26

no longer constitute Registrable Securities.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**[NEWCO, INC.]**

By: _____
Name:
Title:

**[FAHRENHEIT LLC]**

By: _____
Name:
Title:

*Signature Page to Investors' and Registration Rights Agreement*

## Exhibit A

### *Form of Joinder Agreement*

This Joinder Agreement (this "Joinder Agreement") is made as of the date written below by the undersigned (the "Joining Party") in accordance with the Investors' and Registration Rights Agreement, dated as of [●], and as amended from time to time (the "Investors' and Registration Rights Agreement"), among [NewCo, Inc.] (the "Company") and the stockholders of the Company parties thereto. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Investors' and Registration Rights Agreement.

The Joining Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, the Joining Party shall be deemed to be a party to, and a "Holder" under, the Investors' and Registration Rights Agreement as of the date hereof as if he, she or it had executed the Investors' and Registration Rights Agreement. The Joining Party hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Investors' and Registration Rights Agreement.

This Joinder Agreement shall be governed by and construed in accordance with the domestic substantive laws of the State of New York without giving effect to any choice or conflict of laws provision or rule that would cause the application of the domestic substantive laws of any other jurisdiction.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date written below.

**[JOINING PARTY]**

By: _____
Name: [●]
Title:   [●]
Address: [●]

Date: [●]

## **Exhibit J**

**U.S. Bitcoin Management Agreement**

*DRAFT*

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Manager and [Celsius Mining LLC] entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan), including the Mining (as defined in the Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, Fahrenheit LLC ("**Fahrenheit**") is entering into that certain Management Services Agreement by and between Fahrenheit and the Company, dated as of the date hereof (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), whereby Fahrenheit shall provide certain management services to the Company and its subsidiaries.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Appointment. The Company hereby engages the Manager[ on an exclusive basis][1], and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of

---

[1] **BR Note to Draft**: To be discussed.

this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof.

(b)     Termination. This Agreement may be terminated only as follows:

(i)     By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)     By the Manager, in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); and

(iii)     By the Company, during the Initial Term or the Term Extension:

(A)     in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)     in the event of the Manager's persistent and material failure to manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)     [if Asher Genoot ("**Genoot**") ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or is indicted of any act which is a felony involving financial crimes or theft of corporate property;][2]

(D)     [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;][3] or

(E)     if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of

---

[2] **Note to Draft**: Reserved.

[3] **Note to Draft**: Reserved.

3

competent jurisdiction to take charge of or sell any material portion of its property or business.

(iv)    [For the purposes of this Agreement, "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.][4]

(c)    Termination Event Procedures. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(d)    Effect of Termination.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms.[5] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-

---

[4] **Note to Draft**: Reserved. Parties to work together in good faith to agree on language.

[5] **Note to Draft:**: Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)     Upon the termination of this Agreement pursuant to Section 2(b)(iii) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); <u>provided</u>, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a). For clarity, nothing in this Section shall relieve Company of its obligations to pay to the Manager the Mining Management Fee and the Fahrenheit Cash Fee Split for the performance of Services during any Transition Period.

(iii)     If this Agreement is terminated other than pursuant to Section 2(b)(ii), or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)     the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement; and

(B)     the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a pro rated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)     If this Agreement is terminated pursuant to Section 2(b)(ii), then:

(A)     the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the

5

effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; and

(B)    in the event that the Fahrenheit Management Agreement is no longer in effect upon the effective date of termination or at the time that the Manager receives a Non-Renewal Notice (as applicable), the Manager shall also receive the following as additional consideration, due upon the effective date of such expiration or termination: (i) 31.881% of the Base Cash Fee (as defined in the Fahrenheit Management Agreement) ("**Fahrenheit Cash Fee Split**") that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect, to be paid in one lump-sum; and (ii) 31.881% of the Equity Fee (as defined in the Fahrenheit Management Agreement) that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect ("**Fahrenheit Equity Fee Split**"). With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 2(d)(iv)(B), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents necessarily required in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(v)    Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager receives all amounts payable pursuant to Sections 2(d)(i) – (iv), such payment shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(v) shall not result in any double payment by the Company for the same underlying obligation.

(vi)    The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.    <u>Services</u>.

(a)    <u>Services</u>. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including

all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on Exhibit A hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on Exhibit B hereto (collectively, the "**Projects**").

4.    Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company.

(a)    The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on Exhibit B hereto.

(b)    [RESERVED].

(c)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with Exhibit A for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(d)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(e)    Obligations of the Manager. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the

7

Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)     Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)     Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)     Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)     At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(c)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(f)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)    Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)    Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)    At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(d)(iv) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget.

[Notwithstanding the foregoing, in the event that there has not been Substantial Completion, (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services in accordance with Section 3 and Section 4 of the Cedarvale Agreement to the extent that such provisions differ from the terms of Section 3 and Section 4 hereunder.][6]

5.    Compensation for Services and Expense Reimbursement.

(a)    Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $15,000,000, which shall be paid in quarterly installments each in an amount equal to $3,750,000 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided, however, that, during any Term

---

[6] **Note to Draft**: Subject to further review and comment.

Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor Index) ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)    Other Consideration. To the extent that the Fahrenheit Agreement is no longer in effect, then the Manager shall receive the Fahrenheit Cash Fee Split and Fahrenheit Equity Fee Split as additional consideration for providing the Services. The Fahrenheit Cash Fee Split shall be paid quarterly in roughly equal amounts (subject to adjustment as described in Section 4(a) of the Fahrenheit Management Agreement) on the first Business Day of each January, April, July, and October. With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 5(b), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents the Manager deems necessary or advisable in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(c)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)    Review and Objections.

(i)    During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based

10

Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, provided, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[7] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)    Expenses.

(i)    The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for

---

[7] **BR NTD**: To confirm Kroll not currently utilized by any party.

additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)     The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.[ The Manager shall not be responsible or liable for any breaches, failures or delays, including breaches, failures or delays in the performance of Services or the completion of Projects, caused by the Manager's performance in accordance with a Budget deemed approved in accordance with the foregoing.][8]

(iii)     The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject

---

[8] **BR Note to Draft**: This sentence subject to further review.

to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving

practices (<u>provided</u> any information so maintained will remain subject to the confidentiality obligations of this Agreement).

       7.    <u>Intellectual Property</u>.

       (a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicenseable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

       (b)    All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. [The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).]

       (c)    Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

       (d)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

       (e)    "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall

provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.    Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of the aggregate amount of any Mining Management Fee actually paid to the Manager hereunder in the preceding 6 months, unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"). Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business; provided that with respect to: (1) the Company's liability, this Section 8 shall not apply to (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) the Manager's liability, this Section 8 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    Indemnification.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding

15

upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)      Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, [violation of law] or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except, to the extent such alleged infringement, misappropriation, or other violation arise out of (i) the performance of the Services pursuant to the Company's instructions regarding the performance of such Services; or (ii) the use of the Manager-Developed IP or the Services in combination with the Intellectual Property Rights of a third party. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or [violation of law] by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)      Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in

16

connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the later of (i) the fourth anniversary of this Agreement and (ii) the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than six months ("**Unrestricted Employees**"); provided further that at the Company's request, which the Manager may reject in its reasonable discretion, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the twelve month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

11.    Force Majeure.

(a)    Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction, or any arbitrator, court, or tribunal of competent jurisdiction.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period, if the Excluded Event has resulted in miners and/or infrastructure under management by the Manager that have an aggregate name capacity (in megawatts) below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate name capacity (in megawatts) of the current miners and/or infrastructure under management by the Manager and the

17

denominator of which is 200 megawatts.[9] In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

(c)    During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

If to the Company:                     [COMPANY ADDRESS]
                                       Email: [EMAIL ADDRESS]
                                       Attention: [TITLE OF OFFICER TO RECEIVE
                                       NOTICES]

---

[9] **Note to Draft**: Mechanics to be further refined to account for the fact that the payment of Mining Management Fee is paid in advance. So refund/credit mechanics will be introduced. **BR Note to Draft**: Please insert language on this mechanic as currently agreed upon/proposed.

with a copy to:                    [COMPANY LAW FIRM]
                                   Email: [EMAIL ADDRESS]
                                   Attention: [ATTORNEY NAME]


If to the Manager:                 [MANAGER ADDRESS]
                                   Email: [EMAIL ADDRESS]
                                   Attention: [TITLE OF OFFICER TO RECEIVE
                                   NOTICES]


with a copy to:                    Brown Rudnick LLP
                                   7 Times Square,
                                   New York, NY 10036
                                   Email: jfitzsimons@brownrudnick.com
                                   Attention: Jonathan Fitzsimons

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver

thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.    Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    Fees and Expense. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:


U.S. Data Management Group, LLC

By_____
Name:
Title:

**Exhibit A**

**Services**

| Description of Service / Activity | Fee Structure |
|---|---|
| Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| Use of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee  [NTD: added in start up costs if any custom developed software is required. Updates/patches should be included in base fee as well as basic reporting. Presume any modifications would be IP of USBTC to use for other aires/customers and we shouldn't fund that as a pass through cost] |
| Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| Customer contract management will be performed by the Manager through its hosting team. Only where additional individuals need to be hired to service exclusively this Project and those individuals are budgeted and approved by owner will it be a passthrough. | Fixed fee / Pass-Through Expenses (see description) |
| Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, | Fixed fee |

| Description of Service / Activity | Fee Structure |
|---|---|
| condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | |
| Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through. | Fixed fee / Pass-Through Expenses (see description) [NTD: r company should have discretion whether resources belong in USBTC or NewCo if we're hiring or funding dedicated FTE] |
| Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through. | Fixed fee / Pass-Through Expenses (see description) [NTD: Maintaining and training staff should be part of the site SOPs and would not require dedicated personnel] |
| Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |

AMERICAS 124751481
65111313 v24

| Description of Service / Activity | Fee Structure |
|---|---|
| Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through. | Fixed fee / Pass-Through Expenses (see description) [NTD: dedicated personnel here should be employees of NewCo or part of a specific build project as covered below in pass through costs.] |
| The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company | Pass-Through Expenses |
| Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |

25

| Description of Service / Activity | Fee Structure |
|---|---|
| Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |
| Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| Insurance related expenses. | Pass-Through Expenses |
| Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |

26

| Description of Service / Activity | Fee Structure |
|---|---|
| Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |

27

## Exhibit B

### Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this Exhibit B, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; provided, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.][10]

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

2. The Manager will provide the Debtors or the Company, as applicable, with an option which can be exercised on or before December 5, 2023 to purchase an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such site) identified to the Debtors and the Committee during the bid process for $575,000 per MW that is "plug ready," and support the immediate installation at miners at such site upon Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into a mining management agreement with the Manager respecting such 50 MW site on terms acceptable to the parties.

3. To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

4. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

5. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month

---

[10] **BR NTD**: Subject to further review and agreement by the parties.

option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

6.    The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

7.    The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

8.    The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

9.    The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

10.    The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments[11]**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

---

[11] **W&C Note to Draft**: Subject to further review.

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**[Exhibit C]**[12]

**Insurance Requirements**

1) Manager's Minimum Insurance Requirements:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) Worker's Compensation and Employer's Liability.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) Company's Minimum Insurance Requirements:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) Worker's Compensation and Employer's Liability.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.

---

[12] **W&C Note to Draft:** Subject to further review against insurance package proposal being prepared by Fahrenheit.

Employer's Liability with limits no less than:

    i)  $1,000,000 Bodily Injury by Accident (Each Accident)

    ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

    iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

**<u>Exhibit J-1</u>**

**(Redline) U.S. Bitcoin Management Agreement**

*DRAFT*

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Manager and [Celsius Mining LLC] entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan), including the Mining (as defined in the Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, Fahrenheit LLC ("**Fahrenheit**") is entering into that certain Management Services Agreement by and between Fahrenheit and the Company, dated as of the date hereof (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), whereby Fahrenheit shall provide certain management services to the Company and its subsidiaries.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Appointment. The Company hereby engages the Manager[ on a~~an~~ ~~non-~~exclusive basis][1], and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this

---

[1] **BR Note to Draft**: To be discussed.

Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof.

(b)    Termination. This Agreement may be terminated only as follows:

(i)    By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)    By the Manager, in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); and

(iii)    By the Company, during the Initial Term or the Term Extension:

(A)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)    in the event of the Manager's persistent and material failure to ~~competently~~ manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)    [if Asher Genoot ("**Genoot**") ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or is indicted of any act which is a felony involving financial crimes or theft of corporate property;][12]

(D)    [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;][23] or

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or

---

[12] **Note to Draft**: Reserved. ~~Parties to work together in good faith to agree on language by September 30, 2023.~~

[23] ~~**BR NTD**~~ **Note to Draft**: Reserved. ~~Parties to work together in good faith to agree on language by September 30, 2023.~~

involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(iv)    [For the purposes of this Agreement, "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on <u>Exhibit D</u> hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.]~~3~~4

(c)    <u>Termination Event Procedures</u>. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(d)    <u>Effect of Termination</u>.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; <u>provided</u>, <u>however</u>, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any

---

~~3~~ ~~**BR NTD**~~4 **Note to Draft**: Reserved. Parties to work together in good faith to agree on language ~~by September 30, 2023~~.

4

Definitive Agreements shall survive in accordance with their own terms.[45] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Section 2(b)(iii)2(b)(iii) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 44, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a).[5]5(a). For clarity, nothing in this Section shall relieve Company of its obligations to pay to the Manager the Mining Management Fee and the Fahrenheit Cash Fee Split for the performance of Services during any Transition Period.

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement; and

(B)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a pro rated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to

---

[45] **Note to Draft::** Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

[5] Note to BR: As mentioned on the call, we don't think the obligation to pay Fahrenheit Cash Fee Split need to be repeated here, which is already governed by Section 5(b).

this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; and

(B)    in the event that the Fahrenheit Management Agreement is no longer in effect upon the effective date of termination or at the time that the Manager receives a Non-Renewal Notice (as applicable), the Manager shall also receive the following as additional consideration, due upon the effective date of such expiration or termination: (i) 31.881% of the Base Cash Fee (as defined in the Fahrenheit Management Agreement) ("**Fahrenheit Cash Fee Split**") that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect, to be paid in one lump-sum; and (ii) 31.881% of the Equity Fee (as defined in the Fahrenheit Management Agreement) that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect ("**Fahrenheit Equity Fee Split**"). With respect to any Fahrenheit Equity Fee Split due pursuant to this Section ~~2(d)(iv)(B)~~2(d)(iv)(B), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents necessarily required in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(v)    Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager receives all amounts payable pursuant to Sections 2(d)(i) – (iv), such payment shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e)

obligations of the Company to indemnify the Manager ~~for Losses arising from third party claims~~ under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(v) shall not result in any double payment by the Company for the same underlying obligation.

(vi)    The provisions of this Section 2(d), Sections 6 and 7, and Sections ~~10~~10 through ~~24~~24 shall survive the termination of this Agreement.

3.    <u>Services</u>.

(a)    <u>Services</u>. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on <u>Exhibit A</u> hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on <u>Exhibit B</u> hereto (collectively, the "**Projects**").

4.    <u>Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company</u>.

(a)    The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to ~~competently~~ provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on <u>Exhibit B</u> hereto.

(b)    [RESERVED].

(c)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with <u>Exhibit A</u> for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with <u>Exhibit A</u> for the prior quarter.

(d)    <u>Modification of Services</u>. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section ~~19~~19 and attached to this Agreement.

(e)    <u>Obligations of the Manager</u>. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law

7

after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)     Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a)4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)    Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)   Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)  Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance.

This Section 4(c)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(f)     Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)     Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)     Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)     At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(d)(iv) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f)4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget.

[Notwithstanding the foregoing, in the event that there has not been Substantial Completion, (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services in accordance with Section 3 and Section 4 of the

9

Cedarvale Agreement to the extent that such provisions differ from the terms of Section 3 and Section 4 hereunder.][6]

5.    Compensation for Services and Expense Reimbursement.

(a)    Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d))2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $15,000,000, which shall be paid in quarterly installments each in an amount equal to $3,750,000 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided, however, that, during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United     States     Department     of     Labor     (or     its     successor     Index)     ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)    Other Consideration. To the extent that the Fahrenheit Agreement is no longer in effect, then the Manager shall receive the Fahrenheit Cash Fee Split and Fahrenheit Equity Fee Split as additional consideration for providing the Services. The Fahrenheit Cash Fee Split shall be paid quarterly in roughly equal amounts (subject to adjustment as described in Section 4(a) of the Fahrenheit Management Agreement) on the first Business Day of each January, April, July, and October. With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 5(b)5(b), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents the Manager deems necessary or advisable in order to effect the transfer of the Fahrenheit

---

[6] **Note to Draft**: Subject to further review and comment.

Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(c)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)    Review and Objections.

(i)    During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, provided, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[67] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions

---

[67] **BR NTD**: To confirm Kroll not currently utilized by any party.

and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)     Expenses.

(i)     The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv)2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)     The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.[ The Manager shall not be responsible or liable for any breaches, failures or delays, including breaches, failures or delays in the

performance of Services or the completion of Projects, caused by the Manager's performance in accordance with a Budget deemed approved in accordance with the foregoing.][8]

(iii)    The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d)2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.    <u>Confidentiality</u>.

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental

---

[8] **BR Note to Draft**: This sentence subject to further review.

Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Intellectual Property.

(a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicenseable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms,

uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. [The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).]

(c)    Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

(d)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

(e)    "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section ~~7(b)~~7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section ~~2(d)(ii)~~2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.    <u>Limitation of Liability</u>. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of ~~$[10,000,000] in~~ the aggregate <u>amount of any Mining Management Fee actually paid to the Manager hereunder in the preceding 6 months</u>, unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"). Except for the Liability Exceptions, in no event will either party be liable to the other for special,

indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business; provided that with respect to: (1) the Company's liability, this Section 8 shall not apply to (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and [(viii) reasonable expenses incurred [by the Manager] in enforcing its rights under this Agreement against the Company;]⁷ and (2) the Manager's liability, this Section 8 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    Indemnification.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c)9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c)9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c)9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c)9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c)9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, [violation of law] or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except, in the case of the Services, to the extent such alleged infringement, misappropriation, or other violation could not be avoided while followingarise out of (i) the performance of the Services pursuant to the Company's instructions regarding the performance of such Services; or (ii) the use of the Manager-Developed IP or

---

⁷ **Note to Draft**: Reserved. To be negotiated by parties in good faith by September 30, 2023.

the Services in combination with the Intellectual Property Rights of a third party. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c)9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or [violation of law] by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 99, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the later of (i) the fourth anniversary of this Agreement and (ii) the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 1010 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for at leastfewer than 12six months ("**Unrestricted Employees**"); provided further that at the Company's request, which the Manager shall makemay reject in its reasonable transition plans for, and communications to, thediscretion, the Manager shall reasonably

facilitate communications between an Unrestricted Employees and the Company during the twelve month period prior to the Non-Solicit Fallaway Date for thesuch Unrestricted Employees to be transferred to the Company.

11.  Force Majeure.

(a)  Subject to Section 11(b)11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction, or any arbitrator, court, or tribunal of competent jurisdiction.

(b)  Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period, if the Excluded Event has resulted in miners and/or infrastructure under management by the Manager having an outputthat have an aggregate name capacity (in megawatts) below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the outputactual aggregate name capacity (in megawatts) of the current miners and/or infrastructure under management by the Manager and the denominator of which is 200 megawatts.[89] In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

(c)  During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a

---

[89] **Note to Draft**: Mechanics to be further refined to account for the fact that the payment of Mining Management Fee is paid in advance. So refund/credit mechanics will be introduced. **BR Note to Draft**: Please insert language on this mechanic as currently agreed upon/proposed.

written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section ~~11~~11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

If to the Company:                            [COMPANY ADDRESS]
                                              Email: [EMAIL ADDRESS]
                                              Attention: [TITLE OF OFFICER TO RECEIVE
                                              NOTICES]


with a copy to:                               [COMPANY LAW FIRM]
                                              Email: [EMAIL ADDRESS]
                                              Attention: [ATTORNEY NAME]


If to the Manager:                            [MANAGER ADDRESS]
                                              Email: [EMAIL ADDRESS]
                                              Attention: [TITLE OF OFFICER TO RECEIVE
                                              NOTICES]


with a copy to:                               Brown Rudnick LLP
                                              7 Times Square,

New York, NY 10036
Email: jfitzsimons@brownrudnick.com
Attention: Jonathan Fitzsimons

15.      Entire Agreement. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.      Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.      No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.      Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.      Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.      Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.      Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any

choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.    <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expenses</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation, and preparation and performance of and compliance with the terms of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives), regardless of whether the transactions contemplated hereby are consummated; provided that, if there is a dispute regarding payment of the Base Cash Fee or any unvested portion of the Equity Fee to the Manager, then any legal costs or expenses incurred with respect to such dispute shall be paid by the Manager, on the one hand, and the Company on the other hand, based upon the percentage that the portion of the contested amount not awarded to each party bears to the amount actually contested by such party, as determined by a court of competent jurisdiction..

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended,

supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:


U.S. Data Management Group, LLC

By_____
Name:
Title:

**Exhibit A**

**Services**

| Description of Service / Activity | Fee Structure |
|---|---|
| Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| Use of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee    [NTD: added in start up costs if any custom developed software is required. Updates/patches should be included in base fee as well as basic reporting. Presume any modifications would be IP of USBTC to use for other aires/customers and we shouldn't fund that as a pass through cost] |
| Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| Customer contract management will be performed by the Manager through its hosting team. Only where additional individuals need to be hired to service exclusively this Project and those individuals are budgeted and approved by owner will it be a passthrough. | Fixed fee / Pass-Through Expenses (see description) |
| Send material adverse effect notifications for any Customer | |

| Description of Service / Activity | Fee Structure |
|---|---|
| defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |
| Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted ~~and approved by the owner~~ will it be pass-through. | Fixed fee / Pass-Through Expenses (see description) [NTD: r company should have discretion whether resources belong in USBTC or NewCo if we're hiring or funding dedicated FTE] |
| Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. _Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through._ | Fixed fee _/ Pass-Through Expenses (see description)_ [NTD: Maintaining and training staff should be part of the site SOPs and would not require dedicated personnel] |
| Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| Overseeing strategy and development of new Bitcoin mining | Fixed fee _/ Pass-Through Expenses (see description)_ [NTD: |

25

| Description of Service / Activity | Fee Structure |
|---|---|
| facilities owned by, or to be owned by the Company. Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through. | dedicated personnel here should be employees of NewCo or part of a specific build project as covered below in pass through costs.] |
| The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company | Pass-Through Expenses |
| Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |

26

| Description of Service / Activity | Fee Structure |
|---|---|
| Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |
| Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| Insurance related expenses. | Pass-Through Expenses |
| Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |

AMERICAS 124751481
65111313 v2165111313 v24

| Description of Service / Activity | Fee Structure |
|---|---|
| Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |

AMERICAS 124751481
65111313 v2165111313 v24

## Exhibit B

## Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this
Exhibit B, and the transactions contemplated thereby, may be documented in one or more
agreements by and among the Manager, the Company, and/or their Affiliates, and any third
parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent
that the provisions of a Definitive Agreement directly conflict with those contained in this
Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or
waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement;
provided, that any silence on an obligation or condition in such Definitive Agreement shall not
be construed as an intention to waive such obligation or condition.]910

1. The Manager shall use its commercially reasonable efforts to contribute to the Company
   the leasehold and development rights to a 240 MW behind-the-meter site on economic
   terms no worse than those available to the Manager identified to the Debtors and the
   Committee during the bid process, subject to KYC, approval, and commercial
   discussions with the independent power producer jointly developing such site. To the
   extent that the Manager is unable to contribute such 240 MW site, it shall use
   commercially reasonable efforts to contribute a site (or sites) of substantially similar
   economics.

2. The Manager will provide the Debtors or the Company, as applicable, with an option
   which can be exercised on or before December 5, 2023 to purchase an existing, fully
   permitted and as-is built 50 MW facility in upstate New York (including the 12 years of
   existing leasehold rights and renewal terms, and the option to purchase such site)
   identified to the Debtors and the Committee during the bid process for $575,000 per MW
   that is "plug ready," and support the immediate installation at miners at such site upon
   Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not
   confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into
   a mining management agreement with the Manager respecting such 50 MW site on terms
   acceptable to the parties.

3. To the extent that the Debtors or the Company, as applicable, elect not to purchase the
   Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility
   for a 5-year term at substantially similar terms to the machines hosted at the Beowulf
   facility.

4. The Manager will offer up to 50 MW of immediately available containers and
   transformers currently owned by the Manager, and other supplies to the Debtors or the
   Company, as applicable, at the lower of its cost to obtain such items or market prices.

---

910 **BR NTD**: Subject to further review and agreement by the parties.

5. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

6. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

7. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

8. The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

9. The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

10. The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments**[1011]

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

---

[1011] **W&C Note to Draft**: Subject to further review.

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period. In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*: Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; <u>provided</u>, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

## [Exhibit C][1112]

## Insurance Requirements

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

[1112] **W&C Note to Draft:** Subject further review against insurance package proposal being prepared by Fahrenheit.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)   $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## **Exhibit K**

**Proof Group IP License**

*DRAFT*

# INTELLECTUAL PROPERTY LICENSE AND SUPPORT AGREEMENT

## By and between

## [Proof Group Capital Management LLC]

## And

## [NewCo, Inc.]

This Intellectual Property License and Support Agreement (this "**Agreement**"), is made and entered as of [●], by and among (i) [Proof Group Capital Management LLC], a [Delaware] limited liability company ("**Provider**"), (ii) Noah Jessop ("**Jessop**", and together with the Provider, the "**Provider Parties**"), and (iii) [NewCo, Inc.], a Delaware corporation (the "**Company**" and together with the Provider, the "**Parties**" and each a "**Party**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected Fahrenheit LLC ("**Fahrenheit**") as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, pursuant to the Plan Term Sheet, the Company and Fahrenheit entered into that certain Management Services Agreement by and between Fahrenheit and the Company, dated [●], 2023 (the "**Management Agreement**");

**WHEREAS**, on August 15, 2023, the Debtors filed the fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

1 of 13

*DRAFT*

**WHEREAS**, on [●], 2023, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**"), and on [●], 2023 (the "**Effective Date**"), the Plan became effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the Company desires to license certain intellectual property described herein, and the Provider is willing to license such intellectual property to the Company; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Intellectual Property License.

(a)    The Provider hereby grants to the Company, on behalf of themselves and their affiliates, a fully paid-up, royalty-free, worldwide, exclusive (except as to the Provider), non-transferable (except to the extent permitted by Section 14), non-sublicensable (except to any of the Company's affiliates or to contractors of the Company or its affiliates acting on behalf of the Company or any of its affiliates), perpetual and irrevocable license effective as of the date of this Agreement to use (i) the Proof Group Software and (ii) the Proof Group IP solely to the extent that such Proof Group IP is incorporated in or practiced or embodied by the Proof Group Software, in each of the foregoing cases (i) and (ii), for purposes of the Company staking or offering staking-related services. "**Proof Group IP**" means any Intellectual Property Rights in or to the Proof Group Software. "**Proof Group Software**" means all software and other technology owned by Provider or any of its affiliates from time to time during the term of this Agreement that relates to staking (as defined below) functionalities, together with all documentation relating thereto. "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (a) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (b) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (c) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations-in-part and reexaminations for any of the foregoing in (a)-(b), and (e) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    On the date of this Agreement, the Provider shall deliver to the Company copies of the Proof Group Software, including all then-current commented source code and related documentation, and all other documents, tangible embodiments or other materials necessary for Company to use the Proof Group Software. Thereafter, the Provider shall deliver to the Company copies of all new versions, bug fixes, improvements and other updates to the Proof Group Software, in each case, promptly after the development or acquisition thereof.

(c)    If the Provider believes that any of the Proof Group IP is being infringed or misappropriated by a third party, the Provider possessing such belief or awareness of such claims shall promptly provide written notice to the Company and provide it with all details of such infringement or claim, as applicable, that are known by the Provider.

(d)    The Company shall have the first right, but not the obligation to bring an infringement or misappropriation action concerning any Proof Group IP, defend any declaratory

*DRAFT*

judgment action concerning any Proof Group IP, and protect, enforce, or defend any Proof Group IP and control the conduct thereof and attempt to resolve any claims relating thereto. The Provider shall provide all reasonable cooperation and assistance, including providing access to relevant documents and other evidence, making its employees available at reasonable business hours and being joined as a party to such action. The Provider shall and hereby does irrevocably and unconditionally waive any objection to the Company's joinder of any of the Provider to any proceeding described in this Section on any grounds whatsoever, including on the grounds of personal jurisdiction, venue, or forum non conveniens. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Company as contemplated by this Section will be retained in its entirety by the Company, and the Company may settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, without the prior written approval of either Provider Party. After the Term, in the event that the Company decides not to take action against an infringement or misappropriation of Proof Group IP, it shall promptly inform the Provider, and the Provider shall then have the right (but not the obligation) to enforce the rights in the Proof Group IP. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Provider as contemplated by this Section shall be retained in its entirety by the Provider, and the Company hereby expressly waives any claim thereto.

2.   <u>Staking Support</u>. The Provider shall provide support services for the implementation of staking within the Company utilizing the Proof Group Software at no cost to the Company. Until such time that the Company has the capability and infrastructure to stake tokens (as reasonably determined by the Company and notified by the Company to the Provider in writing which notice shall be provided by the Company to the Provider promptly following such determination), the Provider shall provide the Company with staking services in accordance with the same performance standards as set forth in that certain Ethereum Staking and Services Agreement (the "**Staking and Services Agreement**") between the Provider and Celsius Network LLC, dated July 31, 2023 (which terms and conditions are incorporated herein by reference, except as modified herein); provided, however, that no fees shall apply to such staking services. For purposes of this Agreement, to "**stake**" means to operate one or more validator nodes (or similar nodes that may earn rewards) in connection with a digital asset network, whether or not the operator holds title to any or all tokens staked in connection with such node. After the Company has notified the Provider that the Company has the capability and infrastructure to stake tokens, (i) the Provider shall provide ongoing support services for the Company's staking efforts utilizing the Proof Group Software and (ii) Jessop shall provide reasonable assistance in furtherance of the Provider's performance of the foregoing ongoing support services, in each case, at no cost to the Company. The Provider Parties represent, warrant, and covenant that all services contemplated by this paragraph will be provided in a good and workmanlike manner consistent with industry best practices.

3.   <u>Third Party Staking Option</u>. At any time prior to the termination of this Agreement the Company may, by providing written notice to the Provider, elect to cause the Provider to migrate the Provider's and its affiliates' staking services customers ("**Customers**") to the Company (the "**Migration Notice**"). Upon the Provider's receipt of the Migration Notice, the Provider shall use (and cause its affiliates to use) commercially reasonable efforts to migrate the Customers to the Company such that the Customers shall become staking services customers of the Company; <u>provided</u>, <u>however</u>, that the Provider shall not be required to migrate Customers that

*DRAFT*

do not agree to such migration ("**Non-Consenting Customers**"). The Provider shall (i) notify each Customer of the proposed migration, and if such migration is not accepted the termination, of its agreement with the Provider for staking services within 5 business days after the Provider's receipt of the Migration Notice and (ii) terminate the provision of staking services to all Non-Consenting Customers as soon as practicable, and in any event no later than the 60th day following the Provider's receipt of the Migration Notice (the "**Migration End Date**"). The Provider shall not solicit or directly induce or encourage any Non-Consenting Customer's migration to any third party provider of staking services. On a weekly basis, the Provider and its affiliates shall promptly remit to the Company all funds they receive in consideration for providing staking services between the date of the Migration Notice and the date 60 days after the Migration End Date. If Company is not due at least $25,000 at the end of an applicable week, such funds will be held until the week in which such funds amount to $25,000 or more.

    4.    Exclusivity.

        (a)    Each of the Provider and Jessop covenants and agrees that, for the period beginning on the Effective Date and ending on the date of expiration or termination of this Agreement, that it or he (as applicable) shall not (and the Provider shall cause its affiliates not to), directly or indirectly engage in or assist any other Person in engaging in the Restricted Business (including by referring potential customers to any such other Person), other than (i) providing staking services to existing Customers prior to the termination or migration of staking services for each such Customer pursuant to the provisions of Section 3 hereof; (ii) in the course of providing services to the Company; or (iii) as otherwise consented to in writing by the Company. Notwithstanding the foregoing, (y) Jessop represents that Exhibit A contains a true, accurate and complete list of all of his roles and positions as of the date of this Agreement and as of the Effective Date, the participation in which would otherwise violate this Section 4(a); and [(z) Jessop's participation therein will not constitute a breach of this Section 4(a) from the date of this Agreement until a determination by the board of directors of the Company as to whether such participation is permitted, and thereafter for so long as any such participation is permitted by the board of directors (which consents to such participation shall not be unreasonably withheld). "**Restricted Business**" means the business of providing services relating to staking.][1]

        (b)    Except as otherwise expressly provided in this Agreement, neither the Provider nor Jessop is restricted hereunder from engaging in any business activities or from performing services for its own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its affiliates. Notwithstanding anything to the contrary, each of the Provider and Jessop may own, directly or indirectly, solely as an investment, up to twenty percent (20%) (or any other percentage value that may be provided in a conflicts policy that is duly adopted by the board of directors of the Company, provided such percentage value is not lower than 10%) of any class securities of any business engaged in the Restricted Business.

        (c)    Upon the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers, the license granted in Section 1

---

[1] Note to BR: Under continuing discussion between the parties.

will (automatically and without further action by either Party) convert into an exclusive license (even as to the Provider, except with respect to the Provider's use of the Proof Group Software to support Non-Consenting Customers solely to the extent permitted by Section 3).

5.    Term and Termination. This Agreement shall be coterminous with the Management Agreement and shall immediately terminate upon the expiration or termination of the Management Agreement; provided, however, that Sections 1(a), 1(d), 7, and 9-23 hereof shall survive the expiration and/or termination of this Agreement. Upon the expiration or termination of this Agreement, the license granted in Section 1 will (automatically and without further action by either Party) convert into an exclusive license (except as to the Provider).

