Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) Case No. 22-10964 (MG) |
| Debtors. | ) (Jointly Administered) |

## NOTICE OF FILING OF CONFIRMATION HEARING TRANSCRIPTS

**PLEASE TAKE NOTICE** that a hearing (the "CEL Token Hearing") regarding the (i) the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431]; and (ii) the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues with Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] was held on September 28, 2023. The CEL Token Hearing was held in a hybrid fashion both in person and via Zoom for Government before the Honorable Martin Glenn, Chief United States

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408.

**PLEASE TAKE FURTHER NOTICE** that the hearing (the "Confirmation Hearing") regarding confirmation of the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as modified, amended, or supplemented from time to time, the "Plan") commenced on October 2, 2023 at 2:00 p.m., prevailing Eastern Time, continued on October 3, 2023, October 4, 2023, and October 16, 2023, October 17, 2023, and will continue on October 30, 2023 at 2:00 p.m., prevailing Eastern Time. Other than opening arguments, which were held in a hybrid fashion both in person and via Zoom for Government, the Confirmation Hearing was held in person before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. Closing arguments will be held in a hybrid fashion both in person and via Zoom for Government.

**PLEASE TAKE FURTHER NOTICE** that the Court requested that the Debtors make available for the public the full transcripts for the CEL Token Hearing and the Confirmation Hearing.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibits A**, **B**, **C**, **D**, **E**, and **F** are true and correct copies of the transcripts for the CEL Token Hearing and each day of the Confirmation Hearing.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, Disclosure Statement, and all pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/Celsius. You may also obtain copies of the Plan,

Disclosure Statement, and other documents filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of Page Intentionally Left Blank]*

New York, New York
Dated:  October 23, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:           patrick.nash@kirkland.com
                 ross.kwasteniet@kirkland.com
                 chris.koenig@kirkland.com
                 dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

4

**<u>Exhibit A</u>**

**September 28, 2023 Transcript (CEL Token Hearing)**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   September 28, 2023

17                   10:01 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   JONATHAN

Page 2

1    HEARING re Hybrid Hearing on CEL Token Legal Issues (To The

2    Extent a CEL Token Resolution Event Has Not Occurred).

3    (Doc. ## 3356, 3360, 3412, 3431, 3432, 3433 to 3436, 3476,

4    3528).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

1    A P P E A R A N C E S :

2

3    WHITE & CASE LLP

4         Attorneys for Official Committee of Unsecured Creditors

5         555 South Flower Street, Suite 2700

6         Los Angeles, CA 90071

7

8    BY:  AARON COLODNY

9

10   KIRKLAND ELLIPS LLP

11        Attorneys for the Debtor

12        300 North LaSalle

13        Chicago, IL 60654

14

15   BY:  CHRISTOPHER KOENIG

16

17   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

18        Attorneys for the US SEC

19        100 F Street NE

20        Washington, D.C. 20549

21

22   BY:  THERESE SCHEUER

23

24   OTIS DAVIS, Pro se

25

Page 4

1    ARTUR ABREU, Pro se

2

3    ERIK MENDELSON, Pro se

4

5    JASON IOVINE, Pro se

6

7    ALSO PRESENT:

8    JASMINE ARMAND

9    DEAN LINDSAY CHAPMAN

10   CHRISTOPHER J. COCO

11   THOMAS DIFIORE

12   SCOTT DUFFY

13   SEAN ANDREW FEENER

14   MIRA HAQQANI

15   SAMUEL P. HERSHEY

16   JEFFREY S. KRAMER

17   NICHOLAS R. LOMBARDI

18   KEITH NOYES

19   CAITLIN O'CONNELL

20   GREGORY F. PESCE

21   MARK ROBINSON

22   ELIZABETH D. SCOTT

23   MICHAEL STANLEY

24   DAVID TURETSKY

25   CAROLINE WARREN

1    KEITH WOFFORD

2    ANDREW YOON

3    TANZILA ZOMO

4    UDAY GORREPATI

5    TAYLOR HARRISON

6    JEREMY HILL

7    MIKE LEGGE

8    VINCE SULLIVAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Everybody please be

3      seated.  All right.  We're here in Celsius 22-10964.

4            Mr. Koenig, good morning.

5            MR. KOENIG:  good morning, Your Honor.  For the

6      record, Chris Koenig, Kirkland & Ellis, for the Debtors.

7            Your Honor, you know the case number by heart.

8            Your Honor, this status conference was initially

9      scheduled as an argument on the legal issues for CEL token

10     in the event that we did not have a settlement with the CEL

11     token holders.  As a reminder, our Chapter 11 plan includes

12     a settlement for CEL token that values the token at 25 cents

13     per CEL token.

14            At the disclosure statement hearing, you asked me

15     who is the counterparty to the settlement.  And I said,

16     well, we're going to wait and see.  We're going to see what

17     creditors say about the plan.  And as I'm sure Your Honor

18     saw, we filed the voting report on Monday.  The results were

19     overwhelming.  And if I can be candid, exceeded our wildest

20     hopes and expectations.

21            Just a couple of numbers for the record.  All

22     accountholder classes entitled to vote voted to accept the

23     plan by a very large margin.  In the Earn class, which is

24     our largest class of creditors, over $2.4 billion in dollar

25     amount voted on the plan out of a total of about $4.2

1  billion total of Earn creditors.  And of those voting, more

2  than 99 percent by both number and dollar amount voted to

3  accept the plan.  The same holds true for the other

4  accountholder Classes.  In all of those, over 98 percent in

5  number and 96 percent in dollar amount except for withhold,

6  where one large no vote in a small class brought the dollar

7  amount down a bit.

8          And that level of support continued for CEL token

9  holders, too.  We separately examined ballots of CEL token

10  holders and ran the calculations as if they were a separate

11  class.  With almost 37,000 CEL token holders submitting

12  ballots, 482 voted no.  that's an acceptance rate of 98.71

13  percent by number.  We believe that the process worked as

14  intended.  The CEL token settlement was an open offer to CEL

15  token holders, and the CEL token holders accepted that

16  offer.

17          As we disclosed at the prior discovery conference

18  on this topic, we signed two formal settlement agreements

19  with Mr. (indiscernible) and Mr. Wiles, who are two of the

20  very large CEL token holders who have been litigating this

21  issue throughout these cases.

22          The lack of objections to the plan bear this out,

23  too.  There was one formal objection that was filed by Mr.

24  Otis Davis.  There was one letter that was submitted.  This

25  is in stark contrast to the dozens of letters that Your

Page 8

1    Honor received on this topic in the past.

2              So our position is that the CEL token settlement

3    has been overwhelmingly accepted as part of the plan and the

4    CEL token settlement should be approved as part of

5    confirmation next week.  That's how Chapter 11 plans work.

6    Creditors have the right to vote on their treatment, and

7    dissenting creditors get dragged along.  Unanimity is not

8    required.

9              THE COURT:  Let me ask a couple of questions.

10             MR. KOENIG:  Sure.

11             THE COURT:  So not everybody has signed on the

12   settlement.

13             MR. KOENIG:  Sure.

14             THE COURT:  Can 9019 settlement bind non-settling

15   -- people who have not agreed to settle?

16             MR. KOENIG:  I think if we file this as a separate

17   9019 motion, that might be challenging.  But this is a

18   Chapter 11 --

19             THE COURT:  Let me just go through a series of

20   questions.

21             MR. KOENIG:  I understand.

22             THE COURT:  But you agree that in terms of the

23   9019, only those parties who have agreed are bound by this

24   settlement per say.

25             MR. KOENIG:  Pursuant to Bankruptcy Rule 9019, I

Page 9

1    agree.

2              THE COURT:  Okay.  The plan proposes a treatment

3    of 25 cents for CEL token holders, correct?

4              MR. KOENIG:  Yes, Your Honor.

5              THE COURT:  All right.  There is no single class

6    of CEL token holders.  They are spread among a number of

7    classes, of accepting classes.

8              MR. KOENIG:  Yes.

9              THE COURT:  So it is the issue of -- become

10   whether to the extent they object, for dissenting members of

11   an accepting class, the question then becomes the best

12   interest test; are they receiving at least as much as they

13   would in a Chapter 7 liquidation.  Is that about the

14   analysis?

15             MR. KOENIG:  I think that's right, Your Honor.

16             THE COURT:  Because I sort of went back and forth

17   in my own mind.  And I haven't read the entire trial brief.

18   I did look at parts of it last night.  And I specifically

19   looked at the CEL token portions of it.  And it doesn't

20   address this analysis.

21             So if I had a case where it didn't specifically

22   deal with the treatment of CEL tokens, the issue would then

23   become it seems to me in the claim objection process.  You

24   know, they filed claims and there's a contested matter

25   whether CEL tokens are worth zero, 25 cents, eight dollars,

Page 10

```
 1    you pick a number.  And that would be resolved as part of a

 2    claims resolution process.  But just to kind of work this

 3    through in my mind, that doesn't seem to apply here because

 4    the plan proposes the treatment of 25 cents.  And therefore,

 5    we fall into this best interest analysis.  If they object --

 6    okay, who has the burden in the best interest analysis?

 7               MR. KOENIG:  The debtors.  I believe the debtor

 8    has the burden by a preponderance of the evidence.

 9               THE COURT:  So I read -- again, not every page,

10    but I looked at the expert the committee submitted, the

11    report on CEL tokens.  And maybe I missed something, but

12    what I derived from that is the expert doesn't believe it's

13    81 cents, but doesn't say what it is.

14               He's putting on evidence -- and I haven't made my

15    mind up -- this is the analysis that the Court has to make.

16    Okay.  So assume for those dissenting class members who

17    argue that the CEL token is worth more than 25 cents, what

18    does the Court have to conclude?  That the value of the CEL

19    token does not exceed 25 cents.  Is that a sufficient

20    finding?  I'm not saying that's -- okay.  I'm just thinking

21    out loud.  Okay?  Because -- so with respect to the CEL

22    token, there are many issues.  Is it a security?  If it's a

23    security, it's subordinated under 510.  If it's

24    subordinated, value zero.  If it's not a security, what's

25    the value of it?
```

1          Assuming that the objectors carry forward with

2    objections, they're absolutely entitled to.

3          MR. KOENIG:  Of course.

4          THE COURT:  I'm just trying to understand what is

5    it I'm going to hear.  Because the only written expert

6    report that I've seen so far says it's not 81 cents.  Have I

7    missed something?

8          MR. KOENIG:  Your Honor, it's the committee's

9    experts -- I'll let Mr. Colodny speak, but I don't believe

10   that the expert report says it's 20 cents or 25 cents or

11   anything other than it's not 81.

12         THE COURT:  It says it's not 81 -- I looked.  That

13   was one of the things I was interested in seeing, what does

14   the expert say.

15         MR. KOENIG:  Right.

16         THE COURT:  And he said it's not 81 cents.

17         MR. KOENIG:  Right.  I think, Your Honor, the

18   standard would be for best interest whether the proper value

19   of CEL token under a Chapter 7 liquidation would be higher

20   than the value that is being given to CEL token holders

21   under our plan.

22         THE COURT:  I said the reverse.  Basically is it -

23   - does the court find based on the evidence presented that

24   the value of the CEL token is equal to or less than 25

25   cents.  Because that's the treatment that's proposed in the

1    plan.

2              MR. KOENIG:  Right.  And I think it could even be,

3    depending on the math -- and lawyer math is admittedly

4    challenging.  But as long as the plan will provide higher

5    recovery for all creditors than under Chapter 7, that's our

6    burden, that's what we'll show generally.  But if there are

7    more proceeds to go out to creditors under a Chapter 11

8    plan, the math could work out such that CEL token could be

9    worth 30 cents and you still pass best interest because the

10   margin between the Chapter 11 plan distributions and the

11   Chapter 7 distributions are so high that that margin

12   actually -- there's a little bit of margin for error.

13             THE COURT:  So I searched the brief and I didn't

14   see anything in the brief that deals with the issue.  I

15   realize that we're probably dealing with a -- I don't know

16   how many people we're dealing with who didn't join the

17   settlement.

18             MR. KOENIG:  Right.  And we have the burden to

19   demonstrate at confirmation.

20             THE COURT:  Is somebody going to put on something

21   in the -- so, look, on the issue is it a security, one of

22   the conclusions, I've read both Ripple and Terraform.  You

23   know, Judge Torres' Decision in Ripple, Judge Rakoff's

24   decision in Terraform.  It seems to me different cases,

25   different CEL property -- not a capital C-E-L.  Crypto.

1    Different crypto.  Different conclusions as to what's a

2    security and what's not.

3           So if based on the evidence presented the Court

4    concludes that the value of the CEL token is less than 25

5    cents, I don't think I have to resolve the issue of whether

6    it's a security or not.  The question is do I need to

7    resolve the issue.  I'm not (indiscernible) to decide

8    issues, but if I decide the issue, it's an appellate issue.

9    But it seems to me that I don't have -- if the evidence is

10   such that the Court concludes the value is less than 25

11   cents, I don't have to resolve the issue of whether it's a

12   security.  Those are my -- I'm ruminating about this.  I

13   haven't resolved how to deal with it, but that's -- I wanted

14   to get reactions from anybody on Zoom or in the courtroom

15   today.

16           MR. KOENIG:  Right.  Thank you, Your Honor.  And

17   we appreciate it.  I mean, obviously a trial about whether

18   or not CEL is a security could be a lengthy trial.  And I

19   know Ms. Scheuer from the SEC is here, and there are a lot

20   of folks that might be interested in what that decision is.

21   And we're trying to get out of bankruptcy first and

22   foremost.

23           THE COURT:  I understand.

24           MR. KOENIG:  And so if there's a way for us to

25   resolve the matter in a way that doesn't lead to a

Page 14

1   contested, expensive, drawn-out appellate process, we would

2   like to do that.  So we appreciate the guidance.  We'll

3   certainly --

4           THE COURT:  I'm asking questions.  I'm looking --

5   I didn't see a roadmap presented in what briefs I've looked

6   at so far.

7           MR. KOENIG:  Well, that is helpful feedback for us

8   to consider in advance of next week, Your Honor.

9           THE COURT:  So Mr. Colodny is -- if your witness

10  testifies and one of the pro se creditors or a represented

11  creditor or the court asks the question do you have an

12  opinion what the value of the CEL token was at the petition

13  date, is the witness going to answer that?

14          MR. COLODNY:  Your Honor, Aaron Colodny from White

15  & Case on behalf of the Official Committee of Unsecured

16  Creditors.

17          You are correct, we did not put a value and our

18  expert did not opine on the value of CEL token.  What he

19  opined on was that the value is less than 81 cents, and much

20  less than 81 cents.  The issue that we have, which I think

21  is uncontroverted, is that prior to the petition date,

22  significant manipulation of the CEL token price --

23          THE COURT:  Okay.  Let's assume I find -- I

24  understand the arguments about manipulation, indictment of

25  Mashinsky, the whole -- I think I understand that.

1          MR. COLODNY:  Correct.

2          THE COURT:  But then the question still may come

3    down to -- let's assume -- again, assumption, not making any

4    finding.  Let's assume that I find that 81 cents is not the

5    value of the CEL token, is not satisfactory evidence of the

6    value of the CEL token at the petition date.  Well, what is

7    it?

8          MR. COLODNY:  So I think you can get to your best

9    interest question and in a number of different ways.  I

10   think Mr. Koenig pointed out one.  You can assume that the

11   price is 81 cents.  And if the liquidation value of the

12   debtors would provide CEL token claims with more value than

13   if the token was 81 cents, then the best interest test is

14   satisfied.

15         In addition, if Your Honor found that the value of

16   the CEL token was less than 25 cents, it would be satisfied

17   (indiscernible) because you could not give -- we're not

18   giving a hundred percent back to everybody.

19         THE COURT:  I just want to say I didn't -- maybe

20   because I hadn't thought about it before, I didn't

21   completely follow how the best interest test is satisfied if

22   the value was 81 cents at the petition date.  I know you

23   went through it very quickly, and I'm not sure I was

24   completely tuned into it.

25         MR. COLODNY:  So the way that I as thinking about

Page 16

1    it, Your Honor, is if you assume that the value of the CEL

2    token is 81 cents and assuming a claim at 81 cents under a

3    Chapter 7 liquidation, a creditor would get back say five

4    dollars.  But under the 25 cent settlement in our plan, they

5    would get back seven.  Then the best interest plan test

6    would be satisfied.

7             THE COURT:  So if your expert is asked the

8    question during the confirmation hearing, do you have an

9    opinion as to the value of the CEL token at the petition

10   date.  Is the Court going to get an answer to that question?

11            MR. COLODNY:  In our expert's report, he opines

12   that the value is less than 81 cents.  He does not provide a

13   specific value to the CEL token.

14            THE COURT:  I didn't read every page of it, but I

15   did look for does he have an opinion as to the value of it.

16   And the only opinion I saw was it's less than 81 cents.

17            MR. COLODNY:  That's correct.

18            THE COURT:  But my question to you is if he's

19   asked on cross-examination do you have an opinion as to the

20   value of the CEL token on the petition date, is he going to

21   have an answer?

22            MR. COLODNY:  I'm not sure that I should be

23   testifying for my witness, Your Honor.

24            THE COURT:  I'm not -- he's your witness.  I just

25   -- I'm not asking what his opinion is.  Is he going to have

Page 17

1    an opinion as to the value of the CEL token on the petition

2    date?

3                    MR. COLODNY:  Right.  And the problem I'm having,

4    Your Honor, is I am not my witness.  And so to --

5                    THE COURT:  Okay.  Better find out the answer.

6                    MR. COLODNY:  I understand, Your Honor.  What I'll

7    say, Your Honor, is in his expert report, he does not opine

8    as to the value of the CEL token.

9                    THE COURT:  I know that.  That much I got.  I

10   looked carefully.  Because I was running through this

11   analysis in my head where people who didn't join the

12   settlement aren't bound.  The plan treatment is 25 cents.

13   They are dissenting members of a bunch of different classes.

14   The best interest test has to be satisfied.  And that raised

15   the question maybe you have multiple loops to get there.

16   But the question to me naturally followed if they're getting

17   25 cents, what would they get in a Chapter 7.

18                   MR. COLODNY:  Understood, Your Honor.

19                   THE COURT:  That could vary by -- is it a

20   security?  They get zero because it's subordinated.  It's

21   not a security, what do they get.

22                   MR. COLODNY:  Right, Your Honor.  I think that's

23   one of the points that I wanted to raise today, is how I

24   view it, there are four different arguments that you could

25   get to zero.  And CEL token holders would have to win all of

Page 18

1     them to get to something more.

2             First, what is CEL token?  Is it a debt

3     instrument?  Is it equity?  If it's equity, then the answer

4     would be zero.

5             Second, if it's a security and subordinated under

6     510(b), it would also be zero or be subordinated to the

7     value of unsecured claims --

8             THE COURT:  My guess -- and I'm not anxious to

9     decide whether it's a security or not one way or the other -

10    -

11            MR. COLODNY:  Reading the room, I understand that.

12            THE COURT:  -- one way or the other.

13            MR. COLODNY:  Correct.  Third, does it have any

14    value since on the petition date Celsius ceased to exist.

15    And CEL token, when I think about CEL token, there is no

16    payment obligation.  There is no inherent right of anyone

17    that holds CEL token to any value from Celsius.

18            THE COURT:  For native tokens of an insolvent --

19    whatever, exchange, lending platform, whatever -- but for a

20    native token with company that's not going to have ongoing

21    business, one could say it can't have any value.

22            MR. COLODNY:  Correct.  Because --

23            THE COURT:  Whether it's a security or a

24    commodity, it's an it.  But if Celsius' business doesn't

25    exist anymore, how can it have any value other than people

Page 19

1    who want to manipulate the price.

2         MR. COLODNY:  Correct.  And then the third is the

3    market price -- or the fourth, excuse me, is the market

4    price, Your Honor.  And whether that market price was an

5    accurate indication of that.

6         THE COURT:  Let's assume I find it's not an

7    accurate -- what is it -- is it 80 cents instead of 81?  Is

8    it 75?  Let's take it all the way down.

9         MR. COLODNY:  Right.  And I think --

10        THE COURT:  Am I going to hear evidence about

11   that?

12        MR. COLODNY:  Your Honor hit the nail on the head

13   where you said if it's less than 25, then there's no issue.

14   And here, one of the things that we have is we have an

15   overwhelming amount of affected parties on both sides saying

16   we accept 25.  We have 96 percent --

17        THE COURT:  They do.  But people who didn't join

18   the settlement don't.

19        MR. COLODNY:  Correct.  But if I were to ask the

20   market is 25 cents a correct price, you now have 98 percent

21   of CEL token holder saying --

22        THE COURT:  No, you have 98 percent saying enough

23   is enough and we'll take the 25 cents.

24        MR. COLODNY:  You have 98 percent voting in favor

25   of a plan that treats CEL token as 25 cents.

1        THE COURT:  Okay.  But the 98 percent can't bind

2    objectors -- you know, dissenting members of a class.

3        MR. COLODNY:  Understood, Your Honor.  You also

4    have 96 percent of all other creditors who are diluted by

5    that saying we accept this as well --

6        THE COURT:  And they still can't find -- you still

7    -- if I'm wrong, tell me.  Because none of the -- I haven't

8    seen any briefs that raise this issue.  But in my mind, it

9    then became an issue of dissenting creditors have to receive

10   at least as much as they would in a Chapter 7 liquidation,

11   the best interest test.  Okay.  So -- and if -- I take it

12   you're acknowledging that it's the Debtor's burden, the

13   committee pushing this burden to establish that the best

14   interest test is satisfied.

15       MR. COLODNY:  Correct.

16       THE COURT:  Okay.  Are you going to tell me how

17   you're going to do that?

18       MR. COLODNY:  Your Honor --

19       THE COURT:  Between now and Monday?

20       MR. COLODNY:  I guess my point, Your Honor --

21       THE COURT:  Just that I entered an order this

22   morning.  We're starting the evidence on Tuesday morning.

23   We're going to deal with -- we'll deal with opening

24   statements and I want to raise another issue that I want

25   addressed that I alluded to in the order that was entered a

Page 21

1  little while ago.

2         MR. COLODNY:  I guess my point, Your Honor, is

3  that the value of CEL, it's not as if this is a manipulation

4  case where we can look back and say a month ago, two months

5  ago there was no manipulation and we're going to look at

6  that price.  We've got a token that was heavily manipulated

7  throughout its history.  And that started at the very

8  beginning.

9         THE COURT:  At the (indiscernible) it was, what,

10 20 cents?

11        MR. COLODNY:  (indiscernible) it was 28 cents I

12 believe under Mr. (indiscernible) calculation.

13        THE COURT:  Okay.  I don't (indiscernible).

14        MR. COLODNY:  But even then, Your Honor --

15        THE COURT:  But I want to make sure that you

16 understood that the -- I'm not sure -- I'll listen to

17 anybody who wants to talk during the hearing about, well,

18 don't approve the settlement, Judge.  But let's assume I

19 approve the settlement.  What amount, how am I going to deal

20 with the dissenting members of -- and I appreciate the fact

21 that you -- while there was no separate class, you did --

22 the voting results do break out, look at the CEL

23 (indiscernible) overwhelmingly, but not a hundred percent.

24        MR. COLODNY:  That's right, Your Honor.

25        THE COURT:  You know, I mean, I could certainly

1    envision a witness, expect witness testifying assuming I've

2    been asked to assume that it's a security and I've been

3    advised about 510(a), assuming those issues, the value is

4    zero.  Okay.  I've been asked to assume that it's not a

5    security.  And in that scenario -- if one of the other

6    creditors hasn't asked about it, I'm going to ask about it.

7    Do you have an opinion as to the value -- assuming it wasn't

8    the security, do you have an opinion as to the value -- I

9    guess it wouldn't really matter if it was a security or not

10    -- do you have an opinion as to the value of the CEL token

11    on the petition date?  You know, whatever the value is.  If

12    it was a security, the law arguably demands a different

13    result.

14            Let me stop there.  I wanted to make sure I got

15    out -- and look, if you all disagree with this sort of

16    mental gymnastics I've been going through trying to figure

17    out how am I supposed to deal with dissenting members of the

18    class.  And I do -- and look, and it may be that somebody is

19    going to try and persuade me this is not an issue of the

20    best interest test, this is an issue of the claims allowance

21    process.  It struck me not if the plan proposes the

22    following treatment and the plan is adopted, that pushes you

23    back to the best interest test.  I don't know the difference

24    -- okay.  Anything else you want to say?

25            MR. COLODNY:  No, Your Honor.

Page 23

1           THE COURT:  Okay.  Does anybody else want to be

2      heard?

3           UNIDENTIFIED SPEAKER:  (indiscernible).

4           THE COURT:  Hold on.  We have somebody else in the

5      courtroom.  And then I will hear anybody on Zoom.  But let

6      me finish with the people in the courtroom.  Okay?  Go

7      ahead.

8           MS. SCHEUER:  Thank you, Your Honor.  Good

9      morning.  For the record, Therese Scheuer for the U.S.

10     Securities and Exchange Commission.  With me on the line

11     through Zoom is my colleague, Matthew Uptegrove, also from

12     the U.S. Securities and Exchange Commission.

13           As Your Honor may know, the SEC filed an action in

14     the U.S. District Court for the Southern District of New

15     York against both Celsius and Mr. Mashinsky alleging, among

16     other things, that the CEL token was offered and sold as a

17     security.  Celsius has consented to a final judgment against

18     it I the district court, but that action has been stayed

19     pending the outcome of a criminal case against Mr.

20     Mashinsky.

21           Given what's been discussed today, I'm not sure

22     that the Court needs to rule on whether CEL is or is not a

23     security.  But to the extent that Your Honor is inclined to

24     do so --

25           THE COURT:  I'm not inclined to do so.  Unless I

1    have to.

2           MS. SCHEUER:  -- the SEC would request that such a

3    ruling be limited to the facts before the Court.

4           THE COURT:  It would be.

5           MS. SCHEUER:  Thank you.  And not without

6    preclusive effect outside these cases.

7           THE COURT:  I've already said I'm not -- as I've

8    gone through these mental gymnastics, it seemed to me I

9    didn't have to reach a result -- under some scenarios, I

10   don't have to reach a result of deciding whether it is or is

11   not a security.  Okay.  And at least my reading of Judge

12   Rakoff's decision and Judge Torres' decision, they differ.

13   Not that either one is necessarily the absolute answer as

14   applied to the CEL token, but nevertheless.  I have great

15   respect for both Judge Rakoff and Judge Torres.

16          Let me ask you.  My understanding -- and may be

17   wrong, correct me -- is that the Celsius, its agreement with

18   the SEC -- and this is one of the things I focused on -- and

19   you can tell me if I'm wrong -- Celsius did not agree as

20   part of its settlement with the SEC that the CEL token was a

21   security.  Am I right or wrong about that?

22          MS. SCHEUER:  Well, Your Honor, the consent is on

23   a no-deny basis.  I think that the Debtors have given their

24   view of what the language in that consent means.  At this

25   time, not taking a position on whether that is...

1          THE COURT:  Thank you.  Anything else you want to

2    say?

3          MS. SCHEUER:  No thank you, Your Honor.

4          THE COURT:  Thank you very much.  Anybody else in

5    the courtroom want to be heard?

6          All right.  I'll listen to anybody who wants to be

7    heard on Zoom.

8          MR. DAVIS:  Can I go first, Your Honor?  This is

9    Otis Davis.

10         THE COURT:  (indiscernible), Mr. Davis.

11         MR. DAVIS:  Yes.  Sorry about my appearance

12   earlier.  I did try to login, but I got kicked off.  But for

13   the record, this is Otis Davis.

14         THE COURT:  Yes.

15         MR. DAVIS:  Your Honor, the burden of proof is on

16   the debtors to show that CEL token is below 81 cents after

17   the petition date.  Aaron Colodny cannot answer the question

18   of what the CEL token price is on the petition date because

19   his expert (indiscernible) doesn't know the answer.  The

20   answer is 81 cents --

21         THE COURT:  No, it --

22         MR. DAVIS:  I am sure Aaron Colodny --

23         THE COURT:  Mr. Davis, the expert report hasn't

24   been admitted in evidence yet, and he's not testified.  But

25   my reading of the report is that the value of the CEL token

Page 26

1    on the petition date is less than 81 cents.  He didn't say

2    what it was, he just said it was less than 81 cents.

3              MR. DAVIS:  It's interesting that he didn't say

4    what it was.  He cannot say what it was because he doesn't

5    have any evidence to prove what it was.

6              Anyway, Judge, I did file a motion at Docket

7    Number 3532.  And in that motion, you will see the evidence

8    that I provided that shows why the CEL token should be at 81

9    cents.  Specifically 15 million shorts being closed that

10   pushed the price back up to neutral.  All the evidence --

11             THE COURT:  Mr. Davis, Mr. Davis, I don't consider

12   the activity of shorts as establishing what the price for

13   bankruptcy purposes of the CEL token was on the petition

14   date.  So if that's the evidence you're relying on, good

15   luck.  Okay.  You'll be free to cross-examine any witnesses

16   who testify about the value of the CEL token, and I ought to

17   hear evidence I suppose about the activity relating to the

18   short.  But don't expect that the Court is going to rule

19   based on the short activity that the value was 81 cents.

20   The price on the petition date, if it was manipulated, does

21   not reflect the value of the CEL token on the petition date.

22             If you have a witness who is going to testify to

23   give an opinion on value, I'll certify listen to that.  It

24   will be subject to any objections or anything.  But if you

25   have a witness, I gave a deadline for anyone objecting to

Page 27

1    confirmation to submit written testimony supporting that

2    position.  And the reason I staggered whether -- you know,

3    all of the objections are important.  There are fewer

4    objections than I thought we would find ourselves in this

5    position now.  I thought it was important for all of those

6    who are objecting to be able to see the written direct

7    testimony of anyone testifying in support of confirmation.

8    And of course we'll have a chance during the cross-

9    examination to participate in the cross-examination of them.

10   And I staggered it so that you wouldn't actually have to

11   submit the written testimony in support until you knew what

12   it is that you were responding to.  Okay.  That's why the

13   separate dates for submitting evidence in support of,

14   evidence in opposition.

15          But if you have a witness who is going to testify

16   that the value of the CEL token based on the big short

17   reflects its actual value, you could put on that evidence.

18   I'll listen to it and I'll keep an open mind about it.

19          Anything else you want to add at this point?  So

20   the issue is not --

21          MR. DAVIS:  No, that's it.

22          THE COURT:  -- getting decided today, Mr. Davis.

23          MR. DAVIS:  Correct, Your Honor.  It's not getting

24   decided today.

25          THE COURT:  Okay.  Anything else you want to add?

Page 28

```
 1     I'm happy to hear you.

 2             MR. DAVIS:  I think I'm done.

 3             THE COURT:  Okay.  Does anybody else on Zoom wish

 4     to be heard today?

 5             MR. ABREU:  Judge, Your Honor?  Artur Abreu.

 6             THE COURT:  Yes, go ahead.  Just identify yourself

 7     again.

 8             MR. ABREU:  Yes.  Pro se creditor, Artur Abreu.

 9     You can call me Arthur.  I just want to...

10             THE COURT:  Go ahead.

11             MR. ABREU:  I just want to add some points that

12     the Judge brought.

13             So I purchased CEL from (indiscernible) at five

14     dollars.  You are referring to the value (indiscernible) if

15     CEL is given to those people that had CEL, they can at least

16     start (indiscernible) at their point in time, which will be

17     I suppose much more beneficial than just getting I think 17

18     cents with the recovery.  The other point that you mentioned

19     is that anyone that had no voice in arguing against this

20     plan and why Celsius did business is that it was -- it makes

21     sense to have a small percentage in CEL of their holdings,

22     but never a full position.  So everyone is forced to vote

23     for the plan because in most cases, their holdings on other

24     creditors are superior to the total value of CEL.  So the

25     plan puts us against the world and effectually in my view
```

Page 29

1    not equitable because some people did not have CEL, others

2    had.  But all the proceedings of CEL was used in a matter

3    that had no determination or no separation of investments

4    and earnings.  And you could say that some of the

5    proceedings that Celsius received from the value of CEL went

6    to pay -- so you are creating an issue that is not equitable

7    and that should be seen as well.

8            The other matter that you refer -- that there is

9    no value in CEL without Celsius.  It's not entirely true

10   because the ledger itself, the coins are just a database

11   value.  And you could use the total value to create another

12   project.  For example, all the current CEL holders.  So in

13   many crypto projects you have tokens that are equal to CEL.

14   Sometimes even the company or the initial promoter or

15   creator of this coin went to other things and part of the

16   community uses the digital, decentralized entry to then

17   distribute maybe another token at no cost for the user but

18   tries to add some value.  So this is just to highlight that

19   it's not entirely true.  There is no value without Celsius.

20   Celsius actually after the filing disappears.  So I could

21   argue that for me, CEL currently -- if Celsius just

22   (indiscernible) the entire supply does not pass any sort of

23   security concerns.

24           My issue here is not really the price.  Okay?  The

25   issue is that Celsius (indiscernible) blocked the

Page 30

1    withdrawals of CEL at the filing.  So you could not

2    liquidate.  And what was perceived by creditors varies

3    greatly in time.

4            So first, people believed that some of the

5    statements of the liquidity were correct.  And I had some

6    creditors approach me telling that they were still buying

7    CEL due to the misrepresentations of the company.

8    (indiscernible).  So people were actually still believing it

9    was (indiscernible) and they bought more CEL.  And now they

10   are -- they bought more CEL in the app so they are now stuck

11   with an investment being made on false pretexts.

12           You also have -- the UCC I think (indiscernible)

13   at some point say highlight that Celsius still had value I

14   think around September or November, the CEL token.  That all

15   I think had impact on how creditors could (indiscernible)

16   because they think, oh, they are trying to make a plan that

17   could have some value to CEL.  So all of those things affect

18   this.

19           But I think it would have been simple just to know

20   how much Celsius earned from selling CEL.  So how much did

21   actually creditors spend buying CEL at inflated prices.

22   Because I should (indiscernible) the 81 cents.  Okay?  It's

23   (indiscernible) the long and the short side of different

24   points in time.  So I think it would have been simple just

25   to (indiscernible) how much CEL -- Celsius received from the

Page 31

1   proceedings of selling CEL.  See that value, what is the

2   average cost.  And if not given a recovery, (indiscernible)

3   at least have a discrimination of the claims.  Because most

4   of the claims that (indiscernible) are following seems to

5   portray to CEL itself.  Yet they are giving a very well

6   recovery and are not being specific on, okay, so we are

7   going to receive a (indiscernible) for following the CEL

8   market manipulation from insiders and company itself, but we

9   are not giving that recovery to the people that got affected

10  the most by buying inflated prices of CEL from the company.

11  That's my point.  If anyone wants to argue something -- I

12  read the (indiscernible) filing.  It's -- there is a lot of

13  information that is taken out of context that I would like

14  to at least (indiscernible).  But that's my other point.

15          Go ahead, Judge.  Sorry for the delay.

16          THE COURT:  All right.  Thank you very much.  Mr.

17  Mendelson?

18          MR. MENDELSON:  Thank you, Judge.  Good to see you

19  again.  Erik Mendelson, pro se creditor.

20          The foundation, the building blocks as to why we

21  are in this mess is because of the CEL token.  I'm a little

22  bit concerned why we've been talking so much about price for

23  the last 41 minutes and not talking about why CEL is a

24  security.  So I'll give my opinion.

25          The SEC determines a security based on the Howey

Page 32

1    Test, which qualifies an investment contact subjecting asset

2    as under the securities law.  When investment contracts

3    exist, there is investment money in a common enterprise with

4    a reasonable expectation of profits.  The four elements of

5    the Howey Test -- and I know I'm probably talking to an echo

6    chamber because all of you understand this -- is, A, an

7    investment of money.  Clearly, every person that bought CEL

8    token invested their money.  I don't think that can be

9    disputed.

10           Two, in a common enterprise, that common

11   enterprise is the CEL token, AKA Celsius Network.

12           Three, there was an expectation of profit.  There

13   is not one person that bought CEL token with the expectation

14   of a donation or with the expectation of losing money.

15           And four, (indiscernible) the efforts of others

16   clearly as the Elementus opinion stated, Alex Mashinsky and

17   other members of Celsius executive team manipulated the

18   price of CEL token even before the sales squeeze.

19           All four elements of the Howey Test are met with

20   the CEL token.  And I therefore respectfully request that

21   you rule the CEL token as a security.  And I hope that your

22   ruling of CEL as a security does not affect the other

23   creditors that have already opted into the plan.  That's the

24   only reason why I have been going on record about this.  I

25   don't want other class members that have accepted the plan

Page 33

1   to be affected by it.  Unfortunately, if your ruling does

2   affect them, then so be it.  But I hope that your ruling of

3   CEL as a security affects those members that feel like CEL

4   is worth more than 25 cents.  And I thank you for your

5   (indiscernible).

6           THE COURT:  Thank you, Mr. Mendelson.

7           Mr. Abreu?

8           MR. KOENIG:  He was the gentleman that just spoke,

9   Your Honor, right before Mr. Mendelson.  That was Mr. Abreu.

10          THE COURT:  Oh, okay.  All right.  Thank you.  All

11   right.  Anybody else who hasn't spoken yet wish to be heard?

12          MR. IOVINE:  Hi, Your Honor.  This is Jason

13   Iovine, pro se creditor.

14          THE COURT:  Yes, Mr. Iovine.

15          MR. IOVINE:  One of the issues that I had, one is

16   that I believe CEL token should have been a separate

17   question on the ballots.  It would have had I believe a

18   different outcome.  We are tired and we did want to just get

19   over this.  But a lot of us do believe that it is being

20   undervalued.  And I would point out that there would have

21   been a big difference in the vote if it was just CEL token

22   being questioned.

23          And the other thing is with -- I don't know if

24   this is the right hearing or not, but within the plan, there

25   is no recovery in the litigation for CEL token holders.

Page 34

1   They were removed from that.  And this is with

2   (indiscernible) pleading guilty to manipulation.  And we're

3   going to be left out of a possible fraud recovery when we

4   were hurt twice now with Celsius and CEL token.  I don't

5   think that's right.  And I hope Your Honor sees that and

6   changes that or instructs them to look into it.  Thank you.

7            THE COURT:  Thank you, Mr. Iovine.  Anybody else

8   wish to be heard?

9            MR. KIRSANOV:  Your Honor, Dimitry Kirsanov, pro

10  se creditor.

11           MR. KIRSANOV:  I have a comment about residents of

12  Hawaii where (indiscernible) CEL token holders cannot

13  receive their CEL or any cryptocurrency token in kind

14  according to the plan and thus are entitled to cash.  I have

15  attempted to reach out to Kirkland and the UCC regarding

16  this matter, but I have yet to receive a response.

17           My question is what valuation would they be

18  provided in the first 90 days of distribution.  This is not

19  explained in the plan.  I understand that after the 90 days,

20  it utilizes the deactivation date value.  In the custody

21  settlement, there is some language that indicates the Debtor

22  is not able to satisfy in-kind, they utilize the petition

23  date values.  So I'm wondering what Hawaii residents

24  actually receive.  Thank you.

25           THE COURT:  Thank you.  That's really not relevant

Page 35

1    to the issue today.  But, Mr. Koenig, are you able to

2    respond at all?

3             MR. KOENIG:  Good morning again.  Chris Koenig.

4             Mr. Kirsanov, so what Mr. Kirsanov is referring to

5    is that in certain jurisdictions, we can't make crypto

6    distributions under securities laws.  And we're obviously

7    not going to violate securities laws.

8             He has an interesting point that I frankly had not

9    considered.  And I apologize if we haven't connected.  If

10   you want to email me, my email is in the signature block for

11   all of the Celsius filings.  It's Chris.Koenig@kirkland.com.

12   And I'm happy to speak after this.

13            His point is that the plan provides that custody

14   distributions would be made for 90 days.  And then after the

15   90 days, there is a conversion table that will convert

16   crypto into fiat.  I think his question is what happens in

17   the first 90 days before that conversion table is set.

18            I want to think about it more, but we should -- we

19   can certainly discuss after the hearing.  It's a fair point.

20            THE COURT:  You ought to try and discuss and see

21   whether there's a way of...

22            MR. KOENIG:  I think there's a pretty simple

23   solution, Your Honor.

24            MR. KIRSANOV:  Thank you.  I appreciate it.

25            MR. KOENIG:  Thank you.

1          THE COURT:  Does anybody else wish to be heard.

2          MR. AMERSON:  Yes, Judge.  This is Jason Amerson,

3     pro se creditor.

4          THE COURT:  Yes.  Go ahead.

5          MR. AMERSON:  So a couple quick comments if you

6     will indulge, comments and observations on just long and

7     shorting in general.  I would like to point out that buying

8     and selling activity is not the only determination that

9     should be considered, Your Honor.  I mean, it

10    (indiscernible) White & Case is putting on that only the

11    longing or the buying activity should be considered

12    manipulation.  But price activity is a two-way street and it

13    always is.  So the notion that shorting activity shouldn't

14    be considered -- should not be considered as price

15    manipulation seems to be very complex.  And I would like to

16    point out that even today there is -- just this last week

17    there was a Barons article published that Tesla tops the

18    list for one of the most manipulated insurance stocks on the

19    market.  Now, I know we're talking about a security and not

20    a crypto.  But the same rules apply.  Every price of every

21    stock in crypto is determined (indiscernible).  You cannot

22    dismiss the shorting activity and only consider the longing

23    activity.  And besides, not -- in and of itself, there's

24    nothing wrong with that.  There's nothing illegal.  There's

25    nothing amoral.  It's simply people choosing to buy a

1   security or a crypto for whatever reason, which is their

2   right.

3            THE COURT:  Mr. Amerson, the issue potentially for

4   the Court to have to resolve is what was the value of the

5   CEL token on the petition date.  Let's say that it has to be

6   whatever the value was with all shorting activity at that

7   time, which is something I don't fully grasp.  I'll listen

8   to the testimony when it comes in.  So we're not going to

9   resolve that today.

10           MR. AMERSON:  I understand that.  I understand

11   that.  But all I'm trying to say is that --

12           THE COURT:  Thank you, Mr. Amerson.

13           MR. AMERSON:  -- the manipulation goes on with

14   every stock in every cryptocurrency, every single day.

15           THE COURT:  Okay.  Does anybody else wish to be

16   heard who has not been heard already?  All right.  The Court

17   has another hearing in 11 minutes.  So we'll adjourn this.

18           Deanna, are we using the same Zoom connection for

19   the others?

20           CLERK:  It's not hybrid, so it's going to be a

21   separate login.

22           THE COURT:  Fine.  Okay.

23           MR. KOENIG:  Your Honor, just very briefly.  You

24   mentioned you want to say something about -- you mentioned

25   your order for next week and there was something you wanted

Page 38

1    to say about it.

2              THE COURT:  Yes, I did.  Thank you.  And it's one

3    of the reasons I added to the order that got entered.  And I

4    inadvertently left out the U.S. Trustee who had requested an

5    opening statement.  So a corrective order has been filed.

6              MR. KOENIG:  Yes.

7              THE COURT:  But the end of the order -- this is

8    something I wanted to talk about, how to deal with exhibits.

9    Something was brought to my attention yesterday that

10   Kirkland was, because of the volume, was putting F...

11             MR. KOENIG:   FTP.

12             THE COURT:  FTP address, but was requiring that

13   only people who had filed a proof of claim could get access

14   to it.  Where do you get that from?

15             MR. KOENIG:  We understand the point, Your Honor.

16             THE COURT:  Let me make crystal clear, I don't

17   know how this is going to shake out with all the exhibits.

18   I do public trials.  If there's anything that somebody

19   wishes to seal or redact, they have to make a motion.  Okay.

20   I understand with a lot of exhibits, that can get

21   complicated.  I, as I think you know from the beginning of

22   this case when I refused to redact a lot of information, I

23   am pretty much a stickler for public trials, public filings.

24   Everybody has access to it.  So what I would ask you to do,

25   talk with Mr. Colodny and your colleagues.  Come up with

Page 39

1    another plan.  We're not going to have a system where only

2    creditors who signed a non-disclosure agreement and who have

3    had a proof of claim are going to get access to exhibits.

4    This is a public trial.

5              MR. KOENIG:  Understood.

6              THE COURT:  That's what I wanted to talk about.

7              MR. KOENIG:  Understood.  I have two very narrow

8    points there.  One is a number of our exhibits include

9    personally identifiable information that has been sealed.

10   We can redact those.

11             THE COURT:  Okay.  Redact.

12             MR. KOENIG:  And we have a very narrow -- we will

13   file a sealing motion of -- we have -- as part of the trial

14   -- I'm sorry.

15             THE COURT:  Personally identifiable information is

16   frankly a no-brainer as far as I am concerned.

17             MR. KOENIG:  Right.

18             THE COURT:  But redaction is the answer.

19             MR. KOENIG:  Right.  We will do that.  And the

20   other item is as part of our case-in-chief, we value the

21   illiquid assets.  The illiquid assets include litigations

22   against counterparties.  If the counterparty were to see

23   where we marked that litigation, that could harm the company

24   competitively.  So we will file a sealing motion for it

25   after --

1           THE COURT:  You have to file a sealing motion.

2           MR. KOENIG:  We will of course -- I just wanted to

3     bring it to your attention.

4           THE COURT:  That was what -- I reacted when -- one

5     of my law clerks brought it to my attention that you had

6     filed something or put something that people had to -- only

7     people with proofs of claim, and they have to agree to a

8     non-disclosure agreement.  That's not how we conduct trials.

9           MR. KOENIG:  Understand.  We will redact

10    personally-identifiable information.  We will redact,

11    consistent with the sealing motion that we will file.

12    Because I just don't want the counterparty to see what we

13    marked the litigation at, which we will explain in the

14    sealing motion, Your Honor.

15          THE COURT:  That's fine.  I think...

16          MR. KOENIG:  Okay.  So we understand Monday will

17    be opening statements.

18          THE COURT:  Yes.

19          MR. KOENIG:  Tuesday we'll start the evidence.

20          THE COURT:  Yes.  Tuesday.  And also -- the only

21    reason I did that is I think we'll comfortably get the

22    opening statements done on Monday.  Because of the judicial

23    conference policy on access to court hearings, remote access

24    to court hearings once the evidence starts, the public and

25    the press can only be in the courthouse to hear it.  I don't

Page 41

1     know how many are going to show up.  We'll have overflow

2     available to the extent we need it.  There is video into the

3     overflow rooms.  So that was one of the reasons I separated

4     out the evidence from opening statements.

5                Let me think.  I don't think there's anything else

6     that I want to raise specifically about the trial.

7                Just I will alert you all I should be back here by

8     -- I teach Monday morning and then I have another

9     commitment.  I should be back by exactly two or a few

10    minutes late.  We'll comfortably get everything done that is

11    going to get done on Monday.

12               MR. KOENIG:  Okay.  The only other question I had,

13    Your Honor, is if there is a government shutdown, I see that

14    that does not affect anything.  But I had to ask the

15    question.

16               THE COURT:  The court remains open.  We're

17    committed going -- look, the problem is not for this trial.

18    I have other things.  I can't -- you know, there's a lot of

19    days set aside for this.  I don't know whether we need all

20    of them.  We'll see.  November, I've got a 20-day trial.

21    I'm scheduling other matters for 5:00 in the afternoon

22    because I've got to keep up with a calendar.  That means

23    overtime for staff.

24               The federal courts have from filing fees money

25    available to keep us going for some time, whether judges and

Page 42

1    clerks and everybody gets paid or not, we'll keep going.  So

2    yes, we're going forward.

3              MR. KOENIG:  Okay.  That's what I thought.  I just

4    wanted to hear it from you.  Okay.  We will see you next

5    week.

6              THE COURT:  We'll see you next week.

7              MR. KOENIG:  Thank you, Your Honor.

8              THE COURT:  Okay.

9              (Whereupon these proceedings were concluded at

10   10:55 AM)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 43

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:   September 29, 2023

22-10964-mg    Doc 3881    Filed 10/23/23    Entered 10/23/23 21:49:20    Main Document
Pg 49 of 1289

**[& - affected]**

## &

**&**   3:3 6:6 14:15 36:10

## 1

**100**   3:19
**10004**   1:14
**10:01**   1:17
**10:55**   42:10
**11**   6:11 8:5,18 12:7,10 37:17
**11501**   43:23
**12151**   43:7
**15**   26:9
**17**   28:17

## 2

**2.4**   6:24
**20**   11:10 21:10 41:20
**2023**   1:16 43:25
**20549**   3:20
**22-10964**   1:3 6:3
**25**   6:12 9:3,25 10:4,17,19 11:10,24 13:4 13:10 15:16 16:4 17:12,17 19:13,16,20,23 19:25 33:4
**2700**   3:5
**28**   1:16 21:11
**29**   43:25

## 3

**30**   12:9
**300**   3:12 43:22
**330**   43:21
**3356**   2:3
**3360**   2:3
**3412**   2:3
**3431**   2:3
**3432**   2:3
**3433**   2:3
**3436**   2:3
**3476**   2:3
**3528**   2:4
**3532**   26:7
**37,000**   7:11

## 4

**4.2**   6:25
**41**   31:23
**482**   7:12

## 5

**510**   10:23 18:6 22:3
**555**   3:5
**5:00**   41:21

## 6

**60654**   3:13

## 7

**7**   9:13 11:19 12:5,11 16:3 17:17 20:10
**75**   19:8

## 8

**80**   19:7
**81**   10:13 11:6 11:11,12,16

14:19,20 15:4 15:11,13,22 16:2,2,12,16 19:7 25:16,20 26:1,2,8,19 30:22

## 9

**90**   34:18,19 35:14,15,17
**90071**   3:6
**9019**   8:14,17 8:23,25
**96**   7:5 19:16 20:4
**98**   7:4 19:20,22 19:24 20:1
**98.71**   7:12
**99**   7:2

## a

**aaron**   3:8 14:14 25:17,22
**able**   27:6 34:22 35:1
**abreu**   4:1 28:5 28:5,8,8,11 33:7,9
**absolute**   24:13
**absolutely**   11:2
**accept**   6:22 7:3 19:16 20:5
**acceptance**   7:12
**accepted**   7:15 8:3 32:25
**accepting**   9:7 9:11

**access**   38:13,24 39:3 40:23,23
**accountholder**   6:22 7:4
**accurate**   19:5 19:7 43:4
**acknowledgi...**   20:12
**action**   23:13,18
**activity**   26:12 26:17,19 36:8 36:11,12,13,22 36:23 37:6
**actual**   27:17
**actually**   12:12 27:10 29:20 30:8,21 34:24
**add**   27:19,25 28:11 29:18
**added**   38:3
**addition**   15:15
**address**   9:20 38:12
**addressed**   20:25
**adjourn**   37:17
**admitted**   25:24
**admittedly**   12:3
**adopted**   22:22
**advance**   14:8
**advised**   22:3
**affect**   30:17 32:22 33:2 41:14
**affected**   19:15 31:9 33:1

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

| | | | |
|---|---|---|---|
| **affects** 33:3 | 18:3 24:13 | **arthur** 28:9 | **ballots** 7:9,12 |
| **afternoon** | 25:17,19,20 | **article** 36:17 | 33:17 |
| 41:21 | 39:18 | **artur** 4:1 28:5 | **bankruptcy** |
| **ago** 21:1,4,5 | **anxious** 18:8 | 28:8 | 1:1,12,23 8:25 |
| **agree** 8:22 9:1 | **anybody** 13:14 | **aside** 41:19 | 13:21 26:13 |
| 24:19 40:7 | 21:17 23:1,5 | **asked** 6:14 | **barons** 36:17 |
| **agreed** 8:15,23 | 25:4,6 28:3 | 16:7,19 22:2,4 | **based** 11:23 |
| **agreement** | 33:11 34:7 | 22:6 | 13:3 26:19 |
| 24:17 39:2 | 36:1 37:15 | **asking** 14:4 | 27:16 31:25 |
| 40:8 | **anymore** 18:25 | 16:25 | **basically** 11:22 |
| **agreements** | **anyway** 26:6 | **asks** 14:11 | **basis** 24:23 |
| 7:18 | **apologize** 35:9 | **asset** 32:1 | **bear** 7:22 |
| **ahead** 23:7 | **app** 30:10 | **assets** 39:21,21 | **beginning** 21:8 |
| 28:6,10 31:15 | **appearance** | **assume** 10:16 | 38:21 |
| 36:4 | 25:11 | 14:23 15:3,4 | **behalf** 14:15 |
| **aka** 32:11 | **appellate** 13:8 | 15:10 16:1 | **believe** 7:13 |
| **alert** 41:7 | 14:1 | 19:6 21:18 | 10:7,12 11:9 |
| **alex** 32:16 | **applied** 24:14 | 22:2,4 | 21:12 33:16,17 |
| **alleging** 23:15 | **apply** 10:3 | **assuming** 11:1 | 33:19 |
| **allowance** | 36:20 | 16:2 22:1,3,7 | **believed** 30:4 |
| 22:20 | **appreciate** | **assumption** | **believing** 30:8 |
| **alluded** 20:25 | 13:17 14:2 | 15:3 | **beneficial** |
| **amerson** 36:2 | 21:20 35:24 | **attempted** | 28:17 |
| 36:2,5 37:3,10 | **approach** 30:6 | 34:15 | **best** 9:11 10:5 |
| 37:12,13 | **approve** 21:18 | **attention** 38:9 | 10:6 11:18 |
| **amoral** 36:25 | 21:19 | 40:3,5 | 12:9 15:8,13 |
| **amount** 6:25 | **approved** 8:4 | **attorneys** 3:4 | 15:21 16:5 |
| 7:2,5,7 19:15 | **aren't** 17:12 | 3:11,18 | 17:14 20:11,13 |
| 21:19 | **arguably** 22:12 | **available** 41:2 | 22:20,23 |
| **analysis** 9:14 | **argue** 10:17 | 41:25 | **better** 17:5 |
| 9:20 10:5,6,15 | 29:21 31:11 | **average** 31:2 | **big** 27:16 33:21 |
| 17:11 | **arguing** 28:19 | | **billion** 6:24 7:1 |
| **andrew** 4:13 | **argument** 6:9 | **b** | **bind** 8:14 20:1 |
| 5:2 | **arguments** | **b** 1:21 18:6 | **bit** 7:7 12:12 |
| **angeles** 3:6 | 14:24 17:24 | **back** 9:16 | 31:22 |
| **answer** 14:13 | **armand** 4:8 | 15:18 16:3,5 | **block** 35:10 |
| 16:10,21 17:5 | | 21:4 22:23 | |
| | | 26:10 41:7,9 | |

**blocked** 29:25
**blocks** 31:20
**bought** 30:9,10
  32:7,13
**bound** 8:23
  17:12
**bowling** 1:13
**brainer** 39:16
**break** 21:22
**brief** 9:17
  12:13,14
**briefly** 37:23
**briefs** 14:5
  20:8
**bring** 40:3
**brought** 7:6
  28:12 38:9
  40:5
**building** 31:20
**bunch** 17:13
**burden** 10:6,8
  12:6,18 20:12
  20:13 25:15
**business** 18:21
  18:24 28:20
**buy** 36:25
**buying** 30:6,21
  31:10 36:7,11

**c**

**c** 3:1 6:1 12:25
  43:1,1
**ca** 3:6
**caitlin** 4:19
**calculation**
  21:12
**calculations**
  7:10

**calendar** 41:22
**call** 28:9
**candid** 6:19
**can't** 18:21
  20:1,6 35:5
  41:18
**capital** 12:25
**carefully** 17:10
**caroline** 4:25
**carry** 11:1
**case** 1:3 3:3 6:7
  9:21 14:15
  21:4 23:19
  36:10 38:22
  39:20
**cases** 7:21
  12:24 24:6
  28:23
**cash** 34:14
**ceased** 18:14
**cel** 2:1,2 6:9,10
  6:12,13 7:8,9
  7:11,14,14,15
  7:20 8:2,4 9:3
  9:6,19,22,25
  10:11,17,18,21
  11:19,20,24
  12:8,25 13:4
  13:18 14:12,18
  14:22 15:5,6
  15:12,16 16:1
  16:9,13,20
  17:1,8,25 18:2
  18:15,15,17
  19:21,25 21:3
  21:22 22:10
  23:16,22 24:14

24:20 25:16,18
  25:25 26:8,13
  26:16,21 27:16
  28:13,15,15,21
  28:24 29:1,2,5
  29:9,12,13,21
  30:1,7,9,10,14
  30:17,20,21,25
  31:1,5,7,10,21
  31:23 32:7,11
  32:13,18,20,21
  32:22 33:3,3
  33:16,21,25
  34:4,12,13
  37:5
**celsius** 1:7 6:3
  18:14,17 23:15
  23:17 24:17,19
  28:20 29:5,9
  29:19,20,21,25
  30:13,20,25
  32:11,17 34:4
  35:11
**celsius'** 18:24
**cent** 16:4
**cents** 6:12 9:3
  9:25 10:4,13
  10:17,19 11:6
  11:10,10,16,25
  12:9 13:5,11
  14:19,20 15:4
  15:11,13,16,22
  16:2,2,12,16
  17:12,17 19:7
  19:20,23,25
  21:10,11 25:16
  25:20 26:1,2,9

26:19 28:18
  30:22 33:4
**certain** 35:5
**certainly** 14:3
  21:25 35:19
**certified** 43:3
**certify** 26:23
**challenging**
  8:17 12:4
**chamber** 32:6
**chance** 27:8
**changes** 34:6
**chapman** 4:9
**chapter** 6:11
  8:5,18 9:13
  11:19 12:5,7
  12:10,11 16:3
  17:17 20:10
**chicago** 3:13
**chief** 39:20
**choosing** 36:25
**chris** 6:6 35:3
**chris.koenig**
  35:11
**christopher**
  3:15 4:10
**claim** 9:23 16:2
  38:13 39:3
  40:7
**claims** 9:24
  10:2 15:12
  18:7 22:20
  31:3,4
**class** 6:23,24
  7:6,11 9:5,11
  10:16 20:2
  21:21 22:18

32:25
classes 6:22 7:4
9:7,7 17:13
clear 38:16
clearly 32:7,16
clerk 37:20
clerks 40:5
42:1
closed 26:9
coco 4:10
coin 29:15
coins 29:10
colleague
23:11
colleagues
38:25
colodny 3:8
11:9 14:9,14
14:14 15:1,8
15:25 16:11,17
16:22 17:3,6
17:18,22 18:11
18:13,22 19:2
19:9,12,19,24
20:3,15,18,20
21:2,11,14,24
22:25 25:17,22
38:25
come 15:2
38:25
comes 37:8
comfortably
40:21 41:10
comment
34:11
comments 36:5
36:6

commission
3:17 23:10,12
commitment
41:9
committed
41:17
committee 3:4
10:10 14:15
20:13
committee's
11:8
commodity
18:24
common 32:3
32:10,10
community
29:16
company 18:20
29:14 30:7
31:8,10 39:23
competitively
39:24
completely
15:21,24
complex 36:15
complicated
38:21
concerned
31:22 39:16
concerns 29:23
conclude 10:18
concluded 42:9
concludes 13:4
13:10
conclusions
12:22 13:1

conduct 40:8
conference 6:8
7:17 40:23
confirmation
8:5 12:19 16:8
27:1,7
connected 35:9
connection
37:18
consent 24:22
24:24
consented
23:17
consider 14:8
26:11 36:22
considered
35:9 36:9,11
36:14,14
consistent
40:11
contact 32:1
contested 9:24
14:1
context 31:13
continued 7:8
contracts 32:2
contrast 7:25
conversion
35:15,17
convert 35:15
correct 9:3
14:17 15:1
16:17 18:13,22
19:2,19,20
20:15 24:17
27:23 30:5

corrective 38:5
cost 29:17 31:2
counterparties
39:22
counterparty
6:15 39:22
40:12
country 43:21
couple 6:21 8:9
36:5
course 11:3
27:8 40:2
court 1:1,12
6:2 8:9,11,14
8:19,22 9:2,5,9
9:16 10:9,15
10:18 11:4,12
11:16,22,23
12:13,20 13:3
13:10,23 14:4
14:9,11,23
15:2,19 16:7
16:10,14,18,24
17:5,9,19 18:8
18:12,18,23
19:6,10,17,22
20:1,6,16,19
20:21 21:9,13
21:15,25 23:1
23:4,14,18,22
23:25 24:3,4,7
25:1,4,10,14
25:21,23 26:11
26:18 27:22,25
28:3,6,10
31:16 33:6,10
33:14 34:7,25

35:20 36:1,4
37:3,4,12,15
37:16,22 38:2
38:7,12,16
39:6,11,15,18
40:1,4,15,18
40:20,23,24
41:16,16 42:6
42:8
**courthouse**
40:25
**courtroom**
13:14 23:5,6
25:5
**courts** 41:24
**create** 29:11
**creating** 29:6
**creator** 29:15
**creditor** 14:11
16:3 28:8
31:19 33:13
34:10 36:3
**creditors** 3:4
6:17,24 7:1 8:6
8:7 12:5,7
14:10,16 20:4
20:9 22:6
28:24 30:2,6
30:15,21 32:23
39:2
**criminal** 23:19
**cross** 16:19
26:15 27:8,9
**crypto** 12:25
13:1 29:13
35:5,16 36:20
36:21 37:1

**cryptocurrency**
34:13 37:14
**crystal** 38:16
**current** 29:12
**currently**
29:21
**custody** 34:20
35:13

**d**

**d** 4:22 6:1
**d.c.** 3:20
**database** 29:10
**date** 14:13,21
15:6,22 16:10
16:20 17:2
18:14 22:11
25:17,18 26:1
26:14,20,21
34:20,23 37:5
43:25
**dates** 27:13
**david** 4:24
**davis** 3:24 7:24
25:8,9,10,11
25:13,15,22,23
26:3,11,11
27:21,22,23
28:2
**day** 37:14
41:20
**days** 34:18,19
35:14,15,17
41:19
**deactivation**
34:20
**deadline** 26:25

**deal** 9:22 13:13
20:23,23 21:19
22:17 38:8
**dealing** 12:15
12:16
**deals** 12:14
**dean** 4:9
**deanna** 37:18
**debt** 18:2
**debtor** 1:9 3:11
10:7 34:21
**debtors** 6:6
10:7 15:12
24:23 25:16
**debtor's** 20:12
**decentralized**
29:16
**decide** 13:7,8
18:9
**decided** 27:22
27:24
**deciding** 24:10
**decision** 12:23
12:24 13:20
24:12,12
**delay** 31:15
**demands** 22:12
**demonstrate**
12:19
**deny** 24:23
**depending**
12:3
**derived** 10:12
**determination**
29:3 36:8
**determined**
36:21

**determines**
31:25
**didn't** 9:21
12:13,16 14:5
15:19,20 16:14
17:11 19:17
24:9 26:1,3
**differ** 24:12
**difference**
22:23 33:21
**different** 12:24
12:25 13:1,1
15:9 17:13,24
22:12 30:23
33:18
**difiore** 4:11
**digital** 29:16
**diluted** 20:4
**dimitry** 34:9
**direct** 27:6
**disagree** 22:15
**disappears**
29:20
**disclosed** 7:17
**disclosure** 6:14
39:2 40:8
**discovery** 7:17
**discrimination**
31:3
**discuss** 35:19
35:20
**discussed**
23:21
**dismiss** 36:22
**disputed** 32:9
**dissenting** 8:7
9:10 10:16

17:13 20:2,9
21:20 22:17
**distribute**
29:17
**distribution**
34:18
**distributions**
12:10,11 35:6
35:14
**district** 1:2
23:14,14,18
**doc** 2:3
**docket** 26:6
**doesn't** 9:19
10:3,12,13
13:25 18:24
25:19 26:4
**dollar** 6:24 7:2
7:5,6
**dollars** 9:25
16:4 28:14
**donation** 32:14
**don't** 11:9
12:15 13:5,9
13:11 19:18
21:13,18 22:23
24:10 26:11,18
32:8,25 33:23
34:4 37:7
38:16 40:12,25
41:5,19
**dozens** 7:25
**dragged** 8:7
**drawn** 14:1
**due** 30:7
**duffy** 4:12

**e**

**e** 1:21,21 3:1,1
6:1,1 12:25
43:1
**earlier** 25:12
**earn** 6:23 7:1
**earned** 30:20
**earnings** 29:4
**echo** 32:5
**ecro** 1:25
**effect** 24:6
**effectually**
28:25
**efforts** 32:15
**eight** 9:25
**either** 24:13
**elements** 32:4
32:19
**elementus**
32:16
**elizabeth** 4:22
**ellips** 3:10
**ellis** 6:6
**email** 35:10,10
**entered** 20:21
20:25 38:3
**enterprise** 32:3
32:10,11
**entire** 9:17
29:22
**entirely** 29:9
29:19
**entitled** 6:22
11:2 34:14
**entry** 29:16
**envision** 22:1

**equal** 11:24
29:13
**equitable** 29:1
29:6
**equity** 18:3,3
**erik** 4:3 31:19
**error** 12:12
**establish** 20:13
**establishing**
26:12
**event** 2:2 6:10
**everybody** 6:2
8:11 15:18
38:24 42:1
**evidence** 10:8
10:14 11:23
13:3,9 15:5
19:10 20:22
25:24 26:5,7
26:10,14,17
27:13,14,17
40:19,24 41:4
**exactly** 41:9
**examination**
16:19 27:9,9
**examine** 26:15
**examined** 7:9
**example** 29:12
**exceed** 10:19
**exceeded** 6:19
**except** 7:5
**exchange** 3:17
18:19 23:10,12
**excuse** 19:3
**executive**
32:17

**exhibits** 38:8
38:17,20 39:3
39:8
**exist** 18:14,25
32:3
**expect** 22:1
26:18
**expectation**
32:4,12,13,14
**expectations**
6:20
**expensive** 14:1
**expert** 10:10
10:12 11:5,10
11:14 14:18
16:7 17:7
25:19,23
**experts** 11:9
**expert's** 16:11
**explain** 40:13
**explained**
34:19
**extent** 2:2 9:10
23:23 41:2

**f**

**f** 1:21 3:19
4:20 38:10
43:1
**fact** 21:20
**facts** 24:3
**fair** 35:19
**fall** 10:5
**false** 30:11
**far** 11:6 14:6
39:16
**favor** 19:24

**federal** 41:24
**feedback** 14:7
**feel** 33:3
**feener** 4:13
**fees** 41:24
**fewer** 27:3
**fiat** 35:16
**figure** 22:16
**file** 8:16 26:6
  39:13,24 40:1
  40:11
**filed** 6:18 7:23
  9:24 23:13
  38:5,13 40:6
**filing** 29:20
  30:1 31:12
  41:24
**filings** 35:11
  38:23
**final** 23:17
**find** 11:23
  14:23 15:4
  17:5 19:6 20:6
  27:4
**finding** 10:20
  15:4
**fine** 37:22
  40:15
**finish** 23:6
**first** 13:21 18:2
  25:8 30:4
  34:18 35:17
**five** 16:3 28:13
**flower** 3:5
**focused** 24:18
**folks** 13:20

**follow** 15:21
**followed** 17:16
**following**
  22:22 31:4,7
**forced** 28:22
**foregoing** 43:3
**foremost** 13:22
**formal** 7:18,23
**forth** 9:16
**forward** 11:1
  42:2
**found** 15:15
**foundation**
  31:20
**four** 17:24 32:4
  32:15,19
**fourth** 19:3
**frankly** 35:8
  39:16
**fraud** 34:3
**free** 26:15
**ftp** 38:11,12
**full** 28:22
**fully** 37:7

**g**

**g** 6:1
**general** 36:7
**generally** 12:6
**gentleman**
  33:8
**getting** 17:16
  27:22,23 28:17
**give** 15:17
  26:23 31:24
**given** 11:20
  23:21 24:23
  28:15 31:2

**giving** 15:18
  31:5,9
**glenn** 1:22
**go** 8:19 12:7
  23:6 25:8 28:6
  28:10 31:15
  36:4
**goes** 37:13
**going** 6:16,16
  11:5 12:20
  14:13 16:10,20
  16:25 18:20
  19:10 20:16,17
  20:23 21:5,19
  22:6,16,19
  26:18,22 27:15
  31:7 32:24
  34:3 35:7 37:8
  37:20 38:17
  39:1,3 41:1,11
  41:17,25 42:1
  42:2
**good** 6:2,4,5
  23:8 26:14
  31:18 35:3
**gorrepati** 5:4
**government**
  41:13
**grasp** 37:7
**great** 24:14
**greatly** 30:3
**green** 1:13
**gregory** 4:20
**guess** 18:8
  20:20 21:2
  22:9

**guidance** 14:2
**guilty** 34:2
**gymnastics**
  22:16 24:8

**h**

**hadn't** 15:20
**happens** 35:16
**happy** 28:1
  35:12
**haqqani** 4:14
**harm** 39:23
**harrison** 5:5
**hasn't** 22:6
  25:23 33:11
**haven't** 9:17
  10:14 13:13
  20:7 35:9
**hawaii** 34:12
  34:23
**head** 17:11
  19:12
**hear** 11:5
  19:10 23:5
  26:17 28:1
  40:25 42:4
**heard** 23:2
  25:5,7 28:4
  33:11 34:8
  36:1 37:16,16
**hearing** 2:1,1
  6:14 16:8
  21:17 33:24
  35:19 37:17
**hearings** 40:23
  40:24
**heart** 6:7

heavily   21:6
helpful   14:7
hershey   4:15
he's   16:18,24
  25:24
hi   33:12
high   12:11
higher   11:19
  12:4
highlight   29:18
  30:13
hill   5:6
history   21:7
hit   19:12
hold   23:4
holder   19:21
holders   6:11
  7:9,10,11,15
  7:15,20 9:3,6
  11:20 17:25
  29:12 33:25
  34:12
holdings   28:21
  28:23
holds   7:3 18:17
hon   1:22
honor   6:5,7,8
  6:17 8:1 9:4,15
  11:8,17 13:16
  14:8,14 15:15
  16:1,23 17:4,6
  17:7,18,22
  19:4,12 20:3
  20:18,20 21:2
  21:14,24 22:25
  23:8,13,23
  24:22 25:3,8

25:15 27:23
28:5 33:9,12
34:5,9 35:23
36:9 37:23
38:15 40:14
41:13 42:7
hope   32:21
  33:2 34:5
hopes   6:20
howey   31:25
  32:5,19
hundred   15:18
  21:23
hurt   34:4
hybrid   2:1
  37:20
hyde   2:25 43:3
  43:8

**i**

identifiable
  39:9,15 40:10
identify   28:6
il   3:13
illegal   36:24
illiquid   39:21
  39:21
impact   30:15
important   27:3
  27:5
inadvertently
  38:4
inclined   23:23
  23:25
include   39:8,21
includes   6:11
indicates   34:21

indication   19:5
indictment
  14:24
indiscernible
  7:19 13:7
  15:17 21:9,11
  21:12,13,23
  23:3 25:10,19
  28:13,14,16
  29:22,25 30:8
  30:9,12,15,22
  30:23,25 31:2
  31:4,7,12,14
  32:15 33:5
  34:2,12 36:10
  36:21
indulge   36:6
inflated   30:21
  31:10
information
  31:13 38:22
  39:9,15 40:10
inherent   18:16
initial   29:14
initially   6:8
insiders   31:8
insolvent   18:18
instructs   34:6
instrument
  18:3
insurance
  36:18
intended   7:14
interest   9:12
  10:5,6 11:18
  12:9 15:9,13
  15:21 16:5

17:14 20:11,14
22:20,23
interested
  11:13 13:20
interesting
  26:3 35:8
invested   32:8
investment
  30:11 32:1,2,3
  32:7
investments
  29:3
iovine   4:5
  33:12,13,14,15
  34:7
issue   7:21 9:9
  9:22 12:14,21
  13:5,7,8,8,11
  14:20 19:13
  20:8,9,24
  22:19,20 27:20
  29:6,24,25
  35:1 37:3
issues   2:1 6:9
  10:22 13:8
  22:3 33:15
item   39:20
it's   10:12,22,23
  10:23,24 11:4
  11:8,10,11,12
  11:16 13:6,8
  13:11 16:16
  17:20,20 18:3
  18:5,9,23,24
  19:6,13 20:12
  21:3 22:2,4
  26:3 27:23

29:9 30:22
31:12 35:11,19
36:25 37:20,20
38:2
**i'll**   11:9 17:6
21:16 25:6
26:23 27:18,18
31:24 37:7
**i'm**   6:17 10:20
10:20 11:4,5
13:7,12 14:4,4
15:23 16:22,24
16:25 17:3
18:8 20:7
21:16 22:6
23:21,25 24:7
24:19 28:1,2
31:21 32:5
34:23 35:12
37:11 39:14
41:21
**i've**   11:6 12:22
14:5 22:1,2,4
22:16 24:7,7
41:20,22

**j**

**j**   4:10
**jasmine**   4:8
**jason**   4:5 33:12
36:2
**jeffrey**   4:16
**jeremy**   5:6
**join**   12:16
17:11 19:17
**jonathan**   1:25
**judge**   1:23
12:23,23 21:18

24:11,12,15,15
26:6 28:5,12
31:15,18 36:2
**judges**   41:25
**judgment**
23:17
**judicial**   40:22
**jurisdictions**
35:5

**k**

**keep**   27:18
41:22,25 42:1
**keith**   4:18 5:1
**kicked**   25:12
**kind**   10:2
34:13,22
**kirkland**   3:10
6:6 34:15
38:10
**kirkland.com.**
35:11
**kirsanov**   34:9
34:9,11 35:4,4
35:24
**knew**   27:11
**know**   6:7 9:24
12:15,23 13:19
15:22 17:9
20:2 21:25
22:11,23 23:13
25:19 27:2
30:19 32:5
33:23 36:19
38:17,21 41:1
41:18,19
**koenig**   3:15 6:4
6:5,6 8:10,13

8:16,21,25 9:4
9:8,15 10:7
11:3,8,15,17
12:2,18 13:16
13:24 14:7
15:10 33:8
35:1,3,3,22,25
37:23 38:6,11
38:15 39:5,7
39:12,17,19
40:2,9,16,19
41:12 42:3,7
**kramer**   4:16

**l**

**l**   12:25
**lack**   7:22
**language**   24:24
34:21
**large**   6:23 7:6
7:20
**largest**   6:24
**lasalle**   3:12
**late**   41:10
**law**   22:12 32:2
40:5
**laws**   35:6,7
**lawyer**   12:3
**lead**   13:25
**ledanski**   2:25
43:3,8
**ledger**   29:10
**left**   34:3 38:4
**legal**   2:1 6:9
43:20
**legge**   5:7
**lending**   18:19

**lengthy**   13:18
**letter**   7:24
**letters**   7:25
**let's**   14:23 15:3
15:4 19:6,8
21:18 37:5
**level**   7:8
**limited**   24:3
**lindsay**   4:9
**line**   23:10
**liquidate**   30:2
**liquidation**
9:13 11:19
15:11 16:3
20:10
**liquidity**   30:5
**list**   36:18
**listen**   21:16
25:6 26:23
27:18 37:7
**litigating**   7:20
**litigation**   33:25
39:23 40:13
**litigations**
39:21
**little**   12:12
21:1 31:21
**llc**   1:7
**llp**   3:3,10
**login**   25:12
37:21
**lombardi**   4:17
**long**   12:4 30:23
36:6
**longing**   36:11
36:22

**look**  9:18 12:21
  16:15 21:4,5
  21:22 22:15,18
  34:6 41:17
**looked**  9:19
  10:10 11:12
  14:5 17:10
**looking**  14:4
**loops**  17:15
**los**  3:6
**losing**  32:14
**lot**  13:19 31:12
  33:19 38:20,22
  41:18
**loud**  10:21
**luck**  26:15

**m**

**made**  10:14
  30:11 35:14
**make**  10:15
  21:15 22:14
  30:16 35:5
  38:16,19
**makes**  28:20
**making**  15:3
**manipulate**
  19:1
**manipulated**
  21:6 26:20
  32:17 36:18
**manipulation**
  14:22,24 21:3
  21:5 31:8 34:2
  36:12,15 37:13
**margin**  6:23
  12:10,11,12

**mark**  4:21
**marked**  39:23
  40:13
**market**  19:3,3
  19:4,20 31:8
  36:19
**martin**  1:22
**mashinsky**
  14:25 23:15,20
  32:16
**math**  12:3,3,8
**matter**  1:5
  9:24 13:25
  22:9 29:2,8
  34:16
**matters**  41:21
**matthew**  23:11
**mean**  13:17
  21:25 36:9
**means**  24:24
  41:22
**members**  9:10
  10:16 17:13
  20:2 21:20
  22:17 32:17,25
  33:3
**mendelson**  4:3
  31:17,18,19
  33:6,9
**mental**  22:16
  24:8
**mentioned**
  28:18 37:24,24
**mess**  31:21
**met**  32:19
**mg**  1:3

**michael**  4:23
**mike**  5:7
**million**  26:9
**mind**  9:17 10:3
  10:15 20:8
  27:18
**mineola**  43:23
**minutes**  31:23
  37:17 41:10
**mira**  4:14
**misrepresent...**
  30:7
**missed**  10:11
  11:7
**monday**  6:18
  20:19 40:16,22
  41:8,11
**money**  32:3,7,8
  32:14 41:24
**month**  21:4
**months**  21:4
**morning**  6:2,4
  6:5 20:22,22
  23:9 35:3 41:8
**motion**  8:17
  26:6,7 38:19
  39:13,24 40:1
  40:11,14
**multiple**  17:15

**n**

**n**  3:1 6:1 43:1
**nail**  19:12
**narrow**  39:7
  39:12
**native**  18:18,20
**naturally**
  17:16

**ne**  3:19
**necessarily**
  24:13
**need**  13:6 41:2
  41:19
**needs**  23:22
**network**  1:7
  32:11
**neutral**  26:10
**never**  28:22
**nevertheless**
  24:14
**new**  1:2,14
  23:14
**nicholas**  4:17
**night**  9:18
**non**  8:14 39:2
  40:8
**north**  3:12
**notion**  36:13
**november**
  30:14 41:20
**noyes**  4:18
**number**  6:7
  7:2,5,13 9:6
  10:1 15:9 26:7
  39:8
**numbers**  6:21
**ny**  1:14 43:23

**o**

**o**  1:21 6:1 43:1
**o'connell**  4:19
**object**  9:10
  10:5
**objecting**
  26:25 27:6

**objection** 7:23
  9:23
**objections** 7:22
  11:2 26:24
  27:3,4
**objectors** 11:1
  20:2
**obligation**
  18:16
**observations**
  36:6
**obviously**
  13:17 35:6
**occurred** 2:2
**offer** 7:14,16
**offered** 23:16
**official** 3:4
  14:15
**oh** 30:16 33:10
**okay** 9:2 10:6
  10:16,20,21
  14:23 17:5
  20:1,11,16
  21:13 22:4,24
  23:1,6 24:11
  26:15 27:12,25
  28:3 29:24
  30:22 31:6
  33:10 37:15,22
  38:19 39:11
  40:16 41:12
  42:3,4,8
**old** 43:21
**once** 40:24
**ongoing** 18:20
**open** 7:14
  27:18 41:16

**opening** 20:23
  38:5 40:17,22
  41:4
**opine** 14:18
  17:7
**opined** 14:19
**opines** 16:11
**opinion** 14:12
  16:9,15,16,19
  16:25 17:1
  22:7,8,10
  26:23 31:24
  32:16
**opposition**
  27:14
**opted** 32:23
**order** 20:21,25
  37:25 38:3,5,7
**otis** 3:24 7:24
  25:9,13
**ought** 26:16
  35:20
**outcome** 23:19
  33:18
**outside** 24:6
**overflow** 41:1
  41:3
**overtime** 41:23
**overwhelming**
  6:19 19:15
**overwhelmin...**
  8:3 21:23
**own** 9:17

| p |
|---|

**p** 3:1,1 4:15 6:1
**page** 10:9
  16:14

**paid** 42:1
**part** 8:3,4 10:1
  24:20 29:15
  39:13,20
**participate**
  27:9
**parties** 8:23
  19:15
**parts** 9:18
**pass** 12:9 29:22
**past** 8:1
**pay** 29:6
**payment** 18:16
**pending** 23:19
**people** 8:15
  12:16 17:11
  18:25 19:17
  23:6 28:15
  29:1 30:4,8
  31:9 36:25
  38:13 40:6,7
**perceived** 30:2
**percent** 7:2,4,5
  7:13 15:18
  19:16,20,22,24
  20:1,4 21:23
**percentage**
  28:21
**person** 32:7,13
**personally**
  39:9,15 40:10
**persuade**
  22:19
**pesce** 4:20
**petition** 14:12
  14:21 15:6,22
  16:9,20 17:1

  18:14 22:11
  25:17,18 26:1
  26:13,20,21
  34:22 37:5
**pick** 10:1
**plan** 6:11,17
  6:23,25 7:3,22
  8:3 9:2 10:4
  11:21 12:1,4,8
  12:10 16:4,5
  17:12 19:25
  22:21,22 28:20
  28:23,25 30:16
  32:23,25 33:24
  34:14,19 35:13
  39:1
**plans** 8:5
**platform** 18:19
**pleading** 34:2
**please** 6:2
**point** 20:20
  21:2 27:19
  28:16,18 30:13
  31:11,14 33:20
  35:8,13,19
  36:7,16 38:15
**pointed** 15:10
**points** 17:23
  28:11 30:24
  39:8
**policy** 40:23
**portions** 9:19
**portray** 31:5
**position** 8:2
  24:25 27:2,5
  28:22

possible 34:3
potentially 37:3
preclusive 24:6
preponderance 10:8
present 4:7
presented 11:23 13:3 14:5
press 40:25
pretexts 30:11
pretty 35:22 38:23
price 14:22 15:11 19:1,3,4 19:4,20 21:6 25:18 26:10,12 26:20 29:24 31:22 32:18 36:12,14,20
prices 30:21 31:10
prior 7:17 14:21
pro 3:24 4:1,3 4:5 14:10 28:8 31:19 33:13 34:9 36:3
probably 12:15 32:5
problem 17:3 41:17
proceedings 29:2,5 31:1 42:9 43:4

proceeds 12:7
process 7:13 9:23 10:2 14:1 22:21
profit 32:12
profits 32:4
project 29:12
projects 29:13
promoter 29:14
proof 25:15 38:13 39:3
proofs 40:7
proper 11:18
property 12:25
proposed 11:25
proposes 9:2 10:4 22:21
prove 26:5
provide 12:4 15:12 16:12
provided 26:8 34:18
provides 35:13
public 38:18 38:23,23 39:4 40:24
published 36:17
purchased 28:13
purposes 26:13
pursuant 8:25
pushed 26:10
pushes 22:22

pushing 20:13
put 12:20 14:17 27:17 40:6
puts 28:25
putting 10:14 36:10 38:10

**q**

qualifies 32:1
question 9:11 13:6 14:11 15:2,9 16:8,10 16:18 17:15,16 25:17 33:17 34:17 35:16 41:12,15
questioned 33:22
questions 8:9 8:20 14:4
quick 36:5
quickly 15:23

**r**

r 1:21 3:1 4:17 6:1 43:1
raise 17:23 20:8,24 41:6
raised 17:14
rakoff 24:15
rakoff's 12:23 24:12
ran 7:10
rate 7:12
reach 24:9,10 34:15

reacted 40:4
reactions 13:14
read 9:17 10:9 12:22 16:14 31:12
reading 18:11 24:11 25:25
realize 12:15
really 22:9 29:24 34:25
reason 27:2 32:24 37:1 40:21
reasonable 32:4
reasons 38:3 41:3
receive 20:9 31:7 34:13,16 34:24
received 8:1 29:5 30:25
receiving 9:12
record 6:6,21 23:9 25:13 32:24 43:4
recovery 12:5 28:18 31:2,6,9 33:25 34:3
redact 38:19 38:22 39:10,11 40:9,10
redaction 39:18
refer 29:8

| | | | |
|---|---|---|---|
| **referring** 28:14 35:4 | **respectfully** 32:20 | **s** | **sec** 3:18 13:19 23:13 24:2,18 |
| **reflect** 26:21 | **respond** 35:2 | **s** 3:1 4:16 6:1 | 24:20 31:25 |
| **reflects** 27:17 | **responding** 27:12 | **sales** 32:18 | **second** 18:5 |
| **refused** 38:22 | **response** 34:16 | **samuel** 4:15 | **securities** 3:17 23:10,12 32:2 |
| **regarding** 34:15 | **result** 22:13 24:9,10 | **satisfactory** 15:5 | 35:6,7 |
| **relating** 26:17 | **results** 6:18 | **satisfied** 15:14 15:16,21 16:6 | **security** 10:22 10:23,24 12:21 |
| **relevant** 34:25 | 21:22 | 17:14 20:14 | 13:2,6,12,18 |
| **relying** 26:14 | **reverse** 11:22 | **satisfy** 34:22 | 17:20,21 18:5 |
| **remains** 41:16 | **right** 6:3 8:6 | **saw** 6:18 16:16 | 18:9,23 22:2,5 |
| **reminder** 6:11 | 9:5,15 11:15 | **saying** 10:20 | 22:8,9,12 |
| **remote** 40:23 | 11:17 12:2,18 | 19:15,21,22 | 23:17,23 24:11 |
| **removed** 34:1 | 13:16 17:3,22 | 20:5 | 24:21 29:23 |
| **report** 6:18 | 18:16 19:9 | **says** 11:6,10,12 | 31:24,25 32:21 |
| 10:11 11:6,10 | 21:24 24:21 | **scenario** 22:5 | 32:22 33:3 |
| 16:11 17:7 | 25:6 31:16 | **scenarios** 24:9 | 36:19 37:1 |
| 25:23,25 | 33:9,10,11,24 | **scheduled** 6:9 | **see** 6:16,16 |
| **represented** 14:10 | 34:5 37:2,16 39:17,19 | **scheduling** 41:21 | 12:14 14:5 26:7 27:6 31:1 |
| **request** 24:2 | **ripple** 12:22,23 | **scheuer** 3:22 | 31:18 35:20 |
| 32:20 | **road** 43:21 | 13:19 23:8,9 | 39:22 40:12 |
| **requested** 38:4 | **roadmap** 14:5 | 24:2,5,22 25:3 | 41:13,20 42:4 |
| **required** 8:8 | **robinson** 4:21 | **scott** 4:12,22 | 42:6 |
| **requiring** 38:12 | **room** 18:11 | **se** 3:24 4:1,3,5 | **seeing** 11:13 |
| **residents** 34:11 | **rooms** 41:3 | 14:10 28:8 | **seem** 10:3 |
| 34:23 | **rule** 8:25 23:22 | 31:19 33:13 | **seemed** 24:8 |
| **resolution** 2:2 | 26:18 32:21 | 34:10 36:3 | **seems** 9:23 |
| 10:2 | **rules** 36:20 | **seal** 38:19 | 12:24 13:9 |
| **resolve** 13:5,7 | **ruling** 24:3 | **sealed** 39:9 | 31:4 36:15 |
| 13:11,25 37:4 | 32:22 33:1,2 | **sealing** 39:13 | **seen** 11:6 20:8 |
| 37:9 | **ruminating** 13:12 | 39:24 40:1,11 | 29:7 |
| **resolved** 10:1 | | 40:14 | **sees** 34:5 |
| 13:13 | **running** 17:10 | **sean** 4:13 | **selling** 30:20 |
| **respect** 10:21 | | **searched** 12:13 | 31:1 36:8 |
| 24:15 | | **seated** 6:3 | |

sense  28:21
separate  7:10
    8:16 21:21
    27:13 33:16
    37:21
separated  41:3
separately  7:9
separation
    29:3
september
    1:16 30:14
    43:25
series  8:19
set  35:17 41:19
settle  8:15
settlement  6:10
    6:12,15 7:14
    7:18 8:2,4,12
    8:14,24 12:17
    16:4 17:12
    19:18 21:18,19
    24:20 34:21
settling  8:14
seven  16:5
shake  38:17
short  26:18,19
    27:16 30:23
shorting  36:7
    36:13,22 37:6
shorts  26:9,12
shouldn't
    36:13
show  12:6
    25:16 41:1
shows  26:8
shutdown
    41:13

side  30:23
sides  19:15
signature
    35:10 43:7
signed  7:18
    8:11 39:2
significant
    14:22
simple  30:19
    30:24 35:22
simply  36:25
single  9:5
    37:14
small  7:6 28:21
sold  23:16
solution  35:23
solutions  43:20
somebody
    12:20 22:18
    23:4 38:18
sonya  2:25
    43:3,8
sorry  25:11
    31:15 39:14
sort  9:16 22:15
    29:22
south  3:5
southern  1:2
    23:14
speak  11:9
    35:12
speaker  23:3
specific  16:13
    31:6
specifically
    9:18,21 26:9
    41:6

spend  30:21
spoke  33:8
spoken  33:11
spread  9:6
squeeze  32:18
staff  41:23
staggered  27:2
    27:10
standard  11:18
stanley  4:23
stark  7:25
start  28:16
    40:19
started  21:7
starting  20:22
starts  40:24
stated  32:16
statement  6:14
    38:5
statements
    20:24 30:5
    40:17,22 41:4
states  1:1,12
    3:17
status  6:8
stayed  23:18
stickler  38:23
stock  36:21
    37:14
stocks  36:18
stop  22:14
street  3:5,19
    36:12
struck  22:21
stuck  30:10
subject  26:24

subjecting
    32:1
submit  27:1,11
submitted  7:24
    10:10
submitting
    7:11 27:13
subordinated
    10:23,24 17:20
    18:5,6
sufficient
    10:19
suite  3:5 43:22
sullivan  5:8
superior  28:24
supply  29:22
support  7:8
    27:7,11,13
supporting
    27:1
suppose  26:17
    28:17
supposed
    22:17
sure  6:17 8:10
    8:13 15:23
    16:22 21:15,16
    22:14 23:21
    25:22
system  39:1

t

t  43:1,1
table  35:15,17
take  19:8,23
    20:11
taken  31:13

| talk 21:17 38:8 | 38:2 42:7 | thinking 10:20 | 32:8,11,13,18 |
|---|---|---|---|
| 38:25 39:6 | that's 7:12 8:5 | 15:25 | 32:20,21 33:16 |
| talking 31:22 | 9:15 10:20 | third 18:13 | 33:21,25 34:4 |
| 31:23 32:5 | 11:25,25 12:5 | 19:2 | 34:12,13 37:5 |
| 36:19 | 12:6 13:13 | thomas 4:11 | tokens 9:22,25 |
| tanzila 5:3 | 16:17 17:22 | thought 15:20 | 10:11 18:18 |
| taylor 5:5 | 18:20 21:24 | 27:4,5 42:3 | 29:13 |
| teach 41:8 | 26:14 27:12,21 | three 32:12 | topic 7:18 8:1 |
| team 32:17 | 31:11,14 32:23 | time 24:25 | tops 36:17 |
| tell 20:7,16 | 34:5,25 39:6 | 28:16 30:3,24 | torres 24:15 |
| 24:19 | 40:8,15 42:3 | 37:7 41:25 | torres' 12:23 |
| telling 30:6 | therese 3:22 | tired 33:18 | 24:12 |
| terms 8:22 | 23:9 | today 13:15 | total 6:25 7:1 |
| terraform | there's 9:24 | 17:23 23:21 | 28:24 29:11 |
| 12:22,24 | 12:12 13:24 | 27:22,24 28:4 | transcribed |
| tesla 36:17 | 19:13 35:21,22 | 35:1 36:16 | 2:25 |
| test 9:12 15:13 | 36:23,24,24 | 37:9 | transcript 43:4 |
| 15:21 16:5 | 38:18 41:5,18 | token 2:1,2 6:9 | treatment 8:6 |
| 17:14 20:11,14 | they're 11:2 | 6:11,12,12,13 | 9:2,22 10:4 |
| 22:20,23 32:1 | 17:16 | 7:8,9,11,14,15 | 11:25 17:12 |
| 32:5,19 | thing 33:23 | 7:15,20 8:2,4 | 22:22 |
| testified 25:24 | things 11:13 | 9:3,6,19 10:17 | treats 19:25 |
| testifies 14:10 | 19:14 23:16 | 10:19,22 11:19 | trial 9:17 13:17 |
| testify 26:16,22 | 24:18 29:15 | 11:20,24 12:8 | 13:18 39:4,13 |
| 27:15 | 30:17 41:18 | 13:4 14:12,18 | 41:6,17,20 |
| testifying | think 8:16 9:15 | 14:22 15:5,6 | trials 38:18,23 |
| 16:23 22:1 | 11:17 12:2 | 15:12,13,16 | 40:8 |
| 27:7 | 13:5 14:20,25 | 16:2,9,13,20 | tries 29:18 |
| testimony 27:1 | 15:8,10 17:22 | 17:1,8,25 18:2 | true 7:3 29:9 |
| 27:7,11 37:8 | 18:15 19:9 | 18:15,15,17,20 | 29:19 43:4 |
| thank 13:16 | 24:23 28:2,17 | 19:21,25 21:6 | trustee 38:4 |
| 23:8 24:5 25:1 | 30:12,14,15,16 | 22:10 23:16 | try 22:19 25:12 |
| 25:3,4 31:16 | 30:19,24 32:8 | 24:14,20 25:16 | 35:20 |
| 31:18 33:4,6 | 34:5 35:16,18 | 25:18,25 26:8 | trying 11:4 |
| 33:10 34:6,7 | 35:22 38:21 | 26:13,16,21 | 13:21 22:16 |
| 34:24,25 35:24 | 40:15,21 41:5 | 27:16 29:17 | 30:16 37:11 |
| 35:25 37:12 | 41:5 | 30:14 31:21 | |

**tuesday** 20:22
40:19,20
**tuned** 15:24
**turetsky** 4:24
**twice** 34:4
**two** 7:18,19
21:4 32:10
36:12 39:7
41:9

**u**

**u.s.** 1:23 23:9
23:12,14 38:4
**ucc** 30:12
34:15
**uday** 5:4
**unanimity** 8:7
**uncontrovert...**
14:21
**under** 10:23
11:19,21 12:5
12:7 16:2,4
18:5 21:12
24:9 32:2 35:6
**understand**
8:21 11:4
13:23 14:24,25
17:6 18:11
32:6 34:19
37:10,10 38:15
38:20 40:9,16
**understanding**
24:16
**understood**
17:18 20:3
21:16 39:5,7
**undervalued**
33:20

**unfortunately**
33:1
**unidentified**
23:3
**united** 1:1,12
3:17
**unsecured** 3:4
14:15 18:7
**uptegrove**
23:11
**use** 29:11
**used** 29:2
**user** 29:17
**uses** 29:16
**using** 37:18
**utilize** 34:22
**utilizes** 34:20

**v**

**valuation**
34:17
**value** 10:18,24
10:25 11:18,20
11:24 13:4,10
14:12,17,18,19
15:5,6,11,12
15:15,22 16:1
16:9,12,13,15
16:20 17:1,8
18:7,14,17,21
18:25 21:3
22:3,7,8,10,11
25:25 26:16,19
26:21,23 27:16
27:17 28:14,24
29:5,9,11,11
29:18,19 30:13
30:17 31:1

34:20 37:4,6
39:20
**values** 6:12
34:23
**varies** 30:2
**vary** 17:19
**veritext** 43:20
**video** 41:2
**view** 17:24
24:24 28:25
**vince** 5:8
**violate** 35:7
**voice** 28:19
**volume** 38:10
**vote** 6:22 7:6
8:6 28:22
33:21
**voted** 6:22,25
7:2,12
**voting** 6:18 7:1
19:24 21:22

**w**

**wait** 6:16
**want** 15:19
19:1 20:24,24
21:15 22:24
23:1 25:1,5
27:19,25 28:9
28:11 32:25
33:18 35:10,18
37:24 40:12
41:6
**wanted** 13:13
17:23 22:14
37:25 38:8
39:6 40:2 42:4

**wants** 21:17
25:6 31:11
**warren** 4:25
**washington**
3:20
**wasn't** 22:7
**way** 13:24,25
15:25 18:9,12
19:8 35:21
36:12
**ways** 15:9
**week** 8:5 14:8
36:16 37:25
42:5,6
**went** 9:16
15:23 29:5,15
**we'll** 12:6 14:2
19:23 20:23
27:8 37:17
40:19,21 41:1
41:10,20 42:1
42:6
**we're** 6:3,16
6:16 12:15,16
13:21 15:17
20:22,23 21:5
34:2 35:6
36:19 37:8
39:1 41:16
42:2
**we've** 21:6
31:22
**what's** 10:24
13:1,2 23:21
**white** 3:3 14:14
36:10

| | |
|---|---|
| **wildest**  6:19 | **y** |
| **wiles**  7:19 | **yesterday**  38:9 |
| **win**  17:25 | **yoon**  5:2 |
| **wish**  28:3 | **york**  1:2,14 |
|     33:11 34:8 |     23:15 |
|     36:1 37:15 | **you'll**  26:15 |
| **wishes**  38:19 | **you're**  20:12 |
| **withdrawals** |     20:17 26:14 |
|     30:1 | **z** |
| **withhold**  7:5 | **zero**  9:25 10:24 |
| **witness**  14:9,13 |     17:20,25 18:4 |
|     16:23,24 17:4 |     18:6 22:4 |
|     22:1,1 26:22 | **zomo**  5:3 |
|     26:25 27:15 | **zoom**  13:14 |
| **witnesses** |     23:5,11 25:7 |
|     26:15 |     28:3 37:18 |
| **wofford**  5:1 | |
| **wondering** | |
|     34:23 | |
| **work**  8:5 10:2 | |
|     12:8 | |
| **worked**  7:13 | |
| **world**  28:25 | |
| **worth**  9:25 | |
|     10:17 12:9 | |
|     33:4 | |
| **wouldn't**  22:9 | |
|     27:10 | |
| **written**  11:5 | |
|     27:1,6,11 | |
| **wrong**  20:7 | |
|     24:17,19,21 | |
|     36:24 | |
| **x** | |
| **x**  1:4,10 | |

**<u>Exhibit B</u>**

**October 2, 2023 Transcript (Opening Arguments)**

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC,

8

9           Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   October 2, 2023

17                   2:13 PM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: JONATHAN

1    HEARING re HYBRID CONFIRMATION HEARING.

2

3    HEARING re Hybrid Hearing RE: CEL token Settlement under

4    Bankruptcy Rule 9019, if applicable.

5

6    HEARING re Hybrid Hearing RE: Debtor's Amended Motion for

7    Entry of an Order Authorizing the Debtors to Redact and File

8    Under Seal Certain Confidential Information (Doc## 3644,

9    3635)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND ELLIS LLP

 4        Attorneys for the Debtors

 5        300 North La Salle Drive

 6        Chicago, IL 60654

 7

 8   BY:  CHRIS KOENIG

 9

10   KIRKLAND & ELLIS LLP

11        Attorneys for the Debtors

12        601 Lexington Avenue

13        New York, NY 10022

14

15   BY:  ELIZABETH HELEN JONES

16

17   WHITE CASE LLP

18        Attorneys for the Official Committee

19        of Unsecured Creditors

20        555 South Flower Street, Suite 2700

21        Los Angeles, CA 90071

22

23   BY:  AARON COLODNY

24

25
```

**Page 4**

```
1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         One Bowling Green

4         New York, NY 10004

5

6    BY:  SHARA CLAIRE CORNELL

7

8    OFFIT KURMAN

9         Attorneys for Ad Hoc Group of Earn Account Holders

10        590 Madison Avenue

11        New York, NY 10022

12

13   BY:  JOYCE A. KUHNS

14

15   MCCARTER ENGLISH, LLP

16        Attorneys for Ad Hoc Group of Borrowers

17        245 Park Avenue

18        New York, NY 10167

19

20   BY:  DAVID J. ADLER

21

22

23

24

25
```

Page 5

1   TROUTMAN PEPPER HAMILTON SANDERS LLP

2        Attorneys for Ad Hoc Group of Withhold Account Holders

3        4000 Town Center, Suite 1800

4        Southfield, MI 48075

5

6   BY:  DEBORAH KOVSKY-APAP

7

8   DANIEL FRISHBERG

9        Pro Se

10   ████████████████

11   ██████████████████████

12

13   VENABLE LLP

14        Attorneys for Ignat Tuganov

15        151 West 42nd Street

16        New York, New York 10003

17

18   BY:  JEFFREY S. SABIN

19

20   VICTOR UBIERNA DE LAS HERAS

21        Pro Se

22   ████████████████

23   ████████████

24

25

Page 6

1    QUINN EMANUEL URQUHART & SULLIVAN LLP

2         Attorneys for Pharos Fund SP of Pharos Master SPC and

3         Pharos USD Fund SP of Pharos Master SPC

4         51 Madison Avenue, 22nd Floor

5         New York, New York 10010

6

7    BY:  VICTOR NOSKOV

8

9    KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

10        Attorneys for Brendan White

11        500 Fifth Avenue

12        New York, NY 10110

13

14   BY:  BARRY R. KLEINER

15

16   KIRKLAND & ELLIS LLP

17        Attorneys for the Debtors

18        1301 Pennsylvania Avenue NW

19        Washington, DC, DC 20004

20

21   BY:  T.J. MCCARRICK

22

23

24

25

Page 7

1    DIMITRY KIRSANOV

2         Pro Se

3    ██████ ██████ ████████ ████████

4    ██████████ ████ ████████

5

6    ALSO PRESENT TELEPHONICALLY:

7    ARTUR ABREU

8    YOHANNES AFEWORK

9    KATHERINE AIZPURU

10   ANDREA AMULIC

11   JASMINE ARMAND

12   DAVID BARSE

13   CHRIS BECIN

14   JEFFREY BERNSTEIN

15   PAUL BREUDER

16   GRACE C. BRIER

17   NURALDEEN BRIFKANI

18   JOHAN BRONGE

19   JUDSON BROWN

20   STUART S. BROWN

21   MARK BRUH

22   VITOR CUNHA

23   SANTOS CACERES

24   ANDREW CARTY

25   ROY CARVER

1   FRANK CHAIR

2   RICKIE CHANG

3   JEFFREY CHUBAK

4   GEOFFREY CIRKEL

5   CHRISTOPHER J. COCO

6   KEVIN COFSKY

7   LAFAYETTE A. COOK

8   KAREN CORDRY

9   CARL J. COTE

10   CAMERON CREWS

11   OONA ESTELLE CRUSELL

12   DAVID J. DALHART

13   KENNETH DARSCHEWSKI

14   CURT L. DELL

15   THOMAS DIFIORE

16   SHENAYA DIAS

17   TRISTAN DIAZ

18   SIMON DIXON

19   AMY DONAHUE

20   SHARON DOW

21   SCOTT DUFFY

22   JOHN PETER DZARAN

23   SIMON ELIMELECH

24   BEN EADES

25   JANELLE ECKHARDT

Page 9

1   CONSTANTINE ECONOMIDES

2   KEN EHRLER

3   JAMES ENGEL

4   DAVID AVERY FAHEY

5   FLORENCE FLANNIGAN

6   SEAN T. FLYNN

7   BRADLEY H. FOREMAN

8   DANIEL FRISHBERG

9   MAX GALKA

10  REBECCA GALLAGHER

11  JASLEIGH GEARY

12  JOANNE GELFAND

13  DARIUS GHEORGHE

14  BRADLEY GIARDIELLO

15  JAMIE GILBERT

16  JAMES I. GLASSER

17  MATTHEW J. GOLD

18  RAMON GONZALES

19  TODD GORDON

20  KATHRYN GUNDERSEN

21  CAROLYN GURLAND

22  CAMERON GUTHRIE

23  MIRA HAQQANI

24  YI HE

25  GABRIELA HENSLEY

1   IMMANUEL HERRMANN

2   SAMUEL P. HERSHEY

3   KAITLYN A. HITTELMAN

4   KYLE HOLZHAUER

5   MITCHELL HURLEY

6   JASON IOVINE

7   ROBERTO JACOBS

8   MICHAEL JAOUDE

9   STIG JELLESTAD

10   KATHERINE JOHNSON

11   MIKE JOHNSON

12   GREG KACZKOWSKI

13   DAN KAPLAN

14   BRIAN P. KARPUK

15   YARA KASS-GERGI

16   RAVI KAZA

17   TRAVIS KEENEY

18   THOMAS S. KESSLER

19   DIMITRY KIRSANOV

20   MATTHEW KLEIN

21   BARRY R. KLEINER

22   UMBER KOHLI

23   DEBORAH KOVSKY-APAP

24   KATHRYN KUETHMAN

25   ROSS KWASTENIET

Page 11

1   CHRISTOPHER E. LACKEY

2   JOSEPH LALIA

3   DAN LATONA

4   JEAN-PHILIPPE LATREILLE

5   TYLER NATHANIAL LAYNE

6   JOE LEHRFELD

7   BRIAN S. LENNON

8   MARK S. LEONARD

9   NOEL A. LEONARD

10   ESTHER LEVINE

11   MARK LINDSAY

12   JASON LU

13   JESSE LUND

14   SERBAN LUPU

15   DAVE KURMAR MALHOTRA

16   KEVIN M. MANUS

17   CHASE MARSH

18   BRIAN S. MASUMOTO

19   T.J. MCCARRICK

20   KEITH MCCORMACK

21   VIK MECHANDA

22   MOHSIN MEGHJI

23   ERIK MENDELSON

24   ALEX MICHAELS

25   LAYLA MILLIGAN

Page 12

1   MICHAEL D. MORRIS

2   JASON A. NAGI

3   LEIGH NATHANSON

4   HENRY SEIJI NEWMAN

5   KEITH NOYES

6   JARNO OBERG

7   CHRISTOPHER PAGNANELLI

8   MILIN PATEL

9   JOHN PATOUHAS

10   JEFF PATTON

11   GREGORY F. PESCE

12   KHAI PHAM

13   RYAN PHAN

14   RICHARD PHILIPS

15   CATHERINE PHUNG

16   LALANA PUNDISTO

17   JOHN P. REDING

18   ANNEMARIE V. REILLY

19   MARK ROBINSON

20   AUSTIN ROCKWOOD

21   ILUSION RODRIGUEZ

22   JONATHAN RODRIGUEZ

23   JOE ROSELIUS

24   ANDREW RUDOLPH

25   JOSEPH E. SARACHEK

Page 13

1    THERESE SCHEUER

2    JAVIER SCHIFFRIN

3    DAVID SCHNEIDER

4    NOAH M. SCHOTTENSTEIN

5    SAMUEL SCHREIBERG

6    WILLIAM D. SCHROEDER

7    DAVID SENES

8    ALEX SHLIVKO

9    MATTHEW W. SILVERMAN

10   MATTHEW SMART

11   DON SMITH

12   CHRISTOPHER S. SONTCHI

13   KATHERINE STADLER

14   GEORGE STANBURY

15   MICHAEL STANLEY

16   COURTNEY BURKS STEADMAN

17   DAN STEEFEL

18   MICHAEL SWEET

19   LUCY THOMSON

20   JEFFREY S. TOROSIAN

21   DAVID TURETSKY

22   ELVIN TURNER

23   WILLIAM MATTHEW UPTEGROVE

24   MELISSA L. VAN ECK

25   EZRA VAZQUEZ-D'AMICO

1    VETON VEJSELI

2    DANIELLE WALKER

3    CAROLINE WARREN

4    JOSHUA WEEDMAN

5    KATIE WICK

6    ZACHARY WILDES

7    KEITH WOFFORD

8    ANDREW YOON

9    BRYAN YOUNG

10   KAILA ZAHARIS

11   TANZILA ZOMO

12   YIYUE CHEN

13   DEBORAH FRANKEL

14   ROBERT M. KAUFMANN

15   RAKESH PATEL

16   MARSHALL WEST

17   RICK ARCHER

18   HUSSAM BATSHON

19   SOMA BISWAS

20   RAYN CHEN

21   BEN CLARKE

22   DREW DUFFY

23   PAUL L. FABSIK

24   SCOTT FLAHERTY

25   CHRISTOPHER GASTELU

Page 15

1    UDAY GORREPATI

2    DAVID KAHN

3    VEN KAZ

4    DIETRICH KNAUTH

5    LEONIE C. KOCH

6    MIKE LEGGE

7    KAREN LEUNG

8    JAMES J. NANI

9    MACIEJ PROCZEK

10   JONATHAN RANDLES

11   CRAIG RASILE

12   TIMONTHY REILLY

13   CAROLINE SALLS

14   DAVID SHAFER

15   PETER J. SPROFERA

16   VINCE SULLIVAN

17   ZACHARY ZABIB

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right, please be seated.  Good

3      afternoon, everyone.  Mr. Koenig.

4              MR. KOENIG:  Good afternoon, Your Honor.  Deanna,

5      could you please make my colleague Jeremy Young a cohost for

6      sharing privileges?

7              CLERK:  All right, Mr. Young is a cohost.

8              MR. KOENIG:  Thank you so much.  For the record,

9      Chris Koenig, Kirkland & Ellis, for Celsius.  Your Honor, it

10     is such a pleasure to be here at the commencement of the

11     confirmation hearing.  We're here seeking confirmation of

12     our modified Chapter 11 plan that's been overwhelmingly

13     accepted by our accountholders.

14             This plan is the culmination of over a year of

15     working collaboratively with all of our stakeholders from

16     the Committee, formal ad hoc groups, regulators, and other

17     governmental parties, as well as individual accountholders.

18     Simply put, it's time to confirm the plan so that we can get

19     out of bankruptcy and promptly make distributions to our

20     accountholders and other creditors.

21             Before getting into what's next, I want to take a

22     minute to walk through how we got here because context is so

23     important.  We filed a presentation at Docket No. 3630.

24     Your Honor, do you have a copy of that presentation?

25             THE COURT:  It's up on the screen.

1           MR. KOENIG:   Okay.   Wonderful.   I'm going to start

2      on Slide 4.   So these cases were filed in July of 2022.

3      Today, on the eve of confirmation that has such overwhelming

4      support, it's easy to forget just how challenging the early

5      stages of the case was.   We filed for Chapter 11 in the

6      midst of an industry-wide crypto winter that depressed

7      prices across the board.   The pause had happened just a

8      month prior to filing.

9           State and federal regulators and other

10     governmental agencies were actively investigating Celsius'

11     prepetition business model for, among other things, alleged

12     unregistered offerings of securities, money transmitter

13     license issues, and securities fraud.   That's not the way

14     that anybody draws up the playbook for a Chapter 11 case.

15           So the early days of these cases continued to be

16     difficult and uncertain.   U.S. Trustee filed a motion to

17     appoint an examiner.   Regulators routinely appeared at

18     hearings and told Your Honor about their concerns with our

19     business model.   Accountholders filed motions trying to

20     regain access to the cryptocurrency that they deposited on

21     Celsius platform.   So what did Celsius do in light of all of

22     these challenges?

23           At the direction of our independent and newly

24     appointed special committee of the board of directors, we

25     decided that the only path forward was full engagement and

Page 18

1    full transparency.  We did not object to the appointment of

2    the examiner.  Rather, we consented to her appointment and

3    we fully cooperated with her investigation.  We provided

4    over 230,000 documents and she conducted 34 total interviews

5    with 26 current or former employees.

6              Around the same time, the special committee told

7    Mr. Mashinsky that he could either resign or be fired and he

8    resigned.  We engaged with regulators and other governmental

9    agencies about their concerns regarding our business model.

10   We reached historic, consensual resolutions with each of

11   those regulators.  None of the regulators are objecting to

12   the plan today, and that's because of those agreements.

13             I think that's truly remarkable, given where these

14   cases started.  It seemed in the early hearings of the case,

15   there was a revolving door of regulators who wanted to make

16   sure Your Honor understood their frustrations about our lack

17   of engagement.  We fixed that.  We were so pleased to be

18   able to work with them to be able to fully resolve their

19   issues on the plan.

20             At Your Honor's suggestion early in the case, we

21   established email and phone lines where Celsius creditors

22   can easily write in and ask questions.  We responded to well

23   over 1,000 emails to creditors during these cases.  At some

24   point, we just stopped counting.  Perhaps most importantly,

25   we decided to fully engage with the Committee, individual

Page 19

1    creditors, and groups of creditors, to find consensus

2    wherever possible, even if it meant making very large

3    concessions in order to reach an agreement and drive the

4    cases forward.

5            The Committee is the natural statutory portal to

6    the Debtors.  Their goal is to be a fiduciary for unsecured

7    creditors and to provide a check on the Debtor in

8    Possession.  In most cases, the Committee is the Debtor's

9    principal adversary.  At the beginning of these cases, it

10   certainly went that way.  The Committee objected to many of

11   our initial motions, insisted on wide-ranging consent

12   rights, and the Committee also objected to our first

13   exclusivity motion.

14           What the early days of the case taught us was that

15   the only way to get out of bankruptcy was by truly building

16   consensus and working with all stakeholders and not fighting

17   over every last little thing.  These cases are very

18   expensive and we certainly could have fought over every last

19   little thing and asked Your Honor to make rulings on every

20   legal issue, but that would've been costly, would've led to

21   delay, and also uncertainty in developing our transaction.

22           So building consensus meant that the Debtors had

23   to really embrace the Committee and the accountholders that

24   they represent and work together, and that meant making

25   significant concessions to the Committee.  We agreed to a

Page 20

1    very short first extension of exclusivity with the

2    Committee, even though we thought that the facts and

3    circumstances of these cases certainly warranted a much

4    longer one.

5          We agreed to wide-ranging consent rights for the

6    Committee on cash management, security stipulation, bidding

7    procedures, and other key orders.  We truly invited the

8    Committee in and gave them co-equal consent rights over key

9    decisions in the case, from the decision to announce a

10   stalking horse to picking a winner of the auction and giving

11   them broad consent rights over all of the documents

12   underlying the plan.

13         Perhaps most importantly, we agreed to turn over

14   claims and causes of action to a litigation administrator

15   that would pursue that litigation post-emergence on behalf

16   of creditors.  In many Chapter 11 cases, the Debtor and the

17   Committee fight over exactly that issue, who is going to

18   bring claims and causes of action of the estate, and Your

19   Honor may have -- you know, in other cases, may have had to

20   rule on the STN standard and whether it was the Debtors or

21   the Committee that would bring those cases.

22         That did not happen here.  Earlier this year, we

23   entered into a stipulation with the Committee to put those

24   claims against former insiders aside and allow the

25   Committee's designee, a litigation administrator, to pursue

Page 21

1    those claims for the benefit of accountholders.  Simply put,

2    we could have fought about everything and instead, we made

3    the intentional and conscious decision to truly work with

4    the Committee and try to get out of bankruptcy.

5            These Committee members in particular have

6    dedicated an inordinate amount of their own personal time

7    and efforts to this case to try to get the best effort --

8    the best outcome for creditors.  I know that there are folks

9    on social media who think it's very easy to second guess the

10   Committee members, but their dedication of their own time,

11   all of which is totally unpaid, and their fervent and honest

12   desire to get to the right answer for accountholders is

13   without question.

14           So I want to thank Mr. Colodny.  I want to thank

15   his clients for being able to work so constructively with us

16   to get to this point.  We simply wouldn't be here without

17   them and without being able to work so constructively with

18   them.  Even though we often disagreed on key issues, we were

19   able to work together to get to resolutions that allowed us

20   to move these cases forward.

21           So, getting back to the timeline on the slide.  So

22   the way that I think about these cases is really in two

23   stages.  In the first stage, we needed to get the business

24   operating safely in bankruptcy, start cooperating with all

25   the different investigations, and get our new management

Page 22

1    team in place with Mr. Ferraro as our new interim CEO.  And

2    we had some key legal issues that we had to resolve before

3    we could work towards actually developing a transaction to

4    get out of bankruptcy.

5            We had to have the Earn trial in trial in December

6    to resolve the dispute over who owned the cryptocurrency in

7    the Earn accounts, the Debtors or the accountholders.  Given

8    how many active pro se accountholders were arguing that the

9    crypto belonged to them, there was no alternative.  We had

10   to have a judicial resolution.  We could not have done it

11   consensually.  And we litigated with Custody and Withhold

12   about their ownership rights as well.

13           Flipping to the next slide on the developments in

14   this calendar year, January and December were probably the

15   key turning point in the cases.  We litigated Earn, Custody,

16   and Withhold.  We obtained the Court's ruling on the Earn

17   dispute and we got the final examiner's report.  All of

18   these items shed light on key issues and frankly set the

19   framework for the rest of the cases.

20           So that moved the cases into phase two and allowed

21   us to move forward and focus on developing a transaction

22   that would maximize the value of Celsius' business so that

23   we can get out of bankruptcy.  And during stage two, we kept

24   resolving issues and building consensus wherever possible.

25           In the early portion of 2023 we reached

Page 23

1    settlements with both the Custody and Withhold ad hoc groups

2    to resolve key questions about the applicability of

3    preferences and defenses for those accountholders.  The

4    preference portion of that Custody and Withhold trial would

5    have been very interesting academically, but it would have

6    been expensive, risky, and would have delayed the

7    development of any transaction.

8              And so we've worked to pay out cryptocurrency to

9    those accountholders that participated in the settlements.

10   As Mr. Ferraro has regularly reported in his updates to the

11   Court, we've now distributed almost $80 million in crypto to

12   folks that have participated in those settlements.

13   Critically, we reached a deal with Series B investors.  This

14   was perhaps the most complex and challenging dispute of the

15   case.

16             Series B were seeking priority over all

17   accountholders.  They said that they had the right to the

18   value of CNL and subsidiaries including mining and GK8.

19   After the Court ruled that the customers did not have

20   contractual claims against every legal entity, the Debtors

21   and the Committee advanced numerous alternative theories

22   from constructive fraudulent transfer to intercompany

23   claims, substantive consolidation, and even a class claim on

24   behalf of all accountholders.

25             Simply put, these cases would not -- we would not

Page 24

1    we standing here today if we not -- had resolved that

2    litigation.  We would still be fighting with the Series B

3    holders.  Because of that settlement, we're able to take the

4    value of GK8 mining and CNL, and in our view, rightly

5    distribute the value of those legal entities to

6    accountholders and other creditors under the plan instead of

7    the Series B.  Can we turn to Slide 11.

8            So these settlements cleared the way for us to

9    develop and pursue a value maximizing transaction.  The

10   sales and marketing process was long and involved, but it

11   was wildly successful.  We started in March and we named

12   NovaWulf as a stalking horse bidder.  That transaction

13   wasn't perfect, but it was a good starting point and it

14   generated real competitive tension among other bidders.

15           We got numerous additional bids.  We named two

16   additional qualified bidders and we had a month long

17   auction.  The auction lasted longer than any of us would

18   have liked, but it was wildly successful, as I said.  We

19   generated hundreds of millions of dollars of additional

20   value for the transaction through the competitive tension of

21   the auction process and through lower fees and extra

22   contributions by Fahrenheit to the transaction.

23           And the particularly unique part of Celsius'

24   business is that we have not only liquid cryptocurrency but

25   real illiquid assets, too, most notably the mining business.

Page 25

1    Celsius' mining business is already one of the largest in

2    the country and we also have other illiquid assets too.  We

3    have causes of action relating to historic relationships and

4    investments in a variety of other cryptocurrency businesses.

5           So maximizing value means not only distributing

6    the liquid cryptocurrency that we have, but ensuring that

7    accountholders can realize the full value of the illiquid

8    assets as well, the mining business in particular.  Selling

9    the mining grades for the scrap that they are outside of the

10   mining company would be particularly value destructive.

11          So what we were focused on in phase two and stage

12   two of the cases was we wanted to find an excellent partner

13   with a proven track record in crypto and finance generally.

14   We found that partner in Fahrenheit who has demonstrated

15   experience in key areas of managing cryptocurrency, Bitcoin

16   mining, staking, and risk management generally.  More

17   specifically U.S. Bitcoin is already one of the largest and

18   most successful Bitcoin mining operators in the country.

19   They will run Newco's mining operations.

20          Proof Group will lead Newco's staking efforts and

21   contribute intellectual property with respect to staking and

22   assist Newco in developing its own staking business.  And

23   Fahrenheit is going to work to list the equity of Newco on

24   NASDAQ to provide creditors with the maximum liquidity

25   possible for the stock.

1          So we're very excited about Fahrenheit and what

2    they have to offer.  We believe that they will maximize the

3    value of Newco for the benefit of the accountholders.  And

4    Fahrenheit believes in the business.  They have agreed to

5    invest up to $50 million of their own money in the business,

6    right alongside accountholders.  They are putting their

7    money where their mouth is.

8          So after we announced the Fahrenheit transaction

9    in late May, we worked to build additional consensus.  In

10   mid-July, we met with the Earn and Borrow ad hoc groups for

11   three days in mediation before Judge Wiles.  We reached an

12   agreement on the terms of amendments to the plan that would

13   gain the approval of those ad hoc groups and resolve the

14   intercreditor disputes between Earn and Borrow.

15         Once that was completed, that meant that we had

16   agreements with each ad hoc group for each of the Debtors'

17   programs:  Earn, Custody, Borrow, and Withhold.  And before

18   turning to the objections, I just really briefly want to

19   talk about the orderly winddown.  Experience in these cases,

20   has taught us that it's important to have a backup plan.  We

21   believe that the Newco plan is executable and we maximize

22   value, but we don't know exactly what the future holds.

23         We hope to be able to get out of bankruptcy by the

24   end of this year, but we thought it prudent to set up a

25   backup plan so that if we have to pivot for any reason, we

Page 27

1    are ready to do so.

2            So, with that very long winded opening, that

3    brings us to today.  I'm not going to go through all of

4    these slides.  I don't want to go through all these slides,

5    but can we do Slide 15?

6            So these are folks that filed formal and informal

7    objections.  Looked at the list of the parties that are

8    going to speak this afternoon and what's notable is how many

9    are speaking in support of the plan, and in looking at some

10   of the names, a couple of months ago, you might have thought

11   that they would have been on the other side of the ledger.

12           So we're pleased to have driven so much consensus.

13   But turning to the objectors, as we set forth in our brief,

14   we think we've resolved nearly all of the objections that

15   have been filed.  We made adjustments and clarifications to

16   the release and exculpation provisions to incorporate all

17   the comments that we received from the U.S. Trustee.

18           We are now resolved with the SEC and the state

19   regulators and we also resolved many of the reservations of

20   rights and other limited objections that were filed through

21   agreed language in the modified plan or in the confirmation

22   order.  So only a few objections remain.  This is just an

23   opening, but I'll just briefly walk through a couple of the

24   key ones now.

25           First, there were a number of borrowers that filed

Page 28

1    letters -- retail borrowers who objected to the plan on the

2    basis that they believe their plan treatment is

3    inappropriate.  They are arguing that they own the

4    cryptocurrency that was deposited to support their loan.

5    But the Borrow terms of use are very clear on this issue,

6    just as the Earn terms of use were.  Celsius holds legal

7    title to those cryptocurrency assets and we can use,

8    dispose, or hypothecate those assets as Celsius sees fit.

9    The borrowers don't own the collateral, we do.

10           They are unsecured creditors.  What the borrowers

11   do have is a right of setoff because they have claims

12   against Celsius for the return of the cryptocurrency they

13   deposited and Celsius has a claim against them for the

14   repayment of the loan principal.  And that's exactly how the

15   Chapter 11 plan is structured.  Borrowers have a right of

16   setoff.

17           And notably, this treatment was accepted by

18   borrowers in over 96 percent in dollar amount and 98 percent

19   in number.  And they also have some additional rights that

20   they achieve through the mediated settlement that we reached

21   with the Borrower Ad Hoc Group.  Most importantly, they have

22   the option to repay the principal balance of their loan.

23   They will receive a like amount of cryptocurrency back in

24   the amount of the principal balance.

25           Now, why that's important, Your Honor, is tax

Page 29

1    reasons, frankly.  If they have a low basis in the

2    cryptocurrency they deposited, receiving a like amount back

3    is a much better tax outcome for them than if they were to

4    have those claims set off.  It might be otherwise

5    economically the same, but obviously, if we can structure a

6    transaction to save taxes for our accountholders, we're

7    happy to do so.

8            We also agreed to work constructively with

9    borrowers who want to take advantage of this option but

10   might need financing.  So to the extent they identify a

11   third party lender who would come in and give them financing

12   to make this principal repayment, we will cooperate to the

13   extent we can and with the lender to make sure that this

14   transaction can go through.

15           So this is all consistent with the borrower's

16   legal rights under the borrower terms of use, which means

17   that the best interest test is satisfied with respect to

18   them.  For that reason, these objections by these retail

19   borrowers should be overruled.

20           Pharos objected on two discrete issues, the

21   absolute priority rule and the best interest test.  On the

22   absolute priority rule, they complained the Series B holders

23   who are equity holders are receiving a distribution under

24   the plan when creditors are not being paid in full.  To be

25   clear, the Series B holders -- this is only those that did

1    not affirmatively participate in settlement that Your Honor

2    ordered earlier this year.  This is just for them to receive

3    their pro rata share of the million dollars that you

4    approved.

5            Pharos says that this violates absolute priority,

6    but this Court approved settlement resolved an issue of

7    priority, too.  The Series B holders argued that they were

8    ahead of creditors and the whole reason we entered into the

9    settlement was to resolve this very important issue.

10           And notably, I think Your Honor has dealt with

11   this issue at least adjacently in the Dewey and LeBoeuf

12   case.  In that case, there was a settlement that was entered

13   into among the partners and some objecting party said that

14   it was a sub rosa plan and it violated absolute priority.

15           And there, you found that you can -- that a

16   absolute priority can be diverged from if there is a good

17   reason to do so.  And here we think that there's a very good

18   reason to do so.  It resolved another priority dispute.  And

19   had we not done so, the Series B may have been entitled to

20   up to $600 million of assets.

21           Second, they raised the best interest test.  They

22   argue that the liquidation analysis to be presented doesn't

23   demonstrate that holders of general unsecured claims like

24   them are receiving under the plan as much as they would in a

25   Chapter 7 liquidation.  But as part of making an argument,

Page 31

1    they argue that Newco is actually completely valueless, even

2    though it's being seeded with $450 million of liquid

3    currency, Newco will run and operate a mining business where

4    the Debtors submitted a valuation that has a midpoint value

5    of $565 million and other liquid assets that a separate

6    valuation report valued in the hundreds of millions of

7    dollars.

8              Their objection says that we've submitted no

9    evidence, but actually, there's over $1.2 billion of assets

10   that Newco is going to be seeded with and we've submitted

11   two separate expert reports to prove that point and we will

12   certainly submit them for cross examination this week to

13   prove the point in Court.

14             Moving on to the next point.  A few individuals

15   objected to the emergence incentive plan that is embedded in

16   our chapter 11 plan.  I want to acknowledge, I know that

17   executive compensation is understandably a hot button issue

18   for accountholders who were defrauded.  They just want to

19   get out of bankruptcy.  We do, too.  But this management

20   team was not the ones that defrauded the accountholders.

21   That management team is gone.  Those former insiders are

22   gone.

23             We're under new management who has been working

24   around the clock to make sure that our systems are ready to

25   make distributions of over $2 billion of cryptocurrency

Page 32

1    that's required negotiating agreements with Coinbase and

2    PayPal, coordinating with them to make sure that all the

3    distributions can go off without a hitch and preparing for

4    Celsius' own distributions of custody under the plan.

5    Celsius and the distribution agents need to make over

6    400,000 distributions of liquid cryptocurrency on the

7    effective date.

8              Accountholders will want that to be done in a very

9    short period of time, and it's only thanks to the continued

10   efforts of the company's management team that this will even

11   be possible.  So as an initial matter, the plan included

12   this incentive plan as part of its terms.  The plan was

13   voted on.  The classes of accountholders who objected to

14   this term voted to accept the plan.  It is binding on the

15   rest of the class so long as it meets best interests, which

16   it does.

17             This is a payment of up to $2.6 million.  The

18   difference between a Chapter 7 liquidation and the plan is

19   well over 100 times that amount and the payment isn't going

20   to be made by the Debtors, either.  It's going to be made by

21   the post effective date Debtors and only after the plan

22   administrator verifies that the metrics have been met.  That

23   was a change that we made at the suggestion of the U.S.

24   Trustee to help resolve their issues with the emergence

25   incentive plan.

Page 33

1              So we think the requirements of the Bankruptcy

2    Code for payment of executive bonuses don't even apply for

3    these reasons.  But even if they apply, the evidence will

4    demonstrate that EIP easily meets those requirements.  The

5    evidence will show the management team is paid well under

6    market and in fact will continue to be paid under market

7    even after the EIP is paid.

8              And the management team's contributions are far in

9    excess of their typical job duties.  Frankly, we could not

10   be here without the efforts of these executives and we need

11   to make sure that we properly incentivize them so we can

12   maximize value and promptly return cryptocurrency to

13   creditors.

14             The only other significant objections on this list

15   are largely on CEL token.  I believe that Mr. Colodny will

16   be covering that.  It's the Committee's expert on the

17   valuation of CEL token that is really at the heart of this

18   issue.  There are a few other objections that were covered

19   in the Committee's brief but not the Debtors' brief so I'll

20   defer to Mr. Colodny there as well.  This is just an opening

21   statement.  We filed a 150-page brief which not sure if Your

22   Honor has fully read yet.

23             THE COURT:  I have now.

24             MR. KOENIG:  So --

25             THE COURT:  We had a hearing last week.  I hadn't

Page 34

1    been all the way through it, but I have now.

2            MR. KOENIG:  So the brief walkthrough is required

3    in some more detail.  I'm not going to belabor the point.  I

4    know we have a lot of folks to speak.  So unless Your Honor

5    has any questions for me, I'll conclude my remarks by saying

6    we're excited to present our case to confirm the plan.

7    We're going to work to get out of bankruptcy and make

8    distributions to our accountholders.  I'll cede the lectern

9    to my colleague, Elizabeth Jones, who's going to be

10   presenting on the voting results and going to be outlining

11   the witnesses that you're going to hear from this week.

12           THE COURT:  Thank you.

13           MR. KOENIG:  Thank you.

14           THE COURT:  Ms. Jones?

15           MS. JONES:  Good afternoon, Your Honor.  Elizabeth

16   Jones of Kirkland & Ellis on behalf of the Debtors.  If we

17   could start now on Slide 26, which walks through the voting

18   results.  The next two slides, Your Honor, demonstrate the

19   voting results that we filed in Mr. Brian Karpuk's

20   declaration at Docket No. 3560 then was subsequently amended

21   at Docket No. 3574.

22           Your Honor, as demonstrated in the voting results,

23   the plan has been overwhelmingly accepted by accountholders

24   in both number and amount.  Classes 2, 4, 5, 6A, 7, 10, and

25   14 out of our 17 classes voted to accept and while Classes 8

1    and 9 may have voted to reject the plan and we have a few

2    other deemed to reject, as my colleague, Mr. Koenig noted,

3    we can and do think that the plan should be confirmed as we

4    set forth in our papers.

5            Your Honor, if I may --

6            THE COURT:  There's no one junior to those

7    rejecting classes that are receiving anything under the

8    plan?

9            MS. JONES:  Not on behalf of their status as an

10   interest holder, but on behalf of the settlement in Series

11   B.

12           Your Honor, if I may also provide just a few other

13   statistics to demonstrate how successful this solicitation

14   process was.  The Debtors distributed approximately 380,000

15   ballots and received approximately 80,000 in return, giving

16   us a little bit more than a 20 percent return rate.  In

17   comparison to two of the recently filed crypto cases, in

18   Voyager, they had about a 5 to 6 percent return rate and in

19   BlockFi, they had approximately a 10 percent return rate.

20   Both of those had ballots returned anywhere between 35 and

21   65 thousand ballots.

22           Your Honor, what's even more impressive here is

23   that out of those 80,000 ballots that were returned, we had

24   $3 billion worth of those claims out of approximately $5

25   billion in claims; $2.55 billion of that came from holders

Page 36

1    in our Earn class.

2            So Your Honor, what that demonstrates here is that

3    there has been a lot of participation.  We know the ballot

4    was complicated.  It was not an easy check box and yet we

5    were very, very fortunate that we had 80,000 individuals

6    willing to walk through that and demonstrate their support

7    for the plan.

8            In addition, Your Honor, and a few other important

9    statistics, we had roughly only 515 parties opt out of the

10   third-party releases and have only a little bit over

11   1,700 individuals opt out of the class claim settlement.  We

12   had 30,000 proofs of claim filed, so to have only 1,700 of

13   them opt out and elect to continue pursuing that is a huge

14   success from our view.

15           So Your Honor, we would just like to conclude our

16   opening by introducing the witnesses that we will hear from

17   over the next few days in addition to Mr. Karpuk from

18   Stretto.  So Your Honor, we have also filed declarations on

19   behalf of six other witnesses.

20           First, we'll have Mr. Christopher Ferraro, whose

21   declaration was filed at Docket No. 3581.  He is the

22   Debtors' interim chief executive officer, the Debtors' chief

23   financial officer, and the Debtors' chief restructuring

24   officer.  He will be providing evidence in support of

25   certain of the 1129 factors as well as a number of other

Page 37

1    items that we address through our brief.

2           Your Honor, we will also hear from Mr. Robert

3    Compagna, who is a managing director at Alvarez & Marsal.

4    His declaration was filed today -- or was filed last week at

5    Docket No. 3582 and a supplemental declaration was filed

6    shortly before this hearing at Docket No. 3653.  He will

7    also provide evidence in support of certain of the 1129

8    factors as well as the best interest test.

9           Next, Your Honor, we have Mr. Ryan Kielty, who's a

10   partner of Centerview Partners LLC.  His declaration was

11   filed at Docket No. 3592.  He will provide evidence in

12   support of the mining valuation.  You could turn to slide --

13   perfect, than, you, 29.

14          Next, Your Honor, we have Mr. Steven Kokinos,

15   whose declaration was filed at Docket No. 3591.  He is the

16   proposed chief executive officer of Newco and a member of

17   the Fahrenheit Group who was our plan -- and is our plan

18   sponsor.  He will provide evidence in support of the

19   proposed Fahrenheit go forward business plan.

20          Next, Your Honor, we have Ms. Allison Hoeinghaus

21   who has filed a declaration at Docket No. 3586.  She is also

22   a managing director at Alvarez & Marsal and she will provide

23   evidence in support of the Debtors' emerge incentive plan.

24          Finally, Your Honor, we have Mr. Joel Cohen who

25   filed a declaration at Docket No. 3588.  He is a managing

```
 1    director at Stout Risius Ross LLC and he will provide

 2    evidence in support of the Debtors' valuation of certain

 3    liquid and illiquid assets.

 4            So Your Honor, as my colleague, Mr. Koenig noted,

 5    we filed a large brief in support of our argument and we

 6    will hear from the witnesses in the next few days on the

 7    factual basis as to why we think the plan can and should be

 8    confirmed.

 9            We're here today as a result of a lot of hard work

10    and consensus building in the last 14, 15 months and we

11    stand here ready today both to prove our case in chief,

12    confirm the Chapter 11 plan, and hopefully conclude these

13    chapter 11 cases.

14            THE COURT:  Thank you very much.  Mr. Colodny.

15            MR. COLODNY:  Good afternoon, Your Honor.  Aaron

16    Colodny from White & Case on behalf of the Official

17    Committee of Unsecured Creditors.  Could my colleague Mr.

18    Dowdy be made a cohost to share our presentation?

19            CLERK:  Yes, just give me one moment, please.

20            MR. COLODNY:  Thank you.  While you're doing that,

21    Your Honor, I know I always am batting second to Mr. Koenig

22    here.  We come at this from a slightly different

23    perspective, and so while I may repeat some of the things he

24    said, I made an effort to keep my opening remarks shorter

25    for Your Honor.
```

Page 39

```
 1              THE COURT:  They didn't use their full allotted

 2     time.

 3              MR. COLODNY:  To ensure I don't go over, I think

 4     I'll start while they do that.

 5              THE COURT:  That's fine, go ahead.

 6              CLERK:  It's -- he's a cohost.  He's been a cohost

 7     for a little bit.

 8              MR. COLODNY:  Yeah, I see it.  It's just I think

 9     he's working on trying to get it to a presentation slide

10     instead of the PowerPoint people.

11              THE COURT:  No problem.

12              MR. COLODNY:  I'll go a cappella, I guess.

13              THE COURT:  Give it another minute.  I think if

14     you click from the beginning in the upper ribbon, you'll get

15     there.  Go ahead.

16              MR. COLODNY:  All right.  On June 12th, 2022,

17     Celsius paused withdrawals to stop a run on the bank.

18     Before the pause, as will be shown in the next slide,

19     Celsius and executives repeatedly assured accountholders and

20     the public that everything was fine and all their funds were

21     safe.  On the date of the pause, everyone knew that they

22     were not.  For a month, Celsius was silent and rumors

23     flowed.  Then on July 13th, 2022, we filed Chapter 11 cases

24     before this Court with no plan for how these cases would

25     proceed.
```

1          The first day declaration painted a picture of a

2     company that was crippled by the crypto winter and had

3     invested with the wrong people.  At that time, Mr. Mashinsky

4     testified that the company had a $1.2 billion deficit.  The

5     Committee was appointed on July 27th and was tasked with

6     representing the interests of the Debtors' largest

7     constituency, the company's unsecured creditors including

8     nearly 600,000 retail holders who held the majority of the

9     claims against the Debtors.

10          Those accountholders were dispersed all over the

11     world and were without access to their funds.  Shortly

12     thereafter, it became clear that what was testified to in

13     the first day declaration was not the entire story.

14          Rather, information published by the Debtors and

15     investigations conducted by the Committee and independent

16     examiner uncovered a company rife with issues including a

17     hole in the balance sheet that began in March '21, the

18     company's repeated misrepresentations of business practices,

19     an orchestrated corporate cover up of those

20     misrepresentations, and the company's manipulation of the

21     CEL token.

22          And while Mr. Mashinsky and Mr. Leon were telling

23     accountholders that all funds are safe and damn the

24     torpedoes, full speed ahead, they were secretly withdrawing

25     tens of millions of dollars from the platform.  That is

Page 41

1   where we started, with a heavy cloud over these estates,

2   accountholders who had been deceived into entrusting their

3   hard earned assets with Celsius and a platform that was shut

4   down so that the few who were quick to withdraw would not

5   further dissipate the remaining assets to the detriment of

6   those who did not ask.

7           Upon learning all of that information, we acted

8   quickly and firmly to ensure that the bad actors were

9   removed from positions of power that they occupied with

10  control over accountholder assets.  Today, we are before

11  Your Honor with a plan that if confirmed and consummated

12  will distribute nearly $2 billion of Bitcoin and Ethereum

13  and stock in a new company to the Debtors' creditors.

14          The new equity will maximize the value of the

15  Debtors' other assets and provide creditors with the ability

16  to monetize those assets when they would like.  Importantly,

17  the plan also preserves claims against Mr. Mashinsky, Mr.

18  Leon, and others related to that wrongdoing to be prosecuted

19  after the bankruptcy case is concluded.

20          The plan includes explicit carveouts to the

21  typical Chapter 11 releases or excluded parties which

22  include all former employees, equity holders, contract

23  counter parties, promoters, advertisers of Celsius that are

24  not specifically identified as released parties.

25          Now to touch on the plan process a bit and move to

Page 42

1      where we're going with this trial.  Since the beginning of

2      these cases, our Committee has had one goal, to return as

3      much value to creditors as soon as we could responsibly do

4      so.  The process has taken longer than we would like, but we

5      stand on the precipice of confirming the first

6      reorganization of a major cryptocurrency company.

7               And as Mr. Koenig explained, the path to get here

8      was not easy or rarely a straight line.  There were

9      significant and novel legal issues that needed to be

10     resolved to fairly distribute the Debtors' assets.  We

11     methodically navigated those issues before this Court, each

12     time putting accountholders as a whole first, building

13     consensus, and creating a foundation for the plan that's

14     before Your Honor today.

15              We methodically navigated -- while those issues

16     were being determined, the Committee did not stand in place.

17     Rather, we pushed the Debtors and worked cooperatively with

18     them to reorganize and rehabilitate their mining business.

19     That was not an easy task.  The mining business was in

20     disarray upon the filing and after the filing suffered

21     significant setbacks due to the financial issues of many of

22     its major counterparts.

23              As you will hear from Mr. Kielty of Centerview

24     Partners, the Debtors and the Committee ran a competitive

25     sales and auction process that took advantage of a rebound

Page 43

1   in the crypto market and renewed interest in sponsoring the

2   plan of reorganization for the Debtors.  Through the

3   auction, we were able to leverage that competitive tension

4   to bring multiple bidders to the table and drive the best

5   deal possible for creditors including the distribution of a

6   significant amount more liquid cryptocurrency than was in

7   the stocking horse bid.

8        The Debtors for their part understood that

9   creditors would own substantially all of any reorganized

10  business.  And as a part of that auction process, they

11  worked cooperatively with our clients to identify the

12  highest and best -- highest bid and best management team to

13  run the new company.  Given the history of Celsius, it was

14  of paramount importance to our clients that Newco be placed

15  in trusted hands and our clients spent many days with each

16  bidder to make the right choice for who would sponsor that

17  plan.

18       At the end of the auction, the Committee members,

19  as they've done throughout this case, acted unanimously to

20  select the Fahrenheit Group as the winning bidder.

21  Fahrenheit is a group of seasoned professionals with

22  experience in the cryptocurrency industry.  They also have

23  experience building technology companies and managing risk

24  at large financial institutions.  And as you will hear from

25  Mr. Kokinos, the proposed CEO of Newco, each of the members

Page 44

1    of Fahrenheit will be making a significant financial

2    investment in a new company which has yet to be named.

3              Fahrenheit will stand alongside accountholders

4    with aligned incentives to increase the equity value of

5    Newco for the benefit of everyone.  Now, this new company

6    will be a first of its kind business.  It will have

7    significant operations concerning two major

8    cryptocurrencies, a Bitcoin mining company, and it will also

9    stake the company's own ethereum.  I want to touch on three

10   points that guided the Committee's approach to constructing

11   this new company.  First, compliance with applicable

12   regulations.

13             We worked to color inside the lines and consult

14   with the regulators to create a compliant entity out of the

15   gates.  We were presented with many unique ideas for how to

16   reorganize and restructure the claims against the Debtors.

17   In many instances, we opted to take the conservative

18   approach to ensure that we could exit bankruptcy.  That was

19   of paramount importance to my clients.

20             Bankruptcy provides the Debtors with a fresh start

21   upon emergence.  And here, that fresh start is a competitive

22   advantage for the new company that we were unwilling to

23   compromise.  We also understood that to emerge on our

24   timeline, we had to work with regulators to ensure that they

25   were comfortable that accountholders were protected on the

1    other side of these Chapter 11 cases.  As Mr. Koenig

2    mentioned, we've been in constructive dialogue with the

3    regulators which were led by the Debtors throughout this

4    process and the lack of any objection from regulators is a

5    reflection and validation of that approach.  It's also

6    something that differentiates these cases from any other

7    Chapter 11 case concerning a cryptocurrency company.

8            Second, we wanted to provide creditors with

9    liquidity.  We understand that creditors did not sign up to

10   own equity and many creditors need access to their

11   investments.  However, many of the investments that Celsius'

12   prepetition management made are illiquid and selling them

13   now would have resulted in a steep discount.  Putting those

14   assets in a liquidating trust would also not maximize their

15   value, as those instruments typically trade for pennies on

16   the dollar.

17           The plan currently contemplates that those

18   illiquid assets will be transferred to Newco whose equity is

19   anticipated to be listed on NASDAQ.  That unique opportunity

20   is only presented through Section 1145 exemption under the

21   Bankruptcy Code.  And as we flagged in our brief, there are

22   still regulatory approvals that need to be received for that

23   equity to be listed; however, those regulatory approvals

24   will not hold up confirmation.

25           THE COURT:  Is there an estimate of the timeline

1    to get the securities registered?

2           MR. COLODNY:  My understanding, Your Honor, is we

3    are waiting on the SEC audit function to approve a

4    preclearance letter.  Once that preclearance letter is

5    approved, we'll then submit the Form 10 and there's a 60 day

6    waiting period, then, while the SEC reviews that Form 10.

7    But I want to flag, Your Honor, that it is customary for

8    confirmation orders to be entered with a condition precedent

9    to the plan being the receipt of regulatory approvals.

10          And if those necessary regulatory approvals are

11   not obtained, the plan provides for the mechanism to toggle

12   to the plan B.  We believe the plan B will result in lower

13   recoveries, but it will allow the Debtors to proceed with

14   distributing assets to creditors, which is --

15          THE COURT:  Is there an estimate on the time for

16   regulatory approval?

17          MR. COLODNY:  Of the --

18          THE COURT:  When?

19          MR. COLODNY:  I think we're confident it will

20   occur by the end of the year, but I don't know that we've

21   received a set estimate from the SEC at this time.

22          THE COURT:  Okay.

23          MR. COLODNY:  Third, we want to ensure that Newco

24   will be transparent and overseen by a competent and

25   accountable board of directors.  Before I proceed, Your

Page 47

1    Honor, I don't want to make any promises that we are going

2    to receive regulatory approval or emerge by the end of the

3    year.  I think the answer, to be candid, it's unclear and

4    it's dependent on whether the SEC will grant our

5    preclearance letter.

6            THE COURT:  I wasn't looking for promises.

7            MR. COLODNY:  So our third pillar, when we were

8    thinking about this new company, is we wanted to ensure that

9    Newco was transparent and overseen by a competent and

10   accountable board of directors.  Newco will be a public

11   reporting entity that will file 10Ks, 10Qs, and 8Ks of major

12   events.

13           It will be overseen by a qualified board of

14   directors, a majority of which were selected by the

15   Committee through an intensive interview process and Your

16   Honor will hear from our committee member, Major Mark

17   Robinson, regarding the board selection process and why our

18   clients believe that they have selected the best set of

19   experienced directors to oversee this new company.

20           We also heard from our constituency who wanted to

21   ensure that creditors had oversight of that board, and we

22   worked with the Earn group who identified three significant

23   prepetition creditors to act as board overseers.  Now, five

24   prepetition creditors with a significant stake in Newco will

25   have a seat at the table and that board will ensure that

Page 48

1    Newco is operated for the benefit of its shareholders who

2    will initially be creditors.

3              There were lots of debates throughout the auction

4    in these cases about how best to reorganize the Debtors'

5    assets, how to reorganize a cryptocurrency company is not

6    something you can look up in a cookbook, and we went through

7    an intensive process which has been detailed in the record

8    and will be detailed by Mr. Kielty to select the option that

9    the Committee believes and the Debtors believe is the best

10   path forward.

11             We heard loud and clear throughout these cases

12   that creditors were not interested in receiving fiat

13   currency through a liquidation under Chapter 7, and as will

14   be demonstrated by the Debtors' witnesses, the recoveries

15   provided to creditors through the plan far exceed the

16   recoveries that would be provided if the Chapter 7 Trustee

17   was appointed and liquidated the Debtors' cryptocurrency,

18   mining rigs, and illiquid assets.  And quite frankly, it's

19   not close.

20             The culmination of this entire process is an

21   overwhelming vote in favor of the plan.  With over 87,000

22   accountholders voting to accept in the amount of $2.8

23   billion which far surpasses anyone's wildest expectations,

24   and given where these cases started and the long strange

25   trip it's taken to get here, I think we all can say these

Page 49

1   results are a vindication of all the hard work.

2          Now, Mr. Koenig has addressed many of the

3   objections and I want to spend the rest of my time speaking

4   about the proposed treatment of CEL token under the plan.

5   One of the questions before the Court is, what is the CEL

6   token.  The evidence will show that CEL token is a fungible

7   digital representation of ownership of a unit that was

8   issued by the Debtors.  Mr. Ferraro will explain how holders

9   of CEL token could use those tokens to pay the company

10  interest on retail loans at a discounted rate.

11         Accountholders could elect to earn and sell and

12  receive a higher rewards rate on their deposits than if they

13  if they elected to receive in the cryptocurrency the

14  deposited.  And CEL token functioned as a type of airline

15  loyalty miles, where people that held a certain amount of

16  CEL token could get access to lower rates or products that

17  the company was offering.

18         Mr. Ferraro will also testify that after the

19  pause, none of those uses continued to exist.  To be clear,

20  Celsius has no obligation at any time to redeem CEL tokens

21  or make any payment of cash on account of CEL token.  Its

22  only obligation is to return the CEL token to accountholders

23  when requested, if they have accounts in the Earn program.

24         Mr. Ferraro will also testify that Celsius

25  advertised in investor presentations and directly to the

Page 50

1    public that the value of the CEL token represented the

2    success of Celsius.  Mr. Mashinsky regularly touted the

3    value of the CEL token on his public videos and how the

4    efforts of the Celsius team to grow the business would cause

5    the CEL token to increase and used the circular flywheel

6    model to demonstrate this.

7            Put simply, CEL token was an equity or equity-like

8    security whose value rose and fell based on the efforts of

9    Celsius and Celsius' ability to go -- continue as a going

10   concern.  Now, what CEL token is, determines how it should

11   be treated under the Bankruptcy Code.  If CEL token is an

12   equity or equity-like security, it would come after all

13   unsecured claims.  Moreover, if CEL token is determined to

14   be a security, as we have argued in our pleadings, claims

15   arising on account of the purchase or sale of the CEL token

16   would be subordinated and would only recover after all

17   claims are paid in full.

18           However, because the treatment of digital assets

19   under the Bankruptcy Code is a new issue, it is the

20   Committee's position that denying any recovery to CEL token

21   holders who were lied to the same as all other

22   accountholders, would be inequitable.  I want to pause and

23   point out that all eligible accountholders could have

24   elected to earn in CEL token, and those that did so

25   knowingly took a greater risk tied to the success of Celsius

Page 51

1  than those who elected to earn in kind in the cryptocurrency

2  that they transferred to Celsius.

3          For example, those that elected to receive

4  interest in Bitcoin elected to receive a token that had a

5  value independent of Celsius.  Those that deposited Bitcoin

6  and elected to receive in CEL, elected for this riskier

7  option which had the potential for a higher return both in

8  terms of the growth of the token and the amount that they

9  received as interest.

10          But Celsius has now failed, and because there are

11  not enough assets to satisfy all claims, providing value to

12  one set of creditors decreases the amount recoveries for all

13  other creditors.  The Committee attempted to navigate this

14  delicate balance by offering a 25 cent settlement as value

15  of CEL token under the plan.  That settlement was proposed

16  through the plan and after a lot of development, the plan

17  was clear that a vote to accept the plan was a vote to

18  accept that settlement and the settlement was accepted by an

19  overwhelming amount.

20          Those voting results are a testament to the

21  reasonableness of the settlement.  Now at the last hearing,

22  Your Honor noted that the treatment for dissenting CEL token

23  holders cannot be imposed on those dissenting creditors

24  unless the Debtors demonstrate that the treatment meets the

25  best interests of creditors test.

Page 52

1          In other words, the Debtors must show by a

2     preponderance of the evidence that the CEL token holders

3     receive more under this plan than they would receive in a

4     Chapter 7 liquidation.  Here, that test can mean that in

5     three ways.  As we discussed before, first, the Court could

6     find that the CEL token was the equivalent of equity or

7     should be recharacterized as equity.

8          THE COURT:  Let me just stop you there for a

9     minute.  In the SEC's complaint against Mashinsky and

10    Celsius, the complaint takes the position that the Earn

11    accounts under the Howey Test were securities.

12          MR. COLODNY:  Correct.

13          THE COURT:   If the Earn accounts were securities

14    and the CEL token was a security, wouldn't they both be

15    subordinated and essentially be in the same class for

16    distribution?

17          MR. COLODNY:  I don't agree with that, Your Honor.

18          THE COURT:  Okay, tell me why.

19          MR. COLODNY:  Because the Earn accounts are the

20    akin to a debt obligation.  Celsius has a payment obligation

21    under an Earn account to return the assets to

22    accountholders.  In every Chapter 11 case, there are

23    unsecured notes.  Unsecured notes is the first item listed

24    in the definition of security under the Bankruptcy Code, and

25    payment obligations on behalf of unsecured notes are never

Page 53

1  subordinated.  Damage claims arising from those unsecured

2  notes may be, but the payment obligations are not.

3          When I think about the CEL token, it's a security

4  inside of that security and because it's an equity interest

5  with no payment obligation on behalf of the Debtors, it

6  should be treated differently than the Earn accounts.  I

7  know it's a fine distinction, but I think it's one that's

8  incredibly important and it is one that is -- happens in

9  bankruptcy cases all the time.  I've dealt with bankruptcy

10 cases with $2.7 billion worth of payment obligations on

11 unsecured notes and it's never mentioned that those payment

12 obligations will be subordinated.

13         So I think where I was when I left off were the

14 three reasons how it can meet the best interest test.  The

15 first, as I talked about, was if it was recharacterized.

16 The second is 510(b) as you mentioned.  In both cases, the

17 plan could be confirmed if the Court makes either finding if

18 it provided no value to CEL token holders.  However, Your

19 Honor doesn't need to reach those points.

20         As Mr. Compagna will testify, you only need to

21 find by a preponderance of the evidence that the value of

22 the CEL token on the petition date was less than 34 cents to

23 determine that the best interest test is met.  And here,

24 that's clearly the case.

25         THE COURT:  The 34 cents because of what?

1          MR. COLODNY:  Thirty-four cents because if you

2    look at 34 cents times the 47 percent recovery analysis and

3    look at the 25 cent proposed recovery times the 65 percent -

4    - 67 percent reorganization, the 67 percent reorganization

5    on the 25 cent recovery is greater than 47 on the 34

6    percent.  Sorry.

7          Now, if you consider the CEL token in terms of its

8    value being tied to Celsius and consider that Celsius by its

9    own admission was wildly insolvent as of the petition date

10   and that the Celsius platform was shut down and there was no

11   longer a use for the CEL token, the value on the CEL token

12   has to be zero or something close to it.  Mr. Galka, our

13   expert, is going to tell you that determining the specific

14   value of the CEL token at a point in time is not easy

15   endeavor for a number of reasons.

16         First, it lacks any underlying cash flows or

17   financial metrics that would support its value in a manner

18   that's traditionally applied to valuation.  The market price

19   of CEL token could be an indicator of the value; however, as

20   the evidence will show the market price, here was never an

21   accurate indication of its value as it was significantly

22   affected by Celsius' covert purchases of the token prior to

23   the petition date.

24         Celsius advertised that it was purchasing the

25   amount of CEL token it needed to pay customer rewards.  That

Page 55

1    was a business model.  It's one of the critical elements of

2    why CEL token should be a security.  The evidence will show

3    that what Celsius did not tell the public or even many of

4    its employees was that it was purchasing far more than

5    required to pay rewards to inflate the price and create the

6    perception of success for its flailing enterprise.

7            Celsius has admitted that, and I'm quoting from

8    the statement of facts that Celsius admitted was true as

9    part of its non-prosecution agreement it entered with the

10   DOJ.  The rise in the value of the CEL token was not the

11   product of market forces, but was instead attributable to

12   the fact that Celsius executives including Mashinsky had

13   orchestrated a scheme to manipulate the CEL token by taking

14   steps to artificially support the price of CEL.

15           Now, Your Honor will hear testimony from Mr.

16   Galka, our expert witness and Mr. Galka will corroborate

17   that admission and he will --

18           THE COURT:  Is that admission entitled a

19   preclusive weight in this trial?

20           MR. COLODNY:  I'm not sure, standing here today,

21   Your Honor.  But what Mr. Galka will demonstrate by the

22   evidence is that applying every assumption Celsius' favor,

23   it purchased CEL -- it's purchases of CEL token exceeded the

24   amount of CEL token it paid the customer by over $100

25   million.  And that fact led him to conclude that Celsius was

Page 56

1    taking actions to affect the price of the token prepetition.

2    And the market wasn't only affected by Celsius' purchase of

3    the token.  The market was lied to as Celsius persistently

4    misrepresented its financial position and covered up those

5    lies.

6            It was not the case that some people knew and some

7    people didn't.  Some people did.  They watched the videos

8    live and then the clips were deleted.  Now, you only have to

9    look at the first pages of our presentation where Celsius

10   and executives were telling the market everything was fine,

11   while under the curtain, they've admitted they were

12   insolvent by a billion dollars.

13           Now, prior to starting Elementus, Mr. Galka traded

14   complex derivatives for over nine years.  Part of his role

15   in those positions was to identify dislocated markets or in

16   other words, markets where for the price of an asset did not

17   reflect its intrinsic value.  And Mr. Galka will testify

18   that following the date that Celsius paused withdraws based

19   on his review of market data and significant experience

20   trading dislocated markets, it is his opinion that the

21   market for CEL token was extremely dislocated and

22   thereafter, the market price was not remotely accurate

23   indication of its value.

24           Now, at the last hearing, you asked me the very

25   direct question, what will Mr. Galka say the CEL token is

1     worth on the petition date.

2             THE COURT:  Yes, and I gave my permission earlier

3     today that a supplemental declaration can be -- I don't know

4     whether the order got entered or not.  I was not at the

5     courthouse this morning, but I was asked that question.  I

6     gather there was a request to be able to file a supplemental

7     declaration and I approved that.

8             MR. COLODNY:  Correct, Your Honor.  And the reason

9     why we want to file that supplemental declaration is we

10    understood that you want to give everybody the chance to see

11    the testimony.  So we didn't -- even though we didn't want

12    it to come out on the (indiscernible).  We wanted everyone

13    to have the opportunity.  And what Mr. Galka will testify is

14    that if asked to put a price on the CEL token on petition

15    date, he would not have quoted a price.  I think that's

16    unremarkable, and it's because he believes that the CEL

17    token had no value and there were no economics supporting

18    the value of the token on that petition date that he has

19    seen.

20            Mr. Ferraro, the CEO of the company, will

21    similarly testify that he believed the CEL token had little

22    to no value on the petition date and there is no

23    economically rational reason for the value to increase

24    between the pause and the petition date.  Now, people have

25    taken issue with that conclusion, but it should come as no

1   surprise.  In fact, well before the pause, Celsius disclosed

2   that the CEL tokens may become unusable, illiquid, and/or

3   worthless in the event that the Celsius platform ceases to

4   operate.

5          Now, that's enclosed in the risk disclosures that

6   as Your Honor found were accepted by 99 percent of all

7   accountholders.  Put simply, Your Honor, it's unremarkable

8   that a token based off of the success of a company whose

9   sole use related to the operation of the platform that

10  company ran would have no value when that platform

11  spectacularly failed.

12         In closing, these cases have been a difficult

13  journey for all accountholders.  The plan has been accepted

14  by an overwhelming amount of those accountholders and as

15  will be demonstrated throughout this week, it meets all the

16  requirements for confirmation under the Bankruptcy Code and

17  should be confirmed.

18         THE COURT:  Thank you very much, Mr. Colodny.

19         MR. COLODNY:  Thank you.

20         THE COURT:  All right.  Let me hear from the

21  United States Trustee next.

22         MS. CORNELL:  Good morning, Your Honor.

23         THE COURT:  Good afternoon, but very nice to see

24  you in the courtroom, Ms. Cornell.

25         MS. CORNELL:  Shara Cornell for the record, the

1    Office of the United States Trustee.  Your Honor, we

2    appreciate the hard work of all the parties in these cases

3    and their engagement with our office on various issues.  We

4    have an active creditor body which began on first days,

5    continued through the 341 meeting with over 1,000 creditors

6    in attendance, up to and through this confirmation hearing.

7    But our role did not end at the 341 meeting, as is often the

8    case.  This case required more.

9            We actively managed this case which resulted in

10   among other things, an examiner, an ombudsman, and several

11   cost saving measures, and the benefit of the work product of

12   the examiner has been discussed extensively previously.

13   Also given that the Debtors' assets are cryptocurrency, cash

14   management required unique disclosures and protocols to

15   safeguard these assets which are ultimately to be

16   distributed to creditors.

17           We worked with the professionals to ensure the

18   safety of these resources for the Debtors' estate and like

19   the Debtors and the Committee and many of the professionals

20   in this case, we have been routinely contacted by creditors.

21   There was activity by various individuals that resulted in

22   referrals to certain agencies, matters that we take

23   seriously as do our sister agencies and departments.

24           Like the Committee and the Debtors and their

25   professionals, we've also been on the receiving end of toxic

Page 60

1    language and threats --

2            THE COURT:  So has the Court.

3            MS. CORNELL:  -- of course -- from creditors and

4    parties and interest.  But through all of this, our goal has

5    remained steadfast.  We moved this case along.  We're also

6    following the letter and the spirit of the law.  And we do

7    stand here today.  We're nearing the finish line.

8            With all that said, we have a few objections

9    pending to confirmation which we were -- which were agreed

10   at the disclosure statement hearing to be heard today at

11   confirmation.  And during the interim, we've engaged in many

12   discussions with the various professionals and the UST is

13   appreciative of those efforts to claw back in some respects,

14   the exculpation and release provisions.  And there really

15   was a lot of negotiating and in some instances disagreement,

16   but overall the Debtors and their professionals worked

17   diligently to include many of our concerns.

18           We still hope that our remaining issues can be

19   negotiated before the end of this confirmation proceedings.

20   While these revisions were helpful, like the temporal

21   limitation, the exculpation provision, both the exculpation

22   and release provisions are still somewhat overbroad and need

23   further revisions and clarifications on the record, which we

24   expect the Debtors to do in the next few days.

25           First, with respect to exculpation, only estate

Page 61

1    fiduciaries can and should be exculpated by the plan.  While

2    the United States Trustee believes that a proper exculpation

3    tracks 1125(e) of the code providing for a limitation of

4    liability in connection with certain good faith solicitation

5    and plan participation efforts, Courts in this District, as

6    Your Honor knows, routinely follow a Aegean Marine Petroleum

7    Network, Inc., 599 B.R. 717.  But here, the Debtors seek

8    exculpation for former and current --

9             THE COURT:  I'm not sure I agree with that

10    statement completely.  I think that judges on this Court,

11    including myself, have granted broader exculpation than that

12    decision.  So there is not uniformity among the judges on

13    our Court.

14             MS. CORNELL:  No, I would not say there's

15    uniformity, Your Honor.  No.  But it is often quoted and

16    used in this context.

17             Transactional parties are also exculpated in this

18    instance, but they're not limited to the specific

19    transactions that they took part in.  Indeed, the ad hoc

20    Committees, the BRIC, Fahrenheit, the class claim

21    representatives, Coinbase, PayPal, all performed specific

22    and limited acts but are being provided broad protections

23    for any and all work done in connection with these cases.

24    The fact that a party is engaged in one action before a

25    Bankruptcy Court does not entitle that party to have all of

Page 62

1      its actions within a bankruptcy case protected.

2              For example, exculpation for events, occurrences,

3      and agreements is vague and not necessarily limited under

4      Aegean.  Furthermore, we believe a temporal scope is

5      necessary and one has now  been added by the Debtors.  But

6      the scope is confusing when read with the other provisions

7      because the other provisions refer to entities that are not

8      in existence and could not have performed any of the

9      appropriately exculpated actions during the identified

10     scope.  Entities that are not in existence or could not p

11     perform the properly exculpated actions during the temporal

12     scope should be removed to avoid any confusion.

13             Second, the released parties are still over broad

14     as well.  For example, the plan administrator is a released

15     party.  The Debtors have not yet provided a factual basis or

16     a legal basis for his inclusion.  What consideration the

17     plan administrator has made to the case must be identified.

18     Evidence of valuable consideration for each party is

19     necessary.

20             Also, while the Debtors allege that various

21     parties played an important role, for example, certain ad

22     hoc committees, it is unclear as to what valuable

23     consideration those parties gave yet, and the terms like

24     other professionals as it relates to released parties is

25     also somewhat unclear.  Any party to be released should be

Page 63

1    named in the plan and not just referred to, generally

2    speaking, as other professionals.

3           Moreover, the Debtors are yet to explain how

4    claimants that have rejected the plan will be bound by these

5    release provisions.  You're not a releasing party if you

6    have rejected the plan, but you're also a releasing party if

7    you fail to vote for the plan.  This question requires

8    additional information on the record by the Debtors.

9           Lastly, the confirmation order includes a waiver

10   of Rule 3020.  Congress intended to give parties 14 days for

11   a reason and there is no basis to waive that in this case.

12   We do not want to force people or parties into expedited

13   motion practice, which is a waste of judicial resources and

14   estate money.  The most recent agenda I believe was the 29

15   responses for confirmation, which is an unusually large

16   amount of responses, and we do not want to cut off the

17   rights of these parties.

18           There are a lot of issues and I think 14 days,

19   which is the rule not the exception, should be applied in

20   these cases.  Also Your Honor, as an update, after the

21   hearing on Friday regarding the United States Trustee's

22   concerns about Committee membership, as the docket reflects,

23   we filed a supplemental notice of appointment at Docket No.

24   3631.

25           Additionally, Your Honor, United States Trustee

Page 64

1    and the Committee have been in contact over the weekend and

2    have reached a resolution in principle regarding certain of

3    the exculpation language regarding to Mr. Noyes and any

4    potential actions associated therewith.  The language is

5    currently being finalized and we hope to present that to the

6    Court later this week via the Debtor.

7              This concludes our opening remarks and we're

8    available to answer any questions from the Court or

9    otherwise.

10             THE COURT:  Thank you, Mr. Solomon.

11             MS. CORNELL:   Thank you.

12             THE COURT:  All right.  The Ad Hoc Earn Account

13   Group.

14             MS. KUHNS:  Good afternoon, Your Honor.  Joyce

15   Kuhns of Offit Kurman for the Ad Hoc Group of Earn

16   Accountholders.  This has undisputedly been a long and

17   arduous road for the Earn customers, starting with the pause

18   and subsequent revelations of a systemic fraud perpetrated

19   on them, and then navigating the intersection of two

20   seemingly disconnected worlds, the decentralized world of

21   cryptocurrency which they were used to, and the centralized

22   bankruptcy forum which they were not.

23             There were many misunderstandings at that time.

24   New legal theories had to be tested, starting with who owned

25   the customer deposited cryptocurrency.  It is no surprise

Page 65

```
 1    that the January 4 decision determining that it was property

 2    of the estate sent shockwaves through the Earn community.

 3    The concept of dollarization was also concerning,

 4    dollarization of crypto claims as of the petition date, and

 5    at a time when Bitcoin, for example, was steadily rising in

 6    value.  It led to the inevitable Earn question.  Who is

 7    benefiting from the appreciation in the crypto and why isn't

 8    it us?

 9          These were among the concerns that led to the

10    formation of the Ad Hoc Earn Group by significant Earn

11    claimants who realized the need to come together and speak

12    with a unified voice to advance their common goals.  On

13    behalf of the Ad Hoc Group, Mr. Nagi and I would like to

14    publicly thank Brett Perry, Nicholas Farr, and Immanuel

15    Herrmann, the founders of the Ad Hoc Group and its original

16    steering committee members of which Mr. Herrmann was chair,

17    who were dedicated from the onset to two guiding principles,

18    parity among creditors and consensus building, and never

19    wavered in serving the larger Earn community even at the

20    expense of their individual interests.

21          The first test of the ad hoc's cohesiveness came

22    with a July mediation before Judge Wiles.  It also served as

23    a reality check of what could be accomplished and what could

24    not under the Bankruptcy code.  The group's acceptance of

25    certain constraints such as dollarization of crypto claims
```

1    on the petition date led to a successful mediation that set

2    the treatment of Earn versus Borrower claims, led to the

3    Borrower settlement, critical milestones on the path to plan

4    confirmation among other things achieved in the mediation

5    term sheet.

6            Having had a seat at the table at the mediation,

7    the Ad Hoc and its larger constituency recognized the

8    importance of keeping a seat at the table as future

9    stockholders of Newco.  This led to intense series of

10   negotiations among the primary stakeholders, resulting in

11   the Newco -- the three Newco board observer seats being

12   designated by the Ad Hoc Earn Group and Earn designee

13   appointed to the Litigation Oversight Committee responsible

14   for prosecuting future litigation to enhance creditor

15   recoveries, and lastly, to enter into a plan support

16   agreement among the Debtors, the Committee, the Ad Hoc Earn

17   Group, certain Earn pro se claimants, the class action

18   plaintiff Mr. Tuganov, and Simon Dixon.

19           No one got everything they wanted in this case,

20   but everyone had an opportunity to be heard in this

21   courtroom and we appreciate that, Your Honor, as well as to

22   be heard outside the courtroom in an unprecedented mix of

23   media, mass emails, Twitters, telegram, Twitter spaces, town

24   halls and YouTube presentations.  The active participation

25   of creditors in this case has set a new bar for creditor

1    engagement, enabling consensus building to occur and

2    culminating in the astounding result of almost $2.5 billion

3    in Earn claims voting to accept a plan in a crypto case.

4           No one did this alone, admittedly, but as a result

5    of the dedication of many, including the tireless efforts of

6    the Debtors' new management, the Committee, their respective

7    counsel, and their professionals, in a very complex case

8    which as you've heard had many, many active constituents and

9    novel issues.  In the end, the major stakeholders came

10   together in their commitment to deliver the best outcome

11   possible to creditors with the quickest exit achievable.

12          Now we are at the final stage.  We look forward to

13   a successful confirmation process and the long awaited start

14   of distributions, hopefully in 2023, as well as the future

15   opportunities presented to creditors as shareholders in

16   Newco.  Thank you, Your Honor for the time today on the

17   agenda.

18          THE COURT:  Thank you for your presentation.  All

19   right, counsel for the Ad Hoc Borrowers Group.

20          MR. ADLER:  Good afternoon, Your Honor.  David

21   Adler from Carter & English on behalf of the Ad Hoc Group of

22   Borrowers.  First, I want to say it's again pleasure being

23   back in this courtroom. This is only the second time that

24   I've been here since COVID started.  The first was in June,

25   maybe July.

1          But I wanted to talk a little bit about the

2    concerns of the Borrowers, and as Your Honor knows, the

3    group that I represent are the group of individuals who

4    transferred their crypto onto the Celsius platform in

5    exchange for a loan and for which they paid interest.  So

6    they paid interest.  They did not take interest out.  And

7    that was primarily a choice that they made because they

8    wanted to have some liquidity against their crypto, but they

9    didn't want to run the risk of having a disposition event

10   because many, many of the borrowers and Celsius have

11   extremely low basis.  And a disposition event would be very,

12   very bad in this case, especially for some of the higher

13   borrowers.

14          So, going back in time to March, we were happy

15   with the NovaWulf transaction because it kept the loan alive

16   and following the auction, we received thereafter a plan

17   that, in which the Debtor wanted to exercise its setoff

18   rights, which would potentially be very, very bad for the

19   Borrowers in terms of a disposition.  And that was sort of

20   the groundwork where we were when we got to the mediation.

21          So after three intensive days of mediation down

22   the hall and upstairs, the Borrowers reached -- or the

23   steering group reached a resolution on the issues in which

24   the Borrowers would pay back the loans if they could.  They

25   were given the option to do that.  As Mr. Koenig said

Page 69

1   earlier, the Debtors have indicated that they'll cooperate

2   in terms of finding a new lending source, and we've spent

3   many, many, many hours since the mediation identifying new

4   sources who can provide refinancing to the Borrowers.  And

5   in exchange for that, the excess claim is essentially, is

6   treated as the Earn claim.

7           The Borrowers will get back 100 percent of their

8   principal amount in crypto if it's Bitcoin and ETH, but not

9   in the other currencies.  So from the Borrowers'

10  perspective, that was a result that they could live with.

11  Certainly, the voting reflects that the Borrowers were --

12  that the plan was acceptable to the Borrowers, and I do want

13  to say that probably the biggest issue in the mediation was

14  over the liquid crypto weighted distribution because for the

15  Borrowers that need to refinance, they need to get as much

16  crypto as possible in order that their LTVs are in the range

17  that traditional crypto lenders require.  And it's hard to

18  say that, traditional crypto lenders, but be that as it may.

19          So Your Honor, we have -- I worked consensually

20  with the Debtors and the Committee.  I want to thank Mr.

21  Koenig, Mr. Kwasteniet, Mr. Colodny, Mr. Wofford for all

22  their assistance over the last few months in trying to get

23  to an achievable plan.  We do have a couple of issues that

24  will need to be addressed at some point.  I mean, one issue

25  and I've raised it with Mr. Koenig and Mr. Colodny.  It's

1   not a big issue, but there's -- there was supposed to be an

2   election on the ballot form for whether the Borrower wished

3   to repay or not which did not make it on the ballot.  Some

4   subsequent form of notice needs to be sent out to the

5   Borrowers so that they can make that election.

6          And there are also some timing issues that need to

7   be addressed in the plan, but I consider those minor non-

8   substantive issues in this plan.  I mean, the result that

9   was achieved at the mediation as a result of that --

10         THE COURT:  How many Borrowers are there?

11         MR. ADLER:  23,000, Your Honor.  Now, when I say

12  23,000, there are some Borrowers -- if you have Bitcoin and

13  you had ETH, you show up twice on the spreadsheet.  So when

14  you cull all those out, it's probably more like 18,000 or

15  so.  Approximately half of them are in the United States;

16  approximately half of them are international, with the

17  biggest international locations being Australia, Spain.  I

18  think actually Poland is one of the largest jurisdictions

19  and that's because the largest Borrower in this case who

20  I've never spoken to, is apparently a resident of Poland.

21  And you know, I mean, I think that that Europe and Australia

22  dominate on the borrower side of the equation.

23         So, obviously we have a couple of issues to work

24  out, but we are supportive of the plan.  The voting reflects

25  it.  There have been people, Borrowers, who have asked Your

1    Honor for a ruling on the collateral and the only thing that

2    I would say is we would ask Your Honor to limit that ruling

3    to whether it is property of the estate or not, okay, so

4    that we're not making any rulings about any other potential

5    issues.

6              THE COURT:  Okay, thanks, Mr. Adler.

7              MR. ADLER:  Okay.  Thank you, Your Honor.  On that

8    note, I will conclude.

9              THE COURT:  Thank you.  Thank you very much.  I've

10   said this before.  I greatly appreciate what my colleague

11   Judge Wiles did in the three-day mediation.  There were lots

12   of issues that got resolved.  Essentially, it was very

13   important to us being here today.  I appreciate that.

14             All right, the Withhold Ad Hoc Group, Ms. Kovsky.

15             MS. KOVSKY-APAP:  Good afternoon, Your Honor.  Deb

16   Kovsky, Troutman Pepper, on behalf of the Withhold Ad Hoc

17   Group.  As Your Honor knows, at the outset of these cases,

18   the Withhold accountholders, including members of the

19   Withhold Ad Hoc Group were kind of a weird no man's land on

20   the Celsius platform.  They weren't in the Earn program

21   anymore and if the Debtors had been able to offer custody

22   services in their states of residence, they would have been

23   in Custody, but that wasn't the case.  So instead their

24   status was kind of ambiguous, neither fish nor fowl.

25             And the question of the status of their assets

1    could have been litigated all the way to resolution,

2    possibly through appeals at great expense and uncertainty.

3    Instead, the Withhold Ad Hoc Group, the Debtors, and the

4    Committee found a more efficient pathway to deal with the

5    complex and novel questions regarding property of the estate

6    raised by the Withhold assets, and those discussions and

7    pathway resulted in the Withhold settlement, a compromise

8    that provided enhanced treatment for the Withhold

9    accountholders while allowing a substantial bucket of assets

10   to be treated as property of the estate.

11          And the settlement was embodied in the plan and

12   has been overwhelmingly accepted by Class 7, the Withhold

13   accountholders.  The Withhold Ad Hoc Group appreciates the

14   Debtors' and the Committee's willingness to work with us and

15   to find a compromise solution that recognize the claims of

16   the Withhold accountholders while avoiding the cost and

17   complexity of an extended litigation.

18          Withhold Ad Hoc also appreciates the Debtors and

19   the Committee working with us on our informal comments to

20   the plan which obviated the need to file a formal objection.

21   The Withhold Ad Hoc Group was concerned about the potential

22   preclusive effect that the Debtors' calculation of

23   withdrawal preference exposure under the plan might have.

24   The Debtors and Committee agreed to add clarifying language

25   that those calculations will not be binding on any defendant

1    in a subsequent avoidance action.

2              Even more importantly, the plan as it was

3    originally solicited out appeared to give the plan

4    administrator unfettered discretion to distribute fiat

5    currency rather than cryptocurrency to accountholders.  Now,

6    we understand that the plan does provide for the retention

7    of distribution agents for the purpose of distributing

8    cryptocurrency, but those are time limited contracts and

9    there was nothing in the plan that really pushed or

10   encouraged the distribution of crypto rather than fiat.

11             And as Your Honor is well aware from the course of

12   this case, and as Mr. Colodny alluded to, many

13   accountholders feel very, very strongly about getting back

14   crypto, not fiat currency . And this is particularly true in

15   instances where there may be a delay in a claim becoming an

16   allowed claim.  So accountholders are very concerned about

17   potentially not getting the benefit of the appreciation and

18   value of crypto if the plan administrator could simply

19   distribute fiat currency at some later point in time.

20             The Debtors and the Committee agreed to language

21   requiring the plan administrator to use commercially

22   reasonable efforts to make distributions in liquid

23   cryptocurrency, rather than fiat, to the greatest extent

24   possible.  The language requires reserves on account of not

25   yet allowed claims to be held in the form of liquid

Page 74

1    cryptocurrency.  And if by the time a distribution is to be

2    made, there isn't a distribution agent around who can

3    actually distribute crypto, the plan now requires that the

4    crypto be converted to fiat as close to the distribution

5    date as possible, the idea being that this would allow the

6    amount of the fiat to mirror as closely as possible, the

7    appreciated value of the crypto that otherwise would have

8    been distributed.

9           And these changes provide important protections to

10   accountholders.  We really appreciate the constructive

11   approach taken by the estate's professionals in negotiating

12   these terms with us.

13          Finally, I wanted to say a couple of words about

14   the ADR procedures.  The Withhold Ad Hoc Group filed a

15   reservation of rights with respect to the ADR procedures in

16   connection with the disclosure statement hearing.  Since

17   then, we've had extended discussions with the Committee's

18   professionals resulting in significant modifications to the

19   proposed procedures.

20          The Committee has clarified that the procedures

21   are not binding on anyone who did not file a proof of claim

22   and revisions to the procedures which were filed as a

23   redline also make it easier and more straightforward to opt

24   out, and among other changes, make the flow of information

25   between the parties mutual rather than one sided.

Page 75

1          However, as I'm sure you'll hear more from Mr.

2     Kleiner, the ADR procedures are not yet finalized and it

3     does seem a little bit odd and perhaps premature for the

4     Court to approve procedures that are still being discussed

5     and negotiated.

6          The Withhold Ad Hoc Group did not see this as a

7     basis to deny confirmation of a plan, particularly one with

8     widespread support of creditors, including the members of

9     the Withhold Ad Hoc Group themselves; however, we suggest it

10    may make more sense to defer approval of the ADR procedures

11    until they're more fully baked.  But either way, whatever

12    the Court rules, we will certainly continue to --

13          THE COURT:  Speed up the process and finalize

14    everything.

15          MS. KOVSKY-APAP:  We are absolutely working on

16    that.  We are continuing to negotiate the procedures in good

17    faith, exchanged emails today and we are working

18    expeditiously.  So, in conclusion, the Withhold Ad Hoc Group

19    believes the plan is not perfect but no plan of

20    reorganization ever is.  We do believe that it is the best

21    option under the circumstances and we are happy to join the

22    Debtors, Committee, and other ad hoc groups in supporting

23    it.

24          THE COURT:  Thank you very much, Ms. Kovsky.  All

25    right.  Next is Mr. Frishberg.

1            MR. FRISHBERG:  Thank you, Your Honor.  To start

2    off with, I think everyone will agree that I'm direct and I

3    speak my mind, so I will do so today.  I believe that

4    confirming this plan is the best path forward for creditors

5    that we have at this time.  And I'm not saying this only

6    because I'm the PSA, I'm saying this because I truly believe

7    it, that this is the best option we have currently.

8            The Debtors, the UCC, the U.S. Trustee, numerous

9    regulators, all the professionals in this case, and more

10    have done a very, very good job thus far.  (indiscernible)

11    know, this is a very complex and unusual case.  The Debtors

12    and the UCC have stated that accountholders overwhelmingly

13    support the plan, including the visions about the EIP

14    bonuses and releases.

15            I would like to add a bit of clarity to that.

16    Something I have not heard mentioned thus far is that the

17    reason people, creditors such as myself voted for it, it was

18    the only option that was not a very bad scenario of the plan

19    getting voted down.  Customers are very openly against the

20    overly, in my opinion, broad releases to the plan, but

21    again, it is what it is, to (indiscernible) employees and as

22    well in my opinion, the unnecessary (indiscernible)

23    employees.

24            The reason they voted for it is as well as I did

25    is because they want it to be over.  An analogy that I think

Page 77

1    sums this up well, is imagine that you are (indiscernible)

2    deserted island in the middle of nowhere and then you find

3    some moldy bread, a tiny bit of mold.  You're going to eat

4    the bread since it is better than starving to death.  I know

5    I would eat the bread and it seems about 98 percent of

6    creditors chose to also eat the bread.  Though I would love

7    nothing more than to cut off the moldy parts which include

8    the EIP bonuses and a few others.  It's not an option, so I

9    voted for the plan.

10         We must (audio glitch) and we must (audio glitch).

11   This is (audio glitch) the plan being confirmed regardless

12   of the presence of the metaphorical mold, trimming off the

13   metaphorical small moldy parts would improve the plan, but

14   slightly moldy bread is better than nothing in this

15   scenario.  Thank you, Your Honor.

16         THE COURT:  Thank you very much, Mr. Frishberg.

17   All right, Mr. Sabin, you're going to argue for Mr. Tuganov?

18   Just so everybody knows, my plan is after Mr. Sabin, we have

19   three more openings in opposition to the plan.  We'll take a

20   brief recess after Mr. Sabin and before we proceed with the

21   remaining three.  Mr. Sabin, good afternoon.

22         MR. SABIN:  Thank you, Your Honor.  It's a

23   pleasure to be back here in person.  It's a pleasure to

24   hopefully soon stand here and thank many people for tireless

25   work.  I am Jeff Sabin from Venable on behalf of Ignat

1    Tuganov, a long time Earn rewards customer, creditor, one of

2    three class representatives appointed pursuant to the now

3    final order of this Court approving the settlement of the

4    class proof of claim that among other things allowed

5    noncontract claims for all accountholders.

6         And he was also and still is a party to the plan

7    support agreement and spent the better part of his three

8    days, and I did, too, before Judge Wiles.  And you've

9    already taken notice of the benefits of that.

10        I requested ten minutes to otherwise speak to

11   support this plan, to cover matters material to confirmation

12   not covered or otherwise that I thought needed to be

13   supplemented by the very good efforts of all those who come

14   before me, be it Debtors' counsel, UCC counsel, or other

15   supporters.  I'm happy to say that if I were a contestant on

16   "Name That Tune," I can do it in two minutes.

17        But here goes.  First and most importantly, you

18   asked Mr. Colodny a question that I have a supplement to an

19   answer.  There is a provision in the order of approving the

20   class settlement agreement, now final, that otherwise waived

21   objections to otherwise trying to subordinate pursuant to

22   510(b) any of the claims of Earn customers and/or retail

23   borrower customers.

24        Secondly, I believe that that the plan as amended

25   is confirmable, not only because I have confidence that the

1   record will establish by all of the witnesses and the

2   testimony to be educed that otherwise you can make findings

3   of fact that would be supportive of confirmation, but also

4   by the vote itself and the use of the vote in connection

5   with three settlements, not that you otherwise approved, but

6   are embedded in the plan including the retail borrower

7   settlement, which has in it as a component part not yet

8   mentioned in the record of an additional substantive

9   consolidation of several lenders in this case and several

10   debtors in this case.

11          And finally and most importantly, as you've heard,

12   Mr. Tuganov is no different than all of the other customers.

13   He is waiting and hopefully sees the light at the end of the

14   tunnel, indeed, that the PSA milestones of October 31 for

15   entry of a confirmation order and a December 31, 2023

16   effective date can be had.

17          In addition, as you heard from Mr. Colodny,

18   there's no promise that all the conditions to the effective

19   date can be done, but I think we are confident that the

20   tireless efforts will continue, not just of the Debtors and

21   the Committee and the U.S. Trustee, but the regulators

22   themselves and of course, the plan sponsor such that the

23   transparency referred to by Mr. Koenig is indeed going to be

24   helpful to satisfy those conditions.

25          And so, like so many others, it has been a long

Page 80

1     and winding road, and as the song goes, I hope that we soon

2     get to sing a different tune.  Maybe everyone can sing happy

3     or at least happier.  Thank you, Your Honor.

4           THE COURT:  Thank you very much, Mr. Sabin.  All

5     right, we are going to take -- it's 3;40.  We'll take a ten-

6     minute recess.  We'll resume at 3:50 and when we resume Mr.

7     Ubierna, you're up next, okay?  All right.

8           (Recess)

9           THE COURT:  Everybody can sit down.  All right,

10    the Court is back in session.  Mr. Ubierna, it's your turn

11    for an opening statement.

12          MR. UBIERNA DE LAS HERAS:  Good afternoon, Your

13    Honor.  Victor Ubierna, pro se creditor.  Thank you for your

14    time.  First, English is not my native language as I am from

15    Spain.  So I ask that you forgive me if I make any mistake I

16    speak in English.  During this Chapter 11 bankruptcy, I have

17    filed some objections and joinders.  Since the beginning, I

18    believe that while other people were just complaining in

19    social media, the way to be useful to others was to file

20    formal documents.

21          With regard to plan confirmation, I filed an

22    objection with Docket No. 3542.  This bankruptcy have been

23    particularly difficult for many people, so I don't object to

24    closing this difficult chapter in their lives.  I objected

25    to two items.  First, regarding the emergence incentive

Page 81

1    program, I argue that insider employees already receive

2    salaries, that they have a fiduciary duty to act in the best

3    interest of the company, and that the bar is very low for

4    these rewards.  For example, Ferraro will receive a bonus if

5    this Court confirms a plan before the end of October.  It is

6    obvious that a Chapter 11 CEO should be working to get a

7    plan confirmed.

8              Furthermore, a lot of the metrics are just what

9    they should be doing as employees.  These targets are

10   objectives that are well within the scope and scale of their

11   existing contractual obligations to the company as

12   stakeholders and creditors.  Some items haven't got

13   numerical targets and (indiscernible) and can be easily

14   abused.

15             Secondly, I also believe that the releases are too

16   broad and that creditors did not have a real chance to opt

17   out.  (audio glitch) argue that the third party releases are

18   wholly consensual; however, evidence does not point on that

19   direction.  I want to remark that a little more than 5,000

20   holders in voting classes that voted to accept the plan

21   attempted to select the third-party release opt out and were

22   not permitted to do so.  How can they argue that releases

23   are wholly consensual if 5,160 creditors are being forced

24   into them against their will?  I joined what the UST has

25   just said about the releases.

1           Lastly, I do welcome the change that the Debtors

2      made to the release and the exculpation provision.  They

3      clarify that what happened on the failure to file a proof of

4      claim on the Voyager bankruptcy is not covered by those

5      provisions.  That is a good change in response to my

6      objection.  Thank you.  Nothing more for today, Your Honor.

7           THE COURT:  Thank you very much, Mr. Ubierna.

8      You've been a regular participant in the hearings and I

9      appreciate hearing from you.  Thank you.  All right, counsel

10     for Pharos Fund.

11          MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

12     Emanuel on behalf of Pharos.  We're here today for an

13     objection on the best interest of creditors test.  The test

14     is simple.  It's simply whether the Debtors would realize

15     more value under Chapter 7 than what they would realize

16     under the plan as proposed by the Debtors.

17          As Your Honor aptly noted with regard to the CEL

18     token valuation, the test, the burden is on the Debtors to

19     prove that the test is satisfied and as long as the plan is

20     not unanimous, and here our client has objected to the plan,

21     they have to carry that burden.

22          Our simple position is that they have not, that

23     there's insufficient evidence in support of the best

24     interest of creditors test here.  And that is for two

25     reasons.  On the one hand, in support of their plan, the

Page 83

1   Debtors submit a liquidation analysis that is severely

2   depressed.

3            THE COURT:  It usually is.

4            MR. NOSKOV:  Correct, Your Honor, but usually with

5   justification.  And in our view, the evidence this week will

6   show that the severely depressed value which is by about 80

7   to 85 percent of the plan value -- and not just compared to

8   the going concern value, but also to the orderly winddown

9   value scenario under the plan, it's -- the Chapter 7 process

10  is severely depressed.

11           I think the only real argument that is in the

12  declaration supporting such devaluation of the liquidation

13  analysis is a view that's expressed that a Chapter 7 Trustee

14  whose fiduciary duty it is to maximize value of the estate

15  for the creditors and who's empowered by the Bankruptcy Code

16  to do so would not be able to run a proper sale process of

17  these particular assets.  And we intend to probe why the

18  Debtors have arrived at that conclusion throughout this

19  week, Your Honor.

20           THE COURT:  You placed zero value on Newco.

21           MR. NOSKOV:  I can get to Newco as well, Your

22  Honor.  I'm not so sure that we place zero value.

23           THE COURT:  What value do you place on Newco?

24           MR. NOSKOV:  We -- well, I think the question,

25  Your Honor is whether the Debtors place the correct value --

Page 84

1          THE COURT:  I understand that, but do you place

2    any value on Newco?

3          MR. NOSKOV:  Yes, we --

4          THE COURT:  What value do you place on Newco?

5          MR. NOSKOV:  We think that the value -- that the -

6    - we don't disagree with the inherent value that the Debtors

7    present.  We just think it should be severely discounted or

8    discounted at all based on the several risk factors that the

9    Debtors have themselves identified in these cases including

10   in the disclosure statement.

11         THE COURT:  So you're not disputing the value they

12   place on it, but you, you believe it should be discounted

13   from the value they placed on it?

14         MR. NOSKOV:  I believe the way that they've

15   arrived at the value, which again, will come in through

16   evidence and we will probe exactly how they did so because

17   we think the disclosure has not been sufficient, we believe

18   that that testimony will show that they did not adequately

19   discount it based on risk factors that they have identified

20   themselves and based on how creditors have spoken in

21   choosing their options under the plan.

22         So with that, Your Honor, I think that goes to the

23   Newco value.  That has nothing to do with the orderly

24   winddown scenario which the Debtors propose, which is a

25   value of $450 million for the assets, which compared to the

Page 85

1    liquidation value, which is about 88, is significantly

2    higher and I'm not sure why --

3                THE COURT:  But you agree, I take it, that a

4    comparator has to be the liquidation value, not the orderly

5    winddown value, the comparator for the best interest test --

6                MR. NOSKOV:  The best interest test should compare

7    what would happen in a Chapter 7, the hypothetical Chapter 7

8    proceeding, versus the winddown value or the plan value,

9    whichever one is more likely.  It's a difficult comparison

10   and we'll probe which one is really appropriate, but yes,

11   it's what would happen in a Chapter 7 value, but I don't

12   think that it's appropriate to devalue what would happen in

13   a Chapter 7 by as much as the Debtors have done here.  There

14   are tools at the behest of the Chapter 7 Trustee that --

15               THE COURT:  May I ask, do you plan to call any

16   witnesses on liquidation value?

17               MR. NOSKOV:  We ourselves are not in a position to

18   put in witnesses ourselves.  To the extent that the Court

19   would be willing to override the deadlines that have

20   occurred --

21               THE COURT:  No, I -- the deadlines are the

22   deadlines, but the deadline for those to submit direct

23   written testimony in opposition to the plan hasn't run yet.

24               MR. NOSKOV:  The deadline, I believe, Your Honor,

25   for experts has passed and our client was not in a position

Page 86

1    to do so.  To the extent that Your Honor suggests we can put

2    in affirmative evidence, we'd be glad to do so.

3              THE COURT:  Bear with me a second.  The order

4    establishing case management procedures for the confirmation

5    hearing is ECF 3478.  In Paragraph 4 on page 3, says, "On or

6    before 12 noon October 11th, 2023, all parties in interest

7    shall file and docket written direct testimony under oath

8    and copies of exhibits that they expect to offer in

9    opposition to confirmation."

10             MR. NOSKOV:  Your Honor, that that comes as a

11   surprise to me and if that's the case --

12             THE COURT:  It's on the docket.  That's been --

13   you know, this order was entered on September 15th because I

14   wanted to be sure everybody knew when they had to put in

15   evidence.

16             MR. NOSKOV:  I appreciate you pointing us to that

17   order, Your Honor, and certainly something that we will

18   consider.  But my point today is only --

19             THE COURT:  Here's what I want to know.

20             MR. NOSKOV:  Sure.

21             THE COURT:  Do you plan[ to offer evidence or

22   simply to cross examine the Debtors' witnesses -- Debtor and

23   the Committee's witnesses?

24             MR. NOSKOV:  We certainly intend to cross examine

25   the Debtors' witnesses, Your Honor.  Our client, given the

1   situation -- and certainly I can explain what it is --

2          THE COURT:  I'm not interested in your client's

3   situation --

4          MR. NOSKOV:  -- has not, to this date, been able

5   to -- we, with the client, have not gotten to a point where

6   we can put in evidence affirmatively, but we may, Your

7   Honor.

8          THE COURT:  That's fine.  You can cross examine

9   their experts, but I just wanted to know -- October 11th was

10  the deadline for anybody in opposition to confirmation to

11  put in written evidence, and I was trying to ascertain

12  whether it's your expectation that you're going to offer

13  evidence by October 11, written evidence.

14         MR. NOSKOV:  Your Honor, if I may, may I reserve

15  on that and answer and --

16         THE COURT:  Yes.  The deadline hasn't come yet.

17         MR. NOSKOV:  Thank you very much.  Getting back to

18  regardless of affirmative evidence, which we may or may not

19  put forward, we think that on their own, the disclosures

20  that are provided by the Debtors are insufficient to support

21  the analysis that they provided.  I think on the one hand,

22  they depress value of a Chapter 7 process which actually

23  Courts have called an orderly winddown just the same as what

24  they're proposing with the orderly winddown scenario.

25         We think that the Chapter 7 Trustee is well within

1    its power to run a sophisticated process and so that

2    discount is much too low.  And on the other side of the

3    equation, we think that appropriate discounts have not been

4    applied to the value of the Newco and the other assets that

5    would be, you know, part of the proposed plan.

6          We think that obviously the -- in some sense, the

7    best interest of creditors is mathematical and so once you

8    push one of those values up and one of them down, that the

9    Debtors do not satisfy the test under 1129(a)(7), and

10   therefore the claim should be rejected.  And we think that,

11   with just the bare conclusionary assertions that are in the

12   declaration without further backup and without our ability

13   to probe them in cross examination, the Debtors cannot

14   satisfy the test.

15         THE COURT:  Thank you.

16         MR. NOSKOV:  Thank you.

17         THE COURT:  All right.  Harrison Schoenau.  Is

18   that you, Mr. Kleiner?

19         MR. KLEINER:  Yes.  Thank you.  Thank you, Your

20   Honor.  Good afternoon.

21         THE COURT:  Go ahead, Mr. Kleiner.

22         MR. KLEINER:  Barry Kleiner from Kleinberg,

23   Kaplan, Wolff & Cohen for Harrison Schoenau.  I asked the

24   Court for five minutes of time to frame our position and I

25   very much appreciate the opportunity, but I hope to follow

1     Mr. Sabin's lead and he's much less than that.

2              To be clear, we are not objecting to the plan

3     itself.  Rather, we filed a limited response objecting

4     solely to approval of the ADR procedures as implemented in

5     the plan and as they apply to avoidance action defendants.

6     We laid out the specific items we objected to in our

7     response that was filed as Docket No. 3529 and the Debtor

8     and Committee (indiscernible).  I know that you'll read our

9     objection and the responses, so I just wish to make two

10    points today.

11             First, we are primarily here because the Committee

12    has insisted on retaining the right to (indiscernible) ADR.

13             THE COURT:  Say that again?  I'm sorry, just

14    repeat that.

15             MR. KLEINER:  Yes, so we're primarily here because

16    of the fact that the Committee has retained in the ADR

17    procedures the right to force parties into ADR even if they

18    (indiscernible).  As Ms. Kovsky noted, we have been in

19    discussion with them and the Committee, for example, has

20    agreed that parties can't be forced to offer counter, but

21    nonetheless, we're a bit troubled by the insistence that

22    even if they (audio glitch) they're forced to proceed with

23    ADR.  We're troubled that that remains a (indiscernible).

24             The other point is, (audio glitch) I want to

25    address, again, as Ms. Kovsky noted, the procedures aren't

Page 90

1    yet complete.  We have been, since the disclosure statement

2    hearing -- and I don't want to understate this.  In fact,

3    the parties have been cooperating in good faith working

4    together.  The procedures that were filed in preparation for

5    confirmation differ from those that were filed at the time

6    disclosure statement and much progress has been made, but

7    some items remain open.

8          Since the time we filed the objection and right

9    now, the parties have been in communication and we expect

10   that we'll continue to communicate and hopefully resolve

11   these issues.  But as we stand here today, it's not done yet

12   and you don't have in front of you a final (audio glitch)

13   procedures to approve.

14         So we ask two things.  One, if Your Honor is to

15   approve ADR (audio glitch), we understand why you might, you

16   don't -- you approve them without the ability to force

17   people who don't think it would be (audio glitch) to

18   participate.  And second, since the procedures still remain

19   incomplete, you would delay approval until the parties have

20   had a time to finish it.

21         I would just submit that there's really -- there's

22   no urgency to this particular issue until the effective

23   date.  It's not something that has to be done by

24   confirmation.  Obviously, we would like to, but really, this

25   is something that's only relevant when the plan is prepared

Page 91

1    to go effective because it really deals with claims

2    objections and avoidance actions which have not yet been

3    brought.  Thank you.

4            THE COURT:  All right, let me just make a couple

5    of comments on that.  One, I think I commented earlier,

6    speed it up, because assuming that the plan is confirmed, I

7    don't want to leave issues hanging out there.  Okay.  This

8    is a little different than some of the other issues, but

9    it's my goal that everything be resolved if the plan is

10   going to be confirmed.

11           Second, I'm not saying that the issues as to which

12   the ADR proceeding -- procedures would apply are identical

13   to the issues I've had in other cases, but I will just tell

14   you, I have in large Chapter 11 cases, I have approved

15   mandatory ADR procedures.  You know, the issues here may be

16   a little different.  You may have arguments why you don't

17   think it should be mandatory.  But I -- in more than one

18   large case, I have approved mandatory ADR procedures.  Just

19   saying that.

20           I may -- you know, you or somebody else may be

21   able to persuade me, well, that should -- it should be

22   different here for whatever the reason.  Now is not the time

23   to argue it.  What I would urge is, and I appreciate you

24   indicated certainly willingness to continue to do this, is

25   try to hammer out these issues in a way that's consensual.

1    Okay?

2              MR. KLEINER:  I agree, Your Honor.  I think we

3    just didn't quite have enough time --

4              THE COURT:  And I understand that.  Okay.  All

5    right.  We have heard all of the opening statements from

6    people who requested openings.  The order that I had entered

7    with the order in which, and the time allocation -- and I

8    appreciate that everybody stuck to their time allocations.

9    Very much appreciated.

10             So I wanted to talk -- and anybody who wants to be

11   excused certainly can be.  There were issues about how

12   exhibits are going to be handled and I raised this in a

13   prior hearing, just -- I conduct public trials.  Sealing or

14   redaction has to be an absolute minimum.  And I wanted to

15   cover some of those issues, and I didn't get a chance to

16   look at over the weekend -- trust me, I was working on this

17   -- the sealing motion that was made, so I want to get a

18   better understanding.

19             So let me just make some general points on it and

20   I'm willing to hear argument, and frequently it's the U.S.

21   Trustee who rightfully, in my view, is defending what the

22   Bankruptcy Code creates as the presumption that all these

23   bankruptcy hearings are going to be public.  I appreciate

24   that.  Okay.  There are certain things, from what I've

25   looked at and talked with my clerks about, that I have less

Page 93

1     problem with that.

2              For example, the Debtor has unresolved litigation

3     claims that it's pursuing.  StakeHound, to -- just to name

4     one.  I certainly don't think that the Debtor should be

5     obligated to file exhibits on the public -- unredacted

6     exhibits on the public docket that say how they internally

7     have assessed those claims.   That's just an example.

8              So yes, there are things that should be redacted.

9     How we deal with it during the hearing is -- also can be an

10    issue.  When I've had in other cases in trial where we don't

11    -- where a witness is testifying and involves some redacted

12    documents, we've usually tried to keep the test -- they've

13    been directed, don't talk about the numbers that have been

14    redacted, talk more generally, including a cross

15    examination.

16             So yes, I have dealt with it in the past.  So I

17    would like to get a better idea.  I guess the thing -- and I

18    said this at the last hearing we had, when I heard that the

19    Debtor was proposing a link on the docket that required

20    people to sign a confidentiality agreement, that was

21    unacceptable to me.  So -- but go ahead.

22             MR. McCARRICK:  Yes, Your Honor.  The amended --

23             THE COURT:  -- identify yourself.

24             MR. McCARRICK:  I'm sorry.  T.J. McCarrick,

25    Kirkland & Ellis, on behalf of the Debtors.  The Debtors

Page 94

1    filed an amended motion to seal at Docket No. 3644.  It

2    supersedes the initial --

3                   THE COURT:  Okay.

4                   MR. McCARRICK:  -- request for sealing at Docket

5    No. 3635.  We've substantially narrowed the scope of

6    information on the exhibit list that we seek to seal.  It's

7    only certain cells on four exhibits and candidly, Your

8    Honor, it's not even clear that those are going to be

9    offered into evidence.  So I don't expect this is going to

10   be an issue to your practical point of whether or you'll

11   have to seal the courtroom or how we address it.

12                  There are four Excels and there are tabs.  So

13   Exhibit 53, it's the Coin Manual Adjustment tab and it cells

14   B15, B17, E15, to E17.  For Exhibit 55, it's the Coin Manual

15   Adjustments tab and cells B14 to B16, B101 to B103, E14 to

16   E16, and E101 to E103.  For Exhibit 56, again it's the Coin

17   Manual Adjustments tab and it cells B14 to B16, B101 to

18   B103,  E14 to E16, and E101 to E103.  And finally, it's

19   Exhibit 62, it's the Coin Manual Adjustments tab, the

20   Comments column and the CBP Illustrative Recovery tab, cells

21   K55 to K57.

22                  And what we're dealing with here, Your Honor, it's

23   relating to litigation and asset recovery assessments.  And

24   so the redactions are pretty slim at this point.

25                  THE COURT:  Here's what I would ask you to do.

1    Maybe you've done it already.  Confer with the Committee and

2    the U.S. Trustee, and let's see if those parties are in

3    agreement about it, and if they are, then I'm okay with

4    sealing -- or redaction.  It's not wholesale sealing, it's

5    redacting certain cells -- subject to further order of the

6    Court so that if evidence develops in a way that I -- that,

7    you know, we have to address it, we'll address it.

8                But if the U.S. Trustee, the Committee and the

9    Debtors agree on these redactions, we go forward on that

10   basis subject to any subsequent Court ruling, which in

11   principle what you describe, I understand the reason for

12   doing that and I'm fine with it, okay.  But I want you to

13   have a discussion with the U.S. Trustee about it.

14               MR. McCARRICK:  Yes, Your Honor.

15               THE COURT:  Because what I found is they're the

16   only ones who really try to protect the public interest and

17   disclosure of what happens.  Okay.

18               MR. McCARRICK:  That's it, Your Honor.

19               THE COURT:  Okay.  I guess it was PII and --

20               MR. McCARRICK:  Yeah, the --

21               THE COURT:  The PII, I think I already said,

22   absolutely should be redacted.

23               MR. McCARRICK:  Yes.  Just, last, one housekeeping

24   matter.  To the extent that the Debtors are going to use

25   demonstratives with any of their exhibits, do you want those

1    filed 5 p.m. the docket the day before or just use them in

2    Court?

3                THE COURT:  I would like them filed before, for

4    this reason.  Obviously, we start the evidence tomorrow.

5    The public and the media are not permitted under new

6    guidance from the Administrative Office of the Courts,

7    they're not permitted -- they're only permitted to be in the

8    courtroom or we have an overflow room if we need it, but

9    there are parties in interest who are appearing remotely and

10   so that we don't have any delays.  If you're going to use

11   demonstratives, post them the night before so that anybody

12   who wants access to it can see that.

13                Demonstratives typically are not introduced in

14   evidence.  They are -- they're illustrative for purposes of

15   testimony and used for that purpose, but it would be helpful

16   if demonstratives are filed the -- you know, by five o'clock

17   the day before they're going to be used.

18                MR. McCARRICK:  Yes, Your Honor.

19                THE COURT:  Okay?  All right.  So does anybody

20   else have any other issues either about exhibits or anything

21   else in terms of our procedures that we're going to be

22   following during the trial?  Mr. McCarrick, shouldn't have

23   sat down so quickly.

24                MR. McCARRICK:  I know.  For folks who are

25   appearing virtually who may cross examine using exhibits, I

Page 97

1    guess I seek the Court's guidance on how that should be

2    handled because the witness may not have a copy.  As far as

3    I can tell, there's been no exhibit list disclosed by anyone

4    other than the Committee and the Debtors.  That's just the

5    one practical question I have.

6         THE COURT:  That's true.  I would say this.  If

7    anyone who is appearing remotely, any party in interest

8    appearing remotely, who wishes to cross examine any of the

9    witnesses and wishes to use exhibits that are not already

10   marked, they should also post them on the docket by 5 p.m.

11   the day before a witness is testifying.  Okay.  So there

12   often is an exception for impeachment exhibits, but we're

13   not -- because we're doing this with remote access and --

14   look, I've appreciated, you know, at one point early in this

15   case, we had 786 people on Zoom.

16        And what it is demonstrated to me, is it has

17   really helped with the transparency of the bankruptcy

18   proceeding.  If there are people on Zoom who are going to

19   cross examine witnesses, they'll have to, you know, use the

20   raise hand function to be recognized to do that.  Obviously,

21   cross examination needs to be limited to the scope of the

22   direct examination that's occurred, but I want to be -- give

23   some leeway to people, particularly nonlawyers in their

24   examination.  I certainly reserve the right either to

25   sustain objections that are made or myself limit the cross

Page 98

1    examination that can be done.

2         But it's a new world with us trying to do --

3    particularly in a case like this where there are so many

4    creditors who are not in the New York metropolitan area who

5    want to appear, and if they wish to cross examine.  So, yes,

6    I'm directing that if you're going to appear and cross

7    examine remotely, if you intend to use any exhibits, you're

8    going to need to post them as proposed cross examination

9    exhibits by 5 p.m. the day before a witness testifies, which

10   necessarily is going to require that the parties here who

11   are calling witnesses disclose the day before who the

12   witnesses are going to be for the next day.

13        MR. McCARRICK:  Yes, Your Honor.  Do you want us

14   to file that on the docket?

15        THE COURT:  I think you should, because again,

16   we've got people appearing remotely.

17        MR. McCARRICK:  Yes, Your Honor.

18        THE COURT:  And I think in response to a question

19   for clarification that the Debtors had asked, if, rather

20   than having to recall witnesses during the opposition case,

21   you know, I'm not going to limit cross examination to the

22   scope of the direct, if someone was planning on calling

23   someone as part of their main case.  There's no jury.  We'll

24   do it.  I want, to the fullest extent possible, that a

25   witness when they testify and they're done, they're done.

Page 99

1    They don't have to come back.  So, okay.  Any other

2    questions, Mr. McCarrick?

3              MR. McCARRICK:  I can't promise in between here

4    and there, but thank you.

5              THE COURT:  Good exercise.  Anybody else have any

6    other issues they want to raise about how we're going to be

7    proceeding?  Mr. Koenig, who are we going to hear from

8    tomorrow?  Well, I picked on you, Mr. Koenig, but if

9    somebody else -- if Mr. McCarrick wants to get up again, he

10   can.

11             MR. McCARRICK:  This has been very special for me,

12   yes, Your Honor.

13             THE COURT:  I'm sure.

14             MR. McCARRICK:  We anticipate tomorrow calling Mr.

15   Ferraro, Mr. Kokinos, potentially Mr. Kielty, Mr. Cohen.  I

16   would expect that would --

17             THE COURT:  Okay.

18             MR. McCARRICK:  -- likely be it.  Those are at

19   least four.

20             THE COURT:  So my expectation, we're going to

21   start at nine.  We'll take a recess.  We'll take one break

22   in the morning and then a lunch break and then we'll

23   continue probably until five o'clock is my expectation.  My

24   pattern has been that if a witness is almost done for the

25   day, we'll go late.  Okay, try -- so they don't have to come

Page 100

1    back the next morning.  Okay?

2              MR. McCARRICK:  Thank you again, Your Honor.

3              THE COURT:  Go ahead and sit down again, Mr.

4    McCarrick.  Anybody have a question for Mr. McCarrick, if we

5    want him to come back.  All right.  I will see you all in

6    the morning, okay?

7              CLERK:  Judge, there's two parties on Zoom that

8    are -- have their hand up.

9              THE COURT:  Okay, I didn't see that.  Okay.

10             CLERK:  Yeah.

11             THE COURT:  Yes?

12             MR. KIRSANOV:  Good afternoon, Your Honor.

13   Dimitry Kirsanov, pro se creditor.  I was not listed on the

14   objections and I have concerns that involve best interest

15   and adverse amendments to the plan after the vote, ballot

16   valuation issues, and continued lack of clarity regarding

17   CEL valuation and custody in Hawaii.  I was wondering if I

18   could be heard today.

19             THE COURT:  Not in an opening statement.  I made

20   clear that the opening statements request had to be filed by

21   the deadlines that I gave.  I've heard everyone.  I

22   respected the time request that everyone had made.  I'm not

23   going to reopen -- this doesn't preclude you -- let me make

24   clear.  This does not preclude you from examining witnesses

25   on these issues.  The only thing that I did was fix a

Page 101

1    specific date and time as a deadline for requests for

2    opening statements.

3              So it doesn't preclude you from raising this issue

4    during the trial, cross examining where appropriate, but no

5    more opening statements today.

6              MR. KIRSANOV:  Thank you, Your Honor.

7              THE COURT:  Okay.  Anybody else wish to be heard

8    on Zoom?

9              CLERK:  I don't see any additional hands, Judge.

10             THE COURT:  Okay.  Thank you very much.  I'll see

11   everybody in the morning.

12             (Whereupon these proceedings were concluded at

13   4:23 PM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 102

1                    C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  October 3, 2023

| & | | | |
|---|---|---|---|
| **&**  3:10 6:1,16 16:9 34:16 37:3,22 38:16 67:21 88:23 93:25 | **1129**  36:25 37:7 88:9 | **22-10964**  1:3 | **3630**  16:23 |
| | **1145**  45:20 | **22nd**  6:4 | **3631**  63:24 |
| | **11501**  102:23 | **23,000**  70:11 70:12 | **3635**  2:9 94:5 |
| **0** | **11th**  86:6 87:9 | **230,000**  18:4 | **3644**  2:8 94:1 |
| **09002**  5:23 | **12**  86:6 | **245**  4:17 | **3653**  37:6 |
| **1** | **12151**  102:7 | **25**  51:14 54:3,5 | **380,000**  35:14 |
| **1,000**  18:23 59:5 | **12th**  39:16 | **26**  18:5 34:17 | **3:50**  80:6 |
| **1,700**  36:11,12 | **1301**  6:18 | **2700**  3:20 | **4** |
| **1.2**  31:9 40:4 | **13th**  39:23 | **27th**  40:5 | **4**  17:2 34:24 65:1 86:5 |
| **10**  34:24 35:19 46:5,6 | **14**  34:25 38:10 63:10,18 | **284**  5:10 | **40**  80:5 |
| **100**  32:19 55:24 69:7 | **15**  27:5 38:10 | **29**  37:13 63:14 | **400,000**  32:6 |
| **10003**  5:16 | **150**  33:21 | **2:13**  1:17 | **4000**  5:3 |
| **10004**  1:14 4:4 | **151**  5:15 | **3** | **42nd**  5:15 |
| **10010**  6:5 | **15th**  86:13 | **3**  35:24 80:5 86:5 102:25 | **4430**  7:3 |
| **10022**  3:13 4:11 | **17**  34:25 | **30,000**  36:12 | **450**  31:2 84:25 |
| **10110**  6:12 | **18,000**  70:14 | **300**  3:5 102:22 | **47**  54:2,5 |
| **10167**  4:18 | **1800**  5:3 | **3020**  63:10 | **48075**  5:4 |
| **10ks**  47:11 | **2** | **31**  79:14,15 | **4:23**  101:13 |
| **10qs**  47:11 | **2**  1:16 31:25 34:24 41:12 | **330**  102:21 | **5** |
| **11**  16:12 17:5 17:14 20:16 24:7 28:15 31:16 38:12,13 39:23 41:21 45:1,7 52:22 80:16 81:6 87:13 91:14 | **2.5**  67:2 | **34**  18:4 53:22 53:25 54:2,5 | **5**  34:24 35:18 35:24 96:1 97:10 98:9 |
| | **2.55**  35:25 | **341**  59:5,7 | **5,000**  81:19 |
| | **2.6**  32:17 | **3478**  86:5 | **5,160**  81:23 |
| | **2.7**  53:10 | **35**  35:20 | **50**  26:5 |
| | **2.8**  48:22 | **3529**  89:7 | **500**  6:11 |
| | **20**  35:16 | **3542**  80:22 | **51**  6:4 |
| | **20004**  6:19 | **3560**  34:20 | **510**  53:16 78:22 |
| | **2022**  17:2 39:16,23 | **3574**  34:21 | **515**  36:9 |
| | **2023**  1:16 22:25 67:14 79:15 86:6 102:25 | **3581**  36:21 | **53**  94:13 |
| **1125**  61:3 | | **3582**  37:5 | **53092**  7:4 |
| | **21**  40:17 | **3586**  37:21 | **55**  94:14 |
| | | **3588**  37:25 | **555**  3:20 |
| | | **3591**  37:15 | |
| | | **3592**  37:11 | |

**56**  94:16
**565**  31:5
**590**  4:10
**599**  61:7

**6**

**6**  35:18
**60**  46:5
**600**  30:20
**600,000**  40:8
**601**  3:12
**60654**  3:6
**62**  94:19
**65**  35:21 54:3
**67**  54:4,4
**6a**  34:24

**7**

**7**  30:25 32:18
34:24 48:13,16
52:4 72:12
82:15 83:9,13
85:7,7,11,13
85:14 87:22,25
88:9
**717**  61:7
**786**  97:15

**8**

**8**  34:25
**80**  23:11 83:6
**80,000**  35:15
35:23 36:5
**85**  83:7
**87,000**  48:21
**88**  85:1
**8ks**  47:11

**9**

**9**  5:22 35:1
**90071**  3:21
**9019**  2:4
**94040**  5:11
**96**  28:18
**98**  28:18 77:5
**99**  58:6

**a**

**aaron**  3:23
38:15
**ability**  41:15
50:9 88:12
90:16
**able**  18:18,18
21:15,17,19
24:3 26:23
43:3 57:6
71:21 83:16
87:4 91:21
**abreu**  7:7
**absolute**  29:21
29:22 30:5,14
30:16 92:14
**absolutely**
75:15 95:22
**abused**  81:14
**academically**
23:5
**accept**  32:14
34:25 48:22
51:17,18 67:3
81:20
**acceptable**
69:12

**acceptance**
65:24
**accepted**  16:13
28:17 34:23
51:18 58:6,13
72:12
**access**  17:20
40:11 45:10
49:16 96:12
97:13
**accomplished**
65:23
**account**  4:9 5:2
49:21 50:15
52:21 64:12
73:24
**accountable**
46:25 47:10
**accountholder**
41:10
**accountholders**
16:13,17,20
17:19 19:23
21:1,12 22:7,8
23:3,9,17,24
24:6 25:7 26:3
26:6 29:6
31:18,20 32:8
32:13 34:8,23
39:19 40:10,23
41:2 42:12
44:3,25 48:22
49:11,22 50:22
50:23 52:22
58:7,13,14
64:16 71:18
72:9,13,16

**acceptance** 73:5,13,16
74:10 76:12
78:5
**accounts**  22:7
49:23 52:11,13
52:19 53:6
**accurate**  54:21
56:22 102:4
**achievable**
67:11 69:23
**achieve**  28:20
**achieved**  66:4
70:9
**acknowledge**
31:16
**act**  47:23 81:2
**acted**  41:7
43:19
**action**  20:14,18
25:3 61:24
66:17 73:1
89:5
**actions**  56:1
62:1,9,11 64:4
91:2
**active**  22:8
59:4 66:24
67:8
**actively**  17:10
59:9
**activity**  59:21
**actors**  41:8
**acts**  61:22
**actually**  22:3
31:1,9 70:18
74:3 87:22

| | | | |
|---|---|---|---|
| **ad** 4:9,16 5:2 16:16 23:1 26:10,13,16 28:21 61:19 62:21 64:12,15 65:10,13,15,21 66:7,12,16 67:19,21 71:14 71:16,19 72:3 72:13,18,21 74:14 75:6,9 75:18,22 | 94:19 **adler** 4:20 67:20,21 70:11 71:6,7 **administrative** 96:6 **administrator** 20:14,25 32:22 62:14,17 73:4 73:18,21 **admission** 54:9 55:17,18 | **affect** 56:1 **affected** 54:22 56:2 **affirmative** 86:2 87:18 **affirmatively** 30:1 87:6 **afternoon** 16:3 16:4 27:8 34:15 38:15 58:23 64:14 67:20 71:15 77:21 80:12 88:20 100:12 | 32:1 62:3 **ahead** 30:8 39:5,15 40:24 88:21 93:21 100:3 **airline** 49:14 **aizpuru** 7:9 **akin** 52:20 **alex** 11:24 13:8 **aligned** 44:4 **alive** 68:15 **allege** 62:20 |
| **add** 72:24 76:15 **added** 62:5 **addition** 36:8 36:17 79:17 **additional** 24:15,16,19 26:9 28:19 63:8 79:8 101:9 | **admitted** 55:7 55:8 56:11 **admittedly** 67:4 **adr** 74:14,15 75:2,10 89:4 89:12,16,17,23 90:15 91:12,15 91:18 | **agencies** 17:10 18:9 59:22,23 **agenda** 63:14 67:17 **agent** 74:2 **agents** 32:5 73:7 **ago** 27:10 | **alleged** 17:11 **allison** 37:20 **allocation** 92:7 **allocations** 92:8 **allotted** 39:1 **allow** 20:24 46:13 74:5 |
| **additionally** 63:25 **address** 37:1 89:25 94:11 95:7,7 | **advance** 65:12 **advanced** 23:21 **advantage** 29:9 42:25 44:22 | **agree** 52:17 61:9 76:2 85:3 92:2 95:9 **agreed** 19:25 20:5,13 26:4 | **allowed** 21:19 22:20 73:16,25 78:4 **allowing** 72:9 **alluded** 73:12 **alongside** 26:6 |
| **addressed** 49:2 69:24 70:7 **adequately** 84:18 **adjacently** 30:11 **adjustment** 94:13 **adjustments** 27:15 94:15,17 | **adversary** 19:9 **adverse** 100:15 **advertised** 49:25 54:24 **advertisers** 41:23 **aegean** 61:6 62:4 **afework** 7:8 | 27:21 29:8 60:9 72:24 73:20 89:20 **agreement** 19:3 26:12 55:9 66:16 78:7,20 93:20 95:3 **agreements** 18:12 26:16 | 44:3 **alternative** 22:9 23:21 **alvarez** 37:3,22 **ambiguous** 71:24 **amended** 2:6 34:20 78:24 93:22 94:1 **amendments** 26:12 100:15 |

Page 4

amount 21:6
28:18,23,24
29:2 32:19
34:24 43:6
48:22 49:15
51:8,12,19
54:25 55:24
58:14 63:16
69:8 74:6
amulic 7:10
amy 8:19
analogy 76:25
analysis 30:22
54:2 83:1,13
87:21
andrea 7:10
andrew 7:24
12:24 14:8
angeles 3:21
annemarie
12:18
announce 20:9
announced
26:8
answer 21:12
47:3 64:8
78:19 87:15
anticipate
99:14
anticipated
45:19
anybody 17:14
87:10 92:10
96:11,19 99:5
100:4 101:7
anymore 71:21

anyone's 48:23
apap 5:6 10:23
71:15 75:15
apparently
70:20
appeals 72:2
appear 98:5,6
appeared
17:17 73:3
appearing 96:9
96:25 97:7,8
98:16
applicability
23:2
applicable 2:4
44:11
applied 54:18
63:19 88:4
apply 33:2,3
89:5 91:12
applying 55:22
appoint 17:17
appointed
17:24 40:5
48:17 66:13
78:2
appointment
18:1,2 63:23
appreciate
59:2 66:21
71:10,13 74:10
82:9 86:16
88:25 91:23
92:8,23
appreciated
74:7 92:9
97:14

appreciates
72:13,18
appreciation
65:7 73:17
appreciative
60:13
approach
44:10,18 45:5
74:11
appropriate
85:10,12 88:3
101:4
appropriately
62:9
approval 26:13
46:16 47:2
75:10 89:4
90:19
approvals
45:22,23 46:9
46:10
approve 46:3
75:4 90:13,15
90:16
approved 30:4
30:6 46:5 57:7
79:5 91:14,18
approving
78:3,19
approximately
35:14,15,19,24
70:15,16
aptly 82:17
archer 14:17
arduous 64:17
area 98:4

areas 25:15
argue 30:22
31:1 77:17
81:1,17,22
91:23
argued 30:7
50:14
arguing 22:8
28:3
argument
30:25 38:5
83:11 92:20
arguments
91:16
arising 50:15
53:1
armand 7:11
arrived 83:18
84:15
artificially
55:14
artur 7:7
ascertain
87:11
aside 20:24
asked 19:19
56:24 57:5,14
70:25 78:18
88:23 98:19
assertions
88:11
assessed 93:7
assessments
94:23
asset 56:16
94:23

[assets - believe]                                                    Page 5

**assets** 24:25
25:2,8 28:7,8
30:20 31:5,9
38:3 41:3,5,10
41:15,16 42:10
45:14,18 46:14
48:5,18 50:18
51:11 52:21
59:13,15 71:25
72:6,9 83:17
84:25 88:4
**assist** 25:22
**assistance**
69:22
**associated** 64:4
**assuming** 91:6
**assumption**
55:22
**assured** 39:19
**astounding**
67:2
**attempted**
51:13 81:21
**attendance**
59:6
**attorneys** 3:4
3:11,18 4:2,9
4:16 5:2,14 6:2
6:10,17
**attributable**
55:11
**auction** 20:10
24:17,17,21
42:25 43:3,10
43:18 48:3
68:16

**audio** 77:10,10
77:11 81:17
89:22,24 90:12
90:15,17
**audit** 46:3
**austin** 12:20
**australia** 70:17
70:21
**authorizing**
2:7
**available** 64:8
**avenue** 3:12
4:10,17 6:4,11
6:18
**avery** 9:4
**avoid** 62:12
**avoidance** 73:1
89:5 91:2
**avoiding** 72:16
**awaited** 67:13
**aware** 73:11

**b**

**b** 1:21 23:13,16
24:2,7 29:22
29:25 30:7,19
35:11 46:12,12
53:16 78:22
**b.r.** 61:7
**b101** 94:15,17
**b103** 94:15,18
**b14** 94:15,17
**b15** 94:14
**b16** 94:15,17
**b17** 94:14
**back** 21:21
28:23 29:2
60:13 67:23

68:14,24 69:7
73:13 77:23
80:10 87:17
99:1 100:1,5
**backup** 26:20
26:25 88:12
**bad** 41:8 68:12
68:18 76:18
**baked** 75:11
**balance** 28:22
28:24 40:17
51:14
**ballot** 36:3
70:2,3 100:15
**ballots** 35:15
35:20,21,23
**bank** 39:17
**bankruptcy**
1:1,12,23 2:4
16:19 19:15
21:4,24 22:4
22:23 26:23
31:19 33:1
34:7 41:19
44:18,20 45:21
50:11,19 52:24
53:9,9 58:16
61:25 62:1
64:22 65:24
80:16,22 82:4
83:15 92:22,23
97:17
**bar** 66:25 81:3
**bare** 88:11
**barry** 6:14
10:21 88:22

**barse** 7:12
**based** 50:8
56:18 58:8
84:8,19,20
**basis** 28:2 29:1
38:7 62:15,16
63:11 68:11
75:7 95:10
**batshon** 14:18
**batting** 38:21
**bear** 86:3
**becin** 7:13
**becoming**
73:15
**began** 40:17
59:4
**beginning** 19:9
39:14 42:1
80:17
**behalf** 20:15
23:24 34:16
35:9,10 36:19
38:16 52:25
53:5 65:13
67:21 71:16
77:25 82:12
93:25
**behest** 85:14
**belabor** 34:3
**believe** 26:2,21
28:2 33:15
46:12 47:18
48:9 62:4
63:14 75:20
76:3,6 78:24
80:18 81:15
84:12,14,17

85:24
**believed** 57:21
**believes** 26:4
   48:9 57:16
   61:2 75:19
**belonged** 22:9
**ben** 8:24 14:21
**benefit** 21:1
   26:3 44:5 48:1
   59:11 73:17
**benefiting** 65:7
**benefits** 78:9
**bernstein** 7:14
**best** 21:7,8
   29:17,21 30:21
   32:15 37:8
   43:4,12,12
   47:18 48:4,9
   51:25 53:14,23
   67:10 75:20
   76:4,7 81:2
   82:13,23 85:5
   85:6 88:7
   100:14
**better** 29:3
   77:4,14 78:7
   92:18 93:17
**bid** 43:7,12
**bidder** 24:12
   43:16,20
**bidders** 24:14
   24:16 43:4
**bidding** 20:6
**bids** 24:15
**big** 70:1
**biggest** 69:13
   70:17

**billion** 31:9,25
   35:24,25,25
   40:4 41:12
   48:23 53:10
   56:12 67:2
**binding** 32:14
   72:25 74:21
**biswas** 14:19
**bit** 35:16 36:10
   39:7 41:25
   68:1 75:3
   76:15 77:3
   89:21
**bitcoin** 25:15
   25:17,18 41:12
   44:8 51:4,5
   65:5 69:8
   70:12
**blockfi** 35:19
**board** 17:7,24
   46:25 47:10,13
   47:17,21,23,25
   66:11
**body** 59:4
**bonus** 81:4
**bonuses** 33:2
   76:14 77:8
**borrow** 26:10
   26:14,17 28:5
**borrower**
   28:21 29:16
   66:2,3 70:2,19
   70:22 78:23
   79:6
**borrower's**
   29:15

**borrowers**
   4:16 27:25
   28:1,9,10,15
   28:18 29:9,19
   67:19,22 68:2
   68:10,13,19,22
   68:24 69:4,7,9
   69:11,12,15
   70:5,10,12,25
**bound** 63:4
**bowling** 1:13
   4:3
**box** 36:4
**bradley** 9:7,14
**bread** 77:3,4,5
   77:6,14
**break** 99:21,22
**brendan** 6:10
**brett** 65:14
**breuder** 7:15
**brian** 10:14
   11:7,18 34:19
**bric** 61:20
**brief** 27:13
   33:19,19,21
   34:2 37:1 38:5
   45:21 77:20
**briefly** 26:18
   27:23
**brier** 7:16
**brifkani** 7:17
**bring** 20:18,21
   43:4
**brings** 27:3
**broad** 20:11
   61:22 62:13
   76:20 81:16

**broader** 61:11
**bronge** 7:18
**brought** 91:3
**brown** 7:19,20
**bruh** 7:21
**bryan** 14:9
**bucket** 72:9
**build** 26:9
**building** 19:15
   19:22 22:24
   38:10 42:12
   43:23 65:18
   67:1
**burden** 82:18
   82:21
**burgos** 5:23
**burks** 13:16
**business** 17:11
   17:19 18:9
   21:23 22:22
   24:24,25 25:1
   25:8,22 26:4,5
   31:3 37:19
   40:18 42:18,19
   43:10 44:6
   50:4 55:1
**businesses**
   25:4
**button** 31:17

---

**c**

**c** 3:1 7:16 15:5
   16:1 102:1,1
**ca** 3:21 5:11
**caceres** 7:23
**calculation**
   72:22

| | | | |
|---|---|---|---|
| **calculations** 72:25 | 73:12 76:9,11 79:9,10 86:4 | 50:1,3,5,7,10 50:11,13,15,20 | **centralized** 64:21 |
| **calendar** 22:14 | 86:11 91:18 | 50:24 51:6,15 | **cents** 53:22,25 |
| **call** 85:15 | 97:15 98:3,20 | 51:22 52:2,6 | 54:1,2 |
| **calle** 5:22 | 98:23 | 52:14 53:3,18 | **ceo** 22:1 43:25 |
| **called** 87:23 | **cases** 17:2,15 | 53:22 54:7,11 | 57:20 81:6 |
| **calling** 98:11 | 18:14,23 19:4 | 54:11,14,19,25 | **certain** 2:8 |
| 98:22 99:14 | 19:8,9,17 20:3 | 55:2,10,13,14 | 36:25 37:7 |
| **cameron** 8:10 | 20:16,19,21 | 55:23,23,24 | 38:2 49:15 |
| 9:22 | 21:20,22 22:15 | 56:21,25 57:14 | 59:22 61:4 |
| **candid** 47:3 | 22:19,20 23:25 | 57:16,21 58:2 | 62:21 64:2 |
| **candidly** 94:7 | 25:12 26:19 | 82:17 100:17 | 65:25 66:17 |
| **cappella** 39:12 | 35:17 38:13 | **cells** 94:7,13,15 | 92:24 94:7 |
| **carl** 8:9 | 39:23,24 42:2 | 94:17,20 95:5 | 95:5 |
| **caroline** 14:3 | 45:1,6 48:4,11 | **celsius** 1:7 16:9 | **certainly** 19:10 |
| 15:13 | 48:24 53:9,10 | 17:10,21,21 | 19:18 20:3 |
| **carolyn** 9:21 | 53:16 58:12 | 18:21 22:22 | 31:12 69:11 |
| **carry** 82:21 | 59:2 61:23 | 24:23 25:1 | 75:12 86:17,24 |
| **carter** 67:21 | 63:20 71:17 | 28:6,8,12,13 | 87:1 91:24 |
| **carty** 7:24 | 84:9 91:13,14 | 32:4,5 39:17 | 92:11 93:4 |
| **carveouts** 41:20 | 93:10 | 39:19,22 41:3 | 97:24 |
| **carver** 7:25 | **cash** 20:6 | 41:23 43:13 | **certified** 102:3 |
| **case** 1:3 3:17 | 49:21 54:16 | 45:11 49:20,24 | **chair** 8:1 65:16 |
| 17:5,14 18:14 | 59:13 | 50:2,4,9,9,25 | **challenges** 17:22 |
| 18:20 19:14 | **casillas** 5:22 | 51:2,5,10 | **challenging** |
| 20:9 21:7 | **catherine** 12:15 | 52:10,20 54:8 | 17:4 23:14 |
| 23:15 30:12,12 | **cause** 50:4 | 54:8,10,22,24 | **chance** 57:10 |
| 34:6 38:11,16 | **causes** 20:14 | 55:3,7,8,12,22 | 81:16 92:15 |
| 41:19 43:19 | 20:18 25:3 | 55:25 56:2,3,9 | **chang** 8:2 |
| 45:7 52:22 | **cbp** 94:20 | 56:18 58:1,3 | **change** 32:23 |
| 53:24 56:6 | **ceases** 58:3 | 68:4,10 71:20 | 82:1,5 |
| 59:8,8,9,20 | **cede** 34:8 | **cent** 51:14 54:3 | **changes** 74:9 |
| 60:5 62:1,17 | **cel** 2:3 33:15 | 54:5 | 74:24 |
| 63:11 66:19,25 | 33:17 40:21 | **center** 5:3 | **chapter** 16:12 |
| 67:3,7 68:12 | 49:4,5,6,9,14 | **centerview** | 17:5,14 20:16 |
| 70:19 71:23 | 49:16,20,21,22 | 37:10 42:23 | 28:15 30:25 |

31:16 32:18
38:12,13 39:23
41:21 45:1,7
48:13,16 52:4
52:22 80:16,24
81:6 82:15
83:9,13 85:7,7
85:11,13,14
87:22,25 91:14
**chase** 11:17
**check** 19:7
36:4 65:23
**chen** 14:12,20
**chicago** 3:6
**chief** 36:22,22
36:23 37:16
38:11
**choice** 43:16
68:7
**choosing** 84:21
**chose** 77:6
**chris** 3:8 7:13
16:9
**christopher**
8:5 11:1 12:7
13:12 14:25
36:20
**chubak** 8:3
**circular** 50:5
**circumstances**
20:3 75:21
**cirkel** 8:4
**claim** 23:23
28:13 36:11,12
61:20 69:5,6
73:15,16 74:21
78:4 82:4

88:10
**claimants** 63:4
65:11 66:17
**claims** 20:14
20:18,24 21:1
23:20,23 28:11
29:4 30:23
35:24,25 40:9
41:17 44:16
50:13,14,17
51:11 53:1
65:4,25 66:2
67:3 72:15
73:25 78:5,22
91:1 93:3,7
**claire** 4:6
**clarification**
98:19
**clarifications**
27:15 60:23
**clarified** 74:20
**clarify** 82:3
**clarifying**
72:24
**clarity** 76:15
100:16
**clarke** 14:21
**class** 23:23
32:15 36:1,11
52:15 61:20
66:17 72:12
78:2,4,20
**classes** 32:13
34:24,25,25
35:7 81:20
**claw** 60:13

**clear** 28:5
29:25 40:12
48:11 49:19
51:17 89:2
94:8 100:20,24
**cleared** 24:8
**clearly** 53:24
**clerk** 16:7
38:19 39:6
100:7,10 101:9
**clerks** 92:25
**click** 39:14
**client** 82:20
85:25 86:25
87:5
**client's** 87:2
**clients** 21:15
43:11,14,15
44:19 47:18
**clips** 56:8
**clock** 31:24
**close** 48:19
54:12 74:4
**closely** 74:6
**closing** 58:12
80:24
**cloud** 41:1
**cnl** 23:18 24:4
**coco** 8:5
**code** 33:2
45:21 50:11,19
52:24 58:16
61:3 65:24
83:15 92:22
**cofsky** 8:6
**cohen** 6:9
37:24 88:23

99:15
**cohesiveness**
65:21
**cohost** 16:5,7
38:18 39:6,6
**coin** 94:13,14
94:16,19
**coinbase** 32:1
61:21
**collaboratively**
16:15
**collateral** 28:9
71:1
**colleague** 16:5
34:9 35:2 38:4
38:17 71:10
**colodny** 3:23
21:14 33:15,20
38:14,15,16,20
39:3,8,12,16
46:2,17,19,23
47:7 52:12,17
52:19 54:1
55:20 57:8
58:18,19 69:21
69:25 73:12
78:18 79:17
**color** 44:13
**column** 94:20
**come** 29:11
38:22 50:12
57:12,25 65:11
78:13 84:15
87:16 99:1,25
100:5
**comes** 86:10

comfortable
  44:25
commencem...
  16:10
commented
  91:5
comments
  27:17 72:19
  91:5 94:20
commercially
  73:21
commitment
  67:10
committee
  3:18 16:16
  17:24 18:6,25
  19:5,8,10,12
  19:23,25 20:2
  20:6,8,17,21
  20:23 21:4,5
  21:10 23:21
  38:17 40:5,15
  42:2,16,24
  43:18 47:15,16
  48:9 51:13
  59:19,24 63:22
  64:1 65:16
  66:13,16 67:6
  69:20 72:4,19
  72:24 73:20
  74:20 75:22
  79:21 89:8,11
  89:16,19 95:1
  95:8 97:4
committee's
  20:25 33:16,19
  44:10 50:20

72:14 74:17
  86:23
committees
  61:20 62:22
common  65:12
communicate
  90:10
communicati...
  90:9
community
  65:2,19
compagna  37:3
  53:20
companies
  43:23
company  25:10
  40:2,4,16
  41:13 42:6
  43:13 44:2,5,8
  44:11,22 45:7
  47:8,19 48:5
  49:9,17 57:20
  58:8,10 81:3
  81:11
company's
  32:10 40:7,18
  40:20 44:9
comparator
  85:4,5
compare  85:6
compared  83:7
  84:25
comparison
  35:17 85:9
compensation
  31:17

competent
  46:24 47:9
competitive
  24:14,20 42:24
  43:3 44:21
complained
  29:22
complaining
  80:18
complaint  52:9
  52:10
complete  90:1
completed
  26:15
completely
  31:1 61:10
complex  23:14
  56:14 67:7
  72:5 76:11
complexity
  72:17
compliance
  44:11
compliant
  44:14
complicated
  36:4
component
  79:7
compromise
  44:23 72:7,15
concept  65:3
concern  50:10
  83:8
concerned
  72:21 73:16

concerning
  44:7 45:7 65:3
concerns  17:18
  18:9 60:17
  63:22 65:9
  68:2 100:14
concessions
  19:3,25
conclude  34:5
  36:15 38:12
  55:25 71:8
concluded
  41:19 101:12
concludes  64:7
conclusion
  57:25 75:18
  83:18
conclusionary
  88:11
condition  46:8
conditions
  79:18,24
conduct  92:13
conducted
  18:4 40:15
confer  95:1
confidence
  78:25
confident
  46:19 79:19
confidential
  2:8
confidentiality
  93:20
confirm  16:18
  34:6 38:12

confirmable
78:25
confirmation
2:1 16:11,11
17:3 27:21
45:24 46:8
58:16 59:6
60:9,11,19
63:9,15 66:4
67:13 75:7
78:11 79:3,15
80:21 86:4,9
87:10 90:5,24
confirmed 35:3
38:8 41:11
53:17 58:17
77:11 81:7
91:6,10
confirming
42:5 76:4
confirms 81:5
confusing 62:6
confusion
62:12
congress 63:10
connection
61:4,23 74:16
79:4
conscious 21:3
consensual
18:10 81:18,23
91:25
consensually
22:11 69:19
consensus 19:1
19:16,22 22:24
26:9 27:12

38:10 42:13
65:18 67:1
consent 19:11
20:5,8,11
consented 18:2
conservative
44:17
consider 54:7,8
70:7 86:18
consideration
62:16,18,23
consistent
29:15
consolidation
23:23 79:9
constantine
9:1
constituency
40:7 47:20
66:7
constituents
67:8
constraints
65:25
constructing
44:10
constructive
23:22 45:2
74:10
constructively
21:15,17 29:8
consult 44:13
consummated
41:11
contact 64:1
contacted
59:20

contemplates
45:17
contestant
78:15
context 16:22
61:16
continue 33:6
36:13 50:9
75:12 79:20
90:10 91:24
99:23
continued
17:15 32:9
49:19 59:5
100:16
continuing
75:16
contract 41:22
contracts 73:8
contractual
23:20 81:11
contribute
25:21
contributions
24:22 33:8
control 41:10
converted 74:4
cook 8:7
cookbook 48:6
cooperate
29:12 69:1
cooperated
18:3
cooperating
21:24 90:3
cooperatively
42:17 43:11

coordinating
32:2
copies 86:8
copy 16:24
97:2
cordry 8:8
cornell 4:6
58:22,24,25,25
60:3 61:14
64:11
corporate
40:19
correct 52:12
57:8 83:4,25
corroborate
55:16
cost 59:11
72:16
costly 19:20
cote 8:9
counsel 67:7
67:19 78:14,14
82:9
counter 41:23
89:20
counterparts
42:22
counting 18:24
country 25:2
25:18 102:21
couple 27:10
27:23 69:23
70:23 74:13
91:4
course 60:3
73:11 79:22

| | | | |
|---|---|---|---|
| **court** 1:1,12 16:2,25 23:11 23:19 30:6 31:13 33:23,25 34:12,14 35:6 38:14 39:1,5 39:11,13,24 42:11 45:25 46:15,18,22 47:6 49:5 52:5 52:8,13,18 53:17,25 55:18 57:2 58:18,20 58:23 60:2,2 61:9,10,13,25 64:6,8,10,12 67:18 70:10 71:6,9 75:4,12 75:13,24 77:16 78:3 80:4,9,10 81:5 82:7 83:3 83:20,23 84:1 84:4,11 85:3 85:15,18,21 86:3,12,19,21 87:2,8,16 88:15,17,21,24 89:13 91:4 92:4 93:23 94:3,25 95:6 95:10,15,19,21 96:2,3,19 97:6 98:15,18 99:5 99:13,17,20 100:3,9,11,19 101:7,10 | **court's** 22:16 97:1 **courthouse** 57:5 **courtney** 13:16 **courtroom** 58:24 66:21,22 67:23 94:11 96:8 **courts** 61:5 87:23 96:6 **cover** 40:19 78:11 92:15 **covered** 33:18 56:4 78:12 82:4 **covering** 33:16 **covert** 54:22 **covid** 67:24 **craig** 15:11 **create** 44:14 55:5 **creates** 92:22 **creating** 42:13 **creditor** 59:4 66:14,25 78:1 80:13 100:13 **creditors** 3:19 16:20 18:21,23 19:1,1,7 20:16 21:8 24:6 25:24 28:10 29:24 30:8 33:13 38:17 40:7 41:13,15 42:3 43:5,9 45:8,9,10 | 46:14 47:21,23 47:24 48:2,12 48:15 51:12,13 51:23,25 59:5 59:16,20 60:3 65:18 66:25 67:11,15 75:8 76:4,17 77:6 81:12,16,23 82:13,24 83:15 84:20 88:7 98:4 **crews** 8:10 **crippled** 40:2 **critical** 55:1 66:3 **critically** 23:13 **cross** 31:12 86:22,24 87:8 88:13 93:14 96:25 97:8,19 97:21,25 98:5 98:6,8,21 101:4 **crusell** 8:11 **crypto** 17:6 22:9 23:11 25:13 35:17 40:2 43:1 65:4 65:7,25 67:3 68:4,8 69:8,14 69:16,17,18 73:10,14,18 74:3,4,7 **cryptocurren...** 44:8 | **cryptocurrency** 17:20 22:6 23:8 24:24 25:4,6,15 28:4 28:7,12,23 29:2 31:25 32:6 33:12 42:6 43:6,22 45:7 48:5,17 49:13 51:1 59:13 64:21,25 73:5,8,23 74:1 **cull** 70:14 **culminating** 67:2 **culmination** 16:14 48:20 **cunha** 7:22 **currencies** 69:9 **currency** 31:3 48:13 73:5,14 73:19 **current** 18:5 61:8 **currently** 45:17 64:5 76:7 **curt** 8:14 **curtain** 56:11 **custody** 22:11 22:15 23:1,4 26:17 32:4 71:21,23 100:17 **customary** 46:7 |

**customer**
54:25 55:24
64:25 78:1
**customers**
23:19 64:17
76:19 78:22,23
79:12
**cut** 63:16 77:7

**d**

**d** 12:1 13:6
16:1
**d'amico** 13:25
**dalhart** 8:12
**damage** 53:1
**damn** 40:23
**dan** 10:13 11:3
13:17
**daniel** 5:8 9:8
**danielle** 14:2
**darius** 9:13
**darschewski**
8:13
**data** 56:19
**date** 32:7,21
39:21 53:22
54:9,23 56:18
57:1,15,18,22
57:24 65:4
66:1 74:5
79:16,19 87:4
90:23 101:1
102:25
**dave** 11:15
**david** 4:20
7:12 8:12 9:4
13:3,7,21 15:2
15:14 67:20

**day** 40:1,13
46:5 71:11
96:1,17 97:11
98:9,11,12
99:25
**days** 17:15
19:14 26:11
36:17 38:6
43:15 59:4
60:24 63:10,18
68:21 78:8
**dc** 6:19,19
**de** 5:20 80:12
**deadline** 85:22
85:24 87:10,16
101:1
**deadlines**
85:19,21,22
100:21
**deal** 23:13 43:5
72:4 93:9
**dealing** 94:22
**deals** 91:1
**dealt** 30:10
53:9 93:16
**deanna** 16:4
**death** 77:4
**deb** 71:15
**debates** 48:3
**deborah** 5:6
10:23 14:13
**debt** 52:20
**debtor** 1:9 19:7
20:16 64:6
68:17 86:22
89:7 93:2,4,19

**debtor's** 2:6
19:8
**debtors** 2:7 3:4
3:11 6:17 19:6
19:22 20:20
22:7 23:20
26:16 31:4
32:20,21 33:19
34:16 35:14
36:22,22,23
37:23 38:2
40:6,9,14
41:13,15 42:10
42:17,24 43:2
43:8 44:16,20
45:3 46:13
48:4,9,14,17
49:8 51:24
52:1 53:5
59:13,18,19,24
60:16,24 61:7
62:5,15,20
63:3,8 66:16
67:6 69:1,20
71:21 72:3,14
72:18,22,24
73:20 75:22
76:8,11 78:14
79:10,20 82:1
82:14,16,18
83:1,18,25
84:6,9,24
85:13 86:22,25
87:20 88:9,13
93:25,25 95:9
95:24 97:4
98:19

**deceived** 41:2
**december** 22:5
22:14 79:15
**decentralized**
64:20
**decided** 17:25
18:25
**decision** 20:9
21:3 61:12
65:1
**decisions** 20:9
**declaration**
34:20 36:21
37:4,5,10,15
37:21,25 40:1
40:13 57:3,7,9
83:12 88:12
**declarations**
36:18
**decreases**
51:12
**dedicated** 21:6
65:17
**dedication**
21:10 67:5
**deemed** 35:2
**defendant**
72:25
**defendants**
89:5
**defending**
92:21
**defenses** 23:3
**defer** 33:20
75:10
**deficit** 40:4

**definition**
  52:24
**defrauded**
  31:18,20
**delay**  19:21
  73:15 90:19
**delayed**  23:6
**delays**  96:10
**deleted**  56:8
**delicate**  51:14
**deliver**  67:10
**dell**  8:14
**demonstrate**
  30:23 33:4
  34:18 35:13
  36:6 50:6
  51:24 55:21
**demonstrated**
  25:14 34:22
  48:14 58:15
  97:16
**demonstrates**
  36:2
**demonstratives**
  95:25 96:11,13
  96:16
**deny**  75:7
**denying**  50:20
**department**
  4:1
**departments**
  59:23
**dependent**
  47:4
**deposited**
  17:20 28:4,13
  29:2 49:14

  51:5 64:25
**deposits**  49:12
**depress**  87:22
**depressed**  17:6
  83:2,6,10
**derivatives**
  56:14
**describe**  95:11
**deserted**  77:2
**designated**
  66:12
**designee**  20:25
  66:12
**desire**  21:12
**destructive**
  25:10
**detail**  34:3
**detailed**  48:7,8
**determine**
  53:23
**determined**
  42:16 50:13
**determines**
  50:10
**determining**
  54:13 65:1
**detriment**  41:5
**devaluation**
  83:12
**devalue**  85:12
**develop**  24:9
**developing**
  19:21 22:3,21
  25:22
**development**
  23:7 51:16

**developments**
  22:13
**develops**  95:6
**dewey**  30:11
**dialogue**  45:2
**dias**  8:16
**diaz**  8:17
**dietrich**  15:4
**differ**  90:5
**difference**
  32:18
**different**  21:25
  38:22 79:12
  80:2 91:8,16
  91:22
**differentiates**
  45:6
**differently**
  53:6
**difficult**  17:16
  58:12 80:23,24
  85:9
**difiore**  8:15
**digital**  49:7
  50:18
**diligently**
  60:17
**dimitry**  7:1
  10:19 100:13
**direct**  56:25
  76:2 85:22
  86:7 97:22
  98:22
**directed**  93:13
**directing**  98:6
**direction**  17:23
  81:19

**directly**  49:25
**director**  37:3
  37:22 38:1
**directors**  17:24
  46:25 47:10,14
  47:19
**disagree**  84:6
**disagreed**
  21:18
**disagreement**
  60:15
**disarray**  42:20
**disclose**  98:11
**disclosed**  58:1
  97:3
**disclosure**
  60:10 74:16
  84:10,17 90:1
  90:6 95:17
**disclosures**
  58:5 59:14
  87:19
**disconnected**
  64:20
**discount**  45:13
  84:19 88:2
**discounted**
  49:10 84:7,8
  84:12
**discounts**  88:3
**discrete**  29:20
**discretion**  73:4
**discussed**  52:5
  59:12 75:4
**discussion**
  89:19 95:13

discussions
60:12 72:6
74:17
dislocated
56:15,20,21
dispersed
40:10
dispose 28:8
disposition
68:9,11,19
dispute 22:6,17
23:14 30:18
disputes 26:14
disputing
84:11
dissenting
51:22,23
dissipate 41:5
distinction
53:7
distribute 24:5
41:12 42:10
73:4,19 74:3
distributed
23:11 35:14
59:16 74:8
distributing
25:5 46:14
73:7
distribution
29:23 32:5
43:5 52:16
69:14 73:7,10
74:1,2,4
distributions
16:19 31:25
32:3,4,6 34:8

67:14 73:22
district 1:2
61:5
diverged 30:16
dixon 8:18
66:18
doc 2:8
docket 16:23
34:20,21 36:21
37:5,6,11,15
37:21,25 63:22
63:23 80:22
86:7,12 89:7
93:6,19 94:1,4
96:1 97:10
98:14
documents
18:4 20:11
80:20 93:12
doing 38:20
81:9 95:12
97:13
doj 55:10
dollar 28:18
45:16
dollarization
65:3,4,25
dollars 24:19
30:3 31:7
40:25 56:12
dominate
70:22
don 13:11
donahue 8:19
door 18:15
dow 8:20

dowdy 38:18
draws 17:14
drew 14:22
drive 3:5 5:10
19:3 43:4
driven 27:12
due 42:21
duffy 8:21
14:22
duties 33:9
duty 81:2
83:14
dzaran 8:22

**e**

e 1:21,21 3:1,1
11:1 12:25
16:1,1 61:3
102:1
e101 94:16,18
e103 94:16,18
e14 94:15,18
e15 94:14
e16 94:16,18
e17 94:14
eades 8:24
earlier 20:22
30:2 57:2 69:1
91:5
early 17:4,15
18:14,20 19:14
22:25 97:14
earn 4:9 22:5,7
22:15,16 26:10
26:14,17 28:6
36:1 47:22
49:11,23 50:24
51:1 52:10,13

52:19,21 53:6
64:12,15,17
65:2,6,10,10
65:19 66:2,12
66:12,16,17
67:3 69:6
71:20 78:1,22
earned 41:3
easier 74:23
easily 18:22
33:4 81:13
easy 17:4 21:9
36:4 42:8,19
54:14
eat 77:3,5,6
ecf 86:5
eck 13:24
eckhardt 8:25
economically
29:5 57:23
economics
57:17
economides
9:1
ecro 1:25
educed 79:2
effect 72:22
effective 32:7
32:21 79:16,18
90:22 91:1
efficient 72:4
effort 21:7
38:24
efforts 21:7
25:20 32:10
33:10 50:4,8
60:13 61:5

67:5 73:22
78:13 79:20
**ehrler** 9:2
**eip** 33:4,7
76:13 77:8
**either** 18:7
32:20 53:17
75:11 96:20
97:24
**elect** 36:13
49:11
**elected** 49:13
50:24 51:1,3,4
51:6,6
**election** 70:2,5
**elements** 55:1
**elementus**
56:13
**eligible** 50:23
**elimelech** 8:23
**elizabeth** 3:15
34:9,15
**ellis** 3:3,10
6:16 16:9
34:16 93:25
**elvin** 13:22
**email** 18:21
**emails** 18:23
66:23 75:17
**emanuel** 6:1
82:12
**embedded**
31:15 79:6
**embodied**
72:11
**embrace** 19:23

**emerge** 37:23
44:23 47:2
**emergence**
20:15 31:15
32:24 44:21
80:25
**employees** 18:5
41:22 55:4
76:21,23 81:1
81:9
**empowered**
83:15
**enabling** 67:1
**enclosed** 58:5
**encouraged**
73:10
**endeavor**
54:15
**engage** 18:25
**engaged** 18:8
60:11 61:24
**engagement**
17:25 18:17
59:3 67:1
**engel** 9:3
**english** 4:15
67:21 80:14,16
**enhance** 66:14
**enhanced** 72:8
**ensure** 39:3
41:8 44:18,24
46:23 47:8,21
47:25 59:17
**ensuring** 25:6
**enter** 66:15
**entered** 20:23
30:8,12 46:8

55:9 57:4
86:13 92:6
**enterprise** 55:6
**entire** 40:13
48:20
**entities** 24:5
62:7,10
**entitle** 61:25
**entitled** 30:19
55:18
**entity** 23:20
44:14 47:11
**entrusting**
41:2
**entry** 2:7 79:15
**equal** 20:8
**equation** 70:22
88:3
**equity** 25:23
29:23 41:14,22
44:4 45:10,18
45:23 50:7,7
50:12,12 52:6
52:7 53:4
**equivalent**
52:6
**erik** 11:23
**especially**
68:12
**essentially**
52:15 69:5
71:12
**establish** 79:1
**established**
18:21
**establishing**
86:4

**estate** 20:18
59:18 60:25
63:14 65:2
71:3 72:5,10
83:14
**estate's** 74:11
**estates** 41:1
**estelle** 8:11
**esther** 11:10
**estimate** 45:25
46:15,21
**eth** 69:8 70:13
**ethereum**
41:12 44:9
**europe** 70:21
**eve** 17:3
**event** 58:3 68:9
68:11
**events** 47:12
62:2
**everybody**
57:10 77:18
80:9 86:14
92:8 101:11
**evidence** 31:9
33:3,5 36:24
37:7,11,18,23
38:2 49:6 52:2
53:21 54:20
55:2,22 62:18
81:18 82:23
83:5 84:16
86:2,15,21
87:6,11,13,13
87:18 94:9
95:6 96:4,14

exactly 20:17
26:22 28:14
84:16
examination
31:12 88:13
93:15 97:21,22
97:24 98:1,8
98:21
examine 86:22
86:24 87:8
96:25 97:8,19
98:5,7
examiner
17:17 18:2
40:16 59:10,12
examiner's
22:17
examining
100:24 101:4
example 51:3
62:2,14,21
65:5 81:4
89:19 93:2,7
exceed 48:15
exceeded 55:23
excellent 25:12
excels 94:12
exception
63:19 97:12
excess 33:9
69:5
exchange 68:5
69:5
exchanged
75:17
excited 26:1
34:6

excluded 41:21
exclusivity
19:13 20:1
exculpated
61:1,17 62:9
62:11
exculpation
27:16 60:14,21
60:21,25 61:2
61:8,11 62:2
64:3 82:2
excused 92:11
executable
26:21
executive
31:17 33:2
36:22 37:16
executives
33:10 39:19
55:12 56:10
exemption
45:20
exercise 68:17
99:5
exhibit 94:6,13
94:14,16,19
97:3
exhibits 86:8
92:12 93:5,6
94:7 95:25
96:20,25 97:9
97:12 98:7,9
exist 49:19
existence 62:8
62:10
existing 81:11

exit 44:18
67:11
expect 60:24
86:8 90:9 94:9
99:16
expectation
87:12 99:20,23
expectations
48:23
expedited
63:12
expeditiously
75:18
expense 65:20
72:2
expensive
19:18 23:6
experience
25:15 26:19
43:22,23 56:19
experienced
47:19
expert 31:11
33:16 54:13
55:16
experts 85:25
87:9
explain 49:8
63:3 87:1
explained 42:7
explicit 41:20
exposure 72:23
expressed
83:13
extended 72:17
74:17

extension 20:1
extensively
59:12
extent 29:10,13
73:23 85:18
86:1 95:24
98:24
extra 24:21
extremely
56:21 68:11
ezra 13:25

f

f 1:21 12:11
102:1
fabsik 14:23
fact 33:6 55:12
55:25 58:1
61:24 79:3
89:16 90:2
factors 36:25
37:8 84:8,19
facts 20:2 55:8
factual 38:7
62:15
fahey 9:4
fahrenheit
24:22 25:14,23
26:1,4,8 37:17
37:19 43:20,21
44:1,3 61:20
fail 63:7
failed 51:10
58:11
failure 82:3
fairly 42:10
faith 61:4
75:17 90:3

**far** 33:8 48:15
48:23 55:4
76:10,16 97:2
**farr** 65:14
**favor** 48:21
55:22
**federal** 17:9
**feel** 73:13
**fees** 24:21
**fell** 50:8
**ferraro** 22:1
23:10 36:20
49:8,18,24
57:20 81:4
99:15
**fervent** 21:11
**fiat** 48:12 73:4
73:10,14,19,23
74:4,6
**fiduciaries**
61:1
**fiduciary** 19:6
81:2 83:14
**fifth** 6:11
**fight** 20:17
**fighting** 19:16
24:2
**file** 2:7 47:11
57:6,9 72:20
74:21 80:19
82:3 86:7 93:5
98:14
**filed** 16:23
17:2,5,16,19
27:6,15,20,25
33:21 34:19
35:17 36:12,18

36:21 37:4,4,5
37:11,15,21,25
38:5 39:23
63:23 74:14,22
80:17,21 89:3
89:7 90:4,5,8
94:1 96:1,3,16
100:20
**filing** 17:8
42:20,20
**final** 22:17
67:12 78:3,20
90:12
**finalize** 75:13
**finalized** 64:5
75:2
**finally** 37:24
74:13 79:11
94:18
**finance** 25:13
**financial** 36:23
42:21 43:24
44:1 54:17
56:4
**financing**
29:10,11
**find** 19:1 25:12
52:6 53:21
72:15 77:2
**finding** 53:17
69:2
**findings** 79:2
**fine** 39:5,20
53:7 56:10
87:8 95:12
**finish** 60:7
90:20

**fired** 18:7
**firmly** 41:8
**first** 19:12 20:1
21:23 27:25
36:20 40:1,13
42:5,12 44:6
44:11 52:5,23
53:15 54:16
56:9 59:4
60:25 65:21
67:22,24 78:17
80:14,25 89:11
**fish** 71:24
**fit** 28:8
**five** 47:23
88:24 96:16
99:23
**fix** 100:25
**fixed** 18:17
**flag** 46:7
**flagged** 45:21
**flaherty** 14:24
**flailing** 55:6
**flannigan** 9:5
**flipping** 22:13
**floor** 6:4
**florence** 9:5
**flow** 74:24
**flowed** 39:23
**flower** 3:20
**flows** 54:16
**flynn** 9:6
**flywheel** 50:5
**focus** 22:21
**focused** 25:11
**folks** 21:8
23:12 27:6

34:4 96:24
**follow** 61:6
88:25
**following**
56:18 60:6
68:16 96:22
**force** 63:12
89:17 90:16
**forced** 81:23
89:20,22
**forces** 55:11
**foregoing**
102:3
**foreman** 9:7
**forget** 17:4
**forgive** 80:15
**form** 46:5,6
70:2,4 73:25
**formal** 16:16
27:6 72:20
80:20
**formation**
65:10
**former** 18:5
20:24 31:21
41:22 61:8
**forth** 27:13
35:4
**fortunate** 36:5
**forum** 64:22
**forward** 17:25
19:4 21:20
22:21 37:19
48:10 67:12
76:4 87:19
95:9

fought 19:18
21:2
found 25:14
30:15 58:6
72:4 95:15
foundation
42:13
founders 65:15
four 54:1 94:7
94:12 99:19
fowl 71:24
frame 88:24
framework
22:19
frank 8:1
frankel 14:13
frankly 22:18
29:1 33:9
48:18
fraud 17:13
64:18
fraudulent
23:22
frequently
92:20
fresh 44:20,21
friday 63:21
frishberg 5:8
9:8 75:25 76:1
77:16
front 90:12
frustrations
18:16
full 17:25 18:1
25:7 29:24
39:1 40:24
50:17

fullest 98:24
fully 18:3,18
18:25 33:22
75:11
function 46:3
97:20
functioned
49:14
fund 6:2,3
82:10
funds 39:20
40:11,23
fungible 49:6
further 41:5
60:23 88:12
95:5
furthermore
62:4 81:8
future 26:22
66:8,14 67:14

g

g 16:1
gabriela 9:25
gain 26:13
galka 9:9 54:12
55:16,16,21
56:13,17,25
57:13
gallagher 9:10
gastelu 14:25
gates 44:15
gather 57:6
geary 9:11
gelfand 9:12
general 30:23
92:19

generally
25:13,16 63:1
93:14
generated
24:14,19
geoffrey 8:4
george 13:14
gergi 10:15
getting 16:21
21:21 73:13,17
76:19 87:17
gheorghe 9:13
giardiello 9:14
gilbert 9:15
give 29:11
38:19 39:13
57:10 63:10
73:3 97:22
given 18:13
22:7 43:13
48:24 59:13
68:25 86:25
giving 20:10
35:15
gk8 23:18 24:4
glad 86:2
glasser 9:16
glenn 1:22
glitch 77:10,10
77:11 81:17
89:22,24 90:12
90:15,17
go 27:3,4 29:14
32:3 37:19
39:3,5,12,15
50:9 88:21
91:1 93:21

95:9 99:25
100:3
goal 19:6 42:2
60:4 91:9
goals 65:12
goes 78:17 80:1
84:22
going 17:1
20:17 25:23
27:3,8 31:10
32:19,20 34:3
34:7,9,10,11
42:1 47:1 50:2
54:13 68:14
77:3,17 79:23
80:5 83:8
87:12 91:10
92:12,23 94:8
94:9 95:24
96:10,17,21
97:18 98:6,8
98:10,12,21
99:6,7,20
100:23
gold 9:17
gonzales 9:18
good 16:2,4
24:13 30:16,17
34:15 38:15
58:22,23 61:4
64:14 67:20
71:15 75:16
76:10 77:21
78:13 80:12
82:5 88:20
90:3 99:5
100:12

gordon 9:19
gorrepati 15:1
gotten 87:5
governmental
  16:17 17:10
  18:8
grace 7:16
grades 25:9
grant 47:4
granted 61:11
great 72:2
greater 50:25
  54:5
greatest 73:23
greatly 71:10
green 1:13 4:3
greg 10:12
gregory 12:11
groundwork
  68:20
group 4:9,16
  5:2 25:20
  26:16 28:21
  37:17 43:20,21
  47:22 64:13,15
  65:10,13,15
  66:12,17 67:19
  67:21 68:3,3
  68:23 71:14,17
  71:19 72:3,13
  72:21 74:14
  75:6,9,18
group's 65:24
groups 16:16
  19:1 23:1
  26:10,13 75:22

grow 50:4
growth 51:8
guess 21:9
  39:12 93:17
  95:19 97:1
guidance 96:6
  97:1
guided 44:10
guiding 65:17
gundersen
  9:20
gurland 9:21
guthrie 9:22

**h**

h 9:7
half 70:15,16
hall 68:22
halls 66:24
hamilton 5:1
hammer 91:25
hand 82:25
  87:21 97:20
  100:8
handled 92:12
  97:2
hands 43:15
  101:9
hanging 91:7
happen 20:22
  85:7,11,12
happened 17:7
  82:3
happens 53:8
  95:17
happier 80:3
happy 29:7
  68:14 75:21

78:15 80:2
haqqani 9:23
hard 38:9 41:3
  49:1 59:2
  69:17
harrison 88:17
  88:23
hawaii 100:17
hear 34:11
  36:16 37:2
  38:6 42:23
  43:24 47:16
  55:15 58:20
  75:1 92:20
  99:7
heard 47:20
  48:11 60:10
  66:20,22 67:8
  76:16 79:11,17
  92:5 93:18
  100:18,21
  101:7
hearing 2:1,1,3
  2:3,6,6 16:11
  33:25 37:6
  51:21 56:24
  59:6 60:10
  63:21 74:16
  82:9 86:5 90:2
  92:13 93:9,18
hearings 17:18
  18:14 82:8
  92:23
heart 33:17
heavy 41:1
heidel 7:3

held 40:8 49:15
  73:25
helen 3:15
help 32:24
helped 97:17
helpful 60:20
  79:24 96:15
henry 12:4
hensley 9:25
heras 5:20
  80:12
herrmann 10:1
  65:15,16
hershey 10:2
higher 49:12
  51:7 68:12
  85:2
highest 43:12
  43:12
historic 18:10
  25:3
history 43:13
hitch 32:3
hittelman 10:3
hoc 4:9,16 5:2
  16:16 23:1
  26:10,13,16
  28:21 61:19
  62:22 64:12,15
  65:10,13,15
  66:7,12,16
  67:19,21 71:14
  71:16,19 72:3
  72:13,18,21
  74:14 75:6,9
  75:18,22

hoc's  65:21
hoeinghaus
  37:20
hold  45:24
holder  35:10
holders  4:9 5:2
  24:3 29:22,23
  29:25 30:7,23
  35:25 40:8
  41:22 49:8
  50:21 51:23
  52:2 53:18
  81:20
holds  26:22
  28:6
hole  40:17
holzhauer  10:4
hon  1:22
honest  21:11
honor  16:4,9
  16:24 17:18
  18:16 19:19
  20:19 28:25
  30:1,10 33:22
  34:4,15,18,22
  35:5,12,22
  36:2,8,15,18
  37:2,9,14,20
  37:24 38:4,15
  38:21,25 41:11
  42:14 46:2,7
  47:1,16 51:22
  52:17 53:19
  55:15,21 57:8
  58:6,7,22 59:1
  61:6,15 63:20
  63:25 64:14

66:21 67:16,20
68:2 69:19
70:11 71:1,2,7
71:15,17 73:11
76:1 77:15,22
80:3,13 82:6
82:11,17 83:4
83:19,22,25
84:22 85:24
86:1,10,17,25
87:7,14 88:20
90:14 92:2
93:22 94:8,22
95:14,18 96:18
98:13,17 99:12
100:2,12 101:6
honor's  18:20
hope  26:23
  60:18 64:5
  80:1 88:25
hopefully
  38:12 67:14
  77:24 79:13
  90:10
horse  20:10
  24:12 43:7
hot  31:17
hours  69:3
housekeeping
  95:23
howey  52:11
huge  36:13
hundreds
  24:19 31:6
hurley  10:5
hussam  14:18

hybrid  2:1,3,6
hyde  2:25
  102:3,8
hypothecate
  28:8
hypothetical
  85:7

**i**

idea  74:5 93:17
ideas  44:15
identical  91:12
identified
  41:24 47:22
  62:9,17 84:9
  84:19
identify  29:10
  43:11 56:15
  93:23
identifying
  69:3
ignat  5:14
  77:25
il  3:6
illiquid  24:25
  25:2,7 38:3
  45:12,18 48:18
  58:2
illustrative
  94:20 96:14
ilusion  12:21
imagine  77:1
immanuel  10:1
  65:14
impeachment
  97:12
implemented
  89:4

importance
  43:14 44:19
  66:8
important
  16:23 26:20
  28:25 30:9
  36:8 53:8
  62:21 71:13
  74:9
importantly
  18:24 20:13
  28:21 41:16
  73:2 78:17
  79:11
imposed  51:23
impressive
  35:22
improve  77:13
inappropriate
  28:3
incentive  31:15
  32:12,25 37:23
  80:25
incentives  44:4
incentivize
  33:11
include  41:22
  60:17 77:7
included  32:11
includes  41:20
  63:9
including
  23:18 40:7,16
  43:5 55:12
  61:11 67:5
  71:18 75:8
  76:13 79:6

84:9 93:14
inclusion   62:16
incomplete
  90:19
incorporate
  27:16
increase   44:4
  50:5 57:23
incredibly   53:8
independent
  17:23 40:15
  51:5
indicated   69:1
  91:24
indication
  54:21 56:23
indicator
  54:19
indiscernible
  57:12 76:10,21
  76:22 77:1
  81:13 89:8,12
  89:18,23
individual
  16:17 18:25
  65:20
individuals
  31:14 36:5,11
  59:21 68:3
industry   17:6
  43:22
inequitable
  50:22
inevitable   65:6
inflate   55:5
informal   27:6
  72:19

information
  2:8 40:14 41:7
  63:8 74:24
  94:6
inherent   84:6
initial   19:11
  32:11 94:2
initially   48:2
inordinate
  21:6
inside   44:13
  53:4
insider   81:1
insiders   20:24
  31:21
insisted   19:11
  89:12
insistence
  89:21
insolvent   54:9
  56:12
instance   61:18
instances
  44:17 60:15
  73:15
institutions
  43:24
instruments
  45:15
insufficient
  82:23 87:20
intellectual
  25:21
intend   83:17
  86:24 98:7
intended   63:10

intense   66:9
intensive   47:15
  48:7 68:21
intentional
  21:3
intercompany
  23:22
intercreditor
  26:14
interest   29:17
  29:21 30:21
  35:10 37:8
  43:1 49:10
  51:4,9 53:4,14
  53:23 60:4
  68:5,6,6 81:3
  82:13,24 85:5
  85:6 86:6 88:7
  95:16 96:9
  97:7 100:14
interested
  48:12 87:2
interesting
  23:5
interests   32:15
  40:6 51:25
  65:20
interim   22:1
  36:22 60:11
internally   93:6
international
  70:16,17
intersection
  64:19
interview
  47:15

interviews
  18:4
intrinsic   56:17
introduced
  96:13
introducing
  36:16
invest   26:5
invested   40:3
investigating
  17:10
investigation
  18:3
investigations
  21:25 40:15
investment
  44:2
investments
  25:4 45:11,11
investor   49:25
investors   23:13
invited   20:7
involve   100:14
involved   24:10
involves   93:11
iovine   10:6
island   77:2
issue   19:20
  20:17 28:5
  30:6,9,11
  31:17 33:18
  50:19 57:25
  69:13,24 70:1
  90:22 93:10
  94:10 101:3
issued   49:8

**issues** 17:13 18:19 21:18 22:2,18,24 29:20 32:24 40:16 42:9,11 42:15,21 59:3 60:18 63:18 67:9 68:23 69:23 70:6,8 70:23 71:5,12 90:11 91:7,8 91:11,13,15,25 92:11,15 96:20 99:6 100:16,25

**item** 52:23

**items** 22:18 37:1 80:25 81:12 89:6 90:7

**j**

**j** 4:20 8:5,9,12 9:17 15:8,15

**jacobs** 10:7

**james** 9:3,16 15:8

**jamie** 9:15

**janelle** 8:25

**january** 22:14 65:1

**jaoude** 10:8

**jarno** 12:6

**jasleigh** 9:11

**jasmine** 7:11

**jason** 10:6 11:12 12:2

**javier** 13:2

**jean** 11:4

**jeff** 12:10 77:25

**jeffrey** 5:18 7:14 8:3 13:20

**jellestad** 10:9

**jeremy** 16:5

**jesse** 11:13

**joanne** 9:12

**job** 33:9 76:10

**joe** 11:6 12:23

**joel** 37:24

**johan** 7:18

**john** 8:22 12:9 12:17

**johnson** 10:10 10:11

**join** 75:21

**joinders** 80:17

**joined** 81:24

**jonathan** 1:25 12:22 15:10

**jones** 3:15 34:9 34:14,15,16 35:9

**joseph** 11:2 12:25

**joshua** 14:4

**journey** 58:13

**joyce** 4:13 64:14

**judge** 1:23 26:11 65:22 71:11 78:8 100:7 101:9

**judges** 61:10 61:12

**judicial** 22:10 63:13

**judson** 7:19

**july** 17:2 26:10 39:23 40:5 65:22 67:25

**june** 39:16 67:24

**junior** 35:6

**jurisdictions** 70:18

**jury** 98:23

**justice** 4:1

**justification** 83:5

**k**

**k55** 94:21

**k57** 94:21

**kaczkowski** 10:12

**kahn** 15:2

**kaila** 14:10

**kaitlyn** 10:3

**kaplan** 6:9 10:13 88:23

**karen** 8:8 15:7

**karpuk** 10:14 36:17

**karpuk's** 34:19

**kass** 10:15

**katherine** 7:9 10:10 13:13

**kathryn** 9:20 10:24

**katie** 14:5

**kaufmann** 14:14

**kaz** 15:3

**kaza** 10:16

**keeney** 10:17

**keep** 38:24 93:12

**keeping** 66:8

**keith** 11:20 12:5 14:7

**ken** 9:2

**kenneth** 8:13

**kept** 22:23 68:15

**kessler** 10:18

**kevin** 8:6 11:16

**key** 20:7,8 21:18 22:2,15 22:18 23:2 25:15 27:24

**khai** 12:12

**kielty** 37:9 42:23 48:8 99:15

**kind** 44:6 51:1 71:19,24

**kirkland** 3:3 3:10 6:16 16:9 34:16 93:25

**kirsanov** 7:1 10:19 100:12 100:13 101:6

**klein** 10:20

**kleinberg** 6:9 88:22

**kleiner** 6:14 10:21 75:2 88:18,19,21,22 88:22 89:15

92:2
**knauth** 15:4
**knew** 39:21
56:6 86:14
**know** 20:19
21:8 26:22
31:16 34:4
36:3 38:21
46:20 53:7
57:3 70:21
76:11 77:4
86:13,19 87:9
88:5 89:8
91:15,20 95:7
96:16,24 97:14
97:19 98:21
**knowingly**
50:25
**knows** 61:6
68:2 71:17
77:18
**koch** 15:5
**koenig** 3:8 16:3
16:4,8,9 17:1
33:24 34:2,13
35:2 38:4,21
42:7 45:1 49:2
68:25 69:21,25
79:23 99:7,8
**kohli** 10:22
**kokinos** 37:14
43:25 99:15
**kovsky** 5:6
10:23 71:14,15
71:16 75:15,24
89:18,25

**kuethman**
10:24
**kuhns** 4:13
64:14,15
**kurman** 4:8
64:15
**kurmar** 11:15
**kwasteniet**
10:25 69:21
**kyle** 10:4

**l**

**l** 8:14 13:24
14:23
**la** 3:5
**lack** 18:16 45:4
100:16
**lackey** 11:1
**lacks** 54:16
**lafayette** 8:7
**laid** 89:6
**lalana** 12:16
**lalia** 11:2
**land** 71:19
**language** 27:21
60:1 64:3,4
72:24 73:20,24
80:14
**large** 19:2 38:5
43:24 63:15
91:14,18
**largely** 33:15
**larger** 65:19
66:7
**largest** 25:1,17
40:6 70:18,19
**las** 5:20 80:12

**lasted** 24:17
**lastly** 63:9
66:15 82:1
**late** 26:9 99:25
**latona** 11:3
**latreille** 11:4
**law** 60:6
**layla** 11:25
**layne** 11:5
**lead** 25:20 89:1
**learning** 41:7
**leave** 91:7
**leboeuf** 30:11
**lectern** 34:8
**led** 19:20 45:3
55:25 65:6,9
66:1,2,9
**ledanski** 2:25
102:3,8
**ledger** 27:11
**leeway** 97:23
**left** 53:13
**legal** 19:20
22:2 23:20
24:5 28:6
29:16 42:9
62:16 64:24
102:20
**legge** 15:6
**lehrfeld** 11:6
**leigh** 12:3
**lender** 29:11
29:13
**lenders** 69:17
69:18 79:9
**lending** 69:2

**lennon** 11:7
**leon** 40:22
41:18
**leonard** 11:8,9
**leonie** 15:5
**letter** 46:4,4
47:5 60:6
**letters** 28:1
**leung** 15:7
**leverage** 43:3
**levine** 11:10
**lexington** 3:12
**liability** 61:4
**license** 17:13
**lied** 50:21 56:3
**lies** 56:5
**light** 17:21
22:18 79:13
**liked** 24:18
**likely** 85:9
99:18
**limit** 71:2
97:25 98:21
**limitation**
60:21 61:3
**limited** 27:20
61:18,22 62:3
73:8 89:3
97:21
**lindsay** 11:11
**line** 42:8 60:7
**lines** 18:21
44:13
**link** 93:19
**liquid** 24:24
25:6 31:2,5
32:6 38:3 43:6

69:14 73:22,25
**liquidated**
48:17
**liquidating**
45:14
**liquidation**
30:22,25 32:18
48:13 52:4
83:1,12 85:1,4
85:16
**liquidity** 25:24
45:9 68:8
**list** 25:23 27:7
33:14 94:6
97:3
**listed** 45:19,23
52:23 100:13
**litigated** 22:11
22:15 72:1
**litigation** 20:14
20:15,25 24:2
66:13,14 72:17
93:2 94:23
**little** 19:17,19
35:16 36:10
39:7 57:21
68:1 75:3
81:19 91:8,16
**live** 56:8 69:10
**lives** 80:24
**llc** 1:7 37:10
38:1
**llp** 3:3,10,17
4:15 5:1,13 6:1
6:16
**loan** 28:4,14,22
68:5,15

**loans** 49:10
68:24
**locations** 70:17
**long** 24:10,16
27:2 32:15
48:24 64:16
67:13 78:1
79:25 82:19
**longer** 20:4
24:17 42:4
54:11
**look** 48:6 54:2
54:3 56:9
67:12 92:16
97:14
**looked** 27:7
92:25
**looking** 27:9
47:6
**los** 3:21
**lot** 34:4 36:3
38:9 51:16
60:15 63:18
81:8
**lots** 48:3 71:11
**loud** 48:11
**love** 77:6
**low** 29:1 68:11
81:3 88:2
**lower** 24:21
46:12 49:16
**loyalty** 49:15
**ltvs** 69:16
**lu** 11:12
**lucy** 13:19
**lunch** 99:22

**lund** 11:13
**lupu** 11:14

**m**

**m** 11:16 13:4
14:14
**maciej** 15:9
**made** 21:2
27:15 32:20,20
32:23 38:18,24
45:12 62:17
68:7 74:2 82:2
90:6 92:17
97:25 100:19
100:22
**madison** 4:10
6:4
**main** 98:23
**major** 42:6,22
44:7 47:11,16
67:9
**majority** 40:8
47:14
**make** 16:5,19
18:15 19:19
29:12,13 31:24
31:25 32:2,5
33:11 34:7
43:16 47:1
49:21 70:3,5
73:22 74:23,24
75:10 79:2
80:15 89:9
91:4 92:19
100:23
**makes** 53:17
**making** 19:2
19:24 30:25

44:1 71:4
**malhotra**
11:15
**man's** 71:19
**managed** 59:9
**management**
20:6 21:25
25:16 31:19,21
31:23 32:10
33:5,8 43:12
45:12 59:14
67:6 86:4
**managing**
25:15 37:3,22
37:25 43:23
**mandatory**
91:15,17,18
**manipulate**
55:13
**manipulation**
40:20
**manner** 54:17
**manual** 94:13
94:14,17,19
**manus** 11:16
**march** 24:11
40:17 68:14
**marine** 61:6
**mark** 7:21 11:8
11:11 12:19
47:16
**marked** 97:10
**market** 33:6,6
43:1 54:18,20
55:11 56:2,3
56:10,19,21,22

marketing 24:10
markets 56:15 56:16,20
marsal 37:3,22
marsh 11:17
marshall 14:16
martin 1:22
mashinsky 18:7 40:3,22 41:17 50:2 52:9 55:12
mass 66:23
master 6:2,3
masumoto 11:18
material 78:11
mathematical 88:7
matter 1:5 32:11 95:24
matters 59:22 78:11
matthew 9:17 10:20 13:9,10 13:23
max 9:9
maximize 22:22 26:2,21 33:12 41:14 45:14 83:14
maximizing 24:9 25:5
maximum 25:24
mccarrick 6:21 11:19 93:22,24

93:24 94:4 95:14,18,20,23 96:18,22,24 98:13,17 99:2 99:3,9,11,14 99:18 100:2,4 100:4
mccarter 4:15
mccormack 11:20
mean 52:4 69:24 70:8,21
means 25:5 29:16
meant 19:2,22 19:24 26:15
measures 59:11
mechanda 11:21
mechanism 46:11
media 21:9 66:23 80:19 96:5
mediated 28:20
mediation 26:11 65:22 66:1,4,6 68:20 68:21 69:3,13 70:9 71:11
meet 53:14
meeting 59:5,7
meets 32:15 33:4 51:24 58:15

meghji 11:22
melissa 13:24
member 37:16 47:16
members 21:5 21:10 43:18,25 65:16 71:18 75:8
membership 63:22
mendelson 11:23
mentioned 45:2 53:11,16 76:16 79:8
mequon 7:4
met 26:10 32:22 53:23
metaphorical 77:12,13
methodically 42:11,15
metrics 32:22 54:17 81:8
metropolitan 98:4
mg 1:3
mi 5:4
michael 10:8 12:1 13:15,18
michaels 11:24
mid 26:10
middle 77:2
midpoint 31:4
midst 17:6
mike 10:11 15:6

miles 49:15
milestones 66:3 79:14
milin 12:8
milligan 11:25
million 23:11 26:5 30:3,20 31:2,5 32:17 55:25 84:25
millions 24:19 31:6 40:25
mind 76:3
mineola 102:23
minimum 92:14
mining 23:18 24:4,25 25:1,8 25:9,10,16,18 25:19 31:3 37:12 42:18,19 44:8 48:18
minor 70:7
minute 16:22 39:13 52:9 80:6
minutes 78:10 78:16 88:24
mira 9:23
mirror 74:6
misrepresent... 40:18,20
misrepresented 56:4
mistake 80:15
misundersta... 64:23

| | | | |
|---|---|---|---|
| mitchell 10:5 | moving 31:14 | 53:20 60:22 | newco 25:22 |
| mix 66:22 | multiple 43:4 | 65:11 69:15,15 | 25:23 26:3,21 |
| model 17:11,19 | mutual 74:25 | 69:24 70:6 | 31:1,3,10 |
| 18:9 50:6 55:1 | **n** | 72:20 96:8 | 37:16 43:14,25 |
| modifications | | 98:8 | 44:5 45:18 |
| 74:18 | n 3:1 16:1 | needed 21:23 | 46:23 47:9,10 |
| modified 16:12 | 102:1 | 42:9 54:25 | 47:24 48:1 |
| 27:21 | nagi 12:2 65:13 | 78:12 | 66:9,11,11 |
| mohsin 11:22 | name 78:16 | needs 70:4 | 67:16 83:20,21 |
| mold 77:3,12 | 93:3 | 97:21 | 83:23 84:2,4 |
| moldy 77:3,7 | named 24:11 | negotiate | 84:23 88:4 |
| 77:13,14 | 24:15 44:2 | 75:16 | newco's 25:19 |
| moment 38:19 | 63:1 | negotiated | 25:20 |
| monetize 41:16 | names 27:10 | 60:19 75:5 | newly 17:23 |
| money 17:12 | nani 15:8 | negotiating | newman 12:4 |
| 26:5,7 63:14 | narrowed 94:5 | 32:1 60:15 | nice 58:23 |
| monroe 5:10 | nasdaq 25:24 | 74:11 | nicholas 65:14 |
| month 17:8 | 45:19 | negotiations | night 96:11 |
| 24:16 39:22 | nathanial 11:5 | 66:10 | nine 56:14 |
| months 27:10 | nathanson | neither 71:24 | 99:21 |
| 38:10 69:22 | 12:3 | network 1:7 | noah 13:4 |
| morning 57:5 | native 80:14 | 61:7 | noel 11:9 |
| 58:22 99:22 | natural 19:5 | never 52:25 | non 55:9 70:7 |
| 100:1,6 101:11 | navigate 51:13 | 53:11 54:20 | noncontract |
| morris 12:1 | navigated | 65:18 70:20 | 78:5 |
| motion 2:6 | 42:11,15 | new 1:2,14 | nonlawyers |
| 17:16 19:13 | navigating | 3:13 4:4,11,18 | 97:23 |
| 63:13 92:17 | 64:19 | 5:16,16 6:5,5 | noon 86:6 |
| 94:1 | nearing 60:7 | 6:12 21:25 | north 3:5 |
| motions 17:19 | nearly 27:14 | 22:1 31:23 | noskov 6:7 |
| 19:11 | 40:8 41:12 | 41:13,14 43:13 | 82:11,11 83:4 |
| mountain 5:11 | necessarily | 44:2,5,11,22 | 83:21,24 84:3 |
| mouth 26:7 | 62:3 98:10 | 47:8,19 50:19 | 84:5,14 85:6 |
| move 21:20 | necessary | 64:24 66:25 | 85:17,24 86:10 |
| 22:21 41:25 | 46:10 62:5,19 | 67:6 69:2,3 | 86:16,20,24 |
| moved 22:20 | need 29:10 | 96:5 98:2,4 | 87:4,14,17 |
| 60:5 | 32:5 33:10 | | 88:16 |
| | 45:10,22 53:19 | | |

| | | | |
|---|---|---|---|
| **notable** 27:8 | **oath** 86:7 | **obviated** 72:20 | 95:17,19 96:19 |
| **notably** 24:25 | **oberg** 12:6 | **obvious** 81:6 | 97:11 99:1,17 |
| 28:17 30:10 | **object** 18:1 | **obviously** 29:5 | 99:25 100:1,6 |
| **note** 71:8 | 80:23 | 70:23 88:6 | 100:9,9 101:7 |
| **noted** 35:2 | **objected** 19:10 | 90:24 96:4 | 101:10 |
| 38:4 51:22 | 19:12 28:1 | 97:20 | **old** 102:21 |
| 82:17 89:18,25 | 29:20 31:15 | **occupied** 41:9 | **ombudsman** |
| **notes** 52:23,23 | 32:13 80:24 | **occur** 46:20 | 59:10 |
| 52:25 53:2,11 | 82:20 89:6 | 67:1 | **once** 26:15 |
| **notice** 63:23 | **objecting** | **occurred** 85:20 | 46:4 88:7 |
| 70:4 78:9 | 18:11 30:13 | 97:22 | **ones** 27:24 |
| **novawulf** | 89:2,3 | **occurrences** | 31:20 95:16 |
| 24:12 68:15 | **objection** 31:8 | 62:2 | **onset** 65:17 |
| **novel** 42:9 67:9 | 45:4 72:20 | **october** 1:16 | **oona** 8:11 |
| 72:5 | 80:22 82:6,13 | 79:14 81:5 | **open** 90:7 |
| **noyes** 12:5 | 89:9 90:8 | 86:6 87:9,13 | **opening** 27:2 |
| 64:3 | **objections** | 102:25 | 27:23 33:20 |
| **number** 27:25 | 26:18 27:7,14 | **odd** 75:3 | 36:16 38:24 |
| 28:19 34:24 | 27:20,22 29:18 | **offer** 26:2 | 64:7 80:11 |
| 36:25 54:15 | 33:14,18 49:3 | 71:21 86:8,21 | 92:5 100:19,20 |
| **numbers** 93:13 | 60:8 78:21 | 87:12 89:20 | 101:2,5 |
| **numerical** | 80:17 91:2 | **offered** 94:9 | **openings** 77:19 |
| 81:13 | 97:25 100:14 | **offering** 49:17 | 92:6 |
| **numerous** | **objectives** | 51:14 | **openly** 76:19 |
| 23:21 24:15 | 81:10 | **offerings** 17:12 | **operate** 31:3 |
| 76:8 | **objectors** | **office** 59:1,3 | 58:4 |
| **nuraldeen** 7:17 | 27:13 | 96:6 | **operated** 48:1 |
| **nw** 6:18 | **obligated** 93:5 | **officer** 36:22 | **operating** |
| **ny** 1:14 3:13 | **obligation** | 36:23,24 37:16 | 21:24 |
| 4:4,11,18 6:12 | 49:20,22 52:20 | **official** 3:18 | **operation** 58:9 |
| 102:23 | 52:20 53:5 | 38:16 | **operations** |
| **o** | **obligations** | **offit** 4:8 64:15 | 25:19 44:7 |
| **o** 1:21 16:1 | 52:25 53:2,10 | **okay** 17:1 | **operators** |
| 102:1 | 53:12 81:11 | 46:22 52:18 | 25:18 |
| **o'clock** 96:16 | **observer** 66:11 | 71:3,6,7 80:7 | **opinion** 56:20 |
| 99:23 | **obtained** 22:16 | 91:7 92:1,4,24 | 76:20,22 |
| | 46:11 | 94:3 95:3,12 | |

**opportunities**
67:15
**opportunity**
45:19 57:13
66:20 88:25
**opposition**
77:19 85:23
86:9 87:10
98:20
**opt** 36:9,11,13
74:23 81:16,21
**opted** 44:17
**option** 28:22
29:9 48:8 51:7
68:25 75:21
76:7,18 77:8
**options** 84:21
**orchestrated**
40:19 55:13
**order** 2:7 19:3
27:22 57:4
63:9 69:16
78:3,19 79:15
86:3,13,17
92:6,7 95:5
**ordered** 30:2
**orderly** 26:19
83:8 84:23
85:4 87:23,24
**orders** 20:7
46:8
**original** 65:15
**originally** 73:3
**outcome** 21:8
29:3 67:10
**outlining** 34:10

**outset** 71:17
**outside** 25:9
66:22
**overall** 60:16
**overbroad**
60:22
**overflow** 96:8
**overly** 76:20
**override** 85:19
**overruled**
29:19
**oversee** 47:19
**overseen** 46:24
47:9,13
**overseers**
47:23
**oversight**
47:21 66:13
**overwhelming**
17:3 48:21
51:19 58:14
**overwhelmin...**
16:12 34:23
72:12 76:12
**own** 21:6,10
25:22 26:5
28:3,9 32:4
43:9 44:9
45:10 54:9
87:19
**owned** 22:6
64:24
**ownership**
22:12 49:7

**p**

**p** 3:1,1 10:2,14
12:17 16:1
62:10
**p.c.** 6:9
**p.m.** 96:1
97:10 98:9
**page** 33:21
86:5
**pages** 56:9
**pagnanelli**
12:7
**paid** 29:24
33:5,6,7 50:17
55:24 68:5,6
**painted** 40:1
**papers** 35:4
**paragraph**
86:5
**paramount**
43:14 44:19
**parity** 65:18
**park** 4:17
**part** 24:23
30:25 32:12
43:8,10 55:9
56:14 61:19
78:7 79:7 88:5
98:23
**participant**
82:8
**participate**
30:1 90:18
**participated**
23:9,12
**participation**
36:3 61:5

66:24
**particular** 21:5
25:8 83:17
90:22
**particularly**
24:23 25:10
73:14 75:7
80:23 97:23
98:3
**parties** 16:17
27:7 36:9
41:21,23,24
59:2 60:4
61:17 62:13,21
62:23,24 63:10
63:12,17 74:25
86:6 89:17,20
90:3,9,19 95:2
96:9 98:10
100:7
**partner** 25:12
25:14 37:10
**partners** 30:13
37:10 42:24
**parts** 77:7,13
**party** 29:11
30:13 36:10
61:24,25 62:15
62:18,25 63:5
63:6 78:6
81:17,21 97:7
**passed** 85:25
**past** 93:16
**patel** 12:8
14:15
**path** 17:25
42:7 48:10

66:3 76:4
**pathway** 72:4
72:7
**patouhas** 12:9
**pattern** 99:24
**patton** 12:10
**paul** 7:15
14:23
**pause** 17:7
39:18,21 49:19
50:22 57:24
58:1 64:17
**paused** 39:17
56:18
**pay** 23:8 49:9
54:25 55:5
68:24
**payment** 32:17
32:19 33:2
49:21 52:20,25
53:2,5,10,11
**paypal** 32:2
61:21
**pending** 60:9
**pennies** 45:15
**pennsylvania**
6:18
**people** 39:10
40:3 49:15
56:6,7,7 57:24
63:12 70:25
76:17 77:24
80:18,23 90:17
92:6 93:20
97:15,18,23
98:16

**pepper** 5:1
71:16
**percent** 28:18
28:18 35:16,18
35:19 54:2,3,4
54:4,6 58:6
69:7 77:5 83:7
**perception**
55:6
**perfect** 24:13
37:13 75:19
**perform** 62:11
**performed**
61:21 62:8
**period** 32:9
46:6
**permission**
57:2
**permitted**
81:22 96:5,7,7
**perpetrated**
64:18
**perry** 65:14
**persistently**
56:3
**person** 77:23
**personal** 21:6
**perspective**
38:23 69:10
**persuade**
91:21
**pesce** 12:11
**peter** 8:22
15:15
**petition** 53:22
54:9,23 57:1
57:14,18,22,24

65:4 66:1
**petroleum** 61:6
**pham** 12:12
**phan** 12:13
**pharos** 6:2,2,3
6:3 29:20 30:5
82:10,12
**phase** 22:20
25:11
**philippe** 11:4
**philips** 12:14
**phone** 18:21
**phung** 12:15
**picked** 99:8
**picking** 20:10
**picture** 40:1
**pii** 95:19,21
**pillar** 47:7
**pivot** 26:25
**place** 22:1
42:16 83:22,23
83:25 84:1,4
84:12
**placed** 43:14
83:20 84:13
**plaintiff** 66:18
**plan** 16:12,14
16:18 18:12,19
20:12 24:6
26:12,20,21,25
27:9,21 28:1,2
28:15 29:24
30:14,24 31:15
31:16 32:4,11
32:12,12,14,18
32:21,25 34:6
34:23 35:1,3,8

36:7 37:17,17
37:19,23 38:7
38:12 39:24
41:11,17,20,25
42:13 43:2,17
45:17 46:9,11
46:12,12 48:15
48:21 49:4
51:15,16,16,17
52:3 53:17
58:13 61:1,5
62:14,17 63:1
63:4,6,7 66:3
66:15 67:3
68:16 69:12,23
70:7,8,24
72:11,20,23
73:2,3,6,9,18
73:21 74:3
75:7,19,19
76:4,13,18,20
77:9,11,13,18
77:19 78:6,11
78:24 79:6,22
80:21 81:5,7
81:20 82:16,19
82:20,25 83:7
83:9 84:21
85:8,15,23
86:21 88:5
89:2,5 90:25
91:6,9 100:15
**planning** 98:22
**platform** 17:21
40:25 41:3
54:10 58:3,9
58:10 68:4

71:20
**playbook**
  17:14
**played**  62:21
**pleadings**
  50:14
**please**  16:2,5
  38:19
**pleased**  18:17
  27:12
**pleasure**  16:10
  67:22 77:23,23
**pm**  1:17
  101:13
**point**  18:24
  21:16 22:15
  24:13 31:11,13
  31:14 34:3
  50:23 54:14
  69:24 73:19
  81:18 86:18
  87:5 89:24
  94:10,24 97:14
**pointing**  86:16
**points**  44:10
  53:19 89:10
  92:19
**poland**  70:18
  70:20
**portal**  19:5
**portion**  22:25
  23:4
**position**  50:20
  52:10 56:4
  82:22 85:17,25
  88:24

**positions**  41:9
  56:15
**possession**
  19:8
**possible**  19:2
  22:24 25:25
  32:11 43:5
  67:11 69:16
  73:24 74:5,6
  98:24
**possibly**  72:2
**post**  20:15
  32:21 96:11
  97:10 98:8
**potential**  51:7
  64:4 71:4
  72:21
**potentially**
  68:18 73:17
  99:15
**power**  41:9
  88:1
**powerpoint**
  39:10
**practical**  94:10
  97:5
**practice**  63:13
**practices**  40:18
**precedent**  46:8
**precipice**  42:5
**preclearance**
  46:4,4 47:5
**preclude**
  100:23,24
  101:3
**preclusive**
  55:19 72:22

**preference**
  23:4 72:23
**preferences**
  23:3
**premature**
  75:3
**preparation**
  90:4
**prepared**
  90:25
**preparing**  32:3
**prepetition**
  17:11 45:12
  47:23,24 56:1
**preponderance**
  52:2 53:21
**presence**  77:12
**present**  7:6
  34:6 64:5 84:7
**presentation**
  16:23,24 38:18
  39:9 56:9
  67:18
**presentations**
  49:25 66:24
**presented**
  30:22 44:15
  45:20 67:15
**presenting**
  34:10
**preserves**
  41:17
**presumption**
  92:22
**pretty**  94:24
**previously**
  59:12

**price**  54:18,20
  55:5,14 56:1
  56:16,22 57:14
  57:15
**prices**  17:7
**primarily**  68:7
  89:11,15
**primary**  66:10
**principal**  19:9
  28:14,22,24
  29:12 69:8
**principle**  64:2
  95:11
**principles**
  65:17
**prior**  17:8
  54:22 56:13
  92:13
**priority**  23:16
  29:21,22 30:5
  30:7,14,16,18
**privileges**  16:6
**pro**  5:9,21 7:2
  22:8 30:3
  66:17 80:13
  100:13
**probably**
  22:14 69:13
  70:14 99:23
**probe**  83:17
  84:16 85:10
  88:13
**problem**  39:11
  93:1
**procedures**
  20:7 74:14,15
  74:19,20,22

75:2,4,10,16
86:4 89:4,17
89:25 90:4,13
90:18 91:12,15
91:18 96:21
**proceed** 39:25
46:13,25 77:20
89:22
**proceeding**
85:8 91:12
97:18 99:7
**proceedings**
60:19 101:12
102:4
**process** 24:10
24:21 35:14
41:25 42:4,25
43:10 45:4
47:15,17 48:7
48:20 67:13
75:13 83:9,16
87:22 88:1
**proczek** 15:9
**product** 55:11
59:11
**products** 49:16
**professionals**
43:21 59:17,19
59:25 60:12,16
62:24 63:2
67:7 74:11,18
76:9
**program** 49:23
71:20 81:1
**programs**
26:17

**progress** 90:6
**promise** 79:18
99:3
**promises** 47:1
47:6
**promoters**
41:23
**promptly**
16:19 33:12
**proof** 25:20
74:21 78:4
82:3
**proofs** 36:12
**proper** 61:2
83:16
**properly** 33:11
62:11
**property** 25:21
65:1 71:3 72:5
72:10
**propose** 84:24
**proposed**
37:16,19 43:25
49:4 51:15
54:3 74:19
82:16 88:5
98:8
**proposing**
87:24 93:19
**prosecuted**
41:18
**prosecuting**
66:14
**prosecution**
55:9
**protect** 95:16

**protected**
44:25 62:1
**protections**
61:22 74:9
**protocols**
59:14
**prove** 31:11,13
38:11 82:19
**proven** 25:13
**provide** 19:7
25:24 35:12
37:7,11,18,22
38:1 41:15
45:8 69:4 73:6
74:9
**provided** 18:3
48:15,16 53:18
61:22 62:15
72:8 87:20,21
**provides** 44:20
46:11
**providing**
36:24 51:11
61:3
**provision**
60:21 78:19
82:2
**provisions**
27:16 60:14,22
62:6,7 63:5
82:5
**prudent** 26:24
**psa** 76:6 79:14
**public** 39:20
47:10 50:1,3
55:3 92:13,23
93:5,6 95:16

96:5
**publicly** 65:14
**published**
40:14
**pundisto** 12:16
**purchase**
50:15 56:2
**purchased**
55:23
**purchases**
54:22 55:23
**purchasing**
54:24 55:4
**purpose** 73:7
96:15
**purposes** 96:14
**pursuant** 78:2
78:21
**pursue** 20:15
20:25 24:9
**pursuing** 36:13
93:3
**push** 88:8
**pushed** 42:17
73:9
**put** 16:18
20:23 21:1
23:25 50:7
57:14 58:7
85:18 86:1,14
87:6,11,19
**putting** 26:6
42:12 45:13

**q**

**qualified** 24:16
47:13

**question** 21:13
56:25 57:5
63:7 65:6
71:25 78:18
83:24 97:5
98:18 100:4
**questions**
18:22 23:2
34:5 49:5 64:8
72:5 99:2
**quick** 41:4
**quickest** 67:11
**quickly** 41:8
96:23
**quinn** 6:1
82:11
**quite** 48:18
92:3
**quoted** 57:15
61:15
**quoting** 55:7

**r**

**r** 1:21 3:1 6:14
10:21 16:1
102:1
**raise** 97:20
99:6
**raised** 30:21
69:25 72:6
92:12
**raising** 101:3
**rakesh** 14:15
**ramon** 9:18
**ran** 42:24
58:10
**randles** 15:10

**range** 69:16
**ranging** 19:11
20:5
**rarely** 42:8
**rasile** 15:11
**rata** 30:3
**rate** 35:16,18
35:19 49:10,12
**rates** 49:16
**rather** 18:2
40:14 42:17
73:5,10,23
74:25 89:3
98:19
**rational** 57:23
**ravi** 10:16
**rayn** 14:20
**reach** 19:3
53:19
**reached** 18:10
22:25 23:13
26:11 28:20
64:2 68:22,23
**read** 33:22
62:6 89:8
**ready** 27:1
31:24 38:11
**real** 24:14,25
81:16 83:11
**reality** 65:23
**realize** 25:7
82:14,15
**realized** 65:11
**really** 19:23
21:22 26:18
33:17 60:14
73:9 74:10

85:10 90:21,24
91:1 95:16
97:17
**reason** 26:25
29:18 30:8,17
30:18 57:8,23
63:11 76:17,24
91:22 95:11
96:4
**reasonable**
73:22
**reasonableness**
51:21
**reasons** 29:1
33:3 53:14
54:15 82:25
**rebecca** 9:10
**rebound** 42:25
**recall** 98:20
**receipt** 46:9
**receive** 28:23
30:2 47:2
49:12,13 51:3
51:4,6 52:3,3
81:1,4
**received** 27:17
35:15 45:22
46:21 51:9
68:16
**receiving** 29:2
29:23 30:24
35:7 48:12
59:25
**recent** 63:14
**recently** 35:17
**recess** 77:20
80:6,8 99:21

**recharacteriz...**
52:7 53:15
**recognize**
72:15
**recognized**
66:7 97:20
**record** 16:8
25:13 48:7
58:25 60:23
63:8 79:1,8
102:4
**recover** 50:16
**recoveries**
46:13 48:14,16
51:12 66:15
**recovery** 50:20
54:2,3,5 94:20
94:23
**redact** 2:7
**redacted** 93:8
93:11,14 95:22
**redacting** 95:5
**redaction**
92:14 95:4
**redactions**
94:24 95:9
**redeem** 49:20
**reding** 12:17
**redline** 74:23
**refer** 62:7
**referrals** 59:22
**referred** 63:1
79:23
**refinance**
69:15
**refinancing**
69:4

reflect 56:17
reflection 45:5
reflects 63:22
  69:11 70:24
regain 17:20
regard 80:21
  82:17
regarding 18:9
  47:17 63:21
  64:2,3 72:5
  80:25 100:16
regardless
  77:11 87:18
registered 46:1
regular 82:8
regularly
  23:10 50:2
regulations
  44:12
regulators
  16:16 17:9,17
  18:8,11,11,15
  27:19 44:14,24
  45:3,4 76:9
  79:21
regulatory
  45:22,23 46:9
  46:10,16 47:2
rehabilitate
  42:18
reilly 12:18
  15:12
reject 35:1,2
rejected 63:4,6
  88:10
rejecting 35:7

related 41:18
  58:9
relates 62:24
relating 25:3
  94:23
relationships
  25:3
release 27:16
  60:14,22 63:5
  81:21 82:2
released 41:24
  62:13,14,24,25
releases 36:10
  41:21 76:14,20
  81:15,17,22,25
releasing 63:5
  63:6
relevant 90:25
remain 27:22
  90:7,18
remained 60:5
remaining 41:5
  60:18 77:21
remains 89:23
remark 81:19
remarkable
  18:13
remarks 34:5
  38:24 64:7
remote 97:13
remotely 56:22
  96:9 97:7,8
  98:7,16
removed 41:9
  62:12
renewed 43:1

reopen 100:23
reorganization
  42:6 43:2 54:4
  54:4 75:20
reorganize
  42:18 44:16
  48:4,5
reorganized
  43:9
repay 28:22
  70:3
repayment
  28:14 29:12
repeat 38:23
  89:14
repeated 40:18
repeatedly
  39:19
report 22:17
  31:6
reported 23:10
reporting
  47:11
reports 31:11
represent
  19:24 68:3
representation
  49:7
representatives
  61:21 78:2
represented
  50:1
representing
  40:6
request 57:6
  94:4 100:20,22

requested
  49:23 78:10
  92:6
requests 101:1
require 69:17
  98:10
required 32:1
  34:2 55:5 59:8
  59:14 93:19
requirements
  33:1,4 58:16
requires 63:7
  73:24 74:3
requiring
  73:21
reservation
  74:15
reservations
  27:19
reserve 87:14
  97:24
reserves 73:24
residence
  71:22
resident 70:20
resign 18:7
resigned 18:8
resolution
  22:10 64:2
  68:23 72:1
resolutions
  18:10 21:19
resolve 18:18
  22:2,6 23:2
  26:13 30:9
  32:24 90:10

**resolved** 24:1
27:14,18,19
30:6,18 42:10
71:12 91:9
**resolving**
22:24
**resources**
59:18 63:13
**respect** 25:21
29:17 60:25
74:15
**respected**
100:22
**respective** 67:6
**respects** 60:13
**responded**
18:22
**response** 82:5
89:3,7 98:18
**responses**
63:15,16 89:9
**responsible**
66:13
**responsibly**
42:3
**rest** 22:19
32:15 49:3
**restructure**
44:16
**restructuring**
36:23
**result** 38:9
46:12 67:2,4
69:10 70:8,9
**resulted** 45:13
59:9,21 72:7

**resulting** 66:10
74:18
**results** 34:10
34:18,19,22
49:1 51:20
**resume** 80:6,6
**retail** 28:1
29:18 40:8
49:10 78:22
79:6
**retained** 89:16
**retaining**
89:12
**retention** 73:6
**return** 28:12
33:12 35:15,16
35:18,19 42:2
49:22 51:7
52:21
**returned** 35:20
35:23
**revelations**
64:18
**review** 56:19
**reviews** 46:6
**revisions** 60:20
60:23 74:22
**revolving**
18:15
**rewards** 49:12
54:25 55:5
78:1 81:4
**ribbon** 39:14
**richard** 12:14
**rick** 14:17
**rickie** 8:2

**rife** 40:16
**right** 16:2,7
21:12 23:17
26:6 28:11,15
39:16 43:16
58:20 64:12
67:19 71:14
75:25 77:17
80:5,7,9 82:9
88:17 89:12,17
90:8 91:4 92:5
96:19 97:24
100:5
**rightfully**
92:21
**rightly** 24:4
**rights** 19:12
20:5,8,11
22:12 27:20
28:19 29:16
63:17 68:18
74:15
**rigs** 48:18
**rise** 55:10
**rising** 65:5
**risius** 38:1
**risk** 25:16
43:23 50:25
58:5 68:9 84:8
84:19
**riskier** 51:6
**risky** 23:6
**road** 7:3 64:17
80:1 102:21
**robert** 14:14
37:2

**roberto** 10:7
**robinson** 12:19
47:17
**rockwood**
12:20
**rodriguez**
12:21,22
**role** 56:14 59:7
62:21
**room** 96:8
**rosa** 30:14
**rose** 50:8
**roselius** 12:23
**ross** 10:25 38:1
**roughly** 36:9
**routinely**
17:17 59:20
61:6
**roy** 7:25
**rudolph** 12:24
**rule** 2:4 20:20
29:21,22 63:10
63:19
**ruled** 23:19
**rules** 75:12
**ruling** 22:16
71:1,2 95:10
**rulings** 19:19
71:4
**rumors** 39:22
**run** 25:19 31:3
39:17 43:13
68:9 83:16
85:23 88:1
**ryan** 12:13
37:9

| s | | | |
|---|---|---|---|
| **s** 3:1 5:18 7:20 10:18 11:7,8 11:18 13:12,20 16:1 | **says** 30:5 31:8 86:5 | **seated** 16:2 | **seems** 77:5 |
| **sabin** 5:18 77:17,18,20,21 77:22,25 80:4 | **scale** 81:10 | **seats** 66:11 | **seen** 57:19 |
| **sabin's** 89:1 | **scenario** 76:18 77:15 83:9 84:24 87:24 | **sec** 27:18 46:3 46:6,21 47:4 | **sees** 28:8 79:13 |
| **safe** 39:21 40:23 | **scheme** 55:13 | **sec's** 52:9 | **seiji** 12:4 |
| **safeguard** 59:15 | **scheuer** 13:1 | **second** 21:9 30:21 38:21 45:8 53:16 62:13 67:23 86:3 90:18 91:11 | **select** 43:20 48:8 81:21 |
| **safely** 21:24 | **schiffrin** 13:2 | | **selected** 47:14 47:18 |
| **safety** 59:18 | **schneider** 13:3 | | **selection** 47:17 |
| **salaries** 81:2 | **schoenau** 88:17,23 | **secondly** 78:24 81:15 | **sell** 49:11 |
| **sale** 50:15 83:16 | **schottenstein** 13:4 | **secretly** 40:24 | **selling** 25:8 45:12 |
| **sales** 24:10 42:25 | **schreiberg** 13:5 | **section** 45:20 | **senes** 13:7 |
| **salle** 3:5 | **schroeder** 13:6 | **securities** 17:12,13 46:1 52:11,13 | **sense** 75:10 88:6 |
| **salls** 15:13 | **scope** 62:4,6,10 62:12 81:10 94:5 97:21 98:22 | **security** 20:6 50:8,12,14 52:14,24 53:3 53:4 55:2 | **sent** 65:2 70:4 |
| **samuel** 10:2 13:5 | **scott** 8:21 14:24 | | **separate** 31:5 31:11 |
| **sanders** 5:1 | **scrap** 25:9 | **see** 39:8 57:10 58:23 75:6 95:2 96:12 100:5,9 101:9 101:10 | **september** 86:13 |
| **santos** 7:23 | **screen** 16:25 | | **serban** 11:14 |
| **sarachek** 12:25 | **se** 5:9,21 7:2 22:8 66:17 80:13 100:13 | | **series** 23:13,16 24:2,7 29:22 29:25 30:7,19 35:10 66:9 |
| **sat** 96:23 | **seal** 2:8 94:1,6 94:11 | **seeded** 31:2,10 | |
| **satisfied** 29:17 82:19 | | **seek** 61:7 94:6 97:1 | **seriously** 59:23 |
| **satisfy** 51:11 79:24 88:9,14 | **sealing** 92:13 92:17 94:4 95:4,4 | **seeking** 16:11 23:16 | **served** 65:22 |
| **save** 29:6 | **sean** 9:6 | **seem** 75:3 | **services** 71:22 |
| **saving** 59:11 | **seasoned** 43:21 | **seemed** 18:14 | **serving** 65:19 |
| **saying** 34:5 76:5,6 91:11 91:19 | **seat** 47:25 66:6 66:8 | **seemingly** 64:20 | **session** 80:10 |
| | | | **set** 22:18 26:24 27:13 29:4 35:4 46:21 47:18 51:12 66:1,25 |
| | | | **setbacks** 42:21 |

setoff 28:11,16
  68:17
settlement 2:3
  24:3 28:20
  30:1,6,9,12
  35:10 36:11
  51:14,15,18,18
  51:21 66:3
  72:7,11 78:3
  78:20 79:7
settlements
  23:1,9,12 24:8
  79:5
several 59:10
  79:9,9 84:8
severely 83:1,6
  83:10 84:7
shafer 15:14
shara 4:6
  58:25
share 30:3
  38:18
shareholders
  48:1 67:15
sharing 16:6
sharon 8:20
shed 22:18
sheet 40:17
  66:5
shenaya 8:16
shlivko 13:8
shockwaves
  65:2
short 20:1 32:9
shorter 38:24
shortly 37:6
  40:11

show 33:5 49:6
  52:1 54:20
  55:2 70:13
  83:6 84:18
shown 39:18
shut 41:3 54:10
side 27:11 45:1
  70:22 88:2
sided 74:25
sign 45:9 93:20
signature
  102:7
significant
  19:25 33:14
  42:9,21 43:6
  44:1,7 47:22
  47:24 56:19
  65:10 74:18
significantly
  54:21 85:1
silent 39:22
silverman 13:9
similarly 57:21
simon 8:18,23
  66:18
simple 82:14
  82:22
simply 16:18
  21:1,16 23:25
  50:7 58:7
  73:18 82:14
  86:22
sing 80:2,2
sister 59:23
sit 80:9 100:3
situation 87:1
  87:3

six 36:19
slide 17:2
  21:21 22:13
  24:7 27:5
  34:17 37:12
  39:9,18
slides 27:4,4
  34:18
slightly 38:22
  77:14
slim 94:24
small 77:13
smart 13:10
smith 13:11
social 21:9
  80:19
sole 58:9
solely 89:4
solicitation
  35:13 61:4
solicited 73:3
solomon 64:10
solution 72:15
solutions
  102:20
soma 14:19
somebody
  91:20 99:9
somewhat
  60:22 62:25
song 80:1
sontchi 13:12
sonya 2:25
  102:3,8
soon 42:3
  77:24 80:1

sophisticated
  88:1
sorry 54:6
  89:13 93:24
sort 68:19
source 69:2
sources 69:4
south 3:20
southern 1:2
southfield 5:4
sp 6:2,3
spaces 66:23
spain 70:17
  80:15
spc 6:2,3
speak 27:8
  34:4 65:11
  76:3 78:10
  80:16
speaking 27:9
  49:3 63:2
special 17:24
  18:6 99:11
specific 54:13
  61:18,21 89:6
  101:1
specifically
  25:17 41:24
spectacularly
  58:11
speed 40:24
  75:13 91:6
spend 49:3
spent 43:15
  69:2 78:7
spirit 60:6

spoken 70:20
84:20
sponsor 37:18
43:16 79:22
sponsoring
43:1
spreadsheet
70:13
sprofera 15:15
stadler 13:13
stage 21:23
22:23 25:11
67:12
stages 17:5
21:23
stake 44:9
47:24
stakeholders
16:15 19:16
66:10 67:9
81:12
stakehound
93:3
staking 25:16
25:20,21,22
stalking 20:10
24:12
stanbury 13:14
stand 38:11
42:5,16 44:3
60:7 77:24
90:11
standard 20:20
standing 24:1
55:20
stanley 13:15

start 17:1
21:24 34:17
39:4 44:20,21
67:13 76:1
96:4 99:21
started 18:14
24:11 41:1
48:24 67:24
starting 24:13
56:13 64:17,24
starving 77:4
state 17:9
27:18
stated 76:12
statement
33:21 55:8
60:10 61:10
74:16 80:11
84:10 90:1,6
100:19
statements
92:5 100:20
101:2,5
states 1:1,12
4:1 58:21 59:1
61:2 63:21,25
70:15 71:22
statistics 35:13
36:9
status 35:9
71:24,25
statutory 19:5
steadfast 60:5
steadily 65:5
steadman
13:16

steefel 13:17
steep 45:13
steering 65:16
68:23
steps 55:14
steven 37:14
stig 10:9
stipulation
20:6,23
stn 20:20
stock 25:25
41:13
stockholders
66:9
stocking 43:7
stop 39:17 52:8
stopped 18:24
story 40:13
stout 38:1
straight 42:8
straightforw...
74:23
strange 48:24
street 3:20
5:15
stretto 36:18
strongly 73:13
structure 29:5
structured
28:15
stuart 7:20
stuck 92:8
sub 30:14
subject 95:5,10
submit 31:12
46:5 83:1
85:22 90:21

submitted 31:4
31:8,10
subordinate
78:21
subordinated
50:16 52:15
53:1,12
subsequent
64:18 70:4
73:1 95:10
subsequently
34:20
subsidiaries
23:18
substantial
72:9
substantially
43:9 94:5
substantive
23:23 70:8
79:8
success 36:14
50:2,25 55:6
58:8
successful
24:11,18 25:18
35:13 66:1
67:13
suffered 42:20
sufficient
84:17
suggest 75:9
suggestion
18:20 32:23
suggests 86:1
suite 3:20 5:3
102:22

| | | | |
|---|---|---|---|
| **sullivan** 6:1 | **surpasses** | **tax** 28:25 29:3 | 88:9,14 93:12 |
| 15:16 | 48:23 | **taxes** 29:6 | **testament** |
| **sums** 77:1 | **surprise** 58:1 | **team** 22:1 | 51:20 |
| **supersedes** | 64:25 86:11 | 31:20,21 32:10 | **tested** 64:24 |
| 94:2 | **sustain** 97:25 | 33:5 43:12 | **testified** 40:4 |
| **supplement** | **sweet** 13:18 | 50:4 | 40:12 |
| 78:18 | **systemic** 64:18 | **team's** 33:8 | **testifies** 98:9 |
| **supplemental** | **systems** 31:24 | **technology** | **testify** 49:18,24 |
| 37:5 57:3,6,9 | | 43:23 | 53:20 56:17 |
| 63:23 | **t** | **telegram** 66:23 | 57:13,21 98:25 |
| **supplemented** | **t** 9:6 102:1,1 | **telephonically** | **testifying** |
| 78:13 | **t.j.** 6:21 11:19 | 7:6 | 93:11 97:11 |
| **support** 17:4 | 93:24 | **tell** 52:18 54:13 | **testimony** |
| 27:9 28:4 36:6 | **tab** 94:13,15 | 55:3 91:13 | 55:15 57:11 |
| 36:24 37:7,12 | 94:17,19,20 | 97:3 | 79:2 84:18 |
| 37:18,23 38:2 | **table** 43:4 | **telling** 40:22 | 85:23 86:7 |
| 38:5 54:17 | 47:25 66:6,8 | 56:10 | 96:15 |
| 55:14 66:15 | **tabs** 94:12 | **temporal** 60:20 | **thank** 16:8 |
| 75:8 76:13 | **take** 16:21 24:3 | 62:4,11 | 21:14,14 34:12 |
| 78:7,11 82:23 | 29:9 44:17 | **ten** 78:10 80:5 | 34:13 38:14,20 |
| 82:25 87:20 | 59:22 68:6 | **tens** 40:25 | 58:18,19 64:10 |
| **supporters** | 77:19 80:5,5 | **tension** 24:14 | 64:11 65:14 |
| 78:15 | 85:3 99:21,21 | 24:20 43:3 | 67:16,18 69:20 |
| **supporting** | **taken** 42:4 | **term** 32:14 | 71:7,9,9 75:24 |
| 57:17 75:22 | 48:25 57:25 | 66:5 | 76:1 77:15,16 |
| 83:12 | 74:11 78:9 | **terms** 26:12 | 77:22,24 80:3 |
| **supportive** | **takes** 52:10 | 28:5,6 29:16 | 80:4,13 82:6,7 |
| 70:24 79:3 | **talk** 26:19 68:1 | 32:12 51:8 | 82:9 87:17 |
| **supposed** 70:1 | 92:10 93:13,14 | 54:7 62:23 | 88:15,16,19,19 |
| **sure** 18:16 | **talked** 53:15 | 68:19 69:2 | 91:3 99:4 |
| 29:13 31:24 | 92:25 | 74:12 96:21 | 100:2 101:6,10 |
| 32:2 33:11,21 | **tanzila** 14:11 | **test** 29:17,21 | **thanks** 32:9 |
| 55:20 61:9 | **targets** 81:9,13 | 30:21 37:8 | 71:6 |
| 75:1 83:22 | **task** 42:19 | 51:25 52:4,11 | **theories** 23:21 |
| 85:2 86:14,20 | **tasked** 40:5 | 53:14,23 65:21 | 64:24 |
| 99:13 | **taught** 19:14 | 82:13,13,18,19 | **therese** 13:1 |
| | 26:20 | 82:24 85:5,6 | |

therewith   64:4
thing   19:17,19
  71:1 93:17
  100:25
things   17:11
  38:23 59:10
  66:4 78:4
  90:14 92:24
  93:8
think   18:13
  21:9,22 27:14
  30:10,17 33:1
  35:3 38:7 39:3
  39:8,13 46:19
  47:3 48:25
  53:3,7,13
  57:15 61:10
  63:18 70:18,21
  76:2,25 79:19
  83:11,24 84:5
  84:7,17,22
  85:12 87:19,21
  87:25 88:3,6
  88:10 90:17
  91:5,17 92:2
  93:4 95:21
  98:15,18
thinking   47:8
third   29:11
  36:10 46:23
  47:7 81:17,21
thirty   54:1
thomas   8:15
  10:18
thomson   13:19
thought   20:2
  26:24 27:10

78:12
thousand
  35:21
threats   60:1
three   26:11
  44:9 47:22
  52:5 53:14
  66:11 68:21
  71:11 77:19,21
  78:2,7 79:5
tied   50:25 54:8
time   16:18
  18:6 21:6,10
  32:9 39:2 40:3
  42:12 46:15,21
  49:3,20 53:9
  54:14 64:23
  65:5 67:16,23
  68:14 73:8,19
  74:1 76:5 78:1
  80:14 88:24
  90:5,8,20
  91:22 92:3,7,8
  100:22 101:1
timeline   21:21
  44:24 45:25
times   32:19
  54:2,3
timing   70:6
timothy
  15:12
tiny   77:3
tireless   67:5
  77:24 79:20
title   28:7
today   17:3
  18:12 24:1

27:3 37:4 38:9
  38:11 41:10
  42:14 55:20
  57:3 60:7,10
  67:16 71:13
  75:17 76:3
  82:6,12 86:18
  89:10 90:11
  100:18 101:5
todd   9:19
together   19:24
  21:19 65:11
  67:10 90:4
toggle   46:11
token   2:3
  33:15,17 40:21
  49:4,6,6,9,14
  49:16,21,22
  50:1,3,5,7,10
  50:11,13,15,20
  50:24 51:4,8
  51:15,22 52:2
  52:6,14 53:3
  53:18,22 54:7
  54:11,11,14,19
  54:22,25 55:2
  55:10,13,23,24
  56:1,3,21,25
  57:14,17,18,21
  58:8 82:18
tokens   49:9,20
  58:2
told   17:18 18:6
tomorrow   96:4
  99:8,14
took   42:25
  50:25 61:19

tools   85:14
torosian   13:20
torpedoes
  40:24
total   18:4
totally   21:11
touch   41:25
  44:9
touted   50:2
towards   22:3
town   5:3 66:23
toxic   59:25
track   25:13
tracks   61:3
trade   45:15
traded   56:13
trading   56:20
traditional
  69:17,18
traditionally
  54:18
transaction
  19:21 22:3,21
  23:7 24:9,12
  24:20,22 26:8
  29:6,14 68:15
transactional
  61:17
transactions
  61:19
transcribed
  2:25
transcript
  102:4
transfer   23:22
transferred
  45:18 51:2

68:4

**transmitter**
17:12

**transparency**
18:1 79:23
97:17

**transparent**
46:24 47:9

**travis** 10:17

**treated** 50:11
53:6 69:6
72:10

**treatment** 28:2
28:17 49:4
50:18 51:22,24
66:2 72:8

**trial** 22:5,5
23:4 42:1
55:19 93:10
96:22 101:4

**trials** 92:13

**tried** 93:12

**trimming**
77:12

**trip** 48:25

**tristan** 8:17

**troubled** 89:21
89:23

**troutman** 5:1
71:16

**true** 55:8 73:14
97:6 102:4

**truly** 18:13
19:15 20:7
21:3 76:6

**trust** 45:14
92:16

**trusted** 43:15

**trustee** 4:2
17:16 27:17
32:24 48:16
58:21 59:1
61:2 63:25
76:8 79:21
83:13 85:14
87:25 92:21
95:2,8,13

**trustee's** 63:21

**try** 21:4,7
91:25 95:16
99:25

**trying** 17:19
39:9 69:22
78:21 87:11
98:2

**tuganov** 5:14
66:18 77:17
78:1 79:12

**tune** 78:16
80:2

**tunnel** 79:14

**turetsky** 13:21

**turn** 20:13
24:7 37:12
80:10

**turner** 13:22

**turning** 22:15
26:18 27:13

**twice** 70:13

**twitter** 66:23

**twitters** 66:23

**two** 21:22
22:20,23 24:15
25:11,12 29:20

31:11 34:18
35:17 44:7
64:19 65:17
78:16 80:25
82:24 89:9
90:14 100:7

**tyler** 11:5

**type** 49:14

**typical** 33:9
41:21

**typically** 45:15
96:13

**u**

**u.s.** 1:23 4:2
17:16 25:17
27:17 32:23
76:8 79:21
92:20 95:2,8
95:13

**ubierna** 5:20
80:7,10,12,13
82:7

**ucc** 76:8,12
78:14

**uday** 15:1

**ultimately**
59:15

**umber** 10:22

**unacceptable**
93:21

**unanimous**
82:20

**unanimously**
43:19

**uncertain**
17:16

**uncertainty**
19:21 72:2

**unclear** 47:3
62:22,25

**uncovered**
40:16

**under** 2:3,8
24:6 29:16,23
30:24 31:23
32:4 33:5,6
35:7 45:20
48:13 49:4
50:11,19 51:15
52:3,11,21,24
56:11 58:16
62:3 65:24
72:23 75:21
82:15,16 83:9
84:21 86:7
88:9 96:5

**underlying**
20:12 54:16

**understand**
45:9 73:6 84:1
90:15 92:4
95:11

**understanda...**
31:17

**understanding**
46:2 92:18

**understate**
90:2

**understood**
18:16 43:8
44:23 57:10

**undisputedly**
64:16

unfettered
  73:4
unified  65:12
uniformity
  61:12,15
unique  24:23
  44:15 45:19
  59:14
unit  49:7
united  1:1,12
  4:1 58:21 59:1
  61:2 63:21,25
  70:15
unnecessary
  76:22
unpaid  21:11
unprecedented
  66:22
unredacted
  93:5
unregistered
  17:12
unremarkable
  57:16 58:7
unresolved
  93:2
unsecured  3:19
  19:6 28:10
  30:23 38:17
  40:7 50:13
  52:23,23,25
  53:1,11
unusable  58:2
unusual  76:11
unusually
  63:15

unwilling
  44:22
update  63:20
updates  23:10
upper  39:14
upstairs  68:22
uptegrove
  13:23
urge  91:23
urgency  90:22
urquhart  6:1
usd  6:3
use  28:5,6,7
  29:16 39:1
  49:9 54:11
  58:9 73:21
  79:4 95:24
  96:1,10 97:9
  97:19 98:7
used  50:5
  61:16 64:21
  96:15,17
useful  80:19
uses  49:19
using  96:25
ust  60:12 81:24
usually  83:3,4
  93:12

v

v  12:18
vague  62:3
validation  45:5
valuable  62:18
  62:22
valuation  31:4
  31:6 33:17
  37:12 38:2

54:18 82:18
  100:16,17
value  22:22
  23:18 24:4,5,9
  24:20 25:5,7
  25:10 26:3,22
  31:4 33:12
  41:14 42:3
  44:4 45:15
  50:1,3,8 51:5
  51:11,14 53:18
  53:21 54:8,11
  54:14,17,19,21
  55:10 56:17,23
  57:17,18,22,23
  58:10 65:6
  73:18 74:7
  82:15 83:6,7,8
  83:9,14,20,22
  83:23,25 84:2
  84:4,5,6,11,13
  84:15,23,25
  85:1,4,5,8,8,11
  85:16 87:22
  88:4
valued  31:6
valueless  31:1
values  88:8
van  13:24
variety  25:4
various  59:3
  59:21 60:12
  62:20
vazquez  13:25
vejseli  14:1
ven  15:3

venable  5:13
  77:25
verifies  32:22
veritext  102:20
versus  66:2
  85:8
veton  14:1
victor  5:20 6:7
  80:13 82:11
videos  50:3
  56:7
view  5:11 24:4
  36:14 83:5,13
  92:21
vik  11:21
vince  15:16
vindication
  49:1
violated  30:14
violates  30:5
virtually  96:25
visions  76:13
vitor  7:22
voice  65:12
vote  48:21
  51:17,17 63:7
  79:4,4 100:15
voted  32:13,14
  34:25 35:1
  76:17,19,24
  77:9 81:20
voting  34:10
  34:17,19,22
  48:22 51:20
  67:3 69:11
  70:24 81:20

**voyager** 35:18
82:4

**w**

**w** 13:9
**waiting** 46:3,6
79:13
**waive** 63:11
**waived** 78:20
**waiver** 63:9
**walk** 16:22
27:23 36:6
**walker** 14:2
**walks** 34:17
**walkthrough**
34:2
**want** 16:21
21:14,14 26:18
27:4 29:9
31:16,18 32:8
44:9 46:7,23
47:1 49:3
50:22 57:9,10
57:11 63:12,16
67:22 68:9
69:12,20 76:25
81:19 86:19
89:24 90:2
91:7 92:17
95:12,25 97:22
98:5,13,24
99:6 100:5
**wanted** 18:15
25:12 45:8
47:8,20 57:12
66:19 68:1,8
68:17 74:13
86:14 87:9

92:10,14
**wants** 92:10
96:12 99:9
**warranted**
20:3
**warren** 14:3
**washington**
6:19
**waste** 63:13
**watched** 56:7
**wavered** 65:19
**way** 17:13
19:10,15 21:22
24:8 34:1 72:1
75:11 80:19
84:14 91:25
95:6
**ways** 52:5
**we've** 23:8,11
27:14 31:8,10
45:2 46:20
59:25 60:11
69:2 74:17
93:12 94:5
98:16
**weedman** 14:4
**week** 31:12
33:25 34:11
37:4 58:15
64:6 83:5,19
**weekend** 64:1
92:16
**weight** 55:19
**weighted** 69:14
**weird** 71:19
**welcome** 82:1

**went** 19:10
48:6
**west** 5:15 7:3
14:16
**whichever**
85:9
**white** 3:17 6:10
38:16
**wholesale** 95:4
**wholly** 81:18
81:23
**wi** 7:4
**wick** 14:5
**wide** 17:6
19:11 20:5
**widespread**
75:8
**wildes** 14:6
**wildest** 48:23
**wildly** 24:11
24:18 54:9
**wiles** 26:11
65:22 71:11
78:8
**william** 13:6
13:23
**willing** 36:6
85:19 92:20
**willingness**
72:14 91:24
**winddown**
26:19 83:8
84:24 85:5,8
87:23,24
**winded** 27:2
**winding** 80:1

**winner** 20:10
**winning** 43:20
**winter** 17:6
40:2
**wish** 89:9 98:5
101:7
**wished** 70:2
**wishes** 97:8,9
**withdraw** 41:4
**withdrawal**
72:23
**withdrawals**
39:17
**withdrawing**
40:24
**withdraws**
56:18
**withhold** 5:2
22:11,16 23:1
23:4 26:17
71:14,16,18,19
72:3,6,7,8,12
72:13,16,18,21
74:14 75:6,9
75:18
**witness** 55:16
93:11 97:2,11
98:9,25 99:24
**witnesses**
34:11 36:16,19
38:6 48:14
79:1 85:16,18
86:22,23,25
97:9,19 98:11
98:12,20
100:24

| | | |
|---|---|---|
| **wofford** 14:7 | **write** 18:22 | **zomo** 14:11 |
| 69:21 | **written** 85:23 | **zoom** 97:15,18 |
| **wolff** 6:9 88:23 | 86:7 87:11,13 | 100:7 101:8 |
| **wonderful** | **wrong** 40:3 | |
| 17:1 | **wrongdoing** | |
| **wondering** | 41:18 | |
| 100:17 | **x** | |
| **words** 52:1 | **x** 1:4,10 | |
| 56:16 74:13 | **y** | |
| **work** 18:18 | **yara** 10:15 | |
| 19:24 21:3,15 | **yeah** 39:8 | |
| 21:17,19 22:3 | 95:20 100:10 | |
| 25:23 29:8 | **year** 16:14 | |
| 34:7 38:9 | 20:22 22:14 | |
| 44:24 49:1 | 26:24 30:2 | |
| 59:2,11 61:23 | 46:20 47:3 | |
| 70:23 72:14 | **years** 56:14 | |
| 77:25 | **yi** 9:24 | |
| **worked** 23:8 | **yiyue** 14:12 | |
| 26:9 42:17 | **yohannes** 7:8 | |
| 43:11 44:13 | **yoon** 14:8 | |
| 47:22 59:17 | **york** 1:2,14 | |
| 60:16 69:19 | 3:13 4:4,11,18 | |
| **working** 16:15 | 5:16,16 6:5,5 | |
| 19:16 31:23 | 6:12 98:4 | |
| 39:9 72:19 | **young** 14:9 | |
| 75:15,17 81:6 | 16:5,7 | |
| 90:3 92:16 | **youtube** 66:24 | |
| **world** 40:11 | **z** | |
| 64:20 98:2 | **zabib** 15:17 | |
| **worlds** 64:20 | **zachary** 14:6 | |
| **worth** 35:24 | 15:17 | |
| 53:10 57:1 | **zaharis** 14:10 | |
| **worthless** 58:3 | **zero** 54:12 | |
| **would've** 19:20 | 83:20,22 | |
| 19:20 | | |

## Exhibit C

### October 3, 2023 Transcript (Case in Chief in Support of Plan)

*Includes the testimony of (i) Christopher Ferraro (Celsius), (ii) Steven Kokinos (Fahrenheit), (iii) Ryan Kielty (Centerview Partners), (iv) Joel Cohen (Stout), (v) Brian Karpuk (Stretto), (vi) Alison Hoeinghaus (Alvarez & Marsal), and (vii) Mark Robinson (UCC Member).*



Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-MG

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK LLC

8

9        Debtors.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                United States Bankruptcy Court

13                One Bowling Green

14                New York, NY  10004

15

16                October 3, 2023

17                09:00 AM

18

19

20

21   B E F O R E :

22  HON Martin Glenn

23  U.S. BANKRUPTCY JUDGE

24  ECRO:  Karen

25

Page 2

1    HEARING re Doc# 3667 Statement / Notice of Debtors

2    Confirmation Hearing Demonstratives For October 3, 2023

3    (related document(s)3609, 3577)

4

5    Doc# 3668 Statement / Notice of Debtors Confirmation Hearing

6    Witnesses for October 3, 2023 (related document(s)3609, 3577

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dani Rossean

25

1   A P P E A R A N C E S :

2

3   Kirkland & Ellis LLP

4        Attorneys for Debtors

5        601 Lexington Avenue

6        New York, NY 10022

7

8   BY:  Judson Brown, Chris Koenig, T.J. McCarrick, Elizabeth

9   Jones, Jeremy Young

10

11   White & Case LLP

12        Attorneys for the Committee

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16   BY:  Aaron Colodny, Keith Woffard, Joshua Weedman

17   Jeffrey Sabin

18

19   WITNESSES:

20

21   Christopher Ferraro

22   Steven Kokinos

23

24

25

Page 4

1    ALSO APPEARING TELEPHONICALLY:

2    Office of the US Trustee

3    By:  Shana Cornell, Mark Brah, Brian Masumoto

4

5    Dimitry Kirsanov

6    Otis Davis

7    Jason Lovine

8    Richard Phillipos

9    Johan Bronge

10   Arthur Abreu

11   Victor Ubierna de las Heras

12   Sami Sheik

13   Jeff Patton

14   Sharon Dow

15   Simon Dixon

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2

3           THE COURT:  Please be seated. All right. Good

4     morning, everyone. Before we start with the testimony, I

5     wanted to raise one thing with the Debtor, the Committee,

6     the US Trustee. The Consumer Privacy Ombudsman, Lucy

7     Thomson, filed a request to be able to testify remotely for

8     cross-examination. Her -- the document is ECF Document 3589.

9     She attached to it -- there's the letter requesting

10    permission. There is a copy of her purported direct

11    testimony. I'm assuming she's not a lawyer.

12           What she submitted as her testimony is not under

13    oath. The -- I don't know, the thrust of what her purported

14    -- of her statement was that she's continuing to work with

15    the Debtors and Committee, I guess the US Trustee, in trying

16    to finalize privacy arrangements, primarily with NewCo. Rule

17    43(A) of the Federal Rules of Civil Procedure is applicable

18    with respect to whether or not someone can appear remotely

19    for testimony. What I would ask is that between the Debtor,

20    the Committee, and the US Trustee, reach out to Ms. Thomson.

21    Her letter request doesn't satisfy the requirements. It just

22    would be -- she's in Washington. It would be inconvenient

23    for her to come. I understand.

24           What's not clear to me is whether the Debtor or

25    the Committee or the US Trustee intends to cross-examine

1    her. It may well be that there isn't going to be any cross-

2    examination, in which case, her direct -- assuming that

3    she'll need to correct that so that it's under oath -- would

4    come in. But if there's going to be cross-examination, she's

5    going to have to come. I mean, just the inconvenience, I

6    mean, is not sufficient. If you all agree that she's not

7    going to be cross-examined -- I understand a lot of other

8    parties and interests. But if the Debtor, the Committee and

9    the US Trustee agree that she can submit her testimony,

10   direct testimony without cross-examination, I'm not going to

11   require her to come to New York. But she's going to have to

12   fix it and put it under oath. But reach out and see whether

13   -- I don't know. Mr. Koenig, what's the status of efforts to

14   resolve matters with Ms. Thomson?

15           MR. KOENIG:  Good morning, Your Honor.

16           THE COURT:  Mr. McCarrick's running up here. I

17   don't know whether --

18           MR. KOENIG:  Good morning, Your Honor.

19           THE COURT:  It's his exercise for the day, but --

20   go ahead. Good morning.

21           MR. KOENIG:  Good morning, Your Honor. Chris

22   Koenig, Kirkland & Ellis, for the Debtors. We've been

23   working with Ms. Thomson collaboratively to try to resolve

24   matters, and we have included language in the Proposed

25   Confirmation Order that we proposed with her. We've been

Page 7

```
 1    working with her. I don't believe she's signed off on it

 2    yet. We're also working on a formal privacy policy that

 3    would apply to NewCo. So it's all in motion.

 4              THE COURT:  Okay.

 5              MR. KOENIG:  I would say well in motion, but it's

 6    not quite done yet.

 7              THE COURT:  So I -- the three parties who I

 8    suggested, see whether you can get things resolved.

 9              MR. KOENIG:  We certainly will.

10              THE COURT:  I don't know if there's any particular

11    order in which she needs to testify, but it wasn't clear to

12    me that there would be cross-examination. Hopefully you'll

13    be able to resolve the issue. I mean, she raises serious

14    issues. I'm not questioning that.

15              MR. KOENIG:  No, we certainly agree. We've been

16    working with her to try to address her issues and, you know,

17    fulfill, make sure that she can fulfill her mandate.  Thank

18    you, Your Honor.

19              THE COURT:  Okay.  Thank you very much. All right,

20    let's begin with -- is there -- let me ask this, is there

21    anything that you wish to raise before we call the first

22    witness?

23              MR. BROWN:  No, Your Honor. Ready to proceed.

24              THE COURT:  You have to identify yourself as well.

25              MR. BROWN:  Good morning, Your Honor.  Judson
```

Page 8

1    Brown from Kirkland & Ellis on behalf of the Debtors. We'll

2    begin with Mr. Chris Ferraro this morning.

3              THE COURT:  Okay. Come on up, Mr. Ferraro.

4              MR. BROWN:  Your Honor, while Mr. Ferraro's

5    getting situated, we have a binder with various exhibits

6    that we might use, including Mr. Ferraro's Declarations. If

7    I might hand those to Mr. Ferraro in Court while he's

8    getting situated.

9              THE COURT:  Sure.  Please.

10             MR. BROWN:  Thank you.

11             THE COURT:  Carrie, if you would -- Mr. Ferraro,

12   if you would, raise your right hand.

13             THE CLERK:  Do you solemnly swear or affirm all

14   the testimony you're about to give before this Court is the

15   truth and the whole truth?

16             MR. FERRARO:  I do.

17             THE COURT:  Thank you.

18             MR. BROWN:  Your Honor, may I proceed?

19             THE COURT:  Please.

20             MR. BROWN:  Good morning, Mr. Ferraro. I know

21   you've testified in front of this Court many times, both

22   formally and informally. But can you please introduce

23   yourself for the record?

24             MR. FERRARO:  Yeah, good morning, everybody. My

25   name is Christopher Ferraro. I am the acting CEO, Chief

Page 9

1    Restructuring Officer, and Chief Financial Officer of

2    Celsius. I've been with the company since March of 2022. I

3    originally started as the Head of Planning and Analysis and

4    Investor Relations. I became the CFO the day before the

5    Petition, and I became the CEO, Acting CEO in late

6    September. I come off of a almost two-decade career with JP

7    Morgan where I was a Managing Director, and ran Global

8    Financial Analysis, as well as a Senior Managing Director at

9    Cerberus.

10          MR. BROWN:  And can you just briefly describe some

11   of your responsibilities as the Interim CEO and the CRO of

12   the Debtors over the course of the last year plus?

13          MR. FERRARO:  Yeah. From the very beginning, I hit

14   the ground running. I think it was very important that we

15   were aligned with the Committee.  So, in conversations with

16   the Committee chairs, we were able to kind of find out the

17   trajectory of this case -- where they were, where we were.

18   We started off in, you know, my tenure in October by really

19   kicking the tires. There was a sales marketing process that

20   was just kicking off, that Ryan Kielty will talk about

21   later. But -- and we were also internally looking at a

22   standalone plan. So we were spending a ton of time trying to

23   develop a standalone plan while that process was going.

24          When bids of interest came back, you know, I think

25   we all determined that the best course of action was a

Page 10

1    sponsor plan, and that led us to the stalking horse,

2    NovaWulf, and then we went into the auction. The auction

3    lasted a long time. I mean, this was on the back of, I

4    think, seven, eight-month sales and marketing process, four

5    weeks.  We were able to drive a lot, preserve a lot of value

6    for the creditors.  I think we distributed a hundred, we had

7    the ability to distribute hundreds of millions more

8    cryptocurrency, and lower management fees. That all led into

9    kind of naming Fahrenheit.  We felt that they had the best

10   plan and the best management team.  And then, we went into

11   kind of a plain sponsor agreement, settlements, et cetera,

12   leading up to everything to where we are today.

13           MR. BROWN:  We'll get into a little bit more of

14   those details. Just want to take a minute. Over the course

15   of the Debtors' restructuring, you submitted various

16   declarations in support of various requests and motions that

17   the Debtors have put before the Court, correct?

18           MR. FERRARO:  Yes.

19           MR. BROWN:  I want to take a look at a couple of

20   those this morning. I want to start, in your binder, it's

21   Celsius Exhibit 44. If you can flip to that, please,

22   Mr. Ferraro.

23           MR. FERRARO:  I'm there.

24           MR. BROWN:  Do you recognize this Declaration,

25   sir?

1            MR. FERRARO:  Yes.

2            MR. BROWN:  And is this the Declaration that you

3     submitted in support of confirmation?

4            MR. FERRARO:  Yes.

5            MR. BROWN:  And if you'll flip to the last page,

6     is that your signature, Mr. Ferraro?

7            MR. FERRARO:  Yes, it is.

8            MR. BROWN:  And is everything in this Declaration

9     true and accurate to the best of your knowledge,

10    Mr. Ferraro?

11           MR. FERRARO:  Yes, it is.

12           MR. BROWN:  You adopt it as your testimony here

13    today?

14           MR. FERRARO:  Yes, I do.

15           MR. BROWN:  Your Honor, the Debtors would move

16    Celsius Exhibit 44 into evidence.

17           THE COURT:  Any objections? Exhibit 44 is in

18    evidence.

19           (Debtors' Exhibit 44 Received into Evidence)

20           MR. BROWN:  Now, Mr. Ferraro, I want to take a

21    look at another Declaration you submitted in this case. It

22    is Celsius Exhibit 34. It is also in your binder. If you'll

23    flip to it and let me know when you're there.

24           MR. FERRARO:  I'm there.

25           MR. BROWN:  Do you recognize this document, sir?

1           MR. FERRARO:  I do.

2           MR. BROWN:  What is it?

3           MR. FERRARO:  This is the -- my Declaration in

4    Support of a Backup Plan Sponsor.

5           MR. BROWN:  And if we flip to the last page there,

6    the last substantive page, is that your signature, sir?

7           MR. FERRARO:  Yes, it is.

8           MR. BROWN:  And is everything in this Declaration

9    true and accurate to the best of your knowledge?

10           MR. FERRARO:  Yes, it is.

11           MR. BROWN:  And you adopt that as additional

12    portions of your testimony here today, sir?

13           MR. FERRARO:  Yes, I do.

14           MR. BROWN:  Your Honor, the Debtors would move

15    Celsius Exhibit 34 into evidence.

16           THE COURT:  Any objections?  It's admitted into

17    evidence.

18           (Debtors' Exhibit 34 Received into Evidence)

19           MR. BROWN:  And lastly, Mr. Ferraro, I want to

20    look at one more Declaration you submitted in this case. It

21    is in your binder. It's Celsius Exhibit 37. If you can flip

22    there for me.

23           MR. FERRARO:  I'm there.

24           MR. BROWN:  And do you recognize that Declaration?

25           MR. FERRARO:  Yes, I do.

1          MR. BROWN:  And what is it?

2          MR. FERRARO:  This is my Declaration in Support of

3    the Proposed CEL Token Settlement.

4          MR. BROWN:  And if you flip to -- do you see at

5    the top there's a written -- it's got page number out of

6    147. You see where I'm at?

7          MR. FERRARO:  Yeah, I do.

8          MR. BROWN:  If you flip to Page 13 of 147, is that

9    your signature?

10          MR. FERRARO:  Yes, it is.

11          MR. BROWN:  And are the contents of this

12    Declaration true and accurate to the best of your knowledge?

13          MR. FERRARO:  Yes, they are.

14          MR. BROWN:  And do you adopt that as additional

15    portions of your direct testimony here today, sir?

16          MR. FERRARO:  I do.

17          MR. BROWN:  Your Honor, the Debtors would move

18    Celsius Exhibit 37 into evidence.

19          THE COURT:  Any objections? All right. It's

20    admitted into evidence as well.

21          (Debtors' Exhibit 37 Received into Evidence)

22          MR. BROWN:  Thank you. Now, Mr. Ferraro, you just

23    submitted or admitted a number of declarations.  I just want

24    to take a minute and talk about a couple of different

25    aspects of those Declarations, just to highlight them for

Page 14

1    the Court here. I want to start with confirmation.  Can you

2    just describe for the Court briefly the process that you and

3    the Debtors and their advisors undertook to get to the

4    proposed Plan of Confirmation before the Court today?

5             MR. FERRARO:  Yeah, I mean, it -- again, it all

6    started many, many, many months ago, as we started to wind -

7    - kind of whittle down our options. That led into the

8    auction. We had three qualified bidders at the auctions, all

9    acting in good faith. Throughout the auction, we were

10   aligned with the creditors. And the goal was always to

11   maximize value and get out of bankruptcy as fast as

12   possible. We continued those discussions across all of those

13   parties -- the sponsor, the backup sponsor, the Debtors, the

14   Committee -- throughout negotiating the contracts. You know,

15   providing additional settlements to move these matters

16   behind us. And that's where we are today.

17            MR. BROWN:  And how would you describe the

18   negotiations between the various parties who participated in

19   this process along the many months, as you've described?

20            MR. FERRARO:  As a guy who does not like conflict,

21   it was not fun for me. And it went very, very slow, just

22   like the auction. But it was fruitful, so it all worked out

23   in the end.

24            MR. BROWN:  Now, the plan, the proposed plan

25   before the Court, includes various releases and exculpations

Page 15

1    and an injunction. Are you familiar with those provisions of

2    the plan, Mr. Ferraro?

3              MR. FERRARO:  Yes, I am.

4              MR. BROWN:  Can you just describe them at a high

5    level for the court, what your understanding of them is?

6              MR. FERRARO:  Yeah. I mean, these are, again,

7    hard-fought negotiated things which consideration was

8    exchanged. I think the, on the Debtors' piece, Debtors'

9    release, I'd just like to say that, you know, the settlement

10   agreement on the preference actions, I think, brings a lot

11   of closure and comfort to people. That was very important.

12   On the -- also on those release sides, the employees have ,

13   you know, been through a lot in this year, in, you know,

14   three months. I think it's important for the ones that did

15   not commit any bad acts to be released.

16              And then there's consensual third-party releases

17   that were part of the solicitation of ballot process. And

18   then the exculpations is, you know, there's a lot of

19   uncertainty in the regulatory environment. Distributing $2

20   billion of liquid crypto is not easy and always clear, and I

21   think these -- that's an important protection. And then on

22   the injunction side is the arms and legs to make sure that,

23   you know, releases and exculpation operate and are executed.

24              MR. BROWN:  From your perspective, Mr. Ferraro,

25   are these releases -- the Debtor release, the third-party

1    release, the exculpation, the injunction -- are these

2    appropriate and necessary provisions in the plan?

3              MR. FERRARO:  Absolutely. A lot of effort,

4    investigations went into this as well. These, like

5    everything in this case, hard fought and highly negotiated.

6              MR. BROWN:  I want to talk about another aspect of

7    the plan. You testified a moment ago that you selected

8    Fahrenheit to be the proposed path for emergence for

9    reorganization for the company. Can you just describe, from

10   your perspective, is the Fahrenheit path one that is

11   executable?  Is it feasible, in your view, Mr. Ferraro?

12             MR. FERRARO:  Yeah. Let me step back and just hit

13   some notes on the Fahrenheit plan, 'cause I think it's

14   important. This is a -- this is a company that has a $1.25

15   billion balance sheet. I think Stout and Joel Cohen will

16   come up and talk about some of that work that was done that

17   goes into those numbers. This is -- NewCo will be a company

18   that has $450 of liquid crypto, that it can vest into

19   staking, creating anywhere from 10 to 20 million dollars per

20   year right out of the gate. It has a mining business that is

21   healing and getting better by the day, has 125,000 rigs. No

22   debt. It has an excellent mining manager in the US Bitcoin.

23   I've been truly impressed, and this is one of the reasons

24   why they were selected.

25             And, you know, I think, all in all, at the end of

1    the day, if you look at it, we've been operating in a very

2    difficult time over the last 15 months in mining. We had

3    positive EBITDA, adjusted EBITDA, throughout the entire

4    time.  I think it was a low point of 250,000 in December

5    2022. Approximately 50 percent of that 20 million EBITDA

6    over the last 15 months was made in the summer months, the

7    three summer months. So there was a lot of effort that went

8    into that, risk management, hedging, et cetera, and I think

9    we're delivering a great set of assets to the NewCo. And

10   this should be a company that has a great future.

11             MR. BROWN:  So I just want to tease that out for a

12   second, Mr. Ferraro. Did you -- were you saying that the

13   mining business itself had generated adjusted EBITDA over

14   the course of restructuring of approximately $20 million?

15             MR. FERRARO:  Yeah, that's correct.

16             MR. BROWN:   And did you say that approximately 10

17   million of that alone, approximately half of it, was

18   generated just in the summer months?

19             MR. FERRARO:  That's correct.

20             MR. BROWN:  And so, what does that suggest to you

21   for the future of the mining business going forward under

22   Fahrenheit's operation?

23             MR. FERRARO:  Significant earnings power. No debt.

24   Ability, downside protection. It's important for everybody

25   to understand that in mining, if your marginal costs are

Page 18

1    higher than your marginal revenue, you curtail. So your

2    downside protection is kind of limited to your OpEx, your,

3    you know, fixed costs and such. So, you know, it's a strong

4    balance sheet with a very, you know, stable business from

5    the standpoint of minimizing losses.

6           MR. BROWN:  Now, if the Fahrenheit path is not

7    executable for whatever reason -- regulatory concern,

8    whatever -- what's the Debtors' alternative, Mr. Ferraro?

9           MR. FERRARO:  Yeah, so in our plan there is a

10   backup bid, with the backup sponsor being the BRIC. And we -

11   - given all the uncertainties in the regulatory landscape,

12   the volatility of the asset, et cetera, we thought it was

13   incredibly important to have a backup bid. We want to return

14   value to customers as soon as possible. They need the

15   liquidity. And part of the reason to have this backup bid

16   was so that we could tip it and not have to spend months

17   kind of looking for somebody to help us with this. This is a

18   different structure, I think it has a very different

19   regulatory kind of risk to it. So, we thought that this made

20   a lot of sense, given the fact that, you know, bankruptcy's

21   expensive and we want to return value.

22          MR. BROWN:  Now, I want to switch gears for a

23   second. We admitted your Declaration concerning the CEL

24   Token. I want to talk about that for just a second. In that

25   Declaration, did you identify a market price for CEL Token

Page 19

1    as of the pause date?

2              MR. FERRARO:  Yes, 12:00 p.m. Eastern on the pause

3    date, .28 cents.

4              MR. BROWN:  And just so the record's clear, I

5    think we all know what it is, but can you just describe what

6    a pause date is?

7              MR. FERRARO:  June 12th, 2022.

8              MR. BROWN:  And what happens?

9              MR. FERRARO:  We pause withdrawals, swaps,

10   transfers, et cetera.

11             MR. BROWN:  And the market price of the CEL Token

12   at the end of the day on the pause was what, Mr. Ferraro?

13             MR. FERRARO:  It was .28 cents.

14             MR. BROWN:  Okay.  Now, I want to talk about some

15   of the events that led up to that pause. And to do that, I

16   want to look at a couple of exhibits in the binder. I want

17   to start with Exhibit 69. And Your Honor, I want to pause

18   here and note that this exhibit was added to the Debtors'

19   Exhibit List in an Amended Exhibit List filed last night. I

20   do not believe you have a hard copy in your binder, but I

21   have some for you. May I approach?

22             THE COURT:  Yes, please. Thank you.

23             MR. BROWN:  Mr. Ferraro, are you at Celsius

24   Exhibit 69 in your binder?

25             MR. FERRARO:  Yes, I am.

Page 20

```
 1              MR. BROWN:  And this is a pleading filed on the

 2    docket in this case, and the caption says 'Notice of

 3    Consensual Resolution of Government Investigations.' Do you

 4    see that?

 5              MR. FERRARO:  Yes.

 6              MR. BROWN:  I want to look at one particular

 7    exhibit to this pleading. It's back on Page 6, is where it

 8    begins.

 9              THE COURT:  What page numbers -- are you using the

10    page numbers at the bottom of the page or the page up?

11              MR. BROWN:  At the top, Your Honor. And I will

12    clarify that for the record. Mr. Ferraro, you see the ribbon

13    at the top? Let's go to Page 6 of 233.

14              MR. FERRARO:  I'm there.

15              MR. BROWN:  And do you recognize this document,

16    sir?

17              MR. FERRARO:  Yes, I do.

18              MR. BROWN:  What is it?

19              MR. FERRARO:  This is a Non-Prosecution Agreement

20    between Celsius and the Government.

21              MR. BROWN:  And does this Agreement continue from

22    Page 6 over through Page 10 of 233?

23              MR. FERRARO:  Yes.

24              MR. BROWN:  And on Page 10 of 233, is that your

25    signature, Mr. Ferraro?
```

Page 21

1           MR. FERRARO:  Yes, it is. Yes.

2           MR. BROWN:  Did you sign this Non-Prosecution

3      Agreement on behalf of Celsius?

4           MR. FERRARO:  Yes, I did.

5           MR. BROWN:  Is this a fair and accurate copy of

6      the Non-Prosecution Agreement that you executed,

7      Mr. Ferraro?

8           MR. FERRARO:  To the best of my knowledge, yes, it

9      is.

10          MR. BROWN:  Your Honor, the Debtors would move --

11     I really just want to move Pages 6 through 10 of Exhibit 69

12     into evidence. And we can supply the Court with just those

13     limited pages, if you would like. But I want to move those

14     five pages, 6 through 10, into evidence.

15          THE COURT:  Any objections? Pages 6 through 10 of

16     the 233-page document, which is ECF 3293, are admitted in

17     evidence.

18          (Debtors' Exhibit 69 Pages 6 Through 10 Received

19     into Evidence)

20          MR. BROWN:  Thank you, Your Honor. Now,

21     Mr. Ferraro, let's go back to the first page of this Non-

22     Prosecution Agreement. Can you please just review to

23     yourself the first paragraph of the Agreement, let me know

24     when you're done.

25          MR. FERRARO:  Yeah, I've read it.

1            MR. BROWN:  And do you see where it talks about a

2    scheme to defraud investors by Celsius?

3            MR. FERRARO:  Yes, I do.

4            MR. BROWN:  And what does this Non-Prosecution

5    describe as the scheme to defraud investors, sir?

6            MR. FERRARO:  In non-legal terms, making false

7    statements, misrepresentations and manipulating CEL Token

8    price.

9            MR. BROWN:  Now, I want to look at the last

10   exhibit in your binder. Mr. Ferraro, it is on the tab UCC

11   195. This is a document on the Unsecured Creditor Committee

12   Exhibit List at 195. Do you have that document?

13           MR. FERRARO:  Yes, I do.

14           MR. BROWN:  Do you recognize it?

15           MR. FERRARO:  Yes, I do.

16           MR. BROWN:  What is it?

17           MR. FERRARO:  This is the Statement of Facts

18   Related to the Non-Prosecution Agreement.

19           MR. BROWN:  And just so we're clear, the Non-

20   Prosecution agreement that we just -- the five pages of

21   Exhibit 69 that were just admitted into evidence had, as an

22   attachment, this Statement of Facts?

23           MR. FERRARO:  Yes.

24           MR. BROWN:  And UCC 195 is the Statement of Facts

25   that was attached to the Non-Prosecution Agreement?

1              MR. FERRARO:  Yes, it is.

2              MR. BROWN:  And are you familiar with the

3    Statement of Facts, Mr. Ferraro?

4              MR. FERRARO:  Yes. Yes, I am.

5              MR. BROWN:  Did you review them in conjunction

6    with executing the Non-Prosecution Agreement?

7              MR. FERRARO:  Yes, I did.

8              MR. BROWN:  Are these a fair and accurate copy of

9    the Statement of Facts attached to the Non-Prosecution

10   Agreement?

11             MR. FERRARO:  Yes, yes, they are.

12             MR. BROWN:  Your Honor, the Debtors would move UCC

13   Exhibit 195 into evidence.

14             THE COURT:  Any objections? All right, UCC 195 is

15   admitted into evidence.

16             (Debtors' Exhibit UCC 195 Received into Evidence)

17             MR. BROWN:  Now, Mr. Ferraro, I want to just ask

18   you, you talked about the market price that you identified

19   for CEL, CEL Token, as of the pause date. Are you -- from

20   your perspective at the company, as an executive at Celsius,

21   are you aware of any evidence, anything that would have led

22   the price, the value of CEL, the CEL Token, to increase from

23   the pause date to the petition date?

24             MR. FERRARO:  So I'll start by saying I'm not a

25   valuation expert. I worked at a bank for almost 20 years,

Page 24

1    but I was not in valuation control, but I was around these

2    processes for a long part of my career. My belief is simple.

3    Celsius. in the springtime, was facing a lot of pressures.

4    The crypto industry was facing a lot of pressures. There was

5    a large selloff. Leading up to the pause date, CEL Token had

6    plummeted quite a bit in value up until that point. I think

7    it was .36 cents where it opened. We talked about how it

8    closed at .28. I look at a couple price points during that

9    day.

10           When the Tweet went out about the pause, I think

11   it was around 10:00 at night, the price was .25 cents.

12   Shortly thereafter, the price went down to .15 cents, and

13   then it bounced back to the .28 cents. Between the pause and

14   the petition it went from 28 to 81. This is on the back of a

15   month of nothing but negative news about Celsius and the

16   industry. Bitcoin sold off 25 percent at that time period.

17   It's hard for me understand a token that is represented and

18   marketed as a utility token in which the disclosure

19   statements say that if the platform were to cease to

20   operate, it could become worthless, it's hard for me to

21   believe why it would go up.

22           MR. BROWN:  So I might have misheard you,

23   Mr. Ferrao. Did you say between the pause and the petition,

24   CEL Token went from 25 to 81?  I might have mis --

25           MR. FERRARO:  28 to 81.

Page 25

1          MR. BROWN:  28 to 81.

2          MR. FERRARO:  Yeah.

3          MR. BROWN:  And --

4          THE COURT:  But it went from 25 down to -- it went

5    28 to 25, then to 81.

6          MR. FERRARO:  Let me, let me start. It opened at

7    36 on the date of the pause. At the point of when it was

8    communicated around 10:00 p.m. that night, it went down to

9    .25 cents. Shortly thereafter, it went as low as 15, and it

10   bounced back up to 28. So it closed the day of the pause at

11   28, and then the price at the petition was 81.

12         MR. BROWN:  And you're -- okay. Got the numbers.

13   And from your perspective, was there any economic rationale

14   to support an increase in the value of CEL Token from that

15   pause date to the petition date, the date of the bankruptcy

16   filing?

17         MR. FERRARO:  I do not see any reason why the

18   token price would've increased.

19         MR. BROWN:  And why is that?

20         MR. FERRARO:  It's a utility token on a platform

21   that ceased -- that paused. It says right in the disclosure

22   statement that in that circumstance it could be worthless.

23         MR. BROWN:  When you say 'disclosure statement'

24   what are you talking about?

25         MR. FERRARO:  These are the general -- sorry, I

Page 26

1   say 'disclosure statement' -- general terms of use. There is

2   a risk, a risk disclosure around the risks of CEL Token.

3           MR. BROWN:  And what is that disclosure,

4   Mr. Ferraro?

5           MR. FERRARO:  It effectively says that if the

6   platform were to shut down, that the token could become

7   worthless. It's a utility token.

8           THE COURT:  Which version of the terms of use

9   there are you referring? Is this Version 8?

10           MR. FERRARO:  This is not the earn terms of use,

11   this is the general.

12           MR. BROWN:  Now, Mr. Ferraro, I want to shift

13   gears to one more topic. In the Debtors' Proposed Plan of

14   Reorganization, are you familiar with the employee incentive

15   program?

16           MR. FERRARO:  Yes, I am.

17           MR. BROWN:  Can you just briefly describe that for

18   the Court?

19           MR. FERRARO:  Yeah, this is incentive program to,

20   you know, incent the executives to maximize value and get

21   out of bankruptcy as fast as possible. And it encompasses

22   different things. Some of it is an effective date target,

23   some of it is a distribution target. There's KYC targets,

24   and then there's a bunch of mining operational targets. The

25   goal of this is effectively to get out of bankruptcy as

1    quick as possible. We are burning $20 million a month on

2    professional costs while in bankruptcy. And on the mining

3    side, it's incredibly important to us that NewCo is a

4    success. And the mining asset is the crown jewel of NewCo.

5    So getting rigs plugged in, getting margins up, general risk

6    management is important for this handoff to maximize value.

7          MR. BROWN:  And what is it that you and the other

8    executives remaining at Celsius are going to be doing

9    between now and potential emergence from the company, from

10   bankruptcy if the plan is confirmed?

11         MR. FERRARO:  Yeah, it's a Herculean effort. I

12   mean, I'll give you an example. Myself and my team, we've

13   been negotiating two distribution agreements with PayPal and

14   Coinbase, custody agreements. This is, you know, this is --

15   these are not -- these are normally months and months of

16   negotiation that we're trying to pack into a short period of

17   time. You know, the mining business, there's no CEO of

18   mining. I'm the acting CEO of mining. This takes an

19   incredible amount of our time. We meet weekly with the UCC

20   on mining to make sure that his handoff is smooth. So --

21         THE COURT:  How many employees remain at Celsius?

22         MR. BROWN:  We have currently on payroll just

23   under 150, but we've noticed almost 50 of them. So we expect

24   to be right below 100 at the effective date. And which we'll

25   wind that down after distribution.

Page 28

1          MR. BROWN:  From your perspective, Mr. Ferraro, is

2    the employee incentive program proposed in the plan, is it

3    reasonable and appropriate here, sir?

4          MR. FERRARO:  Yes. Quite frankly, I think, you

5    know, some of these targets are probably not going to be

6    achieved. They were a stretch. This was, you know, weeks and

7    weeks of negotiation. I think Alvarez and Marsal and M3

8    negotiated this a bunch and went through the special

9    Committee for approval. This was done months ago. And we,

10   we're trying like hell to hit them all for the benefit of

11   the creditors, but I'm not sure that we will.

12         MR. BROWN:  Nothing further at this time, Your

13   Honor.

14         THE COURT:  All right. Cross-examination.

15         MR. BROWN:  Your Honor, I think the Committee

16   might've wanted to do one thing before we get to cross for

17   housekeeping matters.

18         THE COURT:  That's fine. Okay. Mr. Colodny.

19         MR. COLODNY:  Yeah, Your Honor, we have a number

20   of exhibits that are documents that were produced to us by

21   Celsius, and Mr. Ferraro as the primary company witness. I

22   was wondering if we could admit those exhibits --

23         THE COURT:  If you tell me what they are.

24         MR. COLODNY:  I've got them right here.  So the

25   Bates-stamped ones are UCC 3 through 15, 27 through 51, only

Page 29

```
1    Number 30 is blank, 54 through 56, 88 through 89, 91 through

2    121.

3              THE COURT:  Hold on, give me that last?

4              MR. COLODNY:  91 through 121.

5              THE COURT:  Okay.

6              MR. COLODNY:  And 183.

7              THE COURT:  Have you provided copies to other

8    parties?

9              MR. COLODNY:  Yes, they're all in our exhibit

10   list. It was filed in the docket and per Your Honor's

11   instruction, we had an FTP site which we made open to

12   everyone in the public. I know there was an issue initially,

13   but we posted [indiscernible]

14             THE COURT:  Okay.  Are there any objections to the

15   Court admitting in evidence Exhibits 3 through 15, 27

16   through 51, 30 is blank, 54 through 56, 88 through -- and

17   89, 91 through 121 and 183? Hearing no objection, they're

18   admitted into evidence.

19             (Exhibits UCC 3 through 15, 27 through 51, 30 is

20   blank, 54 through 56, 88, 89, 91 through 121, 184 Received

21   into Evidence)

22             MR. COLODNY:  And then we have, uh, three other

23   exhibits that are official blog posts and Tweets from the

24   Celsius Network accounts. Those are 177 through 178 and 181.

25             THE COURT:  All right. Are there any objections to
```

Page 30

1    the Court admitting in evidence Exhibits 177, 178 and 181?

2    They're admitted into evidence.

3              (Exhibits 177, 178 and 181 Received into Evidence)

4              MR. COLODNY:  And then, Your Honor, we have a

5    number of exhibits which are YouTube videos, AMA's. And we

6    plan to address how to admit those later today.

7              THE COURT:  Okay, all right. Thank you,

8    Mr. Colodny. Mr. Brown.

9              MR. BROWN:  Your Honor, just one housekeeping

10   matter, I apologize. I needed to move one more exhibit into

11   evidence that's referenced in Mr. Ferraro's Declaration. I

12   want to --

13             THE COURT:  Which Declaration?

14             MR. BROWN:  Yeah, so it's Exhibit 44, the

15   Confirmation Declaration, Paragraph 53 of Mr. Ferraro's

16   Declaration. It's on Page 21. References various exhibits to

17   Docket 393. These are the terms of use that the Debtors

18   filed on the docket a year ago. They are on the Debtors'

19   exhibit list at Exhibit 38. Exhibit 38 is one compilation,

20   all of those exhibits that were filed on the docket at 393.

21   The Debtors would move Exhibit 38 into evidence.

22             THE COURT:  You started by referring to Exhibit

23   44.

24             MR. BROWN:  Yes, I did.

25             THE COURT:  So I'm confused.

```
 1              MR. BROWN:  Yeah, my apologies. Exhibit 44 is

 2     Mr. Ferraro's Confirmation Declaration.

 3              THE COURT:  Okay.

 4              MR. BROWN:  That's into evidence.

 5              THE COURT:  Yes.

 6              MR. BROWN:  And Paragraph 53 in Exhibit 44

 7     references all of these terms of use which are on the

 8     Debtors' exhibit list at Exhibit 38.

 9              THE COURT:  Okay.

10              MR. BROWN:  My apologies.

11              THE COURT:  Any objections? They're into evidence.

12              (Debtors' Exhibit 44, Paragraph 53 at Exhibit 38

13     Received into Evidence)

14              MR. BROWN:  Thank you, Your Honor.

15              THE COURT:  Let me just say, I will try to keep my

16     own accurate list of what's in evidence. But I think when

17     the evidence concludes, parties should confer and seek to

18     provide me with a combined list of all exhibits that have

19     been admitted in evidence. And if there are any

20     disagreements about it, we'll sort it out then.

21              MR. BROWN:  Absolutely. Happy to do that, Your

22     Honor.

23              THE COURT:  Okay.  Thank you very much, Mr. Brown.

24              Ms. Cornell, are you going to [indiscernible]

25     examine? While you're going up, I've just got to step out
```

Page 32

1    and look for some notes on my desk. But nobody get up when I

2    come back in. So you can get ready to examine as soon as I

3    get back. All right, Ms. Cornell.

4              MS. CORNELL:  My name is Shara Cornell with the

5    Office of the United States Trustee. I will try my best not

6    to [indiscernible] lower.

7              THE COURT:  All right.

8              MS. CORNELL:  I'll do my best --

9              THE COURT:  Shara will keep everybody on the

10   straight and narrow path. Including, including --

11             MS. CORNELL:  She will. I'm a little shorter than

12   everybody else. So I'll try not to repeat what's already

13   been put into testimony today. But I may have to ask a

14   couple of questions again. So, Mr. Ferraro, are you familiar

15   with the plan as filed?

16             MR. FERRARO:  Yes.

17             MS. CORNELL:  Did you sign the plan as filed?

18             MR. FERRARO:  Yes.

19             THE COURT:  You have to keep your voice up as

20   well.

21             MR. FERRARO:  I'm sorry. Yes.

22             MS. CORNELL:  Are you familiar with the releases

23   and exculpation provisions found in the plan and the plan

24   supplement?

25             MR. FERRARO:  Yes, I am.

Page 33

1              MS. CORNELL:  And to all of the amended and

2      supplemental versions of those plans and plan supplements?

3              MR. FERRARO:  To the best of my knowledge.

4              MS. CORNELL:  And are there a lot of them?

5              MR. FERRARO:  Yeah.

6              MS. CORNELL:  Are you familiar -- and I think you

7      are -- with the declaration filed at Docket Number 3581 on

8      September 27th, 2023? It's Debtors' Exhibit 44 that we've

9      just been discussing.

10             MR. FERRARO:  Yes.

11             MS. CORNELL:  Do you have a copy of that in front

12     of you?

13             MR. FERRARO:  I do.

14             MS. CORNELL:  And just for the record, I know we

15     already spoke about this, but did you sign this Declaration

16     that's found at ECF Docket Number 3581?

17             MR. FERRARO:  Yes, I did.

18             MS. CORNELL:  Did you prepare this Declaration?

19             MR. FERRARO:  It was drafted by the legal

20     advisors. I reviewed it and we iterated on it until it got

21     to this point.

22             MS. CORNELL:  Okay. What I'm going to do now is

23     I'm going to ask you questions as they relate to specific

24     provisions in the Declaration, if that's all right. So if

25     I'm moving too fast or you need time to re-read, just put

Page 34

1    your hand up, but also say hold on a minute.

2            MR. FERRARO:  Okay.

3            MS. CORNELL:  So, I first want to direct you to

4    Paragraph 8.

5            MR. FERRARO:  Yes.

6            MS. CORNELL:  So in Paragraph 8, you state that

7    you had personal involvement in plan negotiations and

8    drafting process. Can you please confirm if that is

9    accurate?

10           MR. FERRARO:  Yes, that is accurate.

11           MS. CORNELL:  In Paragraph 12 you state that you

12   had close involvement with marketing and sales process and

13   negotiations. Can you please confirm that this is accurate?

14           MR. FERRARO:  yes, that's correct.

15           MS. CORNELL:  You also state that you had

16   firsthand knowledge of the importance of such releases and

17   exculpation. Can you confirm that -- if that's accurate?

18           MR. FERRARO:  Yeah, that's correct.

19           MS. CORNELL:  Okay. In Paragraph 13 you state, or

20   your Declaration states, that in consideration for the

21   Debtor releases, that the Debtors and their estates will

22   provide mutual releases for a few -- for certain releasing

23   parties. Is this true?

24           MR. FERRARO:  Yes.

25           MS. CORNELL:  I'm not going to go through them

1   all, but I'd like to go through a few of the releasing

2   parties if possible to discuss what type of consideration

3   they provide to the Debtors' estates.  Are you familiar with

4   that information?

5              MR. FERRARO:  I'll do my best, yes.

6              MS. CORNELL:  The first party I'd like to discuss

7   is the BRIC. And I don't think we discussed them at length

8   on the record today. So just for the record, would you mind

9   explaining who the BRIC is and what that means in relation

10  to the plan?

11             MR. FERRARO:  Yeah, the BRIC is our backup plan

12  sponsor. Their plan is a slightly different structure. It

13  has a higher kind of initial liquid crypto distribution.

14  Equity in a mining company. The illiquids stay back and are

15  not part of the NewCo.  So one of the differences in this

16  plan is the illiquid assets are not converted to liquid

17  equity, if that makes sense, and the overall recovery rates

18  are slightly lower than the NewCo plan, which we think is

19  the value maximizing.

20             MS. CORNELL:  Okay. And what about the BRIC as an

21  entity? Could you explain who makes up the BRIC consortium,

22  please?

23             MR. FERRARO:  Yeah, the BRIC is made up -- and

24  I'll probably, I'll probably miss a few -- but it's made up

25  of GXD, which is a company that is involved in the digital

1    assets base in mining. It's made up of VanEck, which is a,

2    you know, a long-term player and investment space, et

3    cetera. It was -- we had Gemini as the distribution agent,

4    if I remember correctly. Yeah, that's kind of the

5    highlights.

6           MS. CORNELL:  Now, to the best of your knowledge,

7    what consideration has the BRIC consortium provided to the

8    Debtors and the Debtors' estates to receive releases in this

9    case?

10          MR. FERRARO:  So I look at what the BRIC

11   contributed as much more than the transactions, the backup

12   bid. They were there through the auction. They were there

13   and drove, like we said, preserved an immense amount of

14   value. I meet with the BRIC weekly, with the special

15   Committee, to make sure that they're up to speed on any sort

16   of pivot. They were critical to the success of this plan and

17   played a unique role as a backup sponsor.

18          MS. CORNELL:  Are you familiar with the breakup

19   fee and expense reimbursement that this Court previously

20   authorized for the BRIC?

21          MR. FERRARO:  Yes.

22          MS. CORNELL:  How do you view those breakup fees

23   and expense reimbursements as they relate to consideration

24   in this case? You just discussed that they've been helpful

25   to the Debtors and that they've assisted throughout, and

Page 37

1    that they're still, I don't want to say on standby, but

2    they're available. And it's my understanding that the

3    expense reimbursement and breakup fee were related to what

4    you just discussed. Could you explain a little bit more

5    about what additional consideration is to be provided?

6            MR. FERRARO:  Yeah. I think the breakup fee, the

7    expense reimbursement, that's related to the transaction.

8    BRIC's been here for almost a year through the sales and

9    marketing process early on, you know, driving, driving value

10   for the estate. So I think they've provided a lot more than

11   just the transaction, which was the reason for the breakup

12   fee and the expense reimbursement.

13           MS. CORNELL:  Okay. I'm going to move on now to

14   PayPal. Are you familiar with PayPal's role in this case?

15           MR. FERRARO:  Yeah, I am. We've been working with

16   them quite a bit in long negotiations, yeah.

17           MS. CORNELL:  Could you explain for the record

18   what PayPal's role is in this case?

19           MR. FERRARO:  They'll be a distribution agent. So

20   they'll provide distribution of BTC and ETH to the creditors

21   within the United States. And they also have backup fiat

22   capabilities for those that cannot get either distributed

23   from Coinbase or from PayPal, we use PayPal fiat.

24           MS. CORNELL:  Are you familiar with the timing

25   that PayPal would be involved in this case?

1          MR. FERRARO:  Yeah, it's up to 5 years.

2          MS. CORNELL:  Let me rephrase that, I'm sorry.

3     When do you believe that PayPal would begin their role in

4     this case as a distribution agent?

5          MR. FERRARO:  Well, the actual distribution will

6     not occur until the effective date. But PayPal, I mean,

7     there is tons of kind of work that's going on right now,

8     technical work between the IT teams, the technology teams,

9     the security teams, the operational teams, to make sure that

10    this handoff is smooth with, you know, really, the security

11    of the customers' coins at the center of everything we do.

12         MS. CORNELL:  So would it be fair to say that your

13    testimony today is that PayPal, right now, is working on the

14    contractual relationship with the Debtors prior to

15    confirmation or the effective date?

16         MR. FERRARO:  Contractual and operations.

17         MS. CORNELL:  Okay, thank you. To the best of your

18    knowledge, what consideration, valuable consideration, do

19    you believe that PayPal is providing to the Debtors' estate

20    in exchange for its releases?

21         MR. FERRARO:  They're returning a lot of

22    cryptocurrency to creditors who need it.

23         MS. CORNELL:  Is PayPal receiving a fee for that

24    role?

25         MR. FERRARO:  No, they're actually paying the

1    estate.

2             MS. CORNELL:  I'm going to move on to the plan

3    administrator. Are you familiar with the plan administrator

4    in this case?

5             MR. FERRARO:  Yes.

6             MS. CORNELL:  Or the plan administrator's role?

7             MR. FERRARO:  Yes, I am.

8             MS. CORNELL:  To the best of your knowledge, what

9    valuable consideration do you believe the plan administrator

10   is providing to the estate in exchange for releases?

11            MR. FERRARO:  Overseeing the distribution is a --

12   again, it ties back to the distribution agents. We're

13   returning $2 billion of crypto. So that's kind of job one

14   and two for the plan administrator right out of the gates.

15            MS. CORNELL:  Is the plan administrator going to

16   be compensated for its role?

17            MR. FERRARO:  Is the plan administrator -- yes,

18   yes.

19            MS. CORNELL:  Okay. I'm going to move on to

20   Paragraph 15 of your Declaration.

21            MR. FERRARO:  Okay.

22            THE COURT:  Let me ask a question. What does the -

23   - what's the scope of the release that they're getting? What

24   is it that's released, what's not released?

25            MR. FERRARO:  Specifically for PayPal?

Page 40

1           THE COURT:  Well, we went through BRIC, PayPal and

2     plan administrator. You can go through them one at a time,

3     but what conduct is not being protected by the -- what

4     potential conduct is not being protected by the releases

5     that they're receiving? For example, is there a gross, you

6     know, misconduct, fraud --

7           MR. FERRARO:  Oh, yes.  Yeah, yeah.

8           THE COURT:  -- what's the scope -- what's the

9     limitations on the release that each -- that BRIC, PayPal

10    and the plan administrator would be receiving if the plan's

11    approved?

12          MR. FERRARO:  Okay, perfect. Sorry, I'm not, I'm

13    not a lawyer and this is my first time, so some of this

14    stuff is a learning curve for me. There's a carveout for, of

15    course, negligence, fraud, willful misconduct, yes.

16          THE COURT:  Go ahead.

17          MS. CORNELL:  Absolutely. So I'm going to turn to

18    Paragraph 15. And with respect to Paragraph 15 of your

19    Declaration, I want to turn specifically to the ad hoc

20    Committees. Are you familiar with the ad hoc Committees in

21    this case?

22          MR. FERRARO:  Yes, I am.

23          MS. CORNELL:  Various ad hoc Committees.

24          MR. FERRARO:  Yes, I am.

25          MS. CORNELL:  Again, I don't want to belabor

Page 41

1   things or go through all of the different Committees and

2   what have you. But let's just -- we'll focus on one, just as

3   an example. We'll talk about Earn Ad Hoc, just because

4   they're a larger group. To the best of your knowledge, what

5   consideration has the Earn Ad Hoc group provided in exchange

6   for releases?

7            MR. FERRARO:  I mean, the contributions of the ad

8   hoc groups to where we are today cannot be understated by

9   any, any means whatsoever. They support the plan, that was

10  an important element of the consideration. I mean, they've

11  been here along the way. We would not be here without the ad

12  hoc groups, all of them.

13           MS. CORNELL:  To the best of your knowledge, have

14  you or the Debtors agreed to not object to any substantial

15  contribution claims made by any ad hoc groups as part of

16  those settlements?

17           MR. FERRARO:  I do not know.

18           MS. CORNELL:  Okay. Do you know who would know

19  that information?

20           MR. FERRARO:  I would probably have to turn over

21  to my legal advisors.

22           MS. CORNELL:  Okay. Thank you. To the best of your

23  knowledge, are you providing these releases in exchange for

24  support of the plan?

25           MR. FERRARO:  It's a consideration to support the

Page 42

1    plan. I don't think it's the only consideration.

2           MS. CORNELL:  Okay. In the last sentence of

3    Paragraph 15, you state that without these releases -- and

4    I'm paraphrasing, I'm sorry -- without these releases, it

5    would threaten the ability to make in-kind distributions.

6    Can you please elaborate?

7           MR. FERRARO:  Yeah, ma'am. The simplest way to

8    think about it is, if we didn't kind of come to settlements

9    with the various groups, we'd be litigating a lot of these

10   items. We would still be litigating these items. And that

11   would obviously slow down, not only slow down the return of

12   liquid crypto, but it would decrease the amount that we have

13   available. We continue to burn 20 million a month.

14          MS. CORNELL:  I'm going to go back to Paragraph

15   17, if you don't mind. And again, I apologize if I'm

16   repeating earlier things, but they're -- try to go in the

17   order of the Declaration to make it as easy as possible. In

18   Paragraph 17, the Declaration states that you know full well

19   the contributions that the Debtors will need the release

20   parties to continue to make. Do you think you could help us

21   unpack that sentence? Again, it says that you know full well

22   the contributions that the Debtors will need the release

23   parties to continue to make.

24          MR. FERRARO:  Think of the employees getting this

25   distribution done. Think -- we talked about PayPal,

Page 43

1    Coinbase. These are Herculean efforts to do this.

2                MS. CORNELL:  What about the ad hoc groups, what

3    kind of contributions will they continue to make?

4                MR. FERRARO:  I mean, the ad hoc groups continue

5    to support the plan. The ad hoc groups, you know, we got to

6    the settlements. And, you know, there's Board observers, et

7    cetera. So --

8                MS. CORNELL:  Okay. I'm going to move on to

9    Paragraph 20. Paragraph 20 states that third-party releases

10   are wholly consensual. Can you explain for the record what

11   that means to you?

12               MR. FERRARO:  It means that in the ballots, you

13   can opt out of the releases.

14               MS. CORNELL:  So --

15               MR. FERRARO:  So people had a vote.

16               MS. CORNELL:  So it's your opinion, based on the

17   balloting and the receipt of those ballots, that the third-

18   party releases were wholly consensual.

19               MR. FERRARO:  Yes.

20               MS. CORNELL:  I'm going to move on to Paragraph

21   21, please. Are you familiar with the voting process and

22   tabulation?

23               MR. FERRARO:  Somewhat. Not, not intimately, but

24   somewhat.

25               MS. CORNELL:  And if you don't know the answer to

Page 44

1      my question, that's acceptable. But do you know the number

2      of opt-out forms that were received by the Debtors?

3              MR. FERRARO:  I do not.

4              MS. CORNELL:  Okay. Who would be the best person

5      to ask that information?

6              MR. FERRARO:  I would probably ask the legal

7      advisors, who are very close to this.

8              MS. CORNELL:  I'm going to go to Paragraph 22,

9      please. And again, in Paragraph 22, you discuss the release

10     parties' substantial contributions. I'd like to go through

11     some of the post-effective date entities here. Are you

12     familiar with what I mean when I say post-effective date

13     entities?

14             MR. FERRARO:  I think so, yes.

15             MS. CORNELL:  Okay. I won't -- again, I won't go

16     through them all, but just, just a few. The first one I'd

17     like to go through is the plan administrator. I know we

18     spoke about that role a little bit earlier. But would you

19     agree that the plan administrator is not currently in

20     existence?

21             MR. FERRARO:  Yeah.

22             MS. CORNELL:  To the best of your knowledge, when

23     will the plan administrator role come into existence?

24             MR. FERRARO:  At the effective date.

25             MS. CORNELL:  The effective date. Okay. What about

Page 45

1    NewCo, is NewCo currently in existence?

2            MR. FERRARO:  There might be entities related to

3    NewCo that have been opened, but the assets have not vested.

4    So I wouldn't say that it exists at the moment.

5            MS. CORNELL:  So would it be your testimony that

6    NewCo will not exist until post-confirmation, post-effective

7    date?

8            MR. FERRARO:  In a meaningful way, yes.

9            MS. CORNELL:  Okay. And without going through all

10   the parties, would it be your understanding that there are

11   some parties listed in the release and exculpation

12   provisions that will not be in existence? And I know that's

13   a weird turn of phrase, but be in existence until after the

14   plan is confirmed and the plan goes effective?

15           MR. FERRARO:  Yeah, I think we went through the

16   two good examples of that.

17           THE COURT:  I'm sorry, I didn't hear the last

18   part.

19           MR. FERRARO:  I'm sorry, I think we went through

20   two good examples of that, yeah.

21           MS. CORNELL:  Thank you. So now I'm going to move

22   onto some of the exculpation provisions in the plan and in

23   your Declaration. The first one is Paragraph 26. You state

24   your belief that these provisions are appropriate. Can you

25   please confirm that for the record, that you believe that?

1          MR. FERRARO:  Yeah, I, I do, and I can confirm

2     that this is a situation in which this industry does not

3     have a clear regulatory kind of understanding. And, you

4     know, distributing crypto is, is -- doesn't come without

5     risk.

6          MS. CORNELL:  Sure. In Paragraph 27, you state

7     that these exculpation provisions are critical to ensure

8     that funds can be returned to creditors. Is that your

9     belief?

10          MR. FERRARO:  Yeah, absolutely.

11          MS. CORNELL:  Can you explain just a little bit

12     for the record how these exculpation provisions will impact

13     distributions in this case, and the return of funds to

14     creditors?

15          MR. FERRARO:  Well I think it's a key component of

16     the distribution partners getting comfortable with the

17     situation.

18          MS. CORNELL:  Okay.

19          THE COURT:  Is there a list that specifically

20     names who will receive releases or exculpation?

21          MR. FERRARO:  Exculpations, releases are --

22     there's a black list of people who are excluded.

23          THE COURT:  I understand -- that part I

24     understand. But is there a list identifying the parties who

25     will receive releases or exculpation?

1            MR. FERRARO:  To my knowledge, we have not gone

2      back and included every single person that was -- and

3      created a list, that was ever an employee, that's not on the

4      excluded list and things like that. So I'm not sure that

5      there's a master list.

6            THE COURT:  How is a court supposed to know who is

7      receiving a release or exculpation? I can look at a list of

8      excluded parties, but you've acknowledged there's no list of

9      who's receiving releases or exculpations. How -- whether

10     it's this Court or a non-bankruptcy court or some other

11     court, how -- if issue arises, if someone sues someone who

12     is involved, how is a court supposed to know whether they

13     received a release or exculpation?

14            MR. FERRARO:  I'll do my best. Again, not a

15     lawyer, first time. I think it's pretty clear who's

16     excluded, and I --

17            THE COURT:  I think I understand who's excluded.

18            MR. FERRARO:  Okay.

19            MS. CORNELL:  Mm-hmm.

20            THE COURT:  My question is, who is included.

21            MR. FERRARO:  I think the way it's written, it's

22     everybody who's not excluded.

23            THE COURT:  Is that everybody in the universe?

24            THE COURT:  Well, it's, it's labeled -- sorry,

25     it's qualified employee, you know, Debtors, employees,

1    special Committee, et cetera.

2            MS. CORNELL:  And I think the release parties also

3    are included.

4            MR. FERRARO:  Yeah, it's the [indiscernible]

5    release parties, I apologize for --

6            THE COURT:  Right. That, just for the benefit of

7    the Committee and the Debtors, that is something that's

8    bothering me, is I think I know who the excluded parties

9    are. They're identified. It's that who's receiving a release

10   or exculpation is not. I understand Ms. Cornell has made the

11   point that the plan administrator is not selected yet, but

12   that will be easily identified. Go ahead.

13           MS. CORNELL:  Thank you, Your Honor. So we just

14   spoke about it's your belief in the Declaration that these

15   exculpation provisions are critical to insuring funds are

16   distributed to creditors. Are you aware of the Voyager

17   bankruptcy case and the Voyager bankruptcy plan? Generally

18   speaking.

19           MR. FERRARO:  Generally. Not in any details. I've

20   been focused on this one.

21           MS. CORNELL:  Absolutely. So, as of right now, the

22   plan, as I understand, in Voyager, was confirmed. But the

23   exculpation provision was held in abeyance. What is your

24   opinion about how those exculpation provisions in this case

25   are required for distribution? Or are those some -- are

1   those something that can be seen as a separate issue?

2            THE COURT:  I'm going to object, stating the

3   objection.

4            MS. CORNELL:  Sure.

5            THE COURT:  I mean, if you've got -- I don't think

6   it's proper to ask him about what's in the Voyager --

7            MS. CORNELL:  Sorry.

8            THE COURT:  -- plan or exculpations, or in Judge

9   Wiles' opinions when he addressed the issues.

10           MS. CORNELL:  Right.

11           THE COURT:  He obviously was very troubled.

12           MS. CORNELL:  Yes.

13           THE COURT:  By some of the objections to

14   exculpation and releases. So I'm ruling that out.

15           MS. CORNELL:  Understood, Your Honor. So moving on

16   to Paragraph 28. And I'd like to specifically discuss the

17   BRIC as they relate to the exculpation provisions. Are you

18   aware that the BRIC were given an option to be retained by

19   the estate in these cases, but declined?

20           MR. FERRARO:  Referencing the consulting

21   arrangement?

22           MS. CORNELL:  Yes. Exactly. I'm sorry, yes.

23           MR. FERRARO:  Yes.

24           MS. CORNELL:  With respect to their consulting,

25   that they had originally desired.

1              MR. FERRARO:  Yeah, the 500,000 a month, yes.

2              MS. CORNELL:  Mm-hmm.

3              MR. FERRARO:  I am.

4              MS. CORNELL:  Why should the BRIC receive the same

5    type of benefits that retained professionals receive, when

6    they made a choice not to be retained by the estate?

7              THE COURT:  I don't think that's a fair question.

8    When the issue about their retention arose, it was a

9    question of whether provisions of the code regarding

10   retention arose. We had a whole colloquy about it. I

11   supported the position of the US Trustee that they could not

12   be retained at that point, and it didn't get pressed. So I

13   think the question is an unfair question because it really

14   excludes what the whole background and colloquy about

15   whether or not they're retained. Here they are, the backup

16   bidder, and the issue of whether they're -- whether they

17   should also be provided with releases or exculpations is

18   very much an issue.

19             MS. CORNELL:  Mm-hmm.

20             THE COURT:  But I don't think it's fair to ask

21   about what your -- the basis for your objection or my

22   agreement with it.

23             MS. CORNELL:  Mm-hmm. Okay. That's fair. Moving on

24   to Paragraph 28, and this deals with PayPal and Coinbase.

25   Would you agree that both PayPal and Coinbase have and will

Page 51

1   be included in very discreet acts with respect to this case?

2          MR. FERRARO:  The main purpose will be to return

3   crypto and value to customers, yes.

4          MS. CORNELL:  For the record, could you explain a

5   little bit about each Coinbase and PayPal's specific acts

6   within this bankruptcy case, and what their -- what the

7   Debtors' expectations are for them?

8          MR. FERRARO:  Yeah. We'll start with PayPal. Think

9   of PayPal predominantly as the distribution agent. They'll

10  return BTC and ETH to US customers. We also will use Paxos

11  as a custodian. It's not PayPal specifically, but Paxos as a

12  custodian for the amounts that we're going to distribute

13  vis-à-vis PayPal.

14         MS. CORNELL:  Mm-hmm.

15         MR. FERRARO:  And then Coinbase is doing the

16  distribution and they're also the custodian for the assets

17  that are related to international distribution. So it is

18  narrow distribution agent and custodian.

19         MS. CORNELL:  So with that in mind, with these

20  narrow roles in mind, why, in your belief, should they

21  receive the same type of broad exculpations as, say,

22  Kirkland & Ellis?

23         MR. FERRARO:  I mean, simply stated, there's no

24  knowledge of any issues with either of these. They're a key

25  partner in the distribution, and we feel that, you know,

Page 52

1    this is something that helps get us to that point.

2              MS. CORNELL:  But you do agree that their role is

3    limited to distribution and not the entirety of the

4    bankruptcy case.

5              MR. FERRARO:  Yeah, distribution and for Coinbase

6    as well, custody, yes.

7              MS. CORNELL:  Okay. Is it your understanding that

8    no post-effective date entity will be exculpated?

9              MR. FERRARO:  Yeah, I mean, I think the

10   exculpations are all for -- yeah.

11             MS. CORNELL:  And I bring that up because there

12   was a temporal scope added to the exculpation provision. Are

13   you familiar with that?

14             MR. FERRARO:  No, I don't -- I'm not sure that I -

15   - I don't want to get into that [indiscernible]

16             MS. CORNELL:  That's okay.

17             THE COURT:  That's something that was negotiated

18   between your office and the Debtors and the Committee, and

19   it was added to narrow the scope of release or exculpation.

20             MS. CORNELL:  During a specific time period pre-

21   effective date. Just as -- by way of background.

22             THE COURT:  Yeah. I'm not sure, what's the -- why

23   is that a proper question here?

24             MS. CORNELL:  Well, I was --

25             THE COURT:  They negotiated -- you raised an

1    objection to --

2              MS. CORNELL:  I just wanted to know if he had --

3    if he knew -- I just wanted to know if he was familiar with

4    it.

5              THE COURT:  Let me -- you raised an objection to

6    scope of releases and exculpation. You still have some

7    objections.

8              MS. CORNELL:  Mm-hmm.

9              THE COURT:  But you negotiated modifications to

10   the language to have a temporal limitation. But that was

11   between the lawyers. I mean --

12             MS. CORNELL:  I just wanted to know if he was

13   familiar with it. The limitation that was provided.

14             THE COURT:  Next question.

15             MS. CORNELL:  Okay.

16             MR. FERRARO:  I know that we went -- I'm sorry.

17             THE COURT:  Go ahead.

18             MS. CORNELL:  With respect to the plan

19   administrator, are you familiar with the Plan Administration

20   Agreement?

21             MR. FERRARO:  I've been through the agreement,

22   I've read through it a few times, yes.

23             MS. CORNELL:  I don't believe it's listed on one

24   of the Debtors' exhibits. So if Your Honor would allow us to

25   approach to provide an excerpt from the Plan Administration

Page 54

1    Agreement. It was in a plan supplement.

2              THE COURT:  If there's no objection, go ahead.

3    We'll see if we have any objections.

4              MS. CORNELL:  [indiscernible] do you have a copy?

5              MR. COLODNY:  Your Honor, can she admit the whole

6    exhibit, just so we have everything?

7              THE COURT:  Ask your questions, agree with the

8    Debtors and the Committee, you can introduce the exhibit. It

9    doesn't have to be right now. You can go ahead with your

10   question.

11             MS. CORNELL:   Yes, that's fine, I, yeah.

12             THE COURT:  Go ahead.

13             MS. CORNELL:  Absolutely fine.  The Plan

14   Administrator Agreement provides for different standards for

15   exculpation than the plan itself and the confirmation order.

16   Are you familiar with those distinctions?

17             MR. FERRARO:  I believe so.

18             MS. CORNELL:  Would you mind explaining for the

19   record why there's a difference in the exculpation provided

20   in the plan and in the Plan Administrator Agreement?

21             MR. FERRARO:  Yeah, I think the Plan Administrator

22   Agreement, the exculpation is more like a -- and I'm sort of

23   venturing outside my comfort zone here. But it's sort of

24   more of a contract type of situation, not a bankruptcy

25   situation. This is like a limitation of liability clause, to

Page 55

1   my understanding. So effectively, you know, it shields the

2   plan administrator unless it's negligent, willful

3   misconduct, bad acts, et cetera. That's my understanding.

4           MS. CORNELL:  I think that's all that I have for

5   now, Your Honor. Thank you.

6           THE COURT:  Thank you very much. Anybody else wish

7   to cross-examine?

8           MR. KIRSANOV:  I do, Your Honor. Dimitry Kirsanov.

9           THE COURT:  All right.  Go ahead.

10          MR. KIRSANOV:  Good morning, Mr. Ferraro. You

11  mentioned your gross maximized value to [indiscernible] so

12  let's talk about the CEL Token matter. Were you aware that

13  about 750,000 of my CEL Tokens in custody were unable to be

14  moved months ahead of the freeze of bankruptcy?

15          MR. FERRARO:  I'm not aware of that specific

16  situation.

17          MR. KIRSANOV:  Did Celsius have enough CEL Token

18  to move my funds?

19          MR. FERRARO:  Celsius has enough CEL Tokens to

20  satisfy any obligations.

21          MR. KIRSANOV:  Did Celsius have enough CEL Tokens

22  to move my funds when I had requested them to be moved?

23          MR. FERRARO:  I can't speak to your specific

24  situation, but we had ample amount of CEL Token.

25          MR. KIRSANOV:  Are you familiar with the Blunsine

Page 56

1     [ph] Declaration?

2            MR. FERRARO:  Generally. It's been a while ago,

3     but yes.

4            MR. KIRSANOV:  Were you aware that the custody and

5     withhold liabilities where CEL exceeded the assets available

6     on Fireblocks ahead of the freeze and filing date?

7            MR. FERRARO:  Not, not sure I'm following or

8     knowledgeable about those details.

9            THE COURT:  You can ask questions, but you can't

10    testify as to facts, whether they're facts or not. But I'll

11    permit you to ask the witness questions. But you're making

12    statements of fact that are not in the record.

13           MR. KIRSANOV:  All right, thank you, Your Honor.

14    Did CEL Token have a market value ahead of the asset pause?

15           MR. FERRARO:  Yeah, I mean, ahead of the pause it

16    was traded. It was traded on exchanges, traded on Celsius

17    OTC. So there was a market pre-pause, yes.

18           MR. KIRSANOV:  Did the CEL Token have a market

19    value ahead of the bankruptcy filing day?

20           MR. FERRARO:  Yeah, I think we just talked about

21    that, that there was value at the pause, there was value

22    thinly traded post the pause. Most of the coins were -- it

23    had --

24           THE COURT:  We had a price, but what is -- value

25    may be different than the price.

1          MR. FERRARO:  Value might be different from price.

2     There's a price that we could see on the screen.

3          MR. KIRSANOV:  So the CEL Token did have a market

4     value after bankruptcy as well.

5          MR. COLODNY:  Objection, Your Honor. He's

6     [indiscernible] referring to price.

7          THE COURT:  Sustained. You can ask whether it had

8     a price, but not a value.

9          MR. KIRSANOV:  Did the CEL Token have a price

10    after bankruptcy?

11         MR. FERRARO:  Yes, you could see it on, you could

12    see the price on the screen, yes. It had a price.

13         MR. KIRSANOV:  Could an individual acquire CEL or

14    transact with CEL Token even today?

15         MR. FERRARO:  Yes, there's about 5 percent of the

16    circulating supply that is tradable at this moment.

17         MR. KIRSANOV:  Did the price of CEL Token exceed

18    .81 cents after bankruptcy?

19         MR. FERRARO:  It might have, for a moment in time.

20    I think it precipitously declined to this point, largely.

21         MR. KIRSANOV:  Did it exceed one dollar after

22    bankruptcy?

23         MR. FERRARO:  I don't know the specifics, sir. It

24    might have.

25         MR. KIRSANOV:  Okay. Were you aware that the

Page 58

1    majority of CEL Token holders in the custody class voted to

2    reject the CEL Token settlement? [indiscernible]

3                MR. FERRARO:  No, I was not aware.

4                MR. KIRSANOV:  Accepting the custody settlement

5    transfers the ownership of tokens to the creditor. Is that

6    correct?

7                MR. COLODNY:  Objection, Your Honor. Calls for a

8    legal conclusion.

9                THE COURT:  Sustained.

10                MR. FERRARO:  Can you ask again?

11                THE COURT:  No, objection sustained.  Ask the next

12    question.

13                MR. FERRARO:  Okay.

14                MR. KIRSANOV:  If a custody holder has not

15    accepted the custody settlement and rejected the plan, can

16    Debtors retain control of the CEL Token settlement, is that

17    correct?

18                MR. COLODNY:  Objection, Your Honor. Calls for a

19    legal conclusion.

20                THE COURT:  Sustained.

21                MR. KIRSANOV:  Does the CEL Token settlement apply

22    to the CEL Tokens held in the custody class?

23                MR. COLODNY:  Objection, Your Honor.

24                THE COURT:  Sustained.

25                MR. KIRSANOV:  CEL Tokens were not able to be

Page 59

1   distributed immediately upon the initial custody settlement

2   on disbursement day. Why is this?

3            MR. FERRARO:  CEL Tokens were not able to be

4   distributed -- we distributed CEL Tokens to custody holders.

5            MR. KIRSANOV:  But they were not able to be

6   distributed immediately on disbursement day. Why was this?

7            MR. FERRARO:  I'm not following. We were able to

8   distribute CEL Token back to custody customers.

9            MR. KIRSANOV:  You were, but not in the platform

10  immediately open. Why was it unavailable to be distributed

11  for up to two weeks?

12           MR. COLODNY:  Objection, Your Honor.  Asked and

13  answered.

14           THE COURT:  Sustained.

15           MR. KIRSANOV:  Is there a reason why CEL Token may

16  have not been able to be distributed?

17           MR. COLODNY:  Objection.

18           THE COURT:  Overruled.  Do you know the answer to

19  that?

20           MR. FERRARO:  We have -- I mean, there -- for

21  custody specifically, sir?

22           MR. KIRSANOV:  Yes, for the custody settlement.

23           MR. FERRARO:  Yeah, we can distribute CEL Token. I

24  think there's areas that we are still going through the

25  details on whether or not we can distribute coin back given

1    MTL laws, et cetera. But the plan is to --

2              THE COURT:  It's a jurisdictional issue.

3              MR. FERRARO:  Jurisdictional issue, the plan is to

4    distribute CEL back to custody holders.

5              MR. KIRSANOV:  When did Celsius obtain the CEL

6    Tokens to pay out the initial custody claims?

7              MR. FERRARO:  We had them on our balance sheet.

8              MR. KIRSANOV:  Where will Celsius obtain the CEL

9    to distribute to --  the rest of the CEL Tokens to the

10   custody groups?

11             MR. FERRARO:  We have ample supply on our balance

12   sheet.

13             MR. KIRSANOV:  Why was the .21 cent CEL Token

14   valuation decided for the custody class on the plan vote

15   when the custody class, in a monetary majority, rejected the

16   CEL Token plan?

17             MR. COLODNY:  Objection, Your Honor.

18             THE COURT:  Sustained.

19             MR. KIRSANOV:  How can Celsius distribute custody

20   assets aside from Bitcoin and Ethereum, to non-settling

21   custody class residents of Hawaii that voted no to the plan?

22             MR. BROWN:  Objection, Your Honor.

23             THE COURT:  Sustained.

24             MR. KIRSANOV:  Can Celsius distribute custody

25   assets aside from Bitcoin and Ethereum, to Hawaii residents?

Page 61

1

2                MR. BROWN:  Objection calls for --

3                THE COURT:  Sustained.

4                MR. BROWN:  Calls for legal conclusion.

5                MR. KIRSANOV:  Can Celsius -- what value are CEL

6    Token holders provided to the non-settling custody class, to

7    residents of Hawaii?

8                MR. FERRARO:  We plan to distribute CEL in kind to

9    the custody class. We are hoping that we can achieve that in

10   Hawaii. The system will be open for 90 -- the plan is for

11   the system to open, be open for 90 days post the effective

12   date, so that customers can get their in-kind distribution.

13   After 90 days, we have to shut the system down. We have to

14   reduce the employees. You know, so the distribution is

15   timebound. If folks come and get their in-kind distribution

16   within those 90 days, that, you know, they will be able to

17   leave the platform. Otherwise, that would be converted to

18   BTC and ETH and distributed by PayPal.

19               MR. KIRSANOV:  The CEL Token valuation and

20   bankruptcy valuations is .81 cents. Is that true?

21               MR. BROWN:  Objection.

22               THE COURT:  Sustained.

23               MR. KIRSANOV:  What is the CEL Token valuation and

24   bankruptcy valuation?

25               MR. BROWN:  Objection.

Page 62

1                    THE COURT:  Sustained.

2                    MR. KIRSANOV:  The valuation that was provided to

3       CEL Token claims and the custody class at deactivation date

4       is .25 cents. Is that true?

5                    MR. FERRARO:  That's the proposed settlement for

6       the CEL Token, yes.

7                    MR. KIRSANOV:  Chapter 7 liquidation values for

8       the custody class is 72 1/2 percent and 100 percent for pure

9       custody. Is this true?

10                   MR. FERRARO:  Can you say that again? I'm sorry.

11                   MR. KIRSANOV:  Certainly. In a Chapter 7

12      liquidation matter, the liquidation values for the custody

13      class are 72 1/2 percent, and 100 percent for pure custody.

14      Is that true?

15                   MR. FERRARO:  Yeah, but the custody coins will be

16      returned in kind. This is only --

17                   MR. KIRSANOV:  If, if the --

18                   THE COURT:  No, don't interrupt. Go ahead.

19                   MR. KIRSANOV:  All right.

20                   MR. FERRARO:  This is only the .25 cents as it

21      pertains to custody, is only in case they don't come within

22      the 90 days or we can't distribute and we have to convert it

23      to BTC or ETH, in which it's proposed to do at the

24      settlement price, is my understanding.

25                   MR. KIRSANOV:  If someone rejects the custody

Page 63

1    agreement, what is the procedure with their custody

2    holdings?

3                MR. FERRARO:  If somebody rejects -- I, I didn't

4    pick up the end. If somebody rejects -- can you say -- ask

5    again?

6                MR. KIRSANOV:  Yes, certainly. If someone -- if a

7    class holder in the custody section rejects the plan, what

8    is the procedures of their assets?

9                MR. BROWN:  Objection.

10               THE COURT:  Sustained.

11               MR. KIRSANOV:  If somebody in the custody class

12   rejects the plan, what happens?

13               MR. BROWN:  Objection.

14               MR. COLODNY:  Objection.

15               THE COURT:  Sustained.

16               MR. KIRSANOV:  Why does a Chapter 11 plan give

17   less to a CEL custody creditor than a Chapter 7 plan?

18               MR. BROWN:  Objection.

19               MR. COLODNY:  Objection.

20               THE COURT:  Sustained.

21               MR. KIRSANOV:  Is it in the best interest of the

22   CEL custody holder that does not accept the plan to prefer

23   Chapter 7 versus Chapter 11?

24               MR. BROWN:  Objection.

25               MR. COLODNY:  Objection.

Page 64

1          THE COURT:  Sustained.

2          MR. KIRSANOV:  Do you think it is fair that a

3   creditor who could not move his custody funds ahead of the

4   freeze and bankruptcy filing date be subject to the .25 cent

5   deactivation valuation?

6          MR. FERRARO:  I think we went through that, sir.

7   You have 90 days to come to the platform and take the coins

8   off in kind.

9          MR. KIRSANOV:  After 90 days, it goes to the

10  deactivation date, is that correct?

11         MR. FERRARO:  After 90 days it would be converted

12  to BTC and ETH at the settlement price, is my understanding,

13  yes.

14         MR. KIRSANOV:  And the settlement price is less

15  than the bankruptcy date price, is that correct?

16         MR. FERRARO:  I think the contested point is that

17  price and whether that was a real front value, given the

18  manipulation and the lack of trading volume. 95 percent is

19  locked on the platform.

20         MR. KIRSANOV:  But the price is less, ultimately,

21  is that correct?

22         MR. FERRARO:  I, I don't know, I mean --

23         THE COURT:  .25 cents is less than .81 cents. Yes.

24  Ask your next question.

25         MR. KIRSANOV:  That's it for now, Your Honor.

1      Thank you.

2                THE COURT:  Thank you very much. Any other

3      questions? Any other cross-examination?

4                MR. DAVIS:  Yeah, I have a cross-examination, Your

5      Honor.

6                THE COURT:  All right, Mr. Davis.

7                MR. DAVIS: Sure, thank you. Mr. Ferraro, good

8      morning. My name's Otis Davis. I'm a Pro Se Creditor.

9                MR. FERRARO:  Good morning. Sorry, I'm taking a

10     drink of water. Good morning, Mr. Davis.

11               MR. DAVIS:  Now I'd like to turn to Docket 3532,

12     my Motion, page 6 of 29. Mr. Ferraro, are you aware of the

13     conversation that you had with Jason Perman, which were

14     included with my Motion filed with the Court at Docket 3532,

15     wherein you speak about creating a presentation

16     [indiscernible] financial information of Celsius?

17               MR. BROWN:  Your Honor, I'm going to object. I

18     don't have exhibit lists, I don't --

19               THE COURT:  Sustained. I ordered that any

20     documents that any party wished to use in cross-examination

21     had to be filed on the docket by 5:00 p.m. yesterday. My

22     desk is --

23               MR. DAVIS:  Your Honor, we were --

24               THE COURT:  Just a second. Don't interrupt. My

25     desk is piled with documents. There are thousands of

1    exhibits, there are thousands of entries on the docket. You

2    can ask questions, but unless you provided documents you

3    wish to use in cross-examination by last night, you can't

4    use anything. Go ahead.

5            MR. DAVIS:  Mr. Ferraro, are you aware about

6    [indiscernible]

7            THE COURT:  I'm sorry, you cut out.

8            MR. DAVIS:  Mr. Ferraro, are --

9            THE COURT:  Could you ask your question again?

10           MR. DAVIS:  Sure. Mr. Ferraro, are you aware at

11   the moment of the pause on June 12th, 2022, the amount of

12   open short positions against CEL Token on FTX exploded from

13   8 million short positions to over 20 million short

14   positions?

15           MR. FERRARO:  I've, I've read about it, I've been

16   in conversations about it. I haven't studied it uniquely.

17   I'm aware of the general discussion of this topic.

18           MR. DAVIS:  Are you aware there were only about 5

19   million CEL Tokens on the FTX platform at the time of the

20   pause, and that 15 million of those 20 million short

21   positions were illegal [indiscernible] shorts?

22           MR. BROWN:  Objection, Your Honor.

23           THE COURT:  Sustained.

24           MR. DAVIS:  Are you also aware that from the pause

25   to the petition date, over 17 million --

Page 67

1              THE COURT:  I sustained the objection to the last

2    question, so you can't ask whether he's also aware. If you

3    want to ask a question, ask a question.

4              MR. DAVIS:  One second, Your Honor. Mr. Ferraro,

5    was the price of CEL Token at any time higher than .81 cents

6    from the pause, the petition date?

7              MR. FERRARO:  My understanding is it went above

8    .81 cents at, at periods of time in that time period.

9              MR. DAVIS:  Is it fair to state it went to $1.60

10   as reflected in Mr. [Indiscernible] report?

11             MR. FERRARO:  I don't have all the numbers in

12   front of me, but doesn't sound unreasonable that it could

13   hit that for a point in time, yes.

14             MR. DAVIS:  Mr. Ferraro, is it your testimony that

15   you are aware of no other factors that could have moved the

16   price of CEL Token from the .28 cent closing price on the

17   date of the pause, to the $1.60 price on June 22nd, to the

18   .81 cent price on the petition date?

19             MR. BROWN:  Objection.

20             THE COURT:  Sustained.

21             MR. DAVIS:  Do you have any idea or explanation

22   why the price of CEL Token moved up to $1.60 on June 22nd,

23   2022?

24             MR. BROWN:  Objection.

25             THE COURT:  Do you know, Mr. Ferraro, whether it

1    moved to that price or not?

2              MR. FERRARO:  I don't know the exact price, no.

3              THE COURT:  Sustained.

4              MR. DAVIS:  Can you describe the extent and nature

5    of the contract that you or anyone were in Celsius that you

6    are aware of had with FTX or  Alameda Research 3 months

7    prior to the pause?

8              MR. FERRARO:  I'm only aware of interactions with

9    FTX and Alameda Research that went through our bankers. At

10   the time that was Citibank.

11             MR. DAVIS:  Mr. Ferraro, do you know about how

12   many CEL Tokens Celsius purchased from the market between

13   the pause and the petition date?

14             MR. FERRARO:  Zero.

15             MR. DAVIS:  Thank you. Mr. Ferraro, would you be

16   surprised to know that Celsius did not -- sorry.

17   Mr. Ferraro, do you know how many CEL Tokens Celsius was a

18   net seller of for the combined months of June 2022 and July

19   2022, which included the entirety of the pause?

20             MR. FERRARO:  I do not know the amount that you're

21   referencing, no.

22             MR. DAVIS:  One second, Your Honor. Thank you,

23   Judge. I'm finished.

24             THE COURT:  Thank you. Anyone else wish to cross-

25   examine?

Page 69

1            MR. IOVINE:  Yes.  Jason Iovine, Pro Se Creditor.

2            THE COURT:  Go ahead, Mr. IOVINE.

3            MR. IOVINE:  I -- please excuse me, I'm not a

4     lawyer, so bear with me. Mr. Ferraro, can you tell us who

5     has control over the CEL Token contract, the administrator

6     rights of it?

7            MR. FERRARO:  I, I'm not in technology so I'm not

8     a native crypto person. I believe the smart contract governs

9     it, but I don't have those details.

10           MR. IOVINE:  So you don't know if Celsius has the

11    ability to freeze the CEL Token contract where the CEL Token

12    cannot interact with the contract?

13           THE COURT:  I don't understand your question.

14           MR. IOVINE:  How can I explain it. The contracts

15    have -- some contracts have the ability to freeze so they

16    cannot interact with the contract. It's kind of like

17    removing a stock from trading.

18           MR. BROWN:  Your Honor, can he ask the question

19    again?

20           THE COURT:  Ask the question and we'll see what

21    we, what -- go ahead.

22           MR. IOVINE:  Okay, go ahead. Sorry. You said you

23    don't know if Celsius, or who has control over the contract.

24    So let me ask, as in, like, any equity that's traded when a

25    company goes into bankruptcy, it should -- it gets delisted

Page 70

1    or a Q put on the end of it. Why wasn't that done with CEL

2    Token?

3              MR. FERRARO:  I mean, CEL Token is traded on

4    exchanges. There was a supply outside of what was on the

5    platform that was locked.

6              MR. IOVINE:  Okay. Now, with what was being said

7    is that CEL Token is dependent on Celsius. Was there any

8    other financial institutions that used CEL Token?

9              MR. FERRARO:  I'm not sure I understand the

10   question.

11             MR. IOVINE:  As I know as BP Finance, Chedal [ph],

12   DeFi protocols that used it for lending and borrowing, yield

13   farming. Is that correct?

14             MR. FERRARO:  I, I --

15             MR. IOVINE:  Good swap also.

16             MR. FERRARO:  I'm -- CEL Token was widely held, so

17   it was held by many people in different entities. And there

18   was some use of CEL in yield farming on exchanges, et

19   cetera. But I don't know the depths of it, and I don't think

20   it was that deep of a market, to my understanding.

21             MR. IOVINE:  Okay, so it had been solely

22   independent of Celsius.

23             MR. FERRARO:  Um --

24             THE COURT:  I don't understand your question.

25             MR. IOVINE:  It goes to --

1           THE COURT:  Just ask, just ask questions.

2           MR. IOVINE:  CEL Token was --

3           THE COURT:  Just ask questions.

4           MR. IOVINE:  Okay.

5           MR. BROWN:  Your Honor, I just want to note for

6    the record, our notes indicate that Mr. IOVINE actually

7    voted to accept the plan.

8           THE COURT:  I'm going to let -- Mr. Brown, sit

9    down.

10          MR. BROWN:  I understand.

11          THE COURT:  Mr. Brown. Mr. IOVINE, go ahead.

12          MR. IOVINE:  Thank you, sir. Is it not reasonable

13   to think that CEL Token could've had a future with Celsius

14   during the pause time, because Celsius was lacking

15   communications and they were still paying out rewards to the

16   accounts?

17          MR. BROWN:  Objection, Your Honor.

18          THE COURT:  Sustained.

19          MR. IOVINE:  Okay, Your Honor, that's about all.

20          THE COURT:  All right. Anybody else wish to cross-

21   examine?

22          MR. PHILLIPS:  Yes, Your Honor.  Yes.

23          THE COURT:  All right, it was Mr. Phillips.

24          MR. PHILLIPS:  Thank you, Your Honor.

25          MR. IOVINE:  I don't care if I accept it.

Page 72

1            THE COURT:  Excuse me. Mr. Phillips, you wish to

2     question?

3            MR. PHILLIPS:  Yes, I do.

4            THE COURT:  Go ahead.

5            MR. PHILLIPS:  Thank you. Mr. Ferraro, I'm going

6     to follow, essentially, the order of your Declaration. And

7     so I'd like to turn to Paragraph Number 9.

8            THE COURT:  Which of the Declarations? Because

9     there are several that have been admitted into evidence.

10           MR. PHILLIPS:  3581. Mr. Ferraro's got it up

11    there.

12           THE COURT:  Okay, what paragraph? I have it open

13    in front of me as well.

14           MR. PHILLIPS:  It's A, Section of Officers and

15    Directors, Number 9.

16           MR. FERRARO:  Yes, I'm there.

17           THE COURT:  Go ahead.

18           MR. PHILLIPS:  Okay. The sentence that says 'I

19    discussed the selection process with the Committee and the

20    Plan Sponsor and understand that it was, is, and will be

21    consistent with the . . . Holders of Claims, the Claims and

22    Interests and public policy.'  Why do you say that?

23           MR. FERRARO:  I did discuss the selection of the

24    Board with the cochairs of the Committee, and Steve Kokinos

25    of Fahrenheit. And I think that their selection process was

Page 73

1    robust, and I think they picked a really good Board.

2              MR. PHILLIPS:  And why do you believe it's

3    consistent with the interests of the holders of the claims

4    and interests?

5              MR. FERRARO:  I think that there's representation.

6    the UCC was able to -- the creditors picked the vast

7    majority, the majority of the Board seats. So -- and there's

8    representation from the creditors, there's also Board

9    observers. I think the interests are aligned.

10             MR. PHILLIPS:  Okay. On Paragraph Number 20

11   discussing the Third-Party Release. You state that 'the

12   Third-Party Release is a wholly consensual release and that

13   all Holders of Claims entitled to vote had the opportunity

14   to opt out of the Third-Party Release.' Do you think that

15   there is a difference between a wholly consensual and a

16   coercive release?

17             MR. BROWN:  Objection.

18             THE COURT:  Sustained.

19             MR. PHILLIPS:  Why do you believe that the release

20   was wholly consensual?

21             MR. FERRARO:  It was on the ballot. Folks could

22   opt out.

23             MR. PHILLIPS:  Could you opt out of it if you

24   voted yes?

25             MR. FERRARO:  My understanding is, yes.

1          MR. PHILLIPS:  I don't believe that's correct.

2          MR. FERRARO:  Maybe I'm confused, I'm sorry. You

3   vote for the plan, then, yeah, you're, you're supporting the

4   releases.

5          MR. PHILLIPS:  All right. And if you wanted to

6   avail yourself of the preference avoidance settlement, could

7   you opt out of the release?

8          THE COURT:  If you know the answer, go ahead.

9          MR. FERRARO:  I don't. I'm, I'm stalling, I

10  apologize, sir.

11         THE COURT:  No, it's not stalling. The Plan is a

12  lengthy document. The Ballot was a lengthy document. If you

13  know the answer, you can answer it.

14         MR. FERRARO:  I do not know the answer.

15         THE COURT:  Otherwise, it's okay.

16         MR. FERRARO:  Yeah, I do not know the answer.

17         THE COURT:  Go ahead, Mr. Phillips.

18         MR. PHILLIPS:  Okay. So, are you still concluding

19  that the release was wholly consensual.

20         MR. FERRARO:  Yes.

21         MR. PHILLIPS:  On Paragraph 21, you mention

22  receiving informal comments from the SEC. What were those

23  comments?

24         MR. FERRARO:  My understanding is, if a class was

25  deemed to reject, that they would have -- they would not --

Page 75

1      they would need to opt into the release.

2              MR. PHILLIPS:  That was the comment from the SEC?

3              MR. FERRARO:  That's my understanding.

4              MR. PHILLIPS:  Okay. And when you said

5      'exculpation,' which I know Ms. Cornell covered extensively,

6      Paragraph 26, how many exculpation provisions have you

7      previously applied upon?

8              MR. BROWN:  Objection.

9              THE COURT:  Sustained.

10             MR. PHILLIPS:  On what basis do you believe that

11     the exculpation provision in the plan is appropriate?

12             MR. FERRARO:  I think I testified to this earlier.

13     I think it's a critical component, and it was arms-length

14     transaction with these parties. They're supporters of the

15     plan and they've contributed to the plan.

16             MR. PHILLIPS:  And Ms. Cornell dug into this in

17     Paragraph 27 a little bit. But you stated that 'The

18     exculpation provision is critical to ensuring that funds

19     could be returned to creditors as promptly as possible

20     through the transactions that are approved by the Bankruptcy

21     Court . . .' Is it critical to all the exculpated parties,

22     or are there only certain parties that are exculpated that's

23     critical so that funds can be returned?

24             MR. FERRARO:  We went through some examples on

25     exculpations. I think that they're critical.

1           MR. PHILLIPS:  So why, for example, is it critical

2     that the Debtors' attorneys, K & E, be exculpated for the

3     funds to be returned?

4           MR. FERRARO:  I mean, they're part of that, they

5     are part of that process. They are part of contract

6     negotiations, they are part of setting up the way in which

7     the different counter-parties --  Celsius, the Debtor and

8     PayPal and Coinbase -- interact.

9           MR. PHILLIPS:  But why do they need the protection

10    of the exculpation? They're highly sophisticated lawyers and

11    been paid significant fees to set this up appropriately. Why

12    do they need the additional protection of the exculpation to

13    shield them from any potential liability from how the

14    distribution [indiscernible]

15          MR. FERRARO:  We're not really -- there's, there's

16    -- we're not really giving up anything, we know of no issues

17    where there's any potential claims, causes of action against

18    any of these folks. So, I mean, we -- these -- we've gotten

19    to a good place in this case with the contribution of all

20    these parties, and I think that's the reason why we're

21    comfortable giving these exculpations.

22          MR. PHILLIPS:  Doesn't exculpation cover known and

23    unknown claims?

24          MR. FERRARO:  That's my understanding. And as I

25    said, we -- there is nothing that we know that would, you

Page 77

1    know, prevent us. There's been tons of investigations that

2    have gone into this, from the examiner to the special

3    Committee, to the UCC. And all of these parties have come

4    out clean on this.

5                MR. PHILLIPS:  I'm not saying that they did

6    anything wrong, but I'm saying that they should stand up for

7    their work on their own two feet, not be shielded by

8    exculpation. I don't understand that.

9                THE COURT:  That may be your position, but ask

10   questions.

11               MR. PHILLIPS:  So why do you think that the

12   professionals who advise both the Debtor and the Committee

13   are in need of exculpation for the distributions to actually

14   be -- to have effect, to actually take place and have

15   effect?

16               MR. FERRARO:  I mean, I think we've gone through

17   some of these details. Both parties have reviewed the

18   contracts. Both parties, UCC advisors as well as the

19   Debtors' legal advisors, helped negotiate the contract, set

20   up the processes for the distribution with the Debtors'

21   internal team. So significant contributions have been made.

22               MR. PHILLIPS:  That's all I have.

23               THE COURT:  Thank you very much, Mr. Phillips.

24   Anybody else wish to cross-examine?

25               MR. BRONGE:  Your Honor, yes. This is Johan

1    Bronge, Pro Se Creditor.

2              THE COURT:  Okay, Mr. Bronge, go ahead.

3              MR. BRONGE:  Yes.  Good morning, Mr. Ferraro.

4              MR. FERRARO:  Good morning.

5              MR. BRONGE:  I'm a [indiscernible] and a CEL

6    accountholder on the CEL platform. I want to ask you a

7    little bit about ownership at the, of the collateral. And to

8    do that, I would like to refer to the Terms of Service

9    Version 7 that is Docket 393, and it starts on Page 858.

10             THE COURT:  Mr. Bronge, Mr. Bronge?

11             MR. BRONGE:  Yes.

12             THE COURT:  I ordered that anybody wishing to use

13   a document in cross-examination had to post it on the docket

14   by 5:00 p.m. yesterday.  I can't magically -- I'm sorry, I

15   can't magically make it appear for purposes of cross-

16   examination. If you wish to ask --

17             MR. BRONGE:  But I think this is --

18             THE COURT:  Don't, don't interrupt me. If you wish

19   to ask questions without the use of documents, if the

20   witness knows about it, he can. But, you know, I'm

21   permitting people to cross-examine by using Zoom, but it was

22   essential that everyone know what documents anybody wishing

23   to cross-examine is using, they be made available on the

24   docket last night. So I'll permit you to continue with your

25   questioning, but not referring to documents that have not

Page 79

1    been provided for cross-examination.

2            MR. BRONGE:  This is under exhibit list of the

3    Debtor. So it's in the, the docket as well.

4            THE COURT:   Mr. Bronge, if you wish to cross-

5    examine on a document, you have to post it by 5:00

6    yesterday. If you wish to --

7            MR. BRONGE:  Okay.

8            THE COURT:  -- ask questions without regard to

9    documents, go ahead and do that.

10           MR. BRONGE:  All right.  Mr. Ferraro, could you

11   explain what rationale the Debtor has to consider the

12   collateral property of the estate?

13           MR. FERRARO:  I mean, somewhat of a legal

14   question. But in reviewing the Terms of Use, I mean, there's

15   language that says you can pledge, repledge, lend out, et

16   cetera. It's pretty consistent with the Terms of Use there.

17           MR. BRONGE:  So in reference to your answer, there

18   is a -- we could agree that there is a distinction between

19   ownership title and pledging or using an asset.

20           MR. BROWN:  Objection, Your Honor.

21           THE COURT:  Sustained.

22           MR. BRONGE:  So, is it possible to use an asset

23   without owning an asset?

24           MR. BROWN:  Objection.

25           THE COURT:  Sustained.

Page 80

1           MR. BRONGE:  Can you explain how you define

2    ownership from the Debtor in relation to assets?

3           MR. BROWN:  Objection, Your Honor.

4           THE COURT:  I'm going to permit the witness to

5    answer. It's not, he's not a lawyer and he's not giving a

6    legal opinion. If you're able to answer that, go ahead.

7    Otherwise, please say.

8           MR. FERRARO:  Can you please restate the question?

9           MR. BRONGE:  Yes. I want to understand how the

10   Debtor determines the ownership status of an asset. What

11   they base those on.

12          MR. FERRARO:  I'm not a lawyer. I think that's

13   clear in the Terms of Use.

14          MR. BRONGE:  Okay. So may I ask a procedure

15   question to the Judge?

16          THE COURT:  Go ahead.

17          MR. BRONGE:  Yes. If I want to examine the

18   conditions in the TOS that is listed on that Debtors'

19   exhibit list, how should I do that?

20          THE COURT:  If it's listed on the Debtors' exhibit

21   list, I have all of those documents in front of me. I'll

22   permit you to use the exhibits that the Debtor marked.

23   They're all before the Court. They're all before any

24   parties. So yes, you can go ahead and do that. Just identify

25   the exhibit and give everyone a chance to pull it out, okay?

Page 81

1                MR. BRONGE:  Yes. Okay. I think what I tried to do

2       originally is the exhibitor list, I think it was 44 on the

3       Debtor, on the Debtor list presented, and it's reference to

4       the Terms of Service.

5                THE COURT:  Well, Exhibit 44 is the Declaration of

6       Mr. Ferraro. It was marked and admitted in evidence this

7       morning.

8                MR. BRONGE:  Exactly.

9                THE COURT:  But it does not have Terms of Service

10      or --

11               MR. BRONGE:  Yes it --

12               THE COURT:  Terms of Use attached.

13               MR. BRONGE:  It does, it does have it as a

14      reference.

15               THE COURT:  Well, it does not have the exhibit.

16      Hold on, I think the, the Debtors' counsel is going to help

17      you out on this one.

18               MR. BROWN:  Going to try to, Your Honor.

19               THE COURT:  Yeah.

20               MR. BROWN:  The Terms of Service were admitted

21      into evidence as Exhibit 38. They're not in the binder,

22      they're -- that's the paragraph that was referenced in

23      Exhibit 44 that we went through. I have a binder with

24      Exhibit 38. I can bring it to Your Honor and Mr. Ferraro so

25      everybody has a copy.

1              THE COURT:  Please. Thank you.

2              MR. FERRARO:  Could he also bring me another

3     water? It's a lot of talking, sorry.

4              THE COURT:  There probably is water in that

5     pitcher.

6              MR. FERRARO:  Oh, oh, even better. Thank you.

7              THE COURT:  There should. If not, my apologies.

8              MR. FERRARO:  Yeah, yeah, I think you're right. I

9     assumed that was just there for aesthetics.

10             THE COURT:  No, no. Aesthetics and for your use.

11             MR. FERRARO:  Okay, thank you, thank you. Okay.

12             THE COURT:  Exhibit 38 has been placed in front of

13    the witness. It's Terms of Use --

14             MR. BROWN:  And Your Honor --

15             MR. BRONGE:  Thank you. So may I --

16             THE COURT:  Hold on just a second.

17             MR. BROWN:  I just want to clarify before

18    Mr. Bronge gets going here. Exhibit 38, as I stated

19    previously, is a compilation of all Terms of Service that

20    were filed on the docket previously. I can get that docket

21    entry. I don't know what page, which version of the Terms of

22    Service, what he's interested in. So Exhibit 38 is

23    approximately 11, 1,200 pages.

24             THE COURT:  Okay, so Mr. Bronge, you're not here,

25    so you don't see it. But the --

Page 83

1                MR. BRONGE:  I have it here, so --

2                THE COURT:  Just a second.

3                MR. BRONGE:  -- I will be fine.

4                THE COURT:  -- 38 is 1,026 pages long. It has a

5      compilation of all of the versions of the Terms of Use,

6      starting with Terms of Use 1. So you need to be more

7      specific as to which version of the Terms of Use --

8                MR. BRONGE:  I will --

9                THE COURT:  -- you're referring to.

10               MR. BRONGE:  -- I will be extremely specific, Your

11     Honor. I would like to go to Page 858.

12               THE COURT:  All right, just a second. All right, I

13     have it open in front of me. Mr. Ferraro, when you have Page

14     858 of 1,026 open, just please tell me that.

15               MR. FERRARO:  I'm there.

16               THE COURT:  Go ahead, Mr. Bronge.

17               MR. BRONGE:  Thank you. So this page is Celsius

18     Loan Terms and Condition, and this is in reference to

19     Version 7. Version 7 is the conditions under which I took my

20     first loan. So that's why I refer to this one. Because also

21     in this document it states that the loan is controlled by

22     the version of the TOS that was in force when the loan was

23     taken. So if we move on to definitions, Number 3, I would

24     like to understand -- I would like to know your

25     understanding of that sentence's definitions Number 3. If

1     you could read it, please.

2          MR. FERRARO:  Number 3. Collateral means the

3     amount in eligible digital assets as provided by the

4     Borrower to the Lender as security for the loan.

5          MR. BRONGE:  Okay. Is there anything in that

6     statement that indicates that I have transferred ownership

7     in your opinion?

8          MR. BROWN:  Objection. Calls for legal conclusion.

9          THE COURT:  Overruled. It says what it says,

10    Mr. Bronge.

11         MR. BRONGE:  Yes, and I'm trying to understand how

12    the Debtor can consider the collateral his property, and

13    that's why I want to understand, what in this sentence

14    indicates that this is the Debtor's property.

15         MR. FERRARO:  I don't think that that's the

16    sentence that refers to the property. That's talking about

17    the collateral that's provided by the borrower as security

18    for the loan.

19         MR. BRONGE:  Okay, so, that's fine, so we

20    understand, from this sentence, the collateral has no --

21         THE COURT:  Just ask your question, Mr. Bronge.

22         MR. BRONGE:  Okay, next -- all right. Next, I

23    would like to go to Page 859 under ineligibility and

24    Application [indiscernible] D. So can you see what that

25    says?

Page 85

1              MR. FERRARO:  Celsius receives the collateral from

2     you and.

3              MR. BRONGE:  Yeah, so, just want to state that

4     this collateral comes from the borrowers there, is that

5     correct?

6              MR. FERRARO:  You broke up a little bit. That

7     collateral comes from what?

8              MR. BRONGE:  It's the collateral -- my

9     understanding, and I want to understand if the Debtor has

10    the same, is that the collateral comes from the borrower.

11             MR. FERRARO:  For security on the loan, yes.

12             MR. BRONGE:  Thank you. Then we move to Page 860,

13    Item 1. So I can read the relevant part here. It's in --

14    from the sentence after what is called deferred event. It

15    says Celsius may immediately liquidate the corresponding

16    amount from your collateral. Would you consider that meaning

17    the borrower's collateral, or is this somehow the Debtor's

18    collateral?

19             MR. FERRARO:  I think it's referring to the

20    collateral that was posted to secure the loan.

21             MR. BRONGE:  So, but 'your' in this sentence,

22    doesn't that refer to the borrowers, the owner of the

23    collateral?

24             MR. FERRARO:  No, I think it's referring to the

25    one that provided the collateral for the loan. At least,

Page 86

1    that's my reading. Not a lawyer, again.

2          MR. BRONGE:  So 'your collateral' in your mind is

3    not the borrower's, it is somebody else's. Even though it

4    states to the borrower.

5          MR. FERRARO:  Provided by the borrower as security

6    for the loan, security interest for the loan.

7          MR. BRONGE:  I'm just reading -- I cannot put in

8    any words there, I'm just reading the sentence as it is. So

9    'your collateral' do you consider that be 'your' referring

10   to the Debtor in this case or the borrower?

11         MR. FERRARO:  I think it's referring to the

12   borrower who provided collateral as security for the loan.

13         MR. BRONGE:  All right. So there is a number of

14   sentences where it always refers to 'your collateral.' And

15   since 'your' in this, in this context would be the borrower

16   who provided the collateral, is that your understanding?

17         MR. FERRARO:  I think, I think we went over this a

18   couple times. My understanding is it's referring to that the

19   borrower provided collateral as security interest for the

20   loan.

21         MR. BRONGE:  Okay, so we continue here. If we go

22   to Page 862, under Collateral Item C. So here, I can read

23   the sentence. It says 'Collateral shall be subject to a

24   pledge for Celsius' benefit in accordance with the terms

25   herein.' Can you explain how that sentence transfers

1   ownership and title of the collateral?

2            MR. BROWN:  Objection, Your Owner. Calls for a

3   legal conclusion.

4            THE COURT:  Overruled. If you know.

5            MR. FERRARO:  So, I'll do my best.

6            THE COURT:  You're not testifying as a lawyer.

7            MR. FERRARO:  I'm not testifying as a lawyer, I

8   will do my best. I think what it says here is subject to a

9   pledge for Celsius' benefit. And if I may, on Page 869 of

10  1,126, Section B --

11           MR. BRONGE:  Excuse me, I --

12           THE COURT:  Yes.

13           MR. BRONGE:  You broke up, so --

14           THE COURT:  Okay, [indiscernible] go ahead. Just

15  read it loudly.

16           MR. FERRARO:  Sorry. Page -- I have this huge

17  binder on my lap and it's hard to get too close, so --

18           THE COURT:  Me, too.

19           MR. FERRARO:  -- on Page 869 of 1,126, Conditions

20  to the Lender Obligation, D, this kind of refers to how the,

21  how the borrower agrees that the lender may, for its own

22  account, pledge and repledge.

23           MR. BRONGE:  Okay. I understand. Now, in your

24  review, is pledging an asset the same as transferring title

25  of an asset?

1           MR. BROWN:  Objection, Your Honor.

2           THE COURT:  Sustained.

3           MR. BRONGE:  Okay. What -- if, if you contrast the

4    statements in this section with the statements of the UK

5    Lending where there is a sale and repurchase agreement,

6    which is -- you can find much later in this. I can refer to

7    the exact pages. That -- the statements are very different

8    where they explicitly state you transfer title. I would like

9    to understand where in this Terms of Service Version 7 there

10   is a statement that I transfer ownership title. Do you have

11   that? Do you know about any such statement in this version?

12          THE COURT:  I'm going to sustain an objection to

13   the questions. I will permit a question as to whether, you

14   know, there is anything in this version of the Terms that

15   you believe transfers ownership.

16          MR. FERRARO:  From my reading of this, it implies

17   transfer of ownership, right to pledge. Not a lawyer, again.

18   Lender may do so without retaining, retaining its possession

19   to control for delivery. Borrower agrees that it can do it

20   for its own account. So it's obviously transferring a lot of

21   rights to Celsius.

22          THE COURT:  Ask your next question, Mr. Bronge.

23          MR. BRONGE:  Yes. So you consider transferring

24   rights as the same as transferring, as the same as

25   transferring title?

1          MR. BROWN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. BRONGE:  Okay, so can I maybe ask him a

4   different way, if --

5          THE COURT:  Let me --

6          MR. BRONGE:  Yes.

7          THE COURT:  Go ahead, Mr. Bronge.

8          MR. BRONGE:  Yeah, I'm trying to get the Debtor to

9   explain the way they interpret this section. I don't know if

10  I should ask --

11         THE COURT:  Mr. Bronge, I'm not asking questions

12  of the witness, but this is a long document. If you look on

13  Page 870 under Consent to Celsius' use of your Digital

14  Assets --

15         MR. BRONGE:  Yes, that is --

16         THE COURT:  -- transferring with all, transferring

17  with all attendant rights of ownership. So I think --

18         MR. BRONGE:  Yes, let me --

19         THE COURT:  -- you're asking a non-lawyer

20  questions about a lengthy document.

21         MR. BRONGE:  How in proceedings shall I ask these

22  questions? Should it be at a later date?

23         THE COURT:  I'll let you continue with questions,

24  but you can't ask for legal opinions. This is a lengthy

25  document.

1              MR. BRONGE:  So how can I ask --

2              THE COURT:  -- paragraph on Page 870, under

3      Consent to Celsius' use of your digital assets, where it

4      says --

5              MR. BRONGE:  May I address that question?

6              THE COURT:  -- it says with all right, attendant

7      rights of ownership.

8              MR. BRONGE:  It says, first of all, that --

9              THE COURT:  I'm not going to have a legal argument

10     about this.

11             MR. BRONGE:  No.

12             THE COURT:  If you want to ask a question, ask,

13     questions --

14             MR. BRONGE:  I understand.

15             THE COURT:  -- of the witness, I'm going to permit

16     you to do that.

17             MR. BRONGE:  Yes. I understand. But I will not

18     continue these questions because obviously I cannot answer,

19     ask them to the right person. So is there any time in the

20     hearing I can ask these legal questions regarding this Terms

21     of Service?

22             THE COURT:  You can't ask the lawyers about it.

23     You'll, you know, when we get to closing argument and you

24     wish to argue that a document in evidence means what you say

25     it means, you can argue that. But that's pure argument, not

1   evidence. The document itself is in evidence. And you can --

2   when we get to the conclusion of the case, if you wish to

3   file a memorandum of law, I'll permit you to do that. But

4   this is not a proper subject for a question of this non-

5   lawyer.

6           MR. BRONGE:  Okay. So in that case, I --

7           THE COURT:  Do you have any other questions,

8   Mr. Bronge?

9           MR. BRONGE:  Just one quick question on the

10  valuation of the CEL Token, if I May.

11          THE COURT:  Go ahead.

12          MR. BRONGE:  I would like to understand the reason

13  why the Debtor are distinguishing the CEL Token as different

14  from all the other tokens except Bitcoin, that it has been

15  on the Celsius platform, and why this is singled out for

16  some kind of reasoning for that rather than all the other

17  coins taken the value at the bankruptcy.

18          MR. FERRARO:  I mean, I think CEL Token, there's a

19  few things. One, the manipulation of the token. And two, the

20  fact that 95 percent of it was locked on the platform and

21  there was limited trading volume. It was kind of a

22  dislocated market at that point. Those are just two things

23  that are top of mind.

24          MR. BRONGE:  So do you know that that does not

25  apply to any of the other tokens? Because they are all the

Page 92

1    same except Bitcoin. They have a central entity and they

2    have treasuries and they have companies in charge of them.

3            THE COURT:  Mr. Bronge, the CEL Token is a native

4    token of the Celsius platform.

5            MR. BRONGE:  Let me make [indiscernible]

6            THE COURT:  Do you have a question for the

7    witness?

8            MR. BRONGE:  No, I have no more questions.

9            THE COURT:  All right. Anybody else wish to cross-

10   examine?

11           MR. ABREU:  Your Honor, Artur Abreu

12   [indiscernible] I want to be very brief and I just want to

13   ask question to the witness.

14           THE COURT:  Go ahead, Mr. Abreu.

15           MR. ABREU:  Thank you. I am Pro Se Creditor and I

16   actually bought CEL outside, outside, outside

17   [indiscernible] just so, just a disclosure. So, Chris

18   Ferrera, you mentioned that in this hearing that mining has

19   had significant hurdles, but it has been successful

20   considering the circumstances. You also refer that you had

21   implemented or were successful in hedging strategies. As I

22   am aware, you have significant experience in banking. Is it

23   fair to also argue that hedging in banking is a essential

24   strategy to mitigate risk?

25           MR. BROWN:  Objection, Your Honor, relevance.

Page 93

1              THE COURT:  overruled.

2              MR. FERRARO:  I think any manager of a business

3     should understand the risks and try to mitigate them to a

4     residual level that's acceptable. So when we look at the

5     mining business, we think about what our main kind of

6     components of risk, BTC -- that we can hedge, BTC price and

7     energy. When we think about banking, there's many different

8     types of market and credit risk in which you do the same

9     type of exam--, you know, you cascade risk and you do the

10    same type of analytics related to.

11             MR. ABREU:  Thank you, thank you. Could you

12    explain your understanding of hedging, in the basic form.

13             MR. FERRARO:  With regards to?

14             THE COURT:  Keep it, you know, focused on Celsius

15    and --

16             MR. ABREU:  Yeah, okay, so let's imagine this.

17             THE COURT:  This is not an educational course in

18    hedging. Go ahead.

19             MR. FERRARO:  Okay.

20             MR. ABREU:  Well let me rephrase it, then.

21             THE COURT:  He's going to answer your question. Go

22    ahead.

23             MR. ABREU:  Okay.

24             MR. FERRARO:  Yeah, I think there's two things.

25    One first comes to mind, and I think that's predominantly

Page 94

1    what we're discussing here, is the hedging out of the power

2    costs related to running the mining rigs.

3            MR. ABREU:  Okay, if you were to hedge CEL Token,

4    what will the company do? I'm sure you probably had the

5    discussions internally or you see some of the strategies.

6    Can you share to the Court what type of strategies in the

7    case of hedging CEL Token would imply?

8            MR. FERRARO:  I joined Celsius in March of 2022.

9    You know, we froze in mid-June. I was involved in a lot of

10   conversations, did a lot of work during that time period. I

11   do not remember talking about macro hedges on CEL Token. And

12   I'm not even sure there's market depth to do it at the scale

13   that you're implying.

14           MR. ABREU:  Okay, let me then tell you this. Do

15   you think shorting is an important tool to do an hedge of an

16   asset?

17           MR. BROWN:  Objection.

18           THE COURT:  Overruled. Focus on Celsius. If you

19   have an answer, go ahead. If you haven't, you don't have an

20   answer, just say that.

21           MR. FERRARO:  I think hedging depends on the risk,

22   the specific risk you're trying to hedge out and the cost of

23   hedging out that risk versus the tail you're trying to

24   protect against.

25           THE COURT:  Next question, Mr. Abreu.

Page 95

1              MR. ABREU:  Let me say this. Do --

2              THE COURT:  Just ask questions. I don't want any

3     statements.

4              MR. ABREU:  Okay, yeah, yeah, yeah.

5              THE COURT:  Just ask questions.

6              MR. ABREU:  Are you familiar with shorting? Do you

7     understand shorting an asset?

8              MR. FERRARO:  I'm not a shorter. In my investment

9     --

10             MR. ABREU:  But you understand, you understand?

11             MR. FERRARO:  I understand it generally, yes.

12             THE COURT:  You understand, it's one of the things

13    that's said, that certainly an allegation that insiders

14    manipulated the price of the CEL Token certainly near the

15    end, correct?

16             MR. FERRARO:  Yeah, my understanding is that the

17    CEL Token was manipulated, really, throughout its existence,

18    yeah.

19             THE COURT:  Okay.

20             MR. ABREU:  Okay, so as you said, that you have

21    some basic understanding of short. Do you think shorting can

22    add market value to an asset, even if the underlying

23    business is bankrupt? I'm sure with your experience in

24    financials that you have seen companies on the market that

25    went bankrupt but still their underlying stock spikes in

Page 96

1    price, even when the company is bankrupt. Do you think

2    shorting can add some value to a bankrupt company or asset

3    tied to this company?

4              MR. BROWN:  Objection.

5              THE COURT:  Sustained.

6              MR. ABREU:  Okay. Just do you also believe that

7    faced with the level of misrepresentation that has been said

8    in court by officers and the company itself, do you think

9    it's fair to say that the market was not completely aware of

10   the level of risk and leverage that the company was in at

11   the pause and at the petition date?

12             MR. FERRARO:  Yeah, I think the general financial

13   conditions of Celsius leading up to the pause were very

14   poor. And I'm not sure that that was reflected in the

15   disclosures to the marketplace.

16             MR. ABREU:  There were many instances in this

17   process that I believe the company itself was trying to come

18   with a reorg. Which, let's say previous [indiscernible] was

19   putting CEL as maybe a way to reorg it around it. When was

20   this completely taken out of the discussion and it was then

21   pursued the current framework reorg plan?

22             MR. FERRARO:  CEL has never been taken out of the

23   discussion. We've always thought about CEL in an equitable

24   way to solve this issue from the beginning.

25             MR. ABREU:  When were the employees and the

Page 97

1    company -- when did the previous leadership and their

2    associated reorg [indiscernible] removal from the company?

3              MR. FERRARO:  It was never removed. This whole

4    process has been iterative and learning and organic. As I

5    mentioned earlier in my testimony, we spent a lot of time

6    developing an internal standalone plan. We determined that

7    the NovaWulf sponsor plan as a stalking horse bid was the

8    right route and went into the auction accordingly.

9              MR. ABREU:  About company compensation. Are you

10   aware of whether your former insiders and former officers,

11   former officers of the company who received CEL as

12   compensation? If any of former officer are not included in

13   the excluded parties from this plan. So are former officers

14   with significant compensations of CEL not an excluded party?

15             MR. FERRARO:  There are people who have

16   concentrations of CEL who through the investigations was not

17   determined that they were not bad actors. And because of

18   that, they're not on the excluded party list. That's my

19   understanding.

20             MR. ABREU:  In the matter of compensation to those

21   officers I'm -- this former officers, was this compensation

22   given at a zero bust or the employee, former employee,

23   meaning they just received a zero balance and had to pay

24   taxes?

25             MR. FERRARO:  It was part of the compensation

1    structure. Employees were rewarded in salary, discretionary

2    bonuses, equity up front and CEL Tokens. So this was one of

3    the key components of it.

4            MR. ABREU:  So you are saying that former officers

5    and employees were both compensation in terms of equity and

6    CEL Token at zero value for -- at zero cost for them, but at

7    cost for the company and for the investors were potentially

8    being diluted by more market supply. Is that a fair

9    assessment?

10           MR. FERRARO:  I look at it as total compensation

11   in which CEL Token equity and salary and discretionary

12   bonuses are different components of compensation. So it was

13   included for numerous employees.

14           MR. ABREU:  So it's fair to say that at some

15   point, an officer could just receive both CEL as

16   compensation at zero cost and equity on the company at zero

17   cost, is that right?

18           MR. FERRARO:  They're working for --

19           MR. ABREU:  There was, mm-hmm, so there were two

20   vehicles for compensation, correct?

21           MR. FERRARO:  It's a full compensation structure

22   in which employees committed their time and effort in return

23   for compensation. In which, I just named four main

24   components of that compensation.

25           MR. ABREU:  Yeah, and they will also receive a

1    salary and then compensation on top of that, what could be

2    CEL or equity, correct? So that's what you're saying?

3              MR. FERRARO:  I said it four, four times. There's

4    four components of compensation, and employees were largely

5    eligible for those four components.

6              THE COURT:  Ask your next question.

7              MR. ABREU:  Yeah, so is it fair to say that

8    according to [indiscernible] Declaration by the Debtors,

9    that 94 percent of the CEL supply was locked.

10             MR. FERRARO:  That's my understanding --

11             MR. ABREU:  Yeah, that's, that's around --

12             MR. FERRARO:  In reading -- sorry, sir. In

13   reading, in reading that Declaration you're referring to,

14   that's my understanding.

15             MR. ABREU:  Yeah, but I think you have previously

16   mentioned --

17             THE COURT:  Let's not argue, ask questions.

18             MR. ABREU:  Yeah, so my point here, and final

19   question, is that I -- let me just give a follow up for the

20   next question. When you were shorting, you have to put

21   collateral. So imagine that I'm going to short CEL Token,

22   which is at $1. I use $10,000 to take a loan of CEL at $1,

23   and then I, then I sell into the market. I receive $1,000 of

24   CEL. So now I have $2,000 of CEL but a debt of $1,000.

25             MR. FERRARO:  Mm-hmm.

Page 100

1              MR. ABREU:  If the price of CEL, because I have a

2       liability, a debt to the exchange, which is 1,000 CEL

3       Tokens, if the price increases by 100 percent, which means

4       it doubles, it's your understanding that I will be

5       liquidated and the previous collateral that I use to take

6       that short position or take that loan on CEL will be

7       liquidated and used, and will be transferred to the market.

8       Is that a clear, a correct assessment of shorting?

9              MR. BROWN:  Objection.

10             THE COURT:  Sustained.

11             MR. ABREU:  I just, just to finalize, what is the

12      percentage of loans, of international loans in terms of

13      users? Is that 50 percent, 51 percent? Can you give a round

14      number?

15             MR. FERRARO:  I don't have the statistics in front

16      of me, but I think generally it's about half. Generally.

17             MR. ABREU:  Do you understand that there was a

18      difference between the loans international and domestic, and

19      US-based loans? Do -- are you aware of any differences?

20             MR. FERRARO:  The UK comes to mind in terms.

21             MR. ABREU:  Let me give you an example. I was an

22      international creditor, and I took a loan. I could pay with

23      CEL, right? Because I was international. There were a few

24      options that I got in discount on my interest because I was

25      paying with CEL. Was that a product that Celsius had just

Page 101

1    for international users, but US users were not -- this

2    product was not available?

3              MR. FERRARO:  I -- sorry, I didn't run product and

4    while this product was active I had a very short amount of

5    time with the company, so I'm not knowledgeable of all the

6    details. So I don't want to answer that question because I

7    don't -- I'm not --

8              MR. ABREU:  That's your, I believe it's your

9    Declaration --

10             THE COURT:  Ask the next question.

11             MR. ABREU:  Okay. You -- was CEL creditors -- did

12   US users got the same products available to them in terms of

13   CEL? Was there an incentive to purchase CEL as international

14   users?

15             MR. FERRARO:  I'm sorry, I'm not following the

16   question. Was there an incentive --

17             MR. ABREU:  Was there, was there an incentive for

18   US users to purchase CEL [indiscernible]

19             MR. FERRARO:  My understanding is there's a tiered

20   reward system, loyalty system, in which if people hold CEL

21   they would be entitled to discounts in certain products, et

22   cetera. So if that's what you're referring to as an

23   incentive, I mean, that sounds reasonable.

24             MR. ABREU:  I believe US users were not --

25             THE COURT:  You're not testifying. If you have a

1    question, ask your question.

2              MR. ABREU:  Judge, that's it. That's all I wanted.

3              THE COURT:  Okay. Thank you. Anybody else have any

4    other questions?

5              MR. UBIERNA:  Yes, Your Honor.

6              THE COURT:  Mr. Ubierna.

7              MR. UBIERNA:  Okay. Good morning, Ferraro. Before

8    you have talk about Emergence Incentive Plan [indiscernible]

9    are you aware that if the plan is approved, you are going to

10   receive a bonus or award?

11             MR. FERRARO:  If certain targets are hit, yes,

12   that's the way it is written in the plan, yes.

13             MR. UBIERNA:  What are your, your responsibilities

14   as Interim CEO?

15             MR. FERRARO:  I'm sorry, I didn't hear that.

16             MR. UBIERNA:  What are your, your responsibilities

17   as Interim CEO?

18             MR. FERRARO:  Oh, thank you. Yeah, it's managing

19   the, the company through the bankruptcy process. Think

20   working with the legal and financial advisors, reporting

21   monthly operating reports to the Court. Obviously mining is

22   an operational business in which we've been deploying rigs,

23   we talked about hedging and managing that business, et

24   cetera. Those are the general qualifications. We've also

25   obviously had to reduce the workforce quite a bit, going

Page 103

1    from, I think it was 950 plus in early 2022 to the 150 we

2    have today.

3         MR. UBIERNA:  Would that responsibilities include

4    getting a plan confirmed?

5         MR. FERRARO:  I think the goal is to get out of

6    bankruptcy. The, you know, the responsibility that I feel

7    personally that I have is to maximize value and do that as

8    fast as possible. But there are threshold and target dates

9    in which I hope we hit and we can return crypto to

10   customers. But, I mean, they're definitely in jeopardy.

11   These are pretty aggressive targets.

12        MR. UBIERNA:  Are you familiar with the Emergence

13   Incentive Plan performance targets?

14        MR. FERRARO:  Yes.

15        MR. UBIERNA:  What was your involvement in

16   drafting the target performance for the work?

17        MR. FERRARO:  This was, I think, the compensation

18   consultant from Alvarez & Marsal will come up and talk about

19   that in detail. My understanding is that these were drafted

20   and negotiated between Alvarez & Marsal and M3 on the UCC

21   side, and then approved by the Special Committee.

22        MR. UBIERNA:  Okay. Are you aware that you are

23   getting a bonus if this Court approves the plan before the

24   end of October?

25        MR. FERRARO:  That is one of the, that is one of

Page 104

1    the metrics, yes.

2            MR. UBIERNA:  Would you say that getting a plan

3    approved is already in your responsibilities and in your

4    salary?

5            MR. FERRARO:  Getting a plan approved is the goal

6    of my work. Getting a plan approved by October 31st takes a

7    lot of weekends and nights.

8            MR. UBIERNA:  Why should you get a bonus on top of

9    your salary for getting the plan confirmed?

10           MR. FERRARO:  I'll give you an example. We spent a

11   tremendous amount of time, tens of hours in negotiating, me

12   and my executive team, in setting up these agreements with

13   the distribution partners. The rate and the speed at which

14   we're doing this is, to me, really impressive, and we're

15   trying to do it in order to hit those goals.

16           MR. UBIERNA:   Okay. Nothing more, Your Honor.

17   Thank you.

18           THE COURT:  Thank you very much, Mr. Ubierna.

19   Anybody else wish to cross-examine?

20           MR. SHEIK:  Yes, Your Honor. I have some questions

21   that are just general questions, if I may.

22           THE COURT:  Go ahead.

23           MR. SHEIK:  Okay. And, all right, so my first

24   question. Was Simon Dixon ever officially or unofficially

25   brought in as a consultant or liaison to the Debtor during

Page 105

1    the audit, and was there ever -- was he ever put under an

2    NDA for any other reason through the course of this

3    bankruptcy?

4            MR. FERRARO:  My understanding is Simon was

5    involved in the bidding process with Bank to the Future and

6    there was an NDA related to that. He's, to me, been very

7    helpful in educating the community and being part of those

8    conversations. So I think there was an NDA on --

9            MR. SHEIK:  Thank you. That's good to hear. Second

10   question. Was a formal process for the selection of the

11   Special Committee of the NewCo followed, can you describe

12   that process to us?

13           MR. COLODNY:  Objection, Your Honor.

14           THE COURT:  Overruled.

15           MR. SHEIK:  Okay --

16           THE COURT:  He can answer the question. I

17   overruled the objection.

18           MR. FERRARO:  Yeah. So --

19           THE COURT:  Go ahead, Mr. Ferraro, if you know the

20   answer, go ahead and answer.

21           MR. FERRARO:  I'll do my best. I wasn't in the

22   driver seat on this, the Committee was on the driver seat of

23   this. As I mentioned earlier in my testimony, I did discuss

24   it with the co-chairs as well as the proposed CEO of

25   Fahrenheit. So that's kind of my level of knowledge. I, as I

1   said, I'm impressed with the people that they've selected.

2   I think there's a large amount of creditor support and

3   creditors on the Board and on the Board observer roles.

4           MR. SHEIK:  Okay, great. And Mr. Ferraro, I

5   understand that you have a financial services background.

6   The reason why I'm asking you these questions is because,

7   you know, there's a specific process that is followed in

8   hiring or selecting of, you know, Board members, or any kind

9   of position in the financial services realm. And, and

10  especially when it comes to having fiduciary responsibility

11  or any financial oversight in, you know, in a manner such as

12  ours. And I'm an Earn creditor, by the way, just for

13  everybody to know.

14          But my question is, so when the process was rolled

15  out, you know, was there any specific job description or a

16  criteria of selection for, you know, these Board members to

17  be appointed to the select -- to the Board Committee?

18          MR. FERRARO:  I don't -- with all respect, I don't

19  think I'm the right person to answer that question. I was

20  not involved in setting up the details of the selection.

21  I've had conversations around --

22          MR. SHEIK:  Okay, okay, not a problem. So then,

23  I'll just ask you a very general question in that sense.

24  When it -- so in the financial services realm, would anyone

25  ever hire or appoint somebody in a position like this that

Page 107

1    has -- well, first of all, there would be a credit report

2    check that would be done as part of the background check, if

3    I'm not mistaken.

4              MR. BROWN:  Objection.

5              THE COURT:  Sustained.

6              MR. SHEIK:  Okay. Would anybody be appointed to

7    this position that has a negative financial -- like, let's

8    say owes back taxes, for a lien imposed by the federal

9    government over the last few years.

10             THE COURT:  He did not select the Board.

11             MR. SHEIK:  I understand.  I was just asking

12   because of his financial services background, that's the

13   only reason.

14             THE COURT:  Objection sustained.

15             MR. SHEIK:  Okay.

16             THE COURT:  Whoever has a phone in the courtroom

17   better shut it off. Go ahead, Mr. Sheik.

18             MR. SHEIK:  Thank you. You know, my next question

19   -- and please feel free to object. Again, it was -- I just

20   wrote these down very quickly because I didn't know I was

21   going to be able to attend this. But we were told that there

22   was a special investigator that was hired to look at the

23   backgrounds of all these that were selected. Why was a

24   special investigator hired, instead of just doing a standard

25   background check?

Page 108

1          MR. BROWN:  Objection.

2          THE COURT:  Sustained.

3          MR. SHEIK:  Okay. Now, I'm going to skip ahead,

4    then. Okay, so, so when it came to the selection of the

5    Board and the observers, was it necessary to increase the

6    number of members from seven appointees on the Board to

7    nine? Given the true revenue streams for NewCo are A,

8    staking, which is pretty much set on autopilot. B, mining,

9    which no one other than USBTC, which is US Bitcoin, mining,

10   who has the subject matter expertise to add any value to

11   this process.

12         THE COURT:  Mr. Sheik, I'm going to cut you off in

13   the middle of that question, because it clearly is not a

14   proper question. If you have more questions to ask, go

15   ahead.

16         MR. SHEIK:  Okay, then. So, why was it necessary

17   to increase the number of members from seven to nine?

18         MR. FERRARO:  I was not part of the selection

19   Committee, I --

20         THE COURT:  Next question.

21         MR. SHEIK:  Okay. Now, USBTC was the only company

22   that brings value to this process. And I believe USBTC -- I

23   mean, Fahrenheit allowed us to go directly to USBTC. So, as

24   part of their plan, they gave us an out.  So, or, you know

25   if --

1              THE COURT:  Mr. Sheik, Mr. Sheik, okay --

2              MR. SHEIK:  Yes.

3              THE COURT:  -- you're able to ask questions,

4    you're not testifying. So if you have questions you wish to

5    ask, I'm trying to give you some latitude. I understand

6    you're not a lawyer.

7              MR. SHEIK:  Yes.

8              THE COURT:  But you can't testify, okay? You can't

9    testify about facts that are not in the record.

10             MR. SHEIK:  Sure, I understand. And thank you, and

11   be as harsh as possible, it only motivates me to do better

12   next time.

13             THE COURT:  I'm not trying to be harsh.

14             MR. SHEIK:  I appreciate.

15             THE COURT:  Just try to follow the rules, okay?

16             MR. SHEIK:  No, no, not at all. I'm just saying,

17   I'm just letting you know, you can. I appreciate it. Thank

18   you very much, Judge. Your Honor. Okay, so, so basically,

19   you know, if USBTC is the only party that adds value to this

20   process, why not go to USBTC directly?

21             MR. FERRARO:  I, I --

22             MR. BROWN:  Objection.

23             THE COURT:  Sustained.

24             MR. SHEIK:  Okay. Were you physically present

25   during the mediation between Earn and the Board members?

Page 110

1           MR. FERRARO:  No, I was in Ecuador at my, in my

2    home office working on the Celsius case. I was not at the

3    mediation.

4           MR. SHEIK:  Did you -- so you did not attend,

5    whether by Zoom or, you know, electronically somehow?

6           THE COURT:  Whatever was said in the mediation is

7    subject to mediation privilege, and I will not let you

8    inquire about -- he wasn't there, but whatever happened in

9    the mediation stays in the mediation.

10          MR. SHEIK:  I understand, okay. Well, now that the

11   mediation was complete, I guess my last question is, you

12   know, you know, did this -- since I come from the Earn group

13   and, you know, I feel -- I just wanted to ask, did this

14   negotiation, according to you, between Earn and the Board

15   members, really help the Earn in the end, and do you think

16   that the mediation was necessary?

17          MR. BROWN:  Objection.

18          THE COURT:  Sustained.

19          MR. SHEIK:  Those are all the questions I had,

20   Your Honor. Thank you very much.

21          THE COURT:  Anybody else wish to cross-examine?

22          UNIDENTIFIED SPEAKER:  Yes, Your Honor, I have one

23   additional set of questions.

24          THE COURT:  You already had your chance. I'll only

25   hear anybody who hasn't questioned yet.

Page 111

1           MR. PATTON:  Your Honor, Jeff Patton, Pro Se

2      Creditor.

3           THE COURT:  Go ahead, Mr. Patton.

4           MR. PATTON:  Good morning, Mr. Ferraro.

5           MR. FERRARO:  Good morning.

6           MR. PATTON:  I understood you mentioned earlier

7      that you joined the company shortly before the pause and or

8      the bankruptcy filing.

9           UNIDENTIFIED SPEAKER:  Great timing.

10          MR. FERRARO:  Yeah.

11          MR. PATTON:  Is that correct?

12          MR. FERRARO:  Yes, that's correct. Both of you are

13     correct.

14          MR. PATTON:  Okay, I just want to touch on a

15     couple things regarding the plan and the vote and the

16     ballot.  The -- after the filing and prior to voting, the

17     creditors were divided into, into groups, we've heard there

18     was classes. Did you take part in that activity?

19          MR. FERRARO:  It's, I think that's largely a legal

20     question, class definition. I understand the classes, I

21     understand the plan. But the actual -- your question is, I

22     think, more of a legal question.

23          MR. PATTON:  Okay, so you didn't do any work or

24     participate in any meetings or discussions of how the

25     classes were determined?

Page 112

1           MR. FERRARO:  No, I think we had general

2    discussions in formulating the plan. And I think I have a

3    general understanding of how the classes were formed.

4           MR. PATTON:  All right, thank you, thank you. Now

5    that activity in dividing creditors into classes, you

6    mentioned was taken on by legal teams prior to, prior to the

7    development of the plan itself, is that correct?

8           MR. FERRARO:  I think they're kind of, in my

9    opinion, they're kind of aligned and organically done around

10   the same time, throughout the case. You know, you're always

11   thinking about kind of your creditors and their needs and

12   their contractual rights and all that throughout. And I

13   think that formulates a lot of this.

14          MR. PATTON:  All right. Terrific. Do you happen to

15   have any opinion as far as the principle difference between

16   creditor classes versus the difference between creditor

17   classes four and five?

18          MR. BROWN:  Objection.

19          THE COURT:  Sustained.

20          MR. PATTON:  Thank you. Sorry. In terms of the

21   ballot, under the plan, to your knowledge, was it possible

22   for a class five creditor to elect to take a lesser

23   distribution and join class four?

24          THE COURT:  These are really legal questions, so I

25   really -- they're not proper subject for the examination of

Page 113

1    this witness, Mr. Patton. Any other questions?

2              MR. PATTON:  I, I have nothing. I would say

3    nothing further, but I have nothing. Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Patton. Anybody else

5    wish to cross-examine?  I have some questions.

6              THE CLERK:  Judge, there is a Sharon Dow that

7    raised her hand.

8              THE COURT:  Oh, I couldn't see it. So, who is

9    that, Deanna?

10             THE CLERK:  Sharon Dow, last name is spelled

11   D-O-W.

12             THE COURT:  Okay. Ms. Dow, go ahead if you wish to

13   ask questions.

14             MS. DOW:  Yes, good day, Your Honor. Thank you

15   very much. I'm Sharon Dow, I am a creditor, and Earn

16   Creditor. I have a few questions for Mr. Ferraro around the

17   business plan that he's sponsoring, putting forward.

18             THE COURT:  Yes, go ahead.

19             MS. DOW:  Yeah, and the reference in exhibits

20   would be Exhibits 32 in the Mining Business Plan, and 35 in

21   the Disclosure Statement, Exhibit E.

22             THE COURT:  We don't have the exhibits in front of

23   us, but go ahead and ask your questions. We'll see whether

24   the witness can answer.

25             MS. DOW:  Yes, thank you. My questions are, are

Page 114

1    more general. First of all, in any business plan in general,

2    the -- how do you determine -- how do you do a determination

3    of quality of revenue analysis?

4              MR. FERRARO:  Well, you project the revenue. It's

5    a bottoms-up exercise. You do it by site. It's based upon --

6    I'm talking specifically mining here. It's based upon site

7    level. There's a full review of the power costs. We have a

8    model that kind of predicts the network size, so you can

9    calculate your kind of market share. So, it's -- and then

10   there's operational costs, there's profit shares, so the

11   revenue elements are all loaded and the expense elements are

12   all loaded and they're done at a site level.

13             MS. DOW:  So, what are the key drivers in your

14   determination of the revenue going forward and its

15   reliability?

16             MR. FERRARO:  What was the last part? And the true

17   liability?

18             MS. DOW:  The revenues going forward and the

19   reliability of those revenues.

20             MR. FERRARO:  Oh, okay, sorry. I mean, it's a

21   forecast, right? So it's uncertain. So you try to do your

22   best to take into account a reasonable view of the

23   marketplace. So we have a view of, kind of, Bitcoin price,

24   and as I mentioned before, network growth. That gives you a

25   good view of kind of how much computational power,

Page 115

1    computational power you have versus the total universe of

2    Bitcoin miners, which effectively determines what your share

3    of the rewards awards will be, the block awards. So it's,

4    it's -- there's many different, as I would say in my old

5    job, there's many different kind of seeds to the forecast

6    that are all assumptions. And you do your best to come up,

7    come up with the right assumptions.

8              MS. DOW:  And do you stand by the revenues and the

9    compute power hash rates in the plan that you've presented?

10             MR. FERRARO:  Yeah, I think the deployment

11   schedules are generally reasonable. I think with the Core

12   Scientific settlement and the 250 megawatt site in West

13   Texas, I -- just one man's view, I believe NewCo will beat

14   those projections, holding constant the Bitcoin price in the

15   network. The vertical integration should drive wider through

16   the, through cycle spreads and decrease counterparty

17   reliance, which are both good things for the support of the

18   business.

19             MS. DOW:  Mr. Ferraro, thank you for that.

20   Mr. Ferraro, do you happen to know the approximate current

21   hash rate?

22             MR. FERRARO:  We have total miners equate to about

23   12, 12 exa hash. I think right in production right now it's

24   probably around 7 exa hash.

25             MS. DOW:  And what is the current hash rate and

Page 116

1    difficulty rating in the market?

2             MR. FERRARO:  I don't know off the top of my head,

3    but I think we're around, somewhere around 3 percent of the

4    network.

5             MS. DOW:  Okay.

6             MR. FERRARO:  A little over 3 percent.

7             MS. DOW:  Sure. And at what rate does hash rate

8    and difficulty escalate through a cycle?

9             MR. FERRARO:  It depends on --

10            MS. DOW:  Are you familiar with that?

11            MR. FERRARO:  Yeah, it depends on many different

12   things. It's quite complex. I think hash rate will be

13   determined based upon Bitcoin price, energy prices and the

14   age of the machines and the efficiency of the machines. And

15   those are key components that go into the forecast.

16            MS. DOW:  So one of the key line items in your

17   forecast is actually hash rate. It's down, Line 7 or 8. It -

18   - can you share with me what are the underlying assumptions

19   to the beginning point of that hash rate and how that grows

20   or adjusts over the five periods in your plan?

21            MR. FERRARO:  Yeah, so we're starting from a point

22   where, you know, as of, as of the end of August we had

23   80,000, 85,000 miners deployed and hashing. As I mentioned,

24   you know, we are going through some counterparty

25   difficulties. So, you know, I actually expect that number to

Page 117

1    potentially drop. But, with the Core Scientific settlement

2    and the site in West Texas, I think we're going to have a

3    plan to deploy -- NewCo has a plan to deploy 40 megawatts

4    worth of machines very rapidly, I think within 90 days of

5    that deal closing. We plan to work on that before the

6    effective date, just to make sure that NewCo has all -- as

7    many rigs deployed as possible.

8            And then within the forecast there's other

9    deployment assumptions that are largely done at similar

10   economics for existing hosting contracts.

11           MS. DOW:  Yeah, understood. I actually would like

12   to explore where the assumptions on the productivity, hash

13   rate and share of global network, where those assumptions

14   lie versus current state of the business environment. So are

15   you aware of what the first period hash rate number is?

16   'Cause this, this is in your calculation that is a key

17   driver to the revenue and the number of Bitcoin.

18           MR. FERRARO:  I've tried my best to -- sorry if

19   you were -- I didn't mean to cut you off.

20           MS. DOW:  No, you're fine. Please, go ahead.

21           MR. FERRARO:  Okay. I've tried my best to memorize

22   as much as I can. That's not one of them, I apologize. I

23   think it's -- off of memory, I believe our, our share of the

24   hash rate was trending flat to down-ish throughout the 5-

25   year projection. Off of memory, and I could be wrong.

Page 118

1            MS. DOW:  Okay, so let me help you a little bit.

2            THE COURT:  Ms. Dow, I'm --

3            MS. DOW:  I'm actually referring --

4            THE COURT:  Ms. Dow, I'm going to stop you.

5            MS. DOW:  -- I'm actually referring --

6            THE COURT:  Ms. Dow, stop. I'm permitting you to

7     examine with respect to documents that you didn't post last

8     night for cross-examination. The witness is generally

9     familiar with it. I'm trying to provide some leeway. So

10    don't expect him to be able to pull numbers from a document

11    that you have not put in front of the witness for cross-

12    examination. Go ahead with your questions.

13           MS. DOW:  Sure. May I try to state this way, and

14    this is my first time ever doing this. I apologize, Your

15    Honor. So, it appears to me in the chart that there is a

16    hash rate number of 307, sizing the entire Bitcoin network,

17    that your comparing this production to. So the 307 exa hash

18    per second, are you familiar with what that correlating

19    number in reality today is?

20           MR. FERRARO:  I don't have it off the top --

21           MS. DOW:  The size of the Bitcoin venture.

22           MR. FERRARO:  I don't have it off the top of my

23    head, but the launch -- that change, it goes up and down.

24    You know, so it is a volatile kind of metric that you're

25    trying to compare to. But I think it's generally off -- I

Page 119

1    think it was -- off of memory I have, like, a 270 in my mind

2    or something like that. So I think it's pretty consistent.

3              MS. DOW:  Would it surprise you to know that it's

4    481 today and it's been in the 400s in the latter part of

5    the month of September? Would that surprise you?

6              MR. FERRARO:  It's volatile, it moves up and down,

7    you know.

8              MS. DOW:  Sure.

9              MR. FERRARO:  The launch point, you can't -- with

10   this type of asset it's very hard to kind of true up the

11   launch point at all points, 'cause it moves so much.

12             MS. DOW:  Sure. But, so a plan, would you say that

13   you're comfortable with a plan that states a starting year

14   period, end-of-period value, in, as being 30 percent lower

15   than what reality is? And so that kind of difficulty rating

16   -- so, so when hash rate is high, once --

17             THE COURT:  Ms. Dow, you're saying what reality

18   is. Reality would be evidence. It's not before the witness,

19   it's an improper question.

20             MS. DOW:  Okay. I'm sorry. So, if the plan -- if

21   in fact the plan is 30 percent off of what current

22   difficulty is, do you feel that there are enough resources

23   in the plan to make up the difference to maintain the

24   revenue you're projecting?

25             MR. FERRARO:  Yeah, I think it's quite volatile,

Page 120

1    the hash rate, it moves back and forth. I think the key

2    assumption is kind of what happens around [indiscernible]

3              MS. DOW:  [indiscernible]

4              MR. FERRARO:  Well, I mean, that's, that's

5    occurring in 2024, it's right around the corner, and that's

6    going to impact your 5-year projection. So --

7              MS. DOW:  Sure. And how are you seeing that rate

8    to -- be impacted by having [indiscernible] and what does

9    that mean for resources needing to be applied by the, the

10   NewCo? To maintain revenue.

11             MR. FERRARO:  As the rewards get cut in half, you

12   would expect people with less efficient rigs and maybe less

13   desirable power markets would have to shut off and curtail.

14   Now, this is why it's volatile. They can turn back on at any

15   point in time. If Bitcoin prices rise, energy prices fall,

16   or the network shrinks, these coins or the machines can be

17   turned right back on. And that's why it's so volatile and

18   elastic.

19             THE COURT:  Let's wrap up the questions, Ms. Dow.

20             MS. DOW:  Sure. Last cycle -- so you're talking

21   about the beginning of a new cycle we're coming into. Last

22   cycle, what was the range of hash rate? What was the, the

23   variance from the low to the high?

24             MR. FERRARO:  I don't know that information, I

25   don't have it in front of me. I apologize.

Page 121

1          MS. DOW:  Okay. All right. So you're not -- are

2     you familiar with it went from 100 to 400, does that seem

3     similar to the assumptions that drove into your plan?

4          THE COURT:  I'm going to object to that and

5     sustain the objection. Wrap up your questioning, please.

6          MS. DOW:  How did you anticipate remaining

7     profitable if, by chance, the plan starting point is

8     significantly off to the low side from what it really takes

9     to mine in this current competitive environment?

10          MR. FERRARO:  Yeah, it's a great question. Thank

11     you for that. I think it's important to note that this

12     business has a lot of intrinsic defensive capabilities. So

13     you talk about profitability and you talk about losses. The

14     ability to curtail, to economically curtail when the

15     marginal cost is higher than marginal revenue is something

16     that is decided on a minute-by-minute basis. I think it's 5-

17     minute intervals. This greatly reduces the risk of loss if

18     managed appropriately.

19          So I think, you know, it comes down to having a

20     lean operational kind of shop, in which you're going to eat

21     some operational expenses when your machines are shut off,

22     but it's important to note that you do have that natural

23     kind of defensive mechanism in this business.

24          THE COURT:  Last question, Ms. Dow.

25          MS. DOW:  So can I --

1         THE COURT:  Ms. Dow --

2         MS. DOW:  Sure.

3         THE COURT:  -- one, one more question.

4         MS. DOW:  Yes, so to, to follow up on that,

5    Mr. Ferraro, that curtailment strategy, how often has it,

6    and do you see the curtailment which impacts your variable

7    cost, how do -- how often do you see that covering and

8    making up for, and covering the fixed cost portion in the

9    operation?

10        MR. FERRARO:  Yes, great question. We experience

11   this quite a bit in West Texas over the summer. The heat

12   index was off the charts, the power spikes were dramatic.

13   And because of that, we economic curtailed a significant

14   portion of the time. And that's one of the driving reasons

15   why the EBITDA was so high over the summer months, almost

16   $10 million.

17        THE COURT:  All right. Anybody else wish to cross-

18   examine?

19        MS. DOW:  Thank you, Your Honor.

20        THE CLERK: I don't see any hands, Judge.

21        THE COURT:  All right. I have a few questions for

22   Mr. Ferraro. So I'm looking at Exhibit 37, which was your

23   Declaration in Support of CEL Token Settlement. And among

24   the things attached to it was what's described as Exhibit A,

25   the White Paper. Just tell me what that was and why it was

Page 123

1    prepared.

2            MR. FERRARO:  Yeah, I'll do my best. I think the

3    White Paper was prepared right before the ICO, which I think

4    was around circa 2018. And this White Paper effectively

5    describes how the CEL Token will be issued, what its value

6    and contributions are, and kind of, you know, you know, the

7    utility components of it.

8            THE COURT:  All right, so your, your Declaration

9    and the Disclosure Statement describe this as the CEL as a

10   utility token. Can you explain what that means, as a utility

11   token?

12           MR. FERRARO:  Yeah, you can -- I think there's

13   three key components to it. Let's see if I can remember all

14   three after a couple hours of testimony. One is kind of --

15           THE COURT:  Time to finish this up.

16           MR. FERRARO:  I know. Discounted loan rates, you

17   can pay your loan with it. The other one is enhanced --

18           THE COURT:  Higher interest rate on deposits.

19           MR. FERRARO:  Higher on, on deposits and the third

20   piece was --

21           THE COURT:  Lower interest rate on loans.

22           MR. FERRARO:  Lower interest rates, and the third

23   piece is product and services.

24           THE COURT:  Reduced transaction fees.

25           MR. FERRARO:  Yep.

1          THE COURT:  Could the CEL Token be used to pay for

2     goods or services within the Celsius network ecosystem?

3          MR. FERRARO:  You could trade it in for other

4     currencies, and you could pay that --

5          THE COURT:  Through the Celsius Network.

6          MR. FERRARO:  Through the Celsius Network.

7          THE COURT:  So the platform shut down, and the

8     plan doesn't resume it, correct?

9          MR. FERRARO:  That's correct.

10         THE COURT:  All right. So do utility tokens have

11    any value if the platform on which they're used ceases to

12    function?

13         MR. FERRARO:  I personally do not believe so,

14    outside of being speculative meme coin.

15         THE COURT:  So whenever market trading, you would

16    consider that to mean speculative trading.

17         MR. FERRARO:  That's what I - yes. Correct.

18         THE COURT:  Perhaps subject to the manipulation

19    that happened before between around the pause date.

20         MR. FERRARO:  And the disconnects in the

21    marketplace, and all the locked tokens, yes.

22         THE COURT:  I don't have any other questions. Do

23    you have any more? You know what, we're going to take a

24    break, but we will finish with the witness.

25         MR. BROWN:  Nothing further, no, Your Honor.

Page 125

1                    THE COURT:  Committee?

2                    MR. COLODNY:  I have one, Your Honor. Mr. Ferraro,

3        you answered a number of questions about exculpation

4        regarding the distributions. Is it your understanding that

5        the exculpations in the plan only apply to the

6        distributions?

7                    MR. FERRARO:  My understanding is the exculpations

8        for the distribution part -- are you asking specifically --

9                    MR. COLODNY:  No, the exculpation as a whole for

10       the Debtors, for the Committee, for the Committee Advisors.

11                   MR. FERRARO:  It's broader than just the

12       distribution, correct.

13                   MR. COLODNY:  It covers all actions between the

14       petition date to the effective date.

15                   MR. FERRARO:  Throughout the bankruptcy, yes.

16                   MR. COLODNY:  No further questions, your Honor.

17                   THE COURT:  Thank you. Ms. Cornell?

18                   MS. CORNELL:  Nothing further, Your Honor.

19                   THE COURT:  You're excused.

20                   MR. FERRARO:  Thank you.

21                   THE COURT:  Thank you for your testimony. What's

22       next?

23                   MR. BROWN:  Your Honor, we're next going to call

24       Mr. Kokinos to the stand. Maybe probably a good time for

25       morning break.

Page 126

```
 1                    THE COURT:  It is.

 2                    MR. BROWN:  We can --

 3                    THE COURT:  It is.

 4                    MR. BROWN:  -- shift around if necessary.

 5                    THE COURT:  Sure. Let's take a break until noon.

 6     And do you have an idea about how long you're going to be

 7     with Mr. Kokinos?

 8                    MR. BROWN:  I'll defer to Mr. McCarrick.

 9                    MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

10     on behalf of the Debtors. I don't expect at least the direct

11     examination to go more than 10 minutes.

12                    THE COURT:  Okay. All right, let's take a break

13     until noon and we'll resume at noon. Thank you very much,

14     everyone. Please be seated.

15                    MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

16     on behalf of the Debtors. We call Steven Kokinos to the

17     stand.

18                    THE COURT:  Okay.

19                    MR. MCCARRICK:  And, Your Honor, like my partner,

20     I have some witness binders that I can hand up to the bench,

21     the witness and the clerks in turn.

22                    THE CLERK: Do you solemnly swear and affirm all

23     the testimony you're about to give before this Court is the

24     truth and the whole truth?

25                    MR. KOKINOS:  I do.
```

1             THE COURT:  Thank you. Please have a seat. And

2     there are cups and there is water there, if you --

3             MR. KOKINOS:  Thank you.

4             THE COURT:  Please go ahead.

5             MR. MCCARRICK:  Good afternoon, Mr. Kokinos. Could

6     you introduce yourself?

7             MR. KOKINOS:  I'm Steven Kokinos, and I'm the

8     proposed CEO of NewCo.

9             MR. MCCARRICK:  What do you do for a living,

10    Mr. Kokinos?

11            MR. KOKINOS:  I'm a tech investor. But I's say

12    principally I've spent the majority of my life building tech

13    companies, starting with internet infrastructure, software,

14    telecommunications and crypto most recently.

15            MR. MCCARRICK:  How did you become involved in

16    these Chapter 11 cases?

17            MR. KOKINOS:  I was introduced to Celsius by Mike

18    Arrington, who runs Arrington Capital. He's one of the

19    Fahrenheit principals and he brought a group of us together

20    to take a look at the opportunity.

21            MR. MCCARRICK:  When you say 'Fahrenheit,' what is

22    the Fahrenheit Group?

23            MR. KOKINOS:  Fahrenheit Group is a team of five

24    principals, a US Bitcoin Proof Group, or US Bitcoin of which

25    Asher Genoot is a founder and involved personally here.

Page 128

1    Proof Group, which is run by Noah Jessop, is a staking

2    service, or staking service provider and venture capitol.

3    Ravi Kaza, who is a risk management expert and has a lot of

4    experience in both managing both public and private hedge

5    funds, along with myself.

6           MR. MCCARRICK:  And is Arrington the fifth?

7           MR. KOKINOS:  I'm sorry, yes. I'm sorry. And last

8    but not least, Arrington Capital, which is founded and run

9    by Mike Arrington, is a longtime investor in the tech space

10   and crypto space.

11          MR. MCCARRICK:  Mr. Kokinos, are you generally

12   familiar with the sales and auction process for the Debtors'

13   assets?

14          MR. KOKINOS:  Yes, I am.

15          MR. MCCARRICK:  How would you describe that

16   process based on your participation in it?

17          MR. KOKINOS:  Well, it was a very competitive

18   process. It went much longer than we anticipated it might.

19   You know, but I think from our standpoint, you know, it

20   yielded, you know, a much better deal for the creditors

21   than, than the stalking horse bid was, certainly.

22          MR. MCCARRICK:  What is Fahrenheit's role in

23   restructuring the Debtors today?

24          MR. KOKINOS:  Fahrenheit will be the manager of

25   the new entity and providing, you know, much of the

1    executive team. And is also in particular responsible for

2    managing the three core business lines. One being Bitcoin

3    mining, the second being staking, especially self-staking

4    Ethereum, and the third is managing a portfolio of illiquid

5    venture investments and other assets.

6             MR. MCCARRICK:  You refer to the management team

7    of NewCo. Who is that management team or the anticipated

8    management team?

9             MR. KOKINOS:  Today the confirmed members of

10   Fahrenheit that will be involved in NewCo full time are

11   myself as CEO, Joel Block, who's in the audience, will be

12   the CFO, and then Ravi Kaza will be on the Board as well as

13   Asher Genoot. And US Bitcoin as a firm will also be

14   responsible for managing Bitcoin mining and has a separate

15   management agreement specific to those services they'll be

16   providing.

17            MR. MCCARRICK:  Is Fahrenheit committed to making

18   any investments in NewCo?

19            MR. KOKINOS:  Yes, the Fahrenheit members have

20   committed up to $50 million of our own money to go into

21   NewCo and purchasing that at net asset value at the time of

22   emergence.

23            MR. MCCARRICK:  What, if anything, does that

24   investment say about Fahrenheit's incentives to make NewCo

25   successful on a going-forward basis?

1            MR. KOKINOS:  You know, we think that us owning

2     equity is important because it -- the creditors will be the

3     majority owners of this new business. And it incents us in

4     the same way that the creditors are incented, i.e., the

5     lines are incentives to grow the business and grow

6     enterprise value.

7            THE COURT:  You said that Fahrenheit will invest

8     up to 50 million. How and when will the precise amount be

9     determined?

10           MR. KOKINOS:  So approximately 30 million will go

11    in at emergence, and then the Board will have two one-year

12    options in year four and year five to extend the deal.

13    Should they choose to, approximately another 10 million is

14    committed to be invested in those years, should they elect

15    to continue the agreement. If they terminate the agreement

16    at the end of three years, then those additional investments

17    wouldn't happen.

18           MR. MCCARRICK:  You testified earlier about

19    NewCo's primary business lines. Could you remind the Court

20    what those are?

21           MR. KOKINOS:  Yes, I think I mentioned a little

22    bit earlier, but just to reiterate. Bitcoin mining will be

23    the largest business line at emergence. The second is

24    Ethereum staking, and obviously we'll need the Board to

25    approve the business plan, but we think that we're likely to

1    want to stake a portion of the Ethereum, so that we can earn

2    yield. One of the points I think that's important on the

3    Ethereum side is that Proof Group is contributing

4    intellectual property into NewCo that will enhance the

5    ability to get -- obtain higher yields on Ethereum staking

6    than would be possible by someone doing it themselves. So

7    that, we think, is a key, a key point.

8            And then the third, you know, there are many

9    different kind of illiquid assets that are on the balance

10   sheet. The Arrington team in particular is very skilled at

11   managing those and looking at ways to both get them

12   ultimately liquid, but also be able to, you know, manage the

13   value of those assets.

14           THE COURT:  What's the approximate value of

15   Ethereum that's being seeded into NewCo?

16           MR. KOKINOS:  So it's approximately 450 million

17   with one modifier. I know the Cedarvale deal is being

18   discussed here. If the Cedarvale deal does happen, then I

19   believe it would be reduced to approximately 420 million.

20           MR. MCCARRICK:  Turning to the mining business

21   which you were just discussing a little bit, what steps is

22   Fahrenheit taking to set the NewCo mining business up for

23   success, or what's the business case for mining on a go-

24   forward basis?

25           MR. KOKINOS:  Sure. I mean, I think this is an

Page 132

1    important one. I think one of the things that excites us

2    about US Bitcoin as a partner is that, you know, their focus

3    has really been on vertical integration. Owning property,

4    being able to build that infrastructure, that we -- that

5    NewCo will ultimately own, and then enable us to be more

6    efficient than, you know, others in a competitive situation.

7    Which mining is. And so if you look at, you know, whether

8    it's a property like Cedarvale or potentially other

9    opportunities, should the Board, you know, be open to

10   further investments, we think that US Bitcoin is

11   particularly well situated to help us both build out those -

12   - that new infrastructure, but also manage it in a very

13   efficient way. And I think our belief is that moving away

14   from third-party hosted contracts as quickly as possible

15   will yield economic benefit to NewCo.

16           MR. MCCARRICK:  All right, Mr. Kokinos, can you

17   open the binder in front of you at Celsius Exhibit 61.

18           MR. KOKINOS:  Exhibit 61

19           THE COURT:  Is it his Declaration?

20           MR. KOKINOS:  Yes.

21           MR. MCCARRICK:  Yes. Celsius Exhibit 61 is a copy

22   of Mr. Kokinos' Declaration, which is filed at Docket Number

23   3591. Is that a true and accurate copy of your Declaration,

24   sir?

25           MR. KOKINOS:  yes, it is.

Page 133

1          MR. MCCARRICK:  Do you adopt the statements in

2     your Declaration as your testimony under oath here today?

3          MR. KOKINOS:  I do.

4          MR. MCCARRICK:  All right, this next exhibit I'd

5     like to -- the Debtors offer Exhibit Celsius Exhibit 61 into

6     evidence.

7          THE COURT:  Any objections? Exhibit 61 is admitted

8     into evidence.

9          (Debtors' Exhibit 61 Received into Evidence)

10         MR. MCCARRICK:  All right, I'd like to now turn to

11    Exhibit 3 in your binder.

12         MR. KOKINOS:  Okay.

13         MR. MCCARRICK:  Celsius Exhibit 3 is the Debtors'

14    Disclosure Statement filed at Docket 2902.

15         MR. KOKINOS:  Okay.

16         MR. MCCARRICK:  And this is an excerpt of that

17    Disclosure Statement, Pages 296 to 324 of the Disclosure

18    Stmt. What are Pages 296 to 394 of Celsius Exhibit 3?

19         MR. KOKINOS:  I just wanna make sure --

20         THE COURT:  The copy says to 332.

21         MR. MCCARRICK:  332.

22         MR. KOKINOS:  I have Page 301 to 332, is what it

23    shows on mine, is that right?

24         THE COURT:  I have 296 to 332.

25         MR. MCCARRICK:  One second.

Page 134

1          MR. KOKINOS:  Oh, I apologize. There we are. You

2     guys are right, I missed the cover pages. 296 to 332, yes.

3          MR. MCCARRICK:  296 to 332?

4          MR. KOKINOS:  You got it.

5          MR. MCCARRICK:  Okay. What are Pages 296 to 332 of

6     Celsius Exhibit 3?

7          MR. KOKINOS:  This is a presentation that we

8     provided outlining some of the highlights of Fahrenheit's

9     approach to NewCo.

10          MR. MCCARRICK:  Is it a fair description and

11     summary of the highlights of Fahrenheit's approach?

12          MR. KOKINOS:  Yes.

13          MR. MCCARRICK:  And do you stand by --

14          MR. KOKINOS:  Yes.

15          MR. MCCARRICK:  -- that business plan?

16          MR. KOKINOS:  Yeah, we do.

17          MR. MCCARRICK:  Your Honor, at this time we admit

18     that excerpt of Exhibit 3 into evidence.

19          THE COURT:  Any objections to the Court admitting

20     in evidence Celsius Exhibit 3? All right, it's admitted into

21     evidence.

22          (Celsius Exhibit 3 Received into Evidence)

23          MR. MCCARRICK:  Okay. Your Honor, I have nothing

24     further for this witness, happy to pass.

25          THE COURT:  Thank you. All right, cross-

Page 135

1    examination. First does Committee wish to examine?

2                MR. COLODNY:  No.

3                THE COURT:  US Trustee?

4                MS. CORNELL:  Just one question, Your Honor.

5                THE COURT:  Go ahead, Ms. Cornell.

6                MS. CORNELL:  Good morning, Your Honor.

7                THE COURT:  I've rarely heard somebody say they

8    only have one question and then stick by it.

9                MS. CORNELL:  I only have one, I swear it, one.

10               MR. KOKINOS:  Morning.

11               MS. CORNELL:  Shara Cornell, I'm here for the

12   Office of the United States Trustee. I just wanted to ask

13   one clarifying question from your testimony earlier. You

14   indicated that a $30 million, $30 million would be paid into

15   NewCo upon emergence. Could you just explain a little bit

16   better for the record what emergence means to you?

17               MR. KOKINOS:  Sure. You know, I guess upon the

18   plan effective date is what I should've chosen for words.

19               MS. CORNELL:  Thank you. That's all I have, Your

20   Honor.

21               THE COURT:  Congratulations. All right. Any other

22   cross-examination of Mr. Kokinos?

23               MR. DIXON: Yes, Your Honor.

24               THE COURT:  Mr. Dixon, I see you on the screen.

25   You wish to examine?

Page 136

1           MR. DIXON:  Yes, hello, hello, Mr. Kokinos.

2           MR. KOKINOS:  [indiscernible]

3           MR. DIXON:  How are you doing. If you've -- I

4    didn't see in the Disclosure Statement any disclosure on who

5    the ultimate beneficial owners of Fahrenheit are. Would you

6    mind sharing the relative UBOs for Fahrenheit?

7           MR. KOKINOS:  Of who the ultimate beneficial

8    owners of Fahrenheit are?

9           MR. DIXON:  Yeah, and, like, the relative

10   percentages, and, like, the makeup of the shareholding.

11          MR. KOKINOS:  Sure. The five partners that I --

12   five principals that I mentioned before are the beneficial

13   owners. Arrington Capital, US Bitcoin, or I believe it's a

14   designee from US Bitcoin, Sonic Boom Capital, which is my

15   family office, Ravi Kaza in his individual capacity in Proof

16   Group.

17          MR. DIXON:  And are they --

18          THE COURT:  Excuse me. He also asked about the

19   relative percentage of each -- ownership of each of those

20   five.

21          MR. KOKINOS:  Yeah, I don't know the exact

22   percentages, but US Bitcoin and Arrington Capital are

23   larger, the two larger investors. And then the other three

24   are somewhat smaller.

25          MR. DIXON:  Excellent. And could you help us --

Page 137

1    could you tell us what the source of funds are for the 30

2    million, where are the funds coming from?

3            MR. KOKINOS:  Sure. Well, you know, I can't speak

4    for the others, I can speak for myself. It's coming from,

5    you know, personal family money that's going in. But it is

6    our money and for the other investors it's, you know, funds

7    coming from their funds or themselves.

8            MR. DIXON:  Okay. So this is an external capital

9    from [indiscernible] or is it all just the principals?

10           MR. KOKINOS:  I don't, you know, I'm not aware of

11   what the specifics of how Proof Group is investing. You

12   know, so I can only speak for myself. The others are

13   investing through their funds.

14           MR. DIXON:  Okay. And then, do we know the breakup

15   of, like, the 33 million, like, relative? Is it, is, like,

16   the larger percentage coming from US Bitcoin or Michael

17   Arrington?

18           MR. KOKINOS:  Yeah, I believe I already answered

19   that.

20           THE COURT:  Answer it again.

21           MR. KOKINOS:  Okay. US Bitcoin and Arrington

22   Capital are the largest investors of the group, and the

23   remaining three are somewhat smaller. But it's not the case

24   that if there's any, you know, disproportionate.

25           MR. DIXON:  Okay. Do you -- are you aware of

Page 138

1   anything that would prevent NewCo being able to invest in

2   Fahrenheit if it ever wanted additional capital so that

3   NewCo and Fahrenheit could align interests, given it's going

4   to be the manager?

5           MR. KOKINOS:  I'm not sure I really -- maybe you

6   could restate. I don't completely understand what you're --

7           MR. DIXON:  Yeah, sure. Because, you know,

8   Fahrenheit is going to be the beneficial of most of the

9   management contracts, are you aware of anything, like, where

10  NewCo might be able to invest in Fahrenheit, to become an

11  equity holder in Fahrenheit so that they would have complete

12  alignment of interests?

13          THE COURT:  Let me ask this question. Are there

14  any restrictions on NewCo investing in Fahrenheit?

15          MR. KOKINOS:  Not that I'm aware.

16          THE COURT:  Okay, ask your next question.

17          MR. DIXON:  That's all. Thank you, Your Honor.

18  Thank you, Mr. Kokinos.

19          THE COURT:  All right, anybody else wish to cross-

20  examine?

21          MR. SHEIK:  Yes, Your Honor.

22          THE COURT:  Mr. Sheik, go ahead.

23          MR. SHEIK:  Okay. So, Mr. Kokinos, I wanted to

24  ask, was there a reason why you guys decided to increase the

25  number of Board Committee members from seven to nine?

Page 139

1          MR. KOKINOS:  Well, we -- this wasn't a decision

2     that we made. We had discussions with the Committee just to

3     --

4          THE COURT:  With the Creditors Committee?

5          MR. KOKINOS:  With the Creditors Committee around

6     Board composition. The original Board composition was a

7     seven-person board, of which we would have two seats and

8     consent rights over two additional seats. The Committee

9     approached us about the possibility of increasing the Board

10    size from seven to nine, where we would get three seats and

11    maintain consent rights over two of the seats as we had had

12    previously. We didn't have any objection to that, and so,

13    you know, that's where that went.

14         MR. SHEIK:  Is it correct that during the two

15    Spaces that you guys held via Zoom and on Twitter Spaces,

16    with the creditors, you had mentioned -- well, not

17    specifically you, but, you know, Fahrenheit had mentioned

18    that there would be -- that the creditors would be able to

19    sit on this Board and have maximum representation. Is that

20    correct?

21         MR. KOKINOS:  I don't have the recording of that,

22    but my recollection is somewhat different. I believe what we

23    -- my recollection was from Spaces, was that the creditors

24    would be the majority shareholders of this new business, and

25    would also have the majority of seats on the Board. And as a

Page 140

1  result, would have, you know, by nature, you know, a control

2  position over what goes on in the new company?

3          MR. SHIEK:    So then, if that is the case, then

4  why would there be a change in courts with, you know, an

5  increase from seven to nine and zero representation of

6  committee members to the board other than having observer

7  spots. That was a bit of a surprise to us.

8          MR. KOKINOS:   I wasn't, so first of all, you

9  know, the selection of the board wasn't our, you know, we

10 were not the ones constructing the board. It was the

11 committee so I think it's worth being clear there. And to

12 our, you know, to my knowledge there are two UCC members who

13 are on the board and that there also board observers that

14 are creditors as well.

15         MR. SHIEK:    Okay. And when it came to the

16 selection of notable, you know, members of this committee,

17 Emanual Idu [ph] and Ms. La Palma [ph], I believe that's her

18 last name. Was that a decision that was made by Fahrenheit?

19         MR. KOKINOS:   As, you know, I stated previously,

20 the committee as the right to select their board members. We

21 had consent rights over two of those seats. Irrespective of

22 that, the committee presented the names of their candidates

23 to us, Fahrenheit members both spoke with them and reviewed

24 their backgrounds and CVs. And we had no objections to the

25 members who were chosen to the board.

Page 141

1              MR. SHIEK:    So there was not a selection by

2    Fahrenheit?

3              MR. KOKINOS:    No.

4              MR. SHIEK:    Okay.

5              MR. KOKINOS:    Other than --

6              MR. SHIEK:    Who were the two selected by --

7              THE COURT:    Hold on. Hold on.

8              MR. SHIEK:    Sorry, go ahead.

9              MR. KOKINOS:    I was just going to say --

10             THE COURT:    Go ahead.

11             MR. KOKINOS:    -- to be perfectly clear, other

12   than to the extent that for the two seats that we had

13   consent rights to, but we did not object to those seats.

14             THE COURT:    Go ahead, Mr. Shiek.

15             MR. SHIEK:    Thank you. So when it came to the

16   selection, the last minute change of, let's say, Mr.

17   Arrington bowing out of the selection committee, I'm sorry,

18   the board, was there a reason why that, you know, that

19   change was made in the last minute?

20             MR. KOKINOS:    Mike Arrington had, you know,

21   personal thoughts on the composition of the board.

22   Fahrenheit, as a group, is comfortable with the composition

23   of the board and board observers and felt, you know, it was

24   best to appoint Robbie as a new board member as Mr.

25   Arrington wasn't comfortable.

Page 142

1           MR. SHIEK:     Okay. Now when it comes to the

2    composition of the board, I had asked a previous question to

3    Mr. Ferraro, which I'll ask you as well. When it comes to

4    the true revenue streams which are basically the mining

5    company and the staked Eth, I believe Mr. Asher Genoot has

6    been brought onto the board as the representative from

7    USBTC, is that correct?

8           MR. KOKINOS:   Yes, that's right. Asher will be

9    one of the board members.

10          MR. SHIEK:     Great. Now Asher is currently in a

11   position where he is both, or at least in three positions,

12   he's the CEO of US Bitcoin, he's the CEO of Hut 8, he's also

13   in the middle of a merger, and he's also responsible for

14   managing this mining company for NewCo. Do you think that

15   that is a bit of a large undertaking as in he may be spread

16   a little too thin?

17          THE COURT:     Mr. Shiek --

18          MR. KOKINOS:   [indiscernible]

19          THE COURT:     Hold on. Mr. Shiek included various

20   assumptions that are in evidence before the court. Do you

21   know those to be true?

22          MR. KOKINOS:   No.

23          MR. SHIEK:     Yes, Your Honor, I do.

24          THE COURT:     I'm sorry, your --

25          MR. SHIEK:     Oh, I'm sorry.

Page 143

1          THE COURT:     -- your objection is sustained to

2     your question.

3          MR. SHIEK:     Okay, no worries. Thank you. I'll

4     proceed then. So when it comes to, you know, the makeup of

5     this board, it seems like NewCo is largely, well this plan

6     sponsor will largely be, you know, responsible for

7     overseeing the mining company since staked Eth is kind of

8     set to autopilot. So why add more members to the board when,

9     you know, the bulk of the responsibility will lie on USBTC

10    and Asher Genoot as CEO.

11         UNIDENTIFIED SPEAKER #1: Objection.

12         THE COURT:     Objection sustained.

13         MR. SHIEK:     Okay. Your Honor, I think that's

14    all I have.

15         THE COURT:     All right. Thank you --

16         MR. SHIEK:     I appreciate it, thank you.

17

18         THE COURT:     Thank you very much, Mr. Shiek.

19    Anybody else have any questions?

20         MR. PHILLIPS:  Yes, Your Honor.

21         THE COURT:     Mr. Phillips?

22         MR. PHILLIPS:  Thank you, Your Honor. Mr. Kokinos,

23    I wanted to go back to the issue of Fahrenheit's overall

24    investment in NewCo. What the portion of the 50 and of the

25    33 million are you responsible for?

Page 144

1            MR. KOKINOS:   Approximately 6 million.

2            MR. PHILLIPS:  Thank you. Is that of the 50 or of

3      the 33?

4            MR. KOKINOS:   I honestly, I can't recall right

5      now because the numbers have moved around. But I believe out

6      of the 30.

7            MR. PHILLIPS:  You think of the 33? I'm sorry, I

8      didn't hear.

9            MR. KOKINOS:   Yeah, I believe of the 33.

10           MR. PHILLIPS:  Can you help us understand why that

11     being upfront was reduced from 50 million to 33 as opposed

12     to, you know, structuring it maybe with all 50 up front and

13     then giving back the 33 if you exit off [indiscernible]?

14           MR. KOKINOS:   Our understanding coming out of the

15     option was that there was a five year deal and that that's

16     what we were contributing into. You know, subsequent

17     discussions that were productive with the committee and the

18     debtors suggested that the committee would like to have, to

19     turn years four and five into their option rather than a

20     commitment to have us manage the company for those five

21     years. And pursuant to those discussions we arrived at a

22     different formula.

23           MR. PHILLIPS:  And why, do you think that the

24     structure using a termination fee as opposed to an increase

25     fee for the additional year would have been beneficial to

Page 145

1    the NewCo shareholder?

2         MR. KOKINOS:   This was all of the structure that

3    all the parties felt comfortable with and agreed to.

4         MR. PHILLIPS:  Okay. All right. In your

5    declaration, in paragraph 14, you talk about the NewCo

6    mining [indiscernible] and Exhibit E to the disclosure

7    statement, so that Exhibit E to the disclosure statement,

8    which I believe are incorporated into three of the debtors.

9    And I also, Your Honor, did submit some exhibits for cross

10   exam which, albeit, past the 5:00 p.m. deadline because,

11   like that caught me by surprise yesterday. But if I could

12   refer you to --

13        MR. KOKINOS:   I'm not sure which exhibit or page

14   you're looking at.

15        THE COURT:    If you'll hold on Mr. Phillips --

16        MR. PHILLIPS:  Well --

17        THE COURT:     -- Mr. McCarrick is going to bring

18   him the position exhibits. Okay? Just hold on.

19        MR. PHILLIPS:  Sure. I'd like to start with

20   Exhibit E if that's possible.

21        MR. MCCARRICK: Mr. Phillips, for the record, are

22   these the excerpts that you submitted on the docket last

23   night? That's the filing that I gave him.

24        MR. PHILLIPS:  Yes, they are. I believe that

25   they're also contained, Mr. McCarrick, within your exhibits

Page 146

1   as well.

2           MR. KOKINOS:   So this is from Exhibit E of

3   disclosure statement and there's a chart, that's what you're

4   looking at?

5           MR. PHILLIPS:  Correct.

6           MR. KOKINOS:   Okay.

7           MR. PHILLIPS:  That is the one I'd like to start

8   with. Thank you.

9           Mr. MCCARRICK: [indiscernible]

10          MR. KOKINOS:   Thank you.

11          THE COURT:     What's the question?

12          MR. PHILLIPS:  Okay, so are you responsible or is

13  the Fahrenheit team responsible for this exhibit?

14          THE COURT:     You're referring to Exhibit E of

15  the disclosure statement?

16          MR. PHILLIPS:  Correct.

17          MR. KOKINOS:   I believe, I just need to

18  understand where this chart came from. Is this the debtors'

19  financial projections in the disclosure statements? Okay. So

20  what I would say is no, we were not responsible for these.

21  However, Fahrenheit did provide input into certain aspects

22  of this principally around the network hash rate assumptions

23  and BTC price over time.

24          MR. PHILLIPS:  Okay, so let's focus on those two

25  elements. So you said Fahrenheit did provide input into the

Page 147

1    network hash rate, again, which starts at 307, September

2    '24. Correct?

3              MR. KOKINOS:    Mm-hmm.

4              THE COURT:      You have to answer yes or no.

5              MR. KOKINOS:    I'm sorry, yes.

6              MR. PHILLIPS:   Do you know what the actual hash

7    rate in September of 2024 was?

8              MR. KOKINOS:    I know what the hash rate is today,

9    I do not know what it was in September '24.

10             MR. PHILLIPS:   What is it today?

11             MR. KOKINOS:    Approximately 480.

12             MR. PHILLIPS:   Okay, so if the hash rate is

13   approximately 480, which if I look here is not going to

                              th
14   exceed again until September 26 , what does that imply as to

15   the profitability and cash flow you've dealt with netcap,

16   CapEx that are shown on this chart?

17             MR. KOKINOS:    Well, first of all, I don't have

18   the details of this financial projection so it's hard for me

19   to speculate on, you know, what that would, you know, how it

20   would change the numbers. I think it's impossible for me to

21   say in isolation, you know, what impact that would have

22   without, you know, having a spreadsheet and deeper data

23   here. And I wasn't a party --

24             MR. PHILLIPS:   Would it be --

25             THE COURT:      [indiscernible]

Page 148

1          MR. KOKINOS:    -- to the calculation.

2          MR. PHILLIPS:  Would it be fair to say that the

3    network share would drop from three and a half to a lower

4    number more in accordance to about, you know, two and a

5    half?

6          MR. KOKINOS:   I mean, I think it is a fair

7    assumption that if your hash rate, if the network hash rate

8    is going up then, you know, you would have a smaller share

9    of it. I agree. I think in reality it's likely not that

10   simple, which is why, you know, I would need to defer to

11   look at these. And again, I would just say that the specific

12   calculations here were done by the debtor. We gave input as

13   to the reasonableness on, you know, certain aspects here

14   which, you know, we felt were reasonable at the time and

15   stand by, you know, that. Obviously, you know, Bitcoin is a

16   volatile asset and network hash rates are a volatile thing

17   as well so they go up and they go down.

18          MR. PHILLIPS:  So you think that now that hash

19   rates are 60 percent higher, in actuality than has been

20   illustrated on this chart, that this number is still

21   feasible?

22          MR. KOKINOS:   What was in my testimony --

23          MR. PHILLIPS:  [indiscernible]

24          MR. KOKINOS:    -- and what I am reiterating here,

25   is that, you know, the numbers as presented with the

Page 149

1    information that we had at the time, was reasonable and we

2    stand behind that.

3            MR. PHILLIPS:  And you agree that if the network

4    hash rate is substantially higher than was illustrated here,

5    the profitability would be lower? Not saying a particular

6    number but that it would actually be lower for sure.

7            MR. KOKINOS:   I'm not sure I agree with that part

8    of your statement. I think we, you know, as all things in

9    business and forecasting, you know, you have to look at the

10   totality of it. I don't have the levers in front of me to

11   understand, you know, how that might change or what other

12   decisions might go along with, you know, changes in a

13   dynamic environment. I think that's part of capital

14   allocation and risk management and those are the sorts of

15   things that we would look at. But I think the assertion

16   you're trying to make is that we would just leave the

17   business alone in the face of changing dynamics and I don't,

18   you know, I'm not suggesting that's true. That's something

19   we'll work with the board on to determine kind of the

20   appropriate course forward. And, again, the numbers that,

21   you know, as presented and the projects at the time, they

22   were reasonable and we stand behind that.

23           MR. PHILLIPS:  Okay, I understand you had reason

24   with this at the time presented but would you agree that as

25   your percentage of network hash rate goes down that the

Page 150

1    revenue holding Bitcoin plays constant that your revenues

2    would go down?

3              MR. KOKINOS:   I'm not sure I agree with that

4    because you have other variables such as price and, you

5    know, other elements that --

6              MR. PHILLIPS:  I said when Bitcoin price --

7              THE COURT:     Don't interrupt. Mr. Phillips,

8    don't interrupt the witness.

9              MR. PHILLIPS:  Sorry.

10             THE COURT:     Go ahead.

11             MR. KOKINOS:   Yeah, what I was saying is, you

12   know, you're taking one variable in isolation and in a

13   complex business there are many different variables that

14   could offset and you have to look at those things

15   holistically.

16             MR. PHILLIPS:  Okay, but assuming Bitcoin price is

17   constant, if your share of the network hash rate decreases,

18   would you agree that revenues decrease?

19             MR. KOKINOS:   All things being equal, yes.

20             MR. PHILLIPS:  Thank you. And if those revenues

21   decrease, all other elements being equal, profitability and

22   cash flow, also decrease.

23             MR. KOKINOS:   What was the, could you repeat

24   that?

25             MR. PHILLIPS:  I was saying that if revenues

Page 151

1    decrease, and all clear things being equal, that

2    profitability and cash flow also decrease.

3              MR. KOKINOS:   I mean, yes --

4              MR. PHILLIPS:  Do you agree?

5              MR. KOKINOS:   -- what you said makes logical

6    sense. What I'm saying is as, you know, a business person

7    and somebody's going to be running the business, we would

8    not look at things in such a static way. We would, you know,

9    look at what different elements of the business need to be

10   adjusted as market conditions change.

11             MR. PHILLIPS:  But in general, if hash rate,

12   network hash rate increased, in order to be competitive and

13   produce the same amount of profits that really you would

14   incur to increase costs then.

15             MR. KOKINOS:   Could you rephrase what you're

16   saying? I'm trying to follow you here.

17             MR. PHILLIPS:  Would you agree then, you know, you

18   mentioned that as a business operator that you would make

19   adjustments. And that if the operating conditions were such,

20   your network hash rate was low, or your overall share of the

21   network hash rate was lower, Bitcoin price was constant,

22   let's assume that for now, that, you know, that the

23   adjustments that you would have to make in order to maintain

24   or exceed this level of profitability would then, or to

25   achieve it. I don't know how you would. But maybe you have a

Page 152

1    magic dial, but you would have to increase your --

2              THE COURT:     You're rambling on with the

3    question. And start the question again. Ask a quick, crisp

4    question if you wish the witness to answer.

5              MR. PHILLIPS:  In order to maintain --

6              THE COURT:     You're not testifying, Mr.

7    Phillips. Ask simple direct questions.

8              MR. PHILLIPS:  Okay. Assuming Bitcoin price is

9    constant, and the network hash rate is higher than

10   illustrated here, in order to achieve the same level of

11   revenue then, you would have to increase your direct cost in

12   order to achieve that revenue level as one of your business

13   operation adjustments.

14             MR. KOKINOS:    I agree, that's one possibility.

15   What I would say though is our focus, you know, in that, you

16   know, if you look at a market which was going in that

17   direction would be where are there efficiency improvements,

18   you know, that could be employed to better manage the

19   business. How do we drive cost out and/or, you know, are

20   there, as an example, are there certain locations that are

21   higher cost versus lower cost. You would turn of the higher

22   cost locations and run the lower more optimized ones. So I

23   hear what you're saying, I'm not sure that it follows

24   logically the profitability would decline simple as a result

25   of one of these numbers being held constant or going in a

Page 153

1   different direction. And that's part of the nuance of, you

2   know, managing a Bitcoin mining business. Is you have to

3   look at all these variables together to come up with the

4   right answer and, you know, that's what we will seek to do

5   at NewCo with the board's consent.

6           MR. PHILLIPS:  Okay. So knowing what you now know

7   today about the network in its current state, do you believe

8   these projections to still be accurate and conservative or -

9   -

10          THE COURT:    I don't know what accurate means.

11  Projections can be reasonable, they could be not reasonable.

12  Finish up your --

13          MR. PHILLIPS:  Do you --

14          THE COURT:    -- finish up your question, Mr.

15  Phillips, let's go.

16          MR. PHILLIPS:  Okay. Do you believe that these

17  projections are reasonable?

18          MR. KOKINOS:   I, you know, previously answered

19  this.

20          THE COURT:    Do you believe the projections are

21  reasonable?

22          MR. KOKINOS:   Yes.

23          THE COURT:    Okay. One more question, Mr.

24  Phillips.

25          MR. PHILLIPS:  Okay. One moment, please, Your

Page 154

1    Honor. So, as the previous question Mr. Sheik was mentioning

2    about Asher Genoot being brought onto the board when the

3    board was expanded from seven to nine. Why was Asher Genoot

4    appointed to the Fahrenheit board?

5            MR. MCCARRICK: Asked and answered.

6            THE COURT:    Sustained. You've asked your

7    questions. Next person. Anybody else wish to cross examine?

8            THE CLERK:    I don't see any additional hands

9    raised, Judge.

10           THE COURT:    All right, any redirect?

11           MR. MCCARRICK: No, Your Honor.

12           THE COURT:    All right, you're excused. Thank

13   you very much.

14           MR. KOKINOS:    Thank you.

15           THE COURT:    All right, we're going to take a

16   lunch break. It is 12:38. We'll resume, who's

17   [indiscernible]?

18           MR. MCCARRICK: The next witness would be Ryan

19   Kielty.

20           THE COURT:    Try it again.

21           MR. MCCARRICK: Ryan Kielty of Centerview.

22           THE COURT:    Okay. 2:00. Everybody can leave

23   things in the courtroom.

24           MR. MCCARRICK: Thank you, Your Honor.

25           (Whereupon the proceedings were paused at 12:38

Page 155

1    for a lunch break.)

2            (Whereupon proceedings were resumed at 2:01 p.m.)

3            THE CLERK:     All rise.

4            THE COURT:     Please be seated. Mr. McCarrick.

5            MR. MCCARRICK: T.J. McCarrick, Kirkland and Ellis

6    on behalf of the debtors. The debtors call Ryan Kielty to

7    the stand.

8            THE COURT:     You'll raise your right hand,

9    you'll be sworn in.

10           UNIDENTIFIED SPEAKER:    Do you solemnly swear

11   that [indiscernible] today before the [indiscernible]?

12           MR. KIELTY     I do.

13           THE COURT:     All right.

14           MR. MCCARRICK: Permission to approach the witness

15   in the [indiscernible] --

16           THE COURT:     Yes, please.

17           MR. MCCARRICK: -- copy of the binder.

18           THE COURT:     Absolutely.

19           MR. KIELTY:    Thank you.

20           THE COURT:     Just for everyone's guidance, we

21   will need to break at about 4:50, 4:55, I have another, I

22   have a 5:00 here. I have another matter. So --

23           MR. MCCARRICK: May I proceed?

24           THE COURT:     Please.

25           MR. MCCARRICK: Can you introduce yourself to the

Page 156

1    court?

2         MR. KIELTY:   Sure, my name is Ryan Kielty. I'm a

3    partner with Centerview Partners in the debt advisory and

4    structure and practice.

5         MR. MCCARRICK: What kind of firm is Centerview,

6    Mr. Kielty? What sort of work does Centerview do?

7         MR. KIELTY:   Centerview is an investment banking

8    advisory firm. We provide companies and occasionally

9    creditors with advice on mergers and acquisitions, on

10   restructuring matters, on financing processes, on liability

11   management, a full range of corporate finance advisory help.

12        MR. MCCARRICK: What, if any, experience do you

13   personally have in restructuring matters?

14        MR. KIELTY:   For approximately 17 years I've

15   been working in the debt advisory infrastructure industry,

16   initially with Noah Bruckfire [ph]. And then starting in

17   2011 with Centerview Partners. Both consistent roles

18   advising companies and creditors in restructuring matters.

19        MR. MCCARRICK: How did Centerview become involved

20   in these Chapter 11 cases?

21        MR. KIELTY:   Centerview was retained by the

22   debtors in June of 2022 to provide advice on a full range of

23   financing, structuring alternatives. And sale alternatives.

24        MR. MCCARRICK: I'm going to talk about two areas

25   and your involvement in these cases. The first is the sales

1    process for the debtors. And the second is the valuation of

2    the debtors mining business.

3            MR. KIELTY:    Okay.

4            MR. MCCARRICK: Are you familiar with the marketing

5    sales and auction process that the debtors participated in

6    for their assets?

7            MR. KIELTY:    Yes, I am.

8            MR. MCCARRICK: Let's start with fall of 2022. Can

9    you describe the initial sales process?

10           MR. KIELTY:    Sure, so I think just for

11   organization, I'll start with the mining sale process even

12   though the kickoff of that lagged the, what I'll call the

13   platform sale process by a few months. So we initiated a

14   mining sale process in November of 2022. We contacted over

15   70 potential acquirers. I think the exact number was 78. We

16   signed about 15 nondisclosure agreements for parties of that

17   78 that were interested in participating in the process. And

18   the sale process mandate was quite broad. At that point we

19   did not know exactly what the shape of the case, ultimate

20   plan or sale would take. And so we were open and flexible to

21   bids in all forms. Bids for individual mining assets, bids

22   for the mining business as a whole co, bids for parties that

23   wished to reorganize the mining business and leave an equity

24   stake behind for creditors. Sort of the broad structure.

25   After a month of providing diligence information, including

Page 158

1    a business plan, structural information about all the

2    assets, diligence you'd expect to include in a sale process.

3    In December we received seven bids. Three of those bids were

4    for the mining business in its entirety. And then four bids

5    were for individual assets of the mining business. Of the

6    three holistic bids for mining, one of them was for $10

7    million plus a very small earn out. One of them was for an

8    enterprise value of approximately 175 million but that

9    enterprise value was contingent upon those proceeds being

10   financed in the marketplace. The buyer was not coming to the

11   table with any cash proceeds for the assets and financing at

12   that time was very difficult and we do not believe that

13   financing could be raised to fund that purchase. And then

14   the third whole co-bid was for an enterprise value of

15   approximately $300 million but that bid would have left the

16   creditors of the debtors with a very small equity stake

17   sitting behind a tranche of debt, large tranche of debt that

18   the buyer was proposing to put in and own which had punitive

19   terms.

20           MR. MCCARRICK: All right, you just talked about

21   the mining bids. You had also mentioned some platform bids.

22   Can you describe the platform bids that the debtors received

23   in connection with the sales process?

24           MR. KIELTY:     Sure. I guess before I get there,

25   the other four bids for mining were bids for individual

Page 159

1    assets, primarily bids for small selections of rigs, eight

2    to ten thousand rigs with prices in the 350 to 550 dollars

3    per rig level. For the platform bid process, we started that

4    process earlier in September of 2022. We reached out to a

5    similar number of parties for the mining business, over 70,

6    signed a similar quantum of NDA's, 15. So an aggregate

7    between the two processes there was a little bit of overlap

8    but we reached out to about 135 total bidders for the two

9    asset buckets. Similar to the mining process, we were

10   flexible on the bids that we would consider. We would

11   consider all structures. We would also consider bids that

12   included mining, bids that excluded mining, again, because

13   we weren't sure exactly what that value maximizing

14   formulation of sale would be. We did extensive diligence

15   with those bidders. Ultimately at the end of November we

16   received three bids for the non-mining assets as a whole and

17   then two bids for specific assets of non-mining, mostly

18   focused on the company's large staked ETH position, which

19   brought substantial discounts. So of the three bids that

20   were total company bids, we received a NovaWulf bid, which

21   we ultimately selected as the stalking horse. And we

22   received two other bids, one of them was from a party that

23   was seeking to take the non-mining assets of Celsius, a

24   subset of them actually not even all of them, put them onto

25   their platform, open accounts for Celsius creditors and then

1    allow Celsius creditors access to those assets with trading

2    fees and other economics for the acquirer. And that bidder

3    had had regulatory issues in other Chapter 11 cases that

4    were going on at the time so we didn't feel that bid was one

5    we could pursue. And then the second bid, other than the

6    NovaWulf bid was from a party that had a relatively small

7    platform at the time and was looking to set up individual

8    SPV's for Celsius' non-mining assets that would be

9    individually traded on that platform. And that was just,

10   that platform was not tested at the quantum of what that

11   transaction would be. It had only transacted a small

12   fraction of the total asset size of what the Celsius bid

13   would mean for that company. And also because the assets

14   would be individually traded, we thought liquidity would be

15   at issue. And so at that point the NovaWulf bid which

16   provided a comprehensive solution for the vast majority of

17   Celsius' assets, including mining, we thought was the best

18   bid and we thought it was important to have a floor for the

19   sale process going forward. And so we moved to make that

20   bid, the stalking horse. So I think the, one of the factors

21   we've learned from the mining process that sort of informed

22   our selection when it came to the platform-winning-bidder

23   was that the mining bids were very, very low for the total

24   company and/or inexecutable. And so it was, we thought it

25   was important that there be a solution for mining to

1    effectively delivery the equity of mining back to the

2    creditors because selling it at that time didn't make sense.

3    And so that was sort of further rational for why the

4    NovaWulf we viewed at the time is the best path forward.

5            MR. MCCARRICK: When you describe the NovaWulf as a

6    stalking Horse, what exactly do you mean by that?

7            MR. KIELTY:    I mean that what we intended was

8    that NovaWulf there would be a floor and that it would

9    provide certainty to the estates of an exit at a time in the

10   future and that we would use that floor as a springboard to

11   further market the assets in the hopes that we could have a

12   competitive process which we ended up, which we did.

13           MR. MCCARRICK: Okay.

14           THE COURT:    What was the Bitcoin price at the

15   time of the NovaWulf bid?

16           MR. KIELTY:    So the Bitcoin price in November, I

17   don't remember off the top of my head, Your Honor, I

18   apologize.

19           MR. MCCARRICK: You describe the --

20           MR. KIELTY:    I think I remember it being 24-ish,

21   perhaps, something like that.

22           MR. MCCARRICK: You describe the competitive

23   process that followed selection of NovaWulf as the stalking

24   horse bid, was that processed in the auction?

25           MR. KIELTY:    I'm sorry, can you repeat that

Page 162

1    question?

2              MR. MCCARRICK: Yeah, sure. Following the selection

3    of the NovaWulf bid you testified that there was a

4    competitive process, was that the auction process?

5              MR. KIELTY:    So after the stalking horse bid was

6    selected, we made calls to parties that had declined in the

7    sale process that had let up to that point. We also got

8    inbounds from other parties like the Fahrenheit Group that

9    had not participated previously in the sale process. And so

10   we conducted diligence with those bidders and set a

11   qualified bid deadline in this spring of 2023. And we

12   collected additional bids from Fahrenheit and BRICK and one

13   other at that point. So that's the process that came after

14   the selection of the Stalking Horse. And then at that point

15   we selected Fahrenheit and BRICK and we qualified those

16   bidders and together with NovaWulf they participated in the

17   auction. The other bid that I mentioned that we received at

18   that time, there were significant financing contingencies

19   and from a diligence perspective they were months and months

20   behind the other bidders and so we didn't feel that that was

21   actionable.

22              THE COURT:    Had you reached out to BRICK and

23   Fahrenheit during the initial round of assessing interest in

24   this?

25              MR. KIELTY:    So Fahrenheit as an investor group

1    was not composed yet and so we did not reach out to the

2    members of Fahrenheit because I think on their own, given

3    the size of the assets we were marketing, they wouldn't have

4    been actional bidders and we didn't think to call them up at

5    that time. With BRICK we got an inbound from Global X

6    Digital in the fall around the September, October timeframe.

7    We had sent them an NDA, they didn't come back to us but

8    then they re-engaged after the stalking horse bid was put on

9    the record and so we engaged with them at that time.

10           MR. MCCARRICK: I guess, what group was ultimately

11   successful in their bid and why?

12           MR. KIELTY:   So we, together with the creditors

13   committee ultimately selected Fahrenheit as the winning

14   bidder. As it's described in the disclosure statement, at

15   the outset of the auction we had selected the BRICK which

16   was a winddown bid as the highest and best. Because at that

17   time with what had happened to Bitcoin prices and the other

18   factors around the industry, the fees in the NovaWulf bid

19   were entirely too high. And at that point a winddown made

20   the most sense given that a fee structure that was contained

21   in that bid. In, I'm not sure if it was the second or third

22   round of the auction, both platform NewCo bidders,

23   Fahrenheit and NovaWulf significantly improved their fee

24   structures by hundreds of millions of dollars. And at that

25   point it became clear, given the businesses that they were

1    to create and the potential return profile there and their

2    expertise, that a NewCo bid was better than a winddown bid.

3    And so the NewCo bidders went back and forth over multiple

4    rounds, ultimately the fee structures for the NovaWulf bid

5    and Fahrenheit bid were very similar. Minor differences

6    between the two of them. And so what it really came down to

7    is the collective you between the debtors and the creditors

8    committee as to which of the management teams we were

9    selecting was going to drive the greatest value for

10   creditors, who was going to build, manage the mining

11   business most successfully, most profitably, monetize the

12   illiquid assets in a very value maximizing way and run a

13   staking business and build a staking business relatively

14   quickly. The committee members felt very strongly that the

15   Fahrenheit Group met those more qualitative factors and the

16   debtors, we supported them in that distinction. From the

17   debtors' perspective, we think it was quite close but I

18   would say on mining we really were incredibly impressed with

19   the US Bitcoin Group and we thought that that would be the

20   best choice for mining. And as it relates to the other

21   business lines, again, we thought it was close but

22   ultimately, you know, agreed with the committee.

23           MR. MCCARRICK: Okay, I want to switch gears to

24   valuation. Was Centerview asked to value the debtors' mining

25   assets?

Page 165

1            MR. KIELTY:    Yes, we were.

2            MR. MCCARRICK: And what sort of valuation were you

3    asked to perfom?

4            MR. KIELTY:    We were asked to value the

5    enterprise value of the mining business.

6            MR. MCCARRICK: And what is enterprise value

7    measure?

8            MR. KIELTY:    The total value of the company and

9    all of it's assets.

10           MR. MCCARRICK: What methodology or methodologies

11   did you and Centerview team use to generate that enterprise

12   value for the debtors' mining assets?

13           MR. KIELTY:    So we used two methodologies to

14   value mining business. We used a discounted cash flow

15   methodology using the on lever free cash flow forecast that

16   we received from the debtors in consultation with

17   Fahrenheit. And then we also used a public company multiples

18   analysis and we used two variants of that. We measured

19   enterprise value as a multiple of the current, meaning May

20   2023 when we performed the valuation. The current hash rate

21   of the enterprise. And then we also measured enterprise

22   value based on the projected end of 2023 hash rate for the

23   enterprise. Mining companies are valued based upon a

24   multiple of their computing power and so that's why we used

25   those multiples. So we took the lows of those three data

Page 166

1    points and the highs of the range of those three data

2    points, the average of those lows and highs is the 410 to

3    720 million valuation disclosure statement of which 565 is

4    the midpoint.

5             MR. MCCARRICK: All right, Mr. Kielty, can you open

6    up the binder in front of you?

7             MR. KIELTY:    Sure.

8             MR. MCCARRICK: This is Celsius Exhibit 45. For the

9    record, Exhibit 45 is a copy of Mr. Kielty's declaration. Is

10   that a true and accurate copy of your declaration?

11            MR. KIELTY:    Yes, it is.

12            MR. MCCARRICK: Do you adopt the statements in your

13   declaration and the analysis in the attached valuation

14   report as your, excuse me, do you adopt the statements in

15   your declaration as your testimony under oath here today?

16            MR. KIELTY:    I do.

17            MR. MCCARRICK: Your Honor, we move that Celsius

18   Exhibit 45 be entered into evidence.

19            THE COURT:     Any objections? All right, Celsius

20   Exhibit 45 is admitted into evidence.

21            MR. MCCARRICK: Mr. Kielty, can you now turn to

22   debtors Exhibit 8 in your binder? For the record, Exhibit 8

23   is a copy of the mining valuation analysis, attaches and

24   exhibit to the debtors disclosure statement. [indiscernible]

25   that document, sir?

Page 167

1          MR. KIELTY:    Yes, I am.

2          MR. MCCARRICK: Does that fairly describe the

3    mining valuation analysis that Centerview performed?

4          MR. KIELTY:    It does.

5          MR. MCCARRICK: Your Honor, we would move that

6    Celsius Exhibit 8, which has not been objected to, be

7    entered into evidence.

8          THE COURT:     Any obstruction? Admitted into

9    evidence.

10         MR. MCCARRICK: All right, thank you for your time,

11   Mr. Kielty. We'll pass the lens.

12         THE COURT:     Thank you very much. All right,

13   cross examination. [indiscernible] Yes, Trustee?

14         MS. Cornell:   No, thank you.

15         THE COURT:     All right, anyone on Zoom or in the

16   courtroom, anyone else with to wish to examine Mr. Kielty?

17         MR. SHEIK:     Yes, Your Honor, if I may.

18         THE COURT:     Please, go ahead, Mr. Sheik.

19         MR. SHEIK:     Mr. Kielty, I do have a question,

20   in regards to, now, when you guys did perform, you were one

21   of the first auditing firms that did a full review and audit

22   of the CNL and the value of the contents or the, as they

23   say, illiquid assets, or illiquid crypt in CNL,is that

24   correct?

25         MR. KIELTY:    No, we're not an auditing firm and

1    didn't perform any such audit.

2            MR. SHEIK:    Okay, so to your knowledge, do you

3    know what the valuation of CNL was at that time or is that

4    something that you were not privy to or do not have any

5    oversight on?

6            MR. KIELTY:    I do not.

7            MR. SHEIK:    Okay, never mind then. Thank you, I

8    appreciate the, those are all the questions I have.

9            THE COURT:    Thank you very much, Mr. Sheik.

10   Anybody else wish to cross examine?

11           MR. PHILLIPS:  Yes, Your Honor.

12           THE COURT:    Mr. Phillips, go ahead.

13           MR. PHILLIPS:  Hi, Mr. Kielty. Let me start with

14   the auction process which is, you just testified to and is

15   paragraph 9 of your declaration. In your experience, what's

16   the typical length of a formal bankruptcy auction?

17           MR. KIELTY:    I would say that there's no typical

18   length but I would agree typical bankruptcy auctions are

19   shorter than the auction here for the debtors.

20           MR. PHILLIPS:  And what would you tribute the

21   extended length of this particular auction to?

22           MR. KIELTY:    Well I think there were a number of

23   factors, one, this was a very complex transaction. Both the

24   winddown transaction proposed by BRICK as well as the NewCo

25   style transactions proposed by NovaWulf and Fahrenheit, both

Page 169

1    had intricate regulatory frameworks. They both had, they all

2    had business lines that are quite complicated to understand.

3    And I think more important than the complexity, regardless

4    of which of those three bidders we ultimately went with,

5    there was some degree, meaningful degree of ongoing

6    management of these assets going forward that the creditors

7    would be relying upon to generate meaningful value and

8    recovery. And so a significant part of the auction was

9    spending time with each of the bidders hearing, it had to be

10   hundreds of pages around business planning, bios, prior

11   experience and getting that familiarity with each of the

12   bidder groups so that in addition to just the economic

13   proposals around management fees the debtors and the

14   creditors committee could make a determination based on the

15   very important qualitative factors that, you know, weighed

16   heavy on the decision as to who the winning bidder would be.

17   And that took a lot of time.

18           MR. PHILLIPS:  Fair enough. And getting up to the

19   end of the auction when the decision essentially was, I

20   believe, by the debtor that the two business economically

21   equivalent and you deferred to the UCC and their advisors in

22   determining which was the best bid at that time.

23           MR. MCCARRICK: Objection, Your Honor.

24           MR. PHILLIPS:  And make sure the --

25           THE COURT:    Sustained.

1          MR. PHILLIPS:  Can I get to the end of the auction

2     and can you describe the role that Perella Weinberg

3     Partners and in particular that Mr. Aidoo in aiding the

4     committee and the debtor in selecting Fahrenheit as the

5     winning bidder.

6          MR. KIELTY:    I know that Mr. Aidoo was a part of

7     the Perella team that at times was at the auction. But I,

8     you know, the creditor's committee had their own room. I'm

9     not privy to the advice or activity of Mr. Aidoo in the

10    committee's deliberations.

11         MR. PHILLIPS:  Were there any other distinct

12    members of the Perella team present at the auction?

13         MR. KIELTY:    Yes, Perella had a large team at

14    the auction.

15         MR. PHILLIPS:  Thank you. Moving onto the

16    valuation. And you admitted, I forget the number on the

17    debtor advise, but Exhibit D, which is the valuation

18    analysis, and I submitted that as an exhibit for cross

19    examination as well.

20         MR. MCCARRICK: It's Exhibit 8. 8.

21         MR. PHILLIPS:  Exhibit 8 in the debtors in the

22    [indiscernible], the first part of that.

23         MR. KIELTY:    I have it in front of me, Mr.

24    Phillips.

25         MR. PHILLIPS:  You did, okay. And you mentioned in

Page 171

1    your testimonial the range of [indiscernible] was, I believe

2    the lows and highs of three different valuations, did you

3    see that? And market value comparable is based on both the

4    current EVA [ph] hash rate and EVA hash rate and SCN [ph] at

5    the end of 2023.

6              MR. KIELTY:     That's correct.

7              MR. PHILLIPS:   In your experience, is a range of

8    75 percent typically of a valuation computed?

9              MR. KIELTY:     I think that every valuation is

10   unique and different to the situation. And I think that

11   range is appropriate under the circumstances.

12             MR. PHILLIPS:   How many past valuations

13   approximately is a fraction of the ones that you've done in

14   your career that have a range of equal to or greater than 75

15   percent?

16             MR. KIELTY:     I don't know that data point off

17   the top of my head.

18             MR. PHILLIPS:   Can you list the market comparable

19   companies that were used as your comparable in the

20   valuation.

21             MR. KIELTY:     I don't have it in front of me, Mr.

22   Phillips, but I know that we used eight companies in our

23   public companies analysis. There's no perfect comparable, as

24   in many situations. Within that public company set we had

25   Riot, Marathon, Hut 8, Adjusted, Proforma for the US Bitcoin

1    merger. Clean Spark, Irish Energy, Tarawolf, I'm forgetting

2    one or two off the top of my head.

3              MR. PHILLIPS:  And did you use all eight data

4    points or did you elect to save the one, you know, sometimes

5    in these market comparables people disregard one because

6    they say it's too far out of the range with the others?

7              MR. KIELTY:    We took the metrics for all of the

8    public companies that we chose into consideration in

9    selecting the ranges. Then ultimately informed the ultimate

10   range that's in the disclosure statement. We did not

11   disqualify any one data point. We interpreted what we saw

12   and assessed, each of those companies as relative to the

13   Celsius mining assets where they are in their lifecycle. You

14   know, what portion is hosted versus proprietary among many,

15   many other factors. And then we chose a range based on that

16   analysis.

17             MR. PHILLIPS:  Were you and Centerview involved in

18   the preparation of the disclosure statement, in particular

19   the section regarding the waited distributional action?

20             MR. KIELTY:    No, we were not.

21             MR. PHILLIPS:  Okay, that's the end of my

22   questions.

23             THE COURT:    Thank you very much, Mr. Phillips.

24   Anybody else wish to cross examine? Any redirect?

25             MR. MCCARRICK: No, Your Honor.

Page 173

1           THE COURT:     Anybody else? You're excused. Thank

2    you very much for your testimony.

3           MR. KIELTY:     Thank you.

4           MR. MCCARRICK: T.J. McCarrick, Kirkland and Ellis

5    on behalf of the debtors. The debtors call Joel Cohen to the

6    stand.

7           THE COURT:     Mr. Cohen, come on up.

8           (Whereupon the Witness was sworn in.)

9           THE COURT:     Thank you very much. Mr. Cohen.

10          MR. MCCARRICK: Your Honor, permission to approach

11   the witness box.

12          THE COURT:     Please.

13          MR. COHEN:     Thank you.

14          MR. MCCARRICK: Good afternoon, could you introduce

15   yourself to the court?

16          MR. COHEN:     Joel Cohen.

17          MR. MCCARRICK: What do you do for a living, Mr.

18   Cohen?

19          MR. COHEN:     Forensic account, valuation, and

20   restructuring consulting.

21          MR. MCCARRICK: Where do you do that?

22          MR. COHEN:     At Stout.

23          MR. MCCARRICK: What kind of firm is Stout?

24          MR. COHEN:     Stout's a professional services

25   form that focuses in this space as well investment banking,

Page 174

1    accounting advisory.

2           MR. MCCARRICK: What kind of experience do you

3    personally have in restructuring reorganization.

4           MR. COHEN:    I've been doing this type of work

5    for almost 20 years. So I'm focused in sort of as an FA of

6    being a consulting expert or providing evidence.

7           MR. MCCARRICK: How did Stout become involved in

8    these Chapter 11 cases?

9           MR. COHEN:    The interim management of the

10   company reached out for a consultation on valuation.

11          MR. MCCARRICK: What valuation analysis was Stout

12   asked to perform?

13          MR. COHEN:    We were asked to take a select

14   listing of assets that the company held and perform a fair

15   value.

16          MR. MCCARRICK: What's a fair value analysis?

17          MR. COHEN:    The receipt of a price for an asset

18   or payment of consideration for a liability at a particular

19   time.

20          MR. MCCARRICK: And what markets of the debtors'

21   assets did you perform an evaluation analysis for?

22          MR. COHEN:    There were three assets classes.

23   The first was cryptocurrency or digital assets. The next was

24   loans or the lending platform. And then the final were

25   alternative assets.

1           MR. MCCARRICK: I'm going to start with the first

2      bucket. How did you value debtors' cryptocurrency assets?

3           MR. COHEN:     We needed to come up with a

4      principle market. They were liquid coins that were traded

5      over a number of different block chains and so we performed

6      an analysis to obtain the best or what we felt was the

7      principle market. And then we received a price for the

8      assets and given that there wasn't a stoppage of trading at

9      this, you know, for these types of assets, we performed an

10     average. We would have a cut off at 4:00 p.m. on a

11     particular date and then average over the prior 24 hours.

12          MR. MCCARRICK: Did you make any adjustments for

13     the valuation of liquid cryptocurrency assets versus liquid

14     assets?

15          MR. COHEN:     Yeah, for those that were liquid we

16     had what's typical discount for lack of marketability. The

17     inability to trade freely.

18          MR. MCCARRICK: The second bucket of assets. How

19     did Stout go about valuing he debtors institutional loans?

20          MR. COHEN:     For the loans we looked to see

21     which of the loans were performing and which might not be.

22     And for the ones that were performing it was principle

23     interest plus the coupon and just performed a market

24     approach for that. And then for the nonperforming we worked

25     with management to understand what the situation was and how

Page 176

1    best to put a discount rate on it.

2           MR. MCCARRICK: And the third bucket of assets, how

3    did Stout value the debtors' alternative investments?

4           MR. COHEN:    Similar, we looked at the

5    agreements that were provided to us by management to

6    understand the assets and provide the right discount for

7    those assets.

8           MR. MCCARRICK: All right, could you open the

9    binder in front of you to Celsius Exhibit 51?

10          MR. COHEN:    Sure.

11          MR. MCCARRICK: And for the record, that's a copy

12   of Mr. Cohen's declaration with attached exhibits which was

13   filed as docket number 3588. Is Exhibit 51 a true and

14   accurate copy of your declaration?

15          MR. COHEN:    It is.

16          MR. MCCARRICK: And is the attachment a true and

17   accurate of Stout's evaluation reports?

18          MR. COHEN:    It is.

19          MR. MCCARRICK: Your Honor, at this time, the

20   debtors would move Exhibit 51 into evidence.

21          THE COURT:    Any obstruction? Green on submitted

22   into evidence.

23          MR. MCCARRICK: All right, Mr. Cohen, did you

24   prepare any visual showing the upshot of your analysis for

25   these three asset classes?

Page 177

1           MR. COHEN:     Yeah, for help today we had one

2    slide just to have a summary.

3           MR. MCCARRICK: All right, and if Mr. Young could

4    made a cohost so he could share what we'll mark as Debtors'

5    Demonstrative 1. Permission to approach.

6           THE COURT:     Yes, please, go ahead.

7           THE CLERK:     Mr. Young is a cohost.

8           MR. MCCARRICK: Mr. Cohen, can you describe what's

9    reflected in this demonstrative?

10          MR. COHEN:     This is a summary or the total

11   value attributed to the three categories of assets that we

12   just described.

13          MR. MCCARRICK: And what was the total?

14          MR. COHEN:     3.2 billion.

15          MR. MCCARRICK: And was that conclusion reached to

16   a sufficient degree of certainty?

17          MR. COHEN:     Yes.

18          MR. MCCARRICK: Your Honor, pass the witness.

19          THE COURT:     All right, cross examination. But

20   first, does the committee have any examination

21   [indiscernible].

22          MR. MCCARRICK: No, Your Honor.

23          THE COURT:     Yes, Trustee. Anyone else in the

24   courtroom. Anyone on Zoom?

25          MR. SHEIK:     Yes, Your Honor.

Page 178

1          THE COURT:     Go ahead, Mr. Sheik.

2          MR. SHEIK:     Mr. Kielty, could you, for the

3    record, state what the valuation of the CNL assets were at

                                        th
4    the beginning of Chapter 11 which is dated 14  of July 2022.

5          MR. COHEN:     This is Mr. Cohen, and we were not

6    asked to value the CEO, is that's, if I heard you correctly.

7          MR. SHEIK:     No, no, was it valued at 9.8

8    billion?

9          MR. COHEN:     I'm --

10          THE COURT:     I don't understand your question,

11    Mr. Sheik.

12          MR. COHEN:     I don't either.

13          MR. SHEIK:     I was just looking to see what the

14    valuation of CNL, what assets, you know, the liquid assets

15    were at the time as you entered Chapter 11.

                                        st
16          MR. COHEN:     So our report was as of May 31 .

17          MR. SHEIK:     Of '23.

18          MR. COHEN:     Yeah, 2023.

19          MR. SHEIK:     Got it, okay. And per the previous

20    slide, I believe, that the final conclusion was 3 point, I

21    believe, point 5 billion dollars was the amount that it was

22    valued at after adjustments, correct?

23          MR. COHEN:     It was 3.2 billion for the select

24    assets that were provided to us.

25          MR. SHEIK:     I apologize, that's what I saw, I

Page 179

1    just got a quick glimpse of it. That's all I needed to know.

2    Thank you very much.

3            THE COURT:    Thank you, Mr. Sheik. Anyone else

4    with to cross examine?

5            MR. PHILLIPS:  Yes, Your Honor.

6            THE COURT:    Mr. Phillips.

7            MR. PHILLIPS:  Thank you, Your Honor. Let's see, I

8    submitted amended sort of exhibits and if I could ask you

9    about one of them. It's entitled disclosure statement

10   weighted distribution election example.

11           THE COURT:    If you would hold on, please, Mr.

12   Phillips, I think Mr. McCarrick is going to bring that to

13   the court and to the witness, all right?

14           MR. COHEN:    Thank you.

15           THE COURT:    All right, Mr. Phillips.

16           MR. PHILLIPS:  Do you recognize this?

17           THE COURT:    You're talking about the last page,

18   the weight of distribution?

19           MR. COHEN:    The --

20           MR. PHILLIPS:  It says disclosure statement

21   weighted distribution example, it's a screenshot of the

22   [indiscernible] the bottom of page 24 and the top of page 55

23   from the disclosure statement.

24           MR. COHEN:    I don't recognize it but I

25   understand what it is.

Page 180

1              MR. PHILLIPS:   Okay, do you know who prepared

2    this?

3              MR. COHEN:     I don't.

4              MR. PHILLIPS:   Okay. Do you believe, what is your

5    belief that a reasonable creditor who was billing on the

6    plan would infer that it would receive if they elected the

7    liquid cryptocurrency weighted distribution as compared to

8    the default election.

9              MR. PHILLIPS:   Objection, Your Honor.

10             THE COURT:     Sustained.

11             MR. PHILLIPS:   Okay. In your fair value analysis,

12   did you estimate the overall enterprise value of the company

13   or, including the mining company or did it exclude the

14   mining company?

15             MR. COHEN:     We did not perform a fair value, or

16   enterprise value for the entire company. And we did not

17   value the mining company.

18             MR. PHILLIPS:   So you had the assets, other than

19   the mining company and Centerview valued the mining company

20   but nobody, to your knowledge, valued the entire enterprise?

21             MR. COHEN:     I don't believe so.

22             MR. PHILLIPS:   Thank you, no further questions.

23             THE COURT:     Thank you, Mr. Phillips. Anyone

24   else wish to cross examine?

25             MR. KIRSANOV:  Yes, Your Honor. Dimitry Kirsanov

1    with Perasonia [ph].

2              THE COURT:     All right, go ahead.

3              MR. KIRSANOV:  Were all digital currency assets

4    categorized based on their valuation at the time of

5    bankruptcy?

6              MR. COHEN:     I'm sorry, can you repeat the

7    question?

8              MR. KIRSANOV:  Certainly. Were all digital

9    currency assets categorized based on their valuation at the

10   time of bankruptcy?

11             MR. COHEN:     I'm not sure if they were all

12   categorized at the time of bankruptcy.

13             MR. KIRSANOV:  Does the analysis encompass the

14   cell token?

15             MR. COHEN:     This analysis does not encompass

16   the cell token.

17             MR. KIRSANOV:  Thank you, I have no further

18   questions.

19             THE COURT:     Thank you. Anyone else wish to

20   cross examine?

21             THE CLERK: I don't see any raised hands, judge.

22             THE COURT:     You're excused. Well, let me ask,

23   any redirect?

24             MR. MCCARRICK: No, Your Honor.

25             THE COURT:     Anyone else? You're excused. Thank

Page 182

1     you very much for your testimony.

2               MR. COHEN:      Thank you.

3               MR. MCCARRICK: Your Honor, my watch has ended.

4               THE COURT:      You're passing the baton.

5               MR. MCCARRICK: My, I'm passing baton to my

6     colleague Hannah Simson.

7               THE COURT:      Oh, Ms. Simson, okay. Who are you

8     calling as your witness, Ms. Simson?

9               MS. SIMSON:     Mr. Karpuk.

10              THE COURT:      Can you say it again, I couldn't

11    hear you.

12              MS. SIMSON:     Mr. Brian Karpuk, Your Honor.

13              THE COURT:      Okay, thank you very much.

14              MS. SIMSON:     Your Honor, Hannah Simson with

15    Kirkland and Ellis, debtors call Mr. Karpuk to the stand. I

16    also have some exhibit binder to the witness, permission to

17    approach the stand.

18              THE COURT:      Please, absolutely.

19              THE CLERK:      [indiscernible]

20              MR. KARPUK:     I do.

21              THE COURT: Thank you, Karen. Good afternoon, Mr.

22    Karpuk.

23              MR. KARPUK:     Good afternoon, Your Honor.

24              THE COURT:      Ms. Simson.

25              MS. SIMSON:     May I proceed, Your Honor?

Page 183

1                    THE COURT:      Please.

2                    MS. SIMSON:      Can you please introduce yourself

3        to the court?

4                    MR. KARPUK:      My name is Brian Karpuk and I'm

5        Managing Director with Streto. Streto was retained as the

6        official claims and noticing agent and administrative

7        advisor in these cases.

8                    MS. SIMSON:      How long have you worked for

9        Streto?

10                   MR. KARPUK:      I've worked for Streto for

11       approximately four years.

12                   MS. SIMSON:      And how did you get involved in the

13       Celsius Chapter 11 cases?

14                   MR. KARPUK:      Streto was retained approximately a

15       month prior to the petition date and we have been engaged

16       with the debtors as both a claims and noticing agent and

17       administrator advisor throughout the case.

18                   MS. SIMSON:      I'd like to spend a couple minutes

19       on this solicitation and tabulation process. What have your

20       roles and responsibilities been in connection with the

21       Chapter 11 cases here?

22                   MR. KARPUK:      Strato's engaged as a claims and

23       noticing agent and then with respect to solicitation and

24       tabulation, Strato worked with the debtors legal advisors

25       and financial advisors to classify claims pursuant to the

Page 184

1   courts order approving disclosure statement and solicitation

2   and voting procedures to identify parties that were entitled

3   to vote and receive solicitation packages and then to ballot

4   and send ballots or solicitation packages to all parties and

5   interest.

6          MS. SIMSON:    What informed procedures you used

7   when soliciting and tabulating the votes?

8          MR. KARPUK:    Strato used, in connection with our

9   discussions with the debtors' counsel we used the courts

10  order approving the disclosure statement and solicitation

11  and tabulation procedures.

12         MS. SIMSON:    Do you have experience in ballot

13  restructuring?

14         MR. KARPUK:    I've been in the restructuring

15  industry for approximately 20 years. For the last 15 I've

16  been a claims and noticing agent and prior to that I was an

17  attorney practicing court restructuring.

18         MS. SIMSON:    I had handed you your amended

19  declaration at docket number 3574. Your Honor, debtors

20  premarked this as Exhibit 60. I will review to it as exhibit

21  60.

22         THE COURT:    Okay.

23         MS. SIMSON:    Is this a true and accurate copy of

                                            th
24  the declaration that you signed on September 27 , 2023?

25         MR. KARPUK:    It is.

Page 185

1          MS. SIMSON:     Do you adopt the declaration that

2     you submitted as exhibit 60 as your sworn testimony under

3     oath today?

4          MR. KARPUK:     I do.

5          MS. SIMSON:     Can you describe the process you

6     and your team followed in soliciting and tabulating the

7     votes?

8          MR. KARPUK:     Once the disclosure statement was

9     filed and the disclosure statement hearing was noticed, the

10    debtors worked with the, Strato worked with the debtors

11    legal advisors and financial advisors to identify all claims

12    entitled to vote, to classify those claims into each of the

13    individual classes. Strato also worked in connection with

14    the debtors to ensure that it had the most up to date

15    contact information that the debtors had one file,

16    specifically the email address that was tied to each and

17    every account. Which would then allow that account holder to

18    log into a custom ballot portal that Strato had created. And

19    when they logged in there that party's balloting information

20    was available to them.

21         MS. SIMSON:     Throughout the balloting process

22    were there any material irregularities outside the norm you

23    usually see in this process?

24         MR. KARPUK:     There were not.

25         MS. SIMSON:     What was the response rate for the

Page 186

1    votes overall?

2              MR. KARPUK:    We balloted approximately just over

3    400,000 parties and we received just under 80,000 votes. I

4    believe that's about 20 percent which is, you know, a

5    relatively high percentage response rate. And I believe

6    that, you know, over 50 percent of parties of account holder

7    claims voted during the process.

8              MS. SIMSON:    And can you summarize for the court

9    how the classes voted?

10             MR. KARPUK:    There were three classes which

11   voted to reject and, but beyond that all other classes

12   accepted and specifically with respect to the account holder

13   classes, many of those classes accepted in the high 90

14   percentile both by count and by dollar.

15             MS. SIMSON:    And can you  summarize for the

16   court how the parties and interest voted for the cell token

17   settlement?

18             MR. KARPUK:    Voting for the cell token was very

19   similar to, overall to the account holder classes. I believe

20   --

21             THE COURT:    Cell tokens were not in a separate

22   class.

23             MR. KARPUK:    That's correct. They were --

24             THE COURT:    The holders of cell tokens were in

25   multiple classes.

Page 187

1              MR. KARPUK:    That's correct.

2              THE COURT:    And, am I correct, Strato broke

3     out, was able to break out how cell token holders voted in

4     the classes of which they voted for.

5              MR. KARPUK:    That's correct, Your Honor.

6              THE COURT:    Okay.

7              MS. SIMSON:    And I would also like to admit

8     exhibit number 60 through declaration into evidence today.

9     Thank you for your . . .

10             THE COURT:    Any objections? All right, exhibit

11    60 is admitted into evidence.

12             MS. SIMSON:    Thank you very much for your time,

13    nothing further. Pass the witness.

14             THE COURT:    All right, cross examination. Does

15    committee with to examine?

16             MR. COLODNY:    No, Your Honor.

17             THE COURT:    Ms. Trustee, Ms. Cornell?

18             MS. CORNELL:    Good afternoon. Shara Cornell on

19    behalf of the Office of the United States Trustee. I only

20    have a few questions and they have been already answered but

21    I'm just gonna ask them a little bit of a different way

22    because sometimes it can be a little confusing with the

23    voting tabulation. As part of your declaration you submitted

24    several charts, are you familiar with them?

25             MR. KARPUK:    I am.

Page 188

1          MS. CORNELL:   The charts reference accept or

2     reject. Can you tell us how many ballots were actually sent

3     out?

4          MR. KARPUK:   I guess there was just over 400,000

5     in the account holder classes plus, you know, a few hundred

6     in the other classes. So probably just over 400,000.

7          MS. CORNELL:   Do you know how many of those

8     ballots that were sent out were undeliverable or not

9     received by account holders?

10         MR. KARPUK:   Strato worked ahead of time,

11    because we had, we'd been doing email campaigns throughout

12    the process and we preidentified approximately 20,000

13    account holders that we expected to be undeliverable. And so

14    during, currently with the email campaign, we also mailed

15    physical solicitation packages to those 20,000. I believe

16    when we then reanalyzed that the email campaign against what

17    was expected, there were another maybe 500 parties that we

18    mailed physical solicitation packages to.

19         MS. CORNELL:   Okay. Also in the tabulation

20    summaries provided, for example on page two of exhibit A,

21    you know, you used the term all ballots, all ballots total.

22    When you use that term in these charts, and again, I'm

23    referring to page two of exhibit A to your declaration.

24         MR. KARPUK:   Mm-hmm.

25         MS. CORNELL:   Could you just explain what you

Page 189

1    mean in that context? All ballots total. Is it all ballots,

2    is it that 400,000 number that you referenced earlier?

3              THE COURT:    Just orient me. I turned to that

4    page but --

5              MS. CORNELL:   Oh, I'm sorry.

6              THE COURT:    No, that's okay. Just tell me where

7    to look.

8              MS. CORNELL:   Sure, page two of Exhibit A --

9              THE COURT:    Yes.

10             MS. CORNELL:   -- the declaration.

11             THE COURT:    Yes. All right, I see it.

12             MS. CORNELL:   Sure.

13             THE COURT:    Thank you.

14             MS. CORNELL:   And so my question is, you used the

15   phrase all ballots total. Does that refer to that 400,000

16   number you spoke of earlier or does that refer to the amount

17   of ballots that were actually received in response by

18   debtors?

19             MR. KARPUK:    That is all ballots received in

20   response. Whether that ballot was tabulated, whether it

21   abstained or whether it was amended or late filed.

22             MS. CORNELL:   And that leads me actually to my

23   next question. Can you explain for the record what abstained

24   means in this context, please?

25             MR. KARPUK:    Abstained means that the voting

Page 190

1    party came into the balloting portal. They may or may not

2    have made an election, but they did not vote on the plan and

3    they did click submit. The submit, they completed submission

4    of their ballot but they did not vote to accept or reject

5    the plan.

6            THE COURT:    They electronically accessed the

7    portal.

8            MR. KARPUK:    All the way through the process to

9    hit submit.

10           THE COURT:    And they returned, but they hit

11   submit, but it was a blank ballot.

12           MR. KARPUK:    Although they may have made an

13   election.

14           MS. CORNELL:  And in that context, the election

15   would've gone through?

16           MR. KARPUK:  Yes.

17           THE COURT:  Election for what?

18           MR. KARPUK:  Third-party release or opt out of the

19   class claim settlement. Any election that that particular

20   ballot was entitled to make.

21           THE COURT:  Thank you.

22           MS. CORNELL:  And in conclusion, just for the

23   record one more time, what percentage of accountholders

24   actually voted?

25           MR. KARPUK:  I --

Page 191

1              THE COURT:  When you say 'actually voted' --

2              MS. CORNELL:  Not including the abstention number

3    that we --

4              THE COURT:  Leaving the abstentions out, how many

5    that were returned actually had votes to count.

6              MS. CORNELL:  Yes, Your Honor.

7              MR. KARPUK:  I'd have to add it up here. I know we

8    received about 79,500 ballots tied to, you know, unique

9    accountholders, right? So they may have voted in more than

10   one class. But if, you know, here there were -- I mean, it

11   looks like there was probably 2 to 3,000 accountholders that

12   submitted a ballot but did not vote, they abstained.

13             MS. CORNELL:  Thank you. That's all I have for

14   today.

15             THE COURT:  Anybody else wish to examine?

16             MR. KIRSAKOV:  Hi, Dimitry Kirsakov, pro se.

17             THE COURT:  Yes, please go ahead.

18             MR. KIRSAKOV:  Hi, Mr. Karpuk. A few questions.

19   Was the valuation of CEL Token the sum of .25 cents for

20   building leverage throughout the ballot vote, is that

21   correct?

22             MS. SIMSON:  Objection.

23             THE COURT:  Sustained.

24             MR. KIRSAKOV:  Who provided the directive to

25   modify the bankruptcy date valuations of the CEL Token?

Page 192

1          MS. SIMSON:  Objection.

2          THE COURT:  Sustained.

3          MR. KIRSAKOV:  I will ask the witness to open Page

4    2 to review the General Custody Claims. It appears that a

5    significant portion of the CEL custody class have rejected

6    the CEL Token settlement. Can you confirm that's accurate?

7          MR. KARPUK:  By dollar amount, yes, 64 percent of

8    the CEL Token holders in Class A voted to reject. Although

9    by count, 97 percent voted to accept.

10         MR. KIRSAKOV:  Can you confirm just the majority

11   of CEL Token holders did in fact reject the plan?

12         MR. KARPUK:  That is not correct.

13         MR. KIRSAKOV:  CEL Token holders did not reject

14   the plan?

15         MS. SIMSON:  Objection.

16         THE COURT:  Sustained.

17         MR. KARPUK:  What percentage of CEL Token custody

18   holders rejected the plan?

19         MS. SIMSON:  Objection.

20         THE COURT:  Are you able to answer that question?

21         MR. KARPUK:  I mean, looking -- in general, the

22   numbers for CEL Token holders mirrored overall. I think I --

23   we received approximately 36,000 ballots from CEL Token

24   holders, and they, in general, voted in the high 90 percent

25   to accept the plan.

Page 193

1             MR. KIRSAKOV:  So you ventured that the outcomes

2    for the CEL Tokens were comparable to other classes.

3    However, is it accurate to state the monetary majority of

4    the custody class holding CEL Tokens rejected the CEL Token

5    class?

6             MS. SIMSON:  Objection.

7             THE COURT:  Sustained.

8             MR. KIRSAKOV:  Is it accurate to state the

9    monetary majority of voters in the custody class rejected

10   the plan?

11            MS. SIMSON:  Objected.

12            THE COURT:  Sustained. Mr. Kirsakov, the

13   tabulation is in evidence. When we get to the closing

14   argument, you're certainly free to argue from the exhibit.

15   But I don't understand your questions. I mean, the documents

16   say what they say.

17            MR. KIRSAKOV:  Thank you, Your Honor. I have no

18   further questions.

19            THE COURT:  Thank you. All right. Mr. Sabin, did

20   you want -- anybody else wish to examine?

21            MR. PHILLIPS:  Yes, Your Honor, yes.

22            THE COURT:  Mr. Phillips.

23            MR. PHILLIPS:  Thank you, Your Honor. And I, once

24   again, I did submit an exhibit which is part of the Amended

25   Declaration, and specifically Row 7 and 8 of the Amended

Page 194

1    Declaration with regards to weighted distribution election.

2            THE COURT:  All right, I have that opened in front

3    of me. That's the last page of what you submitted, is that

4    correct?

5            MR. PHILLIPS:  I'm sorry?

6            THE COURT:  Is that the last page of what you

7    submitted? Weighted distribution election?

8            MR. PHILLIPS:  Yes, yes.

9            THE COURT:  Okay. Do you have it?

10           MR. KARPUK:  I have the, my -- I don't have that,

11   but I do have my thing here which is the -- I think that's

12   what he's excerpting.

13           MR. COLODNY:  Let me hand -- this is exactly what

14   we're showing here. I want to be sure you have the same

15   thing. Go ahead, Mr. Phillips.

16           MR. PHILLIPS:  Okay. So, so in reviewing the

17   results of the weighted distribution election, is it

18   accurate to say that a total of $112,131,300.78 in claims

19   elected more crypto?

20           MR. COLODNY:  Objection, Your Honor. This is a

21   document that has totals on the bottom that apparently

22   Mr. Phillips calculated by himself. Mr. Karpuk, if you gave

23   him a calculator, might be able to do it, but there's no way

24   to tell if these totals are accurate.

25           THE COURT:  Sustained.

Page 195

1                 MR. PHILLIPS:  Would you agree that that total,

2    though, is approximate given that in Paragraph 16, you know,

3    there's 960 million plus -- in holders of Class 5, then

4    approximately, it's approximately accurate. And there's 163

5    million in, in Paragraph 15 that elected that.

6                 MS. SIMSON:  Objection, Your Honor.

7                 MR. COLODNY:  Objection, Your Honor. The document

8    speaks for itself.

9                 THE COURT:  Overruled.

10                 MR. KARPUK:  The numbers that I put forth within

11    my Certification are accurate.

12                 THE COURT:  Okay.

13                 MR. PHILLIPS:  Would -- do you have any reason to

14    doubt that if I told you that those numbers indicated that

15    6.19 times as many claims were voted in favor of more crypto

16    than more equity?

17                 MS. SIMSON:  Objection.

18                 THE COURT:  Overruled. You can -- if you're able

19    to answer that, go ahead.

20                 MR. KARPUK:  Sure. Without doing the math, I do

21    know that the cryptocurrency weighted election came in

22    significantly higher than the share weighted election.

23                 MR. PHILLIPS:  Okay, thank you. Does that enable

24    you to then -- to make any inference with regards to the 30

25    percent discount that was offered on the price of the more

Page 196

1    equity election?

2           THE COURT:  I'm going to sustain an objection to

3    that. The documents -- look, the vote was the vote. You cold

4    interpret it the way you want to interpret it, you can argue

5    what you want to argue from it, but not with this witness.

6           MR. PHILLIPS:  Your Honor, I guess I'm still

7    puzzled as to who was responsible for the weighted

8    distribution election and the Disclosure Statement given --

9           THE COURT:  Mr. Phillips, your uncertainty is not

10   relevant to questioning of this witness. If you want to

11   submit a brief later on in this case, you can, but this

12   witness is testifying about the ballots that were received,

13   how they were counted, and I don't think you're asking him

14   about that. Do you have any other questions?

15          MR. PHILLIPS:  I have no further questions for

16   this witness, Your Honor.

17          THE COURT:  All right. Anybody else wish to

18   question the witness?

19          MR. UBIERNA:  Yes, Your Honor, if I May.

20          THE COURT:  Who is that?

21          MR. UBIERNA:  Victor Ubierna de las Heras, Pro Se

22   Creditor.

23          THE COURT:  Please, go ahead.

24          MR. UBIERNA:  Was there -- okay, thank you. Was

25   there an item on the ballot to opt out of the third-party

1    releases?

2              MS. SIMSON:  Objection.

3              THE COURT:  Overruled. Do you know -- in ballots,

4    what opt-outs were provided?

5              MR. KARPUK:  I believe that the -- each of the

6    ballots contained -- each of the ballots in the voting

7    classes contained an option to opt out of the third-party

8    release.

9              THE COURT:  And could people who voted in favor of

10   the plan opt out of the releases?

11             MR. KARPUK:  They could not.

12             THE COURT:  Any other questions?

13             MR. UBIERNA:  Do you have the -- yes, do you have

14   the number of creditors that tried to opt out of the third-

15   party releases but were not able to do so because they

16   accepted the plan?

17             MR. KARPUK:  As set forth in my Certification,

18   5,160 holders attempted to opt out of those third-party

19   releases but did accept the plan.

20             MR. UBIERNA:  Okay. And do you have a total amount

21   of that number of creditors?

22             MR. KARPUK:  That is not a calculation that's in

23   the Certification.

24             MR. UBIERNA:  Okay, thank you. I have no more

25   questions.

Page 198

1              THE COURT:  Thank you very much. Any additional

2      cross-examination? You're excused. Thank you very much for

3      your testimony. Well actually, is there any redirect?

4              MS. SIMSON:  Nothing, Your Honor.

5              THE COURT:  Deanna, is there somebody else? 'Cause

6      I don't see any hands raised in my --

7              CLERK:  Yeah, Mr. Patton, his hand was raised. Now

8      it's back.

9              THE COURT:  Mr. Patton, did you want to question

10     the witness?

11             MR. PATTON:  Yes, Your Honor. One question,

12     please.

13             THE COURT:  Okay, go ahead.

14             MR. PATTON:  Sir, are you aware of any items that

15     were not settled on the ballot or any elections for any

16     creditors that had to be extended past the closure of

17     voting?

18             MR. KARPUK:  That is correct. During the process,

19     we determined that parties within the convenience class were

20     unable to make the election to opt out of the class claim

21     settlement. We did open that ability for them to do that

22     during the process. Subsequent to that in connection with

23     Debtors' Counsel asked us after the voting period had

24     completed to then e-mail each of the holders in those

25     classes, and they have now until October 9th to return an e-

1    mail that says they'd like to opt out of that -- the class

2    claim settlement.

3              MR. PATTON:  Thank you very kindly. I have no

4    further questions.

5              THE COURT:  Thank you, Mr. Patton. Anybody else

6    wish to examine? Mr. Adler?

7              MS. DOW:  Sharon Dow.

8              THE COURT:  Hold on, Mr. Adler is to the podium

9    first.

10             MS. DOW:  Oh, sorry.

11             MR. ADLER: Hello, I'm David Adler from McCarter &

12   English, on behalf of the ad hoc group of borrowers. I just

13   want to clarify, with respect to the Class 2 ballot, the

14   retail borrowers. There was not a box there that allowed the

15   borrowers to make an election as to whether they wished to

16   repay their loans or not, is that correct?

17             MR. KARPUK:  I believe the box for -- you're

18   talking for the avoidance action settlement?

19             MR. ADLER:  I'm talking about under Class 2, the

20   borrowers are given an option to repay their outstanding

21   loans.

22             MR. KARPUK:  I believe there was an election for

23   them to request more information.

24             THE COURT:  Mr. Adler, I think you raised this

25   issue, this was discussed earlier in the hearing. And I

Page 200

```
 1    believe that the Committee agreed to work with you to

 2    provide the opportunity for people to repay their loan.

 3              MR. ADLER:  Your Honor, I have no further

 4    questions. I just want to clarify the record because there

 5    was a question asked about balloting issues.

 6              THE COURT:  Okay.

 7              MR. COLODNY:  Your Honor, I'll clarify. Within the

 8    modified plan that we filed, we said we'd file -- we'd send

 9    an additional notice, and we fixed this kind of confusion in

10    the --

11              THE COURT:  Ms. Jones, do you want to be heard?

12              MS. JONES:  Your Honor, Elizabeth Jones with

13    Kirkland & Ellis. There is a footnote in the ballot when

14    explaining Class 2 that says we will send out a notice, and

15    if you would like to elect to either repay or set off, then

16    we will follow up with that information. So it was clarified

17    on the ballot.

18              THE COURT:  So that's in the process of being

19    done.

20              MS. JONES:  Correct.

21              THE COURT:  Okay. Thanks very much. All right.

22    Ms. Dow, you wanted to question?

23              CLERK:  She's no longer raising her hand, Judge.

24              THE COURT:  All right.

25              MS. DOW:  Hi. Sorry, I'm in a tropical storm, so
```

1    things are going in and out here. I apologize. I do have one

2    question.

3              THE COURT:  Go ahead.

4              MS. DOW:  About, about the voting process and how

5    much -- how many votes were changed during the voting

6    process. And people were able to change their votes, we know

7    that there were disclosure statements rolling out through

8    the voting period. How many people -- how many votes were,

9    were changed?

10             MR. KARPUK:  I don't have information as to how

11   many votes were changed. Although if you look at Exhibit C

12   to the -- my Certification, you can see that -- the list of

13   amended ballots. So there are 834 amended ballots in Class

14   2, 2,026 in Class 4, 5,126 in Class 5, 513 in 6 A and 64 in

15   Class 7. Those are not unique counts because there were --

16   you know, many accountholders would go through the ballot

17   process over and over, so . . .

18             MS. DOW:  Thank you.

19             THE COURT:  Any other questions, Ms. Dow?

20             MS. DOW:  Yes, thank you. The question was of

21   those 834, were they flipping to vote for versus not for the

22   plan, or were most of the changes the other attributes in

23   the vote?

24             MR. KARPUK:  I did not examine that information.

25             MS. DOW:  Thank you very much.

Page 202

1           THE COURT:  Thank you. Anybody else wish to cross-

2      examine? You're excused.

3           MR. KARPUK:  Thank you, Your Honor.

4           MS. SIMSON:  I'm going to pass the time to my

5      colleague.

6           THE COURT:  Thank you, Ms. Simson.

7           MS. BRIER:  Good afternoon, Your Honor. Grace

8      Brier, Kirkland & Ellis on behalf of Debtors. At this time,

9      Debtors call Allison Hoeinghaus to the stand.

10          THE COURT:  Thank you very much.

11          MS. BRIER:  And Your Honor, may I approach with

12     the exhibits that we will use with Ms. Hoeinghaus? Thank

13     you.

14          CLERK: Please raise your right hand. Do you

15     solemnly swear and affirm that all the testimony you're

16     about to give before this Court is the truth, the whole

17     truth and nothing but the truth?

18          MS. HOEINGHAUS:  Yes, I do.

19          MS. BRIER:  Good afternoon. Can you please

20     introduce yourself to the Court?

21          MS. HOEINGHAUS:  Hi, I'm Allison Hoeinghaus, I'm a

22     Managing Director at Alvarez & Marsal.

23          MS. BRIER:  And Ms. Hoeinghaus, how did you first

24     become involved in the matters before the Court today?

25          MS. HOEINGHAUS:  I was asked to be involved in

Page 203

1    these cases back in January of this year to advise around

2    incentive programs for executives and other key employees of

3    the Debtors.

4            MS. BRIER:  And as part of your work on this case,

5    can you describe the tasks that you performed?

6            MS. HOEINGHAUS:  Sure. We were tasked with helping

7    develop the incentive program, determining what might be

8    reasonable amounts relative to other Chapter 11 cases, and

9    what's typical in the Debtors' industry.

10           MS. BRIER:  And have you developed incentive

11   programs before?

12           MS. HOEINGHAUS:  Yes, I have.

13           MS. BRIER:  Now, were you asked to do anything

14   else in addition to developing incentive programs?

15           MS. HOEINGHAUS:  At this debtor or are you talking

16   about in general?

17           MS. BRIER:  Were you asked to analyze that

18   incentive program after you developed it?

19           MS. HOEINGHAUS:  Yes, it was a collaborative

20   process where we were actually using the other cases and the

21   facts and other comparables to actually help develop the

22   program along the way.

23           MS. BRIER:  Now, have you previously analyzed and

24   offered opinions on incentive programs in other

25   restructuring cases and in other restructuring contexts?

Page 204

1           MS. HOEINGHAUS:  Yes, I have. For incentive

2     programs, retention programs, severance and other

3     compensation matters.

4           MS. BRIER:  Now, I'd like to turn to the document

5     that I handed you earlier. Can you tell us what that

6     document is?

7           MS. HOEINGHAUS:  It's a Declaration I filed on

8     behalf of the Debtors.

9           MS. BRIER:  And for the purposes of the record,

10     this is Document 3586, previously marked Exhibit 68 by

11     Debtors. Now, Ms. Hoeinghaus, can you please turn to the

12     last page of this document? Is that your signature there?

13           MS. HOEINGHAUS:  Yes, it is.

14           MS. BRIER:  And is this a true and accurate copy

15     of the Declaration submitted in this case?

16           MS. HOEINGHAUS:  Yes, it is.

17           MS. BRIER:  Your Honor, at this time, Debtors move

18     to admit Exhibit 68 into evidence.

19           THE COURT:  Any objections? All right, Exhibit 68

20     is admitted into evidence.

21           (Debtors' Exhibit 68 Received into Evidence)

22           MS. BRIER:  Now, Ms. Hoeinghaus, are your

23     conclusions that you reached about the EIP contained in this

24     Declaration?

25           MS. HOEINGHAUS:  Yes, they are.

Page 205

```
 1                   MS. BRIER:  I'd like to discuss a couple of those

 2      today. Do you adopt this Declaration under oath as your

 3      sworn testimony?

 4                   MS. HOEINGHAUS:  Yes, I do.

 5                   MS. BRIER:  Now, at a high level, what is an EIP?

 6                   MS. HOEINGHAUS:  It is an incentive program that's

 7      intended to align the --

 8                   THE COURT:  Just speak a little slower.

 9                   MS. HOEINGHAUS:  Oh, sorry. It is an incentive

10      program that is intended to align the key executives, their

11      interests with those of the various stakeholders in this

12      case. And to really motivate them to perform certain goals

13      and objectives in this case to get to the best possible

14      outcome as part of these Chapter 11 cases.

15                   MS. BRIER:  And what were you asked to analyze in

16      the EIP in this case?

17                   MS. HOEINGHAUS:  I was specifically asked to

18      analyze how it compared to similar other distress

19      situations. Some particular other cases that have been

20      approved in Chapter 11 cases. And then also, how it compares

21      to the Debtors' market where they're competing for talent.

22                   MS. BRIER:  And did you summarize the results of

23      those analyses in your Declaration?

24                   MS. HOEINGHAUS:  Yes, I did.

25                   MS. BRIER:  Now, to be clear, Ms. Hoeinghaus, did
```

Page 206

1      you analyze the performance metrics that are under the EIP?

2              MS. HOEINGHAUS:  I did not. My colleague,

3      Mr. Campagna, who I believe will be testifying later, he is

4      who actually weighed in on the metrics and where those

5      performance levels were set.

6              MS. BRIER:  So what specifically did you look at?

7              MS. HOEINGHAUS:  I specifically looked at the

8      amounts that were being proposed, how level the number of

9      participants that were being included, and the overarching

10     structure of the program.

11             MS. BRIER:  Mr. Young, if you could please pull up

12     our Exhibit 68 and turn to Page 11. I'd like to take a look

13     at one of the charts on that page. And if you could zoom in

14     on that chart, that'd be excellent. Ms. Hoeinghaus, does

15     this summarize one of the analyses that you did in this

16     matter?

17             MS. HOEINGHAUS:  Yes, this analyzes the first

18     test, the distressed compensation test.

19             MS. BRIER:  And in the distressed --

20             THE COURT:  This is on Page 11 of her Declaration.

21             MS. BRIER:  Yes. Yes, Your Honor. This is Page 11

22     of Exhibit 68, Docket Number 3586. And can you tell us what

23     this analysis is showing us?

24             MS. HOEINGHAUS:  Sure. It's showing that the

25     amount being proposed here for the Debtors is very

1    reasonable relative to the peer group of Chapter 11 cases

2    that have also approved similar type incentive programs. And

3    specifically you can see here, this analysis we did here is

4    on an annualized basis. So you can see Debtors are proposing

5    just shy of 3.5 million, again, on an annualized basis,

6    which was actually at the 1 percent tile of this peer group

7    based on target cost.

8             And then we also looked at it to be assured it was

9    appropriate in terms of the number of participants. So we

10   looked at the average cost per participant, and you can see

11   here that the proposal for the Debtors is actually the

12   lowest at just over $388,000. And similarly, as we looked at

13   it as a percent of the total assets, and it was also below

14   the tenth percentile.

15            MS. BRIER:  And just to drill down a bit into what

16   you are comparing the Debtors to, can you describe what the

17   comparison is here?

18            MS. HOEINGHAUS:  Sure. So my team and I prepared a

19   peer group of other Chapter 11 cases that had incentive

20   plans approved in 2017 or later. We focused on non-energy

21   companies, and then limited those that had prepetition

22   assets greater than a billion but fewer than 25 executives

23   to ensure that we were looking at ones that were focused at

24   the executive level and not rank and file incentive plans.

25            MS. BRIER:  You earlier described another analysis

Page 208

1    that you did, a market rate analysis. Did you summarize that

2    analysis in your Declaration?

3            MS. HOEINGHAUS:  Yes, I did.

4            MS. BRIER:  Mr. Young, can you please turn to Page

5    12 of the Declaration and display the first table there?

6    Ms. Hoeinghaus, can you tell us what you did in the market

7    rate comparison that you are showing in this table?

8            MS. HOEINGHAUS:  Sure. So my team and I pulled

9    compensation survey data for the various EIP participants

10   and the various specific roles and responsibilities that

11   they are fulfilling to the Debtors. And we compared that to

12   these compensation surveys to provide the market level of

13   compensation. So essentially the going rate for these

14   positions at similar sized companies. And you can see here

15   at the bottom, the -- this is showing currently where the

16   executives are only working for their base salary. And with

17   only base salary, since such a large component of executive

18   compensation is around incentives, absent those incentives,

19   the base salaries are significantly below market.

20           Under P 25 there, you can see that they're 31

21   percent below the 25th percentile of the market peer group.

22   They're approximately 50 percent below the median, and

23   almost 70 percent below the market P 75.

24           MS. BRIER:  Now, based on your finding that these

25   base salaries are significantly below market, what did you

1      conclude about the EIP?

2            MS. HOEINGHAUS:  Concluded that an incentive

3      program was very much necessary here to ensure that market

4      levels of compensation would be offered to key executives.

5            MS. BRIER:  Finally, I'd like to look at the

6      analysis you did of market rate, including the incentive

7      program. And Mr. Young, if you could pull up the last chart

8      there on Page 12, please. Ms. Hoeinghaus, can you explain to

9      us what the difference is between the chart we just looked

10     at and this one?

11           MS. HOEINGHAUS:  Sure. So this now includes the

12     proposed EIP amount, to wit, the total for all of the

13     executives included here is almost $6 million. So it's in

14     addition to the base salary that we just discovered -- or

15     just discussed. And you can see that with the inclusion of

16     the EIP, now the market levels of compensation are on

17     average between the P 25 and P 50 of market, and no

18     individual is above P 75.

19           MS. BRIER:  And can you break that down for us?

20     What does that mean in kind of plain English?

21           MS. HOEINGHAUS:  Sure. So it shows that now

22     including an EIP, the executives are more in line with

23     market and within a healthy range of what would be

24     considered competitive with on average being between, you

25     know, the 25th percentile of a peer group of different types

Page 210

1     of companies where they're competing for talent.

2          MS. BRIER:  And taking into account those results,

3     what did you conclude about the EIP overall?

4          MS. HOEINGHAUS:  I concluded both on, based on the

5     distressed analysis of other Chapter 11, as well as the

6     industry market analysis here that the EIP was very

7     reasonable in terms of the amounts and the opportunities

8     that are being offered to the executives here.

9          MS. BRIER:  Thank you, Ms. Hoeinghaus. I'll pass

10    the witness for cross, Your Honor.

11          THE COURT:  Debtors' Committee?

12          MR. COLODNY:  I have nothing.

13          THE COURT:  Ms. Cornell?

14          MS. CORNELL:  Good afternoon, Shara Cornell again

15    on behalf of the Office of the United States Trustee. For

16    the record, under the EIP, who makes -- strike that. Under

17    the EIP, are the awards discretionary as to when they will

18    be received?

19          MS. HOEINGHAUS:  No, they're not. They're very

20    specific metrics that are outlined in the program and in the

21    Motion before the Court today, that it lays out exactly how

22    the executives can earn these. And if those metrics are not

23    satisfied, then the amounts will not be earned under the

24    program.

25          MS. CORNELL:  Under the EIP, is there a discretion

Page 211

```
 1    as to -- is there any discretion as to how much each award

 2    can be?

 3              MS. HOEINGHAUS:  No, there's set amounts by

 4    individual.

 5              MS. CORNELL:  Under the EIP, are the awards

 6    discretionary or mandatory?

 7              MS. HOEINGHAUS:  They are not discretionary, they

 8    are -- if approved, there are set targets for each

 9    individual.

10              THE COURT:  If metrics are met, at measurement

11    dates, they're entitled to the amounts provided in the

12    program.

13              MS. HOEINGHAUS:  Correct.

14              MS. CORNELL:  Are you certain that that is the way

15    the EIP is currently set up under the revised plan and its

16    amendments?

17              MS. HOEINGHAUS:  Assuming it gets approved, yes.

18    The structure is already set.

19              MS. CORNELL:  Okay. Then that will be something we

20    will discuss with Debtors, because I believe there's been a

21    revision to reflect that the --

22              THE COURT:  Let's not get into a discussion about

23    it, okay?

24              MS. CORNELL:  Okay. So it's your testimony here

25    today that if the benchmarks are met, that the EIP awards
```

1      are mandatory upon the Plan Administrator to be paid out.

2              MS. HOEINGHAUS:  I think maybe this might be

3      better for my colleague, Mr. Campagna, maybe, to weigh in on

4      the details on that. But that was my understanding.

5              MS. CORNELL:  Okay. Thank you.

6              THE COURT:  Thank you. Anyone else in the

7      courtroom? All right. On Zoom, anybody wish to cross-examine

8      who's on Zoom?

9              MR. VITHANI:  Yes, Your Honor. This is Imran

10     Vithani speaking. How are you?

11             THE COURT:  Okay.

12             MR. VITHANI:  Ms. Allison, just a quick question

13     for you. Are you able to share the companies that you were

14     actually able to do the comparison with? Are there any

15     examples of companies that you're able to share right now?

16             MS. HOEINGHAUS:  Yes. In my Declaration, I can get

17     the exact paragraph, Paragraph 15 on Page 10 of my

18     Declaration outlines the specific criteria which we did to

19     use to develop the peer group and the specific companies are

20     also listed there.

21             MR. VITHANI:  Thank you, ma'am.

22             MS. HOEINGHAUS:  Of course.

23             THE COURT:  Just give me a second, I'm a little

24     crowded. All right, any further questions, Mr. Vithani?

25             MR. VITHANI:  No, sir. Thank you so much, Judge.

Page 213

1                    THE COURT:  All right. Anybody else on Zoom who

2       wishes to cross-examine?

3                    MR. SHEIK:  Yes, Your Honor. Just a quick question

4       for the -- thank you. So, for [indiscernible] I just wanted

5       to make, you know, a clarification, if you could clarify.

6       What was the post-petition valuation of CNL illiquid assets

7       as we enter Chapter 11?

8                    MS. BRIER:  Objection.

9                    THE COURT:  Sustained.

10                   MR. SHEIK:  My questions were really about just

11      that. So if that's sustained, then I do not --

12                   THE COURT:  -- for that, Mr. Sheik.

13                   MR. SHEIK:  Okay. I apologize for that.

14                   THE COURT:  It's okay. Any other cross-

15      examination?

16                   MR. SHEIK:  Thank you.

17                   CLERK:  Judge, Mr. Cruz has his hand up.

18                   THE COURT:  Mr. Cruz, go ahead.

19                   MR. CRUZ:  Yes. Cameron Cruz, Pro Se Creditor.

20      Three questions. First off, under comparators, how many, if

21      any, involved financial fraud?

22                   MS. HOEINGHAUS:  I don't specifically know in

23      these particular cases.

24                   MR. CRUZ:  Next question. In establishing your

25      baseline for Celsius, if you were to subtract out customer

Page 214

1    deposits, what would the baseline become?

2              MS. BRIER:  Objection.

3              THE COURT:  Sustained.

4              MR. CRUZ:  Finally, in the initial submission for

5    the incentive program, there was a recommendation for

6    $239,000 for Mr. Roni Cohen-Pavon. Could you explain why

7    he's been taken out and how he initially was included?

8              THE COURT:  That's pretty easy, Mr. Cruz. Can you

9    answer the question?

10             MS. HOEINGHAUS:  My understanding is that if

11   anyone was thought to be having done wrong things, they were

12   going to be removed from this program.

13             THE COURT:  Mr. Pavon was indicted, I believe, did

14   he plead guilty? Yes, he pled guilty.

15             MR. CRUZ:  It was the act -- yes, so it was the

16   act of him being criminally charged that prompted him being

17   removed. Was there any --

18             MR. MCCARRICK:  Objection.

19             THE COURT:  Sustained.

20             MR. CRUZ:  All right. That's it for now. Thank

21   you.

22             THE COURT:  Thank you, Mr. Cruz. Anybody else wish

23   to cross-examine?

24             CLERK:  I don't see any hands raised, Judge.

25             THE COURT:  All right. Any redirect?

Page 215

1              MS. BRIER:  No, Your Honor.

2              THE COURT:  All right. You're excused. Thank you

3     very much for your testimony.

4              MS. HOEINGHAUS:   Thank you.

5              MS. BRIER:  Your Honor, Grace Brier, Kirkland &

6     Ellis on behalf of the Debtors. That concludes the witnesses

7     we disclosed for today on the docket. We can ask the Court's

8     preference whether you'd like us to continue or wrap for

9     today and disclose new witnesses at 5:00 p.m.

10             THE COURT:  Let me understand what witnesses --

11    assuming we're finished for the day, I haven't yet decided -

12    - who are the witnesses for tomorrow?

13             MS. BRIER:  Yes, Your Honor. I believe the UCC has

14    two witnesses that will be called tomorrow.

15             THE COURT:  Well let me ask this. Has the Debtor

16    put on its case at this point?

17             MS. BRIER:  We have one more witness that our --

18             THE COURT:  Mr. Campagna.

19             MS. BRIER:  Mr. Campagna. And our current plan is

20    for him to follow the two UCC witnesses.

21             THE COURT:  Okay.

22             MS. BRIER:  We can reorder that if Your Honor

23    prefers, but we were going to start with the UCC witnesses.

24             THE COURT:  All right. Mr. Colodny?

25             MR. COLODNY:  Good afternoon, Your Honor. Aaron

Page 216

1    Colodny from White & Case on behalf of the Official

2    Committee. We've exceeded the notice witness. We have

3    Mr. Robinson, Mr. Delco and Mr. Campagna. Mr. Robinson, I

4    believe --

5                THE COURT:  Is testifying by Zoom.

6                MR. COLODNY:  Is testifying by Zoom, and I believe

7    he could be available this afternoon. But we did not notice

8    him yesterday.

9                THE COURT:  Right.

10               MR. COLODNY:  And we would be okay calling him

11   this afternoon if it fits with Your Honor, if we're not

12   going to hang over. We can get him done between -- I think

13   he could be ready by 4:00 p.m., if we can get him on your

14   window at 4:00 p.m., that would work. Or we would prefer if

15   he's going to hang over the time, to do it --

16               THE COURT:  Sure, sure. Mr. Robinson was

17   testifying about the selection of the Board members, if I'm

18   not mistaken.

19               MR. COLODNY:  That's correct, Your Honor.

20               THE COURT:  And who -- I know there was someone

21   who wanted to cross-examine him.

22               MR. COLODNY:  Mr. Phillips, Your Honor.

23               THE COURT:  Mr. Phillips. Mr. Phillips, would you

24   be prepared to cross-examine this afternoon?

25               MR. PHILLIPS:  Your Honor, I would be, provided

Page 217

1   that you accept the exhibits that I just filed on the docket

2   now as part of that cross-examination.

3            THE COURT:  Sure. Why don't we take a break until

4   4:00. And I'll get copies of what you filed on the docket.

5   And I appreciate your willingness to cross-examine this

6   afternoon, because that was not one of the witnesses who was

7   noticed for today. Mr. Colodny --

8            MR. PHILLIPS:  Should I e-mail a copy of -- I'm

9   sorry.

10           MR. COLODNY:  That's fine with us, Your Honor, as

11  long as we finish, can finish Mr. Robinson.

12           THE COURT:  I can't imagine that we're not going

13  to finish Mr. Robinson.

14           MR. COLODNY:  Okay.

15           THE COURT:  And again, I have another hearing at

16  5:00, so we'll -- I'd be very -- I've read his direct

17  examination, his written direct, and so you can put in

18  whatever background quickly you want to do for him, and then

19  we'll turn him over for cross.

20           MR. COLODNY:  Sounds great.

21           THE COURT:  Okay. All right, so we'll -- go ahead.

22           MR. PHILLIPS:  Mr. Colodny, would you like me to

23  e-mail you those exhibits?

24           MR. COLODNY:  If they're on the docket I can get

25  them from there.

Page 218

1           THE COURT:  It's on the docket, Mr. Phillips?

2           MR. PHILLIPS:  I used the pro se uploader tool

3    which doesn't immediately publish onto the docket, unlike

4    the [indecipherable]

5           THE COURT:  If you could, why don't you e-mail it

6    to Mr. Colodny. Okay?

7           MR. PHILLIPS:  I'll be happy to, thank you.

8           THE COURT:  All right.

9           MR. COLODNY:  Thank you, Your Honor.

10          THE COURT:   So we'll be in recess until 4:00.

11          MR. COLODNY:  Okay.

12          (Whereupon the proceedings were paused for a

13   break.)

14          THE COURT:   All right. I believe we're going to

15   begin with the testimony of Major Robinson. Is that correct?

16          MR. WEEDMAN:  Correct, Your Honor. Good afternoon.

17   This is Joshua Weedman of White & Case, LLP on behalf of the

18   committee.

19          THE COURT:  Okay.

20          MR. WEEDMAN:  The committee calls Mark Robinson.

21          THE COURT:  All right, Mr. Robinson. If you would

22   raise your right hand, you will be sworn.

23          (Whereupon the witness was sworn in.)

24          THE COURT:  All right. Please have a seat.

25          MR. WEEDMAN:  And, Your Honor, before we begin,

1    Mr. Robinson would just like me to note he is currently on

2    active duty, and therefore, in his fatigues. But he is only

3    appearing in his personal capacity --

4              THE COURT:  I understand that.

5              MR. WEEDMAN:  -- and not representing the United

6    States Army today.

7              THE COURT:  Thank you.

8              MR. WEEDMAN:  And Your Honor, for the witness

9    kits, I have a copy of his declaration. May I approach,

10   please?

11             THE COURT:  Yes, please. And I think I indicated

12   before that I have read it already.

13             MR. WEEDMAN: And, Mr. Robinson, could you please

14   state your name for the record?

15             MR. ROBINSON: Yes. My name is Mark Robinson.

16             MR. WEEDMAN:  And is it okay if I call you Mr.

17   Robinson today, or do you prefer to be called something

18   else?

19             MR. ROBINSON:  Certainly, yeah. You can call me

20   Mark, Mr. Robinson, whatever works for you.

21             MR. WEEDMAN:  And, Mr. Robinson, where are you

22   located right now?

23             MR. ROBINSON:  I'm currently located in my office

24   at Fort Knox, Kentucky.

25             MR. WEEDMAN:   And, sir, can you please confirm

Page 220

1    that there is no other person in the room with you right

2    now?

3              MR. ROBINSON: I am by myself.

4              MR. WEEDMAN: And, Mr. Robinson, what's your

5    current job?

6              MR. ROBINSON: Yeah. I'm currently a Chief of

7    Military Justice at the Fort Knox Consolidated Military

8    Justice office.

9              MR. WEEDMAN:   And, Mr. Robinson, are you a member

10   of the UCC in these proceedings?

11             MR. ROBINSON:  I am.

12             MR. WEEDMAN:   And since when have you had that

13   role?

14             MR. ROBINSON:  Since July 2022.

15             MR. WEEDMAN:   As part of your role in the UCC,

16   did you have any role in the board selection process for the

17   NewCo?

18             MR. ROBINSON:  I did.

19             MR. WEEDMAN:   All right. And, sir, could you

20   please generally describe what your role was in that board

21   selection process?

22             MR. ROBINSON:  Yeah. So my role as a UCC member

23   was to review applicants, material, CVs, conducted

24   interviews. We had discussions with and without our advisors

25   to vote on and to select board members for the NewCo.

1            MR. WEEDMAN:   And, sir, do you have your

2    declaration that you provided in this case in front of you?

3            MR. ROBINSON:   I do.

4            MR. WEEDMAN:   And is that document 3584?

5            MR. ROBINSON:   Yes.

6            MR. WEEDMAN:   And can you please turn to page 9

7    of that document? And are you there, sir?

8            MR. ROBINSON:   Yes.

9            MR. WEEDMAN:   And is that your signature on this

10   page?

11           MR. ROBINSON:   Yes.

12           MR. WEEDMAN:   And do you understand that this is

13   your testimony that you are providing in this confirmation

14   hearing under oath?

15           MR. ROBINSON:   Yes.

16           MR. WEEDMAN:   And finally, sir, do you have a

17   copy of a limited objection and reservations of rights of

18   Rick Phillips that was filed in these proceedings?

19           MR. ROBINSON:   Yes, sir.

20           MR. WEEDMAN:   And do you have that with you

21   today?

22           MR. ROBINSON:   I do.

23           MR. WEEDMAN:   Thank you, Your Honor. I pass the

24   witness.

25           THE COURT:   All right. Mr. Phillips, do you wish

1    to examine?

2              MR. PHILLIPS:  Yes, Your Honor, I do. Major

3    Robinson, how are you doing today? I wanted to first thank

4    you for your service on the UCC, which I know it has been a

5    volunteer job and entails many hours, as well as thank you

6    for your service to our country.

7              MR. ROBINSON:  Thank you, sir.

8              MR. PHILLIPS:  As I looked over your declaration,

9    in paragraph 4, you state that you, you know, your

10   participation in the UCC included participating in

11   comparative [indiscernible] due process that occurred during

12   the course of the bankruptcy, correct?

13             MR. ROBINSON:  Yes.

14             MR. PHILLIPS:  Were you involved, and did you

15   actually personally attend the auction that took place over

16   April and May in New York, I believe?

17             MR. ROBINSON:  No, sir. I was not there in person,

18   but I had a lot of meetings about it.

19             MR. PHILLIPS:  So you participated in Zooms or

20   conference calls regarding with the proceedings in real

21   time?

22             MR. ROBINSON:  Yes, sir. Well, I didn't, as it was

23   going on, yes, sir, we had meetings throughout the auction

24   process.

25             MR. PHILLIPS:  Thank you. Did you participate in

Page 223

 1    the decision to select Fahrenheit as the ultimate winner of

 2    that auction?

 3              MR. ROBINSON:  I did.

 4              MR. PHILLIPS:  Okay. Can you describe who was

 5    involved in that decision?

 6              MR. ROBINSON:  The members of the UCC were.

 7              MR. PHILLIPS:  Were there any advisors involved in

 8    that decision?

 9              MR. ROBINSON:  They advised us, but we were the

10    ones who voted and made the decision. So, certainly yes, we

11    had plenty of meetings with our advisors. We discussed it

12    numerous times throughout the process. And then we had lots

13    of external meetings as well. Ultimately, the members of the

14    UCC decided to select Fahrenheit.

15              MR. PHILLIPS:  Were there any particular advisors

16    who were vocal in their recommendations in that process?

17              MR. WEEDMAN:  Objection, Your Honor.

18              THE COURT:  Overruled.

19              MR. ROBINSON:  I apologize. It was a, no, there

20    wasn't any particular, anything that stood out. There were

21    splits among the advisors and there were diverse opinions,

22    which was very helpful for us to balance and weigh our

23    options.

24              MR. PHILLIPS:  Do you remember or recall if any

25    particular advisors were strongly in favor of Fahrenheit?

Page 224

1          THE COURT:  Let me just, before he answers that,

2     can you tell me who the advisors were? I'm particularly

3     interested whether there were any lawyers and whether you

4     received legal advice, because, in which case, there may

5     well be attorney-client privilege involved. So before you

6     get into who said what to whom, could you tell me who were

7     the advisors that you refer to, Major Robinson?

8          MR. ROBINSON:  Yes, sir. The advisors we are

9     referring to are a mix of lawyers from White & Case, and

10    some advisors from Sparello [ph], but they were all, or had

11    many meetings where there were joint parties'

12    representatives.

13         THE COURT:  All right. So we'll go ahead with the

14    questioning and when the questions are asked, we'll see

15    whether the committee has any attorney-client privilege

16    objections to make. Not saying that there would be a valid

17    one, but I want to be sure you don't answer before they have

18    a chance to say whatever they're going to say, OK? Go ahead.

19         MR. ROBINSON:  Yes, Your Honor.

20         MR. PHILLIPS:  To help on that, Your Honor, may I

21    just request that , the witness his response to any advisors

22    from the financial advisory side as opposed to the --

23         THE COURT:  Well, let him answer the question, Mr.

24    Phillips. If the lawyers --

25         MR. PHILLIPS:  Okay.

1           THE COURT:  -- were present, it may well be that

2    attorney-client privilege applies. Attorney-client privilege

3    would not be waived because the committee had its financial

4    advisors present as well. So ask your questions. We'll see

5    whether the committee has any objections.

6           MR.PHILLIPS:   Okay. I believe I asked it. So

7    basically, were there any particular advisors who were

8    strongly in favor of selecting Fahrenheit or NovaWulf at the

9    end of the auction?

10          MR. WEEDMAN:   Objection, Your Honor. The question

11   calls for privileged communications between White & Case and

12   its financial advisors.

13          THE COURT:  Well, it may or may not --

14          MR. WEEDMAN:   It also reflects [indiscernible]

15          THE COURT:     -- because if it's business advice

16   it wouldn't. If it's legal advice that was being given, it

17   may well. So, Major Robinson, can you separate out whether

18   the advice you received, whether you consider it to be legal

19   advice or discussion of the business issues?

20          MR. ROBINSON:  Yes, Your Honor.

21          THE COURT:  Go ahead.

22          MR. ROBINSON:  Yeah. So to answer Mr. Phillips'

23   question, I don't recall any particular financial advisors

24   that were particularly strong for Fahrenheit. I know that I

25   did have conversations with lawyers present, without the

1    lawyers present, with our financial advisors. I had numerous

2    conversations with advisors in the process. But I don't

3    recall one like really pushing Fahrenheit specifically. It

4    was a very challenging and tough decision. The reason why

5    the auction took so long is both bidders were very good and

6    the process, through the bidding process, the bids changed

7    and we got better. And so, it was a, it was not a

8    necessarily easy decision. And I don't recall a particularly

9    strong push by financial advisors for Fahrenheit.

10           MR. PHILLIPS:  Thank you. And you had also

11   mentioned here that you were involved in the selection of

12   the Litigation Oversight Committee.

13           MR. ROBINSON:  Yes.

14           MR. PHILLIPS:  In paragraph 4.

15           MR. ROBINSON:  Yes.

16           MR. PHILLIPS:  I believe that you were one of the

17   appointees?

18           MR. ROBINSON:  Yes, sir.

19           MR. PHILLIPS:  Did that, does that mean that you

20   recused yourself from the selection of the other members?

21           MR. ROBINSON:  No, sir. I recused myself from the

22   selection for my selection, whether or not I would get a

23   seat on the Litigation Oversight Committee.

24   MR. PHILLIPS:  And what exactly do you mean that you recused

25   yourself from your selection as opposed to the other

Page 227

1   members?

2           MR. ROBINSON:  Well, sir, I didn't vote on whether

3   or not I would be one of them or not. The rest of the

4   committee made a decision to put me on it. So I did not have

5   a vote in whether or not, I, I raised my hand, I volunteered

6   to be on it. I submitted my name for consideration. But I

7   did not, I did not get a vote on myself.

8           MR. PHILLIPS:  All right so you didn't vote but

9   you were involved in discussions of the, of the Litigation

10  Oversight Committee members?

11          MR. ROBINSON:  Yes, sir, I, and yes.

12          MR. PHILLIPS:  Okay. And can you, were you

13  involved in discussions to appoint Keith Noyes?

14          MR. ROBINSON:  I was.

15          MR. PHILLIPS:  What was your knowledge of the

16  status of Keith Noyes at the time he was appointed to

17  Litigation Oversight Committee?

18          MR. ROBINSON:  At the time that we selected him

19  for a position on the Litigation Oversight Committee, my

20  understanding is that he is a member of the UCC.

21          MR. PHILLIPS:  Were you, was it your understanding

22  that he was a member of the UCC as a representative of

23  Covario?

24          MR. ROBINSON:  Yes.

25          MR. PHILLIPS:  Were you aware that Covario had

Page 228

1    filed for insolvency?

2            MR. ROBINSON:  I was.

3            MR. PHILLIPS:  Were you aware that Covario had not

4    been in contact with the UCC apparently for nine months per

5    what I learned at the emergency hearing last Friday?

6            MR. WEEDMAN:   Objection, Your Honor.

7            THE COURT:    Sustained.

8            MR. PHILLIPS:  What, what was your knowledge of

9    the relationship between Covario and Keith Noyes at the

10   time, at that time that he was appointed to Litigation

11   Oversight Committee?

12           MR. ROBINSON:  My knowledge was that they're still

13   in contact with them or creditors to some extent. But I

14   don't have, I don't have any personal knowledge of, of it. I

15   don't recall any conversations that we had about it.

16           MR. PHILLIPS:  When did you first become aware of

17   this issue of Covario, its insolvency, and Keith Noyes

18   eventual removal from UCC?

19           MR. ROBINSON:  Well --

20           THE COURT: I ask what relevance this has, Mr.

21   Phillips, anything that we're considering?

22           MR. PHILLIPS:  Well, I, I think it goes to this

23   issue of, you know, whether, you know, honestly, White &

24   Case was hiding the ball on some issues, because it seemed

25   like from the hearing on Friday that Mr. Pesce was aware of

Page 229

1    these things. But I'm trying to understand whether the UCC

2    members were aware of these things when these decisions were

3    made.

4            THE COURT: I still don't understand what relevance

5    that has to the issues that you're, you want, that are

6    properly before the court.

7            MR. PHILLIPS:  Well, I guess the issue that I'm

8    probing at is, you know, the UCC's independence in, in

9    actually acting on its own versus acting at the behest of

10   White & Case.

11           THE COURT:    Go on with your questions for now.

12           MR. PHILLIPS:  Okay. And, and were you aware of

13   the other members of the Litigation Oversight Committee; I

14   believe there are two [indiscernible], I forget the other

15   person's name, that they were former law partners of White &

16   Case when you appointed them to Litigation Oversight

17   Committee?

18           MR. WEEDMAN:   Objection, Your Honor, it seems

19   that's not in the record.

20           THE COURT:    Sustained.

21           MR. PHILLIPS:  I thought that was in Mr. Pesce's

22   Declaration of Disinterestedness that was filed on the

23   docket.

24           THE COURT:    I don't know.

25           MR. COLODNY:   Mr. Pesce's Declaration 9 that is,

1    Your Honor.

2             THE COURT:    I'm going to permit the question.

3    Go ahead, let's get this, let's get on with this. I'm not

4    sure what relevance this has to any of it, but go ahead.

5    What is your challenge, Mr. Phillips?

6             MR. PHILLIPS:  Like I said, I, I'm trying to probe

7    this issue of whether the –

8             THE COURT:    Just tell, tell me what your

9    objection is. I want to know why we're going through this

10   exercise.

11            MR. PHILLIPS:  Because I want, I want the UCC

12   selections of the Litigation Oversight Committee and the

13   board to be, you know, the issue in whether it was their

14   selection or White & Case's. Because, you know, my objection

15   whether it is potential malpractice on the part of White &

16   Case.

17            THE COURT:    Ask your next question.

18            MR. PHILLIPS:  Thank you. So in paragraph seven,

19   you, you say the board you had an open process to identify

20   potential new board committee members. And then you had

21   approximately 45 candidates that were considered in that

22   process. Do you remember approximately or approximately what

23   fraction were, you know, from corporate open process versus

24   were recommended by White & Case, versus were recommended by

25   Perella Weinberg?

Page 231

1              MR. ROBINSON:  I don't recall off the top of my

2     head what fraction it was. I know we had some recommended to

3     us from our financial advisors, our legal advisors, from

4     Fahrenheit themselves. But I don't, I don't recall the

5     percentage breakdown.

6              MR. PHILLIPS:  Okay, and do you remember how many

7     candidates were actually interviewed of those 45?

8              MR. ROBINSON:  I want to say we interviewed 19,

9     18. That's in my declaration, I believe. What paragraph was

10    it? I believe it was 19 that we interviewed.

11             MR. PHILLIPS:  Okay. And did you participate in

12    all 19 of those interviews? I realize they were all

13    recorded, but did you participate in those?

14             MR. ROBINSON:  No, sir. I participated in as many

15    as I could but I was not able to make all 19.

16             MR. PHILLIPS:  And approximately how many was

17    that?

18             MR. ROBINSON:  I want to say nine to twelve or so.

19             MR. PHILLIPS:  Okay.

20             MR. ROBINSON:  And when --

21             MR. PHILLIPS:  I'm sorry.

22             MR. ROBINSON:  Yeah, in person, like on Zoom where

23    I was asking questions.

24             MR. PHILLIPS:  In paragraph eight you mention that

25    there were there committee candidates, and we know that Mr.

Page 232

1    DiFiore and Mr. Duffy were two of them. Who was the third?

2            MR. ROBINSON:  I believe Keith Noyes.

3            MR. PHILLIPS:  Okay. And you also say here in your

4    declaration that they recused themselves from the

5    deliberation. So does that mean they did, that they did not

6    participate in the interviews or the seconds, or that, did

7    they solely recuse themself from the vote?

8            MR. ROBINSON:  They recused themselves from the

9    discussions of, of their positions and, but they were

10   participating in the other, the other independent or other

11   board positions. But they did not vote on themselves. And we

12   kind of, so first, the way the process works, we first

13   selected how many creditors who really wanted, wanted onto

14   the board. And then they did not participate in those votes.

15           MR. PHILLIPS:  Okay, well you're, you're going to

16   make me jump now to that process, which I think you, you had

17   in paragraph 14 of your declaration. And I guess before we

18   get to 14, what was the paragraph 13, which discusses the

19   increase of the size of the board from seven to nine. Why

20   did you choose to increase the size of the board from seven

21   to nine?

22           MR. ROBINSON:  We chose to increase the size of

23   the board to nine based on further consideration of the

24   amount of work and that the board would be asked to do,

25   getting NewCo out of bankruptcy on its feet and then going

Page 233

1    public. And just the kind of experience and skill sets of

2    what we wanted on the board, we figured, we decided it's in

3    the best interest to increase the size of the board,

4    primarily because of the workload.

5           MR. PHILLIPS:  Okay. And when you did that

6    increase you realized that the ratio of UCC appointees to

7    Fahrenheit appointees decreased from 2.5 to 1 to 2 to 1?

8           MR. ROBINSON:  Yes, we were very aware of that.

9           MR. PHILLIPS:  So, so why in increasing the size

10   of the board and you know desiring to have more bandwidth,

11   didn't you increase it to 11 so that you could maintain that

12   ratio? And again, I mean I'm looking at it from the UCC side

13   to the one appointee from the Fahrenheit side.

14          MR. ROBINSON:  Right. No, I think that the, the

15   board size of nine was appropriate. We decided it was

16   appropriate for the amount of work. We discussed the voice,

17   I mean the ratio. We felt that the board members that we

18   appointed, that they would be able to provide the necessary

19   oversight and voice for creditors and future shareholders to

20   kind of balance and oversight, provide oversight for

21   Fahrenheit. So we didn't think that it was necessary to go

22   to 11.

23          MR. PHILLIPS:  And the balance, any concern?

24          MR. ROBINSON:  It was definitely something we

25   considered, but it ultimately we felt like nine was the

Page 234

1    right fit.

2              MR. PHILLIPS:  Were you expecting Fahrenheit to

3    appoint any particular person to their third additional seat

4    in expansion to nine?

5              MR. ROBINSON:  No.

6              MR. PHILLIPS:  Okay. Now, now you had mentioned

7    and  also it's, it's in the plan supplement. I think it's

8    exhibit E, and supplement D it might have been amended set

9    of exhibits that when you look at this new, new board

10   structure of having six UCC appointees that you determined

11   that only two should be prepetition creditors including

12   committee members. Correct?

13             MR. ROBINSON:  Yes, sir.

14             MR. PHILLIPS:  Okay, and I think that's in

15   paragraph 14 of your declaration.

16             MR. ROBINSON:  Yes, sir.

17             MR. PHILLIPS:  And then you have four that are,

18   and I have to read the wording here so hang on a second

19   while I look for it. But you had four that were, were

20   independent direct is what it was characterized as. So, so

21   help me understand this because I really don't.

22             THE COURT:    Leave your editorial comments out

23   of this, please. Ask your questions.

24             MR. PHILLIPS:  Okay. So, as I understand it, the

25   agreement with Fahrenheit allowed you to make four

Page 235

1    unilateral selections to the NewCo Board of Directors.

2    Correct?

3              MR. ROBINSON:  Yes, sir.

4              MR. PHILLIPS:  And only two that were subject to

5    the mutual consent of Fahrenheit?

6              MR. ROBINSON:  Yes.

7              MR. PHILLIPS:  And why did you then choose to have

8    only two prepetition creditors including UCC members and

9    "four independent directors?"

10             MR. ROBINSON:  Yeah, so we had a lot of discussion

11   about this. And we were trying to complete the balance

12   competing interests. We knew that it was important for

13   creditors to have a voice. And the experience that creditors

14   brought to the, to the new board would be very important for

15   applying oversight to the [indiscernible]. At the same time,

16   we wanted creditors with previous experience and on public

17   boards and we wanted to balance the necessary for outside

18   professional experience with experience with Celsius or with

19   creditor experience. And so balancing those and competing

20   interests, we decided that having two creditor, reserved

21   just for creditors, was important, so the creditors still

22   making a very important voice in NewCo going forward. And at

23   the same time with the independent creditors or independent

24   board members we selected. All of our, our interview process

25   was questioning each of them on their capabilities and

Page 236

1    ability to advocate for soon-to-be shareholders, creditors,

2    that they would provide an outside oversight necessary for

3    Fahrenheit and for NewCo to be successful. We wanted to make

4    NewCo have the best chance at success, and so that's why we

5    kind of just settled on that balance.

6              MR. PHILLIPS:  Did you believe that no, um,

7    creditors other than the two UCC members could fill those

8    roles?

9              MR. ROBINSON:  We felt that those two were the

10   best for the two roles. Other people could, but they weren't

11   the best for it.

12             MR. PHILLIPS:  Okay, but that wasn't my question.

13   My question was, were there any other creditors who were

14   qualified to fill that role on the NewCo board besides the

15   two UCC members?

16             MR. ROBINSON:  Yeah, I would say we interviewed a

17   lot of really qualified candidates.

18             MR. PHILLIPS:  Were they all, were there any

19   creditors --

20             MR. ROBINSON:  Yeah, there were other qualified --

21             MR. PHILLIPS:  Okay, and were there any creditors

22   that had more world experience that Mr. Duffy or Mr.

23   DiFiore?

24             MR. ROBINSON:  I'm trying to recall candidates

25   right now. I think there may have been.

Page 237

1          MR. PHILLIPS:  And why weren't they selected?

2          MR. ROBINSON:  Well, in the review of all the

3    materials that each applicant submitted along with their

4    interviews, resumes, certainly we had a lot of experience

5    with Tom and Scott, right. We've been on UCC for a long time

6    with them. There is a fair amount of trust. And we, the four

7    of us, we voted on it. We're cognizant of the fact that we

8    did not want to have a subconscious bias just because we had

9    worked with them. And so we had a very deliberative process

10   of speaking with advisors and discussing amongst ourselves

11   which of the creditor candidates were the best qualified.

12   And ultimately, we decided that Tom and Scott would be best

13   qualified.

14          MR. PHILLIPS:  And why weren't any of those

15   creditors qualified any of the "four independent director

16   slots?"

17          MR. ROBINSON:  I never said they weren't

18   qualified.

19          MR. PHILLIPS:  So there were, there were some

20   creditors that would qualify for the independent director

21   slots?

22          MR. WEEDMAN:   Objection, that's been answered

23   three times now.

24          THE COURT:    Sustained.

25          MR. PHILLIPS:  Okay.

Page 238

1            THE COURT:     Wrap it up --

2            MR. PHILLIPS:  So again, okay. Well, I got a

3    couple of pieces of evidence or exhibits that I, I wanted to

4    ask you about regarding my own candidacy. --

5            THE COURT:     Now, Mr. Phillips, this is not a

6    hearing for a disgruntled person not selected for a

7    committee. If you have any more questions, ask them. Let's

8    get it over with, because I view everything you're asking as

9    a disgruntled person who was not selected. That's not the

10   purpose of this hearing.

11           MR. PHILLIPS:  Your Honor, I'm merely asking why

12   creditors --

13           THE COURT:     Ask your next question, Mr.

14   Phillips, or you're over.

15           MR. PHILLIPS:  Okay. So in selecting Mr. Aidoo for

16   the committee, did he have any prior board experience?

17           MR. ROBINSON:  I don't recall the specifics of his

18   prior board experience.

19           MR. PHILLIPS:  In selecting Mr. Aidoo for the

20   committee, you said you were aware of his tax issues. What

21   impact did you think his tax issues would have on the

22   confidence of NewCo equity investors in the future when they

23   were evaluating whether or not to purchase stock?

24           MR. WEEDMAN:   Objection, Your Honor.

25           THE COURT:     Sustained.

Page 239

1              MR. PHILLIPS:  What impact did you think Mr.

2     Aidoo's tax issues would have?

3              MR. WEEDMAN:   Objection, Your Honor.

4              THE COURT:    Sustained.

5              MR. PHILLIPS:  Are you familiar with NASDAQ Rule

6     5605 (a)(2) regarding independent directors?

7              MR. ROBINSON:  Can you, can you refresh my

8     recollection? I may have heard it in a discussion but I

9     don't want to misspeak.

10             MR. PHILLIPS:  Sure. NASDAQ Rule 5605, uh, defines

11    board of directors and (a)(2) essentially deals with who is

12    an independent director. And so you said in your declaration

13    that you considered independence and diversity as part of

14    the qualifications for directors, correct?

15             MR. ROBINSON:  Yes, sir.

16             MR. PHILLIPS:  Okay. NASDAG Rule 5605(a)(2)(B)says

17    a director who accepted or has a family member who has

18    accepted any --

19             THE COURT:    Mr. Robinson, did you consider that

20    NASDAQ release in your deliberations, yes or no?

21             MR. ROBINSON:  I believe so. Yes, Your Honor.

22             THE COURT:    All right go ahead.

23             MR. PHILLIPS:  Okay in paragraph 9 I believe you

24    stated that. It's and so it, in 5605(a)(2)(B) it says a

25    director who accepted or who has a family member who accepts

Page 240

1   any compensation from a company in excess of $120,000 during

2   any period of 12 consecutive months within the three years

3   preceding a determination of independence, that is involved

4   which has the three minor exceptions. Did you consider

5   whether or not Mr. Aidoo met the requirements including

6   NASDAQ Rule 5605(a)(2)(B) for being an independent director?

7           MR. WEEDMAN:   I'm going to object to the question

8   to the extent he's asking about a NASDAQ regulation that's

9   not before the witness and we can't verify.

10          THE COURT:     Sustained.

11          MR. PHILLIPS:  Did you consider whether or not Mr.

12  Aidoo met the requirements, as we stated here the NASDAQ

13  requirements, for boards of directors including in respects

14  to independency and diversity?

15          MR. ROBINSON:  Yes, sir.

16          MR. PHILLIPS:  And you determined that he did?

17          MR. ROBINSON:  Yes, sir.

18          MR. PHILLIPS:  Do you believe that all six

19  directors selected by the UCC met the requirements of

20  independence?

21          MR. ROBINSON:  Yes, sir.

22          MR. PHILLIPS:  Okay. So why did you make the

23  distinguishment between prepetition creditors and

24  independence directors if all six met the requirement of

25  independence?

Page 241

1          MR. ROBINSON:  I'm confused. Can you, can you

2      re --

3          MR. PHILLIPS:  Yeah, so, so, so your testimony is

4      that the UCC decided to have two prepetition creditors and

5      four independent creditors. And then you just said that all

6      six met the requirements of the independent creditors. So,

7      why did you split the requirement between two prepetition

8      creditors and four independent directors when all six were

9      actually independent directors?

10          MR. WEEDMAN:   Objection, Your Honor, he, I think

11      he's misstating the witness's testimony.

12          THE COURT:    Overruled. Are you able to answer

13      that question?

14          MR. ROBINSON:  I'm sorry?

15          THE COURT:    Are you able to answer that

16      question, Mr. Robinson, Major Robinson?

17          MR. ROBINSON:  I, I think that I may be, so when

18      we were discussing the NASDAQ requirements, I wasn't

19      necessarily reading the, like the by-number statute of what

20      the NASDAQ required. We were advised on what the NASDAQ

21      required and whether or not we, we discussed whether or not

22      what candidate meet that, met those requirements. We

23      certainly asked questions. We relied on legal advice. And

24      the, my understanding is that, that nobody would be

25      prohibited from serving on, my, no one would be prohibited

Page 242

1   on the NASDAQ requirements. I'm sorry to [indiscernible] for

2   it. So maybe I'm just misunderstanding what Mr. Phillips was

3   asking.

4          MR. PHILLIPS:  I'm asking why you split between

5   the two prepetitioned and four independent and all six were

6   actually independent?

7          MR. ROBINSON:  Maybe I'm misspeaking when I'm

8   saying independent because I'm not sure if I'm using the

9   word independent properly there. So I, I would say that all

10  six are, one of the, when I say independents but met

11  requirements for that. And at that point I'm [indiscernible]

12  I'm not aware of anything from the NASDAQ requirements that

13  would prohibit any of the candidates from serving.

14         MR. PHILLIPS:  In paragraph 11 of your declaration

15  you talk about Mr. Aidoo's relationship with, relationship

16  with Perella Weinberg. Do you have personal knowledge of his

17  current status as an employee or not an employee for Perella

18  Weinberg?

19         MR. ROBINSON:  Not personal knowledge in terms of

20  that. I haven't called his company and asked them.

21         MR. PHILLIPS:  So, the statement that he'll be

22  stepping down from his executive director position at

23  Perella Weinberg is based on what?

24         MR. ROBINSON:  Information I was told.

25         MR. PHILLIPS:  So it's kind of hearsay?

Page 243

1          MR. WEEDMAN:   Objection. Form.

2          THE COURT:    Sustained.

3          MR. PHILLIPS:  So who told you that information?

4          MR. ROBINSON:  My advisors. Our, our advisors.

5          MR. PHILLIPS:  Okay.

6          MR. ROBINSON:  Yes.

7          MR. PHILLIPS:  And then, um, with regards to the

8    background investigation. Let me go back, back here just for

9    a second to allow me, I'll be finishing up quickly here,

10   Your Honor. Um, you, you mentioned in here that in paragraph

11   ten that the committee authorized counsel on prior

12   independent investigator to conduct comprehensive background

13   checks on certain candidates. Do you know how many

14   candidates that, that was, the background checks were

15   conducted on?

16         MR. ROBINSON:  I think it was around ten.

17         MR. PHILLIPS:  Okay. And then if I could direct

18   you to the amendment that, which is from the plan supplement

19   on Page 51 of 170, Docket Number ECCF 3444, the new board of

20   directors?

21         MR. WEEDMAN:   Your Honor, if I may, uh, Mr.

22   Phillips had indicated he was going to circulate this

23   information and he, we didn't receive it prior to, to this

24   hearing.

25         THE COURT:    I did.

Page 244

1           MR. WEEDMAN:   Oh, I don't think that we did, and

2    the witness doesn't have it in front of him.

3           MR. PHILLIPS:   I did send it to Aaron, Aaron

4    Colodny's email prior to the, this beginning.

5           MR. COLODNY:   I think I got it three minutes

6    before, Your Honor. And it's Exhibit B from Docket

7    [indiscernible]. But I am not sure if Mr. Robinson knows.

8           THE COURT:     Well, there is specific language in

9    it, Mr. Phillips that you want to ask him about, just read

10   it to him slowly.

11          MR. PHILLIPS:   Sure. I'm going to read you the

12   third paragraph of it. And it says to facilitate the

13   committee's final selection, the committee's legal and

14   financial advisors assembled recommended elected board

15   questionnaires, conducted interviews with perspective board

16   members along with the committee members and hired an

17   independent investigator to conduct comprehensive background

18   checks on candidates who all agreed to the investigation. So

19   I'm a little confused because this seems to me that saying

20   that there were --

21          THE COURT:     I don't care whether you're

22   confused. If you have a question, ask him a question.

23          MR. PHILLIPS:   Okay, so it's, were the background

24   checks conducted on all candidates who agreed to the

25   investigations or on only nine candidates?

Page 245

1              MR. ROBINSON:  I'm --

2              MR. COLODNY:   Your Honor, objection, Your Honor.

3              THE COURT:     Overruled.

4              MR. ROBINSON:  I believe every candidate we did

5    the background check on agreed to it. I don't think we did

6    any that were, but I, I could be mistaken.

7              MR. PHILLIPS:  Do you know the identities of what

8    candidates had background checks on, and can you, can you

9    state which ones you remember?

10             MR. ROBINSON:  I don't recall all ten off the top

11   of my head. Uh, I know that everybody was selected or, had a

12   background check and I know there were several others. But I

13   can name a few if you want me to.

14             MR. PHILLIPS:  Yes, please do.

15             THE COURT:     I don't want you to name any of

16   them.

17             MR. PHILLIPS:  All right, thank you, Your Honor.

18   I have no further questions.

19             THE COURT:     Any, redirect?

20             MR. WEEDMAN:   One, one question here.

21             THE COURT:     Go ahead.

22             MR. WEEDMAN:   So if there are any, are there any

23   other cross examiners? I need, need to --

24             THE COURT:     Does anybody else wish to cross

25   examine?

Page 246

```
 1                THE CLERK:     Sam-, Sami Sheik is on the line,
 2      Judge.
 3                THE COURT:     Go ahead, Mr. Sheik.
 4                MR. SHEIK:     Can you hear me? Thank you, Your
 5      Honor. Sir, if, would you, when it comes to Asher
 6      Jenoot, were you aware that there was a SEC fine that was
 7      levied on him and his organization, USBTC before his
 8      addition to the board or the, you know to the board?
 9                MR. WEEDMAN:     Objection, assumes facts not in
10      record.
11                THE COURT:     I'm sorry?
12                MR. WEEDMAN:     Assumes facts in record.
13                THE COURT:     Well, do you know whether that's
14      the case or not, Major Robinson? Don't, don't assume the,
15      that the question is correct, but do you have knowledge
16      about that alleged fact?
17                MR. ROBINSON:   No, Your Honor.
18                THE COURT:     Okay. Sustained.
19                MR. SHEIK:     Okay. Thank you. And final
20      question, when, when deciding to go from seven to nine
21      individuals on this board, or this committee, rather, and in
22      assessing the value of that let's say Fahrenheit would be
23      bringing into this, you had mentioned earlier that, you
24      know, that you needed to increase that number because there
25      was that much work to be done. How did you go about
```

Page 247

1    determining, you know, that assessing their value and, and

2    you know coming to the conclusion that you would need to

3    increase the number of positions to nine board members as

4    opposed to seven, given that there is a bunch of people will

5    be introduced into this board that will all come with a

6    heavy cost to the estate?

7              MR. WEEDMAN:   Objection Your Honor.

8              THE COURT:     Sustained.

9              MR. SHEIKH:   And how --

10             THE COURT:     One more question.

11             MR. SHEIKH:    Sure, I, I'm trying to gather my

12   thoughts on this one, Your Honor. Please bear with me. How

13   is the, uh, the, okay so was there a job description or a

14   process formally rolled out to the creditors to apply for a

15   position on the board?

16             MR. ROBINSON:  I'm not sure if there was like a

17   formal rollout [indiscernible] votes, something to be

18   posted. I know that we expected at least, we expected

19   applicants to come from many different [indiscernible]. And

20   we also asked and requested our advisors to compile a list.

21   So they, they were tasked with, you know, helping us solicit

22   and gather applicants from many sources, from some they

23   knew, and from outside sources.

24             MR. SHEIKH:    So this was not officially rolled

25   out as a requisition, uh, as such as a normal job would, you

Page 248

1    know a requisition would be rolled out. This was more, I

2    guess it was just mentioned over a town hall or through some

3    other informal means?

4              MR. WEEDMAN:    Objection, Your Honor.

5              THE COURT:     Sustained. All right that's your

6    questions.

7              MR. SHEIKH:     Those are all the questions I had.

8    Thank you, Your Honor. I appreciate it.

9              The COURT:     Thank you very much. Anybody else

10   wish to examine? All right, Mr. Weedman.

11             MR. WEEDMAN:    Just one question Your Honor. Mr.

12   Robinson, were all creditors other than Mr. DeFiore[ph] and

13   Mr. Duffey considered for all spots in the NewCo board?

14             MR. ROBINSON:  Yes.

15             MR. WEEDMAN:    Okay, thank you Mr. Robinson. And

16   Your Honor, I realize when I was up there before I

17   authenticated and introduced the affidavit but I didn't move

18   it into evidence and so I'd like to move --

19             THE COURT:     All right any objections to Major

20   Robinson's affidavit, it's declaration, it's UCC Exhibit

21   230, ECF3584? If there is no objection, it's in evidence.

22        (UCC Exhibit 230, ECF3784, received into evidence)

23             MR. WEEDMAN:    Thank you, Your Honor.

24             THE COURT:     All right. All right that's the end

25   of the evidence for today. Let's just talk briefly about

Page 249

1    what witnesses will be called tomorrow, Mr. Colodny?

2              MR. COLODNY:    Yes, Your Honor, I think we'll

3    begin tomorrow with Mr. Galpo[ph] our expert witness. And

4    then I believe that Mr. Kampanya[ph] will be the next

5    witness which will conclude the case-in-chief.

6              THE COURT:    Okay.

7              MR. PHILLIPS:  Your, Your Honor?

8              THE COURT:    No, just a second. Go ahead, Mr.

9    Colodny.

10             MR. COLODNY:    We have a, a few evidentiary issues

11   about the video clips and other things that we intend to

12   address with Your Honor tomorrow.

13             THE COURT:    Okay. All right that's our day for

14   tomorrow. Let me, is there anything that's intended to fill

15   Thursday and Friday, and we'll have completed the witnesses

16   as part of Debtor and Committees case-in-chief?

17             MR. KOENIG:    Your Honor, Chris Koenig, Kirkland

18   & Ellis for Celsius. We don't have any other witnesses.  We

19   do have an omnibus hearing on Thursday at 10:00 a.m.

20             THE COURT:    Yeah.

21             MR. KOENIG:    Nothing else for this trial.

22             THE COURT:    Okay. All right. All right I see

23   you all tomorrow. I would ask that, because I have another

24   hearing at, you need to move your materials off of the

25   counsel table. You can keep them, the court room is going to

Page 250

1   be locked. So if you want to put them on the side you don't

2   have, anything you want to leave, you can do that. Mr.

3   Phillips, you wanted to be heard?

4           MR. PHILLIPS:  Yes, Your Honor. I would just

5   request that, that I be given remote access to the

6   transcript from today's hearing --

7           THE COURT:     There is no transcript to the,

8   there is no transcript from today's hearing. A transcript

9   can only be, there, there is a voice recording system. The

10  transcript needs to be ordered. There is no transcript

11  ready.

12          MR. PHILLIPS:  Can I be given access to that voice

13  recording?

14          THE COURT:     You, no, not tonight. If you want

15  to order the transcript, you can order the transcript. There

16  will not be a transcript tomorrow. We are adjourned for the

17  day.

18      (Whereupon the proceedings were concluded at 4:43 PM)

19

20

21

22

23

24

25

1            C E R T I F I C A T I O N

2

3        I, Dani Rossean, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8

9    Dani Rossean

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[& - 22]                                                                    Page 1

| **&** | **100**  27:24 62:8 | **14**  145:5 178:4 | 200:14 201:14 |
|---|---|---|---|
| **&**  3:3,11 6:22 | 62:13 100:3 | 232:17,18 | 233:7 239:6,11 |
| 8:1 51:22 76:2 | 121:2 | 234:15 | 239:16,24 |
| 103:18,20 | **10004**  1:14 | **147**  13:6,8 | 240:6 |
| 126:9,15 | **10020**  3:14 | **15**  17:2,6 24:12 | **2,000**  99:24 |
| 199:11 200:13 | **10022**  3:6 | 25:9 28:25 | **2,026**  201:14 |
| 202:8,22 215:5 | **10:00**  24:11 | 29:15,19 39:20 | **2.5**  233:7 |
| 216:1 218:17 | 25:8 249:19 | 40:18,18 42:3 | **20**  16:19 17:5 |
| 224:9 225:11 | **11**  63:16,23 | 66:20 157:16 | 17:14 23:25 |
| 228:23 229:10 | 82:23 127:16 | 159:6 184:15 | 27:1 42:13 |
| 229:15 230:14 | 156:20 160:3 | 195:5 212:17 | 43:9,9 66:13 |
| 230:15,24 | 174:8 178:4,15 | **150**  27:23 | 66:20 73:10 |
| 249:18 | 183:13,21 | 103:1 | 174:5 184:15 |
| **0** | 203:8 205:14 | **16**  195:2 | 186:4 |
| **09:00**  1:17 | 205:20 206:12 | **163**  195:4 | **20,000**  188:12 |
| **1** | 206:20,21 | **17**  42:15,18 | 188:15 |
| **1**  83:6 85:13 | 207:1,19 210:5 | 66:25 156:14 | **2011**  156:17 |
| 99:22,22 | 213:7 233:11 | **170**  243:19 | **2017**  207:20 |
| 143:11 177:5 | 233:22 242:14 | **175**  158:8 | **2018**  123:4 |
| 207:6 233:7,7 | **112,131,300....** | **177**  29:24 30:1 | **2022**  9:2 17:5 |
| **1,000**  99:23,24 | 194:18 | 30:3 | 19:7 66:11 |
| 100:2 | **12**  34:11 | **178**  29:24 30:1 | 67:23 68:18,19 |
| **1,026**  83:4,14 | 115:23,23 | 30:3 | 94:8 103:1 |
| **1,126**  87:10,19 | 208:5 209:8 | **18**  231:9 | 156:22 157:8 |
| **1,200**  82:23 | 240:2 | **181**  29:24 30:1 | 157:14 159:4 |
| **1.25**  16:14 | **120,000**  240:1 | 30:3 | 178:4 220:14 |
| **1.60**  67:9,17,22 | **121**  29:2,4,17 | **183**  29:6,17 | **2023**  1:16 2:2,6 |
| **1/2**  62:8,13 | 29:20 | **184**  29:20 | 33:8 162:11 |
| **10**  16:19 17:16 | **1221**  3:13 | **19**  231:8,10,12 | 165:20,22 |
| 20:22,24 21:11 | **125,000**  16:21 | 231:15 | 171:5 178:18 |
| 21:14,15,18 | **12:00**  19:2 | **195**  22:11,12 | 184:24 |
| 122:16 126:11 | **12th**  19:7 | 22:24 23:13,14 | **2024**  120:5 |
| 130:13 158:6 | 66:11 | 23:16 | 147:7 |
| 212:17 | **13**  13:8 34:19 | **2** | **21**  30:16 43:21 |
| **10,000**  99:22 | 232:18 | **2**  15:19 39:13 | 60:13 74:21 |
|  | **135**  159:8 | 191:11 192:4 | **22**  44:8,9 |
|  |  | 199:13,19 |  |

[22-10964 - 50]

Page 2

**22-10964**  1:3
**22nd**  67:17,22
**230**  248:21,22
**233**  20:13,22
20:24 21:16
**239,000**  214:6
**24**  161:20
175:11 179:22
**25**  24:11,16,24
25:4,5,9 62:4
62:20 64:4,23
191:19 207:22
208:20 209:17
**250**  115:12
**250,000**  17:4
**25th**  208:21
209:25
**26**  45:23 75:6
147:14
**27**  28:25 29:15
29:19 46:6
75:17 184:24
**270**  119:1
**27th**  33:8
**28**  19:3,13 24:8
24:13,14,25
25:1,5,10,11
49:16 50:24
67:16
**28369**  251:8
**29**  65:12
**2902**  133:14
**296**  133:17,18
133:24 134:2,3
134:5
**2:00**  154:22

**2:01**  155:2

**3**

**3**  1:16 2:2,6
28:25 29:15,19
68:6 83:23,25
84:2 116:3,6
133:11,13,18
134:6,18,20,22
178:20
**3,000**  191:11
**3.2**  177:14
178:23
**3.5**  207:5
**30**  29:1,16,19
119:14,21
130:10 135:14
135:14 137:1
144:6 195:24
**300**  158:15
**301**  133:22
**307**  118:16,17
147:1
**31**  178:16
208:20
**31st**  104:6
**32**  113:20
**324**  133:17
**3293**  21:16
**33**  137:15
143:25 144:3,7
144:9,11,13
**332**  133:20,21
133:22,24
134:2,3,5
**34**  11:22 12:15
12:18

**3444**  243:19
**35**  113:20
**350**  159:2
**3532**  65:11,14
**3574**  184:19
**3577**  2:3,6
**3581**  33:7,16
72:10
**3584**  221:4
**3586**  204:10
206:22
**3588**  176:13
**3589**  5:8
**3591**  132:23
**36**  24:7 25:7
**36,000**  192:23
**3609**  2:3,6
**3667**  2:1
**3668**  2:5
**37**  12:21 13:18
13:21 122:22
**38**  30:19,19,21
31:8,12 81:21
81:24 82:12,18
82:22 83:4
**388,000**  207:12
**393**  30:17,20
78:9
**394**  133:18

**4**

**4**  201:14 222:9
226:14
**40**  117:3
**400**  121:2
**400,000**  186:3
188:4,6 189:2
189:15

**400s**  119:4
**410**  166:2
**420**  131:19
**43**  5:17
**44**  10:21 11:16
11:17,19 30:14
30:23 31:1,6
31:12 33:8
81:2,5,23
**45**  166:8,9,18
166:20 230:21
231:7
**450**  16:18
131:16
**480**  147:11,13
**481**  119:4
**4:00**  175:10
216:13,14
217:4 218:10
**4:43**  250:18
**4:50**  155:21
**4:55**  155:21

**5**

**5**  38:1 57:15
66:18 117:24
120:6 121:16
178:21 195:3
201:14
**5,126**  201:14
**5,160**  197:18
**50**  17:5 27:23
100:13 129:20
130:8 143:24
144:2,11,12
186:6 208:22
209:17

**500**  188:17
**500,000**  50:1
**51**  28:25 29:16
29:19 100:13
176:9,13,20
243:19
**513**  201:14
**53**  30:15 31:6
31:12
**54**  29:1,16,20
**55**  179:22
**550**  159:2
**56**  29:1,16,20
**5605**  239:6,10
239:16,24
240:6
**565**  166:3

**6**

**6**  20:7,13,22
21:11,14,15,18
65:12 144:1
201:14 209:13
**6.19**  195:15
**60**  148:19
184:20,21
185:2 187:8,11
**601**  3:5
**61**  132:17,18
132:21 133:5,7
133:9
**64**  192:7
201:14
**68**  204:10,18
204:19,21
206:12,22
**69**  19:17,24
21:11,18 22:21

**7**

**7**  62:7,11 63:17
63:23 78:9
83:19,19 88:9
115:24 116:17
193:25 201:15
**70**  157:15
159:5 208:23
**72**  62:8,13
**720**  166:3
**75**  171:8,14
208:23 209:18
**750,000**  55:13
**78**  157:15,17
**79,500**  191:8

**8**

**8**  26:9 34:4,6
66:13 116:17
142:12 166:22
166:22 167:6
170:20,20,21
171:25 193:25
**80,000**  116:23
186:3
**81**  24:14,24,25
25:1,5,11
57:18 61:20
64:23 67:5,8
67:18
**834**  201:13,21
**85,000**  116:23
**858**  78:9 83:11
83:14
**859**  84:23
**860**  85:12

**862**  86:22
**869**  87:9,19
**870**  89:13 90:2
**88**  29:1,16,20
**89**  29:1,17,20

**9**

**9**  72:7,15
168:15 221:6
229:25 239:23
**9.8**  178:7
**90**  61:10,11,13
61:16 62:22
64:7,9,11
117:4 186:13
192:24
**91**  29:1,4,17,20
**94**  99:9
**95**  64:18 91:20
**950**  103:1
**960**  195:3
**97**  192:9
**9th**  198:25

**a**

**a.m.**  249:19
**aaron**  3:16
215:25 244:3,3
**abeyance**
48:23
**ability**  10:7
17:24 42:5
69:11,15
121:14 131:5
198:21 236:1
**able**  5:7 7:13
9:16 10:5
58:25 59:3,5,7

59:16 61:16
73:6 80:6
107:21 109:3
118:10 131:12
132:4 138:1,10
139:18 187:3
192:20 194:23
195:18 197:15
201:6 212:13
212:14,15
231:15 233:18
241:12,15
**above**  67:7
209:18
**abreu**  4:10
92:11,11,14,15
93:11,16,20,23
94:3,14,25
95:1,4,6,10,20
96:6,16,25
97:9,20 98:4
98:14,19,25
99:7,11,15,18
100:1,11,17,21
101:8,11,17,24
102:2
**absent**  208:18
**absolutely**  16:3
31:21 40:17
46:10 48:21
54:13 155:18
182:18
**abstained**
189:21,23,25
191:12
**abstention**
191:2

**abstentions**
191:4
**accept** 63:22
71:7,25 188:1
190:4 192:9,25
197:19 217:1
**acceptable**
44:1 93:4
**accepted** 58:15
186:12,13
197:16 239:17
239:18,25
**accepting** 58:4
**accepts** 239:25
**access** 160:1
250:5,12
**accessed** 190:6
**accordance**
86:24 148:4
**account** 87:22
88:20 114:22
173:19 185:17
185:17 186:6
186:12,19
188:5,9,13
210:2
**accountholder**
78:6
**accountholders**
190:23 191:9
191:11 201:16
**accounting**
174:1
**accounts** 29:24
71:16 159:25
**accurate** 11:9
12:9 13:12

21:5 23:8
31:16 34:9,10
34:13,17
132:23 153:8
153:10 166:10
176:14,17
184:23 192:6
193:3,8 194:18
194:24 195:4
195:11 204:14
251:4
**achieve** 61:9
151:25 152:10
152:12
**achieved** 28:6
**acknowledged**
47:8
**acquire** 57:13
**acquirer** 160:2
**acquirers**
157:15
**acquisitions**
156:9
**act** 214:15,16
**acting** 8:25 9:5
14:9 27:18
229:9,9
**action** 9:25
76:17 172:19
199:18
**actionable**
162:21
**actional** 163:4
**actions** 15:10
125:13
**active** 101:4
219:2

**activity** 111:18
112:5 170:9
**actors** 97:17
**acts** 15:15 51:1
51:5 55:3
**actual** 38:5
111:21 147:6
**actuality**
148:19
**actually** 38:25
71:6 77:13,14
92:16 116:17
116:25 117:11
118:3,5 149:6
159:24 188:2
189:17,22
190:24 191:1,5
198:3 203:20
203:21 206:4
207:6,11
212:14 222:15
229:9 231:7
241:9 242:6
**ad** 40:19,20,23
41:3,5,7,11,15
43:2,4,5
199:12
**add** 95:22 96:2
108:10 143:8
191:7
**added** 19:18
52:12,19
**addition**
169:12 203:14
209:14 246:8
**additional**
12:11 13:14

14:15 37:5
76:12 110:23
130:16 138:2
139:8 144:25
154:8 162:12
198:1 200:9
234:3
**address** 7:16
30:6 90:5
185:16 249:12
**addressed** 49:9
**adds** 109:19
**adjourned**
250:16
**adjusted** 17:3
17:13 151:10
171:25
**adjustments**
151:19,23
152:13 175:12
178:22
**adjusts** 116:20
**adler** 199:6,8
199:11,11,19
199:24 200:3
**administration**
53:19,25
**administrative**
183:6
**administrator**
39:3,3,9,14,15
39:17 40:2,10
44:17,19,23
48:11 53:19
54:14,20,21
55:2 69:5
183:17 212:1

administrator's
39:6
admit 28:22
30:6 54:5
134:17 187:7
204:18
admitted 12:16
13:20,23 18:23
21:16 22:21
23:15 29:18
30:2 31:19
72:9 81:6,20
133:7 134:20
166:20 167:8
170:16 187:11
204:20
admitting
29:15 30:1
134:19
adopt 11:12
12:11 13:14
133:1 166:12
166:14 185:1
205:2
advice 156:9
156:22 170:9
224:4 225:15
225:16,18,19
241:23
advise 77:12
170:17 203:1
advised 223:9
241:20
advising
156:18
advisor 183:7
183:17

advisors 14:3
33:20 41:21
44:7 77:18,19
102:20 125:10
169:21 183:24
183:25 185:11
185:11 220:24
223:7,11,15,21
223:25 224:2,7
224:8,10,21
225:4,7,12,23
226:1,2,9
231:3,3 237:10
243:4,4 244:14
247:20
advisory 156:3
156:8,11,15
174:1 224:22
advocate 236:1
aesthetics 82:9
82:10
affidavit
248:17,20
affirm 8:13
126:22 202:15
afternoon
127:5 173:14
182:21,23
187:18 202:7
202:19 210:14
215:25 216:7
216:11,24
217:6 218:16
age 116:14
agent 36:3
37:19 38:4
51:9,18 183:6

183:16,23
184:16
agents 39:12
aggregate
159:6
aggressive
103:11
ago 14:6 16:7
28:9 30:18
56:2
agree 6:6,9
7:15 44:19
50:25 52:2
54:7 79:18
148:9 149:3,7
149:24 150:3
150:18 151:4
151:17 152:14
168:18 195:1
agreed 41:14
145:3 164:22
200:1 244:18
244:24 245:5
agreement
10:11 15:10
20:19,21 21:3
21:6,22,23
22:18,20,25
23:6,10 50:22
53:20,21 54:1
54:14,20,22
63:1 88:5
129:15 130:15
130:15 234:25
agreements
27:13,14
104:12 157:16

176:5
agrees 87:21
88:19
ahead 6:20
40:16 48:12
53:17 54:2,9
54:12 55:9,14
56:6,14,15,19
62:18 64:3
66:4 69:2,21
69:22 71:11
72:4,17 74:8
74:17 78:2
79:9 80:6,16
80:24 83:16
87:14 89:7
91:11 92:14
93:18,22 94:19
104:22 105:19
105:20 107:17
108:3,15 111:3
113:12,18,23
117:20 118:12
127:4 135:5
138:22 141:8
141:10,14
150:10 167:18
168:12 177:6
178:1 181:2
188:10 191:17
194:15 195:19
196:23 198:13
201:3 213:18
217:21 224:13
224:18 225:21
230:3,4 239:22
245:21 246:3

249:8
aiding 170:3
aidoo 170:3,6,9
  238:15,19
  240:5,12
aidoo's 239:2
  242:15
alameda 68:6,9
albeit 145:10
align 138:3
  205:7,10
aligned 9:15
  14:10 73:9
  112:9
alignment
  138:12
allegation
  95:13
alleged 246:16
allison 202:9
  202:21 212:12
allocation
  149:14
allow 53:24
  160:1 185:17
  243:9
allowed 108:23
  199:14 234:25
alternative
  18:8 174:25
  176:3
alternatives
  156:23,23
alvarez 28:7
  103:18,20
  202:22

ama's 30:5
amended 19:19
  33:1 179:8
  184:18 189:21
  193:24,25
  201:13,13
  234:8
amendment
  243:18
amendments
  211:16
americas 3:13
amount 27:19
  36:13 42:12
  55:24 66:11
  68:20 84:3
  85:16 101:4
  104:11 106:2
  130:8 151:13
  178:21 189:16
  192:7 197:20
  206:25 209:12
  232:24 233:16
  237:6
amounts 51:12
  203:8 206:8
  210:7,23 211:3
  211:11
ample 55:24
  60:11
analyses
  205:23 206:15
analysis 9:3,8
  114:3 165:18
  166:13,23
  167:3 170:18
  171:23 172:16

174:11,16,21
175:6 176:24
180:11 181:13
181:15 206:23
207:3,25 208:1
208:2 209:6
210:5,6
analytics 93:10
analyze 203:17
  205:15,18
  206:1
analyzed
  203:23
analyzes
  206:17
annualized
  207:4,5
answer 43:25
  59:18 74:8,13
  74:13,14,16
  79:17 80:5,6
  90:18 93:21
  94:19,20 101:6
  105:16,20,20
  106:19 113:24
  137:20 147:4
  152:4 153:4
  192:20 195:19
  214:9 224:17
  224:23 225:22
  241:12,15
answered
  59:13 125:3
  137:18 153:18
  154:5 187:20
  237:22

answers 224:1
anticipate
  121:6
anticipated
  128:18 129:7
anybody 55:6
  71:20 77:24
  78:12,22 92:9
  102:3 104:19
  107:6 110:21
  110:25 113:4
  122:17 138:19
  143:19 154:7
  168:10 172:24
  173:1 191:15
  193:20 196:17
  199:5 202:1
  212:7 213:1
  214:22 245:24
  248:9
apologies 31:1
  31:10 82:7
apologize
  30:10 42:15
  48:5 74:10
  117:22 118:14
  120:25 134:1
  161:18 178:25
  201:1 213:13
  223:19
apparently
  194:21 228:4
appear 5:18
  78:15
appearing 4:1
  219:3

| | | | |
|---|---|---|---|
| **appears** 118:15 192:4 | **approach** 19:21 53:25 134:9,11 155:14 173:10 175:24 177:5 182:17 202:11 219:9 | 130:13 131:16 131:19 144:1 147:11,13 156:14 158:8 158:15 171:13 183:11,14 184:15 186:2 188:12 192:23 195:4,4 208:22 230:21,22,22 231:16 | **arrived** 144:21 |
| **applicable** 5:17 | | | **arthur** 4:10 |
| **applicant** 237:3 | | | **artur** 92:11 |
| **applicants** 220:23 247:19 247:22 | | | **asher** 127:25 129:13 142:5,8 142:10 143:10 154:2,3 246:5 |
| **application** 84:24 | | | **aside** 60:20,25 |
| **applied** 75:7 120:9 | **approached** 139:9 | | **asked** 59:12 136:18 142:2 154:5,6 164:24 165:3,4 174:12 174:13 178:6 198:23 200:5 202:25 203:13 203:17 205:15 205:17 224:14 225:6 232:24 241:23 242:20 247:20 |
| **applies** 225:2 | **appropriate** 16:2 28:3 45:24 75:11 149:20 171:11 207:9 233:15 233:16 | | |
| **apply** 7:3 58:21 91:25 125:5 247:14 | | **april** 222:16 | |
| | | **areas** 59:24 156:24 | |
| | | **argue** 90:24,25 92:23 99:17 193:14 196:4,5 | |
| **applying** 235:15 | **appropriately** 76:11 121:18 | | |
| **appoint** 106:25 141:24 227:13 234:3 | **approval** 28:9 | **argument** 90:9 90:23,25 193:14 | |
| | **approve** 130:25 | | |
| | **approved** 40:11 75:20 102:9 103:21 104:3,5,6 205:20 207:2 207:20 211:8 211:17 | **arises** 47:11 | **asking** 89:11 89:19 106:6 107:11 125:8 196:13 231:23 238:8,11 240:8 242:3,4 |
| **appointed** 106:17 107:6 154:4 227:16 228:10 229:16 233:18 | | **arms** 15:22 75:13 | |
| | | **army** 219:6 | |
| | | **arose** 50:8,10 | |
| | | **arrangement** 49:21 | **aspect** 16:6 |
| **appointee** 233:13 | **approves** 103:23 | **arrangements** 5:16 | **aspects** 13:25 146:21 148:13 |
| **appointees** 108:6 226:17 233:6,7 234:10 | **approving** 184:1,10 | **arrington** 127:18,18 128:6,8,9 131:10 136:13 136:22 137:17 137:21 141:17 141:20,25 | **assembled** 244:14 |
| | **approximate** 115:20 131:14 195:2 | | **assertion** 149:15 |
| **appreciate** 109:14,17 143:16 168:8 217:5 248:8 | | | **assessed** 172:12 |
| | **approximately** 17:5,14,16,17 82:23 130:10 | | **assessing** 162:23 246:22 |

247:1
**assessment**
98:9 100:8
**asset** 18:12
27:4 56:14
79:19,22,23
80:10 87:24,25
94:16 95:7,22
96:2 119:10
129:21 148:16
159:9 160:12
174:17 176:25
**assets** 17:9
35:16 36:1
45:3 51:16
56:5 60:20,25
63:8 80:2 84:3
89:14 90:3
128:13 129:5
131:9,13 157:6
157:21 158:2,5
158:11 159:1
159:16,17,23
160:1,8,13,17
161:11 163:3
164:12,25
165:9,12
167:23 169:6
172:13 174:14
174:21,22,23
174:25 175:2,8
175:9,13,14,18
176:2,6,7
177:11 178:3
178:14,14,24
180:18 181:3,9
207:13,22

213:6
**assisted** 36:25
**associated** 97:2
**assume** 151:22
246:14
**assumed** 82:9
**assumes** 246:9
246:12
**assuming** 5:11
6:2 150:16
152:8 211:17
215:11
**assumption**
120:2 148:7
**assumptions**
115:6,7 116:18
117:9,12,13
121:3 142:20
146:22
**assured** 207:8
**attached** 5:9
22:25 23:9
81:12 122:24
166:13 176:12
**attaches**
166:23
**attachment**
22:22 176:16
**attempted**
197:18
**attend** 107:21
110:4 222:15
**attendant**
89:17 90:6
**attorney**
184:17 224:5
224:15 225:2,2

**attorneys** 3:4
3:12 76:2
**attributed**
177:11
**attributes**
201:22
**auction** 10:2,2
14:8,9,22
36:12 97:8
128:12 157:5
161:24 162:4
162:17 163:15
163:22 168:14
168:16,19,21
169:8,19 170:1
170:7,12,14
222:15,23
223:2 225:9
226:5
**auctions** 14:8
168:18
**audience**
129:11
**audit** 105:1
167:21 168:1
**auditing**
167:21,25
**august** 116:22
**authenticated**
248:17
**authorized**
36:20 243:11
**autopilot** 108:8
143:8
**avail** 74:6
**available** 37:2
42:13 56:5

78:23 101:2,12
185:20 216:7
**avenue** 3:5,13
**average** 166:2
175:10,11
207:10 209:17
209:24
**avoidance** 74:6
199:18
**award** 102:10
211:1
**awards** 115:3,3
210:17 211:5
211:25
**aware** 23:21
48:16 49:18
55:12,15 56:4
57:25 58:3
65:12 66:5,10
66:17,18,24
67:2,15 68:6,8
92:22 96:9
97:10 100:19
102:9 103:22
117:15 137:10
137:25 138:9
138:15 198:14
227:25 228:3
228:16,25
229:2,12 233:8
238:20 242:12
246:6

| **b** |

**b** 1:21 87:10
108:8 239:16
239:24 240:6
244:6

**back** 9:24 10:3
16:12 20:7
21:21 24:13,14
25:10 32:2,3
35:14 39:12
42:14 47:2
59:8,25 60:4
107:8 120:1,14
120:17 143:23
144:13 161:1
163:7 164:3
198:8 203:1
243:8,8
**background**
50:14 52:21
106:5 107:2,12
107:25 217:18
243:8,12,14
244:17,23
245:5,8,12
**backgrounds**
107:23 140:24
**backup** 12:4
14:13 18:10,10
18:13,15 35:11
36:11,17 37:21
50:15
**bad** 15:15 55:3
97:17
**balance** 16:15
18:4 60:7,11
97:23 131:9
223:22 233:20
233:23 235:11
235:17 236:5
**balancing**
235:19

**ball** 228:24
**ballot** 15:17
73:21 74:12
111:16 112:21
184:3,12
185:18 189:20
190:4,11,20
191:12,20
196:25 198:15
199:13 200:13
200:17 201:16
**balloted** 186:2
**balloting** 43:17
185:19,21
190:1 200:5
**ballots** 43:12
43:17 184:4
188:2,8,21,21
189:1,1,15,17
189:19 191:8
192:23 196:12
197:3,6,6
201:13,13
**bandwidth**
233:10
**bank** 23:25
105:5
**bankers** 68:9
**banking** 92:22
92:23 93:7
156:7 173:25
**bankrupt**
95:23,25 96:1
96:2
**bankruptcy**
1:1,12,23
14:11 25:15

26:21,25 27:2
27:10 47:10
48:17,17 51:6
52:4 54:24
55:14 56:19
57:4,10,18,22
61:20,24 64:4
64:15 69:25
75:20 91:17
102:19 103:6
105:3 111:8
125:15 168:16
168:18 181:5
181:10,12
191:25 222:12
232:25
**bankruptcy's**
18:20
**base** 36:1
80:11 208:16
208:17,19,25
209:14
**based** 43:16
100:19 114:5,6
116:13 128:16
165:22,23
169:14 171:3
172:15 181:4,9
207:7 208:24
210:4 232:23
242:23
**baseline**
213:25 214:1
**basic** 93:12
95:21
**basically**
109:18 142:4

225:7
**basis** 50:21
75:10 121:16
129:25 131:24
207:4,5
**bates** 28:25
**baton** 182:4,5
**bear** 69:4
247:12
**beat** 115:13
**beginning** 9:13
96:24 116:19
120:21 178:4
244:4
**begins** 20:8
**behalf** 8:1 21:3
126:10,16
155:6 173:5
187:19 199:12
202:8 204:8
210:15 215:6
216:1 218:17
**behest** 229:9
**belabor** 40:25
**belief** 24:2
45:24 46:9
48:14 51:20
132:13 180:5
**believe** 7:1
19:20 24:21
38:3,19 39:9
45:25 53:23
54:17 69:8
73:2,19 74:1
75:10 88:15
96:6,17 101:8
101:24 108:22

115:13 117:23
124:13 131:19
136:13 137:18
139:22 140:17
142:5 144:5,9
145:8,24
146:17 153:7
153:16,20
158:12 169:20
171:1 178:20
178:21 180:4
180:21 186:4,5
186:19 188:15
197:5 199:17
199:22 200:1
206:3 211:20
214:13 215:13
216:4,6 218:14
222:16 225:6
226:16 229:14
231:9,10 232:2
236:6 239:21
239:23 240:18
245:4 249:4
**bench** 126:20
**benchmarks**
211:25
**beneficial**
136:5,7,12
138:8 144:25
**benefit** 28:10
48:6 86:24
87:9 132:15
**benefits** 50:5
**best** 9:25 10:9
10:10 11:9
12:9 13:12

21:8 32:5,8
33:3 35:5 36:6
38:17 39:8
41:4,13,22
44:4,22 47:14
63:21 87:5,8
105:21 114:22
115:6 117:18
117:21 123:2
141:24 160:17
161:4 163:16
164:20 169:22
175:6 176:1
205:13 233:3
236:4,10,11
237:11,12
**better** 16:21
82:6 107:17
109:11 128:20
135:16 152:18
164:2 212:3
226:7
**beyond** 186:11
**bias** 237:8
**bid** 18:10,13
18:15 36:12
97:7 128:21
158:14,15
159:3,20 160:4
160:5,6,12,15
160:18,20
161:15,24
162:3,5,11,17
163:8,11,16,18
163:21 164:2,2
164:4,5 169:22

**bidder** 50:16
160:2,22
163:14 169:12
169:16 170:5
**bidders** 14:8
159:8,15
162:10,16,20
163:4,22 164:3
169:4,9 226:5
**bidding** 105:5
226:6
**bids** 9:24
157:21,21,21
157:22 158:3,3
158:4,6,21,21
158:22,25,25
159:1,10,11,12
159:16,17,19
159:20,22
160:23 162:12
226:6
**billing** 180:5
**billion** 15:20
16:15 39:13
177:14 178:8
178:21,23
207:22
**binder** 8:5
10:20 11:22
12:21 19:16,20
19:24 22:10
81:21,23 87:17
132:17 133:11
155:17 166:6
166:22 176:9
182:16

**binders** 126:20
**bios** 169:10
**bit** 10:13 24:6
37:4,16 44:18
46:11 51:5
75:17 78:7
85:6 102:25
118:1 122:11
130:22 131:21
135:15 140:7
142:15 159:7
187:21 207:15
**bitcoin** 16:22
24:16 60:20,25
91:14 92:1
108:9 114:23
115:2,14
116:13 117:17
118:16,21
120:15 127:24
127:24 129:2
129:13,14
130:22 132:2
132:10 136:13
136:14,22
137:16,21
142:12 148:15
150:1,6,16
151:21 152:8
153:2 161:14
161:16 163:17
164:19 171:25
**black** 46:22
**blank** 29:1,16
29:20 190:11
**block** 115:3
129:11 175:5

blog  29:23
blunsine  55:25
board  43:6
  72:24 73:1,7,8
  106:3,3,8,16
  106:17 107:10
  108:5,6 109:25
  110:14 129:12
  130:11,24
  132:9 138:25
  139:6,6,7,9,19
  139:25 140:6,9
  140:10,13,13
  140:20,25
  141:18,21,23
  141:23,24
  142:2,6,9
  143:5,8 149:19
  154:2,3,4
  216:17 220:16
  220:20,25
  230:13,19,20
  232:11,14,19
  232:20,23,24
  233:2,3,10,15
  233:17 234:9
  235:1,14,24
  236:14 238:16
  238:18 239:11
  243:19 244:14
  244:15 246:8,8
  246:21 247:3,5
  247:15 248:13
boards  235:17
  240:13
board's  153:5

bonus  102:10
  103:23 104:8
bonuses  98:2
  98:12
boom  136:14
borrower  84:4
  84:17 85:10
  86:4,5,10,12
  86:15,19 87:21
  88:19
borrower's
  85:17 86:3
borrowers
  85:4,22 199:12
  199:14,15,20
borrowing
  70:12
bothering  48:8
bottom  20:10
  179:22 194:21
  208:15
bottoms  114:5
bought  92:16
bounced  24:13
  25:10
bowing  141:17
bowling  1:13
box  173:11
  199:14,17
bp  70:11
brah  4:3
break  124:24
  125:25 126:5
  126:12 154:16
  155:1,21 187:3
  209:19 217:3
  218:13

breakdown
  231:5
breakup  36:18
  36:22 37:3,6
  37:11 137:14
brian  4:3
  182:12 183:4
bric  18:10 35:7
  35:9,11,20,21
  35:23 36:7,10
  36:14,20 40:1
  40:9 49:17,18
  50:4
bric's  37:8
brick  162:12
  162:15,22
  163:5,15
  168:24
brief  92:12
  196:11
briefly  9:10
  14:2 26:17
  248:25
brier  202:7,8
  202:11,19,23
  203:4,10,13,17
  203:23 204:4,9
  204:14,17,22
  205:1,5,15,22
  205:25 206:6
  206:11,19,21
  207:15,25
  208:4,24 209:5
  209:19 210:2,9
  213:8 214:2
  215:1,5,5,13
  215:17,19,22

bring  52:11
  81:24 82:2
  145:17 179:12
bringing
  246:23
brings  15:10
  108:22
broad  51:21
  157:18,24
broader
  125:11
broke  85:6
  87:13 187:2
bronge  4:9
  77:25 78:1,2,3
  78:5,10,10,11
  78:17 79:2,4,7
  79:10,17,22
  80:1,9,14,17
  81:1,8,11,13
  82:15,18,24
  83:1,3,8,10,16
  83:17 84:5,10
  84:11,19,21,22
  85:3,8,12,21
  86:2,7,13,21
  87:11,13,23
  88:3,22,23
  89:3,6,7,8,11
  89:15,18,21
  90:1,5,8,11,14
  90:17 91:6,8,9
  91:12,24 92:3
  92:5,8
brought
  104:25 127:19
  142:6 154:2

159:19 235:14
**brown**   3:8 7:23
7:25 8:1,4,10
8:18,20 9:10
10:13,19,24
11:2,5,8,12,15
11:20,25 12:2
12:5,8,11,14
12:19,24 13:1
13:4,8,11,14
13:17,22 14:17
14:24 15:4,24
16:6 17:11,16
17:20 18:6,22
19:4,8,11,14
19:23 20:1,6
20:11,15,18,21
20:24 21:2,5
21:10,20 22:1
22:4,9,14,16
22:19,24 23:2
23:5,8,12,17
24:22 25:1,3
25:12,19,23
26:3,12,17
27:7,22 28:1
28:12,15 30:8
30:9,14,24
31:1,4,6,10,14
31:21,23 60:22
61:2,4,21,25
63:9,13,18,24
65:17 66:22
67:19,24 69:18
71:5,8,10,11
71:17 73:17
75:8 79:20,24

80:3 81:18,20
82:14,17 84:8
87:2 88:1 89:1
92:25 94:17
96:4 100:9
107:4 108:1
109:22 110:17
112:18 124:25
125:23 126:2,4
126:8
**bruckfire**
156:16
**btc**   37:20 51:10
61:18 62:23
64:12 93:6,6
146:23
**bucket**   175:2
175:18 176:2
**buckets**   159:9
**build**   132:4,11
164:10,13
**building**
127:12 191:20
**bulk**   143:9
**bunch**   26:24
28:8 247:4
**burn**   42:13
**burning**   27:1
**business**   16:20
17:13,21 18:4
27:17 93:2,5
95:23 102:22
102:23 113:17
113:20 114:1
115:18 117:14
121:12,23
129:2 130:3,5

130:19,23,25
131:20,22,23
134:15 139:24
149:9,17
150:13 151:6,7
151:9,18
152:12,19
153:2 157:2,22
157:23 158:1,4
158:5 159:5
164:11,13,13
164:21 165:5
165:14 169:2
169:10,20
225:15,19
**businesses**
163:25
**bust**   97:22
**buyer**   158:10
158:18

**c**

**c**   3:1 5:1 86:22
201:11 251:1,1
**calculate**   114:9
**calculated**
194:22
**calculation**
117:16 148:1
197:22
**calculations**
148:12
**calculator**
194:23
**call**   7:21
125:23 126:16
155:6 157:12
163:4 173:5

182:15 202:9
219:16,19
**called**   85:14
215:14 219:17
242:20 249:1
**calling**   182:8
216:10
**calls**   58:7,18
61:2,4 84:8
87:2 162:6
218:20 222:20
225:11
**cameron**
213:19
**campagna**
206:3 212:3
215:18,19
216:3
**campaign**
188:14,16
**campaigns**
188:11
**candidacy**
238:4
**candidate**
241:22 245:4
**candidates**
140:22 230:21
231:7,25
236:17,24
237:11 242:13
243:13,14
244:18,24,25
245:8
**can't**   144:4
240:9

| | | | |
|---|---|---|---|
| **capabilities** | 205:13,16 | **cel** 13:3 18:23 | 192:22,23 |
| 37:22 121:12 | 215:16 216:1 | 18:25 19:11 | 193:2,4,4 |
| 235:25 | 218:17 221:2 | 22:7 23:19,19 | **cell** 181:14,16 |
| **capacity** | 224:4,9 225:11 | 23:22,22 24:5 | 186:16,18,21 |
| 136:15 219:3 | 228:24 229:10 | 24:24 25:14 | 186:24 187:3 |
| **capex** 147:16 | 229:16 230:16 | 26:2 55:12,13 | **celsius** 1:7 9:2 |
| **capital** 127:18 | 230:24 246:14 | 55:17,19,21,24 | 10:21 11:16,22 |
| 128:8 136:13 | 249:5,16 | 56:5,14,18 | 12:15,21 13:18 |
| 136:14,22 | **cases** 49:19 | 57:3,9,13,14 | 19:23 20:20 |
| 137:8,22 138:2 | 127:16 156:20 | 57:17 58:1,2 | 21:3 22:2 |
| 149:13 | 156:25 160:3 | 58:16,21,22,25 | 23:20 24:3,15 |
| **capitol** 128:2 | 174:8 183:7,13 | 59:3,4,8,15,23 | 27:8,21 28:21 |
| **caption** 20:2 | 183:21 203:1,8 | 60:4,5,8,9,13 | 29:24 55:17,19 |
| **care** 71:25 | 203:20,25 | 60:16 61:5,8 | 55:21 56:16 |
| 244:21 | 205:14,19,20 | 61:19,23 62:3 | 60:5,8,19,24 |
| **career** 9:6 24:2 | 207:1,19 | 62:6 63:17,22 | 61:5 65:16 |
| 171:14 | 213:23 | 66:12,19 67:5 | 68:5,12,16,17 |
| **carrie** 8:11 | **case's** 230:14 | 67:16,22 68:12 | 69:10,23 70:7 |
| **carveout** 40:14 | **cash** 147:15 | 68:17 69:5,11 | 70:22 71:13,14 |
| **cascade** 93:9 | 150:22 151:2 | 69:11 70:1,3,7 | 76:7 83:17 |
| **case** 1:3 3:11 | 158:11 165:14 | 70:8,16,18 | 85:1,15 86:24 |
| 6:2 9:17 11:21 | 165:15 | 71:2,13 78:5,6 | 87:9 88:21 |
| 12:20 16:5 | **categories** | 91:10,13,18 | 89:13 90:3 |
| 20:2 36:9,24 | 177:11 | 92:3,16 94:3,7 | 91:15 92:4 |
| 37:14,18,25 | **categorized** | 94:11 95:14,17 | 93:14 94:8,18 |
| 38:4 39:4 | 181:4,9,12 | 96:19,22,23 | 96:13 100:25 |
| 40:21 46:13 | **caught** 145:11 | 97:11,14,16 | 110:2 124:2,5 |
| 48:17,24 51:1 | **cause** 16:13 | 98:2,6,11,15 | 124:6 127:17 |
| 51:6 52:4 | 117:16 119:11 | 99:2,9,21,22 | 132:17,21 |
| 62:21 76:19 | 198:5 | 99:24,24 100:1 | 133:5,13,18 |
| 86:10 91:2,6 | **causes** 76:17 | 100:2,6,23,25 | 134:6,20,22 |
| 94:7 110:2 | **cease** 24:19 | 101:11,13,13 | 159:23,25 |
| 112:10 131:23 | **ceased** 25:21 | 101:18,20 | 160:1,12 166:8 |
| 137:23 140:3 | **ceases** 124:11 | 122:23 123:5,9 | 166:17,19 |
| 157:19 183:17 | **cedarvale** | 124:1 191:19 | 167:6 172:13 |
| 196:11 203:4 | 131:17,18 | 191:25 192:5,6 | 176:9 183:13 |
| 204:15 205:12 | 132:8 | 192:8,11,13,17 | 213:25 235:18 |

249:18
celsius' 160:8
  160:17
cent 60:13 64:4
  67:16,18
center 38:11
centerview
  154:21 156:3,5
  156:6,7,17,19
  156:21 164:24
  165:11 167:3
  172:17 180:19
central 92:1
cents 19:3,13
  24:7,11,12,13
  25:9 57:18
  61:20 62:4,20
  64:23,23 67:5
  67:8 191:19
ceo 8:25 9:5,5
  9:11 27:17,18
  102:14,17
  105:24 127:8
  129:11 142:12
  142:12 143:10
  178:6
cerberus 9:9
certain 34:22
  75:22 101:21
  102:11 146:21
  148:13 152:20
  205:12 211:14
  243:13
certainly 7:9
  7:15 62:11
  63:6 95:13,14
  128:21 181:8

193:14 219:19
  223:10 237:4
  241:23
certainty 161:9
  177:16
certification
  195:11 197:17
  197:23 201:12
certified 251:3
cetera 10:11
  17:8 18:12
  19:10 36:3
  43:7 48:1 55:3
  60:1 70:19
  79:16 101:22
  102:24
cfo 9:4 129:12
chains 175:5
chairs 9:16
  105:24
challenge
  230:5
challenging
  226:4
chance 80:25
  110:24 121:7
  224:18 236:4
change 118:23
  140:4 141:16
  141:19 147:20
  149:11 151:10
  201:6
changed 201:5
  201:9,11 226:6
changes
  149:12 201:22

changing
  149:17
chapter 62:7
  62:11 63:16,17
  63:23,23
  127:16 156:20
  160:3 174:8
  178:4,15
  183:13,21
  203:8 205:14
  205:20 207:1
  207:19 210:5
  213:7
characterized
  234:20
charge 92:2
charged
  214:16
chart 118:15
  146:3,18
  147:16 148:20
  206:14 209:7,9
charts 122:12
  187:24 188:1
  188:22 206:13
check 107:2,2
  107:25 245:5
  245:12
checks 243:13
  243:14 244:18
  244:24 245:8
chedal 70:11
chief 8:25 9:1
  220:6 249:5,16
choice 50:6
  164:20

choose 130:13
  232:20 235:7
chose 172:8,15
  232:22
chosen 135:18
  140:25
chris 3:8 6:21
  8:2 92:17
  249:17
christopher
  3:21 8:25
circa 123:4
circulate
  243:22
circulating
  57:16
circumstance
  25:22
circumstances
  92:20 171:11
citibank 68:10
civil 5:17
claim 190:19
  198:20 199:2
claims 41:15
  60:6 62:3
  72:21,21 73:3
  73:13 76:17,23
  183:6,16,22,25
  184:16 185:11
  185:12 186:7
  192:4 194:18
  195:15
clarification
  213:5
clarified
  200:16

**clarify** 20:12
82:17 199:13
200:4,7 213:5
**clarifying**
135:13
**class** 58:1,22
60:14,15,21
61:6,9 62:3,8
62:13 63:7,11
74:24 111:20
112:22,23
186:22 190:19
191:10 192:5,8
193:4,5,9
195:3 198:19
198:20 199:1
199:13,19
200:14 201:13
201:14,14,15
**classes** 111:18
111:20,25
112:3,5,16,17
174:22 176:25
185:13 186:9
186:10,11,13
186:13,19,25
187:4 188:5,6
193:2 197:7
198:25
**classify** 183:25
185:12
**clause** 54:25
**clean** 77:4
172:1
**clear** 5:24 7:11
15:20 19:4
22:19 46:3

47:15 80:13
100:8 140:11
141:11 151:1
163:25 205:25
**clearly** 108:13
**clerk** 8:13
113:6,10
122:20 126:22
154:8 155:3
177:7 181:21
182:19 198:7
200:23 202:14
213:17 214:24
246:1
**clerks** 126:21
**click** 190:3
**client** 224:5,15
225:2,2
**clips** 249:11
**close** 34:12
44:7 87:17
164:17,21
**closed** 24:8
25:10
**closing** 67:16
90:23 117:5
193:13
**closure** 15:11
198:16
**cnl** 167:22,23
168:3 178:3,14
213:6
**cochairs** 72:24
**code** 50:9
**coercive** 73:16
**cognizant**
237:7

**cohen** 16:15
173:5,7,9,13
173:16,16,18
173:19,22,24
174:4,9,13,17
174:22 175:3
175:15,20
176:4,10,15,18
176:23 177:1,8
177:10,14,17
178:5,5,9,12
178:16,18,23
179:14,19,24
180:3,15,21
181:6,11,15
182:2 214:6
**cohen's** 176:12
**cohost** 177:4,7
**coin** 59:25
124:14
**coinbase** 27:14
37:23 43:1
50:24,25 51:5
51:15 52:5
76:8
**coins** 38:11
56:22 62:15
64:7 91:17
120:16 175:4
**cold** 196:3
**collaborative**
203:19
**collaboratively**
6:23
**collateral** 78:7
79:12 84:2,12
84:17,20 85:1

85:4,7,8,10,16
85:17,18,20,23
85:25 86:2,9
86:12,14,16,19
86:22,23 87:1
99:21 100:5
**colleague**
182:6 202:5
206:2 212:3
**collected**
162:12
**collective**
164:7
**colloquy** 50:10
50:14
**colodny** 3:16
28:18,19,24
29:4,6,9,22
30:4,8 54:5
57:5 58:7,18
58:23 59:12,17
60:17 63:14,19
63:25 105:13
125:2,9,13,16
135:2 187:16
194:13,20
195:7 200:7
210:12 215:24
215:25 216:1,6
216:10,19,22
217:7,10,14,20
217:22,24
218:6,9,11
229:25 244:5
245:2 249:1,2
249:9,10

| | | | |
|---|---|---|---|
| **colodny's** | **committed** | **committees** | 174:14 180:12 |
| 244:4 | 98:22 129:17 | 40:20,20,23 | 180:13,14,16 |
| **combined** | 129:20 130:14 | 41:1 249:16 | 180:17,19,19 |
| 31:18 68:18 | **committee** | **committee's** | 240:1 242:20 |
| **come** 5:23 6:4 | 3:12 5:5,15,20 | 170:10 244:13 | **company's** |
| 6:5,11 8:3 9:6 | 5:25 6:8 9:15 | 244:13 | 159:18 |
| 16:16 32:2 | 9:16 14:14 | **communicated** | **comparable** |
| 42:8 44:23 | 22:11 28:9,15 | 25:8 | 171:3,18,19,23 |
| 46:4 61:15 | 36:15 48:1,7 | **communicati...** | 193:2 |
| 62:21 64:7 | 52:18 54:8 | 71:15 225:11 | **comparables** |
| 77:3 96:17 | 72:19,24 77:3 | **community** | 172:5 203:21 |
| 103:18 110:12 | 77:12 103:21 | 105:7 | **comparative** |
| 115:6,7 153:3 | 105:11,22 | **companies** | 222:11 |
| 163:7 173:7 | 106:17 108:19 | 92:2 95:24 | **comparators** |
| 175:3 247:5,19 | 125:1,10,10 | 127:13 156:8 | 213:20 |
| **comes** 85:4,7 | 135:1 138:25 | 156:18 165:23 | **compare** |
| 85:10 93:25 | 139:2,4,5,8 | 171:19,22,23 | 118:25 |
| 100:20 106:10 | 140:6,11,16,20 | 172:8,12 | **compared** |
| 121:19 142:1,3 | 140:22 141:17 | 207:21 208:14 | 180:7 205:18 |
| 143:4 246:5 | 144:17,18 | 210:1 212:13 | 208:11 |
| **comfort** 15:11 | 163:13 164:8 | 212:15,19 | **compares** |
| 54:23 | 164:14,22 | **company** 9:2 | 205:20 |
| **comfortable** | 169:14 170:4,8 | 16:9,14,17 | **comparing** |
| 46:16 76:21 | 177:20 187:15 | 17:10 23:20 | 118:17 207:16 |
| 119:13 141:22 | 200:1 210:11 | 27:9 28:21 | **comparison** |
| 141:25 145:3 | 216:2 218:18 | 35:14,25 69:25 | 207:17 208:7 |
| **coming** 120:21 | 218:20 224:15 | 94:4 96:1,2,3,8 | 212:14 |
| 137:2,4,7,16 | 225:3,5 226:12 | 96:10,17 97:1 | **compensated** |
| 144:14 158:10 | 226:23 227:4 | 97:2,9,11 98:7 | 39:16 |
| 247:2 | 227:10,17,19 | 98:16 101:5 | **compensation** |
| **comment** 75:2 | 228:11 229:13 | 102:19 108:21 | 97:9,12,20,21 |
| **comments** | 229:17 230:12 | 111:7 140:2 | 97:25 98:5,10 |
| 74:22,23 | 230:20 231:25 | 142:5,14 143:7 | 98:12,16,20,21 |
| 234:22 | 234:12 238:7 | 144:20 159:20 | 98:23,24 99:1 |
| **commit** 15:15 | 238:16,20 | 160:13,24 | 99:4 103:17 |
| **commitment** | 243:11 244:16 | 165:8,17 | 204:3 206:18 |
| 144:20 | 246:21 | 171:24 174:10 | 208:9,12,13,18 |

209:4,16 240:1
**compensations**
97:14
**competing**
205:21 210:1
235:12,19
**competitive**
121:9 128:17
132:6 151:12
161:12,22
162:4 209:24
**compilation**
30:19 82:19
83:5
**compile** 247:20
**complete**
110:11 138:11
235:11
**completed**
190:3 198:24
249:15
**completely**
96:9,20 138:6
**complex**
116:12 150:13
168:23
**complexity**
169:3
**complicated**
169:2
**component**
46:15 75:13
208:17
**components**
93:6 98:3,12
98:24 99:4,5
116:15 123:7

123:13
**composed**
163:1
**composition**
139:6,6 141:21
141:22 142:2
**comprehensive**
160:16 243:12
244:17
**computational**
114:25 115:1
**compute** 115:9
**computed**
171:8
**computing**
165:24
**concentrations**
97:16
**concern** 18:7
233:23
**concerning**
18:23
**conclude** 209:1
210:3 249:5
**concluded**
209:2 210:4
250:18
**concludes**
31:17 215:6
**concluding**
74:18
**conclusion**
58:8,19 61:4
84:8 87:3 91:2
177:15 178:20
190:22 247:2

**conclusions**
204:23
**condition**
83:18
**conditions**
80:18 83:19
87:19 96:13
151:10,19
**conduct** 40:3,4
243:12 244:17
**conducted**
162:10 220:23
243:15 244:15
244:24
**confer** 31:17
**conference**
222:20
**confidence**
238:22
**confirm** 34:8
34:13,17 45:25
46:1 192:6,10
219:25
**confirmation**
2:2,5 6:25 11:3
14:1,4 30:15
31:2 38:15
45:6 54:15
221:13
**confirmed**
27:10 45:14
48:22 103:4
104:9 129:9
**conflict** 14:20
**confused** 30:25
74:2 241:1
244:19,22

**confusing**
187:22
**confusion**
200:9
**congratulatio...**
135:21
**conjunction**
23:5
**connection**
158:23 183:20
184:8 185:13
198:22
**consecutive**
240:2
**consensual**
15:16 20:3
43:10,18 73:12
73:15,20 74:19
**consent** 89:13
90:3 139:8,11
140:21 141:13
153:5 235:5
**conservative**
153:8
**consider** 79:11
84:12 85:16
86:9 88:23
124:16 159:10
159:11,11
225:18 239:19
240:4,11
**consideration**
15:7 34:20
35:2 36:7,23
37:5 38:18,18
39:9 41:5,10
41:25 42:1

172:8 174:18
227:6 232:23
**considered**
209:24 230:21
233:25 239:13
248:13
**considering**
92:20 228:21
**consistent**
72:21 73:3
79:16 119:2
156:17
**consolidated**
220:7
**consortium**
35:21 36:7
**constant**
115:14 150:1
150:17 151:21
152:9,25
**constructing**
140:10
**consultant**
103:18 104:25
**consultation**
165:16 174:10
**consulting**
49:20,24
173:20 174:6
**consumer** 5:6
**contact** 185:15
228:4,13
**contacted**
157:14
**contained**
145:25 163:20
197:6,7 204:23

**contents** 13:11
167:22
**contested**
64:16
**context** 86:15
189:1,24
190:14
**contexts**
203:25
**contingencies**
162:18
**contingent**
158:9
**continue** 20:21
42:13,20,23
43:3,4 78:24
86:21 89:23
90:18 130:15
215:8
**continued**
14:12
**continuing**
5:14
**contract** 54:24
68:5 69:5,8,11
69:12,16,23
76:5 77:19
**contracts**
14:14 69:14,15
77:18 117:10
132:14 138:9
**contractual**
38:14,16
112:12
**contrast** 88:3
**contributed**
36:11 75:15

**contributing**
131:3 144:16
**contribution**
41:15 76:19
**contributions**
41:7 42:19,22
43:3 44:10
77:21 123:6
**control** 24:1
58:16 69:5,23
88:19 140:1
**controlled**
83:21
**convenience**
198:19
**conversation**
65:13
**conversations**
9:15 66:16
94:10 105:8
106:21 225:25
226:2 228:15
**convert** 62:22
**converted**
35:16 61:17
64:11
**copies** 29:7
217:4
**copy** 5:10
19:20 21:5
23:8 33:11
54:4 81:25
132:21,23
133:20 155:17
166:9,10,23
176:11,14
184:23 204:14

217:8 219:9
221:17
**core** 115:11
117:1 129:2
**cornell** 4:3
31:24 32:3,4,4
32:8,11,17,22
33:1,4,6,11,14
33:18,22 34:3
34:6,11,15,19
34:25 35:6,20
36:6,18,22
37:13,17,24
38:2,12,17,23
39:2,6,8,15,19
40:17,23,25
41:13,18,22
42:2,14 43:2,8
43:14,16,20,25
44:4,8,15,22
44:25 45:5,9
45:21 46:6,11
46:18 47:19
48:2,10,13,21
49:4,7,10,12
49:15,22,24
50:2,4,19,23
51:4,14,19
52:2,7,11,16
52:20,24 53:2
53:8,12,15,18
53:23 54:4,11
54:13,18 55:4
75:5,16 125:17
125:18 135:4,5
135:6,9,11,11
135:19 167:14

| | | | |
|---|---|---|---|
| 187:17,18,18 | **correctly** 36:4 | **course** 9:12,25 | 58:20,24 59:14 |
| 188:1,7,19,25 | 178:6 | 10:14 17:14 | 59:18 60:2,18 |
| 189:5,8,10,12 | **correlating** | 40:15 93:17 | 60:23 61:3,22 |
| 189:14,22 | 118:18 | 105:2 149:20 | 62:1,18 63:10 |
| 190:14,22 | **corresponding** | 212:22 222:12 | 63:15,20 64:1 |
| 191:2,6,13 | 85:15 | **court** 1:1,12 | 64:23 65:2,6 |
| 210:13,14,14 | **cost** 94:22 98:6 | 5:3 6:16,19 7:4 | 65:14,19,24 |
| 210:25 211:5 | 98:7,16,17 | 7:7,10,19,24 | 66:7,9,23 67:1 |
| 211:14,19,24 | 121:15 122:7,8 | 8:3,7,9,11,14 | 67:20,25 68:3 |
| 212:5 | 152:11,19,21 | 8:17,19,21 | 68:24 69:2,13 |
| **corner** 120:5 | 152:21,22 | 10:17 11:17 | 69:20 70:24 |
| **corporate** | 207:7,10 247:6 | 12:16 13:19 | 71:1,3,8,11,18 |
| 156:11 230:23 | **costs** 17:25 | 14:1,2,4,25 | 71:20,23 72:1 |
| **correct** 6:3 | 18:3 27:2 94:2 | 15:5 19:22 | 72:4,8,12,17 |
| 10:17 17:15,19 | 114:7,10 | 20:9 21:12,15 | 73:18 74:8,11 |
| 34:14,18 58:6 | 151:14 | 23:14 25:4 | 74:15,17 75:9 |
| 58:17 64:10,15 | **could've** 71:13 | 26:8,18 27:21 | 75:21 77:9,23 |
| 64:21 70:13 | **counsel** 81:16 | 28:14,18,23 | 78:2,10,12,18 |
| 74:1 85:5 | 184:9 198:23 | 29:3,5,7,14,15 | 79:4,8,21,25 |
| 95:15 98:20 | 243:11 249:25 | 29:25 30:1,7 | 80:4,16,20,23 |
| 99:2 100:8 | **count** 186:14 | 30:13,22,25 | 81:5,9,12,15 |
| 111:11,12,13 | 191:5 192:9 | 31:3,5,9,11,15 | 81:19 82:1,4,7 |
| 112:7 124:8,9 | **counted** | 31:23 32:7,9 | 82:10,12,16,24 |
| 124:17 125:12 | 196:13 | 32:19 36:19 | 83:2,4,9,12,16 |
| 139:14,20 | **counter** 76:7 | 39:22 40:1,8 | 84:9,21 87:4,6 |
| 142:7 146:5,16 | **counterparty** | 40:16 45:17 | 87:12,14,18 |
| 147:2 167:24 | 115:16 116:24 | 46:19,23 47:6 | 88:2,12,22 |
| 171:6 178:22 | **country** 222:6 | 47:6,10,10,11 | 89:2,5,7,11,16 |
| 186:23 187:1,2 | **counts** 201:15 | 47:12,17,20,23 | 89:19,23 90:2 |
| 187:5 191:21 | **couple** 10:19 | 47:24 48:6 | 90:6,9,12,15 |
| 192:12 194:4 | 13:24 19:16 | 49:2,5,8,11,13 | 90:22 91:7,11 |
| 198:18 199:16 | 24:8 32:14 | 50:7,20 52:17 | 92:3,6,9,14 |
| 200:20 211:13 | 86:18 111:15 | 52:22,25 53:5 | 93:1,14,17,21 |
| 216:19 218:15 | 123:14 183:18 | 53:9,14,17 | 94:6,18,25 |
| 218:16 222:12 | 205:1 238:3 | 54:2,7,12 55:6 | 95:2,5,12,19 |
| 234:12 235:2 | **coupon** 175:23 | 55:9 56:9,24 | 96:5,8 99:6,17 |
| 239:14 246:15 | | 57:7 58:9,11 | 100:10 101:10 |

| | | | |
|---|---|---|---|
| 101:25 102:3,6 | 145:17 146:11 | 195:9,12,18 | 240:10 241:12 |
| 102:21 103:23 | 146:14 147:4 | 196:2,9,17,20 | 241:15 243:2 |
| 104:18,22 | 147:25 150:7 | 196:23 197:3,9 | 243:25 244:8 |
| 105:14,16,19 | 150:10 152:2,6 | 197:12 198:1,5 | 244:21 245:3 |
| 107:5,10,14,16 | 153:10,14,20 | 198:9,13 199:5 | 245:15,19,21 |
| 108:2,12,20 | 153:23 154:6 | 199:8,24 200:6 | 245:24 246:3 |
| 109:1,3,8,13 | 154:10,12,15 | 200:11,18,21 | 246:11,13,18 |
| 109:15,23 | 154:20,22 | 200:24 201:3 | 247:8,10 248:5 |
| 110:6,18,21,24 | 155:4,8,13,16 | 201:19 202:1,6 | 248:9,19,24 |
| 111:3 112:19 | 155:18,20,24 | 202:10,16,20 | 249:6,8,13,20 |
| 112:24 113:4,8 | 156:1 161:14 | 202:24 204:19 | 249:22,25 |
| 113:12,18,22 | 162:22 166:19 | 205:8 206:20 | 250:7,14 |
| 118:2,4,6 | 167:8,12,15,18 | 210:11,13,21 | **court's** 215:7 |
| 119:17 120:19 | 168:9,12 | 211:10,22 | **courtroom** |
| 121:4,24 122:1 | 169:25 172:23 | 212:6,11,23 | 107:16 154:23 |
| 122:3,17,21 | 173:1,7,9,12 | 213:1,9,12,14 | 167:16 177:24 |
| 123:8,15,18,21 | 173:15 176:21 | 213:18 214:3,8 | 212:7 |
| 123:24 124:1,5 | 177:6,19,23 | 214:13,19,22 | **courts** 140:4 |
| 124:7,10,15,18 | 178:1,10 179:3 | 214:25 215:2 | 184:1,9 |
| 124:22 125:1 | 179:6,11,13,15 | 215:10,15,18 | **covario** 227:23 |
| 125:17,19,21 | 179:17 180:10 | 215:21,24 | 227:25 228:3,9 |
| 126:1,3,5,12 | 180:23 181:2 | 216:5,9,16,20 | 228:17 |
| 126:18,23 | 181:19,22,25 | 216:23 217:3 | **cover** 76:22 |
| 127:1,4 130:7 | 182:4,7,10,13 | 217:12,15,21 | 134:2 |
| 130:19 131:14 | 182:18,21,24 | 218:1,5,8,10 | **covered** 75:5 |
| 132:19 133:7 | 183:1,3 184:17 | 218:14,19,21 | **covering** 122:7 |
| 133:20,24 | 184:22 186:8 | 218:24 219:4,7 | 122:8 |
| 134:19,19,25 | 186:16,21,24 | 219:11 221:25 | **covers** 125:13 |
| 135:3,5,7,21 | 187:2,6,10,14 | 223:18 224:1 | **create** 164:1 |
| 135:24 136:18 | 187:17 189:3,6 | 224:13,23 | **created** 47:3 |
| 137:20 138:13 | 189:9,11,13 | 225:1,13,15,21 | 185:18 |
| 138:16,19,22 | 190:6,10,17,21 | 228:7,20 229:4 | **creating** 16:19 |
| 139:4 141:7,10 | 191:1,4,15,17 | 229:6,11,20,24 | 65:15 |
| 141:14 142:17 | 191:23 192:2 | 230:2,8,17 | **credit** 93:8 |
| 142:19,20,24 | 192:16,20 | 234:22 237:24 | 107:1 |
| 143:1,12,15,18 | 193:7,12,19,22 | 238:1,5,13,25 | **creditor** 22:11 |
| 143:21 145:15 | 194:2,6,9,25 | 239:4,19,22 | 58:5 63:17 |

[creditor - cvs]                                                      Page 21

| | | | |
|---|---|---|---|
| 64:3 65:8 69:1 | creditor's | crowded | 211:15 219:1 |
| 78:1 92:15 | 170:8 | 212:24 | 219:23 220:6 |
| 100:22 106:2 | criminally | crown 27:4 | curtail 18:1 |
| 106:12 111:2 | 214:16 | cruz 213:17,18 | 120:13 121:14 |
| 112:16,16,22 | crisp 152:3 | 213:19,19,24 | 121:14 |
| 113:15,16 | criteria 106:16 | 214:4,8,15,20 | curtailed |
| 180:5 196:22 | 212:18 | 214:22 | 122:13 |
| 213:19 235:19 | critical 36:16 | crypt 167:23 | curtailment |
| 235:20 237:11 | 46:7 48:15 | crypto 15:20 | 122:5,6 |
| creditors 10:6 | 75:13,18,21,23 | 16:18 24:4 | curve 40:14 |
| 14:10 28:11 | 75:25 76:1 | 35:13 39:13 | custodian |
| 37:20 38:22 | cro 9:11 | 42:12 46:4 | 51:11,12,16,18 |
| 46:8,14 48:16 | cross 5:8,25 | 51:3 69:8 | custody 27:14 |
| 73:6,8 75:19 | 6:1,4,7,10 7:12 | 103:9 127:14 | 52:6 55:13 |
| 101:11 106:3 | 28:14,16 55:7 | 128:10 194:19 | 56:4 58:1,4,14 |
| 111:17 112:5 | 65:3,4,20 66:3 | 195:15 | 58:15,22 59:1 |
| 112:11 128:20 | 68:24 71:20 | cryptocurrency | 59:4,8,21,22 |
| 130:2,4 139:4 | 77:24 78:13,15 | 10:8 38:22 | 60:4,6,10,14 |
| 139:5,16,18,23 | 78:21,23 79:1 | 174:23 175:2 | 60:15,19,21,24 |
| 140:14 156:9 | 79:4 92:9 | 175:13 180:7 | 61:6,9 62:3,8,9 |
| 156:18 157:24 | 104:19 110:21 | 195:21 | 62:12,13,15,21 |
| 158:16 159:25 | 113:5 118:8,11 | cups 127:2 | 62:25 63:1,7 |
| 160:1 161:2 | 122:17 134:25 | currencies | 63:11,17,22 |
| 163:12 164:7 | 135:22 138:19 | 124:4 | 64:3 192:4,5 |
| 164:10 169:6 | 145:9 154:7 | currency 181:3 | 192:17 193:4,9 |
| 169:14 197:14 | 167:13 168:10 | 181:9 | custom 185:18 |
| 197:21 198:16 | 170:18 172:24 | current 96:21 | customer |
| 228:13 232:13 | 177:19 179:4 | 115:20,25 | 213:25 |
| 233:19 234:11 | 180:24 181:20 | 117:14 119:21 | customers |
| 235:8,13,13,16 | 187:14 198:2 | 121:9 153:7 | 18:14 38:11 |
| 235:21,21,23 | 202:1 210:10 | 165:19,20 | 51:3,10 59:8 |
| 236:1,7,13,19 | 212:7 213:2,14 | 171:4 215:19 | 61:12 103:10 |
| 236:21 237:15 | 214:23 216:21 | 220:5 242:17 | cut 66:7 108:12 |
| 237:20 238:12 | 216:24 217:2,5 | currently | 117:19 120:11 |
| 240:23 241:4,5 | 217:19 245:23 | 27:22 44:19 | 175:10 |
| 241:6,8 247:14 | 245:24 | 45:1 142:10 | cvs 140:24 |
| 248:12 | | 188:14 208:15 | 220:23 |

**cycle**  115:16
  116:8 120:20
  120:21,22

**d**

**d**  5:1 84:24
  87:20 113:11
  170:17 234:8
**dani**  2:24
  251:3,9
**data**  147:22
  165:25 166:1
  171:16 172:3
  172:11 208:9
**date**  19:1,3,6
  23:19,23,23
  24:5 25:7,15
  25:15,15 26:22
  27:24 38:6,15
  44:11,12,24,25
  45:7 52:8,21
  56:6 61:12
  62:3 64:4,10
  64:15 66:25
  67:6,17,18
  68:13 89:22
  96:11 117:6
  124:19 125:14
  125:14 135:18
  175:11 183:15
  185:14 191:25
**dated**  178:4
**dates**  103:8
  211:11
**david**  199:11
**davis**  4:6 65:4
  65:6,7,8,10,11
  65:23 66:5,8

66:10,18,24
67:4,9,14,21
68:4,11,15,22
**day**  6:19 9:4
  16:21 17:1
  19:12 24:9
  25:10 56:19
  59:2,6 113:14
  215:11 249:13
  250:17
**days**  61:11,13
  61:16 62:22
  64:7,9,11
  117:4
**de**  4:11 196:21
**deactivation**
  62:3 64:5,10
**deadline**
  145:10 162:11
**deal**  117:5
  128:20 130:12
  131:17,18
  144:15
**deals**  50:24
  239:11
**dealt**  147:15
**deanna**  113:9
  198:5
**debt**  16:22
  17:23 99:24
  100:2 156:3,15
  158:17,17
**debtor**  5:5,19
  5:24 6:8 15:25
  34:21 76:7
  77:12 79:3,11
  80:2,10,22

81:3,3 84:12
85:9 86:10
89:8 91:13
104:25 148:12
169:20 170:4
170:17 203:15
215:15 249:16
**debtor's**  84:14
85:17
**debtors**  1:9 2:1
2:5 3:4 5:15
6:22 8:1 9:12
10:15,17 11:15
11:19 12:14,18
13:17,21 14:3
14:13 15:8,8
18:8 19:18
21:10,18 23:12
23:16 26:13
30:17,18,21
31:8,12 33:8
34:21 35:3
36:8,8,25
38:14,19 41:14
42:19,22 44:2
47:25 48:7
51:7 52:18
53:24 54:8
58:16 76:2
77:19,20 80:18
80:20 81:16
99:8 125:10
126:10,16
128:12,23
133:5,9,13
144:18 145:8
155:6,6 156:22

157:1,2,5
158:16,22
164:7,16
165:16 166:22
166:24 168:19
169:13 170:21
173:5,5 175:19
176:20 182:15
183:16,24
184:19 185:10
185:10,14,15
189:18 198:23
202:8,9 203:3
203:9 204:8,11
204:17,21
205:21 206:25
207:4,11,16
208:11 210:11
211:20 215:6
**debtors'**
  146:18 164:17
  164:24 165:12
  174:20 175:2
  176:3 177:4
  184:9
**decade**  9:6
**december**  17:4
  158:3
**decided**  60:14
  121:16 138:24
  215:11 223:14
  233:2,15
  235:20 237:12
  241:4
**deciding**
  246:20

decision 139:1
140:18 169:16
169:19 223:1,5
223:8,10 226:4
226:8 227:4
decisions
149:12 229:2
declaration
10:24 11:2,8
11:21 12:3,8
12:20,24 13:2
13:12 18:23,25
30:11,13,15,16
31:2 33:7,15
33:18,24 34:20
39:20 40:19
42:17,18 45:23
48:14 56:1
72:6 81:5 99:8
99:13 101:9
122:23 123:8
132:19,22,23
133:2 145:5
166:9,10,13,15
168:15 176:12
176:14 184:19
184:24 185:1
187:8,23
188:23 189:10
193:25 194:1
204:7,15,24
205:2,23
206:20 208:2,5
212:16,18
219:9 221:2
222:8 229:22
229:25 231:9

232:4,17
234:15 239:12
242:14 248:20
declarations
8:6 10:16
13:23,25 72:8
decline 152:24
declined 49:19
57:20 162:6
decrease 42:12
115:16 150:18
150:21,22
151:1,2
decreased
233:7
decreases
150:17
deemed 74:25
deep 70:20
deeper 147:22
default 180:8
defensive
121:12,23
defer 126:8
148:10
deferred 85:14
169:21
defi 70:12
define 80:1
defines 239:10
definitely
103:10 233:24
definition
111:20
definitions
83:23,25

defiore 248:12
defraud 22:2,5
degree 169:5,5
177:16
delco 216:3
deliberation
232:5
deliberations
170:10 239:20
deliberative
237:9
delisted 69:25
delivering 17:9
delivery 88:19
161:1
demonstrative
177:5,9
demonstratives
2:2
dependent
70:7
depends 94:21
116:9,11
deploy 117:3,3
deployed
116:23 117:7
deploying
102:22
deployment
115:10 117:9
deposits
123:18,19
214:1
depth 94:12
depths 70:19
describe 9:10
14:2,17 15:4

16:9 19:5 22:5
26:17 68:4
105:11 123:9
128:15 157:9
158:22 161:5
161:19,22
167:2 170:2
177:8 185:5
203:5 207:16
220:20 223:4
described
14:19 122:24
163:14 177:12
207:25
describes
123:5
description
106:15 134:10
247:13
designee
136:14
desirable
120:13
desired 49:25
desiring
233:10
desk 32:1
65:22,25
detail 103:19
details 10:14
48:19 56:8
59:25 69:9
77:17 101:6
106:20 147:18
212:4
determination
114:2,14

169:14 240:3

**determine**
114:2 149:19

**determined**
9:25 97:6,17
111:25 116:13
130:9 198:19
234:10 240:16

**determines**
80:10 115:2

**determining**
169:22 203:7
247:1

**develop** 9:23
203:7,21
212:19

**developed**
203:10,18

**developing**
97:6 203:14

**development**
112:7

**dial** 152:1

**didn't** 222:22
227:2,8 233:11
233:21 243:23
248:17

**difference**
54:19 73:15
100:18 112:15
112:16 119:23
209:9

**differences**
35:15 100:19
164:5

**different** 13:24
18:18,18 26:22

35:12 41:1
54:14 56:25
57:1 70:17
76:7 88:7 89:4
91:13 93:7
98:12 115:4,5
116:11 131:9
139:22 144:22
150:13 151:9
153:1 171:2,10
175:5 187:21
209:25 247:19

**difficult** 17:2
158:12

**difficulties**
116:25

**difficulty**
116:1,8 119:15
119:22

**difiore** 232:1
236:23

**digital** 35:25
84:3 89:13
90:3 163:6
174:23 181:3,8

**diligence**
157:25 158:2
159:14 162:10
162:19

**diluted** 98:8

**dimitry** 4:5
55:8 180:25
191:16

**direct** 5:10 6:2
6:10 13:15
34:3 126:10
152:7,11

217:16,17
234:20 243:17

**direction**
152:17 153:1

**directive**
191:24

**directly** 108:23
109:20

**director** 9:7,8
183:5 202:22
237:15,20
239:12,17,25
240:6 242:22

**directors** 72:15
235:1,9 239:6
239:11,14
240:13,19,24
241:8,9 243:20

**disagreements**
31:20

**disbursement**
59:2,6

**disclose** 215:9

**disclosed** 215:7

**disclosure**
24:18 25:21,23
26:1,2,3 92:17
113:21 123:9
133:14,17,17
136:4,4 145:6
145:7 146:3,15
146:19 163:14
166:3,24
172:10,18
179:9,20,23
184:1,10 185:8
185:9 196:8

201:7

**disclosures**
96:15

**disconnects**
124:20

**discount**
100:24 175:16
176:1,6 195:25

**discounted**
123:16 165:14

**discounts**
101:21 159:19

**discovered**
209:14

**discreet** 51:1

**discretion**
210:25 211:1

**discretionary**
98:1,11 210:17
211:6,7

**discuss** 35:2,6
44:9 49:16
72:23 105:23
205:1 211:20

**discussed** 35:7
36:24 37:4
72:19 131:18
199:25 209:15
223:11 233:16
241:21

**discusses**
232:18

**discussing** 33:9
73:11 94:1
131:21 237:10
241:18

**discussion**
66:17 96:20,23
211:22 225:19
235:10 239:8
**discussions**
14:12 94:5
111:24 112:2
139:2 144:17
144:21 184:9
220:24 227:9
227:13 232:9
**disgruntled**
238:6,9
**disinterested...**
229:22
**dislocated**
91:22
**display**   208:5
**disproportio...**
137:24
**disqualify**
172:11
**disregard**
172:5
**distinct**   170:11
**distinction**
79:18 164:16
**distinctions**
54:16
**distinguishing**
91:13
**distinguishm...**
240:23
**distress**   205:18
**distressed**
206:18,19
210:5

**distribute**   10:7
51:12 59:8,23
59:25 60:4,9
60:19,24 61:8
62:22
**distributed**
10:6 37:22
48:16 59:1,4,4
59:6,10,16
61:18
**distributing**
15:19 46:4
**distribution**
26:23 27:13,25
35:13 36:3
37:19,20 38:4
38:5 39:11,12
42:25 46:16
48:25 51:9,16
51:17,18,25
52:3,5 61:12
61:14,15 76:14
77:20 104:13
112:23 125:8
125:12 179:10
179:18,21
180:7 194:1,7
194:17 196:8
**distributional**
172:19
**distributions**
42:5 46:13
77:13 125:4,6
**district**   1:2
**diverse**   223:21
**diversity**
239:13 240:14

**divided**   111:17
**dividing**   112:5
**dixon**   4:15
104:24 135:23
135:24 136:1,3
136:9,17,25
137:8,14,25
138:7,17
**doc**   2:1,5
**docket**   20:2
29:10 30:17,18
30:20 33:7,16
65:11,14,21
66:1 78:9,13
78:24 79:3
82:20,20
132:22 133:14
145:22 176:13
184:19 206:22
215:7 217:1,4
217:24 218:1,3
229:23 243:19
244:6
**document**   2:3
2:6 5:8,8 11:25
20:15 21:16
22:11,12 74:12
74:12 78:13
79:5 83:21
89:12,20,25
90:24 91:1
118:10 166:25
194:21 195:7
204:4,6,10,12
221:4,7
**documents**
28:20 65:20,25

66:2 78:19,22
78:25 79:9
80:21 118:7
193:15 196:3
**doesn't**   244:2
**doing**   27:8
51:15 104:14
107:24 118:14
131:6 136:3
174:4 188:11
195:20 222:3
**dollar**   57:21
186:14 192:7
**dollars**   16:19
159:2 163:24
178:21
**domestic**
100:18
**don't**   149:17
150:7,8 154:8
171:16 178:12
179:24 180:3
181:21 224:17
225:23 226:2,8
228:14,14,15
229:4,24 231:1
231:4,4 234:21
238:17 239:9
244:1,21 245:5
245:10,15
246:14,14
249:18 250:1
**doubles**   100:4
**doubt**   195:14
**dow**   4:14 113:6
113:10,12,14
113:15,19,25

114:13,18
115:8,19,25
116:5,7,10,16
117:11,20
118:1,2,3,4,5,6
118:13,21
119:3,8,12,17
119:20 120:3,7
120:19,20
121:1,6,24,25
122:1,2,4,19
199:7,7,10
200:22,25
201:4,18,19,20
201:25
**downside**
17:24 18:2
**drafted** 33:19
103:19
**drafting** 34:8
103:16
**dramatic**
122:12
**drill** 207:15
**drink** 65:10
**drive** 10:5
115:15 152:19
164:9
**driver** 105:22
105:22 117:17
**drivers** 114:13
**driving** 37:9,9
122:14
**drop** 117:1
148:3
**drove** 36:13
121:3

**due** 222:11
**duffey** 248:13
**duffy** 232:1
236:22
**dug** 75:16
**duty** 219:2
**dynamic**
149:13
**dynamics**
149:17

**e**

**e** 1:21,21 3:1,1
5:1,1 76:2
113:21 145:6,7
145:20 146:2
146:14 198:24
198:25 217:8
217:23 218:5
234:8 251:1
**earlier** 42:16
44:18 75:12
97:5 105:23
111:6 130:18
130:22 135:13
159:4 189:2,16
199:25 204:5
207:25 246:23
**early** 37:9
103:1
**earn** 26:10
41:3,5 106:12
109:25 110:12
110:14,15
113:15 131:1
158:7 210:22
**earned** 210:23

**earnings** 17:23
**easily** 48:12
**eastern** 19:2
**easy** 15:20
42:17 214:8
226:8
**eat** 121:20
**ebitda** 17:3,3,5
17:13 122:15
**eccf** 243:19
**ecf** 5:8 21:16
33:16
**ecf3584** 248:21
**ecf3784** 248:22
**economic**
25:13 122:13
132:15 169:12
**economically**
121:14 169:20
**economics**
117:10 160:2
**ecosystem**
124:2
**ecro** 1:24
**ecuador** 110:1
**editorial**
234:22
**educating**
105:7
**educational**
93:17
**effect** 77:14,15
**effective** 26:22
27:24 38:6,15
44:11,12,24,25
45:6,14 52:8
52:21 61:11

117:6 125:14
135:18
**effectively** 26:5
26:25 55:1
115:2 123:4
161:1
**efficiency**
116:14 152:17
**efficient**
120:12 132:6
132:13
**effort** 16:3
17:7 27:11
98:22
**efforts** 6:13
43:1
**eight** 10:4
159:1 171:22
172:3 231:24
**eip** 204:23
205:5,16 206:1
208:9 209:1,12
209:16,22
210:3,6,16,17
210:25 211:5
211:15,25
**either** 37:22
51:24 178:12
200:15
**elaborate** 42:6
**elastic** 120:18
**elect** 112:22
130:14 172:4
200:15
**elected** 180:6
194:19 195:5
244:14

election   179:10
180:8 190:2,13
190:14,17,19
194:1,7,17
195:21,22
196:1,8 198:20
199:15,22
elections
198:15
electronically
110:5 190:6
element   41:10
elements
114:11,11
146:25 150:5
150:21 151:9
eligible   84:3
99:5
elizabeth   3:8
200:12
ellis   3:3 6:22
8:1 51:22
126:9,15 155:5
173:4 182:15
200:13 202:8
215:6 249:18
else's   86:3
email   185:16
188:11,14,16
244:4
emanual
140:17
emergence
16:8 27:9
102:8 103:12
129:22 130:11
130:23 135:15

135:16
emergency
228:5
employed
152:18
employee
26:14 28:2
47:3,25 97:22
97:22 242:17
242:17
employees
15:12 27:21
42:24 47:25
61:14 96:25
98:1,5,13,22
99:4 203:2
enable   132:5
195:23
encompass
181:13,15
encompasses
26:21
ended   161:12
182:3
energy   93:7
116:13 120:15
172:1 207:20
engaged   163:8
163:9 183:15
183:22
english   199:12
209:20
enhance   131:4
enhanced
123:17
ensure   46:7
185:14 207:23

209:3
ensuring   75:18
entails   222:5
enter   213:7
entered   166:18
167:7 178:15
enterprise
130:6 158:8,9
158:14 165:5,6
165:11,19,21
165:21,23
180:12,16,20
entire   17:3
118:16 180:16
180:20
entirely   163:19
entirety   52:3
68:19 158:4
entities   44:11
44:13 45:2
70:17
entitled   73:13
101:21 179:9
184:2 185:12
190:20 211:11
entity   35:21
52:8 92:1
128:25
entries   66:1
entry   82:21
environment
15:19 117:14
121:9 149:13
equal   150:19
150:21 151:1
171:14

equate   115:22
equitable
96:23
equity   35:14
35:17 69:24
98:2,5,11,16
99:2 130:2
138:11 157:23
158:16 161:1
195:16 196:1
238:22
equivalent
169:21
escalate   116:8
especially
106:10 129:3
essential   78:22
92:23
essentially
72:6 169:19
208:13 239:11
establishing
213:24
estate   37:10
38:19 39:1,10
49:19 50:6
79:12 247:6
estates   34:21
35:3 36:8
161:9
estimate
180:12
et   10:11 17:8
18:12 19:10
36:2 43:6 48:1
55:3 60:1
70:18 79:15

101:21 102:23
**eth**   37:20 51:10
  61:18 62:23
  64:12 142:5
  143:7 159:18
**ethereum**
  60:20,25 129:4
  130:24 131:1,3
  131:5,15
**eva**   171:4,4
**evaluating**
  238:23
**evaluation**
  174:21 176:17
**event**   85:14
**events**   19:15
**eventual**
  228:18
**everybody**
  8:24 17:24
  32:9,12 47:22
  47:23 81:25
  106:13 154:22
  245:11
**everyone's**
  155:20
**evidence**   11:16
  11:18,19 12:15
  12:17,18 13:18
  13:20,21 21:12
  21:14,17,19
  22:21 23:13,15
  23:16,21 29:15
  29:18,21 30:1
  30:2,3,11,21
  31:4,11,13,16
  31:17,19 72:9

81:6,21 90:24
91:1,1 119:18
133:6,8,9
134:18,20,21
134:22 142:20
166:18,20
167:7,9 174:6
176:20,22
187:8,11
193:13 204:18
204:20,21
238:3 248:18
248:21,22,25
**evidentiary**
249:10
**exa**   115:23,24
  118:17
**exact**   68:2 88:7
  136:21 157:15
  212:17
**exactly**   49:22
  81:8 157:19
  159:13 161:6
  194:13 210:21
  226:24
**exam**   93:9
  145:10
**examination**
  5:8 6:2,4,10
  7:12 28:14
  65:3,4,20 66:3
  78:13,16 79:1
  112:25 118:8
  118:12 126:11
  135:1,22
  167:13 170:19
  177:19,20

187:14 198:2
213:15 217:2
217:17
**examine**   5:25
  31:25 32:2
  55:7 68:25
  71:21 77:24
  78:21,23 79:5
  80:17 92:10
  104:19 110:21
  113:5 118:7
  122:18 135:1
  135:25 138:20
  154:7 167:16
  168:10 172:24
  179:4 180:24
  181:20 187:15
  191:15 193:20
  199:6 201:24
  202:2 212:7
  213:2 214:23
  216:21,24
  217:5 222:1
  245:25 248:10
**examined**   6:7
**examiner**   77:2
**examiners**
  245:23
**example**   27:12
  40:5 41:3 76:1
  100:21 104:10
  152:20 179:10
  179:21 188:20
**examples**
  45:16,20 75:24
  212:15

**exceed**   57:17
  57:21 147:14
  151:24
**exceeded**   56:5
  216:2
**excellent**   16:22
  136:25 206:14
**except**   91:14
  92:1
**exceptions**
  240:4
**excerpt**   53:25
  133:16 134:18
**excerpting**
  194:12
**excerpts**
  145:22
**excess**   240:1
**exchange**
  38:20 39:10
  41:5,23 100:2
**exchanged**
  15:8
**exchanges**
  56:16 70:4,18
**excites**   132:1
**exclude**   180:13
**excluded**   46:22
  47:4,8,16,17
  47:22 48:8
  97:13,14,18
  159:12
**excludes**   50:14
**exculpated**
  52:8 75:21,22
  76:2

**exculpation**
15:23 16:1
32:23 34:17
45:11,22 46:7
46:12,20,25
47:7,13 48:10
48:15,23,24
49:14,17 52:12
52:19 53:6
54:15,19,22
75:5,6,11,18
76:10,12,22
77:8,13 125:3
125:9
**exculpations**
14:25 15:18
46:21 47:9
49:8 50:17
51:21 52:10
75:25 76:21
125:5,7
**excuse** 69:3
72:1 87:11
136:18 166:14
**excused** 125:19
154:12 173:1
181:22,25
198:2 202:2
215:2
**executable**
16:11 18:7
**executed** 15:23
21:6
**executing** 23:6
**executive**
23:20 104:12
129:1 207:24

208:17 242:22
**executives**
26:20 27:8
203:2 205:10
207:22 208:16
209:4,13,22
210:8,22
**exercise** 6:19
114:5 230:10
**exhibit** 10:21
11:16,17,19,22
12:15,18,21
13:18,21 19:17
19:18,19,19,24
20:7 21:11,18
22:10,12,21
23:13,16 29:9
30:10,14,19,19
30:19,21,22
31:1,6,8,8,12
31:12 33:8
54:6,8 65:18
79:2 80:19,20
80:25 81:5,15
81:21,23,24
82:12,18,22
113:21 122:22
122:24 132:17
132:18,21
133:4,5,5,7,9
133:11,13,18
134:6,18,20,22
145:6,7,13,20
146:2,13,14
166:8,9,18,20
166:22,22,24
167:6 170:17

170:18,20,21
176:9,13,20
182:16 184:20
184:20 185:2
187:8,10
188:20,23
189:8 193:14
193:24 201:11
204:10,18,19
204:21 206:12
206:22 234:8
244:6 248:20
248:22
**exhibitor** 81:2
**exhibits** 8:5
19:16 28:20,22
29:15,19,23
30:1,3,5,16,20
31:18 53:24
66:1 80:22
113:19,20,22
145:9,18,25
176:12 179:8
202:12 217:1
217:23 234:9
238:3
**exist** 45:6
**existence** 44:20
44:23 45:1,12
45:13 95:17
**existing** 117:10
**exists** 45:4
**exit** 144:13
161:9
**expanded**
154:3

**expansion**
234:4
**expect** 27:23
116:25 118:10
120:12 126:10
158:2
**expectations**
51:7
**expected**
188:13,17
247:18,18
**expecting**
234:2
**expense** 36:19
36:23 37:3,7
37:12 114:11
**expenses**
121:21
**expensive**
18:21
**experience**
92:22 95:23
122:10 128:4
156:12 168:15
169:11 171:7
174:2 184:12
233:1 235:13
235:16,18,18
235:19 236:22
237:4 238:16
238:18
**expert** 23:25
128:3 174:6
249:3
**expertise**
108:10 164:2

**explain**  35:21
37:4,17 43:10
46:11 51:4
69:14 79:11
80:1 86:25
89:9 93:12
123:10 135:15
188:25 189:23
209:8 214:6
**explaining**
35:9 54:18
200:14
**explanation**
67:21
**explicitly**  88:8
**exploded**  66:12
**explore**  117:12
**extend**  130:12
**extended**
168:21 198:16
**extensive**
159:14
**extensively**
75:5
**extent**  68:4
141:12 228:13
240:8
**external**  137:8
223:13
**extremely**
83:10

**f**

**f**  1:21 251:1
**fa**  174:5
**face**  149:17
**faced**  96:7

**facilitate**
244:12
**facing**  24:3,4
**fact**  18:20
56:12 91:20
119:21 192:11
237:7 246:16
**factors**  67:15
160:20 163:18
164:15 168:23
169:15 172:15
**facts**  22:17,22
22:24 23:3,9
56:10,10 109:9
203:21 246:9
246:12
**fahrenheit**
10:9 16:8,10
16:13 18:6
72:25 105:25
108:23 127:19
127:21,22,23
128:24 129:10
129:17,19
130:7 131:22
136:5,6,8
138:2,3,8,10
138:11,14
139:17 140:18
140:23 141:2
141:22 146:13
146:21,25
154:4 162:8,12
162:15,23,25
163:2,13,23
164:5,15
165:17 168:25

170:4 223:1,14
223:25 225:8
225:24 226:3,9
231:4 233:7,13
233:21 234:2
234:25 235:5
236:3 246:22
**fahrenheit's**
17:22 128:22
129:24 134:8
134:11
**fahrenheit's**
143:23
**fair**  21:5 23:8
38:12 50:7,20
50:23 64:2
67:9 92:23
96:9 98:8,14
99:7 134:10
148:2,6 169:18
174:14,16
180:11,15
237:6
**fairly**  167:2
**faith**  14:9
**fall**  120:15
157:8 163:6
**false**  22:6
**familiar**  15:1
23:2 26:14
32:14,22 33:6
35:3 36:18
37:14,24 39:3
40:20 43:21
44:12 52:13
53:3,13,19
54:16 55:25

95:6 103:12
116:10 118:9
118:18 121:2
128:12 157:4
187:24 239:5
**familiarity**
169:11
**family**  136:15
137:5 239:17
239:25
**far**  112:15
172:6
**farming**  70:13
70:18
**fast**  14:11
26:21 33:25
103:8
**fatigues**  219:2
**favor**  195:15
197:9 223:25
225:8
**feasible**  16:11
148:21
**federal**  5:17
107:8
**fee**  36:19 37:3
37:6,12 38:23
144:24,25
163:20,23
164:4
**feel**  51:25
103:6 107:19
110:13 119:22
160:4 162:20
**fees**  10:8 36:22
76:11 123:24
160:2 163:18

| | | | |
|---|---|---|---|
| 169:13 | 28:1,4,21 | 65:9,12 66:5,8 | 110:1 111:4,5 |
| **feet** 77:7 | 32:14,16,18,21 | 66:10,15 67:4 | 111:10,12,19 |
| 232:25 | 32:25 33:3,5 | 67:7,11,14,25 | 112:1,8 113:16 |
| **felt** 10:9 | 33:10,13,17,19 | 68:2,8,11,14 | 114:4,16,20 |
| 141:23 145:3 | 34:2,5,10,14 | 68:15,17,20 | 115:10,19,20 |
| 148:14 164:14 | 34:18,24 35:5 | 69:4,7 70:3,9 | 115:22 116:2,6 |
| 175:6 233:17 | 35:11,23 36:10 | 70:14,16,23 | 116:9,11,21 |
| 233:25 236:9 | 36:21 37:6,15 | 72:5,16,23 | 117:18,21 |
| **ferrao** 24:23 | 37:19 38:1,5 | 73:5,21,25 | 118:20,22 |
| **ferraro** 3:21 | 38:16,21,25 | 74:2,9,14,16 | 119:6,9,25 |
| 8:2,3,7,11,16 | 39:5,7,11,17 | 74:20,24 75:3 | 120:4,11,24 |
| 8:20,24,25 | 39:21,25 40:7 | 75:12,24 76:4 | 121:10 122:5 |
| 9:13 10:18,22 | 40:12,22,24 | 76:15,24 77:16 | 122:10,22 |
| 10:23 11:1,4,6 | 41:7,17,20,25 | 78:3,4 79:10 | 123:2,12,16,19 |
| 11:7,10,11,14 | 42:7,24 43:4 | 79:13 80:8,12 | 123:22,25 |
| 11:20,24 12:1 | 43:12,15,19,23 | 81:6,24 82:2,6 | 124:3,6,9,13 |
| 12:3,7,10,13 | 44:3,6,14,21 | 82:8,11 83:13 | 124:17,20 |
| 12:19,23,25 | 44:24 45:2,8 | 83:15 84:2,15 | 125:2,7,11,15 |
| 13:2,7,10,13 | 45:15,19 46:1 | 85:1,6,11,19 | 125:20 142:3 |
| 13:16,22 14:5 | 46:10,15,21 | 85:24 86:5,11 | **ferraro's** 8:4,6 |
| 14:20 15:2,3,6 | 47:1,14,18,21 | 86:17 87:5,7 | 30:11,15 31:2 |
| 15:24 16:3,11 | 48:4,19 49:20 | 87:16,19 88:16 | 72:10 |
| 16:12 17:12,15 | 49:23 50:1,3 | 91:18 93:2,13 | **ferrera** 92:18 |
| 17:19,23 18:8 | 51:2,8,15,23 | 93:19,24 94:8 | **fewer** 207:22 |
| 18:9 19:2,7,9 | 52:5,9,14 | 94:21 95:8,11 | **fiat** 37:21,23 |
| 19:12,13,23,25 | 53:16,21 54:17 | 95:16 96:12,22 | **fiduciary** |
| 20:5,12,14,17 | 54:21 55:10,15 | 97:3,15,25 | 106:10 |
| 20:19,23,25 | 55:19,23 56:2 | 98:10,18,21 | **fifth** 128:6 |
| 21:1,4,7,8,21 | 56:7,15,20 | 99:3,10,12,25 | **figured** 233:2 |
| 21:25 22:3,6 | 57:1,11,15,19 | 100:15,20 | **file** 91:3 185:15 |
| 22:10,13,15,17 | 57:23 58:3,10 | 101:3,15,19 | 200:8 207:24 |
| 22:23 23:1,3,4 | 58:13 59:3,7 | 102:7,11,15,18 | **filed** 5:7 19:19 |
| 23:7,11,17,24 | 59:20,23 60:3 | 103:5,14,17,25 | 20:1 29:10 |
| 24:25 25:2,6 | 60:7,11 61:8 | 104:5,10 105:4 | 30:18,20 32:15 |
| 25:17,20,25 | 62:5,10,15,20 | 105:18,19,21 | 32:17 33:7 |
| 26:4,5,10,12 | 63:3 64:6,11 | 106:4,18 | 65:14,21 82:20 |
| 26:16,19 27:11 | 64:16,22 65:7 | 108:18 109:21 | 132:22 133:14 |

176:13 185:9
189:21 200:8
204:7 217:1,4
221:18 228:1
229:22
**filing** 25:16
56:6,19 64:4
111:8,16
145:23
**fill** 236:7,14
249:14
**final** 99:18
174:24 178:20
244:13 246:19
**finalize** 5:16
100:11
**finally** 209:5
214:4 221:16
**finance** 70:11
156:11
**financed**
158:10
**financial** 9:1,8
65:16 70:8
96:12 102:20
106:5,9,11,24
107:7,12
146:19 147:18
183:25 185:11
213:21 224:22
225:3,12,23
226:1,9 231:3
244:14
**financials**
95:24
**financing**
156:10,23

158:11,13
162:18
**find** 9:16 88:6
**finding** 208:24
**fine** 28:18
54:11,13 83:3
84:19 117:20
217:10 246:6
**finish** 123:15
124:24 153:12
153:14 217:11
217:11,13
**finished** 68:23
215:11
**finishing** 243:9
**fireblocks** 56:6
**firm** 129:13
156:5,8 167:25
173:23
**firms** 167:21
**first** 7:21 21:21
21:23 34:3
35:6 40:13
44:16 45:23
47:15 83:20
90:8 93:25
104:23 107:1
114:1 117:15
118:14 135:1
140:8 147:17
156:25 167:21
170:22 174:23
175:1 177:20
199:9 202:23
206:17 208:5
213:20 222:3
228:16 232:12

232:12
**firsthand**
34:16
**fit** 234:1
**fits** 216:11
**five** 21:14
22:20 112:17
112:22 116:20
127:23 130:12
136:11,12,20
144:15,19,20
**fix** 6:12
**fixed** 18:3
122:8 200:9
**flat** 117:24
**flexible** 157:20
159:10
**flip** 10:21 11:5
11:23 12:5,21
13:4,8
**flipping** 201:21
**floor** 160:18
161:8,10
**flow** 147:15
150:22 151:2
165:14,15
**focus** 41:2
94:18 132:2
146:24 152:15
**focused** 48:20
93:14 159:18
174:5 207:20
207:23
**focuses** 173:25
**folks** 61:15
73:21 76:18

**follow** 72:6
99:19 109:15
122:4 151:16
200:16 215:20
**followed**
105:11 106:7
161:23 185:6
**following** 56:7
59:7 101:15
162:2
**follows** 152:23
**footnote**
200:13
**force** 83:22
**forecast**
114:21 115:5
116:15,17
117:8 165:15
**forecasting**
149:9
**foregoing**
251:3
**forensic**
173:19
**forget** 170:16
229:14
**forgetting**
172:1
**form** 93:12
173:25 243:1
**formal** 7:2
105:10 168:16
247:17
**formally** 8:22
247:14
**formed** 112:3

**former** 97:10
97:10,11,12,13
97:21,22 98:4
229:15
**forms** 44:2
157:21
**formula**
144:22
**formulates**
112:13
**formulating**
112:2
**formulation**
159:14
**fort** 219:24
220:7
**forth** 120:1
164:3 195:10
197:17
**forward** 17:21
113:17 114:14
114:18 129:25
131:24 149:20
160:19 161:4
169:6 235:22
**fought** 15:7
16:5
**found** 32:23
33:16
**founded** 128:8
**founder**
127:25
**four** 10:4 98:23
99:3,3,4,5
112:17,23
130:12 144:19
158:4,25

183:11 234:17
234:19,25
235:9 237:6,15
241:5,8 242:5
**fraction**
160:12 171:13
230:23 231:2
**framework**
96:21
**frameworks**
169:1
**frankly** 28:4
**fraud** 40:6,15
213:21
**free** 107:19
165:15 193:14
**freely** 175:17
**freeze** 55:14
56:6 64:4
69:11,15
**friday** 228:5,25
249:15
**front** 8:21
33:11 64:17
67:12 72:13
80:21 82:12
83:13 98:2
100:15 113:22
118:11 120:25
132:17 144:12
149:10 166:6
170:23 171:21
176:9 194:2
221:2 244:2
**froze** 94:9
**fruitful** 14:22

**ftp** 29:11
**ftx** 66:12,19
68:6,9
**fulfill** 7:17,17
**fulfilling**
208:11
**full** 42:18,21
98:21 114:7
129:10 156:11
156:22 167:21
**fun** 14:21
**function**
124:12
**fund** 158:13
**funds** 46:8,13
48:15 55:18,22
64:3 75:18,23
76:3 128:5
137:1,2,6,7,13
**further** 28:12
113:3 124:25
125:16,18
132:10 134:24
161:3,11
180:22 181:17
187:13 193:18
196:15 199:4
200:3 212:24
232:23 245:18
**future** 17:10
17:21 71:13
105:5 161:10
233:19 238:22

**g**

**g** 5:1
**galpo** 249:3

**gate** 16:20
**gates** 39:14
**gather** 247:11
247:22
**gears** 18:22
26:13 164:23
**gemini** 36:3
**general** 25:25
26:1,11 27:5
66:17 96:12
102:24 104:21
106:23 112:1,3
114:1,1 151:11
192:4,21,24
203:16
**generally**
48:17,19 56:2
95:11 100:16
100:16 115:11
118:8,25
128:11 220:20
**generate**
165:11 169:7
**generated**
17:13,18
**genoot** 127:25
129:13 142:5
143:10 154:2,3
**getting** 8:5,8
16:21 27:5,5
39:23 42:24
46:16 103:4,23
104:2,5,6,9
169:11,18
232:25
**give** 8:14 27:12
29:3 63:16

80:25 99:19
100:13,21
104:10 109:5
126:23 202:16
212:23
**given** 18:11,20
49:18 59:25
64:17 97:22
108:7 138:3
163:2,20,25
175:8 195:2
196:8 199:20
225:16 247:4
250:5,12
**gives** 114:24
**giving** 76:16,21
80:5 144:13
**glenn** 1:22
**glimpse** 179:1
**global** 9:7
117:13 163:5
**go** 6:20 20:13
21:21 24:21
34:25 35:1
40:2,16 41:1
42:14,16 44:8
44:10,15,17
48:12 53:17
54:2,9,12 55:9
62:18 66:4
69:2,21,22
71:11 72:4,17
74:8,17 78:2
79:9 80:6,16
80:24 83:11,16
84:23 86:21
87:14 89:7

91:11 92:14
93:18,21 94:19
104:22 105:19
105:20 107:17
108:14,23
109:20 111:3
113:12,18,23
116:15 117:20
118:12 126:11
127:4 129:20
130:10 131:23
135:5 138:22
141:8,10,14
143:23 148:17
148:17 149:12
150:2,10
153:15 167:18
168:12 175:19
177:6 178:1
181:2 191:17
194:15 195:19
196:23 198:13
201:3,16
213:18 217:21
224:13,18
225:21 229:11
230:3,4 233:21
239:22 243:8
245:21 246:3
246:20,25
249:8
**goal** 14:10
26:25 103:5
104:5
**goals** 104:15
205:12

**goes** 16:17
45:14 64:9
69:25 70:25
118:23 140:2
149:25 228:22
**going** 6:1,4,5,7
6:10,11 9:23
17:21 27:8
28:5 31:24,25
33:22,23 34:25
37:13 38:7
39:2,15,19
40:17 42:14
43:8,20 44:8
45:9,21 49:2
51:12 59:24
65:17 71:8
72:5 80:4
81:16,18 82:18
88:12 90:9,15
93:21 99:21
102:9,25
107:21 108:3
108:12 114:14
114:18 116:24
117:2 118:4
120:6 121:4,20
124:23 125:23
126:6 129:25
137:5 138:3,8
141:9 145:17
147:13 148:8
151:7 152:16
152:25 154:15
156:24 160:4
160:19 164:9
164:10 169:6

175:1 179:12
196:2 201:1
202:4 208:13
214:12 215:23
216:12,15
217:12 218:14
222:23 224:18
230:2,9 232:15
232:25 235:22
240:7 243:22
244:11 249:25
**gonna** 187:21
**good** 5:3 6:15
6:18,20,21
7:25 8:20,24
14:9 45:16,20
55:10 65:7,9
65:10 70:15
73:1 76:19
78:3,4 102:7
105:9 111:4,5
113:14 114:25
115:17 125:24
127:5 135:6
173:14 182:21
182:23 187:18
202:7,19
210:14 215:25
218:16 226:5
**goods** 124:2
**gotten** 76:18
**government**
20:3,20 107:9
**governs** 69:8
**grace** 202:7
215:5

**great** 17:9,10
106:4 111:9
121:10 122:10
142:10 217:20
**greater** 171:14
207:22
**greatest** 164:9
**greatly** 121:17
**green** 1:13
176:21
**gross** 40:5
55:11
**ground** 9:14
**group** 41:4,5
110:12 127:19
127:22,23,24
128:1 131:3
136:16 137:11
137:22 141:22
162:8,25
163:10 164:15
164:19 199:12
207:1,6,19
208:21 209:25
212:19
**groups** 41:8,12
41:15 42:9
43:2,4,5 60:10
111:17 169:12
**grow** 130:5,5
**grows** 116:19
**growth** 114:24
**guess** 5:15
110:11 135:17
158:24 163:10
188:4 196:6
229:7 232:17

248:2
**guidance**
155:20
**guilty** 214:14
214:14
**guy** 14:20
**guys** 134:2
138:24 139:15
167:20
**gxd** 35:25

**h**

**half** 17:17
100:16 120:11
148:3,5
**hall** 248:2
**hand** 8:7,12
34:1 113:7
126:20 155:8
194:13 198:7
200:23 202:14
213:17 218:22
227:5
**handed** 184:18
204:5
**handoff** 27:6
27:20 38:10
**hands** 122:20
154:8 181:21
198:6 214:24
**hang** 216:12,15
234:18
**hannah** 182:6
182:14
**happen** 112:14
115:20 130:17
131:18

**happened**
110:8 124:19
163:17
**happens** 19:8
63:12 120:2
**happy** 31:21
134:24 218:7
**hard** 15:7 16:5
19:20 24:17,20
87:17 119:10
147:18
**harsh** 109:11
109:13
**hash** 115:9,21
115:23,24,25
116:7,12,17,19
117:12,15,24
118:16,17
119:16 120:1
120:22 146:22
147:1,6,8,12
148:7,7,16,18
149:4,25
150:17 151:11
151:12,20,21
152:9 165:20
165:22 171:4,4
**hashing** 116:23
**hasn't** 110:25
**haven't** 242:20
**hawaii** 60:21
60:25 61:7,10
**head** 9:3 116:2
118:23 161:17
171:17 172:2
231:2 245:11

**healing** 16:21
**healthy** 209:23
**hear** 45:17
102:15 105:9
110:25 144:8
152:23 182:11
246:4
**heard** 111:17
135:7 178:6
200:11 239:8
250:3
**hearing** 2:1,2,5
29:17 90:20
92:18 169:9
185:9 199:25
217:15 221:14
228:5,25 238:6
238:10 243:24
249:19,24
250:6,8
**hearsay** 242:25
**heat** 122:11
**heavy** 169:16
247:6
**hedge** 93:6
94:3,15,22
128:4
**hedges** 94:11
**hedging** 17:8
92:21,23 93:12
93:18 94:1,7
94:21,23
102:23
**held** 48:23
58:22 70:16,17
139:15 152:25
174:14

hell 28:10
hello 136:1,1
  199:11
help 18:17
  42:20 81:16
  110:15 118:1
  132:11 136:25
  144:10 156:11
  177:1 203:21
  224:20 234:21
helped 77:19
helpful 36:24
  105:7 223:22
helping 203:6
  247:21
helps 52:1
heras 4:11
  196:21
herculean
  27:11 43:1
he'll 242:21
he's 142:12,12
  142:12,13
  240:8 241:11
hi 168:13
  191:16,18
  200:25 202:21
hiding 228:24
high 15:4
  119:16 120:23
  122:15 163:19
  186:5,13
  192:24 205:5
higher 18:1
  35:13 67:5
  121:15 123:18
  123:19 131:5

148:19 149:4
152:9,21,21
195:22
highest 163:16
highlight 13:25
highlights 36:5
  134:8,11
highly 16:5
  76:10
highs 166:1,2
  171:2
hire 106:25
hired 107:22
  107:24 244:16
hiring 106:8
hit 9:13 16:12
  28:10 67:13
  102:11 103:9
  104:15 190:9
  190:10
hmm 47:19
  50:2,19,23
  51:14 53:8
  98:19 99:25
  147:3 188:24
hoc 40:19,20
  40:23 41:3,5,8
  41:12,15 43:2
  43:4,5 199:12
hoeinghaus
  202:9,12,18,21
  202:21,23,25
  203:6,12,15,19
  204:1,7,11,13
  204:16,22,25
  205:4,6,9,17
  205:24,25

206:2,7,14,17
206:24 207:18
208:3,6,8
209:2,8,11,21
210:4,9,19
211:3,7,13,17
212:2,16,22
213:22 214:10
215:4
hold 29:3 34:1
  81:16 82:16
  101:20 141:7,7
  142:19 145:15
  145:18 179:11
  199:8
holder 58:14
  63:7,22 138:11
  185:17 186:6
  186:12,19
  188:5
holders 58:1
  59:4 60:4 61:6
  72:21 73:3,13
  186:24 187:3
  188:9,13 192:8
  192:11,13,18
  192:22,24
  195:3 197:18
  198:24
holding 115:14
  150:1 193:4
holdings 63:2
holistic 158:6
holistically
  150:15
home 110:2

hon 1:22
honestly 144:4
  228:23
honor 6:15,18
  6:21 7:18,23
  7:25 8:4,18
  11:15 12:14
  13:17 19:17
  20:11 21:10,20
  23:12 28:13,15
  28:19 30:4,9
  31:14,22 48:13
  49:15 53:24
  54:5 55:5,8
  56:13 57:5
  58:7,18,23
  59:12 60:17,22
  64:25 65:5,17
  65:23 66:22
  67:4 68:22
  69:18 71:5,17
  71:19,22,24
  77:25 79:20
  80:3 81:18,24
  82:14 83:11
  88:1 89:1
  92:11,25 102:5
  104:16,20
  105:13 109:18
  110:20,22
  111:1 113:3,14
  118:15 122:19
  124:25 125:2
  125:16,18,23
  126:19 134:17
  134:23 135:4,6
  135:20,23

138:17,21
142:23 143:13
143:20,22
145:9 154:1,11
154:24 161:17
166:17 167:5
167:17 168:11
169:23 172:25
173:10 176:19
177:18,22,25
179:5,7 180:9
180:25 181:24
182:3,12,14,23
182:25 184:19
187:5,16 191:6
193:17,21,23
194:20 195:6,7
196:6,16,19
198:4,11 200:3
200:7,12 202:3
202:7,11
204:17 206:21
210:10 212:9
213:3 215:1,5
215:13,22,25
216:11,19,22
216:25 217:10
218:9,16,25
219:8 221:23
222:2 223:17
224:19,20
225:10,20
228:6 229:18
230:1 238:11
238:24 239:3
239:21 241:10
243:10,21

244:6 245:2,2
245:17 246:5
246:17 247:7
247:12 248:4,8
248:11,16,23
249:2,7,12,17
250:4
**honor's** 29:10
**hope** 103:9
**hopefully** 7:12
**hopes** 161:11
**hoping** 61:9
**horse** 10:1 97:7
128:21 159:21
160:20 161:6
161:24 162:5
162:14 163:8
**hosted** 132:14
172:14
**hosting** 117:10
**hours** 104:11
123:14 175:11
222:5
**housekeeping**
28:17 30:9
**huge** 87:16
**hundred** 10:6
188:5
**hundreds** 10:7
163:24 169:10
**hurdles** 92:19
**hut** 142:12
171:25

---

**i**

**i.e.** 130:4
**ico** 123:3

**idea** 67:21
126:6
**identified**
23:18 48:9,12
**identify** 7:24
18:25 80:24
184:2 185:11
230:19
**identifying**
46:24
**identities**
245:7
**idu** 140:17
**illegal** 66:21
**illiquid** 35:16
129:4 131:9
164:12 167:23
167:23 213:6
**illiquids** 35:14
**illustrated**
148:20 149:4
152:10
**imagine** 93:16
99:21 217:12
**immediately**
59:1,6,10
85:15 218:3
**immense** 36:13
**impact** 46:12
120:6 147:21
238:21 239:1
**impacted**
120:8
**impacts** 122:6
**implemented**
92:21

**implies** 88:16
**imply** 94:7
147:14
**implying** 94:13
**importance**
34:16
**important** 9:14
15:11,14,21
16:14 17:24
18:13 27:3,6
41:10 94:15
121:11,22
130:2 131:2
132:1 160:18
160:25 169:3
169:15 235:12
235:14,21,22
**imposed** 107:8
**impossible**
147:20
**impressed**
16:23 106:1
164:18
**impressive**
104:14
**improper**
119:19
**improved**
163:23
**improvements**
152:17
**imran** 212:9
**inability**
175:17
**inbound** 163:5
**inbounds**
162:8

**incent** 26:20
**incented** 130:4
**incentive** 26:14
  26:19 28:2
  101:13,16,17
  101:23 102:8
  103:13 203:2,7
  203:10,14,18
  203:24 204:1
  205:6,9 207:2
  207:19,24
  209:2,6 214:5
**incentives**
  129:24 130:5
  208:18,18
**incents** 130:3
**include** 103:3
  158:2
**included** 6:24
  47:2,20 48:3
  51:1 65:14
  68:19 97:12
  98:13 142:19
  159:12 206:9
  209:13 214:7
  222:10
**includes** 14:25
  209:11
**including** 8:6
  32:10,10
  157:25 160:17
  180:13 191:2
  209:6,22
  234:11 235:8
  240:5,13
**inclusion**
  209:15

**inconvenience**
  6:5
**inconvenient**
  5:22
**incorporated**
  145:8
**increase** 23:22
  25:14 108:5,17
  138:24 140:5
  144:24 151:14
  152:1,11
  232:19,20,22
  233:3,6,11
  246:24 247:3
**increased**
  25:18 151:12
**increases** 100:3
**increasing**
  139:9 233:9
**incredible**
  27:19
**incredibly**
  18:13 27:3
  164:18
**incur** 151:14
**indecipherable**
  218:4
**independence**
  229:8 239:13
  240:3,20,24,25
**independency**
  240:14
**independent**
  70:22 232:10
  234:20 235:9
  235:23,23
  237:15,20

  239:6,12 240:6
  241:5,6,8,9
  242:5,6,8,9
  243:12 244:17
**independents**
  242:10
**index** 122:12
**indicate** 71:6
**indicated**
  135:14 195:14
  219:11 243:22
**indicates** 84:6
  84:14
**indicted**
  214:13
**indiscernible**
  29:13 31:24
  32:6 48:4
  52:15 54:4
  55:11 57:6
  58:2 65:16
  66:6,21 67:10
  76:14 78:5
  84:24 87:14
  92:5,12,17
  96:18 97:2
  99:8 101:18
  102:8 120:2,3
  120:8 136:2
  137:9 142:18
  144:13 145:6
  146:9 147:25
  148:23 154:17
  155:11,11,15
  166:24 167:13
  170:22 171:1
  177:21 179:22

  182:19 213:4
  222:11 225:14
  229:14 235:15
  242:1,11 244:7
  247:17,19
**individual**
  57:13 136:15
  157:21 158:5
  158:25 160:7
  185:13 209:18
  211:4,9
**individually**
  160:9,14
**individuals**
  246:21
**industry** 24:4
  24:16 46:2
  156:15 163:18
  184:15 203:9
  210:6
**ineligibility**
  84:23
**inexecutable**
  160:24
**infer** 180:6
**inference**
  195:24
**informal** 74:22
  248:3
**informally**
  8:22
**information**
  35:4 41:19
  44:5 65:16
  120:24 149:1
  157:25 158:1
  185:15,19

199:23 200:16
201:10,24
242:24 243:3
243:23
**informed**
160:21 172:9
184:6
**infrastructure**
127:13 132:4
132:12 156:15
**initial** 35:13
59:1 60:6
157:9 162:23
214:4
**initially** 29:12
156:16 214:7
**initiated**
157:13
**injunction**
15:1,22 16:1
**input** 146:21
146:25 148:12
**inquire** 110:8
**insiders** 95:13
97:10
**insolvency**
228:1,17
**instances**
96:16
**institutional**
175:19
**institutions**
70:8
**instruction**
29:11
**insuring** 48:15

**integration**
115:15 132:3
**intellectual**
131:4
**intend** 249:11
**intended** 161:7
205:7,10
249:14
**intends** 5:25
**interact** 69:12
69:16 76:8
**interactions**
68:8
**interest** 9:24
63:21 86:6,19
100:24 123:18
123:21,22
162:23 175:23
184:5 186:16
233:3
**interested**
82:22 157:17
224:3
**interests** 6:8
72:22 73:3,4,9
138:3,12
205:11 235:12
235:20
**interim** 9:11
102:14,17
174:9
**internal** 77:21
97:6
**internally** 9:21
94:5
**international**
51:17 100:12

100:18,22,23
101:1,13
**internet**
127:13
**interpret** 89:9
196:4,4
**interpreted**
172:11
**interrupt**
62:18 65:24
78:18 150:7,8
**intervals**
121:17
**interview**
235:24
**interviewed**
231:7,8,10
236:16
**interviews**
220:24 231:12
232:6 237:4
244:15
**intimately**
43:23
**intricate** 169:1
**intrinsic**
121:12
**introduce** 8:22
54:8 127:6
155:25 173:14
183:2 202:20
**introduced**
127:17 247:5
248:17
**invest** 130:7
138:1,10

**invested**
130:14
**investigation**
243:8 244:18
**investigations**
16:4 20:3 77:1
97:16 244:25
**investigator**
107:22,24
243:12 244:17
**investing**
137:11,13
138:14
**investment**
36:2 95:8
129:24 143:24
156:7 173:25
**investments**
129:5,18
130:16 132:10
176:3
**investor** 9:4
127:11 128:9
162:25
**investors** 22:2
22:5 98:7
136:23 137:6
137:22 238:22
**involved** 35:25
37:25 47:12
94:9 105:5
106:20 127:15
127:25 129:10
156:19 172:17
174:7 183:12
202:24,25
213:21 222:14

223:5,7 224:5
226:11 227:9
227:13 240:3
**involvement**
34:7,12 103:15
156:25
**iovine** 69:1,1,2
69:3,10,14,22
70:6,11,15,21
70:25 71:2,4,6
71:11,12,19,25
**irish** 172:1
**irregularities**
185:22
**irrespective**
140:21
**ish** 117:24
161:20
**isolation**
147:21 150:12
**issue** 7:13
29:12 47:11
49:1 50:8,16
50:18 60:2,3
96:24 143:23
160:15 199:25
228:17,23
229:7 230:7,13
**issued** 123:5
**issues** 7:14,16
49:9 51:24
76:16 160:3
200:5 225:19
228:24 229:5
238:20,21
239:2 249:10

**item** 85:13
86:22 196:25
**items** 42:10,10
116:16 198:14
**iterated** 33:20
**iterative** 97:4
**it's** 6:19 12:21
140:11 147:18
147:20 148:9
163:14 165:9
170:20 172:6
179:9,21
225:15,16
233:2 234:7,7
234:7 239:24
242:25 244:6
244:23 248:20
248:20,21
**i'd** 145:19
146:7 183:18
248:18
**i'll** 142:3 143:3
157:11,12
243:9
**i'm** 145:13
149:7,18 150:3
151:6,16
152:23 156:2
156:24 163:21
170:8 172:1
174:5 175:1
178:9 181:11
182:5 183:4
187:21 188:22
219:23 220:6
224:2 229:1,7
230:2,3,6

231:21 233:12
236:24 238:11
240:7 241:1,14
242:1,2,4,7,8
242:8,11,12
244:11,19
245:1 246:11
247:11,16
**i've** 156:14
174:4 183:10
184:14,15

**j**

**january** 203:1
**jason** 4:7 65:13
69:1
**jeff** 4:13 111:1
**jeffrey** 3:17
**jenoot** 246:6
**jeopardy**
103:10
**jeremy** 3:9
**jessop** 128:1
**jewel** 27:4
**job** 39:13
106:15 115:5
220:5 222:5
247:13,25
**joel** 16:15
129:11 173:5
173:16
**johan** 4:9
77:25
**join** 112:23
**joined** 94:8
111:7
**joint** 224:11

**jones** 3:9
200:11,12,12
200:20
**joshua** 3:16
218:17
**jp** 9:6
**judge** 1:23
49:8 68:23
80:15 102:2
109:18 113:6
122:20 154:9
181:21 200:23
212:25 213:17
214:24 246:2
**judson** 3:8
7:25
**july** 68:18
178:4 220:14
**jump** 232:16
**june** 19:7
66:11 67:17,22
68:18 94:9
156:22
**jurisdictional**
60:2,3
**justice** 220:7,8

**k**

**k** 76:2
**kampanya**
249:4
**karen** 1:24
182:21
**karpuk** 182:9
182:12,15,20
182:22,23
183:4,4,10,14
183:22 184:8

| | | | |
|---|---|---|---|
| 184:14,25 | **kielty** 9:20 | 123:14 131:9 | **kits** 219:9 |
| 185:4,8,24 | 154:19,21 | 143:7 149:19 | **knew** 53:3 |
| 186:2,10,18,23 | 155:6,12,19 | 156:5 173:23 | 235:12 247:23 |
| 187:1,5,25 | 156:2,2,6,7,14 | 174:2 200:9 | **know** 5:13 6:13 |
| 188:4,10,24 | 156:21 157:3,7 | 209:20 232:12 | 6:17 7:10,16 |
| 189:19,25 | 157:10 158:24 | 233:1,20 236:5 | 8:20 9:18,24 |
| 190:8,12,16,18 | 161:7,16,20,25 | 242:25 | 11:23 14:14 |
| 190:25 191:7 | 162:5,25 | **kindly** 199:3 | 15:9,13,13,18 |
| 191:18 192:7 | 163:12 165:1,4 | **kirkland** 3:3 | 15:23 16:25 |
| 192:12,17,21 | 165:8,13 166:5 | 6:22 8:1 51:22 | 18:3,3,4,20 |
| 194:10,22 | 166:7,11,16,21 | 126:9,15 155:5 | 19:5 21:23 |
| 195:10,20 | 167:1,4,11,16 | 173:4 182:15 | 26:20 27:14,17 |
| 197:5,11,17,22 | 167:19,25 | 200:13 202:8 | 28:5,6 29:12 |
| 198:18 199:17 | 168:6,13,17,22 | 215:5 249:17 | 33:14 36:2 |
| 199:22 201:10 | 170:6,13,23 | **kirsakov** | 37:9 38:10 |
| 201:24 202:3 | 171:6,9,16,21 | 191:16,16,18 | 40:6 41:17,18 |
| **kaza** 128:3 | 172:7,20 173:3 | 191:24 192:3 | 41:18 42:18,21 |
| 129:12 136:15 | 178:2 | 192:10,13 | 43:5,6,25 44:1 |
| **keep** 31:15 | **kielty's** 166:9 | 193:1,8,12,17 | 44:17 45:12 |
| 32:9,19 93:14 | **kind** 9:16 10:9 | **kirsanov** 4:5 | 46:4 47:6,12 |
| 249:25 | 10:11 14:7 | 55:8,8,10,17 | 47:25 48:8 |
| **keith** 3:16 | 18:2,17,19 | 55:21,25 56:4 | 51:25 53:2,3 |
| 227:13,16 | 35:13 36:4 | 56:13,18 57:3 | 53:12,16 55:1 |
| 228:9,17 232:2 | 38:7 39:13 | 57:9,13,17,21 | 57:23 59:18 |
| **kentucky** | 42:5,8 43:3 | 57:25 58:4,14 | 61:14,16 64:22 |
| 219:24 | 46:3 61:8,12 | 58:21,25 59:5 | 67:25 68:2,11 |
| **key** 46:15 | 61:15 62:16 | 59:9,15,22 | 68:16,17,20 |
| 51:24 98:3 | 64:8 69:16 | 60:5,8,13,19 | 69:10,23 70:11 |
| 114:13 116:15 | 87:20 91:16,21 | 60:24 61:5,19 | 70:19 74:8,13 |
| 116:16 117:16 | 93:5 105:25 | 61:23 62:2,7 | 74:14,16 75:5 |
| 120:1 123:13 | 106:8 112:8,9 | 62:11,17,19,25 | 76:16,25 77:1 |
| 131:7,7 203:2 | 112:11 114:8,9 | 63:6,11,16,21 | 78:20,22 82:21 |
| 205:10 209:4 | 114:23,25 | 64:2,9,14,20 | 83:24 87:4 |
| **kicking** 9:19 | 115:5 118:24 | 64:25 180:25 | 88:11,14 89:9 |
| 9:20 | 119:10,15 | 180:25 181:3,8 | 90:23 91:24 |
| **kickoff** 157:12 | 120:2 121:20 | 181:13,17 | 93:9,14 94:9 |
| | 121:23 123:6 | | 103:6 105:19 |

106:7,8,11,13
106:15,16
107:18,20
108:24 109:17
109:19 110:5
110:12,12,13
112:10 115:20
116:2,22,24,25
118:24 119:3,7
120:24 121:19
123:6,6,16
124:23 128:19
128:19,20,25
130:1 131:8,12
131:17 132:2,6
132:7,9 135:17
136:21 137:3,5
137:6,10,12,14
137:24 138:7
139:13,17
140:1,1,4,9,9
140:12,16,19
141:18,20,23
142:21 143:4,6
143:9 144:12
144:16 147:6,8
147:9,19,19,21
147:22 148:4,8
148:10,13,14
148:15,15,25
149:8,9,11,12
149:18,21
150:5,12 151:6
151:8,17,22,25
152:15,16,18
152:19 153:2,4
153:6,10,18

157:19 164:22
168:3 169:15
170:6,8 171:16
171:22 172:4
172:14 175:9
178:14 179:1
180:1 186:4,6
188:5,7,21
191:7,8,10
195:2,21 197:3
201:6,16
209:25 213:5
213:22 216:20
222:4,9 225:24
228:23,23
229:8,24 230:9
230:13,14,23
231:2,25
233:10 243:13
245:7,11,12
246:8,13,24
247:1,2,18,21
248:1
**knowing**   153:6
**knowledge**
  11:9 12:9
  13:12 21:8
  33:3 34:16
  36:6 38:18
  39:8 41:4,13
  41:23 44:22
  47:1 51:24
  105:25 112:21
  140:12 168:2
  180:20 227:15
  228:8,12,14
  242:16,19

246:15
**knowledgeable**
  56:8 101:5
**known**   76:22
**knows**   78:20
  244:7
**knox**   219:24
  220:7
**koenig**   3:8 6:13
  6:15,18,21,22
  7:5,9,15
  249:17,17,21
**kokinos**   3:22
  72:24 125:24
  126:7,16,25
  127:3,5,7,7,10
  127:11,17,23
  128:7,11,14,17
  128:24 129:9
  129:19 130:1
  130:10,21
  131:16,25
  132:16,18,20
  132:22,25
  133:3,12,15,19
  133:22 134:1,4
  134:7,12,14,16
  135:10,17,22
  136:1,2,7,11
  136:21 137:3
  137:10,18,21
  138:5,15,18,23
  139:1,5,21
  140:8,19 141:3
  141:5,9,11,20
  142:8,18,22
  143:22 144:1,4

144:9,14 145:2
145:13 146:2,6
146:10,17
147:3,5,8,11
147:17 148:1,6
148:22,24
149:7 150:3,11
150:19,23
151:3,5,15
152:14 153:18
153:22 154:14
**kyc**   26:23

**l**

**la**   140:17
**labeled**   47:24
**lack**   64:18
  175:16
**lacking**   71:14
**lagged**   157:12
**landscape**
  18:11
**language**   6:24
  53:10 79:15
  244:8
**lap**   87:17
**large**   24:5
  106:2 142:15
  158:17 159:18
  170:13 208:17
**largely**   57:20
  99:4 111:19
  117:9 143:5,6
**larger**   41:4
  136:23,23
  137:16
**largest**   130:23
  137:22

| | | | |
|---|---|---|---|
| **las** 4:11 196:21 | **led** 10:1,8 14:7 | 246:22 248:25 | 221:17 |
| **lasted** 10:3 | 19:15 23:21 | **level** 15:5 93:4 | **line** 116:16,17 |
| **lastly** 12:19 | **leeway** 118:9 | 96:7,10 105:25 | 130:23 209:22 |
| **late** 9:5 189:21 | **left** 158:15 | 114:7,12 | 246:1 |
| **latitude** 109:5 | **legal** 22:6 | 151:24 152:10 | **lines** 129:2 |
| **launch** 118:23 | 33:19 41:21 | 152:12 159:3 | 130:5,19 |
| 119:9,11 | 44:6 58:8,19 | 205:5 206:8 | 164:21 169:2 |
| **law** 91:3 | 61:4 77:19 | 207:24 208:12 | **liquid** 15:20 |
| 229:15 | 79:13 80:6 | **levels** 206:5 | 16:18 35:13,16 |
| **laws** 60:1 | 84:8 87:3 | 209:4,16 | 42:12 131:12 |
| **lawyer** 5:11 | 89:24 90:9,20 | **lever** 165:15 | 175:4,13,13,15 |
| 40:13 47:15 | 102:20 111:19 | **leverage** 96:10 | 178:14 180:7 |
| 69:4 80:5,12 | 111:22 112:6 | 191:20 | **liquidate** 85:15 |
| 86:1 87:6,7 | 112:24 183:24 | **levers** 149:10 | **liquidated** |
| 88:17 89:19 | 185:11 224:4 | **levied** 246:7 | 100:5,7 |
| 91:5 109:6 | 225:16,18 | **lexington** 3:5 | **liquidation** |
| **lawyers** 53:11 | 231:3 241:23 | **liabilities** 56:5 | 62:7,12,12 |
| 76:10 90:22 | 244:13 | **liability** 54:25 | **liquidity** 18:15 |
| 224:3,9,24 | **legs** 15:22 | 76:13 100:2 | 160:14 |
| 225:25 226:1 | **lend** 79:15 | 114:17 156:10 | **list** 19:19,19 |
| **lays** 210:21 | **lender** 84:4 | 174:18 | 22:12 29:10 |
| **leadership** | 87:20,21 88:18 | **liaison** 104:25 | 30:19 31:8,16 |
| 97:1 | **lending** 70:12 | **lie** 117:14 | 31:18 46:19,22 |
| **leading** 10:12 | 88:5 174:24 | 143:9 | 46:24 47:3,4,5 |
| 24:5 96:13 | **length** 35:7 | **lien** 107:8 | 47:7,8 79:2 |
| **leads** 189:22 | 75:13 168:16 | **life** 127:12 | 80:19,21 81:2 |
| **lean** 121:20 | 168:18,21 | **lifecycle** | 81:3 97:18 |
| **learned** 160:21 | **lengthy** 74:12 | 172:13 | 171:18 201:12 |
| 228:5 | 74:12 89:20,24 | **likely** 130:25 | 247:20 |
| **learning** 40:14 | **lens** 167:11 | 148:9 | **listed** 45:11 |
| 97:4 | **lesser** 112:22 | **limitation** | 53:23 80:18,20 |
| **leave** 61:17 | **letter** 5:9,21 | 53:10,13 54:25 | 212:20 |
| 149:16 154:22 | **letting** 109:17 | **limitations** | **listing** 174:14 |
| 157:23 234:22 | **let's** 141:16 | 40:9 | **lists** 65:18 |
| 250:2 | 146:24 151:22 | **limited** 18:2 | **litigating** 42:9 |
| **leaving** 191:4 | 153:15 157:8 | 21:13 52:3 | 42:10 |
| | 230:3,3 238:7 | 91:21 207:21 | |

litigation
226:12,23
227:9,17,19
228:10 229:13
229:16 230:12
little 10:13
32:11 37:4
44:18 46:11
51:5 75:17
78:7 85:6
116:6 118:1
130:21 131:21
135:15 142:16
159:7 187:21
187:22 205:8
212:23 244:19
living 127:9
173:17
llc 1:7
llp 3:3,11
218:17
loaded 114:11
114:12
loan 83:18,20
83:21,22 84:4
84:18 85:11,20
85:25 86:6,6
86:12,20 99:22
100:6,22
123:16,17
200:2
loans 100:12
100:12,18,19
123:21 174:24
175:19,20,21
199:16,21

located 219:22
219:23
locations
152:20,22
locked 64:19
70:5 91:20
99:9 124:21
250:1
log 185:18
logged 185:19
logical 151:5
logically
152:24
long 10:3 24:2
36:2 37:16
83:4 89:12
126:6 183:8
217:11 226:5
237:5
longer 128:18
200:23
longtime 128:9
look 10:19
11:21 12:20
17:1 19:16
20:6 22:9 24:8
32:1 36:10
47:7 89:12
93:4 98:10
107:22 127:20
132:7 147:13
148:11 149:9
149:15 150:14
151:8,9 152:16
153:3 189:7
196:3 201:11
206:6,12 209:5

234:9,19
looked 175:20
176:4 206:7
207:8,10,12
209:9 222:8
looking 9:21
18:17 122:22
131:11 145:14
146:4 160:7
178:13 192:21
207:23 233:12
looks 191:11
loss 121:17
losses 18:5
121:13
lot 6:7 10:5,5
15:10,13,18
16:3 17:7
18:20 24:3,4
33:4 37:10
38:21 42:9
82:3 88:20
94:9,10 97:5
104:7 112:13
121:12 128:3
169:17 222:18
235:10 236:17
237:4
lots 223:12
loudly 87:15
lovine 4:7
low 17:4 25:9
120:23 121:8
151:20 160:23
lower 10:8
32:6 35:18
119:14 123:21

123:22 148:3
149:5,6 151:21
152:21,22
lowest 207:12
lows 165:25
166:2 171:2
loyalty 101:20
lucy 5:6
lunch 154:16
155:1

## m

m3 28:7 103:20
ma'am 42:7
212:21
machines
116:14,14
117:4 120:16
121:21
macro 94:11
made 17:6
18:19 29:11
35:23,24 36:1
41:15 48:10
50:6 77:21
78:23 139:2
140:18 141:19
162:6 163:19
177:4 190:2,12
223:10 227:4
229:3
magic 152:1
magically
78:14,15
mail 198:24
199:1 217:8,23
218:5

mailed  188:14
188:18
main  51:2 93:5
98:23
maintain
119:23 120:10
139:11 151:23
152:5 233:11
major  218:15
222:2 224:7
225:17 241:16
246:14 248:19
majority  58:1
60:15 73:7,7
127:12 130:3
139:24,25
160:16 192:10
193:3,9
make  7:17
15:22 27:20
36:15 38:9
42:5,17,20,23
43:3 78:15
92:5 117:6
119:23 129:24
133:19 149:16
151:18,23
160:19 161:2
169:14,24
175:12 190:20
195:24 198:20
199:15 213:5
224:16 231:15
232:16 234:25
236:3 240:22
makes  35:17
35:21 151:5

210:16
makeup
136:10 143:4
making  22:6
56:11 122:8
129:17 235:22
malpractice
230:15
man's  115:13
manage  131:12
132:12 144:20
152:18 164:10
managed
121:18
management
10:8,10 17:8
27:6 128:3
129:6,7,8,15
138:9 149:14
156:11 164:8
169:6,13 174:9
175:25 176:5
manager  16:22
93:2 128:24
138:4
managing  9:7
9:8 102:18,23
128:4 129:2,4
129:14 131:11
142:14 153:2
183:5 202:22
mandate  7:17
157:18
mandatory
211:6 212:1
manipulated
95:14,17

manipulating
22:7
manipulation
64:18 91:19
124:18
manner  106:11
marathon
171:25
march  9:2 94:8
marginal  17:25
18:1 121:15,15
margins  27:5
mark  4:3 177:4
218:20 219:15
219:20
marked  80:22
81:6 204:10
market  18:25
19:11 23:18
56:14,17,18
57:3 68:12
70:20 91:22
93:8 94:12
95:22,24 96:9
98:8 99:23
100:7 114:9
116:1 124:15
151:10 152:16
161:11 171:3
171:18 172:5
175:4,7,23
205:21 208:1,6
208:12,19,21
208:23,25
209:3,6,16,17
209:23 210:6

marketability
175:16
marketed
24:18
marketing
9:19 10:4
34:12 37:9
157:4 163:3
marketplace
96:15 114:23
124:21 158:10
markets
120:13 174:20
marsal  28:7
103:18,20
202:22
martin  1:22
master  47:5
masumoto  4:3
material
185:22 220:23
materials
237:3 249:24
math  195:20
matter  1:5
30:10 55:12
62:12 97:20
108:10 155:22
206:16
matters  6:14
6:24 14:15
28:17 156:10
156:13,18
202:24 204:3
maximize
14:11 26:20
27:6 103:7

**maximized**
  55:11
**maximizing**
  35:19 159:13
  164:12
**maximum**
  139:19
**mccarrick**  3:8
  126:8,9,9,15
  126:15,19
  127:5,9,15,21
  128:6,11,15,22
  129:6,17,23
  130:18 131:20
  132:16,21
  133:1,4,10,13
  133:16,21,25
  134:3,5,10,13
  134:15,17,23
  145:17,21,25
  146:9 154:5,11
  154:18,21,24
  155:4,5,5,14
  155:17,23,25
  156:5,12,19,24
  157:4,8 158:20
  161:5,13,19,22
  162:2 163:10
  164:23 165:2,6
  165:10 166:5,8
  166:12,17,21
  167:2,5,10
  169:23 170:20
  172:25 173:4,4
  173:10,14,17
  173:21,23
  174:2,7,11,16

  174:20 175:1
  175:12,18
  176:2,8,11,16
  176:19,23
  177:3,8,13,15
  177:18,22
  179:12 181:24
  182:3,5 214:18
**mccarrick's**
  6:16
**mccarter**
  199:11
**mean**  6:5,6
  7:13 10:3 14:5
  15:6 27:12
  38:6 41:7,10
  43:4 44:12
  49:5 51:23
  52:9 53:11
  56:15 59:20
  64:22 70:3
  76:4,18 77:16
  79:13,14 91:18
  101:23 103:10
  108:23 114:20
  117:19 120:4,9
  124:16 131:25
  148:6 151:3
  160:13 161:6,7
  189:1 191:10
  192:21 193:15
  209:20 226:19
  226:24 232:5
  233:12,17
**meaning**  85:16
  97:23 165:19

**meaningful**
  45:8 169:5,7
**means**  35:9
  41:9 43:11,12
  84:2 90:24,25
  100:3 123:10
  135:16 153:10
  189:24,25
  248:3
**measure**  165:7
**measured**
  165:18,21
**measurement**
  211:10
**mechanism**
  121:23
**median**  208:22
**mediation**
  109:25 110:3,6
  110:7,9,9,11
  110:16
**meet**  27:19
  36:14 241:22
**meetings**
  111:24 222:18
  222:23 223:11
  223:13 224:11
**megawatt**
  115:12
**megawatts**
  117:3
**member**
  141:24 220:9
  220:22 227:20
  227:22 239:17
  239:25

**members**
  106:8,16 108:6
  108:17 109:25
  110:15 129:9
  129:19 138:25
  140:6,12,16,20
  140:23,25
  142:9 143:8
  163:2 164:14
  170:12 216:17
  220:25 223:6
  223:13 226:20
  227:1,10 229:2
  229:13 230:20
  233:17 234:12
  235:8,24 236:7
  236:15 244:16
  244:16 247:3
**meme**  124:14
**memorandum**
  91:3
**memorize**
  117:21
**memory**
  117:23,25
  119:1
**mention**  74:21
  231:24
**mentioned**
  55:11 92:18
  97:5 99:16
  105:23 111:6
  112:6 114:24
  116:23 130:21
  136:12 139:16
  139:17 151:18
  158:21 162:17

170:25 226:11
234:6 243:10
246:23 248:2
**mentioning**
154:1
**merely** 238:11
**merger** 142:13
172:1
**mergers** 156:9
**met** 164:15
211:10,25
240:5,12,19,24
241:6,22
242:10
**methodologies**
165:10,13
**methodology**
165:10,15
**metric** 118:24
**metrics** 104:1
172:7 206:1,4
210:20,22
211:10
**mg** 1:3
**michael** 137:16
**mid** 94:9
**middle** 108:13
142:13
**midpoint**
166:4
**might've** 28:16
**mike** 127:17
128:9 141:20
**military** 220:7
220:7
**million** 16:19
17:5,14,17

27:1 42:13
66:13,13,19,20
66:20,25
122:16 129:20
130:8,10,13
131:16,19
135:14,14
137:2,15
143:25 144:1
144:11 158:7,8
158:15 166:3
195:3,5 207:5
209:13
**millions** 10:7
163:24
**mind** 35:8
42:15 51:19,20
54:18 86:2
91:23 93:25
100:20 119:1
136:6 168:7
**mine** 121:9
133:23
**miners** 115:2
115:22 116:23
**minimizing**
18:5
**mining** 16:20
16:22 17:2,13
17:21,25 26:24
27:2,4,17,18
27:18,20 35:14
36:1 92:18
93:5 94:2
102:21 108:8,9
113:20 114:6
129:3,14

130:22 131:20
131:22,23
132:7 142:4,14
143:7 145:6
153:2 157:2,11
157:14,21,22
157:23 158:4,5
158:6,21,25
159:5,9,12,12
159:16,17,23
160:8,17,21,23
160:25 161:1
164:10,18,20
164:24 165:5
165:12,14,23
166:23 167:3
172:13 180:13
180:14,17,19
180:19
**minor** 164:5
240:4
**minute** 10:14
13:24 34:1
121:16,16,17
141:16,19
**minutes** 126:11
183:18 244:5
**mirrored**
192:22
**mis** 24:24
**misconduct**
40:6,15 55:3
**misheard**
24:22
**misrepresent...**
96:7

**misrepresent...**
22:7
**missed** 134:2
**misspeak**
239:9
**misspeaking**
242:7
**misstating**
241:11
**mistaken** 107:3
216:18 245:6
**misundersta...**
242:2
**mitigate** 92:24
93:3
**mix** 224:9
**mm** 47:19 50:2
50:19,23 51:14
53:8 98:19
99:25 147:3
188:24
**model** 114:8
**modifications**
53:9
**modified** 200:8
**modifier**
131:17
**modify** 191:25
**moment** 16:7
45:4 57:16,19
66:11 153:25
**monetary**
60:15 193:3,9
**monetize**
164:11
**money** 129:20
137:5,6

| | | | |
|---|---|---|---|
| **month** 10:4 24:15 27:1 42:13 50:1 119:5 157:25 183:15 | 21:13 23:12 30:10,21 37:13 39:2,19 43:8 43:20 45:21 55:18,22 64:3 | **name's** 65:8 **named** 98:23 **names** 46:20 140:22 **naming** 10:9 | 245:23,23 247:2 249:24 **needed** 30:10 175:3 179:1 246:24 |
| **monthly** 102:21 | 83:23 85:12 166:17 167:5 | **narrow** 32:10 51:18,20 52:19 | **needing** 120:9 **needs** 7:11 |
| **months** 14:6 14:19 15:14 17:2,6,6,7,18 | 176:20 204:17 248:17,18 249:24 | **nasdag** 239:16 **nasdaq** 239:5 239:10,20 | 112:11 250:10 **negative** 24:15 107:7 |
| 28:9 55:14 68:6,18 122:15 | **moved** 55:14 55:22 67:15,22 68:1 144:5 | 240:6,8,12 241:18,20,20 242:1,12 | **negligence** 40:15 **negligent** 55:2 |
| 157:13 162:19 162:19 228:4 240:2 | 160:19 **moves** 119:6 119:11 120:1 | **native** 69:8 92:3 **natural** 121:22 | **negotiate** 77:19 **negotiated** 15:7 16:5 28:8 |
| **morgan** 9:7 **morning** 5:4 | **moving** 33:25 49:15 50:23 | **nature** 68:4 140:1 | 52:17,25 53:9 103:20 |
| 6:15,18,20,21 7:25 8:2,20,24 | 132:13 170:15 **mr.phillips** | **nda** 105:2,6,8 163:7 | **negotiating** 14:14 27:13 |
| 10:20 55:10 65:8,9,10 78:3 | 225:6 **mtl** 60:1 | **nda's** 159:6 **near** 95:14 | 104:11 **negotiation** |
| 78:4 81:7 102:7 111:4,5 | **multiple** 164:3 165:19,24 | **necessarily** 226:8 241:19 | 27:16 28:7 110:14 |
| 125:25 135:6 135:10 | 186:25 **multiples** | **necessary** 16:2 108:5,16 | **negotiations** 14:18 34:7,13 |
| **motion** 7:3,5 65:12,14 | 165:17,25 **mutual** 34:22 | 110:16 126:4 209:3 233:18 | 37:16 76:6 **net** 68:18 |
| 210:21 | 235:5 | 233:21 235:17 236:2 | 129:21 |
| **motions** 10:16 | **n** | **need** 6:3 18:14 | **netcap** 147:15 |
| **motivate** 205:12 | **n** 3:1 5:1 251:1 **name** 8:25 32:4 | 33:25 38:22 42:19,22 75:1 | **network** 1:7 29:24 114:8,24 |
| **motivates** 109:11 | 113:10 140:18 156:2 183:4 | 76:9,12 77:13 83:6 130:24 | 115:15 116:4 117:13 118:16 |
| **move** 11:15 12:14 13:17 14:15 21:10,11 | 219:14,15 227:6 229:15 245:13,15 | 146:17 148:10 151:9 155:21 | 120:16 124:2,5 124:6 146:22 |

147:1 148:3,7
148:16 149:3
149:25 150:17
151:12,20,21
152:9 153:7
**never** 96:22
97:3 168:7
237:17
**new** 1:2,14 3:6
3:14 6:11
120:21 128:25
130:3 132:12
139:24 140:2
141:24 215:9
222:16 230:20
234:9,9 235:14
243:19
**newco** 5:16 7:3
16:17 17:9
27:3,4 35:15
35:18 45:1,1,3
45:6 105:11
108:7 115:13
117:3,6 120:10
127:8 129:7,10
129:18,21,24
131:4,15,22
132:5,15 134:9
135:15 138:1,3
138:10,14
142:14 143:5
143:24 145:1,5
153:5 163:22
164:2,3 168:24
220:17,25
232:25 235:1
235:22 236:3,4

236:14 238:22
248:13
**newco's** 130:19
**news** 24:15
**night** 19:19
24:11 25:8
66:3 78:24
118:8 145:23
**nights** 104:7
**nine** 108:7,17
138:25 139:10
140:5 154:3
228:4 231:18
232:19,21,23
233:15,25
234:4 244:25
246:20 247:3
**noah** 128:1
156:16
**non** 20:19 21:2
21:6,21 22:4,6
22:18,19,25
23:6,9 47:10
60:20 61:6
89:19 91:4
159:16,17,23
160:8 207:20
**nondisclosure**
157:16
**nonperforming**
175:24
**noon** 126:5,13
126:13
**norm** 185:22
**normal** 247:25
**normally** 27:15

**notable** 140:16
**note** 19:18 71:5
121:11,22
219:1
**notes** 16:13
32:1 71:6
**notice** 2:1,5
20:2 200:9,14
216:2,7
**noticed** 27:23
185:9 217:7
**noticing** 183:6
183:16,23
184:16
**novawulf** 10:2
97:7 159:20
160:6,15 161:4
161:5,8,15,23
162:3,16
163:18,23
164:4 168:25
225:8
**november**
157:14 159:15
161:16
**noyes** 227:13
227:16 228:9
228:17 232:2
**nuance** 153:1
**number** 13:5
13:23 28:19
29:1 30:5 33:7
33:16 44:1
72:7,15 73:10
83:23,25 84:2
86:13 100:14
108:6,17

116:25 117:15
117:17 118:16
118:19 125:3
132:22 138:25
148:4,20 149:6
157:15 159:5
168:22 170:16
175:5 176:13
184:19 187:8
189:2,16 191:2
197:14,21
206:8,22 207:9
241:19 243:19
246:24 247:3
**numbers** 16:17
20:9,10 25:12
67:11 118:10
144:5 147:20
148:25 149:20
152:25 192:22
195:10,14
**numerous**
98:13 223:12
226:1
**ny** 1:14 3:6,14

**o**

**o** 1:21 5:1
113:11 251:1
**oath** 5:13 6:3
6:12 133:2
166:15 185:3
205:2 221:14
**object** 41:14
49:2 65:17
107:19 121:4
141:13 240:7

**objected** 167:6
193:11
**objection**
29:17 49:3
50:21 53:1,5
54:2 57:5 58:7
58:11,18,23
59:12,17 60:17
60:22 61:2,21
61:25 63:9,13
63:14,18,19,24
63:25 66:22
67:1,19,24
71:17 73:17
75:8 79:20,24
80:3 84:8 87:2
88:1,12 89:1
92:25 94:17
96:4 100:9
105:13,17
107:4,14 108:1
109:22 110:17
112:18 121:5
139:12 143:1
143:11,12
169:23 180:9
191:22 192:1
192:15,19
193:6 194:20
195:6,7,17
196:2 197:2
213:8 214:2,18
221:17 223:17
225:10 228:6
229:18 230:9
230:14 237:22
238:24 239:3

241:10 243:1
245:2 246:9
247:7 248:4,21
**objections**
11:17 12:16
13:19 21:15
23:14 29:14,25
31:11 49:13
53:7 54:3
133:7 134:19
140:24 166:19
187:10 204:19
224:16 225:5
248:19
**objectives**
205:13
**obligation**
87:20
**obligations**
55:20
**observer** 106:3
140:6
**observers** 43:6
73:9 108:5
140:13 141:23
**obstruction**
167:8 176:21
**obtain** 60:5,8
131:5 175:6
**obviously**
42:11 49:11
88:20 90:18
102:21,25
130:24 148:15
**occasionally**
156:8

**occur** 38:6
**occurred**
222:11
**occurring**
120:5
**october** 1:16
2:2,6 9:18
103:24 104:6
163:6 198:25
**offer** 133:5
**offered** 195:25
203:24 209:4
210:8
**office** 4:2 32:5
52:18 110:2
135:12 136:15
187:19 210:15
219:23 220:8
**officer** 9:1,1
97:12 98:15
**officers** 72:14
96:8 97:10,11
97:13,21,21
98:4
**official** 29:23
183:6 216:1
**officially**
104:24 247:24
**offset** 150:14
**oh** 40:7 82:6,6
102:18 113:8
114:20 134:1
142:25 182:7
189:5 199:10
205:9 244:1
**ok** 224:18

**okay** 7:4,19 8:3
19:14 25:12
28:18 29:5,14
30:7 31:3,9,23
33:22 34:2,19
35:20 37:13
38:17 39:19,21
40:12 41:18,22
42:2 43:8 44:4
44:15,25 45:9
46:18 47:18
50:23 52:7,16
53:15 57:25
58:13 69:22
70:6,21 71:4
71:19 72:12,18
73:10 74:15,18
75:4 78:2 79:7
80:14,25 81:1
82:11,11,24
84:5,19,22
86:21 87:14,23
88:3 89:3 91:6
93:16,19,23
94:3,14 95:4
95:19,20 96:6
101:11 102:3,7
103:22 104:16
104:23 105:15
106:4,22,22
107:6,15 108:3
108:4,16,21
109:1,8,15,18
109:24 110:10
111:14,23
113:12 114:20
116:5 117:21

118:1 119:20
121:1 126:12
126:18 133:12
133:15 134:5
134:23 137:8
137:14,21,25
138:16,23
140:15 141:4
142:1 143:3,13
145:4,18 146:6
146:12,19,24
147:12 149:23
150:16 152:8
153:6,16,23,25
154:22 157:3
161:13 164:23
168:2,7 170:25
172:21 178:19
180:1,4,11
182:7,13
184:22 187:6
188:19 189:6
194:9,16
195:12,23
196:24 197:20
197:24 198:13
200:6,21
211:19,23,24
212:5,11
213:13,14
215:21 216:10
217:14,21
218:6,11,19
219:16 223:4
224:25 225:6
227:12 229:12
231:6,11,19

232:3,15 233:5
234:6,14,24
236:12,21
237:25 238:2
238:15 239:16
239:23 240:22
243:5,17
244:23 246:18
246:19 247:13
248:15 249:6
249:13,22
**old** 115:4
**ombudsman**
5:6
**omnibus**
249:19
**once** 119:16
185:8 193:23
**ones** 15:14
28:25 140:10
152:22 171:13
175:22 207:23
223:10 245:9
**ongoing** 169:5
**open** 29:11
59:10 61:10,11
61:11 66:12
72:12 83:13,14
132:9,17
157:20 159:25
166:5 176:8
192:3 198:21
230:19,23
**opened** 24:7
25:6 45:3
194:2

**operate** 15:23
24:20
**operating** 17:1
102:21 151:19
**operation**
17:22 122:9
152:13
**operational**
26:24 38:9
102:22 114:10
121:20,21
**operations**
38:16
**operator**
151:18
**opex** 18:2
**opinion** 43:16
48:24 80:6
84:7 112:9,15
**opinions** 49:9
89:24 203:24
223:21
**opportunities**
132:9 210:7
**opportunity**
73:13 127:20
200:2
**opposed**
144:11,24
224:22 226:25
247:4
**opt** 43:13 44:2
73:14,22,23
74:7 75:1
190:18 196:25
197:4,7,10,14
197:18 198:20

199:1
**optimized**
152:22
**option** 49:18
144:15,19
197:7 199:20
**options** 14:7
100:24 130:12
223:23
**order** 6:25
7:11 42:17
54:15 72:6
104:15 151:12
151:23 152:5
152:10,12
184:1,10
250:15,15
**ordered** 65:19
78:12 250:10
**organic** 97:4
**organically**
112:9
**organization**
157:11 246:7
**orient** 189:3
**original** 139:6
**originally** 9:3
49:25 81:2
**otc** 56:17
**otis** 4:6 65:8
**outcome**
205:14
**outcomes**
193:1
**outlined**
210:20

[outlines - participants]                                                    Page 52

outlines  212:18
outlining  134:8
outs  197:4
outset  163:15
outside  54:23
  70:4 92:16,16
  92:16 124:14
  185:22 235:17
  236:2 247:23
outstanding
  199:20
overall  35:17
  143:23 151:20
  180:12 186:1
  186:19 192:22
  210:3
overarching
  206:9
overlap  159:7
overruled
  59:18 84:9
  87:4 93:1
  94:18 105:14
  105:17 195:9
  195:18 197:3
  223:18 241:12
  245:3
overseeing
  39:11 143:7
oversight
  106:11 168:5
  226:12,23
  227:10,17,19
  228:11 229:13
  229:16 230:12
  233:19,20,20
  235:15 236:2

owes  107:8
own  31:16 77:7
  87:21 88:20
  129:20 132:5
  158:18 163:2
  170:8 229:9
  238:4
owner  85:22
  87:2
owners  130:3
  136:5,8,13
ownership
  58:5 78:7
  79:19 80:2,10
  84:6 87:1
  88:10,15,17
  89:17 90:7
  136:19
owning  79:23
  130:1 132:3

**p**

p  3:1,1 5:1
  208:20,23
  209:17,17,18
p.m.  19:2 25:8
  65:21 78:14
  145:10 155:2
  175:10 215:9
  216:13,14
pack  27:16
packages  184:3
  184:4 188:15
  188:18
page  11:5 12:5
  12:6 13:5,8
  20:7,9,10,10
  20:10,13,22,22

20:24 21:16,21
30:16 65:12
78:9 82:21
83:11,13,17
84:23 85:12
86:22 87:9,16
87:19 89:13
90:2 133:22
145:13 179:17
179:22,22
188:20,23
189:4,8 192:3
194:3,6 204:12
206:12,13,20
206:21 208:4
209:8 212:17
221:6,10
243:19
pages  21:11,13
  21:14,15,18
  22:20 82:23
  83:4 88:7
  133:17,18
  134:2,5 169:10
paid  76:11
  135:14 212:1
palma  140:17
paper  122:25
  123:3,4
paragraph
  21:23 30:15
  31:6,12 34:4,6
  34:11,19 39:20
  40:18,18 42:3
  42:14,18 43:9
  43:9,20 44:8,9
  45:23 46:6

49:16 50:24
72:7,12 73:10
74:21 75:6,17
81:22 90:2
145:5 168:15
195:2,5 212:17
212:17 222:9
226:14 230:18
231:9,24
232:17,18
234:15 239:23
242:14 243:10
244:12
paraphrasing
  42:4
part  15:17
  18:15 24:2
  35:15 41:15
  45:18 46:23
  76:4,5,5,6
  85:13 97:25
  105:7 107:2
  108:18,24
  111:18 114:16
  119:4 125:8
  149:7,13 153:1
  169:8 170:6,22
  187:23 193:24
  203:4 205:14
  217:2 220:15
  230:15 239:13
  249:16
participant
  207:10
participants
  206:9 207:9
  208:9

participate
111:24 222:25
231:11,13
232:6,14
participated
14:18 157:5
162:9,16
222:19 231:14
participating
157:17 222:10
232:10
participation
128:16 222:10
particular 7:10
20:6 129:1
131:10 149:5
168:21 170:3
172:18 174:18
175:11 190:19
205:19 213:23
223:15,20,25
225:7,23 234:3
particularly
132:11 224:2
225:24 226:8
parties 6:8 7:7
14:13,18 29:8
31:17 34:23
35:2 42:20,23
44:10 45:10,11
46:24 47:8
48:2,5,8 75:14
75:21,22 76:7
76:20 77:3,17
77:18 80:24
97:13 145:3
157:16,22

159:5 162:6,8
184:2,4 186:3
186:6,16
188:17 198:19
parties' 224:11
partner 51:25
126:19 132:2
156:3
partners 46:16
104:13 136:11
156:3,17 170:3
229:15
party 15:16,25
35:6 43:9,18
65:20 73:11,12
73:14 97:14,18
109:19 132:14
147:23 159:22
160:6 190:1,18
196:25 197:7
197:15,18
party's 185:19
pass 134:24
167:11 177:18
187:13 202:4
210:9 221:23
passing 182:4
182:5
past 145:10
171:12 198:16
path 16:8,10
18:6 32:10
161:4
patton 4:13
111:1,1,3,4,6
111:11,14,23
112:4,14,20

113:1,2,4
198:7,9,11,14
199:3,5
pause 19:1,2,6
19:9,12,15,17
23:19,23 24:5
24:10,13,23
25:7,10,15
56:14,15,17,21
56:22 66:11,20
66:24 67:6,17
68:7,13,19
71:14 96:11,13
111:7 124:19
paused 25:21
154:25 218:12
pavon 214:6,13
paxos 51:10,11
pay 60:6 97:23
100:22 123:17
124:1,4
paying 38:25
71:15 100:25
payment
174:18
paypal 27:13
37:14,23,23,25
38:3,6,13,19
38:23 39:25
40:1,9 42:25
50:24,25 51:8
51:9,11,13
61:18 76:8
paypal's 37:14
37:18 51:5
payroll 27:22

peer 207:1,6,19
208:21 209:25
212:19
people 15:11
43:15 46:22
70:17 78:21
97:15 101:20
106:1 120:12
172:5 197:9
200:2 201:6,8
236:10 247:4
perasonia
181:1
percent 17:5
24:16 57:15
62:8,8,13,13
64:18 91:20
99:9 100:3,13
100:13 116:3,6
119:14,21
148:19 171:8
171:15 186:4,6
192:7,9,24
195:25 207:6
207:13 208:21
208:22,23
percentage
100:12 136:19
137:16 149:25
186:5 190:23
192:17 231:5
percentages
136:10,22
percentile
186:14 207:14
208:21 209:25

| | | | |
|---|---|---|---|
| **perella** 170:2,7 | 88:13 90:15 | **ph** 56:1 70:11 | 179:5,6,7,12 |
| 170:12,13 | 91:3 230:2 | 140:17,17 | 179:15,16,20 |
| 230:25 242:16 | **permitting** | 156:16 171:4,4 | 180:1,4,9,11 |
| 242:17,23 | 78:21 118:6 | 181:1 224:10 | 180:18,22,23 |
| **perfect** 40:12 | **person** 44:4 | 248:12 249:3,4 | 193:21,22,23 |
| 171:23 | 47:2 69:8 | **phillipos** 4:8 | 194:5,8,15,16 |
| **perfectly** | 90:19 106:19 | **phillips** 71:22 | 194:22 195:1 |
| 141:11 | 139:7 151:6 | 71:23,24 72:1 | 195:13,23 |
| **perfom** 165:3 | 154:7 220:1 | 72:3,5,10,14 | 196:6,9,15 |
| **perform** | 222:17 231:22 | 72:18 73:2,10 | 216:22,23,23 |
| 167:20 168:1 | 234:3 238:6,9 | 73:19,23 74:1 | 216:25 217:8 |
| 174:12,14,21 | **personal** 34:7 | 74:5,17,18,21 | 217:22 218:1,2 |
| 180:15 205:12 | 137:5 141:21 | 75:2,4,10,16 | 218:7 221:18 |
| **performance** | 219:3 228:14 | 76:1,9,22 77:5 | 221:25 222:2,8 |
| 103:13,16 | 242:16,19 | 77:11,22,23 | 222:14,19,25 |
| 206:1,5 | **personally** | 143:20,21,22 | 223:4,7,15,24 |
| **performed** | 103:7 124:13 | 144:2,7,10,23 | 224:20,24,25 |
| 165:20 167:3 | 127:25 156:13 | 145:4,15,16,19 | 226:10,14,16 |
| 175:5,9,23 | 174:3 222:15 | 145:21,24 | 226:19,24 |
| 203:5 | **person's** | 146:5,7,12,16 | 227:8,12,15,21 |
| **performing** | 229:15 | 146:24 147:6 | 227:25 228:3,8 |
| 175:21,22 | **perspective** | 147:10,12,24 | 228:16,21,22 |
| **period** 24:16 | 15:24 16:10 | 148:2,18,23 | 229:7,12,21 |
| 27:16 52:20 | 23:20 25:13 | 149:3,23 150:6 | 230:5,6,11,18 |
| 67:8 94:10 | 28:1 162:19 | 150:7,9,16,20 | 231:6,11,16,19 |
| 117:15 119:14 | 164:17 244:15 | 150:25 151:4 | 231:21,24 |
| 119:14 198:23 | **pertains** 62:21 | 151:11,17 | 232:3,15 233:5 |
| 201:8 240:2 | **pesce** 228:25 | 152:5,7,8 | 233:9,23 234:2 |
| **periods** 67:8 | **pesce's** 229:21 | 153:6,13,15,16 | 234:6,14,17,24 |
| 116:20 | 229:25 | 153:24,25 | 235:4,7 236:6 |
| **perman** 65:13 | **petition** 9:5 | 168:11,12,13 | 236:12,18,21 |
| **permission** | 23:23 24:14,23 | 168:20 169:18 | 237:1,14,19,25 |
| 5:10 155:14 | 25:11,15 66:25 | 169:24 170:1 | 238:2,5,11,14 |
| 173:10 177:5 | 67:6,18 68:13 | 170:11,15,21 | 238:15,19 |
| 182:16 | 96:11 125:14 | 170:24,25 | 239:1,5,10,16 |
| **permit** 56:11 | 183:15 213:6 | 171:7,12,18,22 | 239:23 240:11 |
| 78:24 80:4,22 | | 172:3,17,21,23 | 240:16,18,22 |

241:3 242:2,4
242:14,21,25
243:3,5,7,17
243:22 244:3,9
244:11,23
245:7,14,17
249:7 250:3,4
250:12
**phillips'**
  225:22
**phone**   107:16
**phrase**   45:13
  189:15
**physical**
  188:15,18
**physically**
  109:24
**pick**   63:4
**picked**   73:1,6
**piece**   15:8
  123:20,23
**pieces**   238:3
**piled**   65:25
**pitcher**   82:5
**pivot**   36:16
**place**   76:19
  77:14 222:15
**placed**   82:12
**plain**   10:11
  209:20
**plan**   9:22,23
  10:1,10 12:4
  14:4,24,24
  15:2 16:2,7,13
  18:9 26:13
  27:10 28:2
  30:6 32:15,17

32:23,23 33:2
34:7 35:10,11
35:12,16,18
36:16 39:2,3,6
39:9,14,15,17
40:2,10 41:9
41:24 42:1
43:5 44:17,19
44:23 45:14,14
45:22 48:11,17
48:22 49:8
53:18,19,25
54:1,13,15,20
54:20,21 55:2
58:15 60:1,3
60:14,16,21
61:8,10 63:7
63:12,16,17,22
71:7 72:20
74:3,11 75:11
75:15,15 96:21
97:6,7,13
102:8,9,12
103:4,13,23
104:2,5,6,9
108:24 111:15
111:21 112:2,7
112:21 113:17
113:20 114:1
115:9 116:20
117:3,3,5
119:12,13,20
119:21,23
121:3,7 124:8
125:5 130:25
134:15 135:18
143:5 157:20

158:1 180:6
190:2,5 192:11
192:14,18,25
193:10 197:10
197:16,19
200:8 201:22
211:15 212:1
215:19 234:7
243:18
**plan's**   40:10
**planning**   9:3
  169:10
**plans**   33:2
  207:20,24
**platform**   24:19
  25:20 26:6
  59:9 61:17
  64:7,19 66:19
  70:5 78:6
  91:15,20 92:4
  124:7,11
  157:13 158:21
  158:22 159:3
  159:25 160:7,9
  160:10,22
  163:22 174:24
**played**   36:17
**player**   36:2
**plays**   150:1
**plead**   214:14
**pleading**   20:1
  20:7
**please**   5:3 8:9
  8:19,22 10:21
  19:22 21:22
  34:8,13 35:22
  42:6 43:21

44:9 45:25
69:3 80:7,8
82:1 83:14
84:1 107:19
117:20 121:5
126:14 127:1,4
153:25 155:4
155:16,24
167:18 173:12
177:6 179:11
182:18 183:1,2
189:24 191:17
196:23 198:12
202:14,19
204:11 206:11
208:4 209:8
218:24 219:10
219:11,13,25
220:20 221:6
234:23 245:14
247:12
**pled**   214:14
**pledge**   79:15
  86:24 87:9,22
  88:17
**pledging**   79:19
  87:24
**plenty**   223:11
**plugged**   27:5
**plummeted**
  24:6
**plus**   9:12 103:1
  158:7 175:23
  188:5 195:3
**pm**   250:18
**podium**   199:8

**point**   17:4 24:6
25:7 33:21
48:11 50:12
52:1 57:20
64:16 67:13
91:22 98:15
99:18 116:19
116:21 119:9
119:11 120:15
121:7 131:7
157:18 160:15
162:7,13,14
163:19,25
171:16 172:11
178:20,21
215:16 242:11
**points**   24:8
119:11 131:2
166:1,2 172:4
**policy**   7:2
72:22
**poor**   96:14
**portal**   185:18
190:1,7
**portfolio**   129:4
**portion**   122:8
122:14 131:1
143:24 172:14
192:5
**portions**   12:12
13:15
**position**   50:11
77:9 100:6
106:9,25 107:7
140:2 142:11
145:18 159:18
227:19 242:22

247:15
**positions**   66:12
66:13,14,21
142:11 208:14
232:9,11 247:3
**positive**   17:3
**possession**
88:18
**possibility**
139:9 152:14
**possible**   14:12
18:14 26:21
27:1 35:2
42:17 75:19
79:22 103:8
109:11 112:21
117:7 131:6
132:14 145:20
205:13
**post**   44:11,12
45:6,6 52:8
56:22 61:11
78:13 79:5
118:7 213:6
**posted**   29:13
85:20 247:18
**posts**   29:23
**potential**   27:9
40:4 76:13,17
157:15 164:1
230:15,20
**potentially**
98:7 117:1
132:8
**power**   17:23
94:1 114:7,25
115:1,9 120:13

122:12 165:24
**practice**   156:4
**practicing**
184:17
**pre**   52:20
56:17
**preceding**
240:3
**precipitously**
57:20
**precise**   130:8
**predicts**   114:8
**predominantly**
51:9 93:25
**prefer**   63:22
216:14 219:17
**preference**
15:10 74:6
215:8
**prefers**   215:23
**preidentified**
188:12
**premarked**
184:20
**preparation**
172:18
**prepare**   33:18
176:24
**prepared**
123:1,3 180:1
207:18 216:24
**prepetition**
207:21 234:11
235:8 240:23
241:4,7
**prepetitioned**
242:5

**present**   109:24
170:12 225:1,4
225:25 226:1
**presentation**
65:15 134:7
**presented**   81:3
115:9 140:22
148:25 149:21
149:24
**preserve**   10:5
**preserved**
36:13
**pressed**   50:12
**pressures**   24:3
24:4
**pretty**   47:15
79:16 103:11
108:8 119:2
214:8
**prevent**   77:1
138:1
**previous**   96:18
97:1 100:5
142:2 154:1
178:19 235:16
**previously**
36:19 75:7
82:19,20 99:15
139:12 140:19
153:18 162:9
203:23 204:10
**price**   18:25
19:11 22:8
23:18,22 24:8
24:11,12 25:11
25:18 56:24,25
57:1,2,6,8,9,12

57:12,17 62:24
64:12,14,15,17
64:20 67:5,16
67:16,17,18,22
68:1,2 93:6
95:14 96:1
100:1,3 114:23
115:14 116:13
146:23 150:4,6
150:16 151:21
152:8 161:14
161:16 174:17
175:7 195:25

**prices** 116:13
120:15,15
159:2 163:17

**primarily** 5:16
159:1 233:4

**primary** 28:21
130:19

**principally**
127:12 146:22

**principals**
127:19,24
136:12 137:9

**principle**
112:15 175:4,7
175:22

**prior** 38:14
68:7 111:16
112:6,6 169:10
175:11 183:15
184:16 238:16
238:18 243:11
243:23 244:4

**privacy** 5:6,16
7:2

**private** 128:4
**privilege** 110:7
224:5,15 225:2
225:2
**privileged**
225:11
**privy** 168:4
170:9
**pro** 65:8 69:1
78:1 92:15
111:1 191:16
196:21 213:19
218:2
**probably** 28:5
35:24,24 41:20
44:6 82:4 94:4
115:24 125:24
188:6 191:11
**probe** 230:6
**probing** 229:8
**problem**
106:22
**procedure** 5:17
63:1 80:14
**procedures**
63:8 184:2,6
184:11
**proceed** 7:23
8:18 143:4
155:23 182:25
**proceedings**
89:21 154:25
155:2 218:12
220:10 221:18
222:20 250:18
251:4

**proceeds** 158:9
158:11
**process** 9:19
9:23 10:4 14:2
14:19 15:17
34:8,12 37:9
43:21 72:19,25
76:5 96:17
97:4 102:19
105:5,10,12
106:7,14
108:11,22
109:20 128:12
128:16,18
157:1,5,9,11
157:13,14,17
157:18 158:2
158:23 159:3,4
159:9 160:19
160:21 161:12
161:23 162:4,4
162:7,9,13
168:14 183:19
185:5,21,23
186:7 188:12
190:8 198:18
198:22 200:18
201:4,6,17
203:20 220:16
220:21 222:11
222:24 223:12
223:16 226:2,6
226:6 230:19
230:22,23
232:12,16
235:24 237:9
247:14

**processed**
161:24
**processes** 24:2
77:20 156:10
159:7
**produce**
151:13
**produced**
28:20
**product**
100:25 101:2,3
101:4 123:23
**production**
115:23 118:17
**productive**
144:17
**productivity**
117:12
**products**
101:12,21
**professional**
27:2 173:24
235:18
**professionals**
50:5 77:12
**profile** 164:1
**profit** 114:10
**profitability**
121:13 147:15
149:5 150:21
151:2,24
152:24
**profitable**
121:7
**profitably**
164:11

| | | | |
|---|---|---|---|
| **profits** 151:13 | 136:15 137:11 | **protocols** | 32:23 33:24 |
| **proforma** | **proper** 49:6 | 70:12 | 45:12,22,24 |
| 171:25 | 52:23 91:4 | **provide** 31:18 | 46:7,12 48:15 |
| **program** 26:15 | 108:14 112:25 | 34:22 35:3 | 48:24 49:17 |
| 26:19 28:2 | **properly** 229:6 | 37:20 53:25 | 50:9 75:6 |
| 203:7,18,22 | 242:9 | 118:9 146:21 | **public** 29:12 |
| 205:6,10 | **property** 79:12 | 146:25 156:8 | 72:22 128:4 |
| 206:10 209:3,7 | 84:12,14,16 | 156:22 161:9 | 165:17 171:23 |
| 210:20,24 | 131:4 132:3,8 | 176:6 200:2 | 171:24 172:8 |
| 211:12 214:5 | **proposal** | 208:12 233:18 | 233:1 235:16 |
| 214:12 | 207:11 | 233:20 236:2 | **publish** 218:3 |
| **programs** | **proposals** | **provided** 29:7 | **pull** 80:25 |
| 203:2,11,14,24 | 169:13 | 36:7 37:5,10 | 118:10 206:11 |
| 204:2,2 207:2 | **proposed** 6:24 | 41:5 50:17 | 209:7 |
| **prohibit** | 6:25 13:3 14:4 | 53:13 54:19 | **pulled** 208:8 |
| 242:13 | 14:24 16:8 | 61:6 62:2 66:2 | **punitive** |
| **prohibited** | 26:13 28:2 | 79:1 84:3,17 | 158:18 |
| 241:25,25 | 62:5,23 105:24 | 85:25 86:5,12 | **purchase** |
| **project** 114:4 | 127:8 168:24 | 86:16,19 134:8 | 101:13,18 |
| **projected** | 168:25 206:8 | 160:16 176:5 | 158:13 238:23 |
| 165:22 | 206:25 209:12 | 178:24 188:20 | **purchased** |
| **projecting** | **proposing** | 191:24 197:4 | 68:12 |
| 119:24 | 158:18 207:4 | 211:11 216:25 | **purchasing** |
| **projection** | **proprietary** | 221:2 | 129:21 |
| 117:25 120:6 | 172:14 | **provider** 128:2 | **pure** 62:8,13 |
| 147:18 | **prosecution** | **provides** 54:14 | 90:25 |
| **projections** | 20:19 21:2,6 | **providing** | **purported** |
| 115:14 146:19 | 21:22 22:4,18 | 14:15 38:19 | 5:10,13 |
| 153:8,11,17,20 | 22:20,25 23:6 | 39:10 41:23 | **purpose** 51:2 |
| **projects** | 23:9 | 128:25 129:16 | 238:10 |
| 149:21 | **protect** 94:24 | 157:25 174:6 | **purposes** 78:15 |
| **prompted** | **protected** 40:3 | 221:13 | 204:9 |
| 214:16 | 40:4 | **provision** | **pursuant** |
| **promptly** | **protection** | 48:23 52:12 | 144:21 183:25 |
| 75:19 | 15:21 17:24 | 75:11,18 | **pursue** 160:5 |
| **proof** 127:24 | 18:2 76:9,12 | **provisions** | **pursued** 96:21 |
| 128:1 131:3 | | 15:1 16:2 | |

**push** 226:9
**pushing** 226:3
**put** 6:12 10:17
   32:13 33:25
   70:1 86:7
   99:20 105:1
   118:11 158:18
   159:24 163:8
   176:1 195:10
   215:16 217:17
   227:4 250:1
**putting** 96:19
   113:17
**puzzled** 196:7

**q**

**qualifications**
   102:24 239:14
**qualified** 14:8
   47:25 162:11
   162:15 236:14
   236:17,20
   237:11,13,15
   237:18
**qualify** 237:20
**qualitative**
   164:15 169:15
**quality** 114:3
**quantum**
   159:6 160:10
**question** 39:22
   44:1 47:20
   50:7,9,13,13
   52:23 53:14
   54:10 58:12
   64:24 66:9
   67:2,3,3 69:13
   69:18,20 70:10

70:24 72:2
79:14 80:8,15
84:21 88:13,22
90:5,12 91:4,9
92:6,13 93:21
94:25 99:6,19
99:20 101:6,10
101:16 102:1,1
104:24 105:10
105:16 106:14
106:19,23
107:18 108:13
108:14,20
110:11 111:20
111:21,22
119:19 121:10
121:24 122:3
122:10 135:4,8
135:13 138:13
138:16 142:2
143:2 146:11
152:3,3,4
153:14,23
154:1 162:1
167:19 178:10
181:7 189:14
189:23 192:20
196:18 198:9
198:11 200:5
200:22 201:2
201:20 212:12
213:3,24 214:9
224:23 225:10
225:23 230:2
230:17 236:12
236:13 238:13
240:7 241:13

241:16 244:22
244:22 245:20
246:15,20
247:10 248:11
**questioned**
   110:25
**questioning**
   7:14 78:25
   121:5 196:10
   224:14 235:25
**questionnaires**
   244:15
**questions**
   32:14 33:23
   54:7 56:9,11
   65:3 66:2 71:1
   71:3 77:10
   78:19 79:8
   88:13 89:11,20
   89:22,23 90:13
   90:18,20 91:7
   92:8 95:2,5
   99:17 102:4
   104:20,21
   106:6 108:14
   109:3,4 110:19
   110:23 112:24
   113:1,5,13,16
   113:23,25
   118:12 120:19
   122:21 124:22
   125:3,16
   143:19 152:7
   154:7 168:8
   172:22 180:22
   181:18 187:20
   191:18 193:15

193:18 196:14
196:15 197:12
197:25 199:4
200:4 201:19
212:24 213:10
213:20 224:14
225:4 229:11
231:23 234:23
238:7 241:23
245:18 248:6,7
**quick** 27:1
   91:9 152:3
   179:1 212:12
   213:3
**quickly** 107:20
   132:14 164:14
   217:18 243:9
**quite** 7:6 24:6
   28:4 37:16
   102:25 116:12
   119:25 122:11
   157:18 164:17
   169:2

**r**

**r** 1:21 3:1 5:1
   251:1
**raise** 5:5 7:21
   8:12 155:8
   202:14 218:22
**raised** 52:25
   53:5 113:7
   154:9 158:13
   181:21 198:6,7
   199:24 214:24
   227:5
**raises** 7:13

raising 200:23
rambling
152:2
ran 9:7
range 120:22
156:11,22
166:1 171:1,7
171:11,14
172:6,10,15
209:23
ranges 172:9
rank 207:24
rapidly 117:4
rarely 135:7
rate 104:13
115:21,25
116:7,7,12,17
116:19 117:13
117:15,24
118:16 119:16
120:1,7,22
123:18,21
146:22 147:1,7
147:8,12 148:7
148:7 149:4,25
150:17 151:11
151:12,20,21
152:9 165:20
165:22 171:4,4
176:1 185:25
186:5 208:1,7
208:13 209:6
rates 35:17
115:9 123:16
123:22 148:16
148:19

rather 91:16
144:19 246:21
rating 116:1
119:15
ratio 233:6,12
233:17
rational 161:3
rationale 25:13
79:11
ravi 128:3
129:12 136:15
reach 5:20
6:12 163:1
reached 159:4
159:8 162:22
174:10 177:15
204:23
read 21:25
33:25 53:22
66:15 84:1
85:13 86:22
87:15 217:16
219:12 234:18
244:9,11
reading 86:1,7
86:8 88:16
99:12,13,13
241:19
ready 7:23
32:2 216:13
250:11
real 64:17
222:20
reality 118:19
119:15,17,18
148:9

realize 231:12
248:16
realized 233:6
really 9:18
21:11 38:10
50:13 73:1
76:15,16 95:17
104:14 110:15
112:24,25
121:8 132:3
138:5 151:13
164:6,18
205:12 213:10
226:3 232:13
234:21 236:17
realm 106:9,24
reanalyzed
188:16
reason 18:7,15
25:17 37:11
59:15 76:20
91:12 105:2
106:6 107:13
138:24 141:18
149:23 195:13
226:4
reasonable
28:3 71:12
101:23 114:22
115:11 148:14
149:1,22
153:11,11,17
153:21 180:5
203:8 207:1
210:7
reasonableness
148:13

reasoning
91:16
reasons 16:23
122:14
recall 144:4
223:24 225:23
226:3,8 228:15
231:1,4 236:24
238:17 245:10
receipt 43:17
174:17
receive 36:8
46:20,25 50:4
50:5 51:21
98:15,25 99:23
102:10 180:6
184:3 243:23
received 11:19
12:18 13:21
21:18 23:16
29:20 30:3
31:13 44:2
47:13 97:11,23
133:9 134:22
158:3,22
159:16,20,22
162:17 165:16
175:7 186:3
188:9 189:17
189:19 191:8
192:23 196:12
204:21 210:18
224:4 225:18
248:22
receives 85:1
receiving 38:23
40:5,10 47:7,9

48:9 74:22
**recently**
127:14
**recess** 218:10
**recognize**
10:24 11:25
12:24 20:15
22:14 179:16
179:24
**recollection**
139:22,23
239:8
**recommenda...**
214:5
**recommenda...**
223:16
**recommended**
230:24,24
231:2 244:14
**record** 8:23
20:12 33:14
35:8,8 37:17
43:10 45:25
46:12 51:4
54:19 56:12
71:6 109:9
135:16 145:21
163:9 166:9,22
176:11 178:3
189:23 190:23
200:4 204:9
210:16 219:14
229:19 246:10
246:12 251:4
**record's** 19:4
**recorded**
231:13

**recording**
139:21 250:9
250:13
**recovery** 35:17
169:8
**recuse** 232:7
**recused** 226:20
226:21,24
232:4,8
**redirect** 154:10
172:24 181:23
198:3 214:25
245:19
**reduce** 61:14
102:25
**reduced**
123:24 131:19
144:11
**reduces** 121:17
**refer** 78:8
83:20 85:22
88:6 92:20
129:6 145:12
189:15,16
224:7
**reference**
79:17 81:3,14
83:18 113:19
188:1
**referenced**
30:11 81:22
189:2
**references**
30:16 31:7
**referencing**
49:20 68:21

**referring** 26:9
30:22 57:6
78:25 83:9
85:19,24 86:9
86:11,18 99:13
101:22 118:3,5
146:14 188:23
224:9
**refers** 84:16
86:14 87:20
**reflect** 211:21
**reflected** 67:10
96:14 177:9
**reflects** 225:14
**refresh** 239:7
**regard** 79:8
**regarding** 50:9
90:20 111:15
125:4 172:19
222:20 238:4
239:6
**regardless**
169:3
**regards** 93:13
167:20 194:1
195:24 243:7
**regulation**
240:8
**regulatory**
15:19 18:7,11
18:19 46:3
160:3 169:1
**reimbursement**
36:19 37:3,7
37:12
**reimburseme...**
36:23

**reiterate**
130:22
**reiterating**
148:24
**reject** 58:2
74:25 186:11
188:2 190:4
192:8,11,13
**rejected** 58:15
60:15 192:5,18
193:4,9
**rejects** 62:25
63:3,4,7,12
**relate** 33:23
36:23 49:17
**related** 2:3,6
22:18 37:3,7
45:2 51:17
93:10 94:2
105:6
**relates** 164:20
**relation** 35:9
80:2
**relations** 9:4
**relationship**
38:14 228:9
242:15,15
**relative** 136:6
136:9,19
137:15 172:12
203:8 207:1
**relatively**
160:6 164:13
186:5
**release** 15:9,12
15:25 16:1
39:23 40:9

42:19,22 44:9
45:11 47:7,13
48:2,5,9 52:19
73:11,12,12,14
73:16,19 74:7
74:19 75:1
190:18 197:8
239:20
**released** 15:15
39:24,24
**releases** 14:25
15:16,23,25
32:22 34:16,21
34:22 36:8
38:20 39:10
40:4 41:6,23
42:3,4 43:9,13
43:18 46:20,21
46:25 47:9
49:14 50:17
53:6 74:4
197:1,10,15,19
**releasing** 34:22
35:1
**relevance**
92:25 228:20
229:4 230:4
**relevant** 85:13
196:10
**reliability**
114:15,19
**reliance** 115:17
**relied** 241:23
**relying** 169:7
**remain** 27:21
**remaining** 27:8
121:6 137:23

**remember** 36:4
94:11 123:13
161:17,20
223:24 230:22
231:6 245:9
**remind** 130:19
**remote** 250:5
**remotely** 5:7
5:18
**removal** 97:2
228:18
**removed** 97:3
214:12,17
**removing**
69:17
**reorder** 215:22
**reorg** 96:18,19
96:21 97:2
**reorganization**
16:9 26:14
174:3
**reorganize**
157:23
**repay** 199:16
199:20 200:2
200:15
**repeat** 32:12
150:23 161:25
181:6
**repeating**
42:16
**rephrase** 38:2
93:20 151:15
**repledge** 79:15
87:22
**report** 67:10
107:1 166:14

178:16
**reporting**
102:20
**reports** 102:21
176:17
**representation**
73:5,8 139:19
140:5
**representative**
142:6 227:22
**representatives**
224:12
**represented**
24:17
**representing**
219:5
**repurchase**
88:5
**request** 5:7,21
199:23 224:21
250:5
**requested**
55:22 247:20
**requesting** 5:9
**requests** 10:16
**require** 6:11
**required** 48:25
241:20,21
**requirement**
240:24 241:7
**requirements**
5:21 240:5,12
240:13,19
241:6,18,22
242:1,11,12
**requisition**
247:25 248:1

**research** 68:6
68:9
**reservations**
221:17
**reserved**
235:20
**residents** 60:21
60:25 61:7
**residual** 93:4
**resolution** 20:3
**resolve** 6:14,23
7:13
**resolved** 7:8
**resources**
119:22 120:9
**respect** 5:18
40:18 49:24
51:1 53:18
106:18 118:7
183:23 186:12
199:13
**respects**
240:13
**response**
185:25 186:5
189:17,20
224:21
**responsibiliti...**
9:11 102:13,16
103:3 104:3
183:20 208:10
**responsibility**
103:6 106:10
143:9
**responsible**
129:1,14
142:13 143:6

143:25 146:12
146:13,20
196:7
**rest** 60:9 227:3
**restate** 80:8
138:6
**restrictions**
138:14
**restructuring**
9:1 10:15
17:14 128:23
156:10,13,18
173:20 174:3
184:13,14,17
203:25,25
**result** 140:1
152:24
**results** 194:17
205:22 210:2
**resume** 124:8
126:13 154:16
**resumed** 155:2
**resumes** 237:4
**retail** 199:14
**retain** 58:16
**retained** 49:18
50:5,6,12,15
156:21 183:5
183:14
**retaining**
88:18,18
**retention** 50:8
50:10 204:2
**return** 18:13
18:21 42:11
46:13 51:2,10
98:22 103:9

164:1 198:25
**returned** 46:8
62:16 75:19,23
76:3 190:10
191:5
**returning**
38:21 39:13
**revenue** 18:1
108:7 114:3,4
114:11,14
117:17 119:24
120:10 121:15
142:4 150:1
152:11,12
**revenues**
114:18,19
115:8 150:1,18
150:20,25
**review** 21:22
23:5 87:24
114:7 167:21
184:20 192:4
220:23 237:2
**reviewed** 33:20
77:17 140:23
**reviewing**
79:14 194:16
**revised** 211:15
**revision**
211:21
**reward** 101:20
**rewarded** 98:1
**rewards** 71:15
115:3 120:11
**ribbon** 20:12
**richard** 4:8

**rick** 221:18
**rig** 159:3
**right** 5:3 7:19
8:12 13:19
16:20 23:14
25:21 27:24
28:14,24 29:25
30:7 32:3,7
33:24 38:7,13
39:14 48:6,21
49:10 54:9
55:9 56:13
62:19 65:6
71:20,23 74:5
79:10 82:8
83:12,12 84:22
86:13 88:17
90:6,19 92:9
97:8 98:17
100:23 104:23
106:19 112:4
112:14 114:21
115:7,23,23
120:5,17 121:1
122:17,21
123:3,8 124:10
126:12 132:16
133:4,10,23
134:2,20,25
135:21 138:19
140:20 142:8
143:15 144:4
145:4 153:4
154:10,12,15
155:8,13
158:20 166:5
166:19 167:10

167:12,15
176:6,8,23
177:3,19
179:13,15
181:2 187:10
187:14 189:11
191:9 193:19
194:2 196:17
200:21,24
202:14 204:19
212:7,15,24
213:1 214:20
214:25 215:2
215:24 216:9
217:21 218:8
218:14,21,22
218:24 219:22
220:1,19
221:25 224:13
227:8 233:14
234:1 236:25
237:5 239:22
245:17 248:5
248:10,19,24
248:24 249:13
249:22,22
**rights** 69:6
88:21,24 89:17
90:7 112:12
139:8,11
140:21 141:13
221:17
**rigs** 16:21 27:5
94:2 102:22
117:7 120:12
159:1,2

riot 171:25
rise 120:15
  155:3
risk 17:8 18:19
  26:2,2 27:5
  46:5 92:24
  93:6,8,9 94:21
  94:22,23 96:10
  121:17 128:3
  149:14
risks 26:2 93:3
robbie 141:24
robinson 216:3
  216:3,16
  217:11,13
  218:15,20,21
  219:1,13,15,15
  219:17,19,20
  219:21,23
  220:3,4,6,9,11
  220:14,18,22
  221:3,5,8,11
  221:15,19,22
  222:3,7,13,17
  222:22 223:3,6
  223:9,19 224:7
  224:8,19
  225:17,20,22
  226:13,15,18
  226:21 227:2
  227:11,14,18
  227:24 228:2
  228:12,19
  231:1,8,14,18
  231:20,22
  232:2,8,22
  233:8,14,24

234:5,13,16
235:3,6,10
236:9,16,20,24
237:2,17
238:17 239:7
239:15,19,21
240:15,17,21
241:1,14,16,16
241:17 242:7
242:19,24
243:4,6,16
244:7 245:1,4
245:10 246:14
246:17 247:16
248:12,14,15
robinson's
  248:20
robust 73:1
role 36:17
  37:14,18 38:3
  38:24 39:6,16
  44:18,23 52:2
  128:22 170:2
  220:13,15,16
  220:20,22
  236:14
roles 51:20
  106:3 156:17
  183:20 208:10
  236:8,10
rolled 106:14
  247:14,24
  248:1
rolling 201:7
rollout 247:17
roni 214:6

room 170:8
  220:1 249:25
rossean 2:24
  251:3,9
round 100:13
  162:23 163:22
rounds 164:4
route 97:8
row 193:25
rule 5:16 239:5
  239:10,16
  240:6
rules 5:17
  109:15
ruling 49:14
run 101:3
  128:1,8 152:22
  164:12
running 6:16
  9:14 94:2
  151:7
runs 127:18
ryan 9:20
  154:18,21
  155:6 156:2

s

s 2:3,6 3:1 5:1
sabin 3:17
  193:19
salaries 208:19
  208:25
salary 98:1,11
  99:1 104:4,9
  208:16,17
  209:14
sale 88:5
  156:23 157:11

157:13,14,18
157:20 158:2
159:14 160:19
162:7,9
sales 9:19 10:4
  34:12 37:8
  128:12 156:25
  157:5,9 158:23
sam 246:1
sami 4:12
  246:1
satisfied
  210:23
satisfy 5:21
  55:20
save 172:4
saw 172:11
  178:25
saying 17:12
  23:24 77:5,6
  98:4 99:2
  109:16 119:17
  149:5 150:11
  150:25 151:6
  151:16 152:23
  224:16 242:8
  244:19
says 20:2 25:21
  26:5 42:21
  72:18 79:15
  84:9,9,25
  85:15 86:23
  87:8 90:4,6,8
  133:20 179:20
  199:1 200:14
  239:16,24
  244:12

scale 94:12
schedules
    115:11
scheme 22:2,5
scientific
    115:12 117:1
scn 171:4
scope 39:23
    40:8 52:12,19
    53:6
scott 237:5,12
screen 57:2,12
    135:24
screenshot
    179:21
se 65:8 69:1
    78:1 92:15
    111:1 191:16
    196:21 213:19
    218:2
seat 105:22,22
    127:1 218:24
    226:23 234:3
seated 5:3
    126:14 155:4
seats 73:7
    139:7,8,10,11
    139:25 140:21
    141:12,13
sec 74:22 75:2
    246:6
second 17:12
    18:23,24 65:24
    67:4 68:22
    82:16 83:2,12
    105:9 118:18
    129:3 130:23

133:25 157:1
160:5 163:21
175:18 212:23
234:18 243:9
249:8
seconds 232:6
section 63:7
    72:14 87:10
    88:4 89:9
    172:19
secure 85:20
security 38:9
    38:10 84:4,17
    85:11 86:5,6
    86:12,19
see 6:12 7:8
    13:4,6 20:4,12
    22:1 25:17
    54:3 57:2,11
    57:12 69:20
    82:25 84:24
    94:5 113:8,23
    122:6,7,20
    123:13 135:24
    136:4 154:8
    171:3 175:20
    178:13 179:7
    181:21 185:23
    189:11 198:6
    201:12 207:3,4
    207:10 208:14
    208:20 209:15
    214:24 224:14
    225:4 249:22
seeded 131:15
seeds 115:5

seeing 120:7
seek 31:17
    153:4
seeking 159:23
seem 121:2
seemed 228:24
seems 143:5
    229:18 244:19
seen 49:1 95:24
select 106:17
    107:10 140:20
    174:13 178:23
    220:25 223:1
    223:14
selected 16:7
    16:24 48:11
    106:1 107:23
    141:6 159:21
    162:6,15
    163:13,15
    227:18 232:13
    235:24 237:1
    238:6,9 240:19
    245:11
selecting 106:8
    164:9 170:4
    172:9 225:8
    238:15,19
selection 72:19
    72:23,25
    105:10 106:16
    106:20 108:4
    108:18 140:9
    140:16 141:1
    141:16,17
    160:22 161:23
    162:2,14

216:17 220:16
220:21 226:11
226:20,22,22
226:25 230:14
244:13
selections
    159:1 230:12
    235:1
self 129:3
sell 99:23
seller 68:18
selling 161:2
selloff 24:5
send 184:4
    200:8,14 244:3
senior 9:8
sense 18:20
    35:17 106:23
    151:6 161:2
    163:20
sent 163:7
    188:2,8
sentence 42:2
    42:21 72:18
    84:13,16,20
    85:14,21 86:8
    86:23,25
sentence's
    83:25
sentences
    86:14
separate 49:1
    129:14 186:21
    225:17
september 9:6
    33:8 119:5
    147:1,7,9,14

159:4 163:6
184:24
**serious** 7:13
**service** 78:8
81:4,9,20
82:19,22 88:9
90:21 128:2,2
222:4,6
**services** 106:5
106:9,24
107:12 123:23
124:2 129:15
173:24
**serving** 241:25
242:13
**set** 17:9 76:11
77:19 108:8
110:23 131:22
143:8 160:7
162:10 171:24
197:17 200:15
206:5 211:3,8
211:15,18
234:8
**sets** 233:1
**setting** 76:6
104:12 106:20
**settled** 198:15
236:5
**settlement** 13:3
15:9 58:2,4,15
58:16,21 59:1
59:22 62:5,24
64:12,14 74:6
115:12 117:1
122:23 186:17
190:19 192:6

198:21 199:2
199:18
**settlements**
10:11 14:15
41:16 42:8
43:6
**settling** 60:20
61:6
**seven** 10:4
108:6,17
138:25 139:7
139:10 140:5
154:3 158:3
230:18 232:19
232:20 246:20
247:4
**several** 72:9
187:24 245:12
**severance**
204:2
**shana** 4:3
**shape** 157:19
**shara** 32:4,9
135:11 187:18
210:14
**share** 94:6
114:9 115:2
116:18 117:13
117:23 148:3,8
150:17 151:20
177:4 195:22
212:13,15
**shareholder**
145:1
**shareholders**
139:24 233:19
236:1

**shareholding**
136:10
**shares** 114:10
**sharing** 136:6
**sharon** 4:14
113:6,10,15
199:7
**she'll** 6:3
**sheet** 16:15
18:4 60:7,12
131:10
**sheik** 4:12
104:20,23
105:9,15 106:4
106:22 107:6
107:11,15,17
107:18 108:3
108:12,16,21
109:1,1,2,7,10
109:14,16,24
110:4,10,19
138:21,22,23
139:14 154:1
167:17,18,19
168:2,7,9
177:25 178:1,2
178:7,11,13,17
178:19,25
179:3 213:3,10
213:12,13,16
246:1,3,4,19
**sheikh** 247:9
247:11,24
248:7
**shiek** 140:3,15
141:1,4,6,8,14
141:15 142:1

142:10,17,19
142:23,25
143:3,13,16,18
**shield** 76:13
**shielded** 77:7
**shields** 55:1
**shift** 26:12
126:4
**shop** 121:20
**short** 27:16
66:12,13,13,20
95:21 99:21
100:6 101:4
**shorter** 32:11
95:8 168:19
**shorting** 94:15
95:6,7,21 96:2
99:20 100:8
**shortly** 24:12
25:9 111:7
**shorts** 66:21
**should've**
135:18
**showing**
176:24 194:14
206:23,24
208:7,15
**shown** 147:16
**shows** 133:23
209:21
**shrinks** 120:16
**shut** 26:6 61:13
107:17 120:13
121:21 124:7
**shy** 207:5
**side** 15:22 27:3
103:21 121:8

131:3 224:22
233:12,13
250:1
**sides** 15:12
**sign** 21:2 32:17
33:15
**signature** 11:6
12:6 13:9
20:25 204:12
221:9 251:8
**signed** 7:1
157:16 159:6
184:24
**significant**
17:23 76:11
77:21 92:19,22
97:14 122:13
162:18 169:8
192:5
**significantly**
121:8 163:23
195:22 208:19
208:25
**similar** 117:9
121:3 159:5,6
159:9 164:5
176:4 186:19
205:18 207:2
208:14
**similarly**
207:12
**simon** 4:15
104:24 105:4
**simple** 24:2
148:10 152:7
152:24

**simplest** 42:7
**simply** 51:23
**simson** 182:6,7
182:8,9,12,14
182:14,24,25
183:2,8,12,18
184:6,12,18,23
185:1,5,21,25
186:8,15 187:7
187:12 191:22
192:1,15,19
193:6,11 195:6
195:17 197:2
198:4 202:4,6
**single** 47:2
**singled** 91:15
**sir** 10:25 11:25
12:6,12 13:15
20:16 22:5
28:3 57:23
59:21 64:6
71:12 74:10
99:12 132:24
166:25 198:14
212:25 219:25
220:19 221:1,7
221:16,19
222:7,17,22,23
224:8 226:18
226:21 227:2
227:11 231:14
234:13,16
235:3 239:15
240:15,17,21
246:5
**sit** 71:8 139:19

**site** 29:11
114:5,6,12
115:12 117:2
**sitting** 158:17
**situated** 8:5,8
132:11
**situation** 46:2
46:17 54:24,25
55:16,24 132:6
171:10 175:25
**situations**
171:24 205:19
**six** 234:10
240:18,24
241:6,8 242:5
242:10
**size** 114:8
118:21 139:10
160:12 163:3
232:19,20,22
233:3,9,15
**sized** 208:14
**sizing** 118:16
**skill** 233:1
**skilled** 131:10
**skip** 108:3
**slide** 177:2
178:20
**slightly** 35:12
35:18
**slots** 237:16,21
**slow** 14:21
42:11,11
**slower** 205:8
**slowly** 244:10
**small** 158:7,16
159:1 160:6,11

**smaller** 136:24
137:23 148:8
**smart** 69:8
**smooth** 27:20
38:10
**software**
127:13
**sold** 24:16
**solely** 70:21
232:7
**solemnly** 8:13
126:22 155:10
202:15
**solicit** 247:21
**solicitation**
15:17 183:19
183:23 184:1,3
184:4,10
188:15,18
**soliciting** 184:7
185:6
**solution**
160:16,25
**solve** 96:24
**somebody**
18:17 63:3,4
63:11 86:3
106:25 135:7
198:5
**somebody's**
151:7
**somewhat**
43:23,24 79:13
136:24 137:23
139:22
**sonic** 136:14

soon   18:14
  32:2 236:1
sophisticated
  76:10
sorry   25:25
  32:21 38:2
  40:12 42:4
  45:17,19 47:24
  49:7,22 53:16
  62:10 65:9
  66:7 68:16
  69:22 74:2
  78:14 82:3
  87:16 99:12
  101:3,15
  102:15 112:20
  114:20 117:18
  119:20 128:7,7
  141:8,17
  142:24,25
  144:7 147:5
  150:9 161:25
  181:6 189:5
  194:5 199:10
  200:25 205:9
  217:9 231:21
  241:14 242:1
  246:11
sort   31:20
  36:15 54:22,23
  156:6 157:24
  160:21 161:3
  165:2 174:5
  179:8
sorts   149:14
sound   67:12

sounds   101:23
  217:20
source   137:1
sources   247:22
  247:23
southern   1:2
space   36:2
  128:9,10
  173:25
spaces   139:15
  139:15,23
sparello
  224:10
spark   172:1
speak   55:23
  65:15 137:3,4
  137:12 205:8
speaker   110:22
  111:9 143:11
  155:10
speaking   48:18
  212:10 237:10
speaks   195:8
special   28:8
  36:14 48:1
  77:2 103:21
  105:11 107:22
  107:24
specific   33:23
  51:5 52:20
  55:15,23 83:7
  83:10 94:22
  106:7,15
  129:15 148:11
  159:17 208:10
  210:20 212:18
  212:19 244:8

specifically
  39:25 40:19
  46:19 49:16
  51:11 59:21
  114:6 125:8
  139:17 185:16
  186:12 193:25
  205:17 206:6,7
  207:3 213:22
  226:3
specifics   57:23
  137:11 238:17
speculate
  147:19
speculative
  124:14,16
speed   36:15
  104:13
spelled   113:10
spend   18:16
  183:18
spending   9:22
  169:9
spent   97:5
  104:10 127:12
spikes   95:25
  122:12
split   241:7
  242:4
splits   223:21
spoke   33:15
  44:18 48:14
  140:23 189:16
sponsor   10:1
  10:11 12:4
  14:13,13 18:10
  35:12 36:17

72:20 97:7
  143:6
sponsoring
  113:17
spots   140:7
  248:13
spread   142:15
spreads   115:16
spreadsheet
  147:22
spring   162:11
springboard
  161:10
springtime
  24:3
spv's   160:8
st   178:15
stable   18:4
stake   131:1
  157:24 158:16
staked   142:5
  143:7 159:18
stakeholders
  205:11
staking   16:19
  108:8 128:1,2
  129:3,3 130:24
  131:5 164:13
  164:13
stalking   10:1
  97:7 128:21
  159:21 160:20
  161:6,23 162:5
  162:14 163:8
stalling   74:9,11
stamped   28:25

**stand** 77:6
115:8 125:24
126:17 134:13
148:15 149:2
149:22 155:7
173:6 182:15
182:17 202:9
**standalone**
9:22,23 97:6
**standard**
107:24
**standards**
54:14
**standby** 37:1
**standpoint**
18:5 128:19
**start** 5:4 10:20
14:1 19:17
23:24 25:6
51:8 145:19
146:7 152:3
157:8,11
168:13 175:1
215:23
**started** 9:3,18
14:6,6 30:22
159:3
**starting** 83:6
116:21 119:13
121:7 127:13
156:16
**starts** 78:9
147:1
**state** 34:6,11
34:15,19 42:3
45:23 46:6
67:9 73:11

85:3 88:8
117:14 118:13
153:7 178:3
193:3,8 219:14
222:9 245:9
**stated** 51:23
75:17 82:18
140:19 239:24
240:12
**statement** 2:1
2:5 5:14 22:17
22:22,24 23:3
23:9 25:22,23
26:1 84:6
88:10,11
113:21 123:9
133:14,17
136:4 145:7,7
146:3,15 149:8
163:14 166:3
166:24 172:10
172:18 179:9
179:20,23
184:1,10 185:8
185:9 196:8
242:21
**statements**
22:7 24:19
56:12 88:4,4,7
95:3 133:1
146:19 166:12
166:14 201:7
**states** 1:1,12
32:5 34:20
37:21 42:18
43:9 83:21
86:4 119:13

135:12 187:19
210:15 219:6
**static** 151:8
**stating** 49:2
**statistics**
100:15
**status** 6:13
80:10 227:16
242:17
**statute** 241:19
**stay** 35:14
**stays** 110:9
**step** 16:12
31:25
**stepping**
242:22
**steps** 131:21
**steve** 72:24
**steven** 3:22
126:16 127:7
**stick** 135:8
**stmt** 133:18
**stock** 69:17
95:25 238:23
**stood** 223:20
**stop** 118:4,6
**stoppage** 175:8
**storm** 200:25
**stout** 16:15
173:22,23
174:7,11
175:19 176:3
**stout's** 173:24
176:17
**straight** 32:10
**strategies**
92:21 94:5,6

**strategy** 92:24
122:5
**strato** 183:24
184:8 185:10
185:13,18
187:2 188:10
**strato's** 183:22
**streams** 108:7
142:4
**stretch** 28:6
**streto** 183:5,5
183:9,10,14
**strike** 210:16
**strong** 18:3
225:24 226:9
**strongly**
164:14 223:25
225:8
**structural**
158:1
**structure**
18:18 35:12
98:1,21 144:24
145:2 156:4
157:24 163:20
206:10 211:18
234:10
**structures**
159:11 163:24
164:4
**structuring**
144:12 156:23
**studied** 66:16
**stuff** 40:14
**style** 168:25
**subconscious**
237:8

subject 64:4
86:23 87:8
91:4 108:10
110:7 112:25
124:18 235:4
submission
190:3 214:4
submit 6:9
145:9 190:3,3
190:9,11
193:24 196:11
submitted 5:12
10:15 11:3,21
12:20 13:23
145:22 170:18
176:21 179:8
185:2 187:23
191:12 194:3,7
204:15 227:6
237:3
subsequent
144:16 198:22
subset 159:24
substantial
41:14 44:10
159:19
substantially
149:4
substantive
12:6
subtract
213:25
success 27:4
36:16 131:23
236:4
successful
92:19,21

129:25 163:11
236:3
successfully
164:11
sues 47:11
sufficient 6:6
177:16
suggest 17:20
suggested 7:8
144:18
suggesting
149:18
sum 191:19
summaries
188:20
summarize
186:8,15
205:22 206:15
208:1
summary
134:11 177:2
177:10
summer 17:6,7
17:18 122:11
122:15
supplement
32:24 54:1
234:7,8 243:18
supplemental
33:2
supplements
33:2
supply 21:12
57:16 60:11
70:4 98:8 99:9
support 10:16
11:3 12:4 13:2

25:14 41:9,24
41:25 43:5
106:2 115:17
122:23
supported
50:11 164:16
supporters
75:14
supporting
74:3
supposed 47:6
47:12
sure 7:17 8:9
15:22 27:20
28:11 36:15
38:9 46:6 47:4
49:4 52:14,22
56:7 65:7
66:10 70:9
94:4,12 95:23
96:14 109:10
116:7 117:6
118:13 119:8
119:12 120:7
120:20 122:2
126:5 131:25
133:19 135:17
136:11 137:3
138:5,7 145:13
145:19 149:6,7
150:3 152:23
156:2 157:10
158:24 159:13
162:2 163:21
166:7 169:24
176:10 181:11
189:8,12

194:14 195:20
203:6 206:24
207:18 208:8
209:11,21
216:16,16
217:3 224:17
230:4 239:10
242:8 244:7,11
247:11,16
surprise 119:3
119:5 140:7
145:11
surprised
68:16
survey 208:9
surveys 208:12
sustain 88:12
121:5 196:2
sustained 57:7
58:9,11,20,24
59:14 60:18,23
61:3,22 62:1
63:10,15,20
64:1 65:19
66:23 67:1,20
68:3 71:18
73:18 75:9
79:21,25 88:2
89:2 96:5
100:10 107:5
107:14 108:2
109:23 110:18
112:19 143:1
143:12 154:6
169:25 180:10
191:23 192:2
192:16 193:7

193:12 194:25
213:9,11 214:3
214:19 228:7
229:20 237:24
238:25 239:4
240:10 243:2
246:18 247:8
248:5
**swap** 70:15
**swaps** 19:9
**swear** 8:13
126:22 135:9
155:10 202:15
**switch** 18:22
164:23
**sworn** 155:9
173:8 185:2
205:3 218:22
218:23
**system** 61:10
61:11,13
101:20,20
250:9

**t**

**t** 251:1,1
**t.j.** 3:8 126:9
126:15 155:5
173:4
**tab** 22:10
**table** 158:11
208:5,7 249:25
**tabulated**
189:20
**tabulating**
184:7 185:6
**tabulation**
43:22 183:19

183:24 184:11
187:23 188:19
193:13
**tail** 94:23
**take** 10:14,19
11:20 13:24
64:7 77:14
99:22 100:5,6
111:18 112:22
114:22 124:23
126:5,12
127:20 154:15
157:20 159:23
174:13 206:12
217:3
**taken** 83:23
91:17 96:20,22
112:6 214:7
**takes** 27:18
104:6 121:8
**talent** 205:21
210:1
**talk** 9:20 13:24
16:6,16 18:24
19:14 41:3
55:12 102:8
103:18 121:13
121:13 145:5
156:24 242:15
248:25
**talked** 23:18
24:7 42:25
56:20 102:23
158:20
**talking** 25:24
82:3 84:16
94:11 114:6

120:20 179:17
199:18,19
203:15
**talks** 22:1
**tarawolf** 172:1
**target** 26:22,23
103:8,16 207:7
**targets** 26:23
26:24 28:5
102:11 103:11
103:13 211:8
**tasked** 203:6
247:21
**tasks** 203:5
**tax** 238:20,21
239:2
**taxes** 97:24
107:8
**team** 10:10
27:12 77:21
104:12 127:23
129:1,6,7,8
131:10 146:13
165:11 170:7
170:12,13
185:6 207:18
208:8
**teams** 38:8,8,9
38:9 112:6
164:8
**tease** 17:11
**tech** 127:11,12
128:9
**technical** 38:8
**technology**
38:8 69:7

**telecommuni...**
127:14
**telephonically**
4:1
**tell** 28:23 69:4
83:14 94:14
122:25 137:1
188:2 189:6
194:24 204:5
206:22 208:6
224:2,6 230:8
230:8
**temporal** 52:12
53:10
**ten** 159:2
243:11,16
245:10
**tens** 104:11
**tenth** 207:14
**tenure** 9:18
**term** 36:2
188:21,22
**terminate**
130:15
**termination**
144:24
**terms** 22:6
26:1,8,10
30:17 31:7
78:8 79:14,16
80:13 81:4,9
81:12,20 82:13
82:19,21 83:5
83:6,7,18
86:24 88:9,14
90:20 98:5
100:12,20

| | | | |
|---|---|---|---|
| 101:12 112:20 | **texas**   115:13 | 155:19 167:10 | 152:14 153:1,4 |
| 158:19 207:9 | 117:2 122:11 | 167:12,14 | 162:13 165:24 |
| 210:7 242:19 | **th**   147:13 | 168:7,9 170:15 | 171:6 172:10 |
| **terrific**   112:14 | 178:3 184:23 | 172:23 173:1,3 | 172:21 176:11 |
| **test**   206:18,18 | **thank**   7:17,19 | 173:9,13 179:2 | 178:6,25 179:1 |
| **tested**   160:10 | 8:10,17 13:22 | 179:3,7,14 | 186:4,23 187:1 |
| **testified**   8:21 | 19:22 21:20 | 180:22,23 | 187:5 189:6 |
| 16:7 75:12 | 30:7 31:14,23 | 181:17,19,25 | 229:19 231:9 |
| 130:18 162:3 | 38:17 41:22 | 182:2,13,21 | 234:14 236:4 |
| 168:14 | 45:21 48:13 | 187:9,12 | 237:22 238:9 |
| **testify**   5:7 7:11 | 55:5,6 56:13 | 189:13 190:21 | 240:8 246:13 |
| 56:10 109:8,9 | 65:1,2,7 68:15 | 191:13 193:17 | 248:5,24 |
| **testifying**   87:6 | 68:22,24 71:12 | 193:19,23 | 249:13,14 |
| 87:7 101:25 | 71:24 72:5 | 195:23 196:24 | **themself**   232:7 |
| 109:4 152:6 | 77:23 82:1,6 | 197:24 198:1,2 | **there's**   146:3 |
| 196:12 206:3 | 82:11,11,15 | 199:3,5 201:18 | 168:17 171:23 |
| 216:5,6,17 | 83:17 85:12 | 201:20,25 | **they're**   145:25 |
| **testimonial** | 92:15 93:11,11 | 202:1,3,6,10 | 224:18 228:12 |
| 171:1 | 102:3,18 | 202:12 210:9 | **thin**   142:16 |
| **testimony**   5:4 | 104:17,18 | 212:5,6,21,25 | **thing**   5:5 28:16 |
| 5:11,12,19 6:9 | 105:9 107:18 | 213:4,16 | 148:16 194:11 |
| 6:10 8:14 | 109:10,17 | 214:20,22 | 194:15 |
| 11:12 12:12 | 110:20 112:4,4 | 215:2,4 218:7 | **things**   7:8 15:7 |
| 13:15 32:13 | 112:20 113:3,4 | 218:9 219:7 | 26:22 41:1 |
| 38:13 45:5 | 113:14,25 | 221:23 222:3,5 | 42:16 47:4 |
| 67:14 97:5 | 115:19 121:10 | 222:7,25 | 91:19,22 93:24 |
| 105:23 123:14 | 122:19 125:17 | 226:10 230:18 | 95:12 111:15 |
| 125:21 126:23 | 125:20,21 | 245:17 246:4 | 115:17 116:12 |
| 133:2 135:13 | 126:13 127:1,3 | 246:19 248:8,9 | 122:24 132:1 |
| 148:22 166:15 | 134:25 135:19 | 248:15,23 | 149:8,15 |
| 173:2 182:1 | 138:17,18 | **thanks**   200:21 | 150:14,19 |
| 185:2 198:3 | 141:15 143:3 | **that'd**   206:14 | 151:1,8 154:23 |
| 202:15 205:3 | 143:15,16,18 | **that's**   140:17 | 201:1 214:11 |
| 211:24 215:3 | 143:22 144:2 | 142:8 143:13 | 229:1,2 249:11 |
| 218:15 221:13 | 146:8,10 | 144:15 145:20 | **think**   9:14,24 |
| 241:3,11 | 150:20 154:12 | 145:23 146:3 | 10:4,6 15:8,10 |
| | 154:14,24 | 149:13,18,18 | 15:14,21 16:13 |

| | | | |
|---|---|---|---|
| 16:15,25 17:4 | 112:8,13 | **thinly**  56:22 | 169:4 171:2 |
| 17:8 18:18 | 115:10,11,23 | **third**  15:16,25 | 174:22 176:25 |
| 19:5 24:6,10 | 116:3,12 117:2 | 43:9,17 73:11 | 177:11 186:10 |
| 28:4,7,15 | 117:4,23 | 73:12,14 | 213:20 237:23 |
| 31:16 33:6 | 118:25 119:1,2 | 123:19,22 | 240:2,4 244:5 |
| 35:7,18 37:6 | 119:25 120:1 | 129:4 131:8 | **threshold** |
| 37:10 42:1,8 | 121:11,16,19 | 132:14 158:14 | 103:8 |
| 42:20,24,25 | 123:2,3,12 | 163:21 176:2 | **thrust**  5:13 |
| 44:14 45:15,19 | 128:19 130:1 | 190:18 196:25 | **thursday** |
| 46:15 47:15,17 | 130:21,25 | 197:7,14,18 | 249:15,19 |
| 47:21 48:2,8 | 131:2,7,25 | 232:1 234:3 | **tied**  96:3 |
| 49:5 50:7,13 | 132:1,10,13 | 244:12 | 185:16 191:8 |
| 50:20 51:8 | 140:11 142:14 | **thomson**  5:7 | **tiered**  101:19 |
| 52:9 54:21 | 143:13 144:7 | 5:20 6:14,23 | **ties**  39:12 |
| 55:4 56:20 | 144:23 147:20 | **thought**  18:12 | **tile**  207:6 |
| 57:20 59:24 | 148:6,9,18 | 18:19 96:23 | **time**  9:22 10:3 |
| 64:2,6,16 | 149:8,13,15 | 160:14,17,18 | 17:2,4 24:16 |
| 70:19 71:13 | 157:10,15 | 160:24 164:19 | 27:17,19 28:12 |
| 72:25 73:1,5,9 | 160:20 161:20 | 164:21 214:11 | 33:25 40:2,13 |
| 73:14 75:12,13 | 163:2,4 164:17 | 229:21 | 47:15 52:20 |
| 75:25 76:20 | 168:22 169:3 | **thoughts** | 57:19 66:19 |
| 77:11,16 78:17 | 171:9,10 | 141:21 247:12 | 67:5,8,8,13 |
| 80:12 81:1,2 | 179:12 192:22 | **thousand** | 68:10 71:14 |
| 81:16 82:8 | 194:11 196:13 | 159:2 | 90:19 94:10 |
| 84:15 85:19,24 | 199:24 212:2 | **thousands** | 97:5 98:22 |
| 86:11,17,17 | 216:12 219:11 | 65:25 66:1 | 101:5 104:11 |
| 87:8 89:17 | 228:22 232:16 | **threaten**  42:5 | 109:12 112:10 |
| 91:18 93:2,5,7 | 233:14,21 | **three**  7:7 14:8 | 118:14 120:15 |
| 93:24,25 94:15 | 234:7,14 | 15:14 17:7 | 122:14 123:15 |
| 94:21 95:21 | 236:25 238:21 | 29:22 123:13 | 125:24 129:10 |
| 96:1,8,12 | 239:1 241:10 | 123:14 129:2 | 129:21 134:17 |
| 99:15 100:16 | 241:17 243:16 | 130:16 136:23 | 146:23 148:14 |
| 102:19 103:1,5 | 244:1,5 245:5 | 137:23 139:10 | 149:1,21,24 |
| 103:17 105:8 | 249:2 | 142:11 145:8 | 158:12 160:4,7 |
| 106:2,19 | **thinking** | 148:3 158:3,6 | 161:2,4,9,15 |
| 110:15 111:19 | 112:11 | 159:16,19 | 162:18 163:5,9 |
| 111:22 112:1,2 | | 165:25 166:1 | 163:17 167:10 |

168:3 169:9,17
169:22 174:19
176:19 178:15
181:4,10,12
187:12 188:10
190:23 202:4,8
204:17 216:15
222:21 227:16
227:18 228:10
228:10 235:15
235:23 237:5
**timebound**
61:15
**timeframe**
163:6
**times** 8:21
53:22 86:18
99:3 170:7
195:15 223:12
237:23
**timing** 37:24
111:9
**tip** 18:16
**tires** 9:19
**title** 79:19 87:1
87:24 88:8,10
88:25
**today** 10:12
11:13 12:12
13:15 14:4,16
30:6 32:13
35:8 38:13
41:8 57:14
103:2 118:19
119:4 128:23
129:9 133:2
147:8,10 153:7

155:11 166:15
177:1 185:3
187:8 191:14
202:24 205:2
210:21 211:25
215:7,9 217:7
219:6,17
221:21 222:3
248:25
**today's** 250:6,8
**together**
127:19 153:3
162:16 163:12
**token** 13:3
18:24,25 19:11
22:7 23:19,22
24:5,17,18,24
25:14,18,20
26:2,6,7 55:12
55:17,24 56:14
56:18 57:3,9
57:14,17 58:1
58:2,16,21
59:8,15,23
60:13,16 61:6
61:19,23 62:3
62:6 66:12
67:5,16,22
69:5,11,11
70:2,3,7,8,16
71:2,13 91:10
91:13,18,19
92:3,4 94:3,7
94:11 95:14,17
98:6,11 99:21
122:23 123:5
123:10,11

124:1 181:14
181:16 186:16
186:18 187:3
191:19,25
192:6,8,11,13
192:17,22,23
193:4
**tokens** 55:13
55:19,21 58:5
58:22,25 59:3
59:4 60:6,9
66:19 68:12,17
91:14,25 98:2
100:3 124:10
124:21 186:21
186:24 193:2,4
**told** 107:21
195:14 242:24
243:3
**tom** 237:5,12
**tomorrow**
215:12,14
249:1,3,12,14
249:23 250:16
**ton** 9:22
**tonight** 250:14
**tons** 38:7 77:1
**took** 83:19
100:22 165:25
169:17 172:7
222:15 226:5
**tool** 94:15
218:2
**top** 13:5 20:11
20:13 91:23
99:1 104:8
116:2 118:20

118:22 161:17
171:17 172:2
179:22 231:1
245:10
**topic** 26:13
66:17
**tos** 80:18 83:22
**total** 98:10
115:1,22 159:8
159:20 160:12
160:23 165:8
177:10,13
188:21 189:1
189:15 194:18
195:1 197:20
207:13 209:12
**totality** 149:10
**totals** 194:21
194:24
**touch** 111:14
**tough** 226:4
**town** 248:2
**tradable** 57:16
**trade** 124:3
175:17
**traded** 56:16
56:16,16,22
69:24 70:3
160:9,14 175:4
**trading** 64:18
69:17 91:21
124:15,16
160:1 175:8
**trajectory** 9:17
**tranche** 158:17
158:17

transact  57:14
transacted
  160:11
transaction
  37:7,11 75:14
  123:24 160:11
  168:23,24
transactions
  36:11 75:20
  168:25
transcribed
  2:24
transcript
  250:6,7,8,8,10
  250:10,15,15
  250:16 251:4
transfer  88:8
  88:10,17
transferred
  84:6 100:7
transferring
  87:24 88:20,23
  88:24,25 89:16
  89:16
transfers  19:10
  58:5 86:25
  88:15
treasuries  92:2
tremendous
  104:11
trending
  117:24
trial  249:21
tribute  168:20
tried  81:1
  117:18,21
  197:14

tropical  200:25
troubled  49:11
true  11:9 12:9
  13:12 34:23
  61:20 62:4,9
  62:14 108:7
  114:16 119:10
  132:23 142:4
  142:21 149:18
  166:10 176:13
  176:16 184:23
  204:14 251:4
truly  16:23
trust  237:6
trustee  4:2 5:6
  5:15,20,25 6:9
  32:5 50:11
  135:3,12
  167:13 177:23
  187:17,19
  210:15
truth  8:15,15
  126:24,24
  202:16,17,17
try  6:23 7:16
  31:15 32:5,12
  42:16 81:18
  93:3 109:15
  114:21 118:13
  154:20
trying  5:15
  9:22 27:16
  28:10 84:11
  89:8 94:22,23
  96:17 104:15
  109:5,13 118:9
  118:25 149:16

151:16 229:1
  230:6 235:11
  236:24 247:11
turn  40:17,19
  41:20 45:13
  65:11 72:7
  120:14 126:21
  133:10 144:19
  152:21 166:21
  204:4,11
  206:12 208:4
  217:19 221:6
turned  120:17
  189:3
turning  131:20
tweet  24:10
tweets  29:23
twelve  231:18
twitter  139:15
two  9:6 27:13
  39:14 45:16,20
  59:11 77:7
  91:19,22 93:24
  98:19 130:11
  136:23 139:7,8
  139:11,14
  140:12,21
  141:6,12
  146:24 148:4
  156:24 159:7,8
  159:17,22
  164:6 165:13
  165:18 169:20
  172:2 188:20
  188:23 189:8
  215:14,20
  229:14 232:1

234:11 235:4,8
  235:20 236:7,9
  236:10,15
  241:4,7 242:5
type  35:2 50:5
  51:21 54:24
  93:9,10 94:6
  119:10 174:4
  207:2
types  93:8
  175:9 209:25
typical  168:16
  168:17,18
  175:16 203:9
typically  171:8

**u**

u.s.  1:23
ubierna  4:11
  102:5,6,7,13
  102:16 103:3
  103:12,15,22
  104:2,8,16,18
  196:19,21,21
  196:24 197:13
  197:20,24
ubos  136:6
ucc  22:10,24
  23:12,14,16
  27:19 28:25
  29:19 73:6
  77:3,18 103:20
  140:12 169:21
  215:13,20,23
  220:10,15,22
  222:4,10 223:6
  223:14 227:20
  227:22 228:4

228:18 229:1
230:11 233:6
233:12 234:10
235:8 236:7,15
237:5 240:19
241:4 248:20
248:22
**ucc's** 229:8
**uh** 29:22
239:10 243:21
245:11 247:13
247:25
**uk** 88:4 100:20
**ultimate** 136:5
136:7 157:19
172:9 223:1
**ultimately**
64:20 131:12
132:5 159:15
159:21 163:10
163:13 164:4
164:22 169:4
172:9 223:13
233:25 237:12
**um** 70:23
236:6 243:7,10
**unable** 55:13
198:20
**unavailable**
59:10
**uncertain**
114:21
**uncertainties**
18:11
**uncertainty**
15:19 196:9

**undeliverable**
188:8,13
**under** 5:12 6:3
6:12 17:21
27:23 79:2
83:19 84:23
86:22 89:13
90:2 105:1
112:21 133:2
166:15 171:11
185:2 186:3
199:19 205:2
206:1 208:20
210:16,16,23
210:25 211:5
211:15 213:20
221:14
**underlying**
95:22,25
116:18
**understand**
5:23 6:7 17:25
24:17 46:23,24
47:17 48:10,22
69:13 70:9,24
71:10 72:20
77:8 80:9
83:24 84:11,13
84:20 85:9
87:23 88:9
90:14,17 91:12
93:3 95:7,10
95:10,11,12
100:17 106:5
107:11 109:5
109:10 110:10
111:20,21

138:6 144:10
146:18 149:11
149:23 169:2
175:25 176:6
178:10 179:25
193:15 215:10
219:4 221:12
229:1,4 234:21
234:24
**understanding**
15:5 37:2
45:10 46:3
52:7 55:1,3
62:24 64:12
67:7 70:20
73:25 74:24
75:3 76:24
83:25 85:9
86:16,18 93:12
95:16,21 97:19
99:10,14 100:4
101:19 103:19
105:4 112:3
125:4,7 144:14
212:4 214:10
227:20,21
241:24
**understated**
41:8
**understood**
49:15 111:6
117:11
**undertaking**
142:15
**undertook**
14:3

**unfair** 50:13
**unidentified**
110:22 111:9
143:11 155:10
**unilateral**
235:1
**unique** 36:17
171:10 191:8
201:15
**uniquely** 66:16
**united** 1:1,12
32:5 37:21
135:12 187:19
210:15 219:5
**universe** 47:23
115:1
**unknown**
76:23
**unofficially**
104:24
**unpack** 42:21
**unreasonable**
67:12
**unsecured**
22:11
**upfront** 144:11
**uploader** 218:2
**upshot** 176:24
**usbtc** 108:9,21
108:22,23
109:19,20
142:7 143:9
246:7
**use** 8:6 26:1,8
26:10 30:17
31:7 37:23
51:10 65:20

66:3,4 70:18
78:12,19 79:14
79:16,22 80:13
80:22 81:12
82:10,13 83:5
83:6,7 89:13
90:3 99:22
100:5 161:10
165:11 172:3
188:22 202:12
212:19
**used** 70:8,12
100:7 124:1,11
165:13,14,17
165:18,24
171:19,22
184:6,8,9
188:21 189:14
218:2
**users** 100:13
101:1,1,12,14
101:18,24
**using** 20:9
78:21,23 79:19
144:24 165:15
203:20 242:8
**usually** 185:23
**utility** 24:18
25:20 26:7
123:7,10,10
124:10

**v**

**valid** 224:16
**valuable** 38:18
39:9
**valuation**
23:25 24:1

60:14 61:19,23
61:24 62:2
64:5 91:10
157:1 164:24
165:2,20 166:3
166:13,23
167:3 168:3
170:16,17
171:8,9,20
173:19 174:10
174:11 175:13
178:3,14 181:4
181:9 191:19
213:6
**valuations**
61:20 171:2,12
191:25
**value** 10:5
14:11 18:14,21
23:22 24:6
25:14 26:20
27:6 35:19
36:14 37:9
51:3 55:11
56:14,19,21,21
56:24 57:1,4,8
61:5 64:17
91:17 95:22
96:2 98:6
103:7 108:10
108:22 109:19
119:14 123:5
124:11 129:21
130:6 131:13
131:14 158:8,9
158:14 159:13
164:9,12,24

165:4,5,6,8,12
165:14,19,22
167:22 169:7
171:3 174:15
174:16 175:2
176:3 177:11
178:6 180:11
180:12,15,16
180:17 246:22
247:1
**valued** 165:23
178:7,22
180:19,20
**values** 62:7,12
**valuing** 175:19
**vaneck** 36:1
**variable** 122:6
150:12
**variables**
150:4,13 153:3
**variance**
120:23
**variants**
165:18
**various** 8:5
10:15,16 14:18
14:25 30:16
40:23 42:9
142:19 205:11
208:9,10
**vast** 73:6
160:16
**vehicles** 98:20
**venture** 118:21
128:2 129:5
**ventured** 193:1

**venturing**
54:23
**verify** 240:9
**version** 26:8,9
78:9 82:21
83:7,19,19,22
88:9,11,14
**versions** 33:2
83:5
**versus** 63:23
94:23 112:16
115:1 117:14
152:21 172:14
175:13 201:21
229:9 230:23
230:24
**vertical** 115:15
132:3
**vest** 16:18
**vested** 45:3
**victor** 4:11
196:21
**video** 249:11
**videos** 30:2
**view** 16:11
36:22 114:22
114:23,25
115:13 238:8
**viewed** 161:4
**vis** 51:13,13
**visual** 176:24
**vithani** 212:9
212:10,12,21
212:24,25
**vocal** 223:16
**voice** 32:19
233:16,19

235:13,22
250:9,12
**volatile**  118:24
119:6,25
120:14,17
148:16,16
**volatility**  18:12
**volume**  64:18
91:21
**volunteer**
222:5
**volunteered**
227:5
**vote**  43:15
60:14 73:13
74:3 111:15
184:3 185:12
190:2,4 191:12
191:20 196:3,3
201:21,23
220:25 227:2,5
227:7,8 232:7
232:11
**voted**  58:1
60:21 71:7
73:24 186:7,9
186:11,16
187:3,4 190:24
191:1,9 192:8
192:9,24
195:15 197:9
223:10 237:7
**voters**  193:9
**votes**  184:7
185:7 186:1,3
191:5 201:5,6
201:8,11

232:14 247:17
**voting**  43:21
111:16 184:2
186:18 187:23
189:25 197:6
198:17,23
201:4,5,8
**voyager**  48:16
48:17,22 49:6

**w**

**w**  113:11
**waited**  172:19
**waived**  225:3
**wanna**  133:19
**want**  10:14,19
10:20 11:20
12:19 13:23
14:1 16:6
17:11 18:13,21
18:22,24 19:14
19:16,16,17
20:6 21:11,13
22:9 23:17
26:12 30:12
34:3 37:1
40:19,25 52:15
67:3 71:5 78:6
80:9,17 82:17
84:13 85:3,9
90:12 92:12,12
95:2 101:6
111:14 131:1
164:23 193:20
194:14 196:4,5
196:10 198:9
199:13 200:4
200:11 217:18

224:17 229:5
230:9,11,11
231:8,18 237:8
239:9 244:9
245:13,15
250:1,2,14
**wanted**  5:5
28:16 53:2,3
53:12 74:5
102:2 110:13
135:12 138:2
138:23 143:23
200:22 213:4
216:21 222:3
232:13,13
233:2 235:16
235:17 236:3
238:3 250:3
**washington**
5:22
**wasn't**  140:8,9
141:25 147:23
175:8 223:20
236:12 241:18
**watch**  182:3
**water**  65:10
82:3,4 127:2
**way**  41:11 42:7
45:8 47:21
52:21 76:6
89:4,9 96:19
96:24 102:12
106:12 118:13
130:4 132:13
151:8 164:12
187:21 190:8
194:23 196:4

203:22 211:14
232:12
**ways**  131:11
**we've**  6:22,25
7:15 17:1
27:12,23 33:8
37:15 76:18
77:16 96:23
102:22,24
111:17 216:2
**weedman**  3:16
218:16,17,20
218:25 219:5,8
219:13,16,21
219:25 220:4,9
220:12,15,19
221:1,4,6,9,12
221:16,20,23
223:17 225:10
225:14 228:6
229:18 237:22
238:24 239:3
240:7 241:10
243:1,21 244:1
245:20,22
246:9,12 247:7
248:4,10,11,15
248:23
**weekends**
104:7
**weekly**  27:19
36:14
**weeks**  10:5
28:6,7 59:11
**weigh**  212:3
223:22

weighed
169:15 206:4
weight 179:18
weighted
179:10,21
180:7 194:1,7
194:17 195:21
195:22 196:7
weinberg
170:2 230:25
242:16,18,23
weird 45:13
went 10:2,10
14:21 16:4
17:7 24:10,12
24:14,24 25:4
25:4,8,9 28:8
40:1 45:15,19
53:16 64:6
67:7,9 68:9
75:24 81:23
86:17 95:25
97:8 121:2
128:18 139:13
164:3 169:4
weren't 159:13
236:10 237:1
237:14,17
west 115:12
117:2 122:11
we'd 188:11
we'll 149:19
154:16 167:11
177:4 224:13
224:14 225:4
249:2,15

we're 154:15
167:25 218:14
228:21 230:9
237:7
we've 160:21
237:5
whatsoever
41:9
what's 146:11
168:15 174:16
175:16 177:8
220:4
white 3:11
122:25 123:3,4
216:1 218:17
224:9 225:11
228:23 229:10
229:15 230:14
230:15,24
whittle 14:7
wholly 43:10
43:18 73:12,15
73:20 74:19
who's 154:16
widely 70:16
wider 115:15
wiles 49:9
willful 40:15
55:2
willingness
217:5
wind 14:6
27:25
winddown
163:16,19
164:2 168:24

window 216:14
winner 223:1
winning
160:22 163:13
169:16 170:5
wish 7:21 55:6
66:3 68:24
71:20 72:1
77:24 78:16,18
79:4,6 90:24
91:2 92:9
104:19 109:4
110:21 113:5
113:12 122:17
135:1,25
138:19 152:4
154:7 167:16
168:10 172:24
180:24 181:19
191:15 193:20
196:17 199:6
202:1 212:7
214:22 221:25
245:24 248:10
wished 65:20
157:23 199:15
wishes 213:2
wishing 78:12
78:22
wit 209:12
withdrawals
19:9
withhold 56:5
witness 7:22
28:21 56:11
78:20 80:4
82:13 89:12

90:15 92:7,13
113:1,24 118:8
118:11 119:18
124:24 126:20
126:21 134:24
150:8 152:4
154:18 155:14
173:8,11
177:18 179:13
182:8,16
187:13 192:3
196:5,10,12,16
196:18 198:10
210:10 215:17
216:2 218:23
219:8 221:24
224:21 240:9
244:2 249:3,5
witnesses 2:6
3:19 215:6,9
215:10,12,14
215:20,23
217:6 249:1,15
249:18
witness's
241:11
woffard 3:16
wondering
28:22
word 242:9
wording
234:18
words 86:8
135:18
work 5:14
16:16 38:7,8
77:7 94:10

103:16 104:6
111:23 117:5
149:19 156:6
174:4 200:1
203:4 216:14
232:24 233:16
246:25
**worked** 14:22
23:25 175:24
183:8,10,24
185:10,10,13
188:10 237:9
**workforce**
102:25
**working** 6:23
7:1,2,16 37:15
38:13 98:18
102:20 110:2
156:15 208:16
**workload**
233:4
**works** 219:20
232:12
**world** 236:22
**worries** 143:3
**worth** 117:4
140:11
**worthless**
24:20 25:22
26:7
**would've** 25:18
190:15
**wouldn't**
225:16
**wrap** 120:19
121:5 215:8
238:1

**written** 13:5
47:21 102:12
217:17
**wrong** 77:6
117:25 214:11
**wrote** 107:20

| x |
|---|

**x** 1:4,10 163:5

| y |
|---|

**yeah** 8:24 9:13
13:7 14:5 15:6
16:12 17:15
18:9 21:25
25:2 26:19
27:11 28:19
30:14 31:1
33:5 34:18
35:11,23 36:4
37:6,15,16
38:1 40:7,7
42:7 44:21
45:15,20 46:1
46:10 48:4
50:1 51:8 52:5
52:9,10,22
54:11,21 56:15
56:20 59:23
62:15 65:4
74:3,16 81:19
82:8,8 85:3
89:8 93:16,24
95:4,4,4,16,18
96:12 98:25
99:7,11,15,18
102:18 105:18
111:10 113:19

115:10 116:11
116:21 117:11
119:25 121:10
123:2,12
134:16 136:9
136:21 137:18
138:7 144:9
150:11 162:2
175:15 177:1
178:18 198:7
219:19 220:6
220:22 225:22
231:22 235:10
236:16,20
241:3 249:20
**year** 9:12
15:13 16:20
30:18 37:8
117:25 119:13
120:6 130:11
130:12,12
144:15,25
203:1
**years** 23:25
38:1 107:9
130:14,16
144:19,21
156:14 174:5
183:11 184:15
240:2
**yep** 123:25
**yesterday**
65:21 78:14
79:6 145:11
216:8
**yield** 70:12,18
131:2 132:15

**yielded** 128:20
**yields** 131:5
**york** 1:2,14 3:6
3:14 6:11
222:16
**young** 3:9
177:3,7 206:11
208:4 209:7
**youtube** 30:5
**you'd** 158:2
**you'll** 145:15
155:8,9
**you're** 145:14
146:3,14
149:16 150:12
151:15 152:2,6
152:23 173:1
179:17 181:22
182:4 229:5
232:15,15
238:8,14
244:21
**you've** 147:15
154:6 171:13

| z |
|---|

**zero** 68:14
97:22,23 98:6
98:6,16,16
140:5
**zone** 54:23
**zoom** 78:21
110:5 139:15
167:15 177:24
206:13 212:7,8
213:1 216:5,6
231:22

| zooms | 222:19 |
| --- | --- |
| **,** | |
| **'23** | 178:17 |
| **'24** | 147:2,9 |
| **à** | |
| **à** | 51:13 |

## **Exhibit D**

### **October 4, 2023 Transcript (Case in Chief in Support of Plan)**

*Includes the testimony of (i) Maxwell Galka (Elementus) and (ii) Robert Campagna (Alvarez & Marsal).*

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC, et al.,

8

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    October 4, 2023

17                    9:05 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

Page 2

1    HEARING re HYBRID CONFIRMATION HEARING

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    WHITE & CASE LLP

 4         Attorneys for the Official

 5         Committee of Unsecured Creditors

 6         1221 Avenue of the Americas

 7         New York, NY 10020

 8

 9    BY:  AARON COLODNY

10         KEITH WOFFARD

11         JOSHUA WEEDMAN

12

13    KIRKLAND & ELLIS LLP

14         Attorneys for the Debtors

15         601 Lexington Avenue

16         New York, NY 10022

17

18    BY:  CHRIS KOENIG

19         ELIZABETH JONES

20         T.J. MCCARRICK

21         GRACE BRIER

22         JEREMY YOUNG

23

24

25
```

```
 1    UNITED STATES DEPARTMENT OF JUSTICE

 2         Attorneys for the U.S. Trustee

 3         201 Varick Street, Suite 1006

 4         New York, NY 10014

 5

 6    BY:  SHARA CORNELL

 7         MARK BRUH

 8         BRIAN MASUMOTO

 9

10    QUINN EMANUEL URQUHART & SULLIVAN, LLP

11         Attorneys for Pharos Fund SP of Pharos Master SPC and

12         Pharos USD Fund SP of Pharos Master SPC

13         51 Madison Avenue 22nd Floor

14         New York, NY 10010

15

16    BY:  VICTOR NOSKOV

17

18    VENABLE LLP

19         Attorneys for Ignat Tuganov

20         151 West 42nd Street

21         New York, NY 10036

22

23    BY:  JEFFREY S. SABIN

24

25
```

Page 5

1   PRO SE CREDITORS

2   RICHARD PHILLIPS

3   SHARON DOW

4   VICTOR UBIERNA DE LAS HERAS

5   DANIEL FRISHBERG

6   ARTUR ABREU

7   MIKE JOHNSON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    WITNESSES:            DIRECT:    CROSS:    REDIRECT:  RECROSS:

4    MAXWELL GALKA          11

5    ROBERT CAMPAGNA

6

7    EXHIBITS:                                            PAGE:

8    UCC Exhibit 231                                      10

9    UCC Exhibit 228                                      20

10   UCC Exhibit 18                                       25

11   UCC Exhibits 16 & 17                                 28

12   UCC Exhibit 70                                       29

13   UCC Exhibit 74                                       30

14   UCC Exhibit 75                                       31

15   UCC Exhibit 80                                       31

16   UCC Exhibit 82                                       32

17   UCC Exhibit 83                                       33

18   UCC Exhibit 84                                       35

19   UCC Exhibit 87                                       34

20   UCC Exhibit 229                                      41

21   Exhibit 46                                           117

22   Exhibit 7                                            121

23   Exhibit A                                            123

24

25

Page 7

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Morning.  All

4     right, Mr. Colodny.

5              MR. COLODNY:  Hi, Your Honor.  Aaron Colodny of

6     White & Case on behalf of the Official Committee of

7     Unsecured Creditors.  Our first witness this morning is

8     going to be Mr. Galka, but before I get to that, last night,

9     we filed a revised exhibit list which is at Docket No. 3702.

10    It includes a new exhibit marked as UCC 231 which is a

11    transcript of this proceedings in the matter of the United

12    States of America v. Roni Cohen-Pavon.  And that's Case No.

13    23-CR-000347.

14             And in that transcript, which I have copies for

15    Your Honor here, and be made available on our FTP site, and

16    I believe I sent a copy to your chambers last night, Mr.

17    Cohen-Pavon, who is the former chief revenue officer of the

18    Debtors enters a plea of guilty for certain charges against

19    him and testifies under oath.  And if it's ok with the

20    Court, if I can approach and give Your Honor --

21             THE COURT:  Sure.

22             MR. COLODNY:  -- a copy of the --

23             THE COURT:  Thank you.

24             MR. COLODNY:  If it's okay with Your Honor, I'd

25    like to read one paragraph of that into the record.

Page 8

1          THE COURT:  Sure.

2          MR. COLODNY:  So that paragraph begins on Page 38

3      at Line 17.

4          THE COURT:  Just wait.  Wait 'til I get there.  Go

5      ahead.

6          MR. COLODNY:  This is Mr. Cohen-Pavon testifying

7      and he says, "In October of 2021, I became responsible for

8      overseeing and approving Celsius' market purchases of CEL

9      token.  Beginning in 2019, Celsius publicly told CEL market

10     participants that the company was purchasing a certain

11     amount of CEL in the market to fund the interest payment

12     that it owned to Celsius' clients" --

13         THE COURT:  It owed.  I think you may have misread

14     -- just read that sentence again.

15         MR. COLODNY:  Says, "Beginning in 2019, Celsius

16     publicly told CEL market participants that the company was

17     purchasing a certain amount of CEL in the market to fund the

18     interest payments that it owned to Celsius' clients.  From

19     October 21 through December 31, 2021, I oversaw and at times

20     directly ordered a pattern of CEL token purchases in excess

21     of what the company needed to buy to meet its interest

22     obligations.

23         "I knew and understood that the purpose of these

24     excess purchases was at least in part to increase the price

25     of the CEL token, prevent the price of the CEL token from

Page 9

1    dropping, and all to create the appearance of a more liquid

2    market in CEL token trading, all of which were intended to,

3    at least in part, to induce additional CEL purchases by the

4    public at prices that likely did not reflect the true market

5    price.

6            "I communicated with other Celsius employees by

7    either email and telephone about these access purchases,

8    including the purpose behind the purchases at the time

9    agreed to order excess purchases based on the -- based on

10   agreement with orders from these other individuals.

11   Throughout this time," and then the Court stops him and I

12   will jump down to Paragraph 20.  The defendant --

13            THE COURT:  Line 20.

14            MR. COLODNY:  Line 20.  The defendant continues.

15   " I communicated with other Celsius employees by either

16   email and telephone about these excess purchases including

17   the purpose behind the purchases, and at times agreed to

18   order excess purchases based on agreement or orders from

19   these other individuals.  Throughout this time period, I

20   believe that the CEL token qualified as a security under the

21   relevant laws and regulation."

22            Your Honor, we would ask that UCC Exhibit 231 be

23   admitted into evidence.

24            THE COURT:  Any objections?  All right, UCC 231 --

25            MR. DAVIS:  I object, Your Honor.  There has been

Page 10

1    no opportunity to cross examine Roni Cohen-Pavon.

2            MR. COLODNY:  So Your Honor, last night we reached

3    out to Mr. Cohen-Pavon's counsel who confirmed that he is

4    unavailable and I believe that since this is a statement

5    against interest, the plea would be admissible under rule --

6    Federal Rule of Evidence 8033.

7            THE COURT:  One second.

8            MR. COLODNY:  804(b)(3) is unavailability, Your

9    Honor, as well.

10           THE COURT:  Okay.  Objection's overruled.  Exhibit

11   UCC 231 is admitted in evidence.

12           (UCC 231 Admitted Into Evidence)

13           MR. COLODNY:  Thank you, Your Honor.  I'll pass

14   the podium to my partner Joshua Weedman.

15           THE COURT:  Okay.

16           MR. WEEDMAN:  Good morning, Your Honor.

17           THE COURT:  Good morning.

18           MR. WEEDMAN:  Joshua Weedman of White & Case on

19   behalf of the Committee.  Committee would like to call Max

20   Galka as our next witness.

21           THE COURT:  Okay.  Come on up.  Hi.

22           MR. GALKA:  Hi.

23           CLERK:  Raise your right hand, please.  Do you

24   solemnly swear or affirm that al the testimony you are about

25   to give before this Court is truth (indiscernible)?

Page 11

1                    THE WITNESS:  Yes, I do.

2                    MR. WEEDMAN:  And Your Honor, with permission, I

3    have a binder for the Court --

4                    THE COURT:  Please.

5                    MR. WEEDMAN: -- witness.

6                    THE COURT:  Thank you.  Thank you.

7                         DIRECT EXAMINATION OF MAX GALKA

8    BY MR. WEEDMAN:

9    Q    Good morning, Mr. Galka.

10   A    Good morning.

11   Q    Mr. Galka, what is your current employment?

12   A    I am the chief executive officer of Elementus.

13   Q    And what is Elementus?

14   A    Elements is a blockchain analytics and forensics

15   company.  We work with government agencies, financial

16   institutions, and a variety of other kind of parties to help

17   them understand what's actually happening on the blockchain.

18   Q    Does Elementus have any other specialties?

19   A    Well, we work with -- I work with government.  What we

20   focus on is helping them to trace the funds from illicit

21   activity which could be ransomware, dark net markets, or

22   other types of illegal activity on the blockchain and help

23   them find where the money goes.  When it comes to financial

24   institutions, our focus is mainly on helping them to

25   understand risk and identify market opportunities.

1   Q    Mr. Galka, could you please provide the Court with your

2   educational background?

3   A    Sure.  I graduated with a degree in finance from the

4   Wharton School of Business, a degree in computer science and

5   engineering from the University of Pennsylvania Engineering

6   School.  And I also taught data science as an adjunct

7   lecturer at the University of Pennsylvania.

8   Q    And Mr. Galka, do you have any experience with trading

9   in financial instruments?

10  A    Yes, I do.

11  Q    Could you please explain what that is?

12  A    Sure.  For nine years, I worked as a trader on Wall

13  Street at both Deutsche Bank and Credit Suisse, where I

14  traded a variety of different fixed income instruments

15  ranging from structured products, mortgage backed

16  securities, to insurance linked derivatives.

17  Q    Do you have as part of your experience in trading

18  financial instruments any experience with trading in

19  dislocated markets?

20  A    Yes, I have a great deal of experience trading

21  dislocated markets.

22  Q    And could you please explain for the Court what a

23  dislocated market is?

24  A    Sure.  Well, a dislocated market usually starts off

25  with some sort of shock to the market which could be a shock

Page 13

```
 1   to the supply and demand.  It could be a market rumor.  It
 2   could be a policy change on behalf of government.  But it's
 3   some sort of shock that sets the market price off in a
 4   trajectory that diverges from the underlying intrinsic
 5   value.
 6   Q    And Mr. Galka, could I please direct your attention to
 7   Tab 3 in the binder in front of you?
 8   A    Sure.
 9   Q    This is a document marked UCC Exhibit 228 with a docket
10   number of 3580.  Mr. Galka, do you recognize this as your
11   first declaration in this matter?
12   A    Yes, I do.
13   Q    And if you turn to Page 4 of this first declaration, do
14   you recognize that as your signature?
15   A    Yes.
16   Q    And Mr. Galka, do you see that your first declaration
17   attaches your expert report, which is in your binder as
18   Exhibit 2 that you prepared on September 22nd, 2023?
19   A    Yes.
20   Q    And your expert report from September 22nd contains two
21   primary opinions; is that right?
22   A    Yes, that's right.
23   Q    Can you briefly summarize for the Court your first
24   opinion set forth in your September 22nd expert report
25   regarding the company's prepetition purchases of the CEL
```

Page 14

1   token?

2   A    Sure.  The opinion is that the company went into the

3   market and purchased more CEL token than what they had

4   announced as their stated policy, which had the effect of

5   artificially boosting the price for -- well, for the

6   duration of Celsius' existence.

7   Q    And sir, does your expert report also contain any

8   opinion as to the market price of CEL token calculated in

9   the petition date price notice?

10  A    Yes, it does.

11  Q    First of all, do you know what the market price for CEL

12  token was as of the date of the petition?

13  A    Yes, it was 81 cents.

14  Q    And what is the opinion that you are offering as to the

15  validity of that price?

16  A    In my opinion, that price has effectively zero

17  significance with respect to the actual intrinsic value of

18  the token, that the market had become dislocated.

19  Q    Could you please briefly explain why you believe it has

20  zero value?

21  A    Sure.  Well, I would say that at the time of the pause,

22  that was when the market for CEL token became dislocated.

23  You had a number of different factors at play.  Suddenly

24  about 40 percent of the supply of CEL token, which was

25  controlled by customers of Celsius, were suddenly locked up

Page 15

1    on their platform.  So those tokens were for all intents and

2    purposes excluded from the market.  So all that remained was

3    about 5 percent of the existing supply of CEL.  The pause

4    itself started a number of rumors swirling about the future

5    of Celsius and the potential for bankruptcy.  And after that

6    point, the market for CEL token became completely dislocated

7    from its intrinsic value.  And that's very clearly visible

8    just by looking at the volatility of the price between the

9    pause and the petition date.

10           THE COURT:  The second time in expressing your

11   opinion, you referred to intrinsic value.  Can you --

12           THE WITNESS:  Yes.

13           THE COURT:  -- explain what that is?

14           THE WITNESS:  Sure.  I would say that in this

15   discussion, if we're talking about the price of an asset, I

16   will either be talking about one of two things, the market

17   price, which is the price at which it's trading on different

18   trading venues, and the intrinsic value, which represents

19   the value of the asset separate and distinct from the market

20   price.  What is the actual value of this object?

21           THE COURT:  Go ahead.

22   BY MR. WEEDMAN:

23   Q    And Mr. Galka, just to follow up on the Court's

24   question, do -- are the market price on the intrinsic value

25   inherently linked in any way?

Page 16

1    A     Well, for the most part, the market price is the

2    market's perception of what the intrinsic value is.  There's

3    no objective number to put on the intrinsic value in those

4    cases.  So it represents a reasonable, reliable estimate in

5    most cases when the market is trading under normal

6    conditions.  When a market becomes dislocated, what the

7    dislocated refers to is the dislocation of the market price

8    from the intrinsic value.  So in this case, the 81 cents was

9    a dislocated market price which really was not connected in

10   any way to the intrinsic value of the token.

11   Q     In addition to the dislocating factors that you just

12   discussed after the pause, were there any external shocks to

13   the economic system that might have affected the price of

14   CEL token around this time?

15   A     Yes.  Just as the backdrop, this was a crypto industry

16   that was in the middle of a bit of a panic.  The price of

17   Bitcoin had fallen more than 50 percent in the prior few

18   months.  There were a number of other crypto firms that had

19   already declared bankruptcy in the few months prior to that.

20   So the entire industry was a bit skittish and was worried

21   about what was going to be the next shoe to drop.  So this

22   was not coming out of nowhere.

23   Q     And Mr. Galka, after the pause, was the full supply of

24   CEL token available to be freely traded?

25   A     No, it was not.

1   Q    What percentage was locked up or what percentage was

2   available?

3   A    Well, if I were to break down the supply of CEL into

4   three buckets, what was owned by the company and its

5   treasury, what was owned by Celsius customers but sitting on

6   the Celsius platform, and what was owned by Celsius

7   customers but was outside of the Celsius platform, those

8   numbers would be about 55 percent of the supply of tokens

9   was in Celsius' treasury.  About 40 percent was on Celsius

10  owned by its customers, and about 5 percent was out there

11  outside of the Celsius platform.  So at the time of the

12  pause, that 40 percent that was owned by customers but was

13  sitting on Celsius became locked up.

14  Q    And does it matter, Mr. Galka, that only 5 percent of

15  the CEL token supply could be actively traded after the

16  pause?

17  A    Yes, it does.

18  Q    Could you please explain why?

19  A    Sure.  Well, there are a number of different reasons

20  why that would be conducive to a dislocated market.  I would

21  say the first one is that it's likely to think that some

22  percentage, if not a very large percentage, of those Celsius

23  customers that had their tokens sitting on the Celsius

24  exchange would have withdrawn them and attempted to sell

25  them during this period.  But once they became locked up,

1    that completely removed the supply that -- the majority of

2    the supply out of the equation, which allowed the market to

3    be more free floating.  You -- it also has the impact of,

4    for anyone who has a short position that they're looking to

5    cover, there's a limited amount of CEL out there for them to

6    buy back.  So it increased the potential for a short

7    squeeze.  And just generally speaking, when you disrupt the

8    supply or the demand of a market to that degree, that's

9    undoubtedly going to have consequences and act as a real

10   shock to that market.

11   Q    Mr. Galka, does the market data that you've reviewed

12   support your conclusion that the CEL token market was

13   dislocated?

14   A    Yes, it does.

15   Q    And so based on what you just testified, is it your

16   opinion that the market price of CEL token is not a reliable

17   indicator of the value of the CEL token after the pause?

18   A    Yes, it is.

19   Q    Finally, Mr. Galka, with respect to your expert report

20   and your first declaration, you just referenced something

21   called a short squeeze.  Can you explain for the Court what

22   a short squeeze is?

23   A    Sure.  A short squeeze is a market condition in which

24   for some asset there is a large short open position, which

25   means there are people who are short the asset and at some

Page 19

1    point, will need to go into the market to buy it back and

2    cover that short.  And the squeeze part usually starts with

3    some kind of upward shock to the price at which time anyone

4    who has a short on will need to either post margin or will

5    need to buy the security or asset back.

6        For those that do end up buying it back to cover their

7    short, that will drive the price higher.  And it creates

8    this cycle of increasing price that self-perpetuates.  And

9    what you also have sometimes is third parties that come in

10   from the outside to buy the price for the explicit purpose

11   of driving it up to sell it to the short coverers once they

12   buy their shorts back/

13   Q    Mr. Galka, what is the relevance of a short squeeze

14   here?

15   A    Well, there were discussions taking place on social

16   media after the time of the pause about a short squeeze.  I

17   believe there was a coordinated effort to effect a short

18   squeeze on the market.  From the data that we saw, there

19   were short positions put on after the pause and some of

20   those shorts look like they had to cover at prices far above

21   where they shorted it, so it looks like there was to some

22   degree short squeeze activity happening after the pause.

23       All that said, I would say that, you know, my

24   perspective is that anything after the pause is essentially

25   irrelevant for, with respect to looking at the intrinsic

Page 20

1    value of the token.  So the fact that there was a short

2    squeeze, there were shorts, and that they were squeezed and

3    that the price moved around is really evidence that bolsters

4    and supports that conclusion.

5    Q    Mr. Galka, do you understand that your expert report

6    and your first declaration are being offered today as your

7    direct testimony under oath?

8    A    Yes, I do.

9              MR. WEEDMAN:  Your Honor, at this time, we would

10   offer evidence Exhibit UCC 228 and the initial first

11   declaration of Mr. Galka along with certain reliance

12   exhibits which are not yet into evidence which I can list

13   for Your Honor.

14             THE COURT:  Just a moment.  Any objections to the

15   Court admitting in evidence Exhibit 228, Mr. Galka's initial

16   report?  It's in evidence.

17             (UCC 228 Admitted Into Evidence)

18             MR. WEEDMAN:  And Your Honor, we offer Exhibits 16

19   to 26, 52 to 53 --

20             THE COURT:  Oh, 16 to 26 --.

21             MR. WEEDMAN:  52 to 53, 57 to 58, 65 to 68, 70, 74

22   to 75, 80, 82 to 84, and 87.

23             THE COURT:  Just briefly, are these in the binder?

24             MR. WEEDMAN:  They're not, Your Honor, but I have

25   a copy.

Page 21

1            THE COURT:  -- see them.

2            MR. WEEDMAN:  And Your Honor, we're offering these

3    as reliance materials for Mr. Galka.  And to be clear, Your

4    Honor, they're also cited in his reports.

5            THE COURT:  I understand, but I do want to see

6    them.

7            MR. COLODNY:  Your Honor, some of them are Excel

8    sheets.

9            THE COURT:  Mr. Galka, in preparing your report

10   which has just been admitted into evidence, did you rely on

11   the exhibits that have just been described, Exhibit 16 to

12   26, 52 and 53, 57 and 58, 65 through 68, 70, 74 through 75,

13   80, 82 through 84, and 87?

14           THE WITNESS:  Are these the exhibits here in my

15   binder?  Are those the --

16           THE COURT:  Did you put a copy in the binder

17   before the witness?

18           MR. WEEDMAN:  Your Honor, permission to approach?

19           THE COURT:  Yeah, please.  Yeah.  So the first

20   groups were 16 to 26.  I want you to confirm whether these

21   were materials you relied on preparing your report, which

22   has been admitted exhibit -- as Exhibit UCC 228; 16 through

23   26 is the first group.

24           THE WITNESS:  Yes, Your Honor.  I'm going through

25   them.

1              THE COURT:  Okay.

2              THE WITNESS:  Your Honor, I have not finished

3    going through these yet, but just --

4              THE COURT:  Take your time.

5              THE WITNESS:  -- having gone through the first

6    few, I can say that, I'm familiar with all the material in

7    here, but none of this did I rely on for my report from what

8    I've seen so far.

9              THE COURT:  I think he just undercut the basis for

10   your admitting them in evidence.  He's just testified he did

11   not rely on them.

12             MR. WEEDMAN:  Your Honor, if I may, these are

13   exhibits that are cited as reliance materials in the report

14   and for --

15             THE COURT:  The witnesses just testified he didn't

16   rely on them.  Would you like to take him through it?

17             MR. WEEDMAN:  Yeah, sure.

18             THE COURT:  If they're not -- if he didn't rely on

19   them, they don't come into evidence unless you establish a

20   separate foundation for each and every one of them.

21             MR. WEEDMAN:  Your Honor, if -- actually come back

22   to this on redirect to the extent --

23             THE COURT:  No.  If you don't want to admit the

24   evidence, then you go on to your next subject.  If you're

25   going -- if you're going to seek to admit them, you're going

Page 23

1    to do it now.

2              THE WITNESS:  Your Honor, may I speak freely?

3              THE COURT:  No.  Wait one --

4              THE WITNESS:  Sure.

5    BY MR. WEEDMAN:

6    Q    Mr. Galka, can I turn your direction to your report,

7    which is in Tab 3 in the binder in front of you, the spiral

8    binder in front of you?

9    A    Yes.

10   Q    And if you turn to Page 47 of the expert report, you

11   see that there's a list of materials relied upon?

12   A    Yes, I do.

13   Q    And Mr. Galka, does this refresh your recollection that

14   there were materials that you relied upon in preparing your

15   expert report?

16   A    Yes, it does.  Allow me to finish going through these,

17   please.

18             MR. KIRSANOV:  Your Honor, I object.  The witness

19   already indicated that he did not rely on the exhibits.

20             THE COURT:  The examination is still going on.

21   You'll have a chance on cross examination, if you wish to

22   examine.  Your objection is overruled.

23             Mr. Weedman, I would note that Exhibit B to his

24   report, list of materials relied upon, has Bates numbers, no

25   exhibit numbers.  There are no Bates numbers on the -- at

Page 24

1    least, I've started to go through the exhibits in the binder

2    and I don't see Bates numbers on them.

3              MR. WEEDMAN:  One moment, Your Honor.  Your Honor,

4    I believe all the ones that were -- that have Bates numbers

5    on them have already been admitted to evidence and this

6    exercise that we're trying to admit the ones that are not

7    Bates numbered but were still relied upon or cited to.

8              THE COURT:  I'm at a complete loss.

9              MR. McCARRICK:  Your Honor, I think just to --

10   T.J. McCarrick, Kirkland & Ellis, on behalf of the Debtors.

11   Just to clear up the record a little bit with respect to the

12   Bates stamp reliance materials that are on the UCC's exhibit

13   list, those were moved into evidence following Mr. Ferraro's

14   direct examination.

15             I believe what the Committee is now attempting to

16   do is to admit additional non-Bates stamp reliance materials

17   that appear on page -- I guess pages, between 37 and 60 of

18   Mr. Galka's report.  And what might be helpful is just to

19   use those pages and tick through the exhibits in the binder

20   to confirm whether or not Mr. Galka relied upon them.  But

21   that's for the Committee.

22   BY MR. WEEDMAN:

23   Q    Mr. Galka, can I direct your attention to Tab 18 in the

24   big binder in front of you?

25   A    Sure.  And you see that this is a article about -- from

Page 25

1    Reuters titled "Bitcoin stabilizes after heavy losses, but

2    pessimism reigns in crypto markets."

3    A    Yes.

4    Q    And Mr. Galka, do you recall reviewing this in

5    preparation of your expert report?

6    A    Yes, I do.

7    Q    And was this something that you relied upon in

8    preparation of your expert report?

9    A    Yes, it was.

10            THE COURT:  That's Exhibit 18 -- Tab 18, UCC 18?

11            MR. WEEDMAN:  Correct, Your Honor.

12            THE COURT:  Any objections to UCC 18?  It's in

13   evidence.

14            (UCC 18 Admitted Into Evidence)

15   BY MR. WEEDMAN:

16   Q    Mr. Galka, can I --

17            THE COURT:  Let's -- we are going to take a brief

18   recess.  You better get your act together.

19            MR. WEEDMAN:  Thank you, Your Honor.

20            THE COURT:  Okay?  This -- you know, this ought to

21   be -- it ought to go smoothly.  Am I correct that everything

22   listed as a reliance material in Exhibit B to his report is

23   not among -- and you're saying they're already in evidence

24   and they're not among the exhibits that you're now seeking

25   to admit?  Do you understand my question?

Page 26

1            MR. WEEDMAN:  I did not understand your question,

2     sir.

3            THE COURT:  I'm looking at Pages 47 through the

4     top of 56 of the report.

5            MR. WEEDMAN:  Yes.

6            THE COURT:  And it lists Bates numbers.  You're

7     representing those have already been in evidence?

8            MR. WEEDMAN:  I believe that those with Bates

9     numbers have -- were admitted into evidence after Mr.

10    Ferraro's --

11            THE COURT:  And that doesn't include anything that

12    you now are trying to admit?

13            MR. WEEDMAN:  That's correct, Your Honor.

14            THE COURT:  Are any of the exhibits which you're

15    seeking to admit, 16 to 26, 52 and 53, 57 and 58, 65, 68,

16    70, 74 and 75, 80, 82 to 84, and 87; are they listed in his

17    report?

18            MR. WEEDMAN:  They are, Your Honor.

19            THE COURT:  They are.

20            MR. WEEDMAN:  Throughout the report, the footnotes

21    and -- sorry.  The issue, Your Honor, we're having right now

22    is they're not cross referenced with the exhibit number that

23    we are -- that is on the UCC exhibit list.  And so that's

24    just the challenge when we're trying to walk through and tie

25    them.  But I appreciate Your Honor's suggestion for a short

1    recess.  I think we can organize this very, very quickly.

2              THE COURT:  I'll be back on the bench at five to

3    ten.

4              MR. WEEDMAN:  Thank you, Your Honor.

5              (Recess)

6              CLERK:  All rise.

7              AUTOMATED VOICE:  Recording in progress.

8              THE COURT:  All right, everybody please be seated.

9    Mr. Galka, you're still under oath.  Mr. Weedman.

10             MR. WEEDMAN:  Thank you, Your Honor.

11   BY MR. WEEDMAN:

12   Q    Mr. Galka, when we broke, we were talking about certain

13   exhibits and whether or not you relied on them.  Can I ask

14   you, sir, do you still have your report in front of you?

15   A    Yes, I do.

16   Q    Can I ask you to turn to Page 27 of your report,

17   please?

18   A    Sure.

19   Q    And sir, do you see here that you're discussing certain

20   Slack messages?

21   A    Yes, I do.

22   Q    Okay.  And you see there is a Footnote 50 relating to

23   Etherscan transaction data?

24   A    Mm hmm.

25   Q    And can I ask you, sir, to please turn to, in your big

Page 28

1    binder, Tab 16 and 17?  You see --

2    A     -- got it.

3    Q     This reference is Excel data that's on the USB.

4    A     Sixteen through eighteen in the binder?

5    Q     Sixteen and seventeen.   The reference to Etherscan

6    data.

7    A     Yes.

8    Q     And is this the Etherscan data that you relied on in

9    Footnote 50 of your report?

10   A     Yes, it is.

11              MR. WEEDMAN:  Your Honor, I would offer Exhibits

12   16 and 17 into evidence.

13              THE COURT:  Any objections?  Sixteen and seventeen

14   are admitted.

15              (Exhibits 16 and 17 Admitted Into Evidence)

16   BY MR. WEEDMAN:

17   Q     Mr. Galka, on the same page, Footnote 51, do you see a

18   reference to -- the same page of your report, sorry, on Page

19   27.

20   A     Yes.

21   Q     Do you see a reference to Mashinsky trades corrected

22   XLSX?

23   A     Yes, I do.

24   Q     And do you see his XLSX, a reference to Excel data?

25   A     Yes, that's an Excel spreadsheet.

Page 29

1    Q    And can I turn your attention to UCC Exhibit 70 in your

2    big binder?

3              THE COURT:  I'm sorry, which one?

4              MR. WEEDMAN:  Seventy, sir.

5              MR. COLODNY:  These ones aren't going to be in the

6    binder, Your Honor, because they're exhibits that are in the

7    --

8              MR. WEEDMAN:  These are in the -- on the data

9    files, the FTP file.

10             THE COURT:  Okay.

11   BY MR. WEEDMAN:

12   Q    And Mr. Galka, do you understand that the Excel data

13   for the Mashinsky trades which is on UCC Exhibit 70 is the

14   data that you relied upon in Footnote 51?

15   A    Yes.

16             MR. WEEDMAN:  Your Honor, I'd offer exhibit -- UCC

17   Exhibit 70 into evidence.

18             THE COURT:  It's in evidence.

19             (UCC Exhibit 70 Admitted Into Evidence)

20   BY MR. WEEDMAN:

21   Q    Mr. Galka, can I ask you to turn to Page 17 of your

22   report, please?

23   A    Yes.

24   Q    And sir, do you see in Footnote 32, there's a reference

25   to Celsius CEL OTC transactions and then an Excel suffix

1    there?

2    A    Yes, I do.

3    Q    And is that -- that's also a reference to an Excel data

4    sheet?

5    A    Yes, it is.

6    Q    And sir in Tab 74, UCC Exhibit 74, which is also data

7    which is on the FTP site, can you confirm that you relied

8    upon the data in that Excel chart in your reference to

9    Footnote 32?

10   A    Yes, I can.  Yes.

11             THE COURT:  So that's 74?

12             MR. WEEDMAN:  That's correct, Your Honor, and we

13   would offer that into evidence.

14             THE COURT:  All right, it's in evidence.

15             (UCC Exhibit 74 Admitted Into Evidence)

16   BY MR. WEEDMAN:

17   Q    And Mr. Galka, can you please turn to Page 13?

18   A    Yeah.  I got it.

19   Q    And do you see on Page 13, there is a Footnote 28

20   referencing Excel data for CEL token burn data?

21   A    Yes.

22   Q    And in UCC Exhibit 75, again on the FTP data site,

23   there is an Excel chart.  Can you please confirm that you

24   relied upon this CEL token burn data in UCC Exhibit 75 as

25   referenced in Footnote 28 of your report?

Page 31

1    A    Yes, confirmed.

2              MR. WEEDMAN:  Your Honor, we would offer UCC

3    Exhibit 75.

4              THE COURT:  All right, it's in evidence.

5              (UCC Exhibit 75 Admitted Into Evidence)

6    BY MR. WEEDMAN:

7    Q    Mr. Galka, will you please turn to Page 14 of your

8    report?

9    A    Okay.

10   Q    Footnote 30, there's a reference to an Excel chart, the

11   FREEZE report.  Do you see that?

12   A    Yes, I do.

13   Q    And that is on data which is UCC Exhibit No. 80.  Can

14   you confirm that the Excel chart in UCC Exhibit 80 is

15   something that you relied upon as reference to Footnote 30

16   of your report?

17   A    Yes, confirmed.

18             MR. WEEDMAN:  Your Honor, we would offer footnote

19   -- or, I'm sorry, we would offer UCC Exhibit 80 into

20   evidence.

21             THE COURT:  All right, it's admitted into

22   evidence.

23             (UCC Exhibit 80 Admitted Into Evidence)

24   BY MR. WEEDMAN:

25   Q    Mr. Galka, can you please turn to Page 10 of your

Page 32

1    report?

2    A    Yes.

3    Q    And do you see, sir, in Footnote 20 there's a reference

4    to Celsius magic-wallets.csv?  do you see that?

5    A    Yes, I do.

6    Q    And the data for that Celsius Magic Wallets is

7    reflected in UCC Exhibit 82.  Can you please confirm that

8    this is something that you relied upon in the preparation of

9    your expert report as reflected here?

10   A    Confirmed.

11             MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 82.

12             THE COURT:  All right, 82 is in evidence.

13             (UCC Exhibit 82 Admitted Into Evidence)

14   BY MR. WEEDMAN:

15   Q    Just a few more.  Can you please, Mr. Galka, turn to

16   Page 20 of your report?

17   A    Okay.

18   Q    And you see in Footnote 39 there is a reference to two

19   Excel charts for Celsius On-Chain Buybacks and Celsius

20   Weekly CEL Buybacks and Rewards.  Do you see that?

21   A    Yes, I do.

22   Q    And that data is included in UCC Exhibit 33 at FTP.

23   Can you please confirm that this is data upon which you

24   relied in preparing your report?

25   A    Yeah, confirmed.

1          MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 83

2    into evidence.

3          THE COURT:  All right, 33 is in evidence.

4          MR. WEEDMAN:  And -- Your Honor, that was UCC 83.

5    I'm not sure if I misspoke.

6          THE COURT:  Oh, 83.  I'm sorry.  I misspoke.

7    Okay, 83 is in evidence.

8          (UCC Exhibit 83 Admitted Into Evidence)

9    BY MR. WEEDMAN:

10   Q    And Mr. Galka, on the same page, the prior footnote

11   there is a reference to an Excel chart, Celsius Weekly CEL

12   Buybacks and Rewards.  Do you see that?

13   A    Yes, I do.

14   Q    And that data is included in UCC Exhibit 84.  Can you

15   please confirm that this is data upon which you relied in

16   preparing your report?

17   A    Yeah, confirmed.

18         MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 84

19   into evidence.

20         THE COURT:  All right, it's in evidence.

21         (UCC Exhibit 84 Admitted Into Evidence)

22   BY MR. WEEDMAN:

23   Q    Finally, Mr. Galka, can I have you turn to Page 23 of

24   your report?

25   A    Yes.

Page 34

1    Q    And you see in Footnote 43 there's a reference to OTC

2    transactions data UnMasked, UCC request, September 2023.

3    You see that?

4    A    Yes, I do.

5    Q    And that's also a reference to Excel data?

6    A    Yes.

7    Q    And can you please -- and that data is included on the

8    FTP for UCC Exhibit 87.  Can you please confirm that this

9    data is something upon which you relied on preparing your

10   expert report?

11   A    Confirmed.

12              MR. WEEDMAN:  Your Honor, we offer UCC Exhibit 87

13   into evidence.

14              THE COURT:  All right, it's in evidence.

15              (UCC Exhibit 87 Admitted Into Evidence)

16   BY MR. WEEDMAN:

17   Q    Thank you, Mr. Galka.

18              MR. WEEDMAN:  Thank you, Your Honor, for your

19   indulgence.

20              THE COURT:  So you're not moving the rest in or --

21              MR. WEEDMAN:  That's all for now.

22              THE COURT:  All right.  Just, let me just go over

23   to make sure that my records are the same as yours.  My

24   records show that Exhibits 16, 17, and 18 have been admitted

25   in evidence.  And then exhibits -- UCC Exhibits 70, 74, 75,

Page 35

1    80, 82, 83, 84, and 87 are in evidence.

2            MR. WEEDMAN:  That's correct, Your Honor.  May I?

3            THE COURT:  All right.  Go ahead.

4    BY MR. WEEDMAN:

5    Q    Now, Mr. Galka, I'd like to direct your attention to

6    Tab 4 in the small binder in front of you and this is UCC

7    Exhibit 229 with the docket number of 3659.

8    A    Okay.

9    Q    And Mr. Galka, is this second declaration that you

10   offered in this matter?  And it starts at the fourth page of

11   this.  Page 4 of 10 --

12   A    Yeah.

13   Q    -- on the banner at the top.

14   A    Yeah.  Yes, it is.

15   Q    Okay.  And Mr. Galka, if you turn to the last page of

16   this declaration, is that your signature?

17   A    Yes, it is.

18   Q    And Mr. Galka, why did you offer an additional second

19   declaration?

20   A    Well, after the first declaration, I had opined that

21   the price of 81 cents, the market price at the time of 81

22   cents, was not an accurate reflection of the intrinsic

23   value.  My opinion is that there is no reliable way of

24   putting a market price on it.  So I did not, but it was my

25   understanding that Your Honor wished to see a market price

1    which --

2              THE COURT:  Well, I want to know the --

3              THE WITNESS:  -- the value --

4              THE COURT:  -- whether you had -- what I wanted --

5    no, I know there's no market --

6              THE WITNESS:  Yeah, sorry.

7              THE COURT:  But my question that I had asked was

8    whether you have an opinion about what the value of the CEL

9    token was at the petition date.

10             THE WITNESS:  Yes.  I misspoke saying market price

11   and what I meant to say was the value.  Pardon me.  So I --

12   that was the substance of this second addition to my

13   opinion.  I still was not able to put a market price on it,

14   but I did give some additional context as to how I see the

15   intrinsic value.

16   BY MR. WEEDMAN:

17   Q    And --

18   A    Assuming --

19   Q    Can you explain for the Court why you were not able to

20   put a market price on the value of CEL token on the petition

21   date?

22   A    And apologies, when I misspoke when I said market

23   price.  I really meant intrinsic value.  Yes, I can.  Well,

24   there are really only two ways of getting to a -- to the

25   value of an asset.  One would be looking at the market price

Page 37

1    when the market is functioning under normal conditions.

2    Short of that, would be using some sort of model to

3    calculate a market price.  Now, when valuing most

4    traditional financial assets, what you're really -- what

5    you're really valuing is a series of future cashflows which

6    you're discounting back to the present, and that represents

7    the intrinsic value.

8        In this case, with the CEL token, there are no

9    cashflows.  So it doesn't really fit into any kind of

10   traditional asset valuation model.  The market or the

11   intrinsic value, I would not say is zero.  Certainly, I

12   think there are arguments for why it could have some

13   intrinsic value.  There is an argument that it could have

14   like a -- something of a meme coin intrinsic value to it

15   where people are trading it as some kind of like a

16   collectible.

17       There's, I imagine, some potential for it to

18   hypothetically have some value, if there is a hypothetical

19   entity that emerges from the restructuring that uses this

20   token and -- within its platform as a utility token.  I

21   could see an argument, if someone feels strongly that that's

22   going to be the case.  I could see an argument for that

23   having value.  In my opinion -- well, both of those factors

24   are well, really impossible to quantify and in my opinion,

25   de minimis.

Page 38

1          So if I were asked to place a value on to this asset

2     and I were trading this token at the time of the petition

3     date, I would decline to put a price on it.

4               THE COURT:  If you knew with the petition date

5     that the Debtor is going to be liquidated, will never --

6     will not exist.

7               THE WITNESS:  Yes.

8               THE COURT:  What -- do you have a view of

9     hypothetically what the value of that would be, if you knew

10    at the petition date, no chance?

11              THE WITNESS:  Yeah, I think, the reality is, I

12    think in almost all circumstances, I would see the value as

13    being zero, Your Honor.

14              THE COURT:  So, you know, there are Chapter 11

15    debtors whose stock continues to trade over the over the

16    counter market, for example, at a petition date but it's a

17    guess or expectation that this debtor may reorganize and

18    equity will have some value, unknown at that time.  Okay.

19    Do you agree with that or -- I mean, it's a speculation, an

20    estimate whether you think this debtor can reorganize and

21    that there will be some equity now.

22              THE WITNESS:  Yes.  Yes.

23              THE COURT:  What about the situation with

24    something like the CEL token?

25              THE WITNESS:  Well, you know, utility tokens can

1    take any shape or form and there are -- it's really just up

2    to your imagination what they can be used for.  In this case

3    with the Celsius platform gone, I mean, the -- a utility

4    token like this really has no real function outside of

5    Celsius.  You know, as to whether or not this token could

6    have a function in, like, a restructured entity that emerges

7    from the restructuring, I mean, I can imagine hypothetically

8    scenarios where it does, but I'm at that point, sort of

9    grasping at straws.

10            THE COURT:  Okay.

11            THE WITNESS:  Yeah.

12   BY MR. WEEDMAN:

13   Q    And Mr. Galka, in coming to your conclusion that the

14   value of the CEL token would be de minimis at the petition

15   date, did you look at any historical pricing data?

16   A    Yes, I did.

17   Q    And do you have a view as to whether or not any

18   historical pricing data has any indicative value in coming

19   to a valuation of the CEL token at the time of the petition?

20   A    Well, I think there's a little bit you can infer from

21   the market pricing history.  At the time of the pause, the

22   price was around 35 1/2.  I think that's the last time the

23   market price really has any -- carries any information

24   regarding the intrinsic value, because after that, the

25   market became dislocated.  That being said, I think that is

Page 40

1   an upper bound even at the time of the pause and certainly

2   at the time of the petition, a significant upper bound.  IN

3   that month period between the pause and the petition, there

4   was a lot of news that came out.  None of it, as I recall,

5   was positive.  So, in my opinion, yeah, the 35 1/2

6   represents some sort of upper bound on what the price was at

7   the time of petition, but I think that that's an extremely

8   high upper bound and that more likely the prices -- the

9   value, excuse me, was something closer to zero.

10  Q    And Mr. Galka, the price at the time of the pause, do

11  you think that that's indicative of the price at the time of

12  the petition?

13  A    No.

14  Q    And why is that?

15  A    Well, because in that month that it passed, all the

16  information, all the news that came out about Celsius was --

17  I don't mean to make a absolute statement, but predominantly

18  negative.  So, if 35 1/2 represented an upper bound on the

19  intrinsic value at the time of the pause, then that is

20  certainly an upper bound at the time of the petition.  I

21  would expect the value to be substantially lower.

22  Q    And Mr. Galka, do you understand that the testimony set

23  forth in your declaration which is Exhibit UCC 229, Docket

24  3659 is being offered as your direct testimony under oath in

25  Court today?

Page 41

1    A    Yes, I do.

2              MR. WEEDMAN:  Your Honor, we would offer into

3    evidence UCC Exhibit 229, Docket No. 3659 into evidence.

4              THE COURT:   Any objections?  All right, it's

5    admitted into evidence.

6              (UCC Exhibit 229 Admitted Into Evidence)

7    BY MR. WEEDMAN:

8    Q    Mr. Galka, one final question.  We just heard some

9    reference to utility tokens.  Can you describe what you

10   understand the utility token to be?

11   A    Yes.  A utility token is a token that has some kind of

12   function within the platform for which it was designed.  So

13   for example, on Celsius, I believe that the CEL token could

14   be used to make interest payments on loans that you had

15   taken out and you get some kind of discounted interest rate

16   if you pay with CEL.

17        Conversely, if you have your assets sitting there and

18   earning interest, you can elect to earn the interest in CEL

19   and get a boosted rate.  And I believe depending on the

20   amount of CEL that you held on the platform, it unlocked

21   various features within the website.  So a utility token has

22   a function within the ecosystem for which it was designed,

23   but outside of that, it's just a ledger of transactions.

24   Q    And in your opinion, is there any way to put any

25   quantification to the value of a utility token?

Page 42

1   A    Hard to say, in the general sense, because utility

2   tokens can be anything we want them to be.  But generally

3   speaking, no.  I am not familiar with any methodology for

4   valuing utility token.

5            MR. WEEDMAN:  Thank you, Mr. Galka  I pass the

6   witness, Your Honor.

7            THE COURT:  All right, thank you.  Anybody in the

8   courtroom wish to cross examine?

9            MR. KIRSANOV:  Dimitry Kirsanov, pro se --

10            THE COURT:  Just a second.  Is there anyone in the

11   courtroom who wishes to cross examine?  All right.  Mr.

12   Kirsanov, on Zoom.

13            MR. KIRSANOV:  Thank you, Your Honor.

14                 CROSS EXAMINATION OF MAX GALKA

15   BY MR. KIRSANOV:

16   Q    Good morning, Mr. Galka.

17   A    Good morning, Mr. Kirsanov.

18   Q    You've never been employed by a competitor of Celsius,

19   have you?

20   A    No.

21   Q    You haven't invested in any competitor of Celsius, have

22   you?

23   A    No, I have not.

24   Q    You've never been involved with FTX or Alameda

25   Research, is that correct?

Page 43

1    A    Well, Alameda Research participated in a fundraising

2    round of ours in our Series A fundraising, so if -- to the

3    extent being involved with includes that, then yes.

4    Q    What is your opinion of the price of CEL token on

5    bankruptcy day?

6               MR. WEEDMAN:  Objection.

7               THE COURT: Sustained.

8    BY MR. KIRSANOV:

9    Q    So the deciding -- I'm sorry.  So the decision

10   regarding the price of CEL token on bankruptcy day is your

11   own assessment?

12              MR. WEEDMAN:  Objection.

13              THE COURT:  Let me ask you.  You're asking for his

14   opinion on the value of the CEL token as of the petition

15   date; is that correct, Mr. Kirsanov?

16              MR. KIRSANOV:  That's correct.

17              THE COURT:  All right.  Are you able to answer

18   that?

19              THE WITNESS:  Sorry.  Could you repeat the

20   question, please, Mr. Kirsanov?

21   BY MR. KIRSANOV:

22   Q    So the decision regarding the price of CEL token on

23   bankruptcy day is your own assessment?

24              THE COURT:  Let me ask this.  Do you have an

25   opinion about the value of the CEL token at the petition

Page 44

1    date?

2             THE WITNESS:  Yes.  I would say that it is de

3    minimis, very close to zero, but I do not have a number that

4    I can put on it.

5    BY MR. KIRSANOV:

6    Q    Do you not have an exact, precise opinion for the

7    bankruptcy day evaluation?  Correct?

8    A    Well, I have a precise opinion.  I do not have a

9    precise number, if that's your question.

10   Q    Mr. Galka, you did not extensively study the Celsius

11   wallet structure, did you?

12   A    Yes, I did, as a matter of fact.

13   Q    You did?  Okay.  You were not provided with information

14   about Celsius that regular creditors couldn't access, were

15   you?

16             MR. McCARRICK:  Object to form.

17             THE COURT:  Sustained.

18   BY MR. KIRSANOV:

19   Q    You have no knowledge of any technical issues related

20   to Celsius wallets, do you?

21   A    Could you be more specific, please?

22   Q    Were there any technical issues that you were aware of

23   with Celsius wallets?

24   A    Could you please be more specific what you mean by

25   technical issues?

Page 45

1    Q    Any technical issues with Celsius wallets.

2              MR. McCARRICK:  Objection.

3              THE COURT:  Sustained.  You're going to have to

4    make your questions more specific and clear.

5              MR. KIRSANOV:  Yes, Your Honor.

6    BY MR. KIRSANOV:

7    Q    Were you aware of any technical issues related to

8    Celsius custody wallets?

9              THE COURT:   What do you mean by technical issues,

10   Mr. Kirsanov?

11             MR. KIRSANOV:  I'd like to actually put in Exhibit

12   4 and if I may request permission for the witness to have a

13   copy.

14             MR. WEEDMAN:  Your Honor, we would object.  We

15   haven't received any exhibits.

16             THE COURT:  Mr. Kirsanov, did you post exhibits

17   last night?

18             MR. KIRSANOV:  Yes, I did.

19             THE COURT:  Okay.  Does somebody have them?

20             MR. McCARRICK:  Yeah, I think -- the Debtors have

21   a copy, Your Honor.  Give us a second.

22             THE COURT:  Okay.  I got Mr. Davis' list of

23   exhibits, but I did not see Mr. Kirsanov's.  But Mr.

24   Kirsanov, if you'll hold on, one of the Debtors' counsel is

25   going to hand the exhibit to the witness.

1           MR. KIRSANOV:  I appreciate that.  Thank you.

2           THE COURT:  All right.  Go ahead, Mr. Kirsanov.  I

3    think the witness has it.  I have a copy of it and so do

4    other counsel.

5    BY MR. KIRSANOV:

6    Q    Mr. Galka, does this appear to be the Celsius app?

7    A    Bear with me just one moment, please, Mr. Kirsanov.

8           THE COURT:  Which are -- you're referring to

9    Exhibit 4 in your little packet?

10          MR. KIRSANOV:  Correct.  Yes, sir.

11          THE COURT:  Yeah, that's labeled, "Example of

12   inability to transfer funds ahead of freeze April 19, 2022."

13   That's the date on it.  It's Page 3 of 6 of ECF 3694.

14   BY MR. KIRSANOV:

15   A    Okay, I have it in front of me, Mr. Kirsanov.   Would

16   you mind repeating your question?

17   Q    Absolutely.  Does this appear to be the Celsius app?

18   A    Yes, it does.

19   Q    Does this appear to be a Celsius transfer?

20          MR. WEEDMAN:  Objection, Your Honor.  I think this

21   is outside of the scope of anything that this witness --

22          THE COURT:  Overruled.

23   BY MR. KIRSANOV:

24   A    Well, it appears to be a pending transfer.  It says you

25   will transfer.  So, yes, it seems like a transfer that has

Page 47

1    not yet been effected.

2    Q    Does this appear that the wallet has funding?

3    A    Yeah, from what I can make out, yes, it does look like

4    the wallet does have these --

5    Q    -- why would the wallet show that I am unable to

6    transfer zero funds?

7              MR. McCARRICK:  Objection.  Lacks personal

8    knowledge.

9              THE COURT:  Sustained.

10   BY MR. KIRSANOV:

11   Q    Can you find the orange message at the top?

12             MR. WEEDMAN:  Objection, Your Honor.

13   (indiscernible).

14             THE COURT:  I don't know what the -- what is your

15   question, Mr. Kirsanov?

16             MR. KIRSANOV:  I'm trying to ask if he can define

17   that orange message in the top of the --

18             THE COURT:  -- you can't transfer zero funds?  Is

19   that what you're --

20             MR. KIRSANOV: Correct.

21             THE COURT:  Do you have any idea what that is

22             THE WITNESS:  No, I do not.

23   BY MR. KIRSANOV:

24   Q    I also like you to refer to Exhibit 6 at this point.

25             THE COURT:  Exhibit 6 is Page 5 of 6 of ECF 3694.

1    Go ahead, Mr. Kirsanov.

2    BY MR. KIRSANOV:

3    Q    Okay.  Does this also appear to be the Celsius app?

4    A    Yes, it does.

5    Q    Does this appear to be a Celsius transfer?

6    A    Yes, it looks like a transfer that has -- is pending

7    confirmation.

8    Q    Does this appear -- does -- excuse me.  Does this

9    appear that the wallet has funding?

10   A    Yes, it does.

11   Q    What is the message in orange, error -- the error

12   message contradictory?

13            MR. McCARRICK:  Objection.

14            THE COURT:  Sustained.

15   BY MR. KIRSANOV:

16   Q    There's a clear explanation for why the wallet is

17   showing insufficient funds, isn't there?

18            MR. McCARRICK:  Objection.

19            THE COURT:   Sustained.

20   BY MR. KIRSANOV:

21   Q    Do you have any idea why it indicates the funds are not

22   available, Mr. Galka?

23            MR. WEEDMAN:  Objection, Your Honor.

24            THE COURT:  Overruled.

25   BY MR. KIRSANOV:

1    A    Well, I can read the message.  I see that the amount,

2    it says not enough funds, 100,000 CEL requested and only

3    271,585 cell is available, which of course doesn't make a

4    whole lot of sense.  All that being said, I don't know why

5    this message came up, if that's your question./

6              MR. KIRSANOV:  Your Honor, could I enter these

7    exhibits into evidence?

8              MR. McCARRICK:  Objection.

9              THE COURT:  Sustained.  There's no foundation for

10   these documents having been laid.

11   BY MR. KIRSANOV:

12   Q    When was the Custody wallet created?

13             MR. WEEDMAN:  Objection, Your Honor.

14             THE COURT:  Overruled.  You can answer if you

15   know.

16   BY MR. KIRSANOV:

17   A    I don't know.

18   Q    Based on your written testimony, you indicated it was

19   created in April of 2022; it this information accurate?

20   A    Yeah, if it's in my written testimony, then yes, that

21   is accurate.

22             THE COURT:  May I ask you, Mr. Kirsanov, what

23   paragraph of his written testimony are you referring to?

24             MR. KIRSANOV:  I do not have that exactly offhand,

25   but it was in his written testimony.

Page 50

 1              THE COURT:  Was it in the original testimony or

 2    this, the more recent supplemental declaration?

 3              MR. KIRSANOV:  I believe -- I'm not sure about

 4    that, Your Honor.

 5              MR. COLODNY:  Your Honor, it's on Paragraph 61

 6    (inaudible).

 7              THE COURT:  Of the original?

 8              MR. COLODNY:  The original.

 9              THE COURT:  Just give me a minute.

10              MR. COLODNY:  (indiscernible).

11              THE COURT:  Yes.  Do you have your original report

12    in front of you, Paragraph 61?

13              THE WITNESS:  Yes, I do.  It's on Page 12.  Go

14    ahead with your questions, Mr. Kirsanov.

15    BY MR. KIRSANOV:

16    Q    Are you familiar with the Blonstein declaration, Mr.

17    Galka?

18    A    No, I am not.

19              MR. KIRSANOV:  Can Mr. Galka please be provided my

20    Exhibit 2?

21              THE COURT:  Mr. Kirsanov --

22              CLERK:  Yeah, we could ask --

23              THE COURT:  If you'll wait, we'll see if we can

24    find it.  You reference it on the first page of your filing,

25    Page 1 of 6.  Exhibit 2 is ECF 1531, but we don't have all

Page 51

1    of these in the courtroom.  Someone is trying to see whether

2    they can locate it.

3              MR. McCARRICK:  Can we make Mr. Young a cohost?

4              THE COURT:  Yes, you can.

5              CLERK:  Just pull it up --

6              MR. McCARRICK:  And Mr. Young, if you could --

7              CLERK:  (indiscernible).

8              MR. McCARRICK:  Thank you.

9              THE COURT:  Deanna, you can make Mr. Young a

10   cohost.  We'll put it up on the screen.

11             CLERK:  Okay.

12             THE COURT:  Thank you very much.

13             CLERK:  Just one moment.

14             MR. KIRSANOV:  Thank you.

15             CLERK:  Okay, he is a cohost.

16             MR. McCARRICK:  Okay.  Mr. Young, could you

17   display Docket No. 1531?

18             MR. YOUNG:  1531?

19             MR. McCARRICK:  Yes, sir.

20             MR. YOUNG:  -- second.

21             THE COURT:  Sure.  Fine.

22             MR. McCARRICK:  Apologies for the delay.  It

23   should be shared on screen now.

24             MR. KIRSANOV:  Thank you.

25             THE COURT:  All right, so on the screen in the

Page 52

1  courtroom, I don't know whether you can see it or not, is

2  exhibit -- the Blonstein declaration, ECF 1531.

3          MR. KIRSANOV:  If you could scroll down to Page 8,

4  please.

5  BY MR. KIRSANOV:

6  Q   Mr. Galka, is this document dated June 6th of 2022?

7  A   Yeah, that that's the date that I see at the top of the

8  chart right there.

9  Q   Was this before Celsius froze?

10  A   Yes, it is.

11  Q   In this document, are there adequate amounts of CEL

12  token under assets to meet the liabilities of Custody and

13  Withhold?

14          MR. WEEDMAN:  Objection.

15          THE COURT:  Sustained.

16  BY MR. KIRSANOV:

17  Q   In this document, there are not an adequate number of

18  CEL tokens under assets to meet the liabilities of Custody

19  and the Withhold, are there?

20          MR. WEEDMAN:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. KIRSANOV:

23  Q   Mr. Galka, how many CEL are shown there under assets?

24  A   The number that I see there is -- appears to be

25  1,184,948.  Although I would say that this is a document

1    that I have not seen before, so I'm just reading what is --

2    what I see appearing on the screen.

3    Q    Thank you, Mr. Galka.  Could you tell me what it says

4    under liabilities for CEL and under Withhold for CEL?

5    A    Yeah, liabilities I see negative one million, nine

6    hundred -- or excuse me, ninety-seven thousand, one, seven,

7    four, and Withhold, I see 402,804.

8    Q    Mr. Galka, does -- do the assets reflect lower than

9    the liabilities?

10            MR. WEEDMAN:  Objection, Your Honor.

11            THE COURT:  Sustained.

12   BY MR. KIRSANOV:

13   Q    Mr. Galka, would it be safe to say the liabilities are

14   1.5 million or thereabouts?

15            MR. WEEDMAN:  Objection, Your Honor.

16            THE COURT:  Sustained.  I don't -- you know, I

17   don't understand what you're asking.

18            MR. KIRSANOV:  I'm trying to ask if effectively

19   the assets held were less than the liabilities.

20            MR. WEEDMAN:  Your Honor --

21            THE COURT:  First off, this document is not in

22   evidence.  That's number one.  I'm permitting you to cross

23   examine from it.  Have you seen this document before?

24            THE WITNESS:  No, I have not, Your Honor.

25            THE COURT:  Let's move on.  The document is not in

Page 54

1    evidence.  The witness has not seen it before.  I've permit

2    you to cross examine from this document, but it's not in

3    evidence.

4              MR. KIRSANOV:  Can I submit it into evidence?

5              THE COURT:  No.  You can't.  Let's move along.

6              MR. KIRSANOV:  All right, I'm going to move along.

7    BY MR. KIRSANOV:

8    Q    Mr. Galka, CEL token did not have a price after

9    bankruptcy, did it?

10   A    Well, it did have a market price, yes, and it does to

11   this day.

12   Q    Okay.  CEL token is not actively traded today, is it?

13   A    Yes.  In fact, I believe it is to some degree.

14   Q    The price of CEL token one after bankruptcy was not --

15   A    Sorry, Mr. Kirsanov, did you have a question?

16   Q    Yes.  What was the price of CEL token one month after

17   bankruptcy?

18   A    Oh, I don't have that number off the top of my head.

19   Q    Was there a price of CEL token on December 20th, 2022?

20             MR. WEEDMAN:  Objection, Your Honor.

21             THE COURT:  Sustained.

22   BY MR. KIRSANOV:

23   Q    What is the price of sale today?

24   A    I don't know the price of it.  I think last I checked

25   it was something in the ballpark of maybe 10 cents, but I --

Page 55

1   Q    Thank you, Mr. Galka.  I -- you answered the question.

2   Did the price of CEL token exceed $1 after the bankruptcy

3   day?

4   A    Yes, I believe it did.

5   Q    Did the price of CEL token exceed $2?

6   A    Yes, I believe it did.

7   Q    Did it exceed $3?

8   A    It may have.  I don't recall what it reached at a peak,

9   but I do recall it being above $2.  It may have gone higher

10  than that.

11  Q    Did it surprise you that the CEL token rose in price

12  following bankruptcy?

13  A    Well, I would say yes to the extent that had you asked

14  me to speculate ahead of time whether the price would go up

15  or go down, I certainly would have chosen down.  That being

16  said, in a dislocated market like this --

17  Q    Mr. Galka, thank you.

18          THE COURT:  Don't interrupt the witness when he's

19  answering.  Did you finish your answer?

20          THE WITNESS:  Just to finish out the last piece,

21  in a dislocated market like that, much like the GameStop

22  stock, very crazy things can happen.  So it was not all

23  altogether shocking to see the price go up after bankruptcy.

24  BY MR. KIRSANOV:

25  Q    Thank you, Mr. Galka.  Would it be important to

1   determine the price of an asset following a bankruptcy?

2   A    I'm sorry.  What's the question, Mr. Kirsanov?

3   Q    Would it be important to determine the price of an

4   asset following a bankruptcy?

5           MR. WEEDMAN:  Objection, Your Honor.

6           THE COURT:  Overruled.

7   BY MR. KIRSANOV:

8   A    Is it important.  I don't feel that I'm qualified to

9   answer whether -- the importance of determining the price.

10  Q    Well, Mr. Galka, if there's a bankruptcy and you have

11  an asset, you do want to determine the price of that asset;

12  is that correct?

13  A    Well, it's my understanding that the Court wishes to

14  know the value of the asset, not necessarily the market

15  price.

16  Q    Would it be important to determine the price of that

17  asset a month after bankruptcy?

18  A    I don't know, Mr. Kirsanov.

19  Q    Do you have an analysis on the price of CEL post-

20  bankruptcy?

21  A    Do I have an analysis?  I've seen the price of it post-

22  bankruptcy.  I don't recall any explicit analyses.

23  Q    Does your pricing opinion apply on the price of CEL

24  token after the bankruptcy filing day?

25          MR. McCARRICK:  Objection.

Page 57

1           THE COURT:  Sustained.  He doesn't give an opinion

2     about the price.  Any more questions, Mr. Kirsanov?

3           MR. KIRSANOV:  Yes, sir.

4           THE COURT:  Let's move along.

5     BY MR. KIRSANOV:

6     Q    You were not aware that the proposed Chapter 11 plan

7     has the CEL token settlement at 25 cents, were you?

8     A    I have heard that number mentioned but I'm not familiar

9     with the details.

10    Q    You were not aware that the CEL Custody token deposit

11    claims are excluded in the CEL token settlement, were you?

12    A    No, I do not believe so.

13    Q    You are not aware that the Custody CEL tokens found in

14    the Custody program have been ruled on to be owned by the

15    creditor, were you?

16           MR. KIRSANOV:  Exhibit 3, please?  May I request

17    permission for the witness to see that?

18           THE COURT:  All right, Mr. Kirsanov, what he's

19    described as Exhibit 3 is Page 2 of 6 of ECF Docket No.

20    3694.  It's "CEL token price since bankruptcy, trading

21    view," is what it's labeled.

22    BY MR. KIRSANOV:

23    Q    Mr. Galka, are you familiar with a chart such as this?

24    A    Yes, this looks like a candlestick chart.

25    Q    Would you consider the crypto market volatile?

1    A    Sure.  Compared to traditional financial markets, yes,

2    absolutely.

3    Q    You answered my next question.  Thank you.  Was the CEL

4    token volatile prior to the freeze date?

5    A    Compared to traditional financial assets, yes.

6    Q    Was the CEL token volatile -- excuse me.  Was the CEL

7    token volatile prior to the bankruptcy date?

8    A    Was it volatile?  Well, if we're comparing to

9    traditional financial markets such as the S&P500 or the

10   market for government treasuries, I would say --

11   Q    Respectfully --

12              THE COURT:  Don't interrupt, Mr. Kirsanov.  He

13   hadn't finished his answer.

14   BY MR. KIRSANOV:

15   A    Yeah, I would say that that all cryptocurrencies are

16   volatile, if that's the measure.

17   Q    Was the CEL token volatile a month after bankruptcy?

18   A    Yes.

19   Q    Does the CEL token continue to be volatile?

20   A    Over what time horizon?

21   Q    Since bankruptcy day.

22   A    I can't say.  I can say that it was volatile in the

23   period shortly after the petition date, but I have not

24   examined the volatility in the entire period since then.

25   Q    In this exhibit, does the CEL token appear to be over

Page 59

1    $5 after the bankruptcy filing?

2    A    Yeah, it looks like one of the intraday prices did

3    exceed $5, yes.

4    Q    This would suggest a higher intrinsic value than the

5    bankruptcy filing value of 81 cents, correct?

6              MR. McCARRICK:  Objection.  It's not in evidence.

7              THE COURT:  Sustained.

8    BY MR. KIRSANOV:

9    Q    You stated that you assist others in finding market

10   opportunities; is that accurate?

11   A    Yeah, that's correct.

12   Q    For a CEL token holder, not on Celsius at the date of

13   bankruptcy, this would have presented a selling opportunity,

14   wouldn't it?

15             MR. McCARRICK:  Objection.

16             THE COURT:  Sustained.

17   BY MR. KIRSANOV:

18   Q    Did you make an assessment to determine if I had

19   financially participated in the short squeeze?

20   A    I'm sorry.  Could you repeat that one, please?

21   Q    Did you make an assessment to determine if I had

22   financially participated in the short squeeze?

23   A    You in particular, Mr. Kirsanov?

24   Q    Correct.

25   A    No, not to my knowledge.

Page 60

1                MR. KIRSANOV:  Your Honor, may I enter any of

2     these into evidence?

3                MR. McCARRICK:  Objection.

4                THE COURT:  Sustained --

5                MR. McCARRICK:  No --

6                THE COURT:  There's no foundation.

7                MR. KIRSANOV:  Okay.  Thank you for your testimony

8     today, Mr. Galka.  Your Honor, I have no further questions.

9     Thank you.

10                THE COURT:  Thank you, Mr. Kirsanov.  Anybody else

11     wish to cross examine?

12                MR. DAVIS:  Yes, Your Honor.

13                THE COURT:  Mr. Davis.

14                MR. DAVIS:  Thank you, Judge.

15     BY MR. DAVIS:

16     Q    Good morning, Mr. Galka.

17     A    Good morning, Mr. Davis.

18     Q    Would you say that when preparing your expert report,

19     it was created and submitted in a professional manner, free

20     of any bias, undue influence, or undisclosed conflicts?

21     A    Yes, I would.

22     Q    Are you sure about that, as you are about all of the

23     conclusions and statements you made in your report to date,

24     meaning both your expert report and your supplemental

25     declaration?

Page 61

1               MR. McCARRICK: Objection.

2               MR. WEEDMAN:  Objection.

3               THE COURT:  Sustained.

4    BY MR. DAVIS:

5    Q    You have stated prior here today about Alameda Research

6    invested in your company.  How much was that investment?

7    A    I don't recall the dollar figure.  It was less than 1

8    percent of the company at the time.  We were raising our

9    Series A which was about a $12 million fundraise.  They put

10   in about $200,000.  To date, we've raised about close to $27

11   million, so it's a fairly small portion of the investment.

12   I said $200,000; I don't know that that's necessarily the

13   exact number, but something in that ballpark.

14   Q    Could it have been $500,000?

15   A    No, it was not $500,000.

16   Q    Okay.  Did you disclose the Alameda Research

17   relationship to the examiner and the UCC before you were

18   engaged?

19   A    Yes.  Yeah, this was disclosed in a document, I believe

20   the document was filed in October, but this was disclosed

21   prior to that.

22   Q    Are you aware of Alameda Research's relationship with

23   FTX?

24   A    Well, I'm aware that the two organizations have a very

25   close relationship.  I don't know specifically what that

Page 62

1   relationship is, whether one is the parent and the child or

2   -- but yes, I'm aware that they are closely affiliated.

3   Q    Do you know that Sam Bankman-Fried owns both entities?

4   A    I don't know the ownership structure of those two

5   entities.

6   Q    Seeing that Alameda Research gave you capital

7   investment, does Alameda Research have any influence,

8   control, or input in how you operate your company or conduct

9   your research?

10  A    No.

11  Q    Have you ever had any communications with Sam Bankman-

12  Fried in the two years?

13  A    No. I've never had any communications with Sam Bankman-

14  Fried.

15  Q    How much stock options or debt instruments in your

16  company does Alameda Research or FTX possess?

17  A    Zero.

18  Q    Are there any board members or officers of your company

19  that were selected or appointed by Alameda Research or FTX?

20  A    No.

21  Q    Did you know of a company called Cherokee Acquisitions?

22  A    Yes.

23  Q    Are you aware that Cherokee Acquisitions has been

24  involved in buying and selling Celsius (indiscernible) at

25  significant discount, 20 to 30 cents on the dollar since

Page 63

1    August 2022?

2    A    No --

3              MR. McCARRICK:   Objection.

4    BY MR. DAVIS:

5    Q    Does your company or your company's board of directors

6    have any relationship with Cherokee Acquisitions?

7    A    Well, I -- if we're talking about organizational

8    structure, I'm not sure.   The owner of Cherokee Acquisitions

9    was an investor in our -- one of our early rounds.   So, yes,

10   there is a relationship but I don't know if it's, the entity

11   that participated was Cherokee or if it was just him in his

12   personal capacity, as I sit here.

13   Q    You know an individual by the name of Vladimir

14   Jelisavcic?

15   A    Yes.

16   Q    J-E-L-I-S-A-V-C-I-C, for the record.

17   A    Yes.   Yes.

18   Q    Is Vladimir Jelisavcic an investor, shareholder, or

19   board member of Elementus

20   A    Yeah, he was one of our early investors.

21   Q    So he's on your board?

22   A    No, he's not on our board.

23   Q    Was he ever on your board?

24   A    Yes.   I believe it was early on for a short while.

25   Q    What time period?

Page 64

1   A    I don't recall, as I sit here.  He participated in our

2   friends and family round, which was a very small early round

3   that we had raised before we had built the product, which I

4   believe was back in, I think --

5   Q    -- a year?

6   A    I'm sorry?

7            THE COURT:  Can you tell him the year?

8   BY MR. DAVIS:

9   Q    Can you give us a timeframe.  Year.

10  A    The year was 2018 when we closed that round.  I don't

11  recall --

12  Q    So --

13           THE COURT:  Mr. Davis, allow the witness to answer

14  questions before you ask your next question.

15           MR. DAVIS:  Sorry, Judge.

16           THE COURT:  Mr. Galka, had you finished your

17  answer?

18  BY MR. DAVIS:

19  A    I'm sorry, could you repeat the question again, Mr.

20  Davis?

21  Q    Is mister -- what time period was Vladimir Jelisavcic

22  on your board?

23  A    I really don't recall.  It was -- yeah, I really don't

24  recall.  It was 2018, was when we closed that round.  I

25  don't recall the board movements.

Page 65

1    Q    -- fall, summer, spring of 2018?

2    A    I believe it was spring of 2018 was when we closed that

3    fundraising round and when we formed the company, so that

4    would have been around the time that he joined the board.  I

5    don't recall.  The makeup of the board had shifted several

6    times after that.  It's been several years since he has been

7    on the board; although, don't recall the exact date.

8    Q    Was he the founder of Cherokee?

9    A    Was he the founder of Cherokee?  Yes, I --

10   Q    Correct.

11   A    -- believe so.

12   Q    Did you or Elementus purposely create a false and

13   overly negative representation of Celsius' bankruptcy

14   situation to encourage creditors to sell their Celsius claim

15   to Cherokee Acquisitions at deflated prices to Vladimir

16   Jelisavcic as a board member and apparently have a financial

17   interest?

18               MR. McCARRICK:  Objection.

19               THE COURT:  Sustained.  Mr. Davis, if you want to

20   ask --

21               MR. DAVIS:  Understood, Your Honor.

22               THE COURT:  -- questions, they better be

23   appropriate and not compound.

24               MR. DAVIS:  I'll move on.

25               THE COURT:  Do you have any more questions?

Page 66

```
 1                 MR. DAVIS:  Yes, I do.

 2    BY MR. DAVIS:

 3    Q    Are you familiar with Shoba Pillay?

 4    A    I'm sorry, who?

 5                 THE COURT: Shoba Pillay.

 6    BY MR. DAVIS:

 7    A    No.

 8    Q    The examiner.

 9                 THE COURT: She was the examiner in Celsius.

10                 THE WITNESS:  Yeah, I --

11                 THE COURT:  -- partner at Jenner and Block --

12                 THE WITNESS:  Okay.  Okay.  The name didn't ring a

13    bell, but yes, I understand now who she is.

14    BY MR. DAVIS:

15    Q    Did you provide information to Shoba Pillay for the

16    examiner's final report?

17    A    Yes, I believe we did.

18    Q    Does the information you provided in the examiner

19    report match the information you provided both in the Max

20    Galka expert report and the Max Galka supplemental

21    declaration?

22    A    I would assume so, although I have not reviewed it

23    recently to check.  I don't know what has changed in that

24    time, so I can't say that definitively.

25    Q    Mr. Galka, can lien tokens have value?
```

Page 67

1   A    Lien tokens.  Yeah, I would say so.

2   Q    Can they have significant value?

3   A    Yes, sure.  There are examples where they can have

4   significant value.

5   Q    Do you know the value of Dogecoin?  For example, the

6   market cap of Dogecoin, which is entirely a new coin, do you

7   know what the market cap of Dogecoin is, which has zero

8   utility?

9   A    No, not offhand.  I know I'm fully fairly familiar with

10  Dogecoin. That one is a very popular one in this ecosystem.

11  Elon Musk has tweeted about it several times.  I know that

12  the value is quite substantial.

13  Q    Does 8.5 billion -- does 8.5 billion market cap sound

14  about what it is today?

15           MR. WEEDMAN:  Objection.

16           THE COURT:  Sustained.

17  BY MR. DAVIS:

18  Q    Mr. Galka, can you describe what action would someone

19  have needed to take in order to short CEL token on FTX?

20           MR. McCARRICK:  Objection.

21           MR. WEEDMAN:  Objection.

22           THE COURT:  Sustained.

23  BY MR. DAVIS:

24  Q    With your expert trading background, are you familiar

25  with how short selling an asset can lower the market price

Page 68

1    value of a particular asset?

2    A    Yes.

3    Q    In your investigations and analysis for the expert

4    report, did you or are you aware about the moment of the

5    pause on June 12th, 2022 the amount of open short positions

6    against CEL token on FTX exploded from 8 million short

7    positions to over 20 million short positions?

8              MR. McCARRICK:  Objection.

9              THE COURT:  Sustained.

10   BY MR. DAVIS:

11   Q    Are you aware that --

12             THE COURT:  You're not -- Mr. Davis.  You can't

13   testify now.  If you want to ask questions, you can ask

14   questions.

15             MR. DAVIS:  Sure.

16   BY MR. DAVIS:

17   Q    Mr. Galka, can you turn to -- can you please turn to

18   and read from Page 47 of your report, No. 156?

19             THE COURT:  I'm sorry, which page, Mr. Davis?

20             MR. DAVIS:  Forty-seven, Your Honor.  Item No.

21   156.

22             MR. McCARRICK:  I think that's the docket where

23   the --

24   BY MR. DAVIS:

25   Q    Yeah, 47 of 83.

Page 69

1   A    So this would be numbered Page 409?

2   Q    It's the docket number, yes, numbered Page 40.

3   A    Yeah.  Okay.

4              THE COURT:  Go ahead.  Ask your question.

5   BY MR. DAVIS:

6   Q    Mr. Galka, in your explanation of a short squeeze, you

7   say it is a condition that triggers rapidly rising prices

8   when a coin or a token has a significant number of short

9   sellers, meaning it's being heavily shorted and lots of

10  investors are betting it will go down.  Can you tell us what

11  happens when those short sellers are wrong and the price

12  begins to rise?

13  A    I'm sorry.  Could you repeat the question, please?

14  Q    Mr. Galka, in your explanation of a short squeeze, you

15  say it is a condition that triggers a rapidly rising prices

16  when a coin or token has a significant number of short

17  sellers.

18             THE COURT:  It actually says, "in a stock or other

19  tradeable security."  So if you're going --

20             MR. DAVIS:  I mean --

21             THE COURT:  -- from his report, read it

22  accurately.

23             MR. DAVIS:  Sure.

24  BY MR. DAVIS:

25  Q    Mr. Galka, in your explanation of a short squeeze, you

1    say a short squeeze is a condition that triggers rapidly

2    rising prices in a stock or other tradable security.

3    A    Yes.

4    Q    Can you tell us what happens when those short sellers

5    are wrong and the price begins to rise?

6    A    What happens in a typical short squeeze?

7    Q    Correct.

8    A    Well, I think a lot of different things can happen.  So

9    we're talking hypotheticals here.  But if we're kind of

10   talking about the prototypical short squeeze such as

11   GameStop, what would happen as the price begins to rise is

12   that people with a short position need to post margin

13   because to cover the liability of the position that's moving

14   against them.

15        At some point, people run out of money to be able to

16   post margins, so they're forced to go into the market to buy

17   the asset back and cover their short, which drives the price

18   up and creates more pressure for the additional people that

19   have the open short positions.  You quite commonly will see

20   other market participants come in, deliberately trying to

21   push the price up, seeing an opportunity to profit by

22   squeezing out these shorts and the price can go up extremely

23   high in some cases.

24   Q    Thank you.  In order to short an asset, do you borrow

25   that asset from an exchange?

Page 71

1   A    Well, yeah.  Typically when you're shorting an asset,

2   you are borrowing it from somebody who owns the asset and in

3   exchange, you are giving them some sort of collateral,

4   usually cash.  And then you sell that asset into the market

5   and later you buy it back, hopefully at a lower price.

6   Q    What happens when you sell the asset into the market?

7           MR. McCARRICK:  Objection.

8   MR. DAVIS:

9   Q    Does the price go down?

10          THE COURT:  If you can answer it, go ahead.

11  BY MR. DAVIS:

12  A    It could.

13          THE COURT:  Mr. Davis --

14  BY MR. DAVIS:

15  Q    -- then you buy back that asset?

16          THE COURT:  Mr. Davis, I'm giving you another ten

17  minutes and then --

18          MR. DAVIS:  Okay.

19          THE COURT:  -- your examination is over.

20          MR. DAVIS:  Okay.

21          THE COURT:  Go ahead.

22  BY MR. DAVIS:

23  Q    Would you agree that the term funding rate in this

24  context refers to the amount of money it costs to keep a

25  leverage trading position open?

Page 72

1            MR. WEEDMAN:  Objection.

2            THE COURT:  Sustained.

3            MR. DAVIS:  One second, Your Honor.

4    BY MR. DAVIS:

5    Q    Did you and your team receive the discovery from

6    FTX.org, the product of a subpoena that was issued by this

7    Court?

8    A    Yes, we did receive the -- a series of documents

9    produced from FTX.  Yes.

10   Q    One (audio glitch), Mr. Galka.  Mr. Galka, please turn

11   to Page 72 of your expert report titled, "Analysis of

12   Company CEL purchases, data versus rewards, and other

13   transactions."

14   A    Mr. Davis, this is numbered Page 64?  Is that right?

15   Q    Yes, Page 72 of your report.

16           MR. WEEDMAN:  -- 72 on --

17           THE COURT:  Yes.

18           THE WITNESS:  Yeah.  Okay.

19           THE COURT:  Page 64 of the numbered page, the

20   bottom of the page.

21           MR. WEEDMAN:  Thank you, Your Honor.

22   BY MR. DAVIS:

23   A    Okay, Mr. Davis, I have it open.

24   Q    Mr. Galka, on Page 72 of your report, it indicates that

25   during the period January 2020 to April 2021, the company

Page 73

1    was a net seller of about 23 million CEL tokens, meaning the

2    company sold 23 million more CEL tokens than it purchased.

3    Is that correct?

4              MR. WEEDMAN:  Objection.

5              THE COURT:  Sustained.

6    BY MR. DAVIS:

7    Q    Please turn to page 19 of your report.

8              THE COURT:  Which page number are you using, at

9    the top or the bottom?

10             MR. DAVIS:  The top.

11   BY MR. DAVIS:

12   A    Okay.  I have it open.

13   Q    Are you aware that during the same exact period from

14   January 2020 to April 2021 where your report shows on Page

15   19 Figure 3 that CEL token rose in price from 15 cents to

16   over $6?

17             MR. WEEDMAN:  Objection.

18             THE COURT:  Overruled.

19   BY MR. DAVIS:

20   A    Yes, I -- that -- I don't see the price at its lowest

21   point, but yeah, it goes from something that's -- looks like

22   a matter of cents up to what appears to be in the ballpark

23   of $8.

24   Q    Do you have any explanation for how the price of CEL

25   token could rise from -- by over 4,000 percent from the

1    period of January 2020 to April 2021, in a period where

2    Celsius was selling an additional 23 million CEL tokens?

3             MR. WEEDMAN:  Objection, Your Honor.

4             THE COURT:  Sustained.

5    BY MR. DAVIS:

6    Q    Mr. Galka, additionally, can you confirm that your

7    report shows on Page 72 between May 2021 to July 2022, the

8    company purchased a net 25 million XSL (audio glitch)?

9             MR. WEEDMAN:  Objection, Your Honor.

10            THE COURT:  Overruled.  He's referring to Page 72

11   of 83.  There's a column for company buybacks.  If you're

12   able to answer the question, go ahead.

13   BY MR. DAVIS:

14   A    Yeah, I'm sorry, what was the question, Mr. Davis?

15   Q    Can you confirm that your report shows on Page 72

16   between May 2021 through July 2022, the company purchased a

17   net 25 million excess CEL tokens?

18   A    So this is Page 72, numbered at the top?

19   Q    72 of 83, correct.

20   A    Yeah, and I'm sorry, could you repeat the question

21   again?  The number you mentioned, I didn't see here.

22            THE COURT:  It doesn't show --

23            MR. DAVIS:  (indiscernible).

24            THE COURT:  -- and it requires the map.

25            MR. DAVIS:  It's his expert report, Judge.  I

Page 75

```
 1   thought he was --

 2              THE COURT:  Mr. Davis -- are you able to answer

 3   the question, Mr. Galka?

 4              MR. GALKA:  I didn't follow the question, Your

 5   Honor.

 6              THE COURT:  He wants to know -- what's the date

 7   range you're asking about?  Mr. Davis, what date range are

 8   you asking about their purchase?

 9              MR. DAVIS:  Oh, I'm sorry, May 2021 to July 2022.

10              THE WITNESS:  Okay.  And your question is?

11              THE COURT:  He wants to know how many they -- how

12   many they repurchased, the company bought back during that

13   period, May '21 to July '22.

14              THE WITNESS:  Yeah, I see the numbers here.  I'm

15   not so good at arithmetic to be able to sum those up in my

16   head.

17              THE COURT:  Ask your next question, Mr. Davis.

18   BY MR. DAVIS:

19   Q    Mr. Galka, in your opinion, do changes in the price of

20   major assets like Bitcoin and Ethereum affect smaller assets

21   like CEL token?

22              THE COURT:  You're going to have to ask your

23   questions more slowly, Mr. Davis.  I have a hard time

24   following.

25              MR. DAVIS:  Sure.  Sorry.
```

Page 76

1    BY MR. DAVIS:

2    Q    Mr. Galka, in your opinion, do changes in the price of

3    major assets like Bitcoin and Ethereum affect smaller assets

4    like CEL token?

5    A    Yes, certainly there's some correlation between them.

6    Yes.

7    Q    Do you take into consideration the price movements of

8    major assets like Bitcoin and Ethereum and how they may

9    affect smaller assets like CEL token?

10   A    No, not directly.

11   Q    Mr. Galka, you said the market became dislocated at the

12   time of the pause and that a lot of volatility occurred

13   between the pause and the petition date.

14   A    Yes, that's right.

15   Q    Isn't it true that crypto markets are extremely

16   volatile?

17   A    Sure, relative to traditional financial markets, yeah,

18   absolutely.

19   Q    What's the volume of CEL token on June 11th, 2022, the

20   day before the pause?

21   A    Sorry.  Could you repeat the question please, Mr.

22   Davis?

23   Q    What was the volume of CEL token on June 11th, 2022,

24   the day before the pause?

25   A    I don't number -- don't know that number off the top of

1    my head.

2    Q    What was the volume of CEL token on the date of the

3    pause?

4    A    I don't know the volume numbers off the top of my head,

5    Mr. Davis.

6    Q    Okay.  Is it correct that your report indicates at the

7    bottom of Page 72 that Celsius' net CEL token position was

8    only 1.8 million CEL tokens or 0.28 percent of the total 693

9    million CEL token supply from January 2020 to July 2022?

10   A    Pardon, I'm not following.

11            THE COURT:  I don't see that in the chart.  Is

12   there some place that you're pointing to on the chart, Mr.

13   Davis?

14            MR. DAVIS:  Yes, Your Honor.  Bottom right, 1.886.

15            THE COURT:  What's your question?

16   BY MR. DAVIS:

17   Q    Is it correct that your report indicates at the bottom

18   of Page 72 that Celsius' net CEL token position was only 1.8

19   million CEL tokens or 0.2 percent of the total 693 million

20   CEL token supply from January 2020 to July 2022?

21   A    No, I would say that the net position was substantially

22   larger than that.

23   Q    Why do you have this 1.8 million number on your

24   document?

25   A    I'm sorry, I don't understand the question, Mr. Davis.

1    Are you wondering about --

2    Q    What does -- on the bottom right of Page 72, what does

3    this 1.8 million number represent?

4    A    That represents the difference between the company

5    buybacks minus the interest and the net OTC.

6    Q    Is it your testimony that Celsius manipulated the

7    entire CEL token market by purchasing a net 1.8 million CEL

8    tokens, as reflected on the bottom right of your -- of Page

9    72 on your report?

10   A    I'm sorry, can you -- could you repeat the question,

11   please?

12   Q    It is their testimony that Celsius manipulated the

13   entire CEL token market by purchasing a net 1.8 million CEL

14   tokens?

15   A    No --

16   Q    Over the 31-month period of January 2020 to July 2022.

17   A    No.  No, I would say that -- well, manipulation, I

18   don't know the legal definition of manipulation, so I would

19   rather not use that term as part of my testimony.

20   Q    I'm --

21            THE COURT:  -- Mr. Davis, do not interrupt.

22   BY MR. DAVIS:

23   A    The -- my first opinion was with respect to Celsius'

24   buying activity and how it affected the market price.  I

25   would say that out of all the different opinions that I've

1    put here that one is really kind of the, just really the

2    backdrop because at the time of the pause, the market became

3    dislocated what.  What I intended to demonstrate was that

4    the price of CEL token was never really a reliable indicator

5    of its underlying value.  That being said, the arguments and

6    all the other opinions with respect to the price on the

7    petition date really does not depend on that first opinion.

8                THE COURT:  Thank you, Mr. Davis.  Your time is

9    up.

10               MR. DAVIS:  Your Honor --

11               THE COURT:  -- take a recess --

12               MR. DAVIS:  -- few more questions.

13               THE COURT:  -- until 11:15.  We'll resume at

14   11:15.  If there's anybody else on Zoom who wishes to

15   examine, I will recognize you then.

16               MR. WEEDMAN:  Your Honor, could you instruct Mr.

17   Galka --

18               THE COURT:  Yeah, don't talk to anybody --

19               THE WITNESS:  Okay.

20               THE COURT:  -- about your testimony.

21               THE WITNESS:  Okay, Your Honor.  Yeah.

22               (Recess)

23               CLERK:  All rise.

24               AUTOMATED VOICE:  Recording in progress.

25               THE COURT:  Please be seated.  All right.  We're

1    back on the record and Mr. Galka, you're still under oath.

2              THE WITNESS:  Okay.

3              THE COURT:  Does anybody else wish to cross

4    examine Mr. Galka?

5              MR. ABREU:  Yes, Artur Abreu, pro se creditor.

6              THE COURT:  Mr. Abreu, go ahead.

7    BY MR. ABREU:

8    Q    Good morning, Mr. Galka.

9    A    Good morning, Mr. Abreu.

10   Q    In your declaration, you said you have 15 years of

11   experience, which includes trading complex derivatives at

12   Credit Suisse, Deutsche Bank, and nine years of experience

13   trading financial instruments.  This is correct?

14   A    Yes.  Yes, that's correct.

15   Q    You also found the Elementus (indiscernible) company

16   that specializes in reading blockchain data?

17   A    Yes, that's correct.

18   Q    Is it fair for me to conclude that you have a

19   significant or are comfortable speaking, even if just in a

20   broader sense, about concepts of cryptocurrency derivatives,

21   in the case of derivatives from crypto exchanges?

22   A    Conceptually, sure.  I can't speak to the specifics,

23   derivatives that various exchanges had or how the mechanics

24   work, but conceptually, certainly, yeah.

25   Q    We have an understanding of perpetual products provided

Page 81

1    by most (indiscernible)?

2             MR. McCARRICK:  Objection.  I couldn't understand.

3             THE COURT:  Could you just ask that again, slowly?

4    I had trouble understanding.

5    BY MR. ABREU:

6    Q    Do you have understanding of perpetual projects which

7    is a derivative provided by crypto exchanges, by most crypto

8    exchanges?

9    A    Perpetual swaps?  Is that what you're referring to?

10   Q    Perpetual products which includes perpetuals positions

11   there are -- that don't have a closing date.

12            THE COURT:  Mr. Abreu, I'm having difficulty

13   understanding what you're asking.

14            MR. ABREU:  Yeah.  Okay, I will give -- can I give

15   the context of my question?

16            THE COURT:  Sure, go ahead.

17            MR. ABREU:  So my question is that there was

18   significant positions on the derivative sites of CEL token

19   which influenced the price.  And I'm just trying to

20   understand --

21            THE COURT:  Let me ask, do you agree with that

22   much of the question, that trading derivatives with CEL

23   token influenced the price.

24            THE WITNESS:  I --

25            THE COURT:  -- that was the question.

Page 82

1   BY MR. ABREU:

2   A    Yeah, I -- it would not be surprising if it did.  I

3   would not say conclusively that it did.  I don't know that

4   it did, but it's certainly possible.

5   Q    Did you -- so let me go back to your declaration.

6              MR. ABREU:  I'm going to refer, Judge, by the

7   document page, so the PDF number.

8              THE COURT:  Okay.

9              MR. ABREU:  Which, give me just one moment to --

10              THE COURT:  Sure.

11              MR. ABREU:  -- look at mine as well. S

12   BY MR. ABREU:

13   Q    So on Page 25 of your expert report --

14              THE COURT:  Are you talking about the supplemental

15   expert report?

16              MR. ABREU:  No, no, no.  The expert report, not

17   the supplemental.  Docket No. 3580.

18   BY MR. ABREU:

19   Q    So an eight -- in the eight-point analysis of data from

20   FTX --

21   A    Okay.  Yes, I have it open.

22   Q    Okay.  So under the eight, analysis of data from FTX.

23   on the sub-point which is 90, I understand that certain

24   creditors and other parties in these cases have indicated

25   that there were significant short positions open on FTX

Page 83

1    exchange in the picture from before the pause to after the

2    petition date.  The FTX Debtors also produced information

3    showing borrowing positions on the FTX exchange from May

4    2022 to the petition date, as well information with respect

5    to the accounts that placed those short positions.

6              THE COURT:  Okay --

7    BY MR. ABREU:

8    Q    -- which are discussed in further detail in this

9    report.  Where in this report --

10             THE COURT:  Just stop for a second.

11             MR. ABREU:  Sorry.

12             THE COURT:  You had a lot of information that's

13   not in evidence, and I want to see whether Mr. Galka -- do

14   you know the information that Mr. Abreu is referring to?

15             THE WITNESS:  Yeah, so I'm looking at No. 90 and

16   I'm hearing you read out what's there at No. 90 about the

17   short position opened on FTX.  Yes, that I'm familiar with.

18             THE COURT:  Okay.

19             THE WITNESS:  And that the FTX Debtors, they

20   produced information with respect to borrow positions on the

21   exchange.  I'm familiar with that information as well.

22             THE COURT:  Go ahead, Mr. Abreu.

23   BY MR. ABREU:

24   Q    Yeah, but in this point, you say, "which are discussed

25   further in detail in this report."  What are you referring

1    that is in detail in this report?

2    A    As I sit here, I don't recall where it's discussed in

3    further detail.  I'm looking just to -- scanning through the

4    pages.  I see it mentioned here in 97 --

5              THE COURT:  What 97?

6              THE WITNESS:  But I --

7              THE COURT:  Paragraph No. 97?

8              THE WITNESS:  Yes, Paragraph No. 97, just right on

9    the next page.  In short, I don't know all the specific

10   places where it's referred to in the report.

11   BY MR. ABREU:

12   Q    At no point in this report do you provide any data that

13   was subpoenaed by FTX relating to the short positions,

14   correct?

15   A    That sounds correct, yes.

16   Q    Why not?

17   A    Why -- I don't have an answer for that one.

18   Q    But didn't you just say that you're going to report in

19   detail in this document, but you did not provide such

20   detailed information?

21   A    Well, the last clause of Paragraph 9 says, "which are

22   discussed further in further detail in this report."  So I -

23   - there are other places in the report where this is

24   discussed in more detail, but your question was about the

25   underlying data which does not appear in the report.

1    Q    So you're basically saying that you do not provide any

2    detail, correct?

3    A    No, I'm saying that I do not believe that the

4    underlying full data is in the report, but there is -- it's

5    discussed in further detail, as it's mentioned here.

6    Q    Is it fair to say that you should have mentioned that

7    because you do report about the price (indiscernible) CEL

8    but never produced the short information that you got that

9    data from?  Would be a fair assessment that you should have

10   provided?

11   A    I'm sorry, could you repeat the question, please, Mr.

12   Abreu?

13   Q    Will it be a fair assessment that if you are mentioning

14   the price of CEL or at least showing the charged positions

15   and that you -- that you have that data from subpoena,

16   shouldn't been inserted here on this document?  I said it --

17   go ahead.  Go ahead.

18   A    Your question is about whether the raw data should have

19   been included in the document?  I --

20   Q    Yes.

21   A    -- can't answer that one.  I don't know.

22   Q    Because you just replied to me that the derivatives or

23   the perpetuals do have an impact in price, but you do not

24   provide any information about that, correct?

25            MR. WEEDMAN:  Objection, Your Honor.  Think that

Page 86

1    misstates his prior testimony.

2             THE COURT:  He can answer the question.

3    BY MR. ABREU:

4    A    Yeah.  What you're referring to right now is the

5    underlying data that we received from FTX and that we

6    examined for the opinion written here.  That underlying

7    data, the full data set, I do not believe is in the report.

8    What the clause that you referenced here says is that --

9             THE COURT:  Where are you reading from?

10            THE WITNESS:  This is Paragraph 90 at the very

11   end, the last --

12   BY MR. ABREU:

13   Q    Are the -- Paragraph 90?

14   A    Yes.

15            THE COURT:  Go ahead.

16   BY MR. ABREU:

17   A    Which was the one I believe that you were referring to,

18   where it ends --

19   Q    Okay.

20   A    -- by saying, "as well as information with respect to

21   the accounts that placed those short positions which are

22   discussed in further detail in the report."  Nowhere in

23   there does it say --

24   Q    So --

25   A    -- anything about providing the full underlying data

1    that we examined.

2    Q    Okay, so where is the information respective to these

3    accounts?

4           MR. WEEDMAN:  Objection, Your Honor.   Asked and

5    answered.

6           THE COURT:  Sustained.

7           MR. ABREU:  Okay.  Can you -- Mr. Otis put an

8    exhibit, one of letters to the Court.  It's Docket 2882.

9    Could the Court provide this to Mr. Galka?

10           THE COURT:  One of the counsel is bringing that up

11    now, Mr. Abreu, so you just have to wait for a minute.

12    Okay?

13           MR. ABREU:  Of course.  Thank you.  Thank you.

14           THE WITNESS:   Thank you.

15           THE COURT:  All right, so a copy of ECF 2882 has

16    been provided to the witness and to me, and I believe other

17    counsel have it as well.  Go ahead, Mr. Abreu.

18    BY MR. ABREU:

19    Q    Could you go to Page 10 of the PDF?

20           THE COURT:  Ten of 37?

21           MR. ABREU:  Exactly.

22    BY MR. ABREU:

23    A    Okay, I have it open here.

24    Q    So this is the data that I took from FTX.  They

25    provided also short position data before they went bankrupt.

Page 88

1    The data that you received a subpoena, can you confirm if

2    this data here which is also from FTX, I do make some

3    treatments on Excel, but can you speak to the general

4    understanding and what you recollect from the data that you

5    got from FTX, if those charts which have a time stamp, which

6    is (indiscernible) time, if you recall seeing, for example,

7    the reported landing of CEL which can be perceived as the

8    short condition?  Can you recall these values or with that

9    data that you received?

10                MR. WEEDMAN:  Objection, Your Honor.

11                THE COURT:  Let me ask you first.  Have you seen

12   before now the data that's on Page 10 of 37 of ECF 2882?

13                THE WITNESS:  Well, it appears to show the short

14   position --

15                THE COURT:  What I want to -- have you seen it

16   before?

17                THE WITNESS:  No, I have not.

18   BY MR. ABREU:

19   Q    You have not?

20   A    This particular table, no.  I have not seen it before.

21   Q    I'm not referring to a particular table, but the values

22   on the table.

23                THE COURT:  I'm not going to have him interpreting

24   a document he hasn't seen before.

25                MR. ABREU:  Is, just the values, that they should

1    match those that he received from the subpoena, so should be

2    straightforward.

3                 MR. McCARRICK:  Objection.

4                 MR. WEEDMAN:  Objection, Your Honor.

5                 THE COURT:  Sustained.

6                 MR. ABREU:  Okay, can you move to the Page 9 of 37

7    of the same documents.

8                 THE COURT:  Nine of 37.

9                 MR. ABREU:  Yes.

10   BY MR. ABREU:

11   Q    So this first picture shows the funding rights of

12   perpetuals.  Can you see it, Mr. Galka?

13   A    Yes, I can.

14   Q    Do you see the -- on June 11th, the funding rate of FTX

15   -- and you can correct me if this is wrong -- was as

16   reported by, I believe it's CoinGecko -- sorry.  If you look

17   on the Page 8, I took the link where it is coming from.

18   It's from CoinGlass.  And this refers to the funding rate of

19   the derivatives between 20 -- 31 of May to July 12th.  So

20   but I didn't make a question.  Mr. Galka, do you see that

21   funding, that negative 1.77?

22                MR. WEEDMAN:  Objection, Your Honor.

23                MR. McCARRICK:  Object to foundation.

24                THE COURT:  Sustained.  Have you seen this chart

25   before?

1           THE WITNESS:  No, I have not, Your Honor.

2    BY MR. ABREU:

3    Q    From the data that you got subpoenaed from FTX,

4    (indiscernible) to the funding right from the derivatives

5    products?

6    A    You're asking me to recall the -- all the different

7    columns and -- that we received in the data from FTX?

8    Offhand I --

9    Q    Yes --

10   A    I don't recall.

11   Q    Around this date, so we're talking June 11.  So this is

12   before the pause.

13           THE COURT:  Mr. Abreu --

14   BY MR. ABREU:

15   Q    Do you recall --

16           THE COURT:  Mr. Abreu.

17           MR. ABREU:  Yes.

18           THE COURT:  You can't use -- if he hasn't seen it

19   and it's not in evidence, I don't know where these charts

20   came from or what it is, so I'm sustaining the objection to

21   the questions about it.  It may be that -- well, I don't

22   know what it is.

23           MR. ABREU:  The picture, it's on the previous

24   page, it shows the source.

25           THE COURT:  That is not getting it into evidence.

Page 91

1    Your statement about it is not the foundation that's

2    required in order to introduce this into evidence.

3              MR. ABREU:  Thank you.  Thank you, Your Honor.  So

4    I will rephrase it.

5    BY MR. ABREU:

6    Q    Mr. Galka, did you ever spotted any unusual funding

7    rates on the perpetuals or derivatives from FTX, from your

8    data that you requested that were open and were affecting

9    the price before the pause, so before June 13th?

10   A    Sorry, can you repeat the question one more time,

11   please?

12   Q    From the data that you received from FTX, did you

13   receive data pertaining to the derivatives that they -- that

14   they had on the products of sale which you say that

15   influence also the price or could influence the price?

16   A    Yes.  We looked at data regarding the derivatives, if

17   that's your question.

18   Q    Was there an unusual short and negative funding right,

19   which means that there is an imbalance towards the short

20   side before the pause?

21   A    Well, I'll -- speaking generally, we examined this data

22   very, very closely and we did not identify anything unusual

23   in the data.

24   Q    So in your report, you talk between the June 13 until

25   the petition date.  Let me just go back to one of your

Page 92

1    pictures.  So back to Mr. Galka's expert reports.  On Page

2    22 of the PDF, did you see the Figure 6 of Page 22 of Mr.

3    Galka expert report.

4              THE COURT:  Is this the supplemental report?

5              MR. ABREU:  No, no.  Every time that I refer to

6    the expert report, I'm referring to the first one and not

7    the supplement.

8              THE COURT:  I have it open I see on Page 22 Figure

9    9, customer employee --

10             MR. WEEDMAN:  Your Honor, sorry, it's Tab 3, if

11   you look at 22 of 83 at the top.

12             THE COURT:  All right.

13             MR. ABREU:  Okay, it's Figure 6.

14             THE COURT:  Okay.  I'm there.  Go ahead.

15             THE WITNESS:  Yeah.

16             THE COURT:  Ask your question.

17   BY MR. ABREU:

18   Q    So, Mr. Galka, you start by mentioning or showing here

19   the candles, which is the price starting on June 13,

20   correct?

21   A    Yes, that's correct.

22   Q    But as you (indiscernible) stated, the price of

23   perpetuals can have a significant impact on the price, yet

24   you do not put some extra days before there's this timeline.

25   Is there a reason for this?

Page 93

1    A    I'm sorry, could you repeat -- please repeat the

2    question, Mr. Abreu?

3    Q    Why haven't you added some days before June 13 on this

4    chart, as you understand when you are dealing with market

5    moving events, as you refer, there usually information that

6    gets leaked.  The company can stop making communications.

7    They can (indiscernible) can sell their assets and this

8    usually has already an effect on the price.  All right?

9    Isn't that a fair assessment?

10            MR. McCARRICK:  Objection.

11            THE COURT:  Sustained.  Let me ask you this, Mr.

12   Galka.

13            THE WITNESS:  Yes, Your Honor.

14            THE COURT:  Why didn't you include in Figure 6 on

15   Page 22 of 83 any date for the period before June 13th,

16   2022?

17            THE WITNESS:  Sure.  Well, what this chart is

18   really supposed to show is the dislocation of the market.

19   So it was at the time of the pause that the dislocation

20   really began, and this chart this chart with these

21   candlesticks demonstrates just the extreme volatility that

22   the price took between those two periods.

23            THE COURT:  Did you examine volatility for a

24   period -- for some period before June 13th, 2022?

25            THE WITNESS:  Yes, we did examine that, yes.

Page 94

1          THE COURT:  And what, if any, conclusions did you

2     draw -- over what period did you look at, and what, if any,

3     conclusions did you draw?

4          THE WITNESS:  I believe we looked all the way back

5     to the beginning of 2022, possibly a bit further back.  The

6     volatility until very close to the pause date was fairly in

7     line with other crypto assets.  There is a chart elsewhere

8     in this opinion that shows the volatility over time compared

9     to Bitcoin and Ethereum.  In the period leading up to the

10    pause, that was when rumors were already starting to

11    circulate regarding the potential insolvency of Celsius, so

12    I would say that -- if we're being technical, I would say

13    that the market started to be come dislocated shortly before

14    the pause.  It was really at the pause was when the

15    dislocation became extremely exacerbated, but as I recall,

16    it was maybe a week or two before that market was showing

17    signs of dislocation.

18          MR. ABREU:  Judge, can I say that --

19          THE COURT:  Ask the question, Mr. Abreu.  Ask your

20    next question.

21    BY MR. ABREU:

22    Q    What data do you -- do you provide on this report that

23    shows that before June 13th the price was not dislocated?

24          THE COURT:  That's not what he just said.

25          MR. ABREU:  It's a question, because he said --

1            THE COURT:  Do you have anything in your report

2     showing what, if any, volatility there was prior to June

3     13th, 2022?

4            THE WITNESS:  Yes.  Allow me to just thumb through

5     here and find the chart that speaks to this.

6     BY MR. ABREU:

7     A    So, Mr. Abreu, if you flip to Page 44 of 83, or the

8     numbered page 37 -- at the top, you see --

9     Q    Page 44 of the PDF?  Okay, I'm there.

10    A    Yes.  Yep, so Figure 12 at the top of the PDF shows the

11    volatility of daily price appreciation in CEL increased

12    post-pause.  So, you'll see three charts in there.  There is

13    a chart showing Bitcoin and what its daily volatility looks

14    like, and it's a -- on the same scale, it's fairly constant

15    across the timeline.  Same with Ether.  And CEL also looks

16    very similar until you get until around sometime what

17    appears to be early to mid-May, and you can see there that

18    the fluctuations start to grow.

19    Q    So, you're referring that there is dislocation between

20    before -- the price you previously stated before, right?

21    And you can see on this, on your graphic -- so, on June 1

22    until July 1, it's very difficult to understand or to

23    correlate here what you're referring to, because it's very

24    important to understand if there was already price

25    dislocation before what you stated, because --

1          THE COURT:  You're going to have to leave your

2     editorial comments out.  You can ask questions, but you're

3     not testifying.

4          MR. ABREU:  Of course, Your Honor.  I'm sorry.

5     Q    Do you believe on this table it's easy to understand if

6     there was CEL price dislocation before June 13th?

7     A    Well, so, in my opinion, if there was dislocation

8     prior to that, that would really only add -- bolster the

9     opinion that I'm making here that the market prices were not

10    reliable as any kind of indicator of the intrinsic value.

11    So, as far as when the dislocation officially began, I don't

12    see that as being relevant to any of my opinions.  If you

13    look at the chart, just to finish what it is we're looking

14    at here, the red line that goes vertical in the CEL, that

15    was the date of the pause and you can see very clearly just

16    eyeballing it how the volatility went to very extreme levels

17    shortly after the pause.

18    Q    So, volatility means that it can go up and down,

19    right?  It can go to a very large number and a very low

20    number.

21    A    Yes.

22    Q    But --

23    A    Yes.

24    Q    The question -- let me rephrase it.  So, in the table

25    that you showed previously -- the graph.  Let me go back to

1    it.  You start on June 13, but that doesn't show the

2    previous price, which can influence the interpretation or

3    the overall picture of the dislocation.  Because if you see

4    the price was maybe near 81 cents, it went down to your 35

5    cents that you (indiscernible) the two.  That'd be a fair

6    value -- fair market value at the time.

7              MR. WEEDMAN:  Objection.

8              MR. ABREU:  And then --

9              THE COURT:  Sustained.

10             MR. ABREU:  Apologies.

11   BY MR. ABREU:

12   Q    The graph that you showed does not show the previous

13   days, which I think is important to paint a picture.

14             MR. WEEDMAN:  Objection.

15             THE COURT:  Sustained.  Mr. Abreu, just ask

16   questions.

17   BY MR. ABREU:

18   Q    Okay.  Let's go to your report again, Page 19 of the

19   PDF.  On the Figure 3, do you see this table -- this graph

20   which shows the CEL price, correct?

21   A    Yes.

22   Q    You (indiscernible) let me state this is the CEL price

23   performance, so you basically are taking the first price it

24   was traded, then you put the chart and you put those

25   (indiscernible) and create this chart, correct?  It's purely

1    based on the price.

2    A    Yes, this is a time series of the CEL token price.

3    Q    Why didn't you compare with similar tokens like VGX?

4    Because out of context, this doesn't say much --

5              MR. WEEDMAN:  Objection.

6              THE COURT:  Sustained.  Why didn't you compare --

7              MR. ABREU:  Why does --

8              THE COURT:  Why didn't you compare it to other CEL

9    tokens -- other tokens, not only CEL?

10             MR. ABREU:  Judge, can I just say --

11             THE COURT:  Stop, Mr. Abreu.  I asked the

12    question.

13             MR. ABREU:  Yes, sir.

14             THE COURT:  I'd like an answer.

15             THE WITNESS:  On this one?  Well, Your Honor, this

16    chart was provided just for context to give a picture of

17    what the CEL price -- the token price looked like over time.

18    I don't believe this chart itself was meant to articulate

19    any kind of specific argument.

20             THE COURT:  Thank you.  I would ask you to look at

21    Pages 44 of 83.  We just looked at 45 of 83 and 46 of 83.

22    We looked -- you explained your chart for CEL on Page 44.

23             THE WITNESS:  Mm-hm.

24             THE COURT:  Your chart on Page 45 deals with

25    trading volume.  Does that -- and I see the spike in May in

Page 99

1    trading volume.

2                THE WITNESS:  Mm-hm.

3                THE COURT:  And what, if any -- what conclusions

4    do you draw from the spikes in trading volume?

5                THE WITNESS:  Oh, sure.  I can explain this in

6    more detail, Your Honor.  When a market becomes dislocated,

7    there are certain hallmarks that are almost always the case.

8    One is that you will see extreme volatility -- GameStop --

9    you would see the same.  So, this was -- that's what's

10   illustrated by the data in Figure 12, and there we compared

11   it to Bitcoin and Ethereum, just as a point of reference

12   that the amount of volatility that's taken place here, even

13   in the context of cryptocurrency, was quite extreme.  So,

14   just eyeballing that, you can see that something was going

15   on funny around the time of the pause and afterward.

16               The trading volume -- typically, during a market

17   dislocation, the trading volume could increase or it could

18   decrease, but usually you will see some sort of change

19   because the market starts operating in a different manner.

20   GameStop, the volume went up enormously and that was the

21   case here, was that at around the time of the pause, the

22   volume -- daily trading volume of CEL token increased

23   enormously from the period before, and in the last chart,

24   what we're looking at is the bid ask spread.

25               THE COURT:  Which is on Page 46 of 83.

1          THE WITNESS:  Yes, thank you, Your Honor.  That's

2     right.  So, Figure 14.  What this shows is a third indicator

3     examining the period leading up to the pause, and the period

4     afterward.  Bid ask spread is a measure of the liquidity of

5     an asset.  So, that's the difference between where the

6     market is going to buy it versus where the market is willing

7     to sell it.  So, in a dislocated market where there's a lot

8     of information asymmetry and people don't really know where

9     to -- you know, where the market really is, you will

10    typically see a widening of the bid offer spreads.  People

11    are nervous and are scared, and liquidity decreases

12    substantially, which is consistent with what you see here.

13         THE COURT:  Thank you.  Go ahead, Mr. Abreu.

14    BY MR. ABREU:

15    Q    So, Mr. Galka, in this chart that you just referred,

16    the trading volume of CEL token pre and post pause -- which

17    volume are you referring to?  Is it the spot, includes

18    perpetuals, just perpetuals?  What type of volume are you

19    referring to here?

20    A    This was the trading volume on FTX, which was the

21    trading venue that had the largest amount of volume.

22    Q    That was not my question.  My question -- is this

23    volume referring to spot CEL, which is the real underlying

24    asset, or was it referring to the perpetuals process, which

25    is a derivative which you said can influence the price?

1   A    It's referring to the spot trading volume on FTX.

2   Q    Do you know if the perpetuals volumes usually exceed

3   the volume of the underlying spot?

4   A    I don't know, Mr. Abreu.

5   Q    Do you know if there were millions in volumes --

6   millions of dollars in volumes traded on the perpetuals side

7   when it comes to CEL token?

8            MR. MCCARRICK:  Objection.

9            THE COURT:  Sustained.

10  BY MR. ABREU:

11  Q     Were you aware of any data that shows that the volume

12  was significant on the perpetuals (indiscernible)?

13  A    No, Mr. Abreu.

14  Q    You are -- you are experienced in derivatives, right?

15  A    Yes, that's right.

16  Q    So, why would you not include any volume about the

17  perpetuals and derivatives when it comes to this volume

18  (indiscernible) of CEL which you just referred to as an

19  (indiscernible) price?

20  A     Well, these three charts, Mr. Abreu, were meant to

21  illustrate in clear graphical format that at the time of the

22  pause, something changed with this market, that this market

23  is no longer trading under normal conditions.  So, these are

24  the three indicators that we selected to make that point.

25  We could have selected a number of other indicators, but in

Page 102

1  my opinion, these three indicators make the point clear

2  enough.

3           THE COURT:  Mr. Abreu, on my watch it's 11:47.

4  I'm giving you another thirteen minutes, until 12:00 noon --

5           MR. ABREU:  Okay.

6           THE COURT:  -- for cross-examination.

7           MR. ABREU:  Roger that.  I will move on.  And let

8  me just -- give me one minute here.

9  BY MR. ABREU:

10  Q    When it came -- when it comes to the market maker of

11  CEL, which was Wintermute, you say that you are not -- let

12  me just go to it.  So, on Page 23 of the PDF, of your expert

13  report, on Point 75, you say, "We analyzed Celsius..." --

14  I'm going to quote.  "We analyzed Celsius's market-making

15  agreement with Winternote and then compared historical

16  spreads of the market-making agreement.  The guidance in

17  this agreement was to maintain 1 percent to 5 percent.

18  Elementus was unable to verify the desired spread -- that

19  desired spread was maintained or enforced during the

20  lifetime of the Wintermute market activities -- market

21  agreement."  Did you receive any data of Wintermute and

22  their market-making agreements?

23  A    Could you repeat the question, please?

24  Q    Did you receive data of Wintermute about their market-

25  making agreement and their bids and -- their bid spreads?

1           MR. WEEDMAN:  Objection.

2           MR. ABREU:  Because you --

3           THE COURT:  Overruled.

4    BY MR. ABREU:

5    A    Well, we received the market-making agreement itself.

6    Is there -- I'm sorry if I don't understand your question,

7    Mr. Abreu.  Is --

8    Q    It says you were unable to verify.  What do you mean by

9    this?  So, was that insufficient?

10   A    Well, we analyzed the agreement and the summary of what

11   we found in there was what's written here, that the guidance

12   in the agreement was to maintain spreads of 1 percent to 5

13   percent as far as the bid offer spread.  We were not able to

14   verify whether those numbers were maintained or not.

15   Q    In your experience, do you -- would it be fair to say

16   that market-makers use -- make heavy use of derivatives in

17   order to maintain a price and fight volatility?  Is that a

18   fair assessment?

19   A    Speaking generically, I would not say that as a general

20   matter, no.  No.

21   Q    Let's say that Wintermute used derivatives in order to

22   fight -- in order to maintain -- to control volatility on

23   CEL.

24   A    I don't know.  I do not see any reason why they would

25   have, but I also don't know that they didn't.

Page 104

1   Q    In your view, do derivatives -- are derivatives

2   important to keep a neutral hedge, meaning that you don't

3   have -- you're not overexposed to a strategy?

4   A    Well, a market-maker like Wintermute, they -- the

5   market-maker agreement, the reason they were out there, was

6   to provide liquidity for participants who wanted to buy or

7   sell the token.  So, if they were making markets in just the

8   token, I do not see off the top of my head any reason why

9   they would trade anything other than the token.  I can

10  imagine some hypothetical scenarios in which they might also

11  be trading the derivatives, but based on my knowledge, I see

12  no reason why they would have, necessarily.

13  Q    It's fair to assume Wintermute being the market-maker,

14  they will have significant volumes when it comes to the

15  trading of CEL.

16  A    The token or derivatives?

17  Q    Both.  You can go -- each one.

18  A    Well, certainly if they were making markets for the

19  token, I would expect them to have substantial trading

20  volume for the token.  I can't speak to trading volume of

21  derivatives.

22  Q    Okay.  Let's go to Page 28 of your expert opinion,

23  Figure 8.  Tell me when you're there.

24  A    Okay, I have it open.

25  Q    So, where it says "Celsius Total Net OTC Transactions"

Page 105

1    with a dollar sign, and this section (indiscernible) says

2    "OTC Sales", does that refer to the OTC desk sales of CEL to

3    potential investors, users, in an OTC desk?

4    A    I'm sorry, can you -- could you please repeat the

5    question?

6    Q    Did the OTC --

7               THE COURT:  Tell me what it is you're

8    communicating in Figure 8 in the column "OTC Sales".

9               THE WITNESS:  Yeah, those were sales of the CEL

10   token in terms of dollar amounts by the OTC desk.

11   BY MR. ABREU:

12   Q    So, is it fair to assume that Celsius received liquid

13   crypto or unstable form -- unstable coin forms of

14   (indiscernible) VTC portions of CEL which netted $351

15   million?  Is that a fair assessment?

16              MR. WEEDMAN:  Objection, Your Honor.

17   (indiscernible)

18              THE COURT:  Overruled.  Can you answer the

19   question?

20   BY MR. ABREU:

21   A    Yeah, could you repeat the question, please, Mr. Abreu?

22   Q    Is it a fair assessment that the OTC desk of Celsius

23   sold in a total amount of sale over $350 million?

24   A    Yes.  The OTC desk sold $351 million of CEL.

25              THE COURT:  In a three-year period.

1          THE WITNESS:  In the three-year period, yes.

2    Thank you, Your Honor.

3    BY MR. ABREU:

4    Q    Is that -- and below, where it says "Celsius Total Net

5    OTC Transactions", that cardinal which refers to the units

6    of sale, the OTC sales is basically what you -- so, both in

7    terms of CEL units, correct?

8    A    Yes, that's correct.

9    Q    Would it be a fair assumption in order to figure out

10   the average costs that OTC users (indiscernible) to Celsius

11   to buy their token -- would it be a fair calculation to get

12   this 351 million and divide by the total units of CEL sold

13   in this three-year period (indiscernible) average cost for a

14   CEL buyer?

15   A    Yes.

16   Q    So, do you know what is the average?

17   A    Well, I (indiscernible) and running some back-of-the-

18   envelope arithmetic, it looks like it's somewhere in the

19   ballpark of between 3.5 and 4 dollars.

20   THE COURT:  Averaged over the three years.

21   A    Yeah, around -- yes, averaged over the three years.

22   Q    Exactly, around 3 -- 73 percent.  Would you, by reading

23   this -- this data, would you say that because of the prices

24   in 2021 there was a large number of (indiscernible)

25   transactions by dollar amount that would increase

1    significantly the average price cost to these OTC buyers?

2    So basically doing 270 divided by 53.

3    A    Your question is whether the average price in 2021 was

4    larger than the average price for the other years?

5    Q    Yes, and it benefited from the increased market cap of

6    BTC.  They were reaching higher prices as well.

7    A    So, could you please restate the question, please?

8    Q    I'm just saying it's a fair assessment that from 2021

9    the CEL purchase price also correlated with the Bitcoin

10   price.  The market was -- the market cap had increased.

11              MR. WEEDMAN:  Objection, Your Honor.

12   (indiscernible)

13              THE COURT:  Overruled.  If you're able to answer

14   it, please do.  If you can't, just tell us.

15   BY MR. ABREU:

16   A    Yeah, I -- pardon me, Mr. Abreu.  I don't understand

17   the question.

18   A    Do you think the CEL price benefited from the

19   appreciation of Bitcoin in 2021?

20   A    Yes, probably.

21   A    Okay.  Just for context, the average cost here is 5.09.

22              THE COURT:  You can't testify, Mr. Abreu.

23              MR. ABREU:  Apologies.  I'll (indiscernible) what

24   I just said.

25   BY MR. ABREU:

1        Q    Does the OTC buys reflect the buybacks from

2    the company on that same table?

3    A    Does it reflect the buybacks from the company?  There

4    is some overlap, but not necessarily.

5    Q    Does this include the interest buybacks or just the OTC

6    purchase by the company?  Does it include the interest --

7    the interest, as I understand, you refer it to the year that

8    CEL -- that Celsius network was provided to users.

9    A    Yes, that's correct.

10   Q    So, the OTC buys here include that -- that

11   (indiscernible) the interest, or it does not?

12   A    No, this is explicitly buys from the OTC desk.

13   Q    So, you -- so, we can conclude that Celsius overall on

14   this graph made 150 -- 160 million by selling CEL.

15   A    No, I would not draw that conclusion, if that's your

16   question.

17   Q    Okay.

18           THE COURT:  You don't know whether these reflect

19   buys and sells by people in the market or whether they're

20   Celsius.  It doesn't show that.

21           THE WITNESS:  No, it does not show that.  This is

22   strictly buys and sells by the OTC desk.  Your question, Mr.

23   Abreu, was with respect to how much money they made, and I

24   would say that the 160 number doesn't represent profit.

25   BY MR. ABREU:

1    Q    Okay, so let me rephrase it.  The value only reflects

2    the net amount from the OTC sales and buys, correct?

3    A    Yes, that's right.

4              THE COURT:  Two more minutes.

5              MR. ABREU:  Okay.

6    BY MR. ABREU:

7    Q    So, in Page 5 of the document, Exhibit 1, did you

8    create this table?

9              THE COURT:  I'm sorry, what page are you referring

10   to?

11             MR. ABREU:  Page 5 of this same document.

12             THE COURT:  Okay.

13             MR. ABREU:  Exhibit 1.

14             THE COURT:  That's fine.

15   BY MR. ABREU:

16   A    Yes, my team and I created this table.  That's correct.

17   Q    You mention seven insiders who have 98 million worth of

18   CEL.  Correct?

19   A    Yes, that's correct.

20   Q    Did you tally other insiders and officers, including

21   former officers and former insiders and their composition of

22   CEL in this calculation or you just did it for the seven

23   insiders?

24   A    Could you please repeat the question, Mr. Abreu?

25   Q    Besides the seven insiders, did you tally other

Page 110

1    insiders or officers and/or former officers and insiders?

2    A    I believe the answer is no.  I believe this is the

3    extent of the insiders that we examined.

4    THE COURT:  Finish up (indiscernible) Mr. Abreu.

5    Q    Did you ever -- yeah.  Did you ever -- the letters

6    mention before that 81 cents will dilute creditors.  Did you

7    calculate the dilution?

8              MR. MCCARRICK:  Objection.

9              THE COURT:  I don't understand your question, Mr.

10   Abreu.

11             MR. ABREU:  I'm going to move to another question.

12             THE COURT:  No, you're not.

13             MR. ABREU:  Did you ever --

14             THE COURT:  Your time is up.  I'll let you ask one

15   more question.

16   BY MR. ABREU:

17   Q    Do you believe there is significant -- there is a

18   significant number of creditors that are employees which

19   receive CEL that are in similar amounts of the seven

20   insiders?

21             MR. MCCARRICK:  Objection, foundation.  He

22   testified he didn't tally it.

23             THE COURT:  Do you know the information about the

24   amount of CEL that other employees other than the seven

25   received?

Page 111

1            THE WITNESS:  I'm not aware.  As far as I know,

2    these are the only insiders that we have this kind of

3    information for.

4            THE COURT:  Thank you very much for your

5    questions, Mr. Abreu.  Is there anybody else who wishes to

6    cross-examine?

7            MR. FRISHBERG:  Yes, Your Honor, I do.  Daniel

8    Frishberg, pro se.

9            THE COURT:  Go ahead, Mr. Frishberg.

10   BY MR. FRISHBERG:

11   Q    I have just literally one question.  Would you say that

12   it is more likely than not that the CEL token had a fair

13   value of zero or close to zero at the (indiscernible) date?

14   A    Yes, I would agree with that.

15           MR. FRISHBERG:  Thank you.  That's all.  Thank

16   you, Judge.

17           THE COURT:  Thank you, Mr. Frishberg.  Anybody

18   else wish to cross-examine?

19           UNKNOWN:  Your Honor, I just have a statement that

20   will take ten seconds.

21           THE COURT:  Nope.  Nope.  Is there anybody else

22   who has not been heard who wishes to cross examine?

23           MR. IOVINE:  Yes, Your Honor.  Jason Iovine, pro

24   se creditor.

25           THE COURT:  Go ahead, Mr. Iovine.

Page 112

1    BY MR. IOVINE:

2    Q    (indiscernible) this witness can answer this question

3    or if he did anything, but was there any calculation done on

4    the distributions if CEL token was at 81 cents?

5    A    Not that I'm aware of, Mr. -- I understand that it

6    certainly impacts how the proceeds are distributed, so I

7    fully appreciate, you know, the importance of this number.

8    For my analysis, I did not look at any of the circumstances

9    with any of the creditors or the distributions.  I

10   restricted my focus on my understanding and interpretation

11   of the data with respect to what the price was at the time

12   of the petition.

13                MR. IOVINE:  Okay, thank you.  That's all I had.

14                THE COURT:  All right, anybody else wish to be

15   heard who wishes to cross-examine?  Any redirect?

16                MR. WEEDMAN:  No, Your Honor.

17                THE COURT:  Any other examination from anyone in

18   the courtroom?  All right, you're excused.  Thank you very

19   much for your testimony.

20                THE WITNESS:  Thank you, Your Honor.

21                THE COURT:  So, are there any other witnesses that

22   we're going to hear from today?

23                MS. BRIER:  Yes, Your Honor.  Debtor defendants

24   call Robert Campagna to the stand.

25                THE COURT:  Okay.  Do you have --

Page 113

1           UNKNOWN:  (indiscernible)

2           THE COURT:  I'm sorry?  Go ahead and call Mr.

3    Campagna.

4           MS. BRIER:  Thank you, Your Honor.

5           UNKNOWN:  (indiscernible)

6           MS. BRIER:  Good afternoon, Your Honor.  Grace

7    Brier, Kirkland & Ellis, on behalf of debtors and we call

8    Mr. Campagna to the stand.

9           THE COURT:  Thank you very much.  If you would

10   raise your right hand.  You'll be sworn, Mr. Campagna.

11          THE WITNESS:  Certainly.

12          CLERK:  Do you solemnly swear or affirm that any

13   testimony you're about to give before this court is the

14   truth (indiscernible)

15          THE WITNESS:  Yes, I do.

16          THE COURT:  Thank you very much.  Please have a

17   seat.  Ms. Brier.

18          MS. BRIER:  May I approach with the exhibit

19   binders?

20          THE COURT:  Absolutely.

21          MS. BRIER:  (indiscernible)

22          THE COURT:  Thank you.

23          THE WITNESS:  Thanks.

24          THE COURT:  Thank you.

25          UNKNOWN:  Is my mic still on?

Page 114

1      THE COURT:  Yes, it is.

2      UNKNOWN:  I don't under --

3      THE COURT:  Please mute yourself.  Ms. Brier, go

4  ahead.

5      MS. BRIER:  Thank you, Your Honor.

6          DIRECT EXAMINATION OF ROBERT CAMPAGNA

7  BY MS. BRIER:

8  Q    Good afternoon.  Could you please reintroduce yourself

9  to the court?

10  A    Yes.  I'm Robert Campagna.  I'm the Managing Director

11  in the restructuring practice of Alvarez & Marsal.

12  Q    And can you give a brief summary of your professional

13  background?

14  A    Sure.  I've been working at Alvarez & Marsal for 20-

15  plus years and in the restructuring space for over 25.

16  Primarily for those 25 years I focused on nothing but

17  helping large debtor side companies through large

18  restructurings, much like this one.

19  Q    Mr. Campagna, are you certified as a restructuring

20  advisor?

21  A    I'm a certified insolvency and restructuring advisor

22  and I'm also -- well, inactive -- I'm a CPA.

23  Q    Now, how did you first become involved in this case,

24  this Celsius restructuring, Chapter 11?

25  A    The debtors reached out in late June of 2022, post-

Page 115

1    pause, looking for financial assistance and assistance, you

2    know, with the severity of the situation they were facing.

3    Q    Can you summarize the type of work that you've done in

4    this restructuring matter?

5    A    Much like in most matters, much of our work is focused

6    on liquidity and cashflow forecasting, cash management,

7    expense reductions, reducing the size of the workforce,

8    extending the runway by cutting costs, and then associated

9    more directly with the restructuring, getting ready for a

10   bankruptcy filing and the recording required in bankruptcy

11   and to get out of bankruptcy.

12   Q    And turning to the matter and the hearing here today,

13   can you explain what work you were asked to do with relation

14   to this hearing specifically?

15   A    Yes.  With respect to the confirmation hearing, I was

16   specifically tasked with looking at the best interests test,

17   performing liquidation analysis, and then certain other

18   matters related to the confirmation of the plan.

19   Q    And did you include the conclusions of the work that

20   you did and the analyses behind it in your declaration that

21   you submitted to the Court?

22   A    I did.

23   Q    That declaration -- if you'd open your binder, please,

24   to Tab 46 and take a look at that.

25   A    Okay.

Page 116

1    Q    If you could please flip to the last page of that

2    document, Page 27, and confirm that that's your signature.

3    A    Yes, that's my electronic signature.

4    Q    And is this a true and accurate copy of the declaration

5    you submitted in this matter?

6    A    It is.

7    Q    Do you adopt this declaration as your testimony here

8    under oath today?

9    A    Yes, I do.

10   Q    Now, now that that's in evidence, I'd like to highlight

11   a couple points from it today live for the court --

12   THE COURT:  Well, it's in evidence if you offer it.

13   Q    Your Honor, thank you for reminding me.  Move to admit

14   Exhibit 46 into evidence, Your Honor.

15        THE COURT:  Any objections?  All right, Exhibit 46

16   is in evidence.

17        (Exhibit 46 Admitted Into Evidence)

18   Q    Thank you.  Now I'd like to highlight a couple points

19   from your testimony before the Court here today, and did you

20   prepare any slides to assist with your testimony?

21   A    We did.  We prepared a demonstrative.

22   Q    We'll flash that up in a second.  Mr. Campagna, can you

23   please turn to Exhibit 7 in your binder, just the first tab

24   there?

25   A    Okay.

1    Q     What is Exhibit 7?

2    A     Exhibit 7 looks to be a copy of the liquidation

3    analysis that was part of the disclosure statement.

4    Q     What was your involvement in that liquidation analysis?

5    A     I led the team that assisted the debtors in preparing

6    this analysis.

7    Q     And Mr. Young, if you could please turn the screen on

8    to Page 2 of the demonstrative exhibits, and Your Honor,

9    we'd mark this as Demonstrative Exhibit 2 for purposes of

10   this hearing.  We filed it on the docket last night.

11              THE COURT:  Thank you.

12   Q     Mr. Campagna, can you explain what this slide is

13   showing us here?

14   A     This is a summary of the distribution waterfall, and it

15   shows a distributable value under the plan scenarios, which

16   are the two left scenarios, which are NewCo, primary path,

17   and if there were a pivot to the orderly winddown path

18   compared to a liquidation analysis, the liquidation analysis

19   that we just referred to in the right column, assuming it

20   converts into Chapter 7.  I would note the two first columns

21   -- NewCo is quite obvious.  That's the NewCo transaction

22   with Fahrenheit.  While named the orderly winddown, Path 2

23   is really a -- still has the company merging with a public

24   mining entity, so lots of effort to go into that.

25   Q     And the numbers in that liquidation column -- what do

Page 118

1    those represent?

2    A    Those are -- it's a summary of numbers found in the

3    liquidation analysis that we just referred to.

4    Q    Now, I don't want to go through every line item, but

5    I'd like to focus on one or two of them, starting with

6    mining.  We heard some testimony about that $565 million

7    number earlier this week.  Can you describe what the

8    difference is between that number and the $424 million in

9    the orderly winddown column?

10   A    Sure.  565 was the midpoint of the center evaluation,

11   which you heard testimony on yesterday, so that simply is

12   the value they assessed -- the going concern value they

13   assessed related to the mining value under the Fahrenheit

14   proposal.  Fahrenheit brings a lot of things to the table.

15   They were our number one choice, our number one bidder, so

16   obviously they present the most valuable solution for the

17   company.

18        Very specifically, if you look at the orderly winddown

19   exhibit, which was also part of the disclosure statement, we

20   highlighted things like $100 million of coupons to purchase

21   rigs in the future, caps on buildout costs of 395,000 per

22   megawatt, perpetual free lease on software that manages the

23   energy usage of the rigs and things like that, so losing

24   Fahrenheit is a -- would be a significant blow to the

25   company, not that some of those things couldn't be replaced,

1    but we have no definitive agreements in place at the moment

2    that equate to something similar.  So, as we move from the

3    NewCo transaction to the public miner/orderly winddown, we

4    assess the 25 percent discount on the value from the center

5    revaluation.

6    Q    Now, we talked about those first two columns.  Let's

7    talk about the last column, that $88 million number.  Can

8    you explain what that number represents?

9    A    Yes.  Specifically with mining, that represents an

10   estimate of what we believe we could sell the fixed assets

11   for, the mining rigs and the mining facilities.  The company

12   has a Midland, Texas mining site which is composed of four

13   separate units in close proximity.

14   Q    And there have been some objections filed regarding the

15   assumptions that you made underlying that $88 million

16   number.  Can you explain some of the assumptions you made

17   underlying that number and how they relate to the orderly

18   winddown?

19   A    Sure.  We looked at an asset-by-asset listing of all

20   the company's rigs by rig type, met with a management team,

21   who has extensive knowledge of what the prices paid for

22   these rigs were, what they could buy them for now.  Has some

23   insights into what they sell for in the used market.  Most

24   of these rigs are one to two years old.  Similar to a three-

25   year-old laptop, they lose their value pretty quickly, and

Page 120

1   the market's flooded with them at the moment.  There's more

2   rigs than there are ability to -- than there are plugs to

3   get these units up and running, which is why, you know,

4   80,000 of the debtor's 120 are up and running today.

5   We also -- Mr. Kielty yesterday also mentioned -- we had

6   looked at sales of rigs early on in these cases and he

7   summarized those yesterday in the range of 350 to 550

8   dollars per rig is where the offers were that we had

9   received, and some of those we had executed upon.  The

10  analysis behind this has an average rig price of about $640.

11  So, higher than the high end of Mr. Kielty's range.

12  Q    I'd like to focus next on the recovery percentage

13  numbers at the bottom there.  Can you explain what those

14  are?

15  A    Yes.  Those are the recovery percentages to -- we would

16  refer to them as the remaining claims classes, but as you

17  get to the middle of this page, it has distributable value

18  and then distributions to certain claims.  Administrative

19  claimants get 100 cents, so we show that -- we show those

20  values that are above the -- sort of what the remaining

21  claims are and the average recovery to the rest of the

22  group.  But at the end of the day, those are the recovery

23  percentages to creditors under each of the three scenarios.

24  So, 67 percent recovery between cryptocurrency and then an

25  asset value of distributable assets in the NewCo plan and

Page 121

1   then in the liquidation, that number is 47 -- that

2   percentage is 47.4 percent recovery.

3   Q    And Mr. Campagna, when you assessed these numbers that

4   we're looking at here, what conclusions did that lead you to

5   reach?

6   A    These conclusions -- these numbers lead me to believe

7   that this meets the best interests test by class as laid out

8   in the plan.

9   Q    And Your Honor, I'd move to admit Exhibit 7, the

10  liquidation analysis that Mr. Campagna (indiscernible)

11         THE COURT:  All right, any objections?  All right,

12  Exhibit 7 -- Celsius Exhibit 7 is admitted into evidence.

13         (Exhibit 7 admitted into evidence)

14  BY MS. BRIER:

15  Q    And Mr. Campagna, if you could turn to the second to

16  last tab in your -- in your binder there and let me know

17  when you're there.

18  A    I'm there.

19  Q    Can you let me know what that is?

20  A    This is the supplemental affidavit or just a

21  declaration that I filed related to confirmation.

22  Q    And Your Honor, for purposes of the record, Debtors

23  have premarked this as Exhibit 70.  Mr. Campagna, can you

24  please turn to the last page of that document?

25  A    Yes.

Page 122

1    Q    Is that your signature there?

2    A    It is my electronic signature, yes.

3    Q    And do you adopt that document under oath as your

4    testimony here today?

5    A    I do.

6    Q    Your Honor, I will move to admit that into evidence

7    this time on my own accord.

8           THE COURT:  Hearing no objections, it's admitted.

9    Q    Thank you, Your Honor.  Mr. Campagna, what is the

10   subject matter of your supplemental declaration?

11   A    The supplemental declaration was in response to

12   questions the Court raised last week, looking at the CEL

13   token group as an individual class.  The CEL token holders

14   in the plan as it's laid out today are in several classes.

15   They're in the one-order group; they're in the earn group;

16   they're in the custody group; they're elsewhere.  So, this

17   was looking at the CEL token group as a group individually.

18   Q    And Mr. Young, if you could please show Demonstrative

19   1, which is contained in Mr. Campagna's declaration that is

20   now Exhibit 70.  Mr. Campagna, can you --

21          THE COURT:  This is the diagram -- Exhibit A on

22   Page 5 and 6?

23          MS. BRIER:  Exactly, Your Honor.  Yes, and we also

24   used a demonstrative exhibit, but it's the exact same thing

25   (indiscernible)

Page 123

1              THE COURT:  It's in evidence.

2              (Exhibit A admitted into evidence)

3              MS. BRIER:  Thank you, Your Honor.

4    BY MS. BRIER:

5    Q    Mr. Campagna, can you at high level explain what this

6    is showing?

7    A    Sure.  This shows the recovery value to CEL token

8    holders in dollars under the plan, under the two scenarios

9    of the plan, and under the liquidation analysis.  For the

10   liquidation analysis, which is the red dotted line, it shows

11   what CEL token creditors would receive under a increasing

12   level of assessed value of the -- or assessed price of the

13   CEL token.  For the plan classes or for the two plan

14   scenarios, the dark blue line represents the NewCo line.

15   It's fixed, 25 cent price.  It's probably -- looks like

16   about $44 million of recovery value.  And then the orderly

17   winddown plan, it's the lighter blue line, horizontal --

18   roughly $41 million of recovery.  And you can see where the

19   red line intersects those two lines; that's where the best

20   interests test would exactly be met, where the creditors --

21   under the plan for the 25 percent value would receive the

22   same recovery as under a liquidation at different -- at that

23   price point, which is 34 cents under the orderly winddown

24   and 36 cents under the NewCo scenario.

25   Q    And have you reviewed the supplemental declaration of

Page 124

1    Mr. Galka and were you in the courtroom during his

2    testimony?

3    A    I did and I was, yes.

4    Q    And how does his valuation of CEL token fit within this

5    analysis that you've performed?

6    A    At negligible to zero value.  This says there's no

7    issue with the best interests test as it results -- as it

8    relates to the CEL token holders.

9    Q    Thank you, Mr. Campagna.

10            MS. BRIER:  I'll pass the witness at this time.

11            THE COURT:  Let me -- I just -- why don't you put

12   that chart back up.

13            MS. BRIER:  Absolutely.

14            THE COURT:  The demonstrative.

15            MS. BRIER:  Mr. Young, if you could put that back

16   up, that'd be excellent.

17            THE COURT:  Looking at that chart, how much do CEL

18   holders -- in a liquidation analysis in a Chapter 7 --

19            THE WITNESS:  Mm-hm.

20            THE COURT:  -- best interests test, how much do

21   the CEL holders -- what allowed (indiscernible) would they

22   be entitled to receive in a liquidation?

23            THE WITNESS:  That's a good question.  I would

24   turn to the attorneys.  I don't quite know what happens in a

25   liquidation under the plan.  I know it's fixed at 25 cents

Page 125

1    and my understanding is based on Mr. Galka's testimony today

2    at a near-zero value.  I think we would -- I think that's

3    where we would be leaning as a debtor's side.

4                THE COURT:  From this chart, am I supposed to be

5    able to determine whether 25 cents would satisfy the best

6    interests test?

7                THE WITNESS:  Yes.  So, if you look across the

8    bottom axis, zero is increasing to 81.  If you pick the

9    point where it's roughly 25 cents and, you know, go directly

10   up to intersect that red line, it would say the value is --

11   it's well below the dark blue and the light blue lines, so

12   they're getting far less.

13               THE COURT:  All right.  Cross --

14               THE WITNESS:  And we did this on dollars as

15   opposed to percents because as you increase the size of the

16   denominator, it's somewhat circular.

17               THE COURT:  Cross-examination.

18               MS. BRIER:  Thank you, Your Honor.

19               THE COURT:  Thank you very much.

20               MR. KIRSANOV:  Yes, hello, Your Honor.  Dimitry

21   Kirsanov, pro se.

22               THE COURT:  Go ahead, Mr. Kirsanov.

23               MR. KIRSANOV:  Hello, Mr. Campagna.

24               THE WITNESS:  Hi.

25               CROSS EXAMINATION OF ROBERT CAMPAGNA

Page 126

1    BY MR. KIRSAOV:

2    Q    Can you explain what the best interests are in

3    comparison to a Chapter 7 versus an 11?

4    A    I don't follow the question.

5    Q    What does a Chapter 11 plan have to meet that a Chapter

6    7 plan wouldn't?

7              MS. BRIER:  Objection.

8              THE COURT:  Sustained.  What is your

9    understanding, Mr. Campagna, about -- what is the best

10   interests test?

11             THE WITNESS:  The best interests test states that

12   creditors under the plan can receive no less than they would

13   receive under a Chapter -- actually, it's the inverse.

14   Under a Chapter 7 -- whatever the creditors receive under a

15   Chapter 7, they at least have to receive that amount under

16   the Chapter 11 plan.

17             THE COURT:  Ask your next question.

18   BY MR. KIRSAOV:

19   Q    Are you aware the CEL token holders in the custody

20   class rejected the CEL custody settlement?

21   A    No, I'm not.

22   Q    Are you aware that the deactivation date pricing for

23   custody CEL holders is 25 cents?

24   A    No, I'm not.

25   Q    (indiscernible) bankruptcy values, CEL is valued at 81

Page 127

1    cents.  Is that correct?

2              MS. BRIER:  Objection, Your Honor.

3              THE COURT:  Sustained.

4    BY MR. KIRSAOV:

5    Q    Is the liquidation analysis for pure custody 100

6    percent?

7    A    I don't follow that.

8    Q     So, in a Chapter 7 case for pure custody, is the

9    liquidation value 100 percent?

10             MS. BRIER:  Objection.

11             THE COURT:  Sustained.

12   BY MR. KIRSAOV:

13   Q    Wouldn't the plan currently fail the best interests

14   tests as it assigns 25-cent deactivation day value to the

15   CEL custody holder?

16   A    I don't believe it does, no.

17   Q    Isn't 25 cents less than 81 cents?

18             THE COURT:  Mr. Kirsanov, yes, 25 cents is less

19   than 81 cents, but that's not meaningful.  Ask your next

20   question or I'm going to end your examination.

21             MR. KIRSANOV:  Yes, sir.

22   BY MR. KIRSAOV:

23   Q    What is the liquidation analysis for general custody,

24   sir?

25   A    What is the percentage recovery under the liquidation

Page 128

1    for general custody?

2    Q    Correct.

3    A    72.5 percent.

4    Q    And 72.5 percent of 81 exceeds 25 cents; is that

5    correct?

6    A    I don't follow the question.

7    Q    If CEL token is valued at 81 cents and it has a

8    liquidation in the custody class of 72.5 percent --

9              THE COURT:  Mr. Kirsanov, it doesn't have a value

10   of 81 cents.

11             MR. KIRSANOV:  Well, the bankruptcy filing value

12   is 81 cents.

13             THE COURT:  No, sir.  At the petition date, it was

14   trading at 81 cents.

15             MR. KIRSANOV:  Correct, so --

16             THE COURT:  The testimony is that that was not the

17   value, the intrinsic value of the CEL token.  Ask your next

18   question or I'll end your examination.

19   BY MR. KIRSAOV:

20             Q    Are you aware that CEL token holders can un-

21   accept their in-kind distributions in Hawaii for a rejecting

22   class in the first 90 days?

23             MS. BRIER:  Objection, Your Honor.

24             THE COURT:  Sustained.  It's beyond the scope of

25   the direct.  He's not testified about Hawaii or anyplace

Page 129

1    else.

2    BY MR. KIRSAOV:

3    Q    And what is the liquidation analysis for pure custody,

4    sir?

5              MS. BRIER:  Objection.  Asked and answered.

6              THE COURT:  Overruled.  Go ahead.  If you can,

7    answer.

8    BY MR. KIRSAOV:

9    A    I believe pure custody is the withdrawable custody

10   claims today and it's 100 cents, and it's -- it's in-kind,

11   I'd say --

12   Q    (indiscernible)

13             THE COURT:  Let him finish his answer, Mr.

14   Kirsanov.

15   BY MR. KIRSAOV:

16   A    The custody -- all the custody numbers are proposed to

17   be in-kind, so we're actually giving the coin back, so

18   that's why we're giving all the coin back for the pure

19   custody, 100 percent of whatever that is, and under the with

20   -- the general custody, we're giving 72.5 percent of the

21   coins back.  That's what the plan calls for.

22   Q    Sir, could I refer to the disclosure statement?

23   A    I don't have that in front of me.

24             THE COURT:  What is it that you want from the

25   disclosure statement?

Page 130

1          MR. KIRSANOV:  I'd like to go to the deactivation

2   date cryptocurrency conversion table.

3          MS. BRIER:  Was that included on your -- we'll

4   grab that.

5          THE COURT:  You're going to have to wait, Mr.

6   Kirsanov.  All right, while they're looking for that, at

7   around 2:00 p.m. there will be an emergency test from FEMA,

8   and therefore you need to -- when we're back here at 2

9   o'clock, before that you need to turn off the volume or turn

10  off your cell phone so that we do not hear the FEMA

11  emergency alert.  Thank you, Deanna, my courtroom deputy.

12          UNKNOWN:  Your Honor, I don't think turning off

13  the volume does it --

14          THE COURT:  Well, then, you've got to turn off

15  your phone.  I think that's probably -- and I'd better do

16  that, too, when I come back from lunch.  Were you able to --

17          THE WITNESS:  I have a binder with several

18  documents in front of me and one is titled "Disclosure

19  Statements".

20          THE COURT:  Okay, he has the disclosure statement

21  in front of him, Mr. Kirsanov.  Ask your question.

22          MR. KIRSANOV:  Could you locate the --

23          THE COURT:  (indiscernible) page number --

24          MR. KIRSANOV:  Yes, sir.  In Section 84, the

25  deactivation date cryptocurrency conversion table, could you

Page 131

1   go there, sir?

2           THE WITNESS:  What page is that?

3           THE COURT:  Can somebody help out?

4           MS. BRIER:  Sure.  Mr. Kirsanov, what version of

5   the disclosure statement are you looking at and what --

6           MR. KIRSANOV:  It is the one you --

7           MS. BRIER:  Are you referring to (indiscernible)

8           MR. KIRSANOV:  It is the one that Kirkland filed

9   on 9/27, which adjusted the language from -- that the

10  debtors and UCC would determine a value to 25 cents --

11          MR. KOENIG:  Your Honor --

12          THE COURT:  Mr. Koenig.

13          MR. KOENIG:  It's Chris Koenig from Kirkland &

14  Ellis for Celsius.  I think what Mr. Kirsanov is referring

15  to is a revised version of the Chapter 11 plan, not the

16  disclosure statement.  That's what was filed on September

17  27th.  We have that language.

18          MS. BRIER:  He has the language and I think what

19  he filed, so I can put that up.

20          MR. KOENIG:  We should give that to the witness.

21          MS. BRIER:  Yes.

22          MR. KIRSANOV:  Thank you.

23          THE WITNESS:  So, I understand there may have been

24  something filed in respect to the plan.  This is -- I have

25  not looked at this.  The document dated 10 --

1             MR. KIRSANOV:  Yes, sir -- do you have that

2     document in front of you, sir?

3             THE WITNESS:  I have a document in front of me.

4             MR. KIRSANOV:  Does it include the deactivation

5     date cryptocurrency conversion table?

6             THE WITNESS:  I see a table.  It's not titled, but

7     -- a table of numbers, coin types.

8             MS. BRIER:  Your Honor, for purposes of the

9     record, we'd just note that this contains excerpts from a

10     much larger document.

11             THE COURT:  Yes.

12             MS. BRIER:  And it's not entirely clear --

13             THE COURT:  So, what we're looking at is something

14     Mr. Kirsanov filed as ECF-3688.  It's three pages long.  It

15     contains excerpts from various documents and places.  Did

16     you ask your question, Mr. Kirsanov, and we'll see whether

17     the witness has the information needed to be able to

18     respond.

19             MR. KIRSANOV:  Yes -- yes, sir.

20     BY MR. KIRSAOV:

21     Q    Are you aware that the deactivation price for CEL token

22     in the custody class is 25 cents?

23     A    No, I'm not.

24     Q    Do you see the amendment on Section 84 on deactivation

25     date cryptocurrency conversion table?

Page 133

1    A    I do.

2    Q    You do.  Could you read out the section that it says 25

3    cents, please?

4              MS. BRIER:  Objection, Your Honor.

5              THE COURT:  Sustained.  I don't know what you're

6    referring to, Mr. Kirsanov.

7              MR. KIRSANOV:  So, on the deactivation date

8    cryptocurrency conversion table, it says that the

9    deactivation date cryptocurrency table shall provide that

10   CEL token is priced at 25 cents if the bankruptcy court

11   approves the CEL token settlement.

12             THE COURT:  That's what the plan provides; that's

13   correct.

14             MR. KIRSANOV:  Correct.  I'm --

15             THE COURT:  That's not liquidation value.  That is

16   what the plan provides.

17   BY MR. KIRSAOV:

18   Q    Is the liquidation value of CEL token in a Chapter 7 81

19   cents?

20             MS. BRIER:  Objection.

21             THE COURT:  Sustained.

22             MR. KIRSANOV:  What is the liquidation value of

23   the CEL token under Chapter 7?

24             MS. BRIER:  Objection.

25             THE COURT:  Do you know, Mr. Campagna?

Page 134

1            THE WITNESS:  I believe we're prevent -- the

2    company is unable to sell CEL tokens, so we value it at zero

3    from an asset side.  What the claim is I leave up to the

4    Court and others.

5    BY MR. KIRSAOV:

6    Q    Under Chapter 7, are all claims dollarized?

7            THE COURT:  I didn't understand your question.

8            MS. BRIER:  Objection.

9            THE COURT:  Ask it again.

10   BY MR. KIRSAOV:

11   Q    If it goes to Chapter 7, are all claims and all classes

12   dollarized?

13           MS. BRIER:  Objection.

14           THE COURT:  Sustained.

15   BY MR. KIRSAOV:

16   Q    How does -- how is Chapter 7 dollarized?

17           MS. BRIER:  Objection.

18           THE COURT:  Sustained.

19   BY MR. KIRSAOV:

20   Q    How is Chapter 7 dollarized for the individual

21   creditors?

22           MS. BRIER:  Objection.

23           THE COURT:  Sustained.

24   BY MR. KIRSAOV:

25   Q    Sir, the liquidation analysis of pure custody is 100

Page 135

1    percent; is that correct?

2              MS. BRIER:  Objection.

3              THE COURT:  Sustained.

4              THE WITNESS:  I believe that --

5    BY MR. KIRSAOV:

6    Q    Sir, the -- what is the analysis for pure custody

7    holders of CEL token?

8              MS. BRIER:  Objection.

9    BY MR. KIRSAOV:

10   A    Which analysis?  Under what --

11   Q    Chapter 7.

12   A    Under Chapter 7, what is the recovery we've associated

13   with pure custody?

14   Q    Correct.

15   A    It's 100 percent.  We would still propose to give the

16   coins back --

17             THE COURT:  (indiscernible) give an in-kind.

18             THE WITNESS:  We've give an in-kind distribution,

19   exactly.

20             THE COURT:  (indiscernible) was in custody.

21             THE WITNESS:  So, pure custody would be given

22   their coins back.

23   BY MR. KIRSAOV:

24   Q    After 90 days, does the plan not call for 25 cents?

25             MS. BRIER:  Objection.

Page 136

1                    THE COURT:  Sustained.

2     BY MR. KIRSAOV:

3     Q    What does the plan call after 90 days if CEL custody

4     holders do not withdraw their assets?

5                    MS. BRIER:  Objection.

6                    THE COURT:  Sustained.  This witness is testifying

7     about the distributions under different scenarios, including

8     liquidation value.

9                    MR. KIRSANOV:  Yes, Your Honor, and my point is in

10    comparison to a Chapter 11, a CEL token holder would obtain

11    more in the pure custody and custody class under a Chapter 7

12    than a Chapter 11.  Thus, it does not meet the best

13    interests clause.

14                   MS. BRIER:  Objection.

15                   THE COURT:  I hear your argument.  I don't think

16    it's right, but I hear your argument.  Ask your next

17    question.  Ten more minutes and I'm cutting you off.

18                   MR. KIRSANOV:  Your Honor, one second, please.

19    BY MR. KIRSAOV:

20    Q    Sir, can you refer to Page 48?  That indicates the CEL

21    token settlement on Section 2.

22                   THE COURT:  48 of what?

23                   MR. KIRSANOV:  Docket 3577, the one filed on 9/27,

24    which is the one that should be in front of you, sir.

25                   MS. BRIER:  Your Honor, there's an excerpt of this

Page 137

1    in that same document he filed, Docket No. 3688.

2            THE COURT:  All right.  Do you have it in front of

3    you, Mr. Campagna?

4            THE WITNESS:  I'm sorry, which docket number was

5    it?  3688?

6            MR. KIRSANOV:  3577.

7            MS. BRIER:  And for purposes of the record,

8    there's --

9            THE COURT:  It's on Page 2 of 3 (indiscernible)

10           MS. BRIER:  -- excerpt of 3577 contained in his

11    filing on Page -- Docket No. 3688.

12    BY MR. KIRSAOV:

13    Q    Could you read out what is highlighted there, sir?

14           MS. BRIER:  Objection, Your Honor.

15           THE WITNESS:  It's an excerpt of Document 1192.

16    Page 17 of 22?  Is that what we're looking at?

17           MR. KIRSANOV:  It should be under the CEL token

18    settlement --

19           THE COURT:  No, it's on Page 2 of his three-page

20    document under CEL token settlement.

21           THE WITNESS:  Okay.

22           THE COURT:  He's highlighted some --

23           THE WITNESS:  Yes, I see that now.

24    BY MR. KIRSAOV:

25    Q    Could you read out the highlighted section, please?

1          MS. BRIER:  Objection.

2          THE COURT:   I'll read the whole excerpt of it.

3          MR. KIRSANOV:  Yes, sir.

4          THE COURT:  "Except as provided in Article

5    3(b)(17), all CEL token deposit claims other than custody

6    claims that are CEL token deposit claims shall be valued at

7    25 cents per CEL token (i.e., one CEL token equals a 25-cent

8    CEL token deposit claim), and shall otherwise receive the

9    treatment associated with the program in which they were

10   deployed."  What's your question?

11         MR. KIRSANOV:  My concern is that --

12         THE COURT:  I don't want your concern.  I want a

13   question.

14         MR. KIRSANOV:  Okay.  Yes, sir.  One second,

15   please.

16         MS. BRIER:  Your Honor, just for purposes of the

17   record, we'd object to the admission of this document.

18         THE COURT:  It's not in evidence.

19         MS. BRIER:  Thank you.

20         THE COURT:  What's your question?

21   BY MR. KIRSAOV:

22   Q    What would the CEL custody holder obtain in a Chapter 7

23   liquidation?

24   A    I think that requires a legal determination, but I

25   believe the testimony you heard today is it's valued at

1    worth -- at zero.  We are attempting to give back the coin,

2    the token itself, so folks are welcome to the tokens that

3    are in custody.  I would -- if your question is, "What do

4    people who can't take the tokens get?", I assume we would

5    sell them for zero or not sell the CEL token and ascribe a

6    zero to it and pass the value on for any remaining points.

7    Q    Wouldn't that fail the best interests test?

8              MS. BRIER:  Objection.

9    BY MR. KIRSAOV:

10   A    No, it would show that you'd do much worse under a

11   liquidation under the current plan where you're being given

12   25-cent value.

13   Q    The CEL token under Chapter 7 -- is that dollarized?

14             MS. BRIER:  Objection.

15             THE COURT:  Sustained.

16   BY MR. KIRSAOV:

17   Q    What is the CEL token worth under -- excuse me.  What

18   is the dollar amount for CEL token under Chapter 7?

19             MS. BRIER:  Objection.

20             THE COURT:  Sustained.

21   BY MR. KIRSAOV:

22   Q    Under Chapter 7, how much is a CEL token worth?

23             MS. BRIER:  Objection.

24             THE COURT:  Sustained.

25             MR. KIRSANOV:  One moment, Your Honor.

1           THE COURT:  One more question, Mr. Kirsanov.

2           MR. KIRSANOV:  One moment, Your Honor.

3           THE COURT:  All right, the examination has

4    concluded.  We're going to -- before anybody leaves, we're

5    going to take our lunch break, but before doing that --

6           MR. SHEIK:  Judge, I have cross.

7           THE COURT:  Stop.  Anybody else who has not been

8    heard so far who wishes to cross-examine Mr. Campagna,

9    please identify yourself now.

10          MR. SHEIK:  (indiscernible) pro se -- I mean,

11   cross-examiner.

12          MR. DAVIS:  Otis Davis, cross-examination.

13   Creditor.

14          THE COURT:  Okay.  Mr. Davis, Mr. Sheik.  Anybody

15   else on Zoom?

16          MR. ABREU:  Artur Abreu.  One question.

17          UNKNOWN:  (indiscernible)

18          THE COURT:  One at a time.  Stop.

19          MR. ABREU:  Artur Abreu, just to make two

20   questions, sir.

21          THE COURT:  Nope.

22          MR. ABREU:  One question?

23          THE COURT:  You've already questioned, Mr. Abreu.

24   No more questions.

25          MR. BRONGE:  (indiscernible)

```
 1                THE COURT:  Mr. (indiscernible)

 2                MR. BRONGE:  (indiscernible), pro se creditor.

 3                THE COURT:  Okay, I'm not -- I want to just get

 4      the names now.  Mr. Bronge.  Who else?  I have Mr. Davis,

 5      Mr. Sheik, Mr. Bronge.  Anybody else who has not been heard?

 6                MR. PHILLIPS:  Yes, Your Honor.

 7                THE COURT:  Who is that?

 8                MR. PHILLIPS:  Richard Phillips, pro se.  I only

 9      have a few questions.

10                MS. DOW:  Yes, Your Honor.  Sharon Dow, pro se.

11      Thank you.

12                MR. UBIERNA:  Victor Ubierna, pro so.

13                MR. FRISHBERG:  Daniel Frishberg, pro se.

14      (indiscernible)

15                THE COURT:  Hold on.  Mr. Frishberg, you asked a

16      question already.  You said you had one question.  You've

17      examined --

18                MR. FRISHBERG:  I did not -- I did not examine

19      (indiscernible) --

20                THE COURT:  Okay, you didn't.  That's right.

21      You're correct.  Okay, Mr. Frishberg.

22                MR. FRISHBERG:  Thank you.

23                THE COURT:  I apologize, Mr. Frishberg.  Who else?

24                MR. ABREU:  Judge, I also did not examine this

25      witness.
```

Page 142

 1              THE COURT:  Okay, Mr. Abreu.  Anybody else?

 2              MR. UBIERNA:  Victor Ubierna, pro se

 3     (indiscernible)

 4              THE COURT:  I have you, Mr. Ubierna.  What I have

 5     so far is Mr. Davis, Mr. Sheik, Mr. Bronge, Mr. Phillips,

 6     Ms. Dow, Mr. Ubierna, Mr. Frishberg, Mr. Abreu.  Anyone else

 7     on Zoom?

 8              MR. JOHNSON:  Michael Johnson, pro se.

 9              THE COURT:  Hold on.

10              MS. BRIER:  Your Honor, Sharon Dow I think also

11     was on the list.

12              THE COURT:  Yeah, I have her.

13              MS. BRIER:  Okay, great.

14              THE COURT:  I have her down.

15              MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

16     Emanuel, for Pharos.

17              THE COURT:  All right.  All right, ten people have

18     indicated that they wish to cross-examine after lunch.

19     We're breaking until 2 o'clock.  We're going to go in the

20     following order:  Mr. Davis, Mr. Sheik, Mr. Bronge, Mr.

21     Phillips, Ms. Dow, Mr. Ubierna, Mr. Frishberg, Mr. Abreu,

22     Mr. Johnson and Mr. Noskov.  We're recessed until 2 o'clock.

23              BAILIFF:  All rise.

24              (Recess)

25              THE COURT:  Please be seated.  All right, court's

Page 143

1    back in session.  Mr. Campagna, you're still under oath.

2    We'll begin with the cross-examination by Mr. Davis.

3              MR. DAVIS:  Give me one second, Your Honor.

4              THE COURT:  Go ahead, Mr. Davis.

5              MR. DAVIS:  Your Honor, (indiscernible) --

6              THE COURT:  I'm sorry, I can't hear you.  I'm not

7    able to hear you.

8              MR. DAVIS:  (indiscernible)

9              THE COURT:  We're not able to hear you, Mr. Davis.

10             MR. DAVIS:  Can you hear me now, Judge?

11             THE COURT:  Yes, I can hear you now.

12             MR. DAVIS:  I'm sorry.  Your Honor, I think that

13   the limiting of my time for cross-examination to seventeen

14   minutes with respect to Expert Witness Mr. Galka is

15   prejudicial to my rights as a creditor.

16             THE COURT:  Mr. Davis --

17             MR. DAVIS:  And also to the other --

18             THE COURT:  Mr. Davis, you're cutting in and out.

19   What kind of microphone are you using?

20             MR. DAVIS:  I'm using my headphones, Judge.

21             THE COURT:  You're cutting in and out.

22             MR. DAVIS:  (indiscernible) headphones that I was

23   using before.  I'm not using anything different --

24             THE COURT:  You're going to need to fix your

25   sound, Mr. Davis.

Page 144

1                    MR. DAVIS:  Is it any better now?

2                    THE COURT:  Only slightly.

3                    MR. DAVIS:  I'll connect and reconnect.

4                    THE COURT:  Please begin.  We can't hear you if

5      you're --

6                    MR. DAVIS:  (indiscernible)

7                    THE COURT:  We can't hear you if you're speaking.

8                    MR. DAVIS:  I'm speaking now.  I disconnected and

9      reconnected.  Thank you.  Your Honor, I think about the

10     limiting of my time for cross-examination to seventeen

11     minutes with respect to the expert witness Mr. Galka is

12     prejudicial to my rights as a creditor, and also the other

13     36,000 CEL token creditors in this case.  And being that I

14     was not allowed to finish my cross-examination --

15                   THE COURT:  Mr. Davis --

16                   MR. DAVIS:  I would like to --

17                   THE COURT:  Mr. Davis, ask your questions or I'm

18     going to cut you off.

19     BY MR. DAVIS:

20     Q    Mr. Campagna, are you familiar with the claim filed by

21     the debtors in (indiscernible) bankruptcy related to CEL

22     token?

23     A    No, I'm not.

24     Q    Mr. Campagna, have you conducted an analysis of the CEL

25     token OTC transactions from 2020 to 2022?

Page 145

```
 1    A    No, I have not.

 2    Q    Do you know if Celsius sold CEL token from its treasury

 3    from 2018 to 2022?

 4              MS. BRIER:  Objection.

 5              THE COURT:  Overruled.

 6    BY MR. DAVIS:

 7    A    I do not.

 8    Q    Mr. Campagna, are you aware of any parties

 9    (indiscernible) CEL token on FTX in 2022?

10    A    No.

11    Q    Do you agree that Celsius did not purchase and CEL

12    token from the market after the pause?

13    A    I don't have a view on that topic.

14    Q    Can you please turn to Page 71 of the Max Galka report.

15              THE COURT:  I'm sorry, of what?  I can't -- I

16    didn't hear you.

17              MR. DAVIS:  Of the Max Galka report.

18              THE COURT:  His initial report or his second

19    report?

20              MR. DAVIS:  His initial report.

21              THE WITNESS:  What page?

22              MR. DAVIS:  71.

23              THE WITNESS:  Okay.

24    BY MR. DAVIS:

25    Q    On Page 71 of the Galka report, in the Difference
```

Page 146

1    column, it shows a dollar value of 15.9 million in income

2    for the month of December 2020, correct?

3    A    Mine shows text message strings or something.

4    Q    It's in the right column, in the Difference column all

5    the way to the right.

6    A    (indiscernible)

7    Q    For the month of December 2020.

8    A    I do not see that.  Page 71 --

9            THE COURT:  Which exhibit number are you looking

10   at?

11           MR. DAVIS:  It's on Docket 3580.

12           MR. COLODNY:  Page 71 at the top (indiscernible)

13           MR. DAVIS:  71 at the top.  71 of 83.

14           THE WITNESS:  Yeah, there's no ribbon on this

15   document.  Wait -- okay, there was an expert report, then

16   there's --

17           MR. COLODNY:  (indiscernible) 63 on the bottom.

18           THE WITNESS:  Okay, we have it.

19           THE COURT:  Go ahead.

20   BY MR. DAVIS:

21   Q    On Page 71 of the Galka report, in the Difference

22   column, it shows a dollar value of 15.9 million in income

23   for the month of December 2020, correct?

24   A    I see a difference of -15,911,247.00 reading this page.

25   Q    On Page 72 of the Galka report, in the Difference

Page 147

1    column, it shows that in the month of December 2020, the

2    company sold a net 6.5 million CEL tokens, correct?

3    A    I'm not familiar with this report.  Do you want to tell

4    me the column you'd like me to read to you again?

5    Q    Sure.  Page 72 --

6              THE COURT:  Have you -- excuse me.  Have you

7    reviewed this before?

8              THE WITNESS:  No, I haven't.

9              THE COURT:  Okay.

10   BY MR. DAVIS:

11   Q    Okay, can you turn to Page 19 in the Max Galka report?

12             MS. BRIER:  Objection, Your Honor.  Foundation as

13   to this witness's knowledge --

14             THE COURT:  Well, let's see what Page 19 is and

15   then we'll see.  This is Page 19 of 83?

16             MR. DAVIS:  Correct, 19 of 83.

17             THE WITNESS:  Okay.

18   BY MR. DAVIS:

19   Q    In the Max Galka report on Page 19, it also shows that

20   the price of CEL token dramatically increased during that

21   same period of December 2020.  Is that correct?

22             MS. BRIER:  Objection.

23             THE COURT:  Are you familiar with this report?

24             THE WITNESS:  I am not.

25             MS. BRIER:  Objection.

1          THE COURT:  Objection sustained.

2     BY MR. DAVIS:

3     Q    Was most of the CEL token trading volume conducted by

4     the company denominated in Bitcoin, Ethereum, or Dollar

5     (indiscernible)

6          MS. BRIER:  Objection.

7          THE COURT:  Sustained.

8          MR. DAVIS:  (indiscernible)

9          THE COURT:  The examination of this witness has to

10    be within the scope of his direct examination.  Cross-

11    examination within the scope of his direct.

12         MR. DAVIS:  I'm finished.

13         THE COURT:  You're finished?  Okay.

14         MR. DAVIS:  Yes, I said that two minutes ago.  I'm

15    finished.

16         THE COURT:  Mr. Sheik.

17         MR. SHEIK:  Thank you, Your Honor.  The questions

18    that I have to ask are general in nature.  May I proceed?

19         THE COURT:  Yes, go ahead.

20    BY MR. SHEIK:

21    Q    Okay, thank you.  Mr. Campagna, A&M was responsible for

22    auditing and determining the value of the debtor's assets

23    that made up the estate.  Is that correct?

24    A    No, that's not correct.

25    Q    How would you describe the nature of your engagement

Page 149

```
 1   with the debtors?

 2   A    First, Alvarez & Marsal is not an audit firm.  We don't

 3   conduct audits.  We're not an accounting firm.  We're

 4   financial advisors for --

 5             THE COURT:  Just describe what your engagement is.

 6             THE WITNESS:  We were engaged to assist the

 7   company with liquidity, liquidity management and reporting

 8   requirements pursuant to the bankruptcy code and entering

 9   and exiting Chapter 11.

10   BY MR. SHEIK:

11   Q    Okay, and -- but were you -- did A&M provide the Court

12   and, you know, all the parties involved the financial

13   documents that you had prepared to basically value the

14   property of the debtors, such as DNO?

15   A    The debtors provided all the financial information.  We

16   assisted the debtors with some of that information.

17   Q    Assisted how?

18   A    Assisted in compiling the data that existed from the

19   company's systems, spreadsheets, wherever we could find it.

20   Q    Okay.  Now, when it comes to the determination of the

21   value of the liquid assets in CNL and what they were worth,

22   what according to you was the final number?

23   A    I did not conduct evaluation of any assets.  I believe

24   the assets you're referring to were valued by Stout.  They

25   presented their report yesterday, and their witness.
```

Page 150

1    Q    I see.  But to your knowledge, you know, and per the

2    Campagna declaration, I believe, that one of the reports had

3    mentioned that it was valued at around $9.8 billion.  Is

4    that correct?

5              MS. BRIER:  Objection.

6    BY MR. SHEIK:

7    A    I am not familiar with a 9.8 -- was that a billion-

8    dollar figure?

9    Q    Correct, yes.  I did mention billion, yes.

10   A    I'm not aware of that figure.

11   Q    Okay.  Now, if there was a valuation on any of the

12   properties or the assets of the debtors, when it comes to

13   crypto or liquid crypto, would they be, you know, based on

14   petition date pricing?

15             MS. BRIER:  Objection.

16             THE COURT:  Do you know?

17             THE WITNESS:  I don't conduct values --

18   valuations.  I don't know.

19             THE COURT:  He doesn't know.  Go ahead, ask your

20   next question.

21             MR. SHEIK:  Okay, sure.

22   BY MR. SHEIK:

23   Q    So, now I understand, you know, yesterday Mr. Kielty

24   had provided, you know, the value based on -- as of March

25   2023, the value of the assets in CNL were marked at $3.5

Page 151

1    billion.  Are you aware of this?

2              MS. BRIER:  Objection.  Misstates testimony.

3              THE COURT:  Sustained.

4              MR. SHEIK:  Okay.  I'm going to skip ahead, then.

5    BY MR. SHEIK:

6    Q    Okay, so Mr. Campagna, what was the size of the hole,

7    according to you -- and just to add to it, the -- publicly,

8    what was reported by Reuters, Bloomberg, Associated Press

9    and whatnot -- the size of the hole was about $1.2 billion.

10   Is that correct according to what your understanding is?

11             THE COURT:  Mr. Sheik, I don't understand your

12   question.

13             MR. SHEIK:  Your Honor, the reason I ask that

14   question is because what's publicly reported was $4 billion,

15   but when you look at any of the documents that we've been --

16   you know, the true value of the size of the hole was 1.2

17   billion.  So, I just --

18             THE COURT:  Mr. Sheik, I do not understand your

19   question.  If you --

20             MR. SHEIK:  Oh.

21             THE COURT:  If you want to refer to specific

22   documents, we'll see whether that's proper, but in the form

23   that you've asked it, it's not a proper question.

24             MR. SHEIK:  I see what you're saying.  Okay, then.

25   I'll try to rephrase that.

1    BY MR. SHEIK:

2    Q    So, according to you, Mr. Campagna, what was the size

3    of the whole in this bankruptcy?

4              MS. BRIER:  Objection.

5              THE COURT:  You -- do you understand the question?

6              THE WITNESS:  I don't.

7              THE COURT:  Ask your next question.

8              THE WITNESS:  Okay.

9    BY MR. SHEIK:

10   Q    Is the size of the hole $1.2 billion?

11             MS. BRIER:  Objection.

12             THE COURT:  When you're referring to the size of

13   the hole, what are you referring to, Mr. Sheik?

14             MR. SHEIK:  The insolvency and that whether, you

15   know -- why we came into this situation in the first place.

16             THE COURT:  I still don't understand your

17   question.  The debtor -- the debtor is insolvent; I

18   understand.  It's liabilities exceed its assets.

19             MR. SHEIK:  Right.  And you know, then we have a

20   CNL that was once valued at $9.8 billion and I'm just -- I'm

21   trying to get a sense of -- because there's been a lot of

22   misinformation.  I just wanted to ask the right people the

23   right questions just to get the -- you know, an expert

24   analysis or at least an opinion on the matter, Your Honor.

25             THE COURT:  Ask another question.

Page 153

1    BY MR. SHEIK:

2    Q    Okay.  When it comes to the value of the illiquid

3    crypto assets in CNL post adjustments, which as per Mr.

4    Kielty yesterday was determined to be $3.2 billion, would

5    you say that more than sufficiently covers the $1.2 billion

6    shortfall that we have in this insolvency?

7              MS. BRIER:  Objection, Your Honor.  Misstates

8    testimony.

9              THE COURT:  Sustained.

10             MR. SHEIK:  Okay.  I'm trying to gather -- Judge,

11   if you -- Your Honor, if you'd give me just a second, I'll

12   try and skip over.

13             THE COURT:  Okay, go ahead.

14             MR. SHEIK:  Thank you.

15   BY MR. SHEIK:

16   Q    So, Mr. Campagna, is -- did A&M provide the final

17   report, or at least in the last few months, the monthly

18   reports which have, you know, full disclosure on the type of

19   liquid crypto --

20             (Alarms sounding.)

21             THE COURT:  You didn't follow the rules.  Please

22   close it off.

23             MR. SHEIK:  Judge, if I may, this is one of my

24   proudest achievements as actually representing Bloomberg's

25   assets to actually install an e-notification, which just

Page 154

1    went off, many, many years ago.

2             THE COURT:  Okay.  It's the US Trustee.  Who

3    else's phone is going off?  Somebody else has their phone

4    turned on.

5             MR. SHEIK:  I'm not in New York anymore, so I

6    don't think --

7             THE COURT:  (indiscernible) -- I'm not going to do

8    it.

9             (Alarms sounding, crosstalk.)

10            THE COURT:  This is not a complicated instruction

11   to follow, (indiscernible)

12            MR. SHEIK:  I hope it's -- I hope it's not me.

13            THE COURT:  I'm just surprised they didn't go off

14   simultaneously.

15            UNKNOWN:  I know, they didn't.

16            THE COURT:  All right, we're -- let's get

17   (indiscernible)

18            MR. SHEIK:  Okay, I think we're -- okay, sounds

19   good.

20            THE COURT:  Mr. Sheik, why don't you go ahead.

21   BY MR. SHEIK:

22   Q    Sure, I'll repeat the question.  So, Mr. Campagna, was

23   -- I believe that A&M has been providing us with the monthly

24   report of the -- month-end reports of all assets that were

25   either in CNL or, you know, that basically give us a full

1    understanding of the contents of the illiquid crypto that

2    was in CNL.  Is that correct?

3    A    I don't think that's correct.

4    Q    Where did I go wrong?

5    A    I think the debtors provide you with --

6              MS. BRIER:  Objection.

7    BY MR. SHEIK:

8    A    -- financial information.  I don't know that A&M is

9    providing any reports to the public.

10   Q    I'm sorry, I couldn't quite hear you.  It was a bit

11   muffled.

12   A    I don't think that A&M is providing those reports.  The

13   debtors may be providing reports.  If you want to show me

14   one, I'm happy to look.

15   Q    I see, and forgive me for misspeaking and you're right;

16   it is the debtors that are providing those reports.  But did

17   your team or staff have any, you know, play in creating

18   those reports?

19   A    I think we assisted with getting them in the proper

20   format, but the company obviously has a CFO and a controller

21   and a whole finance chain that's responsible for the data in

22   those reports.

23   Q    Okay.  And so, was A&M responsible for verifying any of

24   the numbers in those reports at all, or no?

25   A    No.

1    Q     Okay.   Now -- and this is just an opinion-based

2    question.   What is your opinion on why this case has taken a

3    direction that would result in a much smaller recovery to

4    creditors, given that the $3.2 billion petition date priced

5    illiquid assets that currently, you know, were in CNL as of,

6    you know, March 2023?  And based on what you see, is the

7    going forward plan for recovery for creditors?

8              MS. BRIER:  Objection.

9              THE COURT:  Mr. Sheik, one of the problems is your

10   question was loaded with a lot of assumptions that are not

11   in evidence.  If you want to -- if you believe it is and you

12   want to point to the documents, I'll certainly permit you to

13   do it.

14             MR. SHEIK:  Sure.

15             THE COURT:  I'm sustaining the --

16             MR. SHEIK:  I -- and forgive me, Judge, I don't

17   have that exact docket number.  That's my mistake.  Lesson

18   learned.  Okay, then I'll conclude, you know, with my final

19   question.

20   BY MR. SHEIK:

21   Q     So, Mr. Campagna, do you have any comments or any

22   remarks to share on what your opinion on this recovery is

23   for creditors?  Do you believe that, you know, based on your

24   estimate of, you know, the reality of the numerations, is

25   that fair according to you or not?

Page 157

1   A    I think the recoveries are as they were laid out in the

2   demonstrative that was shared earlier in this -- in this

3   testimony.  67-cent recovery for NewCo, and 47.4 percent

4   under a liquidation scenario.

5   Q    And I missed that last part.  I'm sorry.  You're a bit

6   far away --

7   A    47.4 --

8   Q    Sorry, go ahead.

9   A    47.4 percent recovery under a liquidation, Chapter 7

10  liquidation.

11  Q    I see.  Okay.  Do you think that there's any potential

12  for a full recovery or no?

13           MS. BRIER:  Objection.

14           THE COURT:  Do you have an answer to the question?

15           THE WITNESS:  No, I don't.

16           MR. SHEIK:  Thank you, Mr. Campagna.  Your Honor,

17  I appreciate you giving me the time.  Thank you.

18           THE COURT:  Okay, Mr. Sheik.  Mr. Bronge.

19           MR. BRONGE:  Yes, good afternoon.  Can you hear

20  me?

21           THE COURT:  Yes.

22           THE WITNESS:  Yes.

23  BY MR. BRONGE:

24  Q    Yes, good afternoon, Mr. Campagna.  I would like to

25  start with looking at your declaration, which I understand

Page 158

1    is the Debtor Item 46, Docket No. 3582 and Page 4 of 27, and

2    that would be Item 11 there.

3    A    What page are you on?

4    Q    4 of 27 --

5    MR. BRONGE:  Page 4 --

6            THE COURT:  Paragraph 11, which is at the bottom

7    of Page 4, carries over to Page 5.

8            THE WITNESS:  Okay.

9            MR. BRONGE:  Okay --

10           THE COURT:  Just give him a chance to read it, Mr.

11   Bronge, and then you can ask your question, okay?

12           MR. BRONGE:  Okay.

13           THE WITNESS:  Okay, I'm familiar with the

14   paragraph.

15   BY MR. BRONGE:

16   Q    Okay.  So, in the beginning here, you say:  "I believe

17   that valid business, legal and factual reasons justify a

18   separate classification."  Now, in relation to the status of

19   collateral, what legal basis did your belief -- what did you

20   base those beliefs on?

21           MS. BRIER:  Objection.

22           THE COURT:  Sustained.  I -- I'm not sure what

23   you're asking, Mr. Bronge.  Why don't you try again and

24   clarify.

25           MR. BRONGE:  Yeah, okay.  So, (indiscernible) the

1    belief that there are valid legal reasons for these

2    classifications, and I would like to know what he bases that

3    belief on.  What legal, factual things did he base his

4    beliefs on?

5              THE COURT:  It's the first part of --

6              MR. BRONGE:  The first -- yeah.  Yes, exactly.

7              THE COURT:  (indiscernible) base your belief.

8    THE WITNESS:  Right.  I was guided by legal counsel of the

9    debtors on some of these points when it comes down to legal

10   rights, but the classification scheme treated different

11   creditors -- put different creditors into different classes

12   based on whether they were customer claims and what specific

13   type of customer claims; whether they were general unsecured

14   creditors, trade creditors institutional debtholders and the

15   like.  So that's how the classification scheme was done.

16   Q    Yes.  So I understand you yourself have been advised by

17   your legal advisor what (indiscernible) for instance the

18   collateral will have.  Therefore, you believe that is

19   correct.  Am I correct in that?

20   A    Yes.

21   Q    So you have not made your own analysis of that?

22   A    Say that again, pleases?

23   Q    You have not made your own analysis of that -- the

24   legal status of the different accounts or collateral.

25   A    I didn't form a legal view, but I on my own can

Page 160

1    understand that a general unsecured creditor of a trade

2    claim has different rights than a depositor on the Celsius

3    platform.  So maybe it's a small-l legal analysis on my

4    part, but I was guided by legal counsel on the finer points.

5    Q    Okay.  So let me (indiscernible) it's the legal counsel

6    that has that opinion.  Now let me then move to a different

7    document.  I would like to use Debtor Exhibit 69, which I

8    think that's from yesterday as Docket Number 3293.

9              MS. BRIER:  Mr. young, can you please pull up

10   Debtor's Exhibit 69?

11             THE COURT:  Hold on, Mr. Bronge.  We're getting

12   that.

13             MS. BRIER:  And can we please make Mr. Young a co-

14   host on the Zoom?  Thank you.

15             MR. BRONGE:  Your Honor, may I ask you a

16   procedural question in the meantime?

17             THE COURT:  Sure.  Go ahead.

18             MR. BRONGE:  In order for these documents to

19   become into evidence, should I ask for that, or are they

20   already there?

21             THE COURT:  I'm trying to look through my notes.

22   Does anybody know?  Is Exhibit 69 in evidence?

23             MS. BRIER:  Bob's declaration is in.  I think a

24   portion is --

25             THE COURT:  I'm sorry, I didn't --

Page 161

1              MS. BRIER:  69 is in evidence as of yesterday.

2              THE COURT:  All right.  It's in evidence, so you

3      can go ahead and ask questions about it.

4              MR. BRONGE:  Thank you.  Do we have that

5      available?

6              THE COURT:  It's not up on the screen yet.

7      Deanna, can you give them permission to share the screen?

8              CLERK:  Yes.  Is that Jeremy Young?

9              THE COURT:  Yes.

10             MR. BRONGE:  So before we start that, in the

11     meantime I can ask him on the classification --

12             THE COURT:  Hold on.  It will be on the screen in

13     just a moment.

14             CLERK:  He has permission.  He can share.

15             MR. BRONGE:  Okay.  We can stay with the previous

16     document just for one more question.

17     BY MR. BRONGE:

18     Q    In your liquidation analysis, you have used the same

19     classification as you did -- as you stated in this paragraph

20     we just read.  Is that correct?

21     A    That's correct.

22     Q    Now then I draw your attention to item -- sorry, Page

23     18, Item 25 in this document that we just have up.  And this

24     document is an agreement between Celsius and different

25     governmental entities (indiscernible) some kind of

Page 162

1    settlement.  Can you read that paragraph, pleases?

2    A    Yes, I'm reading it.  Do you want me to read it out

3    loud?

4          THE COURT:  I just want to be sure that we're all

5    on the same place.  So...

6          MR. BRONGE:  Yes.  It's Item -- I can read it on--

7          THE COURT:  Exhibit 69, Paragraph 25, which reads,

8    "Congress used a broad definition of security in the

9    Securities Act and Exchange Act.  Security encompasses a

10   wide range of investments."  Is that the paragraph you are

11   referring to?

12         MR. BRONGE:  Yes, correct.

13         THE COURT:  Okay.  All right.  It's up on the

14   screen, and the witness can see that as well.  Go ahead with

15   your questions.

16   BY MR. BRONGE:

17   Q    Okay.  So I would like to understand if you have done

18   an analysis on the liquidation considering the Earn interest

19   program as a security.

20   A    No, I have not.

21   Q    Would you agree that if that is done, they would

22   subordinate the (indiscernible) program?

23         MS. BRIER:  Objection.

24         THE COURT:  Calls for a legal conclusion.

25   Objection sustained.

Page 163

1   BY MR. BRONGE:

2   A    Would you agree to this paragraph stating that Earn

3   interest is a security?

4            MS. BRIER:  Objection, calls for a legal

5   conclusion.

6            THE COURT:  Sustained.

7   BY MR. BRONGE:

8   Q    Okay.  So if I read this paragraph, I can see that it

9   says Celsius offered and sold CEL and the Earn interest

10  program as securities.  Is that a correct sentence I just

11  read?

12  A    That's what it says on the page in front of me.

13  Q    So if that would be true, would the liquidation

14  analysis make a difference for me as a borrower recovery?

15            MS. BRIER:  Objection.  Calls for a legal

16  conclusion.

17            THE COURT:  Overruled.

18  BY MR. BRONGE:

19  Q    So can we answer?

20  A    Can you restate the question, please?

21  Q    Yes.  So if that last sentence is true, would the

22  recovery for the borrower in a liquidation be different?

23  A    Yes.  In a liquidation, it would be different.

24  Q    Yes.  So the borrower would receive a better recovery.

25  A    Very small.  Very nominal in a liquidation, yes.

Page 164

1   Q    Okay.  That is actually all I needed to know.  So me

2   being a borrower would then receive a better recover in a

3   liquidation.

4   A    In liquidation compared to itself, yes.

5   Q    Compared to CEL and Earn.  That's correct, yes.

6   A    Yeah.

7   Q    And compared to --

8              THE COURT:  I'm going to stop -- hold on.  Hold on

9   for a second, Mr. Bronge.  I am serious about this.  If

10  everybody -- anybody in this room still has their phone on

11  and it goes off, you're going to be out of the hearing for

12  the rest of the hearing today.  All right?  Everybody was

13  warned this morning repeatedly.  And I've tried to make

14  light of the fact that several phones went off this

15  afternoon.  But that's the end of it.  If somebody else's

16  phone goes off, you're out of here.

17             Go ahead, Mr. Bronge.

18             MR. BRONGE:  Okay.  Thank you.  I don't have any

19  further questions.

20             MR. SABIN:  Your Honor, the first questions were

21  hypotheticals I raised -- and this is Jeff Sabin for the

22  record for Ignat Tuganov.  He's getting into an area where I

23  believe he's running counter to an order you've entered

24  approving the class proof of claim which otherwise contains

25  a provision that otherwise says there is no 510(b)

Page 165

1    subordination of Earn.

2            THE COURT:  I'm going to let him ask his questions

3    and...

4            MS. SABIN:  I just wanted to make sure.  Thank

5    you.

6            THE COURT:  You can make your arguments.  Go

7    ahead, Mr. Bronge.  Go ahead.

8            MR. BRONGE:  Yes.  In this -- in this case, I will

9    say I've opted out of those settlements.  And so I'm

10   pursuing this.  And I'm just following what the documents

11   say and I just --

12           THE COURT:  Just ask your questions, Mr. Bronge.

13   Go ahead.

14           MR. BRONGE:  Yeah.  This is the question I asked,

15   and I got the answer.  So I'm satisfied.  I'm finished.

16           THE COURT:  Okay.  All right.

17           MR. BRONGE:  Thank you.

18           THE COURT:  Thank you, Mr. Bronge.  Mr. Phillips,

19   you are next.

20           MR. PHILLIPS:  Thank you, Your Honor.

21   BY MR. PHILLIPS:

22   Q    Mr. Campagna, how are you doing today?

23   A    I'm doing well, thank you.

24   Q    All right.

25           MR. PHILLIPS:  I'm going to need some assistance

Page 166

1    in the courtroom with -- I believe it was Debtor's Exhibit

2    47, which had the consolidated liquidation waterfall.  And

3    then also my amended set of exhibits that I submitted on the

4    docket.  I wanted to (indiscernible) a couple of things.

5              MS. BRIER:  Can you please let us know the docket

6    IDs that you're referring to?

7              MR. PHILLIPS:  The Docket ID of what I submitted?

8    Hang on.

9              MS. BRIER:  No, sorry.  The documents you want us

10   to have available for the witness right now.

11             MR. PHILLIPS:  One is the -- I mean, his original

12   declaration, 3482.  You have what I got from Mr.

13   (indiscernible), Exhibit 47, includes the consolidated

14   liquidation waterfall, which I believe you've used in your

15   examination earlier.

16             MS. BRIER:  I don't know that that is in evidence,

17   but we will get it pulled up while I get your exhibits to

18   the witness.  And your exhibits are filed at Docket 3676, is

19   that correct?

20             MR. PHILLIPS:  I would have to double-check on

21   that honestly.  But in particular it's the first one I was

22   going to ask about, the (indiscernible).

23             MS. BRIER:  All right.  Okay.  I just want to be

24   sure that the witness has in front of him what you want him

25   to have in front of him.  So we'll give him what we have,

1    and you can -- we'll find more if we need it.

2              MR. PHILLIPS:  Fair enough.

3              THE COURT:  All right.  Go ahead, Mr. Phillips.

4              MR. PHILLIPS:  Okay.

5    BY MR. PHILLIPS:

6    Q    In Paragraph 56 of your original declaration, Docket

7    3582, you refer to newco being (indiscernible) at

8    (indiscernible) billion dollars of value, correct?

9    A    Correct.

10   Q    And in (indiscernible) and Alvarez and Marsal's

11   opinion, is that a (indiscernible) value?

12   A    That's what the valuation estimates provided by the

13   other experts would indicate.

14   Q    And which expert in particular provided that?

15   A    The billion 248 is made up of the mining valuation from

16   Centerview.  The illiquid asset valuation originally

17   provided by Stout, and then $450 million of seed capital, of

18   liquid crypto with a $15 million deduction, which is a

19   nuance in the valuation.  And that sums to $1.2 billion,

20   which -- $1.248 billion, which I believe is the number

21   you're citing.

22   Q    And so if I could go to the mining forecast from my --

23   the exhibits.

24   A    Which page?

25             THE COURT:  Which portion of your exhibit, Mr.

Page 168

1    Phillips?

2              MR. PHILLIPS:  It's...

3              THE WITNESS:  I have a ten-page exhibit.

4              MR. PHILLIPS:  Yeah, hang on.  It's the first one,

5    (indiscernible) Exhibit E of disclosure statement.

6              THE COURT:  Okay.

7              THE WITNESS:  Okay.

8    BY MR. PHILLIPS:

9    Q    Do you recognize this?

10   A    Generally recognize this, yes.

11   Q    Do you have any opinion as to the reasonableness of

12   this forecast?

13   A    I don't.  This was the opinion of Centerview and Ryan

14   Kielty, who testified to this yesterday.

15   Q    Okay.  And so when you used the number in the

16   consolidated liquidation waterfall in Exhibit 47 of 565,

17   that was totally reliant on Centerview and you just accepted

18   their number.

19   A    Without following through to that exhibit you just

20   referenced, the 565 was their number and I did rely on it.

21   Q    Okay.

22   A    I was going to say if you want to direct me to that

23   exhibit again.  You mentioned an exhibit that I didn't

24   follow, but...

25   Q    That was the Exhibit 47, Consolidated Liquidation

Page 169

1    Waterfall.  Debtor's Exhibit 47, Consolidated Liquidation

2    Waterfall.  Page 7 of exhibit -- in the draft that I have,

3    it's Page 7 of the (indiscernible).

4    A    Okay.  I don't have that document in front of me.

5            MS. BRIER:  Mr. Phillips, did you notice that

6    document as one you plan to use?

7            MR. PHILLIPS:  I did not.  I thought that I could

8    (indiscernible).

9            THE COURT:  Celsius Exhibit 7, which is in --

10           MS. BRIER:  I think he's saying 47.

11           THE COURT:  Just a second.  Celsius Exhibit 7,

12   which is in the witness book at Page 7 as Consolidated

13   Debtor Liquidation Waterfall.  Is that what you're referring

14   to, Mr. Phillips?

15           MR. PHILLIPS:  Hang on a second.  No.  Actually,

16   yes.  I apologize.  Yes.  I have it under a different

17   exhibit number, which was 47.  (indiscernible) 259 of 332.

18           THE COURT:  It's part of Exhibit 7 at Page 7 is

19   Consolidated Debtor Liquidation Waterfall.  It comes from

20   Page 269 of 332, ECFE document number 2902.  That's what

21   you're referring to, Mr. Phillips?

22           MR. PHILLIPS:  Yes.

23           THE COURT:  Okay.  All right.  Everybody's got it

24   in front of them.  Go ahead.

25   BY MR. PHILLIPS:

Page 170

1   Q    All right.  So the 565 you relied on Centerview for,

2   correct?

3   A    That's correct.

4   Q    And you have no opinion as to the reasonableness of it

5   or not?

6   A    Wasn't a subject of my analysis.

7   Q    Okay.  And then when you did the liquidation, you

8   estimated recovery at 16 percent, correct, as the midpoint.

9   A    I think it's math that was backed into.  We actually

10  calculated the 88 million to the right and calculated what

11  that recovery estimate would be.

12  Q    Which was essentially -- correct me if I'm wrong, but

13  that was essentially determined as a fire sale of the mining

14  rigs themselves.  Is that correct?

15  A    It was a sale process of the rigs under Chapter 7

16  liquidation run by a trustee.  I don't know that I would use

17  the word fire sale, but it was a sale over a condensed

18  timeframe.

19  Q    But do not envision the sale by a trustee of, for

20  example, a site as a whole site, just like Celsius purchased

21  --

22  A    That's correct.  That's correct.  Sorry for

23  interrupting you.

24  Q    If the liquidation was performed as the sale of a site-

25  by-site liquidation, for example, would you expect that the

1    value would be higher than your predicted value here?

2    A    It could be.

3    Q    You'd have an estimate by how much?

4    A    I would rely on something else that Mr. Kielty

5    mentioned yesterday.  The company had received one bid for

6    mining in total.  That would have provided $175 million of

7    value to the estate.  That bid was a mix of cash and notes

8    to the company and required the potential buyer to raise

9    $275 million of cash on their own before they could execute

10   the deal.  And it was indicated that that seemed highly

11   unlikely and the debtors didn't really consider it.  That

12   would be a going concern -- that would be a sale of the

13   entire business, you know, would have been.

14   Q    And I believe the timing of that bid was in December of

15   2022 if I'm correct.

16   A    That timing sounds about right.

17   Q    And would you agree that conditions now are different

18   than in December of 2022, which was about a month after FTX

19   failed?

20   A    They are different every day it seems, yes.

21   Q    Would you agree that conditions and valuations of

22   mining companies overall are higher today than they were in

23   December of 2022?

24   A    I don't know that to be the case.

25   Q    So if you used -- is it reasonable to have used a

Page 172

1    different valuation method for the recovery -- the estimated

2    liquidation value if you would have done either a site-by-

3    site or sale of the mining company as a whole?

4    A    I think the approach we took was reasonable.

5    Q    Are there other reasonable approaches that would have

6    led to a higher value?

7    A    There are other approaches and, you know, others could

8    have landed at other conclusions.  And those conclusions

9    could be higher.

10   Q    Thank you.  Going next to my amended exhibits -- the

11   next one, Disclosure statement, Weighted Distribution, and

12   Election Example.  Have you seen this before?

13            THE COURT:  I'm sorry, which page were you at, Mr.

14   Phillips?

15            MR. PHILLIPS:  The next page of my amended

16   exhibits.

17            THE COURT:  What is it headed?

18            MR. PHILLIPS:  Disclosure Statement, Weighted

19   Distribution, Election Example.

20            THE COURT:  Okay.  Page 5 of 10 from ECF 3698.

21            MR. PHILLIPS:  I'm sorry, I don't have that

22   docket.  I have it as Page 54 of the disclosure statement

23   here.

24            THE COURT:  I have your document in front of me.

25   At the top of that page, it has Docket 3698.  And it's Page

1   5 of 10.  Below that is the heading Disclosure statement,

2   Weighted Distribution, Election Example.

3           MR. PHILLIPS:  That sounds correct, Your Honor.

4           THE COURT:  Go on with the questions.

5   BY MR. PHILLIPS:

6   Q    Have you seen this before?

7   A    I am not familiar with where this is located, but -- so

8   I'm not intimately familiar with the schedule.

9   Q    Okay.  And so are you knowledgeable of the whole

10  disclosure statement or only certain parts?

11  A    Disclosure statement is a big document.  I'm generally

12  knowledgeable of many parts, but this chart is not standing

13  out.

14  Q    So you and/or Alvarez & Marsal did not prepare this

15  chart at all?

16  A    It's possible we prepared it.  I don't know who

17  prepared this chart.

18  Q    That's the question I'm trying to get answered.  But

19  you have no knowledge of --

20          THE COURT:  All you can do is ask questions and

21  the witness can answer them.  So let's ask another question.

22          MR. PHILLIPS:  Fair enough.  And I'm finished with

23  my cross-examination, Your Honor.  Thank you so much, Mr.

24  Campagna.

25          THE WITNESS:  Thank you.

Page 174

1              THE COURT:  Thank you very much, Mr. Phillips.

2              Ms. Dow?

3              MS. DOW:  Yes.  Good afternoon.  In regards to

4     exhibits, would you please go back to the best interest test

5     exhibits that was shared earlier I guess this morning your

6     time.

7              MS. BRIER:  That would be Exhibit 70.  And, Mr.

8     Young, if you could pull that up on the screen.  Mr.

9     Campagna, that's also in your binder as the last tab and the

10    second-to-last tab, too.

11             MS. DOW:  Thank you for assisting with that.

12    BY MS. DOW:

13    A    I'm sorry, what document did you ask for?  You asked

14    for the best interest test?  What's pulled up now is --

15    Q    The best interest test.  It was the chart with the

16    three columns comparing the different disposition scenarios.

17    A    The demonstrative from this morning.

18             MS. BRIER:  The demonstrative from this morning.

19    Mr. Young, that's at Page 5 on the document that you are

20    displaying.  Thank you.

21             THE COURT:  All right.  Just so that the record is

22    clear, what we have up on the screen is docket number 3697.

23             MS. DOW:  Yes, Mr. Campagna, you are correct.

24             THE COURT:  Page 5 of 6.  CEL Token Liquidation

25    Break-Even Values.  I just want to make sure we have a clear

Page 175

1    -- that's now what we're looking at?

2              MS. DOW:  No, Your Honor, sir.

3              MS. BRIER:  They show the same thing.  3653 and

4    3697 both have this chart.  And we'll put up 3697, which is

5    the exact one we showed this morning.  And it's Page 5 of 6

6    of 3697.

7              THE COURT:  THE COURT:  All right.  So what I have

8    open in front of me is ECF 3653, Page 5 of 6, Exhibit A is

9    the chart -- it shows a chart -- that's what we're looking

10   at?

11             MS. DOW:  Correct.  It's not what's currently on

12   screen.

13             THE COURT:  Go ahead.

14             THE WITNESS:  It's 6 of 6 from the stack she's

15   looking for I believe, not 5 of 6.

16             THE COURT:  We're not at the same place then.

17             MS. DOW:  There we go.  Okay, yes.  The plan and

18   the liquidation recovery waterfall.  Thank you.

19             THE COURT:  Just stop for a second because I want

20   to make sure we have a clear record on what we're looking

21   at.  I believe what we're looking at is Page 6 of 6 of ECF

22   Docket Number 3697, Plan and Liquidation Recovery Waterfall.

23   I believe that's the chart that's on the screen now.

24             MS. BRIER:  Thank you, Your Honor.

25             THE COURT:  Go ahead, Ms. Dow.

```
 1              MS. DOW:  Yes, thank you.

 2    BY MS. DOW:

 3    Q    Thank you.  Mr. -- good afternoon, Mr. Campagna.  Am I

 4    saying the name incorrectly?

 5    A    Campagna.  It's close enough.

 6    Q    I apologize --

 7    A    No problem.  No problem.

 8    Q    -- for the pronunciation.  So I believe you perhaps had

 9    mentioned before that you and your organization did not

10    originate all of the numbers in this comparison, is that

11    correct?

12    A    That's correct.

13    Q    Okay.  And so for the purpose of a liquidation recovery

14    waterfall or a best interest test, what is the typical

15    accredited procedure requirements for vetting the numbers in

16    the analysis?

17    A    Specifically for the liquidation analysis?

18    Q    I'm sorry, I didn't hear the first word you said.

19    A    Specifically for the liquidation analysis is the basis

20    for your question?

21    Q    For any of the comparatives, the liquidation, the

22    orderly winddown, or the newco.

23    A    We rely heavily on the company's books and records and

24    market analysis in this case, the cryptocurrency.  And most

25    of the illiquid assets were valued by a third-party
```

Page 177

1    valuation firm.  Again, the mining value, at least in the

2    newco column, was valued by a reputable investment bank.

3    Those are the biggest -- that represents the biggest numbers

4    on the page here.  And some of the other numbers come from a

5    variety of financial analysis, the plan and the like.  So a

6    lot of this was based on third-party valuation of assets and

7    the valuation of the mining business by an investment bank.

8    Q    And then what level are you required to vet those

9    numbers and verify?

10   A    I don't think there's any requirement.  But again,

11   they're third-party, reputable firms that were in the

12   courtroom yesterday available for questioning.  And, you

13   know, their reports were submitted.

14   Q    Sure.  And what accreditation standard is this work

15   product produced under?

16   A    Say that again, please.

17   Q    What accreditation standard is the work product

18   produced under?

19   A    I'm not aware of an accreditation standard.

20   Q    Okay.  So in valuation of the liquidation or any parts

21   of this, you're saying there has not been an accreditation

22   standard applied?

23   A    I'm not aware of an accreditation standard for

24   performing a liquidation analysis.  But as far as

25   accreditation standards applicable to doing business

1    valuations and doing asset valuations, you'd have to speak

2    to those firms.  I don't do either.

3    Q    Okay.  All right.  So -- okay.  So when comparing a

4    liquidation or comparing assets to generate a comparative

5    recovery, in looking at -- and then doing the best interest

6    chart, what -- do you feel that in your professional

7    opinion, do the projections hold a healthy degree of

8    conservatism?

9              MS. BRIER:  Objection.

10             THE COURT:  Sustained.

11   BY MS. DOW:

12   Q    Okay.  I'm going to switch gears here.  Perhaps you

13   could share with us what experience and how many bitcoin

14   mining business models you have produced or those that put

15   input into this recovery waterfall has produced.

16             MS. BRIER:  Objection.

17             THE COURT:  Overruled.

18   BY MS. DOW:

19   A    I personally have not worked on another crypto or

20   bitcoin mining company.  I can't speak to the firms of Stout

21   or Centerview, who prepared the valuation components I think

22   you're referring to.

23   Q    Okay.  All right.  Can you speak to what the drivers to

24   determine the mining, in particular -- in the liquidation

25   valuation, is there any operating period or immediate

```
 1   liquidation?

 2   A     In this analysis, the $88 million is reflective of a

 3   sale of the assets on a non-operating basis.

 4   Q     Okay.  So immediately after effective date?

 5   A     Right.

 6   Q     Okay.  All right.

 7   A     The plan fails after trying newco and then trying to

 8   come out with a public mining vehicle with a smaller goal

 9   than the newco.  And if we fail on both of those, then yes,

10   it was presumed that this goes to an asset sale type

11   liquidation.

12   Q     You said a smaller -- I didn't hear one -- it's a

13   smaller what?

14   A     A smaller footprint.  NewCo is doing more than bitcoin

15   mining.  They're doing staking and other services.  So NewCo

16   has a bigger mandate than what you see here in the middle

17   column with a public mining company being stood up.  We're

18   still trying to harvest the value of the public miner and

19   get that in folks' hands, get the equity security in folks'

20   hands.  And you're winding down the rest of the operation.

21   If we can't do NewCo and we can't do a standalone public

22   mining entity, there's not a lot of steps left.  So in this

23   analysis, it's shown as an asset sale type of liquidation.

24   Q     Okay.  Through the course of the analysis, what

25   criteria did you have line of sight to on how the drivers
```

Page 180

1   were set for the different disposition analyses, the

2   liquidation (indiscernible) the NewCo?

3   A    I'm not sure I follow the question.

4   Q    So what criteria was set, for example, if the primary

5   business model of the liquidation is for immediate asset

6   sale on the individual unit or site?  What line of sight do

7   you have as compared to the valuation criteria, drivers to

8   the public?  Public miner and orderly winddown versus the

9   NewCo.

10  A    I'm not sure I can directly answer the question, but

11  again, the NewCo valuation was done by a third party firm.

12  We took a 25 percent discount off of that for a variety of

13  reasons in orderly winddown, public miner column.  And then

14  in the asset liquidation, we spoke with the company's mining

15  team who have purchased these rigs new.  They've seen the

16  marketplace for what they're valued at now.  And we did a

17  buildup on a rig-type by rig-type basis that sort of arrived

18  at the $88 million along with sale of the physical

19  facilities that they own.  And the data point to back that

20  up, that was about an average price of $640 per rig as a

21  component of the $88 million.  And based on some sale

22  transactions that were presented to the debtors earlier in

23  the case, the range for rigs was about $350 to $550 I

24  believe was what you heard yesterday from testimony.  So it

25  felt like we were in the right zip code.  And again, I could

Page 181

1    also benchmark it with the one offer that would have

2    resulted in $175 million of value for all the mining

3    business, which also had a lot of things the buyer needed to

4    do before they could actually follow through that in the

5    opinion of our investment bankers was not likely to happen

6    and wasn't deemed to even be a valid bid.

7         So that would say 175 at the top end if you're lucky

8    enough to really close that bid along the lines of what we

9    saw before.  And we have an $88 million on an asset-by-asset

10   basis.

11   Q    Okay.

12            THE COURT:  Let me ask you -- hold on, Ms. Dow.

13   I'll let you ask additional questions.  But I just want to

14   make sure I understand something.  So (indiscernible) this

15   was a demonstrative.  Just in the NewCo column first, were

16   any of those numbers derived by A&M or were those inputs all

17   from other valuations or other analyses by other experts?

18            THE WITNESS:  So if you look at that NewCo column,

19   the numbers that came from third-party firms.  A big chunk

20   of the liquid cryptocurrency, so the $2.6 billion right on

21   the top, we had Stout look at that.  Again, a big piece of

22   that is Ethereum and bitcoin.  Very easy to value.  So I

23   don't want to overstate the level of valuation work that's

24   required there.

25            But then there are some alt coins in there that

Page 182

1   required some more substantive valuation by Stout.  The

2   mining 565 came from our investment banker.  And Ryan Kielty

3   was here yesterday to speak to that number.  And then the

4   illiquid assets, the vast majority if not all of that 283,

5   and the same in the other columns, came from a Stout

6   valuation.  So the vast majority of this came from third-

7   party valuations.

8                  THE COURT:  And what about the adjustments, the

9   downward -- the deductions.  Where did they come from?

10                 THE WITNESS:  The distributions to claims?  That -

11  -

12                 THE COURT:  You know, less post-emergence costs to

13  estate, litigation trust funding...

14                 THE WITNESS:  Perfect.  Yes.

15                 THE COURT:  See capital.  Just walk me through.

16  I'm just trying to understand where the numbers in this

17  demonstrative came from.

18                 THE WITNESS:  Sure.

19                 THE COURT:  With the work of Alvarez & Marsal,

20  which were essentially inputs that were given to you.

21                 THE WITNESS:  Sure.  So the liquid cryptocurrency

22  is based on the coin-by-coin analysis that the company

23  supplied to Stout and Stout then valued.  The post-emergence

24  cost to the estate, these were estimates that we at Alvarez

25  & Marsal helped the company put together.  So we definitely

Page 183

1    were driving these costs.  And under the NewCo scenario,

2    what you're really looking at is six to 12 months of

3    operating expenses to get the distribution out.  We hope to

4    do it in six months.  We budgeted for a little longer.  So

5    six to 12 months of real work to get the distribution out

6    and you can get to the distribution perhaps around 14 months

7    out for unclaimed -- people don't show up for the recovery

8    and it redistributes.  So that's sort of the operating cost

9    behind that.  And then some fees to wind down these entities

10   over a couple of years.

11              In the orderly winddown public miner, the

12   presumption there is a five-year winddown plan where the

13   plan administrator tries to harvest the most value for the

14   illiquid assets, the litigation, and the like.  But it's a

15   longer-term plan with some more dollars behind it.

16              THE COURT:  Are those A&M numbers or are those the

17   numbers that were given to you?

18              THE WITNESS:  About half of that is an A&M number.

19   Maybe $100 million of that is an A&M number.  $60 million

20   was reflected in the bid from the backup bidder for their

21   fees associated with that transaction.  And then finally the

22   liquidation, again, is a number A&M helped derive.  It's

23   about fifty-fifty.  About 80 million is --

24              THE COURT:  That's the $159 million?

25              THE WITNESS:  Yes.  It's about $80 million of

Page 184

1    operating costs to take care of the liquidation on an

2    expedited basis, and then $80 million, three percent fee to

3    a Chapter 7 trustee.

4              THE COURT:  Without going through the explanation

5    at this point, are there other numbers in this demonstrative

6    that are inputs from A&M as opposed to information you got

7    from others?

8              THE WITNESS:  Well, the next two lines are

9    specifically in the plan.  Litigation trust funding of $50

10   million, seed capital to NewCo of 50.  Under the current

11   proposal with Fahrenheit, we put a $50 million because the

12   mining business would need some capital.

13             Beyond that, the answer is no until you get to the

14   claims where we did -- obviously we had been helping the

15   company assess claims, but most of these numbers are books

16   and records numbers as the claim process -- the claims

17   reconciliation process continues.

18             THE COURT:  Thanks very much.  Okay.  Go ahead,

19   Ms. Dow, with your questions.

20             MS. DOW:  Thank you, Your Honor.

21   BY MS. DOW:

22   Q    Okay.  So I believe what I heard is that this page has

23   a mix of parties that have inputted to it and that your

24   organization, A&M, are largely involved in the derivation of

25   the second and third column.  Did I hear that correctly?

1    A    I think that's fair.

2    Q    And so with some involvement with calculating and

3    analyzing some of the deductions (indiscernible).

4    A    Yes, that's right.

5    Q    Okay.  Thank you for that.  So when you did work on the

6    analysis of the mining operation, did (indiscernible) going

7    concern business model or orderly winddown business model

8    inputs (indiscernible)?

9    A    You're talking about the underlying forecast that was

10   supplied to Centerview to conduct their business valuation?

11   Q    Yes.  And whatever numbers you utilized as inputs to

12   the orderly winddown.

13   A    We just used the $565 million valuation from Centerview

14   and discounted it by 25 percent.

15   Q    Okay.

16   A    And that's (indiscernible).

17   Q    And did you do any tests on the 565 beyond the --

18   before doing mathematical adjustment?

19   A    I think we've been through this.  That was the expert

20   opinion of Centerview in their valuation that was provided.

21   So no, we didn't do anything beyond that.

22   Q    So no verification of quality of revenues to verify the

23   input data.

24   A    Not done by me.

25   Q    Okay.  And again could you go through how you derived

Page 186

1    the 25 percent discount to get us from the NewCo so the

2    winddown?  What is the math or procedure behind that?

3    A    I believe I did.

4    Q    Could you summarize that again?  I'm sorry.

5    A    Sure.  We pointed to a couple of factors.  One, in the

6    NewCo the $565 million presupposes that Fahrenheit and U.S.

7    Bitcoin is running the operation.  That was important -- an

8    important component of the valuation was knowing who the

9    operator was, and it was the Debtor and UCC's first choice

10   operator.  So inherently if you're going to your second

11   choice operator, you probably think they're going to do a

12   slightly -- not quite as good of a job.  Could be a great

13   second choice bidder, but likely not going to do quite as

14   good or you'd rather go with your first choice.  So that's a

15   piece of it.

16        U.S. Bitcoin also put several -- U.S. Bitcoin and

17   Fahrenheit also put several items very specifically into the

18   terms of the deal that is inked and signed and ready to be -

19   - ready to go.  There was $100 million of credits for future

20   purchases of rigs.  So $100 million in discounts.  There was

21   a cap placed on buildout costs where they capped buildout

22   costs at $395,000 per megawatt.  So if construction costs

23   run higher than that, it's on them.  That was deemed

24   valuable.  And they were also supplying software to all our

25   rigs that will help regulate the power usage, when they turn

1    on, when they turn off, and keep them running efficiently.

2    So those three items, we can soft circle those.

3        I mentioned one very specifically with $100 million.

4    Big numbers that also helped us guide to a 25 percent

5    discount.  So that's largely how we assessed the 25 percent

6    from NewCo to orderly winddown/public miner.

7    Q    Thank you for that.  So could you -- two questions

8    about inputs to the orderly winddown numbers.  IN orderly

9    winddown did you consider what would the capital infusion

10   required in order to fully electrify and energize the idle

11   assets and over what period of time?

12   A    Yeah, I'm not the best person to speak to the

13   underlying forecast for mining.  I think that was the

14   subject of Mr. Ferrara's discussion yesterday.  But I do

15   believe it had -- the 565 presumes $50 million of capital to

16   fund it upfront, which is why you see a deduction on the

17   very next line.  There's a little bit of semantics with the

18   -- but it presupposes they have $50 million in capital to

19   start with.  And it does include some rig replacement and

20   other capital costs along the way.  But again, Mr. Ferrara

21   would be a better person to speak to on the details there.

22   Q    Okay, thank you for that.  So you don't have line of

23   sight of what the additional capital to energize the site,

24   just for some of the in-service costs?

25   A    There were some costs that energized sites built in.

1    There was a projected buildout of certain items in the

2    underlying business plan that, again, I'm not fully familiar

3    with those details.

4    Q    All right.  So did you offer support to the mining

5    valuation?

6    A    No, we don't -- my firm doesn't do valuation work on

7    that level.

8    Q    Okay.  On that level.  You mean actively producing

9    valuation analysis?

10    A    I mean we have a division that does some valuation

11    work, but we don't have experience in the crypto-mining

12    space.  And we're not asked to value -- provide any

13    assistance with respect to valuation of the mining assets.

14    Q    Okay, thank you.  How about the backup bids for the

15    orderly winddown?  What kind of review or input did that

16    have on the numbers there?

17    A    I think what I've already stated is sort of the breadth

18    of my knowledge on the backup bids.  You know, moving from

19    our first bidder to our second bidder was part of the reason

20    for the decrease in the valuation that you see on the mining

21    business.  But again, our investment banker was collecting

22    the backup bids as well as the primary bids and performed

23    all the assessments on those bids.

24    Q    So thank you for that.  And so the orderly winddown is

25    materially based on the work of others, yet you've done some

1    analysis and added to it, such as the discount.  And you're

2    discounting total value, or are you discounting the

3    productivity of the assets to generate revenue?

4             MS. BRIER:  Objection.

5             THE COURT:  Overruled.

6    BY MS. DOW:

7    A    565 times 75 percent equals 424.  I'm just discounting

8    the number.

9    Q    Okay.  So in the event of the criteria supporting your

10   underlying numbers, did you look at and verify your inputs

11   that were given to you, if there perhaps might be any

12   irregularities in the assumptions that are flawed versus,

13   you know, industry standards?

14   A    In applying a 25 percent discount to 565?  I'm not sure

15   I follow.  I did not do the valuation of the 565, so I am

16   not aware of the firm that did do that analysis used.

17   Q    Okay.  I apologize, I didn't mean to speak over you.

18   A    That's okay.

19   Q    Sorry about that.  But if you are in fact using a

20   discount through the revenue or overall valuation, shouldn't

21   there be an understanding of the key assumptions --

22            THE COURT:  He's explained what he's done.  Just

23   move along with the examination.

24            MS. DOW:  Okay.

25   BY MS. DOW:

Page 190

1    Q    So if in fact irregularities are found in the

2    underlying assumption, whether it's the assumptions driving

3    the 25 percent discount or others, where does that put this

4    analysis in the range of high degree of conservatism?

5              MS. BRIER:  Objection.

6              THE COURT:  Sustained.  Let's move along.

7              MS. DOW:  Okay.  So, Your Honor, I'm trying to

8    voice tactfully a question on the line of probing my concern

9    area, which is around the assumptions of the productivity of

10   the assets and creating their primary --

11             THE COURT:  He's explained where the numbers have

12   come from.  You already asked about that.

13             MS. DOW:  Thank you, Your Honor.  What I'm trying

14   to understand is how if there is a flaw, since this is a

15   single number and not a range, which is often used, how that

16   --

17             THE WITNESS:  He has indicated which experts did

18   valuations and what he relied on.  Move on with your

19   examination.  If you had questions about the other

20   valuations, you should have asked it of them.  Let's go.

21   BY MS. DOW:

22   Q    So on the orderly winddown piece that you valued, I

23   heard you speak about I think it was the Bricks.  What was

24   the findings or your review and your use of that into rollup

25   numbers here of the other two?

1    A    I'm sorry, was that the Brick?  Was that what you just

2    said?

3    Q    I think that's the colloquial name for the bid that you

4    were mentioning just a few moments ago.

5    A    Yes.

6    Q    But there were other -- I believe two other bids.

7    Could you please share how they impacted the calculations,

8    the review of those impacting the calculations.

9    A    I think I mentioned the backup bidder, which, yes, was

10   the Brick Group.  Their cost structure is built into the

11   second line on this chart, the less post-emergence costs to

12   the estate.  So part of that 163 of expense relates to costs

13   associated with that backup bid, which is our signed-up

14   backup bidder.

15        As far as other backup bids, I did not look at any

16   other backup bids.  I am not aware of what they are or what

17   the impact would be.

18   Q    Okay.  Thank you.  And then finally for the use of this

19   overall analysis, if -- how does a change in either three of

20   these columns perhaps impact the best interest test?

21             MS. BRIER:  Objection.

22   BY MS. DOW:

23   A    Mathematically?  More asset recoveries make the bottom

24   number higher.  The percents go up.  As does less

25   distributions to claims.  I don't -- that's the way the math

1   would work.  If NewCo goes up, you increase the gap that you

2   need to hit to have an issue with the best interest test.

3   Q    Could you repeat that again?  I'm sorry, it was

4   muffled.

5   A    If you increase the values under the NewCo column, then

6   the positive numbers, the value of these assets

7   (indiscernible) everything else constant, you would increase

8   the gap of room or the cushion you have before there's any

9   issue with the best interest test.

10  Q    And what about the other way, if for some reason the

11  value of large operation is significantly less, like 20, 30,

12  40 percent in practicality?

13  A    Maybe not directly answering your question, but if you

14  increase -- left everything else the same and increased the

15  asset values on the liquidation, that would decrease the

16  cushion between NewCo and liquidation value and decrease the

17  cushion we currently have on the best interest test.

18  Q    Okay.

19          THE COURT:  Let's finish up, Ms. Dow.

20  BY MS. DOW:

21  A    I don't recall the specifics on -- you know, there were

22  some other points in that question, but I didn't really

23  follow the specifics.

24  Q    Okay.  So the cushion would be decreased if the left

25  two column's numbers were overstated currently and come out

Page 193

1    lower or the cushion would also increase --

2             THE COURT:  Ms. Dow, finish up.  Now.

3             MS. DOW:  (indiscernible), did I hear that

4    (indiscernible)?

5             THE COURT:  Ms. Dow, finish up now.

6             MS. DOW:  Thank you.  I was just asking for

7    clarification on -- on the (indiscernible).

8             THE COURT:  Ms. Dow, it's math.  Go on.  If you

9    have any more questions, ask them now.

10            MS. DOW:  Thank you, Your Honor.

11            THE COURT:  All right.  We'll take a recess until

12   3:30.

13            (Recess)

14            THE COURT:  All right, please be seated.  Next up

15   is Mr. Ubierna.

16            And you're still under oath.

17            Go ahead, Mr. Ubierna.

18   BY MR. UBIERNA:

19   Q    Good afternoon, Mr. Campagna. Are you familiar with the

20   EIP part of the plan?

21   A    Yes, I generally am.

22   Q    What role, if any, has Celsius employees or directors

23   in drafting the EIP?

24   A    I'm sorry, was that what role have the directors and

25   officers had in the EIP?

Page 194

1    Q     In drafting the EIP, yes.

2    A     I don't know that they drafted it, but they certainly

3    reviewed it and approved it before it made its way into what

4    was filed on the docket once upon a time into the plan.

5    Q     Okay.  Have you been involved in drafting the Emergency

6    Incentive Plan (indiscernible) targets?

7    A     Yes, I have.

8    Q     How have you established the targets?

9    A     Well, this is a very unusual situation.  In a typical

10   situation, typical business, you have revenue targets and

11   EBITDA targets.  It's a little bit easier to talk about what

12   is target performance, what's exceeding performance and the

13   like.  Here, the path forward is to do a couple of things,

14   but primarily to get liquid crypto returned to customers as

15   quickly as possible.  So we tried to drive targets around

16   with those goals in mind and get the mining business as

17   operational and get as many rigs profitably in action as

18   quickly as possible to drive that business to approved

19   cashflow performance as quickly as possible and set it up

20   for success as part of -- well, now in this part of NewCo.

21   And that's what the mining metrics were designed to do as

22   well.

23   Q     Ballots were sent in late August.  And today it's

24   October 4th.  How -- would you consider easy getting a plan

25   approved by October 31?

Page 195

```
 1    A    I've never used the word easy.  So that counts on

 2    things that are out of my control and out of our control.

 3    Maybe except for one person on the room's control.  So

 4    that's really our hope.  And it looks better maybe -- maybe

 5    it looks better now than it did a couple of months ago.  I

 6    don't know.

 7    Q    What has happened recently with Celsius Mawson site?

 8    A    I'm sorry, say that again?

 9    Q    What has happened recently with Celsius Mawson site?

10    A    I'm sorry...

11              MS. BRIER:  Mawson.  I think he's saying Mawson.

12    Yes.

13              THE WITNESS:  Mawson.  Okay.

14    BY MR. UBIERNA:

15    A    Yes.  I'm probably not the most up-to-speed on all the

16    folks you could have asked that, but I know the Mawson rigs

17    are offline or going offline.  And we would look to redeploy

18    them.

19    Q    Okay.  How does disclosure impact the EIP rewards?

20    A    So if you look -- one of the performance metrics is

21    rigs -- I forget the terminology.  Rigs online, rigs hashing

22    profitably.  I know there was a threshold target.  I don't

23    know if I have the data point in my declaration.  I'm just

24    looking to see if I have that data point.  There's a target

25    performance and -- and threshold and a target.  One was as
```

1    of August 31st, a company needs to have over 85,000 rigs

2    online.  I might have the number wrong.  They did achieve

3    that portion of the milestone.  But the target for September

4    30th was higher than where the online rigs ended couple days

5    ago.  So based on the math, the math isn't in their favor at

6    this time for the second half of that opportunity.

7    Q    Okay.  How is it that four months target for the

8    (indiscernible) is measured?

9    A    That one has been met.  It was a long time coming.  We

10   need certain easements from folks who are economically

11   motivated to help.  I think that performance target actually

12   helped get that completed and get in excess of 10,000 rigs

13   up and running.

14   Q    Okay.  The performance target says completed and

15   operational.  How is that measured?

16   A    That was -- I'm (indiscernible) the specifics, but I

17   believe it had to be energized, we had to have control of

18   the facility and it had to be energized and ready to go.

19   And it was all of those things.

20   Q    Okay.  Does it have any numerical target that

21   (indiscernible) performance target (indiscernible) --

22   A    That I don't --

23   Q    -- completed and operational?

24   A    Apologies for speaking over you.  I don't

25   (indiscernible) a numerical target.  It was more those

1    qualitative factors that I just mentioned that needed to

2    move forward.  Get through the easement issue, get the --

3    which then allowed us to energize the facility and get it

4    operational.

5    Q    Okay.  Going back to the 95,000 mining rigs.  Will they

6    needed to be vetted for the metric to be monthly or weekly

7    average for it to be not so easily abused?

8    A    There's a whole bunch of different ways to set this up.

9    And we had many weeks of negotiations with the Unsecured

10   Creditors' Committee to set the targets where they are.  And

11   this is where we landed.

12   Q    Are the mining metrics difficult to meet in your

13   opinion?

14   A    Well, one of them met, one is 50 percent met.  And I

15   think there's a third one that I'm -- again, as a memory

16   test I'm not remembering it offhand.  So I know they haven't

17   met all of them.  And it doesn't look like they will meet

18   all of them.  So they seem sufficient.

19   Q    Okay.  Have this target been made more difficult

20   because of previous failures by Celsius management?

21   Yeah, I don't know how to answer that.

22   A    Okay.  I don't have any more questions.

23             MR. UBIERNA:  Thank you, Your Honor.

24             THE COURT:  Thank you very much, Mr. Ubierna.

25             Mr. Frishberg?

Page 198

1           MR. FRISHBERG:  Hi.  Thank you, Your Honor.  I

2    just have a very brief question.

3    BY MR. FRISHBERG:

4    Q    I believe  you covered part of this earlier.  Has there

5    been any offers or have there been any offers to buy all the

6    CEL tokens in the event of a liquidation?

7    A    Not that I'm aware of.  I haven't heard of any.

8    Q    Okay.  If Celsius was to go into, as some have

9    suggested, a Chapter 7 liquidation, how would they sell the

10   CEL tokens?

11   A    I don't think they would.  I think the SEC's regulatory

12   bodies have prevented the company from selling the CEL

13   tokens.  So I do not think they would be sold.

14   Q    So the CEL tokens for the company have no value.

15   A    Correct.

16   Q    Would that be accurate?

17   A    Under a liquidation analysis, we have zero value

18   reflected for them in the liquidation column.

19   Q    Those are the questions.

20           THE COURT:  Thank you very much, Mr. Frishberg.

21           Mr. Abreu?

22   BY MR. ABREU:

23   Q    Hello, Mr. Campagna.  Were you here when Mr. Galka was

24   speaking?

25   A    For part, yes.  Not all of his testimony, no.

Page 199

1   Q    Okay.  So could you -- I'm just going to mention -- I'm

2   going just to use his expert report and your supplement

3   statement, your supplement declaration.  That's -- so let's

4   open the document 3580, which is Mr. Galka's expert report.

5   A    I have that in front of me.

6   Q    Let's go to Page 28 of the PDF.  On figure 8.

7   A    Okay.

8   Q    Where it says Celsius Annual (indiscernible)

9   Transactions.  Do you recall --

10           THE COURT:  What page are you on, Mr. Abreu?

11           MR. ABREU:  Twenty-eight.  It's that table of

12   Celsius Annual --

13           THE COURT:  That's fine.  I just needed to turn to

14   it.  Go ahead.

15   BY MR. ABREU:

16   Q    Do you recall when Mr. Galka said it was fair to assess

17   the average price of CEL purchase by buyers through the

18   company by taking the -- for example, the 2021 dollar value

19   and then dividing by the 2021 number of CEL tokens?  Do you

20   recall that?

21           MR. WEEDMAN:  Objection, Your Honor.

22           MS. BRIER:  Objection.

23           MR. WEEDMAN:  I think that misstates Mr. Galka's -

24   -

25           THE COURT:  Sustained.  Ask your next question,

Page 200

1    Mr. Abreu.

2    BY MR. ABREU:

3    Q    Are you familiar with tax harvesting?

4            THE COURT:  I couldn't hear you, Mr. Abreu.  Just

5    --

6    BY MR. ABREU:

7    Q    Mr. Campagna, are you familiar with tax harvesting?

8    A    No, I'm not.

9    Q    Have you ever filed your taxes in a year that you have

10   capital gains?

11   A    Yes.

12   Q    Have you ever held or traded cryptocurrencies?

13   A    I have not.

14           MR. ABREU:  Judge, could I just explain what tax

15   harvesting is?

16           THE COURT:  No.  Just ask your questions.

17           MR. ABREU:  Okay.

18   BY MR. ABREU:

19   Q    Are you aware if cryptocurrencies are subject to

20   capital gains in the U.S.?

21           THE COURT:  I'm sorry, I couldn't hear your

22   question.

23   BY MR. ABREU:

24   Q    Are you aware if cryptocurrencies in U.S. are subject

25   to capital gains?

1            THE COURT:  Subject to capital gains.

2   BY MR. ABREU:

3   A    I'm certainly no tax advisor, but I have heard that.

4   I'm not aware of them from anything other than generally

5   being around the cases and hearing things.

6   Q    In a case of (indiscernible) or CEL, which both for

7   example at $5 (indiscernible) the company, do you believe

8   there might be a greater recovery if he gets (indiscernible)

9   his asset that he bought?

10           THE COURT:  I don't understand your question, Mr.

11  Abreu.

12           MR. ABREU:  My question is to the matter that if

13  there is a distribution of CEL tokens, OTC buyers can choose

14  to sell it in the market at any point and have a value that

15  they can harvest against their capital gains, which is

16  higher than what would be proposed -- what is said on the

17  (indiscernible).

18           THE COURT:  Your question is beyond the scope of

19  the direct examination and I won't permit it.  It's also

20  beyond the expertise that he has been using in this case.

21           MR. ABREU:  Okay.

22  BY MR. ABREU:

23  Q    (indiscernible) that the proposed reorg plan already

24  excludes parties who might violate securities laws and are

25  subject to litigation in the case of CEL token.

Page 202

1              MS. BRIER:  Objection, Your Honor.

2              THE COURT:  Sustained.

3    BY MR. ABREU:

4    Q    Does the company intend to pursue any value creation

5    for CEL token?

6              MS. BRIER:  Objection.

7              THE COURT:  Sustained.

8    BY MR. ABREU:

9    Q    Are you aware if the current reorg plan has any

10   (indiscernible) or CEL token besides liquidating or just

11   settling on the proposed price?

12             MS. BRIER:  Objection.

13             THE COURT:  Could you ask your question again?

14   I'm not sure I followed it.

15   BY MR. ABREU:

16   Q    Are you aware if the current reorg plan has any use

17   case for CEL token on the reorganization?

18   A    As part of NewCo?

19   Q    Yes.

20   A    I'm not aware of any.

21   Q    Do you understand that -- let me rephrase it.  If there

22   is -- if there is no plan for continuing any sort of value

23   for CEL on reorg, if that will eliminate any issues with

24   security concerns?  Just if you are aware, if you have any

25   understanding of this.

1             MS. BRIER:  Objection.

2             THE COURT:  You can answer the question.

3     BY MR. ABREU:

4     A     No.  I have no knowledge of that topic.

5             MR. ABREU:  Just one question for you, Judge,

6     about our proceeding.  Just my final question.  In the

7     matter of Mr. Galka's witness statements, if you recall I

8     ask him why he did not provide any data from FTX, which they

9     subpoenaed.  And I believe it's not sealed.  Would you

10    inclined to approve a motion to release that data?  Because

11    I believe there might be sufficient information that an

12    expert witness could shed some doubts on what Mr. Galka has

13    reported here today.

14            THE COURT:  I don't have a motion in front of me,

15    Mr. Abreu.  If you make a motion, I'll decide the motion.

16            MR. ABREU:  Thank you.  That's all for me.

17            THE COURT:  Thank you very much, Mr. Abreu.

18            All right, Mr. Johnson.

19            MR. JOHNSON:  Okay.  Hearing me?

20            THE COURT:  Yes, we can.

21            MR. JOHNSON:  Okay.  Good afternoon, everybody.

22    BY MR. JOHNSON:

23    Q     Good afternoon, Mr. Campagna.  I want to -- I will not

24    ask you questions about (indiscernible) CEL token so you

25    will be happy, okay?  Okay.  So I know you have 25 years'

1    experience in this (indiscernible) business, right?

2    A    I have 25 years' experience working with distressed

3    companies, yes.

4    Q    Yes.  So how many years you have experience in crypto

5    business advising?

6    A    Including this one, since June of 2022.  So this is the

7    first one.

8    Q    Okay.  So how many years you have experience in bitcoin

9    mining?

10   A    Again, this is the first engagement involving bitcoin

11   or bitcoin money, crypto or bitcoin mining.

12   Q    Okay.  So in the last 25 years were you advising this

13   bankruptcy case, how many unsecured (indiscernible),

14   unsecured creditor maximally you have seen in one bankruptcy

15   case?

16   A    I'm sorry, I did not pick up all of that question.

17   Q    In the 25 years in your experience for the bankruptcy

18   case (indiscernible) many of unsecured creditor, right?  So

19   in those bankruptcy case, maximally in one case, how many

20   unsecured creditors you ever see?

21   A    I understand the question.  The answer is I'm not sure.

22   But I would think less than 100,000 in any of those cases.

23   Q    (indiscernible)?

24   A    You're asking about the number of creditors, number of

25   unsecured creditors in those cases?

Page 205

```
 1    Q     Yes.

 2    A     Yeah.  I don't have a precise answer.  But I would

 3    estimate it at less than 100,000.

 4    Q     Less than 100,000.  So in our case, we have nearly one

 5    million unsecured creditors, right?  Do you know?

 6    A     I don't know, but that number sounds high.

 7    Q     Okay.  And for unsecured creditor committee, the seven

 8    member of unsecured creditor committee members is not

 9    elected by our unsecured creditors.  They are appointed by

10    U.S. Trustee.  You know that?

11              MS. BRIER:  Objection.

12              THE COURT:  Sustained.

13    BY MR. JOHNSON:

14    Q     Okay.  Back to my questions.  So I want to ask you

15    about the exhibit number 47.  Okay.  Do you see that?

16    A     No, I don't have that.  Exhibit 37 you mentioned?

17    Q     Forty-seven.

18    A     Forty-seven.

19    Q     And 48.

20              MS. BRIER:  Mr. Johnson, did you put exhibits on

21    the record last night that you intend to enter?

22              MR. JOHNSON:  That's debtor -- creditor --

23    debtor's 47 (indiscernible) Celsius Liquidation Analysis.

24    And Debtor 48, Celsius Liquidation Analysis Supporting data.

25              MR. COLODNY:  Your Honor, I believe this would be
```

Page 206

1    the exhibit that Mr. Phillips asked about before.

2              THE COURT:  I'm sorry, I can't hear you.

3              MS. BRIER:  I think they're talking -- yeah.

4              MR. COLODNY:  Your Honor, I believe this is the

5    exhibit Mr. Phillips asked about, which is Celsius Exhibit 7

6    in your binder in front of you.  And it's Page 269 at the

7    top.  It's in the skinny --

8              MS. BRIER:  Your Honor, I think a couple of -- I

9    think a couple of these questioners have been referencing

10   Exhibit 47, which is a large Excel that is on Debtor's

11   exhibit list that underlies his analysis.  So they may be

12   referencing that.  We have it available.  It's a very large

13   Excel that's on the exhibit list.

14             THE COURT:  You had to post your exhibits last

15   night by 5:00 if you wanted to use them in cross-

16   examination.

17             MR. JOHNSON:  No, that's not my -- that's not my--

18             THE COURT:  Ask your next question, Mr. Johnson.

19             MR. JOHNSON:  I mean the exhibit in the

20   (indiscernible) 3699 and filed by another (indiscernible)

21   the -- let me see.  (indiscernible) document for today's

22   hearing.  But there is cross-examination.  I want to use

23   that document.  I think it's -- Your Honor, you have seen

24   that document.

25             THE COURT:  You have to file any documents you

1    wish to use in cross-examination by last night.  You did

2    not.  Go on with your examination if you have any.

3             MR. JOHNSON:  Is that document (indiscernible) --

4             THE COURT:  Don't argue with me, Mr. Johnson.  If

5    you have a question, ask your question of the witness.

6             MR. JOHNSON:  Okay.  So for the exhibit Debtor 47,

7    48, 49 --

8             THE COURT:  Mr. Johnson, you can't ask about that

9    exhibit.  You didn't send it last night.  Ask your next

10   question.  Do you have another question to ask?

11   BY MR. JOHNSON:

12   Q    Okay.  Mr. Campagna, for the (indiscernible) being

13   done, you mentioned on your own statement on Page 25,

14   Paragraph 68.

15   A    Page 25, Paragraph 68?

16   Q    Yes.

17   A    Okay.  I'm there.  I'm just going to read that

18   paragraph.

19   Q    That (indiscernible) you mentioned it is likely that

20   (indiscernible) trustee will be liquidating the assets on a

21   much shorter timeframe (indiscernible) values, right?

22   (indiscernible)?

23            MS. BRIER:  Your Honor, can he repeat that

24   question?  I'm not sure I understood it.

25            THE COURT:  Mr. Johnson, we're having a hard time

Page 208

1    understanding your questions.  Can you just repeat it,

2    please?

3              MR. JOHNSON:  Okay.  Under Paragraph 68, Mr.

4    Campagna mentioned that (indiscernible) Chapter 7 trustee

5    would liquidate the assets on a much shorter timeframe.  Is

6    that what you said?

7              THE COURT:  That's what it says.  What's your

8    question?

9    BY MR. JOHNSON:

10   Q    Okay.  You mentioned that you don't have any experience

11   in the liquidation (indiscernible) of crypto business and

12   (indiscernible) bitcoin mining business.  Then why you can

13   have such -- you make such statement that is likely it's a

14   shorter liquidation timeframe for Chapter 7 trustee?  Why?

15   If you don't have experience, why can say that?

16   A    I think the answer is I have experience in Chater 11

17   cases when they come to the end of a plan out for a vote.

18   If the answer is no and we have, you know, two paths under

19   which -- a yes vote is a yes vote for a NewCo.  Or in the

20   alternative, if NewCo can't be completed, a standalone

21   public mining company and a winddown of the platform

22   business.   If we're unable to enact either of those,

23   there's not a lot of other places to go other than selling

24   assets and trying to return fiat cash to people as quickly

25   as possible, and that's what the estimates underlying the

1     liquidation analysis show.

2     Q    Why are trustee 7 (indiscernible) trustee cannot hire

3     another manager to do the actual same things for the other

4     wind down?

5     A    To do the same thing that the --

6            THE COURT:  I'm going to object to the question

7     myself.  This is a matter of law as to what a Chapter 7

8     trustee must do.  Ask your next question.

9            MR. JOHNSON:  Okay.

10           BY MR. JOHNSON:

11           Q    So back to today's your demonstration.  We

12    can see your doc 367.  Today your demonstration, Page 6 of

13    6.

14           MS. BRIER:  Can you repeat the docket number?  I

15    just didn't catch that.

16           MR. JOHNSON:  Today, you're fine.

17           THE COURT:  Could you just repeat where we're

18    supposed to be looking?

19           MR. JOHNSON:  Yes, there you have a chart.  You

20    have a -- it's a (indiscernible) workflow.

21           THE COURT:  Mr. Johnson, I'm sorry, I can't follow

22    you.  What is it that you want the witness to look at?

23           MR. JOHNSON:  I want to ask him a question about

24    the different figure on the wind down and NewCo and

25    (indiscernible)

Page 210

1              THE COURT:  And is there a specific page in the

2    exhibit that you want him to look at and that you want me to

3    look at?

4              MR. JOHNSON:  Yes, Page 6 of 6.

5              THE WITNESS:  It's the last page of that dec

6    altogether.  I think it's this one again.

7              MR. JOHNSON:  The plan and liquidation require

8    one, four.

9              THE COURT:  All right.  Go ahead with your

10   question.

11             MR. JOHNSON:  Okay.

12   BY MR. JOHNSON:

13   Q    We can see there is a huge difference for the post

14   emergency coast to the estate between the three sides,

15   especially for the order being done.  We can see there are

16   not much more difference between these two sides.  You can

17   have nearly 90 million U.S. dollar difference for that cost.

18   Why that --

19             THE COURT:  What's your question?

20   BY MR. JOHNSON:

21   Q        Why have such huge difference -- 116,000,075.

22   What's the difference?  Why so big difference?

23   A    Are you on the second line of the schedule?

24   Q    Yes.

25   A    Okay.  Under the NewCo scenario, the work that needs to

Page 211

1   be done is to get the initial crypto distribution out and

2   perhaps a second distribution out.  The initial crypto

3   distribution isn't always all going to go out in one slug.

4   There will be multiple with reserves and other mechanics.

5   It'll take some time.  So we've estimated the cost of

6   maintaining employees and some infrastructure for 6 to 12

7   months.  That's what the $75 million represents.  In the

8   public minor column, that is an orderly wind down scheduled

9   for five years.  So it's a greater time frame, which results

10  in increased expenses.  And 60 million of those expenses,

11  roughly, are fees associated with the backup bidder --

12  included in the backup bidder term sheet.  So roughly, 60

13  million of fees to the backup bidder to run this process and

14  do a lot of the work behind the scenes.  And the rest is

15  costs of keeping folks around to drive to higher recoveries

16  on some of the illiquid assets and the like.  And then in a

17  liquidation column, it's approximately $80 million of costs

18  to run a Chapter 7 liquidation and have some employees and

19  pay some fees for selling assets and things of the like.

20  And $80 million, which I understand is a statutory rate of

21  sorts.  I don't know that it always has to be the 3 percent,

22  but 3 percent of distributable proceeds to a Chapter 7

23  trustee, which is the second 80 million.  So 80 million of

24  real cost, 80 million to the Chapter 7 trustee is

25  160,000,000 -- the 159 that you see there.  That's the math

Page 212

1    on that at a high level.

2    Q    But why you put two quite a different time frame

3    between NewCo and other wind down?

4    A    Because under the NewCo scenario, NewCo is taking all

5    those illiquid assets and managing them themselves on the

6    new platform and they're expected to have income generation

7    of their own that will offset the costs of liquidating those

8    assets.  Under the orderly wind down, there is no NewCo.

9    There's a standalone mining company that's public on its own

10   and someone has to, you know, bear the costs of winding down

11   the remaining assets.  NewCo will do that as part of the

12   transaction for 5 years, 7 years, 10 years, however long it

13   takes.  It's their choice.  In the middle column, we've

14   estimated that to take 4 to 5 years and be done by this plan

15   administrator and the cost would be borne by the wind down

16   entity here.

17   Q    The older wind down cannot generate extra profit during

18   that period, but the new code can get extra money --

19   A    Correct.  Sorry.

20   Q    -- from extra business, is that what you mean?

21   A    Yes, that's what I mean.

22   Q    But your estimation is based on the estimation of a new

23   code business model, right?

24   A    Sorry, say that again.

25   Q    So your estimation is based on the new code estimation?

1   A    Yes.  Mr. Kokinos is in charge of the NewCo business

2   plan.  I know he had an exhibit and a declaration as well,

3   so I can't really speak to that.  But NewCo plans to have

4   income generating activities separate and apart from mining.

5   Q    Okay.  So let's go to the nuclear business model that

6   is also your only document is doc 2902 -- the plan.

7            MS. BRIER:  Sorry.  Did you say --

8            THE COURT:  Sorry, Mr. Johnson, I couldn't

9   understand you.

10           MR. JOHNSON:  I mean we can go to the record.  Let

11  me see.  Wait a moment, please.  Okay.  That's Exhibit E of

12  disclosure statement.

13           MS. BRIER:  Exhibit E of the disclosure statement;

14  is that what you're looking for?

15           MR. JOHNSON:  Yes.

16           MS. BRIER:  And which version of the disclosure

17  statement are you talking about?  What docket number are you

18  looking at?

19           MR. JOHNSON:  Docket 2902.

20           MS. BRIER:  Okay.  I believe that's an older

21  version of the disclosure statement, but -- and did you put

22  that on the docket last night?  We can pull it up if that

23  would be helpful.  I don't know that we -- it's an older

24  version we can have someone send it to Mr. Young and show

25  it, but I don't -- we didn't have advanced notice for that.

1          THE COURT:  Well, what's your next question?  You

2     didn't send in -- you didn't file on the docket the

3     documents you want to use in cross examination today.  I'm

4     giving you leeway.

5          MR. JOHNSON:  Your Honor, I'm --

6          THE COURT:  You've got to bring your examination

7     to an end.

8          MR. JOHNSON:  Your Honor, another cross-

9     examination creditor has been serving such exhibit.

10         THE COURT:  Mr. Johnson, if you have another

11    question, ask it or your examination is over.

12         MR. JOHNSON:  Okay.

13    BY MR. JOHNSON:

14    Q    Mr. Campagna, my question is based on the -- do we know

15    the hash rate?  Do we know Bitcoin Hash rate?

16    A    The answer is no, I don't.  I'm not a Bitcoin mining

17    person.

18    Q    Okay.  The data is advanced modeling (indiscernible) is

19    a nuclear analysis --

20         THE COURT:  All right.  Mr. Johnson, this is

21    beyond the scope of the direct.  Your examination is over.

22    We have one more person who wanted to cross examiner who's

23    in the courtroom.  Come on up.  You're not really going to

24    go through all of that, are you?

25         MR. NOSKOV:  Wasn't sure how this is all going to

Page 215

1    go so --

2              THE COURT:  Just make your appearance.

3              MR. NOSKOV:  Victor Noskov, Quinn Emanuel for

4    Pharaoh's fund.

5              MS. BRIER:  And, Your Honor -- sorry to interrupt,

6    but just for purposes of the record, Mr. Noskov is appearing

7    on behalf of Pharaohs.  He filed a 2019 that indicated he's

8    also appearing on behalf of Nexus, another creditor in this

9    case.  Pharaohs is advancing an objection that liquidation

10   would be better than the plan because of the NewCo equity.

11   Just for the record, Nexus advisors has -- and -- or its

12   affiliates have voted for the plan and have selected equity

13   as opposed to liquid crypto.  So we wanted to notify the

14   court of that fact and reserve rights of course.

15             THE COURT:  You're suggesting Mr. Noskov has a

16   conflict?

17             MS. BRIER:  We're just notifying the court of the

18   fact and reserving rights to seek discovery on that.

19             THE COURT:  Okay.

20             MS. BRIER:  We don't know much at this point.

21             THE COURT:  Go ahead, Mr. Noskov.

22             MR. NOSKOV:  Sure.  Your Honor, I have a couple of

23   binders.  May I bring them up to the court and hand to the

24   witness?

25             THE COURT:  Sure.  You have copies for other

```
 1    counsel?

 2             MR. NOSKOV:  All of these are --

 3             THE COURT:  If you don't, you're not using them.

 4             MR. NOSKOV:  I'm not going to be using all of

 5    them.

 6             THE COURT:  Do you have copies for other counsel,

 7    the committee --

 8             MR. NOSKOV:  These are all --

 9             THE COURT:  -- and for the debtor?

10             MR. NOSKOV:  These are all exhibits.  These are

11    all debtor exhibits and I --

12             THE COURT:  Did you post last night a list of --

13             MR. NOSKOV:  Of course, Your Honor.

14             THE COURT:  Go ahead.

15             MR. NOSKOV:  Your Honor, these should all be

16    familiar to the witness and to the parties.

17             THE COURT:  We'll see.  Go ahead.

18    BY MR. NOSKOV:

19    Q        Mr. Campagna, it's been a long day.

20    A    How are you?

21    Q    I'm well.  How are you?

22    A    Good, thanks.

23    Q    You're not a lawyer, right, Mr. Campagna?

24    A    That's correct.

25    Q    But in your declaration, you opine as to the factors
```

Page 217

1    for confirmation of a Chapter 11 plan, correct?

2    A    I believe I opined on certain factors, yes, that's

3    true.

4    Q    One of those is the best interest of creditors test,

5    correct?

6    A    Yes, it is.

7    Q    And the best interest of creditors test is that under a

8    Chapter 11 plan, the creditors have to get at least as much

9    in distributions as under a Chapter 7 plan, correct?

10   A    Correct.

11   Q    So what you're comparing is really the distributions

12   that go out to creditors in those two scenarios, correct?

13   A    Distributions or recoveries, yes.

14   Q    Sure.

15              MR. NOSKOV:  And could we pull up the

16   demonstrative that the debtors have been using and others

17   have used, filed on docket 3697?

18              MS. BRIER:  Are you asking Mr. Young to pull that

19   up?

20              MR. NOSKOV:  Yeah, if you could.  I have copies if

21   needed, but I figured we could just --

22              MS. BRIER:  Just want to be clear.  Yes.

23              THE COURT:  All right.  I'd like a copy.

24              MS. BRIER:  Thank you.

25              MR. NOSKOV:  Sure.  (indiscernible).

Page 218

```
1              MAN 1:  I just really think a second.

2              MR. NOSKOV:  Sure.  Would you like a copy?

3              MAN 2:  This one?

4              MR. NOSKOV:  Yes.

5              MAN 2:  I'm good.  Go ahead.  I'll just take it.

6     Okay.

7     BY MR. NOSKOV:

8     Q    So, Mr. Campagna, this is what you went through with

9     your counsel in your direct examination and shows the three

10    scenarios, the NewCo scenario, the orderly wind down

11    scenario, and the liquidation scenario, correct?

12    A    That's correct.

13    Q    And these three scenarios are what you compared in

14    opining, that the best interest of creditors test was

15    complied with by the debtors, correct?

16    A    Yes.

17    Q    Now, let's take a look at what composes the value that

18    you came up with in terms of the value of the NewCo.  So

19    that's just the first column.

20    A    Okay.

21    Q    We've been having and that is the mining business,

22    right, which is valued at 565,000,000?

23    A    That's correct.

24    Q    The illiquid assets, other, 283,000,000?

25    A    Correct.
```

Page 219

1   Q    And the seed capital, 450,000,000, correct?

2   A    Right.  And there's a nuance there where 50 of the seed

3   capital was included in the mining valuations.  That's the

4   $50 million deduction you see in that same section, but yes.

5   Q    And the seed capital, is that cash?

6   A    Crypto.

7   Q    That's Crypto.  What kind of Crypto?  Is that,

8   Ethereum?

9   A    It'll be BTC and/or Ethereum.  I think it's the choice

10  of -- Fahrenheit's choice.

11  Q    Hasn't been decided yet?

12  A    Correct.

13  Q    But it's not going to be -- it could be Bitcoin?

14  A    I believe so.

15  Q    Now, the numbers that you have here, right, the

16  $565,000,000 number for the mining business.  You testified

17  earlier that that was a number that you took from the center

18  view analysis of the valuation of the mining business,

19  correct?

20  A    That's correct.

21  Q    And you've reviewed the valuation analysis provided by

22  Mr. Kielty, correct?

23  A    I likely read the one page from the disclosure

24  statement exhibit -- two page.

25  Q    Have you read Mr. Kielty's declaration?

Page 220

1     A     I don't believe I have.

2     Q     Okay.  Are you aware that the number -- the

3     $565,000,000 valuation is a valuation of the net asset value

4     of the mining business?

5     A     I'm not aware of what type of valuation it is, but I

6     would -- yeah.

7     Q     You're not aware whether it's a market valuation or a

8     net asset valuation?

9     A     Mr. Kielty yesterday testified that it was based on

10    market comps and discounted cash flow analysis.  So it seems

11    as though it's a going concern valuation of the entity.

12    Q     Could we pull up or could you turn in your binder to

13    Exhibit 45, which is Ryan Kielty's declaration, please?

14    A     I'm sorry, which (indiscernible)?

15    Q     It's 45.

16    A     Just going to have to make space here.

17    Q     If you could turn to Paragraph 13 when you get there.

18          MS. BRIER:  And, Your Honor --  go ahead.

19    BY MR. NOSKOV:

20    A     Okay.  I'm on Paragraph 13.

21    Q     You see the second sentence says, these estimates --

22    let's start in the first sentence.  The mining valuation

23    analysis was prepared solely to assist the debtors in

24    formulating the plan and to analyze implied relative

25    recoveries to creditors thereunder; you see that there?

Page 221

1    A    I do.

2    Q    These estimates do not purport to reflect or constitute

3    appraisals, liquidation values, or estimates of the actual

4    market value that may be realized through the sale of any

5    securities in NewCo; you see that there?

6    A    I do.

7    Q    Did -- were you aware before reading that sentence that

8    the analysis was not meant to reflect any market value that

9    may be realized through the sale of any securities in NewCo?

10   A    I was not aware of any comment on securities.

11   Q    The securities in NewCo, that's referencing the NewCo

12   shares, correct?

13   A    I don't know what it's referencing.

14   Q    Upon the formation of NewCo, there will be NewCo common

15   stock that will be distributed to creditors through the

16   plan?

17   A    Yes.

18   Q    And so, is it your understanding that the analysis of -

19   - the mining valuation analysis was supposed to value the

20   shares, the common stock of NewCo that was supposed to be

21   distributed under the plan?

22   A    It's not my understanding, but it'd be a better

23   question for Mr. Kielty.

24   Q    But is it -- but, no -- well, I agree that you've

25   testified earlier --

Page 222

 1                THE COURT:  Just ask him questions.

 2    BY MR. NOSKOV:

 3    Q        You testified earlier that you did not do the

 4    mining valuation analysis, correct?

 5    A    That's correct.

 6    Q    You accepted the analysis and you imported that into

 7    your analysis of the total value of NewCo, correct?

 8    A    As a line item in the NewCo column, yes.

 9    Q    That's right.  But you were not aware at the time that

10    that line item represented not a market valuation but a net

11    asset valuation of the mining business?

12                MR. WEEDMAN:  Objection, Your Honor.

13                THE COURT:  Overruled.

14    BY MR. NOSKOV:

15    A    Where does it say net asset value of mining?

16    Q    Well, let's try an easier way.  Do you have your --

17                THE COURT:  Does it say net asset value?  He asked

18    you -- you asked him a question.  He asked you a question

19    back.  It was a fair question in light of your question.

20                MR. NOSKOV:  Sure, of course.

21                THE COURT:  Are you representing that it's --

22                MR. NOSKOV:  I can flip to that.  I thought it'd

23    be easier to point him to his own declaration, which has

24    been admitted into evidence where he says the same thing,

25    but I can --

Page 223

1              THE COURT:  Let's move on.  Ask your next

2      question.

3      BY MR. NOSKOV:

4          Q    Could we --

5              THE COURT:  Ask your next question.

6      BY MR. NOSKOV:

7      Q          Apologies, Mr. Campagna.  I would like to just

8      point you to your own declaration, Exhibit 46 in the binder

9      there or if you have it separately.

10     A          I'll go with yours to keep it in one place here.

11     Okay.  I'm there.

12     Q    Paragraph 56 of your declaration, please.

13     A    Okay.

14     Q    To prepare this liquidation analysis, the debtors, with

15     the assistance of their advisor, estimated proceeds, costs

16     and resulting recoveries, in either the event that the

17     plaintiffs confirmed and consummated, or in the event the

18     plan is converted to a liquidation under Chapter 7 of the

19     Bankruptcy Code.  The debtors, supported by their advisors

20     estimated creditor recoveries under the NewCo transactions,

21     including on account of NewCo common stock based on the net

22     asset value of NewCo, which is approximated to be 1.248

23     billion and consists of the following components, and it

24     goes on.  You see there where it says net asset value of

25     NewCo?

Page 224

1    A     I do.

2    Q     Correct.  Was your analysis of NewCo supposed to be a

3    market value analysis of NewCo or a net asset value analysis

4    of NewCo?

5    A     My analysis wasn't meant to be anything in particular.

6    But the mathematics behind the 1,000,000,248 is a market

7    valuation of mining for 565,000,000 that was conducted by

8    Centerview.  283,000,000 of illiquid assets valued by Stout

9    $450,000,000 of liquid crypto.  We simply did the math.

10   It's 1 billion, 248.  It's a combination of assets and a

11   market valuation.

12   Q     And you mentioned Stout did the valuation of the liquid

13   assets, who did the valuation of the seed capital?

14   A     It's a numerical figure in the Fahrenheit Agreement.

15   We just need to give them 450,000,000 of liquid crypto at

16   closing.  It's market based.

17   Q     It's market based for the crypto standalone?

18             THE COURT:  I don't know what you mean by

19   standalone.

20             THE WITNESS:  Yeah.  I don't either.

21             MR. NOSKOV:  I can rephrase, Your Honor.

22   BY MR. NOSKOV:

23   Q         It's the value of those crypto assets that are not

24   valued as part of a NewCo business that will be formed under

25   the plan.  They were valued separately, correct?

Page 225

1    A         Yeah.  I'd say that one's less of a value, more of

2    a transfer from what would otherwise be liquid crypto going

3    to creditors at Emergence to shift a portion to NewCo based

4    on, you know, whatever the price is on that day, divided by

5    the Bitcoin price.  If we're giving them all BTC, which we

6    won't, I don't think that would be their suggestion, but

7    it's just going to be math on that day and hand them that

8    appropriate number of coins.

9    Q    Understood.  And that amount, in your mathematical

10   exercise of adding it up, is not discounted by any amount.

11   You're attributing 100 percent of that value to the

12   Enterprise value?

13   A    That's right.

14   Q    And same with the $565,000,000 in value you got from

15   another advisor as well, from Centerview, you're not

16   discounting that amount when you put it together with the

17   other assets, are you?

18   A    No.  In the NewCo column it was based upon ownership

19   under the proposed plan of reorganization by the Fahrenheit

20   Group and that asset being run by U.S. Bitcoin, so, no,

21   there's no discount to that.

22   Q    Right.  And then same with the liquid assets, you took

23   the number that staff came up with on a standalone number

24   for those assets, you added it together and you -- and that

25   became part of your net asset value of 1.248 billion,

Page 226

1     correct?

2     A     Largely.  I think we made an adjustment to two items.

3     Two items as a result of additional information we had that

4     Stout didn't have.

5     Q     What were those two items?

6           THE COURT:  What were those adjustments?

7           THE WITNESS:  One related to a loan from a party

8     called EFH, who we've since initiated significant litigation

9     with, and it called into question the collectability of that

10    loan.  So we marked it down from -- I can look at the Stout

11    number, it's in their expert report.  I don't remember

12    positively, but I believe we marked it down from 196,000,000

13    to something south of 50 million in both the NewCo and the

14    early wind down column.  And that became the starting point

15    for the liquidation.  And similarly, we discounted the

16    number they had calculated for StakeHound due to litigation

17    that was -- it may have been somewhat ongoing, but we had

18    new facts and circumstances that led us to just discount it

19    a bit more.  And again, whatever that discount is, it's

20    consistent in NewCo and orderly wind down, and then, you

21    know, the liquidation discount would have been applied from

22    there.  So the methodology is consistent, but you'll see

23    differences from Stout.

24    BY MR. NOSKOV:

25    Q     And we're talking about Centerview.  We're talking

1    about Stout in terms of what A&M did in coming up with the

2    1.248 million number.  You did not adjust the sum of these

3    numbers other than the adjustment you just talked about for

4    any other reason.  You simply took the standalone value of

5    the mining business, the liquid assets, and the seed

6    capital, and you added it together to get to 1.248 million

7    minus the $50 million of seed, correct?

8    A    That is right, yes.

9    Q    And there's no other advisor that the debtors have that

10   is valuing the market value of that NewCo all as one, as a

11   conglomerate?

12   A    No.

13   Q    In your job as -- and your experience at A&M over the

14   years, are you aware of the concept of a hold code discount?

15   A    No, I'm not.

16   Q    You're not aware of a concept that sometimes the sum of

17   all parts isn't valued by the market as highly as those

18   parts valued separately?

19   A    No, I'm not.

20   Q    And so, you didn't consider whether that could be the

21   case with these particular assets when you put them together

22   into NewCo?

23   A    That sounds like it's moving into business valuation,

24   and that's not my expertise.

25   Q    I'm not asking to be clear about the valuation of the

Page 228

1    mining business itself, which Centerview conducted.  I'm

2    asking about the value of distributions that will ultimately

3    go to creditors --

4              THE COURT:  Ask your question.

5    BY MR. NOSKOV:

6    Q    -- of the estate.

7              THE COURT:  Ask a question.

8    BY MR. NOSKOV:

9    Q    So my question is, who was put into -- in charge by the

10   debtors then, if it wasn't A&M to value -- the total value

11   of the distributions that will go to creditors upon

12   confirmation of the plan?

13   A    The value was described as the sum of those parts that

14   you just mentioned.

15   Q    And to --

16   A    It's not marked as a business valuation of NewCo's

17   equity.  It's marked, at least on this page, as

18   distributable liquid assets/net asset value.

19   Q    And I believe I heard you correctly, you did not apply

20   any discount based on an analysis that may have concluded

21   that when you combined these types of assets, the overall

22   value of the stock on the market would go down, you didn't

23   do that analysis?

24             MS. BRIER:  Objection, Your Honor.  Asked and

25   answered.

Page 229

1              THE COURT:  Overruled.

2    BY MR. NOSKOV:

3    A    I did not do that analysis, nor is it analysis I would

4    be -- it wouldn't fall to me that analysis.

5    Q    Did you analyze, as part of your evaluation of the

6    NewCo value, any comparable companies that are a combination

7    of these types of assets?

8              MS. BRIER:  Objection.

9    BY MR. NOSKOV:

10   A    I didn't -- yeah -- I didn't connect evaluation of

11   NewCo.

12   Q    But you did provide a value that would be distributable

13   to creditors on account of the newly formed NewCo entity,

14   correct?

15   A    We provided the numbers that are on this page for folks

16   to decide, make their own decisions.

17   Q    So as part of that analysis of the net asset

18   value/distributable -- the total -- apologies.  As part of

19   that analysis of the total distributable value to creditors,

20   you did not analyze any comparable companies that combined

21   these types of assets all into one?

22             MS. BRIER:  Objection.

23             THE COURT:  Overruled.

24   BY MR. NOSKOV:

25   A    I did not.

Page 230

1    Q    To receive a distribution in NewCo stock, a creditor

2    who receives that stock would have to be able to sell the

3    stock, correct?

4    A    Say your question again.

5    Q    In order to receive any value from the stock that a

6    creditor receives, that creditor would have to be able to

7    monetize the stock somehow, correct?

8             MS. BRIER:  Objection.

9             THE COURT:  Overruled.

10   BY MR. NOSKOV:

11   A    They may be able to take a margin loan on it.  I don't

12   know how to answer that question.  There may be other ways

13   to monetize the asset without selling it and taking --

14   losing ownership.

15   Q    Let me be a little bit more general.  A creditor has to

16   find someone else that would be willing to attribute value

17   to that asset in order to gain some value from it for the

18   creditor, correct?

19   A    I'm not quite sure I follow that question.  It seems to

20   be going into, is there a market?  And I just can't speak to

21   markets, I'm not -- it seems like an investment banker type

22   thing.

23   Q    You didn't analyze what the market would be for NewCo

24   shares, did you?

25   A    I did not.

1    Q     And yet the distribution under the plan, part of that

2    distribution is the stock of the NewCo, correct?

3    A     That's correct.

4    Q     So without assessing the value of the NewCo stock as it

5    could be sold on the market, you still applied in your

6    declaration that the best interest of creditor test is

7    satisfied, correct?

8    A     That's right.

9    Q     And that's without any analysis of what the NewCo

10   common stock is actually worth to the creditors as a

11   distribution?

12   A     It's based on an assessment that it has a mining

13   business worth 565,000,000, illiquid assets valued at

14   283,000,000, and seed capital with a market rate of a net

15   400 million.

16   Q     And then it's all packaged together, correct?

17   A     That's right.

18   Q     There's a common stock that is going to be listed on

19   Nasdaq, correct?

20   A     It's my understanding.

21   Q     And then that common stock will have a price that can

22   be sold or traded by the creditor that receives that stock,

23   correct?

24   A     That's right.

25   Q     And the value that they will receive in return, you did

1     not do an analysis of that value at all?

2     A    Right.  It could be higher; it could be lower.  That's

3     right.  We didn't analyze it.

4     Q    Did you come up with a range of how much higher, how

5     much lower it could be?

6     A    I did not.

7     Q    And did you consider what the profile of any purchaser

8     of such a stock could be from any creditor that received

9     such stock?

10    A    I did not.

11    Q    Can we go to Exhibit three, please?  Which is the --

12    it's in my binder.  It's the debtor's disclosure statement.

13    I've heard earlier maybe the wrong version of the debtor's

14    disclosure statement, but it is a Celsius Three Exhibit so -

15    -

16    A    Yeah, this is -- this looks like the very first --

17             MR. MCCARRICK:  For the record, parts have been

18    updated, so you could pull that from the docket if you want

19    the most updated, but we can work with this one.

20             MR. NOSKOV:  If we go to page --

21             MR. COLODNY:   What's the number?

22             MR. NOSKOV:  Docket number 2902.

23             MR. COLODNY:   What page?

24             MR. NOSKOV:  0627.

25             THE COURT:  What page?

Page 233

1           MR. COLODNY:  June 27?

2           MR. NOSKOV:  Yes.  Page 210 out of 332.

3           MR. COLODNY:  Your Honor, I believe this document

4    he's referring to is two versions still.

5           THE WITNESS:  It is.

6           THE COURT:  It is what?

7           MR. COLODNY:  Two versions (indiscernible)  from

8    the operative disclosure statement?

9           THE WITNESS:  I think there's a fourth that was

10   the solicitation version.

11          THE COURT:  Are you objecting?

12          MR. COLODNY:  I am objecting, yes.

13          THE COURT:  Sustained.

14   BY MR. NOSKOV:

15   Q   Your Honor, the debtors submitted this Celsius Exhibit

16   3 in this proceeding.

17          THE COURT:  Is it admitted in evidence?

18          MS. BRIER:  It's not, Your Honor.  Parts of it

19   are.  Exhibits to it that have not changed since that

20   disclosure statement was filed are in evidence.  The entire

21   document is not in evidence.

22          MR. NOSKOV:  Sure.  Your Honor, I'm not offering

23   it into evidence.  I'd just like to show it to the witness

24   to see if he is -- just to use it for cross.

25          THE COURT:  We'll see.  What page?

Page 234

1           MR. NOSKOV:  Page 210.

2           THE WITNESS:  I'm on Page 210.

3    BY MR. NOSKOV:

4    Q        You see the subtitle 16?

5    A    Yes.

6    Q    It's titled the liquid trading market for the NewCo

7    common stock may not develop, and the trading price for the

8    NewCo common stock may be depressed or volatile following

9    the effective date; see that?

10   A    I do.

11   Q    You disagree with that?

12   A    No.  That's certainly a risk.

13   Q    And you see -- if you read further down, the second

14   sentence of that paragraph says, accordingly, there can be

15   no assurance that an active trading market for the NewCo

16   common stock -- I think there's a typo -- will develop.  Nor

17   can any assurance be given as to the liquidity or prices at

18   which securities might be traded; you see that?

19   A    I do.

20   Q    Do you disagree with that?

21   A    No, we're certainly not giving any assurance or

22   guarantees.

23   Q    And so, when you talk about distributions to creditors

24   on account of stock distributed under the plan, you have no

25   idea what the value of that stock or the price at which it

Page 235

1    would be traded is, do you?

2    A    That's why we relied on market valuations and asset

3    valuations.  We don't know where the stock will trade.

4    Q    Market valuations, per your testimony, of the

5    individual component parts of the NewCo, not the entire,

6    enterprise, correct?

7    A    That's correct.

8    Q    You mentioned earlier that this is your first case

9    dealing with crypto, correct?

10   A    That's right.

11   Q    So on what basis did you determine that combining

12   potentially different crypto assets like Ethereum and

13   Bitcoin, that the fact that those two are being combined in

14   a new enterprise shouldn't result or should result in a

15   discount?

16   A    I'm not sure how to answer that question.

17   Q    You did not consider whether a discount to the separate

18   parts of each of these items, the mining, the liquid assets,

19   and the seed capital should be discounted?  You didn't

20   consider the possibility that should be part of your

21   analysis, correct?

22   A    Right, I didn't consider the possibility of a premium

23   or discount, correct.

24   Q    So how are you qualified to determine how those assets

25   should be added together as part of one enterprise and how

1    that enterprise should be valued?

2    A    I feel qualified to do that math.  That's it.

3    (indiscernible)

4    Q    So that's all you've done?  You just typed in the

5    numbers into a calculator?

6    A    No, we did a lot of work behind the scenes on those

7    numbers, but at the end of the day, we added those four

8    components together and put it out there for the world to

9    see and make a determination.

10    Q    But as a standalone enterprise --

11            THE COURT:  With risk factors included?

12            THE WITNESS:  Right.  Risk factors included.

13    BY MR. NOSKOV:

14    Q    Risk factors included as to the individual pieces,

15    correct?

16    A    To a whole list of risk factors.  But the one that you

17    just mentioned, with respect to where NewCo stock may trade.

18    Q    Do -- I'm sorry -- you applied a discount based on

19    those risk factors to the total amount once you added that

20    together?

21    A    No.  We did not place a discount for risks or any

22    premium for opportunities that NewCo would trade higher.

23    Q    And without any experience in the crypto world, would

24    you have passed --

25            THE COURT:  Ask your next question.  You've

1    already asked that.

2    BY MR. NOSKOV:

3    Q    I just want to get a little bit deeper.  And this is

4    not to probe your view of the reasonableness or not

5    reasonableness of the mining valuation analysis, but I'd

6    like you to take a look at Exhibit 45, Mr. Kielty's

7    declaration.

8    A    Okay.  I'm at 45.

9    Q    And you based your value again, I'm sorry to repeat

10   myself, on the analysis that Centerview conducted in this

11   case, correct?

12           MS. BRIER:  Your Honor, at this point, if he had--

13           THE COURT:  Sustained.

14           MS. BRIER:  -- questions for Mr. Kielty, should

15   have asked him yesterday.

16           THE COURT:  Ask new questions and move on.

17   BY MR. NOSKOV:

18   Q    If you turn to Paragraph 11 of Mr. Kielty's

19   declaration.  Let me know when you're there.

20   A    I'm there.  Sorry.

21           MS. BRIER:  Paragraph 11.

22   BY MR. NOSKOV:

23   Q    You see, the third sentence of Paragraph 11 says, the

24   mining valuation analysis is, among other things, based on

25   the information and financial projections provided by the

1    debtor's management and certain other publicly available

2    information, correct?

3    A    That's what it says.

4    Q    So that valuation was based on the financial

5    projections, at least, in part?

6    A    Correct.

7    Q    Let's turn to the financial projections.  And again, I

8    don't want to probe the reasonableness of this.  This isn't

9    the point of this questioning.  Exhibit 32 is the financial

10   projections.  If you could turn to that's.  And when you get

11   there that's the mining business plan.

12   A    I'm there.

13   Q    If you could go to slide three.  Sorry, it's actually

14   slide two.  It's third in the, you know, PDF.  Slide two.

15   A    Okay.

16   Q    And this is the five-year projections, correct?

17   A    No audible response.

18   Q    But first of all, have you seen this document?  Have

19   you ever reviewed the financial projections?

20   A    I've seen versions of this document.  I don't know if

21   I've seen the final version before.

22   Q    Well, you're generally (indiscernible) with the

23   financial projections of the company?

24   A    No, not really.  Not of the mining business.  Mr.

25   Ferarro spoke to the mining projections a bit yesterday.

Page 239

1   Q    Earlier, you were speaking in a lot of detail about the

2   various mining operations of the debtors.  Is that not part

3   of your mandate to kind of know what's going on with the

4   business and what the projections are?

5           MS. BRIER:  Objection.

6   BY MR. NOSKOV:

7   A    I know generally what's going on with the business.

8   This is a five-year projection based upon changing Bitcoin

9   prices in the future, changing hash rates.  A lot of true

10  expertise that I don't feel that I'm the best person to

11  address.

12  Q    Can we take a look at -- you see the date September 23,

13  September 24, September 25?

14  A    I do.

15  Q    Under September 25, that's 2025.  If you look down that

16  list, you see the BTC price there?

17  A    I do.

18  Q    That's 90,587, correct?

19  A    I'm sorry, maybe I'm not looking in the right place.

20  Oh, yes, I see it.  Sorry, I was looking a couple of lines

21  down.

22  Q    So the projection under this business plan, the five-

23  year projection, is that in two years the Bitcoin price

24  would be 90,000?

25          MS. BRIER:  Your Honor, I renew my objection that

Page 240

1    these questions are better asked if Mr. Kielty.

2              THE COURT:  Sustained.

3              MR. NOSKOV:  Your Honor --

4              THE COURT:  No, you can't dig into this.  This is

5    not this witness's document.  He is not giving an opinion on

6    what's in this document.

7              MR. NOSKOV:  This is relevant to the convict to

8    how he --

9              THE COURT:  Ask the question that's relevant to

10   the cross examination of this witness.  This is not.

11   Objection is sustained.

12   BY MR. NOSKOV:

13   Q    Mr. Campagna, do you think that the nature of a

14   business and financial projections underlying that business

15   affect how that business can be combined with another

16   business all in one enterprise?

17   A    That's a bit of a complex question, but there's

18   uncertainties in any business as to how a combination will

19   turn out.

20   Q    Would you agree that the value of the crypto business,

21   including the NewCo which you looked at the value of, would

22   depend on the value of the underlying cryptocurrency?

23   A    I mean, to some degree, yes, but --

24   Q    And would you agree that there is a relationship

25   between the value of Bitcoin and the value of Ethereum?

Page 241

1   A      There is.

2   Q      And is that relationship linear?

3   A      I don't know.

4   Q      You can't opine on whether if Bitcoin goes up, Ethereum

5   goes down or vice versa?

6   A      I can't opine on how they move for one versus the

7   other.  I think generally they would move in a similar

8   direction.

9   Q      Your view is that they would move in similar direction?

10  A      Push -- yeah.

11          MS. BRIER:  Objection.

12  BY MR. NOSKOV:

13  Q      And so, you didn't think that --

14          THE COURT:  Why is this examination within the

15  scope of the direct?  You're asking him about an evaluation

16  done by different experts which he used in his analysis.

17          MS. BRIER:  And, Your Honor, I don't -- sorry.

18          THE COURT:  Mr. Kielty's cross examination was the

19  time to do this, not now.

20          MR. NOSKOV:  May I answer?

21          THE COURT:  No.  Move on.

22          MS. BRIER:  And, Your Honor, I'd also note for

23  purposes of the record, that Exhibit 32 is not in evidence

24  that he was asking about.

25  BY MR. NOSKOV:

1   Q    Mr. Campagna, are you aware that generally, with the

2   options offered to creditors under the plan and the choices

3   they could have made with regard to their distributions?

4   A    I know there were a lot of them.  I'm familiar with

5   some of them.

6   Q    Are you aware that the creditors, when voting on the

7   plan in certain classes, had the choice to either get the

8   default distribution ratio to get a distribution that had

9   more new stock and less liquid crypto, and then another

10  choice to get more liquid crypto and less new stock?

11  A    Yes, I'm familiar with that provision.

12  Q    Are you familiar with the outcomes of how that -- those

13  determinations and votes by creditors went under the

14  liquidation now under the plan?

15  A    Yes, generally.

16  Q    Would it surprise you that significantly more creditors

17  elected the crypto weighted option?

18  A    Say that again.

19  Q    Would it surprise you, Mr. Campagna, that significantly

20  more creditors elected the crypto weighted option?

21  A    I know that more creditors chose that option.  I don't

22  know.  I wouldn't use the word surprise.

23  Q    You know for a fact that that is true?

24  A    I know that that -- that's the way that vote, yes.

25  That's the way that election -- there's more liquid crypto -

Page 243

1    - more selected, more liquid crypto than equity.

2    Q    And those creditors that selected more liquid crypto,

3    that liquid crypto was distributed to them at a 30 percent

4    discount, correct?

5    A    There's a 30 percent, yes.  Depends which way you go on

6    that mechanism.  But there's a 30 percent premium on the

7    liquid crypto versus the equity.

8    Q    Let's make it easier.  It's quite a bit complicated.

9    If we look at just at the Exhibit 3 again.  We don't need to

10   move it into evidence.  We can just look at it as a

11   demonstrative to show how this mechanism works.  Exhibit 3

12   at Page 43.

13              THE COURT:  43 of 332 or --

14              THE WITNESS:  One second.

15              THE COURT:  There are page numbers at the top and

16   bottom.

17              MR. NOSKOV:  Yeah.  No.  I'm sorry, Your Honor.

18              THE WITNESS:  It's 54 of 332, I think.

19              MR. NOSKOV:  It's 54 on the top.  If you're

20   looking at 54 --

21              THE COURT:  All right.  54 of 332 of Celsius

22   Exhibit 3.

23   BY MR. NOSKOV:

24   Q    Are you there?

25   A    Yes, I am.

Page 244

1    Q    You see the table there?

2    A    I do.

3    Q    So this is a table that provides an example for

4    outcomes of a holder of general claims in the amount of

5    10,000, just to make it easy for us, correct?

6    A    Correct.

7    Q    So you see the no election default, you get just a

8    little over 36 percent of liquid cryptocurrency, or I

9    apologize, you get 3,642 in liquid cryptocurrency and 3,328

10   in new common stock?

11   A    Right.  That's what it says.

12   Q    Right.  And then if you elect the -- and the total

13   recovery percentage is estimated below that, or those two

14   numbers are added up to give you 6,970, right?

15   A    That's what's on the page, yes.

16   Q    And this is the debtor's view of the value of the

17   stock, you know, of the distribution of the stock and the

18   crypto together.  So you're getting $0.69 on the dollar?

19   A    That's right.

20             MS. BRIER:  Objection.

21   BY MR. NOSKOV:

22   Q    The next column is the NewCo common stock weighted

23   distribution election.  And that one gives you a premium on

24   if you elect more new common stock, correct?

25   A    Yeah, I'd have to do the math, but it looks like that's

Page 245

1   what it's doing, yes.

2   Q    And so, the value, according to the debtors comes out

3   below to 7,516.  With the debtor's valuation of the new

4   common stock, you're getting a better deal here for

5   creditors, correct?

6   A    Yes.

7   Q    And the next one is the liquid cryptocurrency weighted

8   distribution election.  And that's where you choose more

9   liquid crypto, but you get less common stock, correct?

10  A    Correct.

11  Q    And that's where there's a 30 percent discount,

12  correct?

13  A    Yeah.  Without doing the math to calculate those

14  numbers, directionally, it's moving that way, yes.

15  Q    And according to the debtors, that provides the

16  smallest of the three values at 6,424, correct?

17  A    According to this page, yes.

18  Q    And yet, as you've testified, you know for a fact that

19  creditors chose the third option over the other two.  More

20  creditors chose the third option than the other two?

21  A    That's correct.

22  Q    So in terms of the market participants that have

23  actually acted and have spoken with their wallets --

24           THE COURT:  You're putting a lot into that

25  question that there's nothing in the record for.  I'm going

1    to sustain even before you go on, frame a new question.

2    BY MR. NOSKOV:

3    Q    Let's go back to the -- no, let's stay here.  And so,

4    the creditors who chose the crypto heavy distribution,

5    voluntarily chose a 30 percent haircut on the new stock

6    value, correct?

7    A    That's the mathematical deal, yes.

8    Q    Don't you agree that that's market evidence that

9    creditors don't value NewCo stock as high as the debtors do?

10          MS. BRIER:  Objection.

11          MR. COLODNY:  Objection.  Calls for speculation.

12          THE COURT:  Sustained.

13   BY MR. NOSKOV:

14   Q    When valuing NewCo, did you consider the outcome of

15   this vote by creditors?

16   A    I didn't value NewCo.

17   Q    When you came up with the total distributable value of

18   NewCo, did you consider this vote by creditors?

19   A    The vote hadn't been completed, no.

20   Q    If you could go back, would you?

21          MS. BRIER:  Objection.

22          THE COURT:  Overruled.

23          BY MR. NOSKOV:

24   A    I would do the math the same way we did it in the

25   disclosure state.  No, I wouldn't have changed it.

Page 247

1    Q    This evidence of the vote wouldn't affect the way that

2    you value the total distributable value?

3    A    No.  It doesn't affect the valuation of mining, doesn't

4    affect the asset valuation done by Stout, and it doesn't

5    affect 450,000,000 illiquid cryptos -- 450,000,000 illiquid

6    crypto.

7    Q    Let's just shift quickly to plan B.  There's an orderly

8    wind down option, correct?

9    A    Correct.

10   Q    In your declaration, you state that the orderly wind

11   down process would take five years, correct?

12   A    We allotted five years for that administrator to wind

13   down the assets, maximize value, yes.

14   Q    Is the five year number is just the underlying

15   assumption for how long that'll take?

16   A    That's right.

17   Q    And how did you arrive at the five-year number?

18   A    Some input from the bidders.  I feel like that's what

19   folks were indicating on the inbound side was it be a four-

20   to-five-year process.  But, you know, as we look at this,

21   these wind downs go for quite some time.  I think the bulk

22   of the work is in the early years, but they go on for quite

23   some time.  And these are very unusual illiquid assets.  And

24   the thought was some of them it just makes sense to hold

25   onto.  And that may be what the plan administrator wants to

Page 248

1   do.  So we just gave them time to work it out.

2   Q    So was it based on comparables to other similar wind

3   downs?

4   A    It was just an estimate we came up with.  I don't know

5   that we looked at a lot of similar wind downs, but, you

6   know, I do know -- there's not similar wind downs that I've

7   experienced.  A lot of the wind downs are -- here's a bucket

8   of money, a million dollars to go to a basket of unsecured

9   creditors, figure out the claims, distribute, start closing

10  up the entities.  Maybe you have a miscellaneous asset or

11  two to sell.  Those can be done in a couple of years.  But

12  the estate keeps going for four years -- four or five years,

13  it seems, before they finally get closed up and the case is

14  closed.  So that's sort of the methodology we applied here.

15  We just thought that the operational time frame here to

16  maximize value of these crypto assets, and these

17  investments, and private equity type investments in a

18  variety of crypto entities, debt securities and crypto

19  entities, it would just take more time.  So we had the

20  operational phase a bit longer.

21  Q    None of this analysis is in your declaration, however,

22  correct?

23  A    It (indiscernible) the expense component, but no.

24  Q    Did you analyze when distributions would be made to

25  holders throughout this five-year period?

1    A     At a high level.

2    Q     And where is that in your declaration?

3    A     Not sure if it's in the declaration, I have to check,

4    but it's definitely in the disclosure statement.  There was

5    a chart on Page 11 or 12 that showed timing of

6    distributions.

7    Q     And did you discount the distributions based on the

8    time value of money in that --

9    A     No, we didn't.

10   Q     A dollar today is worth more than a dollar tomorrow, is

11   it not?

12   A     It is.

13   Q     Yet you valued a dollar distributed in five years, the

14   same as a dollar distributed in one?

15   A     A big piece of the value to be distributed, even in the

16   orderly wind down is the equity value of the mining

17   business.  So that's virtually unchanged between the two

18   analyses and the concept on some of these other assets, if

19   you hold them to (indiscernible) you'll get more.  So we

20   didn't project getting more and we didn't project the

21   discounted cash flow of bringing back the sums.  And our

22   comparative point was everything happening in NewCo upfront.

23   So we just -- that's the way we left the analysis.

24   Q     Those are two separate things.  You're talking about

25   the growth of the value of the asset.  I'm talking about

Page 250

1    just the value -- the discount over time that you would

2    apply to any asset you're not getting today, but are getting

3    tomorrow?

4    A    Agree.  But as Bitcoin rises, right, the value of all

5    these assets rise as well.  We didn't forecast an increasing

6    BTC price over time that could have an upward impact on the

7    value of the assets.  But I agree with you, all things being

8    consistent, a dollar today is worth more than a dollar

9    tomorrow.

10   Q    And so, without applying that discount, the

11   distribution of the total sum of dollars is overstated in

12   your analysis, correct?

13   A    I don't know that it is.  There would be increasing

14   values as well.  You'd stake Ethereum, the company would

15   have assets that they could invest for periods of time.  So

16   I think there's puts and takes.

17   Q    Those are value increasing strategies, though.  That's

18   not a discounted analysis of distributions to creditors, is

19   it?

20   A    That's a value accredited concept, correct.  It's not -

21   - but if we were sitting on a billion dollars of crypto that

22   was waiting to be distributed, perhaps they would stake it

23   and try and earn a return or, you know, do something low

24   risk and have a return.  We don't have that return in here

25   either, but, you know.

Page 251

1    Q    But if you're telling a creditor you're going to get

2    $1,000, the first question is when; is that not right?

3                THE COURT:  Hold on.

4    BY MR. NOSKOV:

5    Q    Chapter 7 liquidation, however, is not five years

6    according to your analysis, you assumed six months, correct?

7    A    Yeah, we assumed that the assets would be liquidated

8    and largely distributed in six months.  It would have a tail

9    as well, but, you know, nominal work for a period of time,

10   one person, you know, continuing to try and wind up the

11   entities.  But we did forecast that the bulk of the assets

12   and distributions would be made in six months.

13   Q    And a dollar in 6 months is worth more than a dollar in

14   12 months, correct?

15               THE COURT:  Hold on.

16   BY MR. NOSKOV:

17   Q    You mentioned during earlier testimony that the

18   distributions in the NewCo scenario may not occur for 6 to

19   12 months; did I hear that right?

20   A    The -- I think you did hear about right.  We're trying

21   to distribute two things, BTC, as quickly as possible.  We

22   still are finalizing our arrangements with PayPal, Coinbase

23   and the like.  So until those are done, there's going to be

24   no distributions that can be made.  We have to get the

25   confirmation.  We have to also, on the public miner, there's

Page 252

1    also an SEC process that's running.  So yeah, it'll take --

2    we're hoping to start by the end of the year and do it

3    quickly, but there's no guarantee as to when it'll start.

4    And once it starts, whatever the amount of crypto we have to

5    distribute, some portions will be held back for claims

6    reserves and the like, and there'll be another distribution

7    down the road, so it'll take a little while.

8    Q    But like the orderly wind down analysis of

9    distributions, you didn't discount the distributions under

10   the NewCo scenario either, did you?

11   A    No, we didn't.

12   Q    I know you're not a lawyer, but for the Chapter 7

13   liquidation analysis that you did, did you consider whether

14   the mining assets could be sold as a going concern?

15   A    Not in the analysis.  We looked at it.  I think I

16   discussed it earlier as part of this testimony.  There was a

17   bid in the $175,000,000 range that had a lot of outs and a

18   lot of things the buyer had to do before it would even

19   become executable, including raising 275,000,000 to then

20   have 175 go to the debtors in the form of some cash and some

21   debt.  And I know our investment banker viewed the

22   likelihood of them being able to raise the 275 as very

23   slight, and it wasn't (indiscernible).

24   Q    And I believe that was also in an earlier testimony

25   that that process took place in December 2002; is that

1    right?

2    A    December time frame sounds right.

3    Q    And the market conditions are completely different back

4    then, correct?

5    A    Markets are always different.  Yeah, they were

6    different.

7    Q    Did you consider what that sale would look like in

8    today's market?

9    A    I did not.

10   Q    The reason you took the orderly wind down scenario

11   takes five years is because in your view, that's the best

12   way to maximize value of the assets, correct?

13   A    I think extending the runway from six months, if it's

14   six months to something like two years, you have to go to at

15   least two years.  Whether it's two years, three years, four

16   years, five years.  It's a bit of semantics, but I think the

17   bulk of the activity, in my opinion, would be done in the

18   first two to three years, but we have the estate loan for

19   five years and you don't really wind down.

20   Q    And if that's the best way to maximize value for

21   creditors you're not suggesting that a Chapter 7 trustee

22   wouldn't want to maximize value for creditors, are you?

23   A    No, I'm not suggesting that.

24   Q    You're not suggesting that such a Chapter 7 liquidation

25   could move quarterly?

Page 254

1            THE COURT:  Move on.  Let's go.

2    BY MR. NOSKOV:

3    Q    Can we just flip back to the demonstrative again that

4    we looked at at the beginning that -- it's  debtor's

5    demonstrative?

6    A    Sure.

7            MS. BRIER:  Can you clarify for the record which

8    demonstrative?

9            MR. NOSKOV:  Demonstrative one, I believe that you

10   used.  It's Page 6 of 6, docket 3697.

11           MS. BRIER:  Got it.

12           MR. NOSKOV:  It's the second page, but I think you

13   used the first.

14           MS. BRIER:  Got it.

15   BY MR. NOSKOV:

16   Q    We've talked about the various inputs you considered

17   and didn't consider in coming up with your total

18   distributable value number here, correct?

19   A    Yeah, we've talked a lot.

20   Q    And the values, if we just -- just to recap for the

21   NewCo is 3.352 billion in total distributable value?

22   A    That's correct.

23   Q    For the (indiscernible) orderly wind down, that's

24   3.123, correct?

25   A    Yes.

1   Q     And for the liquidation, it's 2.716, correct?

2   A     Correct.

3   Q     Even with all of the assumptions that you made and I

4   asked you about, correct, that's the difference between the

5   three scenarios?

6   A     Those are based on the assumptions we discussed.

7   Q     And changes in those assumptions would move those

8   numbers and swing them one way or the other under the

9   different scenarios, correct?

10  A     Yes.

11         MAN 1:  Form.

12         THE COURT:  Which part of moving ahead do you not

13  understand?

14         MR. NOSKOV:  I'm winding down, Your Honor.  Just

15  the last question.

16  BY MR. NOSKOV:

17  Q     The liquidation scenario in terms of net liquid

18  cryptocurrency that's distributed, the largest amount is

19  under liquidation scenario, correct?

20  A     Mathematically, yes, because it's not seeding another

21  company with 450,000,000 of liquid crypto that then lands in

22  their net distributable asset line, and it's not funding a

23  litigation trust for 50 million, which may be another

24  deficiency in the liquidation column is -- the first two

25  columns have zero recovery for litigation.  But we are

1    funding a $50 million trust.  We didn't want to guess, but I

2    would say the best path to recovery on litigation proceeds

3    is going to be under the NewCo and you were going to wind

4    down public minor scenarios and not by a Chapter 7 trustee

5    who's probably going to have a shorter timeline in mind.

6    Q    With all those inputs, it's true that the liquidation

7    scenario provides for a net liquid cryptocurrency

8    distribution that's higher than the other two scenarios?

9    A    Yeah.  2.444 is bigger than the other two numbers.

10   Q    And the orderly wind down also provides more than the

11   NewCo, despite having some of those features like the

12   litigation trust funding and the seed capital for a new

13   entity, correct?

14   A    Again, it's all about seeding capital to NewCo, which

15   should be dollar for dollar -- improve NewCo.

16   Q    Thank you.

17              THE COURT:  Redirect?

18              MS. BRIER:  Yes, Your Honor.

19                REDIRECT EXAMINATION OF ROBERT CAMPAGNA

20   BY MS. BRIER:

21   Q    Mr. Campagna --

22              THE COURT:  Just make your appearance.

23              MS. BRIER:  Grace Brier, Kirkland and Ellis

24   on behalf of debtors.

25   BY MS. BRIER:

1   Q    Mr. Campagna, to your knowledge, has Pharaohs ever

2   offered a view on the value of NewCo?

3   A    No.

4        MS. BRIER:  And, Mr. Young, if you could put up

5   that demonstrative we were just looking at, it's Page 6 of

6   6.  It's the second page of the Demonstrative exhibit.  And

7   zoom in on that recovery percentage number at the bottom,

8   please.  There.

9   BY MS. BRIER:

10  Q    Mr. Campagna, what are the recovery percentage --

11  percentages in each scenario here?

12  A    67 percent recovery under the NewCo path, 61.2 percent

13  under the public minor/orderly wind down path, and 47.4

14  percent under the liquidation path.

15  Q    And based on your 25 years of experience in

16  restructuring, can you provide some context as to the

17  difference between those percentages in the NewCo and

18  orderly wind down scenario versus the liquidation scenario?

19  A    The fact that they're significantly higher.  What else?

20  You're looking for something else?

21  Q    That's perfect.  And were you ever presented with any

22  adjustment based on a discount rate or anything else that

23  would make an outcome determinative difference under the

24  best interest test?

25  A    No.

Page 258

```
 1              MS. BRIER:  Thank you, Honor.

 2              THE COURT:  All right.  And the committee rest?

 3              MR. COLODNY:  Yes.

 4              THE COURT:  Has the debtor rested?

 5              MR. MCCARRICK:  We have -- we have a couple of

 6    housekeeping matters.

 7              THE COURT:  Okay.  In terms of witnesses, debtor,

 8    have any other witnesses?

 9              MR. MCCARRICK:  No other witnesses, Your Honor.

10    T.J. McCarrick, for Kirkland & Ellis on behalf of the

11    debtors.

12              MAN 1:  Am I free?

13              MR. MCCARRICK:  No other witnesses.

14              THE COURT:  Yeah, I think you.

15              MAN 1:  Thank you very much.

16              THE COURT:  Why are you rushing off the state?

17              MR. MCCARRICK:  We also have some housekeeping as

18    well.

19              THE COURT:  Okay.  All right.  So let's take up

20    the housekeeping.

21              MR. MCCARRICK:  Just following up on Your Honors

22    guidance from yesterday, the Debtors intend to submit in the

23    next 24 to 48 hours a list of exhibits that were admitted

24    into evidence, at least in the Debtors case in chief.  I

25    assume the committee will take care of their own.
```

Page 259

1           THE COURT:  It would be nice to get one list.  You

2   actually can talk to each other and submit a combined list.

3           MR. MCCARRICK:  We'd be glad to do that.  We also

4   intend to submit at that time a list of the docket numbers

5   that we would ask Your Honor to take judicial notice of.  I

6   could read them into the record now, but I'm sure you don't

7   be reading those numbers at you.  It'll be everything that's

8   referenced in the proposed confirmation order.

9           THE COURT:  Okay.  When I say okay, we'll see

10  whether --

11          MR. MCCARRICK:  Understood.  You'll be able to

12  determine whether or not you will take judicial notice, but

13  I think that's all the Debtors have.

14          THE COURT:  Okay.

15          MR. COLODNY:  Your Honor, we have --

16          THE COURT:  Mr. Colodny?

17          MR. COLODNY:  Aaron Colodny, from White & Case, on

18  behalf of the official committee of unsecured creditors.

19  Court Reporter definitely --

20          THE COURT:  Karen knows everybody.

21          MR. COLODNY:  In our exhibit list, we have a

22  number of YouTube clips of AMAs and other marketing material

23  from Celsius.  These were pulled from public Internet

24  sources, and we would ask that Your Honor take judicial

25  notice of them.  I'm happy to read the different numbers.

Page 260

1    We put them in our FTP site in two different ways.  One was

2    the full YouTube video, and the second was a clip of the

3    part that's cited so that if people have --

4              THE COURT:  They're going to want to spend the

5    rest of their life watching YouTube videos, they can just

6    watch the clips that you want to introduce?

7              MR. COLODNY:  Correct.  And so, we'd like to admit

8    those into evidence, Your Honor.  And I'm happy to read

9    those.

10             THE COURT:  It probably would be better if you

11   submit it in writing and what it is, rather than reading

12   them into the record now.  How long a list is it?

13             MR. COLODNY:  It is -- it's two ranges and one

14   document in our exhibit list.

15             THE COURT:  Have you conferred with other parties

16   about whether anybody has any objections to them?

17             MR. COLODNY:  I have not, Your Honor.

18             THE COURT:  Okay.  Mr. McCarrick, do you want to

19   be heard?

20             MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

21   on behalf of the debtors.  I would note, Your Honor, that

22   the objection deadline to the exhibits listed on the

23   parties' respective exhibits list has passed.  So to the

24   extent Your Honor wanted to move these for admission, I

25   think everyone missed their shot.

Page 261

1            THE COURT:  I'd like to have a written list.  You

2      can give it to me tomorrow morning, if that's convenient.

3            MR. COLODNY:  Your Honor, if I could propose why

4      don't we put these on the list we'll submit with the debtors

5      --

6            THE COURT:  That would be great.

7            MR. COLODNY:  -- and we'll flag them for you or

8      who wants to have them.

9            THE COURT:  Okay.  These -- there were no

10     objections to any of these?

11           MR. COLODNY:  There were no objections made.

12           THE COURT:  All right.

13           MR. COLODNY:  We'll flag that these ones have not

14     been admitted into evidence --

15           THE COURT:  Okay.

16           MR. COLODNY:  -- and we'll submit reason for

17     (indiscernible)

18           THE COURT:  Okay.  Any other housekeeping matters?

19           MR. COLODNY:  I don't believe so, Your Honor.

20           THE COURT:  Thank you.  Mr. Koenig?

21           MR. KOENIG:  Good afternoon, Your Honor.  Chris

22     Koenig, Kirkland & Ellis for the debtor.  The only

23     housekeeping matter I had was it seems like this is the end

24     of the confirmation trial for this week.  We do have an

25     omnibus hearing tomorrow.  We're scheduled to resume the

Page 262

1    confirmation hearing the week of October the 16th with

2    anybody's case opposing confirmation --

3              THE COURT:  Right.  And that they have a deadline

4    for submitting direct testimony.

5              MR. KOENIG:  Correct.  And their exhibits that

6    they would use during --

7              THE COURT:  Right.

8              MR. KOENIG:  -- that case.  We wanted to

9    understand what Your Honor was thinking as far as closing

10   argument timing.  If you wanted post-trial briefing.  We

11   obviously all submitted briefing in advance of the

12   confirmation hearing.  Frankly, I think that we could

13   probably handle it during closing argument, but if Your

14   Honor preferred post-trial briefing --

15             THE COURT:  What I would like is proposed findings

16   of fact, conclusions of law is what I would like.  I don't

17   think I need any more briefs.  Let me put it this way.  If

18   there are issues that have either come up so far or in the

19   remainder of the case come up and you wish to brief them,

20   ask me when we get to the end, okay?

21             MR. KOENIG:  Understood.

22             THE COURT:  The briefs -- your brief, in

23   particular, is quite comprehensive, let me put it that way.

24             MR. KOENIG:  I think that's a compliment, Your

25   Honor.  I'm not sure, but --

1                THE COURT:  It wasn't intended to be disparaged.

2       It was very comprehensive.

3                MR. KOENIG:  Okay.  And so, Your Honor believes

4       that we would have closing arguments whenever the objecting

5       parties conclude their case in chief the week of the 16th,

6       we would schedule closing argument.

7                THE COURT:  We'll schedule closing argument.  I

8       usually -- in lengthier matters, I usually schedule closing

9       arguments.  Well, is anybody ordering a transcript?

10               MR. KOENIG:  Is anybody ordering a transcript?

11               THE COURT:  Transcript, yes.

12               MR. KOENIG:  We've been ordering transcripts of

13      the proceedings this week, yes.

14               THE COURT:  Okay.  So, you know, when the

15      transcripts are completed, they'll be filed on the docket.

16      And so, usually when I get your proposed findings of fact

17      and conclusions of law, it ought to reference, you know,

18      page numbers in the transcript.  And if they're, you know, I

19      haven't heard all the evidence yet.  Obviously, the

20      objectors have an opportunity to do that.  So I'd want

21      counter proposals, proposed findings and fact, conclusions

22      law from them as well.  I typically will schedule closing

23      argument for probably no more than a week after all of

24      that's done.  So I, you know, I want to see the proposed

25      finding conclusions and we'll be able to check them against

Page 264

1    the transcripts and then we'll have closing argument.

2              MR. KOENIG:  Great.  So you would like --

3              THE COURT:  But I have to put a caveat in all of

4    this.  The caveat is, I'm scheduled to start a trial on

5    November 1st that I think is supposed to last 15 or 20 days.

6    I don't -- it is -- it's a length, you know, it may not

7    happen, but it's scheduled to happen.  This isn't going to

8    wait till the end of the trial, let's put it that way.  I'm

9    not going to wait until the end of the trial to hear

10   argument in this.  I just can't give you a date and time

11   when we'll be scheduled.

12             MR. KOENIG:  Understood.  Is there a deadline that

13   Your Honor --

14             THE COURT:  Are you getting daily transcripts?

15   What are you getting?

16             MR. KOENIG:  We've been ordering the transcripts

17   every day on whatever the maximum rush possible is.

18             THE COURT:  Right.  Okay.

19             MR. KOENIG:  The -- so would -- does Your Honor

20   have a deadline in mind for the parties, including the

21   supporters and the objectors to submit findings of fact or

22   conclusions of law, or would Your Honor like to take some

23   time to consider that?

24             THE COURT:  How quickly will you get ready to

25   submit your proposed findings of fact?

Page 265

1           MR. KOENIG:  I think it'll depend on how lengthy

2   the evidence is the week of October the 16th.  If it's

3   short, I imagine we'll be able to move quite quickly because

4   we can use the week in the interim to work on --

5           THE COURT:  Sure.

6           MR. KOENIG:  -- the proposed findings back from

7   the case that you heard this week.

8           THE COURT:  That's fine.  We'll take it up early.

9   I think you'll have a better sense of it when you see what

10  written direct is offered --

11          MR. KOENIG:  Agreed.

12          THE COURT:  -- in support of objections.  Let me

13  also raise a couple of things while we're talking about it.

14  There are a number of open confirmation issues where I've

15  been told the discussions are ongoing.

16          MR. KOENIG:  For example, the ADR procedures?

17          THE COURT:  Right.  The ADR procedures, you know,

18  I think the U.S. Trustee has indicated that there may be

19  some additional discussions between the debtor and the U.S.

20  Trustee with respect to some of the remaining issues.  So I

21  really do hope that you'll use the time off from trial.  I

22  know where you're going to be, but you're part of it.  I say

23  that because the NCBJ is meeting in Austin, Texas next week.

24  And I know that Mr. Koenig is on one of the panels.  I'm on

25  a different panel, but I know he's on a panel.  So unless

1    he's backed out, I think I know where he's going to.

2              MR. KOENIG:  No, Your Honor.

3              THE COURT:  Some of you may be there as well.

4    I'll see you there.  So I hope you will continue, you know,

5    I raised the issue about the consumer privacy ombudsman for

6    one.  I hope you'll be able to work that out.

7              MR. KOENIG:  Understood, Your Honor.

8              THE COURT:  None of that seemed insurmountable to

9    me.

10             MR. KOENIG:  No.  We saw that she filed her

11   proposed direct testimony the other day, so that --

12             THE COURT:  She did not under oath, but she --

13             MR. KOENIG:  -- should speed things along and we

14   can do housekeeping there and make sure that --

15             THE COURT:  I do want to -- I raised this issue

16   during the hearing.  I haven't decided at all, but I'm

17   uncomfortable about approving releases when I don't know

18   who's getting released.  I've made that point.  You may be

19   able to convince me that I don't have to know that, but

20   usually I do.

21             MR. KOENIG:  Yeah.  Your Honor, what I would say

22   is the plan includes categories of released parties, which

23   is very common in large Chapter 11 cases.  If one of the

24   things Your Honor is concerned about is one of the items in

25   the releases are current employees as of a certain date --

Page 267

1                    THE COURT:  Yeah.

2                    MR. KOENIG:  If that information --

3                    THE COURT:  Well you'll provide me with a list of

4      the current employees.

5                    MR. KOENIG:  We would be more than happy to submit

6      that list --

7                    THE COURT:  I think --

8                    MR. KOENIG:  -- if that helps give some comfort.

9                    THE COURT:  Well, it may give some comfort to the

10     U.S. Trustee that's had objections to the releases.  If they

11     know who it is you're proposing to give releases to.

12                   THE COURT:  We would be happy to do that.

13                   THE COURT:  Okay.  You know, some of the other

14     categories may not quite lend themselves to that.  I

15     understand.

16                   MR. KOENIG:  Yes.  We'll confer with the U.S.

17     Trustee and see if there's some additional meat that we can

18     put on the bones to make sure that the record is clear.  And

19     as you said, there are some categories that I think it will

20     be difficult --

21                   THE COURT:  Sure.

22                   MR. KOENIG:  -- to do, but we will do what we can.

23     We'll confer with the U.S. Trustee on that.

24                   THE COURT:  But, you know, from time to time I've

25     seen some of this happens in bankruptcy court and some

1    happens in non-bankruptcy courts where people say, I got a

2    release, but their name isn't anywhere near it.  And then

3    their issues, do they fit in a particular category, or not

4    fit in a particular category --

5              MR. KOENIG:  Understood.

6              THE COURT:  -- and I'm trying to avoid as much

7    uncertainty as possible.  I'm not saying I'm approving the

8    releases or disapproving the releases, but I just -- okay.

9    Keep talking among yourselves and see --

10             MR. KOENIG:  We certainly will.  We'll use the

11   time off.

12             THE COURT:  All right.  So I guess -- are you

13   going to be here tomorrow?

14             MR. KOENIG:  I plan on it, Your Honor.

15             THE COURT:  I will be.

16             MR. KOENIG:  All right.  Let me just make sure

17   that we don't have anything else housekeeping wise.

18             THE COURT:  Go up to the microphone.  Wait.  Pull

19   a microphone so you don't have to hobble over there.

20             MS. CORNELL:  As of right now, the scheduling for

21   tomorrow consists of the confirmation hearing continuing at

22   9:00 and the omnibus starting at 10:00.  Do you -- are you

23   prepared to begin at 10:00 tomorrow for all matters?

24             THE COURT:  Wouldn't that be nice?

25             MS. CORNELL:  I just want to make sure that we're

Page 269

1     prepared at the right time, sorry.

2           THE COURT:  I don't see any reason to start at

3     9:00 tomorrow, okay?  We'll start at 10:00 tomorrow.

4           MS. CORNELL:  Thank you.

5           MR. NOSKOV:  Your Honor, Victor Noskov, Quinn

6     Emanuel for Pharaohs.  At the last hearing you asked me

7     whether we would be submitting affirmative evidence --

8           THE COURT:  I did.

9           MR. NOSKOV:  -- in connection with our case, and I

10    reserved on the question.  I just want to say that, yes, we

11    will.  Just to the extent the court --

12          THE COURT:  And, you know, and I read to you from

13    the procedures order that I had entered, and shortly after

14    that, one of my law clerks pointed out to me the schedule

15    for submitting expert testimony, which was earlier than

16    that, but I said on the record what deadline I was setting.

17    So we'll follow that.  So you're not out of time.  Let's put

18    it that way.

19          MR. NOSKOV:  Thank you very much, Your Honor.

20          MR. MCCARRICK:  T.J. McCarrick, Kirland & Ellis,

21    on behalf of debtors.  So long as we reserve the right to

22    take a deposition or discovery from any expert that they

23    might offer (indiscernible).

24          THE COURT:  You can take depositions next week if

25    you'd like to.

Page 270

1          MR. MCCARRICK:  Thank you.

2          MR. NOSKOV:  Thank you, Your Honor.

3          THE COURT:  How many witnesses do you expect to --

4          MR. NOSKOV:  At this point, we expect just one.

5          THE COURT:  One.  All right.  Anybody else have

6    anything they want to raise for now?

7          MR. KIRSANOV:  Your Honor, Dimitry Kirsanov, pro

8    se.

9          THE COURT:  Yes.

10         MR. KIRKSANOV:  I would like to bring to the

11   court's attention we have an update from the Ripple case.

12   An appeals court yesterday rejected that CC's appeal.

13         THE COURT:  No, actually, what happened is the

14   District Court refused to certify it for immediate appeal.

15   To have an immediate appeal is at least a two-step process.

16   One, the District Court has to certify it, and then the

17   Circuit has to decide whether to accept it.  So I'm aware

18   that the District Judge, Judge Torres, declined to certify

19   it.  She found that it was mixed questions of fact and law

20   and therefore not entitled, so I'm aware of that, Mr.

21   Kirsanov.

22         MR. KIRSANOV:  Thank you, Your Honor.

23         THE COURT:  Thank you.  Anything else anybody has?

24   See you at 10:00 tomorrow for some of you at lease.

25         MS. LAU:  Hello?

1           THE COURT:  Yes?

2           MS. LAU:  Sorry.  This is Cathy Lau.  I think that

3      you mentioned me yesterday.  I don't know if you're

4      referring to somebody else, but I was the one who submitted

5      the objection, and you said that if I couldn't come, then,

6      like, everyone has to vote to accept it, so I came, I guess.

7      I put my -- I submitted my thing too late.  So I guess

8      nobody knew that I was here because I announced it at the

9      start of the meeting.

10          MR. KOENIG:  Your Honor, Chris Koenig, Kirkland &

11     Ellis.  And I'll try to jump in and see if I can help

12     explain here.  Here's what I think happened.  Ms. Lau

13     submitted to us a letter before the objection deadline.  I

14     don't believe it was ever filed on the docket.  I don't know

15     if you can hear me.  And what we did in our confirmation

16     brief and reply in support of objections we responded to Ms.

17     Lau.  We treated her as timely.  We had -- your chambers

18     reached out to us and said that letter was never actually

19     docketed.  Can we have a copy of it?  We provided that copy

20     to change --

21          THE COURT:  I consider it to be timely.  You've

22     addressed it.  And so, Ms. Lau, your objection is pending

23     before the court.

24          MS. LAU:  Thank you so much.

25          THE COURT:  Okay.  Thank you.  And --

Page 272

1          MS. LAU:  Does that mean I get to do anything with

2     it or --

3          THE COURT:  Well, when we resume, anyone who is

4     opposing confirmation of the plan has an opportunity to

5     submit evidence or argument on it.  So I should comment.  I

6     appreciate -- because look, there have been numerous

7     letters, emails, all sorts of things, some of which may or

8     may not be objections, but the debtor has cataloged them and

9     treated them as objections, and the court will treat them as

10    objections as well, so they won't be denied because they

11    weren't filed on the docket by the deadline.

12          MS. LAU:  Thank you so much.

13          MR. KOENIG:  Thank you, Judge.

14          THE COURT:  Thank you.

15          (Whereupon these proceedings were concluded at

16    5:20 PM)

17

18

19

20

21

22

23

24

25

Page 273

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    _Sonya M. Ledanski Hyde_

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 6, 2023

| **&** |
| --- |

**&**  3:3,13 4:10
6:11 7:6 10:18
24:10 113:7
114:11,14
131:13 149:2
173:14 182:19
182:25 258:10
259:17 260:20
261:22 269:20
271:10

| **0** |
| --- |

**0.2**  77:19
**0.28**  77:8
**0.69**  244:18
**000347**  7:13
**0627**  232:24

| **1** |
| --- |

**1**  50:25 55:2
61:7 95:21,22
102:17 103:12
109:7,13
122:19 218:1
224:10 255:11
258:12,15
**1,000**  251:2
**1,000,000,248**
224:6
**1,184,948**
52:25
**1.2**  151:9,16
152:10 153:5
167:19
**1.248**  167:20
223:22 225:25
227:2,6

**1.5**  53:14
**1.77**  89:21
**1.8**  77:8,18,23
78:3,7,13
**1.886.**  77:14
**1/2**  39:22 40:5
40:18
**10**  6:8 31:25
35:11 54:25
87:19 88:12
131:25 172:20
173:1 212:12
**10,000**  196:12
244:5
**100**  118:20
120:19 127:5,9
129:10,19
134:25 135:15
183:19 186:19
186:20 187:3
225:11
**100,000**  49:2
204:22 205:3,4
**10004**  1:14
**10010**  4:14
**10014**  4:4
**10020**  3:7
**10022**  3:16
**10036**  4:21
**1006**  4:3
**10:00**  268:22
268:23 269:3
270:24
**11**  6:4 38:14
57:6 90:11
114:24 126:3,5
126:16 131:15

136:10,12
149:9 158:2,6
208:16 217:1,8
237:18,21,23
249:5 266:23
**11501**  273:23
**116,000,075**
210:21
**117**  6:21
**1192**  137:15
**11:15**  79:13,14
**11:47**  102:3
**11th**  76:19,23
89:14
**12**  50:13 61:9
95:10 99:10
183:2,5 211:6
249:5 251:14
251:19
**120**  120:4
**121**  6:22
**12151**  273:7
**1221**  3:6
**123**  6:23
**12:00**  102:4
**12th**  68:5
89:19
**13**  30:17,19
91:24 92:19
93:3 97:1
220:17,20
**13th**  91:9
93:15,24 94:23
95:3 96:6
**14**  31:7 100:2
183:6

**15**  73:15 80:10
167:18 264:5
**15,911,247.00**
146:24
**15.9**  146:1,22
**150**  108:14
**151**  4:20
**1531**  50:25
51:17,18 52:2
**156**  68:18,21
**159**  183:24
211:25
**16**  6:11 20:18
20:20 21:11,20
21:22 26:15
28:1,12,15
34:24 170:8
234:4
**160**  108:14,24
**160,000,000**
211:25
**163**  191:12
**16th**  262:1
263:5 265:2
**17**  6:11 8:3
28:1,12,15
29:21 34:24
137:16 138:5
**175**  171:6
181:2,7 252:20
**175,000,000**
252:17
**18**  6:10 24:23
25:10,10,10,12
25:14 34:24
161:23

[19 - 3]

Page 2

| | | | |
|---|---|---|---|
| **19** 46:12 73:7 73:15 97:18 147:11,14,15 147:16,19 **196,000,000** 226:12 **1st** 264:5 | **2021** 8:7,19 72:25 73:14 74:1,7,16 75:9 106:24 107:3,8 107:19 199:18 199:19 **2022** 46:12 49:19 52:6 | **22nd** 4:13 13:18,20,24 **23** 7:13 33:23 73:1,2 74:2 102:12 239:12 **231** 6:8 7:10 9:22,24 10:11 10:12 **24** 239:13 | **269** 169:20 206:6 **27** 27:16 28:19 61:10 116:2 158:1,4 233:1 **270** 107:2 **271,585** 49:3 **275** 171:9 252:22 |

**2**

| | | | |
|---|---|---|---|
| **2** 13:18 50:20 50:25 55:5,9 57:19 117:8,9 117:22 130:8 136:21 137:9 137:19 142:19 142:22 218:3,5 **2.444** 256:9 **2.6** 181:20 **2.716** 255:1 **20** 6:9 9:12,13 9:14 32:3,16 62:25 68:7 89:19 114:14 192:11 264:5 **200,000** 61:10 61:12 **2002** 252:25 **201** 4:3 **2018** 64:10,24 65:1,2 145:3 **2019** 8:9,15 215:7 **2020** 72:25 73:14 74:1 77:9,20 78:16 144:25 146:2,7 146:23 147:1 147:21 | 54:19 63:1 68:5 74:7,16 75:9 76:19,23 77:9,20 78:16 83:4 93:16,24 94:5 95:3 114:25 144:25 145:3,9 171:15 171:18,23 204:6 **2023** 1:16 13:18 34:2 150:25 156:6 273:25 **2025** 239:15 **20th** 54:19 **21** 8:19 75:13 **210** 233:2 234:1,2 **22** 75:13 92:2,2 92:8,11 93:15 137:16 **22-10964** 1:3 **228** 6:9 13:9 20:10,15,17 21:22 **229** 6:20 35:7 40:23 41:3,6 | **248** 167:15 224:10 **25** 6:10 57:7 74:8,17 82:13 114:15,16 119:4 123:15 123:21 124:25 125:5,9 126:23 127:14,17,18 128:4 131:10 132:22 133:2 133:10 135:24 138:7,7 139:12 161:23 162:7 180:12 185:14 186:1 187:4,5 189:14 190:3 203:25 204:2 204:12,17 207:13,15 239:13,15 257:15 **259** 169:17 **26** 20:19,20 21:12,20,23 26:15 | **275,000,000** 252:19 **27th** 131:17 **28** 6:11 30:19 30:25 104:22 199:6 **283** 182:4 **283,000,000** 218:24 224:8 231:14 **2882** 87:8,15 88:12 **29** 6:12 **2902** 169:20 213:6,19 232:22 **2:00** 130:7 |

**3**

| | | | |
|---|---|---|---|
| | | | **3** 10:8 13:7 23:7 46:13 55:7 57:16,19 73:15 92:10 97:19 106:22 137:9 138:5 211:21,22 233:16 243:9 243:11,22 |

**[3,328 - 54]**

**3,328** 244:9
**3,642** 244:9
**3.123** 254:24
**3.2** 153:4 156:4
**3.352** 254:21
**3.5** 106:19
  150:25
**30** 6:13 31:10
  31:15 62:25
  192:11 243:3,5
  243:6 245:11
  246:5
**300** 273:22
**30th** 196:4
**31** 6:14,15 8:19
  78:16 89:19
  194:25
**31st** 196:1
**32** 6:16 29:24
  30:9 238:9
  241:23
**3293** 160:8
**33** 6:17 32:22
  33:3
**330** 273:21
**332** 169:17,20
  233:2 243:13
  243:18,21
**34** 6:19 123:23
**3482** 166:12
**35** 6:18 39:22
  40:5,18 97:4
**350** 105:23
  120:7 180:23
**351** 105:14,24
  106:12

**3577** 136:23
  137:6,10
**3580** 13:10
  82:17 146:11
  199:4
**3582** 158:1
  167:7
**36** 123:24
  244:8
**36,000** 144:13
**3653** 175:3,8
**3659** 35:7
  40:24 41:3
**367** 209:12
**3676** 166:18
**3688** 132:14
  137:1,5,11
**3694** 46:13
  47:25 57:20
**3697** 174:22
  175:4,4,6,22
  217:17 254:10
**3698** 172:20,25
**3699** 206:20
**37** 24:17 87:20
  88:12 89:6,8
  95:8 205:16
**3702** 7:9
**38** 8:2
**39** 32:18
**395,000** 118:21
  186:22
**3:30** 193:12

**4**

**4** 1:16 13:13
  35:6,11 45:12
  46:9 106:19

  151:14 158:1,4
  158:5,7 212:14
**4,000** 73:25
**40** 14:24 17:9
  17:12 69:2
  192:12
**400** 231:15
**402,804** 53:7
**409** 69:1
**41** 6:20 123:18
**424** 118:8
  189:7
**42nd** 4:20
**43** 34:1 243:12
  243:13
**44** 95:7,9 98:21
  98:22 123:16
**45** 98:21,24
  220:13,15
  237:6,8
**450** 167:17
**450,000,000**
  219:1 224:9,15
  247:5,5 255:21
**46** 6:21 98:21
  99:25 115:24
  116:14,15,17
  158:1 223:8
**47** 23:10 26:3
  68:18,25 121:1
  166:2,13
  168:16,25
  169:1,10,17
  205:15,23
  206:10 207:6
**47.4** 121:2
  157:3,7,9

  257:13
**48** 136:20,22
  205:19,24
  207:7 258:23
**49** 207:7
**4th** 194:24

**5**

**5** 15:3 17:10,14
  47:25 59:1,3
  102:17 103:12
  109:7,11
  122:22 158:7
  172:20 173:1
  174:19,24
  175:5,8,15
  201:7 212:12
  212:14
**5.09.** 107:21
**50** 16:17 27:22
  28:9 184:9,10
  184:11 187:15
  187:18 197:14
  219:2,4 226:13
  227:7 255:23
  256:1
**500,000** 61:14
  61:15
**51** 4:13 28:17
  29:14
**510** 164:25
**52** 20:19,21
  21:12 26:15
**53** 20:19,21
  21:12 26:15
  107:2
**54** 172:22
  243:18,19,20

243:21
**55**  17:8
**550**  120:7
180:23
**56**  26:4 167:6
223:12
**565**  118:6,10
168:16,20
170:1 182:2
185:13,17
186:6 187:15
189:7,14,15
**565,000,000**
218:22 219:16
220:3 224:7
225:14 231:13
**57**  20:21 21:12
26:15
**58**  20:21 21:12
26:15
**5:00**  206:15
**5:20**  272:16

**6**

**6**  46:13 47:24
47:25,25 50:25
57:19 73:16
92:2,13 93:14
122:22 174:24
175:5,8,14,14
175:15,21,21
209:12,13
210:4,4 211:6
251:13,18
254:10,10
257:5,6 273:25
**6,424**  245:16

**6,970**  244:14
**6.5**  147:2
**60**  24:17
183:19 211:10
211:12
**601**  3:15
**61**  50:5,12
**61.2**  257:12
**63**  146:17
**64**  72:14,19
**640**  120:10
180:20
**65**  20:21 21:12
26:15
**67**  120:24
157:3 257:12
**68**  20:21 21:12
26:15 207:14
207:15 208:3
**69**  160:7,10,22
161:1 162:7
**693**  77:8,19
**6th**  52:6

**7**

**7**  6:22 116:23
117:1,2,20
121:9,12,12,13
124:18 126:3,6
126:14,15
127:8 133:18
133:23 134:6
134:11,16,20
135:11,12
136:11 138:22
139:13,18,22
157:9 169:2,3
169:9,11,12,18

169:18 170:15
184:3 198:9
206:5 208:4,14
209:2,7 211:18
211:22,24
212:12 217:9
223:18 251:5
252:12 253:21
253:24 256:4
**7,516**  245:3
**70**  6:12 20:21
21:12 26:16
29:1,13,17,19
34:25 121:23
122:20 174:7
**71**  145:14,22
145:25 146:8
146:12,13,13
146:21
**72**  72:11,15,16
72:24 74:7,10
74:15,18,19
77:7,18 78:2,9
146:25 147:5
**72.5**  128:3,4,8
129:20
**73**  106:22
**74**  6:13 20:21
21:12 26:16
30:6,6,11,15
34:25
**75**  6:14 20:22
21:12 26:16
30:22,24 31:3
31:5 34:25
102:13 189:7
211:7

**8**

**8**  52:3 68:6
73:23 89:17
104:23 105:8
199:6
**8.5**  67:13,13
**80**  6:15 20:22
21:13 26:16
31:13,14,19,23
35:1 183:23,25
184:2 211:17
211:20,23,23
211:24
**80,000**  120:4
**8033**  10:6
**804**  10:8
**81**  14:13 16:8
35:21,21 59:5
97:4 110:6
112:4 125:8
126:25 127:17
127:19 128:4,7
128:10,12,14
133:18
**82**  6:16 20:22
21:13 26:16
32:7,11,12,13
35:1
**83**  6:17 33:1,4
33:6,7,8 35:1
68:25 74:11,19
92:11 93:15
95:7 98:21,21
98:21 99:25
146:13 147:15
147:16

| | | | |
|---|---|---|---|
| **84** 6:18 20:22 | 154:23 155:8 | 94:21,25 95:6 | **accepted** |
| 21:13 26:16 | 155:12,23 | 95:7 96:4 97:8 | 168:17 222:6 |
| 33:14,18,21 | 181:16 183:16 | 97:10,11,15,17 | **access** 9:7 |
| 35:1 130:24 | 183:18,19,22 | 98:7,10,11,13 | 44:14 |
| 132:24 | 184:6,24 227:1 | 100:13,14 | **accord** 122:7 |
| **85,000** 196:1 | 227:13 228:10 | 101:4,10,13,20 | **account** 223:21 |
| **87** 6:19 20:22 | **aaron** 3:9 7:5 | 102:3,5,7,9 | 229:13 234:24 |
| 21:13 26:16 | 259:17 | 103:2,4,7 | **accounting** |
| 34:8,12,15 | **ability** 120:2 | 105:11,20,21 | 149:3 |
| 35:1 | **able** 36:13,19 | 106:3 107:15 | **accounts** 83:5 |
| **88** 119:7,15 | 43:17 70:15 | 107:16,22,23 | 86:21 87:3 |
| 170:10 179:2 | 74:12 75:2,15 | 107:25 108:23 | 159:24 |
| 180:18,21 | 103:13 107:13 | 108:25 109:5,6 | **accreditation** |
| 181:9 | 125:5 130:16 | 109:11,13,15 | 177:14,17,19 |
| **9** | 132:17 143:7,9 | 109:24 110:4 | 177:21,23,25 |
| **9** 84:21 89:6 | 230:2,6,11 | 110:10,11,13 | **accredited** |
| 92:9 | 252:22 259:11 | 110:16 111:5 | 176:15 250:20 |
| **9.8** 150:3,7 | 263:25 265:3 | 140:16,16,19 | **accurate** 35:22 |
| 152:20 | 266:6,19 | 140:19,22,23 | 49:19,21 59:10 |
| **9/27** 131:9 | **above** 19:20 | 141:24 142:1,6 | 116:4 198:16 |
| 136:23 | 55:9 120:20 | 142:21 198:21 | 273:4 |
| **90** 82:23 83:15 | **abreu** 5:6 80:5 | 198:22 199:10 | **accurately** |
| 83:16 86:10,13 | 80:5,6,7,9 81:5 | 199:11,15 | 69:22 |
| 128:22 135:24 | 81:12,14,17 | 200:1,2,4,6,14 | **achieve** 196:2 |
| 136:3 210:17 | 82:1,6,9,11,12 | 200:17,18,23 | **achievements** |
| **90,000** 239:24 | 82:16,18 83:7 | 201:2,11,12,21 | 153:24 |
| **90,587** 239:18 | 83:11,14,22,23 | 201:22 202:3,8 | **acquisitions** |
| **95,000** 197:5 | 84:11 85:12 | 202:15 203:3,5 | 62:21,23 63:6 |
| **97** 84:4,5,7,8 | 86:3,12,16 | 203:15,16,17 | 63:8 65:15 |
| **98** 109:17 | 87:7,11,13,17 | **absolute** 40:17 | **act** 18:9 25:18 |
| **9:00** 268:22 | 87:18,21,22 | **absolutely** | 162:9,9 |
| 269:3 | 88:18,25 89:6 | 46:17 58:2 | **acted** 245:23 |
| **9:05** 1:17 | 89:9,10 90:2 | 76:18 113:20 | **action** 67:18 |
| **a** | 90:13,14,16,17 | 124:13 | 194:17 |
| **a&m** 148:21 | 90:23 91:3,5 | **abused** 197:7 | **active** 234:15 |
| 149:11 153:16 | 92:5,13,17 | **accept** 128:21 | **actively** 17:15 |
| | 93:2 94:18,19 | 270:17 271:6 | 54:12 188:8 |

Page 6

**activities**
102:20 213:4
**activity** 11:21
11:22 19:22
78:24 253:17
**actual** 14:17
15:20 209:3
221:3
**actually** 11:17
22:21 45:11
69:18 126:13
129:17 153:24
153:25 164:1
169:15 170:9
181:4 196:11
231:10 238:13
245:23 259:2
270:13 271:18
**add** 96:8 151:7
**added** 93:3
189:1 225:24
227:6 235:25
236:7,19
244:14
**adding** 225:10
**addition** 16:11
36:12
**additional** 9:3
24:16 35:18
36:14 70:18
74:2 181:13
187:23 226:3
265:19 267:17
**additionally**
74:6
**address** 239:11

**addressed**
271:22
**adequate**
52:11,17
**adjunct** 12:6
**adjust** 227:2
**adjusted** 131:9
**adjustment**
185:18 226:2
227:3 257:22
**adjustments**
153:3 182:8
226:6
**administrative**
120:18
**administrator**
183:13 212:15
247:12,25
**admissible**
10:5
**admission**
138:17 260:24
**admit** 22:23,25
24:6,16 25:25
26:12,15
116:13 121:9
122:6 260:7
**admitted** 9:23
10:11,12 20:17
21:10,22 24:5
25:14 26:9
28:14,15 29:19
30:15 31:5,21
31:23 32:13
33:8,21 34:15
34:24 41:5,6
116:17 121:12

121:13 122:8
123:2 222:24
233:17 258:23
261:14
**admitting**
20:15 22:10
**adopt** 116:7
122:3
**adr** 265:16,17
**advance**
262:11
**advanced**
213:25 214:18
**advancing**
215:9
**advised** 159:16
**advising** 204:5
204:12
**advisor** 114:20
114:21 159:17
201:3 223:15
225:15 227:9
**advisors** 149:4
215:11 223:19
**affect** 75:20
76:3,9 240:15
247:1,3,4,5
**affected** 16:13
78:24
**affecting** 91:8
**affidavit**
121:20
**affiliated** 62:2
**affiliates**
215:12
**affirm** 10:24
113:12

**affirmative**
269:7
**afternoon**
113:6 114:8
157:19,24
164:15 174:3
176:3 193:19
203:21,23
261:21
**afterward**
99:15 100:4
**agencies** 11:15
**ago** 148:14
154:1 191:4
195:5 196:5
**agree** 38:19
71:23 81:21
111:14 145:11
162:21 163:2
171:17,21
221:24 240:20
240:24 246:8
250:4,7
**agreed** 9:9,17
265:11
**agreement**
9:10,18 102:15
102:16,17,21
102:25 103:5
103:10,12
104:5 161:24
224:14
**agreements**
102:22 119:1
**ahead** 8:5
15:21 35:3
46:2,12 48:1

| | | | |
|---|---|---|---|
| 50:14 55:14 | 197:3 | 117:3,4,6,18 | **analytics** 11:14 |
| 69:4 71:10,21 | **alt** 181:25 | 117:18 118:3 | **analyze** 220:24 |
| 74:12 80:6 | **alternative** | 120:10 121:10 | 229:5,20 |
| 81:16 83:22 | 208:20 | 123:9,10 124:5 | 230:23 232:3 |
| 85:17,17 86:15 | **altogether** | 124:18 127:5 | 248:24 |
| 87:17 92:14 | 55:23 210:6 | 127:23 129:3 | **analyzed** |
| 100:13 111:9 | **alvarez** 114:11 | 134:25 135:6 | 102:13,14 |
| 111:25 113:2 | 114:14 149:2 | 135:10 144:24 | 103:10 |
| 114:4 125:22 | 167:10 173:14 | 152:24 159:21 | **analyzing** |
| 129:6 143:4 | 182:19,24 | 159:23 160:3 | 185:3 |
| 146:19 148:19 | **amas** 259:22 | 161:18 162:18 | **announced** |
| 150:19 151:4 | **amended** 166:3 | 163:14 170:6 | 14:4 271:8 |
| 153:13 154:20 | 172:10,15 | 176:16,17,19 | **annual** 199:8 |
| 157:8 160:17 | **amendment** | 176:24 177:5 | 199:12 |
| 161:3 162:14 | 132:24 | 177:24 179:2 | **answer** 43:17 |
| 164:17 165:7,7 | **america** 7:12 | 179:23,24 | 49:14 55:19 |
| 165:13 167:3 | **americas** 3:6 | 182:22 185:6 | 56:9 58:13 |
| 169:24 175:13 | **amount** 8:11 | 188:9 189:1,16 | 64:13,17 71:10 |
| 175:25 184:18 | 8:17 18:5 | 190:4 191:19 | 74:12 75:2 |
| 193:17 199:14 | 41:20 49:1 | 198:17 205:23 | 84:17 85:21 |
| 210:9 215:21 | 68:5 71:24 | 205:24 206:11 | 86:2 98:14 |
| 216:14,17 | 99:12 100:21 | 209:1 214:19 | 105:18 107:13 |
| 218:5 220:18 | 105:23 106:25 | 219:18,21 | 110:2 112:2 |
| 255:12 | 109:2 110:24 | 220:10,23 | 129:7,13 |
| **al** 1:7 10:24 | 126:15 139:18 | 221:8,18,19 | 157:14 163:19 |
| **alameda** 42:24 | 225:9,10,16 | 222:4,6,7 | 165:15 173:21 |
| 43:1 61:5,16 | 236:19 244:4 | 223:14 224:2,3 | 180:10 184:13 |
| 61:22 62:6,7 | 252:4 255:18 | 224:3,5 228:20 | 197:21 203:2 |
| 62:16,19 | **amounts** 52:11 | 228:23 229:3,3 | 204:21 205:2 |
| **alarms** 153:20 | 105:10 110:19 | 229:4,17,19 | 208:16,18 |
| 154:9 | **analyses** 56:22 | 231:9 232:1 | 214:16 230:12 |
| **alert** 130:11 | 115:20 180:1 | 235:21 237:5 | 235:16 241:20 |
| **allotted** 247:12 | 181:17 249:18 | 237:10,24 | **answered** 55:1 |
| **allow** 23:16 | **analysis** 56:19 | 241:16 248:21 | 58:3 87:5 |
| 64:13 95:4 | 56:21 68:3 | 249:23 250:12 | 129:5 173:18 |
| **allowed** 18:2 | 72:11 82:19,22 | 250:18 251:6 | 228:25 |
| 124:21 144:14 | 112:8 115:17 | 252:8,13,15 | |

answering
55:19 192:13
anybody 42:7
60:10 79:14,18
80:3 111:5,17
111:21 112:14
140:4,7,14
141:5 142:1
160:22 164:10
260:16 263:9
263:10 270:5
270:23
anybody's
262:2
anymore 154:5
anyplace
128:25
apart 213:4
apologies
36:22 51:22
97:10 107:23
196:24 223:7
229:18
apologize
141:23 169:16
176:6 189:17
244:9
app 46:6,17
48:3
apparently
65:16
appeal 270:12
270:14,15
appeals 270:12
appear 24:17
46:6,17,19
47:2 48:3,5,8,9

58:25 84:25
appearance
9:1 215:2
256:22
appearing 53:2
215:6,8
appears 46:24
52:24 73:22
88:13 95:17
applicable
177:25
applied 177:22
226:21 231:5
236:18 248:14
apply 56:23
228:19 250:2
applying
189:14 250:10
appointed
62:19 205:9
appraisals
221:3
appreciate
26:25 46:1
112:7 157:17
272:6
appreciation
95:11 107:19
approach 7:20
21:18 113:18
172:4
approaches
172:5,7
appropriate
65:23 225:8
approve
203:10

approved
194:3,18,25
approves
133:11
approving 8:8
164:24 266:17
268:7
approximated
223:22
approximately
211:17
april 46:12
49:19 72:25
73:14 74:1
area 164:22
190:9
argue 207:4
argument
37:13,21,22
98:19 136:15
136:16 262:10
262:13 263:6,7
263:23 264:1
264:10 272:5
arguments
37:12 79:5
165:6 263:4,9
arithmetic
75:15 106:18
arrangements
251:22
arrive 247:17
arrived 180:17
article 24:25
138:4
articulate
98:18

artificially
14:5
artur 5:6 80:5
140:16,19
ascribe 139:5
asked 36:7
38:1 55:13
87:4 98:11
115:13 129:5
141:15 151:23
165:14 174:13
188:12 190:12
190:20 195:16
206:1,5 222:17
222:18,18
228:24 237:1
237:15 240:1
255:4 269:6
asking 43:13
53:17 75:7,8
81:13 90:6
158:23 193:6
204:24 217:18
227:25 228:2
241:15,24
assess 119:4
184:15 199:16
assessed
118:12,13
121:3 123:12
123:12 187:5
assessing 231:4
assessment
43:11,23 59:18
59:21 85:9,13
93:9 103:18
105:15,22

107:8 231:12

**assessments**
  188:23

**asset** 15:15,19
  18:24,25 19:5
  36:25 37:10
  38:1 56:1,4,11
  56:11,14,17
  67:25 68:1
  70:17,24,25
  71:1,2,4,6,15
  100:5,24
  119:19,19
  120:25 134:3
  167:16 178:1
  179:10,23
  180:5,14 181:9
  181:9 191:23
  192:15 201:9
  220:3,8 222:11
  222:15,17
  223:22,24
  224:3 225:20
  225:25 228:18
  229:17 230:13
  230:17 235:2
  247:4 248:10
  249:25 250:2
  255:22

**assets** 37:4
  41:17 52:12,18
  52:23 53:8,19
  58:5 75:20,20
  76:3,3,8,9 93:7
  94:7 119:10
  120:25 136:4
  148:22 149:21

149:23,24
  150:12,25
  152:18 153:3
  153:25 154:24
  156:5 176:25
  177:6 178:4
  179:3 182:4
  183:14 187:11
  188:13 189:3
  190:10 192:6
  207:20 208:5
  208:24 211:16
  211:19 212:5,8
  212:11 218:24
  224:8,10,13,23
  225:17,22,24
  227:5,21
  228:18,21
  229:7,21
  231:13 235:12
  235:18,24
  247:13,23
  248:16 249:18
  250:5,7,15
  251:7,11
  252:14 253:12

**assigns** 127:14
**assist** 59:9
  116:20 149:6
  220:23
**assistance**
  115:1,1 165:25
  188:13 223:15
**assisted** 117:5
  149:16,17,18
  155:19

**assisting**
  174:11
**associated**
  115:8 135:12
  138:9 151:8
  183:21 191:13
  211:11
**assume** 66:22
  104:13 105:12
  139:4 258:25
**assumed** 251:6
  251:7
**assuming**
  36:18 117:19
**assumption**
  106:9 190:2
  247:15
**assumptions**
  119:15,16
  156:10 189:12
  189:21 190:2,9
  255:3,6,7
**assurance**
  234:15,17,21
**asymmetry**
  100:8
**attaches** 13:17
**attempted**
  17:24
**attempting**
  24:15 139:1
**attention** 13:6
  24:23 29:1
  35:5 161:22
  270:11
**attorneys** 3:4
  3:14 4:2,11,19

124:24

**attribute**
  230:16
**attributing**
  225:11
**audible** 238:17
**audio** 72:10
  74:8
**audit** 149:2
**auditing**
  148:22
**audits** 149:3
**august** 63:1
  194:23 196:1
**austin** 265:23
**automated**
  27:7 79:24
**available** 7:15
  16:24 17:2
  48:22 49:3
  161:5 166:10
  177:12 206:12
  238:1
**avenue** 3:6,15
  4:13
**average** 106:10
  106:13,16
  107:1,3,4,21
  120:10,21
  180:20 197:7
  199:17
**averaged**
  106:20,21
**avoid** 268:6
**aware** 44:22
  45:7 57:6,10
  57:13 61:22,24

62:2,23 68:4
68:11 73:13
101:11 111:1
112:5 126:19
126:22 128:20
132:21 145:8
150:10 151:1
177:19,23
189:16 191:16
198:7 200:19
200:24 201:4
202:9,16,20,24
220:2,5,7
221:7,10 222:9
227:14,16
242:1,6 270:17
270:20
**axis** 125:8

**b**

**b** 1:21 10:8
23:23 25:22
138:5 164:25
247:7
**back** 18:6 19:1
19:5,6,12
22:21 27:2
37:6 64:4
70:17 71:5,15
75:12 80:1
82:5 91:25
92:1 94:4,5
96:25 106:17
124:12,15
129:17,18,21
130:8,16
135:16,22
139:1 143:1

174:4 180:19
197:5 205:14
209:11 222:19
246:3,20
249:21 252:5
253:3 254:3
265:6
**backdrop**
16:15 79:2
**backed** 12:15
170:9 266:1
**background**
12:2 67:24
114:13
**backup** 183:20
188:14,18,22
191:9,13,14,15
191:16 211:11
211:12,13
**bailiff** 142:23
**ballots** 194:23
**ballpark** 54:25
61:13 73:22
106:19
**bank** 12:13
80:12 177:2,7
**banker** 182:2
188:21 230:21
252:21
**bankers** 181:5
**bankman** 62:3
62:11,13
**bankrupt**
87:25
**bankruptcy**
1:1,12,23 15:5
16:19 43:5,10

43:23 44:7
54:9,14,17
55:2,12,23
56:1,4,10,17
56:20,22,24
57:20 58:7,17
58:21 59:1,5
59:13 65:13
115:10,10,11
126:25 128:11
133:10 144:21
149:8 152:3
204:13,14,17
204:19 223:19
267:25 268:1
**banner** 35:13
**base** 158:20
159:3,7
**based** 9:9,9,18
18:15 49:18
98:1 104:11
125:1 150:13
150:24 156:1,6
156:23 159:12
177:6 180:21
182:22 188:25
196:5 212:22
212:25 214:14
220:9 223:21
224:16,17
225:3,18
228:20 231:12
236:18 237:9
237:24 238:4
239:8 248:2
249:7 255:6
257:15,22

**bases** 159:2
**basically** 85:1
97:23 106:6
107:2 149:13
154:25
**basis** 22:9
158:19 176:19
179:3 180:17
181:10 184:2
235:11
**basket** 248:8
**bates** 23:24,25
24:2,4,7,12,16
26:6,8
**bear** 46:7
212:10
**began** 93:20
96:11
**beginning** 8:9
8:15 94:5
158:16 254:4
**begins** 8:2
69:12 70:5,11
**behalf** 7:6
10:19 13:2
24:10 113:7
215:7,8 256:24
258:10 259:18
260:21 269:21
**belief** 158:19
159:1,3,7
**beliefs** 158:20
159:4
**believe** 7:16
9:20 10:4
14:19 19:17
24:4,15 26:8

41:13,19 50:3
54:13 55:4,6
57:12 61:19
63:24 64:4
65:2,11 66:17
85:3 86:7,17
87:16 89:16
94:4 96:5
98:18 110:2,2
110:17 119:10
121:6 127:16
129:9 134:1
135:4 138:25
149:23 150:2
154:23 156:11
156:23 158:16
159:18 164:23
166:1,14
167:20 171:14
175:15,21,23
176:8 180:24
184:22 186:3
187:15 191:6
196:17 198:4
201:7 203:9,11
205:25 206:4
213:20 217:2
219:14 220:1
226:12 228:19
233:3 252:24
254:9 261:19
271:14
**believes** 263:3
**bell** 66:13
**bench** 27:2
**benchmark**
  181:1

**benefited**
  107:5,18
**best** 115:16
  121:7 123:19
  124:7,20 125:5
  126:2,9,11
  127:13 136:12
  139:7 174:4,14
  174:15 176:14
  178:5 187:12
  191:20 192:2,9
  192:17 217:4,7
  218:14 231:6
  239:10 253:11
  253:20 256:2
  257:24
**better** 25:18
  65:22 130:15
  144:1 163:24
  164:2 187:21
  195:4,5 215:10
  221:22 240:1
  245:4 260:10
  265:9
**betting** 69:10
**beyond** 128:24
  184:13 185:17
  185:21 201:18
  201:20 214:21
**bias** 60:20
**bid** 99:24
  100:4,10
  102:25 103:13
  171:5,7,14
  181:6,8 183:20
  191:3,13
  252:17

**bidder** 118:15
  183:20 186:13
  188:19,19
  191:9,14
  211:11,12,13
**bidders** 247:18
**bids** 102:25
  188:14,18,22
  188:22,23
  191:6,15,16
**big** 24:24 27:25
  29:2 173:11
  181:19,21
  187:4 210:22
  249:15
**bigger** 179:16
  256:9
**biggest** 177:3,3
**billion** 67:13
  67:13 150:3,7
  150:9 151:1,9
  151:14,17
  152:10,20
  153:4,5 156:4
  167:8,15,19,20
  181:20 223:23
  224:10 225:25
  250:21 254:21
**binder** 11:3
  13:7,17 20:23
  21:15,16 23:7
  23:8 24:1,19
  24:24 28:1,4
  29:2,6 35:6
  115:23 116:23
  121:16 130:17
  174:9 206:6

220:12 223:8
232:12
**binders** 113:19
  215:23
**bit** 16:16,20
  24:11 39:20
  94:5 155:10
  157:5 187:17
  194:11 226:19
  230:15 237:3
  238:25 240:17
  243:8 248:20
  253:16
**bitcoin** 16:17
  25:1 75:20
  76:3,8 94:9
  95:13 99:11
  107:9,19 148:4
  178:13,20
  179:14 181:22
  186:7,16,16
  204:8,10,11,11
  208:12 214:15
  214:16 219:13
  225:5,20
  235:13 239:8
  239:23 240:25
  241:4 250:4
**block** 66:11
**blockchain**
  11:14,17,22
  80:16
**blonstein**
  50:16 52:2
**bloomberg**
  151:8

bloomberg's
153:24
blow  118:24
blue  123:14,17
125:11,11
board  62:18
63:5,19,21,22
63:23 64:22,25
65:4,5,7,16
bob's  160:23
bodies  198:12
bolster  96:8
bolsters  20:3
bones  267:18
book  169:12
books  176:23
184:15
boosted  41:19
boosting  14:5
borne  212:15
borrow  70:24
83:20
borrower
163:14,22,24
164:2
borrowing
71:2 83:3
bottom  72:20
73:9 77:7,14
77:17 78:2,8
120:13 125:8
146:17 158:6
191:23 243:16
257:7
bought  75:12
201:9

bound  40:1,2,6
40:8,18,20
bowling  1:13
breadth
188:17
break  17:3
140:5 174:25
breaking
142:19
brian  4:8
brick  191:1,10
bricks  190:23
brief  25:17
114:12 198:2
262:19,22
271:16
briefing
262:10,11,14
briefly  13:23
14:19 20:23
briefs  262:17
262:22
brier  3:21
112:23 113:4,6
113:7,17,18,21
114:3,5,7
121:14 122:23
123:3,4 124:10
124:13,15
125:18 126:7
127:2,10
128:23 129:5
130:3 131:4,7
131:18,21
132:8,12 133:4
133:20,24
134:8,13,17,22

135:2,8,25
136:5,14,25
137:7,10,14
138:1,16,19
139:8,14,19,23
142:10,13
145:4 147:12
147:22,25
148:6 150:5,15
151:2 152:4,11
153:7 155:6
156:8 157:13
158:21 160:9
160:13,23
161:1 162:23
163:4,15 166:5
166:9,16,23
169:5,10 174:7
174:18 175:3
175:24 178:9
178:16 189:4
190:5 191:21
195:11 199:22
202:1,6,12
203:1 205:11
205:20 206:3,8
207:23 209:14
213:7,13,16,20
215:5,17,20
217:18,22,24
220:18 228:24
229:8,22 230:8
233:18 237:12
237:14,21
239:5,25
241:11,17,22
244:20 246:10

246:21 254:7
254:11,14
256:18,20,23
256:23,25
257:4,9 258:1
bring  214:6
215:23 270:10
bringing  87:10
249:21
brings  118:14
broad  162:8
broader  80:20
broke  27:12
bronge  140:25
141:2,4,5
142:5,20
157:18,19,23
158:5,9,11,12
158:15,23,25
159:6 160:11
160:15,18
161:4,10,15,17
162:6,12,16
163:1,7,18
164:9,17,18
165:7,8,12,14
165:17,18
bruh  4:7
btc  107:6 219:9
225:5 239:16
250:6 251:21
bucket  248:7
buckets  17:4
budgeted
183:4
buildout
118:21 186:21

186:21 188:1
**buildup** 180:17
**built** 64:3
187:25 191:10
**bulk** 247:21
251:11 253:17
**bunch** 197:8
**burn** 30:20,24
**business** 12:4
158:17 171:13
177:7,25
178:14 180:5
181:3 184:12
185:7,7,10
188:2,21
194:10,16,18
204:1,5 208:11
208:12,22
212:20,23
213:1,5 218:21
219:16,18
220:4 222:11
224:24 227:5
227:23 228:1
228:16 231:13
238:11,24
239:4,7,22
240:14,14,15
240:16,18,20
249:17
**buy** 8:21 18:6
19:1,5,10,12
70:16 71:5,15
100:6 104:6
106:11 119:22
198:5

**buybacks**
32:19,20 33:12
74:11 78:5
108:1,3,5
**buyer** 106:14
171:8 181:3
252:18
**buyers** 107:1
199:17 201:13
**buying** 19:6
62:24 78:24
**buys** 108:1,10
108:12,19,22
109:2

**c**

**c** 3:1 7:1 63:16
63:16 273:1,1
**calculate** 37:3
110:7 245:13
**calculated** 14:8
170:10,10
226:16
**calculating**
185:2
**calculation**
106:11 109:22
112:3
**calculations**
191:7,8
**calculator**
236:5
**call** 10:19
112:24 113:2,7
135:24 136:3
**called** 18:21
62:21 226:8,9

**calls** 129:21
162:24 163:4
163:15 246:11
**campagna** 6:5
112:24 113:3,8
113:10 114:6
114:10,19
116:22 117:12
121:3,10,15,23
122:9,20 123:5
124:9 125:23
125:25 126:9
133:25 137:3
140:8 143:1
144:20,24
145:8 148:21
150:2 151:6
152:2 153:16
154:22 156:21
157:16,24
165:22 173:24
174:9,23 176:3
176:5 193:19
198:23 200:7
203:23 207:12
208:4 214:14
216:19,23
218:8 223:7
240:13 242:1
242:19 256:19
256:21 257:1
257:10
**campagna's**
122:19
**candles** 92:19
**candlestick**
57:24

**candlesticks**
93:21
**can't** 178:20
179:21,21
206:2 207:8
208:20
**cap** 67:6,7,13
107:5,10
186:21
**capacity** 63:12
**capital** 62:6
167:17 182:15
184:10,12
187:9,15,18,20
187:23 200:10
200:20,25
201:1,15 219:1
219:3,5 224:13
227:6 231:14
235:19 256:12
256:14
**capped** 186:21
**caps** 118:21
**cardinal** 106:5
**care** 184:1
258:25
**carries** 39:23
158:7
**case** 1:3 3:3 7:6
7:12 10:18
16:8 37:8,22
39:2 80:21
99:7,21 114:23
127:8 144:13
156:2 165:8
171:24 176:24
180:23 201:6

| | | | |
|---|---|---|---|
| 201:20,25 | **cel**  8:8,9,11,16 | 100:23 101:7 | **celsius**  1:7 8:8 |
| 202:17 204:13 | 8:17,20,25,25 | 101:18 102:11 | 8:9,12,15,18 |
| 204:15,18,19 | 9:2,3,20 13:25 | 103:23 104:15 | 9:6,15 14:6,25 |
| 204:19 205:4 | 14:3,8,11,22 | 105:2,9,14,24 | 15:5 17:5,6,6,7 |
| 215:9 227:21 | 14:24 15:3,6 | 106:7,12,14 | 17:9,9,11,13 |
| 235:8 237:11 | 16:14,24 17:3 | 107:9,18 108:8 | 17:22,23 29:25 |
| 248:13 258:24 | 17:15 18:5,12 | 108:14 109:18 | 32:4,6,19,19 |
| 259:17 262:2,8 | 18:16,17 29:25 | 109:22 110:19 | 33:11 39:3,5 |
| 262:19 263:5 | 30:20,24 32:20 | 110:24 111:12 | 40:16 41:13 |
| 265:7 269:9 | 33:11 36:8,20 | 112:4 122:12 | 42:18,21 44:10 |
| 270:11 | 37:8 38:24 | 122:13,17 | 44:14,20,23 |
| **cases**  16:4,5 | 39:14,19 41:13 | 123:7,11,13 | 45:1,8 46:6,17 |
| 70:23 82:24 | 41:16,18,20 | 124:4,8,17,21 | 46:19 48:3,5 |
| 120:6 201:5 | 43:4,10,14,22 | 126:19,20,23 | 52:9 59:12 |
| 204:22,25 | 43:25 49:2 | 126:25 127:15 | 62:24 65:13,14 |
| 208:17 266:23 | 52:11,18,23 | 128:7,17,20 | 66:9 74:2 77:7 |
| **cash**  71:4 | 53:4,4 54:8,12 | 132:21 133:10 | 77:18 78:6,12 |
| 115:6 171:7,9 | 54:14,16,19 | 133:11,18,23 | 78:23 94:11 |
| 208:24 219:5 | 55:2,5,11 | 134:2 135:7 | 102:13 104:25 |
| 220:10 249:21 | 56:19,23 57:7 | 136:3,10,20 | 105:12,22 |
| 252:20 | 57:10,11,13,20 | 137:17,20 | 106:4,10 108:8 |
| **cashflow**  115:6 | 58:3,6,6,17,19 | 138:5,6,7,7,8 | 108:13,20 |
| 194:19 | 58:25 59:12 | 138:22 139:5 | 114:24 121:12 |
| **cashflows**  37:5 | 67:19 68:6 | 139:13,17,18 | 131:14 145:2 |
| 37:9 | 72:12 73:1,2 | 139:22 144:13 | 145:11 160:2 |
| **cataloged** | 73:15,24 74:2 | 144:21,24 | 161:24 163:9 |
| 272:8 | 74:17 75:21 | 145:2,9,11 | 169:9,11 |
| **catch**  209:15 | 76:4,9,19,23 | 147:2,20 148:3 | 170:20 193:22 |
| **categories** | 77:2,7,8,9,18 | 163:9 164:5 | 195:7,9 197:20 |
| 266:22 267:14 | 77:19,20 78:7 | 174:24 198:6 | 198:8 199:8,12 |
| 267:19 | 78:7,13,13 | 198:10,12,14 | 205:23,24 |
| **category**  268:3 | 79:4 81:18,22 | 199:17,19 | 206:5 232:14 |
| 268:4 | 85:7,14 88:7 | 201:6,13,25 | 233:15 243:21 |
| **cathy**  271:2 | 95:11,15 96:6 | 202:5,10,17,23 | 259:23 |
| **caveat**  264:3,4 | 96:14 97:20,22 | 203:24 | **celsius's** |
| **cc's**  270:12 | 98:2,8,9,17,22 | **cell**  49:3 | 102:14 |
| | 99:22 100:16 | 130:10 | |

cent 123:15
127:14 138:7
139:12 157:3
center 118:10
119:4 219:17
centerview
167:16 168:13
168:17 170:1
178:21 185:10
185:13,20
224:8 225:15
226:25 228:1
237:10
cents 14:13
16:8 35:21,22
54:25 57:7
59:5 62:25
73:15,22 97:4
97:5 110:6
112:4 120:19
123:23,24
124:25 125:5,9
126:23 127:1
127:17,17,18
127:19 128:4,7
128:10,12,14
129:10 131:10
132:22 133:3
133:10,19
135:24 138:7
certain 7:18
8:10,17 20:11
27:12,19 82:23
99:7 115:17
120:18 173:10
188:1 196:10
217:2 238:1

242:7 266:25
certainly 37:11
40:1,20 55:15
76:5 80:24
82:4 104:18
112:6 113:11
156:12 194:2
201:3 234:12
234:21 268:10
certified
114:19,21
273:3
certify 270:14
270:16,18
cfo 155:20
chain 32:19
155:21
challenge
26:24
chambers 7:16
271:17
chance 23:21
38:10 158:10
change 13:2
99:18 191:19
271:20
changed 66:23
101:22 233:19
246:25
changes 75:19
76:2 255:7
changing
239:8,9
chapter 38:14
57:6 114:24
117:20 124:18
126:3,5,5,13

126:14,15,16
127:8 131:15
133:18,23
134:6,11,16,20
135:11,12
136:10,11,12
138:22 139:13
139:18,22
149:9 157:9
170:15 184:3
198:9 208:4,14
209:7 211:18
211:22,24
217:1,8,9
223:18 251:5
252:12 253:21
253:24 256:4
266:23
charge 213:1
228:9
charged 85:14
charges 7:18
chart 30:8,23
31:10,14 33:11
52:8 57:23,24
77:11,12 89:24
93:4,17,20,20
94:7 95:5,13
96:13 97:24,25
98:16,18,22,24
99:23 100:15
124:12,17
125:4 173:12
173:15,17
174:15 175:4,9
175:9,23 178:6
191:11 209:19

249:5
charts 32:19
88:5 90:19
95:12 101:20
chater 208:16
check 66:23
166:20 249:3
263:25
checked 54:24
cherokee 62:21
62:23 63:6,8
63:11 65:8,9
65:15
chief 7:17
11:12 258:24
263:5
child 62:1
choice 118:15
186:9,11,13,14
212:13 219:9
219:10 242:7
242:10
choices 242:2
choose 201:13
245:8
chose 242:21
245:19,20
246:4,5
chosen 55:15
chris 3:18
131:13 261:21
271:10
chunk 181:19
circle 187:2
circuit 270:17
circular 125:16

circulate 94:11
circumstances
  38:12 112:8
  226:18
cited 21:4
  22:13 24:7
  260:3
citing 167:21
claim 65:14
  134:3 138:8
  144:20 160:2
  164:24 184:16
claimants
  120:19
claims 57:11
  120:16,18,21
  129:10 134:6
  134:11 138:5,6
  138:6 159:12
  159:13 182:10
  184:14,15,16
  191:25 244:4
  248:9 252:5
clarification
  193:7
clarify 158:24
  254:7
class 121:7
  122:13 126:20
  128:8,22
  132:22 136:11
  164:24
classes 120:16
  122:14 123:13
  134:11 159:11
  242:7

classification
  158:18 159:10
  159:15 161:11
  161:19
classifications
  159:2
clause 84:21
  86:8 136:13
clear 21:3
  24:11 45:4
  48:16 101:21
  102:1 132:12
  174:22,25
  175:20 217:22
  227:25 267:18
clearly 15:7
  96:15
clerk 7:2 10:23
  27:6 50:22
  51:5,7,11,13
  51:15 79:23
  113:12 161:8
  161:14
clerks 269:14
clients 8:12,18
clip 260:2
clips 259:22
  260:6
close 44:3
  61:10,25 94:6
  111:13 119:13
  153:22 176:5
  181:8
closed 64:10,24
  65:2 248:13,14
closely 62:2
  91:22

closer 40:9
closing 81:11
  224:16 248:9
  262:9,13 263:4
  263:6,7,8,22
  264:1
cnl 149:21
  150:25 152:20
  153:3 154:25
  155:2 156:5
coast 210:14
code 149:8
  180:25 212:18
  212:23,25
  223:19 227:14
cohen 7:12,17
  8:6 10:1,3
cohost 51:3,10
  51:15
coin 37:14 67:6
  69:8,16 105:13
  129:17,18
  132:7 139:1
  182:22,22
coinbase
  251:22
coingecko
  89:16
coinglass 89:18
coins 129:21
  135:16,22
  181:25 225:8
collateral 71:3
  158:19 159:18
  159:24
collectability
  226:9

collectible
  37:16
collecting
  188:21
colloquial
  191:3
colodny 3:9 7:4
  7:5,5,22,24 8:2
  8:6,15 9:14
  10:2,8,13 21:7
  29:5 50:5,8,10
  146:12,17
  205:25 206:4
  232:21,23
  233:1,3,7,12
  246:11 258:3
  259:15,16,17
  259:17,21
  260:7,13,17
  261:3,7,11,13
  261:16,19
column 74:11
  105:8 117:19
  117:25 118:9
  119:7 146:1,4
  146:4,22 147:1
  147:4 177:2
  179:17 180:13
  181:15,18
  184:25 192:5
  198:18 211:8
  211:17 212:13
  218:19 222:8
  225:18 226:14
  244:22 255:24
columns 90:7
  117:20 119:6

174:16 182:5
191:20 255:25
**column's**
192:25
**combination**
224:10 229:6
240:18
**combined**
228:21 229:20
235:13 240:15
259:2
**combining**
235:11
**come**  10:21
19:9 22:19,21
70:20 94:13
130:16 177:4
179:8 182:9
190:12 192:25
208:17 214:23
232:4 262:18
262:19 271:5
**comes**  11:23
101:7,17
102:10 104:14
149:20 150:12
153:2 159:9
169:19 245:2
**comfort**  267:8
267:9
**comfortable**
80:19
**coming**  16:22
39:13,18 89:17
196:9 227:1
254:17

**comment**
221:10 272:5
**comments**  96:2
156:21
**committee**  3:5
7:6 10:19,19
24:15,21
197:10 205:7,8
216:7 258:2,25
259:18
**common**
221:14,20
223:21 231:10
231:18,21
234:7,8,16
244:10,22,24
245:4,9 266:23
**commonly**
70:19
**communicated**
9:6,15
**communicati...**
105:8
**communicati...**
62:11,13 93:6
**companies**
114:17 171:22
204:3 229:6,20
**company**  8:10
8:16,21 11:15
14:2 17:4 61:6
61:8 62:8,16
62:18,21 63:5
65:3 72:12,25
73:2 74:8,11
74:16 75:12
78:4 80:15

93:6 108:2,3,6
117:23 118:17
118:25 119:11
134:2 147:2
148:4 149:7
155:20 171:5,8
172:3 178:20
179:17 182:22
182:25 184:15
196:1 198:12
198:14 199:18
201:7 202:4
208:21 212:9
238:23 250:14
255:21
**company's**
13:25 63:5
119:20 149:19
**company's**
176:23 180:14
**comparable**
229:6,20
**comparables**
248:2
**comparative**
178:4 249:22
**comparatives**
176:21
**compare**  98:3
98:6,8
**compared**  58:1
58:5 94:8
99:10 102:15
117:18 164:4,5
164:7 180:7
218:13

**comparing**
58:8 174:16
178:3,4 217:11
**comparison**
126:3 136:10
176:10
**competitor**
42:18,21
**compiling**
149:18
**complete**  24:8
**completed**
196:12,14,23
208:20 246:19
263:15
**completely**
15:6 18:1
253:3
**complex**  80:11
240:17
**complicated**
154:10 243:8
**complied**
218:15
**compliment**
262:24
**component**
180:21 186:8
235:5 248:23
**components**
178:21 223:23
236:8
**composed**
119:12
**composes**
218:17

composition
109:21
compound
65:23
comprehensive
262:23 263:2
comps 220:10
computer 12:4
concept 227:14
227:16 249:18
250:20
concepts 80:20
conceptually
80:22,24
concern 118:12
138:11,12
171:12 185:7
190:8 220:11
252:14
concerned
266:24
concerns
202:24
conclude 80:18
108:13 156:18
263:5
concluded
140:4 228:20
272:15
conclusion
18:12 20:4
39:13 108:15
162:24 163:5
163:16
conclusions
60:23 94:1,3
99:3 115:19

121:4,6 172:8
172:8 262:16
263:17,21,25
264:22
conclusively
82:3
condensed
170:17
condition
18:23 69:7,15
70:1 88:8
conditions
16:6 37:1
101:23 171:17
171:21 253:3
conducive
17:20
conduct 62:8
149:3,23
150:17 185:10
conducted
144:24 148:3
224:7 228:1
237:10
confer 267:16
267:23
conferred
260:15
confirm 21:20
24:20 30:7,23
31:14 32:7,23
33:15 34:8
74:6,15 88:1
116:2
confirmation
2:1 48:7
115:15,18

121:21 217:1
228:12 251:25
259:8 261:24
262:1,2,12
265:14 268:21
271:15 272:4
confirmed 10:3
31:1,17 32:10
32:25 33:17
34:11 223:17
conflict 215:16
conflicts 60:20
conglomerate
227:11
congress 162:8
connect 144:3
229:10
connected 16:9
connection
269:9
consequences
18:9
conservatism
178:8 190:4
consider 57:25
171:11 187:9
194:24 227:20
232:7 235:17
235:20,22
246:14,18
252:13 253:7
254:17 264:23
271:21
consideration
76:7
considered
254:16

considering
162:18
consistent
100:12 226:20
226:22 250:8
consists 223:23
268:21
consolidated
166:2,13
168:16,25
169:1,12,19
constant 95:14
192:7
constitute
221:2
construction
186:22
consumer
266:5
consummated
223:17
contain 14:7
contained
122:19 137:10
contains 13:20
132:9,15
164:24
contents 155:1
context 36:14
71:24 81:15
98:4,16 99:13
107:21 257:16
continue 58:19
266:4
continues 9:14
38:15 184:17

**continuing**
202:22 251:10
268:21
**contradictory**
48:12
**control** 62:8
103:22 195:2,2
195:3 196:17
**controlled**
14:25
**controller**
155:20
**convenient**
261:2
**conversely**
41:17
**conversion**
130:2,25 132:5
132:25 133:8
**converted**
223:18
**converts**
117:20
**convict** 240:7
**convince**
266:19
**coordinated**
19:17
**copies** 7:14
215:25 216:6
217:20
**copy** 7:16,22
20:25 21:16
45:13,21 46:3
87:15 116:4
117:2 217:23
218:2 271:19

271:19
**cornell** 4:6
268:20,25
269:4
**correct** 25:11
25:21 26:13
30:12 35:2
42:25 43:15,16
44:7 46:10
47:20 56:12
59:5,11,24
65:10 70:7
73:3 74:19
77:6,17 80:13
80:14,17 84:14
84:15 85:2,24
89:15 92:20,21
97:20,25 106:7
106:8 108:9
109:2,16,18,19
127:1 128:2,5
128:15 133:13
133:14 135:1
135:14 141:21
146:2,23 147:2
147:16,21
148:23,24
150:4,9 151:10
155:2,3 159:19
159:19 161:20
161:21 162:12
163:10 164:5
166:19 167:8,9
170:2,3,8,12
170:14,22,22
171:15 173:3
174:23 175:11

176:11,12
198:15 212:19
216:24 217:1,5
217:9,10,12
218:11,12,15
218:23,25
219:1,12,19,20
219:22 221:12
222:4,5,7
224:2,25 226:1
227:7 229:14
230:3,7,18
231:2,3,7,16
231:19,23
235:6,7,9,21
235:23 236:15
237:11 238:2,6
238:16 239:18
243:4 244:5,6
244:24 245:5,9
245:10,12,16
245:21 246:6
247:8,9,11
248:22 250:12
250:20 251:6
251:14 253:4
253:12 254:18
254:22,24
255:1,2,4,9,19
256:13 260:7
262:5
**corrected**
28:21
**correctly**
184:25 228:19
**correlate** 95:23

**correlated**
107:9
**correlation**
76:5
**cost** 106:13
107:1,21
182:24 183:8
191:10 210:17
211:5,24
212:15
**costs** 71:24
106:10 115:8
118:21 182:12
183:1 184:1
186:21,22,22
187:20,24,25
191:11,12
211:15,17
212:7,10
223:15
**couldn't**
118:25 155:10
200:4,21
**counsel** 10:3
45:24 46:4
87:10,17 159:8
160:4,5 216:1
216:6 218:9
**counter** 38:16
164:23 263:21
**country** 273:21
**counts** 195:1
**couple** 116:11
116:18 166:4
183:10 186:5
194:13 195:5
196:4 206:8,9

[couple - court]                                                    Page 20

| | | | |
|---|---|---|---|
| 215:22 239:20 | 44:17 45:3,9 | 87:20 88:11,15 | 130:5,14,20,23 |
| 248:11 258:5 | 45:16,19,22 | 88:23 89:5,8 | 131:3,12 |
| 265:13 | 46:2,8,11,22 | 89:24 90:13,16 | 132:11,13 |
| **coupons** | 47:9,14,18,21 | 90:18,25 92:4 | 133:5,10,12,15 |
| 118:20 | 47:25 48:14,19 | 92:8,12,14,16 | 133:21,25 |
| **course**   49:3 | 48:24 49:9,14 | 93:11,14,23 | 134:4,7,9,14 |
| 87:13 96:4 | 49:22 50:1,7,9 | 94:1,19,24 | 134:18,23 |
| 179:24 215:14 | 50:11,21,23 | 95:1 96:1 97:9 | 135:3,17,20 |
| 216:13 222:20 | 51:4,9,12,21 | 97:15 98:6,8 | 136:1,6,15,22 |
| **court**   1:1,12 | 51:25 52:15,21 | 98:11,14,20,24 | 137:2,9,19,22 |
| 7:3,20,21,23 | 53:11,16,21,25 | 99:3,25 100:13 | 138:2,4,12,18 |
| 8:1,4,13 9:11 | 54:5,21 55:18 | 101:9 102:3,6 | 138:20 139:15 |
| 9:13,24 10:7 | 56:6,13 57:1,4 | 103:3 105:7,18 | 139:20,24 |
| 10:10,15,17,21 | 57:18 58:12 | 105:25 106:20 | 140:1,3,7,14 |
| 10:25 11:3,4,6 | 59:7,16 60:4,6 | 107:13,22 | 140:18,21,23 |
| 12:1,22 13:23 | 60:10,13 61:3 | 108:18 109:4,9 | 141:1,3,7,15 |
| 15:10,13,21 | 64:7,13,16 | 109:12,14 | 141:20,23 |
| 18:21 20:14,15 | 65:19,22,25 | 110:4,9,12,14 | 142:1,4,9,12 |
| 20:20,23 21:1 | 66:5,9,11 | 110:23 111:4,9 | 142:14,17,25 |
| 21:5,9,16,19 | 67:16,22 68:9 | 111:17,21,25 | 143:4,6,9,11 |
| 22:1,4,9,15,18 | 68:12,19 69:4 | 112:14,17,21 | 143:16,18,21 |
| 22:23 23:3,20 | 69:18,21 71:10 | 112:25 113:2,9 | 143:24 144:2,4 |
| 24:8 25:10,12 | 71:13,16,19,21 | 113:13,16,20 | 144:7,15,17 |
| 25:17,20 26:3 | 72:2,7,17,19 | 113:22,24 | 145:5,15,18 |
| 26:6,11,14,19 | 73:5,8,18 74:4 | 114:1,3,9 | 146:9,19 147:6 |
| 27:2,8 28:13 | 74:10,22,24 | 115:21 116:11 | 147:9,14,23 |
| 29:3,10,18 | 75:2,6,11,17 | 116:12,15,19 | 148:1,7,9,13 |
| 30:11,14 31:4 | 75:22 77:11,15 | 117:11 121:11 | 148:16,19 |
| 31:21 32:12 | 78:21 79:8,11 | 122:8,12,21 | 149:5,11 |
| 33:3,6,20 | 79:13,18,20,25 | 123:1 124:11 | 150:16,19 |
| 34:14,20,22 | 80:3,6 81:3,12 | 124:14,17,20 | 151:3,11,18,21 |
| 35:3 36:2,4,7 | 81:16,21,25 | 125:4,13,17,19 | 152:5,7,12,16 |
| 36:19 38:4,8 | 82:8,10,14 | 125:22 126:8 | 152:25 153:9 |
| 38:14,23 39:10 | 83:6,10,12,18 | 126:17 127:3 | 153:13,21 |
| 40:25 41:4 | 83:22 84:5,7 | 127:11,18 | 154:2,7,10,13 |
| 42:7,10 43:7 | 86:2,9,15 87:6 | 128:9,13,16,24 | 154:16,20 |
| 43:13,17,24 | 87:8,9,10,15 | 129:6,13,24 | 156:9,15 |

157:14,18,21
158:6,10,22
159:5,7 160:11
160:17,21,25
161:2,6,9,12
162:4,7,13,24
163:6,17 164:8
165:2,6,12,16
165:18 167:3
167:25 168:6
169:9,11,18,23
172:13,17,20
172:24 173:4
173:20 174:1
174:21,24
175:7,7,13,16
175:19,25
178:10,17
181:12 182:8
182:12,15,19
183:16,24
184:4,18 189:5
189:22 190:6
190:11 192:19
193:2,5,8,11
193:14 197:24
198:20 199:10
199:13,25
200:4,16,21
201:1,10,18
202:2,7,13
203:2,14,17,20
205:12 206:2
206:14,18,25
207:4,8,25
208:7 209:6,17
209:21 210:1,9

210:19 213:8
214:1,6,10,20
215:2,14,15,17
215:19,21,23
215:25 216:3,6
216:9,12,14,17
217:23 222:1
222:13,17,21
223:1,5 224:18
226:6 228:4,7
229:1,23 230:9
232:25 233:6
233:11,13,17
233:25 236:11
236:25 237:13
237:16 240:2,4
240:9 241:14
241:18,21
243:13,15,21
245:24 246:12
246:22 251:3
251:15 254:1
255:12 256:17
256:22 258:2,4
258:7,14,16,19
259:1,9,14,16
259:19,20
260:4,10,15,18
261:1,6,9,12
261:15,18,20
262:3,7,15,22
263:1,7,11,14
264:3,14,18,24
265:5,8,12,17
266:3,8,12,15
267:1,3,7,9,12
267:13,21,24

267:25 268:6
268:12,15,18
268:24 269:2,8
269:11,12,24
270:3,5,9,12
270:13,14,16
270:23 271:1
271:21,23,25
272:3,9,14
**court's** 15:23
142:25 270:11
**courtroom**
42:8,11 51:1
52:1 112:18
124:1 130:11
166:1 177:12
214:23
**courts** 268:1
**cover** 18:5 19:2
19:6,20 70:13
70:17
**covered** 198:4
**coverers** 19:11
**covers** 153:5
**cpa** 114:22
**cr** 7:13
**crazy** 55:22
**create** 9:1
65:12 97:25
109:8
**created** 49:12
49:19 60:19
109:16
**creates** 19:7
70:18
**creating**
155:17 190:10

**creation** 202:4
**credit** 12:13
80:12
**creditor** 57:15
80:5 111:24
140:13 141:2
143:15 144:12
160:1 204:14
204:18 205:7,8
205:22 214:9
215:8 223:20
230:1,6,6,15
230:18 231:6
231:22 232:8
251:1
**creditors** 3:5
5:1 7:7 44:14
65:14 82:24
110:6,18 112:9
120:23 123:11
123:20 126:12
126:14 134:21
144:13 156:4,7
156:23 159:11
159:11,14,14
204:20,24,25
205:5,9 217:4
217:7,8,12
218:14 220:25
221:15 225:3
228:3,11
229:13,19
231:10 234:23
242:2,6,13,16
242:20,21
243:2 245:5,19
245:20 246:4,9

246:15,18
248:9 250:18
253:21,22
259:18
**creditors'**
197:10
**credits** 186:19
**criteria** 179:25
180:4,7 189:9
**cross** 6:3 10:1
23:21 26:22
42:8,11,14
53:22 54:2
60:11 80:3
102:6 111:6,18
111:22 112:15
125:13,17,25
140:6,8,11,12
142:18 143:2
143:13 144:10
144:14 148:10
173:23 206:15
206:22 207:1
214:3,8,22
233:24 240:10
241:18
**crosstalk** 154:9
**crypto** 16:15
16:18 25:2
57:25 76:15
80:21 81:7,7
94:7 105:13
150:13,13
153:3,19 155:1
167:18 178:19
188:11 194:14
204:4,11

208:11 211:1,2
215:13 219:6,7
219:7 224:9,15
224:17,23
225:2 235:9,12
236:23 240:20
242:9,10,17,20
242:25 243:1,2
243:3,7 244:18
245:9 246:4
247:6 248:16
248:18,18
250:21 252:4
255:21
**cryptocurren...**
58:15 200:12
200:19,24
**cryptocurrency**
80:20 99:13
120:24 130:2
130:25 132:5
132:25 133:8,9
176:24 181:20
182:21 240:22
244:8,9 245:7
255:18 256:7
**cryptos** 247:5
**current** 11:11
139:11 184:10
202:9,16
266:25 267:4
**currently**
127:13 156:5
175:11 192:17
192:25
**cushion** 192:8
192:16,17,24

193:1
**custody** 45:8
49:12 52:12,18
57:10,13,14
122:16 126:19
126:20,23
127:5,8,15,23
128:1,8 129:3
129:9,9,16,16
129:19,20
132:22 134:25
135:6,13,20,21
136:3,11,11
138:5,22 139:3
**customer** 92:9
159:12,13
**customers**
14:25 17:5,7
17:10,12,23
194:14
**cut** 144:18
**cutting** 115:8
136:17 143:18
143:21
**cycle** 19:8

**d**

**d** 6:1 7:1
**daily** 95:11,13
99:22 264:14
**daniel** 5:5
111:7 141:13
**dark** 11:21
123:14 125:11
**data** 12:6
18:11 19:18
27:23 28:3,6,8
28:24 29:8,12

29:14 30:3,6,8
30:20,20,22,24
31:13 32:6,22
32:23 33:14,15
34:2,5,7,9
39:15,18 72:12
80:16 82:19,22
84:12,25 85:4
85:9,15,18
86:5,7,7,25
87:24,25 88:1
88:2,4,9,12
90:3,7 91:8,12
91:13,16,21,23
94:22 99:10
101:11 102:21
102:24 106:23
112:11 149:18
155:21 180:19
185:23 195:23
195:24 203:8
203:10 205:24
214:18
**date** 14:9,12
15:9 36:9,21
38:3,4,10,16
39:15 43:15
44:1 46:13
52:7 58:4,7,23
59:12 60:23
61:10 65:7
75:6,7 76:13
77:2 79:7
81:11 83:2,4
90:11 91:25
93:15 94:6
96:15 111:13

126:22 128:13
130:2,25 132:5
132:25 133:7,9
150:14 156:4
179:4 234:9
239:12 264:10
266:25 273:25
**dated** 52:6
131:25
**davis** 9:25
45:22 60:12,13
60:14,15,17
61:4 63:4 64:8
64:13,15,18,20
65:19,21,24
66:1,2,6,14
67:17,23 68:10
68:12,15,16,19
68:20,24 69:5
69:20,23,24
71:8,11,13,14
71:16,18,20,22
72:3,4,14,22
72:23 73:6,10
73:11,19 74:5
74:13,14,23,25
75:2,7,9,17,18
75:23,25 76:1
76:22 77:5,13
77:14,16,25
78:21,22 79:8
79:10,12
140:12,12,14
141:4 142:5,20
143:2,3,4,5,8,9
143:10,12,16
143:17,18,20

143:22,25
144:1,3,6,8,15
144:16,17,19
145:6,17,20,22
145:24 146:11
146:13,20
147:10,16,18
148:2,8,12,14
**day** 43:5,10,23
44:7 54:11
55:3 56:24
58:21 76:20,24
120:22 127:14
171:20 216:19
225:4,7 236:7
264:17 266:11
**days** 92:24
93:3 97:13
128:22 135:24
136:3 196:4
264:5
**de** 5:4 37:25
39:14 44:2
**deactivation**
126:22 127:14
130:1,25 132:4
132:21,24
133:7,9
**deadline**
260:22 262:3
264:12,20
269:16 271:13
272:11
**deal** 12:20
171:10 186:18
245:4 246:7

**dealing** 93:4
235:9
**deals** 98:24
**deanna** 51:9
130:11 161:7
**debt** 62:15
248:18 252:21
**debtholders**
159:14
**debtor** 38:5,17
38:20 112:23
114:17 152:17
152:17 158:1
160:7 169:13
169:19 186:9
205:22,24
207:6 216:9,11
258:4,7 261:22
265:19 272:8
**debtor's** 120:4
125:3 148:22
232:12,13
238:1 244:16
245:3 254:4
**debtors** 1:9
3:14 7:18
24:10 38:15
45:20,24 83:2
83:19 113:7
114:25 117:5
121:22 131:10
144:21 149:1
149:14,15,16
150:12 155:5
155:13,16
159:9 171:11
180:22 217:16

218:15 220:23
223:14,19
227:9 228:10
233:15 239:2
245:2,15 246:9
252:20 256:24
258:11,22,24
259:13 260:21
261:4 269:21
**debtor's**
160:10 166:1
169:1 205:23
206:10
**dec** 210:5
**december** 8:19
54:19 146:2,7
146:23 147:1
147:21 171:14
171:18,23
252:25 253:2
**decide** 203:15
229:16 270:17
**decided** 219:11
266:16
**deciding** 43:9
**decision** 43:9
43:22
**decisions**
229:16
**declaration**
13:11,13,16
18:20 20:6,11
35:9,16,19,20
40:23 50:2,16
52:2 60:25
66:21 80:10
82:5 115:20,23

116:4,7 121:21
122:10,11,19
123:25 150:2
157:25 160:23
166:12 167:6
195:23 199:3
213:2 216:25
219:25 220:13
222:23 223:8
223:12 231:6
237:7,19
247:10 248:21
249:2,3
**declared** 16:19
**decline** 38:3
**declined**
223:12 231:6
270:18
**decrease** 99:18
188:20 192:15
192:16
**decreased**
192:24
**decreases**
100:11
**deduction**
167:18 187:16
219:4
**deductions**
182:9 185:3
**deemed** 181:6
186:23
**deeper** 237:3
**default** 242:8
244:7
**defendant** 9:12
9:14

**defendants**
112:23
**deficiency**
255:24
**define** 47:16
**definitely**
182:25 249:4
259:19
**definition**
78:18 162:8
**definitive**
119:1
**definitively**
66:24
**deflated** 65:15
**degree** 12:3,4
18:8 19:22
54:13 178:7
190:4 240:23
**delay** 51:22
**deliberately**
70:20
**demand** 13:1
18:8
**demonstrate**
79:3
**demonstrates**
93:21
**demonstration**
209:11,12
**demonstrative**
116:21 117:8,9
122:18,24
124:14 157:2
174:17,18
181:15 182:17
184:5 217:16

243:11 254:3,5
254:8,9 257:5
257:6
**denied** 272:10
**denominated**
148:4
**denominator**
125:16
**department**
4:1
**depend** 79:7
240:22 265:1
**depending**
41:19
**depends** 243:5
**deployed**
138:10
**deposit** 57:10
138:5,6,8
**deposition**
269:22
**depositions**
269:24
**depositor**
160:2
**depressed**
234:8
**deputy** 130:11
**derivation**
184:24
**derivative** 81:7
81:18 100:25
**derivatives**
12:16 80:11,20
80:21,23 81:22
85:22 89:19
90:4 91:7,13

91:16 101:14
101:17 103:16
103:21 104:1,1
104:11,16,21
**derive** 183:22
**derived** 181:16
185:25
**describe** 41:9
67:18 118:7
148:25 149:5
**described**
21:11 57:19
228:13
**designed** 41:12
41:22 194:21
**desired** 102:18
102:19
**desk** 105:2,3
105:10,22,24
108:12,22
**despite** 256:11
**detail** 83:8,25
84:1,3,19,22
84:24 85:2,5
86:22 99:6
239:1
**detailed** 84:20
**details** 57:9
187:21 188:3
**determination**
138:24 149:20
236:9
**determinations**
242:13
**determinative**
257:23

**determine**  56:1
  56:3,11,16
  59:18,21 125:5
  131:10 178:24
  235:11,24
  259:12
**determined**
  153:4 170:13
**determining**
  56:9 148:22
**deutsche**  12:13
  80:12
**develop**  234:7
  234:16
**diagram**
  122:21
**didn't**  98:6,8
  103:25 110:22
  134:7 141:20
  145:16 153:21
  154:13,15
  159:25 160:25
  168:23 171:11
  176:18 179:12
  185:21 189:17
  192:22 207:9
**difference**  78:4
  100:5 118:8
  145:25 146:4
  146:21,24,25
  163:14 210:13
  210:16,17,21
  210:22,22
  255:4 257:17
  257:23
**differences**
  226:23

**different**  12:14
  14:23 15:17
  17:19 70:8
  78:25 90:6
  99:19 123:22
  136:7 143:23
  159:10,11,11
  159:24 160:2,6
  161:24 163:22
  163:23 169:16
  171:17,20
  172:1 174:16
  180:1 197:8
  209:24 212:2
  235:12 241:16
  253:3,5,6
  255:9 259:25
  260:1 265:25
**difficult**  95:22
  197:12,19
  267:20
**difficulty**
  81:12
**dig**  240:4
**dilute**  110:6
**dilution**  110:7
**dimitry**  42:9
  125:20 270:7
**direct**  6:3 11:7
  13:6 20:7
  24:14,23 35:5
  40:24 114:6
  128:25 148:10
  148:11 168:22
  201:19 214:21
  218:9 241:15
  262:4 265:10

266:11
**direction**  23:6
  156:3 241:8,9
**directionally**
  245:14
**directly**  8:20
  76:10 115:9
  125:9 180:10
  192:13
**director**
  114:10
**directors**  63:5
  193:22,24
**disagree**
  234:11,20
**disapproving**
  268:8
**disclose**  61:16
**disclosed**  61:19
  61:20
**disclosure**
  117:3 118:19
  129:22,25
  130:18,20
  131:5,16
  153:18 168:5
  172:11,18,22
  173:1,10,11
  195:19 213:12
  213:13,16,21
  219:23 232:12
  232:14 233:8
  233:20 246:25
  249:4
**disconnected**
  144:8

**discount**  62:25
  119:4 180:12
  186:1 187:5
  189:1,14,20
  190:3 225:21
  226:18,19,21
  227:14 228:20
  235:15,17,23
  236:18,21
  243:4 245:11
  249:7 250:1,10
  252:9 257:22
**discounted**
  41:15 185:14
  220:10 225:10
  226:15 235:19
  249:21 250:18
**discounting**
  37:6 189:2,2,7
  225:16
**discounts**
  186:20
**discovery**  72:5
  215:18 269:22
**discussed**
  16:12 83:8,24
  84:2,22,24
  85:5 86:22
  252:16 255:6
**discussing**
  27:19
**discussion**
  15:15 187:14
**discussions**
  19:15 265:15
  265:19

**dislocated**
12:19,21,23,24
14:18,22 15:6
16:6,7,9 17:20
18:13 39:25
55:16,21 76:11
79:3 94:13,23
99:6 100:7
**dislocating**
16:11
**dislocation**
16:7 93:18,19
94:15,17 95:19
95:25 96:6,7
96:11 97:3
99:17
**disparaged**
263:1
**display**   51:17
**displaying**
174:20
**disposition**
174:16 180:1
**disrupt**   18:7
**distinct**   15:19
**distressed**
204:2
**distributable**
117:15 120:17
120:25 211:22
228:18 229:12
229:18,19
246:17 247:2
254:18,21
255:22
**distribute**
248:9 251:21

252:5
**distributed**
112:6 221:15
221:21 234:24
243:3 249:13
249:14,15
250:22 251:8
255:18
**distribution**
117:14 135:18
172:11,19
173:2 183:3,5
183:6 201:13
211:1,2,3
230:1 231:1,2
231:11 242:8,8
244:17,23
245:8 246:4
250:11 252:6
256:8
**distributions**
112:4,9 120:18
128:21 136:7
182:10 191:25
217:9,11,13
228:2,11
234:23 242:3
248:24 249:6,7
250:18 251:12
251:18,24
252:9,9
**district**   1:2
270:14,16,18
**diverges**   13:4
**divide**   106:12
**divided**   107:2
225:4

**dividing**
199:19
**division**   188:10
**dno**   149:14
**doc**   209:12
213:6
**docket**   7:9 13:9
35:7 40:23
41:3 51:17
57:19 68:22
69:2 82:17
87:8 117:10
136:23 137:1,4
137:11 146:11
156:17 158:1
160:8 166:4,5
166:7,18 167:6
172:22,25
174:22 175:22
194:4 209:14
213:17,19,22
214:2 217:17
232:18,22
254:10 259:4
263:15 271:14
272:11
**docketed**
271:19
**document**   13:9
52:6,11,17,25
53:21,23,25
54:2 61:19,20
77:24 82:7
84:19 85:16,19
88:24 109:7,11
116:2 121:24
122:3 131:25

132:2,3,10
137:1,15,20
138:17 146:15
160:7 161:16
161:23,24
169:4,6,20
172:24 173:11
174:13,19
199:4 206:21
206:23,24
207:3 213:6
233:3,21
238:18,20
240:5,6 260:14
**documents**
49:10 72:8
89:7 130:18
132:15 149:13
151:15,22
156:12 160:18
165:10 166:9
206:25 214:3
**doesn't**   97:1
98:4 108:20,24
128:9 150:19
188:6 197:17
**dogecoin**   67:5
67:6,7,10
**doing**   107:2
140:5 165:22
165:23 177:25
178:1,5 179:14
179:15 185:18
245:1,13
**dollar**   61:7
62:25 105:1,10
106:25 139:18

146:1,22 148:4
150:8 199:18
210:17 244:18
249:10,10,13
249:14 250:8,8
251:13,13
256:15,15
**dollarized**
134:6,12,16,20
139:13
**dollars** 101:6
106:19 120:8
123:8 125:14
167:8 183:15
248:8 250:11
250:21
**don't** 96:11
98:18 100:8
101:4 103:6,24
103:25 104:2
107:16 108:18
110:9 114:2
118:4 124:11
124:24 126:4
127:7,16 128:6
129:23 130:12
133:5 136:15
138:12 145:13
149:2 150:17
150:18 151:11
152:6,16 154:6
154:20 155:3,8
155:12 156:16
157:15 158:23
164:18 166:16
168:13 169:4
170:16 171:24

172:21 173:16
177:10 178:2
181:23 183:7
187:22 188:6
188:11 191:25
192:21 194:2
195:6,22
196:22,24
197:21,22
198:11 201:10
203:14 205:2,6
205:16 207:4
208:10,15
**dotted** 123:10
**double** 166:20
**doubts** 203:12
**dow** 5:3 141:10
141:10 142:6
142:10,21
174:2,3,11,12
174:23 175:2
175:11,17,25
176:1,2 178:11
178:18 181:12
184:19,20,21
189:6,24,25
190:7,13,21
191:22 192:19
192:20 193:2,3
193:5,6,8,10
**downs** 247:21
248:3,5,6,7
**downward**
182:9
**draft** 169:2
**drafted** 194:2

**drafting**
193:23 194:1,5
**dramatically**
147:20
**draw** 94:2,3
99:4 108:15
161:22
**drive** 19:7
194:15,18
211:15
**drivers** 178:23
179:25 180:7
**drives** 70:17
**driving** 19:11
183:1 190:2
**drop** 16:21
**dropping** 9:1
**due** 226:16
**duration** 14:6

**e**

**e** 1:21,21 3:1,1
6:1 7:1,1 63:16
153:25 168:5
213:11,13
273:1
**earlier** 118:7
157:2 166:15
174:5 180:22
198:4 219:17
221:25 222:3
232:13 235:8
239:1 251:17
252:16,24
269:15
**early** 63:9,20
63:24 64:2
95:17 120:6

226:14 247:22
265:8
**earn** 41:18
122:15 162:18
163:2,9 164:5
165:1 250:23
**earning** 41:18
**easement**
197:2
**easements**
196:10
**easier** 194:11
222:16,23
243:8
**easily** 197:7
**easy** 96:5
181:22 194:24
195:1 244:5
**ebitda** 194:11
**ecf** 46:13 47:25
50:25 52:2
57:19 87:15
88:12 132:14
172:20 175:8
175:21
**ecfe** 169:20
**economic**
16:13
**economically**
196:10
**ecosystem**
41:22 67:10
**ecro** 1:25
**editorial** 96:2
**educational**
12:2

effect 14:4
  19:17 93:8
effected 47:1
effective 179:4
  234:9
effectively
  14:16 53:18
efficiently
  187:1
effort 19:17
  117:24
efh 226:8
eight 82:19,19
  82:22 199:11
eighteen 28:4
eip 193:20,23
  193:25 194:1
  195:19
either 9:7,15
  15:16 19:4
  154:25 172:2
  178:2 191:19
  208:22 223:16
  224:20 242:7
  250:25 252:10
  262:18
elect 41:18
  244:12,24
elected 205:9
  242:17,20
election 172:12
  172:19 173:2
  242:25 244:7
  244:23 245:8
electrify
  187:10

electronic
  116:3 122:2
elements 11:14
elementus
  11:12,13,18
  63:19 65:12
  80:15 102:18
eliminate
  202:23
elizabeth 3:19
ellis 3:13 24:10
  113:7 131:14
  256:23 258:10
  260:20 261:22
  269:20 271:11
elon 67:11
else's 154:3
else's 164:15
email 9:7,16
emails 272:7
emanuel 4:10
  142:16 215:3
  269:6
emergence
  182:12,23
  191:11 225:3
emergency
  130:7,11 194:5
  210:14
emerges 37:19
  39:6
employed
  42:18
employee 92:9
employees 9:6
  9:15 110:18,24
  193:22 211:6

211:18 266:25
  267:4
employment
  11:11
enact 208:22
encompasses
  162:9
encourage
  65:14
ended 196:4
ends 86:18
energize
  187:10,23
  197:3
energized
  187:25 196:17
  196:18
energy 118:23
enforced
  102:19
engaged 61:18
  149:6
engagement
  148:25 149:5
  204:10
engineering
  12:5,5
enormously
  99:20,23
enter 49:6 60:1
  205:21
entered 164:23
  269:13
entering 149:8
enterprise
  225:12 235:6
  235:14,25

236:1,10
  240:16
enters 7:18
entire 16:20
  58:24 78:7,13
  171:13 233:20
  235:5
entirely 67:6
  132:12
entities 62:3,5
  161:25 183:9
  248:10,18,19
  251:11
entitled 124:22
  270:20
entity 37:19
  39:6 63:10
  117:24 179:22
  212:16 220:11
  229:13 256:13
envelope
  106:18
envision
  170:19
equals 138:7
  189:7
equate 119:2
equation 18:2
equity 38:18
  38:21 179:19
  215:10,12
  228:17 243:1,7
  248:17 249:16
error 48:11,11
especially
  210:15

**essentially**
19:24 170:12
170:13 182:20
**establish**  22:19
**established**
194:8
**estate**  148:23
171:7 182:13
182:24 191:12
210:14 228:6
248:12 253:18
**estimate**  16:4
38:20 119:10
156:24 170:11
171:3 205:3
248:4
**estimated**
170:8 172:1
211:5 212:14
223:15,20
244:13
**estimates**
167:12 182:24
208:25 220:21
221:2,3
**estimation**
212:22,22,25
212:25
**et**  1:7
**ether**  95:15
**ethereum**
75:20 76:3,8
94:9 99:11
148:4 181:22
219:8,9 235:12
240:25 241:4
250:14

**etherscan**
27:23 28:5,8
**evaluation**
44:7 118:10
149:23 229:5
229:10 241:15
**event**  189:9
198:6 223:16
223:17
**events**  93:5
**everybody**
27:8 164:10,12
203:21 259:20
**everybody's**
169:23
**evidence**  9:23
10:6,11,12
20:3,10,12,15
20:16,17 21:10
22:10,19,24
24:5,13 25:13
25:14,23 26:7
26:9 28:12,15
29:17,18,19
30:13,14,15
31:4,5,20,22
31:23 32:12,13
33:2,3,7,8,19
33:20,21 34:13
34:14,15,25
35:1 41:3,3,5,6
49:7 53:22
54:1,3,4 59:6
60:2 83:13
90:19,25 91:2
116:10,12,14
116:16,17

121:12,13
122:6 123:1,2
138:18 156:11
160:19,22
161:1,2 166:16
222:24 233:17
233:20,21,23
241:23 243:10
246:8 247:1
258:24 260:8
261:14 263:19
265:2 269:7
272:5
**exacerbated**
94:15
**exact**  44:6
61:13 65:7
73:13 122:24
156:17 175:5
**exactly**  49:24
87:21 106:22
122:23 123:20
135:19 159:6
**examination**
11:7 23:20,21
24:14 42:14
71:19 102:6
112:17 114:6
125:17,25
127:20 128:18
140:3,12 143:2
143:13 144:10
144:14 148:9
148:10,11
166:15 173:23
189:23 190:19
201:19 206:16

206:22 207:1,2
214:3,6,9,11
214:21 218:9
240:10 241:14
241:18 256:19
**examine**  10:1
23:22 42:8,11
53:23 54:2
60:11 79:15
80:4 93:23,25
111:6,18,22
112:15 140:8
141:18,24
142:18
**examined**
58:24 86:6
87:1 91:21
110:3 141:17
**examiner**
61:17 66:8,9
66:18 140:11
214:22
**examiner's**
66:16
**examining**
100:3
**example**  38:16
41:13 46:11
67:5 88:6
170:20,25
172:12,19
173:2 180:4
199:18 201:7
244:3 265:16
**examples**  67:3
**exceed**  55:2,5,7
59:3 101:2

152:18

**exceeding**
194:12

**exceeds**  128:4

**excel**  21:7 28:3
28:24,25 29:12
29:25 30:3,8
30:20,23 31:10
31:14 32:19
33:11 34:5
88:3 206:10,13

**excellent**
124:16

**except**  138:4
195:3

**excerpt**  136:25
137:10,15
138:2

**excerpts**  132:9
132:15

**excess**  8:20,24
9:9,16,18
74:17 196:12

**exchange**
17:24 70:25
71:3 83:1,3,21
162:9

**exchanges**
80:21,23 81:7
81:8

**excluded**  15:2
57:11

**excludes**
201:24

**excuse**  40:9
48:8 53:6 58:6
139:17 147:6

**excused**  112:18

**executable**
252:19

**execute**  171:9

**executed**  120:9

**executive**
11:12

**exercise**  24:6
225:10

**exhibit**  6:8,9
6:10,12,13,14
6:15,16,17,18
6:19,20,21,22
6:23 7:9,10
9:22 10:10
13:9,18 20:10
20:15 21:11,22
21:22 23:23,25
24:12 25:10,22
26:22,23 29:1
29:13,16,17,19
30:6,15,22,24
31:3,5,13,14
31:19,23 32:7
32:11,13,22
33:1,8,14,18
33:21 34:8,12
34:15 35:7
40:23 41:3,6
45:11,25 46:9
47:24,25 50:20
50:25 52:2
57:16,19 58:25
87:8 109:7,13
113:18 116:14
116:15,17,23
117:1,2,9

118:19 121:9
121:12,12,13
121:23 122:20
122:21,24
123:2 146:9
160:7,10,22
162:7 166:1,13
167:25 168:3,5
168:16,19,23
168:23,25
169:1,2,9,11
169:17,18
174:7 175:8
205:15,16
206:1,5,5,10
206:11,13,19
207:6,9 210:2
213:2,11,13
214:9 219:24
220:13 223:8
232:11,14
233:15 237:6
238:9 241:23
243:9,11,22
257:6 259:21
260:14

**exhibits**  6:7,11
20:12,18 21:11
21:14 22:13
23:19 24:1,19
25:24 26:14
27:13 28:11,15
29:6 34:24,25
34:25 45:15,16
45:23 49:7
117:8 166:3,17
166:18 167:23

172:10,16
174:4,5 205:20
206:14 216:10
216:11 233:19
258:23 260:22
260:23 262:5

**exist**  38:6

**existed**  149:18

**existence**  14:6

**existing**  15:3

**exiting**  149:9

**expect**  40:21
104:19 170:25
270:3,4

**expectation**
38:17

**expected**  212:6

**expedited**
184:2

**expense**  115:7
191:12 248:23

**expenses**  183:3
211:10,10

**experience**
12:8,17,18,20
80:11,12
103:15 178:13
188:11 204:1,2
204:4,8,17
208:10,15,16
227:13 236:23
257:15

**experienced**
101:14 248:7

**expert**  13:17
13:20,24 14:7
18:19 20:5

23:10,15 25:5
25:8 32:9
34:10 60:18,24
66:20 67:24
68:3 72:11
74:25 82:13,15
82:16 92:1,3,6
102:12 104:22
143:14 144:11
146:15 152:23
167:14 185:19
199:2,4 203:12
226:11 269:15
269:22
**expertise**
201:20 227:24
239:10
**experts** 167:13
181:17 190:17
241:16
**explain** 12:11
12:22 14:19
15:13 17:18
18:21 36:19
99:5 115:13
117:12 119:8
119:16 120:13
123:5 126:2
200:14 271:12
**explained**
98:22 189:22
190:11
**explanation**
48:16 69:6,14
69:25 73:24
184:4

**explicit** 19:10
56:22
**explicitly**
108:12
**exploded** 68:6
**expressing**
15:10
**extending**
115:8 253:13
**extensive**
119:21
**extensively**
44:10
**extent** 22:22
43:3 55:13
110:3 260:24
269:11
**external** 16:12
**extra** 92:24
212:17,18,20
**extreme** 93:21
96:16 99:8,13
**extremely** 40:7
70:22 76:15
94:15
**eyeballing**
96:16 99:14

**f**

**f** 1:21 273:1
**facilities**
119:11 180:19
**facility** 196:18
197:3
**facing** 115:2
**fact** 20:1 44:12
54:13 164:14
189:19 190:1

215:14,18
235:13 242:23
245:18 257:19
262:16 263:16
263:21 264:21
264:25 270:19
**factors** 14:23
16:11 37:23
186:5 197:1
216:25 217:2
236:11,12,14
236:16,19
**facts** 226:18
**factual** 158:17
159:3
**fahrenheit**
117:22 118:13
118:14,24
184:11 186:6
186:17 224:14
225:19
**fahrenheit's**
219:10
**fail** 127:13
139:7 179:9
**failed** 171:19
**fails** 179:7
**failures** 197:20
**fair** 80:18 85:6
85:9,13 93:9
97:5,6 103:15
103:18 104:13
105:12,15,22
106:9,11 107:8
111:12 156:25
167:2 173:22
185:1 199:16

222:19
**fairly** 61:11
67:9 94:6
95:14
**fall** 65:1 229:4
**fallen** 16:17
**false** 65:12
**familiar** 22:6
42:3 50:16
57:8,23 66:3
67:9,24 83:17
83:21 144:20
147:3,23 150:7
158:13 173:7,8
188:2 193:19
200:3,7 216:16
242:4,11,12
**family** 64:2
**far** 19:20 22:8
96:11 103:13
111:1 125:12
140:8 142:5
157:6 177:24
191:15 262:9
262:18
**favor** 196:5
**features** 41:21
256:11
**federal** 10:6
**fee** 184:2
**feel** 56:8 178:6
236:2 239:10
247:18
**feels** 37:21
**fees** 183:9,21
211:11,13,19

**felt** 180:25
**fema** 130:7,10
**ferarro** 238:25
**ferrara** 187:20
**ferrara's**
  187:14
**ferraro's** 24:13
  26:10
**fiat** 208:24
**fifty** 183:23,23
**fight** 103:17,22
**figure** 61:7
  73:15 92:2,8
  92:13 93:14
  95:10 97:19
  99:10 100:2
  104:23 105:8
  106:9 150:8,10
  199:6 209:24
  224:14 248:9
**figured** 217:21
**file** 29:9 206:25
  214:2
**filed** 7:9 61:20
  117:10 119:14
  121:21 131:8
  131:16,19,24
  132:14 136:23
  137:1 144:20
  166:18 194:4
  200:9 206:20
  215:7 217:17
  233:20 263:15
  266:10 271:14
  272:11
**files** 29:9

**filing** 50:24
  56:24 59:1,5
  115:10 128:11
  137:11
**final** 41:8
  66:16 149:22
  153:16 156:18
  203:6 238:21
**finalizing**
  251:22
**finally** 18:19
  33:23 183:21
  191:18 248:13
**finance** 12:3
  155:21
**financial** 11:15
  11:23 12:9,18
  37:4 58:1,5,9
  65:16 76:17
  80:13 115:1
  149:4,12,15
  155:8 177:5
  237:25 238:4,7
  238:9,19,23
  240:14
**financially**
  59:19,22
**find** 11:23
  47:11 50:24
  95:5 149:19
  167:1 230:16
**finding** 59:9
  263:25
**findings**
  190:24 262:15
  263:16,21
  264:21,25

  265:6
**fine** 51:21
  109:14 199:13
  209:16 265:8
**finer** 160:4
**finish** 23:16
  55:19,20 96:13
  110:4 129:13
  144:14 192:19
  193:2,5
**finished** 22:2
  58:13 64:16
  148:12,13,15
  165:15 173:22
**fire** 170:13,17
**firm** 149:2,3
  177:1 180:11
  188:6 189:16
**firms** 16:18
  177:11 178:2
  178:20 181:19
**first** 7:7 13:11
  13:13,16,23
  14:11 17:21
  18:20 20:6,10
  21:19,23 22:5
  35:20 50:24
  53:21 78:23
  79:7 88:11
  89:11 92:6
  97:23 114:23
  116:23 117:20
  119:6 128:22
  149:2 152:15
  159:5,6 164:20
  166:21 168:4
  176:18 181:15

  186:9,14
  188:19 204:7
  204:10 218:19
  220:22 232:16
  235:8 238:18
  251:2 253:18
  254:13 255:24
**fit** 37:9 124:4
  268:3,4
**five** 27:2
  183:12 211:9
  238:16 239:8
  239:22 247:11
  247:12,14,17
  247:20 248:12
  248:25 249:13
  251:5 253:11
  253:16,19
**fix** 143:24
**fixed** 12:14
  119:10 123:15
  124:25
**flag** 261:7,13
**flash** 116:22
**flaw** 190:14
**flawed** 189:12
**flip** 95:7 116:1
  222:22 254:3
**floating** 18:3
**flooded** 120:1
**floor** 4:13
**flow** 220:10
  249:21
**fluctuations**
  95:18
**focus** 11:20,24
  112:10 118:5

120:12

**focused**  114:16
115:5

**folks**  139:2
195:16 196:10
211:15 229:15
247:19

**folks'**  179:19
179:19

**follow**  15:23
75:4 126:4
127:7 128:6
153:21 154:11
168:24 180:3
181:4 189:15
192:23 209:21
230:19 269:17

**followed**
202:14

**following**
24:13 55:12
56:1,4 75:24
77:10 142:20
165:10 168:19
223:23 234:8
258:21

**footnote**  27:22
28:9,17 29:14
29:24 30:9,19
30:25 31:10,15
31:18 32:3,18
33:10 34:1

**footnotes**
26:20

**footprint**
179:14

**forced**  70:16

**forecast**
167:22 168:12
185:9 187:13
250:5 251:11

**forecasting**
115:6

**foregoing**
273:3

**forensics**  11:14

**forget**  195:21

**forgive**  155:15
156:16

**form**  39:1
44:16 105:13
151:22 159:25
252:20 255:11

**format**  101:21
155:20

**formation**
221:14

**formed**  65:3
224:24 229:13

**former**  7:17
109:21,21
110:1

**forms**  105:13

**formulating**
220:24

**forth**  13:24
40:23

**forty**  68:20
205:17,18

**forward**  156:7
194:13 197:2

**found**  57:13
80:15 103:11

118:2 190:1
270:19

**foundation**
22:20 49:9
60:6 89:23
91:1 110:21
147:12

**founder**  65:8,9

**four**  53:7
119:12 196:7
210:8 236:7
247:19 248:12
248:12 253:15

**fourth**  35:10
233:9

**frame**  211:9
212:2 246:1
248:15 253:2

**frankly**  262:12

**free**  18:3 60:19
118:22 258:12

**freely**  16:24
23:2

**freeze**  31:11
46:12 58:4

**fried**  62:3,12
62:14

**friends**  64:2

**frishberg**  5:5
111:7,8,9,10
111:15,17
141:13,13,15
141:18,21,22
141:23 142:6
142:21 197:25
198:1,3,20

**front**  13:7 23:7
23:8 24:24
27:14 35:6
46:15 50:12
129:23 130:18
130:21 132:2,3
136:24 137:2
163:12 166:24
166:25 169:4
169:24 172:24
175:8 199:5
203:14 206:6

**froze**  52:9

**ftp**  7:15 29:9
30:7,22 32:22
34:8 260:1

**ftx**  42:24 61:23
62:16,19 67:19
68:6 72:9
82:20,22,25
83:2,3,17,19
84:13 86:5
87:24 88:2,5
89:14 90:3,7
91:7,12 100:20
101:1 145:9
171:18 203:8

**ftx.org**  72:6

**full**  16:23 85:4
86:7,25 153:18
154:25 157:12
260:2

**fully**  67:9
112:7 187:10
188:2

**function**  39:4,6
41:12,22

functioning
  37:1
fund 4:11,12
  8:11,17 187:16
  215:4
funding 47:2
  48:9 71:23
  89:11,14,18,21
  90:4 91:6,18
  182:13 184:9
  255:22 256:1
  256:12
fundraise 61:9
fundraising
  43:1,2 65:3
funds 11:20
  46:12 47:6,18
  48:17,21 49:2
funny 99:15
further 60:8
  83:8,25 84:3
  84:22,22 85:5
  86:22 94:5
  164:19 234:13
future 15:4
  37:5 118:21
  186:19 239:9

g

g 7:1
gain 230:17
gains 200:10
  200:20,25
  201:1,15
galka 6:4 7:8
  10:20,22 11:7
  11:9,11 12:1,8
  13:6,10,16

15:23 16:23
17:14 18:11,19
19:13 20:5,11
21:3,9 23:6,13
24:20,23 25:4
25:16 27:9,12
28:17 29:12,21
30:17 31:7,25
32:15 33:10,23
34:17 35:5,9
35:15,18 39:13
40:10,22 41:8
42:5,14,16
44:10 46:6
48:22 50:17,19
52:6,23 53:3,8
53:13 54:8
55:1,17,25
56:10 57:23
60:8,16 64:16
66:20,20,25
67:18 68:17
69:6,14,25
72:10,10,24
74:6 75:3,4,19
76:2,11 79:17
80:1,4,8 83:13
87:9 89:12,20
91:6 92:3,18
93:12 100:15
124:1 143:14
144:11 145:14
145:17,25
146:21,25
147:11,19
198:23 199:16
203:12

galka's 20:15
  24:18 92:1
  125:1
galka's 199:4
  199:23 203:7
gamestop
  55:21 70:11
  99:8,20
gap 192:1,8
gather 153:10
gears 178:12
general 42:1
  88:3 103:19
  127:23 128:1
  129:20 148:18
  159:13 160:1
  230:15 244:4
generally 18:7
  42:2 91:21
  168:10 173:11
  193:21 201:4
  238:22 239:7
  241:7 242:1,15
generate 178:4
  189:3 212:17
generating
  213:4
generation
  212:6
generically
  103:19
getting 36:24
  90:25 115:9
  125:12 155:19
  160:11 164:22
  194:24 244:18
  245:4 249:20

250:2,2 264:14
264:15 266:18
give 7:20 10:25
  36:14 45:21
  50:9 57:1 64:9
  81:14,14 82:9
  98:16 102:8
  113:13 114:12
  131:20 135:15
  135:17,18
  139:1 143:3
  153:11 154:25
  158:10 161:7
  166:25 224:15
  244:14 261:2
  264:10 267:8,9
  267:11
given 135:21
  139:11 156:4
  182:20 183:17
  189:11 234:17
gives 244:23
giving 71:3,16
  102:4 129:17
  129:18,20
  157:17 214:4
  225:5 234:21
  240:5
glad 259:3
glenn 1:22
glitch 72:10
  74:8
go 8:4 15:21
  19:1 22:24
  24:1 25:21
  34:22 35:3
  46:2 48:1

50:13 55:14,15
55:23 69:4,10
70:16,22 71:9
71:10,21 74:12
80:6 81:16
82:5 83:22
85:17,17 86:15
87:17,19 91:25
92:14 96:18,19
96:25 97:18
100:13 102:12
104:17,22
111:9,25 113:2
114:3 117:24
118:4 125:9,22
129:6 130:1
131:1 142:19
143:4 146:19
148:19 150:19
153:13 154:13
154:20 155:4
157:8 160:17
161:3 162:14
164:17 165:6,7
165:13 167:3
167:22 169:24
173:4 174:4
175:13,17,25
184:18 185:25
186:14,19
190:20 191:24
193:8,17
196:18 198:8
199:6,14 207:2
208:23 210:9
211:3 213:5,10
214:24 215:1

215:21 216:14
216:17 217:12
218:5 220:18
223:10 228:3
228:11,22
232:11,20
238:13 243:5
246:1,3,20
247:21,22
248:8 252:20
253:14 254:1
268:18
**goal**   179:8
**goals**   194:16
**goes**   11:23
73:21 96:14
134:11 164:11
164:16 179:10
192:1 223:24
241:4,5
**going**   7:8 16:21
18:9 21:24
22:3,25,25,25
23:16,20 25:17
29:5 37:22
38:5 45:3,25
54:6 69:19
75:22 82:6
84:18 88:23
96:1 99:14
100:6 102:14
110:11 112:22
118:12 127:20
130:5 140:4,5
142:19 143:24
144:18 151:4
154:3,7 156:7

164:8,11 165:2
165:25 166:22
168:22 171:12
172:10 178:12
184:4 185:6
186:10,11,13
195:17 197:5
199:1,2 207:17
209:6 211:3
214:23,25
216:4 219:13
220:11,16
225:2,7 230:20
231:18 239:3,7
245:25 248:12
251:1,23
252:14 256:3,3
256:5 260:4
264:7,9 265:22
266:1 268:13
**good**   10:16,17
11:9,10 42:16
42:17 60:16,17
75:15 80:8,9
113:6 114:8
124:23 154:19
157:19,24
174:3 176:3
186:12,14
193:19 203:21
203:23 216:22
218:5 261:21
**government**
11:15,19 13:2
58:10
**governmental**
161:25

**grab**   130:4
**grace**   3:21
113:6 256:23
**graduated**
12:3
**graph**   96:25
97:12,19
108:14
**graphic**   95:21
**graphical**
101:21
**grasping**   39:9
**great**   12:20
142:13 186:12
261:6 264:2
**greater**   201:8
211:9
**green**   1:13
**group**   21:23
120:22 122:13
122:15,15,16
122:17,17
191:10 225:20
**groups**   21:20
**grow**   95:18
**growth**   249:25
**guarantee**
252:3
**guarantees**
234:22
**guess**   24:17
38:17 174:5
256:1 268:12
271:6,7
**guidance**
102:16 103:11
258:22

guide 187:4
guided 159:8
 160:4
guilty 7:18

**h**

haircut 246:5
half 183:18
 196:6
hallmarks 99:7
hand 10:23
 45:25 113:10
 215:23 225:7
handle 262:13
hands 179:19
 179:20
hang 166:8
 168:4 169:15
happen 55:22
 70:8,11 181:5
 264:7,7
happened
 195:7,9 270:13
 271:12
happening
 11:17 19:22
 249:22
happens 69:11
 70:4,6 71:6
 124:24 267:25
 268:1
happy 155:14
 203:25 259:25
 260:8 267:5,12
hard 42:1
 75:23 207:25
harvest 179:18
 183:13 201:15

harvesting
 200:3,7,15
hash 214:15,15
 239:9
hashing 195:21
haven't 147:8
 197:16 198:7
hawaii 128:21
 128:25
head 54:18
 75:16 77:1,4
 104:8
headed 172:17
heading 173:1
headphones
 143:20,22
healthy 178:7
hear 112:22
 130:10 136:15
 136:16 143:6,7
 143:9,10,11
 144:4,7 145:16
 155:10 157:19
 176:18 179:12
 184:25 193:3
 200:4,21 206:2
 251:19,20
 264:9 271:15
heard 41:8
 57:8 111:22
 112:15 118:6
 118:11 138:25
 140:8 141:5
 180:24 184:22
 190:23 198:7
 201:3 228:19
 232:13 260:19

263:19 265:7
hearing 2:1,1
 83:16 115:12
 115:14,15
 117:10 122:8
 164:11,12
 201:5 203:19
 206:22 261:25
 262:1,12
 266:16 268:21
 269:6
heavily 69:9
 176:23
heavy 25:1
 103:16 246:4
hedge 104:2
held 41:20
 53:19 200:12
 252:5
hello 125:20,23
 198:23 270:25
help 11:16,22
 131:3 186:25
 196:11 271:11
helped 182:25
 183:22 187:4
 196:12
helpful 24:18
 213:23
helping 11:20
 11:24 114:17
 184:14
helps 267:8
heras 5:4
he's 164:22,23
 169:10 189:22
 189:22 190:11

195:11
hi 7:5 10:21,22
 125:24 198:1
high 40:8
 70:23 120:11
 123:5 190:4
 205:6 212:1
 246:9 249:1
higher 19:7
 55:9 59:4
 107:6 120:11
 171:1,22 172:6
 172:9 186:23
 191:24 196:4
 201:16 211:15
 232:2,4 236:22
 256:8 257:19
highlight
 116:10,18
highlighted
 118:20 137:13
 137:22,25
highly 171:10
 227:17
hire 209:2
historical
 39:15,18
 102:15
history 39:21
hit 192:2
hm 98:23 99:2
 124:19
hmm 27:24
hobble 268:19
hold 45:24
 141:15 142:9
 160:11 161:12

164:8,8 178:7
181:12 227:14
247:24 249:19
251:3,15
**holder**  59:12
127:15 136:10
138:22 244:4
**holders**  122:13
123:8 124:8,18
124:21 126:19
126:23 128:20
135:7 136:4
248:25
**hole**  151:6,9,16
152:10,13
**hon**  1:22
**honestly**
166:21
**honor**  7:5,15
7:20,24 9:22
9:25 10:2,9,13
10:16 11:2
20:9,13,18,24
21:2,4,7,18,24
22:2,12,21
23:2,18 24:3,3
24:9 25:11,19
26:13,18,21
27:4,10 28:11
29:6,16 30:12
31:2,18 32:11
33:1,4,18
34:12,18 35:2
35:25 38:13
41:2 42:6,13
45:5,14,21
46:20 47:12

48:23 49:6,13
50:4,5 52:20
53:10,15,20,24
54:20 56:5
60:1,8,12
65:21 68:20
72:3,21 74:3,9
75:5 77:14
79:10,16,21
85:25 87:4
88:10 89:4,22
90:1 91:3
92:10 93:13
96:4 98:15
99:6 100:1
105:16 106:2
107:11 111:7
111:19,23
112:16,20,23
113:4,6 114:5
116:13,14
117:8 121:9,22
122:6,9,23
123:3 125:18
125:20 127:2
128:23 130:12
131:11 132:8
133:4 136:9,18
136:25 137:14
138:16 139:25
140:2 141:6,10
142:10,15
143:3,5,12
144:9 147:12
148:17 151:13
152:24 153:7
153:11 157:16

160:15 164:20
165:20 173:3
173:23 175:2
175:24 184:20
190:7,13
193:10 197:23
198:1 199:21
202:1 205:25
206:4,8,23
207:23 214:5,8
215:5,22
216:13,15
220:18 222:12
224:21 228:24
233:3,15,18,22
237:12 239:25
240:3 241:17
241:22 243:17
255:14 256:18
258:1,9 259:5
259:15,24
260:8,17,21,24
261:3,19,21
262:9,14,25
263:3 264:13
264:19,22
266:2,7,21,24
268:14 269:5
269:19 270:2,7
270:22 271:10
**honor's**  26:25
**honors**  258:21
**hope**  154:12,12
183:3 195:4
265:21 266:4,6
**hopefully**  71:5

**hoping**  252:2
**horizon**  58:20
**horizontal**
123:17
**host**  160:14
**hours**  258:23
**housekeeping**
258:6,17,20
261:18,23
266:14 268:17
**huge**  210:13,21
**hundred**  53:6
**hybrid**  2:1
**hyde**  2:25
273:3,8
**hypothetical**
37:18 104:10
**hypothetically**
37:18 38:9
39:7
**hypotheticals**
70:9 164:21

## i

**i.e.**  138:7
**idea**  47:21
48:21 234:25
**identify**  11:25
91:22 140:9
**idle**  187:10
**ids**  166:6
**ignat**  4:19
164:22
**illegal**  11:22
**illicit**  11:20
**illiquid**  153:2
155:1 156:5
167:16 176:25

182:4 183:14
211:16 212:5
218:24 224:8
231:13 247:5,5
247:23
**illustrate**
101:21
**illustrated**
99:10
**imagination**
39:2
**imagine** 37:17
39:7 104:10
265:3
**imbalance**
91:19
**immediate**
178:25 180:5
270:14,15
**immediately**
179:4
**impact** 18:3
85:23 92:23
191:17,20
195:19 250:6
**impacted**
191:7
**impacting**
191:8
**impacts** 112:6
**implied** 220:24
**importance**
56:9 112:7
**important**
55:25 56:3,8
56:16 95:24
97:13 104:2

186:7,8
**imported**
222:6
**impossible**
37:24
**improve**
256:15
**inability** 46:12
**inactive** 114:22
**inaudible** 50:6
**inbound**
247:19
**incentive** 194:6
**inclined**
203:10
**include** 26:11
93:14 101:16
108:5,6,10
115:19 132:4
187:19
**included** 32:22
33:14 34:7
85:19 130:3
211:12 219:3
236:11,12,14
**includes** 7:10
43:3 80:11
81:10 100:17
166:13 266:22
**including** 9:8
9:16 109:20
136:7 204:6
223:21 240:21
252:19 264:20
**income** 12:14
146:1,22 212:6
213:4

**incorrectly**
176:4
**increase** 8:24
99:17 106:25
125:15 192:1,5
192:7,14 193:1
**increased** 18:6
95:11 99:22
107:5,10
147:20 192:14
211:10
**increasing**
19:8 123:11
125:8 250:5,13
250:17
**indicate**
167:13
**indicated**
23:19 49:18
82:24 142:18
171:10 190:17
215:7 265:18
**indicates** 48:21
72:24 77:6,17
136:20
**indicating**
247:19
**indicative**
39:18 40:11
**indicator**
18:17 79:4
96:10 100:2
**indicators**
101:24,25
102:1
**indiscernible**
10:25 47:13

50:10 51:7
62:24 74:23
80:15 81:1
85:7 88:6 90:4
92:22 93:7
97:5,22,25
101:12,18,19
105:1,14,17
106:10,13,17
106:24 107:12
107:23 108:11
110:4 111:13
112:2 113:1,5
113:14,21
121:10 122:25
124:21 126:25
129:12 130:23
131:7 135:17
135:20 137:9
140:10,17,25
141:1,2,14,19
142:3 143:5,8
143:22 144:6
144:21 145:9
146:6,12,17
148:5,8 154:7
154:11,17
158:25 159:7
159:17 160:5
161:25 162:22
166:4,13,22
167:7,8,10,11
168:5 169:3,8
169:17 180:2
181:14 185:3,6
185:8,16 192:7
193:3,4,7

194:6 196:8,16
196:21,21,25
199:8 201:6,7
201:8,17,23
202:10 203:24
204:1,13,18,23
205:23 206:20
206:20,21
207:3,12,19,20
207:21,22
208:4,11,12
209:2,20,25
214:18 217:25
220:14 233:7
236:3 238:22
248:23 249:19
252:23 254:23
261:17 269:23
**individual**
63:13 122:13
134:20 180:6
235:5 236:14
**individually**
122:17
**individuals**
9:10,19
**induce** 9:3
**indulgence**
34:19
**industry** 16:15
16:20 189:13
**infer** 39:20
**influence**
60:20 62:7
91:15,15 97:2
100:25

**influenced**
81:19,23
**information**
39:23 40:16
44:13 49:19
66:15,18,19
83:2,4,12,14
83:20,21 84:20
85:8,24 86:20
87:2 93:5
100:8 110:23
111:3 132:17
149:15,16
155:8 184:6
203:11 226:3
237:25 238:2
267:2
**infrastructure**
211:6
**infusion** 187:9
**inherently**
15:25 186:10
**initial** 20:10,15
145:18,20
211:1,2
**initiated** 226:8
**inked** 186:18
**input** 62:8
178:15 185:23
188:15 247:18
**inputs** 181:16
182:20 184:6
185:8,11 187:8
189:10 254:16
256:6
**inputted**
184:23

**inserted** 85:16
**insiders** 109:17
109:20,21,23
109:25 110:1,1
110:3,20 111:2
**insights** 119:23
**insolvency**
94:11 114:21
152:14 153:6
**insolvent**
152:17
**install** 153:25
**instance**
159:17
**institutional**
159:14
**institutions**
11:16,24
**instruct** 79:16
**instruction**
154:10
**instruments**
12:9,14,18
62:15 80:13
**insufficient**
48:17 103:9
**insurance**
12:16
**insurmounta...**
266:8
**intend** 202:4
205:21 258:22
259:4
**intended** 9:2
79:3 263:1
**intents** 15:1

**interest** 8:11
8:18,21 10:5
41:14,15,18,18
65:17 78:5
108:5,6,7,11
162:18 163:3,9
174:4,14,15
176:14 178:5
191:20 192:2,9
192:17 217:4,7
218:14 231:6
257:24
**interests**
115:16 121:7
123:20 124:7
124:20 125:6
126:2,10,11
127:13 136:13
139:7
**interim** 265:4
**internet**
259:23
**interpretation**
97:2 112:10
**interpreting**
88:23
**interrupt**
55:18 58:12
78:21 215:5
**interrupting**
170:23
**intersect**
125:10
**intersects**
123:19
**intimately**
173:8

intraday 59:2
intrinsic 13:4
  14:17 15:7,11
  15:18,24 16:2
  16:3,8,10
  19:25 35:22
  36:15,23 37:7
  37:11,13,14
  39:24 40:19
  59:4 96:10
  128:17
introduce 91:2
  260:6
inverse 126:13
invest 250:15
invested 42:21
  61:6
investigations
  68:3
investment
  61:6,11 62:7
  177:2,7 181:5
  182:2 188:21
  230:21 252:21
investments
  162:10 248:17
  248:17
investor 63:9
  63:18
investors 63:20
  69:10 105:3
involved 42:24
  43:3 62:24
  114:23 149:12
  184:24 194:5
involvement
  117:4 185:2

involving
  204:10
iovine 111:23
  111:23,25
  112:1,13
irregularities
  189:12 190:1
irrelevant
  19:25
isn't 196:5
issue 26:21
  124:7 192:2,9
  197:2 266:5,15
issued 72:6
issues 44:19,22
  44:25 45:1,7,9
  202:23 262:18
  265:14,20
  268:3
it'd 221:22
  222:22
it'll 211:5
  219:9 252:1,3
  252:7 259:7
  265:1
item 68:20
  118:4 158:1,2
  161:22,23
  162:6 222:8,10
items 186:17
  187:2 188:1
  226:2,3,5
  235:18 266:24
it's 160:3,5
  161:2,6 162:6
  162:13 166:21
  168:2,4 169:3

169:18 170:9
  172:25 173:16
  175:5,11,14
  176:5 179:12
  179:23 183:14
  183:22,25
  186:23 190:2
  193:8 194:11
  194:23 199:11
  201:19 203:9
  206:6,7,12,23
  208:13
i'll 181:13
  203:15
i'm 160:21,25
  162:2 164:8
  165:2,9,10,15
  165:15,23,25
  170:12 171:15
  172:13,21
  173:8,11,18,22
  174:13 176:18
  177:19,23
  178:12 180:3
  180:10 182:16
  186:4 187:12
  188:2 189:7,14
  190:7,13 191:1
  192:3 193:24
  195:8,10,15,23
  196:16 197:15
  197:16 198:7
  199:1,1 200:8
  200:21 201:3,4
  202:14,20
  204:16,21
  206:2 207:17

207:17,24
i've 164:13
  165:9 188:17
  195:1

j

j 63:16
january 72:25
  73:14 74:1
  77:9,20 78:16
jason 111:23
jeff 164:21
jeffrey 4:23
jelisavcic
  63:14,18 64:21
  65:16
jenner 66:11
jeremy 3:22
  161:8
job 186:12
  227:13
johnson 5:7
  142:8,8,22
  203:18,19,21
  203:22 205:13
  205:20,22
  206:17,18,19
  207:3,4,6,8,11
  207:25 208:3,9
  209:9,10,16,19
  209:21,23
  210:4,7,11,12
  210:20 213:8
  213:10,15,19
  214:5,8,10,12
  214:13,20
joined 65:4

jones   3:19
joshua   3:11
  10:14,18
judge   1:23
  60:14 64:15
  74:25 82:6
  94:18 98:10
  111:16 140:6
  141:24 143:10
  143:20 153:10
  153:23 156:16
  200:14 203:5
  270:18,18
  272:13
judicial   259:5
  259:12,24
july   74:7,16
  75:9,13 77:9
  77:20 78:16
  89:19 95:22
jump   9:12
  271:11
june   52:6 68:5
  76:19,23 89:14
  90:11 91:9,24
  92:19 93:3,15
  93:24 94:23
  95:2,21 96:6
  97:1 114:25
  204:6 233:1
justice   4:1
justify   158:17

k

karen   1:25
  259:20
keep   71:24
  104:2 187:1

223:10 268:9
keeping   211:15
keeps   248:12
keith   3:10
key   189:21
kielty   120:5
  150:23 153:4
  168:14 171:4
  182:2 219:22
  220:9 221:23
  237:14 240:1
kielty's   120:11
  219:25 220:13
  237:6,18
  241:18
kind   11:16
  19:3 37:9,15
  41:11,15 70:9
  79:1 96:10
  98:19 111:2
  128:21 129:10
  129:17 135:17
  135:18 143:19
  161:25 188:15
  219:7 239:3
kirkland   3:13
  24:10 113:7
  131:8,13
  256:23 258:10
  260:20 261:22
  271:10
kirksanov
  270:10
kirland   269:20
kirsanov   23:18
  42:9,9,12,13
  42:15,17 43:8

43:15,16,20,21
44:5,18 45:5,6
45:10,11,16,18
45:24 46:1,2,5
46:7,10,14,15
46:23 47:10,15
47:16,20,23
48:1,2,15,20
48:25 49:6,11
49:16,22,24
50:3,14,15,19
50:21 51:14,24
52:3,5,16,22
53:12,18 54:4
54:6,7,15,22
55:24 56:2,7
56:18 57:2,3,5
57:16,18,22
58:12,14 59:8
59:17,23 60:1
60:7,10 125:20
125:21,22,23
127:18,21
128:9,11,15
129:14 130:1,6
130:21,22,24
131:4,6,8,14
131:22 132:1,4
132:14,16,19
133:6,7,14,22
136:9,18,23
137:6,17 138:3
138:11,14
139:25 140:1,2
270:7,7,21,22
kirsanov's
  45:23

kirsaov   126:1
  126:18 127:4
  127:12,22
  128:19 129:2,8
  129:15 132:20
  133:17 134:5
  134:10,15,19
  134:24 135:5,9
  135:23 136:2
  136:19 137:12
  137:24 138:21
  139:9,16,21
knew   8:23 38:4
  38:9 271:8
know   14:11
  19:23 25:20
  36:2,5 38:14
  38:25 39:5
  47:14 49:4,15
  49:17 52:1
  53:16 54:24
  56:14,18 61:12
  61:25 62:3,4
  62:21 63:10,13
  66:23 67:5,7,9
  67:11 75:6,11
  76:25 77:4
  78:18 82:3
  83:14 84:9
  85:21 90:19,22
  100:8,9 101:2
  101:4,5 103:24
  103:25 106:16
  108:18 110:23
  111:1 112:7
  115:2 120:3
  121:16,19

124:24,25
125:9 133:5,25
145:2 149:12
150:1,13,16,18
150:19,23,24
151:16 152:15
152:19,23
153:18 154:15
154:25 155:8
155:17 156:5,6
156:18,23,24
159:2 160:22
164:1 166:5,16
170:16 171:13
171:24 172:7
173:16 177:13
182:12 188:18
189:13 192:21
194:2 195:6,16
195:22,23
197:16,21
203:25 205:5,6
205:10 208:18
211:21 212:10
213:2,23
214:14,15
215:20 221:13
224:18 225:4
226:21 230:12
235:3 237:19
238:14,20
239:3,7 241:3
242:4,21,22,23
242:24 244:17
245:18 247:20
248:4,6,6
250:13,23,25

251:9,10
252:12,21
263:14,17,18
263:24 264:6
265:17,22,24
265:25 266:1,4
266:17,19
267:11,13,24
269:12 271:3
271:14
**knowing** 186:8
**knowledge**
44:19 47:8
59:25 104:11
119:21 147:13
150:1 173:19
188:18 203:4
257:1
**knowledgeable**
173:9,12
**knows** 259:20
**koenig** 3:18
131:11,12,13
131:13,20
261:20,21,22
262:5,8,21,24
263:3,10,12
264:2,12,16,19
265:1,6,11,16
265:24 266:2,7
266:10,13,21
267:2,5,8,16
267:22 268:5
268:10,14,16
271:10,10
272:13

**kokinos** 213:1

**l**

**l** 63:16 160:3
**labeled** 46:11
57:21
**lacks** 47:7
**laid** 49:10
121:7 122:14
157:1
**landed** 172:8
197:11
**landing** 88:7
**lands** 255:21
**language** 131:9
131:17,18
**laptop** 119:25
**large** 17:22
18:24 96:19
106:24 114:17
114:17 192:11
206:10,12
266:23
**largely** 184:24
187:5 226:2
251:8
**larger** 77:22
107:4 132:10
**largest** 100:21
255:18
**las** 5:4
**late** 114:25
194:23 271:7
**lau** 270:25
271:2,2,12,17
271:22,24
272:1,12

**law** 209:7
262:16 263:17
263:22 264:22
269:14 270:19
**laws** 9:21
201:24
**lawyer** 216:23
252:12
**lead** 121:4,6
**leading** 94:9
100:3
**leaked** 93:6
**leaning** 125:3
**learned** 156:18
**lease** 118:22
270:24
**leave** 96:1
134:3
**leaves** 140:4
**lecturer** 12:7
**led** 117:5 172:6
226:18
**ledanski** 2:25
273:3,8
**ledger** 41:23
**leeway** 214:4
**left** 117:16
179:22 192:14
192:24 249:23
**legal** 78:18
138:24 158:17
158:19 159:1,3
159:8,9,17,24
159:25 160:3,4
160:5 162:24
163:4,15
273:20

**lend** 267:14
**length** 264:6
**lengthier** 263:8
**lengthy** 265:1
**lesson** 156:17
**letter** 271:13
  271:18
**letters** 87:8
  110:5 272:7
**let's** 173:21
  190:6,20
  192:19 199:3,6
**level** 123:5,12
  177:8 181:23
  188:7,8 212:1
  249:1
**levels** 96:16
**leverage** 71:25
**lexington** 3:15
**liabilities**
  52:12,18 53:4
  53:5,9,13,19
  152:18
**liability** 70:13
**lien** 66:25 67:1
**life** 260:5
**lifetime** 102:20
**light** 125:11
  164:14 222:19
**lighter** 123:17
**likelihood**
  252:22
**likely** 9:4 17:21
  40:8 111:12
  181:5 186:13
  207:19 208:13
  219:23

**limited** 18:5
**limiting** 143:13
  144:10
**line** 8:3 9:13,14
  94:7 96:14
  118:4 123:10
  123:14,14,17
  123:19 125:10
  179:25 180:6
  187:17,22
  190:8 191:11
  210:23 222:8
  222:10 255:22
**linear** 241:2
**lines** 123:19
  125:11 181:8
  184:8 239:20
**link** 89:17
**linked** 12:16
  15:25
**liquid** 9:1
  105:12 149:21
  150:13 153:19
  167:18 181:20
  182:21 194:14
  215:13 224:9
  224:12,15
  225:2,22 227:5
  228:18 234:6
  235:18 242:9
  242:10,25
  243:1,2,3,7
  244:8,9 245:7
  245:9 255:17
  255:21 256:7
**liquidate** 208:5

**liquidated** 38:5
  251:7
**liquidating**
  202:10 207:20
  212:7
**liquidation**
  115:17 117:2,4
  117:18,18,25
  118:3 121:1,10
  123:9,10,22
  124:18,22,25
  127:5,9,23,25
  128:8 129:3
  133:15,18,22
  134:25 136:8
  138:23 139:11
  157:4,9,10
  161:18 162:18
  163:13,22,23
  163:25 164:3,4
  166:2,14
  168:16,25
  169:1,13,19
  170:7,16,24,25
  172:2 174:24
  175:18,22
  176:13,17,19
  176:21 177:20
  177:24 178:4
  178:24 179:1
  179:11,23
  180:2,5,14
  183:22 184:1
  192:15,16
  198:6,9,17,18
  205:23,24
  208:11,14

  209:1 210:7
  211:17,18
  215:9 218:11
  221:3 223:14
  223:18 226:15
  226:21 242:14
  251:5 252:13
  253:24 255:1
  255:17,19,24
  256:6 257:14
  257:18
**liquidity** 100:4
  100:11 104:6
  115:6 149:7,7
  234:17
**list** 7:9 20:12
  23:11,24 24:13
  26:23 45:22
  142:11 206:11
  206:13 216:12
  236:16 239:16
  258:23 259:1,2
  259:4,21
  260:12,14,23
  261:1,4 267:3
  267:6
**listed** 25:22
  26:16 231:18
  260:22
**listing** 119:19
**lists** 26:6
**literally** 111:11
**litigation**
  182:13 183:14
  184:9 201:25
  226:8,16
  255:23,25

256:2,12
**little** 24:11
39:20 46:9
183:4 187:17
194:11 230:15
237:3 244:8
252:7
**live** 116:11
**llc** 1:7
**llp** 3:3,13 4:10
4:18
**loaded** 156:10
**loan** 226:7,10
230:11 253:18
**loans** 41:14
**locate** 51:2
130:22
**located** 173:7
**locked** 14:25
17:1,13,25
**long** 132:14
196:9 212:12
216:19 247:15
260:12 269:21
**longer** 101:23
183:4,15
248:20
**look** 19:20
39:15 47:3
82:11 89:16
92:11 94:2
96:13 98:20
112:8 115:24
118:18 125:7
151:15 155:14
160:21 181:18
181:21 189:10

191:15 195:17
195:20 197:17
209:22 210:2,3
218:17 226:10
237:6 239:12
239:15 243:9
243:10 247:20
253:7 272:6
**looked** 91:16
94:4 98:17,21
98:22 119:19
120:6 131:25
240:21 248:5
252:15 254:4
**looking** 15:8
18:4 19:25
26:3 36:25
83:15 84:3
96:13 99:24
115:1,16 121:4
122:12,17
124:17 130:6
131:5 132:13
137:16 146:9
157:25 175:1,9
175:15,20,21
178:5 183:2
195:24 209:18
213:14,18
239:19,20
243:20 257:5
257:20
**looks** 19:21
48:6 57:24
59:2 73:21
95:13,15
106:18 117:2

123:15 195:4,5
232:16 244:25
**lose** 119:25
**losing** 118:23
230:14
**loss** 24:8
**losses** 25:1
**lot** 40:4 49:4
70:8 76:12
83:12 100:7
118:14 152:21
156:10 177:6
179:22 181:3
208:23 211:14
236:6 239:1,9
242:4 245:24
248:5,7 252:17
252:18 254:19
**lots** 69:9
117:24
**loud** 162:3
**low** 96:19
250:23
**lower** 40:21
53:8 67:25
71:5 193:1
232:2,5
**lowest** 73:20
**lucky** 181:7
**lunch** 130:16
140:5 142:18

**m**

**made** 7:15
60:23 108:14
108:23 119:15
119:16 148:23
159:21,23

167:15 194:3
197:19 226:2
242:3 248:24
251:12,24
255:3 261:11
266:18
**madison** 4:13
**magic** 32:4,6
**maintain**
102:17 103:12
103:17,22
**maintained**
102:19 103:14
**maintaining**
211:6
**major** 75:20
76:3,8
**majority** 18:1
182:4,6
**make** 34:23
40:17 41:14
45:4 47:3 49:3
51:3,9 59:18
59:21 88:2
89:20 101:24
102:1 103:16
140:19 160:13
163:14 164:13
165:4,6 174:25
175:20 181:14
191:23 203:15
208:13 215:2
220:16 229:16
236:9 243:8
244:5 256:22
257:23 266:14
267:18 268:16

268:25

**maker** 102:10
104:4,5,13

**makers** 103:16

**makes** 247:24

**makeup** 65:5

**making** 93:6
96:9 102:14,16
102:22,25
103:5 104:7,18

**man** 218:1,3,5
255:11 258:12
258:15

**management**
115:6 119:20
149:7 197:20
238:1

**manager** 209:3

**manages**
118:22

**managing**
114:10 212:5

**mandate**
179:16 239:3

**manipulated**
78:6,12

**manipulation**
78:17,18

**manner** 60:19
99:19

**map** 74:24

**march** 150:24
156:6

**margin** 19:4
70:12 230:11

**margins** 70:16

**mark** 4:7 117:9

**marked** 7:10
13:9 150:25
226:10,12
228:16,17

**market** 8:8,9
8:11,16,17 9:2
9:4 11:25
12:23,24,25
13:1,3 14:3,8
14:11,18,22
15:2,6,16,19
15:24 16:1,5,6
16:7,9 17:20
18:2,8,10,11
18:12,16,23
19:1,18 35:21
35:24,25 36:5
36:10,13,20,22
36:25 37:1,3
37:10 38:16
39:21,23,25
54:10 55:16,21
56:14 57:25
58:10 59:9
67:6,7,13,25
70:16,20 71:4
71:6 76:11
78:7,13,24
79:2 93:4,18
94:13,16 96:9
97:6 99:6,16
99:19 100:6,6
100:7,9 101:22
101:22 102:10
102:14,16,20
102:20,22,24

103:5,16 104:4
104:5,13 107:5
107:10,10
108:19 119:23
145:12 176:24
201:14 220:7
220:10 221:4,8
222:10 224:3,6
224:11,16,17
227:10,17
228:22 230:20
230:23 231:5
231:14 234:6
234:15 235:2,4
245:22 246:8
253:3,8

**market's** 16:2
120:1

**marketing**
259:22

**marketplace**
180:16

**markets** 11:21
12:19,21 25:2
58:1,9 76:15
76:17 104:7,18
230:21 253:5

**marsal** 114:11
114:14 149:2
173:14 182:19
182:25

**marsal's**
167:10

**martin** 1:22

**mashinsky**
28:21 29:13

**master** 4:11,12

**masumoto** 4:8

**match** 66:19
89:1

**material** 22:6
25:22 259:22

**materially**
188:25

**materials** 21:3
21:21 22:13
23:11,14,24
24:12,16

**math** 170:9
186:2 191:25
193:8 196:5,5
211:25 224:9
225:7 236:2
244:25 245:13
246:24

**mathematical**
185:18 225:9
246:7

**mathematica...**
191:23 255:20

**mathematics**
224:6

**matter** 1:5
7:11 13:11
17:14 35:10
44:12 73:22
103:20 115:4
115:12 116:5
122:10 152:24
201:12 203:7
209:7 261:23

**matters** 115:5
115:18 258:6

261:18 263:8
268:23
**mawson** 195:7
195:9,11,11,13
195:16
**max** 10:19 11:7
42:14 66:19,20
145:14,17
147:11,19
**maximally**
204:14,19
**maximize**
247:13 248:16
253:12,20,22
**maximum**
264:17
**maxwell** 6:4
**mccarrick** 3:20
24:9,10 44:16
45:2,20 47:7
48:13,18 49:8
51:3,6,8,16,19
51:22 56:25
59:6,15 60:3,5
61:1 63:3
65:18 67:20
68:8,22 71:7
81:2 89:3,23
93:10 101:8
110:8,21
232:17 258:5,9
258:10,13,17
258:21 259:3
259:11 260:18
260:20,20
269:20,20
270:1

**mean** 38:19
39:3,7 40:17
44:24 45:9
69:20 103:8
140:10 166:11
188:8,10
189:17 206:19
212:20,21
213:10 224:18
240:23 272:1
**meaning** 60:24
69:9 73:1
104:2
**meaningful**
127:19
**means** 18:25
91:19 96:18
**meant** 36:11
36:23 98:18
101:20 221:8
224:5
**measure** 58:16
100:4
**measured**
196:8,15
**meat** 267:17
**mechanics**
80:23 211:4
**mechanism**
243:6,11
**media** 19:16
**meet** 8:21
52:12,18 126:5
136:12 197:12
197:17
**meeting** 265:23
271:9

**meets** 121:7
**megawatt**
118:22 186:22
**member** 63:19
65:16 205:8
**members**
62:18 205:8
**meme** 37:14
**memory**
197:15
**mention**
109:17 110:6
150:9 199:1
**mentioned**
57:8 74:21
84:4 85:5,6
120:5 150:3
168:23 171:5
176:9 187:3
191:9 197:1
205:16 207:13
207:19 208:4
208:10 224:12
228:14 235:8
236:17 251:17
271:3
**mentioning**
85:13 92:18
191:4
**merging**
117:23
**message** 47:11
47:17 48:11,12
49:1,5 146:3
**messages** 27:20
**met** 119:20
123:20 196:9

197:14,14,17
**method** 172:1
**methodology**
42:3 226:22
248:14
**metric** 197:6
**metrics** 194:21
195:20 197:12
**mg** 1:3
**mic** 113:25
**michael** 142:8
**microphone**
143:19 268:18
268:19
**mid** 95:17
**middle** 16:16
120:17 179:16
212:13
**midland**
119:12
**midpoint**
118:10 170:8
**mike** 5:7
**milestone**
196:3
**million** 53:5,14
61:9,11 68:6,7
73:1,2 74:2,8
74:17 77:8,9
77:19,19,23
78:3,7,13
105:15,23,24
106:12 108:14
109:17 118:6,8
118:20 119:7
119:15 123:16
123:18 146:1

146:22 147:2
167:17,18
170:10 171:6,9
179:2 180:18
180:21 181:2,9
183:19,19,23
183:24,25
184:2,10,11
185:13 186:6
186:19,20
187:3,15,18
205:5 210:17
211:7,10,13,17
211:20,23,23
211:24 219:4
226:13 227:2,6
227:7 231:15
248:8 255:23
256:1
**millions**  101:5
101:6
**mind**  46:16
194:16 256:5
264:20
**mine**  82:11
146:3
**mineola**  273:23
**miner**  119:3
179:18 180:8
180:13 183:11
187:6 251:25
**minimis**  37:25
39:14 44:3
**mining**  117:24
118:6,13 119:9
119:11,11,12
167:15,22

170:13 171:6
171:22 172:3
177:1,7 178:14
178:20,24
179:8,15,17,22
180:14 181:2
182:2 184:12
185:6 187:13
188:4,11,13,20
194:16,21
197:5,12 204:9
204:11 208:12
208:21 212:9
213:4 214:16
218:21 219:3
219:16,18
220:4,22
221:19 222:4
222:11,15
224:7 227:5
228:1 231:12
235:18 237:5
237:24 238:11
238:24,25
239:2 247:3
249:16 252:14
**minor**  211:8
256:4 257:13
**minus**  78:5
227:7
**minute**  50:9
87:11 102:8
**minutes**  71:17
102:4 109:4
136:17 143:14
144:11 148:14

**miscellaneous**
248:10
**misinformati...**
152:22
**misread**  8:13
**missed**  157:5
260:25
**misspeaking**
155:15
**misspoke**  33:5
33:6 36:10,22
**misstates**  86:1
151:2 153:7
199:23
**mistake**  156:17
**mister**  64:21
**mix**  171:7
184:23
**mixed**  270:19
**mm**  27:24
98:23 99:2
124:19
**model**  37:2,10
180:5 185:7,7
212:23 213:5
**modeling**
214:18
**models**  178:14
**moment**  20:14
24:3 46:7
51:13 68:4
82:9 119:1
120:1 139:25
140:2 161:13
213:11
**moments**  191:4

**monetize**  230:7
230:13
**money**  11:23
70:15 71:24
108:23 204:11
212:18 248:8
249:8
**month**  40:3,15
54:16 56:17
58:17 78:16
146:2,7,23
147:1 154:24
171:18
**monthly**
153:17 154:23
197:6
**months**  16:18
16:19 153:17
183:2,4,5,6
195:5 196:7
211:7 251:6,8
251:12,13,14
251:19 253:13
253:14
**morning**  7:3,7
10:16,17 11:9
11:10 42:16,17
60:16,17 80:8
80:9 164:13
174:5,17,18
175:5 261:2
**mortgage**
12:15
**motion**  203:10
203:14,15,15
**motivated**
196:11

**move** 53:25
54:5,6 57:4
65:24 89:6
102:7 110:11
116:13 119:2
121:9 122:6
160:6 189:23
190:6,18 197:2
223:1 237:16
241:6,7,9,21
243:10 253:25
254:1 255:7
260:24 265:3
**moved** 20:3
24:13
**movements**
64:25 76:7
**moving** 34:20
70:13 93:5
188:18 227:23
245:14 255:12
**muffled** 155:11
192:4
**multiple** 211:4
**musk** 67:11
**mute** 114:3

**n**

**n** 3:1 6:1 7:1
273:1
**name** 63:13
66:12 176:4
191:3 268:2
**named** 117:22
**names** 141:4
**nasdaq** 231:19
**nature** 148:18
148:25 240:13

**ncbj** 265:23
**near** 97:4
125:2 268:2
**nearly** 205:4
210:17
**necessarily**
56:14 61:12
104:12 108:4
**need** 19:1,4,5
70:12 130:8,9
143:24 165:25
167:1 184:12
192:2 196:10
224:15 243:9
262:17
**needed** 8:21
67:19 132:17
164:1 181:3
197:1,6 199:13
217:21
**needs** 196:1
210:25
**negative** 40:18
53:5 65:13
89:21 91:18
**negligible**
124:6
**negotiations**
197:9
**nervous**
100:11
**net** 11:21 73:1
74:8,17 77:7
77:18,21 78:5
78:7,13 104:25
106:4 109:2
147:2 220:3,8

222:10,15,17
223:21,24
224:3 225:25
228:18 229:17
231:14 255:17
255:22 256:7
**netted** 105:14
**network** 1:7
108:8
**neutral** 104:2
**never** 38:5
42:18,24 62:13
79:4 85:8
195:1 271:18
**new** 1:2,14 3:7
3:16 4:4,14,21
7:10 67:6
154:5 180:15
212:6,18,22,25
226:18 235:14
237:16 242:9
242:10 244:10
244:24 245:3
246:1,5 256:12
**newco** 117:16
117:21,21
119:3 120:25
123:14,24
157:3 167:7
176:22 177:2
179:7,9,14,15
179:21 180:2,9
180:11 181:15
181:18 183:1
184:10 186:1,6
187:6 192:1,5
192:16 194:20

202:18 208:19
208:20 209:24
210:25 212:3,4
212:4,8,11
213:1,3 215:10
218:10,18
221:5,9,11,11
221:14,14,20
222:7,8 223:20
223:21,22,25
224:2,3,4,24
225:3,18
226:13,20
227:10,22
229:6,11,13
230:1,23 231:2
231:4,9 234:6
234:8,15 235:5
236:17,22
240:21 244:22
246:9,14,16,18
249:22 251:18
252:10 254:21
256:3,11,14,15
257:2,12,17
**newco's** 228:16
**newly** 229:13
**news** 40:4,16
**nexus** 215:8,11
**nice** 259:1
268:24
**night** 7:8,16
10:2 45:17
117:10 205:21
206:15 207:1,9
213:22 216:12

**nine** 12:12 53:5
80:12 89:8
**ninety** 53:6
**nominal**
163:25 251:9
**non** 24:16
179:3 268:1
**noon** 102:4
**nope** 111:21,21
140:21
**normal** 16:5
37:1 101:23
**noskov** 4:16
142:15,15,22
214:25 215:3,3
215:6,15,21,22
216:2,4,8,10
216:13,15,18
217:15,20,25
218:2,4,7
220:19 222:2
222:14,20,22
223:3,6 224:21
224:22 226:24
228:5,8 229:2
229:9,24
230:10 232:20
232:22,24
233:2,14,22
234:1,3 236:13
237:2,17,22
239:6 240:3,7
240:12 241:12
241:20,25
243:17,19,23
244:21 246:2
246:13,23

251:4,16 254:2
254:9,12,15
255:14,16
269:5,5,9,19
270:2,4
**note** 23:23
117:20 132:9
241:22 260:21
**notes** 160:21
171:7
**notice** 14:9
169:5 213:25
259:5,12,25
**notification**
153:25
**notify** 215:13
**notifying**
215:17
**november**
264:5
**nuance** 167:19
219:2
**nuclear** 213:5
214:19
**number** 13:10
14:23 15:4
16:3,18 17:19
26:22 35:7
44:3,9 52:17
52:24 53:22
54:18 57:8
61:13 69:2,8
69:16 73:8
74:21 76:25,25
77:23 78:3
82:7 96:19,20
101:25 106:24

108:24 110:18
112:7 118:7,8
118:15,15
119:7,8,16,17
121:1 130:23
137:4 146:9
149:22 156:17
160:8 167:20
168:15,18,20
169:17,20
174:22 175:22
182:3 183:18
183:19,22
189:8 190:15
191:24 196:2
199:19 204:24
204:24 205:6
205:15 209:14
213:17 219:16
219:17 220:2
225:8,23,23
226:11,16
227:2 232:21
232:22 247:14
247:17 254:18
257:7 259:22
265:14
**numbered** 24:7
69:1,2 72:14
72:19 74:18
95:8
**numbers** 17:8
23:24,25,25
24:2,4 26:6,9
75:14 77:4
103:14 117:25
118:2 120:13

121:3,6 129:16
132:7 155:24
176:10,15
177:3,4,9
181:16,19
182:16 183:16
183:17 184:5
184:15,16
185:11 187:4,8
188:16 189:10
190:11,25
192:6,25
219:15 227:3
229:15 236:5,7
243:15 244:14
245:14 255:8
256:9 259:4,7
259:25 263:18
**numerations**
156:24
**numerical**
196:20,25
224:14
**numerous**
272:6
**ny** 1:14 3:7,16
4:4,14,21
273:23

**o**

**o** 1:21 7:1
273:1
**o'clock** 130:9
142:19,22
**oath** 7:19 20:7
27:9 40:24
80:1 116:8
122:3 143:1

193:16 266:12
**object** 9:25
  15:20 23:18
  44:16 45:14
  89:23 138:17
  209:6
**objecting**
  233:11,12
  263:4
**objection**
  23:22 43:6,12
  45:2 46:20
  47:7,12 48:13
  48:18,23 49:8
  49:13 52:14,20
  53:10,15 54:20
  56:5,25 59:6
  59:15 60:3
  61:1,2 63:3
  65:18 67:15,20
  67:21 68:8
  71:7 72:1 73:4
  73:17 74:3,9
  81:2 85:25
  87:4 88:10
  89:3,4,22
  90:20 93:10
  97:7,14 98:5
  101:8 103:1
  105:16 107:11
  110:8,21 126:7
  127:2,10
  128:23 129:5
  133:4,20,24
  134:8,13,17,22
  135:2,8,25
  136:5,14

137:14 138:1
139:8,14,19,23
145:4 147:12
147:22,25
148:1,6 150:5
150:15 151:2
152:4,11 153:7
155:6 156:8
157:13 158:21
162:23,25
163:4,15 178:9
178:16 189:4
190:5 191:21
199:21,22
202:1,6,12
203:1 205:11
215:9 222:12
228:24 229:8
229:22 230:8
239:5,25
240:11 241:11
244:20 246:10
246:11,21
260:22 271:5
271:13,22
**objection's**
  10:10
**objections** 9:24
  20:14 25:12
  28:13 41:4
  116:15 119:14
  121:11 122:8
  260:16 261:10
  261:11 265:12
  267:10 271:16
  272:8,9,10

**objective** 16:3
**objectors**
  263:20 264:21
**obligations**
  8:22
**obtain** 136:10
  138:22
**obvious** 117:21
**obviously**
  118:16 155:20
  184:14 262:11
  263:19
**occur** 251:18
**occurred** 76:12
**october** 1:16
  8:7,19 61:20
  194:24,25
  262:1 265:2
  273:25
**offer** 20:10,18
  28:11 29:16
  30:13 31:2,18
  31:19 32:11
  33:1,18 34:12
  35:18 41:2
  100:10 103:13
  116:12 181:1
  188:4 269:23
**offered** 20:6
  35:10 40:24
  163:9 242:2
  257:2 265:10
**offering** 14:14
  21:2 233:22
**offers** 120:8
  198:5,5

**offhand** 49:24
  67:9 90:8
  197:16
**officer** 7:17
  11:12
**officers** 62:18
  109:20,21
  110:1,1 193:25
**official** 3:4 7:6
  259:18
**officially** 96:11
**offline** 195:17
  195:17
**offset** 212:7
**oh** 20:20 33:6
  54:18 75:9
  99:5 151:20
  239:20
**ok** 7:19
**okay** 7:24
  10:10,15,21
  22:1 25:20
  27:22 29:10
  31:9 32:17
  33:7 35:8,15
  38:18 39:10
  44:13 45:19,22
  46:15 48:3
  51:11,15,16
  54:12 60:7
  61:16 66:12,12
  69:3 71:18,20
  72:18,23 73:12
  75:10 77:6
  79:19,21 80:2
  81:14 82:8,21
  82:22 83:6,18

[okay - opinions]                                                    Page 51

| | | | |
|---|---|---|---|
| 86:19 87:2,7 | 177:20 178:3,3 | 269:3 271:25 | **operational** |
| 87:12,23 89:6 | 178:12,23 | **old**   119:24,25 | 194:17 196:15 |
| 92:13,14 95:9 | 179:4,6,24 | 273:21 | 196:23 197:4 |
| 97:18 102:5 | 181:11 184:18 | **older**   212:17 | 248:15,20 |
| 104:22,24 | 184:22 185:5 | 213:20,23 | **operations** |
| 107:21 108:17 | 185:15,25 | **ombudsman** | 239:2 |
| 109:1,5,12 | 187:22 188:8 | 266:5 | **operative** |
| 112:13,25 | 188:14 189:9 | **omnibus** | 233:8 |
| 115:25 116:25 | 189:17,18,24 | 261:25 268:22 | **operator**   186:9 |
| 130:20 137:21 | 190:7 191:18 | **once**   17:25 | 186:10,11 |
| 138:14 140:14 | 192:18,24 | 19:11 152:20 | **opine**   216:25 |
| 141:3,20,21 | 194:5 195:13 | 194:4 236:19 | 241:4,6 |
| 142:1,13 | 195:19 196:7 | 252:4 | **opined**   35:20 |
| 145:23 146:15 | 196:14,20 | **one's**   225:1 | 217:2 |
| 146:18 147:9 | 197:5,19,22 | **ones**   24:4,6 | **opining**   218:14 |
| 147:11,17 | 198:8 199:1,7 | 29:5 261:13 | **opinion**   13:24 |
| 148:13,21 | 200:17 201:21 | **ongoing** | 14:2,8,14,16 |
| 149:11,20 | 203:19,21,25 | 226:17 265:15 | 15:11 18:16 |
| 150:11,21 | 203:25 204:8 | **online**   195:21 | 35:23 36:8,13 |
| 151:4,6,24 | 204:12 205:7 | 196:2,4 | 37:23,24 40:5 |
| 152:8 153:2,10 | 205:14,15 | **open**   18:24 | 41:24 43:4,14 |
| 153:13 154:2 | 207:6,12,17 | 68:5 70:19 | 43:25 44:6,8 |
| 154:18,18 | 208:3,10 209:9 | 71:25 72:23 | 56:23 57:1 |
| 155:23 156:1 | 210:11,25 | 73:12 82:21,25 | 75:19 76:2 |
| 156:18 157:11 | 213:5,11,20 | 87:23 91:8 | 78:23 79:7 |
| 157:18 158:8,9 | 214:12,18 | 92:8 104:24 | 86:6 94:8 96:7 |
| 158:11,12,13 | 215:19 218:6 | 115:23 175:8 | 96:9 102:1 |
| 158:16,25 | 218:20 220:2 | 199:4 265:14 | 104:22 152:24 |
| 160:5 161:15 | 220:20 223:11 | **opened**   83:17 | 156:1,2,22 |
| 162:13,17 | 223:13 237:8 | **operate**   62:8 | 160:6 167:11 |
| 163:8 164:1,18 | 238:15 258:7 | **operating** | 168:11,13 |
| 165:16 166:23 | 258:19 259:9,9 | 99:19 178:25 | 170:4 178:7 |
| 167:4 168:6,7 | 259:14 260:18 | 179:3 183:3,8 | 181:5 185:20 |
| 168:15,21 | 261:9,15,18 | 184:1 | 197:13 240:5 |
| 169:4,23 170:7 | 262:20 263:3 | **operation** | 253:17 |
| 172:20 173:9 | 263:14 264:18 | 179:20 185:6 | **opinions**   13:21 |
| 175:17 176:13 | 267:13 268:8 | 186:7 192:11 | 78:25 79:6 |

96:12
**opportunities**
11:25 59:10
236:22
**opportunity**
10:1 59:13
70:21 196:6
263:20 272:4
**opposed**
125:15 184:6
215:13
**opposing** 262:2
272:4
**opted** 165:9
**option** 242:17
242:20,21
245:19,20
247:8
**options** 62:15
242:2
**orange** 47:11
47:17 48:11
**order** 9:9,18
67:19 70:24
91:2 103:17,21
103:22 106:9
122:15 142:20
160:18 164:23
187:10 210:15
230:5,17 259:8
269:13
**ordered** 8:20
**ordering** 263:9
263:10,12
264:16
**orderly** 117:17
117:22 118:9

118:18 119:3
119:17 123:16
123:23 176:22
180:8,13
183:11 185:7
185:12 187:6,8
187:8 188:15
188:24 190:22
211:8 212:8
218:10 226:20
247:7,10
249:16 252:8
253:10 254:23
256:10 257:13
257:18
**orders** 9:10,18
**organization**
176:9 184:24
**organizational**
63:7
**organizations**
61:24
**organize** 27:1
**original** 50:1,7
50:8,11 166:11
167:6
**originally**
167:16
**originate**
176:10
**otc** 29:25 34:1
78:5 104:25
105:2,2,3,6,8
105:10,22,24
106:5,6,10
107:1 108:1,5
108:10,12,22

109:2 144:25
201:13
**otis** 87:7
140:12
**ought** 25:20,21
263:17
**outcome**
246:14 257:23
**outcomes**
242:12 244:4
**outs** 252:17
**outside** 17:7,11
19:10 39:4
41:23 46:21
**overall** 97:3
108:13 171:22
189:20 191:19
228:21
**overexposed**
104:3
**overlap** 108:4
**overly** 65:13
**overruled**
10:10 23:22
46:22 48:24
49:14 56:6
73:18 74:10
103:3 105:18
107:13 129:6
145:5 163:17
178:17 189:5
222:13 229:1
229:23 230:9
246:22
**oversaw** 8:19
**overseeing** 8:8

**overstate**
181:23
**overstated**
192:25 250:11
**owed** 8:13
**own** 43:11,23
122:7 159:21
159:23,25
171:9 180:19
207:13 212:7,9
222:23 223:8
229:16 258:25
**owned** 8:12,18
17:4,5,6,10,12
57:14
**owner** 63:8
**ownership**
62:4 225:18
230:14
**owns** 62:3 71:2

**p**

**p** 3:1,1 7:1
**p.m.** 130:7
**packaged**
231:16
**packet** 46:9
**page** 6:7 8:2
13:13 23:10
24:17 27:16
28:17,18,18
29:21 30:17,19
31:7,25 32:16
33:10,23 35:10
35:11,15 46:13
47:25 50:13,24
50:25 52:3
57:19 68:18,19

69:1,2 72:11
72:14,15,19,19
72:20,24 73:7
73:8,14 74:7
74:10,15,18
77:7,18 78:2,8
82:7,13 84:9
87:19 88:12
89:6,17 90:24
92:1,2,8 93:15
95:7,8,9 97:18
98:22,24 99:25
102:12 104:22
109:7,9,11
116:1,2 117:8
120:17 121:24
122:22 130:23
131:2 136:20
137:9,11,16,19
137:19 145:14
145:21,25
146:8,12,21,24
146:25 147:5
147:11,14,15
147:19 158:1,3
158:5,7,7
161:22 163:12
167:24 168:3
169:2,3,12,18
169:20 172:13
172:15,20,22
172:25,25
174:19,24
175:5,8,21
177:4 184:22
199:6,10 206:6
207:13,15

209:12 210:1,4
210:5 219:23
219:24 228:17
229:15 232:20
232:23,25
233:2,25 234:1
234:2 243:12
243:15 244:15
245:17 249:5
254:10,12
257:5,6 263:18
**pages** 24:17,19
26:3 84:4
98:21 132:14
**paid** 119:21
**paint** 97:13
**panel** 265:25
265:25
**panels** 265:24
**panic** 16:16
**paragraph**
7:25 8:2 9:12
49:23 50:5,12
84:7,8,21
86:10,13 158:6
158:14 161:19
162:1,7,10
163:2,8 167:6
207:14,15,18
208:3 220:17
220:20 223:12
234:14 237:18
237:21,23
**pardon** 36:11
77:10 107:16
**parent** 62:1

**part** 8:24 9:3
12:17 16:1
19:2 78:19
117:3 118:19
157:5 159:5
160:4 169:18
188:19 191:12
193:20 194:20
194:20 198:4
198:25 202:18
212:11 224:24
225:25 229:5
229:17,18
231:1 235:20
235:25 238:5
239:2 252:16
255:12 260:3
265:22
**participants**
8:10,16 70:20
104:6 245:22
**participated**
43:1 59:19,22
63:11 64:1
**particular**
59:23 68:1
88:20,21
166:21 167:14
178:24 224:5
227:21 262:23
268:3,4
**parties** 11:16
19:9 82:24
145:8 149:12
184:23 201:24
216:16 260:15
260:23 263:5

264:20 266:22
**partner** 10:14
66:11
**parts** 173:10
173:12 177:20
227:17,18
228:13 232:17
233:18 235:5
235:18
**party** 176:25
177:6,11
180:11 181:19
182:7 226:7
**pass** 10:13 42:5
124:10 139:6
**passed** 40:15
236:24 260:23
**path** 117:16,17
117:22 194:13
256:2 257:12
257:13,14
**paths** 208:18
**pattern** 8:20
**pause** 14:21
15:3,9 16:12
16:23 17:12,16
18:17 19:16,19
19:22,24 39:21
40:1,3,10,19
68:5 76:12,13
76:20,24 77:3
79:2 83:1
90:12 91:9,20
93:19 94:6,10
94:14,14 95:12
96:15,17 99:15
99:21 100:3,16

101:22 115:1
145:12
**pavon** 7:12,17
8:6 10:1
**pavon's** 10:3
**pay** 41:16
211:19
**payment** 8:11
**payments** 8:18
41:14
**paypal** 251:22
**pdf** 82:7 87:19
92:2 95:9,10
97:19 102:12
199:6 238:14
**peak** 55:8
**pending** 46:24
48:6 271:22
**pennsylvania**
12:5,7
**people** 18:25
37:15 70:12,15
70:18 100:8,10
108:19 139:4
142:17 152:22
183:7 208:24
260:3 268:1
**perceived** 88:7
**percent** 14:24
15:3 16:17
17:8,9,10,12
17:14 61:8
73:25 77:8,19
102:17,17
103:12,13
106:22 119:4
120:24 121:2

123:21 127:6,9
128:3,4,8
129:19,20
135:1,15 157:3
157:9 170:8
180:12 184:2
185:14 186:1
187:4,5 189:7
189:14 190:3
192:12 197:14
211:21,22
225:11 243:3,5
243:6 244:8
245:11 246:5
257:12,12,14
**percentage**
17:1,1,22,22
120:12 121:2
127:25 244:13
257:7,10
**percentages**
120:15,23
257:11,17
**percents**
125:15 191:24
**perception**
16:2
**perfect** 182:14
257:21
**performance**
97:23 194:12
194:12,19
195:20,25
196:11,14,21
**performed**
124:5 170:24
188:22

**performing**
115:17 177:24
**period** 9:19
17:25 40:3
58:23,24 63:25
64:21 72:25
73:13 74:1,1
75:13 78:16
93:15,24,24
94:2,9 99:23
100:3,3 105:25
106:1,13
147:21 178:25
187:11 212:18
248:25 251:9
**periods** 93:22
250:15
**permission**
11:2 21:18
45:12 57:17
161:7,14
**permit** 54:1
156:12 201:19
**permitting**
53:22
**perpetual**
80:25 81:6,9
81:10 118:22
**perpetuals**
81:10 85:23
89:12 91:7
92:23 100:18
100:18,24
101:2,6,12,17
**perpetuates**
19:8

**person** 187:12
187:21 195:3
214:17,22
239:10 251:10
**personal** 47:7
63:12
**personally**
178:19
**perspective**
19:24
**pertaining**
91:13
**pessimism** 25:2
**petition** 14:9
14:12 15:9
36:9,20 38:2,4
38:10,16 39:14
39:19 40:2,3,7
40:12,20 43:14
43:25 58:23
76:13 79:7
83:2,4 91:25
112:12 128:13
150:14 156:4
**pharaoh's**
215:4
**pharaohs**
215:7,9 257:1
269:6
**pharos** 4:11,11
4:12,12 142:16
**phase** 248:20
**phillips** 5:2
141:6,8,8
142:5,21
165:18,20,21
165:25 166:7

166:11,20
167:2,3,4,5
168:1,2,4,8
169:5,7,14,15
169:21,22,25
172:14,15,18
172:21 173:3,5
173:22 174:1
206:1,5
**phone**   130:10
130:15 154:3,3
164:10,16
**phones**   164:14
**physical**
180:18
**pick**   125:8
204:16
**picture**   83:1
89:11 90:23
97:3,13 98:16
**pictures**   92:1
**piece**   55:20
181:21 186:15
190:22 249:15
**pieces**   236:14
**pillay**   66:3,5
66:15
**pivot**   117:17
**place**   19:15
38:1 77:12
99:12 119:1
152:15 162:5
175:16 223:10
236:21 239:19
252:25
**placed**   83:5
86:21 186:21

**places**   84:10,23
132:15 208:23
**plaintiffs**
223:17
**plan**   57:6
115:18 117:15
120:25 121:8
122:14 123:8,9
123:13,13,17
123:21 124:25
126:5,6,12,16
127:13 129:21
131:15,24
133:12,16
135:24 136:3
139:11 156:7
169:6 175:17
175:22 177:5
179:7 183:12
183:13,15
184:9 188:2
193:20 194:4,6
194:24 201:23
202:9,16,22
208:17 210:7
212:14 213:2,6
215:10,12
217:1,8,9
220:24 221:16
221:21 223:18
224:25 225:19
228:12 231:1
234:24 238:11
239:22 242:2,7
242:14 247:7
247:25 266:22
268:14 272:4

**plans**   213:3
**platform**   15:1
17:6,7,11
37:20 39:3
41:12,20 160:3
208:21 212:6
**play**   14:23
155:17
**plea**   7:18 10:5
**please**   7:3
10:23 11:4
12:1,11,22
13:6 14:19
17:18 21:19
23:17 27:8,17
27:25 29:22
30:17,23 31:7
31:25 32:7,15
32:23 33:15
34:7,8 43:20
44:21,24 46:7
50:19 52:4
57:16 59:20
68:17 69:13
72:10 73:7
76:21 78:11
79:25 85:11
91:11 93:1
102:23 105:4
105:21 107:7,7
107:14 109:24
113:16 114:3,8
115:23 116:1
116:23 117:7
121:24 122:18
133:3 136:18
137:25 138:15

140:9 142:25
144:4 145:14
153:21 160:9
160:13 163:20
166:5 174:4
177:16 191:7
193:14 208:2
213:11 220:13
223:12 232:11
257:8
**pleases**   159:22
162:1
**plugs**   120:2
**plus**   114:15
**pm**   272:16
**podium**   10:14
**point**   15:6 19:1
39:8 47:24
70:15 73:21
82:19,23 83:24
84:12 99:11
101:24 102:1
102:13 123:23
125:9 136:9
156:12 180:19
184:5 195:23
195:24 201:14
215:20 222:23
223:8 226:14
237:12 238:9
249:22 266:18
270:4
**pointed**   186:5
269:14
**pointing**   77:12
**points**   116:11
116:18 139:6

159:9 160:4
192:22
**policy** 13:2
14:4
**popular** 67:10
**portion** 61:11
160:24 167:25
196:3 225:3
**portions**
105:14 252:5
**position** 18:4
18:24 70:12,13
71:25 77:7,18
77:21 83:17
87:25 88:14
**positions** 19:19
68:5,7,7 70:19
81:10,18 82:25
83:3,5,20
84:13 85:14
86:21
**positive** 40:5
192:6
**positively**
226:12
**possess** 62:16
**possibility**
235:20,22
**possible** 82:4
173:16 194:15
194:18,19
208:25 251:21
264:17 268:7
**possibly** 94:5
**post** 19:4 45:16
56:19,21 70:12
70:16 95:12

100:16 114:25
153:3 182:12
182:23 191:11
206:14 210:13
216:12 262:10
262:14
**potential** 15:5
18:6 37:17
94:11 105:3
157:11 171:8
**potentially**
235:12
**power** 186:25
**practicality**
192:12
**practice**
114:11
**pre** 100:16
**precise** 44:6,8
44:9 205:2
**predicted**
171:1
**predominantly**
40:17
**preferred**
262:14
**prejudicial**
143:15 144:12
**premarked**
121:23
**premium**
235:22 236:22
243:6 244:23
**preparation**
25:5,8 32:8
**prepare** 116:20
173:14 223:14

**prepared**
13:18 116:21
149:13 173:16
173:17 178:21
220:23 268:23
269:1
**preparing** 21:9
21:21 23:14
32:24 33:16
34:9 60:18
117:5
**prepetition**
13:25
**present** 37:6
118:16
**presented**
59:13 149:25
180:22 257:21
**press** 151:8
**pressure** 70:18
**presumed**
179:10
**presumes**
187:15
**presumption**
183:12
**presupposes**
186:6 187:18
**pretty** 119:25
**prevent** 8:25
134:1
**prevented**
198:12
**previous** 90:23
97:2,12 161:15
197:20

**previously**
95:20 96:25
**price** 8:24,25
9:5 13:3 14:5,8
14:9,11,15,16
15:8,15,17,17
15:20,24 16:1
16:7,9,13,16
18:16 19:3,7,8
19:10 20:3
35:21,21,24,25
36:10,13,20,23
36:25 37:3
38:3 39:22,23
40:6,10,11
43:4,10,22
54:8,10,14,16
54:19,23,24
55:2,5,11,14
55:23 56:1,3,9
56:11,15,16,19
56:21,23 57:2
57:20 67:25
69:11 70:5,11
70:17,21,22
71:5,9 73:15
73:20,24 75:19
76:2,7 78:24
79:4,6 81:19
81:23 85:7,14
85:23 91:9,15
91:15 92:19,22
92:23 93:8,22
94:23 95:11,20
95:24 96:6
97:2,4,20,22
97:23 98:1,2

98:17,17
100:25 101:19
103:17 107:1,3
107:4,9,10,18
112:11 120:10
123:12,15,23
132:21 147:20
180:20 199:17
202:11 225:4,5
231:21 234:7
234:25 239:16
239:23 250:6
**priced**  133:10
156:4
**prices**  9:4
19:20 40:8
59:2 65:15
69:7,15 70:2
96:9 106:23
107:6 119:21
234:17 239:9
**pricing**  39:15
39:18,21 56:23
126:22 150:14
**primarily**
114:16 194:14
**primary**  13:21
117:16 180:4
188:22 190:10
**prior**  16:17,19
33:10 58:4,7
61:5,21 86:1
95:2 96:8
**privacy**  266:5
**private**  248:17
**pro**  5:1 42:9
80:5 111:8,23

125:21 140:10
141:2,8,10,12
141:13 142:2,8
270:7
**probably**
107:20 123:15
130:15 186:11
195:15 256:5
260:10 262:13
263:23
**probe**  237:4
238:8
**probing**  190:8
**problem**  176:7
176:7
**problems**
156:9
**procedural**
160:16
**procedure**
176:15 186:2
**procedures**
265:16,17
269:13
**proceed**  148:18
**proceeding**
203:6 233:16
**proceedings**
7:11 263:13
272:15 273:4
**proceeds**  112:6
211:22 223:15
256:2
**process**  100:24
170:15 184:16
184:17 211:13
247:11,20

252:1,25
270:15
**produced**  72:9
83:2,20 85:8
177:15,18
178:14,15
**producing**
188:8
**product**  64:3
72:6 177:15,17
**productivity**
189:3 190:9
**products**  12:15
80:25 81:10
90:5 91:14
**professional**
60:19 114:12
178:6
**profile**  232:7
**profit**  70:21
108:24 212:17
**profitably**
194:17 195:22
**program**  57:14
138:9 162:19
162:22 163:10
**progress**  27:7
79:24
**project**  249:20
249:20
**projected**
188:1
**projection**
239:8,22,23
**projections**
178:7 237:25
238:5,7,10,16

238:19,23,25
239:4 240:14
**projects**  81:6
**pronunciation**
176:8
**proof**  164:24
**proper**  151:22
151:23 155:19
**properties**
150:12
**property**
149:14
**proposal**
118:14 184:11
**proposals**
263:21
**propose**
135:15 261:3
**proposed**  57:6
129:16 201:16
201:23 202:11
225:19 259:8
262:15 263:16
263:21,24
264:25 265:6
266:11
**proposing**
267:11
**prototypical**
70:10
**proudest**
153:24
**provide**  12:1
66:15 84:12,19
85:1,24 87:9
94:22 104:6
133:9 149:11

153:16 155:5
188:12 203:8
229:12 257:16
267:3
**provided** 44:13
50:19 66:18,19
80:25 81:7
85:10 87:16,25
98:16 108:8
138:4 149:15
150:24 167:12
167:14,17
171:6 185:20
219:21 229:15
237:25 271:19
**provides**
133:12,16
244:3 245:15
256:7,10
**providing**
86:25 154:23
155:9,12,13,16
**provision**
164:25 242:11
**proximity**
119:13
**public** 9:4
117:23 119:3
155:9 179:8,17
179:18,21
180:8,8,13
183:11 187:6
208:21 211:8
212:9 251:25
256:4 257:13
259:23

**publicly** 8:9,16
151:7,14 238:1
**pull** 51:5 160:9
174:8 213:22
217:15,18
220:12 232:18
268:18
**pulled** 166:17
174:14 259:23
**purchase** 75:8
107:9 108:6
118:20 145:11
199:17
**purchased**
14:3 73:2 74:8
74:16 170:20
180:15
**purchaser**
232:7
**purchases** 8:8
8:20,24 9:3,7,8
9:9,16,17,18
13:25 72:12
186:20
**purchasing**
8:10,17 78:7
78:13
**pure** 127:5,8
129:3,9,18
134:25 135:6
135:13,21
136:11
**purely** 97:25
**purport** 221:2
**purpose** 8:23
9:8,17 19:10
176:13

**purposely**
65:12
**purposes** 15:2
117:9 121:22
132:8 137:7
138:16 215:6
241:23
**pursuant**
149:8
**pursue** 202:4
**pursuing**
165:10
**push** 70:21
241:10
**put** 16:3 19:19
21:16 36:13,20
38:3 41:24
44:4 45:11
51:10 61:9
79:1 87:7
92:24 97:24,24
124:11,15
131:19 159:11
175:4 178:14
182:25 184:11
186:16,17
190:3 205:20
212:2 213:21
225:16 227:21
228:9 236:8
257:4 260:1
261:4 262:17
262:23 264:3,8
267:18 269:17
271:7
**puts** 250:16

**putting** 35:24
245:24

**q**

**qualified** 9:20
56:8 235:24
236:2
**qualitative**
197:1
**quality** 185:22
**quantification**
41:25
**quantify** 37:24
**quarterly**
253:25
**question** 15:24
25:25 26:1
36:7 41:8
43:20 44:9
46:16 47:15
49:5 54:15
55:1 56:2 58:3
64:14,19 69:4
69:13 74:12,14
74:20 75:3,4
75:10,17 76:21
77:15,25 78:10
81:15,17,22,25
84:24 85:11,18
86:2 89:20
91:10,17 92:16
93:2 94:19,20
94:25 96:24
98:12 100:22
100:22 102:23
103:6 105:5,19
105:21 107:3,7
107:17 108:16

108:22 109:24
110:9,11,15
111:11 112:2
124:23 126:4
126:17 127:20
128:6,18
130:21 132:16
134:7 136:17
138:10,13,20
139:3 140:1,16
140:22 141:16
141:16 150:20
151:12,14,19
151:23 152:5,7
152:17,25
154:22 156:2
156:10,19
157:14 158:11
160:16 161:16
163:20 165:14
173:18,21
176:20 180:3
180:10 190:8
192:13,22
198:2 199:25
200:22 201:10
201:12,18
202:13 203:2,5
203:6 204:16
204:21 206:18
207:5,5,10,10
207:24 208:8
209:6,8,23
210:10,19
214:1,11,14
221:23 222:18
222:18,19,19

223:2,5 226:9
228:4,7,9
230:4,12,19
235:16 236:25
240:9,17
245:25 246:1
251:2 255:15
269:10
**questioned**
140:23
**questioners**
206:9
**questioning**
177:12 238:9
**questions** 45:4
50:14 57:2
60:8 64:14
65:22,25 68:13
68:14 75:23
79:12 90:21
96:2 97:16
111:5 122:12
140:20,24
141:9 144:17
148:17 152:23
161:3 162:15
164:19,20
165:2,12 173:4
173:20 181:13
184:19 187:7
190:19 193:9
197:22 198:19
200:16 203:24
205:14 208:1
222:1 237:14
237:16 240:1
270:19

**quickly** 27:1
119:25 194:15
194:18,19
208:24 247:7
251:21 252:3
264:24 265:3
**quinn** 4:10
142:15 215:3
269:5
**quite** 67:12
70:19 99:13
117:21 124:24
155:10 186:12
186:13 212:2
230:19 243:8
247:21,22
262:23 265:3
267:14
**quote** 102:14

**r**

**r** 1:21 3:1 7:1
273:1
**raise** 10:23
113:10 171:8
252:22 265:13
270:6
**raised** 61:10
64:3 122:12
164:21 266:5
266:15
**raising** 61:8
252:19
**range** 75:7,7
120:7,11
162:10 180:23
190:4,15 232:4
252:17

**ranges** 260:13
**ranging** 12:15
**ransomware**
11:21
**rapidly** 69:7,15
70:1
**rate** 41:15,19
71:23 89:14,18
211:20 214:15
214:15 231:14
257:22
**rates** 91:7
239:9
**rather** 78:19
186:14 260:11
**ratio** 242:8
**raw** 85:18
**reach** 121:5
**reached** 10:2
55:8 114:25
271:18
**reaching** 107:6
**read** 7:25 8:14
49:1 68:18
69:21 83:16
133:2 137:13
137:25 138:2
147:4 158:10
161:20 162:1,2
162:6 163:8,11
207:17 219:23
219:25 234:13
259:6,25 260:8
269:12
**reading** 53:1
80:16 86:9
106:22 146:24

162:2 221:7
259:7 260:11
**reads** 162:7
**ready** 115:9
186:18,19
196:18 264:24
**real** 18:9 39:4
100:23 183:5
211:24
**reality** 38:11
156:24
**realized** 221:4
221:9
**really** 16:9
20:3 36:23,24
37:4,5,9,24
39:1,4,23
64:23,23 79:1
79:1,4,7 93:18
93:20 94:14
96:8 100:8,9
117:23 171:11
181:8 183:2
192:22 195:4
213:3 214:23
217:11 218:1
238:24 253:19
265:21
**reason** 92:25
103:24 104:5,8
104:12 151:13
188:19 192:10
227:4 253:10
261:16 269:2
**reasonable**
16:4 171:25
172:4,5

**reasonableness**
168:11 170:4
237:4,5 238:8
**reasons** 17:19
158:17 159:1
180:13
**recall** 25:4
40:4 55:8,9
56:22 61:7
64:1,11,23,24
64:25 65:5,7
84:2 88:6,8
90:6,10,15
94:15 192:21
199:9,16,20
203:7
**recap** 254:20
**receive** 72:5,8
91:13 102:21
102:24 110:19
123:11,21
124:22 126:12
126:13,14,15
138:8 163:24
164:2 230:1,5
231:25
**received** 45:15
86:5 88:1,9
89:1 90:7
91:12 103:5
105:12 110:25
120:9 171:5
232:8
**receives** 230:2
230:6 231:22
**recent** 50:2

**recently** 66:23
195:7,9
**recess** 25:18
27:1,5 79:11
79:22 142:24
193:11,13
**recessed**
142:22
**recognize**
13:10,14 79:15
168:9,10
**recollect** 88:4
**recollection**
23:13
**reconciliation**
184:17
**reconnect**
144:3
**reconnected**
144:9
**record** 7:25
24:11 63:16
80:1 121:22
132:9 137:7
138:17 164:22
174:21 175:20
205:21 213:10
215:6,11
232:17 241:23
245:25 254:7
259:6 260:12
267:18 269:16
273:4
**recording** 27:7
79:24 115:10
**records** 34:23
34:24 176:23

184:16
**recover** 164:2
**recoveries**
157:1 191:23
211:15 217:13
220:25 223:16
223:20
**recovery**
120:12,15,21
120:22,24
121:2 123:7,16
123:18,22
127:25 135:12
156:3,7,22
157:3,9,12
163:14,22,24
170:8,11 172:1
175:18,22
176:13 178:5
178:15 183:7
201:8 244:13
255:25 256:2
257:7,10,12
**recross** 6:3
**red** 96:14
123:10,19
125:10
**redeploy**
195:17
**redirect** 6:3
22:22 112:15
256:17,19
**redistributes**
183:8
**reducing** 115:7
**reductions**
115:7

**refer** 47:24
82:6 92:5 93:5
105:2 108:7
120:16 129:22
136:20 151:21
167:7
**reference** 28:3
28:5,18,21,24
29:24 30:3,8
31:10,15 32:3
32:18 33:11
34:1,5 41:9
50:24 99:11
263:17
**referenced**
18:20 26:22
30:25 86:8
168:20 259:8
**referencing**
30:20 206:9,12
221:11,13
**referred** 15:11
84:10 100:15
101:18 117:19
118:3
**referring** 46:8
49:23 74:10
81:9 83:14,25
86:4,17 88:21
92:6 95:19,23
100:17,19,23
100:24 101:1
109:9 131:7,14
133:6 149:24
152:12,13
162:11 166:6
169:13,21

178:22 233:4
271:4
**refers** 16:7
71:24 89:18
106:5
**reflect** 9:4 53:8
108:1,3,18
221:2,8
**reflected** 32:7
32:9 78:8
183:20 198:18
**reflection**
35:22
**reflective**
179:2
**reflects** 109:1
**refresh** 23:13
**refused** 270:14
**regard** 242:3
**regarding**
13:25 39:24
43:10,22 91:16
94:11 119:14
**regards** 174:3
**regular** 44:14
**regulate**
186:25
**regulation**
9:21
**regulatory**
198:11
**reigns** 25:2
**reintroduce**
114:8
**rejected**
126:20 270:12

**rejecting**
128:21
**relate** 119:17
**related** 44:19
45:7 115:18
118:13 121:21
144:21 226:7
**relates** 124:8
191:12
**relating** 27:22
84:13
**relation** 115:13
158:18
**relationship**
61:17,22,25
62:1 63:6,10
240:24 241:2
**relative** 76:17
220:24
**release** 203:10
268:2
**released**
266:18,22
**releases** 266:17
266:25 267:10
267:11 268:8,8
**relevance**
19:13
**relevant** 9:21
96:12 240:7,9
**reliable** 16:4
18:16 35:23
79:4 96:10
**reliance** 20:11
21:3 22:13
24:12,16 25:22

**reliant** 168:17
**relied** 21:21
23:11,14,24
24:7,20 25:7
27:13 28:8
29:14 30:7,24
31:15 32:8,24
33:15 34:9
170:1 190:18
235:2
**rely** 21:10 22:7
22:11,16,18
23:19 168:20
171:4 176:23
**remainder**
262:19
**remained** 15:2
**remaining**
120:16,20
139:6 212:11
265:20
**remarks**
156:22
**remember**
226:11
**remembering**
197:16
**reminding**
116:13
**removed** 18:1
**renew** 239:25
**reorg** 201:23
202:9,16,23
**reorganization**
202:17 225:19
**reorganize**
38:17,20

**repeat** 43:19
59:20 64:19
69:13 74:20
76:21 78:10
85:11 91:10
93:1,1 102:23
105:4,21
109:24 154:22
192:3 207:23
208:1 209:14
209:17 237:9
**repeatedly**
164:13
**repeating**
46:16
**rephrase** 91:4
96:24 109:1
151:25 202:21
224:21
**replaced**
118:25
**replacement**
187:19
**replied** 85:22
**reply** 271:16
**report** 13:17
13:20,24 14:7
18:19 20:5,16
21:9,21 22:7
22:13 23:6,10
23:15,24 24:18
25:5,8,22 26:4
26:17,20 27:14
27:16 28:9,18
29:22 30:25
31:8,11,16
32:1,9,16,24

33:16,24 34:10
50:11 60:18,23
60:24 66:16,19
66:20 68:4,18
69:21 72:11,15
72:24 73:7,14
74:7,15,25
77:6,17 78:9
82:13,15,16
83:9,9,25 84:1
84:10,12,18,22
84:23,25 85:4
85:7 86:7,22
91:24 92:3,4,6
94:22 95:1
97:18 102:13
145:14,17,18
145:19,20,25
146:15,21,25
147:3,11,19,23
149:25 153:17
154:24 199:2,4
226:11
**reported** 88:7
89:16 151:8,14
203:13
**reporter**
259:19
**reporting**
149:7
**reports** 21:4
92:1 150:2
153:18 154:24
155:9,12,13,16
155:18,22,24
177:13

**represent** 78:3
108:24 118:1
**representation**
65:13
**represented**
40:18 222:10
**representing**
26:7 153:24
222:21
**represents**
15:18 16:4
37:6 40:6 78:4
119:8,9 123:14
177:3 211:7
**repurchased**
75:12
**reputable**
177:2,11
**request** 34:2
45:12 57:16
**requested** 49:2
91:8
**require** 210:7
**required** 91:2
115:10 171:8
177:8 181:24
182:1 187:10
**requirement**
177:10
**requirements**
149:8 176:15
**requires** 74:24
138:24
**research** 42:25
43:1 61:5,16
62:6,7,9,16,19

**research's**
61:22
**reserve** 215:14
269:21
**reserved**
269:10
**reserves** 211:4
252:6
**reserving**
215:18
**respect** 14:17
18:19 19:25
24:11 78:23
79:6 83:4,20
86:20 108:23
112:11 115:15
131:24 143:14
144:11 188:13
236:17 265:20
**respectfully**
58:11
**respective** 87:2
260:23
**respond**
132:18
**responded**
271:16
**response**
122:11 238:17
**responsible** 8:7
148:21 155:21
155:23
**rest** 34:20
120:21 164:12
179:20 211:14
258:2 260:5

| | | | |
|---|---|---|---|
| **restate** 107:7 | **revenues** | 95:20 96:19 | 243:21 244:11 |
| 163:20 | 185:22 | 100:2 101:14 | 244:12,14,19 |
| **rested** 258:4 | **review** 188:15 | 101:15 109:3 | 247:16 250:4 |
| **restricted** | 190:24 191:8 | 112:14,18 | 251:2,19,20 |
| 112:10 | **reviewed** 18:11 | 113:10 116:15 | 253:1,2 258:2 |
| **restructured** | 66:22 123:25 | 117:19 121:11 | 258:19 261:12 |
| 39:6 | 147:7 194:3 | 121:11 125:13 | 262:3,7 264:18 |
| **restructuring** | 219:21 238:19 | 130:6 136:16 | 265:17 268:12 |
| 37:19 39:7 | **reviewing** 25:4 | 137:2 140:3 | 268:16,20 |
| 114:11,15,19 | **revised** 7:9 | 141:20 142:17 | 269:1,21 270:5 |
| 114:21,24 | 131:15 | 142:17,25 | **rights** 89:11 |
| 115:4,9 257:16 | **rewards** 32:20 | 146:4,5 152:19 | 143:15 144:12 |
| **restructurings** | 33:12 72:12 | 152:22,23 | 159:10 160:2 |
| 114:18 | 195:19 | 154:16 155:15 | 215:14,18 |
| **result** 156:3 | **ribbon** 146:14 | 159:8 161:2 | **rigs** 118:21,23 |
| 226:3 235:14 | **richard** 5:2 | 162:13 164:12 | 119:11,20,22 |
| 235:14 | 141:8 | 165:16,24 | 119:24 120:2,6 |
| **resulted** 181:2 | **rig** 119:20 | 166:10,23 | 170:14,15 |
| **resulting** | 120:8,10 | 167:3 169:23 | 180:15,23 |
| 223:16 | 180:17,17,20 | 170:1,10 | 186:20,25 |
| **results** 124:7 | 187:19 | 171:16 174:21 | 194:17 195:16 |
| 211:9 | **right** 7:4 9:24 | 175:7 178:3,23 | 195:21,21,21 |
| **resume** 79:13 | 10:23 13:21,22 | 179:5,6 180:25 | 196:1,4,12 |
| 261:25 272:3 | 26:21 27:8 | 181:20 185:4 | 197:5 |
| **return** 208:24 | 30:14 31:4,21 | 188:4 193:11 | **ring** 66:12 |
| 231:25 250:23 | 32:12 33:3,20 | 193:14 203:18 | **ripple** 270:11 |
| 250:24,24 | 34:14,22 35:3 | 204:1,18 205:5 | **rise** 7:2 27:6 |
| **returned** | 41:4 42:7,11 | 207:21 210:9 | 69:12 70:5,11 |
| 194:14 | 43:17 46:2 | 212:23 214:20 | 73:25 79:23 |
| **reuters** 25:1 | 51:25 52:8 | 216:23 217:23 | 142:23 250:5 |
| 151:8 | 54:6 57:18 | 218:22 219:2 | **rises** 250:4 |
| **revaluation** | 72:14 76:14 | 219:15 222:9 | **rising** 69:7,15 |
| 119:5 | 77:14 78:2,8 | 225:13,22 | 70:2 |
| **revenue** 7:17 | 79:25 84:8 | 227:8 231:8,17 | **risk** 11:25 |
| 189:3,20 | 86:4 87:15 | 231:24 232:2,3 | 234:12 236:11 |
| 194:10 | 90:4 91:18 | 235:10,22 | 236:12,14,16 |
| | 92:12 93:8 | 236:12 239:19 | 236:19 250:24 |

risks 236:21
road 252:7
  273:21
robert 6:5
  112:24 114:6
  114:10 125:25
  256:19
roger 102:7
role 193:22,24
rollup 190:24
roni 7:12 10:1
room 164:10
  192:8
room's 195:3
rose 55:11
  73:15
roughly 123:18
  125:9 211:11
  211:12
round 43:2
  64:2,2,10,24
  65:3
rounds 63:9
rule 10:5,6
ruled 57:14
rules 153:21
rumor 13:1
rumors 15:4
  94:10
run 70:15
  170:16 186:23
  211:13,18
  225:20
running
  106:17 120:3,4
  164:23 186:7
  187:1 196:13

252:1
runway 115:8
  253:13
rush 264:17
rushing 258:16
ryan 168:13
  182:2 220:13

**s**

s 3:1 4:23 7:1
  63:16 82:11
s&p500 58:9
sabin 4:23
  164:20,21
  165:4
safe 53:13
sale 54:23
  91:14 105:23
  106:6 170:13
  170:15,17,17
  170:19,24
  171:12 172:3
  179:3,10,23
  180:6,18,21
  221:4,9 253:7
sales 105:2,2,8
  105:9 106:6
  109:2 120:6
sam 62:3,11,13
satisfied
  165:15 231:7
satisfy 125:5
saw 19:18
  181:9 266:10
saying 25:23
  36:10 85:1,3
  86:20 107:8
  151:24 169:10

176:4 177:21
  195:11 268:7
says 8:7,15
  46:24 49:2
  53:3 69:18
  84:21 86:8
  103:8 104:25
  105:1 106:4
  124:6 133:2,8
  163:9,12
  164:25 196:14
  199:8 208:7
  220:21 222:24
  223:24 234:14
  237:23 238:3
  244:11
scale 95:14
scanning 84:3
scared 100:11
scenario
  123:24 157:4
  183:1 210:25
  212:4 218:10
  218:11,11
  251:18 252:10
  253:10 255:17
  255:19 256:7
  257:11,18,18
scenarios 39:8
  104:10 117:15
  117:16 120:23
  123:8,14 136:7
  174:16 217:12
  218:10,13
  255:5,9 256:4
  256:8

scenes 211:14
  236:6
schedule 173:8
  210:23 263:6,7
  263:8,22
  269:14
scheduled
  211:8 261:25
  264:4,7,11
scheduling
  268:20
scheme 159:10
  159:15
school 12:4,6
science 12:4,6
scope 46:21
  128:24 148:10
  148:11 201:18
  214:21 241:15
screen 51:10
  51:23,25 53:2
  117:7 161:6,7
  161:12 162:14
  174:8,22
  175:12,23
scroll 52:3
se 5:1 42:9
  80:5 111:8,24
  125:21 140:10
  141:2,8,10,13
  142:2,8 270:8
sealed 203:9
seat 113:17
seated 7:3 27:8
  79:25 142:25
  193:14

**sec** 252:1
**second** 10:7
  15:10 35:9,18
  36:12 42:10
  45:21 51:20
  72:3 83:10
  116:22 121:15
  136:18 138:14
  143:3 145:18
  153:11 164:9
  169:11,15
  174:10 175:19
  184:25 186:10
  186:13 188:19
  191:11 196:6
  210:23 211:2
  211:23 218:1
  220:21 234:13
  243:14 254:12
  257:6 260:2
**seconds** 111:20
**section** 105:1
  130:24 132:24
  133:2 136:21
  137:25 219:4
**securities**
  12:16 162:9
  163:10 201:24
  221:5,9,10,11
  234:18 248:18
**security** 9:20
  19:5 69:19
  70:2 162:8,9
  162:19 163:3
  179:19 202:24
**sec's** 198:11

**see** 13:16 21:1
  21:5 23:11
  24:2,25 27:19
  27:22 28:1,17
  28:21,24 29:24
  30:19 31:11
  32:3,4,18,20
  33:12 34:1,3
  35:25 36:14
  37:21,22 38:12
  45:23 49:1
  50:23 51:1
  52:1,7,24 53:2
  53:5,7 55:23
  57:17 70:19
  73:20 74:21
  75:14 77:11
  83:13 84:4
  89:12,14,20
  92:2,8 95:8,12
  95:17,21 96:12
  96:15 97:3,19
  98:25 99:8,9
  99:14,18
  100:10,12
  103:24 104:8
  104:11 123:18
  132:6,16,24
  137:23 146:8
  146:24 147:14
  147:15 150:1
  151:22,24
  155:15 156:6
  157:11 162:14
  163:8 179:16
  182:15 187:16
  188:20 195:24

  204:20 205:15
  206:21 209:12
  210:13,15
  211:25 213:11
  216:17 219:4
  220:21,25
  221:5 223:24
  226:22 233:24
  233:25 234:4,9
  234:13,18
  236:9 237:23
  239:12,16,20
  244:1,7 259:9
  263:24 265:9
  266:4 267:17
  268:9 269:2
  270:24 271:11
**seed** 167:17
  184:10 219:1,2
  219:5 224:13
  227:5,7 231:14
  235:19 256:12
**seeding** 255:20
  256:14
**seeing** 62:6
  70:21 88:6
**seek** 22:25
  215:18
**seeking** 25:24
  26:15
**seem** 197:18
**seemed** 171:10
  266:8
**seems** 46:25
  171:20 220:10
  230:19,21
  248:13 261:23

**seen** 22:8 53:1
  53:23 54:1
  56:21 88:11,15
  88:20,24 89:24
  90:18 172:12
  173:6 180:15
  204:14 206:23
  238:18,20,21
  267:25
**selected** 62:19
  101:24,25
  215:12 243:1,2
**self** 19:8
**sell** 17:24
  19:11 65:14
  71:4,6 93:7
  100:7 104:7
  119:10,23
  134:2 139:5,5
  198:9 201:14
  230:2 248:11
**seller** 73:1
**sellers** 69:9,11
  69:17 70:4
**selling** 59:13
  62:24 67:25
  74:2 108:14
  198:12 208:23
  211:19 230:13
**sells** 108:19,22
**semantics**
  187:17 253:16
**send** 207:9
  213:24 214:2
**sense** 42:1 49:4
  80:20 152:21
  247:24 265:9

**sent** 7:16
194:23
**sentence** 8:14
163:10,21
220:21,22
221:7 234:14
237:23
**separate** 15:19
22:20 119:13
158:18 213:4
235:17 249:24
**separately**
223:9 224:25
227:18
**september**
13:18,20,24
34:2 131:16
196:3 239:12
239:13,13,15
**series** 37:5
43:2 61:9 72:8
98:2
**serious** 164:9
**service** 187:24
**services** 179:15
**serving** 214:9
**session** 143:1
**set** 13:24 40:22
86:7 166:3
180:1,4 194:19
197:8,10
**sets** 13:3
**setting** 269:16
**settlement** 57:7
57:11 126:20
133:11 136:21
137:18,20

162:1
**settlements**
165:9
**settling** 202:11
**seven** 53:6,6
68:20 109:17
109:22,25
110:19,24
205:7,17,18
**seventeen** 28:5
28:13 143:13
144:10
**seventy** 29:4
**several** 65:5,6
67:11 122:14
130:17 164:14
186:16,17
**severity** 115:2
**shape** 39:1
**shara** 4:6
**share** 156:22
161:7,14
178:13 191:7
**shared** 51:23
157:2 174:5
**shareholder**
63:18
**shares** 221:12
221:20 230:24
**sharon** 5:3
141:10 142:10
**shed** 203:12
**sheet** 30:4
211:12
**sheets** 21:8
**sheik** 140:6,10
140:14 141:5

142:5,20
148:16,17,20
149:10 150:6
150:21,22
151:4,5,11,13
151:18,20,24
152:1,9,13,14
152:19 153:1
153:10,14,15
153:23 154:5
154:12,18,20
154:21 155:7
156:9,14,16,20
157:16,18
**she's** 175:14
**shift** 225:3
247:7
**shifted** 65:5
**shoba** 66:3,5
66:15
**shock** 12:25,25
13:3 18:10
19:3
**shocking** 55:23
**shocks** 16:12
**shoe** 16:21
**short** 18:4,6,21
18:22,23,24,25
19:2,4,7,11,13
19:16,17,19,22
20:1 26:25
37:2 59:19,22
63:24 67:19,25
68:5,6,7 69:6,8
69:11,14,16,25
70:1,4,6,10,12
70:17,19,24

82:25 83:5,17
84:9,13 85:8
86:21 87:25
88:8,13 91:18
91:19 265:3
**shorted** 19:21
69:9
**shorter** 207:21
208:5,14 256:5
**shortfall** 153:6
**shorting** 71:1
**shortly** 58:23
94:13 96:17
269:13
**shorts** 19:12,20
20:2 70:22
**shot** 260:25
**shouldn't**
189:20
**show** 34:24
47:5 74:22
88:13 93:18
97:1,12 108:20
108:21 120:19
120:19 122:18
139:10 155:13
175:3 183:7
209:1 213:24
233:23 243:11
**showed** 96:25
97:12 175:5
249:5
**showing** 48:17
83:3 85:14
92:18 94:16
95:2,13 117:13
123:6

shown 52:23
179:23
shows 73:14
74:7,15 89:11
90:24 94:8,23
95:10 97:20
100:2 101:11
117:15 123:7
123:10 146:1,3
146:22 147:1
147:19 175:9
218:9
side 91:20
101:6 114:17
125:3 134:3
247:19
sides 210:14,16
sight 179:25
180:6 187:23
sign 105:1
signature
13:14 35:16
116:2,3 122:1
122:2 273:7
signed 186:18
191:13
significance
14:17
significant
40:2 62:25
67:2,4 69:8,16
80:19 81:18
82:25 92:23
101:12 104:14
110:17,18
118:24 226:8

significantly
107:1 192:11
242:16,19
257:19
signs 94:17
similar 95:16
98:3 110:19
119:2,24 241:7
241:9 248:2,5
248:6
similarly
226:15
simply 118:11
224:9 227:4
simultaneously
154:14
single 190:15
sir 14:7 26:2
27:14,19,25
29:4,24 30:6
32:3 46:10
51:19 57:3
98:13 127:21
127:24 128:13
129:4,22
130:24 131:1
132:1,2,19
134:25 135:6
136:20,24
137:13 138:3
138:14 140:20
175:2
sit 63:12 64:1
84:2
site 7:15 30:7
30:22 119:12
170:20,20,24

170:25 172:2,3
180:6 187:23
195:7,9 260:1
sites 81:18
187:25
sitting 17:5,13
17:23 41:17
250:21
situation 38:23
65:14 115:2
152:15 194:9
194:10
six 183:2,4,5
251:6,8,12
253:13,14
sixteen 28:4,5
28:13
size 115:7
125:15 151:6,9
151:16 152:2
152:10,12
skinny 206:7
skip 151:4
153:12
skittish 16:20
slack 27:20
slide 117:12
238:13,14,14
slides 116:20
slight 252:23
slightly 144:2
186:12
slowly 75:23
81:3
slug 211:3
small 35:6
61:11 64:2

160:3 163:25
smaller 75:20
76:3,9 156:3
179:8,12,13,14
smallest
245:16
smoothly
25:21
social 19:15
soft 187:2
software
118:22 186:24
sold 73:2
105:23,24
106:12 145:2
147:2 163:9
198:13 231:5
231:22 252:14
solely 220:23
solemnly 10:24
113:12
solicitation
233:10
solution
118:16
solutions
273:20
somebody
45:19 71:2
131:3 154:3
164:15 271:4
somewhat
125:16 226:17
sonya 2:25
273:3,8
sorry 26:21
28:18 29:3

31:19 33:6
36:6 43:9,19
54:15 56:2
59:20 64:6,15
64:19 66:4
68:19 69:13
74:14,20 75:9
75:25 76:21
77:25 78:10
83:11 85:11
89:16 91:10
92:10 93:1
96:4 103:6
105:4 109:9
113:2 137:4
143:6,12
145:15 155:10
157:5,8 160:25
161:22 166:9
170:22 172:13
172:21 174:13
176:18 186:4
189:19 191:1
192:3 193:24
195:8,10
200:21 204:16
206:2 209:21
212:19,24
213:7,8 215:5
220:14 236:18
237:9,20
238:13 239:19
239:20 241:17
243:17 269:1
271:2
**sort** 12:25 13:3
37:2 39:8 40:6

71:3 99:18
120:20 180:17
183:8 188:17
202:22 248:14
**sorts** 211:21
272:7
**sound** 67:13
143:25
**sounding**
153:20 154:9
**sounds** 84:15
154:18 171:16
173:3 205:6
227:23 253:2
**source** 90:24
**sources** 259:24
**south** 226:13
**southern** 1:2
**sp** 4:11,12
**space** 114:15
188:12 220:16
**spc** 4:11,12
**speak** 23:2
80:22 88:3
104:20 178:1
178:20,23
182:3 187:12
187:21 189:17
190:23 213:3
230:20
**speaking** 18:7
42:3 80:19
91:21 103:19
144:7,8 196:24
198:24 239:1
**speaks** 95:5

**specializes**
80:16
**specialties**
11:18
**specific** 44:21
44:24 45:4
84:9 98:19
151:21 159:12
210:1
**specifically**
61:25 115:14
115:16 118:18
119:9 176:17
176:19 184:9
186:17 187:3
**specifics** 80:22
192:21,23
196:16
**speculate**
55:14
**speculation**
38:19 246:11
**speed** 195:15
266:13
**spend** 260:4
**spike** 98:25
**spikes** 99:4
**spiral** 23:7
**spoke** 180:14
238:25
**spoken** 245:23
**spot** 100:17,23
101:1,3
**spotted** 91:6
**spread** 99:24
100:4 102:18
102:19 103:13

**spreads** 100:10
102:16,25
103:12
**spreadsheet**
28:25
**spreadsheets**
149:19
**spring** 65:1,2
**squeeze** 18:7
18:21,22,23
19:2,13,16,18
19:22 20:2
59:19,22 69:6
69:14,25 70:1
70:6,10
**squeezed** 20:2
**squeezing**
70:22
**stabilizes** 25:1
**stack** 175:14
**staff** 155:17
225:23
**stake** 250:14
250:22
**stakehound**
226:16
**staking** 179:15
**stamp** 24:12,16
88:5
**stand** 112:24
113:8
**standalone**
179:21 208:20
212:9 224:17
224:19 225:23
227:4 236:10

**standard**
177:14,17,19
177:22,23
**standards**
177:25 189:13
**standing**
173:12
**start** 92:18
95:18 97:1
157:25 161:10
187:19 220:22
248:9 252:2,3
264:4 269:2,3
271:9
**started** 15:4
24:1 94:13
**starting** 92:19
94:10 118:5
226:14 268:22
**starts** 12:24
19:2 35:10
99:19 252:4
**state** 97:22
246:25 247:10
258:16
**stated** 14:4
59:9 61:5
92:22 95:20,25
161:19 188:17
**statement** 10:4
40:17 91:1
111:19 117:3
118:19 129:22
129:25 130:20
131:5,16 168:5
172:11,18,22
173:1,10,11

199:3 207:13
208:13 213:12
213:13,17,21
219:24 232:12
232:14 233:8
233:20 249:4
**statements**
60:23 130:19
203:7
**states** 1:1,12
4:1 7:12
126:11
**stating** 163:2
**status** 158:18
159:24
**statutory**
211:20
**stay** 161:15
246:3
**step** 270:15
**steps** 179:22
**stock** 38:15
55:22 62:15
69:18 70:2
221:15,20
223:21 228:22
230:1,2,3,5,7
231:2,4,10,18
231:21,22
232:8,9 234:7
234:8,16,24,25
235:3 236:17
242:9,10
244:10,17,17
244:22,24
245:4,9 246:5
246:9

**stood** 179:17
**stop** 83:10 93:6
98:11 140:7,18
164:8 175:19
**stops** 9:11
**stout** 149:24
167:17 178:20
181:21 182:1,5
182:23,23
224:8,12 226:4
226:10,23
227:1 247:4
**straightforw...**
89:2
**strategies**
250:17
**strategy** 104:3
**straws** 39:9
**street** 4:3,20
12:13
**strictly** 108:22
**strings** 146:3
**strongly** 37:21
**structure**
44:11 62:4
63:8 191:10
**structured**
12:15
**study** 44:10
**sub** 82:23
**subject** 22:24
122:10 170:6
187:14 200:19
200:24 201:1
201:25
**submit** 54:4
258:22 259:2,4

260:11 261:4
261:16 264:21
264:25 267:5
272:5
**submitted**
60:19 115:21
116:5 166:3,7
177:13 233:15
262:11 271:4,7
271:13
**submitting**
262:4 269:7,15
**subordinate**
162:22
**subordination**
165:1
**subpoena** 72:6
85:15 88:1
89:1
**subpoenaed**
84:13 90:3
203:9
**substance**
36:12
**substantial**
67:12 104:19
**substantially**
40:21 77:21
100:12
**substantive**
182:1
**subtitle** 234:4
**success** 194:20
**suddenly** 14:23
14:25
**sufficient**
197:18 203:11

| | | | |
|---|---|---|---|
| **sufficiently** | 123:25 | 76:17 80:22 | 49:9 52:15,21 |
| 153:5 | **supplied** | 81:16 82:10 | 53:11,16 54:21 |
| **suffix** 29:25 | 182:23 185:10 | 93:17 99:5 | 57:1 59:7,16 |
| **suggest** 59:4 | **supply** 13:1 | 114:14 118:10 | 60:4 61:3 |
| **suggested** | 14:24 15:3 | 119:19 123:7 | 65:19 67:16,22 |
| 198:9 | 16:23 17:3,8 | 131:4 147:5 | 68:9 72:2 73:5 |
| **suggesting** | 17:15 18:1,2,8 | 150:21 154:22 | 74:4 87:6 89:5 |
| 215:15 253:21 | 77:9,20 | 156:14 158:22 | 89:24 93:11 |
| 253:23,24 | **supplying** | 160:17 162:4 | 97:9,15 98:6 |
| **suggestion** | 186:24 | 165:4 166:24 | 101:9 126:8 |
| 26:25 225:6 | **support** 18:12 | 174:25 175:20 | 127:3,11 |
| **suisse** 12:13 | 188:4 265:12 | 177:14 180:3 | 128:24 133:5 |
| 80:12 | 271:16 | 180:10 181:14 | 133:21 134:14 |
| **suite** 4:3 | **supported** | 182:18,21 | 134:18,23 |
| 273:22 | 223:19 | 186:5 189:14 | 135:3 136:1,6 |
| **sullivan** 4:10 | **supporters** | 202:14 204:21 | 139:15,20,24 |
| **sum** 75:15 | 264:21 | 207:24 214:25 | 148:1,7 151:3 |
| 227:2,16 | **supporting** | 215:22,25 | 153:9 158:22 |
| 228:13 250:11 | 189:9 205:24 | 217:14,25 | 162:25 163:6 |
| **summarize** | **supports** 20:4 | 218:2 222:20 | 178:10 190:6 |
| 13:23 115:3 | **supposed** | 230:19 233:22 | 199:25 202:2,7 |
| 186:4 | 93:18 125:4 | 235:16 249:3 | 205:12 233:13 |
| **summarized** | 209:18 221:19 | 254:6 259:6 | 237:13 240:2 |
| 120:7 | 221:20 224:2 | 262:25 265:5 | 240:11 246:12 |
| **summary** | 264:5 | 266:14 267:18 | **sustaining** |
| 103:10 114:12 | **sure** 7:21 8:1 | 267:21 268:16 | 90:20 156:15 |
| 117:14 118:2 | 12:3,12,24 | 268:25 | **swaps** 81:9 |
| **summer** 65:1 | 13:8 14:2,21 | **surprise** 55:11 | **swear** 10:24 |
| **sums** 167:19 | 15:14 17:19 | 242:16,19,22 | 113:12 |
| 249:21 | 18:23 22:17 | **surprised** | **swing** 255:8 |
| **supplement** | 23:4 24:25 | 154:13 | **swirling** 15:4 |
| 92:7 199:2,3 | 27:18 33:5 | **surprising** | **switch** 178:12 |
| **supplemental** | 34:23 50:3 | 82:2 | **sworn** 113:10 |
| 50:2 60:24 | 51:21 58:1 | **sustain** 246:1 | **system** 16:13 |
| 66:20 82:14,17 | 60:22 63:8 | **sustained** 43:7 | **systems** 149:19 |
| 92:4 121:20 | 67:3 68:15 | 44:17 45:3 | |
| 122:10,11 | 69:23 75:25 | 47:9 48:14,19 | |

| t | | | |
|---|---|---|---|
| **t** 273:1,1 | 269:22,24 | **team** 72:5 | 218:14 231:6 |
| **t.j.** 3:20 24:10 | **taken** 41:15 | 109:16 117:5 | 257:24 |
| 258:10 260:20 | 99:12 156:2 | 119:20 155:17 | **testified** 18:15 |
| 269:20 | **takes** 212:13 | 180:15 | 22:10,15 |
| **tab** 13:7 23:7 | 250:16 253:11 | **technical** 44:19 | 110:22 128:25 |
| 24:23 25:10 | **talk** 79:18 | 44:22,25 45:1 | 168:14 219:16 |
| 28:1 30:6 35:6 | 91:24 119:7 | 45:7,9 94:12 | 220:9 221:25 |
| 92:10 115:24 | 194:11 234:23 | **telephone** 9:7 | 222:3 245:18 |
| 116:23 121:16 | 259:2 | 9:16 | **testifies** 7:19 |
| 174:9,10 | **talked** 119:6 | **tell** 53:3 64:7 | **testify** 68:13 |
| **table** 88:20,21 | 227:3 254:16 | 69:10 70:4 | 107:22 |
| 88:22 96:5,24 | 254:19 | 104:23 105:7 | **testifying** 8:6 |
| 97:19 108:2 | **talking** 15:15 | 107:14 147:3 | 96:3 136:6 |
| 109:8,16 | 15:16 27:12 | **telling** 251:1 | **testimony** |
| 118:14 130:2 | 63:7 70:9,10 | **ten** 27:3 71:16 | 10:24 20:7 |
| 130:25 132:5,6 | 82:14 90:11 | 87:20 111:20 | 40:22,24 49:18 |
| 132:7,25 133:8 | 185:9 206:3 | 136:17 142:17 | 49:20,23,25 |
| 133:9 199:11 | 213:17 226:25 | 168:3 | 50:1 60:7 78:6 |
| 244:1,3 | 226:25 249:24 | **term** 71:23 | 78:12,19 79:20 |
| **tactfully** 190:8 | 249:25 265:13 | 78:19 183:15 | 86:1 112:19 |
| **tail** 251:8 | 268:9 | 211:12 | 113:13 116:7 |
| **take** 22:4,16 | **tally** 109:20,25 | **terminology** | 116:19,20 |
| 25:17 39:1 | 110:22 | 195:21 | 118:6,11 122:4 |
| 67:19 76:7 | **target** 194:12 | **terms** 105:10 | 124:2 125:1 |
| 79:11 111:20 | 195:22,24,25 | 106:7 186:18 | 128:16 138:25 |
| 115:24 139:4 | 196:3,7,11,14 | 218:18 227:1 | 151:2 153:8 |
| 140:5 184:1 | 196:20,21,25 | 245:22 255:17 | 157:3 180:24 |
| 193:11 211:5 | 197:19 | 258:7 | 198:25 235:4 |
| 212:14 218:5 | **targets** 194:6,8 | **test** 115:16 | 251:17 252:16 |
| 218:17 230:11 | 194:10,11,15 | 121:7 123:20 | 252:24 262:4 |
| 237:6 239:12 | 197:10 | 124:7,20 125:6 | 266:11 269:15 |
| 247:11,15 | **tasked** 115:16 | 126:10,11 | **tests** 127:14 |
| 248:19 252:1,7 | **taught** 12:6 | 130:7 139:7 | 185:17 |
| 258:19,25 | **tax** 200:3,7,14 | 174:4,14,15 | **texas** 119:12 |
| 259:5,12,24 | 201:3 | 176:14 191:20 | 265:23 |
| 264:22 265:8 | **taxes** 200:9 | 192:2,9,17 | **text** 146:3 |
| | | 197:16 217:4,7 | |

| | | | |
|---|---|---|---|
| **thank** 7:23 | 190:13 191:18 | 176:12 181:23 | 266:13,24 |
| 10:13 11:6,6 | 193:6,10 | 183:8,24 185:1 | 272:7 |
| 25:19 27:4,10 | 197:23,24 | 185:4,16 | **think** 8:13 |
| 34:17,18 42:5 | 198:1,20 | 186:14 187:5 | 17:21 22:9 |
| 42:7,13 46:1 | 203:16,17 | 189:18 191:3 | 24:9 27:1 |
| 51:8,12,14,24 | 217:24 256:16 | 191:25 194:21 | 37:12 38:11,12 |
| 53:3 55:1,17 | 258:1,15 | 195:4 199:3,13 | 38:20 39:20,22 |
| 55:25 58:3 | 261:20 269:4 | 203:16 205:22 | 39:25 40:7,11 |
| 60:7,9,10,14 | 269:19 270:1,2 | 206:13,17,17 | 45:20 46:3,20 |
| 70:24 72:21 | 270:22,23 | 208:7 | 54:24 64:4 |
| 79:8 87:13,13 | 271:24,25 | **thereabouts** | 68:22 70:8 |
| 87:14 91:3,3 | 272:12,13,14 | 53:14 | 85:25 97:13 |
| 98:20 100:1,13 | **thanks** 113:23 | **thereunder** | 107:18 125:2,2 |
| 106:2 111:4,15 | 184:18 216:22 | 220:25 | 130:12,15 |
| 111:15,17 | **that'd** 97:5 | **there's** 177:10 | 131:14,18 |
| 112:13,18,20 | 124:16 | 179:22 187:17 | 136:15 138:24 |
| 113:4,9,16,22 | **that's** 99:9 | 192:8 195:24 | 142:10 143:12 |
| 113:24 114:5 | 100:1,5 101:15 | 197:8,15 | 144:9 154:6,18 |
| 116:13,18 | 108:9,15 109:3 | **they're** 177:11 | 155:3,5,12,19 |
| 117:11 122:9 | 109:16 111:15 | 179:15 180:16 | 157:1,11 160:8 |
| 123:3 124:9 | 112:13 116:2,3 | 186:11 206:3 | 160:23 169:10 |
| 125:18,19 | 116:10 117:21 | **they've** 180:15 | 170:9 172:4 |
| 130:11 131:22 | 123:19 125:2 | **thing** 122:24 | 177:10 178:21 |
| 138:19 141:11 | 127:19 129:21 | 175:3 209:5 | 185:1,19 |
| 141:22 144:9 | 130:15 131:16 | 222:24 230:22 | 186:11 187:13 |
| 148:17,21 | 133:12,12 | 271:7 | 188:17 190:23 |
| 153:14 157:16 | 141:20 148:24 | **things** 15:16 | 191:3,9 195:11 |
| 157:17 160:14 | 151:22 155:3 | 55:22 70:8 | 196:11 197:15 |
| 161:4 164:18 | 155:21 156:17 | 118:14,20,23 | 198:11,11,13 |
| 165:4,17,18,20 | 159:15 160:8 | 118:25 159:3 | 199:23 204:22 |
| 165:23 172:10 | 161:21 163:12 | 166:4 181:3 | 206:3,8,9,23 |
| 173:23,25 | 164:5,15 | 194:13 195:2 | 208:16 210:6 |
| 174:1,11,20 | 167:12 169:20 | 196:19 201:5 | 218:1 219:9 |
| 175:18,24 | 170:3,22,22 | 209:3 211:19 | 225:6 226:2 |
| 176:1,3 184:20 | 173:18 174:9 | 237:24 249:24 | 233:9 234:16 |
| 185:5 187:7,22 | 174:19 175:1,9 | 250:7 251:21 | 240:13 241:7 |
| 188:14,24 | 175:23,23 | 252:18 265:13 | 241:13 243:18 |

| | | | |
|---|---|---|---|
| 247:21 250:16 | 253:18 255:5 | 250:15 251:9 | **today's** 209:11 |
| 251:20 252:15 | **threshold** | 253:2 259:4 | 253:8 |
| 253:13,16 | 195:22,25 | 264:10,23 | **today's** 206:21 |
| 254:12 258:14 | **thumb** 95:4 | 265:21 267:24 | **together** 25:18 |
| 259:13 260:25 | **tick** 24:19 | 267:24 268:11 | 182:25 225:16 |
| 262:12,17,24 | **tie** 26:24 | 269:1,17 | 225:24 227:6 |
| 264:5 265:1,9 | **till** 264:8 | **timeframe** | 227:21 231:16 |
| 265:18 266:1 | **time** 9:8,11,19 | 64:9 170:18 | 235:25 236:8 |
| 267:7,19 271:2 | 14:21 15:10 | 207:21 208:5 | 236:20 244:18 |
| 271:12 | 16:14 17:11 | 208:14 | **token** 8:9,20,25 |
| **thinking** 262:9 | 19:3,16 20:9 | **timeline** 92:24 | 8:25 9:2,20 |
| **third** 19:9 | 22:4 35:21 | 95:15 256:5 | 14:1,3,8,12,18 |
| 100:2 176:25 | 38:2,18 39:19 | **timely** 271:17 | 14:22,24 15:6 |
| 177:6,11 | 39:21,22 40:1 | 271:21 | 16:10,14,24 |
| 180:11 181:19 | 40:2,7,10,11 | **times** 8:19 9:17 | 17:15 18:12,16 |
| 182:6 184:25 | 40:19,20 55:14 | 65:6 67:11 | 18:17 20:1 |
| 197:15 237:23 | 58:20 61:8 | 189:7 | 30:20,24 36:9 |
| 238:14 245:19 | 63:25 64:21 | **timing** 171:14 | 36:20 37:8,20 |
| 245:20 | 65:4 66:24 | 171:16 249:5 | 37:20 38:2,24 |
| **thirteen** 102:4 | 75:23 76:12 | 262:10 | 39:4,5,14,19 |
| **thought** 75:1 | 79:2,8 88:5,6 | **titled** 25:1 | 41:10,11,11,13 |
| 169:7 222:22 | 91:10 92:5 | 72:11 130:18 | 41:21,25 42:4 |
| 247:24 248:15 | 93:19 94:8 | 132:6 234:6 | 43:4,10,14,22 |
| **thousand** 53:6 | 97:6 98:2,17 | **today** 20:6 | 43:25 52:12 |
| **three** 17:4 | 99:15,21 | 40:25 54:12,23 | 54:8,12,14,16 |
| 95:12 101:20 | 101:21 110:14 | 60:8 61:5 | 54:19 55:2,5 |
| 101:24 102:1 | 112:11 122:7 | 67:14 112:22 | 55:11 56:24 |
| 105:25 106:1 | 124:10 140:18 | 115:12 116:8 | 57:7,10,11,20 |
| 106:13,20,21 | 143:13 144:10 | 116:11,19 | 58:4,6,7,17,19 |
| 119:24 120:23 | 157:17 174:6 | 120:4 122:4,14 | 58:25 59:12 |
| 132:14 137:19 | 187:11 194:4 | 125:1 129:10 | 67:19 68:6 |
| 174:16 184:2 | 196:6,9 207:25 | 138:25 164:12 | 69:8,16 73:15 |
| 187:2 191:19 | 211:5,9 212:2 | 165:22 171:22 | 73:25 75:21 |
| 210:14 218:9 | 222:9 241:19 | 194:23 203:13 | 76:4,9,19,23 |
| 218:13 232:11 | 247:21,23 | 209:12,16 | 77:2,7,9,18,20 |
| 232:14 238:13 | 248:1,15,19 | 214:3 249:10 | 78:7,13 79:4 |
| 245:16 253:15 | 249:8 250:1,6 | 250:2,8 | 81:18,23 98:2 |

98:17 99:22
100:16 101:7
104:7,8,9,16
104:19,20
105:10 106:11
111:12 112:4
122:13,13,17
123:7,11,13
124:4,8 126:19
128:7,17,20
132:21 133:10
133:11,18,23
135:7 136:10
136:21 137:17
137:20 138:5,6
138:7,7,8
139:2,5,13,17
139:18,22
144:13,22,25
145:2,9,12
147:20 148:3
174:24 201:25
202:5,10,17
203:24
**tokens** 15:1
17:8,23 38:25
41:9 42:2
52:18 57:13
66:25 67:1
73:1,2 74:2,17
77:8,19 78:8
78:14 98:3,9,9
134:2 139:2,4
147:2 198:6,10
198:13,14
199:19 201:13

**told** 8:9,16
265:15
**tomorrow**
249:10 250:3,9
261:2,25
268:13,21,23
269:3,3 270:24
**took** 87:24
89:17 93:22
172:4 180:12
219:17 225:22
227:4 252:25
253:10
**top** 26:4 35:13
47:11,17 52:7
54:18 73:9,10
74:18 76:25
77:4 92:11
95:8,10 104:8
146:12,13
172:25 181:7
181:21 206:7
243:15,19
**topic** 145:13
203:4
**torres** 270:18
**total** 77:8,19
104:25 105:23
106:4,12 171:6
189:2 222:7
228:10 229:18
229:19 236:19
244:12 246:17
247:2 250:11
254:17,21
**totally** 168:17

**towards** 91:19
**trace** 11:20
**tradable** 70:2
**trade** 38:15
104:9 159:14
160:1 235:3
236:17,22
**tradeable**
69:19
**traded** 12:14
16:24 17:15
54:12 97:24
101:6 200:12
231:22 234:18
235:1
**trader** 12:12
**trades** 28:21
29:13
**trading** 9:2
12:8,17,18,20
15:17,18 16:5
37:15 38:2
57:20 67:24
71:25 80:11,13
81:22 98:25
99:1,4,16,17
99:22 100:16
100:20,21
101:1,23
104:11,15,19
104:20 128:14
148:3 234:6,7
234:15
**traditional**
37:4,10 58:1,5
58:9 76:17

**trajectory** 13:4
**transaction**
27:23 117:21
119:3 183:21
212:12
**transactions**
29:25 34:2
41:23 72:13
104:25 106:5
106:25 144:25
180:22 199:9
223:20
**transcribed**
2:25
**transcript** 7:11
7:14 263:9,10
263:11,18
273:4
**transcripts**
263:12,15
264:1,14,16
**transfer** 46:12
46:19,24,25,25
47:6,18 48:5,6
225:2
**treasuries**
58:10
**treasury** 17:5,9
145:2
**treat** 272:9
**treated** 159:10
271:17 272:9
**treatment**
138:9
**treatments**
88:3

| | | | |
|---|---|---|---|
| **trial**  261:24 | 51:1 53:18 | 117:20 118:5 | **typo**  234:16 |
| 262:10,14 | 70:20 81:19 | 119:6,24 123:8 | **u** |
| 264:4,8,9 | 152:21 153:10 | 123:13,19 | **u.s.**  1:23 4:2 |
| 265:21 | 160:21 173:18 | 140:19 148:14 | 186:6,16,16 |
| **tried**  164:13 | 179:7,7,18 | 184:8 187:7 | 200:20,24 |
| 194:15 | 182:16 190:7 | 190:25 191:6 | 205:10 210:17 |
| **tries**  183:13 | 190:13 208:24 | 192:25 208:18 | 225:20 265:18 |
| **triggers**  69:7 | 251:20 268:6 | 210:16 212:2 | 265:19 267:10 |
| 69:15 70:1 | **tuganov**  4:19 | 217:12 219:24 | 267:16,23 |
| **trouble**  81:4 | 164:22 | 226:2,3,5 | **ubierna**  5:4 |
| **true**  9:4 76:15 | **turn**  13:13 | 233:4,7 235:13 | 141:12,12 |
| 116:4 151:16 | 23:6,10 27:16 | 238:14,14 | 142:2,2,4,6,21 |
| 163:13,21 | 27:25 29:1,21 | 239:23 244:13 | 193:15,17,18 |
| 217:3 239:9 | 30:17 31:7,25 | 245:19,20 | 195:14 197:23 |
| 242:23 256:6 | 32:15 33:23 | 248:11 249:17 | 197:24 |
| 273:4 | 35:15 68:17,17 | 249:24 251:21 | **ucc**  6:8,9,10,11 |
| **trust**  182:13 | 72:10 73:7 | 253:14,15,15 | 6:12,13,14,15 |
| 184:9 255:23 | 116:23 117:7 | 253:18 255:24 | 6:16,17,18,19 |
| 256:1,12 | 121:15,24 | 256:8,9 260:1 | 6:20 7:10 9:22 |
| **trustee**  4:2 | 124:24 130:9,9 | 260:13 270:15 | 9:24 10:11,12 |
| 154:2 170:16 | 130:14 145:14 | **type**  100:18 | 13:9 20:10,17 |
| 170:19 184:3 | 147:11 186:25 | 115:3 119:20 | 21:22 25:10,12 |
| 205:10 207:20 | 187:1 199:13 | 153:18 159:13 | 25:14 26:23 |
| 208:4,14 209:2 | 220:12,17 | 179:10,23 | 29:1,13,16,19 |
| 209:2,8 211:23 | 237:18 238:7 | 180:17,17 | 30:6,15,22,24 |
| 211:24 253:21 | 238:10 240:19 | 220:5 230:21 | 31:2,5,13,14 |
| 256:4 265:18 | **turned**  154:4 | 248:17 | 31:19,23 32:7 |
| 265:20 267:10 | **turning**  115:12 | **typed**  236:4 | 32:11,13,22 |
| 267:17,23 | 130:12 | **types**  11:22 | 33:1,4,8,14,18 |
| **truth**  10:25 | **tweeted**  67:11 | 132:7 228:21 | 33:21 34:2,8 |
| 113:14 | **twenty**  199:11 | 229:7,21 | 34:12,15,25 |
| **try**  151:25 | **two**  13:20 | **typical**  70:6 | 35:6 40:23 |
| 153:12 158:23 | 15:16 32:18 | 176:14 194:9 | 41:3,6 61:17 |
| 222:16 250:23 | 36:24 61:24 | 194:10 | 131:10 |
| 251:10 271:11 | 62:4,12 93:22 | **typically**  71:1 | **ucc's**  24:12 |
| **trying**  24:6 | 94:16 97:5 | 99:16 100:10 | **ucc's**  186:9 |
| 26:12,24 47:16 | 109:4 117:16 | 263:22 | |

| | | | |
|---|---|---|---|
| **ultimately** | 135:12 136:7 | **understand** | 264:12 266:7 |
| 228:2 | 136:11 137:17 | 11:17,25 20:5 | 268:5 |
| **un** 128:20 | 137:20 139:10 | 21:5 25:25 | **undisclosed** |
| **unable** 47:5 | 139:11,13,17 | 26:1 29:12 | 60:20 |
| 102:18 103:8 | 139:18,22 | 40:22 41:10 | **undoubtedly** |
| 134:2 208:22 | 143:1 157:4,9 | 53:17 66:13 | 18:9 |
| **unavailability** | 169:16 170:15 | 77:25 81:2,20 | **undue** 60:20 |
| 10:8 | 177:15,18 | 82:23 93:4 | **unit** 180:6 |
| **unavailable** | 183:1 184:10 | 95:22,24 96:5 | **united** 1:1,12 |
| 10:4 | 192:5 193:16 | 103:6 107:16 | 4:1 7:11 |
| **uncertainties** | 198:17 208:3 | 108:7 110:9 | **units** 106:5,7 |
| 240:18 | 208:18 210:25 | 112:5 131:23 | 106:12 119:13 |
| **uncertainty** | 212:4,8 217:7 | 134:7 150:23 | 120:3 |
| 268:7 | 217:9 221:21 | 151:11,18 | **university** 12:5 |
| **unchanged** | 223:18,20 | 152:5,16,18 | 12:7 |
| 249:17 | 224:24 225:19 | 157:25 159:16 | **unknown** |
| **unclaimed** | 231:1 234:24 | 160:1 162:17 | 38:18 111:19 |
| 183:7 | 239:15,22 | 181:14 182:16 | 113:1,5,25 |
| **uncomfortable** | 242:2,13,14 | 190:14 201:10 | 114:2 130:12 |
| 266:17 | 252:9 255:8,19 | 202:21 204:21 | 140:17 154:15 |
| **under** 7:19 | 256:3 257:12 | 211:20 213:9 | **unlocked** 41:20 |
| 9:20 10:5 16:5 | 257:13,14,23 | 255:13 262:9 | **unmasked** 34:2 |
| 20:7 27:9 37:1 | 266:12 | 267:15 | **unsecured** 3:5 |
| 40:24 52:12,18 | **undercut** 22:9 | **understanding** | 7:7 159:13 |
| 52:23 53:4,4 | **underlies** | 35:25 56:13 | 160:1 197:9 |
| 80:1 82:22 | 206:11 | 80:25 81:4,6 | 204:13,14,18 |
| 101:23 114:2 | **underlying** | 81:13 88:4 | 204:20,25 |
| 116:8 117:15 | 13:4 79:5 | 112:10 125:1 | 205:5,7,8,9 |
| 118:13 120:23 | 84:25 85:4 | 126:9 151:10 | 248:8 259:18 |
| 122:3 123:8,8 | 86:5,6,25 | 155:1 189:21 | **unstable** |
| 123:9,11,21,22 | 100:23 101:3 | 202:25 208:1 | 105:13,13 |
| 123:23,24 | 119:15,17 | 221:18,22 | **unusual** 91:6 |
| 124:25 126:12 | 185:9 187:13 | 231:20 | 91:18,22 194:9 |
| 126:13,14,14 | 188:2 189:10 | **understood** | 247:23 |
| 126:15 127:25 | 190:2 208:25 | 8:23 65:21 | **update** 270:11 |
| 129:19 133:23 | 240:14,22 | 207:24 225:9 | **updated** |
| 134:6 135:10 | 247:14 | 259:11 262:21 | 232:18,19 |

| | | | |
|---|---|---|---|
| **upfront** 187:16 | **using** 37:2 73:8 | 220:3,3,5,7,8 | 120:17,25 |
| 249:22 | 143:19,20,23 | 220:11,22 | 123:7,12,16,21 |
| **upper** 40:1,2,6 | 143:23 189:19 | 221:19 222:4 | 124:6 125:2,10 |
| 40:8,18,20 | 201:20 216:3,4 | 222:10,11 | 127:9,14 128:9 |
| **upward** 19:3 | 217:16 | 224:7,11,12,13 | 128:11,17,17 |
| 250:6 | **usually** 12:24 | 227:23,25 | 131:10 133:15 |
| **urquhart** 4:10 | 19:2 71:4 93:5 | 228:16 237:5 | 133:18,22 |
| **usage** 118:23 | 93:8 99:18 | 237:24 238:4 | 134:2 136:8 |
| 186:25 | 101:2 263:8,8 | 245:3 247:3,4 | 139:6,12 146:1 |
| **usb** 28:3 | 263:16 266:20 | **valuations** | 146:22 148:22 |
| **usd** 4:12 | **utility** 37:20 | 150:18 171:21 | 149:13,21 |
| **use** 24:19 | 38:25 39:3 | 178:1,1 181:17 | 150:24,25 |
| 78:19 90:18 | 41:9,10,11,21 | 182:7 190:18 | 151:16 153:2 |
| 103:16,16 | 41:25 42:1,4 | 190:20 219:3 | 167:8,11 171:1 |
| 160:7 169:6 | 67:8 | 235:2,3,4 | 171:1,7 172:2 |
| 170:16 190:24 | **utilized** 185:11 | **value** 13:5 | 172:6 177:1 |
| 191:18 199:2 | | 14:17,20 15:7 | 179:18 181:2 |
| 202:16 206:15 | **v** | 15:11,18,19,20 | 181:22 183:13 |
| 206:22 207:1 | **v** 7:12 63:16 | 15:24 16:2,3,8 | 188:12 189:2 |
| 214:3 233:24 | **valid** 158:17 | 16:10 18:17 | 192:6,11,16 |
| 242:22 262:6 | 159:1 181:6 | 20:1 35:23 | 198:14,17 |
| 265:4,21 | **validity** 14:15 | 36:3,8,11,15 | 199:18 201:14 |
| 268:10 | **valuable** | 36:20,23,25 | 202:4,22 |
| **used** 39:2 | 118:16 186:24 | 37:7,11,13,14 | 218:17,18 |
| 41:14 103:21 | **valuation** | 37:18,23 38:1 | 220:3 221:4,8 |
| 119:23 122:24 | 37:10 39:19 | 38:9,12,18 | 221:19 222:7 |
| 161:18 162:8 | 124:4 150:11 | 39:14,18,24 | 222:15,17 |
| 166:14 168:15 | 167:12,15,16 | 40:9,19,21 | 223:22,24 |
| 171:25,25 | 167:19 172:1 | 41:25 43:14,25 | 224:3,3,23 |
| 185:13 189:16 | 177:1,6,7,20 | 56:14 59:4,5 | 225:1,11,12,14 |
| 190:15 195:1 | 178:21,25 | 66:25 67:2,4,5 | 225:25 227:4 |
| 217:17 241:16 | 180:7,11 | 67:12 68:1 | 227:10 228:2 |
| 254:10,13 | 181:23 182:1,6 | 79:5 96:10 | 228:10,10,13 |
| **users** 105:3 | 185:10,13,20 | 97:6,6 109:1 | 228:18,22 |
| 106:10 108:8 | 186:8 188:5,6 | 111:13 117:15 | 229:6,12,18,19 |
| **uses** 37:19 | 188:9,10,13,20 | 118:12,12,13 | 230:5,16,17 |
| | 189:15,20 | 119:4,25 | 231:4,25 232:1 |
| | 219:18,21 | | |

234:25 237:9
240:20,21,22
240:25,25
244:16 245:2
246:6,9,16,17
247:2,2,13
248:16 249:8
249:15,16,25
250:1,4,7,17
250:20 253:12
253:20,22
254:18,21
257:2
**valued**   126:25
128:7 138:6,25
149:24 150:3
152:20 176:25
177:2 180:16
182:23 190:22
218:22 224:8
224:24,25
227:17,18
231:13 236:1
249:13
**values**   88:8,21
88:25 120:20
126:25 150:17
174:25 192:5
192:15 207:21
221:3 245:16
250:14 254:20
**valuing**   37:3,5
42:4 227:10
246:14
**varick**   4:3
**variety**   11:16
12:14 177:5

180:12 248:18
**various**   41:21
80:23 132:15
239:2 254:16
**vast**   182:4,6
**vehicle**   179:8
**venable**   4:18
**venue**   100:21
**venues**   15:18
**verification**
185:22
**verify**   102:18
103:8,14 177:9
185:22 189:10
**verifying**
155:23
**veritext**   273:20
**versa**   241:5
**version**   131:4
131:15 213:16
213:21,24
232:13 233:10
238:21
**versions**   233:4
233:7 238:20
**versus**   72:12
100:6 126:3
180:8 189:12
241:6 243:7
257:18
**vertical**   96:14
**vet**   177:8
**vetted**   197:6
**vetting**   176:15
**vgx**   98:3
**vice**   241:5

**victor**   4:16 5:4
141:12 142:2
142:15 215:3
269:5
**video**   260:2
**videos**   260:5
**view**   38:8
39:17 57:21
104:1 145:13
159:25 219:18
237:4 241:9
244:16 253:11
257:2
**viewed**   252:21
**violate**   201:24
**virtually**
249:17
**visible**   15:7
**vladimir**   63:13
63:18 64:21
65:15
**voice**   27:7
79:24 190:8
**volatile**   57:25
58:4,6,7,8,16
58:17,19,22
76:16 234:8
**volatility**   15:8
58:24 76:12
93:21,23 94:6
94:8 95:2,11
95:13 96:16,18
99:8,12 103:17
103:22
**volume**   76:19
76:23 77:2,4
98:25 99:1,4

99:16,17,20,22
99:22 100:16
100:17,18,20
100:21,23
101:1,3,11,16
101:17 104:20
104:20 130:9
130:13 148:3
**volumes**   101:2
101:5,6 104:14
**voluntarily**
246:5
**vote**   208:17,19
208:19 242:24
246:15,18,19
247:1 271:6
**voted**   215:12
**votes**   242:13
**voting**   242:6
**vtc**   105:14

**w**

**wait**   8:4,4 23:3
50:23 87:11
130:5 146:15
213:11 264:8,9
268:18
**waiting**   250:22
**walk**   26:24
182:15
**wall**   12:12
**wallet**   44:11
47:2,4,5 48:9
48:16 49:12
**wallets**   32:6
44:20,23 45:1
45:8 245:23

| | | | |
|---|---|---|---|
| **wallets.csv** 32:4 | **wasn't** 170:6 181:6 | **weedman** 3:11 10:14,16,18,18 | **week** 94:16 118:7 122:12 |
| **want** 21:5,20 22:23 36:2 42:2 56:11 65:19 68:13 83:13 88:15 118:4 129:24 138:12,12 141:3 147:3 151:21 155:13 156:11,12 162:2,4 166:9 166:23,24 168:22 174:25 175:19 181:13 181:23 203:23 205:14 206:22 209:22,23 210:2,2 214:3 217:22 232:18 237:3 238:8 253:22 256:1 260:4,6,18 263:20,24 266:15 268:25 269:10 270:6 | **watch** 102:3 260:6 | 11:2,5,8 15:22 20:9,18,21,24 | 261:24 262:1 263:5,13,23 |
| | **watching** 260:5 | 21:2,18 22:12 | 265:2,4,7,23 |
| | **waterfall** 117:14 166:2 | 22:17,21 23:5 | 269:24 |
| | 166:14 168:16 | 23:23 24:3,22 | **weekly** 32:20 |
| | 169:1,2,13,19 | 25:11,15,19 | 33:11 197:6 |
| | 175:18,22 | 26:1,5,8,13,18 | **weeks** 197:9 |
| | 176:14 178:15 | 26:20 27:4,9 | **weighted** |
| | **way** 15:25 | 27:10,11 28:11 | 172:11,18 |
| | 16:10 35:23 | 28:16 29:4,8 | 173:2 242:17 |
| | 41:24 94:4 | 29:11,16,20 | 242:20 244:22 |
| | 146:5 187:20 | 30:12,16 31:2 | 245:7 |
| | 191:25 192:10 | 31:6,18,24 | **welcome** 139:2 |
| | 194:3 222:16 | 32:11,14 33:1 | **went** 14:2 |
| | 242:24,25 | 33:4,9,18,22 | 87:25 96:16 |
| | 243:5 245:14 | 34:12,16,18,21 | 97:4 99:20 |
| | 246:24 247:1 | 35:2,4 36:16 | 154:1 164:14 |
| | 249:23 253:12 | 39:12 41:2,7 | 218:8 242:13 |
| | 253:20 255:8 | 42:5 43:6,12 | **west** 4:20 |
| | 262:17,23 | 45:14 46:20 | **we'll** 166:25 |
| | 264:8 269:18 | 47:12 48:23 | 167:1 175:4 |
| | **ways** 36:24 | 49:13 52:14,20 | 193:11 |
| | 197:8 230:12 | 53:10,15,20 | **we're** 160:11 |
| | 260:1 | 54:20 56:5 | 162:4 175:1,9 |
| **wanted** 36:4 104:6 152:22 165:4 166:4 206:15 214:22 215:13 260:24 262:8,10 | **we've** 61:10 | 61:2 67:15,21 | 175:16,20,21 |
| | 135:12,18 | 72:1,16,21 | 179:17 188:12 |
| | 151:15 211:5 | 73:4,17 74:3,9 | 207:25 |
| | 212:13 218:21 | 79:16 85:25 | **we've** 185:19 |
| | 226:8 254:16 | 87:4 88:10 | **wharton** 12:4 |
| | 254:19 263:12 | 89:4,22 92:10 | **whatnot** 151:9 |
| | 264:16 | 97:7,14 98:5 | **what's** 174:14 |
| **wants** 75:6,11 247:25 261:8 | **website** 41:21 | 103:1 105:16 | 175:11 194:12 |
| | | 107:11 112:16 | 208:7 |
| **warned** 164:13 | | 199:21,23 | **white** 3:3 7:6 |
| | | 222:12 | 10:18 259:17 |

| | | | |
|---|---|---|---|
| **wide** 162:10 | **wise** 268:17 | 84:6,8 86:10 | 203:7,12 207:5 |
| **widening** | **wish** 23:21 | 87:14,16 88:13 | 209:22 210:5 |
| 100:10 | 42:8 60:11 | 88:17 90:1 | 215:24 216:16 |
| **willing** 100:6 | 80:3 111:18 | 92:15 93:13,17 | 224:20 226:7 |
| 230:16 | 112:14 142:18 | 93:25 94:4 | 233:5,9,23 |
| **wind** 183:9 | 207:1 262:19 | 95:4 98:15,23 | 234:2 236:12 |
| 209:4,24 211:8 | **wished** 35:25 | 99:2,5 100:1 | 240:10 243:14 |
| 212:3,8,15,17 | **wishes** 42:11 | 105:9 106:1 | 243:18 |
| 218:10 226:14 | 56:13 79:14 | 108:21 111:1 | **witness's** |
| 226:20 247:8 | 111:5,22 | 112:2,20 | 147:13 240:5 |
| 247:10,12,21 | 112:15 140:8 | 113:11,15,23 | **witnesses** 6:3 |
| 248:2,5,6,7 | **withdraw** | 124:10,19,23 | 22:15 112:21 |
| 249:16 251:10 | 136:4 | 125:7,14,24 | 258:7,8,9,13 |
| 252:8 253:10 | **withdrawable** | 126:11 130:17 | 270:3 |
| 253:19 254:23 | 129:9 | 131:2,20,23 | **woffard** 3:10 |
| 256:3,10 | **withdrawn** | 132:3,6,17 | **wondering** |
| 257:13,18 | 17:24 | 134:1 135:4,18 | 78:1 |
| **winddown** | **withhold** 52:13 | 135:21 136:6 | **won't** 201:19 |
| 117:17,22 | 52:19 53:4,7 | 137:4,15,21,23 | **word** 170:17 |
| 118:9,18 119:3 | **witness** 7:7 | 141:25 143:14 | 176:18 195:1 |
| 119:18 123:17 | 10:20 11:1,5 | 144:11 145:21 | 242:22 |
| 123:23 176:22 | 15:12,14 21:14 | 145:23 146:14 | **work** 11:15,19 |
| 180:8,13 | 21:17,24 22:2 | 146:18 147:8 | 11:19 80:24 |
| 183:11,12 | 22:5 23:2,4,18 | 147:17,24 | 115:3,5,13,19 |
| 185:7,12 186:2 | 36:3,6,10 38:7 | 148:9 149:6,25 | 177:14,17 |
| 187:6,8,9 | 38:11,22,25 | 150:17 152:6,8 | 181:23 182:19 |
| 188:15,24 | 39:11 42:6 | 157:15,22 | 183:5 185:5 |
| 190:22 208:21 | 43:19 44:2 | 158:8,13 159:8 | 188:6,11,25 |
| **winding** | 45:12,25 46:3 | 162:14 166:10 | 192:1 210:25 |
| 179:20 212:10 | 46:21 47:22 | 166:18,24 | 211:14 232:19 |
| 255:14 | 50:13 53:24 | 168:3,7 169:12 | 236:6 247:22 |
| **wintermute** | 54:1 55:18,20 | 173:21,25 | 248:1 251:9 |
| 102:11,20,21 | 57:17 64:13 | 175:14 181:18 | 265:4 266:6 |
| 102:24 103:21 | 66:10,12 72:18 | 182:10,14,18 | **worked** 12:12 |
| 104:4,13 | 75:10,14 79:19 | 182:21 183:18 | 178:19 |
| **winternote** | 79:21 80:2 | 183:25 184:8 | **workflow** |
| 102:15 | 81:24 83:15,19 | 190:17 195:13 | 209:20 |

| | | | |
|---|---|---|---|
| **workforce** 115:7 | 49:20 50:22 | 248:25 252:2 | **young** 3:22 |
| **working** 114:14 204:2 | 52:7 53:5 | **years** 12:12 | 51:3,6,9,16,18 |
| **works** 243:11 | 58:15 59:2,11 | 62:12 65:6 | 51:20 117:7 |
| **world** 236:8,23 | 61:19 63:20 | 80:10,12 | 122:18 124:15 |
| **worried** 16:20 | 64:23 66:10 | 106:20,21 | 160:9,13 161:8 |
| **worse** 139:10 | 67:1 68:25 | 107:4 114:15 | 174:8,19 |
| **worth** 109:17 | 69:3 71:1 | 114:16 119:24 | 213:24 217:18 |
| 139:1,17,22 | 72:18 73:21 | 154:1 183:10 | 257:4 |
| 149:21 231:10 | 74:14,20 75:14 | 204:4,8,12,17 | **youtube** |
| 231:13 249:10 | 76:17 79:18,21 | 211:9 212:12 | 259:22 260:2,5 |
| 250:8 251:13 | 80:24 81:14 | 212:12,12,14 | **you'd** 171:3 |
| **wouldn't** 126:6 | 82:2 83:15,24 | 227:14 239:23 | 178:1 186:14 |
| 127:13 139:7 | 86:4 92:15 | 247:11,12,22 | **you're** 164:11 |
| **writing** 260:11 | 105:9,21 | 248:11,12,12 | 164:16 166:6 |
| **written** 49:18 | 106:21 107:16 | 249:13 251:5 | 167:21 169:13 |
| 49:20,23,25 | 110:5 142:12 | 253:11,14,15 | 169:21 177:21 |
| 86:6 103:11 | 146:14 158:25 | 253:15,15,16 | 178:22 179:20 |
| 261:1 265:10 | 159:6 164:6 | 253:16,18,19 | 181:7 183:2 |
| **wrong** 69:11 | 165:14 168:4 | 257:15 | 185:9 186:10 |
| 70:5 89:15 | 187:12 197:21 | **years'** 203:25 | 189:1 193:16 |
| 155:4 170:12 | 205:2 206:3 | 204:2 | 204:24 |
| 196:2 232:13 | 217:20 220:6 | **yep** 95:10 | **you've** 115:3 |
| **x** | 224:20 225:1 | **yesterday** | 130:14 141:16 |
| | 229:10 232:16 | 118:11 120:5,7 | 151:23 164:23 |
| **x** 1:4,10 6:1 | 241:10 243:17 | 149:25 150:23 | 166:14 188:25 |
| **xlsx** 28:22,24 | 244:25 245:13 | 153:4 160:8 | **z** |
| **xsl** 74:8 | 251:7 252:1 | 161:1 168:14 | **zero** 14:16,20 |
| **y** | 253:5 254:19 | 171:5 177:12 | 37:11 38:13 |
| | 256:9 258:14 | 180:24 182:3 | 40:9 44:3 47:6 |
| **yeah** 21:19,19 | 266:21 267:1 | 187:14 220:9 | 47:18 62:17 |
| 22:17 30:18 | **year** 64:5,7,9 | 237:15 238:25 | 67:7 111:13,13 |
| 32:25 33:17 | 64:10 105:25 | 258:22 270:12 | 124:6 125:2,8 |
| 35:12,14 36:6 | 106:1,13 108:7 | 271:3 | 134:2 139:1,5 |
| 38:11 39:11 | 119:25 183:12 | **york** 1:2,14 3:7 | 139:6 198:17 |
| 40:5 45:20 | 200:9 238:16 | 3:16 4:4,14,21 | 255:25 |
| 46:11 47:3 | 239:8,23 | 154:5 | **zip** 180:25 |
| | 247:14,17,20 | | |

**[zoom - zoom]**                                                    Page 82

**zoom**   42:12
 79:14 140:15
 142:7 160:14
 257:7

**Exhibit E**

**October 16, 2023 Transcript (Case in Chief in Opposition to Plan)**

*Includes (i) arguments of all presenting objecting creditors other than David Schneider and (ii) the testimony of (a) Otis Davis (pro se creditor) and (b) Richard Phillips (pro se creditor).*

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                 United States Bankruptcy Court

12                 One Bowling Green

13                 New York, NY  10004

14

15                 October 16, 2023

16                 2:05 PM

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1    HEARING re Hybrid Confirmation Hearing

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND ELLIS

 4         Attorneys for the Debtors

 5         300 N LaSalle Drive

 6         Chicago, IL 60654

 7

 8    BY:  DAN LATONA

 9

10    KIRKLAND ELLIS

11         Attorneys for the Debtor

12         1301 Pennsylvania Avenue NW

13         Washington, D.C. 20004

14

15    BY:  T.J. MCCARRICK

16         GRACE BRIER

17

18    MCELROY DEUTSCH MULVANEY CARPENTER LLP

19         Attorneys for the New Jersey Bureau of Securities

20         570 Broad Street

21         Newark, NY 07102

22

23    BY:  JEFFREY BERNSTEIN

24

25
```

Page 4

1    WHITE CASE LLP

2          Attorneys for the Official Committee of Unsecured

3          Creditors

4          555 South Flower Street, Suite 2700

5          Los Angeles, CA 90071

6

7    BY:  AARON COLODNY

8

9    WHITE CASE LLP

10          Attorneys for the Official Committee of Unsecured

11          Creditors

12          1221 Avenue of the Americas

13          New York, NY 10020

14

15    BY:  KEITH WOFFORD

16          JOSHUA WEEDMAN

17

18    UNITED STATES DEPARTMENT OF JUSTICE

19          Attorneys for the U.S. Trustee

20          Alexander Hamilton Custom House

21          One Bowling Green, Room 534

22          New York, NY 10004

23

24    BY:  MARK BRUH

25          SHARA CORNELL

1  SECURITIES AND EXCHANGE COMMISSION

2      Attorneys for the U.S. Securities and Exchange

3      Commission

4      100 F Street NE

5      Washington, D.C. 20549

6

7  BY:  THERESE SCHEUER

8

9  SECURITIES AND EXCHANGE COMMISSION

10      Attorneys for the U.S. Securities and Exchange

11      Commission

12      950 East Paces Ferry Road NE, Suite 900

13      Atlanta, GA 30326

14

15  BY:  ALAN MAZA

16      WILLIAM UPTEGROVE

17

18  DIMITRY KIRSANOV, Pro Se

19

20  RICHARD PHILLIPS, Pro Se

21

22  DAVID SCHNEIDER, Pro Se

23

24  VICTOR UBIERNA DE LAS HERAS, Pro Se

25

Page 6

1   OTIS DAVIS, Pro Se

2

3   JASON IOVINE, Pro Se

4

5   DANIEL FRISHBERG, Pro Se

6

7   JOHAN BRONGE, Pro Se

8

9   ALSO PRESENT:

10   CHARLES ABONCE

11   ARTUR ABREU

12   DAVID J. ADLER

13   TEMIDAYO AGANGA-WILLIAMS

14   ANDREA AMULIC

15   JASMINE ARMAND

16   CHRIS BECIN

17   ANDREW BEHLMANN

18   DEREK BLOCHWITZ

19   KYLE BRAY

20   PAUL BREUDER

21   NURALDEEN BRIFKANI

22   JUDSON BROWN

23   KITRA CAHANA

24   ROBERT CAMPAGNA

25   RICKIE CHANG

Page 7

1   ROBERT CHRISTIANSEN

2   PAOLO CIAMARONE

3   CHRISTINA CIANCARELLI

4   CHRISTOPHER J. COCO

5   KEVIN COFSKY

6   LAFAYETTE COOK

7   CARL J. COTE

8   CAMERON CREWS

9   VTOR CUNHA

10   JOSEPH D'ANTONIO

11   STEFFAN DAVIED

12   THOMAS DIFIORE

13   TRISTAN DIAZ

14   SIMON DIXON

15   SHARON DOE

16   SCOTT DUFFY

17   JOHN PETER DZARAN

18   BEN EADES

19   JANELL ECKHARDT

20   KENNETH EHRLER

21   PAUL L. FABSIK

22   DAVID AVERY FAHEY

23   CHRIS FERRARO

24   FLORENCE FLANNIGAN

25   MAX GALKA

Page 8

1   JASLEIGH GEARY

2   DARIOUS GHEORGHE

3   BRADLEY GIARDIELLO

4   MICHAEL GONZALEZ

5   MICHAEL GRAUBERT

6   ANTHONY GREENE

7   KATHRYN GUNDERSEN

8   CAROLYN GURLAND

9   CAMERON GUTHRIE

10  MIRA HAQQANI

11  SAMUEL P. HERSHEY

12  ROBERTO HERNANDEZ

13  IMMANUEL HERRMANN

14  KAITLYN A. HITTELMAN

15  LUCAS HOLCOMB

16  ROBERTO JACOBS

17  JANKO JANKOVIC

18  MICHAEL JAOUDE

19  HARSH JIVANI

20  MIKE JOHNSON

21  ELIZABETH H. JONES

22  GREG KACZKOWSKI

23  DAVID KAHN

24  DAN KAPLAN

25  YARA KASS-GERGI

Page 9

1   RAVI KAZA

2   TRAVIS KEENEY

3   PHILLIP KHEZRI

4   LEA KLORANE

5   CHRIS KOENIG

6   UMBER KOHLI

7   MARIBEL L. KORDOMENOS

8   TOMAS KOSTER

9   RIKI KOULY

10   KATHRYN KUETHMAN

11   JOYCE A. KUHNS

12   CARLO KUHRT

13   ROSS M. KWASTENIET

14   CHRISPTOHER LACKEY

15   TYLER NATHANIEL LAYNE

16   JOE LEHRFELD

17   BRIAN S. LENNON

18   MARK LEONARD

19   NICOLE A. LEONARD

20   ESTHER LEVINE

21   PIETRO VINCENT LICARI

22   JOSE LOPEZ

23   DAVID LOS ARCOS CARCAMO

24   SERBAN LUPU

25   KEVIN M. MANUS

1    ANDY MARKS

2    CHASE MARSH

3    BRIAN S. MASUMOTO

4    CAROL MAUNDER

5    GEORGIA MEADOW

6    MOHSIN (MO) MEGHJI

7    ERIK MENDELSON

8    BRIAN MENDIETA

9    LAYLA MILLIGA

10    KEITH NOYES

11    CAITLIN O'CONNELL

12    DONALD L. POYNTER

13    CHRISTOPHER PAGNANELLI

14    JEFF PATTON

15    BRETT A. PERRY

16    GREGORY F. PESCE

17    KHAI PHAM

18    MORGAN PHOENIX

19    KAROLINA PIASEK

20    HANS POLZMACHER

21    MACIEJ PRCZEK

22    CRAIG RASILE

23    ANNEMARIE V. REILLY

24    MARK ROBINSON

25    JONATHAN RODRIGUEZ

Page 11

1    MIKE SARKISSIAN

2    JAVIER SCHIFFRIN

3    NOAH M. SCHOTTENSTEIN

4    SAM SCHREIBER

5    TOBY SEGAR

6    DAVID SENES

7    SAMI SAIKH

8    LAUREN NICOLE SICKLES

9    MATTHEW W. SILVERMAN

10   HANNA SIMSON

11   LUKE SPANGLER

12   COURTNEY BURKS STEADMAN

13   CHINGIZ SULEYMANOV

14   KEYAN TAJI

15   ELLE TOUSSI

16   DAVID TURETSKY

17   ELVIN TURNER

18   VETON VEJSELI

19   PATRICIA WALSH

20   CAROLINE WARREN

21   KATIE WICK

22   ZACHARY WILDES

23   ANDREW YOON

24   BRIAN YOUNG

25   KAILA ZAHARIS

Page 12

1    JARNO BERG

2    JOEL BLOCK

3    DAKEN COLEMAN

4    ROBERT M. KAUFMANN

5    RAKESH PATEL

6    MIA COOPER

7    DREW DUFFY

8    SCOTT FLAHERTY

9    UDAY GORREPATI

10   TAYLOR HARRISON

11   DIETRICH KNAUTH

12   ALEX MCCAMMON

13   TIMOTHY REILLY

14   RYAN SCHRAMM

15   PETER J. SPROFERA

16   ZACHARY ZABIB

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3     WITNESSES:           DIRECT:   CROSS:    REDIRECT: RECROSS:

 4     OTIS DAVIS

 5     By Mr. McCarrick              58

 6     By Mr. Kirsanov               91

 7     By Mr. Frishberg              95

 8     By Mr. Iovine                 97

 9

10     RICHARD PHILLIPS

11     By Mr. Weedman               107

12     By Ms. Brie                  118

13

14     EXHIBITS:                                        PAGE:

15     Exhibit 90                                        75

16     Exhibit 87                                        76

17     Exhibit 102                                       80

18     Exhibit 99                                        82

19     Exhibit 94                                        90

20     Exhibit 237                                      110

21     Exhibit 236                                      112

22     Exhibit 118                                      121

23

24

25
```

1                P R O C E E D I N G S

2               CLERK:  Okay, good afternoon.  Starting the

3      recording for October 16th, 2023, two o'clock hearing.

4      Calling Case No. 22-10964, Celsius Network LLC.  For the

5      parties, let's start with the parties in the courtroom.  If

6      anyone is speaking on the record, please come to the (audio

7      glitch) appearance for the record.

8               Again, anyone in the courtroom so far?  Oh.

9               MR. LATONA:  Hi, good afternoon, Deanna.  It's Dan

10     Latona of Kirkland & Ellis.  Today we'll have T.J. McCarrick

11     and Grace Brier, among others for the Debtors.

12               CLERK:  Okay, thank you.  All right.  Yes, Dimitry

13     on Zoom.

14               MR. KIRSANOV:  Good afternoon.  Dimitry Kirsanov,

15     pro se creditor.  Thank you.

16               CLERK:  Thank you.  All right, any additional

17     parties that are speaking on the record this morning --

18     sorry, this afternoon, either in the courtroom or on Zoom?

19     All right.  I will pause the recording for now.  Thank you.

20               (Pause)

21               CLERK:  All right, good afternoon.  For the

22     parties in the courtroom, if anyone is speaking on (audio

23     glitch) this afternoon and would like to state their

24     appearance, please come to the middle podium to do so.

25               WOMAN:  You're not making an appearance?  But

Page 15

1   Deanna's taking it for the recording.

2           CLERK:   They could come back and give it, as long

3   as -- yeah, go ahead.

4           MR. SABIN:  Deanna.  Deanna, hi, it's Jeff Sabin.

5   I'm from Venable LLP for Ignat Tuganov.  Thank you.

6           CLERK:  Okay, thank you.  For the parties on Zoom,

7   if anyone is speaking on the record, please use the raise

8   hand function.  I will ask you to state your appearance.

9   Mr. Schneider.

10          MR. SCHNEIDER:  David Schneider, pro se creditor.

11          CLERK:  Thank you.  Mr. Bernstein.

12          MR. BERNSTEIN:  Good afternoon.  Just in case,

13  Jeffery Bernstein, McElroy, Deutsch, Mulvaney & Carpenter

14  for the New Jersey Bureau of Securities.

15          CLERK:  Thank you.  Mr. Phillips.

16          MR. PHILLIPS:  Richard Phillips, pro se.

17          CLERK:  Okay, thank you.  All right, are there any

18  additional parties at this time that are speaking on the

19  record and have not put in their appearance?  If not, I'll

20  pause the recording for now.  Okay.

21          (Pause)

22          CLERK:  All right.  Good afternoon.  For the

23  parties in the courtroom, if anyone is speaking on the

24  record, please come to the middle podium and state your

25  appearance.

Page 16

1                WOMAN:  Just give Deanna your appearance.

2                MR. COLODNY:  For White & Case LLP on behalf of

3      the Official Committee of Unsecured Creditors, Aaron

4      Colodny, Keith Wofford, and Joshua Weedman.

5                CLERK:  Okay, thank you.  Are there any additional

6      parties in the courtroom that have stated their appearance

7      on the record?  If so, please come to the middle podium to

8      give your appearance.

9                MR. BRUH:  Deanna, Mark Bruh for the United States

10     Trustee.

11               CLERK:  All right, thank you.  Are there any

12     parties on Zoom that have not stated their appearance for

13     the record?  If so, please use the raise hand function.  Ms.

14     Cornell?

15               MS. CORNELL:  Morning.  Shara Cornell for the

16     Office of the United States Trustee.  Thank you.

17               CLERK:  Thank you.  All right.  Victor?

18               MR. UBIERNA DE LAS HERAS:  Good morning, Deanna.

19     Victor Ubierna de las Heras, pro se creditor.

20               CLERK:  All right, thank you.  All right, any

21     additional parties in the courtroom or on Zoom?

22               All right.  Again, for the parties that have

23     joined, if anyone is speaking on the record this afternoon

24     and has not given their appearance yet and would like to

25     make their appearance, if you are on Zoom, please use the

1   raised hand function to do so.  Mr. Davis.

2           MR. DAVIS:  Otis Davis.  I'm not sure I'll be

3   speaking, but I just want to note my appearance.  Pro se

4   creditor.

5           CLERK:  Thank you.  All right, Jason?

6           MR. IOVINE:  Yes, Jason Iovine, pro se creditor.

7   I don't know if I'm going to speak, just notifying.

8           CLERK:  Okay, thank you.  All right, again, any

9   additional parties that are speaking on the record this

10  afternoon and have not given their appearance yet?  All

11  right, I'll pause the recording for now.

12          (Pause)

13          CLERK:  All right.  Again this after -- good

14  afternoon.  For the parties that are in the courtroom, if

15  anyone is speaking on the record, please come to the middle

16  --

17          MR. McCARRICK:   T.J. McCarrick, Kirkland & Ellis.

18  Oh, you already got it?  Never mind.

19          WOMAN:  Okay, you're going to have to

20  (indiscernible) appearance.  So you go to the podium

21  (indiscernible).  Right there.  Yep.

22          MR. MAZA:  Right now, I should make --

23          WOMAN:  Yeah, she's on.  Deanna, someone making an

24  appearance.  Go ahead.

25          MR. MAZA:  Alan Maza from the SEC and I have on

1    Zoom also my colleagues Therese Scheuer and William

2    Uptegrove.

3              CLERK:  All right, thank you, sir.  Are there any

4    additional parties in the courtroom?  This is the final call

5    for appearances.  All right.  Are there any parties on Zoom

6    that are speaking on the record this afternoon and have not

7    stated their appearance yet?  If so, please use the raise

8    hand function in Zoom.  Mr. Frishberg.

9              MR. FRISHBERG:  Hi, Danial Frishberg, pro se.  I

10   don't plan on speaking (audio glitch).

11             CLERK:  Okay, thank you.  Johan.

12             MR. BRONGE:  Yes, hello.  Johan Bronge, pro se

13   creditor, and I may speak.

14             CLERK:  Okay, thank you.  Yeah, Mr. Bernstein, did

15   you have a question?

16             MR. BERNSTEIN:  No, sorry --

17             CLERK:  Okay.

18             All right, are we waiting for any additional

19   parties or can we start promptly at two?

20             MR. COLODNY:  Hi, Deanna.  This is Aaron Colodny

21   from White & Case.  I believe we are ready to begin.

22             CLERK:  All right, thank you.

23             All right, if everyone could please pay attention

24   to the following announcement.  All persons are strictly

25   prohibited from making any recording of Court proceedings,

Page 19

1   whether by video, audio, screenshot, or otherwise.

2   Violation of this prohibition may result in the imposition

3   of monetary and nonmonetary sanctions.  The clerk of the

4   court maintains an audio recording of all proceedings which

5   constitutes the official record.

6         Parties must state their name each time they speak

7   on the Court record.  Party must join with the full first

8   and last name to be admitted from the waiting room.  Parties

9   that join with initials, a partial name, a designation such

10   as iPhone, et cetera, will not be admitted.  Also the phone

11   number that you sign up for your e-Court appearance needs to

12   be the same number that you use to log in.

13         Also, please keep in mind that you should mute all

14   your cell phone and devices so they do not interfere with

15   the recording.  Thank you.

16         MR. ABREU:  Sorry Deanna, can you hear me?

17         CLERK:  Yes, Mr. Abreu.

18         MR. ABREU:  Just to state that I might speak as

19   well.

20         CLERK:  Okay.

21         MR. ABREU:  Pro se creditor.

22         CLERK:  Okay, Artur Abreu, your appearance is

23   noted.  Thank you.

24         CLERK:  All rise.

25         THE COURT:  All right, please be seated.  Good

Page 20

1    afternoon, everyone.  I'm sure you all had busy weeks even

2    though we weren't in the courtroom last week.  Let me just

3    cover just a few preliminaries.  So we're going to pick up,

4    I know for sure, with the objections today.

5          I inadvertently -- so there was an order that was

6    entered on October 13th and had the list, the order in which

7    I would hear objectors.  I inadvertently omitted Dmitry

8    Kirsanov, and I think it was because he had actually filed

9    the objection before and I hadn't seen it.  So I'm going to

10   include him after number six, Koala 2 LLC.  We'll give Mr.

11   Kirsanov an opportunity to speak then.

12         So I also am aware that the Committee has

13   objected to the new proposed expert report and this really

14   goes -- I know there are also objections to some of the pro

15   se creditors as well.  I'm going to reserve ruling on

16   whether or not the proposed expert report is or is not

17   admissible.  I'm going to hear, and this is really going to

18   go with respect to some of the pro se creditors who are

19   going to speak as well.

20         If you have an objection, you should assert it,

21   but I will listen to the testimony and will decide after

22   whether or not to sustain objections or not.  But I'm going

23   to give people an opportunity to have their say.  Okay?

24         So with that, let me ask first from the Debtor,

25   anything that I need to cover preliminarily before we get

Page 21

1   started?

2          MR. McCARRICK:  Thank you, Your Honor.  T.J.

3   McCarrick, Kirkland & Ellis, on behalf of the Debtors.  Just

4   as a process point, we understand Your Honor entered the

5   October 13th order identifying the order in which you would

6   hear argument and testimony, depending upon whether or not

7   folks submitted testimony.

8          The only -- it's a wee proposal that I would

9   offer for Your Honor's consideration, is whether it would

10  make sense to have the folks who are going to be giving a

11  statement but not evidence or testimony go sequentially and

12  then pick up with the evidence.  I'm happy to do it anyway

13  Your Honor --

14         THE COURT:  Mr. McCarrick, at this stage, I don't

15  have clearly in mind --

16         MR. McCARRICK:  That's perfectly fine.

17         THE COURT:  I thought it would -- it was going to

18  be easier if I had an order, so we don't have five people

19  trying to interject at the same time, not there was anything

20  wrong with it, but it's just difficult with (audio glitch)

21  on Zoom.  Okay.  And the other thing I raise is about remote

22  testimony and I tried to make clear the Federal Rules, Rule

23  43(a) has a rule that essentially requires compelling

24  circumstances in order for me to permit remote testimony.

25         The case law is not particularly well developed on

Page 22

1    this area.  As I understand it, where no objections have

2    been raised to remote testimony, Courts have more often than

3    not permitted the remote testimony.  I think, you know, for

4    example, where there are pro se creditors outside the United

5    States or in California, I'll leave it to the U.S. Trustee,

6    the Committee, and the Debtors to see whether there are

7    objections to that person testifying remotely or not.

8             Obviously, there'll be cross examination by Zoom.

9    But Rule 43(a) creates a pretty strong presumption that the

10   testimony is supposed to be in the courtroom.  Until

11   September 21st, the Bankruptcy Courts had much greater

12   flexibility about it.  After the judicial conference imposed

13   new limitations on remote hearings, it got a little -- it

14   got tighter.

15            So I'm not telling anybody whether to object,

16   don't object, or whatever.  I think, you know, we don't have

17   juries.  Frankly, I think the remote testimony for the most

18   part has gone pretty well, but we'll deal with it as the

19   individuals arise.

20            So as much -- we came up with the order because I

21   just wanted people to know you're next online, you're next

22   online.

23            MR. McCARRICK:  Understood, Your Honor, and we're

24   happy to proceed that way.

25            THE COURT:  Okay.  Thanks very much, Mr.

Page 23

 1   McCarrick.  All right, anything from the Committee before we

 2   start?

 3               MR. COLODNY:  No, Your Honor.

 4               THE COURT:  Okay.  All right --

 5               MR. KIRSANOV:  Your Honor, (audio glitch), pro se

 6   creditor.

 7               THE COURT:  Yes.

 8               MR. KIRSANOV:  I wasn't aware that I would be

 9   number six today.  May I ask the Court --

10               THE COURT:  You're going to be number seven today,

11   Mr. Kirsanov.

12               MR. KIRSANOV:  I understand.  Thank you, Your

13   Honor.  May I ask permission to go last on the list, so

14   prepare?

15               THE COURT:  All right, so right now, I will do

16   that.  I didn't want you to feel that somehow you've been

17   slighted and not put on the list and it was my oversight

18   that kept you from going on.  With your permission, you'll

19   be number 23 after Cathy Lau.

20               MR. KIRSANOV:  Thank you --

21               THE COURT:  Is that all right?

22               MR. KIRSANOV:  Yes, thank you.

23               THE COURT:  Okay.  I slotted you up because I

24   didn't -- you've spoken before.  I didn't want you to feel

25   that I'd left you off and then didn't consider you.

Page 24

1           MR. KIRSANOV:  I appreciate that sincerely, Your

2    Honor.  Thank you.

3           THE COURT:  All right.  So you're going to be on

4    the list for number 23.  All right?

5           So let's start with the U.S. Trustee.  Mr. Bruh?

6           MR. BRUH:  Thank you, Your Honor.  For the record,

7    Mark Bruh for the United States Trustee.  We will not be

8    presenting, Your Honor, so that will be quick.

9           THE COURT:  Okay.

10          MR. BRUH:  We'll just reserve for closing in the

11   case.

12          THE COURT:  Well, let me ask you.  I asked the

13   Debtor, the Committee, and the U.S. Trustee to confer about

14   the Consumer Privacy ombudsman and is -- has there been a

15   resolution reached on that?  I see Ms. Cornell shaking her

16   head, but somebody tell me where we stand on that because

17   she's not on the list.

18          MR. KOENIG:  Good afternoon, Your Honor.  Chris

19   Koenig, Kirkland & Ellis, for the Debtors.  We've been in

20   conversations with her.  We're very close on a resolution of

21   language that would go in a confirmation order.  I don't

22   know whether she intends to testify or not.  If we reach a

23   resolution, maybe her testimony is no longer needed.  We've

24   discussed it with her.

25          THE COURT:  Okay.  And I guess the point, first

Page 25

1   off, she's not lawyer, I take it.  Her statement wasn't

2   under oath.

3           MR. KOENIG:  Right.

4           THE COURT:  I went out of my way and this last

5   thing is to put what the two subsections of 1746 are about

6   what it has to say.  Hopefully, you'll be able to work out a

7   resolution.  If she wishes to put the testimony in, point

8   out to her the affirmation that it has to have.

9           MR. KOENIG:  We have.

10          THE COURT:  And it may be that you're not going to

11  want -- if you reached a resolution her testimony

12  (indiscernible) but there won't be cross examination.

13          MR. KOENIG:  Yes.

14          THE COURT:  Okay.  The argument --

15          MS. CORNELL:  Your Honor --

16          THE COURT:  Just a second.  The arguments for her

17  not having to come up from Washington are weaker than

18  somebody who's out of the country.  Go ahead, Ms. Cornell.

19          MS. CORNELL:  Your Honor, Shara Cornell again for

20  the Office of the United States Trustee.  I just wanted to

21  clarify for the record that Ms. Thompson is, in fact, an

22  attorney.

23          THE COURT:  She is.  Well --

24          MS. CORNELL:  Yes, sir.

25          THE COURT:  Then she ought to know what you have

Page 26

1    to do to say something under oath, but in any event.  See if

2    you can work it out.  It may be that she doesn't care about

3    the testimony going in, if you've reached a resolution.

4    Leave that to you to work out.

5              MR. KOENIG:  Right.  I don't want to speak for

6    her.  I suspect that that will likely be the case, but we'll

7    continue --

8              THE COURT:  All right.

9              MR. KOENIG:  -- with her.

10             THE COURT:  That's fine.

11             MR. KOENIG:  Thanks, Your Honor.

12             THE COURT:  Okay.  All right.  The SEC.  Anybody

13   from the SEC wish to make a statement?  I think they had a

14   reservation of rights.  Is anybody from the SEC on Zoom?

15             MS. SCHEUER:  Yes, good afternoon, Your Honor.

16   Therese Scheuer for the U.S. Securities and Exchange

17   Commission.

18             THE COURT:  Yes.

19             MS. SCHEUER:  With me on the line is William

20   Uptegrove and in the courtroom is Alan Maza from the U.S.

21   Securities and Exchange Commission.

22             THE COURT:  Okay.

23             MS. SCHEUER:  Your Honor, the SEC filed a limited

24   objection and a reservation of rights at Docket 3522.  Based

25   on representations by Debtors' counsel, I anticipate the

Page 27

1   Debtors will incorporate changes to respond to the issues

2   raised in our informal comments and limited objections, and

3   we're review any proposed modifications.

4           Your Honor, the SEC does not have an evidentiary

5   presentation for today, but if Your Honor will permit, I

6   would like to clarify a few points for the record.

7           THE COURT:  Please go ahead.

8           MS. SCHEUER:  Thank you, Your Honor.  Certain

9   statements have been made about the SEC's District Court

10  action and our position in the case during the course of

11  these hearings, as including in Mr. Davis' filed statement

12  at Docket 3769, and similar statements may be made again.

13          Your Honor, regarding the District Court action,

14  we would respectfully refer the Court to the SEC complaint

15  for an accurate statement of the SEC's position in that

16  case, which was filed at Docket 3293.  In addition, I wanted

17  to clarify for the record that we're not asking for this

18  Court to rule on whether CEL and Earn are securities, as

19  that is an issue for the District Court, nor are we taking

20  any position as to whether any claim should be subordinated.

21          Your Honor, determining the priority of these

22  claims may turn on whether these programs are debt or equity

23  instruments and not necessarily on whether they're

24  securities.  To the extent the Court may have to make

25  certain findings about whether something is a security, we'd

Page 28

1    reiterate our request that such a ruling be limited to the

2    bankruptcy case and without conclusive effect on the SEC

3    outside of this case.

4          I'm happy to walk the Court through the factual

5    allegations about CEL and Earn and the commission's

6    complaint if that would be helpful to Your Honor.

7          THE COURT:  I -- what I'm going to say now, I've

8    said on the record before and that is -- and while I've

9    certainly reached no final conclusion about it, it seemed to

10   me that it was unlikely that I would have to decide the

11   issue of whether either the Earn or the CEL token was a

12   security in the case of Celsius.  What the Court is faced

13   with is a proposed plan which, with a couple of exceptions,

14   has been overwhelmingly accepted by classes that proposes

15   plan treatment for the CEL token and obviously for Earn

16   account holders.

17         The issue may well be, then, whether dissenting

18   members of accepting classes are receiving at least as much

19   as they would in a Chapter 7 liquidation.  If they are, it

20   seemed likely to the Court that the plan could be confirmed.

21   May be other objections the Court has to deal with, and the

22   Court would be able to do that without having to take a

23   position on whether either Earn or the CEL token was a

24   security.

25         From the Court's standpoint, I usually try not to

Page 29

1    decide more than I have to decide.  And so, it seemed to me

2    -- I'm not foreclosing entirely the possibility, but it did

3    not seem to me that the issues for confirmation in this case

4    were going to require the Court to reach that determination.

5    Obviously, if I did, it's not binding on any District Court

6    or any, you know, or any other Court.

7            So, I mean that -- you know, you're -- the SEC is

8    free to take whatever position it's going to take elsewhere

9    or in this Court.  But that's -- I've said this.  You were

10   that prior hearing we had.  Not everybody was a party to

11   that -- that that was the Court's thinking.  We'll see.

12   Okay?  I don't know what to say more than that.  I can't

13   give you more comfort than that.

14           I understand the SEC's position.  I know these are

15   difficult issues.  I commented before that I think Judge

16   Torres and Judge Rakoff have somewhat different views of the

17   analysis and conclusions.  Obviously, they had two different

18   cases.  But I'm aware of that and I don't -- I'm not looking

19   for the opportunity to jump into the fray of the differences

20   between those two judges and maybe others.  Okay?

21           MS. SCHEUER:  Thank you, Your Honor.

22           THE COURT:  I think with respect -- again and

23   understand, I'm not asking you to waive whatever limited

24   objections you have.  I'll make no secret of it.  I was

25   quite concerned with the events during the Voyager case with

Page 30

1    respect to what certainly appeared to me to be late

2    objections by securities regulators.  It torpedoed one

3    confirmed plan.  I think throughout this case, I have

4    encouraged the Debtors and the Committee multiple times to

5    make sure they were conferring with the regulators, state

6    and federal securities regulators, CFTC, et cetera.

7              I think -- obviously, I was not privy to those

8    conversations, but there were from time to time reports that

9    those were ongoing and I was glad to hear that.  Obviously,

10   the plan structure in Celsius is not the same as it was in

11   Voyager.  I think that that doesn't -- you know, still -- if

12   the plan is confirmed, which is far from being the case at

13   this point, the plan sponsor would still have to get SEC

14   approval and registration for what they're attempting and

15   I'm not -- that's not today -- that's not the issue for the

16   Court at this point.

17             I don't know whether that -- so yes, I've been

18   quite sensitive to the issues of the regulators.  They've

19   been important throughout this case and to the extent that

20   their views could be taken into account and orders adjusted

21   accordingly to avoid those issues, that's helpful.  Anything

22   else you wish to add?

23             MS. SCHEUER:  No.  Thank you, Your Honor.

24             THE COURT:  All right.  Okay.  The New Jersey

25   Bureau of Securities.

Page 31

1            MR. BERNSTEIN:  Good afternoon, Your Honor.

2    Jeffrey Bernstein, McElroy, Deutsch, Mulvaney & Carpenter

3    for the New Jersey Bureau of Securities.

4            THE COURT:  Nice to see you, Mr. Bernstein.

5            MR. BERNSTEIN:  Thank you, Your Honor.  Your

6    Honor, the New Jersey Bureau of Securities filed a

7    reservation of rights at Docket 3524 and that was prior to

8    the Debtor filing at Docket 3526 a resolution of plan

9    language with the state.  Accordingly, I had notified the

10   Debtor earlier today that we no longer intended to make any

11   presentation to the Court today on any issues.  Thank you.

12           THE COURT:  Thank you, Mr. Bernstein.

13           MR. BERNSTEIN:  Good day.

14           THE COURT:  Core Scientific and Core Scientific

15   Operating Company.

16           MR. KOENIG:  Your Honor, again for the record,

17   Chris Koenig for Celsius.   Their reservation of rights was

18   --

19           THE COURT: That was the thing that was resolved?

20           MR. KOENIG:  To the extent their settlement was

21   not approved, their settlement was approved.  I'm not

22   surprised that they're not here today.

23           THE COURT:  Okay.  All right.  Next is 168 Trading

24   Limited.  Is there anyone appearing for 168 Trading Limited?

25           MR. KOENIG:  Your Honor, it's Chris Koenig.  I'm

Page 32

1    informed by my colleagues that they actually asked if they

2    could go at the conclusion.  We're close on language and --

3              THE COURT:  All right.

4              MR. KOENIG:  -- that was a request that they --

5              THE COURT:  I will --

6              MR. KOENIG:  -- earlier.

7              THE COURT:  The conclusion today or the conclusion

8    --

9              MS. BRIER:  They just said last.

10             MR. KOENIG:  Perhaps this is --

11             THE COURT:  Ms. Nathanson?  You're in mute.

12             MS. NATHANSON:  Apologies, Your Honor.  I'm the

13   next -- counsel for the next objector, so we're not quite up

14   to me.

15             THE COURT:  You're for Koala or --

16             MS. NATHANSON:  Yes.

17             THE COURT:  All right.  Okay.  So I will move --

18   remind me to call -- I don't know where we're going to get

19   to today.  Okay?

20             MR. KOENIG:  And we'll email that as well.

21             THE COURT:  Okay.  Remind me to call them again at

22   the end of today, and if it's not today, we'll see where we

23   are.  Okay.

24             MR. KOENIG:  Thank you.

25             THE COURT:  All right.  Ms. Nathanson, Koala 2

Page 33

1    LLC.

2             MS. NATHANSON:  Thank you, Your Honor.  Leigh

3    Nathanson from King & Spalding for Koala 2 LLC.  We too had

4    filed a limited objection.  This was based on Koala 2's

5    inclusion on the proposed list of equitably subordinated

6    entities.  The Debtor subsequently filed some revisions to

7    the plan language that were designed to address our

8    objection, which was essentially to the effect that the plan

9    did not provide clearly for what would happen to a party

10   that was proposed to be equitably subordinated, but for

11   which the Court ultimately denied that subordination

12   proceeding, should that occur.

13             So the changes that the Debtors have proposed

14   resolve Koala 2's limited objection, but I did just want to

15   note for the record that this objection and Koala 2's

16   inclusion on the proposed equitable subordination list are

17   based on a factual inaccuracy that Koala 2 is an entity that

18   is controlled by Alex Mashinsky.  It is not.

19             We've discussed with the Kirkland team that fact

20   and expect that given the stay of the equitable

21   subordination proceeding, we will have discussions with them

22   and either deal with that at the subordination proceeding or

23   potentially agree to some resolution beforehand.  But I just

24   wanted to note for the record that fact.

25             THE COURT:  All right.  Thank you very much, Ms.

1    Nathanson.  All right.  Mr. Bronge, can you hear me?

2           MR. BRONGE:  Yes, hello?  Can you hear me?

3           THE COURT:  Yes, I can.

4           MR. BRONGE:  Yes.  Good afternoon, I suppose it is

5    in New York.  So --

6           THE COURT:  It is.

7           MR. BRONGE:  I, obviously, I'm a pro se and I'm

8    not a hundred percent sure what I'm supposed to do at this

9    stage, but I would like to bring up a couple of issues.  One

10   is that I requested for the witness Oren Blonstein and I

11   have not heard anything about that. So, I don't know if

12   that's going to show up or not because I also saw that the

13   Debtor have objected to it.

14          THE COURT:  Well, let me see.  One of the Debtors'

15   lawyers has approached the podium, and let me have her

16   identify herself and we'll see what happens.

17          MS. BRIER:  Good afternoon, Your Honor.  Grace

18   Brier, Kirkland & Ellis on behalf of Debtors.  Your Honor,

19   Mr. Bronge requested Mr. Blonstein's testimony as part of

20   his exhibit list and witness list.  Mr. Blonstein's a

21   Celsius employee.  He's the chief compliance officer there.

22          We filed an objection to his testimony, a motion

23   in limine, on October 13th.  It's Docket No. 3802.  For the

24   reasons that we list in there, we anticipate based on Mr.

25   Bronge's objection, that it will be questioning that is

Page 35

1    duplicative of questioning he already posed to Mr. Ferraro

2    who was here last week or two weeks ago and offered

3    testimony in response to Mr. Bronge's questions.

4            Mr. Bronge responded and said that he does not

5    anticipate they will be duplicative and we filed our motion.

6    We think that if he's going to ask questions entirely

7    duplicative of Mr. Ferraro's questioning, it would be

8    duplicative and unnecessary.  And to the extent he can

9    proffer or allege that he --

10           THE COURT:  Let's schedule Mr. Blonstein's

11   testimony, and I will not permit duplicative testimony on

12   it.

13           MS. BRIER:  Thank you, Your Honor.

14           THE COURT:  You'll be able to do it.  So Mr.

15   Bronge, you'll get your deposition, but it can't cover what

16   Mr. Ferraro testified about.

17           MS. BRIER:  And Your Honor, my understanding is

18   he's seeking testimony in Court from Mr. Blonstein.  We have

19   reached out to Mr. Blonstein.  He's based in California.

20   We'd request that he can testify remotely as we understand

21   it Mr. Bronge will be questioning remotely and he's, you

22   know, a few hours away at this point for a few questions, it

23   sounds like Mr. Bronge has.

24           THE COURT:  Here's my suggestion.  Well, here's my

25   order.  Arrange his deposition.  He's out of -- he's in

1   California.  He's out of the subpoena range of the Court to

2   compel him to come to Court to testify.  Let Mr. Bronge take

3   the deposition remotely and if there are non-duplicative

4   testimony questions and answers, he'll -- Mr. Bronge will be

5   able to introduce them here.

6             MS. BRIER:  Understood.

7             THE COURT:  So we won't have to have Mr. Blonstein

8   travel to New York and Mr. Bronge will get to ask his

9   questions.

10            MS. BRIER:  Understood.  Thank you, Your Honor.

11            THE COURT:  Okay?  And hopefully you can arrange

12   that within the next day or so.

13            MS. BRIER:  We'll do what we can, Your Honor.

14            THE COURT:  Mr. Bronge, does that work for you?

15            MR. BRONGE:  Yeah, that sounds adequate.  So, I

16   will not have duplicative questions.  There might be one or

17   two in that area but they mainly a different focus.

18            THE COURT:  All right.  So Ms. Brier will be in

19   touch with you and arrange for the deposition of Mr.

20   Blonstein for non-duplicative questions and then you'll get

21   a transcript quickly prepared and whatever comes in will

22   come in.  Okay?  Is there anything else you wanted to raise,

23   Mr. Bronge?

24            MR. BRONGE:  Yes.  It has to do with the similar

25   objection that the Debtor had to the exhibit list I want to

Page 37

```
 1    have introduced.  They objected to that as well, to all my

 2    exhibits.  I don't understand why, and I do -- I would like

 3    the Court to allow them.

 4              THE COURT:  Ms. Brier, do you want to address the

 5    issue of the exhibits that Mr. Bronge has offered?

 6              MS. BRIER:  Yes, Your Honor.  We filed objections

 7    to and responses to the exhibits that Mr. Bronge included on

 8    his exhibit list.

 9              THE COURT:  Right.

10              MS. BRIER:  Largely, our objections were that they

11    were more appropriately judicially noticed and entered into

12    evidence.  A lot of them are docket filings.  I'm happy to

13    walk through each of them.  I think there are 11, but it's

14    on Docket No. 3810.

15              THE COURT:  All right.  Just give me a second.

16              MR. BRONGE:  I did early this morning file an

17    extended, an updated list as well.  Obviously, I'm not 100

18    percent familiar what the difference is to have the document

19    in evidence or as a judicial notice.

20              THE COURT:  I'm a little bit at a loss.  Are there

21    --

22              MS. BRIER:  Your Honor, do you want -- would you

23    like us to pull up our objections to the --

24              THE COURT:  Yeah, could you?

25              MS. BRIER:  Absolutely.  So this is Docket No.
```

Page 38

1    3810.  If someone could please get that to our helpful trial

2    tech, we would love to be able to show that to the Court.

3              CLERK:  Excuse me, who am I making a cohost, if

4    I'm -- is it -- who's screen sharing?

5              MR. LOPEZ:  Jose Lopez.

6              MS. BRIER:  Jose Lopez, please.

7              CLERK:  Okay, he is a cohost.

8              MS. BRIER:  Thank you.  And actually -- thank you.

9    And if you --

10             THE COURT:  Just give me a minute.

11             MS. BRIER:  Of course.

12             THE COURT:  I'm trying to put them up on my other

13   computer as well.

14             MS. BRIER:  Excellent.

15             THE COURT:  Sorry for the delay.

16             MS. BRIER:  No problem.

17             THE COURT:  All right.  So I have 3810 open on my

18   own computer rather than just on the -- on what's on the

19   screen.

20             MS. BRIER:  Excellent.

21             THE COURT:  I'm looking at Mr. Bronge --

22             MS. BRIER:  Perfect.

23             THE COURT:  -- his exhibit offer.

24             MS. BRIER:  All right, so I'm looking at Page 3,

25   starting with Johan Bronge's first exhibit, Mashinsky

Page 39

1    declaration.  We could pull that -- yeah.

2            THE COURT:  Mashinsky declaration?

3            MS. BRIER:  Yes.  Your Honor, we have no objection

4    to the admission of the Terms of Use that were attached to

5    Mashinsky's declaration and in fact, they are already in

6    evidence as Debtors' Exhibit 38.  He seeks to admit the

7    entire filing.  We just objected to the admission of the

8    declaration itself, which just describes the contents behind

9    it.  But to the extent he intends to use anything in that,

10   we're happy to discuss it.  If he just is using the Terms of

11   Use, already in evidence as Exhibit 38.

12           THE COURT:  Well --

13           MR. BRONGE:  Yeah, can -- so I do intend to use

14   certain parts in the preceding pages as they are relevant to

15   my arguments and to the whole Terms of Use, especially

16   because of the different version of the Terms of Use are

17   described when they were valid and certain other statements

18   in the beginning that are important as well.

19           THE COURT:  I'm overruling the objection and the

20   Mashinsky declaration is an admission and it comes into

21   evidence.

22           MS. BRIER:  Let me see.  Exhibits 2 -- I don't

23   know if it's easier to do this by category or by each

24   exhibit.  I'm happy to --

25           THE COURT:  Well, you can tell me by category and

Page 40

1    then we'll see if we have to go through by exhibits.

2         MS. BRIER:  Understood.  Exhibits 2, 5, 6, 7, 8,

3    9, 10, and 11, it's our position that they are more

4    appropriately judicially noticed than entered into evidence,

5    as many of them are filings or complaints or legal arguments

6    as opposed to evidence that would be admissible.

7         MR. BRONGE:  Okay, can I comment on that?

8         THE COURT:  Go ahead.

9         MR. BRONGE:  Yeah.  First of all, I would

10   appreciate if you can explain the difference between the

11   document being in evidence and subject to judicial notice

12   from a legal standpoint.

13        THE COURT:  I'm going to sustain the objection.

14   I'll consider it as judicial notice, so that's Exhibits 2 --

15   Ms. Brier, which were the other ones?

16        MS. BRIER:  2, 5, 6, 7, 8, 9,. 10, and 11.

17        THE COURT:  What about Exhibit 3?

18        MS. BRIER:  So three is, I think a category

19   slightly separate from the others that we -- has a slight

20   caveat.  The others, I think, all fall within the category

21   of judicial notice.

22        MR. BRONGE:  So if I, I still would like to

23   understand the difference between judicial notice and to the

24   document being in evidence.  Can the Debtor explain that?

25   The reason is that in the Exhibit 3 as well, there is

1    statements and legal conclusions regarding securities that I

2    would like to have --

3              THE COURT:  Mr. Bronge --

4              MR. BRONGE:  -- able to argue from.  Yes?

5              THE COURT:  Mr. Bronge.

6              MR. BRONGE:  Yes.

7              THE COURT:  It was largely without admission, or

8    without admitting or denying, so this is not -- it may be

9    that that was the resolution of the DOJ, you know, for DOJ

10   non-prosecution agreement for an SEC complaint, but there

11   are only portions of it which are actually binding on the

12   Debtor.  So I'll take judicial notice of them but they're

13   not properly in evidence as admissions.

14             MS. BRIER:  Yes, Your Honor, and part of that

15   document is in, depending on what he asks about.  We're

16   happy to object to that as well, but that was our position.

17             THE COURT:  Okay.

18             MR. BRONGE:  May I use those references for argue

19   --

20             THE COURT:  Well, you can try.  We'll see how --

21   we'll have to see as we go along.

22             MR. BRONGE:  Okay.

23             THE COURT:  I'm just making some notes here.

24             Does that deal with all of Mr. Bronge's --

25             MS. BRIER:  That deals with all of his evidentiary

1    -- proposed exhibits, to the extent he offers any evidence

2    at this time.  I don't understand.  He submitted a

3    declaration but reserved the right to cross examine on

4    anything he submits at this time.

5              THE COURT:  All right.  Go ahead, Mr. Bronge.

6              MS. BRIER:  Thank you, Your Honor.

7              MR. BRONGE:  Okay. So I understand that this is

8    not the time to do a proper argument.  Is that correct?

9              THE COURT:  You can make your argument now, sure.

10             MR. BRONGE:  Okay.  So I have two lines of

11   argument that I want to pursue going forward and I also

12   reserve to have another go at this at the late -- later,

13   more appropriate state.  But what I shortly trying to argue

14   is the ownership of the collateral and I base that on my

15   first loan, primarily.  And let me see if I can give you the

16   docket number of that.

17             My -- let me see here, where it is.  So I have

18   filed an objection and I also filed a motion regarding the

19   collateral ownership.  My first loan is governed by the

20   Terms of Service No. 7, the loan agreement number seven,

21   which I think unambiguously states that there is no legal

22   title transfer on collateral.  Therefore, I think that the

23   collateral ownership of that loan particularly should be

24   that the legal title reside with me and it is not part of

25   the bankruptcy estate.

Page 43

1           And I also argue that the same applies for my

2     other loans that are governed by Terms of Service No. 9.

3     The basic only thing that has changed in that -- in the No.

4     9 from No. 7 is one sentence that has been added that

5     collateral is exclusive property of Celsius.

6           Now, I argue that when you look at the Terms of

7     Service, the intention of a collateralized loan agreement is

8     not to transfer title and should there be a transfer of

9     legal title involved, it should be explicitly state so, not

10    just a cursory one sentence or not even one sentence in one

11    paragraph, while all other paragraphs referring to the

12    collateral as the borrowers or it's even so in the

13    definition.

14          Additionally, in the terms, General Terms of

15    Service and the Risk Disclosure, it also specifically state

16    that the borrower's risk is not being able to fulfill the

17    loan obligation.  And that is when the collateral is at

18    risk.  And that is very different from what it states when

19    it comes to the Earn accounts.  So I will obviously have a

20    better prepared speech when I come to argument because I

21    thought this was not the time to do this.

22          The other line of -- that I will follow is Earn

23    subordination.  Several governmental entities have rulings

24    saying Earn is a security and securities would be

25    subordinated in Chapter 11.  Especially this plan, I would

Page 44

1    receive a significantly better recovery under Chapter 7

2    where Earn would be subordinated.  That also was admitted by

3    the expert Mr. (audio glitch) in the last hearing.

4           So finally, the last thing I want to argue is that

5    the valuation of the collateral is unfair and incorrect.

6    There has been a lot of discussion regarding CEL token

7    valuation where there has been witnesses and arguments that

8    there has been manipulated market in relation to the price

9    of CEL, and that should preclude the use of the petition

10   price.  Now, this turns out that the same is -- seems to be

11   true with Bitcoin as it was heavily shorted by FTX during

12   the time of the bankruptcy of Celsius.

13          That's one thing, but the proposed plan had

14   different pricing of Bitcoin.  I specifically refer to

15   Bitcoin collateral, but it's true even for other collateral

16   because the Debtor suggests to use petition price when

17   valuing the collateral, but when you give back collateral

18   after dollarizing, you use market prices.

19          Now, obviously, when you have the petition price

20   done at the bottom of a bear market, it's very likely that

21   the market price when the actual repurchase of the remaining

22   collateral value in Bitcoin will significantly reduce the

23   amount of Bitcoin you get back, which is unfair.  So my

24   argument is that the valuation should be, one, so either you

25   use market prices all the time or you use petition prices

Page 45

1    all the time.  And I think the fairest thing is to use

2    market prices as all crypto markets are manipulated one way

3    or another, short selling, long selling, or as in the case

4    of CEL, by trying to increase value for insiders.

5            So these are the three lines of argument and when

6    it comes to the more appropriate time, I will have the

7    references all ready for this.

8            THE COURT:  Let me ask one -- ask for

9    clarification.  So I understand one of your arguments to be

10   that collateral as a legal matter remain property of the

11   account holder as opposed to becoming property of the

12   Debtor.  Am I correct in that, that's your argument, Mr.

13   Bronge?

14           MR. BRONGE:  That's absolutely correct.  And --

15           THE COURT:  Okay.

16           MR. BRONGE:  And --

17           THE COURT:  And I would just say that when we get

18   to any closing briefs, I would expect the Committee and/or

19   the Debtor to address that issue specifically.  I mean, the

20   issue has come up in the case before.  It's not precisely

21   what was decided in the Earn opinion because it didn't deal

22   with the collateral.

23           I think it would during one other earlier day in

24   the hearing.  I think I was actually pointed to and we did

25   look at the language in the Terms of Use.  I think it may

Page 46

1    have been from an earlier version, I don't remember which

2    version, and looked at the difference in the language.  I

3    just -- I'm not reaching a conclusion.  It just did -- it

4    appeared to me then, that the Debtor had the better side of

5    the argument, that Debtor and the Committee had the better

6    side of the argument that collateral did become property of

7    the estate.

8            But I'll -- I'm going to reserve any ruling on

9    that.  So I understand your point on that, Mr. Bronge.  I

10   think it's a fair legal argument to -- that has to be

11   addressed.

12           MR. BRONGE:  Yes, Your Honor --

13           THE COURT:  I'm not sure I follow --

14           MR. BRONGE:  (indiscernible)

15           THE COURT:  Let me just say I'm not sure I

16   followed completely when you were talking about on

17   valuation, market price.

18           MR. BRONGE:  Yeah.  So let me see if I can explain

19   it better.  So when -- because of the dollarization that is

20   done, there is a petition date price on all the different

21   cryptocurrencies.  Now when you -- let's say you do the set

22   of treatment like the debtor has planned in his plan.  You

23   would use that petition price for bitcoin.  So if you settle

24   for low, one bitcoin will only be valued to $19,980 roughly.

25           But when you -- when the excess collateral after

1   such treatment is going to be handed back to the borrowers

2   after the haircut that is in the plan, it will then go out

3   and buy bitcoin for the remaining value and then use market

4   prices.  And for instance, today I think it's $8,000, $9,000

5   more expensive per bitcoin.  And that gives you an

6   additional 30 percent haircut on your bitcoin recovery.  For

7   me, that is very unfair and especially since bitcoin is

8   legal tender and used as a currency and a commodity.  So --

9           THE COURT:  The Bankruptcy Code requires that you

10  use dollars and not bitcoin.  But I think I understand your

11  point.

12          Mr. Koenig, did you want to respond?

13          MR. KOENIG:  Yes.  Thank you, Your Honor.  Chris

14  Koenig, from Kirkland & Ellis, for the debtors.  I just

15  wanted to point out on the loan terms of use points is

16  actually in our confirmation brief and, not surprised, it's

17  a long document.  But if Your Honor wanted to look at that,

18  we'll for sure address it again in closing argument, but if

19  you wanted to refresh the citations we have.

20          THE COURT:  And I did look at it.  But we'll --

21  it's important.  He's not -- Mr. Bronge is not the only

22  person to raise this --

23          MR. KOENIG:  No.  It's a very fair point.

24          MR. BRONGE:  May I interject there?  Because --

25          THE COURT:  Yes, go ahead.

1           MR. BRONGE:  Yeah.  In this response to my motion

2    that the debtor has filed and I have responded to as well,

3    they state only citations from version nine of the loan

4    terms of years and that is, let me say, a little bit unfair

5    since the wording is different in version seven, which is

6    the one that controls the loan I'm discussing here.

7           There is also in those pages that the debtor

8    conveniently didn't want to have as evidence statement that

9    says that the version that was in force when the loan was

10   approved is the one that controls the loan, which means if

11   you have a loan from, let's say, early 2021, you fall under

12   this version seven.  There is no statement of exclusivity --

13   exclusive property to Celsius in that version seven, while

14   there is in version nine.  And there is quite a few

15   references where it's abundantly clear that there is no

16   legal title transfer in version seven.

17          In addition, as I said, in the general disclosure,

18   risk disclosure, there is specific -- it's a specific

19   section stating that the borrower's risk is in conjunction

20   with notes fulfilling the loan obligation.  And finally, the

21   debtor has in the 168 -- where they discuss the 168 issue,

22   they refer to their master loan agreement in one space, and

23   there it's again unambiguously clear how it's written when

24   you do transfer title.  Very different from any other terms

25   and service that the retail borrowers have.

1              Additionally the debtor has not shown, properly

2    shown any of their master loan agreements which they argue

3    are different from the retail loan agreements, and that's

4    why these groups should have different treatment.  But as

5    long as they don't show those agreements, it's just hearsay

6    in my view.  So there's two places in the terms and service

7    and at least one master loan agreement where you can

8    explicitly see how the agreement should be written if there

9    is an attempt to try and transfer the ownership title, and

10   it's that master loan agreement for the 168 issue.  It's

11   also in the sale and repurchase agreement that was the

12   structure that was done in UK.  You can see -- if you

13   compare those two agreements, it's abundantly clear that

14   title is transferred in the sale and repurchase agreement.

15             But no such statements are available in any of the

16   terms of service for the retail loans, not even in number

17   nine.  So to me, it's no question here because in a common

18   sense approach (indiscernible) collateralized loan agreement

19   not to transfer title.  Those are done to provide security

20   for an obligation to repay a loan.  If they --

21             THE COURT:  Well, I'm not sure that the language

22   in the terms of use supports your argument.  But we're going

23   to leave that for the closing.

24             MR. BRONGE:  Yes.  I understand that.  But --

25             THE COURT:  Because I don't have the terms of use

Page 50

1    open in front of me, Mr. Bronge.

2              MR. BRONGE:  No.  There is many --

3              THE COURT:  But I recall it saying that when

4    collateral is deposited with the debtor, they have the right

5    to hypothecate, rehypothecate, et cetera, all of the

6    attributes of ownership.

7              MR. BRONGE:  Yes.  But --

8              THE COURT:  But that's not the issue.  I

9    understand your argument, Mr. Bronge.

10             MR. BRONGE:  Yeah.  So --

11             THE COURT:  (indiscernible) have we gone through

12   all of his list of exhibits and, one, I overrule the

13   objection as to the Mashinsky declaration, which comes in as

14   an admission; 2, 3, 5, 6, 7, 8, 9, 10 and 11 are all

15   judicial notice.

16             WOMAN 1:  Yes, Your Honor.  Two points from our

17   end.  To the extent any of his testimony, or I --

18             THE COURT:  That wasn't testimony.

19             WOMAN 1:  That was exactly my question.  I was

20   wondering if any of that --

21             THE COURT:  It's not testimony.

22             WOMAN 1:  -- was given testimonial value.  Thank

23   you.  Then no cross from us as to that argument.

24             THE COURT:  Right.

25             WOMAN 1:  And to the extent we are sending up Mr.

Page 51

1    Bronstein's declaration, my understanding from Your Honor's

2    order is that we will be entering that evidence --

3              THE COURT:  Correct.

4              WOMAN 1:  -- as deposition designation --

5              THE COURT:  Yes.

6              WOMAN 1:  -- from the deposition.

7              THE COURT:  Correct.

8              WOMAN 1:  Understood.  We just would reserve

9    rights to enter a rebuttal evidence to the extent anything

10   is still open as to his evidence to that point.

11             THE COURT:  That's fine.  Okay.  All right.  All

12   right.

13             Thank you, Mr. Bronge.

14             MR. BRONGE:  Thank you.

15             WOMAN 1:  Thank you, Your Honor.

16             THE COURT:  All right.  Just bear with me now.

17   The next is Harrison Schoenau, and I may have mispronounced

18   your name.  Is Mr. Schoenau on Zoom?

19             Mr. Colodny?

20             MR. COLODNY:  Hi, Your Honor.  Aaron Colodny, from

21   White & Case, on behalf of the Official Committee of

22   Unsecured Creditors.  Mr. Schoenau objected to the ADR

23   procedures.

24             THE COURT:  I'm having a little trouble hearing

25   you.

1           MR. COLODNY:  Sorry.  Mr. Schoenau objected to the

2    ADR procedures, and we've been working with him and counsel

3    for the withhold group this week.  I think we're very close.

4    We're talking about form discovery requests that hopefully

5    will speed up the exchange of information between parties,

6    and I hope that we get to the bottom of that shortly.  We've

7    been trying to push that along with Your Honor's comment

8    last week and hope to be done soon.

9           THE COURT:  All right.  Mr. Davis, you're next.

10          MR. DAVIS:  Thank you, Your Honor.  Your Honor,

11   I'm objecting to the 25-cent CEL token settlement between

12   the UCC and the debtors.  I'm also objecting to the UCC and

13   the debtors giving me 81 cents for my CEL token in custody

14   and 25 cents for my CEL tokens in Earn, which is not

15   equitable, which objections are all outlined in my

16   "Statement Under Oath of Otis Davis" located at Docket 3769.

17          Your Honor, the day the UCC and the debtors agreed

18   to give CEL token holders in custody 81 cents which was on

19   or around February 28, 2023 is the day the debtors and the

20   UCC agreed that all CEL token holders, regardless if they're

21   in custody or Earn to get 81 cents and Your Honor approved

22   that CEL token custody settlement.

23          I also object, Your Honor, to the Max Galka expert

24   report for undisclosed bias which is also in my statement

25   under oath at Docket Number 3769.  And lastly, Your Honor, I

1    would also like to join in Johan Bronge's deposition

2    request.  I have a few questions for Mr. Blonstein as well.

3    Thank you.

4              THE COURT:  Well, first off, Mr. Davis, unless you

5    requested and this Court approved remote testimony, your

6    direct testimony does not come in.

7              What's the position of the debtor with respect to

8    that?  I set this out quite clearly in an order for today's

9    hearing that Federal Rule of Civil Procedure 43(a) requires

10   in-court testimony.  Written direct is fine, but the

11   declarant has to be available in court for cross-

12   examination.  Let me first -- were you able to take Mr.

13   Davis's deposition?

14             MR. MCCARRICK:  We were, Your Honor.

15             THE COURT:  All right.  Do you object to his --

16   the direct occurring by Zoom?

17             MR. MCCARRICK:  I think Your Honor is well within

18   your rights to enforce the pretrial procedures which were

19   clear I think on multiple occasiosn that --

20             THE COURT:  Where are you located, Mr. Davis?

21             MR. DAVIS:  I'm in Jamaica.

22             MR. MCCARRICK:  We're prepared to proceed with

23   cross-examination, to the extent that Your Honor wishes.

24   But we think your pretrial order was clear and that a

25   request has not been filed by Mr. Davis to submit his direct

1    or to appear remotely for purposes of this hearing.

2              THE COURT:  Mr. Davis, did you receive the order

3    that said that if you wished to have remote testimony, you

4    had to file an application?

5              MR. DAVIS:  No, Your Honor.  I don't recall seeing

6    it.

7              THE COURT:  It was just filed a couple of days

8    ago.

9              MR. DAVIS:  I'll check the docket.  But I don't

10   recall seeing it.  I'm outside the country.  I simply don't

11   recall seeing it.

12             MR. MCCARRICK:  However Your Honor wants to

13   proceed, the debtors are happy to, although, if it's

14   acceptable, we will ask Mr. Davis to go on camera for his

15   cross.

16             THE COURT:  Yeah.  Just a second.  So I'm

17   referring to ECF Document 3813.  It was filed on the docket

18   on October 13, 2023, and it says, in part, beginning at the

19   bottom of Page 1, "For the direct testimony to be admitted

20   in evidence, witnesses must appear in the courtroom for

21   cross-examination and redirect examination unless the Court

22   permits remote appearance by Zoom pursuant to Federal Rule

23   of Civil Procedure 43(a) which requires, in relevant part,

24   'for good cause and compelling circumstances and with

25   appropriate safeguards, the Court may permit testimony in

Page 55

1    open court by contemporaneous transmission from a different

2    location.'  Witnesses requesting to appear remotely must

3    file an application with the Court requesting to do so and

4    must satisfy the compelling circumstances standard."  You

5    didn't do that.  I'm going to reserve ruling on whether I'm

6    going to permit your testimony to be considered by the

7    Court.  You submitted -- you submitted written direct.  Let

8    me just find it again.

9              MR. DAVIS:  Your Honor, does that include my

10   deposition or that's outside my deposition?

11             THE COURT:  Just stop.

12             MR. MCCARRICK:  Your Honor, the docket number --

13             THE COURT:  3769.

14             MR. MCCARRICK:  Beat me to it.

15             THE COURT:  So your "Statement Under Oath of Otis

16   Davis" was submitted before the Court posted what is the

17   rules.  I didn't make up the rules about what oath has to

18   be.  I will take it under consideration.  I'll permit you to

19   cross-examine Mr. Davis now.  So your direct testimony is in

20   evidence, subject to being stricken for failure to comply

21   with the rules.  But I'll permit you to go ahead and cross-

22   examine Mr. Davis now.

23             MR. MCCARRICK:  Thank you, Your Honor.  May I

24   approach with copies of the cross-examination exhibit

25   binder?

Page 56

1                THE COURT:  Sure.  Please.  Go ahead.

2                CLERK:  Judge Glenn?  He has to be sworn in?  He

3      has to be sworn?

4                THE COURT:  Yes.  He has to be sworn, particularly

5      since he didn't follow the oath for the --

6                MR. MCCARRICK:  Yes, and could I ask that his

7      camera be enabled?

8                THE COURT:  Yeah.  Could you turn your camera on,

9      Mr. Davis?

10               MR. MCCARRICK:  Your Honor, I didn't know I was

11     going to be deposed today.  I have a t-shirt and shorts on.

12               THE COURT:  Mr. Davis, if you want your testimony

13     considered, you have to turn your camera on.

14               MR. DAVIS:  I'm not saying no.  I'm just telling

15     you I have a t-shirt and shorts on.

16               THE COURT:  That's fine.  That's fine.  If you

17     would raise your right hand, and the ECRO operator will --

18               MR. DAVIS:  Can I put a white shirt -- can I put a

19     regular white shirt on?

20               THE COURT:  Mr. Davis, raise your right hand and

21     be sworn.

22               CLERK:  Do you solemnly swear or affirm that all

23     the testimony you're about to give before this Court is the

24     truth and the whole truth?

25               MR. DAVIS:  Yes, I do.

1              THE COURT:  Okay.

2              MR. MCCARRICK:  May I proceed?

3              THE COURT:  Yes.

4                   CROSS-EXAMINATION OF OTIS DAVIS

5    BY MR. MCCARRICK:

6    Q    Good afternoon, Mr. Davis.

7    A    Good afternoon.

8              THE COURT:  Just identify yourself for the record.

9              MR. MCCARRICK:  This is TJ McCarrick, Kirkland &

10   Ellis, on behalf of the debtors.

11   BY MR. MCCARRICK:

12   Q    You've offered an opinion on the value of CEL token,

13   correct?

14   A    The petition date price opinion, which was 81 cents.

15   Correct.

16   Q    And that's right, your view, your personal view is that

17   CEL token's value as of the petition date was 81 cents,

18   correct?

19   A    Correct.

20   Q    That 81 cents figure is based on the price of CEL token

21   on the petition date?

22   A    That is correct.

23   Q    And so what you're focused on is the price, correct?

24   A    The price.

25   Q    And you agree with me there's a difference between

1   price and value, correct?

2   A    I do.

3   Q    You personally didn't conduct a valuation of CEL token,

4   correct?

5   A    I did not.

6   Q    And you're not qualified to provide a valuation of CEL

7   token, correct?

8   A    I'm not an expert.

9   Q    Yeah.  I tallied up --

10  A    No, I'm not.

11  Q    I'm sorry.  Please.

12          THE COURT:  He answered your question, I thought.

13          MR. MCCARRICK:  Okay.

14  BY MR. MCCARRICK:

15  Q    Okay.  You're not trained in valuation techniques,

16  correct?

17  A    Correct.

18  Q    And instead you're offering a valuation opinion from

19  someone you claim is an expert witness, Hussen Faraj,

20  correct?

21  A    Correct.

22  Q    And your expert does not agree with you that the value

23  of CEL token is 81 cents, true?

24  A    He came to the valuation of 71 cents.

25  Q    And 71 cents is different than 81 cents, correct?

Page 59

1    A    Yes, it is.

2    Q    The 71 cents is also different from the 86-cent value

3    that you discussed in your sworn statement, true?

4    A    I don't recall discussing any 86-cent value in my sworn

5    statement.

6            MR. MCCARRICK:   Okay.   Can we display Celsius

7    Exhibit 82, which would be Tab 1 in the cross binder.   It's

8    Mr. Davis's sworn statement.

9            CLERK:   Give me one moment, please.   All right.

10   Mr. Lopez is a co-host.

11           MR. MCCARRICK:   Thank you, and can we turn to Page

12   PDF -- or PDF Page 86, Exhibit 82?   And can you blow up the

13   top paragraph there?

14   BY MR. MCCARRICK:

15   Q    This is an excerpt from your sworn statement in which

16   you're discussing the expert report of Mr. Galka, correct?

17   A    Correct.

18   Q    And what you're observing here is that certain

19   dislocation events were backed out, Mr. Galka's price should

20   have been 86 cents, correct?

21   A    I think that should have been -- it could have been 81.

22   But I don't recall doing the 86 cents.

23   Q    Well, do you see at the last line here where it says, I

24   will submit to this Court the average price between both

25   dislocation events is 86 cents?

1    A    I see that.

2    Q    Okay.  You also in your --

3          MR. MCCARRICK:  You can take that down, Mr. Lopez.

4    Thank you.

5    BY MR. MCCARRICK:

6    Q    You also in your sworn statement refer to a $2.01 price

7    value, correct?

8    A    Correct.

9    Q    And your expert doesn't agree with you that the value

10   of CEL token is $2.01, correct?

11   A    He does not.

12   Q    You also discussed a $2.88 figure in your sworn

13   statement, correct, Mr. Davis?

14   A    Correct.

15   Q    And your expert doesn't agree with you that $2.88 is

16   the value of CEL token on the petition date, correct?

17   A    He didn't opine on the $2 billion claim that was filed

18   in the FTX bankruptcy.

19   Q    So is that a yes to my question, Mr. Davis, that your

20   expert does not agree with you that the value of CEL token

21   on the petition date is $2.88?

22   A    My expert agreed that the value is 71 cents.  You are

23   correct.

24   Q    Okay.  So fair to say, sir, you've put forward four

25   different potential CEL token valuations, 81 cents, 86

Page 61

1    cents, $2.01 and $2.88, correct?

2    A    Sir, I'm not an expert.  The $2.01 came from a

3    dislocation event.  But your expert, Mr. Galka, said as a

4    result the price would be 35.5 cents based on a dislocation.

5    So I said why not use the Terra Luna dislocation event which

6    is a much bigger dislocation event.  Why are you just using

7    one dislocation event?  We had two huge dislocation events

8    in crypto and the Terra Luna one was much bigger.

9    Q    Okay, and just to be clear, what you're talking about

10   now are the two dislocation events that you think should

11   have been, or that you criticize Mr. Galka for not using,

12   correct?

13   A    Correct.

14   Q    Or for not backing out, I should say, correct?

15   Q    My opinion is if he's going to use one dislocation

16   event, why not use other dislocation event, which was much

17   bigger.

18   Q    And let's just get on the record what those dislocation

19   events are.  The first dislocation event is the collapse of

20   Terra Luna you just testified about, correct?

21   A    Correct.

22   Q    The second dislocation event is the pause on June 12,

23   2022, on Celsius's platform, correct?

24   A    Correct.

25   Q    And you think, sir, that the fair market value of CEL

1    token is best measured before both of those dislocation

2    events, don't you?

3    A    Sir, I'm not an expert.  My expert agreed that 71 cents

4    is a fair value for CEL token.  I was simply pointing out

5    that -- I was simply pointing out that Mr. Galka, prior to

6    the pause, said the price should be 35.5 cents.  That's one

7    dislocation event.  And I was saying to the Court, if you're

8    going to use this dislocation event, why not use the other

9    dislocation event where the price was $2.01?  You can't just

10   use one dislocation event and ignore a bigger dislocation

11   event.

12   Q    Okay.  I just want to make clear, it is your sworn

13   testimony that the fair market value of CEL token is best

14   measured before the Terra Luna dislocation event and the

15   pause, true?

16   A    Correct.  That's what I wrote.

17   Q    That's what you put in your sworn statement, correct?

18   A    That's what I put in my sworn statement.

19   Q    Terra Luna collapsed May 6, 2022, correct?

20   A    It happened over a timeframe.  It didn't happen in one

21   day.

22   Q    Okay.  What's the timeframe, sir?

23   A    I think the timeframe was around -- I think it was

24   around May 7th to May 12th, May 13th.

25   Q    All right.  So it's your position that any valuation of

1   CEL token should be before May 7, correct?

2   A    Sir, my opinion is if Mr. Galka is going to use one

3   dislocation event, why not use another?  That's all I was

4   saying.  There are two dislocation events.  Why would you

5   choose the lower one?  If you're going to choose 35.5 cents,

6   why not choose the $2.01 cents?

7   Q    My question, Mr. Davis, is, is it your position that

8   the fair market value of CEL needs to be measured, or is

9   best measured before both of those dislocation events, yes

10  or no?

11  A    Sir, my fair market value of CEL, I agree with my

12  expert, should be 71 cents.  I'm not an expert.  I did

13  provide this document.

14          THE COURT:  Mr. Davis, listen to the question

15  again, and then answer the question.

16          Go ahead, ask your question again, Mr. McCarrick.

17  BY MR. MCCARRICK:

18  Q    Mr. Davis, is it your position that the fair market

19  value of CEL token is best measured before the collapse of

20  Terra Luna and the pause, yes or no?

21  A    No.

22  Q    Okay.  You submitted a sworn statement in this case,

23  correct?

24  A    Correct.

25  Q    Told the truth in that sworn statement, didn't you?

Page 64

1    A    I did.

2    Q    You had the chance -- actually, you submitted an

3    unsworn statement first, correct?

4    A    I'm not sure what that means.

5    Q    Okay.  Well, you submitted your sworn statement after

6    reviewing it carefully, correct?

7    A    Correct.

8    Q    And you stand by everything in that sworn statement?

9    A    I do.

10           MR. MCCARRICK:  Okay.  Mr. Lopez, can we please

11   put Celsius Exhibit 81 back up?  And we're going to go to

12   Page 6 of the PDF.

13           THE COURT:  What's the page of the ECF?  I want to

14   see it my screen here so I can see it.

15           MR. LOPEZ:  ECF 3769, Page 6.

16           THE COURT:  Page 6?  Okay.  Go ahead.

17           MR. MCCARRICK:  It's Page 7 of the PDF with the

18   exhibit slip sheet.  Okay.

19           THE COURT:  Go ahead.

20   BY MR. MCCARRICK:

21   Q    This is your sworn statement, correct?

22   A    Correct.

23   Q    Do you see where you write, "I submit to this Court

24   that the fair market value of CEL token is best measured

25   before both of these dislocation events, one being the

Page 65

1    pause, the other being the gigantic collapse of the $60

2    billion crypto project, Terra Luna."

3    A    That was my opinion before I was in contact with my

4    expert.  I filed it before speaking to my expert.  I see

5    that, yes.

6    Q    Well, that's not true, sir, is it?  You contacted the

7    expert during the first or second week of October, right?

8    A    But he didn't agree to testify then.  We were just

9    talking.

10   Q    Okay.

11   A    He didn't agree to testify until, I think, around seven

12   or eight days ago, or write a report, I should say.

13   Q    When was the first time you talked to Mr. Faraj?

14   A    The first time ever?

15   Q    Yes, sir.

16   A    I think it was after Celsius filed for bankruptcy, and

17   he was on a (indiscernible) where I was on, I think,

18   probably July 2022 or maybe August 2022.

19   Q    Okay.  Well, the first time you talked to Mr. Faraj

20   about the expert report in this case was on October 6th,

21   wasn't it?

22   A    It wasn't about the expert report that we discussed on

23   October 6th.  He just contacted me and said, if you need

24   some help, I can provide some assistance.  We didn't speak

25   about him writing a report until about, I think, around

Page 66

1    seven or eight days ago.

2    Q    Okay.  Well, you posted on Twitter about Mr. Faraj's

3    71-cent valuation before October 11th, didn't you?

4    A    Correct.

5    Q    And you submitted this sworn statement on October 11th,

6    correct?

7    A    October 11th was around five or six days ago, sir.

8    Q    Right.  My question is, you were aware of Mr. Faraj's

9    71-cent valuation before you submitted this sworn statement

10   to the Court, true?

11   A    I was not aware of it.

12   Q    Okay.  So it's your -- I just want to be very clear.

13   It's your sworn testimony that you were not aware of the 71-

14   cent valuation before October 11th?

15   A    It is my sworn testimony that I was not aware of Mr.

16   Faraj's 71-cent valuation before I submitted this.  That is

17   my testimony, my sworn testimony.

18   Q    Okay.  In any event, you generally think that any

19   valuation should exclude trading data from the Terra Luna

20   collapse, correct?

21   A    I'm not sure what that means.

22   Q    Okay.  You agree with me that Mr. Faraj, his own

23   valuation period, looked at data from May 21st to June 9th,

24   correct?

25   A    Correct.

1    Q    And you don't criticize Mr. Faraj for doing that, do

2    you?

3    A    No, I do not.  He's an expert.  I'm not.

4    Q    Well, Mr. Galka is an expert too, right?

5    A    Yes.  He's an expert.  I disagree with his opinion.

6    Q    Okay.  You agree with me that Mr. Faraj, your expert

7    witness in this case, did not value CEL token as of the

8    petition date, correct?

9    A    He did not.

10   Q    Okay.

11   A    You testified that Mr. Faraj contacted you to offer an

12   expert opinion in this case, right?  He was the first one to

13   reach out to you?

14   A    I don't recall who contacted who first.  I remember

15   there are some tweets back and forth that were public, and

16   he could have contacted me first.  I could have contacted

17   him first.  I really don't remember who contacted who first,

18   but I believe he contacted me first.  But as I said, I don't

19   recall who contacted who first.

20   Q    Okay.  Well, you gave a deposition in this case,

21   correct?

22   A    Correct.

23   Q    The deposition was, like, 48 hours ago?

24   A    Correct.

25   Q    You took the same oath that you took today?

Page 68

1    A    Yes, I did.

2    Q    And you told the truth during that deposition?

3    A    Yes, I did.

4            MR. MCCARRICK:  Okay.  Mr. Lopez, can we look at

5    Page 41, Lines 2 to 5 of Mr. Davis's deposition?

6    BY MR. MCCARRICK:

7    Q    Do you have that?  Do you see that on your screen

8    there, sir?

9    A    I see that.

10   Q    And did I ask you this question, and did you give this

11   answer:

12        Question: Okay.  So who contacted who first?  Did you

13   contact Mr. Faraj or did Mr. Faraj contact you?

14        Answer: He contacted me.

15        That's the testimony you gave, correct?

16   A    Correct.

17            MR. MCCARRICK:  Okay.  You can take that down.

18   BY MR. MCCARRICK:

19   Q    You spoke with Mr. Faraj twice on the phone, correct?

20   A    Correct.

21   Q    The first time, he offered to provide an expert report

22   on the value of CEL token, correct?

23   A    I don't recall exactly what the first conversation was

24   about.  They may blend in my mind, but if you have something

25   to refresh my recollection, I'm happy to look at it.

1    Q    Sure.  We can go back to your deposition.  Let's look

2    at Page 33, Lines 20 to 24.  And do you see where I asked

3    you what kind of assistance did Mr. Faraj offer, ad your

4    answer was, he said he could prepare an expert report and do

5    an analysis and come to the fair market price of CEL token.

6    Do you see that?

7    A    Correct.

8    Q    Is your recollection refreshed that that's the

9    assistance that Mr. Faraj offered you during the first phone

10   call you had with him?

11   A    Correct, and I recall asking him if there would be any

12   charge, if he would charge, and he said no, he would not

13   charge me.

14   Q    Okay.  So Mr. Faraj said he wouldn't charge you.  Did

15   he ask you to do anything in return?

16   A    No.  He did not.

17   Q    Did he ask you to do --

18   A    I did ask him --

19   Q    Sorry.  Go ahead.

20   A    I did ask him why he's doing this.  He says he loved

21   the space and he believes he can add value and give the

22   Court a proper valuation.

23   Q    Okay.  The second phone call you had with Mr. Faraj,

24   you claim you didn't discuss anything related to these

25   Chapter 11 cases at all, right?

1    A    We didn't discuss anything related to the Chapter 11

2    cases because I said to him at the beginning of the

3    conversation that I don't have counsel here on this phone,

4    so I don't have any attorney-client privilege as far as I

5    know.  So we shouldn't even discuss anything related to the

6    Chapter 11 or your expert report or what you're going to do

7    or your value or anything like that because it's all

8    discoverable.

9    Q    Well, we'll get to whether or not it's discoverable in

10   a second.  You communicated with Mr. Faraj in writing as

11   well, correct?

12   A    Correct.

13   Q    You direct messaged Mr. Faraj on Twitter, correct?

14   A    Correct.

15   Q    You had conversations with Mr. Faraj on WhatsApp

16   correct?

17   A    Correct.

18   Q    And at your deposition, I asked you to read those

19   messages with your expert witness into the record, didn't I?

20   A    Yes, you did.

21   Q    And you refused to do that, didn't you, sir?

22   A    I did not read them into the record.

23   Q    You acknowledge --

24              THE COURT:  Did you refuse to do that?

25              THE WITNESS:  I did refuse to do that, Your Honor.

Page 71

1            THE COURT:  Go ahead.

2    BY MR. MCCARRICK:

3    Q    You acknowledge that in those messages you talked about

4    what the Court was interested in with respect to the value

5    of CEL token, correct?

6    A    I don't recall that.

7            MR. MCCARRICK:  Okay.  Could we bring up Mr.

8    Davis's deposition, Page 44, Lines 13 to 22.

9    BY MR. MCCARRICK:

10   Q    And I asked you some questions about whether or not you

11   had discussed the Court or what the Court is interested in,

12   correct?

13   A    Correct.

14   Q    Did I ask this question, and did you give this answer:

15        Question: I'm not assuming you disparaged Judge Glenn

16   at all.  I'm just wondering whether or not you had any

17   conversations about what you think Judge Glenn might be

18   interested in and what testimony you might want to elicit

19   from Mr. Galka -- not Mr. Galka, excuse me, Mr. Faraj.

20        Answer: The conversation would be around Judge Glenn

21   wants a value for CEL token.  Mr. Galka couldn't give him

22   that value.

23        Did I ask that question?  Did you give that answer?

24   A    Yes, you did.

25            MR. MCCARRICK:  Okay.  You could take that down,

Page 72

1    Mr. Lopez.

2    BY MR. MCCARRICK:

3    Q    Mr. Davis, you're familiar with the concept of utility

4    token, correct?

5    A    Yes, I am.

6    Q    A utility token is a token that is used in connection

7    with a particular ecosystem or platform, correct?

8    A    Correct.

9    Q    And a utility token's value primarily derives from the

10   use cases it has on the ecosystem it's in, fair?

11   A    That is not fair.

12   Q    Well, you would agree with me that the more utilities

13   that a token has, the better it is, right?

14   A    Correct.

15   Q    And CEL token is a utility token, in your view, right?

16   A    It is.

17   Q    Before the pause or petition date, you thought that

18   CEL's utility could use some improvement, correct?

19   A    Correct.

20   Q    In your view, there weren't enough use cases for CEL

21   before the pause and petition date, correct?

22   A    Correct.

23   Q    And in fact, you talked with Celsius's former CEO, who

24   is now under federal indictment, Alex Mashinsky, about how

25   to improve CEL, correct?

1    A    Correct.

2            MR. MCCARRICK:  Okay.  Mr. Lopez, we'd like to

3    look at Celsius Exhibit 90, which is Tab 3 in the cross

4    binder.  And can we go to Page 3 of the PDF?  And can we

5    blow up the -- no, the one before that.  I'm adjusting my

6    head, Mr. Lopez.  Thank you.

7    BY MR. MCCARRICK:

8    Q    That's an email from yourself to Mr. Mashinsky.  Do you

9    see that?

10   A    What date is this?

11   Q    December 6, 2021.  Do you see that's an email from you

12   on December 6, 2021?

13   A    Correct.  I see that.

14   Q    It says CEL token fixes, correct?

15   A    Correct.

16   Q    And you proposed a number of changes to the CEL token

17   program, right?

18   A    Correct.

19   Q    And the idea was to make CEL more attractive to users,

20   true?

21   A    True.

22   Q    One of the reasons you wanted to make CEL more

23   attractive to users is so that Celsius wasn't the only whale

24   in the marketplace doing buybacks; is that correct?

25   A    Celsius was not the only whale that I know that was in

Page 74

1    the marketplace doing buybacks.

2            MR. MCCARRICK:  Okay.  Let's turn to Page 5 of the

3    PDF, and I want to look at Entry Number 32.  Page 4.  There

4    we go.  Could we blow up Number 32?

5    BY MR. MCCARRICK:

6    Q    Do you see where you wrote Mr. Mashinsky, you can

7    guarantee more people in the market like Celsius buying lots

8    of CEL tokens every week, and this creates a new flywheel

9    effect.  Do you see that?

10   A    I see that.

11   Q    So it's your understanding that in December 2021,

12   Celsius was buying lots of CEL tokens on a weekly basis,

13   right?

14   A    They did their weekly buybacks on a weekly basis.

15   Q    And it's your understanding that those weekly buybacks

16   created a flywheel effect, correct?

17   A    Correct.

18   Q    And the gist of a flywheel effect is that by increasing

19   demand, CEL token price is going to rise and the cycle is

20   going to reinforce itself, true?

21   A    True.

22   Q    And at that time, sir, was it or was it not your view

23   that Celsius was the only whale making buybacks?

24   A    Sir, I know what I wrote, but I could not have known

25   how many whales are buying CEL token.  I wrote that, but

1    there is no way for me to know how many whales are buying

2    CEL tokens.  We had a lot of whales in Celsius.

3    Q    The only whale that you knew of at the time, sir, was

4    Celsius making buybacks, right?

5    A    I didn't know of any of a specific whale, but there

6    were other whales, but I didn't know of any of a specific

7    whale.

8    Q    Okay.  This isn't the last time you talked to Mr.

9    Mashinsky about CEL.

10            MR. MCCARRICK:  Actually, Your Honor, we'd like to

11   move Exhibit 90 into evidence.

12            THE COURT:  Any objections?  Exhibit 90 is in

13   evidence.

14       (Exhibit 90 admitted into evidence.)

15   BY MR. MCCARRICK:

16   Q    Okay.  That's not the last time you talked to Mr.

17   Mashinsky about CEL token utility, correct?

18   A    Correct.

19            MR. MCCARRICK:  Okay.  Mr. Lopez, can we bring up

20   Celsius Exhibit 87?  Can we turn to Page 2 of the PDF, and

21   can we blow up the bottom email from Mr. Davis so we can see

22   what the date is?

23   BY MR. MCCARRICK:

24   Q    This is an email from you to Mr. Mashinsky on January

25   26, 2022.  Do you see that?

1    A    I see that.

2    Q    And that is, in fact, a fair and accurate copy of your

3    email.  We looked at this during your deposition, right?

4    A    Right.

5              MR. MCCARRICK:  Okay.  Your Honor, we'd offer

6    Celsius Exhibit 87 into evidence.

7              THE COURT:  All right.  It's admitted in evidence.

8         (Exhibit 87 admitted into evidence.)

9              MR. MCCARRICK:  All right.  Let's look at Page 3

10   of the PDF, and I want to look at the paragraph, the last

11   paragraph that says, Alex, all you need.  Can we blow that

12   up, Mr. Lopez?

13   BY MR. MCCARRICK:

14   Q    Do you see in this paragraph, Mr. Davis, where you

15   write, we also voiced our concerns that CEL has no utilities

16   whatsoever?

17   A    I see that.

18   Q    And you write, it's only when the tide goes out you

19   realize who's swimming naked.  The tide has gone out and CEL

20   is swimming naked.  Do you see that?

21   A    I see that.

22   Q    And that was your view in January 2022.  CEL had no

23   useful utilities, correct?

24   A    CEL had no good utilities.  They could add more.  They

25   did have utilities.  There was Earn in CEL, discount on

Page 77

1    loans and higher swap limits.  Those are utilities.  And you

2    can also take loans against your CEL token.  That's a big

3    utility.

4    Q    Well, you said in January 2022 that it had no useful

5    utilities, right?

6    A    Sir, I know what I said.  I wrote the email to get the

7    attention of Alex Mashinsky because I could not get the

8    attention of Alex Mashinsky no matter what I did.

9    Q    So is it your answer that you were saying something

10   that might have been inaccurate in order to get the

11   attention of someone whose attention you wanted?

12   A    I was being hyperbolic.  You seem to think that Alex

13   Mashinsky and I had a good relationship before the pause.

14   We did not and we don't now.  I was hounding him for 15

15   months to add useful utilities.  That's why I wrote the

16   email.

17   Q    I just want to break that down, Mr. Davis.  You were

18   hounding Mr. Mashinsky for 15 months to add useful utilities

19   to CEL that you did not think it had, correct?

20   A    I didn't think it had enough utilities.  I didn't think

21   Earn in CEL, discount on loans, highest swap limits and

22   taking a loan against your CEL token was enough.  I thought

23   there should be more.  An example that I gave you in the

24   deposition was withdrawal fees.  When you withdraw Bitcoin,

25   ETH or other altcoins, the fee should be paid in CEL.

1    Q    Understood, Mr. Davis.  I was just following up on your

2    last answer.  Your last answer was that you had been

3    hounding Mr. Mashinsky for 15 months to add useful utilities

4    to CEL, correct?  That was your testimony.

5    A    Correct.

6    Q    And he didn't add that utility, correct?

7    A    He didn't add any more utilities.

8              MR. MCCARRICK:  Okay.  Can we go to the next page?

9    BY MR. MCCARRICK:

10   Q    You just listed a number of utilities that you said CEL

11   had at the time, right?

12   A    Correct.

13   Q    You didn't like any of those utilities, did you?

14   A    That's not true.  I love the swap utilities.  I love

15   the loans utilities, had my CEL-backed loans liquidated.  I

16   think the loans was one of the best utilities.  I just

17   wanted him to add more.  As I said, I was being hyperbolic.

18   We just needed more utilities as a community.

19   Q    Okay.  Well, you see here where you wrote Mr.

20   Mashinsky: I don't know how one -- withdrawn.

21        You see here that you wrote Mr. Mashinsky, I don't know

22   of one CEL utility that I use or that I like, not one.

23        That's what you wrote in January of 2022, correct?

24   A    That was hyperbolic.  I obviously had loans at that

25   point.  And the loans were -- they totaled to be seven

Page 79

1    figures, so that was hyperbolic.  A loan is a very useful

2    utility.

3            MR. MCCARRICK:  Okay.  Mr. Lopez, you can take

4    that down.

5    BY MR. MCCARRICK:

6    Q    Sir, it's true that you communicated with Mr. Mashinsky

7    in between the pause and the petition date, right?

8    A    Your definition of communication, as we agreed in the

9    deposition, we disagree on because you are the attorney that

10   represented Mr. Mashinsky at that point, and you instructed

11   him not to speak to anybody.  I sent Mr. Mashinsky a direct

12   message, and he did not respond.  You are the attorney

13   Kirkland & Ellis that represented Mr. Mashinsky between the

14   pause and when he was ousted, and you directed him not to

15   speak to anybody, and he did not respond to that DM, and

16   that's what I told you at the deposition.

17   Q    Well, I'll represent to you I've never spoken to Mr.

18   Mashinsky in my life.  But my question -- I won't use word

19   communication, if it helps.

20   A    I meant your firm.

21   Q    You mentioned -- or withdrawn.

22        You messaged Mr. Mashinsky in between the pause and the

23   petition date, true?

24   A    True.

25            MR. MCCARRICK:  All right.  Let's put up Celsius

1    Exhibit 102, which are a series of direct messages between

2    Mr. Davis and Mr. Mashinsky, and Your Honor, we would offer

3    Exhibit 102 into evidence.

4             THE COURT:  What is it comprised?  Just tell me

5    what it is.

6             MR. MCCARRICK:  Your Honor, it's a series of

7    direct messages that begins in June of 2022 between Mr.

8    Mashinsky and Mr. Davis.

9             THE COURT:  Are there messages back from

10   Mashinsky?

11            MR. MCCARRICK:  There are not any messages.

12            THE COURT:  They're all messages from Mr. Davis to

13   Mr. Mashinsky?

14            MR. MCCARRICK:  Yes, Your Honor.

15            THE COURT:  All right.  Exhibit 102 is admitted in

16   evidence.

17        (Exhibit 102 admitted into evidence.)

18   BY MR. MCCARRICK:

19   Q    Okay.  Do you see here on June 24, 2022, that you write

20   Mr. Mashinsky, I've singlehandedly inspired the community

21   against these short sellers.

22   A    I see that.

23   Q    That refers to your efforts to organize the so-called

24   short squeeze, correct?

25   A    It wasn't an effort to organize.  I was DM'ing him to

Page 81

1    get his attention, like I said before.

2    Q    I'm sorry.  I couldn't understand your answer.  Could

3    you please repeat it?

4    A    I was being hyperbolic once again here.

5    Q    Okay.  Well, fair enough.

6    A    I can't singlehandedly inspire an entire community.

7    Q    Okay.  So when you said that here, that was false.

8    A    It was not false.  I was being hyperbolic.  I wanted

9    him to respond to the message, but I knew between the pause

10   and petition date, he was probably pretty busy.  And as you

11   can see, I did not get a response.

12   Q    All right.  Well, do you see a couple of lines down

13   where you say, that's what you need them to do, make them

14   believe, give them a reason to believe.  Useful utility/use

15   cases around CEL and not gimmicks will give them that reason

16   to believe.  Do you see that?

17   A    Yes, I see that.

18   Q    And that's consistent with the January 2022 email we

19   just looked at where you're complaining about the use cases

20   of CEL, right?

21   A    In this instance, I thought we were going to open back

22   up.  The pause is just temporary.  And my opinion was if

23   you're going to open back up, you need to add more utilities

24   to CEL tokens.  The ones that you have, because we have a

25   market downturn, would just not be enough.  You need to add

Page 82

1    more utilities.

2    Q    Well, you also were complaining about the lack of

3    utilities on CEL back in January of 2022, well before any

4    pause, correct?

5    A    Yes.

6    Q    Okay.  Sir, is it your view today that CEL is

7    worthless?

8    A    No, it's not.

9            MR. MCCARRICK:  All right.  Let's put up Celsius

10   Exhibit 99, which is a tweet from Mr. Davis.  And can we

11   blow up the top part of that, Mr. Lopez?  I can't see it.

12           First we'd move Celsius Exhibit 99 into evidence.

13           THE COURT:  It's in evidence.

14      (Exhibit 99 admitted into evidence.)

15   BY MR. MCCARRICK:

16   Q    Okay.  Mr. Davis, do you see where you wrote here, at

17   Celsius Network is a bankrupt company with a worthless

18   token?

19   A    I see that.

20   Q    I asked you about this tweet at your deposition,

21   correct?

22   A    I think you did.

23   Q    I asked whether CEL is a worthless token, and you told

24   me that the document speaks for itself, correct?

25   A    I think I said that.

Page 83

1    Q    Do you want me to refresh your recollection?  Would

2    that be helpful?

3    A    Yes, please.

4              MR. MCCARRICK:  Okay.  Can we bring up Mr. Davis's

5    deposition, Page 92, Lines 13 to 14.

6              MR. LOPEZ:  (indiscernible)

7              MR. MCCARRICK:  (indiscernible) the Internet?

8    Okay.

9    BY MR. MCCARRICK:

10   Q    Well, Mr. Davis, I can read it out loud to you.

11             MR. MCCARRICK:  And, Your Honor, it's the first

12   tab in your binder.  It's Page 92.  It's Line 13 to 14.

13   BY MR. MCCARRICK:

14   Q    And I'll represent to you that the question I asked

15   was:

16        Question: Okay --

17             THE COURT:  I have it open and I see it.  Go ahead

18   and put it in the record.

19   BY MR. MCCARRICK:

20   Q    Okay.  You were asked this question, and you gave this

21   answer Mr. Davis:

22        Question: Okay.  Is CEL a worthless token?

23        Answer: The document speaks for itself, sir.

24        Does that sound familiar to you?

25   A    What date is that document?

Page 84

1   Q    What day was that?  That was two days ago when we spoke

2   --

3   A    What date?  No.  What date is the tweet, sir?

4   Q    Oh, the date of the tweet.  Well, it was certainly

5   after the bankruptcy.  Give me one moment.  I can get that

6   for you.  It looks like it's in October of 2022.

7            THE WITNESS:  Objection, Your Honor, relevance.

8   Post-petition.

9            THE COURT:  You agree then, that the Celsius token

10  is worthless post-petition?

11           THE WITNESS:  I didn't think it was fully

12  worthless.

13           THE COURT:  I'm asking -- I'm asking you a direct

14  question.  Do you believe that the Celsius token is

15  worthless post-petition?

16           THE WITNESS:  No.

17  BY MR. MCCARRICK:

18  Q    Okay.  Mr. Davis, that's what you wrote, though, in

19  October of 2022, correct, that Celsius is a bankrupt company

20  with a worthless token, right?

21  A    I see that.

22  Q    Is that more hyperbole?

23  A    I wrote that.  But Celsius cannot be worthless because

24  the market cap right now is -- I don't recall exactly what

25  it is, but I'm sure it's something like $40 or $50 million.

Page 85

1    That is obviously not worthless.  It is hyperbole.

2    Q    Okay, and when I asked you, after you had told me that

3    the document speaks for itself, again, whether or not CEL

4    was worthless, you took the Fifth Amendment, didn't you?

5    A    I don't recall what I said.

6    Q    You don't recall what you said.  Okay.  Well, why don't

7    we bring back your deposition.

8            MR. MCCARRICK:  And let's go to Pages 93, 24 to

9    94, 7.  Can I have that, Mr. Lopez?

10           MR. LOPEZ:  I have to log on (indiscernible) --

11   BY MR. MCCARRICK:

12   Q    Okay.  Well, I'll represent to you --

13           THE COURT:  Just read him question and answer.

14           MR. MCCARRICK:  Yes.

15   BY MR. MCCARRICK:

16   Q    Question: Do you think that CEL is a worthless token

17   today?

18       Answer: I'll take the Fifth Amendment.  Do you feel

19   better?

20       Does that sound familiar?

21   A    It sounds familiar.

22   Q    Yeah.  That's what you said, isn't it?

23           THE COURT:  Ask him the next --

24           THE WITNESS:  You kept asking me the same question

25   over and over again and it was asked and answered.

Page 86

1          MR. MCCARRICK:  Let's go to Page 94.  You're still

2     off, Mr. Lopez.

3          MR. LOPEZ:   (indiscernible)

4          MR. MCCARRICK:  Okay.

5          THE COURT:  I'll read it to you, Mr. Davis.  Page

6     94, Line 3: You're taking the Fifth Amendment on whether or

7     not you think CEL is a worthless token.

8          Answer on Line 6: Taking the Fifth about you

9     asking questions outside the petition date.

10         Question: Okay.  Is it your position that CEL was

11    a worthless token on the petition date?

12         No.

13         Question: What changed between, in your view, why

14    is it worthless after the petition date, but not on the

15    petition date?

16         Answer: In my mind, after the petition date, you

17    can't use any utilities.

18    BY MR. MCCARRICK:

19    Q    That was your testimony, right, Mr. Davis?

20    A    Correct.

21    Q    And so your testimony is that the reason you don't

22    think that CEL has value after the petition date is because

23    you're unable to use it anymore, correct?

24    A    You can use CEL token for anything in DeFi, just like

25    you can use DOGE that has no utility, that has a $5 billion

1    market cap.

2    Q    Understood, Mr. Davis.  I'm just asking when you say,

3    in my mind after the petition date, you can't use any

4    utilities, that's the reason you called it worthless after

5    the petition date?

6    A    That was hyperbole, and that's what I said because you

7    can't use it.  The platform is obviously paused, so you

8    can't take a loan.  You can't get discount interest on

9    loans.

10   Q    And that was true on the pause date as well, correct,

11   sir?

12   A    As of June 13, 2022, no one could use utilities for

13   CEL.

14   Q    Okay.  I just have a few more questions, Mr. Davis.

15   Have you ever publicly threatened anyone in connection with

16   these Chapter 11 proceedings?

17   A    I know what you're going to ask me.  You asked me at my

18   deposition.  But I don't consider that a threat.

19            MR. MCCARRICK:  Okay.  Well, let's look at it.

20   Let's go to Celsius Exhibit 94, and that's a tweet from

21   February 21, 2023.

22            Deanna, can you grant Mr. Lopez rights to share

23   his screen again?

24            CLERK:  Judge, unfortunately, Deanna stepped away

25   from her desk, and I can't give rights.  We'll have to wait

Page 88

1    for her to return, unfortunately.

2    BY MR. MCCARRICK:

3    Q    Okay.  Well, Mr. Davis, you said that you know the

4    tweet that I'm referring to, correct?

5    A    Correct.

6    Q    Celsius Exhibit 94 is a Tweet you wrote on February 21,

7    2023, correct?

8    A    Correct.

9         MR. MCCARRICK:  And, Your Honor, just for your

10   reference, that's going to be Tab 5.  Oh, no, I'm sorry,

11   it's not Tab 5 in the binder.  We'll have to wait for Mr.

12   Lopez.

13        THE COURT:  Okay.

14   BY MR. MCCARRICK:

15   Q    Let me ask you just if you recall it.  Do you recall

16   making the following post: the days are coming when we CEL

17   token holders will lift you up out of the water with butcher

18   hooks and the rest of you with fish hooks and then burn your

19   tabernacle to the ground for your error towards us CEL token

20   holders.  Do you remember issuing that tweet?

21   A    It's part of a Bible quote.  I remember it.

22   Q    Okay, and when I asked you who that tweet was directed

23   to, you refused to answer, correct?

24   A    I think I refused to answer initially, and then I

25   answered.  When you said, is it directed at White & Case, I

1    said no.  It's not directed at White & Case.  White & Case

2    and I had no beef at that point.

3    Q    Well, who's it directed at, sir?

4    A    It was directed at all the people that were attacking

5    CEL token holders.

6    Q    And when you say attack CEL token holders, what do you

7    mean?

8    A    The people on Twitter.  All the people on Twitter that

9    are saying we deserve zero.  You guys deserve nothing.  Go

10   away.  You're lucky you're getting something.

11   Q    Okay.  So it's your position --

12   A    Told me to burn in hell.

13          MR. MCCARRICK:  Your Honor, permission to approach

14   with copies of Exhibit 94.  Thank you.

15          THE WITNESS:  And these are the people that were

16   making threats towards CEL token holders.

17   BY MR. MCCARRICK:

18   Q    Understood.  I just want to clean up your testimony a

19   little bit.  Is it your testimony that the people who need

20   to be hung by butcher and fish hooks are the people who

21   think that CEL has a value of zero?

22   A    Sir, it was hyperbole, and they were threatening me,

23   telling me, you should burn in hell, go to hell.  And as you

24   know, there are a lot of threats.  Your firm and White &

25   Case have said the same thing, that you guys have to look

Page 90

1    over your shoulders.  We did, too.  Same thing that was

2    going on at that point.  We even brought it to the judge's

3    attention.  People's lives are in danger.  There are a lot

4    of threats.  So I was pushing back on those threats.  And I

5    don't know why you would think it was White & Case.  I had

6    no beef with White & Case at that point.

7                 MR. MCCARRICK:  Okay.  Your Honor, we'd move

8    Exhibit 94 into evidence.

9                 THE COURT:  Into evidence.

10        (Exhibit 94 admitted into evidence.)

11                MR. MCCARRICK:  Thank you for your time, Mr.

12   Davis.  To the extent the committee has any questions, I'll

13   pass the witness.

14                THE COURT:  Mr. Colodny?

15                MR. COLODNY:  No questions at this time, Your

16   Honor.

17                THE COURT:  Anybody else wish to examine Mr.

18   Davis?

19                MR. KIRSANOV:  Yes, Your Honor.  Dimitry Kirsanov,

20   pro se.

21                THE COURT:  Go ahead.

22                    CROSS-EXAMINATION OF OTIS DAVIS

23   BY MR. KIRSANOV:

24   Q    Mr. Davis, good afternoon.

25   A    Good afternoon, Dimitry.

Page 91

1    Q     Mr. Davis, does dogecoin trade today?

2    A     Yes, it does.

3    Q     Mr. Davis, is dogecoin worthless?

4    A     No, it's not.

5    Q     Mr. Davis, do you know that expert witness Max Galka

6    obtained seed funding from Alameda Research?

7              MR. MCCARRICK:  Objection.

8              THE COURT:  Sustained.

9              THE WITNESS:  Yes, I do.

10             THE COURT:  Sustained.  Strike the answer.

11   BY MR. KIRSANOV:

12   Q     Mr. Davis, do you know that Alameda Research was FTX's

13   sister company?

14   A     Yes, I do.

15   Q     Mr. Davis, did you know that FTX was a competitor of

16   Celsius?

17   A     Yes, it was.

18   Q     Mr. Davis, do you think there was market manipulation

19   from competitors of Celsius?

20             MR. MCCARRICK:  Objection.

21             THE WITNESS:  Please repeat the question.  I

22   didn't hear all of the question.

23             MR. KIRSANOV:  Certainly.

24   BY MR. KIRSANOV:

25   Q     Mr. Davis, do you think there was market manipulation

Page 92

1   from the competitors of Celsius?

2   A    Yes.

3   Q    Mr. Davis, is the CEL token traded today?

4   A    Yes, it is.

5   Q    Mr. Davis, has CEL token been traded after bankruptcy?

6   A    Yes, it has.

7   Q    Mr. Davis, did you have loans on Celsius?

8   A    Yes, I did.

9   Q    Mr. Davis, did all your loans get liquidated?

10  A    Yes, they did.

11  Q    Mr. Davis, did your CEL from liquidation go to your

12  custody wallet?

13  A    Yes, it did.  I believe 54,000 CEL tokens went to my

14  custody wallet.

15  Q    I see.  Mr. Davis, did you know the Chapter 7

16  liquidation rates across --

17          MR. MCCARRICK:  Objection.

18          THE COURT:  Sustained.  Ask another question, Mr.

19  Kirsanov.

20          THE WITNESS:  I didn't -- I didn't hear the

21  question.

22  BY MR. KIRSANOV:

23  Q    Mr. Davis, do you know the liquidation for your Earn

24  claim on your CEL tokens?

25          MR. MCCARRICK:  Objection, Your Honor.

Page 93

```
 1              THE COURT:  Sustained.

 2              THE WITNESS:  Eighty-one cents.

 3              THE COURT:  Sustained.

 4    BY MR. KIRSANOV:

 5    Q    Mr. Davis, do you think you are receiving fair value in

 6    comparison to your Earn from your custody class?

 7              MR. MCCARRICK:  Objection, Your Honor.

 8              THE WITNESS:  No, I do not.

 9    BY MR. KIRSANOV:

10    Q    Mr. Davis, are you aware of deactivation day pricing?

11    A    Please explain it to me what it means.

12              MR. KIRSANOV:  I'd like to open to the plan, Page

13    3000 -- I'm sorry, Docket 3000 --

14              MR. COLODNY:  Objection.  He's testifying.

15              THE COURT:  Sustained.

16              MR. KIRSANOV:  Can we open the plan up to the

17    witness, please?

18              THE COURT:  No.  If you wish to cross-examine, you

19    have to post the exhibits that you wish to use in

20    examination.

21    BY MR. KIRSANOV:

22    Q    Okay.  Mr. Davis, have you been intimidated relating to

23    the CEL token?

24    A    Yes, I have.

25    Q    Have you been threatened in relation to the CEL token?
```

Page 94

1    A     Yes, I have.

2              MR. KIRSANOV:  I have no further questions, Your

3    Honor.  Thank you.

4              THE COURT:  Thank you, Mr. Kirsanov.

5              Anybody else wish to cross-examine?

6              MR. FRISHBERG:  I do.  Daniel Frishberg, pro se.

7              THE COURT:  Mr. Frishberg, go ahead.

8                    CROSS-EXAMINATION OF OTIS DAVIS

9    BY MR. FRISHBERG:

10   Q   Mr. Davis, do you recall being in a Twitter Space where

11   you said in reference to me that, quote, "Motherfuckers will

12   hunt you down."

13   A     Play the recording.  I don't recall that.

14             MR. FRISHBERG:  Your Honor, may I admit the

15   recording into evidence?

16             MS. CORNELL:  Your Honor, this is Shara Cornell,

17   with the Office of the United States Trustee.  I object to

18   the relevance and hearsay.

19             THE COURT:  Yeah.  Sustained.

20             MS. CORNELL:  Thank you.

21             THE COURT:  Mr. Frishberg --

22             MR. FRISHBERG:  No further questions.

23             THE COURT:  Mr. Frishberg, let me just say this.

24   There have been, in my view, inappropriate things that have

25   been said, directed at creditors, directed at the creditors'

1    committee counsel, directed at the Court, directed at the

2    debtor's counsel.

3              On several occasions I've contacted the U.S.

4    marshals or the U.S. trustee to report episodes.  I think at

5    this stage, and I know it occurred.  I think it's

6    unfortunate.  I think feelings were very high.  People lost

7    a lot of money.  People felt deceived.  And it can't excuse

8    what I perceive to be serious, inappropriate behavior in

9    connection with a bankruptcy case.

10             What I'd like to do, Mr. Frishberg, is try and

11   keep this going forward directed at the issues that the

12   Court is going to have to resolve.  So I understand your

13   strong feelings, Mr. Frishberg.  I'm aware of things that

14   happened in the past.  I want to try and keep it on the

15   scope of the direct examination and cross-examination.  So

16   I'm going to sustain my own objection to that, Mr.

17   Frishberg.  But if there are other questions you want to ask

18   that go to the testimony you've heard, I'll certainly permit

19   that.

20             MR. FRISHBERG:  I do not.  Thank you, Your Honor.

21             THE COURT:  Thanks, Mr. Frishberg.

22             Is there anybody else who wishes to examine the

23   witness, Mr. Davis?

24             MR. IOVINE:  Yes, Mr. -- Judge Glenn.  I'm sorry.

25   Jason Iovine, pro state creditor.

Page 96

1          THE COURT:  Okay.  Go ahead, Mr. Iovine.

2                CROSS-EXAMINATION OF OTIS DAVIS

3     BY MR. IOVINE:

4     Q    Mr. Davis, good afternoon.

5     A    Good afternoon, sir.

6     Q    Real quick questions.  Was CEL token able to be used

7     outside of Celsius?

8     A    Yes.

9     Q    Do you recall which platforms allowed this?

10    A    FTX, OKX and I believe Gate.io post-petition.

11    Q    Do you remember any decentralized platform finance

12    platforms that allowed it?

13    A    Uniswap was the main one.

14    Q    Do you recall (indiscernible) or (indiscernible)?

15    A    Yes.

16    Q    And what were you able to do, if you know, with CEL

17    token on those platforms?

18    A    I think you can post your CEL token as collateral on

19    those platforms.

20    Q    So CEL token wasn't dependent strictly on Celsius?

21    A    No.  You can also use it in DeFi.

22          MR. IOVINE:  Thank you.  All my questions.

23          THE COURT:  Thank you very much, Mr. Iovine.

24    Anybody else?  All right.  Thank you very much, Mr. Davis.

25    So I will consider -- again your direct examination wasn't

1    really in the proper form.  I will evaluate, I'm going to

2    admit it in evidence and give it such weight as I think it's

3    entitled to under the circumstances, and I appreciate your

4    cross-examination.

5            The issue arose about you sitting for a

6    deposition, and the Court had entered an order.  I'm pleased

7    that you did cooperate and that your deposition was taken.

8    And thank you for your testimony and your statements.  All

9    right.

10           MR. DAVIS:  You are very welcome, Your Honor.

11           THE COURT:  Okay.  Mr. Ubierna, you're next.

12           MR. UBIERNA DE LAS HERAS:  Good afternoon, Your

13    Honor.  Can you hear me okay?

14           THE COURT:  Yeah, I can hear you okay, Mr.

15    Ubierna.

16           MR. UBIERNA DE LAS HERAS:  Okay.  Victor Ubierna

17    de las Heras, pro se creditor.  I don't have any evidentiary

18    presentation for today, Your Honor.  I only restate what I

19    said at the opening statement of the confirmation hearing,

20    and I don't have anything for today.  Thank you for your

21    time.

22           THE COURT:  Thank you very much, Mr. Ubierna.  All

23    right.  The next on my list are the securities plaintiffs.

24    I have them listed separately.  But who is their counsel?

25           MR. KHEZRI:  Good afternoon, Your Honor.  Phil

Page 98

1    Khezri, Lowenstein Sandler, on behalf of the securities

2    plaintiffs.

3              THE COURT:  Thanks, Mr. Khezri.

4              MR. KHEZRI:  I'm going to be very brief.

5              THE COURT:  Go ahead.

6              MR. KHEZRI:  We filed a limited objection, which

7    appears at Docket Number 3544.  Securities plaintiffs appear

8    to fall within the class of subordinated claims under

9    510(b).  Limited objection seeks to preserve rights to

10   pursue recovery from Side C coverage of any applicable

11   insurance policies.  We are in discussion with the debtors

12   about adding language to the confirmation order to resolve

13   the objection.  So hopefully, this can just be kicked out

14   pending resolution.

15             THE COURT:  All right.  Thanks very much, Mr.

16   Khezri.  All right.  David Schneider?  Mr. Schneider, are

17   you on Zoom?

18             MR. SCHNEIDER:  Can you hear me now, sir?

19             THE COURT:  Okay, Mr. Schneider.  I can hear you.

20   Go ahead.

21             MR. SCHNEIDER:  Okay.  I'm sorry.  I'm on phone

22   using my phone.

23             THE COURT:  Okay.  Go ahead.  That's all right.

24             MR. SCHNEIDER:  David Schneider, and -- creditor.

25   And I would also like to request to be moved to a later

1   order position because --

2           THE COURT:  I'm sorry.  I couldn't hear that.  I

3   couldn't hear that, Mr. Schneider.  Just say that again.  I

4   heard you were requesting something, but I couldn't hear

5   what.

6           MR. SCHNEIDER:  I would also like to request to be

7   moved to a later order position as far as presenting my

8   testimony -- presenting my exhibit --

9           MR. MCCARRICK:  TJ McCarrick, Kirkland & Ellis, on

10  behalf of the debtors.  I think Mr. Schneider is asking to

11  be put later in the order.

12          THE COURT:  Okay.  Mr. Schneider, I'll put you at

13  the end.  It'll give you a little more time.  Okay.

14          MR. SCHNEIDER:  Thank you very much, Your Honor.

15          THE COURT:  All right.  Mr. Phillips?

16          MR. PHILLIPS:  Yes, Your Honor.  Well, I guess I'd

17  prefer -- I thought I would go tomorrow, and so I'd prefer

18  to do later as well, but if necessary, I'll proceed.  I did

19  put in my request to appear remotely at Docket Number 3648.

20          THE COURT:  All right.  And you were deposed?

21          MR. PHILLIPS:  I was deposed yesterday for four

22  hours.

23          THE COURT:  Okay.

24          MR. PHILLIPS:  By both debtor and committee

25  counsel.

Page 100

```
1              THE COURT:  Well, let me ask the debtor and the
2    committee, is there any objection to Mr. Phillips testifying
3    remotely?
4              MR. WEEDMAN:  Your Honor, I think with the same
5    reservations that we discussed earlier, not necessarily to
6    the remoteness, but we do have overall objections to his
7    declaration being admitted into evidence.  We think it's
8    just a wholesale adoption of his argument put into a
9    declaration form, and so we would -- but we're prepared to
10   go forward with a cross-examination.
11             THE COURT:  I'll give it such weight as I think
12   it's entitled to.  We always have this issue about mixing
13   argument and evidence.  But go ahead, Mr. Phillips, if you
14   want to --
15             MR. WEEDMAN:  Your Honor, if I may just --
16             THE COURT:  Well, let Mr. Phillips.  Just be brief
17   and summarize what your objections are and then we'll permit
18   -- are you going to cross-examine?
19             MR. WEEDMAN:  We are, Your Honor.  I was just
20   going to note that I think counsel for Perella Weinberg was
21   going to dial in when he knew that Mr. Phillips was joining.
22   We've kind of gone a lot faster than we expected.
23             THE COURT:  Yeah.
24             MR. WEEDMAN:  So we --
25             THE COURT:  I'll tell you what.  I have on my
```

Page 101

```
 1    watch 3:59, so 4:00.  Let's take a recess until 4:15.

 2              MR. WEEDMAN:  Thank you, Your Honor.

 3              THE COURT:  Okay, and then we'll -- so, Mr.

 4    Phillips, we'll be back and you can remain on the line.

 5    We're taking a break of 15 minutes, and you can contact

 6    Perella.  Okay?

 7              MR. WEEDMAN:  Thank you, Your Honor.

 8              MR. PHILLIPS:  Yes, Your Honor.  Thank you very

 9    much.

10              THE COURT:  Thank you.

11         (Recess)

12              THE COURT:  Please be seated.  All right.  Are we

13    ready to proceed with Mr. Phillips's examination?

14              MR. WEEDMAN:  Yes, Your Honor.

15              THE COURT:  All right.  Mr. Phillips, do you want

16    to briefly -- I mean, I'm going to admit your direct

17    testimony.  Let me ask you, are you a lawyer, Mr. Phillips?

18              MR. PHILLIPS:  No, sir.

19              THE COURT:  All right.  I'm trying to bend over

20    backwards not to strictly apply the rules of evidence.  I'm

21    admitting things in evidence where I think the substance is

22    important to be heard.  I'll give it such weight as I think

23    is appropriate.  You've been deposed.  So I'll give you a

24    chance if you want to say anything briefly, and then I'll

25    turn it over for cross-examination.
```

Page 102

1                MR. PHILLIPS:  Thank you, Your Honor.  I am a

2    little confused, Your Honor, about testifying to my

3    declaration as opposed to providing argument, how you want

4    to handle that.

5                THE COURT:  Well, I'll give you a chance if you

6    want to summarize.  Some of what was in your declaration is

7    really argument in a sense.  I'll give you a chance if you

8    want to just summarize your argument and then in terms of

9    cross-examination, I'll turn it over to counsel to the

10   committee for it.  But before I ask for cross-examination, I

11   thought I would give you a chance, if there's anything that

12   you want to raise.

13               MR. PHILLIPS:  Thank you, Your Honor.

14               THE COURT:  Did we swear Mr. Phillips?

15               CLERK:  I did not.

16               THE COURT:  Let's do this.  Let me have you sworn

17   at this point so I don't forget.  Karen, our ECRO operator,

18   keeps me on the straight and narrow to make sure that I

19   always make sure that all witnesses have been sworn.  So if

20   you would raise your right hand, Karen is going to go ahead

21   and administer the oath.

22               CLERK:  Do you solidly swear or affirm that all

23   the testimony you're about to give before this Court is the

24   truth, the whole truth and nothing but the truth?

25               MR. PHILLIPS:  Yes.

1              THE COURT:  All right.  Thank you, Mr. Phillips.

2     All right.  So is there anything you wanted to summarize

3     before?  And I have your statement.  I've read it.  But if

4     there's anything that you wanted to add orally, I'll permit

5     you to do that.

6              MR. PHILLIPS:  Well, just in brief outline, if I

7     could, I did file my original objection at 3548 and 3557 on

8     the docket, the remote request at 3648.  I added some

9     amended exhibits which I used in cross at 3706.  I then

10    filed a declaration at 3758, which I'd like to submit into

11    evidence.  And I also filed a rebuttal argument that relied

12    in part on the declaration at 3705.  I filed the rebuttal at

13    3767 and that relied in part on the declaration at 3705.  I

14    have not responded to all the exhibits that were filed late

15    last night by both the debtor and UCC.  And I do have

16    objections to some of the UCC exhibits, should they be used.

17             THE COURT:  All right.

18             MR. PHILLIPS:  So my fundamental argument is this,

19    right, which is that the professionals in this case who are

20    representing the committee, both White & Case and Perella,

21    should be accountable.  And I believe that there's evidence

22    of misconduct in both the appointment of the litigation

23    oversight committee as well as the board.

24             And I think that given especially the speed at

25    which this confirmation hearing is proceeding and the

1    limited amount of discovery that was available, especially

2    since some of the facts and circumstances did not become

3    apparent until post the discovery schedule that was laid out

4    at the beginning of the hearing, which really it was laid

5    out, in my opinion, to support the CEL valuation argument

6    that we just heard, that complete discovery and

7    investigation wasn't able to occur.

8            So therefore, those claims should be preserved

9    post the effective date, that an appropriate fiduciary

10   should be unable to prosecute those behaviors, those claims

11   essentially on behalf of the UCC, the committee itself and

12   that I'd propose two separate ones that for that fiduciary

13   would either be a subset of the litigation oversight

14   committee who is unconflicted and not a witness.  And that

15   would be the three members, Mr. Adler, Mr. Crews and Ms.

16   O'Connor or that the U.S. trustee would appoint such a

17   fiduciary, that if Your Honor saw fit, given to the

18   circumstances of the misconduct, that he would remove Mr.

19   Aidoo from the board of NewCo and vacate the appointments

20   essentially from the board of NewCo of Mr. Aidoo and of Mr.

21   Jindal, Mr. Uzzi and Mr. Noyes from the litigation oversight

22   committee.

23           And then the separate part of my declaration,

24   which relies in part on my qualification, is regarding the

25   valuations that were presented during the debtor's case by

Page 105

1    experts from three different firms, Mr. Kielty on behalf of

2    Centerview, Mr. Cohen on behalf of behalf of Stout Risius

3    Ross and by Mr. Campagna on behalf of Alvarez & Marsal.  And

4    in my opinion, their valuation of the orderly winddown

5    versus NewCo was in error.  And I provided an updated

6    valuation of NewCo, showing that its recovery percentage is

7    lower than that of the orderly winddown scenario, both of

8    which scenarios are included under the plan, and thus that

9    the debtors and committee should be directed to carry out

10   their fiduciary duties and evaluate the current value of

11   both the recovery of NewCo and orderly winddown and to make

12   the proper determination to toggle through orderly winddown

13   because it's important to note that all the valuation work

14   that has been done to date and presented in the disclosure

15   statement, which was approved but has some inadequacies, as

16   I will point out.

17          But I did not object to it at the time, but was

18   done as of a stale valuation date of May 31, 2023, which was

19   neither current with the disclosure statement approval,

20   which was late August, nor is it current now, especially

21   true in light of the volatility, for example, of Bitcoin

22   Microsoft prices, which are the key comp set that Mr. Kielty

23   used in evaluating (indiscernible).  So that's my brief

24   summary, Your Honor.

25          THE COURT:  Okay.  All right.  All right.  Cross-

Page 106

1    examination.

2              MR. WEEDMAN:  Thank you, Your Honor.  Your Honor,

3    Joshua Weedman, White & Case LLP, on behalf of the

4    committee.  May I approach, Your Honor?

5              THE COURT:  Yes, you can.  Thank you.

6                CROSS-EXAMINATION OF RICHARD PHILLIPS

7    BY MR. WEEDMAN:

8    Q    Good afternoon, Mr. Phillips.

9    A    Good afternoon, Mr. Weedman.

10   Q    You applied to be on the board of NewCo, right?

11   A    Yes.

12   Q    And you submitted your application well in advance of

13   the process being formally announced, right?

14   A    I don't remember exactly the formal date of

15   announcement, but I started expressing my interest

16   (indiscernible) I believe of this year.

17   Q    I'm sorry.  I couldn't hear you.  Could you please

18   repeat that?

19   A    Sure.  I don't remember the date of the "formal"

20   announcement of the process because I'm not sure there was a

21   date of formal announcement of when the process was

22   launched, but I believe I submitted my, you know, and

23   started indicating interest in March of this year.

24   Q    Okay.  In March of 2023, correct?

25   A    Correct.

1    Q    And when you submitted your application, you submitted

2    it pseudonymously, right?  Under a pseudonym?

3    A    Yes.

4    Q    And you were told that the use of a pseudonym on your

5    resume was a problem, right?

6    A    Well, the committee members who co-chaired it knew who

7    I was because they were able to identify my LinkedIn profile

8    from the pseudonymous resume.

9    Q    And my question was, you were told that the use of a

10   pseudonym was a problem for your resume, correct?

11   A    That is what Mr. Colodny told me, yes.

12   Q    And eventually you did send a resume with your name,

13   correct?

14   A    Yes.

15   Q    And that was in around June or July of 2023, right?

16   Correct.

17   Q    And you've never previously served on the board of a

18   publicly traded company, right?

19   A    Correct.

20   Q    But you were still interviewed for a seat on NewCo's

21   board, right?

22   A    Yes, on approximately August 30th.

23   Q    That was my next question.  You were interviewed on

24   August 30th, right?

25   A    I just said so.

Page 108

1    Q    And that interview was approximately one hour?

2    A    Yes, it was.

3    Q    And you recall being asked questions during that

4    interview, right?

5    A    I do.

6    Q    And you vaguely recollect that you were told that you

7    were being asked the same series of questions that were

8    being asked of all board applicants, right?

9    A    Well, I believe what occurred in the depo, and I'm sure

10   you have the testimony, is you stated that there were five

11   standard questions that were asked, and that I was asked

12   that.  And I couldn't recall that I was specifically asked

13   about five standard questions that were there.  But I

14   vaguely recall being told that I was being asked similar

15   questions.  But there were clearly some questions that were

16   not asked of all applicants.

17          MR. WEEDMAN:  And if I could ask Mr. Lopez to

18   please bring up UCC Exhibit 237.

19          THE WITNESS:  Objection, Your Honor.

20          THE COURT:  You can't object to his putting up an

21   exhibit on the screen.  When he asks you some questions,

22   we'll see if there's an objection.

23          THE WITNESS:  Okay.

24          MR. WEEDMAN:  And Your Honor, this is in your

25   binder under Tab 3C, as in Charlie.  I'm sorry, 3D.

Page 109

```
 1              THE COURT:  Okay.

 2   BY MR. WEEDMAN:

 3   Q    And Mr. Phillips, you see on this is an email from an

 4   email address ███████████.  Do you see that?

 5   A    Yes.

 6              THE WITNESS:  And I still object to this email

 7   being brought here, Your Honor.

 8   BY MR. WEEDMAN:

 9   Q    I'm still asking some questions about this, Mr.

10   Phillips.  Is that your email address?

11   A    Yes.

12              MR. RICHARDS:  Your Honor, I object.  He's not

13   aware of this exhibit.

14              THE COURT:  Overruled.  Go on with your questions.

15   BY MR. WEEDMAN:

16   Q    And this is an email that you sent on August 30, 2023

17   at 6:12 p.m. to Aaron Colodny, at White & Case, correct?

18   A    That is what it says, so, yes.

19   Q    And you remember sending this email, don't you?

20   A    Yes.

21              MR. WEEDMAN:  Your Honor, I would offer Exhibit

22   237 into evidence.

23              THE COURT:  Any objections?

24              THE WITNESS:  Objection.  Objection, Your Honor.

25              MR. RICHARDS:  I object.
```

Page 110

1                THE COURT:  What's the objection?

2                MR. RICHARDS:  He's not (indiscernible) this

3      exhibit.

4                THE COURT:  One at a time.  First, Mr. Richards.

5      Mr. Phillips, I'm sorry.

6                MR. PHILLIPS:  Thank you, Your Honor.  This

7      applies to the whole series of emails that Mr. Weedman may

8      or may not introduce here, in that they're out of context.

9      And so I would like to introduce the full email train,

10     thread that includes all the emails and the particular that

11     that one is taken from.

12               THE COURT:  You acknowledge this is an email that

13     you sent to Mr. Colodny on Wednesday, August 30, 2023, at

14     6:12 p.m.; is that correct?

15               THE WITNESS:  Yes, and he responded to at 10:23

16     the same night.

17               THE COURT:  Objections is overruled.  It's in

18     evidence.

19          (Exhibit 237 admitted into evidence.)

20               MR. WEEDMAN:  Thank you.

21     BY MR. WEEDMAN:

22     Q    And, Mr. Phillips, in this email to Mr. Colodny, of

23     White & Case, you said, thanks for taking the time to

24     interview me and meet over Zoom.  You see that?

25     A    Yes.

1   Q    And you also say, I appreciate the ups you gave me.  Do

2   you see that?

3   A    Yes.

4   Q    And when you said appreciate the ups, you were thanking

5   Mr. Colodny for speaking favorably about you during the Zoom

6   meeting.  Isn't that correct?

7   A    Yes.

8   Q    And so, as of August 30, 2023, you thought Mr. Colodny

9   had been speaking favorably about you, correct?

10          THE WITNESS:  Misstates the testimony.  So I'll

11   object on that ground.

12          THE COURT:  Can you answer the question yes or no?

13   The objection is overruled.

14          THE WITNESS:  So yes, he did, but it was only

15   solely on that date.

16   BY MR. WEEDMAN:

17   Q    And in fact, you'd had many conversations with Mr.

18   Colodny before August 30th, correct?

19   A    Yes.

20   Q    And those had spanned over the course of many months,

21   correct?

22   A    Since probably -- yes.

23          MR. WEEDMAN:  Can I ask Mr. Lopez to please bring

24   up UCC Exhibit Number 236?

25   BY MR. WEEDMAN:

Page 112

1   Q    And, Mr. Phillips, you see this is another email from

2   your email address, ████████████, dated Friday, August

3   25, 2023, at 10:14 a.m.  Do you see that?

4   A    Yes.

5   Q    And this is another email you sent to Mr. Colodny, of

6   White & Case, with a subject line, "Good Job and Some Follow

7   Up."  Do you see that?

8   A    Yes.

9   Q    And you recall sending this email to Mr. Colodny as

10  well, correct?

11  A    Yes.

12        MR. WEEDMAN:  Your Honor, I would offer in UCC

13  Exhibit Number 236 into evidence.

14        THE COURT:  Any objections?

15        THE WITNESS:  Same objection, that it's part of an

16  email thread, so I would like to -- can I submit the whole

17  thread as rebuttal evidence?

18        THE COURT:  Well, I take -- I rule one at a time.

19        THE WITNESS:  Fair enough.

20        THE COURT:  Objection's overruled.  It's admitted.

21  236 is admitted into evidence.

22      (Exhibit 236 admitted into evidence.)

23  BY MR. WEEDMAN:

24  Q    And again, Mr. Phillips, this is you on August 25,

25  2023, telling Mr. Colodny in the first sentence, great job

1   on the spaces.  Do you see that?

2   A    Yes.

3   Q    Is that a reference to Twitter Spaces that Mr. Colodny

4   had hosted?

5   A    Yes.

6   Q    And I'm going to direct your attention to the last

7   paragraph of this email.  You say to Mr. Colodny, of White &

8   Case: Thank you.  I really do appreciate all the hard work

9   you and your team have put into the case.  I'm probably one

10  of the few in the creditor community that truly understand

11  how much work these engagements are and the sacrifices they

12  require on the work-life balance front.  If we exit prior to

13  the end of the year, I'll try to get you to a Chargers game

14  at SoFi, the yolo incentive plan.  Think the Chiefs and the

15  Bills are the final two games, so they could be important

16  and exciting.  Did I read that correctly?

17  A    Yes.

18  Q    And again, this is you on August 25th thanking Mr.

19  Colodny for what you've described as a good job and all the

20  hard work that he put into the case, correct?

21  A    Correct.

22  Q    Shortly after these two emails that we just reviewed,

23  you learned you weren't selected for the NewCo's board,

24  correct?

25  A    Define shortly.

Page 114

```
 1    Q    How about September 4, 2023?

 2    A    Yes.

 3    Q    And you learned who had been selected, correct?

 4    A    Yes.

 5    Q    And you were upset learning that the board included

 6    someone named Emmanuel Aidoo over you, correct?

 7    A    Not at that time.  I would not characterize, you know,

 8    I would --

 9         THE WITNESS:  Well, again, object, misstates

10    testimony.  I would more characterize my feeling at that

11    time as disappointed that I was not selected.

12    BY MR. WEEDMAN:

13    Q    I'm going to show you what is marked as UCC Exhibit

14    Number 238.  Mr. Phillips, this is an email chain.  If we

15    scroll down to the bottom, it's an email that you sent again

16    from your email address, ▮▮▮▮▮▮▮▮, on September 4,

17    14, 2023 at 3:48 p.m., to Aaron Colodny, Gregory Pesce,

18    Keith Wafford, Scott Duffy, and Thomas DiFiore.  Do you see

19    that?

20    A    Yes.

21    Q    And you recall sending this email, correct?

22    A    Yes.

23    Q    And the subject line of this email says "Board

24    Diversity Requirements UCC Only Needs ONE," and one is in

25    all caps, correct?
```

1   A    Yes, and I appreciate you increasing the magnification

2   so I can read it.

3   Q    And by one in all caps, you were referring to a diverse

4   member of the board, correct?

5   A    Yes.

6   Q    And you sent this email because you were worried that

7   Mr. Aidoo had been selected for diversity requirements,

8   correct?

9   A    No.

10  Q    I'm sorry.  You said that's not -- are you saying no to

11  that?

12  A    I did.

13  Q    Can I please direct you to your deposition that was

14  taken yesterday?

15          MR. WEEDMAN:  I'd ask Mr. Lopez to bring up Mr.

16  Phillips' deposition, Page 49.  And, Your Honor, this is Tab

17  4 in your binder.

18          THE COURT:  I have it open.  What line number?

19          MR. WEEDMAN:  And I'm going to read, Your Honor,

20  from Line 6 to 16.

21          THE COURT:  Okay.

22          MR. WEEDMAN:  And the question, you say --

23          THE COURT:  I think you're starting in the wrong

24  place.

25          MR. WEEDMAN:  Oh, I'm sorry.  Page 48.  Thank you.

Page 116

1    BY MR. WEEDMAN:

2    Q    And so the only thing I couldn't -- I couldn't

3    understand why and so I thought that they may perceive that

4    they needed him for diversity requirements.  And so I wrote

5    that, that, you know, because of Mr. Genoot meeting those

6    diversity requirements, they didn't need anybody else as

7    long as they kept Ms. LaPuma.  And I was not aware that

8    there was another director, apparently, that also met

9    diversity requirements.

10       Do you see that?

11   A    I do.

12   Q    Is that testimony that you gave under oath yesterday?

13   A    It is.  And also I don't see the prior transcript, so I

14   don't know if there was an objection.  I saw that there was

15   an objection in the other page.  I don't know if there was

16   an objection on the record prior to this statement.

17   Q    Mr. Phillips, you agree you did not participate in the

18   committee's deliberations regarding the board composition?

19   A    I agree, yes.

20   Q    I'm sorry.  You cut out.

21   A    I said I do agree with that, yes.

22            MR. WEEDMAN:  And Your Honor, I would like to move

23   UCC Exhibit 238 into evidence.

24            THE WITNESS:  I'm sorry, Your Honor.  For

25   clarification, is that the whole transcript or what is UCC

1       Exhibit 238?

2                   THE COURT:  He hasn't moved -- he moved the

3       emails.  UCC 238 was an email chain.

4                   THE WITNESS:  The August 30th email?

5                   THE COURT:  The top of the list says Email 3, but

6       this is ECF 3706, Pages 9 and 10 are what are included here.

7                   THE WITNESS:  Okay.  Thank you, Your Honor.

8                   THE COURT:  All right.  Are there any objections?

9       All right.  Exhibit 238 is admitted into evidence.

10          (Exhibit 239 admitted into evidence.)

11                  MR. WEEDMAN:  Thank you, Your Honor.

12      BY MR. WEEDMAN:

13      Q    Shortly after you found out that you had not been

14      selected for the NewCo board, you filed a limited objection

15      on September 22nd, correct?

16      A    I believe it was September 21st when I submitted it,

17      but it appeared on the docket on September 22nd.

18      Q    And one of the objections that you lodged in your

19      limited objection from September related to White & Case and

20      Perella Weinberg's conduct in the board selection process,

21      correct?

22      A    Yes.

23      Q    And in particular you object to the exculpation of

24      White & Case and Perella Weinberg, correct?

25      A    Correct.

Page 118

1    Q    And that's because you believed that creditors,

2    including yourself, should be able to sue those two

3    companies regarding the board selection process, correct?

4    A    And the fiduciary appointed on behalf of the UCC goes

5    out of business on the effective date.

6    Q    And you agree with me that you probably would have not

7    filed that objection if you had been selected to the Board,

8    right?

9    A    Yes.

10         MR. WEEDMAN:  I have no further questions, Your

11   Honor.

12         THE COURT:  Any other examination?

13         MR. BRIER:  Yes, Your Honor.

14         THE COURT:  Okay, Ms. Brier.

15         MS. BRIER:  Grace Brier, Kirkland & Ellis, on

16   behalf of Debtors.

17              CROSS-EXAMINATION OF RICHARD PHILLIPS

18   BY MS. BRIER:

19   Q    Good afternoon, Mr. Phillips.

20   A    Good afternoon, Ms. Brier.

21   Q    I saw you pretty recently.  Welcome.

22   A    We did.

23   Q    Mr. Phillips, you submitted a ballot in this case

24   regarding the plan, correct?

25   A    I did.

Page 119

```
 1    Q    And you voted to approve the plan when you submitted

 2    your ballot, correct?

 3    A    I did.

 4    Q    And you submitted that in September of 2023?

 5    A    I did.  I submitted that ballot either the last day or

 6    the day before the end of the voting period, on the -- I

 7    think it was September 22nd.

 8    Q    I would like to talk about some of your early

 9    involvement in this case.  You signed an NDA to listen in on

10    the auction proceedings, right?

11    A    I did.

12             MS. BRIER:  Your Honor, permission to approach

13    with Celsius Exhibit 118?

14             THE COURT:  Sure.

15             MS. BRIER:  Mr. Lopez, if you could please pull

16    that up.

17             THE COURT:  Thank you.

18             MS. BRIER:  All right.  And if you could please

19    zoom in on that first tweet, Mr. Lopez.

20    BY MS. BRIER:

21    Q    Mr. Phillips, this is a tweet from your.  Your Twitter

22    handle is @cryptoyolo7, correct?

23    A    Yes.

24    Q    And in May 2023, you tweeted, "It's official.  The

25    winner is @farenheithldg @arrington.  Significant work to
```

Page 120

1    improve the value of @CelsiusNetwork mining operations for

2    #Celsians @CelsiusUCC and reductions in overall management

3    fees, #auctionswork."  Right?

4    A    Yes.

5    Q    Now, as a result of the things that you learned and saw

6    while observing the auction, you thought the Celsius auction

7    involved significant work to improve the value of the

8    Celsius Network mining operations, correct?

9    A    I would rephrase that.  I think that taking a 140-

10   character tweet does not summarize my thoughts.  It just

11   says the length of 140 characters.  So first off, the

12   transcript was essentially public at that point.  The

13   transcript was publicized.  And I referred to the Stretto

14   filing here.  So I based it essentially on the Stretto

15   filing, not on listening in on the auction.  But it was

16   clear that the resulting final bid as described in that

17   Stretto filing was better than the stalking horse bid that

18   existed at the beginning of the auction process from

19   NovaWulf and that's why I tweeted this.

20   Q    And you tweeted on May 25th, 2023, "Significant work to

21   improve the value of the mining operations."  True?

22   A    Yes.

23            MS. BRIER:  Your Honor, permission to move into

24   evidence Celsius Exhibit 118.

25            THE COURT:  I'm sorry, say it again.

Page 121

1              MS. BRIER:  Celsius Exhibit 118, the tweet.

2     Permission to move into evidence.

3              THE COURT:  All right.  Any objections?

4              THE WITNESS: That's this tweet, correct, Ms.

5     Brier?

6              THE COURT:  Yes, this tweet.  Exhibit 118 is

7     admitted in evidence.

8              (Exhibit 118 admitted into evidence)

9     BY MS. BRIER:

10    Q    And, Mr. Phillips, as a result of the things that you

11    learned and you saw and you knew about the auction, you

12    tweeted, "#AuctionsWork".  Right?

13             THE WITNESS:  Objection.  Misstates testimony.

14             MS. BRIER:  My question is did you tweet

15    "#AuctionsWork" based on what you knew and learned and saw

16    about the auction?

17             THE WITNESS:  Objection.  Misstates testimony.

18             THE COURT:  Could you just answer the question,

19    Mr. Phillips?

20             THE WITNESS:  Sure.

21             THE COURT:  You can answer it yes or no.

22    BY MS. BRIER:

23    A    Well, no based on how she phrased it.

24    Q    All right.  On --

25    A    I tweeted "Auctions Work" based on the two public

Page 122

1    filings, one post-auction and the NovaWulf stalking horse

2    pre-auction.

3    Q    So let's do it this way.  Based on the public filings

4    that you saw, you tweeted #AuctionsWork on May 25th, 2023,

5    right?

6    A    Yes.

7    Q    Now, since that time, May 25th, 2023, you've applied to

8    be a member of the NewCo board, right?

9         THE WITNESS:  Asked and answered.

10         THE COURT:  Mr. Phillips.

11         THE WITNESS:  Yes.

12         THE COURT:  Look, let's stop fencing.  We're going

13    to get through this a lot faster if she asks questions, you

14    can answer the questions.  Okay?

15    BY MS. BRIER:

16    Q    I'll ask that again.  You applied to serve as a member

17    of the NewCo board since this time in May 25th, 2023, right?

18    A    Yes.

19    Q    And you were not selected for the board, right?

20    A    Yes.

21         THE COURT:  I mean, that's established already.

22    Let's move on.

23    BY MS. BRIER:

24    Q    Now, after you weren't selected, you filed some

25    objections.  And I would like to talk about those.  Mr.

Page 123

1    Phillips, you submitted a valuation to the Court as part of

2    a recent declaration.  Now, that valuation wasn't included

3    in your original declaration, true?

4    A    Yes.

5    Q    And you're not offering an expert opinion in this

6    matter, correct?

7    A    No.

8    Q    But you offered some valuation statements in your

9    declaration that you filed with the Court, correct?

10   A    Yes.  But I am an expert.

11   Q    Your testimony is that you're an expert?

12   A    Absolutely.

13            THE COURT:  Well, you haven't been -- you didn't

14   lay the foundation for expertise.  I'm not hearing the

15   expert opinions.  Go on with your examination.  He's not

16   testifying as an expert.

17            THE WITNESS:  Your Honor?

18            THE COURT:  No.  I'm sorry.  You did not -- you're

19   being examined as a fact witness.  You put in your

20   declarations as a fact witness.  I understand your

21   background with Houlihan Lokey and others.  You're not

22   testifying here as an expert.  Ask questions of the witness

23   and let's get answers and let's move on.

24            MS. BRIER:  Thank you, Your Honor.  In Tab 2 of

25   the binder that the UCC handed up, which is also Celsius

Page 124

1    Exhibit 81 -- I'm happy to bring up a copy, but I think that

2    it's the exact same document.

3              THE COURT:  This is in the (indiscernible) binder?

4              MS. BRIER:  Oh, no.  This is a copy of Mr.

5    Phillips declaration.  I'll just bring this up.  And, Mr.

6    Lopez, if you could please pull up Exhibit 81.  And turn to

7    the next page.

8    BY MS. BRIER:

9    Q    Mr. Phillips, this is the declaration you filed,

10   correct?

11   A    Yes.

12   Q    And on the last page, Page 28, you offer a valuation

13   hearing, right?

14   A    Yes.

15   Q    And in that valuation, you take two discounts to the

16   total NewCo number of $1.2 billion, correct?

17   A    Can you repeat the question, please?

18   Q    Sure.  That was a confusing one.  You take two

19   different --

20             THE COURT:  Let's make sure I'm -- you're looking

21   at Exhibit E, the last page of this page, 28 of 28?

22             MS. BRIER:  Exactly.

23             THE COURT:  All right.  Go ahead.

24   BY MS. BRIER:

25   Q    And, Mr. Phillips, this is a valuation that you

Page 125

1    yourself prepared, right?

2    A    Yes.

3    Q    And what you did was you took two different discounts

4    to the total valuation that was included in the disclosure

5    statement for NewCo at $1.2 billion, correct?

6    A    Yes.

7    Q    And one of those discounts was a Holdco discount at 7.5

8    percent, right?

9    A    Yes.

10   Q    And you took that Holdco discount because, as you say,

11   this is a sum of the parts number, right?

12   A    Yes.

13   Q    And that's the only reason you apply that 7.5 percent

14   number here, right?

15   A    No.

16   Q    Is it your testimony that you apply a 7.5 percent

17   discount for any other reason than the fact that it's a sum

18   of the parts number?

19           THE WITNESS:  It's not a yes/no answer, Your

20   Honor.

21           THE COURT:  Go ahead and explain, Mr. Phillips.

22           THE WITNESS:  Sure.

23   BY MS. BRIER:

24   A    So a holdco discount is appropriate because it is a sum

25   of the parts.  7.5 percent was the factor I used because

Page 126

1   that was in my (indiscernible), however you want to

2   characterize my judgement, an appropriate discount factor

3   given the normal range of holdco discounts for the facts and

4   circumstances (indiscernible).

5   Q    Now, however you reached the 7.5 percent discount, the

6   only reason you're buying a holdco discount at all is

7   because it's a sum of the parts number, right?

8   A    Yes.

9   Q    And you also apply a 30 percent discount, correct?

10  A    Yes.

11  Q    And you apply that 30 percent discount because, as you

12  explain in your declaration, the voting results of the plan

13  result in a 30 percent discount, correct?

14  A    Yes.

15  Q    You have no other valuation or independent reason to

16  reach that 30 percent number, right?

17  A    Correct.

18  Q    You pulled it directly out of the plan?

19  A    Out of the plan and voting results.

20  Q    Correct.  And you apply that 30 percent discount across

21  the entire total, that $1,248 number, correct?

22  A    Yes.

23  Q    Now, you don't know why --

24       THE COURT:  It's billions.

25       MS. BRIER:  Yes.

1            THE COURT:  $1,248,000,000.

2            MS. BRIER:  Thank you for the clarification,  Your

3    Honor.

4            THE COURT:  Everything is adding thousands to.

5            MS. BRIER:  For purposes of the record, this 1,248

6    number I'm referencing is in millions on this sheet.  So I

7    will be more clear next time.  Thank you.

8    BY MS. BRIER:

9    Q    Now, Mr. Phillips, you don't know why any single

10   creditor voted to elect either liquid crypto or equity,

11   correct?

12   A    No.

13   Q    But you applied the results of the plan to apply this -

14   -

15           THE COURT:  Wait.  I think there's an ambiguity.

16   You asked if that's correct and he said no.

17           MS. BRIER:  Thank you, Your Honor.

18   BY MS. BRIER:

19   Q    You have no knowledge as to why any other creditor

20   voted to select liquid crypto or equity, right?

21   A    No.

22           THE COURT:  You have to answer the question if you

23   can.  No comment is not an --

24           THE WITNESS:  I --

25           THE COURT:  Yes, no, I don't know.  But you can't

Page 128

```
  1    --

  2              THE WITNESS:  Your Honor, I said no.  I said no

  3    twice.

  4    BY MS. BRIER:

  5    Q    So just to be clear, there are other reasons people

  6    could have selected liquid crypto or NewCo equity other than

  7    a valuation opinion that you offered here, right?

  8    A    Yes.

  9              THE COURT:  That was the point.

 10              MS. BRIER:  Thank you, Your Honor.

 11    BY MS. BRIER:

 12    Q    Now, you apply the 7.5 percent discount and the 30

 13    percent discount to the total.  You don't make any

 14    distinctions among the three component parts, correct?

 15    A    Correct.

 16    Q    Now, you would agree with me that the $450 million

 17    number there is liquid cryptocurrency, right?

 18    A    I don't --

 19              THE COURT:  You're talking about staking as

 20    opposed to value.

 21              MS. BRIER:  Yes, Your Honor.

 22              THE COURT:  I want to be sure we have a clear

 23    transcript.  The $450 million number is listed for staking

 24    of book value.  Is that what you're referring to?

 25              MS. BRIER:  Yes, Your Honor.  And at this time, it
```

Page 129

1    is liquid cryptocurrency.

2              THE COURT:  Yes.

3    BY MS. BRIER:

4    A    Yes -- I'm sorry.  Was there a question on the floor or

5    not?

6    Q    I'll re-ask it.  You would agree with me that that $450

7    million number there is at this moment liquid

8    cryptocurrency, correct?

9    A    Yes.

10   Q    And you apply the 30 percent discount and the 7.5

11   percent discount to a total that includes it without making

12   any distinction for that number, correct?

13   A    Correct.

14             THE COURT:  Let me ask you this, Mr. Philips.  How

15   did you arrive at the 7.5 percent reduction for conglomerate

16   discount and the 30 percent initial market capitalization?

17   Because you're applying those numbers across the board

18   whether it's staking at book value, which is essentially

19   it's liquid crypto.  You're applying those discounts to the

20   full numbers and not simply to particular categories.  Why

21   did you do that?

22             THE WITNESS:  Yes, Your Honor.  I mean, that's the

23   way it's done.  There is no holdco/conglomerate discount on

24   each individual part.  The holdco conglomerate discount only

25   exists when someone is doing a sum-of-the-parts type

Page 130

1    valuation, which is what is attempted in the disclosure

2    statement by simply adding the three numbers up, which is

3    what Mr. Campagna testified to in his direct testimony, and

4    that's inappropriate.  And so that's why the holdco

5    conglomerate discount is applied at the total because that's

6    the right level (indiscernible) buy it at.  And I chose 7.5

7    percent, which is at the lower end of the common range,

8    which usually is either five to 15 percent or five to 20

9    percent because of the similarity of the three types of

10   businesses or operations that are -- or assets that are

11   included in the total enterprise.

12            THE COURT:  Did you include -- did you make a

13   comparable company analysis to determine what discount rates

14   you were going to apply?

15            THE WITNESS:  Your Honor, comparable company

16   analyses are not usually used in holdco conglomerate

17   discounts.  Mr. Kielty --

18            THE COURT:  Did you just pick the numbers out of

19   the air if there are no comparable companies that would

20   apply such discounts?

21            The  Your Honor, there are numerous studies that

22   establish the holdco conglomerate discounts in the range

23   that I stated of five to 15 percent or five to 20 percent.

24            THE COURT:  Go ahead, Ms. Brier.

25   BY MS. BRIER:

Page 131

1    Q    Mr. Phillips, you include the 30 percent discount and

2    the 7.5 percent discount and you add them both together,

3    correct?

4    A    Correct.

5    Q    And you would agree with me that it's possible that

6    there's overlap between the two, right?

7    A    Yes.

8    Q    You don't account for that at all, right?

9    A    Correct.

10   Q    In your view, Mr. Phillips, it's in the best interest

11   of the creditors to confirm this plan, correct?

12   A    Subject to the modifications that I have suggested,

13   yes.

14   Q    Subject to the limited modifications you suggested, you

15   agree with me that it's in your view that it's in the best

16   interest of creditors to confirm this plan, right?

17   A    Yes.  I think it's time for everyone to get out of

18   this.

19   Q    And you're not offering that it would be better for

20   creditors to enter a Chapter 7 liquidation than it would be

21   to confirm the plan, true?

22   A    Correct.  And I have not done that analysis, although I

23   did establish on cross that the liquidation value of the

24   mining business was significantly understated and Mr.

25   Campagna admitted it was significantly understated by at

Page 132

1    least a factor of two.

2    Q    So, Mr. Philips, the answer to my question is yes.

3    You're not offering the view that there is a -- that it

4    would be better for creditors to enter a Chapter 7

5    liquidation than confirm the plan, true?

6    A    Correct.

7    Q    Thank you.

8         MS. BRIER:  No further questions, Your Honor.  I

9    pass the witness.

10        THE COURT:  Any other cross-examination?

11   BY MR. SABIN:

12   Q    Good afternoon, Mr. Phillips.  Jeff Sabin from Venable.

13   I have four quick questions.  One, on what date did you

14   submit your ballot?

15   A    Your Honor -- sorry, Mr. Sabin, as I said, I believe

16   that a final ballot was submitted either on the final

17   deadline date, which was September 22nd, or on September

18   21st, the day before.

19   Q    And was that before or after you filed your initial

20   plan objection?

21   A    I don't remember the exact deadlines for each.  I

22   believe it might well have been -- I mean, I just don't

23   remember.  If I could look at the filing date, I could tell

24   you the answer to that.

25   Q    That's okay.  I'm just asking your recollection.  My

Page 133

1    third question is did you read the approved disclosure

2    statement before you voted?

3    A    Yes.

4    Q    And did you read the ballot and instructions before you

5    voted?

6    A    Yes.

7    Q    Thank you.

8            THE COURT:  All right.  Anybody else wish to

9    cross-examine?  All right.

10           Mr. Phillips, when I've had a witness testify

11   without counsel, I've usually given them an opportunity to

12   in effect redirect.  We don't use the Q&A format.  So if

13   there are any evidentiary points that you want to raise in

14   effectively redirect in response to the cross-examination,

15   now would be the time to do it.

16           MR. PHILLIPS:  Yes, Your Honor.  I think that with

17   respect to the two emails that were introduced -- let me get

18   the right one here.  Actually, it was -- I'm sorry, what was

19   the date of the email that had the (indiscernible)?  That's

20   the one I wanted to put up.  Or if you could re-put that one

21   up.  Because the whole spread was on that.  And Mr. Weedman

22   used it.

23           THE COURT:  I'm trying to see which ones you're

24   referring to.  So the ones --

25           MR. PHILLIPS:  It's on 9/14.

Page 134

1          THE COURT:  What I have is Celsius Exhibit 118

2     which was the exchange of Twitter messages it looks like.

3     Well, it's up on the screen now.  Go ahead.

4          MR. PHILLIPS:  Yeah.  And if we could magnify that

5     top email there, Your Honor?

6          THE COURT:  Exhibit 238.

7          MR. PHILLIPS:  Yes, thank you.  One of the things

8     that I point out in my rebuttal is essentially what starts

9     here on the second paragraph and which I will read.  "I am

10    still waiting for anyone on the UCC side, advisor or member,

11    to explain the observer's duties and responsibilities.  The

12    agreement I sought provided no or unspecified compensation

13    and the right for NewCo to sue the observer for any number

14    of reasons.  In other words, no upside and high downside.

15    Please articulate to me the observer's duties and

16    responsibilities."

17         So I do think that this is something that has

18    never been responded to by the UCC, yet Mr. Colodny used in

19    his rebuttal to my objection that the statement that the

20    board consist of five prepetition -- significant prepetition

21    creditors which are two board members and three board

22    observers.  But the three board observers have no power.  So

23    I think that that's something that's very telling.

24         I do think that the orderly winddown scenario

25    needs to be considered much more strongly.  I do believe

Page 135

1   that one of the -- the definition of value -- you can take

2   that down, please.

3            THE COURT:  Let's take the email down so Mr.

4   Phillips is on the screen.

5            MR. PHILLIPS:  Thank you.

6            THE COURT:  Go ahead, Mr. Phillips.

7            MR. PHILLIPS:  Thank you.  I do believe that the

8   definition of value in any valuation is the price that a

9   willing buyer and seller would agree to in a transaction.  I

10  think that the ballot, the weighted distribution election,

11  which had a compelling number of creditors choose more

12  crypto, over $1.1 billion in claims toggling for more

13  crypto, which is over 25 percent of the actual claims in the

14  case and actually over 80 percent of the people that

15  participated in the toggle by claim value are quite telling

16  as to value.  And so the 30 percent discount that I applied

17  to the equity value, the NewCo equity value, is actually

18  understated if anything because it's clear that there wasn't

19  a fair market set at 30 percent.  And if you were to go to

20  the disclosure statement, the weighted distribution example

21  table, which was in my exhibits to my declaration I believe

22  and is an excerpt from the disclosure table basically showed

23  that you would get eight percent more value or less value

24  depending on which way you toggle and assumed essentially an

25  equal number claims toggling in each direction.  Which

1   clearly wasn't the case once the ballot results came in.  So

2   I think that my 30 percent discount is conservative if

3   anything and is higher.

4            And I would point to three specific actions that

5   occurred in the month of September that undercut the value

6   of NewCo stock and contributed to that election being so

7   lopsided.

8            One was the lack of creditor representation on the

9   board, which as Mr. Weedman pointed out (indiscernible) on

10  September 4th posted a disclosure statement but brought in

11  on a Friday night filing that a lot of creditors don't read.

12  And also wasn't distributed in the same way that the

13  disclosure statement was.  So that occurred on September

14  4th.

15           Subsequent to that in the next plan supplement,

16  which I think was one or two weeks later, again, on a Friday

17  night, there is the revelation that Fahrenheit had dropped

18  its initial contribution from $50 million up front to $33

19  million which undercut the price of the stock out of the

20  gate no doubt because there is less of a stabilization fund

21  available to stabilize the price upon listing.

22           And thirdly, there seemed to be some kind of board

23  twitter war between Mr. Arrington and Mr. Dixon and -- that

24  or -- no, a following, a subsequent plan supplement resigned

25  from the board in a surprise move, Mr. Arrington did.  And

1    he is the lead name investor in the Fahrenheit Group.

2    Arrington Capital is the lead investor.  Mr. Arrington

3    suddenly resigned from the board and replaced himself with

4    Ravi Kava.  I had no objection to him and is certainly well-

5    qualified and well within Fahrenheit's rights to put on the

6    board.  But basically said he was doing that because he

7    disagreed with the board observer process and specifically

8    the appointment of Mr. Dixon in a board observer role.

9              And so I believe that those all undercut the stock

10   price significantly and that is why creditors ran and taking

11   more equity.  And a 30 percent discount is the minimum

12   discount that should be taken to the NewCo equity in the

13   valuation.

14             THE COURT:  All right.  Thank you very much, Mr.

15   Phillips.

16             The next person is Mr. Cassidy, Eric Cassidy.  Mr.

17   Cassidy, are you on Zoom?  No response from Mr. Cassidy.

18             The next is Elizabeth Bohon.  Ms. Bohon, are you

19   on?  I may be mispronouncing your name, for which I

20   apologize.  No response.

21             Travis Keeney?  Mr. Keeney, are you on the line,

22   on Zoom?

23             Michael Windham?

24             James Johantgen?  J-O-H-A-N-T-G-E-N?

25             May I ask whoever is operating the Zoom -- and I

Page 138

```
1    know Deanna has left for the day, but I know somebody is.

2    Are you able to tell whether Ms. Bohan, Mr. Keeney, Mr.

3    Windham, or Mr. Johantgen are still on the Zoom connection?

4              CLERK:  Good afternoon, Judge.  It's Jessica.  No,

5    those entities are not on Zoom.

6              THE COURT:  Okay.  The next person is Caroline

7    Abruzese, A-B-R-U-Z-E-S-E.  Is she on Zoom?

8              CLERK:  I do not see her.

9              THE COURT:  Okay.  Peter Truss?  Is Mr. Truss on

10   Zoom?

11             CLERK:  I do not see him, either.

12             THE COURT:  Benjamin Dame, D-A-M-E?

13             CLERK:  I do not see him, either.

14             THE COURT:  Okay.  Cathy Lau, L-A-U.

15             CLERK:  Ms. Lau is on.

16             THE COURT:  All right.  Mr. Kirsanov, we are back

17   to you.  Dimitry Kirsanov.  Are you still on the line?

18             MR. KIRSANOV:  I am indeed.

19             THE COURT:  Okay, Mr. Kirsanov, you are up.

20             MR. KIRSANOV:  Thank you, Your Honor, for hearing

21   my concerns.

22             So my concerns primarily revolve around best

23   interests and fair and equitable clauses and the mixed

24   language in the plan along with the concerns of CEL token

25   and other cryptocurrency in the custody class.  And the
```

1   language of deactivation they value, not providing

2   guaranteed value returned in comparison to a Chapter 7

3   liquidation.

4           From my understanding, all distribution methods

5   from effective date to deactivation day are to follow best

6   interests.  On the plan under CEL token settlement in the

7   plan, Docket 3332 on Page 116, it indicates that all CEL

8   token deposit claims other than custody claims that are CEL

9   token deposit claims shall be valued at 25 cents.

10          However, on the debtor's balloting, the custody

11  class was assigned 25 cent valuation for cell tokens in the

12  custody class.  And I do want to note that the custody class

13  in the CEL monetary majority voted to reject the CEL

14  settlement plan.

15          In my particular situation, I had pure custody

16  assets that were not able to be withdrawn pursuant to the

17  withdrawal order as a result of having a (indiscernible).

18  This resulted in my pure custody assets moved into 6A from

19  the 6B class as I -- and I was able to reject the proposed

20  CEL custody settlement in the custody class by a monetary

21  majority after initially accepting the custody settlement as

22  a result.

23          This was never explained in explicit listing or

24  ballot instructions or otherwise.  From my understanding

25  maybe a double-digit number of people in the world that

1    could do this.  But I fell under that category.  So the

2    settlement, the custody settlement calls for the debtor if

3    they cannot satisfy in-kind distributions during the trustee

4    phase and the debtor has confirmed they are not able to

5    distribute any other cryptocurrency aside from bitcoin or

6    Ethereum in Hawaii in that phase, that the conversion rate

7    shall be determined using the value of the original digital

8    asset of petition date in U.S. dollars and will be converted

9    into an (indiscernible) cryptocurrency based on the value of

10   such digital asset on the date of entry of the settlement

11   approval order.

12          In the CEL token hearing of September 28th which

13   was a day after the final amendment of the plan, the

14   debtor's counsel indicated that this was an excellent

15   question and they had not thought of that scenario.

16          In addition, I do believe the deactivation day

17   language indicates that a creditor may receive less than

18   their Chapter 7 liquidation value.  It is reasonable to

19   assume that many people have moved on from Celsius and will

20   simply receive a check in the mail from the trustee with the

21   activation day value.

22          While most cryptocurrencies have indeed risen in

23   value, there are some that have fallen in value on petition

24   date.  And I believe the Debtor must follow the best

25   interest in that case, providing equal or greater value to

Page 141

1      the cryptocurrency as of that petition date.

2             The Debtor has indicated they want to use market

3      rates, which do not always reflect liquidation values of the

4      assets that have fallen in value since petition date.  My

5      interpretation of the change after balloting on the 27th

6      stem from the fact that the debtor wishes to assign a value

7      of 25 cents to the CEL token in custody class, which in my

8      opinion is not fair and equitable in terms of liquidation

9      rates in comparison to other classes.

10            Custody is targeted with the most monetary loss as

11     a result.  I do believe that this violates Bankruptcy Code

12     1127 and Bankruptcy Rule 3019.  My stance is that CEL should

13     be assigned a liquidation value across its respective

14     classes.  For the CEL token in pure custody, that's 100

15     percent liquidation value of petition day prices.  The value

16     returned in that case must be equal to 81 cents.

17            For CEL general custody at a 72.5 liquidation

18     rate, the value returned must be equal or to at least 59

19     cents.  For CEL in general Earn, which has a 47.4 percent

20     liquidation rate of a Chapter 7, the value returned must be

21     equal or greater than 38 cents.

22            And my concerns is this does not meet the best

23     interest of a creditor like myself.  My claim, my dollarized

24     claim on CEL token is $600,000.  And I believe the Debtor

25     tries to mitigate that petition date value down to under

Page 142

1    $200,000.  And this monetary loss is not fair and equitable

2    to me in comparison to other classes.  And therefore I

3    reject the plan.

4         You know, I do want to mention since becoming a

5    vocal dissenting member, I've been the subject of

6    harassment, intimidation, and threats.  And I don't think

7    that's appropriate at all.  You know, my objective is to get

8    through this Chapter 11 in a fast process so we can all

9    maximize our value.  But these specific concerns, I have

10   been getting vague responses on.  Nobody has given me my

11   direct options on this.  This wasn't even explained on the

12   balloting, Your Honor.  And the debtor's counsel even said

13   that was a great question and they didn't even think of

14   that.  So, you know, I would like a clarification on that.

15        I would also like to update the Court in regards

16   to a criminal matter from the FTX and Alameda case.  And I

17   submitted this on the docket today, Your Honor.  I did

18   submit a formal transcript.  The CEO of Alameda Research,

19   Caroline Ellison, who has agreed on a plea deal with

20   prosecutors to testify against FTX, last Wednesday, Ms.

21   Ellison testified that her and Mr. Bankman-Fried the CEO of

22   FTX, were considering selling billions of dollars-worth of

23   bitcoin if it was ever above $20,000.  I believe this

24   presents potential challenges to any valuation arguments and

25   presents challenges to valuation concerns on all assets

Page 143

1    (indiscernible), especially if a competitor was conspiring

2    to suppress the price of bitcoin.

3           So, Your Honor, those are my concerns today.  And

4    I appreciate the Court's time in hearing my objections and

5    concerns.

6           THE COURT:  All right.  I think, Mr. Kirsanov, you

7    previously raised issues about those with custody.  And I

8    believe that the Debtor's counsel words to effect that it

9    was a good question and that it clearly -- it doesn't go to

10   the evidence that's been admitted, but it is clearly going

11   to go to final arguments that have to be made.  So I'm not

12   going to ask Debtor's counsel to respond today.  But it's

13   something -- and Mr. Kirsanov, when we get to the closing

14   argument, you'll have a chance to raise it again.  I think

15   because this is the second time, you laid it out in more

16   detail today.  And I'm sure the Debtor's counsel is going to

17   want to respond.

18           I think the one point, if I'm understanding what

19   you said that I'm going to push back on -- and I'm not

20   deciding the evidence at this point.  There's no witness who

21   has testified that CEL should be valued at 81 cents at the

22   petition date.  There's been a variety of testimony from --

23   at the petition date, it was really worthless because it was

24   a utility token and had no utility.  Or if it did, it was

25   purely speculative whether there was going to be a

Page 144

1    reorganization possible where the CEL token would have any

2    utility going forward.  So zero at the low end.  No one,

3    including in the cross-examination today, there is no one

4    who said it's 81 cents.  So we'll have to see.  This will be

5    for legal argument.

6                MR. KIRSANOV:  If I may respond to that, Your

7    Honor?

8                THE COURT:  Briefly.

9                MR. KIRSANOV:  With regard to the most recent

10   testimony by Ms. Ellison from Alameda Research, I do believe

11   it is perhaps even a conflict of interest in the expert

12   witness who will have admitted to receiving seed funding

13   from Alameda research.  And now if Alameda research and FTX

14   were indeed conspiring to keep the price of bitcoin

15   suppressed under $20,000, this prevents -- excuse me, this

16   presents substantial issues on general valuation not only on

17   the CEL token, but across all other petition date values.

18               THE COURT:  All right.  So I'm going to stop that

19   testimony.  I'm going to stop those arguments for now.

20               We have one other witness that we moved to the

21   end, and that's Mr. Schneider.  Do you wish to be heard

22   today?  It was David Schneider.  He originally was number 12

23   on the list.  And at his request, I moved him to the last

24   for today.

25               MR. SCHNEIDER:  Yes.

Page 145

1              THE COURT:  Go ahead, Mr. Schneider.

2              MR. SCHNEIDER:  Okay.  Can you hear me fine, Your

3     Honor?

4              THE COURT:  Yes, I can.  Go ahead.

5              MR. SCHNEIDER:  Okay.  Yeah, I would prefer to be

6     heard tomorrow.  I've been up all night for the past 24

7     hours working on this.  I am definitely inexperienced at

8     what -- where I'm at here today.  And I need a little bit

9     more time to be able to be prepared.

10             THE COURT:  What is it that you're preparing, Mr.

11    Schneider?

12             MR. SCHNEIDER:  To be honest, I'm not exactly sure

13    exactly the intent and purpose of this hearing here today.

14    I know I submitted my exhibits and I'm basically preparing a

15    statement of verbalizing how the exhibits fit in with my

16    objections.  And I'm not there yet, Your Honor.

17             THE COURT:  Okay.  Why don't you hold off for a

18    second.  So let me ask the debtors then.  So the objectors

19    are seeking to call an additional expert witness.

20             MR. MCCARRICK:  Yes, Your Honor.  We're happy to -

21    -

22             THE COURT:  Make your appearance.

23             MR. MCCARRICK:  Sorry.  Every time.

24             THE COURT:  Every time.

25             MR. MCCARRICK:  T.J. McCarrick, Kirkland &  Ellis,

Page 146

1    on behalf of the Debtors.  We're happy to push forward

2    tonight to the extent the witness is available.  If you'd

3    like to proceed tomorrow with remote testimony, we're happy

4    to do that.

5              THE COURT:  I think I would like to proceed

6    tomorrow with remote testimony.

7              MR. MCCARRICK:  And in fairness, I would like

8    that, too.  There have been some new underlying materials I

9    understand have been posted on Twitter from the expert.  So

10   I'll spend the evening with those and we can --

11             THE COURT:  All right.  So let me understand.  I

12   am prepared to allow Mr. Schneider to go in the morning as

13   well to give him some more time.  I hope you're not going to

14   spend another sleepless night, Mr. Schneider, but I will

15   wait to give you a chance to speak tomorrow morning, okay?

16             MR. SCHNEIDER:  Okay.  Thank you, Your Honor.  I

17   appreciate it very much.

18             THE COURT:  Let's deal with -- I guess I have a

19   couple of questions.  So who is the expert and who is

20   calling him?

21             MR. MCCARRICK:  Mr. Faraj.  There's been a number

22   of letters on the docket, but Mr. Davis identified Mr. Faraj

23   on his witness list.  So I think technically Mr. Davis would

24   be the sponsoring --

25             THE COURT:  Okay.  Have you deposed Mr. Faraj?

Page 147

1              MR. MCCARRICK:  We have.

2              THE COURT:  Okay.  So the only witnesses as of now

3     for the objectors to listen to would be Mr. Faraj and Mr.

4     Schneider.

5              MR. MCCARRICK:  Correct.  And my understanding

6     just as to Mr. Schneider is that he did not submit any

7     written testimony.

8              THE COURT:  Correct.

9              MR. MCCARRICK:  He had certain exhibits listed,

10    which we can discuss.  But yes.

11             THE COURT:  Correct.

12             UNIDENTIFIED SPEAKER:  Your Honor, Ms. Lau raised

13    her hand.

14             THE COURT:  Yeah.  We're going to finish with Ms.

15    Lau this afternoon before we finish.

16             Does the Debtors or the Committee plan to call any

17    rebuttal witnesses?

18             MR. MCCARRICK:  Speaking for the Debtors, not at

19    this time, Your Honor.

20             THE COURT:  I don't know what time you're thinking

21    about.

22             MR. MCCARRICK:  No, I understand.  I would be

23    surprised if we had to haul someone in here tomorrow.

24             THE COURT:  Okay.  Let me hear from the Committee.

25             UNIDENTIFIED SPEAKER:  We're in the same

Page 148

1    situation, Your Honor.

2              THE COURT:  Okay.  So, Ms. Lau, I'm going to go

3    ahead and listen to you.  I called you earlier.  I don't

4    know whether you had dropped off and signed back on, but you

5    were on the list.  So go ahead, Ms. Lau.  Go ahead, Ms. Lau.

6              MS. LAU:  Can you hear me?

7              THE COURT:  Yes, I can hear you.

8              MS. LAU:  Okay.  Sorry.  I had to hook up an

9    external microphone.  This is like -- I didn't know if it

10   works.

11             THE COURT:  Okay.

12             MS. LAU:  I wasn't aware that I was supposed to be

13   here, but I can, like, voice my objections, the ones that I

14   wrote down before.  Because I do have everything.

15             THE COURT:  Well, let me ask you this.  If there's

16   anything you want to add to your written objections, now

17   would be the time to do it.

18             So the Court entered an order on October 13th and

19   it provided the list and the order that I was going to hear

20   the objectors.  And you were listed as number 22 on the

21   list.  So it's okay.  It's okay.  I'm listening to you now.

22             In your written objection, you don't have to just

23   repeat what's there, but I'm going to give you a chance to

24   speak if you wish to.

25             MS. LAU:  Can I say what was in there and then

Page 149

1    also maybe add?  Or do you just want me to say if I have

2    anything new.

3              THE COURT:  We have the written objection.  I'm

4    not -- I want to give you a chance to say what you want to

5    say.  Okay?  So go ahead.

6              MS. LAU:  I guess my feelings towards, like, what

7    I felt was based on the disclosure statement.  Because I

8    really felt like it made all these -- it took all these

9    liberties that I don't feel were really there.  Like, I

10   thought that, like, for example, I'm in my very first

11   objection, like you already ruled, but we were supposed to

12   get our Flare tokens back.  And then they said they're not

13   going to give us the Flare tokens back because, like,

14   Celsius didn't have a custody account at the time.  And,

15   like, I've never had a custody account because I'm Canadian.

16   Canadians don't even have custody accounts.  And we've been

17   waiting since 2020 to get those.  So I was like, how could

18   you just say we're not going to give you back just because

19   there were no custody accounts?

20             And, like, a lot of the rulings I felt like didn't

21   take into account a lot of -- like even how they said that

22   everybody -- that because so many people voted in favor of

23   the Celsius plan that Celsius creditor -- like all the

24   people who have Celsius actually agreed to the valuation of

25   Celsius.  I really wanted to stress that I don't think that

Page 150

1    that's true.  I already know another creditor who only voted

2    that way because she wanted to get some money back from the

3    claim.  And even though she has CEL token, she's like, well,

4    what can I do.  If I don't vote yes, I don't any money.  And

5    that doesn't reflect the fact that we're like, yes, we're

6    fine with you valuing 25 cents.

7              Like I said in my letter, I took out a line of

8    credit just to buy some CEL token.  And some of it was even

9    for, like, four dollars.  And I think that it's crazy that

10   regardless -- I realize that everyone's trying to value CEL

11   and see what price it was at the time, but I think it's

12   ridiculous if we get nothing back.

13             Like, I feel -- from what I understand, Alex

14   Mashinsky and all the other people aren't even getting any

15   value for their CEL.  But I don't -- if they're not going to

16   get anything for their CEL, why is it that everyone who

17   bought CEL has to suffer?  Because so many people are mad at

18   Alex and all the people for, like, manipulating the price of

19   Celsius.  We bought CEL token at certain prices.  And now

20   because so many people are, like, Celsius is stupid, Celsius

21   did this and that and that, then we can't get anything what

22   we purchased because of all these negative feelings towards

23   Celsius people.  I feel like it should at least be taken

24   into account that there was a lot of us that bought Celsius,

25   and we bought it for certain prices, like a lot higher than

1   this 25 cents or 20 cents and all those prices that they got

2   to buy it for.  And now we have to worry about not even

3   getting anything for it or getting like 20 cents or 25

4   cents.  Like I said, I took out one line of credit just to

5   buy it for 40 cents and another just to buy it for like four

6   dollars.  So I already had $10,000 invested in Celsius.  And

7   I feel like everybody just being like we shouldn't get

8   anything because Celsius is, like, this, that and another.

9   Like that we all bought it thinking that it had value, and

10  it should.  And it's not like it didn't have any value.

11  Like somebody mentioned, there's still a market cap for it.

12  So I don't understand why there's this big argument that we

13  should just get nothing for it.

14          And I know it's probably too late to talk about

15  this, but I thought it was really unfair how they forced us

16  to, like, just accept our coins in terms of bitcoin and in

17  Ethereum.  It's like I have 36 coins and then my taxes are

18  going to be ridiculous now because they're selling all my

19  coins without me getting a say in it.  And just so that the

20  people who kept lots of bitcoin because from my

21  understanding, a lot of the creditors that have big holdings

22  have, like, mostly just bitcoin and Ethereum.  So it all

23  helps them.  And then they get what they want.  But all

24  these little guys like me who only buys -- who have, like,

25  smaller holdings.  But we have many coins.  Now we lose all

1    the work we put into, like, getting each one of those --

2    every one of those coins.  Like, we have to research a lot

3    to find out which coins we want to buy.  We have to, like,

4    try to buy them at good prices all the time.  It's really

5    difficult.  There was so much work into going into that.

6    And I thought that it was really unfair that people just --

7    just because the biggest creditors have bitcoin and

8    Ethereum, we all just lose all the work we put in just

9    because that satisfies them.

10            I put in my -- I submitted evidence.  I didn't

11   know after the fact with the letter.  And I showed that one

12   of the articles was showing that (indiscernible) of Celsius

13   -- of the (indiscernible) in Celsius (indiscernible).  I

14   think it said like sixth-something percent (indiscernible)

15   coin.  And they lost the coin that they had, but it's not

16   like they lost the coins that we bought.  But because so

17   many people are invested in bitcoin, now it feels like we

18   just get -- we have to go along with whatever everybody else

19   does.  I just didn't think that was fair.

20            And I wrote for number four inappropriate

21   allocation of $2.6 million of accountholder funds to the

22   emergence incentive plan awards.  I know that's been

23   addressed a number of times.  And I know that people have

24   come on here saying that, oh, this is normal that -- but I

25   already feel like they're already getting paid so much money

1    from creditor money.  And then it already said somewhere

2    later, like in the plan way later that NewCo, they were

3    going to get -- they were going to have penalties instead of

4    incentives for, like, if they don't meet quota.  And I don't

5    understand why.  Like, I think that would motivate someone

6    just as much to have a penalty if they didn't meet what they

7    were supposed to do than, like, an incentive.

8               And I said there was too much freedom for plan

9    creators to use the plan after the fact with no limitations

10   and no requirements to stick to what was already put forth

11   (indiscernible).  I just thought it was crazy that they

12   have, like, potential exists for inaccuracies and the

13   Debtors have no duty to update.  They're basically saying

14   that we could put something completely wrong here and we

15   don't have to tell you and we can change it.  And as long as

16   you, the judge, doesn't tell them you have to inform

17   everybody that you've made an update or changed something,

18   they can get away with changing the plan as much as they

19   want.  And the fact that they added two NewCo members

20   without telling anybody even though that's going to require

21   so much Celsius creditor money, I felt like that was really

22   unfair.  That's a huge deal.  Like, how much is it going to

23   cost to pay for two more people?  Plus, they're people from

24   the NewCo board.  They're not even Celsius creditors.  So it

25   just felt to me like how do you know that they're not just

Page 154

1    voting for each other and promising each other I'll vote for

2    you here if you vote for me here so then we can all get

3    seats.  And then we don't even get a say because we're

4    creditors.  From my understanding, people from the committee

5    of creditors, they have seats on the litigation committee,

6    (indiscernible) board and all these different committees.

7    And some of them you get to vote on.  And how do we know

8    that they're not voting for each other so that they can stay

9    on and make even more money after this while we still get

10   less money and less money and less money because they keep

11   creating these positions that we are funding from our money.

12          And then I said it was unfair protection of plan

13   creators from litigation because I was saying that if these

14   people are really taking advantage of the fact that there's

15   all these holes where they can add what they want and then

16   change so many things whenever they want, now we're not even

17   allowed to complain about it because we're not allowed to

18   litigate against them because we were forced to sign and we

19   were forced to opt out of the third-party release if we

20   wanted (indiscernible) of this plan.  I thought that it was

21   really unfair that if you want to accept the plan, even if

22   you say I opt out of the third-party release, you still get

23   opted in regardless so then you can't do anything about it.

24          And then later I said overly narrow scope of plans

25   for litigation, administrators appearing confined to

Page 155

1    pursuing litigation against former debtors with no

2    indication of a plan to go after potentially bigger fish.

3    I'm not sure if they already were planning to go after FTX,

4    because I know there was a claim that was, like, Celsius

5    filed a $2 billion claim against FTX.  But when I read the

6    (indiscernible) last year (indiscernible) everybody hates

7    now because they, like, ran off with creditor money, but

8    they're not going after this big fish that has, like, a $2

9    billion claim.  Where if they go after them, then we could

10   all get back $2 billion.  And then that's going to be so

11   much more money for creditors.

12          I know that it said that they're not necessarily -

13   - they don't have to name everybody they're going after, but

14   I thought it was very concerning that they don't list

15   something huge like that.  Because we could get so much more

16   money if they actually pursued that and if they actually

17   made that a focus rather than just focusing every -- all

18   their energy Alex, Alex, Alex.  Like --

19          THE COURT:  Ms. Lau, I'm going to -- because I

20   think I have your arguments down.  And there will be closing

21   argument in the case.  Let me raise -- thank you very much,

22   Ms. Lau, for your participation.

23          Let me ask a couple of things with respect to Mr.

24   Blonstein's deposition, has that been set at this point?

25          MS. BRIER:  Your Honor, Grace Brier, Kirkland &

Page 156

1   Ellis on behalf of Debtors.  I don't know that we have an

2   official time set, but we will get confirmation as soon as

3   we have it.

4            THE COURT:  Okay.  Here's what I would like to do.

5   We've got Mr. Faraj should be available to -- where is he?

6   I don't know where --

7            MS. BRIER:  Australia.

8            THE COURT:  Sydney, Australia.  Nine a.m. tomorrow

9   morning he has to be available for examination in court.  My

10  plan is -- and Mr. Schneider will have his opportunity.  I'm

11  going to give Mr. Schneider -- Mr. Schneider, I'm going to

12  give you a chance to speak first right at 9:00 tomorrow

13  morning.  All right?  And then we'll deal with Mr. Faraj.

14           I plan to recess this hearing tomorrow no later

15  than 12:30.  We can talk about a schedule for closing

16  statements in any post-trial briefs.  The opening briefs

17  were quite comprehensive.  I think they may need -- they may

18  have some additional arguments in light of how the evidence

19  has come in.

20           I don't know what your schedule is for when you

21  expect to have transcripts, when they'll be posted.  Others

22  would have an opportunity as well to file briefs.  So we

23  ought to do that tomorrow.

24           Is there any reason that anybody expects the

25  testimony to go beyond tomorrow morning?

Page 157

1          MS. BRIER:  None from Debtors, Your Honor, other

2     than Mr. Blonstein's deposition.

3          THE COURT:  Right.  So, look, I would hope that

4     that could be done -- if necessary, we could resume the

5     hearing on Wednesday morning just with respect to Mr.

6     Blonstein.

7          MS. BRIER:  Understood, Your Honor.  We'll have an

8     update for the Court right when we start tomorrow as to when

9     that's scheduled.  And we'll endeavor to get that done

10    tomorrow.

11         THE COURT:  All right.  So one of my law clerks

12    just handed me a note.  Mr. Kirsanov, you wanted to say

13    something?

14         MR. KIRSANOV:  Yes, sir.  May I ask a procedural

15    question?

16         THE COURT:  Go ahead.

17         MR. KIRSANOV:  Does the Court have jurisdiction

18    over the claim of breach of contract before a petition date

19    and before the freeze?

20         THE COURT:  Prepetition claims are definitely part

21    of this Court's jurisdiction to deal with.  That would have

22    to be included in -- and that had to be -- any breach of

23    contract claim had to be asserted and a proof of claim filed

24    with the Court by the bar date.  There certainly have been

25    breach of contract claims that have been asserted, but the

Page 158

1    bar date has come and gone a long time ago.

2            MR. KIRSANOV:  Yes, sir.  And in regards to a

3    breach of settlement, is that something that the Court has

4    jurisdiction over the custody settlement?

5            THE COURT:  I'm sorry, I didn't understand the

6    beginning of your question, Mr. Kirsanov.

7            MR. KIRSANOV:  With regards to breach of

8    settlement and the custody settlement, the first payout,

9    does the Court also have jurisdiction over that?

10           MR. KOENIG:  Your Honor, Chris Koenig for the

11   Debtors.  I think what Mr. Kirsanov is asking is do you have

12   jurisdiction -- he signed the custody settlement.  I think

13   he is alleging that we violated the custody settlement.  I

14   think he's asking --

15           THE COURT:  I certainly have jurisdiction over

16   that issue.

17           MR. KOENIG:  Yes.

18           THE COURT:  Okay.  And the other thing is, Mr.

19   Davis, I've been advised that you also wanted to say

20   something before we end for the day.

21           MR. DAVIS:  Yes I do, Judge.  Your Honor, I would

22   just once again ask the UCC and the Debtors to turn over all

23   the FTX data they received through the subpoena that you

24   issued.

25           THE COURT:  Overruled.  I mean sustained --

Page 159

1        objection.  There's an objection.  It's sustained.

2                MR. MCCARRICK:  Objection, Your Honor.  T.J.

3        McCarrick, Kirkland & Ellis, on behalf of the Debtors.

4                THE COURT:  Yes.

5                MR. MCCARRICK:  I would just note that the

6        discovery deadline for opposition of confirmation --

7                THE COURT:  Has come and gone.  Come and gone.

8        All right.

9                So that finishes our hearing for today.  I'll see

10       you all at 9:00 tomorrow morning.  You can leave anything in

11       the courtroom.  The courtroom is going to be locked up.

12       Okay?  Thanks very much.  See you all tomorrow.

13               MR. DAVIS:  Judge, tomorrow --

14               THE COURT:  No, Mr. Davis.  Enough.  Enough.  See

15       you all -- if you log in tomorrow, we'll have a hearing

16       tomorrow morning.  Court is adjourned.  Thank you.

17               (Whereupon these proceedings were concluded at

18       5:39 PM)

19

20

21

22

23

24

25

Page 160

1                 C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:

**[& - 238]**                                                                 Page 1

| **&** |
| --- |
| **&**  14:10 15:13 16:2 17:17 18:21 21:3 24:19 31:2 33:3 34:18 47:14 51:21 57:9 79:13 88:25 89:1,1 89:24 90:5,6 99:9 103:20 105:3 106:3 109:17 110:23 112:6 113:7 117:19,24 118:15 145:25 155:25 159:3 |

| **0** |
| --- |
| **07102**  3:21 |

| **1** |
| --- |
| **1**  50:16,19,22 50:25 51:4,6,8 51:15 54:19 59:7 |
| **1,248**  126:21 127:5 |
| **1,248,000,000**  127:1 |
| **1.1**  135:12 |
| **1.2**  124:16 125:5 |
| **10**  40:3,16 50:14 117:6 |
| **10,000**  151:6 |
| **100**  5:4 37:17 141:14 |

**10004**  1:13 4:22
**10020**  4:13
**102**  13:17 80:1 80:3,15,17
**107**  13:11
**10:14**  112:3
**11**  37:13 40:3 40:16 43:25 50:14 69:25 70:1,6 87:16 142:8
**110**  13:20
**112**  13:21
**1127**  141:12
**11501**  160:23
**116**  139:7
**118**  13:12,22 119:13 120:24 121:1,6,8 134:1
**11th**  66:3,5,7 66:14
**12**  61:22 144:22
**121**  13:22
**12151**  160:7
**1221**  4:12
**12:30**  156:15
**12th**  62:24
**13**  54:18 71:8 83:5,12 87:12
**1301**  3:12
**13th**  20:6 21:5 34:23 62:24 148:18

**14**  83:5,12 114:17
**140**  120:9,11
**15**  77:14,18 78:3 101:5 130:8,23
**16**  1:15 115:20
**168**  31:23,24 48:21,21 49:10
**16th**  14:3
**1746**  25:5
**19,980**  46:24

| **2** |
| --- |
| **2**  20:10 32:25 33:3,17 39:22 40:2,14,16 50:14 60:17 68:5 75:20 123:24 155:5,8 155:10 |
| **2's**  33:4,14,15 |
| **2.01**  60:6,10 61:1,2 62:9 63:6 |
| **2.6**  152:21 |
| **2.88**  60:12,15 60:21 61:1 |
| **20**  69:2 130:8 130:23 151:1,3 |
| **20,000**  142:23 144:15 |
| **200,000**  142:1 |
| **20004**  3:13 |
| **2020**  149:17 |
| **2021**  48:11 73:11,12 74:11 |

**2022**  61:23 62:19 65:18,18 75:25 76:22 77:4 78:23 80:7,19 81:18 82:3 84:6,19 87:12
**2023**  1:15 14:3 52:19 54:18 87:21 88:7 105:18 106:24 107:15 109:16 110:13 111:8 112:3,25 114:1 114:17 119:4 119:24 120:20 122:4,7,17
**20549**  5:5
**21**  87:21 88:6
**21st**  22:11 66:23 117:16 132:18
**22**  71:8 148:20
**22-10964**  1:3 14:4
**22nd**  117:15,17 119:7 132:17
**23**  23:19 24:4
**236**  13:21 111:24 112:13 112:21,22
**237**  13:20 108:18 109:22 110:19
**238**  114:14 116:23 117:1,3 117:9 134:6

| | | | |
|---|---|---|---|
| **239** 117:10 | **31** 105:18 | **4** | **60** 65:1 |
| **24** 69:2 80:19 | **32** 74:3,4 | **4** 74:3 114:1,16 | **600,000** 141:24 |
| 85:8 145:6 | **3293** 27:16 | 115:17 | **60654** 3:6 |
| **25** 52:11,14 | **33** 69:2 136:18 | **40** 84:25 151:5 | **6:12** 109:17 |
| 112:3,24 | **330** 160:21 | **41** 68:5 | 110:14 |
| 135:13 139:9 | **3332** 139:7 | **43** 21:23 22:9 | **6a** 139:18 |
| 139:11 141:7 | **35.5** 61:4 62:6 | 53:9 54:23 | **6b** 139:19 |
| 150:6 151:1,3 | 63:5 | **44** 71:8 | **6th** 65:20,23 |
| **25th** 113:18 | **3522** 26:24 | **450** 128:16,23 | **7** |
| 120:20 122:4,7 | **3524** 31:7 | 129:6 | **7** 28:19 40:2,16 |
| 122:17 | **3526** 31:8 | **47.4** 141:19 | 42:20 43:4 |
| **26** 75:25 | **3544** 98:7 | **48** 67:23 | 44:1 50:14 |
| **2700** 4:4 | **3548** 103:7 | 115:25 | 63:1 64:17 |
| **27th** 141:5 | **3557** 103:7 | **49** 115:16 | 85:9 92:15 |
| **28** 52:19 | **36** 151:17 | **4:00** 101:1 | 131:20 132:4 |
| 124:12,21,21 | **3648** 99:19 | **4:15** 101:1 | 139:2 140:18 |
| **28th** 140:12 | 103:8 | **4th** 136:10,14 | 141:20 |
| **2:05** 1:16 | **3705** 103:12,13 | **5** | **7.5** 125:7,13,16 |
| **3** | 117:6 | **5** 40:2,16 50:14 | 125:25 126:5 |
| **3** 38:24 40:17 | **3706** 103:9 | 68:5 74:2 | 128:12 129:10 |
| 40:25 50:14 | 117:6 | 86:25 88:10,11 | 129:15 130:6 |
| 73:3,4 76:9 | **3758** 103:10 | **50** 84:25 | 131:2 |
| 86:6 117:5 | **3767** 103:13 | 136:18 | **71** 58:24,25 |
| **30** 47:6 109:16 | **3769** 27:12 | **510** 98:9 | 59:2 60:22 |
| 110:13 111:8 | 52:16,25 55:13 | **534** 4:21 | 62:3 63:12 |
| 126:9,11,13,16 | 64:15 | **54,000** 92:13 | 66:3,9,13,16 |
| 126:20 128:12 | **38** 39:6,11 | **555** 4:4 | **72.5** 141:17 |
| 129:10,16 | 141:21 | **570** 3:20 | **75** 13:15 |
| 131:1 135:16 | **3802** 34:23 | **58** 13:5 | **76** 13:16 |
| 135:19 136:2 | **3810** 37:14 | **59** 141:18 | **7th** 62:24 |
| 137:11 | 38:1,17 | **5:39** 159:18 | **8** |
| **300** 3:5 160:22 | **3813** 54:17 | **6** | **8** 40:2,16 50:14 |
| **3000** 93:13,13 | **3:48** 114:17 | **6** 40:2,16 50:14 | **8,000** 47:4 |
| **3019** 141:12 | **3:59** 101:1 | 62:19 64:12,15 | **80** 13:17 |
| **30326** 5:13 | **3c** 108:25 | 64:16 73:11,12 | 135:14 |
| **30th** 107:22,24 | **3d** 108:25 | 86:8 115:20 | |
| 111:18 117:4 | | | |

**[81 - admissions]**

**81**  52:13,18,21
  57:14,17,20
  58:23,25 59:21
  60:25 64:11
  124:1,6 141:16
  143:21 144:4
**82**  13:18 59:7
  59:12
**86**  59:2,4,12,20
  59:22,25 60:25
**87**  13:16 75:20
  76:6,8

**9**

**9**  40:3,16 43:2
  43:4 50:14
  117:6
**9,000**  47:4
**9/14**  133:25
**90**  13:15,19
  73:3 75:11,12
  75:14
**900**  5:12
**90071**  4:5
**91**  13:6
**92**  83:5,12
**93**  85:8
**94**  13:19 85:9
  86:1,6 87:20
  88:6 89:14
  90:8,10
**95**  13:7
**950**  5:12
**97**  13:8
**99**  13:18 82:10
  82:12,14
**9:00**  156:12
  159:10

**9th**  66:23

**a**

**a.m.**  112:3
  156:8
**aaron**  4:7 16:3
  18:20 51:20
  109:17 114:17
**able**  25:6 28:22
  35:14 36:5
  38:2 41:4
  43:16 53:12
  96:6,16 104:7
  107:7 118:2
  138:2 139:16
  139:19 140:4
  145:9
**abonce**  6:10
**above**  142:23
**abreu**  6:11
  19:16,17,18,21
  19:22
**abruzese**  138:7
**absolutely**
  37:25 45:14
  123:12
**abundantly**
  48:15 49:13
**accept**  151:16
  154:21
**acceptable**
  54:14
**accepted**  28:14
**accepting**
  28:18 139:21
**account**  28:16
  30:20 45:11
  131:8 149:14

  149:15,21
  150:24
**accountable**
  103:21
**accountholder**
  152:21
**accounts**  43:19
  149:16,19
**accurate**  27:15
  76:2 160:4
**acknowledge**
  70:23 71:3
  110:12
**action**  27:10,13
**actions**  136:4
**activation**
  140:21
**actual**  44:21
  135:13
**actually**  20:8
  32:1 38:8
  41:11 45:24
  47:16 64:2
  75:10 133:18
  135:14,17
  149:24 155:16
  155:16
**ad**  69:3
**add**  30:22
  69:21 76:24
  77:15,18 78:3
  78:6,7,17
  81:23,25 103:4
  131:2 148:16
  149:1 154:15
**added**  43:4
  103:8 153:19

**adding**  98:12
  127:4 130:2
**addition**  27:16
  48:17 140:16
**additional**
  14:16 15:18
  16:5,21 17:9
  18:4,18 47:6
  145:19 156:18
**additionally**
  43:14 49:1
**address**  33:7
  37:4 45:19
  47:18 109:4,10
  112:2 114:16
**addressed**
  46:11 152:23
**adequate**
  36:15
**adjourned**
  159:16
**adjusted**  30:20
**adjusting**  73:5
**adler**  6:12
  104:15
**administer**
  102:21
**administrators**
  154:25
**admissible**
  20:17 40:6
**admission**  39:4
  39:7,20 41:7
  50:14
**admissions**
  41:13

[admit - answer]                                                      Page 4

| | | | |
|---|---|---|---|
| **admit** 39:6 | 97:12,25 106:8 | 71:1 83:17 | 154:17 |
| 94:14 97:2 | 106:9 118:19 | 90:21 94:7 | **altcoins** 77:25 |
| 101:16 | 118:20 132:12 | 96:1 98:5,20 | **alvarez** 105:3 |
| **admitted** 19:8 | 138:4 147:15 | 98:23 100:13 | **ambiguity** |
| 19:10 44:2 | **aganga** 6:13 | 102:20 124:23 | 127:15 |
| 54:19 75:14 | **ago** 35:2 54:8 | 125:21 130:24 | **amended** 103:9 |
| 76:7,8 80:15 | 65:12 66:1,7 | 134:3 135:6 | **amendment** |
| 80:17 82:14 | 67:23 84:1 | 145:1,4 148:3 | 85:4,18 86:6 |
| 90:10 100:7 | 158:1 | 148:5,5 149:5 | 140:13 |
| 110:19 112:20 | **agree** 33:23 | 157:16 | **americas** 4:12 |
| 112:21,22 | 57:25 58:22 | **aidoo** 104:19 | **amount** 44:23 |
| 117:9,10 121:7 | 60:9,15,20 | 104:20 114:6 | 104:1 |
| 121:8 131:25 | 63:11 65:8,11 | 115:7 | **amulic** 6:14 |
| 143:10 144:12 | 66:22 67:6 | **air** 130:19 | **analyses** |
| **admitting** 41:8 | 72:12 84:9 | **alameda** 91:6 | 130:16 |
| 101:21 | 116:17,19,21 | 91:12 142:16 | **analysis** 29:17 |
| **adoption** 100:8 | 118:6 128:16 | 142:18 144:10 | 69:5 130:13 |
| **adr** 51:22 52:2 | 129:6 131:5,15 | 144:13,13 | 131:22 |
| **advance** | 135:9 | **alan** 5:15 17:25 | **andrea** 6:14 |
| 106:12 | **agreed** 52:17 | 26:20 | **andrew** 6:17 |
| **advantage** | 52:20 60:22 | **alex** 12:12 | 11:23 |
| 154:14 | 62:3 79:8 | 33:18 72:24 | **andy** 10:1 |
| **advised** 158:19 | 142:19 149:24 | 76:11 77:7,8 | **angeles** 4:5 |
| **advisor** 134:10 | **agreement** | 77:12 150:13 | **annemarie** |
| **affirm** 56:22 | 41:10 42:20 | 150:18 155:18 | 10:23 |
| 102:22 | 43:7 48:22 | 155:18,18 | **announced** |
| **affirmation** | 49:7,8,10,11 | **alexander** 4:20 | 106:13 |
| 25:8 | 49:14,18 | **allegations** | **announcement** |
| **afternoon** 14:2 | 134:12 | 28:5 | 18:24 106:15 |
| 14:9,14,18,21 | **agreements** | **allege** 35:9 | 106:20,21 |
| 14:23 15:12,22 | 49:2,3,5,13 | **alleging** 158:13 | **answer** 63:15 |
| 16:23 17:10,14 | **ahead** 15:3 | **allocation** | 68:11,14 69:4 |
| 18:6 20:1 | 17:24 25:18 | 152:21 | 71:14,20,23 |
| 24:18 26:15 | 27:7 40:8 42:5 | **allow** 37:3 | 77:9 78:2,2 |
| 31:1 34:4,17 | 47:25 55:21 | 146:12 | 81:2 83:21,23 |
| 57:6,7 90:24 | 56:1 63:16 | **allowed** 96:9 | 85:13,18 86:8 |
| 90:25 96:4,5 | 64:16,19 69:19 | 96:12 154:17 | 86:16 88:23,24 |

[answer - asked]                                                                Page 5

91:10 111:12
121:18,21
122:14 125:19
127:22 132:2
132:24
**answered**
58:12 85:25
88:25 122:9
**answers** 36:4
123:23
**anthony** 8:6
**anticipate**
26:25 34:24
35:5
**anybody** 22:15
26:12,14 79:11
79:15 90:17
94:5 95:22
96:24 116:6
133:8 153:20
156:24
**anymore** 86:23
**anyway** 21:12
**apologies**
32:12
**apologize**
137:20
**apparent**
104:3
**apparently**
116:8
**appear** 54:1,20
55:2 98:7
99:19
**appearance**
14:7,24,25
15:8,19,25

16:1,6,8,12,24
16:25 17:3,10
17:20,24 18:7
19:11,22 54:22
145:22
**appearances**
18:5
**appeared** 30:1
46:4 117:17
**appearing**
31:24 154:25
**appears** 98:7
**applicable**
98:10
**applicants**
108:8,16
**application**
54:4 55:3
106:12 107:1
**applied** 106:10
122:7,16
127:13 130:5
135:16
**applies** 43:1
110:7
**apply** 101:20
125:13,16
126:9,11,20
127:13 128:12
129:10 130:14
130:20
**applying**
129:17,19
**appoint** 104:16
**appointed**
118:4

**appointment**
103:22 137:8
**appointments**
104:19
**appreciate**
24:1 40:10
97:3 111:1,4
113:8 115:1
143:4 146:17
**approach**
49:18 55:24
89:13 106:4
119:12
**approached**
34:15
**appropriate**
42:13 45:6
54:25 101:23
104:9 125:24
126:2 142:7
**appropriately**
37:11 40:4
**approval** 30:14
105:19 140:11
**approve** 119:1
**approved**
31:21,21 48:10
52:21 53:5
105:15 133:1
**approximately**
107:22 108:1
**arcos** 9:23
**area** 22:1
36:17
**aren't** 150:14
**argue** 41:4,18
42:13 43:1,6

44:4 49:2
**argument** 21:6
25:14 42:8,9
42:11 43:20
44:24 45:5,12
46:5,6,10
47:18 49:22
50:9,23 100:8
100:13 102:3,7
102:8 103:11
103:18 104:5
143:14 144:5
151:12 155:21
**arguments**
25:16 39:15
40:5 44:7 45:9
142:24 143:11
144:19 155:20
156:18
**armand** 6:15
**arose** 97:5
**arrange** 35:25
36:11,19
**arrington**
119:25 136:23
136:25 137:2,2
**arrive** 129:15
**articles** 152:12
**articulate**
134:15
**artur** 6:11
19:22
**aside** 140:5
**asked** 24:12
32:1 69:2
70:18 71:10
82:20,23 83:14

83:20 85:2,25
87:17 88:22
108:3,7,8,11
108:11,12,14
108:16 122:9
127:16
**asking**  27:17
29:23 69:11
84:13,13 85:24
86:9 87:2
99:10 109:9
132:25 158:11
158:14
**asks**  41:15
108:21 122:13
**assert**  20:20
**asserted**
157:23,25
**asset**  140:8,10
**assets**  130:10
139:16,18
141:4 142:25
**assign**  141:6
**assigned**
139:11 141:13
**assistance**
65:24 69:3,9
**assume**  140:19
**assumed**
135:24
**assuming**
71:15
**atlanta**  5:13
**attached**  39:4
**attack**  89:6
**attacking**  89:4

**attempt**  49:9
**attempted**
130:1
**attempting**
30:14
**attention**  18:23
77:7,8,11,11
81:1 90:3
113:6
**attorney**  25:22
70:4 79:9,12
**attorneys**  3:4
3:11,19 4:2,10
4:19 5:2,10
**attractive**
73:19,23
**attributes**  50:6
**auction**  119:10
120:6,6,15,18
121:11,16
122:1,2
**auctions**
121:25
**auctionswork**
120:3 121:12
121:15 122:4
**audio**  14:6,22
18:10 19:1,4
21:20 23:5
44:3
**august**  65:18
105:20 107:22
107:24 109:16
110:13 111:8
111:18 112:2
112:24 113:18
117:4

**australia**  156:7
156:8
**available**  49:15
53:11 104:1
136:21 146:2
156:5,9
**avenue**  3:12
4:12
**average**  59:24
**avery**  7:22
**avoid**  30:21
**awards**  152:22
**aware**  20:12
23:8 29:18
66:8,11,13,15
93:10 95:13
109:13 116:7
148:12

**b**

**b**  1:21 98:9
138:7
**back**  15:2
44:17,23 47:1
64:11 67:15
69:1 80:9
81:21,23 82:3
85:7 90:4
101:4 138:16
143:19 148:4
149:12,13,18
150:2,12
155:10
**backed**  59:19
78:15
**background**
123:21

**backing**  61:14
**backwards**
101:20
**balance**  113:12
**ballot**  118:23
119:2,5 132:14
132:16 133:4
135:10 136:1
139:24
**balloting**
139:10 141:5
142:12
**bankman**
142:21
**bankrupt**
82:17 84:19
**bankruptcy**
1:1,11,23
22:11 28:2
42:25 44:12
47:9 60:18
65:16 84:5
92:5 95:9
141:11,12
**bar**  157:24
158:1
**base**  42:14
**based**  26:24
33:4,17 34:24
35:19 57:20
61:4 120:14
121:15,23,25
122:3 140:9
149:7
**basic**  43:3
**basically**
135:22 137:6

145:14 153:13
**basis** 74:12,14
**bear** 44:20
  51:16
**beat** 55:14
**becin** 6:16
**becoming**
  45:11 142:4
**beef** 89:2 90:6
**beginning**
  39:18 54:18
  70:2 104:4
  120:18 158:6
**begins** 80:7
**behalf** 16:2
  21:3 34:18
  51:21 57:10
  98:1 99:10
  104:11 105:1,2
  105:2,3 106:3
  118:4,16 146:1
  156:1 159:3
**behavior** 95:8
**behaviors**
  104:10
**behlmann** 6:17
**believe** 18:21
  67:18 81:14,14
  81:16 84:14
  92:13 96:10
  103:21 106:16
  106:22 108:9
  117:16 132:15
  132:22 134:25
  135:7,21 137:9
  140:16,24
  141:11,24

142:23 143:8
  144:10
**believed** 118:1
**believes** 69:21
**ben** 7:18
**bend** 101:19
**benjamin**
  138:12
**berg** 12:1
**bernstein** 3:23
  15:11,12,13
  18:14,16 31:1
  31:2,4,5,12,13
**best** 62:1,13
  63:9,19 64:24
  78:16 131:10
  131:15 138:22
  139:5 140:24
  141:22
**better** 43:20
  44:1 46:4,5,19
  72:13 85:19
  120:17 131:19
  132:4
**beyond** 156:25
**bias** 52:24
**bible** 88:21
**bid** 120:16,17
**big** 77:2 151:12
  151:21 155:8
**bigger** 61:6,8
  61:17 62:10
  155:2
**biggest** 152:7
**billion** 60:17
  65:2 86:25
  124:16 125:5

135:12 155:5,9
  155:10
**billions** 126:24
  142:22
**bills** 113:15
**binder** 55:25
  59:7 73:4
  83:12 88:11
  108:25 115:17
  123:25 124:3
**binding** 29:5
  41:11
**bit** 37:20 48:4
  89:19 145:8
**bitcoin** 44:11
  44:14,15,22,23
  46:23,24 47:3
  47:5,6,7,10
  77:24 105:21
  140:5 142:23
  143:2 144:14
  151:16,20,22
  152:7,17
**blend** 68:24
**blochwitz** 6:18
**block** 12:2
**blonstein**
  34:10 35:18,19
  36:7,20 53:2
  157:6
**blonstein's**
  34:19,20 35:10
**blonstein's**
  155:24 157:2
**blow** 59:12
  73:5 74:4
  75:21 76:11

82:11
**board** 103:23
  104:19,20
  106:10 107:17
  107:21 108:8
  113:23 114:5
  114:23 115:4
  116:18 117:14
  117:20 118:3,7
  122:8,17,19
  129:17 134:20
  134:21,21,22
  136:9,22,25
  137:3,6,7,8
  153:24 154:6
**bohan** 138:2
**bohon** 137:18
  137:18
**book** 128:24
  129:18
**borrower's**
  43:16 48:19
**borrowers**
  43:12 47:1
  48:25
**bottom** 44:20
  52:6 54:19
  75:21 114:15
**bought** 150:17
  150:19,24,25
  151:9 152:16
**bowling** 1:12
  4:21
**bradley** 8:3
**bray** 6:19
**breach** 157:18
  157:22,25

158:3,7
**break** 77:17
101:5
**brett** 10:15
**breuder** 6:20
**brian** 9:17 10:3
10:8 11:24
**brie** 13:12
**brief** 47:16
98:4 100:16
103:6 105:23
**briefly** 101:16
101:24 144:8
**briefs** 45:18
156:16,16,22
**brier** 3:16
14:11 32:9
34:17,18 35:13
35:17 36:6,10
36:13,18 37:4
37:6,10,22,25
38:6,8,11,14
38:16,20,22,24
39:3,22 40:2
40:15,16,18
41:14,25 42:6
118:13,14,15
118:15,18,20
119:12,15,18
119:20 120:23
121:1,5,9,14
121:22 122:15
122:23 123:24
124:4,8,22,24
125:23 126:25
127:2,5,8,17
127:18 128:4

128:10,11,21
128:25 129:3
130:24,25
132:8 155:25
155:25 156:7
157:1,7
**brifkani** 6:21
**bring** 34:9 71:7
75:19 83:4
85:7 108:18
111:23 115:15
124:1,5
**broad** 3:20
**bronge** 6:7
18:12,12 34:1
34:2,4,7,19
35:4,15,21,23
36:2,4,8,14,15
36:23,24 37:5
37:7,16 38:21
39:13 40:7,9
40:22 41:3,4,5
41:6,18,22
42:5,7,10
45:13,14,16
46:9,12,14,18
47:21,24 48:1
49:24 50:1,2,7
50:9,10 51:13
51:14
**bronge's** 34:25
35:3 38:25
41:24 53:1
**bronstein's**
51:1
**brought** 90:2
109:7 136:10

**brown** 6:22
**bruh** 4:24 16:9
16:9 24:5,6,7
24:10
**bureau** 3:19
15:14 30:25
31:3,6
**burks** 11:12
**burn** 88:18
89:12,23
**business** 118:5
131:24
**businesses**
130:10
**busy** 20:1
81:10
**butcher** 88:17
89:20
**buy** 47:3 130:6
150:8 151:2,5
151:5 152:3,4
**buybacks**
73:24 74:1,14
74:15,23 75:4
**buyer** 135:9
**buying** 74:7,12
74:25 75:1
126:6
**buys** 151:24

**c**

**c** 3:1 14:1
98:10 160:1,1
**ca** 4:5
**cahana** 6:23
**caitlin** 10:11
**california** 22:5
35:19 36:1

**call** 18:4 32:18
32:21 69:10,23
145:19 147:16
**called** 80:23
87:4 148:3
**calling** 14:4
146:20
**calls** 140:2
**camera** 54:14
56:7,8,13
**cameron** 7:8
8:9
**campagna** 6:24
105:3 130:3
131:25
**canadian**
149:15
**canadians**
149:16
**can't** 127:25
150:21 154:23
**cap** 84:24 87:1
151:11
**capital** 137:2
**capitalization**
129:16
**caps** 114:25
115:3
**carcamo** 9:23
**care** 26:2
**carefully** 64:6
**carl** 7:7
**carlo** 9:12
**carol** 10:4
**caroline** 11:20
138:6 142:19

**carolyn** 8:8
**carpenter** 3:18
  15:13 31:2
**carry** 105:9
**case** 1:3 4:1,9
  14:4 15:12
  16:2 18:21
  21:25 24:11
  26:6 27:10,16
  28:2,3,12 29:3
  29:25 30:3,12
  30:19 45:3,20
  51:21 63:22
  65:20 67:7,12
  67:20 88:25
  89:1,1,25 90:5
  90:6 95:9
  103:19,20
  104:25 106:3
  109:17 110:23
  112:6 113:8,9
  113:20 117:19
  117:24 118:23
  119:9 135:14
  136:1 140:25
  141:16 142:16
  155:21
**cases** 29:18
  69:25 70:2
  72:10,20 81:15
  81:19
**cassidy** 137:16
  137:16,17,17
**categories**
  129:20
**category** 39:23
  39:25 40:18,20

140:1
**cathy** 23:19
  138:14
**cause** 54:24
**caveat** 40:20
**cel** 27:18 28:5
  28:11,15,23
  44:6,9 45:4
  52:11,13,14,18
  52:20,22 57:12
  57:17,20 58:3
  58:6,23 60:10
  60:16,20,25
  61:25 62:4,13
  63:1,8,11,19
  64:24 67:7
  68:22 69:5
  71:5,21 72:15
  72:20,25 73:14
  73:16,19,22
  74:8,12,19,25
  75:2,9,17
  76:15,19,22,24
  76:25 77:2,19
  77:21,22,25
  78:4,10,15,22
  81:15,20,24
  82:3,6,23
  83:22 85:3,16
  86:7,10,22,24
  87:13 88:16,19
  89:5,6,16,21
  92:3,5,11,13
  92:24 93:23,25
  96:6,16,18,20
  104:5 138:24
  139:6,7,8,13

139:13,20
  140:12 141:7
  141:12,14,17
  141:19,24
  143:21 144:1
  144:17 150:3,8
  150:10,15,16
  150:17,19
**cel's** 72:18
**celbk7** 109:4
  112:2 114:16
**cell** 19:14
  139:11
**celsians** 120:2
**celsius** 1:7 14:4
  28:12 30:10
  31:17 34:21
  43:5 44:12
  48:13 59:6
  64:11 65:16
  73:3,23,25
  74:7,12,23
  75:2,4,20 76:6
  79:25 82:9,12
  82:17 84:9,14
  84:19,23 87:20
  88:6 91:16,19
  92:1,7 96:7,20
  119:13 120:6,8
  120:24 121:1
  123:25 134:1
  140:19 149:14
  149:23,23,24
  149:25 150:19
  150:20,20,23
  150:24 151:6,8
  152:12,13

153:21,24
  155:4
**celsius's** 61:23
  72:23
**celsiusnetwork**
  120:1
**celsiusucc**
  120:2
**cent** 52:11 59:2
  59:4 66:3,9,14
  66:16 139:11
**centerview**
  105:2
**cents** 52:13,14
  52:18,21 57:14
  57:17,20 58:23
  58:24,25,25
  59:2,20,22,25
  60:22,25 61:1
  61:4 62:3,6
  63:5,6,12 93:2
  139:9 141:7,16
  141:19,21
  143:21 144:4
  150:6 151:1,1
  151:3,4,5
**ceo** 72:23
  142:18,21
**certain** 27:8,25
  39:14,17 59:18
  147:9 150:19
  150:25
**certainly** 28:9
  30:1 84:4
  91:23 95:18
  137:4 157:24
  158:15

**certified** 160:3
**cetera** 19:10
   30:6 50:5
**cftc** 30:6
**chain** 114:14
   117:3
**chaired** 107:6
**challenges**
   142:24,25
**chance** 64:2
   101:24 102:5,7
   102:11 143:14
   146:15 148:23
   149:4 156:12
**chang** 6:25
**change** 141:5
   153:15 154:16
**changed** 43:3
   86:13 153:17
**changes** 27:1
   33:13 73:16
**changing**
   153:18
**chapter** 28:19
   43:25 44:1
   69:25 70:1,6
   87:16 92:15
   131:20 132:4
   139:2 140:18
   141:20 142:8
**character**
   120:10
**characterize**
   114:7,10 126:2
**characters**
   120:11

**charge** 69:12
   69:12,13,14
**chargers**
   113:13
**charles** 6:10
**charlie** 108:25
**chase** 10:2
**check** 54:9
   140:20
**chicago** 3:6
**chief** 34:21
**chiefs** 113:14
**chingiz** 11:13
**choose** 63:5,5,6
   135:11
**chose** 130:6
**chris** 6:16 7:23
   9:5 24:18
   31:17,25 47:13
   158:10
**chrisptoher**
   9:14
**christiansen**
   7:1
**christina** 7:3
**christopher**
   7:4 10:13
**ciamarone** 7:2
**ciancarelli** 7:3
**circumstances**
   21:24 54:24
   55:4 97:3
   104:2,18 126:4
**citations** 47:19
   48:3
**civil** 53:9 54:23

**claim** 27:20
   58:19 60:17
   69:24 92:24
   135:15 141:23
   141:24 150:3
   155:4,5,9
   157:18,23,23
**claims** 27:22
   98:8 104:8,10
   135:12,13,25
   139:8,8,9
   157:20,25
**clarification**
   45:9 116:25
   127:2 142:14
**clarify** 25:21
   27:6,17
**class** 93:6 98:8
   138:25 139:11
   139:12,12,19
   139:20 141:7
**classes** 28:14
   28:18 141:9,14
   142:2
**clauses** 138:23
**clean** 89:18
**clear** 21:22
   48:15,23 49:13
   53:19,24 61:9
   62:12 66:12
   120:16 127:7
   128:5,22
   135:18
**clearly** 21:15
   33:9 53:8
   108:15 136:1
   143:9,10

**clerk** 14:2,12
   14:16,21 15:2
   15:6,11,15,17
   15:22 16:5,11
   16:17,20 17:5
   17:8,13 18:3
   18:11,14,17,22
   19:3,17,20,22
   19:24 38:3,7
   56:2,22 59:9
   87:24 102:15
   102:22 138:4,8
   138:11,13,15
**clerks** 157:11
**client** 70:4
**close** 24:20
   32:2 52:3
**closing** 24:10
   45:18 47:18
   49:23 143:13
   155:20 156:15
**coco** 7:4
**code** 47:9
   141:11
**cofsky** 7:5
**cohen** 105:2
**cohost** 38:3,7
**coin** 152:15,15
**coins** 151:16
   151:17,19,25
   152:2,3,16
**coleman** 12:3
**collapse** 61:19
   63:19 65:1
   66:20
**collapsed**
   62:19

**collateral**
42:14,19,22,23
43:5,12,17
44:5,15,15,17
44:17,22 45:10
45:22 46:6,25
50:4 96:18
**collateralized**
43:7 49:18
**colleagues** 18:1
32:1
**colodny** 4:7
16:2,4 18:20
18:20 23:3
51:19,20,20
52:1 90:14,15
93:14 107:11
109:17 110:13
110:22 111:5,8
111:18 112:5,9
112:25 113:3,7
113:19 114:17
134:18
**come** 14:6,24
15:2,24 16:7
17:15 25:17
36:2,22 43:20
45:20 53:6
69:5 152:24
156:19 158:1
159:7,7
**comes** 36:21
39:20 43:19
45:6 50:13
**comfort** 29:13
**coming** 88:16

**comment** 40:7
52:7 127:23
**commented**
29:15
**comments** 27:2
**commission**
5:1,3,9,11
26:17,21
**commission's**
28:5
**committee** 4:2
4:10 16:3
20:12 22:6
23:1 24:13
30:4 45:18
46:5 51:21
90:12 95:1
99:24 100:2
102:10 103:20
103:23 104:11
104:14,22
105:9 106:4
107:6 147:16
147:24 154:4,5
**committee's**
116:18
**committees**
154:6
**commodity**
47:8
**common** 49:17
130:7
**communicated**
70:10 79:6
**communicati...**
79:8,19

**community**
78:18 80:20
81:6 113:10
**comp** 105:22
**companies**
118:3 130:19
**company** 31:15
82:17 84:19
91:13 107:18
130:13,15
**comparable**
130:13,15,19
**compare** 49:13
**comparison**
93:6 139:2
141:9 142:2
**compel** 36:2
**compelling**
21:23 54:24
55:4 135:11
**compensation**
134:12
**competitor**
91:15 143:1
**competitors**
91:19 92:1
**complain**
154:17
**complaining**
81:19 82:2
**complaint**
27:14 28:6
41:10
**complaints**
40:5
**complete** 104:6

**completely**
46:16 153:14
**compliance**
34:21
**comply** 55:20
**component**
128:14
**composition**
116:18
**comprehensive**
156:17
**comprised**
80:4
**computer**
38:13,18
**concept** 72:3
**concerned**
29:25
**concerning**
155:14
**concerns** 76:15
138:21,22,24
141:22 142:9
142:25 143:3,5
**concluded**
159:17
**conclusion**
28:9 32:2,7,7
46:3
**conclusions**
29:17 41:1
**conclusive**
28:2
**conduct** 58:3
117:20
**confer** 24:13

conference
  22:12
conferring
  30:5
confined
  154:25
confirm 131:11
  131:16,21
  132:5
confirmation
  2:1 24:21 29:3
  47:16 97:19
  98:12 103:25
  156:2 159:6
confirmed
  28:20 30:3,12
  140:4
conflict 144:11
confused 102:2
confusing
  124:18
conglomerate
  129:15,23,24
  130:5,16,22
conjunction
  48:19
connection
  72:6 87:15
  95:9 138:3
conservative
  136:2
consider 23:25
  40:14 87:18
  96:25
consideration
  21:9 55:18

considered
  55:6 56:13
  134:25
considering
  142:22
consist 134:20
consistent
  81:18
conspiring
  143:1 144:14
constitutes
  19:5
consumer
  24:14
contact 65:3
  68:13,13 101:5
contacted 65:6
  65:23 67:11,14
  67:16,16,17,18
  67:19 68:12,14
  95:3
contemporan...
  55:1
contents 39:8
context 110:8
continue 26:7
contract
  157:18,23,25
contributed
  136:6
contribution
  136:18
controlled
  33:18
controls 48:6
  48:10

conveniently
  48:8
conversation
  68:23 70:3
  71:20
conversations
  24:20 30:8
  70:15 71:17
  111:17
conversion
  140:6
converted
  140:8
cook 7:6
cooper 12:6
cooperate 97:7
copies 55:24
  89:14
copy 76:2
  124:1,4
core 31:14,14
cornell 4:25
  16:14,15,15
  24:15 25:15,18
  25:19,19,24
  94:16,16,20
correct 42:8
  45:12,14 51:3
  51:7 57:13,15
  57:18,19,22,23
  58:1,4,7,16,17
  58:20,21,25
  59:16,17,20
  60:7,8,10,13
  60:14,16,23
  61:1,12,13,14
  61:20,21,23,24

  62:16,17,19
  63:1,23,24
  64:3,6,7,21,22
  66:4,6,20,24
  66:25 67:8,21
  67:22,24 68:15
  68:16,19,20,22
  69:7,11 70:11
  70:12,13,14,16
  70:17 71:5,12
  71:13 72:4,7,8
  72:14,18,19,21
  72:22,25 73:1
  73:13,14,15,18
  73:24 74:16,17
  75:17,18 76:23
  77:19 78:4,5,6
  78:12,23 80:24
  82:4,21,24
  84:19 86:20,23
  87:10 88:4,5,7
  88:8,23 106:24
  106:25 107:10
  107:13,16,19
  109:17 110:14
  111:6,9,18,21
  112:10 113:20
  113:21,24
  114:3,6,21,25
  115:4,8 117:15
  117:21,24,25
  118:3,24 119:2
  119:22 120:8
  121:4 123:6,9
  124:10,16
  125:5 126:9,13
  126:17,20,21

| | | | |
|---|---|---|---|
| 127:11,16 | 27:18,19,24 | 64:19,23 66:10 | 122:10,12,21 |
| 128:14,15 | 28:4,7,12,20 | 69:22 70:24 | 123:1,9,13,18 |
| 129:8,12,13 | 28:21,22 29:4 | 71:1,4,11,11 | 124:3,20,23 |
| 131:3,4,9,11 | 29:5,6,9,22 | 75:12 76:7 | 125:21 126:24 |
| 131:22 132:6 | 30:16,24 31:4 | 80:4,9,12,15 | 127:1,4,15,22 |
| 147:5,8,11 | 31:11,12,14,19 | 82:13 83:17 | 127:25 128:9 |
| **correctly** | 31:23 32:3,5,7 | 84:9,13 85:13 | 128:19,22 |
| 113:16 | 32:11,15,17,21 | 85:23 86:5 | 129:2,14 |
| **cost**  153:23 | 32:25 33:11,25 | 88:13 90:9,14 | 130:12,18,24 |
| **cote**  7:7 | 34:3,6,14 | 90:17,21 91:8 | 132:10 133:8 |
| **counsel**  26:25 | 35:10,14,18,24 | 91:10 92:18 | 133:23 134:1,6 |
| 32:13 52:2 | 36:1,2,7,11,14 | 93:1,3,15,18 | 135:3,6 137:14 |
| 70:3 95:1,2 | 36:18 37:3,4,9 | 94:4,7,19,21 | 138:6,9,12,14 |
| 97:24 99:25 | 37:15,20,24 | 94:23 95:1,12 | 138:16,19 |
| 100:20 102:9 | 38:2,10,12,15 | 95:21 96:1,23 | 142:15 143:6 |
| 133:11 140:14 | 38:17,21,23 | 97:6,11,14,22 | 144:8,18 145:1 |
| 142:12 143:8 | 39:2,12,19,25 | 98:3,5,15,19 | 145:4,10,17,22 |
| 143:12,16 | 40:8,13,17 | 98:23 99:2,12 | 145:24 146:5 |
| **country**  25:18 | 41:3,5,7,17,20 | 99:15,20,23 | 146:11,18,25 |
| 54:10 160:21 | 41:23 42:5,9 | 100:1,11,16,23 | 147:2,8,11,14 |
| **couple**  28:13 | 45:8,15,17 | 100:25 101:3 | 147:20,24 |
| 34:9 54:7 | 46:13,15 47:9 | 101:10,12,15 | 148:2,7,11,15 |
| 81:12 146:19 | 47:20,25 49:21 | 101:19 102:5 | 148:18 149:3 |
| 155:23 | 49:25 50:3,8 | 102:14,16,23 | 155:19 156:4,8 |
| **course**  27:10 | 50:11,18,21,24 | 103:1,17 | 156:9 157:3,8 |
| 38:11 111:20 | 51:3,5,7,11,16 | 105:25 106:5 | 157:11,16,17 |
| **court**  1:1,11 | 51:24 52:9 | 108:20 109:1 | 157:20,24 |
| 18:25 19:4,7 | 53:4,5,10,11 | 109:14,23 | 158:3,5,9,15 |
| 19:11,25 21:14 | 53:15,20 54:2 | 110:1,4,12,17 | 158:18,25 |
| 21:17 22:25 | 54:7,16,21,25 | 111:12 112:14 | 159:4,7,14,16 |
| 23:4,7,9,10,15 | 55:1,3,7,11,13 | 112:18,20 | **court's**  28:25 |
| 23:21,23 24:3 | 55:15,16 56:1 | 115:18,21,23 | 29:11 |
| 24:9,12,25 | 56:4,8,12,16 | 117:2,5,8 | **courtney**  11:12 |
| 25:4,10,14,16 | 56:20,23 57:1 | 118:12,14 | **courtroom** |
| 25:23,25 26:8 | 57:3,8 58:12 | 119:14,17 | 14:5,8,18,22 |
| 26:10,12,18,22 | 59:24 62:7 | 120:25 121:3,6 | 15:23 16:6,21 |
| 27:7,9,13,14 | 63:14 64:13,16 | 121:18,21 | 17:14 18:4 |

20:2 22:10
26:20 54:20
159:11,11
**courts** 22:2,11
**court's** 143:4
157:21
**cover** 20:3,25
35:15
**coverage** 98:10
**craig** 10:22
**crazy** 150:9
153:11
**created** 74:16
**creates** 22:9
74:8
**creating**
154:11
**creators** 153:9
154:13
**credit** 150:8
151:4
**creditor** 14:15
15:10 16:19
17:4,6 18:13
19:21 23:6
95:25 97:17
98:24 113:10
127:10,19
136:8 140:17
141:23 149:23
150:1 153:1,21
155:7
**creditors** 4:3
4:11 16:3
20:15,18 22:4
51:22 94:25,25
118:1 131:11

131:16,20
132:4 134:21
135:11 136:11
137:10 151:21
152:7 153:24
154:4,5 155:11
**crews** 7:8
104:15
**criminal**
142:16
**criticize** 61:11
67:1
**cross** 13:3 22:8
25:12 42:3
50:23 53:11,23
54:15,21 55:19
55:21,24 57:4
59:7 73:3
90:22 93:18
94:5,8 95:15
96:2 97:4
100:10,18
101:25 102:9
102:10 103:9
105:25 106:6
118:17 131:23
132:10 133:9
133:14 144:3
**crypto** 45:2
61:8 65:2
127:10,20
128:6 129:19
135:12,13
**cryptocurren...**
46:21 140:22
**cryptocurrency**
128:17 129:1,8

138:25 140:5,9
141:1
**cryptoyolo7**
119:22
**cunha** 7:9
**currency** 47:8
**current** 105:10
105:19,20
**cursory** 43:10
**custody** 52:13
52:18,21,22
92:12,14 93:6
138:25 139:8
139:10,12,12
139:15,18,20
139:20,21
140:2 141:7,10
141:14,17
143:7 149:14
149:15,16,19
158:4,8,12,13
**custom** 4:20
**cut** 116:20
**cycle** 74:19

**d**

**d** 13:1 14:1
138:12
**d.c.** 3:13 5:5
**daken** 12:3
**dame** 138:12
**dan** 3:8 8:24
14:9
**danger** 90:3
**danial** 18:9
**daniel** 6:5 94:6
**darious** 8:2

**data** 66:19,23
158:23
**date** 46:20
57:14,17,21
60:16,21 67:8
72:17,21 73:10
75:22 79:7,23
81:10 83:25
84:3,3,4 86:9
86:11,14,15,16
86:22 87:3,5
87:10 104:9
105:14,18
106:14,19,21
111:15 118:5
132:13,17,23
133:19 139:5
140:8,10,24
141:1,4,25
143:22,23
144:17 157:18
157:24 158:1
160:25
**dated** 112:2
**david** 5:22
6:12 7:22 8:23
9:23 11:6,16
15:10 98:16,24
144:22
**davied** 7:11
**davis** 6:1 13:4
17:1,2,2 27:11
52:9,10,16
53:4,20,21,25
54:2,5,9,14
55:9,16,19,22
56:9,12,14,18

56:20,25 57:4
57:6 60:13,19
63:7,14,18
72:3 75:21
76:14 77:17
78:1 80:2,8,12
82:10,16 83:10
83:21 84:18
86:5,19 87:2
87:14 88:3
90:12,18,22,24
91:1,3,5,12,15
91:18,25 92:3
92:5,7,9,11,15
92:23 93:5,10
93:22 94:8,10
95:23 96:2,4
96:24 97:10
146:22,23
158:19,21
159:13,14
**davis's**  53:13
59:8 68:5 71:8
83:4
**day**  31:13
36:12 45:23
52:17,19 62:21
84:1 93:10
119:5,6 132:18
138:1 139:5
140:13,16,21
141:15 158:20
**days**  54:7
65:12 66:1,7
84:1 88:16
**de**  5:24 16:18
16:19 97:12,16

97:17
**deactivation**
93:10 139:1,5
140:16
**deadline**
132:17 159:6
**deadlines**
132:21
**deal**  22:18
28:21 33:22
41:24 45:21
142:19 146:18
153:22 156:13
157:21
**deals**  41:25
**deanna**  14:9
15:4,4 16:1,9
16:18 17:23
18:20 19:16
87:22,24 138:1
**deanna's**  15:1
**debt**  27:22
**debtor**  1:9 3:11
20:24 24:13
31:8,10 33:6
34:13 36:25
40:24 41:12
44:16 45:12,19
46:4,5,22 48:2
48:7,21 49:1
50:4 53:7
99:24 100:1
103:15 140:2,4
140:24 141:2,6
141:24
**debtor's**  95:2
104:25

**debtors**  3:4
14:11 21:3
22:6 24:19
26:25 27:1
30:4 33:13
34:14,18 39:6
47:14 52:12,13
52:17,19 54:13
57:10 98:11
99:10 105:9
118:16 145:18
146:1 147:16
147:18 153:13
155:1 156:1
157:1 158:11
158:22 159:3
**debtor's**
139:10 140:14
142:12 143:8
143:12,16
**deceived**  95:7
**december**
73:11,12 74:11
**decentralized**
96:11
**decide**  20:21
28:10 29:1,1
**decided**  45:21
**deciding**
143:20
**declarant**
53:11
**declaration**
39:1,2,5,8,20
42:3 50:13
51:1 100:7,9
102:3,6 103:10

103:12,13
104:23 123:2,3
123:9 124:5,9
126:12 135:21
**declarations**
123:20
**defi**  86:24
96:21
**define**  113:25
**definitely**
145:7 157:20
**definition**
43:13 79:8
135:1,8
**delay**  38:15
**deliberations**
116:18
**demand**  74:19
**denied**  33:11
**denying**  41:8
**department**
4:18
**dependent**
96:20
**depending**
21:6 41:15
135:24
**depo**  108:9
**deposed**  56:11
99:20,21
101:23 146:25
**deposit**  139:8,9
**deposited**  50:4
**deposition**
35:15,25 36:3
36:19 51:4,6
53:1,13 55:10

55:10 67:20,23
68:2,5 69:1
70:18 71:8
76:3 77:24
79:9,16 82:20
83:5 85:7
87:18 97:6,7
115:13,16
155:24 157:2
**derek** 6:18
**derives** 72:9
**described**
39:17 113:19
120:16
**describes** 39:8
**deserve** 89:9,9
**designation**
19:9 51:4
**designed** 33:7
**desk** 87:25
**detail** 143:16
**determination**
29:4 105:12
**determine**
130:13
**determined**
140:7
**determining**
27:21
**deutsch** 3:18
15:13 31:2
**developed**
21:25
**devices** 19:14
**dial** 100:21
**diaz** 7:13

**didn't** 123:13
142:13 148:9
149:14,20
151:10 152:10
152:19 153:6
158:5
**dietrich** 12:11
**difference**
37:18 40:10,23
46:2 57:25
**differences**
29:19
**different** 29:16
29:17 36:17
39:16 43:18
44:14 46:20
48:5,24 49:3,4
55:1 58:25
59:2 60:25
105:1 124:19
125:3 154:6
**difficult** 21:20
29:15 152:5
**difiore** 7:12
114:18
**digit** 139:25
**digital** 140:7
140:10
**dimitry** 5:18
14:12,14 90:19
90:25 138:17
**direct** 13:3
53:6,10,16,25
54:19 55:7,19
70:13 79:11
80:1,7 84:13
95:15 96:25

101:16 113:6
115:13 130:3
142:11
**directed** 79:14
88:22,25 89:1
89:3,4 94:25
94:25 95:1,1
95:11 105:9
**direction**
135:25
**directly** 126:18
**director** 116:8
**disagree** 67:5
79:9
**disagreed**
137:7
**disappointed**
114:11
**disclosure**
43:15 48:17,18
105:14,19
125:4 130:1
133:1 135:20
135:22 136:10
136:13 149:7
**discount** 76:25
77:21 87:8
125:7,10,17,24
126:2,5,6,9,11
126:13,20
128:12,13
129:10,11,16
129:23,24
130:5,13 131:1
131:2 135:16
136:2 137:11
137:12

**discounts**
124:15 125:3,7
126:3 129:19
130:17,20,22
**discoverable**
70:8,9
**discovery** 52:4
104:1,3,6
159:6
**discuss** 39:10
48:21 69:24
70:1,5 147:10
**discussed**
24:24 33:19
59:3 60:12
65:22 71:11
100:5
**discussing** 48:6
59:4,16
**discussion** 44:6
98:11
**discussions**
33:21
**dislocation**
59:19,25 61:3
61:4,5,6,7,7,10
61:15,16,18,19
61:22 62:1,7,8
62:9,10,10,14
63:3,4,9 64:25
**disparaged**
71:15
**display** 59:6
**dissenting**
28:17 142:5
**distinction**
129:12

distinctions
  128:14
distribute
  140:5
distributed
  136:12
distribution
  135:10,20
  139:4
distributions
  140:3
district  1:2
  27:9,13,19
  29:5
diverse  115:3
diversity
  114:24 115:7
  116:4,6,9
dixon  7:14
  136:23 137:8
dm  79:15
dm'ing  80:25
dmitry  20:7
docket  26:24
  27:12,16 31:7
  31:8 34:23
  37:12,14,25
  42:16 52:16,25
  54:9,17 55:12
  93:13 98:7
  99:19 103:8
  117:17 139:7
  142:17 146:22
document
  37:18 40:11,24
  41:15 47:17
  54:17 63:13

82:24 83:23,25
  85:3 124:2
doe  7:15
doesn't  143:9
  150:5 153:16
doge  86:25
dogecoin  91:1
  91:3
doing  59:22
  67:1 69:20
  73:24 74:1
  129:25 137:6
doj  41:9,9
dollarization
  46:19
dollarized
  141:23
dollarizing
  44:18
dollars  47:10
  140:8 142:22
  150:9 151:6
donald  10:12
don't  49:5,25
  54:5,9,10 59:4
  59:22 126:23
  127:9,25
  128:13,18
  131:8 132:21
  132:22 133:12
  136:11 142:6
  145:17 147:20
  148:3,22 149:9
  149:16,25
  150:4,4,15
  151:12 153:4,4
  153:15 154:3

155:13,14
  156:1,6,20
double  139:25
doubt  136:20
downside
  134:14
downturn
  81:25
drew  12:7
drive  3:5
dropped
  136:17 148:4
duffy  7:16 12:7
  114:18
duplicative
  35:1,5,7,8,11
  36:3,16,20
duties  105:10
  134:11,15
duty  153:13
dzaran  7:17
d'antonio  7:10

e

e  1:21,21 3:1,1
  13:1 14:1,1
  19:11 124:21
  137:24 138:7,7
  138:12 160:1
eades  7:18
earlier  31:10
  32:6 45:23
  46:1 100:5
  148:3
early  37:16
  48:11 119:8
earn  27:18
  28:5,11,15,23

43:19,22,24
  44:2 45:21
  52:14,21 76:25
  77:21 92:23
  93:6 141:19
easier  21:18
  39:23
east  5:12
ecf  54:17 64:13
  64:15 117:6
eckhardt  7:19
ecosystem  72:7
  72:10
ecro  1:25 56:17
  102:17
effect  28:2 33:8
  74:9,16,18
  133:12 143:8
effective  104:9
  118:5 139:5
effectively
  133:14
effort  80:25
efforts  80:23
ehrler  7:20
eight  65:12
  66:1 135:23
eighty  93:2
either  14:18
  28:11,23 33:22
  44:24 104:13
  119:5 127:10
  130:8 132:16
  138:11,13
elect  127:10
election  135:10
  136:6

elicit 71:18
elizabeth 8:21
  137:18
elle 11:15
ellis 3:3,10
  14:10 17:17
  21:3 24:19
  34:18 47:14
  57:10 79:13
  99:9 118:15
  145:25 156:1
  159:3
ellison 142:19
  142:21 144:10
elvin 11:17
email 32:20
  73:8,11 75:21
  75:24 76:3
  77:6,16 81:18
  109:3,4,6,10
  109:16,19
  110:9,12,22
  112:1,2,5,9,16
  113:7 114:14
  114:15,16,21
  114:23 115:6
  117:3,4,5
  133:19 134:5
  135:3
emails 110:7
  110:10 113:22
  117:3 133:17
emergence
  152:22
emmanuel
  114:6

employee
  34:21
enabled 56:7
encouraged
  30:4
endeavor
  157:9
energy 155:18
enforce 53:18
engagements
  113:11
enter 51:9
  131:20 132:4
entered 20:6
  21:4 37:11
  40:4 97:6
  148:18
entering 51:2
enterprise
  130:11
entire 39:7
  81:6 126:21
entirely 29:2
  35:6
entities 33:6
  43:23 138:5
entitled 97:3
  100:12
entity 33:17
entry 74:3
  140:10
episodes 95:4
equal 135:25
  140:25 141:16
  141:18,21
equitable
  33:16,20 52:15

138:23 141:8
  142:1
equitably 33:5
  33:10
equity 27:22
  127:10,20
  128:6 135:17
  135:17 137:11
  137:12
eric 137:16
erik 10:7
error 88:19
  105:5
especially
  39:15 43:25
  47:7 103:24
  104:1 105:20
  143:1
essentially
  21:23 33:8
  104:11,20
  120:12,14
  129:18 134:8
  135:24
establish
  130:22 131:23
established
  122:21
estate 42:25
  46:7
esther 9:20
et 19:10 30:6
  50:5
eth 77:25
ethereum
  140:6 151:17
  151:22 152:8

evaluate 97:1
  105:10
evaluating
  105:23
evening 146:10
event 26:1 61:3
  61:5,6,7,16,16
  61:19,22 62:7
  62:8,9,10,11
  62:14 63:3
  66:18
events 29:25
  59:19,25 61:7
  61:10,19 62:2
  63:4,9 64:25
eventually
  107:12
everybody
  29:10 149:22
  151:7 152:18
  153:17 155:6
  155:13
everyone's
  150:10
evidence 21:11
  21:12 37:12,19
  39:6,11,21
  40:4,6,11,24
  41:13 42:1
  48:8 51:2,9,10
  54:20 55:20
  75:11,13,14
  76:6,7,8 80:3
  80:16,17 82:12
  82:13,14 90:8
  90:9,10 94:15
  97:2 100:7,13

| | | | |
|---|---|---|---|
| 101:20,21 | 95:22 100:18 | 64:18 73:3 | 58:22 59:16 |
| 103:11,21 | 133:9 | 75:11,12,14,20 | 60:9,15,20,22 |
| 109:22 110:18 | **examined** | 76:6,8 80:1,3 | 61:2,3 62:3,3 |
| 110:19 112:13 | 123:19 | 80:15,17 82:10 | 63:12,12 65:4 |
| 112:17,21,22 | **example**  22:4 | 82:12,14 87:20 | 65:4,7,20,22 |
| 116:23 117:9 | 77:23 105:21 | 88:6 89:14 | 67:3,4,5,6,12 |
| 117:10 120:24 | 135:20 149:10 | 90:8,10 99:8 | 68:21 69:4 |
| 121:2,7,8 | **excellent**  38:14 | 108:18,21 | 70:6,19 91:5 |
| 143:10,20 | 38:20 140:14 | 109:13,21 | 123:5,10,11,15 |
| 152:10 156:18 | **exceptions** | 110:3,19 | 123:16,22 |
| **evidentiary** | 28:13 | 111:24 112:13 | 144:11 145:19 |
| 27:4 41:25 | **excerpt**  59:15 | 112:22 114:13 | 146:9,19 |
| 97:17 133:13 | 135:22 | 116:23 117:1,9 | **expertise** |
| **exact**  124:2 | **excess**  46:25 | 117:10 119:13 | 123:14 |
| 132:21 | **exchange**  5:1,2 | 120:24 121:1,6 | **experts**  105:1 |
| **exactly**  50:19 | 5:9,10 26:16 | 121:8 124:1,6 | **explain**  40:10 |
| 68:23 84:24 | 26:21 52:5 | 124:21 134:1,6 | 40:24 46:18 |
| 106:14 124:22 | 134:2 | **exhibits**  13:14 | 93:11 125:21 |
| 145:12,13 | **exciting**  113:16 | 37:2,5,7 39:22 | 126:12 134:11 |
| **examination** | **exclude**  66:19 | 40:1,2,14 42:1 | **explained** |
| 22:8 25:12 | **exclusive**  43:5 | 50:12 93:19 | 139:23 142:11 |
| 53:12,23 54:21 | 48:13 | 103:9,14,16 | **explicit**  139:23 |
| 54:21 55:24 | **exclusivity** | 135:21 145:14 | **explicitly**  43:9 |
| 57:4 90:22 | 48:12 | 145:15 147:9 | 49:8 |
| 93:20 94:8 | **exculpation** | **existed**  120:18 | **expressing** |
| 95:15,15 96:2 | 117:23 | **exists**  129:25 | 106:15 |
| 96:25 97:4 | **excuse**  38:3 | 153:12 | **extended**  37:17 |
| 100:10 101:13 | 71:19 95:7 | **exit**  113:12 | **extent**  27:24 |
| 101:25 102:9 | 144:15 | **expect**  33:20 | 30:19 31:20 |
| 102:10 106:1,6 | **exhibit**  13:15 | 45:18 156:21 | 35:8 39:9 42:1 |
| 118:12,17 | 13:16,17,18,19 | **expected** | 50:17,25 51:9 |
| 123:15 132:10 | 13:20,21,22 | 100:22 | 53:23 90:12 |
| 133:14 144:3 | 34:20 36:25 | **expects**  156:24 | 146:2 |
| 156:9 | 37:8 38:23,25 | **expensive**  47:5 | **external**  148:9 |
| **examine**  42:3 | 39:6,11,24 | **expert**  20:13 | |
| 55:19,22 90:17 | 40:17,25 55:24 | 20:16 44:3 | |
| 93:18 94:5 | 59:7,12 64:11 | 52:23 58:8,19 | |

| **f** | **fairness** 146:7 | **feel** 23:16,24 | 54:7,17 60:17 |
|---|---|---|---|
| **f** 1:21 5:4 | **fall** 40:20 | 85:18 149:9 | 65:4,16 98:6 |
| 10:16 160:1 | 48:11 98:8 | 150:13,23 | 103:10,11,12 |
| **fabsik** 7:21 | **fallen** 140:23 | 151:7 152:25 | 103:14 117:14 |
| **faced** 28:12 | 141:4 | **feeling** 114:10 | 118:7 122:24 |
| **fact** 25:21 | **false** 81:7,8 | **feelings** 95:6 | 123:9 124:9 |
| 33:19,24 39:5 | **familiar** 37:18 | 95:13 149:6 | 132:19 155:5 |
| 72:23 76:2 | 72:3 83:24 | 150:22 | 157:23 |
| 111:17 123:19 | 85:20,21 | **feels** 152:17 | **filing** 31:8 39:7 |
| 123:20 125:17 | **far** 14:8 30:12 | **fees** 77:24 | 120:14,15,17 |
| 141:6 150:5 | 70:4 99:7 | 120:3 | 132:23 136:11 |
| 152:11 153:9 | **faraj** 58:19 | **fell** 140:1 | **filings** 37:12 |
| 153:19 154:14 | 65:13,19 66:22 | **felt** 95:7 149:7 | 40:5 122:1,3 |
| **factor** 125:25 | 67:1,6,11 | 149:8,20 | **final** 18:4 28:9 |
| 126:2 132:1 | 68:13,13,19 | 153:21,25 | 113:15 120:16 |
| **facts** 104:2 | 69:3,9,14,23 | **fencing** 122:12 | 132:16,16 |
| 126:3 | 70:10,13,15 | **ferraro** 7:23 | 140:13 143:11 |
| **factual** 28:4 | 71:19 146:21 | 35:1,16 | **finally** 44:4 |
| 33:17 | 146:22,25 | **ferraro's** 35:7 | 48:20 |
| **fahey** 7:22 | 147:3 156:5,13 | **ferry** 5:12 | **finance** 96:11 |
| **fahrenheit** | **faraj's** 66:2,8 | **fiduciary** | **find** 55:8 152:3 |
| 136:17 137:1 | 66:16 | 104:9,12,17 | **findings** 27:25 |
| **fahrenheit's** | **farenheithldg** | 105:10 118:4 | **fine** 21:16 |
| 137:5 | 119:25 | **fifth** 85:4,18 | 26:10 51:11 |
| **failure** 55:20 | **fast** 142:8 | 86:6,8 | 53:10 56:16,16 |
| **fair** 46:10 | **faster** 100:22 | **figure** 57:20 | 145:2 150:6 |
| 47:23 60:24 | 122:13 | 60:12 | **finish** 147:14 |
| 61:25 62:4,13 | **favor** 149:22 | **figures** 79:1 | 147:15 |
| 63:8,11,18 | **favorably** | **file** 37:16 54:4 | **finishes** 159:9 |
| 64:24 69:5 | 111:5,9 | 55:3 103:7 | **firm** 79:20 |
| 72:10,11 76:2 | **february** 52:19 | 156:22 | 89:24 |
| 81:5 93:5 | 87:21 88:6 | **filed** 20:8 | **firms** 105:1 |
| 112:19 135:19 | **federal** 21:22 | 26:23 27:11,16 | **first** 19:7 20:24 |
| 138:23 141:8 | 30:6 53:9 | 31:6 33:4,6 | 24:25 38:25 |
| 142:1 152:19 | 54:22 72:24 | 34:22 35:5 | 40:9 42:15,19 |
| **fairest** 45:1 | **fee** 77:25 | 37:6 42:18,18 | 53:4,12 61:19 |
| | | 48:2 53:25 | 64:3 65:7,13 |

65:14,19 67:12
67:14,16,17,17
67:18,19 68:12
68:21,23 69:9
82:12 83:11
110:4 112:25
119:19 120:11
149:10 156:12
158:8
**fish** 88:18
89:20 155:2,8
**fit** 104:17
145:15
**five** 21:18 66:7
108:10,13
130:8,8,23,23
134:20
**fixes** 73:14
**flaherty** 12:8
**flannigan** 7:24
**flare** 149:12,13
**flexibility**
22:12
**floor** 129:4
**florence** 7:24
**flower** 4:4
**flywheel** 74:8
74:16,18
**focus** 36:17
155:17
**focused** 57:23
**focusing**
155:17
**folks** 21:7,10
**follow** 43:22
46:13 56:5
112:6 139:5

140:24
**followed** 46:16
**following**
18:24 78:1
88:16 136:24
**force** 48:9
**forced** 151:15
154:18,19
**foreclosing**
29:2
**foregoing**
160:3
**forget** 102:17
**form** 52:4 97:1
100:9
**formal** 106:14
106:19,21
142:18
**formally**
106:13
**format** 133:12
**former** 72:23
155:1
**forth** 67:15
153:10
**forward** 42:11
60:24 95:11
100:10 144:2
146:1
**found** 117:13
**foundation**
123:14
**four** 60:24
99:21 132:13
150:9 151:5
152:20

**frankly** 22:17
**fray** 29:19
**free** 29:8
**freedom** 153:8
**freeze** 157:19
**friday** 112:2
136:11,16
**fried** 142:21
**frishberg** 6:5
13:7 18:8,9,9
94:6,6,7,9,14
94:21,22,23
95:10,13,17,20
95:21
**front** 50:1
113:12 136:18
**ftx** 44:11 60:18
91:15 96:10
142:16,20,22
144:13 155:3,5
158:23
**ftx's** 91:12
**fulfill** 43:16
**fulfilling** 48:20
**full** 19:7 110:9
129:20
**fully** 84:11
**function** 15:8
16:13 17:1
18:8
**fund** 136:20
**fundamental**
103:18
**funding** 91:6
144:12 154:11
**funds** 152:21

**further** 94:2,22
118:10 132:8

### g

**g** 14:1 137:24
**ga** 5:13
**galka** 7:25
52:23 59:16
61:3,11 62:5
63:2 67:4
71:19,19,21
91:5
**galka's** 59:19
**game** 113:13
**games** 113:15
**gate** 136:20
**gate.io** 96:10
**geary** 8:1
**general** 43:14
48:17 141:17
141:19 144:16
**generally**
66:18
**genoot** 116:5
**georgia** 10:5
**gergi** 8:25
**getting** 89:10
142:10 150:14
151:3,3,19
152:1,25
**gheorghe** 8:2
**giardiello** 8:3
**gigantic** 65:1
**gimmicks**
81:15
**gist** 74:18
**give** 15:2 16:1
16:8 20:10,23

29:13 37:15
38:10 42:15
44:17 52:18
56:23 59:9
68:10 69:21
71:14,21,23
81:14,15 84:5
87:25 97:2
99:13 100:11
101:22,23
102:5,7,11,23
146:13,15
148:23 149:4
149:13,18
156:11,12
**given** 16:24
17:10 33:20
50:22 103:24
104:17 126:3
133:11 142:10
**gives** 47:5
**giving** 21:10
52:13
**glad** 30:9
**glenn** 1:22 56:2
71:15,17,20
95:24
**glitch** 14:7,23
18:10 21:20
23:5 44:3
**go** 15:3 17:20
17:24 20:18
21:11 23:13
24:21 25:18
27:7 32:2 40:1
40:8 41:21
42:5,12 47:2

47:25 54:14
55:21 56:1
63:16 64:11,16
64:19 69:1,19
71:1 73:4 74:4
78:8 83:17
85:8 86:1
87:20 89:9,23
90:21 92:11
94:7 95:18
96:1 98:5,20
98:23 99:17
100:10,13
102:20 109:14
123:15 124:23
125:21 130:24
134:3 135:6,19
143:9,11 145:1
145:4 146:12
148:2,5,5
149:5 152:18
155:2,3,9
156:25 157:16
**goes** 20:14
76:18 118:4
**going** 17:7,19
20:3,9,15,17
20:17,19,22
21:10,17 23:10
23:18 24:3
25:10 26:3
28:7 29:4,8
32:18 34:12
35:6 40:13
42:11 46:8
47:1 49:22
55:5,6 56:11

61:15 62:8
63:2,5 64:11
70:6 74:19,20
81:21,23 87:17
88:10 90:2
95:11,12,16
97:1 98:4
100:18,20,21
101:16 102:20
113:6 114:13
115:19 122:12
130:14 143:10
143:12,16,19
143:25 144:2
144:18,19
146:13 147:14
148:2,19,23
149:13,18
150:15 151:18
152:5 153:3,3
153:20,22
155:8,10,13,19
156:11,11
159:11
**gonzalez** 8:4
**good** 14:2,9,14
14:21 15:12,22
16:18 17:13
19:25 24:18
26:15 31:1,13
34:4,17 54:24
57:6,7 76:24
77:13 90:24,25
96:4,5 97:12
97:25 106:8,9
112:6 113:19
118:19,20

132:12 138:4
143:9 152:4
**gorrepati** 12:9
**governed**
42:19 43:2
**governmental**
43:23
**grace** 3:16
14:11 34:17
118:15 155:25
**grant** 87:22
**graubert** 8:5
**great** 112:25
142:13
**greater** 22:11
140:25 141:21
**green** 1:12
4:21
**greene** 8:6
**greg** 8:22
**gregory** 10:16
114:17
**ground** 88:19
111:11
**group** 52:3
137:1
**groups** 49:4
**guarantee** 74:7
**guaranteed**
139:2
**guess** 24:25
99:16 146:18
149:6
**gundersen** 8:7
**gurland** 8:8
**guthrie** 8:9

**guys** 89:9,25
151:24

**h**

**h** 8:21 137:24
**haircut** 47:2,6
**hamilton** 4:20
**hand** 15:8
16:13 17:1
18:8 56:17,20
102:20 147:13
**handed** 47:1
123:25 157:12
**handle** 102:4
119:22
**hanna** 11:10
**hans** 10:20
**happen** 33:9
62:20
**happened**
62:20 95:14
**happens** 34:16
**happy** 21:12
22:24 28:4
37:12 39:10,24
41:16 54:13
68:25 124:1
145:20 146:1,3
**haqqani** 8:10
**harassment**
142:6
**hard** 113:8,20
**harrison** 12:10
51:17
**harsh** 8:19
**hates** 155:6
**haul** 147:23

**haven't** 123:13
**hawaii** 140:6
**he'll** 36:4
**head** 24:16
73:6
**hear** 19:16
20:7,17 21:6
30:9 34:1,2
91:22 92:20
97:13,14 98:18
98:19 99:2,3,4
106:17 145:2
147:24 148:6,7
148:19
**heard** 34:11
95:18 99:4
101:22 104:6
144:21 145:6
**hearing** 2:1,1
14:3 29:10
44:3 45:24
51:24 53:9
54:1 97:19
103:25 104:4
123:14 124:13
138:20 140:12
143:4 145:13
156:14 157:5
159:9,15
**hearings** 22:13
27:11
**hearsay** 49:5
94:18
**heavily** 44:11
**hell** 89:12,23
89:23

**hello** 18:12
34:2
**help** 65:24
**helpful** 28:6
30:21 38:1
83:2
**helps** 79:19
151:23
**heras** 5:24
16:18,19 97:12
97:16,17
**here's** 156:4
**hernandez**
8:12
**herrmann** 8:13
**hershey** 8:11
**he's** 123:15
158:14
**hi** 14:9 15:4
18:9,20 51:20
**high** 95:6
134:14
**higher** 77:1
136:3 150:25
**highest** 77:21
**hittelman** 8:14
**holcomb** 8:15
**hold** 145:17
**holdco** 125:7
125:10,24
126:3,6 129:23
129:24 130:4
130:16,22
**holder** 45:11
**holders** 28:16
52:18,20 88:17
88:20 89:5,6

89:16
**holdings**
151:21,25
**holes** 154:15
**hon** 1:22
**honest** 145:12
**honor** 21:2,4
21:13 22:23
23:3,5,13 24:2
24:6,8,18
25:15,19 26:11
26:15,23 27:5
27:5,8,13,21
28:6 29:21
30:23 31:1,5,6
31:16,25 32:12
33:2 34:17,18
35:13,17 36:10
36:13 37:6,22
39:3 41:14
42:6 46:12
47:13,17 50:16
51:15,20 52:10
52:10,17,21,23
52:25 53:14,17
53:23 54:5,12
55:9,12,23
56:10 70:25
75:10 76:5
80:2,6,14
83:11 84:7
88:9 89:13
90:7,16,19
92:25 93:7
94:3,14,16
95:20 97:10,13
97:18,25 99:14

99:16 100:4,15
100:19 101:2,7
101:8,14 102:1
102:2,13
104:17 105:24
106:2,2,4
108:19,24
109:7,12,21,24
110:6 112:12
115:16,19
116:22,24
117:7,11
118:11,13
119:12 120:23
123:17,24
125:20 127:3
127:17 128:2
128:10,21,25
129:22 130:15
130:21 132:8
132:15 133:16
134:5 138:20
142:12,17
143:3 144:7
145:3,16,20
146:16 147:12
147:19 148:1
155:25 157:1,7
158:10,21
159:2
**honor's** 21:9
51:1 52:7
**hook** 148:8
**hooks** 88:18,18
89:20
**hope** 52:6,8
146:13 157:3

**hopefully** 25:6
36:11 52:4
98:13
**horse** 120:17
122:1
**host** 59:10
**hosted** 113:4
**houlihan**
123:21
**hounding**
77:14,18 78:3
**hour** 108:1
**hours** 35:22
67:23 99:22
145:7
**house** 4:20
**huge** 61:7
153:22 155:15
**hundred** 34:8
**hung** 89:20
**hunt** 94:12
**hussen** 58:19
**hybrid** 2:1
**hyde** 2:25
160:3,8
**hyperbole**
84:22 85:1
87:6 89:22
**hyperbolic**
77:12 78:17,24
79:1 81:4,8
**hypothecate**
50:5

**i**

**idea** 73:19
**identified**
146:22

**identify** 34:16
57:8 107:7
**identifying**
21:5
**ignat** 15:5
**ignore** 62:10
**il** 3:6
**immanuel** 8:13
**important**
30:19 39:18
47:21 101:22
105:13 113:15
**imposed** 22:12
**imposition**
19:2
**improve** 72:25
120:1,7,21
**improvement**
72:18
**inaccuracies**
153:12
**inaccuracy**
33:17
**inaccurate**
77:10
**inadequacies**
105:15
**inadvertently**
20:5,7
**inappropriate**
94:24 95:8
130:4 152:20
**incentive**
113:14 152:22
153:7
**incentives**
153:4

**include** 20:10
55:9 130:12
131:1
**included** 37:7
105:8 114:5
117:6 123:2
125:4 130:11
157:22
**includes**
110:10 129:11
**including**
27:11 118:2
144:3
**inclusion** 33:5
33:16
**incorporate**
27:1
**incorrect** 44:5
**increase** 45:4
**increasing**
74:18 115:1
**independent**
126:15
**indicated**
140:14 141:2
**indicates** 139:7
140:17
**indicating**
106:23
**indication**
155:2
**indictment**
72:24
**indiscernible**
17:20,21 25:12
46:14 49:18
50:11 65:17

83:6,7 85:10
86:3 96:14,14
105:23 106:16
110:2 124:3
126:1,4 130:6
133:19 136:9
139:17 140:9
143:1 152:12
152:13,13,14
153:11 154:6
154:20 155:6,6
**individual**
129:24
**individuals**
22:19
**inexperienced**
145:7
**inform** 153:16
**informal** 27:2
**information**
52:5
**informed** 32:1
**initial** 129:16
132:19 136:18
**initially** 88:24
139:21
**initials** 19:9
**insiders** 45:4
**inspire** 81:6
**inspired** 80:20
**instance** 47:4
81:21
**instructed**
79:10
**instructions**
133:4 139:24

**instruments**
27:23
**insurance**
98:11
**intend** 39:13
**intended** 31:10
**intends** 24:22
39:9
**intent** 145:13
**intention** 43:7
**interest** 87:8
106:15,23
131:10,16
140:25 141:23
144:11
**interested** 71:4
71:11,18
**interests**
138:23 139:6
**interfere** 19:14
**interject** 21:19
47:24
**internet** 83:7
**interpretation**
141:5
**interview**
108:1,4 110:24
**interviewed**
107:20,23
**intimidated**
93:22
**intimidation**
142:6
**introduce** 36:5
110:8,9
**introduced**
37:1 133:17

**invested** 151:6
152:17
**investigation**
104:7
**investor** 137:1
137:2
**involved** 43:9
120:7
**involvement**
119:9
**iovine** 6:3 13:8
17:6,6 95:24
95:25 96:1,3
96:22,23
**iphone** 19:10
**issue** 27:19
28:11,17 30:15
37:5 45:19,20
48:21 49:10
50:8 97:5
100:12 158:16
**issued** 158:24
**issues** 27:1
29:3,15 30:18
30:21 31:11
34:9 95:11
143:7 144:16
**issuing** 88:20
**it'll** 99:13
**it's** 119:24
124:2 125:17
125:19 126:7
126:24 129:18
129:19,23
131:5,10,15,15
131:17 133:25
134:3 135:18

138:4 143:12
144:4 148:21
148:21 150:9
150:11 151:10
151:14,17
152:4,15 159:1
**i'll** 122:16
124:5 129:6
146:10 154:1
159:9
**i'm** 120:25
123:14,18
124:1,20 127:6
129:4 132:25
133:18,23
143:11,16,18
143:19,19
144:18,19
145:8,12,14,16
148:2,21,23
149:3,10,15
155:3,19
156:10,11
158:5
**i've** 133:10,11
142:5 145:6
149:15 158:19

**j**

**j** 6:12 7:4,7
12:15 137:24
**jacobs** 8:16
**jamaica** 53:21
**james** 137:24
**janell** 7:19
**janko** 8:17
**jankovic** 8:17

| | | | |
|---|---|---|---|
| **january** 75:24 76:22 77:4 78:23 81:18 82:3 | **joining** 100:21 **jonathan** 10:25 **jones** 8:21 **jose** 9:22 38:5 38:6 | **justice** 4:18 | **khezri** 9:3 97:25 98:1,3,4 98:6,16 |

**k**

| | | | |
|---|---|---|---|
| **jaoude** 8:18 **jarno** 12:1 **jasleigh** 8:1 **jasmine** 6:15 **jason** 6:3 17:5 17:6 95:25 **javier** 11:2 **jeff** 10:14 15:4 132:12 **jeffery** 15:13 **jeffrey** 3:23 31:2 **jersey** 3:19 15:14 30:24 31:3,6 **jessica** 138:4 **jindal** 104:21 **jivani** 8:19 **job** 112:6,25 113:19 **joe** 9:16 **joel** 12:2 **johan** 6:7 18:11,12 38:25 53:1 **johantgen** 137:24 138:3 **john** 7:17 **johnson** 8:20 **join** 19:7,9 53:1 **joined** 16:23 | **joseph** 7:10 **joshua** 4:16 16:4 106:3 **joyce** 9:11 **judge** 1:23 29:15,16 56:2 71:15,17,20 87:24 95:24 138:4 153:16 158:21 159:13 **judge's** 90:2 **judgement** 126:2 **judges** 29:20 **judicial** 22:12 37:19 40:11,14 40:21,23 41:12 50:15 **judicially** 37:11 40:4 **judson** 6:22 **july** 65:18 107:15 **jump** 29:19 **june** 61:22 66:23 80:7,19 87:12 107:15 **juries** 22:17 **jurisdiction** 157:17,21 158:4,9,12,15 | **kaczkowski** 8:22 **kahn** 8:23 **kaila** 11:25 **kaitlyn** 8:14 **kaplan** 8:24 **karen** 1:25 102:17,20 **karolina** 10:19 **kass** 8:25 **kathryn** 8:7 9:10 **katie** 11:21 **kaufmann** 12:4 **kava** 137:4 **kaza** 9:1 **keeney** 9:2 137:21,21 138:2 **keep** 19:13 95:11,14 144:14 154:10 **keeps** 102:18 **keith** 4:15 10:10 16:4 114:18 **kenneth** 7:20 **kept** 23:18 85:24 116:7 151:20 **kevin** 7:5 9:25 **key** 105:22 **keyan** 11:14 **khai** 10:17 | **kicked** 98:13 **kielty** 105:1,22 130:17 **kind** 69:3 100:22 136:22 140:3 **king** 33:3 **kirkland** 3:3 3:10 14:10 17:17 21:3 24:19 33:19 34:18 47:14 57:9 79:13 99:9 118:15 145:25 155:25 159:3 **kirsanov** 5:18 13:6 14:14,14 20:8,11 23:5,8 23:11,12,20,22 24:1 90:19,19 90:23 91:11,23 91:24 92:19,22 93:4,9,12,16 93:21 94:2,4 138:16,17,18 138:19,20 143:6,13 144:6 144:9 157:12 157:14,17 158:2,6,7,11 **kitra** 6:23 **klorane** 9:4 |

knauth 12:11
knew 75:3 81:9
  100:21 107:6
  121:11,15
know 17:7 20:4
  20:14 22:3,16
  22:21 24:22
  25:25 29:6,7
  29:12,14 30:11
  30:17 32:18
  34:11 35:22
  39:23 41:9
  56:10 70:5
  73:25 74:24
  75:1,5,6 77:6
  78:20,21 87:17
  88:3 89:24
  90:5 91:5,12
  91:15 92:15,23
  95:5 96:16
  106:22 114:7
  116:5,14,15
  126:23 127:9
  127:25 138:1,1
  142:4,7,14
  145:14 147:20
  148:4,9 150:1
  151:14 152:11
  152:22,23
  153:25 154:7
  155:4,12 156:1
  156:6,20
knowledge
  127:19
known 74:24
koala 20:10
  32:15,25 33:3

33:4,14,15,17
koenig 9:5
  24:18,19 25:3
  25:9,13 26:5,9
  26:11 31:16,17
  31:20,25,25
  32:4,6,10,20
  32:24 47:12,13
  47:14,23
  158:10,10,17
kohli 9:6
kordomenos
  9:7
koster 9:8
kouly 9:9
kuethman 9:10
kuhns 9:11
kuhrt 9:12
kwasteniet
  9:13
kyle 6:19

**l**

l 7:21 9:7 10:12
  138:14
lack 82:2 136:8
lackey 9:14
lafayette 7:6
laid 104:3,4
  143:15
language 24:21
  31:9 32:2 33:7
  45:25 46:2
  49:21 98:12
  138:24 139:1
  140:17
lapuma 116:7

largely 37:10
  41:7
las 5:24 16:18
  16:19 97:12,16
  97:17
lasalle 3:5
lastly 52:25
late 30:1 42:12
  103:14 105:20
  151:14
latona 3:8 14:9
  14:10
lau 23:19
  138:14,15
  147:12,15
  148:2,5,5,6,8
  148:12,25
  149:6 155:19
  155:22
launched
  106:22
lauren 11:8
law 21:25
  157:11
lawyer 25:1
  101:17
lawyers 34:15
lay 123:14
layla 10:9
layne 9:15
lea 9:4
lead 137:1,2
learned 113:23
  114:3 120:5
  121:11,15
learning 114:5

leave 22:5 26:4
  49:23 159:10
ledanski 2:25
  160:3,8
left 23:25
  138:1
legal 40:5,12
  41:1 42:21,24
  43:9 45:10
  46:10 47:8
  48:16 144:5
  160:20
lehrfeld 9:16
leigh 33:2
length 120:11
lennon 9:17
leonard 9:18
  9:19
letter 150:7
  152:11
letters 146:22
let's 122:3,12
  122:22 123:23
  123:23 124:20
  135:3 146:18
level 130:6
levine 9:20
liberties 149:9
licari 9:21
life 79:18
  113:12
lift 88:17
light 105:21
  156:18
likely 26:6
  28:20 44:20

**limine** 34:23
**limitations**
22:13 153:9
**limited** 26:23
27:2 28:1
29:23 31:24,24
33:4,14 98:6,9
104:1 117:14
117:19 131:14
**limits** 77:1,21
**line** 26:19
43:22 59:23
83:12 86:6,8
101:4 112:6
114:23 115:18
115:20 137:21
138:17 150:7
151:4
**lines** 42:10
45:5 68:5 69:2
71:8 81:12
83:5
**linkedin** 107:7
**liquid** 127:10
127:20 128:6
128:17 129:1,7
129:19
**liquidated**
78:15 92:9
**liquidation**
28:19 92:11,16
92:23 131:20
131:23 132:5
139:3 140:18
141:3,8,13,15
141:17,20

**list** 20:6 23:13
23:17 24:4,17
33:5,16 34:20
34:20,24 36:25
37:8,17 50:12
97:23 117:5
144:23 146:23
148:5,19,21
155:14
**listed** 78:10
97:24 128:23
147:9 148:20
**listen** 20:21
63:14 119:9
147:3 148:3
**listening**
120:15 148:21
**listing** 136:21
139:23
**litigate** 154:18
**litigation**
103:22 104:13
104:21 154:5
154:13,25
155:1
**little** 22:13
37:20 48:4
51:24 89:19
99:13 102:2
145:8 151:24
**lives** 90:3
**llc** 1:7 14:4
20:10 33:1,3
**llp** 3:18 4:1,9
15:5 16:2
106:3

**loan** 42:15,19
42:20,23 43:7
43:17 47:15
48:3,6,9,10,11
48:20,22 49:2
49:3,7,10,18
49:20 77:22
79:1 87:8
**loans** 43:2
49:16 77:1,2
77:21 78:15,15
78:16,24,25
87:9 92:7,9
**located** 52:16
53:20
**location** 55:2
**locked** 159:11
**lodged** 117:18
**log** 19:12 85:10
159:15
**lokey** 123:21
**long** 15:2 45:3
47:17 49:5
116:7 153:15
158:1
**longer** 24:23
31:10
**look** 43:6 45:25
47:17,20 68:4
68:25 69:1
73:3 74:3 76:9
76:10 87:19
89:25 122:12
132:23 157:3
**looked** 46:2
66:23 76:3
81:19

**looking** 29:18
38:21,24
124:20
**looks** 84:6
134:2
**lopez** 9:22 38:5
38:5,6 59:10
60:3 64:10,15
68:4 72:1 73:2
73:6 75:19
76:12 79:3
82:11 83:6
85:9,10 86:2,3
87:22 88:12
108:17 111:23
115:15 119:15
119:19 124:6
**lopsided** 136:7
**los** 4:5 9:23
**lose** 151:25
152:8
**loss** 37:20
141:10 142:1
**lost** 95:6
152:15,16
**lot** 37:12 44:6
75:2 89:24
90:3 95:7
100:22 122:13
136:11 149:20
149:21 150:24
150:25 151:21
152:2
**lots** 74:7,12
151:20
**loud** 83:10

**love** 38:2 78:14
78:14
**loved** 69:20
**low** 46:24
144:2
**lowenstein**
98:1
**lower** 63:5
105:7 130:7
**lucas** 8:15
**lucky** 89:10
**luke** 11:11
**luna** 61:5,8,20
62:14,19 63:20
65:2 66:19
**lupu** 9:24

**m**

**m** 9:13,25 11:3
12:4 138:12
**maciej** 10:21
**mad** 150:17
**made** 27:9,12
143:11 149:8
153:17 155:17
**magnification**
115:1
**magnify** 134:4
**mail** 140:20
**main** 96:13
**maintains** 19:4
**majority**
139:13,21
**make** 16:25
17:22 21:10,22
26:13 27:24
29:24 30:5
31:10 42:9

55:17 62:12
73:19,22 81:13
102:18,19
105:11 124:20
128:13 130:12
145:22 154:9
**making** 14:25
17:23 18:25
38:3 41:23
74:23 75:4
88:16 89:16
129:11
**management**
120:2
**manipulated**
44:8 45:2
**manipulating**
150:18
**manipulation**
91:18,25
**manus** 9:25
**march** 106:23
106:24
**maribel** 9:7
**mark** 4:24 9:18
10:24 16:9
24:7
**marked** 114:13
**market** 44:8,18
44:20,21,25
45:2 46:17
47:3 61:25
62:13 63:8,11
63:18 64:24
69:5 74:7
81:25 84:24
87:1 91:18,25

129:16 135:19
141:2 151:11
**marketplace**
73:24 74:1
**markets** 45:2
**marks** 10:1
**marsal** 105:3
**marsh** 10:2
**marshals** 95:4
**martin** 1:22
**mashinsky**
33:18 38:25
39:2,20 50:13
72:24 73:8
74:6 75:9,17
75:24 77:7,8
77:13,18 78:3
78:20,21 79:6
79:10,11,13,18
79:22 80:2,8
80:10,13,20
150:14
**mashinsky's**
39:5
**master** 48:22
49:2,7,10
**masumoto**
10:3
**materials**
146:8
**matter** 1:5
45:10 77:8
123:6 142:16
**matthew** 11:9
**maunder** 10:4
**max** 7:25 52:23
91:5

**maximize**
142:9
**maza** 5:15
17:22,25,25
26:20
**mccammon**
12:12
**mccarrick** 3:15
13:5 14:10
17:17,17 21:2
21:3,14,16
22:23 23:1
53:14,17,22
54:12 55:12,14
55:23 56:6,10
57:2,5,9,9,11
58:13,14 59:6
59:11,14 60:3
60:5 63:16,17
64:10,17,20
68:4,6,17,18
71:2,7,9,25
72:2 73:2,7
74:2,5 75:10
75:15,19,23
76:5,9,13 78:8
78:9 79:3,5,25
80:6,11,14,18
82:9,15 83:4,7
83:9,11,13,19
84:17 85:8,11
85:14,15 86:1
86:4,18 87:19
88:2,9,14
89:13,17 90:7
90:11 91:7,20
92:17,25 93:7

99:9,9 145:20
145:23,25,25
146:7,21 147:1
147:5,9,18,22
159:2,3,5
**mcelroy**   3:18
15:13 31:2
**meadow**   10:5
**mean**   29:7
45:19 89:7
101:16 122:21
129:22 132:22
158:25
**means**   48:10
64:4 66:21
93:11
**meant**   79:20
**measured**   62:1
62:14 63:8,9
63:19 64:24
**meet**   110:24
141:22 153:4,6
**meeting**   111:6
116:5
**meghji**   10:6
**member**   115:4
122:8,16
134:10 142:5
**members**
28:18 104:15
107:6 134:21
153:19
**mendelson**
10:7
**mendieta**   10:8
**mention**   142:4

**mentioned**
79:21 151:11
**message**   79:12
81:9
**messaged**
70:13 79:22
**messages**   70:19
71:3 80:1,7,9
80:11,12 134:2
**met**   116:8
**methods**   139:4
**mg**   1:3
**mia**   12:6
**michael**   8:4,5
8:18 137:23
**microphone**
148:9
**microsoft**
105:22
**middle**   14:24
15:24 16:7
17:15
**mike**   8:20 11:1
**milliga**   10:9
**million**   84:25
128:16,23
129:7 136:18
136:19 152:21
**millions**   127:6
**mind**   17:18
19:13 21:15
68:24 86:16
87:3
**mineola**   160:23
**minimum**
137:11

**mining**   120:1,8
120:21 131:24
**minute**   38:10
**minutes**   101:5
**mira**   8:10
**misconduct**
103:22 104:18
**mispronounc...**
51:17
**mispronounc...**
137:19
**misstates**
111:10 114:9
121:13,17
**mitigate**
141:25
**mixed**   138:23
**mixing**   100:12
**mo**   10:6
**modifications**
27:3 131:12,14
**mohsin**   10:6
**moment**   59:9
84:5 129:7
**monetary**   19:3
139:13,20
141:10 142:1
**money**   95:7
150:2,4 152:25
153:1,21 154:9
154:10,10,10
154:11 155:7
155:11,16
**month**   136:5
**months**   77:15
77:18 78:3
111:20

**morgan**   10:18
**morning**   14:17
16:15,18 37:16
146:12,15
156:9,13,25
157:5 159:10
159:16
**motherfuckers**
94:11
**motion**   34:22
35:5 42:18
48:1
**motivate**   153:5
**move**   32:17
75:11 82:12
90:7 116:22
120:23 121:2
122:22 123:23
136:25
**moved**   98:25
99:7 117:2,2
139:18 140:19
144:20,23
**multiple**   30:4
53:19
**mulvaney**   3:18
15:13 31:2
**mute**   19:13
32:11

**n**

**n**   3:1,5 13:1
14:1 137:24,24
160:1
**naked**   76:19,20
**name**   19:6,8,9
51:18 107:12
137:1,19

155:13
**named** 114:6
**narrow** 102:18
154:24
**nathaniel** 9:15
**nathanson**
32:11,12,16,25
33:2,3 34:1
**nda** 119:9
**ne** 5:4,12
**necessarily**
27:23 100:5
155:12
**necessary**
99:18 157:4
**need** 20:25
65:23 76:11
81:13,23,25
89:19 116:6
145:8 156:17
**needed** 24:23
78:18 116:4
**needs** 19:11
63:8 114:24
134:25
**negative**
150:22
**neither** 105:19
**network** 1:7
14:4 82:17
120:8
**never** 17:18
79:17 107:17
134:18 139:23
149:15
**new** 1:2,13
3:19 4:13,22

15:14 20:13
22:13 30:24
31:3,6 34:5
36:8 74:8
146:8 149:2
**newark** 3:21
**newco** 104:19
104:20 105:5,6
105:11 106:10
117:14 122:8
122:17 124:16
125:5 128:6
134:13 135:17
136:6 137:12
153:2,19,24
**newco's** 107:20
113:23
**nice** 31:4
**nicole** 9:19
11:8
**night** 103:15
110:16 136:11
136:17 145:6
146:14
**nine** 48:3,14
49:17 156:8
**noah** 11:3
**non** 36:3,20
41:10
**nonmonetary**
19:3
**normal** 126:3
152:24
**note** 17:3 33:15
33:24 100:20
105:13 139:12
157:12 159:5

**noted** 19:23
**notes** 41:23
48:20
**notice** 37:19
40:11,14,21,23
41:12 50:15
**noticed** 37:11
40:4
**notified** 31:9
**notifying** 17:7
**novawulf**
120:19 122:1
**noyes** 10:10
104:21
**number** 19:11
19:12 20:10
23:9,10,19
24:4 42:16,20
49:16 52:25
55:12 73:16
74:3,4 78:10
98:7 99:19
111:24 112:13
114:14 115:18
124:16 125:11
125:14,18
126:7,16,21
127:6 128:17
128:23 129:7
129:12 134:13
135:11,25
139:25 144:22
146:21 148:20
152:20,23
**numbers**
129:17,20
130:2,18

**numerous**
130:21
**nuraldeen** 6:21
**nw** 3:12
**ny** 1:13 3:21
4:13,22 160:23

**o**

**o** 1:21 14:1
137:24 160:1
**o'clock** 14:3
**o'connell** 10:11
**o'connor**
104:16
**oath** 25:2 26:1
52:16,25 55:15
55:17 56:5
67:25 102:21
116:12
**object** 22:15,16
41:16 52:23
53:15 94:17
105:17 108:20
109:6,12,25
111:11 114:9
117:23
**objected** 20:13
34:13 37:1
39:7 51:22
52:1
**objecting**
52:11,12
**objection** 20:9
20:20 26:24
33:4,8,14,15
34:22,25 36:25
39:3,19 40:13
42:18 50:13

84:7 91:7,20
92:17,25 93:7
93:14 95:16
98:6,9,13
100:2 103:7
108:19,22
109:24,24
110:1 111:13
112:15 116:14
116:15,16
117:14,19
118:7 121:13
121:17 132:20
134:19 137:4
148:22 149:3
149:11 159:1,1
159:2

**objection's**
112:20

**objections** 20:4
20:14,22 22:1
22:7 27:2
28:21 29:24
30:2 37:6,10
37:23 52:15
75:12 100:6,17
103:16 109:23
110:17 112:14
117:8,18 121:3
122:25 143:4
145:16 148:13
148:16

**objective** 142:7
**objector** 32:13
**objectors** 20:7
145:18 147:3
148:20

**obligation**
43:17 48:20
49:20

**observer**
134:13 137:7,8

**observers**
134:22,22

**observer's**
134:11,15

**observing**
59:18 120:6

**obtained** 91:6

**obviously** 22:8
28:15 29:5,17
30:7,9 34:7
37:17 43:19
44:19 78:24
85:1 87:7

**occasions** 95:3

**occasiosn**
53:19

**occur** 33:12
104:7

**occurred** 95:5
108:9 136:5,13

**occurring**
53:16

**october** 1:15
14:3 20:6 21:5
34:23 54:18
65:7,20,23
66:3,5,7,14
84:6,19 148:18

**offer** 21:9
38:23 67:11
69:3 76:5 80:2
109:21 112:12

124:12

**offered** 35:2
37:5 57:12
68:21 69:9
123:8 128:7

**offering** 58:18
123:5 131:19
132:3

**offers** 42:1

**office** 16:16
25:20 94:17

**officer** 34:21

**official** 4:2,10
16:3 19:5
51:21 119:24
156:2

**oh** 14:8 17:18
84:4 88:10
115:25 124:4
152:24

**okay** 14:2,12
15:6,17,20
16:5 17:8,19
18:11,14,17
19:20,22 20:23
21:21 22:25
23:4,23 24:9
24:25 25:14
26:12,22 29:12
29:20 30:24
31:23 32:17,19
32:21,23 36:11
36:22 38:7
40:7 41:17,22
42:7,10 45:15
51:11 57:1
58:13,15 59:6

60:2,24 61:9
62:12,22 63:22
64:5,10,16,18
65:10,19 66:2
66:12,18,22
67:6,10,20
68:4,12,17
69:14,23 71:7
71:25 73:2
74:2 75:8,16
75:19 76:5
78:8,19 79:3
80:19 81:5,7
82:6,16 83:4,8
83:16,20,22
84:18 85:2,6
85:12 86:4,10
87:14,19 88:3
88:13,22 89:11
90:7 93:22
96:1 97:11,13
97:14,16 98:19
98:21,23 99:12
99:13,23 101:3
101:6 105:25
106:24 108:23
109:1 115:21
117:7 118:14
122:14 132:25
138:6,9,14,19
145:2,5,17
146:15,16,25
147:2,24 148:2
148:8,11,21,21
149:5 156:4
158:18 159:12

okx   96:10
old   160:21
ombudsman
   24:14
omitted   20:7
once   81:4
   136:1 158:22
ones   40:15
   81:24 104:12
   133:23,24
   148:13
ongoing   30:9
online   22:21,22
open   38:17
   50:1 51:10
   55:1 81:21,23
   83:17 93:12,16
   115:18
opening   97:19
   156:16
operating
   31:15 137:25
operations
   120:1,8,21
   130:10
operator   56:17
   102:17
opine   60:17
opinion   45:21
   57:12,14 58:18
   61:15 63:2
   65:3 67:5,12
   81:22 104:5
   105:4 123:5
   128:7 141:8
opinions
   123:15

opportunity
   20:11,23 29:19
   133:11 156:10
   156:22
opposed   40:6
   45:11 102:3
   128:20
opposition
   159:6
opt   154:19,22
opted   154:23
options   142:11
orally   103:4
order   20:5,6
   21:5,5,18,24
   22:20 24:21
   35:25 51:2
   53:8,24 54:2
   77:10 97:6
   98:12 99:1,7
   99:11 139:17
   140:11 148:18
   148:19
orderly   105:4
   105:7,11,12
   134:24
orders   30:20
oren   34:10
organize   80:23
   80:25
original   103:7
   123:3 140:7
originally
   144:22
otis   6:1 13:4
   17:2 52:16
   55:15 57:4

90:22 94:8
   96:2
ought   25:25
   156:23
ousted   79:14
outline   103:6
outlined   52:15
outside   22:4
   28:3 54:10
   55:10 86:9
   96:7
overall   100:6
   120:2
overlap   131:6
overly   154:24
overrule   50:12
overruled
   109:14 110:17
   111:13 112:20
   158:25
overruling
   39:19
oversight
   23:17 103:23
   104:13,21
overwhelmin...
   28:14
own   38:18
   66:22 95:16
ownership
   42:14,19,23
   49:9 50:6

**p**

p   3:1,1 8:11
   14:1
p.m.   109:17
   110:14 114:17

paces   5:12
page   13:14
   38:24 54:19
   59:11,12 64:12
   64:13,15,16,17
   68:5 69:2 71:8
   73:4 74:2,3
   75:20 76:9
   78:8 83:5,12
   86:1,5 93:12
   115:16,25
   116:15 124:7
   124:12,12,21
   124:21 139:7
pages   39:14
   48:7 85:8
   117:6
pagnanelli
   10:13
paid   77:25
   152:25
paolo   7:2
paragraph
   43:11 59:13
   76:10,11,14
   113:7 134:9
paragraphs
   43:11
part   22:18
   34:19 41:14
   42:24 54:18,23
   82:11 88:21
   103:12,13
   104:23,24
   112:15 123:1
   129:24 157:20

partial 19:9
participate
  116:17
participated
  135:15
participation
  155:22
particular 72:7
  110:10 117:23
  129:20 139:15
particularly
  21:25 42:23
  56:4
parties 14:5,5
  14:17,22 15:6
  15:18,23 16:6
  16:12,21,22
  17:9,14 18:4,5
  18:19 19:6,8
  52:5
parts 39:14
  125:11,18,25
  126:7 128:14
  129:25
party 19:7
  29:10 33:9
  154:19,22
pass 90:13
  132:9
past 95:14
  145:6
patel 12:5
patricia 11:19
patton 10:14
paul 6:20 7:21
pause 14:19,20
  15:20,21 17:11

17:12 61:22
62:6,15 63:20
65:1 72:17,21
77:13 79:7,14
79:22 81:9,22
82:4 87:10
paused 87:7
pay 18:23
  153:23
payout 158:8
pdf 59:12,12
  64:12,17 73:4
  74:3 75:20
  76:10
penalties 153:3
penalty 153:6
pending 98:14
pennsylvania
  3:12
people 20:23
  21:18 22:21
  74:7 89:4,8,8
  89:15,19,20
  95:6,7 128:5
  135:14 139:25
  140:19 149:22
  149:24 150:14
  150:17,18,20
  150:23 151:20
  152:6,17,23
  153:23,23
  154:4,14
people's 90:3
perceive 95:8
  116:3
percent 34:8
  37:18 47:6

125:8,13,16,25
126:5,9,11,13
126:16,20
128:12,13
129:10,11,15
129:16 130:7,8
130:9,23,23
131:1,2 135:13
135:14,16,19
135:23 136:2
137:11 141:15
141:19 152:14
percentage
  105:6
perella 100:20
  101:6 103:20
  117:20,24
perfect 38:22
perfectly 21:16
period 66:23
  119:6
permission
  23:13,18 89:13
  119:12 120:23
  121:2
permit 21:24
  27:5 35:11
  54:25 55:6,18
  55:21 95:18
  100:17 103:4
permits 54:22
permitted 22:3
perry 10:15
person 22:7
  47:22 137:16
  138:6

personal 57:16
personally
  58:3
persons 18:24
pesce 10:16
  114:17
peter 7:17
  12:15 138:9
petition 44:9
  44:16,19,25
  46:20,23 57:14
  57:17,21 60:16
  60:21 67:8
  72:17,21 79:7
  79:23 81:10
  84:8,10,15
  86:9,11,14,15
  86:16,22 87:3
  87:5 96:10
  140:8,23 141:1
  141:4,15,25
  143:22,23
  144:17 157:18
pham 10:17
phase 140:4,6
phil 97:25
philips 129:14
  132:2
phillip 9:3
phillips 5:20
  13:10 15:15,16
  15:16 99:15,16
  99:21,24 100:2
  100:13,16,21
  101:4,8,15,17
  101:18 102:1
  102:13,14,25

103:1,6,18
106:6,8 109:3
109:10 110:5,6
110:22 112:1
112:24 114:14
115:16 116:17
118:17,19,23
119:21 121:10
121:19 122:10
123:1 124:5,9
124:25 125:21
127:9 131:1,10
132:12 133:10
133:16,25
134:4,7 135:4
135:5,6,7
137:15
**phillips's**
101:13
**phoenix** 10:18
**phone** 19:10,14
68:19 69:9,23
70:3 98:21,22
**phrased**
121:23
**piasek** 10:19
**pick** 20:3 21:12
130:18
**pietro** 9:21
**place** 115:24
**places** 49:6
**plaintiffs** 97:23
98:2,7
**plan** 18:10
28:13,15,20
30:3,10,12,13
31:8 33:7,8

43:25 44:13
46:22 47:2
93:12,16 105:8
113:14 118:24
119:1 126:12
126:18,19
127:13 131:11
131:16,21
132:5,20
136:15,24
138:24 139:6,7
139:14 140:13
142:3 147:16
149:23 152:22
153:2,8,9,18
154:12,20,21
155:2 156:10
156:14
**planned** 46:22
**planning** 155:3
**plans** 154:24
**platform** 61:23
72:7 87:7
96:11
**platforms** 96:9
96:12,17,19
**play** 94:13
**plea** 142:19
**please** 14:6,24
15:7,24 16:7
16:13,25 17:15
18:7,23 19:13
19:25 27:7
38:1,6 56:1
58:11 59:9
64:10 81:3
83:3 91:21

93:11,17
101:12 106:17
108:18 111:23
115:13 119:15
119:18 124:6
124:17 134:15
135:2
**pleased** 97:6
**plus** 153:23
**pm** 1:16
159:18
**podium** 14:24
15:24 16:7
17:20 34:15
**point** 21:4
24:25 25:7
30:13,16 35:22
46:9 47:11,15
47:23 51:10
78:25 79:10
89:2 90:2,6
102:17 105:16
120:12 128:9
134:8 136:4
143:18,20
155:24
**pointed** 45:24
136:9
**pointing** 62:4,5
**points** 27:6
47:15 50:16
133:13
**policies** 98:11
**polzmacher**
10:20
**portions** 41:11

**posed** 35:1
**position** 27:10
27:15,20 28:23
29:8,14 40:3
41:16 53:7
62:25 63:7,18
86:10 89:11
99:1,7
**positions**
154:11
**possibility** 29:2
**possible** 131:5
144:1
**post** 84:8,10,15
88:16 93:19
96:10,18 104:3
104:9 122:1
156:16
**posted** 55:16
66:2 136:10
146:9 156:21
**potential** 60:25
142:24 153:12
**potentially**
33:23 155:2
**power** 134:22
**poynter** 10:12
**prczek** 10:21
**pre** 122:2
**preceding**
39:14
**precisely** 45:20
**preclude** 44:9
**prefer** 99:17
99:17 145:5
**preliminaries**
20:3

preliminarily
  20:25
prepare  23:14
  69:4
prepared
  36:21 43:20
  53:22 100:9
  125:1 145:9
  146:12
preparing
  145:10,14
prepetition
  134:20,20
  157:20
present  6:9
presentation
  27:5 31:11
  97:18
presented
  104:25 105:14
presenting
  24:8 99:7,8
presents
  142:24,25
  144:16
preserve  98:9
preserved
  104:8
presumption
  22:9
pretrial  53:18
  53:24
pretty  22:9,18
  81:10 118:21
prevents
  144:15

previously
  107:17 143:7
price  44:8,10
  44:16,19,21
  46:17,20,23
  57:14,20,23,24
  58:1 59:19,24
  60:6 61:4 62:6
  62:9 69:5
  74:19 135:8
  136:19,21
  137:10 143:2
  144:14 150:11
  150:18
prices  44:18,25
  44:25 45:2
  47:4 105:22
  141:15 150:19
  150:25 151:1
  152:4
pricing  44:14
  93:10
primarily
  42:15 72:9
  138:22
prior  29:10
  31:7 62:5
  113:12 116:13
  116:16
priority  27:21
privacy  24:14
privilege  70:4
privy  30:7
pro  5:18,20,22
  5:24 6:1,3,5,7
  14:15 15:10,16
  16:19 17:3,6

18:9,12 19:21
  20:14,18 22:4
  23:5 34:7
  90:20 94:6
  95:25 97:17
probably
  65:18 81:10
  111:22 113:9
  118:6 151:14
problem  38:16
  107:5,10
procedural
  157:14
procedure  53:9
  54:23
procedures
  51:23 52:2
  53:18
proceed  22:24
  53:22 54:13
  57:2 99:18
  101:13 146:3,5
proceeding
  33:12,21,22
  103:25
proceedings
  18:25 19:4
  87:16 119:10
  159:17 160:4
process  21:4
  106:13,20,21
  117:20 118:3
  120:18 137:7
  142:8
professionals
  103:19

proffer  35:9
profile  107:7
program  73:17
programs
  27:22
prohibited
  18:25
prohibition
  19:2
project  65:2
promising
  154:1
promptly
  18:19
proof  157:23
proper  42:8
  69:22 97:1
  105:12
properly  41:13
  49:1
property  43:5
  45:10,11 46:6
  48:13
proposal  21:8
propose
  104:12
proposed
  20:13,16 27:3
  28:13 33:5,10
  33:13,16 42:1
  44:13 73:16
  139:19
proposes  28:14
prosecute
  104:10
prosecution
  41:10

prosecutors
142:20
protection
154:12
proton.me
112:2 114:16
proton.me.
109:4
provide 33:9
49:19 58:6
63:13 65:24
68:21
provided 105:5
134:12 148:19
providing
102:3 139:1
140:25
pseudonym
107:2,4,10
pseudonymous
107:8
pseudonymo...
107:2
public 67:15
120:12 121:25
122:3
publicized
120:13
publicly 87:15
107:18
pull 37:23 39:1
119:15 124:6
pulled 126:18
purchased
150:22
pure 139:15,18
141:14

purely 143:25
purpose
145:13
purposes 54:1
127:5
pursuant
54:22 139:16
pursue 42:11
98:10
pursued
155:16
pursuing 155:1
push 52:7
143:19 146:1
pushing 90:4
put 15:19
23:17 25:5,7
38:12 56:18,18
60:24 62:17,18
64:11 79:25
82:9 83:18
99:11,12,19
100:8 113:9,20
123:19 133:20
133:20 137:5
152:1,8,10
153:10,14
putting 108:20

q

q&a 133:12
qualification
104:24
qualified 58:6
137:5
question 18:15
49:17 50:19
58:12 60:19

63:7,14,15,16
66:8 68:10,12
71:14,15,23
79:18 83:14,16
83:20,22 84:14
85:13,16,24
86:10,13 91:21
91:22 92:18,21
107:9,23
111:12 115:22
121:14,18
124:17 127:22
129:4 132:2
133:1 140:15
142:13 143:9
157:15 158:6
questioning
34:25 35:1,7
35:21
questions 35:3
35:6,22 36:4,9
36:16,20 53:2
71:10 86:9
87:14 90:12,15
94:2,22 95:17
96:6,22 108:3
108:7,11,13,15
108:15,21
109:9,14
118:10 122:13
122:14 123:22
132:8,13
146:19
quick 24:8
96:6 132:13
quickly 36:21

quite 29:25
30:18 32:13
48:14 53:8
135:15 156:17
quota 153:4
quote 88:21
94:11

r

r 1:21 3:1 14:1
138:7 160:1
raise 15:7
16:13 18:7
21:21 36:22
47:22 56:17,20
102:12,20
133:13 143:14
155:21
raised 17:1
22:2 27:2
143:7 147:12
rakesh 12:5
rakoff 29:16
ran 137:10
155:7
range 36:1
126:3 130:7,22
rasile 10:22
rate 140:6
141:18,20
rates 92:16
130:13 141:3,9
rather 38:18
155:17
ravi 9:1 137:4
reach 24:22
29:4 67:13
126:16

**reached**  24:15
  25:11 26:3
  28:9 35:19
  126:5
**reaching**  46:3
**read**  70:18,22
  83:10 85:13
  86:5 103:3
  113:16 115:2
  115:19 133:1,4
  134:9 136:11
  155:5
**ready**  18:21
  45:7 101:13
**real**  96:6
**realize**  76:19
  150:10
**really**  20:13,17
  67:17 97:1
  102:7 104:4
  113:8 143:23
  149:8,9,25
  151:15 152:4,6
  153:21 154:14
  154:21
**reason**  40:25
  81:14,15 86:21
  87:4 125:13,17
  126:6,15
  156:24
**reasonable**
  140:18
**reasons**  34:24
  73:22 128:5
  134:14
**rebuttal**  51:9
  103:11,12

112:17 134:8
134:19 147:17
**recall**  50:3
  54:5,10,11
  59:4,22 67:14
  67:19 68:23
  69:11 71:6
  84:24 85:5,6
  88:15,15 94:10
  94:13 96:9,14
  108:3,12,14
  112:9 114:21
**receive**  44:1
  54:2 140:17,20
**received**
  158:23
**receiving**  28:18
  93:5 144:12
**recent**  123:2
  144:9
**recently**
  118:21
**recess**  101:1,11
  156:14
**recollect**  108:6
**recollection**
  68:25 69:8
  83:1 132:25
**record**  14:6,7
  14:17 15:7,19
  15:24 16:7,13
  16:23 17:9,15
  18:6 19:5,7
  24:6 25:21
  27:6,17 28:8
  31:16 33:15,24
  57:8 61:18

70:19,22 83:18
116:16 127:5
160:4
**recording**  14:3
  14:19 15:1,20
  17:11 18:25
  19:4,15 94:13
  94:15
**recovery**  44:1
  47:6 98:10
  105:6,11
**recross**  13:3
**redirect**  13:3
  54:21 133:12
  133:14
**reduce**  44:22
**reduction**
  129:15
**reductions**
  120:2
**refer**  27:14
  44:14 48:22
  60:6
**reference**
  88:10 94:11
  113:3
**references**
  41:18 45:7
  48:15
**referencing**
  127:6
**referred**
  120:13
**referring**  43:11
  54:17 88:4
  115:3 128:24
  133:24

**refers**  80:23
**reflect**  141:3
  150:5
**refresh**  47:19
  68:25 83:1
**refreshed**  69:8
**refuse**  70:24,25
**refused**  70:21
  88:23,24
**regard**  144:9
**regarding**
  27:13 41:1
  42:18 44:6
  104:24 116:18
  118:3,24
**regardless**
  52:20 150:10
  154:23
**regards**  142:15
  158:2,7
**registration**
  30:14
**regular**  56:19
**regulators**
  30:2,5,6,18
**rehypothecate**
  50:5
**reilly**  10:23
  12:13
**reinforce**  74:20
**reiterate**  28:1
**reject**  139:13
  139:19 142:3
**related**  69:24
  70:1,5 117:19
**relating**  93:22

**relation** 44:8
93:25
**relationship**
77:13
**release** 154:19
154:22
**relevance** 84:7
94:18
**relevant** 39:14
54:23
**relied** 103:11
103:13
**relies** 104:24
**remain** 45:10
101:4
**remaining**
44:21 47:3
**remember** 46:1
67:14,17 88:20
88:21 96:11
106:14,19
109:19 132:21
132:23
**remind** 32:18
32:21
**remote** 21:21
21:24 22:2,3
22:13,17 53:5
54:3,22 103:8
146:3,6
**remotely** 22:7
35:20,21 36:3
54:1 55:2
99:19 100:3
**remoteness**
100:6

**remove** 104:18
**reorganization**
144:1
**repay** 49:20
**repeat** 81:3
91:21 106:18
124:17 148:23
**rephrase** 120:9
**replaced** 137:3
**report** 20:13
20:16 52:24
59:16 65:12,20
65:22,25 68:21
69:4 70:6 95:4
**reports** 30:8
**represent**
79:17 83:14
85:12
**representation**
136:8
**representations**
26:25
**represented**
79:10,13
**representing**
103:20
**repurchase**
44:21 49:11,14
**request** 28:1
32:4 35:20
53:2,25 98:25
99:6,19 103:8
144:23
**requested**
34:10,19 53:5
**requesting**
55:2,3 99:4

**requests** 52:4
**require** 29:4
113:12 153:20
**requirements**
114:24 115:7
116:4,6,9
153:10
**requires** 21:23
47:9 53:9
54:23
**research** 91:6
91:12 142:18
144:10,13,13
152:2
**reservation**
26:14,24 31:7
31:17
**reservations**
100:5
**reserve** 20:15
24:10 42:12
46:8 51:8 55:5
**reserved** 42:3
**reside** 42:24
**resigned**
136:24 137:3
**resolution**
24:15,20,23
25:7,11 26:3
31:8 33:23
41:9 98:14
**resolve** 33:14
95:12 98:12
**resolved** 31:19
**respect** 20:18
29:22 30:1
53:7 71:4

133:17 155:23
157:5
**respectfully**
27:14
**respective**
141:13
**respond** 27:1
47:12 79:12,15
81:9 143:12,17
144:6
**responded**
35:4 48:2
103:14 110:15
134:18
**response** 35:3
48:1 81:11
133:14 137:17
137:20
**responses** 37:7
142:10
**responsibiliti...**
134:11,16
**rest** 88:18
**restate** 97:18
**result** 19:2
61:4 120:5
121:10 126:13
139:17,22
141:11
**resulted**
139:18
**resulting**
120:16
**results** 126:12
126:19 127:13
136:1

| | | | |
|---|---|---|---|
| **resume** 107:5,8 | 30:24 31:23 | 126:7,16 | 53:9 54:22 |
| 107:10,12 | 32:3,17,25 | 127:20 128:7 | 112:18 141:12 |
| 157:4 | 33:25 34:1 | 128:17 130:6 | **ruled** 149:11 |
| **retail** 48:25 | 36:18 37:9,15 | 131:6,8,16 | **rules** 21:22 |
| 49:3,16 | 38:17,24 42:3 | 133:8,9,18 | 55:17,17,21 |
| **return** 69:15 | 42:5 50:4,24 | 134:13 137:14 | 101:20 |
| 88:1 | 51:11,12,16 | 138:16 143:6 | **ruling** 20:15 |
| **returned** 139:2 | 52:9 53:15 | 144:18 146:11 | 28:1 46:8 55:5 |
| 141:16,18,20 | 56:17,20 57:16 | 156:12,13 | **rulings** 43:23 |
| **revelation** | 59:9 62:25 | 157:3,8,11 | 149:20 |
| 136:17 | 65:7 66:8 67:4 | 159:8 | **ryan** 12:14 |
| **review** 27:3 | 67:12 69:25 | **rights** 26:14,24 | s |
| **reviewed** | 72:13,15 73:17 | 31:7,17 51:9 | |
| 113:22 | 74:13 75:4 | 53:18 87:22,25 | **s** 3:1 9:17 10:3 |
| **reviewing** 64:6 | 76:3,4,7,9 77:5 | 98:9 137:5 | 14:1 138:7 |
| **revisions** 33:6 | 78:11 79:7,25 | **riki** 9:9 | **sabin** 15:4,4 |
| **revolve** 138:22 | 80:15 81:12,20 | **rise** 19:24 | 132:11,12,15 |
| **richard** 5:20 | 82:9 84:20,24 | 74:19 | **sacrifices** |
| 13:10 15:16 | 86:19 96:24 | **risen** 140:22 | 113:11 |
| 106:6 118:17 | 97:9,23 98:15 | **risius** 105:2 | **safeguards** |
| **richards** | 98:16,23 99:15 | **risk** 43:15,16 | 54:25 |
| 109:12,25 | 99:20 101:12 | 43:18 48:18,19 | **saikh** 11:7 |
| 110:2,4 | 101:15,19 | **road** 5:12 | **sale** 49:11,14 |
| **rickie** 6:25 | 102:20 103:1,2 | 160:21 | **sam** 11:4 |
| **ridiculous** | 103:17,19 | **robert** 6:24 7:1 | **sami** 11:7 |
| 150:12 151:18 | 105:25,25 | 12:4 | **samuel** 8:11 |
| **right** 14:12,16 | 106:10,13 | **roberto** 8:12 | **sanctions** 19:3 |
| 14:19,21 15:17 | 107:2,5,15,18 | 8:16 | **sandler** 98:1 |
| 15:22 16:11,17 | 107:21,24 | **robinson** 10:24 | **sarkissian** 11:1 |
| 16:20,20,22 | 108:4,8 117:8 | **rodriguez** | **satisfies** 152:9 |
| 17:5,8,11,13 | 117:9 118:8 | 10:25 | **satisfy** 55:4 |
| 17:21,22 18:3 | 119:10,18 | **role** 137:8 | 140:3 |
| 18:5,18,22,23 | 120:3 121:3,12 | **room** 4:21 19:8 | **saw** 34:12 |
| 19:25 23:1,4 | 121:24 122:5,8 | **ross** 9:13 105:3 | 104:17 116:14 |
| 23:15,15,21 | 122:17,19 | **roughly** 46:24 | 118:21 120:5 |
| 24:3,4 25:3 | 124:13,23 | **rule** 21:22,23 | 121:11,15 |
| 26:5,8,12 | 125:1,8,11,14 | 22:9 27:18 | 122:4 |

saying 43:24
  50:3 56:14
  62:7 63:4 77:9
  89:9 115:10
  152:24 153:13
  154:13
says 48:9 54:18
  59:23 69:20
  73:14 76:11
  109:18 114:23
  117:5 120:11
scenario 105:7
  134:24 140:15
scenarios
  105:8
schedule 35:10
  104:3 156:15
  156:20
scheduled
  157:9
scheuer 5:7
  18:1 26:15,16
  26:19,23 27:8
  29:21 30:23
schiffrin 11:2
schneider 5:22
  15:9,10,10
  98:16,16,18,19
  98:21,24,24
  99:3,6,10,12
  99:14 144:21
  144:22,25
  145:1,2,5,11
  145:12 146:12
  146:14,16
  147:4,6 156:10
  156:11,11

schoenau
  51:17,18,22
  52:1
schottenstein
  11:3
schramm
  12:14
schreiber 11:4
scientific 31:14
  31:14
scope 95:15
  154:24
scott 7:16 12:8
  114:18
screen 38:4,19
  64:14 68:7
  87:23 108:21
  134:3 135:4
screenshot
  19:1
scroll 114:15
se 5:18,20,22
  5:24 6:1,3,5,7
  14:15 15:10,16
  16:19 17:3,6
  18:9,12 19:21
  20:15,18 22:4
  23:5 34:7
  90:20 94:6
  97:17
seat 107:20
seated 19:25
  101:12
seats 154:3,5
sec 17:25 26:12
  26:13,14,23
  27:4,14 28:2

29:7 30:13
  41:10
sec's 27:9,15
  29:14
second 25:16
  37:15 54:16
  61:22 65:7
  69:23 70:10
  134:9 143:15
  145:18
secret 29:24
section 48:19
securities 3:19
  5:1,2,9,10
  15:14 26:16,21
  27:18,24 30:2
  30:6,25 31:3,6
  41:1 43:24
  97:23 98:1,7
security 27:25
  28:12,24 43:24
  49:19
see 22:6 24:15
  26:1 29:11
  31:4 32:22
  34:14,16 39:22
  40:1 41:20,21
  42:15,17 46:18
  49:8,12 59:23
  60:1 64:14,14
  64:23 65:4
  68:7,9 69:2,6
  73:9,11,13
  74:6,9,10
  75:21,25 76:1
  76:14,17,20,21
  78:19,21 80:19

80:22 81:11,12
  81:16,17 82:11
  82:16,19 83:17
  84:21 92:15
  108:22 109:3,4
  110:24 111:2
  112:1,3,7
  113:1 114:18
  116:10,13
  133:23 138:8
  138:11,13
  144:4 150:11
  159:9,12,14
seed 91:6
  144:12
seeing 54:5,10
  54:11
seeking 35:18
  145:19
seeks 39:6 98:9
seem 29:3
  77:12
seemed 28:9,20
  29:1 136:22
seems 44:10
seen 20:9
segar 11:5
select 127:20
selected 113:23
  114:3,11 115:7
  117:14 118:7
  122:19,24
  128:6
selection
  117:20 118:3
seller 135:9

| | | | |
|---|---|---|---|
| **sellers** 80:21 | **served** 107:17 | **shortly** 42:13 | **simply** 54:10 |
| **selling** 45:3,3 | **service** 42:20 | 52:6 113:22,25 | 62:4,5 129:20 |
| 142:22 151:18 | 43:2,7,15 | 117:13 | 130:2 140:20 |
| **send** 107:12 | 48:25 49:6,16 | **shorts** 56:11,15 | **simson** 11:10 |
| **sending** 50:25 | **set** 46:21 53:8 | **shoulders** 90:1 | **sincerely** 24:1 |
| 109:19 112:9 | 105:22 135:19 | **shouldn't** | **single** 127:9 |
| 114:21 | 155:24 156:2 | 151:7 | **singlehandedly** |
| **senes** 11:6 | **settle** 46:23 | **show** 34:12 | 80:20 81:6 |
| **sense** 21:10 | **settlement** | 38:2 49:5 | **sir** 18:3 25:24 |
| 49:18 102:7 | 31:20,21 52:11 | 114:13 | 60:24 61:2,25 |
| **sensitive** 30:18 | 52:22 139:6,14 | **showed** 135:22 | 62:3,22 63:2 |
| **sent** 79:11 | 139:20,21 | 152:11 | 63:11 65:6,15 |
| 109:16 110:13 | 140:2,2,10 | **showing** 105:6 | 66:7 68:8 |
| 112:5 114:15 | 158:3,4,8,12 | 152:12 | 70:21 74:22,24 |
| 115:6 | 158:13 | **shown** 49:1,2 | 75:3 77:6 79:6 |
| **sentence** 43:4 | **seven** 23:10 | **sickles** 11:8 | 82:6 83:23 |
| 43:10,10 | 42:20 48:5,12 | **side** 46:4,6 | 84:3 87:11 |
| 112:25 | 48:13,16 65:11 | 98:10 134:10 | 89:3,22 96:5 |
| **separate** 40:19 | 66:1 78:25 | **sign** 19:11 | 98:18 101:18 |
| 104:12,23 | **several** 43:23 | 154:18 | 157:14 158:2 |
| **separately** | 95:3 | **signature** | **sister** 91:13 |
| 97:24 | **shaking** 24:15 | 160:7 | **sitting** 97:5 |
| **september** | **shara** 4:25 | **signed** 119:9 | **situation** |
| 22:11 114:1,16 | 16:15 25:19 | 148:4 158:12 | 139:15 148:1 |
| 117:15,16,17 | 94:16 | **significant** | **six** 20:10 23:9 |
| 117:19 119:4,7 | **share** 87:22 | 119:25 120:7 | 66:7 |
| 132:17,17 | **sharing** 38:4 | 120:20 134:20 | **sixth** 152:14 |
| 136:5,10,13 | **sharon** 7:15 | **significantly** | **sleepless** |
| 140:12 | **sheet** 64:18 | 44:1,22 131:24 | 146:14 |
| **sequentially** | 127:6 | 131:25 137:10 | **slight** 40:19 |
| 21:11 | **she's** 150:3 | **silverman** 11:9 | **slighted** 23:17 |
| **serban** 9:24 | **shirt** 56:11,15 | **similar** 27:12 | **slightly** 40:19 |
| **series** 80:1,6 | 56:18,19 | 36:24 108:14 | **slip** 64:18 |
| 108:7 110:7 | **short** 45:3 | **similarity** | **slotted** 23:23 |
| **serious** 95:8 | 80:21,24 | 130:9 | **smaller** 151:25 |
| **serve** 122:16 | **shorted** 44:11 | **simon** 7:14 | **sofi** 113:14 |

| | | | |
|---|---|---|---|
| **solely** 111:15 | **space** 48:22 | **spoke** 68:19 | **state** 14:23 |
| **solemnly** 56:22 | 69:21 94:10 | 84:1 | 15:8,24 19:6 |
| **solidly** 102:22 | **spaces** 113:1,3 | **spoken** 23:24 | 19:18 30:5 |
| **solutions** | **spalding** 33:3 | 79:17 | 31:9 42:13 |
| 160:20 | **spangler** 11:11 | **sponsor** 30:13 | 43:9,15 48:3 |
| **somebody** | **spanned** | **sponsoring** | 95:25 |
| 24:16 25:18 | 111:20 | 146:24 | **stated** 16:6,12 |
| 138:1 151:11 | **speak** 17:7 | **spread** 133:21 | 18:7 108:10 |
| **somewhat** | 18:13 19:6,18 | **sprofera** 12:15 | 130:23 |
| 29:16 | 20:11,19 26:5 | **squeeze** 80:24 | **statement** |
| **sonya** 2:25 | 65:24 79:11,15 | **stabilization** | 21:11 25:1 |
| 160:3,8 | 146:15 148:24 | 136:20 | 26:13 27:11,15 |
| **soon** 52:8 | 156:12 | **stabilize** | 48:8,12 52:16 |
| 156:2 | **speaker** 147:12 | 136:21 | 52:24 55:15 |
| **sorry** 14:18 | 147:25 | **stage** 21:14 | 59:3,5,8,15 |
| 18:16 19:16 | **speaking** 14:6 | 34:9 95:5 | 60:6,13 62:17 |
| 38:15 52:1 | 14:17,22 15:7 | **staking** 128:19 | 62:18 63:22,25 |
| 58:11 69:19 | 15:18,23 16:23 | 128:23 129:18 | 64:3,5,8,21 |
| 81:2 88:10 | 17:3,9,15 18:6 | **stale** 105:18 | 66:5,9 97:19 |
| 93:13 95:24 | 18:10 65:4 | **stalking** | 103:3 105:15 |
| 98:21 99:2 | 111:5,9 147:18 | 120:17 122:1 | 105:19 116:16 |
| 106:17 108:25 | **speaks** 82:24 | **stance** 141:12 | 125:5 130:2 |
| 110:5 115:10 | 83:23 85:3 | **stand** 24:16 | 133:2 134:19 |
| 115:25 116:20 | **specific** 48:18 | 64:8 | 135:20 136:10 |
| 116:24 120:25 | 48:18 75:5,6 | **standard** 55:4 | 136:13 145:15 |
| 123:18 129:4 | 136:4 142:9 | 108:11,13 | 149:7 |
| 132:15 133:18 | **specifically** | **standpoint** | **statements** |
| 145:23 148:8 | 43:15 44:14 | 28:25 40:12 | 27:9,12 39:17 |
| 158:5 | 45:19 108:12 | **start** 14:5 | 41:1 49:15 |
| **sought** 134:12 | 137:7 | 18:19 23:2 | 97:8 123:8 |
| **sound** 83:24 | **speculative** | 24:5 157:8 | 156:16 |
| 85:20 | 143:25 | **started** 21:1 | **states** 1:1,11 |
| **sounds** 35:23 | **speech** 43:20 | 106:15,23 | 4:18 16:9,16 |
| 36:15 85:21 | **speed** 52:5 | **starting** 14:2 | 22:5 24:7 |
| **south** 4:4 | 103:24 | 38:25 115:23 | 25:20 42:21 |
| **southern** 1:2 | **spend** 146:10 | **starts** 134:8 | 43:18 94:17 |
| | 146:14 | | |

| | | | |
|---|---|---|---|
| stating 48:19 | submit 53:25 | suddenly 137:3 | 56:1 64:4 |
| stay 33:20 | 59:24 64:23 | sue 118:2 | 66:21 69:1 |
| 154:8 | 103:10 112:16 | 134:13 | 84:25 102:18 |
| steadman | 132:14 142:18 | suffer 150:17 | 102:19 106:19 |
| 11:12 | 147:6 | suggested | 106:20 108:9 |
| steffan 7:11 | submits 42:4 | 131:12,14 | 119:14 121:20 |
| stem 141:6 | submitted 21:7 | suggestion | 124:18,20 |
| stepped 87:24 | 42:2 55:7,7,16 | 35:24 | 125:22 128:22 |
| stick 153:10 | 63:22 64:2,5 | suggests 44:16 | 143:16 145:12 |
| stock 136:6,19 | 66:5,9,16 | suite 4:4 5:12 | 155:3 |
| 137:9 | 106:12,22 | 160:22 | surprise |
| stop 55:11 | 107:1,1 117:16 | suleymanov | 136:25 |
| 122:12 144:18 | 118:23 119:1,4 | 11:13 | surprised |
| 144:19 | 119:5 123:1 | sum 125:11,17 | 31:22 47:16 |
| stout 105:2 | 132:16 142:17 | 125:24 126:7 | 147:23 |
| straight 102:18 | 145:14 152:10 | 129:25 | suspect 26:6 |
| street 3:20 4:4 | subordinated | summarize | sustain 20:22 |
| 5:4 | 27:20 33:5,10 | 100:17 102:6,8 | 40:13 95:16 |
| stress 149:25 | 43:25 44:2 | 103:2 120:10 | sustained 91:8 |
| stretto 120:13 | 98:8 | summary | 91:10 92:18 |
| 120:14,17 | subordination | 105:24 | 93:1,3,15 |
| stricken 55:20 | 33:11,16,21,22 | supplement | 94:19 158:25 |
| strictly 18:24 | 43:23 | 136:15,24 | 159:1 |
| 96:20 101:20 | subpoena 36:1 | support 104:5 | swap 77:1,21 |
| strike 91:10 | 158:23 | supports 49:22 | 78:14 |
| strong 22:9 | subsections | suppose 34:4 | swear 56:22 |
| 95:13 | 25:5 | supposed | 102:14,22 |
| strongly | subsequent | 22:10 34:8 | swimming |
| 134:25 | 136:15,24 | 148:12 149:11 | 76:19,20 |
| structure | subsequently | 153:7 | sworn 56:2,3,4 |
| 30:10 49:12 | 33:6 | suppress 143:2 | 56:21 59:3,4,8 |
| studies 130:21 | subset 104:13 | suppressed | 59:15 60:6,12 |
| stupid 150:20 | substance | 144:15 | 62:12,17,18 |
| subject 40:11 | 101:21 | sure 17:2 20:1 | 63:22,25 64:5 |
| 55:20 112:6 | substantial | 20:4 30:5 34:8 | 64:8,21 66:5,9 |
| 114:23 131:12 | 144:16 | 42:9 46:13,15 | 66:13,15,17 |
| 131:14 142:5 | | 47:18 49:21 | 102:16,19 |

sydney   156:8

**t**

t   56:11,15
  137:24 160:1,1
t.j.   3:15 14:10
  17:17 21:2
  145:25 159:2
tab   59:7 73:3
  83:12 88:10,11
  108:25 115:16
  123:24
tabernacle
  88:19
table   135:21,22
taji   11:14
take   25:1 28:22
  29:8,8 36:2
  41:12 53:12
  55:18 60:3
  68:17 71:25
  77:2 79:3
  85:18 87:8
  101:1 112:18
  124:15,18
  135:1,3 149:21
taken   30:20
  97:7 110:11
  115:14 137:12
  150:23
talk   119:8
  122:25 151:14
  156:15
talked   65:13
  65:19 71:3
  72:23 75:8,16
talking   46:16
  52:4 61:9 65:9

128:19
tallied   58:9
targeted
  141:10
taxes   151:17
taylor   12:10
team   33:19
  113:9
tech   38:2
technically
  146:23
techniques
  58:15
tell   24:16 39:25
  80:4 100:25
  132:23 138:2
  153:15,16
telling   22:15
  56:14 89:23
  112:25 134:23
  135:15 153:20
temidayo   6:13
temporary
  81:22
tender   47:8
terms   39:4,10
  39:15,16 42:20
  43:2,6,14,14
  45:25 47:15
  48:4,24 49:6
  49:16,22,25
  102:8 141:8
  151:16
terra   61:5,8,20
  62:14,19 63:20
  65:2 66:19

testified   35:16
  61:20 67:11
  130:3 142:21
  143:21
testify   24:22
  35:20 36:2
  65:8,11 133:10
  142:20
testifying   22:7
  93:14 100:2
  102:2 123:16
  123:22
testimonial
  50:22
testimony
  20:21 21:6,7
  21:11,22,24
  22:2,3,10,17
  24:23 25:7,11
  26:3 34:19,22
  35:3,11,11,18
  36:4 50:17,18
  50:21 53:5,6
  53:10 54:3,19
  54:25 55:6,19
  56:12,23 62:13
  66:13,15,17,17
  68:15 71:18
  78:4 86:19,21
  89:18,19 95:18
  97:8 99:8
  101:17 102:23
  108:10 111:10
  114:10 116:12
  121:13,17
  123:11 125:16
  130:3 143:22

144:10,19
  146:3,6 147:7
  156:25
thank   14:12,15
  14:16,19 15:5
  15:6,11,15,17
  16:5,11,16,17
  16:20 17:5,8
  18:3,11,14,22
  19:15,23 21:2
  23:12,20,22
  24:2,6 27:8
  29:21 30:23
  31:5,11,12
  32:24 33:2,25
  35:13 36:10
  38:8,8 42:6
  47:13 50:22
  51:13,14,15
  52:10 53:3
  55:23 59:11
  60:4 73:6
  89:14 90:11
  94:3,4,20
  95:20 96:22,23
  96:24 97:8,20
  97:22 99:14
  101:2,7,8,10
  102:1,13 103:1
  106:2,5 110:6
  110:20 113:8
  115:25 117:7
  117:11 119:17
  123:24 127:2,7
  127:17 128:10
  132:7 133:7
  134:7 135:5,7

| | | | |
|---|---|---|---|
| 137:14 138:20 | **thing**  21:21 | 120:9 124:1 | **thread**  110:10 |
| 146:16 155:21 | 25:5 31:19 | 127:15 131:17 | 112:16,17 |
| 159:16 | 43:3 44:4,13 | 133:16 134:17 | **threat**  87:18 |
| **thanking**  111:4 | 45:1 89:25 | 134:23,24 | **threatened** |
| 113:18 | 90:1 116:2 | 135:10 136:2 | 87:15 93:25 |
| **thanks**  22:25 | 158:18 | 136:16 142:6 | **threatening** |
| 26:11 95:21 | **things**  94:24 | 142:13 143:6 | 89:22 |
| 98:3,15 110:23 | 95:13 101:21 | 143:14,18 | **threats**  89:16 |
| 159:12 | 120:5 121:10 | 146:5,23 | 89:24 90:4,4 |
| **that's**  118:1 | 134:7 154:16 | 149:25 150:9 | 142:6 |
| 120:19 121:4 | 155:23 | 150:11 152:14 | **three**  40:18 |
| 122:21 125:13 | **think**  20:8 22:3 | 152:19 153:5 | 45:5 104:15 |
| 127:16 129:22 | 22:16,17 26:13 | 155:20 156:17 | 105:1 128:14 |
| 130:4,4,5 | 29:15,22 30:3 | 158:11,12,14 | 130:2,9 134:21 |
| 132:25 133:19 | 30:7,11 35:6 | **thinking**  29:11 | 134:22 136:4 |
| 134:23,23 | 37:13 40:18,20 | 147:20 151:9 | **tide**  76:18,19 |
| 141:14 142:7 | 42:21,22 45:1 | **third**  133:1 | **tighter**  22:14 |
| 143:10 144:21 | 45:23,24,25 | 154:19,22 | **time**  15:18 |
| 150:1 152:22 | 46:10 47:4,10 | **thirdly**  136:22 | 19:6 21:19 |
| 153:20,22 | 52:3 53:17,19 | **thomas**  7:12 | 30:8,8 42:2,4,8 |
| 155:10 157:9 | 53:24 59:21 | 114:18 | 43:21 44:12,25 |
| **therese**  5:7 | 61:10,25 62:23 | **thompson** | 45:1,6 65:13 |
| 18:1 26:16 | 62:23 65:11,16 | 25:21 | 65:14,19 68:21 |
| **there's**  127:15 | 65:17,25 66:18 | **thought**  21:17 | 74:22 75:3,8 |
| 131:6 143:20 | 71:17 77:12,19 | 43:21 58:12 | 75:16 78:11 |
| 143:22 146:21 | 77:20,20 78:16 | 72:17 77:22 | 90:11,15 97:21 |
| 148:15 151:11 | 82:22,25 84:11 | 81:21 99:17 | 99:13 105:17 |
| 151:12 154:14 | 85:16 86:7,22 | 102:11 111:8 | 110:4,23 |
| 159:1 | 88:24 89:21 | 116:3 120:6 | 112:18 114:7 |
| **they'll**  156:21 | 90:5 91:18,25 | 140:15 149:10 | 114:11 122:7 |
| **they're**  149:12 | 93:5 95:4,5,6 | 151:15 152:6 | 122:17 127:7 |
| 150:15 151:18 | 96:18 97:2 | 153:11 154:20 | 128:25 131:17 |
| 152:25 153:13 | 99:10 100:4,7 | 155:14 | 133:15 143:4 |
| 153:23,24,25 | 100:11,20 | **thoughts** | 143:15 145:9 |
| 154:8 155:8,12 | 101:21,22 | 120:10 | 145:23,24 |
| 155:13 | 103:24 113:14 | **thousands** | 146:13 147:19 |
| | 115:23 119:7 | 127:4 | 147:20 148:17 |

149:14 150:11
152:4 156:2
158:1
**timeframe**
62:20,22,23
**times** 30:4
152:23
**timothy** 12:13
**title** 42:22,24
43:8,9 48:16
48:24 49:9,14
49:19
**tj** 57:9 99:9
**toby** 11:5
**today** 14:10
20:4 23:9,10
27:5 30:15
31:10,11,22
32:7,19,22,22
47:4 56:11
67:25 82:6
85:17 91:1
92:3 97:18,20
142:17 143:3
143:12,16
144:3,22,24
145:8,13 159:9
**today's** 53:8
**together** 131:2
**toggle** 105:12
135:15,24
**toggling**
135:12,25
**token** 28:11,15
28:23 44:6
52:11,13,18,20
52:22 57:12,20

58:3,7,23
60:10,16,20,25
62:1,4,13 63:1
63:19 64:24
67:7 68:22
69:5 71:5,21
72:4,6,6,13,15
72:15 73:14,16
74:19,25 75:17
77:2,22 82:18
82:23 83:22
84:9,14,20
85:16 86:7,11
86:24 88:17,19
89:5,6,16 92:3
92:5 93:23,25
96:6,17,18,20
138:24 139:6,8
139:9 140:12
141:7,14,24
143:24 144:1
144:17 150:3,8
150:19
**token's** 57:17
72:9
**tokens** 52:14
74:8,12 75:2
81:24 92:13,24
139:11 149:12
149:13
**told** 63:25 68:2
79:16 82:23
85:2 89:12
107:4,9,11
108:6,14
**tomas** 9:8

**tomorrow**
99:17 145:6
146:3,6,15
147:23 156:8
156:12,14,23
156:25 157:8
157:10 159:10
159:12,13,15
159:16
**tonight** 146:2
**took** 67:25,25
85:4 125:3,10
149:8 150:7
151:4
**top** 59:13
82:11 117:5
134:5
**torpedoed** 30:2
**torres** 29:16
**total** 124:16
125:4 126:21
128:13 129:11
130:5,11
**totaled** 78:25
**touch** 36:19
**toussi** 11:15
**towards** 88:19
89:16 149:6
150:22
**trade** 91:1
**traded** 92:3,5
107:18
**trading** 31:23
31:24 66:19
**train** 110:9
**trained** 58:15

**transaction**
135:9
**transcribed**
2:25
**transcript**
36:21 116:13
116:25 120:12
120:13 128:23
142:18 160:4
**transcripts**
156:21
**transfer** 42:22
43:8,8 48:16
48:24 49:9,19
**transferred**
49:14
**transmission**
55:1
**travel** 36:8
**travis** 9:2
137:21
**treatment**
28:15 46:22
47:1 49:4
**trial** 38:1
156:16
**tried** 21:22
**tries** 141:25
**tristan** 7:13
**trouble** 51:24
**true** 44:11,15
58:23 59:3
62:15 65:6
66:10 73:20,21
74:20,21 78:14
79:6,23,24
87:10 105:21

120:21 123:3
131:21 132:5
150:1 160:4
**truly**  113:10
**truss**  138:9,9
**trustee**  4:19
16:10,16 22:5
24:5,7,13
25:20 94:17
95:4 104:16
140:3,20
**truth**  56:24,24
63:25 68:2
102:24,24,24
**try**  28:25 41:20
49:9 95:10,14
113:13 152:4
**trying**  21:19
38:12 42:13
45:4 52:7
101:19 133:23
150:10
**tuganov**  15:5
**turetsky**  11:16
**turn**  27:22
56:8,13 59:11
74:2 75:20
101:25 102:9
124:6 158:22
**turner**  11:17
**turns**  44:10
**tweet**  82:10,20
84:3,4 87:20
88:4,6,20,22
119:19,21
120:10 121:1,4
121:6,14

**tweeted**  119:24
120:19,20
121:12,25
122:4
**tweets**  67:15
**twice**  68:19
128:3
**twitter**  66:2
70:13 89:8,8
94:10 113:3
119:21 134:2
136:23 146:9
**two**  14:3 18:19
25:5 29:17,20
35:2 36:17
42:10 49:6,13
50:16 61:7,10
63:4 84:1
104:12 113:15
113:22 118:2
121:25 124:15
124:18 125:3
131:6 132:1
133:17 134:21
136:16 153:19
153:23
**tyler**  9:15
**type**  129:25
**types**  130:9

| u |
|---|

**u**  138:7,14
**u.s.**  1:23 4:19
5:2,10 22:5
24:5,13 26:16
26:20 95:3,4
104:16 140:8

**ubierna**  5:24
16:18,19 97:11
97:12,15,16,16
97:22
**ucc**  52:12,12
52:17,20
103:15,16
104:11 108:18
111:24 112:12
114:13,24
116:23,25
117:3 118:4
123:25 134:10
134:18 158:22
**uday**  12:9
**uk**  49:12
**ultimately**
33:11
**umber**  9:6
**unable**  86:23
104:10
**unambiguou...**
42:21 48:23
**unconflicted**
104:14
**under**  25:2
26:1 44:1
48:11 52:16,25
55:15,18 72:24
97:3 98:8
105:8 107:2
108:25 116:12
139:6 140:1
141:25 144:15
**undercut**
136:5,19 137:9

**underlying**
146:8
**understand**
21:4 22:1
23:12 29:14,23
35:20 37:2
40:23 42:2,7
45:9 46:9
47:10 49:24
50:9 81:2
95:12 113:10
116:3 123:20
146:9,11
147:22 150:13
151:12 153:5
158:5
**understanding**
35:17 51:1
74:11,15 139:4
139:24 143:18
147:5 151:21
154:4
**understated**
131:24,25
135:18
**understood**
22:23 36:6,10
40:2 51:8 78:1
87:2 89:18
157:7
**undisclosed**
52:24
**unfair**  44:5,23
47:7 48:4
151:15 152:6
153:22 154:12
154:21

**unfortunate**
95:6
**unfortunately**
87:24 88:1
**unidentified**
147:12,25
**uniswap**  96:13
**united**  1:1,11
4:18 16:9,16
22:4 24:7
25:20 94:17
**unnecessary**
35:8
**unsecured**  4:2
4:10 16:3
51:22
**unspecified**
134:12
**unsworn**  64:3
**update**  142:15
153:13,17
157:8
**updated**  37:17
105:5
**ups**  111:1,4
**upset**  114:5
**upside**  134:14
**uptegrove**  5:16
18:2 26:20
**use**  15:7 16:13
16:25 18:7
19:12 39:4,9
39:11,13,15,16
41:18 44:9,16
44:18,25,25
45:1,25 46:23
47:3,10,15

49:22,25 61:5
61:15,16 62:8
62:8,10 63:2,3
72:10,18,20
78:22 79:18
81:14,19 86:17
86:23,24,25
87:3,7,12
93:19 96:21
107:4,9 133:12
141:2 153:9
**used**  47:8 72:6
96:6 103:9,16
105:23 125:25
130:16 133:22
134:18
**useful**  76:23
77:4,15,18
78:3 79:1
81:14
**users**  73:19,23
**using**  39:10
61:6,11 98:22
140:7
**usually**  28:25
130:8,16
133:11
**utilities**  72:12
76:15,23,24,25
77:1,5,15,18
77:20 78:3,7
78:10,13,14,15
78:16,18 81:23
82:1,3 86:17
87:4,12
**utility**  72:3,6,9
72:15,18 75:17

77:3 78:6,22
79:2 81:14
86:25 143:24
143:24 144:2
**uzzi**  104:21

**v**

**v**  10:23
**vacate**  104:19
**vague**  142:10
**vaguely**  108:6
108:14
**valid**  39:17
**valuation**  44:5
44:7,24 46:17
58:3,6,15,18
58:24 62:25
66:3,9,14,16
66:19,23 69:22
104:5 105:4,6
105:13,18
123:1,2,8
124:12,15,25
125:4 126:15
128:7 130:1
135:8 137:13
139:11 142:24
142:25 144:16
149:24
**valuations**
60:25 104:25
**value**  44:22
45:4 47:3
50:22 57:12,17
58:1,22 59:2,4
60:7,9,16,20
60:22 61:25
62:4,13 63:8

63:11,19 64:24
67:7 68:22
69:21 70:7
71:4,21,22
72:9 86:22
89:21 93:5
105:10 120:1,7
120:21 128:20
128:24 129:18
131:23 135:1,8
135:15,16,17
135:17,23,23
136:5 139:1,2
140:7,9,18,21
140:23,23,25
141:4,6,13,15
141:15,18,20
141:25 142:9
150:10,15
151:9,10
**valued**  46:24
139:9 143:21
**values**  141:3
144:17
**valuing**  44:17
150:6
**variety**  143:22
**vejseli**  11:18
**venable**  15:5
132:12
**verbalizing**
145:15
**veritext**  160:20
**version**  39:16
46:1,2 48:3,5,9
48:12,13,14,16

| | | | |
|---|---|---|---|
| **versus** 105:5 | **w** | **wanted** 22:21 | 100:4,15,19,24 |
| **veton** 11:18 | **w** 11:9 | 25:20 27:16 | 101:2,7,14 |
| **victor** 5:24 | **wafford** | 33:24 36:22 | 106:2,3,7,9 |
| 16:17,19 97:16 | 114:18 | 47:15,17,19 | 108:17,24 |
| **video** 19:1 | **wait** 87:25 | 73:22 77:11 | 109:2,8,15,21 |
| **view** 49:6 | 88:11 127:15 | 78:17 81:8 | 110:7,20,21 |
| 57:16,16 72:15 | 146:15 | 103:2,4 133:20 | 111:16,23,25 |
| 72:20 74:22 | **waiting** 18:18 | 149:25 150:2 | 112:12,23 |
| 76:22 82:6 | 19:8 134:10 | 154:20 157:12 | 114:12 115:15 |
| 86:13 94:24 | 149:17 | 158:19 | 115:19,22,25 |
| 131:10,15 | **waive** 29:23 | **wants** 54:12 | 116:1,22 |
| 132:3 | **walk** 28:4 | 71:21 | 117:11,12 |
| **views** 29:16 | 37:13 | **war** 136:23 | 118:10 133:21 |
| 30:20 | **wallet** 92:12,14 | **warren** 11:20 | 136:9 |
| **vincent** 9:21 | **walsh** 11:19 | **washington** | **week** 20:2 35:2 |
| **violated** | **want** 17:3 | 3:13 5:5 25:17 | 52:3,8 65:7 |
| 158:13 | 23:16,24 25:11 | **wasn't** 123:2 | 74:8 |
| **violates** 141:11 | 26:5 33:14 | 135:18 136:1 | **weekly** 74:12 |
| **violation** 19:2 | 36:25 37:4,22 | 136:12 142:11 | 74:14,14,15 |
| **vocal** 142:5 | 42:11 44:4 | 148:12 | **weeks** 20:1 |
| **voice** 148:13 | 47:12 48:8 | **watch** 101:1 | 35:2 136:16 |
| **voiced** 76:15 | 56:12 62:12 | **water** 88:17 | **weight** 97:2 |
| **volatility** | 64:13 66:12 | **way** 22:24 25:4 | 100:11 101:22 |
| 105:21 | 71:18 74:3 | 45:2 75:1 | **weighted** |
| **vote** 150:4 | 76:10 77:17 | 122:3 129:23 | 135:10,20 |
| 154:1,2,7 | 83:1 89:18 | 135:24 136:12 | **weinberg** |
| **voted** 119:1 | 95:14,17 | 150:2 153:2 | 100:20 117:24 |
| 127:10,20 | 100:14 101:15 | **we've** 24:19,23 | **weinberg's** |
| 133:2,5 139:13 | 101:24 102:3,6 | 33:19 52:2,6 | 117:20 |
| 149:22 150:1 | 102:8,12 126:1 | 100:22 | **welcome** 97:10 |
| **voting** 119:6 | 128:22 133:13 | **weaker** 25:17 | 118:21 |
| 126:12,19 | 139:12 141:2 | **wednesday** | **went** 25:4 |
| 154:1,8 | 142:4 143:17 | 110:13 142:20 | 92:13 |
| **voyager** 29:25 | 148:16 149:1,4 | 157:5 | **weren't** 122:24 |
| 30:11 | 149:4 151:23 | **wee** 21:8 | **we'll** 144:4 |
| **vtor** 7:9 | 152:3 153:19 | **weedman** 4:16 | 156:13 157:7,9 |
| | 154:15,16,21 | 13:11 16:4 | 159:15 |

we're  122:12
  145:20 146:1,3
  147:14,25
  149:18 150:5,5
  154:3,16,17
we've  149:16
  156:5
whale  73:23,25
  74:23 75:3,5,7
whales  74:25
  75:1,2,6
whatsapp
  70:15
whatsoever
  76:16
what's  148:23
white  4:1,9
  16:2 18:21
  51:21 56:18,19
  88:25 89:1,1
  89:24 90:5,6
  103:20 106:3
  109:17 110:23
  112:6 113:7
  117:19,24
wholesale
  100:8
wick  11:21
wildes  11:22
william  5:16
  18:1 26:19
williams  6:13
willing  135:9
winddown
  105:4,7,11,12
  134:24

windham
  137:23 138:3
winner  119:25
wish  26:13
  30:22 90:17
  93:18,19 94:5
  133:8 144:21
  148:24
wished  54:3
wishes  25:7
  53:23 95:22
  141:6
withdraw
  77:24
withdrawal
  77:24 139:17
withdrawn
  78:20 79:21
  139:16
withhold  52:3
witness  34:10
  34:20 58:19
  67:7 70:19,25
  84:7,11,16
  85:24 89:15
  90:13 91:5,9
  91:21 92:20
  93:2,8,17
  95:23 104:14
  108:19,23
  109:6,24
  110:15 111:10
  111:14 112:15
  112:19 114:9
  116:24 117:4,7
  121:4,13,17,20
  122:9,11

123:17,19,20
123:22 125:19
125:22 127:24
128:2 129:22
130:15 132:9
133:10 143:20
144:12,20
145:19 146:2
146:23
witnesses  13:3
  44:7 54:20
  55:2 102:19
  147:2,17
wofford  4:15
  16:4
woman  14:25
  16:1 17:19,23
  50:16,19,22,25
  51:4,6,8,15
wondering
  50:20 71:16
word  79:18
wording  48:5
words  134:14
  143:8
work  25:6 26:2
  26:4 36:14
  105:13 113:8
  113:11,12,20
  119:25 120:7
  120:20 121:25
  152:1,5,8
working  52:2
  145:7
works  148:10
world  139:25

worried  115:6
worry  151:2
worth  142:22
worthless  82:7
  82:17,23 83:22
  84:10,12,15,20
  84:23 85:1,4
  85:16 86:7,11
  86:14 87:4
  91:3 143:23
write  64:23
  65:12 76:15,18
  80:19
writing  65:25
  70:10
written  48:23
  49:8 53:10
  55:7 147:7
  148:16,22
  149:3
wrong  21:20
  115:23 153:14
wrote  62:16
  74:6,24,25
  77:6,15 78:19
  78:21,23 82:16
  84:18,23 88:6
  116:4 148:14
  152:20

x
x  1:4,10 13:1
y
yara  8:25
yeah  15:3
  17:23 18:14
  36:15 37:24

39:1,13 40:9
46:18 48:1
50:10 54:16
56:8 58:9
85:22 94:19
97:14 100:23
134:4 145:5
147:14
**year** 106:16,23
113:13 155:6
**years** 48:4
**yep** 17:21
**yesterday**
99:21 115:14
116:12
**yolo** 113:14
**yoon** 11:23
**york** 1:2,13
4:13,22 34:5
36:8
**young** 11:24
**you'd** 146:2
**you'll** 143:14
**you're** 123:5
123:11,18,21
124:20 126:6
128:19,24
129:17,19
131:19 132:3
133:23 145:10
146:13 147:20
**you've** 122:7
153:17

**z**

**z** 138:7
**zabib** 12:16

**zachary** 11:22
12:16
**zaharis** 11:25
**zero** 89:9,21
144:2
**zoom** 14:13,18
15:6 16:12,21
16:25 18:1,5,8
21:21 22:8
26:14 51:18
53:16 54:22
98:17 110:24
111:5 119:19
137:17,22,25
138:3,5,7,10

## Exhibit F

**October 17, 2023 Transcript (Case in Chief in Opposition to Plan)**

*Includes (i) arguments of David Schneider and (ii) the testimony of Hussein Faraj (Nugenesis).*

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-mg

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY   10004

15

16                    October 17, 2023

17                    9:03 AM

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  KAREN

1    HEARING re HYBRID CONFIRMATION HEARING

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtor

 5        601 Lexington Avenue

 6        New York, NY 10022

 7

 8   BY:  GRACE BRIER

 9        T.J. MCCARRICK

10        CHRIS KOENIG

11

12   VENABLE LLP

13        Attorneys for

14        151 West 42nd Street

15        New York, NY 10036

16

17   BY:  JEFFREY S. SABIN

18

19   WHITE CASE LLP

20        Attorneys for the Official Committee of Unsecured

21        Creditors

22        555 South Flower Street, Suite 2700

23        Los Angeles, CA 90071

24

25   BY:  AARON COLODNY
```

Page 4

1   WHITE CASE LLP

2        Attorneys for the Official Committee of Unsecured

3        Creditors

4        1221 Avenue of the Americas

5        New York, NY 10020

6

7   BY:  KEITH WOFFORD

8        JOSHUA WEEDMAN

9

10  UNITED STATES DEPARTMENT OF JUSTICE

11       Attorneys for the U.S. Trustee

12       Alexander Hamilton Custom House

13       One Bowling Green, Room 534

14       New York, NY 10004

15

16  BY:  MARK BRUH

17       SHARA CORNELL

18

19  SECURITIES AND EXCHANGE COMMISSION

20  Attorneys for the U.S. Securities and Exchange Commission

21  950 East Paces Ferry Road NE, Suite 900

22  Atlanta, GA 30326

23

24  BY:  ALAN MAZA

25

**Page 5**

1   DIMITRY KIRSANOV, Pro Se

2

3   DAVID SCHNEIDER, Pro Se

4

5   ARTUR ABREU, Pro Se

6

7   OTTO DAVIS, Pro Se

8

9   DANIEL FRISHBERG, Pro Se

10

11  CAM CREWS, Pro Se

12

13  SHARON DOW, Pro Se

14

15  ERIC MENDELSON, Pro Se

16

17  JASON LEE, Pro Se

18

19  DAVID DALHART, Pro Se

20

21  ALSO PRESENT TELEPHONICALLY:

22  CHARLES ABONCE

23  DAVID J. ADLER

24  TEMIDAYO AGANGA-WILLIAMS

25  ANDREA AMULIC

Page 6

1   JASMINE ARMAND

2   CHRIS BECIN

3   ANDREW BEHLMANN

4   DEREK BLOCHWITZ

5   KYLE BRAY

6   PAUL BREUDER

7   NURALDEEN BRIFKANI

8   JUDSON BROWN

9   KITRA CAHANA

10  ROBERT CAMPAGNA

11  RICKIE CHANG

12  ROBERT CHRISTIANSEN

13  PAOLO CIAMARONE

14  CHRISTINA CIANCARELLI

15  CHRISTOPHER J. COCO

16  KEVIN COFSKY

17  LAFAYETTE COOK

18  CARL J. COTE

19  VTOR CUNHA

20  JOSEPH D'ANTONIO

21  STEFFAN DAVIED

22  THOMAS DIFIORE

23  TRISTAN DIAZ

24  SIMON DIXON

25  SHARON DOE

1   SCOTT DUFFY

2   JOHN PETER DZARAN

3   BEN EADES

4   JANELL ECKHARDT

5   KENNETH EHRLER

6   PAUL L. FABSIK

7   DAVID AVERY FAHEY

8   CHRIS FERRARO

9   FLORENCE FLANNIGAN

10  MAX GALKA

11  JASLEIGH GEARY

12  DARIOUS GHEORGHE

13  BRADLEY GIARDIELLO

14  MICHAEL GONZALEZ

15  MICHAEL GRAUBERT

16  ANTHONY GREENE

17  KATHRYN GUNDERSEN

18  CAROLYN GURLAND

19  CAMERON GUTHRIE

20  MIRA HAQQANI

21  SAMUEL P. HERSHEY

22  ROBERTO HERNANDEZ

23  IMMANUEL HERRMANN

24  KAITLYN A. HITTELMAN

25  LUCAS HOLCOMB

Page 8

1   ROBERTO JACOBS

2   JANKO JANKOVIC

3   MICHAEL JAOUDE

4   HARSH JIVANI

5   MIKE JOHNSON

6   ELIZABETH H. JONES

7   GREG KACZKOWSKI

8   DAVID KAHN

9   DAN KAPLAN

10  YARA KASS-GERGI

11  RAVI KAZA

12  TRAVIS KEENEY

13  PHILLIP KHEZRI

14  LEA KLORANE

15  CHRIS KOENIG

16  UMBER KOHLI

17  MARIBEL L. KORDOMENOS

18  TOMAS KOSTER

19  RIKI KOULY

20  KATHRYN KUETHMAN

21  JOYCE A. KUHNS

22  CARLO KUHRT

23  ROSS M. KWASTENIET

24  CHRISPTOHER LACKEY

25  TYLER NATHANIEL LAYNE

1 | JOE LEHRFELD

2 | BRIAN S. LENNON

3 | MARK LEONARD

4 | NICOLE A. LEONARD

5 | ESTHER LEVINE

6 | PIETRO VINCENT LICARI

7 | JOSE LOPEZ

8 | DAVID LOS ARCOS CARCAMO

9 | SERBAN LUPU

10 | KEVIN M. MANUS

11 | ANDY MARKS

12 | CHASE MARSH

13 | BRIAN S. MASUMOTO

14 | CAROL MAUNDER

15 | GEORGIA MEADOW

16 | MOHSIN (MO) MEGHJI

17 | BRIAN MENDIETA

18 | LAYLA MILLIGA

19 | KEITH NOYES

20 | CAITLIN O'CONNELL

21 | DONALD L. POYNTER

22 | CHRISTOPHER PAGNANELLI

23 | JEFF PATTON

24 | BRETT A. PERRY

25 | GREGORY F. PESCE

1   KHAI PHAM

2   MORGAN PHOENIX

3   KAROLINA PIASEK

4   HANS POLZMACHER

5   MACIEJ PRCZEK

6   CRAIG RASILE

7   ANNEMARIE V. REILLY

8   MARK ROBINSON

9   JONATHAN RODRIGUEZ

10   MIKE SARKISSIAN

11   JAVIER SCHIFFRIN

12   NOAH M. SCHOTTENSTEIN

13   SAM SCHREIBER

14   TOBY SEGAR

15   DAVID SENES

16   SAMI SAIKH

17   LAUREN NICOLE SICKLES

18   MATTHEW W. SILVERMAN

19   HANNA SIMSON

20   LUKE SPANGLER

21   COURTNEY BURKS STEADMAN

22   CHINGIZ SULEYMANOV

23   KEYAN TAJI

24   ELLE TOUSSI

25   DAVID TURETSKY

1   ELVIN TURNER

2   VETON VEJSELI

3   PATRICIA WALSH

4   CAROLINE WARREN

5   KATIE WICK

6   ZACHARY WILDES

7   ANDREW YOON

8   BRIAN YOUNG

9   KAILA ZAHARIS

10   JARNO BERG

11   JOEL BLOCK

12   DAKEN COLEMAN

13   ROBERT M. KAUFMANN

14   RAKESH PATEL

15   MIA COOPER

16   DREW DUFFY

17   SCOTT FLAHERTY

18   UDAY GORREPATI

19   TAYLOR HARRISON

20   DIETRICH KNAUTH

21   ALEX MCCAMMON

22   TIMOTHY REILLY

23   RYAN SCHRAMM

24   PETER J. SPROFERA

25   ZACHARY ZABIB

1              I N D E X

2

3    WITNESSES:            DIRECT:   CROSS:   REDIRECT: RECROSS:

4    HUSSEIN FARAJ

5    By Mr. McCarrick              36

6    By Mr. Kirsanov               91

7    By Mr. Davis                  96

8    By Mr. Abreu                  105

9    By Mr. Frishberg              110

10   By Mr. Crews                  114

11   By Mr. Mendelson              120

12   By Mr. Lu                     123

13   By Mr. Dalhart                122

14   EXHIBITS:                              PAGE:

15   Schneider 3 and 4                      23

16   Schneider 5B                           27

17   Schneider 6                            28

18   Schneider 7 and 8                      28

19   Schneider 9 and 10                     29

20   Schneider 26B                          32

21   Schneider 28A, B, and C                33

22   Celsius 113                            47

23   Celsius 114                            88

24   Celsius 119                            88

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  You may be seated.  Good morning,

4    everyone.  All right.  Anything to report over night?  Any

5    new developments?

6              MS. BRIER:  Yes, Your Honor.

7              THE COURT:  Ms. Brier.

8              MS. BRIER:  Good morning.  Grace Brier, Kirkland &

9    Ellis, on behalf of Debtor.  A couple of housekeeping items,

10   Your Honor.

11             THE COURT:  Sure.

12             MS. BRIER:  We filed an exhibit list last night at

13   5 p.m. with documents we intend to use on cross examination

14   today.  I have a copy of that for the Court.

15             THE COURT:  Could you?  Because I didn't --

16             MS. BRIER:  -- the U.S. Trustee.

17             THE COURT:  -- have a chance to look at it this

18   morning, so.

19             MR. KIRSANOV:  I would note that those exhibits

20   were filed after 5 p.m. and (indiscernible) exhibits to be

21   submitted as well.

22             THE COURT:  Who is that speaking?

23             MR. KIRSANOV:  I'm sorry, Your Honor.  That's

24   Dimitry Kirsanov, pro se creditor.

25             MS. BRIER:  Your Honor, my understanding is they

1    were filed at 5:01.

2              THE COURT:  I still couldn't hear.  Who is that --

3              MR. KIRSANOV:  I'm sorry, that's me, Dimitry

4    Kirsanov, pro se.

5              THE COURT:  Okay.  Objection is overruled.  Go

6    ahead, Ms. Brier.

7              MS. BRIER:  Next on the list, Your Honor, is the

8    Blonstein deposition.  We have that scheduled tentatively

9    for noon today.

10             THE COURT:  Okay.

11             MS. BRIER:  Mr. Bronge has asked that if Court is

12   still continuing at that time that we start later.

13             THE COURT:  We'll recess by then.

14             MS. BRIER:  Excellent.  That is the current start

15   time.  There's a court reporter and everything set up.  We

16   would propose that once we have a transcript, Debtors would

17   file that on the docket on Mr. Bronge's behalf and then

18   follow up after we file that with our objections to the

19   admissibility of testimony that is inadmissible based on our

20   objections.

21             THE COURT:  All right, just give me a second.  So

22   he'll be deposed by -- and you know, you're going to examine

23   him and if there's any redirect, they'll do it as well.  And

24   then the testimony is just going to be submitted to the

25   Court?  Is that --

Page 15

1          MS. BRIER:  That's our proposal, Your Honor, that

2     we'd submit the transcript as his testimony on Mr. Bronge's

3     behalf, and then we'd also submit our own objections to --

4          THE COURT:  Sure

5          MS. BRIER:  -- that testimony as to what should

6     and should not be admissible.

7          THE COURT:  That's fine.  We'll do it that way.

8     So I'm not going to schedule another -- essentially, I

9     contemplate that we're going to conclude taking evidence in

10    the courtroom today, subject to completing the deposition,

11    the Faraj deposition, and that will be submitted with any

12    objections.

13         MS. BRIER:  Yes, Your Honor.  And once it -- one

14    other proposal is when we do set closing arguments, perhaps

15    if there are any outstanding evidentiary questions as to

16    those objections, we could open the record briefly and

17    resolve those, if any.

18         THE COURT:  I'm going to rule -- I'm going to rule

19    on the objections, okay.

20         MS. BRIER:  Excellent.  Even better.

21         THE COURT:  We're not going to hear any argument

22    about the objections.  I -- as I do in trial, I rule

23    promptly.

24         MS. BRIER:  Perfect.  That sounds fantastic.

25         THE COURT:  Okay.  That's -- that'll be how we do

Page 16

1    it.  When we concluded yesterday, I agreed to have Mr.

2    Schneider testify first, if he wishes to or appear first.

3    And Mr. Schneider, do you wish to be heard?

4              MR. SCHNEIDER:  Yes, I do, Your Honor.

5              THE COURT:  All right, please go ahead.

6              MR. SCHNEIDER:  Okay.  I guess what I'm going to

7    start with is just presenting my exhibits one by one for the

8    Court here.  The first exhibit I'd like to submit or present

9    is the Terms of Service, Version 8 and Schneider's Exhibit

10   22, 23 --

11             THE COURT:  It's already in evidence as Celsius

12   Exhibit 84.

13             MS. BRIER:  So, Your Honor --

14             THE COURT:  Wait a second.  No, it's not.  Hold

15   on.

16             MS. BRIER:  This is a filing that Mr. Schneider

17   made.  It was a day late, so we did not submit objections to

18   it.

19             THE COURT:  Okay.

20             MS. BRIER:  That said, we have a filing ready and

21   we are happy to go through them and say our objections as to

22   each --

23             THE COURT:  Just --

24             MS. BRIER:  -- as he walks through them.

25             THE COURT:  Just -- you can orally.

Page 17

1                    MS. BRIER:  Exactly.  We're happy to do that and

2       I'm prepared to do that.

3                    THE COURT:  There's a Terms of Service in here?

4                    MS. BRIER:  So he does have the terms of service

5       in here.  I don't think it's his Exhibit 1.  I think it's

6       later in the filing.  Exhibit 1 is --

7                    MR. SCHNEIDER:  I --

8                    MS. BRIER:  -- "The Wealth of Nations" by Adam

9       Smith.

10                    THE COURT:  Yeah.

11                    MR. SCHNEIDER:  Yeah.

12                    MS. BRIER:  And we'd object to that as hearsay.

13                    THE COURT:  Objection to "The Wealth of Nations"

14      Exhibit 1 is sustained.  Go ahead, Mr. Schneider.

15                    MR. SCHNEIDER:  Okay, so this is my Exhibit 22 and

16      Exhibit 23A and 23B.  And essentially, this is Version 8 of

17      the Terms of Service.  And I'm just going to read the

18      highlight that I highlighted on there.

19                    THE COURT:  Just hold on.  I want to make sure I

20      have them before we go there.

21                    MR. SCHNEIDER:  Okay.

22                    THE COURT:  Did you include this in the exhibits

23      that you submitted, Mr. Schneider?

24                    MR. SCHNEIDER:  Yes, I did.  Yes.

25                    MS. BRIER:  So Your Honor, I think what he

Page 18

1    submitted is this document.  And so it's excerpts of things

2    rather than sort of a list of what he proposed to admit.  So

3    for example, we're looking -- I think you just raised 22 --

4              MR. SCHNEIDER:  Yes.

5              MS. BRIER:  -- 23A and 23B.  They're just excerpts

6    of the Terms of Service with highlights.

7              THE COURT:  What --

8              MS. BRIER:  Our position is that those are -- the

9    Terms of Service in entirety are already in evidence and

10   that's more appropriate than excerpts.

11             THE COURT:  They are, but just point to me where

12   in --

13             MS. BRIER:  Sure.  I'm Page 22 of the filing.  And

14   I think he's referencing --

15             MR. SCHNEIDER:  That document number --

16             THE COURT:  Mr. Schneider, stop for a second.

17             MR. SCHNEIDER:  (indiscernible).

18             THE COURT:  Mr. Schneider, stop.

19             MR. SCHNEIDER:  Okay.

20             THE COURT:  Go ahead, Ms. Brier.

21             MR. SCHNEIDER:  Yes, sir.

22             MS. BRIER:  So, as I understand Mr. Schneider's

23   filing, he excerpted certain documents throughout and I

24   think that's his exhibit list.  So he's talking about

25   Exhibits 22, 23A and 23B which are on Pages 22 and 23 of

1    Docket 3780.

2                THE COURT:  And those are all part of the terms of

3    service Version 7?

4                MS. BRIER:  Yes, Your Honor.  They're all Docket

5    No. 393 which is Celsius Exhibit 38 already in evidence, so

6    our position is that's in evidence.  We have no objection,

7    of course, to that and this would just be duplicative to

8    what's already in evidence.

9                THE COURT:  All right.  So Schneider Exhibits 22,

10   23A, and 23B are from what's already in evidence as Celsius

11   Exhibit 38, so it's in evidence.  I'll permit you,

12   certainly, to refer the excerpt, but the entire document is

13   in evidence.  Go ahead, Mr. Schneider.

14               MR. SCHNEIDER:  Okay.  So the excerpt, I'd like to

15   verbalize is for Exhibit 22, it states that "You may

16   terminate any loan to Celsius at any time and request that

17   Celsius return the borrowed eligible digital assets."

18               THE COURT:  Okay, I see it.

19               MR. SCHNEIDER:  And then further -- okay, and then

20   on Exhibit 23A, Section 11 under withdrawals, it says "You

21   have a call option on all loans made to Celsius to demand

22   immediate complete or partial repayment of any loan at any

23   time."

24               THE COURT:  Okay, I see it.

25               MR. SCHNEIDER:  Okay.  And then the third exhibit,

1   23B, it says, "For the avoidance of doubt, repayment shall

2   be in kind, i.e., in the same type of eligible digital asset

3   loaned by you."

4                THE COURT:  Okay.  I see it.

5                MR. SCHNEIDER:  So -- okay, so here's my

6   commentary on this.  Cryptocurrency is a property that

7   creditors deposited with Celsius and receiving back that

8   property is what creditors expected, agreed to, and it is

9   what Celsius is contractually obligated to return to

10  creditors upon demand. Schneider demands that his crypto

11  property be returned to him.

12               THE COURT:  You agree --

13               MR. SCHNEIDER:  I would --

14               THE COURT:  Mr. Schneider, you agree, you don't

15  get the same Bitcoin back.  You get --

16               MR. SCHNEIDER:  Yes.

17               THE COURT:  -- an equivalent amount of Bitcoin or

18  whatever the --

19               MR. SCHNEIDER:  Correct.

20               THE COURT:  -- currency is.  You don't -- it's not

21  like you're -- if you deposited Bitcoin, it's not earmarked.

22  It's not kept for safe keeping.  You have a contract right

23  to get back the same amount of Bitcoin or ether or whatever

24  you deposited.  Correct?

25               MR. SCHNEIDER:  Correct, yes.  I -- that is my

Page 21

1    understanding.  Yes, sir.

2              THE COURT:  Okay.

3              MR. SCHNEIDER:  And --

4              THE COURT:  Go ahead.

5              MR. SCHNEIDER:  Schneider demands that its crypto

6    property be returned to him in like kind, not necessarily in

7    the actual one.  Okay.  As this Court has -- as this Court

8    had contractually determined according to the terms of

9    service that the crypto that Schneider deposited is property

10   of the Debtors' estate, even so, should this Court also

11   contractually determine according to the terms of Service

12   that the debt value owed to Schneider should, in fact, be

13   returned to him in the same form if possible, in the same

14   form that he deposited with the Debtor.

15             THE COURT:  If there hadn't been a bankruptcy,

16   that might have been true.

17             MR. SCHNEIDER:  Correct.  I understand that, sir.

18   And -- but partial returns or whatever the Debtor is

19   obligated to return back to myself, is essentially what's at

20   issue here.  And indeed -- so, if possible.  And indeed, it

21   is possible because Debtor is withholding $450 million in

22   cryptocurrency to feed Newco, which effectively reduces the

23   value of crypto creditors would otherwise receive.

24             And my position is for this Court to act

25   otherwise, without just cause and due process in the face of

Page 22

1    Debtors' contractual obligations to creditors would affect

2    the unlawful and unconstitutional taking of property.

3            THE COURT:  Bankruptcy has a way of doing that.

4    Your rights as a creditor are determined along with the

5    rights of all other creditors.  So you may think you have a

6    right, absolute right to get back exactly what you put in,

7    but that's not how the bankruptcy system works.

8            MR. SCHNEIDER:  Right.  I think -- that's not

9    exactly what I'm thinking.  I understand that (audio glitch)

10   as the total amount back, I realize I won't receive the

11   total amount back, and that's not what I'm arguing here.

12   Basically, I'm arguing the recovery (indiscernible) that I

13   am due to receive back should be returned to me in crypto

14   according to the contract that Celsius is obligated to

15   uphold.

16           THE COURT:  All right.  Are there any other

17   exhibits that you wish to offer?

18           MR. SCHNEIDER:  Yes, there is, sir.

19           THE COURT:  What are they?

20           MR. SCHNEIDER:  Okay.  My next one is Exhibit 3

21   and Exhibit 4 concerning the liquidation analysis.  They're

22   two charts, a (indiscernible) and a chart.

23           MS. BRIER:  Your Honor, we have no objection to

24   these.  They're straight out of the disclosure statement.

25           THE COURT:  All right.  Schneider Exhibits 3 and 4

Page 23

```
 1    in evidence.

 2              (Schneider Exhibit 3 and 4 entered into evidence)

 3              MS. BRIER:  And I guess with the caveat that they

 4    are as they purport to be and are straight out of the

 5    disclosure statement, I think there's some commentary under

 6    it that we object to, but --

 7              THE COURT:  The commentary -- when you say

 8    commentary under it, I see on Page 6 of 41, that looks like

 9    it's -- you're not objecting to the footnotes.  They're

10    actually part of the chart.

11              MS. BRIER:  Exactly; 6 of 41, no objection.

12    That's in my understanding straight from the disclosure

13    statement.

14              THE COURT:  Your issue is the bottom of --

15              MS. BRIER:  Exhibit 3.

16              THE COURT:  -- Exhibit 3.

17              MS. BRIER:  Has some bullets.

18              THE COURT:  Okay.  That's argument.

19              MS. BRIER:  Exactly.  Thank you.

20              THE COURT:  Go ahead, Mr. Schneider.

21              MR. SCHNEIDER:  Okay.  So in the Debtors'

22    liquidation analysis, as recovery for creditor's claim, the

23    Debtor has calculated certain recovery percent for

24    creditors.  In Exhibit 4, you can see basically at the

25    bottom of the waterfall it shows Newco plan at 67 percent
```

Page 24

1    recovery percent, orderly winddown is at 61.2, and

2    liquidation midpoint is 47.4 percent.

3            And I'd just like to point out with a strong

4    emphasis that the total recovery percent values in Exhibit 3

5    are, in fact, the same recovery percent values in Exhibit 4.

6    What the difference is, is that Exhibit 3 has broken down

7    that recovery, that the -- that the Debtor says, I realize

8    it's an estimate based on whatever -- depending on the

9    market.  And so basically -- and so while Exhibit 3 shows

10   the same recovery percent value as Exhibit 4, Exhibit 3

11   shows Debtor is apportioning some of that recovery value to

12   creditors in the form of common stock or equity.

13           So, while the total -- totalities of (audio

14   glitch) presented in Exhibit 3 are the same as in Exhibit 4,

15   Debtor is attempting without Schneider's consent to offering

16   value in a form different than what Debtors' obligation

17   demands.  And Debtors' obligation, again, as I'm speaking

18   of, is the Terms of Service which requires them to return --

19           THE COURT:  Mr. Schneider, once there's a

20   bankruptcy, what you get back is what's in an approved plan,

21   not what you put in originally.  That's just how bankruptcy

22   works.  It depends on the plan --

23           MR. SCHNEIDER:  Okay.

24           THE COURT:  -- being confirmed, but you just don't

25   get back what you put in when there's been a bankruptcy and

1    they don't have it to give it back to you.  All similarly

2    situated creditors have to be treated the same.

3              MR. SCHNEIDER:  Okay.  All right.

4              THE COURT:  Go on with your next exhibit.

5              MR. SCHNEIDER:  Okay.  My next exhibit is Exhibits

6    1 and 2.

7              MS. BRIER:  Exhibits 1 and 2 are "The Wealth of

8    Nations" by Adam Smith.

9              THE COURT:  I already sustained --

10             MS. BRIER:  -- by James Madison --

11             THE COURT:  Sustained.  Objection sustained.

12             MS. BRIER:  Thank you.

13             THE COURT:  Go on with your exhibits.

14             MR. SCHNEIDER:  Okay.  First, I'd just like to

15   read the highlights on both of these new exhibits.

16             THE COURT:  I just sustained the objection.

17   They're not coming into evidence.  We're not going to hear

18   about "The Wealth of Nations."

19             MR. SCHNEIDER:  Okay, I'm sorry.  I was thinking

20   sustained meant --

21             THE COURT:  I read it when I was in college, but

22   not since, but --

23             MR. SCHNEIDER:  Okay.  Well, I'll just read the

24   comments, my commentary then.

25             THE COURT:  Move on --

```
 1               MR. SCHNEIDER:  (indiscernible).

 2               THE COURT:  -- your exhibits, Mr. Schneider.

 3               MR. SCHNEIDER:  So, all right.

 4               THE COURT:  What's your Exhibit 5A.

 5               MR. SCHNEIDER:  My Exhibit 5 A is concerning the

 6   way to distribute -- distribution election and it's -- ,

 7   well, basically --

 8               THE COURT:  Where does 5A come from, 5A and 5B?

 9               MR. SCHNEIDER:  Okay, 5A came from (indiscernible)

10   which somebody post -- did this picture and everything like

11   that.

12               MS. BRIER:  We'd object on foundation grounds --

13               MR. SCHNEIDER:  And I just copied and pasted it.

14               THE COURT:  Objection sustained.  What about 5B?

15               MS. BRIER:  We have no objection to 5B.

16               MR. SCHNEIDER:  5B --

17               MS. BRIER:  It's already in evidence.

18               THE COURT:  All right, 5B is in evidence.  5C.

19               (Schneider Exhibit 5B entered into evidence)

20               MR. SCHNEIDER:  Okay, 5C is a workup of the

21   numbers from 5B.

22               THE COURT:  Ms. Brier?

23               MS. BRIER:  So it's hard for me to know what this

24   is.  I object to foundation.  If it's something we have in

25   evidence, maybe we wouldn't object, but I don't know what it
```

```
 1    is.

 2              THE COURT:  What is it, Mr. Schneider?  Did you

 3    create it?

 4              MR. SCHNEIDER:  5C --

 5              THE COURT:  Yes, 5C.

 6              MR. SCHNEIDER:  5C, the total of the dollar amount

 7    that people toggled to either equity or crypto.  And

 8    basically it's totaled out here and then it comes to

 9    basically a 6.1 ratio of dollars that accepted -- elected to

10    toggle to crypto as opposed to toggling to equity.

11              THE COURT:  Did you create this chart or did it

12    come from somewhere in the evidence already?

13              MR. SCHNEIDER:  I created it.

14              THE COURT:  Objection sustained.

15              MS. BRIER:  Thank you, Your Honor.

16              THE COURT:  Exhibit 6.

17              MS. BRIER:  Exhibit 6 is -- it appears to be a

18    section from Mr. Compagna's declaration which is already in

19    evidence.  So to the extent it's already in evidence, we

20    have no objection.

21              THE COURT:  Does that come from Mr. Compagna's

22    declaration, Mr. Schneider?

23              MR. SCHNEIDER:  Document 3332, I believe, Exhibit

24    7 is Compagna's.

25              THE COURT:  All right, it's in evidence.
```

1               (Schneider Exhibit 6 entered into evidence)

2               MR. SCHNEIDER: I'm not sure.

3               THE COURT:  Okay, it's in evidence.  What about

4    your Exhibit 7?

5               MR. SCHNEIDER:  Excuse me?  I'm sorry?

6               THE COURT:  What is your Exhibit 7?

7               MR. SCHNEIDER:  Exhibit 7.  I believe that's what

8    we were talking about, wasn't it?

9               THE COURT:  I was still back on six.  What is

10   Exhibit 7?

11              MR. SCHNEIDER:  Okay.  Exhibit 7 is Document No.

12   3332, which actually that is disclosure statement.

13              THE COURT:  All right.  And I take it that your

14   Exhibit 8 is also from the disclosure statement?

15              MR. SCHNEIDER:  Yes, sir.

16              THE COURT:  Okay, they're in evidence.

17              (Schneider Exhibits 7 and 8 entered into evidence)

18              MR. SCHNEIDER:  And Exhibit 9 is also from the

19   disclosure statement --

20              THE COURT:  Nine --

21              MR. SCHNEIDER:  -- and Exhibit 10.

22              THE COURT:  Any disagreement, Ms. Brier?

23              MS. BRIER:  No.  I think we've already judicially

24   --

25              THE COURT:  Seven, eight, nine, and ten are in

1      evidence.  Okay.  What about Exhibit 11?

2             (Schneider Exhibits 9 and 10 entered into

3      evidence)

4             MR. SCHNEIDER:  Okay, I --

5             MS. BRIER:  Your Honor, we'd object to Exhibits

6      11, 12, and 13 ad hearsay.  They appear to be websites, but

7      it's hard for me to tell where they're coming from.  So I'd

8      also object on foundation.

9             THE COURT:  Well, let me ask, Mr. Schneider, where

10     do 11, 12, and 13 come from?

11            MR. SCHNEIDER:  Okay, let me find where that's at

12     here.  Kind of out of order in what I had anticipated.  So

13     as far as exhibit -- like, I can't put any commentary on it

14     then.  Is that correct, Your Honor?

15            THE COURT:  I'm asking where 11, 12, and 13 come

16     from.

17            MR. SCHNEIDER:  Okay, 11, 12, and 13.  Eleven come

18     -- okay, 11 comes from UK.  I don't have the link on there.

19     It comes from the UK authority government, UK.gov, which

20     shows Celsius Network Limited information that they're

21     required to file.

22            MS. BRIER:  Your Honor, I don't know the

23     foundation for this.  I -- to the extent that --

24            THE COURT:  There's no foundation.

25            MS. BRIER:  -- already in evidence --

1          THE COURT:  Eleven, twelve, thirteen, objection

2    sustained.  If they're in evidence already -- there's no

3    foundation for it.  What about 14?

4          MR. SCHNEIDER:  Twelve, thirteen --

5          THE COURT:  What about 14, 15, 16, 17, 18?

6          MS. BRIER:  Our position on all of those up to 19,

7    which is already in evidence, is that they are more

8    appropriately judicially noticed.  They're orders from this

9    Court or filings from parties.

10          THE COURT:  Well, the whole filing, if you want

11    the Court to take traditional notice of it, I need to know

12    what documents those are.  I'm not going to just let this

13    in, these excerpts.

14          MR. SCHNEIDER:  Okay, so Exhibit 14 is the order

15    approving solicitation and voting procedure statement.  It's

16    your order approving solicitation and voting procedures,

17    approving the form the notices.  It's Document No. 3337.

18          THE COURT:  Give me the number again, 33 what?

19          MR. SCHNEIDER:  3337.

20          THE COURT:  All right.  The Court will take

21    judicial notice of it.

22          MS. BRIER:  I would also point out that it appears

23    the way Mr. Schneider put this together is he included in

24    brackets underneath some of the excerpted titles of the

25    docket number he's --

1                    THE COURT:  Okay.  All right.

2                    MS. BRIER:  -- referring to.

3                    THE COURT:  So, with respect to 14, 15, 16, 17,

4     18, 19, 20, 21, those are from Court pleadings and the Court

5     will take judicial notice of each of them.  All right, 22.

6                    MS. BRIER:  Your Honor, I believe we addressed 22,

7     23A, and 23B --

8                    THE COURT:  We did.  We did.

9                    MS. BRIER:  -- at the outset with Mr. Schneider.

10                   THE COURT:  We already did that.  Okay.  What's

11    24?

12                   MS. BRIER:  Twenty-four, I think, is similarly

13    situated to the ones we just talked about.  It looks like a

14    docket filed, Docket 2054.

15                   MR. SCHNEIDER:  Yes.

16                   THE COURT:  All right.  The Court will take

17    judicial notice of them.  What about 25A?  That's different.

18                   MS. BRIER:  25A, would object on hearsay and

19    foundation grounds.

20                   THE COURT:  Sustained.  25B.  Did we take -- did I

21    take judicial notice of this yesterday?

22                   MS. BRIER:  So Your Honor, some of these I think

23    are either in evidence or have been discussed.  It's hard

24    for me to tell based on some of the excerpts which are and

25    are not in evidence, but to the extent the Court wants to

Page 32

1    take judicial notice or these facts about some of these

2    items are certainly already in evidence.  So there's no

3    objection to the fact that, for example, Mr. Mashinsky was

4    subject of a complaint or --

5              THE COURT:  I'll take judicial notice of the

6    sealed indictment of Alex Mashinsky and Roni Cohen-Pavon.

7              MS. BRIER:  But a lot of that I think has already

8    been --

9              THE COURT:  Right.

10             MS. BRIER:  -- introduced in other forms.  26A

11   looks like an article, so we'd object to foundation and

12   hearsay on that.

13             THE COURT:  Objection sustained.

14             MS. BRIER:  And same with 27A --

15             THE COURT:  What about 26B?

16             MS. BRIER:  Oh, sorry.  26B.  Similarly, I think

17   this fact is already in evidence.  I don't know if this

18   exact document is, but no objection to the fact that Mr.

19   Pavon pleaded guilty.  I think, some of those documents are

20   in evidence.  I just don't know if this one is.

21             THE COURT:  Okay.  It's going to be admitted.

22   27A.

23             (Schneider Exhibit 26B entered into evidence)

24             MS. BRIER:  Object to foundation and hearsay here.

25             THE COURT:  Sustained.

Page 33

1          MS. BRIER:  Same with --

2          THE COURT:  27B?

3          MS. BRIER:  -- 27B.  27C is a tweet from Simon

4    Dixon.  Object to hearsay on that.

5          THE COURT:  Objections to 27A, B, and C are all

6    sustained.

7          MS. BRIER:  We're almost done.  28A, B, C are all

8    excerpts from the disclosure statement, so no objection to

9    those.

10         THE COURT:  Okay, 28A, B, and C.  All right,

11   they're admitted in evidence.  29A, B.

12         (Schneider Exhibits 28A, B, and C entered into

13   evidence)

14         MS. BRIER:  29A and 29B are -- appear to be a

15   Celsius Network tweet and then a number of replies and we

16   don't object to the admission of the Celsius Network tweet

17   as it's an admission as it relates to Mr. Schneider, but we

18   do object to the replies which are all hearsay.

19         THE COURT:  Which are the replies?

20         MS. BRIER:  So I think everything after the first

21   tweet is a reply from someone other than Celsius.  So

22   there's a reply from @Celsius Newco, (indiscernible).

23   There's a number of responses to the Celsius tweet from

24   others on the internet, and we'd object to those as hearsay.

25         THE COURT:  Right.  Sustained.  Objection

1    sustained.  None of those are coming in.

2           MS. BRIER:  I think that's it.  I believe that

3    gets us through all of them.

4           THE COURT:  I think that's all of them.  All

5    right.  So we've taken care of your exhibit.  Is anything

6    you want to add, Mr. Schneider?

7           MR. SCHNEIDER:  Well, there's one other thing I'd

8    like to ask of you is to take judicial notice of my

9    objection to plan confirmation, docket number --

10          THE COURT:  It's --

11          MR. SCHNEIDER:  -- 35 --

12          THE COURT:  I have -- you know, Mr. Schneider, you

13   don't even have to raise that.  I'm considering all of all

14   of the objections to confirmation, including that.

15          MR. SCHNEIDER:  Okay.

16          THE COURT:  -- just to be clear.

17          MR. SCHNEIDER:  All right.  Thank you.

18          MS. BRIER:  And just for purposes of the record,

19   our understanding is that he did not submit a declaration or

20   testimony here today, just his argument and --

21          THE COURT:  Correct, and the exhibits.

22          MS. BRIER:  Thank you, Your Honor.

23          THE COURT:  Anything else you want to add, Mr.

24   Schneider, before we finish?

25          MR. SCHNEIDER:  No, just -- no.

Page 35

```
 1            THE COURT:  Okay.  And since he hasn't submitted a

 2     declaration, there's no cross examination.

 3            MS. BRIER:  No cross.

 4            THE COURT:  Okay.  All right.  Let's begin with

 5     Mr. Faraj.  That's next, right?

 6            Yeah, let's just -- why don't you tell me what

 7     we've got here.

 8            MR. McCARRICK:  T.J. McCarrick, Kirkland & Ellis,

 9     on behalf of the Debtors.  We have, I believe, the cross

10     examination of Mr. Faraj.  I believe Your Honor said

11     yesterday that you would consider his expert report as the

12     testimony that he is offering here, subject to cross

13     examination.  I have two binders I'm happy to hand up to the

14     Court and then proceed, unless you don't want any more

15     binders.

16            THE COURT:  I do, I do.  Absolutely.  All right,

17     Mr. Faraj, you're going to be sworn in.  If you would raise

18     your right hand.

19            CLERK:  -- solemnly swear or affirm all the

20     testimony you're about to give (indiscernible) is the truth

21     and the whole truth?

22            THE WITNESS:  I do.

23            THE COURT:  All right, thank you, Mr. Faraj.

24            MR. McCARRICK:  May I proceed?

25            THE COURT:  Where are you located, Mr. Faraj?
```

Page 36

1              THE WITNESS:  I'm in Australia, Your Honor.

2              THE COURT:  Oh.  What time is it there?

3              THE WITNESS:  It's 12:30 and I've been watching

4    yesterday, so yesterday, so I've been up for about 37 to 40

5    hours straight.

6              THE COURT:  Not a good idea.  All right.  Mr.

7    McCarrick, go ahead.

8              MR. McCARRICK:  All right.

9                   CROSS EXAMINATION OF HUSSEIN FARAJ

10   BY MR. McCARRICK:

11   Q    Mr. Faraj, you've never testified as an expert before,

12   correct?

13   A    No, I haven't.

14   Q    You've never prepared a fair value analysis of any

15   digital asset, correct?

16   A    No, I haven't.

17   Q    You've never prepared a fair value analysis of any

18   financial instrument, true?

19   A    That's true.

20   Q    You've never prepared a true value analysis of any

21   digital asset, correct?

22   A    For R&D -- sorry.  For R&D yes.  For Courts, no.

23   Q    Okay, and let's just distinguish that.  When you say

24   research and development, what you're talking about is

25   training your proprietary AI model, correct?

Page 37

1   A    Correct.

2   Q    You've never performed a true value analysis for any

3   external third party for a cryptocurrency asset, true?

4   A    No, just for ourselves.  It's true.

5   Q    And when you're training your AI model, that's not

6   something you've opened up to the world, right?  Your AI

7   model hasn't been studied or peer tested by anyone outside

8   of your company, true?

9   A    It hasn't been studied or tested, but it was opened up

10  to the world to actually utilize it, use it, and make sure

11  it works.

12  Q    Okay.  You've never prepared a formal analysis of the

13  intrinsic value of a digital asset before, have you?

14  A    Not (indiscernible).  The only thing I do is or R&D

15  (indiscernible).

16  Q    Okay, so for the rest of my questions about whether or

17  not you prepared an analysis, I'm going to be excluding your

18  internal research and development efforts.  I'm just asking

19  whether it's for third parties or for a Court.  Is that

20  fair?

21  A    That's fair.

22  Q    Okay.  So you've never prepared a formal analysis of

23  the intrinsic value of any financial instrument, true?

24  A    True.

25  Q    You've never prepared a speculative value analysis of a

22-10964-mg   Doc 3881   Filed 10/23/23   Entered 10/23/23 21:49:20   Main Document
Pg 1152 of 1289

1   digital asset, true?

2   A     True.

3   Q     You've never prepared a comps analysis of any digital

4   asset, true?

5   A     That's true.

6   Q     In fact, this is the very first case in which you're

7   offering an opinion to any external audience about the value

8   of a digital asset, fair?

9   A     For Court purposes, yes.

10  Q     Or what other purposes?

11  A     I do assessments valuation for clients that come in who

12  want to deploy a cryptocurrency or deploy a project, so I've

13  got to give them advice on all the tokenomics.  I have to go

14  very deep into economics and assessments on digital asset.

15  Q     Okay, and when you give them that assessment, are you

16  giving them a value?

17  A     I'm giving a proposition on how to obtain the value

18  depending on the tokenomics, and how the tokenomics function

19  inside the crypto space to actually derive a proposed value

20  when they go to the market and a proposed growth value when

21  they're on the market.

22  Q     So I just want --

23          THE COURT:  I just want to ask you, just speak a

24  little more slowly.  I understood you so far, but it would

25  help if you just spoke a little more slowly, okay?

Page 39

```
 1              THE WITNESS:  I will.  I'll slow down.

 2              THE COURT:  All right, go ahead.

 3              MR. McCARRICK:  -- Your Honor.

 4    BY MR. McCARRICK:

 5    Q    Mr. Faraj, I just want to make clear, have you ever

 6    prepared a valuation analysis for any third party?

 7    A    No.  Except property, sorry, just because your question

 8    is very broad.  So when it comes to feasibility and

 9    assessments by some property infrastructure, I've done a lot

10    of them.  When it comes to digital assets, no, not for a

11    third party.

12    Q    Okay, so setting aside property or real estate, you've

13    never performed a valuation analysis of a digital asset for

14    a third party, true?

15    A    Not a third party.  That's true.

16    Q    All right.  This is the first -- withdraw.  The first

17    person you've ever asked to adopt a valuation analysis that

18    you've performed of a digital asset as the judge in this

19    case, correct?

20    A    It is, an official, for Court purpose, yes.

21    Q    The first time you've ever formally addressed in a

22    public setting -- withdrawn.  The first person you've ever

23    formally addressed in a public setting to provide evaluation

24    of the digital asset is the judge in this case, correct?

25    A    Correct.
```

1    Q     You don't have a degree in finance, do you, sir?

2    A     I don't have a degree in finance.

3    Q     You don't have a degree in business, correct?

4    A     I don't have a degree in business.  I have diplomas and

5    I have extensive experience in multifacets of business.

6    I've done over 7 to 10 billion dollars of contracts

7    globally, but I don't have a degree (indiscernible).

8    Q     You don't have a degree in economics, correct?

9    A     I don't have a degree in economics, but I actually give

10   assistance and aid to countries and governments who require

11   assistance in regards to digital assets and likewise, and I

12   actually, again, I've got function on the ground.  I don't

13   have a qualification.

14   Q     Okay.  You don't have any degrees in valuation or

15   valuation efforts, true?

16   A     It's very true.  I've got extensive experience, like I

17   said, non-digital, that's for third parties.  For digital,

18   just because you haven't said digital space, I don't have

19   any degree for it.

20   Q     You're not a certified financial modeling and valuation

21   analysis -- analyst, are you?

22   A     Are we talking about digital space or are we talking

23   about external?  Because experience -- depends what you're

24   after.  Experience or qualification?

25   Q     Well, I asked if you're certified.  That's

Page 41

1    qualification, correct?

2    A    Well, certification doesn't only mean qualification

3    because if you work in an industry --

4              THE COURT:  -- speak a little more slowly.

5              THE WITNESS:  Sorry, Your Honor, I'll slow down.

6              THE COURT:  Okay?

7              THE WITNESS:  I'll go more slow.

8    BY MR. McCARRICK:

9    A    When you say certification, I mean, you can be

10   certified by your peers.  It's not -- a certification is a

11   piece of paper.  But I'll take it that you're talking about

12   university qualifications, and the answer is no.

13   Certification by peers, I've got plenty.

14   Q    Let's break it down.  First, you don't have a formal

15   certification, a la a degree from a professional

16   institution, correct?

17   A    Correct.

18   Q    Okay, and when you say you can be certified by your

19   peers, what's that look like?

20   A    So that's extensive experience that I've been in the

21   industry, especially in business and economics.  I've gotten

22   plenty of contracts.  I've negotiated a lot of large scale

23   projects.  I'm a strategic partner to over 168 global

24   companies, and some Fortune 500 companies.  I get (audio

25   glitch) negotiate deals extensively.  So again, if you want

Page 42

1    experience I have it.  If you want a piece of paper, I don't

2    have it.

3    Q    Okay.  All that experience that you just talked about,

4    none of it involved providing a valuation analysis to any of

5    those companies, individuals, or peers, true?

6    A    Not for digital assets.

7    Q    Correct, not for digital assets, right?

8    A    Correct.

9    Q    Okay.  You don't have professional accreditations as

10   evaluation professional, true?

11   A    Very true.

12   Q    You haven't taken a single course in valuing financial

13   instruments, including digital assets, true?

14   A    Now I've created the tools that we currently use

15   through research and development, but you're saying

16   (indiscernible), so you're correct.

17   Q    You've never worked at a valuation firm?

18   A    No, I haven't.

19   Q    And you've never worked at an investment bank, correct?

20   A    Correct.

21   Q    You've never worked as an investment banker, true?

22   A    True.

23   Q    Well, for ten years, you told the world that you were

24   an investment banker, didn't you?

25   A    That's true.

1            MR. McCARRICK:  All right.  So Mr. Lopez, can we

2    display Celsius Exhibit 115, which is your LinkedIn profile

3    as of 72 hours ago.  Can we have sharing privileges --

4            THE COURT:  Deanna, can you allow --

5            MR. McCARRICK:  --for Mr. Lopez?

6            THE COURT:  -- Mr. Lopez to share, please?

7            CLERK:  All right, he's a cohost.

8            THE COURT:  Thank you very much, Deanna.

9            MR. McCARRICK:  Thanks.  And Mr. Lopez, it's

10   Celsius Exhibit 115, which is Mr. Faraj's LinkedIn profile

11   as of 72 hours ago.  Can we go to Page 2 of the PDF?

12   BY MR. McCARRICK:

13   Q    This is the document we reviewed during your

14   deposition, isn't it, Mr. Faraj?

15   A    Yes, it is.

16   Q    And can we look at Page 4 of the PDF, specifically the

17   Advantage Group Australasia entry?  You held yourself out

18   here as an investment banker at Advantage Group Australasia,

19   correct?

20   A    I did.

21   Q    And that was false, wasn't it?

22   A    No, not at the time.  I actually thought we were

23   investment bankers.  Like, if I put it down on a piece of

24   paper, look, I know a lot more now than I knew when I was

25   actually doing this job.  So in this space, especially when

Page 44

1    you're doing international finance and international

2    governance, one of the things that most people call

3    themselves is investment bankers.  Now, you're asking, do I

4    think it's true now; no, because I know a lot better.  I

5    know much more now, so I would not agree that it's a true

6    proposition.  I would call myself an investment specialist

7    instead of an investment banker.  But at the time that this

8    thing was done, it was true in terms of what I thought it

9    was.

10   Q    So let me understand this.  Is it your testimony that

11   you considered yourself an investment banker because you

12   were a -- you brokered financial arrangements between

13   different government entities?

14   A    I considered myself an investment banker because I

15   didn't understand what that role actually was, and I thought

16   my role was an investment banker.  But now I know a lot

17   better and that's why when you gave me advice and I saw it -

18   - I really haven't seen that for a long time -- I actually

19   went and changed it, just as he told me to.

20   Q    Well, if you didn't know what an investment banker was,

21   why would you tell the world that's what you were?

22   A    Because that's what we perceived we were.  So in the

23   role that I was on, especially when I started, I mean, I was

24   very young when I started Advantage Group.

25   Q    Well, how did you perceive that you were an investment

Page 45

1  banker, if you didn't know -- let me finish the question.

2  How do you perceive that you were an investment banker if

3  you didn't know exactly what it meant to be an investment

4  banker?

5  A    Because the way it was explained to us when we were

6  very young and going in this industry --

7         THE COURT:  Mr. McCarrick --

8         THE WITNESS:  Is that our role --

9  BY MR. McCARRICK:

10  Q    Okay, and just to be clear, you changed your LinkedIn

11  profile in the past 24 hours, correct?

12  A    Yes, exactly like you told me I should.  I actually

13  agree with you.  I agree with you that it should not be an

14  investment banker and I went and changed it straightaway.

15         MR. McCARRICK:  Okay.  You can take that down, Mr.

16  Lopez.

17  BY MR. McCARRICK:

18  Q    I want to talk about your expert report.  You didn't

19  write each and every word of this report, correct?

20  A    No, I didn't.

21  Q    You used artificial intelligence to draft the report,

22  correct?

23  A    Correct.  I compiled it with artificial intelligence

24  and I basically, like I explained to you in the deposition,

25  I guided the artificial intelligence.  I gave the data.  I

1    gave it the boundaries.  I gave my evaluation reports and I

2    said to learn from my evaluation reports.  I then compiled

3    all the data utilizing artificial intelligence.

4    Q    Okay.  Mr. Faraj, isn't it true that it took you longer

5    to read the report than it took you to write it?

6    A    Very true.

7    Q    You generated this 300-plus page report in 72 hours,

8    correct?

9    A    Actually, the 300 pages -- more than 300 pages, but you

10   got about 140, 150 pages.  That was the writing side.  I

11   mean, you've got 1.5 spacing, reduce the 1.5 spacing to 1.

12   You've probably got about 90 to 100 pages and I did it

13   probably in about, yeah, three days.  About nine hours to

14   ten hours in compilation.

15   Q    Okay.  Well, leaving the font and the pages out of it,

16   it took you -- whatever's in this report -- 72 hours to

17   generate, right?

18   A    Correct, correct.  It's not all of it, 72 hours because

19   a lot of the data from page one hundred and whatever it was

20   onwards, we already had.

21              MR. McCARRICK:  All right.  Mr. Lopez, can we look

22   at Celsius Exhibit 113, which is a forensically collected

23   copy of a tweet that Mr. Faraj posted at 3:27 p.m. on

24   October 9th, 2023.  If we go to Page 2 of the PDF.  And can

25   we blow up the top?

1    BY MR. McCARRICK:

2    Q    Mr. Faraj, this is a tweet that you issued on

3    October  9th, 2023, correct?

4    A    Correct.

5    Q    And we talked about this during the deposition, right?

6    A    We did.

7              MR. McCARRICK:  Your Honor, at this time, we'd

8    move Celsius Exhibit 113 into evidence.

9              THE COURT:  Hearing no objection, it's in

10   evidence.

11             (Celsius Exhibit 113 entered into evidence)

12   BY MR. McCARRICK:

13   Q    All right, Mr. Faraj.  You write here, "I haven't had

14   much time to follow the issues with CEL."  Do you see that?

15   A    Correct.

16   Q    And that's true.  Two days before you filed your expert

17   report in this case, you hadn't had much time to follow the

18   issues with CEL, right?

19   A    That's 100 percent correct.  That's after we finished

20   doing our investigation on CEL.  So from the time we

21   finished investigating CEL post FTX collapse and the FTX

22   issue from past that, we haven't had much time.  We've been

23   restoring our network.

24   Q    All right.  And you also wrote, "We completed the

25   entire assessment within 72 hours.  In reality, this is

Page 48

1    usually a six- to eight-week job."  You see that?

2    A    That's correct.

3    Q    So you did a 1,000-plus hour job in 72 in this case.

4    Is that your testimony?

5    A    That's 100 percent correct.  That's my testimony.

6    Q    And you acknowledge, Mr. Faraj, that 72 hours is

7    nowhere near enough time to generate a comprehensive report,

8    true?

9    A    I acknowledge for someone else, it's not near enough,

10   but (indiscernible) to me, I can actually do it.  Without

11   artificial intelligence, without -- let me finish the

12   answer, (indiscernible).  If I wasn't utilizing artificial

13   intelligence to compile the information, compile the

14   information, then yes, it's impossible.  But with these days

15   with artificial intelligence and the utilization of

16   artificial intelligence, it's doable.  I mean you got it in

17   front of you and you've done the tests on the metadata.  So

18   the metadata has actually told you that it was nine hours.

19            THE COURT:  What AI platform do you use in

20   preparing your report.

21            THE WITNESS:  Your Honor, we used two.  So in the

22   early days, we had NAVIS which is NuGenesis Artificial

23   Validation Intelligence System.  It's an AI that was trained

24   by --

25            THE COURT:  You're going to have to go -- you're

1    going to have to speak more slowly.

2              THE WITNESS:  Sorry.  I'm going to slow down.

3    I'll sit down.  Okay.  So we had, the early information

4    which you see is in the boxes.  They were compiled a long

5    time ago.  We were investigating CEL for a different matter.

6    So when we were investigating CEL and FTX, we actually

7    compiled a lot of information about CEL.  Now, that data was

8    compiled and used through one of the systems that we

9    developed, which is NuGenesis Artificial Validation

10   Intelligence System.

11             It's the same system that caught Sam Bankman

12   (audio glitch) scam.  All right, it was the system that was

13   able to tell that Sam had created fake and synthetic coins

14   on the market.  That AI system is the same system we taught

15   how to predict the market.  So in terms of the report, about

16   200 or 150 pages, whatever it is, that information was

17   already compiled.  So that information we already had access

18   to.  Now with the news, the further access I was using Open

19   AI.

20             So utilizing the Open AI platform, I actually took

21   all the information that I had.  I taught the Open AI, and

22   you'll see, I've got a, I've got the whole data dump on how

23   we used it.  So everything that the AI was assessing was the

24   stuff I taught it.  I gave it to --

25             THE COURT:  I only asked you which platform you

1    used.  Go ahead, Mr. McCarrick.

2              THE WITNESS:  Sorry, Your Honor.  Open AI.  Open

3    AI.  ChatGPT-4.  Open AI.

4    BY MR. McCARRICK:

5    Q    Mr. Faraj, just to clear up the record, it's your

6    testimony you used two different AI tools in preparing

7    different part of this report, correct?

8    A    That's correct.

9    Q    Right?  There's the Exhibit 2 attached to your report,

10   which is a close to 200-page chart, summarizing public

11   articles, correct?

12   A    That's correct.

13   Q    And that's what you used NAVIS NuGenesis' own internal

14   platform to generate, correct?

15   A    That's correct.

16   Q    And the report itself that you generated for this case,

17   you used Open AI to do that, correct?

18   A    I didn't generate the report.  What I did is I compiled

19   the report.  There's a very big difference between the two

20   words.  But yes, that's correct.  I compiled the report

21   using ChatGPT.

22   Q    Okay.  Well, whatever you used, you agree with me, Mr.

23   Faraj, that 72 hours is nowhere near enough time to generate

24   a comprehensive report, right?

25   A    Okay, we completed the entire assessment, the

Page 51

1    assessment with the full valuation assessment --

2              THE COURT:  Mr. Faraj.  Mr. Faraj --

3              THE WITNESS:  Sorry, Your Honor.

4              THE COURT:  Listen to the question and just answer

5    the question.  Ask your question again.

6    BY MR. McCARRICK:

7    Q    Mr. Faraj, if it was going to be comprehensive, 72

8    hours was not enough to generate this report, true?

9    A    Correct.

10   Q    It's your testimony that you only spent eight to ten

11   hours editing this 372-page document, correct?

12   A    Five or take.  I don't want to lie to you and give you

13   the wrong answer.

14   Q    Okay.  Do you have any reason to disagree with me,

15   that's over half a page every minute?

16   A    I have no reason to disagree with you.

17   Q    Do you agree with me, sir, that there are errors in

18   your report, true?

19   A    I agree.  I agree and -- yeah.

20   Q    And in your view, it would be impossible to prepare a

21   report in 72 hours without introducing errors, correct?

22   A    That's true.

23              MR. McCARRICK:  Mr. Lopez, can we pull up Celsius

24   Exhibit 80, which is Docket No. 3752.  That's Mr. Davis'

25   request to submit Mr. Faraj's expert report and report

Page 52

1    attached to it.  It should be Tab 80 in your binder, Your

2    Honor.

3              THE COURT:  Okay.

4              MR. McCARRICK:  And I want to look at Page 32 of

5    the PDF.  And let's -- you see the section there titled

6    Introduction to Tokenomics and Crypto Evaluation.

7              THE COURT:  Just tell me, are you using numbers at

8    the bottom of the page or the top of the page?

9              MR. McCARRICK:  Oh, I'm sorry, Your Honor.  So I'm

10   using the PDF page, but if you want the --

11             THE COURT:  You -- that's okay.

12             MR. McCARRICK:  I can get it for you.

13             THE COURT:  PDF page is the number at the bottom,

14   right?

15             MAN:  -- no number at the bottom.

16             THE COURT:  Well, my copy has numbers at the

17   bottom.

18             MR. McCARRICK:  There's, yeah, numbers at the

19   bottom and numbers at the top, but if you just give me one

20   second, I can get it for you, Your Honor.

21             MR. WEEDMAN:  Page 24 on the bottom.

22             THE COURT:  Thank you.

23             MR. McCARRICK:  Thank you, Mr. Weedman.

24             THE COURT:  Go ahead.

25   BY MR. McCARRICK:

1    Q    All right.  This says, "Introduction to Tokenomics and

2    Crypto Valuation."  See that?

3    A    I do.

4    Q    And the first paragraph starts, "In the burgeoning

5    world of cryptocurrencies."  Do you see that?

6    A    I do.

7    Q    and the next paragraph repeats that first paragraph,

8    all 92 words, word for word, correct?

9    A    Correct.

10   Q    You didn't catch that error during the review, did you?

11   A    No, I didn't.

12   Q    And your testimony is that we shouldn't worry about

13   that because you didn't make any major mistakes on the

14   actual fair value analysis, correct?

15   A    No, that's what I think.  It's a copy and paste issue

16   and I take it out of the format of the AI and I pasted it

17   here.  So I go over every single thing and as you can see in

18   the -- I don't know if you've got to see the transcript of

19   the AI, but if you go through the AI information, you'll see

20   I actually review on that and copy and paste it.  So when

21   it's come here, it's just a double copy and paste by

22   accident.

23   Q    Okay.  When you were reviewing your final report, you

24   didn't catch this, did you?

25   A    I didn't.  I didn't catch it.

1    Q    All right.  It's true, sir, that you also make errors

2    in your fair value analysis as well?

3    A    You've got to open up and show it to me because I don't

4    know if it's the fair value assessment or if it's one of the

5    other paragraphs.

6    Q    Okay.  Do you agree with me that your fair value

7    assessment includes the trading data you selected for the

8    analysis, right?

9    A    Correct.

10   Q    And selecting the trading window that is most

11   representative for purposes of the fair value analysis is

12   part of your fair value analysis, right?

13   A    No, it's part of the document which says we're going to

14   do the fair value assessment on.  It's not the fair value

15   assessment.

16   Q    Well, let me understand this.  Is it your testimony

17   that determining what trading window is most representative

18   is not part of your fair value analysis?

19   A    No. What I'm saying is, it's introduction to the

20   analysis.  So it's the part where we introduce what we're

21   going to do in the analysis.  It's not the actual analysis.

22   But yes, there is a mistake there.  I acknowledge it.

23   Q    Well, it's actually what you use to select the trading

24   dates that you analyzed, right?

25   A    No.  I actually used the dates I selected.  It's what I

1    actually wrote down by accident when I was doing the report.

2    Q    Okay.  Is it your testimony that you wrote it down by

3    accident or that the artificial intelligence wrote it down

4    by accident?

5    A    I composed through the AI.  So if you got the AI and

6    you look at AI data, you'd see that I would have given it

7    the wrong data for that period.

8    Q    Okay.  Do you agree that in conducting your fair value

9    analysis, it was essential to consider sales trading

10   history, correct?

11   A    I do.

12   Q    And selection of trading days is instrumental to

13   provide insights into an asset's true value?

14   A    It's true.

15   Q    And to make sure those insights are accurate, you have

16   to neutralize the impact of deliberate price manipulation,

17   correct?

18   A    I do.

19   Q    And it was paramount in your analysis to hone in on the

20   most stable market conditions around CEL trading, correct?

21   A    Correct.

22           MR. McCARRICK:  All right.  Mr. Lopez, can we put

23   up Exhibit 80 again, and I want to go to Page 95 of the PDF.

24           THE COURT:  Are we looking at the numbers at the

25   top or the bottom?

Page 56

1              MR. McCARRICK:  So the answer, Your Honor, is, I -
2      - it's going to be page on the bottom.

3              THE COURT:  Okay.

4              MR. McCARRICK:  It should be page --

5              THE COURT:  I don't care which you use.  Just try
6      and be consistent.

7              MR. McCARRICK:  Yep.

8              MAN:  Eighty-seven.

9              MR. McCARRICK:  Yeah, 87 to 88, Your Honor.
10     That's what we're going to be looking at.

11             THE COURT:  At the top or bottom?

12             MR. McCARRICK:  We're going to be looking at --
13     give me one second.

14             THE COURT:  There's page something of 378 at the
15     top and there's something of 172 at the bottom.

16             MR. McCARRICK:  Yes.  The slip sheet with the
17     exhibit number is what's taking it off by one, so it should
18     be -- give me one second.

19             THE COURT:  Isn't there -- the Court ledger's at
20     the top and it says -- it has the ECF docket number and a
21     page of 378.

22             MR. McCARRICK:  Correct, but Your Honor, if you
23     look at Page 1, there won't be that header because it's --

24             THE COURT:  Okay, but there is here, so just tell
25     me which page to go look at.

Page 57

1          MR. McCARRICK:  Understood, Your Honor.  Give me

2    one second.  Let's do it this way.  Here's what we're going

3    to do, Your Honor.

4          THE COURT:  What's the complication?

5          MR. McCARRICK:  It's just slippage by a number, is

6    what the complication is.

7          THE COURT:  Okay.  All right.  I'm there.  It's

8    Page 94 of 378.

9          MR. McCARRICK:  Thank you, Your Honor.

10         THE COURT:  That's where I am.

11         MAN:  Thank you, Your Honor.

12         MR. McCARRICK:  Thank you, Your Honor.  Take --

13   let's just take this down.  Oh, I'm sorry, it's going to be

14   Page 95 of 378 --

15         THE COURT:  Okay.

16         MR. McCARRICK:  -- what we're looking at and we're

17   looking at the second paragraph.

18         THE COURT:  Got it.

19   BY MR. McCARRICK:

20   Q    And do you see where it says, "The values from June 9th

21   to June 12th might be the most representative of CEL's share

22   value in the least manipulated market conditions."

23   A    You mean to me?  Do you want me to answer?  Sorry.

24   Q    Yes.  Do you see the last sentence --

25   A    Yes, I do, I do.  I do.

Page 58

1   Q    And June 9th to 12th, you didn't use all of the trading

2   data from those dates in performing your price analysis,

3   correct?

4   A    No.  It should've -- no.  It should've been May the

5   21st to June the 9th, but that's a mistake.

6   Q    And you didn't use --

7   A    -- is correct.  Sorry.

8   Q    So you didn't use June the 10th to June the 12th,

9   correct?

10  A    No, I didn't.

11  Q    So when you say that June 9th to June 12th might be the

12  most representative sample of CEL's fair value in the least

13  manipulated market conditions, that's incorrect?

14  A    It's incorrect.  Correct.

15  Q    Okay.  Let me ask you this.  Since we pointed out these

16  errors to you during your deposition, have you gone back to

17  check for other errors?

18  A    No, I haven't.

19  Q    All right.  Sitting her today, you have no idea what

20  other errors there might be in your report, correct?

21  A    Well, I doubt there'll be.  You would have put them up

22  already and told me.  And they're not -- I don't need to

23  rely on them on my assessment.  So once we get the

24  assessment and you understand the assessment methodology,

25  most of the data that was published in (indiscernible)

1   between the petition and the pause date is not relied on.

2   But go ahead, sorry.

3   Q    Okay.  Mr. Faraj, around 1 p.m. yesterday, you publicly

4   posted a number of materials on DropBox, correct?

5   A    Correct.

6   Q    That included an artificial intelligence extraction

7   report?

8   A    Correct.

9   Q    That document reflects what you did with your

10  artificial intelligence software to generate the report in

11  this case, correct?

12  A    Yes, it is.

13             MR. McCARRICK:  All right, Mr. Lopez, can we bring

14  up Celsius Exhibit 120?  And this document is not internally

15  paginated, so --

16             THE COURT:  Okay.

17             MR. McCARRICK:  We're going to try with the PDFs.

18  If you can go to the first page.

19  BY MR. McCARRICK:

20  Q    That -- this is the artificial extraction report we

21  were just discussing, correct?

22  A    That's 100 percent correct.

23             MR. McCARRICK:  Your Honor, we'd like to move

24  Celsius Exhibit 120 into evidence.

25             THE COURT:  Hearing no objection, it's in

Page 60

1    evidence.

2    BY MR. McCARRICK:

3    Q    And Mr. Faraj, what you're doing here is providing

4    instructions to the artificial intelligence software that

5    you used, right?

6    A    Correct.

7    Q    You provide certain data or information at times,

8    correct?

9    A    Correct.

10   Q    Fair to say you can go line by line to understand where

11   or how the artificial intelligence sourced all of the

12   statements that it makes about tokenomics, right?

13   A    I did.  When they say to line to line, let me explain.

14   So it used my tokenomics report.  If you go to the first

15   page of this, I actually fed it my design and my report on

16   how we do tokenomics, and I asked it to analyze it and learn

17   my reports, so it can actually learn my style.  And then I

18   asked it to -- basically if you go to the first page, you'll

19   see.

20   Q    Okay.  We'll get to the first page in a second, but I

21   want to start by, you also use the artificial intelligence

22   software to respond to some of the Debtors' discovery

23   requests in this case, correct?

24   A    I used -- yes, correct.  I use AI to reply to a lot of

25   emails.  I'm very bad at grammar.  So I put my language and

1   I always ask it to reply to my things.

2          MR. McCARRICK:  All right.  Mr. Lopez, can we go

3   to PDF Pages 382 and 383?

4   BY MR. McCARRICK:

5   Q    And it says, "We need to reply to the following."  Do

6   you see that, Mr. Faraj, on the left?

7   A    Yeah.

8   Q    And then it lists all of the requests that I had

9   emailed you.  Is that right?

10  A    Yep.  That's correct.  I fed it the email that you gave

11  me and I asked it to write a reply.

12  Q    And one of the things we asked to produce were

13  documents and communications including direct messages, text

14  messages, and email communications between yourself and any

15  person including but not limited to Otis Davis, correct?

16  A    Correct, in regard to the Chapter 11 proceedings.

17  Q    Okay.  You're aware that Mr. Davis testified yesterday

18  that there were written communications, right?

19  A    (indiscernible) he said it.  He said, I'm not too sure.

20  I didn't hear it.

21  Q    Okay.  In fairness --

22  A    If you tell me he did, he did.

23  Q    You didn't turn over to the Debtors, any of your direct

24  messages or WhatsApps with Mr. Davis, did you?

25  A    No, I didn't.

1   Q   And you didn't post those to the internet yesterday

2   when you posted all this other material, did you?

3   A   You asked me for things related to Chapter 11.  If

4   there's something that's unrelated to Chapter 11 I did

5   (indiscernible).

6   Q   Is it your testimony that what you were talking about

7   with Mr. Davis is not relevant to these proceedings?

8   A   Sitting here right now, the phone call discussions we

9   had may -- discussed, but I don't think there's anything in

10   relevance to the Chapter 11.  Asking -- him asking me to do

11   an expert over -- well, I offered an expert report, but if

12   that's a communication that you think is part of the Chapter

13   11, I don't take that as being part of the Chapter 11.

14   Q   Okay.  Well, fair to say and -- well, withdraw.  I'm

15   not asking you about your oral communications.  I want to

16   talk about your written communications.  Did you or did you

17   not have written communications with Mr. Davis about these

18   Chapter 11 proceedings?

19   A   I've got to go over it.  I've got to check all my

20   messages.

21   Q   So --

22   A   I can't remember between (indiscernible) message.  I've

23   got a lot of things that I do.  I just don't want to lie to

24   you.  I don't want to give the wrong answer.

25   Q   Okay.  Fair to say you had a server issue on your side

Page 63

1    that initially prevented you from responding to this

2    request, right?

3    A    That's true.

4    Q    And we had emailed you back again saying that we

5    reserve the right to move to exclude your testimony in the

6    event that you didn't sit for a deposition, engage in

7    discovery, correct?

8    A    That's correct.

9    Q    And you used AI to generate a response to that email

10   too, correct?

11   A    Correct.

12   Q    All right.  Can we look at Page 389 to 390 of this PDF?

13   The HU is you, correct, Mr. Faraj?

14   A    That's correct, a hundred percent.

15   Q    And you copied and pasted my email to you there,

16   correct?

17   A    Hundred percent.

18   Q    And then you see where you write, "Please reply to this

19   email in a smartass way."

20   A    Yeah, a hundred percent.  I told it to reply in a

21   smartass way, and then I realized the server issues was ours

22   and you weren't just sending me emails in a row without

23   reading my emails.

24   Q    Okay, but your initial reaction was to reply to me in a

25   smartass way, correct?

Page 64

1   A    Yes, by AI.  So in AI, when you say smartass way by AI,

2   it's not like a human being, being a smartass.  Right?  It's

3   just a funny way it replies basically saying come on, you

4   just sent me the first email.  I've already replied to you.

5   Come on, you're already sending me more emails?  So that's

6   what it refers to.

7   Q    Okay, so it's your testimony there's a difference

8   between what smartass means to people like you and me and

9   what it means to the AI machine?

10  A    Yeah, hundred percent.

11          MR. McCARRICK:  Okay.  Take that down Mr. Lopez.

12          THE COURT:  It has a distinct meaning to the

13  Court, Mr. Faraj.

14          THE WITNESS:  My apology, Your Honor.

15          THE COURT:  I take Court proceedings seriously.

16          THE WITNESS:  My -- Your Honor, at the time, to be

17  fair -- and I agree with you a hundred percent --

18          THE COURT:  Did you produce --

19          THE WITNESS:  I got emails --

20          THE COURT:  Let me ask you though.  Stop.  Did you

21  produce copies of your communications to the Debtors'

22  counsel?  Yes or no?

23          THE WITNESS:  Your Honor, I don't think I've got

24  anything in writing.

25          THE COURT:  Did you hear my question?  No --

1           THE WITNESS:  No.  No.

2           MR. McCARRICK:  Fair to say, sir -- actually, you

3     can leave that up, Mr. Lopez.  We're going to be going back

4     there.

5     BY MR. McCARRICK:

6     Q    You didn't just use AI correct grammar, respond to

7     discovery requests, right?  You used it to select the

8     methodology, true?

9     A    No, I gave it the methodologies that I wanted to use

10    through my tokenomics report that I structured, and then I

11    asked her to go through those tokenomics.

12    Q    Okay, let's go to Page 156 of the PDF.

13    A    Yes, please.

14    Q    Okay, can you highlight the HU entry there and what's

15    under it?

16    A    Yeah.

17    Q    This is you asking the AI intrinsic valuation of CEL,

18    and can this method be used for determining value of CEL on

19    pause date.  Do you see that?

20    A    Yes, I do.

21    Q    And that's you asking the AI whether or not that's a

22    proper valuation?

23    A    Yes, but you -- yes, but you've got to go to the start

24    of the AI and what I trained the AI to start with.

25    Q    Okay.  I'm just asking you about this and right here --

Page 66

```
 1    A     Yes, yes, correct.

 2    Q     Okay.  Let's do the same thing on Page 157.

 3    A     Go ahead.

 4    Q     And at the bottom, can we highlight the HU entry?  You

 5    say speculative valuation of CEL, and is this method

 6    acceptable to be used to determine the value of CEL on the

 7    pause date.  Do you see that?

 8    A     Correct.

 9    Q     And that's what you're asking the AI there as well,

10    correct?

11    A     correct.

12    Q     Okay.

13    THE COURT:  Why did you have to ask the AI that?  Do you

14    have any professional experience as to what's appropriate,

15    an appropriate methodology for determining the value of CEL

16    on the pause date?  Yes or no.

17            THE WITNESS:  Yes, I do, Your Honor.

18            THE COURT:  Go ahead, Mr. McCarrick.

19            MR. McCARRICK:  Okay.  I want to talk value of

20    cryptocurrency, and now we can take that down, Mr. Lopez.

21    Thank you.

22    BY MR. McCARRICK:

23    Q     Do you agree with me there are inherent challenges to

24    valuing any cryptocurrency?

25    A     I do.
```

1    Q    There's an entire section in your report titled,

2    Inherent Challenges in Cryptocurrency Valuations, correct?

3    A    I do.

4    Q    And your view is that there is no way to come up with a

5    true, exact value for a digital asset, correct?

6    A    Correct.

7    Q    And in this specific case, your view is that it's

8    nearly impossible to achieve pinpoint accuracy and

9    evaluation of CEL, correct?

10   A    Correct.

11   Q    I want to talk a little bit about your methodology.

12   You applied what you call a best value analysis, correct?

13   A    A fair value assessment, correct.

14   Q    Okay, a fair value assessment is the methodology that

15   you used?

16   A    That's what we call it, correct.

17   Q    And that's a method that you personally developed,

18   correct?

19   A    Correct.

20   Q    That's not a method that's widely adopted in terms of

21   valuing cryptocurrency, correct?

22   A    Honestly, I don't know what's widely accepted in

23   adopting crypto, what other people do in assessments.

24   Q    Okay --

25   A    I don't know -- I don't know.

Page 68

1   Q    You gave a deposition in this case, didn't you, Mr.

2   Faraj?

3   A    Yeah.  I did.

4   Q    And you took the same oath that you took here today?

5   A    I did/

6   Q    And you told the truth in that deposition?

7   A    I did.

8            MR. McCARRICK:  Okay.  Let's look at Page 71,

9   Lines 6 to 8 in the deposition, and could I have a copy of

10  it to hand to the Court?  There's two volumes.  This is

11  going to be from volume one (indiscernible).

12           THE COURT:  Thank you.

13  BY MR. McCARRICK:

14  Q    Mr. Faraj, did I ask this question and did you give

15  this answer?

16       "Q   And has that -- is that method widely adopted to

17  value cryptocurrency?

18       "A   No, it's not at all."

19       That's the testimony you gave, correct?

20  A    Yeah. Correct.

21           MR. McCARRICK:  Okay, you can take that down, Mr.

22  Lopez.

23  BY MR. McCARRICK:

24  Q    You agree with me that your fair value method hasn't

25  been peer tested, correct?

1    A    Under the fair value assessment, the criteria, no.

2    Q    You're not aware of a single investment bank that

3    publicly reports the fair value of any platform-specific

4    cryptocurrency token, are you?

5    A    No.

6    Q    You're not aware of any investment bank that publicly

7    reports the intrinsic value of any -- withdrawn.  To

8    calculate the fair value of CEL token in this case, you

9    calculated what you believe to be the fair value of CEL

10   before June 12th, 2022, correct?

11   A    Correct.

12   Q    In other words, you calculated fair value from

13   immediately before the pause date, correct?

14   A    It wasn't the -- yes, it is the pause date, but yes, it

15   was because of the market this like -- sorry.  The market is

16   (indiscernible) on the actual network on this period.  But

17   yes, you're correct.

18   Q    So let me just make sure I break down your testimony.

19   Your testimony is you selected pre-June 12th, 2022 because

20   it's your view that the trading window you selected was the

21   least manipulated and least dislocated range that you could

22   have selected, right?

23   A    That's correct.  That's a hundred percent correct.

24   Q    Okay.  You didn't calculate the fair value of CEL token

25   as of July 13th, 2022, the petition date, right?

1    A    No.  I looked at the data during that area and I said

2    it was over inflated.  I looked at volume to market cap

3    ratios and all of it told me that that was a dislocated

4    market.  So I actually ruled that whole period out.

5    Q    All right.  You would agree with me that the fair value

6    of CEL token decreased between the pause date, June 12th and

7    the petition date July 13th, correct?

8    A    As a value, myself, I would agree with you.

9    Q    And you didn't look at how much it decreased, correct?

10   A    No, because I looked at that area and it was a

11   dislocated market.  So the only way to deal with a

12   dislocated market is to strike it out.

13   Q    Understood.  I'm just asking, you didn't basically take

14   the walk between June 12th and July 13th to figure out how

15   much the value of CEL decreased before the petition date,

16   right?

17   A    No, no.  It was a dislocated market, so even if I

18   looked at it, the data is actually -- it's no good.  The

19   data can't be used.  Under dislocated market methodology,

20   once there's a dislocated market, you can't actually utilize

21   that data.  It's not a fair assessment to utilize any data

22   where there's a dislocated market.

23   Q    All right.  Let's talk about the pause date for a

24   second.  Do you agree with me that as of the pause date,

25   there was not any intrinsic value left for the CEL token

1    because the platform was frozen, correct?

2    A    From the pause date, I agree with you.

3    Q    As of the petition date, CEL also had no intrinsic

4    value, correct?

5    A    I agree with you.

6    Q    There's no -- there's intrinsic value to CEL -- there's

7    -- withdrawn. There is no intrinsic value to the CEL token

8    on the petition date because the CEL holder can't do

9    anything with it as of the petition date, correct?

10   A    I agree with you.

11   Q    And the only remaining value for the CEL token as of

12   the petition date is speculative value, correct?

13   A    I agree a hundred percent with that.  So what happens,

14   you always (indiscernible) from intrinsic to speculative.

15   Q    And when you say speculative value, what you're talking

16   about is CEL's potential value in the future, correct?

17   A    That's correct.

18   Q    And what you're doing there, the analysis you're

19   performing, is putting yourself in the position of a

20   potential buyer of CEL right before the petition date,

21   correct?

22   A    That's correct because that's -- yeah.

23   Q    What you're valuing is what you think the buyer thinks

24   will happen with cell, correct?

25   A    Correct, but I have to take that out -- again, I've got

1    to take out the period which I know the data is corrupt.

2    Then I have to do it in a period that's not corrupt.

3    Q    Understood.  If there's no future use case for the CEL

4    token, you agree that it wouldn't even have speculative

5    value, right?

6    A    If it was announced, there was absolutely no use cases

7    and it was completely a hundred percent said that it's going

8    to be closed down and there was no other option, then all

9    the speculative value would also go.  But if there's any

10   type of hope, any type of hope, then the speculative value

11   actually increases.

12   Q    And when you're talking about hope one of the things

13   that you say you need to value or consider is the journey of

14   CEL, its accomplishments in the amassed user base, right?

15   A    Not in the crypto world.  I mean, it's something that I

16   would assess, but in the crypto world it's a gamble.  Most

17   people jump on crypto for a speculative -- the speculative

18   increase.  So they look at the all-time high that

19   (indiscernible) had a long time ago, whenever, before the

20   (indiscernible) market and then they'll say if I bought it

21   now I'll buy it cheap.  There's a chance that these will go

22   back up to its all-time high if they restore it.  That's how

23   the spec -- sorry, the speculative value actually works.

24   Q    Well, it's also your testimony that CEL's future

25   speculative value assumes in part that's part of a corporate

Page 73

1    reorganization, right?

2    A     It can be anything.  A speculative value crypto,

3    doesn't have to be unique to CEL.  If anyone decides to use

4    it, if something happened and someone says it's got a hope,

5    there's a restructure, it could be anything.  At a given

6    point, I mean, I can only go on information a customer has

7    at a given point to do my assessment.  I can't go on

8    information that was granted after that because I can only

9    assess something based on two things, is the data being

10   positive or being not corrupt, so no dislocated market, and

11   then what information that customer had when he was actually

12   looking at the value at that date.  Because I'm looking at

13   the value for that period.  I'm not looking at the value

14   after that period.

15   Q     All right.  Let's turn back into it this way.  You

16   understand there's a corporate reorganization proposed in

17   this case, correct?

18   A     I do.

19   Q     You're aware that that reorganization doesn't include a

20   role for CEL token, correct?

21   A     I do now, yes.

22   Q     Are you aware of any corporate reorganization that has

23   been formally proposed that had a role for CEL token?

24   A     I'm not aware of it, no.

25   Q     All right.  The alternative to the proposed

Page 74

1    reorganization here is a liquidation of CEL, correct?

2    A    You're the lawyer.  You know more than me.

3    Q    Well, you gave a deposition in this case, correct?

4    A    Yeah.

5    Q    Okay.  Let's go back to it.  and let's --

6    A    Yeah.

7              MR. McCARRICK:  This is going to be Volume 2, for

8    the Court's reference and it's going to be Page 309, Lines 9

9    to 12.  See if we can refresh your recollection.

10   BY MR. McCARRICK:

11   Q    Did I ask this question, did you give this answer?

12        "Q   And you also know that the alternative to that

13   corporate reorganization is a liquidation of CEL by -- you

14   liquidate the value, right?

15        "A   I do."

16   A    Yeah.

17   Q    Okay.

18   A    I do.

19   Q    So you are aware that the alternative to the corporate

20   reorganization proposed here is a liquidation, correct?

21   A    I do.

22   Q    Okay.  If CEL were liquidated today, you agree with me,

23   it wouldn't be worth anything, correct?

24   A    Correct.

25   Q    You didn't put a price on the speculative value for CEL

1    token here, did you?

2    A    No, I didn't.

3    Q    So it's your testimony that as of the petition date,

4    the only remaining value for CEL is speculative value,

5    correct?

6    A    At that point, yes, correct.

7    Q    And you didn't actually put a price or calculate a

8    value for that speculative value, did you?

9    A    I can't put a price (indiscernible) to the speculative

10   value because the assessment is to look at the

11   (indiscernible) and come to a valuation on the petition

12   date.  So (indiscernible) value based on the information

13   that I had on that date, the speculative value would

14   actually increase.  Because they're not going to look at the

15   all-time high.

16        During that period, I don't have information at that

17   period that was available that said that CEL was not going

18   to (indiscernible) was not going to issue (indiscernible)

19   coins, or there was going to be no utility for CEL in any

20   future.  I can't go on information that came about after the

21   petition date.  I only can assess something based on

22   information that someone else would have had at that same

23   period.

24   Q    Understood.  Let's talk about the method that you did

25   use.  What you did is you took a 20-day trading window.  You

1   averaged the closing prices from each day and you divided

2   that average by the number of days, right?

3   A    Correct.

4   Q    You agree with me that 20 days isn't some industry

5   standard.  That's just a window you selected, correct?

6   A    Correct.  It's the theory of randomness, theory of

7   numbers.  So the more data points you can use, the more

8   clarify you get on market movement.  So I had to look for a

9   period -- seven days I thought was too short, 14 days.  But

10  it's actually a random number.  And the random number was

11  the biggest number I could get where I could go to the

12  market where I did not hit an issue with dislocated markets.

13  Because you've got a double dislocated market here.  So CEL

14  is very hard -- and (indiscernible) the problem trying to

15  get to the valuation.  CEL is very unique.  It's got a

16  double dislocated market.  It's got the Terra LUNA collapse

17  and then it's got after that the (indiscernible), right?  So

18  you've got two things to look at.  So I couldn't go any

19  further in that data, go over 20 days.  And I didn't want to

20  go any less than 20 days.  I was trying to get the area with

21  good market representation.  So I chose 20 days for that

22  reason.  So it's a random number, but it was the best number

23  I could come up with to have a fair value (indiscernible)

24  across as many days as possible.

25  Q    Okay.  You said a lot just there.  I want to break it

1    down.  You ended by saying that 20 days is a random number,

2    correct?

3    A    Correct.

4    Q    And you also testified that it was a double-dislocated

5    market, correct?

6    A    Correct.

7    Q    One of the reasons it was dislocated was the Terra LUNA

8    collapse, correct?

9    A    That's correct.  We had the first instance -- yeah.

10   Q    But you used trading data from after the Terra LUNA

11   collapse, correct?

12   A    I used trading data all the way from before to after.

13   So I stopped -- so the analysis where I stop at is the

14   petition date.  So I did look at the data on top, but that's

15   not for the value.  Anything to the bottom of that I've

16   seen.  But again, to determine my value, I didn't need to go

17   into more details.  I needed to find a window which I could

18   use to have a fair value.  Because you can't get an exact

19   value.  There's no one in the world, it doesn't matter which

20   specialist, which guy you bring in.  It doesn't matter if

21   it's (indiscernible) and it doesn't matter if it's anyone

22   else and give you an exact value.  The only way to come to a

23   value is to have a compromise.  So if you're not using a

24   value assessment, there is no way to get a value.

25   Q    Okay.  Let's back up to your methodology.  You've

Page 78

1    effectively calculated a price average, right?

2    A    I did.

3    Q    And you agree with me that price is a different concept

4    than value, correct?

5    A    I do.

6    Q    All right.  You agree with me that market manipulation

7    can artificially inflate the price of a cryptocurrency

8    asset, correct?

9    A    I do.

10   Q    And because market making is endemic and ongoing in

11   crypto, according to you the key question is now much of an

12   impact that manipulation has, correct?

13   A    I agree, correct.

14   Q    In your view, it's close to impossible to differentiate

15   between organic, legitimate price movements for a digital

16   asset and movements based on manipulation, correct?

17   A    That's correct.

18   Q    And here you have no way to tell what part of the 71

19   cent average you arrived at was organic versus manipulated,

20   correct?

21   A    I have a way to limit the damage because I have a scope

22   of what they call market making window, which is between a

23   one and five percent spread.  So all I can do is reduce --

24   in a case where you're coming to get a value in the crypto

25   industry, you can't get a correct value, you're correct.

1    The only thing you can do is limit the outside influence on

2    that coin.  So there has to be a range of influence that

3    you're willing to accept as being okay to use.

4        Now, a one to five percent spread is what I consider to

5    be okay to use because it's the common standard across the

6    board for marker making.

7    Q    Okay.  I just want to break that down.  It's your

8    testimony that you took what you consider to be the least-

9    manipulated window of trading data, correct?

10   A    Correct.

11   Q    But even taking that and averaging it, sitting here

12   today, you can't tell the Court what portion of the 71 cent

13   price is attributable to manipulation, right?

14   A    But I can't do that for any single coin on the market

15   because every single coin has exactly the same problem.  So

16   arguing that CEL, that this is an issue for CEL is not

17   different than arguing that BTC shouldn't have the same

18   value as BCT.  Because the market makers are used across the

19   entire industry.

20       Because it's a common standard, like I said in the

21   deposition, whenever we have to do a fair assessment, we

22   can't just single one thing out.  We have to look at the

23   entire market.  And we also have to look at the other coins

24   and how they actually operate.  If all the coins -- it's a

25   common practice in the industry, we have to take that as

1   being a common practice.  All we can do is limit the access

2   or the influence from outside, but we have to accept it.

3   Because you can't say that CEL has no value because it was

4   market made and then go (indiscernible) that BTC has value,

5   because BTC is also market made.  So you have to compromise.

6   You have to grade as -- as an assessment.  I have to look at

7   it and say to be fair, I have to look at the ranges, which

8   is commonly known as the industry as being a safe standard

9   of market making.  So I choose under five percent.  If it's

10  over five percent, it tells me that there's some movement

11  that moved it.  If it's over ten percent, then I know that

12  there's a market dislocation in that area.  But I have to be

13  fair to my assessment.  I can't rule out CEL's value because

14  CEL market makes and other people market make as well.

15  Q    Okay.  You said a lot there.  But I think the gist of

16  what you were saying is that because everyone is making the

17  market in crypto, you've just got to take it as a given,

18  right?

19  A    It's the industry.  If you're assessing a value in this

20  industry, you have to understand how this industry

21  functions.  If you want to (indiscernible) a currency and

22  you don't understand how the industry works, you can't

23  assess the value.  You can't come to a value.

24  Q    Okay.  I want to talk a little bit now about what you

25  reviewed and what you didn't review.

1    A    Got it.

2    Q    You reviewed the data from your firm, NuGenesis,

3    correct?  Trading data.

4    A    Correct.  Correct, I did.

5    Q    You reviewed coin market cap data, correct?

6    A    Correct, we did.

7    Q    You reviewed the Elementus report, correct?

8    A    I did.

9    Q    And those were the only three things that you

10   personally looked at, correct, in preparing this report?

11   A    No, I looked at -- my biggest thing that I used was the

12   Max Galka supplementary declaration -- sorry, I'm very bad

13   with names -- the Max Galka supplementary declaration and

14   his assessment.  I took Max -- sorry.

15   Q    No, please.  I looked at them, too.  Those were the

16   first things I actually assessed.

17   A    You are aware that Max Galka is from Elementus, right?

18   Q    I'm very bad with names.  I memorize things just by

19   people.  I have so much information that I go through, and

20   that's why (indiscernible) give you the figures.  But I'm

21   very bad with memorizing names (indiscernible).  So Max

22   Galka is how I remember that report.

23   Q    Well, I'll call it the Galka report, then.  You don't

24   dispute the veracity of the information provided in the

25   Galka report, correct?

1    A    It depends -- can  you word -- because I know you're

2    saying veracity, but what we're discussing, there's a lot of

3    things in the report I agree a hundred percent with.  And

4    there's a lot of things -- and there's other things I don't

5    agree with.  So Max's report, especially the supplementary

6    report, is really well-written.  I find an issue with a

7    point that he brings up in his supplementary report, but I

8    have no issue in the methodology he uses.

9        In fact, Max actually seems to use exactly the same

10   strategy that I use in the same way I approach that.  So

11   although he calls it the dislocated market, the dislocated

12   market then pushes you to a fair value assessment.  Because

13   if you use dislocated markets, especially if you're

14   following that dislocated market theory, that means that

15   that data can't be used because it's unfair to use it.  So

16   that pushes you into the range of actually looking at a fair

17   assessment.

18       Now, I don't know what you guys call it.  I can tell

19   you what we do and how we assess it.  But there's no

20   difference between the way Max portrayed the data that I

21   looked at.  Max actually says that it's uncredited and it's

22   dislocated.  So when Max says that, I mean, there's no

23   difference.  I agree a hundred percent on that.  That data

24   is dislocated and it cannot be used.  It's unfair to use

25   that data.

1    Q    Was it your testimony that it's unclear what veracity

2    means when it comes to the information that's provided in

3    the Elementus report?

4    A    I said it's unclear what your intention is with that.

5    (indiscernible) broke down the report, which sections.

6    Because there's sections I agree with and the sections I

7    don't agree with.

8    Q    All right.  Well, you don't dispute the veracity or

9    accuracy of the information provided in the Elementus

10   report, do you?

11   A    Sorry, the information?  No, I don't.  I don't.  I

12   actually use that data.  It's pretty good data.

13   Q    And that data was foundational to your own analysis,

14   correct?

15   A    It was.  It was very foundational to it.

16   Q    All right.  Now, you claim that your analysis delved

17   deep, harnessing information from over a thousand distinct

18   sources, correct?

19   A    Correct.

20   Q    And those are the sources we talked about earlier in

21   the 200-plus page exhibit, spreadsheet attached to your

22   report?

23   A    Correct.

24   Q    And that spreadsheet has events and weblinks, correct?

25   A    Correct.

1    Q    You did not check those source links, correct?

2    A    No.  Personally I don't check it.

3    Q    You didn't open up a single one, correct?

4    A    No.  I wouldn't check.  I have faith that my analyst

5    would have done it for me.  I just --

6    Q    Is it -- go ahead.

7    A    Yeah, I just take the descriptions on the side and then

8    I just take the -- so they break it down -- they should have

9    read it.  I say they should have, right, because I don't

10   want to lie to you and say they did everything perfect.  I

11   wasn't the (indiscernible) doing it and I don't want to lie

12   to the Court.

13        So what they should have done, and I hope they did do,

14   is actually go through all the links, check all the links,

15   take the information, run it through artificial

16   intelligence, get a summary of it, put the summary in the

17   summary box so I can read the summary.  That's what they

18   should have done.  If they haven't done it or they've missed

19   something, I didn't check.

20   Q    Right.  So sitting here today, you don't know what they

21   did or didn't do, fair?

22   A    Yeah, that's very fair.

23   Q    All right.  Now let's talk about some of the things you

24   did look at in preparing your report.  You don't cite the

25   examiner in your report at all, do you?

Page 85

1    A    No, because the valuation methodology I used, it wasn't

2    necessary to (indiscernible) -- sorry, the examiner report.

3    Q    But you would agree with me that nothing in your report

4    specifically engages with or comments on the factual

5    findings that the examiner offered, fair?

6    A    That's fair.  I can agree with you there's a lot of

7    things missing in the report if I wanted to get into more

8    detail. But they weren't relevant inside of my valuation.

9    The only thing relevant in the valuation was a fair value

10   assessment on petition date.  So that's all I needed to

11   have.  (indiscernible) enough data to do that.

12   Q    Well, part of that fair value assessment is determining

13   when the market was manipulated, right?

14   A    Yeah, but -- yes.  But I'm going from my experience,

15   and I might be wrong, but I'm just telling you because

16   (indiscernible).  But in my experience, I think I can tell

17   when markets have been manipulate more than the standard

18   manipulation that currently happens in the market.  Because

19   we are saying manipulated.  We're not using the word market

20   making.  We're not using the word liquidity acquisition.

21   We're not using the word (indiscernible).  All of those are

22   forms of market making.  Market making itself is deceptive

23   because most people don't understand how market making

24   works.  But it's a common practice.  And without it, you

25   can't actually hold the point value up.

1    Q    Mr. Faraj, what was my question?

2    A    (indiscernible).

3    Q    All right.  I'm just going to ask my question again.

4    It was a little bit simpler.  It's are you aware that the

5    examiner's report makes factual findings about Celsius'

6    market manipulation?  Yes or no?

7    A    Yes.

8    Q    Okay.  And we talked about some of those during your

9    deposition, didn't we?

10   A    Yeah.  I can't remember exactly everything, but yes.

11   But if it's in there, it's in there.

12   Q    It was like 48 hours ago, right?  You know we talked

13   about the examiner's report.

14   A    Yeah.  It was seven -- I had five to seven hours

15   (indiscernible).

16   Q    Sitting here today, you can't think of a single finding

17   that the examiner made about market manipulation of the CEL

18   token that you disagree with, correct?

19   A    Not that I've seen anything to disagree with.  Even in

20   Max's report, there's nothing I've seen to disagree with in

21   terms of that data.

22   Q    All right.  Well, even though you can't disagree with

23   that, that hasn't stopped you from criticizing the examiner,

24   has it?

25   A    No.  I did criticize the examiner's report.  I

Page 87

1    (indiscernible) that data.

2    Q    Okay.  Well, let's put up Celsius Exhibit 119, which is

3    a series of tweets from you from February 2023.

4    A    (indiscernible).

5    Q    And let's go to PDF Page 2.  I'm sorry, one second.

6    A    Yeah, I remember.  It says she should be locked up with

7    the $20 million.  I remember.

8    Q    Exactly.  You write --

9    A    I remember.

10            MR. MCCARRICK:  And, Mr. Lopez, if you can control

11   F and find it.  If you control F "Locked up", it will come

12   up.

13   BY MR. MCCARRICK:

14   Q    Okay.  You remember this.  You did in fact tweet, "If

15   you ask me, the examiner should be locked up as well.  She

16   stole $20 million in my eyes."  Correct?

17   A    Correct.

18   Q    And you also said that that report was "piss weak" and

19   was a "repetitive, wasted document".  That's what you said,

20   didn't you?

21   A    I did.

22   Q    And, sir, sitting here today, you stand by that

23   determination, don't you?

24   A    I stand by any comment I make at any given point of

25   time.  So it's eight months ago.  It's in February.  And it

1    says that I believe -- and it (indiscernible), the $20

2    million assessment cost.  Now, that's my personal belief and

3    that's what I think.  I mean, if it's wrong, it's wrong.

4    But I don't want to lie to you and say I think anything

5    otherwise.

6    Q    Okay.  Let's do this.  Let's look at a different one of

7    your tweets.  Let's pull up Celsius Exhibit 114, which is a

8    tweet from you on October 9th.  And let's go to PDF Page 2

9    and let's blow it up.

10            MR. MCCARRICK:  And actually, Your Honor, we would

11   move into evidence Celsius Exhibit 119.

12            THE COURT:  All right.  It's in evidence.

13            (Celsius Exhibit 119 entered into evidence.)

14            MR. MCCARRICK:  And for Your Honor's reference,

15   Page 11 is the tweet we were just looking at on the last

16   one.  Now we were on Celsius Exhibit 114, which is a tweet

17   from Mr. Faraj on October 9th.

18   BY MR. MCCARRICK:

19   Q    That's your tweet, correct?

20   A    Correct.  I remember it very well.

21            MR. MCCARRICK:  Your Honor, we move Exhibit 114

22   into evidence.

23            THE COURT:  All right.  It's in evidence.

24            (Celsius Exhibit 114 entered into evidence.)

25   BY MR. MCCARRICK:

1   Q    All right.  Do you see where you write here, "I was

2   never pro-Alex.  I would have loved to see Alex working on

3   restoring the network."  Do you see that?

4   A    Yes, I do.

5   Q    And that's Alex Mashinsky, correct?

6   A    That's Mashinsky, correct.

7   Q    And you are aware that he has been indicted, right?

8   A    I wasn't aware he was indicted, but yes.

9   Q    So this is the first time you're hearing that Mr.

10  Mashinsky was indicted?

11  A    Sorry.  I thought that -- when you said

12  (indiscernible), I thought it was (indiscernible).  So yes,

13  (indiscernible).

14  Q    Okay.  And the last sentence here you say, "It is also

15  why I would love for them to give SBF a chance to fix

16  things."  Do you see that?

17  A    Yes, I do.

18  Q    And that's Sam Bankman-Fried?

19  A    Yeah.  And that's the guy who -- that was one of --

20  sorry, (indiscernible) and one of the people that was most

21  heavily hurt by Alameda Research.  But it doesn't mean I

22  still don't want SBF to try to fix the thing so most people

23  get back maximum returns.

24  Q    And in fact, you think that Mr. Mashinsky and Mr.

25  Bankman-Fried should be offered advisor positions during the

Page 90

1    reorganization process for each of the respective companies,

2    correct?

3    A    I think they should be there to try to fix the problems

4    they caused.

5    Q    Well, you think they should be board advisors, right?

6    That's what you told me during your deposition.

7    A    It's board advisor, if in any other capacity.  That's

8    for me.  I believe that someone who caused the problem, who

9    knows the industry back to front, who knows what they caused

10   and how they caused it, who can help fist the problem, they

11   should be fixing the problems they caused.

12   Q    Okay.  So I just want to ask you this one final

13   question, which is how you view the market and how it should

14   go.  On the one hand, you think that the examiner should be

15   locked up for issuing a $20 million piss-weak report, but

16   Mr. Mashinsky and Mr. Bankman-Fried should be appointed

17   board advisors to the companies during the reorganization

18   process?

19   A    Yeah, if you want to say it like that, I'll say it

20   again.  I do believe that I would like to -- and this is my

21   personal opinion -- see anyone that causes an issue inside

22   of the space, who understands the space very well, who can

23   optimize return back to the people who they hurt, to go back

24   and actually help them.

25        Now, with the examiner's report -- and again, eight

Page 91

1    months ago when I made this statement, I would have made

2    this statement.  I don't make statements that I don't mean.

3    Q    Okay.  So the answer is yes, you stand by that the

4    examiner should be locked up but Bankman-Fried and Mashinsky

5    should be on corporate boards, right?

6    A    When you say the examiner should be locked up, you know

7    it's said in a (indiscernible) way.  It wasn't yeah, go to

8    jail, put her in jail.  But I will agree with you just so we

9    don't have to argue.

10   Q    Okay.

11           MR. MCCARRICK:  That's all, Your Honor.

12           THE COURT:  Thank you.  Any other examination?

13           MR. COLODNY:  None from us, Your Honor.

14           THE COURT:  All right.

15           MR. KIRSANOV:  Your Honor?

16           THE COURT:  Yes, Mr. Kirsanov?

17           MR. KIRSANOV:  (indiscernible)?

18           THE COURT:  Yes, very briefly.

19           MR. KIRSANOV:  Thank you.

20               CROSS EXAMINATION OF HUSSEIN FARAJ

21   BY MR. KIRSANOV:

22   Q    Mr. Faraj, good morning or I guess good night over

23   there.

24   A    Good morning.

25   Q    When did you first connect with Mr. Davis?

Page 92

1  A    I don't know the exact date.  I spoke to

2  (indiscernible) probably when FTX first collapsed.  I was on

3  -- I don't want to lie to the Court.  I don't want to give

4  wrong dates.  Probably on Twitter space -- I mean, I was

5  teaching people exactly what Sam Bankman-Fried

6  (indiscernible).  I was explaining to the reporters exactly

7  how it happened or explaining the (indiscernible).  And I

8  met a lot of people.  And I was investigating CEL at the

9  same time.  I just don't know the dates.  But I don't want

10  to lie to you and give you the wrong date.

11  Q    Are you familiar with Dogecoin?

12  A    I am familiar with Dogecoin.

13  Q    Does Dogecoin have any use cases?

14  A    No, not really.

15  Q    Does Dogecoin --

16  A    (indiscernible).

17  Q    Does Dogecoin have speculative value?

18  A    It has a lot of speculative value.

19  Q    Are you familiar with Elon Musk?

20  A    Yes, I do.

21  Q    If Elon Musk tweets about Dogecoin, would this be a

22  dislocation event?

23  A    It would be.  Under the terms -- this is why we say you

24  have to take the parameters of what it means for a

25  dislocated market.  So any external factor which manipulates

1    the market, you have to then rule it out because it's a

2    dislocated market.  But if  Elon Musk says, you know what,

3    I'm going to maybe accept it for my Teslas.  What would

4    happen is the market makers in the industry will also

5    (indiscernible) that to pump up the market.  Now, that

6    becomes a dislocated market.

7    Q    Mr. Faraj, what is your current employment again?

8    A    I am the CEO of NuGenesis Network.  I'm also head of

9    R&D for MetaLabs Global.  I am the CEO of Advantage Group

10   Australasia.  I am the -- I've got plenty of positions.

11   Strategic analyst for (indiscernible) Australia.  I am the

12   head of the United Shia Islamic Foundation.  I'm the head of

13   the United (indiscernible).  I'm co-founder of Regenerate

14   Earth.  I am strategic partner.  So there's many things, but

15   I don't think it's relevant in this.

16   Q    Would it surprise you to learn that the CEL token

17   raised in price after petition date?

18   A    No, it wouldn't.  Because what would happen is -- okay,

19   well, the reason why I take it out isn't because it won't

20   raise in value, it's because the rise in value would be

21   based on the same -- sorry, the (indiscernible) of the

22   dislocated data.  So no, it wouldn't.  I mean, it would go

23   higher.  And this is why I say speculative value in the

24   crypto industry can actually be worth more than intrinsic

25   value if someone thinks that that coin will actually

Page 94

1   (indiscernible) back to the full-time high.  So I'll give

2   you an example.

3       If someone didn't know that CEL was not going to be

4   real on July the 13th, just as an example, and they saw that

5   it went to 60 cents but it had all-time high of $5 or $6, in

6   that person's mind, the speculative value is that that coin

7   has the potential to return to that all-time high.  Every

8   coin, you know, that grows (indiscernible) have that up and

9   down and up and down.  So at that point, the speculative

10  value actually would make it valued to some people more than

11  the extrinsic -- so the extrinsic value at the time, because

12  it doesn't have extrinsic value anymore.  So you have to

13  rule out the extrinsic value.  And so when I get really

14  tired, my English gets a little bit bad, so please forgive

15  me.  The speculative value then (indiscernible).

16  Q    Would it surprise you to know that even today CEL token

17  currently trades?

18  A    No, it wouldn't.  And even if everything closes down,

19  it wouldn't surprise --

20          MR. MCCARRICK:  Objection.

21          THE COURT:  Sustained.  There's been an objection

22  sustained.

23          THE WITNESS:  Your Honor, no problem.

24  BY MR. KIRSANOV:

25  Q    Mr. Faraj, are you familiar with FTX?

1    A    I am, very well.

2    Q    Are you familiar with Alameda Research?

3    A    I am, very well.

4    Q    Have you ever been employed by FTX or Alameda Research?

5    A    No, I haven't.

6    Q    Have you ever received seed funding from Alameda

7    Research or FTX?

8    A    No, I haven't.

9         MR. KIRSANOV:  Your Honor, if I may ask to provide

10   the witness the testimony of Caroline Ellison which I

11   submitted yesterday?

12        THE COURT:  No.  Ask your next question and finish

13   up.

14   BY MR. KIRSANOV:

15   Q    Would selling billions of dollars' worth of bitcoin

16   dislocate the bitcoin market?

17        MR. MCCARRICK:  Objection.

18        THE COURT:  Sustained.  Last question.

19   BY MR. KIRSANOV:

20   Q    Does your report assessment take market manipulation

21   into account?

22   A    It does.  Because we put market manipulation under --

23   sorry, dislocated market.  So anything that --

24        THE COURT:  Thank you for your questions, Mr.

25   Kirsanov.

Page 96

1           Anybody else wish to examine?

2           MR. DAVIS:  Yes, I do, Judge.  This is Otis Davis.

3           THE COURT:  Go ahead, Mr. Davis.  Briefly.

4           CROSS EXAMINATION OF HUSSEIN FARAJ

5    BY MR. DAVIS:

6    Q    Good morning, Mr. Faraj, good afternoon.  My name is

7    Otis and I'll be asking you questions.

8         Do you have Max Galka's supplemental declaration in

9    front of you, which is at Docket 3646?

10   A    Give me a second.  The supplementary report?

11   Q    Yes, the supplementary report.

12   A    (indiscernible).

13   Q    Do you agree with Max Galka's supplementary declaration

14   that the value of CEL not being 81 cents at the petition

15   dates?

16   A    I do.

17   Q    Do you agree (indiscernible) 2011 in Max Galka's

18   supplemental declaration (indiscernible) Mr. Galka claims

19   there was a dislocated market and the difficulty in

20   determining an exact value?

21   A    I do.

22   Q    Do you agree with Point 12 of the Max Galka

23   supplemental declaration?

24   A    Yes, I do.  A hundred percent.

25   Q    Do you agree with point 13?

1    A    This has two parts to it.  So I do and I don't.  I

2    don't believe that all the parties (indiscernible) at the

3    time.  And I know it says that a reasonable investor.  But

4    in the crypto space, I mean, you can't assume every single

5    person is a reasonable investor and knows everything to do

6    with everything.  So I do believe -- that one is -- I

7    believe it's correct in terms of the extrinsic value.  All

8    right?  There's no issue with that.  A hundred percent

9    correct.  But when intrinsic value ends, (indiscernible)

10   value starts.  And so I don't believe that -- you can't

11   (indiscernible) at zero.  I mean, just let's put that

12   completely aside.  It's impossible for a zero assessment

13   because that means someone (indiscernible), so it has to

14   have value.  If someone is paying for something, it has

15   value.  And again, if you think that there's a restructure

16   or something is going to happen -- we just spoke about it

17   before, then (indiscernible) value.  So I can't say that

18   having a zero or having value is there, but I can agree that

19   if someone was a sophisticated investor, they may have

20   thought at that point (indiscernible).  Most people will

21   just say (indiscernible) and, you know, no.  That's a

22   difficult one.

23   Q    How about point 14?

24        THE COURT:  I don't understand your question, Mr.

25   Davis.  Ask another question.

1    BY MR. DAVIS:

2    Q    Do you agree with point 14 in the Max Galka

3    declaration?

4    A    The 0.35?

5    Q    Yes.

6    A    Okay.  This is a really good question.  Yeah, if Your

7    Honor would allow me, I would like to answer this.  It's a

8    very critical question, actually.  I just read --

9              THE COURT:  I don't know what he's reading from.

10   I don't have it.

11             MR. DAVIS:  It's the Max Galka --

12             MR. MCCARRICK:  Mr. Davis, could you read point 13

13   into the record?

14             THE COURT:  Read it into the record and then you

15   can ask your question.

16             MR. DAVIS:  Give me one second, Your Honor.  My

17   computer just froze.  Give me one second.

18             THE WITNESS:  Do you want me to read it?

19             THE COURT:  Could you read it out loud, Mr. Faraj?

20             THE WITNESS:  Of course I can, Your Honor.  "After

21   the (indiscernible) approximately 94 percent of CEL tokens

22   in Celsius' possession and not able to be withdrawn, CEL

23   token supply and demand was virtually disrupted, as

24   described in my expert report.  It is in my opinion that

25   after that date, the pause in the market of CEL tokens was

1    severely dislocated and the movement in that token markets

2    price was not indicative of its value."  Okay, this is a

3    really, really important thing, point 14.  Because what he

4    is saying is the dislocated market means he has to move away

5    from the data that was dislocated.  The only thing that's an

6    issue is the dislocated market never finished when he says

7    it finished.  So the dislocated market actually goes and

8    never finishes all the way because you've got a double

9    dislocation.  But it actually goes up to the -- so the 10th

10   of June is still a dislocated market.  So you can't use the

11   0.355 and you can't use those (indiscernible) because you're

12   still sitting on a 20 percent volume to market cap ratio.

13   So you're sitting at 10.61 percent on the 10th of June.

14   You're sitting at 18.48 percent on the 11th of June.  So

15   you're actually still in dislocated markets.

16        So, yes, what he did was completely correct.  But he

17   actually stopped short.  He should have continued to go

18   until the dislocated market had subsided.  The dislocated

19   market has reduced on the 9th of June.  So he can't use the

20   10th, 11th, 12th, 13th, 14th, 15th, because the 10th and

21   11th are still a part of the dislocated cycle.

22        So what he's saying is true, that you can't use that

23   data.  But what he has done -- and I don't know how he's

24   missed it.  Because I read his report.  He actually knows

25   what he's talking about.  So when he goes into the

Page 100

1   dislocated markets, he has to go the whole way.  He can't

2   choose to stop when it's still under dislocation.  So the

3   10th of June and the 11th of June, you have a 10.6

4   (indiscernible) volume to market cap ratio.  That's a

5   dislocated market.  Now, the dislocated market is just a

6   (indiscernible).  It's a 4.77 percent.  Now, that's within

7   the boundaries of a one to five percent spread.

8       So if you drop down to 9th of June, you are now in the

9   safety of --

10          MR. MCCARRICK:  (indiscernible).

11          THE COURT:  Finish your answer, Mr. Faraj.

12  BY MR. DAVIS:

13  A    Sorry, yeah.  If you drop down that one to the 9th of

14  June, you're actually in the safe zone.  So if you want to

15  argue that dislocated market exists, it's true.  What Max is

16  saying is a hundred percent spot-on.  The only thing, like I

17  said, you can't stop short.  If you are arguing a dislocated

18  market, you have to take all the data.  You can't stop too

19  short because it's the lowest point.

20          THE COURT:  Three more questions, Mr. Davis.

21  Three more questions.

22  BY MR. DAVIS:

23  Q    Thank you.  How about point 15?  And I will read it

24  into the record.

25  A    That's --

1    Q    Go ahead, sir.

2    A    I just spoke about that.  So I just read -- because I

3    was reading the thing.  So that's the 3.55.  So I've already

4    answered that.

5    Q    How about point 16?  How about point 16?

6    A    Do you want me to read it or do you want to read it

7    into the --

8             THE COURT:  Mr. Faraj, why don't you read it

9    slowly?

10   BY MR. DAVIS:

11   A    I will.  "First, approximately one month passed between

12   the (indiscernible) petition date.  During the

13   (indiscernible) time, the news about Celsius was

14   overwhelmingly negative with the public questioning Celsius'

15   solvency.  Representation by the company and the future of

16   the platform, I cannot (indiscernible) an economic, rational

17   reason for the value of CEL token would have increased from

18   the pause to the petition date in response to that

19   information in proper (indiscernible) markets."

20        And the next one says, "Second, even before the pause,

21   the market for CEL token was already showing the traditional

22   indicia of the dislocated market.  There was a significant

23   information asymmetry regarding Celsius' financial condition

24   and it's --" sorry, my screen is very small, "-- provision

25   cell token transactions.  Major shock to the cryptocurrency

Page 102

1    market with the collapse of several other coins."

2         So what he's saying here, this is actually one of the

3    most -- I'm really glad you put this one up.  Okay.  So what

4    he's saying is that even before the pause date, there was a

5    dislocated market.  Now, what he is referring to is the 10th

6    and 11th of June.  The pause date was on the 12th.  So he

7    actually says he agrees that that's a dislocated market.  So

8    I don't know why he has actually referred to it being of

9    value.

10        If he had raised that area before, even before the

11   pause, the market for CEL token was already showing the

12   traditional indica of a dislocated market, which it is.  The

13   dislocated market starts from the 10th of June.  So you have

14   to -- if you are arguing the dislocated market methodology,

15   you have to strike out 10th, 11th, 12th (indiscernible).

16   You have to strike (indiscernible).  You can't argue it and

17   then use the same -- you can't say you have to have -- this

18   is a dislocated market, but you know what?  On the 10th of

19   June it's the cheapest point.  It's 30 cents.  So I'm going

20   to go with that and I'm going to leave it there.  You have

21   to strike it out because it still is a dislocated market.

22        He agrees here that it's a dislocated market.  So he

23   actually agrees with you on the same point.

24             THE COURT:  Two more questions, Mr. Davis.

25             MR. DAVIS:  Thank you, Judge.

1    BY MR. DAVIS:

2    Q    How about point 18?

3    A    "My experience, when a market for an --"

4              THE COURT:  You have to read it -- stop.

5              THE WITNESS:  Sorry.

6              THE COURT:  Read it slowly into the record and

7    then I'll let you answer a question.

8    BY MR. DAVIS:

9    A    "In my experience, when a market for an asset or

10   security becomes dislocated, the market price for an asset

11   is typically above the extrinsic value of the asset.  One

12   example of this phenomenon was the GameStop short squeeze of

13   January 2021 when the GameStop stopped trade at far above

14   the intrinsic value of a dislocated market."  Yes, okay.

15   Q    Do you agree with that?

16   A    I do agree with that.  I do agree with --

17             THE COURT:  Next question, Mr. Davis.

18   BY MR. DAVIS:

19   Q    Point number 19.  Last one.

20   A    Okay.  (indiscernible) ascribe a specific value

21   (indiscernible) on petition date (indiscernible) my

22   experience trading a financial instrument, and especially

23   trading in dislocated markets, (indiscernible) a price of

24   the CEL token on the petition date, I would have declined

25   because I think the CEL token was most likely worthless at

Page 104

1    the time and have seen no probable support for it being

2    worth more than zero zero at the time."

3        Okay.  There's two parts to this.  And I'll answer as

4    quick as I can, because I know (indiscernible) Your Honor

5    for the long answers.

6        You can't have a zero value.  So there's no such thing

7    -- as long as something is trading and someone is buying

8    something, there's no such thing as a zero value.  You can

9    just (indiscernible).  Anything that's being traded and

10   anything that converts from one value to another so it

11   becomes speculative cannot have a zero value.

12       And the second part (indiscernible) petition date.  He

13   is correct.  On the petition -- you can't ascribe a specific

14   value because it is a -- sorry, a dislocated market.  So the

15   only way to do it is a fair value assessment.  The only way

16   to do a fair value assessment is to strike out the entire

17   period which is dislocated.

18       Now, the issue here is if you argue this one too hard

19   and you keep saying the dislocated market, the value of CEL

20   increases the more you actually look at the dislocated

21   market.  So the fair value assessment makes a fair value

22   instead of keep going further down.  And I don't have a lot

23   of time to explain it.  But if you look at a dislocated

24   market and then you rule in a double dislocated market, the

25   value of CEL becomes much higher.  Because every single time

1    we go away from the Terra LUNA crash, the value of CEL

2    (indiscernible).  You've got to be very careful when you're

3    (indiscernible).  So the fair value assessment is the safest

4    and fairest way for everybody.

5              THE COURT:  Thank you for your testimony.  Does

6    anybody else wish to ask any questions?

7              MR. ABREU:  Judge, Arthur Abreu, pro se creditor.

8              THE COURT:  Go ahead, Mr. Abreu.

9              CROSS EXAMINATION OF HUSSEIN FARAJ

10   BY MR. ABREU:

11   Q    Can you open the first expert report by Mr. Galka,

12   document 3580?  It's the first expert report.

13   A    Yeah, one second.  So reports.  Okay, (indiscernible).

14   Q    And you go to Page 35 of the PDF of the document is 38,

15   figure 13, which represents the trading volume of CEL token

16   pre and post-pause dates.

17   A    Yes.

18   Q    Do you see the Y axis where it says one?

19   A    Yes, I do.

20   Q    Do you (indiscernible) the market dislocated

21   (indiscernible) volume?  So this figure refers to the volume

22   of CEL.  Do you spot where the LUNA event happened?

23   A    My screen is really, really small because I've got the

24   thing up.  So if you want to ask me a question, I'll be able

25   to answer it, but I -- my screen is really tiny.

```
 1              MR. ABREU:  Judge, could we share it on the screen
 2    if it's possible?
 3              THE COURT:  No.
 4    BY MR. ABREU:
 5    Q    Okay.  So I will refer to this.  On this figure, you
 6    have two (indiscernible) that go over one after the 2022 May
 7    event.  Do you see those two specks?
 8    A    Yes.  I can see it, yes.
 9    Q    And then there is a (indiscernible) where the volume
10    kind of retraces to which has ben in the past, correct?
11    A    Correct.  But it's still a dislocated market because
12    you don't have enough volume on there.  So with dislocated
13    markets, if you are (indiscernible) the dislocated market --
14    and I know -- I've got to be fair on both assessments.  A
15    dislocated market isn't just --
16    Q    That's --
17              THE COURT:  Mr. Abreu, don't interrupt his answer.
18    Go ahead, Mr. Faraj.
19    BY MR. ABREU:
20    A    It's very important just because -- okay, anything that
21    happens post-petition in a dislocated market, what that
22    means is that the circulating supply is now being reduced.
23    The circulating supply being reduced therefore actually
24    changes the dynamics of the original market.  When you
25    change the dynamics of the original market, you are actually
```

1    inside of -- you are still within what we call the

2    boundaries of a dislocated market.

3              THE COURT:  Two more questions, Mr. Abreu.

4    BY MR. ABREU:

5    Q    Are you aware at this time the supply was not

6    (indiscernible)?

7    A    Pardon?

8    Q    Are you aware if the supply of CEL was locked in this

9    period?

10   A    Even if they were locked -- and again, the fact that

11   you can't access -- the fact that the CEL can't be accessed

12   by so many people -- I think it's 294 million -- look, I

13   don't have it in front of me.  I think it's 294 million CEL

14   that was locked up.  The minute that it gets locked up, you

15   can't then look at it as a fair value assessment.  Now, you

16   can look at other assessment.  But once you lock up that

17   liquidity, it's no longer fair value.  Because there's not -

18   - look at it this way.  Let's just say the other people

19   don't believe what the first people thought and they just

20   wanted to get rid of it.  It changes the dynamic of the

21   market.  So then the dislocated market theory still applies.

22   Q    No, no, my question is related.  Do you see the

23   timeline which you offered your methodology here to

24   calculate the average price on this figure?  Can you spot it

25   through this figure?

Page 108

```
1    A    Which figure?  I don't know what I'm looking at.

2    Q    So on the document of Mr. Galka, Page 38 of the

3    document, there is a Figure 13, correct?

4    A    Figure 13.

5    Q    38 of the document and 45 of the PDF.

6    A    Oh, sorry, 45 of the PDF.  Okay.  My apologies.  Yes.

7    Q    So do you see -- you use a methodology which goes --

8    does an average price in a period of time.  Like you say, 20

9    days.

10   A    Correct.

11   Q    Do you see a period of time here clearly in this

12   figure?

13   A    Honestly, I apologize.  I know what you want me to do.

14   My screen is too small.  I don't want to give a wrong

15   assessment.  I can't make a mistake.  So I can't see it.  I

16   can't answer your question.

17   Q    You cannot see the --

18            THE COURT:  One more question, Mr. Abreu.

19   BY MR. ABREU:

20   A    My screen is very, very small.  I can't see it.

21   Q    Okay.  Let's go to page -- of this same document, Page

22   36 of the document, which is the page -- which is the 43 of

23   the PDF.  So 36 of the document and 43 of the PDF.

24   A    I've got it.

25   Q    Do you see Paragraph 147?
```

1   A     Yes (indiscernible).

2   Q     So let me read it.  "The (indiscernible) shows the time

3   series of daily price returns of BTC, ETH, which is

4   Ethereum, FTT, HEX, and CEL token from the start of 2022 to

5   the petition date."

6   A     Yes, I can see that.

7   Q     So on the charts do you see the charts referring to HEX

8   and FTT?

9   A     I see BTC, Ethereum.  Okay, can you tell me is that

10  figure 12?  Which figure?  Because I can't see where it says

11  HEX.

12  Q     (indiscernible) the chart below.  So it's the following

13  page.

14  A     Yeah, I know, but BTC, Ethereum, and CEL.  Where's HEX?

15  Q     Exactly.  The report alludes to this, but it does not

16  mention anything related to this.  There are more

17  discrepancies, but for the time constraints of the Court are

18  requiring -- there are very -- there are numbers

19  inconsistent between the Galka report of things that he

20  talking that he never refers to.  So that's my point, just

21  to say that there are omissions --

22  A     I read the report -- sorry.  Can I answer that just

23  quickly?  I read the report.  The issue is even him -- no

24  one is perfect.  So even when you go through his report, I

25  mean, the supplementary report he did, he actually looks at

1   the right methodology in his first report.  But it's very

2   hard putting everything in a report.  I mean, it doesn't

3   matter who you are and it doesn't matter how much time you

4   have.  So there's going to be things missing.  I mean, this

5   market -- if I was to do a proper report and I had time,

6   this would be a 5,000 page report.  This is talking about

7   complete market dynamics.  So -- and I'm not trying to

8   protect anybody, but he actually done a really good job.  He

9   just made a mistake when it came to where he ended the

10  proposition of the dislocated market.  And I don't know why

11  he made that mistake, because that's a very crucial mistake.

12  But everything else inside of here, assessments and

13  methodologies are actually really well written.

14              THE COURT:  Thank you -- Mr. Abreu, thank you for

15  your questions.

16              Does anybody else wish to examine the witness?

17              MR. FRISHBERG:  I have a couple questions, Your

18  Honor.

19              THE COURT:  Mr. Frishberg, go ahead.

20              MR. FRISHBERG:  Thank you.  I will try to be as

21  brief as I can.

22                  CROSS EXAMINATION OF HUSSEIN FARAJ

23  BY MR. FRISHBERG:

24  Q    Dogecoin is the first meme coin, correct?

25  A    I'm not sure if it's the first meme coin that ever

1    existed.  I don't have that kind of knowledge.  But it was

2    created as a joke and it is a meme coin, but --

3    Q    It's the first widely-accepted meme coin?

4    A    Yeah, it's been very well adopted.

5    Q    Is one of the reasons bitcoin has so much value is

6    because it was the first widely-adopted cryptocurrency?

7    A    It wasn't -- bitcoin wasn't because it was the first

8    widely-adopted cryptocurrency.  It's because it changed the

9    status from its asset class.  And I don't mean it from a

10   financial perspective, I mean it from a functionality

11   perspective.  BTC as technology is actually very poor

12   technology.  Even Satoshi's code and even the way Satoshi

13   puts the -- the way he designs it for the complexity.  The

14   issue is not bitcoin.  Bitcoin became a store of value.  So

15   when you change something from a function of a

16   cryptocurrency or for a trade, whatever you create, and you

17   try to store a value, it actually changes the whole

18   (indiscernible) of what that currency is.  So bitcoin is a

19   different class.  Right?  So bitcoin is a store of value.

20   You can't compare it to a cryptocurrency.

21   Q    Okay.  Is one of the reasons dogecoin has such a large

22   following is because it was extensively promoted by Elon

23   Musk?

24   A    Yes and no.  To be honest with you, when we did our

25   data assessments on the (indiscernible) movement -- because,

1   remember, I have to train neighbors.  And I know it's our

2   software and I know it's our AI, but -- okay.  So one thing

3   you've got to realize, it's not Elon musk moving the market

4   himself.  There's factors behind it.  There's a lot of

5   market makers, market manipulators, market movers.  Now,

6   what they do is they know that when Elon Musk tweets, that

7   they can actually move the market and (indiscernible) value

8   and (indiscernible) value (indiscernible).  So there's a

9   level of market manipulation in the market that goes up.

10      Is he the catalyst for the movement?  Yes.  Is he the

11  reason it's moving?  He's only one part of that whole

12  mechanism.

13          THE COURT:  Mr. Frishberg, do you have any

14  questions about the CEL token?  This is not really relevant

15  to what we're doing here.

16  BY MR. FRISHBERG:

17  Q    Is the cell token affected in the same way by Elon

18  Musk?

19  A    I am not too sure.  I haven't heard Elon Musk tweet

20  about or say something about the CEL token.  But yes, it

21  would be.  Look, it's not a matter of him tweeting.  You've

22  got to understand the dynamics of the market, right?  If you

23  own your own exchange, anyone that has -- like I said, we've

24  developed our own exchanges (indiscernible) for over a year.

25  So once you understand how they actually work, market moving

Page 113

 1   is -- it's not a one fit all.  So someone says something

 2   doesn't mean he moved it.  But there is then an opportunity

 3   for people in the background who have liquidity to actually

 4   move the market.  So there's a series of things.  It's very

 5   complicated to explain it in five minutes.  And I don't want

 6   Your Honor to get angry with me, so I don't want to answer

 7   too long.

 8              THE COURT:  Last two questions, Mr. Frishberg.

 9   BY MR. FRISHBERG:

10   Q    This will be the two questions.  Is Dogecoin the only

11   cryptocurrency that Tesla accepts as a payment?

12   A    I'm not aware of -- listen, I really -- ask me about

13   technology, I'll tell you whatever you want.  I don't follow

14   Elon Musk and what he accepts in terms of currencies.  I

15   mean, Dogecoin is one -- Elon Musk makes a lot of money when

16   he is tweeting or -- I can't speculate because I don't know

17   exactly how he spends his money, but I assume that he is

18   buying and selling crypto.  But that's not related --

19              THE COURT:  Mr. Frishberg, do you have any more

20   questions about CEL?

21   BY MR. FRISHBERG:

22   Q    I have one question.  Do you see CEL having any utility

23   as a currency and does anyone accept it as a payment?

24   A    It's not up to me to see it because the valuation

25   crisis it not about its future, it's about what it was at

1    the petition date.  So if you ask me to value the currency

2    as of today knowing the information we have now, then it's

3    got no value unless someone wants to use it for something

4    else.  But if you ask me to value something based on a

5    petition date, I can't take the future into consideration.

6    Q    Thank you.

7            THE COURT:  Anybody else have any questions?

8            MR. CREWS:  Yes, Your Honor.  I have a few.

9            THE COURT:  Go ahead, Mr. Crews.

10           MR. CREWS:  This is Cam Crews, pro se.

11           THE COURT:  Go ahead.

12               CROSS EXAMINATION OF HUSSEIN FARAJ

13   BY MR. CREWS:

14   Q    How are you?  In your opinion, did the Terra LUNA

15   dislocation event disproportionately affect CEL token or all

16   cryptocurrencies?

17   A    It was all cryptocurrency.  That was a major dislocated

18   event.  So what happens whenever you've got a major event --

19   you've got a major and a minor event, right?  So the CEL

20   token is what we classify as a minor event.  It's a minor

21   dislocation.  A major event is like the FTX collapse.  It's

22   like Terra LUNA collapse.  It's like any other major

23   collapse.  When you have a major event, it doesn't affect

24   one coin, it affects the entire system.

25   Q    Thank you.  In your opinion, did the Celsius pause

Page 115

1    dislocation event disproportionately affect CEL token or all

2    cryptocurrencies?

3    A    Okay.  To answer honestly, I would have to look at the

4    market all the way through except sentiment follows.  So

5    what that means is to give you a safe answer without giving

6    you a wrong answer, sentiment from one collapse can follow

7    to another collapse.  So if someone (indiscernible) money on

8    Celsius, that person or someone next might panic and not

9    want to spend money or buy crypto on another platform.

10        So the rolling on effect from a dislocated market,

11   minor or major, does roll on to other platforms.

12   Q    And did the Celsius pause cause CEL tokens to be locked

13   on the Celsius platform?

14   A    So once they locked those coins, that actually changes

15   -- it's a dislocated event.  But even -- I'll give you an

16   example.  It's not just the lock.  Insider trading, insider

17   selling.  Anything that comes in earlier that people that --

18   let's just say an insider had information (indiscernible)

19   and that was used to shift the market, that becomes a

20   dislocation event.  So the only thing you can do to be fair

21   is to strike out all dislocated events.

22   Q    You accepted 95 percent of the circulating supply of

23   CEL token was locked on the Celsius platform as of the

24   pause?

25   A    Yeah, I think 245 million I think we said before.  And

Page 116

1    once that happens, it becomes a dislocated market.  So

2    regardless if you -- I can't argue that later on the values

3    are proper.  Because even if I take the maximum supply

4    (indiscernible) five dollars.  So I can say that it had

5    value.  But it doesn't mean it had value under a non-

6    dislocated market value.  So once -- if you argue dislocated

7    value, you have to go to fair assessment.  You can't have

8    the (indiscernible).  So if I argue that there's a

9    dislocated market and I need to go to fair value assessment,

10   I have to go to fair value assessment.  And this is why I

11   had to use the methodology I used.  And if I argue there was

12   a dislocation, then I can argue that after the pause date,

13   after the petition, CEL value actually went up to $4.60.

14   That means was -- was CEL worth $4.60?  And you can't argue

15   that because there is a dislocated market there.  So you

16   can't pick and choose.

17   Q    And just for clarification, that number you read out,

18   that was a dollar value?

19   A    I think it was four -- I'm just saying off the top -- I

20   think it was four dollars -- when I did an assessment -- I

21   don't have it in front of me.  But when I did an assessment,

22   I realized that post-petition date, that CEL went up to two,

23   three four dollars, $4.60.  Now, that's a dislocated market.

24   So you have to wipe it out.  You can't accept it as

25   (indiscernible) assessment.

Page 117

1          THE COURT:  Thank you for your questions.  Anybody

2     else have any questions?

3          MS. DOW:  Yes, Your Honor.  Sharon Dow, pro se

4     creditor.

5          THE COURT:  Go ahead, Ms. Dow.

6          MS. DOW:  Yes, good day.  There seems to be

7     someone else who is --

8          THE COURT:  Yeah.  Anybody else, close your

9     microphone please.

10          CLERK:  They've been muted, Judge.  It was Bob

11     (indiscernible).

12          THE COURT:  All right.  Cut him off.  Go ahead,

13     Ms. Dow.

14          MS. DOW:  Thank you, Your Honor.

15     BY MS. DOW:

16     Q    Mr. Faraj, so today are you sharing with us or giving

17     us all of this plethora of information as a lay witness

18     opinion or are you holding yourself out as a qualified

19     expert valuer who is in the U.S. federal courts?

20     A    I will let the Court decide.  Because I've never done

21     this in court, and I wouldn't even know how to honestly

22     answer that question you just gave me.  I can tell you that

23     I am extremely knowledgeable and you can ask me anything you

24     wanted and I'll give you the exact details that you wanted.

25     I've done years of R&D.  R&D means I actually practice this

1    stuff.  I don't have a qualification, but I can guarantee

2    you nobody will know what I know.  Now, I've owned my own

3    exchanges.  I've owned my own market makers.  But I don't

4    have an answer to it because I don't know.  I'm here to give

5    evidence to help out so the judge can -- or anyone

6    understand how this thing functions.  But I don't know in

7    what term that is.

8    Q    So what is the purpose of the work product that you are

9    submitting?  Have you chosen the exact purpose of the

10   valuation?

11   A    I have.  I came down to a fair value assessment based

12   on all the stuff we just discussed.  And the fair value

13   assessment I took into consideration the dislocated market.

14   I chose a period of time which had the least affected area.

15   And then I looked at marginal spreads.  There's a good

16   spread between there.  And then I came to a fair value

17   assessment of 71 cents.

18   Q    So here and in your testimony (indiscernible) have you

19   expounded any deductions over -- based on the fact pattern

20   representing --

21              MR. MCCARRICK:  Objection.

22              THE COURT:  Sustained.  Next question.

23              MS. DOW:  And then just one more question.  But

24   give me one moment, Your Honor, please, to collect it.

25   BY MS. DOW:

Page 119

1    Q    Okay.  So, Mr. Faraj, just final confirmation here.

2    You are asking to be considered an expert valuator yet this

3    is your first time ever preparing a work product or

4    testimony and have not been through any of the typical

5    training for U.S. federal -- appearing in U.S. federal

6    court.

7    A    Okay.  Let me answer that and I'll -- and please, Your

8    Honor, excuse me for answering this.  And I thank you so

9    much for your patience today.

10        When it comes to expertise, the expertise isn't a piece

11   of paper (indiscernible).  Expertise in this industry

12   requires hands-on.  You've got to understand the dynamics of

13   this industry.  So if my expertise -- if you want to say am

14   I an expert, I do believe I am one of the biggest experts or

15   the -- whatever in English you want to say, expert in the

16   field.  I don't think anybody you're going to find is going

17   to have the information that I had.  But I can answer any

18   question you have in regards to any type of valuation in

19   crypto, and I can answer any question you have with

20   methodologies.  I can answer any question you have in

21   technology.

22        Now, is that enough to be an expert?  I would think it

23   is enough to be an expert.  But that's not up to me; that's

24   up to the judge.  So I respect whatever the judge says and

25   whatever decision he makes is his decision.

1          MR. LICARI:  (indiscernible).

2          THE COURT:  Mr. Licari -- cut him off.  Deanna,

3    cut him off.

4          Any interruptions in this proceeding will not be

5    tolerated.

6          Ms. Dow, do you have any last questions?

7    BY MS. DOW:

8    Q    So just to clarify that you feel you are qualified in

9    the area, but you have not been qualified as an expert

10   valuator in the federal court, is that correct?

11   A    In the federal court, no.  But if you need peer

12   references or peer reviews -- I mean, you've just heard

13   today, I mean, if hearing me today is not enough to

14   understand that I am an expert in the field, then I don't

15   know what I can tell you.  I mean, it's the judge's call.

16   It's not my decision.

17   Q    Yeah.  I'm asking the questions.  Thank you very much.

18          THE COURT:  Thank you, Ms. Dow.  Anybody else have

19   any questions?

20          MR. MENDELSON:  Yes, Your Honor.  Eric Mendelson,

21   pro se.

22          THE COURT:  Go ahead, Mr. Mendelson.

23          MR. MENDELSON:  I will be very brief.  And thank

24   you for your time as usual.

25          CROSS EXAMINATION OF HUSSEIN FARAJ

Page 121

BY MR. MENDELSON:

Q    Mr. Faraj, did you get paid for this report?  Did you
receive any compensation for it?

A    I didn't get paid.  I received nothing in return.  I
don't want anything in return.  I want to help people
understand this data.  More than that, I don't want anything
in return.

Q    Are you aware that Elementus was paid for their
valuation report?

A    Yes, but I don't want to comment.  The last time I
commented about someone making such a large, vat amount of
money, I got criticized.  So I really don't want to look
like -- and I speak my mind.  So I don't want to be in a
position where I'm going to say something and someone is
going to criticize me for it.

Q    All I asked was were you aware if they got paid or not.

A    Yes, I am aware they got paid.

Q    Do you enjoy working for free or providing reports for
free?

          UNIDENTIFIED SPEAKER:  Objection.

          THE COURT:  Sustained.

BY MR. MENDELSON:

Q    Okay.  Mr. Faraj, what was your motivation for
providing the report without...

A    I really love this industry.  I've been in it -- one of

1   the first crypto architects.  I've been in this industry for

2   so long.  I've designed over 138 chains.  I've looked after

3   over 500 people.  I've trained over a hundred people on the

4   stuff that we've been discussing.  I love this industry.

5   Right?  It's not that I agree with every principal in the

6   industry, but I love this industry.

7        If there's a position that I can get and I can help

8   someone, I will be there to help them.  You can ask anyone

9   who knows me throughout this industry.

10           THE COURT:  Any last questions, Mr. Mendelson?

11   Mr. Mendelson, are you still there?

12           Anybody else wish to question the witness?

13           MR. DALHART:  I would just like to have one

14   question.  I've never participated in the past.

15           THE COURT:  Okay.  Just identify --

16           MR. DALHART:  If I am allowed to.

17           THE COURT:  Yeah.  Just identify your name,

18   please.

19           MR. DALHART:  My name is David Dalhart.

20           THE COURT:  Okay.  Go ahead, Mr. Dalhart.

21               CROSS EXAMINATION OF HUSSEIN FARAJ

22   BY MR. DALHART:

23   Q    I just have one quick -- in your opinion, would it be

24   just easier to give everyone some CEL tokens and if they

25   want to sell them, fine.  If they can't sell them, that's

Page 123

1   fine.  Would it be simple or am I just oversimplifying it.

2           UNIDENTIFIED SPEAKER:  Objection.  Objection.

3           MR. DALHART:  Oh, sorry.

4           THE COURT:  Sustained.  Any other questions, Mr.

5   Dalhart?

6           MR. DALHART:  No, thank you.  That was my only

7   question.

8           THE COURT:  Thank you, Mr. Dalhart.  Anybody else

9   wish to cross-examine?

10          MR. LU:  Hi.  My name is Jason Lu.  I am a

11   creditor.

12          THE COURT:  Go ahead, Mr. Lu.

13            CROSS EXAMINATION OF HUSSEIN FARAJ

14   BY MR. LU:

15   Q   Mr. Faraj, you just said you have designed over 138

16   chains.  Is that correct?

17   A   Designed, yes.

18   Q   And could you name of any of them?  Are any of them

19   successful or ones that we would have heard of?

20   A   We do R&D.  So we're a research and development

21   company.  And we design concepts on chains.  We're also

22   developing some of the largest infrastructure right now.  So

23   we're doing major projects including the (indiscernible),

24   we're doing (indiscernible) the -- I could send you a list.

25   We've got heaps.  I mean, when it comes to infrastructure,

Page 124

1     the (indiscernible).

2                THE COURT:  Let's not do advertising.  Okay, Mr.

3     Faraj?

4                THE WITNESS:  Sorry, Your Honor.

5                THE COURT:  That's okay.

6     BY MR. LU:

7     Q    Well, I've been in this industry a long time, too.

8     And, frankly, I've never heard of you or any of these chains

9     that you've mentioned.  So if you're using the basis that

10    you've designed 138 chains to show that you're an expert,

11    perhaps maybe you could clarify that --

12               THE COURT:  Mr. Lu, I'm going to cut you off

13    because it's not a proper question.  I don't know where you

14    are.  Mr. Faraj is in Australia.  I don't know if you know

15    everybody all around the world.  Do you have any other

16    questions, Mr. Lu?

17               MR. LU:  No, that's it.  Thank you.

18               THE COURT:  Thank you very much.  Anybody else

19    wish to cross-examine?

20               All right.  Any recross from anybody in the

21    courtroom?

22               MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

23    on behalf of the debtors.  Nothing for the debtors.  We

24    would just like to re-note the Debtor's and the Committee's

25    joint Daubert motion, which I understand Your Honor has

Page 125

 1    taken under submission subject to --

 2              THE COURT:  Yeah.  We're going to talk about that

 3    in a minute and any final briefing.  I'm not going to rule

 4    from the bench on it.

 5              MR. MCCARRICK:  Understood.

 6              THE COURT:  All right. No one else in the

 7    courtroom appears to want to cross-examine.

 8              Mr. Faraj, thank you very much for your testimony.

 9    I hope you get some sleep.  I know you said you've been up

10    for a long time.  Tell me again where in Australia are you?

11              THE WITNESS:  We're in Sydney.

12              THE COURT:  Sydney, okay.  All right.  Thank you

13    very much.

14              THE WITNESS:  Thank you so much, Your Honor.  I do

15    appreciate you letting me get on the stand.  Thank you so

16    much.  I hope I helped you out.  Bye bye.

17              THE COURT:  All right.  Do the Debtor or the

18    Committee wish to call any rebuttal witnesses?

19              MR. MCCARRICK:  The Debtors do not, Your Honor.

20              THE COURT:  All right.  So all parties have rested

21    at this point. The evidence is closed.  All right.

22              So let's talk about proposed findings of fact and

23    conclusions of law and any additional closing briefs.  I

24    certainly have the briefs, but there have been some changes,

25    movements in the evidence, and that sort of thing.

Page 126

1          MR. KOENIG:  Good morning, Your Honor.  Chris

2     Koenig, Kirkland & Ellis, for the Debtors.

3          So, Your Honor, the last time we spoke about

4     briefing, you indicted you didn't want briefing.  But during

5     the colloquy yesterday you suggested maybe there were some

6     limited topics.

7          THE COURT:  Let me put it this way.  There's a lot

8     of briefing that's been done already.  You know, cases take

9     twists and turns as they go along.  If you feel there are

10    any issues that you want to address in the brief, you can.

11    But I'm not telling you which issues I want to -- I mean,

12    the one issue that's come up I think throughout multiple

13    times -- and I think you even stood and said that's a good

14    question -- was the treatment of collateral with

15    (indiscernible) I think was -- I would have to go back in my

16    notes.

17         MR. KOENIG:  Right, Mr. Bronge.

18         THE COURT:  Yes.

19         MR. KOENIG:  Whether the collateral is the

20    property of the borrowers or property of Celsius.

21         THE COURT:  Correct.

22         MR. KOENIG:  We addressed that issue in Version 9

23    in our confirmation brief.  But you raised that -- Mr.

24    Bronge raised Version 7 was not addressed in our brief.  So

25    perhaps we'll submit something just limited on that.

1          THE COURT:  I think you ought to limit --

2     obviously the briefing is very extensive.  There were

3     proposed findings of fact that were done earlier.  We now

4     have a record.  You can either take what you had submitted

5     before, and if you believe that's sufficient, add citations.

6          When is the transcript supposed to be completed?

7          MR. KOENIG:  We've been getting transcripts on a

8     rolling basis I would say every 24 hours.

9          THE COURT:  Okay.

10         MR. KOENIG:  So we will be prepared to submit

11    proposed findings of facts and conclusions of law I would

12    say by the end of this week.  Maybe it's most helpful to

13    work backwards from closing.

14         THE COURT:  Sure.

15         MR. KOENIG:  I know Your Honor has a very busy

16    schedule, especially in November.  We are already scheduled

17    to have an omnibus hearing next Tuesday the 24th.  I don't

18    know if that's too soon for Your Honor.  We would be

19    prepared to present at that hearing.  But if you would

20    rather schedule a different date before -- I think you said

21    you had a hearing in November.

22         THE COURT:  Yeah.  That's a moving target, too.

23         MR. KOENIG:  So we're happy to work with Your

24    Honor's schedule and sort of work backwards from there.

25         THE COURT:  Hold on.  Too much paper.  Just give

1    me a moment.

2              Let me -- I must have left it on my desk.  Let me

3    just -- everybody stay seated and we'll come back in.  Okay?

4    It will just be a moment.

5              So tell me when would the Debtor and Committee be

6    prepared to submit their proposed findings of fact and

7    conclusions of law?

8              MR. KOENIG:  Your Honor, for the Debtors, we would

9    be prepared to do it by the end of this week.

10             MR. COLODNY:  Your Honor, I'm envisioning

11   submitting one joint document.

12             THE COURT:  Are you going to submit joint proposed

13   findings.

14             MR. COLODNY:  That's what I was envisioning, Your

15   Honor.  And I believe we can work on that.

16             MR. KOENIG:  Yes.

17             THE COURT:  Most beneficial.

18             MR. KOENIG:  Yes.  The Debtors and the Committee

19   will submit one joint proposal.

20             THE COURT:  And you would do whatever additional

21   briefing you're going to do all by...

22             MR. KOENIG:  Your Honor, we would submit that at

23   the same time.  I think it would be very limited, frankly.

24   We've got enough paper in this case.

25             THE COURT:  All right.  The Debtors and the

Page 129

1    Committee shall submit proposed findings of fact and

2    conclusions of law and any additional brief by Monday --

3    hold on, let me make sure that's right.  Friday, October

4    20th, 5:00 p.m.

5              Any objectors submit proposed findings of fact and

6    conclusions of law and any closing briefs by Friday, October

7    27 at 5:00 p.m.  Closing argument Monday, October 30 at 2:00

8    p.m.  I'm squeezing it in with a lot of things.

9              MR. KOENIG:  We appreciate it, Your Honor.  A

10   couple of just housekeeping questions.  For openings, you

11   issued an order and we were supposed to submit how long we

12   wanted for closing argument.  Will you be doing something

13   similar?

14             THE COURT:  I will enter it in a similar...

15             MR. KOENIG:  Okay.  The other item I would note is

16   you mentioned -- I'll just wait a moment for the siren.

17             We mentioned during openings that one of the

18   conditions precedent to emergence, not to confirmation, is

19   an SEC approval of a Form 10 registration.  We may at the

20   same -- we are continuing to discuss with the SEC.

21   Hopefully we can make some progress between now and closing

22   argument.  We may ask for a status conference just to update

23   you and the rest of the parties on this important issue at

24   the time of closing, which I think you said was the 30th.

25             THE COURT:  Okay.  So let me ask a couple other

Page 130

1    questions.  Were you able to resolve things with the

2    Consumer Privacy Ombudsman?

3              MR. KOENIG:  Not quite yet, but we're close.

4              THE COURT:  I think there were -- I don't have the

5    list in front of me, but I think there were some open issues

6    with the U.S. Trustee that you were endeavoring to resolve.

7    Has there been any progress on that?

8              MR. KOENIG:  Yes.  I believe we are now resolved.

9    I don't want to speak for the U.S. Trustee, but...

10             MR. BRUH:  I think we're still --

11             THE COURT:  You have to identify yourself, Mr.

12   Bruh.

13             MR. BRUH:  Mark Bruh for the United States

14   Trustee.  I think we're trying to schedule a follow-up call.

15   We have been exchanging information, Your Honor.  I know

16   exculpation and release are some of the issues we're

17   discussing with the Debtors and a discrete issue regarding

18   exculpation with the Committee.  And that's where we stand

19   on that.

20             THE COURT:  Are you within striking range of a

21   resolution of those issues?

22             MR. BRUH:  I hope so, Your Honor.  One of the

23   issues Your Honor did raise was the disclosure of various

24   individuals in the release provisions and --

25             THE COURT:  It's clear that there were some people

1    that ought to be specifically identified and in other

2    instances many categories, but it needs more of a

3    definition.

4              And I expressed this before.  I don't want open

5    litigation issues about who gets a release, who is getting

6    exculpated, that sort of thing.  It's got to be -- it needs

7    to be pre-cleared.

8              MR. BRUH:  We'll do our best, Your Honor.

9              THE COURT:  Okay.

10             MR. KOENIG:  We've had very productive

11   discussions.  I think we're close.

12             THE COURT:  Are there other open issues that are

13   still being discussed, negotiated?

14             MR. KOENIG:  I think it's the ADR procedures are

15   close but not final.  I'm looking at Mr. Colodny.

16             MR. COLODNY:  We're going to send them back today,

17   Your Honor.

18             MR. KOENIG:  I think that that's the other open

19   issue.

20             MR. COLODNY:  And then there are a couple changes

21   to I think litigation administrator agreements and some of

22   the other corporate documents.  So there will likely be

23   another plan supplement filed where we can include the list

24   of released parties and other (indiscernible).

25             THE COURT:  Mr. Bruh?

1          MR. BRUH:  Yes, Your Honor.  Mark Bruh for the

2    United States Trustee.  Also, the substantial contribution

3    applications --

4          THE COURT:  We'll push those off.

5          MR. BRUH:  To November 30th at the confirmation.

6    I just wanted to apprise the Court.

7          MR. KOENIG:  I think that's all that's open, Your

8    Honor.

9          CLERK:  Judge?

10          THE COURT:  Yes, Deanna.

11          CLERK:  Sorry to interrupt.  There is the SVB

12    omnibus hearing on the 30th at 2:00.  Do you want it at the

13    same time or do you want --

14          THE COURT:  Hold on.  Let me just look.  I thought

15    I had brought out a whole list of -- give me just a moment.

16          We'll move that date, Deanna.  We'll talk after.

17    We'll move the date for the SVB omnibus hearing which is

18    scheduled for 2:00 on October 30th.  We'll move that.

19          CLERK:  Okay.  Great.  Thank you.

20          THE COURT: Thank you, Deanna.  All right.

21    Anything else we need to talk about today?

22          MR. KOENIG:  Nothing from the Debtors.  Thank you,

23    Your Honor.  We'll wait for your order.

24          THE COURT:  I appreciate all the effort to get

25    this done promptly.  See you all soon.  We are adjourned.

Page 133

1          (Whereupon these proceedings were concluded at

2    11:25 AM)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 19, 2023

[& - 27a]                                                                                          Page 1

### &

**&**  3:3 13:8
  35:8 124:22
  126:2

### 0

**0.35**  98:4
**0.355**  99:11

### 1

**1**  17:5,6,14
  25:6,7 46:11
  56:23 59:3
**1,000**  48:3
**1.5**  46:11,11
**10**  12:19 28:21
  29:2 40:6
  129:19
**10.6**  100:3
**10.61**  99:13
**100**  46:12
  47:19 48:5
  59:22
**10004**  1:14
  4:14
**10020**  4:5
**10022**  3:6
**10036**  3:15
**105**  12:8
**10th**  58:8 99:9
  99:13,20,20
  100:3 102:5,13
  102:15,18
**11**  19:20 29:1,6
  29:10,15,17,18
  61:16 62:3,4
  62:10,13,13,18
  88:15

**110**  12:9
**113**  12:22
  46:22 47:8,11
**114**  12:10,23
  88:7,16,21,24
**115**  43:2,10
**11501**  134:23
**119**  12:24 87:2
  88:11,13
**11:25**  133:2
**11th**  99:14,20
  99:21 100:3
  102:6,15
**12**  29:6,10,15
  29:17 74:9
  96:22 109:10
**120**  12:11
  59:14,24
**12151**  134:7
**122**  12:13
**1221**  4:4
**123**  12:12
**12:30**  36:3
**12th**  57:21
  58:1,8,11
  69:10,19 70:6
  70:14 99:20
  102:6,15
**13**  29:6,10,15
  29:17 96:25
  98:12 105:15
  108:3,4
**138**  122:2
  123:15 124:10
**13th**  69:25
  70:7,14 94:4
  99:20

**14**  30:3,5,14
  31:3 76:9
  97:23 98:2
  99:3
**140**  46:10
**147**  108:25
**14th**  99:20
**15**  30:5 31:3
  100:23
**150**  46:10
  49:16
**151**  3:14
**156**  65:12
**157**  66:2
**15th**  99:20
**16**  30:5 31:3
  101:5,5
**168**  41:23
**17**  1:16 30:5
  31:3
**172**  56:15
**18**  30:5 31:4
  103:2
**18.48**  99:14
**19**  30:6 31:4
  103:19 134:25

### 2

**2**  25:6,7 43:11
  46:24 50:9
  74:7 87:5 88:8
**20**  31:4 75:25
  76:4,19,20,21
  77:1 87:7,16
  88:1 90:15
  99:12 108:8
**200**  49:16
  50:10 83:21

**2011**  96:17
**2021**  103:13
**2022**  69:10,19
  69:25 106:6
  109:4
**2023**  1:16
  46:24 47:3
  87:3 134:25
**2054**  31:14
**20th**  129:4
**21**  31:4
**21st**  58:5
**22**  16:10 17:15
  18:3,13,25,25
  19:9,15 31:5,6
**22-10964**  1:3
**23**  12:15 16:10
  18:25
**23a**  17:16 18:5
  18:25 19:10,20
  31:7
**23b**  17:16 18:5
  18:25 19:10
  20:1 31:7
**24**  31:11 45:11
  52:21 127:8
**245**  115:25
**24th**  127:17
**25a**  31:17,18
**25b**  31:20
**26a**  32:10
**26b**  12:20
  32:15,16,23
**27**  12:16 129:7
**2700**  3:22
**27a**  32:14,22
  33:5

| | | | |
|---|---|---|---|
| **27b** 33:2,3 | **372** 51:11 | **534** 4:13 | **81** 96:14 |
| **27c** 33:3 | **3752** 51:24 | **555** 3:22 | **84** 16:12 |
| **28** 12:17,18 | **378** 56:14,21 | **5:00** 129:4,7 | **87** 56:9 |
| **28a** 12:21 33:7 | 57:8,14 | **5:01** 14:1 | **88** 12:23,24 |
| 33:10,12 | **3780** 19:1 | **5a** 26:4,8,8,9 | 56:9 |
| **29** 12:19 | **38** 19:5,11 | **5b** 12:16 26:8 | **9** |
| **294** 107:12,13 | 105:14 108:2,5 | 26:14,15,16,18 | |
| **29a** 33:11,14 | **382** 61:3 | 26:19,21 | **9** 12:19 28:18 |
| **29b** 33:14 | **383** 61:3 | **5c** 26:18,20 | 29:2 74:8 |
| **3** | **389** 63:12 | 27:4,5,6 | 126:22 |
| | **390** 63:12 | **6** | **90** 46:12 |
| **3** 12:15 22:20 | **393** 19:5 | | **900** 4:21 |
| 22:25 23:2,15 | **3:27** 46:23 | **6** 12:17 23:8,11 | **90071** 3:23 |
| 23:16 24:4,6,9 | **4** | 27:16,17 28:1 | **91** 12:6 |
| 24:10,14 | | 68:9 94:5 | **92** 53:8 |
| **3.55.** 101:3 | **4** 12:15 22:21 | **6.1** 27:9 | **94** 57:8 98:21 |
| **30** 102:19 | 22:25 23:2,24 | **60** 94:5 | **95** 55:23 57:14 |
| 129:7 | 24:5,10,14 | **601** 3:5 | 115:22 |
| **300** 46:7,9,9 | 43:16 50:3 | **61.2** 24:1 | **950** 4:21 |
| 134:22 | **4.60** 116:14 | **67** 23:25 | **96** 12:7 |
| **30326** 4:22 | **4.60.** 116:13,23 | **7** | **9:03** 1:17 |
| **309** 74:8 | **4.77** 100:6 | | **9th** 46:24 47:3 |
| **30th** 129:24 | **40** 36:4 | **7** 12:18 19:3 | 57:20 58:1,5 |
| 132:5,12,18 | **41** 23:8,11 | 27:24 28:4,6,7 | 58:11 88:8,17 |
| **32** 12:20 52:4 | **42nd** 3:14 | 28:10,11,17 | 99:19 100:8,13 |
| **33** 12:21 30:18 | **43** 108:22,23 | 40:6 126:24 | **a** |
| **330** 134:21 | **45** 108:5,6 | **71** 68:8 78:18 | |
| **3332** 27:23 | **450** 21:21 | 79:12 118:17 | **aaron** 3:25 |
| 28:12 | **47** 12:22 | **72** 43:3,11 46:7 | **able** 49:13 |
| **3337** 30:17,19 | **47.4** 24:2 | 46:16,18 47:25 | 98:22 105:24 |
| **35** 34:11 | **48** 86:12 | 48:3,6 50:23 | 130:1 |
| 105:14 | **5** | 51:7,21 | **abonce** 5:22 |
| **3580** 105:12 | | **8** | **above** 103:11 |
| **36** 12:5 108:22 | **5** 13:13,20 26:5 | | 103:13 |
| 108:23 | 94:5 | **8** 12:18 16:9 | **abreu** 5:5 12:8 |
| **3646** 96:9 | **5,000** 110:6 | 17:16 28:14,17 | 105:7,7,8,10 |
| **37** 36:4 | **500** 41:24 | 68:9 | 106:1,4,17,19 |
| | 122:3 | **80** 51:24 52:1 | 107:3,4 108:18 |
| | | 55:23 | |

| | | | |
|---|---|---|---|
| 108:19 110:14 | 69:16 | **address**  126:10 | 115:1 |
| **absolute**  22:6 | **actually**  23:10 | **addressed**  31:6 | **affected** |
| **absolutely** | 28:12 37:10 | 39:21,23 | 112:17 118:14 |
| 35:16 72:6 | 38:19 40:9,12 | 126:22,24 | **affects**  114:24 |
| **accept**  79:3 | 43:22,25 44:15 | **adjourned** | **affirm**  35:19 |
| 80:2 93:3 | 44:18 45:12 | 132:25 | **afternoon**  96:6 |
| 113:23 116:24 | 46:9 48:10,18 | **adler**  5:23 | **aganga**  5:24 |
| **acceptable** | 49:6,20 53:20 | **administrator** | **ago**  43:3,11 |
| 66:6 | 54:23,25 55:1 | 131:21 | 49:5 72:19 |
| **accepted**  27:9 | 60:15,17 65:2 | **admissibility** | 86:12 87:25 |
| 67:22 111:3 | 70:4,18,20 | 14:19 | 91:1 |
| 115:22 | 72:11,23 73:11 | **admissible** | **agree**  20:12,14 |
| **accepts**  113:11 | 75:7,14 76:10 | 15:6 | 44:5 45:13,13 |
| 113:14 | 79:24 81:16 | **admission** | 50:22 51:17,19 |
| **access**  49:17,18 | 82:9,16,21 | 33:16,17 | 51:19 54:6 |
| 80:1 107:11 | 83:12 84:14 | **admit**  18:2 | 55:8 64:17 |
| **accessed** | 85:25 88:10 | **admitted**  32:21 | 66:23 68:24 |
| 107:11 | 90:24 93:24,25 | 33:11 | 70:5,8,24 71:2 |
| **accident**  53:22 | 94:10 98:8 | **adopt**  39:17 | 71:5,10,13 |
| 55:1,3,4 | 99:7,9,15,17 | **adopted**  67:20 | 72:4 74:22 |
| **accomplishm...** | 99:24 100:14 | 68:16 111:4,6 | 76:4 78:3,6,13 |
| 72:14 | 102:2,7,8,23 | 111:8 | 82:3,5,23 83:6 |
| **account**  95:21 | 104:20 106:23 | **adopting**  67:23 | 83:7 85:3,6 |
| **accreditations** | 106:25 109:25 | **adr**  131:14 | 91:8 96:13,17 |
| 42:9 | 110:8,13 | **advantage** | 96:22,25 97:18 |
| **accuracy**  67:8 | 111:11,17 | 43:17,18 44:24 | 98:2 103:15,16 |
| 83:9 | 112:7,25 113:3 | 93:9 | 103:16 122:5 |
| **accurate**  55:15 | 115:14 116:13 | **advertising** | **agreed**  16:1 |
| 134:4 | 117:25 | 124:2 | 20:8 |
| **achieve**  67:8 | **ad**  29:6 | **advice**  38:13 | **agreements** |
| **acknowledge** | **adam**  17:8 | 44:17 | 131:21 |
| 48:6,9 54:22 | 25:8 | **advisor**  89:25 | **agrees**  102:7 |
| **acquisition** | **add**  34:6,23 | 90:7 | 102:22,23 |
| 85:20 | 127:5 | **advisors**  90:5 | **ahead**  14:6 |
| **act**  21:24 | **additional** | 90:17 | 16:5 17:14 |
| **actual**  21:7 | 125:23 128:20 | **affect**  22:1 | 18:20 19:13 |
| 53:14 54:21 | 129:2 | 114:15,23 | 21:4 23:20 |

36:7 39:2 50:1
52:24 59:2
66:3,18 84:6
96:3 101:1
105:8 106:18
110:19 114:9
114:11 117:5
117:12 120:22
122:20 123:12
**ai** 36:25 37:5,6
48:19,23 49:14
49:19,20,21,23
50:2,3,3,6,17
53:16,19,19
55:5,5,6 60:24
63:9 64:1,1,1,9
65:6,17,21,24
65:24 66:9,13
112:2
**aid** 40:10
**alameda** 89:21
95:2,4,6
**alan** 4:24
**alex** 11:21 32:6
89:2,2,5
**alexander** 4:12
**allow** 43:4 98:7
**allowed** 122:16
**alludes** 109:15
**alternative**
73:25 74:12,19
**amassed** 72:14
**americas** 4:4
**amount** 20:17
20:23 22:10,11
27:6 121:11

**amulic** 5:25
**analysis** 22:21
23:22 36:14,17
36:20 37:2,12
37:17,22,25
38:3 39:6,13
39:17 40:21
42:4 53:14
54:2,8,11,12
54:18,20,21,21
55:9,19 58:2
67:12 71:18
77:13 83:13,16
**analyst** 40:21
84:4 93:11
**analyze** 60:16
**analyzed** 54:24
**andrea** 5:25
**andrew** 6:3
11:7
**andy** 9:11
**angeles** 3:23
**angry** 113:6
**annemarie**
10:7
**announced**
72:6
**answer** 41:12
48:12 51:4,13
56:1 57:23
62:24 68:15
74:11 91:3
98:7 100:11
103:7 104:3
105:25 106:17
108:16 109:22
113:6 115:3,5

115:6 117:22
118:4 119:7,17
119:19,20
**answered**
101:4
**answering**
119:8
**answers** 104:5
**anthony** 7:16
**anticipated**
29:12
**anybody** 96:1
105:6 110:8,16
114:7 117:1,8
119:16 120:18
122:12 123:8
124:18,20
**anymore** 94:12
**apologies**
108:6
**apologize**
108:13
**apology** 64:14
**appear** 16:2
29:6 33:14
**appearing**
119:5
**appears** 27:17
30:22 125:7
**applications**
132:3
**applied** 67:12
**applies** 107:21
**appointed**
90:16
**apportioning**
24:11

**appreciate**
125:15 129:9
132:24
**apprise** 132:6
**approach**
82:10
**appropriate**
18:10 66:14,15
**appropriately**
30:8
**approval**
129:19
**approved**
24:20
**approving**
30:15,16,17
**approximately**
98:21 101:11
**architects**
122:1
**arcos** 9:8
**area** 70:1,10
76:20 80:12
102:10 118:14
120:9
**argue** 91:9
100:15 102:16
104:18 116:2,6
116:8,11,12,14
**arguing** 22:11
22:12 79:16,17
100:17 102:14
**argument**
15:21 23:18
34:20 129:7,12
129:22

| | | | |
|---|---|---|---|
| **arguments** 15:14 | 80:23 82:19 | 42:6,7,13 | **avery** 7:7 |
| **armand** 6:1 | **assessed** 81:16 | **assistance** 40:10,11 | **avoidance** 20:1 |
| **arrangements** 44:12 | **assessing** 49:23 80:19 | **assume** 97:4 113:17 | **aware** 61:17 69:2,6 73:19 73:22,24 74:19 |
| **arrived** 78:19 | **assessment** 38:15 47:25 | **assumes** 72:25 | 81:17 86:4 89:7,8 107:5,8 |
| **arthur** 105:7 | 50:25 51:1,1 | **asymmetry** 101:23 | 113:12 121:8 121:16,17 |
| **article** 32:11 | 54:4,7,14,15 | **atlanta** 4:22 | **axis** 105:18 |
| **articles** 50:11 | 58:23,24,24 | **attached** 50:9 | |
| **artificial** 45:21 45:23,25 46:3 48:11,12,15,16 | 67:13,14 69:1 70:21 73:7 75:10 77:24 | 52:1 83:21 **attempting** 24:15 | **b** |
| 48:22 49:9 55:3 59:6,10 | 79:21 80:6,13 81:14 82:12,17 | **attorneys** 3:4 3:13,20 4:2,11 | **b** 1:21 12:21 33:5,7,10,11 33:12 |
| 59:20 60:4,11 60:21 84:15 | 85:10,12 88:2 95:20 97:12 | 4:20 **attributable** | **back** 20:7,15 20:23 21:19 |
| **artificially** 78:7 | 104:15,16,21 105:3 107:15 | 79:13 **audience** 38:7 | 22:6,10,11,13 24:20,25 25:1 |
| **artur** 5:5 | 107:16 108:15 | **audio** 22:9 | 28:9 58:16 |
| **ascribe** 103:20 104:13 | 116:7,9,10,20 116:21,25 | 24:13 41:24 49:12 | 63:4 65:3 72:22 73:15 |
| **aside** 39:12 97:12 | 118:11,13,17 **assessments** | **australasia** 43:17,18 93:10 | 74:5 77:25 89:23 90:9,23 |
| **asked** 14:11 39:17 40:25 | 38:11,14 39:9 67:23 106:14 | **australia** 36:1 93:11 124:14 | 90:23 94:1 126:15 128:3 |
| 49:25 60:16,18 61:11,12 62:3 | 110:12 111:25 **asset** 20:2 | 125:10 **authority** | 131:16 **background** |
| 65:11 121:16 | 36:15,21 37:3 | 29:19 | 113:3 |
| **asking** 29:15 37:18 44:3 | 37:13 38:1,4,8 38:14 39:13,18 | **available** 75:17 **avenue** 3:5 4:4 | **backwards** 127:13,24 |
| 62:10,10,15 65:17,21,25 | 39:24 67:5 78:8,16 103:9 | **average** 76:2 78:1,19 107:24 | **bad** 60:25 81:12,18,21 |
| 66:9 70:13 96:7 119:2 | 103:10,11 111:9 | 108:8 **averaged** 76:1 | 94:14 **bank** 42:19 |
| 120:17 **assess** 72:16 | **asset's** 55:13 **assets** 19:17 | **averaging** 79:11 | 69:2,6 **banker** 42:21 |
| 73:9 75:21 | 39:10 40:11 | | 42:24 43:18 |

44:7,11,14,16
44:20 45:1,2,4
45:14
**bankers** 43:23
44:3
**bankman**
49:11 89:18,25
90:16 91:4
92:5
**bankruptcy**
1:1,12,23
21:15 22:3,7
24:20,21,25
**base** 72:14
**based** 14:19
24:8 31:24
73:9 75:12,21
78:16 93:21
114:4 118:11
118:19
**basically** 22:12
23:24 24:9
26:7 27:8,9
45:24 60:18
64:3 70:13
**basis** 124:9
127:8
**bct** 79:18
**becin** 6:2
**behalf** 13:9
14:17 15:3
35:9 124:23
**behlmann** 6:3
**belief** 88:2
**believe** 27:23
28:7 31:6 34:2
35:9,10 69:9

88:1 90:8,20
97:2,6,7,10
107:19 119:14
127:5 128:15
130:8
**ben** 7:3 106:10
**bench** 125:4
**beneficial**
128:17
**berg** 11:10
**best** 67:12
76:22 131:8
**better** 15:20
44:4,17
**big** 50:19
**biggest** 76:11
81:11 119:14
**billion** 40:6
**billions** 95:15
**binder** 52:1
**binders** 35:13
35:15
**bit** 67:11 80:24
86:4 94:14
**bitcoin** 20:15
20:17,21,23
95:15,16 111:5
111:7,14,14,18
111:19
**blochwitz** 6:4
**block** 11:11
**blonstein** 14:8
**blow** 46:25
88:9
**board** 79:6
90:5,7,17

**boards** 91:5
**bob** 117:10
**borrowed**
19:17
**borrowers**
126:20
**bottom** 23:14
23:25 52:8,13
52:15,17,19,21
55:25 56:2,11
56:15 66:4
77:15
**bought** 72:20
**boundaries**
46:1 100:7
107:2
**bowling** 1:13
4:13
**box** 84:17
**boxes** 49:4
**brackets** 30:24
**bradley** 7:13
**bray** 6:5
**break** 41:14
69:18 76:25
79:7 84:8
**brett** 9:24
**breuder** 6:6
**brian** 9:2,13,17
11:8
**brief** 110:21
120:23 126:10
126:23,24
129:2
**briefing** 125:3
126:4,4,8
127:2 128:21

**briefly** 15:16
91:18 96:3
**briefs** 125:23
125:24 129:6
**brier** 3:8 13:6
13:7,8,8,12,16
13:25 14:6,7
14:11,14 15:1
15:5,13,20,24
16:13,16,20,24
17:1,4,8,12,25
18:5,8,13,20
18:22 19:4
22:23 23:3,11
23:15,17,19
25:7,10,12
26:12,15,17,22
26:23 27:15,17
28:22,23 29:5
29:22,25 30:6
30:22 31:2,6,9
31:12,18,22
32:7,10,14,16
32:24 33:1,3,7
33:14,20 34:2
34:18,22 35:3
**brifkani** 6:7
**bring** 59:13
77:20
**brings** 82:7
**broad** 39:8
**broke** 83:5
**broken** 24:6
**brokered**
44:12
**bronge** 14:11
126:17,24

bronge's 14:17 15:2
brought 132:15
brown 6:8
bruh 4:16 130:10,12,13 130:13,22 131:8,25 132:1 132:1,5
btc 79:17 80:4 80:5 109:3,9 109:14 111:11
bullets 23:17
burgeoning 53:4
burks 10:21
business 40:3,4 40:5 41:21
busy 127:15
buy 72:21 115:9
buyer 71:20,23
buying 104:7 113:18
bye 125:16,16

**c**

c 3:1 12:21 13:1 33:5,7,10 33:12 134:1,1
ca 3:23
cahana 6:9
caitlin 9:20
calculate 69:8 69:24 75:7 107:24

calculated 23:23 69:9,12 78:1
call 19:21 44:2 44:6 62:8 67:12,16 78:22 81:23 82:18 107:1 120:15 125:18 130:14
calls 82:11
cam 5:11 114:10
cameron 7:19
campagna 6:10
cap 70:2 81:5 99:12 100:4
capacity 90:7
carcamo 9:8
care 34:5 56:5
careful 105:2
carl 6:18
carlo 8:22
carol 9:14
caroline 11:4 95:10
carolyn 7:18
case 1:3 3:19 4:1 38:6 39:19 39:24 47:17 48:3 50:16 59:11 60:23 67:7 68:1 69:8 72:3 73:17 74:3 78:24 128:24
cases 72:6 92:13 126:8

catalyst 112:10
catch 53:10,24 53:25
categories 131:2
caught 49:11
cause 21:25 115:12
caused 90:4,8 90:9,10,11
causes 90:21
caveat 23:3
cel 47:14,18,20 47:21 49:5,6,7 55:20 65:17,18 66:5,6,15 67:9 69:8,9,24 70:6 70:15,25 71:3 71:6,7,8,11,20 72:3,14 73:3 73:20,23 74:1 74:13,22,25 75:4,17,19 76:13,15 79:16 79:16 80:3,14 86:17 92:8 93:16 94:3,16 96:14 98:21,22 98:25 101:17 101:21 102:11 103:24,25 104:19,25 105:1,15,22 107:8,11,13 109:4,14 112:14,20 113:20,22

114:15,19 115:1,12,23 116:13,14,22 122:24
cel's 57:21 58:12 71:16 72:24 80:13
cell 71:24 101:25 112:17
celsius 1:7 12:22,23,24 16:11 19:5,10 19:16,17,21 20:7,9 22:14 29:20 33:15,16 33:21,22,23 43:2,10 46:22 47:8,11 51:23 59:14,24 86:5 87:2 88:7,11 88:13,16,24 98:22 101:13 101:14,23 114:25 115:8 115:12,13,23 126:20
cent 78:19 79:12
cents 94:5 96:14 102:19 118:17
ceo 93:8,9
certain 18:23 23:23 60:7
certainly 19:12 32:2 125:24

**certification**
41:2,9,10,13
41:15
**certified** 40:20
40:25 41:10,18
134:3
**chains** 122:2
123:16,21
124:8,10
**challenges**
66:23 67:2
**chance** 13:17
72:21 89:15
**chang** 6:11
**change** 106:25
111:15
**changed** 44:19
45:10,14 111:8
**changes**
106:24 107:20
111:17 115:14
125:24 131:20
**chapter** 61:16
62:3,4,10,12
62:13,18
**charles** 5:22
**chart** 22:22
23:10 27:11
50:10 109:12
**charts** 22:22
109:7,7
**chase** 9:12
**chatgpt** 50:3
50:21
**cheap** 72:21
**cheapest**
102:19

**check** 58:17
62:19 84:1,2,4
84:14,19
**chingiz** 10:22
**choose** 80:9
100:2 116:16
**chose** 76:21
118:14
**chosen** 118:9
**chris** 3:10 6:2
7:8 8:15 126:1
**chrisptoher**
8:24
**christiansen**
6:12
**christina** 6:14
**christopher**
6:15 9:22
**ciamarone**
6:13
**ciancarelli**
6:14
**circulating**
106:22,23
115:22
**citations** 127:5
**cite** 84:24
**claim** 23:22
83:16
**claims** 96:18
**clarification**
116:17
**clarify** 76:8
120:8 124:11
**class** 111:9,19
**classify** 114:20

**clear** 34:16
39:5 45:10
50:5 130:25
**cleared** 131:7
**clearly** 108:11
**clerk** 13:2
35:19 43:7
117:10 132:9
132:11,19
**clients** 38:11
**close** 50:10
78:14 117:8
130:3 131:11
131:15
**closed** 72:8
125:21
**closes** 94:18
**closing** 15:14
76:1 125:23
127:13 129:6,7
129:12,21,24
**coco** 6:15
**code** 111:12
**cofsky** 6:16
**cohen** 32:6
**cohost** 43:7
**coin** 79:2,14,15
81:5 93:25
94:6,8 110:24
110:25 111:2,3
114:24
**coins** 49:13
75:19 79:23,24
102:1 115:14
**coleman** 11:12
**collapse** 47:21
76:16 77:8,11

102:1 114:21
114:22,23
115:6,7
**collapsed** 92:2
**collateral**
126:14,19
**collect** 118:24
**collected** 46:22
**college** 25:21
**colloquy** 126:5
**colodny** 3:25
91:13 128:10
128:14 131:15
131:16,20
**come** 26:8
27:12,21 29:10
29:15,17 38:11
53:21 64:3,5
67:4 75:11
76:23 77:22
80:23 87:11
126:12 128:3
**comes** 27:8
29:18,19 39:8
39:10 83:2
115:17 119:10
123:25
**coming** 25:17
29:7 34:1
78:24
**comment**
87:24 121:10
**commentary**
20:6 23:5,7,8
25:24 29:13
**commented**
121:11

comments
  25:24 85:4
commission
  4:19,20
committee
  3:20 4:2
  125:18 128:5
  128:18 129:1
  130:18
committee's
  124:24
common 24:12
  79:5,20,25
  80:1 85:24
commonly
  80:8
communicati...
  62:12
communicati...
  61:13,14,18
  62:15,16,17
  64:21
compagna's
  27:18,21,24
companies
  41:24,24 42:5
  90:1,17
company 37:8
  101:15 123:21
compare
  111:20
compensation
  121:3
compilation
  46:14
compile 48:13
  48:13

compiled 45:23
  46:2 49:4,7,8
  49:17 50:18,20
complaint 32:4
complete 19:22
  110:7
completed
  47:24 50:25
  127:6
completely
  72:7 97:12
  99:16
completing
  15:10
complexity
  111:13
complicated
  113:5
complication
  57:4,6
composed 55:5
comprehensive
  48:7 50:24
  51:7
compromise
  77:23 80:5
comps 38:3
computer
  98:17
concept 78:3
concepts
  123:21
concerning
  22:21 26:5
conclude 15:9
concluded 16:1
  133:1

conclusions
  125:23 127:11
  128:7 129:2,6
condition
  101:23
conditions
  55:20 57:22
  58:13 129:18
conducting
  55:8
conference
  129:22
confirmation
  2:1 34:9,14
  119:1 126:23
  129:18 132:5
confirmed
  24:24
connect 91:25
consent 24:15
consider 35:11
  55:9 72:13
  79:4,8
consideration
  114:5 118:13
considered
  44:11,14 119:2
considering
  34:13
consistent 56:6
constraints
  109:17
consumer
  130:2
contemplate
  15:9

continued
  99:17
continuing
  14:12 129:20
contract 20:22
  22:14
contracts 40:6
  41:22
contractual
  22:1
contractually
  20:9 21:8,11
contribution
  132:2
control 87:10
  87:11
converts
  104:10
cook 6:17
cooper 11:15
copied 26:13
  63:15
copies 64:21
copy 13:14
  46:23 52:16
  53:15,20,21
  68:9
cornell 4:17
corporate
  72:25 73:16,22
  74:13,19 91:5
  131:22
correct 20:19
  20:24,25 21:17
  29:14 34:21
  36:12,15,21,25
  37:1 39:19,24

| | | | |
|---|---|---|---|
| 39:25 40:3,8 | 78:20,25,25 | 18:7,11,16,18 | 56:11,14,19,19 |
| 41:1,16,17 | 79:9,10 81:3,4 | 18:20 19:2,9 | 56:24 57:4,7 |
| 42:7,8,16,19 | 81:4,5,6,7,10 | 19:18,24 20:4 | 57:10,15,18 |
| 42:20 43:19 | 81:25 83:14,18 | 20:12,14,17,20 | 59:16,25 64:12 |
| 45:11,19,22,23 | 83:19,23,24,25 | 21:2,4,7,7,10 | 64:13,15,15,18 |
| 46:8,18,18 | 84:1,3 86:18 | 21:15,24 22:3 | 64:20,25 66:13 |
| 47:3,4,15,19 | 87:16,17 88:19 | 22:16,19,25 | 66:18 68:10,12 |
| 48:2,5 50:7,8 | 88:20 89:5,6 | 23:7,14,16,18 | 79:12 84:12 |
| 50:11,12,14,15 | 90:2 97:7,9 | 23:20 24:19,24 | 88:12,23 91:12 |
| 50:17,20 51:9 | 99:16 104:13 | 25:4,9,11,13 | 91:14,16,18 |
| 51:11,21 53:8 | 106:10,11 | 25:16,21,25 | 92:3 94:21 |
| 53:9,14 54:9 | 108:3,10 | 26:2,4,8,14,18 | 95:12,18,24 |
| 55:10,17,20,21 | 110:24 120:10 | 26:22 27:2,5 | 96:3 97:24 |
| 56:22 58:3,7,9 | 123:16 126:21 | 27:11,14,16,21 | 98:9,14,19 |
| 58:14,20 59:4 | **corrupt**  72:1,2 | 27:25 28:3,6,9 | 100:11,20 |
| 59:5,8,11,21 | 73:10 | 28:13,16,20,22 | 101:8 102:24 |
| 59:22 60:6,8,9 | **cost**  88:2 | 28:25 29:9,15 | 103:4,6,17 |
| 60:23,24 61:10 | **cote**  6:18 | 29:24 30:1,5,9 | 105:5,8 106:3 |
| 61:15,16 63:7 | **counsel**  64:22 | 30:10,11,18,20 | 106:17 107:3 |
| 63:8,10,11,13 | **countries** | 30:20 31:1,3,4 | 108:18 109:17 |
| 63:14,16,25 | 40:10 | 31:4,8,10,16 | 110:14,19 |
| 65:6 66:1,8,10 | **country**  134:21 | 31:16,20,25 | 112:13 113:8 |
| 66:11 67:2,5,6 | **couple**  13:9 | 32:5,9,13,15 | 113:19 114:7,9 |
| 67:9,10,12,13 | 110:17 129:10 | 32:21,25 33:2 | 114:11 117:1,5 |
| 67:16,18,19,21 | 129:25 131:20 | 33:5,10,19,25 | 117:8,12,20,21 |
| 68:19,20,25 | **course**  19:7 | 34:4,10,12,16 | 118:22 119:6 |
| 69:10,11,13,17 | 42:12 98:20 | 34:21,23 35:1 | 120:2,10,11,18 |
| 69:23,23 70:7 | **court**  1:1,12 | 35:4,14,16,23 | 120:22 121:21 |
| 70:9 71:1,4,9 | 13:3,7,11,14 | 35:25 36:2,6 | 122:10,15,17 |
| 71:12,16,17,21 | 13:15,17,22 | 37:19 38:9,23 | 122:20 123:4,8 |
| 71:22,24,25 | 14:2,5,10,11 | 39:2,20 41:4,6 | 123:12 124:2,5 |
| 73:17,20 74:1 | 14:13,15,21,25 | 43:4,6,8 45:7 | 124:12,18 |
| 74:3,20,23,24 | 15:4,7,18,21 | 47:9 48:19,25 | 125:2,6,12,17 |
| 75:5,6 76:3,5,6 | 15:25 16:5,8 | 49:25 51:2,4 | 125:20 126:7 |
| 77:2,3,5,6,8,9 | 16:11,14,19,23 | 52:3,7,11,13 | 126:18,21 |
| 77:11 78:4,8 | 16:25 17:3,10 | 52:16,22,24 | 127:1,9,14,22 |
| 78:12,13,16,17 | 17:13,19,22 | 55:24 56:3,5 | 127:25 128:12 |

128:17,20,25
129:14,25
130:4,11,20,25
131:9,12,25
132:4,6,10,14
132:20,24
**court's** 74:8
**courtney** 10:21
**courtroom**
15:10 124:21
125:7
**courts** 36:22
117:19
**craig** 10:6
**crash** 105:1
**create** 27:3,11
111:16
**created** 27:13
42:14 49:13
111:2
**creditor** 13:24
22:4 105:7
117:4 123:11
**creditor's**
23:22
**creditors** 3:21
4:3 20:7,8,10
21:23 22:1,5
23:24 24:12
25:2
**crews** 5:11
12:10 114:8,9
114:10,10,13
**crisis** 113:25
**criteria** 69:1
**critical** 98:8

**criticize** 86:25
121:15
**criticized**
121:12
**criticizing**
86:23
**cross** 12:3
13:13 35:2,3,9
35:12 36:9
91:20 96:4
105:9 110:22
114:12 120:25
122:21 123:9
123:13 124:19
125:7
**crucial** 110:11
**crypto** 20:10
21:5,9,23
22:13 27:7,10
38:19 52:6
53:2 67:23
72:15,16,17
73:2 78:11,24
80:17 93:24
97:4 113:18
115:9 119:19
122:1
**cryptocurren...**
53:5 114:16
115:2
**cryptocurrency**
20:6 21:22
37:3 38:12
66:20,24 67:2
67:21 68:17
69:4 78:7
101:25 111:6,8

111:16,20
113:11 114:17
**cunha** 6:19
**currencies**
113:14
**currency** 20:20
80:21 111:18
113:23 114:1
**current** 14:14
93:7
**currently**
42:14 85:18
94:17
**custom** 4:12
**customer** 73:6
73:11
**cut** 117:12
120:2,3 124:12
**cycle** 99:21

**d**

**d** 12:1 13:1
**d'antonio** 6:20
**daily** 109:3
**daken** 11:12
**dalhart** 5:19
12:13 122:13
122:16,19,19
122:20,22
123:3,5,6,8
**damage** 78:21
**dan** 8:9
**daniel** 5:9
**darious** 7:12
**data** 45:25
46:3,19 49:7
49:22 54:7
55:6,7 58:2,25

60:7 70:1,18
70:19,21,21
72:1 73:9 76:7
76:19 77:10,12
77:14 79:9
81:2,3,5 82:15
82:20,23,25
83:12,12,13
85:11 86:21
87:1 93:22
99:5,23 100:18
111:25 121:6
**date** 59:1 65:19
66:7,16 69:13
69:14,25 70:6
70:7,15,23,24
71:2,3,8,9,12
71:20 73:12
75:3,12,13,21
77:14 85:10
92:1,10 93:17
98:25 101:12
101:18 102:4,6
103:21,24
104:12 109:5
114:1,5 116:12
116:22 127:20
132:16,17
134:25
**dates** 54:24,25
58:2 92:4,9
96:15 105:16
**daubert**
124:25
**david** 5:3,19
5:23 7:7 8:8
9:8 10:15,25

122:19
davied  6:21
davis  5:7 12:7
  51:24 61:15,17
  61:24 62:7,17
  91:25 96:2,2,3
  96:5 97:25
  98:1,11,12,16
  100:12,20,22
  101:10 102:24
  102:25 103:1,8
  103:17,18
day  16:17
  75:25 76:1
  117:6
days  46:13
  47:16 48:14,22
  55:12 76:2,4,9
  76:9,19,20,21
  76:24 77:1
  108:9
deal  70:11
deals  41:25
deanna  43:4,8
  120:2 132:10
  132:16,20
debt  21:12
debtor  1:9 3:4
  13:9 21:14,18
  21:21 23:23
  24:7,11,15
  125:17 128:5
debtor's
  124:24
debtors  14:16
  21:10 22:1
  23:21 24:16,17

35:9 60:22
61:23 64:21
124:23,23
125:19 126:2
128:8,18,25
130:17 132:22
deceptive
  85:22
decide  117:20
decides  73:3
decision
  119:25,25
  120:16
declaration
  27:18,22 34:19
  35:2 81:12,13
  96:8,13,18,23
  98:3
declined
  103:24
decreased  70:6
  70:9,15
deductions
  118:19
deep  38:14
  83:17
definition
  131:3
degree  40:1,2,3
  40:4,7,8,9,19
  41:15
degrees  40:14
deliberate
  55:16
delved  83:16
demand  19:21
  20:10 98:23

demands  20:10
  21:5 24:17
department
  4:10
depending
  24:8 38:18
depends  24:22
  40:23 82:1
deploy  38:12
  38:12
deposed  14:22
deposited  20:7
  20:21,24 21:9
  21:14
deposition
  14:8 15:10,11
  43:14 45:24
  47:5 58:16
  63:6 68:1,6,9
  74:3 79:21
  86:9 90:6
derek  6:4
derive  38:19
described
  98:24
descriptions
  84:7
design  60:15
  123:21
designed  122:2
  123:15,17
  124:10
designs  111:13
desk  128:2
detail  85:8
details  77:17
  117:24

determination
  87:23
determine
  21:11 66:6
  77:16
determined
  21:8 22:4
determining
  54:17 65:18
  66:15 85:12
  96:20
developed  49:9
  67:17 112:24
developing
  123:22
development
  36:24 37:18
  42:15 123:20
developments
  13:5
diaz  6:23
dietrich  11:20
difference  24:6
  50:19 64:7
  82:20,23
different  24:16
  31:17 44:13
  49:5 50:6,7
  78:3 79:17
  88:6 111:19
  127:20
differentiate
  78:14
difficult  97:22
difficulty
  96:19

| difiore 6:22 | discussions | display 43:2 | 61:13 131:22 |
|---|---|---|---|
| digital 19:17 | 62:8 131:11 | disproportio... | doe 6:25 |
| 20:2 36:15,21 | dislocate 95:16 | 114:15 115:1 | dogecoin 92:11 |
| 37:13 38:1,3,8 | dislocated | dispute 81:24 | 92:12,13,15,17 |
| 38:14 39:10,13 | 69:21 70:3,11 | 83:8 | 92:21 110:24 |
| 39:18,24 40:11 | 70:12,17,19,20 | disrupted | 111:21 113:10 |
| 40:17,17,18,22 | 70:22 73:10 | 98:23 | 113:15 |
| 42:6,7,13 67:5 | 76:12,13,16 | distinct 64:12 | doing 22:3 |
| 78:15 | 77:4,7 82:11 | 83:17 | 43:25 44:1 |
| dimitry 5:1 | 82:11,13,14,22 | distinguish | 47:20 55:1 |
| 13:24 14:3 | 82:24 92:25 | 36:23 | 60:3 71:18 |
| diplomas 40:4 | 93:2,6,22 | distribute 26:6 | 84:11 112:15 |
| direct 12:3 | 95:23 96:19 | distribution | 123:23,24 |
| 61:13,23 | 99:1,4,5,6,7,10 | 26:6 | 129:12 |
| disagree 51:14 | 99:15,18,18,21 | district 1:2 | dollar 27:6 |
| 51:16 86:18,19 | 100:1,5,5,15 | divided 76:1 | 116:18 |
| 86:20,22 | 100:17 101:22 | dixon 6:24 | dollars 27:9 |
| disagreement | 102:5,7,12,13 | 33:4 | 40:6 95:15 |
| 28:22 | 102:14,18,21 | doable 48:16 | 116:4,20,23 |
| disclosure | 102:22 103:10 | docket 14:17 | donald 9:21 |
| 22:24 23:5,12 | 103:14,23 | 19:1,4 30:25 | double 53:21 |
| 28:12,14,19 | 104:14,17,19 | 31:14,14 34:9 | 76:13,16 77:4 |
| 33:8 130:23 | 104:20,23,24 | 51:24 56:20 | 99:8 104:24 |
| discovery | 105:20 106:11 | 96:9 | doubt 20:1 |
| 60:22 63:7 | 106:12,13,15 | document 18:1 | 58:21 |
| 65:7 | 106:21 107:2 | 18:15 19:12 | dow 5:13 117:3 |
| discrepancies | 107:21 110:10 | 27:23 28:11 | 117:3,5,6,13 |
| 109:17 | 114:17 115:10 | 30:17 32:18 | 117:14,15 |
| discrete 130:17 | 115:15,21 | 43:13 51:11 | 118:23,25 |
| discuss 129:20 | 116:1,6,6,9,15 | 54:13 59:9,14 | 120:6,7,18 |
| discussed | 116:23 118:13 | 87:19 105:12 | draft 45:21 |
| 31:23 62:9 | dislocation | 105:14 108:2,3 | drew 11:16 |
| 118:12 131:13 | 80:12 92:22 | 108:5,21,22,23 | drop 100:8,13 |
| discussing | 99:9 100:2 | 128:11 | dropbox 59:4 |
| 59:21 82:2 | 114:15,21 | documents | due 21:25 |
| 122:4 130:17 | 115:1,20 | 13:13 18:23 | 22:13 |
| | 116:12 | 30:12 32:19 | |

duffy   7:1 11:16
dump   49:22
duplicative
   19:7
dynamic
   107:20
dynamics
   106:24,25
   110:7 112:22
   119:12
dzaran   7:2

**e**

e   1:21,21 3:1,1
   12:1 13:1,1
   134:1
eades   7:3
earlier   83:20
   115:17 127:3
early   48:22
   49:3
earmarked
   20:21
earth   93:14
easier   122:24
east   4:21
ecf   56:20
eckhardt   7:4
economic
   101:16
economics
   38:14 40:8,9
   41:21
ecro   1:25
editing   51:11
effect   115:10
effectively
   21:22 78:1

effort   132:24
efforts   37:18
   40:15
ehrler   7:5
eight   28:25
   48:1 51:10
   87:25 90:25
eighty   56:8
either   27:7
   31:23 127:4
elected   27:9
election   26:6
elementus   81:7
   81:17 83:3,9
   121:8
eleven   29:17
   30:1
eligible   19:17
   20:2
elizabeth   8:6
elle   10:24
ellis   3:3 13:9
   35:8 124:22
   126:2
ellison   95:10
elon   92:19,21
   93:2 111:22
   112:3,6,17,19
   113:14,15
elvin   11:1
email   61:10,14
   63:9,15,19
   64:4
emailed   61:9
   63:4
emails   60:25
   63:22,23 64:5

64:19
emergence
   129:18
emphasis   24:4
employed   95:4
employment
   93:7
endeavoring
   130:6
ended   77:1
   110:9
endemic   78:10
ends   97:9
engage   63:6
engages   85:4
english   94:14
   119:15
enjoy   121:18
enter   129:14
entered   23:2
   26:19 28:1,17
   29:2 32:23
   33:12 47:11
   88:13,24
entire   19:12
   47:25 50:25
   67:1 79:19,23
   104:16 114:24
entirety   18:9
entities   44:13
entry   43:17
   65:14 66:4
envisioning
   128:10,14
equity   24:12
   27:7,10

equivalent
   20:17
eric   5:15
   120:20
error   53:10
errors   51:17
   51:21 54:1
   58:16,17,20
especially
   41:21 43:25
   44:23 82:5,13
   103:22 127:16
essential   55:9
essentially
   15:8 17:16
   21:19
estate   21:10
   39:12
esther   9:5
estimate   24:8
eth   109:3
ether   20:23
ethereum
   109:4,9,14
evaluation
   39:23 42:10
   46:1,2 52:6
   67:9
event   63:6
   92:22 105:22
   106:7 114:15
   114:18,18,19
   114:20,21,23
   115:1,15,20
events   83:24
   115:21

**everybody**
105:4 124:15
128:3
**evidence** 15:9
16:11 18:9
19:5,6,8,10,11
19:13 23:1,2
25:17 26:17,18
26:19,25 27:12
27:19,19,25
28:1,3,16,17
29:1,3,25 30:2
30:7 31:23,25
32:2,17,20,23
33:11,13 47:8
47:10,11 59:24
60:1 88:11,12
88:13,22,23,24
118:5 125:21
125:25
**evidentiary**
15:15
**exact** 32:18
67:5 77:18,22
92:1 96:20
117:24 118:9
**exactly** 17:1
22:6,9 23:11
23:19 45:3,12
79:15 82:9
86:10 87:8
92:5,6 109:15
113:17
**examination**
13:13 35:2,10
35:13 36:9
91:12,20 96:4

105:9 110:22
114:12 120:25
122:21 123:13
**examine** 14:22
96:1 110:16
123:9 124:19
125:7
**examiner**
84:25 85:2,5
86:17,23 87:15
90:14 91:4,6
**examiner's**
86:5,13,25
90:25
**example** 18:3
32:3 94:2,4
103:12 115:16
**excellent** 14:14
15:20
**except** 39:7
115:4
**excerpt** 19:12
19:14
**excerpted**
18:23 30:24
**excerpts** 18:1,5
18:10 30:13
31:24 33:8
**exchange** 4:19
4:20 112:23
**exchanges**
112:24 118:3
**exchanging**
130:15
**exclude** 63:5
**excluding**
37:17

**exculpated**
131:6
**exculpation**
130:16,18
**excuse** 28:5
119:8
**exhibit** 13:12
16:8,9,12 17:5
17:6,14,15,16
18:24 19:5,11
19:15,20,25
22:20,21 23:2
23:15,16,24
24:4,5,6,9,10
24:10,14,14
25:4,5 26:4,5
26:19 27:16,17
27:23 28:1,4,6
28:7,10,11,14
28:18,21 29:1
29:13 30:14
32:23 34:5
43:2,10 46:22
47:8,11 50:9
51:24 55:23
56:17 59:14,24
83:21 87:2
88:7,11,13,16
88:21,24
**exhibits** 12:14
13:19,20 16:7
17:22 18:25
19:9 22:17,25
25:5,7,13,15
26:2 28:17
29:2,5 33:12
34:21

**existed** 111:1
**exists** 100:15
**expected** 20:8
**experience**
40:5,16,23,24
41:20 42:1,3
66:14 85:14,16
103:3,9,22
**expert** 35:11
36:11 45:18
47:16 51:25
62:11,11 98:24
105:11,12
117:19 119:2
119:14,15,22
119:23 120:9
120:14 124:10
**expertise**
119:10,10,11
119:13
**experts** 119:14
**explain** 60:13
104:23 113:5
**explained** 45:5
45:24
**explaining**
92:6,7
**expounded**
118:19
**expressed**
131:4
**extensive** 40:5
40:16 41:20
127:2
**extensively**
41:25 111:22

**extent**  27:19
  29:23 31:25
**external**  37:3
  38:7 40:23
  92:25
**extraction**  59:6
  59:20
**extremely**
  117:23
**extrinsic**  94:11
  94:11,12,13
  97:7 103:11
**eyes**  87:16

**f**

**f**  1:21 9:25
  87:11,11 134:1
**fabsik**  7:6
**face**  21:25
**fact**  21:12 24:5
  32:3,17,18
  38:6 82:9
  87:14 89:24
  107:10,11
  118:19 125:22
  127:3 128:6
  129:1,5
**factor**  92:25
**factors**  112:4
**facts**  32:1
  127:11
**factual**  85:4
  86:5
**fahey**  7:7
**fair**  36:14,17
  37:20,21 38:8
  53:14 54:2,4,6
  54:11,12,14,14

54:18 55:8
58:12 60:10
62:14,25 64:17
65:2 67:13,14
68:24 69:1,3,8
69:9,12,24
70:5,21 76:23
77:18 79:21
80:7,13 82:12
82:16 84:21,22
85:5,6,9,12
104:15,16,21
104:21 105:3
106:14 107:15
107:17 115:20
116:7,9,10
118:11,12,16
**fairest**  105:4
**fairness**  61:21
**faith**  84:4
**fake**  49:13
**false**  43:21
**familiar**  92:11
  92:12,19 94:25
  95:2
**fantastic**  15:24
**far**  29:13 38:24
  103:13
**faraj**  12:4
  15:11 35:5,10
  35:17,23,25
  36:9,11 39:5
  43:14 46:4,23
  47:2,13 48:6
  50:5,23 51:2,2
  51:7 59:3 60:3
  61:6 63:13

64:13 68:2,14
86:1 88:17
91:20,22 93:7
94:25 96:4,6
98:19 100:11
101:8 105:9
106:18 110:22
114:12 117:16
119:1 120:25
121:2,23
122:21 123:13
123:15 124:3
124:14 125:8
**faraj's**  43:10
  51:25
**feasibility**  39:8
**february**  87:3
  87:25
**fed**  60:15 61:10
**federal**  117:19
  119:5,5 120:10
  120:11
**feed**  21:22
**feel**  120:8
  126:9
**ferraro**  7:8
**ferry**  4:21
**field**  119:16
  120:14
**figure**  70:14
  105:15,21
  106:5 107:24
  107:25 108:1,3
  108:4,12
  109:10,10
**figures**  81:20

**file**  14:17,18
  29:21
**filed**  13:12,20
  14:1 31:14
  47:16 131:23
**filing**  16:16,20
  17:6 18:13,23
  30:10
**filings**  30:9
**final**  53:23
  90:12 119:1
  125:3 131:15
**finance**  40:1,2
  44:1
**financial**  36:18
  37:23 40:20
  42:12 44:12
  101:23 103:22
  111:10
**find**  29:11
  77:17 82:6
  87:11 119:16
**finding**  86:16
**findings**  85:5
  86:5 125:22
  127:3,11 128:6
  128:13 129:1,5
**fine**  15:7
  122:25 123:1
**finish**  34:24
  45:1 48:11
  95:12 100:11
**finished**  47:19
  47:21 99:6,7
**finishes**  99:8
**firm**  42:17
  81:2

| | | | |
|---|---|---|---|
| **first** 16:2,2,8 | **font** 46:15 | 110:20,23 | 105:11 108:2 |
| 25:14 33:20 | **footnotes** 23:9 | 112:13,16 | 109:19 |
| 38:6 39:16,16 | **foregoing** | 113:8,9,19,21 | **galka's** 96:8,13 |
| 39:21,22 41:14 | 134:3 | **front** 48:17 | 96:17 |
| 53:4,7 59:18 | **forensically** | 90:9 96:9 | **gamble** 72:16 |
| 60:14,18,20 | 46:22 | 107:13 116:21 | **gamestop** |
| 64:4 77:9 | **forgive** 94:14 | 130:5 | 103:12,13 |
| 81:16 89:9 | **form** 21:13,14 | **froze** 98:17 | **geary** 7:11 |
| 91:25 92:2 | 24:12,16 30:17 | **frozen** 71:1 | **generate** 46:17 |
| 101:11 105:11 | 129:19 | **ftt** 109:4,8 | 48:7 50:14,18 |
| 105:12 107:19 | **formal** 37:12 | **ftx** 47:21,21 | 50:23 51:8 |
| 110:1,24,25 | 37:22 41:14 | 49:6 92:2 | 59:10 63:9 |
| 111:3,6,7 | **formally** 39:21 | 94:25 95:4,7 | **generated** 46:7 |
| 119:3 122:1 | 39:23 73:23 | 114:21 | 50:16 |
| **fist** 90:10 | **format** 53:16 | **full** 51:1 94:1 | **georgia** 9:15 |
| **fit** 113:1 | **forms** 32:10 | **function** 38:18 | **gergi** 8:10 |
| **five** 51:12 | 85:22 | 40:12 111:15 | **getting** 127:7 |
| 78:23 79:4 | **fortune** 41:24 | **functionality** | 131:5 |
| 80:9,10 86:14 | **foundation** | 111:10 | **gheorghe** 7:12 |
| 100:7 113:5 | 26:12,24 29:8 | **functions** | **giardiello** 7:13 |
| 116:4 | 29:23,24 30:3 | 80:21 118:6 | **gist** 80:15 |
| **fix** 89:15,22 | 31:19 32:11,24 | **funding** 95:6 | **give** 14:21 25:1 |
| 90:3 | 93:12 | **funny** 64:3 | 30:18 35:20 |
| **fixing** 90:11 | **foundational** | **further** 19:19 | 38:13,15 40:9 |
| **flaherty** 11:17 | 83:13,15 | 49:18 76:19 | 51:12 52:19 |
| **flannigan** 7:9 | **founder** 93:13 | 104:22 | 56:13,18 57:1 |
| **florence** 7:9 | **four** 31:12 | **future** 71:16 | 62:24 68:14 |
| **flower** 3:22 | 116:19,20,23 | 72:3,24 75:20 | 74:11 77:22 |
| **follow** 14:18 | **frankly** 124:8 | 101:15 113:25 | 81:20 89:15 |
| 47:14,17 | 128:23 | 114:5 | 92:3,10 94:1 |
| 113:13 115:6 | **free** 121:18,19 | | 96:10 98:16,17 |
| 130:14 | **friday** 129:3,6 | **g** | 108:14 115:5 |
| **following** 61:5 | **fried** 89:18,25 | **g** 13:1 | 115:15 117:24 |
| 82:14 109:12 | 90:16 91:4 | **ga** 4:22 | 118:4,24 |
| 111:22 | 92:5 | **galka** 7:10 | 122:24 127:25 |
| **follows** 115:4 | **frishberg** 5:9 | 81:12,13,17,22 | 132:15 |
| | 12:9 110:17,19 | 81:23,25 96:18 | |
| | | 96:22 98:2,11 | |

**given**  55:6 73:5
  73:7 80:17
  87:24
**giving**  38:16,17
  115:5 117:16
**glad**  102:3
**glenn**  1:22
**glitch**  22:9
  24:14 41:25
  49:12
**global**  41:23
  93:9
**globally**  40:7
**go**  14:5 16:5,21
  17:14,20 18:20
  19:13 21:4
  23:20 25:4,13
  36:7 38:13,20
  39:2 41:7
  43:11 46:24
  48:25 50:1
  52:24 53:17,19
  55:23 56:25
  59:2,18 60:10
  60:14,18 61:2
  62:19 65:11,12
  65:23 66:3,18
  72:9,21 73:6,7
  74:5 75:20
  76:11,18,19,20
  77:16 80:4
  81:19 84:6,14
  87:5 88:8
  90:14,23 91:7
  93:22 96:3
  99:17 100:1
  101:1 102:20

105:1,8,14
  106:6,18
  108:21 109:24
  110:19 114:9
  114:11 116:7,9
  116:10 117:5
  117:12 120:22
  122:20 123:12
  126:9,15
**goes**  99:7,9,25
  108:7 112:9
**going**  14:22,24
  15:8,9,18,18
  15:21 16:6
  17:17 25:17
  30:12 32:21
  35:17 37:17
  45:6 48:25
  49:1,2 51:7
  54:13,21 56:2
  56:10,12 57:2
  57:13 59:17
  65:3,3 68:11
  72:7 74:7,8
  75:14,17,18,19
  85:14 86:3
  93:3 94:3
  97:16 102:19
  102:20 104:22
  110:4 119:16
  119:16 121:14
  121:15 124:12
  125:2,3 128:12
  128:21 131:16
**gonzalez**  7:14
**good**  13:3,8
  36:6 70:18

76:21 83:12
  91:22,22,24
  96:6,6 98:6
  110:8 117:6
  118:15 126:1
  126:13
**gorrepati**
  11:18
**gotten**  41:21
**governance**
  44:2
**government**
  29:19 44:13
**governments**
  40:10
**grace**  3:8 13:8
**grade**  80:6
**grammar**
  60:25 65:6
**granted**  73:8
**graubert**  7:15
**great**  132:19
**green**  1:13
  4:13
**greene**  7:16
**greg**  8:7
**gregory**  9:25
**ground**  40:12
**grounds**  26:12
  31:19
**group**  43:17,18
  44:24 93:9
**grows**  94:8
**growth**  38:20
**guarantee**
  118:1

**guess**  16:6 23:3
  91:22
**guided**  45:25
**guilty**  32:19
**gundersen**
  7:17
**gurland**  7:18
**guthrie**  7:19
**guy**  77:20
  89:19
**guys**  82:18

---

**h**

**h**  8:6
**half**  51:15
**hamilton**  4:12
**hand**  35:13,18
  68:10 90:14
**hands**  119:12
**hanna**  10:19
**hans**  10:4
**happen**  71:24
  93:4,18 97:16
**happened**  73:4
  92:7 105:22
**happens**  71:13
  85:18 106:21
  114:18 116:1
**happy**  16:21
  17:1 35:13
  127:23
**haqqani**  7:20
**hard**  26:23
  29:7 31:23
  76:14 104:18
  110:2
**harnessing**
  83:17

| | | | |
|---|---|---|---|
| **harrison** 11:19 | **high** 72:18,22 | 52:9,20 56:1,9 | **house** 4:12 |
| **harsh** 8:4 | 75:15 94:1,5,7 | 56:22 57:1,3,9 | **housekeeping** |
| **he'll** 14:22 | **higher** 93:23 | 57:11,12 59:23 | 13:9 129:10 |
| **head** 93:8,12 | 104:25 | 64:14,16,23 | **hu** 63:13 65:14 |
| 93:12 | **highlight** 17:18 | 66:17 88:10,21 | 66:4 |
| **header** 56:23 | 65:14 66:4 | 91:11,13,15 | **human** 64:2 |
| **heaps** 123:25 | **highlighted** | 94:23 95:9 | **hundred** 46:19 |
| **hear** 14:2 | 17:18 | 98:7,16,20 | 63:14,17,20 |
| 15:21 25:17 | **highlights** 18:6 | 104:4 110:18 | 64:10,17 69:23 |
| 61:20 64:25 | 25:15 | 113:6 114:8 | 71:13 72:7 |
| **heard** 16:3 | **history** 55:10 | 117:3,14 | 82:3,23 96:24 |
| 112:19 120:12 | **hit** 76:12 | 118:24 119:8 | 97:8 100:16 |
| 123:19 124:8 | **hittelman** 7:24 | 120:20 124:4 | 122:3 |
| **hearing** 2:1,1 | **holcomb** 7:25 | 124:25 125:14 | **hurt** 89:21 |
| 47:9 59:25 | **hold** 16:14 | 125:19 126:1,3 | 90:23 |
| 89:9 120:13 | 17:19 85:25 | 127:15,18 | **hussein** 12:4 |
| 127:17,19,21 | 127:25 129:3 | 128:8,10,15,22 | 36:9 91:20 |
| 132:12,17 | 132:14 | 129:9 130:15 | 96:4 105:9 |
| **hearsay** 17:12 | **holder** 71:8 | 130:22,23 | 110:22 114:12 |
| 29:6 31:18 | **holding** 117:18 | 131:8,17 132:1 | 120:25 122:21 |
| 32:12,24 33:4 | **hon** 1:22 | 132:8,23 | 123:13 |
| 33:18,24 | **hone** 55:19 | **honor's** 88:14 | **hybrid** 2:1 |
| **heavily** 89:21 | **honest** 111:24 | 127:24 | **hyde** 2:25 |
| **held** 43:17 | **honestly** 67:22 | **hope** 72:10,10 | 134:3,8 |
| **help** 38:25 | 108:13 115:3 | 72:12 73:4 | |
| 90:10,24 118:5 | 117:21 | 84:13 125:9,16 | **i** |
| 121:5 122:7,8 | **honor** 13:6,10 | 130:22 | **i.e.** 20:2 |
| **helped** 125:16 | 13:23,25 14:7 | **hopefully** | **idea** 36:6 58:19 |
| **helpful** 127:12 | 15:1,13 16:4 | 129:21 | **identified** |
| **hernandez** | 16:13 17:25 | **hour** 48:3 | 131:1 |
| 7:22 | 19:4 22:23 | **hours** 36:5 | **identify** 122:15 |
| **herrmann** 7:23 | 27:15 29:5,14 | 43:3,11 45:11 | 122:17 130:11 |
| **hershey** 7:21 | 29:22 31:6,22 | 46:7,13,14,16 | **immanuel** 7:23 |
| **hex** 109:4,7,11 | 34:22 35:10 | 46:18 47:25 | **immediate** |
| 109:14 | 36:1 39:3 41:5 | 48:6,18 50:23 | 19:22 |
| **hi** 123:10 | 47:7 48:21 | 51:8,11,21 | **immediately** |
| | 50:2 51:3 52:2 | 86:12,14 127:8 | 69:13 |

| | | | |
|---|---|---|---|
| **impact** 55:16 | **indiscernible** | 109:12 111:18 | **infrastructure** |
| 78:12 | 13:20 18:17 | 111:25 112:7,8 | 39:9 123:22,25 |
| **important** 99:3 | 22:12,22 26:1 | 112:8,24 115:7 | **inherent** 66:23 |
| 106:20 129:23 | 26:9 33:22 | 115:18 116:4,8 | 67:2 |
| **impossible** | 35:20 37:14,15 | 116:25 117:11 | **initial** 63:24 |
| 48:14 51:20 | 40:7 42:16 | 118:18 119:11 | **initially** 63:1 |
| 67:8 78:14 | 48:10,12 58:25 | 120:1 123:23 | **inside** 38:19 |
| 97:12 | 61:19 62:5,22 | 123:24 124:1 | 85:8 90:21 |
| **inadmissible** | 68:11 69:16 | 126:15 131:24 | 107:1 110:12 |
| 14:19 | 71:14 72:19,20 | **individuals** | **insider** 115:16 |
| **include** 17:22 | 75:9,11,12,18 | 42:5 130:24 | 115:16,18 |
| 73:19 131:23 | 75:18 76:14,17 | **industry** 41:3 | **insights** 55:13 |
| **included** 30:23 | 76:23 77:21 | 41:21 45:6 | 55:15 |
| 59:6 | 80:4,21 81:20 | 76:4 78:25 | **instance** 77:9 |
| **includes** 54:7 | 81:21 83:5 | 79:19,25 80:8 | **instances** |
| **including** | 84:11 85:2,11 | 80:19,20,20,22 | 131:2 |
| 34:14 42:13 | 85:16,21 86:2 | 90:9 93:4,24 | **institution** |
| 61:13,15 | 86:15 87:1,4 | 119:11,13 | 41:16 |
| 123:23 | 88:1 89:12,12 | 121:25 122:1,4 | **instructions** |
| **inconsistent** | 89:13,20 91:7 | 122:6,6,9 | 60:4 |
| 109:19 | 91:17 92:2,6,7 | 124:7 | **instrument** |
| **incorrect** 58:13 | 92:16 93:5,11 | **inflate** 78:7 | 36:18 37:23 |
| 58:14 | 93:13,21 94:1 | **inflated** 70:2 | 103:22 |
| **increase** 72:18 | 94:8,15 96:12 | **influence** 79:1 | **instrumental** |
| 75:14 | 96:17,18 97:2 | 79:2 80:2 | 55:12 |
| **increased** | 97:9,11,13,17 | **information** | **instruments** |
| 101:17 | 97:20,21 98:21 | 29:20 48:13,14 | 42:13 |
| **increases** 72:11 | 99:11 100:4,6 | 49:3,7,16,17 | **intelligence** |
| 104:20 | 100:10 101:12 | 49:21 53:19 | 45:21,23,25 |
| **indica** 102:12 | 101:13,16,19 | 60:7 73:6,8,11 | 46:3 48:11,13 |
| **indicative** 99:2 | 102:15,16 | 75:12,16,20,22 | 48:15,16,23 |
| **indicia** 101:22 | 103:20,21,21 | 81:19,24 83:2 | 49:10 55:3 |
| **indicted** 89:7,8 | 103:23 104:4,9 | 83:9,11,17 | 59:6,10 60:4 |
| 89:10 126:4 | 104:12 105:2,3 | 84:15 101:19 | 60:11,21 84:16 |
| **indictment** | 105:13,20,21 | 101:23 114:2 | **intend** 13:13 |
| 32:6 | 106:6,9,13 | 115:18 117:17 | **intention** 83:4 |
| | 107:6 109:1,2 | 119:17 130:15 | |

| | | | |
|---|---|---|---|
| **internal** 37:18 50:13 | 45:2,3,14 69:2 69:6 | **january** 103:13 | 32:1,5 34:8 **judicially** |
| **internally** 59:14 | **investor** 97:3,5 97:19 | **jaoude** 8:3 **jarno** 11:10 | 28:23 30:8 **judson** 6:8 |
| **international** 44:1,1 | **involved** 42:4 **islamic** 93:12 | **jasleigh** 7:11 **jasmine** 6:1 | **july** 69:25 70:7 70:14 94:4 |
| **internet** 33:24 62:1 | **issue** 21:20 23:14 47:22 | **jason** 5:17 123:10 | **jump** 72:17 **june** 57:20,21 |
| **interrupt** 106:17 132:11 | 53:15 62:25 75:18 76:12 | **javier** 10:11 **jeff** 9:23 | 58:1,5,8,8,11 58:11 69:10,19 |
| **interruptions** 120:4 | 79:16 82:6,8 90:21 97:8 | **jeffrey** 3:17 **jivani** 8:4 | 70:6,14 99:10 99:13,14,19 |
| **intrinsic** 37:13 37:23 65:17 | 99:6 104:18 109:23 111:14 | **job** 43:25 48:1 48:3 110:8 | 100:3,3,8,14 102:6,13,19 |
| 69:7 70:25 71:3,6,7,14 | 126:12,22 129:23 130:17 | **joe** 9:1 **joel** 11:11 | **justice** 4:10 |
| 93:24 97:9 103:14 | 131:19 **issued** 47:2 | **john** 7:2 **johnson** 8:5 | **k** |
| **introduce** 54:20 | 129:11 **issues** 47:14,18 | **joint** 124:25 128:11,12,19 | **kaczkowski** 8:7 |
| **introduced** 32:10 | 63:21 126:10 126:11 130:5 | **joke** 111:2 **jonathan** 10:9 | **kahn** 8:8 **kaila** 11:9 |
| **introducing** 51:21 | 130:16,21,23 131:5,12 | **jones** 8:6 **jose** 9:7 | **kaitlyn** 7:24 **kaplan** 8:9 |
| **introduction** 52:6 53:1 | **issuing** 90:15 **item** 129:15 | **joseph** 6:20 **joshua** 4:8 | **karen** 1:25 **karolina** 10:3 |
| 54:19 | **items** 13:9 32:2 | **journey** 72:13 **joyce** 8:21 | **kass** 8:10 **kathryn** 7:17 |
| **investigating** 47:21 49:5,6 | **j** | **judge** 1:23 39:18,24 96:2 | 8:20 **katie** 11:5 |
| 92:8 | **j** 5:23 6:15,18 11:24 | 102:25 105:7 106:1 117:10 | **kaufmann** 11:13 |
| **investigation** 47:20 | **jacobs** 8:1 **jail** 91:8,8 | 118:5 119:24 119:24 132:9 | **kaza** 8:11 **keeney** 8:12 |
| **investment** 42:19,21,24 | **james** 25:10 **janell** 7:4 | **judge's** 120:15 **judicial** 30:21 | **keep** 104:19,22 **keeping** 20:22 |
| 43:18,23 44:3 44:6,7,11,14 | **janko** 8:2 **jankovic** 8:2 | 31:5,17,21 | **keith** 4:7 9:19 **kenneth** 7:5 |
| 44:16,20,25 | | | |

kept 20:22
kevin 6:16 9:10
key 78:11
keyan 10:23
khai 10:1
khezri 8:13
kind 20:2 21:6
  29:12 106:10
  111:1
kirkland 3:3
  13:8 35:8
  124:22 126:2
kirsanov 5:1
  12:6 13:19,23
  13:24 14:3,4
  91:15,16,17,19
  91:21 94:24
  95:9,14,19,25
kitra 6:9
klorane 8:14
knauth 11:20
knew 43:24
know 14:22
  26:23,25 29:22
  30:11 32:17,20
  34:12 43:24
  44:4,5,16,20
  45:1,3 53:18
  54:4 67:22,25
  67:25 72:1
  74:2,12 80:11
  82:1,18 84:20
  86:12 91:6
  92:1,9 93:2
  94:3,8,16 97:3
  97:21 98:9
  99:23 102:8,18

104:4 106:14
108:1,13
109:14 110:10
112:1,2,6
113:16 117:21
118:2,2,4,6
120:15 124:13
124:14,14
125:9 126:8
127:15,18
130:15
knowing 114:2
knowledge
  111:1
knowledgeable
  117:23
known 80:8
knows 90:9,9
  97:5 99:24
  122:9
koenig 3:10
  8:15 126:1,2
  126:17,19,22
  127:7,10,15,23
  128:8,16,18,22
  129:9,15 130:3
  130:8 131:10
  131:14,18
  132:7,22
kohli 8:16
kordomenos
  8:17
koster 8:18
kouly 8:19
kuethman 8:20
kuhns 8:21

kuhrt 8:22
kwasteniet
  8:23
kyle 6:5

**l**

l 7:6 8:17 9:21
la 41:15
lackey 8:24
lafayette 6:17
language 60:25
large 41:22
  111:21 121:11
largest 123:22
late 16:17
lauren 10:17
law 125:23
  127:11 128:7
  129:2,6
lawyer 74:2
lay 117:17
layla 9:18
layne 8:25
lea 8:14
learn 46:2
  60:16,17 93:16
leave 65:3
  102:20
leaving 46:15
ledanski 2:25
  134:3,8
ledger's 56:19
lee 5:17
left 61:6 70:25
  128:2
legal 134:20
legitimate
  78:15

lehrfeld 9:1
lennon 9:2
leonard 9:3,4
letting 125:15
level 112:9
levine 9:5
lexington 3:5
licari 9:6 120:1
  120:2
lie 51:12 62:23
  84:10,11 88:4
  92:3,10
likely 103:25
  131:22
likewise 40:11
limit 78:21
  79:1 80:1
  127:1
limited 29:20
  61:15 126:6,25
  128:23
line 60:10,10
  60:13,13
lines 68:9 74:8
link 29:18
linkedin 43:2
  43:10 45:10
links 84:1,14
  84:14
liquidate 74:14
liquidated
  74:22
liquidation
  22:21 23:22
  24:2 74:1,13
  74:20

**liquidity**  85:20
  107:17 113:3
**list**   13:12 14:7
  18:2,24 123:24
  130:5 131:23
  132:15
**listen**   51:4
  113:12
**lists**   61:8
**litigation**   131:5
  131:21
**little**   38:24,25
  41:4 67:11
  80:24 86:4
  94:14
**llc**   1:7
**llp**   3:3,12,19
  4:1
**loan**   19:16,22
**loaned**   20:3
**loans**   19:21
**located**   35:25
**lock**   107:16
  115:16
**locked**   87:6,11
  87:15 90:15
  91:4,6 107:8
  107:10,14,14
  115:12,14,23
**long**   44:18 49:4
  72:19 104:5,7
  113:7 122:2
  124:7 125:10
  129:11
**longer**   46:4
  107:17

**look**   13:17
  41:19 43:16,24
  46:21 52:4
  55:6 56:23,25
  63:12 68:8
  70:9 72:18
  75:10,14 76:8
  76:18 77:14
  79:22,23 80:6
  80:7 84:24
  88:6 104:20,23
  107:12,15,16
  107:18 112:21
  115:3 121:12
  132:14
**looked**   70:1,2
  70:10,18 81:10
  81:11,15 82:21
  118:15 122:2
**looking**   18:3
  55:24 56:10,12
  57:16,17 73:12
  73:12,13 82:16
  88:15 108:1
  131:15
**looks**   23:8
  31:13 32:11
  109:25
**lopez**   9:7 43:1
  43:5,6,9 45:16
  46:21 51:23
  55:22 59:13
  61:2 64:11
  65:3 66:20
  68:22 87:10
**los**   3:23 9:8

**lot**   32:7 39:9
  41:22 43:24
  44:4,16 46:19
  49:7 60:24
  62:23 76:25
  80:15 82:2,4
  85:6 92:8,18
  104:22 112:4
  113:15 126:7
  129:8
**loud**   98:19
**love**   89:15
  121:25 122:4,6
**loved**   89:2
**lowest**   100:19
**lu**   12:12 123:10
  123:10,12,14
  124:6,12,16,17
**lucas**   7:25
**luke**   10:20
**luna**   76:16
  77:7,10 105:1
  105:22 114:14
  114:22
**lupu**   9:9

**m**

**m**   8:23 9:10
  10:12 11:13
**machine**   64:9
**maciej**   10:5
**made**   16:17
  19:21 80:4,5
  86:17 91:1,1
  110:9,11
**madison**   25:10
**major**   53:13
  101:25 114:17

114:18,19,21
  114:22,23
  115:11 123:23
**make**   17:19
  37:10 39:5
  53:13 54:1
  55:15 69:18
  80:14 87:24
  91:2 94:10
  108:15 129:3
  129:21
**makers**   79:18
  93:4 112:5
  118:3
**makes**   60:12
  80:14 86:5
  104:21 113:15
  119:25
**making**   78:10
  78:22 79:6
  80:9,16 85:20
  85:22,22,23
  121:11
**man**   52:15
  56:8 57:11
**manipulate**
  85:17
**manipulated**
  57:22 58:13
  69:21 78:19
  79:9 85:13,19
**manipulates**
  92:25
**manipulation**
  55:16 78:6,12
  78:16 79:13
  85:18 86:6,17

95:20,22 112:9
**manipulators**
  112:5
**manus** 9:10
**marginal**
  118:15
**maribel** 8:17
**mark** 4:16 9:3
  10:8 130:13
  132:1
**marker** 79:6
**market** 24:9
  38:20,21 49:14
  49:15 55:20
  57:22 58:13
  69:15,15 70:2
  70:4,11,12,17
  70:19,20,22
  72:20 73:10
  76:8,12,13,16
  76:21 77:5
  78:6,10,22
  79:14,18,23
  80:4,5,9,12,14
  80:14,17 81:5
  82:11,12,14
  85:13,18,19,22
  85:22,23 86:6
  86:17 90:13
  92:25 93:1,2,4
  93:5,6 95:16
  95:20,22,23
  96:19 98:25
  99:4,6,7,10,12
  99:18,19 100:4
  100:5,5,15,18
  101:21,22

102:1,5,7,11
102:12,13,14
102:18,21,22
103:3,9,10,14
104:14,19,21
104:24,24
105:20 106:11
106:13,15,21
106:24,25
107:2,21,21
110:5,7,10
112:3,5,5,5,7,9
112:9,22,25
113:4 115:4,10
115:19 116:1,6
116:9,15,23
118:3,13
**markets** 76:12
  82:13 85:17
  99:1,15 100:1
  101:19 103:23
  106:13
**marks** 9:11
**marsh** 9:12
**martin** 1:22
**mashinsky**
  32:3,6 89:5,6
  89:10,24 90:16
  91:4
**masumoto**
  9:13
**material** 62:2
**materials** 59:4
**matter** 1:5
  49:5 77:19,20
  77:21 110:3,3
  112:21

**matthew** 10:18
**maunder** 9:14
**max** 7:10 81:12
  81:13,14,17,21
  82:9,20,21,22
  96:8,13,17,22
  98:2,11 100:15
**max's** 82:5
  86:20
**maximum**
  89:23 116:3
**maza** 4:24
**mccammon**
  11:21
**mccarrick** 3:9
  12:5 35:8,8,24
  36:7,8,10 39:3
  39:4 41:8 43:1
  43:5,9,12 45:7
  45:9,15,17
  46:21 47:1,7
  47:12 50:1,4
  51:6,23 52:4,9
  52:12,18,23,25
  55:22 56:1,4,7
  56:9,12,16,22
  57:1,5,9,12,16
  57:19 59:13,17
  59:19,23 60:2
  61:2,4 64:11
  65:2,5 66:18
  66:19,22 68:8
  68:13,21,23
  74:7,10 87:10
  87:13 88:10,14
  88:18,21,25
  91:11 94:20

95:17 98:12
100:10 118:21
124:22,22
125:5,19
**meadow** 9:15
**mean** 41:2,9
  44:23 46:11
  48:16 57:23
  72:15 73:6
  82:22 88:3
  89:21 91:2
  92:4 93:22
  97:4,11 109:25
  110:2,4 111:9
  111:10 113:2
  113:15 116:5
  120:12,13,15
  123:25 126:11
**meaning** 64:12
**means** 64:8,9
  82:14 83:2
  92:24 97:13
  99:4 106:22
  115:5 116:14
  117:25
**meant** 25:20
  45:3
**mechanism**
  112:12
**meghji** 9:16
**meme** 110:24
  110:25 111:2,3
**memorize**
  81:18
**memorizing**
  81:21

| | | | |
|---|---|---|---|
| **mendelson** 5:15 12:11 120:20,20,22 120:23 121:1 121:22 122:10 122:11 | **microphone** 117:9 | **monday** 129:2 129:7 | **multiple** 126:12 |
| **mendieta** 9:17 | **midpoint** 24:2 **mike** 8:5 10:10 **milliga** 9:18 **million** 21:21 | **money** 113:15 113:17 115:7,9 121:12 | **musk** 92:19,21 93:2 111:23 112:3,6,18,19 113:14,15 |
| **mention** 109:16 | 87:7,16 88:2 90:15 107:12 | **month** 101:11 **months** 87:25 | **muted** 117:10 |
| **mentioned** 124:9 129:16 129:17 | 107:13 115:25 **mind** 94:6 121:13 | 91:1 **morgan** 10:2 **morning** 13:3 | **n** |
| **message** 62:22 **messages** 61:13 61:14,24 62:20 | **mineola** 134:23 **minor** 114:19 114:20,20 | 13:8,18 91:22 91:24 96:6 126:1 | **n** 3:1 12:1 13:1 134:1 **name** 96:6 |
| **met** 92:8 **metadata** 48:17,18 | 115:11 **minute** 51:15 107:14 125:3 | **motion** 124:25 **motivation** 121:23 | 122:17,19 123:10,18 **names** 81:13 |
| **metalabs** 93:9 **method** 65:18 66:5 67:17,20 | **minutes** 113:5 **mira** 7:20 **missed** 84:18 | **move** 25:25 47:8 59:23 63:5 88:11,21 | 81:18,21 **nathaniel** 8:25 **nations** 17:8,13 |
| 68:16,24 75:24 **methodologies** 65:9 110:13 | 99:24 **missing** 85:7 110:4 | 99:4 112:7 113:4 132:16 132:17,18 | 25:8,18 **navis** 48:22 50:13 |
| 119:20 **methodology** 58:24 65:8 | **mistake** 54:22 58:5 108:15 110:9,11,11 | **moved** 80:11 113:2 **movement** | **ne** 4:21 **near** 48:7,9 50:23 |
| 66:15 67:11,14 70:19 77:25 82:8 85:1 | **mistakes** 53:13 **mo** 9:16 **model** 36:25 | 76:8 80:10 99:1 111:25 112:10 | **nearly** 67:8 **necessarily** 21:6 |
| 102:14 107:23 108:7 110:1 116:11 | 37:5,7 **modeling** 40:20 | **movements** 78:15,16 125:25 | **necessary** 85:2 **need** 30:11 58:22 61:5 |
| **mg** 1:3 **mia** 11:15 **michael** 7:14 | **mohsin** 9:16 **moment** 118:24 128:1,4 | **movers** 112:5 **moving** 112:3 112:11,25 | 72:13 77:16 116:9 120:11 132:21 |
| 7:15 8:3 | 129:16 132:15 | 127:22 **multifacets** 40:5 | **needed** 77:17 85:10 **needs** 131:2,6 **negative** 101:14 |

**negotiate**
41:25
**negotiated**
41:22 131:13
**neighbors**
112:1
**network** 1:7
29:20 33:15,16
47:23 69:16
89:3 93:8
**neutralize**
55:16
**never** 36:11,14
36:17,20 37:2
37:12,22,25
38:3 39:13
42:17,19,21
89:2 99:6,8
109:20 117:20
122:14 124:8
**new** 1:2,14 3:6
3:15 4:5,14
13:5 25:15
**newco** 21:22
23:25 33:22
**news** 49:18
101:13
**nicole** 9:4
10:17
**night** 13:4,12
91:22
**nine** 28:20,25
46:13 48:18
**noah** 10:12
**non** 40:17
116:5

**noon** 14:9
**note** 13:19
124:24 129:15
**notes** 126:16
**notice** 30:11,21
31:5,17,21
32:1,5 34:8
**noticed** 30:8
**notices** 30:17
**november**
127:16,21
132:5
**noyes** 9:19
**nugenesis**
48:22 49:9
50:13 81:2
93:8
**number** 18:15
30:18,25 33:15
33:23 34:9
52:13,15 56:17
56:20 57:5
59:4 76:2,10
76:10,11,22,22
77:1 103:19
116:17
**numbers** 26:21
52:7,16,18,19
55:24 76:7
109:18
**nuraldeen** 6:7
**ny** 1:14 3:6,15
4:5,14 134:23

**o**

**o** 1:21 13:1
134:1

**o'connell** 9:20
**oath** 68:4
**object** 17:12
23:6 26:12,24
26:25 29:5,8
31:18 32:11,24
33:4,16,18,24
**objecting** 23:9
**objection** 14:5
17:13 19:6
22:23 23:11
25:11,16 26:14
26:15 27:14,20
30:1 32:3,13
32:18 33:8,25
34:9 47:9
59:25 94:20,21
95:17 118:21
121:20 123:2,2
**objections**
14:18,20 15:3
15:12,16,19,22
16:17,21 33:5
34:14
**objectors**
129:5
**obligated** 20:9
21:19 22:14
**obligation**
24:16,17
**obligations**
22:1
**obtain** 38:17
**obviously**
127:2
**october** 1:16
46:24 47:3

88:8,17 129:3
129:6,7 132:18
134:25
**offer** 22:17
**offered** 62:11
85:5 89:25
107:23
**offering** 24:15
35:12 38:7
**official** 3:20
4:2 39:20
**oh** 32:16 36:2
52:9 57:13
108:6 123:3
**okay** 14:5,10
15:19,25 16:6
16:19 17:15,21
18:19 19:14,18
19:19,24,25
20:4,5 21:2,7
22:20 23:18,21
24:23 25:3,5
25:14,19,23
26:9,20 28:3
28:11,16 29:1
29:4,11,17,18
30:14 31:1,10
32:21 33:10
34:15 35:1,4
36:23 37:12,16
37:22 38:15,25
39:12 40:14
41:6,18 42:3,9
45:10,15 46:4
46:15 49:3
50:22,25 51:14
52:3,11 53:23

54:6 55:2,8
56:3,24 57:7
57:15 58:15
59:3,16 60:20
61:17,21 62:14
62:25 63:24
64:7,11 65:12
65:14,25 66:2
66:12,19 67:14
67:24 68:8,21
69:24 74:5,17
74:22 76:25
77:25 79:3,5,7
80:15,24 86:8
87:2,14 88:6
89:14 90:12
91:3,10 93:18
98:6 99:2
102:3 103:14
103:20 104:3
105:13 106:5
106:20 108:6
108:21 109:9
111:21 112:2
115:3 119:1,7
121:23 122:15
122:20 124:2,5
125:12 127:9
128:3 129:15
129:25 131:9
132:19
**old** 134:21
**ombudsman**
130:2
**omissions**
109:21

**omnibus**
127:17 132:12
132:17
**once** 14:16
15:13 24:19
58:23 70:20
107:16 112:25
115:14 116:1,6
**ones** 31:13
123:19
**ongoing** 78:10
**onwards** 46:20
**open** 15:16
49:18,20,21
50:2,2,3,17
54:3 84:3
105:11 130:5
131:4,12,18
132:7
**opened** 37:6,9
**openings**
129:10,17
**operate** 79:24
**opinion** 38:7
90:21 98:24
114:14,25
117:18 122:23
**opportunity**
113:2
**opposed** 27:10
**optimize** 90:23
**option** 19:21
72:8
**oral** 62:15
**orally** 16:25
**order** 29:12
30:14,16

129:11 132:23
**orderly** 24:1
**orders** 30:8
**organic** 78:15
78:19
**original** 106:24
106:25
**originally**
24:21
**otis** 61:15 96:2
96:7
**otto** 5:7
**ought** 127:1
131:1
**outset** 31:9
**outside** 37:7
79:1 80:2
**outstanding**
15:15
**overruled** 14:5
**oversimplify...**
123:1
**overwhelmin...**
101:14
**owed** 21:12
**own** 15:3 50:13
83:13 112:23
112:23,24
118:2,3
**owned** 118:2,3

| p |
| --- |

**p** 3:1,1 7:21
13:1
**p.m.** 13:13,20
46:23 59:3
129:4,7,8

**paces** 4:21
**page** 12:14
18:13 23:8
43:11,16 46:7
46:19,24 50:10
51:11,15 52:4
52:8,8,10,13
52:21 55:23
56:2,4,14,21
56:23,25 57:8
57:14 59:18
60:15,18,20
63:12 65:12
66:2 68:8 74:8
83:21 87:5
88:8,15 105:14
108:2,21,21,22
109:13 110:6
**pages** 18:25
46:9,9,10,12
46:15 49:16
61:3
**paginated**
59:15
**pagnanelli**
9:22
**paid** 121:2,4,8
121:16,17
**panic** 115:8
**paolo** 6:13
**paper** 41:11
42:1 43:24
119:11 127:25
128:24
**paragraph**
53:4,7,7 57:17
108:25

paragraphs 54:5
parameters 92:24
paramount 55:19
pardon 107:7
part 19:2 23:10 50:7 54:12,13 54:18,20 62:12 62:13 72:25,25 78:18 85:12 99:21 104:12 112:11
partial 19:22 21:18
participated 122:14
parties 30:9 37:19 40:17 97:2 125:20 129:23 131:24
partner 41:23 93:14
parts 97:1 104:3
party 37:3 39:6 39:11,14,15
passed 101:11
past 45:11 47:22 106:10 122:14
paste 53:15,20 53:21
pasted 26:13 53:16 63:15

patel 11:14
patience 119:9
patricia 11:3
pattern 118:19
patton 9:23
paul 6:6 7:6
pause 59:1 65:19 66:7,16 69:13,14 70:6 70:23,24 71:2 98:25 101:18 101:20 102:4,6 102:11 105:16 114:25 115:12 115:24 116:12
pavon 32:6,19
paying 97:14
payment 113:11,23
pdf 43:11,16 46:24 52:5,10 52:13 55:23 61:3 63:12 65:12 87:5 88:8 105:14 108:5,6,23,23
pdfs 59:17
peer 37:7 68:25 120:11 120:12
peers 41:10,13 41:19 42:5
people 27:7 44:2 64:8 67:23 72:17 80:14 81:19 85:23 89:20,22

90:23 92:5,8 94:10 97:20 107:12,18,19 113:3 115:17 121:5 122:3,3 130:25
perceive 44:25 45:2
perceived 44:22
percent 23:23 23:25 24:1,2,4 24:5,10 47:19 48:5 59:22 63:14,17,20 64:10,17 69:23 71:13 72:7 78:23 79:4 80:9,10,11 82:3,23 96:24 97:8 98:21 99:12,13,14 100:6,7,16 115:22
perfect 15:24 84:10 109:24
performed 37:2 39:13,18
performing 58:2 71:19
period 55:7 69:16 70:4 72:1,2 73:13 73:14 75:16,17 75:23 76:9 104:17 107:9 108:8,11

118:14
permit 19:11
perry 9:24
person 39:17 39:22 61:15 97:5 115:8
person's 94:6
personal 88:2 90:21
personally 67:17 81:10 84:2
perspective 111:10,11
pesce 9:25
peter 7:2 11:24
petition 59:1 69:25 70:7,15 71:3,8,9,12,20 75:3,11,21 77:14 85:10 93:17 96:14 101:12,18 103:21,24 104:12,13 106:21 109:5 114:1,5 116:13 116:22
pham 10:1
phenomenon 103:12
phillip 8:13
phoenix 10:2
phone 62:8
piasek 10:3
pick 116:16

| | | | |
|---|---|---|---|
| **picture** 26:10 | 96:22,25 97:20 | **practice** 79:25 | **prices** 76:1 |
| **piece** 41:11 | 97:23 98:2,12 | 80:1 85:24 | **principal** |
| 42:1 43:23 | 99:3 100:19,23 | 117:25 | 122:5 |
| 119:10 | 101:5,5 102:19 | **prczek** 10:5 | **privacy** 130:2 |
| **pietro** 9:6 | 102:23 103:2 | **pre** 69:19 | **privileges** 43:3 |
| **pinpoint** 67:8 | 103:19 109:20 | 105:16 131:7 | **pro** 5:1,3,5,7,9 |
| **piss** 87:18 | 125:21 | **precedent** | 5:11,13,15,17 |
| 90:15 | **pointed** 58:15 | 129:18 | 5:19 13:24 |
| **plan** 23:25 | **points** 76:7 | **predict** 49:15 | 14:4 89:2 |
| 24:20,22 34:9 | **polzmacher** | **prepare** 51:20 | 105:7 114:10 |
| 131:23 | 10:4 | **prepared** 17:2 | 117:3 120:21 |
| **platform** 48:19 | **poor** 111:11 | 36:14,17,20 | **probable** 104:1 |
| 49:20,25 50:14 | **portion** 79:12 | 37:12,17,22,25 | **probably** |
| 69:3 71:1 | **portrayed** | 38:3 39:6 | 46:12,13 92:2 |
| 101:16 115:9 | 82:20 | 127:10,19 | 92:4 |
| 115:13,23 | **position** 18:8 | 128:6,9 | **problem** 76:14 |
| **platforms** | 19:6 21:24 | **preparing** | 79:15 90:8,10 |
| 115:11 | 30:6 71:19 | 48:20 50:6 | 94:23 |
| **pleaded** 32:19 | 121:14 122:7 | 81:10 84:24 | **problems** 90:3 |
| **pleadings** 31:4 | **positions** 89:25 | 119:3 | 90:11 |
| **please** 16:5 | 93:10 | **present** 5:21 | **procedure** |
| 43:6 63:18 | **positive** 73:10 | 16:8 127:19 | 30:15 |
| 65:13 81:15 | **possession** | **presented** | **procedures** |
| 94:14 117:9 | 98:22 | 24:14 | 30:16 131:14 |
| 118:24 119:7 | **possible** 21:13 | **presenting** | **proceed** 35:14 |
| 122:18 | 21:20,21 76:24 | 16:7 | 35:24 |
| **plenty** 41:13 | 106:2 | **pretty** 83:12 | **proceeding** |
| 41:22 93:10 | **post** 26:10 | **prevented** 63:1 | 120:4 |
| **plethora** | 47:21 62:1 | **price** 55:16 | **proceedings** |
| 117:17 | 105:16 106:21 | 58:2 74:25 | 61:16 62:7,18 |
| **plus** 46:7 48:3 | 116:22 | 75:7,9 78:1,3,7 | 64:15 133:1 |
| 83:21 | **posted** 46:23 | 78:15 79:13 | 134:4 |
| **point** 18:11 | 59:4 62:2 | 93:17 99:2 | **process** 21:25 |
| 24:3 30:22 | **potential** 71:16 | 103:10,23 | 90:1,18 |
| 73:6,7 75:6 | 71:20 94:7 | 107:24 108:8 | **produce** 61:12 |
| 82:7 85:25 | **poynter** 9:21 | 109:3 | 64:18,21 |
| 87:24 94:9 | | | |

product 118:8
  119:3
productive
  131:10
professional
  41:15 42:9,10
  66:14
profile 43:2,10
  45:11
progress
  129:21 130:7
project 38:12
projects 41:23
  123:23
promoted
  111:22
promptly
  15:23 132:25
proper 65:22
  101:19 110:5
  116:3 124:13
property 20:6
  20:8,11 21:6,9
  22:2 39:7,9,12
  126:20,20
proposal 15:1
  15:14 128:19
propose 14:16
proposed 18:2
  38:19,20 73:16
  73:23,25 74:20
  125:22 127:3
  127:11 128:6
  128:12 129:1,5
proposition
  38:17 44:6
  110:10

proprietary
  36:25
protect 110:8
provide 39:23
  55:13 60:7
  95:9
provided 81:24
  83:2,9
providing 42:4
  60:3 121:18,24
provision
  101:24
provisions
  130:24
public 39:22
  39:23 50:10
  101:14
publicly 59:3
  69:3,6
published
  58:25
pull 51:23 88:7
pump 93:5
purport 23:4
purpose 39:20
  118:8,9
purposes 34:18
  38:9,10 54:11
push 132:4
pushes 82:12
  82:16
put 22:6 24:21
  24:25 29:13
  30:23 43:23
  55:22 58:21
  60:25 74:25
  75:7,9 84:16

87:2 91:8
95:22 97:11
102:3 126:7
puts 111:13
putting 71:19
  110:2

**q**

qualification
  40:13,24 41:1
  41:2 118:1
qualifications
  41:12
qualified
  117:18 120:8,9
question 39:7
  45:1 51:4,5,5
  64:25 68:14
  74:11 78:11
  86:1,3 90:13
  95:12,18 97:24
  97:25 98:6,8
  98:15 103:7,17
  105:24 107:22
  108:16,18
  113:22 117:22
  118:22,23
  119:18,19,20
  122:12,14
  123:7 124:13
  126:14
questioning
  101:14
questions
  15:15 37:16
  95:24 96:7
  100:20,21
  102:24 105:6

107:3 110:15
110:17 112:14
113:8,10,20
114:7 117:1,2
120:6,17,19
122:10 123:4
124:16 129:10
130:1
quick 104:4
  122:23
quickly 109:23
quite 130:3

**r**

r 1:21 3:1 13:1
  134:1
r&d 36:22,22
  37:14 93:9
  117:25,25
  123:20
raise 34:13
  35:17 93:20
  130:23
raised 18:3
  93:17 102:10
  126:23,24
rakesh 11:14
random 76:10
  76:10,22 77:1
randomness
  76:6
range 69:21
  79:2 82:16
  130:20
ranges 80:7
rasile 10:6
rather 18:2
  127:20

| | | | |
|---|---|---|---|
| **ratio** 27:9 99:12 100:4 | **reasonable** 97:3,5 | **referencing** 18:14 | **rely** 58:23 |
| **rational** 101:16 | **reasons** 77:7 111:5,21 | **referred** 102:8 | **remaining** 71:11 75:4 |
| **ratios** 70:3 | **rebuttal** 125:18 | **referring** 31:2 102:5 109:7 | **remember** 62:22 81:22 |
| **ravi** 8:11 | **receive** 21:23 22:10,13 121:3 | **refers** 64:6 105:21 109:20 | 86:10 87:6,7,9 87:14 88:20 |
| **reaction** 63:24 | **received** 95:6 | **reflects** 59:9 | 112:1 |
| **read** 17:17 25:15,21,23 46:5 84:9,17 98:8,12,14,18 98:19 99:24 100:23 101:2,6 101:6,8 103:4 103:6 109:2,22 109:23 116:17 | 121:4 | **refresh** 74:9 | **reorganization** 73:1,16,19,22 74:1,13,20 90:1,17 |
| | **receiving** 20:7 | **regard** 61:16 | |
| | **recess** 14:13 | **regarding** 101:23 130:17 | |
| | **recollection** 74:9 | **regardless** 116:2 | **repayment** 19:22 20:1 |
| | **record** 15:16 34:18 50:5 98:13,14 100:24 103:6 127:4 134:4 | **regards** 40:11 119:18 | **repeats** 53:7 |
| **reading** 63:23 98:9 101:3 | | **regenerate** 93:13 | **repetitive** 87:19 |
| **ready** 16:20 | | **registration** 129:19 | **replied** 64:4 |
| **real** 39:12 94:4 | **recovery** 22:12 23:22,23 24:1 24:4,5,7,10,11 | **reilly** 10:7 11:22 | **replies** 33:15 33:18,19 64:3 |
| **reality** 47:25 | | **related** 62:3 107:22 109:16 113:18 | **reply** 33:21,22 60:24 61:1,5 61:11 63:18,20 63:24 |
| **realize** 22:10 24:7 112:3 | **recross** 12:3 124:20 | | |
| **realized** 63:21 116:22 | **redirect** 12:3 14:23 | **relates** 33:17 | **report** 13:4 35:11 45:18,19 45:21 46:5,7 46:16 47:17 48:7,20 49:15 50:7,9,16,18 50:19,20,24 51:8,18,21,25 51:25 53:23 55:1 58:20 59:7,10,20 60:14,15 62:11 65:10 67:1 |
| **really** 44:18 82:6 92:14 94:13 98:6 99:3,3 102:3 105:23,23,25 110:8,13 112:14 113:12 121:12,25 | **reduce** 46:11 78:23 | **release** 130:16 130:24 131:5 | |
| | **reduced** 99:19 106:22,23 | **released** 131:24 | |
| | **reduces** 21:22 | **relevance** 62:10 | |
| | **refer** 19:12 106:5 | **relevant** 62:7 85:8,9 93:15 112:14 | |
| **reason** 51:14 51:16 76:22 93:19 101:17 112:11 | **reference** 74:8 88:14 | | |
| | **references** 120:12 | **relied** 59:1 | |

81:7,10,22,23
81:25 82:3,5,6
82:7 83:3,5,10
83:22 84:24,25
85:2,3,7 86:5
86:13,20,25
87:18 90:15,25
95:20 96:10,11
98:24 99:24
105:11,12
109:15,19,22
109:23,24,25
110:1,2,5,6
121:2,9,24
**reporter** 14:15
**reporters** 92:6
**reports** 46:1,2
60:17 69:3,7
105:13 121:18
**representation**
76:21 101:15
**representative**
54:11,17 57:21
58:12
**representing**
118:20
**represents**
105:15
**request** 19:16
51:25 63:2
**requests** 60:23
61:8 65:7
**require** 40:10
**required** 29:21
**requires** 24:18
119:12

**requiring**
109:18
**research** 36:24
37:18 42:15
89:21 95:2,4,7
123:20
**reserve** 63:5
**resolution**
130:21
**resolve** 15:17
130:1,6
**resolved** 130:8
**respect** 31:3
119:24
**respective** 90:1
**respond** 60:22
65:6
**responding**
63:1
**response** 63:9
101:18
**responses**
33:23
**rest** 37:16
129:23
**rested** 125:20
**restore** 72:22
**restoring**
47:23 89:3
**restructure**
73:5 97:15
**retraces**
106:10
**return** 19:17
20:9 21:19
24:18 90:23
94:7 121:4,5,7

**returned** 20:11
21:6,13 22:13
**returns** 21:18
89:23 109:3
**review** 53:10
53:20 80:25
**reviewed** 43:13
80:25 81:2,5,7
**reviewing**
53:23
**reviews** 120:12
**rickie** 6:11
**rid** 107:20
**right** 13:4
14:21 16:5
19:9 20:22
22:6,6,8,16,25
25:3 26:3,18
27:25 28:13
30:20 31:1,5
31:16 32:9
33:10,25 34:5
34:17 35:4,5
35:16,18,23
36:6,8 37:6
39:2,16 42:7
43:1,7 46:17
46:21 47:5,13
47:18,24 49:12
50:9,24 52:14
53:1 54:1,8,12
54:24 55:22
57:7 58:19
59:13 60:5,12
61:2,9,18 62:8
63:2,5,12 64:2
65:7,25 69:22

69:25 70:5,16
70:23 71:20
72:5,14 73:1
73:15,25 74:14
76:2,17 78:1,6
79:13 80:18
81:17 83:8,16
84:9,20,23
85:13 86:3,12
86:22 88:12,23
89:1,7 90:5
91:5,14 97:8
110:1 111:19
112:22 114:19
117:12 122:5
123:22 124:20
125:6,12,17,20
125:21 126:17
128:25 129:3
132:20
**rights** 22:4,5
**riki** 8:19
**rise** 13:2 93:20
**road** 4:21
134:21
**robert** 6:10,12
11:13
**roberto** 7:22
8:1
**robinson** 10:8
**rodriguez** 10:9
**role** 44:15,16
44:23 45:8
73:20,23
**roll** 115:11
**rolling** 115:10
127:8

roni   32:6
room   4:13
ross   8:23
row   63:22
rule   15:18,18
   15:22 80:13
   93:1 94:13
   104:24 125:3
ruled   70:4
run   84:15
ryan   11:23

**s**

s   3:1,17 9:2,13
   13:1
sabin   3:17
safe   20:22 80:8
   100:14 115:5
safest   105:3
safety   100:9
saikh   10:16
sales   55:9
sam   10:13
   49:11,13 89:18
   92:5
sami   10:16
sample   58:12
samuel   7:21
sarkissian
   10:10
satoshi   111:12
satoshi's
   111:12
saw   44:17 94:4
saying   42:15
   54:19 63:4
   64:3 77:1
   80:16 82:2

85:19 99:4,22
100:16 102:2,4
104:19 116:19
says   19:20 20:1
   24:7 53:1
   54:13 56:20
   57:20 61:5
   73:4 82:21,22
   87:6 88:1 93:2
   97:3 99:6
   101:20 102:7
   105:18 109:10
   113:1 119:24
sbf   89:15,22
scale   41:22
scam   49:12
schedule   15:8
   127:16,20,24
   130:14
scheduled   14:8
   127:16 132:18
schiffrin   10:11
schneider   5:3
   12:15,16,17,18
   12:19,20,21
   16:2,3,4,6,16
   17:7,11,14,15
   17:21,23,24
   18:4,15,16,17
   18:18,19,21
   19:9,13,14,19
   19:25 20:5,10
   20:13,14,16,19
   20:25 21:3,5,5
   21:9,12,17
   22:8,18,20,25
   23:2,20,21

24:19,23 25:3
25:5,14,19,23
26:1,2,3,5,9,13
26:16,19,20
27:2,4,6,13,22
27:23 28:1,2,5
28:7,11,15,17
28:18,21 29:2
29:4,9,11,17
30:4,14,19,23
31:9,15 32:23
33:12,17 34:6
34:7,11,12,15
34:17,24,25
schneider's
   16:9 18:22
   24:15
schottenstein
   10:12
schramm
   11:23
schreiber
   10:13
scope   78:21
scott   7:1 11:17
screen   101:24
   105:23,25
   106:1 108:14
   108:20
se   5:1,3,5,7,9
   5:11,13,15,17
   5:19 13:24
   14:4 105:7
   114:10 117:3
   120:21
sealed   32:6

seated   13:3
   128:3
sec   129:19,20
second   14:21
   16:14 18:16
   52:20 56:13,18
   57:2,17 60:20
   70:24 87:5
   96:10 98:16,17
   101:20 104:12
   105:13
section   19:20
   27:18 52:5
   67:1
sections   83:5,6
   83:6
securities   4:19
   4:20
security
   103:10
see   19:18,24
   20:4 23:8,24
   47:14 48:1
   49:4,22 52:5
   53:2,5,17,18
   53:19 55:6
   57:20,24 60:19
   61:6 63:18
   65:19 66:7
   74:9 89:1,2,3
   89:16 90:21
   105:18 106:7,8
   107:22 108:7
   108:11,15,17
   108:20,25
   109:6,7,9,10
   113:22,24

132:25
**seed** 95:6
**seems** 82:9
   117:6
**seen** 44:18
   77:16 86:19,20
   104:1
**segar** 10:14
**select** 54:23
   65:7
**selected** 54:7
   54:25 69:19,20
   69:22 76:5
**selecting** 54:10
**selection** 55:12
**sell** 122:25,25
**selling** 95:15
   113:18 115:17
**send** 123:24
   131:16
**sending** 63:22
   64:5
**senes** 10:15
**sent** 64:4
**sentence** 57:24
   89:14
**sentiment**
   115:4,6
**serban** 9:9
**series** 87:3
   109:3 113:4
**seriously** 64:15
**server** 62:25
   63:21
**service** 16:9
   17:3,4,17 18:6
   18:9 19:3 21:9

21:11 24:18
**set** 14:15 15:14
**setting** 39:12
   39:22,23
**seven** 28:25
   56:8 76:9
   86:14,14
**several** 102:1
**severely** 99:1
**shara** 4:17
**share** 43:6
   57:21 106:1
**sharing** 43:3
   117:16
**sharon** 5:13
   6:25 117:3
**sheet** 56:16
**shia** 93:12
**shift** 115:19
**shock** 101:25
**short** 76:9
   99:17 100:17
   100:19 103:12
**should've** 58:4
   58:4
**show** 54:3
   124:10
**showing**
   101:21 102:11
**shows** 23:25
   24:9,11 29:20
   109:2
**sickles** 10:17
**side** 46:10
   62:25 84:7
**signature**
   134:7

**significant**
   101:22
**silverman**
   10:18
**similar** 129:13
   129:14
**similarly** 25:1
   31:12 32:16
**simon** 6:24
   33:3
**simple** 123:1
**simpler** 86:4
**simson** 10:19
**single** 42:12
   53:17 69:2
   79:14,15,22
   84:3 86:16
   97:4 104:25
**sir** 18:21 21:1
   21:17 22:18
   28:15 40:1
   51:17 54:1
   65:2 87:22
   101:1
**siren** 129:16
**sit** 49:3 63:6
**sitting** 58:19
   62:8 79:11
   84:20 86:16
   87:22 99:12,13
   99:14
**situated** 25:2
   31:13
**six** 28:9 48:1
**sleep** 125:9
**slip** 56:16

**slippage** 57:5
**slow** 39:1 41:5
   41:7 49:2
**slowly** 38:24
   38:25 41:4
   49:1 101:9
   103:6
**small** 101:24
   105:23 108:14
   108:20
**smartass** 63:19
   63:21,25 64:1
   64:2,8
**smith** 17:9
   25:8
**software** 59:10
   60:4,22 112:2
**solemnly** 35:19
**solicitation**
   30:15,16
**solutions**
   134:20
**solvency**
   101:15
**somebody**
   26:10
**sonya** 2:25
   134:3,8
**soon** 127:18
   132:25
**sophisticated**
   97:19
**sorry** 13:23
   14:3 25:19
   28:5 32:16
   36:22 39:7
   41:5 49:2 50:2

51:3 52:9
57:13,23 58:7
59:2 69:15
72:23 81:12,14
83:11 85:2
87:5 89:11,20
93:21 95:23
100:13 101:24
103:5 104:14
108:6 109:22
123:3 124:4
132:11
**sort** 18:2
125:25 127:24
131:6
**sounds** 15:24
**source** 84:1
**sourced** 60:11
**sources** 83:18
83:20
**south** 3:22
**southern** 1:2
**space** 38:19
40:18,22 43:25
90:22,22 92:4
97:4
**spacing** 46:11
46:11
**spangler** 10:20
**speak** 38:23
41:4 49:1
121:13 130:9
**speaker** 121:20
123:2
**speaking** 13:22
24:17

**spec** 72:23
**specialist** 44:6
77:20
**specific** 67:7
69:3 103:20
104:13
**specifically**
43:16 85:4
131:1
**specks** 106:7
**speculate**
113:16
**speculative**
37:25 66:5
71:12,14,15
72:4,9,10,17
72:17,23,25
73:2 74:25
75:4,8,9,13
92:17,18 93:23
94:6,9,15
104:11
**spend** 115:9
**spends** 113:17
**spent** 51:10
**spoke** 38:25
92:1 97:16
101:2 126:3
**spot** 100:16
105:22 107:24
**spread** 78:23
79:4 100:7
118:16
**spreads** 118:15
**spreadsheet**
83:21,24

**sprofera** 11:24
**squeeze** 103:12
**squeezing**
129:8
**stable** 55:20
**stand** 87:22,24
91:3 125:15
130:18
**standard** 76:5
79:5,20 80:8
85:17
**start** 14:12,14
16:7 60:21
65:23,24 109:4
**started** 44:23
44:24
**starts** 53:4
97:10 102:13
**statement**
22:24 23:5,13
28:12,14,19
30:15 33:8
91:1,2
**statements**
60:12 91:2
**states** 1:1,12
4:10 19:15
130:13 132:2
**status** 111:9
129:22
**stay** 128:3
**steadman**
10:21
**steffan** 6:21
**stock** 24:12
**stole** 87:16

**stood** 126:13
**stop** 18:16,18
64:20 77:13
100:2,17,18
103:4
**stopped** 77:13
86:23 99:17
103:13
**store** 111:14,17
111:19
**straight** 22:24
23:4,12 36:5
**straightaway**
45:14
**strategic** 41:23
93:11,14
**strategy** 82:10
**street** 3:14,22
**strike** 70:12
102:15,16,21
104:16 115:21
**striking** 130:20
**strong** 24:3
**structured**
65:10
**studied** 37:7,9
**stuff** 49:24
118:1,12 122:4
**style** 60:17
**subject** 15:10
32:4 35:12
125:1
**submission**
125:1
**submit** 15:2,3
16:8,17 34:19
51:25 126:25

127:10 128:6
128:12,19,22
129:1,5,11
**submitted**
13:21 14:24
15:11 17:23
18:1 35:1
95:11 127:4
**submitting**
118:9 128:11
**subsided** 99:18
**substantial**
132:2
**successful**
123:19
**sufficient**
127:5
**suggested**
126:5
**suite** 3:22 4:21
134:22
**suleymanov**
10:22
**summarizing**
50:10
**summary**
84:16,16,17,17
**supplement**
131:23
**supplemental**
96:8,18,23
**supplementary**
81:12,13 82:5
82:7 96:10,11
96:13 109:25
**supply** 98:23
106:22,23

107:5,8 115:22
116:3
**support** 104:1
**supposed**
127:6 129:11
**sure** 13:11 15:4
17:19 18:13
28:2 37:10
55:15 61:19
69:18 110:25
112:19 127:14
129:3
**surprise** 93:16
94:16,19
**sustained**
17:14 25:9,11
25:11,16,20
26:14 27:14
30:2 31:20
32:13,25 33:6
33:25 34:1
94:21,22 95:18
118:22 121:21
123:4
**svb** 132:11,17
**swear** 35:19
**sworn** 35:17
**sydney** 125:11
125:12
**synthetic** 49:13
**system** 22:7
48:23 49:10,11
49:12,14,14
114:24
**systems** 49:8

**t**

**t** 134:1,1
**t.j.** 3:9 35:8
124:22
**tab** 52:1
**taji** 10:23
**take** 28:13
30:11,20 31:5
31:16,20,21
32:1,5 34:8
41:11 45:15
51:12 53:16
57:12,13 62:13
64:11,15 66:20
68:21 70:13
71:25 72:1
79:25 80:17
84:7,8,15
92:24 93:19
95:20 100:18
114:5 116:3
126:8 127:4
**taken** 34:5
42:12 125:1
**talk** 45:18
62:16 66:19
67:11 70:23
75:24 80:24
84:23 125:2,22
132:16,21
**talked** 31:13
42:3 47:5
83:20 86:8,12
**talking** 18:24
28:8 36:24
40:22,22 41:11
62:6 71:15

72:12 99:25
109:20 110:6
**target** 127:22
**taught** 49:14
49:21,24
**taylor** 11:19
**teaching** 92:5
**technology**
111:11,12
113:13 119:21
**telephonically**
5:21
**tell** 29:7 31:24
35:6 44:21
49:13 52:7
56:24 61:22
78:18 79:12
82:18 85:16
109:9 113:13
117:22 120:15
125:10 128:5
**telling** 85:15
126:11
**tells** 80:10
**temidayo** 5:24
**ten** 28:25 42:23
46:14 51:10
80:11
**tentatively**
14:8
**term** 118:7
**terminate**
19:16
**terms** 16:9
17:3,4,17 18:6
18:9 19:2 21:8
21:11 24:18

44:8 49:15
67:20 86:21
92:23 97:7
113:14
**terra**  76:16
77:7,10 105:1
114:14,22
**tesla**  113:11
**teslas**  93:3
**tested**  37:7,9
68:25
**testified**  36:11
61:17 77:4
**testify**  16:2
**testimony**
14:19,24 15:2
15:5 34:20
35:12,20 44:10
48:4,5 50:6
51:10 53:12
54:16 55:2
62:6 63:5 64:7
68:19 69:18,19
72:24 75:3
79:8 83:1
95:10 105:5
118:18 119:4
125:8
**tests**  48:17
**text**  61:13
**thank**  23:19
25:12 27:15
34:17,22 35:23
43:8 52:22,23
57:9,11,12
66:21 68:12
91:12,19 95:24

100:23 102:25
105:5 110:14
110:14,20
114:6,25 117:1
117:14 119:8
120:17,18,23
123:6,8 124:17
124:18 125:8
125:12,14,15
132:19,20,22
**thanks**  43:9
**theory**  76:6,6
82:14 107:21
**thing**  34:7
37:14 44:8
53:17 66:2
79:1,22 81:11
85:9 89:22
99:3,5 100:16
101:3 104:6,8
105:24 112:2
115:20 118:6
125:25 131:6
**things**  18:1
44:2 61:1,12
62:3,23 72:12
73:9 76:18
81:9,16,18
82:3,4,4 84:23
85:7 89:16
93:14 109:19
110:4 113:4
129:8 130:1
**think**  17:5,5,25
18:3,14,24
22:5,8 23:5
28:23 31:12,22

32:7,16,19
33:20 34:2,4
44:4 53:15
62:9,12 64:23
71:23 80:15
85:16 86:16
88:3,4 89:24
90:3,5,14
93:15 97:15
103:25 107:12
107:13 115:25
115:25 116:19
116:20 119:16
119:22 126:12
126:13,15
127:1,20
128:23 129:24
130:4,5,10,14
131:11,14,18
131:21 132:7
**thinking**  22:9
25:19
**thinks**  71:23
93:25
**third**  19:25
37:3,19 39:6
39:11,14,15
40:17
**thirteen**  30:1,4
**thomas**  6:22
**thought**  43:22
44:8,15 76:9
89:11,12 97:20
107:19 132:14
**thousand**
83:17

**three**  46:13
81:9 100:20,21
116:23
**time**  14:12,15
19:16,23 36:2
39:21 43:22
44:7,18 47:7
47:14,17,20,22
48:7 49:5
50:23 64:16
72:18,19,22
75:15 87:25
89:9 92:9 94:1
94:5,7,11 97:3
101:13 104:1,2
104:23,25
107:5 108:8,11
109:2,17 110:3
110:5 118:14
119:3 120:24
121:10 124:7
125:10 126:3
128:23 129:24
132:13
**timeline**
107:23
**times**  60:7
126:13
**timothy**  11:22
**tiny**  105:25
**tired**  94:14
**titled**  52:5 67:1
**titles**  30:24
**toby**  10:14
**today**  13:14
14:9 15:10
34:20 58:19

68:4 74:22
79:12 84:20
86:16 87:22
94:16 114:2
117:16 119:9
120:13,13
131:16 132:21
**together** 30:23
**toggle** 27:10
**toggled** 27:7
**toggling** 27:10
**token** 69:4,8,24
70:6,25 71:7
71:11 72:4
73:20,23 75:1
86:18 93:16
94:16 98:23
99:1 101:17,21
101:25 102:11
103:24,25
105:15 109:4
112:14,17,20
114:15,20
115:1,23
**tokenomics**
38:13,18,18
52:6 53:1
60:12,14,16
65:10,11
**tokens** 98:21
98:25 115:12
122:24
**told** 42:23
44:19 45:12
48:18 58:22
63:20 68:6
70:3 90:6

**tolerated** 120:5
**tomas** 8:18
**took** 46:4,5,16
49:20 68:4,4
75:25 79:8
81:14 118:13
**tools** 42:14
50:6
**top** 46:25 52:8
52:19 55:25
56:11,15,20
77:14 116:19
**topics** 126:6
**total** 22:10,11
24:4,13 27:6
**totaled** 27:8
**totalities** 24:13
**toussi** 10:24
**trade** 103:13
111:16
**traded** 104:9
**trades** 94:17
**trading** 54:7
54:10,17,23
55:9,12,20
58:1 69:20
75:25 77:10,12
79:9 81:3
103:22,23
104:7 105:15
115:16
**traditional**
30:11 101:21
102:12
**train** 112:1
**trained** 48:23
65:24 122:3

**training** 36:25
37:5 119:5
**transactions**
101:25
**transcribed**
2:25
**transcript**
14:16 15:2
53:18 127:6
134:4
**transcripts**
127:7
**travis** 8:12
**treated** 25:2
**treatment**
126:14
**trial** 15:22
**tristan** 6:23
**true** 21:16
36:18,19,20
37:2,3,4,8,23
37:24 38:1,2,4
38:5 39:14,15
40:15,16 42:5
42:10,11,13,21
42:22,25 44:4
44:5,8 46:4,6
47:16 48:8
51:8,18,22
54:1 55:13,14
63:3 65:8 67:5
99:22 100:15
134:4
**trustee** 4:11
13:16 130:6,9
130:14 132:2

**truth** 35:20,21
68:6
**try** 56:5 59:17
89:22 90:3
110:20 111:17
**trying** 76:14,20
110:7 130:14
**tuesday** 127:17
**turetsky** 10:25
**turn** 61:23
73:15
**turner** 11:1
**turns** 126:9
**tweet** 33:3,15
33:16,21,23
46:23 47:2
87:14 88:8,15
88:16,19
112:19
**tweeting**
112:21 113:16
**tweets** 87:3
88:7 92:21
112:6
**twelve** 30:1,4
**twenty** 31:12
**twists** 126:9
**twitter** 92:4
**two** 22:22
35:13 47:16
48:21 50:6,19
68:10 73:9
76:18 97:1
102:24 104:3
106:6,7 107:3
113:8,10
116:22

tyler   8:25
type   20:2 72:10
   72:10 119:18
typical   119:4
typically
   103:11

**u**

u.s.   1:23 4:11
   4:20 13:16
   117:19 119:5,5
   130:6,9
uday   11:18
uk   29:18,19
uk.gov   29:19
umber   8:16
unclear   83:1,4
unconstitutio...
   22:2
uncredited
   82:21
under   19:20
   23:5,8 65:15
   69:1 70:19
   80:9 92:23
   95:22 100:2
   116:5 125:1
underneath
   30:24
understand
   18:22 21:17
   22:9 44:10,15
   54:16 58:24
   60:10 73:16
   80:20,22 85:23
   97:24 112:22
   112:25 118:6
   119:12 120:14

121:6 124:25
understanding
   13:25 21:1
   23:12 34:19
understands
   90:22
understood
   38:24 57:1
   70:13 72:3
   75:24 125:5
unfair   82:15
   82:24
unidentified
   121:20 123:2
unique   73:3
   76:15
united   1:1,12
   4:10 93:12,13
   130:13 132:2
university
   41:12
unlawful   22:2
unrelated   62:4
unsecured   3:20
   4:2
update   129:22
uphold   22:15
use   13:13
   37:10 42:14
   48:19 54:23
   56:5 58:1,6,8
   60:21,24 65:6
   65:9 72:3,6
   73:3 75:25
   76:7 77:18
   79:3,5 82:9,10
   82:13,15,24

83:12 92:13
   99:10,11,19,22
   102:17 108:7
   114:3 116:11
used   45:21
   48:21 49:8,23
   50:1,6,13,17
   50:22 54:25
   60:5,14,24
   63:9 65:7,18
   66:6 67:15
   70:19 77:10,12
   79:18 81:11
   82:15,24 85:1
   115:19 116:11
user   72:14
uses   82:8
using   49:18
   50:21 52:7,10
   77:23 85:19,20
   85:21 124:9
usual   120:24
usually   48:1
utility   75:19
   113:22
utilization
   48:15
utilize   37:10
   70:20,21
utilizing   46:3
   48:12 49:20

**v**

v   10:7
validation
   48:23 49:9
valuation
   38:11 39:6,13

39:17 40:14,15
   40:20 42:4,17
   51:1 53:2
   65:17,22 66:5
   75:11 76:15
   85:1,8,9
   113:24 118:10
   119:18 121:9
valuations
   67:2
valuator   119:2
   120:10
value   21:12,23
   24:10,11,16
   36:14,17,20
   37:2,13,23,25
   38:7,16,17,19
   38:20 53:14
   54:2,4,6,11,12
   54:14,14,18
   55:8,13 57:22
   58:12 65:18
   66:6,15,19
   67:5,12,13,14
   68:17,24 69:1
   69:3,7,8,9,12
   69:24 70:5,8
   70:15,25 71:4
   71:6,7,11,12
   71:15,16 72:5
   72:9,10,13,23
   72:25 73:2,12
   73:13,13 74:14
   74:25 75:4,4,8
   75:8,10,12,13
   76:23 77:15,16
   77:18,19,22,23

77:24,24 78:4
78:24,25 79:18
80:3,4,13,19
80:23,23 82:12
85:9,12,25
92:17,18 93:20
93:20,23,25
94:6,10,11,12
94:13,15 96:14
96:20 97:7,9
97:10,14,15,17
97:18 99:2
101:17 102:9
103:11,14,20
104:6,8,10,11
104:14,15,16
104:19,21,21
104:25 105:1,3
107:15,17
111:5,14,17,19
112:7,8 114:1
114:3,4 116:5
116:5,6,7,9,10
116:13,18
118:11,12,16
**valued** 94:10
**valuer** 117:19
**values** 24:4,5
57:20 116:2
**valuing** 42:12
66:24 67:21
71:23
**various** 130:23
**vat** 121:11
**vejseli** 11:2
**venable** 3:12

**veracity** 81:24
82:2 83:1,8
**verbalize**
19:15
**veritext** 134:20
**version** 16:9
17:16 19:3
126:22,24
**versus** 78:19
**veton** 11:2
**view** 51:20
67:4,7 69:20
78:14 90:13
**vincent** 9:6
**virtually** 98:23
**volume** 68:11
70:2 74:7
99:12 100:4
105:15,21,21
106:9,12
**volumes** 68:10
**voting** 30:15
30:16
**vtor** 6:19

## w

**w** 10:18
**wait** 16:14
129:16 132:23
**walk** 70:14
**walks** 16:24
**walsh** 11:3
**want** 17:19
30:10 34:6,23
35:14 38:12,22
38:23 39:5
41:25 42:1
45:18 51:12

52:4,10 55:23
57:23 60:21
62:15,23,24
66:19 67:11
76:19,25 79:7
80:21,24 84:10
84:11 88:4
89:22 90:12,19
92:3,3,9 98:18
100:14 101:6,6
105:24 108:13
108:14 113:5,6
113:13 115:9
119:13,15
121:5,5,6,10
121:12,13
122:25 125:7
126:4,10,11
130:9 131:4
132:12,13
**wanted** 65:9
85:7 107:20
117:24,24
129:12 132:6
**wants** 31:25
114:3
**warren** 11:4
**wasted** 87:19
**watching** 36:3
**waterfall** 23:25
**way** 15:7 22:3
26:6 30:23
45:5 57:2
63:19,21,25
64:1,3 67:4
70:11 73:15
77:12,22,24

78:18,21 82:10
82:20 91:7
99:8 100:1
104:15,15
105:4 107:18
111:12,13
112:17 115:4
126:7
**we've** 28:23
34:5 35:7
47:22 112:23
122:4 123:25
127:7 128:24
131:10
**weak** 87:18
90:15
**wealth** 17:8,13
25:7,18
**weblinks** 83:24
**websites** 29:6
**weedman** 4:8
52:21,23
**week** 48:1
127:12 128:9
**went** 44:19
45:14 94:5
116:13,22
**west** 3:14
**whatever's**
46:16
**whatsapps**
61:24
**white** 3:19 4:1
**wick** 11:5
**widely** 67:20
67:22 68:16
111:3,6,8

| | | | |
|---|---|---|---|
| **wildes** 11:6 | 125:11,14 | **writing** 46:10 | **years** 42:23 |
| **williams** 5:24 | **witnesses** 12:3 | 64:24 | 117:25 |
| **willing** 79:3 | 125:18 | **written** 61:18 | **yep** 56:7 61:10 |
| **winddown** | **wofford** 4:7 | 62:16,17 82:6 | **yesterday** 16:1 |
| 24:1 | **word** 45:19 | 110:13 | 31:21 35:11 |
| **window** 54:10 | 53:8,8 82:1 | **wrong** 51:13 | 36:4,4 59:3 |
| 54:17 69:20 | 85:19,20,21 | 55:7 62:24 | 61:17 62:1 |
| 75:25 76:5 | **words** 50:20 | 85:15 88:3,3 | 95:11 126:5 |
| 77:17 78:22 | 53:8 69:12 | 92:4,10 108:14 | **yoon** 11:7 |
| 79:9 | **work** 41:3 | 115:6 | **york** 1:2,14 3:6 |
| **wipe** 116:24 | 112:25 118:8 | **wrote** 47:24 | 3:15 4:5,14 |
| **wish** 16:3 | 119:3 127:13 | 55:1,2,3 | **young** 11:8 |
| 22:17 96:1 | 127:23,24 | | 44:24 45:6 |
| 105:6 110:16 | 128:15 | **x** | |
| 122:12 123:9 | **worked** 42:17 | **x** 1:4,10 12:1 | **z** |
| 124:19 125:18 | 42:19,21 | | **zabib** 11:25 |
| **wishes** 16:2 | **working** 89:2 | **y** | **zachary** 11:6 |
| **withdraw** | 121:18 | **y** 105:18 | 11:25 |
| 39:16 62:14 | **works** 22:7 | **yara** 8:10 | **zaharis** 11:9 |
| **withdrawals** | 24:22 37:11 | **yeah** 17:10,11 | **zero** 97:11,12 |
| 19:20 | 72:23 80:22 | 35:6 46:13 | 97:18 104:2,2 |
| **withdrawn** | 85:24 | 51:19 52:18 | 104:6,8,11 |
| 39:22 69:7 | **workup** 26:20 | 56:9 61:7 | **zone** 100:14 |
| 71:7 98:22 | **world** 37:6,10 | 63:20 64:10 | |
| **withholding** | 42:23 44:21 | 65:16 68:3,20 | |
| 21:21 | 53:5 72:15,16 | 71:22 74:4,6 | |
| **witness** 35:22 | 77:19 124:15 | 74:16 77:9 | |
| 36:1,3 39:1 | **worry** 53:12 | 84:7,22 85:14 | |
| 41:5,7 45:8 | **worth** 74:23 | 86:10,14 87:6 | |
| 48:21 49:2 | 93:24 95:15 | 89:19 90:19 | |
| 50:2 51:3 | 104:2 116:14 | 91:7 98:6 | |
| 64:14,16,19,23 | **worthless** | 100:13 105:13 | |
| 65:1 66:17 | 103:25 | 109:14 111:4 | |
| 94:23 95:10 | **write** 45:19 | 115:25 117:8 | |
| 98:18,20 103:5 | 46:5 47:13 | 120:17 122:17 | |
| 110:16 117:17 | 61:11 63:18 | 125:2 127:22 | |
| 122:12 124:4 | 87:8 89:1 | **year** 112:24 | |