Johan Bronge

*Pro se creditor*

25 October 2023

**United States Bankruptcy Court Southern District of New York Re: Chapter 11 Case No. [22-10964 (MG)**

Johan Bronge's response, objection and request for relief to DEBTORS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES AND OMNIBUS REPLY TO CERTAIN OBJECTIONS THERETO (docket 3864) and to the REVISED PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE MODIFIED JOINT CHAPTER 11 PLAN OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES (docket 3867).

**Table of Contents**

Introduction.............................................................................................................................3
1. General discussion regarding Legal Ownership in Collateralized Loans...............................3
2. Detailed response to the Debtor arguments and interpretations.........................................6
3. Valuation of collateral.........................................................................................................14
4. Subordination of Earn accounts........................................................................................14
5. Conclusions.........................................................................................................................16
6. Requested relief..................................................................................................................16
7. Exhibit list...........................................................................................................................18
8. Exhibit A

**Introduction.**

The Debtor has filed a supplemental memorandum of law in support of confirmation of the Celsius Chapter 11 Reorganization plan. Among other objections filed against confirming the plan the Debtor has responded to my response to the original memorandum of law (Bronge response). I stand firm in my conclusions, objections and request for relief in my previous response (docket 3641), in my objection (docket 3511), in my corrected motion (docket 3649) and in previous filing (docket 902).

Below follows my response and objection to the Debtor supplemental memorandum of law (docket 3864) and the Debtor conclusion of law (docket 3867).


**1. General discussion regarding Legal Ownership in Collateralized Loans**

In financial agreements, the choice of words holds unparalleled significance. This is evident in Loan Agreements, especially when it pertains to the distinction between property rights and ownership title concerning collateral. The language employed in these contracts is not mere semantics; it is the linchpin that determines the rightful ownership of assets. If the contract explicitly states that only property rights (security interest) are transferred, omitting any mention of the transfer of title, the borrower retains legal ownership of the collateral. However, this does not diminish the lender's authority to seize and sell the collateral in case of borrower default, ensured by the security interest granted in the Loan Agreement, nor does it hinder lender's ability to use collateral as agreed and established in a Loan Agreement.


Differentiating Ownership Title and Property Rights:

1. Ownership Title:

   - Definition: Ownership title embodies the legal right to own, possess, and control a property. Possession of the title signifies complete ownership, granting the holder the authority to use, sell, or transfer the property within the boundaries of legal regulations.
   - Transfer of Legal Ownership Title: The transfer of ownership title entails a formal alteration in legal ownership, necessitating specific procedures and explicit, unambiguous wording. It denotes a change in the entity recognized by the law as the rightful owner.

2. Property Rights:

- Definition: Property rights encompass a broader spectrum, incorporating the *rights* to possess, use, and dispose of property. While ownership title represents a subset of property rights, other rights can exist, such as usage rights without absolute ownership.
- Transfer of Legal Ownership Title: Property rights can encompass security interests, providing specific privileges to a lender, like the right to seize and sell collateral upon borrower default. However, these rights do not equate to a full transfer of legal ownership title.

In a collateralized loan, the borrower typically maintains ownership title of the property while granting specific property rights, manifested as a security interest, to the lender. Consider Celsius in this case, which possesses the right to employ Digital Assets as collateral for loans, enabling various actions without acquiring ownership title. Celsius exercises specific property rights and control delineated in the Loan Agreement, ensuring loan security while the borrower retains legal ownership of the assets.


The Significance of Explicit Language:

The specific language employed in Loan Agreements adheres to the legal principle of "expressio unius est exclusio alterius" — the expression of one thing implies the exclusion of another. In essence, if a term or condition is not explicitly stated in the contract, it is presumed that the parties did not intend for it to be a part of the agreement. Given this legal doctrine, it is arduous to argue that a loan contract implies the transfer of legal ownership title from the borrower to the lender without an explicit statement or mention of the transfer of title in the agreement. Without explicit language indicating a transfer of legal ownership, the presumption remains that legal ownership title has not been relinquished.


Defining Key Terms:

1. **Pledge:**

- Definition: Pledge denotes offering an asset as security for a debt or obligation without transferring ownership. The borrower retains legal ownership title while granting the lender the right to possess the asset upon default.

4

- <u>Transfer of Legal Ownership Title:</u> Legal ownership title is not transferred in a pledge. The lender gains a security interest but does not own the asset outright.

2. **Re-pledge:**

- <u>Definition:</u> Re-pledge occurs when an asset previously pledged as collateral is utilized again as security for another loan. The original borrower becomes the pledgor, and a new lender becomes the pledgee.
- <u>Transfer of Legal Ownership Title:</u> Similar to a regular pledge, legal ownership title is not transferred in a re-pledge. The asset serves as collateral for the new loan without changing ownership title.

3. **Hypothecate:**

- <u>Definition:</u> Hypothecation is using an asset as loan security without transferring ownership. The borrower retains legal ownership title while the lender gains a security interest in it. Actual possession may be with borrower or lender as agreed.
- <u>Transfer of Legal Ownership Title:</u> Legal ownership title is not transferred in hypothecation. The borrower retains ownership title, allowing the lender to seize the asset in case of default.

4. **Rehypothecate:**

- <u>Definition:</u> Rehypothecation occurs when a financial institution uses its clients' hypothecated assets as collateral for its own borrowing or trading activities.
- <u>Transfer of Legal Ownership Title:</u> Rehypothecation does not involve the transfer of legal ownership title. Clients maintain ownership while allowing the institution to use the assets as collateral.

In summary, the specific language utilized in Loan Agreements transcends mere semantics; it defines the contours of legal ownership and property rights. Clear and explicit wording safeguards the borrower's legal ownership while enabling lenders to wield essential security interests. It upholds not just the integrity of the agreement but also ensures fairness and equity for all parties involved. With the above in mind and as will be shown below, it is unambiguously clear that legal ownership title of collateral has not been transferred in version 7 of the Loan Agreement (docket 393 pages 857-853).

## 2. Detailed response to the Debtor arguments and interpretations

The points below refers to the Debtor supplemental memorandum of law (docket 3864 pages 10-15) The points, 31-34, in Debtor conclusion of law (docket 3867 pages 26-27) are also answered but not referenced to.

Point 15:

The Debtor, uncalled for and to the detriment of myself, disclosed the size of my loan 31904 despite the fact that I have meticulously redacted all such information in my filings. I see this as an act of willful malice and therefor request the Court to officially reprimand the Debtor and it's counsel and demand an official apology and appropriate compensation.

Point 16

The Debtors do not dispute that my loan, 31904, is governed by Version 7 of the Loan Agreement. However, the Debtors incorrectly asserts that version 7 of the Loan Agreement unambiguously transfer legal ownership title of the collateral, pledged by the borrower as a security for a retail loan. They then cite part of the "Consent to Celsius' Use of Your Digital Assets" (docket 393 page 870) with added emphasis on words that unambiguously **does not** transfer legal ownership title. Celsius only gains a security interest and the right to use the collateral without owning it outright. For clarity the full clause is copied below (in different font)

Consent to Celsius' Use of Your Digital Assets

In consideration for the Loan, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk.

You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:

(a) You may not be able to exercise certain rights of ownership;

(b) Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and

(c) You will not be entitled to receive any benefits granted to the holder of any Digital Asset from time to time, including any airdrops, New Currency resulting from a Hard Fork (as these terms are defined in the Network Terms).

Nothing in this clause explicitly transfer legal ownership title. As explained in section 1 of

this document, none of the terms used in this clause express a title transfer. To *hold* an asset, with some or all *attendant rights of ownership, does not* transfer legal ownership *title*. (see Earn ruling docket 1822 page 38-39, copied here under point 21)

Additionally, the Debtor, without explanation and rational, refer to this clause as the "Grant of Ownership Clause". The Debtor, keeps referring to this clause under this new name which implies ownership title transfer, thereby creating ambiguity where none exists. I can find no clause named "Grant of Ownership Clause" in version 7 of the Loan Agreement (nor in any other version of TOS). Unless the Debtor points out where to find such clause or present a valid reason for this re-naming, I can only conclude that this is an act of purposeful misleading and deception. (The Debtor has used a similar tactic in the Plan and in the Disclosure statement, re-naming Collateral and Loan to "Retail Borrower Deposit Claim" and "Retail Borrower Advance Obligation" respectively, thereby removing implied attributes and causing ambiguity where none exists). I stand firm in my previous objection to re-naming and also strongly object to this new re-naming.


Point 17

The Debtor refers to version 5 of the General Terms of Use which the Debtor correctly has identified is incorporated by reference into the version 7 of the Loan Agreement. The Debtor quotes only a selected part of the General Terms of Use, Version 5 at 8, "4. Nature of e-Services – B. Loans", (docket 393 page 188-189), emphasizing certain text while *omitting other significant text that negates the previous emphasized part*. This is misleading and dishonest. For clarity the full text of the relevant part is copied below (in different font) showing the Debtor's emphasis (cursive underlined) and also my emphasis (in bold), of the part the Debtor omitted;

B. Loans

You may apply to borrow Fiat from Celsius Networks Lending LLC (the "CNL"), a Celsius Affiliate, or from another affiliate of Celsius, as will be agreed between you and Celsius in writing, against Digital Assets in your Celsius Wallet. If approved, such application shall be subject to a separate Loan Agreement to be entered into between you and CNL (the "Loan Agreement"), and Celsius shall hold the Digital Assets provided as collateral under the Loan Agreement for the benefit of the Lender. Any Digital Assets you provide as collateral under a Loan Agreement shall not generate revenue for your benefit, save as set out below.

In this clause 4B, notwithstanding the use of expressions such as "borrow", "loan", and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, *title to the Digital Assets shall pass from you to CNL on the basis of an outright sale*, subject to your right to request at a later date the delivery of equivalent (but not identical) Digital Assets to those sold to CNL. As consideration for the sale of the Digital Assets to Celsius you will receive an agreed Fiat amount from CNL, which shall act as the purchase price for the sale, along with a fee that shall be calculated by reference to such matters as the Digital Assets sold and the length of time prior to

the exercise of your right to request delivery of equivalent Digital Assets. In order to exercise your right to delivery of equivalent Digital Assets to those originally sold to CNL, you must pay an agreed Fiat amount to CNL. **In each case the matters expressed above shall be set out in the Loan Agreement and nothing in this clause 4B shall be taken to modify, supplement or otherwise impact the Loan Agreement between you and CNL.**

It is unambiguously clear in this clause that it is **not applicable unless specifically set out in the Loan Agreement**. The Loan Agreement is the controlling document and this clause becomes moot and holds no legal value if it contradicts or is not fully supported by the Loan Agreement. (The intent of this paragraph seems to be as support of the Sale and Repurchase Agreement the Debtor used in the UK). The Debtor has deceptively and misleadingly only shown a selected part of this clause while omitting the part that completely alters the understanding, validity and implication of the clause.

Point 18

The Debtor refers to version 8 of General terms of use. This version is not applicable to any of my loans and it is therefore irrelevant, something the Debtor should be aware of. Instead, the version of General terms of use that by reference is incorporated in the Loan Agreement controlling my three loans (141558, 141544, 141539) is version 7. The clauses are different in these two versions and for clarity both are included below (in different font, most relevant parts emphasized in bold)

General Terms of Use Version 8

13. Consent to Celsius' Use of Digital Assets

**In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights**, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise rights of ownership;

2. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

**3. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, any Eligible Digital Assets used in the Earn Service or as collateral under the Borrow Service may not be recoverable, and you may not have any legal remedies or rights in connection with Celsius' obligations to you other than your rights as a creditor of Celsius under any applicable laws.**

8

<u>General Terms of Use Version 7</u>

13. Consent to Celsius' Use of Digital Assets

**In consideration for the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights,** and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You acknowledge that with respect to Digital Assets used by Celsius pursuant to this paragraph:

i. You will not be able to exercise rights of ownership;

ii. Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

**iii. In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you may not be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.**


It is unambiguously obvious that version 7 is significantly different from version 8 as it **does not include collateral or loans** when it explicitly transfers legal ownership title and disclose risks. This clause in version 7 specifically states that the transfer of legal ownership title is in consideration for the rewards payable in the Earn account. (Furthermore, in the for my loans irrelevant version 8, it states that providing collateral transfers rights and title including ownership rights. However, transfer of legal title normally require a consideration, something that is not explicitly present or referred to in this paragraph in conjunction with transferring collateral to Celsius and it is therefore doubtful and ambiguous if version 8 legally transfers ownership title of collateral).

In my view the Debtor and it's counsel have acted deceptively referring to an incorrect version of General terms of service to give the impression that legal ownership title may have been transferred.


<u>Point 19</u>

The Debtor states; When the contract is clear and unambiguous, courts will "give effect to the plain meaning of the contract's terms and provisions". In relation to the evidence presented by the Debtor, I have clearly, conclusively and unambiguously shown that legal ownership title to my collateral has not been transferred from me to the Debtor.

Point 20

The Debtor asserts my reliance on certain statements and terms in Loan Terms of use version 7 are incorrect and reference some of them out of context of the overall argument. My argument is not erroneous. It is simply explaining that not only does this paragraph, "Consent to Celsius' Use of Your Digital Assets" explicitly **not** transfer ownership title, it does not even imply transfer of ownership title. I contrast the language used in the Sale and Repurchase agreement (docket 393 page 990, Title Transfer of Tendered Assets) with Loan Agreement version 7, "Consent to Celsius use of Your Digital Assets" (copied above under point 16) and conclusively show that the language is fundamentally different. (docket 3641, bottom page 2, top page 3) In addition to this comparison I below show a comparison with the Master Loan Agreement used for 168 Trading, where the Debtor intended to transfer legal ownership title. (docket 3609 page 265) The relevant section is copied below for clarity (in different font, bold emphasis mine)

Section 4 of the MLA makes clear that upon 168 Trading's transfer of the Collateral to Celsius, 168 Trading retains no interest in the Collateral: "**The delivery of Collateral to Lender shall be on a full-title transfer basis, meaning the Lender shall be the legal and beneficial owner of the assets posted as Collateral and the Borrower shall have no right, title or interest in those assets**" (emphasis added by Debtor). Moreover, the MLA includes language similar to the language highlighted by the Court's Earn Ruling when it held that, pursuant to the Terms of Use, the Debtors have title to assets in Earn Accounts.

Section 4.4.3. of the MLA provides that:

Collateral is not, and shall not be, held by Lender on behalf of the Borrower, and Lender shall be the sole and exclusive owner of all Digital Assets and/or Fiat Currencies posted as Collateral.

Lender may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise dispose of the Collateral to counterparties or hold them with counterparties, or otherwise exercise any ownership rights in the Collateral. **Borrower shall have no right or title in or to the Collateral** throughout the term of this Agreement, until such time as the Loan Amount is fully paid up and the Collateral is returned to the Borrower.

Legal title transfer is explicitly stated in the above clause and it is unambiguously clear that legal title is transferred. The language employed to do this is explicit, clear and very different from the language used anywhere in the version 7 (or in version 9) of the Loan Agreement. In the above clause the Debtor has *correctly differentiated between rights and title*, something that is not done in the version 7 of the Loan Agreement (and neither in version 9). Despite I have previously requested that all MLAs (Master Loan Agreements) regulating Institutional Loans should be made available, the Debtor has not complied with this request so I am not able to provide further examples.

Point 21

The Debtor references to the Earn ruling are not applicable and the language used is not similar as I have previously shown. Additionally, the version referred to in the Earn ruling is version 8 of General terms of use which, as explained above, is not applicable to any of my loans. As explained and argued earlier, the referenced statements, "all attendant rights of ownership", "may not be able to exercise certain rights of ownership" and, "all attendant rights" are not statements that transfer legal title, they only transfer rights. However, interestingly, relevant and fully supporting my arguments is the following statement in the Earn ruling (docket 1822 page 38-39) copied here for clarity (in different font, my emphasize in bold);

Terms Versions 2–4 contains the following text that **discusses ownership, but not transfer of title**: In consideration for the rewards earned on your Account and the use of our Services, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets available in your account in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership . . . . You acknowledge that with respect to assets used by Celsius pursuant to this paragraph. (i) You may not be able to exercise certain rights of ownership.

The quoted language is similar, if not almost identical, to the language used in Loan Agreement version 7 and 9 clause "Consent to Celsius use of Your Digital Assets". Here the Court explicitly states that **this language does not transfer title**.

Point 22

The Debtor refers to the seemingly invented and non-existent "Grant of Ownership Clause" and argues that this non-existent clause is superfluous if the following statement "you may not be able to exercise certain rights of ownership" is interpreted to override the non-existent grant of ownership in the non-existing "Grant of Ownership Clause". This whole point 22 is nonsensical. I can not find any "Grant of Ownership Clause" and the existing clause "Consent to Celsius use of Your Digital Assets" in version 7 (and even in version 9) is unambiguously clear that legal ownership title has not been transferred.

Point 23

The Debtor again reference the non-existent "Grant of Ownership Clause" and the whole argument is therefore nonsensical. However, I suspect that the Debtor actually means the "Consent to Celsius use of Your Digital Assets" and therefore I will respond as if the Debtor was referring to this clause.

11

The Debtor argues that added language in version 8 and 9 can not be used as evidence that version 7 is ambiguous. I have never argued that version 7 is ambiguous. Version 7 of the Loan Agreement is, as I have extensively evidenced and argued here, **unambiguous in not transferring, explicitly or implicitly, legal ownership title of collateral**. Version 7 of the Loan Agreement is clear and consistent that legal ownership title remains with the borrower. The ambiguity exist in version 9 (version 8 is irrelevant as previously explained). The added language under "Collateral" stand in opposition to language in the "Consent to Celsius use of Your Digital Assets" clause, and in other language in version 9 Loan Agreement[1], as well as in language used in Truth In Lending Disclosure Statement and Loan Detail Summary (see docket 3649 attachment A-C pages 6-33) of my loans, thereby creating ambiguity in this version[2]. This in combination with the lack of explicit statements in the updates sent out in conjunction with changes in the TOS creates enough ambiguity to warrant use of external evidence, provided by official communication from Celsius that strongly and consistently supports the conclusion that collateral legal ownership title has not been relinquished by the borrower. Furthermore, when ambiguity exist in a contract agreement it should be interpreted in favor of the party that has not framed and penned the agreement. (see RE: Corrected Motion for Repayment of Loans and Return of Collateral by Johan Bronge Pro Se Creditor. docket 3649 item F and attachment A-C pages 6-33)

Additionally support for this argument is found in following quote (docket 1822 page 29, Contract interpretation) from the Earn ruling (my emphasis in bold):

C. Contract Interpretation Under New York law, when a contract's terms are unambiguous, courts must apply them as written. In re Enron Corp., 292 B.R. 752, 762 (Bankr. S.D.N.Y. 2003) ("If the contract language is 'unambiguous,' this Court must enforce the plain, ordinary, and common meaning of those terms as a matter of law without reference to extrinsic evidence."). Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. See, e.g., W.W.W. Assoc. v Giancontieri, 77 N.Y.2d 157, 162 (1990). A contract is unambiguous if "on its face [it] is reasonably susceptible of only one meaning." Greenfield v. Philles Records, 98 N.Y.2d 562, 570 (2002). Extrinsic evidence cannot be used to create an ambiguity where the words of the parties' agreement are otherwise clear and unambiguous. Innophos, Inc. v Rhodia, S.A., 38 A.D.3d 368, 369 (1st Dept. 2007), aff'd, 10 N.Y.3d 25 (2008). **Conversely, "[a] contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."** New York City Off-Track Betting Corp. v. Safe Factory Outlet, Inc., 28 A.D.3d 175, 177 (1st Dept. 2006) (internal quotation marks and citation omitted).

---

[1] Examples: ""Collateral" means an amount in Eligible Digital Assets, as provided by the Borrower to the Lender as security for a Loan" (docket 393, page 932, definitions) "You hereby represent and warrant to us that, as of the Loan Effective Date and throughout the Loan Term: 1. You are the sole owner of all Digital Assets used in connection with the Loan (including the Collateral and any Margin Call delivery);" (docket 393, page 940, Borrower's representations) "Celsius reserves the right to withhold or delay the withdrawal or return of assets belonging to you if you fail to comply with the Loan Conditions." (docket 393, page 944, last paragraph) "Borrower hereby pledges in favor of Celsius and its Affiliates any and all assets regardless of their form or kind that currently are (or which may be in the future) held in Borrower's Celsius Account(s) as collateral" (docket 393, page 943, Pledge Agreement) In addition, several referrals to "your Collateral " is done in the agreement.

[2] In the TRUTH IN LENDING DISCLOSURE STATEMENT: Security: You are giving a security interest in the following collateral: Pledged digital assets.

In the LOAN DETAIL SUMMARY: Collateral: The security interest you are providing

Point 24

The Debtor refers to case law. I have no access to the referenced case and I have absolutely no trust that the Debtor have or will accurately reference any document, clauses or law. The Debtor and it's counsel have time and time again, deceptively and misleadingly, misrepresented clauses, versions and paragraphs and re-named clauses, all seemingly in an effort to obfuscate the true interpretation in favor of their own. Accordingly, I am not able to comment or argue this particular section. Despite this I will still argue that no external evidence or case law are required to interpret version 7 of the Loan Agreement. (see quote in point 23, ref. docket 1822 page 29, Contract interpretation) I have extensively argued and evidenced, that it is unambiguously clear that no transfer of legal ownership title of collateral has taken place, explicitly or implicitly in version 7 of Loan Agreement.

The Debtor also states that I have made no attempt to identify my specific property and trace to my specific digital assets, without stating what implications, if any, this should have on the ownership argument. This statement is nonsensical. BTC is legal tender and money as per the Earn ruling. (docket 1822 page 40) copied below for clarity ( in different font, my emphasis in bold):

But, more importantly:

By current definition, cryptocurrency is not money because it is not a medium of exchange created, authorized**, or adopted by a domestic or foreign government**, or by an intergovernmental organization or by agreement between two or more countries.

BTC is recognized as legal tender and money by El Salvador and consequently fulfills the above requirement to be money. Furthermore, BTC is also classified as a commodity by the SEC in the USA. As commodities and money are fungible it follows that Bitcoin possesses inherent property attributes, exempt from commingling concerns. ( see RE: Corrected Motion for Repayment of Loans and Return of Collateral by Johan Bronge Pro Se Creditor, docket 3649 item D)

Point 25

Based on all the reasons set forth above and arguments in my motion (docket 3649), the relief in my motion should be approved and my BTC collateral declared my encumbered property until Loan Agreement fulfillment, whereafter the full collateral, unencumbered, should be returned to me, outside of Celsius platform, in kind and without any reduction of amount of BTC.

## 3. Valuation of collateral

In my objection (docket 3511, page 1-2, valuation of collateral) I discuss the unfair valuation of collateral under the proposed plan. Insofar as any of my loan collateral is deemed to fall under the treatment of the plan, I reiterate the argument in my objection and add the following reference to Loan Agreement version 7 and 9 (docket 393 pages 871 and 943 respectively, Conversion rates) The full clause is copied below for clarity (in different font, from version 9, my emphasis in bold);

Conversion Rates

Unless otherwise provided herein, **any conversion between a Digital Asset and another Digital Asset or Fiat currency shall be made by us in accordance with the rates and prices applicable at the actual time of conversion.** Applicable rates are indexed to those used by industry-leading platforms, as we may choose to use from time to time, in our sole discretion. We currently use rates provided by BitGo - http://www.bitgo.com/ , CMC Markets - https://coinmarketcap.com/ , and our own rates as determined by our liquidity providers. We may change these rate sources at any time and without giving prior notice or updating these Loan Conditions, and you shall not have any claims regarding our choice of rate sources or rates made available by any third party.

This clause, present in the relevant Loan Agreements version 7 and 9 (and 8), explicitly states that any conversion in relation to Loan Agreement (i.e collateral) shall be made with prices applicable at actual time of conversion. This clause negates the proposed plan use of a combination of petition day prices and market prices when applied to collateral. It supports my argument for using only market prices for any conversion of collateral to and from fiat currency. Based on the above I request that the remedy sought in my objection( docket 3511 page 2, valuation of collateral), the first alternative, be approved and incorporated in the plan.

## 4. Subordination of Earn accounts

In my response to the Debtor memorandum of law (docket 3641 page 4, 4th paragraph), I argue that collateral claims should be in a higher priority class for recovery than Earn accounts. Numerous state and federal regulators have determined that the "Earn" program was an investment contract that was an unregistered security. The Court has taken judicial notice of these decisions (exhibit A) which include:

1. State of Washington Department of Financial Institutions Securities Division, Order No. S-21-3212-21-SC01 (page 8, item 1)

2. State of New Jersey Bureau of Securities in the matter of Celsius Network LLC, Summary Cease and Desist Order (page 11, item 38)

3. Commonwealth of Kentucky Public Protection Cabinet Department of Financial Institutions Division of Securities Administrative Action no. 2021-AH-00024 (page 6, item 18-20)

4. Texas State Securities Board SOAH DOCKET NO. 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 (page 7, item 35)

5. Supreme Court of the State of New York County of New York Commercial Division Part 49M, index no. 450040/2023, Decision + Order on Motion (page 12, last paragraph before item II)

6. United States District Court Southern District of New York, Civil Action No. 1:23-cv-6005 (page 7, item 25)

Participation in the Earn service may be considered a risky investment. Celsius' Earn service is an exempt offering from SEC registration requirements under rule 506(c) of the Securities Act of 1933.

Section 1129(a)(7) requires that "The court shall confirm a plan only if . . . : (7) With respect to each impaired class of claims or interests- (A) each holder of a claim or interest of such class- (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

I have not accepted the Plan nor the class claim settlement and therefore the Court must determine whether I will receive property that is not less than I would receive in a chapter 7 liquidation.

In my questioning of Mr. Campagna he admitted that my recovery under the Plan is less than what I would receive in a chapter 7 liquidation (2023.10.04 Hearing_Campangna page 163):

8 Q Okay. So if I read this paragraph, I can see that it

9 says Celsius offered and sold CEL and the Earn interest

10 program as securities. Is that a correct sentence I just

11 read?

12 A That's what it says on the page in front of me.

13 Q So if that would be true, would the liquidation

14 analysis make a difference for me as a borrower recovery?

15 MS. BRIER: Objection. Calls for a legal

16 conclusion.

17 THE COURT: Overruled.

18 BY MR. BRONGE:

19 Q So can we answer?

20 A Can you restate the question, please?

21 Q Yes. So if that last sentence is true, would the

22 recovery for the borrower in a liquidation be different?

23 A Yes. In a liquidation, it would be different.

24 Q Yes. So the borrower would receive a better recovery.

25 A Very small. Very nominal in a liquidation, yes.

I also rely on the arguments, reasoning and references in the objection of Greg Kieser, through his attorneys, Law Office of Eduardo Glas PC, that objects to the Disclosure Statement (docket 3154, item I, pages 1-5).

## 5. Conclusions

Based on the arguments and evidence in this document, on all my previous filings, their attachments and referenced documents, it is unambiguously clear that;

A) I hold legal ownership title to my collateral and my collateral is not part of the bankruptcy estate. My collateral is encumbered by a pledge to Celsius as a security for obligations under the Loan Agreement.

B) Any valuations of collateral and any conversion between digital assets, functioning as collateral, and fiat currency shall be done at market prices as per Loan Agreement.

C) Earn accounts are securities and investment contracts and should therefore  b e subordinated in order for the plan to be confirmed.

## 6. Requested relief.

I respectfully request the Court to:

1. Declare my BTC collateral for loan 31904 my legal property, not part of the bankruptcy estate.

2. Order the Debtor to return the full BTC collateral to address, specified by me, outside Celsius platform, immediately upon repayment of loan 31904 principal and accrued interest.

3. Order the same as in point 1 and 2 for my loans 141539, 141544, 141558.

4. Order that for any collateral being subject to the plan or not, market prices shall be used in all valuation and conversion between Digital Asset and fiat.

5. Order Earn accounts subordinated, in the plan or not, so that any collateral claims will be filled in full before Earn claims.

6. No relief or exculpation to be granted to the Debtor and Kirkland & Ellis unless and until such time the concerns below are fully addressed and remedied.

It has become abundantly clear in this document that the Debtor and it's counsel have, probably willfully, used deceptive and misleading behavior when referencing clauses and paragraphs in various documents. This is unacceptable and it cast serious doubts on the veracity of any of the Debtor's filings where references to other documents are incorporated. I am very concerned that a reputable law firm like K&E partake in this kind of behavior and I am deeply troubled over the implications this have on the whole CH 11 case. As a remedy, to try to restore trust and transparency, I request the Court to order the Debtor's counsel to immediately, on their own expense, refile any and all documents **ensuring and proving** that references used are correct and not misstated, misrepresented or otherwise deceptively referenced and manipulated.

I reserve all rights in relation to the subjects discussed.


