Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF DEBTORS'
## CONFIRMATION HEARING CLOSING PRESENTATION

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file the presentation (the "Presentation"), attached hereto as **Exhibit A**, that will be used at the hearing that will take place on **Monday, October 30, 2023 at 2:00 p.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that copies of the Presentation and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated:  October 26, 2023

/s/  Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

   - and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                    ross.kwasteniet@kirkland.com
                    chris.koenig@kirkland.com
                    dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Presentation**



# In re Celsius Network LLC

**Confirmation Hearing – Closing**

**Case No. 22-10964**
**United States Bankruptcy Court for Southern District of New York**
**Honorable Judge Martin Glenn**
**October 30, 2023**

# Introduction



- Since July 2022, the Debtors have worked tirelessly to implement a value-maximizing conclusion to these Chapter 11 Cases.

- The Debtors are now on the verge of confirming a chapter 11 plan that nearly 98% of voting Account Holders (over 84,000 Account Holders) voted to accept.

- The Debtors, the numerous stakeholders that affirmatively support the Plan, and dozens of other stakeholders, have spent the last several weeks presenting their case-in-chief in support of Confirmation and listening to and — to the extent possible, working to resolve — all outstanding objections to the Confirmation of the Plan.

- Today, the Debtors are going to seek Confirmation of their Plan, as modified on September 27, 2023, via entry of the Revised Proposed Confirmation Order [Docket No. 3867].

- Confirmation of the Plan will allow the Debtors to move forward with the Restructuring Transactions set forth in the Plan and will provide the Debtors and their creditors with the best possible recovery and a smooth conclusion to these Chapter 11 Cases.

* Capitalized terms used but not defined have the meaning ascribed to them in the Disclosure Statement or the Plan, as applicable.

2

# Voting Results



| CLASSES | TOTAL BALLOTS RECEIVED | | | | RESULT |
|---|---|---|---|---|---|
| | Accept | | Reject | | |
| | AMOUNT (% of Amount Voting) | NUMBER (% of Number Voting) | AMOUNT (% of Amount Voting) | NUMBER (% of Number Voting) | |
| Class 2 (Retail Borrower Deposit Claims) | 96.33% | 98.83% | 3.67% | 1.17% | ACCEPT |
| Class 4 (Convenience Claims) | 98.69% | 98.25% | 1.31% | 1.75% | ACCEPT |
| Class 5 (General Earn Claims) | 99.28% | 99.35% | 0.72% | 0.65% | ACCEPT |
| Class 6A (General Custody Claims) | 98.78% | 99.51% | 1.22% | 0.49% | ACCEPT |
| Class 7 (Withhold Claims) | 82.56% | 98.79% | 17.44% | 1.21% | ACCEPT |

3

# Voting Results (cont'd)



| CLASSES | TOTAL BALLOTS RECEIVED | | | | RESULT |
|---|---|---|---|---|---|
| | **Accept** | | **Reject** | | |
| | **AMOUNT (% of Amount Voting)** | **NUMBER (% of Number Voting)** | **AMOUNT (% of Amount Voting)** | **NUMBER (% of Number Voting)** | |
| Class 8 (Unsecured Loan Claims) | 0% | 0% | 100% | 100% | REJECT |
| Class 9 (General Unsecured Claims – Consolidated Debtors) | 99.56% | 74.07% | 0.44% | 25.93% | ACCEPT |
| Class 9 (General Unsecured Claims – Celsius Mining LLC) | 2.58% | 50% | 97.42% | 50% | REJECT |
| Class 9 (General Unsecured Claims – Celsius Network Inc.) | 0% | 0% | 100% | 100% | REJECT |
| Class 10 (State Regulatory Claims) | 100% | 100% | 0% | 0% | ACCEPT |
| Class 14 (Series B Preferred Interests) | 98.34% | 87.50% | 1.66% | 12.50% | ACCEPT |

4

# Affirmative Supporters of the Plan



- The Debtors have steadily built consensus for the Plan over time.

- Not only did nearly 98% of Account Holders vote to accept the Plan, the Plan is also affirmatively supported by the following stakeholders:

  - The Committee of Unsecured Creditors (the "Committee")

  - Earn Ad Hoc Group

  - Retail Borrower Ad Hoc Group

  - Custody Ad Hoc Group

  - Withhold Ad Hoc Group

  - Ignat Tuganov

  - Certain *pro se* creditors

5

# Key Objections Resolved



- The Debtors received 12 formal Objections, 12 informal objection letters, and 2 Reservations of Rights to the confirmation of the Plan.

- The Debtors have worked to address numerous comments they received from **the U.S. Trustee**, including:

  - The **U.S. Trustee**'s informal concerns regarding the releases by agreeing to file a list of the names of the employees being released prior to the Effective Date.  *See* Revised Proposed Confirmation Order ¶ 25.

  - The **U.S. Trustee**'s informal concerns regarding the Emergence Incentive Plan.  *See* Revised Proposed Confirmation Order ¶ 316.

- The Debtors believe that they have resolved all objections and comments from **the SEC and the state regulators,** and have also resolved, since the start of the Confirmation Hearing on October 2, 2023, the following:

  - The objection filed by **Pharos Fund SP of Pharos Master SPC** [Docket No. 3527], the only objecting party that was in a dissenting class.  *See* Notice of Withdrawal of Confirmation Objection [Docket No. 3751].

  - Matters with the **Consumer Privacy Ombudsman** by adding language to the Revised Proposed Confirmation Order and drafting a formal privacy policy that would apply to NewCo.  *See* Revised Proposed Confirmation Order ¶¶ 331-333.

  - The need for the Court to determine **whether CEL Token is a security**.  The Debtors added language deferring the Other CEL Token Claims of Holders of Claims who did not vote to accept the Plan and opted out of the Class Claim Settlement ("Potential CEL Token Litigants") to the Claims reconciliation process, thus minimizing the risk of a complicated appeal that would delay distributions and preserving the rights of Potential CEL Token Litigants for adjudication.  *See* Revised Proposed Confirmation Order ¶ 259.

