RICHARD PHILLIPS (*In pro per*)

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re:* <br><br> CELSIUS NETWORK LLC, *et al.*[1] <br><br> Debtor. | **Case No. 22-10964 (MG)** <br><br> **Chapter 11** <br> **(Jointly Administered)** |

**CLOSING BRIEF IN SUPPORT OF
RICHARD PHILLIPS LIMITED OBJECTION AND
RESERVATION OF RIGHTS TO DEBTORS' CHAPTER 11 PLAN**

1.  In closing, it's clear that the time has come for creditors to get their recovery, but it's also clear that the professionals need to be held accountable for their misconduct and misdeeds through a mechanism that is operative post the Plan becoming effective. The checks and balances ingrained in the bankruptcy system and code have almost totally disappeared since the *Disclosure Statement Order* [Docket No. 3337] was entered. It is up to this Court, as a Court of equity, to intervene though the upcoming Confirmation Order to right the wrongs that have occurred.

2.  The Court no doubt has the authority to do this. The cumulative changes that have occurred since the Disclosure Statement Order was entered through the multiple plan supplements [Docket Nos. 3444, 3483, 3550, 3583 and 3869] constitute changes, that when taken in the aggregate, are materially adverse to creditors. Thus, confirmation of the Plan does

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

not meet the requirements of 11 U.S.C. §1129, and it cannot be confirmed as proposed.

## BOARD AND BOARD OBSERVER PROCESS

3.      The *Third Notice of Filing of Plan Supplement* [Docket No. 3444] ("Third Supplement") revealed that the Board did not contain a single creditor other than the two co-chairs of the Committee. After diligencing the selected Board members, it became known to creditors that there were background checks with negative information, conflicts of interest and self-dealing. This was a betrayal of the fiduciary duties of the Committee and the professional advisors to the Committee.

4.      Contrary to the claim that Mr. Aidoo "at the outset of his candidacy…disclosed to the Committee's advisors certain tax arrearages," the Committee's counsel, White & Case ("W&C"), learned of these "arrearages" from its background check vendor Sourcd on August 29th. Presumably Perella Weinberg Partners' ("Perella") compliance department had known for over a year, as they made the original FINRA filing with the disclosures on Aidoo's U-4 in 2022. Perella just never bothered to inform their client, the Committee. It was only after Sourcd disclosed the issue to White & Case on August 29th that Mr. Aidoo came clean on his being a tax cheat. This should have disqualified Mr. Aidoo from further consideration. While the Committee may have had the benefit of hearing his explanation, their advisors telling them it was no problem and reading a letter from his accountant to get over the issue, the investing public will not. Prospective investors will however be able to easily see that he is a tax cheat with multiple outstanding liens and/or judgements on his publicly accessible FINRA Brokercheck, Exhibit B of *Declaration of Richard Phillips in Support of his Limited Objection and Reservation of Rights to Debtors' Chapter 11 Plan* [Docket No. 3758] ("Phillips Declaration"). This fundamentally undermines the confidence that investors need in a Board that will be

overseeing a company that they are potentially investing in.

5. Mr. Aidoo is also currently employed by Perella, even if he told the Committee that he expects to step down from that position. His Perella employment and receiving compensation from this matter disqualifies him under NASDAQ Rule 5605(a)(2)(B), as an Independent Director for NewCo, Phillips Declaration ¶ 21. Neither the Committee nor the Debtor have refuted this, so it is an undisputed fact. The Committee was required to appoint all Independent Directors under the *Plan Sponsor Agreement* [Docket No. 2759] and by its own decisions as explained in Exhibit D of the Third Supplement, where the Committee stated that its six (6) candidate slate would consist of two groups, "two prepetition creditors" and "four **independent directors**."  (emphasis added)

6. Mr. Robinson, on cross-examination, admitted that the Committee had Board candidates who were both creditors and qualified to be on the Board.[2] The Committee has and had a fiduciary duty to select a slate of candidates that were qualified and would best represent creditor interests on the Board, which is distinct and different that selecting the most qualified candidates for the Board regardless of their loyalty or alignment with creditors.

7. Ms. LaPuma is another NewCo Board member where conflicts and self-dealing are evident. Not only is Ms. LaPuma a former Perella employee, but also a current White & Case client, the *Ninth Declaration Of Gregory F. Pesce In Support Of The Official Committee Of Unsecured Creditors' Application For Entry Of An Order Authorizing The Employment And Retention Of White & Case LLP As Counsel Effective As Of July 29, 2022* [Docket No. 3590]. Certainly she is qualified to be on the Board, but the Committee no doubt interviewed other candidates who were more than qualified to be on the Board, but who did not have these

---

[2] *Transcript of Court Hearing on October 3 pg. 236*

conflicts. Again, Mr. Robinson stated that multiple creditors who applied to the Board were qualified to serve on it. Who is more aligned with the interests of creditors and hence the fiduciary duties of the Committee in selecting Board members than fellow qualified creditors?

