**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## EIGHTH NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Plan Supplement").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on September 27, 2023, the Debtors filed the *Sixth Notice of Filing of Plan Supplement* [Docket No. 3583] (the "Sixth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on October 20, 2023, the Debtors filed the *Seventh Notice of Filing of Plan Supplement* [Docket No. 3869] (the "Seventh Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Eighth Plan Supplement" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, and the Seventh Plan Supplement, the "Plan Supplement")[3], which includes the following documents:

| Exhibit | Document |
|---------|----------|
| A | Litigation Administrator Agreement |
| A-1 | (Redline) Litigation Administrator Agreement |
| B | U.S. Bitcoin Management Agreement |
| B-1 | (Redline) U.S. Bitcoin Management Agreement |
| C | U.S. Bitcoin Cedarvale Interim Services Agreement |
| C-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Sponsor Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights to the extent provided in the Plan and the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re:

---

[3]    **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, and the Sixth Plan Supplement.

Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

*[Rest of page intentionally left blank]*

New York, New York
Dated: October 30, 2023

/s/ Joshua A. Sussberg

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:           joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:           patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Annex 1

I.    ***Notice of Filing of Plan Supplement* [Docket No. 3115].**

<u>Exhibit</u>    <u>Document</u>

A    Schedule of Released and Exculpated Parties

B    ADR Procedures

II.    ***Second Notice of Filing of Plan Supplement* [Docket No. 3273].**

<u>Exhibit</u>    <u>Document</u>

A    Schedule of Retained Causes of Action

B    Schedule of Equitably Subordinated Claims

C    Schedule of Excluded Parties

III.    ***Third Notice of Filing of Plan Supplement* [Docket No. 3444].**

<u>Exhibit</u>    <u>Document</u>

A    New Organizational Documents

B    Identities of the members of the New Board of NewCo

C    Schedule of Rejected Executory Contracts and Unexpired Leases

D    Schedule of Assumed Executory Contracts and Unexpired Leases

E    Litigation Administrator Agreements

F    Identity of Litigation Administrator

G    Identities of Litigation Oversight Committee Members

H    Employee Transition Services Agreement

I    Plan Administrator Budget

J    ADR Procedures (Redline at Exhibit J-1)

K    Schedule of Retained Causes of Action (Redline at Exhibit K-1)

IV.    ***Fourth Notice of Filing of Plan Supplement*** **[Docket No. 3483].**

| Exhibit | Document |
|---------|----------|
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) NewCo Organizational Documents |

V.    ***Fifth Notice of Filing of Plan Supplement*** **[Docket No. 3550].**

| Exhibit | Document |
|---------|----------|
| A | Identities of the members of the New Board of NewCo |
| A-1 | (Redline) Identities of the members of the New Board of NewCo |

**VI.**    ***Sixth Notice of Filing of Plan Supplement*** [Docket No. 3583].

| Exhibit | Document |
|---------|----------|
| A | Identities of Litigation Oversight Committee Members |
| A-1 | (Redline) Identities of Litigation Oversight Committee Members |
| B | Coinbase Prime Brokerage Agreement |
| B-1 | (Redline) Coinbase Prime Brokerage Agreement |
| C | Litigation Administrator Agreement |
| C-1 | (Redline) Litigation Administrator Agreement |
| D | Plan Administrator Agreement |
| D-1 | (Redline) Plan Administrator Agreement |
| E | Schedule of Excluded Parties |
| E-1 | (Redline) Schedule of Excluded Parties |
| F | Board Observer Agreement |
| G | Identities of the Board Observers |
| H | NewCo Board Terms |

**VII.**    ***Seventh Notice of Filing of Plan Supplement*** [Docket No. 3869].

| Exhibit | Document |
|---------|----------|
| A | Schedule of Retained Causes of Action |
| A-1 | (Redline) Schedule of Retained Causes of Action |
| B | ADR Procedures |
| B-1 | (Redline) ADR Procedures |
| C | ADR Valuation Form |
| D | Litigation Administrator Agreement |
| D-1 | (Redline) Litigation Administrator Agreement |
| E | Plan Administrator Agreement |

| | |
|---|---|
| E-1 | (Redline) Plan Administrator Agreement |
| F | Paxos Agreement |
| F-1 | (Redline) Paxos Agreement |
| G | Coinbase Agreement |
| G-1 | (Redline) Coinbase Agreement |
| H | Schedule of Released and Exculpated Parties |
| H-1 | (Redline) Schedule of Released and Exculpated Parties |
| I | Registration Rights Agreement |
| J | U.S. Bitcoin Management Agreement |
| J-1 | (Redline) U.S. Bitcoin Management Agreement |
| K | Proof Group IP License |
| K-1 | (Redline) Proof Group IP License |
| L | U.S. Bitcoin Cedarvale Interim Services Agreement |
| L-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |
| M | PayPal Distribution Services Agreement |

## Exhibit A

**Litigation Administrator Agreement**

*DRAFT*

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "<u>Agreement</u>"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "<u>Debtor</u>" and collectively the "<u>Debtors</u>"), and [Mohsin Y. Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "<u>Litigation Adminstrator</u>"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "<u>Plan</u>"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>."

### RECITALS

WHEREAS, each Debtor other than the GK8 Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on July 13, 2022 (the "<u>Petition Date</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "<u>GK8 Debtors</u>") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (such cases, the "<u>Chapter 11 Cases</u>"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "<u>Confirmation Order</u>"); and

WHEREAS, the Plan provides, among other things, for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "<u>Plan Claims</u>"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "<u>Collection Actions</u>", and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "<u>Post-Emergence Claims</u>"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1    Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)    The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claim Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)    The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)    The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)    The Litigation Administrator agrees to administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement.

(e)    The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)    Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claim Holder shall be binding and conclusive on all Claim Holders even if such Claim Holders have different or conflicting interests.

(g)    The Litigation Oversight Committee shall designate three (3) members to serve on a subcommittee, the ("Avoidance Action Oversight Subcommittee").  The Earn Ad Hoc

2

Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action Oversight Subcommittee, subject to the consent of the Committee (as defined in the Plan). The Avoidance Action Oversight Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the settlement and prosecution of, Avoidance Actions against non-Insider (or former Insider) individual Account Holders for prepetition transfers of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date. The Litigation Oversight Committee, the Litigation Administrator, and the Avoidance Action Oversight Subcommittee shall agree on a process for resolving the settlement and prosecution of Avoidance Actions described in this subsection. For the avoidance of doubt, the Avoidance Action Oversight Subcommittee shall be subject to the same fiduciary duties as the Litigation Oversight Committee.

       2.2    <u>Removal of Litigation Oversight Committee Members.</u>

       (a)    A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

       (b)    To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

For purposes of this Agreement:

       (i)    "<u>Cause</u>" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of written notice specifying such failure in reasonable detail; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's disclosure of information in violation of Section 2.9; (iv) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (v) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder; (vi) a Person's breach of fiduciary duties; or (vii) an unresolved conflict of interest which cannot be obviated by appointment of a substitute with respect to claims that are the subject of a conflict determination made by the Litigation Oversight Committee pursuant to Section 2.8; and

       (ii)    "<u>Disability</u>" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties hereunder for three (3)

consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

2.3     The Post-Emergence Claims.

(a)     From and after the Effective Date, the Litigation Administrator shall have access to copies of the Debtors', the Estates', the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, all in compliance with applicable law.  From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Litigation Administrator shall have access to any relevant documents, information or personnel reasonably related to the Litigation Administrator's responsibilities under the Plan and this Agreement, and the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved.

(b)     The Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)     The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any

4

reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.

(d)    To the extent requested by the Litigation Administrator, the Debtors shall cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims. Without limiting the foregoing, the Celsius Professionals shall provide the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Disputed Claims, the Recovery Causes of Action, and the Contributed Claims.    Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants). The Celsius Professionals shall be reimbursed from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals directly connected with such cooperation by the Celsius Professionals.

(e)    Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof.

2.4    Privileges.

(a)    The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "Privileges") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "Privilege Parties") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "Privileged Information").    The Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a

5

privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Parties.

(b)    The foregoing shall vest the Privileges concerning the Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claim Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Privileged Information.

(c)    The Privilege Parties agree to take all necessary actions to provide to the Litigation Administrator without the necessity of a subpoena all Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity directly related to action taken pursuant to this provision.  The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Privileged Information, and no such person may object to the production to the Litigation Administrator of such Privileged Information on the basis of a Privilege held by a Privilege Party.  Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Privileged Information shall be produced solely to the Litigation Administrator or as required by law.  For the avoidance of doubt, this Subsection is subject in all respects to Section 2.4(a) of this Agreement.

(d)    Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Privileged Information between the Privilege Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section 2.4, for the avoidance of doubt, no Privilege or Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent access to any Privileged

Information to the extent that such Privileged Information also directly or indirectly relates to Post-Emergence Claims.

2.5  <u>Payment of Fees and Expenses</u>.  The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan ("<u>Litigation Administrator Professionals</u>").  The Litigation Administrator has the right and authority, without further approval from the Bankruptcy Court or any other party, to engage Litigation Administrator Professionals, including without limitation one or more attorneys, to handle specific litigations or to represent the Litigation Administrator in a general capacity, in furtherance of the Litigation Administrator's duties.  The Litigation Oversight Committee shall exercise oversight and may give direction with respect to the initiation or settlement of litigation to the extent specifically provided in the Plan, including, to the extent not expressly delegated by the Litigation Oversight Committee to the Litigation Administrator, the selection, compensation or supervision of Litigation Administrator Professionals.  All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid solely from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors.  For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the Claim Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.  For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

2.6  <u>Nature and Purpose of the Litigation Administrator</u>.

(a)  <u>Purpose</u>.  The Litigation Administrator is empowered, subject to the terms and conditions of this Agreement, to implement the Plan with respect to all Debtors on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders.  The Litigation Administrator shall (i) prosecute all Post-Emergence Claims, resolve all Post-Emergence Claims, monetize the Post-Emergence Claims, and distribute the Litigation Proceeds in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with the Plan, Confirmation Order, and this Agreement, without the objective of continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement.  The Responsibilites of the Litigation Administrator shall include: (a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or

beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Agreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of this Agreement;

(b)    Relationship.  Subject to Section 4.10, the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claim Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claim Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall be as conferred upon them by the Plan, the Confirmation Order and this Agreement. Pursuant to Article IV.G.6 of the Plan, the Litigation Administrator and Litigation Oversight Committee shall each act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account.  For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

(c)    No Waiver of Claims.  In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Disputed Claims or Interests after the Effective Date. No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto.  The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7    Appointment as Representative.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims.  Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the

extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce
and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors,
and the Estates for the benefit of the Claim Holders or settle or otherwise dispose of Post-
Emergence Claims.  Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to
the Claim Holders consistent with the provisions of the Plan, Confirmation Order, and this
Agreement.

      2.8    <u>Conflicts of Interest</u>. Notwithstanding anything to the contrary contained in this
Agreement, the Litigation Oversight Committee shall have the exclusive power and right to
oversee and determine any actual or potential conflicts of interest with respect to the Litigation
Administrator and the Litigation Administrator's performance under this Agreement.   Any
decision or determination made by the Litigation Oversight Committee with respect to whether
the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation
Administrator.  Until such time as the circumstances giving rise to such conflict of interest are
remedied, the Litigation Oversight Committee shall have the exclusive power and right, as its sole
and exclusive option, to designate a member of the Litigation Oversight Committee, professional
natural person, entity or financial institution with experience administering bankruptcy claims to
act as the Litigation Administrator with respect to any claims that are the subject of a conflict
determination made by the Litigation Oversight Committee. The Litigation Administrator
designated by the Litigation Oversight Committee with respect to any conflict determination made
by the Litigation Oversight Committee may incur any reasonable and necessary expenses in
connection with retaining professionals, consultants and advisors to aid it in fulfilling its
obligations under this Agreement and the Plan.

      2.9    <u>Confidentiality</u>.  The Litigation Administrator and the Members shall, during the
period that the Litigation Administrator and the Members serve as Litigation Administrator or
Member, whichever is applicable, under this Agreement and for a period of two (2) years following
the termination of this Agreement or following such Litigation Administrator's or Member's
removal or resignation hereunder, whichever is applicable, hold strictly confidential and not use
for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator
or Member may be employed any non-public information of or pertaining to any Person to which
any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the
Litigation Administrator or the Members have become aware in the Litigation Administrator's
capacity as Litigation Administrator (including information contained or reflected in the Litigation
Administrator Materials) or the Members' capacity as Member, until (a) such information is made
public other than by disclosure by the Litigation Administrator, any Members, or any Litigation
Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator or
Member is required by law to disclose such information (in which case the Litigation
Administrator or Member shall provide the relevant Person reasonable advance notice and an
opportunity to protect his, her, or its rights); (c) the Litigation Administrator or Member obtains a
waiver of confidentiality from the applicable Person; or (d) the Litigation Administrator is
reasonably advised by the Litigation Administrator Professionals to disclose the type of
information described in Section 2.9 herein to the extent that it is done in the performance of the
Litigation Administrator's responsibilities under this Agreement.

## ARTICLE III
## INTERESTS

3.1    <u>Interests.</u>  The Claim Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    <u>Interests Beneficial Only</u>.  The entitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claim Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3    <u>Registry of Post-Emergence Claims.</u>

(a)    The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "<u>Registrar</u>"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)    The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claim Holders (the "<u>Claim Holder Register</u>"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claim Holder Register shall be made available to Claim Holders at the office of the Litigation Administrator or such other location as the Litigation Administrator reasonably shall specify upon three (3) Business Days' written notice to the Litigation Administrator.

3.4    <u>Effect of Death, Incapacity or Bankruptcy</u>.  The death, incapacity or bankruptcy of any Claim Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claim or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claim Holders under this Agreement.

3.5    <u>Change of Address</u>.  Any Claim Holders may, after the Effective Date, select an alternative distribution address by providing written notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar. Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6    <u>Standing</u>.  No Claim Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

## ARTICLE IV
## RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR

4.1    <u>Role of the Litigation Administrator</u>.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment and maintenance of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in good faith in the interests of all Claim Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts in its reasonable judgment and discretion to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2    <u>Power to Contract</u>.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3    <u>Ultimate Right to Act Based on Advice of Counsel or Other Professionals</u>.  Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4    [RESERVED]

4.5    <u>Authority to Prosecute and Settle Post-Emergence Claims.</u>

(a)     Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall have sole authority to prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than an amount determined by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)     To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."  Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable Claim.  For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)     Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6     <u>Liquidation of Post-Emergence Claims.</u>  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.  The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim Holders, *provided*, *however*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination).  Pursuant to

an agreed-upon budget in accordance with Section 4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

      4.7   <u>Distributions</u>.

      (a)   After the Litigation Proceeds are received by the Litigation Administrator, the Litigation Administrator shall make periodic distributions of the Litigation Proceeds (net of the costs of obtaining such Litigation Proceeds) to the Claim Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement as the Litigation Administrator shall determine, in consultation with the Litigation Oversight Committee, after (i) funding any reserves deemed necessary or appropriate by the Litigation Administrator and (ii) maintaining such funding in the Litigation Recovery Account in accordance with the Plan and as deemed necessary or appropriate by the Litigation Administrator.

      (b)   In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent or committed to be spent by the Litigation Administrator(s) or reasonably determined by the Litigation Administrator to be maintained as an expense reserve in the proper performance of its responsibilities hereunder, the funds in the Litigation Recovery Account Pro Rata to the Claim Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, in consultation with the Litigation Oversight Committee, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

      (c)   The Litigation Administrator shall make distributions to Claim Holders at the last-known address for each such Claim Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date. Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer or ACH payment from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "<u>Litigation Administrator Account</u>"), the option of which shall be in the sole discretion of the Litigation Administrator. If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date. After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the

terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred. Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)    The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement. The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)    The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim. In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim. Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)    The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)    The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Allowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution. Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Wind-Down Process set forth in Section 9.1 of this Agreement.

(h)    Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 180 days after the issuance of such check. Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby

against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 240 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have been negotiated within 180 days after the date the check was mailed or otherwise delivered to the Holder.

(i)     Subject to Sections 4.8, 4.10 and 4.11 hereof, and the provisions of this Section 4.7, any non-Cash property made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim Holders pursuant to the reporting obligations provided in Section 4.13 of this Agreement.  If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property.  Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)     Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day, and the 180-day limit described in Section 4.7(h) above shall be similarly extended to the next Business Day if it would otherwise occur on a date that is not a Business Day.

4.8     Management of Post-Emergence Claims.

(a)     Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement.  No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)     In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement,

the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) to the extent expressly required herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9    <u>Investment of Cash</u>.  The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act or money market funds containing only such U.S. Government securities; *provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses, subject in all cases to Section 2.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.5).

4.10    <u>Additional Powers of the Litigation Administrator.</u>  In addition to any and all of the powers specifically enumerated above, and subject to the retained jurisdiction of the Bankruptcy Court, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee, shall be empowered to:

(a)    take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)    make distributions to Claim Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)    hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claim Holders (including any Litigation Proceeds);

(d)    perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the

Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.3 hereof;

(e)    protect and enforce the rights of the Post-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)    subject to Section 2.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)    make all payments relating to the administration of the Litigation Recovery Account;

(i)    expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning as promptly as is reasonably practicable after the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)    obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)    (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)    request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m)    investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to

or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n)    without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o)    execute offsets or assert counterclaims against Claim Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p)    subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)    retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and (ii) prepare and file any tax returns or informational returns for the Litigation Recovery Account as may be required;

(r)    take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)    take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)    liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)    take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)    (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to

them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided* that the Litigation Administrator shall work in good faith with the Plan Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement.

4.11    Limitations on Power and Authority of the Litigation Administrator. The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would reasonably be expected to make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claim Holders or assign the Debtors', Post-Effective Date Debtors', or Claim Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee to the extent provided in Section 2.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    Books and Records. The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation

Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements for the Litigation Recovery Account. Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    <u>Reports</u>.

(a)    <u>Financial and Status Reports</u>. The fiscal year of the Litigation Recovery Account shall be the calendar year. Within 90 days after the end of each calendar year during the existence of the Litigation Recovery Account, within 45 days after the end of each calendar quarter during the existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claim Holders appearing in the Claim Holder Register as of the end of such period or such date of closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claim Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claim Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate by the Litigation Administrator, in its reasonable judgment, to be disclosed by it. In addition, the Litigation Administrator shall make available unaudited financial statements to each Claim Holder on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court). The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claim Holder. The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claim Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claim Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)      Annual Plan and Budget.   If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

## ARTICLE V
## LITIGATION RECOVERY ACCOUNT

5.1      Establishment of Litigation Recovery Account.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such Claims, and (d) fund the Litigation Administrator Expenses.   The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, and Litigation Administrator Expenses have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired. Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claim Holders in accordance with the Plan and this Agreement. The Litigation Oversight Committee may authorize reserving amounts for obligations and expenses expected to be payable.

5.2      Cash in the Litigation Recovery Account.  Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Post-Effective Date Debtors for the benefit of Claim Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan.  Cash shall be either (x) held in an interest-bearing account or (y) invested in interest-bearing obligations of the type described in Section 4.9, and having (in either case) a maturity date of not more than 30 days.  All such Cash or investments shall be held at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import.  Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

5.3      Distributions After Allowance of Disputed Claims or Disputed Interests.  At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so

retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter. The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

5.4    <u>Distributions After Disallowance of Disputed Claims</u>. If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1    <u>Independent Litigation Administrator</u>. The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2    <u>Litigation Administrator's Term of Service, Compensation and Reimbursement</u>.

(a)    <u>Term of Service</u>. The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)    <u>Compensation</u>. The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on <u>Exhibit B</u> hereto (the "<u>Litigation Administrator Compensation</u>"). The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court. Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; *provided*, *however*, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)    <u>Expenses</u>. The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator

hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Administrator Expenses" and, together with the Litigation Administrator Compensation, the "Litigation Administrator Fees").

(d)    Payment.  The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.  The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3    Resignation.  The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claim Holders); *provided, however*, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claim Holders.  Such resignation shall become effective on the earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment.  Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein.  Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claim Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.  Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 2.2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a

23

Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided*, *however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claim Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided*, *however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder. For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)    During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee, in consultation with the Litigation Administrator, shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator"). The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided*, *however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses. Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)    To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6    Effect of Resignation or Removal. The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to

the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator. In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator. Notwithstanding anything to the contrary contained in this Agreement, any Litigation Administrator who is removed or resigns pursuant to this Agreement shall retain its right to coverage under any applicable insurance policies and indemnification in accordance with Article VII for its acts or omissions occurring prior to such removal or resignation.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

7.1    No Further Liability.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless determined by a final judgment of a court of competent jurisdiction to arise out of such Person's own fraud, willful misconduct or gross negligence.  Unless so arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator. Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.  None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.  Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given.   Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions determined by a final judgment of a court of competent jurisdiction to have arisen out of such Person's fraud, willful misconduct or gross negligence.  Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) will conclusively be deemed not to constitute fraud,

25

willful misconduct or gross negligence. No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such termination, amendment, modification or repeal. Notwithstanding the foregoing, in no event shall the Litigation Administrator have any liability under any circumstances for any acts or omissions taken by it at the direction of the Litigation Oversight Committee.

7.2    <u>Indemnification of the Litigation Administrator and Litigation Oversight Committee</u>.

