**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:                                        )

**CELSIUS NETWORK LLC,** _et al.,_            ) Chapter 11

                              Debtors.    ) Case No. 22-10964 (MG)

                                              ) (Jointly Administered)

_____)


# OTIS DAVIS CLOSING BRIEF

# OBJECTIONS TO:

# (1) THE PLAN CONFIRMATION &

# (2) $0.25 CEL TOKEN SETTLEMENT

# Summary

Throughout this process, we have seen the Debtors and the UCC make feeble attempts to unfairly and unjustly steal value from CEL token creditors.  The Debtors and the UCC have fallen well short of their burden to come close to proving that CEL token should be valued at something other than the Petition date price of $0.81, and have been completely unable to point to a more accurate value for CEL token.

The evidence is clear and Incontrovertible.  Even though they have not been able to overcome this simple fact of reality in the expert report I have submitted, the Debtors and the UCC have repeatedly tried to move the goalpost over and over again in order to desperately find a justification to steal value from CEL token creditors in this case, the same CEL token creditors that the UCC has a fiduciary duty to represent.

I have summarized and rebutted each and every one of their weak attempts to subvert CEL token creditors, and I reaffirm my arguments against each failed attempt with the simple truth that CEL token should be

valued at the Petition date price of $0.81.   There is zero evidence to the

contrary, and so the Court cannot find for any value below the $0.81.

# FALLACY ARGUMENT:
# CEL TOKEN HAS NO UTILITY THEREFORE
# IT HAS NO VALUE

The Debtors' attorneys have argued vociferously that because Celsius is a

bankrupt company and sits in Chapter 11 and the utilities that CEL token

offered to its users are no longer available anymore to them as users,

therefore CEL token has no value.   Those arguments are false and go

against the reality of the situation; ***as of writing (Friday, October 27, 2023***

***at 9:40 AM Eastern) CEL token is trading at $0.3004.***

I would direct this court to a coin that has a $650 billion market  cap that

has no utility, zero utility, yet has significant value, and that coin is **Bitcoin.**

Bitcoin and CEL token both have the same utility now:  None.

Bitcoin provides no utility, benefits, privileges, bonuses, or discounts, yet its

speculative value has it trading north of $33,954 as of writing (Friday,

October 27, 2023 at 9:40 AM Eastern).  During the Pause, users could not

utilize CEL token to take loans, pay lower interest on borrowed funds, pay your interest in CEL, etc. yet CEL token maintained a speculative value of $0.81 on the Petition date.  Utility is only one of many factors that can attribute value to a cryptoasset.  Would the UCC deny that Bitcoin has any value?  I would think not.

In fact, of the top 10 ranked cryptocurrencies on [CoinMarketCap](CoinMarketCap), only one of them has utilities, and that cryptocurrency is Ethereum.  You can use Ethereum in DeFi (decentralized finance) to take loans against your cryptoassets; Ethereum's smart contract functionality can be used as an escrow agent, thereby eliminating the need for a third-party escrow agent; you can use Ethereum for the tokenization of assets; Ethereum can be used for gaming and non-fungible tokens (NFTs); decentralized file storage; supply chain management; digital identity solutions, just to name a few.

The Debtors arguing that CEL token has no value because it has no utilities is a red herring at best, proven simply by looking at the top 10 ranked cryptocurrency coins on [CoinMarketCap](CoinMarketCap), of which only one has utilities, and that coin is Ethereum.  No other finding can be supported by the evidence or reality.

Some people would argue that Bitcoin is a "store of value," but any store of value is meant to be stable.  That is certainly not Bitcoin in any way, shape or form.  24 months ago, Bitcoin was trading above $50,000; on July 13, 2022, the Petition date, Bitcoin was trading at $19,880; today as of writing, October 27, 2023, Bitcoin is trading at $33,954.  Bitcoin is highly speculative and derives almost all of its value from that speculation.  That is not a "store of value."  Gold has behaved like a store of value, and is a store of value, because it has preserved its purchasing power over thousands of years.

## OTIS DAVIS' 34,867 CEL TOKENS IN CUSTODY &
## 1,648,111 CEL TOKENS IN EARN

I, Otis Davis, have 34,867 CEL tokens in Custody, and 1,648,111 CEL tokens in my Earn account.  The day the Debtors and the UCC agreed to a **Custody Settlement and had your Honor sign that Custody Settlement giving CEL token Custody holders $0.81 (February 28, 2023) is the day**

**the Debtors and the UCC agreed that all CEL token holders, regardless if they're in Custody or Earn, should get the Petition date price of $0.81.  Anything else is contrary to the rule of law, equity and is not supported by any facts, claims or arguments.**

My 34,867 CEL tokens in Custody are not reflected on Schedule F and Schedule D of Docket No. 974; in other words, the CEL tokens in my Celsius account are no longer on Schedule F and Schedule D for pure withdrawals, which leads me to believe it was erased.  My name, Otis Davis, appears on Docket 974, # 5, page 3440.  This cannot be overlooked and must be remedied.  I have already instituted several complaints with professional organizations in several jurisdictions in regard to professional conduct of a few individuals in this matter, including recorded threats to my freedom, and I intend to follow through with all remedies available to me under the law.

