```
                                              Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 22-10964-MG

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    CELSIUS NETWORK LLC,

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                      United States Bankruptcy Court

13                      One Bowling Green

14                      New York, NY  10004

15

16                      October 30, 2023

17                      2:02 PM

18

19

20

21    B E F O R E :

22    HON MARTIN GLENN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  KAREN
```

1    HEARING re HYBRID CLOSING ARGUMENTS RELATED TO PLAN

2    CONFIRMATION.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4          Attorneys for the Debtor

 5          300 North LaSalle

 6          Chicago, IL 60654

 7

 8    BY:  CHRIS KOENIG

 9

10    KIRKLAND & ELLIS LLP

11          Attorneys for the Debtor

12          1301 Pennsylvania Avenue NW

13          Washington, DC, DC 20004

14

15    BY:  T.J. MCCARRICK

16

17    KIRKLAND & ELLIS LLP

18          Attorneys for the Debtor

19          601 Lexington Avenue

20          New York, NY 10022

21

22    BY:  ELIZABETH H. JONES

23

24

25
```

Page 4

```
 1   WHITE & CASE LLP

 2        Attorneys for the Official Committee of

 3        Unsecured Creditors

 4        555 South Flower Street, Suite 2700

 5        Los Angeles, CA 90071

 6

 7   BY:  AARON COLODNY

 8

 9   WHITE CASE LLP

10        Attorneys for the Official Committee of

11        Unsecured Creditors

12        1221 Avenue of the Americas

13        New York, NY 10036

14

15   BY:  KEITH WOFFORD

16        JOSHUA WEEDMAN

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        Attorneys for the U.S. Trustee

20        201 Varick Street, Suite 1006

21        New York, NY 10014

22

23   BY:  SHARA CORNELL

24        MARK BRUH

25
```

**Page 5**

1    MCCARTER ENGLISH, LLP

2         Attorneys for the Ad Hoc Group of Borrowers

3         245 Park Avenue

4         New York, NY 10167

5

6    BY:  DAVID J. ADLER

7

8    U.S. SECURITIES AND EXCHANGE COMMISSION

9         100 F Street, NE

10        Washington, DC 20549

11

12   BY:  THERESE A. SCHEUER

13

14   VENABLE LLP

15        Attorneys for Ignat Tuganov

16        151 West 42nd Street

17        New York, NY 10036

18

19   BY:  JEFFREY S. SABIN

20

21

22

23

24

25

**Page 6**

1   OFFIT KURMAN

2       Attorneys for Ad Hoc Group of Earn Account Holders

3       300 East Lombard Street, Suite 2010

4       Baltimore, MD 21202

5

6   BY:  JOYCE A. KUHNS

7

8   DANIEL FRISHBERG, Pro Se

9

10  IMMANUEL HERMANN, Pro Se

11

12  RICHARD R. PHILLIPS, Pro Se

13

14  OTIS DAVIS, Pro Se

15

16  DIMITRY KIRSANOV, Pro Se

17

18  ARTUR ABREU, Pro Se

19

20  JOHAN BRONGE, Pro Se

21

22  DAVID SCHNEIDER, Pro Se

23

24  CATHY LAU, Pro Se

25

Page 7

1    ALSO PRESENT TELEPHONICALLY:

2

3    ARTUR ABREU

4    KATHERINE AIZPURU

5    JASMINE AMAND

6    CHRIS BECIN

7    ANDREW BEHLMANN

8    JEFFREY BERNSTEIN

9    ED G. BIRCH

10   JOEL BLOCK

11   KYLE BRAY

12   GRACE BRIER

13   NURALDEEN BRIFKANI

14   VTOR CUNHA

15   SANTOS CACERES

16   ROBERT CAMPAGNA

17   ANDREW CARTY

18   RICKI CHANG

19   CHRISTINA CIANCARELLI

20   JOSHUA CLARK

21   CHRISTOPHER COCO

22   LAFAYETTE A. COOK

23   CARL J. COTE

24   DAVID J. DALHART

25   STEFFAN DAVIES

1    THOMAS DIFIORE

2    TRISTAN DIAZ

3    SIMON DIAZ

4    SIMON DIXON

5    SHARON DOW

6    SCOTT DUFFY

7    JOHN PETER DZARAN

8    BEN EADES

9    JAMES ENGEL

10   DAVID AVERY FAHEY

11   FLORENCE FLANNIGAN

12   REBECCA GALLAGHER

13   JASLEIGH GEARY

14   DARIUS GHEORGHE

15   BRADLEY GIARDIELLO

16   MICHAEL GRAUBERT

17   ANTHONY GREENE

18   KATHRYN GUNDERSEN

19   CAMERON GUTHRIE

20   MIRA HAQQANI

21   GABRIELA ZAMFIR HENSLEY

22   ROBERTO HERNANDEZ

23   SAMUEL P. HERSHEY

24   KAITLYN A. HITTELMAN

25   LUCAS HOLCOMB

1   MITCHELL HURLEY

2   ALI JAMSHID FAR

3   MIKE JOHNSON

4   GREG KACZKOWSKI

5   DAVID KAHN

6   YARA KASS-GERGI

7   RAVI KAZA

8   ANNE S. KEASEY

9   MARTIN E. KEDZIOR

10   PHILIP KHERZI

11   LEA KLORANE

12   CARLO KUHRT

13   CHRISTOPHE LACKEY

14   DAN LATONA

15   JEAN-PHILIPPE LATREILLE

16   JOSEPH LEHRFELD

17   BRIAN S. LENNON

18   MARK S. LEONARD

19   NICOLE A. LEONARD

20   JASON LU

21   KEVIN M. MANUS

22   JEREMY MARONPOT

23   CHASE MARSH

24   JERRY MASSEY

25   KEITH MCCORMACK

Page 10

1    ERIK MENDELSON

2    TOM MERCURI

3    ALEX MICHAELS

4    LAYLA MILLIGAN

5    KEITH NOYES

6    DONALD L. POYNTER

7    ERIK PAPP

8    MILIN PATEL

9    JOHN PATOUHAS

10   BRETT A. PERRY

11   GREGORY F. PESCE

12   RICHARD R. PHILLIPS

13   MACIEJ PORCZEK

14   LALANA PUNDISTO

15   CRAIG RASILE

16   ANNEMARIE V. REILLY

17   MARK ROBINSON

18   SHAYA ROCHESTER

19   JONATHAN RODRIGUEZ

20   JENNIFER ROOD

21   MICHAEL ROSELLA

22   WAYNE P. ROTHENBERGER

23   CHASE C. RUBIN

24   JOSEPH E. SARACHEK

25   MIKE SARKISSIAN

1    DAVID SCHNEIDER

2    NOAH M. SCHOTTENSTEIN

3    SAM SCHREIBER

4    WILLIAM D. SCHROEDER

5    DAVID SENES

6    EZRA SERRUR

7    MATTHEW W. SILVERMAN

8    HANNAH SIMSON

9    DON SMITH

10    LUKE SPANGLER

11    COURTNEY BURKS STEADMAN

12    KEYAN TAJI

13    LUCY THOMSON

14    ANHMINH TRAN

15    DAVID TURETSKY

16    ELVIN TURNER

17    VICTOR UBIERNA DE LAS HERAS

18    WILLIAM MATTHEW UPTEGROVE

19    MELISSA L. VAN ECK

20    VETON VEJSELI

21    CAROLINE WARREN

22    CHRISTIAN DANIEL ERIC WASER

23    ZACH WILDES

24    MARTIN WILLIAMS

25    TAK YEUNG

1    ANDREW YOON

2    ZAHARIS

3    TANZILA ZOMO

4    JARNO BERG

5    ROBERT M. KAUFMANN

6    RAKESH PATEL

7    HEIN VAN DER WIELEN

8    RICK ARCHER

9    BRITTANY SUZANNE BIAS

10   SOMA BISWAS

11   BEN CLARKE

12   MIA COOPER

13   DREW DUFFY

14   RAMON GONZALES

15   UDAY GORREPATI

16   SANDALI HANDAGAMA

17   TAYLOR HARRISON

18   PATRICK HOLOHAN

19   DIETRICH KNAUTH

20   MIKE LEGGE

21   SERBAN LUPU

22   JONATHAN RANDLES

23   TIMOTHY REILLY

24   CAROLINE SALLS

25   PETER J. SPROFERA

Page 13

1    VINCE SULLIVAN

2    MAUDE TIPTON

3    ZACHARY ZABIB

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Just give me a

4    moment, Mr. Koenig.  Good afternoon.

5              MR. KOENIG:  Good afternoon, Your Honor.  Chris

6    Koenig, Kirkland & Ellis, for the Debtors.  Is there

7    anything you want to address the outset, Your Honor?

8              THE COURT:  No.  Let me just, you know, the list

9    of parties who can make opening statements -- closing

10   arguments, rather, was filed and has allocations of time for

11   both the Debtor and the Committee.  I'm going to permit, if

12   they want to reserve time for rebuttal, you need to let me

13   know now how much time you want to reserve.

14             MR. KOENIG:  Yes.  I'll reserve 15 minutes for

15   rebuttal.

16             THE COURT:  Okay.  All right.  So I'm going to

17   have one of my law clerks keep track of time as we're going

18   through.  Let me just cover the use of demonstratives.  So

19   the Court has received, let's see, one, two, three -- five

20   demonstratives to be used.  Mr. Phillips a little while ago

21   emailed a -- I think it must've been a PowerPoint to the

22   Court.

23             He had previously filed, I guess, something as ECF

24   3913.  I'm not going to permit the use -- I don't know

25   whether there's any changes from what he previously

Page 15

1    circulated.  We have the ECF docket numbers.  I gather that

2    can be pulled up on the screen.  I'll permit him to use

3    that.  For security reasons, if nothing else, we don't

4    permit late sent things that can't be scrubbed for viruses

5    and things like that.  So I'll permit him to use what was

6    previously circulated to the Court.

7            But, all right, Mr. Koenig, let's go ahead.

8            MR. KOENIG:  Deanna, could you please make Mr.

9    Jose Lopez a co-host for sharing the demonstratives?

10           CLERK:  All right.  He is a co-host.

11           MR. KOENIG:  Wonderful.  Okay, thank you.  Your

12   Honor, Celsius' bankruptcy case has gone on for well over a

13   year.  This case has sparked strong opinions and pushback

14   from our accountholders, which is more than understandable

15   given that they were defrauded and they lost access to their

16   investments for over a year.  Our goal throughout these

17   cases have been to build consensus and return as much value

18   as possible to creditors as quickly as possible, and we've

19   clearly done just that.

20           Just to remind the Court about the voting results

21   really quickly -- sorry, next slide.  The -- nearly 98

22   percent of our accountholders voted to accept the plan and

23   every accountholder class separately voted to accept the

24   plan.  And the interesting thing is there's actually very

25   few open issues remaining for the Court to decide here

Page 16

1   today.  Nearly most of the confirmation requirements

2   pursuant to Section 129 of the Bankruptcy Code have been

3   established by the Debtors that are actually uncontested.

4           We filed a very robust brief in support of

5   confirmation in Slide 37 of this presentation -- which we

6   don't need to skip to -- lays out each of the confirmation

7   factors and points to the evidence that's in the record,

8   satisfies each of those factors.

9           This case is very complicated and there's a lot of

10  strong opinions on all sides.  But in this argument, I'm

11  going to focus on what the Court has to focus on today and

12  that's the remaining outstanding objections and the relevant

13  legal standards.

14          THE COURT:  Am I correct, you -- I think I saw it

15  in ECF a little while ago the revised disclosure -- findings

16  of fact and conclusions of law.

17          MR. KOENIG:  That's right, Your Honor.  What we've

18  done is we worked through the weekend with some of the

19  remaining objecting parties, including most notably the U.S.

20  Trustee, the SEC, and several other parties and I'm pleased

21  the report and we'll be reporting in a little bit more

22  detail, we've resolved a number of objections and that was

23  what the revised order was meant to address was to

24  incorporate agreed language.

25          We understand that account holders want all of

Page 17

1    their crypto back.  That is simply not possible under the

2    circumstances.  Celsius does not have it.  It's also not the

3    legal standing for confirmation; although, to be clear we're

4    striving to return as much crypto as possible under the

5    plan.

6            For the most part, the relevant legal standard

7    before the Court today is best interests because for each of

8    the remaining objecting parties, their class voted to accept

9    the plan.  And so the question is, does the plan meet the

10   best interest test with any -- with respect to any

11   dissenting parties?  So just really quickly, I want to -- I

12   want to overview some of the recently resolved objections

13   and highlight the remaining objections.

14           We've built a lot of consensus in this case over

15   time.  We've worked constructively to resolve as many issues

16   as possible.  We have a number of parties that affirmatively

17   support the plan.  Of course, the Creditors Committee, each

18   of the formal ad hoc groups of creditors in this case, Ignat

19   Tuganov, and many other.  Many account holders that used to

20   oppose everything in these cases now support the plan, too.

21   And as I mentioned a moment ago, we've resolved many

22   objections since the start of the confirmation hearing

23   itself, starting with the U.S. Trustee.

24           We've resolved nearly everything with the U.S.

25   Trustee.  I understand that there's a handful of open issues

Page 18

1    that she still has.  I'll let her articulate her remaining

2    issues and then I'll respond in rebuttal.  One of the issues

3    I wanted to flag for Your Honor was you raised the issue at

4    the conclusion of the trial of the idea of naming the

5    released parties in a little bit more detail.  So following

6    the hearing, we met and conferred with the U.S. Trustee and

7    the Committee and we've come to an agreement on some

8    additional disclosure that should help to bolster the

9    record.

10           What we will do is we will file a list of the

11   released employees that will be attached to the confirmation

12   order.  It's about 70 individuals.  And we've modified the

13   confirmation order to make additional disclosures about the

14   releases as well.  We're naming the members of the Special

15   Committee of the Debtors by name.  We're referencing the

16   members of Fahrenheit by name.  The references to the Ad Hoc

17   Groups in the releases are qualified by referencing the Rule

18   2019 disclosures they filed just so the record is clear

19   about what is the member of an Ad Hoc Group at any

20   particular time.

21           We've resolved a number of other objections as

22   well, in addition to the U.S. Trustee who again has a few

23   issues remaining.  We've resolved with the consumer privacy

24   ombudswoman.  There's language in the confirmation order.  I

25   understand she no longer opposes confirmation.  I believe

Page 19

1    she's going to file a final report just for the record.

2    We've resolved with the securities law plaintiffs.  We've

3    resolved regarding the ADR procedures which Your Honor has

4    heard about on a number of different hearings and we finally

5    managed to close that out.  And Pharos, who objected early

6    in this case, resolved its objection -- withdrew its

7    objection as well.

8            So if you look at the parties who are going to

9    speak today that oppose confirmation, there's only a few

10   people that still oppose the plan and they can be grouped

11   into a few main categories, being first CEL token obviously,

12   the board appointment issues, the retail loans, and the

13   emergence incentive plan.

14           Let me start with CEL token.  So CEL token was the

15   most contested issue during the confirmation trial.  There

16   are strong opinions by both CEL token holders who want to

17   maximize the recovery and non-CEL token holders who don't

18   want to be diluted by the CEL token holders.  The CEL token

19   settlement was designed to try to resolve this contested

20   issue and get support for a middle ground of 25 cents per

21   CEL token, and that settlement was overwhelmingly accepted

22   by both CEL token holders and non-CEL token holders alike.

23           I talked about the general support for the plan

24   but for CEL token holders specifically, 98.71 percent in

25   number and 96.06 percent in dollar amount voted to accept

Page 20

1    the plan --

2           THE COURT:  There is no class but there were --

3    there was a separate report done that isolated out the CEL

4    token holders in each of the voting classes.

5           MR. KOENIG:  That's exactly right, Your Honor.  We

6    tried to do that just so we could understand what the

7    separate support for the settlement was from the most

8    effective group of creditors, that being the CEL token

9    holders.

10          So that means that the questions before the Court

11   on CEL token are actually pretty narrow.  The first question

12   is, should the CEL token settlement be approved, and the

13   second settle -- the second question is, does the CEL token

14   treatment meet the best interest test.  The answer to both

15   questions is yes.  First, the settlement meets the standard

16   set forth in this district for settlements pursuant to

17   Bankruptcy Rule 9019.

18          This Court has, for better or worse, had the

19   opportunity to consider many settlements in this case and

20   the standard throughout has been the iridium factors.  I

21   won't focus on all the factors, but just to focus on key

22   ones, this litigation would certainly be protracted and

23   complex if it were fully litigated, in particular, some of

24   the security issues that have been raised.  Both CEL token

25   holders and non-CEL token holders overwhelmingly voted to

Page 21

1    accept the plan and the settlement.

2            So the question for the Court is whether the

3    settlement falls below the lowest point in the range of

4    reasonableness, and it does not, particularly when the

5    settlement was incorporated in the plan and creditors

6    overwhelmingly voted to accept the plan.  Turning to best

7    interests, the plan's treatment of CEL token clearly meets

8    the best interest test as well.

9            The threshold question is, what is the value of

10   CEL token under a Chapter 7 liquidation, at which point,

11   best interest test would be violated.  And again --

12           THE COURT:  On the petition date.

13           MR. KOENIG:  On the petition date.  And again, I

14   said the word value and that was intentional.  Value is

15   different from price, as both Mr. Galka and Mr. Faraj

16   testified during the trial.  So Mr. Compagna from Alvarez

17   and Marsal testified about the issue of at what value of CEL

18   token as of the petition date the best interest test would

19   no longer be met.  And his testimony on this point was

20   actually uncontroverted.

21           He said that the point at which the best interest

22   test is no longer met is any value for CEL token under a

23   Chapter 7 liquidation that is at or above 34 cents for the

24   orderly winddown and any value at or above 36 cents for the

25   NewCo transaction.  So the question before the Court is

1    simple.  Is the value of CEL token as of the petition date

2    in a Chapter 7 liquidation lower than 34 cents?

3            Now, the Court heard from both Mr. Galka and Mr.

4    Faraj on this point and they actually agree on a lot of the

5    key points.  They both agreed that CEL token is a utility

6    token.  They agree that CEL token had no utility after the

7    pause.  They agree that the market for CEL token was

8    dislocated and disrupted, and the market price is not a

9    reflection of the actual value of the CEL token on the

10   petition date for that reason.

11           They also agree that the only remaining value for

12   the CEL token as of the petition date was speculative value.

13   That is, that CEL token would have some utility in the

14   future because they both agreed it had no utility as of the

15   pause, much less the petition date.  The main difference in

16   their analysis is what is the speculative value of CEL token

17   as of the petition date?

18           Mr. Galka's testimony was very clear.  The value

19   of CEL token as of the petition date is zero or near zero.

20   On the other hand, Mr. Faraj's testimony is confusing,

21   inconsistent, and unreliable.  He agreed with Mr. Galka that

22   CEL token had no utility post pause and that the only

23   remaining value as of the petition date was speculative.

24   Nonetheless, his analysis and his report focused on actual

25   trading data from before the pause, which is when CEL token

Page 23

1    still had utility on the platform.

2            So how could that have any bearing on the

3    speculative value of CEL token on the petition date when he

4    admits that there was no utility anymore?  And that's really

5    the key flaw in Faraj's testimony and why it should be given

6    no weight.  On the one hand, he says that the only remaining

7    value as of the petition date is speculative because there's

8    no utility, but he uses pre-pause pricing to support his

9    theory on valuation.

10           There's lots of other reasons why Mr. Faraj's

11   testimony is not reliable and should be given no weight.

12   I'm not going to waste a lot of time on this argument

13   focusing on it, but a couple of the key points, he's not a

14   qualified expert, for the reasons that we set forth in the

15   motion in limine that we filed at Docket No. 3817 prior to

16   his testimony.  He doesn't have a degree in this area.  He's

17   never performed this type of analysis before.  He's never

18   presented to a Court before.

19           His report is not even his opinion.  It's an

20   artificial intelligence that actually wrote the report.  And

21   he relied on the artificial intelligence for more than just

22   typing words on the page.  He had to ask the AI substantive

23   questions including, notably, whether the analysis he was

24   using could be used to value CEL token as of the petition

25   date.  That was an astonishing fact and that alone should be

Page 24

1    disqualifying in and of itself.

2            There's some other reasons that his testimony

3    isn't reliable, either.  First, he admitted that it took

4    longer to read the report than to write it.  He admitted

5    that there were significant errors including that he gave

6    the artificial intelligence that wrote the report, the wrong

7    date ranges for the analysis.  He testified that the dates

8    should have been May 21st to June 9th, that the AI analyzed

9    for the trading data, but the report instead said "The value

10   from June 9th to June 12th might be the most representative

11   of CEL's share value in the least manipulated market

12   conditions."

13           That wasn't what he meant.  It was just a goof.

14   And Mr. Faraj and his artificial intelligence are both

15   confused about key issues.  He asked the artificial

16   intelligence at one point about something relating to the

17   "petition (pause) date."  Those dates are different dates.

18   They're a month apart and that's a really substantive

19   difference.

20           The value of CEL token almost certainly declined

21   during that period as the pause went on and the CEL token

22   utility did not return.  That's what Mr. Ferraro testified.

23   But Mr. Faraj is confusing the petition date and the pause

24   date, not only here but in other places in his report as

25   well.  That's all I have to say about Mr. Faraj.

Page 25

1          Mr. Faraj was Mr. Davis' purported expert witness,

2     but Mr. Davis himself also testified about CEL token.  Mr.

3     Davis is certainly vocal and even persistent about CEL

4     token, but his testimony is also internally inconsistent and

5     should be given no weight.  He suggests four different

6     values for CEL token in his sworn testimony.  Each one is

7     more outlandish than the last.

8          He suggested in the same document that the value

9     of CEL token as of the petition date should be either 81

10    cents, 86 cents, $2.01, or $2.88.  At the same time, he

11    admits he's not an expert on valuation and none of those

12    four prices are the same price that his purported expert

13    came up with either.

14         Now, during cross examination, Mr. Davis was

15    confronted with various contemporaneous statements that he

16    made about CEL token and its value and utility.  For

17    example, post-petition, he called CEL token worthless.  On

18    many occasions even before the pause, he openly complained

19    about CEL tokens' lack of utility.  Now, on cross

20    examination he tried to explain those away as mere

21    hyperbole, I think is the word he used.  But those

22    statements are his contemporaneous reaction to CEL token

23    when it is not during a trial that Mr. Davis personally

24    stands to economically benefit from.

25         So I would respectfully submit that when the Court

Page 26

1    evaluates Mr. Davis' testimony, it's clear that Mr. Davis'

2    views on CEL token shift to meet whatever his objective is

3    at the moment.  When he was trying to convince Mr. Mashinsky

4    to add utility to the CEL token prepetition, he said that

5    CEL token had no useful utilities.

6          When he was trying to prop up his own importance,

7    he told Mr. Mashinsky that he orchestrated the short

8    squeeze.  He then testified in Court that he didn't

9    orchestrate the short squeeze.  And now when Mr. Davis

10   stands to benefit economically from the value of CEL token,

11   he's insisting that it is worth up to $2.88 as of the

12   petition date.

13         Before moving on from CEL token, I just want to

14   flag one more CEL token related item for Your Honor.  In our

15   supplemental brief, we explained this a little bit.  The

16   plan actually contemplates that it's a defined term, the

17   other CEL token claims which are defined as claims related

18   to the purchase or sale of CEL token, would be subordinated

19   pursuant to Section 510(b) of the Bankruptcy Code.

20         During this trial, we have endeavored to provide

21   the Court with evidence to make a finding on the value of

22   CEL token that would obviate the need for the Court to reach

23   a ruling on the security issue or the applicability of

24   Section 510(b).  So, what we've done is we've modified the

25   confirmation order to make that more clear with respect to

Page 27

1    this other CEL token claim issue.

2           The reason we can do that is the class claim

3    settlement actually resolves almost all of these types of

4    claims.  Again, the class claim settlement provided every

5    accountholder with the opportunity to opt out and if they

6    did not opt out, their claim was limited to the crypto on

7    the platform.  So if they opted out, they still have the

8    right to pursue their other CEL token claim for purchase or

9    sale of CEL token, and that will be resolved during the

10   claims allowance process.

11          Your Honor does not need to decide that issue

12   today.  It has been carved out of the confirmation order so

13   that all Your Honor has to decide today is, is the value of

14   CEL token less than 34 cents, not is CEL token a security.

15   And again, we explained this in a little bit more detail in

16   our supplemental brief that we filed last week.

17          So turning to the retail loan issue having gone

18   through --

19          THE COURT:  Let me stop you there.

20          MR. KOENIG:  Sure.

21          THE COURT:  Few minutes.  I want to go through the

22   -- how you arrive at figures for CEL token under the NewCo

23   scenario, winddown scenario, and the liquidation scenario.

24          MR. KOENIG:  Sure.

25          THE COURT:  Okay.  So under the NewCo scenario,

1    what is the projected percentage recovery?  Not the value of

2    the token itself, but the percentage that they would recover

3    from whatever that value is.

4              MR. KOENIG:  Right.  It's 67 percent under the

5    NewCo scenario.  What was what was in the disclosure

6    statement.

7              THE COURT:  And the 25 cents, that's equal to

8    0.1675.

9              MR. KOENIG:  Mm hmm.

10              THE COURT:  Okay.  On the orderly winddown, it's

11    what, 61.2 percent?

12              MR. KOENIG:  That's right, Your Honor.

13              THE COURT:  And that translates into 0.1530.

14              MR. KOENIG:  Mm hmm.

15              THE COURT:  And the liquidation projecting it as

16    47.4 percent?

17              MR. KOENIG:  That's right, Your Honor.

18              THE COURT:  All right.  And that's 0.1185.  All

19    right.  So if the CEL token is valued at 25 cents, what does

20    that mean for the actual recovery under the three different

21    scenarios, NewCo, orderly winddown, liquidation recovery?

22              MR. KOENIG:  Right.  So Your Honor, what you would

23    do is you would take the 25 cents and you would multiply it

24    by the recovery under the NewCo and the orderly winddown, 67

25    cents for the -- 67 percent I should say, to avoid

1    confusion, and the lower number, the 61.5 or whatever the

2    number is on the orderly winddown.

3              And then what you have to do is on the other side

4    of the equation, I've mentioned several times how lawyer

5    math is challenging, but when you have -- what you take, is

6    you take Mr. Compagna's testimony that at 36 cents is when

7    it is violative.  You take the 36 cents and you multiply it

8    by the liquidation value of 47 and change, and then you

9    compare those two numbers and that's the point at which they

10   intersect.

11             There's the -- can we go back to the slide that

12   had the graph on how that works?  And that's how Mr.

13   Compagna ran those calculations was on the bottom, you have

14   the CEL token claim in the liquidation and the liquidation,

15   that line is multiplying the prices, the value, I should

16   say, on the bottom by the 47 and change that's under

17   liquidation, and then the lines that are left to right are

18   the steady state value of here's where it would be violated

19   under the NewCo scenario.

20             THE COURT:  Okay.  So actually, it's forty -- to

21   determine the liquidation value, it would be 47.4 percent

22   times what?

23             MR. KOENIG:  Times -- so if you go to 34 cents and

24   you multiply 34 cents times 47 and change --

25             THE COURT:  Okay.

1          MR. KOENIG:  -- the number you get should be --

2    that's the inflection point of 25 cents times the orderly

3    winddown amount.

4          THE COURT:  I think that's 15.3 percent -- cents.

5          MR. KOENIG:  I'm saying, you're going to do both

6    calculations and those numbers should be almost identical.

7    That's where the inflection point is.

8          THE COURT:  Okay.  All right.

9          MR. KOENIG:  Okay, so moving on to the loans

10   issues, the retail loans.  So the main objector here is Mr.

11   Bronge and this is the issue of whether or not the

12   cryptocurrency that was transferred to Celsius to support

13   the loans is property of Celsius or property of ---

14         THE COURT:  Which number slide is that on the

15   screen?

16         MR. KOENIG:  Number 19, Your Honor.

17         THE COURT:  Okay.  All right.  I have the slide

18   deck in front of me.

19         MR. KOENIG:  I believe that even Mr. Bronge admits

20   that Version 9 transferred title to Celsius.  The question

21   he has raised is whether Version 7 transferred title.  So if

22   we click through.  So here is Version 7 with some of the

23   relevant language highlighted.  And it says, "You, Borrower,

24   grant Celsius the right" -- words, words, words to, and then

25   we see the highlighted language we've seen before --

Page 31

1          THE COURT:  Pledge, repledge, hypothecate, et

2     cetera.

3          MR. KOENIG:  Right.  And then there's some other

4     keywords here, too, "with all attendant rights of

5     ownership."

6          THE COURT:  Got it.

7          MR. KOENIG:  We think that's very clear.  Now if

8     you go to two more slides, there's a redline between Version

9     7 and Version 9 that shows the words that were changed

10    between Version 7 and Version 9.  And what Mr. Bronge is

11    focused on is at the bottom here where it was an A and now

12    it's a 1, the words were in Version 7, "you may not be able

13    to exercise certain rights of ownership."  And in Version 9

14    it says, "you will not be able to exercise any rights of

15    ownership."

16         So what we would submit to Your Honor is the

17    language was already clear in Version 7.  We think this is

18    the same analysis as your Earn opinion, when you ruled that

19    Version 5 was clear, not it just got more clear over time.

20    And what I would focus on, "you grant Celsius the right to"

21    -- words, words, words -- "pledge, repledge, hypothecate

22    with all attendant rights of ownership."  Those are the key

23    words.  These other words make it a little bit more clear,

24    but we think that it was clear enough before.

25         Moving on to the board appointment issues, I

Page 32

1    suspect that Mr. Colodny is going to address this topic more

2    squarely in his remarks, given that the Committee was the

3    one to select the board.  But I wanted to make a couple of

4    observations from the Celsius side of things.  The standard

5    for the Court is Section 1129(a)(5)(A)(ii) of the Bankruptcy

6    Code which asks whether the board selection is consistent

7    with the interests of creditors and with public policy.

8            On the one hand, you have sworn testimony from a

9    Committee member, Major Mark Robinson, regarding the board

10   selection process and how robust it was.  There's actually

11   been more testimony on this point than any case I've ever

12   been part of.  Usually, we just file a schedule and it's

13   part of a plan supplement and off we go.  But being as it

14   may, on the other hand, the only evidence that you actually

15   have is the sworn testimony of what amounts to a

16   disappointed and resentful would-be board member, Mr. Rick

17   Phillips.

18           Mr. Phillips admitted during cross examination

19   that he would not have objected to the plan if he was

20   selected to the board.  He even voted for the plan even

21   after he learned that he was not selected to the board.  And

22   those two points are enough to discount his testimony and

23   give it no weight.  The testimony of Major Robinson was

24   extensive and credible.  Mr. Phillips is not.  The decision

25   for the Court is simple on this point.

Page 33

1           Turning to the emergence incentive plan, I'm not

2     actually certain if anybody's even objecting to this

3     anymore.  We resolved with the U.S. Trustee regarding the

4     emergence incentive plan, but I just want to point to a

5     couple of the uncontroverted facts in evidence.

6           THE COURT:  Mr. Ubierna?

7           MR. KOENIG:  I don't -- I didn't see him objecting

8     -- I didn't see him providing closing this afternoon, Your

9     Honor.

10          THE COURT:  Okay.

11          MR. KOENIG:  But again, just for the record, I

12    want to make sure that we point to the record and talk about

13    the legal standards for a moment.  First, I want to say we

14    know that executive bonuses are a hot button issue for

15    accountholders who were defrauded and are not going to

16    receive 100 percent of their investment.  But the management

17    team who defrauded those account holders is gone.

18          This is a different management team, none of whom

19    were involved in the prepetition wrongdoing.  The management

20    team led by Chris Ferraro who was hired just a few months

21    before the petition date, Mr. Ferraro got a battlefield

22    promotion, first to chief financial officer and then to CEO

23    after the Special Committee told Mr. Mashinsky to either

24    resign or be fired.

25          This new management team ran into the burning

Page 34

1    building to help stabilize this business and get

2    distributions back to accountholders.  These employees have

3    stayed with Celsius for over a year to see this through on

4    sub-market pay.  The simple fact of the matter is we would

5    not be here today without these people working around the

6    clock to maximize value and get distributions out to

7    creditors.

8             What these executives are being incentivized to do

9    under the EIP is key to creditor recoveries.  The metrics

10   include making liquid crypto distributions available.  The

11   target is within 30 days of the effective date.  There's

12   over $2 billion of liquid crypto distributions that have to

13   be made.

14            That requires negotiating distribution agreements

15   with PayPal and Coinbase, significant coordination with

16   those distribution agents to make sure that they're ready to

17   distribute all of this liquid cryptocurrency to our

18   stakeholders.  And Celsius itself is going to keep its

19   platform open for 90 days to make distributions to Custody

20   holders under the plan.

21            So there are several possible standards of review

22   for the EIP.  We outline this further in our confirmation

23   brief.  The main issue is, does Section 503(c) of the

24   Bankruptcy Code apply or not.  We think the right standard

25   is best interest and that Section 503(c) doesn't apply at

Page 35

1    all.  We think that that is the case because the

2    distribution is not to be made by a Debtor.

3            It's going to be made by a post-effective date

4    Debtor.  It's going to be overseen by the plan

5    administrator, not by a Debtor.  The Bankruptcy Code doesn't

6    apply to the post-effective date Debtors or to NewCo or any

7    other post-emergence entity and it shouldn't apply to this

8    payment either.  But we think that we meet Section 503(c)

9    even if that section does apply, because the EIP is an

10   incentive-based program with performance metrics that are

11   not easily achievable, and that's what the evidence showed.

12           So Mr. Ferraro testified that it was a herculean

13   effort, the work that had to be done, particularly with

14   respect to the distributions, and that it would normally be

15   months and months of negotiation that we were packing into a

16   short amount of time.  Next slide.

17           He pointed out that these targets were a stretch

18   and that several of them are not going to be achieved and

19   that they were trying like hell, but that he wasn't sure

20   that they were going to meet those metrics.  He also pointed

21   out that these metrics were negotiated extensively between

22   the financial advisors for the Debtors and the financial

23   advisors for the Creditors Committee.

24           Ms. Hoeinghaus testified about the market, the

25   market salaries, and other compensation for executives and

Page 36

1    that the EIP participants of Celsius were significantly

2    below the market.  If you can go to the next slide.  And she

3    testified that an incentive program was "very much necessary

4    here to ensure that market levels of compensation would be

5    offered to key executives."  Next slide.

6            And the -- she pointed out that the EIP costs were

7    significantly lower than most other KEIPs in other

8    bankruptcies.  Next slide.  And she also concluded that the

9    EIP is "very reasonable in terms of the amounts and the

10   opportunities."  Next slide.

11           Your Honor, that covers the big buckets of issues.

12   I just want to cover really quickly, Mr. Kirsanov's issue.

13   He makes a variety of arguments and I'm not going to try to

14   preempt all of them, but I wanted to make a few quick

15   points.  He's now claiming that we improperly changed his

16   Custody vote on the plan, but just to reiterate, he accepted

17   the Custody settlement and actually withdrew his Custody

18   coins off the platform consistent with that settlement.

19           That settlement and order specifically provided

20   that any accountholder who accepted the settlement and voted

21   no on the plan or abstained from voting would be deemed to

22   have voted to accept.  It was clear in the settlement.  It

23   was clear in the disclosure statement.  But even assuming

24   Mr. Kirsanov is right on that point, which he's not, there

25   would be no legal difference.  He suggests that the subclass

1    of Custody CEL token holders voted no on the plan, if his

2    vote was not changed, consistent with the Custody

3    settlement.  But there is no such subclass.

4         That doesn't change the legal standard before the

5    Court.  There is simply a class of Custody holders who

6    overwhelmingly voted to accept the plan.  Mr. Kirsanov also

7    argues that we violated the Custody settlement which is

8    perplexing given that he actually withdrew all of his coins

9    off the platform when he was entitled to withdraw back in

10   May.

11        I think he's complaining that it took us too long

12   to make distributions, but the settlement only required that

13   Celsius make distributions "as soon as reasonably

14   practicable," and we did just that.  We made distributions

15   about a month after the settlement opt-in period ended in

16   April.  The remainder of his argument is essentially the

17   same as the other CEL token holders' argument.  To the

18   extent the Court finds that the value of CEL token is -- on

19   the petition date is higher than 34 cents in a liquidation,

20   the plan is going to fail best interest.  If it's lower than

21   34 cents, it's going to pass best interest and his objection

22   should be overruled.

23        Your Honor, the last thing I want to talk about

24   before sitting down is the SEC and Form 10.  We've talked

25   before about the Form 10 process.  That's a condition

1    precedent to the effective date.  Since we last discussed

2    this at the beginning of the confirmation hearing, we have

3    continued to work constructively with the SEC, the Creditors

4    Committee, and Fahrenheit to move this important item

5    forward.

6              We've been discussing a preclearance letter with

7    the SEC and the other parties, which if the SEC approved,

8    would pre-clear one of the key issues for the Form 10, which

9    is the fact that Celsius will not have audited financials

10   for the historic customer facing businesses, other than the

11   mining business.  We will have audits of the mining

12   business.

13             And because Celsius' historic customer facing

14   businesses will not be continued by NewCo -- the Earn

15   program, the Loan program, et cetera -- we believe it is

16   totally appropriate to not provide audits of those

17   businesses through the Form 10 process.  We think there's no

18   benefit of those audited financials for a defunct business

19   line.  But it is a typical SEC rule that audited financials

20   of all the predecessor entity would be provided as part of

21   the Form 10, so we need to seek SEC approval of a waiver of

22   this provision under the circumstances, which we have done.

23             And just to be clear, this process would be needed

24   under any scenario, be it the NewCo scenario or the orderly

25   winddown.  Anything that includes a new company that issues

1    equity has to go through this process with the SEC.  We've

2    continued to have constructive discussions with the SEC.  We

3    have not received their signoff.  We're pleased with our

4    recent constructive discussions.  We hope to continue to

5    make progress in the near term.

6            Now, if and when the preclearance letter is

7    received, we will promptly file the Form 10 itself with the

8    SEC.  That Form 10 will include the audited financials of

9    the mining business.  We're currently expecting we can file

10   that Form 10 sometime in mid-November.  The filing of the

11   Form 10 kicks off an automatic 60-day waiting period.

12           Now, from our constructive discussions with the

13   SEC, it seems that it might take longer than that automatic

14   60-day period to receive and incorporate all of the SEC's

15   comments.  We've committed to work with the SEC to ensure

16   that all of their comments are incorporated before the Form

17   10 goes live, so it is possible that it may take longer than

18   60 days for the Form 10 to go live.

19           On the other hand, we've committed to making

20   liquid crypto distributions to our account holders under the

21   plan as soon as possible.  And so as we go through this

22   process post-confirmation, we, the Creditors Committee,

23   Fahrenheit, we're all going to continue to evaluate the

24   timing of the SEC process.  If it looks like the Form 10

25   process is going to drag a little bit and take us beyond

Page 40

1    very early in 2024, I suspect we will come back to Your

2    Honor with some sort of post-confirmation motion in aid of

3    distributions or something that would allow us to modify the

4    plan to make distributions sooner to accountholders.

5            It's not an issue for today.  We wanted to update

6    Your Honor and the other partis on this important process

7    and let everybody know we're going to be evaluating this

8    issue.  We want to get liquid crypto distributions out to

9    people as soon as possible, even if the Form 10 isn't yet

10   approved.

11           Now, we have had the goal of opening liquid crypto

12   distributions by the end of this year.  We will continue to

13   evaluate it, but obviously, these transactions are very

14   complicated.  We want to make sure that all these

15   distributions can be made smoothly, securely, fairly, all

16   the rest of it.  Currently, it seems more likely than not

17   that those distributions probably begin the first few weeks

18   of January instead of the last few weeks of December, and we

19   think that there's probably another benefit to having

20   distributions begin in January for accountholders anyways.

21           This is not tax advice, but if distributions are

22   received in December they would have to file and pay taxes

23   in April of 2024.  If those distributions are received a few

24   weeks later in January, those taxes would not be due until

25   April of 2025.  So we'll continue to evaluate the process,

Page 41

1    provide updates to Your Honor and to the parties, but we

2    wanted to update you on this important process.  So with

3    that, unless Your Honor has any questions for me, I will sit

4    down.

5              THE COURT:  Thank you very much, Mr. Koenig.

6              MR. KOENIG:  Thank you.

7              THE COURT:  All right.  Who's arguing for the

8    Committee?

9              MR. COLODNY:  Good afternoon, Your Honor.  Aaron

10   Colodny from White & Case on behalf of the Official

11   Committee of Unsecured Creditors.

12             THE COURT:  Are you reserving any of your time?

13             MR. COLODNY:  As always, I'm batting second, so I

14   think that some of my comments would be duplicative and I'll

15   try to streamline.  I'd like to deserve 10 minutes at the

16   end, and hopefully take 20 minutes, probably less.

17             THE COURT:  Okay.  Go ahead.

18             MR. COLODNY:  Your Honor, these cases have been

19   challenging.  Unlike a lot of large Chapter 11 bankruptcies

20   that we see where the main creditors are companies, the

21   primary creditors here are individuals who entrusted their

22   coins and in some instance, their life savings to Celsius.

23   At the beginning of this case, it faced a complete wipeout.

24   That's a lot different than what we normally encounter and

25   the Committee and its professionals were acutely aware of

Page 42

1    our responsibilities here.

2            These cases involve relatively new and novel

3    industry thrust into a period of prolonged distress.  The

4    legal framework and the application of bankruptcy law to

5    that industry was uncertain and they were made a lot more

6    difficult by the fact that Celsius misled its customers and

7    that the company's financial records, investments, and legal

8    agreements were a mess.

9            It's against this backdrop that the Committee was

10   faced with the complicated task of investigating the

11   prepetition actions of the Debtor, assessing the legal

12   rights of the creditors and equity holders of the Debtors,

13   and how to allocate the value among those constituencies

14   maximizing the value of Celsius' distressed mining business

15   and other liquid assets, creating a way for creditors to

16   monetize their share of those liquid assets and addressing

17   the constant and quite natural questions, concerns, and

18   criticisms from our constituents.

19           By working in good faith with creditors,

20   regulators, and the Debtors, the Committee was able to work

21   with the Debtors to formulate a plan that addresses each of

22   these issues.  Causes of action against wrongdoers like Mr.

23   Mashinsky and others who took advantages of customers will

24   be preserved.  All available assets will be distributed in

25   an equitable manner.  NewCo will be formed and the best in

1    class management team will grow the management moving

2    forward and the shares of Newco are intended to be traded on

3    a public market.

4           The overwhelming support from the plan is a

5    testament to those good faith efforts.  It's also evidence

6    of an overwhelming desire to exit Chapter 11, cut off the

7    administrative burn, and return value to creditors.  Now,

8    Mr. Koenig detailed a number of objections in his remarks.

9    I'm going to focus on two.  The first is the value of CEL

10   token, which I hope not to be duplicative, and the second is

11   Mr. Phillips' demand to reconstitute the board and request

12   that Committee professionals be excluded from the

13   exculpations.

14          Turning to the first issue concerning the CEL

15   token, as Mr. Koenig went over, the Court does not need to

16   determine at this time whether CEL token is a security.

17   That arrangement is now noted in Paragraph 262 of the

18   revised confirmation order which was filed this morning at

19   3937.  That provision's unchanged from the previous version

20   that the Debtors and the Committee filed following the

21   closing of confirmation -- or evidence at confirmation.

22          So the relevant question, as Your Honor went

23   through with Mr. Koenig, is whether the proposed 25 cent

24   settlement of the value CEL token provides the dissenting

25   holders with at least as much as they would receive under

Page 44

1    general liquidation under Chapter 7 of the Bankruptcy Code.

2    The testimony presented at confirmation unequivocally

3    supports this finding.

4         Your Honor went through Mr. Compagna's testimony

5    which shows that below 34 cents, the best interests of

6    creditor test is met.  No party has disputed that.  Mr.

7    Galka of Elementus testified in his opinion, the market

8    price of CEL token was not indicative of its value on the

9    petition date because the market was extremely dislocated.

10   He believes that CEL token had de minimis and likely zero

11   value as of the petition date.

12        And Your Honor asked the $208 million question of

13   Mr. Galka, if he had a view of hypothetically what the value

14   of CEL token would be if you knew at the petition date the

15   Debtors would be liquidated, in other words, the

16   hypothetical Chapter 7 liquidation that the best interests

17   of creditors test provides.  And Mr. Galka's response, "I

18   think in almost all circumstances, I would see the value as

19   being zero."  That's at the October 4th hearing transcript,

20   Page 38 Lines 8 through 13.

21        That testimony is not seriously contested by the

22   creditors who rejected the proposed CEL token settlement.

23   Mr. Otis Davis sought to introduce the expert testimony of

24   Mr. Hussein Faraj, and as detailed in the Debtors' and

25   Committee's motion to exclude Mr. Faraj's testimony and was

1      detailed by Mr. Koenig which is filed at Docket No. 3817,

2      Mr. Faraj's opinion is not reliable.  But even if the Court

3      were to consider Mr. Faraj's testimony, it supports Mr.

4      Galka's de minimis value.  \Both experts agree that CEL

5      token was manipulated prior to the petition date.  Both

6      agree that the market for CEL token became severely

7      dislocated prior to the petition date.  Both agree that

8      because of that dislocation, the market price of CEL token

9      on the petition date was not an accurate indication of its

10     value and both agree that CEL token had not intrinsic value

11     on the petition date.

12          Both agree that the CEL token had speculative

13     value on the petition date.  Mr. Faraj, however, offers no

14     opinion as to that speculative value.  Rather he looks at

15     prices prior to the pause date to determine a fair market

16     value.  Mr. Galka, on the other hand, states that as a

17     utility token of a bankrupt company where the platform was

18     not likely to survive, the speculative value of CEL token

19     was likely de minimis on the petition date.

20          And if the Court assumes the platform was not to

21     survive, as it must in a hypothetical Chapter 7, the value

22     is likely zero.  Even Mr. Davis' testimony supports this

23     proposition.  Specifically, when asked why he called CEL a

24     worthless token after the petition date, Mr. Davis admitted

25     it was because it didn't have any utility and he admits it

Page 46

1    did not have any utility following pause date.  That's not

2    hyperbole.

3            Based on the evidence presented, the issue is not

4    close.  The CEL token settlement was accepted by an

5    overwhelming majority of creditors and it should be approved

6    under 9019.  It also meets the confirmation requirements of

7    the Bankruptcy Code.

8            Now, turning to Mr. Phillips' objection as to the

9    exculpation of the Committee professionals and members.

10   Section 1103(c) of the Bankruptcy Code grants the Committee

11   broad authority to formulate a plan and perform other

12   services that are in interest of those represented.  As the

13   Third Circuit found in in re:  PWS, which is 228 F.3d 224,

14   that provision implies both a fiduciary duty to the

15   Committee's constituents and a limited grant of immunity to

16   the Committee's members and professional.

17           In the LATAM decision, Judge Garrity reiterated

18   that position when he said, "It is well settled that an

19   exculpation clause approved at confirmation may exculpate

20   estate fiduciaries like a Committee, its members, and estate

21   professionals for their actions in a bankruptcy case, except

22   where those actions amount to willful misconduct or gross

23   negligence."

24           Judge Garrity went on further to describe the

25   purpose of exculpation stating that "exculpation provisions

Page 47

1    are frequently included in Chapter 11 plans because the

2    stakeholders all too often blame others for the failures to

3    get the recoveries they desire, seek vengeance against other

4    parties, or simply wish to second guess the decision makers

5    in the Chapter 11 cases."  And that LATAM opinion is 2022

6    Bankruptcy Lexus 1725 at star 158.

7              Here, the exculpation provisions included in

8    Section 8(e) of the plan include carveouts for bad faith,

9    gross negligence, and willful misconduct.  It also

10   explicitly limits the actions to the period during these

11   cases.  These provisions are customary, they accurately

12   restate the law, and they should be approved.  Now here, the

13   Committee members and its professionals have all proceeded

14   in good faith.  That includes attending over 120 official

15   meetings and countless other calls with the Committee, the

16   Debtors, bidders, mining counterparties, the regulators, and

17   other contract counterparties.

18             The Committee has taken a proactive role to

19   protect the interest of customers in these cases, including

20   by moving swiftly to ensure that wrongdoers were removed

21   from power, that coins were secured, and that estate causes

22   of action were preserved which included preparing and filing

23   its own draft complaint which is preserved under the plan.

24             The Committee cooperated with the examiner in her

25   investigation of the Debtors and communicated with the

Page 48

1    accountholders both individually and through public town

2    halls.  The Committee attended and participated in the

3    auction to determine the plan sponsor.  It participated in

4    mediations regarding the treatment under the plan and

5    litigation and it conducted a thorough process to select the

6    proposed board of directors for NewCo.

7            Now throughout that process, the Committee's

8    advisors have made sure to keep its members informed of the

9    facts in the case, applicable law, the Debtors' financial

10   condition, and their discussions with other parties.  And

11   while not remarkable, I want to highlight that our Committee

12   members have directly interfaced with the other principals

13   involved in these Chapter 11 cases.

14           Our two co-chairs have weekly meetings with Chris

15   Ferraro, the interim CEO of the Debtors.  Our Committee

16   members met with the bidders throughout the auction.  They

17   also interviewed the board of director candidates and all of

18   those interviews were videotaped so that those Committee

19   members that did not attend could watch the interviews.

20           I also want to be clear that contrary to what Mr.

21   Phillips may believe, the decisions made throughout these

22   cases have been made by the members and not their advisors.

23   That was made abundantly clear by Major Robinson when in

24   response to a question from Mr. Phillips of whether the

25   advisers were involved in the decision to select Fahrenheit

Page 49

1    as a plan sponsor, Mr. Robinson unequivocally stated, "They

2    advised us, but we were the ones who voted and made the

3    decision."  That's at the October 3rd hearing transcript,

4    Page 223 Lines 7 through 14.

5              And as we previously disclosed to the Court, prior

6    to the beginning of the confirmation hearing, the Committee

7    members unanimously ratified all decisions that have been

8    made throughout these Chapter 11 cases.  Now, this was not

9    the typical Committee representation.  Rather, the Debtors

10   look to the Committee to make difficult decisions regarding

11   the formulation of the plan of organization and the

12   Committee is aware that its decisions directly impact the

13   recovery of creditors, and many creditors disagree with

14   certain of those decisions.

15             However, there can be no question has adeptly

16   represented its constituency throughout these Chapter 11

17   cases.  Put simply, the Committee as a whole have dedicated

18   the better part of the last 15 months to working in good

19   faith to reorganize Celsius.  That also includes Mr. Keith

20   Noyes, who has dedicated hundreds of volunteer hours working

21   in good faith to advance the interests of Celsius' unsecured

22   creditors and any insinuation that the Committee has acted

23   in bad faith is completely unfounded.

24             Now, I want to return to the confirmation

25   standard.  To confirm the plan, this Court must find that

1    the selection of the board is consistent with the interests

2    of creditors and public policy.  And here, the evidence

3    demonstrates that it was.  Your Honor heard testimony from

4    Major Mark Robinson regarding the Committee's efforts

5    specifically with respect to the board process.

6          Mr. Robinson testified the Committee considered 45

7    candidates for board positions.  Those candidates were

8    select -- sourced from direct inquiries from interested

9    candidates like Mr. Phillips and suggestion from other

10   active creditors like the Earn Ad Hoc Group.  The Committee

11   also asked its advisors to submit candidates from their

12   professional networks.  All connections with advisors were

13   disclosed to the Committee.  All candidates except the three

14   committee members who submitted themselves for positions

15   were considered for all spots and that includes again, Mr.

16   Phillips.

17         Those members who put their hat in the ring

18   recused themselves from voting on the two positions they

19   were eligible for and while the Committee advisers

20   participated in certain of those meetings, the discussions

21   of each individual's candidacy was largely driven by the

22   members of the Committee and the Committee members had many

23   independent discussions regarding the proposed candidates.

24         Most importantly, the Committee members selected

25   the candidates that they thought were best suited for the

Page 51

1    job and would best advocate for the interests of creditors

2    who following the effective date would be NewCo

3    shareholders.  The board was announced in the second plan

4    supplement which was filed at Docket No. 3444 -- getting

5    quite high now -- on September 8th, 2023.  Mr. Phillips was

6    -- testified that he was provided with advance notice of

7    selections.

8          Mr. Phillips and all the creditors had ample time

9    to conduct discovery into the board selection process prior

10   to the beginning of the confirmation hearing.  Mr. Phillips

11   and all of the creditors were provided with the opportunity

12   to cross examine Mr. Robinson and none of the testimony

13   elicited rebutted any of the testimony I just recited.

14         There is no evidence of any inappropriate

15   relationship between the board and the members of the

16   Committee who selected the board.  There is no evidence the

17   Committee acted on less than full information and there's no

18   evidence that the proposed board does not reflect the

19   Committee's business judgment as the best candidates for the

20   role, nor does the evidence establish that Mr. Phillips was

21   not given a fair opportunity.

22         Mr. Phillips has an unsupported theory to the

23   contrary, which lacks any evidentiary or legal support. Put

24   simply, Mr. Phillips believes that the Committee is not

25   capable of making its own decisions and was led by the nose

Page 52

1    by its professionals.

2            He believes that it is provable malpractice for a

3    professional to, upon the request of its clients, provide

4    them with its recommendations for potential candidates, for

5    that professional to select candidates based on its own

6    experience working with board members instead of just simply

7    nominating strangers, for the professional to disclose its

8    experience and connections to those individuals  to both its

9    clients in the Court, and to have its clients and instruct

10   its clients and advise its clients to consider all available

11   candidates.

12           That cannot be the case.  Mr. Phillips has

13   identified no breach of duty by the professionals or the

14   Committee here.  At best, he's trying to substitute his

15   business judgment for those of the creditors who were

16   appointed as a fiduciary; and at worst, he's trying to

17   weaponize his disappointment in not being selected.  Neither

18   have any merits.

19           Finally, although Mr. Phillips attempts to

20   minimize the three board observers, it's everyone's hope

21   that they will be an important part of the NewCo board room.

22   Those creditors will have a seat at the table, receive the

23   information the board receives, and provide input to improve

24   the NewCo for all shareholders.

25           Mr. Phillips' issues with the valuation of NewCo

Page 53

1    are likewise unsound.  For instance, he points to a

2    reduction in the initial investment of Fahrenheit from 50

3    million to 33 million, but he ignores Mr. Kokinos' testimony

4    that the full $50 million investment is required if the plan

5    sponsor serves the entire five-year term and the arrangement

6    allows the company to terminate the management team earlier

7    if it does not perform as anticipated.

8            In essence, this feature gives a valuable option

9    to NewCo to move on from the chosen management team if

10   things are not going according to plan.  Now, we all hope

11   that's not the case, but provision to Mr. Phillips' site was

12   a hard fought improvement that was won for creditors, not a

13   material detraction as he says.  He also selectively recites

14   on the record when -- excuse me, Your Honor.  When he

15   questioned Mr. Kokinos, he again selectively argues that

16   this should have been structured as a termination fee.  It's

17   more Monday morning quarterbacking.

18           Similar, he claims that more -- that NewCo should

19   be valued at more than a third less than the opinion of the

20   Debtors' experts because certain creditors, and a large

21   amount of creditors, elected to receive more liquid

22   cryptocurrency than Equity.  It's not true.  It is true that

23   more liquid crypto -- that more creditors elected for liquid

24   crypto, but there are many reasons that they could have.

25           For instance, there's a significant tax

1    consequence for certain creditors, if they receive equity

2    versus liquid cryptocurrency.  That's disclosed in the

3    disclosure statement and many creditors may have made their

4    choice for that reason.  It's not indicative of the equity

5    value.  Now, the Court doesn't need to look any further to

6    see Mr. Phillips' true motive than his testimony that he

7    would have not objected to the plan if he had been selected

8    for a member of the new board.

9              Fiduciaries -- In conclusion, Your Honor,

10   fiduciaries who act in good faith throughout the Chapter 11

11   cases and adeptly represent the interests of their

12   constituents should not be subjected to a disgruntled

13   individual's second guessing of their decisions.  And to be

14   clear, for so long as it exists prior to the effective date,

15   the Committee will continue to uphold its fiduciary duty and

16   evaluate whether the orderly winddown presents a superior

17   recovery both economically or because of other issues.

18             Now, I want to touch on one point that Mr. Koenig

19   raised at the end of his statements regarding the SEC

20   approval process, and I think that Mr. Koenig did an

21   incredible job of summarizing where we stand in that process

22   for everybody.  We have made and my clients have made it a

23   priority to co-operate and encourage the Debtors to

24   cooperate with government regulators.  We view those

25   entities as a key constituency in these Chapter 11 processes

Page 55

1   and understood that we needed to work with the regulators to

2   ensure that creditors and the investing public were

3   protected and that justice was served.

4          Now, actions speak louder than words, and the

5   Committee and the Debtors have demonstrated that commitment

6   throughout these Chapter 11 cases.  We engage in regular

7   discussions with the state and federal regulators.  We

8   agreed to only distribute Bitcoin and Ethereum on account of

9   the Earn and Borrow obligations.  We -- the Debtors

10  cooperated with investigations by the DOJ, the SEC, the

11  CFTC, the FTC into the pre -- into their prepetition conduct

12  which led to the entrance of consensual resolutions with all

13  agencies.

14         The Debtors and the Committee agreed to include

15  the language in the plan regarding exculpation that was

16  appealed in the Voyager case.  We have discussed and

17  resolved issues regarding the proposed distribution

18  agreements.  We have delayed the equitable subordination

19  trial so that the DOJ may proceed with its case in chief

20  first and avoid any prejudice, and we reserved -- resolved

21  all comments to the plan and the confirmation order with

22  state and federal regulators.

23         I don't want to labor the point at what is

24  required to exit Chapter 11, but I want to state that the

25  Committee is focused on getting distributions out to

Page 56

1    creditors as soon as possible and reducing the burden of

2    these Chapter 11 cases.  The Debtors in the Fahrenheit, for

3    their point, have agreed.  They echo that sentiment and they

4    have committed not to hold up distributions if it's possible

5    to go effective prior to the registration statement.

6    However, that's not an easy feat.

7            There's a lot of hard work to be done before

8    distributions can be made and other issues in how to

9    structure the occurrence of the effective date, if that

10   registration statement is not effective.  Now, Mr. Koenig

11   previewed this, but it may be necessary for us to come back

12   before Your Honor for an additional motion in furtherance of

13   confirmation so that those distributions can be made, but I

14   want to make it clear.

15           The Committee is committed to and will push to get

16   distributions out as soon as possible.  The voting results

17   speak for itself and it's time to move forward and out of

18   Chapter 11.

19           THE COURT:  Thank you, Mr. Colodny.  All right,

20   Ms. Cornell, are you going to do the --

21           MS. CORNELL:  Good afternoon, Your Honor.  Shara

22   Cornell on behalf of the Office of the United States

23   Trustee.  We have heard from the Debtors and the Committee

24   throughout these cases, and even today.  These are

25   complicated, unique cases of first impression.  While this

Page 57

1    is true, that does not mean that there aren't common or

2    routine issues also.  A lot of focus has been on how to get

3    these unique cases to resolution, but the "usual issues"

4    also exist in this case.  Exculpation provisions in a plan

5    of reorganization are still just as important as are

6    consensual and affirmative third-party releases.

7             The United States Trustee started his review of

8    the plan with a long list of issues with the proposed

9    exculpation and release provisions, and after many

10   discussions with the Debtors, I'm pleased to report to the

11   Court that the Debtors have accepted many of our requested

12   revisions so that we are able to narrow the outstanding

13   issues before the Court this afternoon.

14            However, I would like to first quickly describe

15   some of those changes that we believe have vastly improved

16   the plan.  First, the Debtors have removed two entities that

17   are not yet in existence from the exculpation provision.

18   The plan administrator and the litigation administrator have

19   been removed.  However, as we'll get to later, NewCo is

20   still receiving the full benefits of the exculpation

21   provision.

22            The Debtors have added a defined temporal scope to

23   the escalation that limits all exculpation to actions from

24   the petition date through the effective date only, and while

25   Aegean is not binding on this Court, it is instructive and

Page 58

1      the Debtors have also limited the actions to be exculpated

2      to those more in line with the Aegean standard.  These

3      changes will help remove ambiguity and confusion for any

4      party down the line trying to assess whether or not they're

5      barred from further litigation.

6              The Debtors have also provided more information

7      regarding who the exculpated parties are.  There is now a

8      reference as to which members of Ad Hoc Groups will be

9      included for referring to the filing of 2019 statements by a

10     certain date.  The Debtors have also provided a list of

11     exculpated current and former employees, again helping to

12     eliminate ambiguity and confusion down the line.

13             Members of the board will also be identified and

14     footnotes to relevant documents in this case that will

15     definitively identify exculpated parties have also been

16     added throughout the provision.  And with respect to the EIP

17     or the emergence incentive plan that Mr. Koenig discussed

18     earlier, I just wanted to add that the Debtors -- I wanted

19     to add to the Debtors' presentation that these awards are

20     not mandatory and that even if the benchmarks are met,

21     they're still discretionary and the revised documents

22     reflect this negotiation between the United States Trustee

23     and the Debtors, and I believe that's a very important

24     nuance to mention for the Court.

25             With all of this said, we could not agree on

Page 59

1    everything.  The BRIC is still an exculpated party despite

2    not being a retained professional and merely serving as a

3    backup bidder.  The BRIC have not been involved since the

4    beginning of this case and are not entitled to the same

5    exculpation as retained professionals and their exculpation

6    should either be qualified to the extent they worked on the

7    backup bid or they should be removed.

8              There's also limited information regarding PayPal

9    and Coinbase, both of whom are serving as distributing

10   agents in these cases.  The exculpation currently provides

11   for exculpation for affiliates, but there's no way for

12   parties to know who these parties are.  The United States

13   Trustee has requested that a supplement be filed prior to

14   the plan going effective, identifying what entity is

15   actually doing the distributions so that exculpation can be

16   limited to parties that are actually doing the work and so

17   that any future litigants can easily ascertain who has been

18   exculpated.  Additionally --

19             THE COURT:  I just want --

20             MS. CORNELL:  I'm sorry.

21             THE COURT:  -- understand.  Those last comments

22   with respect to affiliates of PayPal and --

23             MS. CORNELL:   And Coinbase.

24             THE COURT:  -- and Coinbase.  Okay.

25             MS. CORNELL:  Thank you.  Additionally, as alluded

Page 60

1    to earlier, the Debtors did remove both the plan

2    administrator and the litigation administrator two post-

3    effective created entities from the exculpated parties list.

4    However, NewCo, also an entity not yet in existence, that

5    will not be in existence until emergence, is still included

6    as an exculpated party.  Because NewCo does not and cannot

7    exist prior to the temporal scope of the exculpation

8    provision, it should be removed.

9            I'm also pleased to report to the Court that after

10   lengthy and protracted discussions with the Committee, we've

11   agreed to language regarding the makeup of the Litigation

12   Oversight Committee as well as an appropriate carveout for

13   the Committee's professional exculpation.  The exculpation

14   carveout will apply to both the United States Trustee as

15   well as to all parties in interest and it will carveout any

16   reliance of Committee professionals on knowing, in this case

17   known or should have known, ultra vires actions of a

18   purported Committee member.  And upon recent information

19   from various litigants --

20           THE COURT:  Do I understand, did you say that the

21   U.S. Trustee is going to be exculpated?

22           MS. CORNELL:  No.  No, Your Honor.  What I said

23   was the exculpation will carve out the rights of the United

24   States Trustee and all parties in interest.  I'm sorry.

25           THE COURT:  All right.

Page 61

1          MS. CORNELL:  Upon recent information from various

2     litigants received last week and the raw data received from

3     the voting tabulation also received just last Thursday by

4     the United States Trustee, it became clear that certain

5     creditors that had opted into the Custody settlement back in

6     May and then in turn voting on the plan, attempted to opt

7     out of the third-party releases.  Although their vote was a

8     yes for the plan, that in turn made their --

9          THE COURT:  And the disclosure statement said, you

10    vote in favor of the plan and you accept it.

11         MS. CORNELL:  Absolutely, Your Honor.  However,

12    the Debtors understood our concerns regarding knowing and

13    affirmative consent with the plan and the releases not

14    having been drafted at the time of the Custody settlement

15    and they've agreed to honor those valid -- honor those

16    otherwise invalid optouts for those Custody settlement

17    users.  And that --

18         THE COURT:  How many of those are there?

19         MS. CORNELL:  There are 20, Your Honor.

20         THE COURT:  Is that reflected in the revised order

21    that's been submitted?

22         MS. CORNELL:  It should be, Your Honor.  Was it

23    filed this morning?

24         MAN:  Yes.

25         MS. CORNELL:  Yes, I believe it's in the one that

Page 62

1     was filed this morning.

2            THE COURT:  All right.

3            MS. CORNELL:  So these individuals will have their

4     optouts for releases validated.

5            There is one other issue regarding the optouts of

6     the third-party releases.  While the provisions of the plan

7     may be clear to bankruptcy attorneys, that's not what is

8     always clear to others reading the plan.  Here, the raw

9     voting data shows that thousands of creditors that voted in

10    favor of the plan also attempted to opt out of the third-

11    party releases, despite their vote in favor of the plan and

12    despite the plan's instructions, and we wanted to make sure

13    Your Honor understood that there was confusion and that

14    while this was clear to bankruptcy lawyers, it may not have

15    been as clear for others.

16           And we're given to understand that there were

17    thousands, possibly as many as 5,000 creditors, that did try

18    to vote in favor of the plan and also opt out of the

19    releases.  These variables were not clearly identified

20    earlier, but we felt as though the Court should be made

21    aware of this because it does involve a significant number

22    of creditors that were clearly confused.

23           To circle back for Your Honor, our outstanding

24    issues as we see them today, one, Coinbase and PayPal should

25    have any affiliate identified in order to receive

Page 63

1    exculpation.  Two --

2            THE COURT:  Let me just --

3            MS. CORNELL:  Sure.

4            THE COURT:  I want to be sure I'm understanding --

5            MS. CORNELL:  Absolutely.

6            THE COURT:  -- that.  Is it acceptable to the U.S.

7    Trustee if the affiliates of PayPal and Coinbase are

8    specifically identified by name?  I'm not sure when that --

9            MS. CORNELL:  Yes, Your Honor.

10            THE COURT:  -- before the distributions?

11            MS. CORNELL:  Yes, Your Honor.  That would be

12    acceptable.  We just want to know who is -- included in this

13    exculpation.

14            THE COURT:  Mr. Koenig, is that a problem?  I

15    mean, by then, you know.

16            MR. KOENIG:  Your Honor, Chris Koenig, Kirkland &

17    Ellis for the Debtors.  We've talked -- we've been talking

18    throughout --

19            THE COURT:  I know, but I'm --

20            MR. KOENIG:  -- the process.  We've been talking

21    to PayPal and Coinbase.  They're super critical to our

22    ability to get distributions out --

23            THE COURT:  I understand.

24            MR. KOENIG:  They are understandably concerned.

25    They want to make sure that they have the full protection of

Page 64

1    exculpation.  I mean, my view is --

2              THE COURT:  Let them provide the list.

3              MR. KOENIG:  I've been talking to them about --

4              THE COURT:  I don't consider it to be

5    unreasonable.

6              MR. KOENIG:  We will continue our discussions with

7    them.  We will continue our --

8              THE COURT:  I may order it.

9              MR. KOENIG:  And I'll speak to them, but they're

10   so important to our process that --

11             THE COURT:  I understand.

12             MR. KOENIG:  -- tried to facilitate this because

13   they are --

14             THE COURT:  I mean, it's consistent with the --

15   wanting the Debtors to identify the releasees by name.

16   There were certainly -- there were categories, but is it

17   possible to identify them by name?  I find it hard to

18   believe that it's unreasonable to expect PayPal and

19   Coinbase, if you tell us the names, they're going to get

20   exculpated.

21             MR. KOENIG:  We will continue our discussions with

22   them.  What I would say is I'd like for certain the deadline

23   should be closer to the effective date or even after the

24   effective date because we just don't know today --

25             THE COURT:  I understand.

Page 65

1           MR. KOENIG:  -- these are going to --

2           THE COURT:  I'm just trying to -- I want to make

3    sure I understand what these issues --

4           MR. KOENIG:  Thank you, Your Honor.

5           THE COURT:  Okay.  The next issue that I wrote

6    down was NewCo listed as an exculpated party.

7           MS. CORNELL:  Yes, that NewCo should not -- should

8    be excluded from --

9           THE COURT:  You want to --

10          MS. CORNELL:  -- the exculpation provision as it

11   is not in existence during the relevant time period.  And

12   number three, that BRIC's exculpation should be qualified to

13   only work done on the backup bid or not exculpated at all.

14          THE COURT:  That -- let me push back on that.

15          MS. CORNELL:  Yeah.

16          THE COURT:  So I -- obviously, I was not intimate

17   -- I certainly knew about the discussions with BRIC, but I

18   don't know, you know, all the steps in the negotiation that

19   ultimately led them to be the backup bidder, and why is it

20   unreasonable to exculpate BRIC?  Is there something that you

21   believe that they did that should disentitle them to an

22   exculpation?  The problem I have is that I want releases and

23   exculpation as clear as it can be so you don't get into

24   litigation about who's covered by it.  To narrow -- come up

25   with the description of what conduct it is that they're --

Page 66

1      did they exist on the scene until they were part of a

2      negotiation to be a bidder or a backup bidder?

3              MS. CORNELL:  That's fair, Your Honor.  I think a

4      lot of it does have to do with the fact that we aren't quite

5      clear about what they have been doing throughout the case

6      other than serving as a backup bidder.  So your question is,

7      why should they be exculpated for the whole case.  To our

8      information and knowledge, what they've done so far is just

9      serve as the backup bidder and nothing else.  So their

10     exculpation should be limited to any of that and nothing --

11             THE COURT:  Well, that's what they wound up as.

12             MS. CORNELL:  That's what they wound up as.

13             THE COURT:  I understand --

14             MS. CORNELL:  Yes.

15             THE COURT:  But the problem I have, Ms. Cornell,

16     when the case is going on and you get parties, either

17     they're actually, you know, they're a potential bidder or

18     you get them into negotiation, are they -- are people going

19     to want to get involved in negotiation during the course of

20     the case if somebody's going to turn around and sue them

21     after?  It's very easy to file a lawsuit.

22             MS. CORNELL:  Right.  That's fair.

23             THE COURT:  That's my problem.

24             MS. CORNELL:  That's fair, Your Honor; however,

25     the exculpation could be limited to just the work that they

Page 67

1  did in preparing and serving as a backup bidder.  They would

2  still be exculpated for that work, but they need not be

3  exculpated for everything thereafter or before that.  Why do

4  they need the same exculpation as Kirkland & Ellis or White

5  & Case that have been here since the very beginning --

6           THE COURT:  All right, I have your point.

7           MS. CORNELL:  -- and have been here until the very

8  end?

9           THE COURT:  This one I don't think you're getting

10 a lot of traction.

11          MS. CORNELL:  That's all right, Your Honor.

12          THE COURT:  Okay.  Are there other -- just, were

13 there other open points?  Because you sort of went through

14 some things that --

15          MS. CORNELL:  Just one more.

16          THE COURT:  -- you agreed with the Debtor or were

17 able to work out.  I want to make sure, what's an open

18 issue.

19          MS. CORNELL:  You know what, just those three.

20 And I think Your Honor --

21          THE COURT: NewCo, exculpation of affiliated

22 parties of PayPal and Coinbase, and BRIC.

23          MS. CORNELL:  Mm hmm.

24          THE COURT:  Those three.  Okay.

25          MS. CORNELL:  So I think Your Honor will agree

Page 68

1    that the efforts of the Debtors to narrow the scope of our

2    objection today has made these proceedings much smoother.  I

3    want to personally express my own appreciation for the long

4    phone calls and emails with both the Committee and with the

5    Debtors in this case.  It's definitely been a long journey.

6              THE COURT:  Okay.  Thank you very much.

7              MR. COLODNY:  Your Honor, I have one clarification

8    to Ms. Cornell's comments.

9              THE COURT:  Yeah, go ahead, Mr. Colodny.

10              MR. COLODNY:  So Ms. Cornell --

11              MS. CORNELL:  Sorry.

12              MR. COLODNY:  Aaron Colodny from the Committee on

13    behalf of -- Aaron Colodny from White & Case on behalf of

14    the Official Committee.  This is much nicer than when you

15    make me stand next to Mr. Koenig.

16              MS. CORNELL:  I was just thinking the same thing.

17              MR. COLODNY:  Doesn't look great.  Ms. Cornell

18    referred to the exculpation as a carveout.  It is not a

19    carveout to the exculpation.  It's a reservation of rights

20    for arguments that may be made.  To fall -- or the

21    exculpation as I said in my report is a statutory grant to

22    fiduciaries, and so anyone asserting that White & Case --

23    that causes of action against my firm while outside of that

24    would have to either prove that we are acting ultra vires-ly

25    or we committed bad faith, gross misconduct, the litany of

Page 69

1    lists that are carved out in the exculpation.

2            THE COURT:  Let me say, historically, exculpation

3    was intended for estate fiduciaries, whether that was the

4    Debtor or professionals and, you know, Debtors' counsel, the

5    people the Debtor would work with, the Committee.  My view

6    is that exculpation has largely been accepted broader than

7    that for parties who are engaged in good faith in

8    negotiating a plan and all things attendant to it.

9            So I go back.  I don't have it in front of me, but

10   you know, if you read Judge Wiles' comments in the Voyager

11   case, I very much share his views that we don't want people

12   to be able to turn around and sue people who were -- maybe

13   creditors who in good faith for a result.  They're not

14   estate fiduciaries, but they're participating in the plan

15   process in good faith in an effort to reach a consensual

16   plan.

17           If they're facing the threat of lawsuits by other

18   disgruntled creditors who don't agree with what they did, it

19   makes it very hard to achieve a consensual result.  For

20   those reasons, I think what historically may have been

21   viewed as exculpation just for estate fiduciaries has

22   extended beyond that to other active participants in the

23   plan process.  We may not agree with that, but I mean,

24   that's what I think, where the law has moved.

25           Mr. Colodny, where you're -- you know, your firm

Page 70

1    and the Creditors Committee, estate fiduciaries.  That's the

2    classic case for exculpation.

3              MR. COLODNY:  Thank you, Your Honor.

4              MS. CORNELL:  If it would be easier for Your

5    Honor, for me to --

6              THE COURT:  Why don't you move --

7              MS. CORNELL:  Sure.  If it would be easier, I can

8    read the provision into the record that you have more

9    context at this point.

10             THE COURT:  Sure.

11             MS. CORNELL:  If that's -- that's just easier and

12   makes it --

13             THE COURT:  This is your -- you're reading now

14   what?  What was agreed or --

15             MS. CORNELL:  This would be as it relates to

16   exculpation for the Committee professionals, the reservation

17   of rights that Mr. Colodny just alluded to.

18             THE COURT:  Okay.

19             MS. CORNELL:  If that makes it easier.

20             THE COURT:  Yeah, go ahead.

21             MS. CORNELL:  So we've come to an agreement on

22   this.  We haven't signed anything or dotted any I's, but

23   we're in agreement on this language.

24             THE COURT:  -- back you on that.

25             MS. CORNELL:  "All rights are reserved for the

Page 71

1    U.S. Trustee or any party in interest to argue that any

2    Committee professional acted in knowing reliance on any

3    excluded Committee member.  All rights and defenses are

4    reserved for any Committee professional with respect to any

5    argument by the U.S. Trustee or any party in interest that

6    such professional acted in knowing reliance on an excluded

7    Committee member that acted in ultra vires manner.  For the

8    avoidance of doubt, knowing in this context means knew or

9    should have known."

10           Do you have any other questions for me, Your

11   Honor?

12           THE COURT:  I don't.

13           MS. CORNELL:  Thank you very much.

14           THE COURT:  All right.  Does anybody want to be

15   heard from the Ad Hoc Borrowers Group?

16           MR. ADLER:  Good afternoon, Your Honor.  David

17   Adler from McCarter and English on behalf of the Retail

18   Borrower Ad Hoc Group.  I'll be brief.

19           First, I wish to extend my appreciation to the

20   Debtors and the Committee for the hard work that they've

21   done throughout this case and especially throughout the

22   month of October.  It's been a very long month for me.  I'm

23   sure it's been a very, very long month for them.

24           Second, obviously the Retail Borrower Ad Hoc Group

25   is a settling party.  We've entered into an agreement that's

Page 72

1     embodied in the plan pursuant to which the borrowers who

2     consented to it have agreed to be treated in a certain way

3     under the plan.

4           We raised three issues in response to the proposed

5     findings of fact and conclusions of law, the confirmation

6     order that was filed a week ago last Friday, and I'm pleased

7     to report that I think two of them are resolved.  The first

8     one is, as I noted at the beginning of the confirmation

9     hearing, that the Retail Borrower Advance Obligation

10    Repayment Election had not been included on the ballot and

11    the Debtors changed -- modified the plan to note that it

12    would be included in the repayment notice that is sent to

13    the borrowers.

14          But still there are issues about timing about the

15    repayment, so I proposed language in my objection which is

16    ECF 3928 and in the eighth plan supplement that was filed

17    today.  Mr. Koenig gave me a nice lesson in speed reading.

18    I believe it's Paragraph 323 which is on Page 338 of 365,

19    where he essentially acknowledges that the Debtors will

20    continue to engage commercially reasonable efforts to deal

21    with these issues that might come up in the future regarding

22    the repayment.  So I think that paragraph addresses that.

23          MR. KOENIG:  And sorry, Mr. Adler.  That's the

24    confirmation order.  Just for the record, that's the

25    confirmation order that you're reading from not the plan

Page 73

1    supplement.  Just -- I wanted to make sure that --

2              MR. ADLER:  You're correct.  That was the --

3              MR. KOENIG:  Sorry for interrupting.

4              MR. ADLER:  No, he's -- Mr. Koenig is absolutely

5    correct.  That is the modified confirmation order.  That was

6    filed at 10:59 today.

7              THE COURT:  What's the issue that's not resolved?

8              MR. ADLER:  It was resolved.

9              THE COURT:  I thought you said there were three

10   issues --

11             MR. ADLER:  Well, that's -- I'm dealing with

12   first, the first one.

13             THE COURT:  Yeah, I wanted to get the -- go ahead.

14             MR. ADLER:  All right, I'll breeze through it,

15   Your Honor.  Second one is the litigation or the plan

16   administrator agreement.  There was an issue about the power

17   of the Plan Oversight Committee.  We raised that in an

18   objection on Friday or in our response, I should say.  That

19   was addressed in the plan supplement today on Page 55 which

20   is ECF 3935.  And it essentially defaulted back to what was

21   in an earlier plan supplement with a little bit of

22   clarifying language.

23             What is not resolved, Your Honor, the third issue

24   is, I guess it's Paragraph 269.  We --

25             THE COURT:  Paragraph 269 of the confirmation?

1          MR. ADLER:  The confirmation order, which is where

2    we had asked the Court.  There are a handful of borrowers

3    who objected and we don't really believe that it's necessary

4    for the Court to make the determination on the ownership of

5    the collateral with respect to all borrowers, and we think

6    the Court need only deal with the borrowers who objected to

7    the plan, and not all borrowers.  And that issue still

8    remains the same in the modified confirmation order that was

9    filed today and we think that the Court does not need to

10   address the issue for all borrowers.  We would just suggest

11   that it be dealt with for the objecting borrowers.

12          THE COURT:  I'm at a little bit of a loss because

13   if I determine the ownership, why is it different for the

14   objecting Borrowers from anyone else?  I mean, the language

15   is the language.

16          MR. ADLER:  But if Your Honor issues a ruling, the

17   borrowers, my group, has not put in any documents or any

18   argument with respect to why ownership belongs to the

19   borrowers rather than to the estate.  And to the extent --

20   it's not going to come up here, but to the extent that there

21   becomes an issue later on with respect to facts implications

22   on transfer of ownership, that is the concern.

23          Does that make sense, Your Honor?

24          THE COURT:  I understand the tax issues,

25   unresolved tax issues if there's been transfer of ownership

Page 75

1    and they received -- what those potential issues are.

2    Obviously I'm not being asked and I'm not resolving any tax

3    issues.

4           Mr. Koenig, what's the position with that?

5           MR. KOENIG:  Your Honor, again, Chris Koenig,

6    Kirkland Ellis, for the Debtors.  This is not our issue.

7    The reason we did not include it in the confirmation order

8    is the same reason that Your Honor identified.  We were

9    perplexed as to how Your Honor could make a ruling to some

10   borrowers and not to others, but it's not really for us to

11   decide.  If Your Honor is comfortable, we're not going to

12   stand in the way.  But that was the reason why we didn't

13   include it in the first instance.  We thought it was a

14   decision for Your Honor to make.

15          THE COURT:  Mr. Adler, do you have proposed

16   language that -- first I would say generally I don't like to

17   decide more than I need to decide.  Have you proposed

18   specific language that named the specific borrowers as to

19   which the ownership issue would be addressed in the order?

20          MR. ADLER:  I think we proposed language in

21   ECF3928 that just said that Court was making a determination

22   only with respect to the objecting borrowers.

23   Alternatively, I would suggest that if the Court deems it

24   necessary to use the phrase "accountholders" or "borrowers",

25   that there be a sentence that says nothing in this decision

1    or order shall have any --

2                THE COURT:  I will look at the issue.  I'm not

3    committing one way or the other.  I will look at the issue.

4    Okay?

5                MR. ADLER:  Okay.  Those were my three issues,

6    Your Honor.  Like I said --

7                THE COURT:  Well, two of them resolved and one

8    we're talking about now.

9                MR. ADLER:  Correct.

10               THE COURT:  Okay.  Thank you, Mr. Adler.

11               MR. ADLER:  Thank you, Your Honor.

12               THE COURT:  Okay.

13               MR. KOENIG:  Your Honor, just real quickly, this

14   is not our issue, but if Your Honor is looking for a way to

15   try to satisfy Mr. Adler, I think one way that you could

16   perhaps do it is best interest test is something you're

17   going to need to decide with respect to anybody that's did

18   not affirmatively support the plan.  I think if the

19   borrowers owned the collateral, the plan would likely fail

20   best interest.  What you could do, as opposed to saying

21   you're only deciding for the objectors, I suppose you could

22   say you're only deciding it with respect to anybody that did

23   not affirmatively vote to support the plan because Section

24   1129(a)(7) says that.  I think that could be a way through

25   this if that's something -- if you're trying to satisfy Mr.

Page 77

1     Adler but also make sure that you're making the rulings

2     necessary for confirmation.  I think that that would get Mr.

3     Adler what he wants and maybe satisfy Your Honor.  But

4     that's a middle ground and you're not deciding more than you

5     have to.

6          THE COURT:  I guess what I would ask maybe the two

7     of you, or Mr. Adler, if you would file one more piece of

8     paper on the docket indicating essentially what Mr. Koenig

9     just said.  Okay?

10          MR. KOENIG:  We're comfortable with whatever Your

11    Honor is comfortable with.  And that might be a way through

12    it.  So I just wanted to...

13          THE COURT:  All right.  Thanks very much.

14          MR. ADLER:  And we will do so, Your Honor.  Thank

15    you.

16          THE COURT:  Next is the Ad Hoc Earn account.

17          MS. KUHNS:  Good afternoon, Your Honor.  Joyce

18    Kuhns, Offit Kurman, for the Ad Hoc Earn Accountholders.

19          On behalf of the Earn Ad Hoc Group, we would like

20    to commend the Debtor, its management, and its professionals

21    and the Committee and its professionals for running an

22    extremely efficient five-day confirmation process in a very

23    complex case assisted by court protocols that has

24    demonstrated we believe compliance with all the requirements

25    needed to confirm the plan before you.

Page 78

1          As we observed in the Ad Hoc Earn groups opening,

2     not everyone got everything they wanted here.  But everyone

3     was given an opportunity to be heard in this courtroom

4     whether in person or via Zoom, which was greatly

5     appreciated, Your Honor.

6          Since this may be the last opportunity for the Ad

7     Hoc to be heard by the larger creditor constituency, we

8     would like to clarify what its role has been and what some

9     of its members will continue to do to promote creditor

10    interest going forward.

11         The Ad Hoc Earn group consists of creditors who,

12    like all creditors, were the targets of a massive fraud and

13    suffered significant losses as a result.  They regrouped and

14    in fact contributed additional dollars, critical dollars to

15    form a group committed to building consensus on the way to

16    achieve the best outcome for Earn accountholders as quickly

17    as possible while respecting the position of other

18    creditors.

19         I would like to once again thank in particular the

20    steering committee members, Immanuel Herrmann, Brett Perry,

21    Nick Farr, and Joe Lehrfeld.

22         The Ad Hoc Earn group believes that the $2.5

23    billion it claims voting in favor of the plan is a testament

24    to their efforts and the efforts of others to productively

25    engage with each other and work cooperatively towards the

1    exit.  It is significant that the Ad Hoc's sightline did not

2    end with the exit but extended to what would happen

3    afterwards to enhance recoveries to creditors and future

4    equity holders through Newco and the litigation oversight

5    committee namely by creditors assuming a seat at the table

6    of each.

7              There has been some criticism of the board

8    selection process.  We believe the testimony of Major

9    Robinson was credible and thorough regarding how NewCo board

10   selections occurred, a process in which a number of Ad Hoc

11   Earn members participated as interviewees.

12             While we were not successful in security voting

13   seats on the NewCo initial board and admittedly were

14   disappointed in that, there will be three Earn creditors

15   participating in NewCo board meetings as board observers

16   along with the two co-chairs of the committee who will have

17   voting rights.

18             The board observers are each significant Celsius

19   creditors.  They will each have access to the same

20   information as all board members.  While the board observers

21   may not have a vote, they have a voice and the ability to

22   influence outcomes.  And each in fact has been a positive

23   influencer in this case.  The Ad Hoc is grateful that these

24   creditors have again stepped up to further the goal of

25   working to maximize recoveries.

1          With respect to the NewCo board, it is important

2     to further note that a public board must not only have

3     members who are diverse in skillsets, gender, race, and

4     ethnicity -- in particular to satisfy NASDAQ requirements --

5     but who are committed to work together as a group to advance

6     the company and enhance returns to equity.

7          We are pleased to say that there already exist

8     solid working relationships and mutual respect among the

9     creditor representatives to this board, a critical and

10    promising starting point.  The Earn Ad Hoc and Earn Borrow

11    groups will each have a representative and therefore a voice

12    to speak for Celsius creditors and former accountholders on

13    the Litigation Oversight Committee as well.  The long and

14    the short, Your Honor, is that the work does not end here,

15    but another phase will begin after the effective date with

16    our constituents' continued representation in the recovery

17    process.

18          Your Honor, we have listened in throughout this

19    confirmation hearing and are hopeful and in fact anticipate

20    after much hard work and the dedication of many that a

21    confirmation order will enter soon.  And we will then be

22    looking forward to a prompt exit and the long-awaited

23    commencement of distributions which we hope will occur this

24    year, but if not, as soon as possible in 2024.

25          Thank you for your time, Your Honor.

Page 81

1              THE COURT:  Thank you very much,.  All right.

2     Next is the Withhold Ad Hoc Group.  I think Ms. Kovsky-Apap

3     indicated that she withdrew her request, which I

4     appreciated.

5              Next is the Securities and Exchange Commission.

6              MS. SCHEUR:  Good afternoon, Your Honor.  Therese

7     Scheur for the U.S. Securities and Exchange Commission.

8              THE COURT:  Good afternoon.

9              MS. SCHEUR:  With me on the line is William

10    Uptegrove, also from the U.S. Securities and Exchange

11    Commission.

12             Your Honor, the SEC filed a limited objection and

13    reservation of rights at Docket 3522.  The Debtors have

14    incorporated changes to respond to the issues raised in our

15    informal comments and limited objection.  The SEC continues

16    to reserve its rights to object to any winddown motion if

17    one is filed.  And as stated in our reservation, the SEC is

18    not opining as to the legality under the federal securities

19    laws of the transactions outlined in the plan.

20             Your Honor, with respect to the status of the Form

21    10, as Mr. Koenig noted, the Debtors have sought pre-

22    clearance to file the Form 10.  I'm not a part of the pre-

23    clearance process and therefore am not able to confirm the

24    Debtor's discussions with other staff or the descriptions of

25    those discussions.  But my understanding is that the pre-

Page 82

1    clearance process remains ongoing.

2           If the Debtors obtain pre-clearance, they would

3    then file a Form 10 which would be reviewed by the court fin

4    staff before it could become effective, and this process

5    could take several months.  Thank you, Your Honor.

6           THE COURT:  I guess my only request -- and only a

7    request -- is that the staff do all it can to facilitate

8    this process going forward.  The SEC will make the

9    determination it believes required in the facts and

10   circumstances.  All I'm asking is -- and I think the Debtors

11   and the Committee certainly from the Court's standpoint have

12   been doing all it can to facilitate speedy process.  I would

13   appreciate it if the SEC would do likewise.  The SEC will

14   make whatever decision it believes is the correct one.  I

15   just hope the process will move forward.  So if there are

16   any bumps in the road, we can try to work those out along

17   the way.  I appreciate it.

18          MS. SCHEUR:  Understood, Your Honor.  We can take

19   that back.  Thank you.

20          THE COURT:  Thank you very much.

21          All right, Mr. Frishberg is next.

22          MR. FRISHBERG:  Thank you, Your Honor.  As we all

23   can agree, this case has been very long and complex.

24   Numerous creditors have raised various issues and various

25   complaints about the plan.  But the matter of the fact is

1    the plan is the best one we have at this point in time.  A

2    year ago, an orderly winddown would have been better, but we

3    have come too far and spent way too much money to do

4    anything other than push through with this NewCo as fast as

5    humanly possible.  It may be a bitter pill to swallow for

6    some creditors, and there are a few ways to make it a bit

7    less bitter.  I will suggest them later.

8           The main one is that we ensure that NewCo location

9    trust does not have anyone who worked at Celsius employed

10   there, whether that be the janitor or all the way up to the

11   top.  The creditors were promised a new company with

12   completely new management, and we will hopefully have that.

13   I do not want anyone who was at Celsius -- and that goes all

14   the way up to Mr. Ferrara, although he has done a great job

15   in this bankruptcy thus far.

16          I would like to thank everyone that has helped

17   make this plan as well as made this a relatively smooth

18   bankruptcy and get us (indiscernible) professionals, the

19   U.S. Trustee, Your Honor, and everyone else.

20          I would also like to specifically thank the

21   attorneys from Offit Kurman, Joyce Kuhns and Jason Nagi, who

22   gave Earn a (indiscernible).  Without them, Earn would be in

23   a different position (indiscernible).

24          This plan, while it's not perfect, it's the plan

25   we have.  We need to get out of bankruptcy as soon as

Page 84

1    possible before any more assets are dissipated.  Your Honor

2    should approve this plan with or without the suggestions I

3    made.

4             Let's see.  (indiscernible) carveouts from

5    (indiscernible) carveouts (indiscernible) the parties would

6    likely smooth the process of exiting bankruptcy, but further

7    makes it a bit less of a bitter pill to swallow.

8             We must exit Chapter 11 and we must stop

9    (indiscernible).  We have to exit as fast as humanly

10   possible, and that is why Your Honor should wait the

11   mandatory 14-day stay period for appeals.  I support the

12   plan being approved, and I would like to reserve the rest of

13   my time for rebuttal if possible.

14            THE COURT:  I'm sorry, Mr. Frishberg.  The only

15   parties who are getting rebuttal are the Debtor and the

16   Committee.

17            MR. FRISHBERG:  Okay.

18            THE COURT:  I think I made that clear.  So if you

19   want to use the rest of your time, be my guest.

20            MR. FRISHBERG:  It's fine.  Thank you, Your Honor.

21   The plan should be approved as soon as possible.  Have a

22   good day.

23            THE COURT:  All right.  Thank you.

24            Mr. Sabin, I think you are next.

25            MR. SABIN:  Good afternoon, Your Honor.  Jeff

Page 85

1    Sabin of Venable, counsel for Ignat Tuganov, one of the

2    three class claim representatives in this case, a party to

3    the plan support agreement, a participating in the plan

4    mediation, and Earn Rewards only customer and still today

5    would be a member of the Litigation Oversight Committee.

6            Mr. Tuganov and I believe it is now time for this

7    Court, as you have done throughout these cases, first to

8    carefully consider the voluminous record including the five

9    days of confirmation hearings, testimony, argument, admitted

10   evidence, and all pleadings related thereto as presented and

11   advanced and argued on all sides by the Debtors, the

12   Committee, the plan supporters, plan objectors, interested

13   regulators, and most importantly articulated by numerous pro

14   se creditors.

15           And then after you so consider it, we believe you

16   should confirm the plan.  It is the very first to my

17   knowledge reorganization of a cryptocurrency business and

18   would otherwise permit, subject to satisfaction of certain

19   conditions, the occurrence of an effective date so that

20   customers, hundreds of thousands of them, and other

21   creditors, can begin to receive the contemplated

22   distributions of bitcoin, Eth, NewCo common stock, and

23   potentially net recoveries from retained causes of action.

24           Stated simply, Your Honor, the process and

25   procedures experienced to arrive here today have been

Page 86

1    challenging to say the least.  And I highlight five

2    particular indicia of those factors.

3            One, the sheer number of customers and creditors

4    and the uniqueness of their claims and the use and

5    consequences of today's instant communication vehicles that

6    otherwise at times cause confusion, at times cause perhaps

7    misunderstandings of fact.  But we cannot otherwise stop

8    what is in today's world.

9            The second factor, the uniqueness of legal issues

10   created by the Debtor's prepetition business lines and

11   agreements.

12           The third, the lack of any clear regulatory

13   principles, rules, or decisions regarding the Debtor's

14   services and the various digital assets used therein and the

15   potential effect of those issues on customer claims in the

16   structure of this plan.

17           Fourth, the need for findings or understanding of

18   what, when, and how the Debtors arrived in this case almost

19   15 months ago and the important role that the examiner, the

20   UCC, the Debtors, and others played in helping creditors

21   understand the unfortunate circumstances that led us here.

22   And more importantly, the potential the way the plan is

23   structured to preserve claims not only for the creditor

24   body, but for the regulators to otherwise do their job.

25           The fifth, the importance of various settlements

Page 87

1    leading to and/or embodied in the proposed plan and the

2    various respective best efforts of the Debtors, the

3    Committee, and the various settling parties to achieve

4    compromise and consensus so that distributions can hopefully

5    begin soon and this case indeed can evidence equitable

6    distribution to creditors.

7            Now that the focus of objectors and respondents

8    has become clearer, as you have heard, there remain but a

9    handful of issues of fact and/or relevant law to

10   confirmations.  Mr. Tuganov as a plan support party

11   continues to work with the Debtors and the UCC to address

12   and finalize some revisions that he previously delivered to

13   the Debtor's counsel and, like Mr. Adler, I took that course

14   in speedreading and I'm happy to say that I have read in

15   full, Your Honor, the proposed revisions to the findings of

16   fact and conclusions of law set forth in Docket 3937 and I

17   am happy to say that almost all of Mr. Tuganov's suggested

18   revisions to that document have been incorporated and

19   included.

20           At this point, we are hopeful that the remaining

21   issue with the retail borrowers can be resolved

22   consensually.  I only point out that besides best interest,

23   also relevant to that language for consideration might be

24   the effect of any fact-finding regarding title to collateral

25   on the preference exposure and the way it's dealt with under

Page 88

1    the plan.

2              In any event, Your Honor, many thanks to the

3    various federal and state regulators for resolving their

4    respective claims by effectively subordinating billions of

5    dollars of allowed claims to permit distributions to

6    creditors pursuant to the plan.  And two, by permitting the

7    distributions of more than $2 billion of Bitcoin and Eth.

8    Hopefully soon the distribution of new common stock in a

9    public reporting company which will have as its business

10   cryptocurrency mining and the staking of eth.  The creditors

11   can only hope and expect that if indeed this Court confirms

12   the plan and that soon thereafter an effective date will

13   occur, that distributions can flow, whether it's before the

14   end of this year or early in 2024.

15             Finally, as others have done, I wish to say

16   special thanks to the Debtor's management team, to the

17   special committees, and most importantly, to the lead

18   counsels for the Debtors and the UCC and their respective

19   team members for their tireless efforts to get us to this

20   point today.  Thank you, Your Honor.

21             THE COURT:  Thank you very much, Mr. Sabin.

22             All right, Mr. Herrmann.  Just so everybody knows,

23   Immanuel Herrmann is next.  Then we're going to take a ten-

24   minute break and then we will resume.

25             Mr. Herrmann?

1          MR. HERRMANN:  Thank you.  Good afternoon, Your

2    Honor.  Immanuel Herrmann, pro se.  I am speaking today in

3    support of the confirmation of the Chapter 11 plan before

4    this Court.  It's been a long road to get here and I wanted

5    to mention a few highlights of the case that I believe made

6    a big difference in getting where we are today.

7          First, the examiner's report.  Earlier in the

8    case, there were concerns that what happened with customers'

9    deposits would be brushed under the rug and in particular to

10   the detriment of customers like me and other Earn

11   (indiscernible).

12          The Court wisely agreed with pro se Earn creditors

13   David Adler and other objectors at the time informed the

14   examiner to increase the scope of her report.  Doing so

15   allowed phase two of the examiner's report to take place.

16   And this portion of the report made a huge difference in

17   getting us further.

18          Second, the formation of the Earn Ad Hoc.  I would

19   like to thank my fellow steering committee members Brett

20   Perry who went to mediation with me in New York, Nick Farr,

21   Joe Lehrfeld, along with other members of the Ad Hoc.  And

22   of course Joyce Kuhns and Jason Nagi, our amazing counsel at

23   Offit Kurman.

24          Third, the class claims process, which is kudos to

25   the UCC for coming up with that, which resolves the

Page 90

1   bellwether litigation which was a huge step forward with the

2   case.

3           I know firsthand as a potential bellwether

4   claimant just how crazy that litigation would have been, and

5   it was welcome to -- it was great that we had a process to

6   resolve that.

7           Many of these issues, including substantive

8   consolidation as well, were all resolved through the

9   mediation which took place in New York.  Here, the formation

10  of the Earn Ad Hoc was absolutely essential to that

11  mediation occurring, which brought us to where we are today.

12          In the months before mediation, the case seemed

13  quite set.  It seemed that Earn customers such as myself

14  might get just pennies on the dollar, meaning that the

15  largest creditor group might oppose the plan and that it

16  could resolve in a contested plan with a huge amount of

17  litigation.  But fortunately we were able to resolve these

18  issues (indiscernible) and here we have before the Court a

19  plan that has overwhelming support from all the major

20  creditor classes.

21          In mediation we got what I believe is rough

22  justice for Earn subject to the limit of bankruptcy code.

23  To get there, several of us put our own interests aside for

24  the greater good.  It was a huge success and I would like to

25  thank the UCC and the debtors for organizing that mediation

Page 91

1    and for all the work they have done to get us --

2              THE COURT:  And I want to thank Judge Wiles.

3              MR. HERRMANN:  Judge Wiles was wonderful, yes.  I

4    also would like to thank him as well.  Thank you, Your

5    Honor.

6              We also -- yeah, so now that the votes are in, I

7    think it's crystal clear a vast, vast majority of creditors

8    support the treatment in the plan and support exiting

9    Chapter 11 and moving on with our lives.  The plan doesn't

10   everyone happy.  It has some frustrating elements, some

11   things that have to do with the Bankruptcy Code, like

12   dollarizing claims on the petition date, which is pretty

13   terrible in a crypto context where prices keep rising.

14             But at the end of the day considering the

15   Bankruptcy Code, it's roughly equitable and it contained

16   shared sacrifice, which is what Earn customers fought for

17   and what's fair.

18             There are of course outstanding little issues with

19   the plan apart from the financial treatment of creditors.

20   And I think the Court should consider a vote for the plan by

21   creditors is really a vote for economic treatment in the

22   plan.

23             There are some well-thought-out objections from

24   other parties that have been raised here which I won't

25   repeat except to say that I believe the Court should

Page 92

1   seriously consider those objections and make the plan even

2   better while preserving the treatment we all agreed to.  But

3   at the end of the day regardless of which changes are or are

4   not made, the Court should move forward with confirmation of

5   this plan and get us out of Chapter 11.  Thank you very

6   much.

7             THE COURT:  Thank you, Mr. Herrmann.  All right.

8   We're going to take a break for ten minutes.

9             Mr. Phillips is up next.  Mr. Phillips had filed

10  slides as ECF3913 if you are able to tee those up.  Okay?

11  Ten-minute break.  Thank you.

12            (Recess)

13            CLERK:  All rise.

14            THE COURT:  Please be seated.  All right, we are

15  back in session.  We're going to begin with the closing

16  argument of Mr. Phillips.  Mr. Phillips?

17            MR. PHILILPS:  Thank you, Your Honor.  I

18  appreciate the Court hearing me.  So presenting from a PDF

19  is a little hard, but Deanna, if you could advance it to at

20  least the title page?

21            THE COURT:  Mr. Lopez is one of the people in the

22  courtroom who is from Kirkland who is operating the slides.

23  Okay?  But we are on to your first page.

24            MR. PHILILPS:  Thank you very much, Your Honor.

25            THE COURT:  Just so everybody is clear, this is

Page 93

1    ECF 3913.  Go ahead, Mr. Phillips.

2            MR. PHILILPS:  Thank you.  I appreciate the Court

3    hearing me out on my limited objection.  And I want to make

4    clear that I don't stand in the way of plan confirmation.  I

5    just would like to see it modified to be more favorable to

6    creditors.

7            Mr. Lopez, if you could go to the next slide,

8    please.  So since the disclosure statement order was issued

9    in late August, there have been a number of changes to the

10   plan that when taken individually weren't that bad, but when

11   taken together did materially change the plan in an

12   essential way that they were adverse to creditors.

13           The plan was advertised as a NewCo that was

14   creditor-owned and creditor-controlled.  Yet when the

15   appointments were made to the NewCo board, there were no

16   creditors appointed to the board other than the self-

17   appointed UCC members.  And also on the Litigation Oversight

18   Committee, the only creditors who were appointed were the ad

19   hocs and from the UCC itself.  One of those appointments has

20   now been reversed.

21           Importantly, the creditor controlled the board was

22   reduced in the original plan from a ratio of two-and-a-half

23   creditors appointees to Fahrenheit appointees.  So only two

24   creditor appointees to one.  We saw the resignation of the

25   lead investor, Michael Harrington of Fahrenheit from the

Page 94

1    NewCo board and we saw this critical decrease in the

2    investment upfront of support for the NewCo from $50 million

3    to $33 million, which was detrimental to the NewCo equity

4    value.

5         We saw the stripping of the Litigation Oversight

6    Committee of key oversight (indiscernible).  I understand

7    potentially that this has been reserved in Plan Supplement 8

8    that was filed I guess today.  Not sure.  I haven't been

9    able to read everything.  I did not take the pre-law school

10   course in speed reading, so I have yet to catch up on all of

11   the documents.  And that the plan administrator under the

12   plan administration agreement I believe is Chris Ferrara,

13   who -- and he is given oversight over the Employee Incentive

14   Program, or the Emergence Incentive Program depending on

15   which title you want to use.  But he is also a 25 percent

16   beneficiary of the entire pool.  So the changes that have

17   been made have been consistently to the detriment of the

18   creditor.  Next slide, please.

19        So there's a number of conflicted board

20   appointments.  And I think you heard Mr. Colodny say today

21   that essentially they wanted all the appointments to these

22   committees to be people that they knew, i.e. the

23   professionals and were not necessarily in the best interest

24   of creditors.  They wanted people that were ex-employees of

25   Weinberg, current employees of Perella Weinberg even if, you

Page 95

1    know, one of those current employees has multiple

2    outstanding tax judgements and liens and doesn't even

3    qualify as an independent director because of his current

4    employment with Perella Weinberg and on the Celsius matter.

5          We have partners of White & Case being appointed

6    to the Litigation Oversight Committee to ensure that they

7    can be hired.  And again you have Mr. Ferrara overseeing a

8    plan that he is a 25 percent beneficiary of.

9          The only really conflict people that were

10   appointed were, you know, thanks to the ad hoc the Earn Ad

11   Hoc and the Loans Ad Hoc where we did have three court-

12   appointed observers.  And I left off Simon Dixon's name

13   here.  Joe Lehrfeld, and Simon Dixon appointed.  And on the

14   Litigation Oversight Committee, David Adler and Cam Crews.

15   Next slide, please.

16          So what's important here is how these actions were

17   really viewed by creditors.  As opposed to having a

18   creditor-controlled company, we didn't get that.  No

19   unconflicted creditors on the board (indiscernible).  And

20   this was really important.  I can't tell you how detrimental

21   that was to the view of creditors of the NewCo equity.  And

22   it's not just me.  I've talked to multiple creditors who saw

23   that.

24          So instead of getting actual board members, we got

25   pacifiers.  We got a pacifier of three board observers who

Page 96

1    were appointed with the consent of the Earn Ad Hoc who have

2    no actual power.  Yes, they are in the meeting, yes, they

3    can get the materials.  But what was failed to be mentioned

4    by either Colodny or Ms. Kuhns is that they can be thrown

5    out of any board meeting by a simple majority vote of the

6    board, which is the same vote that it would take the board

7    to take any action that they want, input, or observation

8    from the board observers.

9            If was actually the appointment of one of these

10   board observers, Simon Dixon, that led to the resignation of

11   Michael Harrington from the board, which again, was a

12   negative event that's going to be viewed negatively not just

13   by creditors, but by the market as a whole.

14           And finally, that reducing the upfront investment

15   from $50 million to $33 million, even if the overall

16   investment is maintained at $50 million, reduces the

17   available price support upon listing of the stock and thus

18   does not give it the same kind of stability and leads to

19   more likely a (indiscernible) stock.  And with the

20   cumulative event of these things was bad from the creditor's

21   standpoint.

22           Also I need to point out that Mr. Colodny's

23   closing slide was that wouldn't have actually filed my

24   objection had I been appointed to the board.  It's not just

25   that I hadn't been appointed.  If they appointed creditors

Page 97

1    to the board, I wouldn't have filed it.  And that's the

2    whole point here is that if creditors had been appointed to

3    the board, three out of four of these factors -- the no

4    creditors on the board, the pacifier board observers, and

5    the Michael Harrington resignation from the board -- they

6    would not have occurred had creditors been appointed to the

7    board by the committee under the advice of Perella and White

8    & Case.  Next slide, please.

9            So what happened after this occurred?  Creditors

10   ran from actually taking equity.  So the Committee and

11   Debtors have made a big point that, well, there's lesser

12   reasons that people would have chosen liquid crypto.  True.

13   There are multiple reasons that people want liquid crypt.

14   And that's another reason that they should want the orderly

15   winddown because they get more liquid crypto from the

16   orderly winddown.  But more importantly what they haven't

17   addressed, and it's borne out by the facts, is that nobody

18   wants the NewCo equity even at a significantly-reduced price

19   of 30 percent.  There's only $178 million of claims which

20   represent 14 percent of the people that toggle but it

21   represents only seven percent of the people that were

22   eligible to actually toggle to buying more equity at a

23   substantial discount of 30 percent from the Debtor's claimed

24   value of the equity (indiscernible).  So it's clear that

25   that matters (indiscernible).

1          Now I'm going to go and look at what happened here

2     with the valuation.  Go to the next slide, please.

3          We understand based on Mr. Keilty's testimony that

4     an inappropriate process was used.  If you go back to the

5     days of internet companies and the dot-come era being

6     valued, people used all sorts of strange metrics like number

7     of unique clicks, eyeballs.  And those were essentially

8     proxies for revenue or future revenue.  The same mistake was

9     made here by Mr. Keilty and his team of scientists.  They

10    used a revenue proxy which was based on enterprise value

11    (indiscernible) bitcoin mining compute (indiscernible).  And

12    that's basically a discredited valuation technique.  They

13    also used a discounted cashflow analysis and the forecasted

14    supply to the company was wildly inaccurate in its

15    predictions or even proven that way.  The networks had a 450

16    hash rate as opposed to the 307 hash rate that was predicted

17    in the forecast.  And all these things were predicated on

18    the May 31st valuation and circumstances have drastically

19    changed since May 31st.  The company hasn't met its

20    operating plan, either.

21         There was no Holdco discount applied which is, you

22    know, a minor point.  But part of that $450 million that the

23    debtor claim shouldn't be discounted and is not applied on a

24    part-by-part basis, a Holdco discount is only applied at the

25    total company level because that's when you have that sum of

Page 99

1  the parts that needs to be discounted.  But part of that

2  $450 million is actually needed to capitalize the mining

3  company, which is (indiscernible).

4        And then we finally had this first market test

5  that I've just talked about.  And that clearly demonstrated

6  the overvaluation of the equity by at least 30 percent.  The

7  discount would have to be more than 30 percent.  Next slide,

8  please.

9        And so that leads us to the conclusion that the

10  orderly winddown is a superior recovery, distributes more

11  liquid crypto on the effective date.  The Newco equity in

12  the baseline plan is way overvalued by a minimum of 30

13  percent.  And one of the key differences is the orderly

14  winddown gives creditors what they want, which is a maximum

15  liquid crypto recovery by releasing that additional $450

16  million in crypto that's being held back to secretly

17  capitalize essentially the mining business because that's

18  what (indiscernible) capitalize.

19        So in closing -- next slide, please -- get a

20  higher liquid crypto recovery using an orderly winddown and

21  that should be the fiduciary duty that is exercised by the

22  Debtor and Celsius.  The Court should order a revaluation of

23  the two scenarios because they are way out of date given the

24  May 31st valuation date.  And clearly the market test needs

25  to be included in that.

Page 100

1          Professionals need to be held accountable here for

2     their actions.  And they've certainly done a great job and

3     it's been a massive case.  There have been a number of

4     things that they've done extremely well.  But that doesn't

5     mean that everything should be excused and that there needs

6     to be a carveout from the exculpation or the actions

7     (indiscernible).  And the (indiscernible) appointments of

8     the board and the Litigation Oversight Committee should be

9     reversed.  Thank you so much for listening to me, Your

10    Honor.

11          THE COURT:  Thank you, Mr. Phillips.  Thank you,

12    Mr. Phillips.

13          Next is Otis Davis.  Mr. Davis?

14          MR. DAVIS:  The only thing I would say we had a

15    big earthquake here this morning.  We lost power.  Power is

16    back.  We had a few aftershocks.  I just had one 20 minutes

17    ago.  So if the Zoom goes out, I just want to let you know

18    ahead of time we lost power again.

19          THE COURT:  Okay.  Go ahead, Mr. Davis.

20          MR. DAVIS:  Your Honor, with all due respect, I

21    sincerely do not believe that the plan as it currently

22    exists is confirmable based on the disparate price of the

23    binding and court-approved 81 cents for cell token in

24    custody versus a (indiscernible) in Earn.

25          I want to talk about the binding custody

1    settlement agreement right now.  I have 34,867 CEL tokens in

2    my custody account and 1.6 million CEL tokens in my Earn

3    account.  The day the Debtors and the UCC agreed to a CEL

4    token custody settlement at Docket 2271 is the day all CEL

5    token holders tog 81 cents, which Your Honor ratified with a

6    signature which date is February 28th, 2023.

7             The custody settlement has a fixed the CEL token

8    price for custody holders at 81 cents regardless if they are

9    in custody or Earn.  Because of this and this along, all CEL

10   token holders are entitled to get the petition date price of

11   81 cents as their valuation.  The UCC, this Court, and the

12   Debtors are legally estopped from asserting or attempting to

13   undo this so-ordered and court-approved valuation of the CEL

14   token.  Anything else is contrary to the rule of law, not

15   equitable, and is not supported by any facts, claims, or

16   arguments.  As an aside, I would also note that the Custody

17   Ad Hoc Group did not file to support confirmation of the

18   plan.

19            Moving on to the Debtor's $2 billion claim against

20   FTX et al., the Court cannot ignore the fact that the

21   Debtors have officially filed a $2 billion claim FTX

22   bankruptcy against Alameda Research and FTX, et al. for

23   attaching Celsius with CEL token.  In that filing, the

24   Debtors themselves are claiming that CEL token is valued at

25   $2.88.  This Court cannot ignore those legally-sworn

1    assertion in another pending case in this bankruptcy court.

2    The Debtors and their lawyers are ordering on perjury to

3    claim one value in the FTX case and are pushing another in

4    this matter.  Self-serving and perjurious would be

5    (indiscernible) for their conduct which would not be

6    unnoticed.  The Debtors arrived at the $2.88 value by taking

7    the total number of CEL tokens in circulation which as 693

8    million, and multiplying by $2.88 which gives you the $2

9    billion claim number the Debtors filed in the FTX

10   bankruptcy.  Your Honor, this $2 billion claim the Debtors

11   filed in the FTX bankruptcy against FTX et al. undercuts

12   their entire argument in this matter and should subject

13   counsel to sanctions and costs.  The basis of the $2 billion

14   claim is damaging related to CEL token yet it's embarrassing

15   to see the UCC and the Debtors are actively trying to

16   devalue the very asset that can bring so much recovery to

17   all creditors.  The $2 billion claim against FTX will remain

18   with the estate post-confirmation but cutting recovery for

19   CEL token creditors will equate to an inequitable

20   distribution of value of this claim which relies 100 percent

21   of the value of CEL token.  This cannot and will not be

22   allowed.

23         Moving on to Max Galka report and the supplemental

24   declaration.  Objectively speaking, the Max Galka report

25   should be thrown out on its face.  Mr. Galka's company,

Page 103

1    Elementus, took over $200,000 from Alameda Research who the

2    Debtors are currently suing as part of the aforementioned $2

3    billion claim.  Does that count into this amount?  Clearly

4    yes.  Mr. Galka and his company also have another vested

5    interest in devaluating Celsius' claims.  One of the three

6    board members of Elementus, Vladimir Jelisavcic, who founded

7    and is currently the CEO of Cherokee Acquisition, has been

8    purchasing hundreds of millions of dollars' worth of claims

9    in this case assisted by the devaluation efforts of

10   Elementus and Galka.  Mr. Galka and his reports are the

11   definition of a conflict of interest and anything that he

12   said should have no bearing on the value of CEL token.  And

13   investigations should be commenced against the company and

14   the law and the law firm who pushed Galka on this Court.  A

15   refund should also be given to the estate for the waste of -

16   - for the $1,000 an hour paid to Galka and Elementus.

17          Moving on to speculative versus utility value for

18   cryptocurrencies.  Your Honor, cryptocurrency valuation is a

19   complex amalgamation of various factors with utility value

20   being just one of the components.  The digital currency

21   ecosystem showcases a plethora of coins and tokens, the

22   majority of which by traditional standards lack tangible,

23   intrinsic value.  Despite this, many have achieved

24   significant market capitalizations and have become

25   cornerstones of the cryptocurrency world.  Bitcoin is

Page 104

1    commonly dubbed the gold standard of cryptocurrency of the

2    cryptocurrency world.  Bitcoin stands as a testament to the

3    limited role of intrinsic value and digital currency

4    valuation.  Bitcoin by its very design has no utility,

5    doesn't possess intrinsic value in the traditional sense,

6    yet it has established itself as a store of value to most

7    individuals in the crypto space and remains the most

8    dominant and valued cryptocurrency at 34,500 for Bitcoin,

9    underscoring the fact that forces beyond intrinsic or

10   utility value play an essential role in determining its

11   worth.  It all comes down to speculation.  Mime coins often

12   borne out of Internet trends and jokes further emphasizes

13   the point.  Despite lacking any inherent utility or

14   intrinsic value, those mime coins like Dogecoin have

15   astounding market capitalization.  Their value is largely

16   driven by community support, speculation, and market

17   sentiment rather than any tangible utility.

18           To argue that CEL token or any cryptocurrency for

19   that matter is valueless based on its perceived lack of

20   intrinsic value or utility is an illogical and legally-

21   flawed premise.  The cryptocurrency market operates on

22   principals that often diverge from traditional financial

23   markets.  Factors such as community trust, speculative

24   interest, and market sentiment often wield more insurance

25   than intrinsic value or utility.

Page 105

1          Furthermore, the intrinsic value argument fails to

2   consider the potential future application of a token.

3   Before Celsius filed the Chapter 11, we were all under the

4   impression Celsius would reopen and CEL token would be

5   playing the exact same role as it always has.  After the

6   Chapter 22 filing, that all changed.  Yet just because a

7   token's utility value might be low or even nonexistent at a

8   particular point doesn't negate its potential future utility

9   or the speculative value attributed to it by the market.

10  And that is what matters.  Asserting that the CEL token or

11  any cryptocurrency has no value based on a perceived lack of

12  intrinsic value is not just an oversimplification, but is

13  misleading and just plain wrong.

14          The cryptocurrency landscape replete with examples

15  like Bitcoin and various meme coins underly the fact that

16  intrinsic value is just one of the myriad of factors

17  influencing cryptocurrency valuation.  The argument that CEL

18  token has or has no value based on this sole criterion lacks

19  depth and fails to capture the broader dynamics at play in

20  the digital currency world.

21          The following data from coin market

22  (indiscernible) showcase the expansive trading volume for

23  CEL token since its inception.  Total lifetime CEL token

24  value traded, $9.55 billion.  Total CEL token value traded

25  up to petition date, $6.6 billion.  Total CEL token value

1    traded post-petition, $2.6 billion.  Non-dislocated market

2    data for total CEL token value traded, $5.9 billion.

3            The concerns raised about potential market

4    manipulation and insider trading exist.  However, the scope

5    and breadth of CEL trading activity totaling over $9.55

6    billion over five years created the context within one must

7    examine these concerns.  With a CEL token average high of

8    one-thousand-six-nine cents and an average low of one-

9    thousand-fifty-six cents.  Principal here is the sheer scale

10   of this transaction.  The clear manipulation or undue

11   influence on CEL token's value, there would need to be

12   evidence suggested by a significant portion the $9.55

13   billion was controlled or influenced by insiders.  Without

14   such evidence, further manipulation on such an expansive

15   market is akin to alleging that a single cup of water could

16   influence the water levels of the Hudson River.  In light of

17   the presented metrics, it is valued for the Court to

18   differentiate between speculative claims and concrete

19   evidence.  To date, no conclusive evidence has been provided

20   that indicates that a sizeable portion, let alone the

21   majority of the CEL token trading activity was manipulated

22   by insiders.  As such, more allegations without substantial

23   truth cannot undermine the credibility and value of such a

24   broadly-traded token.

25            The litigation environment is replete with

1    accusations and charges.  However, the cornerstone of

2    justice lies grounded in decisions and verifiable facts.  As

3    the court ventures into determining the true value of the

4    CEL token, it is essential to weigh the methods and reports

5    grounded in factual data against speculative and unverified

6    claims.  In the absence of evidence satisfying the burden of

7    proof regarding market manipulation, the Court must anchor

8    its judgment in objective data and methodologies presented

9    ensuring that justice both is fair and evidence-based.

10          Lastly, one matter which calls into question the

11   integrity of this entire matter is the alleged placement and

12   (indiscernible) immediately and formerly of White & Case,

13   the UCC's counsel --

14          THE COURT:  That's it, Mr. Davis.

15          MR. DAVIS:  (indiscernible).

16          THE COURT:  Mr. Davis, that's it.  We're done.

17   You filed that frivolous motion.  I denied your motion.  So

18   that's the end of the subject.  Your time is up.

19          Mr. Kirsanov, you are next.

20          MR. KIRSANOV:  Good afternoon, Your Honor, and

21   thank you for allowing me to speak today in opposition to

22   confirmation of the plan.  As it stands, I do not believe

23   the plan is confirmable.  And I will be addressing my

24   concerns today.

25          There are some very serious concerns I have which

Page 108

1    include ballot integrity, which is alarming.  But there have

2    been such contradictions to what has been clearly spawn into

3    the balloting.

4            Could I have my first slide please come up?

5            THE COURT:  All right.  Mr. Kirsanov -- 3918 is

6    Mr. Kirsanov.

7            MR. KIRSANOV:  Thank you, Your Honor.

8            THE COURT:  All right.  It will be up on the

9    screen in a second.  Are you able to observe what we put up?

10           MR. KIRSANOV:  Yes, Your Honor.  I see it.

11           THE COURT:  Okay.  All right.  Go ahead, Mr.

12   Kirsanov.  If you ask Mr. Lopez to switch pages, he'll do

13   that for you.  Okay?

14           MR. KIRSANOV:  Yes, Your Honor.  Thank you.  I

15   would like to begin by addressing my journey with the issues

16   I have had with Celsius where I could not transfer funds

17   from my custody account as early as April of 2022 before the

18   freeze.  I was locked into this bankruptcy against my will

19   with my CEL token.  I was not even able to transfer my

20   initial full eligible custody settlement until the Debtor's

21   custody wallet shortfall issue was resolved weeks later with

22   a half a million CEL token deposit to their custody wallet.

23           My calls for disbursement in an alternative

24   cryptocurrency as called for in settlement were met with

25   silence.  And numerous withdrawal attempts were cancelled

Page 109

1    until the shortfall issue was resolved.  Next slide, please.

2            As shown in the Blonstein declaration the assets

3    for CEL did not meet the liability ahead of the freeze.

4    Next slide, please.

5            Even expert witness Mr. Galka was not sure why I

6    could not withdraw my funds, and the error message did not

7    make sense.  Next slide, please.

8            Mr. Galka had also indicated the price of CEL did

9    exceed several dollars following the bankruptcy.  Next

10   slide, please.

11           I would like to talk about Mr. Max Galka's

12   support.  When asking Mr. Galka when the custody wallet was

13   created, he had indicated he did not know.  However, his

14   sworn report had indicated the custody wallet was created in

15   April of 2022.  Mr. Galka had also testified he did not rely

16   on the exhibits when they were presented to him for his

17   report.  Your Honor, you had mentioned that you were at a

18   complete loss when it came to this.

19           Mr. Galka had testified that his company obtained

20   Series A funding from Alameda Research.  In the transcript I

21   submitted to the Court with regard to the criminal case of

22   the United States v. Sam Bankman-Fried, Ms. Ellison, the CEO

23   of Alameda Research, indicated in her notes discussing

24   selling billions of dollars' worth of Bitcoin if it went

25   above $20,000 with Mr. Bankman-Fried, the CEO of FTX.  The

Page 110

1   price of Bitcoin at Celsius bankruptcy filing was $19,880.

2   Your Honor, I find this extremely concerning.  Next slide,

3   please.

4           I would also like to talk about how the bulk of

5   the ballot has been misrepresented.  In this memorandum of

6   law by the Debtors, it is said that I had voted in favor of

7   the plan and that I am not a dissenting member.  This is

8   misrepresentation of my vote and attempting to be weaponized

9   against my objection.  Next slide, please.

10           Your Honor, in these final tabulation results in

11   the custody class, there are nine dissenting CEL token

12   holders with a monetary majority of -- excuse me --

13   $197,912.  It is unclear why the already-settled custody

14   class has a 25 cent CEL valuation here, or really any other

15   class as there has been no reading of valuation aside from

16   petition date values.  Next slide, please.

17           Your Honor, in this slide from the Schedule F, my

18   custody assets reflect having $749,200 CEL tokens in my

19   custody account.  And at 25 cents of valuation, my voting

20   weight was $187,300 in the custody class.  This is $600

21   below the rejections in the tabulation.  Next slide, please.

22           In studying the top ten CEL holders in custody,

23   the next nine CEL custody holders; monetary weight could not

24   account for my voting weight.  How could I have voted to

25   accept the plan when the balloting shows otherwise?  Next

Page 111

1    slide, please.

2         Your Honor, here are the detailed Schedule F

3    holders.  What I found particularly interesting is CEL

4    holder number five's custody account was missing

5    (indiscernible) withdrawal Schedule D.  However, it is found

6    in the statement of financial affairs.  That amount was

7    almost 54,000 CEL tokens.  The number five reached out to

8    me.  And it was Mr. Otis Davis who did confirm indeed he had

9    CEL in custody and has it even today.

10        Not even the next top ten CEL holders in custody

11   could amount for my voting weight in the custody class.

12   From my understanding, he had about a 15 percent voting

13   turnout or 20 percent.  To exceed my monetary voting weight,

14   the next 14 CEL token creditors in monetary value after me

15   would all have needed to vote no to pass my monetary value.

16   Next slide, please.

17        Your Honor, the CEO, CRO, and CFO, Mr. Ferraro,

18   was unaware that the CEL token holders in the custody class

19   voted to reject the CEL token settlement and they did reject

20   it in a monetary majority.  Next slide, please.

21        Your Honor, my thoughts on the balloting are

22   straightforward.  There has been misrepresentation.  I do

23   not believe anybody else in the custody class could have

24   determined what their vote was had it not been for my

25   monetary majority rejecting as shown in the balloting.  My

Page 112

1    voting results were refused to be shared with me even though

2    they were listed as an exhibit.

3            Creditors deserve to know what their precise

4    voting results were.  I believe Bankruptcy Code 1144 would

5    apply to this matter.  Next slide, please.

6            Your Honor, in my interactions with the UCC and

7    White & Case, knowing about my situation with my CEL in

8    custody since February, they have not acted in my fiduciary

9    interest.  I was never invited to talks as the largest CEL

10   token holder in custody and they have gone against my best

11   interest by seeking to devalue my assets by over $400,000 of

12   petition date value.

13           I ask that you do not grant any releases from

14   answering why they have failed to act as a fiduciary to a

15   creditor such as myself.

16           I would also like to note that the Custody Ad Hoc

17   Group did not appear to make closing remarks in support of

18   the plan today.  The Debtor's slide, however, indicates

19   affirmative support.  The Custody Ad Hoc Group has rejected

20   my numerous requests for help even though -- even to become

21   a formal member for representation even though I have

22   financially contributed to their legal fight.  Next slide,

23   please.

24           Your Honor, pursuant to the custody settlement, it

25   is clearly written that I was able to reject the plan of my

Page 113

1    CEL token assets in the custody class as I was prevented

2    from withdrawing my pure custody assets as a result of

3    having an outstanding loan.  The Debtor's counsel confirmed

4    this to me in dialogue.  Pursuant to the Section 1125 of the

5    Bankruptcy Code, the requirement is clear to have adequate

6    information to make an informed judgement on the balloting.

7             I was not provided such clarity.  And now my vote

8    is being misrepresented.  My 6A ballot included my

9    (indiscernible) pure custody assets in dollarized value.

10   Next slide, please.

11            Your Honor, on the 27th of September after

12   balloting, there was a language change that went into the

13   plan indicating the deactivation date price will now be 25

14   cents for CEL token.  At this price, neither the Debtor, the

15   UCC, or anyone can guarantee this price as higher or lower

16   than market values.  After bankruptcy, the price of CEL

17   token exceeded several dollars.  Even during this

18   confirmation hearing, the price exceeded 25 cents.  Why is

19   anything less than market values or petition date values

20   attempting to be forced on me?  This was an adverse change

21   and I interpret this violated Code 1127 as I am a dissenting

22   member.  Next slide, please.

23            Your Honor, on this accountholder claims

24   calculation, it indicates CEL token in custody is exempt

25   from the 25 cent valuation, yet it was applied to the

Page 114

1    custody class included in the monetary calculation in the

2    ballot.  My liquidation value and my CEL token that is

3    classified as pure custody is 100 percent.  That's 81 cents.

4    Next slide, please.

5            Your Honor, an example of another asset that

6    Celsius -- I will present to you the MANA ask.  The petition

7    day value of MANA was 80 cents.  The current price is

8    hovering around 30 to 35 cents.  The Debtor must return

9    equal or greater value in accordance to the liquidation

10   value asset on deactivation pricing as well.  Next slide,

11   please.

12           In Hawaii, the first 90 days of distribution on

13   the schedule indicates only cash and perhaps Bitcoin and

14   Ethereum would be distributed.  All other asset account

15   types use petition-date values.  How is it fair and

16   equitable for residents of Hawaii that an asset may not meet

17   its liquidation value?

18           THE COURT:  Are you in Hawaii?

19           MR. KIRSANOV:  I have a home in Hawaii, a place I

20   call home in Hawaii, but I am presently not in Hawaii, sir.

21           THE COURT:  All right.  I'm going to -- finish up.

22   You've already run out of time.  But you're not one of the

23   people in Hawaii that's affected by this provision.

24           MR. KIRSANOV:  Well, I would be affected.

25           THE COURT:  You're not affected by it, Mr.

Page 115

1    Kirsanov.  Finish up.

2            MR. KIRSANOV:  Next slide, please.  Your Honor,

3    there are some instances where I have demonstrated where

4    best interests are not met in Hawaii in regards to the

5    activation date pricing.  The activation date pricing also

6    affects everybody else.  And with around a 20 percent voting

7    turnout, it is fair to say many people have moved on and

8    simply will receive a deactivation day dollarized check.

9    This must also meet best interests.  And I do not believe

10   this meets best interest, and it violates Section 1129.

11   Next slide, please.

12            This is my last slide.  It is the creditor's right

13   to pursue when they want to receive their assets.  This is

14   not a decision that the Debtor makes.  This includes cashing

15   the deactivation date check.  All methods of distribution

16   must meet best interest.  The current plan proposes to give

17   me 30 cents on the dollar when my liquidation value for my

18   pure custody CEL is 100 percent, which is 81 cents on the

19   dollar.  I want to reserve all my rights with regards to

20   these concerns.

21            Your Honor, I want to thank you for allowing me to

22   make my closing arguments today.  This has been an

23   incredibly difficult time to represent myself on short

24   notice after I interpreted an adverse change in the ballot.

25   I immediately became involved in the process the next day

Page 116

1    when I interpreted them as such.

2          English is not my first language, and I do

3    apologize to the Court for any mistakes I've made in this

4    process.  I have tried to communicate with the Court and

5    fellow creditors as best as I could.

6          I ask that you not confirm this plan, as there are

7    some very serious concerns that remain to be addressed.

8    Thank you, Your Honor.

9          THE COURT:  Thank you, Mr. Kirsanov.

10         Artur Abreu.  Mr. Abreu?

11         MR. ABREU:  Can you hear me?

12         THE COURT:  Yes, I can.

13         MR. ABREU:  I turned on my camera.  I'm not sure

14   if it's being seen.  You never know with AI.

15         THE COURT:  There you go.

16         MR. ABREU:  Okay.

17         THE COURT:  We can see you.

18         MR. ABREU:  Yeah.  I'm just going to give a

19   statement.  It's about CEL.

20         Your Honor, I come before this court as an

21   international creditor who onboarded several of my family

22   members to join Celsius network.  At the time, I took

23   diligent steps in reading Celsius Network terms of service,

24   careful reviewed my loan agreements and took loans against

25   CEL, BTC and ETH, all of which I paid around the LUNA event,

1    which was May 12th.  I even contemplated the possibility of

2    small holds in the balance sheet before the polls.  However,

3    I don't think anyone had any idea or was prepared for the

4    level of misrepresentation and how basic fundamental

5    practice were not implemented in Celsius.

6            My involvement with Celsius Network CEL token

7    issue started during the polls via Twitter, or now known as

8    X, eventually leading to a massive following of

9    approximately 4,000 accounts in two profiles.  A substantial

10   portion of this following centers around CEL tokens and

11   concerns related to the potential manipulation of CEL.  I

12   would not be here before this court if Celsius Network had

13   not suspended CEL withdrawals.  When Celsius paused

14   withdrawals, in my opinion, that effactully categorized

15   itself as a debt that needed to be repaired.  In doing so,

16   they eliminated the opportunity for CEL token holders to

17   mitigate their losses and speculate on the reorganization.

18           I also find myself before Your Honor as I firmly

19   believe there are material omissions to distort several key

20   issues, some of which you identified, such as the omission

21   of a CEL price from the initial Galka expert report and the

22   lack of representation for CEL token holders in the

23   decision-making process.

24           During the 28 September hearing, when Your Honor

25   inquired about potential consequences, top price were set at

1    the petition.  The debtors contended that it will dilute

2    creditors.  However, this dilution and impact of CEL were

3    never clearly stated in court or during the ballot process.

4    Is it possible to estimate the potential dilution?  I

5    believe so, and I did so by utilizing the data submitted by

6    Celsius to the court of their coin reports, set appropriate

7    market prices and then expected recovery and the expected

8    recovery indicated in the ballot.  In conjunction with a CEL

9    price of 20 cents and accounting for the excluded parties,

10   the dilution I reach was $1.98.  This was my calculation.  I

11   cannot reach assess the metrics of the (indiscernible) box

12   or the withdrawal settlements.

13        I did file a motion 3835.  I do not know if I made

14   it correctly, but it was just to put this number to the

15   court to have an idea what sort of average impact of the

16   recovery we are talking to creditors.  I also question if

17   there was ever attempt by the debtors to reach a settlement

18   concerning CEL.  Your Honor has consistently emphasized the

19   importance of settlement in bankruptcy proceedings, but I

20   question whether this can apply when dealing with a class

21   that lacks proper representation, consists of only a handful

22   of pro se creditors.  I recall the palpable disappointment

23   expressed by Mr. Santos Caceres here in court when the

24   debtors claimed to have attempted to settle with him and Mr.

25   Caceres stated only 1 cent was proposed to increase in his

Page 119

1     recovery.  No real discussion ever happened.

2          I believe if a real settlement effort had ever

3     been undertaken, the discussion would have centered on the

4     broader impact of CEL on the estate.  Measures have been

5     explored such as capping the price based on the total CEL

6     token claims, allocating some of the litigation proceedings

7     from actions against insiders and other parties linked to

8     CEL manipulation or maybe even utilizing Celsius tax experts

9     to offset CEL compensations with the future taxes these

10    formal employees will pay.  It's my belief that no sincere

11    settlement effort was made, and I trust Your Honor grasps a

12    similar point.

13         In regards to the CEL price, it initial was

14    offered at 20 cents, one of the few of the initial coin

15    offering price of the creation of the company.  Subsequently

16    it was raised to 25 cents.  However, the debtors' expert

17    witness report failed to provide a specific price and

18    instead a supplemental report was filed with a broad market

19    price ranged from zero cents to 35 cents.  It is a margin of

20    error of 100 percent.

21         I underline the expert repeated acknowledgments of

22    the challenges posed by setting a price primarily due to

23    locking of 94 percent of the CEL supply waiting Celsius and

24    the associated volatility in bid ask spreads and abnormal

25    volume being traded.  However, the experts on charts, on his

Page 120

1    reports, Pages 37, the first report, Pages 37, 38,

2    inadvertently revealed that the price began to dislocate

3    days prior to the poll's announcements.  But there was a

4    brief two-week window before June 10th where CEL price

5    remained unaffected where the volume was within the normal

6    range, CEL token from users were available for withdrawal

7    and there were indications of Celsius Network less than

8    ideal financial state.

9           I question why this period was not utilized to

10   establish a price unaffected by the highlighted conditions

11   of Mr. Galka's own report.  On the October 3rd hearing,

12   Christopher Ferraro, and I now quote him from the

13   transcript, "It's hard for me to understand a token that is

14   represented and market has a utility token in which the

15   disclosed statements say that if the platform were ceased to

16   operate, it will become worthless.  It's hard to me to

17   believe why it will go up."  To this, Mr. Galka in his

18   report stated it could even be zero.  But some questions

19   remain.  Did the former CEO ever inquire in social media

20   where CEL token should be included in a recovery plan?

21          In my inquiry to Mr. Christopher Ferraro, he

22   asserted that CEL was never excluded from the discussion and

23   there was an iterative process leading to the current plan.

24   Prior to the emergence of the novel proposal, there was a

25   leaked plan known as Kelvin, which even the UCC acknowledged

Page 121

1    on their Twitter account featuring CEL token as a prominent

2    component.

3             Furthermore, the UCC member Thomas DiFiore in a

4    town hall on October 27, 2022 reiterated the intention to

5    maximize the use of CEL and the CEL tokens held in treasury.

6    Not only he failed to disclose that his CEL holdings had

7    been liquidated through a loan, a fact that I believe only

8    came to light during emergency meeting here in court.  Given

9    the circumstances as of October 27, 2022, there remain a

10   palpable interest in preserving CEL value, and it's

11   difficult to argue that it had ever a zero price as of the

12   petition dates.

13            In the days leading to the petition, Celsius

14   Network continued to pay hundreds of millions of blockchain

15   overcollateralized loans, indicating that they possess a

16   level of liquidity that could facilitate a reorganization

17   effort.  While I'm uncertain if Mr. Galka was privy to this

18   information, it is evident that UCC and Christopher Ferraro

19   at the very least misrepresented their belief that CEL token

20   had no value following Celsius bankruptcy filing.  Its more

21   severe interpretation, it appears that they might have

22   misled the court under oath.

23            THE COURT:  Mr. Abreu, you have one more minute.

24            MR. ABREU:  Thank you.  Thank you, Your Honor.  I

25   could draw further in the case of VGX, a token from Voyager

Page 122

1    that engaged in similar business activities to Celsius that

2    faced bankruptcy and operating within the same timeline.

3    It's perplexing to me that Mr. Galka did not regard VGX as a

4    comparable coin to compare CEL and instead chooses a token

5    like HEX, which has no utility, has an annual inflation rate

6    or stacking and lacks an official company or headquarters.

7            On the examiner's report, Shoba Pillay, on Page

8    124, indicates that Celsius purchased 558 million worth of

9    CEL tokens, a figure curiously omitted from Galka's report.

10   The actual customer estate, according to Mr. Galka, amounted

11   to 128 million.  This is a wide error that I don't think it

12   was probably there.

13           So I'm ending my statement.  In closing, I assert

14   that all creditors, except for insiders, are the victims in

15   this case to varying degrees.  I dare to say that CEL

16   holders are among the most severely affected, starting from

17   the inception of Celsius Network, where internal

18   communications reveal the deliberate action of the fact that

19   their ICO, initial coin offer, did not reach the 50 million

20   mark.  And from Mr. Galka's cross-examination, the average

21   purchase of CEL token over the counter was around $3.72.

22           In the bankruptcy, the UCC in their social

23   platforms kept alluding to making use of the value of CEL in

24   the treasury until the end of October, and I believe only in

25   2022 was the 20 cents mentioned.  Celsius removed the

Page 123

1  ability for certain creditors to sell and prevent further

2  losses.  I hope that I could at least contribute to properly

3  representing most of the issues that CEL token holders, and

4  hopefully this leaves some doubts to the judge.

5          I just want to finish to add to the fact that the

6  diluted impact looked small according to my calculations,

7  and that the current appreciation in the case of BTC and

8  other cryptos today has reached a two-year high which should

9  increase the average recovery by a few points, making it

10 very easy for the judge, if you so choose, to force the

11 petition price of CEL, that you will not affect the average

12 recovery that was highlighted for all voters in the ballot.

13          THE COURT:  All right.  Thank you very much, Mr.

14 Abreu.

15          MR. ABREU:  Thank you for giving --

16          THE COURT:  Thank you.

17          MR. ABREU:  Thank you for giving me chance to

18 speak.

19          THE COURT:  All right.  Mr. Bronge?

20          MR. BRONGE:  Hello.  Can you hear me?

21          THE COURT:  Yes, I can.

22          MR. BRONGE:  Yes.  Good afternoon, Your Honor.

23          THE COURT:  Are you able to turn the camera on?

24          MR. BRONGE:  I'm not able to turn the camera on,

25 I'm afraid.  I hope that is all right.

Page 124

1          THE COURT:  Go ahead.

2          MR. BRONGE:  Yeah.  So first, I would like to say

3     that I have not accepted the plan, nor the class claim

4     settlement.  And I have chosen here not to delve into the

5     detailed response to the debtors' presentation, as I have

6     meticulously and exhaustively addressed all their points in

7     my last filing on the docket, 3908.  So I would hope they

8     actually will read this and understand my position.

9          Instead, I wish to draw your attention to the

10    three fundamental arguments that underscore the essence of

11    my case and that I have detailed in this filing at Docket

12    3908.  First and foremost is the issue of the legal

13    ownership title.  The ownership title on my bitcoin

14    collateral for the loan 31904 should not be a point of

15    contention.  It is a legal fact, explicitly and

16    unambiguously stated in the governing agreements.  I am the

17    holder of the legal title of the collateral as per the terms

18    of a binding agreement.  I urge the court to positively

19    recognize and declare this fact.  Challenging the legal

20    ownership title in this case is to undermine the foundation

21    of the legal system, the sanctity of contracts and the

22    rights of individuals to their property.  Furthermore, more

23    in the view of my arguments and all the supporting evidence

24    that I have presented in Docket 3908, it's clear that the

25    court should also declare the same for my other three loans.

1          Secondly, I will bring your attention to the

2     unfair valuation of the collateral under the proposed plan.

3     The loan agreements in question explicitly state that the

4     conversion between digital assets and fiat currency shall be

5     done at market prices.  The proposed plan deviation from

6     this clause is not just a breach of contracts, it's a

7     betrayal of the trust that should exist between a debtor and

8     a creditor.  The proposed mix of petition and market prices

9     is very likely to result in additional loss of bitcoin

10    collateral for me.  I implore the court to uphold the

11    integrity of the agreement made in good faith and order that

12    market prices will be utilized for all valuations and

13    conversions of collateral as per the terms set forth in the

14    loan agreement.

15          Thirdly, although I have myself substantial Earn

16    claims, I want to address the subordination of Earn

17    accounts.  Many regulatory bodies have clearly classified

18    these accounts as securities and investment contracts

19    subject to specific rules and regulations.  In my

20    questioning of Mr. Campagna, he also agreed that in a

21    Chapter 7 dissolution, I would get a better recovery as Earn

22    would be secured and subordinated.

23          Thirdly -- sorry.  I would request that the court

24    rectify this injustice and ensure that the collateral claims

25    are rightfully prioritized in distribution, regardless of

1    the plan being confirmed or not.

2           So I additionally would like to address the case

3    law that the debtor had in their presentation today.  It's

4    Secure Leverage Group v. Bodenstein that they use as support

5    for their claim that the collateral should be debtors'

6    property.  My analysis of this case is that the debtor here

7    was kind of a trading broker firm, facilitating or

8    performing trades for customers and for customers' benefit.

9    The context is therefore very different to a straight

10   collateral loan agreement, where customers are not trading,

11   or where any trading done are not for the customer benefit.

12          In the loan agreement, customer provides funds as

13   security for a loan and pays an interest on that loan.  Any

14   agreed use of the collateral is purely for the lender

15   benefit and risk, and this is stated in the loan agreement

16   and in the risk disclosure.  Therefore, the context of that

17   case has little or no relevance to the loan agreements I

18   have with the debtor.

19          Your Honor, finally I would like to say it become

20   obvious in my last filing that the debtor and its counsel

21   have employed deceptive behavior and systematic mis-

22   referencing in their responses to my concerns.  Thereby,

23   they are obfuscating the correct interpretation of

24   agreements, clauses and paragraphs in order to support their

25   own incorrect narrative.  Examples of this are the omission

Page 127

1    of the last paragraph of Clause 4B in Version 5 of the

2    general terms of service, the repeated and consistent

3    references to versions of agreements that are not valid for

4    my loans, and also renaming of claims and clauses.

5              Briefly, I would like to address what Mr. Koenig

6    said in his address this morning.  I do not concede that

7    Number 9 version of the loan agreement transfers title.  It

8    is at best ambiguous.  I would also like to address his

9    statement that the text he presented on his Slide Number 20

10   transfers title.  That identical text is by Your Honor

11   yourself said not to transfer title in the Earn ruling.  You

12   can see that on Page 38 and 39.

13             So the intentionality has become clear when

14   considering that the debtors' efforts to exclude from

15   evidence Pages 1 to 13 of the Mashinsky declaration in

16   Docket 393.  This particular piece outlines the validity

17   periods of various agreements and the debtor continuously

18   misrepresent which versions is valid.  So deliberate

19   distortions of fact and manipulating references has created

20   ambiguity in my case where none exists, and it casts a

21   shadow over the integrity of this case.  These behavior do

22   not only undermine the trust in the courtroom, but also

23   strikes at the very heart of justice.  I implore Your Honor

24   to address this misconduct, to restore transparency and

25   trust that should be the bedrock of the legal system.

Page 128

```
 1              In conclusion, Your Honor, I seek the rightful

 2     resolution on my case by the court declaring the collateral

 3     my legal property, not part of the debtors' estate, but

 4     encumbered until loan agreement is fulfilled, by using

 5     market prices for any valuation of collateral and by

 6     subordinating Earn accounts in any distribution.

 7              I also request the court to put a stop to the

 8     machinations and misbehavior of the debtor and its counsel

 9     and to reaffirm the principles upon which this legal system

10     should rest: fairness, justice and the upholding of

11     contractual obligations.  I sincerely hope Your Honor will

12     impartially weigh the evidence, uphold the law and deliver a

13     verdict that reflects the essence of justice.  Thank you for

14     listening.

15              THE COURT:  Thank you very much, Mr. Bronge.

16     David Schneider is next.

17              MR. SCHNEIDER:  Can you hear me, Your Honor?

18              THE COURT:  Yes, I can.

19              MR. SCHNEIDER:  Okay.  Thank you.  The first thing

20     is --

21              THE COURT:  Are you able to turn a camera on?

22              MR. SCHNEIDER:  No, sir.  I'm using my phone.

23              THE COURT:  All right.  Go ahead, Mr. Schneider.

24              MR. SCHNEIDER:  The first thing I'd like to

25     mention is that I fully support Mr. Phillips's objections
```

Page 129

1    and arguments and his conclusions that he has come to.

2    Okay.  So starting off basically, the heart of my objections

3    and my -- against the plan is the plan is illegal.  The

4    illegality of the plan.  Essentially, the contract doesn't

5    allow for it.  It's unconstitutional, and common law doesn't

6    permit it either.  And I'll go through it one by one with

7    you.  And all this is laid out in my original, my objection

8    to plan confirmation, Document Number 3547, and then my

9    proposed findings of fact, conclusions of law and additional

10   briefing, which was just entered into the document this

11   afternoon, just shortly before the court hearing started,

12   but which was filed on time --

13            THE COURT:  Mr. Schneider, anything you filed

14   today is too late.  I'm sorry.  We've passed the deadline.

15   If you filed something today, it's not going to be

16   considered.

17            MR. SCHNEIDER:  No.  I filed it Friday on time.

18   It was filed on time, and I filed a file Friday, but it

19   wasn't entered onto the docket until this afternoon.

20            THE COURT:  All right.  If it was filed on Friday,

21   it will be considered, Mr. Schneider.  Okay.  The fact that

22   it didn't go on the docket until today, if it was filed on

23   Friday, it will be considered.

24            MR. SCHNEIDER:  Okay.  All righty.  So starting

25   off with basically -- I need to get my glasses on.  The

Page 130

1    debtor is legally obligated to pay creditors in digital

2    assets per the contract, and stating the relevant part in

3    the terms of use, it states, for the avoidance of doubt, any

4    repayment shall be in kind, i.e., in the same type of

5    eligible digital assets loaned by you.

6            Every version of the terms of use requires

7    repayment of creditor assets solely in the form of digital

8    assets.  No version of the terms of use has provisions

9    allowing debtor to repay creditors their digital assets in

10   any form other than in digital assets.  Excepting for any

11   bankruptcy laws mandating cash to be the form of creditor

12   repayment, debtors are legally obligated to repay creditors

13   in the form of digital assets.  Article 1, Section 10,

14   Clause 1 of the United States Constitution forbids any law

15   impairing obligation of contracts.

16           The debtor is withholding a portion of creditors'

17   crypto recovery, i.e., $450 million of cryptocurrency that

18   will seed the NewCo, and instead of repaying creditors their

19   due recovery in crypto by contract, debtor is repaying

20   creditors with NewCo common stock.

21           THE COURT:  Go ahead, Mr. Schneider.

22           MR. SCHNEIDER:  No version of the terms -- no

23   version of the terms of use has provisions allowing debtors

24   to repay creditors in the form of common stock.  The NewCo

25   plan provides no option for creditors to reject debtors'

1    debt-for-equity transactions.  Debtors' debt-for-equity

2    Scheme requires consent by the creditors in order for

3    debtors to issue common stock in --

4          FEMALE:  Jesus fucking Christ.

5          THE COURT:  Excuse me.  I'm sorry.  Mr. Schneider

6    is speaking.  Anybody else will be cut off if they

7    interrupt.  Go ahead, Mr. Schneider.

8          MR. SCHNEIDER:  Thank you, sir.  Debtors' debt-

9    for-equity scheme requires an agreement with option to

10   reject it.  An option to reject debtors' debt-for-equity

11   scheme is required for creditor -- for creditor consent to

12   be proper.  A transaction such as debtors' debt-for-equity

13   scheme that provides no option to reject it is improper,

14   unconscionable, being merely a one-sided contract of undue

15   influence without a valid meeting of the minds and it is

16   therefore unenforceable.

17         Debtors' debt-for-equity scheme violates

18   creditors' right to equal protection under the law because

19   the scheme gives no option for creditors to object or reject

20   the securities offering of common stock.  Creditors are

21   forced into it basically.  They have no option.  If it's to

22   reject it, the only way they can reject it, such as myself,

23   is to vote no on the plan.  But if the plan is confirmed,

24   then I have no option to reject the offer, the securities

25   offering to me to be paid in common stock rather than to be

Page 132

1     paid in cryptocurrency as contract requires.

2              A presumption that a yes vote to accept the plan

3     is tacit acceptance of debtors' debt-for-equity scheme is

4     wholly flawed for, as shown above, debtor must receive

5     proper consent from creditors.  While the presumption

6     protects the liberties of creditors who actually want the

7     neutral securities offering, it tramples on the liberties of

8     creditors who don't want the securities offering but would

9     rather receive their crypto as according to contract, that

10    they have an agreement with the debtors.

11             Debtors' debt-for-equity scheme unconstitutionally

12    forces creditors into -- okay, so that's concerning the

13    contract as far as the unconstitutionality of the debtors

14    forcing creditors to receive common stock in place of

15    cryptocurrency.  Debtors' debt-for-equity scheme

16    unconstitutionally -- and the second part as far as the

17    unconstitutionality of it -- debtors' debt-for-equity scheme

18    unconstitutionally forces creditors into a profession.

19             The NewCo plan is unduly forcing creditors to

20    become venture capitalists and/or investors with their

21    securities offering of common stock.  There is no

22    constitutional authority allowing for government to dictate

23    the profession a person must employ their labor at.

24    Creditors have property in their right to be free to choose

25    whatever profession is deemed proper to employ their labor.

Page 133

1    Therefore, their offering of common stock to creditors

2    without proper consent is unconstitutional and it's forcing

3    debtors -- or, excuse me, creditors to enter into a

4    profession which is against their will and which is

5    unconstitutional.  The government has no authority to force

6    an individual to choose any profession against their will,

7    and that's essentially what this is doing.

8           Then, on the third point of case law, case law

9    shows courts' power to convert debt to equity is limited to

10   debt that is at least partially secured or debt that was an

11   infusion of capital.  And this is regarding the Southern

12   District of New York.  The Southern District of New York

13   provides a textbook attempt of a recharacterization of a

14   debt to an equity position in a Chapter 11 case.  In

15   regarding Live Primary, Southern District of New York, March

16   1, 2021, I believe this is your case, Judge, Your Honor.  In

17   the Celsius bankruptcy, the plan proponent seeks to force

18   average customers to become equity holders -- okay.

19          THE COURT:  Mr. Schneider, you have --

20          MR. SCHNEIDER:  In that case --

21          THE COURT:  Mr. Schneider, you have one more

22   minute.

23          MR. SCHNEIDER:  Okay.  In that case, it was

24   referred to in Live Primary, which states that the plan

25   proponent seeks to force average customers to become equity

Page 134

1    holders, which goes well beyond the purpose or authority of

2    this court, even given the broad reach of Section 105(a).

3    Recharacterization is appropriate where the circumstances

4    show that the debt transaction was actually an equity

5    contribution.

6           Eleven-factor test in Autostyle does not apply to

7    the fact of creditors' claims.  So in almost any analysis,

8    forcing creditors' claims such as Schneider's into an equity

9    position is inappropriate at every level.  After standing

10   through maybe several hundred Second Circuit New York

11   bankruptcy courts, it seems obvious that any power to

12   convert debt to equity is limited in cases where the debt is

13   at least a partially secured debt or it is obvious that the

14   debt was an infusion of capital to keep the company afloat.

15          THE COURT:  All right.  Thank you very much for

16   your --

17          MR. SCHNEIDER:  There was --

18          THE COURT:  Thank you very much for your

19   statement.  But your time is up, Mr. Schneider.  Cathy Lau

20   is next.

21          MS. LAU:  Yeah.  Okay.

22          THE COURT:  Go ahead.

23          MS. LAU:  Yes.  Sorry, I'm not used to doing this.

24   Can my demonstratives be put up, please?

25          THE COURT:  Sure.  It's 3921.

1          MS. LAU:  Will this count as part of my time?

2     Because I already don't have enough time.

3          THE COURT:  No.  Just take it easy, Ms. Lau.

4          MS. LAU:  Okay.  Okay.

5          THE COURT:  It's on the screen now.  Go ahead.

6          MS. LAU:  I need it to be in where the votes are,

7     like things that people are saying, not my letter.

8          THE COURT:  Page 2 of Exhibit A.

9          MS. LAU:  No, the next one, please.

10         THE COURT:  Three of nine, Exhibit A.

11         MS. LAU:  Yes.  Okay.  Thank you.  Okay.  So I

12    actually read the whole disclosure statement, and what I

13    discovered spurred me to write and submit an objection, even

14    though I have no legal background know what I was doing

15    because I felt I had to address the injustices I found or

16    forever regret it.  I strongly object to the plan and hope

17    that what I have to say is able to make a difference and

18    help create a fairer and more positive plan for Celsius.

19         My key finding from reading the disclosure

20    statement was, and still is, that the plan was rigged to

21    give insiders, those tasked in the plan's creation, the

22    ability to insert benefits for themselves into the plan

23    while removing rights, some of which had already been

24    granted to creditors that had no inside involvement in the

25    shaping of the plan.  The plan and the voting ballot were

Page 136

1    presented in a way that if creditors voted to reject the

2    plan, they would not be able to opt into the class claim

3    settlement, which would mean that they would be forced to

4    hire their own lawyer to litigate for them to get any of

5    their claim back.  And if they couldn't afford to litigate

6    on their own and were thus forced to accept the plan, they

7    were then forced to opt into a third-party release that

8    released all plan creators in perpetuity from being

9    litigated against by those who opted in.

10          So basically the only way to opt out of releasing

11   the parties involved in creating the plan was to vote to

12   reject the plan.  And the only way a creditor could afford

13   to reject the plan was to have enough money to be able to

14   hire a lawyer to allow to opt out of the class claim

15   settlement.  In short, the only people who had a true choice

16   in deciding whether to accept or reject the plan or opt into

17   or out of the third-party release were those rich enough to

18   be able to afford their own litigation fees.

19          It angers me every time one of the people involved

20   in creating the plan brings up how a creditor can't say that

21   they didn't agree with an item in the plan because they

22   voted to accept the plan when the plan creators rigged the

23   way the plan was presented so that we were forced to accept

24   it no matter what and how many items in the plan we

25   disagreed with.  I feel disgusted that the argument is being

Page 137

1    used that because CEL token holders said yes to the plan,

2    they support the 25 cent CEL token valuation in light of

3    this.  It was flat out deceptive that they accepted the plan

4    and then used our first acceptance of the plan as evidence

5    of our overwhelming support of the plan and its 25 cent CEL

6    token valuation.

7              I myself did accept the plan despite the numerous

8    objections I have brought up, including the CEL token price

9    and the third-party release, because I recognize the bind

10   that the plan put me in that threatened to leave me with no

11   part of my claim at all if I chose to reject it.  The class

12   claim settlement, which is presented as a convenience that

13   allows creditors who aren't rich whales to get back the

14   settlement we should be entitled to and more, is actually a

15   mechanism removing the freedom of anyone but the richest of

16   creditors to reject the plan because access to one's claims

17   are withheld if one chooses to reject the plan.

18             The rigged voting results are then used to present

19   to the court, the media and outsiders that the plan was such

20   a success that it received an over 98 percent and 95 percent

21   acceptance rate, when in reality there is no way of telling

22   how many of these accept votes were coerced, since many of

23   the whales with the most crypto who could have afforded to

24   litigate themselves were given positions on the committee of

25   unsecured creditors and the great majority of us creditors

1    could not, in reality, have afforded to reject the plan.

2           robomartin, in the first demonstrative, always

3    recognized -- I mean, also recognized this.  He said, in

4    BlockFi we could vote yes and opt out, and you didn't have

5    to vote yes to grant releases to get clawback releases for

6    yourself.  Celsius seems to have a bunch of contingencies,

7    i.e., if you check this box, you can't check this one or

8    vice versa or if you check this, you have to check this one

9    too, but this one overrides this checkbox anyway, et cetera,

10   et cetera.  They're definitely playing a lot of games.

11          And cmbarc, another creditor in another Reddit

12   forum, said, okay, but if you vote no and majority votes

13   yes, you have to litigate yourself and pay your own lawyer.

14   Most people can't afford that.  Plus, if you didn't submit a

15   claim by the deadline, your no vote won't do as much as, if

16   I understand it at least.  I'm happy to be proven wrong.

17          In the objection letter I initially submitted, I

18   actually said that I voted to accept the plan while actually

19   hoping it would be rejected because I couldn't afford to

20   gamble losing my claim on the hope that others -- that

21   enough others would vote to reject the plan to have my

22   reject vote actually count for something, especially knowing

23   how rigged it was.  There is no way of telling how many

24   creditors like myself were actually not okay with the plan,

25   but knew that those who chose to reject would end up screwed

Page 139

1    over depending how everyone else in the plan voted.

2         Another common theme when it came to voting was

3    that people knew that the lawyer fees were eating away at

4    our funds, with us having no control over this, creating the

5    general sentiment that everyone should vote yes to the plan

6    no matter what to prevent lawyers from continuing to take

7    more and more of our money.

8         Some comments from creditors include -- I don't

9    know if it's in another slide now -- from JaymZZZ, stop

10   inventing (indiscernible) if we reject the plan, the lawyers

11   will get rich and we'll get half of what we're getting now.

12   And some other sentiments they said like voting yes here,

13   let's get out of this ASAP.  Vote yes, get this over with.

14   In my humble opinion, everyone should just vote yes to cut

15   the losses and move on.  If you vote no at this point, you

16   just want more suffering and less money in the end.  No

17   matter what your situation is, just vote yes and get this

18   over with.  There is no better option coming.  What does a

19   yes or no vote even mean at this point?

20        And then where -- sorry, I'm trying to scroll and

21   it's -- so as their comments show, creditors were feeling so

22   discouraged by how long the creation of this rigged plan had

23   been dragged out and were so tired of being robbed of more

24   funds and feeling so helpless and played around with that we

25   already knew that if we voted no, the lawyers would just

Page 140

1    find new ways to drag the plan out, to take even more of our

2    money so that it was a lose-lose no matter what we voted.

3    So that we should just vote yes to avoid even more games

4    being played with us.

5              The reason I choose to contribute my objection is

6    because I feel that plan creators have taken advantage of

7    scourged feelings that have been instilled among creditors

8    to insert benefits into the plan for themselves that

9    creditors no longer have the fight in them to fight anymore.

10             Creditors of Flare already came and requested a

11   ruling from Judge Glenn on the Flare token distribution and

12   won the right to have our Flare tokens distributed to us.

13   But the plan at the last minute stated that they are no

14   longer going to do that, and despite my objection to it, I

15   haven't seen anything address my objection to the robbing of

16   the rights that was already granted to us.

17             I'm grateful that the U.S. trustee objected to the

18   third-party releases because it feels like nothing would

19   have been done if it was just us pro se creditors voicing

20   our objections to it, even if we all did, because it really

21   seems like all the lawyers have done to address our

22   objections is ignore them or do everything they can to

23   discredit them.

24             I can't believe that the amount of time that has

25   been devoted to disparaging Hussein Faraj's testimony on CEL

Page 141

1    tokens price when the expert they chose to raise up, Max

2    Galka, had a clear conflict of interest in his connection to

3    Alameda Research, which was a sister company to FTX, the

4    company currently being sued for, among other things,

5    shorting CEL tokens and a different person with no conflict

6    of interest should have been chosen for a fair, unbiased

7    take on CEL token's price.

8         Max Galka had every reason to value CEL token at

9    zero when that was what FTX was trying to do when it

10   forwarded it.  It is ridiculous the amount of CEL creditor

11   money the UCC has spent on Max Galka's testimony and the

12   hours they clocked in at his, like thousand plus dollar an

13   hour rate, when they should have put in the time to

14   investigate Galka's background, as they should have with

15   Emmanuel Aidoo's appointment to the NewCo board, despite his

16   poor tax history, calling into question his competence in

17   helping lead our new company.

18        Why is it that so much effort has been put into

19   discrediting pro se creditors and the people they have

20   brought on to testify when the backgrounds of people like

21   Galka and Aidoo are not brought up?  Because they conflict

22   with the narrative the lawyers want to present and the

23   appointments they want to have allowed since they aligned

24   (indiscernible) interests.  Customers were forced to have

25   their crypto converted to bitcoin and Ethereum despite the

1   major tax consequences and headaches attached due to the

2   fact that it was in the interests of big fish to have it

3   like that and they had the money, power and influence to

4   back that.

5         I found a discussion on Reddit between creditors

6   that went like this.  There is -- I don't know.  It's one of

7   my slides.  There has been mention of all aspects being

8   pulled into bitcoin and ETH.  Are they really going to --

9         MALE 1:  (indiscernible).

10        THE COURT:  Please don't interrupt.  Go ahead, Ms.

11   Lau.

12        MS. LAU:  There's been no mention of all assets

13   being sold into bitcoin and ETH.  Are they really going to

14   sell stablecoins instead of giving out dollars?  I feel like

15   this has tax implications aside from all of the

16   complications from partial payouts and claiming losses from

17   fraud.  Many like to know how to handle tax implications

18   under various situations.  I wish creditors having

19   stablecoins returned to them as stablecoins in proportion of

20   disclosure otherwise received in Bitcoin, ETH from

21   (indiscernible) and selling them creates tax situations even

22   though the total amount can be less than stablecoins.

23        THE COURT:  You have one more minute, Ms. Lau.

24        MS. LAU:  I think we can thank Simon for pushing

25   to have anything in bitcoin and ETH unfortunately.  That was

Page 143

1   the outcome both in his vested interest and as he holds

2   predominantly bitcoin.  For anyone holding stables, it's

3   undoubtedly going to create further unnecessary tax events

4   with selling out.  The theme has always been that getting

5   the plan accepted as soon as possible and in turn getting

6   our money back to us as soon as possible has always been

7   pushed as a central benefit to creditors.

8          But I don't believe that it should come at the

9   (indiscernible) sacrificing our freedoms to vote as we truly

10  feel (indiscernible) be justified because of their ability

11  to speed up the acceptance of the plan solutions.  Other

12  ways of the plan seem to include (indiscernible) those

13  listed by Mr. Phillips, like UCC members adding themselves

14  to the NewCo board and two of the law firms representing us

15  directing the appointment of their various former clients

16  and employees to various committees and boards and also how

17  Chris Ferraro was named as planned administrator who will

18  receive $15,000 a month the first month and $25,000 a month

19  for all the months following.

20          On behalf of all other creditors who have balked

21  at how much lawyers and accountants involved in this case

22  are being paid, I protest such a high salary being paid to

23  the litigation administrator.  And we find it convenient

24  that the plan creator, with some of the most clout in the

25  plan's creation, would give himself that position and

Page 144

1    salary.  It's funny to think that --

2              THE COURT:  All right.  Your time is up.  Ms. Lau,

3    your time is up.

4              MS. LAU:  Thanks.

5              THE COURT:  Mr. Koenig, 15 minutes.

6              MR. KOENIG:  Thank you, Your Honor.

7              THE COURT:  If necessary.

8              MR. KOENIG:  Thank you, Your Honor.  Chris Koenig,

9    Kirkland & Ellis, for the debtors.  Your Honor, there's a

10   fair bit in the record that was not admitted into evidence.

11   This is a bench trial, not a jury trial.  We didn't want to

12   interrupt anybody, but we wanted to just note for the record

13   that the documents that were admitted into evidence are at

14   3884 and 3885 were the submissions of the debtors and the

15   committee about what was actually admitted into evidence.

16             Just briefly, I want to start with the U.S.

17   trustee.  I think she had two open issues.  One was the

18   exculpation of the NewCo.  The NewCo has or is about to be

19   created.  The Form 10 is actually filed by the NewCo that we

20   talked about earlier.  That is going to take place before

21   the effective date.  So the exculpation is appropriate, we

22   believe, for actions taken during the case.  NewCo will be

23   formed before the effective date, and so we believe it's

24   appropriate for them to be --

25             THE COURT:  Does the language limit their

Page 145

1    exculpation to acts during the course of the case?

2              MR. KOENIG:  Yes, absolutely.  That's the

3    exculpation generally for all exculpated parties or so

4    limited at the request of the U.S. trustee.  We clarified

5    that language.  As to the BRIC not being able to be

6    qualified, I think Your Honor understood the point.  We

7    struggled with the ability to qualify any party's

8    exculpation.  The BRIC participated in these cases in a

9    variety of different ways, from the auction to the backup

10   plan itself, to preparing to go forward with the backup

11   plan.  I think Your Honor has the point there.

12             Ms. Cornell spoke briefly about the custody

13   settlement releases and the 22 people.  I just wanted to

14   explain that really briefly, just for the record.  There

15   were individuals who took the custody settlement, were

16   contractually obligated to vote for the plan and nonetheless

17   tried to opt out of the releases.  We spoke to Ms. Cornell.

18   We included language in the confirmation order that carved

19   out the ability for them to opt out of the releases if they

20   did not otherwise vote for the plan because if they voted

21   for the plan elsewhere, they can opt out of the releases.

22   The other point that she made on the opt out, I don't know

23   whether it was an objection or not, but she suggested that

24   there were a lot of people who voted for the plan and tried

25   to opt out.  That's just the way that Chapter 11 plans work.

Page 146

1    The plan is a contract.  You can vote for it or against it.

2    That's very typical I think in large Chapter 11 cases.  I

3    think that that's all I had on Ms. Cornell.

4           Mr. Phillips, just really quickly, he raised the

5    issue of the emergence incentive plan, and Mr. Ferraro

6    distributing that.  The plan provides that the plan

7    administrator has the discretion to evaluate paying those

8    bonuses in conjunction with his discretion that is

9    specifically set forth in the plan administrator agreement.

10   And he can consider whether the metrics have been met,

11   interpret the plan, interpret those sorts of things.  But

12   his discretion is pretty limited actually.  And it's not as

13   though Mr. Ferraro could just pay whatever bonus he wants.

14   There's a plan that has been proposed, an emergence

15   incentive plan.  We believe it's appropriate under the

16   circumstances.

17          Mr. Phillips makes much ado about the fact that so

18   many creditors elected more liquid crypto.  He believes that

19   that means that the equity is worth less than what we valued

20   at under the plan.  There's any number of reasons why they

21   may have done that.  It may have been taxes, as Mr. Colodny

22   said.  It may just be preference for liquid crypto.  These

23   individuals invested in crypto in the first place.  They may

24   prefer crypto to equity.  It doesn't mean that the equity is

25   worth less.  He applies a 30 percent discount to the NewCo

Page 147

1    plan, but doesn't apply any discount to the winddown plan,

2    the orderly winddown.  He seems to want the orderly

3    winddown, and he is arbitrarily applying a 30 percent

4    discount to one instead of the other.  I believe that the

5    remainder of Mr. Phillips's issues are probably going to be

6    addressed by Mr. Colodny.

7            Mr. Davis talked about 81 cents in a custody

8    settlement.  Just for the clarification, there was no 81

9    cents in a custody settlement.  Under the custody

10   settlement, holders got the right to receive the tokens

11   themselves, whatever they turned out to be.  Under the plan,

12   we have 90 days to make those distributions.  If somebody

13   doesn't show up and withdraw their coins in those 90 days,

14   we have to do something.  We have to give the equivalent of

15   those coins the best that we can.  And what we're doing is

16   for CEL token we're proposing to provide a 25 cent

17   valuation, which is exactly the same as we're doing under

18   the plan.  So we think that that's appropriate.  This goes a

19   little bit to Mr. Kirsanov's issue too.

20           Mr. Davis raised the FTX $2 billion claim.  It's a

21   claim that is filed against FTX.  We'll see where it leads.

22   Obviously, we're going to be prosecuting, and the post

23   emergence entities will be prosecuting that claim.  But it

24   doesn't mean that the debtors are going to receive $2

25   billion from FTX, which is itself deeply insolvent, it

1     appears.  Mr. Davis's other issues, I think I'll just rely

2     on the argument that I made in my opening argument that the

3     key issue is what is the value of the CEL token as of the

4     petition date in a Chapter 7 liquidation.  And the only

5     credible evidence is that the CEL token is worth zero or

6     near zero.

7             Mr. Kirsanov complains about the fact that his

8     vote was changed.  Just to be clear, it was specifically

9     noted in the voting declaration the number of people whose

10    votes were changed just so that there was total

11    transparency.  He thinks that he has a gotcha.  We actually

12    disclosed it.  He pointed -- Mr. Kirsanov pointed to a

13    number of quotes of different witnesses that he asked

14    whether they knew that he wasn't allowed to withdraw, and

15    they said no.  They would have no reason to know those sorts

16    of things.  I don't really understand what his point is

17    there.

18            As I said in my opening, even if Mr. Kirsanov

19    voted no, that doesn't change his class vote.  He made quite

20    a big to do about it, but that doesn't change the legal

21    standard before the court.  He pointed to a section of the

22    custody withdrawal order, which is different than the

23    custody settlement when he was talking about pure custody.

24    There were two custody orders in this case.  The first one

25    was in December, and it allowed so-called pure custody that

Page 149

1    had never been in Earn.  You could withdraw that, and if you

2    had less than 75/75 in the withdrawal preference exposure,

3    you could withdraw that.  He's pointing to that order that

4    said, if you are a loan holder, you can't participate here

5    because you don't really have pure custody.  And he is

6    conflating the pure custody order and the custody settlement

7    order.  I just wanted that to be clear for the record.

8            Mr. Kirsanov raised 1127(a).  We've briefed this,

9    but just very quickly, the point of this is that, as I said

10   earlier, after 90 days, the custody holders are going to get

11   the value of CEL that is determined by the court.  We made

12   it clear that that is 25 cents for both custody users and

13   Earn users.

14           I believe Mr. Abreu's points were addressed

15   adequately in the discussion of CEL token generally.  He

16   asked if we tried to settle CEL.  We tried to settle

17   everything in this case.  I quipped a little bit in my

18   opening argument that the court has had the opportunity to

19   consider a fair number of settlements.  We tried to settle

20   this one too.  We had an ad hoc group of CEL token holders.

21   It just obviously -- we weren't able to get there with that

22   group, although we did settle with several individual CEL

23   token holders.

24           Mr. Bronge, on the loans, he cited a different

25   portion of the terms of use that said that the borrowers

1    agreed that they had title.  The fact that they had title

2    before they transferred it to Celsius does not obviate the

3    legal language and the terms of use elsewhere saying that

4    they can convey that title to Celsius as part of --

5              THE COURT:  You couldn't use as collateral

6    something you didn't own.

7              MR. KOENIG:  Exactly, and that was the point for

8    Celsius is we wanted to make sure that if somebody

9    transferred property to us, that you actually owned it and

10   somebody else didn't own it and was going to sue us or

11   something of that nature.  He mentioned that he was

12   concerned about the valuation of the collateral as of the

13   petition date.

14             Of course, under Bankruptcy Code Section 502(b),

15   the valuation of a claim is as of the petition date in U.S.

16   dollars.  He has a claim.  He argued about 510(b), and that

17   Earn should be subordinated wholly as a class.  I would note

18   a couple of things.  First, the class claim settlement order

19   included a note that the class claim could not be

20   subordinated pursuant to Section 510(b).

21             But moreover, Section 510(b) can't apply to Earn.

22   Section 510(b) talks about claims related to the purchase or

23   sale of a security.  The Earn claims are not for the

24   purchase or sale of a security.  They're for the return of

25   if it is a security, and I'm not conceding that it is, the

Page 151

1    return of the security itself.

2              I think in opening arguments, I forget whether it

3    was me or Mr. Colodny likened it to an indenture.  An

4    indenture is a security.  The notes are a security.  Claims

5    related to the purchase or sale of that security for fraud

6    or misrepresentation or the likes, those are subordinated.

7    It doesn't mean that the notes themselves are subordinated,

8    and Earn is exactly the same result here.

9              Mr. Schneider made several different arguments

10   that the plane was illegal or unconstitutional.  I would

11   just note in passing that Article 1, Section 8 of the

12   Constitution authorizes Congress to make laws regarding

13   bankruptcy.  Congress enacted the Bankruptcy Code.  He

14   argued that the contract, the terms of use, is not -- that

15   what is being proposed under the plan is different than

16   what's under the contract.  That's permitted by the

17   Bankruptcy Code.  That's how bankruptcy works.

18             Ms. Lau said that she couldn't opt out of the

19   class claim settlement, but -- unless she voted to reject

20   the plan.  That's actually not right.  You could vote

21   against the plan and still opt out.  It's the releases that

22   if you voted for the plan, you were forced to grant the

23   releases because, as I said earlier, the plan is a contract.

24             She complained that people may have had certain

25   objections to the plan, that they were forced to either vote

Page 152

1   yes or no.  I would submit that the plan is a contract.  It

2   would be completely infeasible if 600,000 accountholders had

3   the right to rewrite whatever provision it wants.  The plan

4   is a settlement.  And I think you've heard throughout this

5   trial that not everybody is happy with the plan, with all

6   provisions of the plan.  It's a settlement, and oftentimes

7   what is required is for different parties to make

8   concessions to get to a deal that is good enough.  And the

9   plan might not be perfect for everybody, but it's more than

10  good enough to return the maximum value to creditors as soon

11  as possible.

12          On the Flare token point that she raised, the

13  court authorized the company to distribute Flare tokens.  It

14  did not require the company to distribute Fare tokens.  So

15  Your Honor, I did sort of a whirlwind there.  I don't know

16  if you have any questions for me or anything you'd like me

17  to address.  But I --

18          THE COURT:  I don't.  Thank you very much.

19          Mr. Colodny?

20          MR. KOENIG:  Thank you.

21          MR. COLODNY:  Very, very brief, Your Honor.  Aaron

22  Colodny, White & Case, on behalf of the Official Committee

23  of Unsecured Creditors.

24          With respect to Mr. Phillips, I'll leave the

25  misrepresentations of my testimony or my argument aside.

Page 153

1    Safe to say we vastly disagree that people don't want this

2    stock.  What Mr. Phillips is ignoring is a large number of

3    people, more than the amount that elected liquid crypto,

4    that took the default election.  And there taking the

5    default election is electing half in stock or more in stock.

6    NewCo presents an exciting opportunity here.  It's going to

7    be a first of its kind company.  It's going to have a clean

8    balance sheet and it's going to have a competent management

9    and board which is going to be able to hopefully generate

10   more value to people and bring them back to whole.  That's

11   the whole idea behind the plan and the creation of NewCo.

12           With respect to Mr. Ferraro, Mr. Ferraro, as Mr.

13   Koenig described, verifies the metrics.  They then have to

14   be verified by the UCC.  He has to come to us, show us the

15   metrics have been hit before anything is met.  So there is a

16   check on unfettered discretion in that regard.

17           Mr. Davis and I don't agree on many things.

18   However, one thing he did say is, and I wrote this down, you

19   have to weigh the evidence against speculative claims, and

20   Your Honor has the opportunity to have the evidence in front

21   of yourself.  You can make determinations as to credibility.

22   We made our arguments.  Mr. Otis, or Mr. Davis and Mr.

23   Kirsanov have their own.

24           Lots of people have raised issues with Mr. Galka's

25   connections to Alameda.  Those were disclosed at Docket

1    Number 1009 in October and they also were allowed the

2    opportunity to cross-examine him.

3           Mr. Schneider surprisingly raises that he doesn't

4    agree that Version 9 of the loan terms of use transfer

5    title.  I don't know if this provision has been discussed

6    specifically, but I'm referring to Docket 393, which is the

7    Terms of use.  On Page 936, under the heading "Collateral

8    Number 3," and I'll read it into the record: Digital assets

9    posted as collateral shall be the exclusive property of

10   Celsius, and you grant Celsius your explicit consent to use

11   such digital assets in accordance with Section 20 below for

12   the full term during which the digital assets are posted as

13   collateral.

14          And then lastly, a lot of individuals have talked

15   about the committee's fiduciary duties to them.  We have a

16   fiduciary duty to all unsecured creditors, and that is

17   what's embodied in the plan.  This is our attempt to reach a

18   fair and equitable distribution of the estate among a bunch

19   of competing creditors.  And I think that the vote speaks

20   for itself.  Thank you, Your Honor.

21          THE COURT:  Thank you very much, Mr. Colodny.  All

22   right, that concludes all of the arguments.  I'm not going

23   to recognize anybody else for -- I've gone through the

24   entire list that were included in the order with the

25   allocation of time.  All of the arguments are completed.

Page 155

1          Mr. Adler, if you're going to submit any proposed

2    language, do it by tomorrow.  All right?  It's my goal, as

3    far as I'm concerned, all filings are complete.  I'm not

4    going to consider -- other than what Mr. Adler is going to

5    file by tomorrow, I will not consider any further filings by

6    any party, party in interest.  It's my goal to try and

7    resolve this expeditiously.  The trial I was supposed to

8    start this week has settled.  So I have more time.

9          Thank you very much, everybody, for your

10   participation.  I'll just say we started this when we were

11   still -- we started this case when we were in the midst of

12   the pandemic.  We were forced to have all hearings with

13   remote.  It was a test for all of us.  There were very large

14   numbers of people who appeared by Zoom.  I tried my best at

15   every hearing to get everyone who wanted an opportunity to

16   speak to do so.

17         I think that it's been important to me, hopefully

18   important to the process, that there be transparency, that

19   everyone who had something they wanted to say relevant to an

20   issue that the court was addressing had an opportunity to

21   speak.  I don't think there was any hearing when I didn't

22   recognize everyone who raised their hand on Zoom to speak.

23   I know there are very strong feelings in this case on all

24   sides.  The court will endeavor to do its best in reaching

25   what I believe is a result required by law and the facts in

Page 156

1     the case.  I certainly appreciate the efforts of everyone in

2     the case so far.  We're adjourned for today.

3               MR. KOENIG:  Thank you, Honor.

4               THE COURT:  Karen, thank you.

5               (Whereupon, at 5:23 p.m., these proceedings were

6     concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 1, 2023

| **&** | **1006**  4:20 | 144:5 | **2021**  133:16 |
|---|---|---|---|
| **&**  3:3,10,17 4:1 | **1009**  154:1 | **15,000**  143:18 | **2022**  47:5 |
| 14:6 41:10 | **10167**  5:4 | **15.3**  30:4 | 108:17 109:15 |
| 63:16 67:4,5 | **105**  134:2 | **151**  5:16 | 121:4,9 122:25 |
| 68:13,22 95:5 | **10:59**  73:6 | **158**  47:6 | **2023**  1:16 51:5 |
| 97:8 107:12 | **10th**  120:4 | **1725**  47:6 | 101:6 157:25 |
| 112:7 144:9 | **11**  41:19 43:6 | **178**  97:19 | **2024**  40:1,23 |
| 152:22 | 47:1,5 48:13 | **187,300**  110:20 | 80:24 88:14 |
| **0** | 49:8,16 54:10 | **19**  30:16 | **2025**  40:25 |
| **0.1185.**  28:18 | 54:25 55:6,24 | **19,880**  110:1 | **20549**  5:10 |
| **0.1530.**  28:13 | 56:2,18 84:8 | **197,912**  110:13 | **208**  44:12 |
| **0.1675.**  28:8 | 89:3 91:9 92:5 | **2** | **21202**  6:4 |
| **1** | 105:3 133:14 | **2**  34:12 88:7 | **21st**  24:8 |
| **1**  31:12 118:25 | 145:25 146:2 | 101:19,21 | **22**  105:6 |
| 127:15 130:13 | **1103**  46:10 | 102:8,10,13,17 | 145:13 |
| 130:14 133:16 | **1125**  113:4 | 103:2 135:8 | **22-10964**  1:3 |
| 142:9 151:11 | **1127**  113:21 | 147:20,24 | **223**  49:4 |
| 157:25 | 149:8 | **2.01**  25:10 | **224**  46:13 |
| **1,000**  103:16 | **1129**  32:5 | **2.5**  78:22 | **2271**  101:4 |
| **1.6**  101:2 | 76:24 115:10 | **2.6**  106:1 | **228**  46:13 |
| **1.98.**  118:10 | **1144**  112:4 | **2.88**  26:11 | **245**  5:3 |
| **10**  37:24,25 | **11501**  157:23 | 102:6,8 | **25**  19:20 28:7 |
| 38:8,17,21 | **120**  47:14 | **2.88.**  25:10 | 28:19,23 30:2 |
| 39:7,8,10,11 | **12151**  157:7 | 101:25 | 43:23 94:15 |
| 39:17,18,24 | **1221**  4:12 | **20**  41:16 61:19 | 95:8 110:14,19 |
| 40:9 41:15 | **124**  122:8 | 100:16 111:13 | 113:13,18,25 |
| 81:21,22 82:3 | **128**  122:11 | 115:6 118:9 | 119:16 137:2,5 |
| 130:13 144:19 | **129**  16:2 | 119:14 122:25 | 147:16 149:12 |
| **100**  5:9 33:16 | **12th**  24:10 | 127:9 154:11 | **25,000**  143:18 |
| 102:20 114:3 | 117:1 | **20,000**  109:25 | **262**  43:17 |
| 115:18 119:20 | **13**  44:20 | **200,000**  103:1 | **269**  73:24,25 |
| **10004**  1:14 | 127:15 | **20004**  3:13 | **27**  121:4,9 |
| **10014**  4:21 | **1301**  3:12 | **201**  4:20 | **2700**  4:4 |
| **10022**  3:20 | **14**  49:4 84:11 | **2010**  6:3 | **27th**  113:11 |
| **10036**  4:13 | 97:20 111:14 | **2019**  18:18 | **28**  117:24 |
| 5:17 | **15**  14:14 49:18 | 58:9 | **28th**  101:6 |
| | 86:19 111:12 | | |

**2:02**  1:17

**3**

**3**  154:8
**3.72.**  122:21
**30**  1:16 34:11
97:19,23 99:6
99:7,12 114:8
115:17 146:25
147:3
**300**  3:5 6:3
157:22
**307**  98:16
**31904**  124:14
**31st**  98:18,19
99:24
**323**  72:18
**33**  53:3 94:3
96:15
**330**  157:21
**338**  72:18
**34**  21:23 22:2
27:14 29:23,24
37:19,21 44:5
**34,500**  104:8
**34,867**  101:1
**3444**  51:4
**35**  114:8
119:19
**3522**  81:13
**3547**  129:8
**36**  21:24 29:6,7
**365**  72:18
**37**  16:5 120:1,1
**38**  44:20 120:1
127:12
**3817**  23:15
45:1

**3835**  118:13
**3884**  144:14
**3885**  144:14
**39**  127:12
**3908**  124:7,12
124:24
**3913**  14:24
93:1
**3918**  108:5
**3921**  134:25
**3928**  72:16
**393**  127:16
154:6
**3935**  73:20
**3937**  43:19
87:16
**3rd**  49:3
120:11

**4**

**4,000**  117:9
**400,000**  112:11
**42nd**  5:16
**45**  50:6
**450**  98:15,22
99:2,15 130:17
**47**  29:8,16,24
**47.4**  28:16
29:21
**4b**  127:1
**4th**  44:19

**5**

**5**  31:19 32:5
127:1
**5,000**  62:17
**5.9**  106:2

**50**  53:2,4 94:2
96:15,16
122:19
**502**  150:14
**503**  34:23,25
35:8
**510**  26:19,24
150:16,20,21
150:22
**54,000**  111:7
**55**  73:19
**555**  4:4
**558**  122:8
**5:23**  156:5

**6**

**6.6**  105:25
**60**  39:11,14,18
**600**  110:20
**600,000**  152:2
**601**  3:19
**60654**  3:6
**61.2**  28:11
**61.5**  29:1
**67**  28:4,24,25
**693**  102:7
**6a**  113:8

**7**

**7**  21:10,23 22:2
30:21,22 31:9
31:10,12,17
44:1,16 45:21
49:4 76:24
125:21 148:4
**70**  18:12
**749,200**  110:18

**75/75**  149:2

**8**

**8**  44:20 47:8
94:7 151:11
**80**  114:7
**81**  25:9 100:23
101:5,8,11
114:3 115:18
147:7,8
**86**  25:10
**8th**  51:5

**9**

**9**  30:20 31:9,10
31:13 127:7
154:4
**9.55**  105:24
106:5,12
**90**  34:19
114:12 147:12
147:13 149:10
**90071**  4:5
**9019**  20:17
46:6
**936**  154:7
**94**  119:23
**95**  137:20
**96.06**  19:25
**98**  15:21
137:20
**98.71**  19:24
**9th**  24:8,10

**a**

**aaron**  4:7 41:9
68:12,13
152:21

ability 63:22
79:21 123:1
135:22 143:10
145:7,19
able 31:12,14
42:20 57:12
67:17 69:12
81:23 90:17
92:10 94:9
108:9,19
112:25 123:23
123:24 128:21
135:17 136:2
136:13,18
145:5 149:21
153:9
abnormal
119:24
above 21:23,24
109:25 132:4
abreu 6:18 7:3
116:10,10,11
116:13,16,18
121:23,24
123:14,15,17
abreu's 149:14
absence 107:6
absolutely
61:11 63:5
73:4 90:10
145:2
abstained
36:21
abundantly
48:23
accept 15:22
15:23 17:8

19:25 21:1,6
36:22 37:6
61:10 110:25
132:2 136:6,16
136:22,23
137:7,22
138:18
acceptable
63:6,12
acceptance
132:3 137:4,21
143:11
accepted 19:21
36:16,20 46:4
57:11 69:6
124:3 137:3
143:5
access 15:15
79:19 137:16
accordance
114:9 154:11
account 6:2
16:25 17:19
33:17 39:20
55:8 77:16
101:2,3 108:17
110:19,24
111:4 114:14
121:1
accountable
100:1
accountants
143:21
accountholder
15:23 27:5
36:20 113:23

accountholders
15:14,22 33:15
34:2 40:4,20
48:1 75:24
77:18 78:16
80:12 152:2
accounting
118:9
accounts 117:9
125:17,18
128:6
accurate 45:9
157:4
accurately
47:11
accusations
107:1
achievable
35:11
achieve 69:19
78:16 87:3
achieved 35:18
103:23
acknowledged
120:25
acknowledges
72:19
acknowledg...
119:21
acquisition
103:7
act 54:10
112:14
acted 49:22
51:17 71:2,6,7
112:8

acting 68:24
action 42:22
47:22 68:23
85:23 96:7
122:18
actions 42:11
46:21,22 47:10
55:4 57:23
58:1 60:17
95:16 100:2,6
119:7 144:22
activation
115:5,5
active 50:10
69:22
actively 102:15
activities 122:1
activity 106:5
106:21
acts 145:1
actual 22:9,24
28:20 95:24
96:2 122:10
actually 15:24
16:3 20:11
21:20 22:4
23:20 26:16
27:3 29:20
32:10,14 33:2
36:17 37:8
59:15,16 66:17
96:9,23 97:10
97:22 99:2
124:8 132:6
134:4 135:12
137:14 138:18
138:18,22,24

| | | | |
|---|---|---|---|
| 144:15,19 146:12 148:11 150:9 151:20 | **addressed** 73:19 75:19 97:17 116:7 124:6 147:6 149:14 | **admits** 23:4 25:11 30:19 45:25 | **affairs** 111:6 |
| **acutely** 41:25 | | **admitted** 24:3 24:4 32:18 45:24 85:9 144:10,13,15 | **affect** 123:11 |
| **ad** 5:2 6:2 17:18 18:16,19 50:10 58:8 71:15,18,24 77:16,18,19 78:1,6,11,22 79:1,10,23 80:10 81:2 89:18,21 90:10 93:18 95:10,10 95:11 96:1 101:17 112:16 112:19 149:20 | **addresses** 42:21 72:22 | | **affected** 114:23,24,25 122:16 |
| | **addressing** 42:16 107:23 108:15 155:20 | **admittedly** 79:13 | **affects** 115:6 |
| | **adeptly** 49:15 54:11 | **ado** 146:17 | **affiliate** 62:25 |
| | **adequate** 113:5 | **adr** 19:3 | **affiliated** 67:21 |
| | **adequately** 149:15 | **advance** 49:21 51:6 72:9 80:5 92:19 | **affiliates** 59:11 59:22 63:7 |
| | **adjourned** 156:2 | **advanced** 85:11 | **affirmative** 57:6 61:13 112:19 |
| **add** 26:4 58:18 58:19 123:5 | **adler** 5:6 71:16 71:17 72:23 73:2,4,8,11,14 74:1,16 75:15 75:20 76:5,9 76:10,11,15 77:1,3,7,14 87:13 89:13 95:14 155:1,4 | **advantage** 140:6 | **affirmatively** 17:16 76:18,23 |
| **added** 57:22 58:16 | | **advantages** 42:23 | **afford** 136:5 136:12,18 138:14,19 |
| **adding** 143:13 | | **adverse** 93:12 113:20 115:24 | **afforded** 137:23 138:1 |
| **addition** 18:22 | | **advertised** 93:13 | **afloat** 134:14 |
| **additional** 18:8 18:13 56:12 78:14 99:15 125:9 129:9 | | **advice** 40:21 97:7 | **aforementio...** 103:2 |
| | | **advise** 52:10 | **afraid** 123:25 |
| **additionally** 59:18,25 126:2 | **administration** 94:12 | **advised** 49:2 | **afternoon** 14:4 14:5 33:8 41:9 56:21 57:13 71:16 77:17 81:6,8 84:25 89:1 107:20 123:22 129:11 129:19 |
| **address** 14:7 16:23 32:1 74:10 87:11 125:16 126:2 127:5,6,8,24 135:15 140:15 140:21 152:17 | **administrative** 43:7 | **advisers** 48:25 50:19 | |
| | **administrator** 35:5 57:18,18 60:2,2 73:16 94:11 143:17 143:23 146:7,9 | **advisors** 35:22 35:23 48:8,22 50:11,12 | |
| | | **advocate** 51:1 | **aftershocks** 100:16 |
| | | **aegean** 57:25 58:2 | **agencies** 55:13 |
| | | | **agents** 34:16 59:10 |

ago   14:20
   16:15 17:21
   72:6 83:2
   86:19 100:17
agree   22:4,6,7
   22:11 45:4,6,7
   45:10,12 58:25
   67:25 69:18,23
   82:23 136:21
   153:17 154:4
agreed   16:24
   22:5,14,21
   55:8,14 56:3
   60:11 61:15
   67:16 70:14
   72:2 89:12
   92:2 101:3
   125:20 126:14
   150:1
agreement
   18:7 70:21,23
   71:25 73:16
   85:3 94:12
   101:1 124:18
   125:11,14
   126:10,12,15
   127:7 128:4
   131:9 132:10
   146:9
agreements
   34:14 42:8
   55:18 86:11
   116:24 124:16
   125:3 126:17
   126:24 127:3
   127:17

ahead   15:7
   41:17 68:9
   70:20 73:13
   93:1 100:18,19
   108:11 109:3
   124:1 128:23
   130:21 131:7
   134:22 135:5
   142:10
ai   23:22 24:8
   116:14
aid   40:2
aidoo   141:21
aidoo's   141:15
aizpuru   7:4
akin   106:15
al   101:20,22
   102:11
alameda
   101:22 103:1
   109:20,23
   141:3 153:25
alarming   108:1
alex   10:3
ali   9:2
aligned   141:23
alike   19:22
allegations
   106:22
alleged   107:11
alleging   106:15
allocate   42:13
allocating
   119:6
allocation
   154:25

allocations
   14:10
allow   40:3
   129:5 136:14
allowance
   27:10
allowed   88:5
   89:15 102:22
   141:23 148:14
   148:25 154:1
allowing
   107:21 115:21
   130:9,23
   132:22
allows   53:6
   137:13
alluded   59:25
   70:17
alluding
   122:23
alternative
   108:23
alternatively
   75:23
alvarez   21:16
amalgamation
   103:19
amand   7:5
amazing   89:22
ambiguity   58:3
   58:12 127:20
ambiguous
   127:8
americas   4:12
amount   19:25
   30:3 35:16
   46:22 53:21

90:16 103:3
   111:6,11
   140:24 141:10
   142:22 153:3
amounted
   122:10
amounts   32:15
   36:9
ample   51:8
analysis   22:16
   22:24 23:17,23
   24:7 31:18
   98:13 126:6
   134:7
analyzed   24:8
anchor   107:7
andrew   7:7,17
   12:1
angeles   4:5
angers   136:19
anhminh   11:14
anne   9:8
annemarie
   10:16
announced
   51:3
announceme...
   120:3
annual   122:5
answer   20:14
answering
   112:14
anthony   8:17
anticipate
   80:19
anticipated
   53:7

anybody 71:14
76:17,22
111:23 131:6
144:12 154:23
anybody's 33:2
anymore 23:4
33:3 140:9
anyway 138:9
anyways 40:20
apap 81:2
apart 24:18
91:19
apologize
116:3
appealed 55:16
appeals 84:11
appear 112:17
appeared
155:14
appears
121:21 148:1
applicability
26:23
applicable
48:9
application
42:4 105:2
applied 98:21
98:23,24
113:25
applies 146:25
apply 34:24,25
35:6,7,9 60:14
112:5 118:20
134:6 147:1
150:21

applying 147:3
appointed
52:16 93:16,17
93:18 95:5,10
95:12,13 96:1
96:24,25,25
97:2,6
appointees
93:23,23,24
appointment
19:12 31:25
96:9 141:15
143:15
appointments
93:15,19 94:20
94:21 100:7
141:23
appreciate
82:13,17 92:18
93:2 156:1
appreciated
78:5 81:4
appreciation
68:3 71:19
123:7
appropriate
38:16 60:12
118:6 134:3
144:21,24
146:15 147:18
approval 38:21
54:20
approve 84:2
approved
20:12 38:7
40:10 46:5,19
47:12 84:12,21

100:23 101:13
approximately
117:9
april 37:16
40:23,25
108:17 109:15
arbitrarily
147:3
archer 12:8
area 23:16
argue 71:1
104:18 121:11
argued 85:11
150:16 151:14
argues 37:7
53:15
arguing 41:7
argument
16:10 23:12
37:16,17 71:5
74:18 85:9
92:16 102:12
105:1,17
136:25 148:2,2
149:18 152:25
arguments 2:1
14:10 36:13
68:20 101:16
115:22 124:10
124:23 129:1
151:2,9 153:22
154:22,25
arrangement
43:17 53:5
arrive 27:22
85:25

arrived 86:18
102:6
article 130:13
151:11
articulate 18:1
articulated
85:13
artificial 23:20
23:21 24:6,14
24:15
artur 6:18 7:3
116:10
asap 139:13
ascertain
59:17
aside 90:23
101:16 110:15
142:15 152:25
asked 24:15
44:12 45:23
50:11 74:2
75:2 148:13
149:16
asking 82:10
109:12
asks 32:6
aspects 142:7
assert 122:13
asserted
120:22
asserting 68:22
101:12 105:10
assertion 102:1
assess 58:4
118:11
assessing 42:11

**asset** 102:16
114:5,10,14,16
**assets** 42:15,16
42:24 84:1
86:14 109:2
110:18 112:11
113:1,2,9
115:13 125:4
130:2,5,7,8,9
130:10,13
142:12 154:8
154:11,12
**assisted** 77:23
103:9
**associated**
119:24
**assumes** 45:20
**assuming**
36:23 79:5
**astonishing**
23:25
**astounding**
104:15
**attached** 18:11
142:1
**attaching**
101:23
**attempt** 118:17
133:13 154:17
**attempted** 61:6
62:10 118:24
**attempting**
101:12 110:8
113:20
**attempts** 52:19
108:25

**attend** 48:19
**attendant** 31:4
31:22 69:8
**attended** 48:2
**attending**
47:14
**attention** 124:9
125:1
**attorneys** 3:4
3:11,18 4:2,10
4:19 5:2,15 6:2
62:7 83:21
**attributed**
105:9
**auction** 48:3
48:16 145:9
**audited** 38:9
38:18,19 39:8
**audits** 38:11,16
**august** 93:9
**authority**
46:11 132:22
133:5 134:1
**authorized**
152:13
**authorizes**
151:12
**automatic**
39:11,13
**autostyle** 134:6
**available** 34:10
42:24 52:10
96:17 120:6
**avenue** 3:12,19
4:12 5:3
**average** 106:7
106:8 118:15

122:20 123:9
123:11 133:18
133:25
**avery** 8:10
**avoid** 28:25
55:20 140:3
**avoidance** 71:8
130:3
**awaited** 80:22
**awards** 58:19
**aware** 41:25
49:12 62:21

**b**

**b** 1:21 26:19,24
150:14,16,20
150:21,22
**back** 17:1
29:11 34:2
37:9 40:1
56:11 61:5
62:23 65:14
69:9 70:24
73:20 82:19
92:15 98:4
99:16 100:16
136:5 137:13
142:4 143:6
153:10
**backdrop** 42:9
**background**
135:14 141:14
**backgrounds**
141:20
**backup** 59:3,7
65:13,19 66:2
66:6,9 67:1
145:9,10

**bad** 47:8 49:23
68:25 93:10
96:20
**balance** 117:2
153:8
**balked** 143:20
**ballot** 72:10
108:1 110:5
113:8 114:2
115:24 118:3,8
123:12 135:25
**balloting** 108:3
110:25 111:21
111:25 113:6
113:12
**baltimore** 6:4
**bankman**
109:22,25
**bankrupt**
45:17
**bankruptcies**
36:8 41:19
**bankruptcy**
1:1,12,23
15:12 16:2
20:17 26:19
32:5 34:24
35:5 42:4 44:1
46:7,10,21
47:6 62:7,14
83:15,18,25
84:6 90:22
91:11,15
101:22 102:1
102:10,11
108:18 109:9
110:1 112:4

| | | | |
|---|---|---|---|
| 113:5,16 | 143:20 152:22 | **beneficiary** | 66:9,17 67:1 |
| 118:19 121:20 | **behavior** | 94:16 95:8 | **bidders** 47:16 |
| 122:2,22 | 126:21 127:21 | **benefit** 25:24 | 48:16 |
| 130:11 133:17 | **behlmann** 7:7 | 26:10 38:18 | **big** 36:11 89:6 |
| 134:11 150:14 | **belief** 119:10 | 40:19 126:8,11 | 97:11 100:15 |
| 151:13,13,17 | 121:19 | 126:15 143:7 | 142:2 148:20 |
| 151:17 | **believe** 18:25 | **benefits** 57:20 | **billion** 34:12 |
| **barred** 58:5 | 30:19 38:15 | 135:22 140:8 | 78:23 88:7 |
| **based** 35:10 | 48:21 57:15 | **berg** 12:4 | 101:19,21 |
| 46:3 52:5 98:3 | 58:23 61:25 | **bernstein** 7:8 | 102:9,10,13,17 |
| 98:10 100:22 | 64:18 65:21 | **best** 17:7,10 | 103:3 105:24 |
| 104:19 105:11 | 72:18 74:3 | 20:14 21:6,8 | 105:25 106:1,2 |
| 105:18 107:9 | 77:24 79:8 | 21:11,18,21 | 106:6,13 |
| 119:5 | 85:6,15 89:5 | 34:25 37:20,21 | 147:20,25 |
| **baseline** 99:12 | 90:21 91:25 | 42:25 44:5,16 | **billions** 88:4 |
| **basic** 117:4 | 94:12 100:21 | 50:25 51:1,19 | 109:24 |
| **basically** 98:12 | 107:22 111:23 | 52:14 76:16,20 | **bind** 137:9 |
| 129:2,25 | 112:4 115:9 | 78:16 83:1 | **binding** 57:25 |
| 131:21 136:10 | 117:19 118:5 | 87:2,22 94:23 | 100:23,25 |
| **basis** 98:24 | 119:2 120:17 | 112:10 115:4,9 | 124:18 |
| 102:13 | 121:7 122:24 | 115:10,16 | **birch** 7:9 |
| **batting** 41:13 | 133:16 140:24 | 116:5 127:8 | **biswas** 12:10 |
| **battlefield** | 143:8 144:22 | 147:15 155:14 | **bit** 16:21 18:5 |
| 33:21 | 144:23 146:15 | 155:24 | 26:15 27:15 |
| **bearing** 23:2 | 147:4 149:14 | **betrayal** 125:7 | 31:23 39:25 |
| 103:12 | 155:25 | **better** 20:18 | 73:21 74:12 |
| **becin** 7:6 | **believes** 44:10 | 49:18 83:2 | 83:6 84:7 |
| **bedrock** | 51:24 52:2 | 92:2 125:21 | 144:10 147:19 |
| 127:25 | 78:22 82:9,14 | 139:18 | 149:17 |
| **began** 120:2 | 146:18 | **beyond** 39:25 | **bitcoin** 55:8 |
| **beginning** 38:2 | **bellwether** | 69:22 104:9 | 85:22 88:7 |
| 41:23 49:6 | 90:1,3 | 134:1 | 98:11 103:25 |
| 51:10 59:4 | **belongs** 74:18 | **bias** 12:9 | 104:2,4,8 |
| 67:5 72:8 | **ben** 8:8 12:11 | **bid** 59:7 65:13 | 105:15 109:24 |
| **behalf** 41:10 | **bench** 144:11 | 119:24 | 110:1 114:13 |
| 56:22 68:13,13 | **benchmarks** | **bidder** 59:3 | 124:13 125:9 |
| 71:17 77:19 | 58:20 | 65:19 66:2,2,6 | 141:25 142:8 |

142:13,20,25
143:2
**bitter**  83:5,7
84:7
**blame**  47:2
**block**  7:10
**blockchain**
121:14
**blockfi**  138:4
**blonstein**
109:2
**board**  19:12
31:25 32:3,6,9
32:16,20,21
43:11 48:6,17
50:1,5,7 51:3,9
51:15,16,18
52:6,20,21,23
54:8 58:13
79:7,9,13,15
79:15,18,20,20
80:1,2,9 93:15
93:16,21 94:1
94:19 95:19,24
95:25 96:5,6,6
96:8,10,11,24
97:1,3,4,4,5,7
100:8 103:6
141:15 143:14
153:9
**boards**  143:16
**bodenstein**
126:4
**bodies**  125:17
**body**  86:24
**bolster**  18:8

**bonus**  146:13
**bonuses**  33:14
146:8
**borne**  97:17
104:12
**borrow**  55:9
80:10
**borrower**
30:23 71:18,24
72:9
**borrowers**  5:2
71:15 72:1,13
74:2,5,6,7,10
74:11,14,17,19
75:10,18,22,24
76:19 87:21
149:25
**bottom**  29:13
29:16 31:11
**bowling**  1:13
**box**  118:11
138:7
**bradley**  8:15
**bray**  7:11
**breach**  52:13
125:6
**breadth**  106:5
**break**  88:24
92:8,11
**breeze**  73:14
**brett**  10:10
78:20 89:19
**brian**  9:17
**bric**  59:1,3
65:17,20 67:22
145:5,8

**bric's**  65:12
**brief**  16:4
26:15 27:16
34:23 71:18
120:4 152:21
**briefed**  149:8
**briefing**
129:10
**briefly**  127:5
144:16 145:12
145:14
**brier**  7:12
**brifkani**  7:13
**bring**  102:16
125:1 153:10
**brings**  136:20
**brittany**  12:9
**broad**  46:11
119:18 134:2
**broader**  69:6
105:19 119:4
**broadly**  106:24
**broker**  126:7
**bronge**  6:20
30:11,19 31:10
123:19,20,22
123:24 124:2
128:15 149:24
**brought**  90:11
137:8 141:20
141:21
**bruh**  4:24
**brushed**  89:9
**btc**  116:25
123:7
**buckets**  36:11

**build**  15:17
**building**  34:1
78:15
**built**  17:14
**bulk**  110:4
**bumps**  82:16
**bunch**  138:6
154:18
**burden**  56:1
107:6
**burks**  11:11
**burn**  43:7
**burning**  33:25
**business**  34:1
38:11,12,18
39:9 42:14
51:19 52:15
85:17 86:10
88:9 99:17
122:1
**businesses**
38:10,14,17
**button**  33:14
**buying**  97:22

---

**c**

**c**  3:1 10:23
14:1 34:23,25
35:8 46:10
157:1,1
**ca**  4:5
**caceres**  7:15
118:23,25
**calculation**
113:24 114:1
118:10
**calculations**
29:13 30:6

[calculations - cel]                                                    Page 10

123:6

**call** 114:20
**called** 25:17
45:23 108:24
148:25
**calling** 141:16
**calls** 47:15
68:4 107:10
108:23
**cam** 95:14
**camera** 116:13
123:23,24
128:21
**cameron** 8:19
**campagna** 7:16
125:20
**cancelled**
108:25
**candidacy**
50:21
**candidates**
48:17 50:7,7,9
50:11,13,23,25
51:19 52:4,5
52:11
**can't** 95:20
**capable** 51:25
**capital** 133:11
134:14
**capitalists**
132:20
**capitalization**
104:15
**capitalizations**
103:24
**capitalize** 99:2
99:17,18

**capping** 119:5
**capture** 105:19
**careful** 116:24
**carefully** 85:8
**carl** 7:23
**carlo** 9:12
**caroline** 11:21
12:24
**carty** 7:17
**carve** 60:23
**carved** 27:12
69:1 145:18
**carveout** 60:12
60:14,15 68:18
68:19 100:6
**carveouts** 47:8
84:4,5
**case** 1:3 4:1,9
15:12,13 16:9
17:14,18 19:6
20:19 32:11
35:1 41:10,23
46:21 48:9
52:12 53:11
55:16,19 57:4
58:14 59:4
60:16 66:5,7
66:16,20 67:5
68:5,13,22
69:11 70:2
71:21 77:23
79:23 82:23
85:2 86:18
87:5 89:5,8
90:2,12 95:5
97:8 100:3
102:1,3 103:9

107:12 109:21
112:7 121:25
122:15 123:7
124:11,20
126:2,6,17
127:20,21
128:2 133:8,8
133:14,16,20
133:23 143:21
144:22 145:1
148:24 149:17
152:22 155:11
155:23 156:1,2
**cases** 15:17
17:20 41:18
42:2 47:5,11
47:19 48:13,22
49:8,17 54:11
55:6 56:2,24
56:25 57:3
59:10 85:7
134:12 145:8
146:2
**cash** 114:13
130:11
**cashflow** 98:13
**cashing** 115:14
**casts** 127:20
**catch** 94:10
**categories**
19:11 64:16
**categorized**
117:14
**cathy** 6:24
134:19
**cause** 86:6,6

**causes** 42:22
47:21 68:23
85:23
**ceased** 120:15
**cel** 19:11,14,14
19:16,17,18,18
19:21,22,22,24
20:3,8,11,12
20:13,24,25
21:7,10,17,22
22:1,5,6,7,9,12
22:13,16,19,22
22:25 23:3,24
24:20,21 25:2
25:3,6,9,16,17
25:19,22 26:2
26:4,5,10,13
26:14,17,18,22
27:1,8,9,14,14
27:22 28:19
29:14 37:1,17
37:18 43:9,14
43:16,24 44:8
44:10,14,22
45:4,6,8,10,12
45:18,23 46:4
101:1,2,3,4,7,9
101:13,23,24
102:7,14,19,21
103:12 104:18
105:4,10,17,23
105:23,24,25
106:2,5,7,11
106:21 107:4
108:19,22
109:3,8 110:11
110:14,18,22

110:23 111:3,7
111:9,10,14,18
111:19 112:7,9
113:1,14,16,24
114:2 115:18
116:19,25
117:6,10,11,13
117:16,21,22
118:2,8,18
119:4,5,8,9,13
119:23 120:4,6
120:20,22
121:1,5,5,6,10
121:19 122:4,9
122:15,21,23
123:3,11 137:1
137:2,5,8
140:25 141:5,7
141:8,10
147:16 148:3,5
149:11,15,16
149:20,22
**cel's** 24:11
**cell** 100:23
**celsius** 1:7
15:12 17:2
30:12,13,20,24
31:20 32:4
34:3,18 36:1
37:13 38:9,13
41:22 42:6,14
49:19,21 79:18
80:12 83:9,13
95:4 99:22
101:23 105:3,4
108:16 110:1
114:6 116:22

116:23 117:5,6
117:12,13
118:6 119:8,23
120:7 121:13
121:20 122:1,8
122:17,25
133:17 135:18
138:6 150:2,4
150:8 154:10
154:10
**celsius'** 103:5
**cent** 43:23
110:14 113:25
118:25 137:2,5
147:16
**centered** 119:3
**centers** 117:10
**central** 143:7
**cents** 19:20
21:23,24 22:2
25:10,10 27:14
28:7,19,23,25
29:6,7,23,24
30:2,4 37:19
37:21 44:5
100:23 101:5,8
101:11 106:8,9
110:19 113:14
113:18 114:3,7
114:8 115:17
115:18 118:9
119:14,16,19
119:19 122:25
147:7,9 149:12
**ceo** 33:22
48:15 103:7
109:22,25

111:17 120:19
**certain** 31:13
33:2 49:14
50:20 53:20
54:1 58:10
61:4 64:22
72:2 85:18
123:1 151:24
**certainly** 20:22
24:20 25:3
64:16 65:17
82:11 100:2
156:1
**certified** 157:3
**cetera** 31:2
38:15 138:9,10
**cfo** 111:17
**cftc** 55:11
**chairs** 48:14
79:16
**challenges**
119:22
**challenging**
29:5 41:19
86:1 124:19
**chance** 123:17
**chang** 7:18
**change** 29:8,16
29:24 37:4
93:11 113:12
113:20 115:24
148:19,20
**changed** 31:9
36:15 37:2
72:11 98:19
105:6 148:8,10

**changes** 14:25
57:15 58:3
81:14 92:3
93:9 94:16
**chapter** 21:10
21:23 22:2
41:19 43:6
44:1,16 45:21
47:1,5 48:13
49:8,16 54:10
54:25 55:6,24
56:2,18 84:8
89:3 91:9 92:5
105:3,6 125:21
133:14 145:25
146:2 148:4
**charges** 107:1
**charts** 119:25
**chase** 9:23
10:23
**check** 115:8,15
138:7,7,8,8
153:16
**checkbox**
138:9
**cherokee** 103:7
**chicago** 3:6
**chief** 33:22
55:19
**choice** 54:4
136:15
**choose** 123:10
132:24 133:6
140:5
**chooses** 122:4
137:17

chose 137:11
138:25 141:1
chosen 53:9
97:12 124:4
141:6
chris 3:8 7:6
14:5 33:20
48:14 63:16
75:5 94:12
143:17 144:8
christ 131:4
christian 11:22
christina 7:19
christophe
9:13
christopher
7:21 120:12,21
121:18
ciancarelli
7:19
circle 62:23
circuit 46:13
134:10
circulated 15:1
15:6
circulation
102:7
circumstances
17:2 38:22
44:18 82:10
86:21 98:18
121:9 134:3
146:16
cited 149:24
claim 27:1,2,4
27:6,8 29:14
85:2 98:23

101:19,21
102:3,9,10,14
102:17,20
103:3 124:3
126:5 136:2,5
136:14 137:11
137:12 138:15
138:20 147:20
147:21,23
150:15,16,18
150:19 151:19
claimant 90:4
claimed 97:23
118:24
claiming 36:15
101:24 142:16
claims 26:17
26:17 27:4,10
53:18 78:23
86:4,15,23
88:4,5 89:24
91:12 97:19
101:15 103:5,8
106:18 107:6
113:23 119:6
125:16,24
127:4 134:7,8
137:16 150:22
150:23 151:4
153:19
clarification
68:7 147:8
clarified 145:4
clarify 78:8
clarifying
73:22

clarity 113:7
clark 7:20
clarke 12:11
class 15:23
17:8 20:2 27:2
27:4 37:5 43:1
85:2 89:24
110:11,14,15
110:20 111:11
111:18,23
113:1 114:1
118:20 124:3
136:2,14
137:11 148:19
150:17,18,19
151:19
classes 20:4
90:20
classic 70:2
classified
114:3 125:17
clause 46:19
125:6 127:1
130:14
clauses 126:24
127:4
clawback
138:5
clean 153:7
clear 17:3
18:18 22:18
26:1,25 31:7
31:17,19,19,23
31:24 36:22,23
38:8,23 48:20
48:23 54:14
56:14 61:4

62:7,8,14,15
65:23 66:5
84:18 86:12
91:7 92:25
93:4 97:24
106:10 113:5
124:24 127:13
141:2 148:8
149:7,12
clearance
81:22,23 82:1
82:2
clearer 87:8
clearly 15:19
21:7 62:19,22
99:5,24 103:3
108:2 112:25
118:3 125:17
clerk 14:2
15:10 92:13
clerks 14:17
click 30:22
clicks 98:7
clients 52:3,9,9
52:10,10 54:22
143:15
clock 34:6
clocked 141:12
close 19:5 46:4
closer 64:23
closing 2:1
14:9 33:8
43:21 92:15
96:23 99:19
112:17 115:22
122:13

clout  143:24
cmbarc  138:11
coco  7:21
code  16:2
  26:19 32:6
  34:24 35:5
  44:1 46:7,10
  90:22 91:11,15
  112:4 113:5,21
  150:14 151:13
  151:17
coerced  137:22
coin  105:21
  118:6 119:14
  122:4,19
coinbase  34:15
  59:9,23,24
  62:24 63:7,21
  64:19 67:22
coins  36:18
  37:8 41:22
  47:21 103:21
  104:11,14
  105:15 147:13
  147:15
collateral  74:5
  76:19 87:24
  124:14,17
  125:2,10,13,24
  126:5,10,14
  128:2,5 150:5
  150:12 154:7,9
  154:13
colodny  4:7
  32:1 41:9,10
  41:13,18 56:19
  68:7,9,10,12

68:12,13,17
69:25 70:3,17
94:20 96:4
146:21 147:6
151:3 152:19
152:21,22
154:21
colodny's
  96:22
come  18:7 40:1
  56:11 65:24
  70:21 72:21
  74:20 83:3
  98:5 108:4
  116:20 129:1
  143:8 153:14
comes  104:11
comfortable
  75:11 77:10,11
coming  89:25
  139:18
commenced
  103:13
commencem...
  80:23
commend
  77:20
comments
  39:15,16 41:14
  55:21 59:21
  68:8 69:10
  81:15 139:8,21
commercially
  72:20
commission
  5:8 81:5,7,11

commitment
  55:5
committed
  39:15,19 56:4
  56:15 68:25
  78:15 80:5
committee  4:2
  4:10 14:11
  17:17 18:7,15
  32:2,9 33:23
  35:23 38:4
  39:22 41:8,11
  41:25 42:9,20
  43:12,20 46:9
  46:10,20 47:13
  47:15,18,24
  48:2,11,15,18
  49:6,9,10,12
  49:17,22 50:6
  50:10,13,14,19
  50:22,22,24
  51:16,17,24
  52:14 54:15
  55:5,14,25
  56:15,23 60:10
  60:12,16,18
  68:4,12,14
  69:5 70:1,16
  71:2,3,4,7,20
  73:17 77:21
  78:20 79:5,16
  80:13 82:11
  84:16 85:5,12
  87:3 89:19
  93:18 94:6
  95:6,14 97:7
  97:10 100:8

137:24 144:15
152:22
committee's
  44:25 46:15,16
  48:7 50:4
  51:19 60:13
  154:15
committees
  88:17 94:22
  143:16
committing
  76:3
common  57:1
  85:22 88:8
  129:5 130:20
  130:24 131:3
  131:20,25
  132:14,21
  133:1 139:2
commonly
  104:1
communicate
  116:4
communicated
  47:25
communicati...
  86:5
communicati...
  122:18
community
  104:16,23
compagna
  21:16 29:13
compagna's
  29:6 44:4
companies
  41:20 98:5

**company** 38:25
45:17 53:6
80:6 83:11
88:9 95:18
98:14,19,25
99:3 102:25
103:4,13
109:19 119:15
122:6 134:14
141:3,4,17
152:13,14
153:7
**company's**
42:7
**comparable**
122:4
**compare** 29:9
122:4
**compensation**
35:25 36:4
**compensations**
119:9
**competence**
141:16
**competent**
153:8
**competing**
154:19
**complained**
25:18 151:24
**complaining**
37:11
**complains**
148:7
**complaint**
47:23

**complaints**
82:25
**complete** 41:23
109:18 155:3
**completed**
154:25
**completely**
49:23 83:12
152:2
**complex** 20:23
77:23 82:23
103:19
**compliance**
77:24
**complicated**
16:9 40:14
42:10 56:25
**complications**
142:16
**component**
121:2
**components**
103:20
**compromise**
87:4
**compute** 98:11
**concede** 127:6
**conceding**
150:25
**concern** 74:22
**concerned**
63:24 150:12
155:3
**concerning**
43:14 110:2
118:18 132:12

**concerns** 42:17
61:12 89:8
106:3,7 107:24
107:25 115:20
116:7 117:11
126:22
**concessions**
152:8
**concluded** 36:8
156:6
**concludes**
154:22
**conclusion**
18:4 54:9 99:9
128:1
**conclusions**
16:16 72:5
87:16 129:1,9
**conclusive**
106:19
**concrete**
106:18
**condition**
37:25 48:10
**conditions**
24:12 85:19
120:10
**conduct** 51:9
55:11 65:25
102:5
**conducted**
48:5
**conferred** 18:6
**confirm** 49:25
77:25 81:23
85:16 111:8
116:6

**confirmable**
100:22 107:23
**confirmation**
2:2 16:1,5,6
17:3,22 18:11
18:13,24,25
19:9,15 26:25
27:12 34:22
38:2 39:22
40:2 43:18,21
43:21 44:2
46:6,19 49:6
49:24 51:10
55:21 56:13
72:5,8,24,25
73:5,25 74:1,8
75:7 77:2,22
80:19,21 85:9
89:3 92:4 93:4
101:17 102:18
107:22 113:18
129:8 145:18
**confirmations**
87:10
**confirmed**
113:3 126:1
131:23
**confirms** 88:11
**conflating**
149:6
**conflict** 95:9
103:11 141:2,5
141:21
**conflicted**
94:19
**confronted**
25:15

confused 24:15
   62:22
confusing
   22:20 24:23
confusion 29:1
   58:3,12 62:13
   86:6
congress
   151:12,13
conjunction
   118:8 146:8
connection
   141:2
connections
   50:12 52:8
   153:25
consensual
   55:12 57:6
   69:15,19
consensually
   87:22
consensus
   15:17 17:14
   78:15 87:4
consent 61:13
   96:1 131:2,11
   132:5 133:2
   154:10
consented 72:2
consequence
   54:1
consequences
   86:5 117:25
   142:1
consider 20:19
   45:3 52:10
   64:4 85:8,15

91:20 92:1
   105:2 146:10
   149:19 155:4,5
consideration
   87:23
considered
   50:6,15 129:16
   129:21,23
considering
   91:14 127:14
consistent 32:6
   36:18 37:2
   50:1 64:14
   127:2
consistently
   94:17 118:18
consists 78:11
   118:21
consolidation
   90:8
constant 42:17
constituencies
   42:13
constituency
   49:16 54:25
   78:7
constituents
   42:18 46:15
   54:12
constituents'
   80:16
constitution
   130:14 151:12
constitutional
   132:22
constructive
   39:2,4,12

constructively
   17:15 38:3
consumer
   18:23
contained
   91:15
contemplated
   85:21 117:1
contemplates
   26:16
contemporan...
   25:15,22
contended
   118:1
contention
   124:15
contested
   19:15,19 44:21
   90:16
context 70:9
   71:8 91:13
   106:6 126:9,16
contingencies
   138:6
continue 39:4
   39:23 40:12,25
   54:15 64:6,7
   64:21 72:20
   78:9
continued 38:3
   38:14 39:2
   80:16 121:14
continues
   81:15 87:11
continuing
   139:6

continuously
   127:17
contract 47:17
   129:4 130:2,19
   131:14 132:1,9
   132:13 146:1
   151:14,16,23
   152:1
contracts
   124:21 125:6
   125:18 130:15
contractual
   128:11
contractually
   145:16
contradictions
   108:2
contrary 48:20
   51:23 101:14
contribute
   123:2 140:5
contributed
   78:14 112:22
contribution
   134:5
control 139:4
controlled
   93:14,21 95:18
   106:13
convenience
   137:12
convenient
   143:23
conversion
   125:4
conversions
   125:13

**convert** 133:9
134:12
**converted**
141:25
**convey** 150:4
**convince** 26:3
**cook** 7:22
**cooper** 12:12
**cooperate**
54:24
**cooperated**
47:24 55:10
**cooperatively**
78:25
**coordination**
34:15
**cornell** 4:23
56:20,21,22
59:20,23,25
60:22 61:1,11
61:19,22,25
62:3 63:3,5,9
63:11 65:7,10
65:15 66:3,12
66:14,15,22,24
67:7,11,15,19
67:23,25 68:10
68:11,16,17
70:4,7,11,15
70:19,21,25
71:13 145:12
145:17 146:3
**cornell's** 68:8
**cornerstone**
107:1
**cornerstones**
103:25

**correct** 16:14
73:2,5 76:9
82:14 126:23
**correctly**
118:14
**costs** 36:6
102:13
**cote** 7:23
**counsel** 69:4
85:1 87:13
89:22 102:13
107:13 113:3
126:20 128:8
**counsels** 88:18
**count** 103:3
135:1 138:22
**counter** 122:21
**counterparties**
47:16,17
**countless**
47:15
**country** 157:21
**couple** 23:13
32:3 33:5
150:18
**course** 17:17
66:19 87:13
89:22 91:18
94:10 145:1
150:14
**court** 1:1,12
14:3,8,16,19
14:22 15:6,20
15:25 16:11,14
17:7 20:2,10
20:18 21:2,12
21:25 22:3

23:18 25:25
26:8,21,22
27:19,21,25
28:7,10,13,15
28:18 29:20,25
30:4,8,14,17
31:1,6 32:5,25
33:6,10 37:5
37:18 41:5,7
41:12,17 43:15
45:2,20 49:5
49:25 52:9
54:5 56:19
57:11,13,25
58:24 59:19,21
59:24 60:9,20
60:25 61:9,18
61:20 62:2,20
63:2,4,6,10,14
63:19,23 64:2
64:4,8,11,14
64:25 65:2,5,9
65:14,16 66:11
66:13,15,23
67:6,9,12,16
67:21,24 68:6
68:9 69:2 70:6
70:10,13,18,20
70:24 71:12,14
73:7,9,13,25
74:2,4,6,9,12
74:24 75:15,21
75:23 76:2,7
76:10,12 77:6
77:13,16,23
81:1,8 82:3,6
82:20 84:14,18

84:23 85:7
88:11,21 89:4
89:12 90:18
91:2,20,25
92:4,7,14,18
92:21,25 93:2
95:11 99:22
100:11,19,23
101:11,13,20
101:25 102:1
103:14 106:17
107:3,7,14,16
108:5,8,11
109:21 114:18
114:21,25
116:3,4,9,12
116:15,17,20
117:12 118:3,6
118:15,23
121:8,22,23
123:13,16,19
123:21,23
124:1,18,25
125:10,23
128:2,7,15,18
128:21,23
129:11,13,20
130:21 131:5
133:19,21
134:2,15,18,22
134:25 135:3,5
135:8,10
137:19 142:10
142:23 144:2,5
144:7,25
148:21 149:11
149:18 150:5

152:13,18
154:21 155:20
155:24 156:4
**courtney** 11:11
**courtroom**
78:3 92:22
127:22
**courts** 133:9
134:11
**court's** 82:11
**cover** 14:18
36:12
**covered** 65:24
**covers** 36:11
**craig** 10:15
**crazy** 90:4
**create** 135:18
143:3
**created** 60:3
86:10 106:6
109:13,14
127:19 144:19
**creates** 142:21
**creating** 42:15
136:11,20
139:4
**creation**
119:15 135:21
139:22 143:25
153:11
**creator** 143:24
**creators** 136:8
136:22 140:6
**credibility**
106:23 153:21
**credible** 32:24
79:9 148:5

**creditor** 34:9
44:6 78:7,9
80:9 86:23
90:15,20 93:14
93:14,21,24
94:18 95:18
112:15 116:21
125:8 130:7,11
131:11,11
136:12,20
138:11 141:10
**creditors** 4:3
4:11 15:18
17:17,18 20:8
21:5 32:7 34:7
35:23 38:3
39:22 41:11,20
41:21 42:12,15
42:19 43:7
44:17,22 46:5
49:13,13,22
50:2,10 51:1,8
51:11 52:15,22
53:12,20,21,23
54:1,3 55:2
56:1 61:5 62:9
62:17,22 69:13
69:18 70:1
78:11,12,18
79:3,5,14,19
79:24 80:12
82:24 83:6,11
85:14,21 86:3
86:20 87:6
88:6,10 89:12
91:7,19,21
93:6,12,16,18

93:23 94:24
95:17,19,21,22
96:13,25 97:2
97:4,6,9 99:14
102:17,19
111:14 112:3
116:5 118:2,16
118:22 122:14
123:1 130:1,9
130:12,16,18
130:20,24,25
131:2,18,19,20
132:5,6,8,12
132:14,18,19
132:24 133:1,3
134:7,8 135:24
136:1 137:13
137:16,25,25
138:24 139:8
139:21 140:7,9
140:10,19
141:19 142:5
142:18 143:7
143:20 146:18
152:10,23
154:16,19
**creditor's**
96:20 115:12
**crews** 95:14
**criminal**
109:21
**criterion**
105:18
**critical** 63:21
78:14 80:9
94:1

**criticism** 79:7
**criticisms**
42:18
**cro** 111:17
**cross** 25:14,19
32:18 51:12
122:20 154:2
**crypt** 97:13
**crypto** 17:1,4
27:6 34:10,12
39:20 40:8,11
53:23,24 91:13
97:12,15 99:11
99:15,16,20
104:7 130:17
130:19 132:9
137:23 141:25
146:18,22,23
146:24 153:3
**cryptocurren...**
103:18
**cryptocurrency**
30:12 34:17
53:22 54:2
85:17 88:10
103:18,25
104:1,2,8,18
104:21 105:11
105:14,17
108:24 130:17
132:1,15
**cryptos** 123:8
**crystal** 91:7
**cumulative**
96:20
**cunha** 7:14

cup 106:15
curiously
122:9
currency
103:20 104:3
105:20 125:4
current 58:11
94:25 95:1,3
114:7 115:16
120:23 123:7
currently 39:9
40:16 59:10
100:21 103:2,7
141:4
custody 34:19
36:16,17,17
37:1,2,5,7 61:5
61:14,16
100:24,25
101:2,4,7,8,9
101:16 108:17
108:20,21,22
109:12,14
110:11,13,18
110:19,20,22
110:23 111:4,9
111:10,11,18
111:23 112:8
112:10,16,19
112:24 113:1,2
113:9,24 114:1
114:3 115:18
145:12,15
147:7,9,9
148:22,23,23
148:24,25
149:5,6,6,10

149:12
customary
47:11
customer
38:10,13 85:4
86:15 122:10
126:11,12
customers 42:6
42:23 47:19
85:20 86:3
89:10 90:13
91:16 126:8,8
126:10 133:18
133:25 141:24
customers'
89:8
cut 43:6 131:6
139:14
cutting 102:18

**d**

d 11:4 14:1
111:5
dalhart 7:24
damaging
102:14
dan 9:14
daniel 6:8
11:22
dare 122:15
darius 8:14
data 22:25
24:9 61:2 62:9
105:21 106:2
107:5,8 118:5
date 21:12,13
21:18 22:1,10
22:12,15,17,19

22:23 23:3,7
23:25 24:7,17
24:23,24 25:9
26:12 33:21
34:11 35:3,6
37:19 38:1
44:9,11,14
45:5,7,9,11,13
45:15,19,24
46:1 51:2
54:14 56:9
57:24,24 58:10
64:23,24 80:15
85:19 88:12
91:12 99:11,23
99:24 101:6,10
105:25 106:19
110:16 112:12
113:13,19
114:15 115:5,5
115:15 144:21
144:23 148:4
150:13,15
157:25
dates 24:7,17
24:17 121:12
david 5:6 6:22
7:24 8:10 9:5
11:1,5,15
71:16 89:13
95:14 128:16
davies 7:25
davis 6:14 25:1
25:2,3,14,23
26:1,1,9 44:23
45:22,24
100:13,13,14

100:19,20
107:14,15,16
111:8 147:7,20
153:17,22
davis's 148:1
day 39:11,14
77:22 84:11,22
91:14 92:3
101:3,4 114:7
115:8,25
days 34:11,19
39:18 85:9
98:5 114:12
120:3 121:13
147:12,13
149:10
dc 3:13,13 5:10
de 11:17 44:10
45:4,19
deactivation
113:13 114:10
115:8,15
deadline 64:22
129:14 138:15
deal 72:20 74:6
152:8
dealing 73:11
118:20
dealt 74:11
87:25
deanna 15:8
92:19
debt 117:15
131:1,1,8,10
131:12,17
132:3,11,15,17
133:9,10,10,14

134:4,12,12,13
134:14
**debtor** 1:9 3:4
3:11,18 14:11
35:2,4,5 42:11
67:16 69:4,5
77:20 84:15
98:23 99:22
113:14 114:8
115:14 125:7
126:3,6,18,20
127:17 128:8
130:1,9,16,19
132:4
**debtors** 14:6
16:3 18:15
35:6,22 42:12
42:20,21 43:20
44:15,24 47:16
47:25 48:9,15
49:9 53:20
54:23 55:5,9
55:14 56:2,23
57:10,11,16,22
58:1,6,10,18
58:19,23 60:1
61:12 63:17
64:15 68:1,5
69:4 71:20
72:11,19 75:6
81:13,21 82:2
82:10 85:11
86:18,20 87:2
87:11 88:18
90:25 97:11
101:3,12,21,24
102:2,6,9,10

102:15 103:2
110:6 118:1,17
118:24 119:16
124:5 126:5
127:14 128:3
130:12,23,25
131:1,3,8,10
131:12,17
132:3,10,11,13
132:15,17
133:3 144:9,14
147:24
**debtor's** 81:24
86:10,13 87:13
88:16 97:23
101:19 108:20
112:18 113:3
**december**
40:18,22
148:25
**deceptive**
126:21 137:3
**decide** 15:25
27:11,13 75:11
75:17,17 76:17
**deciding** 76:21
76:22 77:4
136:16
**decision** 32:24
46:17 47:4
48:25 49:3
75:14,25 82:14
115:14 117:23
**decisions** 48:21
49:7,10,12,14
51:25 54:13
86:13 107:2

**deck** 30:18
**declaration**
102:24 109:2
127:15 148:9
**declare** 124:19
124:25
**declaring**
128:2
**declined** 24:20
**decrease** 94:1
**dedicated**
49:17,20
**dedication**
80:20
**deemed** 36:21
132:25
**deems** 75:23
**deeply** 147:25
**default** 153:4,5
**defaulted**
73:20
**defenses** 71:3
**defined** 26:16
26:17 57:22
**definitely** 68:5
138:10
**definition**
103:11
**definitively**
58:15
**defrauded**
15:15 33:15,17
**defunct** 38:18
**degree** 23:16
**degrees** 122:15
**delayed** 55:18

**deliberate**
122:18 127:18
**deliver** 128:12
**delivered**
87:12
**delve** 124:4
**demand** 43:11
**demonstrated**
55:5 77:24
99:5 115:3
**demonstrates**
50:3
**demonstrative**
138:2
**demonstratives**
14:18,20 15:9
134:24
**denied** 107:17
**department**
4:18
**depending**
94:14 139:1
**deposit** 108:22
**deposits** 89:9
**depth** 105:19
**der** 12:7
**describe** 46:24
57:14
**described**
153:13
**description**
65:25
**descriptions**
81:24
**deserve** 41:15
112:3

design 104:4
designed 19:19
desire 43:6
    47:3
despite 59:1
    62:11,12
    103:23 104:13
    137:7 140:14
    141:15,25
detail 16:22
    18:5 27:15
detailed 43:8
    44:24 45:1
    111:2 124:5,11
determination
    74:4 75:21
    82:9
determinations
    153:21
determine
    29:21 43:16
    45:15 48:3
    74:13
determined
    111:24 149:11
determining
    104:10 107:3
detraction
    53:13
detriment
    89:10 94:17
detrimental
    94:3 95:20
devaluating
    103:5
devaluation
    103:9

devalue 102:16
    112:11
deviation
    125:5
devoted 140:25
dialogue 113:4
diaz 8:2,3
dictate 132:22
didn't 75:12
    95:18
dietrich 12:19
difference
    22:15 24:19
    36:25 89:6,16
    135:17
differences
    99:13
different 19:4
    21:15 24:17
    25:5 28:20
    33:18 41:24
    74:13 83:23
    126:9 141:5
    145:9 148:13
    148:22 149:24
    151:9,15 152:7
differentiate
    106:18
difficult 42:6
    49:10 115:23
    121:11
difiore 8:1
    121:3
digital 86:14
    103:20 104:3
    105:20 125:4
    130:1,5,7,9,10

130:13 154:8
    154:11,12
diligent 116:23
dilute 118:1
diluted 19:18
    123:6
dilution 118:2
    118:4,10
dimitry 6:16
direct 50:8
directing
    143:15
directly 48:12
    49:12
director 48:17
    95:3
directors 48:6
disagree 49:13
    153:1
disagreed
    136:25
disappointed
    32:16 79:14
disappointm...
    52:17 118:22
disbursement
    108:23
disclose 52:7
    121:6
disclosed 49:5
    50:13 54:2
    120:15 148:12
    153:25
disclosure
    16:15 18:8
    28:5 36:23
    54:3 61:9 93:8

126:16 135:12
    135:19 142:20
disclosures
    18:13,18
discount 32:22
    97:23 98:21,24
    99:7 146:25
    147:1,4
discounted
    98:13,23 99:1
discouraged
    139:22
discovered
    135:13
discovery 51:9
discredit
    140:23
discredited
    98:12
discrediting
    141:19
discretion
    146:7,8,12
    153:16
discretionary
    58:21
discussed 38:1
    55:16 58:17
    154:5
discussing 38:6
    109:23
discussion
    119:1,3 120:22
    142:5 149:15
discussions
    39:2,4,12
    48:10 50:20,23

55:7 57:10
60:10 64:6,21
65:17 81:24,25
**disentitle**
65:21
**disgruntled**
54:12 69:18
**disgusted**
136:25
**dislocate** 120:2
**dislocated** 22:8
44:9 45:7
106:1
**dislocation**
45:8
**disparaging**
140:25
**disparate**
100:22
**disputed** 44:6
**disqualifying**
24:1
**disrupted** 22:8
**dissenting**
17:11 43:24
110:7,11
113:21
**dissipated** 84:1
**dissolution**
125:21
**distort** 117:19
**distortions**
127:19
**distress** 42:3
**distressed**
42:14

**distribute**
34:17 55:8
152:13,14
**distributed**
42:24 114:14
140:12
**distributes**
99:10
**distributing**
59:9 146:6
**distribution**
34:14,16 35:2
55:17 87:6
88:8 102:20
114:12 115:15
125:25 128:6
140:11 154:18
**distributions**
34:2,6,10,12
34:19 35:14
37:12,13,14
39:20 40:3,4,8
40:12,15,17,20
40:21,23 55:25
56:4,8,13,16
59:15 63:10,22
80:23 85:22
87:4 88:5,7,13
147:12
**district** 1:2
20:16 133:12
133:12,15
**diverge** 104:22
**diverse** 80:3
**dixon** 8:4
95:13 96:10

**dixon's** 95:12
**docket** 15:1
23:15 45:1
51:4 77:8
81:13 87:16
101:4 124:7,11
124:24 127:16
129:19,22
153:25 154:6
**document** 25:8
87:18 129:8,10
**documents**
58:14,21 74:17
94:11 144:13
**doesn't** 91:9
95:2 100:4
104:5 105:8
**dogecoin**
104:14
**doing** 59:15,16
66:5 82:12
89:14 117:15
133:7 134:23
135:14 147:15
147:17
**doj** 55:10,19
**dollar** 19:25
90:14 115:17
115:19 141:12
**dollarized**
113:9 115:8
**dollarizing**
91:12
**dollars** 78:14
78:14 88:5
109:9 113:17
142:14 150:16

**dollars'** 103:8
109:24
**dominant**
104:8
**don** 11:9
**donald** 10:6
**don't** 75:16
93:4
**dot** 98:5
**dotted** 70:22
**doubt** 71:8
130:3
**doubts** 123:4
**dow** 8:5
**draft** 47:23
**drafted** 61:14
**drag** 39:25
140:1
**dragged**
139:23
**drastically**
98:18
**draw** 121:25
124:9
**drew** 12:13
**driven** 50:21
104:16
**dubbed** 104:1
**due** 40:24
100:20 119:22
130:19 142:1
**duffy** 8:6 12:13
**duplicative**
41:14 43:10
**duties** 154:15
**duty** 46:14
52:13 54:15

99:21 154:16
**dynamics**
105:19
**dzaran** 8:7

**e**

**e** 1:21,21 3:1,1
9:9 10:24 14:1
14:1 47:8
157:1
**eades** 8:8
**earlier** 53:6
58:18 60:1
62:20 73:21
89:7 144:20
149:10 151:23
**early** 19:5 40:1
88:14 108:17
**earn** 6:2 31:18
38:14 50:10
55:9 77:16,18
77:19 78:1,11
78:16,22 79:11
79:14 80:10,10
83:22,22 85:4
89:10,12,18
90:10,13,22
91:16 95:10
96:1 100:24
101:2,9 125:15
125:16,21
127:11 128:6
149:1,13
150:17,21,23
151:8
**earthquake**
100:15

**easier** 70:4,7
70:11,19
**easily** 35:11
59:17
**east** 6:3
**easy** 56:6 66:21
123:10 135:3
**eating** 139:3
**ecf** 14:23 15:1
16:15 72:16
73:20 93:1
**ecf3913** 92:10
**ecf3928** 75:21
**echo** 56:3
**eck** 11:19
**economic**
91:21
**economically**
25:24 26:10
54:17
**ecosystem**
103:21
**ecro** 1:25
**ed** 7:9
**effect** 86:15
87:24
**effective** 20:8
34:11 35:3,6
38:1 51:2
54:14 56:5,9
56:10 57:24
59:14 60:3
64:23,24 80:15
82:4 85:19
88:12 99:11
144:21,23

**effectively** 88:4
**effectually**
117:14
**efficient** 77:22
**effort** 35:13
69:15 119:2,11
121:17 141:18
**efforts** 43:5
50:4 68:1
72:20 78:24,24
87:2 88:19
103:9 127:14
156:1
**eighth** 72:16
**eip** 34:9,22
35:9 36:1,6,9
58:16
**either** 24:3
25:9,13 33:23
35:8 59:6
66:16 68:24
96:4 98:20
129:6 151:25
**elected** 53:21
53:23 146:18
153:3
**electing** 153:5
**election** 72:10
153:4,5
**elements** 91:10
**elementus** 44:7
103:1,6,10,16
**eleven** 134:6
**elicited** 51:13
**eligible** 50:19
97:22 108:20
130:5

**eliminate**
58:12
**eliminated**
117:16
**elizabeth** 3:22
**ellis** 3:3,10,17
14:6 63:17
67:4 75:6
144:9
**ellison** 109:22
**elvin** 11:16
**emailed** 14:21
**emails** 68:4
**embarrassing**
102:14
**embodied** 72:1
87:1 154:17
**emergence**
19:13 33:1,4
35:7 58:17
60:5 94:14
120:24 146:5
146:14 147:23
**emergency**
121:8
**emmanuel**
141:15
**emphasized**
118:18
**emphasizes**
104:12
**employ** 132:23
132:25
**employed** 83:9
126:21
**employee**
94:13

**employees**
18:11 34:2
58:11 94:24,25
95:1 119:10
143:16
**employment**
95:4
**enacted** 151:13
**encounter**
41:24
**encourage**
54:23
**encumbered**
128:4
**endeavor**
155:24
**endeavored**
26:20
**ended** 37:15
**engage** 55:6
72:20 78:25
**engaged** 69:7
122:1
**engel** 8:9
**english** 5:1
71:17 116:2
**enhance** 79:3
80:6
**ensure** 36:4
39:15 47:20
55:2 83:8 95:6
125:24
**ensuring** 107:9
**enter** 80:21
133:3
**entered** 71:25
129:10,19

**enterprise**
98:10
**entire** 53:5
94:16 102:12
107:11 154:24
**entities** 54:25
57:16 60:3
147:23
**entitled** 37:9
59:4 101:10
137:14
**entity** 35:7
38:20 59:14
60:4
**entrance** 55:12
**entrusted**
41:21
**environment**
106:25
**equal** 28:7
114:9 131:18
**equate** 102:19
**equation** 29:4
**equitable**
42:25 55:18
87:5 91:15
101:15 114:16
154:18
**equity** 39:1
42:12 53:22
54:1,4 79:4
80:6 94:3
95:21 97:10,18
97:22,24 99:6
99:11 131:1,1
131:9,10,12,17
132:3,11,15,17

133:9,14,18,25
134:4,8,12
146:19,24,24
**equivalent**
147:14
**era** 98:5
**eric** 11:22
**erik** 10:1,7
**error** 109:6
119:20 122:11
**errors** 24:5
**escalation**
57:23
**especially**
71:21 138:22
**essence** 53:8
124:10 128:13
**essential** 90:10
93:12 104:10
107:4
**essentially**
37:16 72:19
73:20 77:8
94:21 98:7
99:17 129:4
133:7
**establish** 51:20
120:10
**established**
16:3 104:6
**estate** 46:20,20
47:21 69:3,14
69:21 70:1
74:19 102:18
103:15 119:4
122:10 128:3
154:18

**estimate** 118:4
**estopped**
101:12
**et** 31:1 38:15
101:20,22
102:11 138:9
138:10
**eth** 85:22 88:7
88:10 116:25
142:8,13,20,25
**ethereum** 55:8
114:14 141:25
**ethnicity** 80:4
**evaluate** 39:23
40:13,25 54:16
146:7
**evaluates** 26:1
**evaluating**
40:7
**event** 88:2
96:12,20
116:25
**events** 143:3
**eventually**
117:8
**everybody**
40:7 54:22
88:22 92:25
115:6 152:5,9
155:9
**everyone's**
52:20
**evidence** 16:7
26:21 32:14
33:5 35:11
43:5,21 46:3
50:2 51:14,16

51:18,20 85:10
87:5 106:12,14
106:19,19
107:6,9 124:23
127:15 128:12
137:4 144:10
144:13,15
148:5 153:19
153:20
**evident** 121:18
**evidentiary**
51:23
**ex** 94:24
**exact** 105:5
**exactly** 20:5
147:17 150:7
151:8
**examination**
25:14,20 32:18
122:20
**examine** 51:12
106:7 154:2
**examiner**
47:24 86:19
89:14
**examiner's**
122:7
**examiner's**
89:7,15
**example** 25:17
114:5
**examples**
105:14 126:25
**exceed** 109:9
111:13
**exceeded**
113:17,18

**except** 46:21
50:13 91:25
122:14
**excepting**
130:10
**exchange** 5:8
81:5,7,10
**exciting** 153:6
**exclude** 44:25
127:14
**excluded** 43:12
65:8 71:3,6
118:9 120:22
**exclusive** 154:9
**exculpate**
46:19 65:20
**exculpated**
58:1,7,11,15
59:1,18 60:3,6
60:21 64:20
65:6,13 66:7
67:2,3 145:3
**exculpation**
46:9,19,25,25
47:7 55:15
57:4,9,17,20
57:23 59:5,5
59:10,11,15
60:7,13,13,23
63:1,13 64:1
65:10,12,22,23
66:10,25 67:4
67:21 68:18,19
68:21 69:1,2,6
69:21 70:2,16
100:6 144:18
144:21 145:1,3

145:8
**exculpations**
43:13
**excuse** 53:14
110:12 131:5
133:3
**excused** 100:5
**executive**
33:14
**executives** 34:8
35:25 36:5
**exempt** 113:24
**exercise** 31:13
31:14
**exercised**
99:21
**exhaustively**
124:6
**exhibit** 112:2
135:8,10
**exhibits** 109:16
**exist** 57:4 60:7
66:1 80:7
106:4 125:7
**existence** 57:17
60:4,5 65:11
**exists** 54:14
100:22 127:20
**exit** 43:6 55:24
79:1,2 80:22
84:8,9
**exiting** 84:6
91:8
**expansive**
105:22 106:14
**expect** 64:18
88:11

**expected** 118:7
118:7
**expecting** 39:9
**expeditiously**
155:7
**experience**
52:6,8
**experienced**
85:25
**expert** 23:14
25:1,11,12
44:23 109:5
117:21 119:16
119:21 141:1
**experts** 45:4
53:20 119:8,25
**explain** 25:20
145:14
**explained**
26:15 27:15
**explicit** 154:10
**explicitly**
47:10 124:15
125:3
**explored** 119:5
**exposure** 87:25
149:2
**express** 68:3
**expressed**
118:23
**extend** 71:19
**extended** 69:22
79:2
**extensive**
32:24
**extensively**
35:21

**extent** 37:18
59:6 74:19,20
**extremely** 44:9
77:22 100:4
110:2
**eyeballs** 98:7
**ezra** 11:6

### f

**f** 1:21 5:9
10:11 110:17
111:2 157:1
**f.3d** 46:13
**face** 102:25
**faced** 41:23
42:10 122:2
**facilitate** 64:12
82:7,12 121:16
**facilitating**
126:7
**facing** 38:10,13
69:17
**fact** 16:16
23:25 34:4
38:9 42:6 66:4
72:5 78:14
79:22 80:19
82:25 86:7
87:9,16,24
101:20 104:9
105:15 121:7
122:18 123:5
124:15,19
127:19 129:9
129:21 134:7
142:2 146:17
148:7 150:1

**factor** 86:9
134:6
**factors** 16:7,8
20:20,21 86:2
97:3 103:19
104:23 105:16
**facts** 33:5 48:9
74:21 82:9
97:17 101:15
107:2 155:25
**factual** 107:5
**fahey** 8:10
**fahrenheit**
18:16 38:4
39:23 48:25
53:2 56:2
93:23,25
**fail** 37:20
76:19
**failed** 96:3
112:14 119:17
121:6
**fails** 105:1,19
**failures** 47:2
**fair** 45:15
51:21 66:3,22
66:24 91:17
107:9 114:15
115:7 141:6
144:10 149:19
154:18
**fairer** 135:18
**fairly** 40:15
**fairness** 128:10
**faith** 42:19
43:5 47:8,14
49:19,21,23

54:10 68:25
69:7,13,15
125:11
**fall** 68:20
**falls** 21:3
**family** 116:21
**far** 9:2 66:8
83:3,15 132:13
132:16 155:3
156:2
**faraj** 21:15
22:4 24:14,23
24:25 25:1
44:24 45:13
**faraj's** 22:20
23:5,10 44:25
45:2,3 140:25
**fare** 152:14
**farr** 78:21
89:20
**fast** 83:4 84:9
**favor** 61:10
62:10,11,18
78:23 110:6
**favorable** 93:5
**feat** 56:6
**feature** 53:8
**featuring**
121:1
**february** 101:6
112:8
**federal** 55:7,22
81:18 88:3
**fee** 53:16
**feel** 136:25
140:6 142:14
143:10

**feeling** 139:21
139:24
**feelings** 140:7
155:23
**feels** 140:18
**fees** 136:18
139:3
**fellow** 89:19
116:5
**felt** 62:20
135:15
**female** 131:4
**ferrara** 83:14
94:12 95:7
**ferraro** 24:22
33:20,21 35:12
48:15 111:17
120:12,21
121:18 143:17
146:5,13
153:12,12
**fiat** 125:4
**fiduciaries**
46:20 54:9,10
68:22 69:3,14
69:21 70:1
**fiduciary**
46:14 52:16
54:15 99:21
112:8,14
154:15,16
**fifth** 86:25
**fifty** 106:9
**fight** 112:22
140:9,9
**figure** 122:9

figures 27:22
file 18:10 19:1
  32:12 39:7,9
  40:22 66:21
  77:7 81:22
  82:3 101:17
  118:13 129:18
  155:5
filed 14:10,23
  16:4 18:18
  23:15 27:16
  43:18,20 45:1
  51:4 59:13
  61:23 62:1
  72:6,16 73:6
  74:9 81:12,17
  92:9 94:8
  96:23 97:1
  101:21 102:9
  102:11 105:3
  107:17 119:18
  129:12,13,15
  129:17,18,18
  129:20,22
  144:19 147:21
filing 39:10
  47:22 58:9
  101:23 105:6
  110:1 121:20
  124:7,11
  126:20
filings 155:3,5
fin 82:3
final 19:1
  110:10
finalize 87:12

finally 19:4
  52:19 88:15
  96:14 99:4
  126:19
financial 33:22
  35:22,22 42:7
  48:9 91:19
  104:22 111:6
  120:8
financially
  112:22
financials 38:9
  38:18,19 39:8
find 49:25
  64:17 110:2
  117:18 140:1
  143:23
finding 26:21
  44:3 87:24
  135:19
findings 16:15
  72:5 86:17
  87:15 129:9
finds 37:18
fine 84:20
finish 114:21
  115:1 123:5
fired 33:24
firm 68:23
  69:25 103:14
  126:7
firmly 117:18
firms 143:14
first 19:11
  20:11,15 24:3
  33:13,22 40:17
  43:9,14 55:20

56:25 57:14,16
  71:19 72:7
  73:12,12 75:13
  75:16 85:7,16
  89:7 92:23
  99:4 108:4
  114:12 116:2
  120:1 124:2,12
  128:19,24
  137:4 138:2
  143:18 146:23
  148:24 150:18
  153:7
firsthand 90:3
fish 142:2
five 14:19 53:5
  77:22 85:8
  86:1 106:6
  111:7
five's 111:4
fixed 101:7
flag 18:3 26:14
flannigan 8:11
flare 140:10,11
  140:12 152:12
  152:13
flat 137:3
flaw 23:5
flawed 104:21
  132:4
florence 8:11
flow 88:13
flower 4:4
focus 16:11,11
  20:21,21 31:20
  43:9 57:2 87:7

focused 22:24
  31:11 55:25
focusing 23:13
following 18:5
  43:20 46:1
  51:2 105:21
  109:9 117:8,10
  121:20 143:19
footnotes
  58:14
forbids 130:14
force 123:10
  133:5,17,25
forced 113:20
  131:21 136:3,6
  136:7,23
  141:24 151:22
  151:25 155:12
forces 104:9
  132:12,18
forcing 132:14
  132:19 133:2
  134:8
forecast 98:17
forecasted
  98:13
foregoing
  157:3
foremost
  124:12
forever 135:16
forget 151:2
form 37:24,25
  38:8,17,21
  39:7,8,10,11
  39:16,18,24
  40:9 78:15

| | | | |
|---|---|---|---|
| 81:20,22 82:3 | **foundation** | 147:20,21,25 | **galka** 21:15 |
| 130:7,10,11,13 | 124:20 | **fucking** 131:4 | 22:3,21 44:7 |
| 130:24 144:19 | **founded** 103:6 | **fulfilled** 128:4 | 44:13 45:16 |
| **formal** 17:18 | **four** 25:5,12 | **full** 51:17 53:4 | 102:23,24 |
| 112:21 119:10 | 97:3 | 57:20 63:25 | 103:4,10,10,14 |
| **formation** | **fourth** 86:17 | 87:15 108:20 | 103:16 109:5,8 |
| 89:18 90:9 | **framework** | 154:12 | 109:12,15,19 |
| **formed** 42:25 | 42:4 | **fully** 20:23 | 117:21 120:17 |
| 144:23 | **fraud** 78:12 | 128:25 | 121:17 122:3 |
| **former** 58:11 | 142:17 151:5 | **fundamental** | 122:10 141:2,8 |
| 80:12 120:19 | **free** 132:24 | 117:4 124:10 | 141:21 |
| 143:15 | **freedom** | **funding** 109:20 | **galka's** 22:18 |
| **formerly** | 137:15 | **funds** 108:16 | 44:17 45:4 |
| 107:12 | **freedoms** | 109:6 126:12 | 120:11 122:9 |
| **formulate** | 143:9 | 139:4,24 | 122:20 141:11 |
| 42:21 46:11 | **freeze** 108:18 | **funny** 144:1 | 141:14 153:24 |
| **formulation** | 109:3 | **further** 34:22 | **galka's** 102:25 |
| 49:11 | **frequently** | 46:24 54:5 | 109:11 |
| **forth** 20:16 | 47:1 | 58:5 79:24 | **gallagher** 8:12 |
| 23:14 87:16 | **friday** 72:6 | 80:2 84:6 | **gamble** 138:20 |
| 125:13 146:9 | 73:18 129:17 | 89:17 104:12 | **games** 138:10 |
| **fortunately** | 129:18,20,23 | 106:14 121:25 | 140:3 |
| 90:17 | **fried** 109:22,25 | 123:1 143:3 | **garrity** 46:17 |
| **forty** 29:20 | **frishberg** 6:8 | 155:5 | 46:24 |
| **forum** 138:12 | 82:21,22 84:14 | **furtherance** | **gather** 15:1 |
| **forward** 38:5 | 84:17,20 | 56:12 | **geary** 8:13 |
| 43:2 56:17 | **frivolous** | **furthermore** | **gender** 80:3 |
| 78:10 80:22 | 107:17 | 105:1 121:3 | **general** 19:23 |
| 82:8,15 90:1 | **front** 30:18 | 124:22 | 44:1 127:2 |
| 92:4 145:10 | 69:9 153:20 | **future** 22:14 | 139:5 |
| **forwarded** | **frustrating** | 59:17 72:21 | **generally** |
| 141:10 | 91:10 | 79:3 98:8 | 75:16 145:3 |
| **fought** 53:12 | **ftc** 55:11 | 105:2,8 119:9 | 149:15 |
| 91:16 | **ftx** 101:20,21 | | **generate** 153:9 |
| **found** 46:13 | 101:22 102:3,9 | **g** | **gergi** 9:6 |
| 111:3,5 135:15 | 102:11,11,17 | **g** 7:9 14:1 | **getting** 51:4 |
| 142:5 | 109:25 141:3,9 | **gabriela** 8:21 | 55:25 67:9 |

84:15 89:6,17
95:24 139:11
143:4,5
**gheorghe**  8:14
**giardiello**  8:15
**give**  14:3 32:23
96:18 115:16
116:18 135:21
143:25 147:14
**given**  15:15
23:5,11 25:5
32:2 37:8
51:21 62:16
78:3 94:13
99:23 103:15
121:8 134:2
137:24
**gives**  53:8
99:14 102:8
131:19
**giving**  123:15
123:17 142:14
**glasses**  129:25
**glenn**  1:22
140:11
**go**  15:7 27:21
29:11,23 31:8
32:13 36:2
39:1,18,21
41:17 56:5
68:9 69:9
70:20 73:13
93:1,7 98:1,2,4
100:19 108:11
116:15 120:17
124:1 128:23
129:6,22

130:21 131:7
134:22 135:5
142:10 145:10
**goal**  15:16
40:11 79:24
155:2,6
**goes**  39:17
83:13 100:17
134:1 147:18
**going**  14:11,16
14:17,24 16:11
19:1,8 23:12
30:5 32:1
33:15 34:18
35:3,4,18,20
36:13 37:20,21
39:23,25 40:7
43:9 53:10
56:20 59:14
60:21 64:19
65:1 66:16,18
66:20 74:20
75:11 76:17
78:10 82:8
88:23 92:8,15
96:12 98:1
114:21 116:18
129:15 140:14
142:8,13 143:3
144:20 147:5
147:22,24
149:10 150:10
153:6,7,8,9
154:22 155:1,4
155:4
**gold**  104:1

**gonzales**  12:14
**good**  14:4,5
41:9 42:19
43:5 47:14
49:18,21 54:10
56:21 69:7,13
69:15 71:16
77:17 81:6,8
84:22,25 89:1
90:24 107:20
123:22 125:11
152:8,10
**goof**  24:13
**gorrepati**
12:15
**gotcha**  148:11
**governing**
124:16
**government**
54:24 132:22
133:5
**grace**  7:12
**grant**  30:24
31:20 46:15
68:21 112:13
138:5 151:22
154:10
**granted**  135:24
140:16
**grants**  46:10
**graph**  29:12
**grasps**  119:11
**grateful**  79:23
140:17
**graubert**  8:16
**great**  68:17
83:14 90:5

100:2 137:25
**greater**  90:24
114:9
**greatly**  78:4
**green**  1:13
**greene**  8:17
**greg**  9:4
**gregory**  10:11
**gross**  46:22
47:9 68:25
**ground**  19:20
77:4
**grounded**
107:2,5
**group**  5:2 6:2
18:19 20:8
50:10 71:15,18
71:24 74:17
77:19 78:11,15
78:22 80:5
81:2 90:15
101:17 112:17
112:19 126:4
149:20,22
**grouped**  19:10
**groups**  17:18
18:17 58:8
78:1 80:11
**grow**  43:1
**guarantee**
113:15
**guess**  14:23
47:4 73:24
77:6 82:6 94:8
**guessing**  54:13
**guest**  84:19

gundersen
  8:18
guthrie  8:19

**h**

h  3:22
hadn't  96:25
half  93:22
  108:22 139:11
  153:5
hall  121:4
halls  48:2
hand  22:20
  23:6 32:8,14
  39:19 45:16
  155:22
handagama
  12:16
handful  17:25
  74:2 87:9
  118:21
handle  142:17
hannah  11:8
happen  79:2
happened  89:8
  97:9 98:1
  119:1
happy  87:14
  87:17 91:10
  138:16 152:5
haqqani  8:20
hard  53:12
  56:7 64:17
  69:19 71:20
  80:20 92:19
  120:13,16
harrington
  93:25 96:11

97:5
harrison  12:17
hash  98:16,16
hasn't  98:19
hat  50:17
haven't  94:8
  97:16
hawaii  114:12
  114:16,18,19
  114:20,20,23
  115:4
headaches
  142:1
heading  154:7
headquarters
  122:6
hear  116:11
  123:20 128:17
heard  19:4
  22:3 50:3
  56:23 71:15
  78:3,7 87:8
  94:20 152:4
hearing  2:1
  17:22 18:6
  38:2 44:19
  49:3,6 51:10
  72:9 80:19
  92:18 93:3
  113:18 117:24
  120:11 129:11
  155:15,21
hearings  19:4
  85:9 155:12
heart  127:23
  129:2

hein  12:7
held  99:16
  100:1 121:5
hell  35:19
hello  123:20
help  18:8 34:1
  58:3 112:20
  135:18
helped  83:16
helping  58:11
  86:20 141:17
helpless  139:24
hensley  8:21
heras  11:17
herculean
  35:12
hermann  6:10
hernandez
  8:22
herrmann
  78:20 88:22,23
  88:25 89:1,2
  91:3 92:7
hershey  8:23
hex  122:5
he'll  108:12
high  51:5
  106:7 123:8
  143:22
higher  37:19
  99:20 113:15
highlight  17:13
  48:11 86:1
highlighted
  30:23,25
  120:10 123:12

highlights  89:5
hire  136:4,14
hired  33:20
  95:7
historic  38:10
  38:13
historically
  69:2,20
history  141:16
hit  153:15
hittelman  8:24
hmm  28:9,14
  67:23
hoc  5:2 6:2
  17:18 18:16,19
  50:10 58:8
  71:15,18,24
  77:16,18,19
  78:1,7,11,22
  79:10,23 80:10
  81:2 89:18,21
  90:10 95:10,11
  95:11 96:1
  101:17 112:16
  112:19 149:20
hocs  93:19
hoc's  79:1
hoeinghaus
  35:24
holcomb  8:25
hold  56:4
holdco  98:21
  98:24
holder  111:4
  112:10 124:17
  149:4

**holders** 6:2
16:25 17:19
19:16,17,18,22
19:22,24 20:4
20:9,25,25
33:17 34:20
37:1,5,17
39:20 42:12
43:25 79:4
101:5,8,10
110:12,22,23
111:3,10,18
117:16,22
122:16 123:3
133:18 134:1
137:1 147:10
149:10,20,23
**holding** 143:2
**holdings** 121:6
**holds** 117:2
143:1
**holohan** 12:18
**home** 114:19
114:20
**hon** 1:22
**honor** 14:5,7
15:12 16:17
18:3 19:3 20:5
26:14 27:11,13
28:12,17,22
30:16 31:16
33:9 36:11
37:23 40:2,6
41:1,3,9,18
43:22 44:4,12
50:3 53:14
54:9 56:12,21

60:22 61:11,15
61:15,19,22
62:13,23 63:9
63:11,16 65:4
66:3,24 67:11
67:20,25 68:7
70:3,5 71:11
71:16 73:15,23
74:16,23 75:5
75:8,9,11,14
76:6,11,13,14
77:3,11,14,17
78:5 80:14,18
80:25 81:6,12
81:20 82:5,18
82:22 83:19
84:1,10,20,25
85:24 87:15
88:2,20 89:2
91:5 92:17,24
100:10,20
101:5 102:10
103:18 107:20
108:7,10,14
109:17 110:2
110:10,17
111:2,17,21
112:6,24
113:11,23
114:5 115:2,21
116:8,20
117:18,24
118:18 119:11
121:24 123:22
126:19 127:10
127:23 128:1
128:11,17

133:16 144:6,8
144:9 145:6,11
152:15,21
153:20 154:20
156:3
**hope** 39:4
43:10 52:20
53:10 80:23
82:15 88:11
123:2,25 124:7
128:11 135:16
138:20
**hopeful** 80:19
87:20
**hopefully**
41:16 83:12
87:4 88:8
123:4 153:9
155:17
**hoping** 138:19
**host** 15:9,10
**hot** 33:14
**hour** 103:16
141:13
**hours** 49:20
141:12
**hovering** 114:8
**hudson** 106:16
**huge** 89:16
90:1,16,24
**humanly** 83:5
84:9
**humble** 139:14
**hundred**
134:10
**hundreds**
49:20 85:20

103:8 121:14
**hurley** 9:1
**hussein** 44:24
140:25
**hybrid** 2:1
**hyde** 2:25
157:3,8
**hyperbole**
25:21 46:2
**hypothecate**
31:1,21
**hypothetical**
44:16 45:21
**hypothetically**
44:13

**i**

**i.e.** 94:22 130:4
130:17 138:7
**ico** 122:19
**idea** 18:4 117:3
118:15 153:11
**ideal** 120:8
**identical** 30:6
127:10
**identified**
52:13 58:13
62:19,25 63:8
75:8 117:20
**identify** 58:15
64:15,17
**identifying**
59:14
**ignat** 5:15
17:18 85:1
**ignore** 101:20
101:25 140:22

ignores   53:3
ignoring   153:2
ii   32:5
il   3:6
illegal   129:3
  151:10
illegality   129:4
illogical   104:20
immanuel   6:10
  78:20 88:23
  89:2
immediately
  107:12 115:25
immunity
  46:15
impact   49:12
  118:2,15 119:4
  123:6
impairing
  130:15
impartially
  128:12
implemented
  117:5
implications
  74:21 142:15
  142:17
implies   46:14
implore   125:10
  127:23
importance
  26:6 86:25
  118:19
important   38:4
  40:6 41:2
  52:21 57:5
  58:23 64:10

80:1 86:19
95:16,20
155:17,18
importantly
  50:24 85:13
  86:22 88:17
  93:21 97:16
impression
  56:25 105:4
improper
  131:13
improperly
  36:15
improve   52:23
improved
  57:15
improvement
  53:12
inaccurate
  98:14
inadvertently
  120:2
inappropriate
  51:14 98:4
  134:9
incentive   19:13
  33:1,4 35:10
  36:3 58:17
  94:13,14 146:5
  146:15
incentivized
  34:8
inception
  105:23 122:17
include   34:10
  39:8 47:8
  55:14 75:7,13

108:1 139:8
143:12
included   47:1
  47:7,22 58:9
  60:5 63:12
  72:10,12 87:19
  99:25 113:8
  114:1 120:20
  145:18 150:19
  154:24
includes   38:25
  47:14 49:19
  50:15 115:14
including
  16:19 23:23
  24:5 47:19
  85:8 90:7
  137:8
inconsistent
  22:21 25:4
incorporate
  16:24 39:14
incorporated
  21:5 39:16
  81:14 87:18
incorrect
  126:25
increase   89:14
  118:25 123:9
incredible
  54:21
incredibly
  115:23
indenture
  151:3,4
independent
  50:23 95:3

indicated   81:3
  109:8,13,14,23
  118:8
indicates
  106:20 112:18
  113:24 114:13
  122:8
indicating   77:8
  113:13 121:15
indication   45:9
indications
  120:7
indicative   44:8
  54:4
indicia   86:2
indiscernible
  83:18,22,23
  84:4,5,5,9
  89:11 90:18
  94:6 95:19
  96:19 97:24,25
  98:11,11 99:3
  99:18 100:7,7
  100:24 102:5
  105:22 107:12
  107:15 111:5
  113:9 118:11
  139:10 141:24
  142:9,21 143:9
  143:10,12
individual
  133:6 149:22
individual's
  50:21 54:13
individually
  48:1 93:10

individuals
18:12 41:21
52:8 62:3
104:7 124:22
145:15 146:23
154:14
industry 42:3,5
inequitable
102:19
infeasible
152:2
inflation 122:5
inflection 30:2
30:7
influence
79:22 106:11
106:16 131:15
142:3
influenced
106:13
influencer
79:23
influencing
105:17
informal 81:15
information
51:17 52:23
58:6 59:8
60:18 61:1
66:8 79:20
113:6 121:18
informed 48:8
89:13 113:6
infusion
133:11 134:14
inherent
104:13

initial 53:2
79:13 108:20
117:21 119:13
119:14 122:19
initially 138:17
injustice
125:24
injustices
135:15
input 52:23
96:7
inquire 120:19
inquired
117:25
inquiries 50:8
inquiry 120:21
insert 135:22
140:8
inside 135:24
insider 106:4
insiders 106:13
106:22 119:7
122:14 135:21
insinuation
49:22
insisting 26:11
insolvent
147:25
instance 41:22
53:1,25 75:13
instances
115:3
instant 86:5
instilled 140:7
instruct 52:9
instructions
62:12

instructive
57:25
insurance
104:24
integrity
107:11 108:1
125:11 127:21
intelligence
23:20,21 24:6
24:14,16
intended 43:2
69:3
intention 121:4
intentional
21:14
intentionality
127:13
interactions
112:6
interest 17:10
20:14 21:8,11
21:18,21 34:25
37:20,21 46:12
47:19 60:15,24
71:1,5 76:16
76:20 78:10
87:22 94:23
103:5,11
104:24 112:9
112:11 115:10
115:16 121:10
126:13 141:2,6
143:1 155:6
interested 50:8
85:12
interesting
15:24 111:3

interests 17:7
21:7 32:7 44:5
44:16 49:21
50:1 51:1
54:11 90:23
115:4,9 141:24
142:2
interfaced
48:12
interim 48:15
internal
122:17
internally 25:4
international
116:21
internet 98:5
104:12
interpret
113:21 146:11
146:11
interpretation
121:21 126:23
interpreted
115:24 116:1
interrupt
131:7 142:10
144:12
interrupting
73:3
intersect 29:10
interviewed
48:17
interviewees
79:11
interviews
48:18,19

intimate 65:16
intrinsic 45:10
  103:23 104:3,5
  104:9,14,20,25
  105:1,12,16
introduce
  44:23
invalid 61:16
inventing
  139:10
invested
  146:23
investigate
  141:14
investigating
  42:10
investigation
  47:25
investigations
  55:10 103:13
investing 55:2
investment
  33:16 53:2,4
  94:2 96:14,16
  125:18
investments
  15:16 42:7
investor 93:25
investors
  132:20
invited 112:9
involve 42:2
  62:21
involved 33:19
  48:13,25 59:3
  66:19 115:25
  136:11,19

143:21
involvement
  117:6 135:24
iridium 20:20
isolated 20:3
issue 18:3
  19:15,20 21:17
  26:23 27:1,11
  27:17 30:11
  33:14 34:23
  36:12 40:5,8
  43:14 46:3
  62:5 65:5
  67:18 73:7,16
  73:23 74:7,10
  74:21 75:6,19
  76:2,3,14
  87:21 108:21
  109:1 117:7
  124:12 131:3
  146:5 147:19
  148:3 155:20
issued 93:8
issues 15:25
  17:15,25 18:2
  18:2,23 19:12
  20:24 24:15
  30:10 31:25
  36:11 38:8,25
  42:22 52:25
  54:17 55:17
  56:8 57:2,3,8
  57:13 62:24
  65:3 72:4,14
  72:21 73:10
  74:16,24,25
  75:1,3 76:5

81:14 82:24
  86:9,15 87:9
  90:7,18 91:18
  108:15 117:20
  123:3 144:17
  147:5 148:1
  153:24
item 26:14
  38:4 136:21
items 136:24
iterative
  120:23
it's 74:20 75:10
  83:24,24 84:20
  87:25 88:13
  89:4 91:7,15
  96:24 97:17,24
  100:3 102:14
  116:14,19
i'm 75:2,2 76:2
  81:22 82:10
  84:14 87:14
  98:1 114:21
  116:13,18
i've 95:22 99:5
  116:3

**j**

j 5:6 7:23,24
  12:25
james 8:9
jamshid 9:2
janitor 83:10
january 40:18
  40:20,24
jarno 12:4
jasleigh 8:13

jasmine 7:5
jason 9:20
  83:21 89:22
jaymzzz 139:9
jean 9:15
jeff 84:25
jeffrey 5:19 7:8
jelisavcic
  103:6
jennifer 10:20
jeremy 9:22
jerry 9:24
jesus 131:4
job 51:1 54:21
  83:14 86:24
  100:2
joe 78:21 89:21
  95:13
joel 7:10
johan 6:20
john 8:7 10:9
johnson 9:3
join 116:22
jokes 104:12
jonathan 10:19
  12:22
jones 3:22
jose 15:9
joseph 9:16
  10:24
joshua 4:16
  7:20
journey 68:5
  108:15
joyce 6:6 77:17
  83:21 89:22

judge 1:23
46:17,24 69:10
91:2,3 123:4
123:10 133:16
140:11
judgement
113:6
judgements
95:2
judgment
51:19 52:15
107:8
june 24:8,10
24:10 120:4
jury 144:11
justice 4:18
55:3 90:22
107:2,9 127:23
128:10,13
justified
143:10

**k**

kaczkowski
9:4
kahn 9:5
kaitlyn 8:24
karen 1:25
156:4
kass 9:6
katherine 7:4
kathryn 8:18
kaufmann 12:5
kaza 9:7
keasey 9:8
kedzior 9:9
keep 14:17
34:18 48:8

91:13 134:14
keilty 98:9
keilty's 98:3
keips 36:7
keith 4:15 9:25
10:5 49:19
kelvin 120:25
kept 122:23
kevin 9:21
key 20:21 22:5
23:5,13 24:15
31:22 34:9
36:5 38:8
54:25 94:6
99:13 117:19
135:19 148:3
keyan 11:12
keywords 31:4
kherzi 9:10
kicks 39:11
kind 96:18
126:7 130:4
153:7
kirkland 3:3
3:10,17 14:6
63:16 67:4
75:6 92:22
144:9
kirsanov 6:16
36:24 37:6
107:19,20
108:5,6,7,10
108:12,14
114:19,24
115:1,2 116:9
148:7,12,18
149:8 153:23

kirsanov's
36:12 147:19
klorane 9:11
knauth 12:19
knew 44:14
65:17 71:8
94:22 138:25
139:3,25
148:14
know 14:8,13
14:24 33:14
40:7 59:12
63:12,15,19
64:24 65:18,18
66:17 67:19
69:4,10,25
90:3 95:1,10
98:22 100:17
109:13 112:3
116:14 118:13
135:14 139:9
142:6,17
145:22 148:15
152:15 154:5
155:23
knowing 60:16
61:12 71:2,6,8
112:7 138:22
knowledge
66:8 85:17
known 60:17
60:17 71:9
117:7 120:25
knows 88:22
koenig 3:8 14:4
14:5,6,14 15:7
15:8,11 16:17

20:5 21:13
27:20,24 28:4
28:9,12,14,17
28:22 29:23
30:1,5,9,16,19
31:3,7 33:7,11
41:5,6 43:8,15
43:23 45:1
54:18,20 56:10
58:17 63:14,16
63:16,20,24
64:3,6,9,12,21
65:1,4 68:15
72:17,23 73:3
73:4 75:4,5,5
76:13 77:8,10
81:21 127:5
144:5,6,8,8
145:2 150:7
152:20 153:13
156:3
kokinos 53:3
53:15
kovsky 81:2
kudos 89:24
kuhns 6:6
77:17,18 83:21
89:22 96:4
kuhrt 9:12
kurman 6:1
77:18 83:21
89:23
kyle 7:11

**l**

l 10:6 11:19
labor 55:23
132:23,25

**lack** 25:19
86:12 103:22
104:19 105:11
117:22
**lackey** 9:13
**lacking** 104:13
**lacks** 51:23
105:18 118:21
122:6
**lafayette** 7:22
**laid** 129:7
**lalana** 10:14
**landscape**
105:14
**language** 16:24
18:24 30:23,25
31:17 55:15
60:11 70:23
72:15 73:22
74:14,15 75:16
75:18,20 87:23
113:12 116:2
144:25 145:5
145:18 150:3
155:2
**large** 41:19
53:20 146:2
153:2 155:13
**largely** 50:21
69:6 104:15
**larger** 78:7
**largest** 90:15
112:9
**las** 11:17
**lasalle** 3:5
**lastly** 107:10
154:14

**latam** 46:17
47:5
**late** 15:4 93:9
129:14
**latona** 9:14
**latreille** 9:15
**lau** 6:24 134:19
134:21,23
135:1,3,4,6,9
135:11 142:11
142:12,23,24
144:2,4 151:18
**law** 14:17
16:16 19:2
42:4 47:12
48:9 69:24
72:5 87:9,16
94:9 101:14
103:14,14
110:6 126:3
128:12 129:5,9
130:14 131:18
133:8,8 143:14
155:25
**laws** 81:19
130:11 151:12
**lawsuit** 66:21
**lawsuits** 69:17
**lawyer** 29:4
136:4,14
138:13 139:3
**lawyers** 62:14
102:2 139:6,10
139:25 140:21
141:22 143:21
**layla** 10:4

**lays** 16:6
**lea** 9:11
**lead** 88:17
93:25 141:17
**leading** 87:1
117:8 120:23
121:13
**leads** 96:18
99:9 147:21
**leaked** 120:25
**learned** 32:21
**leave** 137:10
152:24
**leaves** 123:4
**led** 33:20 51:25
55:12 65:19
86:21 96:10
**ledanski** 2:25
157:3,8
**left** 29:17
95:12
**legal** 16:13
17:3,6 33:13
36:25 37:4
42:4,7,11
51:23 86:9
112:22 124:12
124:15,17,19
124:21 127:25
128:3,9 135:14
148:20 150:3
157:20
**legality** 81:18
**legally** 101:12
101:25 104:20
130:1,12

**legge** 12:20
**lehrfeld** 9:16
78:21 89:21
95:13
**lender** 126:14
**lengthy** 60:10
**lennon** 9:17
**leonard** 9:18
9:19
**lesser** 97:11
**lesson** 72:17
**letter** 38:6 39:6
135:7 138:17
**let's** 84:4
**level** 98:25
117:4 121:16
134:9
**levels** 36:4
106:16
**leverage** 126:4
**lexington** 3:19
**lexus** 47:6
**liability** 109:3
**liberties** 132:6
132:7
**liens** 95:2
**lies** 107:2
**life** 41:22
**lifetime** 105:23
**light** 106:16
121:8 137:2
**likely** 40:16
44:10 45:18,19
45:22 76:19
84:6 96:19
125:9

likened 151:3
likes 151:6
likewise 53:1
  82:13
limine 23:15
limit 90:22
  144:25
limited 27:6
  46:15 58:1
  59:8,16 66:10
  66:25 81:12,15
  93:3 104:3
  133:9 134:12
  145:4 146:12
limits 47:10
  57:23
line 29:15
  38:19 58:2,4
  58:12 81:9
lines 29:17
  44:20 49:4
  86:10
linked 119:7
liquid 34:10,12
  34:17 39:20
  40:8,11 42:15
  42:16 53:21,23
  53:23 54:2
  97:12,13,15
  99:11,15,20
  146:18,22
  153:3
liquidated
  44:15 121:7
liquidation
  21:10,23 22:2
  27:23 28:15,21

29:8,14,14,17
29:21 37:19
44:1,16 114:2
114:9,17
115:17 148:4
liquidity
  121:16
list 14:8 18:10
  57:8 58:10
  60:3 64:2
  154:24
listed 65:6
  112:2 143:13
listened 80:18
listening 100:9
  128:14
listing 96:17
lists 69:1
litany 68:25
litigants 59:17
  60:19 61:2
litigate 136:4,5
  137:24 138:13
litigated 20:23
  136:9
litigation 20:22
  48:5 57:18
  58:5 60:2,11
  65:24 73:15
  79:4 80:13
  85:5 90:1,4,17
  93:17 94:5
  95:6,14 100:8
  106:25 119:6
  136:18 143:23
little 14:20
  16:15,21 18:5

26:15 27:15
31:23 39:25
73:21 74:12
91:18 92:19
126:17 147:19
149:17
live 39:17,18
  133:15,24
lives 91:9
llc 1:7
llp 3:3,10,17
  4:1,9 5:1,14
loan 27:17
  38:15 113:3
  116:24 121:7
  124:14 125:3
  125:14 126:10
  126:12,13,13
  126:15,17
  127:7 128:4
  149:4 154:4
loaned 130:5
loans 19:12
  30:9,10,13
  95:11 116:24
  121:15 124:25
  127:4 149:24
location 83:8
locked 108:18
locking 119:23
lombard 6:3
long 37:11
  54:14 57:8
  68:3,5 71:22
  71:23 80:13,22
  82:23 89:4
  139:22

longer 18:25
  21:19,22 24:4
  39:13,17 140:9
  140:14
look 19:8 49:10
  54:5 68:17
  76:2,3 98:1
looked 123:6
looking 76:14
  80:22
looks 39:24
  45:14
lopez 15:9
  92:21 93:7
  108:12
los 4:5
lose 140:2,2
losing 138:20
loss 74:12
  109:18 125:9
losses 78:13
  117:17 123:2
  139:15 142:16
lost 15:15
  100:15,18
lot 16:9 17:14
  22:4 23:12
  41:19,24 42:5
  56:7 57:2 66:4
  67:10 138:10
  145:24 154:14
lots 23:10
  153:24
louder 55:4
low 105:7
  106:8

lower 22:2
29:1 36:7
37:20 113:15
lowest 21:3
lu 9:20
lucas 8:25
lucy 11:13
luke 11:10
luna 116:25
lupu 12:21
ly 68:24

**m**

m 9:21 11:2
12:5
machinations
128:8
maciej 10:13
made 25:16
34:13 35:2,3
37:14 40:15
42:5 48:8,21
48:22,23 49:2
49:8 54:3,22
54:22 56:8,13
61:8 62:20
68:2,20 83:17
84:3,18 89:5
89:16 92:4
93:15 94:17
97:11 98:9
116:3 118:13
119:11 125:11
145:22 148:2
148:19 149:11
151:9 153:22
main 19:11
22:15 30:10

34:23 41:20
83:8
maintained
96:16
major 32:9,23
48:23 50:4
79:8 90:19
142:1
majority 46:5
91:7 96:5
103:22 106:21
110:12 111:20
111:25 137:25
138:12
make 14:9 15:8
18:13 26:21,25
31:23 32:3
33:12 34:16,19
36:14 37:12,13
39:5 40:4,14
49:10 56:14
62:12 63:25
65:2 67:17
68:15 73:1
74:4,23 75:9
75:14 77:1
82:8,14 83:6
83:17 92:1
93:3 109:7
112:17 113:6
115:22 135:17
147:12 150:8
151:12 152:7
153:21
makers 47:4
makes 36:13
69:19 70:12,19

84:7 115:14
146:17
makeup 60:11
making 34:10
39:19 51:25
75:21 77:1
117:23 122:23
123:9
male 142:9
malpractice
52:2
man 61:24
mana 114:6,7
managed 19:5
management
33:16,18,19,25
43:1,1 53:6,9
77:20 83:12
88:16 153:8
mandating
130:11
mandatory
58:20 84:11
manipulated
24:11 45:5
106:21
manipulating
127:19
manipulation
106:4,10,14
107:7 117:11
119:8
manner 42:25
71:7
manus 9:21
march 133:15

margin 119:19
mark 4:24 9:18
10:17 32:9
50:4 122:20
market 22:7,8
24:11 34:4
35:24,25 36:2
36:4 43:3 44:7
44:9 45:6,8,15
96:13 99:4,24
103:24 104:15
104:16,21,24
105:9,21 106:1
106:3,15 107:7
113:16,19
118:7 119:18
120:14 125:5,8
125:12 128:5
markets
104:23
maronpot 9:22
marsal 21:17
marsh 9:23
martin 1:22
9:9 11:24
mashinsky
26:3,7 33:23
42:23 127:15
massey 9:24
massive 78:12
100:3 117:8
material 53:13
117:19
materially
93:11
materials 96:3

| | | | |
|---|---|---|---|
| **math** 29:5 | **meaning** 90:14 | **members** | 115:4 146:10 |
| **matter** 1:5 | **means** 20:10 | 18:14,16 46:9 | 153:15 |
| 34:4 82:25 | 71:8 146:19 | 46:16,20 47:13 | **methodologies** |
| 95:4 102:4,12 | **meant** 16:23 | 48:8,12,16,19 | 107:8 |
| 104:19 107:10 | 24:13 | 48:22 49:7 | **methods** 107:4 |
| 107:11 112:5 | **measures** | 50:14,17,22,22 | 115:15 |
| 136:24 139:6 | 119:4 | 50:24 51:15 | **meticulously** |
| 139:17 140:2 | **mechanism** | 52:6 58:8,13 | 124:6 |
| **matters** 97:25 | 137:15 | 78:9,20 79:11 | **metrics** 34:9 |
| 105:10 | **media** 120:19 | 79:20 80:3 | 35:10,20,21 |
| **matthew** 11:7 | 137:19 | 88:19 89:19,21 | 98:6 106:17 |
| 11:18 | **mediation** 85:4 | 93:17 95:24 | 118:11 146:10 |
| **maude** 13:2 | 89:20 90:9,11 | 103:6 116:22 | 153:13,15 |
| **max** 102:23,24 | 90:12,21,25 | 143:13 | **mg** 1:3 |
| 109:11 141:1,8 | **mediations** | **meme** 105:15 | **mia** 12:12 |
| 141:11 | 48:4 | **memorandum** | **michael** 8:16 |
| **maximize** | **meet** 17:9 | 110:5 | 10:21 93:25 |
| 19:17 34:6 | 20:14 26:2 | **mendelson** | 96:11 97:5 |
| 79:25 121:5 | 35:8,20 109:3 | 10:1 | **michaels** 10:3 |
| **maximizing** | 114:16 115:9 | **mention** 58:24 | **mid** 39:10 |
| 42:14 | 115:16 | 89:5 128:25 | **middle** 19:20 |
| **maximum** | **meeting** 96:2,5 | 142:7,12 | 77:4 |
| 99:14 152:10 | 121:8 131:15 | **mentioned** | **midst** 155:11 |
| **mccarrick** 3:15 | **meetings** 47:15 | 17:21 29:4 | **mike** 9:3 10:25 |
| **mccarter** 5:1 | 48:14 50:20 | 96:3 109:17 | 12:20 |
| 71:17 | 79:15 | 122:25 150:11 | **milin** 10:8 |
| **mccormack** | **meets** 20:15 | **mercuri** 10:2 | **milligan** 10:4 |
| 9:25 | 21:7 46:6 | **mere** 25:20 | **million** 44:12 |
| **md** 6:4 | 115:10 | **merely** 59:2 | 53:3,3,4 94:2,3 |
| **mean** 28:20 | **melissa** 11:19 | 131:14 | 96:15,15,16 |
| 57:1 63:15 | **member** 18:19 | **merits** 52:18 | 97:19 98:22 |
| 64:1,14 69:23 | 32:9,16 54:8 | **mess** 42:8 | 99:2,16 101:2 |
| 74:14 100:5 | 60:18 71:3,7 | **message** 109:6 | 102:8 108:22 |
| 136:3 138:3 | 85:5 110:7 | **met** 18:6 21:19 | 122:8,11,19 |
| 139:19 146:24 | 112:21 113:22 | 21:22 44:6 | 130:17 |
| 147:24 151:7 | 121:3 | 48:16 58:20 | **millions** 103:8 |
| | | 98:19 108:24 | 121:14 |

**mime** 104:11
104:14
**minds** 131:15
**mineola** 157:23
**minimis** 44:10
45:4,19
**minimize**
52:20
**minimum**
99:12
**mining** 38:11
38:11 39:9
42:14 47:16
88:10 98:11
99:2,17
**minor** 98:22
**minute** 88:24
92:11 121:23
133:22 140:13
142:23
**minutes** 14:14
27:21 41:15,16
92:8 100:16
144:5
**mira** 8:20
**mis** 126:21
**misbehavior**
128:8
**misconduct**
46:22 47:9
68:25 127:24
**misleading**
105:13
**misled** 42:6
121:22
**misrepresent**
127:18

**misrepresent...**
110:8 111:22
117:4 151:6
**misrepresent...**
152:25
**misrepresented**
110:5 113:8
121:19
**missing** 111:4
**mistake** 98:8
**mistakes** 116:3
**misundersta...**
86:7
**mitchell** 9:1
**mitigate**
117:17
**mix** 125:8
**mm** 28:9,14
67:23
**modified** 18:12
26:24 72:11
73:5 74:8 93:5
**modify** 40:3
**moment** 14:4
17:21 26:3
33:13
**monday** 53:17
**monetary**
110:12,23
111:13,14,15
111:20,25
114:1
**monetize** 42:16
**money** 83:3
136:13 139:7
139:16 140:2
141:11 142:3

143:6
**month** 24:18
37:15 71:22,22
71:23 143:18
143:18,18
**months** 33:20
35:15,15 49:18
82:5 86:19
90:12 143:19
**morning** 43:18
53:17 61:23
62:1 100:15
127:6
**motion** 23:15
40:2 44:25
56:12 81:16
107:17,17
118:13
**motive** 54:6
**move** 38:4 53:9
56:17 70:6
82:15 92:4
139:15
**moved** 69:24
115:7
**moving** 26:13
30:9 31:25
43:1 47:20
91:9 101:19
102:23 103:17
**multiple** 95:1
95:22 97:13
**multiply** 28:23
29:7,24
**multiplying**
29:15 102:8

**must've** 14:21
**mutual** 80:8
**myriad** 105:16

**n**

**n** 3:1 14:1
157:1
**nagi** 83:21
89:22
**name** 18:15,16
63:8 64:15,17
95:12
**named** 75:18
143:17
**names** 64:19
**naming** 18:4
18:14
**narrative**
126:25 141:22
**narrow** 20:11
57:12 65:24
68:1
**nasdaq** 80:4
**natural** 42:17
**nature** 150:11
**ne** 5:9
**near** 22:19
39:5 148:6
**nearly** 15:21
16:1 17:24
**necessarily**
94:23
**necessary** 36:3
56:11 74:3
75:24 77:2
144:7
**need** 14:12
16:6 26:22

| | | | |
|---|---|---|---|
| 27:11 38:21 | neutral 132:7 | nicer 68:14 | noyes 10:5 |
| 43:15 54:5 | never 23:17,17 | nick 78:21 | 49:20 |
| 67:2,4 74:6,9 | 112:9 116:14 | 89:20 | nuance 58:24 |
| 75:17 76:17 | 118:3 120:22 | nicole 9:19 | number 16:22 |
| 83:25 86:17 | 149:1 | nine 106:8 | 17:16 18:21 |
| 96:22 100:1 | new 1:2,14 | 110:11,23 | 19:4,25 29:1,2 |
| 106:11 129:25 | 3:20 4:13,21 | 135:10 | 30:1,14,16 |
| 135:6 | 5:4,17 33:25 | noah 11:2 | 43:8 62:21 |
| needed 38:23 | 38:25 42:2 | nominating | 65:12 79:10 |
| 55:1 77:25 | 54:8 83:11,12 | 52:7 | 86:3 93:9 |
| 99:2 111:15 | 88:8 89:20 | non 19:17,22 | 94:19 98:6 |
| 117:15 | 90:9 133:12,12 | 20:25 106:1 | 100:3 102:7,9 |
| needs 99:1,24 | 133:15 134:10 | nonexistent | 111:4,7 118:14 |
| 100:5 | 140:1 141:17 | 105:7 | 127:7,9 129:8 |
| negate 105:8 | newco 21:25 | normal 120:5 | 146:20 148:9 |
| negative 96:12 | 27:22,25 28:5 | normally 35:14 | 148:13 149:19 |
| negatively | 28:21,24 29:19 | 41:24 | 153:2 154:1,8 |
| 96:12 | 35:6 38:14,24 | north 3:5 | numbers 15:1 |
| negligence | 42:25 43:2 | nose 51:25 | 29:9 30:6 |
| 46:23 47:9 | 48:6 51:2 | notably 16:19 | 155:14 |
| negotiated | 52:21,24,25 | 23:23 | numerous |
| 35:21 | 53:9,18 57:19 | note 72:11 80:2 | 82:24 85:13 |
| negotiating | 60:4,6 65:6,7 | 101:16 112:16 | 108:25 112:20 |
| 34:14 69:8 | 67:21 79:4,9 | 144:12 150:17 | 137:7 |
| negotiation | 79:13,15 80:1 | 150:19 151:11 | nuraldeen 7:13 |
| 35:15 58:22 | 83:4,8 85:22 | noted 43:17 | nw 3:12 |
| 65:18 66:2,18 | 93:13,15 94:1 | 72:8 81:21 | ny 1:14 3:20 |
| 66:19 | 94:2,3 95:21 | 148:9 | 4:13,21 5:4,17 |
| neither 52:17 | 97:18 99:11 | notes 109:23 | 157:23 |
| 113:14 | 130:18,20,24 | 151:4,7 | |
| net 85:23 | 132:19 141:15 | notice 51:6 | **o** |
| network 1:7 | 143:14 144:18 | 72:12 115:24 | o 1:21 14:1 |
| 116:22,23 | 144:18,19,22 | novel 42:2 | 157:1 |
| 117:6,12 120:7 | 146:25 153:6 | 120:24 | oath 121:22 |
| 121:14 122:17 | 153:11 | november | obfuscating |
| networks | nice 72:17 | 39:10 157:25 | 126:23 |
| 50:12 98:15 | | | object 81:16 |
| | | | 131:19 135:16 |

| | | | |
|---|---|---|---|
| **objected**  19:5 | **obligation**  72:9 | **october**  1:16 | 100:19 108:11 |
| 32:19 54:7 | 130:15 | 44:19 49:3 | 108:13 116:16 |
| 74:3,6 140:17 | **obligations** | 71:22 120:11 | 128:19 129:2 |
| **objecting** | 55:9 128:11 | 121:4,9 122:24 | 129:21,24 |
| 16:19 17:8 | **observation** | 154:1 | 132:12 133:18 |
| 33:2,7 74:11 | 96:7 | **offer**  122:19 | 133:23 134:21 |
| 74:14 75:22 | **observations** | 131:24 | 135:4,4,11,11 |
| **objection**  19:6 | 32:4 | **offered**  36:5 | 138:12,24 |
| 19:7 37:21 | **observe**  108:9 | 119:14 | **old**  157:21 |
| 46:8 68:2 | **observed**  78:1 | **offering** | **ombudswom...** |
| 72:15 73:18 | **observers** | 119:15 131:20 | 18:24 |
| 81:12,15 93:3 | 52:20 79:15,18 | 131:25 132:7,8 | **omission** |
| 96:24 110:9 | 79:20 95:12,25 | 132:21 133:1 | 117:20 126:25 |
| 129:7 135:13 | 96:8,10 97:4 | **offers**  45:13 | **omissions** |
| 138:17 140:5 | **obtain**  82:2 | **office**  56:22 | 117:19 |
| 140:14,15 | **obtained** | **officer**  33:22 | **omitted**  122:9 |
| 145:23 | 109:19 | **official**  4:2,10 | **onboarded** |
| **objections** | **obviate**  26:22 | 41:10 47:14 | 116:21 |
| 16:12,22 17:12 | 150:2 | 68:14 122:6 | **once**  78:19 |
| 17:13,22 18:21 | **obvious**  126:20 | 152:22 | **one's**  137:16 |
| 43:8 91:23 | 134:11,13 | **officially** | **ones**  20:22 |
| 92:1 128:25 | **obviously** | 101:21 | 49:2 |
| 129:2 137:8 | 19:11 40:13 | **offit**  6:1 77:18 | **ongoing**  82:1 |
| 140:20,22 | 65:16 71:24 | 83:21 89:23 | **open**  15:25 |
| 151:25 | 75:2 147:22 | **offset**  119:9 | 17:25 34:19 |
| **objective**  26:2 | 149:21 | **oftentimes** | 67:13,17 |
| 107:8 | **occasions** | 152:6 | 144:17 |
| **objectively** | 25:18 | **okay**  14:16 | **opening**  14:9 |
| 102:24 | **occur**  80:23 | 15:11 27:25 | 40:11 78:1 |
| **objector**  30:10 | 88:13 | 28:10 29:20,25 | 148:2,18 |
| **objectors** | **occurred**  79:10 | 30:8,9,17 | 149:18 151:2 |
| 76:21 85:12 | 97:6,9 | 33:10 41:17 | **openly**  25:18 |
| 87:7 89:13 | **occurrence** | 59:24 65:5 | **operate**  54:23 |
| **obligated** | 56:9 85:19 | 67:12,24 68:6 | 120:16 |
| 130:1,12 | **occurring** | 70:18 76:4,5 | **operates** |
| 145:16 | 90:11 | 76:10,12 77:9 | 104:21 |
| | | 84:17 92:10,23 | |

operating
  92:22 98:20
  122:2
opining  81:18
opinion  23:19
  31:18 44:7
  45:2,14 47:5
  53:19 117:14
  139:14
opinions  15:13
  16:10 19:16
opportunities
  36:10
opportunity
  20:19 27:5
  51:11,21 78:3
  78:6 117:16
  149:18 153:6
  153:20 154:2
  155:15,20
oppose  17:20
  19:9,10 90:15
opposed  76:20
  95:17 98:16
opposes  18:25
opposition
  107:21
opt  27:5,6
  37:15 61:6
  62:10,18 136:2
  136:7,10,14,16
  138:4 145:17
  145:19,21,22
  145:25 151:18
  151:21
opted  27:7
  61:5 136:9

option  53:8
  130:25 131:9
  131:10,13,19
  131:21,24
  139:18
optouts  61:16
  62:4,5
orchestrate
  26:9
orchestrated
  26:7
order  16:23
  18:12,13,24
  26:25 27:12
  36:19 43:18
  55:21 61:20
  62:25 64:8
  72:6,24,25
  73:5 74:1,8
  75:7,19 76:1
  80:21 93:8
  99:22 125:11
  126:24 131:2
  145:18 148:22
  149:3,6,7
  150:18 154:24
ordered  101:13
ordering  102:2
orderly  21:24
  28:10,21,24
  29:2 30:2
  38:24 54:16
  83:2 97:14,16
  99:10,13,20
  147:2,2
orders  148:24

organization
  49:11
organizing
  90:25
original  93:22
  129:7
otis  6:14 44:23
  100:13 111:8
  153:22
outcome  78:16
  143:1
outcomes
  79:22
outlandish
  25:7
outline  34:22
outlined  81:19
outlines  127:16
outset  14:7
outside  68:23
outsiders
  137:19
outstanding
  16:12 57:12
  62:23 91:18
  95:2 113:3
overall  96:15
overcollatera...
  121:15
overrides
  138:9
overruled
  37:22
overseeing
  95:7
overseen  35:4

oversight
  60:12 73:17
  79:4 80:13
  85:5 93:17
  94:5,6,13 95:6
  95:14 100:8
oversimplifi...
  105:12
overvaluation
  99:6
overvalued
  99:12
overview  17:12
overwhelming
  43:4,6 46:5
  90:19 137:5
overwhelmin...
  19:21 20:25
  21:6 37:6
own  26:6 47:23
  51:25 52:5
  68:3 90:23
  120:11 126:25
  136:4,6,18
  138:13 150:6
  150:10 153:23
owned  76:19
  93:14 150:9
ownership
  31:5,13,15,22
  74:4,13,18,22
  74:25 75:19
  124:13,13,20

| p |
| --- |

p  3:1,1 8:23
  10:22 14:1

**p.m.** 156:5
**pacifier** 95:25
  97:4
**pacifiers** 95:25
**packing** 35:15
**page** 23:22
  44:20 49:4
  72:18 73:19
  92:20,23 122:7
  127:12 135:8
  154:7
**pages** 108:12
  120:1,1 127:15
**paid** 103:16
  116:25 131:25
  132:1 143:22
  143:22
**palpable**
  118:22 121:10
**pandemic**
  155:12
**paper** 77:8
**papp** 10:7
**paragraph**
  43:17 72:18,22
  73:24,25 127:1
**paragraphs**
  126:24
**park** 5:3
**part** 17:6 32:12
  32:13 38:20
  49:18 52:21
  66:1 81:22
  98:22,24,24
  99:1 103:2
  128:3 130:2
  132:16 135:1

137:11 150:4
**partial** 142:16
**partially**
  133:10 134:13
**participants**
  36:1 69:22
**participate**
  149:4
**participated**
  48:2,3 50:20
  79:11 145:8
**participating**
  69:14 79:15
  85:3
**participation**
  155:10
**particular**
  18:20 20:23
  78:19 80:4
  86:2 89:9
  105:8 127:16
**particularly**
  21:4 35:13
  111:3
**parties** 14:9
  16:19,20 17:8
  17:11,16 18:5
  19:8 38:7 41:1
  47:4 48:10
  58:7,15 59:12
  59:12,16 60:3
  60:15,24 66:16
  67:22 69:7
  84:5,15 87:3
  91:24 118:9
  119:7 136:11
  145:3 152:7

**partis** 40:6
**partners** 95:5
**parts** 99:1
**party** 44:6 57:6
  58:4 59:1 60:6
  61:7 62:6,11
  65:6 71:1,5,25
  85:2 87:10
  136:7,17 137:9
  140:18 155:6,6
**party's** 145:7
**pass** 37:21
  111:15
**passed** 129:14
**passing** 151:11
**patel** 10:8 12:6
**patouhas** 10:9
**patrick** 12:18
**pause** 22:7,15
  22:22,25 23:8
  24:17,21,23
  25:18 45:15
  46:1
**paused** 117:13
**pay** 34:4 40:22
  119:10 121:14
  130:1 138:13
  146:13
**paying** 146:7
**payment** 35:8
**payouts** 142:16
**paypal** 34:15
  59:8,22 62:24
  63:7,21 64:18
  67:22
**pays** 126:13

**pdf** 92:18
**pending** 102:1
**pennies** 90:14
**pennsylvania**
  3:12
**people** 19:10
  34:5 40:9
  66:18 69:5,11
  69:12 92:21
  94:22,24 95:9
  97:12,13,20,21
  98:6 114:23
  115:7 135:7
  136:15,19
  138:14 139:3
  141:19,20
  145:13,24
  148:9 151:24
  153:1,3,10,24
  155:14
**perceived**
  104:19 105:11
**percent** 15:22
  19:24,25 28:4
  28:11,16,25
  29:21 30:4
  33:16 94:15
  95:8 97:19,20
  97:21,23 99:6
  99:7,13 102:20
  111:12,13
  114:3 115:6,18
  119:20,23
  137:20,20
  146:25 147:3
**percentage**
  28:1,2

[perella - plan] Page 44

| | | | |
|---|---|---|---|
| **perella** 94:25 | **persistent** 25:3 | 48:21,24 50:9 | 39:21 40:4 |
| 95:4 97:7 | **person** 78:4 | 50:16 51:5,8 | 42:21 43:4 |
| **perfect** 83:24 | 132:23 141:5 | 51:10,20,22,24 | 46:11 47:8,23 |
| 152:9 | **personally** | 52:12,19,25 | 48:3,4 49:1,11 |
| **perform** 46:11 | 25:23 68:3 | 53:11 54:6 | 49:25 51:3 |
| 53:7 | **pesce** 10:11 | 92:9,9,16,16 | 53:4,10 54:7 |
| **performance** | **peter** 8:7 12:25 | 93:1 100:11,12 | 55:15,21 57:4 |
| 35:10 | **petition** 21:12 | 143:13 146:4 | 57:8,16,18 |
| **performed** | 21:13,18 22:1 | 146:17 152:24 | 58:17 59:14 |
| 23:17 | 22:10,12,15,17 | 153:2 | 60:1 61:6,8,10 |
| **performing** | 22:19,23 23:3 | **phillips's** | 61:13 62:6,8 |
| 126:8 | 23:7,24 24:17 | 128:25 147:5 | 62:10,11,18 |
| **period** 24:21 | 24:23 25:9,17 | **phone** 68:4 | 69:8,14,16,23 |
| 37:15 39:11,14 | 26:12 33:21 | 128:22 | 72:1,3,11,16 |
| 42:3 47:10 | 37:19 44:9,11 | **phrase** 75:24 | 72:25 73:15,17 |
| 65:11 84:11 | 44:14 45:5,7,9 | **piece** 77:7 | 73:19,21 74:7 |
| 120:9 | 45:11,13,19,24 | 127:16 | 76:18,19,23 |
| **periods** 127:17 | 57:24 91:12 | **pill** 83:5 84:7 | 77:25 78:23 |
| **perjurious** | 101:10 105:25 | **pillay** 122:7 | 81:19 82:25 |
| 102:4 | 106:1 110:16 | **place** 89:15 | 83:1,17,24,24 |
| **perjury** 102:2 | 112:12 113:19 | 90:9 114:19 | 84:2,12,21 |
| **permit** 14:11 | 114:6,15 118:1 | 132:14 144:20 | 85:3,3,12,12 |
| 14:24 15:2,4,5 | 121:12,13 | 146:23 | 85:16 86:16,22 |
| 85:18 88:5 | 123:11 125:8 | **placement** | 87:1,10 88:1,6 |
| 129:6 | 148:4 150:13 | 107:11 | 88:12 89:3 |
| **permitted** | 150:15 | **places** 24:24 | 90:15,16,19 |
| 151:16 | **pharos** 19:5 | **plain** 105:13 | 91:8,9,19,20 |
| **permitting** | **phase** 80:15 | **plaintiffs** 19:2 | 91:22 92:1,5 |
| 88:6 | 89:15 | **plan** 2:1 15:22 | 93:4,10,11,13 |
| **perpetuity** | **phililps** 92:17 | 15:24 17:5,9,9 | 93:22 94:7,11 |
| 136:8 | 92:24 93:2 | 17:17,20 19:10 | 94:12 95:8 |
| **perplexed** 75:9 | **philip** 9:10 | 19:13,23 20:1 | 98:20 99:12 |
| **perplexing** | **philippe** 9:15 | 21:1,5,6 26:16 | 100:21 101:18 |
| 37:8 122:3 | **phillips** 6:12 | 32:13,19,20 | 107:22,23 |
| **perry** 10:10 | 10:12 14:20 | 33:1,4 34:20 | 110:7,25 |
| 78:20 89:20 | 32:17,18,24 | 35:4 36:16,21 | 112:18,25 |
| | 43:11 46:8 | 37:1,6,20 | 113:13 115:16 |

116:6 120:20
120:23,25
124:3 125:2,5
126:1 129:3,3
129:4,8 130:25
131:23,23
132:2,19
133:17,24
135:16,18,20
135:22,25,25
136:2,6,8,11
136:12,13,16
136:20,21,22
136:22,23,24
137:1,3,4,5,7
137:10,16,17
137:19 138:1
138:18,21,24
139:1,5,10,22
140:1,6,8,13
143:5,11,12,24
145:10,11,16
145:20,21,24
146:1,5,6,6,9
146:11,14,15
146:20 147:1,1
147:11,18
151:15,20,21
151:22,23,25
152:1,3,5,6,9
153:11 154:17
**plan's** 21:7
62:12 135:21
143:25
**plane** 151:10
**planned**
143:17

**plans** 47:1
145:25
**platform** 23:1
27:7 34:19
36:18 37:9
45:17,20
120:15
**platforms**
122:23
**play** 104:10
105:19
**played** 86:20
139:24 140:4
**playing** 105:5
138:10
**pleadings**
85:10
**please** 14:3
15:8 92:14
93:8 94:18
95:15 97:8
98:2 99:8,19
108:4 109:1,4
109:7,10 110:3
110:9,16,21
111:1,16,20
112:5,23
113:10,22
114:4,11 115:2
115:11 134:24
135:9 142:10
**pleased** 16:20
39:3 57:10
60:9 72:6 80:7
**pledge** 31:1,21
**plethora**
103:21

**plus** 138:14
141:12
**pm** 1:17
**point** 21:3,10
21:19,21 22:4
24:16 29:9
30:2,7 32:11
32:25 33:4,12
36:24 54:18
55:23 56:3
67:6 70:9
80:10 83:1
87:20,22 88:20
96:22 97:2,11
98:22 104:13
105:8 119:12
124:14 133:8
139:15,19
145:6,11,22
148:16 149:9
150:7 152:12
**pointed** 35:17
35:20 36:6
148:12,12,21
**pointing** 149:3
**points** 16:7
22:5 23:13
32:22 36:15
53:1 67:13
123:9 124:6
149:14
**policy** 32:7
50:2
**poll's** 120:3
**polls** 117:2,7
**pool** 94:16

**poor** 141:16
**porczek** 10:13
**portion** 89:16
106:12,20
117:10 130:16
149:25
**posed** 119:22
**position** 46:18
75:4 78:17
83:23 124:8
133:14 134:9
143:25
**positions** 50:7
50:14,18
137:24
**positive** 79:22
135:18
**positively**
124:18
**possess** 104:5
121:15
**possibility**
117:1
**possible** 15:18
15:18 17:1,4
17:16 34:21
39:17,21 40:9
56:1,4,16
64:17 78:17
80:24 83:5
84:1,10,13,21
118:4 143:5,6
152:11
**possibly** 62:17
**post** 22:22
25:17 35:3,6,7
39:22 40:2

60:2 102:18
106:1 147:22
**posted** 154:9
154:12
**potential** 52:4
66:17 75:1
86:15,22 90:3
105:2,8 106:3
117:11,25
118:4
**potentially**
85:23 94:7
**power** 47:21
73:16 96:2
100:15,15,18
133:9 134:11
142:3
**powerpoint**
14:21
**poynter** 10:6
**practicable**
37:14
**practice** 117:5
**pre** 23:8 38:8
55:11 81:21,22
81:25 82:2
94:9
**precedent** 38:1
**precise** 112:3
**preclearance**
38:6 39:6
**predecessor**
38:20
**predicated**
98:17
**predicted**
98:16

**predictions**
98:15
**predominantly**
143:2
**preempt** 36:14
**prefer** 146:24
**preference**
87:25 146:22
149:2
**prejudice**
55:20
**premise** 104:21
**prepared**
117:3
**preparing**
47:22 67:1
145:10
**prepetition**
26:4 33:19
42:11 55:11
86:10
**present** 7:1
114:6 137:18
141:22
**presentation**
16:5 58:19
124:5 126:3
**presented**
23:18 44:2
46:3 85:10
106:17 107:8
109:16 124:24
127:9 136:1,23
137:12
**presenting**
92:18

**presently**
114:20
**presents** 54:16
153:6
**preserve** 86:23
**preserved**
42:24 47:22,23
**preserving**
92:2 121:10
**presumption**
132:2,5
**pretty** 20:11
91:12 146:12
**prevent** 123:1
139:6
**prevented**
113:1
**previewed**
56:11
**previous** 43:19
**previously**
14:23,25 15:6
49:5 87:12
**price** 21:15
22:8 25:12
44:8 45:8
96:17 97:18
100:22 101:8
101:10 109:8
110:1 113:13
113:14,15,16
113:18 114:7
117:21,25
118:9 119:5,13
119:15,17,19
119:22 120:2,4
120:10 121:11

123:11 137:8
141:1,7
**prices** 25:12
29:15 45:15
91:13 118:7
125:5,8,12
128:5
**pricing** 23:8
114:10 115:5,5
**primarily**
119:22
**primary** 41:21
133:15,24
**principal**
106:9
**principals**
48:12 104:22
**principles**
86:13 128:9
**prior** 23:15
45:5,7,15 49:5
51:9 54:14
56:5 59:13
60:7 120:3,24
**prioritized**
125:25
**priority** 54:23
**privacy** 18:23
**privy** 121:17
**pro** 6:8,10,12
6:14,16,18,20
6:22,24 85:13
89:2,12 118:22
140:19 141:19
**proactive**
47:18

**probably**
40:17,19 41:16
122:12 147:5
**problem** 63:14
65:22 66:15,23
**procedures**
19:3 85:25
**proceed** 55:19
**proceeded**
47:13
**proceedings**
68:2 118:19
119:6 156:5
157:4
**process** 27:10
32:10 37:25
38:17,23 39:1
39:22,24,25
40:6,25 41:2
48:5,7 50:5
51:9 54:20,21
63:20 64:10
69:15,23 77:22
79:8,10 80:17
81:23 82:1,4,8
82:12,15 84:6
85:24 89:24
90:5 98:4
115:25 116:4
117:23 118:3
120:23 155:18
**processes**
54:25
**productively**
78:24
**profession**
132:18,23,25

133:4,6
**professional**
46:16 50:12
52:3,5,7 59:2
60:13 71:2,4,6
**professionals**
41:25 43:12
46:9,21 47:13
52:1,13 59:5
60:16 69:4
70:16 77:20,21
83:18 94:23
100:1
**profiles** 117:9
**program** 35:10
36:3 38:15,15
94:14,14
**progress** 39:5
**projected** 28:1
**projecting**
28:15
**prolonged** 42:3
**prominent**
121:1
**promised**
83:11
**promising**
80:10
**promote** 78:9
**promotion**
33:22
**prompt** 80:22
**promptly** 39:7
**proof** 107:7
**prop** 26:6
**proper** 118:21
131:12 132:5

132:25 133:2
**properly** 123:2
**property** 30:13
30:13 124:22
126:6 128:3
132:24 150:9
154:9
**proponent**
133:17,25
**proportion**
142:19
**proposal**
120:24
**proposed**
43:23 44:22
48:6 50:23
51:18 55:17
57:8 72:4,15
75:15,17,20
87:1,15 118:25
125:2,5,8
129:9 146:14
151:15 155:1
**proposes**
115:16
**proposing**
147:16
**proposition**
45:23
**prosecuting**
147:22,23
**protect** 47:19
**protected** 55:3
**protection**
63:25 131:18
**protects** 132:6

**protest** 143:22
**protocols**
77:23
**protracted**
20:22 60:10
**provable** 52:2
**prove** 68:24
**proven** 98:15
138:16
**provide** 26:20
38:16 41:1
52:3,23 64:2
119:17 147:16
**provided** 27:4
36:19 38:20
51:6,11 58:6
58:10 106:19
113:7
**provides** 43:24
44:17 59:10
126:12 130:25
131:13 133:13
146:6
**providing** 33:8
**provision**
38:22 46:14
53:11 57:17,21
58:16 60:8
65:10 70:8
114:23 152:3
154:5
**provision's**
43:19
**provisions**
46:25 47:7,11
57:4,9 62:6
130:8,23 152:6

proxies 98:8
proxy 98:10
public 32:7
  43:3 48:1 50:2
  55:2 80:2 88:9
pulled 15:2
  142:8
pundisto 10:14
purchase
  26:18 27:8
  122:21 150:22
  150:24 151:5
purchased
  122:8
purchasing
  103:8
pure 113:2,9
  114:3 115:18
  148:23,25
  149:5,6
purely 126:14
purported
  25:1,12 60:18
purpose 46:25
  134:1
pursuant 16:2
  20:16 26:19
  72:1 88:6
  112:24 113:4
  150:20
pursue 27:8
  115:13
push 56:15
  65:14 83:4
pushback
  15:13

pushed 103:14
  143:7
pushing 102:3
  142:24
put 49:17
  50:17 51:23
  74:17 90:23
  108:9 118:14
  128:7 134:24
  137:10 141:13
  141:18
pws 46:13

**q**

qualified 18:17
  23:14 59:6
  65:12 145:6
qualify 95:3
  145:7
quarterbacking
  53:17
question 17:9
  20:11,13 21:2
  21:9,25 30:20
  43:22 44:12
  48:24 49:15
  66:6 107:10
  118:16,20
  120:9 125:3
  141:16
questioned
  53:15
questioning
  125:20
questions
  20:10,15 23:23
  41:3 42:17
  71:10 120:18

152:16
quick 36:14
quickly 15:18
  15:21 17:11
  36:12 57:14
  76:13 78:16
  146:4 149:9
quipped
  149:17
quite 42:17
  51:5 66:4
  90:13 148:19
quote 120:12
quotes 148:13

**r**

r 1:21 3:1 6:12
  10:12 14:1
  157:1
race 80:3
raise 141:1
raised 18:3
  20:24 30:21
  54:19 72:4
  73:17 81:14
  82:24 91:24
  106:3 119:16
  146:4 147:20
  149:8 152:12
  153:24 155:22
raises 154:3
rakesh 12:6
ramon 12:14
ran 29:13
  33:25 97:10
randles 12:22
range 21:3
  120:6

ranged 119:19
ranges 24:7
rasile 10:15
rate 98:16,16
  122:5 137:21
  141:13
rather 14:10
  45:14 49:9
  74:19 104:17
  131:25 132:9
ratified 49:7
  101:5
ratio 93:22
ravi 9:7
raw 61:2 62:8
reach 26:22
  69:15 118:10
  118:11,17
  122:19 134:2
  154:17
reached 111:7
  123:8
reaching
  155:24
reaction 25:22
read 24:4
  69:10 70:8
  87:14 94:9
  124:8 135:12
  154:8
reading 62:8
  70:13 72:17,25
  94:10 110:15
  116:23 135:19
ready 34:16
reaffirm 128:9

**real**  76:13
  119:1,2
**reality**  137:21
  138:1
**really**  15:21
  17:11 23:4
  24:18 36:12
  74:3 75:10
  91:21 95:9,17
  95:20 110:14
  140:20 142:8
  142:13 145:14
  146:4 148:16
  149:5
**reason**  22:10
  27:2 54:4 75:7
  75:8,12 97:14
  140:5 141:8
  148:15
**reasonable**
  36:9 72:20
**reasonableness**
  21:4
**reasonably**
  37:13
**reasons**  15:3
  23:10,14 24:2
  53:24 69:20
  97:12,13
  146:20
**rebecca**  8:12
**rebuttal**  14:12
  14:15 18:2
  84:13,15
**rebutted**  51:13
**recall**  118:22

**receive**  33:16
  39:14 43:25
  52:22 53:21
  54:1 62:25
  85:21 115:8,13
  132:4,9,14
  143:18 147:10
  147:24
**received**  14:19
  39:3,7 40:22
  40:23 61:2,2,3
  75:1 137:20
  142:20
**receives**  52:23
**receiving**  57:20
**recent**  39:4
  60:18 61:1
**recently**  17:12
**recess**  92:12
**recharacteriz...**
  133:13 134:3
**recited**  51:13
**recites**  53:13
**recognize**
  124:19 137:9
  154:23 155:22
**recognized**
  138:3,3
**recommenda...**
  52:4
**reconstitute**
  43:11
**record**  16:7
  18:9,18 19:1
  33:11,12 53:14
  70:8 72:24
  85:8 144:10,12

  145:14 149:7
  154:8 157:4
**records**  42:7
**recover**  28:2
**recoveries**  34:9
  47:3 79:3,25
  85:23
**recovery**  19:17
  28:1,20,21,24
  49:13 54:17
  80:16 99:10,15
  99:20 102:16
  102:18 118:7,8
  118:16 119:1
  120:20 123:9
  123:12 125:21
  130:17,19
**rectify**  125:24
**recused**  50:18
**reddit**  138:11
  142:5
**redline**  31:8
**reduced**  93:22
  97:18
**reduces**  96:16
**reducing**  56:1
  96:14
**reduction**  53:2
**reference**  58:8
**references**
  18:16 127:3,19
**referencing**
  18:15,17
  126:22
**referred**  68:18
  133:24

**referring**  58:9
  154:6
**reflect**  51:18
  58:22 110:18
**reflected**  61:20
**reflection**  22:9
**reflects**  128:13
**refund**  103:15
**refused**  112:1
**regard**  109:21
  122:3 153:16
**regarding**  19:3
  32:9 33:3 48:4
  49:10 50:4,23
  54:19 55:15,17
  58:7 59:8
  60:11 61:12
  62:5 72:21
  79:9 86:13
  87:24 107:7
  133:11,15
  151:12
**regardless**  92:3
  101:8 125:25
**regards**  115:4
  115:19 119:13
**registration**
  56:5,10
**regret**  135:16
**regrouped**
  78:13
**regular**  55:6
**regulations**
  125:19
**regulators**
  42:20 47:16
  54:24 55:1,7

55:22 85:13
86:24 88:3
**regulatory**
86:12 125:17
**reilly** 10:16
12:23
**reiterate** 36:16
**reiterated**
46:17 121:4
**reject** 111:19
111:19 112:25
130:25 131:10
131:10,13,19
131:22,22,24
136:1,12,13,16
137:11,16,17
138:1,21,22,25
139:10 151:19
**rejected** 44:22
112:19 138:19
**rejecting**
111:25
**rejections**
110:21
**related** 2:1
26:14,17 85:10
102:14 117:11
150:22 151:5
**relates** 70:15
**relating** 24:16
**relationship**
51:15
**relationships**
80:8
**relatively** 42:2
83:17

**release** 57:9
136:7,17 137:9
**released** 18:5
18:11 136:8
**releasees** 64:15
**releases** 18:14
18:17 57:6
61:7,13 62:4,6
62:11,19 65:22
112:13 138:5,5
140:18 145:13
145:17,19,21
151:21,23
**releasing** 99:15
136:10
**relevance**
126:17
**relevant** 16:12
17:6 30:23
43:22 58:14
65:11 87:9,23
130:2 155:19
**reliable** 23:11
24:3 45:2
**reliance** 60:16
71:2,6
**relied** 23:21
**relies** 102:20
**rely** 109:15
148:1
**remain** 87:8
102:17 116:7
120:19 121:9
**remainder**
37:16 147:5
**remained**
120:5

**remaining**
15:25 16:12,19
17:8,13 18:1
18:23 22:11,23
23:6 87:20
**remains** 74:8
82:1 104:7
**remarkable**
48:11
**remarks** 32:2
43:8 112:17
**remind** 15:20
**remote** 155:13
**remove** 58:3
60:1
**removed** 47:20
57:16,19 59:7
60:8 122:25
**removing**
135:23 137:15
**renaming**
127:4
**reopen** 105:4
**reorganization**
57:5 85:17
117:17 121:16
**reorganize**
49:19
**repaired**
117:15
**repay** 130:9,12
130:24
**repaying**
130:18,19
**repayment**
72:10,12,15,22
130:4,7,12

**repeat** 91:25
**repeated**
119:21 127:2
**repledge** 31:1
31:21
**replete** 105:14
106:25
**report** 16:21
19:1 20:3
22:24 23:19,20
24:4,6,9,24
57:10 60:9
68:21 72:7
89:7,14,15,16
102:23,24
109:14,17
117:21 119:17
119:18 120:1
120:11,18
122:7,9
**reporting**
16:21 88:9
**reports** 103:10
107:4 118:6
120:1
**represent**
54:11 97:20
115:23
**representation**
49:9 80:16
112:21 117:22
118:21
**representative**
24:10 80:11
**representatives**
80:9 85:2

**represented**
46:12 49:16
120:14
**representing**
123:3 143:14
**represents**
97:21
**request** 43:11
52:3 81:3 82:6
82:7 125:23
128:7 145:4
**requested**
57:11 59:13
140:10
**requests**
112:20
**require** 152:14
**required** 37:12
53:4 55:24
82:9 131:11
152:7 155:25
**requirement**
113:5
**requirements**
16:1 46:6
77:24 80:4
**requires** 34:14
130:6 131:2,9
132:1
**research**
101:22 103:1
109:20,23
141:3
**resentful** 32:16
**reservation**
68:19 70:16
81:13,17

**reserve** 14:12
14:13,14 81:16
84:12 115:19
**reserved** 55:20
70:25 71:4
94:7
**reserving**
41:12
**residents**
114:16
**resign** 33:24
**resignation**
93:24 96:10
97:5
**resolution** 57:3
128:2
**resolutions**
55:12
**resolve** 17:15
19:19 90:6,16
90:17 155:7
**resolved** 16:22
17:12,21,24
18:21,23 19:2
19:3,6 27:9
33:3 55:17,20
72:7 73:7,8,23
76:7 87:21
90:8 108:21
109:1
**resolves** 27:3
89:25
**resolving** 75:2
88:3
**respect** 17:10
26:25 35:14
50:5 58:16

59:22 71:4
74:5,18,21
75:22 76:17,22
80:1,8 81:20
100:20 152:24
153:12
**respectfully**
25:25
**respecting**
78:17
**respective** 87:2
88:4,18
**respond** 18:2
81:14
**respondents**
87:7
**response** 44:17
48:24 72:4
73:18 124:5
**responses**
126:22
**responsibiliti...**
42:1
**rest** 40:16
84:12,19
128:10
**restate** 47:12
**restore** 127:24
**result** 69:13,19
78:13 113:2
125:9 151:8
155:25
**results** 15:20
56:16 110:10
112:1,4 137:18
**resume** 88:24

**retail** 19:12
27:17 30:10
71:17,24 72:9
87:21
**retained** 59:2,5
85:23
**return** 15:17
17:4 24:22
43:7 49:24
114:8 150:24
151:1 152:10
**returned**
142:19
**returns** 80:6
**revaluation**
99:22
**reveal** 122:18
**revealed** 120:2
**revenue** 98:8,8
98:10
**reversed** 93:20
100:9
**review** 34:21
57:7
**reviewed** 82:3
116:24
**revised** 16:15
16:23 43:18
58:21 61:20
**revisions** 57:12
87:12,15,18
**rewards** 85:4
**rewrite** 152:3
**rich** 136:17
137:13 139:11
**richard** 6:12
10:12

**richest** 137:15
**rick** 12:8 32:16
**ricki** 7:18
**ridiculous**
  141:10
**rigged** 135:20
  136:22 137:18
  138:23 139:22
**right** 14:16
  15:7,10 16:17
  20:5 27:8 28:4
  28:12,17,18,19
  28:22 29:17
  30:8,17,24
  31:3,20 34:24
  36:24 41:7
  56:19 60:25
  62:2 66:22
  67:6,11 71:14
  73:14 77:13
  81:1 82:21
  84:23 88:22
  92:7,14 101:1
  108:5,8,11
  114:21 115:12
  123:13,19,25
  128:23 129:20
  131:18 132:24
  134:15 140:12
  144:2 147:10
  151:20 152:3
  154:22 155:2
**rightful** 128:1
**rightfully**
  125:25
**rights** 31:4,13
  31:14,22 42:12

60:23 68:19
  70:17,25 71:3
  79:17 81:13,16
  115:19 124:22
  135:23 140:16
**righty** 129:24
**ring** 50:17
**rise** 14:2 92:13
**rising** 91:13
**risk** 126:15,16
**river** 106:16
**road** 82:16
  89:4 157:21
**robbed** 139:23
**robbing**
  140:15
**robert** 7:16
  12:5
**roberto** 8:22
**robinson** 10:17
  32:9,23 48:23
  49:1 50:4,6
  51:12 79:9
**robomartin**
  138:2
**robust** 16:4
  32:10
**rochester**
  10:18
**rodriguez**
  10:19
**role** 47:18
  51:20 78:8
  86:19 104:3,10
  105:5
**rood** 10:20

**room** 52:21
**rosella** 10:21
**rothenberger**
  10:22
**rough** 90:21
**roughly** 91:15
**routine** 57:2
**rubin** 10:23
**rug** 89:9
**rule** 18:17
  20:17 38:19
  101:14
**ruled** 31:18
**rules** 86:13
  125:19
**ruling** 26:23
  74:16 75:9
  127:11 140:11
**rulings** 77:1
**run** 114:22
**running** 77:21

**s**

**s** 3:1 5:19 9:8
  9:17,18 14:1
**sabin** 5:19
  84:24,25 85:1
  88:21
**sacrifice** 91:16
**sacrificing**
  143:9
**safe** 153:1
**salaries** 35:25
**salary** 143:22
  144:1
**sale** 26:18 27:9
  150:23,24
  151:5

**salls** 12:24
**sam** 11:3
  109:22
**samuel** 8:23
**sanctions**
  102:13
**sanctity** 124:21
**sandali** 12:16
**santos** 7:15
  118:23
**sarachek** 10:24
**sarkissian**
  10:25
**satisfaction**
  85:18
**satisfies** 16:8
**satisfy** 76:15
  76:25 77:3
  80:4
**satisfying**
  107:6
**savings** 41:22
**saw** 16:14
  93:24 94:1,5
  95:22
**saying** 30:5
  76:20 135:7
  150:3
**says** 23:6 30:23
  31:14 53:13
  75:25 76:24
**scale** 106:9
**scenario** 27:23
  27:23,23,25
  28:5 29:19
  38:24,24

scenarios
   28:21 99:23
scene  66:1
schedule  32:12
   110:17 111:2,5
   114:13
scheme  131:2,9
   131:11,13,17
   131:19 132:3
   132:11,15,17
scheuer  5:12
scheur  81:6,7,9
   82:18
schneider  6:22
   11:1 128:16,17
   128:19,22,23
   128:24 129:13
   129:17,21,24
   130:21,22
   131:5,7,8
   133:19,20,21
   133:23 134:17
   134:19 151:9
   154:3
schneider's
   134:8
school  94:9
schottenstein
   11:2
schreiber  11:3
schroeder  11:4
scientists  98:9
scope  57:22
   60:7 68:1
   89:14 106:4
scott  8:6

scourged  140:7
screen  15:2
   30:15 108:9
   135:5
screwed
   138:25
scroll  139:20
scrubbed  15:4
se  6:8,10,12,14
   6:16,18,20,22
   6:24 85:14
   89:2,12 118:22
   140:19 141:19
seat  52:22 79:5
seated  14:3
   92:14
seats  79:13
sec  16:20 37:24
   38:3,7,7,19,21
   39:1,2,8,13,15
   39:24 54:19
   55:10 81:12,15
   81:17 82:8,13
   82:13
sec's  39:14
second  20:13
   20:13 41:13
   43:10 47:4
   51:3 54:13
   71:24 73:15
   86:9 89:18
   108:9 132:16
   134:10
secondly  125:1
secretly  99:16
section  16:2
   26:19,24 32:5

34:23,25 35:8
   35:9 46:10
   47:8 76:23
   113:4 115:10
   130:13 134:2
   148:21 150:14
   150:20,21,22
   151:11 154:11
secure  126:4
secured  47:21
   125:22 133:10
   134:13
securely  40:15
securities  5:8
   19:2 81:5,7,10
   81:18 125:18
   131:20,24
   132:7,8,21
security  15:3
   20:24 26:23
   27:14 43:16
   79:12 126:13
   150:23,24,25
   151:1,4,4,5
see  14:19 30:25
   33:7,8 34:3
   41:20 44:18
   54:6 62:24
   84:4 93:5
   102:15 108:10
   116:17 127:12
   147:21
seed  130:18
seek  38:21 47:3
   128:1
seeking  112:11

seeks  133:17
   133:25
seem  143:12
seemed  90:12
   90:13
seems  39:13
   40:16 134:11
   138:6 140:21
   147:2
seen  30:25
   116:14 140:15
select  32:3 48:5
   48:25 50:8
   52:5
selected  32:20
   32:21 50:24
   51:16 52:17
   54:7
selection  32:6
   32:10 50:1
   51:9 79:8
selections  51:7
   79:10
selectively
   53:13,15
self  93:16
   102:4
sell  123:1
   142:14
selling  109:24
   142:21 143:4
senes  11:5
sense  74:23
   104:5 109:7
sent  15:4 72:12
sentence  75:25

sentiment 56:3
104:17,24
139:5
sentiments
139:12
separate 20:3,7
separately
15:23
september
51:5 113:11
117:24
serban 12:21
series 109:20
serious 107:25
116:7
seriously 44:21
92:1
serrur 11:6
serve 66:9
served 55:3
serves 53:5
service 116:23
127:2
services 46:12
86:14
serving 59:2,9
66:6 67:1
102:4
session 92:15
set 20:16 23:14
87:16 90:13
117:25 118:6
125:13 146:9
setting 119:22
settle 20:13
118:24 149:16
149:16,19,22

settled 46:18
110:13 155:8
settlement
19:19,21 20:7
20:12,15 21:1
21:3,5 27:3,4
36:17,18,19,20
36:22 37:3,7
37:12,15 43:24
44:22 46:4
61:5,14,16
101:1,4,7
108:20,24
111:19 112:24
118:17,19
119:2,11 124:4
136:3,15
137:12,14
145:13,15
147:8,9,10
148:23 149:6
150:18 151:19
152:4,6
settlements
20:16,19 86:25
118:12 149:19
settling 71:25
87:3
seven 97:21
several 16:20
29:4 34:21
35:18 82:5
90:23 109:9
113:17 116:21
117:19 134:10
149:22 151:9

severe 121:21
severely 45:6
122:16
shadow 127:21
shaping 135:25
shara 4:23
56:21
share 24:11
42:16 69:11
shared 91:16
112:1
shareholders
51:3 52:24
shares 43:2
sharing 15:9
sharon 8:5
shaya 10:18
sheer 86:3
106:9
sheet 117:2
153:8
shift 26:2
shoba 122:7
short 26:7,9
35:16 80:14
115:23 136:15
shortfall
108:21 109:1
shorting 141:5
shortly 129:11
shouldn't
98:23
show 134:4
139:21 147:13
153:14
showcase
105:22

showcases
103:21
showed 35:11
shown 109:2
111:25 132:4
shows 31:9
44:5 62:9
110:25 133:9
side 29:3 32:4
sided 131:14
sides 16:10
85:11 155:24
sightline 79:1
signature
101:6 157:7
signed 70:22
significant
24:5 34:15
53:25 62:21
78:13 79:1,18
103:24 106:12
significantly
36:1,7 97:18
signoff 39:3
silence 108:25
silverman 11:7
similar 53:18
119:12 122:1
simon 8:3,4
95:12,13 96:10
142:24
simple 22:1
32:25 34:4
96:5
simply 17:1
37:5 47:4
49:17 51:24

52:6 85:24
115:8
**simson**  11:8
**sincere**  119:10
**sincerely**
100:21 128:11
**single**  106:15
**sir**  114:20
128:22 131:8
**sister**  141:3
**sit**  41:3
**site**  53:11
**sitting**  37:24
**situation**  112:7
139:17
**situations**
142:18,21
**six**  106:8,9
**sizeable**  106:20
**skillsets**  80:3
**skip**  16:6
**slide**  15:21
16:5 29:11
30:14,17 35:16
36:2,5,8,10
93:7 94:18
95:15 96:23
97:8 98:2 99:7
99:19 108:4
109:1,4,7,10
110:2,9,16,17
110:21 111:1
111:16,20
112:5,18,22
113:10,22
114:4,10 115:2
115:11,12

127:9 139:9
**slides**  31:8
92:10,22 142:7
**small**  117:2
123:6
**smith**  11:9
**smooth**  83:17
84:6
**smoother**  68:2
**smoothly**
40:15
**social**  120:19
122:22
**sold**  142:13
**sole**  105:18
**solely**  130:7
**solid**  80:8
**solutions**
143:11 157:20
**soma**  12:10
**somebody**
147:12 150:8
150:10
**somebody's**
66:20
**sonya**  2:25
157:3,8
**soon**  37:13
39:21 40:9
56:1,16 80:21
80:24 83:25
84:21 87:5
88:8,12 143:5
143:6 152:10
**sooner**  40:4
**sorry**  15:21
59:20 60:24

68:11 72:23
73:3 84:14
125:23 129:14
131:5 134:23
139:20
**sort**  40:2 67:13
118:15 152:15
**sorts**  98:6
146:11 148:15
**sought**  44:23
81:21
**sourced**  50:8
**south**  4:4
**southern**  1:2
133:11,12,15
**space**  104:7
**spangler**  11:10
**sparked**  15:13
**spawn**  108:2
**speak**  19:9
55:4 56:17
64:9 80:12
107:21 123:18
155:16,21,22
**speaking**  89:2
102:24 131:6
**speaks**  154:19
**special**  18:14
33:23 88:16,17
**specific**  75:18
75:18 119:17
125:19
**specifically**
19:24 36:19
45:23 50:5
63:8 83:20
146:9 148:8

154:6
**speculate**
117:17
**speculation**
104:11,16
**speculative**
22:12,16,23
23:3,7 45:12
45:14,18
103:17 104:23
105:9 106:18
107:5 153:19
**speed**  72:17
94:10 143:11
**speedreading**
87:14
**speedy**  82:12
**spent**  83:3
141:11
**spoke**  145:12
145:17
**sponsor**  48:3
49:1 53:5
**spots**  50:15
**spreads**  119:24
**sprofera**  12:25
**spurred**
135:13
**squarely**  32:2
**squeeze**  26:8,9
**stability**  96:18
**stabilize**  34:1
**stablecoins**
142:14,19,19
142:22
**stables**  143:2

| | | | |
|---|---|---|---|
| **stacking** 122:6 | 125:3 | **steffan** 7:25 | **structured** |
| **staff** 81:24 | **stated** 49:1 | **step** 90:1 | 53:16 86:23 |
| 82:4,7 | 81:17 85:24 | **stepped** 79:24 | **struggled** |
| **stakeholders** | 118:3,25 | **steps** 65:18 | 145:7 |
| 34:18 47:2 | 120:18 124:16 | 116:23 | **studying** |
| **staking** 88:10 | 126:15 140:13 | **stock** 85:22 | 110:22 |
| **stand** 54:21 | **statement** 28:6 | 88:8 96:17,19 | **sub** 34:4 |
| 68:15 75:12 | 36:23 54:3 | 130:20,24 | **subclass** 36:25 |
| 93:4 | 56:5,10 61:9 | 131:3,20,25 | 37:3 |
| **standard** 17:6 | 93:8 111:6 | 132:14,21 | **subject** 85:18 |
| 20:15,20 32:4 | 116:19 122:13 | 133:1 153:2,5 | 90:22 102:12 |
| 34:24 37:4 | 127:9 134:19 | 153:5 | 107:18 125:19 |
| 49:25 58:2 | 135:12,20 | **stop** 27:19 84:8 | **subjected** |
| 104:1 148:21 | **statements** | 86:7 128:7 | 54:12 |
| **standards** | 14:9 25:15,22 | 139:9 | **submissions** |
| 16:13 33:13 | 54:19 58:9 | **store** 104:6 | 144:14 |
| 34:21 103:22 | 120:15 | **straight** 126:9 | **submit** 25:25 |
| **standing** 17:3 | **states** 1:1,12 | **straightforw...** | 31:16 50:11 |
| 134:9 | 4:18 45:16 | 111:22 | 135:13 138:14 |
| **standpoint** | 56:22 57:7 | **strange** 98:6 | 152:1 155:1 |
| 82:11 96:21 | 58:22 59:12 | **strangers** 52:7 | **submitted** |
| **stands** 25:24 | 60:14,24 61:4 | **streamline** | 50:14 61:21 |
| 26:10 104:2 | 109:22 130:3 | 41:15 | 109:21 118:5 |
| 107:22 | 130:14 133:24 | **street** 4:4,20 | 138:17 |
| **star** 47:6 | **stating** 46:25 | 5:9,16 6:3 | **subordinated** |
| **start** 17:22 | 130:2 | **stretch** 35:17 | 26:18 125:22 |
| 19:14 144:16 | **status** 81:20 | **strikes** 127:23 | 150:17,20 |
| 155:8 | **statutory** | **stripping** 94:5 | 151:6,7 |
| **started** 57:7 | 68:21 | **striving** 17:4 | **subordinating** |
| 117:7 129:11 | **stay** 84:11 | **strong** 15:13 | 88:4 128:6 |
| 155:10,11 | **stayed** 34:3 | 16:10 19:16 | **subordination** |
| **starting** 17:23 | **steadman** | 155:23 | 55:18 125:16 |
| 80:10 122:16 | 11:11 | **strongly** | **subsequently** |
| 129:2,24 | **steady** 29:18 | 135:16 | 119:15 |
| **state** 29:18 | **steering** 78:20 | **structure** 56:9 | **substantial** |
| 55:7,22,24 | 89:19 | 86:16 | 97:23 106:22 |
| 88:3 120:8 | | | 117:9 125:15 |

substantive
  23:22 24:18
  90:7
substitute
  52:14
success  90:24
  137:20
successful
  79:12
sue  66:20
  69:12 150:10
sued  141:4
suffered  78:13
suffering
  139:16
suggest  74:10
  75:23 83:7
suggested  25:8
  87:17 106:12
  145:23
suggestion
  50:9
suggestions
  84:2
suggests  25:5
  36:25
suing  103:2
suite  4:4,20 6:3
  157:22
suited  50:25
sullivan  13:1
sum  98:25
summarizing
  54:21
super  63:21
superior  54:16
  99:10

supplement
  32:13 51:4
  59:13 72:16
  73:1,19,21
  94:7
supplemental
  26:15 27:16
  102:23 119:18
supply  98:14
  119:23
support  16:4
  17:17,20 19:20
  19:23 20:7
  23:8 30:12
  43:4 51:23
  76:18,23 84:11
  85:3 87:10
  89:3 90:19
  91:8,8 94:2
  96:17 101:17
  104:16 109:12
  112:17,19
  126:4,24
  128:25 137:2,5
supported
  101:15
supporters
  85:12
supporting
  124:23
supports  44:3
  45:3,22
suppose  76:21
supposed
  155:7
sure  27:20,24
  33:12 34:16

  35:19 40:14
  48:8 62:12
  63:3,4,8,25
  65:3 67:17
  70:7,10 71:23
  73:1 77:1 94:8
  109:5 116:13
  134:25 150:8
surprisingly
  154:3
survive  45:18
  45:21
suspect  32:1
  40:1
suspended
  117:13
suzanne  12:9
swallow  83:5
  84:7
swiftly  47:20
switch  108:12
sworn  25:6
  32:8,15 101:25
  109:14
system  124:21
  127:25 128:9
systematic
  126:21

            t

t  157:1,1
t.j.  3:15
table  52:22
  79:5
tabulation
  61:3 110:10,21
tacit  132:3

taji  11:12
tak  11:25
take  28:23 29:5
  29:6,7 39:13
  39:17,25 41:16
  82:5,18 88:23
  89:15 92:8
  94:9 96:6,7
  135:3 139:6
  140:1 141:7
  144:20
taken  47:18
  93:10,11 140:6
  144:22
talk  33:12
  37:23 100:25
  109:11 110:4
talked  19:23
  37:24 63:17
  95:22 99:5
  144:20 147:7
  154:14
talking  63:17
  63:20 64:3
  76:8 118:16
  148:23
talks  112:9
  150:22
tangible
  103:22 104:17
tanzila  12:3
target  34:11
targets  35:17
  78:12
task  42:10
tasked  135:21

tax 40:21 53:25
74:24,25 75:2
95:2 119:8
141:16 142:1
142:15,17,21
143:3
taxes 40:22,24
119:9 146:21
taylor 12:17
team 33:17,18
33:20,25 43:1
53:6,9 88:16
88:19 98:9
technique
98:12
tee 92:10
telephonically
7:1
tell 64:19 95:20
telling 137:21
138:23
temporal 57:22
60:7
ten 88:23 92:8
92:11 110:22
111:10
term 26:16
39:5 53:5
154:12
terminate 53:6
termination
53:16
terms 36:9
116:23 124:17
125:13 127:2
130:3,6,8,22
130:23 149:25

150:3 151:14
154:4,7
terrible 91:13
test 17:10
20:14 21:8,11
21:18,22 44:6
44:17 76:16
99:4,24 134:6
155:13
testament 43:5
78:23 104:2
testified 21:16
21:17 24:7,22
25:2 26:8
35:12,24 36:3
44:7 50:6 51:6
109:15,19
testify 141:20
testimony
21:19 22:18,20
23:5,11,16
24:2 25:4,6
26:1 29:6 32:8
32:11,15,22,23
44:2,4,21,23
44:25 45:3,22
50:3 51:12,13
53:3 54:6 79:8
85:9 98:3
140:25 141:11
152:25
text 127:9,10
textbook
133:13
thank 15:11
41:5,6 56:19
59:25 65:4

68:6 70:3
71:13 76:10,11
77:14 78:19
80:25 81:1
82:5,19,20,22
83:16,20 84:20
84:23 88:20,21
89:1,19 90:25
91:2,4,4 92:5,7
92:11,17,24
93:2 100:9,11
100:11 107:21
108:7,14
115:21 116:8,9
121:24,24
123:13,15,16
123:17 128:13
128:15,19
131:8 134:15
134:18 135:11
142:24 144:6,8
152:18,20
154:20,21
155:9 156:3,4
thanks 77:13
88:2,16 95:10
144:4
that's 76:17,25
77:4 96:12
97:1,14 98:12
98:25 99:16,17
107:14,16,18
114:3,23
theme 139:2
143:4
theory 23:9
51:22

therese 5:12
81:6
thereto 85:10
there's 74:25
94:19 97:11,19
they've 100:2,4
thing 15:24
37:23 68:16
100:14 128:19
128:24 153:18
things 15:4,5
32:4 53:10
67:14 69:8
91:11 96:20
98:17 100:4
135:7 141:4
146:11 148:16
150:18 153:17
think 14:21
16:14 25:21
30:4 31:7,17
31:24 34:24
35:1,8 37:11
38:17 40:19
41:14 44:18
54:20 66:3
67:9,20,25
69:20,24 72:7
72:22 74:5,9
75:20 76:15,18
76:24 77:2
81:2 82:10
84:18,24 91:7
91:20 94:20
117:3 122:11
142:24 144:1
144:17 145:6

145:11 146:2,3
147:18 148:1
151:2 152:4
154:19 155:17
155:21
**thinking** 68:16
**thinks** 148:11
**third** 46:13
53:19 57:6
61:7 62:6,10
73:23 86:12
89:24 133:8
136:7,17 137:9
140:18
**thirdly** 125:15
125:23
**thomas** 8:1
121:3
**thomson** 11:13
**thorough** 48:5
79:9
**thought** 50:25
73:9 75:13
91:23
**thoughts**
111:21
**thousand**
106:8,9 141:12
**thousands** 62:9
62:17 85:20
**threat** 69:17
**threatened**
137:10
**three** 14:19
28:20 50:13
52:20 65:12
67:19,24 72:4

73:9 76:5
79:14 85:2
95:11,25 97:3
103:5 124:10
124:25 135:10
**threshold** 21:9
**thrown** 96:4
102:25
**thrust** 42:3
**thursday** 61:3
**time** 14:10,12
14:13,17 17:15
18:20 23:12
25:10 31:19
35:16 41:12
43:16 51:8
56:17 61:14
65:11 80:25
83:1 84:13,19
85:6 89:13
100:18 107:18
114:22 115:23
116:22 129:12
129:17,18
134:19 135:1,2
136:19 140:24
141:13 144:2,3
154:25 155:8
**timeline** 122:2
**times** 29:4,22
29:23,24 30:2
86:6,6
**timing** 39:24
72:14
**timothy** 12:23
**tipton** 13:2

**tired** 139:23
**tireless** 88:19
**title** 30:20,21
87:24 92:20
94:15 124:13
124:13,17,20
127:7,10,11
150:1,1,4
154:5
**today** 16:1,11
17:7 19:9
27:12,13 34:5
40:5 56:24
62:24 64:24
68:2 72:17
73:6,19 74:9
85:4,25 88:20
89:2,6 90:11
94:8,20 107:21
107:24 111:9
112:18 115:22
123:8 126:3
129:14,15,22
156:2
**today's** 86:5,8
**tog** 101:5
**together** 80:5
93:11
**toggle** 97:20,22
**token** 19:11,14
19:14,16,17,18
19:18,21,22,22
19:24 20:4,8
20:11,12,13,24
20:25 21:7,10
21:18,22 22:1
22:5,6,6,7,9,12

22:13,16,19,22
22:25 23:3,24
24:20,21 25:2
25:4,6,9,16,17
25:22 26:2,4,5
26:10,13,14,17
26:18,22 27:1
27:8,9,14,14
27:22 28:2,19
29:14 37:1,17
37:18 43:10,15
43:16,24 44:8
44:10,14,22
45:5,6,8,10,12
45:17,18,24
46:4 100:23
101:4,5,7,10
101:14,23,24
102:14,19,21
103:12 104:18
105:2,4,10,18
105:23,23,24
105:25 106:2,7
106:21,24
107:4 108:19
108:22 110:11
111:14,18,19
112:10 113:1
113:14,17,24
114:2 117:6,16
117:22 119:6
120:6,13,14,20
121:1,19,25
122:4,21 123:3
137:1,2,6,8
140:11 141:8
147:16 148:3,5

149:15,20,23
152:12
**token's** 141:7
**tokens** 25:19
101:1,2 102:7
103:21 110:18
111:7 117:10
121:5 122:9
140:12 141:1,5
147:10 152:13
152:14
**token's** 105:7
106:11
**told** 26:7 33:23
**tom** 10:2
**tomorrow**
155:2,5
**took** 24:3
37:11 42:23
87:13 90:9
103:1 116:22
116:24 145:15
153:4
**top** 83:11
110:22 111:10
117:25
**topic** 32:1
**total** 98:25
102:7 105:23
105:24,25
106:2 119:5
142:22 148:10
**totaling** 106:5
**totally** 38:16
**touch** 54:18
**towards** 78:25

**town** 48:1
121:4
**track** 14:17
**traction** 67:10
**traded** 43:2
105:24,24
106:1,2,24
119:25
**trades** 126:8
**trading** 22:25
24:9 105:22
106:4,5,21
126:7,10,11
**traditional**
103:22 104:5
104:22
**tramples** 132:7
**tran** 11:14
**transaction**
21:25 106:10
131:12 134:4
**transactions**
40:13 81:19
131:1
**transcribed**
2:25
**transcript**
44:19 49:3
109:20 120:13
157:4
**transfer** 74:22
74:25 108:16
108:19 127:11
154:4
**transferred**
30:12,20,21
150:2,9

**transfers** 127:7
127:10
**translates**
28:13
**transparency**
127:24 148:11
155:18
**treasury** 121:5
122:24
**treated** 72:2
**treatment**
20:14 21:7
48:4 91:8,19
91:21 92:2
**trends** 104:12
**trial** 18:4 19:15
21:16 25:23
26:20 55:19
144:11,11
152:5 155:7
**tried** 20:6
25:20 64:12
116:4 145:17
145:24 149:16
149:16,19
155:14
**tristan** 8:2
**true** 53:22,22
54:6 57:1
97:12 107:3
136:15 157:4
**truly** 143:9
**trust** 83:9
104:23 119:11
125:7 127:22
127:25

**trustee** 4:19
16:20 17:23,25
18:6,22 33:3
56:23 57:7
58:22 59:13
60:14,21,24
61:4 63:7 71:1
71:5 83:19
140:17 144:17
145:4
**truth** 106:23
**try** 19:19 36:13
41:15 62:17
76:15 82:16
155:6
**trying** 26:3,6
35:19 52:14,16
58:4 65:2
76:25 102:15
139:20 141:9
**tuganov** 5:15
17:19 85:1,6
87:10
**tuganov's**
87:17
**turetsky** 11:15
**turn** 61:6,8
66:20 69:12
123:23,24
128:21 143:5
**turned** 116:13
147:11
**turner** 11:16
**turning** 21:6
27:17 33:1
43:14 46:8

**turnout** 111:13
115:7
**twitter** 117:7
121:1
**two** 14:19 29:9
31:8 32:22
43:9 48:14
50:18 57:16
60:2 63:1 72:7
76:7 77:6
79:16 88:6
89:15 93:22,23
99:23 117:9
120:4 123:8
143:14 144:17
148:24
**type** 23:17
130:4
**types** 27:3
114:15
**typical** 38:19
49:9 146:2
**typing** 23:22

**u**

**u.s.** 1:23 4:19
5:8 16:19
17:23,24 18:6
18:22 33:3
60:21 63:6
71:1,5 81:7,10
83:19 140:17
144:16 145:4
150:15
**ubierna** 11:17
33:6
**ucc** 86:20
87:11 88:18

89:25 90:25
93:17,19 101:3
101:11 102:15
112:6 113:15
120:25 121:3
121:18 122:22
141:11 143:13
153:14
**ucc's** 107:13
**uday** 12:15
**ultimately**
65:19
**ultra** 60:17
68:24 71:7
**unaffected**
120:5,10
**unambiguou...**
124:16
**unanimously**
49:7
**unaware**
111:18
**unbiased** 141:6
**uncertain** 42:5
121:17
**unchanged**
43:19
**unclear** 110:13
**unconflicted**
95:19
**unconsciona...**
131:14
**unconstitutio...**
129:5 133:2,5
151:10
**unconstitutio...**
132:13,17

**unconstitutio...**
132:11,16,18
**uncontested**
16:3
**uncontrovert...**
21:20 33:5
**under** 17:1,4
21:10,22 27:22
27:25 28:4,20
28:24 29:16,19
34:9,20 38:22
38:24 39:20
43:25 44:1
46:6 47:23
48:4 72:3
81:18 87:25
89:9 94:11
97:7 105:3
121:22 125:2
131:18 142:18
146:15,20
147:9,11,17
150:14 151:15
151:16 154:7
**undercuts**
102:11
**underline**
119:21
**underly** 105:15
**undermine**
106:23 124:20
127:22
**underscore**
124:10
**underscoring**
104:9

**understand**
16:25 17:25
18:25 20:6
59:21 60:20
62:16 63:23
64:11,25 65:3
66:13 74:24
86:21 94:6
98:3 120:13
124:8 138:16
148:16
**understandable**
15:14
**understanda...**
63:24
**understanding**
63:4 81:25
86:17 111:12
**understood**
55:1 61:12
62:13 82:18
145:6
**undertaken**
119:3
**undo** 101:13
**undoubtedly**
143:3
**undue** 106:10
131:14
**unduly** 132:19
**unenforceable**
131:16
**unequivocally**
44:2 49:1
**unfair** 125:2
**unfettered**
153:16

unfortunate
  86:21
unfortunately
  142:25
unfounded
  49:23
unique  56:25
  57:3 98:7
uniqueness
  86:4,9
united  1:1,12
  4:18 56:22
  57:7 58:22
  59:12 60:14,23
  61:4 109:22
  130:14
unnecessary
  143:3
unnoticed
  102:6
unreasonable
  64:5,18 65:20
unreliable
  22:21
unresolved
  74:25
unsecured  4:3
  4:11 41:11
  49:21 137:25
  152:23 154:16
unsound  53:1
unsupported
  51:22
unverified
  107:5
update  40:5
  41:2

updates  41:1
upfront  94:2
  96:14
uphold  54:15
  125:10 128:12
upholding
  128:10
uptegrove
  11:18 81:10
urge  124:18
use  14:18,24
  15:2,5 75:24
  84:19 86:4
  94:15 114:15
  121:5 122:23
  126:4,14 130:3
  130:6,8,23
  149:25 150:3,5
  151:14 154:4,7
  154:10
used  14:20
  17:19 23:24
  25:21 86:14
  98:4,6,10,13
  134:23 137:1,4
  137:18
useful  26:5
users  61:17
  120:6 149:12
  149:13
uses  23:8
using  23:24
  99:20 128:4,22
usual  57:3
usually  32:12
utilities  26:5

utility  22:5,6
  22:13,14,22
  23:1,4,8 24:22
  25:16,19 26:4
  45:17,25 46:1
  103:17,19
  104:4,10,13,17
  104:20,25
  105:7,8 120:14
  122:5
utilized  120:9
  125:12
utilizing  118:5
  119:8

**v**

v  10:16 109:22
  126:4
valid  61:15
  127:3,18
  131:15
validated  62:4
validity  127:16
valuable  53:8
valuation  23:9
  25:11 52:25
  98:2,12,18
  99:24 101:11
  101:13 103:18
  104:4 105:17
  110:14,15,19
  113:25 125:2
  128:5 137:2,6
  147:17 150:12
  150:15
valuations
  125:12

value  15:17
  21:9,14,14,17
  21:22,24 22:1
  22:9,11,12,16
  22:18,23 23:3
  23:7,24 24:9
  24:11,20 25:8
  25:16 26:10,21
  27:13 28:1,3
  29:8,15,18,21
  34:6 37:18
  42:13,14 43:7
  43:9,24 44:8
  44:11,13,18
  45:4,10,10,13
  45:14,16,18,21
  54:5 94:4
  97:24 98:10
  102:3,6,20,21
  103:12,17,19
  103:23 104:3,5
  104:6,10,14,15
  104:20,25
  105:1,7,9,11
  105:12,16,18
  105:24,24,25
  106:2,11,23
  107:3 111:14
  111:15 112:12
  113:9 114:2,7
  114:9,10,17
  115:17 121:10
  121:20 122:23
  141:8 148:3
  149:11 152:10
  153:10

valued  28:19
  53:19 98:6
  101:24 104:8
  106:17 146:19
valueless
  104:19
values  25:6
  110:16 113:16
  113:19,19
  114:15
van  11:19 12:7
variables
  62:19
varick  4:20
variety  36:13
  145:9
various  25:15
  60:19 61:1
  82:24,24 86:14
  86:25 87:2,3
  88:3 103:19
  105:15 127:17
  142:18 143:15
  143:16
varying  122:15
vast  91:7,7
vastly  57:15
  153:1
vehicles  86:5
vejseli  11:20
venable  5:14
  85:1
vengeance  47:3
venture  132:20
ventures  107:3
verdict  128:13

verifiable
  107:2
verified  153:14
verifies  153:13
veritext  157:20
versa  138:8
version  30:20
  30:21,22 31:8
  31:9,10,10,12
  31:13,17,19
  43:19 127:1,7
  130:6,8,22,23
  154:4
versions  127:3
  127:18
versus  54:2
  100:24 103:17
vested  103:4
  143:1
veton  11:20
vgx  121:25
  122:3
vice  138:8
victims  122:14
victor  11:17
videotaped
  48:18
view  44:13
  54:24 64:1
  69:5 95:21
  124:23
viewed  69:21
  95:17 96:12
views  26:2
  69:11
vince  13:1

violated  21:11
  29:18 37:7
  113:21
violates  115:10
  131:17
violative  29:7
vires  60:17
  68:24 71:7
viruses  15:4
vladimir  103:6
vocal  25:3
voice  79:21
  80:11
voicing  140:19
volatility
  119:24
volume  105:22
  119:25 120:5
voluminous
  85:8
volunteer
  49:20
vote  36:16 37:2
  61:7,10 62:11
  62:18 76:23
  79:21 91:20,21
  96:5,6 110:8
  111:15,24
  113:7 131:23
  132:2 136:11
  138:4,5,12,15
  138:21,22
  139:5,13,14,15
  139:17,19
  140:3 143:9
  145:16,20
  146:1 148:8,19

  151:20,25
  154:19
voted  15:22,23
  17:8 19:25
  20:25 21:6
  32:20 36:20,22
  37:1,6 49:2
  62:9 110:6,24
  111:19 136:1
  136:22 138:18
  139:1,25 140:2
  145:20,24
  148:19 151:19
  151:22
voters  123:12
votes  91:6
  135:6 137:22
  138:12 148:10
voting  15:20
  20:4 36:21
  50:18 56:16
  61:3,6 62:9
  78:23 79:12,17
  110:19,24
  111:11,12,13
  112:1,4 115:6
  135:25 137:18
  139:2,12 148:9
voyager  55:16
  69:10 121:25
vtor  7:14

w

w  11:7
wait  84:10
waiting  39:11
  119:23

waiver  38:21
wallet  108:21
  108:22 109:12
  109:14
want  14:7,12
  14:13 16:25
  17:11,12 19:16
  19:18 26:13
  27:21 33:4,12
  33:13 36:12
  37:23 40:8,14
  48:11,20 49:24
  54:18 55:23,24
  56:14 59:19
  63:4,12,25
  65:2,9,22
  66:19 67:17
  68:3 69:11
  71:14 83:13
  84:19 91:2
  93:3 94:15
  96:7 97:13,14
  99:14 100:17
  100:25 115:13
  115:19,21
  123:5 125:16
  132:6,8 139:16
  141:22,23
  144:11,16
  147:2 153:1
wanted  18:3
  32:3 36:14
  40:5 41:2
  58:18,18 62:12
  73:1,13 77:12
  78:2 89:4
  94:21,24

144:12 145:13
149:7 150:8
155:15,19
wanting  64:15
wants  77:3
  97:18 146:13
  152:3
warren  11:21
waser  11:22
washington
  3:13 5:10
waste  23:12
  103:15
watch  48:19
water  106:15
  106:16
way  42:15
  59:11 72:2
  75:12 76:3,14
  76:15,24 77:11
  78:15 82:17
  83:3,10,14
  86:22 87:25
  93:4,12 98:15
  99:12,23
  131:22 136:1
  136:10,12,23
  137:21 138:23
  145:25
wayne  10:22
ways  83:6
  140:1 143:12
  145:9
we've  15:18
  16:17,22 17:14
  17:15,21,24
  18:7,12,21,23

19:2,2 26:24
26:24 30:25
37:24 38:6
39:1,15,19
60:10 63:17,17
63:20 70:21
71:25 129:14
149:8
weaponize
  52:17
weaponized
  110:8
weedman  4:16
week  27:16
  61:2 72:6
  120:4 155:8
weekend  16:18
weekly  48:14
weeks  40:17,18
  40:24 108:21
weigh  107:4
  128:12 153:19
weight  23:6,11
  25:5 32:23
  110:20,23,24
  111:11,13
weinberg
  94:25,25 95:4
welcome  90:5
went  24:21
  43:15,22 44:4
  46:24 67:13
  89:20 109:24
  113:12 142:6
weren't  93:10
west  5:16

we're  75:11
  76:8 77:10
  88:23 92:8,15
  107:16
whales  137:13
  137:23
what's  75:4
  91:17 95:16
whirlwind
  152:15
white  4:1,9
  41:10 67:4
  68:13,22 95:5
  97:7 107:12
  112:7 152:22
wholly  132:4
  150:17
wide  122:11
wield  104:24
wielen  12:7
wildes  11:23
wildly  98:14
wiles  69:10
  91:2,3
willful  46:22
  47:9
william  11:4
  11:18 81:9
williams  11:24
winddown
  21:24 27:23
  28:10,21,24
  29:2 30:3
  38:25 54:16
  81:16 83:2
  97:15,16 99:10
  99:14,20 147:1

147:2,3
**window** 120:4
**wipeout** 41:23
**wisely** 89:12
**wish** 47:4
71:19 88:15
124:9 142:18
**withdraw** 37:9
109:6 147:13
148:14 149:1,3
**withdrawal**
108:25 111:5
118:12 120:6
148:22 149:2
**withdrawals**
117:13,14
**withdrawing**
113:2
**withdrew** 19:6
36:17 37:8
81:3
**withheld**
137:17
**withhold** 81:2
**withholding**
130:16
**witness** 25:1
109:5 119:17
**witnesses**
148:13
**wofford** 4:15
**won** 53:12
140:12
**wonderful**
15:11 91:3
**won't** 91:24

**word** 21:14
25:21
**words** 23:22
30:24,24,24
31:9,12,21,21
31:21,23,23
44:15 55:4
**work** 35:13
38:3 39:15
42:20 55:1
56:7 59:16
65:13 66:25
67:2,17 69:5
71:20 78:25
80:5,14,20
82:16 87:11
91:1 145:25
**worked** 16:18
17:15 59:6
83:9
**working** 34:5
42:19 49:18,20
52:6 79:25
80:8
**works** 29:12
151:17
**world** 86:8
103:25 104:2
105:20
**worse** 20:18
**worst** 52:16
**worth** 26:11
103:8 104:11
109:24 122:8
146:19,25
148:5

**worthless**
25:17 45:24
120:16
**wouldn't** 96:23
97:1
**wound** 66:11
66:12
**write** 24:4
135:13
**written** 112:25
**wrong** 24:6
105:13 138:16
**wrongdoers**
42:22 47:20
**wrongdoing**
33:19
**wrote** 23:20
24:6 65:5
153:18

| x |
| --- |

**x** 1:4,10 117:8

| y |
| --- |

**yara** 9:6
**yeah** 65:15
68:9 70:20
73:13 91:6
116:18 124:2
134:21
**year** 15:13,16
34:3 40:12
53:5 80:24
83:2 88:14
123:8
**years** 106:6
**yeung** 11:25

**yoon** 12:1
**york** 1:2,14
3:20 4:13,21
5:4,17 89:20
90:9 133:12,12
133:15 134:10
**you're** 76:16
76:21,22,25
77:1,4 114:22
114:25
**you've** 114:22

| z |
| --- |

**zabib** 13:3
**zach** 11:23
**zachary** 13:3
**zaharis** 12:2
**zamfir** 8:21
**zero** 22:19,19
44:10,19 45:22
119:19 120:18
121:11 141:9
148:5,6
**zomo** 12:3
**zoom** 78:4
100:17 155:14
155:22