**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE MODIFIED JOINT CHAPTER 11 PLAN OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES

Celsius Network LLC and its debtor affiliates, as debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors")[2] having:

a.   commenced these chapter 11 cases, (i) on July 13, 2022 for all Debtors except for the GK8 Debtors and (ii) on December 7, 2022 for the GK8 Debtors, in each case, by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" and, all such cases, the "Chapter 11 Cases");

b.   continued to operate their business and manage their property during these Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c.   obtained, on September 1, 2022, the entry of the *Order (I) Approving the Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 687], approving the *Bidding*

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956) (collectively, the "Initial Debtors"); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450) (collectively, the "GK8 Debtors").  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan, the Disclosure Statement, or the Bankruptcy Code (each as defined herein), as applicable.  The rules of interpretation set forth in Article I.B. of the Plan apply.

*Procedures for the Potential Sale of Certain of the Debtors' Assets*, attached thereto as <u>Exhibit 1</u> (the "<u>GK8 Bidding Procedures</u>");

d.    obtained, on November 2, 2022, the entry of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III)Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272], approving the *Bidding Procedures for the Potential Sale of Certain of the Debtors' Assets*, attached thereto as <u>Exhibit 1</u> (the "<u>WholeCo Bidding Procedures</u>");

e.    announced, on December 2, 2022, Galaxy Digital Trading LLC (together with its affiliates, "<u>Galaxy</u>") as the Successful Bidder (as defined in the GK8 Bidding Procedures) for GK8 pursuant to the GK8 Bidding Procedures [Docket No. 1549];

f.    obtained, on December 13, 2022, entry of the *Order (I) Approving the Sale of the GK8 Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances, (II) Authorizing the GK8 Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [Docket No. 1686], which authorized entry into that certain asset purchase agreement by and between the GK8 Debtors and Galaxy (the "<u>GK8 Asset Purchase Agreement</u>");

g.    closed, on February 21, 2023, the sale of GK8 to Galaxy;

h.    filed, on March 31, 2023, the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtors Affiliates* [Docket No. 2358] (as amended, modified, or supplemented from time to time, the "<u>Plan</u>");

i.    commenced, on April 25, 2023, the Auction for the sale of substantially all of the Debtors' assets in accordance with the WholeCo Bidding Procedures;

j.    announced, on May 25, 2023, Fahrenheit, LLC ("<u>Fahrenheit</u>") as the Successful Bidder and the Blockchain Recovery Investment Consortium ("<u>BRIC</u>") as the Backup Bidder (both as defined in the WholeCo Bidding Procedures) for substantially all of the Debtors' assets [Docket No. 2317];

k.    entered into, on June 6, 2023, a plan sponsor agreement with Fahrenheit (the "<u>Plan Sponsor Agreement</u>") and a backup plan sponsor agreement with the BRIC (the "<u>Backup Plan Sponsor Agreement</u>");

l.    filed, on June 15, 2023, a revised *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807];

m.    filed, on June 27, 2023, the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket

No. 2902] (as amended, modified, or supplemented from time to time, the "Disclosure Statement");

n.     filed, on July 28, 2023, the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Notice of Plan Supplement");

o.     filed, on July 29, 2023, a further revised (i) Plan [Docket No. 3116] and (ii) Disclosure Statement [Docket No. 3117];

p.     filed, on August 9, 2023, a further revised (i) Plan [Docket No. 3222] and (ii) Disclosure Statement [Docket No. 3223];

q.     filed, on August 13, 2023, the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Notice of Plan Supplement");

r.     filed, on August 15, 2023, a further revised (i) Plan [Docket No. 3319] and (ii) Disclosure Statement [Docket No. 3220];

s.     filed, on August 17, 2023, a further revised Disclosure Statement [Docket No. 3332] and obtained entry of the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement Order"), approving the Disclosure Statement, the Solicitation Procedures, and solicitation materials, including notices, forms, and ballots (collectively, the "Solicitation Packages");

t.     caused the Solicitation Packages and notice of the Confirmation Hearing and the deadline for objecting to confirmation of the Plan ("Confirmation") to be distributed on or before August 25, 2023, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), the Disclosure Statement Order, and the Solicitation Procedures;

u.     filed, on September 8, 2023, the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Notice of Plan Supplement");

v.     published, on August 22, 2023, the notice of the Confirmation Hearing (the "Confirmation Hearing Notice") in *The New York Times (National Edition)* and *The New York Times (International Edition)*;

w.     published, on September 6, September 13, September 20, and September 27, 2023 the confirmation Hearing Notice in CoinDesk's *Protocol* email newsletter;

3

x.      filed, on September 6, 2023, the *Debtors' Brief in Support of CEL Token Settlement* [Docket No. 3431] (the "CEL Token Brief") and the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, in Support of the Proposed CEL Token Settlement* [Docket No. 3435], entered into evidence as Celsius Exhibit 37;[3]

y.      filed, on September 15, 2023, the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Notice of Plan Supplement");

z.      filed, on September 23, 2023, the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Notice of Plan Supplement");

aa.     filed, on September 25, 2023, the *Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3560] (as modified, amended, or supplemented from time to time, the "Voting Report"), which the Debtors amended on September 25, 2023 [Docket No. 3574], entered into evidence as Celsius Exhibit 60, and which the Debtors further amended on October 19, 2023 [Docket No. 3857];

bb.     filed, on September 27, 2023, the *Sixth Notice of Filing of Plan Supplement* [Docket No. 3583] (the "Sixth Notice of Plan Supplement");

cc.     filed, on September 27, 2023, (i) the *Debtors' Memorandum of Law in Support of Confirmation the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates and Omnibus Reply to Objections Thereto* [Docket No. 3604] (the "Confirmation Brief"); (ii) the *Declaration of Christopher Ferraro, Interim Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, In Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3581] (the "Ferraro Declaration"), entered into evidence as Celsius Exhibit 44;

---

[3]     Additionally, the Committee filed the following documents related to CEL Token: (a) on June 21, 2023, (i) *The Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2840]; (ii) the *Declaration of Maxwell Galka in Support of the Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2845]; and (iii) the *Declaration of Aaron Colodny in Support of the Official Committee of Unsecured Creditors' Omnibus Objection to Motions for Entry of an Order to Dollarize Non-Insider CEL Token Claims at the Petition Date Price of $0.81565* [Docket No. 2844]; (b) on September 6, 2023, (i) the *Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues with Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3432] (the "Committee CEL Brief") and (ii) the *Declaration of Aaron Colodny in Support of the Brief of the Official Committee of Unsecured Creditors Regarding Legal Issues with Respect to the Treatment of CEL Token Under the Debtors' Plan of Reorganization* [Docket No. 3433]; (c) on September 27, 2023, the *Declaration of Maxwell Galka on Behalf of the Official Committee of Unsecured Creditors in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network, LLC and its Debtor Affiliates* [Docket No. 3580] entered into evidence as UCC-228 (the "Initial Galka Declaration") and (d) on October 2, 2023, the *Supplemental Declaration of Max Galka in Support of Confirmation of the Joint Chapter 11 Plan* [Docket No. 3659], entered into evidence as UCC-229 (the "Supplemental Galka Declaration").

(iii) the *Declaration of Joel E. Cohen in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3588] (the "Cohen Declaration"), entered into evidence as Celsius Exhibit 51; (iv) the *Declaration of Robert Campagna in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3582], entered into evidence as Celsius Exhibit 46 (the "Initial Campagna Declaration"); the *Declaration of Steven Kokinos in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3591], entered into evidence as Celsius Exhibit 61 (the "Kokinos Declaration"); (v) the *Declaration of Allison Hoeinghaus in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3586], entered into evidence as Celsius Exhibit 68 (the "Hoeinghaus Declaration"); (vi) the *Declaration of Ryan Kielty in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3592], entered into evidence as Celsius Exhibit 45 (the "Kielty Declaration"); and (vii) the *Supplemental Declaration of Robert Campagna in Support of Confirmation of the Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates*, entered into evidence as Celsius Exhibit 70 [Docket No. 3653] (the "Supplemental Campagna Declaration," and together with the Ferraro Declaration, the Cohen Declaration, the Kokinos Declaration, the Hoeinghaus Declaration, the Initial Campagna Declaration, the Kielty Declaration, the Initial Galka Declaration, the Supplemental Galka Declaration, and the Robinson Declaration, the "Declarations");[4]

dd.    filed, on October 20, 2023, the *Debtors' Supplemental Memorandum of Law in Support of Confirmation of the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates and Omnibus Reply to Certain Objections Thereto* [Docket No. 3864] (the "Supplemental Memo") *Seventh Notice of Filing of Plan Supplement* [Docket No. 3869] (the "Seventh Notice of Plan Supplement"); and

ee.    filed, on October 30, 2023, the *Eighth Notice of Filing of Plan Supplement* [Docket No. 3935] (the "Eighth Notice of Plan Supplement," and together with the First Notice of Plan Supplement, the Second Notice of Plan Supplement, the Third Notice of Plan Supplement, the Fourth Notice of Plan Supplement, the Fifth Notice of Plan Supplement, the Sixth Notice of Plan Supplement, and the Seventh Notice of Plan Supplement, the "Plan Supplement").

The Bankruptcy Court having:

a.    entered the Disclosure Statement Order on August 17, 2023;

---

[4]    Additionally, the Committee filed the *Declaration of Mark Robinson in Support of Confirmation of the Joint Chapter 11 Plan* [Docket No. 3584], entered into evidence as UCC-230 (the "Robinson Declaration").

b.    set September 6, 2023, as the deadline for the Debtors and the Committee to file briefing on CEL Token legal issues;

c.    set September 22, 2023, at 4:00 p.m. (prevailing Eastern Time), as the deadline for (i) filing objections to confirmation of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3319] (the "Objection Deadline") and (ii) voting on the Plan (as such deadline may be extended from time to time, the "Voting Deadline");

d.    set October 2, 2023, at 2:00 p.m. (prevailing Eastern Time), as the date and time to commence the Confirmation Hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

e.    entered the Confirmation Procedures Order on September 15, 2023;

f.    entered the *Order Clarifying Case Management Procedures for the Confirmation Hearing (Modification #1)* [Docket No. 3509] on September 20, 2023;

g.    entered the *Corrected Order Granting Requests to Make Opening Statements, Demonstratives and Handling of Exhibits* [Docket No. 3612] on September 28, 2023;

h.    entered the *Order Clarifying Case Management Procedures for the Confirmation hearing (Modification #2)* [Docket No. 3740] on October 10, 2023;

i.    entered the *Order Granting Requests to Make Closing Arguments* [Docket No. 3923] on October 26, 2023;

j.    entered the *Order Granting Requests to Make Closing Arguments (Modification #1)* [Docket No. 3926] on October 27, 2023;

k.    reviewed: (i) the Plan; (ii) the Disclosure Statement; (iii) the Plan Supplement; (iv) the Confirmation Brief; (v) the Declarations; (vi) the Voting Report; (vii) the Confirmation Hearing Notice; (viii) the affidavits of publication regarding publication of the Confirmation Hearing Notice in *The New York Times (National Edition)* and *The New York Times (International Edition)* and in *CoinDesk's Protocol e-mail newsletter* [Docket Nos. 3367, 3368, and 3507] (collectively, the "Publication Affidavits"); (ix) the *Affidavit of Service of Solicitation Materials* dated [Docket No. 3514] (the "Solicitation Affidavit"); (x) the *Affidavit of Service* regarding the extended deadline for all Holders of Class 4 Claims (Convenience Claims) to opt out of the Class Claim Settlement [Docket No. 3870]; (xi) the affidavits of service relating to the Plan Supplement [Docket Nos. 3338, 3365, 3499, 3500, 3502, 3552, 3553, 3679, 3682, and 3904] (the "Plan Supplement Affidavits" and, together with the Publication Affidavits and the Solicitation Affidavit, the "Affidavits"); and (xii) all Filed pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and Confirmation, including all objections, statements, letters, and reservations of rights;

6

l.      held a hearing on CEL Token legal issues on September 28, 2023;

m.      held the Confirmation Hearing beginning October 2, 2023 at 2:00 p.m., prevailing Eastern Time and continuing on October 3, 2023 at 9:00 a.m., prevailing Eastern time, October 4, 2023 at 9:00 a.m., prevailing Eastern Time, October 16, 2023 at 2:00 p.m., prevailing Eastern Time, October 17, 2023 at 9:00 a.m., prevailing Eastern Time; and October 30, 2023 at 2:00 p.m., prevailing Eastern Time;

n.      considered the record of these Chapter 11 Cases, taken judicial notice of the papers and pleadings referenced in (i) the Debtors' and the Committee's *Joint Admitted Exhibit List and List of Exhibits Where Judicial Notice Is Sought for the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 3737], (ii) the Debtors' and the Committee's *Supplemental Joint Admitted Exhibit List and List of Exhibits Where Judicial Notice is Sought For the Debtors' and the Official Committee of Unsecured Creditors' Case-in-Chief in Support of Confirmation* [Docket No. 3884], and (iii) the *Admitted Exhibit List and List of Exhibits Where Judicial Notice Was Given for the Pro Se Creditors' Case* [Docket No. 3885], and taken judicial notice of all necessary papers and pleadings filed in the Chapter 11 Cases; and

o.      considered all oral representations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence presented at the Confirmation Hearing.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court makes and issues the following findings of fact and conclusions of law, and orders:

## FINDINGS OF FACT

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

1.      The findings of fact and conclusions of law set forth herein, in the Plan (attached hereto as **Exhibit A**) and in the record of the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to Confirmation, including any rulings made on the record at the Confirmation Hearing, are hereby incorporated in this Confirmation Order.  To the extent any of the following constitutes findings

of fact or conclusions of law, they are adopted as such.  To the extent any finding of fact or
conclusion of law set forth in this Confirmation Order (including any findings of fact or
conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and
incorporated herein) constitutes an order of the Bankruptcy Court, it is adopted as such.

2.     **Jurisdiction, Venue, and Core Proceeding**.    The Bankruptcy Court has
jurisdiction over these Chapter 11 Cases pursuant to section 1334 of title 28 of the United States
Code and the *Amended Standing Order of Reference from the United States District Court for the
Southern District of New York*, entered February 1, 2012.  The Bankruptcy Court has exclusive
jurisdiction to determine whether the Plan complies with the applicable provisions of the
Bankruptcy Code and should be confirmed.   Venue is proper in this district pursuant to
sections 1408 and 1409 of title 28 of the United States Code.  Confirmation of the Plan is a core
proceeding within the meaning of section 157(b)(2) of title 28 of the United States Code.

3.     **Ballots**.   The Classes entitled to vote on the Plan (collectively, the "Voting
Classes") are set forth below, *see* Celsius Ex. 60 ¶ 5 & Ex. A:

| Class | Designation |
| --- | --- |
| 2 | Retail Borrower Deposit Claims |
| 4 | Convenience Claims |
| 5 | General Earn Claims |
| 6A | General Custody Claims |
| 7 | Withhold Claims |
| 8 | Unsecured Loan Claims |
| 9 | General Unsecured Claims |
| 10 | State Regulatory Claims |
| 14 | Series B Preferred Interests |

4.     As set forth and approved in the Disclosure Statement Order [Docket No. 3337],
the Ballots the Debtors used to solicit votes to accept or reject the Plan from Holders of Claims
and Interests in the Voting Classes adequately addressed the particular needs of these Chapter 11

Cases and were appropriate for Holders of Claims and Interests in the Voting Classes to vote to accept or reject the Plan.

5.     **Notice**.  The Debtors provided due, adequate, and sufficient notice of the Plan, the Disclosure Statement, the Plan Supplement, the Disclosure Statement Order, the Solicitation Packages, and all other materials distributed by the Debtors in connection with Confirmation of the Plan in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the procedures set forth in the Disclosure Statement Order.  *See* Celsius Ex. 60 ¶ 7; October 3, 2023 Hr'g Tr. 185:5–20 (Karpuk).

6.     Brian Karpuk, the managing director at Stretto, Inc. ("Stretto") testified as to the balloting and voting process with respect to the Plan.  *See generally* Celsius Ex. 6; October 3, 2023 Hr'g Tr. 182:7–202:3 (Karpuk).  Stretto was retained by the Debtors to assist with tasks, including the service of Solicitation Packages, tabulating the votes cast to accept or reject the Plan, distributing required notices to parties in interest, and receiving, maintaining, docketing, and otherwise administering proofs of claim filed in the Debtors' Chapter 11 cases.  Celsius Ex. 6 ¶ 2. Stretto worked "to ensure that it had the most up-to-date contact information that the [D]ebtors had on[] file, specifically the email address that was tied to each and every account."  October 3, 2023 Hr'g Tr. 185:14–17 (Karpuk).  This allowed Account Holders to "log into a custom ballot portal" created by Stretto.  October 3, 2023 Hr'g Tr. 185:18–20 (Karpuk).  When asked if there were "any material irregularities" during the balloting process, Mr. Karpuk confirmed "[t]here were not."  October 3, 2023 Hr'g Tr. 185:21–24 (Karpuk).

7.     As evidenced by the Affidavits and the Voting Report, all parties required to be given notice of the Confirmation Hearing and the Objection Deadline have been given due, proper, adequate, timely, and sufficient notice in accordance with the Disclosure Statement Order and in

compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations, and such parties have had an opportunity to appear and be heard with respect thereto.

8.      **Good-Faith Solicitation**.   Mr. Karpuk testified that Stretto adhered to the Disclosure Statement Order and served Solicitation Packages on all Claim holders entitled to vote on the Plan.  Celsius Ex. 6 ¶ 7.  To accomplish this, Stretto worked with the Debtors to "identify all claims entitled to vote, to classify those claims into each of the individual classes."  October 3, 2023 Hr'g Tr. 185:11–13 (Karpuk).

9.      As described in and evidenced by the Voting Report and the Affidavits, the Solicitation Packages were timely distributed to Holders in the Voting Classes that held a Claim against or Interest in the Debtors, as of July 24, 2023 (the "<u>Voting Record Date</u>" and such distribution, the "<u>Solicitation</u>").  The establishment and notice of the Voting Record Date were approved in the Disclosure Statement Order.  The length of the period during which Holders in the Voting Classes were required to submit acceptances or rejections to the Plan was reasonable and sufficient for such Holders to make an informed decision to accept or reject the Plan and also was approved in the Disclosure Statement Order.

10.     Based on the record before the Bankruptcy Court in the Chapter 11 Cases, the Plan has been developed and solicited in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and therefore all Exculpated Parties are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

11.     **Vote Tabulation.**  As set forth in the Plan and Disclosure Statement, Holders of Claims and Interests in Class 2 (Retail Borrower Deposit Claims), Class 4 (Convenience Claims),

Class 5 (General Earn Claims), Class 6A (General Custody Claims), Class 7 (Withhold Claims), Class 8 (Unsecured Loan Claims), Class 9 (General Unsecured Claims), Class 10 (State Regulatory Claims), and Class 14 (Series B Preferred Interests) were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures.  Holders of Claims and Interests in Class 1 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 6B (Withdrawable Custody Claims) are Unimpaired and conclusively presumed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims and Interests in Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claims), and Class 17 (Equitably Subordinated Claims) (collectively, the "Deemed Rejecting Classes") are Impaired, are entitled to no recovery under the Plan, and are deemed to have rejected the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims and Interests in Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) are either Impaired or Unimpaired and conclusively presumed to either accept the Plan or reject the Plan and, therefore, are not entitled to vote to accept or reject the Plan and under sections 1126(f) and 1126(g) of the Bankruptcy Code.

12.     Stretto sent ballots to over 400,000 parties and received approximately 80,000 completed ballots by the September 22, 2023 voting deadline established in the Disclosure Statement Order.  *See* October 3, 2023 Hr'g Tr. 186:2–3 (Karpuk).  The "20 percent" response rate of creditors submitting ballots is "relatively high" in Mr. Karpuk's experience, *see* October 3, 2023 Hr'g Tr. 186:4–5 (Karpuk), and reflected that "over 50 percent of . . . account holder claims voted during the process," *see* October 3, 2023 Hr'g Tr. 186:6–7 (Karpuk).  Many of the account holder classes voted to accept the plan "in the high 90 percentile both by count and by dollar."  *See* October 3, 2023 Hr'g Tr. 186:12–14 (Karpuk).

13.     As described in the Voting Report, the Holders of Claims and Interests in Classes 2, 4, 5, 6A, 7, 10, and 14 for all Debtors and Class 9 for all Debtors other than Celsius Mining LLC and Celsius Network Inc. have voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code. *See* Celsius Ex. 60 ¶ 13.

14.     Class 8 and Class 9 for the Debtors Celsius Mining LLC and Celsius Network Inc. and the Deemed Rejecting Classes (the "Rejecting Classes") voted to reject the Plan or were deemed to reject the Plan. *See* Celsius Ex. 60 ¶ 13.

15.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims (excluding the acceptance by any Insiders of any of the Debtors) has voted to accept the Plan. The Debtors therefore seek Confirmation, solely with respect to the Rejecting Classes, under section 1129(b) of the Bankruptcy Code, rather than section 1129(a)(8) of the Bankruptcy Code.

16.     Additionally, as described in the Voting Report, Holders of CEL Token Deposit Claims that voted on the Plan voted to accept by 98.71% in number and 95.93% in amount. *See* Celsius Ex. 60, Exhibit A. This "was very similar to, overall, the account holder classes." October 3, 2023 Hr'g Tr. 186:18–19 (Karpuk).

17.     All procedures used to tabulate the Ballots were fair, reasonable, and conducted in good faith in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations.

18.     **Service of Opt-Out and Opt-In Forms**. The process that the Debtors and the Solicitation Agent used (described in the Voting Report and evinced by the Solicitation Affidavit) to identify the relevant parties on which to serve the applicable Ballot or notice containing an

opportunity to opt out of the Third-Party Release (as defined herein) or the Class Claim Settlement (each, an "Opt-Out Form") or opt into the Third-Party Release (as defined herein) (each, an "Opt-In Form"), as applicable, and to distribute the Opt-Out Forms and Opt-In Forms was reasonably calculated to ensure that each Holder of a Claim or Interest was informed of its ability to opt out of or into, as applicable, the Third-Party Release and the Class Claim Settlement as well as the risks, benefits, and/or consequences of doing so or for failing to timely do so.

19.    For the avoidance of doubt, any party that (i) affirmatively elected in the Opt-Out Form to opt out of the Third-Party Release or (ii) was in a Deemed Rejecting Class and received an Opt-In Form but did not affirmatively "opt in" to the Third-Party Release, in each case prior to any deadline to submit a Ballot, shall not be a Releasing Party under the Plan.

20.    Further, for the avoidance of doubt, any party that did not affirmatively opt out of the Class Claim Settlement by (i) the deadline to submit a Ballot or (ii) the supplemental deadline of October 9, 2023 established solely for Holders of Class 4 Convenience Claims to submit Class Claim Settlement Opt-Out Forms, shall be bound by the terms of the Class Claim Settlement and communicated to each Holder of a Class 4 Convenience Claim by email.  Celsius Ex. 60 ¶ 18. Additionally, notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the *Order (I) Approving (A) the Settlement By and Among the Debtors, the Committee, and the Custody Ad Hoc Group and (B) the Election Form and (II) Granting Related Relief* [Docket No. 2291] (the "Custody Settlement Order"), any Account Holder who affirmatively opted into the Custody Settlement pursuant to the Custody Settlement Order using the Election Form (as defined in the Custody Settlement Order) (and was therefore deemed to accept the Plan with respect to their Custody Claims) but (i) did not vote to accept the Plan with respect to any other Claims such Holder held *and* (ii) opted out of the Third-Party Release shall have their Third-Party Release opt-

out election honored, unless otherwise agreed between such party and the Debtors.  A list of all

such Account Holders is attached hereto as **Exhibit B**.