6.    Provider Representations and Warranties. The Provider represents and warrants that: (i) none of the Proof Group Intellectual Property, the Proof Group Software, or the Company's use of either of the foregoing does or will infringe, misappropriate, or otherwise violate the Intellectual Property Rights of any Person; (ii) to the knowledge of the Provider, no Person is infringing, misappropriating, or otherwise violating any Proof Group Intellectual Property; and (iii) the execution of this Agreement and the performance of the Provider's obligations hereunder will not violate or conflict with any contractual or other legal obligations of the Provider. For the purposes of this Agreement, "knowledge of the Provider" shall mean the actual knowledge of Noah Jessop. and "**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

7.    Confidentiality.

(a)    During the Term and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations or exercising its rights under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 7 (or are bound by comparable contractual or professional obligations) and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent permissible, the disclosing party (the "**Disclosing Party**"), and, at the Disclosing Party's request and expense, take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of

*DRAFT*

Confidential Information that it is advised by its counsel that it is legally bound to disclose under such Governmental Order. Notwithstanding anything to the contrary (i) the Proof Group Software is the Confidential Information of both the Provider and the Company; and (ii) until the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers, the Provider may use the Proof Group Software, which may include disclosure of the Proof Group Software (solely in object code form) to its Customers and to third parties, solely as necessary for Provider to provide staking services to such Customers and to fulfill the Provider's obligations under Section 3. For the purposes of this Agreement, (A) "**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order, or other requirement or rule of law of any Governmental Authority, (B) "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction, (C) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, subpoena, warrant, demand, or determination entered by, with, or pursuant to the authority of any Governmental Authority, and (D) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 7; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information, except for the Proof Group Software. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable Law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

8.    Disclaimer. THE PROOF GROUP SOFTWARE IS PROVIDED "AS IS" AND OTHER THAN AS EXPRESSLY SET FORTH HEREIN PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE PROOF GROUP SOFTWARE, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET COMPANY'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE

COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

9. <u>Limitation of Liability</u>.

(a)    NEITHER PARTY NOR ANY OF ITS AFFILIATES WILL BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES, OR FOR ANY LOSS OF ACTUAL OR ANTICIPATED PROFITS, ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE USE OF THE PROOF GROUP SOFTWARE, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), STATUTE, OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    NOTWITHSTANDING ANYTHING IN THIS SECTION 9 TO THE CONTRARY, IN NO EVENT WILL JESSOP'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING UNDER OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL OR EQUITABLE THEORY, EXCEED $1,000,000.

(c)    THE LIMITATIONS IN SECTIONS 9(a) DO NOT APPLY TO BREACHES OF THE CONFIDENTIALITY PROVISIONS SET FORTH IN SECTION 7, THIRD-PARTY CLAIMS THAT ARE SUBJECT TO INDEMNIFICATION UNDER SECTION 10, OR ANY PERSON'S LIABILITY ARISING FROM ITS, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE PERSONNEL'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

10. <u>Indemnification</u>.

(a)    The Provider (the "**Indemnifying Party**") shall indemnify and hold harmless the Company, its affiliates and its and their officers, directors, employees, agents, successors, and assigns (each, an "**Indemnified Party**") from and against any and all losses, claims, actions, damages, and liabilities, joint or several ("**Losses**") arising from any claim, action or demand brought by or on behalf of any third party ("**Claim**") alleging that the Company's or any of its affiliates' or contractors' use of the Proof Group Software in accordance with this Agreement violates or infringes any Intellectual Property Rights; and the Indemnifying Parties will reimburse all Indemnified Parties for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation of, preparation for or defense of any such pending or threatened claim, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The reimbursement and indemnity obligations of the Indemnifying Party under this Section 10 shall be in addition to any liability which the Provider may otherwise have.

(b)    Notwithstanding anything to the contrary, Indemnifying Party will have no obligation under this Section 10 to indemnify or hold harmless an Indemnified Party or any other Person for Losses arising from the other Party's or such Person's negligence, willful misconduct,

*DRAFT*

or breach of this Agreement. In the event of a claim, action, or demand that may give rise to obligations of the Indemnifying Party under this Section 10, the applicable Indemnified Party must promptly notify the Indemnifying Party in writing after receiving the Claim; provided, however, that a failure of the Indemnified Party to deliver such notice promptly shall only relieve the Indemnifying Party of its obligations to the extent actually prejudiced thereby. The Indemnified Party will have control of the defense and all negotiation for any settlement or compromise of any Claim, acting reasonably and in good faith, at the Indemnifying Party's sole expense. Furthermore, at the Indemnifying Party's expense, the Indemnifying Party will assist and cooperate in the defense of any Claim as reasonably requested by the Indemnified Party.

11.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Provider shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Provider or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

12.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12).

If to the Company:                    [COMPANY ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]

with a copy to:                       [COMPANY LAW FIRM]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [ATTORNEY NAME]

If to the Provider:                   [PROVIDER ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]

*DRAFT*

with a copy to:                          Brown Rudnick LLP
                                         7 Times Square,
                                         New York, NY 10036
                                         Email: jfitzsimons@brownrudnick.com
                                         Attention: Jonathan Fitzsimons

13.    <u>Entire Agreement</u>.  This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

14.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Provider may assign its rights and obligations hereunder to any of its affiliates, and (b) the Company may assign its rights and obligations to a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, in connection with a tax-deferred exchange, to an entity in which the Company has sole ownership interest, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

15.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

16.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

18.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this

*DRAFT*

Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.     <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

20.     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 20.

21.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

22.     <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

23.     <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits

*DRAFT*

to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

*DRAFT*

**IN WITNESS WHEREOF**, the parties hereto have executed this Intellectual Property License and Support Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:


[Proof Group Capital Management LLC]

By_____
Name:
Title:




Noah Jessop


_____

*DRAFT*

## Exhibit A

1. Nine Realms – investor, common stock stockholder, and director on the board of directors
2. Stader – investor, and token holder
3. Gynx – advisor

## **Exhibit K-1**

**(Redline) Proof Group IP License**

*DRAFT*

# INTELLECTUAL PROPERTY LICENSE AND SUPPORT AGREEMENT

## By and between

## [Proof Group Capital Management LLC]

## And

## [NewCo, Inc.]

This Intellectual Property License and Support Agreement (this "**Agreement**"), is made and entered as of [●], by and among (i) [Proof Group Capital Management LLC], a [Delaware] limited liability company ("**Provider**"), (ii) Noah Jessop ("**Jessop**", and together with the Provider, the "**Provider Parties**"), and (iii) [NewCo, Inc.], a Delaware corporation (the "**Company**" and together with the Provider, the "**Parties**" and each a "**Party**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected Fahrenheit LLC ("**Fahrenheit**") as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and Fahrenheit entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, pursuant to the Plan Term Sheet, the Company and Fahrenheit entered into that certain Management Services Agreement by and between Fahrenheit and the Company, dated [●], 2023 (the "**Management Agreement**");

**WHEREAS**, on August 15, 2023, the Debtors filed the fourth revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as

65122315.v11

*DRAFT*

may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], 2023, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**"), and on [●], 2023 (the "**Effective Date**"), the Plan became effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, pursuant to the Plan and the Confirmation Order, the Company desires to license certain intellectual property described herein, and the Provider is willing to license such intellectual property to the Company; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    Intellectual Property License.[1]

(a)    The Provider hereby grants to the Company, on behalf of themselves and their affiliates, a fully paid-up, royalty-free, worldwide, exclusive (except as to the Provider), non-transferable (except to the extent permitted by Section ~~14)~~14), non-sublicensable (except to any of the Company's affiliates or to contractors of the Company or its affiliates acting on behalf of the Company or any of its affiliates), perpetual and irrevocable license effective as of the date of this Agreement to use (i) the Proof Group Software and (ii) the Proof Group IP solely to the extent that such Proof Group IP is incorporated in or practiced or embodied by the Proof Group Software, in each of the foregoing cases (i) and (ii), ~~[for purposes of the Company staking or offering~~ ~~staking~~staking-related services].[2] "**Proof Group IP**" means any Intellectual Property Rights in or to the Proof Group Software. "**Proof Group Software**" means all software and other technology owned by Provider or any of its affiliates from time to time during the term of this Agreement that relates to staking (as defined below) functionalities, together with all documentation relating thereto. "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (a) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (b) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (c) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations-in-part ~~in part~~ and reexaminations for any of the foregoing in (a)-(b), and (e) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    On the date of this Agreement, the Provider shall deliver to the Company copies of the Proof Group Software, including all then-current commented source code and related documentation, and all other documents, tangible embodiments or other materials necessary for Company to use the Proof Group Software. Thereafter, the Provider shall deliver to

---

[1] ~~**BR NTD**: Term sheet does not include personal obligations for Jessop beyond being subject to the non-compete. In addition, Provider is repping that it has all IPR here. Jessop has no rights to the relevant IPR to license.~~

[2] ~~Note to BR: Under continuing review by debtor staking team.~~

65122315.v11

the Company copies of all new versions, bug fixes, improvements and other updates to the Proof Group Software, in each case, promptly after the development or acquisition thereof.

(c)     If the Provider believes that any of the Proof Group IP is being infringed or misappropriated by a third party, the Provider possessing such belief or awareness of such claims shall promptly provide written notice to the Company and provide it with all details of such infringement or claim, that are known by the Provider.

(d)     The Company shall have the first right, but not the obligation to bring an infringement or misappropriation action concerning any Proof Group IP, defend any declaratory judgment action concerning any Proof Group IP, and protect, enforce, or defend any Proof Group IP and control the conduct thereof and attempt to resolve any claims relating thereto. The Provider shall provide all reasonable cooperation and assistance, including providing access to relevant documents and other evidence, making its employees available at reasonable business hours and being joined as a party to such action. The Provider shall and hereby does irrevocably and unconditionally waive any objection to the Company's joinder of any of the Provider to any proceeding described in this Section on any grounds whatsoever, including on the grounds of personal jurisdiction, venue, or forum non conveniens. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Company as contemplated by this Section will be retained in its entirety by the Company, and the Company may settle any such suit, action, or other proceeding, whether by consent order, settlement, or other voluntary final disposition, without the prior written approval of either Provider Party. After the Term, in the event that the Company decides not to take action against an infringement or misappropriation of Proof Group IP, it shall promptly inform the Provider, and the Provider shall then have the right (but not the obligation) to enforce the rights in the Proof Group IP. Any recovery, damages, or settlement derived from a suit, action or other proceeding brought by the Provider as contemplated by this Section shall be retained in its entirety by the Provider, and the Company hereby expressly waives any claim thereto.

2.     <u>Staking Support</u>. The Provider shall provide support services for the implementation of staking within the Company utilizing the Proof Group Software at no cost to the Company. Until such time that the Company has the capability and infrastructure to stake tokens (as reasonably determined by the Company and notified by the Company to the Provider in writing which notice shall be provided by the Company to the Provider promptly following such determination), the Provider shall provide the Company with staking services ~~on~~in accordance with the same ~~terms and conditions~~performance standards as set forth in that certain Ethereum Staking and Services Agreement (the "**Staking and Services Agreement**") between the Provider and Celsius Network LLC, dated July 31, 2023 ~~[(for clarity, notwithstanding the termination of the Staking and Services Agreement)]~~ (which terms and conditions are incorporated herein by reference, except as modified herein); provided, however, that no fees shall apply to such staking services. ~~[~~For purposes of this Agreement, to "**stake**" means to operate one or more validator nodes (or similar nodes that may earn rewards) in connection with a digital asset network, whether or not the operator holds title to any or all tokens staked in connection with such node.~~]³~~ After the Company has notified the Provider that the Company has

---

³ ~~Note to BR: Under continuing review by debtor staking team.~~

*DRAFT*

the capability and infrastructure to stake tokens, (i) the Provider shall provide ongoing support services for the Company's staking efforts utilizing the Proof Group Software and (ii) Jessop shall provide reasonable assistance in furtherance of the Provider's performance of the foregoing ongoing support services, in each case, at no cost to the Company. The Provider Parties represent, warrant, and covenant that all services contemplated by this paragraph will be provided in a good and workmanlike manner consistent with industry best practices.

3.    <u>Third Party Staking Option.</u> [At any time prior to the termination of this Agreement the Company may, by providing written notice to the Provider, elect to cause the Provider to migrate the Provider's and its affiliates' staking services customers ("**Customers**") to the Company (the "**Migration Notice**").]4 Upon the Provider's receipt of the Migration Notice, the Provider shall use (and cause its affiliates to use) commercially reasonable efforts to migrate the Customers to the Company such that the Customers shall become staking services customers of the Company; <u>provided</u>, <u>however</u>, that the Provider shall not be required to migrate Customers that do not agree to such migration ("**Non-Consenting Customers**").5 The Provider shall (i) notify each Customer of the proposed migration,6 and if such migration is not accepted the termination, of its agreement with the Provider for staking services within ~~10~~5 business days after the Provider's receipt of the Migration Notice and (ii) terminate the provision of staking services to all Non-Consenting Customers as soon as practicable, and in any event ~~within 60 days~~no la~~ft~~er <u>than the 60th day following</u> the Provider's receipt of the Migration Notice <u>(the "**Migration End Date**")</u>. The Provider shall not solicit~~,~~ or directly induce or encourage~~,~~ any Non-Consenting Customer's migration to any third party provider of staking services. <u>On a weekly basis, the Provider and its affiliates shall promptly remit to the Company all funds they receive in consideration for providing staking services between the date of the Migration Notice and the date 60 days after the Migration End Date. If Company is not due at least $25,000 at the end of an applicable week, such funds will be held until the week in which such funds amount to $25,000 or more.</u>

4.    <u>Exclusivity.</u>

(a)    Each of the Provider and Jessop covenants and agrees that, for the period beginning on the Effective Date and ending on the date of expiration or termination of this Agreement, that it or he (as applicable) shall not (and the Provider shall cause its affiliates not to), directly or indirectly engage in or assist any other Person in engaging in the Restricted Business (including by referring potential customers to any such other Person), other than (i) providing staking services to existing Customers prior to the termination or migration of staking services for each such Customer pursuant to the provisions of Section ~~3~~3 hereof; (ii) in the course of providing services to the Company; or (iii) as otherwise consented to in writing by the

---

4 ~~Note to BR: Under continuing review by debtor staking team – in particular, whether Newco will be ready for migration prior to the Effective Date.~~

5 ~~Note to BR: Please confirm that Proof Group does not custody any Customer assets.~~ **~~Note from BR:~~** ~~Confirmed.~~

6 ~~b: Given the simplicity of the mechanics of the migration – i.e. provide notice, terminate non-consenting customer agreements, facilitate migration – we think with our additions "commercially reasonable efforts" is plenty high as a standard.~~

65122315.v11

*DRAFT*

Company. Notwithstanding the foregoing, (y) Jessop represents that <u>Exhibit A</u> contains a true, accurate and complete list of all of his roles and positions as of the date of this Agreement and as of the Effective Date, the participation in which would otherwise violate this Section ~~4(a)~~4(a); and [(z) Jessop's participation therein will not constitute a breach of this Section ~~4(a).[7]~~4(a) from the date of this Agreement until a determination by the board of directors of the Company as to whether such participation is permitted, and thereafter for so long as any such participation is permitted by the board of directors (which consents to such participation shall not be unreasonably withheld). "**Restricted Business**" means the business of providing services relating to staking.][1]

(b)    Except as otherwise expressly provided in this Agreement, neither the Provider nor Jessop is restricted hereunder from engaging in any business activities or from performing services for its own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its affiliates. Notwithstanding anything to the contrary, each of the Provider and Jessop may own, directly or indirectly, solely as an investment, up to twenty ~~five~~-percent (2~~5~~0%)[8] (or any other percentage value that may be provided in a conflicts policy that is duly adopted by the board of directors of the Company, provided such percentage value is not lower than 10%) of any class securities of any business engaged in the Restricted Business.

(c)    [Upon the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers,][9] the license granted in Section ~~1~~1 will (automatically and without further action by either Party) convert into an exclusive license (even as to the Provider, except with respect to the Provider's use of the Proof Group Software to support Non-Consenting Customers solely to the extent permitted by Section ~~3~~3).

---

[7] ~~**BR NTD**: These positions were disclosed earlier in the transaction. And these entities are not providing services related to staking in any of the ecosystems contemplated by this agreement.~~

[1] Note to BR: Under continuing discussion between the parties.

[8] ~~**BR NTD**: Limiting to anything below this is a problem for the relationships between Provider and its LPs.~~

[9] ~~Note to BR: Under continuing discussion between the Parties.~~

*DRAFT*

5.    <u>Term and Termination</u>. This Agreement shall be coterminous with the Management Agreement and shall immediately terminate upon the expiration or termination of the Management Agreement; <u>provided</u>, <u>however</u>, that Sections ~~1(a), 1(d), 7~~1(a), 1(d), 7, and ~~9-23~~9-23 hereof shall survive the expiration and/or termination of this Agreement. Upon the expiration or termination of this Agreement, the license granted in Section ~~1~~1 will (automatically and without further action by either Party) convert into an exclusive license (except as to the Provider).