Respectfully

Johan Bronge

*Pro Se creditor*

## 7. Exhibit list

Johan Bronge submit the following list of exhibits

| Exhibit | Document Description | Docket |
|---------|---------------------|--------|
| JB 1 | Declaration of Alex Mashinsky, Chief Executive Officer of Celsius Network LLC, Providing Terms of Use Dating Back to February 18, 2018 Filed by Joshua Sussberg on Behalf of Celsius Network LLC. (Sussberg, Joshua)  (full document) | 393 |
| JB 2 | Letter to The Honorable Martin Glenn, dated 9/26/2022 Re: Requesting that the Court immediately order Celsius to accept loan settlements for borrowers willing to pay back principal plus interest in USD, etc. (related document(s)[355]) Filed by Johan Bronge. (Suarez, Aurea) | 902 |
| JB 3 | Memorandum Opinion and Order, Signed on 1/4/2023, Regarding Ownership of Earn Account Assets. (Related Document(s)[1325], [832]) (Anderson, Deanna) | 1822 |
| JB 4 | Objection to Motion Disclosure Statement filed by Eduardo J. Glas on behalf of Gregory Kieser. (Glas, Eduardo) | 3154 |
| JB 5 | Objection to Confirmation of Plan /Limited Objection to Debtors' Plan filed by Johan Bronge. (Suarez, Aurea) | 3511 |
| JB 6 | Memorandum of Law / Debtors' (Revised) Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto (related document(s)[3577]) filed by Joshua Sussberg on behalf of Celsius Network LLC. (Sussberg, Joshua) | 3609 |
| JB 7 | Response to Debtor's Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC And Its Debtor Affiliates (related document(s)[3609]) filed by Johan Bronge. (Acosta, Annya) | 3641 |
| JB 8 | Amended Motion to Approve /Corrected Motion seeking the court's permission to fulfill the Loan Agreements with Celsius and repay my outstanding loans in full, including any accrued interest. (related document(s)[3533]) filed by Johan Bronge. (Suarez, Aurea) | 3649 |
| JB 9 | Memorandum of Law / Debtors' Supplemental Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Certain Objections Thereto (related document(s)[3577]) filed by Joshua Sussberg on behalf of Celsius Network LLC. (Sussberg, Joshua) | 3864 |
| JB 10 | Notice of Proposed Order / Notice of Filing of Revised Proposed Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates (related document(s)[3577]) filed by Joshua Sussberg on behalf of Celsius Network LLC. (Sussberg, Joshua) | 3867 |

EXHIBIT A

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**SECURITIES DIVISION**

| | |
|---|---|
| IN THE MATTER OF DETERMINING Whether there has been a violation of the Securities Act of Washington by:<br><br>**Celsius Network Inc.**;<br>**Celsius Network Limited**;<br>**Celsius US Holding LLC**,<br>**Celsius Network LLC**;<br>**Celsius Lending LLC**;<br>                       Respondents. | Order No. S-21-3212-21-SC01<br><br>STATEMENT OF CHARGES AND NOTICE OF INTENT TO ENTER ORDER TO CEASE AND DESIST, TO IMPOSE A FINE, AND TO CHARGE COSTS |

**THE STATE OF WASHINGTON TO:**

Celsius Network Inc.,
Celsius Network Limited,
Celsius US Holding LLC,
Celsius Network LLC, and
Celsius Lending LLC

**STATEMENT OF CHARGES**

Please take notice that the Securities Administrator of the state of Washington has reason to believe that Respondents Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC have violated the Securities Act of Washington. The Securities Administrator believes these violations justify the entry of an order against Respondents Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC to cease and desist from such violations, to impose a fine, and to charge costs pursuant to RCW 21.20.390 and RCW 21.20.395. The Securities Administrator finds as follows:

**TENTATIVE FINDINGS OF FACT**

**Respondents**

1.    Celsius Network Inc. is a Delaware corporation formed on February 8, 2018 with its principal place of business in Hoboken, New Jersey. Celsius Network Inc. owns over 82% of Celsius Network

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

1

EXHIBIT A

1    Limited. Celsius Network Inc. is not registered to do business in Washington and is not registered with the

2    Securities Division in any capacity.

3         2.     Celsius Network Limited is an England and Wales private limited company formed on

4    February 9, 2018 with its principal place of business in London, England. Celsius Network Limited wholly

5    owns Celsius US Holding LLC. Celsius Network Limited is not registered to do business in Washington

6    and is not registered with the Securities Division in any capacity.

7         3.     Celsius US Holding LLC is a Delaware limited liability company formed on October 5, 2020

8    with its principal place of business in Hoboken, New Jersey. Celsius US Holding LLC wholly owns Celsius

9    Network LLC and Celsius Lending LLC. Celsius US Holding LLC is not registered to do business in

10    Washington and is not registered with the Securities Division in any capacity.

11         4.     Celsius Network LLC is a Delaware limited liability company formed on June 14, 2021 with

12    its principal place of business in Hoboken, New Jersey. Celsius Network LLC is not registered to do

13    business in Washington and is not registered with the Securities Division in any capacity.

14         5.     Celsius Lending LLC is a Delaware limited liability company formed on October 5, 2020 with

15    its principal place of business in Hoboken, New Jersey. Celsius Lending LLC is registered as a foreign

16    limited liability company in Washington but is not registered with the Securities Division in any capacity.

17         6.     The above-named entities will be collectively referred to in this Statement of Charges as

18    "Respondents" or "Celsius." Celsius provides various virtual currency-related financial services to retail

19    and institutional customers in the United States, including trading, borrowing, and lending services. Celsius

20    is also engaged in other income-generating virtual currency activities such as proprietary trading, staking,

21    and mining.

22    //

23    //

STATEMENT OF CHARGES

## Nature of the Conduct

### Overview

7.     From approximately June 2018 until February 2019, and again from approximately January 2020 to July 2021, Celsius offered their Earned Interest Program ("EIP") to Washington customers. The EIP enabled customers to earn interest, called "rewards," on virtual currencies that the customer deposited with Celsius. Celsius offered the EIP through two methods: (1) Earned Interest Accounts ("EIAs") that customers can open directly with Celsius, or (2) the API Partners Program, where partner companies can utilize Celsius' platform to offer their customers the opportunity to participate in the EIP. To earn income to pay interest to EIP customers, Celsius engaged in numerous activities, including lending the customers' virtual currencies to retail and institutional borrowers. To date, Celsius has paid interest to at least 1,400 Washington residents through the EIP. As of August 29, 2021, Washington customers have a collective account value of over $137,000,000.

8.     Celsius promoted the EIP to Washington residents primarily online. Celsius maintained a website at https://celsius.network, through which it provided information about its EIP, a list of supported virtual currencies and their corresponding interest rates, and an updated total of Celsius users and "community assets" on deposit with Celsius. Celsius also promoted the EIP on social media and in numerous "Ask Mashinsky Anything" ("AMA") YouTube videos featuring its CEO, Alex Mashinsky.

9.     Celsius in particular marketed itself as a virtual currency financial solution for its "community" of retail customers called "Celsians." Celsius represented that it provided "fair and transparent services that have been abandoned by banks" to its retail customers. In an AMA and other online content, Celsius stated that it returns up to 80% of its earnings to customers.

10.     Celsius has advertised interest rates of up to 17% APY on particular virtual currencies, much higher than the rates currently being offered for short-term, investment grade, fixed income securities or for

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

3

1  bank savings accounts. Celsius does not insure EIAs against losses incurred by customers, nor are EIAs

2  insured by the FDIC, SIPC, or NCUA.

3  ### Earned Interest Accounts

4  11.    Celsius allows anyone 18 years and older and residing in a permissible jurisdiction to open

5  EIAs on its website and mobile app. Celsius collects customer information, including photo identification,

6  to verify the customer's identity for "Know Your Customer" (KYC) and anti-money laundering (AML)

7  purposes.

8  12.    Celsius also requires customers to accept its Terms of Service upon signing up for an EIA,

9  including the transfer of "all right and title" in the virtual currency from the customer to Celsius. Beginning

10  around August 2021, Celsius began informing customers, through the Terms of Service, that their deposit

11  of virtual currencies into the EIA constituted a loan from the customer to Celsius, and that the interest that

12  Celsius paid to the customer was a finance fee.

13  13.    When an EIP customer funds their EIA with a supported virtual currency, Celsius then

14  transfers the virtual currency into its own wallet, where it is pooled with virtual currency from other EIP

15  customers and other Celsius assets.[1] Celsius then deploys the EIP virtual currency towards various income-

16  generating activities (see Paragraph 19).

17  14.    Celsius credits the customer's EIA with interest on a weekly basis. The customer can choose

18  between receiving interest in like-kind virtual currency or, where available, in CEL Tokens, Celsius' own

19  virtual currency.[2] Celsius pays interest to the customer until the customer withdraws their virtual currencies

---

[1] However, beginning some time in 2020 until approximately July 2021, Celsius transferred Washington customers' EIP virtual currencies to a third-party custodian for holding.  Celsius maintains that the virtual currencies held by the custodian were not deployed in income-generating activities, though these Washington customers still earned interest on their virtual currencies like any other EIP customer.

[2] According to Celsius, CEL Tokens are only available to accredited investors in the United States. Celsius maintains a trading platform where customers can buy and sell CEL Tokens, though Celsius states that this service is not available to Washington residents.

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

4

or uses their virtual currencies as collateral against loans that the customer takes out from Celsius.[3] Celsius allows EIA customers to withdraw their virtual currencies at any time, subject to a maximum three-day processing period.

15.    Celsius revisits the interest rate also on a weekly basis. According to Celsius, it determines interest rates based largely on "market demand" for a particular virtual currency. For certain virtual currencies such as Bitcoin and Ether, Celsius further sets the interest rate using a tiered structure.

### API Partner Program

16.    Celsius offers other companies the opportunity to provide the EIP to their own customers by becoming an API Partner. Celsius conducts due diligence on a potential API Partner prior to the establishment of the relationship. An API Partner can provide Celsius' EIP to its own customers through two different types of accounts: Segmented and Omnibus. Both types of API accounts are subject to the same restrictions and conditions as those on Celsius' own platform.

17.    With Segmented Accounts, the API Partner's customers establish a direct relationship with Celsius. Celsius onboards those customers in the same way that it brings on its own customers, including verifying customer identities for KYC/AML purposes. The API Partner's customers must also open their own Celsius EIA and accept Celsius' Terms of Service, though the customer accesses their account through the Partner's platform. Celsius pays interest directly into the customer's account.

18.    Omnibus Accounts, on the other hand, require the API Partner to establish its own EIP account with Celsius. Celsius pays interest into that account, and the API Partner then distributes the interest to its own customers. Celsius does not maintain a relationship with the API Partner's customers and does not know their identities. However, Celsius conducts additional due diligence into the Partners' business

---

[3]  The retail borrowing program is not open to Washington residents, according to Celsius.

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

5

EXHIBIT A

practices and reviews, among other things, the Partners' policies and procedures related to KYC/AML rules. Celsius establishes a direct contractual relationship with the API Partner and requires the API Partner to offer the same interest to its customers that Celsius offers to its own customers.

## Deployment and Income-Generating Activities

19.     Celsius uses the virtual currencies deposited by EIP customers in several income-generating activities. These activities include lending the virtual currencies to institutional and retail borrowers, posting it as collateral for its own stablecoin borrowing, and using the virtual currencies for market making, staking, mining, yield farming, and proprietary trading. Celsius also invests the EIP virtual currencies, at times through third party asset managers that are vetted by Celsius. Celsius regularly researches the market to identify other possible income-generating activities and has multiples teams tasked to review the potential of these activities.

20.     With regard to institutional and retail lending, Celsius manages most, if not all, aspects of the loan and lending process. Among other things, Celsius obtains borrower information, assesses their credit risks, tailors terms of the loans, including any required collateral, in accordance with the borrower's risk profile, monitors counterparty risk after the loan has been funded, liquidates posted collateral where needed, and services the loans.

21.     Celsius uses the income it receives from these activities to pay interest to EIP customers and for operating expenses, among other uses.

22.     Celsius requires EIP customers to agree to the commingling and deployment of their virtual currencies in this manner in Celsius' Terms of Service. Celsius customers agree to relinquish all rights and title to the virtual currency and to allow Celsius to "pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of [the virtual currency], separately or together with other

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

property,….and to use or invest such [virtual currency]." EIP customers have no control over how their virtual currencies are deployed by Celsius.

**Material Misleading Statements and Omissions in Offer and Sale of EIPs**

23.    In offering the EIPs to Washington residents, Celsius failed to fully disclose material aspects of its business and the EIP including, but not limited to, the types of trading and investment activities that it engages in using EIP virtual currencies, the identities and creditworthiness of those who borrow EIP virtual currencies, the amount of virtual currencies used in each income-generating activity, and Celsius financial statements or other information reflecting its financial state.

24.    In addition, Celsius' statements that it provides 80% of its revenue to its customers is misleading, as EIP customers are only entitled to earning interest at set rates determined by Celsius.

**Need For Further Investigation**

25.    The Securities Division is continuing to investigate the matter alleged herein to determine the full extent of the violations of the Securities Act that have occurred in this matter. The Securities Division may amend this Statement of Charges in the future to reflect any additional factual allegations and/or violations as a result of the continuing investigation.

**Registration Status**

26.    Celsius Network Inc. is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

27.    Celsius Network Inc. is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

28.    Celsius Network Limited is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from

STATEMENT OF CHARGES

EXHIBIT A

registration.

29.    Celsius Network Limited is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

30.    Celsius US Holding LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

31.    Celsius US Holding LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

32.    Celsius Network LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

33.    Celsius Network LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

34.    Celsius Lending LLC is not currently registered to sell the Earned Interest Program in the state of Washington and has not previously been so registered, nor has it filed a claim of exemption from registration.

35.    Celsius Lending LLC is not currently registered as a broker-dealer in the state of Washington and has not previously been so registered.

Based upon the above Tentative Findings of Fact, the following Conclusions of Law are made:

## CONCLUSIONS OF LAW

1.    The offer and/or sale of the Earned Interest Program described above constitutes the offer and/or sale of a security as defined in RCW 21.20.005(14) and (17).

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

2.    Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.140, the securities registration section of the Securities Act of Washington, by offering and/or selling securities for which no registration is on file with the Securities Administrator.

3.    Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.040, the licensee registration section of the Securities Act of Washington, by offering and/or selling said securities while not being registered as a broker-dealer in the state of Washington.

4.    Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC violated RCW 21.20.010, the anti-fraud section of the Securities Act of Washington, by making untrue statements of material fact or omitting to state material facts necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

### NOTICE OF INTENT TO ORDER THE RESPONDENT TO CEASE AND DESIST

Pursuant to RCW 21.20.390(1), and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC, and their agents and employees, to each permanently cease and desist from violating RCW 21.20.010, RCW 21.20.040, and RCW 21.20.140.

### NOTICE OF INTENT TO IMPOSE FINES

Pursuant to RCW 21.20.395, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC shall be jointly and severally liable for and for and shall pay a fine of $100,000.

//

STATEMENT OF CHARGES

EXHIBIT

## NOTICE OF INTENT TO CHARGE COSTS

Pursuant to RCW 21.20.390, and based upon the Tentative Findings of Fact and Conclusions of Law, the Securities Administrator intends to order that Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC shall be jointly and severally liable for and for and for and shall pay the costs, fees, and other expenses incurred in the administrative investigation and hearing of this matter, in an amount not less than $6,500.

## AUTHORITY AND PROCEDURE

This Statement of Charges is entered pursuant to the provisions of Chapter 21.20 RCW and is subject to the provisions of Chapter 34.05 RCW. Celsius Network Inc., Celsius Network Limited, Celsius US Holding LLC, Celsius Network LLC, and Celsius Lending LLC may each make a written request for a hearing as set forth in the Notice of Opportunity for Hearing accompanying this Order. If a respondent does not make a hearing request in the time allowed, the Securities Administrator intends to adopt the above Tentative Findings of Fact and Conclusions of Law as final and to enter a permanent order to cease and desist as to that respondent, to impose any fines sought against that respondent, and to charge any costs sought against that respondent.

SIGNED and ENTERED this 20th day of October, 2021.

_____
William M. Beatty
Securities Administrator

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

10

EXHIBIT A

Approved by:                                    Presented by:


_____            _____
Suzanne Sarason                                Huong Lam
Chief of Enforcement                           Financial Legal Examiner

STATEMENT OF CHARGES

DEPARTMENT OF FINANCIAL INSTITUTIONS
Securities Division
PO Box 9033
Olympia, WA  98507-9033
360-902-8760

11

STATE OF NEW JERSEY
BUREAU OF SECURITIES
P.O. Box 47029
Newark, New Jersey
07101 (973) 504-3600

| | |
|---|---|
| **IN THE MATTER OF:** | |
| Celsius Network, LLC, | **SUMMARY CEASE AND DESIST ORDER** |
| Respondent. | |

Pursuant to the authority granted to Christopher W. Gerold, Chief of the New Jersey Bureau of Securities ("Bureau Chief"), under the Uniform Securities Law (1997), N.J.S.A. 49:3-47 to -89 ("Securities Law") and certain regulations thereunder, and based upon documents and information obtained during the investigation by the New Jersey Bureau of Securities ("Bureau"), the Bureau Chief hereby finds that there is good cause and it is in the public interest to enter this Summary Cease and Desist Order ("Order") against Celsius Network, LLC.

The Bureau Chief makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.     Celsius Network, LLC ("Celsius") is a financial services company that generates revenue through cryptocurrency trading, lending, and borrowing, as well as by engaging in propriety trading. Since June 2018, Celsius has been, at least in part, funding its lending operations and proprietary trading through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts. Celsius refers to these unregistered securities as its "Earn Rewards" account.

2.      Celsius solicits investors to invest in the Earn Rewards accounts by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius. Celsius then pools these cryptocurrencies together to fund its various income generating activities, including lending operations and proprietary trading. In exchange for investing in the Earn Rewards product, investors are promised an attractive interest rate that is paid weekly in the same type of cryptocurrency as originally invested, or, subject to certain conditions, in Celsius' native digital token CEL (which are not currently available for U.S.-based account holders).

3.      The Celsius Earn Rewards accounts are not registered with the Bureau or any other securities regulatory authority, or otherwise exempt from registration. Celsius' Earn Rewards accounts are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA"). This lack of a protective scheme or regulatory oversight subjects Celsius investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

4.      Despite the lack of safeguards that SIPC, FDIC, and the NCUA would offer or the regulatory oversight of registration, Celsius held the equivalent of more than $14 billion from the sale of these unregistered securities in violation of the Securities Law as of August 18, 2021.

5.      The Bureau Chief enters this Order to protect the investing public by halting the offer and sale of these unregistered securities, and the contribution of additional assets to existing accounts. Nothing in this order shall preclude Celsius, or any of its affiliates, from paying interest, also known as "Rewards" on the existing Celsius Earn Rewards accounts or refunding principal to the Earn Rewards investors consistent with Celsius' Terms of Use.

**A.    The Respondent**

6.      Celsius is a Delaware limited liability company, registered on June 14, 2021, with

offices at 221 River Street, 9th Floor, Hoboken, New Jersey. Celsius conducts its business on the internet, through a website accessible to the general public at https://www.celsius.network/ (the "Celsius Website"), which is also accessible through Celsius' own proprietary app via smartphone.

7.       Celsius is not presently registered, and has never been registered, in any capacity with the Bureau. Nor have its Earn Rewards accounts ever been registered with the Bureau.

**B.       The Celsius Earn Rewards Securities**

**a.       Celsius Earn Rewards**

8.       Celsius offers and sells its Celsius Earn Rewards unregistered securities in the form of individual and corporate accounts. Investors in these accounts ("Earn Rewards Investors") deposit certain popular cryptocurrencies with Celsius to earn "up to 17.78% APY." The purported Earn Rewards rates advertised by Celsius are well in excess of the rates currently being offered by short-term investment grade fixed income securities or on bank savings accounts.

9.       Celsius offers its Earn Rewards accounts to anyone over the age of eighteen, except for residents of certain foreign jurisdictions subject to regulatory restrictions.

10.      When an investor signs up with Celsius, they verify their age, identity and address, provide an identification document, complete a user agreement and a KYC (Know Your Customer) protocol. A link to the Celsius Terms of Use ("Celsius Terms") appears at the bottom of each of its web pages.

11.      The Celsius Website states that Celsius does not require a minimum amount of cryptocurrency for deposit in an Earn Rewards account.

12.      Celsius only accepts certain types of cryptocurrencies for deposit in the Earn Rewards accounts. Although Celsius refers to its payments to Earn Rewards Investors as "Rewards," the term "Rewards" is a substitute for "interest" as is apparent from Celsius's API Partner disclosures from the Celsius Website:

EXHIBIT A

API Portal / Guides

## Interest Calculations

This page describes how interest is calculated and disbursed. Celsius pays interest on the value of each asset in a user's wallet. Interest is paid using the same asset(s) that is held in the user's wallet. Obtain current interest rates for each token using the SDK getInterestRates() method or Get Interest Rates API operation.

13.    Earn Rewards Investors earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius.

14.    The variable interest rates for the Earn Rewards Investors are posted on the Celsius Website.  Celsius' interest rates for deposits of certain cryptocurrencies in its Earn Rewards accounts are "tiered" depending upon the nature and amount of the cryptocurrency invested, as explained on the Celsius Website.  Currently, Earn Rewards Investors are entitled to 6.2% on their first Bitcoin deposited and 3.51% on additional deposits of Bitcoin. Rates on other cryptocurrencies range from 13.99% for the Synthetix Network Token (SNX) to 0.0% for Ripple (XRP):

4

EXHIBIT A

## Cryptocurrencies

Celsius supports today's top cryptocurrencies including native blockchain coins such as Bitcoin and Ethereum, staking coins such as DASH, and utility tokens such as CEL.

| | | |
|---|---|---|
| Bitcoin (Up to 1 BTC) | | 6.20% |
| Bitcoin (After 1 BTC) | | 3.51% |
| Ethereum (Up to 100 ETH) | | 5.35% |
| Ethereum (After 100 ETH) | | 5.05% |
| CEL | | 4.86% |
| SNX | | 13.99% |
| MATIC | | 10.51% |
| DOT | | 8.86% |
| BNT | | 5.50% |
| AAVE | | 4.86% |
| DASH | | 4.60% |
| COMP | | 4.60% |
| BCH | | 4.51% |
| EOS | | 4.45% |
| LTC | | 4.08% |
| ADA | | 4.06% |
| ETC | | 3.00% |
| LINK | | 3.00% |
| XRP | | 0.00% |
| UNI | | 2.50% |
| BSV | | 2.02% |
| ZEC | | 2.02% |
| ZRX | | 1.77% |
| XLM | | 1.00% |
| BAT | | 1.00% |
| UMA | | 1.00% |
| OMG | | 0.50% |
| KNC | | 0.50% |
| MANA | | 0.50% |

Reward rates are subject to change from time to time. Celsius does not endorse or recommend any digital asset listed above (or at all). The above is not financial advice and is not intended to provide comprehensive information about any specific digital asset or category. Do your own research.

5

15.    Celsius' also pays interest for deposits of certain stablecoins in its Earn Rewards accounts, as explained on the Celsius Website.

16.    The manner in which interest is calculated and credited to Earn Rewards Investors is illustrated on the Celsius Website and specified in the Celsius Terms:



Rewards are payable based on a daily periodic rate applicable to the Loaned Digital Assets. The daily periodic rate is calculated by dividing the then-applicable annual reward rate by three hundred sixty-four (364) days; then it is further divided down to the hour, minute, and second of that day. Loaned Digital Assets, including those received as Rewards from previous weeks, will begin gaining Rewards according to the hour, minute, and second on the timestamp verifying the completion of the applicable transaction and shall cease and/or decrease the amount paid as Rewards at the moment when the User has entered an external transmission, withdrawal or transfer of rights (via CelPay) request, or posted any Loaned Digital Assets as collateral for a Fiat Loan. Therefore, any Loaned Digital Asset transferred mid-week will receive Rewards with no distinction, based on the rates calculated for the relative time within the allocation period.

17.    Celsius advertises that interest on the Earn Rewards product is paid to investors in cryptocurrency (or CEL Tokens depending on certain factors) based on the "daily periodic rate," which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day" and is credited to the Earn Rewards Investors' accounts weekly on the first business day of the week.

18.    Celsius describes its business model as one that returns 80% of its total revenue to Earn Rewards Investors: "The Celsius business model is structured to do the exact opposite of

what banks do — by giving 80% of total revenue back to our community each week in the form of earned interest. We earn profits by lending coins to hedge funds, exchanges, and institutional traders, and by issuing asset-backed loans at an average of 9% interest. We're taking the exact same 80% profit margin that banks have kept for themselves for centuries and returning it to our community of depositors."

**b.**    **Celsius's Promotion of Earn Rewards Accounts as Investment Products**

19.    Celsius encourages its Earn Rewards account holders to treat their Earn Rewards accounts as long-term investments as evidenced by the statement on Celsius's homepage: "Start earning top rates on any amount of crypto and get paid every paid every Monday to keep HODLing."   As explained on the Celsius Website "HODL started as a typo and has become a crypto rallying cry.  A misspelling of the word 'hold,' HODLers believe in the future of digital currencies and know it would be a mistake to sell at this early stage."

20.    Earn Rewards account holders can also manage their Earn Rewards accounts as long-term investments using the "HODL Mode" feature of their Celsius account.  Celsius describes HODL Mode on its Website as an account security feature "that gives [account holders] the ability to temporarily disable outgoing transactions from [their] Celsius account.  [Account holders] control when HODL Mode is activated and it is an ideal feature for those that do not plan on withdrawing or transferring funds from their account for an extended period of time."

21.    Celsius's corporate culture of promoting "HODLing," including its description of Celsius as a "HODLing platform," the premium interest rates Celsius pays on its Earn Rewards accounts, the weekly compounding of interest payments, and the availability of HODL Mode makes the Celsius Earn Rewards account an attractive long-term investment to Celsius Earn Rewards Investors.

      **c.**    **Celsius' Use of the Earn Rewards Deposit Funds**

22.    The Celsius Terms provide that an Earn Rewards Investor relinquishes control over the deposited cryptocurrency to Celsius and that Celsius is free to use those assets as it sees fit, including commingling the Earn Rewards Investor's cryptocurrency with those of other Earn Rewards Investors, investing those pooled assets in the market, and lending them to institutional and corporate borrowers. Having relinquished control over the deposited cryptocurrency in their Earn Rewards accounts, the Earn Rewards Investors are passive investors.

23.    Specifically, Paragraph 4. B. "Earn Rewards" of the recently-amended Celsius Terms provides:

> Our Earn Rewards service allows you to earn a financing fee from Celsius, referred to as "Rewards", in the form of Digital Assets (either in-kind, i.e. in the same Digital Asset you deliver, or in CEL Tokens, where permitted) in exchange for entering into open-ended loans of your Eligible Digital Assets to Celsius under the terms hereof. By lending your Eligible Digital Assets to Celsius you grant Celsius all rights and title to such Digital Assets, for Celsius to use in its sole discretion.

24.    Paragraph 13 of Celsius's recently-amended Terms, "Consent To Celsius's Use of Digital Assets," further details the status of cryptocurrency deposited with Celsius by Earn Rewards Investors:

> In consideration of the Rewards payable to you on your Celsius Account and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which the Eligible Digital Assets are loaned to us through your Celsius Account, all right and title to such Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion. You

8

acknowledge that with respect to the Digital Assets used by Celsius pursuant to this paragraph:

(i)    You will not be able to exercise rights of ownership;

(ii)    Celsius may receive compensation in connection with lending or otherwise using Digital Assets in its business to which you have no claim or entitlement; and

(iii)   In the event that Celsius becomes bankrupt, enters liquidation or is otherwise unable to repay its obligations, you mayn't be able to recover or regain ownership of such Digital Assets, and other than your rights as a creditor of Celsius under any applicable laws, you may not have any legal remedies or rights in connection with Celsius' obligations to you.

25.    Celsius then pools the deposited cryptocurrencies together with Celsius's other assets, to, among other income-generating activities, collateralize Celsius' borrowings, purchase securities and digital assets for Celsius' own account, make loans to institutional and corporate borrowers, and mine for cryptocurrency.

26.    Celsius does not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities.

27.    As Celsius's founder, Alex Mashinsky, stated in a March 7, 2021 article he authored for the DataDriveInvestors website, reposted in the "Media" tab on the Celsius Website, "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."

**d.    <u>The Earn Rewards Accounts are Unregistered Security</u>**

28.    While certain of Celsius' loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, the Celsius Earn

9

Rewards product is not currently registered with any federal or state securities regulator, nor exempt from registration – as required by law, even though the Earn Rewards product is a "security" and subject to such requirements.

29.    Celsius fails to disclose to Earn Rewards Investors that its Earn Rewards product is not currently registered by federal or state securities regulatory authorities, even though the Earn Rewards product is a "security" and required to be registered.

**e.    Celsius's API Partners Program**

30.    Celsius offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," to integrate with the Celsius platform.

31.    Celsius affords its API Partners the ability to offer the Earn Rewards accounts to retail investors in two different ways.

32.    First, the Celsius "Segmented Accounts" platform allows API Partners to offer the API Partners' own customers the Celsius Earn Rewards accounts through the API Partners' own portal.  An API Partner availing itself of Celsius's Segmented Accounts structure offers the API Partner's own retail customers the opportunity to access the Celsius Earn Rewards account through the API Partner's own portal, as opposed to the API Partner's retail customers accessing the Celsius Earn Rewards account directly from Celsius's own website.  Apart from the difference in how the Earn Rewards account is accessed, individual retail customers of API Partners offering the Segmented Account option are subject to the same rights, benefits, terms, and conditions as Celsius's own Earn Rewards Investors.

33.    Second, Celsius's API Partners can choose to access the Celsius Earn Rewards accounts through what Celsius refers to as an "Omnibus Account."  In the Omnibus Account, the API Partner maintains a direct relationship with Celsius and invests in a Celsius Earn Rewards

account for the benefit of its individual customers, whose cryptocurrencies the API Partner has aggregated for the purpose of investing in the Celsius Earn Rewards account on behalf of, and for the benefit of, the API Partner's individual retail customers.

34.     Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the Earn Rewards payable.

35.     Celsius is selling unregistered securities in the form of Earn Rewards accounts to it API Partners' Segmented Account customers.

36.     Celsius is selling unregistered securities to its API Partners who choose to open API Partner Omnibus Accounts with Celsius.

## CONCLUSIONS OF LAW

### CELSIUS OFFERED AND SOLD UNREGISTERED  SECURITIES
### N.J.S.A. 49:3-60

37.     The preceding paragraphs are incorporated by reference as though set forth verbatim herein.

38.     The Earn Rewards product is a security as defined in N.J.S.A. 49:3-49(m).

39.     The Earn Rewards product was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

40.     The Earn Rewards product has not been registered with the Bureau, is not exempt from registration, and is not federally covered.