  - The objection filed by **168 Trading Limited** ("168 Trading") [Docket No. 3531] by adding language reserving 168 Trading's right to arguments with respect to the effect of rejection of any Executory Contract to which 168 Trading is a party and the priority of the associated rejected damages claim.  *See* Revised Proposed Confirmation Order ¶ 318.

  - The limited objection filed by the court-appointed lead plaintiffs in the federal securities class action *Goines v. Celsius Network, LLC* (the "Securities Plaintiffs") [Docket No. 3544] by adding language reserving their rights to any applicable and available insurance policies.  *See* Revised Proposed Confirmation Order ¶ 319.

6

# Remaining Issues



▪ The few outstanding issues fall into the following categories:

1. **Value of CEL Token.**  *Pro se* creditor Otis Davis formally objected [Docket No. 3532] to the CEL Token Settlement, joined through letter by *pro se* creditor Cathy Lau (the "Lau Letter"), arguing the value of CEL Token should be recognized at a minimum of $0.81 or higher.  Following the objection deadline, *pro se* creditor Dimitry Kirsanov also argued that the value of CEL Token at the Petition Date was $0.81 in connection with his arguments about the modification of the Plan, as described further below.

2. **Retail Borrower Settlement.** *Pro se* creditor Johan Bronge, joined by several others through letters, objected [Docket No. 3511] to the alleged disparate treatment between retail and institutional borrowers and the treatment of Retail Borower Deposit Claims.

   ▪ Related Letters:  The First Keeney Letter [Docket No. 3389], rhe Second Keeney Letter [Docket No. 3400], the First Windom Letter [Docket No. 3533], the Johantgen Letter [Docket No. 3538], the Abruzese Letter [Docket No. 3540], the Truss Letter [Docket No. 3541], and the Dame Letter [Docket No. 3543] (all as defined in the Confirmation Brief).

3. **NewCo Board Selection.** *Pro se* creditor Richard Phillips objected [Docket Nos. 3548, 3557] to the selection process of the NewCo Board, arguing that White & Case LLP and Perella Weinberg Partners advocated for the appointment of members of directors out of self-interest and accordingly should not be included within the Exculpation Provision.

4. **Emergence Incentive Plan.** *Pro se* creditor Víctor Ubierna de las Heras [Docket No. 3542] objected to the Emergence Incentive Plan, joined through letter by *pro se* creditor Cathy Lau [the "Lau Letter"], arguing that the Debtors did not present evidence that the Emergence Incentive Plan complies with section 503(c) of the Bankruptcy Code.

5. **Miscellaneous Issues.**

   ▪ **Modifications to the Plan and CEL Custody Claims.** *Pro se* creditor Dimitry Kirsanov objected [Docket No. 3772] and filed several letters with the Court arguing that the post-solicitation modification of the Plan requires resolicitation and causes the Plan to violate the best interests test with respect to CEL Tokens in the Custody Program (the "CEL Custody Claims").

7

# CEL Token Settlement



▪ *Pro se* creditor Otis Davis formally objected [Docket No. 3532] to the CEL Token Settlement, joined through letter by *pro se* creditor Cathy Lau (the "Lau Letter"), arguing that the value of CEL Token should be recognized at a minimum of $0.81 or higher.  Following the objection deadline, *pro se* creditor Dimitry Kirsanov also argued that the value of CEL Token at the Petition Date was $0.81 in connection with his arguments about the modification of the Plan.

▪ The CEL Token Settlement seeks, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, to settle all Claims and Causes of Action arising out of or related to CEL Token for recharacterizartion and subordination pursuant to the following terms:

    ▪ Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25 per CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

    ▪ All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17, as applicable.

    ▪ Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25.

▪ Because over two-thirds in dollar amount and over half in number of eligible Holders of CEL Token Deposit Claims voted to accept the Plan or not opt out of the Class Claim Settlement, the Debtors presented the settlement for approval as part of Confirmation.

▪ **With respect to the CEL Token Settlement, two questions remain before the Court:**

    1. **Should the $0.25/CEL Token settlement be approved pursuant to Bankruptcy Rule 9019?**

    2. **Does the Plan meet the Best Interests Test with respect to Holders of CEL Token Deposit Claims?**

# CEL Token Settlement (cont'd)

 Celsius

- Based on the evidence presented throughout the Confirmation Hearing:

1. **The CEL Token Settlement should be approved.**

   - The CEL Token Settlement is a reasonable settlement of the contested issues relating to CEL Token, and avoids requiring that the Court rule on whether CEL Token is a security.

   - The CEL Token Settlement is appropriate and reasonable, and provides holders of CEL Token with a meaningful recovery instead of $0.00, which it could be if CEL Token is an equity security of Celsius or a now-worthless utility token.

   - The Plan, which includes the CEL Token Settlement, was approved by over 98% by number and 95% by dollar amount of CEL Token Holders who voted.  The overwhelming support that the CEL Token Settlement has garnered is further evidence that it is fair and reasonable.

2. **The value of CEL Token is less than $0.34, which satisfies the Best Interests Test with respect to Holders of CEL Token Deposit Claims.**

   - The break-even point for the price of CEL Token where the Best Interests Test would be violated is $0.36 for the NewCo Transaction and $0.34 for the Orderly Wind-Down.

   - Expert witness Mr. Galka concluded that the CEL Token was "most likely worthless" on the Petition Date and testified that he had seen no quantifiable support for the CEL Token being worth more than $0.00 at that time.  *See* Galka Declaration ¶ 19 [Docket No. 3659 - Ex. A]; *see also* Campagna Declaration ¶ 10 [Docket No. 3653].

     - Mr. Galka further concluded that the intrinsic value of CEL Token on the Petition Date was "de minimis," and that any remaining value was speculative.  *See* Oct. 4, 2023 Hr'g Tr. 37:8–25 (Galka); *see also* Galka Declaration ¶ 13 [Docket No. 3659 - Ex. A].

   - Here, the Best Interests Test is met with respect to Holders of CEL Token Deposit Claims as a price of $0.00 or *de minimis* value is materially less than $0.34.