8. When the Committee and its professionals realized the mistake they had made by not including creditors on the Board and the ensuing outrage amongst the creditor community, they decided to essentially payoff three significant creditors with meaningless, paid out of NewCo funds, Board Observer positions and silence them through entry into Plan Support Agreements. The Committee and its professionals have never explained the role of the Board Observers and have only tried to conflate them with actual voting Board members through the phrase "the board members and observers include five significant prepetition creditors of the Debtors." Board Observer Agreements, Exhibit B of *Notice of Entry into Plan Support Agreement* [Docket No. 3516] and Exhibit F of the *Sixth Notice of Filing of Plan Supplement* [Docket No.: 3583] ("Supplement Six"). The Board Observers serve no real purpose. They have no constituency to report to. In addition, the Board Observer Agreements do not let the observer say anything to anyone who is not already present in the boardroom without violating their confidentiality provisions. Furthermore, Section 1.3 of the Board Observer Agreements allow the real Board to exclude the observers from observing any action by a simple majority vote, the same vote required to take any action that the Board may want to keep hidden from the observers. Once again neither the Committee, its advisers nor the Debtors have disputed the fact that the Board Observers serve no real purpose, Phillips Declaration ¶ 15-17.

## Litigation Oversight Committee

9. After the clear conflicts of Litigation Oversight Committee ("LOC") members Mr. Jindal and Mr Uzzi were revealed in the *Ninth Declaration Of Gregory F. Pesce In Support*

*Of The Official Committee Of Unsecured Creditors' Application For Entry Of An Order Authorizing The Employment And Retention Of White & Case LLP As Counsel Effective As Of July 29, 2022* [Docket No. 3590] and Phillips Declaration ¶ 27, on the eve of Closing Arguments the Litigation Administrator Agreement, Exhibit D of the *Seventh Notice of Filing of Plan Supplement* [Docket No. 3869] ("Supplement Seven"), was modified in Section 2.5 to strip the LOC of its oversight responsibility over the hiring of the professionals for the Litigation Trust by giving that sole power to the Litigation Administrator. Per Section 2.5 "The Litigation Oversight Committee … shall not control the selection, compensation, or supervision of counsel, which shall be reserved to the Litigation Administrator." That is certainly the wrong way to address this blatant conflict issue and certainly not in the best interests of creditors. The Court should ensure the appointment of a conflict free LOC and let them do their job.

10. Mr. Noyes was also removed from the LOC to correct an obvious wrong in Supplement Seven.

### NewCo Equity Valuation

11. Exhibit A of *Fourth Notice Of Filing Of Revised Disclosure Statement For The Joint Chapter 11 Plan Of Reorganization Of Celsius Network LLC And Its Debtor Affiliates* [Docket No. 3332] ("Disclosure Statement"), contains a valuation of NewCo NAV, $1,248mm, and NewCo Common Stock Recovery Percentage, 29.5%, on page 28 of 830, (the "Valuation"), which has been totally discredited. None of the three witnesses that the Debtor presented took responsibility for the entire Valuation, but only single parts. Mr. Campagna testified that he merely summed the three parts, which is totally inappropriate as all sum of the parts valuations include a HoldCo or Conglomerate discount.

12. Mr. Kielty testified to multiple items, which discredited Centerview's own

valuation. First, he admitted that the range was unusually wide, $410 to $720 million, *Hearing Transcript 10.03.22* page 171, which represents a recovery percentage of 9.7% to 17.0%. This 7.3% range itself is greater than difference in recovery between the NewCo and Orderly Wind Down ("OWD") scenarios under the Plan.

13. Mr. Kielty also testified that Centerview's market comparables analysis only used two multiple metrics: EV/EH/s May 2023 and EV/EH/s 2023E. (Enterprise Value to Exa-Hash per Second) *Ibid* pg.164. This metric represents a proxy for Enterprise Value to Revenue. Revenue multiples ignore profitability and cost structure. There are significant differences in mining company's profitability based on their cost structures, including especially whether facilities are third party hosted or self-hosted and electricity rates paid. These differences were ignored in the market comparables analysis rendering it virtually meaningless. Back in the dot com era, the use of revenue proxy multiples was widespread. Companies were valued on clicks and unique visitors. The folly of this technique soon became apparent in the dot com bust of 2000-2001. Thus, valuation professionals no longer base market comparable analyses on such metrics alone.

14. The DCF analysis that Centerview performed relied on a forecast that is clearly flawed. The Network Hash rates used in 2023 and 2024 have already been exceeded with the recent Network Hash Rate being in excess of 480 EH/s far greater than the 381, 307 and 374 used in the forecast for September 2023, 2024 and 2025, *Celsius Ex. 3*. This means revenues will be significantly lower than predicted.