(a)    From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "<u>Litigation Administrator Agreement Indemnified Party</u>," and collectively, the "<u>Litigation Administrator Agreement Indemnified Parties</u>") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in

26

Section 4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party that expressly waives such benefits.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party. For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    <u>Litigation Administrator Liabilities</u>. All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law. No liability of the Litigation Administrator will be payable in whole or in part by any Claim Holders individually or in the Claim Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claim Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    <u>Limitation of Liability</u>. None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5     Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

# ARTICLE VIII
# TAX MATTERS

8.1     Treatment of Post-Emergence Claims.  For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claim Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)     The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2     Withholding of Taxes. The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claim Holders for all purposes of this Agreement.

(a)     The Litigation Administrator shall be authorized to collect such tax information from the Claim Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claim Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claim Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)     The Litigation Administrator may refuse to make a distribution to any Claim Holders that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Claim Holder, the Litigation Administrator shall make such distribution to which the Claim Holders is entitled, without interest; and, provided, further, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claim Holder fails

to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation Administrator, that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution.

(c)     In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claim Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    <u>Valuation</u>.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

## ARTICLE IX
## TERMINATION OF THE AGREEMENT

9.1    <u>Termination</u>.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or (with the approval of the Litigation Oversight Committee) abandoned all Post-Emergence Claims, (b) all objections to the Disputed Claims have been resolved, and (c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim Holders is likely to exceed the value of consideration available for distribution and provided that clause (c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "<u>Wind-Down Process</u>").  Such date upon which

the Litigation Recovery Account shall finally be closed shall be referred to herein as the "Termination Date."

9.2    Continuance of the Litigation Administrator for Winding Up. During the Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed. During the Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.5 hereof. Upon distribution of all the Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.3 hereof. At the Litigation Administrator's discretion, but subject in all cases to Section 2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder). Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claim Holders as provided herein, the Post-Emergence Claims shall be cancelled.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1    No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claim Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Section 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2    No amendment, supplement or waiver of or to this Agreement shall adversely affect the interests, rights or treatment of the Litigation Administrator without the prior written consent of the Litigation Administrator.

10.3    No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2    Jurisdiction.  Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims.  Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court.  Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement).  Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    Severability.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    Notices.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)      If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway, 19th Floor
New York, New York 10019
Attn: Celsius Litigation Administrator, Mohsin Y. Meghji
Email: Celsius_Litigation_Admin@m3-partners.com

With a copy to:

White & Case LLP
David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
        sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

   (ii)  If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
      ross.kwasteniet@kirkland.com
      chris.koenig@kirkland.com
      dan.latona@kirkland.com

      (iii)    if to any Claim Holders, to the last known address of such Claim Holders, according to the Litigation Administrator's records;

      (iv)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

    11.5   Headings.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

    11.6   Plan and Confirmation Order.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

    11.7   Entire Agreement.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

    11.8   Cumulative Rights and Remedies.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

    11.9   Meanings of Other Terms.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the

33

corresponding Articles, Sections and other subdivisions of this Agreement and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement.  The term "including" shall mean "including, without limitation."

11.10  <u>Successors in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.3 hereto.  The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.3 hereto.  For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11  <u>Limitations</u>.  Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.  The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12  <u>Further Assurances</u>.  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14  <u>Authority</u>.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes a

legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

[Signature Page to Litigation Administrator Agreement]

## <u>EXHIBIT A</u>

**Initial Members of the Litigation Oversight Committee**

1. Mark Robinson

2. Gerard Uzzi

3. Vik Jindal

4. Deirdre O'Connor

5. Cameron Crews, designated by the Earn Ad Hoc Group

6. David Adler, designated by the Retail Borrower Ad Hoc Group

7. A Person or Entity selected in accordance with the Confirmation Order.

## <u>EXHIBIT B</u>

### Compensation of Litigation Administrator

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action.  Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

## Exhibit A-1

**(Redline) Litigation Administrator Agreement**

*DRAFT*

## LITIGATION ADMINISTRATOR AGREEMENT

This Litigation Administrator Agreement is made this [●] day of [●], 2023 (this "Agreement"), by and among Celsius Network, LLC on behalf of itself and its debtor affiliates (each a "Debtor" and collectively the "Debtors"), and [Mohsin Y. Meghji], as the Litigation Adminstrator referred to herein (in such capacity, the "Litigation Adminstrator"), in order to facilitate the implementation of the plan of reorganization as set forth in the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3319] dated August 15, 2023 (as the same may be amended, supplemented, or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement, the "Plan"). Each Debtor and the Litigation Adminstrator are sometimes referred to herein individually as a "Party" and, collectively, as the "Parties."

### RECITALS

WHEREAS, each Debtor other than the GK8 Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on July 13, 2022 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and GK8 Ltd., GK8 UK Limited, and GK8 USA LLC (collectively, the "GK8 Debtors") each filed a voluntary petition for relief under the Bankruptcy Code on December 7, 2022 (such cases, the "Chapter 11 Cases"); and

WHEREAS, on [●], 2023, the Bankruptcy Court entered its order confirming the Plan (the "Confirmation Order"); and

WHEREAS, the Plan provides, among other things, for (a) the prosecution of the remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims by the Litigation Administrator (together, the "Plan Claims"), (b) the collection of the Goldstein Loan, the Leon Loan, and any CEL Insider Loans by the Litigation Administrator (together, the "Collection Actions", and together with the Plan Claims and any Causes of Action (as defined in the Plan) that the Plan Administrator and Litigation Administrator agree should be prosecuted for the benefit of creditors, the "Post-Emergence Claims"), (c) the oversight role of the Litigation Oversight Committee, (d) the establishment of the Litigation Recovery Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation Administrator, and (e) the governance of the powers, duties, and responsibilities of the Litigation Administrator, in accordance with the Plan, the Confirmation Order, and this Agreement; and

WHEREAS, the Litigation Administrator shall have all powers necessary to implement and administer the provisions of this Agreement as provided herein;

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the promises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For all purposes of this Agreement, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION ADMINISTRATOR AND THE LITIGATION OVERSIGHT COMMITTEE

2.1    Establishment and Appointment of the Litigation Administrator and the Litigation Oversight Committee.

(a)    The Debtors and the Litigation Administrator, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of the Bankruptcy Code, hereby establish this Agreement on behalf of the Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account pursuant to the Plan (the "Claim Holders"), on the terms set forth herein.  In connection with the exercise of the Litigation Administrator's powers hereunder, the Litigation Administrator may use the name "Litigation Administrator" or such variation thereof as the Litigation Administrator sees fit.

(b)    The Litigation Administrator is hereby appointed under this Agreement effective as of the Effective Date.

(c)    The initial members of the Litigation Oversight Committee (each such Person and any other Person appointed to be a member of the Litigation Oversight Committee pursuant to this Agreement, a "Member") are identified on **Exhibit A** hereto and were appointed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group in accordance with the Plan.  In the event that the Litigation Oversight Committee has not been established at any time and from time to time, then all references herein to the Litigation Oversight Committee shall be deemed to be omitted and not effective in any respect unless and until the Members thereof are appointed in accordance with the Plan.

(d)    The Litigation Administrator agrees to administer the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders, subject to the provisions of the Plan, the Confirmation Order and this Agreement, and shall serve at the direction of the Litigation Oversight Committee (if appointed) in accordance with the terms of this Agreement.

(e)    The Litigation Administrator and each successor serving from time to time hereunder shall have all the rights, powers, and duties as set forth herein.

(f)    Subject to the terms of this Agreement, any action by the Litigation Administrator and/or the Litigation Oversight Committee that affects the interests of more than one Claim Holder shall be binding and conclusive on all Claim Holders even if such Claim Holders have different or conflicting interests.

(g)    The Litigation Oversight Committee shall designate three (3) members to serve on a subcommittee, the ("Avoidance Action Oversight Subcommittee").  The Earn Ad Hoc

2

Group and the Retail Borrower Ad Hoc Group shall each have the right to appoint one (1) member of the Avoidance Action Oversight Subcommittee, subject to the consent of the Committee (as defined in the Plan). The Avoidance Action Oversight Subcommittee shall confer with the Litigation Administrator with respect to, and oversee the settlement and prosecution of, Avoidance Actions against non-Insider (or former Insider) individual Account Holders for prepetition transfers of less than $1 million, valued at the date of the applicable transfer and taking into account deposits following the first withdrawal in the ninety (90) days prior to the Petition Date. The Litigation Oversight Committee, the Litigation Administrator, and the Avoidance Action Oversight Subcommittee shall agree on a process for resolving the settlement and prosecution of Avoidance Actions described in this subsection. For the avoidance of doubt, the Avoidance Action Oversight Subcommittee shall be subject to the same fiduciary duties as the Litigation Oversight Committee.

        2.2    <u>Removal of Litigation Oversight Committee Members.</u>

        (a)    A Member may be removed by a majority vote of the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof.

        (b)    To the extent there is any dispute regarding the removal of a Member (including any dispute relating to any portion of a Members' fees or a Members' professional fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute.

    For purposes of this Agreement:

        (i)    "<u>Cause</u>" shall mean (i) a Person's willful failure to perform his/her/its material duties hereunder (including, without limitation, with respect to a Member or, to the extent applicable, the Litigation Administrator, regular attendance at meetings of the Litigation Oversight Committee), which is not remedied within 30 days of written notice specifying such failure in reasonable detail; (ii) a Person's commission of an act of fraud, theft or embezzlement; (iii) a Person's disclosure of information in violation of Section 2.9; (iv) a Person's conviction of a felony with all appeals having been exhausted or appeal periods lapsed; (v) a Person's gross negligence, willful misconduct, or knowing violation of law in the performance of his/her/its duties hereunder; (vi) a Person's breach of fiduciary duties; or (vii) an unresolved conflict of interest which cannot be obviated by appointment of a substitute with respect to claims that are the subject of a conflict determination made by the Litigation Oversight Committee pursuant to Section 2.8; and

        (ii)    "<u>Disability</u>" of the Litigation Administrator or a Member who is a natural person shall have occurred if, as a result of such Person's incapacity due to physical or mental illness as determined by a physician selected by the Litigation Administrator or the Member, as applicable, and reasonably acceptable to the Litigation Oversight Committee, the Litigation Administrator or the Member shall have been substantially unable to perform his or her duties

hereunder for three (3) consecutive months or for an aggregate of 180 days during any period of twelve (12) consecutive months.

2.3    The Post-Emergence Claims.

(a)    From and after the Effective Date, the Litigation Administrator shall have access to copies of the Debtors', the Estates', the Post-Effective Date Debtors', the Celsius Professionals' (as defined in Section 2.3(d)), and the Plan Administrator's records and information directly or indirectly relating to the Post-Emergence Claims that are in the possession or control of any of such Parties, including copies of electronic records or documents, all in compliance with applicable law. From and after the Effective Date, pursuant to the Plan and the Confirmation Order, the Litigation Administrator shall have access to any relevant documents, information or personnel reasonably related to the Litigation Administrator's responsibilities under the Plan and this Agreement, and the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, and the Plan Administrator agree to preserve records and documents (including electronic records or documents) directly or indirectly related to any Post-Emergence Claims, including without limitation Disputed Claims, the Recovery Causes of Action, and the Contributed Claims, until such time as the Litigation Administrator notifies the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator in writing that such records are no longer required to be preserved.

(b)    The Litigation Administrator and its advisors shall have access to all records, documents, information, and work product in respect of the Post-Emergence Claims (including all electronic records, documents, information and work product) in the possession of the Debtors, the Estates, the Post-Effective Date Debtors, the Contributing Claimants, the Celsius Professionals, and the Plan Administrator; *provided*, for the avoidance of doubt, that such records, documents, information, and work product shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; *provided*, *further*, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide access to, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).

(c)    The Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, the Celsius Professionals, and any party under the direct or indirect control of such Parties shall take, or cause to be taken, all such further actions as the Litigation Administrator may reasonably request, including, reasonably cooperating with the Litigation Administrator for requests for telephone conferences, interviews, and appearances of current and former directors, officers, employees, agents and professionals as witnesses (by affidavits, at depositions, and at hearings/trials, as necessary) and by providing access to the last known address of any such individual, to the extent reflected in the books and records of the Debtors, the Estates, the Post-Effective Date Debtors, the Celsius Professionals, or the Plan Administrator and to the extent permissible under applicable law, in each case in order to permit the Litigation Administrator to investigate, prosecute, protect and preserve all Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall

reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity that takes action pursuant to this provision.

(d)      To the extent requested by the Litigation Administrator, the Debtors shall cause the professionals retained by the Debtors during the Chapter 11 Cases (the "Celsius Professionals") to, subject to any applicable professional rules of responsibility, cooperate with the Litigation Administrator in the investigation and prosecution of the Post-Emergence Claims. Without limiting the foregoing, the Celsius Professionals shall provide the Litigation Administrator access to those attorneys, accountants and other professionals with knowledge of matters directly or indirectly relevant to the Disputed Claims, the Recovery Causes of Action, and the Contributed Claims.   Any privilege or immunity attaching to any documents or communications (whether written or oral) including, but not limited to, any attorney-client privilege, work-product privilege, joint interest privilege, or any other evidentiary privileges or immunity, in each case relating to any Post-Emergence Claims held by the Debtors pursuant to applicable federal, state, and other law shall vest in the applicable Litigation Administrator(s) as of the Effective Date. The Debtors and the Litigation Administrator(s) are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses, and the Debtors shall transfer any and all prepetition case files and work product from the Debtors' current and former in-house and outside counsel (or unredacted copies of such files, as appropriate) within thirty (30) days of the Effective Date; provided, for the avoidance of doubt, that such production shall not include (a) any materials relating to the preparation, filing, or prosecution of these chapter 11 cases or (b) any internal communications of any advisors to the Debtors that are Released Parties; provided, further, that notwithstanding the foregoing proviso, the Litigation Administrator(s) may request, and such advisors shall provide, any primary documents or final work product identified (in such advisors' professional judgement) as materially relevant to the prosecution of any claims against Excluded Parties (including the UCC Claims Stipulation Defendants).   The Celsius Professionals shall be reimbursed from the Litigation Recovery Account for any reasonable and documented fees and out-of-pocket expenses incurred by the Celsius Professionals directly connected with such cooperation by the Celsius Professionals.

(e)      Subject to Section 5.1, hereof, all of the proceeds received by the Litigation Administrator from the pursuit of any Post-Emergence Claims (including any settlements thereof) shall be added to the Litigation Recovery Account and held as a part thereof.

2.4    <u>Privileges</u>.

(a)    The Litigation Administrator shall, on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders, hold all attorney-client privileges, work product protections and other privileges, immunities or protections from disclosure (the "<u>Privileges</u>") held by any one or more of the Debtors (including any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors), the Committee, the Earn Ad Hoc Group, or the Retail Borrower Ad Hoc Group, as applicable (together the "<u>Privilege Parties</u>") related in any way to the Post-Emergence Claims and the purpose of the Agreement (the "<u>Privileged Information</u>").    The Privileged Information shall include documents and information of all manner, whether oral, written, or digital.  For the avoidance of doubt, the Privileges shall include any right to preserve or enforce a privilege that arises from any joint defense, common interest, or similar agreement involving any of the Privilege Parties.

(b)    The foregoing shall vest the Privileges concerning the Privileged Information exclusively in the Litigation Administrator, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the sole benefit of the Litigation Administrator and Claim Holders.  The Litigation Administrator shall have the exclusive authority and sole discretion to maintain the Privileges and keep the Privileged Information confidential, or waive any Privileges and/or disclose and/or use in litigation or any proceeding any or all of the Privileged Information.

(c)    The Privilege Parties agree to take all necessary actions to provide to the Litigation Administrator without the necessity of a subpoena all Privileged Information in their respective possession, custody, or control necessary for the pursuit of Post-Emergence Claims; *provided* that the Litigation Administrator shall agree that the Litigation Recovery Account shall reimburse any reasonable and documented costs and expenses (including attorneys' fees) for any person or entity directly related to action taken pursuant to this provision.  The Litigation Administrator is further expressly authorized to formally or informally request or subpoena documents, testimony or other information that would constitute Privileged Information from any persons, including attorneys, professionals, consultants and experts that may possess Privileged Information, and no such person may object to the production to the Litigation Administrator of such Privileged Information on the basis of a Privilege held by a Privilege Party.  Until and unless the Litigation Administrator makes a determination in its sole discretion to waive any Privilege, Privileged Information shall be produced solely to the Litigation Administrator or as required by law.  For the avoidance of doubt, this Subsection is subject in all respects to Section 2.4(a) of this Agreement.

(d)    Pursuant to, inter alia, Federal Rule of Evidence 502(d), no Privileges shall be waived by granting access to any Privileged Information to the Litigation Administrator or any of its respective employees, professionals or representatives, or by disclosure of such Privileged Information between the Privilege Parties, on the one hand, and the Litigation Administrator, on the other hand, or any of their respective employees, professionals or representatives.

(e)    If a Privilege Party, the Litigation Administrator, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Privileged Information.  In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Administrator of the production and shall demand of all recipients of the inadvertently disclosed Privileged Information that they return or confirm the destruction of such materials.

(f)    Notwithstanding anything to the contrary contained in Section 2.4, for the avoidance of doubt, no Privilege or Privileged Information related to any claims or causes of action that have been released or exculpated under the Plan shall be made accessible to the Litigation Administrator, *provided*, *however*, that the foregoing shall not prevent access to any Privileged Information to the extent that such Privileged Information also directly or indirectly relates to Post-Emergence Claims.

2.5    <u>Payment of Fees and Expenses</u>.  The Litigation Administrator may incur any reasonable and necessary expenses in connection with the performance of its obligations under the Plan, the Confirmation Order and this Agreement, including fees and expenses incurred to monetize the Post-Emergence Claims and pursue the Post-Emergence Claims and in connection with retaining professionals, consultants and advisors as the Litigation Administrator deems necessary to aid it in fulfilling its obligations under this Agreement and the Plan ("<u>Litigation Administrator Professionals</u>"), and on whatever reasonable and/or customary fee arrangements the Litigation Administrator deems appropriate. The Litigation Administrator has the right and authority, without further approval from the Bankruptcy Court or any other party, to engage Litigation Administrator Professionals, including without limitation one or more attorneys, to handle specific litigations or to represent the Litigation Administrator in a general capacity, in furtherance of the Litigation Administrator's duties.  The Litigation Oversight Committee shall exercise oversight and may give direction with respect to the initiation or settlement of litigation to the extent specifically provided in the Plan, but shall not control<u>including, to the extent not expressly delegated by the Litigation Oversight Committee to the Litigation Administrator,</u> the selection, compensation or supervision of counsel, which shall be reserved to the Litigation Administrator <u>Professionals</u>.  All reasonable, documented, out-of-pocket fees, expenses, and costs of the Litigation Administrator shall be paid solely from the Litigation Recovery Account, and solely be the obligation of, the Post-Effective Date Debtors.  For the avoidance of doubt, (i) neither the Plan Administrator nor the Litigation Administrator shall be required to pay any amounts owed to Litigation Administrator Professionals for which the Litigation Recovery Account does not contain adequate funds, and (ii) the Claim Holders shall have no obligation to provide any funding with respect to the Litigation Recovery Account.  For the avoidance of doubt, prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, or any creditors shall not preclude the Litigation Administrator's retention of such professionals, consultants, or other persons.

2.6    <u>Nature and Purpose of the Litigation Administrator</u>.

(a)    <u>Purpose</u>.  The Litigation Administrator is empowered, subject to the terms and conditions of this Agreement, to implement the Plan with respect to all Debtors on behalf of the Post-Effective Date Debtors for the benefit of the Claim Holders.    The Litigation Administrator shall (i) prosecute all Post-Emergence Claims, resolve all Post-Emergence Claims, monetize the Post-Emergence Claims, and distribute the Litigation Proceeds in accordance with the Plan, the Confirmation Order and this Agreement and (ii) administer the Post-Emergence Claims in accordance with the Plan, Confirmation Order, and this Agreement, without the objective of continuing to engage in the conduct of a trade or any other business, except to the extent reasonably necessary to, and consistent with, the purpose of the Agreement. The Responsibilites of the Litigation Administrator shall include: (a) filing and prosecuting (or settling or otherwise compromising, as appropriate) any Recovery Causes of Action and Contributed Claims that the Litigation Administrator and the Litigation Oversight Committee determine should be filed and prosecuted; (b) filing and prosecuting any objections to Claims or Interests or settling or otherwise compromising such Claims and Interests, if necessary and appropriate, in accordance with the Plan, the ADR Procedures, and any applicable orders of the Bankruptcy Court; (c) exercising the Debtors' rights with respect to (i) the Goldstein Loan, (ii) the Leon Loan, and (iii) the loans (or beneficial interests in such loans) collateralized by CEL Token issued to any other Excluded Party; (d) managing the rights to D&O Liability Insurance Policies provided to the Litigation Administrator(s) under the UCC Claims Stipulation and Article IV.G.3 of the Plan; *provided* that the Litigation Administrator's management of the D&O Liability Insurance Policies shall not affect the rights of (i) Entities covered by the D&O Liability Insurance Policies to pursue coverage under such policies or (ii) Entities eligible to recover from the D&O Liability Insurance Policies to pursue recovery from such policies, and all such Entities' respective rights and priorities are undisturbed by this Agreement; (e) retaining such professionals as are necessary and appropriate in furtherance of such Litigation Administrator's fiduciary obligations; and (f) taking such actions as are necessary and reasonable to carry out the purposes of this Agreement;

(b)    <u>Relationship</u>.  Subject to Section 4.10, the Litigation Administrator is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Administrator, the Litigation Oversight Committee (or any Member thereof) or the Claim Holders for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Claim Holders, on the one hand, to the Litigation Administrator and the Litigation Oversight Committee, on the other hand, shall be as conferred upon them by the Plan, the Confirmation Order and this Agreement. Pursuant to Article IV.G.6 of the Plan, the Litigation Administrator and Litigation Oversight Committee shall each act in a fiduciary capacity on behalf of the interests of all Holders of Claims entitled to receive Litigation Proceeds from the Litigation Recovery Account.  For the avoidance of doubt, the Litigation Administrator is acting on behalf of the Post-Effective Date Debtors to prosecute claims of the Debtors for the benefit of Claim Holders pursuant to the Plan and, for all purposes, the Litigation Administrator shall be treated as an agent of the Debtors or Post-Effective Date Debtors, as the case may be, rather than a separate entity.