For the avoidance of doubt, I, Otis Davis, declare under penalty of perjury that **I voted to REJECT the Plan in every class, as reflected in the balloting, including the Custody Class and the Earn Class.**

**THERE HAS BEEN A SETTLEMENT AND AGREED-UPON VALUATION BY THE UCC AND THE DEBTORS dated March 20, 2023, located at** **Docket No. 2771** titled "**NOTICE OF FILING OF CUSTODY SETTLEMENT AGREEMENT AND CUSTODY AD HOC GROUP LETTER."  The valuation in this Settlement Agreement was the Petition date value of $0.81 per CEL token** (i.e., 1 CEL Token equals an $0.81 CEL Token Deposit Claim).

The law firm of Kirkland & Ellis cannot unilaterally make any, let alone substantial and meaningful changes to the terms of the CEL Token Custody Settlement (Docket No. 2271) signed by your Honor, and file on the docket a Modified Plan (Docket No. 3577) after the vote.

I myself have 34,876 CEL tokens in my Celsius Custody account.  The CEL token holders in the Custody class by a monetary majority voted to reject the $0.25 settlement offered by the UCC and the Debtors.  Furthermore, the $0.25 CEL token Settlement indicates that that settlement does not apply to the Custody class.  The CEL tokens in my Custody account have to have at least a 72.5% valuation to meet the "best interests" test.  At the Debtors' proposed $0.25 value, this does not meet my best interests. Since my Custody CEL is valued at $0.25 deactivation pricing, as a

dissenting member, **I did not consent to the change memorialized in the Modified Plan (Docket 3577) on page 109 of 193, and I hereby present this case to your Honor as a CEL Token Custody holder.**

**The UCC and the Debtors cannot** renege on their settlement with CEL token Custody holders and retroactively and unilaterally reduce CEL token custody holders' claims from $0.81 down to $0.25.  Furthermore, how can the UCC and the Debtors attempt to pay different classes of creditors a different value for their CEL token?  That is clearly not equitable.

If the CEL Token Custody Settlement was based upon an $0.81 Petition Date Price, it would be unacceptable to change that $0.81 Petition Date Price; it would be even further out of line to pay other creditors lower than $0.81, when a settlement based on the Petition date price of CEL token had already been reached with CEL token Custody holders.

My Custody CEL tokens are worth at least 72.5% since I have clawback exposure.  When we do the math, 72.5% of $0.81 is $0.58725.  The Debtors and the UCC are trying to force me as a CEL token Custody holder to take a $0.25 settlement that they offered CEL token holders in Earn; but CEL token Custody holders have already signed a CEL Token Custody Settlement Agreement with the UCC and the Debtors, which was ratified by

your Honor, so they cannot force that $0.25 settlement on me as a CEL token Custody holder, when at minimum they're required to give me $0.58725, which would meet the "best interests" test.

I also adopt herein all of Dimitry Kirsanov's letters and objections in their entirety to this Court, which are located at Docket Numbers 3877, 3729, 3721, 3717, 3716, 3694, 3688, 3647, 3629 and 3628.

Your Honor, it has been determined that Custody holders own their assets and are entitled to a 72.5% liquidation value at bankruptcy.  The UCC and the Debtors are forcing an eventual $0.25 deactivation value on Custody holders as the deactivation valuation.

This goes against the "best interests" clause in Chapter 11 versus Chapter 7 in the Custody class.  As liquidation of CEL in Custody is valued at 72.5%, this is 0.58725 of $0.81, which is far higher than the proposed Chapter 11 clause, which does not meet the "best interests" test.  I will emphasize that all aspects of the Plan – from confirmation to the deactivation date – must meet or exceed the best interests of a creditor.

I accepted the Custody Settlement, and the Custody Settlement at Docket No. 2291 calls for the following:

*"For the avoidance of any doubt, any Holder of an Allowed Custody Claim that abstains from voting or votes to reject the Plan and has only Pure Custody Assets or Transferred Custody Assets, but was prevented from receiving his or her Custody Assets under the Withdrawal Order as a result of an outstanding obligation owed to the Debtors through the Debtors' Borrow Program, shall receive his or her Custody Assets in accordance with the treatment of allowed Deposit Claims under the Plan and otherwise consistent with the Court's findings in the Withdrawal Order."*

I will quote from the **FOURTH NOTICE OF FILING OF REVISED**

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF**

**REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES**

**dated August 17, 2023 which is at [Docket No. 3332](#), page 546 of 830**,

quote:

*"Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (i.e., 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed,"* end quote, which I have attached hereto as Exhibit F.