21.    **Modifications to Plan**.  Pursuant to section 1127 of the Bankruptcy Code, the

modifications to the Plan made after Solicitation of the Plan or in this Confirmation Order

(including those modifications announced on the record of the Confirmation Hearing) constitute

technical or clarifying changes, changes with respect to particular Claims by agreement with

Holders of such Claims or Interests, or modifications that do not otherwise materially and

adversely affect or change the treatment of any other Claim or Interest under the Plan.  *See* Celsius

Ex. 55 ¶ 46 (Ferraro); October 16, 2023 Hr'g Tr. 26:23–27:3, 31:5–11, 33:13–14.  Notice of these

modifications was adequate and appropriate under the facts and circumstances of the Chapter 11

Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional

disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under

section 1126 of the Bankruptcy Code, and such modifications do not require that Holders of

Claims or Interests be afforded any further opportunity to change previously cast acceptances or

rejections of the Plan.  Accordingly, the Plan is properly before the Bankruptcy Court and all votes

cast with respect to the Plan prior to such modification shall be binding and shall apply with respect

to the Plan.  The Plan as modified shall constitute the Plan submitted for Confirmation.  *See* Celsius

Ex. 44 ¶¶ 45–47.

22.    **Settlement of Claims and Interests**.  Article IV.A of the Plan describes and

incorporates certain settlements entered into by and among the Debtors, including, without

limitation, the Account Holder Avoidance Action Settlement, the CEL Token Settlement, the Class

Claim Settlement, the Custody Settlement, the Retail Borrower Settlement, the Series B

Settlement, and the Withhold Settlement.

23.      Pursuant to sections 1123(b) and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, any and all compromise and settlement provisions of the Plan constitute good-faith compromises, are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.  The settlements and compromises pursuant to and in connection with the Plan are substantively fair based on the following factors, as applicable: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.  Celsius Ex. 44 ¶¶ 32; 50–52.

24.      **Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action**.  Article VIII.C of the Plan describes certain releases granted by the Debtors, the Post-Effective Date Debtors, and the Estates (including the Account Holder Avoidance Action Release (where applicable), the "Debtor Release").  Such releases are a necessary, integrated, and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.  Such releases include a release of any and all Avoidance Actions against Holders of Account Holder claims participating in the Account Holder Avoidance Action Settlement.  The Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims or Causes of Actions released by Article VIII.C of the Plan; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable;

(e) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; (f) given, and made, after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (g) a bar to any of the Debtors, the Post-Effective Date Debtors, or the Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

25.     Article VIII.D of the Plan describes certain releases (the "Third-Party Release") granted by the Releasing Parties of the Released Parties, which Released Parties include, as more fully set forth in Article I.A.206 of the Plan: (a) the Debtors; (b) the Special Committee and each of its members; (c) the Post-Effective Date Debtors; (d) the Distribution Agent; (e) the Plan Administrator; (f) the Committee and each of its members (which shall be deemed, for these purposes, to include both corporate or entity Committee members as well as the individuals who have served on the Committee on behalf of any member that is a corporate or limited liability entity); (g) any Litigation Administrator; (h) the Plan Sponsor and each of its members;[5] (i) NewCo and its directors and officers; (j) the Retail Borrower Ad Hoc Group and each of its members; (k) the Earn Ad Hoc Group and each of its members (for the avoidance of doubt, neither BNK To the Future nor Simon Dixon individually are members of the Earn Ad Hoc Group, nor are either of them an agent, consultant or representative of the Earn Ad Hoc Group entitled to a release hereunder); (l) with respect to each of the foregoing, each such Entity's current financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (m) the Class Claim Representatives; (n) the Initial Series B Preferred Holders and their Related Parties; (o) the former directors and board observers of the Debtors designated by the Initial Series B Preferred Holders and their Related Parties; (p) Christopher Ferraro; (q) the BRIC

---

[5]     The Plan Sponsor's members are: (i) US Bitcoin Corp.; (ii) Arrington Capital; (iii) Proof Group Capital Management LLC; (iv) Ravi Kaza, and (v) Steven Kokinos.

Parties; (r) any other Person or Entity identified in the Schedule of Released and Exculpated Parties; and (s) any Releasing Party (for the avoidance of doubt, neither BNK To the Future nor Simon Dixon individually are members of the Earn Ad Hoc Group, nor are either of them an agent, consultant or representative of the Earn Ad Hoc Group entitled to a release hereunder); *provided* that "Released Parties" do not include (i) Holders of Claims or Interests that affirmatively opt out of, or object to, the Third-Party Release, (ii) Excluded Parties, or (iii) Holders of (v) State Regulatory Claims, (w) *De Minimis* Claims, (x) Section 510(b) Claims, (y) Equitably Subordinated Claims, or (z) Other Interests, in each case that have not opted into the Third-Party Release, and in each case in their capacity as such.

26.    For the avoidance of doubt, an "Excluded Party" shall include any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified in the Plan Supplement or Plan as a Released Party (*e.g.*, such Entities will not be Released Parties because they accepted the Plan, are Affiliates of a Released Party, or are Related Parties of a Released Party); *provided* that all individuals who are employed by the Debtors on the date the Disclosure Statement Order was entered and that are not specifically identified as an Excluded Party on the Schedule of Excluded Parties shall be Released and Exculpated except to the extent such employee is later arrested, indicted, or found liable by a court of competent jurisdiction of bad acts and omissions in connection with his or her role with the Debtors, in which case any release provided in the Plan shall be null and void and all statutes of limitation shall be tolled during such time; *provided*, *further*, that any current or former director, officer, employee, independent contractor, professional, equity holder, contract counterparty, or other Entity associated with the Debtors that is not specifically identified as a Released Party who subsequently

enters into an agreement that includes a provision that they shall be identified as a Released Party shall be a Released Party.

27.    A list of employees as of the date of the Disclosure Statement Order was entered are released pursuant to (r) in the immediately preceding sentence will be Filed prior to the Effective Date.  *See* First Notice of Plan Supplement, Ex. A (providing for a release of "[e]ach individual who is employed by the Debtors on the date the Disclosure Statement Order is entered to the extent that each such employee is not (1) later arrested, indicted, or found liable for bad acts or omissions in connection with his or her role with the Debtors, in which case any release provided by the Plan shall be null and void with respect to such employee and all statutes of limitations shall be tolled during such time; (2) a UCC Claims Stipulation Defendant; or (3) listed on the Schedule of Excluded Parties").

28.    The Third-Party Release is consensual with respect to the Releasing Parties.  Such parties were provided notice of the Chapter 11 Cases, the Plan, and the deadline to object to Confirmation of the Plan and received the Confirmation Hearing Notice.  Releasing Parties who received a Ballot or Opt-Out Form were properly informed that Holders of Claims against or Interests in the Debtors that did not check the "opt out" box on their Ballot or Opt-Out Form and return such Ballot or Opt-Out Form by the Voting Deadline or object to the Third-Party Release would be deemed to have consented to the Third-Party Release as set forth in Article I.A.207 and Article VIII.D of the Plan.  Releasing Parties and Holders of Claims or Interests in the Deemed Rejecting Classes who received an Opt-In Form, checked the "opt-in box" on their Opt-In Form, and returned such Opt-In Form by the Voting Deadline expressly agreed to the terms of the Third-Party Release.  The Confirmation Hearing Notice was additionally published in *The New York Times (National Edition)* and *The New York Times (International Edition)* on August 22,

2023 and in CoinDesk.com's *Protocol* email newsletter on September 6, 2023, September 13, 2023, September 20, and September 27, 2023. The release provisions of the Plan are conspicuous and emphasized with boldface type in the Plan, the Disclosure Statement, the Ballots, the Confirmation Hearing Notice, and the Notices of Non-Voting Status and accompanying Opt-Out and Opt-In Forms.[6]

29.    The Third-Party Release is:  (a) consensual; (b) essential to the overall objective and confirmation of the Plan; (c) given by the Releasing Parties in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Debtors' restructuring and implementing the Plan and the mutual release provided by the Released Parties; (d) a good faith settlement and compromise of the claims and causes of action released by the Third-Party Release; (e) in the best interests of the Debtors and their estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; (h) consistent with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable case law interpreting the same; and (i) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.  Celsius Ex. 44 ¶¶ 19–25.

30.    The exculpation, described in Article VIII.E of the Plan and as modified herein (the "Exculpation"), is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good faith, arm's-length negotiations with key constituents, and is appropriately limited in scope.  Each Exculpated Party has participated in good faith in these

---

[6]    "Notices of Non-Voting Status" means, collectively, the (i) *Notice of (I) Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and (II) Opportunity to Opt Out of the Third-Party Releases*, (ii) *Notice of (I) Non-Voting Status to Holders of Unclassified Claims and (II) Opportunity to Opt Out of the Third-Party Releases*, (iii) *Notice of (I) Non-Voting Status With Respect to Disputed Claims and (II) Opportunity to Opt Out of the Third-Party Releases*, and (iv) *Notice of (I) Non-Voting Status to Holders of Impaired Claims or Interests Conclusively Deemed to Reject the Plan and (II) Opportunity to Opt-In to the Third Party Releases*

Chapter 11 Cases and is appropriately released and exculpated from any claim or cause of action as described in the Exculpation, including for the avoidance of doubt, that the Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; *provided*, for the avoidance of doubt, that notwithstanding anything to the contrary herein, the foregoing shall not limit paragraphs 325–329 of this Confirmation Order or any contractual provision between any Distribution Agent and the Debtors or Post-Effective Date Debtors, as applicable.  Celsius Ex. 44 ¶¶ 26–29.

31.    The injunction provisions set forth in Article VIII.F of the Plan (the "Injunction") are necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Release, the Third-Party Release, and the Exculpation, and are narrowly tailored to achieve these purposes. Celsius Ex. 44 ¶ 30.

32.    The release and discharge of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates described in Article VIII.B of the Plan (the "Lien Release"), except as otherwise expressly provided in the Plan and this Confirmation Order, is necessary to implement the Plan.  The provisions of the Lien Release are appropriate, fair, equitable, and reasonable and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

33.    **Ownership of Loan Collateral**.  The Debtors offered certain loan services and products to Account Holders through their Borrow Program.  Account Holders provided digital

assets to the Debtors to support their retail loans pursuant to the terms of the applicable loan agreement. *See, e.g.*, Celsius Ex. 38, <u>Exhibit A-5</u>, "4. Nature of e-Services - B. Loans" ("If approved, such application shall be subject to a separate loan agreement to be entered into between you and CNL (the "Loan Agreement"), and Celsius shall hold the Digital Assets provided as collateral under the Loan Agreement for the benefit of the Lender."); <u>Exhibit A-8</u>, "4. Services – E. Borrow" (same). An Account Holder's loan was governed by the version of the loan terms and conditions (the "<u>Loan T&Cs</u>") or sale and repurchase agreement terms and conditions (the "<u>SAR T&C</u>") in effect at the conclusion of the application process for the subject loan.

34.   Version 7 of the Loan T&Cs, which was in effect from on or around December 8, 2020 to June 26, 2021, provided the Debtors with certain rights to use the collateral securing Account Holders' loans, including "to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such [collateral] . . . with all attendant rights of ownership . . . ." Celsius Ex. 38, <u>Exhibit B-7</u>. Version 7 of the Loan T&Cs further provided that Account Holders "may not be able to exercise certain rights of ownership" with respect to such digital assets. *Id.* Similarly, version 1 of the SAR T&C provided that an Account Holder "transfer[red] title of the Tendered Assets to Celsius UK who, without further notice to you, shall hold the Digital Assets so provided in its own name with the ability to pledge, re-pledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital Assets . . . with all attendant rights of ownership." Celsius Ex. 38, <u>Exhibit C-1</u>.

35.   Starting with Version 8 of the Loan T&Cs, which was in effect on or around June 27, 2021 to October 18, 2021, and continuing with Version 9 of the Loan T&Cs, which were in effect on or around October 19, 2021 to the present date, the Loan T&Cs provided that Account

Holders "will not be able to exercise *any* rights of ownership" over the digital assets supporting an Account Holder's loan.  Celsius Ex. 38, Exhibits B-8 and B-9 (emphasis added).

36.    The Loan T&Cs explicitly incorporated the effective General Terms of Use by reference.  Celsius Ex. 38, Exhibits B-7, B-8, and B-9.  The General Terms of Use provided that an Account Holder transferred title to the Account Holder's digital assets to the Debtors. Specifically, Version 5 of the General Terms of Use, which was in effect from on or around September 30, 2020 to July 21, 2021, provided that title to an Account Holder's Digital Assets "pass from [the Account Holder] to CNL on the basis of an outright sale."  Celsius Ex. 38, Exhibit A-5.  This language is more explicit in Version 8 of the General Terms of Use, which went into effect as of April 14, 2022 and provides that Account Holders transfer "all right and title to such Eligible Digital Assets" to the Debtors as consideration for "entering into any Loan Agreement." Celsius Ex. 38, Exhibit A-8.

37.    **Plan Supplement**.  The Filing and notice of the documents included in the Plan Supplement, and any modifications or supplements thereto, were adequate and proper and in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.  Except as otherwise provided in paragraphs 349 and 350 of this Confirmation Order, all documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan (including Article XI.A of the Plan) and paragraphs 349 and 350 of this Confirmation Order, the Debtors' right to alter, amend, update, or modify the Plan Supplement before the Effective Date is reserved.

38.    **Emergence Retention and Incentive Plans**.  The Plan contemplates an employee incentive plan to "incent[ivize] the executives to maximize value and get out of bankruptcy as fast

as possible." October 3, 2023 Hr'g Tr. 26:19–21 (Ferraro).  The employee incentive plan includes

targets that executives must meet to receive payment under the Emergence Incentive Plan,

including "a distribution target," "KYC targets," and "mining operational targets."  October 3,

2023 Hr'g Tr. 26:22–24 (Ferraro).

39.     Emerging from bankruptcy as quickly as possible will require "a Herculean effort"

for Mr. Ferraro and Celsius employees covered by the employee incentive program.  October 3,

2023 Hr'g Tr. 27:11 (Ferraro).  For instance, Mr. Ferraro and his team have "been negotiating two

distribution agreements with PayPal and Coinbase" on an expedited basis.  October 3, 2023 Hr'g

Tr. 27:12–17 (Ferraro).  Negotiations like this would "normally [involve] months and months of

negotiation." October 3, 2023 Hr'g Tr. 27:12–17 (Ferraro).

40.     Despite the immense amount of work to support the Debtors as they approach

emergence, the Debtors are reducing the number of their employees.  Celsius "currently [has] on

payroll just under 150" employees but has "noticed almost 50 of them" and "expect[s] to be right

below 100 at the effective date."  October 3, 2023 Hr'g Tr. 27:22–25 (Ferraro).

41.     Mr. Campagna reviewed the performance metrics under the proposed Emergence

Incentive Plan ("EIP") to determine if such metrics are sufficiently challenging to satisfy the

requirements of the Bankruptcy Code.  Celsius Ex. 46 ¶ 22.

42.     Mr. Campagna understands that the Liquid Cryptocurrency Distribution Metric is

sufficiently challenging, as such a process has never before been attempted by the Debtors at the

large scale required to implement the Debtors' Plan within the time frame at which the Debtors

must complete an initial distribution to receive a target payout under the EIP.  Celsius Ex. 46 ¶ 23.

43.     Similarly, Mr. Campagna concluded that the Distribution Agreement Metric is

fundamental to allowing creditors to receive recoveries under the Plan and is sufficiently

challenging due to the novel, large-scale nature of the distributions required under the Plan.
Celsius Ex. 46 ¶ 24.

44.    Mr. Campagna determined the Chapter 11 Plan Confirmation Metric and Effective
Date Metric are sufficiently challenging, as the Plan confirmation and consummation process
require significant efforts by all EIP Participants, in addition to their prepetition day-to-day
responsibilities, to confirm and consummate the Plan on the timeline required to receive a target
payout under the EIP.  Celsius Ex. 46 ¶ 25.

45.    Mr. Campagna also determined that the East Stiles Site Metric is sufficiently
challenging because, while such metric has been achieved by the applicable EIP Participants, such
achievement was inherently uncertain due to prolonged delays caused by disputes with multiple
mining counterparties.  Celsius Ex. 46 ¶ 26.

46.    Mr. Campagna believes that the Midland Texas Gross Margin Metric is sufficiently
challenging due to the inherently uncertain, risky nature of the mining business, resulting in
construction and delivery delays, service delays, and disputes with multiple mining counterparties.
Celsius Ex. 46 ¶ 27.

47.    Mr. Campagna understands that the Mining Rig Metric is sufficiently challenging,
as evidenced by the fact that the applicable EIP Participants have not yet achieved target payout
under such metric due.  Celsius Ex. 46 ¶ 28.  Specifically, pursuant to the Mining Rig Metric,
target performance required the Debtors, Post-Effective Date Debtors, or NewCo, as applicable,
to have, among other things, 95,000 mining rigs hashing (or energized but not hashing due to
market conditions), by September 30, 2023.  *Id.*  As of August 31, the Debtors had only
approximately 86,000 mining rigs hashing, thus falling well short of target performance.
Construction and delivery delays, disputes with mining counterparties, and the numerous financial

risks associated with developing and maintaining mining sites have together prevented the Debtors from having 95,000 mining rigs hashing at this point. *Id.*

48.    Allison Hoeinghaus, a Managing Director at Alvarez & Marsal North America, LLC ("A&M") responsible for advising companies, both in and out of bankruptcy, regarding a wide range of executive compensation matters, submitted a declaration in support of confirmation, Celsius Ex. 68, and testified at the Confirmation Hearing, October 3, 2023 Hr'g Tr. 202:7–215:3. Celsius Ex. 68 ¶¶ 1, 6.

49.    Ms. Hoeinghaus is highly experienced in executive, management, and employee compensation, having over fifteen years of experience in the field.  During her tenure at A&M, she has worked closely with a range of companies undergoing financial restructurings to develop a variety of prepetition and postpetition compensation arrangements, including compensation plans and programs for senior executive and non-executive employees.  Specifically, she has led or co-led the review or design of key employee incentive plans, key employee retention plans, and other similar plans or assisted with other compensation matters in at least thirteen chapter 11 cases. Celsius Ex. 68 ¶ 7.

50.    A&M assisted the debtors in developing the EIP, including with respect to its size, participation considerations, and structure.  Celsius Ex. 68 ¶ 2.

51.    At the outset of the engagement, the Debtors, the Debtors' other advisors, and A&M discussed the Debtors' operational history, financial performance, restructuring process, and various other issues and areas of concern regarding the Debtors' workforce and employee programs.  A&M analyzed the structure of the Debtors' prepetition base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.  Celsius Ex. 68 ¶ 8.

52.    <u>The EIP</u>.  The EIP "is an incentive program that is intended to align the key executives, their interests with those of the various stakeholders in this case [a]nd to really motivate them to perform certain goals and objectives in this case to get to the best possible outcome as part of these Chapter 11 cases."  October 3, 23 Hr'g Tr. 205:5–14.  The purpose of the EIP is to maximize the value of the Post-Effective Date Debtors after emergence from these Chapter 11 Cases by distributing EIP Awards subject to the satisfaction of certain metrics included in the Plan and subject to the discretion of the Plan Administrator.  Celsius Ex. 68 ¶ 14.

53.    The EIP provides for cash awards to be paid to participants in the sole discretion of the Plan Administrator (as provided in the Plan Administrator Agreement) based on performance metrics tied to liquid cryptocurrency distribution, confirmation and consummation of the Plan, and certain mining achievements.  Any EIP Award shall be subject to clawback in the event that an EIP participant is later found guilty of a crime in connection with their employment at Celsius, voluntarily terminates their employment at Celsius, or has their employment terminated by Celsius for cause.  Celsius Ex. 68 ¶ 12.  Total EIP Awards for all participants are capped at approximately $2.6 million target performance, with 25% and 50% of that total available to participants if they achieve threshold performance.  Celsius Ex. 68 ¶¶ 10, 12.

54.    <u>Evaluating the EIP</u>.  Ms. Hoeinghaus and her team assessed the reasonableness of the EIP by looking "at the amounts that were being proposed, how level the number of participants that were being included, and the overarching structure of the program."  October 3, 2023 Hr'g Tr. 206:6–10; Celsius Ex. 68 ¶ 15.  Ms. Hoeinghaus did not assess the EIP's performance metrics.  October 3, 2023 Hr'g Tr. 205:25–206:5.

55.    Ms. Hoeinghaus used two methodologies to evaluate the reasonableness of the EIP—a comparison to other approved emergence incentive plans and a comparison to

compensation levels at the Debtors' competitors.  October 3, 2023 Hr'g Tr. 205:15–21; Celsius Ex. 68 ¶ 13.

56.    Ms. Hoeinghaus identified fifteen incentive plans geared toward executive employees and covering fewer than twenty-five participants that were authorized and approved in the chapter 11 cases of the following fifteen similarly sized non-energy companies undergoing chapter 11 that had a key employee incentive plan approved from 2017 through 2023 and had prepetition assets greater than $1.0 billion.  Celsius Ex. 68 ¶ 15.

57.    Relative to those fifteen comparable employee incentive plans, the Debtors' EIP compensation levels are "very reasonable." October 3, 2023 Hr'g Tr. 206:21–207:7.  Specifically: (a) the total aggregate annualized target cost of the EIP is well below the 25th percentile of the comparison group, (b) the average cost per EIP Participant is the lowest among the Comparison Group, and (c) the cost of the EIP as a percentage of the Debtors' assets is less than the 25th percentile of the Comparison Group.  Celsius Ex. 68 ¶ 19.

| ($000s) | Annualized Bankruptcy Incentive Plans Cost | | |
|---|---|---|---|
| Summary Statistics | Target Cost as % of Assets | Target Cost | Avg. Target Cost Per Participant |
| 25th Percentile | 0.11% | $6,017,921 | $770,009 |
| 50th Percentile | 0.21% | $10,031,250 | $914,601 |
| 75th Percentile | 0.27% | $14,141,295 | $1,661,224 |
| Celsius Network LLC[1] | 0.08% | $3,493,333 | $388,148 |
| Percent Rank | 9% | 1% | Lowest |

[1] Total target payout of $2.6M has been annualized based on a 9-month performance period commencing on April 1, 2023 and continuing through December 31, 2023.

Celsius Ex. 68 ¶ 19.

58.  Ms. Hoeinghaus compared the compensation levels of the EIP participants with and without the EIP Awards to the market level of compensation as measured by the compensation levels of similar positions at the Debtors' competitors.  October 3, 2023 Hr'g Tr. 208:4–14.

59.  Without the EIP Awards, the EIP Participants are currently compensated at 50% below median market compensation.

| ($000s) | | | Market TDC | | |
|---|---|---|---|---|---|
| Executive | Title | Current Base Salary | P25 | P50 | P75 |
| Ferraro, Chris | CEO, CFO, Chief Restr. Officer | $750 | $1,029 | $1,682 | $2,768 |
| Bodnar, Guillermo | Chief Technology Officer | $500 | $620 | $860 | $1,529 |
| Blonstein, Oren | Chief Product Officer | $350 | $540 | $696 | $1,109 |
| Deutsch, Ron | General Counsel | $320 | $566 | $750 | $1,263 |
| Ramos, Trunshedda | Chief HR Officer | $320 | $507 | $658 | $977 |
| Alisie, Adrian | Chief Compliance Officer | $300 | $454 | $590 | $856 |
| Fan, Jenny | Chief Financial Officer - Mining | $300 | $439 | $560 | $816 |
| Albert, Dave | Chief Admin Officer - Mining | $280 | $334 | $504 | $1,046 |
| Lawlor, Quinn | Chief Strategy Officer - Mining | $250 | $365 | $444 | $583 |
| $n = 9$ | | | | | |
| | Total | $3,370 | $4,853 | $6,744 | $10,948 |
| | Current Total Compensation relative to Market TDC | | (-31%) | (-50%) | (-69%) |

Celsius Ex. 68 ¶ 20.