6.    <u>Provider Representations and Warranties</u>. The Provider represents and warrants that: (i) none of the Proof Group Intellectual Property, the Proof Group Software, or the Company's use of either of the foregoing does or will infringe, misappropriate, or otherwise violate the Intellectual Property Rights of any Person; ~~and~~ (ii) to the knowledge of the Provider, no Person is infringing, misappropriating, or otherwise violating any Proof Group Intellectual Property<u>; and (iii) the execution of this Agreement and the performance of the Provider's obligations hereunder will not violate or conflict with any contractual or other legal obligations of the Provider</u>. For the purposes of this Agreement, "knowledge of the Provider" shall mean the actual knowledge of Noah Jessop. and "**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, governmental authority, unincorporated organization, trust, association or other entity.

7.    <u>Confidentiality</u>.

(a)    During the Term and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations or exercising its rights under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section ~~7~~7 (or are bound by comparable contractual or professional obligations) and the Receiving Party shall be liable for any breach of these confidentiality provisions by such Persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent permissible, the disclosing party (the "**Disclosing Party**"), and, at the Disclosing Party's request and expense, take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel that it is legally bound to disclose under such Governmental Order. Notwithstanding anything to the contrary (i) the Proof Group Software is the Confidential Information of both the

*DRAFT*

Provider and the Company; and (ii) until the delivery of a Migration Notice and the migration or termination (as applicable) of all Customers and Non-Consenting Customers, the Provider may use the Proof Group Software, which may include disclosure of the Proof Group Software (solely in object code form) to its Customers and to third parties, solely as necessary for Provider to provide staking services to such Customers and to fulfill the Provider's obligations under Section 3̶3. For the purposes of this Agreement, (A) "**Law**" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order, or other requirement or rule of law of any Governmental Authority, (B) "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction, (C) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, subpoena, warrant, demand, or determination entered by, with, or pursuant to the authority of any Governmental Authority, and (D) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 7̶7; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information, except for the Proof Group Software. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable Law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

8.    Disclaimer. THE PROOF GROUP SOFTWARE IS PROVIDED "AS IS" AND OTHER THAN AS EXPRESSLY SET FORTH HEREIN PROVIDER HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. PROVIDER SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE. PROVIDER MAKES NO WARRANTY OF ANY KIND THAT THE PROOF GROUP SOFTWARE, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET COMPANY'S OR ANY OTHER PERSON'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM OR OTHER

SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE.

9.    <u>Limitation of Liability</u>.

(a)    NEITHER PARTY NOR ANY OF ITS AFFILIATES WILL BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, PUNITIVE, OR ENHANCED DAMAGES, OR FOR ANY LOSS OF ACTUAL OR ANTICIPATED PROFITS, ARISING IN ANY WAY OUT OF THIS AGREEMENT OR THE USE OF THE PROOF GROUP SOFTWARE, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), STATUTE, OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE AND WHETHER EITHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(b)    NOTWITHSTANDING ANYTHING IN THIS SECTION ~~9~~9 TO THE CONTRARY, IN NO EVENT WILL JESSOP'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING UNDER OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL OR EQUITABLE THEORY, EXCEED $1,000,000.[10]

~~(c)  IN NO EVENT WILL PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING UNDER OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR ANY OTHER LEGAL OR EQUITABLE THEORY, EXCEED $2,000,000.[11]~~

(c)    ~~(d)~~ THE LIMITATIONS IN SECTIONS ~~9(a) AND 9(c)~~9(a) DO NOT APPLY TO BREACHES OF THE CONFIDENTIALITY PROVISIONS SET FORTH IN SECTION 7, THIRD-PARTY CLAIMS THAT ARE SUBJECT TO INDEMNIFICATION UNDER SECTION ~~10~~10, OR ANY PERSON'S LIABILITY ARISING FROM ITS, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE PERSONNEL'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

10.    <u>Indemnification</u>.

(a)    The Provider (the "**Indemnifying Party**") shall indemnify and hold harmless the Company, its affiliates and its and their officers, directors, employees, agents, successors, and assigns (each, an "**Indemnified Party**") from and against any and all losses, claims, actions, damages, and liabilities, joint or several ("**Losses**") arising from any claim,

---

[10] ~~**BR NTD**: There's no upside for Jessop in this agreement and so the downside protection of the absolute cap is necessary.~~

[11] ~~**BR NTD**: Likewise, there's no upside for Provider in this agreement and so the downside protection of the cap is necessary.~~

action or demand brought by or on behalf of any third party ("**Claim**") alleging that the Company's or any of its affiliates' or contractors' use of the Proof Group Software in accordance with this Agreement violates or infringes any Intellectual Property Rights; and the Indemnifying Parties will reimburse all Indemnified Parties for all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) as they are incurred in connection with the investigation, preparation for or defense of any such pending or threatened claim, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The reimbursement and indemnity obligations of the Indemnifying Party under this Section ~~10~~10 shall be in addition to any liability which the Provider may otherwise have.

(b)    Notwithstanding anything to the contrary, Indemnifying Party will have no obligation under this Section ~~10~~10 to indemnify or hold harmless an Indemnified Party or any other Person for Losses arising from the other Party's or such Person's negligence, willful misconduct, or breach of this Agreement. In the event of a claim, action, or demand that may give rise to obligations of the Indemnifying Party under this Section ~~10~~10, the applicable Indemnified Party must promptly notify the Indemnifying Party in writing after receiving the Claim; provided, however, that a failure of the Indemnified Party to deliver such notice promptly shall only relieve the Indemnifying Party of its obligations to the extent actually prejudiced thereby. The Indemnified Party will have control of the defense and all negotiation for any settlement or compromise of any Claim, acting reasonably and in good faith, at the Indemnifying Party's sole expense. Furthermore, at the Indemnifying Party's expense, the Indemnifying Party will assist and cooperate in the defense of any Claim as reasonably requested by the Indemnified Party.

11.    ~~12~~Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Provider shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Provider or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

12.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to

---

~~12 Note to BR: Miscellaneous provisions from here down to be conformed to agreed miscellaneous provisions for the Fahrenheit Management Agreement.~~

*DRAFT*

the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section ~~12~~12).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Provider: | [PROVIDER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

13.    <u>Entire Agreement</u>. [13] This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

14.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Provider may assign its rights and obligations hereunder to any of its affiliates, and (b) the Company may assign its rights and obligations to ~~any of its affiliates.~~a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of

---

[13] **BR NTD**: ~~The merger clause needs to stay like this. This Agreement is meant to put the PG IP license portions of the term sheet into effect and so the PG IP license provisions of the term sheet should be discharged upon execution of this Agreement. No other PG IP license language should be in other agreements contemplated by the term sheet and so they are also not relevant to the "entire agreement" with respect to the PG IP here.~~

*DRAFT*

spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, in connection with a tax-deferred exchange, to an entity in which the Company has sole ownership interest, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

15.  No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

16.  Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

17.  Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

18.  Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

19.  Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

65122315.v11

*DRAFT*

20.     WAIVER OF JURY TRIAL. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION ~~20~~20.

21.     Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

22.     No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

23.     Interpretation. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

65122315.v11

*DRAFT*

     **IN WITNESS WHEREOF**, the parties hereto have executed this Intellectual Property License and Support Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:


[Proof Group Capital Management LLC]

By_____
Name:
Title:



Noah Jessop


_____

*DRAFT*

<u>Exhibit A</u>

1. Nine Realms – investor, common stock stockholder, and director on the board of directors
2. Stader – investor, and token holder
3. Gynx – advisor

## **Exhibit L**

**U.S. Bitcoin Cedarvale Interim Services Agreement**

*DRAFT*

# INTERIM SERVICES AGREEMENT

## By and between

## [U.S. Data Management Group, LLC], as Manager

## And

## [Celsius Mining LLC], as Company[1]

This Interim Services Agreement (this "**Agreement**") is made and entered as of [[●], 2023] (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC], a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.        Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.        Term and Termination.

(a)        Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)        the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") becomes effective in accordance with its terms and the terms of the order confirming the Plan as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

(ii)        Substantial Completion of the Project.

(b)        Termination. This Agreement may be terminated only as follows:

(i)        by mutual agreement, in writing, of both the Manager and the Company;

---

[1] **W&C Note to Draft**: To confirm parties to this Agreement.

(ii)      by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 30 days after receipt by the Company of written notice of such failure by the Manager; provided, however, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if the Company cures such failure within such 30-day cure period; and

(iii)      by the Company, with an effective date as set forth in Section 2(c):

(A)      within 30 days after (1) the date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise elect not to proceed with the Plan (each, a "**Wind Down Termination Event**") or (2) December 31, 2023;

(B)      in the event of the Manager's fraud, willful misconduct or gross negligence;

(C)      if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company;

(D)      if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

(E)      in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days.

(c)      Effect of Termination.

(i)      Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each Party for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii)      Upon the occurrence of a Wind Down Termination Event, the Company may request that the Manager provide the information set forth in Exhibit [●] with respect to transition of the Services to a successor.

(iii)      Upon notice of termination of this Agreement by either Party pursuant to Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the term of the Agreement shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the

2

Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the term continues pursuant to Section 2(c)(iii)(A), if applicable) (the "**Transition Period**"), the Manager shall provide reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (the "**Transition Services**"). During any Transition Period, in addition to amounts otherwise due under this Agreement during the term of this Agreement, the Manager shall be entitled to prompt reimbursement of any actual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services during the Transition Period. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iv)    [Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant to Section 2(b), the provisions of this Section 2(c), and Sections 6 through 25 shall survive.][2]

3.    <u>Duties of the Manager</u>. The Manager or any of its Affiliates shall (a) perform the services set forth on <u>Exhibit A</u> (collectively, the "**Services**") and (b) use commercially reasonable efforts to achieve Substantial Completion.

4.    <u>Performance Standards</u>.

(a)    The Manager shall perform the Services set forth on <u>Exhibit A</u>, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on <u>Exhibit B</u>; and (z) except to the extent waived in writing by the Company (such waiver not to be unreasonably withheld) or to the extent of any deviations from such materials by the designs, plans, drawings, specifications or other materials created by the Manager as part of the Services hereunder, the plans, specifications and intellectual property purchased licensed from Core Scientific Operating Company ("**Core**") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023 by and between Core and the Company.

(b)    Every two weeks, the Manager shall provide a report to the Company setting forth (i) the Manager's performance and progress towards Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii) any other information reasonably requested by the Company from time to time relating to the performance of the Services hereunder. In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services

---

[2] **<u>BR Note to W&C</u>**: Think it makes more sense to add a provision into the USBTC Management Agreement itself that in the event that Cedarvale site has not reached substantial completion upon the effective date of the USBTC Management Agreement, then with respect to the buildout of the Cedarvale site, the Services will be performed in accordance with Section 3 and 4 hereof.

3

relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.

(c)    <u>Modification of Services</u>. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the Parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the Parties agree to the terms of such amendment, then such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)    <u>Obligations of the Manager</u>. The Manager will:

(i)    Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**"); <u>provided</u>, <u>however</u>, that Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)    Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)    Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

4

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)    Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)    Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)    Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice, (B) drawings, designs and intellectual property relating to the Site or otherwise acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

(ii)    Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)    Creating a working group which, as of the Effective Date, will comprise of [●], [●], and [●], and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and

5

similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)    Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)    [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify and hold harmless the other under this Agreement).][3]

5.    Compensation.

(a)    Compensation for Development Services.

(i)    As consideration payable to Manager for providing the Services to Company, Company shall reimburse Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between the Effective Date and December 31, 2023:

| Item | $/Month |
|------|---------|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |
| Construction Management | $222,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| **Total** | **$734,000** |

---

[3] **Note to Draft**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.

For the period between the January 1, 2024 through August 31, 2024:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $330,000 |
| Site Design & Engineer Management | $148,500 |
| Site Budgeting, FP&A, & Accounting | $156,500 |
| Construction Management | $330,000 |
| Procurement, Logistics, & RFP Coordination | $135,000 |
| **Total** | **$1,100,000** |

(ii)     Manager shall invoice all other costs at cost on a fixed basis per month in the amount specified above for the items.

(iii)     On the Effective Date, the Company shall pay to the Manager an amount equal to $734,000 as compensation for the completion of Milestone 1. Upon the substantial completion of Milestone 2 (which, for the avoidance of doubt, may be the Effective Date), the Company shall pay to the Manager an amount equal to $734,000.

(iv)     The Company shall pay the Manager the Development Costs on the [third] Business Day of each month during the Term. Manager shall invoice Company with detailed information relating to such Development Costs each month.

(b)     [Compensation for Operational Services. To the extent that any mining units are energized and hashing at the Project ("**Operational Units**"), the Company shall pay to the Manager Operational Costs on the [third] Business Day of each month during the Term. "**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of mining proceeds from any Operational Units *minus* expenses that the Manager has incurred in connection with its operation of the Operational Units and the Site *minus* costs of power to run the Operational Units. Operational Costs shall be paid in United States Dollars.][4]

(c)     Reimbursement for Vertical Exhaust Units.[5]

(i)     As of the Effective Date, the Manager is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW, as further described in Exhibit E (the "**VEUs**").

---

[4] **BR Note to Draft**: Subject to further review.

[5] **NTD**: VEU inspection rights, etc. to be further discussed among business principals.

(ii)      Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)     Within 15 Business Days (as defined in the Plan) of the later of (a) the receipt by Company of all information and documentation provided pursuant to Section 5(b)(ii), and (b) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, Company shall notify Manager in writing whether or not Company wants to purchase the VEUs.

(iv)     Company shall pay Manager an amount equal to (A) $[●] per VEU *plus* (B) all shipping, handling and storage costs incurred by Manager, and sales, use and other excise taxes, in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.[6]

(v)     Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU[, and (B) such VEU is free of all liens and encumbrances]. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(B), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vi)     Without limiting the foregoing, at Company's option, Manager shall (a) to the extent transferable, transfer to Company any warranties provided by the manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or (b) enforce such warranties on Company's behalf.

(d)     <u>Reimbursement for Budgeted Expenses</u>. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with <u>Exhibit F</u> within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; <u>provided</u>, <u>however</u>, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("**Breakage Fees**"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of any Manager Service Agreements. For the purposes of this Agreement, "**Manager Service Agreements**", means any agreements entered into by the

---

[6] **<u>NTD</u>**: Amount to be updated.

Manager or its Affiliates in furtherance of the provision of Services, which are approved in advance by the Company.

(e)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the Parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)    To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between the Manager and [NewCo, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**")[7].

(g)    Effect of Substantial Completion. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means all networking and electrical components necessary to support no less than 200 MW of power in aggregate have been installed at the Project, to permit the installation thereafter of ASICS.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential

---

[7] **W&C Note to Draft**: Consider attaching final Management Agreement as Exhibit.

Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    <u>Limitation of Liability</u>. Neither Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other Party or any of its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement in excess of the Liability Cap, except to the extent such loss, liability, damage, or expense shall be proven to arise from the gross negligence, willful misconduct (which in the case of the Manager shall include the knowing and intentional failure to provide substantially all the Services that are essential or required to complete the Project), or fraud (the "**Liability Exceptions**"). Except to the extent arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business; provided that with respect to: (1) the Company's liability, this Section 7 shall not apply to (i) any amounts owed pursuant to Section 5 (*Compensation*), (ii) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement , (iii) damages resulting from the Company's breach of Section 6 (*Confidentiality*), or Section 9 (*Non-Solicitation*), (iv) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company, (v) any indemnification obligation under Section 8 (*Indemnification*) hereof; and (2) the Manager's liability, this Section 7 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or (ii) (v) any indemnification obligation under Section 8 (*Indemnification*) hereof. For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

8.      Indemnification.

(a)      The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, damages, and liabilities, joint or several ("**Losses**") and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or violation of law. In addition, the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take, to have result from the gross negligence, willful misconduct, fraud, or violation of law by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Manager Indemnified Party.

(b)      The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the gross negligence, willful misconduct, fraud, or violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c)      Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate

11

counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.      [Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees upon request of the Company.][8]

10.     Force Majeure.

(a)      The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would include the following: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or tribunal of competent jurisdiction.

(b)      Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. In the event that an Excluded Event affects all or substantially all of the Services, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Manager resumes performance of any portion of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.     Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the

---

[8] **BR Note to Draft:** Subject to further review.

other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Manager: | [MANAGER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

14.    <u>Entire Agreement</u>. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

13

15.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party without the written consent of the other Party, except that [(a) the Manager may assign its rights and obligations hereunder (i) to any of its Affiliates that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, (ii) in connection with any sale of all or substantially all of the [mining operations services business] of the Manager, or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation,] [9] and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New

---

[9] **BR Note to Draft**: Currently being discussed.

York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.    <u>Remedies Cumulative</u>. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

24.    <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

15

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the

date first written above.

[Celsius Mining LLC]

By:_____

Name:

Title:


[U.S. Data Management Group, LLC]

By:_____

Name:

Title:

## Exhibit A

### Services[10]

[The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

The Services to be provided pursuant to this Agreement do not include operations and maintenance services.

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

   a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

   b. confirm reusability of existing equipment; and

   c. identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

---

[10] **W&C Note to Draft**: To be discussed.

7. Modify and/or finalize engineered plans and designs as necessary for:

    a.  civil scope;

    b.  mechanical scope;

    c.  electrical scope; and

    d.  networking scope.

8. Source and procure all necessary equipment in accordance with engineered plans and as identified in prior diligence and planning efforts.

9. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

    a.  civil contractor;

    b.  mechanical contractor;

    c.  electrical contractor; and

    d.  network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Using commercially reasonable efforts to achieve Substantial Completion.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1. Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3. Initiate handoff of existing ISP service.*

18

4. Assist as necessary for the handoff of property ownership including existing and required easements.*

5. Engage a general contractor to:

    a. outline full project scope (to be used in division of responsibilities matrix);

    b. clearly identify work that is already complete;

    c. clearly identify previously completed work that needs to be revisited and/or repaired; and

    d. clearly identify work that is not yet complete.

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7. Coordinate and lead the effort to modify and/or finalize engineered plans and design sets as necessary for:

    a. civil scope;

    b. mechanical scope;

    c. MV electrical scope;

    d. LV electrical scope;

    e. networking scope; and

    f. security scope.

8. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9. Facilitate RFP process for:

    a. general contractor;

    b. civil contractor(s);

    c. mechanical contractor(s);

    d. electrical contractor(s); and

    e. network and cabling contractor(s).

19

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance to engineered plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Using commercially reasonable efforts to achieve Substantial Completion.

## Exhibit B

## Milestones[11]

### Milestone 1 ("Milestone 1"):

**Step 1:** Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.

**Step 2:** Engage Vendors:
   (a) Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.

   (b) PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.

   (c) PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.

   *Note*: No purchase orders or capital commitments will be submitted in Step 2.

**Step 3:** Engage HMC to:
   (a) .Outline full project scope (to be used in Division of Responsibilities Matrix);

   (b) Clearly identify work that is already complete;

   (c) Clearly identify previously completed work that needs to be revisited and/or repaired; and

   (d) Clearly identify work that is not yet complete.

**Step 4:** Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

**Step 5:** Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.

### Milestone 2 ("Milestone 2"):

**Step 1:** Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.

**Step 2:**         Coordinate and lead the effort to modify and/or finalize engineered plans and design sets for:
   (a) Civil Scope;

---

[11] **W&C Note to Draft**: To be discussed.

(b) Mechanical Scope;

(c) MV Electrical Scope;

(d) LV Electrical Scope;

(e) Networking Scope;

(f) Security Scope; and

(g) USBTC containers: Complete engineering reports, review of warranty documents, and complete physical inspection of all containers.

   **_Note_**: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** Initiate RFP process for:
   (a) HMC;

   (b) Civil contractor(s);

   (c) Mechanical contractor(s); and

   (d) Network and cabling contractor(s).

   **_Note_**: Initiating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

**Step 4:** Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.
**Step 5:** Develop project schedule based on RFP process and negotiations.

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

22

## <u>Exhibit C</u>

**[Insurance Requirements]**[12]

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.

---

[12] **<u>W&C Note to Draft</u>**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Employer's Liability with limits no less than:

    i)   $1,000,000 Bodily Injury by Accident (Each Accident)

    ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

    iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

**Exhibit L-1**

**(Redline) U.S. Bitcoin Cedarvale Interim Services Agreement**

PRELIMINARY *DRAFT*   SUBJECT TO MATERIAL REVIEW AND REVISION

# INTERIM SERVICES AGREEMENT

## By and between

## [U.S. Data Management Group, LLC], as Manager

## And

## [Celsius Mining LLC], as Company[1]

This Interim Services Agreement (this "**Agreement**") is made and entered as of [[●], 2023] (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC],[2] a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a 240MW bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.      Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.      Term and Termination.

(a)      Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)      the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") becomes effective in accordance with its terms and the terms of the order confirming the Plan as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

(ii)      Substantial Completion of the Project.

---

[1] **W&C Note to Draft**: To confirm parties to this Agreement.

[2] **Note to USBTC**: Confirm entity.

(ii) the Services are completed, in which case the Parties shall enter into a market-based agreement for the Manager to oversee the operation and maintenance of the Project on terms reasonably acceptable to both parties (operations and maintenance services are not included in the Services under this Agreement). In the event that any portion of the Project is completed prior to the end of the Term of this Agreement, the Parties shall enter into a market-based agreement for the Manager to oversee operation and maintenance of the completed portion of the Project for the duration of the Term on terms reasonably acceptable to both Parties;

(iii) any date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise select an alternative to the Plan, in which case the Manager shall continue to provide the Services on the terms set forth on Exhibit [●];³ and

(iv) December 31, 2023, in which case the Manager shall continue to provide the Services on the terms set forth on Exhibit [●];⁴

(b)    <u>Termination</u>. This Agreement may be terminated only as follows:

(i)    by mutual agreement, in writing, of both the Manager and the Company;

(ii)    by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of ~~1~~30 days after receipt by the Company of written notice of such failure by the Manager; <u>provided</u>, <u>however</u>, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if ~~(x)~~ the Company cures such failure within such 30-day cure period; <u>and</u>

(iii)    by the Company, <u>, with an effective date as set forth in Section 2(c)</u>:

(A)    <u>within 30 days after (1) the date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise elect not to proceed with the Plan (each, a "**Wind Down Termination Event**") or (2) December 31, 2023;</u>

(B)    ~~(A)~~ in the event of the Manager's fraud, willful misconduct or gross negligence;

(C)    ~~(B)~~ if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company; ~~or~~

(D)    ~~(C)~~ if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or

---

³ NTD: Terms TBD and to be set forth on Exhibit TBD.

⁴ NTD: Terms TBD and to be set forth on Exhibit TBD.

involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

    (E)    in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days.

(c)    Effect of Termination.

    (i)    Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each pParty hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

    (ii)    Upon the occurrence of a Wind Down Termination Event, the Company may request that the Manager provide the information set forth in Exhibit [●] with respect to transition of the Services to a successor.

    (iii)    (ii) Upon thenotice of termination of this Agreement by either Party pursuant to Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the term of the Agreement shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the term continues pursuant to Section 2(c)(iii)(A), if applicable) (the "**Transition Period**"), the Manager shall provide all reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"), for a period of no more than 30 days following such termination (the ". During any Transition Period"). The, in addition to amounts otherwise due under this Agreement during the term of this Agreement, the Manager shall be entitled to prompt reimbursement of any out of pocketactual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services and shall perform suchduring the Transition Services until the completion of such transitionPeriod. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

    (i)    [Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant

3

to Section 2(b), the provisions of this Section 2(c), and Sections 6 through 25 shall survive.]²

~~(iii) The provisions of this Section 2(c), Sections 6 and 7, and Sections 8 through 23 shall survive the termination of this Agreement.~~

3.    <u>Duties of the Manager</u>. The Manager or any of its Affiliates shall <u>(a)</u> perform the services set forth on Exhibit A (collectively, the "**Services**") <u>and (b) use commercially reasonable efforts to achieve Substantial Completion</u>.

4.    <u>Performance Standards</u>.

(a)    The Manager shall <u>perform the Services set forth on Exhibit A, and shall</u> cause the Services to be performed, in all material respects: (<u>a</u>i) by qualified personnel (as to training, skill and experience); (<u>b</u>ii) in a good, professional and workmanlike manner; (<u>c</u>iii) consistent with applicable industry standards and best practices; and (<u>d</u>iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. <u>The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on Exhibit B; and (z) except to the extent waived in writing by the Company (such waiver not to be unreasonably withheld) or to the extent of any deviations from such materials by the designs, plans, drawings, specifications or other materials created by the Manager as part of the Services hereunder, the plans, specifications and intellectual property purchased licensed from Core Scientific Operating Company ("Core") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023 by and between Core and the Company.</u>

(b)    Every two weeks, the Manager shall provide a report to the Company setting forth <u>(i)</u> the Manager's performance and progress towards ~~each of the milestones set forth on Exhibit B and, together with~~<u>Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii)</u> any other information reasonably requested by the Company <u>from time to time</u> relating to the performance of the Services hereunder. <u>In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.</u>

(c)    <u>Modification of Services</u>. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager ~~may~~<u>shall</u> consider <u>each</u> such request in good faith. If the Manager is willing to amend the Services, the <u>P</u>~~p~~arties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the <u>P</u>~~p~~arties agree to the terms of such amendment, then such amendment ~~such amendment~~ will be adopted in accordance with Section 18 and attached to this Agreement.

(d)    <u>Obligations of the Manager</u>. The Manager will:

(i)    Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; <u>provided</u>,

---

² **BR Note to W&C**: Think it makes more sense to add a provision into the USBTC Management Agreement itself that in the event that Cedarvale site has not reached substantial completion upon the effective date of the USBTC Management Agreement, then with respect to the buildout of the Cedarvale site, the Services will be performed in accordance with Section 3 and 4 hereof.

however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)     Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**"); provided, however, that the Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner to fulfill in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)    Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change to requirements imposed by in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)   Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)  Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)    At Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than

5

one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)    Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of ~~one~~two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, ~~that~~however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)    Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, ~~other than any records subject to attorney-client privilege or confidentiality obligation~~except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice ~~solely for the purpose of the facilitating the Manager Personnel to deliver the~~, (B) drawings, designs and intellectual property relating to the Site or otherwise acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

(ii)    Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)    Creating a working group which, as of the Effective Date, will comprise of [●], [●], and [●], and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any

6

individual member of the Working Group at any time following consultation with the Manager;

(iv)    Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)    [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify and hold harmless the other under this Agreement).][53]

5.    Compensation ~~for Services~~.

(a)    Compensation for Development Services.

(i)    As ~~sole and exclusive~~ consideration payable to Manager for providing the Services to Company, Company shall reimburse Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between the Effective Date and December 31, 2023:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |
| Construction Management | $22~~0~~2,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| ~~T&E – Per Diem (employee meals, etc.)~~**Total** | $15~~734~~,9~~00~~0 |

---

[53] **Note to Draft**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.

For the period between the January 1, 2024 through August 31, 2024:

| | |
|---|---|
| T&E – Transportation (rental cars and fuel)Item | $15,100/**Month** |
| Project Management Costs & Labor | $330,000 |
| T&E – FlightsSite Design & Engineer Management | $1048,5000 |
| T&E – Housing and HotelsSite Budgeting, FP&A, & Accounting | $1456,5000 |
| Construction Management | $330,000 |
| Procurement, Logistics, & RFP Coordination | $135,000 |
| **Total** | **$7871,100,000** |

(ii)    Manager shall invoice all non T&Eother costs at cost on a fixed basis per month in the amount specified above for the items.

(iii)    Manager shall invoice the costs incurred for the "Per Diem", "Transportation", "Flights", and "Housing and Hotels" items specified above based on actual reasonable and documented costs incurred. The amounts specified above for these items are estimates.

(iv) Development Costs shall be reimbursed within ten (10) days of receipt by Company of Manager's invoices.

(iii)    On the Effective Date, the Company shall pay to the Manager an amount equal to $734,000 as compensation for the completion of Milestone 1. Upon the substantial completion of Milestone 2 (which, for the avoidance of doubt, may be the Effective Date), the Company shall pay to the Manager an amount equal to $734,000.

(iv)    The Company shall pay the Manager the Development Costs on the [third] Business Day of each month during the Term. Manager shall invoice Company with detailed information relating to such Development Costs each month.

(b)      [Compensation for Operational Services. To the extent that any mining units are energized and hashing at the Project ("**Operational Units**"), the Company shall pay to the Manager Operational Costs on the [third] Business Day of each month during the Term. "**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of mining proceeds from any Operational Units *minus* expenses that the Manager has incurred in connection with its operation of the Operational Units and the Site *minus* costs of power to run the Operational Units. Operational Costs shall be paid in United States Dollars.][4]

(c)      (b) Reimbursement for Vertical Exhaust Units.[5]

(i)      As of the Effective Date, the Manager shall contribute to the Project is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW. As sole and exclusive consideration payable to Manager for such contributions (including (i), as further described in Exhibit E (the "**VEUs**").

(ii)     Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)    Within 15 Business Days (as defined in the Plan) of the later of (a) the receipt by Company of all information and documentation provided pursuant to Section 5(b)(ii), and (b) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, Company shall notify Manager in writing whether or not Company wants to purchase the VEUs.

(iv)     Company shall pay Manager an amount equal to (A) $[●] per VEU *plus* (B) all shipping, handling and storage costs incurred by Manager, and (ii) sales, use and other excise taxes, associated with such units or the contribution of such assets, Company shall reimburse Manager's costs for each such unit within ten (10) days of receipt by Company of Manager's invoices. Manager's estimated aggregate costs for all such units, including storage costs, is $[●] in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.[6]

(v)      Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the

---

[4] **BR Note to Draft**: Subject to further review.

[5] **NTD**: VEU inspection rights, etc. to be further discussed among business principals.

[6] **NTD**: Amount to be updated.

9

original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU[, and (B) such VEU is free of all liens and encumbrances]. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(B), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vi)    Without limiting the foregoing, at Company's option, Manager shall (a) to the extent transferable, transfer to Company any warranties provided by the manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or (b) enforce such warranties on Company's behalf.

(ii) To the extent Manager contributes any other Manager owned assets to the Project such contributions shall be reimbursed by Company at cost within ten (10) days of receipt by Company of Manager's invoices.

(iii) Company understands, agrees and acknowledges that: (i) Company, by the execution of this Agreement, agrees to accept any vertical exhaust units or any other assets contributed to the Project "AS IS" at the time of contribution, and will not be entitled to a refund under any circumstances, and (ii) that Manager neither has made nor is making any representation or warranty, express or implied, regarding the condition of any such vertical exhaust unit or other asset contributed to the Project (or any part thereof) or its suitability for Company's proposed use. Without limiting the foregoing, Manager agrees to allow Company to call upon any warranties provided by the manufacturers of the vertical exhaust units or any other assets contributed to the Project under this Section 5.

(d)    (c) Reimbursement for Budgeted Expenses. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with Exhibit F within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; provided, however, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("Breakage Fees"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of agreements between the Manager and/or an Affiliate and any Manager Service Agreements. For the purposes of this Agreement, "Manager Service Agreements", means any agreements entered into by the Manager or its Affiliates in furtherance of the provision of Services hereunder and in accordance with a Project budget (or as otherwise, which are approved in advance by the Company).

(e)    (d) Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts disputed in good faith, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the pParties), until such amounts are paid. "Prime Rate" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall

Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

   (f) (e) To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between the Manager and [NewCo, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**")[7].

   (g) Effect of Substantial Completion. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means all networking and electrical components necessary to support no less than 200 MW of power in aggregate have been installed at the Project, to permit the installation thereafter of ASICS.

  6. Confidentiality.

   (a) During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing pParty (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose

---

[7] **W&C Note to Draft**: Consider attaching final Management Agreement as Exhibit.

such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    <u>Limitation of Liability</u>. Neither ~~the Manager~~Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives~~, and Affiliates~~ (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other ~~p~~Party or any of ~~their~~its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement ~~unless~~in excess of the Liability Cap, except to the extent such loss, liability, damage, or expense shall be proven to ~~result directly~~arise from the gross negligence, willful misconduct~~, or fraud~~ (which in the case of the Manager shall include the knowing and intentional failure to provide substantially all the Services that are essential or required to complete the Project), or fraud (the "**Liability Exceptions**"). Except to the extent arising from the Liability Exceptions, in no event shall ~~the Manager~~either Party be liable to the ~~Company~~other or any of its ~~Affiliates~~related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business. ~~For the avoidance of doubt~~; provided that with respect to: (1) the Company's liability, this Section 7 shall not apply to (i) any amounts owed pursuant to Section ~~2(c) or Section 5~~.5 (*Compensation*), (ii) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement , (iii) damages resulting from the Company's breach of Section 6 (*Confidentiality*), or Section 9 (*Non-Solicitation*), (iv) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company, (v) any indemnification obligation under Section 8 (*Indemnification*) hereof; and (2) the Manager's liability, this Section 7 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or (ii) (v) any indemnification obligation under Section 8 (*Indemnification*) hereof. For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

~~8. Indemnification.~~

**8.** **Indemnification.**

(a) ~~Except in connection with matters contemplated by Section 8(b), the~~The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, ~~claims, actions,~~ damages, and liabilities, joint or several ("**Losses**") ~~to the extent~~and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or violation of law. In addition, ~~and~~ the Company will reimburse any Manager Indemnified Party for ~~all~~costs and expenses ~~(including reasonable attorneys' fees and expenses)~~incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take~~n~~, to have resulte~~d~~ from the gross negligence, willful misconduct ~~or~~, fraud, or violation of law by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8~~(a)~~ shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any ~~Company~~Manager Indemnified Party.

(b) ~~Except in connection with matters contemplated by Section 8(a), the~~The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses ~~to the extent~~arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct ~~or~~, fraud, or violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(~~b~~a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the ~~material breach,~~ gross negligence, willful misconduct, fraud, or violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c) Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8~~8~~, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal

13

defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.    [Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the ~~2~~1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates~~.~~ to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees upon request of the Company.][8]

10.    Force Majeure.

(a)    The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would includ~~ing~~e the following ~~Excluded Events~~: (~~a~~i) acts of God; (~~b~~ii) flood, fire, earthquake, or explosion; (~~c~~iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (~~d~~iv) ~~changes to requirements imposed by Law; (e) actions,~~ embargoes, or blockades in effect on or after the date of this Agreement~~; (f) action or inaction by any Governmental Authority; and (g~~ that relate to the subject of this Agreement; (v) national or regional emergency~~. The Manager shall use reasonable efforts to end the failure or delay, to minimize the effects of~~ ; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event~~, and to resume Services as soon as practicable. "Law" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Governmental Order, or other requirement or rule of law of any Governmental Authority~~ shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or ~~any arbitrator, court, or~~ tribunal of competent jurisdiction.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the

---

[8] **BR Note to Draft:** Subject to further review.