41.     Celsius has offered and sold unregistered securities in violation  of N.J.S.A. 49:3-60 and continues to do so.

42.     Each violation of N.J.S.A. 49:3-60 is a separate violation of the Securities Law and

is cause for the denial of certain exemptions.

43.    N.J.S.A. 49:3-69(a)(1) empowers the Bureau Chief to issue a cease and desist order against persons engaged in prohibited activities, directing them to cease and desist from further illegal activity or doing acts in furtherance thereof.

## **CONCLUSION**

**THEREFORE,** it is on this 17th day of September 2021, **ORDERED** that:

44.    Effective on November 1, 2021, Celsius and any person, agent, employee, broker, partner, officer, director, affiliate, successor, or stockholder thereof, under any of their direction or control shall CEASE AND DESIST from:

a.    offering for sale any security, including any Earn Rewards product, to or from New Jersey unless the security is registered with the Bureau, is a covered security, or is exempt from registration under the Securities Law;

b.    accepting any additional assets into an existing Earn Rewards account; and

c.    violating any other provisions of the Securities Law and any rules promulgated thereunder for the sale of any security in New Jersey.

45.    Nothing in this order shall preclude Celsius from paying interest, also known as "Rewards," on the existing Earn Rewards accounts or refunding principal to the Earn Rewards Investors consistent with the Celsius Terms.

46.    All exemptions contained in N.J.S.A. 49:3-50 subsection (a) paragraph 9, 10, and 11 and subsection (b) are hereby DENIED as to Celsius.

47.    All exemptions to the registration requirements provided by N.J.S.A. 49:3-56(b),

N.J.S.A. 49:3-56(c), and N.J.S.A. 49:3-56(g) are hereby DENIED as to Celsius.

_____

Christopher W. Gerold
Chief, New Jersey Bureau of Securities

## <u>NOTICE OF RIGHT TO HEARING</u>

Pursuant to N.J.S.A. 49:3-69(a)(1)(i), the Bureau Chief shall entertain on no less than three days' notice a written application to lift the Order to Cease and Desist on written application of the person subject thereto and in connection therewith may, but need not, hold a hearing and hear testimony, but shall provide to the person subject thereto a written statement of the reasons for the Order to Cease and Desist.

Pursuant to N.J.S.A. 49:3-69(a)(l)(ii), upon service of notice of the Order to Cease and Desist issued by the Bureau Chief, the person subject thereto shall have up to 15 days to respond to the Bureau in the form of a written answer and written request for a hearing. The Bureau Chief shall, within five days of receiving the answer and request for a hearing, either transmit the matter to the Office of Administrative Law for a hearing or schedule a hearing at the Bureau of Securities. Orders issued pursuant to N.J.S.A. 49:3-69 shall be subject to an application to vacate upon 10 days' notice, and a preliminary hearing on the Order shall be held in any event within 20 days after it is requested, and the filing of a motion to vacate the Order shall toll the time for filing an answer and written request for a hearing.

Pursuant to N.J.S.A. 49:3-69(a)(l)(iii), if any person subject to the Order fails to respond by filing a written answer and written request for a hearing with the Bureau or moving to vacate the order within the 15-day prescribed period, that person shall have waived the opportunity to be heard. The Order will be a Final Order and shall remain in effect until modified or vacated.

## <u>NOTICE OF OTHER ENFORCEMENT REMEDIES</u>

You are advised that the Uniform Securities Law provides several enforcement remedies, which are available to be exercised by the Bureau Chief, either alone or in combination. These remedies include, in addition to this action, the right to seek and obtain injunctive and ancillary relief in a civil enforcement action, N.J.S.A. 49:3-69, and the right to seek and obtain civil penalties in an administrative or civil action, N.J.S.A. 49:3-70.1.

You are further advised that the entry of the relief requested does not preclude the Bureau Chief from seeking and obtaining other enforcement remedies against you in connection with the claims made against you in this action.



RECEIVED
SEP 2 3 2021
11:30 am
PPC/DFI/COMMISSIONERS OFFICE

## COMMONWEALTH OF KENTUCKY
## PUBLIC PROTECTION CABINET
## DEPARTMENT OF FINANCIAL INSTITUTIONS
## DIVISION OF SECURITIES
## ADMINISTRATIVE ACTION NO. 2021-AH-00024

DEPARTMENT OF FINANCIAL INSTITUTIONS        COMPLAINANT

v.        **EMERGENCY ORDER TO CEASE AND DESIST**

CELSIUS NETWORK LLC        RESPONDENT

\* \* \* \* \* \* \* \* \*

Comes now the Department of Financial Institutions (hereinafter referenced as the "Department"), pursuant to Kentucky Revised Statute (KRS 292.470, KRS 292.500, and 808 Kentucky Administrative Regulation (KAR) 10:225, and hereby enters this **Emergency Order to Cease and Desist** against Celsius Network LLC, (hereinafter referenced as "Celsius", the "Company", or "Respondent"). In support thereof, the Department states as follows:

### PARTIES

1.     The Commissioner is responsible for administering the provisions of KRS Chapter 292, the Securities Act of Kentucky ("the Act"), as well as any applicable rules, regulations and orders entered pursuant to the Act.

2.     Celsius Network LLC is a Delaware limited liability company. Respondents have a principal office located at 221 River Street 9th Floor, Hoboken, New Jersey, 07030. Celsius Network LLC has a registered process agent at The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.



EXHIBIT A

## STATEMENT OF FACTS

3.      On January 11, 2021, the Department became aware that Celsius was engaging in securities-related activities. Subsequently, the Department conducted an investigation into Celsius, learning of the facts and circumstances described herein.

4.      On May 26, 2021, the Department searched Celsius's website, https://celsius.network/. The website states, among other things, "Meet Celsius: a community of over 1 million users that earn up to 17% yield on their crypto. Get paid new coins every week…", "Earn up to 17% APY paid every week", "Get Celsius. Unbank yourself. Earn high. Borrow low", "Your crypto earns more with Celsius", "Put your money to work", and "You don't need a bank to make bank".

5.      Celsius offers Earn Interest Accounts ("EIAs"), which are interest-bearing cryptocurrency accounts that are available on Celsius's website and proprietary smartphone application, as part of its Earn Interest Program. EIAs can be either individual or corporate accounts and are offered to anyone eighteen (18) years of age or older, except for residents of certain foreign jurisdictions. Registering for an EIA requires an investor to mark a box to indicate the investor has read and accepted Celsius's "Terms of Use" and "Privacy Policy". These documents are available on the website via hyperlink, although the investor is able to mark the box regardless of whether the hyperlinks are opened or the documents' contents reviewed.

6.      Celsius solicits investors to invest in EIAs by depositing certain eligible cryptocurrencies into the investors' accounts at Celsius. Celsius then pools these cryptocurrencies together to fund its various income-generating activities, including proprietary trading, collateralizing Celsius' borrowings, purchasing securities and digital assets for Celsius' own account, making loans to institutional and corporate borrowers, and mining cryptocurrency. In

exchange for investing in an EIA, Celsius promises to credit U.S. investors with weekly interest payments at an attractive rate and in the same type of cryptocurrency as originally invested.

7.    The interest Celsius pays to investors is referred to as "rewards" or a "financing fee" in the Terms of Use and appear to be the motivating factor for investors to choose an EIA. Celsius offers a variable, "daily periodic rate", which is "calculated by dividing the then-applicable annual reward rate by three hundred and sixty-four days (364); then it is further divided in the hour, minute, and second of that day." The rate is further tiered to the nature and amount of cryptocurrencies invested. Once calculated, the interest is then credited to the investors' accounts weekly on the first business day of the week. The rate adjustment appears to be based on the volatile exchange rate of each cryptocurrency, which can fluctuate based on circulation and popularity of the tokens. The rates currently advertised by Celsius are substantially above the rates offered by similar short-term investment securities or similar certificates of deposit offered by banking institutions.

8.    Celsius' Terms of Use demonstrate that EIA investors are passive investors. The Terms of Use grant the Company all right and title to the deposited assets, and the right to

> …pledge, re-pledge, hypothecate, re-hypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets in Celsius' full discretion.

A separate section of the Terms of Use features additional Celsius rights "to assign, invest, commingle or otherwise dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible Digital Assets with counterparties."

EXHIBIT A

9.    Celsius's founder, Alex Mashinsky, has stated "[u]sers transfer assets with Celsius, Celsius lends funds to institutions and returns up to 80% of earnings to users."[1] Additionally, Celsius's Terms of Use describe that EIA investors are "exposed to the possibility of Celsius becoming unable to repay its obligations in part or in full, in which case [the investor's] Digital Assets may be at risk." Celsius warns that account holders should "only use funds that [the investor] can afford to lose" though the Company represents to potential investors that it will "use [its] best commercial and operational efforts to prevent losses."

10.    At no time before or after investors agree to the EIA Terms of Use does Celsius disclose to investors the amount of money devoted to each of Celsius's investment activities; the identity, nature, or creditworthiness of the borrowers of material amounts of Celsius's pooled cryptocurrency assets; the terms and duration of Celsius's loans; the types of securities and digital assets Celsius trades; or the profits and losses derived from Celsius's use of pooled investor cryptocurrencies.

11.    Celsius also offers an Application Programming Interface ("API") that allows certain entities, known as Celsius "API Partners", to integrate with the Celsius platform. Celsius affords its API Partners the ability to offer the EIAs to retail investors either through a "Segmented Accounts" platform or an "Omnibus Account" Platform.   The Celsius "Segmented Accounts" platform allows API Partners to offer EIAs accounts to the API Partners' customers through the API Partners' own web portal instead of directly from Celsius's website. Alternatively, the Celsius "Omnibus Account" platform allows API Partners to maintain a direct relationship with Celsius and invest in an EIA for the benefit of the API Partners' customers, whose cryptocurrencies the

---

[1] Alex Mashinsky, *How Celsius creates prosperity for retail and institutional investors alike*, Data Driven Investor (March 7, 2021), https://medium.datadriveninvestor.com/how-celsius-creates-prosperity-for-retail-and-institutional-investors-alike-cc086084c6bd. This article was reposted in the "Media" tab on Celsius's Website.

EXHIBIT A

API Partner aggregates for the purpose of investing. Celsius incentivizes the API Partners by paying a fee to Segmented Account partners based on a percentage of rewards payable by Celsius to the end-user, and also pays fees to Omnibus Partners, in addition to the "rewards" payable.

12.    A review of the Department's records revealed that neither Celsius nor the EIAs offered on its website are registered with the Department as required under the Act. Additionally, neither Celsius nor these EIAs appear to be entitled to any exemption from registration under the Act. The EIAs Celsius offers are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC") or insured by the National Credit Union Administration ("NCUA").  As a result, Celsius investors are subject to additional risks compared to investors who maintain assets with most SIPC member broker-dealers, banks and savings associations, or credit unions.

13.    Respondent claims to currently hold approximately twenty-four billion dollars' ($24,000,000,000) worth of account balances. The Department's investigation of Celsius's consumer data found that over a period of three years and four months, 1,607 EIAs were opened among 1,571 Kentucky investors with Celsius and investors pledged $17,594,229.86 worth of digital assets to Celsius. Celsius in turn has paid these investors a total of $453,353.78.

## STATUTORY AUTHORITY

14.    KRS 292.310(19) defines a "security", in relevant part, as:

> ...any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, life settlement investment, voting-trust certificate, certificate of deposit for a security; fractional undivided interest in oil, gas, or other mineral rights; or, in general, any interest or instrument commonly known as a "security[.]"

EXHIBIT A

15.    KRS 292.320 states, in pertinent part,

(1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:
(a) To employ any device, scheme, or artifice to defraud;
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

16.    KRS 292.340 states,

It is unlawful for any person to offer or sell any security in this state, unless the security is registered under this chapter, or the security or transaction is exempt under this chapter, or the security is a covered security.

17.    KRS 292.470 states, in pertinent part,

Whenever it appears to the commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule or order under this chapter, the commissioner may in his or her discretion bring any or all of the following remedies:

(1) Issue a cease and desist order, with or without a prior hearing, appealable to Franklin Circuit Court, against the person or persons engaged in the prohibited activities directing that person or persons to cease and desist from illegal activity. In order to issue an order without prior hearing, the commissioner must find that the delay in issuing a final cease and desist order will cause harm to the public.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

18.    The Department has become aware that the Company is offering securities in the form of investment contracts in exchange for the deposit of assets with the Company. These investment contracts allow passive investors to earn profit in the form of interest on the assets deposited with the Company, and qualify as securities under the Act.

Page **6** of **11**

19.     Based on the facts set forth above, Respondent offered unregistered securities in Kentucky through a publicly available website, in violation of the Act. These securities were not registered with the Department as required, and do not qualify for an exemption from registration.

20.     These EIAs amount to an investment contract because they are "an investment of money in a common enterprise with profits to come solely from the efforts of others." *See* <u>S.E.C. v. W.J. Howey Co.</u>, 328 U.S. 293, 301 (1946).

21.     In addition to selling unregistered securities, Celsius's API Partners program does not disclose to API Partner customers that Celsius is the company that the customer is investing his or her cryptocurrencies with and misleads customers to believe it is the customer-facing API Partner's offering.

22.     By reason of the foregoing, Respondent has violated the Act and, unless enjoined, will continue to violate the law.

23.     Respondent's management of assets is completely unregulated, and is not subject to any government oversight or approval.

24.     Respondent is not currently subject to any disclosure requirements regarding the risks of investing with the Company, or the potential losses that an investor can suffer after opening an EIA.

25.     Accounts opened with Respondent are not insured by the Federal Deposit Insurance Corporation, or any other government entity.

26.     This lack of oversight coupled with the extremely volatile nature of the cryptocurrencies used to fund Respondent's EIAs has resulted in an unregulated market that represents an unprecedented risk to consumers.

27.     Delay in issuing a final cease and desist order in this case would cause direct harm to the public due to Respondent's current and foreseeable conduct. Failure of the Department to enter a cease and desist order in this case could result in extensive financial losses to the citizens of the Commonwealth, and consumers harmed in this way may have little to no recourse whatsoever. The emergency nature of this order is essential to protect the interests of the citizens of the Commonwealth due to the high volume of assets and volatile nature of cryptocurrency.

## Violation of KRS 292.320

28.     Pursuant to KRS 292.320, it is unlawful for any person, in connection with the offer or sale of any security, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person or to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

29.     Celsius' API Partners program deceives consumers by not disclosing to affected Kentucky consumers that the offered security is through Celsius and not the customer-facing API Partners in violation of KRS 292.320.

## Violation of KRS 292.340

30.     Pursuant to KRS 292.340, it is unlawful for any person to solicit or sell securities in Kentucky without first being registered with the Department to do so.

31.     Through Celsius's publicly available website and smartphone application, Respondent has solicited securities in Kentucky.

32.     The Department's records show that Respondent has never been registered with the Department and have never sought registration.

33.     The Respondent and the securities Respondent offered do not qualify for an exemption from registration.

34.     Therefore, Respondent is in violation of KRS 292.340 by soliciting securities in Kentucky without being appropriately registered to do so.

**ORDER**

In light of the foregoing, IT IS HEREBY ORDERED that:

1.     Respondent, Celsius Network LLC, shall **CEASE AND DESIST** from soliciting or selling any security in Kentucky unless that security is registered with the Department pursuant to KRS 292.340; and

2.     Respondent, Celsius Network LLC, shall **CEASE AND DESIST** from any and all activity which would otherwise violate the Act.

**SO ORDERED** on this the __23rd_ day of _September_, 2021.


___/s/ _Charles A. Vice_____

CHARLES A. VICE
COMMISSIONER

**Charles
A. Vice**

Digitally signed by: Charles A. Vice
DN: CN = Charles A. Vice email = charles.
vice@ky.gov C = US O = Dept. of
Financial Institutions OU = PPC/DFI/
Commissioner
Date: 2021.09.23 10:04:37 -05'00'

## NOTICE TO RESPONDENT

You are hereby notified that you are entitled to request an emergency hearing. If requested, an administrative hearing shall be held within ten (10) days pursuant to the provisions of KRS Chapter 13B.125. Please submit any request for hearing, in writing, to Brandon Adcock, Staff Attorney, Kentucky Department of Financial Institutions, 500 Mero Street 2 SW 19, Frankfort, Kentucky 40601. Alternatively, you may also have the right to the judicial review of this Order in Franklin Circuit Court pursuant to KRS 292.470(1).

EXHIBIT A

## CERTIFICATE OF SERVICE

I, *Mary Johnson*                , hereby certify that a copy of the foregoing Emergency Order to Cease and Desist was sent on this the *23rd* day of *September*           , 2021, by certified mail, return receipt requested, to the following:

Alex Mashinsky
CELSIUS NETWORK LLC
221 River Street 9th Floor
Hoboken, NJ 07030

Registered Agent for Service of Process
THE CORPORATION TRUST COMPANY
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

and by messenger mail or electronic delivery to:

Brandon Adcock, Staff Attorney III
DEPARTMENT OF FINANCIAL INSTITUTIONS
500 Mero Street, 2 SW 19
Frankfort, KY 40601
*Counsel for Department of Financial Institutions*

Kentucky Department of Financial Institutions

Name: *Mary Johnson*

Title: *Exec. Admin. Sec.*

EXHIBIT A



TRAVIS J. ILES
SECURITIES COMMISSIONER

CLINTON EDGAR
DEPUTY SECURITIES COMMISSIONER

Mail: P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

Phone: (512) 305-8300
Facsimile: (512) 305-8310

E. WALLY KINNEY
CHAIR

KENNY KONCABA
MEMBER

ROBERT BELT
MEMBER

MELISSA TYROCH
MEMBER

EJIKE E OKPA II
MEMBER

## Texas State Securities Board

208 E. 10th Street, 5th Floor
Austin, Texas 78701-2407
www.ssb.texas.gov

### SOAH DOCKET NO. 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

| | |
|---|---|
| TEXAS STATE SECURITIES BOARD, Petitioner | § BEFORE THE STATE OFFICE |
| | § |
| | § |
| v. | § |
| | § OF |
| CELSIUS NETWORK, INC., CELSIUS NETWORK LIMITED, CELSIUS US HOLDING, LLC, CELSIUS NETWORK, LLC, AND CELSIUS LENDING, LLC Respondents | § |
| | § |
| | § |
| | § |
| | § ADMINISTRATIVE HEARINGS |

**CELSIUS NETWORK INC.**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS NETWORK LIMITED**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS US HOLDING, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John

EXHIBIT A

Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS NETWORK, LLC
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

CELSIUS LENDING, LLC
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

## NOTICE OF HEARING

This is your OFFICIAL NOTICE that a hearing will commence at **9:00 AM on FEBRUARY 14, 2022,** before an Administrative Law Judge. The hearing is being held via videoconference for the purpose of determining whether to issue a proposal for decision for the entry of a CEASE AND DESIST ORDER against Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Network, LLC, and Celsius Lending, LLC (herein collectively referred to as the "Celsius Network" or as "Respondents").

This hearing will be held pursuant to the Securities Act, Tex. Rev. Civ. Stats. Ann. arts. 581-1-581-45 (the "Securities Act"), the Rules and Regulations of the State Securities Board, 7 Tex. Admin. Code §§101.1-139.27 (2019) (Tex. State Sec. Bd.) (the "Board Rules"), the Administrative Procedure Act, Tex. Gov't Code Ann. §§2001.001-2001.902 (the "Administrative Procedure Act"), and the Rules of Practice and Procedure of the State Office of Administrative Hearings, 1 Tex. Admin. Code Chapter 155 (2019) (State Ofc. of Admin. Hearings) (the "SOAH Rules").

## CELSIUS AND THE CRYPTO INTEREST ACCOUNTS

1.     Celsius Network, Inc. is incorporated in Delaware and owns several subsidiaries including an approximately 82.81% interest in Celsius Network Limited.

2.     Celsius Network Limited is incorporated in England and Wales and wholly owns many subsidiaries, including Celsius US Holding, LLC.

3.    Celsius US Holding, LLC is the holding company for Celsius Network's subsidiaries in the United States and two of its wholly owned subsidiaries are Celsius Network, LLC and Celsius Lending, LLC.

4.    Celsius Network, LLC is a Celsius Network company incorporated in Delaware and is the subsidiary providing Celsius Network's user-facing services and activities for customers in the United States.

5.    Celsius Lending, LLC is a Celsius Network company incorporated in Delaware and is the subsidiary providing consumer fiat and stablecoin loans secured by cryptocurrency deposits to Celsius Network's customers in the United States.

6.    The Celsius Network is a network of affiliated financial services companies that generate revenue through cryptocurrency trading, lending, and borrowing, as well as engaging in propriety trading, mining, and other types of transactions.

7.    Respondents are, in part, illegally funding their lending operations, proprietary trading, and other revenue generating activities through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts.

8.    Respondents refer to the unregistered cryptocurrency interest-earning accounts as Celsius Network's "Earn Rewards" program ("Celsius Earn Interest-Bearing Account").

9.    Respondents permit Texans and other investors at least eighteen years old to apply to purchase the Celsius Earn Interest-Bearing Account through the Celsius Network's website or smartphone application.

10.   Investors open accounts by transferring eligible cryptocurrency to the Celsius Network to invest in Celsius Earn Interest-Bearing Accounts. Investors relinquish control over their cryptocurrency and the Celsius Network takes full legal and beneficial ownership of the investors' cryptocurrency.

11.   The Celsius Network is free to use investors' cryptocurrencies consistent with the terms of the Celsius Earn Interest-Bearing Accounts, including commingling cryptocurrencies with cryptocurrencies deposited by other investors, investing in traditional financial assets and cryptocurrency assets, lending those cryptocurrencies to institutional and corporate borrowers, and engaging in any other activities at the Celsius Network's discretion.

12.   In exchange for consideration received in the present, the Celsius Network is promising to pay lucrative interest rates in the future. The Celsius Network is currently promoting the interest rates through its website, which recently advertised an annual return of up to 17.78 percent on certain cryptocurrencies for retail

investors - well in excess of the rates currently being offered for short-term, investment grade, fixed income securities or for bank savings accounts.

13.    The Celsius Network sets the interest rates it pays on various cryptocurrencies in advance and on a periodic basis. The Celsius Network sets its interest rates based on various considerations and prioritizing the Celsius Network's need for particular types of cryptocurrencies.

14.    The Celsius Network incentivizes smaller investors to invest in the Celsius Earn Interest-Bearing Accounts by paying higher rates of interest on smaller investments of principal for certain cryptocurrencies. As an example, the Celsius Network has paid higher rates of interest on investments up to 1 Bitcoin and up to 100 Ethereum and lower rates of interest on investments of more than 1 Bitcoin and more than 100 Ethereum.

15.    The accrual of interest begins "as soon as any funds are credited to [an investor's] Celsius account." Investors transfer cryptocurrencies to the Celsius Network and the transaction is timestamped with the hour, minute, and second. Interest is payable on or around the first business day of each week.

16.    In the United States, interest payments are denominated in the same type of cryptocurrency originally invested. In other jurisdictions, subject to certain conditions, the Celsius Network may make interest payments denominated in its native digital token, CEL.

17.    Retail investors may withdraw their cryptocurrencies at any time, subject to certain processing times.

18.    As of September 3, 2021, the Celsius Network claims it has more than $24,000,000,000 in assets under management, more than 1,000,000 community members, and more than $8,200,000,000 in loans processed.

19.    As of August 18, 2021, the Celsius Network had 348,158 active users worldwide invested in Celsius Earn Interest-Bearing Accounts with global assets under management exceeding $12,500,000,000. As of the same date, the Celsius Network had 139,054 active users in the United States invested in Celsius Earn Interest-Bearing Accounts with United States-based assets under management exceeding $7,000,000,000.

20.    As of June 9, 2021, the Celsius Network has more than $344,000,000 in assets under management from more than 9,000 Texas residents and businesses.

## CELSIUS' API PARTNER PROGRAM

21.    The Celsius Network offers an Application Programming Interface ("API") that allows certain institutional users, known as Celsius "API Partners," ("Celsius API

<u>Partners</u>") to integrate with the Celsius Network's platform. Celsius API Partners can then offer and sell the unregistered Celsius Earn Interest-Bearing Accounts to their clients.

22.    The Celsius Network provides two different types of accounts whereby Celsius API Partners' clients can access Celsius Earn Interest-Bearing Accounts called segmented accounts ("<u>Segmented API Accounts</u>") and omnibus accounts ("<u>Omnibus API Accounts</u>").

23.    Investors who invest in Celsius Earn Interest-Bearing Accounts through a Celsius API Partner's Segmented API Account or Omnibus API Account are subject to the same rights, benefits, terms, and conditions as investors who invest in Celsius Earn Interest-Bearing Accounts directly from the Celsius Network.

24.    Segmented API Accounts allow Celsius API Partners to offer Celsius Earn Interest-Bearing Accounts through their own platforms. For Segmented API Accounts:

  A.    Investors create their own Celsius Network accounts through the Celsius API Partner's platform;

  B.    The Celsius Network performs the onboarding and customer due diligence for investors from Celsius API Partners;

  C.    Investors must accept the Celsius Network's terms and conditions; and

  D.    The Celsius API Partners receive a fee based on the percentage of interest payable by the Celsius Network to the investor.

25.    Omnibus API Accounts allow Celsius API Partners to offer and sell Celsius Earn Interest-Bearing Accounts to their investors on an aggregated basis. For Omnibus API Accounts:

  A.    The Celsius API Partner maintains one account with the Celsius Network where it transfers the aggregated funds of its investors;

  B.    The Celsius Network performs no customer due diligence on the Celsius API Partner's investors, has no relationship with the investors, and does not know their identities;

  C.    The Celsius Network's only contractual relationship is with the Celsius API Partner; and

  D.    The Celsius Network pays a fee to the Celsius API Partner which is in addition to the interested paid on investments in the Celsius Earn Interest-Bearing Accounts.

## THE LACK OF REGISTRATION AND PUBLIC PROTECTIONS

26.     Respondents are not licensed as a Money Service Business in Texas to conduct currency exchange or money transmission activities defined by Chapter 151 of the Texas Finance Code.

27.     Respondents are not licensed with the United States Securities and Exchange Commission. Additionally, they are not registered with the Texas State Securities Board to offer or sell securities in Texas, as required by Section 12 of the Securities Act, and the Celsius Earn Interest-Bearing Accounts are not registered or permitted for sale in Texas, as required by Section 7 of the Securities Act. Accordingly, Respondents are violating laws designed to protect Texans.

28.     The Celsius Earn Interest-Bearing Accounts are also not protected by Securities Investor Protection Corporation, otherwise known as the SIPC, a federally mandated, non-profit, member-funded United States corporation created under the Securities Investor Protection Act of 1970 that mandates membership of most US-registered broker-dealers.

29.     The Celsius Earn Interest-Bearing Accounts are also not insured by the Federal Deposit Insurance Corporation, otherwise known as the FDIC, an agency that provides deposit insurance to depositors in the United States, or the National Credit Union Administration, otherwise known as the NCUA, an agency that regulates and insures credit unions.

## THE UNDISCLOSED RISKS

30.     Respondents are not disclosing material information necessary for investors to make an informed decision, including critical material information about the risks associated with purchasing its unregistered securities.

31.     This material information includes, without limitation, the amount of money or cryptocurrency devoted to permissive uses, the identity, nature, and creditworthiness of borrowers, the type and nature of transactions involving digital assets, equities, options, and futures, the risks associated with individual digital assets, equities, options, and futures, the profits and/or losses derived from transactions, and financial information reflecting the assets and liabilities and cashflow.

## THE VIOLATIONS OF THE SECURITIES ACT

32.     The Securities Act regulates the offer and sale of securities in Texas.

33.     Section 4.A of the Securities Act defines the term securities to include traditional products such as stocks and bonds. The statute also broadly defines the term securities to include investment contracts, notes, and evidences of indebtedness

– broad categories of products that capture the endless number of unique and innovative investment schemes continuously introduced into the market.

34.   The mere fact an investment is tied to a cryptocurrency, blockchain technology, or some type of digital asset does not remove it from securities regulation if it constitutes an investment contract, note, evidence of indebtedness, or other type of security.

35.   Based on the information and allegations set forth herein, the Celsius Earn Interest-Bearing Accounts constitute investment contracts, notes, or evidences of indebtedness regulated as securities as that term is defined by Section 4.A of the Securities Act.

36.   Based on the information and allegations set forth herein, Respondents are violating Section 7 of the Securities Act by offering and selling securities in Texas that are not registered or permitted for sale in Texas.

37.   Based on the information and allegations set forth herein, Respondents are also violating Section 12 of the Securities Act by offering and selling securities in Texas without first being registered as dealers or agents.

<u>THE NOTIFICATION AND REQUEST FOR COMPLIANCE</u>

38.   On or about May 14, 2021, the Enforcement Division of the State Securities Board (the "<u>Enforcement Division</u>") notified Respondents that Respondents may have offered securities in Texas that may not comply with the Securities Act.

39.   The Enforcement Division also explained the regulation of the securities market in Texas, including the identification of laws that require the registration of securities, the registration of dealers and agents, and the truthful disclosure of all known material facts.

40.   Nevertheless, Respondents have continued to offer the Celsius Earn Interest-Bearing Accounts to Texans in violation of Sections 7 and 12 of the Securities Act.

<u>REMEDIES</u>

41.   The Enforcement Division is praying for a proposal for decision for the entry of an order that Respondents immediately cease and desist from violating Sections 7 and 12 of the Securities Act.

42.   Although this Notice of Hearing is praying for a proposal for decision for an order to cease and desist from violating Sections 7 and 12 of the Securities Act, nothing set forth herein shall preclude the Enforcement Division, consistent with applicable law and rule, from pursuing other enforcement remedies, such as filing an amended Notice of Hearing praying for a proposal for decision that orders the

assessment of an administrative fine or the payment of a refund/restitution to Texans.