9

# CEL Token: The Best Interests Test





Ex. 70, Dkt. No. 3653, at 5

10

# CEL Token's Petition-Date Value Is At Or Near $0.00

 Celsius



**Max Galka**
*Founder & CEO at Elementus*

19.    Consequently, while I cannot ascribe a specific value to CEL Token on the Petition Date, based on my experience trading financial instruments and especially trading dislocated markets, if asked to quote price on the CEL Token on the Petition Date, I would have declined because I think the CEL Token was most likely worthless at that time and have seen no quantifiable support for it being worth more than $0.00 at that time.

UCC-229, Dkt. No. 3659, at 9

# No Quantifiable Petition-Date Value for CEL





**Max Galka**
*Founder & CEO at Elementus*



**Hussein Faraj**
*CEO at NuGenesis*



**Otis Davis**
*Pro Se Creditor*

---

**No Quantifiable Intrinsic Value:**

"[W]ith the CEL token, there are no cashflows.  So it doesn't really fit into any kind of traditional asset valuation model. … There is an argument that it could have like a – something of a meme coin intrinsic value … [but that is] really impossible to quantify and in my opinion de minimis."

**No Quantifiable Speculative Value:**

"There's, I imagine, some potential for it to hypothetically have some value, if there is a hypothetical entity that emerges from the restructuring that uses this token … [but that is] really impossible to quantify and in my opinion de minimis."

10/4/2023 Hr'g Tr. 36:19-38:3, 39:2-5 (Galka)

---

**No Quantifiable Intrinsic Value:**

"[Q.] Do you agree with me that as of the pause date, there was not any intrinsic value left for the CEL token because the platfrm was frozen, correct?  A. From the pause date, I agree with you."

"Q. As of the petition date, CEL also had no intrinsic value, correct?  A. I agree with you."

**No Quantifiable Speculative Value:**

"Q. So it's your testimony that as of the petition date, the only remaining value for CEL is speculative value, correct?  A. At that point, yes, correct."

"Q. You didn't put a price on the speculative value for CEL token here, did you?  A. No, I didn't."

10/17/2023 Hr'g Tr. 70:24-71:5, 74:25-75:6 (Faraj)

---

**CEL Is "Worthless" Post-Pause:**

"[Q.] [W]hen you say, in my mind after the petition date, you can't use any utilities, that's the reason you called it worthless after the petition date?  A. That was hyperbole, and that's what I said because you can't use it.  The platform is obviously paused, so you can't take a loan.  You can't get discount interest on loans."

"Q. And that was true on the pause date as well, correct, sir?  A. As of June 13, 2022, no one could use utilities for CEL."

10/16/2023 Hr'g Tr. 87:2-13 (Davis)

12

# CEL "Worthless" Post-Pause





And then ask yourself why all the suspicious activity around CEL lately, from whales buying a 903K CEL wall to whales trying to buy 1.9M CEL on FTX. @CelsiusNetwork is a bankrupt company with a worthless token. So why spend millions of dollars on CEL?

Celsius Ex. 99

13

# CEL Had "No Utility" Even Pre-Pause



Alex, all you need is 100,000 users to buy 1,000 CEL (from whatever tier) and you've taken off the market and locked up 100 million CEL tokens, and that fixes CEL. And you know no one will ever sell those CEL tokens because the benefits are so good. You don't have 100 million CEL for them to buy on the open market, and that's a great problem to have. This is how you start to fix CEL, take it from me. I've been thinking about this a long time, which is why I requested the Zoom meeting on Dec 6th and Rudy and I were trying to tell you, what happens if the price falls significantly and there's a cascade of margin calls on CEL. You said you were not worried about that when I asked you the question. We also voiced our concerns that CEL has no utilities whatsoever. It's only when the tide goes out you realize who's swimming naked. The tide has gone out and CEL is swimming naked; it has no useful utilities and therefore the price fell as everyone lost confidence. Only true Celsius are left now who hold CEL. The community is shattered. I see it on Twitter. There's a lot of hate right now on Twitter about Celsius. We have to rebuild this Community and build it back stronger with CEL utilities that when there's a flash crash people don't go and sell CEL token. We are a HODLer community, flash crashes shouldn't affect us like this. The reason why it affects us like this is because CEL has no useful utilities. I don't know of one CEL utility that I use or that I like, not one. That has to change NOW.

**Otis Davis**
*Pro Se Creditor*

Celsius Ex. 87 at –342–34

14

# The $0.71 CEL Token Figure Is Unreliable



- **No Expertise.** Faraj is not qualified as an expert under Fed. R. Evid. 702:

  - No experience valuing digital assets or financial instruments for third parties. *See* 10/17/23 Hr'g Tr. 36:14-37:4, 37:22-5, 39:12-15 (Faraj).
  - No training or education in valuation techniques. *See* 10/17/23 Hr'g Tr. 40:1-19, 42:3-16 (Faraj).

- **AI Generated Report.** Faraj improperly used AI to generate an expert report:

  - Rife with errors, including duplicated paragraphs and discussions of the wrong trading window. *See* 10/17/23 Hr'g Tr. 52:21-53:11, 57:20-58:18 (Faraj)
  - AI asked whether certain valuation methodologies were appropriate for CEL. *See* Celsius Ex. 120 at 156-57; 10/17/23 Hr'g Tr. 65:12-66:11 (Faraj)
  - Report took longer to read than to write, and Faraj did a 1000-plus hour job in 72—not enough time for a "comprehensive" report. *See* 10/17/23 Hr'g Tr. 46:4-6, 47:13-48:5, 51:7-9 (Faraj); Celsius Ex. 113.



**Hussein Faraj**
*CEO at NuGenesis*

- **No Accepted Methodology.** Faraj's proposed methodology does not satisfy Fed. R. Evid. 702/*Daubert*:

  - Faraj uses a self-created valuation method that is not widely accepted and that has not been peer tested. *See* 10/17/23 Hr'g Tr. 67:14-69:1 (Faraj).
  - No investment bank publicly reports the fair value of any platform-specific cryptocurrency token. *See* 10/17/23 Hr'g Tr. 69:2-5 (Faraj).