15. Finally, Centerview itself stated that the valuation was essentially invalid after the valuation date of May 31, 2023, *Celsius Ex.3 – Exhibit D of Disclosure Statement [Docket No. 2902] C. Valuation Analysis & Celsius 45 Kielty Declaration [Docket No. 3592]* ¶11-12. We are

now five (5) months later and circumstances have certainly changed. The company has not met its mining performance targets over the period and share of network, and hence revenues, is much lower.

16. The very first market test of the desirability of NewCo stock was on the ballot in the form of the Weighted Distribution Election that allowed creditors to choose more cryptocurrency or more equity in their distribution. There were very few buyers of NewCo equity even at a 30% discount. Meanwhile, there was an overwhelming number of sellers of NewCo equity representing more than 25% of total outstanding claims, over **$1.1 BILLION** in claim value, electing more crypto, Phillips Declaration ¶ 30-31 and Exhibit D, *Amended Declaration Of Brian Karpuk Regarding The Solicitation And Tabulation Of Votes On The Joint Chapter 11 Plan Of Reorganization Of Celsius Network LLC And Its Debtor Affiliates* [Docket No. 3574].

17. While it's true that there are multiple reasons that creditors may have chosen more crypto over equity, the value of NewCo equity was clearly undercut due to multiple actions post the Disclosure Order. Many creditors who were originally going to toggle towards equity chose not to after the following negative events occurred due to Committee actions taken under its professionals advice: 1) no creditors, other than Committee members, appointed to NewCo Board, 2) creditor appointees control of Board reduced from 2.5:1 ratio to a 2:1 ratio, 3) reduction in Fahrenheit initial investment from $50 to $33 million, and 4) resignation of the lead Fahrenheit investor Michael Arrington from the NewCo Board due to the appointment of creditor Simon Dixon as a Board Observer. Taken together, these actions are why creditors lost confidence in NewCo and there were only a minimal number of creditors, 4.25% of claim value, interested in buying NewCo equity at what was meant to be an enticing 30% discount.

18. The definition of fair value is the price where a willing buyer and a willing seller transact. The balloting results clearly illustrate that the fair value for NewCo is far below the 30% discount that was used on the ballot. Thus, the value of NewCo must be discounted by a minimum of 30%, which translates to a reduction in recovery percentage of at least 8.9%, which is significantly greater than the 5.8% difference between the NewCo and OWD recovery percentages. If the HoldCo discount is also included, the NewCo recovery percentage should be reduced by 11.5%. Thus, the Plan must be switched to the OWD in compliance with both the Debtor and Committee's fiduciary obligations, which the Court should mandate.

### Plan Administrator

19. The Seventh Supplement also revealed that as the future Plan Administrator, Chris Ferraro, will oversee the proposed EIP awards. Mr. Ferraro is proposed to receive approximately 25% of the overall EIP bonus pool. This is a classic case of the fox guarding the hen house, and clearly illustrates how the Debtor and Committee under the guidance of their professionals have totally ignored their fiduciary obligations to creditors, in favor of their own self-interests.

### Conclusion and Remedies

20. It is time for the Court to make appropriate remedies by modifying the Plan so that it is indeed in the best interests of creditors. The Court should reverse the appointments to the NewCo Board of the tainted Mr. Aidoo and conflicted Ms. LaPuma. It should mandate that the NewCo Board retain the originally agreed ratio of 2.5:1 or better, creditor appointees to Fahrenheit appointees. One way that the Court could remedy the situation would be to place two of the Committee chosen Board Observers into actual Board seats, either replacing Mr. Aidoo and Ms. LaPuma or expanding the Board to 11 with a ratio of 3:1.

21. Given the discredited NewCo valuation and the superior recovery of the OWD, as well as its increased distribution of crypto to creditors, the Court should mandate a toggle to OWD or as a minimum a re-valuation of the NewCo recovery including appropriate discounts and accounting for the voting results of the Weighted Distribution Election.

22. It should restore the proper oversight responsibility to the LOC for the hiring and compensation of professionals for the Litigation Trust. It should also reverse the conflicted appointments of Mr. Jindal and Mr. Uzzi to the LOC.

23. Most importantly, it must allow the professionals to be held accountable for their actions detrimental to creditor interests in violation of their fiduciary duties. It should provide a limited carve-out to the overly broad third-party releases and exculpation provisions for the Board and LOC selection processes and other actions taken post Disclosure Order through the subsequent Plan Supplements that were adverse to creditor interests. It should empower the Avoidance Action Oversight Subcommittee of the LOC, which is unconflicted, to investigate and bring appropriate actions against the professionals, should they be warranted, on behalf of the creditors through the Litigation Trust. This is most important, since appropriate discovery of the full facts and circumstances was not possible within the constraints that the Court placed on discovery by a pro se creditor through the Confirmation Hearing process.

Dated: Los Angeles, California
October 27, 2023

/s/
RICHARD PHILLIPS
Creditor