(c)    No Waiver of Claims.  In accordance with section 1123(b)(3) of the Bankruptcy Code and subject to the terms and conditions of the Plan, the Litigation Administrator may enforce all rights to commence and pursue, as appropriate, any and all Post-Emergence Claims and objections to and resolution of Disputed Claims or Interests after the Effective Date.  No Person or Entity may rely on the absence of a specific reference in the Plan to any Claim against it as any indication that the Litigation Administrator will not pursue any and all Post-Emergence Claims against such Person or Entity; nor may any Person or Entity rely on the absence of a specific reference in the Plan to any Disputed Claim or Interest as any indication that the Litigation Administrator will not pursue any objections thereto.  The Litigation Administrator expressly reserves all Post-Emergence Claims for later adjudication, resolution, abandonment, settlement, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Post-Emergence Claims upon, after or as a consequence of the Confirmation Order.

2.7    Appointment as Representative.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Administrator shall be the duly appointed representative of the Estates for certain limited purposes with respect to prosecution, resolution and settlement of the Post-Emergence Claims.  Post-Emergence Claims and rights shall be transferred to the Post-Effective Date Debtors in accordance with the Transaction Steps Memorandum, and the Litigation Administrator shall be deemed to have been designated as a representative of the Debtors to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Post-Emergence Claims on behalf of the Debtors, the Post-Effective Date Debtors, and the Estates for the benefit of the Claim Holders or settle or otherwise dispose of Post-Emergence Claims.  Notwithstanding the foregoing, all Litigation Proceeds shall be distributed to the Claim Holders consistent with the provisions of the Plan, Confirmation Order, and this Agreement.

2.8    Conflicts of Interest. Notwithstanding anything to the contrary contained in this Agreement, the Litigation Oversight Committee shall have the exclusive power and right to oversee and determine any actual or potential conflicts of interest with respect to the Litigation Administrator and the Litigation Administrator's performance under this Agreement.  Any decision or determination made by the Litigation Oversight Committee with respect to whether the Litigation Administrator is actually or potentially conflicted shall be binding on the Litigation Administrator.  Until such time as the circumstances giving rise to such conflict of interest are remedied, the Litigation Oversight Committee shall have the exclusive power and right, as its sole and exclusive option, to designate a member of the Litigation Oversight Committee, professional natural person, entity or financial institution with experience administering bankruptcy claims to act as the Litigation Administrator with respect to any claims that are the subject of a conflict determination made by the Litigation Oversight Committee. The Litigation Administrator designated by the Litigation Oversight Committee with respect to any conflict determination made by the Litigation Oversight Committee may incur any reasonable and necessary expenses in connection with retaining professionals, consultants and advisors to aid it in fulfilling its obligations under this Agreement and the Plan.

2.9    Confidentiality.  The Litigation Administrator and the Members shall, during the period that the Litigation Administrator and the Members serve as Litigation Administrator or

Member, whichever is applicable, under this Agreement and for a period of two (2) years following the termination of this Agreement or following such Litigation Administrator's or Member's removal or resignation hereunder, whichever is applicable, hold strictly confidential and not use for personal gain or for the gain of any Entity or Person for whom such Litigation Administrator or Member may be employed any non-public information of or pertaining to any Person to which any of the Post-Emergence Claims Materials or Post-Emergence Claims relates or of which the Litigation Administrator or the Members have become aware in the Litigation Administrator's capacity as Litigation Administrator (including information contained or reflected in the Litigation Administrator Materials) or the Members' capacity as Member, until (a) such information is made public other than by disclosure by the Litigation Administrator, any Members, or any Litigation Administrator Professionals in violation of this Agreement; (b) the Litigation Administrator or Member is required by law to disclose such information (in which case the Litigation Administrator or Member shall provide the relevant Person reasonable advance notice and an opportunity to protect his, her, or its rights); (c) the Litigation Administrator or Member obtains a waiver of confidentiality from the applicable Person; or (d) the Litigation Administrator is reasonably advised by the Litigation Administrator Professionals to disclose the type of information described in Section 2.9 herein to the extent that it is done in the performance of the Litigation Administrator's responsibilities under this Agreement.

## ARTICLE III
## INTERESTS

3.1    Interests.  The Claim Holders shall be entitled to distributions from the Litigation Proceeds in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Litigation Administrator will not issue any certificate or certificates to evidence any beneficial interests in the Post-Emergence Claims.

3.2    Interests Beneficial Only.  The entitlement to Claim Holders under the Plan with respect to the Post-Emergence Claims shall not entitle the Claim Holders to any title in or to the Post-Emergence Claims or to any right to call for a partition or division of the Post-Emergence Claims or to require an accounting.

3.3    Registry of Post-Emergence Claims.

(a)    The Litigation Administrator shall appoint a registrar, which may be the Litigation Administrator (the "Registrar"), for the purpose of recording ownership of the Post-Emergence Claims as herein provided.  For its services hereunder, the Registrar, unless it is the Litigation Administrator, shall be entitled to receive reasonable compensation from the Litigation Recovery Account as a cost of administering the Post-Emergence Claims.

(b)    The Litigation Administrator shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Registrar from time to time and acceptable to the Litigation Administrator, a registry of the Claim Holders (the "Claim Holder Register"), which shall be maintained pursuant to such reasonable regulations as the Litigation Administrator and the Registrar may prescribe.  The Claim Holder Register shall be made available to Claim Holders at the office of the Litigation Administrator or such other

location as the Litigation Administrator reasonably shall specify upon three (3) Business Days' written notice to the Litigation Administrator.

3.4     Effect of Death, Incapacity or Bankruptcy.  The death, incapacity or bankruptcy of any Claim Holders during the term of the Agreement shall not (i) operate to terminate the Agreement, (ii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to an accounting, (iii) entitle the representatives or creditors of the deceased, incapacitated or bankrupt party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Post-Emergence Claim or Litigation Proceeds or for a partition thereof, or (iv) otherwise affect the rights and obligations of any of the Claim Holders under this Agreement.

3.5     Change of Address.  Any Claim Holders may, after the Effective Date, select an alternative distribution address by providing written notice to the Litigation Administrator or, as applicable, the Registrar, identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Administrator or, as applicable, the Registrar.  Absent actual receipt of such notice by the Litigation Administrator or, as applicable, the Registrar, the Litigation Administrator shall not recognize any such change of distribution address.

3.6     Standing.  No Claim Holders shall have standing to direct the Litigation Administrator to do or not to do any act or to institute any action or proceeding at law or in equity against any party upon or with respect to the Post-Emergence Claims.

**ARTICLE IV**
**RIGHTS, POWERS AND DUTIES OF LITIGATION ADMINISTRATOR**

4.1     Role of the Litigation Administrator.  In furtherance of and consistent with the purpose of the Agreement and the Plan, subject to the terms and conditions contained in the Plan, the Confirmation Order and this Agreement, the Litigation Administrator shall (i) manage, supervise and protect the Post-Emergence Claims on behalf of the Debtors for the benefit of the Claim Holders; (ii) investigate, analyze, prosecute and, if necessary and appropriate, settle and compromise the Post-Emergence Claims and any objections to the Disputed Claims; (iii) to the extent not duplicative with the Plan Administrator's responsibilities, prepare and file all required tax returns and pay all taxes and all other obligations of the Litigation Administrator; (iv) liquidate and convert the Post-Emergence Claims to Cash and make distributions to the Claim Holders in accordance with Section 4.7 herein; and (v) have all such other responsibilities as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, and all other applicable orders of the Bankruptcy Court, including, but not limited to, establishment and maintenance of the Litigation Recovery Account.  All decisions and duties with respect to the Agreement and the Post-Emergence Claims to be made and fulfilled, respectively, by the Litigation Administrator shall be carried out in accordance with the Plan, the Confirmation Order, this Agreement and all other applicable orders of the Bankruptcy Court.  In all circumstances, the Litigation Administrator shall act in good faith in the interests of all Claim Holders and in furtherance of the purpose of the Agreement, and shall use commercially reasonable efforts in its reasonable judgment and discretion to prosecute, settle or otherwise resolve the Post-Emergence Claims and to make timely distributions of any Litigation Proceeds

realized therefrom and to otherwise monetize the Post-Emergence Claims and not unreasonably prolong the duration of the Agreement.

4.2    Power to Contract.  In furtherance of the purpose of the Agreement, and except as otherwise specifically restricted in the Plan, Confirmation Order, or this Agreement, the Litigation Administrator shall have the right and power on behalf of the Post-Effective Date Debtors, and also may cause the Litigation Recovery Account to enter into any covenants or agreements binding the Litigation Recovery Account, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Litigation Administrator to be consistent with and advisable in furthering the purpose of the Agreement.

4.3    Ultimate Right to Act Based on Advice of Counsel or Other Professionals. Nothing in this Agreement shall be deemed to prevent the Litigation Administrator from taking or refraining to take any action on behalf of the Litigation Recovery Account that, based upon the advice of counsel or other professionals, the Litigation Administrator determines in good faith that it is obligated to take or to refrain from taking in the performance of any duty that the Litigation Administrator may owe the Claim Holders or any other Person pursuant to the Plan, Confirmation Order, or this Agreement.

4.4    [RESERVED]

4.5    Authority to Prosecute and Settle Post-Emergence Claims.

(a)    Subject to the provisions of this Agreement, the Plan, and the Confirmation Order, the Litigation Administrator shall have sole authority to prosecute, pursue, compromise, settle, or abandon any and all Post-Emergence Claims that have not already been resolved as of the Effective Date.  The Litigation Administrator, upon direction by the Litigation Oversight Committee (if appointed), shall have the absolute right to pursue, not pursue, release, abandon, and/or settle any and all Post-Emergence Claims (including any counterclaims asserted against the Litigation Administrator) as it determines in the best interests of the Claim Holders, and consistent with the purposes of the Agreement, and shall have no liability for the outcome of its decision; *provided*, *however*, that the Litigation Administrator shall have the power and authority to pursue, not pursue, release, abandon and/or settle any and all Post-Emergence Claims with a value of less than an amount determined by the Litigation Oversight Committee without any approval by the Litigation Oversight Committee (if appointed).

(b)    To the extent that any action has been taken to prosecute or otherwise resolve any Post-Emergence Claims prior to the Effective Date by the Debtors, on the Effective Date, the Litigation Administrator shall be substituted for the Debtors in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the Litigation Administrator by Bankruptcy Rule 7025, and the caption with respect to such pending litigation shall be changed to the following, at the option of the Litigation Administrator: "[Name of Litigation Administrator], as Representative for the Post-Effective Date Debtors v. [Defendant]" or "Post-Effective Date Debtors v. [Defendant]."  Without limiting the foregoing, the Litigation Administrator shall take any and all actions necessary or prudent to intervene as plaintiff, movant or additional party, as appropriate, with respect to any applicable

Claim.  For purposes of exercising its powers, the Litigation Administrator shall be deemed to be a representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(c)    Subject to Section 4.5(a) hereof, any determinations by the Litigation Administrator, with regard to the amount or timing of settlement or other disposition of any Post-Emergence Claims settled in accordance with the terms of this Agreement shall be conclusive and binding on the Claim Holders and all other parties in interest following the entry of an order of a court of competent jurisdiction (including, as relevant, a Final Order issued by the Bankruptcy Court) approving such settlement or other disposition, to the extent any such order is required to be obtained to enforce any such determinations.

4.6    <u>Liquidation of Post-Emergence Claims.</u>  The Litigation Administrator, in the exercise of its reasonable business judgment, shall, in an expeditious but orderly manner and subject to the other provisions of the Plan, the Confirmation Order, and this Agreement (including Section 2.3), liquidate and convert to Cash the Post-Emergence Claims, make timely distributions in accordance with the terms of the Plan, the Confirmation Order, and this Agreement, and not unduly prolong the existence of the Agreement.  The Litigation Administrator shall exercise reasonable business judgment and liquidate the Post-Emergence Claims to maximize net recoveries to the Claim Holders, *provided*, *however*, that the Litigation Administrator shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the methodologies to be employed to maximize such recoveries.  Such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all of the Post-Emergence Claims or otherwise or through the sale or other disposition of the Post-Emergence Claims (in whole or in combination).  Pursuant to an agreed-upon budget in accordance with Section 4.13(b) of this Agreement, if any, the Litigation Administrator may incur any reasonable and necessary expenses in connection with the liquidation of the Post-Emergence Claims and distribution of the Litigation Proceeds.

4.7    <u>Distributions.</u>

(a)    After the Litigation Proceeds are received by the Litigation Administrator, the Litigation Administrator shall make periodic distributions of the Litigation Proceeds (net of the costs of obtaining such Litigation Proceeds) to the Claim Holders only in accordance with the terms of the Plan, the Confirmation Order, and this Agreement as the Litigation Administrator shall determine, in consultation with the Litigation Oversight Committee, after (i) funding any reserves deemed necessary or appropriate by the Litigation Administrator and (ii) maintaining such funding in the Litigation Recovery Account in accordance with the Plan and as deemed necessary or appropriate by the Litigation Administrator.

(b)    In the reasonable discretion of the Litigation Administrator and subject to Section 4.7(a) hereof, the Litigation Administrator shall promptly distribute, to the extent not spent or committed to be spent by the Litigation Administrator(s) or reasonably determined by the Litigation Administrator to be maintained as an expense reserve in the proper performance of its responsibilities hereunder, the funds in the Litigation Recovery Account Pro Rata to the Claim Holders entitled to receive Litigation Proceeds hereunder, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided* that if such distributions are, in the Litigation Administrator's reasonable judgment, <u>in consultation with the</u>

Litigation Oversight Committee, infeasible to distribute Pro Rata, or such distributions cannot be effectuated for any other reason, the Litigation Administrator(s) may (i) contribute such amounts to NewCo for the benefit of holders of NewCo Common Stock in the event the NewCo Transaction is consummated or (ii) (a) utilize such amounts to fund Wind-Down Expenses or, if no such expenses remain, (b) contribute such amounts to the Bankruptcy Court pursuant to chapter 129 of title 28 of the Judicial Code in the event an Orderly Wind Down is consummated.

(c)    The Litigation Administrator shall make distributions to Claim Holders at the last-known address for each such Claim Holders as indicated on the Litigation Administrator's or Registrar's records as of the applicable distribution date.  Any distribution of Cash by the Litigation Administrator shall be made by the Litigation Administrator via (i) a check drawn on, or (ii) wire transfer or ACH payment from, a bank account established in the name of the Litigation Administrator on or subsequent to the Confirmation Date at a domestic bank selected by the Litigation Administrator (the "Litigation Administrator Account"), the option of which shall be in the sole discretion of the Litigation Administrator.  If any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Litigation Administrator or, as applicable, the Registrar, is notified in writing of the then-current address of such holder, at which time such distribution shall be made as soon as reasonably practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Litigation Administrator Account (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary) for redistribution in accordance with the terms of the Plan and this Agreement, and the claim of any holder to such property or interest in property shall be forever barred.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.

(d)    The Litigation Administrator shall have the authority to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan and this Agreement.  The Litigation Administrator may pay to the Distribution Agents from the Litigation Recovery Account all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents.

(e)    The Litigation Administrator may withhold (but not, except as set forth below, set off) from the distribution called for on account of any Allowed Claim an amount equal in value to any claim or Cause of Action of any nature (including in respect of any Claim) that a Debtor may hold against the Holder of such Claim.  In the event that the value of a Debtor's claim or Cause of Action against a particular Holder of an Allowed Claim is undisputed, resolved by settlement or has been adjudicated by Final Order of any court, the Litigation Administrator may set off such undisputed, resolved or adjudicated amount against distributions that would otherwise be due to such Holder of an Allowed Claim.  Neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Litigation Administrator of any claims or Causes of Action that the Debtors or the Litigation Administrator may possess against any Holder of an Allowed Claim, except to the extent of any waiver, relinquishment, exculpation, release, compromise, or

14

settlement set forth in the Plan or an order of the Bankruptcy Court (including the Confirmation Order).

(f)      The Litigation Administrator may deduct and withhold taxes from any and all amounts otherwise distributable to any Entity determined in the Litigation Administrator's reasonable discretion, required by this Agreement, any law, regulation, rule, ruling, directive, treaty or other governmental requirement in accordance with Section 8.2 hereof.

(g)      The Litigation Administrator shall not be required to make on account of an Allowed Claim (i) partial distributions if any portion of such Claim remains in dispute or payments of fractions of dollars; (ii) a distribution of fractions of Allowed Claims; or (iii) a distribution if the amount of cash to be distributed is less than $250 to any one claimant in a single distribution.  Any funds so withheld and not distributed shall be held in reserve and distributed to such claimant in subsequent distributions except if the aggregate distributions (including the final distribution) to be made by the Litigation Administrator to such claimant is less than $250, in which case such amount shall be included in the Wind-Down Process set forth in Section 9.1 of this Agreement.

(h)      Any check issued by the Litigation Administrator on account of an Allowed Claim shall be null and void if not negotiated within 180 days after the issuance of such check.  Requests for reissuance of any check shall be made directly to the Litigation Administrator by the Holder of the relevant Allowed Claim with respect to which such check originally was issued.  If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within 180 days after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Post-Effective Date Debtors, or any agent acting on their behalf, including the Litigation Administrator.  In such cases, any Cash held for payment on account of such un-negotiated check shall be property of the Post-Effective Date Debtors and revert to the Litigation Administrator Account, free of any Claims of such Holder with respect thereto.  Nothing contained herein shall require the Litigation Administrator to attempt to locate any Holder of an Allowed Claim.  No later than 240 days after the issuance of such checks, the Litigation Administrator shall file with the Bankruptcy Court a list of the Holders of any un-negotiated checks; *provided*, *however*, after the closing or dismissal of the Chapter 11 Cases, the Litigation Administrator shall provide the list of the Holders of any un-negotiated checks on a website maintained by the Litigation Administrator.  For the avoidance of doubt, such list shall not include the Holders of any checks that have been negotiated within 180 days after the date the check was mailed or otherwise delivered to the Holder.

(i)      Subject to Sections 4.8, 4.10 and 4.11 hereof, and the provisions of this Section 4.7, any non-Cash property made accessible to the Litigation Administrator may be sold, transferred, abandoned or otherwise disposed of by the Litigation Administrator.  Notice of such sale, transfer, abandonment or disposition shall be provided to the Claim Holders pursuant to the reporting obligations provided in Section 4.13 of this Agreement.  If, in the Litigation Administrator's reasonable judgment, such property cannot be sold in a commercially reasonable

manner, or the Litigation Administrator believes, in good faith, such property has no value to the Litigation Administrator, the Litigation Administrator shall have the right, subject to the approval of the Litigation Oversight Committee (if appointed), to abandon or otherwise dispose of such property. Except in the case of fraud, willful misconduct, or gross negligence, no party in interest shall have a Cause of Action against the Litigation Administrator, the Litigation Oversight Committee, any Member, or any of their directors, officers, employees, consultants, or professionals arising from or related to the disposition of non-Cash property in accordance with this Section 4.7(i).

(j)    Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day, and the 180-day limit described in Section 4.7(h) above shall be similarly extended to the next Business Day if it would otherwise occur on a date that is not a Business Day.

4.8    Management of Post-Emergence Claims.

(a)    Except as otherwise provided in the Plan, the Confirmation Order or this Agreement, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Administrator may, subject to the direction of the Litigation Oversight Committee (if appointed) to the extent provided in this Agreement, control and exercise authority over the Post-Emergence Claims, over the management and disposition thereof, as necessary or advisable to enable the Litigation Administrator to fulfill the intents and purposes of this Agreement. No Person dealing with the Agreement will be obligated to inquire into the authority of the Litigation Administrator in connection with the acquisition, management or disposition of the Post-Emergence Claims.