**Exhibit F**

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI thereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)     CEL Token Settlement.

Notwithstanding the Cryptocurrency Conversion Table, the Distribution Cryptocurrency Conversion Table, or the Deactivation Date Cryptocurrency Conversion Table, as part of the general settlement described in Article IV.B.1 of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the mutual compromises described in Article IV.B.2 of the Plan and this Article IV.A.2.(b) of the Disclosure Statement, the Plan shall effectuate a settlement of all Claims and Causes of Action arising out of or related to CEL Token for, among other things, recharacterization and subordination, pursuant to the following terms:

- Except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token (*i.e.*, 1 CEL Token equals a $0.25 CEL Token Deposit Claim), and shall otherwise receive the treatment associated with the program in which they were deployed.

- All Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.

The Debtors will evaluate the votes cast by Holders of CEL Token Deposit Claims (not including CEL Token Deposit Claims held by Equitably Subordinated Parties) and the number of Holders of CEL Token Deposit Claims that opt out of the Class Claim Settlement. Such votes will be disclosed on the Voting Report to be Filed by the Solicitation Agent. To the extent the majority of eligible Holders of CEL Token Deposit Claims vote to accept the Plan or not opt out of the Class Claim Settlement and/or the Debtors and the Committee reach an agreement with an ad hoc group of Holders of CEL Token Deposit Claims, the Debtors will present the settlement for approval under Bankruptcy Rule 9019 as part of Confirmation. To the extent a majority of Holders of CEL Token Deposit Claims vote to reject the Plan, the Debtors will seek a determination from the Court of the relative rank and value of CEL Token on the Petition Date at Confirmation.

Without giving notice, unbeknownst to the Custody class, the Debtors filed

a document titled "NOTICE OF FILING OF MODIFIED JOINT CHAPTER 11 PLAN

OF REORGANIZATION OF CELSIUS NETWORK LLC AND ITS DEBTOR

AFFILIATES, dated September 27, 2023, which is at Docket No. 3577, and

which I have attached hereto as Exhibit G.

**Exhibit G**

84.    83.   "*Deactivation Date Cryptocurrency Conversion Table*" means the conversion table the Distribution Agent shall use to calculate the ~~amount of Cash or Cryptocurrency to distribute to a~~ Claims of Holders of ~~an~~ Allowed Custody Claims ~~or Withhold Claim~~ that did not retrieve ~~its~~their Plan distribution from the Celsius platform by the Deactivation Date in Cash and Liquid Cryptocurrency, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date.  Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court.  For the avoidance of doubt, following the Deactivation Date, such Claims shall be subject to further conversion pursuant to any applicable Distribution Cryptocurrency Conversion Table in connection with subsequent distributions.

85.    84.   "*Debtor Release*" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.C of the Plan.

8

**This Modified Plan was filed after the vote**; the Plan vote was September 20, 2023 and this Modified Plan at Docket No. 3577 was filed on September 27, 2023.  The Debtors have inserted the following language in Exhibit G, quote, "which table shall  contain applicable cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date," meaning they don't want to honor the settlement made with CEL Token Custody holders.  **The value on this proposed date CANNOT be less than Petition date prices.**  This is clearly not in my best interest and fails the "best interests" test.  Deactivation date prices must meet or exceed the value of Petition date prices, and $0.25 doesn't meet or exceed that value; similarly, just like assets that dropped in value, such as Matic that dropped from $0.609 to $0.5179, the Debtors and the UCC cannot give me less than Petition date value in comparison for my CEL tokens held in Custody.

**These harmful changes were made by the Debtors after the vote.**  The Debtors and the UCC cannot settle with CEL token Custody holders (Docket No. 3332) and then unilaterally change their mind by modifying the

Plan ([Docket No. 3577](#)) simply because it does not fit their proposed $0.25 CEL token settlement with CEL token creditors in the Earn class.

## DEBTORS' $2 BILLION CLAIM AGAINST FTX, ET AL.

The Debtors and the UCC don't want to talk about their $2 billion claim that they both agreed to file on behalf of Celsius' creditors against FTX, et al., so let me talk about that $2 billion claim on their behalf. I would submit the reason why they don't want to talk about this $2 billion claim that the Debtor Celsius Network filed in the FTX bankruptcy against FTX, et al. is because it **undercuts their argument that CEL token should not be allowed to get the Petition date price of $0.81 and CEL token should instead be subordinated as a security under Rule 510(b) and get $0.00 (zero), or take the $0.25 settlement.**

In addition, it would also raise questions by your Honor of what this $2 billion claim is for, which the Debtors and the UCC have refused to answer when asked. The $2 billion claim filed by the Debtors is for the attack that FTX and Alameda Research launched against CEL token and Celsius,

based on what Scott Duffy, the UCC co-chair, said to me.  Everyone in the world would agree that $2 billion is more than the $1.2 billion hole in Celsius's balance sheet, so Celsius is saying, through that $2 billion filing, that FTX is responsible for more than the $1.2 billion hole in Celsius's balance sheet.  If that's not what they are claiming, they need to simply tell this Court why they filed the $2 billion claim in the FTX bankruptcy on behalf of all creditors.