60.  Including the EIP Awards, the EIP Participants would be compensated between the 25th percentile and median market compensation.

| ($000s) | | | | | Market TDC | | | Posture Relative to Market |
|---|---|---|---|---|---|---|---|---|
| Executive | Title | Current Base Salary | Proposed KEIP at Target | Proposed Target TDC | P25 | P50 | P75 | |
| Ferraro, Chris | CEO, CFO, Chief Restr. Officer | $750 | $938 | $1,688 | $1,029 | $1,682 | $2,768 | ~P50 |
| Bodnar, Guillermo | Chief Technology Officer | $500 | $375 | $875 | $620 | $860 | $1,529 | ~P50 |
| Blonstein, Oren | Chief Product Officer | $350 | $263 | $613 | $540 | $696 | $1,109 | P25 - P50 |
| Deutsch, Ron | General Counsel | $320 | $240 | $560 | $566 | $750 | $1,263 | ~P25 |
| Ramos, Trunshedda | Chief HR Officer | $320 | $240 | $560 | $507 | $658 | $977 | P25 - P50 |
| Alisie, Adrian | Chief Compliance Officer | $300 | $150 | $450 | $454 | $590 | $856 | ~P25 |
| Fan, Jenny | Chief Financial Officer - Mining | $300 | $150 | $450 | $439 | $560 | $816 | ~P25 |
| Albert, Dave | Chief Admin Officer - Mining | $280 | $140 | $420 | $334 | $504 | $1,046 | P25 - P50 |
| Lawlor, Quinn | Chief Strategy Officer - Mining | $250 | $125 | $375 | $365 | $444 | $583 | ~P25 |
| $n = 9$ | | $3,370 | $2,620 | $5,990 | $4,853 | $6,744 | $10,948 | P25 - P50 |

Celsius Ex. 68 ¶ 21.

61.    Ms. Hoeinghaus determined, based on her experience, that: (a) the structure of the EIP (such as the timing of payments, participation levels, and use of cash) comports with her general experience and the findings of her review of incentive plans approved in similarly sized companies, (b) when a reorganizing debtor's primary market for talent is comprised of non-distressed companies in the general industry, financial services and high tech, the reorganizing debtor lacks material short and long-term incentive pay opportunities for critical employees that they could otherwise receive if they sought employment at a competitor in one of these industries, (c) similarly sized companies operating in the financial services, technology, or general industry would not offer base salaries as the sole form of compensation, (d) the EIP participants would very likely receive incentive opportunities should they leave the Debtors for other jobs, and (e) a cash-based EIP will mitigate this weakness in the Debtor's compensation program and help bring them closer to an appropriately competitive range of pay.  Celsius Ex. 68 ¶ 17.

62.    Ms. Hoeinghaus "[c]oncluded that an incentive program was very much necessary here to ensure that market levels of compensation would be offered to key executives" and that, "based on the distressed analysis of other Chapter 11, as well as the industry market analysis here that the EIP was very reasonable in terms of the amounts and the opportunities that are being offered to the executives here."  October 3, 2023 Hr'g Tr. 208:24–209:4, 210:2–8; Celsius Ex. 68 ¶ 23.

63.    **Valuation**.  The evidence and testimony with respect to the valuation analysis of the Debtors introduced at the Confirmation Hearing provides the basis for and supports the distributions and recoveries to Holders of Claims and Interests under the Plan, is reasonable, persuasive, and credible, and uses reasonable and appropriate methodologies and assumptions. Given such value of the Debtors, pursuant to the applicable provisions of the Bankruptcy Code

and Bankruptcy Rules, the Plan's treatment of Other Interests, Section 510(b) Claims, and Equitably Subordinated Claims is appropriate and reasonable. During the Confirmation Hearing, some creditors objected to the valuation of NewCo as calculated based on the methods described in paragraphs 64-75, below. The Court finds by a preponderance of the evidence that all valuations, and the valuation of NewCo calculated in reliance thereon, are fair and reasonable. Consequently, all such objections are OVERRULED.

64.    <u>Asset Valuation</u>: The Debtors engaged Stout Risius Ross, LLC ("<u>Stout</u>") to serve as the Debtors' valuation advisor in determining the fair value of certain liquid assets as of May 31, 2023. Celsius Ex. 51 ¶¶ 1, 7. Stout is a global investment bank and advisory firm with extensive experience delivering valuation services to a broad range of companies, including financially distressed companies. Celsius Ex. 51 ¶ 4. Stout and its senior professionals have extensive experience and expertise in valuation, asset tracing, investment banking, and the analysis, operational restructuring, and liquidation of businesses. Celsius Ex. 51 ¶ 4; October 3, 2023 Hr'g Tr. 173:19–174:1 (Cohen).

65.    Joel Cohen, a managing director in Stout's Disputes, Compliance & Investment group provided testimony regarding valuation of certain of the Debtors' assets. *See generally* Celsius Ex. 51 ¶ 4; October 3, 2023 Hr'g Tr. 173:4–182:2 (Cohen). Mr. Cohen has over twenty years' experience in disputes, forensic, and insolvency practice areas, primarily focused on financial services, asset management, and digital asset industries. Cohen Ex. 51 ¶ 5; October 3, 2023 Hr'g Tr. 174:2–6 (Cohen). His experience includes a number of significant cross-border insolvency and litigation matters, where he has served as a financial advisor and consulting expert to fiduciaries, offshore liquidators, bankruptcy, and litigation trustees. Cohen Ex. 51 ¶ 5. Mr. Cohen has provided a variety of litigation consulting services, including asset tracing, valuation,

fraud, Ponzi schemes, industry custom and practice for investment managers, and forensic analysis. *Id.*

66.     Stout prepared a valuation report estimating the fair values of certain assets, including the Debtors' cryptocurrency holdings, institutional loans, and alternative investments. Celsius Ex. 51 ¶¶ 8-9; October 3, 2023 Hr'g Tr. 174:11–15 (Cohen).   A fair value analysis estimates the price a market participant would have received or would have been required to pay for the sale of an asset or transfer of a liability in an orderly, normally functioning market.  Celsius Ex. 51 ¶ 9; October 3. 2023 Hr'g Tr. 174:16–19 (Cohen).  Stout valued the Debtors' assets as of May 31, 2023. Ex. 51 ¶ 9.

67.     In preparing its valuation report, Stout reviewed—among other things—certain historical financial information from the Debtors; coin reports describing the Debtors' cryptocurrency holdings; relevant institutional loan and investment agreement documents; and certain other economic, industry, and financial information that Stout deemed relevant and appropriate in its analysis.  Celsius Ex. 51 ¶ 10.  Stout also met with certain members of the Debtors' management and their advisors.  *Id.*

68.     Stout prepared its valuation report in accordance with the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") and standards promulgated thereunder.  Celsius Ex. 51 ¶ 11.  Stout's ultimate conclusions were reached to a sufficient degree of certainty within their degree of expertise, and no one challenged Stout's expertise during the confirmation proceedings.  *See* October 3, 2023 Hr'g Tr. 177:15–17 (Cohen). The results of Stout's valuation analysis were as follows:

69.     *Cryptocurrency*: Stout estimated the value of the Debtors' cryptocurrency assets at $2,845,100,598 as of May 31, 2023.  *See* Celsius Ex. 51, Exhibit A at 20.  To estimate the value

of liquid cryptocurrencies, including certain staked cryptocurrencies without a withdrawal period, Stout applied FASB ASC 820 (Fair Value Measurement) guidelines and applied the market approach to value them by determining the principal market as of the valuation date based on sufficient transactional volume and additional market characteristics, like liquidity, market reputation, and market depth. *See* Celsius Ex. 51 ¶ 11; October 3, 2023 Hr'g Tr. 175:1–11 (Cohen). Stout made certain adjustments to account for lack of marketability for certain illiquid cryptocurrencies, DeFi invested cryptocurrencies, staked cryptocurrencies with a stated withdrawal period, Celsius-wrapped tokens, and cryptocurrencies that are not readily tradable. *See* Celsius Ex. 51 ¶ 11; October 3. 2023 Hr'g Tr. 175:12–17 (Cohen) ("MR. MCCARRICK: Did you make any adjustments for the valuation of liquid cryptocurrency assets versus liquid assets? MR. COHEN: Yeah, for those that were liquid we had what's typical discount for lack of marketability. The inability to trade freely.").

70.    *Institutional Loans*:  Stout estimated the value of the Debtors' institutional loans at $196,144,000. *See* Celsius Ex. 51 at 30. To estimate the value of the Debtors' institutional loans for which there was a reasonable expectation of repayment, Stout calculated the fair value on the expected cash flows associated with the repayment of the loans, which then were discounted to present value at a rate commensurate with their risk. *Id.*; October 3, 2023 Hr'g Tr. 175:20–24 (Cohen) ("MR. COHEN: For the loans we looked to see which of the loans were performing and which might not be. And for the ones that were performing it was principal interest plus the coupon and just performed a market approach for that."). For loans not expected to be repaid in full, Stout relied on the expected recoveries provided by the Debtors' management and any expected recovery of underlying collateral. *See* Celsius Ex. 51 ¶ 12; October 3, 2023 Hr'g Tr. 175:24–176:1 (Cohen).

71.    *Alternative Investments*: Stout estimated the value of the Debtors' alternative investments at $154,754,000.  *See* Celsius Ex. 51 at 37.  To estimate the value of the Debtors' alternative investments, Stout used various methodologies, including discounted cash flow analysis and the Black-Scholes Option Pricing Model.  *See* Celsius Ex. 51 ¶ 12; October 3. 2023 Hr'g Tr. 176:2–7 ("MR. MCCARRICK: And the third bucket of assets, how did Stout value the debtors' alternative investments?  MR. COHEN: Similar, we looked at the agreements that were provided to us by management to understand the assets and provide the right discount for those assets.").

72.    <u>Mining Valuation</u>: The Debtors engaged Centerview Partners LLC ("<u>Centerview</u>") to serve as the Debtors' investment banker to evaluate various strategic alternatives to maximize recoveries fort the Debtors' stakeholders and to provide a valuation of the Debtors' mining assets. *See* Celsius Ex. 45 ¶ 6.  Centerview is a full-service independent investment banking firm providing financial advisory services, including M&A and restructuring advice across a range of industries.  Celsius Ex. 45 ¶ 4; October 3, 2023 Hr'g Tr. 156:5–11.  Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in Chapter 11 proceedings.  Celsius Ex. 45 ¶ 4.

73.    Ryan Kielty, a partner in Centerview's Debt Advisory and Restructuring practice, provided testimony regarding the sales and marketing process for the Debtors' assets, as well as a valuation of the Debtors' mining assets.  *See generally* Celsius Ex. 45; October 3, 2023 Hr'g Tr. 155:5–173:3 (Kielty).  Mr. Kielty has approximately 17 years' worth of experience "working in the debt advisory infrastructure industry" and has advised companies in multiple in- and out-of-court restructurings, recapitalizations, and reorganizations, and has experience in structuring,

negotiating, and executing sales transactions, including under section 363 of the Bankruptcy Code and pursuant to Chapter 11 plans.  Celsius Ex. 45 ¶ 5; October 3, 2023 Hr'g Tr. 156:12–18.

74.    In conducting the mining valuation analysis, Centerview estimated a range of the total enterprise value of Mining (the "Enterprise Value").  The Mining valuation analysis is, among other things, based on the information and financial projections provided by the Debtors' management and certain other publicly available information.    In preparing the financial projections, the Debtors conferred with the Plan Sponsor and agreed on certain assumptions used in the financial projections.  The Mining valuation analysis is based on market data as of May 31, 2023.  Celsius Ex. 45 ¶ 11.

75.    Centerview estimated that the Enterprise Value of Mining as of May 31, 2023, is between approximately $410 million and $720 million, with a midpoint of approximately $565 million.  Celsius Ex. 45 ¶ 12.

76.    **Implementation**.  All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's-length and shall, upon completion and execution of documentation, be valid, binding, and enforceable agreements.

77.    **Good Faith Proposal of the Plan**.  The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  In so determining based on the evidence presented to the Bankruptcy Court, including the Declarations, the Plan, the Disclosure Statement and the other motions and pleadings filed and the testimony elicited at the Confirmation Hearing, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of these Chapter 11 Cases, the Plan itself, the Plan Sponsor Agreement, the Account Holder Avoidance Action Settlement, the CEL Token Settlement, the Class Claim Settlement, the Custody Settlement, the Retail Borrower Settlement, the Series B Settlement, the Withhold Settlement, the

process leading to Confirmation, and the transactions to be implemented pursuant thereto. These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to maximize creditor recoveries and for no ulterior purpose. The Plan is the product of good faith, arm's-length negotiations by and among the Debtors, the Plan Sponsor and each of its members, and the Committee, among other creditors and stakeholders. Celsius Ex. 44 ¶¶ 31–33.

78.    **Compliance with the Bankruptcy Code**. The Plan complies with all applicable provisions of the Bankruptcy Code as required by sections 1123(a) and 1123(b) of the Bankruptcy Code.

79.    Robert Campagna opined about the Plan's satisfaction of certain sections of the Bankruptcy Code. He is a Managing Director in the restructuring practice of A&M, a global restructuring advisory services firm and restructuring advisor to the Debtors. *See* October 4, 2023 Hr'g Tr. 114:10–11 (Campagna); Celsius Ex. 46 ¶ 1. The Debtors engaged A&M in June of 2022 for the Celsius restructuring efforts. *See* October 4, 2023 Hr'g Tr. 114:23–115:11 (Campagna); *see also* Celsius Ex. 46 ¶ 6. Since that time, A&M has assisted the Debtors with "liquidity and cashflow forecasting, cash management, expense reductions, reducing the size of the workforce, [and] extending the runway by cutting costs," among other things. *See* October 4, 2023 Hr'g Tr. 115:3–11 (Campagna); *see also* Celsius Ex. 46 ¶ 6.

80.    Mr. Campagna is a Certified Insolvency and Restructuring Advisor and a Certified Public Accountant (inactive). *See* Celsius Ex. 46 ¶ 7; *see also* October 4, 2023 Hr'g Tr. 114:19–22 (Campagna). Through his roles in both senior management and as a restructuring advisor, Mr. Campagna gained "substantial experience" in assisting financially distressed companies

"stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances." *See* Celsius Ex. 46 ¶ 7.

81.    Mr. Campagna provided advisory services to clients in multiple major bankruptcy cases, including *In re Murray Energy Holdings Co.*, No. 19-56885 (JEH); *In re Stearns Holdings, LLC,* No. 19-12226 (SCC); *In re Westmoreland Coal Co.*, No. 18-35672 (DRJ); *In re Payless Holdings LLC*, No. 17-42257 (KSS); *In re Alpha Nat. Res., Inc.*, No. 15-33896 (KRH); *In re GT Advanced Techs. Inc.*, No. 14-11916 (HJB); *In re Cengage Learning, Inc*., No. 13-44106 (ESS); *In re V2V Holding LLC*, No. 12-11385 (MG); *In re Education Holdings 1, Inc.*, No. 13-10101 (BLS); *In re Orchard Brands Corp*., No. 20-10566 (MFW); *In re Cooper Standard Auto.*, No. 09-12743; and *In re Interstate Bakeries Corp.*, No. 04-45814 (JWV).  *See* Celsius Ex. 46 ¶ 7.

82.    <u>Proper Classification (11 U.S.C. § 1129(a)(1))</u>.    In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan provides for the separate classification of Claims and Interests into seventeen Classes.  Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests.  Celsius Ex. 46 ¶ 11.  The classifications were not structured for any improper purpose and do not unfairly discriminate between, or among, Holders of Claims or Interests.  *Id.*  Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

83.    <u>Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.    Article III of the Plan specifies that Claims in Class 1 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 6B (Withdrawable Custody Claims) are Unimpaired under the Plan and Claims and Interests in Class 12 (Intercompany Claims) and Class 13 (Intercompany Interests) are either Impaired or

Unimpaired under the Plan. Celsius Ex. 46 ¶ 15. Article II of the Plan specifies that Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, and all fees due and payable pursuant to section 1930 of title 28 of the United States Code before the Effective Date will be paid in full in accordance with the terms of the Plan, although these Claims are not separately classified under the Plan. Celsius Ex. 46 ¶ 45. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

84.    Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article III of the Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes, in compliance with section 1123(a)(3) of the Bankruptcy Code:

| Class | Designation |
| --- | --- |
| 2 | Retail Borrower Deposit Claims |
| 4 | Convenience Claims |
| 5 | General Earn Claims |
| 6A | General Custody Claims |
| 7 | Withhold Claims |
| 8 | Unsecured Loan Claims |
| 9 | General Unsecured Claims |
| 10 | State Regulatory Claims |
| 11 | *De Minimis* Claims |
| 14 | Series B Preferred Interests |
| 15 | Other Interests |
| 16 | Section 510(b) Claims |
| 17 | Equitably Subordinated Claims |

85.    No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same rights and treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest, and complies with section 1123(a)(4) of the Bankruptcy Code. Celsius Ex. 46 ¶ 17. During the Confirmation Hearing, certain *pro se* creditors voiced their belief that, had they not accepted the

plan, they would have forfeited their entire claim. *See* October 30, 2023 Hr'g Tr. 137:10–11 (Lau) ("[T]he plan threatened to leave me with no party of my claim at all if I chose to reject it"). While this case may be many creditors' first interaction with the chapter 11 process, nothing in the Disclosure Statement nor any decision or order of this Court suggested that expungement of any dissenting creditor's Claim would result from voting against the Plan, and, to be clear, such a result does not occur. Regardless of whether any creditor has voted to accept or reject the plan, a creditor's Claim will receive the treatment that the Plan provides for the Class in which it falls.

86.    Mr. Campagna concluded that the Plan satisfies this requirement, as Article III of the Plan provides that Holders of Allowed Claims or Interests in a particular Class will receive the same treatment as other Holders in such Class, except to the extent that any such Holder agrees to less favorable treatment. Celsius Ex. 46 ¶ 17.

87.    <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>. The provisions in Article IV and elsewhere in the Plan, the Plan Supplement, and in the exhibits and attachments to the Disclosure Statement provide, in detail, adequate and proper means for the Plan's implementation, in satisfaction of the requirements of section 1123(a)(5) of the Bankruptcy Code.

88.    Section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 plan provide adequate means for a plan's implementation. Celsius Ex. 46 ¶ 18.

89.    The Plan provides adequate means for implementation as required under section 1123(a)(5) of the Bankruptcy Code. Celsius Ex. 46 ¶ 18. Among other things, Article IV of the Plan sets forth means of implementation such as (a) the substantive consolidation of the Consolidated Debtors, (b) the CEL Token Settlement, (c) the Account Holder Avoidance Action Settlement, (d) the Custody Settlement, (e) the Withhold Settlement, (f) the Series B Settlement, (g) the Retail Borrower Settlement, (h) the Class Claim Settlement, (i) the NewCo Restructuring

Transactions, (j) the Orderly Wind Down, and (k) the Employee Transition Services Plan.  Celsius Ex. 46 ¶ 18.

90.    In addition to these core transactions, the Plan sets forth other critical mechanics for the implementation of the Plan, such as (a) the appointment of the Plan Administrator and the authorization for the Plan Administrator to issue documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the Plan and the documents described therein, (b) the appointment of the Litigation Administrator to prosecute, settle, or otherwise resolve, without limitation, all remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims in accordance with the Litigation Administrator Agreement(s) and the ADR Procedures, as applicable, and collect the Goldstein Loan and Leon Loan, and any other CEL Insider Loans, (c) the establishment of the Litigation Oversight Committee, (d) the contribution of Contributed Claims, (e) the cancellation of all notes, instruments, certificates, and other documents, (f) the authorization, approval, and ratification of all actions contemplated by the Plan without any further action by the equity holders, members, directors, managers, or officers of the Debtors or the Post-Effective Date Debtors, as applicable, (g) the creation of the New Board and the appointment of such directors in accordance with the terms of the Plan, (h) the adoption and implementation of the Employee Transition Plan, (i) the application of section 1146(a) of the Bankruptcy Code to any transfers of property under the Plan (including the Restructuring Transactions) or pursuant to certain other actions, (j) the preservation of Causes of Action by the Post-Effective Date Debtors and the enforcement thereof by the Litigation Administrator(s) (with respect to Recovery Causes of Action) or the Plan Administrator (with respect to all other Causes of Action), and (k) the release of Avoidance Actions.  Celsius Ex. 46 ¶ 18.

91.    <u>Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's organizational documents prohibit the issuance of nonvoting equity securities.  Celsius Ex. 46 ¶ 30.  In the event that the NewCo Transaction is successfully consummated, the NewCo New Organizational Documents prohibit the issuance of non-voting securities.  Celsius Ex. 46 ¶ 30.

92.    Similarly, in the event of the Orderly Wind Down, no non-voting stock would be issued.  Celsius Ex. 46 ¶ 30.

93.    Accordingly, section 1123(a)(6) of the Bankruptcy Code is inapplicable to the Plan. Celsius Ex. 46 ¶ 30.

94.    <u>Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))</u>.  The Plan Supplement discloses the individuals who will serve as (i) the NewCo's officers and directors in <u>Exhibit A</u> to the Fourth Notice of Plan Supplement (identifying officers of NewCo) and <u>Exhibit A</u> to the Fifth Notice of Plan Supplement (identifying members of the Board of NewCo), (ii) the Board Observers in <u>Exhibit G</u> to the Sixth Notice of Plan Supplement, (iii) the Litigation Administrator in <u>Exhibit F</u> to the Third Notice of Plan Supplement, (iv) the Litigation Oversight Committee Members in <u>Exhibit A</u> to the Sixth Notice of Plan Supplement, and (v) the Plan Administrator in <u>Exhibit I</u> to the Fourth Notice of Plan Supplement.

95.    After the Effective Date, each director, officer, or manager of NewCo shall be appointed and serve pursuant to the terms of the New Organizational Documents and applicable laws of NewCo's jurisdiction of formation.

96.    The Committee ran a thorough process to identify potential New Board members, and received applications from many sources.  UCC Ex. 230 ¶ 7.

97.    Certain candidates expressed interest directly to the Committee by reaching out to its members or professionals.  UCC Ex. 230 ¶ 7.  Other creditors and various ad hoc groups who have appeared in these Chapter 11 Cases proposed candidates for consideration.  UCC Ex. 230 ¶ 7.

98.    Three Committee members submitted themselves for consideration.  UCC Ex. 230 ¶ 7; October 3, 2023 Hr'g Tr. 231:24–232:2.  The Committee determined that its advisors would also propose a roster of qualified candidates for the Committee's consideration.  UCC Ex. 230 ¶ 7; October 3, 2023 Hr'g Tr. 230:18–231:5.

99.    The Committee's advisors, including White & Case and Perella Weinberg Partners ("PWP"), disclosed all of their connections to potential candidates, and these disclosures were discussed among the Committee members.  UCC Ex. 230 ¶ 7.

100.    Over a period of months, the Committee considered approximately 45 candidates for positions on the New Board.  UCC Ex. 230 ¶ 7.

101.    The Committee's evaluation of New Board candidates was thorough and comprehensive.  UCC Ex. 230 ¶ 10.

102.    One of the candidates that the Committee interviewed, and ultimately selected to serve on the New Board, is Emmanuel Aidoo.  UCC Ex. 230 ¶ 11.

103.    At the time of his interview, Mr. Aidoo served as Executive Director at PWP, the investment banker to the Committee in these Chapter 11 Cases.  Mr. Aidoo has been advising the Committee with respect to these cases.  Prior to being nominated for consideration, Mr. Aidoo disclosed that he would be stepping down in short order from his Executive Director position at PWP to serve in a senior advisory capacity as an independent contractor.  UCC Ex. 230 ¶ 11.

104.    At the outset of his candidacy, and prior to his interview, Mr. Aidoo disclosed to the Committee's advisors certain tax arrearages, which included liens filed against him. UCC Ex. 230 ¶ 12.  As part of the board selection process, Mr. Aidoo provided a letter from his accountant explaining this situation to the Committee and informing the Committee that Mr. Aidoo had entered into an installment plan with the IRS and was current on all obligations under such installment plan.  UCC Ex. 230 ¶ 12.