14

delay and stating the period of time the delay is expected to continue. In the event that an Excluded Event affects all or substantially all of the Services, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Manager resumes performance of any portion of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |

If to the Manager:                              [MANAGER ADDRESS]
                                                Email: [EMAIL ADDRESS]
                                                Attention: [TITLE OF OFFICER TO RECEIVE
                                                NOTICES]


with a copy to:                                 Brown Rudnick LLP
                                                7 Times Square,
                                                New York, NY 10036
                                                Email: jfitzsimons@brownrudnick.com
                                                Attention: Jonathan Fitzsimons

      14.    Entire Agreement. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.


      15.    Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party, without the written consent of the other Party, except that [(a) the Manager may assign its rights and obligations hereunder (i) to any of its Affiliates, that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of any portion or division of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or(ii) in connection with any sale of the Manager or any sale of all or substantially all of the [mining operations services business] of the Manager, including for the avoidance of doubt,or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation;,] [9] and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.


      16.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.


      17.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

---

[9] **BR Note to Draft**: Currently being discussed.

18.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.    <u>Remedies Cumulative. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.</u>

24.    ~~23.~~ No Strict Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

25.    ~~24.~~ Interpretation. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the date first written above.

[Celsius Mining LLC]

By:By_____

Name:

Title:


[U.S. Data Management Group, LLC]

By:By_____

Name:

Title:

19

## Exhibit A

## Services[810]

[The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

The Services to be provided pursuant to this Agreement do not include operations and maintenance services.

## A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

   a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

   b. confirm reusability of existing equipment; and

   c. identify additional equipment to be sourced (if required).

---

[810] **W&C Note to Draft**: ~~Populated with Schedule 1 to Project Management Agreement draft received from B.R. 9.1.23 p.m. Subject in all respects to ongoing review and comment~~ To be discussed.

6.  Develop a division of responsibilities matrix to align all parties on scope and responsibility.

7.  Modify and/or finalize engineered plans and designs as necessary for:

    a.  civil scope;

    b.  mechanical scope;

    c.  electrical scope; and

    d.  networking scope.

8.  Source and procure all necessary equipment in accordance with engineered plans and as identified in prior diligence and planning efforts.

9.  Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

    a.  civil contractor;

    b.  mechanical contractor;

    c.  electrical contractor; and

    d.  network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Using commercially reasonable efforts to achieve Substantial Completion.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1.  Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

21

2. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3. Initiate handoff of existing ISP service.*

4. Assist as necessary for the handoff of property ownership including existing and required easements.*

5. Engage a general contractor to:

    a. outline full project scope (to be used in division of responsibilities matrix);

    b. clearly identify work that is already complete;

    c. clearly identify previously completed work that needs to be revisited and/or repaired; and

    d. clearly identify work that is not yet complete.

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7. Coordinate and lead the effort to modify and/or finalize engineered plans and design sets as necessary for:

    a. civil scope;

    b. mechanical scope;

    c. MV electrical scope;

    d. LV electrical scope;

    e. networking scope; and

    f. security scope.

8. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9. Facilitate RFP process for:

    a. general contractor;

    b. civil contractor(s);

22

      c.   mechanical contractor(s);

      d.   electrical contractor(s); and

      e.   network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance to engineered plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. <u>Using commercially reasonable efforts to achieve Substantial Completion.</u>

**<u>Exhibit B</u>**

**<u>Milestones</u>**[11]

~~The major milestones for Project 1 and Project 2 are set forth below:~~
**<u>Milestone 1 ("Milestone 1"):</u>**

~~**Project 1**~~
**Step 1:** ~~Deliver a design & schedule~~<u>Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.</u>
**Step 2:** ~~Receive approval for design & schedule~~<u>Engage Vendors:</u>
  (a) <u>Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.</u>

  (b) <u>PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.</u>

  (c) <u>PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.</u>

  ***Note***<u>: No purchase orders or capital commitments will be submitted in Step 2.</u>

**Step 3:** ~~Deliver a budget~~<u>Engage HMC to:</u>
  (a) <u>.Outline full project scope (to be used in Division of Responsibilities Matrix);</u>

  (b) <u>Clearly identify work that is already complete;</u>

  (c) <u>Clearly identify previously completed work that needs to be revisited and/or repaired; and</u>

  (d) <u>Clearly identify work that is not yet complete.</u>

**Step 4:** ~~Receive approval for budget~~<u>Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.</u>
**Step 5:** ~~Award bids to contractors~~<u>Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.</u>

~~**Project**~~**<u>Milestone 2 ("Milestone 2"):</u>**

**Step 1:** ~~Deliver a design & schedule~~<u>Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.</u>

---

[11] **<u>W&C Note to Draft</u>**<u>: To be discussed.</u>

**Step 2:** ~~Receive approval for~~ Coordinate and lead the effort to modify and/or finalize engineered plans and design ~~& schedule~~sets for:

    (a) Civil Scope;

    (b) Mechanical Scope;

    (c) MV Electrical Scope;

    (d) LV Electrical Scope;

    (e) Networking Scope;

    (f) Security Scope; and

    (g) USBTC containers: Complete engineering reports, review of warranty documents, and complete physical inspection of all containers.

    *Note*: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** ~~Deliver a budget~~Initiate RFP process for:

    (a) HMC;

    (b) Civil contractor(s);

    (c) Mechanical contractor(s); and

    (d) Network and cabling contractor(s).

    *Note*: Initiating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

**Step 4:** ~~Receive approval for budget~~Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.

**Step 5:** ~~Award bids to contractors~~Develop project schedule based on RFP process and negotiations.

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

## **Exhibit C**

## **[Insurance Requirements]**[912]

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

      i)   $1,000,000 Bodily Injury by Accident (Each Accident)

      ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

[912] **W&C Note to Draft**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)   $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)   Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)   Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)   All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

**4)**   The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## **Exhibit M**

**PayPal Distribution Services Agreement**

DRAFT

## DISTRIBUTION SERVICES AGREEMENT

This DISTRIBUTION SERVICES AGREEMENT (this "**Agreement**"), dated [●], 2023 (the "**Effective Date**"), is by and among Celsius Network LLC, a Delaware limited liability company, Celsius Network Limited, a company incorporated under the laws of the United Kingdom, Celsius Lending LLC, a Delaware limited liability company, Celsius EU UAB, a company incorporated under the laws of Lithuania, and, subject to the Confirmation Order, Celsius Networks Lending LLC, a Delaware limited liability company (together, with each of their successors and assigns as permitted hereunder, "**Celsius**") and PayPal, Inc., a Delaware corporation (together with its Affiliates, "**PayPal**"). Celsius and PayPal are each referred to as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Celsius requires payment distribution infrastructure to distribute certain cryptocurrencies and fiat currencies to certain Claimants (as defined below), and desires to use PayPal's services in connection therewith; and

WHEREAS, PayPal is willing to provide such services to Celsius on the terms hereinafter set forth;

NOW, THEREFORE, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1     Definitions**. In this Agreement, the following words and phrases shall have the meanings stated below or as otherwise defined herein:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the recitals.

"**AML/KYC**" has the meaning set forth in Section 7.3(c).

"**Approval Order**" has the meaning set forth in Section 11.2.

"**Bankruptcy Code**" means chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Business Day**" means any day other than a Saturday, Sunday, or any day which is a federal holiday in the United States.

"**Celsius**" has the meaning set forth in the recitals.

"**Celsius-Paxos Agreement**" has the meaning set forth in <u>Section 3.1</u>.

"**Celsius Custody Account**" has the meaning set forth in <u>Section 3.1</u>.

"**Celsius Indemnitees**" has the meaning set forth in <u>Section 8.2.</u>

"**Chapter 11 Case**" means the supervision of the Bankruptcy Court over Celsius following the filing by Celsius of voluntary bankruptcy pursuant to the Bankruptcy Code, in the jointly administered proceedings captioned *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y.).

"**Claimant**" means any party that holds a Claim (as defined in the Reorganization Plan) that has been Allowed (as defined in the Reorganization Plan); *provided* that Claimants who receive Supported Cryptocurrency shall be limited to natural persons.

"**Compliance Requirement**" has the meaning set forth in <u>Section 7.3</u>.

"**Confirmation Order**" has the meaning set forth in the Reorganization Plan.

"**Confidential Information**" has the meaning set forth in <u>Section 10.1</u>.

"**Debtor**" has the meaning set forth in the Reorganization Plan.

"**Disclosure Statement Approval Date**" means date of the Bankruptcy Court order approving the Disclosure Statement (as defined in the Reorganization Plan).

"**Dispute**" means any controversy or claim (whether for breach of contract, tortious conduct or otherwise) arising out of, or relating to, this Agreement.

"**Distribution**" has the meaning set forth in <u>Section 2.2</u>.

"**Effective Date**" has the meaning set forth in the recitals.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency, department, or instrumentality of such government or political subdivision, or any self-regulatory organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of Law), or any arbitrator, mediator, arbitral body, court, or tribunal of competent jurisdiction, or any other regulatory or supervisory body.

"**Gross Payment Term Losses**" means, with respect to each New Crypto Account, all losses or other expenses incurred by PayPal during the Payment Term that are attributable to violations associated with cryptocurrency activities of such New Crypto Account of the PayPal TOS, as determined by PayPal in its reasonable discretion, with any loss or other expense that is denominated in a currency other than U.S. dollars converted into U.S. dollars at the date and time the loss was incurred, as determined by PayPal in its reasonable discretion.

2

"**Gross Payment Term Revenues**" means, with respect to each New Crypto Account, all revenues recognized by PayPal during the Payment Term that are attributable to purchases, sales, and conversions of cryptocurrency in the PayPal Cryptocurrency Hub and the Venmo Cryptocurrency Hub by such New Crypto Account, as determined by PayPal in its reasonable discretion with any revenue that is denominated in a currency other than U.S. dollars converted into U.S. dollars at the date and time the revenue was earned, as determined by PayPal in its reasonable discretion.

"**Indemnified Party**" has the meaning set forth in <u>Section 8.3</u>.

"**Indemnifying Party**" has the meaning set forth in <u>Section 8.3</u>.

"**Initial Term**" has the meaning set forth in <u>Section 11.1</u>.

"**IRC**" has the meaning set forth in <u>Section 3.3.</u>

"**Law**" means any statute, law, act, ordinance, regulation, rule, code, order, constitution, treaty, common law, convention, or other requirement or rule of law of any Governmental Authority.

"**New Crypto Account**" means a PayPal Crypto Account that (i) was created on or subsequent to the Disclosure Statement Approval Date and (ii) has received one or more Distributions of Supported Cryptocurrency under the Reorganization Plan.

"**NYDFS**" has the meaning set forth in <u>Section 11.3</u>.

"**Party**" has the meaning set forth in the recitals.

"**Parties**" has the meaning set forth in the recitals.

"**Paxos**" means Paxos Trust Company, LLC.

"**Payment Period**" means, initially, the period beginning the day of the first deposit of Supported Cryptocurrency under this Agreement and ending the next calendar quarter end, and thereafter, each successive period beginning the day after the preceding period and ending the next calendar quarter end; *provided* that the last such period shall end on the Termination Date.

"**Payment Term**" means, with respect to each New Crypto Account, the one hundred eighty (180)-day period beginning on the first deposit of Supported Cryptocurrency into such New Crypto Account.

"**PayPal**" has the meaning set forth in the recitals.

"**PayPal Account**" means a customer account at PayPal for the services branded as PayPal or Venmo, which may or may not have successfully completed PayPal's onboarding process to be provisioned for cryptocurrency activities.

"**PayPal Crypto Account**" means a PayPal Account that has successfully completed PayPal's onboarding process to be provisioned for cryptocurrency activities.

"**PayPal Cryptocurrency Hub**" means locations within the PayPal app or on the PayPal.com website or its subdomains at which PayPal Crypto Accounts may transact in cryptocurrencies.

"**PayPal Custody Account**" means the custodial account PayPal has established at Paxos for the benefit of PayPal Crypto Account customers.

"**PayPal Indemnitees**" has the meaning set forth in Section 8.1.

"**PayPal TOS**" means PayPal's standard and cryptocurrency terms and conditions applicable to any particular PayPal Account, as revised from time to time.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**PII**" has the meaning set for the in Section 6.2.

"**Portal**" has the meaning set forth in Section 3.3.

"**Renewal Term**" has the meaning set forth in Section 11.1.

"**Reorganization Plan**" means the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Aug. 15, 2023), ECF No. 3319, as may be amended, supplemented, restated, or otherwise modified from time to time in accordance with its terms.

"**Reside**" means, with respect to any Claimant, such Claimant's principal residence as determined by PayPal through the AML/KYC information that such Claimant provides to PayPal.

"**Services**" has the meaning set forth in Section 2.2.

"**Supported Crypto Jurisdiction**" means each jurisdiction PayPal has listed in Schedule A, each of which are jurisdictions where, after diligent inquiry and to the best of its understanding and knowledge, PayPal holds all licenses and registrations necessary to engage in the activities contemplated in this Agreement with respect to Supported Cryptocurrency in such jurisdiction. PayPal may add jurisdictions to or remove jurisdictions from the definition of Supported Crypto Jurisdiction by updating Schedule A, which can be done by providing written notice to Celsius (email will suffice).

"**Supported Cryptocurrency**" means the versions of Bitcoin and Ether commonly accepted as the official Bitcoin and Ether cryptocurrencies, respectively, by the three largest cryptocurrency trading platforms in the United States by trading volume for the three hundred sixty-five (365)-day period ending on the Effective Date. Supported Cryptocurrency shall not include any airdrops related to Bitcoin or Ether unless PayPal notifies Celsius in writing that

4

PayPal has decided, in its sole and absolute discretion, to treat such airdropped asset as a Supported Cryptocurrency.

"**Supported Fiat Currency**" means, for Claimants Residing in the United States of America, U.S. dollars, and, for Claimants Residing outside of the United States, the local currency or currencies that PayPal is licensed to transmit, distribute and hold in customer accounts in the applicable foreign jurisdiction.

"**Supported Fiat Jurisdiction**" means each jurisdiction PayPal has listed in Schedule B, each of which are jurisdictions where, after diligent inquiry and to the best of its understanding and knowledge, PayPal holds any licenses and registrations necessary to engage in the activities contemplated in this Agreement with respect to Supported Fiat Currency in such jurisdiction. PayPal may add jurisdictions to or remove jurisdictions from the definition of Supported Fiat Jurisdiction by updating Schedule B, which can be done by providing written notice to Celsius (email will suffice).

"**Supported Jurisdiction**" means each jurisdiction that is (i) a Supported Crypto Jurisdiction; (ii) a Supported Fiat Jurisdiction; or (iii) both a Supported Crypto Jurisdiction and a Supported Fiat Jurisdiction.

"**Term**" has the meaning set forth in <u>Section 11.1</u>.

"**Termination Date**" has the meaning set forth in <u>Section 11.5</u>.

"**Third Party Claims**" has the meaning set forth in <u>Section 8.1</u>.

"**User Claim**" has the meaning set forth in <u>Exhibit A</u>.

"**Venmo Cryptocurrency Hub**" means locations within the Venmo app at which PayPal Crypto Accounts may transact in cryptocurrencies.

## ARTICLE 2
## PURPOSE

2.1    **Purpose**. During the Term, and subject to the terms and conditions of this Agreement, Celsius appoints PayPal as a non-exclusive worldwide distribution agent for Distributions to Claimants pursuant to the Reorganization Plan.

2.2    **Distributions to Claimants.** Pursuant to the process described in Exhibit A, Celsius may provide PayPal with instructions to distribute to one or more Claimants a portion or all of the payment owed to such Claimants under the Reorganization Plan in the form of Supported Cryptocurrency or Supported Fiat Currency, as applicable (each such distribution under this Agreement, a "**Distribution**"). PayPal shall make Distributions as set forth in Exhibit A and in accordance with instructions provided by Celsius, *provided* such instructions comply with all requirements under this Agreement (collectively the **"Services"**). If the instructions from Celsius state that the Claimant's Distribution shall be in the form of Supported Cryptocurrency and the Claimant Resides in a Supported Crypto Jurisdiction, all Distributions to that Claimant shall be in the form of Supported Cryptocurrency. If the instructions from Celsius state that the Claimant's

Distribution shall be in the form of Supported Fiat Currency and the Claimant Resides in a Supported Fiat Jurisdiction, such Distribution to that Claimant shall be in the form of Supported Fiat Currency.  If the instructions from Celsius state that the Claimant's Distribution shall be in the form of Supported Cryptocurrency and the Claimant Resides in a jurisdiction that is a Supported Fiat Jurisdiction but not a Supported Crypto Jurisdiction, PayPal shall (i) provide prompt notice to Celsius that such instruction cannot be followed and (ii) not act on such instruction until Celsius, in its sole and absolute discretion, provides revised instructions. No Distributions shall be made to Claimants who Reside in a jurisdiction that is neither a Supported Fiat Jurisdiction nor a Supported Crypto Jurisdiction.