## EXISTING CLIENT ACCOUNTS

43.    This Notice of Hearing, and the prayers contained herein, do not preclude Respondents from paying interest or returns to existing clients, refunding principal to investors consistent with the terms of the Celsius Earn Interest-Bearing Accounts, or otherwise lawfully dealing with existing clientele.

## THE HEARING

44.    The hearing will be held before the State Office of Administrative Hearings. It will commence at **9:00 AM on FEBRUARY 14, 2022**.

45.    The State Office of Administrative Hearings may conduct the hearing via Zoom. Zoom is a video conferencing platform for meetings held through the internet. The State Office of Administrative Hearings will provide instructions for accessing the hearing via Zoom.

46.    At the hearing, the Enforcement Division will present testimony and other admissible evidence in support of its prayer for a proposal for decision for the entry of a CEASE AND DESIST ORDER against Respondents. Respondents will be afforded the right to present such testimony and other evidence related thereto.

## LEGAL NOTIFICATIONS

47.    Legal authority and jurisdiction for this matter exist under Section 23 of the Securities Act, Section 2003.021(b) of the Texas Government Code and Rule 155.51 of the SOAH Rules.

48.    **IF YOU DO NOT FILE A WRITTEN ANSWER OR OTHER WRITTEN RESPONSIVE PLEADING TO THIS NOTICE OF HEARING ON OR BEFORE THE 20TH DAY AFTER THE DATE ON WHICH THIS NOTICE WAS MAILED TO YOU OR PERSONALLY SERVED ON YOU, THE FACTUAL ALLEGATIONS IN THIS NOTICE COULD BE DEEMED ADMITTED, AND THE SECURITIES COMMISSIONER MAY DISPOSE OF THIS CASE WITHOUT A HEARING AND MAY GRANT THE RELIEF SOUGHT IN THIS NOTICE. THE RESPONSE MUST BE FILED IN AUSTIN, TEXAS, WITH THE SECURITIES COMMISSIONER AND THE STATE OFFICE OF ADMINISTRATIVE HEARINGS, AND ALSO SERVED ON THE STAFF OF THE STATE SECURITIES BOARD. IF YOU FAIL TO ATTEND THE HEARING, EVEN IF A WRITTEN ANSWER OR OTHER RESPONSIVE PLEADING HAS BEEN FILED AND SERVED, THE FACTUAL ALLEGATIONS IN THIS NOTICE COULD BE DEEMED ADMITTED, AND THE SECURITIES COMMISSIONER MAY DISPOSE OF THIS CASE WITHOUT A HEARING AND MAY GRANT THE RELIEF SOUGHT IN THIS NOTICE.**

**49. PARTIES THAT ARE NOT REPRESENTED BY AN ATTORNEY MAY OBTAIN INFORMATION REGARDING CONTESTED CASE HEARINGS ON THE PUBLIC WEBSITE OF THE STATE OFFICE OF ADMINISTRATIVE HEARINGS AT WWW.SOAH.TEXAS.GOV, OR IN PRINTED FORMAT UPON REQUEST TO THE STATE OF ADMINISTRATIVE HEARINGS.**

50. Respondents may access the Securities Act and the Board Rules through the website of the State Securities Board at www.ssb.texas.gov. Respondents may also access the SOAH Rules through the website of the State Office of Administrative Hearings at www.soah.texas.gov and the Administrative Procedure Act through Texas Legislature Online at statutes.capitol.texas.gov.

51. The Securities Act authorizes the Texas State Securities Board to pursue administrative, civil, or criminal enforcement cases. The Securities Act and Board Rules also authorize the Texas State Securities Board to share information with and refer cases to other governmental agencies with administrative, civil, or criminal jurisdiction. These other governmental agencies include, without limitation, state and federal regulatory agencies, law enforcement agencies and prosecutors' offices. Therefore, any information provided, filed, or otherwise supplied by Respondents may be shared with these other government agencies and/or used in other cases. Whether the Texas State Securities Board makes its files available to other governmental agencies or refers cases to other government agencies is typically confidential pursuant to Section 28 of the Texas Securities Act.

52. Pursuant to Board Rule 105.13, the Enforcement Division is now respectfully requesting and will continue to respectfully request the State Office of Administrative Hearings order all costs charged to the Texas Securities Board by any court reporting service be assessed against Respondents.

53. Persons with disabilities who need special accommodations at the hearing, whether held at the State Office of Administrative Hearings or through an audio or video conferencing platform, should contact the Docketing Department of the State Office of Administrative Hearings at 512-475-4993 at least one week prior to the hearing.

<u>CONTACT AND FILING INFORMATION</u>

54. The Enforcement Division is represented by Rachel Anderson Rynders, Attorney, Enforcement Division. Ms. Anderson Rynders' State Bar Card Number is 24103132, her work address 208 E. 10th Street, 5th Floor, Austin, Texas 78701, her telephone number is 512-305-8392, her facsimile number is 512-355-0404, and her email address is rrynders@ssb.texas.gov.

55.     The Docketing Office of the State Office of Administrative Hearings is located at 300 W. 15th Street, Austin, Texas 78701, and it may be contacted by telephone at 512-745-3445 and by facsimile at 512-475-4994.

56.     The State Office of Administrative Hearings may conduct the hearing via audio or video conferencing. The audio and video conferencing platforms are secure, free meetings held telephonically or through the internet. The State Office of Administrative Hearings will provide instructions for all hearings held telephonically or through a video conferencing platform.

57.     Persons with disabilities who need special accommodations at the hearing, whether held at the State Office of Administrative Hearings or through an audio or video conferencing platform, should contact the Docketing Department of the State Office of Administrative Hearings at 512-475-4993 at least one week prior to the hearing.

58.     Pursuant to Board Rule 105.8, all documents filed by any party, other than business records and transcripts, must be contemporaneously served upon Marlene Sparkman, General Counsel and Securities Commissioner's Representative. Ms. Sparkman's address is 208 E. 10th Street, 5th Floor, Austin, Texas 78701, her telephone number is 512-305-8300, her facsimile number is 512-305-8336, and her email address is msparkman@ssb.texas.gov.

Signed on this, the 17th day of September 2021

By: /s/ Joe Rotunda
    Joe Rotunda
    State Bar No. 24029808
    Division Director, Enforcement Division
    Texas State Securities Board
    208 E. 10th Street, 5th Floor
    Austin, Texas 78701
    T: 512-305-8392
    F: 512-355-0404
    E: jrotunda@ssb.texas.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 17th day of September 2021, true and correct copies of this Notice of Hearing are being served on the following parties through the means set forth below:

EXHIBIT A

**MARLENE SPARKMAN**
General Counsel for the State Securities Board and the Securities Commissioner's Representative, is being served by electronic mail addressed to msparkman@ssb.texas.gov.

**CELSIUS NETWORK INC.**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS NETWORK LIMITED**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS US HOLDING, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS NETWORK, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

**CELSIUS LENDING, LLC**
Service by (1) certified mail, return receipt requested, addressed to 221 River Street, 9th Floor, Hoboken, New Jersey 07030; (2) certified mail, return receipt requested, addressed to The Harley Building, 77-79 New Cavendish Street, London W1W 6XB, United

Kingdom; (3) certified mail, return receipt requested, addressed to its counsel John Sikora, Jr., Partner, Latham & Watkins LLP, 330 North Wabash Avenue, Suite 2800, Chicago, Illinois 60611; and (4) electronic mail to its counsel, John Sikora, Jr., at john.sikora@lw.com.

By:    /s/ Joe Rotunda
Joe Rotunda
State Bar No. 24029808
Director, Enforcement Division
Texas State Securities Board
208 E. 10th Street, 5th Floor
Austin, Texas 78701
T: 512-305-8392
F: 512-355-0404
E: jrotunda@ssb.texas.gov

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  COMMERCIAL DIVISION PART 49M

------------------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK BY
LETITIA JAMES, ATTORNEY GENERAL OF THE STATE
OF NEW YORK

                              Plaintiff,

                - v -

ALEX MASHINSKY,

                         Defendant.

------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 450040/2023 |
| **MOTION DATE** | 05/02/2023 |
| **MOTION SEQ. NO.** | 001 |

**DECISION + ORDER ON
MOTION**

HON. MARGARET CHAN:

The following e-filed documents, listed by NYSCEF document number (Motion 001) 12, 13, 14, 15
were read on this motion to/for                         DISMISS

      The New York State Attorney General (NYAG) commences this action on behalf of the People of the State of New York against defendant Alex Mashinsky (Mashinsky) based on an alleged scheme by Mashinsky to defraud investors by inducing them, through false and misleading statements, to deposit their digital assets with his now-bankrupt company, Celsius Network LLC (Celsius) (NYSCEF # 7 – the Complaint or AC). Mashinsky moves pursuant to CPLR 3211(a)(7) and (10) for an order dismissing the Complaint (NYSCEF # 12). NYAG opposes the motion. For the following reasons, Mashinsky's motion is denied.

### Background[1]

#### *Celsius Network and its "Earn" Program*

      Founded in March 2017, Celsius is a cryptocurrency lending company that offers customers a variety of cryptocurrency-related products and services (AC ¶¶ 1, 17, 19-20, 21). Mashinsky is Celsius's co-founder, majority owner, and former Chief Executive Officer (CEO), and as alleged, he had access to and control over Celsius's overall operations, trading, and corporate strategy (*id.* ¶¶ 13, 17, 19).

      Celsius's flagship product was its "Earn" program (AC ¶ 22). To access Celsius's product offerings (including the "Earn" program), customers created a Celsius account, digitally signed Celsius's user agreement, and acknowledged its terms of use (*id.* ¶ 20). After creating an account, Celsius users could deposit

---

[1] The following facts are drawn from the Complaint and are assumed true for purposes of this motion.

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**                **Page 1 of 25**

1 of 25

existing cryptocurrencies from their own digital wallets into earned interest accounts (EIAs) (*id.* ¶¶ 21-22). Users would then obtain returns from Celsius through a "sleep to earn" model tied to the EIAs (*id.* ¶ 24). Specifically, Celsius pooled the digital assets deposited in the EIAs and invested them in various revenue-generating activities to deliver returns for investors (*id.* ¶¶ 23-24).[2] The yield rates for EIAs changed on a weekly basis and were, according to Mashinsky, "calculated by the weekly demand for [cryptocurrencies] combined with [Celsius's] promise that up to 80% of [its] profits are returned to the depositors" (*id.* ¶ 22). At least 26,390 New York residents registered as users of Celsius and 4,000 of those users were enrolled in EIAs (*id.* ¶ 25).

### *Mashinsky's Representations Concerning Celsius's Business*

Mashinsky acted as Celsius's primary promoter and spokesman across several types of forums, including YouTube, Twitter, and various cryptocurrency conferences (AC ¶ 26). As is relevant here, one of Mashinsky's primary mediums for promoting Celsius was his weekly "Ask Mashinsky Anything" (AMA) segments that were conducted at his New York City apartment (*id.*). During these segments, Mashinsky reviewed and responded to viewers' questions in real time (*id.*). Recordings of the AMA segments were then posted on both YouTube and Celsius's website (*id.* ¶ 27). The videos also often included links to Celsius's website and app so that viewers could invest with Celsius (*id.* ¶ 30).

NYAG alleges that, in promoting Celsius between 2019 and 2022, Mashinsky repeatedly misled the public about various aspects of the company's business model and operations (*see* AC ¶¶ 34-38, 40-43, 47-51, 52-60, 70-79, 94-95). The court provides a brief recitation of certain alleged instances of misrepresentations and omissions recounted in the Complaint:

- Mashinsky repeatedly represented that cryptocurrencies deposited with Celsius would be as safe as any asset deposited with banks or securities broker-dealers (AC ¶¶ 35-37). Unlike those institutions, however, Celsius did not have access to deposit or investor insurance, nor was Celsius subject to the same regulatory oversight as these other institutional entities (*id.* ¶¶ 36, 38).

- Mashinsky indicated that Celsius had a userbase of two million people who had earned yields (AC ¶¶ 41-42). But when he made that statement, approximately two-thirds of Celsius's users held less than a dollar's worth of cryptocurrency in their accounts (*id.* ¶ 43). As one Celsius employee indicated, although Celsius had "1.8mm registered users," "many of [them] have not transferred assets and therefore would not have earned yield (*id.* ¶ 42).

---

[2] Celsius allegedly advertised return rates as high as 17% per year on deposits (AC ¶ 22).

**450040/2023** THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

**Page 2 of 25**

2 of 25

- Mashinsky purportedly claimed in blogposts and interviews between 2019 and 2022 that Celsius would generate yields by making collateralized loans to reputable institutions and cryptocurrency exchanges (AC ¶¶ 44, 47). He further represented that Celsius did not engage in unsecured lending (*id.* ¶¶ 47-50). Yet between 2020 and 2022 Celsius increased its exposure to uncollateralized loans (*id.* ¶¶ 46, 51). In 2020 Celsius made almost $10 million in uncollateralized loans and by May 2022, uncollateralized loans made up 35% of Celsius's portfolio (*see id.* ¶ 51).

- In March 2018, Celsius launched its CEL token—which it viewed as the "backbone" of the Celsius platform—and offered it for sale to investors through an initial coin offering (AC ¶¶ 107, 108). For his part, Mashinsky promoted the CEL token and its value but did not disclose that Celsius was spending millions of dollars to support the token (*id.* ¶¶ 108-109). And despite publicly claiming that he was not a seller of the CEL token, Mashinsky purportedly sold 2.8 million in 2021 (worth $16 million) and 25 million in CEL tokens in 2022 (worth $68.7 million), thereby benefiting from his promotion of the CEL token's value (*id.* ¶¶ 109-11).

- As Celsius's EIAs drew the attention of securities regulators, Mashinsky claimed that none of them had identified any issues despite the existence of multiple active and continuing investigations (AC ¶¶ 112-115). Mashinsky also purportedly misrepresented that Celsius was registered with the Securities and Exchange Commission (SEC) (*id.* ¶ 116).

The above-alleged misrepresentations and omissions were not the only types made by Mashinsky concerning Celsius. In fact, the Complaint avers that Mashinsky also purportedly misrepresented the nature of Celsius's investment and deployment strategies, as well as the resulting losses that the company had sustained. Among other statements, Mashinsky asserted that Celsius did not engage in risky strategies with users' assets, and that the company would generate high yields through low-risk investments (*see* AC ¶ 45). But Mashinsky would later affirm that he knew that Celsius's trading business was "volatile, risk based, capital intensive and unprofitable" (*id.* ¶ 46). For instance, Mashinsky claimed that Celsius's exposure in the "high-risk" decentralized finance (DeFi) market was minimal,[3] yet Celsius had deployed nearly 30% of its investors' digital assets into DeFi activities by spring 2022 (AC ¶¶ 53-60). Mashinsky also purportedly downplayed the losses that Celsius experienced on the DeFi market (*id.* ¶¶ 55-58).

Moreover, although he represented that Celsius only lent assets to institutional counterparties, Mashinsky allegedly failed to disclose that Celsius also engaged with high-risk counterparties that resulted in losses to the company (AC

---

[3] The term DeFi refers to financial services that operate on a blockchain, pursuant to certain predetermined rules, without the involvement of an institutional intermediary such as a bank or broker (AC ¶ 53).

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**          **Page 3 of 25**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**

3 of 25

¶¶ 61-79). Among other things, Mashinsky did not disclose that Celsius took loans from Equities First Holdings, which were collateralized with investor cryptocurrency, or that, after its repayment of the loan, Celsius was unable to reobtain approximately $500 million worth of its collateral (*see id.* ¶¶ 62-63).[4] Instead, Mashinsky represented that Celsius never had an institution not return collateral that was lent to it (*id.* ¶ 63).

Meanwhile, Mashinsky represented that Celsius did not engage in directional and proprietary trading of assets such as Bitcoin (AC ¶¶ 65-66). Yet Mashinsky seemingly did not disclose that, as Bitcoin prices began dropping in or around January 2022, he directed Celsius employees to sell large amounts of Bitcoin in a practice that conflicted with the "delta-neutral" trading strategy relayed to the public (*see id.* ¶¶ 67-68). This decision to "trad[e] around the hedges" was notable because, when Bitcoin prices recovered, Celsius was forced to cover its short position and incur losses (*see id.* ¶¶ 67, 69).

### *Mashinsky's Representations Concerning Celsius's Exposure to the Cryptocurrency Crash of May and June 2022*

Beginning in May 2022, following the collapse of the Terra and Luna stablecoins created by Terraform Labs,[5] the cryptocurrency market experienced a crash (the Crash) (AC ¶¶ 74, 80). The values of nearly all digital assets fell, erasing tens of billions of dollars in cryptocurrency market capitalization (*id.* ¶ 80). With the cryptocurrency market in turmoil, Mashinsky allegedly misled investors about the safety of cryptocurrency assets held at Celsius in an effort to assuage investor concerns (*see* AC ¶¶ 81-83). Specifically, after Celsius investors withdrew over half a billion dollars from the platform in or around May 12, 2022, Mashinsky stated that Celsius was "stronger than ever" and had "billions of dollars in liquidity" (*id.*). In reality, Celsius was insolvent: it had total assets of less than $12 billion and total liabilities of more than $12.75 billion (an approximately $820 million negative delta) (*id.* ¶¶ 84-85). Also, during this same time, customer withdrawals caused Celsius to experience losses of over $1.4 billion in assets (*id.* ¶ 85).

In an effort to mitigate this undisclosed liquidity crises, Mashinsky solicited new investors by offering a bonus for joining Celsius, resulting in the company adding $900 million worth of cryptocurrency and two thousand new investors (*id.* ¶¶ 86-88). While doing so, Mashinsky downplayed Celsius's exposure to the Crash (AC ¶ 90-93). For example, even though Celsius suffered losses from the collapse of Terra and Luna, Mashinsky claimed during a June 1, 2022, YouTube interview that Celsius experienced "very small losses" (*id.* ¶¶ 90-91, 93). Mashinsky purportedly did not disclose that Celsius lost almost $18 million in its investment of $935

---

[4] Celsius also purportedly loaned a billion dollars to Alameda Research Ltd. (Alameda), who Mashinsky viewed as a risky counterparty (AC ¶¶ 70-72). By November 2022, Alameda filed for bankruptcy (*id.* ¶ 73).
[5] Terraform Labs created the Anchor Protocol, a DeFi protocol promising 20% yields on deposits (*id.* ¶ 75). Celsius allegedly deposited investor assets on the Anchor Protocol despite Mashinsky acknowledging its risk (*id.* ¶¶ 75, 78).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX Motion No. 001**    **Page 4 of 25**

4 of 25

million worth of investor's assets into Terra (*id.* ¶ 92). Mashinsky similarly downplayed the exposure suffered by Celsius through its investment activities with other entities severely impacted by the Crash (*id.* ¶¶ 93-95).

### Mashinsky's Representations About Celsius's Financial Health After the Crash

In an AMA conducted on June 1, 2022, Mashinsky continued to downplay Celsius's insolvency issues, stating that Celsius's investors' funds were safe and that "anyone who wanted to withdraw partially or fully" could do so (AC ¶¶ 96-97). Mashinsky doubled down on this position on June 10, 2022, when he stated that Celsius had billions in liquidity and that there would be no limits on withdrawals (*id.* ¶ 98). Yet, just days prior to making these statements, Celsius allegedly had less than $11 billion in total assets and $11.9 billion in total liabilities (*id.* ¶¶ 97, 104). Moreover, for four out of the prior six weeks, Celsius was experiencing negative weekly gross revenue, and thus it was paying EIA investors more in interest than it was generating in income (*id.* ¶ 102). As alleged, Mashinsky never disclosed any of this information during his interviews (*id.* ¶¶ 101, 104).

On June 12, 2022, Celsius paused investor withdrawals in an effort to stabilize its liquidity and operations and to preserve and protect assets (AC ¶ 100). This pause came after investors had withdrawn over $672 million in cryptocurrency between June 10 and June 12, 2022 (*id.* ¶ 105). The next day, on July 13, 2023, Celsius filed for bankruptcy with over $4.7 billion in investor liabilities and only $1.75 billion in cryptocurrency assets (*id.*).

### Mashinsky's Purported Failure to Register as a Securities and Commodities Broker-Dealer or Salesperson

The Complaint avers that, despite promoting EIAs through AMAs, interviews, and website postings, Mashinsky never filed a registration statement with NYAG prior to engaging in such conduct (AC ¶¶117-123). The Complaint further states that, despite offering various cryptocurrencies for sale on behalf of Celsius through commodity contracts, Mashinsky failed to register with NYAG as a commodity broker-dealer and salesperson (*id.* ¶¶126-128).

### Legal Standards

CPLR 3211(a)(7) provides that a party may move for judgment dismissing one or more causes of action when a pleading "fails to state a cause of action" (CPLR 3211 [a] [7]). On a motion to dismiss pursuant to CPLR 3211(a)(7), the court "must accept as true the facts as alleged in the complaint and submissions in opposition to the motion, accord [the non-movant] the benefit of every possible favorable inference and determine only whether the facts as alleged fit within any cognizable legal theory" (*Whitebox Concentrated Convertible Arb. Partners, L.P. v Superior Well Servs., Inc.*, 20 NY3d 59, 63 [2012] [internal quotation omitted]; *accord Pavich v*

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

Page 5 of 25

5 of 25

*Pavich*, 189 AD3d 548, 549 [1st Dept 2020]). "[W]hether a plaintiff . . . can ultimately establish its allegations is not taken into consideration in determining a motion to dismiss" (*Phillips S. Beach LLC v ZC Specialty Ins. Co.*, 55 AD3d 493, 497 [1st Dept 2008], *lv denied* 12 NY3d 713 [2009]). However, the court need not accept "conclusory allegations of fact or law not supported by allegations of specific fact" (*Wilson v Tully*, 243 AD2d 229, 234 [1st Dept 1998]).

Under CPLR 3211(a)(10), a party may move to dismiss on the basis that "the court should not proceed in the absence of" a necessary party (CPLR 3211 [a] [10]). CPLR 1001(a), in turn, defines necessary parties as either "[p]ersons [or entities] who ought to be parties if complete relief is to be accorded between the persons who are parties to the action or [persons or entities] who might be inequitably affected by a judgment in the action." And as set forth in CPLR 1003, "[n]on-joinder of a party who should be joined under section 1001 is a ground for dismissal of an action without prejudice unless the court allows the action to proceed without that party under the provisions of [CPLR 1001(b)]."

### Discussion

NYAG's Complaint advances seven causes of action against Mashinsky under the Martin Act and Executive Law § 63(12). Specifically, NYAG alleges (1) violations of Sections 352, 353, and 352-c(1) of the Martin Act (Counts I & II); (2) a violation of the Martin Act's registration requirements under General Business Law § 359-e (Count III); and (3) various claims for repeated and persistent fraud and/or illegality under Executive law § 63(12), all of which are premised on Mashinsky's alleged violations of the Martin Act (Counts IV-VII) (*see* AC ¶¶ 132-51).

Mashinsky now moves to dismiss (NYSCEF # 12). In his moving papers, Mashinsky advances six primary bases for dismissal (NYSCEF # 13 – MOL at 6). *First*, Mashinsky contends that the EIAs are not securities under the Martin Act (*id.* at 6-9). *Second*, Mashinsky avers that none of his alleged misstatements are "related" to the "issuance, exchange, purchase, or other enumerated actions taken with securities or commodities" under the Martin Act (*id.* at 9-11). *Third*, Mashinsky argues that the Martin Act fraud claims fail because, *inter alia*, the alleged fraud is not pleaded with particularity and, in any event, none of the alleged fraud is actionable (*id.* at 11-19). *Fourth*, Mashinsky maintains that NYAG fails to establish that that Mashinsky is a securities or commodities dealer or salesperson (*id.* at 19-21). *Fifth*, Mashinsky argues that NYAG's Executive Law § 63(12) claims fail for the same reasons as the Martin Act claims (*id.* at 23). *Finally*, Mashinsky contends that NYAG has failed to name Celsius as a necessary party (*id.* at 21-23).

Below, the court addresses each of Mashinsky's bases for dismissal.

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**

**Page 6 of 25**

6 of 25

## I.    Are Earned Interest Accounts Securities Under the Martin Act?

The Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (General Business Law (GBL) § 352-c[1]). The statute, in turn, defines "securities" as, among other things, "any stocks, bonds, notes, evidences of interest or indebtedness or other securities . . . ." (*id.* § 352[1]).

Courts in New York apply a two-fold analysis to determine whether a transaction constitutes a security under the Martin Act. Courts will first assess whether a transaction falls within the definition of a security that is enumerated in the statute's definitional section (*People ex rel. Schneiderman v Bank of New York Mellon Corp.*, 40 Misc3d 1232[A], at *3 [Sup Ct, NY County, Aug. 5, 2013]. If, like here, the transaction does not fall within one of the state's enumerated categories, courts will then determine whether the transaction falls within the definition of the general term "security" (*id.*) To do so, the Court of Appeals has directed courts in this state to consider "as persuasive authority the decisions of the United States Supreme Court and other Federal courts construing the Federal Blue Sky Laws" (*see All Seasons Resorts, Inc. v Abrams*, 68 NY2d 81, 87 [1986]). One such federal test that the Court of Appeals has endorsed for "determining whether a given interest is a security" is the one articulated by the U.S. Supreme Court in *SEC v W.J. Howey Co.* (328 US 293 [1946]) (*All Seasons Resorts*, 68 NY2d at 92).

Under *Howey*, an offering (such as an investment contract) is a security where there is (1) an investment of money, (2) in a common enterprise, and (3) an expectation of profits derived solely from the efforts of others (*People v First Meridian Planning Corp.*, 86 NY2d 608, 618-619 [1995], quoting *Howey*, 328 U.S. at 299). This test "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" (*SEC v Edwards*, 540 U.S. 389, 393 [2004]; *Reves v Ernst & Young*, 494 US 56, 61 [1990]).

Mashinsky argues that NYAG fails to establish that EIAs are securities under the Martin Act (MOL at 6-7). Although Mashinsky does not seriously dispute that the allegations concerning EIAs in the Complaint satisfy the first prong of the *Howey* test, he contends that NYAG does not plausibly allege that Celsius's users invested money in a common enterprise or with the expectation of obtaining profits (*id.* 6-8; NYSCEF # 15 – Reply at 3-6). As explained, the court disagrees.

### A.   Common Enterprise

With regard to the "common enterprise" prong of the *Howey* test, Mashinsky argues that NYAG fails to allege "horizontal commonality," i.e., "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

Page 7 of 25

7 of 25

assets, usually combined with the pro-rata distribution of profits" (MOL at 7, quoting *U.S. Sec. & Exch. Comm'n v Kik Interactive*, 492 F Supp 3d 169, 178 [SD NY 2020]). In response, NYAG argues that New York courts have endorsed a "broad vertical commonality" test that only requires the fortunes of investors to be linked to the efforts of a promoter or third party (NYSCEF # 14 – Opp at 5).

Most courts that have considered the "common enterprise" prong of the *Howey* test have found that it is satisfied "by a showing of so called 'horizontal commonality', i.e. 'the pooling of investment funds, shared profits, and shared losses'" (*Mount Lucas Assocs., Inc. v MG Refining and Marketing, Inc.*, 250 AD2d 245, 252 [1st Dept 1998], quoting *SEC v Life Partners, Inc.*, 87 F3d 536, 543 [DC Cir 1996]; *Revak v SEC Realty Corp.*, 18 F3d 81, 88 [2d Cir 1994]; *see also SEC v SG Ltd.*, 265 F3d 42, 49 [1st Cir 2001]; *Wals v Fox Hills Dev. Corp.*, 24 F3d 1016, 1018 [7th Cir 1994]). But "horizontal commonality" is not the only way to satisfy *Howey*'s common enterprise prong. Indeed, federal courts have recognized that a common enterprise may also be established by a showing of vertical commonality (*see Revak*, 18 F3d at 87 [collecting cases]).

One type of vertical commonality recognized by federal courts is "strict" vertical commonality, which requires that "the fortunes of investors be tied to the *fortunes* of the promoter" (*see Friel v Dapper Labs, Inc.*, – F Supp 3d –, 2023 WL 2162747, at *10 & n.10 [SD NY Feb. 22, 2023] [emphasis in original]; *SEC v NAC Found., LLC*, 512 F Supp 3d 988 [ND Cal 2021], citing *Hocking v Dubois*, 885 F2d 1449, 1459 [9th Cir 1989] ["a common enterprise exists where the investment scheme involves either 'horizontal commonality' or 'strict vertical commonality.'"]). Meanwhile, certain other federal courts have also permitted parties to establish a common enterprise through the less restrictive "broad vertical commonality" test, which only requires a showing that "the fortunate of investors are tied to the *efforts* of the promoter (*Friel*, 2023 WL 2162747 at *10 [emphasis added]; *see e.g. Matter of Living Benefits Asset Mgmt., L.L.C.*, 916 F3d 528, 536 [5th Cir 2019] ["This circuit . . . applies so-called broad vertical commonality, under which a common enterprise exists when 'the fortuity of the investments collectively is essentially dependent upon promoter expertise.'"]; *SEC v ETS Payphones, Inc.*, 408 F3d 727, 732 [11th Cir 2005] [endorsing "broad vertical commonality" test]).[6]  Notably, as is relevant here, the New York Court of Appeals has endorsed the "broad vertical commonality" test in its opinion in *People v First Meridian Planning Corp.* (86 NY2d at 618-21).

In *First Meridian*, defendants were charged with, among other crimes, fraud in the sale of securities related to a scheme to encourage investments into numismatic coin portfolios, art portfolios, and condominiums (*id.* at 614).

---

[6] At the federal level, there is a circuit split over the viability of using "broad vertical commonality" to establish a "common enterprise" (*see Matter of Living Benefits*, 916 F3d at 536 [noting that "the meaning of 'common enterprise' in *Howey*'s second prong" is "controversial" among circuits]; *Friel*, 2023 WL 2162747 at *10 ["[a]lthough other Circuits accept broad vertical commonality as a viable theory, in *Revak*, the Second Circuit explicitly rejected its application"]).