- **Fatally Flawed Analysis.** Faraj's analysis is fundamentally flawed and should not be accepted.

  - Faraj did not value CEL token as of the petition date, and concedes the value of CEL token decreased from his valuation date to the petition date. *See* 10/17/23 Hr'g Tr. 69:24-70:22 (Faraj)
  - Faraj cannot identify what portion of his $0.71 price average is manipulated. *See* 10/17/23 Hr'g Tr. 78:6-80:14 (Faraj).
  - Faraj calculated a price average, but acknowledges price is different than value. *See* 10/17/23 Hr'g Tr. 77:25-78:5 (Faraj).

# Faraj Confuses The Pause & Petition Date



i need your help to access a report and rebud the report . it is a tokenomics based report. we will first start by explaining how crypto coins derive value and methodologies of acessing coins. we will then look at market making liquidity provision and buy backs and how they influence tokenomic structures. we will then talk about excluding market made coins from holding any value would signify the entire crypto space and every coin would have no value and explain why this statement is being made, explaining that without the market maker or positions bought back, that any coin would crash, explaining what a market maker actually does. we will then access the report i will share with you and explain our findings and differences on the report. i want you to do nothing untill i share the report with you. once i have finished sharing the report we will start creating a 50 point structure for our indepth report.

Certainly! I'll wait for you to share the report with me, and then we can work together on creating the structure for the in-depth report as per your outlined topics. Please go ahead and share the report when you're ready.

also i forgot to add we need to talk about otc trades aswell and explain the difference between onchain transactions and how the market cap is determined and what trade is reflected on coin market cap. like i said wait till i share the first report

Understood. We'll incorporate explanations about OTC (Over-The-Counter) trades, the difference between on-chain transactions, and how market cap are determined in relation to what's reflected on platforms like CoinMarketCap. I'm ready whenever you are to view the report you want to share.

CE The Honorable Martin Glenn Chief Bankruptcy Judge United States
Southern District of New York One Bowling Green New York, NY 10004-
.courts.gov Re: In re Celsius Network LLC, et al., Case No. 22-10964
ration to Supplement Expert Witness's Direct Testimony Dear
LLP is counsel to the Official Committee of Unsecured Creditors



**Hussein Faraj**
*CEO at NuGenesis*

---

HU

V. Re-evaluation of CEL's Value: 25. Application of QTM to CEL. analyse if its usable for CEL to determine value on petition (pause) date.

V. Re-evaluation of CEL's Value:

25. Application of QTM to CEL: Determining Value on Petition (Pause) Date

Celsius Ex. 120 at 152

16

# Faraj Is Fundamentally Not Credible

 Celsius

**Contact**
www.linkedin.com/in/hussfaraj
(LinkedIn)

**Top Skills**
Coaching
Employee Training
Security

**Languages**
Arabic

### Hussein Faraj
CEO NuGenesis
Greater Sydney Area

**Summary**

Chief Executive Officer NuGenesis ou
Chief Executive Officer MetaLabs Global
Chief Executive Officer Ledgerx.exchange

At the intersection of international partnerships, finance, and decentralized technology, I've carved a niche for myself, championing groundbreaking innovations and fostering collaborations. As the Founder and CEO of Advantage Australasia and the co-founder of Regenerate Earth, I've played a pivotal role in overseeing more than $7 billion in international contracts and alliances.

Recognized as the CEO to watch out for in Australia for 2023, my journey has been a blend of strategic foresight, tenacity, and diverse professional experiences. With 9 years in law enforcement and security, of which 3 were dedicated to supervision and training, I've cultivated a deep sense of precision, diligence, and risk management.

I pride myself on a vast global network that spans over 100 collaborations, including strategic alliances with some of the Fortune 500 giants. My deep understanding of Middle Eastern politics and expertise in international finance has allowed me to navigate and shape complex geopolitical and economic landscapes with finesse.

Venturing into the world of decentralized technology, I've led Advantage Group Australasia as its CEO for over 13 years, while taking the lead in Nugenesis project from as early as 2013, delving deep into the intricacies of decentralized ledgering systems and meta technology. With 168+ decentralized solutions and networks attributed to my design, my passion for innovation is evident. Beyond that, I am the driving force behind Metalabs Global and serve as the strategic analyst for various projects.

Page 1 of 5

Advantage group Australasia
Chief Executive Officer
January 2013 - Present (10 years 10 months)
New South Wales, Australia
Investment Banker - head of Advantage To Government Program.

CEO of middle east affairs.

```
21   Q    You've never worked as an investment banker, true?

22   A    True.

23   Q    Well, for ten years, you told the world that you were

24   an investment banker, didn't you?

25   A    That's true.
```

10/17/23 Hr'g Tr. 42:21-25 (Faraj)

Celsius Ex. 115

17

# Faraj Is Fundamentally Not Credible





Celsius Ex. 119



@cel We would even be willing to help restore the entire cel network if
they needed it. There is 1.7m people effected by this issue. If we can help
make them whole, we will. We don't need anything in return. I was never
pro Alex I would have loved to see Alex working on restoring the network,
as unless you understood every aspect of this industry, instead of
recovering a project, you would delay trying to make sense of it, then will
end up destroying that project. It is also why I would love for them to give
Sbf a chance to fix things.

That isn't to say they shouldn't be punished, if they did wrong, it is to say,
that in this industry not many people understand how it operates, so the
best person to fix the issues is ussualy the person who caused it. I would
rather see 1.7m people recovered than 1 person in jail. So if anyone from
cel really wants help with tech to advance cel, if they are working on
making people whole, I will pledge our entire teams support in upgrading
the technology to put cel at the forefront of the space.

Celsius Ex. 114

18

# Retail Borrower Settlement



- *Pro se* creditor **Johan Bronge**, joined by several others through letters, objected [Docket No. 3511] to the alleged disparate treatment between retail and institutional borrowers and the treatment of Retail Borower Deposit Claims through the Retail Borrower Settlement.