(b)    In connection with the management and use of the Post-Emergence Claims and except as otherwise expressly limited in the Plan, the Confirmation Order or this Agreement, the Litigation Administrator will have, in addition to any powers conferred upon the Litigation Administrator by any other provision of this Agreement, the power to take any and all actions as, in the Litigation Administrator's reasonable discretion, are necessary or advisable to effectuate the primary purposes of the Agreement, subject to any approvals of the Litigation Oversight Committee (if appointed) to the extent expressly required herein, including, without limitation, the power and authority to (i) engage and compensate the Litigation Administrator Professionals to assist the Litigation Administrator and the Litigation Oversight Committee with respect to their respective responsibilities; (ii) object to, compromise, and settle Disputed Claims, subject to Bankruptcy Court approval, if applicable; (iii) commence and/or pursue any and all actions involving the Post-Emergence Claims that could arise or be asserted at any time, unless otherwise limited, waived, released, compromised, settled, or relinquished in the Plan, the Confirmation Order, or this Agreement; and (iv) implement the Plan, this Agreement, and applicable orders of the Bankruptcy Court (including, as applicable, the Confirmation Order).

4.9    Investment of Cash. The right and power of the Litigation Administrator to invest the Post-Emergence Claims, the proceeds thereof, or any income earned by the Litigation Administrator shall be limited to the right and power to invest such Post-Emergence Claims only in Cash and U.S. Government securities as defined in section 2(a)(16) of the Investment Company Act or money market funds containing only such U.S. Government securities;

*provided*, *however*, that (a) the Litigation Administrator may retain any Post-Emergence Claims received that are not Cash only for so long as may be required for the prompt and orderly liquidation of such assets, and (b) the Litigation Administrator may expend the Post-Emergence Claims (i) as reasonably necessary to meet contingent liabilities and maintain the value of the Post-Emergence Claims during liquidation, (ii) to pay reasonable and documented administrative expenses, subject in all cases to Section 2.5 of this Agreement, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Administrator (or to which the Post-Emergence Claims are otherwise subject) in accordance with the Plan or this Agreement (including, as applicable, Section 2.5).

4.10    <u>Additional Powers of the Litigation Administrator.</u>  In addition to any and all of the powers specifically enumerated above, and subject to the retained jurisdiction of the Bankruptcy Court, the Litigation Administrator, subject to the direction and approval of the Litigation Oversight Committee, shall be empowered to:

(a)    take any action with respect to the Disputed Claims reconciliation process, including to object to, seek to subordinate, compromise, or settle any and all Disputed Claims, except to the extent Disputed Claims have been previously Allowed;

(b)    make distributions to Claim Holders as set forth in the Plan of the Litigation Recovery Assets or any Litigation Proceeds as set forth in the Plan, including determining dates of distributions;

(c)    hold legal title to any and all rights in or arising from the Post-Emergence Claims, including, but not limited to, the right to collect any and all money and other property belonging to the Claim Holders (including any Litigation Proceeds);

(d)    perform the duties, exercise the powers, and assert the rights of a representative of the Estates under section 1123(b) of the Bankruptcy Code with respect to the Post-Emergence Claims, including the right to assert claims, defenses, offsets, and privileges, subject in all cases to Section 2.3 hereof;

(e)    protect and enforce the rights of the Post-Effective Date Debtors in and to the Post-Emergence Claims by any method deemed reasonably appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law (whether foreign or domestic) and general principles of equity;

(f)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Administrator on behalf of the Post-Effective Date Debtors;

(g)    subject to Section 2.4, assert, enforce, release, or waive any Privilege or defense on behalf of the Debtors or Post-Effective Date Debtors with respect to the Post-Emergence Claims, as applicable;

(h)    make all payments relating to the administration of the Litigation Recovery Account;

17

(i)      expunge from the Claims Register Disputed Claims that have been paid, satisfied, superseded, or released and adjust on the Claims Register any Disputed Claims that have been amended without having to file an objection to such Disputed Claims and without any further notice to or action, order or approval of the Bankruptcy Court; *provided*, *however*, that beginning as promptly as is reasonably practicable after the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Litigation Administrator shall file with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and make available on the Debtors' restructuring website each calendar quarter a list of all Disputed Claims that have been paid, satisfied, superseded, released, or amended during such prior calendar quarter;

(j)      obtain reasonable insurance coverage with respect to the potential liabilities and obligations of the Litigation Administrator, the Litigation Oversight Committee and the Members under this Agreement (in the form of a directors and officers policy, an errors and omissions policy, or otherwise, all at the sole cost and expense of the Litigation Recovery Account);

(k)      (i) receive, manage, invest, supervise, protect, and liquidate the Post-Emergence Claims, withdraw and make distributions from and pay taxes and other obligations owed in respect of Litigation Recovery Account from funds held in the Litigation Recovery Account and (ii) withdraw and make distributions from and pay taxes and other obligations owed in respect of any Disputed Claims in accordance with the Plan and are merely incidental to its liquidation and dissolution;

(l)      request any appropriate tax determination with respect to the Post-Emergence Claims and the Litigation Proceeds, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(m)      investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue, prosecute, abandon, dismiss, exercise rights, powers and privileges with respect to or otherwise deal with and settle, in accordance with the terms set forth in this Agreement, the Post-Emergence Claims;

(n)      without expanding the scope of the definition of "Claims" in the Plan, take appropriate actions to recover transfers of any Debtors' property as provided for in the Plan as may be permitted by the Bankruptcy Code or applicable state law; *provided*, *however*, that nothing herein shall give the Litigation Administrator the power to recover any of the NewCo Assets that were transferred to the NewCo;

(o)      execute offsets or assert counterclaims against Claim Holders (except to the extent of any releases, waivers, settlements, compromises or relinquishments set forth in the Plan or the Confirmation Order) and make distributions of the Litigation Recovery Account and Litigation Proceeds as provided for in the Plan and this Agreement;

(p)      subject to applicable law, seek the examination of any Entity or Person, with respect to the Post-Emergence Claims;

(q)      retain and reasonably compensate for services rendered and expenses incurred by Litigation Administrator Professionals to (i) perform such reviews and/or audits of

the financial books and records of the Debtors or Litigation Administrator as may be appropriate in the Litigation Administrator's reasonable discretion and (ii) prepare and file any tax returns or informational returns for the Litigation Recovery Account as may be required;

(r)    take or refrain from taking any and all actions the Litigation Administrator reasonably deems necessary for the continuation, protection, and maximization of the Post-Emergence Claims consistent with the purposes hereof;

(s)    take all steps and execute all instruments and documents the Litigation Administrator reasonably deems necessary to effectuate the Agreement;

(t)    liquidate any remaining Post-Emergence Claims, and provide for the distributions therefrom in accordance with the provisions of the Plan, the Confirmation Order and this Agreement;

(u)    take all actions the Litigation Administrator reasonably deems necessary to comply with the Plan, the Confirmation Order, and this Agreement (including all obligations thereunder);

(v)    (i) take commercially reasonable actions after the Effective Date to assist and cooperate in good faith with the reasonable efforts by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c) for the purposes of establishing the Litigation Oversight Committee and appointing the Members thereof (it being understood that such efforts are primarily the responsibility of the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, and that the Litigation Administrator by this provision shall only be required to provide reasonable assistance and cooperation to them) and (ii) if agreed by the Committee, the Earn Ad Hoc Group, and the Retail Borrower Ad Hoc Group, as applicable, in accordance with Section 2.1(c), file a notice thereof disclosing the names and relevant biographical information regarding the Members, the compensation (if any) to be paid to them by the Litigation Recovery Account and such other information deemed appropriate by the Litigation Administrator with the Bankruptcy Court (prior to the closing or dismissal of the Chapter 11 Cases) and post such notice to the website maintained by the Litigation Administrator; and

(w)    exercise such other powers as may be vested in the Litigation Administrator pursuant to the Plan, the Confirmation Order, this Agreement, any order of the Bankruptcy Court or as otherwise determined by the Litigation Administrator to be reasonably necessary and proper to carry out the obligations of the Litigation Administrator in relation to the Agreement; *provided* that the Litigation Administrator shall work in good faith with the Plan Administrator to ensure that services are not duplicated and to reconcile any conflicts between the Plan Administrator Agreement and this Agreement.

4.11    Limitations on Power and Authority of the Litigation Administrator.    The Litigation Administrator will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, the Confirmation Order, or this Agreement;

19

(b)    take any action that is reserved for the Plan Administrator under the Plan, the Confirmation Order, or the Plan Administrator Agreement;

(c)    take any action that would reasonably be expected to make it impossible to carry on the activities of the Agreement;

(d)    possess property of the Debtors or Claim Holders or assign the Debtors', Post-Effective Date Debtors', or Claim Holders' rights in specific property for any purpose other than as provided herein;

(e)    cause or permit the Litigation Administrator to engage in any trade or business or utilize or dispose of any part of the Post-Emergence Claims or the proceeds, revenue or income therefrom in furtherance of any trade of business;

(f)    without approval of the Litigation Oversight Committee to the extent provided in Section 2.5, retain Litigation Administrator Professionals or agree to any compensation arrangements for such Litigation Administrator Professionals;

(g)    dissolve the Agreement;

(h)    receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets; or

(i)    issue any Post-Emergence Claims other than as expressly contemplated by the Plan, the Confirmation Order, or this Agreement.

4.12    <u>Books and Records</u>.    The Litigation Administrator shall maintain books and records relating to the Post-Emergence Claims (including income realized therefrom and the Litigation Proceeds) and the payment of, costs and expenses of, and liabilities for claims against or which, pursuant to the Plan, are to be paid from the Litigation Recovery Account in such detail and for such period of time as may be necessary to enable the Litigation Administrator to make full and proper accounting in respect thereof and in accordance with applicable law. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements for the Litigation Recovery Account. Nothing in this Agreement requires the Litigation Administrator to file any accounting or seek approval of any court with respect to the administration of the Litigation Recovery Account or as a condition for managing any payment or distribution out of the Post-Emergence Claims, except as may otherwise be set forth in the Plan or the Confirmation Order.

4.13    <u>Reports</u>.

(a)    <u>Financial and Status Reports</u>.    The fiscal year of the Litigation Recovery Account shall be the calendar year. Within 90 days after the end of each calendar year during the existence of the Litigation Recovery Account, within 45 days after the end of each calendar quarter during the existence of the Litigation Recovery Account (other than the fourth quarter), and as soon as practicable upon closure of the Litigation Recovery Account, the Litigation Administrator shall make available to the Claim Holders appearing in the Claim Holder Register

as of the end of such period or such date of closure, a written report including: (i) financial statements of the Litigation Recovery Account for such period, and, if the end of a calendar year, an unaudited report (which may be prepared by an independent certified public accountant employed by the Litigation Administrator) reflecting the result of such procedures relating to the financial accounting administration of the Litigation Recovery Account as may be adopted by the Litigation Administrator; (ii) a summary description of any action taken by the Litigation Administrator which, in the judgment of the Litigation Administrator, materially affects the Litigation Recovery Account and of which notice has not previously been given to the Claim Holders; (iii) a description of the progress of liquidating the Post-Emergence Claims and making distributions to the Claim Holders, which description shall include a written report providing, among other things, a summary of the litigation status of the Post-Emergence Claims, any settlements entered into by the Litigation Administrator with respect to the Post-Emergence Claims, the Litigation Proceeds recovered to date, and the distributions made by the Litigation Administrator to date; (iv) payments made to the Litigation Administrator and the Litigation Administrator Professionals (including fees and expenses paid to contingency fee counsel); and (v) any other material information relating to the Post-Emergence Claims and the administration of the Post-Emergence Claims deemed appropriate by the Litigation Administrator, in its reasonable judgment, to be disclosed by it. In addition, the Litigation Administrator shall make available unaudited financial statements to each Claim Holder on a quarterly basis (which may be quarterly operating reports filed with the Bankruptcy Court). The Litigation Administrator may post any such report on a website maintained by the Litigation Administrator or electronically file it with the Bankruptcy Court in lieu of actual notice to each Claim Holder. The Litigation Administrator shall respond, as soon as reasonably practicable, to reasonable requests for information (to the extent available) described in this clause (a) that is reasonably requested from Claim Holders during reasonable business hours, in each case, to the extent such requests do not (i) request the disclosure of privileged or confidential information, (ii) request the disclosure of information which would not be in the best interest of the Claim Holders (in the reasonable discretion of the Litigation Administrator), and (iii) interfere with the duties of the Litigation Administrator hereunder.

(b)    <u>Annual Plan and Budget</u>.  If instructed by the Litigation Oversight Committee, the Litigation Administrator shall prepare and submit to the Litigation Oversight Committee for approval an annual plan and budget in such detail as is reasonably requested or, if the Litigation Oversight Committee has not been established, prepare and adopt such annual plan and budget as the Litigation Administrator deems reasonably appropriate.

**ARTICLE V**
**LITIGATION RECOVERY ACCOUNT**

5.1    <u>Establishment of Litigation Recovery Account</u>.  On the Effective Date, the Debtors shall fund the Litigation Recovery Account, which shall vest in the Post-Effective Date Debtors free and clear of all Claims, Liens, encumbrances, and charges.  The Litigation Recovery Account shall be held separately from the other Post-Emergence Claims and shall be used to (a) fund the costs and fees of the Litigation Administrator, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Secured Claims to the extent not paid by the Debtors or the Plan Administrator either before or after the Effective Date, (c) fund Disputed Claims reserves relating to such Claims, and (d) fund the Litigation Administrator

21

Expenses. The Litigation Administrator shall transfer any net Cash proceeds from the Post-Emergence Claims to the Litigation Recovery Account until such time as (i) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Secured Claims, and Litigation Administrator Expenses have been paid in full or otherwise resolved or the Disputed Claims reserves relating to such Claims have been fully funded, and (ii) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired. Any excess funds in the Litigation Recovery Account remaining after the payment or funding of amounts required under the preceding clauses (a)-(d) shall be deemed to be Litigation Proceeds and shall be available for distribution to Claim Holders in accordance with the Plan and this Agreement. The Litigation Oversight Committee may authorize reserving amounts for obligations and expenses expected to be payable.

     5.2   <u>Cash in the Litigation Recovery Account</u>. Cash held in the Litigation Recovery Account (including any earnings that have accrued on such Cash, net of any expenses, including any tax, relating thereto) shall be retained by the Post-Effective Date Debtors for the benefit of Claim Holders as contemplated in Section 5.1, the Plan, the Confirmation Order and this Agreement pending determination of their entitlement thereto under the terms of the Plan. Cash shall be either (x) held in an interest-bearing account or (y) invested in interest-bearing obligations of the type described in Section 4.9, and having (in either case) a maturity date of not more than 30 days. All such Cash or investments shall be held at a nationally recognized bank, financial institution, trust company or investment/brokerage firm chosen by the Litigation Administrator and bearing the name "Litigation Recovery Account" or words of similar import. Cash held in the Litigation Recovery Account will (i) be held in trust, pending distribution by the Litigation Administrator and (ii) be accounted for separately from the Post-Emergence Claims.

     5.3   <u>Distributions After Allowance of Disputed Claims or Disputed Interests</u>. At such time as a Disputed Claim or Interest becomes Allowed, the Litigation Administrator shall distribute to the holder thereof the distributions, if any, to which such Holder is then entitled on account of Litigation Proceeds under the Plan (including, with respect to Cash held in the applicable Litigation Recovery Account, any earnings that have accrued on the amount of Cash so retained, net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as reasonably practicable after the date upon which such Disputed Claim or Interest becomes Allowed, whether by settlement, compromise or Final Order or judgment of the Bankruptcy Court, but in no event more than 90 days thereafter. The balance of any Cash thereafter retained in a Disputed Claims reserve account shall be allocated to and included in future distributions to Holders of the remaining applicable Disputed Claims on a Pro Rata basis at such time as any such Disputed Claim becomes an Allowed Claim or otherwise as provided in the Plan, the Confirmation Order and this Agreement.

     5.4   <u>Distributions After Disallowance of Disputed Claims</u>. If a Disputed Claim or Interest is disallowed, in whole or in part, the Litigation Administrator shall cancel the applicable Allowed Claim, if applicable, and distribute the Cash held in the applicable Disputed Claims reserve account with respect to such Claim or Interest to the holders of the applicable series of Post-Emergence Claims in accordance with the terms of the Plan, the Confirmation Order and this Agreement.

## ARTICLE VI
## THE LITIGATION ADMINISTRATOR GENERALLY

6.1     Independent Litigation Administrator.    The Litigation Administrator, in accordance with the Plan and the Confirmation Order, shall be a professional natural person, entity or financial institution with experience administering bankruptcy claims and may not be a Member of the Litigation Oversight Committee.

6.2     Litigation Administrator's Term of Service, Compensation and Reimbursement.

(a)     Term of Service.    The Litigation Administrator shall serve as of the Effective Date until: (a) the completion of all of the Litigation Administrator's duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Agreement in accordance with this Agreement; or (c) the Litigation Administrator's death or dissolution, incapacitation, resignation or removal.

(b)     Compensation.    The Litigation Administrator shall receive compensation from the Litigation Recovery Account as provided on Exhibit B hereto (the "Litigation Administrator Compensation").    The compensation of the Litigation Administrator may be modified from time to time by agreement of the Litigation Administrator and the Litigation Oversight Committee or, if the Chapter 11 Cases have not been closed or dismissed, by order of the Bankruptcy Court.    Notice of any modification of the Litigation Administrator's compensation shall be filed promptly with the Bankruptcy Court; *provided*, *however*, that after the closing or dismissal of the Chapter 11 Cases, such notice will be provided on a website maintained by the Litigation Administrator.

(c)     Expenses.    The Litigation Administrator will reimburse itself (after approval by the Litigation Oversight Committee), from the Litigation Recovery Account for all actual, reasonable and documented out-of-pocket expenses incurred by the Litigation Administrator in connection with the performance of the duties of the Litigation Administrator hereunder or under the Confirmation Order or the Plan, including but not limited to, actual, reasonable and documented fees and disbursements of the Litigation Administrator's legal counsel incurred in connection with the review, execution, and delivery of this Agreement and related documents (collectively, the "Litigation Administrator Expenses" and, together with the Litigation Administrator Compensation, the "Litigation Administrator Fees").

(d)     Payment.    The Litigation Administrator Fees shall be paid to the Litigation Administrator from the Litigation Recovery Account without necessity for review or approval by the Bankruptcy Court or any other Person.    The Bankruptcy Court shall retain jurisdiction until the closing or dismissal of the Chapter 11 Cases to adjudicate any dispute regarding the Litigation Administrator Fees.

6.3     Resignation.    The Litigation Administrator may resign by giving not less than 45 days' prior written notice thereof by filing a notice with the Bankruptcy Court (and such notice shall be served on the Claim Holders); *provided, however*, after the closing or dismissal of the Chapter 11 Cases, such notice shall be posted on a website maintained by the Litigation Administrator and served on the Claim Holders.    Such resignation shall become effective on the

earlier to occur of: (a) the day specified in such notice, and (b) the appointment of a successor satisfying the requirements set out in Section 6.5 by the Litigation Oversight Committee or the Bankruptcy Court and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date (as defined in Section 9.1 below), the Litigation Administrator shall be deemed to have resigned, except as otherwise provided for in Section 9.2 herein. Written notice of the resignation of the Litigation Administrator and the appointment of a successor Litigation Administrator shall be provided promptly to the Claim Holders.

6.4    Removal.

(a)    The Litigation Administrator (or any successor Litigation Administrator) may be removed (i) by the Litigation Oversight Committee, for Cause (as defined in Section 2.2(b) herein), immediately upon notice thereof, or without Cause, upon not less than 45 days' prior written notice; *provided, however*, that the Litigation Administrator (or any successor Litigation Administrator) may only be removed without Cause if a successor Litigation Administrator is simultaneously appointed, or (ii) by order of the Bankruptcy Court for Cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Administrator (including any dispute relating to any portion of the Litigation Administrator Fees) and so long as the Chapter 11 Cases have not been closed or dismissed, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Administrator will continue to serve as the Litigation Administrator after his, her or its removal other than for Cause until the earlier of (i) the time when appointment of a successor Litigation Administrator will become effective in accordance with Section 6.5 of this Agreement or (ii) 45 days after the date of removal.

6.5    Appointment of Successor Litigation Administrator.

(a)    In the event of the death or Disability (as defined in Section 2.2(b) herein) (in the case of a Litigation Administrator that is a natural person), dissolution (in the case of a Litigation Administrator that is not a natural person), resignation, incompetency or removal of the Litigation Administrator (each, a "Succession Event"), the Litigation Oversight Committee shall promptly designate a successor Litigation Administrator satisfying the requirements set forth in Section 6.1 hereof; *provided, however*, the Bankruptcy Court may designate a successor Litigation Administrator to the extent that the Litigation Oversight Committee has not designated a successor Litigation Administrator within 30 days of a Succession Event resulting from the death, Disability, dissolution, resignation or incompetency of the Litigation Administrator. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Administrator appointed hereunder shall execute, acknowledge and deliver to the Claim Holders an instrument accepting the appointment under this Agreement and agreeing to be bound as Litigation Administrator hereto and subject to the terms of this Agreement, and thereupon the successor Litigation Administrator, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts and duties of the predecessor Litigation Administrator and the successor Litigation Administrator shall not be personally liable for any act or omission of the predecessor Litigation Administrator; *provided, however*, that a predecessor Litigation Administrator shall, nevertheless, when requested in writing by the successor Litigation Administrator, execute and deliver an instrument or instruments conveying

24

and transferring to such successor Litigation Administrator under the Agreement all the estates, properties, rights, powers and trusts of such predecessor Litigation Administrator and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Administrator, in effectuating the assumption by the successor Litigation Administrator of his/her/its obligations and functions hereunder.  For notice purposes only and not for approval, the Litigation Oversight Committee shall file with the Bankruptcy Court (or post on a website maintained by the Litigation Administrator if the Chapter 11 Cases have been closed) a notice appointing the successor Litigation Administrator.