By filing this $2 billion claim in the FTX bankruptcy against FTX, et al., the Debtors themselves in their **sworn filing** with the Federal Court have already assessed the value of CEL token; Celsius and the UCC have assessed CEL token's value at $2.88 per CEL token when taking into consideration the 693 million CEL token supply.

They have legally bound themselves and asserted in the Court filing that the damages caused by Alameda Research (which I remind the court funded the compromised and discredited expert report by Elementus and Max Galka) and FTX through their manipulation of CEL token on the FTX exchange was $2 billion, which equates to **$2.88 per CEL token**. Accordingly, the debtors and their attorneys are estopped from claiming anything other than they have sworn to the Court in the FTX matter as

being the actual amount of damages.  They cannot claim one amount in one federal case and another amount in another federal case.  I believe that this violates their ethical considerations and disciplinary rules put upon them in the states in which they practice along with the federal rules governing attorney conduct, and I intend to contact and continue to enforce my rights in this matter regarding the same.

Celsius DOES NOT have any significant outstanding balances or claims that could justify this $2 billion claim against FTX besides the manipulation of CEL token.  I have attached photographs with links as Exhibits D and E showing the $2 billion claim that Celsius filed against FTX, et al.

https://coingape.com/breaking-celsius-network-files-2-billion-claim-against-ftx/





https://restructuring.ra.kroll.com/FTX/Home-ClaimInfo

Exhibit E

| 4027 | 06/29/2023 | Celsius Network Limited | FTX Products (Singapore) Pte Ltd | $2,000,000,000.00 |
|------|------------|-------------------------|----------------------------------|-------------------|
| 3021 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Deep Creek Ltd | $2,000,000,000.00 |
| 3152 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LedgerPrime Digital Asset Opportunities Fund, LLC | $2,000,000,000.00 |
| 3232 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | Liquid Financial USA Inc. | $2,000,000,000.00 |
| 3262 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | Bancroft Way Ltd | $2,000,000,000.00 |
| 3306 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | FTX US Services, Inc. | $2,000,000,000.00 |
| 3350 | 06/29/2023 | Celsius Network Limited and its Affiliated Debtors | FTX Services Solutions Ltd. | $2,000,000,000.00 |
| 3581 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Cedar Bay Ltd | $2,000,000,000.00 |
| 3594 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Cottonwood Grove Ltd | $2,000,000,000.00 |
| 3620 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LedgerPrime LLC | $2,000,000,000.00 |
| 3650 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | LiquidEX LLC | $2,000,000,000.00 |
| 3657 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Hannam Group Inc | $2,000,000,000.00 |
| 3678 | 06/29/2023 | Celsius Network Limited and its affiliated debtors | Deck Technologies Holdings LLC | $2,000,000,000.00 |

The Examiner herself wrote in her report (Docket No. 1956) on page 325 of 426, **"Mr. Bolger recalled that the FTX team 'drilled into' Celsius's balance sheet.** A follow-up meeting with Mr. Bankman-Fried was scheduled, but the meeting never took place.  Ultimately, no deal was finalized."  **After the FTX team 'drilled into' the Celsius balance sheet after receiving the company's private financial information illegally without board approval or the approval of the then-CEO, then the FTX team used that illegally obtained private company financial information to illegally naked short CEL token, which is why the Debtors and the UCC have filed a claim in the FTX bankruptcy for $2 billion.  If that's incorrect, the Debtors are free to state the reason for their filed $2 billion claim in the FTX bankruptcy.**

Your Honor simply needs to ask the Debtors one question and one question only:  *What is the $2 billion claim for damages against FTX for if the CEL token is valued at near $0.00 (zero)?*  Both White & Case and Kirkland & Ellis are devaluing creditors' $2 billion claim, and *that's legal malpractice*; creditors can turn around and sue these big-name law firms of

White & Case and Kirkland & Ellis for this legal malpractice that they are engaged in.

You cannot file a $2 billion claim in the FTX bankruptcy on behalf of all Celsius creditors, allege in that $2 billion claim that FTX manipulated CEL token by naked shorting it using "God mode," and then on the other hand say CEL token is worth $0.00 (zero) in this Celsius Chapter 11 because you're hellbent on screwing over retail CEL token holders and asking this Court to accept your frivolous, flip-flop arguments.  Additionally, all FTX and Alameda Research has to do to kill the Debtors' lawsuit is to use the attorneys' positions here that the CEL token is worthless and the suit against FTX can be extinguished, which is clearly legal malpractice.