105.    The Committee asked questions regarding Mr. Aidoo's tax liens as part of its discussions in connection with Mr. Aidoo's candidacy.  UCC Ex. 230 ¶ 12.  Having considered these facts, the Committee concluded that the tax lien did not preclude Mr. Aidoo from serving as a director of the New Board or outweigh the other strengths of his candidacy.  UCC Ex. 230 ¶ 12. These strengths include his deep institutional knowledge of the cryptocurrency industry and financial expertise, and his great credibility and familiarity among executives within the industry. UCC Ex. 230 ¶ 17.  Further, Mr. Aidoo's interview demonstrated to the Committee a mindset to fiercely advocate to protect the creditors of Celsius who will become NewCo shareholders. UCC Ex. 230 ¶ 17.  The Committee therefore determined that Mr. Aidoo was qualified for his role on the New Board.  UCC Ex. 230 ¶ 17.  The Court finds by a preponderance of the evidence that the selection of Mr. Aidoo was fair and equitable.  Consequently, all objections to his selection to the board are OVERRULED.

106.    The Committee met regularly to discuss the various candidates and the Committee's potential selections.  UCC Ex. 230 ¶ 8.  While the Committee's legal and financial advisors participated in those meetings, the discussion of each individual's candidacy was largely driven by members of the Committee, and the Committee members had many independent discussions regarding the proposed candidates.  UCC Ex. 230 ¶ 8.

107.    The Committee reviewed resumes and other application materials to select candidates for interviews and considered candidates who were prepetition creditors of the Debtors. UCC Ex. 230 ¶ 10; October 3, 2023 Hr'g Tr. 220:19–25.

108.    The Committee authorized counsel to hire an independent investigator to conduct comprehensive background checks on certain candidates who were interviewed.  UCC Ex. 230 ¶ 10.  The results of the background checks were shared with the Committee and thoroughly discussed at multiple meetings.  UCC Ex. 230 ¶ 10.  Each candidate under consideration to be interviewed submitted responses to a lengthy questionnaire regarding the candidate's biographical information, independence, audit committee experience and compliance with other NASDAQ requirements.  UCC Ex. 230 ¶ 10.

109.    As part of the discussions concerning the New Board, the Committee decided that it would be in the best interests of unsecured creditors and NewCo and its future stakeholders to increase the size of the New Board from seven to nine members, with both the Committee and Fahrenheit having an additional seat in their sole discretion.  Docket No. 3550, Exhibit A; UCC Ex. 230 ¶ 13; October 3, 2023 Hr'g Tr. 232:15–233:4.  The Committee discussed, and asked questions of its advisors regarding, the decision to increase the size of the board, including how Fahrenheit's voting power would be affected by the Committee's decision.  UCC Ex. 230 ¶ 13; October 3, 2023 Hr'g Tr. 233:5–22.

110.    As part of the selection process, the Committee reserved two board seats for prepetition creditors, including Committee members.  UCC Ex. 230 ¶ 14.  All prepetition creditors of the Debtors who were interviewed were considered for those two positions.  UCC Ex. 230 ¶ 14. Interested members of the Committee recused themselves from the discussion or vote with respect to these positions.  UCC Ex. 230 ¶ 14; October 3, 2023 Hr'g Tr. 232:3–14.

111.    All candidates, other than the Committee members who sought appointment to the New Board, were eligible for the other four Committee-selected positions.  UCC Ex. 230 ¶ 15.

112.    Following the initial announcement of the selection of the New Board, the Committee engaged in negotiations with Fahrenheit, the Earn Ad Hoc Group, Richard Phillips, and Simon Dixon regarding the composition of the New Board.  UCC Ex. 230 ¶ 18.  As a result of those negotiations, three significant prepetition creditors, Brett Perry, Joseph Lehrfeld, and Simon Dixon, are proposed to be appointed as observers to the New Board.  UCC Ex. 230 ¶ 18.

113.    The Committee determined that the directors of the New Board selected by the Committee are the best and most qualified candidates to fill those positions.  UCC Ex. 230 ¶ 19.

114.    The Committee members also spent a significant time attending interviews, discussions, and deliberations regarding the selection of the Committee's appointees to the Litigation Oversight Committee.  UCC Ex. 230 ¶ 4.

115.    Mr. Robinson was appointed to the Litigation Oversight Committee, but did not vote on his own candidacy.  He did participate in the selection of other members of the Litigation Oversight Committee.  October 3, 2023 Hr'g Tr. 226:16–23.

116.    As part of that process, the Committee selected Keith Noyes to be a member of the Litigation Oversight Committee.  October 3, 2023 Hr'g Tr. 227:18–20.  At the time, the Committee was aware that Covario AG had filed for insolvency and was being overseen by a Swiss liquidator.  October 3, 2023 Hr'g Tr. 227:21–228:5.

117.    Impairment/Unimpairment of Any Class of Claims or Interests (11 U.S.C. § 1123(b)(1)).  Article III of the Plan specifies that some Classes of Claims are Impaired and others are not Impaired, as permitted by section 1123(b)(1) of the Bankruptcy Code.

118.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u> <u>(11 U.S.C. § 1123(b)(2))</u>.  As permitted by section 1123(b)(2) of the Bankruptcy Code, Article V of the Plan provides that, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, including the Employee Transition Services Agreement, all Executory Contracts and Unexpired Leases of the Debtors, including any employee benefit plans, severance plans, or other Executory Contracts under which employee obligations arise, shall be deemed rejected by the Debtors or Post-Effective Date Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the NewCo Transaction or Orderly Wind Down; or (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan.

119.    <u>Compromise and Settlement (11 U.S.C. § 1123(b)(3)(A))</u>.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all holders of Claims or Interests may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The compromise and settlement of such Claims and

Interests embodied in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

120.    <u>Retention of Claims (11 U.S.C. § 1123(b)(3)(B))</u>.    In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Article IV.M of the Plan provides that, among other things, the Post-Effective Date Debtors shall retain, and the Litigation Administrator or the Plan Administrator, as contemplated by the Plan, may enforce all rights to commence, prosecute, pursue, and settle any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Litigation Administrator's and Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.    The Debtors and the Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Person or Entity, except as otherwise expressly released in the Plan. Additionally, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person or Entity shall vest in the Post-Effective Date Debtors on the Effective Date.    All Causes of Action are expressly preserved for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Causes of Action prosecuted upon, after, or as a consequence of the Confirmation or Consummation.

121.    In particular, the Debtor Release would release Celsius Account Holders from the "threat of potential preference actions" if they accepted the Account Holder Avoidance Action Settlement.    Celsius Ex. 44 ¶ 13.

122.    The Debtor Release would also "release[] the Released Parties from any and all Claims and Causes of Action arising before the Effective Date of the Plan related to (a) the events giving rise to the Chapter 11 Cases or (b) the events of these Chapter 11 Cases and related implementation of the Plan and related documents," subject to exceptions.  Celsius Ex. 44 ¶ 13.

123.    Importantly, the Debtor Release does not release any causes of action included in the Schedule of Retained Causes of Action or any Cause of Action under the Plan against an Excluded Party (including Mr. Mashinsky, Mr. Daniel Leon, and Mr. Cohen-Pavon, among others), or any avoidance action not released pursuant to the Account Holder Avoidance Action Settlement.  Celsius Ex. 44 ¶ 13.

124.    As consideration for the Debtor Release, the Debtors and their Estates will receive mutual releases from potential claims and causes of action of each Releasing Party.  Celsius Ex. 44 ¶ 13.

125.    The Debtor Release protects the Released Parties and Account Holders who "did not commit any bad acts" from liability.  October 3, 2023 Hr'g Tr. 15:12–15 (Ferraro); *see also* Celsius Ex. 44 ¶ 14.

126.    Each Released Party is a stakeholder and critical participant in the Plan process and shares a common goal with the Debtors in seeking to confirm the Plan and implement the restructuring transactions contemplated thereunder.  Celsius Ex. 44 ¶ 14.

127.    The Released Parties played an integral role in the development of the Plan and have expended significant time and resources resolving the complex issues in the chapter 11 cases to enable the Debtors to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as quickly as possible.  Celsius Ex. 44 ¶ 15.

128.    Additionally, the Debtors will need the Released Parties' efforts as the Debtors emerge from chapter 11 and return funds to customers.  Celsius Ex. 44 ¶ 17.

129.    Losing the participation of the Released Parties on the eve of confirmation would threaten the viability of the Plan, including potentially eliminating the Debtors' ability to make in-kind distributions and hindering the Debtors' chances of success in consummating the NewCo transaction.  Celsius Ex. 44 ¶ 15.

130.    Moreover, it would be value-destructive and not helpful to the process, and would ultimately lead to less value to creditors, if the Debtors were to spend funds pursuing potential claims that are covered by the Debtor Release.  Celsius Ex. 44 ¶ 17.

131.    Therefore, the Debtor Release is "a vital component of the Plan" and "is a sound exercise of the Debtors' business judgment."  Celsius Ex. 44 ¶ 13.

132.    The Debtor Release is also "the product of good faith, arm's-length negotiations." Celsius Ex. 44 ¶ 13.

133.    Specifically, the Debtor Release was formulated by extensive investigations and is supported by the Committee.  Celsius Ex. 44 ¶ 16.

134.    There were "numerous investigations into the conduct of the Debtors and their current and former officers, directors, and employees, including internal investigations led by the Special Committee, an investigation by the Committee, an investigation by the Examiner that led to a 400+ page report that was published publicly, and numerous investigations by state and federal governmental entities."  Celsius Ex. 44 ¶ 16.

135.    Other Appropriate Provisions (11 U.S.C. § 1123(b)(5)-(6)).  The Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for (1) distributions to Holders of Claims and Interests,

(2) resolution of Disputed Claims and Interests, (3) allowance of certain Claims, (4) releases by the Debtors of certain parties, (5) releases by certain third parties, (6) exculpation of certain parties, (7) the injunction of certain Claims and Causes of Action in order to implement the discharge, release, and exculpation provisions, and (8) retention of this Court's jurisdiction, thereby satisfying the requirements of sections 1123(b)(5) and (6) of the Bankruptcy Code.

136.    The Third-Party Release is consensual.    October 3, 2023 Hr'g Tr. 15:16–17 (Ferraro).

137.    The Third-Party Release would release parties, including holders of claims and interests who vote to accept the Plan or who do not affirmatively opt out of (or for those holders who were deemed to reject the Plan, opt into) the Plan's release provisions, claims, and causes of action arising before the effective date of the Plan related to (a) the events giving rise to the chapter 11 cases or (b) the events of the chapter 11 cases and related implementation of the Plan and related documents.    Celsius Ex. 44 ¶ 19.

138.    The Third-Party Release does not release (i) causes of action included in the schedule of retained causes of action, (ii) causes of action against an Excluded Party, as defined in the Plan (including Mr. Mashinsky, Mr. Leon, and Mr. Cohen-Pavon, among others), or (iii) any avoidance action not released pursuant to the Account Holder Avoidance Action Settlement. Celsius Ex. 44 ¶ 19.

139.    The parties benefiting from the Third-Party Release assisted in developing the NewCo transaction and the Orderly Wind Down.    Celsius Ex. 44 ¶ 22.

140.    In particular, the Released Parties have provided substantial and necessary contributions and share the common goal of effectuating a successful reorganization through the creation of a new, regulatorily compliant NewCo or an organized liquidation through the Orderly

Wind Down and to confirm the Plan and implement the transactions contemplated thereunder. Celsius Ex. 44 ¶ 22.

141.    *The Exculpation Provision Is Necessary and Appropriate*.    The Exculpation Provision was proposed in good faith and formulated following months of extensive good-faith, arm's-length negotiations with key constituents.  Celsius Ex. 44 ¶ 26.

142.    The Exculpation Provision is necessary to provide qualified immunity to those who participated in the Chapter 11 cases in good faith because, among other things, "there's a lot of uncertainty in the regulatory environment."  October 3, 2023 Hr'g Tr. 15:19–20 (Ferraro).

143.    The Exculpation Provision is also critical to ensuring that funds can be returned to creditors as promptly as possible through the transactions that are approved by the Bankruptcy Court and that parties are not subsequently held liable for taking actions that the Bankruptcy Court or the Bankruptcy Code authorized them to take.  Celsius Ex. 44 ¶ 27.

144.    *The Injunction Provisions Are Necessary and Appropriate*.    The Injunction Provisions implement the Plan's release and exculpation provisions, Celsius Ex. 44 ¶ 30, and serve as "the arms and legs to make sure that . . . [the] releases and exculpation operate and are executed." October 3, 2023 Hr'g Tr. 15:22–23 (Ferraro).

145.    Therefore, the Injunction Provisions are necessary in order to effectuate the important goals of the Plan's release and exculpation provisions.

146.    Cure of Defaults (11 U.S.C. § 1123(d)).  Article V.C of the Plan provides for the release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.

50

The Debtors have provided (or will provide, pursuant to the Plan) notice of such assumptions (or assumptions and assignments) and proposed cure amounts to the non-Debtor counterparties to the Executory Contracts and Unexpired Leases proposed to be assumed (or assumed and assigned). As such, the Plan provides that the Debtors will cure, by paying the applicable Cure Claim, or provide adequate assurance that the Debtors will promptly cure by paying the applicable Cure Claim, defaults with respect to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code.  The Plan complies with section 1123(d) of the Bankruptcy Code.

147.    The Debtors have complied with the applicable provisions of the Bankruptcy Code and satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  Specifically, each Debtor:

(i)     is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

(ii)    complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule, and regulation, the Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages and related documents and notices, and in soliciting and tabulating the votes on the Plan.

148.    Only Holders of Claims in classes 2, 3, 5, 6A, 7, 8, 9, 10, and 14 were entitled to vote to accept or reject the Plan.  Celsius Ex. 46 ¶ 35.

149.    The Debtors solicited and tabulated votes to accept or reject the Plan in accordance with the customary solicitation procedures for chapter 11 plans of reorganization in this district.  Celsius Ex. 46 ¶ 36.

150.    The Plan complies with sections 1125 and 1126 of the Bankruptcy Code.  Celsius Ex. 46 ¶ 37.

151.    The Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code. The Debtors have proposed the Plan in good faith and not by any means forbidden by law.

152.    Any payment made or to be made by the Debtors for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, shall be subject to the approval of the Bankruptcy Court for reasonableness, in compliance with section 1129(a)(4) of the Bankruptcy Code.

153.    The Plan satisfies section 1129(a)(5) of the Bankruptcy Code by way of the disclosures described in paragraphs 89 and 90 above.

154.    Section 1129(a)(6) of the Bankruptcy Code is not applicable to these Chapter 11 Cases.  The Plan does not propose any rate change subject to the jurisdiction of any governmental regulatory commission.

155.    The Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, which is known as the best interests of creditors test.  The liquidation analysis attached to the Disclosure Statement and the other evidence related thereto in support of the Plan that was proffered or adduced in the Declarations or at, prior to, or in connection with the Confirmation Hearing:    (a) are reasonable;  (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that Holders of Allowed Claims and Interests in each Class will recover at least as much under the Plan on account of such Claim or Interest, as of the Effective Date, as such Holder would receive if the Debtors were liquidated, on the Effective Date, under chapter 7 of the Bankruptcy Code.  October 10, 2023 Hr'g Tr. 172:4 (Campagna) ("[T]he approach we took [in conducting the Liquidation Analysis] was reasonable.").

156.    The record of the Confirmation Hearing establishes that the value of CEL Token as of the Petition Date was less than $0.34, which is the value at which the best interests test would not be met under the Plan.  *See* Celsius Ex. 70 ¶ 9.  Thus, the best interests test under section 1129(a)(7) of the Bankruptcy Code is satisfied with respect to the treatment of CEL Token Deposit Claims.

157.    The Rejecting Classes voted to reject the Plan or were deemed to reject the Plan. Because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation under section 1129(b), solely with respect to the Rejecting Classes, rather than section 1129(a)(8) of the Bankruptcy Code.  Although section 1129(a)(8) has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

158.    Robert Campagna led the A&M team that assisted the Debtors in preparing the Liquidation Analysis.  *See* October 4, 2023 Hr'g Tr. 117:4–6 (Campagna).  The Liquidation Analysis assesses whether the Plan satisfies the "best interests of creditors" test as defined in section 1129(a)(7) of the Bankruptcy Code.  *See* Celsius Ex. 46 ¶ 8; Celsius Ex. 70 ¶ 8; *see also* Docket No. 2902; *see also* Celsius Ex. 46 ¶ 55, n. 8; *see also* October 4, 2023 Hr'g Tr. 126:11–6 (Campagna).

159.    Mr. Campagna and his team also analyzed whether the best interest test was met with respect to the Holders of CEL Token Deposit Claims in light of the CEL Token Settlement and in connection with the dispute regarding the proper value of CEL Token.  *See* October 4, 2023 Hr'g Tr. 122:11–17 (Campagna); *see also* Celsius Ex. 70 ¶ 9.

160.    <u>Liquidation Analysis</u>.    The Liquidation Analysis assessed whether Holders of Claims in impaired, non-accepting classes would receive as much under the Plan as they would in a hypothetical liquidation under Chapter 7 of the Bankruptcy Code.  Celsius Ex. 46 ¶ 55.

161.    To prepare the Liquidation Analysis, Mr. Campagna and A&M, with the assistance of the Debtors, "estimated proceeds, costs, and resulting recoveries" in the event that the Plan is confirmed and consummated and in the event that the Plan is "converted to a liquidation under chapter 7 of the Bankruptcy Code."  *See* Celsius Ex. 46 ¶ 56.

162.    To calculate the value to be distributed to creditors and creditor recoveries under the NewCo Transaction, the Debtors calculated the value of NewCo Common Stock based on the net asset value of the assets to be transferred to NewCo and the Enterprise Value of Mining, which amounts to approximately $1.248 billion and consists of $450 million of liquid cryptocurrency that will "'seed' NewCo, Mining" and "certain illiquid assets."  *See* Celsius Ex. 46 ¶ 56.  The Debtors then included the value of the Liquid Cryptocurrency estimated to be distributed to Holders of Claims.  To compare distributions under NewCo as opposed to a chapter 7 liquidation, the Debtors "estimated the total Liquidation Proceeds that a chapter 7 trustee could generate under chapter 7" and then calculated the estimated Liquidation Distribution to creditors under the priority scheme outlined in chapter 7 of the Bankruptcy Code.  Celsius Ex. 46 ¶ 56.

163.    To prepare the Liquidation Analysis, the Debtors and A&M used (i) a valuation of certain of the Debtors' assets prepared by Stout as of May 31, 2023; (ii) "input from the management team and advisors;" and (iii) "projected results of operations and cash flows over the period from May 31, 2023 to the Liquidation Date."  *See* Celsius Ex. 46 ¶58.

164.    With respect to the chapter 7 liquidation scenario, the Debtors' current chapter 11 cases were "assumed to be converted to cases under chapter 7 of the Bankruptcy Code" on the

Liquidation Date if the Plan is not confirmed.  *See* Celsius Ex. 46 ¶ 57.  Additionally, in the event of a chapter 7 liquidation, A&M assumed that the Court would appoint a chapter 7 trustee on the Liquidation Date, who would "immediately sell or surrender all of the Debtors' assets and the cash proceeds of those sales."  *See* Celsius Ex. 70 ¶ 57.  The proceeds after the deduction of liquidation-related costs would subsequently be distributed to creditors in accordance with the priority scheme of Chapter 7 of the Bankruptcy Code.  *See* Celsius Ex. 46 ¶ 57.

165.    The assessments made under the Liquidation Analysis demonstrate that a chapter 7 liquidation results in lower distributable value than either the NewCo Transaction or the Orderly Wind Down.  See Celsius Ex. 46 ¶ 67.

166.    <u>Estimating the Recoveries of Creditors Under Each Plan Scenario</u>.  To estimate the recoveries of the creditors under each scenario, Mr. Campagna and his team performed several steps.  *See* Celsius Ex. 46 ¶ 59.

167.    *Estimation of Gross Proceeds*.  For the chapter 7 liquidation scenario, the Debtors and their advisors estimated the cash proceeds that the Trustee would generate if the Debtors' chapter 11 cases were converted to chapter 7 cases and the assets of the Debtors' bankruptcy Estates were liquidated.  *See* Celsius Ex. 46 ¶ 60.

168.    For the Plan scenarios, the Debtors with the assistance of their advisors estimated the proceeds that would be generated if either the NewCo transactions or the Orderly Wind Down were consummated.  *See* Celsius Ex. 46 ¶ 61, n.9.  However, in the event of a liquidation, the accelerated time frame in which the assets are marketed and sold, the negative vendor, customer and general market reaction, and the generally forced nature of the sale would likely materially reduce recovery values for the Debtors' assets.  *See* Celsius Ex. 46 ¶ 61.

169.    *Calculation of Wind-Down Costs*.    To prepare the Liquidation Analysis, the Debtors assumed and estimated certain costs of a hypothetical chapter 7 liquidation.  *See* Celsius Ex. 46 ¶ 62.

170.    Specifically, the Debtors estimated that a hypothetical chapter 7 liquidation would last approximately six months, to provide the chapter 7 trustee the possibility to sell "substantially all remaining assets, collect receivables, pursue all preference claims, make distributions, and otherwise administer and close the Debtors' Estates."  *See* Celsius Ex. 46 ¶ 62.

171.    In a chapter 7 liquidation, the "length of the wind-down could vary significantly, which would impact recoveries."  *See* Celsius Ex. 46 ¶ 62.

172.    The estimated costs of the hypothetical chapter 7 liquidation considered under the Liquidation Analysis include: "(i) wind-down costs; (ii) chapter 7 professional fees; and (iii) chapter 7 trustee fees.  All assumptions regarding the hypothetical chapter 7 liquidation are set forth in more detail in the Liquidation Analysis."  *See* Celsius Ex. 46 ¶ 62.

173.    *Analysis of Intercompany Receivables and Interests*.    To prepare the Liquidation Analysis, the Debtors and their advisors also calculated the "potential recoverability of (i) intercompany receivables owed to the Debtors from non-Debtor affiliates and (ii) the Debtors' equity interests in non-Debtor affiliate subsidiaries."  *See* Celsius Ex. 46 ¶ 63.  Before determining the Net Liquidation Available for Distribution to the Debtors' Claimants, the Debtors and their advisors calculated the "recoverability of the Debtors' intercompany receivables and investments in subsidiaries."  *See* Celsius Ex. 46 ¶ 63.

174.    The analysis of intercompany receivables also considered the "relationships of pre and postpetition intercompany balances, and the superpriority administrative expense status accorded to postpetition intercompany balances in the *Final Order (I) Authorizing the Debtors to*

*(A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 1152]." *See* Celsius Ex. 46 ¶ 63; Docket No. 1152.

175.    <u>Distribution of Net Proceeds</u>.    Lastly, the Liquidation Analysis estimates the recoveries to creditors at each Debtor by running the Net Proceeds and estimated claims as of the Petition Date through a waterfall recovery model, which pays claims based on priority until fulfilled, and then "waterfalls" to the next lower priority claim, until all proceeds are depleted. *See* Celsius Ex. 46 ¶ 64.

176.    The distributions to creditors in the Liquidation Analysis "reflect section 1129 of the Bankruptcy Code's 'absolute priority rule' that no junior creditor at a given entity would receive any distribution until all senior creditors are paid in full at that entity, and no equity holder would receive any distribution until all creditors at such entity are paid in full." *See* Celsius Ex. 46 ¶ 64.

177.    Mr. Campagna and his team concluded that the "estimated total Liquidation Proceeds available for distribution for the Debtors' Holders of Claims and Interests" range between approximately $2.6 billion and $2.9 billion. *See* Celsius Ex. 46 ¶ 65.

178.    Mr. Campagna and his team also concluded that "the distributable proceeds in the Orderly Wind Down are estimated to be in excess of $3.1 billion, and the proceeds under the NewCo Transaction are estimated to exceed $3.4 billion." *See* Celsius Ex. 46 ¶ 65.

179.    When comparing estimated creditor recoveries under the Plan, whether under the NewCo Transaction or the Orderly Wind Down, with the estimated recoveries to creditors under

a chapter 7 liquidation, in each class, "creditors are estimated to receive an equal or greater recovery under either of the NewCo Transaction or the Orderly Wind Down than they would be entitled to receive under a chapter 7 liquidation." *See* Celsius Ex. 46 ¶ 66.

180.    Mr. Campagna ultimately concluded that "the NewCo Transaction and Orderly Wind Down scenarios provide higher recovery rates and higher distributable value for each Impaired Class receiving distributions under the Plan as compared to the recoveries estimated under a chapter 7 liquidation." *See* Celsius Ex. 46 ¶ 67.