2.3    **Taxes.** Celsius acknowledges that PayPal does not believe it is subject to reporting or withholding requirements in accordance with Section 6045 of the Internal Revenue Code of 1986, as amended (the "**IRC**"), in respect of the Distributions to Claimants under current law. PayPal acknowledges that Celsius does not believe it is subject to reporting or withholding requirements in accordance with Section 6045 of the IRC in respect of the Distributions to Claimants under current law. To the extent any information reporting or withholding obligations exist (that the relevant Party becomes aware of after the date hereof) or arise after the date hereof with respect to a Party under applicable law, or that are required under applicable law with respect to any services other than Distributions which the Parties agree shall be performed pursuant to this Agreement, such Party shall comply with its obligations under applicable law (including, for the avoidance of doubt, regulatory and sub-regulatory requirements established by applicable taxing authorities) in respect of United States federal or other applicable tax information reporting and withholding in respect of Distributions to Claimants or any other such services.

2.4    **Invalid Instructions**. If PayPal rejects Celsius' instructions to make a Distribution for any reason, including but not limited to a Claimant's failure to satisfy PayPal's provisioning process pursuant to Section 3.5, fails to make a Distribution or cannot make a Distribution as set forth in Celsius' instructions for a Claimant, PayPal shall provide prompt notice to Celsius that such instruction is not followed and Celsius reserves the right, in its sole and absolute discretion, to use another service provider to make Distributions to such Claimant.

## ARTICLE 3
## CUSTODY AND DISTRIBUTION FRAMEWORK

3.1    **Custody Account.** Celsius shall use Paxos for Distributions of Supported Cryptocurrency contemplated under this Agreement. Subject to that certain Custody Services Agreement by and between Celsius and Paxos dated [●] (the "**Celsius-Paxos Agreement**"), Celsius shall establish a custodial account at Paxos (the "**Celsius Custody Account**"), which shall be held open for the duration of the Term of this Agreement. As between the Parties, Celsius remains solely responsible for any unclaimed assets held in the Celsius Custody Account, including any possible escheatment, return to the estate, or other disposal.

3.2    **Claimant Identification Process.** Celsius shall identify for PayPal all Claimants for which Celsius wishes to use PayPal to make a Distribution and provide information to PayPal on all such Claimants as set forth in Exhibit A.

**3.3     Distribution Portal.**  PayPal shall develop a dedicated portal (the "**Portal**"), subject to the requirements of Article 6, through which each Claimant can initiate the process of receiving the Services from PayPal, including receiving Distributions. PayPal shall provide such Services including making such Distributions in accordance with the terms and conditions of this Agreement, including those detailed in Exhibit A.

**3.4     Notification of Claimants.**  Celsius shall notify Claimants that they may be eligible to receive Distributions in respect of their Celsius claim through PayPal or Venmo. This notification shall state that a Claimant must have (i) a PayPal Account to receive Distributions in Supported Fiat Currency or (ii) a PayPal Crypto Account to receive distributions in Supported Cryptocurrency in respect of their claim through PayPal or Venmo and will provide a web address for the Portal.

**3.5     Provisioning for PayPal Accounts and PayPal Crypto Accounts.**  The Portal shall include a link that a Claimant can follow to begin the process for obtaining a PayPal Account or PayPal Crypto Account, which process shall include AML/KYC checks and a determination that the Claimant Resides in a Supported Fiat Jurisdiction or a Supported Crypto Jurisdiction, as applicable.  PayPal may reject opening a PayPal Account or PayPal Crypto Account for any Claimant for any reason, including that the Claimant had previously had a PayPal Account or PayPal Crypto Account terminated or frozen for any reason, such as for violation of PayPal's TOS. Only Claimants that (i) successfully complete PayPal's provisioning process, including AML/KYC checks, and (ii) have a PayPal Account or PayPal Crypto Account in good standing, as applicable, may receive a Distribution.

**ARTICLE 4**
**REVENUE PAYMENTS**

**4.1     Payment Period Revenues and Losses.** PayPal shall keep a record of the Gross Payment Term Revenues and Gross Payment Term Losses generated by each New Crypto Account for purposes of calculating payments due in respect of each Payment Period under Section 4.2.  It is understood that revenues and losses associated with a particular New Crypto Account after the Payment Term associated with such New Crypto Account shall not be included within such New Crypto Account's Gross Payment Term Losses and/or Gross Payment Term Revenues.

**4.2     Revenue Payments.**  Within thirty (30) days of the end of each Payment Period, PayPal shall pay to Celsius an amount equal to twenty-five percent (25%) of aggregate Gross Payment Term Revenues attributable to all New Crypto Accounts during such Payment Period over aggregate Gross Payment Term Losses attributable to all New Crypto Accounts during such Payment Period. In the event aggregate Gross Payment Term Losses attributable to all New Crypto Accounts during such Payment Period exceed twenty-five percent (25%) of aggregate Gross Payment Term Revenues attributable to all New Crypto Accounts during such Payment Period, the amount of such excess shall be carried over into the next Payment Period and added to, and considered part of, the aggregate Gross Payment Term Losses attributable to New Crypto Accounts during such next Payment Period. Each of Celsius and Paxos agrees to deliver to PayPal (or its Affiliate, as applicable) (i) a properly executed Internal Revenue Service Form W-9 or (ii) any other tax form or documentation reasonably requested by PayPal (or its Affiliate, as applicable), in each case that Celsius or Paxos, as applicable, is eligible to provide.

7

## ARTICLE 5
## ADDITIONAL FEES

**5.1    Fees to Celsius.** PayPal shall not, directly or indirectly, charge any fees to Celsius for providing any of the Services described in this Agreement.

**5.2    Fees to Claimants.** PayPal shall not, directly or indirectly, charge any fees to Claimants for establishing a New Crypto Account, receiving a Distribution into a PayPal Account, or withdrawing a Distribution from a PayPal Account (including any transfer between accounts, to an external wallet, transfer of fiat currency to an external bank account, or any cash-out from such PayPal Account of fiat currency which was distributed to Claimant), except that (i) PayPal will pass on any applicable cryptocurrency network fees to the Claimant for transfers to an external wallet or address, (ii) if a Claimant elects to convert a Supported Fiat Currency Distribution to another fiat currency, PayPal may convert the allocation at the applicable exchange rate including a spread, (iii) PayPal may charge a premium for expedited or instant withdrawals of fiat currency, and (iv) any subsequent activity by a Claimant, including any conversion of Supported Cryptocurrency or Supported Fiat Currency to any other cryptocurrency or fiat currency, will be subject to PayPal's standard fees, as applicable.

**5.3    Custody Fees**. PayPal shall not be responsible for the initial network fees to transfer the Supported Cryptocurrency assets from Celsius' current wallets to the newly formed Celsius Custody Account. PayPal shall be responsible for and pay to Paxos all fees for providing the services associated with the Celsius Custody Account for the three hundred sixty-five (365)-day period beginning on execution of this Agreement, and PayPal shall not pass along such fee payments to Celsius or any of the Claimants. For the avoidance of doubt, Celsius shall incur no fees for the subsequent transfer of Supported Cryptocurrency from the Celsius Custody Account to the PayPal Accounts out of which payments can be made to and for the benefit of Claimants.

## ARTICLE 6
## DISTRIBUTION PORTAL

**6.1    Access.** The Portal shall be made accessible in any or all of (i) the PayPal Cryptocurrency Hub, (ii) the Venmo Cryptocurrency Hub and (iii) another means mutually agreed to by the Parties.

**6.2    PayPal Marketing Rights.** Other than (i) PayPal branding that PayPal customarily uses on its platforms to indicate that such platform is owned or operated by PayPal and (ii) a description of the services provided by PayPal and Paxos to Claimants pursuant to this Agreement, which may include a description of Paxos and the services provided by Paxos to Claimants pursuant to this Agreement and the Celsius-Paxos Agreement, the Portal shall not contain any marketing or advertising or any information or images which could be reasonably understood to be marketing or advertising for PayPal or any of its respective Affiliates. PayPal may only use the Personally Identifiable Information ("**PII**") for each Claimant provided by Celsius for making Distributions to Claimants, and in no case may PayPal use the PII provided by Celsius for marketing or advertising purposes. Subject to the limitations set forth in the previous sentence, following a Claimant's direct registration of its email address with PayPal and acceptance of PayPal's TOS, PayPal may communicate outside of the Portal with such Claimant in a manner

8

consistent with PayPal's communication policy which, among other requirements, permits recipients to unsubscribe from receiving further communications, and may use any information provided by such Claimant directly to PayPal in accordance with PayPal's TOS (regardless of whether such information was separately provided by Celsius to PayPal).

       **6.3**    **Rights to Celsius Brand Use**. Celsius grants PayPal a limited, revocable right to use the name "Celsius" on the Portal during the Term to identify that the Portal is the officially authorized service provider for making Distributions to Claimants, including, with limitation, in the URL (e.g., celsius.paypal.com, or paypal.com/Celsius) and on the Portal.

       **6.4**    **Review Rights.** Celsius shall have the right to approve the Portal before it is made available in any way to any Claimant, which approval shall not be unreasonably withheld. PayPal shall consider in good faith any feedback from Celsius regarding the Portal and use best efforts to, in a timely manner, make any changes requested by Celsius that PayPal deems, in its reasonable discretion, to be appropriate.

       **6.5**    **Governing Terms**. Except as set forth in this Agreement, all activities by Claimants on the Portal shall be governed by the PayPal TOS. In the event of any conflict now, or that may hereinafter arise, between this Agreement and any current or future versions of the PayPal TOS, this Agreement shall govern. For the avoidance of any doubt, Celsius shall not be responsible for Claimants' compliance with the PayPal TOS and shall not be held liable for any noncompliance (or any resulting damages of any kind) by such Claimants, except to the extent such damages are incorporated into Gross Payment Term Losses.

**ARTICLE 7**
**REPRESENTATIONS, WARRANTIES, AND ADDITIONAL COVENANTS**

       **7.1**    **Representations and Warranties of Each Party**. Each Party represents and warrants to the other Party as follows and acknowledges that the Party is relying on such representations and warranties in entering into this Agreement: (i) such Party is duly organized and validly existing and in good standing under the jurisdiction of its formation; (ii) such Party has the full corporate power and is duly authorized to enter into, execute and deliver this Agreement, and to carry out and otherwise perform its obligations hereunder; (iii) once duly executed and delivered by such Party, this Agreement shall constitute the legal and valid obligations binding upon such Party, except as such enforceability may be limited by applicable bankruptcy or other similar laws; and (iv) the entry into, the execution and delivery of, and the carrying out and other performance of its obligations under this Agreement by such Party (x) do not conflict with, or contravene or constitute any default under, any agreement, instrument, or understanding, oral or written, to which it is a Party, including its certificate of incorporation and by-laws, and (y) do not violate applicable Law or any judgment, injunction, order, or decree of any Governmental Authority having jurisdiction over it.

       **7.2**    **Additional Obligations of PayPal**. PayPal represents, warrants, and covenants that, after diligent inquiry and to the best of its understanding and knowledge, it possesses and shall maintain, all licenses, registrations, authorizations, and approvals required by any applicable Governmental Authority in all Supported Jurisdictions for it to operate its business and provide the Services contemplated under this Agreement.

**7.3     Compliance with Laws**.

(a)     Applicable Laws. Subject to Section 7.3(b), PayPal represents, warrants, and covenants that, after diligent inquiry and to the best of its understanding and knowledge, (i) the Services supplied hereunder and (ii) its current practices, in each case of (i) and (ii), will have been in compliance in all material respects with, and PayPal will comply in all material respects with, all applicable Laws in each Supported Jurisdiction.

(b)     Change in Compliance Requirements. Upon a change in any Law, order, rule, regulation, ordinance, convention, or enforcement of any Laws in any Supported Jurisdiction ("**Compliance Requirement**"), or a change in interpretation of any Compliance Requirement by the relevant Governmental Authorities, PayPal shall use commercially reasonable efforts to (i) remain in compliance with such Compliance Requirement and (ii) remain in good standing, with respect to the Compliance Requirement with all relevant Governmental Authorities. If PayPal does not, or determines that because of a change in any Compliance Requirement or interpretation thereof that it cannot, remain in compliance with any Compliance Requirement or remain in good standing with the relevant Governmental Authorities, (i) PayPal shall notify Celsius promptly after coming into knowledge of such noncompliance or event, and (ii) each Party shall have the option, in its sole and absolute discretion, to terminate this Agreement immediately upon written notice to the other Party.

(c)     Compliance with Anti-Money Laundering and Know-Your-Customer Obligations. PayPal shall conduct anti-money laundering and know-your-customer ("**AML/KYC**") account verification in accordance with its current practices for each PayPal Account for any Claimant prior to any account opening within the Portal by any such Claimant or PayPal Account.

**7.4     Additional Obligations of Celsius**. Celsius represents and warrants that it is has taken all steps necessary under applicable Law to permit the sharing of Claimant data with PayPal.

## ARTICLE 8
## INDEMNIFICATION

**8.1     Celsius Indemnification**. Celsius shall defend, indemnify, and hold harmless PayPal, its Affiliates, and their respective directors, managers, officers, shareholders, employees, and agents, and their respective successors and permitted assigns (collectively, the "**PayPal Indemnitees**") from and against any and all losses incurred by them (which in the case of costs and expenses must be reasonable and documented) in connection with any and all claims, suits, actions, proceedings, and allegations by third parties (collectively, "**Third Party Claims**") to the extent arising from or occurring as a result of (i) PayPal's execution of a Distribution in compliance with instructions provided by Celsius in accordance with this Agreement, or (ii) rejection of a Distribution instruction (whether valid or invalid) by PayPal in good faith and consistent with the terms of this Agreement, in each of clauses (i) and (ii) absent gross negligence or willful misconduct by PayPal. Notwithstanding the foregoing, Celsius shall have no obligation to indemnify, defend and/or hold harmless PayPal and/or any other PayPal Indemnitee under this Section 8.1 to the extent PayPal owes Celsius an indemnity pursuant to Section 8.2 directly related to the same Third Party Claim(s). For the avoidance of doubt, Third Party Claims shall include

any liability of PayPal in connection with Distributions (or any other services which the Parties agree shall be performed pursuant to this Agreement) arising from (a) the failure of Celsius to satisfy tax information reporting or withholding requirements, if any, that apply to it with respect to Distributions (or any other such services) or (b) the reliance by PayPal on instruction or information given by Celsius to PayPal relating to tax information reporting or withholding requirements in respect of Distributions (or any other such services); *provided* that, solely in the case of clause (a) of this sentence, Celsius shall have no obligation to indemnify, defend and/or hold harmless PayPal and/or any other PayPal Indemnitee to the extent any loss relates to any failure by PayPal to comply with any of its own applicable tax information reporting or withholding requirements, except if PayPal incurs a Third Party Claim as a result of a failure of Celsius to comply with any tax information reporting or withholding requirement that is the obligation of Celsius in the first instance.

**8.2**    **PayPal Indemnification**. PayPal, Inc. shall defend, indemnify, and hold harmless Celsius, its Affiliates, and its and their respective directors, managers, officers, shareholders, employees, and agents, and their respective successors and permitted assigns (collectively, the "**Celsius Indemnitees**") from and against any and all losses incurred by them (which in the case of costs and expenses must be reasonable and documented) in connection with any and all Third Party Claims to the extent arising from or occurring as a result of (a) failure to comply with <u>Section 7.3</u>, (b) a failure to execute clear and valid instructions for a Distribution provided by Celsius pursuant to <u>Section 2.2</u>, and (c) loss of any Claimant assets upon or following a completed transfer to the PayPal Custody Account or any PayPal Account, absent gross negligence or willful misconduct by Celsius. Notwithstanding the foregoing, PayPal shall not be obligated to indemnify, defend, and/or hold harmless Celsius and/or any other Celsius Indemnitee under this <u>Section 8.2</u> to the extent that Celsius owes PayPal an indemnity pursuant to <u>Section 8.1</u> directly related to the same Third Party Claim(s).

**8.3**    **Procedures for Indemnification**. All indemnification claims under <u>Article 8</u> shall be made solely by a Party to this Agreement. Each Party (on behalf of its indemnitees) shall promptly notify the other Party when it becomes aware of a Third Party Claim for which indemnification may be sought hereunder. To be eligible to be indemnified for a Third Party Claim, a Party or Person seeking indemnification (the "**Indemnified Party**") shall (a) provide the Party required to indemnify such Party or Person (the "**Indemnifying Party**") with prompt written notice of the Third Party Claim giving rise to the indemnification obligation under this <u>Article 8</u>; *provided* that the failure to provide such prompt notice shall not relieve the Indemnifying Party of any of its obligations under this <u>Article 8</u> except to the extent the Indemnifying Party is actually prejudiced thereby; (b) provide the Indemnifying Party with the exclusive ability to defend (with the reasonable cooperation of the Indemnified Party) against the Third Party Claim; and (c) not settle, admit or materially prejudice the Third Party Claim, without the Indemnifying Party's prior written consent, which shall not be unreasonably conditioned, withheld or delayed. The Indemnified Party shall reasonably cooperate with the Indemnifying Party, at the Indemnifying Party's sole expense, in the defense of any Third Party Claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to participate in and have its own counsel participate in any action or proceeding for which the Indemnified Party seeks to be indemnified by the Indemnifying Party. Such participation shall be at the Indemnified Party's expense, unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the

Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Indemnifying Party shall not settle or compromise, or consent to the entry of any judgment with respect to, any Third Party Claim, without the prior written consent of the Indemnified Party, which shall not be unreasonably conditioned, withheld or delayed.