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX Motion No. 001**                                                                          **Page 8 of 25**

8 of 25

Defendants subsequently moved to dismiss the indictment on various grounds, including that the sale of numismatic coins did not constitute a sale of securities, and their motion was granted (*id.* at 615). The Third Department reversed (*People v First Meridian Planning Corp.*, 201 AD2d 145, 151-53 [3d Dept 1994]). In addressing the second prong of the *Howey* test, the court first surveyed the various theories of "commonality" that federal courts have recognized, including "horizontal commonality," "strict vertical commonality," and "broad vertical commonality" (*id.* at 152). The court then determined that, although the facts of the case did not support a finding of either "horizontal commonality" or "strict vertical commonality," the state had established a common enterprise under *Howey* by showing that "the fortunes of the investor [were] linked to the efforts of the promoter," i.e., "broad vertical commonality" (*id.* at 152-53). As the Third Department explained, it reached this conclusion because "application of the 'broad' vertical commonality approach [was] consistent with the liberal interpretation to be given to the Martin Act to give effect to its remedial purpose" (*id.*).

In affirming this decision, the Court of Appeals essentially adopted the "broad vertical commonality" test upon which Third Department relied (86 NY2d at 618-621). Specifically, echoing the Third Department, the Court reiterated that, under the second *Howey* prong, "[i]t is not required that the investor acquires a share in a common fund. Rather, the common enterprise factor can be established by proof *that 'the fortunes of all investors are inextricably tied to the efficacy [of those seeking the investment or a third party]*" (*id.* at 620, quoting *SEC v Koscot Interplanetary*, 497 F2d 473, 479 [5th Cir 1974] [emphasis added]). Thus, following the *First Meridian* decision, New York courts may now analyze the existence of a "common enterprise" through evidence of "broad vertical commonality" (*see Bank of New York Mellon*, 40 Misc 3d 1232[A] at *11 n.14 [acknowledging that the Court of Appeals endorsed broad vertical commonality]; *State v Justin*, 3 Misc 3d 973, 990 [Sup Ct, Erie County, 2003] ["New York State courts . . . have adopted a less restrictive criterion of 'broadly vertical commonality'"]).

Here, the court concludes that NYAG pleaded a "common enterprise" under *Howey* by establishing "broad vertical commonality." As alleged, Celsius's investors could transfer cryptocurrency from their own digital wallets into EIAs (AC ¶¶ 21, 23). Celsius's investors deposited their assets with the understanding that they would earn returns at rates that were updated on a weekly basis based on (1) "weekly demand" for a particular cryptocurrency and, notably, (2) Celsius's "promise that up to 80% of [its] profits are returned to [] depositors" (*id.* ¶ 22). Therefore, any interest earned from the EIAs would be derived from Celsius's "work to generate returns"—the so-called "sleep to earn" model (*id.* ¶¶ 24, 44). Indeed, as NYAG alleges, Celsius pooled its investors' digital assets together and then, "acting in [investors'] best interest," used the pooled assets in various revenue-generating activities, including collateralized loans to institutions and retail investors (*see id.* ¶¶ 23. 32, 35, 44). These facts, accepted as true, plausibly establish that Celsius's investors' fortunes (namely, the returns expected from their EIAs) were

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001
Page 9 of 25

9 of 25

"inextricably tied to the efficacy" of Celsius's efforts to generate profits through its investment activities (see SEC v Gordon, 2021 WL 5086556, at *4-5 [ND Tex Nov. 1, 2021, No. 3:21-CV-1642-B] [concluding that complaint established "broad vertical commonality" where investors would benefit from defendants' ability to generate profits based on its investment and refinancing activities in connection with rental properties]; SEC v ETS Payphones, Inc., 408 F3d 727, 732 [11th Cir 2005] [concluding that "common enterprise" existed where investors depended on defendant's ability to develop business to realize profits]).[7]

In arguing that NYAG fails to plead a "common enterprise," Mashinsky chiefly relies on the Sixth Circuit's unpublished decision in Cooper v King (114 F3d 1186 [Table] [6th Cir May 9, 1997]). To the extent that the central holding in Cooper was not abrogated by the U.S. Supreme Court's decision in SEC v Edwards (see 540 US at 396-97 [reversing 11th Circuit decision concluding that a payphone sale-and-leaseback arrangement was not a security under Howey]), Mashinsky's reliance on this case is ultimately unavailing. Notably, the Cooper court couched its analysis entirely on the basis of "horizontal commonality," not "vertical commonality" (Cooper, 114 F3d 1186 [Table] at *2). But courts that have since considered these types of investment transactions under the lens of "vertical commonality" have concluded that they do amount to a "common enterprise" under Howey (see ETS Payphones, Inc., 408 F3d at 732; see also Justin, 3 Misc 3d at 990-91 [concluding that "sale/leaseback transaction[]" constituted a "common enterprise" under Howey]). Thus, if, as Mashinsky suggests, EIAs are analogous to the transactions set forth in Cooper, the weight of authority confirms that they do involve a "common enterprise."

In short, NYAG sufficiently pleads a "common enterprise" under Howey.

## B. Expectation of Profits

Turning to third Howey prong, Mashinsky argues that there was "no expectation [that Celsius investors] would share in Celsius's profits" because investors only received "a predetermined interest rate" (MOL at 8). NYAG counters that courts have rejected Mashinsky's position (Opp. at 7).

---

[7] As NYAG notes (Opp. at 4-5), the Court of Appeals at one point also accepted the broader "investment definition" set forth in Matter of Waldstein (160 Misc 763, 767 [Sup Ct, Albany County, 1936]) as another way to determine whether an offering or transaction is a security (see All Seasons, 68 NY2d at 94). Under Waldstein, "any form of instrument used for the purpose of financing and promoting enterprises, and which is designed for investment, is a security according to the modern meaning of that term" (Waldstein, 160 Misc at 767). It is ultimately unclear whether the Waldstein approach is still accepted in this state after the First Meridian decision, although at least two courts (including the Third Department) continue to cite Waldstein (in addition to Howey) as one of the "securities law test[s] recognized in New York" (see People v Van Zandt, 43 Misc 3d 563, 573 [Sup Ct, Bronx County, 2014]; Xerox Corp. v New York State Tax Appeals Tribunal, 110 AD3d 1262, 1267 [3d Dept 2013])). Assuming, without deciding, that the Waldstein test is an accepted approach, the EIAs satisfy this test because the EIAs allowed Celsius to finance the collateralized loans it offered as part of its profit-generating efforts.

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY          Page 10 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

10 of 25

As noted above, under the third *Howey* prong, investors must have been "led to expect profits solely from the efforts of the promoter" (*United States v Leonard*, 529 F3d 83, 88 [2d Cir 2008], quoting *Howey*, 328 US at 299]). "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investment'" (*SEC v Telegram Grp. Inc.*, 448 F Supp 3d 352, 371 [SD NY 2020], quoting *Howey*, 328 US at 301]. The term "profits" in turn refers to "the profits that investors seek on their investment, not the profits of the scheme in which they invest" (*Edwards*, 540 US at 394; *see also Warfield v Alaniz*, 569 F3d 1015, 1024 [9th Cir 2009] [concluding that an annuity amount paid at a "fixed rate" amounted to profit for purposes of establishing an expectation of profit within the meaning of *Howey*]; *SEC v Infinity Grp. Co.*, 212 F3d 180, 189 [3d Cir 2000] ["the definition of security does not turn on whether the investor receives a variable or fixed rate of return"]).

When assessing whether expectations of profits were derived "solely from the efforts of the promoter," courts shall construe the term "solely" "realistically," not "literally" (*First Meridian*, 86 NY2d at 620; *People v Sala*, 258 AD2d 182, 194 [3d Dept 1999]). To that end, the Court of Appeals has instructed that the third prong the *Howey* test is met "if the promoter's (or third person's) efforts are 'the undeniably significant ones, those essential managerial efforts, which affect the failure or success of the enterprise'" (*First Meridian*, 86 NY2d at 620-621, quoting *SEC v Turner Enters.*, 474 F2d 476, 482 [9th Cir 1973]).

Here, the court has little trouble concluding that the Complaint's allegations concerning EIAs satisfy the third prong of the *Howey* test. According to the Complaint, the primary draw of EIAs (as promoted by both Mashinsky and Celsius) were their yield rates (AC ¶ 22). Specifically, as noted above, Mashinsky highlighted in blog posts that investors would realize return rates that were calculated based on weekly demand on coins combined with Celsius's promise to share up to 80% of its profits with investors (*id.*). Mashinsky further represented in online interviews that upon depositing virtual currencies with Celsius, investors could expect that "every Monday [Celsius would] pay you yield" from its investment and lending activities (*see id.* ¶¶ 24, 32, 35, 37, 44). And a notable aspect of EIAs, as also promoted by Mashinsky, was that it had a "sleep to earn" model, meaning that investors did not have to take any action to derive a return from their deposit of cryptocurrencies (*id.* ¶ 24). The totality of these allegations, accepted as true, support a conclusion that a reasonable investor depositing digital assets with EIAs would have expected to obtain profits solely from the efforts of Celsius's investment activities (*see SEC v Terraform Labs Pte. Ltd.*, – F Supp 3d –, 2023 WL 4858299, at *14-15 [SD NY July 31, 2023] [concluding that third prong of *Howey* sufficiently alleged where "defendants' embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial and technical skills that would allow the defendants to maximize returns on the investors' coins"]; *SEC v NAC Found., LLC*, 512 F Supp 3d 988, 996-997 [ND Cal 2021] [concluding that third prong of *Howey*

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**
Page 11 of 25

11 of 25

sufficiently alleged where investors expected to derive a profit from defendants' efforts to encourage widespread adoption of a new and novel cryptocurrency]).

To avoid this conclusion, Mashinsky argues that, because Celsius's investors received "a predetermined interest rate," they had "no expectation they would share Celsius's profits" (MOL at 8). As a preliminary matter, this contention is plainly belied by the allegations of the Complaint, which allege, and also support a reasonable inference, that the EIA model was built around the idea that depositors would obtain returns that were, at least in part, premised on Celsius's profits and thus its efforts to obtain those profits (see AC ¶¶ 22, 24, 32).[8] At any rate, insofar as Mashinsky insinuates that any "predetermined interest rate" associated with EIAs undercuts investors' expectancy of profits for purpose of the third *Howey* prong, his contention has been firmly rejected by federal courts[9] (see *Edwards*, 540 US at 396-397 [holding that "an investment scheme promising a fixed rate of return can be an 'investment contract' and thus a 'security' subject to the federal securities laws"]; *Infinity Grp. Co.*, 212 F3d at 189 [observing the same]).

In sum, NYAG sufficiently alleged that the EIAs satisfy the third prong of the *Howey* Test. NYAG has therefore pleaded that Celsius's EIAs are securities for purposes of the Martin Act.

## II. Does the Complaint Sufficiently Alleges Claims "Related To" or "In Connection With" Securities or Commodities?

Mashinsky maintains that the Complaint fails to allege (1) the existence of any securities or commodities, (2) that any of the alleged misstatements relate to the "issuance, exchange, sale, promotion, negotiation, advertisement, investment advice or distribution" of securities or commodities, or (3) that the alleged misstatements induced Celsius investors to buy or sell securities (see MOL at 9-11).

As a preliminary matter, Mashinsky's contention that EIAs are not securities fails for the reasons already articulated in this decision (see *supra*, Discussion § I).

---

[8] As a result, the analysis in *First Citizens Fed. Sav. & Loan Ass'n v Worthen Bank & Tr. Co.*, cited by Mashinsky has no persuasive value to this court given its markedly different factual scenario (see 919 F2d 510 [9th Cir 1990] [explaining that plaintiff was nothing more than a "secured lender" that received a fixed interest rate that was "not dependent on the managerial or entrepreneurial skills" of defendant]).

[9] For these same reasons, Mashinsky's reliance on cases such as *Banco Espanol de Credito v Sec. Pac. Nat. Bank.*, *Resolution Tr. Corp. v Stone*, and *Am. Fletcher Mortg. Co., Inc. v U.S. Steel Credit Corp.*—all of which preceded *Edwards*—is entirely misplaced (*Banco Espanol*, 763 F Supp 36, 44 [SD NY 1991] ["plaintiffs had no expectation of capital appreciation from the monies placed in the loans; the rate of return consisted solely of the repayment of the principal plus a fixed rate of interest"]; *Resolution Tr. Corp.*, 998 F2d 1534, 1540 [10th Cir 1993] [declining to recognize that enhanced automobile receivables were securities because, in part, plaintiff only alleged that it received fixed interest payments]; *Am. Fletcher Mortg.*, 635 F2d 1247, 1254 [7th Cir 1980] [concluding that loan was not a security, in part, because it was "not premised upon a reasonable expectation of profits" given that it bore interest at a "fixed rate above prime"). Not only did each of these cases seemingly reason that "fixed" returns necessarily preclude a finding that an investment involved a reasonable expectation of profit, but, in any event, each case also involved entirely distinguishable factual situations from the case at hand.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**   **Page 12 of 25**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**

12 of 25

With regard to commodities, NYAG avers that CEL tokens, which are, as alleged, "Celsius's proprietary [cryptocurrency] token, held on Celsius's books," constitute commodities (AC ¶¶ 6, 103). The court agrees. Under the Martin Act commodities are defined as "any commodity dealt in on any exchange within the United States of America or the delivery of which is contemplated by transfer of negotiable documents of title" (GBL § 352 [1]), as well as "any foreign currency, and any other good, article, or material" (*id.* § 359-e [14]). Courts, in turn, have acknowledged that cryptocurrencies are a type of commodity under the definitions set forth the Martin Act and the Commodities Exchange Act, respectively (*see James v iFinex Inc.*, 185 AD3d 22 [1st Dept 2020]; *CFTC v McDonnell*, 287 F Supp 3d 213, 228 [ED NY 2018]). Accordingly, the court concludes that the Complaint also contains allegations concerning commodities.

Similarly falling flat is Mashinsky's contention that none of his alleged misstatements " 'relate to' or 'were engaged in to induce or promote' the issuance, exchange, purchase, sale or other action of a security or commodity" (MOL at 10). To reiterate, the Martin Act prohibits fraudulent or misleading practices and representations by any person or entity who is "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any securities or commodities" (GBL § 352-c [1]). Such conduct is prohibited "regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted" (*id.*). Here, the facts alleged in the Complaint place Mashinsky's conduct squarely within the ambit of these proscriptions. For instance, the Complaint contains sufficient details regarding Mashinsky's alleged misstatements and their purported targeting of new and existing Celsius investors (*see* AC ¶¶ 26, 29-30, 34-35, 41-42, 46, 58, 81, 84-88). And those facts, if accepted as true, support a reasonable inference that Mashinsky's alleged misrepresentations induced or promoted investors to deposit assets into Celsius's EIAs, to keep their assets with Celsius as part of the "Earn" program, and/or to invest into Celsius's CEL Token (*see id.* ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-111). All told, the Complaint plausibly alleges fraudulent or misleading practices by Mashinsky (through his promotion and marketing efforts) that are "related to" the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities.

The above notwithstanding, Mashinsky points to *Chadbourne & Parke LLP v Troice*, 571 US 377 [2014]—a case that, among other issues, interpreted the "in connection with" language contained in Section 10(b) of the Securities Exchange Act—to aver that the fraudulent conduct under the Martin Act must lead to the buying and selling of securities (*id.*).[10] This contention fails for multiple reasons.

---

[10] Specifically, in *Troice*, the U.S. Supreme Court concluded that "[a] fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security'" when determining whether a private right of action is precluded by the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb(f)(1)(A) (*see* 571 US at 387).

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY    Page 13 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

13 of 25

*First*, as explained above, there are sufficient allegations alleged to support a plausible inference that Mashinsky's alleged misstatements induced or promoted new investors to deposit assets in Celsius's EIAs. *Second*, as noted by NYAG, the Martin Act does not require investors to take any specific action so long as a defendant has engaged in fraudulent conduct when "engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase" of any securities or commodities (GBL § 352-c [1]; *see State v Sonifer Realty Corp.*, 212 AD2d 366, 367 [1st Dept 1995] ["A false representation may be illegal 'regardless of whether issuance, distribution, exchange, sale, negotiation or purchase resulted'"]). *Finally*, even if the *Troice* court's interpretation of the "in connection with" language in the Exchange Act had any bearing on how to interpret the Martin Act, courts applying *Troice* have held that the alleged securities fraud "must be of the type that is material to someone other than the fraudster to buy, sell, or hold a covered security" (*see Zweiman v AXA Equitable Life Ins. Co.*, 146 F Supp 3d 536, 550 [SD NY 2015]), and this can include "inducement to action or forbearance" (*O'Donnell v AXA Equitable Life Ins. Co.*, 887 F3d 124 [2d Cir 2018]). Thus, even after applying these standards to the case at bar, the court would still conclude that the Complaint sufficiently alleges misstatements and omissions that were "in connection with" investment decisions by both Celsius's current and prospective investors (*see id.* ¶¶ 22, 24-25, 32, 34-35, 39, 65-69, 81-100, 106-11).

At bottom, NYAG sufficiently pleads allegations "related to" securities and commodities under the Martin Act.

## III.    Does the Complaint Sufficiently Allege Fraud and Damages under the Martin Act?

Mashinsky essentially advances three challenges to the alleged misrepresentations and omissions in the Complaint. *First*, Mashinsky maintains that NYAG failed to plead fraud with particularity, and, in any event, none of the representations alleged by NYAG were material to investors (MOL at 11-14, 16-19). *Second*, he contends that certain alleged misrepresentations are non-actionable fraud by hindsight (*id.* at 14-15). *Finally*, he avers that the Complaint fails to allege damages (*id.* at 16). The court addresses each of these contentions in turn.

### A.    Particularity of Allegations and Materiality of Misstatements

It is well established that the Martin Act "should be liberally construed to give effect to its remedial purpose of protecting the public from fraudulent exploitation in the offer and sale of securities" (*People ex rel. Schneiderman v Barclays Cap., Inc.*, 47 Misc 3d 862, 868 [Sup Ct, NY County, 2015] [internal quotations omitted]). For this reason, the terms "fraud" and "fraudulent practices" are given broad meaning and will encompass "all deceitful practices, even acts 'not originating in any actual evil design to perpetrate fraud or injury upon others, which do tend to deceive or mislead the purchasing public" (*People v Lexington*

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX                    Page 14 of 25
Motion No. 001

14 of 25

*Sixty-First Assocs.*, 38 NY2d 588, 595 [1976], citing *People v Federated Radio Corp.*, 244 NY 33, 38-39 [1926]).

To sufficiently plead Martin Act fraud, NYAG must allege that the purported fraud or fraudulent practice involved misrepresentations and/or omissions or concealments of material facts (*see Barclays*, 47 Misc 3d at 869; *see also Greenberg*, 95 AD3d at 483 [explaining that "an essential element of the Attorney General's Martin Act claims is that the alleged fraudulent transactions be material, i.e., that they have more than a trivial effect on net income or shareholder equity"]). NYAG, however, is not required to plead "scienter or intent to defraud" (*see Greenberg*, 95 AD3d at 483). Nor must NYAG plead reliance on the part of any investor to obtain relief (*see People by Schneiderman v Credit Suisse Secs. (USA) LLC*, 31 NY3d 622, 632 [2018], citing *Sonifer Realty Corp.*, 212 AD2d at 367). Even so, pursuant to CPLR 3016(b), NYAG must plead the pertinent elements of a Martin Act fraud claim with particularity (*see People v Katz*, 84 AD2d 381, 385 [1st Dept 1982]; *Barclays*, 47 Misc 3d at 869 n.7; *see also People ex rel. Cuomo v Charles Schwab & Co., Inc.*, 33 Misc 3d 1221[A], at *5 [Sup Ct, NY County, Oct. 24, 2011] [noting that CPLR 3016(b) applies "with equal force" to NYAG]. This requires "facts sufficient to permit a reasonable inference of the alleged conduct" (*Charles Schwab*, 33 Misc 3d 1221[A] at *3, *5 quoting *Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 492 [2008]).

With regard to materiality under the Martin Act, New York courts have adopted the objective standard articulated by federal courts construing federal securities law (*see State v Rachmani Corp.*, 71 NY2d 718, 726-727 [1988]). The test for materiality is whether defendant's representations or omissions, "taken together and in context, would have [misled] a reasonable investor about the nature of the investment" (*Bank of New York Mellon*, 40 Misc3d 1232[A] at *11). In other words, "there must be a substantial likelihood that the [misrepresentation or] disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (*TSC Indus., Inc. v Northway, Inc.*, 426 US 438, 449 [1976]; *accord Rachmani*, 71 NY2d at 727). As part of this assessment, courts will presume that a reasonable investor has "knowledge of information that has already been disclosed or is readily available (*Rachmani*, 71 NY2d at 727).

At the outset, NYAG has alleged Martin Act fraud with particularity. The Complaint provides a thorough recitation of purported misstatements made by Mashinsky, including the date such misstatements were made, the context of those statements, and the general audience of those statements (*see e.g.* AC ¶¶ 35-38, 47, 50-51, 81-85). The Complaint further provides context demonstrating how those misstatements and omissions were purportedly false. Put succinctly, the Complaint's allegations plainly set forth facts that are "sufficient to permit a reasonable inference of alleged fraud" (*Charles Schwab*, 33 Misc3d 1221[A] at *5, quoting *Pludeman*, 10 NY3d at 492).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001**                                                                                   **Page 15 of 25**

15 of 25

In challenging the issue of materiality, Mashinsky points to four categories of alleged misstatements: (1) Mashinsky's comparison of Celsius to banks and broker-dealers, (2) Mashinsky's representations concerning the size of Celsius's user base, (3) Mashinsky's statements concerning Celsius's alleged compliance with state regulators, and (4) Mashinsky's representations about Celsius's investment strategies (MOL at 12-14). In essence, Mashinsky avers that these statements are immaterial because they are nonactionable puffery, insufficiently vague or speculative, and/or mere generalizations (*id.*). The court disagrees. NYAG's allegations concerning Mashinsky's purported misrepresentations and omissions, if accepted as true for purposes of this motion, support a conclusion that a reasonable investor would have viewed them as material to an investment decision. This is the case whether analyzing the alleged misrepresentations collectively or as discussed below, if considering each category of representations on its own.

To start, NYAG sufficiently alleges that the statements concerning the safety of Celsius's deposits are material. As pleaded, Mashinsky repeatedly represented that investors' assets would be safe as if deposited "with the bank," and that Celsius would "act in [these investors'] best interest (AC ¶¶ 35-36). He further averred that Celsius's "only difference" to institutional broker-dealers was that "Celsius gives 80% of [its profit] to the depositor, to the user," and that Celsius would "take full responsibility for safeguarding investor assets" (*id.* ¶¶ 37, 39). These purported statements did not merely, as Mashinsky suggest, offer opinions about the safety of Celsius's deposits that could not be proven false. To the contrary, even if investors did know about the unregulated nature of Celsius's operations, Mashinsky's statements essentially cast Celsius as an entity that was on equal footing with institutional banks and broker-dealers in terms of the rigors of its protection of assets and the likelihood that investors could be made whole in times of crisis. As a result, the Complaint supports a reasonable inference that Mashinsky's statements altered the total mix of information available to investors about the safety of investing with Celsius (*see Woods v Maytag Co.*, 807 F Supp 2d 112, 123 [ED NY 2011] [concluding that false statement regarding the safety of a product made in response to customer question, which in turn induced the product's purchase, did not constitute mere "puffery"). None of the cases cited by Mashinsky support a different conclusion (*Bader v Siegel*, 238 AD2d 272, 272 [1st Dept 1997] [defendant's statements concerning a "promise" to "demonstrate the 'strategies, tactics and formulations'" during self-improvement classes did not amount to anything more than an opinion]; *Paladino v Adelphi Univ.*, 89 AD2d 85, 87 [2d Dept 1982] [no fraudulent misrepresentation where alleged statements only concerned the "quality or comparative quality" of education that students would receive]).

Mashinsky's contention that his statements about Celsius's investors base and its regulatory compliance are insufficiently vague or "not 'sufficiently specific'" is likewise devoid of merit. Regarding Celsius's user base, the crux of NYAG's fraud allegations is that Mashinsky represented (or at least insinuated) that "'two million people' had earned yield," even though many of Celsius's users had not yet

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY          Page 16 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

16 of 25

transferred assets and earned yields (AC ¶¶ 40-43). When properly contextualized, these alleged statements did not, as Mashinsky suggests, amount to "speculative assumptions" about some future occurrence that may impact Celsius. Rather, they addressed Celsius's current state of user engagement and success using EIAs, which could have certainly impacted the investment decisions of current and prospective investors to deposit assets (*cf. People v Exxon Mobil Corp.*, 65 Misc 3d 1233[A], at *20 [Sup Ct, NY County, 2019] [concluding that alleged misstatements made in 2014 concerning greenhouse gas costs that may potentially be incurred by 2030 and 2040 were too speculative to be considered material to a reasonable investor]). As for Mashinsky's alleged statements concerning regulatory compliance (AC ¶¶ 112-15), the Complaint provides sufficient details of alleged misstatements concerning regulatory approval and compliance that supports a reasonable inference of materiality to survive a motion to dismiss.

The final category of alleged misrepresentations on which Mashinsky focuses are those concerning Celsius's deployment strategies. Contrary to Mashinsky's position, these statements are not "mere 'generalizations'" about Celsius (MOL at 13-14). Instead, according to the Complaint, Mashinsky repeatedly assured investors that Celsius was engaged in investment strategies that seemingly minimized any risk to the company and its investors (*see* AC ¶¶ 45, 47, 50, 54-55, 58, 61, 74, 76, 78). This included representations that Celsius (1) would pay yields without taking risk and would avoid deploying assets into risky areas (such as DeFi), (2) only made loans that were collateralized and to reputable counterparties, and (3) avoided taking large positions in Terra and the Anchor Protocol (*id.* ¶¶ 45, 47, 54, 58, 61, 70-72, 74). As alleged, many of Mashinsky's representations proved to be contrary to Celsius's actual practices at the time his statements were made (*see id.* ¶¶ 44-79). Nor were the consequences of Celsius's actual deployment strategies, including its financial exposure arising from its investment strategies, apparent or otherwise discernable from Mashinsky's representations (*id.*). Altogether, the misrepresentations concerning Celsius's deployment strategies detailed in the Complaint, when considered collectively and with context, would have, as alleged, altered the total mix of information available made available to investors (*see McMahan & Co. v Wherehouse Entertainment, Inc.*, 900 F2d 576, 579 [2d Cir 1990] [explaining, for determining materiality, that the "central issue" is "whether defendants' representations, taken together and in context, would have mislead a reasonable investor"]).

In short, accepting the allegations in the Complaint as true and drawing all reasonable inferences in NYAG's favor, the court concludes that NYAG has sufficiently pleaded material misrepresentations and omissions and has done so with particularity. Mashinsky's motion, at most, raises issues of fact concerning materiality. But this only underscores why dismissal is inappropriate at this time (*see People ex rel. Cuomo v Merkin*, 26 Misc3d 1237[A] at *4 [Sup Ct, NY County, Feb. 8, 2010] ["Materiality is a mixed question of fact and law. Therefore, it is inappropriate for resolution at the motion to dismiss stage"]).

**450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY**    **Page 17 of 25**
**GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**
**Motion No. 001**

17 of 25

## B. Nature of Certain of Mashinsky's Alleged Misstatements

In addition to the above contentions, Mashinsky further avers that certain of his alleged misstatements constitute non-actionable fraud in hindsight (MOL at 14-15). It is true that courts will not permit allegations of fraud by hindsight to support a claim for fraud (*see Novak v Kasaks*, 216 F3d 300, 309 [2d Cir 2000]). In other words, NYAG must allege in the Complaint alleged misrepresentations were "false when made" (*Zutty v Rey Select Broad Market Prime Fund, L.P.*, 33 Misc 3d 1226[A], at *10 [Sup Ct, NY County, Apr. 15, 2011]). NYAG has done so here.

According to the Complaint, Celsius was experiencing a liquidity crisis following the Crash (*see* AC ¶¶ 84-85, 97). Specifically, by at least May 13, 2022, Celsius's total liabilities exceeded its assets, and this continued to be the case going into June 2022 (*id.* ¶¶ 84, 97, 105). Moreover, between May 9, 2022, and May 24, 2022, customer withdrawals caused Celsius to experience a net loss of over $1.4 billion in assets, all while the company was experiencing losses as a result of its deployment of investors' assets (*id.* ¶¶ 85, 102). Despite Celsius's financial conditions at the time, Mashinsky repeatedly assured investors that their "assets are there when [they] need them," Celsius was "ready with the liquidity," and the company was not exposed to any of the "huge damage" caused by the Crash (*id.* ¶¶ 82-84, 89-91, 93). Mashinsky went so far as to claim in the days immediately preceding Celsius's freezing of withdrawals that "Celsius has billions in liquidity," which was in stark contrast to Celsius's actual financial condition at the time (*id.* ¶¶ 98, 102, 104). The allegations in the Complaint, do not, as Mashinsky claims, paint a picture of an individual who merely failed to anticipate mass withdrawals (MOL at 15). Instead, the allegations, accepted as true, depict an individual actively misrepresenting the financial condition of his company to keep it afloat. NYAG sufficiently alleges statements that fraudulent at the time they were made, rather than fraud by hindsight.[11]

## C. Basis for NYAG's Claims for Damages against Mashinsky

Finally, Mashinsky avers that NYAG cannot seek money damages or restitution because the Complaint fails to allege an injury to any New York resident, or any unfair gains to Mashinsky (MOL at 16; Reply at 8-9). NYAG responds that Mashinsky would be liable under the Martin Act for damages to all EIA investors based on his fraudulent conduct made within or from New York (Opp. at 17).