- The Retail Borrower Settlement provides that (a) Holders of Retail Borrower Deposit Claims can repay their Retail Borrower Advance Obligations in exchange for an equivalent amount of BTC/ETH, (b) Retail Borrowers do not have to pay any interest on account of their loans during these Chapter 11 Cases, and (c) Liquid Cryptocurrency Weighted Distribution Elections on account of Retail Borrower Post-Set Off Claims will be given priority.

- **The Retail Borrower Settlement is fair and equitable under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code**, given that all Digital Assets transferred to the Borrow Program pursuant to the Loan Terms and Conditions ("Loan T&C") and the General Terms of Use ("General TOU") are property of the Debtors' Estates.

  - Version 7 of the Loan T&C and Version 5 of the General TOU contain explicit provisions, such as the **Grant of Ownership Clause**, similar to that in the General Terms of Use, which the Court found unambiguously transferred title and ownership of the Digital Assets in the Earn Program from Account Holders to the Debtors. *See* Earn Opinion [Docket No. 1822].

  - Version 7 of the Loan T&C unambiguously provided that Retail Borrowers transferred to Celsius "all attendant rights of ownership" in the Digital Assets transferred to the Borrow Program.

  - Subsequent additions and modifications of the Loan T&C (Version 9) and the General TOU (Version 8) are substantially consistent with the Grant of the Ownership Clause, meant to reinforce and supplement it, and are not evidence that it they are otherwise ambiguous. *See Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995).

19

# Retail Borrower Settlement (cont'd)

 Celsius

## Loan T&C v7

### Celsius Ex. 38, Exhibit B-7

## Consent to Celsius' Use of Your Digital Assets

In consideration for the Loan, you grant Celsius the right, subject to applicable law, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:

(a) You may not be able to exercise certain rights of ownership;

20

# Retail Borrower Settlement (cont'd)

## Loan T&C v9



### Celsius Ex. 38, Exhibit B-9

## Consent to Celsius' Use of Your Digital Assets

In consideration for the Loan, you grant Celsius and any of its Affiliates the right, subject to applicable laws, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:

1. You will not be able to exercise any rights of ownership;
2. Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and

21

# Retail Borrower Settlement (cont'd)

 **Celsius**

## Loan T&C v7 v. v9

### Celsius Ex. 38, Exhibit B-7 v. Exhibit B-9

## Consent to Celsius' Use of Your Digital Assets

In consideration for the Loan, you grant Celsius <u>and any of its Affiliates</u> the right, subject to applicable law<u>s</u>, without further notice to you, to hold the Digital Assets provided as Collateral in Celsius' name or in another name, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such Digital Assets at Celsius' own risk. You acknowledge that, with respect to Digital Assets used by Celsius pursuant to this paragraph:

~~(a)~~<u>1.</u> You ~~may~~<u>will</u> not be able to exercise ~~certain~~<u>any</u> rights of ownership;
~~(b)~~<u>2.</u> Celsius may receive compensation in connection with its using the Digital Assets in its business, to which you have no claim or entitlement; and

22

# Retail Borrower Settlement (cont'd)

 Celsius

## General TOU v5

**Celsius Ex. 38, Exhibit A-5
"4. Nature of e-Services – B. Loans."**

In this clause 4B, notwithstanding the use of expressions such as "borrow", "loan", and "collateral" etc., which are used to reflect terminology adopted in the market for transactions of the kind provided for pursuant to the Loan Agreement, title to the Digital Assets shall pass from you to CNL on the basis of an outright sale, subject to your right to request at a later date the delivery of equivalent (but not identical) Digital Assets to those sold to CNL. As

23

# Retail Borrower Settlement (cont'd)

## General TOU v8



### Celsius Ex. 38, Exhibit A-8
### "13. Consent to Celsius' Use of Digital Assets."

In consideration for the Rewards payable to you on the Eligible Digital Assets using the Earn Service, for us entering into any Loan Agreement, and the use of our Services, you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets in the Earn Service (if available to you) and thus loan such Eligible Digital Assets to us through your Celsius Account, or as collateral under the Borrow Service (if available to you), all right and title to such Eligible Digital Assets, including ownership rights, and the right, without further notice to you, to hold such Digital Assets in Celsius' own Virtual Wallet or elsewhere, and to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets, separately or together with other property, with all attendant rights of ownership, and for any period of time, and without retaining in Celsius' possession and/or control a like amount of Digital Assets or any other monies or assets, and to use or invest such

24

# Retail Borrower Settlement Is Appropriate

 Celsius

- The Loan T&C and the General TOU unambiguously provide that Retail Borrowers' cryptocurrency belongs to the Debtors' Estates.

- When the contract is unambiguous, the Court should "give effect to the plain meaning of the contract's terms and provisions," *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010), and interpreting certain phrases in a way that renders other parts of the contract superfluous is contrary to principles of contract interpretation.  *See* Earn Opinion at 42.

- Case law supports the conclusion that Retail Borrowers have only general unsecured claims against the Debtors and not a property right (equitable or otherwise) in commingled cryptocurrency transferred to the Borrow Program.  *See Secured Leverage Grp. v. Bodenstein*, 558 B.R. 226, 237 (N.D. Ill. 2016).

- **The Retail Borrower Settlement, and the Plan's treatment of Retail Borrower Deposit Claims, is appropriate and should be effectuated pursuant to the Plan under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.**

25

# NewCo Board Selection



- *Pro se* creditor **Richard Phillips** objected [Docket Nos. 3548, 3557] to the selection process of the NewCo Board, arguing that White & Case LLP and Perella Weinberg Partners, as advisors to the Committee, advocated for the appointment of members of directors out of self-interest and accordingly should not be included in the Exculpation Provision.

- **The NewCo Board selection process, as set out by the Plan and implemented by the Debtors and the Committee, satisfies the applicable standard set out in section 1129(a)(5) of the Bankruptcy Code.**

    - The Debtors disclosed the process by which the applicable directors were going to be selected;

    - The Committee ran a thorough, transparent process; and

    - The Debtors disclosed the identities of the directors of the NewCo Board in <u>Exhibit A</u> of the Fifth Plan Supplement (and similarly disclosed the identities of the Board Observers in <u>Exhibit G</u> of the Sixth Plan Supplement).