(b)     During any period in which there is a vacancy in the position of Litigation Administrator, the Litigation Oversight Committee, in consultation with the Litigation Administrator, shall appoint (or the Bankruptcy Court may appoint) an interim Litigation Administrator (the "Interim Administrator").  The Interim Administrator shall be subject to all the terms and conditions applicable to a Litigation Administrator hereunder; *provided*, *however*, any such Interim Administrator shall not be entitled to receive the Litigation Administrator Compensation unless approved by the Litigation Oversight Committee, but shall be entitled to receive payment for the Litigation Administrator Expenses.  Such Interim Administrator shall not be limited in any manner from exercising any rights or powers as a Member of the Litigation Oversight Committee merely by such Person's appointment as Interim Administrator, but shall be limited in the exercise of such rights or powers as a Litigation Administrator to the extent the Litigation Oversight Committee shall, to the extent applicable in this Agreement, fail to approve any such action or undertaking by the Interim Administrator.

(c)     To the extent that the Litigation Oversight Committee is unable to appoint a successor Litigation Administrator or Interim Administrator and the Chapter 11 Cases have been closed or dismissed, the Chapter 11 Cases may be reopened for the limited purpose of seeking an order of the Bankruptcy Court to appoint a successor Litigation Administrator.

6.6    Effect of Resignation or Removal.  The death, Disability, dissolution, bankruptcy, resignation, incompetency, incapacity or removal of the Litigation Administrator, as applicable, shall not operate to terminate this Agreement or to revoke any existing agency created pursuant to the terms of this Agreement or invalidate any action theretofore taken by the Litigation Administrator or any prior Litigation Administrator.  In the event of the resignation or removal of the Litigation Administrator, such Litigation Administrator will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court (or any other court of competent jurisdiction) or reasonably requested by the Litigation Oversight Committee or the successor Litigation Administrator to effect the termination of such Litigation Administrator's capacity under this Agreement, (b) deliver to the successor Litigation Administrator all documents, instruments, records and other writings related to the Litigation Administrator as may be in the possession of such Litigation Administrator, including any Post-Emergence Claims Materials, and shall not retain any copies of such materials, even for archival purposes, and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Administrator. Notwithstanding anything to the contrary contained in this Agreement, any Litigation Administrator who is removed or resigns pursuant to this Agreement shall retain its right to coverage under any applicable

insurance policies and indemnification in accordance with Article VII for its acts or omissions occurring prior to such removal or resignation.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

7.1     No Further Liability.  Each of the Litigation Administrator, the Members and their representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Litigation Recovery Account unless determined by a final judgment of a court of competent jurisdiction to arise out of such Person's own fraud, willful misconduct or gross negligence.  Unless so arising out of such Person's own fraud, willful misconduct or gross negligence, in performing its duties under this Agreement, the Litigation Administrator, the Members and their representatives (as applicable) shall have no liability for any action taken by such Person in good faith, in the reasonable belief that such action was in the best interests of the Holders and/or in accordance with the advice of the Litigation Administrator Professionals retained by the Litigation Oversight Committee or the Litigation Administrator. Without limiting the generality of the foregoing, the Litigation Administrator, the Members and their representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon.  None of the provisions of this Agreement shall require the Litigation Administrator, the Members or their representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers.  Each of the Litigation Administrator, the Members and their representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan, the Confirmation Order or this Agreement (including in the execution of such Person's duties hereunder or thereunder) that such Person reasonably believes to be genuine and to have been properly given.  Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Administrator, the Members or their representatives from any liability for any actions or omissions determined by a final judgment of a court of competent jurisdiction to have arisen out of such Person's fraud, willful misconduct or gross negligence. Any action taken or omitted to be taken in the case of the Litigation Administrator or the Litigation Oversight Committee with the express approval of the Bankruptcy Court (so long as the Chapter 11 Cases have not been closed or dismissed) will conclusively be deemed not to constitute fraud, willful misconduct or gross negligence.  No termination of this Agreement or amendment, modification or repeal of this Section 7.1 shall adversely affect any right or protection of the Litigation Administrator, the Members of the Litigation Oversight Committee or their respective designees, professional agents or representatives that exists at the time of such termination, amendment, modification or repeal.  Notwithstanding the foregoing, in no event shall the Litigation Administrator have any liability under any circumstances for any acts or omissions taken by it at the direction of the Litigation Oversight Committee.

7.2     Indemnification of the Litigation Administrator and Litigation Oversight Committee.

(a)     From and after the Effective Date, each of the Litigation Administrator, the Litigation Oversight Committee, the Litigation Administrator Professionals and each of the Litigation Administrator's and Members' representatives (each, a "Litigation Administrator

Agreement Indemnified Party," and collectively, the "Litigation Administrator Agreement Indemnified Parties") shall be, and hereby is, indemnified by recourse solely to the Litigation Recovery Account, to the fullest extent permitted by applicable law, from and against any and all claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs and other assertions of liability arising out of any such Litigation Administrator Agreement Indemnified Party's exercise of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its powers or the discharge of what such Litigation Administrator Agreement Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law or otherwise (except only for actions or omissions to act to the extent determined by a Final Order to be due to such Litigation Administrator Agreement Indemnified Party's own fraud, willful misconduct or gross negligence on and after the Effective Date). The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement; (ii) the services to be rendered pursuant to this Agreement; (iii) any document or information, whether oral or written, referred to herein or supplied to the Litigation Administrator; or (iv) proceedings by or on behalf of any creditor. Expenses, including attorney's fees and other expenses and disbursements, incurred by a Litigation Administrator Agreement Indemnified Party in defending or investigating a threatened or pending action, suit or proceeding shall be paid or reimbursed by the Litigation Administrator, solely out of the Litigation Recovery Account (including any insurance policy obtained by the for the benefit of Litigation Administrator Agreement Indemnified Parties), in advance of the final disposition of such action, suit or proceeding; *provided*, *however*, that any Litigation Administrator Agreement Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by Final Order, that such Litigation Administrator Agreement Indemnified Party is not entitled to indemnification hereunder due to such Person's own fraud, willful misconduct or gross negligence. Any indemnification claim of a Litigation Administrator Agreement Indemnified Party shall be entitled to a priority distribution from the Litigation Recovery Account, ahead of the Post-Emergence Claims and any other claim to, or interest in, such assets. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Litigation Administrator's expense, subject to the foregoing terms and conditions. In addition, the Litigation Oversight Committee shall purchase insurance coverage as set forth in Section 4.10(j) hereof, including fiduciary liability insurance using funds from the Litigation Recovery Account for the benefit of the Litigation Administrator and the Members. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Administrator, the Litigation Oversight Committee, any Member or any other Litigation Administrator Agreement Indemnified Party and shall inure to the benefit of the Litigation Administrator's, each Member's and each other Litigation Administrator Agreement Indemnified Party's respective heirs, successors and assigns.

(b)    The foregoing indemnity in respect of any Litigation Administrator Agreement Indemnified Party shall survive the termination of such Litigation Administrator Agreement Indemnified Party from the capacity for which such party is indemnified.

Termination or modification of this Agreement shall not limit or negatively affect any indemnification rights or obligations set forth herein.

(c)    Any Litigation Administrator Agreement Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Litigation Administrator Agreement Indemnified Party that expressly waives such benefits.

(d)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Litigation Administrator Agreement Indemnified Party may otherwise have at law or in equity, including, without limitation, common law rights to indemnification or contribution.  Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.  For the avoidance of doubt, each Litigation Administrator Agreement Indemnified Party shall be entitled, subject to the terms hereof, to indemnification for any costs and attorneys' fees such Litigation Administrator Agreement Indemnified Party may incur in connection with enforcing any of its rights under this Article VII.

7.3    Litigation Administrator Liabilities.  All liabilities of the Litigation Administrator, including, without limitation, indemnity obligations under Section 7.2 of this Agreement and applicable law will be paid or satisfied solely from the Litigation Recovery Account and paid on a priority basis, *provided*, *however*, that the Litigation Administrator may obtain liability insurance to satisfy its indemnity obligations under applicable law.  No liability of the Litigation Administrator will be payable in whole or in part by any Claim Holders individually or in the Claim Holders' capacity, by the Litigation Administrator individually or in the Litigation Administrator's capacity as Litigation Administrator, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employee, agent, affiliate or advisor of any Claim Holders, any Member, the Litigation Administrator or their respective affiliates.

7.4    Limitation of Liability.  None of the Litigation Administrator Agreement Indemnified Parties shall be liable for direct, indirect, monetary, punitive, exemplary, consequential, special or other damages for a breach of this Agreement, except to the extent his/her/its actions or omissions to act, as determined by a Final Order, are due to such Litigation Administrator Agreement Indemnified Party's own fraud or willful misconduct from and after the Effective Date and any of the foregoing damages are awarded pursuant to any such Final Order.

7.5    Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the court, Person or Entity making such determination shall presume that any Litigation Administrator Agreement Indemnified Party is entitled to exculpation and indemnification under this Agreement and any Person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

28

## ARTICLE VIII
## TAX MATTERS

8.1    <u>Treatment of Post-Emergence Claims</u>.  For all federal, state and local income tax purposes, all parties (including, without limitation, the Debtors, the Post-Emergence Date Debtors, the Litigation Administrator and the Claim Holders) shall treat the Post-Emergence Claims as being retained by the Post-Effective Date Debtors.

(a)    The Litigation Administrator shall be responsible for remitting to the Post-Effective Debtors, out of the Litigation Recovery Account, any taxes imposed on or otherwise required to be paid by, the Post-Effective Debtors by reason of Litigation Recovery Account.

8.2    <u>Withholding of Taxes</u>. The Litigation Administrator shall deduct and withhold and pay to the appropriate Governmental Unit all amounts required to be deducted or withheld pursuant to the IRC or any provision of any state, local or non-U.S. tax law with respect to any payment or distribution to the Litigation Recovery Account.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as amounts distributed to such Claim Holders for all purposes of this Agreement.

(a)    The Litigation Administrator shall be authorized to collect such tax information from the Claim Holders (including, without limitation, social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order and this Agreement.  As a condition to receive distributions under the Plan, all Claim Holders may be required to identify themselves to the Litigation Administrator and provide tax information and the specifics of their holdings, to the extent the Litigation Administrator deems appropriate, including an IRS Form W-9 or, in the case of Claim Holders that are not United States persons for federal income tax purposes, certification of foreign status on an applicable IRS Form W-8.

(b)    The Litigation Administrator may refuse to make a distribution to any Claim Holders that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a Claim Holder, the Litigation Administrator shall make such distribution to which the Claim Holders is entitled, without interest; and, *provided*, *further*, that, if the Litigation Administrator fails to withhold in respect of amounts received or distributable with respect to any such holder and the Litigation Administrator is later held liable for the amount of such withholding, such holder shall reimburse the Litigation Administrator for such liability.  The identification requirements in Section 8.2 may, in certain cases, extend to holders who hold their securities in street name.  If a Claim Holder fails to comply with such a request for tax information within 180 days, the Litigation Administrator may file a document with the Bankruptcy Court, or if the Chapter 11 Cases have been closed or dismissed, post a document on a website maintained by the Litigation

Administrator, that will provide twenty-one days' notice before such distribution may be deemed an unclaimed distribution.

(c)     In the event that the Litigation Administrator elects to make distributions through an intermediary, the party who would be the withholding agent with respect to distributions to the Claim Holders under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Litigation Administrator.

8.3    <u>Valuation</u>.  The Litigation Administrator also shall file (or cause to be filed) any statements, returns or disclosures relating to the Litigation Recovery Account that are required by any governmental unit.

## ARTICLE IX
## TERMINATION OF THE AGREEMENT

9.1    <u>Termination</u>.  The Litigation Administrator, the Litigation Oversight Committee and the Litigation Recovery Account shall be discharged or dissolved, as the case may be, at such time as (a) the Litigation Administrator has liquidated or (with the approval of the Litigation Oversight Committee) abandoned all Post-Emergence Claims, (b) all objections to the Disputed Claims have been resolved, and (c) all distributions required to be made by the Litigation Administrator under the Agreement have been made; *provided*, *however*, that in no event shall the Litigation Recovery Account be closed later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Litigation Administrator) is necessary to facilitate or complete the recovery and liquidation of the Post-Emergence Claims; *provided further*, *however*, that if the Chapter 11 Cases have been closed or dismissed before the date that is five years from the Effective Date, then no Bankruptcy Court approval shall be required and the only requirement for an extension is a private letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Litigation Administrator.  If at any time the Litigation Administrator determines, in reliance upon the advice of the Litigation Administrator Professionals (or any one or more of them), that the expense of administering the Post-Emergence Claims as to make a final distribution to the Claim Holders is likely to exceed the value of consideration available for distribution and provided that clause (c) above has been satisfied, the Litigation Administrator may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to close the Litigation Recovery Account, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from U.S. federal income tax under section 501(a) of the IRC, (C) not a "private foundation," as defined in section 509(a) of the IRC and (D) that is unrelated to the Debtors, NewCo, the Litigation Administrator, the Members, any Litigation Administrator Professionals and any insider of any of the foregoing and (iii) close the Litigation Recovery Account (all of the foregoing actions in clauses (i) through (iii) being referred to as the "<u>Wind-Down Process</u>").  Such date upon which the Litigation Recovery Account shall finally be closed shall be referred to herein as the "<u>Termination Date</u>."

30

9.2     Continuance of the Litigation Administrator for Winding Up.   During the Wind-Down Process, the Litigation Administrator, solely for the purpose of liquidating and winding up the affairs of the Litigation Recovery Account, shall continue to act as such until its duties have been fully performed.   During the Wind-Down Process, the Litigation Administrator shall continue to be entitled to receive the Litigation Administrator Fees called for by Section 6.2(a) hereof and subject to Section 2.5 hereof.   Upon distribution of all the Litigation Proceeds, the Litigation Administrator shall retain the books, records and files that shall have been delivered or created in connection with the administration of the Post-Emergence Claims to the extent not otherwise required to be handled by the Litigation Administrator in accordance with Section 2.3 hereof.   At the Litigation Administrator's discretion, but subject in all cases to Section 2.3 hereof, all of such records and documents may be destroyed no earlier than two (2) years following the Termination Date as the Litigation Administrator deems appropriate (unless such records and documents are necessary to fulfill the Litigation Administrator's obligations hereunder).   Except as otherwise specifically provided herein, upon the Termination Date, the Litigation Administrator shall be deemed discharged and have no further duties or obligations hereunder, except to account to the Claim Holders as provided herein, the Post-Emergence Claims shall be cancelled.

## ARTICLE X
## AMENDMENT AND WAIVER

10.1     No amendment, supplement or waiver of or to this Agreement shall (a) adversely affect the interests, rights or treatment of the Claim Holders, (b) adversely affect the payments and/or distributions to be made under the Plan, the Confirmation Order or this Agreement, (c) amend Section 6.2(b) hereof, (d) be inconsistent with the Plan or the Confirmation Order, or (e) be inconsistent with the purpose and intention of the Agreement to liquidate in an expeditious but orderly manner the Post-Emergence Claims in accordance with Treasury Regulation section 301.7701-4(d).

10.2     No amendment, supplement or waiver of or to this Agreement shall adversely affect the interests, rights or treatment of the Litigation Administrator without the prior written consent of the Litigation Administrator.

10.3     No failure by the Litigation Administrator or the Litigation Oversight Committee to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof, or of any other right, power, or privilege.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1     Governing Law.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law that would require or permit application of the law of another jurisdiction).

11.2     Jurisdiction.   Subject to the proviso below and so long as the Chapter 11 Cases have not been closed or dismissed, the Parties agree that the Bankruptcy Court shall have

jurisdiction over the interpretation and enforcement of the Agreement; *provided*, *however*, that notwithstanding the foregoing, the Litigation Administrator shall have power and authority to bring any action in any court of competent jurisdiction to prosecute any of the Post-Emergence Claims and pursue any recoveries in respect of any Post-Emergence Claims. Each Party to this Agreement hereby irrevocably consents to the jurisdiction of the Bankruptcy Court in any action to enforce, interpret or construe any provision of this Agreement or of any other agreement or document delivered in connection with this Agreement, and also hereby irrevocably waives any defense of improper venue, *forum non conveniens*, or lack of personal jurisdiction to any such action brought in the Bankruptcy Court. Until the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought only in the Bankruptcy Court; *provided*, *however*, that in the event that the Bankruptcy Court does not have jurisdiction pursuant to the foregoing provision, including after the closing or dismissal of the Chapter 11 Cases, any action to enforce, interpret, or construe any provision of this Agreement will be brought in either a state or federal court of competent jurisdiction in the borough of Manhattan in the state of New York (without prejudice to the right of any Party to seek to reopen the Chapter 11 Cases to hear matters with respect to this Agreement). Each Party hereby irrevocably consents to the service by certified or registered mail, return receipt requested, of any process in any action to enforce, interpret, or construe any provision of this Agreement.

11.3    <u>Severability</u>.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by Final Order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.4    <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally or by facsimile or electronic communication, sent by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (a) the date of actual receipt by the receiving party, (b) the date of personal delivery (or refusal upon presentation for delivery), (c) the date of the transmission confirmation or (d) three Business Days after service by first-class mail, to the receiving party's below address(es):

(i)    If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway, 19th Floor
New York, New York 10019
Attn: Celsius Litigation Administrator, Mohsin Y. Meghji
Email: Celsius_Litigation_Admin@m3-partners.com

With a copy to:

White & Case LLP

David M. Turetsky
Samuel P. Hershey
1221 Avenue of the Americas
New York, New York 10020
Email: david.turetsky@whitecase.com
          sam.hershey@whitecase.com

– and –

Gregory F. Pesce
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Email: gregory.pesce@whitecase.com

– and –

Keith H. Wofford
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Email: kwofford@whitecase.com

– and –

Aaron E. Colodny
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Email: aaron.colodny@whitecase.com

       (ii)    If to the Debtors, to:

c/o Celsius Network LLC
50 Harrison Street, Suite 209F
Hoboken, New Jersey 07030
Attn: Ron Deutsch

With a copy to:

Kirkland & Ellis LLP
Kirkland & Ellis International LLP
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Email: joshua.sussberg@kirkland.com

– and –

Patrick J. Nash, Jr., P.C.
Ross M. Kwasteniet, P.C.
Christopher S. Koenig
Dan Latona
300 North LaSalle Street
Chicago, Illinois 60654
Email: patrick.nash@kirkland.com
      ross.kwasteniet@kirkland.com
      chris.koenig@kirkland.com
      dan.latona@kirkland.com

      (iii)    if to any Claim Holders, to the last known address of such Claim Holders, according to the Litigation Administrator's records;

      (iv)    if to a Member of the Litigation Oversight Committee, to the applicable address(es) of such person according to the Litigation Administrator's records.

11.5    <u>Headings</u>.  The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.6    <u>Plan and Confirmation Order</u>.  The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and is subject to the provisions of the Plan and the Confirmation Order.  In the event of any direct conflict or inconsistency between any provision of this Agreement, on the one hand, and the provisions of the Plan, on the other hand, the provisions of this Agreement shall govern and control.  In the event of any direct conflict or inconsistency between any provision in this Agreement, on the one hand, and the provisions of the Confirmation Order, on the other hand, the provisions of the Confirmation Order shall govern and control.

11.7    <u>Entire Agreement</u>.  This Agreement and the exhibits attached hereto, together with the Plan and the Confirmation Order, contain the entire agreement between the parties and supersede all prior and contemporaneous agreements or understandings between the parties with respect to the subject matter hereof.

11.8    <u>Cumulative Rights and Remedies</u>.  The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.

11.9    <u>Meanings of Other Terms</u>.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Agreement

and the words "herein," "hereof" or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or subdivision of this Agreement. The term "including" shall mean "including, without limitation."

11.10  <u>Successors in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of any successor in interest to any one or more of the Debtors, including, but not limited to, the Post-Effective Date Debtors (as limited by the Plan and the Confirmation Order), that shall, upon becoming any such successor be subject to and obligated to comply with the terms and conditions hereof, including, specifically, the terms of Section 2.3 hereto.  The obligations of the Litigation Administrator to any one or more of the Debtors pursuant to this Agreement shall also be obligations of the Post-Effective Date Debtors and Litigation Administrator to any such successor in interest, including, but not limited to, the Post-Effective Date Debtors, including their obligations under Section 2.3 hereto.  For the avoidance of doubt, in the event that any Person (including, as applicable, the Post-Effective Date Debtors) becomes a successor in interest to a Debtor, the claims, privileges, books and records and directors, officers, employees, agents and professionals of such Person, to the extent not otherwise subject to the provisions and requirements of this Agreement (including Section 2.3) prior to such Person becoming a successor in interest to the applicable Debtor, shall not become subject to the provisions and requirements of this Agreement (including Section 2.3) solely because such Person becomes a successor in interest to the applicable Debtor.