We creditors, through our seven selected representatives on the UCC, now six selected representatives, hired White & Case to represent the best interests of creditors.  In this instance, the UCC and White & Case are going against 36,000 CEL token creditors because they want 2% more Bitcoin and Ethereum in their wallets, which is a betrayal, and amounts to legal malpractice.

**The Debtors, along with the UCC, decided that this $2 billion claim against FTX for naked shorting CEL token is valid, while at the same**

**time the UCC and the Debtors are attempting to subordinate the basis of that very same $2 billion claim.**

Scott Duffly, the co-chair of the UCC, told me when we finished our settlement discussions, when I was about to leave the Zoom call, quote, "And, Otis, before you go, we're going to need you guys' help in proving this $2 billion claim that we and the Debtors agreed to file against FTX and other entities because you and others in your group know much more about what happened at FTX than we do," to which I simply answered "Okay" and then left the Zoom meeting.

*The $2.88 CEL token price is derived from the fact that Celsius has 693 million CEL tokens, give or take, and the Celsius claim in the FTX bankruptcy is for $2 billion.  So all one has to do is multiply 693,000,000 by $2.88 and that gives you the $2 billion claim value, which is what the*

**Debtors and the UCC are claiming in the FTX bankruptcy; in other words, the Debtors and the UCC are claiming in the FTX bankruptcy that each CEL token is worth $2.88**, but here in this Celsius Chapter 11 they're claiming that each CEL token is worth $0.00 (zero), undercutting their own arguments for that $2 billion claim in the FTX bankruptcy and engaging in purported legal malpractice by devaluing creditors' claim of $2

billion in the FTX bankruptcy to the benefit of third parties.  This will not go without a hearing before the bar.

**Your Honor, they cannot have it both ways:**  The UCC and the Debtors cannot say that CEL token is worth $2.88 in the FTX bankruptcy based on their $2 billion claim that they filed in said bankruptcy, but then turn around and say in this Celsius Chapter 11 bankruptcy CEL token is worth $0.00 (zero).  That is not a law firm representing the best interests of its clients, the creditors.  That $2 billion claim that we have against FTX is worth much more to creditors than the $128 million that is owed to non-insider CEL token holders.  This is clear legal malpractice by the Debtors' counsel and the UCC's counsel, and creditors shall and will sue both law firms of Kirkland & Ellis and White & Case over this legal malpractice and demand discovery, which includes taking depositions of the lawyers in this case.

## CEL TOKEN AND EARN ACCOUNTS BEING A SECURITY

I wholeheartedly agree with the Judge's series of questions below that says in sum and substance that, **if CEL token is a security, wouldn't that make the Earn accounts a security**?  Aaron Colodny disagrees that it wouldn't make the Earn accounts a security, we CEL token creditors agree

that it would; and therefore, we submit to this Court that **neither CEL token nor the Earn accounts are securities**.

The colloquy between the Judge and Aaron Colodny is quoted below, which took place at the CEL Token Hearing on October 2, 2023, starting on page 52:

"THE COURT:  Let me just stop you there for a minute.  In the SEC's complaint against Mashinsky and Celsius, the complaint takes the position that the Earn accounts under the Howey Test were securities.

"MR. COLODNY:  Correct.

"THE COURT:  If the Earn accounts were securities and the CEL token was a security, wouldn't they both be subordinated and essentially be in the same class for distribution?

"MR. COLODNY:  I don't agree with that, your Honor."

Counsel to the UCC, Mr. Colodny, does not have to agree with your Honor, but that is the position of the SEC and what Ms. Scheuer from the SEC is asking this Court to rule on, specifically whether the entire Celsius Earn account is a security, and Aaron Colodny is doing the same exact thing by asking this Court to rule on whether CEL token is a security, which is the

exact position of the SEC.  Mr. Colodny simply does not understand that a ruling could well be that the entire Earn account is a security, and the Earn account includes CEL token, which is what the SEC is arguing to this Court.

## MAX GALKA'S FAILURE TO DISCLOSE CONFLICTS

The expert witness, Max Galka, put forth by the UCC to testify on the value of CEL token, his testimony should be stricken and report excluded from consideration due to the fact that Galka along with the attorneys that submitted this report, along with the UCC, failed to disclose the blatant and severe conflict of interest that Galka's company has with these proceedings.

Galka's company Elementus is funded by Alameda Research, a wholly-owned subsidiary and controlled company of Sam Bankman-Fried and FTX, who is currently being sued for $2 billion by this Celsius bankruptcy estate (Exhibit E).  A conflict?  There can be none bigger.

As if this was not a glaring omission of conflict, one of the three board
members of Elementus is the founder of a company called Cherokee
Acquisitions, which has been systematically buying up claims in this estate
for well below market value and has reportedly done over $300 million in
Celsius claims transactions.  So Galka's company undervalues assets in
the estate so that his board member can buy the claims for an alleged
artificially reduced price, then resell them for a huge profit.  Does or did this
benefit Galka or Elementus?  We will find out in a hearing, and this is one
of the matters being inserted into the interlocutory appeal that I am in the
process of preparing to file in this matter.