181.    *Objections to the Liquidation Analysis Are Unfounded.*  Mr. Richard Phillips, a *pro se* Celsius creditor, submitted a renewed objection that takes issue with the valuation of NewCo put forth in the Disclosure Statement and utilized by Mr. Campagna in his valuation analysis.  Docket Nos. 3758; 3767.

182.    Mr. Phillips was neither proffered nor qualified as an expert witness during the Confirmation Hearing.  October 16, 2023 Hr'g Tr. 123:5–23.

183.    Mr. Phillips' valuation objection is focused entirely on a comparison between NewCo and the Orderly Wind Down.  Docket No. 3758 ¶¶ 28–32.  Mr. Phillips takes the position that, based on discounts he proposes, NewCo equity is overvalued and the Orderly Wind Down is more valuable.  *Id.*

184.    ***First***, Mr. Phillips proposed a 7.5% HoldCo / Conglomerate discount because the valuation constitutes a "sum of the parts" valuation.  *Id.* at ¶ 29.

185.    Mr. Phillips chose the 7.5% discount without doing a comparable company analysis; instead, he referred to a range of valuations between 5%-20% and chose 7.5% because of "similarities between the three parts of NewCo."  *Id.*

186.    **Second**, Mr. Phillips applied a 30% discount because, as he describes it, creditors chose more crypto over NewCo equity when the plan allowed them to purchase NewCo Equity at a 30% discount by toggling for more equity. *Id.* at ¶ 31.

187.    Mr. Phillips conducted no independent valuation to reach the 30% number. October 16, 2023 Hr'g Tr. 126:11–19.

188.    Mr. Phillips agreed there are many reasons a creditor could have selected liquid cryptocurrency over equity for reasons other than those suggested in his valuation opinion. October 16, 2023 Hr'g Tr. 128:5–8.

189.    Mr. Phillips applied the 30% discount equally to all portions of the NewCo valuation, including to $450 million of Liquid Cryptocurrency that would be transferred to NewCo, providing no reason why a discount should be applied to a liquid, non-operating asset.  October 16, 2023 Hr'g Tr. 129:6–13.

190.    Mr. Phillips agreed that it is possible that there is overlap between his 7.5% discount and his 30% discount, but he added them together without accounting for any such overlap. October 16, 2023 Hr'g Tr. 131:1–13.

191.    Mr. Phillips agreed that he is not offering the view that it would be better for creditors to enter chapter 7 liquidation than to confirm the plan.  October 16, 2023 Hr'g Tr. 132:2–6.

192.    Mr. Phillips testified that, subject to his limited objections, it is his view that confirmation of the Plan is in the best interests of creditors.  October 16, 2023 Hr'g Tr. 131:14–132:1.  For the avoidance of doubt, the Court finds by a preponderance of the evidence that Debtors' Liquidation Analysis is fair and reasonable.  Consequently, all objections are OVERRULED.

193.    <u>The Best Interests Test Is Satisfied as to Dissenting Holders of CEL Token Because CEL Token's Value Is Less than $0.34</u>.  One area of focus under the best interests analysis has been the valuation of CEL Token, Celsius' platform-specific utility token.

194.    The "break-even point for the price of CEL Token [on the Petition Date]—the price above which the best interests test would no longer be met—for the NewCo Transaction is estimated to be 36 cents and for the Orderly Wind-Down is estimated to be 34 cents."  *See* Celsius Ex. 70 ¶ 9; *see also* October 4. 2023 Hr'g Tr. 123:7–24 (Campagna). This figure resulted from Mr. Campagna's assessment of the CEL Token price at which the best interests test would be met if the CEL Token Deposit Claims were valued at $0.25 per CEL Token under the CEL Token Settlement.  *See* Celsius Ex. 70 ¶ 9.



Ex. 70 at 5.

195.    As part of the analysis regarding whether the CEL Token meets the best interests test, Mr. Campagna and his team reviewed the supplemental declaration Mr. Galka submitted to

the Court on October 2, 2023, after the Liquidation Analysis was prepared.  *See* Celsius Ex. 70 ¶ 10; *see also* UCC-229.

196.    Mr. Galka is the CEO and founder of Elementus, a blockchain intelligence company.  UCC Ex. 228, Exhibit 2 ¶ 1.  He holds degrees in finance from the Wharton School of Business and in computer science engineering from the University of Pennsylvania.  UCC Ex. 228, Exhibit 2 ¶ 2.  He has over 15 years of experience in data science, finance, and quantitative analysis, including experience trading complex derivatives at global investment banks Credit Suisse and Deutsche Bank.  UCC Ex. 228, Exhibit 2 ¶ 3.  He also has nine years of experience trading financial instruments, including identifying dislocated markets.  UCC Ex. 228, Exhibit 2 ¶ 3.  He has extensive experience with forensic investigations involving examining financial schemes, and holds two patents for the data science clustering methodologies he has established.  UCC Ex. 228, Exhibit 2 ¶ 5.

197.    Mr. Galka concluded that the market price of the CEL Token was not an accurate indication of the value of the CEL Token on the Petition Date.  UCC Ex. 228, Exhibit 2 ¶128–153; UCC Ex. 229 ¶ 9.  Mr. Galka testified that the market for CEL Token became severely dislocated after the Pause Date.  UCC Ex. 228, Exhibit 2 ¶ 131; UCC Ex. 229 ¶ 11; October 4. 2023 Hr'g Tr. 14:21–22 (Galka).  This dislocation was due to a number of factors, including shocks to the cryptocurrency industry, mixed messages about Celsius' solvency, and the disruption to supply and demand resulting from 94% of the total CEL Token supply being locked on the Celsius platform as a result of Celsius pausing withdrawals on June 12, 2022.  UCC Ex. 228, Exhibit 2 ¶¶ 133-144; October 4, 2023 Hr'g Tr. 14:21–15:9 (Galka).  According to Mr. Galka, this market dislocation meant that the market price during the period between the Pause Date and the Petition Date was not a reliable indicator of CEL Token's value.  UCC Ex. 228, Exhibit 2 ¶¶ 166–67; UCC

Ex. 229 ¶ 11; October 4, 2023 Hr'g Tr. 16:6–10 (Galka).  Mr. Galka concluded that $0.81 cents,

the market price of the CEL Token on the Petition Date, did not reflect the CEL Token's value at

that time.  UCC-228, Exhibit 2 ¶ 167; October 4, 2023 Hr'g Tr. 16:8–10 (Galka).

198.    Mr. Galka concluded that the CEL Token was "most likely worthless" on the

Petition Date and testified that he had seen no quantifiable support for CEL Token being worth

more than $0.00 at that time.  *See* Celsius Ex. 70 ¶ 10; *see also* UCC-229 ¶ 19.  Mr. Galka further

concluded that the intrinsic value of CEL Token on the Petition Date was "*de minimis*," and that

any remaining value was speculative.  October 4, 2023 Hr'g Tr. 37:8–25 (Galka); UCC Ex. 229

¶ 13.  He believed the speculative value of CEL Token was zero or near zero on the Petition Date.

October 4, 2023 Hr'g Tr. 38:8–13 (Galka).  Accordingly, he concluded that CEL Token was most

"in almost all circumstances" valueless.  October 4, 2023 Hr'g Tr. 39:11–13 (Galka).

199.    The best interests test is met with respect to CEL Token holders, as a price of $0.00

or *de minimis* value is materially less than $0.36 and $0.34, at which point the best interests of

creditors test would no longer be satisfied with respect to a dissenting Holder of a CEL Token

Deposit Claim under the NewCo Transaction or the Orderly Wind Down, respectively.  *See* Celsius

Ex. 70 ¶ 10; *see also* October 4, 2023 Hr'g Tr. 124:4–8 (Campagna).

200.    The $0.00 or *de minimis* value of the CEL Token is also materially less than the

$0.25 per CEL Token value proposed under the CEL Token Settlement. *See* Celsius Ex. 70 ¶ 10;

*see also* October 4, 2023 Hr'g Tr. 124:4–8 (Campagna).

201.    One of the principal objectors to the treatment of CEL Token under the Plan is *pro

se* creditor Otis Davis.  Mr. Davis offered testimony that the price of CEL Token was $0.81 as of

the Petition Date and various criticisms of Mr. Galka's analysis.  *See* Docket No. 3769; October

16, 2023 Hr'g Tr. 57:12–15 (Davis) ("Q. You've offered an opinion on the value of CEL token,

correct? A. The petition date price opinion, which was 81 cents. Correct."). None of Mr. Davis's arguments has merit, and they are hereby OVERRULED.

202.    Mr. Davis is not qualified to offer a valuation opinion and has not purported to do so. *See* October 16, 2023 Hr'g Tr. 58:3–8 (Davis) ("Q. You personally didn't conduct a valuation of CEL token, correct? A. I did not. Q. And you're not qualified to provide a valuation of CEL token, correct? A. I'm not an expert."). In addition, Mr. Davis has offered multiple, inconsistent proposed CEL Token Prices—$0.81, $0.86, $2.01, and $2.88—for CEL Token, *see* Docket No. 3769 at 6-12, none of which Mr. Davis's proposed valuation expert, Mr. Hussein Faraj, adopts. *See* October 16, 2023 Hr'g Tr. 58:22–24, 60:6–23 (Davis).

203.    Unlike the testimony offered in connection with the Confirmation Hearing, Mr. Davis's pre-petition communications confirm that the CEL Token had limited-to-no value as a utility token. *See* October 16, 2023 Hr'g Tr. 72:15–16 (Davis) ("Q. And CEL token is a utility token, in your view, right? A. It is."). Mr. Davis acknowledged that prior to the Pause Date and filing of this bankruptcy, CEL's utility could use some improvement and that CEL Token did not have an adequate number of use cases. *See* October 16, 2023 Hr'g Tr. 72:17–22 ("Q. Before the pause or petition date, you thought that CEL's utility could use some improvement, correct? A. Correct. Q. In your view, there weren't enough use cases for CEL before the pause and petition date, correct? A. Correct.").

204.    In December 2021, Mr. Davis communicated with former Celsius CEO, Alex Mashinsky, about the need to improve CEL Token's utility, sending a 36-point list of "CEL TOKEN FIXES." *See* Celsius Ex. 90; October 16, 2023 Hr'g Tr. 73:14–21 ("Q. It says CEL token fixes, correct? A. Correct. Q. And you proposed a number of changes to the CEL token program, right? A. Correct. Q. And the idea was to make CEL more attractive to users, true? A. True.").

205.    Similarly, in January 2023, Mr. Davis reiterated his view that CEL Token lacked

any valuable utilities.  Writing again to Mr. Mashinsky, Mr. Davis stated: "[w]e [ ] voiced our

concerns that CEL has no utilities whatsoever" and that "[t]he tide has gone out and CEL is

swimming naked it has no useful utilities and therefore the price fell as everyone lost confidence."

*See* Celsius Ex. 87 at -342.  Mr. Davis continued: "CEL has no useful utilities.  I don't know of

one CEL utility that I use or that I like, not one.  That has to change NOW."  *See* Celsius Ex. 87 at

-343.    Nothing  did  change,  however,  as  no  additional  utilities  were  added  to  CEL  Token.

*See* October 16, 2023 Hr'g Tr. 78:1–7 (Davis) ("Q. Understood, Mr. Davis.  I was just following

up on your last answer.  Your last answer was that you had been hounding Mr. Mashinsky for

15 months to add useful utilities to CEL, correct?  That was your testimony.  A. Correct.  Q. And

he didn't add that utility, correct?  A. He didn't add any more utilities.").

206.    Most critically, Mr. Davis effectively acknowledged that CEL Token was worthless

as of the Pause Date and the Petition Date.  In October 2022, Mr. Davis issued the following Tweet,

confirming his view that CEL Token was valueless:



Celsius Ex. 99

207.    Mr. Davis testified that he believed CEL Token was "worthless" after the Petition

Date "because you can't use it," "[t]he platform is obviously paused," "so you can't take a loan"

and "can't get discount interest on loans." *See* October 16, 2023 Hr'g Tr. 87:2–9 (Davis).

Mr. Davis acknowledged that the same was true as of the Pause Date, and that "[a]s of June 13,

2022, no one could use utilities for CEL." *See* October 16, 2023 Hr'g Tr. 87:10–13 (Davis). Mr.

Davis's attempts to explain away those statements as "hyperbole" are not credible. *See* October

16, 2023 Hr'g Tr. 77:6-16, 78:13–18, 78:23–79:2, 84:18–85:1 (Davis).

208.    Mr. Davis offered Hussein Faraj as an expert on the value of the CEL Token.

209.    Mr. Faraj had never before: (i) testified as an expert witness; (ii) prepared a fair

value analysis of any digital asset or financial instrument; (iii) prepared a true value analysis of

any cryptocurrency asset for a third party; (iv) prepared an intrinsic value analysis of any digital

asset or financial instrument; (v) prepared a speculative value analysis of any digital asset; or (vi)

prepared a comps analysis of any digital asset. *See* October 17, 2023 Hr'g Tr. 36:11–13, 36:14–

19, 37:2–4, 37:12–24, 37:25–38:2, 38:3–5 (Faraj). The Court is the very first person Mr. Faraj

ever has ever publicly addressed and asked to adopt a valuation of a digital asset. *See* October 17,

2023 Hr'g Tr. 38:6–21 (Faraj).

210.    However, most troublesome to the Court is Mr. Faraj's methodology and approach

to preparing his report (the "Faraj Report" or "Report").

211.    Mr. Faraj used artificial intelligence to generate the Report over the course of

72 hours, when—by his own testimony—a comprehensive report would have taken over

1,000 hours to generate. *See* October 17, 2023 Hr'g Tr. 47:24–48:2 (Faraj); Celsius Ex. 113 ("We

completed the entire assessment within 72 hours. In reality, this is usually a 6-to-8-week job.");

October 17, 2023 Hr'g Tr. 48:3–5 (Faraj) ("Q. So you did a 1,000-plus hour job in 72 in this case.

Is that your testimony? A. That's 100 percent correct. That's my testimony."); October 17, 2023

Hr'g Tr. 51:7–9 (Faraj) ("Q. Mr. Faraj, if it was going to be comprehensive, 72 hours was not

enough to generate this report, true?  A. Correct.").  In fact, it took Mr. Faraj longer to read his report than to write it.  *See* October 17, 2023 Hr'g Tr. 46:4–6 (Faraj) ("Q. Okay.  Mr. Faraj, isn't it true that it took you longer to read the report than it took you to write it?  A. Very true.").  Indeed, in preparing the Report, Mr. Faraj did not review the underlying source material for nearly 1,000 sources cited, and he does not know what his team did (or did not do) to review and summarize those materials.  *See* October 17, 2023 Hr'g Tr. 83:16–84:22 (Faraj).

212.    Because it was prepared so hastily, there were numerous errors in the Faraj Report, ranging from duplicated paragraphs to errors in its description of the trading window selected for evaluation.  *See* October 17, 2023 Hr'g Tr. 51:17–19 (Faraj) ("Q. Do you agree with me, sir, that there are errors in your report, true?  A. I agree.  I agree and – yeah."); October 17, 2023 Hr'g Tr. 51:20–22 (Faraj) ("Q. And in your view, it would be impossible to prepare a report in 72 hours without introducing errors, correct?  A. That's true."); October 17, 2023 Hr'g Tr. 51:23–53:11 (Faraj) (discussing the inclusion of a duplicated 92-word paragraph); October 17, 2023 Hr'g Tr. 57:12–14 (Faraj) (describing incorrect trade dates).  Since learning of these errors, Mr. Faraj has not reviewed his Report to identify or correct additional errors.  *See* October 17, 2023 Hr'g Tr. 58:15–18 ("Q. Okay.  Let me ask you this.  Since we pointed out these errors to you during your deposition, have you gone back to check for other errors?  A. No, I haven't.").

213.    Mr. Faraj also appears to have inappropriately used artificial intelligence to select certain of the methodologies in the Report.  In generating his Report, Mr. Faraj submitted the following instructions: "Intrinsic valuation of CEL and cAN (sic) THIS METHOD BE USED FOR DETERMINING VALYE (sic) OF CEL ON PAUSE DATE" and "Speculative valuation of CEL and is this method acceptable to be used to determine value of cel on pause date."  *See* Celsius Ex. 120 at 156–57.

214.     The methodology used in the Faraj Report does not meet the standards required for expert testimony under Fed. R. Evid. 702.  Mr. Faraj used a "fair value" method that he personally developed.  *See* October 17, 2023 Hr'g Tr. 67:17–19 (Faraj) ("Q. And that's a method that you personally developed, correct?  A. Correct.").  That method is not widely accepted in valuing cryptocurrency; it has not been peer tested; and not a single investment bank today publicly reports the "fair value" of any platform-specific cryptocurrency token.  *See* October 17, 2023 Hr'g Tr. 67:20–69:5 (Faraj).

215.     More problematically, Mr. Faraj did not use the correct valuation date.  Mr. Faraj acknowledges that he did not use the Petition Date in valuing CEL Token.  *See* October 17, 2023 Hr'g Tr. 69:24–70:4 (Faraj) ("Q. Okay.  You didn't calculate the fair value of CEL token as of July 13th, 2022, the petition date, right?  A. No. I looked at the data during that area and I said it was over inflated.  I looked at volume to market cap ratios and all of it told me that that was a dislocated market.  So I actually ruled that whole period out."); *see also* October 16, 2023 Hr'g Tr. 67:6–9 (Davis) ("Q. Okay.  You agree with me that Mr. Faraj, your expert witness in this case, did not value CEL token as of the petition date, correct?  A. He did not.").

216.     Mr. Faraj concedes that the fair value of CEL Token decreased between the Pause Date and the Petition Date and agreed with Mr. Galka that the market for CEL Token was dislocated between the Pause Date and the Petition Date.  *See* October 17, 2023 Hr'g Tr. 70:5–8 (Faraj) ("Q. All right.  You would agree with me that the fair value of CEL token decreased between the pause date, June 12th and the petition date July 13th, correct?  A. As a value, myself, I would agree with you."), 70:17–22 (Faraj).  Mr. Faraj did not calculate the amount of that decrease, and therefore his $0.71 pause date figure is unreliable and inflated by an indeterminate degree.  *See* October 17, 2023 Hr'g Tr. 70:9–22.

217. Mr. Faraj's $0.71 figure is unreliable in other ways as well. For one thing, that $0.71 figure is a price average—and price is different than value. *See* October 17, 2023 Hr'g Tr. 77:25–78:5 ("Q. Okay. Let's back up to your methodology. You've effectively calculated a price average, right? A. I did. Q. And you agree with me that price is a different concept than value, correct? A. I do.").

218. Further, Mr. Faraj is unable to identify the fraction of his $0.71 figure that is attributable to market manipulation and the fraction that reflects legitimate value and price movements. *See* October 17, 2023 Hr'g Tr. 78:14–17 (Faraj) ("Q. In your view, it's close to impossible to differentiate between organic, legitimate price movements for a digital asset and movements based on manipulation, correct? A. That's correct."); *see also* October 17, 2023 Hr'g Tr. 78:18–80:14 (Faraj).

219. What Mr. Faraj could definitively say about CEL Token's value, however, was consistent with the Debtors' and Committee's position:

   a. *Intrinsic Value*: Mr. Faraj conceded that, as of the Pause Date, CEL Token had no intrinsic value. *See* October 17, 2023 Hr'g Tr. 70:23–71:2 (Faraj) ("[Q.] Do you agree with me that as of the pause date, there was not any intrinsic value left for the CEL token because the platform was frozen, correct? A. From the pause date, I agree with you."). Mr. Faraj likewise agreed that CEL had no intrinsic value as of the Petition Date. *See* October 17, 2023 Hr'g Tr. 71:3–5 (Faraj) ("Q. As of the petition date, CEL also had no intrinsic value, correct? A. I agree with you.").

   b. *Speculative Value*: Mr. Faraj therefore agreed that, as of the Petition Date, the only remaining value for CEL Token was speculative value. *See* October

17, 2023 Hr'g Tr. 71:11–14 (Faraj). Mr. Faraj acknowledges that he did not put a price on the speculative value of CEL at the Petition Date, and that—if CEL were liquidated today—it would not be worth anything. *See* October 17, 2023 Hr'g Tr. 74:22–24 (Faraj) ("Q. Okay. If CEL were liquidated today, you agree with me, it wouldn't be worth anything, correct? A. Correct."); October 17, 2023 Hr'g Tr. 74:25–75:2 (Faraj) ("Q. You didn't put a price on the speculative value for CEL token here, did you? A. No, I didn't.").

220. The Court concludes that the Faraj Report is not admissible as expert testimony, and thus rejects the $0.71 valuation in the Faraj Report as an appropriate CEL Token value.

221. [RESERVED].

222. The Court has considered Mr. Faraj's live testimony and given it such weight as the facts and circumstances demand. The Court has written separately to explain its reasoning.

223. <u>Treatment of Administrative Claims and Other Priority Claims (11 U.S.C. § 1129(a)(9))</u>. The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article II of the Plan, and of Allowed Other Priority Claims under Article III of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

224. <u>Accepting Impaired Class (11 U.S.C. § 1129(a)(10))</u>. The Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, at least one class of Claims in the Voting Classes voted to accept the Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code. *See* Celsius Ex. 60 ¶ 13.

225.    <u>Feasibility (11 U.S.C. § 1129(a)(11))</u>.  The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing is reasonable, persuasive, and credible, has not been controverted by other persuasive evidence, and establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization except as contemplated by the Plan itself.

226.    After the conclusion of the auction process, the Debtors selected Fahrenheit as the successful bidder and sponsor of the NewCo transaction under the Plan.  *See, e.g.*, October 3, 2023 Hr'g Tr. 9:24–10:10 (Ferraro).

227.    NewCo will be well capitalized and will have no debt at emergence.  Celsius Ex. 44 ¶ 37.

228.    NewCo will have a $1.25 billion balance sheet.  October 3, 2023 Hr'g Tr. 16:12–15 (Ferraro).  $450 million of that amount will be Liquid Cryptocurrency (valued as of the effective date) from the Debtors free and clear of any liens, claims, interests, charges, or encumbrances on the Effective Date.  Celsius Ex. 44 ¶ 37.  NewCo intends to stake some or all of this Liquid Cryptocurrency to earn staking yields on the Ethereum network, which would generate anywhere from $10 to $20 million per year.  Celsius Ex. 44 ¶ 37.  October 3, 2023 Hr'g Tr. 16:17–20 (Ferraro).

229.    <u>Mining Financial Performance and Projections</u>—*The Mining Business Is Historically Strong*.  The Debtors' mining business has performed well over the last 15 months—despite the pending restructuring proceedings, October 3, 2023 Hr'g Tr. 16:25–17:10 (Ferraro), and challenges with contractual counterparties, such as the rejection of the Core Scientific hosting contract.  Celsius Ex. 44 ¶ 39.

230.    In addition, the Debtors' mining business has dramatically improved over the past few months as the Debtors found new hosting providers and moved towards hosting their own rigs through their own proprietary sites.  Celsius Ex. 44 ¶ 40.

231.    For example, in July 2022, the Debtors had approximately 49,500 mining rigs deployed; as of late September, the Debtors had approximately 75,000 mining rigs deployed. Celsius Ex. 44 ¶ 40.

232.    The mining business has had "positive . . . adjusted EBITDA," October 3, 2023 Hr'g Tr. 17:3 (Ferraro), of approximately "20 million over the last 15 months," October 3, 2023 Hr'g Tr. 17:5–6 (Ferraro).

233.    Since the low point of BTC prices in December 2022 ($250,000 of adjusted EBITDA with the average BTC price below $17,000), the Debtors' mining business has averaged over $1.5 million of adjusted EBITDA per month.  Celsius Ex. 44 ¶ 40.

234.    As of August 2023, the Debtors' mining operations are generating approximately 300 BTC per month, or 10 BTC per day.  Celsius Ex. 44 ¶ 40.