    **8.4**    Celsius shall obtain approval to include PayPal, its Affiliates, and its and their respective financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals as Exculpated Parties (as defined in the Reorganization Plan) under the Debtors' Reorganization Plan, which exculpation shall (i) provide for and include the Services set forth herein and (ii) be effective for the period from the Petition Date through the Effective Date (as each term is defined in the Reorganization Plan) of the Reorganization Plan.

**ARTICLE 9**
**LIMITATIONS OF LIABILITY**

    **9.1**    **CONSEQUENTIAL DAMAGES**. EXCEPT WITH RESPECT TO CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT FOR A PARTY'S WILLFUL MISCONDUCT, GROSS NEGLIGENCE, FRAUD, OR VIOLATION OF LAW OR BREACHES BY A PARTY OF THE CONFIDENTIALITY OBLIGATIONS HEREIN OR EITHER PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN <u>ARTICLE 9</u>, NO PARTY AND/OR ANY OF ITS AFFILIATES SHALL BE LIABLE TO THE OTHER PARTY OR ANY OF THE OTHER PARTY'S AFFILIATES, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE, OR OTHERWISE FOR ANY INDIRECT, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS OR GOODWILL, HOWEVER ARISING, INCLUDING BUT NOT LIMITED TO NETWORK FAILURES OUTSIDE OF THE PARTY'S CONTROL, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE, OR OTHERWISE, EVEN IF THE RELEVANT PARTY HAS BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGE. IN NO EVENT SHALL EITHER PARTY OR ANY OF THEIR AFFILIATES' AGGREGATE LIABILITY WITH RESPECT TO ANY BREACH OF THEIR OBLIGATIONS HEREUNDER EXCEED THE LESSER OF (Y) THE REPLACEMENT OF ANY FUNDS OR DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AND (Z) THE MARKET VALUE OF THE DIGITAL ASSETS TO WHICH SUCH LOSS OR DAMAGE RELATES AT THE TIME SUCH PARTY REASONABLY SHOULD HAVE BEEN AWARE OF SUCH LOSS OR DAMAGE.

**ARTICLE 10**
**CONFIDENTIALITY**

    **10.1**    **Receipt of Confidential Information**. Each Party acknowledges that it may receive or have access to information which is not in the public domain ("**Confidential Information**") of another Party. Each receiving Party shall treat the disclosing Party's Confidential Information as confidential and shall not use such Confidential Information except as expressly permitted under this Agreement. Without limiting the generality of the foregoing, each receiving Party shall use at least the same degree of care that it uses to prevent the disclosure of its own Confidential Information of like importance, but in no event with less than reasonable care,

12

to prevent the disclosure of a disclosing Party's Confidential Information. Each Party shall limit access to Confidential Information of the other Party to its or its Affiliates' employees, representatives and advisors having reasonable need to know such information in connection with this Agreement. Each receiving Party agrees not to provide access to the Confidential Information to Persons other than its and its Affiliates' employees, representatives and advisors without the prior written consent of the disclosing Party. Each receiving Party shall cause any Person to whom such Confidential Information is disclosed by such receiving Party to be subject to the same obligations as regards disclosure and non-use as such receiving Party. Each receiving Party shall assume responsibility and accept liability for the non-fulfillment of these obligations from any Person given access to the Confidential Information. Each receiving Party shall retain any Confidential Information stamps or markings on Confidential Information and notify the disclosing Party immediately if Confidential Information is disclosed in violation of this Article 10 or is otherwise lost or unaccounted for.

**10.2    Return or Destruction**. Upon any termination or expiry of this Agreement, or upon the request of the disclosing Party, each receiving Party shall (a) return or destroy all tangible forms of Confidential Information of a disclosing Party in its possession; (b) use all reasonable efforts to destroy all copies of all materials that incorporate or reflect such Confidential Information; and (c) certify to such disclosing Party that such materials have been either returned or destroyed, in each case except as to materials customarily held by such receiving Party as legal archival material in accordance with such receiving Party's reasonable document retention policy, which shall remain subject to confidentiality for so long as they are so retained.

**10.3    Enforcement**. The Parties agree that any actual or threatened disclosure or misappropriation of Confidential Information in breach of this Article 10 may cause the disclosing Party immediate and irreparable injury, and therefore such disclosing Party shall be entitled to apply to any court of competent jurisdiction for injunctive or other equitable relief, without the posting of any bond and without proof of actual damages. The foregoing shall be in addition to and without prejudice to such other rights as the disclosing Party may have at law or in equity. For greater certainty, the Parties acknowledge and agree that a receiving Party shall not, and hereby irrevocably waives any right it otherwise might have, to plead or in any other manner seek to rely on any contention that damages are or may be an adequate remedy for such a breach or threatened breach or misappropriation.

## ARTICLE 11
## TERM AND TERMINATION

**11.1    Term**. Unless terminated earlier in accordance with Section 11.4, this Agreement is effective as of the entry of the Approval Order (as defined below) and shall remain in force for a period of five (5) years (the "**Initial Term**"), and shall thereafter continue for further successive terms of one (1) year each (each, a "**Renewal Term**") unless either Party terminates in accordance with Section 11.4 at least one hundred eighty (180) days prior to the expiry of the Initial Term or the then-current Renewal Term, as applicable. The Initial Term, together with any Renewal Terms, is referred to herein as the "**Term**."

**11.2    Agreement Subject to Bankruptcy Court Approval**. The Confirmation Order shall approve the entry by Celsius into this Agreement (such provisions in the Confirmation Order

13

relating to the approval of this Agreement, the "**Approval Order**"). Such Approval Order shall be in form and substance acceptable to PayPal in its sole discretion. The Approval Order shall provide, without limitation, that all fees and expenses that come due hereunder during the pendency of the Chapter 11 Cases (including any indemnities) shall be entitled to priority as administrative expenses under section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. In the event that (i) the Bankruptcy Court fails to enter the Approval Order within sixty (60) days of the Parties entering into this Agreement; (ii) enters an order, or Celsius or any of its Debtor-affiliates in the Chapter 11 Cases files or supports an application, motion, or request for an order that has the effect of amending, vacating, reversing, supplementing, or modifying the Approval Order or this Agreement in a manner that PayPal determines in its reasonable discretion is materially adverse to PayPal; (iii) the Bankruptcy Court has made a judicial finding, or any Debtor has declared, that any Debtor is administratively insolvent; or (iv) after its entry, the Approval Order ceases to be in full force and effect, this Agreement shall be null and void without any further action by either Party.

**11.3    PayPal's Obligations Subject to NYDFS Non-Objection.** PayPal shall not be obligated to perform any action or actions under this Agreement to which the New York State Department of Financial Services ("**NYDFS**") objects.

**11.4    Termination**.

(a)    <u>Termination for Material Breach</u>. Either Party may terminate this Agreement with immediate effect without prejudice to any other right upon written notice to the other Party if such other Party is in material breach of this Agreement and fails to remedy such breach (if capable of remedy) within thirty (30) days from receipt of notice in writing specifying the material breach.

(b)    <u>Automatic Termination</u>. This Agreement shall terminate automatically upon the issuance of a final, unappealable order by a court of competent jurisdiction closing the last remaining Chapter 11 Case.

(c)    <u>Termination for Failure to Support in Required Jurisdictions</u>. Celsius has the right, in its sole and absolute discretion, to terminate this Agreement immediately upon written notice to PayPal if PayPal fails to make available as a Supported Crypto Jurisdiction any of the jurisdictions listed in Schedule A, unless PayPal determines in good faith that it may no longer support such jurisdiction due to a change in Law or request by a Governmental Authority.

(d)    <u>Termination for Material Change to Law or Reorganization Plan</u>. PayPal has the right, in its reasonable discretion, to terminate this Agreement immediately upon written notice to Celsius and Paxos if any material change is made to applicable Law or the Reorganization Plan that materially burdens PayPal's ability to perform under this Agreement, if the Reorganization Plan fails to provide for the releases and exculpation provisions as set forth in <u>Section 8.4</u> hereof, or if the Approval Order is not in form and substance reasonably acceptable to PayPal.

**11.5    Effect of Termination**. The date on which this Agreement expires or terminates shall be referred to herein as the "**Termination Date**." PayPal shall, within sixty (60) days after

the Termination Date, pay all sums outstanding or otherwise owed to Celsius under or arising out of this Agreement and, consistent with the terms of this Agreement, execute any Distribution instructions received prior to the Termination Date. PayPal shall be under no obligation to execute any Distribution for which the related instruction was received after the Termination Date.

**11.6    No Release of Obligations**. Subject to Section 11.5, no termination or expiration of this Agreement shall release or relieve Celsius or PayPal from any of its respective obligations accrued hereunder or rescind anything done or any payment made or any consideration given to any Party hereunder prior to the time such termination or expiration became effective.

# ARTICLE 12
# GENERAL PROVISIONS

**12.1    No Agency**. Celsius and PayPal are independent contractors for the purpose of this Agreement. Nothing herein contained shall be deemed to create an agency, joint venture or partnership relation between the Parties.

**12.2    No Third Party Beneficiaries**.  No provision of this Agreement shall be construed to confer any rights, benefits, remedies, or causes of action hereunder upon any Claimant or any other Person, other than the Parties hereto and their respective successors and permitted assigns, against any Party.

**12.3    Notices**. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 12.3):

| | | |
|---|---|---|
| (i) | if to Celsius: | Celsius Network LLC |
| | | 50 Harrison St., Suite 209F |
| | | Hoboken, NJ 07030 |
| | | Attention:  Ron Deutsch, General Counsel |
| | | Email:  legal@celsius.network |
| | | |
| (ii) | if to PayPal: | PayPal, Inc. |
| | | 2211 North First St. |
| | | San Jose, CA 95131 |
| | | Attention:  Legal Counsel |
| | | Email:  CorpLegal@paypal.com |

**12.4    Entire Agreement; Amendments**. This Agreement and all schedules hereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and

supersede all prior agreements, negotiations, discussions, and understandings, written or oral, between the Parties with respect hereto, and there are no representations, warranties, conditions, or other agreements between the Parties in connection with the subject matter hereof except as specifically set forth herein. No amendment to this Agreement shall be effective unless it shall be in writing and signed by both Parties hereto.

**12.5    Order of Precedence**. In the event of any conflict regarding this Agreement between this Agreement and any other agreement between the Parties, this Agreement shall prevail and govern.  In the event of any conflict between this Agreement and the Approval Order, the Approval Order shall govern.

**12.6    Survival**. The following shall survive termination or expiration of this Agreement: Article 1, Section 2.3, Article 8, Article 10, Section 11.5, Section 11.6, and Article 12.

**12.7    Severability**. If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision hereof.

**12.8    Waiver**. No waiver of or consent to depart from the requirements of any provision of this Agreement shall be binding against the Parties unless it is in writing and is signed by the Party giving it. Such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it has been given and shall not be deemed or constitute a waiver of any other provisions (whether or not similar) nor a continuing waiver unless otherwise expressly provided.

**12.9    Further Assurances**. Each Party shall do such acts and shall execute such further documents, and shall cause the doing of such acts and the execution of such further documents as are within its power, as the other Party may in writing at any time and from time to time reasonably request be done and or executed, in order to give full effect to the provisions of this Agreement, such acts and executions of documents not to be unreasonably delayed or withheld.

**12.10    Assignment**.  Either Party may assign its rights under this Agreement to any of such Party's Affiliates or subsidiaries or to any successor in interest of any business associated with the Services contemplated under this Agreement, without the other Party's consent.  Neither Party may assign its rights and obligations under this Agreement to any other Party not described in the previous sentence without the prior written consent of the other Party. Any assignment in violation of the foregoing will be null and void.

**12.11    Force Majeure**. Neither Party shall be liable to the other for failure to perform its obligations under this Agreement (other than payment obligations) where such failure is caused by fires, floods, embargoes, any governmental act or regulation, acts of God, acts of war, pandemics, epidemics or other viral outbreaks, restrictions on travel and movement of goods, or any other cause not under the control of the affected Party. If any event of force majeure should occur, the affected Party shall promptly give notice thereof to the other Party, and the Parties shall use commercially reasonable efforts to perform their obligations despite any such force majeure event. In the event that a force majeure delays the affected Party's performance of any of its

16

obligations and such delay exceeds fifteen (15) days, the other Party shall have the right, upon written notice to such affected Party, to immediately terminate this Agreement with respect to the affected Party.

**12.12    Governing Law**. This Agreement and all Disputes arising hereunder shall be governed by and construed in accordance with the Laws of the State of New York without giving effect to any choice or conflict of law provision or rule of any jurisdiction.

**12.13    Dispute Resolution**.

(a)    ANY DISPUTE OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED ONLY IN THE STATE OR FEDERAL COURTS OF THE STATE OF NEW YORK LOCATED IN THE COUNTY OF NEW YORK. EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS IN ANY SUCH PROCEEDING. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH CLAIM SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY DISPUTE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A PROCEEDING, (II) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (III) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (IV) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.13(b).

**12.14    Counterparts**. This Agreement may be executed in counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each Party and delivered to the other Party.

**12.15    Interpretation**. Headings in this Agreement are for convenience only and shall have no bearing on interpretation. Unless otherwise noted, the use of "including" and "includes" shall mean without limitation. The word "day" means calendar day unless Business Day is specified. Words importing singular shall include the plural, and vice versa. The word "or" is disjunctive but not necessarily exclusive.

**[THE REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK.]**

**IN WITNESS WHEREOF**, the Parties, including, subject to the Confirmation Order, Celsius Networks Lending LLC, have executed this Agreement as of the day and year first above written.

**CELSIUS NETWORK LLC**

By: _____
    Name:
    Title:

**CELSIUS NETWORK LIMITED**

By: _____
    Name:
    Title:

**CELSIUS LENDING LLC**

By: _____
    Name:
    Title:

**CELSIUS NETWORKS LENDING LLC**

By: _____
    Name:
    Title:

*[Signature Page to Distribution Services Agreement]*

**CELSIUS EU UAB**

By: _____
    Name:
    Title:

**PAYPAL, INC.**

By: _____
    Name:
    Title:

[*Signature Page to Distribution Services Agreement*]

**Schedule A**

**Supported Crypto Jurisdictions**

United States and its territories, other than Hawaii and the United States Minor Outlying Islands, as represented in the chart below

| Jurisdiction | Status of PayPal Support |
| --- | --- |
| **United States (Excluding Hawaii)** | Supported By PayPal |
| **Virgin Islands (US)** | Supported By PayPal |
| **Puerto Rico** | Supported By PayPal |
| **Guam** | Supported By PayPal |
| **United States Minor Outlying Islands** | Not Supported By PayPal |
| **Northern Mariana Islands** | Supported By PayPal |
| **American Samoa** | Supported By PayPal |

## **Schedule B**

### **Supported Fiat Jurisdictions**

Hawaii and the jurisdictions listed on PayPal's website at
https://www.paypal.com/us/webapps/mpp/country-worldwide

## EXHIBIT A
## DISTRIBUTION PROCESS

- After Celsius establishes the Celsius Custody Account at Paxos, it will make one or more on-chain transfers of BTC and ETH into the Celsius Custody Account.

- Celsius will provide PayPal with a hashed distribution ledger that contains mutually agreed upon PII for each Claimant, a code that corresponds to each Claimant's Claim ("**User Claim**"), a known personal identifier to be mutually agreed upon by Celsius and PayPal, and the Distribution instructions.

- Claimants will input their User Claim and personal identifier in the Portal to request distribution of assets in respect of their Claim through PayPal.

- PayPal will compare the hashes of the entered information with the hashed distribution ledger to confirm that the hashes match; in addition, other checks against PayPal account information will be performed to validate that the Claimant is the same individual as the PayPal account holder.

- A Claimant is required to be provisioned by PayPal for cryptocurrency activity in order to receive Distributions of ETH or BTC through the PayPal Cryptocurrency Hub or Venmo Cryptocurrency Hub.  In order to be so provisioned, Claimants that are not provisioned for cryptocurrency activity at the time the Agreement is entered into will need to (1) affirmatively accept PayPal's or Venmo's Cryptocurrency Terms and Conditions, as applicable, and (2) successfully complete PayPal's KYC, AML, and other applicable processes and requirements, as determined by PayPal.  PayPal may reject provisioning a Claimant if the Claimant previously had a PayPal account terminated or frozen for a violation of PayPal's terms of service.

- If each of the steps described above is successfully completed and if the Distribution instructions are valid, PayPal will instruct Paxos to make off-chain transfers of BTC and ETH from the Celsius Custody Account to the PayPal Custody Account as necessary to effectuate the Distribution instructions.

- After each such transfer, PayPal will reflect the relevant BTC and ETH positions in the appropriate Claimants' PayPal Account(s).

- The parties will mutually agree on fiat distribution mechanics prior to PayPal making any Distributions to Claimants in fiat currency.