---

[11] Mashinsky also contends that NYAG's allegations concerning Celsius's investment with Alameda is fraud by hindsight. Although a closer call, the court is inclined to permit NYAG's allegations concerning Celsius's loans to Alameda to proceed. To be sure, the nexus between Mashinsky's knowledge of the riskiness of investing with Alameda and Alameda's eventual bankruptcy is, at best, tenuous (*see* AC ¶¶ 71-73). However, these allegations, when coupled with other allegations concerning Celsius's deployment strategies, tends to support the fraudulent nature of Mashinsky's representations (*see id.* ¶¶ 45, 47, 54, 58, 61, 70-72, 74).

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**    **Page 18 of 25**
Motion No. 001

18 of 25

It is well established that NYAG has authority to recover on behalf of non-New York residents (*see People ex rel. Cuomo v H & R Block, Inc.*, 58 AD3d 415, 417 [1st Dept 2009]; *Charles Schwab*, 33 Misc 3d 1221[A] at *6). Indeed, "so long as there is a nexus between a securities transaction and New York, the Martin Act applies" (*Charles Schwab*, 33 Misc 3d 1221[A] at * 6). Here, with respect to the nature of the injury, the Complaint alleges that many Celsius investors were impacted by the eventual bankruptcy of the platform, and it further alleges that these victims would have included New York residents as well (*see* AC ¶¶ 8-9, 25). The Complaint further supports a reasonable inference that the harm suffered by investors flowed, at least in part, from Mashinsky's alleged misrepresentations made in New York concerning Celsius's overall financial health and investment safety (*see id.* ¶¶ 9, 26, 80-105, 132-38). Accordingly, this basis for dismissal is denied.

Mashinsky otherwise avers that NYAG "ignore[s] undisputable principles of law requiring supporting allegations for monetary damages claims" (Reply at 8). But as NYAG avers, although restitution and damages are available under the Martin Act, "[p]roof of actual damages, injury or reliance [is] not a required element for liability to accrue" (*see People v Greenberg*, 2010 WL 4732745, at *34-35 [Sup Ct, NY County, Oct. 21, 2010], *affd* 95 AD3d 474 [1st Dept 2012] [denying motion for summary judgment dismissing complaint on basis that NYAG was unable to establish any damages or reliance]). To be sure, while Martin Act liability does not hinge on proof of damages, NYAG will need to establish damages to obtain the relief identified in the Complaint (*see generally State v McLeod*, 12 Misc 3d 1157[A], at *20 [Sup Ct, NY County, Feb. 9, 2006] [concluding that "hearing [was] necessary on the amount of restitution" that defendant must pay in connection with Martin Act claim]). Nonetheless, the fact that NYAG has not made a specific showing of damages in its Complaint does not preclude its ability to pursue the monetary remedies it otherwise identifies as part of its allegations and causes of action (*see McLeod*, 12 Misc 3d 1157[A] at *20 [rejecting argument that state was unable to seek money damages because "they were not specified in the complaint"]).[12]

Stated succinctly, the court declines to dismiss NYAG's Martin Act claims to the extent they seek monetary damages.

---

[12] *Cohen v Brown, Harris, Stevens, Inc.* is not to the contrary (64 NY2d 728 [1984]). In *Brown*, plaintiffs advanced a fraud cause of action that was premised, in part, on defendants alleged failure to comply with the Martin Act's disclosure provisions (*id.* at 731). The Court of Appeals concluded that this claim was properly dismissed because plaintiffs were unable to establish how they suffered any injury because of defendants' failure to comply with the disclosure provisions (*id.*). This case does not, as Mashinsky claims, establish that a Martin Act fraud claim brought by NYAG, which otherwise does not require allegations of scienter or reliance, must be dismissed for failure to specify an amount of damages.

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY          Page 19 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

19 of 25

In conclusion, as the foregoing makes clear, NYAG has sufficiently stated a claim for securities fraud and damages under the Martin Act. Mashinsky's motion to dismiss NYAG's Martin Act fraud claims is denied.

## IV.    Does the Complaint Sufficiently Allege a Failure to Register Claim under the Martin Act?

NYAG alleges several causes of action concerning Mashinsky's purported failure to register as a dealer or salesperson of securities and/or commodities, as required under the Martin Act (AC ¶¶ 139-40, 149-50). Mashinsky argues that, in addition to failing to adequately allege a security under the Martin Act that is subject to Section 359-e, NYAG has failed to allege that Mashinsky acted as a dealer or salesperson of a security or commodity (MOL at 19). Specifically, Mashinsky avers that the Complaint does not allege that Mashinsky sold any of the EIAs for his "own account," engaged with investors to open or transfer yields to EIAs or acted as a salesperson for Celsius (id. at 20; Reply at 9). Mashinsky also avers that NYAG fails to identify any commodity that Mashinsky promoted or sold as a purported dealer or otherwise establish how he acted as a commodities dealer or salesperson (MOL at 20-21).

Section 359-e of the Martin Act requires certain persons and entities, such as dealers and salespersons, to register before transacting in the business of securities or commodities in New York (see GBL § 359-e). The Martin Act defines a "dealer" as "any person, firm, association or corporation" that "buy[s] or sell[s] securities from or to the public within or from this state for his or its own account, through a broker or otherwise" (id. § 359-e [1] [a]). Similarly, the Act defines a salesperson as "every person employed by a broker or dealer" as defined by Section 359-e (id. § 359-e [1] [c]). Failure to comply with Section 359-e is "deemed a violation of and a fraudulent practice within the meaning of" the Martin Act (id. § 359-e [12]).

Here, accepting the allegations in the Complaint as true, the court concludes that NYAG has stated a claim under Section 359-e of the Martin Act. As a preliminary matter, for the reasons previously explained in connection with NYAG's Martin Act fraud claims, the Complaint sufficiently alleges that EIAs are securities and that CEL tokens are commodities (see supra, Discussion §§ I & II). The Complaint otherwise alleges sufficient facts to support a conclusion that that Celsius was a dealer of securities and/or commodities for purposes of the Martin Act (see AC ¶¶ 20-22, 24-25, 29, 107-109, 121). Finally, the Complaint sets forth sufficient allegations that, if accepted as true, indicate that Mashinsky operated as a salesperson of securities and commodities, particularly given his promotion of Celsius's EIAs and CEL tokens (see id. ¶¶ 24, 26, 29, 34-35, 41, 44, 86-88, 107-111).

To be clear, the burden will remain on NYAG to actually prove that Mashinsky is a salesperson and/or dealer under the Martin Act for purposes of his alleged failure to register. And whether NYAG will be able to do so has yet to be

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX                    Page 20 of 25
Motion No. 001

20 of 25

determined. However, accepting the Complaint's allegations as true and after drawing all reasonable inferences in NYAG's favor, the court cannot conclude at the motion to dismiss stage that that the facts alleged do not fit with any cognizable legal theory under Section 359-e (CPLR 3211 [a] [7]). Mashinsky's motion to dismiss NYAG's Martin Act failure-to-register claim is denied.

## V.    Does the Complaint Sufficiently Allege Executive Law § 63(12) Claims?

Mashinsky argues that NYAG's Executive Law claims should be dismissed for the same reasons supporting dismissal of NYAG's Martin Act claims (MOL at 23). As this argument acknowledges, NYAG's Executive Law § 63(12) claims are premised on the same conduct underlying the Martin Act claims. These claims therefore stand and fall together (*see People v Greenberg*, 95 AD3d 474, 482-483 [1st Dept 2012]; *accord People by Schneiderman v Trump Entrepreneur Initiative LLC*, 137 AD3d 409, 417-418 [1st Dept 2016] ["the language of § 63(12) parallels the language of the Martin Act"]). Hence, for the same reasons articulated in this court's analysis of NYAG's Martin Act claims, Mashinsky's motion to dismiss the Executive Law § 63(12) claims (Counts IV-VII) is denied in its entirety.

## VI.    Is Celsius a Necessary Party?

Mashinsky's final basis for dismissal is that the Complaint fails to name Celsius as a necessary party (MOL at 21-23; Reply at 10-12). On this point Mashinsky states the Complaint has several categories of allegations that are "inextricably tied to Celsius" and thus, by failing to include Celsius as a party, NYAG has "deprived [it] of its right to be heard concerning critical aspects of its business" (MOL at 22).

A plaintiff generally has the right to decide the persons or entities it joins as parties to its action (*Serov ex rel. Serova v Kerzner Intern. Resorts, Inc.*, 52 Misc 3d 1214[A], at *9 [Sup Ct, NY County, July 26, 2016]). Nevertheless, certain parties are deemed necessary under CPLR 1001(a), namely persons or entities (1) "who ought to be parties if complete relief is to be accorded between the persons who are parties to the action," or (2) "who might be inequitably affected by a judgment in the action" (*27th St. Block Ass'n v Dorm. Auth. of State of New York*, 302 AD2d 155, 160 [1st Dept 2002] [internal quotations omitted]). The purpose of CPLR 1001(a) is "not merely to provide a procedural convenience but to implement a requisite of due process—the opportunity to be heard before one's rights or interests are adversely affected" (*Martin v Ronan*, 47 NY2d 486, 490 [1979]).

In assessing the issue of complete relief, courts will consider whether the relief sought against a defendant relies on, in part or in whole, an adjudication of the liability of and/or harm caused by the nonparty sought to be joined (*see Almah LLC v AIG Employee Servs, Inc.*, 159 AD3d 532, 532 [1st Dept 2018] [holding that complete relief could be accorded "between plaintiff and [defendant], without joining

450040/2023 THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX    Page 21 of 25
Motion No. 001

21 of 25

[nonparty]" because "[defendant's] liability, if any, will be limited to any damage that it caused during its tenancy; it will not be liable for damage that [nonparty] may have caused during its earlier tenancy"]; *Interstate Fire & Cas. v Aspen Ins UK Ltd.*, 2019 WL 5547026, at *3 [Sup Ct, NY County, Oct. 28, 2019] [explaining that complete relief could be accorded where "[p]laintiff determined that [insurers'] policies would not cover [] liability in the Underlying Action, whereas plaintiff concluded that [defendant] was the insurer during the relevant time period]). And with regard to whether a non-party would be "inequitably affected by a judgment," courts have held that the "possibility that a judgment rendered without [the omitted party] could have an adverse practical effect [on that omitted party] is enough to indicate joinder" (*27th St. Block*, 302 AD2d at 160, quoting *Hitchcock v Boyack*, 256 Ad2d 842, 844 [3d Dept 1998]).

Here, Mashinsky fails to establish, at this juncture, that the court would be unable to accord complete relief between the parties without Celsius being named as a party, or that Celsius would be inequitably affected by a judgment in this action. Regarding the complete relief factor, NYAG has chosen to institute an action solely against Mashinsky stemming from his alleged misconduct and, in doing so, NYAG has necessarily cabined the requested relief to target only Mashinsky (AC ¶ 11 and Prayer for Relief).[13] Thus, whether Celsius is liable for any harm (if at all) has no bearing on the relief NYAG would be able to obtain (*see Almah LLC*, 159 AD3d at 532; *see also Signature Bank v Faibish*, 142 AD3d 1069, 1070 [2d Dept 2016] [concluding that nonparty corporations in bankruptcy were not necessary parties, even where plaintiff alleged that defendants used conglomerate of entities and several banking institutions to induce plaintiff to enter into a loan with the nonparty corporations who, in turn, defaulted on the loan]).

Mashinsky's position that Celsius would be inequitably affected by a judgment in this action is similarly unavailing. It is true that issues concerning Celsius's deployment and operational activities, as well as what happened at Celsius before and after the Crash, would be addressed in determining Mashinsky's liability. But courts are regularly able to adjudicate such interconnected factual and legal issues without requiring that all relevant parties be named to the action (as reflected in the somewhat analogous context of joint and several tortfeasor liability) (*see e.g. Serov*, 52 Misc 3d 1214[A] at *9, [explaining that "joint and several tortfeasors are permissive, not indispensable parties whose rights will be "inequitably affected" by entry of judgment:]; *see generally* Vincent C. Alexander, Practice Commentaries C1001:1 [noting that joinder typically not required in the context of joint and several tortfeasors "because a plaintiff's judgment against one of

---

[13] Mashinsky's contention that NYAG's pursuit of "restitution of all amounts or assets obtained from investors" inherently makes Celsius a necessary party (*see* MOL at 22-23) ignores the fact that NYAG's remedy of restitution is targeted at solely Mashinsky.

**450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX**                **Page 22 of 25**
**Motion No. 001**

22 of 25

several tortfeasors cannot be undone by other suits, the defendant does not face double liability, and the other tortfeasors will not be inequitably affected"]).

Regarding the contention that several categories of NYAG's allegations are "inextricably tied to Celsius," the only issue identified by Mashinsky that could potentially have an adverse impact on Celsius is whether Celsius qualifies as a broker-dealer for purposes of a determining whether *Mashinsky* (not Celsius) violated Section 359-e of the Martin Act. But on this point, Mashinsky does not explain beyond speculation how, if at all, Celsius will be bound (either legally or practically) by any findings in this case in a future proceeding, particularly given both parties' apparent acknowledgment that neither collateral estoppel nor issue preclusion would be at issue (*see generally Strough v Incorporated Vill. of West Hampton Dunes*, 78 AD3d 1037, 1039-1040 [2d Dept 2010] ["In order to invoke [collateral estoppel], two requirements must be met: (1) the identical issue must have been necessarily decided in the prior action and must be decisive in the present action, and (2) the party who is precluded from relitigating the issue must have had a full and fair opportunity to contest the matter in the prior action"]). Simply put, there is no indication on the current record of even a "mere possibility" that a judgment in this action would adversely impact Celsius.

None of the cases cited by Mashinsky support a contrary conclusion. In *City of New York v Long Island Airports Limousine Serv. Corp.*, for example, the Court of Appeals concluded that plaintiff failed to join the New York State Commissioner of Transportation as a necessary party because the issues raised in the case essentially challenged the Commissioner's power to regulate transportation into large metropolitan areas (48 NY2d 469, 475-76 [1979]). Likewise, in *Fatone v Board of Elections of County of Rensselaer*, the court concluded that two candidates for elected office were necessary parties to a proceeding initiated pursuant to Election Law §16-102 because, although petitioner was only challenging the designation of one candidate on a designating petition for an upcoming election, she claimed that the petition was, in general, "permeated with fraud" (218 AD2d 913, 913-14 [3d Dept 1995]). As the court recognized, these allegations, if sustained, would have "invalidated" the entire designating petition naming candidates for office and, in turn, impacted *all* candidates listed therein (including the nonparty candidates) (*id.*).[14] Contrary to Mashinsky's assertion, these cases do not present "analogous situations" to the case at hand (MOL at 22). Rather, in both cases, unlike here, the legal determinations that would have been rendered by the court would necessarily implicate the legal rights or powers of a nonparty.

---

[14] Although the First Department in *New Delhi Tel. Ltd v Nielsen Holdings N.V.* did conclude that an entity was a necessary party because its conduct was "at issue in every cause action," a key determination was that plaintiff alleged that the nonparty was "defendants' joint venture," and it was this joint venture that engaged in the fraudulent conduct at issue in plaintiff's complaint (111 AD3d 437, 437 [1st Dept 2013]). Here, by contrast, NYAG's allegations are focused on Mashinsky's misconduct. While NYAG alleges Mashinsky was acting to promote Celsius, it is ultimately his alleged misrepresentations and omissions that are at issue in this dispute.

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001
Page 23 of 25

23 of 25

Even if, however, the court did conclude that Celsius were a necessary party, it would still not dismiss this action. As both parties observe, because Celsius is subject to an automatic stay in its bankruptcy proceedings, it cannot be joined in this action (*see D.E. Shaw Composite Holdings, L.L.C. v Terraform Power, LLC,* 2018 WL 731802, at *4 [Sup Ct, NY County, Feb. 6, 2018]). CPLR 1001(b) provides that, in such circumstances, courts may "allow the action to proceed in such nonparty's absence" after considering the following five factors: "(1) whether plaintiff has another remedy if the action is dismissed for nonjoinder; (2) the prejudice which may accrue from nonjoinder to the defendant or to the nonjoined party; (3) whether and by whom prejudice might have been avoided or may in the future be avoided; (4) the feasibility of a protective provision; and (5) whether an effective judgment may be rendered in the absence of the nonjoined person" (*L-3 Comm'cns Corp. v SafeNet, Inc.,* 45 AD3d 1, 10-11 [1st Dept 2007]). When weighing these factors, courts "should be guided by the principle that dismissal for failure to join a necessary party should eventuate only as a 'last resort'" (*id.* at 11, citing *Saratoga Cty Chamber of Commerce, Inc v Pataki,* 100 NY3d 801, 821 [2003]).

Each of these five factors weigh in favor of allowing NYAG's case to proceed. As to the first factor, by virtue of the automatic stay in bankruptcy, dismissal of this action would effectively and indefinitely preclude NYAG from exercising her "broad regulatory and remedial powers to prevent fraudulent securities practices" under the Martin Act (*see generally Assured Guar. (UK) Ltd v J.P. Morgan Inv. Mgmt. Inc.,* 18 NY3d 341, 350 [2011]).

Turning to the second and third factors, the prejudice to either Mashinsky or Celsius is minimal. To start, the relief granted in these proceedings will be premised solely on a determination of Mashinsky's liability (if any) and will not depend on Celsius's liability (if any). Furthermore, as explained above, any rulings from these proceedings will be nonbinding on Celsius, and Mashinsky otherwise fails to articulate any non-speculative prejudice to Celsius's rights if it were not joined. For its part, although it is currently subject to an automatic stay, Celsius could also take steps to avoid any *possibility* of prejudice by seeking authorization to intervene in this action (*see 27th St. Block,* 302 AD2d at 163 [explaining that, although petitioner was aware of non-party's role and bears the responsibility of any prejudice that might result by not joining that party, that nonparty was also "obviously aware of the proceeding, could have avoided any prejudice by seeking intervention, although not required to do so"]; *L-3 Comm'cns,* 45 AD3d at 13 ["Courts have routinely recognized that the ability of a nonjoined party to intervene in an action to avoid prejudice is a compelling factor in determining whether to dismiss a case for failure to join a necessary party"]).

Regarding the fourth factor, although neither party addresses whether there are feasible protections that the court could implement to protect Celsius's interests, the court is nevertheless confident that it will be able to craft orders and judgments to protect against any potential prejudice to a nonparty. Finally, in

450040/2023  THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY          Page 24 of 25
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

24 of 25

weighing the fifth factor, the court reiterates that it will be able to accord complete relief amongst the parties even in Celsius's absence from these proceedings.

In summary, there is no basis to view Celsius as a necessary party under CPLR 1001(a). But even if it were, the circumstances of this case do not warrant dismissal. Mashinsky's motion to dismiss pursuant to CPLR 3211(a)(10) is denied.

### Conclusion

For the foregoing reasons, it is

ORDERED that defendant's motion to dismiss is denied; and it is further

ORDERED that within 30 days of the e-filing of this order, defendant shall file an answer to the complaint (NYSCEF # 7); and it is further

ORDERED that a preliminary conference shall be held via Microsoft Teams on September 27, 2023, at 10:30 a.m. or at such other time that the parties shall set with the court's law clerk.

This constitutes the Decision and Order of the court.

| __08/04/2023__ | |
| --- | --- |
| DATE | MARGARET A. CHAN, J.S.C. |

| CHECK ONE: | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION | |
| --- | --- | --- | --- |
| | ☐ GRANTED ☒ DENIED | ☐ GRANTED IN PART | ☐ OTHER |
| APPLICATION: | ☐ SETTLE ORDER | ☐ SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | ☐ INCLUDES TRANSFER/REASSIGN | ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

450040/2023   THE PEOPLE OF THE STATE OF NEW YORK BY LETITIA JAMES, ATTORNEY
GENERAL OF THE STATE OF NEW YORK vs. MASHINSKY, ALEX
Motion No. 001

Page 25 of 25

25 of 25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> CELSIUS NETWORK LIMITED and ALEXANDER "ALEX" MASHINSKY, <br><br> Defendants. | Civil Action No. <u>1:23-cv-6005</u> <br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges as follows:

### SUMMARY OF ACTION

1. From March 2018 through June 2022, Defendants Celsius Network Limited ("Celsius") and its founder and CEO Alexander "Alex" Mashinsky ("Mashinsky") raised billions of dollars from investors through unregistered and fraudulent offers and sales of crypto asset securities. Defendants falsely promised investors a safe investment with high returns through its "Earn Interest Program," they misled investors about the financial success of Celsius's business, and they fraudulently manipulated the price of Celsius's own crypto asset security—the so-called "CEL" token. Defendants' scheme unraveled in June 2022, leaving investors unable to withdraw billions of dollars in crypto assets from Celsius's online platform. Celsius filed for bankruptcy a month later, stating that the company's liabilities exceeded its assets by approximately $1.2 billion.

2. Mashinsky founded Celsius in 2018. The company claimed it was an alternative to traditional financial institutions and would provide investors who held crypto assets "financial freedom" and "economic opportunity." Defendants promoted the Celsius platform as offering

safe investment opportunities for retail investors to earn interest on their crypto assets, and the

company claimed to generate revenue by lending and investing crypto assets.

3.       Celsius marketed two core investment opportunities to investors.  First, Celsius

offered and sold its own crypto asset security, CEL.  Defendants promised high "earning rates"

to investors who purchased CEL and marketed CEL as an investment in the success of Celsius

itself.  Second, Celsius offered an Earn Interest Program whereby investors tendered their crypto

assets to Celsius in exchange for interest payments.  Defendants promised investors in the Earn

Interest Program returns as high as 17%.  Defendants never filed a registration statement for their

offers and sales of the Earn Interest Program, however, and no exemption from registration was

available.

4.       Defendants made numerous false and misleading statements to induce investors to

purchase CEL and invest in the Earn Interest Program.  Among other false representations,

Defendants misrepresented Celsius's central business model and the risks to investors by

claiming that Celsius did not make uncollateralized loans, the company did not engage in risky

trading, and the interest paid to investors represented 80% of the company's revenue.

5.       None of these claims was true.  Celsius could not consistently generate the

revenue needed to make the required interest payments to investors with respect to the Earn

Interest Program.  The company engaged in risky trading practices and made uncollateralized

loans to try to generate the necessary revenue, putting the entire Celsius enterprise at grave risk.

Celsius was unsuccessful and, as a result, frequently paid much more than 80% of its revenue to

satisfy the company's interest payment obligations—a business practice that was hidden from

investors, unsustainable, and ultimately led to the company's collapse.

6.       Defendants also misrepresented Celsius's financial success to make the company

2

appear more profitable and stable than it was (and, therefore, CEL to be a more attractive and

safe investment than it really was). For example, Defendants claimed that the company raised

$50 million from its so-called initial coin offering ("ICO") of CEL. In reality, Celsius raised less

than 65% of the amount it had been trying to raise. To make up the shortfall, Mashinsky secretly

sought to purchase the unsold $18 million in CEL himself through an undisclosed transaction

with Celsius. Defendants never consummated the deal, however, and, contrary to Mashinsky's

representation to the public, the outstanding CEL remained unsold.

7.      Defendants also falsely claimed that Celsius had 1 million active users on

Celsius's platform. It did not. Celsius's own internal data—which was regularly shared with

Mashinsky—showed that the company only had approximately 500,000 users who had ever

deposited crypto assets on the company's platform and that many were no longer active users.

8.      In addition, Defendants falsely stated that Celsius had not experienced any

institutional loan defaults. In fact, Celsius and Mashinsky knew that the company had

experienced defaults by institutional borrowers totaling hundreds of millions of dollars.

9.      Defendants also misrepresented the safety of investor assets deposited on

Celsius's platform. Defendants claimed that Celsius had received approval from state and

federal regulators for its business even though they knew the company had not. Defendants also

falsely portrayed investor assets as being insured, knowing the company had no such insurance.

10.     In addition to making numerous false statements about Celsius's business,

Defendants also manipulated the market for CEL. Defendants publicly touted a "buy back"

program whereby Celsius purchased the amount of CEL needed to make interest payments to

investors. In reality, Celsius bought, at Mashinsky's direction, millions of dollars of additional

CEL to bolster the price of CEL and induce investors to buy it. Defendants timed their CEL

purchases to have the greatest market impact. At the same time, Celsius and Mashinsky reaped millions of dollars in profits for themselves from sales of CEL.

11.    By 2022, Celsius's business was unsustainable, and it became clear internally that the company would fail. One employee called Celsius a "sinking ship," while another wrote that "there is no hope . . . there is no plan" and that Celsius's business model "is fundamentally broken." On May 21, 2022, a Celsius executive candidly acknowledged in an internal message: "We don't have any profitable services."

12.    A report that circulated among Celsius's executives, including Mashinsky, reached the same conclusion. The report began: "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints. The current business model is not financially sustainable." In fact, Celsius had incurred losses of more than $800 million in 2021 and an additional $165 million during the first quarter of 2022.

13.    Even though they knew that Celsius was failing, Defendants continued to tell the investing public a very different story. In May 2022, Celsius claimed that it "abides by robust risk management frameworks," that "[a]ll user funds are safe," and that it "continue[s] to be open for business as usual." Mashinsky asserted that "Celsius has not experienced any significant losses and funds are safe." On June 10, 2022, Mashinsky sought to reassure investors further by claiming that Celsius has "billions in liquidity." Two days later, however, Celsius stopped allowing investors to withdraw crypto assets from its platform, and the company filed for bankruptcy the next month.

14.    By engaging in the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)]; Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934

EXHIBIT A

("Exchange Act") [15 U.S.C. §§ 78i(a)(2), 78j(b)]; and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5]. Defendants will continue to violate the federal securities laws unless they are

restrained and enjoined by this Court.

## JURISDICTION AND VENUE

15.     The SEC brings this action pursuant to Sections 20 and 22 of the Securities Act [15

U.S.C. §§ 77t, 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e)]

to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business

alleged in this Complaint, and transactions, acts, practices, and courses of business of similar

purport and object. The SEC also seeks against Mashinsky civil penalties, disgorgement of his ill-

gotten gains plus prejudgment interest, an officer and director bar, and a conduct-based injunction

that prohibits him from (i) participating, directly or indirectly, in the purchase, offer, or sale of any

crypto asset securities, or (ii) engaging in activities for the purposes of inducing or attempting to

induce the purchase, offer, or sale of any crypto asset securities by others.

16.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities

Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),

78u(e), 78aa], and 28 U.S.C. § 1331.

17.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391.

18.     Defendants, directly and indirectly, made use of the mails, and the means and

instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and

courses of business alleged in this Complaint.

19.     Certain of the transactions, acts, practices, and courses of business constituting

violations of the Securities Act and the Exchange Act occurred in this District. For example,

5

Defendants made materially false and misleading statements in this District regarding CEL and the

Earn Interest Program, and Defendants offered and sold CEL and the Earn Interest Program to

investors who reside in this District.  Investors in the United States, including this District, were able

to invest in the various investment opportunities available on the Celsius platform through Celsius's

website and mobile application.  In addition, Mashinsky resides in this District, and he and Celsius

regularly conducted business in this District.

## DEFENDANTS

20.     Celsius Network Ltd. is a United Kingdom registered company that served as the

primary company involved with most investor services and activities related to CEL and the Earn

Interest Program.  The company's principal place of business is Hoboken, New Jersey, and it

regularly conducted business in New York, NY.  Celsius is the parent of various operating

subsidiary companies, including U.S. entities.  Celsius is itself the subsidiary of Celsius Network

Inc., a Delaware corporation that is the holding company for all Celsius entities.

21.     Alexander "Alex" Mashinsky, age 57, is the Co-Founder and former Chief

Executive Officer of Celsius.  Mashinsky resides in New York, NY, where he ran Celsius and

frequently conducted business on its behalf until he was asked to resign from the company and

did so on September 27, 2022.  Mashinsky has an 83.7% equity stake in Celsius Network Inc.,

which is the majority owner of Celsius.

## BACKGROUND ON SECURITIES OFFERINGS

22.     Congress enacted the Securities Act nearly a century ago to regulate the offer and

sale of securities.  In contrast to the commercial principle of *caveat emptor*, Congress established

a regime of full and fair disclosure, requiring those who offer and sell securities to the investing

public to provide sufficient and accurate information to allow investors to make informed

decisions before they invest.

23.     Sections 5(a) and 5(c) of the Securities Act require issuers of securities like

Celsius to register offers and sales of those securities with the SEC when they offer and sell

securities to the public.  Registration statements relating to an offering of securities provide

investors with important information about the issuer and the offering, including financial and

managerial information, how the issuer will use offering proceeds, and the risks and trends that

affect the enterprise and an investment in its securities.

24.     The Securities Act and Exchange Act also contain anti-fraud provisions to prevent

fraudulent conduct in the offer, sale, and purchase of securities.  Section 17(a) of the Securities

Act and Section 10(b) of the Exchange Act, for example, seek to ensure honest behavior and fair

dealing in securities transactions.

25.     Congress used a broad definition of "security" in the Securities Act and Exchange

Act.  A "security" encompasses a wide range of investments, including investment contracts.

Investment contracts are instruments through which a person invests money in a common

enterprise and reasonably expects profits or returns derived from the entrepreneurial or

managerial efforts of others.  In this case, Celsius offered and sold CEL and the Earn Interest

Program as securities.

## BACKGROUND ON CRYPTO ASSETS

26.     The term "crypto asset" generally refers to an asset issued and/or transferred using

distributed ledger or blockchain technology, including assets sometimes referred to as

"cryptocurrencies," "digital assets," "virtual currencies," "digital coins," and "digital tokens."

27.     A blockchain or distributed ledger is a peer-to-peer database spread across a

network of computers that records all transactions in theoretically unchangeable, digitally

recorded data packages. The system relies on cryptographic techniques for secure recording of transactions.

28.    Blockchains typically employ a consensus mechanism to "validate" transactions, which, among other things, aims to achieve agreement on a data value or on the state of the ledger. Crypto assets may be traded on crypto asset trading platforms in exchange for other crypto assets or fiat currency (legal tender issued by a country).