    *See generally* Robinson Declaration [Docket No. 3584]; *see also* Revised Proposed Confirmation Order ¶¶ 92–114.

- "The Committee's evaluation of the New Board candidates was thorough and comprehensive. . . . It is my belief that the Directors of the New Board selected by the Committee are the best and most qualified candidates to fill those positions and come equipped with extensive knowledge and experience to ensure the success of New Co and the greatest recoveries for Celsius' customers." *See* Robinson Declaration ¶¶ 10, 19 [Docket No. 3584].

- "[W]e had very deliberative process of speaking with advisors and discussing amongst ourselves which of the creditor candidates were the best qualified." *See* Oct. 3, 2023, Hr'g Tr. 237:9–11 (Robinson).

26

# Emergence Incentive Plan (EIP)



- *Pro se* creditor Victor Ubierna de las Heras [Docket No. 3542] objected to the Emergence Incentive Plan, arguing that the Debtors did not present evidence that the Emergence Incentive Plan complies with section 503(c) of the Bankruptcy Code.

- **The only standard the Emergence Incentive Plan must satisfy to be confirmed as part of the Plan is the "Best Interests" Test of section 1129(a)(7) of the Bankruptcy Code.**  The Best Interests of the Creditors standard requires the debtor to demonstrate the Plan would result in more favorable outcomes for creditors than if the debtor was liquidated under chapter 7.

- **The Emergence Incentive Plan easily meets the Best Interests Test.**

  - The transactions proposed within the Plan are extraordinarily complex and successful implementation requires the dedicated efforts of a highly skilled employee base.  *See* Revised Proposed Confirmation Order ¶¶ 38–39.

  - The maximum aggregate cost of all EIP Awards under the Emergence Incentive Plan is approximately $2.6 million, payable only if all EIP Participants satisfy the applicable maximum target incentive objective.  *See* Plan Art.IV.J.2.

27

# Emergence Incentive Plan (EIP) (cont'd)



- **Objectors mistakenly utilize the section 503(c) standard in objecting to the Emergence Incentive Plan.** Section 503(c) of the Bankruptcy Code does not apply here because the payments will be made by the Post-Effective Date Debtors, not chapter 11 debtors, so any restriction on the Debtors under the Bankruptcy Code is inapplicable.

- **Even if section 503(c) does apply, the Emergence Incentive Plan meets the requirements for confirmation under section 503(c).** The EIP is an incentive-based program – not a "pay-to-stay" retention plan prohibited by section 503(c)(3). The EIP incentivizes EIP Participants to maximize the value of the Post-Effective Date Debtors by distributing EIP awards subject to the satisfaction of certain metrics. Importantly, the metrics are not easily achievable, demonstrated by the fact that certain metrics have not been achieved. *See* Confirmation Brief ¶¶ 220-221 [Docket No. 3609].

- The Confirmation Order has been amended to resolve the U.S. Trustee's informal concern that the distribution of EIP awards should be subject to the discretion of the Plan Administrator in accordance with the terms of the Plan Administration Agreement. *See* Revised Proposed Confirmation Order ¶ 314.

- The objections that remain allege that bonuses are not needed and the chosen metrics are not reasonable, yet the factual record shows otherwise.

28

# EIP Rewards Employees' "Herculean effort" to Emerge From Bankruptcy





**Chris Ferraro**
*Celsius Chief Restructuring Officer, CFO, and Interim CEO*

Q.   And what is it that you and the other executives remaining at Celsius are going to be doing between now and potential emergence from the company, from bankruptcy if the plan is confirmed?

A.   **Yeah, it's a Herculean effort.** I mean, I'll give you an example. Myself and my team, we've been negotiating two distribution agreements with PayPal and Coinbase, custody agreements. **This is, you know, this is -- these are not -- these are normally months and months of negotiation that we're trying to pack into a short period of time.** You know, the mining business, there's no CEO of mining. I'm the acting CEO of mining. **This takes an incredible amount of our time.**

Oct. 3, 2023 Hr'g. Tr. 27:7–20

29

# Ferraro: EIP Targets Are a "Stretch"

 Celsius



**Chris Ferraro**
*Celsius Chief Restructuring Officer, CFO, and Interim CEO*

Q.    From your perspective, Mr. Ferraro, is the employee incentive program proposed in the plan, is it reasonable and appropriate here, sir?

A.    Yes**. Quite frankly, I think, you know, some of these targets are probably not going to be achieved. They were a stretch.** This was, you know, weeks and weeks of negotiation. I think Alvarez and Marsal and M3 negotiated this a bunch and went through the special Committee for approval. This was done months ago. **And we, we're trying like hell to hit them all for the benefit of the creditors, but I'm not sure that we will.**

Oct. 3, 2023 Hr'g. Tr. 28:1-11

# Hoeinghaus: EIP Participants Paid "Significantly Below" Market



($000s)

| Executive | Title | Current Base Salary | Market TDC | | |
|---|---|---|---|---|---|
| | | | P25 | P50 | P75 |
| Ferraro, Chris | CEO, CFO, Chief Restr. Officer | $750 | $1,029 | $1,682 | $2,768 |
| Bodnar, Guillermo | Chief Technology Officer | $500 | $620 | $860 | $1,529 |
| Blonstein, Oren | Chief Product Officer | $350 | $540 | $696 | $1,109 |
| Deutsch, Ron | General Counsel | $320 | $566 | $750 | $1,263 |
| Ramos, Trunshedda | Chief HR Officer | $320 | $507 | $658 | $977 |
| Alisie, Adrian | Chief Compliance Officer | $300 | $454 | $590 | $856 |
| Fan, Jenny | Chief Financial Officer - Mining | $300 | $439 | $560 | $816 |
| Albert, Dave | Chief Admin Officer - Mining | $280 | $334 | $504 | $1,046 |
| Lawlor, Quinn | Chief Strategy Officer - Mining | $250 | $365 | $444 | $583 |
| *n = 9* | | | | | |
| **Total** | | **$3,370** | **$4,853** | **$6,744** | **$10,948** |
| *Current Total Compensation relative to Market TDC* | | | *(-31%)* | *(-50%)* | *(-69%)* |

Ex. 68 (Hoeinghaus Decl.) at 12

31

# Hoeinghaus: EIP Participants Paid "Significantly Below" Market





**Allison Hoeinghaus**
*Managing Director, Alvarez & Marsal*

**Q.**    Mr. Young, can you please turn to Page of the Declaration and display the first table there? Ms. Hoeinghaus, can you tell us what you did in the market rate comparison that you are showing in this table?