11.11  <u>Limitations</u>.  Except as otherwise specifically provided in this Agreement, the Plan or the Confirmation Order, nothing herein is intended or shall be construed to confer upon or to give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.  The parties hereby acknowledge and agree that nothing herein is intended to, does, or shall be construed to prejudice or harm in any way the rights, remedies or treatment (including any releases, exculpation, indemnification, or otherwise) of any Released Party or Exculpated Party, solely in their capacity as a Released Party or Exculpated Party, under the Plan.

11.12  <u>Further Assurances</u>.  From and after the Effective Date, the parties hereto covenant and agree to execute and deliver all such documents and notices and to take all such further actions as may reasonably be required from time to time to carry out the intent and purposes of this Agreement, and to consummate the transactions contemplated hereby.

11.13  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument.  A facsimile or electronic mail signature of any party shall be considered to have the same binding legal effect as an original signature.

11.14  <u>Authority</u>.  Each Party hereby represents and warrants to the other Parties that: (i) such Party has full corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby; (ii) the execution and delivery by such Party of this Agreement and the performance by such Party of its obligations hereunder have been duly authorized by all requisite corporate action on the part of such Party; (iii) this Agreement has been duly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties hereto)

this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

[MOHSIN MEGHJI], AS LITIGATION ADMINSTRATOR

By: _____
Name: [●]
Title: [●]

[●], ON BEHALF OF ITSELF AND THE OTHER DEBTORS

By: _____
Name: [●]
Title: [●]

# EXHIBIT A

**Initial Members of the Litigation Oversight Committee**

1. Mark Robinson

2. Gerard Uzzi

3. Vik Jindal

4. Deirdre O'Connor

5. Cameron Crews, designated by the Earn Ad Hoc Group

6. David Adler, designated by the Retail Borrower Ad Hoc Group

7. A Person or Entity selected in accordance with the Confirmation Order.

**EXHIBIT B**

**Compensation of Litigation Administrator**

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action. Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

## Exhibit B

**U.S. Bitcoin Management Agreement**

DRAFT

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Manager and [Celsius Mining LLC] entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan), including the Mining (as defined in the Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, Fahrenheit LLC ("**Fahrenheit**") is entering into that certain Management Services Agreement by and between Fahrenheit and the Company, dated as of the date hereof (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), whereby Fahrenheit shall provide certain management services to the Company and its subsidiaries.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.    <u>Appointment</u>. The Company hereby engages the Manager on a non-exclusive basis, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in <u>Exhibit A</u> of this Agreement and complete and deliver the Projects described in <u>Exhibit B</u> of this Agreement; provided, however, that if the Company elects to have any Person other than the Company provide any portion of the Services or work on the Projects (an "**Outside Service Provider**"), the Company and its Affiliates shall have no liability for such services delivered or work performed by such Person and shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the action or inaction of an Outside Service Provider. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on <u>Exhibit A</u>, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on <u>Exhibit A</u> and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on <u>Exhibit A</u>; <u>provided</u>, <u>however</u>, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; <u>provided</u>, <u>further</u>, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    <u>Term and Termination</u>.

(a)    <u>Term</u>. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this

Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof.

 (b) Termination. This Agreement may be terminated only as follows:

  (i) By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

  (ii) By the Manager, in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); and

  (iii) By the Company, during the Initial Term or the Term Extension:

   (A) in the event of the Manager's fraud, willful misconduct or gross negligence;

   (B) in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

   (C) [if Asher Genoot ("**Genoot**") ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or is indicted of any act which is a felony involving financial crimes or theft of corporate property;][1]

   (D) [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;][2] or

   (E) if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a

---

[1] **Note to Draft**: Reserved.

[2] **Note to Draft**: Reserved.

receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(iv)    [For the purposes of this Agreement, "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on <u>Exhibit D</u> hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.][3]

(c)    <u>Termination Event Procedures</u>. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(d)    <u>Effect of Termination</u>.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; <u>provided</u>, <u>however</u>, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms.[4] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-

---

[3] **Note to Draft**: Reserved.

[4] **Note to Draft**: Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Section 2(b)(iii) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); <u>provided</u>, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager (x) the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a) and (y), in the event that the conditions set forth in Section 2(d)(iv)(B) have been met such that the Fahrenheit Cash Fee Split would be otherwise payable, the Fahrenheit Cash Fee Split.

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement; and

(B)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a pro rated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the

effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; and

(B)     in the event that the Fahrenheit Management Agreement is no longer in effect upon the effective date of termination or at the time that the Manager receives a Non-Renewal Notice (as applicable), the Manager shall also receive the following as additional consideration, due upon the effective date of such expiration or termination: (i) 31.881% of the Base Cash Fee (as defined in the Fahrenheit Management Agreement) ("**Fahrenheit Cash Fee Split**") that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect, to be paid in one lump-sum; and (ii) 31.881% of the Equity Fee (as defined in the Fahrenheit Management Agreement) that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect ("**Fahrenheit Equity Fee Split**"). With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 2(d)(iv)(B), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents necessarily required in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(v)     Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager receives all amounts payable pursuant to Sections 2(d)(i) – (iv), such payment shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(v) shall not result in any double payment by the Company for the same underlying obligation.

(vi)     The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.     Services.

(a)     Services. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including

6

all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on Exhibit A hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on Exhibit B hereto (collectively, the "**Projects**").

4.      Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company.

(a)      The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on Exhibit B hereto.

(b)      [RESERVED].

(c)      Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with Exhibit A for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(d)      Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(e)      Obligations of the Manager. The Manager will:

(i)      Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)      Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)      Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)      At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the

7

Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)     Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)     Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)     Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)     At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(c)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

In the event that there has not been Substantial Completion (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services (as defined in the Cedarvale Agreement) in accordance with Section 3 and Section 4 of the Cedarvale Agreement which shall apply to this Agreement *mutatis mutandis*

(f)    <u>Obligations of the Company</u>. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)    Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)    Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)    At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on <u>Exhibit C</u> hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under <u>Exhibit C</u>, and shall not do anything to invalidate such insurance. This Section 4(d)(iv) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this <u>Section 4(f)</u>, failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget. In the event that the Manager's performance of a Service or completion of a Project requires funds in excess of those approved in the most recent Budget, the Manager shall not be responsible or liable for any failures or delays in the performance of such Service or completion of such Project, solely to the extent that such failures or delays are caused by such funding shortfall.

5.    <u>Compensation for Services and Expense Reimbursement</u>.

(a)    <u>Cash Compensation for Services</u>. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $15,000,000, which shall be paid in quarterly installments each in an amount equal to $3,750,000 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on <u>Exhibit B</u> (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");<u>provided</u>, <u>however</u>, that, (i) any Project

9

22-10964-mg    Doc 3935    Filed 10/30/23    Entered 10/30/23 10:15:16    Main Document
Pg 98 of 211

Based Mining Management Fee Adjustment caused primarily by the action or inaction of an Outside Service Provider shall not result in such Project Based Mining Management Fee Adjustment being deducted from the Base Mining Management Fee (ii) during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor index) ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)    Other Consideration. To the extent that the Fahrenheit Agreement is no longer in effect, then the Manager shall receive the Fahrenheit Cash Fee Split and Fahrenheit Equity Fee Split as additional consideration for providing the Services. The Fahrenheit Cash Fee Split shall be paid quarterly in roughly equal amounts (subject to adjustment as described in Section 4(a) of the Fahrenheit Management Agreement) on the first Business Day of each January, April, July, and October. With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 5(b), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents the Manager deems necessary or advisable in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(c)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)    Review and Objections.

(i)    During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and

the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)    The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, provided, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[5] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)    Expenses.

(i)    The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which

---

[5] **BR NTD**: To confirm Kroll not currently utilized by any party.

Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)       The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.

(iii)      The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining

Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.    <u>Confidentiality</u>.

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; <u>provided</u>, <u>however</u>, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (<u>provided</u> any information so maintained will remain subject to the confidentiality obligations of this Agreement).

       7.      <u>Intellectual Property</u>.

       (a)      Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicenseable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

       (b)      All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).

       (c)      Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

       (d)      The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

       (e)      "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software

constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.    Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of [\$10,000,000 in the aggregate][6] (the "**Liability Cap**"), unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, knowing violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"), subject to the last sentence of this Section 8. Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business. In addition, the Liability Cap shall not apply to: (1) with respect to the Company's liability, (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) with respect to the Manager's liability, (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    Indemnification.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or knowing violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise

---

[6] **Note to Draft**: Reserved.

have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, knowing violation of law or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except to the extent such alleged infringement, misappropriation, or other violation arises out of the performance of the Services pursuant to the Company's instructions regarding the performance of such Services, where the infringement, misappropriation, or other violation could not have been avoided while following the Company's instructions. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)    <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate

16

counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    <u>Non-Solicitation</u>. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); <u>provided</u>, that, from and after the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than twelve months ("**Unrestricted Employees**"); <u>provided</u> <u>further</u> that at the Company's request, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the six month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

11.    <u>Force Majeure</u>.

(a)    Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (in each case of the foregoing, to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period (the "**Force Majeure Period**"), if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced by, at the Company's election, up to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is 200 megawatts; provided, however, that in the event the Company elects to use any Outside Service Provider to manage the Company's mining assets, as a result of which the average aggregate nameplate capacity (in megawatts) of Miners under Use for the 90-day period immediately prior to any Excluded Event (the "**Revised Capacity**") is below 200 megawatts, then after the Force Majeure Period, if the Excluded Event

17

has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below the Revised Capacity, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is the Revised Capacity (the "**Fee Reduction**"). In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized. In the event that there is a reduction in the Mining Management Fee payable to the Manager under this <u>Section 11(b)</u> with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such reduction occurs, at the Company's election, the Company may offset the amount of such Mining Management Fee reduction against the next payment due to Manager under this Agreement or require the Manager to pay to the Company by wire transfer of immediately available cash the amount of such Mining Management Fee reduction. In the event that a Fee Reduction results in the Mining Management Fee on an annualized basis dropping below the Minimum Fee, then the Manager may elect not to perform the Services or complete or deliver the Projects under this Agreement, and if the Manage so elects the Company shall not be obligated to pay the Mining Management Fee, until such time that the Mining Management Fee on an annualized basis is at least equal to the Minimum Fee. "**Miners under Use**" shall refer to the miners and/or other computing power used to secure and validate digital asset networks managed by Manager or leased to (or otherwise made available to) the Manager from a third party, in each case of such miners or computing power, that are used in providing the Services. "**Minimum Fee**" shall mean an amount equal to $11,500,000 minus an amount equal to the Fahrenheit Cash Fee Split.

(c)    During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

18

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

If to the Company:                    [COMPANY ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]

with a copy to:                       [COMPANY LAW FIRM]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [ATTORNEY NAME]

If to the Manager:                    [MANAGER ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]

with a copy to:                       Brown Rudnick LLP
                                      7 Times Square,
                                      New York, NY 10036
                                      Email: jfitzsimons@brownrudnick.com
                                      Attention: Jonathan Fitzsimons

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-

19

off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.    Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.    Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.    Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed

20

copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    Fees and Expense. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.    Interpretation. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:


U.S. Data Management Group, LLC

By_____
Name:
Title:

**Exhibit A**

**Services**

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 1. | Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| 2. | Use and integration of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee |
| 3. | Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| 4. | Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| 5. | Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| 6. | Customer contract management will be performed by the Manager through its hosting team except for customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Fixed fee |
| 7. | Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |
| 8. | Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial | Fixed fee |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). | |
| 9. | Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| 10. | Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. | Fixed fee |
| 11. | Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| 12. | Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| 13. | Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. | Fixed fee |
| 14. | The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| 15. | Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company and development of upgrades, updates, modifications, enhancements or improvements to such software. For example, custom user interfaces or features requested by the Company, or any other dedicated services or resources that are needed solely for the Company's operations, other than use and integration of the Manager's proprietary miner management software and report generation software referred to in #2 above. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 16. | Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| 17. | Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| 18. | Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |
| 19. | Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| 20. | Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| 21. | Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| 22. | Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| 23. | Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 24. | Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| 25. | Insurance related expenses. | Pass-Through Expenses |
| 26. | Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| 27. | Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| 28. | Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| 29. | Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| 30. | Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| 31. | Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |
| 32. | Any additional staff hired by the Manager with the Company's prior written approval for the purposes of the Manager providing the Company with customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 33. | Effort or resources requested by the Company in order to maintain GAAP-compliant books and records for each Bitcoin mining facility that are dedicated resources to operate software or processes that are different to what the Manager would otherwise provide for itself or its other customers. | Pass-Through Expenses |
| 34. | Specialized training of staff beyond what training otherwise conducted by the Manager in its own business or that would otherwise be required to run site operations. | Pass-Through Expenses |
| 35. | Discretionary advisory or implementation projects that are beyond the scope of base management services. For example, the base management services shall include monthly/quarterly reporting and reviews on items such as financial and operational performance, market outlook, competitive landscape, etc., whereas staff that the Company requests be seconded to the Company shall constitute a pass-through expense. | Pass-Through Expenses |

## Exhibit B

### Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this <u>Exhibit B</u>, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this <u>Exhibit B</u>, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; <u>provided</u>, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.[7]

2. To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

3. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

4. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

5. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

6. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

---

[7] **W&C Note to Draft**: USBTC to provide update on this site.

7.    The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

8.    The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

9.    The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**[Exhibit C]**[8]

**Insurance Requirements**

1) Manager's Minimum Insurance Requirements:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) Worker's Compensation and Employer's Liability.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) Company's Minimum Insurance Requirements:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) Worker's Compensation and Employer's Liability.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.

---

[8] **W&C Note to Draft:** Subject to further review against insurance package proposal being prepared by Fahrenheit.

Employer's Liability with limits no less than:

    i)  $1,000,000 Bodily Injury by Accident (Each Accident)

    ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

    iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## Exhibit B-1

**(Redline) U.S. Bitcoin Management Agreement**

DRAFT

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [NewCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [NewCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**");

**WHEREAS**, on [●], the Manager and [Celsius Mining LLC] entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, on [●], the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**");

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the Plan went effective pursuant to its terms and the terms of the Confirmation Order;

**WHEREAS**, on the Effective Date, the NewCo Assets (as defined in the Plan), including the Mining (as defined in the Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**WHEREAS**, in conjunction with the execution of this Agreement and in accordance with the Plan, Fahrenheit LLC ("**Fahrenheit**") is entering into that certain Management Services Agreement by and between Fahrenheit and the Company, dated as of the date hereof (as amended or restated from time to time, the "**Fahrenheit Management Agreement**"), whereby Fahrenheit shall provide certain management services to the Company and its subsidiaries.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.      Appointment. The Company hereby engages the Manager[ on a~~na~~ non-exclusive basis]‡, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement; provided, however, that if the Company elects to have any Person other than the Company provide any portion of the Services or work on the Projects (an "**Outside Service Provider**"), the Company and its Affiliates shall have no liability for such services delivered or work performed by such Person and shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the action or inaction of an Outside Service Provider. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

---

‡ **BR Note to Draft**: To be discussed.

2

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof.

(b)    Termination. This Agreement may be terminated only as follows:

(i)    By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)    By the Manager, in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); and

(iii)    By the Company, during the Initial Term or the Term Extension:

(A)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)    in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)    [if Asher Genoot ("**Genoot**") ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or is indicted of any act which is a felony involving financial crimes or theft of corporate property;][21]

---

[21] **Note to Draft**: Reserved.

3

(D)    [in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;][32] or

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(iv)    [For the purposes of this Agreement, "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.][43]

(c)    Termination Event Procedures. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(d)    Effect of Termination.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein;

---

[32] **Note to Draft**: Reserved.

[43] **Note to Draft**: Reserved. ~~Parties to work together in good faith to agree on language~~.

provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms.[54] For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Section 2(b)(iii) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the "**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager (x) the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a). For clarity, nothing in this Section shall relieve Company of its obligations to pay to the Manager the Mining Management Fee and and (y), in the event that the conditions set forth in Section 2(d)(iv)(B) have been met such that the Fahrenheit Cash Fee Split for the performance of Services during any Transition Period would be otherwise payable, the Fahrenheit Cash Fee Split.

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement; and

(B)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a pro rated amount of such Mining Management Fee

---

[54] **Note to Draft:**: Reserved. Parties to work together in good faith to agree on language that deal with transition on the unfinished Projects in a reasonable manner.

based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; and

(B)    in the event that the Fahrenheit Management Agreement is no longer in effect upon the effective date of termination or at the time that the Manager receives a Non-Renewal Notice (as applicable), the Manager shall also receive the following as additional consideration, due upon the effective date of such expiration or termination: (i) 31.881% of the Base Cash Fee (as defined in the Fahrenheit Management Agreement) ("**Fahrenheit Cash Fee Split**") that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect, to be paid in one lump-sum; and (ii) 31.881% of the Equity Fee (as defined in the Fahrenheit Management Agreement) that would have become due or payable under the Fahrenheit Management Agreement through the conclusion of the then current Initial Term or Term Extension (as applicable) of this Agreement, as if the Fahrenheit Management Agreement were still in effect ("**Fahrenheit Equity Fee Split**"). With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 2(d)(iv)(B), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents necessarily required in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(v)    Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager receives all amounts payable pursuant to Sections 2(d)(i) – (iv), such payment shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs

6

and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(v) shall not result in any double payment by the Company for the same underlying obligation.

(vi)    The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.    <u>Services</u>.

(a)    <u>Services</u>. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on <u>Exhibit A</u> hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on <u>Exhibit B</u> hereto (collectively, the "**Projects**").

4.    <u>Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company</u>.

(a)    The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on <u>Exhibit B</u> hereto.

(b)    [RESERVED].

(c)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with <u>Exhibit A</u> for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with <u>Exhibit A</u> for the prior quarter.

(d)    <u>Modification of Services</u>. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(e)    <u>Obligations of the Manager</u>. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this

subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

(v)    Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)    Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)    At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required

8

of the Manager under <u>Exhibit C</u>, and shall not do anything to invalidate such insurance. This Section 4(c)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; <u>provided</u>, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

In the event that there has not been Substantial Completion (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services (as defined in the Cedarvale Agreement) in accordance with Section 3 and Section 4 of the Cedarvale Agreement which shall apply to this Agreement *mutatis mutandis*

(f)     <u>Obligations of the Company</u>. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)     Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)     Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)     At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on <u>Exhibit C</u> hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under <u>Exhibit C</u>, and shall not do anything to invalidate such insurance. This Section 4(d)(iv) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this <u>Section 4(f)</u>, failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget. In the event that the Manager's performance of a Service or

9

completion of a Project requires funds in excess of those approved in the most recent Budget, the Manager shall not be responsible or liable for any failures or delays in the performance of such Service or completion of such Project, solely to the extent that such failures or delays are caused by such funding shortfall.

[Notwithstanding the foregoing, in the event that there has not been Substantial Completion, (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services in accordance with Section 3 and Section 4 of the Cedarvale Agreement to the extent that such provisions differ from the terms of Section 3 and Section 4 hereunder.][6]

5.      Compensation for Services and Expense Reimbursement.

(a)      Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $15,000,000, which shall be paid in quarterly installments each in an amount equal to $3,750,000 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided, however, that, (i) any Project Based Mining Management Fee Adjustment caused primarily by the action or inaction of an Outside Service Provider shall not result in such Project Based Mining Management Fee Adjustment being deducted from the Base Mining Management Fee (ii) during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its                     successor                     Index)                     ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

---

[6] Note to Draft: Subject to further review and comment.

(b)     Other Consideration. To the extent that the Fahrenheit Agreement is no longer in effect, then the Manager shall receive the Fahrenheit Cash Fee Split and Fahrenheit Equity Fee Split as additional consideration for providing the Services. The Fahrenheit Cash Fee Split shall be paid quarterly in roughly equal amounts (subject to adjustment as described in Section 4(a) of the Fahrenheit Management Agreement) on the first Business Day of each January, April, July, and October. With respect to any Fahrenheit Equity Fee Split due pursuant to this Section 5(b), (i) the Company shall transfer to the Manager the Fahrenheit Equity Fee Split and shall execute and deliver to the Manager one or multiple instrument(s) transferring the applicable equity securities to the Manager and any additional documents the Manager deems necessary or advisable in order to effect the transfer of the Fahrenheit Equity Fee Split and (ii) upon transfer to the Manager, all equity securities subject to the Fahrenheit Equity Fee Split shall be fully vested through the current applicable Term Extension.

(c)     Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)     Review and Objections.

(i)     During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)     The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, provided, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to [Kroll],[75] or if [Kroll] is unavailable or declines engagement, a nationally or regionally recognized accounting,

---

[75] **BR NTD**: To confirm Kroll not currently utilized by any party.

valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

      (e)    <u>Expenses</u>.

      (i)    The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on <u>Exhibit A</u>, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; <u>provided</u>, <u>however</u>, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

      (ii)    The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the

Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.[ The Manager shall not be responsible or liable for any breaches, failures or delays, including breaches, failures or delays in the performance of Services or the completion of Projects, caused by the Manager's performance in accordance with a Budget deemed approved in accordance with the foregoing.][8]

(iii)    The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted**

___
[8] **BR Note to Draft**: This sentence subject to further review.

13

**Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Intellectual Property.

(a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicenseable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP

14

provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

(b)    All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).

(c)    Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

(d)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

(e)    "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.    Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be

15

liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of [$10,000,000 in the aggregate amount of any Mining Management Fee actually paid to the Manager hereunder in the preceding 6 months]⁶ (the "**Liability Cap**"), unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, knowing violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"), subject to the last sentence of this Section 8. Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business; provided that with respect. In addition, the Liability Cap shall not apply to: (1) with respect to the Company's liability, this Section 8 shall not apply to (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*), ((vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) with respect to the Manager's liability, this Section 8 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.    <u>Indemnification</u>.