If these conflicts of interest were disclosed to the UCC or to the attorneys
for this matter and not further disclosed to the Court or other parties, then
this would amount to a fraud on the Court, for which the party should and
by the grace of God will be held accountable.

**Galka actually testified that he was not able to come up with the value
of the CEL Token on the Petition date.**  So basically the $1,000 an hour
spent on this report, which should never have been proffered, was not only
a waste of money, since there was no conclusion, but also should amount
to the funds being returned to the bankruptcy estate because of the

undisclosed conflicts of interest as well as the expert not being able to perform the task assigned.  If I hire a painter to paint my house and he does not paint my house because he cannot figure out how to, then he does not deserve to get paid and he simply cannot be called an expert.  It is that simple.

Shockingly and surprisingly, even to your Honor, Mr. Galka is still unwilling and/or unable to provide a precise value for CEL token on the Petition date, even though he was informed by your Honor at the hearing held on Thursday, September 28, 2023, through his attorneys, that you, Aaron Colodny, "Better find out an answer."  Mr. Galka apparently did not have any methodology or skill set to come up with a value but did admit that the market value of the CEL token on the Petition date was not $0.81.  His approximately $2 million fee should be refunded to the estate.

Since this supposed expert couldn't come to a value for CEL token on the Petition date, who appeared to be conflicted because of a member of his board of directors buying up undervalued claims in this matter after this expert made sure to undervalue them, it is logical that his testimony should

not be considered at all in determining the value of the CEL token on the Petition date.  This is by his own admission and cannot be argued against.

## AGAIN PRESERVING MY RIGHT ON APPEAL:

## FAILURE OF WHITE & CASE AND YOUR HONOR'S RECUSAL; FACTS, ARGUMENTS AND POINTS OF ORDER

At the October 4, 2023 Confirmation Hearing, your Honor gave the Debtors' attorneys, Kirkland & Ellis, approximately 45 minutes (31 pages of testimony; pages 11-42) during the Max Galka Direct Examination to have their position in this matter shown to the Court properly and completely.

During my Cross-Examination of their expert witness Max Galka, your Honor gave me about 15 minutes in total time (pages 61-79; 18 pages) and then cut me off even though I was not close to finishing.

Two weeks later, at the October 17, 2023 Confirmation Hearing, your Honor allowed the Debtors' counsel, Kirkland & Ellis, to Cross-Examine my expert witness Mr. Hussein Faraj for over an hour; this, before I was given a chance to conduct a Direct Examination of my own expert witness Hussein

Faraj.   Your Honor then limited my Direct Examination to only five questions, for a maximum of seven minutes!

The blaring facts as highlighted above are objectively prejudicial to my rights as a creditor and show severe favoritism to UCC's counsel White & Case and the Debtors' counsel Kirkland & Ellis, which I believe have given rise to a valid rationale for a motion to ask your Honor to recuse himself due to an apparent glaring conflict of interest in your Honor's chambers.

As this court and the general public is aware, recently a member of the law firm of White & Case has started to work for your Honor in your chambers. That law clerk's name is Cathy Shu.  On September 28, 2023, Gregory F. Pesce filed at Docket No. 3625 the TENTH DECLARATION OF GREGORY F. PESCE IN SUPPORT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF WHITE & CASE LLP AS COUNSEL EFFECTIVE AS OF JULY 29, 2022.  Mr. Pesce wrote at Docket No. 3625, page 3 of 4, as follows, quote:

**"Connection to Former Associate**

"6. Cathy Shu is a former associate of White & Case, who was previously employed with the Firm from December 23, 2021 through September 8, 2023.  After Ms. Shu left

employment with the Firm, and on or about September 27, 2023, White & Case was

informed by the Court's staff, in connection with preparations for the commencement of

the confirmation hearing, that Ms. Shu will be joining the chambers of the Honorable

Martin Glenn as a law clerk.  White & Case has reviewed its files and has confirmed that

Ms. Shu did not work on White & Case's representation of the Committee in these

chapter 11 cases.  I do not believe that White & Case's connection to Ms. Shu precludes

White & Case from meeting the standard for the retention of Committee counsel under

the Bankruptcy Code," unquote.

The law states clearly that even the "appearance" of a conflict of interest is

enough to warrant the judge to preclude a law firm from a case, in this case

preclude White & Case from being Committee counsel.  I firmly believe that

White & Case's connection to Ms. Shu precludes White & Case from

meeting the standard for the retention of Committee counsel under the

Bankruptcy Code.

The fact that a member of the law firm that is leading this charge to deny

creditors like myself our rights under the law is now working for your Honor

cannot be overlooked.