235.    Indeed, "[a]pproximately 50 percent of that 20 million EBITDA over the last 15 months was made in the . . . [last] three summer months," October 3, 2023 Hr'g Tr. 17:5–7, despite the fact that the mining business "has been operating in a very difficult time," October 3, 2023 Hr'g Tr. 17:1–2, in light of the pending restructuring, October 3, 2023 Hr'g Tr. 17:11–15.

236.    In addition, the Debtors have taken several steps to improve the adjusted gross margin of the mining business.  Celsius Ex. 44 ¶ 42.

237.    Celsius Mining has a fixed power price hedge for a portion of its proprietary sites, which allows it to participate in ERCOT's energy management programs and take advantage of power price volatility.  Celsius Ex. 44 ¶ 42.

238.    Moreover, Celsius Mining has entered into new hosting agreements with improved economics, deploying 58,000 rigs this calendar year.  Celsius Ex. 44 ¶ 42.  These new hosting agreements include locations with historically lower or more stable power prices, the ability to share in energy management revenue, and curtailment rights.  Celsius Ex. 44 ¶ 42.

239.    In periods where it is not profitable to run their rigs due to high energy prices or low Bitcoin prices, the Debtors' mining business reduces its energy use leaving only operating expenses below gross profit to be incurred, thereby drastically reducing theoretical losses.  Celsius Ex. 44 ¶ 42.

240.    This concept of economic curtailment has improved the Debtors' mining business by allowing it to respond to instances where potential marginal losses would occur, and thereby avoid them.  Celsius Ex. 44 ¶ 42.

241.    The foregoing has vastly improved the financial performance of the mining business, allows it to reduce cash burn in unfavorable macro environments, and has led the mining business to cover its operating costs since July 2022.  Celsius Ex. 44 ¶ 42.

242.    NewCo will have "a mining business that is . . . getting better by the day," with "no debt," "125,000 rigs," and "an excellent mining manager in the US Bitcoin."  October 3, 2023 Hr'g Tr. 16:20–24 (Ferraro).  Mr. Ferraro testified that he was "truly impressed" with the mining business plan put together by US Bitcoin.  October 3, 2023 Hr'g Tr. 16:20–24 (Ferraro).

243.    *The Mining Business Is Projected to Have Significant Earnings Power.*  The Debtors and their advisors thoroughly analyzed NewCo's ability to meet its post-Confirmation obligations regarding the mining business.  Celsius Ex. 44 ¶ 38.

244.    Additionally, the mining business has "[s]ignificant earnings power" moving forward, under Fahrenheit's operation.  October 3, 2023 Hr'g Tr. 17:20–23 (Ferraro).

72

245.   The Debtors prepared mining financial projections for the mining business's financial performance for the fiscal years ending September 30, 2024 through September 30, 2028. Celsius Ex. 44 ¶ 38.

246.   The mining financial projections estimate that 2024 EBITDA will be $61.8 million and project EBITDA above that amount for the following four fiscal years.  Celsius Ex. 44 ¶ 38.

247.   Additionally, both the Plan Sponsor and Backup Plan Sponsor have very competent management teams dedicated to the success of the go-forward mining operations.  Celsius Ex. 44 ¶ 43.

248.   The Debtors' self-mining capability will be further enhanced if the Debtors successfully acquire and build the 215 MW Cedarvale project, which would nearly triple the Debtors' current self-mining capacity.  Celsius Ex. 44 ¶ 41.

249.   <u>Payment of Applicable Fees (11 U.S.C. § 1129(a)(12))</u>.  The Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  Article II.D of the Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by each of the Debtors or Post-Effective Date Debtors, as applicable.

250.   <u>Retiree Benefits (11 U.S.C. § 1129(a)(13))</u>.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.

251.   <u>Domestic Support Obligations, Individual Debtors, Nonprofit Corporations (11 U.S.C. §§ 1129(a)(14)–(16))</u>.  Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to these Chapter 11 Cases.  The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations.

252.    <u>Requirements of 11 U.S.C. § 1129(b)</u>.    The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Notwithstanding the fact that the Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.  *Second*, the Plan is fair and equitable with respect to the Rejecting Classes.  The Plan has been proposed in good faith, is reasonable, and meets the requirements that (a) no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and (b) no Holder of a Claim or Interest in a Class senior to each such Class is receiving more than payment in full on account of its Claim or Interest.  Specifically, although Holders of Class 14 (Series B Preferred Interests) will receive some recovery, such recovery is on account of a previous settlement of disputes concerning the absolute priority rule and whether such Interest Holders were entitled to payment before, among other creditors, Holders of Claims in the Rejecting Classes.  Additionally, to the extent Class 12 (Intercompany Claims) or Class 13 (Intercompany Interests) are Reinstated, such treatment is provided for administrative convenience and efficiency, and not on account of such Interests, and will not alter the treatment provided for any other Holder of any Claim or Interest.  Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in the Rejecting Classes.  *Third*, the Plan does not discriminate unfairly with respect to the Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class.  Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

253. <u>Requirements of 11 U.S.C. § 1129(c)</u>.  The Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code.  The Plan is the only chapter 11 plan filed in each of these Chapter 11 Cases.

254. <u>Requirements of 11 U.S.C. § 1129(d)</u>.  The Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

255. <u>Requirements of 11 U.S.C. § 1129(e)</u>.  The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code does not apply to these Chapter 11 Cases.

256. <u>Requirements of 11 U.S.C. § 1125(e)</u>.  The Exculpation is reasonable in scope and consistent with applicable authority.

257. **Bankruptcy Rule 3016**.  The Plan and all modifications thereto are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).  The Debtors appropriately filed the Disclosure Statement and the Plan with the Bankruptcy Court, thereby satisfying Bankruptcy Rule 3016(b).  The Injunction, Debtor Release, Third-Party Release, and Exculpation and the related provisions in the Disclosure Statement describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the Injunction, thereby satisfying Bankruptcy Rule 3016(c).

258. **Satisfaction of Confirmation**.  Based on the foregoing, the Debtors, as proponents of the Plan, have met their burden of proving by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, that the Plan satisfies all applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code required for Confirmation.

259.    **Limited Waiver of Fourteen-Day Stay**.  It is appropriate to limit any applicable stays contained in the Bankruptcy Code or Bankruptcy Rules to allow the Debtors to begin preparations for distributions under the Plan and to commence distributions on account of Custody Claims; *provided* that the Debtors shall not substantially consummate the Plan for at least fourteen days following entry of this Confirmation Order to allow stakeholders an opportunity to appeal this Confirmation Order and seek a stay pending appeal.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

260.    **Confirmation of the Plan**.  The Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

261.    **Incorporation by Reference**.  The terms of the Plan (including the Plan Supplement) are incorporated herein by reference and are an integral part of this Confirmation Order.  The terms of the Plan, the Plan Supplement, and all other relevant and necessary documents shall be effective and binding as of the Effective Date on all parties in interest, including the Debtors, the Post-Effective Date Debtors, NewCo, and all Holders of Claims and Interests. The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

262.    **Treatment of Other CEL Token Claims**.  Nothing in this Confirmation Order or the Plan constitutes a finding of the Court under any securities laws or otherwise as to whether CEL Token or the Earn Program are securities.  Pursuant to the Class Claim Settlement, any Class Claim Settlement Participant received a Settlement Claim (as defined in the Class Claim Settlement Order) and any other Claims against the Debtors held by such Class Claim Settlement

Participant were deemed to be expunged and superseded by such Settlement Claim. Similarly, any Holder of a Claim that voted to accept the Plan accepted the CEL Token Settlement, which provided that Other CEL Token Claims would be classified as Class 15 Section 510(b) Claims and treated as provided in Article III.B.16. As a result, any Other CEL Token Claims held by any Class Claim Settlement Participants or Holders of Claims who voted to accept the Plan are disallowed and expunged notwithstanding that the Court has not made a ruling regarding whether CEL Token or the Earn Program are securities. Conversely, neither this Confirmation Order nor the Plan shall determine whether Other CEL Token Claims that are held by any Account Holder that (1) timely opted out of the Class Claim Settlement and (2) voted to reject the Plan or abstained from voting on the Plan (an "Excluded CEL Token Claimant") should be subordinated pursuant to section 510(b) of the Bankruptcy Code. Instead, Excluded CEL Token Claimants shall have any Other CEL Token Claims asserted by such Holder resolved through the Claims allowance process (subject to any other applicable order of the Bankruptcy Court, including the Bar Date Order and the Class Claim Settlement Order). For the avoidance of any doubt, under the Class Claim Settlement, any Other CEL Token Claim that was held by a Class Claim Settlement Participant was expunged and superseded.

263. **Objections**. Any and all objections to the Plan that have not been withdrawn, settled, or resolved on the merits as of the entry of this Confirmation Order are overruled in their entirety on the merits.

264. **Notices of Confirmation and Effective Date**. The Debtors or the Post-Effective Date Debtors, as applicable, shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") seven Business Days after the Effective Date on all parties served with the Confirmation Hearing Notice

in the same manner as the Debtors served notice of the Confirmation Hearing pursuant to the Disclosure Statement Order, and such notice shall satisfy Bankruptcy Rules 2002 and 3020(c); *provided* that no notice of any kind shall be required to be mailed or made upon any Person or Entity to whom the Debtors mailed (or emailed) notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address or email address, as applicable. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

265.    No later than ten Business Days after the Effective Date, the Post-Effective Date Debtors shall cause the Notice of Confirmation, modified for publication, to be published on one occasion in *The New York Times (National Edition)* and *The New York Times (International Edition)* and in CoinDesk.com's *Protocol* email newsletter.  Mailing (or emailing) and publication of the Notice of Confirmation in the time and manner set forth in this paragraph will be good, adequate, and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c).  No further notice is necessary.

266.    **Plan Supplement**.  Except as otherwise provided in paragraphs 349 and 350 of this Confirmation Order, all documents contained in the Plan Supplement are integral to the Plan, in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and are approved by the Bankruptcy Court.    The Debtors and the Post-Effective Date Debtors (as applicable) are authorized to take all actions required under the Plan (including the Plan Supplement as described) to effectuate the Plan, including, for the avoidance of doubt:  (i) altering, amending, updating, or modifying the Plan Supplement before the Effective Date as necessary to

effectuate the Plan, subject to the terms of the Plan (including Article XI.A of the Plan) and
paragraphs 349 and 350 of this Confirmation Order; and (ii) the issuance of any new equity
interests as contemplated by the Plan.  In furtherance of the foregoing, the Management Agreement
with Fahrenheit, and the US Bitcoin Management Agreement (including without limitation, the
Interim Services Agreement with US Bitcoin relating to the Cedarvale property) are approved by
the Bankruptcy Court, and the Debtors and the Post-Effective Date Debtors (as applicable) are
authorized to take all actions required thereby.

267.    **Compromises and Settlements Approved**.  The compromises and settlements set
forth in the Plan and Confirmation Order, including, without limitation, the general settlement
described in Article IV.B.1, the Account Holder Avoidance Action Settlement, the CEL Token
Settlement, the Class Claim Settlement, the Custody Settlement, the Retail Borrower Settlement,
the Series B Settlement, and the Withhold Settlement, are approved, and will be immediately
effective and binding on all parties in interest on the Effective Date to the extent not already
effective pursuant to separate order of the Bankruptcy Court.

268.    **Modifications Deemed Accepted**.  All modifications to the Plan made after the
Voting Deadline are hereby approved, pursuant to section 1127 of the Bankruptcy Code and
Bankruptcy Rule 3019.  In accordance with section 1127 of the Bankruptcy Code and Bankruptcy
Rule 3019, all holders of Claims and Interests who voted to accept the Plan or who were
conclusively presumed to have accepted the Plan are presumed to accept the Plan as modified.
No holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Plan
modifications.

269.    **Loan Collateral**.  Pursuant to the applicable Loan T&Cs, including Versions 7, 8,
and 9 of the Loan T&Cs and Version 1 of the SAR T&C, which explicitly incorporated the General

Terms of Use by reference, those Account Holders who did not vote to accept the Plan transferred ownership and control of their Cryptocurrency used to secure loans in the Debtors' Borrow Program to the Debtors. Accordingly, with respect to those Account Holders who did not vote to accept the Plan, such Cryptocurrency held by the Debtors as of the Petition Date as collateral with respect to their loan obligations under the Debtors' Borrow Program constitutes property of the Debtors' Estates pursuant to section 541 of the Bankruptcy Code.

270.    **NewCo Transaction**.  The NewCo Transaction and all of the terms and conditions thereof are hereby approved.  Entry of this Confirmation Order shall authorize the Debtors, the Post-Effective Date Debtors, NewCo, Fahrenheit, and their Related Parties, as applicable, to undertake the NewCo Transaction as described in the Transaction Steps Memorandum.  For the avoidance of doubt, the Special Committee of the Board of Directors of CNL shall have the corporate authority to cause each of the Debtors to take actions in connection with the Plan as contemplated by the Plan and this Confirmation Order.

271.    Pursuant to sections 105(a), 363(b), 363(f), 365(b), 365(f), and 1123(a)(5)(D) of the Bankruptcy Code, the Debtors are authorized to transfer the NewCo Assets in accordance with the Plan, and such transfer shall constitute a legal, valid, binding, and effective sale of the NewCo Assets and shall vest NewCo with title to the NewCo Assets, and to the fullest extent permitted by sections 363(f), 1123(b)(4), and 1141(c) of the Bankruptcy Code, the NewCo Assets shall be free and clear of all Liens, Claims, Encumbrances, and other interests of any kind or nature whatsoever, with all such Liens, Claims, or other interests to attach to the cash proceeds ultimately attributable to the property against or in which such Liens, Claims, or other interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which

such Liens, Claims, or other interests had prior to the transfer, subject to any rights, claims, and defenses the Debtors or their Estates, as applicable, may possess with respect thereto.

272. Except as otherwise permitted by the Plan or this Confirmation Order, all persons and entities holding Claims against or other Interests in the Debtors, or any Liens against the NewCo Assets arising prior to the occurrence of the Effective Date, are hereby forever barred, estopped, and permanently enjoined from asserting such Claims, interests, or Liens against NewCo, any of the foregoing's affiliates, successors, or assigns, their property, or the NewCo Assets.

273. NewCo and Fahrenheit have acted in good faith and are entitled to the protections afforded under section 363(m) of the Bankruptcy Code. No evidence has been presented to the Bankruptcy Court indicating that the NewCo Transaction may be avoided pursuant to section 363(n) of the Bankruptcy Code.

274. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by Plan and this Confirmation Order. A certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

275. The Debtors and NewCo are each authorized to file a copy of this Confirmation Order, which, upon filing, shall be conclusive evidence of the release and termination of any Claim, Lien, or interest that is terminated under the terms of the Plan.

276. This Confirmation Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Plan and this Confirmation Order.

277.    All persons and entities that are presently, or on the Effective Date may be, in possession of some or all of the NewCo Assets are hereby directed to surrender possession of the NewCo Assets to NewCo unless such person or entity was a good faith, bona fide purchaser of the NewCo Assets without notice of the Debtors' rights in such property.  Subject to the terms, conditions, and provisions of this Confirmation Order, all persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and/or transfer the NewCo Assets to NewCo in accordance with the terms of the Plan and this Confirmation Order.

278.    To the fullest extent permitted by sections 363(f), 1123(b)(4), and 1141(c) of the Bankruptcy Code, NewCo shall acquire the NewCo Assets free of any claim that it is liable for liabilities of the Debtors under theories of successor liability, *de facto* merger, substantial continuity, or other similar theory.

279.    The documents related to implementation of the NewCo Transaction may be modified, amended, or supplemented by the parties thereto in non-material ways in accordance with the terms thereof, without further order of the Bankruptcy Court.  Any pre-Effective Date material changes require the approval of the Bankruptcy Court, which may be sought by motion.

280.    In accordance with Article IV.D.7 of the Plan, the New Board of NewCo shall have six directors named by the Committee, which are divided into three classes with staggered terms, with one Class subject to reelection each year.  The Committee has duly named the three Classes as follows: Class I — Frederick Arnold and Elizabeth LaPuma; Class II — Emmanuel Aidoo and Max Holmes; and Class III — Thomas DiFiore and Scott Duffy.  Pursuant to Delaware General Corporate Law Section 303, this Confirmation Order shall constitute requisite shareholder and/or director action naming the above directors to such Classes with respect to NewCo.

281.    **Selection of New Board, Litigation Oversight Committee, and Board Observers**.  The Committee made its determinations as to the directors of the New Board, the selection of each member of the Litigation Oversight Committee, and the selection of each of the Board Observers based on full, timely, and adequate disclosure of all potentially relevant information.

282.    In selecting the directors of the New Board and the members of the Litigation Oversight Committee, the Committee and its advisors did not act in bad faith, nor did they commit willful misconduct or act with gross negligence.

283.    The appointment of each of the members of the New Board, the selection of each member of the Litigation Oversight Committee, and the selection of each of the Board Observers was and is consistent with the interests of creditors and equity security holders as required by section 1129(a)(5) of the Bankruptcy Code.

284.    The appointment of each of the members of the New Board and the selection of each member of the Litigation Oversight Committee, and the selection of each of the Board Observers was and is consistent with public policy as required by section 1129(a)(5) of the Bankruptcy Code.

285.    Accordingly, the Debtors have satisfied section 1129(a)(5) of the Bankruptcy Code.

286.    Further, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

287.    **Substantive Consolidation**.  In accordance with sections 1123(a)(5)(c) and 105 of the Bankruptcy Code, the Consolidated Debtors are hereby substantively consolidated for purposes of the Plan, including for purposes of voting, confirmation, and Plan distributions, subject to the following sentence:  (i) all assets and all liabilities of the Consolidated Debtors shall be treated as though they were merged; (ii) all guarantees of any Consolidated Debtor of the payment, performance, or collection of obligations of another Consolidated Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Consolidated Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the Consolidated Debtors; (iv) all Claims between any Consolidated Debtors shall be deemed cancelled; and (v) each Claim filed or scheduled in the Chapter 11 Case of any Consolidated Debtor shall be deemed filed against the Consolidated Debtors and a single obligation of the Estate of the Consolidated Debtors.  The substantive consolidation and deemed merger effected pursuant to the Plan shall not affect (other than for purposes of the Plan as set forth in Article IV.A.1 thereof) (x) the legal and organizational structure of the Consolidated Debtors, except as provided in the Transaction Steps Memorandum, including, for the avoidance of doubt, the legal existence of any Claim of one Consolidated Debtor against another Consolidated Debtor; (y) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; *provided* that any Claim that is Allowed against any Consolidated Debtor shall be deemed Allowed against the Estate of the Consolidated Debtors; or

(z) distributions out of any insurance contracts or any Entity's or Person's rights, if any, to proceeds of such insurance contracts.

288.    **Releases, Injunction, and Exculpation.**    The Debtor Release, Third-Party Release, Exculpation, Injunction, Lien Release, related provisions set forth in Article VIII, and any other release, injunction, and exculpation provisions of the Plan are expressly incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party.

289.    For the avoidance of doubt, any Holder of a Claim or Interest in Class 10 (State Regulatory Claims), Class 11 (*De Minimis* Claims), Class 15 (Other Interests), Class 16 (Section 510(b) Claim), or Class 17 (Equitably Subordinated Claim) that did not affirmatively "opt in" to the Third-Party Release contained in the Plan shall not be deemed to grant such Third-Party Release.

290.    Notwithstanding anything to the contrary herein, in the Plan, or in the Plan Supplement, Latham & Watkins LLP shall be an Exculpated Party under the Plan and shall receive the protections afforded to Exculpated Parties under the Plan, subject to the limitations applicable to the Exculpation; *provided*, *however*, Latham & Watkins LLP shall not be a Released Party under the Plan; *provided*, *further*, that the foregoing shall not preclude any party from challenging Latham & Watkins LLP's applications for Professional Fee Claims or limit any such challenge. Celsius Ex. 44 ¶¶ 26–29.

291.    **Actions by the Plan Administrator.**    The Plan Administrator may take such actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by

the Plan Administrator on behalf of any Post-Effective Date Debtors without need for any action or approval by the shareholders or board of directors or managers of such Debtor. After the Effective Date, at the direction of the Plan Administrator, one or more of the Post-Effective Date Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

292.    On and after the Effective Date, the Post-Effective Date Debtors (i) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal (ii) shall be deemed to have cancelled pursuant to the Plan all Interests, and (iii) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Notwithstanding any Debtor's dissolution, such Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

293.    **Binding Effect.** Upon the occurrence of the Effective Date, the terms of the Plan are immediately effective and enforceable and deemed binding on the Debtors, the Post-Effective Date Debtors, any and all Holders of Claims or Interests (regardless of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Persons and Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or this Confirmation Order (including, for the avoidance of doubt, NewCo), and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or

compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

294.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Confirmation Order, all prior orders entered in these Chapter 11 Cases and all documents and agreements executed by the Debtors as authorized and directed thereunder as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, NewCo, or the Post-Effective Date Debtors, as applicable, and their respective successors and assigns.

295.    **Vesting of Assets.**  Except as otherwise provided in the Plan, this Confirmation Order, the Schedule of Retained Causes of Action, or in any agreement, instrument, or other documented incorporated herein or therein, or in any agreement, instrument, or other document incorporated in the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property constituting Post-Effective Date Debtors' Assets shall vest in the Post-Effective Date Debtors, free and clear of all Liens, Claims, charges, or other encumbrances.

296.    Prior to the Effective Date, any and all of the Debtors' assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, and on the Effective Date, the Post-Effective Date Debtors' Assets shall, subject to the Plan Administrator Agreement and Litigation Administrator Agreement, be transferred to and vest in the Post-Effective Date Debtors free and clear of any claims.  For the avoidance of doubt, to the extent not otherwise waived in writing, released, settled, compromised, assigned, or sold pursuant to a prior order or the Plan, the Plan Administrator and the Litigation Administrator, on behalf of the Post-Effective Date Debtors, specifically retain and reserve the right to assert, after the Effective Date, any and all of the Causes

of Action and related rights, whether or not asserted as of the Effective Date, and all proceeds of the foregoing, subject to the terms of the Plan, including, without limitation, Article IV.G.4.

297.    On or prior to the Effective Date, the Post-Effective Date Debtors, Plan Administrator, or Litigation Administrator as applicable, may establish one or more accounts or funds to hold and dispose of certain assets, pursue certain litigation (including the Retained Causes of Action), and/or satisfy certain Claims (including Claims that are contingent or have not yet been Allowed).

298.    **Litigation Administrator**.  The Litigation Administrator may take such actions as the Litigation Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  The Litigation Administrator shall have the authority to prosecute, settle, or otherwise resolve, without limitation, all Disputed Claims remaining as of the Effective Date (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Plan), the Recovery Causes of Action, the Contributed Claims, and any other Causes of Action agreed to in writing by the Plan Administrator and the Litigation Administrator, in each case in accordance with the Litigation Administrator Agreement and the ADR Procedures, as applicable, and control collection efforts regarding the Goldstein Loan, Leon Loan, and any other CEL Insider Loans.  The Litigation Administrator shall report to, and act at the direction of, the Litigation Oversight Committee in accordance with the Plan and the Litigation Administrator Agreement. The Litigation Administrator shall serve as a representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of collecting Recovery Causes of Action and enforcing Causes of Action belonging to the Estates related to Disputed Claims or Disputed Interests that are not released, waived, settled, compromised, or transferred pursuant to the Plan (including, for the

avoidance of doubt, the Recovery Causes of Action, objections to Claims, and any other Causes

of Action agreed to by the Plan Administrator and the Litigation Administrator).

299.    On the Effective Date, the Litigation Administrator shall, to the extent provided in

the UCC Claims Stipulation, succeed to the rights of the Debtors under certain of their

D&O Liability Insurance Policies.  For the avoidance of doubt, the Litigation Administrator shall

not succeed to the Debtors' rights with respect to the Special Committee D&O Liability Insurance

Policies.