29.    A blockchain "protocol" is a code, software, or algorithm that governs how a blockchain, or a feature of a blockchain, operates.

30.    On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, advising "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in that report were offered and sold as investment contracts and, thus, securities.

## FACTS

## I.    Mashinsky Launches Celsius and Claims to Provide "Financial Freedom" and "Economic Opportunity" to Investors

31.    Mashinsky and another individual founded Celsius in 2018.

32.    Mashinsky marketed Celsius as an alternative to traditional financial institutions—a place for retail investors to earn interest on their crypto assets invested on Celsius's platform. Celsius and Mashinsky publicized that investors could "unbank" themselves and enjoy "financial freedom" as part of the Celsius community.

33.    Celsius promoted itself as an altruistic organization and referred to its investors as "Celsians." Celsius stated in a blog post: "Can we really bring unprecedented financial freedom, economic opportunity and income equality to everyone in the world? We are Celsius.

8

We dream big."

34.     Mashinsky was the CEO, public face, and primary promoter of Celsius.

35.     Mashinsky frequently spoke about and on behalf of Celsius on social media platforms like Twitter, in interviews, podcasts, live television appearances, and in articles circulated on the internet.

36.     Inside Celsius, Mashinsky actively participated in discussions regarding all aspects of the company's business and also dictated many of the company's business decisions.

37.     Mashinsky was also a member of Celsius's Executive Committee ("EXCO"), Risk Committee, Asset-Liability Committee ("ALCO"), Investment Committee, and Deployment Committee.  Each of these committees met regularly to discuss certain high-level aspects of Celsius's business, strategy, and financial condition.

38.     Since being founded in 2018, Celsius grew quickly in terms of headcount, assets on its balance sheet, and number of users.  From 2018 to 2022, the company went from having only a handful of employees to approximately 900 employees.  From 2018 until November 2021, Celsius went from having $49.8 million of assets to having $28.6 billion of assets on its balance sheet.  By March 2022, Celsius had approximately 285,000 active users.

## II.     Celsius's Core Investments:  the CEL Token and Earn Interest Program

### A.     Celsius Offers and Sells CEL

39.     In March 2018, Celsius conducted an offer and sale of its own crypto asset security in a so-called "ICO."  Celsius created and called the crypto asset security "CEL."

40.     Celsius initially offered CEL at $0.30 per token with a cap of $50 million to be raised from the sale of CEL.

41.     All CEL tokens were fungible with each other, meaning that buying one unit of

one CEL token did not entitle investors to any separately managed accounts. Instead, all CEL

tokens changed in price together, such that an investor's returns were directly proportional to the

amount of CEL purchased.

42.     Accredited investors in the United States could purchase and sell CEL directly

from and to Celsius through the company's over-the-counter desk ("OTC"). Investors were later

able to buy and sell CEL on the secondary market through various crypto asset trading platforms,

and they did so.

43.     According to Celsius's OTC Policies and Procedures, "To comply with CEL

tokens status as a security with the SEC, all US purchases via OTC must be locked for 1-year

within their wallet immediately after settlement."

44.     The price of CEL fluctuated significantly over time, ranging from a low of $0.03

per token in January 2019 to a high of $8.02 per token in June 2021.

45.     Since the founding of Celsius, CEL played a critical role in the company. In a

March 2018 white paper, Celsius described CEL as "the backbone of the Celsius Network."

CEL was a token that unlocked discounts and features on Celsius's platform, such that the

greater the number of people who wanted to use the platform, the higher the demand would be

for CEL.

46.     On March 8, 2018, Mashinsky further explained in a livestreamed event: "We are

focused on enabling the community, on creating a large community because everything we do is

measured by the [CEL] token." Mashinsky went on to say: "The token price goes up, our entire

compensation is the token. So our job is to do everything we can to increase the price of the

token as long as it's in the best interest of the community."

47.     Mashinsky also publicly described the price of CEL as a measure "of the

profitability or how well is Celsius doing." In other words, the price of CEL would increase

when Celsius successfully attracted more users, and the price of CEL would decrease when the

demand for Celsius's investment services declined.

48.     Consistent with their public statements, Mashinsky and others at Celsius viewed

CEL as comparable to stock in a public company. Mashinsky wrote in an internal message that

he wanted "to be able to talk about CEL just like public companies talk about their stock."

49.     The fortunes of CEL purchasers were tied to one another, as well as to Celsius's

and Mashinsky's fortunes with respect to CEL. Mashinsky and other Celsius executives

received CEL as part of the ICO and as part of their compensation. Celsius's founders were

allocated over 100 million CEL, and compensation for Mashinsky and Celsius's employees was

partially tied to the price of CEL, with bonuses triggering when CEL reached certain price

thresholds. As a result, the better CEL performed, the more Mashinsky and Celsius employees

benefitted financially as well.

50.     In fact, Celsius was the largest holder of CEL, and the company controlled over

half the supply of available CEL through its corporate Treasury. After Celsius, Mashinsky was

the second largest holder of CEL.

51.     Celsius controlled how funds received from the sale of CEL were used. Celsius

pooled proceeds from the sale of CEL, both in the ICO and in later CEL sales, for general use in

its business, including funding the development of its infrastructure and related capital costs.

52.     Celsius and Mashinsky publicly promoted CEL as an investment on which

investors could profit based on Celsius's efforts. The company's white paper touted that

investors could earn interest and rewards by purchasing CEL. Celsius and Mashinsky also

marketed CEL as a profitable asset growing in value. On Twitter, they advertised the percentage

11

price increase in CEL. Celsius also publicized whenever CEL was listed on a new crypto asset

trading platform where it could be traded for other assets.

53.    Celsius also publicized the profitability of CEL based on its management team's

efforts—tying CEL's price to Celsius's success. The white paper highlighted the management

team's entrepreneurial experience and success in creating profitable businesses.

54.    Mashinsky similarly publicly emphasized the profitability of CEL based on the

efforts of Celsius and its management team, saying in a January 12, 2022 livestream event:

> We believe that the token has not shown its full potential yet. A lot of it is on us . . . we
> are launching big things this year, and obviously these things are going to have major,
> major impact on the price of CEL.

55.    Celsius and Mashinsky also publicly touted how much investors could earn by

investing in CEL (e.g., "CEL is earning 5.25% APR"). They also encouraged investors to

purchase and hold onto CEL with the expectation that its value would increase, using marketing

phrases like "HODL" (an acronym used in the crypto industry meaning "hold on for dear life")

and "to the moon" (a reference to a rising price).

56.    Celsius also touted on its website the "higher earning rates" investors could earn:



12

57.     Mashinsky also regularly highlighted the financial performance of CEL, including tweeting links to performance charts and news articles, while noting the increase in CEL's price.

58.     For example, in June 2020, Mashinsky tweeted that CEL had increased in value by 364% during the last three months and it was at an all-time high.  In December 2021, Mashinsky tweeted:  "CEL Rallies by 15% Following Celsius Network's Latest Award."  He included a link to an article touting the increase in the price of CEL during that month.

59.     In other words, Defendants told investors they would earn returns as a result of the company's efforts by the price of CEL increasing and through interest payments.

**B.     Celsius's Earn Interest Program**

60.     From around June 2018 until it paused withdrawals in June 2022, Celsius offered and sold interests in the Earn Interest Program to investors in the United States and elsewhere.

61.     To invest in the Earn Interest Program, investors tendered crypto assets to Celsius in exchange for Celsius's promise to provide investors periodic interest payments proportional to their investments in the program.  Celsius called these interest payments "rewards."

62.     The crypto assets tendered to Celsius through the Earn Interest Program were not subject to a lock-up period and investors could retrieve their assets from Celsius on demand.

63.     The investor assets tendered to Celsius through the Earn Interest Program were for the company's general use in its business, which produced income for Celsius and which Celsius indicated would generate returns for its investors.

64.     Celsius pooled the assets received from investors in the Earn Interest Program together with other Celsius assets and exercised full discretion and control over how the pooled assets were used.  Celsius deployed the assets it received through the Earn Interest Program into the same revenue-generating activities (e.g., lending), and the company paid returns to investors

in the Earn Interest Program on a *pro rata* basis on their investment.

65.     The Terms of Use for Celsius provided the following:

ALL DIGITAL ASSETS TRANSFERRED TO CELSIUS AS PART OF THE
SERVICES ARE OWNED AND HELD BY CELSIUS FOR ITS OWN ACOUNT
. . . AND UNDER NO CIRCUMSTANCES DOES CELSIUS HOLD ITS
DIGITAL ASSETS ON YOUR BEHALF AS PART OF THE SERVICES.

66.     Celsius's Terms of Use also contained the following disclosure:

We may lend, sell, pledge, hypothecate, assign, invest, use, commingle or otherwise
dispose of assets and Eligible Digital Assets to counterparties or hold the Eligible
Digital Assets with counterparties, and we will use our best commercial and
operational efforts to prevent losses.

67.     Celsius marketed the Earn Interest Program to U.S. investors through general

solicitations on the company's website, mobile application, and on social media sites.

68.     Celsius publicized that investing in the Earn Interest Program was easy and a

passive way for investors to earn returns.

69.     In response to a CNBC reporter's question about whether it was "difficult" for a

"regular investor" to invest in the Earn Interest Program, Mashinsky stated:  "No, it's pretty

simple.  You download the Celsius Network app or you can also register on our website.  And

you have to move over your crypto assets.  We only accept crypto assets.  And you earn yield

automatically."  Mashinsky went on to say:  "You don't have to do anything.  All you do is you

put the assets in and every Monday you get yield in your account.  You don't have to do

[anything], we do all the hard work."

70.     Celsius promoted the Earn Interest Program as a profit-making opportunity,

including emails with phrases like "Pour Yourself a Cup of Profits" and "Profits in your Pocket."

71.     Mashinsky also marketed the Earn Interest Program through frequent social media

postings on his Twitter account and in livestreamed personal appearances.

14

72.    On its website, Celsius promised investors returns of up to 17% on the crypto

assets they invested in the Earn Interest Program:



73.    Celsius specifically invited investors to expect that any profits earned would come

from Celsius's efforts, stating on its website:  "The Celsius finance team generates returns for

our community by lending out our community's digital assets to institutional and retail

borrowers.  We aim to return up to 80% of the revenues made from lending out our community's

assets back to our community on a weekly basis.  Due to the rate of returns we can achieve in the

lending market change nearly every day [sic], we adjust the rates that our community earns on

their digital assets on a weekly basis."

74.    Celsius also wrote on its website:  "Weekly rewards are calculated every Friday at

05:00:00 UTC, according to prices at that moment.  That means that our rates change on a

weekly basis depending on the current market conditions."

75. Celsius emphasized on its website that up to 80% of the company's revenue is paid back to investors:



76. Mashinsky elaborated on the concept that investor returns would come from Celsius's managerial and entrepreneurial efforts in an online interview with Forbes on May 4, 2020, that was posted to Celsius's website: "Celsius Network goes out to find the best yield for your asset with the lowest risk and then delivers 80% of the value created back to the user[.]" Mashinsky went on to say: "I turn back the majority of my profits to my depositors" and "we share 80% of these revenues with our customers."

77. Mashinsky similarly stated in an interview posted on YouTube on April 13, 2022: "[W]e give most of the profits or most of the yield back to the community. So Celsius, as an example, has paid the community over $1 billion in yield."

78. In other words, the more revenue Celsius generated from investor funds though its managerial efforts, the greater the returns would be for investors in the Earn Interest Program.

79. Celsius accepted crypto assets from any investor willing to sign up for the Earn Interest Program.

80.     The high returns Celsius promised made the Earn Interest Program attractive to retail investors.  In a March 18, 2020 interview with Cointelegraph, Mashinsky noted that "about 90% of the deposits come from the retail clients."

81.     The value of crypto assets that investors invested in the Earn Interest Program is staggering.  As of August 22, 2021, Earn Interest Program balances equaled more than $13 billion.

82.     Celsius and Mashinsky never filed a registration statement or had one in effect with the SEC for their offers and sales of securities through the Earn Interest Program.

83.     Celsius's public disclosures regarding the Earn Interest Program contained limited or inadequate information about Celsius's operations, financial condition, liquidity, and other factors relevant in considering whether to invest in the Earn Interest Program.

## III.    Defendants Defrauded Investors Who Invested in CEL or in the Earn Interest Program

84.     Celsius told the investing public that it generated revenue to pay investors by lending the "community's assets to safe institutions looking to borrow coins."  Celsius also emphasized that its Earn Interest Program was a way for retail investors to obtain "high yield at a low risk."

85.     The reality was much different.  Celsius and Mashinsky deployed investor assets in a variety of ways—many of which were much riskier than institutional lending—including directional trading (trading that bets on the value of an asset or security going up or down), providing liquidity on certain so-called DeFi platforms, staking crypto assets with respect to certain blockchain protocols, and funding crypto asset mining activities.

86.     Celsius needed and relied upon revenue generated from these activities to fund interest payments to investors in the Earn Interest Program and to generate income for the

17

company such that the riskier these activities, the riskier the Earn Interest Program investment became to unknowing investors.

87.     At the same time, Celsius and Mashinsky engaged in a concerted campaign to persuade investors to purchase CEL and invest in the Earn Interest Program.

88.     Celsius and Mashinsky frequently posted information on social media sites such as Twitter, Facebook, and Instagram, as well as on other online platforms like LinkedIn.

89.     Mashinsky also communicated regularly with the investing public through weekly livestreamed events called "Ask Mashinsky Anything" ("AMAs").  Each of these so-called AMA events was viewed, on average, by a thousand to several thousand individuals.

90.     Celsius would then upload a recording of each AMA episode onto YouTube, where an additional ten to fifteen thousand viewers, on average, watched the AMA.

91.     Mashinsky began regularly holding these AMAs in April 2020, and they continued until June 2022.

92.     Celsius and Mashinsky marketed the AMAs extensively on social media channels, and Mashinsky and others at Celsius viewed these episodes as a key way to obtain and retain investors in CEL and the Earn Interest Program.

93.     The AMAs were effective at reaching a large audience, but they also frequently included false or misleading statements, including many of the statements discussed below.

94.     By around May 2021, Mashinsky's public misrepresentations about CEL and the Earn Interest Program were so pervasive and, as Celsius employees recognized, so problematic that Celsius put in place a process to remove certain statements from the AMA episodes before they were posted on Celsius's YouTube channel.  This editing process (the "AMA Editing Process") occurred, however, only after the videos had aired live.

18

95.     Celsius did not publicly correct the false or misleading statements for those who

watched the live AMAs, nor did it disclose that this editing process existed.  In addition, the

AMA Editing Process was limited to contemporaneous AMAs produced and livestreamed by

Celsius.  The company did not have the ability to edit other statements Mashinsky made to the

public via third parties, including Twitter Spaces or news outlets.

96.     Although Mashinsky was not directly involved in the AMA Editing Process, he

was aware that it existed, and Celsius employees told him that certain statements he made during

the AMAs were not accurate.

### A.     Defendants Misrepresented Celsius's Central Business Model and the Risks to Investors

97.     Celsius and Mashinsky repeatedly promoted Celsius as a community-based

company focused on a simple and safe business model.  In reality, their representations about

core aspects of Celsius's business were materially false and misleading.

### 1.     Celsius and Mashinsky Falsely Represented That Celsius Did Not Make Uncollateralized Loans with Investor Assets

98.     A central tenet of Celsius's promotion of its business was that it did not make

uncollateralized loans when deploying investor funds from the Earn Interest Program.  Celsius

and Mashinsky made this representation frequently and in numerous different outlets.  For

example, in a November 26, 2019 livestreamed event, Mashinsky said:  "I can tell you there are

other lenders in the market who lend with no collateral or lend to anybody.  Good.  Good for

them.  We will never do that."

99.     Mashinsky made the same false claim in a March 13, 2020 "Crypto Market

Commentary with Alex Mashinsky" video:  "Credit goes to the Finance Department, Credit Risk

management for not lending to risky institutions or risky hedge funds.  We stick with the highest

quality, we don't do non-collateralized loans, we always have collateral."

100.    In an April 14, 2020 video, Mashinsky similarly stated:  "For us, I mean, we are –

there are crazy guys out there that lend with no collateral.  We don't do that, so, we have very

tight controls."

101.    Mashinsky also reiterated the point in a July 17, 2020 AMA:  "Celsius does not

do non-collateralized loans" because "that would be taking too much risk on [customers']

behalf."

102.    Mashinsky continued making similar false statements through 2022.  In a January

7, 2022 interview with RealVision Finance, Mashinsky stated:  "We don't do uncollateralized

lending . . . . Obviously, we only do asset backed lending."  Mashinsky reiterated in an April 13,

2022 interview with CNBC:  "[W]e do not offer any non-collateralized loans."

103.    In reality, despite the numerous public assurances to the contrary, Celsius made

many uncollateralized institutional loans totaling millions of dollars.  In fact, in November 2019,

Celsius had more than $17 million in uncollateralized institutional loans.

104.    Throughout 2020, the percentage of Celsius's institutional loan book that was

uncollateralized consistently increased.  It went from 16.27% in the first quarter to 26.4% in the

second quarter.  By the third quarter, 28.4% of Celsius's institutional loans were

uncollateralized, and by the fourth quarter the percentage had increased to 31.33%.

105.    By the second quarter of 2021, the percentage of uncollateralized institutional

loans held by Celsius had ballooned to 38%.  These loans totaled approximately $531 million in

value.

20

106.    By 2022, Celsius's uncollateralized institutional loans ranged from $1.3 billion to $1.96 billion in value and accounted for 34-48% of the company's entire institutional loan portfolio.

107.    Mashinsky knew that Celsius had uncollateralized loans throughout this time period—including when he was publicly stating otherwise.  For example, beginning in 2020, Celsius's Risk Committee, of which Mashinsky was a member, held regular weekly or bi-weekly meetings in which high-level Celsius executives reviewed the loan portfolio, including the percentages of the portfolio that were uncollateralized.

108.    In addition to the information discussed at regular Risk Committee meetings, there were internal discussions about the falsity of Mashinsky's public statements regarding collateralized loans.  In an exchange on the messaging application Slack, a Celsius executive told a senior employee at the company:  "I just told [Mashinsky] that the number [of unsecured loans] is increasing and the overall ratio of collateral with institutions is going down. . . . I will talk to him.  I said this numerous times."  The executive's message was prompted by a false statement Mashinsky had made about the company's loan portfolio in a November 6, 2020 AMA.

109.    By the spring of 2021, Celsius executives identified false statements about collateralized loans as part of the AMA Editing Process.  The AMA Editing Process began just after an April 30, 2021 AMA in which a Celsius employee falsely stated, "So I would say a majority of our loans, almost 100% of them are fully collateralized, with other assets right."  A Celsius executive later told Mashinsky in an email, "I think the april 30th AMA video needs to be removed until the changes have been made," citing this misrepresentation.

110.    Nevertheless, two weeks later, at a May 14, 2021 AMA, Mashinsky echoed the April 30 misstatement by saying:  "These loans are collateralized.  This means the institutions

give Celsius assets or dollars to hold onto before we give out the digital assets.  This protects the community and keeps them whole."

111.    Mashinsky's May 14 statement was deleted as part of the AMA Editing Process, at the direction of a Celsius executive.  That executive recognized the falsity of Mashinsky's public statement and noted:  "It is crucial to: delete this section of the AMA, AND remove the curated video explanation from EVERYPLACE on the internet."

112.    Mashinsky continued making similar false statements up until the time that Celsius halted withdrawals in 2022, despite having regularly attended Risk Committee meetings that discussed the large number and percentage of Celsius's unsecured institutional loans.

### 2.    Celsius and Mashinsky Falsely Represented That Celsius Did Not Engage in Directional Trading

113.    Additionally, Mashinsky and Celsius made several false statements regarding the company's trading activities.  As an example, Mashinsky tweeted on September 29, 2020, "Celsius does not trade or take long or short positions with customer coins."

114.    In reality, Celsius engaged in risky directional trading (trading that bets on the value of an asset or security going up or down) that led to large undisclosed losses for the company.

115.    For instance, in 2019, Mashinsky shorted the crypto asset Bitcoin (BTC) on behalf of Celsius and using Celsius investor funds.  A senior executive at Celsius ultimately unwound the positions, which resulted in a $15 million loss for the company.  It also, in part, led Celsius to create a "Recovery Committee," which contemplated liquidating or selling Celsius to cover the loss.  Celsius's financial condition only stabilized after a $20 million capital raise in August 2020.

EXHIBIT A

116.    In 2021, Mashinsky and Celsius continued falsely to represent that the company did not engage in directional trading.  For example, in a July 31, 2021 interview with a crypto asset news outlet, Mashinsky said:  "Celsius does not bet on assets.  It's not like we invest in Bitcoin and hope it's going to go up.  Our job is to create yield, to create interest."

117.    Contrary to Mashinsky's statement, Celsius was engaged in directional trading in Bitcoin (BTC) and another crypto asset called Ether (ETH), sometimes following instructions provided by Mashinsky himself.

118.    As an internal Celsius document dated February 2, 2022 explained:  "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk.  It was presented and discussed in ExCo, ALCO, and R[isk] C[ommittee] and there is extensive supporting evidence."

119.    A Celsius employee even told Mashinsky in a private message on January 24, 2022:  "Hi Alex – on our call last evening, I agreed with reducing the directional trades, but we've effectively replaced them with another set of directional trades, so I want to share with you that I have concerns with the approach we're taking."

120.    Despite Mashinsky's knowledge of and involvement in directional trading, he continued falsely to state publicly that Celsius did not engage in directional trading.  For instance, Mashinsky stated in a December 31, 2021 AMA:  "We don't trade. We only earn yield on top of—we stick to—we don't trade around positions.  We don't buy and sell Bitcoin.  We don't do any of those things that people think will do better than the index."

121.    In response to that statement, a Celsius executive noted internally that Mashinsky's statement that the company does not engage in directional trading was "false."

23

122.    In an April 13, 2022 CNBC interview, Mashinsky again falsely stated:  "We are
what you call a delta-neutral strategy . . . .  Celsius doesn't bet on the market going up or down."

123.    One of Celsius's Account Managers made a similar false statement in a May 27,
2022 AMA.  A Celsius executive responded internally:  "This is untrue and misrepresents
material risk factors associated with yield accounts."

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had No Leverage

124.    Celsius and Mashinsky also falsely stated that the company had no leverage.  In
general, leverage is a ratio used to measure the amount of debt a company has relative to its
capital.  Mashinsky compared Celsius favorably to banks, which he characterized as having
significant leverage.

125.    At least one Celsius executive attempted to get Mashinsky to stop saying that the
company did not have leverage.  The executive told Mashinsky to avoid making such statements
and provided Mashinsky with data demonstrating that Celsius had leverage in similar ratios as
banks.

126.    Nevertheless, Mashinsky continued to state publicly that Celsius did not have
leverage.  For example, in a February 22, 2022, Twitter Spaces interview, Mashinsky stated:

> Oh, yeah, we don't have leverage . . . . Banks are leveraged on average, either 10
> times or 20 times depending on the balance sheet.  And Celsius doesn't have any
> leverage, right? I mean, we, we have a little bit of leverage, because we sometimes
> lend out the collateral we get from third parties.  So it's maybe again, instead of
> 1.0, it's 1.2 or something like that.

127.    Mashinsky's statement was identified by Celsius employees as part of the AMA
Editing Process as among "a selection of recent misrepresentations made by Alex [Mashinsky]
and other Celsius reps on Twitter Spaces AMAs."

128.    As late as May 27, 2022, just weeks before Celsius halted investor withdrawals, Mashinsky falsely claimed that "we don't offer any leverage, and we don't let you even if you want to inside our app."  This statement was also identified as "incorrect" as part of the AMA Editing Process.

### 4.    Celsius and Mashinsky Falsely Represented That 80% of Celsius's Revenue Is Returned to Investors

129.    Celsius and Mashinsky repeatedly represented that Celsius paid 80% of its revenue back to investors.

130.    Beginning as early as March 7, 2019, Mashinsky made this promise in an interview with NASDAQ:  "Celsius network enables you to lend them to someone else, and you get to keep 80%."

131.    From March 2019 through early 2022, Celsius and Mashinsky consistently stated that Celsius gave 80% of the company's revenue back to investors in the form of interest.

132.    For example, on September 19, 2019, Celsius tweeted:  "Our rates are funded by our own revenue - 80% of our total revenue goes back to our depositors as weekly interest income payments."

133.    Mashinsky made the same claim in an AMA on May 15, 2020:  "We have to earn the money, give you 80%, and use the 20% to deliver everything you're asking from us every day."

134.    Celsius reiterated the claim as well in a tweet on April 27, 2021:  "How is it possible that we offer up to 7% APY on crypto, asks @CNBC.  The answer is simple:  we give 80% of our revenue back to the community.  #UnbankYourself."

135.    These representations were false.  Celsius paid investors in the Earn Interest Program an interest rate that was rarely, if ever, tied to the revenue received by the company or

its performance.  Prior to July 2021, Celsius did not even have a formal policy on setting the interest rates paid to Earn Interest Program investors.

136.    Mashinsky and other executives at Celsius feared losing investors as a result of the company lowering the interest rates it paid participants in the Earn Interest Program.  As a result, Celsius largely set its interest rates in order to attract and retain investors rather than the basing them on the returns it was able to receive from its business activities.

137.    Contrary to Defendants' many representations that 80% of revenue is paid to investors, Celsius consistently paid out *more* in interest than the company generated in revenue.

138.    Despite the publicized growth of the company, Celsius did not experience a meaningful period of profitability during the 2018 through 2022 time period.

139.    This fact was well-known to Celsius executives, including Mashinsky.  For example, in February 2021, Celsius's CFO sent Mashinsky a financial document showing that for 2020, Celsius paid out $45.7 million in interest (called "rewards") but generated only $42.7 million in income.  In other words, more than 100% of Celsius's revenue in 2020 went to pay purported interest to investors.

140.    In 2021, Celsius paid 23% more in interest to investors in the Earn Interest Program than it generated in revenue.

141.    Mashinsky and Celsius's senior leadership were aware that the company's payout ratio was above 100%, with one executive noting Celsius was "basically using user balances to pay user rewards."

142.    In July 2021, Celsius implemented a formal policy on setting interest rates.  Even under that policy, however, the interest rate that Celsius paid to investors in the Earn Interest Program was not directly tied to the company's revenue.

EXHIBIT A

143.    Mashinsky knew of the policy and that the purported interest payments to investors in the Earn Interest Program did not represent 80% of the company's revenue.

144.    Even after the formal policy was instituted, and in the face of clear information about the disparity between revenue earned and interest payouts, Mashinsky continued to claim falsely that the company was paying 80% of its revenue back to investors.

145.    Celsius's unsustainable and undisclosed practice of paying more than 80% of its revenue back to investors had the effect of making the company's operations appear more stable and profitable than they really were.

**B.    Defendants Misrepresented Celsius's Financial Success**

146.    From the time of the CEL ICO in March 2018 until days before Celsius halted customer withdrawals off its platform, Celsius and Mashinsky publicly misrepresented significant financial events and the financial condition of the company.

**1.    Celsius and Mashinsky Falsely Represented the Amount Raised by the CEL ICO**

147.    Celsius falsely stated on numerous occasions that the CEL ICO was fully subscribed at $50 million, when in fact only approximately $32 million had been sold.

148.    Even before the ICO had closed, Celsius began falsely to claim success, announcing in March 2018:  "We're excited to announce that we've raised over $42 million of our $50 million hard cap."

149.    Mashinsky falsely claimed in a May 17, 2018 YouTube interview that the CEL ICO was fully subscribed:  "We just closed our [ICO] round about a month ago, we raised $50 million."  In a July 25, 2018 Coin Central interview, Mashinsky similarly claimed:  "[I]t's funny because our ICO raised over $50 million."

150.    These misrepresentations continued until March 2019, when Mashinsky falsely stated in a March 13, 2019 YouTube video:  "We did an ICO, we raised $52 million in March."

151.    The fact that the CEL ICO fell short of its goal of $50 million and raised only $32 million was well-known to Mashinsky and other Celsius executives at the time they made the misrepresentations.

152.    Indeed, Celsius and Mashinsky sought to conceal the fact that the CEL ICO was not fully funded at $50 million.  On March 29, 2018, shortly after the CEL ICO closed, Mashinsky agreed to purchase the 117 million unsold CEL (worth $18 million) himself, entering into a token sale agreement with Celsius through a company in his name called AM Ventures Holdings, Inc.

153.    The token sale agreement between Celsius and Mashinsky and the sale of CEL to Mashinsky were not disclosed to investors and Mashinsky continued to state publicly that Celsius had raised $50 million.  In addition, the sale was never completed, Mashinsky never purchased the CEL or provided the $18 million to Celsius, and the unsold CEL remained in Celsius's possession.

154.    Celsius employees were aware that the representations about the ICO being fully funded were false, and that Celsius investors would care about this misrepresentation.

155.    In a March 1, 2019 internal communication, a Celsius employee stated:  "The public believes that the ICO was fully funded and all tokens purchased.  If they find out now that there were unsold they will be upset."

156.    Likewise, in a June 3, 2020 Slack exchange, Celsius employees discussed whether the unsold CEL should be moved back into the Celsius Treasury where it would be visible to Celsius investors.  When asked whether Celsius investors would care, one of the employees

responded: "Yes, they would absolutely care . . . ou[r] 117M from old ICO stake into the Treasury would change the whole structure of how the ICO was designed—the community would be very angry."

157.    At least one Celsius executive admonished Mashinsky, telling him to stop misrepresenting the amount of CEL sold during the ICO.  In an attempt to prevent Mashinsky from making a misrepresentation about a different capital raise, the executive wrote to Mashinsky on July 23, 2020:  "This mistake was already made by us after the ICO (we didn't raise $50M but we claimed we did.)."  The executive wrote about Mashinsky's false statements to another executive:  "I need your help in making sure he [Mashinsky] doesn't continue saying wrong things.  This has gotten us into trouble time and time again and it's not healthy."