**A.**    Sure. So my team and I pulled compensation survey data for the various EIP participants and the various specific roles and responsibilities that they are fulfilling to the Debtors. And we compared that to these compensation surveys to provide the market level of compensation. So essentially the going rate for these positions at similar sized companies. And you can see here at the bottom, the -- this is showing currently where the executives are only working for their base salary. **And with only base salary, since such a large component of executive compensation is around incentives, absent those incentives, the base salaries are significantly below market.**

Oct. 3, 2023 Hr'g. Tr. 208:4–19        32

# Hoeinghaus: EIP "Necessary" to Ensure Market Level Compensation

 Celsius



**Allison Hoeinghaus**
*Managing Director, Alvarez & Marsal*

Q.    Now, based on your finding that these base salaries are significantly below market, what did you conclude about the EIP?

A.    **Concluded that an incentive program was very much necessary here to ensure that market levels of compensation would be offered to key executives.**

Oct. 3, 2023 Hr'g. Tr. 208:24–209:4

33

# EIP Costs Per Participant Are Lower Than Most Bankruptcy Incentive Plans



($000s)

| Summary Statistics | Annualized Bankruptcy Incentive Plans Cost | | |
|---|---|---|---|
| | Target Cost as % of Assets | Target Cost | Avg. Target Cost Per Participant |
| 25th Percentile | 0.11% | $6,017,921 | $770,009 |
| 50th Percentile | 0.21% | $10,031,250 | $914,601 |
| 75th Percentile | 0.27% | $14,141,295 | $1,661,224 |

| | | | |
|---|---|---|---|
| Celsius Network LLC[1] | 0.08% | $3,493,333 | $388,148 |
| Percent Rank | 9% | 1% | Lowest |

Celsius Ex. 68 at 11

34

# Hoeinghaus: Analysis Shows EIP Is "Very Reasonable"





**Allison Hoeinghaus**
*Managing Director, Alvarez & Marsal*

Q.    And taking into account those results, what did you conclude about the EIP overall?

A:    **I concluded both on, based on the distressed analysis of other Chapter 11, as well as the industry market analysis here that the EIP was very reasonable in terms of the amounts and the opportunities that are being offered to the executives here.**

Oct. 3, 2023 Hr'g. Tr. 210:2–8

35

# The Modifications to the Solicitation Plan Do Not Materially Adversely Affect Any Claim Holders

 Celsius

- *Pro se* creditor Dimitry Kirsanov formally objected [Docket No. 3772] and filed several letters with the Court arguing that post-solicitation modification of the Plan requires resolicitation of the Plan and causes the Plan to violate the Best Interests Test with respect to CEL Custody Claims.

- The Debtors' Solicitation Plan [Docket No. 3319] generally provided that the CEL Token Settlement would not apply to Custody Claims, which generally do not need to be valued because they can be withdrawn in kind prior to the Deactivation Date. *See* Solicitation Plan, Art.IV.B.2.

- On September 27, the Debtors filed a modified Plan pursuant to section 1127(a) to clarify that the conversion price for CEL Tokens in the Custody Program on the Deactivation Date will be the CEL Token Settlement value of $0.25 instead of the market price of CEL Token at the time of such conversion. *See* Plan, Art.I.A.84.

- **The Debtors' modifications to the Plan are permissible and satisfy section 1127(a).** Pursuant to section 1127(a) of the Bankruptcy Code, a debtor may modify the solicitation plan without resoliciting the plan so long as a modification does not "materially and adversely affect" the holders of interests and claims. *See In re AMR Corp.*, 502 B.R. 23, 46 (Bankr. S.D.N.Y. 2013); *see also* Confirmation Brief, ¶¶ 33-36 (referencing section 1127(a) and Bankruptcy Rule 3019).

- The modified Plan clarifies that the $0.25/CEL valuation that is in the Plan as part of the CEL Token Settlement will also be applied to CEL Custody Claims upon the Deactivation Date if a Holder of a CEL Custody Claim fails to withdraw its cryptocurrency in-kind, regardless of what the market price of CEL Token is at the time the Deactivation Date Conversion Table is prepared. *See* Plan, Art.I.A.84.

- The modifications set forth in the Plan do not "materially and adversely" affect any Claim Holders because Holders of CEL Custody Claims were able to withdraw their CEL Tokens in accordance with the terms of the Custody Settlement* before, and they will continue to be able to for ninety days following the Confirmation Date which satisfies the best interests test.

* The Custody Settlement is discussed in the Appendix to this presentation.