(a)    Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or knowing violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the [Lancium Agreement].

(b)    Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an

---

⁶ **Note to Draft**: Reserved.

"**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, [knowing violation of law] or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except, to the extent such alleged infringement, misappropriation, or other violation arises out of (i) the performance of the Services pursuant to the Company's instructions regarding the performance of such Services; or (ii) the use of the Manager-Developed IP or the Services in combination with the Intellectual Property Rights of a third party, where the infringement, misappropriation, or other violation could not have been avoided while following the Company's instructions.  The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or [knowing violation of law] by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and

ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the ~~later of (i) the fourth anniversary of this Agreement and (ii) the~~ expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than ~~six~~twelve months ("**Unrestricted Employees**"); provided further that at the Company's request~~, which the Manager may reject in its reasonable discretion~~, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the ~~twelve~~six month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

11.    Force Majeure.

(a)    Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (in each case of the foregoing, to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction~~, or any arbitrator, court, or tribunal of competent jurisdiction~~.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period (the "**Force Majeure Period**"), if the Excluded Event has resulted in ~~miners and/or infrastructure under management by the Manager that have an~~the aggregate ~~name~~nameplate capacity (in megawatts) of Miners under Use below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced by, at the Company's election, up to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is 200 megawatts; provided, however, that in the event the Company elects to use any Outside Service Provider to manage the Company's mining assets, as a result of which the average aggregate nameplate capacity (in megawatts) of Miners under Use for the 90-day period immediately prior to any Excluded Event (the "**Revised Capacity**") is below 200 megawatts, then after the Force Majeure Period, if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below the Revised Capacity, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate ~~name~~nameplate capacity (in megawatts)

of the ~~current m~~Miners ~~and/or infrastructure~~ under ~~management by the Manager~~Use and the denominator of which is ~~200 megawatts.[9]~~the Revised Capacity (the "**Fee Reduction**"). In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized. In the event that there is a reduction in the Mining Management Fee payable to the Manager under this Section 11(b) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such reduction occurs, at the Company's election, the Company may offset the amount of such Mining Management Fee reduction against the next payment due to Manager under this Agreement or require the Manager to pay to the Company by wire transfer of immediately available cash the amount of such Mining Management Fee reduction. In the event that a Fee Reduction results in the Mining Management Fee on an annualized basis dropping below the Minimum Fee, then the Manager may elect not to perform the Services or complete or deliver the Projects under this Agreement, and if the Manage so elects the Company shall not be obligated to pay the Mining Management Fee, until such time that the Mining Management Fee on an annualized basis is at least equal to the Minimum Fee. "**Miners under Use**" shall refer to the miners and/or other computing power used to secure and validate digital asset networks managed by Manager or leased to (or otherwise made available to) the Manager from a third party, in each case of such miners or computing power, that are used in providing the Services. "**Minimum Fee**" shall mean an amount equal to $11,500,000 minus an amount equal to the Fahrenheit Cash Fee Split.

(c)    During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.    Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for

---

[9] ~~**Note to Draft**: Mechanics to be further refined to account for the fact that the payment of Mining Management Fee is paid in advance. So refund/credit mechanics will be introduced. **BR Note to Draft**: Please insert language on this mechanic as currently agreed upon/proposed.~~

the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Manager: | [MANAGER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or

substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.      No Third-Party Beneficiaries. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.      Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

19.      Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.      Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.      Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.      Waiver of Jury Trial. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not

21

seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expense</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

22

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:

U.S. Data Management Group, LLC

By_____
Name:
Title:

**Exhibit A**

**Services**

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 1. | Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| 2. | Use and integration of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee  [NTD: added in start up costs if any custom developed software is required. Updates/patches should be included in base fee as well as basic reporting. Presume any modifications would be IP of USBTC to use for other aires/customers and we shouldn't fund that as a pass through cost] |
| 3. | Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| 4. | Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| 5. | Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| 6. | Customer contract management will be performed by the Manager through its hosting team. Only where additional individuals need to be hired to service exclusively this Project and those individuals are budgeted and approved by owner will it be a passthrough except for customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional | Fixed fee / Pass-Through Expenses (see description) |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | dedicated hires. | |
| 7. | Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |
| 8. | Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). ~~Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through.~~ | Fixed fee ~~/ Pass Through Expenses (see description) [NTD: r company should have discretion whether resources belong in USBTC or NewCo if we're hiring or funding dedicated FTE]~~ |
| 9. | Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| 10. | Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. ~~Only where additional individuals need to be hired to service exclusively these Services and those individuals are budgeted will it be pass-through.~~ | Fixed fee ~~/ Pass Through Expenses (see description) [NTD: Maintaining and training staff should be part of the site SOPs and would not require dedicated personnel]~~ |
| 11. | Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| 12. | Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| 13. | Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. ~~Only where additional individuals need to be~~ | Fixed fee ~~/ Pass Through Expenses (see description) [NTD: dedicated personnel~~ |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | ~~hired to service exclusively these Services and those individuals are budgeted will it be pass-through~~. | ~~here should be employees of NewCo or part of a specific build project as covered below in pass through costs.]~~ |
| 14. | The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| 15. | Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company and development of upgrades, updates, modifications, enhancements or improvements to such software. For example, custom user interfaces or features requested by the Company, or any other dedicated services or resources that are needed solely for the Company's operations, other than use and integration of the Manager's proprietary miner management software and report generation software referred to in #2 above. | Pass-Through Expenses |
| 16. | Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| 17. | Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| 18. | Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 19. | Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| 20. | Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| 21. | Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| 22. | Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| 23. | Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |
| 24. | Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| 25. | Insurance related expenses. | Pass-Through Expenses |
| 26. | Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| 27. | Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|-----|----------------------------------|---------------|
| 28. | Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| 29. | Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| 30. | Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| 31. | Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |
| 32. | Any additional staff hired by the Manager with the Company's prior written approval for the purposes of the Manager providing the Company with customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Pass-Through Expenses |
| 33. | Effort or resources requested by the Company in order to maintain GAAP-compliant books and records for each Bitcoin mining facility that are dedicated resources to operate software or processes that are different to what the Manager would otherwise provide for itself or its other customers. | Pass-Through Expenses |
| 34. | Specialized training of staff beyond what training otherwise conducted by the Manager in its own business or that would otherwise be required to run site operations. | Pass-Through Expenses |
| 35. | Discretionary advisory or implementation projects that are beyond the scope of base management services. For example, the base management services shall include monthly/quarterly reporting and reviews on items such as financial and operational performance, market outlook, competitive landscape, etc., whereas | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | staff that the Company requests be seconded to the Company shall constitute a pass-through expense. | |

## Exhibit B

### Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this Exhibit B, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; provided, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.]¹⁰

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.⁷

2. ~~The Manager will provide the Debtors or the Company, as applicable, with an option which can be exercised on or before December 5, 2023 to purchase an existing, fully permitted and as-is built 50 MW facility in upstate New York (including the 12 years of existing leasehold rights and renewal terms, and the option to purchase such site) identified to the Debtors and the Committee during the bid process for $575,000 per MW that is "plug ready," and support the immediate installation at miners at such site upon Bankruptcy Court approval of such purchase. To the extent that the Fahrenheit Plan is not confirmed or does not go effective, the Debtors or NewCo (as applicable) shall enter into a mining management agreement with the Manager respecting such 50 MW site on terms acceptable to the parties.~~

2. ~~3.~~ To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

---

¹⁰ ~~**BR NTD**: Subject to further review and agreement by the parties.~~

⁷ **W&C Note to Draft**: USBTC to provide update on this site.

3. 4. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

4. 5. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

5. 6. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

6. 7. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

7. 8. The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in [the accompanying letter agreement].

8. 9. The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in [the accompanying letter agreement].

9. 10. The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments[11]**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

---

[11] **W&C Note to Draft**: Subject to further review.

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**[Exhibit C]**¹²⁸

**Insurance Requirements**

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)   $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

¹²⁸ **W&C Note to Draft:** Subject to further review against insurance package proposal being prepared by Fahrenheit.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i) $1,000,000 Bodily Injury by Accident (Each Accident)

ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## Exhibit C

**U.S. Bitcoin Cedarvale Interim Services Agreement**

*DRAFT*

# INTERIM SERVICES AGREEMENT

## By and between

## [U.S. Data Management Group, LLC], as Manager

## And

## [Celsius Mining LLC], as Company[1]

This Interim Services Agreement (this "**Agreement**") is made and entered as of October [●], 2023 (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC], a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.    Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.    Term and Termination.

(a)    Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)    the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") becomes effective in accordance with its terms and the terms of the order confirming the Plan as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

(ii)    Substantial Completion of the Project.

---

[1] **Note to Draft**: To confirm parties to this Agreement.

(b)      Termination. This Agreement may be terminated only as follows:

(i)      by mutual agreement, in writing, of both the Manager and the Company;

(ii)      by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 30 days after receipt by the Company of written notice of such failure by the Manager; provided, however, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if the Company cures such failure within such 30-day cure period; and

(iii)      by the Company, with an effective date as set forth in Section 2(c):

(A)    within 30 days after (1) the date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise elect not to proceed with the Plan (each, a "**Wind Down Termination Event**") or (2) December 31, 2023;

(B)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(C)    if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company;

(D)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

(E)    in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days.

(c)      Effect of Termination.

(i)      Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each Party for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii)      Upon the occurrence of a Wind Down Termination Event, the Company may request that the Manager provide the information set forth in Exhibit [●] with respect to transition of the Services to a successor.

2

(iii)    Upon notice of termination of this Agreement by either Party pursuant to Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the Term shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the Term continues pursuant to Section 2(c)(iii)(A), if applicable) (the "**Transition Period**"), the Manager shall provide reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (the "**Transition Services**"). During any Transition Period, in addition to amounts due to Manager under this Agreement during the Term pursuant to Section 2(c)(iii)(A), if applicable, the Manager shall be entitled to prompt reimbursement of any actual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services during the Transition Period. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iv)    Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c), Section 6, Section 7, Section 8, and Sections 10 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant to Section 2(b), this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive.

(v)    If this Agreement is terminated and the Parties have entered into the USBTC Management Agreement (as defined herein), the provisions of Section 3 and Section 4 shall apply to the USBTC Management Agreement *mutatis mutandis* with full effect thereto, as if such provisions were originally part of the USBTC Management Agreement.

3.    Duties of the Manager. The Manager or any of its Affiliates shall (a) perform the services set forth on Exhibit A (collectively, the "**Services**") and (b) use commercially reasonable efforts to achieve Substantial Completion.

4.    Performance Standards.

(a)    The Manager shall perform the Services set forth on Exhibit A, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional, workmanlike and timely manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on Exhibit B; and (z) the designs, plans, drawings, specifications, materials and intellectual property purchased licensed from Core Scientific Operating Company ("**Core**") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023 by and between Core and the Company, except (1) to the extent waived in writing by the Company (such waiver not to be unreasonably withheld); (2) to the extent of any deviations from such plans, specifications and intellectual property by Manager's designs, plans, drawings, specifications, materials or intellectual property that Company agrees to in writing as part of the Services hereunder; or (3) to the extent of any

3

immaterial deviations from such plans, specifications and intellectual property by Manager during the performance of the Services hereunder.

(b)    Every two weeks, the Manager shall provide a report to the Company setting forth (i) the Manager's performance and progress towards Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii) any other information reasonably requested by the Company from time to time relating to the performance of the Services hereunder. In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.

(c)    <u>Modification of Services</u>. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the Parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the Parties agree to the terms of such amendment, then such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)    <u>Obligations of the Manager</u>. The Manager will:

(i)    Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**"); <u>provided</u>, <u>however</u>, that Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)    Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee

4

of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)     Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)     Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)     Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)     Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)     Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)     Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)     Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice, (B) drawings, designs and intellectual property relating to the Site or otherwise acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

5

(ii)      Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)     Creating a working group which, as of the Effective Date, will comprise of [●], [●], and [●], and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)     Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)      [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify and hold harmless the other under this Agreement).][2]

5.      Compensation.

(a)      Compensation for Development Services.

(i)      As consideration payable to Manager for providing the Services to Company, Company shall pay Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between the Effective Date and December 31, 2023:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |

---

[2] **Note to Draft**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.

6

| | |
|---|---:|
| Construction Management | $222,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| **Total** | **$734,000** |

For the period between the January 1, 2024 through August 31, 2024:

| Item | $/Month |
|---|---:|
| Project Management Costs & Labor | $330,000 |
| Site Design & Engineer Management | $148,500 |
| Site Budgeting, FP&A, & Accounting | $156,500 |
| Construction Management | $330,000 |
| Procurement, Logistics, & RFP Coordination | $135,000 |
| **Total** | **$1,100,000** |

(ii)     On the Effective Date, the Company shall pay Manager: (A) $734,000 as compensation for the completion of Milestone 1 and (B) $734,000 as compensation for the substantial completion of Milestone 2.

(iii)     The Company shall pay the Manager the Development Costs on the [third] Business Day of each month during the Term for such month's Services. Manager shall provide Company with invoices and detailed information relating to such month's Development Costs on or before the [third Business Day] following such month.

(b)     Compensation for Operational Services. To the extent that any mining units are energized and hashing at the Project during the Term ("**Operational Units**"), (i) the Manager shall perform the Services as such term is defined in that certain Managed Services Agreement dated February 9, 2022 by and between Frontier Outpost 13, LLC and Company (the "**Frontier Agreement**") and in accordance in all respects with Exhibit A thereof, and (ii) the Company shall pay to the Manager the Operational Costs applicable to such Operational Units on the [third] Business Day of each month during the Term.

"**Gross Revenue**" means the revenue realized by Company from BTC mined from Operational Units in the immediately preceding month.

"**Mining Expenses**" means costs of power to run the Operational Units during the immediately preceding month *plus* direct operating costs attributable to such Operational Units (including without limitation costs associated with labor and repair) *plus* $2,920 per MW under management for such prior month *plus* any other direct costs incurred by Company that are applicable to such Operational Units.

7

"**Mining Proceeds**" means Gross Revenue from any Operational Units *minus* Mining Expenses.

"**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of such Mining Proceeds from the immediately preceding month.

(c)     Reimbursement for Vertical Exhaust Units.

(i)     As of the Effective Date, the Manager is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW, as further described in Exhibit E (the "**VEUs**").

(ii)     Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)     Within 15 Business Days (as defined in the Plan) of the later of (A) the receipt by Company of all information and documentation provided pursuant to Section 5(c)(ii), and (B) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, subject to Section 5(c)(iv), Company shall notify Manager in writing whether or not Company wants to purchase either (X) all of the VEUs or (Y) a single VEU for testing purposes.  If the Company elects to purchase a single VEU, Manager shall promptly ship such VEU to the Site, and shall promptly install and test such VEU upon arrival to the Site.  Company may elect to purchase any or all of the remaining VEUs by providing Manager written notice of such election within 60 days of the initial date of testing such initial VEU and, if Company so elects, Manager shall promptly ship such additional VEUs to the Site, and shall promptly install and test such VEUs upon arrival to the Site.

(iv)     Company shall pay Manager an amount equal to (A) $[●] per VEU acquired by Company *plus* (B) all shipping, handling and storage costs incurred by Manager, and sales, use and other excise taxes, in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.

(v)     In the event that following delivery to the Site of the VEUs, any VEU requires repairs (a "**Required Repair**"), the Company will promptly deliver notice of such determination to the Manager (a "**Required Repair Determination**"). Following the delivery of such Required Repair Determination, the Company and Manager will consult in good faith to determine any further repairs necessary to any of the VEUs (the "**Further Repairs**"). The Company shall be responsible for any such Required Repairs up to an aggregate cost of $1,000,000 across all VEUs ("**Required Repair Threshold**") and, in the event that the Company and Manager agree in writing on any Further Repairs, the

8

Company and Manger will split the costs of such Further Repairs. Notwithstanding the foregoing, with respect to any VEU, the Manager's obligations under this Section 5(c)(v) will fall away and be of no further force and effect 60 days following the date such VEU is first energized.

(vi)    Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU, and (B) such VEU is free of all liens and encumbrances. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(C), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vii)    Without limiting the foregoing, at Company's option, Manager shall (A) to the extent transferable, transfer to Company any warranties provided by the manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or, at Company's election (B) diligently pursue and enforce such warranties on Company's behalf.  Any monetary relief from the VEU manufacturers pursuant to such warranties shall be taken into account with respect to the amounts set forth in Section 5(c)(v).

(d)    Reimbursement for Budgeted Expenses. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with Exhibit F within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; provided, however, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("**Breakage Fees**"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of any Manager Service Agreements. For the purposes of this Agreement, "**Manager Service Agreements**" means any agreements entered into by the Manager or its Affiliates in furtherance of the provision of Services that are approved in advance by the Company in writing.

(e)    Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the Parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)    To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered

(the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between the Manager and [NewCo, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**").

(g)    Effect of Substantial Completion. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means that all networking and electrical components necessary to support no less than 200 MWs of power in aggregate at the Project have been installed to permit the prompt installation and operation thereafter of ASICS using 200MWs of power.

(h)    This Section 5 describes the sole consideration due to the Manager for the Manager's performance of the Services.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

10

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Limitation of Liability.

(a)    Neither Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other Party or any of its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement in excess of the Liability Cap, except (i) to the extent such loss, liability, damage, or expense shall be proven to arise from the gross negligence, willful misconduct (which in the case of the Manager shall be deemed to include the knowing and continuing failure to provide the Services that are essential to or required to complete the Project), fraud or knowing violation of law (the "**Liability Exceptions**"), (ii) to the extent such loss, liability, damage or expense arises out of Company's breach of Section 5 (*Compensation*), Section 6 (*Confidentiality*), (iii) for any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (iv) to the extent such loss, liability, damage or expense arises out of Manager's breach of Section 6 (*Confidentiality*), or (v) for any of the Parties' indemnification obligations under Section 8 (*Indemnification*).

(b)    Except to the extent arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business.

(c)    For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

8.    Indemnification.

(a)    The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, damages, and liabilities, joint or several ("**Losses**") and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or knowing violation of law. In addition, the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take, to have result from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Manager Indemnified Party.

11

The reimbursement and indemnity obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Manager Indemnified Party.

(b)     The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or knowing violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c)     <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.     <u>Non-Solicitation</u>. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees promptly upon request of the Company.

12

10.    <u>Force Majeure</u>.

(a)    The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would include the following: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or tribunal of competent jurisdiction.

(b)    Within five business days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. Within five business days of receiving such notice, Company shall notify Manager whether it elects for Manager to suspend all Services during the occurrence of such Excluded Event, in which case (i) Company shall not be required to pay any amounts that would otherwise be payable to the Manger under this Agreement, and (ii) the Manager shall not be required to provide the Service hereunder until such time that the Excluded Event is resolved or the Manager resumes performance of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. If the Company does not elect to suspend all Services pursuant to this Section 10(b), the Company shall be obligated to pay Manager for the Services during such Excluded Event. Notwithstanding anything to the contrary in this Section 10, Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally

13

recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Manager: | [MANAGER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

14.    Entire Agreement. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.    Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party without the written consent of the other Party, except that (a) the Manager may assign its rights and obligations hereunder (i) to any of its Affiliates that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, (ii) in connection with any sale of all or substantially all of the mining operations services business of the Manager, or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation, and (b) the Company may assign its rights and obligations to any of its

Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.     No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.     Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.     Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.     Severability. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.     Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.     Waiver of Jury Trial. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

15

22.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.     <u>Remedies Cumulative</u>. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

24.     <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

25.     <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the

date first written above.

[Celsius Mining LLC]

By:_____

Name:

Title:


[U.S. Data Management Group, LLC]

By:_____

Name:

Title:

## Exhibit A

### Services

The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

    a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

    b. confirm reusability of existing equipment; and

    c. identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

7. Modify and/or finalize engineered plans and designs as necessary for:

    a. civil scope;

    b. mechanical scope;

18

    c.  electrical scope; and

    d.  networking scope.

8.  Source and procure all necessary equipment in accordance with engineered plans and as identified in prior diligence and planning efforts.

9.  Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

    a.  civil contractor;

    b.  mechanical contractor;

    c.  electrical contractor; and

    d.  network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1.  Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2.  Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3.  Initiate handoff of existing ISP service.*

4.  Assist as necessary for the handoff of property ownership including existing and required easements.*

5.  Engage a general contractor to:

19

   a.   outline full project scope (to be used in division of responsibilities matrix);

   b.   clearly identify work that is already complete;

   c.   clearly identify previously completed work that needs to be revisited and/or repaired; and

   d.   clearly identify work that is not yet complete.

6.  Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7.  Coordinate and lead the effort to modify and/or finalize engineered plans and design sets as necessary for:

   a.   civil scope;

   b.   mechanical scope;

   c.   MV electrical scope;

   d.   LV electrical scope;

   e.   networking scope; and

   f.   security scope.

8.  Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9.  Facilitate RFP process for:

   a.   general contractor;

   b.   civil contractor(s);

   c.   mechanical contractor(s);

   d.   electrical contractor(s); and

   e.   network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance to engineered plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

<u>**Exhibit B**</u>

**Milestones**

<u>**Milestone 1 ("Milestone 1"):**</u>

**Step 1:** Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.

**Step 2:** Engage Vendors:

    (a) Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.