The fact that an attorney working for one of the top law firms in the world

making an assumed salary in excess of six figures would coincidentally

want to start working as a law clerk for a reduced salary in the middle of the

law firm's biggest current case that is generating tens of millions of dollars in fees for the firm cannot just be swept under the rug and just assumed to be okay as per the law and Bankruptcy Code, not to mention the Disciplinary Rules and Ethical Considerations that are to be abided by by each and every attorney and judge in the State of New York and the Federal Bar as well.

In fact, a recent interview was done with a news agency regarding this matter and the hundreds of millions of dollars that have been charged to the estate.  The $1,000 an hour fee for a compromised expert opinion that could not come up with a value due to the expert's lack of expertise – where the expert's board of directors also had a direct conflict of interest with the expert in relying on Galka to diminish the value of the estate's assets so that Cherokee Acquisitions could buy them up for pennies on the dollar and then flip them for millions – has led many to question the legitimacy of this entire proceeding as anything other than a money machine for those in the "club."

I say this with all due respect and with deference to the Court:  The glaring double standard in how parties are treated cannot and will not be allowed to stand so long as there is breath in my body.

The prejudicial way that I have been treated needs to be rectified, and I am requesting from this court that I be granted the right to complete my Cross-Examination of the alleged compromised expert witness Max Galka and be allowed to ask any and all questions that I deem appropriate to prove my case, AND also that I be allowed to conduct a proper Direct Examination of my expert witness Hussein Faraj and not be limited to five questions, which the Court has denied my motion at Docket 3891.

I have searched as best I can the Federal Rules of Bankruptcy Procedure and could not find any rationale or allowance allowing courts to limit the times that creditors could take to ask questions while allowing law firms and parties representing the company and/or the UCC to be given carte blanche for whatever they like.  I am not an attorney, but I can still read English.

During his September 5, 2005 Supreme Court Senate Confirmation Hearing, Chief Justice John Roberts compared the role of a judge to that of an umpire and said the following:  "I will decide every case based on the record, according to the rule of law, without fear or favor, to the best of my ability, and I will remember that it's my job to call balls and strikes, and not to pitch or bat."

In this case, the court and your Honor was not acting like an umpire but more like a party to the Celsius bankruptcy case pitching and batting as opposed to calling 'balls and strikes,' thereby giving preferential treatment to the big law firms of Kirkland & Ellis and White & Case and severely prejudicing the rights of Pro Se creditors, like myself, by giving me 15 minutes to ask questions of the UCC's expert witness Max Galka and 7 minutes (your Honor gave me a limit of 5 questions) to ask questions of my own expert witness, Hussein Faraj; this after giving the Debtors' counsel, Kirkland & Ellis, close to 80 minutes to cross-examine my expert witness before I even had a chance to do direct examination of my own expert witness, Hussein Faraj.

A Judge has a wide breadth of latitude in his or her courtroom, but judges are supposed to be fair and impartial, and that's not what we have here. What I have experienced is a court that is picking sides and giving preferential treatment to big-name law firms the likes of Kirkland & Ellis and White & Case over a Pro Se creditor like myself who speaks the truth.

I, Otis Davis, declare under penalty of perjury that I will personally spend every dime I have to appeal this decision, publicize the injustice through the media and do everything legal and in my power to see that justice is served

and that retail CEL token creditors are treated fairly and equitably in this Celsius bankruptcy.

I will appeal this case to the highest level and not allow it to leave the docket to the best of my abilities.  I have tremendous support from others in the crypto community, and if I have to borrow and beg from friends and family and the CEL token community, so be it, that's what I will do, borrow and beg until I can't borrow and beg anymore to right this wrong that has been levied against retail CEL token creditors in this Chapter 11 case.

I understood clearly when I REJECTED the Plan that I would have to fight the UCC's lawyers White & Case and the Debtors' lawyers Kirkland & Ellis, but I had no idea that I would also have to fight the Court.  This is wrong, and I am asking the Court to correct this and allow me my rights.

The judge is there to administer justice and fairness, not to pick sides or prejudice one side over the other, which is what's going on in this Celsius bankruptcy to CEL token creditors.

This is so evident to the average person, not to mention egregious, that numerous media outlets have contacted me, asking if I want to be interviewed about this bias that they see taking place by Judge Glenn towards CEL token creditors, and I've told them not at this point; that I

would prefer to write a Letter/Motion to the Court and place my objections on the docket in hopes that the Judge corrects this injustice that has taken place in his courtroom in front of the world and allow me to do the Direct Examination of my expert witness Hussein Faraj without being cut off during the middle of my examination, which is what the Judge also did during my Cross-Examination of the UCC's expert witness Max Galka.

This is clearly a pattern to prejudice me as a Pro Se creditor and it is wholeheartedly unfair, and I will personally spend every dime I have to appeal this; and if I run out of money, I will beg and borrow until I can't beg and borrow anymore to appeal this case so it doesn't go away from the judge's docket.