300.    **Litigation Oversight Committee**.  Following the Confirmation Date, the members

of the Litigation Oversight Committee identified in the Plan Supplement, or, following the

Effective Date, identified by the Litigation Administrator or the Litigation Oversight Committee,

may propose to appoint an additional member of the Litigation Oversight Committee to fill any

vacant seat or as an officer of the Post-Effective Date Debtors; *provided*, *however*, that Keith

Noyes is ineligible to serve on the Litigation Oversight Committee until there is a judicial finding

that Mr. Noyes did not act in an *ultra vires* manner.  The U.S. Trustee and all parties in interest

reserve all rights to argue that Mr. Noyes should not be appointed to the Litigation Oversight

Committee or as an officer of the Post-Effective Date Debtors because he acted in an *ultra vires*

manner.

301.    **Litigation Recovery Account**.  On or before the Effective Date, the Debtors or the

Post-Effective Date Debtors, as applicable, shall establish a segregated Litigation Recovery

Account, funded with the Initial Litigation Funding Amount and controlled by the Litigation

Administrator.  The funds in the Litigation Recovery Account shall be available to pay, among

other things, the costs and fees of the Litigation Administrator (and any fees associated with the

Litigation Recovery Account), including professional fees, costs, and expenses in connection with

the prosecution of the Recovery Causes of Action, all as more fully set forth in the Litigation Administrator Agreement.  In no event shall the Post-Effective Date Debtors be responsible for funding the Litigation Recovery Account following the funding of the Initial Litigation Funding Amount.

302.    **Effectiveness of All Actions**.  All actions required to implement the Plan, including all actions in connection with the NewCo Transaction or Orderly Wind Down, as applicable, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtors or the Post-Effective Date Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders; *provided*, for the avoidance of doubt, that, notwithstanding the foregoing, the Debtors must file a Wind-Down Motion in the event that the Debtors and the Committee determine to toggle to the Orderly Wind Down in accordance with Article IV.E. of the Plan.

303.    **Cancellation of Notes, Instruments, Certificates, and Other Documents**. On the later of the Effective Date and the date on which distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, this Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the NewCo Transaction, all notes, bonds, indentures, certificates, Securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness

or obligations of, or ownership interest in, the Debtors, giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors shall be deemed cancelled without any need for a Holder to take further action with respect thereto.

304.    For the avoidance of doubt, cancellation of existing Interests pursuant to the Plan shall not affect the rights of the Holders of such existing Interests to receive distributions, if any, under the Plan on account of such existing Interests.  Holders of existing Interests shall continue to possess all rights, powers, privileges, and standing associated with such existing Interests as if those existing Interests continue to exist subject to the terms of the Plan and this Confirmation Order.

305.    **Distributions.**  The procedures governing distributions contained in Article VI of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan or this Confirmation Order, the Debtors or the Plan Administrator (acting directly or through one or more Distribution Agents) on behalf of the Post-Effective Date Debtors, shall make all distributions required under the Plan and may take such actions as are necessary or appropriate to prepare for such distributions (*e.g.*, testing web interface functions and selling or trading any Cryptocurrency to prepare for distributions as contemplated under the Plan notwithstanding any prior limitations on such transactions); *provided* that such preparations shall not affect any Holder of a Claim or Interest's Claim, Interest, or right to a distribution.  The distributions described in the Plan and this Confirmation Order shall be made in accordance with and as set forth in the Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable, and for the avoidance of doubt, any Post-Effective Date claims or causes of actions arising from such distributions made in accordance with Article VI of the Plan against any of the Debtors,

Post-Effective Debtors, NewCo, or any Distribution Agents acting on their behalf shall be subject to the jurisdiction of the Bankruptcy Court in accordance with paragraph 379 hereof; *provided* that, if a creditor does not timely provide the Debtors, Post-Effective Date Debtors, Distribution Agent, or NewCo, as applicable, with required AML/KYC Compliance Information in the manner and by the deadline reasonably established by the Debtors, Post-Effective Date Debtors, or any Distribution Agent, as applicable, and other information required to make distributions, including required tax forms, the creditor shall be deemed to have forfeited its right to any current, reserved, or future distributions provided for under the Plan and such creditor's Claim or Interest shall be Disallowed and expunged without further order of the Bankruptcy Court; *provided*, *further*, that the Debtors shall provide notice, Filed on the docket and served on the affected Claim Holders, of the deadline established for creditors to provide required AML/KYC Compliance Information at least 30 calendar days prior to such deadline.  Any such forfeited distribution shall be deemed to have reverted back to the Post-Effective Date Debtors for all purposes, including for distribution to other Holders of Allowed Claims or Allowed Interests (as applicable) against the particular Debtor in respect of which the forfeited distribution was made, notwithstanding any federal, provincial, or state escheat or abandoned or unclaimed property law to the contrary in accordance with Article IV.F.4. of the Plan.

306.    **Claims Register**.  Any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan) may be adjusted or expunged, as applicable, on the Claims Register at the direction of the Debtors or Post-Effective Date Debtors without the Debtors or Post-Effective Date Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

307.    **Preservation of Rights of Action**.  In accordance with section 1123(b) of the Bankruptcy Code, the Post-Effective Date Debtors shall succeed to all rights to commence and pursue any and all Causes of Action of the Debtors, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action and Recovery Causes of Action and all Causes of Action against Excluded Parties, other than Causes of Action released, waived, settled, compromised, or transferred pursuant to the Plan whether arising before or after the Petition Date.  Such rights shall be preserved by the Debtors and Post-Effective Date Debtors and shall vest in the Post-Effective Date Debtors, with the Post-Effective Date Debtors' or Litigation Administrator's (on behalf of the Post-Effective Date Debtors) rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date; *provided* that the Causes of Action expressly released, waived, settled, or compromised by the Debtors pursuant to the releases contained in the Plan, including in Article VIII of the Plan, shall be deemed released and waived by the Debtors and the Post-Effective Date Debtors as of the Effective Date.

308.    No Entity may rely on the absence of a specific reference to any Cause of Action against it in the Schedules of Assets and Liabilities or Statements of Financial Affairs, the Plan, the Disclosure Statement, or the Schedule of Retained Causes of Action, or the Schedule of Excluded Parties as any indication that the Debtors or the Post-Effective Date Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Post-Effective Date Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, including any Excluded Party, except as otherwise provided in the Plan, including Article VIII of the Plan.  Unless any Cause of Action of the Debtors is expressly waived, relinquished, released, compromised, or settled in the Plan or pursuant to a Final Order, the Debtors and Post-Effective

Date Debtors, as applicable, expressly reserve all such Causes of Action for later adjudication in accordance with the Litigation Administrator Agreement or Plan Administrator Agreement, as applicable, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of Confirmation.

309.    **Subordination**.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Post-Effective Date Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. For the avoidance of doubt, and in accordance with the Equitable Subordination Stay Order, issues related to the Debtors' proposed subordination of the Equitably Subordinated Claims are hereby adjourned to the earlier of (i) the one-year anniversary of the entry of the Equitable Subordination Stipulation and Order (*i.e.*, September 12, 2024); and (ii) the final disposition of the Criminal Case (as defined in the Equitable Subordination Stay Order) against Alexander Mashinsky; *provided* that, to the extent any of the Civil Proceedings (as defined in the Equitable Subordination Stay Order) are not similarly stayed on or before 120 days after September 12, 2023 (or such earlier date as is agreed by the Parties), then the Debtors and/or the Committee (or their respective successors) may request that the Bankruptcy Court lift the stay.  The Debtors shall reserve and hold an amount of distribution consideration sufficient to satisfy the proposed Equitably Subordinated Claims in the event such Claims are not subordinated (*i.e.*, an amount of Liquid Cryptocurrency, NewCo Common Stock, and/or Litigation Proceeds necessary to satisfy such Claims in accordance with the treatment afforded to the Class such Claims would have been classified in had the Debtors not proposed to equitably subordinate them).  The Debtors (or Post-Effective Date Debtors) shall hold such reserve until such time as the Bankruptcy Court rules

upon the Debtors' pending motion to subordinate such Claims or enters a stipulation equitably subordinating such Claims, or the subordination litigation is otherwise resolved by agreement of the parties.

310.    **Release of Liens**.  Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan or this Confirmation Order, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (including the NewCo Assets) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Effective Date Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Post-Effective Date Debtors, or any other Entity.  Any Holder of any mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Effective Date Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Effective Date Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, local, or foreign agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

311.    **Contributed Claims**.  On the Effective Date, all Contributed Claims will be irrevocably contributed to the Post-Effective Date Debtor(s) for the Litigation Administrator to prosecute on behalf of the Holders of Claims entitled to receive Litigation Proceeds and shall thereafter be Recovery Causes of Action for all purposes.  For the avoidance of doubt, any party that did not affirmatively "opt in" to contribute their claims to the Post-Effective Date Debtors as "Contributed Claims" shall not be deemed to contribute their claims to the Post-Effective Date Debtor; *provided*, *however*, that any party may contribute their claims to the Post-Effective Date Debtors on or after the Effective Date by separate agreement with any Litigation Administrator. Any such agreement shall be valid to the same extent as if the party affirmatively opted in their Ballot to contribute their Contributed Claims to the Post-Effective Date Debtors.

312.    **Disputed Claim Reserve**.  On or after the Effective Date, the Debtors, the Post-Effective Date Debtors, the Plan Administrator, any Litigation Administrator, or NewCo, as applicable, may establish one or more reserves or accounts or funds for Claims that are Disputed, contingent, have not yet been Allowed, or where the Holder is or may be subject to an Avoidance Action, in an amount or amounts as reasonably determined by the applicable Debtors or Post-Effective Date Debtors, as applicable, in consultation with the Committee or Litigation Administrator, as applicable, consistent with the Proof of Claim Filed by the applicable Holder of such Disputed Claim and/or the Withdrawal Preference Exposure amount associated with such Claim.  The provisions of Article VII.G regarding the same are incorporated herein by reference and approved.

313.    **Operations After Closing**.  On and after the Effective Date, expect as otherwise provided in the Plan, the Post-Effective Date Debtors may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action in accordance with the Plan

Administrator Agreement and the Litigation Administrator Agreement, as applicable, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

314. **Assumption and Rejection of Executory Contracts and Unexpired Leases**. On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, including the Employee Transition Services Agreement, all Executory Contracts and Unexpired Leases of the Debtors, including any employee benefit plans, severance plans, or other Executory Contracts under which employee obligations arise, shall be deemed rejected by the Debtors or Post-Effective Date Debtors, as applicable, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (a) is specifically described in the Plan as to be assumed in connection with Confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan (including the Plan Supplement); (b) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (c) is to be assumed by the Debtors or assumed by the Debtors and assigned to another third party, as applicable, in connection with the Plan; or (d) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan. Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an Executory Contract or Unexpired Lease under the Plan, if any, are overruled on their merits.

315. The amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated Executory Contracts and

Unexpired Leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment

of such amounts will effect a cure of all defaults existing under such Executory Contracts and

Unexpired Leases and compensate the counterparties to such Executory Contracts and Unexpired

Leases for any actual pecuniary loss resulting from all defaults existing under such Executory

Contracts and Unexpired Leases as of the Effective Date.

316.    As provided in the Solicitation Materials, the Debtors and the Post-Effective Date

Debtors have reserved the right to (a) alter, amend, modify, or supplement the Schedule of

Assumed Executory Contracts and Unexpired Leases and the Schedule of Rejected Executory

Contracts and Unexpired Leases identified in the Plan at any time through and including

forty-five (45) days after the Effective Date and (b) contest any Claim asserted in connection with

rejection of any Executory Contract or Unexpired Lease.

317.    **Emergence Retention and Incentive Plans**.  The Emergence Incentive Plan set

forth in Article IV.J.2 of the Plan and the Emergence Retention Plan set forth in Article IV.J.3 of

the Plan are approved, and the Plan Administrator (on behalf of the Post-Effective Date Debtors)

is authorized to implement such plans on and after the Effective Date in accordance with the Plan.

For the avoidance of doubt, the Emergence Incentive Plan shall become effective on the Effective

Date, at which time the KEIP Motion shall be deemed withdrawn with prejudice.  Further, for the

avoidance of doubt, the decision regarding whether EIP Awards shall be distributed in accordance

with the terms of the Emergence Incentive Plan is vested solely with the Plan Administrator

pursuant to the terms of the Plan Administrator Agreement.

318.    **D&O Insurance Policies**.  To the extent required, entry of this Confirmation Order

constitutes the Bankruptcy Court's approval of the assumption of all D&O Liability Insurance

Policies, and all D&O Liability Insurance Policies and obligations thereunder shall remain in full

force and effect in accordance with their terms. For the avoidance of doubt, the Post-Effective Date Debtors shall not have any obligation to pay any deductible, retention, or any other cost or expense under, arising from, or related to, the D&O Liability Insurance Policies in connection with any such policy or claim made thereunder. For the avoidance of doubt, the succession rights provided in Article IV.G.3 of the Plan shall not limit any third parties' rights with respect to such D&O Liability Insurance Policies.

319.    **Resolution of United States Trustee Plan Issues**.  The following modifications to the Plan are deemed to be made pursuant to this Confirmation Order.  Any reference herein or in the Plan to the provisions that are modified pursuant to this paragraph shall solely refer to those provisions as modified herein:

a.    **Excluded Committee Member**.    The following definition of "Excluded Committee Member" is deemed added to the Plan:

"*Excluded Committee Member*" means any Person or Entity that, without authority under applicable law, acted on behalf of any member of the Committee or acted in an *ultra vires* manner on behalf of any such member of the Committee, in each case solely to the extent that such Person or Entity acted without authority under applicable law or acted in an *ultra vires* manner.

b.    **Excluded Party**.  The Plan's definition of "Excluded Party" is amended and restated in its entirety as follows:

"*Excluded Party*" means each of the following: (a) Alexander Mashinsky; (b) Shlomi Daniel Leon; (c) Roni Cohen Pavon; (d) the other UCC Claims Stipulation Defendants; (e) any current or former director, officer, employee, independent contractor, professional, equity holder, or other Entity associated with the Debtors that is not specifically identified as a Released Party in this Plan or the Schedule of Released and Exculpated Parties, except current and former managing partners, officers, directors, and employees of the Initial Consenting Series B Preferred Holders, WestCap Management LLC, and Caisse de dépôt et placement du Québec, CDPQ Placements privés Québec Inc., CDPQ Placements privés Inc., and CDPQ U.S. Inc.; (f) any party on the Schedule of Excluded Parties; (g) with respect to each of the foregoing, each Related Party of such Person or Entity that is not specifically identified in this Plan or the Schedule of Released and Exculpated Parties as a Released Party; and (h) any Excluded Committee Member. Notwithstanding anything to the contrary in this Plan, no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder.

c.     **Exculpated Parties**.  The Plan's definition of "Exculpated Parties" is amended and restated in its entirety as follows:

"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members (Alan J. Carr and David M. Barse); (c) the Distribution Agent; (d) [RESERVED]; (e) the Committee and each of its members (which shall be deemed, for these purposes, to include both corporate or entity Committee members as well as the individuals who have properly served on the Committee on behalf of any member that is a corporate or limited liability entity), except to the extent that such member is an Excluded Committee Member; (f) [RESERVED]; (g) the Plan Sponsor and each of its members; (h) [ RESERVED] (i) the Retail Borrower Ad Hoc Group and each of its members that has been identified in a Filed statement pursuant to Bankruptcy Rule 2019 as of October 2, 2023; (j) the Earn Ad Hoc Group and each of its members that has been identified on a Filed statement pursuant to Bankruptcy Rule 2019 as of October 2, 2023; (k) with respect to each of the foregoing, each such Entity's financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties"*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Special Committee and each of its members (Alan J. Carr and David M. Barse); (c) the Distribution Agent; (d) [RESERVED]; (e) the Committee and each of its members (which shall be deemed, for these purposes, to include both corporate or entity Committee members as well as the individuals who have properly served on the Committee on behalf of any member that is a corporate or limited liability entity), except to the extent that such member is an Excluded Committee Member; (f) [RESERVED]; (g) the Plan Sponsor and each of its members; (h) [ RESERVED] (i) the Retail Borrower Ad Hoc Group and each of its members that has been identified in a Filed statement pursuant to Bankruptcy Rule 2019 as of October 2, 2023; (j) the Earn Ad Hoc Group and each of its members that has been identified on a Filed statement pursuant to Bankruptcy Rule 2019 as of October 2, 2023; (k) with respect to each of the foregoing, each such Entity's financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; (l) the BRIC Parties; (m) Christopher Ferraro; (n) the Class Claim Representatives; and (o) any other Person or Entity identified in the Schedule of Released and Exculpated Parties.  The Debtors shall file a revised Schedule of Released and Exculpated Parties containing the identities of the parties released and exculpated as Distribution Agents no later than fourteen (14) days prior to the Effective Date.  The Debtors shall attach to the revised Schedule one or declarations setting forth the reasons why each such party should be released and exculpated as Distribution Agents.   The U.S. Trustee and the Committee shall have seven (7) days after the Debtors file such revised Schedule of Released and Exculpated Parties to file any responsive pleading to the release and exculpation of such Distribution Agent parties, which shall be resolved by the Bankruptcy Court, if necessary.  If the U.S. Trustee or Committee does not timely file a responsive pleading, the revised Schedule of Released and Exculpated Parties shall be deemed incorporated into and part of the Plan as if set forth therein in full

without any further action or approval by the Bankruptcy Court. For the avoidance of doubt, if the U.S. Trustee or the Committee timely files a responsive pleading, the Debtors agree that the occurrence of the Effective Date shall not moot any arguments with respect to the release or exculpation of the Distribution Agent parties listed in any filing contemplated by this paragraph. Notwithstanding anything to the contrary in this Plan, (x) an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date and (y) no Excluded Party shall constitute a Released Party or an Exculpated Party in any capacity hereunder. All rights are reserved for the U.S. Trustee with respect to any actions of any Excluded Committee Member.

d.    **Exculpation**. The following provision is added to the end of the first paragraph in the Plan's exculpation provision (Article VIII.E):

All rights are reserved for the U.S. Trustee or any party in interest to argue that any Committee Professional acted in knowing reliance on any Excluded Committee Member. All rights and defenses are reserved for any Committee Professional with respect to any argument by the U.S. Trustee or any party in interest that such Professional acted in knowing reliance on an Excluded Committee Member that acted in an *ultra vires* manner. For the avoidance of doubt, knowing in this context means knew or should have known.

320.    **Definition of Class Claim Settlement Order**. The Plan's definition of "Class Claim Settlement Order" is amended and restated in its entirety as follows:

"Class Claim Settlement Order" means the *Order (I) Approving the Settlement by and Among the Debtors and the Committee with Respect to the Committee Class Claim and (II) Granting Related Relief* [Docket No. 3288].

321.    **Reservation of Rights of 168 Trading Limited**. The Debtors, the Post-Effective Date Debtors, and 168 Trading Limited ("168 Trading") agree that as between such parties, nothing in the Plan or this Confirmation Order shall discharge, prejudice, release, impair, or otherwise affect any arguments 168 Trading may have with respect to (i) the effect of rejection of any Executory Contract to which 168 Trading is a party, including, without limitation, its right to seek the return of any collateral security that it delivered to the Debtors, or (ii) the priority of the associated rejection damages claim (the "Preserved Arguments"), and any and all such Preserved Arguments are hereby expressly reserved and preserved for the benefit of 168 Trading. For the avoidance of doubt, nothing in this paragraph shall be deemed to modify Article V of the Plan.

101

322.    **Reservation of Rights of Lead Securities Plaintiffs**.  Nothing in the Plan or this Confirmation Order shall discharge, prejudice, release, impair, or otherwise affect any arguments Zack Kaplan, Ben Kaplan, Michael Kaplan, Eli Kaplan, and Michael Mazzotta, the court-appointed lead plaintiffs in the federal securities class action captioned as *Goines v. Celsius Network, LLC, et al.*, Case No. 2:22-cv04560-KM-ESK (the "Lead Securities Plaintiffs") have with respect to their rights to any applicable and available insurance policies (and the priority of any such rights).  Notwithstanding Article III.B.16 of the Plan, Section 510(b) Claims shall be preserved solely to the extent of any such available and applicable insurance, if any, and any recovery on such Section 510(b) Claims shall be solely limited to such insurance proceeds, if any.

323.    **Reservation of Rights of Retail Borrower Ad Hoc Group**.  The Debtors acknowledge that the Retail Advance Obligation Repayment Election has not been circulated to date.  The Debtors shall make commercially reasonable efforts to facilitate such third-party financing with respect to the repayment of Retail Advance Obligations, including any issues related to the timing of the Retail Advance Obligation Repayment Deadline and the distributions to be made on the Effective Date.

324.    **Reservation of Rights of the United States and/or Any Governmental Unit**.  As to any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code), nothing in the Plan or this Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Post-Effective Date Debtors are entitled to under the Bankruptcy Code, if any.  The discharge, release, and injunction provisions contained in the Plan and this Confirmation Order are not intended and shall not be construed to bar any Governmental Unit from, subsequent to the entry of this Confirmation Order, pursuing any police or regulatory action.

325. Accordingly, notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, nothing in the Plan or this Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to any Governmental Unit that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of any Governmental Unit arising on or after the Effective Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors; or (4) any liability of the Debtors or Post-Effective Date Debtors under police or regulatory statutes or regulations to any Governmental Unit as the owner, lessor, lessee or operator of property that such entity owns, operates, or leases after the Confirmation Date. Nor shall anything in this Confirmation Order or the Plan: (a) enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (b) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by any Governmental Unit are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code.

326. Moreover, nothing in this Confirmation Order or the Plan shall release or exculpate any non-debtor, including any Released Parties, from any liability to any Governmental Unit, including, but not limited to, any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties, nor shall anything in this Confirmation Order or the Plan enjoin any Governmental Unit from bringing any claim, suit, action or other proceeding against the Released Parties for any liability whatsoever; *provided*, *however*, that the foregoing sentence shall not limit the scope of discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code. Nothing contained in the Plan or this Confirmation Order shall diminish the scope of any qualified immunity, protections, or defenses to which any party is entitled under applicable law.

103

327.    Nothing contained in the Plan or this Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Post-Effective Date Debtors, nor shall the Plan or this Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan or this Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

328.    With respect to any Governmental Unit, nothing in the Plan or this Confirmation Order, including the four paragraphs above, shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the asset transfers set forth in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan. Accordingly, notwithstanding anything to the contrary in the Plan or this Confirmation Order, including Article VI.D.1 of the Plan, to the fullest extent permitted under section 1141(c) of the Bankruptcy Code, the NewCo Assets are transferred free and clear of all Claims (including Administrative Claims, Priority Claims, Secured Claims, and Unsecured Claims) and Interests arising through the Effective Time, but nothing in the Plan or this Confirmation Order releases, nullifies, precludes or enjoins the enforcement of any post-Effective Time liability to a governmental unit under police and regulatory statutes or regulations (including, but not limited to, environmental, health, and safety laws or regulations), and any associated liabilities for penalties, damages, cost recovery or injunctive relief that any entity would be subject to as the owner, lessor, lessee or operator of the NewCo Assets after the Effective Time.  Further, notwithstanding anything to the contrary in the Plan or this Confirmation Order, including Article IV.D.1 of the Plan, nothing contained in the Plan or in this Confirmation Order shall in any

way diminish the obligation of any entity, including the Debtors, Post-Effective Date Debtors, and NewCo, to comply with environmental, health, and safety laws. Nothing in the Plan or this Confirmation Order authorizes the transfer to NewCo of any licenses, permits, registrations or governmental authorizations and approvals without NewCo's compliance with all applicable legal requirements under non-bankruptcy law governing such transfers.

329. The Debtors and their successors and assigns are permanently restrained and enjoined from transacting business, directly or indirectly, as an issuer, issuer agent, broker-dealer, broker-dealer agent, investment adviser, and/or investment adviser representative or otherwise offering and/or selling securities and/or banking or money services. For the avoidance of doubt, the preceding sentence does not apply to NewCo, although NewCo shall comply with state and federal laws and regulations as required going forward. Any and all state regulatory orders and judgments issued to or against Debtors prior to or during these Chapter 11 Cases are not discharged, released, or otherwise affected by Confirmation of the Plan; *provided*, for the avoidance of doubt, that any monetary amounts provided for therein shall be treated as State Regulatory Claims under the Plan. For the avoidance of doubt, Holders of State Regulatory Claims shall be deemed to opt out of any and all releases provided by the Plan, regardless of whether or how such Holders have voted on the Plan.