### 2.    Celsius and Mashinsky Falsely Represented the Number of Active Users on Celsius's Platform

158.    Celsius and Mashinsky falsely touted the number of users on the company's platform as another indicator of Celsius's purported success.

159.    Celsius generated, and Mashinsky received, internal data on a weekly basis that showed the number of investors using Celsius's platform.  According to Celsius's own data, in July 2021, the cumulative number of users who had invested crypto assets with Celsius since the Earn Interest Program launched three years earlier was between 200,000 and 300,000 users.

160.    Despite the company's own data, Mashinsky stated in a July 31, 2021 interview with a crypto asset news outlet:  "Today, there are 50 or so companies that are copying what Celsius has created, which is great. . . . But Celsius is by far the largest leader, with over US$15 billion in assets, and close to a million customers are earning yield on our platform."

161.    In an April 13, 2022 interview with CNBC, Mashinsky falsely claimed:  "We aggregate 1.7 million users, right, pool them together . . . ."

29

162.    In a May 13, 2022 AMA, Mashinsky again falsely stated:  "We have millions of customers . . . ."

163.    An internal report dated May 28, 2022 that Mashinsky received showed that, contrary to his representations, only about 500,000 users had ever invested crypto assets with Celsius.

164.    Celsius employees marked Mashinsky's May 13, 2022 statement regarding the number of investors for removal as part of the AMA Editing Process because it was false.

### 3.    Celsius and Mashinsky Falsely Represented That Celsius Had Not Experienced Any Loan Defaults

165.    In 2021 and 2022, Mashinsky also falsely represented that Celsius had not experienced any defaults on the loans made by the company.  At the time he made these statements, Mashinsky and other Celsius executives knew the statements were false.

166.    For example, Mashinsky stated in a July 31, 2021 interview with an online news outlet:  "So, in Celsius we have 350 institutional counterparties.  None of them defaulted on a loan. . . .  We had thousands of margin calls but none of our counterparties has defaulted."

167.    Similarly, in an October 15, 2021 AMA, Mashinsky said:  "[A]mazingly after four years, we've never had an institution who took a loan from us that did not pay back . . . ."

168.    Mashinsky repeated the false representation again in a November 12, 2021 AMA:  "In four years we have not had a single institution default either not pay the interest or not return the collateral or the . . . coins that we lent them."

169.    In a January 7, 2022 Real Vision interview, Mashinsky reiterated:  "We had tens of thousands of margin calls but not a single counterparty defaulted, uh, on their loans.  So, we only lend to really responsible institutions."

170.    Mashinsky knew before making these statements that Celsius had experienced defaults by institutional borrowers totaling millions of dollars.

171.    In February 2021, Mashinsky and a Celsius executive discussed over email the default involving an institutional borrower, with Mashinsky commenting:  "It used to be a $3m problem now it is a $17m problem . . . .  We were supposed to get 200 BTC back.  Never happened."

172.    In 2021, a Celsius executive asked Mashinsky to stop saying that Celsius never had an institutional loan default because such statements were not accurate.

173.    The fact that Celsius had experienced institutional defaults was also discussed at Celsius's internal ALCO meetings, which Mashinsky regularly attended.  At a July 14, 2021 ALCO meeting, for example, the company identified "bad debts," including failed loans to two institutional borrowers.

174.    As of June 23, 2022, the net value of Celsius's loan defaults was approximately $208 million.

**4.      Celsius and Mashinsky Falsely Represented Celsius's Financial Condition During the Spring 2022 Crypto Asset Crash**

175.    Between May 7 and 9, 2022, certain crypto assets offered by another company experienced a sharp decline in value.

176.    At that time, Celsius sought to reassure its investors by making a number of public statements about the company's healthy financial condition.

177.    On May 11, 2022, Celsius released the following statement on Twitter: "As part of our responsibility to serve our community, @CelsiusNetwork implemented and abides by robust risk management frameworks to ensure the safety and security of assets on our platform. All user funds are safe.  We continue to be open for business as usual."

31

178.    On the same day, Mashinsky similarly tweeted that "Celsius has not experienced any significant losses and all funds are safe."

179.    In reality, Celsius was in dire financial shape even before May 2022.  Contrary to the company's and Mashinsky's public statements of reassurance, Mashinsky and other company executives were communicating internally about the significant financial losses Celsius was experiencing.

180.    On April 26, 2022, Mashinsky and two other senior executives at Celsius communicated internally about the significant financial losses Celsius was suffering.

181.    One of the senior executives stated:  "While none of us want to incur any more large losses, we are hemorrhaging $7.5mm pre-tax losses each week.  We need to figure out how to scale up our deployment efforts."

182.    On May 2, 2022, Mashinsky and other senior executives attended a Celsius Board meeting in which they discussed Celsius's significant financial losses and struggling business model.  The presentation for that meeting showed overall pre-tax losses of $811 million for 2021 and $165 million in losses in the first quarter of 2022.

183.    On May 9, 2022, just two days before Celsius and Mashinsky released their reassuring statements on Twitter, a Celsius executive called the company a "sinking ship."

184.    On May 12 and 25, 2022, that same Celsius executive wrote in Slack exchanges that "there is no hope . . . there is no plan," and that Celsius's business model "is fundamentally broken."

185.    Another employee bluntly stated in an internal message on May 21, 2022:  "We don't have any profitable services."

186.    Mashinsky knew Celsius's continued viability was in doubt.  A Celsius executive told Mashinsky in a May 25, 2022 message:  "[W]e will continue to dig a deeper hole for many months – and the asset/liability gap is much more severe now with lower balances."

187.    Despite understanding that Celsius's financial condition was bleak, Celsius and Mashinsky continued falsely describing the company as having a strong financial condition and outlook.

188.    On June 1, 2022, Mashinsky participated in an interview segment titled, "What's up with Celsius?" and again made several statements that sought to reassure Celsius's investors. Mashinsky stated:

> Yes, so not just that they [investors' assets] are safe, but we provided anyone that wanted to withdraw, partially or fully, there were no problems. . . .  No other exposure that I know . . . . Celsius continues to do what it did for the last five years. . . . Our community is resilient.  We have billions of dollars in liquidity.

189.    On June 7, 2022, Celsius posted a blog post entitled, "Damn the Torpedoes, Full Speed Ahead."  In this blog, Celsius referenced "misinformation and confusion" around Celsius, and claimed that the company "remain[s] deeply optimistic about the future."

190.    Just days before the June 7 blog post, however, a "business outlook" presentation was circulated among Celsius executives, including Mashinsky, that reflected Celsius's true financial state and grim future outlook.

191.    The presentation started out:  "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints.  The current business model is not financially sustainable."

192.    The presentation also noted the need for a $1 billion capital raise.

193.    On June 10, 2022, Mashinsky continued to reassure investors in an AMA: "Celsius has billions in liquidity, right, and we provide immediate access [to] anyone who needs

access to it, to the liquidity.  That includes institutions and people that want to get their loans

back and people who are taking loans."

194.     Contrary to Mashinsky's assurances, Celsius's own historical liquidity model

showed significant liquidity issues with Ether (ETH) and Bitcoin (BTC).

195.     In the days leading up to the June 10 AMA, including on the very same day,

Mashinsky and another Celsius executive actively discussed last resort options to save the

company.  These options included possibly selling Celsius to another large crypto company or

getting a high interest rate loan from that company.

196.     When Mashinsky expressed hesitation about engaging with the other company,

the Celsius executive responded:  "Don't think we have that luxury."

197.     Mashinsky privately acknowledged, "CEL continues to crash.  If we don't do

anything we will have massive withdrawals."

198.     Two days after Mashinsky's June 10 AMA, Celsius halted customer withdrawals

from its platform.

**C.     Defendants Misrepresented the Safety of Customer Assets on Celsius's
Platform**

199.     Celsius and Mashinsky also made many false representations regarding the

overall safety of assets deposited by investors on the company's platform, examples of which

appear below.

**1.     Celsius and Mashinsky Falsely Touted Celsius's Regulatory
Compliance**

200.     In 2021 and 2022, Mashinsky falsely touted Celsius's regulatory compliance to

reassure investors that investing in CEL and the Earn Interest Program was safe.

201.    For example, during a December 1, 2021 interview with KITCO News in Florida, Mashinsky misrepresented that "states and other regulators have looked into Celsius, they all came back thumbs up, there's no problem, we didn't find anything . . . ."

202.    In a December 12, 2021 article with Barron's Online, Mashinsky was quoted as saying:  "The regulators looked into us and said these guys know what they're doing."

203.    On April 15, 2022, Mashinsky made another statement on regulatory compliance in an AMA:  "Here's clarity from different regulators, both from states and federal regulators, telling you the user that there's no issue, there's no legal issues at least with what Celsius provides."

204.    Mashinsky had no basis to make these statements.

205.    In fact, in May 2021, several state securities regulators contacted Celsius regarding concerns about the unregistered securities offering of the Earn Interest Program.

206.    These regulatory activities were known within Celsius.  An October 7, 2021 email from a senior Celsius executive to all Celsius employees, including Mashinsky, even explained that Celsius had received requests for information from several state regulators.

### 2.    Celsius and Mashinsky Misrepresented That Investors' Assets Were Insured

207.    Celsius and Mashinsky also misled investors by assuring them assets invested with Celsius were safe by falsely telling investors that their assets were insured.

208.    In an April 8, 2022 AMA, Mashinsky stated:  "The highest insurance in the industry right? 750 million, right? . . . highest level security, highest level insurance, together with Celsius highest yield in the market, and that's like win-win for everybody."

209.    Contrary to Mashinsky's statement, Celsius did not have an insurance policy for investors' crypto assets.

210.    In fact, the FAQs on the Celsius website in this time period stated, "Celsius does not have an insurance policy.  Fireblocks, our custodian, provides insurance on digital assets held by Celsius.  However, we generate interest rewards by deploying assets. When these assets are out of Celsius's control, they can't be insured by such insurance."

211.    The Celsius Terms of Use, as of April 8, 2022, further stated:  "[Y]our Celsius Account is not a checking or savings account, and it is not covered by insurance against losses."

## IV.    Defendants Manipulated the Market for CEL to Inflate the Value of Celsius and Induce Others to Buy CEL

### A.    As Part of an Ongoing "Buy Back" Program, Celsius and Mashinsky Purportedly Bought CEL to Fund Interest Payments to Investors

212.    Celsius and Mashinsky undertook a secret plan to increase artificially CEL's market price by buying more CEL than they were admitting publicly.

213.    In the summer of 2018, Celsius began purchasing CEL on the secondary market and used CEL it purchased to pay interest (or rewards) to investors who chose to earn their rewards in CEL.  In the AMAs and other public statements, Celsius and Mashinsky regularly described Celsius's CEL purchases as being tied specifically to CEL rewards payments.

214.    For example, Mashinsky stated:  "[J]ust in 2021, we purchased $421 million worth of CEL token . . .  Obviously most of this is . . . to pay the community, to pay the people who earn in CEL."

215.    In another example, Mashinsky stated:  "[T]he piece of how much we buy CEL has nothing to do with Celsius.  Celsius does not decide how many CEL tokens to buy, and then how many of them to burn [i.e., retire from circulation].  You guys decide."

216.    In reality, Celsius's CEL purchases greatly exceeded the purchases needed to make interest payments to investors, which Celsius and Mashinsky concealed from investors.

**B.      Celsius, at Mashinsky's Direction, Bought More CEL to Support the Price of CEL and Induce Additional Purchases of CEL**

217.    By the end of October 2019, the price of CEL had dropped to $0.05 per token, which was well below the $0.30 per token price from the ICO in early 2018.

218.    Celsius, at Mashinsky's direction, took action to support the price of CEL. Specifically, Celsius and Mashinsky wanted the CEL price to mirror Celsius's user and deposit activity.  In other words, if Celsius was growing in terms of users and deposits, then Celsius and Mashinsky wanted the price of CEL also to be increasing.

219.    Internally, Mashinsky was vocal about his desire for Celsius to do everything in its power to boost the price of CEL.

220.    In EXCO meetings, for example, Mashinsky frequently stated that Celsius had to get the price of CEL up.

221.    In one email, Mashinsky remarked that "[o]ur job is to protect CEL" and "the only way we loose [sic] if CEL price drops a lot and people get nervous and keep selling.  We can protect against that scenario."

222.    In November 2019, Celsius disclosed that it was performing a discrete buyback (that was limited in amount) outside the purchases the company needed to pay interest.

223.    In 2020, however, Celsius had developed a plan focused on increasing the price of CEL by expanding buybacks that the company did not disclose publicly.

224.    An internal memo stated as its "Main Thesis" to increase the price of CEL, "[w]e rise and fall with CEL" and that "[t]he more customer[s] use CEL & the more it's worth, the more worth we can extract out of it (for example using it for interest payments instead of our [c]ash)."

EXHIBIT A

225.    The internal memo described a plan to raise the price of CEL. The plan included "[v]alue based repurchase examples" in which Celsius would repurchase certain percentages of the CEL it sold via OTC "on a case to case basis dependent on our Cash Needs." The memo also detailed a plan that would give "value to CEL" through Celsius's increased trading activity:

- The more CEL we sell OTC
- The more CEL we can repurchase
- The more attractive CEL markets look like
- The more CEL buy orders we receive
- In the end: The more our Treasury is worth
- The less # of CEL we need to sell for the same $ value we want to raise with these OTC sales

226.    Significantly, the memo noted that implementing the proposed plan would cause "Official CEL Buybacks" (i.e., the ones that had previously been publicly disclosed) to "lose relevance" because "[e]very OTC sale of CEL is a potential 'Buyback like situation[s].'"

227.    Through the OTC desk, Celsius account holders could sell their CEL back to Celsius or purchase additional CEL. Because these transactions occurred on the Celsius platform, they were only reflected in internal records and not on the blockchain or to other users of the Celsius platform.

228.    In a May 14, 2020 email regarding "CEL OTC," Mashinsky provided specific instructions about the company buying additional CEL more quickly if the price of CEL fell lower.

229.    In response to Mashinsky's request, a Celsius employee proposed an approach that included keeping some of the proceeds from OTC sales for profit for Celsius, while using the remainder of the proceeds to support the price of CEL and replenish the company's Treasury. Under this proposal, Celsius would sell CEL via the non-public OTC desk, and use the proceeds to turn around and repurchase CEL via public means and boost its price. This plan also served,

38

as a Celsius employee wrote, to "support[] the CEL price[,] to stabilize CEL and make it even

more attractive for even more OTC buyer."

230.    Celsius's expansion of CEL purchases was significant both in terms of volume

and dollars.  Throughout 2020 and 2021, Celsius purchased far more CEL than was needed to

pay interest and far more than the additional buybacks it disclosed.  The company purchased

over $700 million worth of CEL (gross) but only used $160 million worth of CEL for interest

payments and to burn (i.e., retire from circulation).

231.    In fact, from May 2019 through July 2022, less than 50% of Celsius's purchases

of CEL on crypto asset platforms was used to fund interest payments to investors or burn.  That

percentage decreases when Celsius's OTC purchases are included.

232.    A Celsius employee regularly updated Mashinsky on the market for CEL and

Celsius's purchases and sales of CEL, but neither the company nor Mashinsky disclosed the full

extent and nature of these additional buybacks of CEL to investors.

233.    For example, on December 10, 2021, a Celsius employee informed Mashinsky

that in 2021, Celsius purchased 23 million CEL over what was needed to pay investors—

comprising nearly half of the company's CEL net purchases for the year.  Nevertheless,

Mashinsky continued stating publicly that Celsius's purchases of CEL were determined by the

amount of rewards the company owed to investors.

234.    In addition to engaging in undisclosed purchases, Celsius strategically structured

and timed its CEL purchases to have the greatest impact on the market.

235.    First, Celsius conducted its CEL transactions such that its purchases of CEL were

primarily through crypto asset trading platforms where the fact that CEL was actively being

purchased would be visible.  At the same time, Celsius concealed most of its sales through OTC

transactions via the Celsius platform that did not result in visible blockchain transactions.  This reflected Mashinsky's belief that buying in the market increased demand for CEL.

236.    Second, Celsius timed purchases of CEL to coincide with AMAs or news announcements, and the company sized its CEL purchases to maximize the price impact on CEL. As one Celsius employee described the process:  "when we start buying actively with good size & good timing we (the FED of CEL) made a huge positive impact."

237.    Celsius also went to great lengths to protect the price of CEL from falling. Among other things, the company used bots to monitor the price and utilized resting orders to prevent the price from dropping below certain thresholds.

238.    The plan to boost the price of CEL by Celsius and Mashinsky had the desired impact.  As Celsius increased its CEL purchases, the price of CEL increased.  From January 3, 2020 to December 31, 2021, CEL's price rose from $0.15 to $4.37.  This represented a 2,900% increase in the price of the crypto asset.

239.    Senior Celsius employees, including Mashinsky, knew that Celsius bought CEL in excess of interest payments to affect the price of CEL and attract more CEL buyers and Earn Interest Program investors.

240.    For example, in an email chain that included Mashinsky, a Celsius executive explained that "a big part of" Celsius's CEL purchases was "supporting the CEL market." Another Celsius employee similarly noted that Celsius purchasing CEL "supports the CEL price to stabilize CEL and make it even more attractive for even more OTC buyer[s]" and that "the more CEL drops the more we buy it back."  The Celsius employee also stated that "the higher" the price of CEL "the more people understand Celsius is a legit company and will get customers."

241.    Internally, Mashinsky directly expressed his desire to raise the price of CEL.  On October 30, 2021, in an internal message with a Celsius employee, Mashinsky stated:  "Every day we have all time record new users joining Celsius yet CEL [p]rice is going down."  He went on to write:  "The price will not take care of itself if everyone will just get scared and sell."

242.    The employee was equally direct in response:  "We're not just sitting and watching the price.  We're on it all week . . . .  The issue is that people are selling and no one is buying except for us.  The main problem was that the value was fake and was based on us spending millions (~\$8M a week and even more until February 2020) just to keep it where it is. This week we spent 'only' \$4M (on top of the rewards) and the price is still going down."

243.    Mashinsky understood that increasing the price of CEL was vital to attracting more investors.  He persisted in trying to develop strategies to inflate the price of CEL and wrote to a Celsius employee on October 30, 2021:  "Everyone knows what these tokens are and want to buy them because they think price is going up. . . . You saw that none of our announcements which had fundamentals like Burn or funding or investment in mining moved CEL so we need to change our tackticks [sic]."

244.    Others within Celsius also recognized that Celsius and Mashinsky were trying to prop up CEL.  As one employee succinctly stated in a Whatsapp message on December 21, 2021:  "we artificially create CEL volume."

245.    Artificially increasing the value of CEL helped Celsius and Mashinsky mask the company's financial difficulties and other failures.  For example, on August 10, 2021, Celsius estimated its net equity position as approximately \$1.02 billion when it included the CEL in its Treasury in the calculation.  Without the CEL in the company's Treasury, Celsius's net equity position was negative \$789 million—a swing of nearly \$1.8 billion.

41

### C.    Celsius and Mashinsky Concealed the Extent and Purpose of Celsius's Buybacks

246.    Despite public assurances of transparency, Celsius and Mashinsky concealed the company's plan of artificially boosting the price of CEL.

247.    As one Celsius employee stated in March 2021:  "The last 3-4 months we bought always more CEL than what we pay as interest per week but we did not buy it for the interest payments, that was just what we told the community."

248.    Another employee described one instance of Celsius buying CEL this way:  "It's like FBI.  The job we do is not to be noticed."

249.    At times, when Celsius was unable to make CEL purchases itself to boost the price, Mashinsky used his own accounts to purchase CEL in consultation with Celsius's traders.  In one such instance, an employee told Mashinsky, "you saved the day."

250.    Mashinsky knew the value of CEL was, as one employee stated, "fake" and was actually based on Celsius spending millions of dollars to maintain its price.

251.    Nevertheless, Mashinsky continued falsely to inform the investing public that Celsius's CEL purchases were to pay interest.

252.    Mashinsky made false statements such as Celsius's CEL purchases were "to pay the community" and Celsius buys CEL based on "how many people chose to earn in CEL."

253.    Mashinsky also falsely claimed in a March 19, 2021 AMA:  "It really comes down to how many buyers versus how many sellers. . . . So we obviously want CEL token to go higher in price but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that."

254.    Celsius's and Mashinsky's false statements led investors to believe incorrectly that the market reflected the fair price of CEL.  It did not.

### D.     Celsius and Mashinsky Benefited from the Artificially Inflated CEL Price

255.    Celsius and Mashinsky benefited financially from the inflated price of CEL.

256.    First, with an inflated price of CEL, Celsius was able to portray Celsius's financial position favorably, using the Treasury's CEL holdings as a growing asset on the company's balance sheet to offset its significant liabilities.

257.    Second, Celsius also traded strategically to reap profits from the inflated prices it created.  In at least some circumstances, Celsius bought through crypto asset trading platforms only 25-50% of the CEL it needed for OTC sales and, as one employee stated in an internal message, "put the other 50-75% into our pocket as Cash."  In other words, Celsius kept the proceeds from sales at inflated prices as profit.  Celsius was thus able simultaneously to sell additional CEL at a higher price and inflate its own value as a company.

258.    Third, Mashinsky was the largest holder of CEL other than Celsius, and he personally profited from its artificially inflated price.

259.    Like other CEL holders in the Earn Interest Program, Mashinsky earned weekly interest in CEL, which only increased as the price of CEL went up.

260.    Moreover, Mashinsky withdrew and sold large amounts of CEL, despite regularly assuring investors that he was only buying CEL.  In fact, Mashinsky was selling CEL at the same time he encouraged investors to "HODL," or "hold on for dear life," their own CEL.

261.    For example, Mashinsky tweeted on December 10, 2020:  "[j]ust bought 35,000 @CelsiusNetwork CEL Token on @UniswapProtocol at $2.19."  In other words, Mashinsky publicly disclosed that he had purchased approximately $75,000 in CEL.

262.    Mashinsky did not tweet, however, that in the same month he sold approximately 1.2 million CEL tokens totaling approximately $4.6 million.

43

263.    In fact, Mashinsky appears to have publicized the single instance in which he bought CEL in December 2020, while he quietly sold CEL numerous times during the month.

264.    Available records indicate that from 2018 through May 2022, Mashinsky withdrew over 86 million CEL worth over $200 million from his accounts on Celsius's platform. Mashinsky later sold many of these tokens.

## V.    Celsius's Collapse

265.    By January 2022, the company's financial condition was dire.

266.    Despite increasing prices for crypto assets in 2021 and the fact that Celsius received a capital infusion of approximately $700 million in late 2021, the company was struggling financially as a result of its failing business model and growing expenses.

267.    In total, Celsius incurred pre-tax losses of approximately $811 million in 2021.

268.    In early 2022, Celsius executives identified core actions for the company to take to improve its condition, including reducing Earn Interest Program interest rates and eliminating riskier deployment activities.

269.    Mashinsky was aware of the company's poor financial condition, and he acknowledged in a May 20, 2022 email to a senior executive at the company "that the current business model is not sustainable and that our capital position is making things worse."

270.    By the end of the first quarter of 2022, Celsius had incurred additional pre-tax losses of approximately $165 million.

271.    Between May 7 and May 9, 2022, the Terraform Labs crypto asset called UST started rapidly losing value, which caused its companion crypto asset, LUNA, to fall from a value of approximately $80 to pennies by May 12, 2022.

272.    Celsius incurred $17.8 million in direct losses associated with the collapse of UST

and Luna and also experienced increased withdrawal requests from investors on the Celsius

platform, resulting in a serious liquidity problem for the company.

273.    In May 2022 alone, net withdrawals from Celsius totaled $1.8 billion.

274.    During the last two weeks of May 2022, Mashinsky withdrew a large percentage

of his Bitcoin (BTC), Ether (ETH), and the crypto asset known as USDC held in accounts at

Celsius, totaling approximately $8 million.

275.    Specifically, Mashinsky withdrew approximately 90% of the combined Bitcoin

(BTC) and Wrapped Bitcoin, 81% of the Ether (ETH), and nearly 100% of all non-CEL related

crypto assets that he held at Celsius.

276.    By comparison, Mashinsky withdrew approximately 3% of the CEL tokens in his

accounts during that same period, totaling approximately $2 million.

277.    During this time period, Celsius's total liabilities, including Celsius's CEL

Treasury, exceeded its total assets by approximately $1 billion.

278.    Privately, a number of senior leaders of the company expressed grave concerns

about Celsius's viability and understood the company was facing an existential crisis.  As one

Celsius executive stated privately:  "I'm sorry – why aren't we talking about the elephant in the

room. [S]urvival? [L]iquidity[.] [H]ow many days we have left[.]"

279.    On June 12, 2022, after failed attempts to secure additional capital and in the face

of a renewed wave of withdrawals, Celsius halted all customer withdrawals, transfers, and

swaps.

280.    On July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

281.    At the time Celsius filed for bankruptcy, the company had approximately $1.2

billion more in liabilities than assets on its balance sheet.

EXHIBIT A

## **TOLLING AGREEMENTS**

282.    In March and May 2023, Celsius signed tolling agreements with the SEC for the period February 22, 2023 through August 21, 2023.  In April 2023, Mashinsky signed a tolling agreement with the SEC for the period March 13, 2023 through June 11, 2023.

283.    Each tolling agreement specifies a period of time (a "tolling period") in which "the running of any statute of limitations applicable to any action or proceeding against [Defendants] authorized, instituted, or brought by . . . the [SEC] . . . arising out of the [SEC's investigation of Defendants' conduct], including any sanctions or relief that may be imposed therein, is tolled and suspended. . . ."

284.    Each tolling agreement further provides that Defendants and any of their agents or attorneys "shall not include the tolling period in the calculation of the running of any statute of limitations or for any other time-related defense applicable to any proceeding, including any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related defenses."

## **COUNT I – FRAUD**

### **Violations of Section 17(a)(1) of the Securities Act**
### **[15 U.S.C. § 77q(a)(1)]**
### **(Against All Defendants)**

285.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

286.    Defendants, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

287.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C.

§ 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and (3)]**
**(Against All Defendants)**

288.     Paragraphs 1 through 284 are realleged and incorporated herein by reference.

289.     Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

290.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a), (b), and (c) thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5]**
**(Against All Defendants)**

291.     Paragraphs 1 through 284 are realleged and incorporated by reference herein.

292.     Defendants, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaged in acts, practices, or a course of

business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or

prospective purchasers of securities.

293.    By engaging in the conduct described above, Defendants violated, and unless

enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15

U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## COUNT IV – FRAUD

### Violations of Section 9(a)(2) of the Exchange Act
### [15 U.S.C. § 78i(a)(2)]
### (Against All Defendants)

294.    Paragraphs 1 through 284 are realleged and incorporated herein by reference.

295.    By virtue of the foregoing, Defendants, directly or indirectly, by use of the means or

instrumentalities of interstate commerce or the facilities of a national securities exchange or the

mail, effected, alone or with one or more persons, a series of transactions in a security registered on

a national securities exchange, a security not so registered, or in connection with a security-based

swap or security-based swap agreement with respect to such security creating actual or apparent

active trading in such security, or raising or depressing the price of such security, for the purpose of

inducing the purchase or sale of such security by others.

296.    By engaging in the conduct described above, Defendants violated, and unless

enjoined will continue to violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

### COUNT V – UNREGISTERED OFFERS AND SALES OF SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) and 77e(c)]
(Against All Defendants)**

297.    Paragraphs 1 through 284 are realleged and incorporated by reference herein.

298.    By virtue of the foregoing, without a registration statement in effect as to the Earn Interest Program, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use of medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

299.    By engaging in the conduct described herein, Defendant Celsius violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### PRAYER FOR RELIEF

The SEC respectfully requests that the Court enter a Final Judgment:

1.    Finding that Defendants committed the violations alleged in this Complaint;

2.    Permanently restraining and enjoining Defendants from engaging in conduct in violation of the following provisions:  Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)], Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2), 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

EXHIBIT A

3.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(e) of the

Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C.

§ 78u(d)(2)], from acting as an officer or director of any issuer that has securities registered

pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section

15(d) of the Exchange Act;

4.      Permanently prohibiting Defendant Mashinsky, pursuant to Section 20(b) of the

Securities Act [15 U.S.C. § 77t] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15

U.S.C. §§ 78u(d)(1) and 78u(d)(5)], from (i) participating, directly or indirectly, in the purchase,

offer, or sale of any crypto asset securities, or (ii) engaging in activities for the purposes of

inducing or attempting to induce the purchase, offer, or sale of any crypto asset securities by

others;

5.      Ordering Defendant Mashinsky to disgorge all ill-gotten gains in the form of any

benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay

prejudgment interest, pursuant to Sections 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C.

§§ 78u(d)(3), (5), (7)];

6.      Ordering Defendant Mashinsky to pay civil penalties pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C.

§ 78u(d)] in an amount to be determined by the Court; and

7.      Ordering such other relief as this Court deems just, equitable, and appropriate in

connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMAND**

The SEC demands a trial by jury as to all issues that may be so tried.


Dated: July 13, 2023                    Respectfully submitted,

                                        /s/ Harry B. Roback
                                        Harry B. Roback*
                                        Securities and Exchange Commission
                                        950 East Paces Ferry Road, NE, Suite 900
                                        Atlanta, GA 30326
                                        Tel: (404) 942-0690
                                        robackh@sec.gov

                                        James P. Connor*
                                        Securities and Exchange Commission
                                        100 F Street NE
                                        Washington, DC 20549
                                        Tel: (202) 551-8394
                                        connorja@sec.gov

                                        Attorneys for Plaintiff

*Pending admission pro hac vice

Of Counsel
Stacy L. Bogert
Pei Y. Chung
Randall D. Friedland
Christian J. Ascunce

Securities and Exchange
Commission