36

# The Plan Satisfies the Confirmation Requirements



| Code Section | Requirement for Confirmation | Evidence on the Record in Support |
|---|---|---|
| § 1129(a)(1) | The plan complies with the applicable provisions of the Bankruptcy Code:<br>• All claims within a particular class are substantially similar to all other claims in such class under § 1122; and<br>• the Plan meets the chapter 11 plan content requirements set forth in § 1123. | Ferraro Declaration ¶¶ 8-13 [Docket No. 3581]; Campagna Declaration ¶¶ 9-19 [Docket No. 3582]; October 3, 2023 Hr'g Tr. 220:19-25, 230:18-231:5, 233:5-22. |
| § 1129(a)(2) | The Debtors complied with the applicable provisions of the Bankruptcy Code, including the requirements set forth in § 1125 and § 1126 regarding solicitation of acceptances of the Plan. | Celsius Ex. 6 ¶ 7; Campagna Declaration ¶¶ 34-37 [Docket No. 3582]; October 3, 2023 Hr'g Tr. 185:11-13; 185:18-20, 186:2-7, 186:12-14 (Karpuk). |
| § 1129(a)(3) | The Plan is proposed in "good faith" and not by any means forbidden by law. | Ferraro Declaration ¶¶ 31-33 [Docket No. 3581]. |
| § 1129(a)(4) | Fees and expenses to be paid by the Debtors under the Plan are subject to approval of the Court as reasonable. | Debtors' Proposed Findings of Fact and Conclusions of Law, ¶ 150 [Docket No. 3867]. |
| § 1129(a)(5) | The Debtors have disclosed the process by which the applicable directors will be selected and will file a Plan Supplement disclosing the identities of all persons appointed to serve on the New Board. | *See generally* Robinson Declaration [Docket No. 3584]; October 3, 2023 Hr'g Tr. 220:19-25, 230:18-231:5, 233:5-22. |
| § 1129(a)(6) | § 1129(a)(6) is not applicable because the Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission. | Debtors' Proposed Findings of Fact and Conclusions of Law, ¶ 152 [Docket No. 3867]. |
| § 1129(a)(7) | The Plan satisfies the "best interest of creditors" test. With respect to each Impaired Class of Claims or Interests, each Holder of a Claim or Interest has either accepted the Plan or will receive or retain property of a value that is not less than the amount such Holder would have received in a chapter 7 liquidation. | Campagna Declaration ¶ 41 [Docket No. 3582]; Supplemental Campagna Declaration ¶¶ 8-10 [Docket No. 3653]; *see generally* Galka Declaration [Docket No. 3580]; *see generally* Galka Supplemental Declaration [Docket No. 3659 – Ex. A]; October 4, 2023 Hr'g Tr. 38:8-13 (Galka); October 10, 2023 Hr'g Tr. 122:11-17, 123:7-24, 124:4-8, 126:11-6, 127:4, 172:4 (Campagna). |
| § 1129(a)(8) | Even though certain Classes are deemed to have rejected the Plan, the Plan remains confirmable because it satisfies the cram down requirements of § 1129(b). | Campagna Declaration ¶¶ 42, 48-51 [Docket No. 3582]; Supplemental Brief ¶ 250 [Docket No. 3867]. |
| § 1129(a)(9) | Entities holding claims entitled to priority under § 507(a) are paid in full in cash under the Plan. | Plan, Article II.A, C; Article III.B. |
| § 1129(a)(10) | At least one impaired class of claims or equity interests has accepted the Plan, excluding acceptance by any insider. | Campagna Declaration ¶ 44 [Docket No. 3582]; Amended Karpuk Declaration ¶¶ 6, 13 [Docket No. 3574]. |
| § 1129(a)(11) | The Plan is feasible—feasibility does not necessarily require that success be guaranteed, only that the Plan has a reasonable assurance of success. | Ferraro Declaration ¶¶ 36-44 [Docket No. 3581]; October 3, 2023 Hr'g Tr. 16:12-17:10, 17:3-7 (Ferraro). |
| § 1129(a)(12) | The Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a). | Plan, Article II.D. |



# Appendix
## Custody Settlement

# The Custody Settlement



- Following the Court's ruling from the bench in December 2022 that Custody Assets belong to Account Holders rather than the Debtors, but that the Debtors could maintain possession of those assets pending resolution of certain avoidance actions, the Debtors set in motion a process for Account Holders to withdraw certain Custody Assets that

  - (1) were only ever in the Custody Program or

  - (2) if transferred from the Earn or Borrow Program to the Custody Program in the 90 days before the Petition Date, were, in the aggregate, less than $7,575 at the time of transfer.

  - In-kind withdrawals of such Custody Assets opened in March 2023 and were processed throughout the spring.

- Shortly thereafter, a **Custody Settlement** was negotiated between the Debtors, the Committee, and the Custody Ad Hoc Group to resolve the remaining issues – the status of Custody Assets that were subject to preference actions by the Debtors and the Debtors' right to setoff in connection with outstanding retail loans under the Retail Borrower Program.

- On February 28, 2023, the Debtors, the Custody Ad Hoc Group, and the Committee filed the Custody Settlement Motion [Docket No. 2148] requesting approval of the settlement, and the Court subsequently entered an order approving it [Docket No. 2291].

- The Custody Settlement provided that participating Custody Account Holders would receive 72.5% of their Custody Assets **in-kind** (*i.e.*, 72.5% of their *coins* rather than the Petition Date US Dollar value of those coins) and the settlement of all Causes of Action the Debtors hold against them, solely with respect to such Holders' Custody Accounts.

  - The Custody Settlement provided that participating Custody Account Holders would be able to withdraw the **first 36.25% of their Custody Assets *as soon as reasonably practicable*** after April 24, 2023 (the deadline to elect to participate in the settlement) and the **second 36.25%** on or shortly after the Effective Date.

# The Custody Settlement (cont'd)

 Celsius

- **The Custody Settlement also provided that Custody Account Holders who entered into the Custody Settlement would be "deemed to accept the Plan" and any Custody Account Holder who participated in the settlement but attempted to vote his General Custody Claim to reject the Plan or abstained from voting on the Plan would nonetheless be deemed to accept the Plan:**

  - "Any Settling Custody Account Holder wishing to elect in to and become a Party to this Settlement Agreement ***must vote all of his or her Allowed Custody Claims to accept the Plan***…"  *See* Custody Settlement Order, Ex. 1 ¶5.

- **The Custody Settlement was also offered in the Plan, with a modification:**

- Custody Account Holders who were eligible but did not enter into the Custody Settlement in the spring OR who were not previously eligible for other reasons had an opportunity to accept the Custody Settlement by voting to accept the Plan and selecting **Treatment A** on their Class 6A General Custody Claim.

- Treatment A for Class 6A General Custody Claims also provided that Custody Settlement Participants that (1) are not Excluded Parties and (2) have a Withdrawal Preference Exposure less than or equal to $100,000 will receive 100% recovery rather than 72.5% of their Custody Assets in-kind.

40