    (b) PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.

    (c) PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.

    <u>***Note***</u>: No purchase orders or capital commitments will be submitted in Step 2.

**Step 3:** Engage HMC to:

    (a) Outline full project scope (to be used in Division of Responsibilities Matrix);

    (b) Clearly identify work that is already complete;

    (c) Clearly identify previously completed work that needs to be revisited and/or repaired; and

    (d) Clearly identify work that is not yet complete.

**Step 4:** Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

**Step 5:** Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.

<u>**Milestone 2 ("Milestone 2"):**</u>

**Step 1:** Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.

**Step 2:**    Coordinate and lead the effort to modify and/or finalize engineered plans and design sets for:

    (a) Civil Scope;

    (b) Mechanical Scope;

(c) MV Electrical Scope;

(d) LV Electrical Scope;

(e) Networking Scope;

(f) Security Scope; and

(g) USBTC containers: Complete engineering reports, review of warranty documents, and complete physical inspection of all containers.

      *__Note__*: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** Conduct RFP process for:
(a) HMC;

(b) Civil contractor(s);

(c) Mechanical contractor(s); and

(d) Network and cabling contractor(s).

      *__Note__*: Conducting the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

**Step 4:** Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.

**Step 5:** Develop project schedule and provide recommendations based on RFP process and negotiations.

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

## Exhibit C

### [Insurance Requirements][3]

1) <u>Manager's Minimum Insurance Requirements</u>:

    a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

    b) <u>Worker's Compensation and Employer's Liability</u>.

    Worker's Compensation with limits no less than the minimum amount required by applicable law.*

    Employer's Liability with limits no less than:*

      i) $1,000,000 Bodily Injury by Accident (Each Accident)

      ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

    c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

    d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

    e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

    a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

    b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

    c) <u>Worker's Compensation and Employer's Liability</u>.

---

[3] **Note to Draft**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)   $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)   Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)   Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)   All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)   The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

**Exhibit C-1**

**(Redline) U.S. Bitcoin Cedarvale Interim Services Agreement**

*DRAFT*

# INTERIM SERVICES AGREEMENT

## By and between

## [U.S. Data Management Group, LLC], as Manager

## And

## [Celsius Mining LLC], as Company[1]

This Interim Services Agreement (this "**Agreement**") is made and entered as of [October [●], 2023] (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC], a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.      Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.      Term and Termination.

(a)      Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)      the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**") becomes effective in accordance with its terms and the terms of the order confirming the Plan as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

(ii)      Substantial Completion of the Project.

---

[1] ~~W&C~~ **Note to Draft**: To confirm parties to this Agreement.

(b)    Termination. This Agreement may be terminated only as follows:

(i)    by mutual agreement, in writing, of both the Manager and the Company;

(ii)    by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 30 days after receipt by the Company of written notice of such failure by the Manager; provided, however, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if the Company cures such failure within such 30-day cure period; and

(iii)    by the Company, with an effective date as set forth in Section 2(c):

(A)    within 30 days after (1) the date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise elect not to proceed with the Plan (each, a "**Wind Down Termination Event**") or (2) December 31, 2023;

(B)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(C)    if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company;

(D)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

(E)    in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days.

(c)    Effect of Termination.

(i)    Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each Party for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii)    Upon the occurrence of a Wind Down Termination Event, the Company may request that the Manager provide the information set forth in Exhibit [●] with respect to transition of the Services to a successor.

(iii)    Upon notice of termination of this Agreement by either Party pursuant to Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the tTerm of the Agreement shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the tTerm continues pursuant to Section 2(c)(iii)(A), if applicable) (the "**Transition Period**"), the Manager shall provide reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (the "**Transition Services**"). During any Transition Period, in addition to amounts otherwise due to Manager under this Agreement during the tTerm of this Agreementpursuant to Section 2(c)(iii)(A), if applicable, the Manager shall be entitled to prompt reimbursement of any actual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services during the Transition Period. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iv)    [Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c), Section 6, Section 7, Section 8, and Sections 610 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant to Section 2(b), the provisions of this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive.][2]

(v)    If this Agreement is terminated and the Parties have entered into the USBTC Management Agreement (as defined herein), the provisions of Section 3 and Section 4 shall apply to the USBTC Management Agreement *mutatis mutandis* with full effect thereto, as if such provisions were originally part of the USBTC Management Agreement.

3.    Duties of the Manager. The Manager or any of its Affiliates shall (a) perform the services set forth on Exhibit A (collectively, the "**Services**") and (b) use commercially reasonable efforts to achieve Substantial Completion.

---

[2] **BR Note to W&C**: Think it makes more sense to add a provision into the USBTC Management Agreement itself that in the event that Cedarvale site has not reached substantial completion upon the effective date of the USBTC Management Agreement, then with respect to the buildout of the Cedarvale site, the Services will be performed in accordance with Section 3 and 4 hereof.

4.      Performance Standards.

(a)      The Manager shall perform the Services set forth on Exhibit A, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and, workmanlike and timely manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on Exhibit B; and (z) except to the extent waived in writing by the Company (such waiver not to be unreasonably withheld) or to the extent of any deviations from such materials by the designs, plans, drawings, specifications or other, materials created by the Manager as part of the Services hereunder, the plans, specifications and intellectual property purchased licensed from Core Scientific Operating Company ("**Core**") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023 by and between Core and the Company., except (1) to the extent waived in writing by the Company (such waiver not to be unreasonably withheld); (2) to the extent of any deviations from such plans, specifications and intellectual property by Manager's designs, plans, drawings, specifications, materials or intellectual property that Company agrees to in writing as part of the Services hereunder; or (3) to the extent of any immaterial deviations from such plans, specifications and intellectual property by Manager during the performance of the Services hereunder.

(b)      Every two weeks, the Manager shall provide a report to the Company setting forth (i) the Manager's performance and progress towards Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii) any other information reasonably requested by the Company from time to time relating to the performance of the Services hereunder. In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.

(c)      Modification of Services. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the Parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the Parties agree to the terms of such amendment, then such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)      Obligations of the Manager. The Manager will:

(i)      Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)      Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the

performance of the Services (the "**Project Manager**"); provided, however, that Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)    Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)    Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)    Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)    Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of

two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)    Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice, (B) drawings, designs and intellectual property relating to the Site or otherwise acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

(ii)    Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)    Creating a working group which, as of the Effective Date, will comprise of [●], [●], and [●], and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)    Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)    [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any

provisions requiring a Party to indemnify and hold harmless the other under this Agreement).]³²

5.    <u>Compensation</u>.

(a)    <u>Compensation for Development Services</u>.

(i)    As consideration payable to Manager for providing the Services to Company, Company shall ~~reimburse~~pay Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between the Effective Date and December 31, 2023:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |
| Construction Management | $222,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| **Total** | **$734,000** |

For the period between the January 1, 2024 through August 31, 2024:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $330,000 |
| Site Design & Engineer Management | $148,500 |
| Site Budgeting, FP&A, & Accounting | $156,500 |
| Construction Management | $330,000 |
| Procurement, Logistics, & RFP Coordination | $135,000 |

---

³² **Note to Draft**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.

|  |  |
|---|---|
| **Total** | **$1,100,000** |

~~(ii) Manager shall invoice all other costs at cost on a fixed basis per month in the amount specified above for the items.~~

(ii)    ~~(iii)~~ On the Effective Date, the Company shall pay ~~to the~~ Manager ~~an amount equal to~~: (A) $734,000 as compensation for the completion of Milestone 1~~.~~ ~~Upon~~ and (B) $734,000 as compensation for the substantial completion of Milestone 2 ~~(which, for the avoidance of doubt, may be the Effective Date), the Company shall pay to the Manager an amount equal to $734,000~~.

(iii)    ~~(iv)~~ The Company shall pay the Manager the Development Costs on the [third] Business Day of each month during the Term for such month's Services. Manager shall ~~invoice~~provide Company with invoices and detailed information relating to such month's Development Costs ~~each~~on or before the [third Business Day] following such month.

(b)    [Compensation for Operational Services. To the extent that any mining units are energized and hashing at the Project during the Term ("**Operational Units**"), (i) the Manager shall perform the Services as such term is defined in that certain Managed Services Agreement dated February 9, 2022 by and between Frontier Outpost 13, LLC and Company (the "**Frontier Agreement**") and in accordance in all respects with Exhibit A thereof, and (ii) the Company shall pay to the Manager the Operational Costs applicable to such Operational Units on the [third] Business Day of each month during the Term. ~~"~~

"**Gross Revenue**" means the revenue realized by Company from BTC mined from Operational Units in the immediately preceding month.

"**Mining Expenses**" means costs of power to run the Operational Units during the immediately preceding month *plus* direct operating costs attributable to such Operational Units (including without limitation costs associated with labor and repair) *plus* $2,920 per MW under management for such prior month *plus* any other direct costs incurred by Company that are applicable to such Operational Units.

"**Mining Proceeds**" means Gross Revenue from any Operational Units *minus* Mining Expenses.

~~(b)~~ "**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of such ~~m~~Mining ~~p~~Proceeds from ~~any Operational Units~~ *minus* ~~expenses that the Manager has incurred in connection with its operation of the Operational Units and the Site *minus* costs of power to run the Operational Units. Operational Costs shall be paid in United States Dollars.]~~[4] the immediately preceding month.

---

[4] ~~**BR Note to Draft**: Subject to further review.~~

(c)    <u>Reimbursement for Vertical Exhaust Units</u>.[5]

(i)    As of the Effective Date, the Manager is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW, as further described in <u>Exhibit E</u> (the "**VEUs**").

(ii)    Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)    Within 15 Business Days (as defined in the Plan) of the later of (a̶A) the receipt by Company of all information and documentation provided pursuant to Section 5(b̶c)(ii), and (b̶B) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, subject to Section 5(c)(iv), Company shall notify Manager in writing whether or not Company wants to purchase t̶h̶e̶ V̶E̶U̶s̶.̶either (X) all of the VEUs or (Y) a single VEU for testing purposes. If the Company elects to purchase a single VEU, Manager shall promptly ship such VEU to the Site, and shall promptly install and test such VEU upon arrival to the Site. Company may elect to purchase any or all of the remaining VEUs by providing Manager written notice of such election within 60 days of the initial date of testing such initial VEU and, if Company so elects, Manager shall promptly ship such additional VEUs to the Site, and shall promptly install and test such VEUs upon arrival to the Site.

(iv)    Company shall pay Manager an amount equal to (A) $[●] per VEU acquired by Company *plus* (B) all shipping, handling and storage costs incurred by Manager, and sales, use and other excise taxes, in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.[6]

(v)    In the event that following delivery to the Site of the VEUs, any VEU requires repairs (a "**Required Repair**"), the Company will promptly deliver notice of such determination to the Manager (a "**Required Repair Determination**"). Following the delivery of such Required Repair Determination, the Company and Manager will consult in good faith to determine any further repairs necessary to any of the VEUs (the "**Further Repairs**"). The Company shall be responsible for any such Required Repairs up to an aggregate cost of $1,000,000 across all VEUs ("**Required Repair Threshold**") and, in the event that the Company and Manager agree in writing on any Further Repairs, the Company and Manger will split the costs of such Further Repairs. Notwithstanding the foregoing, with respect to any VEU, the Manager's obligations under this Section 5(c)(v) will fall away and be of no further force and effect 60 days following the date such VEU is first energized.

---

[5] N̶T̶D̶: V̶E̶U̶ i̶n̶s̶p̶e̶c̶t̶i̶o̶n̶ r̶i̶g̶h̶t̶s̶,̶ e̶t̶c̶.̶ t̶o̶ b̶e̶ f̶u̶r̶t̶h̶e̶r̶ d̶i̶s̶c̶u̶s̶s̶e̶d̶ a̶m̶o̶n̶g̶ b̶u̶s̶i̶n̶e̶s̶s̶ p̶r̶i̶n̶c̶i̶p̶a̶l̶s̶.̶

[6] N̶T̶D̶: A̶m̶o̶u̶n̶t̶ t̶o̶ b̶e̶ u̶p̶d̶a̶t̶e̶d̶.̶

(vi)    ~~(v)~~ Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU~~,~~, and (B) such VEU is free of all liens and encumbrances~~]~~. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(~~B~~C), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vii)    ~~(vi)~~ Without limiting the foregoing, at Company's option, Manager shall (~~a~~A) to the extent transferable, transfer to Company any warranties provided by the manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or ~~(b)~~, at Company's election (B) diligently pursue and enforce such warranties on Company's behalf.  Any monetary relief from the VEU manufacturers pursuant to such warranties shall be taken into account with respect to the amounts set forth in Section 5(c)(v).

(d)    <u>Reimbursement for Budgeted Expenses</u>. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with <u>Exhibit F</u> within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; <u>provided</u>, <u>however</u>, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("**Breakage Fees**"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of any Manager Service Agreements. For the purposes of this Agreement, "**Manager Service Agreements**"~~,~~ means any agreements entered into by the Manager or its Affiliates in furtherance of the provision of Services~~, which~~ that are approved in advance by the Company in writing.

(e)    <u>Interest on Unpaid Amounts</u>. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the Parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u>, <u>however</u>, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)    To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement,

by and between the Manager and [NewCo, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**")[7].

(g)    Effect of Substantial Completion. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means ~~that~~ all networking and electrical components necessary to support no less than 200 MWs of power in aggregate ~~have been installed~~to plugs at the Project~~,~~ have been installed to permit the prompt installation and operation thereafter of ASICS using 200MWs of power.

(h)    This Section 5 describes the sole consideration due to the Manager for the Manager's performance of the Services.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered

---

[7] **W&C Note to Draft**: Consider attaching final Management Agreement as Exhibit.

by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Limitation of Liability.

(a)    Neither Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other Party or any of its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement in excess of the Liability Cap, except (i) to the extent such loss, liability, damage, or expense shall be proven to arise from the gross negligence, willful misconduct (which in the case of the Manager shall be deemed to include the knowing and ~~intentional~~continuing failure to provide ~~substantially all~~ the Services that are essential or required to complete the Project), ~~or~~ fraud or knowing violation of law (the "**Liability Exceptions**")~~. Except~~, (ii) to the extent ~~arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business; provided that with respect to: (1) the Company's liability, this Section 7 shall not apply to (i) any amounts owed pursuant to~~such loss, liability, damage or expense arises out of Company's breach of Section 5 (*Compensation*), ~~(ii)~~Section 6 (*Confidentiality*), (iii) for any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, ~~(iii) damages resulting from the Company's~~iv) to the extent such loss, liability, damage or expense arises out of Manager's breach of Section 6 (*Confidentiality*), or ~~Section 9 (*Non-Solicitation*), (iv) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company, (v) any~~(v) for any of the Parties' indemnification obligations under Section 8 (*Indemnification*)~~hereof; and (2) the Manager's liability, this Section 7 shall not apply to (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or (ii) (v) any indemnification obligation under Section 8 (*Indemnification*) hereof.~~.

(b)    Except to the extent arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business.

(c)    For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

8.    Indemnification.

(a)    The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, damages, and liabilities, joint or several ("**Losses**") and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or knowing violation of law. In addition, the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take, to have result from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Manager Indemnified Party.

(b)    The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or knowing violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal

defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.       [Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees promptly upon request of the Company.][8]

10.      Force Majeure.

(a)      The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would include the following: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or tribunal of competent jurisdiction.

(b)      Within 10five business days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. In the event that an Excluded Event affects all or substantially all of the Services, andWithin five business days of receiving such notice, Company shall notify Manager whether it elects for Manager to suspend all Services during the occurrence of such Excluded Event is in effect in excess of six months, then the, in which case (i) Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement, and (ii) the Manager shall not be required to provide the Services hereunder for

_____

[8] **BR Note to Draft: Subject to further review.**

~~the duration of the time in excess of such six month period~~ until such time that the Excluded Event is resolved or the Manager resumes performance ~~of any portion~~ of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. ~~The Manager~~If the Company does not elect to suspend all Services pursuant to this Section 10(b), the Company shall be obligated to pay Manager for the Services during such Excluded Event. Notwithstanding anything to the contrary in this Section 10, Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.    <u>Independent Contractor</u>. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    <u>Permissible Activities</u>. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    <u>Notices</u>. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

If to the Company:                    [COMPANY ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]


with a copy to:                       [COMPANY LAW FIRM]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [ATTORNEY NAME]


If to the Manager:                    [MANAGER ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE

NOTICES]

with a copy to:                    Brown Rudnick LLP
                                   7 Times Square,
                                   New York, NY 10036
                                   Email: jfitzsimons@brownrudnick.com
                                   Attention: Jonathan Fitzsimons

14.     Entire Agreement. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.     Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party without the written consent of the other Party, except that [(a) the Manager may assign its rights and obligations hereunder (i) to any of its Affiliates that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, (ii) in connection with any sale of all or substantially all of the [mining operations services business] of the Manager, or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation,]9 and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.     No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.     Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.     Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be

---

9 BR Note to Draft: Currently being discussed.

construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.    <u>Remedies Cumulative</u>. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

24.    <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof

will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

     25.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the date first written above.

[Celsius Mining LLC]

By:_____

Name:

Title:

[U.S. Data Management Group, LLC]

By:_____

Name:

Title:

## Exhibit A

### Services[10]

[The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

~~The Services to be provided pursuant to this Agreement do not include operations and maintenance services.~~

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

   a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

   b. confirm reusability of existing equipment; and

   c. identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

---

[10] **W&C Note to Draft**: To be discussed.

7. Modify and/or finalize engineered plans and designs as necessary for:

    a. civil scope;

    b. mechanical scope;

    c. electrical scope; and

    d. networking scope.

8. Source and procure all necessary equipment in accordance with engineered plans and as identified in prior diligence and planning efforts.

9. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

    a. civil contractor;

    b. mechanical contractor;

    c. electrical contractor; and

    d. network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. ~~Using commercially reasonable efforts~~Management of the Project to achieve Substantial Completion.

**B. Project 2 Services**
The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):
1. Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2.  Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3.  Initiate handoff of existing ISP service.*

4.  Assist as necessary for the handoff of property ownership including existing and required easements.*

5.  Engage a general contractor to:

    a.  outline full project scope (to be used in division of responsibilities matrix);

    b.  clearly identify work that is already complete;

    c.  clearly identify previously completed work that needs to be revisited and/or repaired; and

    d.  clearly identify work that is not yet complete.

6.  Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7.  Coordinate and lead the effort to modify and/or finalize engineered plans and design sets as necessary for:

    a.  civil scope;

    b.  mechanical scope;

    c.  MV electrical scope;

    d.  LV electrical scope;

    e.  networking scope; and

    f.  security scope.

8.  Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9.  Facilitate RFP process for:

    a.  general contractor;

    b.   civil contractor(s);

    c.   mechanical contractor(s);

    d.   electrical contractor(s); and

    e.   network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance to engineered plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. ~~Using commercially reasonable efforts~~<u>Management of the Project</u> to achieve Substantial Completion.

**<u>Exhibit B</u>**

**<u>Milestones</u>**[11]

**<u>Milestone 1 ("Milestone 1"):</u>**

**Step 1:** Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.

**Step 2:** Engage Vendors:

    (a) Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.

    (b) PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.

    (c) PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.

    ***<u>Note</u>***: No purchase orders or capital commitments will be submitted in Step 2.

**Step 3:** Engage HMC to:

    (a) Outline full project scope (to be used in Division of Responsibilities Matrix);

    (b) Clearly identify work that is already complete;

    (c) Clearly identify previously completed work that needs to be revisited and/or repaired; and

    (d) Clearly identify work that is not yet complete.

**Step 4:** Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

**Step 5:** Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.

**<u>Milestone 2 ("Milestone 2"):</u>**

**Step 1:** Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.

**Step 2:**       Coordinate and lead the effort to modify and/or finalize engineered plans and design sets for:

---

[11] **W&C Note to Draft**: To be discussed.

(a)  Civil Scope;

(b)  Mechanical Scope;

(c)  MV Electrical Scope;

(d)  LV Electrical Scope;

(e)  Networking Scope;

(f)  Security Scope; and

(g)  USBTC containers: Complete engineering reports, review of warranty documents, and complete physical inspection of all containers.

> ___Note___: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** ~~Initiate~~Conduct RFP process for:
(a)  HMC;

(b)  Civil contractor(s);

(c)  Mechanical contractor(s); and

(d)  Network and cabling contractor(s).

> ___Note___:  ~~Initiating~~Conducting  the  RFP  process  includes  creating  detailed  RFPs, coordinating  site  visits  with  key  counterparties,  fielding  questions  from  bidders,  and negotiating project timelines and cost.

**Step 4:** Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.

**Step 5:** Develop  project  schedule  and provide recommendations based  on  RFP  process  and negotiations.

Following  final  approvals  on  design,  schedule,  and  budget  for  each  project,  Manager  will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

## Exhibit C

### [Insurance Requirements][123]

1) Manager's Minimum Insurance Requirements:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) Worker's Compensation and Employer's Liability.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.*

      Employer's Liability with limits no less than:*

      i)   $1,000,000 Bodily Injury by Accident (Each Accident)

      ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) Company's Minimum Insurance Requirements:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) Worker's Compensation and Employer's Liability.

---

[12] **W&C**[3] **Note to Draft**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

i)  $1,000,000 Bodily Injury by Accident (Each Accident)

ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

4)