I would ask your Honor to give me the ability to do a full Cross-Examination of the compromised expert witness Max Galka and Direct Examination of my expert witness Hussein Faraj and to be allowed equal time as the Debtors to examine my expert witness, which amounted to between 70 and 90 minutes for the Debtors, which your Honor has Denied in an Order at Docket 3891.  Allowing me to ask my own expert witness five questions for a total of five to seven minutes is prejudicial and unfair.

## DISLOCATION EVENTS

Both expert witnesses, Max Galka and Hussein Faraj, in this case agree that the market was dislocated at or around the Pause; Max Galka came to a value of $0.355 using a one-day average based on the price of CEL token on the Pause, and Hussen Faraj used a 20-day average from May 21, 2022 to June 9, 2022 and came to a value of $0.71 for CEL token.

During the deposition of Hussein Faraj, which took place on October 13, 2023, the following question and answer appears on pages 116 to 117, quote:

"Q.   And did you look at longer periods than 20 days?

"A.    I did.  I did.  I did analysis all the way through.  I did analysis to the bottom.  I did May.  I thought that it wasn't fair because I didn't think CEL was valued at that high price.  I did analysis going even further down, and every time I went further down the increase in price -- the price increased.

"When I say I wanted to be fair -- and again, this is my personal opinion -- I didn't think that CEL deserves to have a value sitting at 1 to $2 or a dollar or anything above. I just thought it made no traditional sense from a personal -- from an opinion on my assessment.

"So the more data I took, the higher the value of CEL was getting.  So I basically said, okay, well, if I expand that period to 30 days, then I've got periods where there's $1.50, $1.60 close, you know all these periods.  Is it justifiable to have -- so I had to take a fair value, and I have to -- look.  I speak too fast, sorry.

"I had to find a period where I thought was best that I thought -- and again, as my expertise and my domain experience gives me the ability to confidently say that I'm happy with an outcome.

"What I didn't want to have is an outcome that just looked good but I wasn't satisfied with that outcome," unquote.

Mr. Faraj was very fair and unbiased in his deposition testimony with respect to his expert opinion and assessment of CEL token. Mr. Faraj noted that if he did a 30-day average price for CEL token prior to the Pause dislocation event articulated by Max Galka as opposed to a 20-day average price, the CEL token value would have gone up to $1.50 to $2.00, and he didn't believe that was a fair value for CEL token; he believed $0.71 was a fair value with respect to CEL token.

Whether your Honor decides to use the Petition date price of $0.81 as the value of CEL token or the $0.71 value that my expert witness Hussein Faraj testified to in his deposition and on cross-examination is entirely up to your Honor's discretion based on the evidence presented in this case.

The burden of proof is on the Debtors to prove that $0.81 is not the correct CEL token price on the Petition date, and they have failed that burden in spectacular fashion. The Debtors' position that CEL token has no value because it has no utilities is completely false; because as I said earlier in this brief, Bitcoin, which is the No. 1 ranked cryptocurrency, has zero utilities, yet Bitcoin has a $650 billion market cap and has tremendous value. The argument that the Debtors put forth that CEL token has no utilities so therefore it has no value is 100 percent false. A cryptocurrency

does not need to have utilities in order to have value, as demonstrated by Bitcoin and the 8 other cryptocurrencies in the top 10 ranked on CoinMarketCap that have zero utilities yet have tens of billions of dollars in value.

The UCC's expert witness, Max Galka, said that the value of CEL token is not $0.81 on the Petition date but that he couldn't give a value because he didn't know.  Mr. Galka further went on to file the Supplemental Declaration of Maxwell Galka at Docket No. 3646, wherein he's using the Pause date of $0.355 as the correct value for CEL token.  The Pause date is not the law, the law is the Petition date; and furthermore, even the $0.355 Pause date value for CEL token elucidated by Mr. Galka in his Supplemental Declaration is higher than the $0.25 CEL token settlement that the Debtors and the UCC came up with, which settlement is not in the best interest of CEL token creditors.   The UCC's own expert witness, Max Galka, disagrees with the $0.25 CEL token settlement and believes, in his expert opinion, that the value of CEL token on the date of the Pause was $0.355.

In the alternative, if your Honor decides to go outside the law of Petition date prices and look at the one-day $0.355 Pause date price espoused by Max Galka, then your Honor also has to look at the 20-day average price

articulated by Hussein Faraj in his deposition and trial testimony, which is a better methodology, because it uses a 20-day average price of $0.71 from May 21, 2022 to June 9, 2022, which is outside both dislocation events, as opposed to a one-day average price of $0.355 on the June 12, 2022 Pause date by Max Galka.

Respectfully Signed,

 Otis Davis, *Pro Se*

10/27/2023

*/s/Otis Davis*