330. **Provisions Regarding the Texas Comptroller of Public Accounts**. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, as to the Texas Comptroller of Public Accounts (the "Texas Comptroller"), nothing in the Plan or this Confirmation Order shall:

> c.    affect or impair any setoff or recoupment rights of the Texas Comptroller under applicable bankruptcy and non-bankruptcy law and, subject to any

limitation imposed by the Bankruptcy Code, all such rights of the Texas
Comptroller are preserved;

d.    affect or impair any rights of the Texas Comptroller to pursue any
non-Debtor third parties for tax debts or claims (except with respect to
NewCo, its directors and officers, and its Affiliates respecting tax debts or
Claims owed by Debtors arising on or prior to the Effective Date, including
Claims relating to or arising from transactions or events occurring on or
prior to, or being deemed to occur on or prior to, the Effective Date),
*provided*, *further*, that this paragraph shall not limit Article IV.D.1 of the
Plan;

e.    be construed to preclude the payment of interest and/or penalties provided
under non-bankruptcy law, if any, on Administrative Claim(s) of the Texas
Comptroller;

f.    modify the Texas Comptroller's statutory rights to post-petition and
post-Effective Date interest, and all rights thereto are preserved to the extent
permitted and limited by the Bankruptcy Code; or

g.    impose a requirement to file a request for payment for any Administrative
Claim(s) of the Texas Comptroller as a condition of its allowance or to
receive payment for such claim(s);

331.    For the avoidance of doubt, notwithstanding anything in this Confirmation Order
or the Plan to the contrary, the Texas Comptroller is deemed to have opted out of the Third-Party
Release(s) contained in the Plan and shall neither be a "Releasing Party" nor a "Released Party"
under the Plan.  Nothing in the Plan or this Confirmation Order shall release or exculpate any

non-debtor from any liability to the Texas Comptroller. The Debtors', the Post-Effective Date Debtors', and the Texas Comptroller's rights and defenses under Texas state law and the Bankruptcy Code with respect to the foregoing are fully preserved.

332.    **Provisions Regarding Stored Customer Data**. "Stored Customer Data" means information (a) that could be used, either directly or by employing additional means, to identify a customer of one of the Debtors, together with any related non-public information concerning such customer (including transactions of such customer), (b) which was provided by such customer to one of the Debtors or non-public information obtained from other sources, and (c) which is, as of the date of this Confirmation Order, stored by or under the control of one of the Debtors.

333.    A "hash" of Stored Customer Data means a representation of such data, or a portion of such data, that is rendered unreadable through application of a hash function, such that the resulting hash prepared by different parties can be compared to ascertain that the underlying data is the same (or not) without disclosing any of the underlying data.

334.    From and after the Effective Date, the Post-Effective Date Debtors, NewCo, the Litigation Administrator, and the Plan Administrator, and the service providers and professionals employed by the Post-Effective Date Debtors, NewCo, the Litigation Administrator, or the Plan Administrator (collectively, the "Representatives") shall comply with the following provisions of this Confirmation Order in relation to any use, transfer, or disclosure of Stored Customer Data.

335.    Stored Customer Data shall not be used, accessed, disclosed, or sold to any third party except:

> a. The Solicitation Agent may access and use Stored Customer Data as reasonably required to perform its services as notice, claims, and solicitation agent;

b. The Distribution Agents may exchange secure hashes of portions of Stored Customer Data as may be reasonably required in order to identify and match Holders of Claims entitled to receive a distribution to the customer records of such Distribution Agent;

c. Distribution Agents may exchange additional Stored Customer Data using secure communication means, solely as needed in order to resolve errors, handle processing exceptions, locate and match missing accounts, or resolve any other issues that would prevent the smooth and orderly distributions to Holders of applicable Claims or Interests required under this Confirmation Order, but solely to the extent that the exchange of secure hashed Stored Customer Data is insufficient;

d. Representatives shall have access to and use of the Stored Customer Data as reasonably required to comply with their respective duties, to comply with applicable laws, regulations and court orders, and to perform their respective services contemplated under the Plan and this Confirmation Order;

e. NewCo, as well as any stock transfer service, broker-dealer, custodian, clearinghouse, or other entity subject to regulation by the SEC, may receive Stored Customer Data as reasonably required solely for the purposes of distributing NewCo Common Stock in accordance with the Plan and this Confirmation Order, and only to the extent that the disclosure of Stored Customer Information is required in order to comply with applicable laws

and regulations relating to the distribution, sale, transfer, registration or custody of such NewCo Common Stock;

f.   Service providers providing services as of the date of this Confirmation Order to any of the Debtors with respect to Stored Customer Data shall have such access as required to perform services and adopt reasonable and appropriate security measures designed to protect against accidental or unlawful access or disclosure; and

g.   Any Representative may disclose Stored Customer Data as may be required pursuant to any subpoena, court order, government order, law, or regulation applicable to any of the Debtors or Post-Effective Date Debtors.

336.    The Debtors or Post-Effective Date Debtors, as applicable, shall maintain reasonable and appropriate security measures (technical, operational, and managerial) designed to protect against unauthorized access or disclosure of the Stored Customer Data from any access or use other than as authorized in this Order for so long as such Stored Customer Data is within the possession, custody, or control of any Representative.

337.    The Plan Administrator, or his or her designee, shall act as the "data controller" for the Stored Customer Data and shall be responsible for complying with applicable privacy laws and regulations relating to the Stored Customer Data.  Such data controller shall implement reasonable and appropriate security measures (technical, operational, and managerial) designed to protect against unauthorized access or disclosure for any possession, storage, use, or transfer of Stored Customer Data, which shall include adequate security assurances through legal contracts with third parties and the formulation and implementation of appropriate data security policies, in each case consistent with this Confirmation Order.

338.     The Plan Administrator shall periodically assess, in consultation with the Litigation

Administrator and legal counsel for the Post-Effective Date Debtors, whether any Stored Customer

Data is no longer required in order to fully implement the provisions of this Confirmation Order

and the Plan, to comply with applicable laws or regulations, or to preserve records in connection

with pending or anticipated litigation or governmental investigations.  To the extent that the Plan

Administrator determines in good faith that some portion of the Stored Customer Data within its

possession, custody, or control is no longer required to be maintained for any of the foregoing

purposes, the Plan Administrator will cause such portions of the Stored Customer Data to be

securely and permanently destroyed using means generally accepted in the industry as best

practices (which may be implemented through retention of a reputable data destruction service).

339.     In the event that the Plan Administrator determines in good faith that any portion

of the Stored Customer Data is no longer required to be maintained in an accessible form, but is

still required to be maintained for any of the purposes set forth in the preceding paragraph, the

Plan Administrator shall place such portions of Stored Customer Data into a long-term data storage

facility, archived and secured using generally accepted industry best practices for offline data

storage.

340.     **Authorization to Consummate**.  The Debtors are authorized to consummate the

Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the

required parties) of the conditions precedent to consummation as set forth in Article IX of the Plan.

341.     **Professional Compensation**.  All final requests for payment of Professional Fee

Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation

Date must be Filed no later than forty-five (45) calendar days after the Effective Date.

The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after

110

notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders.  The Post-Effective Date Debtors shall pay the Professional Fee Claims in Cash, including from the Professional Fee Escrow Account, in the amount the Bankruptcy Court Allows as soon as reasonably practicable after such Professional Fee Claims are Allowed.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, any such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.  Allowed Professional Fee Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

342.    As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders.  No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Post-Effective Date Debtors.

343.    The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate to the Debtors no later than five (5) calendar days prior to the anticipated Effective Date; *provided* that such estimate shall not be deemed an

admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound by such estimates in any way. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional, taking into account any prior payments. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

344.    From and after the Confirmation Date, the Debtors, or the Post-Effective Date Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Post-Effective Date Debtors, as applicable, including fees and expenses of the Debtors' professionals and counsel to the Committee incurred prior to the Committee's dissolution in accordance with Article XIII.K. of the Plan. After the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors and Post-Effective Date Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

345.    **Return of Deposits**. All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of the Bankruptcy Code during these Chapter 11 Cases, must return such deposit or other form of adequate assurance of performance to the Post-Effective Date Debtors promptly following the occurrence of the Effective Date, if not returned or applied earlier.

346. **Securities and Exchange Commission Provisions**. Notwithstanding anything to the contrary in this Confirmation Order, or any findings announced at the Confirmation Hearing, nothing in this Confirmation Order, or announced at the Confirmation Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

347. Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Post-Effective Date Debtors, which shall preserve all books, records, electronically stored information, and other documents that are currently in the Debtors' possession. The Post-Effective Date Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, and other documents without (a) providing advance notice to the Securities and Exchange Commission (c/o Therese A. Scheuer, U.S. Securities and Exchange Commission, 100 F Street, N.E., Washington, DC 20549, scheuert@sec.gov) and (b) the permission of the Litigation Administrator or authorization from the Bankruptcy Court. Nothing in the Plan or this Confirmation Order shall affect the obligations of the Debtors, the Post-Effective Date Debtors, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

348. **Federal Trade Commission Stipulation**. For the avoidance of doubt, notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, any Claim held by the Federal Trade Commission pursuant to the settlement approved by the Court dated August 14, 2023 [Docket No. 3289] shall not be subject to discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 1141(d)(6).

349.    **Revisions to Coinbase Broker Agreement**.  Notwithstanding anything to the contrary in the Plan or the Plan Supplement, including the Coinbase Prime Broker Agreement (the "Coinbase Broker Agreement") with Coinbase, Inc. and its affiliates referenced therein ("Coinbase"), or the confidential side letter referenced below, neither the Debtors nor the Post-Effective Date Debtors shall utilize any digital asset trading, brokerage, lending, or post-trade credit services with Coinbase, and any such services are expressly not approved pursuant to the Plan or this Confirmation Order.  The services that the Debtors and the Post-Effective Date Debtors are authorized to engage Coinbase to perform are limited to (i) the custodial services as set forth in Exhibit A to the Coinbase Broker Agreement, and (ii) distribution services as described generally in the Distribution and Exchange Term Sheet attached to the Coinbase Broker Agreement (the more detailed terms and conditions of which are contained in the confidential side letter agreement with Coinbase filed under seal with the Bankruptcy Court).  For the avoidance of doubt, Coinbase shall not act as distribution agent for customers who reside in the United States unless (i) such customers are ineligible to receive Liquid Cryptocurrency distributions from an active alternative Distribution Agent or (ii) the SEC does not object to an exception to the foregoing restriction upon three days' notice.

350.    **Clarification Regarding Scope of Figure Approval**.  For the avoidance of any doubt, nothing in the Plan or this Confirmation Order shall (a) constitute any approval of the Bankruptcy Court of any third-party financing terms or transactions with respect to the refinancing of Retail Advance Obligations (including, for the avoidance of doubt, the refinancing offered by Figure Technologies, Inc. and its affiliates disclosed in the Plan Supplement), or (b) modify any law or regulation applicable to any such financing or transaction.  No such Bankruptcy Court

approval is necessary because neither the Debtors nor their Estates are party to any such third-party financing transaction.

351.    **Provision Regarding EZ Blockchain Settlement Agreement**.  Notwithstanding any provision of the Confirmation Order, the Plan, or any Plan-related document to the contrary, if the EZ Blockchain Settlement Agreement is separately approved by the Bankruptcy Court: (i) nothing in the Confirmation Order, the Plan, or Plan-related documents, shall prejudice, impair, alter or modify the settlement agreement between the Debtors and EZ Blockchain Services, LLC (the "EZ Blockchain Settlement Agreement"); (ii) the EZ Blockchain Settlement Agreement (including, without limitation, the releases contained therein) shall be binding on the Debtors, the Post-Effective Date Debtors, the Plan Administrator, the Litigation Administrator, NewCo, any trustee under the Plan or any other Plan administrator, creditors' trust or liquidating trust or similar entity under the Plan and any of the foregoing parties' successors in interest (each, a "Plan Party," and collectively, the "Plan Parties"); (iii) upon approval of the EZ Blockchain Settlement Agreement, any Causes of Action released under the EZ Blockchain Settlement Agreement shall be deemed released under the Plan, and for the avoidance of doubt, shall not vest with or be transferred to any Plan Party or other party (the timing of the effective date of the releases under the EZ Blockchain Settlement Agreement shall not limit the foregoing, and the foregoing will still be binding if the entry of the Settlement Approval Order (as defined in the EZ Blockchain Settlement Agreement) occurs after the Effective Date of the Plan); *provided* that, if the EZ Blockchain Settlement Agreement is not approved by the Bankruptcy Court, the Debtors and EZ Blockchain reserve all rights with respect to the disputes under the hosting agreements dated January 27, 2022, February 22, 2022, and March 15, 2022; (iv) in the event of a conflict between any provision of the EZ Blockchain Settlement Agreement and the Confirmation Order, the Plan,

or any Plan-related documents, the terms of the EZ Blockchain Settlement Agreement shall control; (v) nothing in the Confirmation Order, the Plan, or Plan related documents shall modify, impair, prejudice or interfere with EZ Blockchain Services, LLC and its Related Parties' setoff and/or recoupment rights; and (vi) EZ Blockchain and any of its Related Parties will not be subject to any third party releases in this Confirmation Order, the Plan, or any Plan-related document.

352.     **Compliance with Tax Requirements**.  In connection with the Plan, to the extent applicable, the Debtors, the Post-Effective Date Debtors, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Debtors, the Post-Effective Date Debtors, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding down a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Post-Effective Date Debtors, acting directly or through their agents, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond.  The Debtors, the Post-Effective Date Debtors, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

353.    **Exemption from Certain Taxes and Fees**.  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Debtor, a Post-Effective Date Debtor, or NewCo and/or its subsidiaries or to any other Person or Entity) of property under the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors, the Post-Effective Date Debtors, or NewCo; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

117

354.    **Orderly Wind Down**.  Subject to Bankruptcy Court approval, the Debtors will effectuate an Orderly Wind Down if, at any time after Confirmation of the Plan, the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interests of the Estates due to complications or delays in implementing the NewCo Transaction.  In the event the Debtors and the Committee pursue an Orderly Wind Down, distributions under the Plan shall be funded from the Wind-Down Assets.

355.    To toggle to an Orderly Wind Down, the Debtors shall:  (a) provide written notice to the Plan Sponsor pursuant to the terms of the Plan Sponsor Agreement, (b) consult with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann, Daniel Frishberg, Cameron Crews, and Ignat Tuganov regarding the decision to toggle, (c) provide the U.S. Trustee with written notice at least five (5) business days prior to filing the Wind-Down Motion, to the extent reasonably practicable, and (d) file the Wind-Down Motion, which shall include the Wind-Down Procedures.  Parties in interest shall have no fewer than ten (10) days to object to the Wind-Down Motion.  In the event of a timely objection, the Bankruptcy Court will hold a hearing regarding the Wind-Down Motion.  In the event the Bankruptcy Court enters an order granting the Wind-Down Motion, no amended Plan or amended Confirmation Order shall be required to implement an Orderly Wind Down.

356.    In the event that the Debtors elect to toggle to the Orderly Wind Down, the terms of the Orderly Wind Down shall be no worse than those contained in the Backup Plan Administrator Term Sheet.

357.    Once the Wind-Down Motion is approved, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions as may

be deemed necessary or appropriate to consummate the Orderly Wind Down pursuant to the Wind-Down Procedures and the Plan.

358.    **Documents, Mortgages, and Instruments**.  Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring Transactions, and this Confirmation Order.

359.    **Notice of Subsequent Pleadings**.  Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date will be limited to the following parties:  (a) the Post-Effective Date Debtors and their counsel; (b) the U.S. Trustee; (c) counsel to NewCo; (d) counsel to the Litigation Administrator, (e) any party known to be directly affected by the relief sought by such pleadings; and (f) any party that has previously requested notice or who files a request for notice under Bankruptcy Rule 2002 after the Effective Date.  The Solicitation Agent shall not be required to file updated service lists.

360.    **Choice of Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, documents, instruments, or contracts, in which case the governing law of such agreement shall control); *provided* that corporate, limited liability company, or partnership governance matters relating to the Debtors or the Post-Effective Date Debtors, as applicable, shall be governed by the laws of the jurisdiction of incorporation or formation of the

relevant Debtor or Post-Effective Date Debtor, as applicable; *provided*, *further*, that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents. To the extent it is not legally permissible for the Bankruptcy Court to have exclusive jurisdiction over any of the foregoing matters, the Bankruptcy Court shall have non-exclusive jurisdiction over such matters to the fullest extent legally permissible.

361. **Protection Against Discriminatory Treatment**. Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Person or Entity, including Governmental Units, shall discriminate against the Post-Effective Date Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Post-Effective Date Debtors, or another Entity with whom the Debtors or Post-Effective Date Debtors have been associated, solely because such Debtor has been a debtor under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

362. **Dissolution of Statutory Committees**. Following the Effective Date, the Committee shall survive for the purpose of filing, prosecuting, reviewing, and objecting to any applications for compensation and reimbursement of expenses filed pursuant to Article II.B of the Plan. The Post-Effective Date Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date, except

for the purposes set forth in the immediately preceding sentence.  Upon the resolution of all matters set forth in this paragraph, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases.

363.    **Issuance of NewCo Common Stock**.  NewCo is hereby authorized to issue, or cause to be issued, and shall issue the NewCo Common Stock on or as soon as reasonably practicable following the Effective Date, in accordance with the terms of the Plan without the need for any further corporate action.  The Debtors, Post-Effective Date Debtors, or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof. All of the NewCo Common Stock issuable under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable when so issued.

364.    **Issuance of Employee and NewCo Board Equity Compensation**.  NewCo is hereby authorized to issue, or cause to be issued, and shall issue the Employee and NewCo Board Equity Compensation on or as soon as reasonably practicable following the Effective Date and thereafter, in accordance with the terms of the Plan without the need for any further corporate action.  The Debtors, Post-Effective Date Debtors, or NewCo, as applicable, shall be authorized to take any action necessary or appropriate in furtherance thereof.  All of the Employee and NewCo Board Equity Compensation issuable under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable when so issued.

365.    **Exemption from Registration**.  The offering, issuance, distribution, and sale of the NewCo Common Stock issued in connection with the satisfaction, settlement, release, and discharge of Allowed Claims pursuant to the Plan shall be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws, in reliance upon section 1145 of the Bankruptcy Code to the maximum extent

permitted and applicable and, to the extent that reliance on such section is either not permitted or not applicable, any other exemption available under the Securities Act, including the exemption set forth in section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Except as set forth in the Plan, any securities issued in reliance upon section 1145 of the Bankruptcy Code shall not be "restricted securities" as defined in Rule 144(a)(3) of the Securities Act and will be freely tradeable and transferable, on or as promptly as practicable after the Effective Date, by any initial recipient thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with the rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions, if any, on the transferability of such securities and instruments, including those set forth in the New Organizational Documents; and (d) applicable regulatory approval, if any.

366.    All other NewCo Common Stock issued or sold on the Effective Date will be issued or sold in reliance on the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D thereunder.  All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder are "restricted securities" and will be subject to resale restrictions, including any applicable holding periods, and may be resold, exchanged, assigned, or otherwise transferred only pursuant to an available exemption from registration under the Securities Act, including compliance with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available), or if such Securities are registered with the Securities and Exchange Commission.

367.    The Post-Effective Date Debtors need not provide any further evidence other than the Plan or the Confirmation Order to any Entity (including The Depository Trust Company and

any transfer agent for the NewCo Common Stock) with respect to the treatment of the NewCo

Common Stock to be issued under the Plan under applicable securities laws, and the Plan or this

Confirmation Order shall be deemed to be legal and binding obligations of NewCo in all respects,

without the need for any further corporate action.  The Debtors, Post-Effective Date Debtors, or

NewCo, as applicable, are authorized to take any action necessary or appropriate in furtherance

thereof.

368.    **Substantial Consummation**.  On the Effective Date, the Plan shall be deemed to

have been substantially consummated or shall be anticipated to be substantially consummated

concurrent with the occurrence of the Effective Date.

369.    **Severability**.  Each term and provision of the Plan, as it may have been altered or

interpreted in accordance with the foregoing, is (a) valid and enforceable in accordance with its

terms; (b) integral to the Plan and may not be deleted or modified except in accordance with

Article XI of the Plan; and (c) nonseverable and mutually dependent.

370.    **Local Rules 3021-1(b) and 3022-1**.  Pursuant to Local Rule 3021-1(b), the time

table for achieving substantial consummation of the Plan and entry of a final decree closing the

Chapter 11 Cases is as follows:

a.    *Substantial Consummation of the Plan*.  The Debtors currently anticipate

that the Effective Date and substantial consummation of the Plan will occur

on or before December 31, 2023, or as soon as reasonably practicable

thereafter.

b.    *Distributions*.  On the Effective Date or as soon as reasonably practicable

thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on

the date that such Claim becomes Allowed or as soon as reasonably

practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class, consistent with the provisions of Article IV of the Plan.

c.      *Resolution of Claims*.  The Debtors, the Post-Effective Date Debtors, the Plan Administrator, and any Litigation Administrator, as applicable, shall resolve Disputed Claims against the Estates consistent with the provisions of Article VII of the Plan.

d.      *Post-Confirmation Status Reports*.  The Post-Effective Date Debtors shall file post-Confirmation disbursement and status reports every six (6) months until the Chapter 11 Cases are closed by means of a final decree, converted to a case under chapter 7, or dismissed, whichever happens earlier.

e.      *Motion for Final Decree*.  Consistent with Bankruptcy Rule 3022 and Local Bankruptcy Rule 3022-1, no later than fourteen (14) days following the full administration of the applicable Estates, the Plan Administrator shall file, on notice to the U.S. Trustee, an application and a proposed order for a final decree.

371.    **Limited Waiver of Fourteen-Day Stay**.  Notwithstanding any Bankruptcy Rule (including, without limitation, Bankruptcy Rules 3020(e), 6004(h), 6006(d), and 7062) to the contrary, this Confirmation Order is effective immediately and not subject to any stay; *provided* that the Plan shall not be substantially consummated for at least fourteen days following the Confirmation Date.

124

372.    **Headings**.  Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

373.    **Effect of Confirmation Order on Other Orders**.  This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order; *provided* that, unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in the Chapter 11 Cases pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 9019 unless specifically stated otherwise.

374.    **Cooperating Witness Order**.  The *Order (I) Authorizing the Debtors to Enter into Witness Cooperation Agreements with Certain Current and Former Employees, (II) Authorizing Reimbursement of Past and Future Out-of-Pocket Expenses of Cooperating Witnesses, Including Future Attorney's Fees, and (III) Granting Related Relief* [Docket No. 3515] shall be deemed amended to clarify that all references to "current or former employees" refer to current or former employees of the Debtors *or any non-Debtor subsidiary of any Debtor, as reflected in the organizational chart set forth in Article V.A.1 of the Disclosure Statement*.

375.    **Exclusivity**.  The Debtors' exclusive period to solicit the Plan is tolled *sine die* unless and until the Confirmation Order is revoked.  If the Confirmation Order is revoked, the Debtors' exclusive period to solicit the Plan shall be extended through and including fourteen days after such revocation absent further order of the Bankruptcy Court; *provided* that nothing herein modifies the eighteen-month outside date in section 1121(d)(2)(A) of the Bankruptcy Code.

376.    **Inconsistency**.  In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in

the Plan Supplement shall control. In the event of an inconsistency between the Plan Sponsor Agreement and the Plan, the Plan shall control. In the event of an inconsistency between the Backup Plan Sponsor Agreement and the Plan, the Plan shall control. In the event of an inconsistency between the Confirmation Order and the Plan (including the Plan Supplement), this Confirmation Order shall control.

377.    **Injunctions and Automatic Stay**. Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the effective date, all injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

378.    **Final, Appealable Order**. This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

379.    **Retention of Jurisdiction**. The Bankruptcy Court may properly, and upon the Effective Date shall, to the full extent set forth in the Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including the matters set forth in Article XI of the Plan.

Dated:    November 9, 2023
         New York, New York

                              *Martin Glenn*
                              MARTIN GLENN
                         Chief United States Bankruptcy Judge

126