Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 22-10964-MG

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    CELSIUS NETWORK LLC

8

9            Debtors.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    One Bowling Green

14                    New York, NY  10004

15

16                    October 3, 2023

17                    09:02 AM

18

19

20

21    B E F O R E :

22    HON Martin Glenn

23    U.S. BANKRUPTCY JUDGE

24    ECRO:  Karen

25

1    HEARING re Doc# 3667 Statement / Notice of Debtors

2    Confirmation Hearing Demonstratives For October 3, 2023

3    (related document(s)3609, 3577)

4

5    Doc# 3668 Statement / Notice of Debtors Confirmation Hearing

6    Witnesses for October 3, 2023 (related document(s)3609, 3577

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Dani Rossean

25

1    A P P E A R A N C E S :

2

3    Kirkland & Ellis LLP

4        Attorneys for Debtors

5        601 Lexington Avenue

6        New York, NY 10022

7

8    BY:  Judson Brown, Chris Koenig, T.J. McCarrick, Elizabeth

9    Jones, Jeremy Young

10

11    White & Case LLP

12        Attorneys for the Committee

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16    BY:  Aaron Colodny, Keith Woffard, Joshua Weedman

17    Jeffrey Sabin

18

19    WITNESSES:

20

21    Christopher Ferraro

22    Steven Kokinos

23

24

25

Page 4

1    ALSO APPEARING TELEPHONICALLY:

2    Office of the US Trustee

3    By:  Shana Cornell, Mark Brah, Brian Masumoto

4

5    Dimitry Kirsanov

6    Otis Davis

7    Jason Lovine

8    Richard Phillipos

9    Johan Bronge

10   Arthur Abreu

11   Victor Ubierna de las Heras

12   Sami Sheik

13   Jeff Patton

14   Sharon Dow

15   Simon Dixon

16

17

18

19

20

21

22

23

24

25

Page 5

P R O C E E D I N G S

1

2

3          THE COURT:  Please be seated. All right. Good

4    morning, everyone. Before we start with the testimony, I

5    wanted to raise one thing with the Debtor, the Committee,

6    the US Trustee. The Consumer Privacy Ombudsman, Lucy

7    Thomson, filed a request to be able to testify remotely for

8    cross-examination. Her -- the document is ECF Document 3589.

9    She attached to it -- there's the letter requesting

10   permission. There is a copy of her purported direct

11   testimony. I'm assuming she's not a lawyer.

12          What she submitted as her testimony is not under

13   oath. The -- I don't know, the thrust of what her purported

14   -- of her statement was that she's continuing to work with

15   the Debtors and Committee, I guess the US Trustee, in trying

16   to finalize privacy arrangements, primarily with NewCo. Rule

17   43(A) of the Federal Rules of Civil Procedure is applicable

18   with respect to whether or not someone can appear remotely

19   for testimony. What I would ask is that between the Debtor,

20   the Committee, and the US Trustee, reach out to Ms. Thomson.

21   Her letter request doesn't satisfy the requirements. It just

22   would be -- she's in Washington. It would be inconvenient

23   for her to come. I understand.

24          What's not clear to me is whether the Debtor or

25   the Committee or the US Trustee intends to cross-examine

1    her. It may well be that there isn't going to be any cross-

2    examination, in which case, her direct -- assuming that

3    she'll need to correct that so that it's under oath -- would

4    come in. But if there's going to be cross-examination, she's

5    going to have to come. I mean, just the inconvenience, I

6    mean, is not sufficient. If you all agree that she's not

7    going to be cross-examined -- I understand a lot of other

8    parties and interests. But if the Debtor, the Committee and

9    the US Trustee agree that she can submit her testimony,

10    direct testimony without cross-examination, I'm not going to

11    require her to come to New York. But she's going to have to

12    fix it and put it under oath. But reach out and see whether

13    -- I don't know. Mr. Koenig, what's the status of efforts to

14    resolve matters with Ms. Thomson?

15          MR. KOENIG:  Good morning, Your Honor.

16          THE COURT:  Mr. McCarrick's running up here. I

17    don't know whether --

18          MR. KOENIG:  Good morning, Your Honor.

19          THE COURT:  It's his exercise for the day, but --

20    go ahead. Good morning.

21          MR. KOENIG:  Good morning, Your Honor. Chris

22    Koenig, Kirkland & Ellis, for the Debtors. We've been

23    working with Ms. Thomson collaboratively to try to resolve

24    matters, and we have included language in the Proposed

25    Confirmation Order that we proposed with her. We've been

Page 7

1    working with her. I don't believe she's signed off on it

2    yet. We're also working on a formal privacy policy that

3    would apply to NewCo. So it's all in motion.

4              THE COURT:  Okay.

5              MR. KOENIG:  I would say well in motion, but it's

6    not quite done yet.

7              THE COURT:  So I -- the three parties who I

8    suggested, see whether you can get things resolved.

9              MR. KOENIG:  We certainly will.

10             THE COURT:  I don't know if there's any particular

11   order in which she needs to testify, but it wasn't clear to

12   me that there would be cross-examination. Hopefully you'll

13   be able to resolve the issue. I mean, she raises serious

14   issues. I'm not questioning that.

15             MR. KOENIG:  No, we certainly agree. We've been

16   working with her to try to address her issues and, you know,

17   fulfill, make sure that she can fulfill her mandate.  Thank

18   you, Your Honor.

19             THE COURT:  Okay.  Thank you very much. All right,

20   let's begin with -- is there -- let me ask this, is there

21   anything that you wish to raise before we call the first

22   witness?

23             MR. BROWN:  No, Your Honor. Ready to proceed.

24             THE COURT:  You have to identify yourself as well.

25             MR. BROWN:  Good morning, Your Honor.  Judson

Page 8

1    Brown from Kirkland & Ellis on behalf of the Debtors. We'll

2    begin with Mr. Chris Ferraro this morning.

3              THE COURT:  Okay. Come on up, Mr. Ferraro.

4              MR. BROWN:  Your Honor, while Mr. Ferraro's

5    getting situated, we have a binder with various exhibits

6    that we might use, including Mr. Ferraro's Declarations. If

7    I might hand those to Mr. Ferraro in Court while he's

8    getting situated.

9              THE COURT:  Sure.  Please.

10             MR. BROWN:  Thank you.

11             THE COURT:  Carrie, if you would -- Mr. Ferraro,

12   if you would, raise your right hand.

13             THE CLERK:  Do you solemnly swear or affirm all

14   the testimony you're about to give before this Court is the

15   truth and the whole truth?

16             MR. FERRARO:  I do.

17             THE COURT:  Thank you.

18             MR. BROWN:  Your Honor, may I proceed?

19             THE COURT:  Please.

20             MR. BROWN:  Good morning, Mr. Ferraro. I know

21   you've testified in front of this Court many times, both

22   formally and informally. But can you please introduce

23   yourself for the record?

24             MR. FERRARO:  Yeah, good morning, everybody. My

25   name is Christopher Ferraro. I am the acting CEO, Chief

Page 9

1    Restructuring Officer, and Chief Financial Officer of

2    Celsius. I've been with the company since March of 2022. I

3    originally started as the Head of Planning and Analysis and

4    Investor Relations. I became the CFO the day before the

5    Petition, and I became the CEO, Acting CEO in late

6    September. I come off of a almost two-decade career with JP

7    Morgan where I was a Managing Director, and ran Global

8    Financial Analysis, as well as a Senior Managing Director at

9    Cerberus.

10          MR. BROWN:  And can you just briefly describe some

11   of your responsibilities as the Interim CEO and the CRO of

12   the Debtors over the course of the last year plus?

13          MR. FERRARO:  Yeah. From the very beginning, I hit

14   the ground running. I think it was very important that we

15   were aligned with the Committee.  So, in conversations with

16   the Committee chairs, we were able to kind of find out the

17   trajectory of this case -- where they were, where we were.

18   We started off in, you know, my tenure in October by really

19   kicking the tires. There was a sales marketing process that

20   was just kicking off, that Ryan Kielty will talk about

21   later. But -- and we were also internally looking at a

22   standalone plan. So we were spending a ton of time trying to

23   develop a standalone plan while that process was going.

24          When bids of interest came back, you know, I think

25   we all determined that the best course of action was a

Page 10

1    sponsor plan, and that led us to the stalking horse,

2    NovaWulf, and then we went into the auction. The auction

3    lasted a long time. I mean, this was on the back of, I

4    think, seven, eight-month sales and marketing process, four

5    weeks.  We were able to drive a lot, preserve a lot of value

6    for the creditors.  I think we distributed a hundred, we had

7    the ability to distribute hundreds of millions more

8    cryptocurrency, and lower management fees. That all led into

9    kind of naming Fahrenheit.  We felt that they had the best

10   plan and the best management team.  And then, we went into

11   kind of a plain sponsor agreement, settlements, et cetera,

12   leading up to everything to where we are today.

13          MR. BROWN:  We'll get into a little bit more of

14   those details. Just want to take a minute. Over the course

15   of the Debtors' restructuring, you submitted various

16   declarations in support of various requests and motions that

17   the Debtors have put before the Court, correct?

18          MR. FERRARO:  Yes.

19          MR. BROWN:  I want to take a look at a couple of

20   those this morning. I want to start, in your binder, it's

21   Celsius Exhibit 44. If you can flip to that, please,

22   Mr. Ferraro.

23          MR. FERRARO:  I'm there.

24          MR. BROWN:  Do you recognize this Declaration,

25   sir?

Page 11

```
 1                MR. FERRARO:  Yes.

 2                MR. BROWN:  And is this the Declaration that you

 3    submitted in support of confirmation?

 4                MR. FERRARO:  Yes.

 5                MR. BROWN:  And if you'll flip to the last page,

 6    is that your signature, Mr. Ferraro?

 7                MR. FERRARO:  Yes, it is.

 8                MR. BROWN:  And is everything in this Declaration

 9    true and accurate to the best of your knowledge,

10    Mr. Ferraro?

11                MR. FERRARO:  Yes, it is.

12                MR. BROWN:  You adopt it as your testimony here

13    today?

14                MR. FERRARO:  Yes, I do.

15                MR. BROWN:  Your Honor, the Debtors would move

16    Celsius Exhibit 44 into evidence.

17                THE COURT:  Any objections? Exhibit 44 is in

18    evidence.

19                (Debtors' Exhibit 44 Received into Evidence)

20                MR. BROWN:  Now, Mr. Ferraro, I want to take a

21    look at another Declaration you submitted in this case. It

22    is Celsius Exhibit 34. It is also in your binder. If you'll

23    flip to it and let me know when you're there.

24                MR. FERRARO:  I'm there.

25                MR. BROWN:  Do you recognize this document, sir?
```

1              MR. FERRARO:  I do.

2              MR. BROWN:  What is it?

3              MR. FERRARO:  This is the -- my Declaration in

4     Support of a Backup Plan Sponsor.

5              MR. BROWN:  And if we flip to the last page there,

6     the last substantive page, is that your signature, sir?

7              MR. FERRARO:  Yes, it is.

8              MR. BROWN:  And is everything in this Declaration

9     true and accurate to the best of your knowledge?

10             MR. FERRARO:  Yes, it is.

11             MR. BROWN:  And you adopt that as additional

12    portions of your testimony here today, sir?

13             MR. FERRARO:  Yes, I do.

14             MR. BROWN:  Your Honor, the Debtors would move

15    Celsius Exhibit 34 into evidence.

16             THE COURT:  Any objections?  It's admitted into

17    evidence.

18             (Debtors' Exhibit 34 Received into Evidence)

19             MR. BROWN:  And lastly, Mr. Ferraro, I want to

20    look at one more Declaration you submitted in this case. It

21    is in your binder. It's Celsius Exhibit 37. If you can flip

22    there for me.

23             MR. FERRARO:  I'm there.

24             MR. BROWN:  And do you recognize that Declaration?

25             MR. FERRARO:  Yes, I do.

Page 13

1              MR. BROWN:  And what is it?

2              MR. FERRARO:  This is my Declaration in Support of

3    the Proposed CEL Token Settlement.

4              MR. BROWN:  And if you flip to -- do you see at

5    the top there's a written -- it's got page number out of

6    147. You see where I'm at?

7              MR. FERRARO:  Yeah, I do.

8              MR. BROWN:  If you flip to Page 13 of 147, is that

9    your signature?

10             MR. FERRARO:  Yes, it is.

11             MR. BROWN:  And are the contents of this

12   Declaration true and accurate to the best of your knowledge?

13             MR. FERRARO:  Yes, they are.

14             MR. BROWN:  And do you adopt that as additional

15   portions of your direct testimony here today, sir?

16             MR. FERRARO:  I do.

17             MR. BROWN:  Your Honor, the Debtors would move

18   Celsius Exhibit 37 into evidence.

19             THE COURT:  Any objections? All right. It's

20   admitted into evidence as well.

21             (Debtors' Exhibit 37 Received into Evidence)

22             MR. BROWN:  Thank you. Now, Mr. Ferraro, you just

23   submitted or admitted a number of declarations.  I just want

24   to take a minute and talk about a couple of different

25   aspects of those Declarations, just to highlight them for

Page 14

1    the Court here. I want to start with confirmation.  Can you

2    just describe for the Court briefly the process that you and

3    the Debtors and their advisors undertook to get to the

4    proposed Plan of Confirmation before the Court today?

5              MR. FERRARO:  Yeah, I mean, it -- again, it all

6    started many, many, many months ago, as we started to wind -

7    - kind of whittle down our options. That led into the

8    auction. We had three qualified bidders at the auctions, all

9    acting in good faith. Throughout the auction, we were

10   aligned with the creditors. And the goal was always to

11   maximize value and get out of bankruptcy as fast as

12   possible. We continued those discussions across all of those

13   parties -- the sponsor, the backup sponsor, the Debtors, the

14   Committee -- throughout negotiating the contracts. You know,

15   providing additional settlements to move these matters

16   behind us. And that's where we are today.

17             MR. BROWN:  And how would you describe the

18   negotiations between the various parties who participated in

19   this process along the many months, as you've described?

20             MR. FERRARO:  As a guy who does not like conflict,

21   it was not fun for me. And it went very, very slow, just

22   like the auction. But it was fruitful, so it all worked out

23   in the end.

24             MR. BROWN:  Now, the plan, the proposed plan

25   before the Court, includes various releases and exculpations

1     and an injunction. Are you familiar with those provisions of

2     the plan, Mr. Ferraro?

3               MR. FERRARO:  Yes, I am.

4               MR. BROWN:  Can you just describe them at a high

5     level for the court, what your understanding of them is?

6               MR. FERRARO:  Yeah. I mean, these are, again,

7     hard-fought negotiated things which consideration was

8     exchanged. I think the, on the Debtors' piece, Debtors'

9     release, I'd just like to say that, you know, the settlement

10    agreement on the preference actions, I think, brings a lot

11    of closure and comfort to people. That was very important.

12    On the -- also on those release sides, the employees have ,

13    you know, been through a lot in this year, in, you know,

14    three months. I think it's important for the ones that did

15    not commit any bad acts to be released.

16              And then there's consensual third-party releases

17    that were part of the solicitation of ballot process. And

18    then the exculpations is, you know, there's a lot of

19    uncertainty in the regulatory environment. Distributing $2

20    billion of liquid crypto is not easy and always clear, and I

21    think these -- that's an important protection. And then on

22    the injunction side is the arms and legs to make sure that,

23    you know, releases and exculpation operate and are executed.

24              MR. BROWN:  From your perspective, Mr. Ferraro,

25    are these releases -- the Debtor release, the third-party

Page 16

1    release, the exculpation, the injunction -- are these

2    appropriate and necessary provisions in the plan?

3              MR. FERRARO:  Absolutely. A lot of effort,

4    investigations went into this as well. These, like

5    everything in this case, hard fought and highly negotiated.

6              MR. BROWN:  I want to talk about another aspect of

7    the plan. You testified a moment ago that you selected

8    Fahrenheit to be the proposed path for emergence for

9    reorganization for the company. Can you just describe, from

10   your perspective, is the Fahrenheit path one that is

11   executable?  Is it feasible, in your view, Mr. Ferraro?

12             MR. FERRARO:  Yeah. Let me step back and just hit

13   some notes on the Fahrenheit plan, 'cause I think it's

14   important. This is a -- this is a company that has a $1.25

15   billion balance sheet. I think Stout and Joel Cohen will

16   come up and talk about some of that work that was done that

17   goes into those numbers. This is -- NewCo will be a company

18   that has $450 of liquid crypto, that it can vest into

19   staking, creating anywhere from 10 to 20 million dollars per

20   year right out of the gate. It has a mining business that is

21   healing and getting better by the day, has 125,000 rigs. No

22   debt. It has an excellent mining manager in the US Bitcoin.

23   I've been truly impressed, and this is one of the reasons

24   why they were selected.

25             And, you know, I think, all in all, at the end of

Page 17

1   the day, if you look at it, we've been operating in a very

2   difficult time over the last 15 months in mining. We had

3   positive EBITDA, adjusted EBITDA, throughout the entire

4   time.  I think it was a low point of 250,000 in December

5   2022. Approximately 50 percent of that 20 million EBITDA

6   over the last 15 months was made in the summer months, the

7   three summer months. So there was a lot of effort that went

8   into that, risk management, hedging, et cetera, and I think

9   we're delivering a great set of assets to the NewCo. And

10  this should be a company that has a great future.

11          MR. BROWN:  So I just want to tease that out for a

12  second, Mr. Ferraro. Did you -- were you saying that the

13  mining business itself had generated adjusted EBITDA over

14  the course of restructuring of approximately $20 million?

15          MR. FERRARO:  Yeah, that's correct.

16          MR. BROWN:   And did you say that approximately 10

17  million of that alone, approximately half of it, was

18  generated just in the summer months?

19          MR. FERRARO:  That's correct.

20          MR. BROWN:  And so, what does that suggest to you

21  for the future of the mining business going forward under

22  Fahrenheit's operation?

23          MR. FERRARO:  Significant earnings power. No debt.

24  Ability, downside protection. It's important for everybody

25  to understand that in mining, if your marginal costs are

1   higher than your marginal revenue, you curtail. So your

2   downside protection is kind of limited to your OpEx, your,

3   you know, fixed costs and such. So, you know, it's a strong

4   balance sheet with a very, you know, stable business from

5   the standpoint of minimizing losses.

6           MR. BROWN:  Now, if the Fahrenheit path is not

7   executable for whatever reason -- regulatory concern,

8   whatever -- what's the Debtors' alternative, Mr. Ferraro?

9           MR. FERRARO:  Yeah, so in our plan there is a

10  backup bid, with the backup sponsor being the BRIC. And we -

11  - given all the uncertainties in the regulatory landscape,

12  the volatility of the asset, et cetera, we thought it was

13  incredibly important to have a backup bid. We want to return

14  value to customers as soon as possible. They need the

15  liquidity. And part of the reason to have this backup bid

16  was so that we could tip it and not have to spend months

17  kind of looking for somebody to help us with this. This is a

18  different structure, I think it has a very different

19  regulatory kind of risk to it. So, we thought that this made

20  a lot of sense, given the fact that, you know, bankruptcy's

21  expensive and we want to return value.

22          MR. BROWN:  Now, I want to switch gears for a

23  second. We admitted your Declaration concerning the CEL

24  Token. I want to talk about that for just a second. In that

25  Declaration, did you identify a market price for CEL Token

1    as of the pause date?

2          MR. FERRARO:  Yes, 12:00 p.m. Eastern on the pause

3    date, .28 cents.

4          MR. BROWN:  And just so the record's clear, I

5    think we all know what it is, but can you just describe what

6    a pause date is?

7          MR. FERRARO:  June 12th, 2022.

8          MR. BROWN:  And what happens?

9          MR. FERRARO:  We pause withdrawals, swaps,

10   transfers, et cetera.

11         MR. BROWN:  And the market price of the CEL Token

12   at the end of the day on the pause was what, Mr. Ferraro?

13         MR. FERRARO:  It was .28 cents.

14         MR. BROWN:  Okay.  Now, I want to talk about some

15   of the events that led up to that pause. And to do that, I

16   want to look at a couple of exhibits in the binder. I want

17   to start with Exhibit 69. And Your Honor, I want to pause

18   here and note that this exhibit was added to the Debtors'

19   Exhibit List in an Amended Exhibit List filed last night. I

20   do not believe you have a hard copy in your binder, but I

21   have some for you. May I approach?

22         THE COURT:  Yes, please. Thank you.

23         MR. BROWN:  Mr. Ferraro, are you at Celsius

24   Exhibit 69 in your binder?

25         MR. FERRARO:  Yes, I am.

Page 20

1          MR. BROWN:  And this is a pleading filed on the

2     docket in this case, and the caption says 'Notice of

3     Consensual Resolution of Government Investigations.' Do you

4     see that?

5          MR. FERRARO:  Yes.

6          MR. BROWN:  I want to look at one particular

7     exhibit to this pleading. It's back on Page 6, is where it

8     begins.

9          THE COURT:  What page numbers -- are you using the

10    page numbers at the bottom of the page or the page up?

11         MR. BROWN:  At the top, Your Honor. And I will

12    clarify that for the record. Mr. Ferraro, you see the ribbon

13    at the top? Let's go to Page 6 of 233.

14         MR. FERRARO:  I'm there.

15         MR. BROWN:  And do you recognize this document,

16    sir?

17         MR. FERRARO:  Yes, I do.

18         MR. BROWN:  What is it?

19         MR. FERRARO:  This is a Non-Prosecution Agreement

20    between Celsius and the Government.

21         MR. BROWN:  And does this Agreement continue from

22    Page 6 over through Page 10 of 233?

23         MR. FERRARO:  Yes.

24         MR. BROWN:  And on Page 10 of 233, is that your

25    signature, Mr. Ferraro?

Page 21

1           MR. FERRARO:  Yes, it is. Yes.

2           MR. BROWN:  Did you sign this Non-Prosecution

3    Agreement on behalf of Celsius?

4           MR. FERRARO:  Yes, I did.

5           MR. BROWN:  Is this a fair and accurate copy of

6    the Non-Prosecution Agreement that you executed,

7    Mr. Ferraro?

8           MR. FERRARO:  To the best of my knowledge, yes, it

9    is.

10          MR. BROWN:  Your Honor, the Debtors would move --

11   I really just want to move Pages 6 through 10 of Exhibit 69

12   into evidence. And we can supply the Court with just those

13   limited pages, if you would like. But I want to move those

14   five pages, 6 through 10, into evidence.

15          THE COURT:  Any objections? Pages 6 through 10 of

16   the 233-page document, which is ECF 3293, are admitted in

17   evidence.

18          (Debtors' Exhibit 69 Pages 6 Through 10 Received

19   into Evidence)

20          MR. BROWN:  Thank you, Your Honor. Now,

21   Mr. Ferraro, let's go back to the first page of this Non-

22   Prosecution Agreement. Can you please just review to

23   yourself the first paragraph of the Agreement, let me know

24   when you're done.

25          MR. FERRARO:  Yeah, I've read it.

Page 22

1                MR. BROWN:  And do you see where it talks about a

2      scheme to defraud investors by Celsius?

3                MR. FERRARO:  Yes, I do.

4                MR. BROWN:  And what does this Non-Prosecution

5      describe as the scheme to defraud investors, sir?

6                MR. FERRARO:  In non-legal terms, making false

7      statements, misrepresentations and manipulating CEL Token

8      price.

9                MR. BROWN:  Now, I want to look at the last

10     exhibit in your binder. Mr. Ferraro, it is on the tab UCC

11     195. This is a document on the Unsecured Creditor Committee

12     Exhibit List at 195. Do you have that document?

13               MR. FERRARO:  Yes, I do.

14               MR. BROWN:  Do you recognize it?

15               MR. FERRARO:  Yes, I do.

16               MR. BROWN:  What is it?

17               MR. FERRARO:  This is the Statement of Facts

18     Related to the Non-Prosecution Agreement.

19               MR. BROWN:  And just so we're clear, the Non-

20     Prosecution agreement that we just -- the five pages of

21     Exhibit 69 that were just admitted into evidence had, as an

22     attachment, this Statement of Facts?

23               MR. FERRARO:  Yes.

24               MR. BROWN:  And UCC 195 is the Statement of Facts

25     that was attached to the Non-Prosecution Agreement?

Page 23

1              MR. FERRARO:  Yes, it is.

2              MR. BROWN:  And are you familiar with the

3     Statement of Facts, Mr. Ferraro?

4              MR. FERRARO:  Yes. Yes, I am.

5              MR. BROWN:  Did you review them in conjunction

6     with executing the Non-Prosecution Agreement?

7              MR. FERRARO:  Yes, I did.

8              MR. BROWN:  Are these a fair and accurate copy of

9     the Statement of Facts attached to the Non-Prosecution

10    Agreement?

11             MR. FERRARO:  Yes, yes, they are.

12             MR. BROWN:  Your Honor, the Debtors would move UCC

13    Exhibit 195 into evidence.

14             THE COURT:  Any objections? All right, UCC 195 is

15    admitted into evidence.

16             (Debtors' Exhibit UCC 195 Received into Evidence)

17             MR. BROWN:  Now, Mr. Ferraro, I want to just ask

18    you, you talked about the market price that you identified

19    for CEL, CEL Token, as of the pause date. Are you -- from

20    your perspective at the company, as an executive at Celsius,

21    are you aware of any evidence, anything that would have led

22    the price, the value of CEL, the CEL Token, to increase from

23    the pause date to the petition date?

24             MR. FERRARO:  So I'll start by saying I'm not a

25    valuation expert. I worked at a bank for almost 20 years,

Page 24

1    but I was not in valuation control, but I was around these

2    processes for a long part of my career. My belief is simple.

3    Celsius. in the springtime, was facing a lot of pressures.

4    The crypto industry was facing a lot of pressures. There was

5    a large selloff. Leading up to the pause date, CEL Token had

6    plummeted quite a bit in value up until that point. I think

7    it was .36 cents where it opened. We talked about how it

8    closed at .28. I look at a couple price points during that

9    day.

10          When the Tweet went out about the pause, I think

11   it was around 10:00 at night, the price was .25 cents.

12   Shortly thereafter, the price went down to .15 cents, and

13   then it bounced back to the .28 cents. Between the pause and

14   the petition it went from 28 to 81. This is on the back of a

15   month of nothing but negative news about Celsius and the

16   industry. Bitcoin sold off 25 percent at that time period.

17   It's hard for me understand a token that is represented and

18   marketed as a utility token in which the disclosure

19   statements say that if the platform were to cease to

20   operate, it could become worthless, it's hard for me to

21   believe why it would go up.

22          MR. BROWN:  So I might have misheard you,

23   Mr. Ferrao. Did you say between the pause and the petition,

24   CEL Token went from 25 to 81?  I might have mis --

25          MR. FERRARO:  28 to 81.

Page 25

1          MR. BROWN:  28 to 81.

2          MR. FERRARO:  Yeah.

3          MR. BROWN:  And --

4          THE COURT:  But it went from 25 down to -- it went

5     28 to 25, then to 81.

6          MR. FERRARO:  Let me, let me start. It opened at

7     36 on the date of the pause. At the point of when it was

8     communicated around 10:00 p.m. that night, it went down to

9     .25 cents. Shortly thereafter, it went as low as 15, and it

10    bounced back up to 28. So it closed the day of the pause at

11    28, and then the price at the petition was 81.

12         MR. BROWN:  And you're -- okay. Got the numbers.

13    And from your perspective, was there any economic rationale

14    to support an increase in the value of CEL Token from that

15    pause date to the petition date, the date of the bankruptcy

16    filing?

17         MR. FERRARO:  I do not see any reason why the

18    token price would've increased.

19         MR. BROWN:  And why is that?

20         MR. FERRARO:  It's a utility token on a platform

21    that ceased -- that paused. It says right in the disclosure

22    statement that in that circumstance it could be worthless.

23         MR. BROWN:  When you say 'disclosure statement'

24    what are you talking about?

25         MR. FERRARO:  These are the general -- sorry, I

Page 26

1    say 'disclosure statement' -- general terms of use. There is

2    a risk, a risk disclosure around the risks of CEL Token.

3              MR. BROWN:  And what is that disclosure,

4    Mr. Ferraro?

5              MR. FERRARO:  It effectively says that if the

6    platform were to shut down, that the token could become

7    worthless. It's a utility token.

8              THE COURT:  Which version of the terms of use

9    there are you referring? Is this Version 8?

10             MR. FERRARO:  This is not the earn terms of use,

11   this is the general.

12             MR. BROWN:  Now, Mr. Ferraro, I want to shift

13   gears to one more topic. In the Debtors' Proposed Plan of

14   Reorganization, are you familiar with the employee incentive

15   program?

16             MR. FERRARO:  Yes, I am.

17             MR. BROWN:  Can you just briefly describe that for

18   the Court?

19             MR. FERRARO:  Yeah, this is incentive program to,

20   you know, incent the executives to maximize value and get

21   out of bankruptcy as fast as possible. And it encompasses

22   different things. Some of it is an effective date target,

23   some of it is a distribution target. There's KYC targets,

24   and then there's a bunch of mining operational targets. The

25   goal of this is effectively to get out of bankruptcy as

Page 27

1   quick as possible. We are burning $20 million a month on

2   professional costs while in bankruptcy. And on the mining

3   side, it's incredibly important to us that NewCo is a

4   success. And the mining asset is the crown jewel of NewCo.

5   So getting rigs plugged in, getting margins up, general risk

6   management is important for this handoff to maximize value.

7            MR. BROWN:  And what is it that you and the other

8   executives remaining at Celsius are going to be doing

9   between now and potential emergence from the company, from

10  bankruptcy if the plan is confirmed?

11           MR. FERRARO:  Yeah, it's a Herculean effort. I

12  mean, I'll give you an example. Myself and my team, we've

13  been negotiating two distribution agreements with PayPal and

14  Coinbase, custody agreements. This is, you know, this is --

15  these are not -- these are normally months and months of

16  negotiation that we're trying to pack into a short period of

17  time. You know, the mining business, there's no CEO of

18  mining. I'm the acting CEO of mining. This takes an

19  incredible amount of our time. We meet weekly with the UCC

20  on mining to make sure that his handoff is smooth. So --

21           THE COURT:  How many employees remain at Celsius?

22           MR. BROWN:  We have currently on payroll just

23  under 150, but we've noticed almost 50 of them. So we expect

24  to be right below 100 at the effective date. And which we'll

25  wind that down after distribution.

1          MR. BROWN:  From your perspective, Mr. Ferraro, is

2     the employee incentive program proposed in the plan, is it

3     reasonable and appropriate here, sir?

4          MR. FERRARO:  Yes. Quite frankly, I think, you

5     know, some of these targets are probably not going to be

6     achieved. They were a stretch. This was, you know, weeks and

7     weeks of negotiation. I think Alvarez and Marsal and M3

8     negotiated this a bunch and went through the special

9     Committee for approval. This was done months ago. And we,

10    we're trying like hell to hit them all for the benefit of

11    the creditors, but I'm not sure that we will.

12         MR. BROWN:  Nothing further at this time, Your

13    Honor.

14         THE COURT:  All right. Cross-examination.

15         MR. BROWN:  Your Honor, I think the Committee

16    might've wanted to do one thing before we get to cross for

17    housekeeping matters.

18         THE COURT:  That's fine. Okay. Mr. Colodny.

19         MR. COLODNY:  Yeah, Your Honor, we have a number

20    of exhibits that are documents that were produced to us by

21    Celsius, and Mr. Ferraro as the primary company witness. I

22    was wondering if we could admit those exhibits --

23         THE COURT:  If you tell me what they are.

24         MR. COLODNY:  I've got them right here.  So the

25    Bates-stamped ones are UCC 3 through 15, 27 through 51, only

1   Number 30 is blank, 54 through 56, 88 through 89, 91 through

2   121.

3            THE COURT:  Hold on, give me that last?

4            MR. COLODNY:  91 through 121.

5            THE COURT:  Okay.

6            MR. COLODNY:  And 183.

7            THE COURT:  Have you provided copies to other

8   parties?

9            MR. COLODNY:  Yes, they're all in our exhibit

10  list. It was filed in the docket and per Your Honor's

11  instruction, we had an FTP site which we made open to

12  everyone in the public. I know there was an issue initially,

13  but we posted [indiscernible]

14            THE COURT:  Okay.  Are there any objections to the

15  Court admitting in evidence Exhibits 3 through 15, 27

16  through 51, 30 is blank, 54 through 56, 88 through -- and

17  89, 91 through 121 and 183? Hearing no objection, they're

18  admitted into evidence.

19            (Exhibits UCC 3 through 15, 27 through 51, 30 is

20  blank, 54 through 56, 88, 89, 91 through 121, 184 Received

21  into Evidence)

22            MR. COLODNY:  And then we have, uh, three other

23  exhibits that are official blog posts and Tweets from the

24  Celsius Network accounts. Those are 177 through 178 and 181.

25            THE COURT:  All right. Are there any objections to

Page 30

1    the Court admitting in evidence Exhibits 177, 178 and 181?

2    They're admitted into evidence.

3              (Exhibits 177, 178 and 181 Received into Evidence)

4              MR. COLODNY:  And then, Your Honor, we have a

5    number of exhibits which are YouTube videos, AMA's. And we

6    plan to address how to admit those later today.

7              THE COURT:  Okay, all right. Thank you,

8    Mr. Colodny. Mr. Brown.

9              MR. BROWN:  Your Honor, just one housekeeping

10   matter, I apologize. I needed to move one more exhibit into

11   evidence that's referenced in Mr. Ferraro's Declaration. I

12   want to --

13             THE COURT:  Which Declaration?

14             MR. BROWN:  Yeah, so it's Exhibit 44, the

15   Confirmation Declaration, Paragraph 53 of Mr. Ferraro's

16   Declaration. It's on Page 21. References various exhibits to

17   Docket 393. These are the terms of use that the Debtors

18   filed on the docket a year ago. They are on the Debtors'

19   exhibit list at Exhibit 38. Exhibit 38 is one compilation,

20   all of those exhibits that were filed on the docket at 393.

21   The Debtors would move Exhibit 38 into evidence.

22             THE COURT:  You started by referring to Exhibit

23   44.

24             MR. BROWN:  Yes, I did.

25             THE COURT:  So I'm confused.

```
1              MR. BROWN:  Yeah, my apologies. Exhibit 44 is
2    Mr. Ferraro's Confirmation Declaration.
3              THE COURT:  Okay.
4              MR. BROWN:  That's into evidence.
5              THE COURT:  Yes.
6              MR. BROWN:  And Paragraph 53 in Exhibit 44
7    references all of these terms of use which are on the
8    Debtors' exhibit list at Exhibit 38.
9              THE COURT:  Okay.
10             MR. BROWN:  My apologies.
11             THE COURT:  Any objections? They're into evidence.
12             (Debtors' Exhibit 44, Paragraph 53 at Exhibit 38
13   Received into Evidence)
14             MR. BROWN:  Thank you, Your Honor.
15             THE COURT:  Let me just say, I will try to keep my
16   own accurate list of what's in evidence. But I think when
17   the evidence concludes, parties should confer and seek to
18   provide me with a combined list of all exhibits that have
19   been admitted in evidence. And if there are any
20   disagreements about it, we'll sort it out then.
21             MR. BROWN:  Absolutely. Happy to do that, Your
22   Honor.
23             THE COURT:  Okay.  Thank you very much, Mr. Brown.
24             Ms. Cornell, are you going to [indiscernible]
25   examine? While you're going up, I've just got to step out
```

1    and look for some notes on my desk. But nobody get up when I

2    come back in. So you can get ready to examine as soon as I

3    get back. All right, Ms. Cornell.

4              MS. CORNELL:  My name is Shara Cornell with the

5    Office of the United States Trustee. I will try my best not

6    to [indiscernible] lower.

7              THE COURT:  All right.

8              MS. CORNELL:  I'll do my best --

9              THE COURT:  Shara will keep everybody on the

10   straight and narrow path. Including, including --

11             MS. CORNELL:  She will. I'm a little shorter than

12   everybody else. So I'll try not to repeat what's already

13   been put into testimony today. But I may have to ask a

14   couple of questions again. So, Mr. Ferraro, are you familiar

15   with the plan as filed?

16             MR. FERRARO:  Yes.

17             MS. CORNELL:  Did you sign the plan as filed?

18             MR. FERRARO:  Yes.

19             THE COURT:  You have to keep your voice up as

20   well.

21             MR. FERRARO:  I'm sorry. Yes.

22             MS. CORNELL:  Are you familiar with the releases

23   and exculpation provisions found in the plan and the plan

24   supplement?

25             MR. FERRARO:  Yes, I am.

1          MS. CORNELL:  And to all of the amended and

2    supplemental versions of those plans and plan supplements?

3          MR. FERRARO:  To the best of my knowledge.

4          MS. CORNELL:  And are there a lot of them?

5          MR. FERRARO:  Yeah.

6          MS. CORNELL:  Are you familiar -- and I think you

7    are -- with the declaration filed at Docket Number 3581 on

8    September 27th, 2023? It's Debtors' Exhibit 44 that we've

9    just been discussing.

10          MR. FERRARO:  Yes.

11          MS. CORNELL:  Do you have a copy of that in front

12    of you?

13          MR. FERRARO:  I do.

14          MS. CORNELL:  And just for the record, I know we

15    already spoke about this, but did you sign this Declaration

16    that's found at ECF Docket Number 3581?

17          MR. FERRARO:  Yes, I did.

18          MS. CORNELL:  Did you prepare this Declaration?

19          MR. FERRARO:  It was drafted by the legal

20    advisors. I reviewed it and we iterated on it until it got

21    to this point.

22          MS. CORNELL:  Okay. What I'm going to do now is

23    I'm going to ask you questions as they relate to specific

24    provisions in the Declaration, if that's all right. So if

25    I'm moving too fast or you need time to re-read, just put

Page 34

```
 1    your hand up, but also say hold on a minute.

 2              MR. FERRARO:  Okay.

 3              MS. CORNELL:  So, I first want to direct you to

 4    Paragraph 8.

 5              MR. FERRARO:  Yes.

 6              MS. CORNELL:  So in Paragraph 8, you state that

 7    you had personal involvement in plan negotiations and

 8    drafting process. Can you please confirm if that is

 9    accurate?

10              MR. FERRARO:  Yes, that is accurate.

11              MS. CORNELL:  In Paragraph 12 you state that you

12    had close involvement with marketing and sales process and

13    negotiations. Can you please confirm that this is accurate?

14              MR. FERRARO:  yes, that's correct.

15              MS. CORNELL:  You also state that you had

16    firsthand knowledge of the importance of such releases and

17    exculpation. Can you confirm that -- if that's accurate?

18              MR. FERRARO:  Yeah, that's correct.

19              MS. CORNELL:  Okay. In Paragraph 13 you state, or

20    your Declaration states, that in consideration for the

21    Debtor releases, that the Debtors and their estates will

22    provide mutual releases for a few -- for certain releasing

23    parties. Is this true?

24              MR. FERRARO:  Yes.

25              MS. CORNELL:  I'm not going to go through them
```

1    all, but I'd like to go through a few of the releasing

2    parties if possible to discuss what type of consideration

3    they provide to the Debtors' estates.  Are you familiar with

4    that information?

5              MR. FERRARO:  I'll do my best, yes.

6              MS. CORNELL:  The first party I'd like to discuss

7    is the BRIC. And I don't think we discussed them at length

8    on the record today. So just for the record, would you mind

9    explaining who the BRIC is and what that means in relation

10   to the plan?

11             MR. FERRARO:  Yeah, the BRIC is our backup plan

12   sponsor. Their plan is a slightly different structure. It

13   has a higher kind of initial liquid crypto distribution.

14   Equity in a mining company. The illiquids stay back and are

15   not part of the NewCo.  So one of the differences in this

16   plan is the illiquid assets are not converted to liquid

17   equity, if that makes sense, and the overall recovery rates

18   are slightly lower than the NewCo plan, which we think is

19   the value maximizing.

20             MS. CORNELL:  Okay. And what about the BRIC as an

21   entity? Could you explain who makes up the BRIC consortium,

22   please?

23             MR. FERRARO:  Yeah, the BRIC is made up -- and

24   I'll probably, I'll probably miss a few -- but it's made up

25   of GXD, which is a company that is involved in the digital

Page 36

1    assets base in mining. It's made up of VanEck, which is a,

2    you know, a long-term player and investment space, et

3    cetera. It was -- we had Gemini as the distribution agent,

4    if I remember correctly. Yeah, that's kind of the

5    highlights.

6            MS. CORNELL:  Now, to the best of your knowledge,

7    what consideration has the BRIC consortium provided to the

8    Debtors and the Debtors' estates to receive releases in this

9    case?

10           MR. FERRARO:  So I look at what the BRIC

11   contributed as much more than the transactions, the backup

12   bid. They were there through the auction. They were there

13   and drove, like we said, preserved an immense amount of

14   value. I meet with the BRIC weekly, with the special

15   Committee, to make sure that they're up to speed on any sort

16   of pivot. They were critical to the success of this plan and

17   played a unique role as a backup sponsor.

18           MS. CORNELL:  Are you familiar with the breakup

19   fee and expense reimbursement that this Court previously

20   authorized for the BRIC?

21           MR. FERRARO:  Yes.

22           MS. CORNELL:  How do you view those breakup fees

23   and expense reimbursements as they relate to consideration

24   in this case? You just discussed that they've been helpful

25   to the Debtors and that they've assisted throughout, and

Page 37

1    that they're still, I don't want to say on standby, but

2    they're available. And it's my understanding that the

3    expense reimbursement and breakup fee were related to what

4    you just discussed. Could you explain a little bit more

5    about what additional consideration is to be provided?

6             MR. FERRARO:  Yeah. I think the breakup fee, the

7    expense reimbursement, that's related to the transaction.

8    BRIC's been here for almost a year through the sales and

9    marketing process early on, you know, driving, driving value

10   for the estate. So I think they've provided a lot more than

11   just the transaction, which was the reason for the breakup

12   fee and the expense reimbursement.

13            MS. CORNELL:  Okay. I'm going to move on now to

14   PayPal. Are you familiar with PayPal's role in this case?

15            MR. FERRARO:  Yeah, I am. We've been working with

16   them quite a bit in long negotiations, yeah.

17            MS. CORNELL:  Could you explain for the record

18   what PayPal's role is in this case?

19            MR. FERRARO:  They'll be a distribution agent. So

20   they'll provide distribution of BTC and ETH to the creditors

21   within the United States. And they also have backup fiat

22   capabilities for those that cannot get either distributed

23   from Coinbase or from PayPal, we use PayPal fiat.

24            MS. CORNELL:  Are you familiar with the timing

25   that PayPal would be involved in this case?

1          MR. FERRARO:  Yeah, it's up to 5 years.

2          MS. CORNELL:  Let me rephrase that, I'm sorry.

3     When do you believe that PayPal would begin their role in

4     this case as a distribution agent?

5          MR. FERRARO:  Well, the actual distribution will

6     not occur until the effective date. But PayPal, I mean,

7     there is tons of kind of work that's going on right now,

8     technical work between the IT teams, the technology teams,

9     the security teams, the operational teams, to make sure that

10    this handoff is smooth with, you know, really, the security

11    of the customers' coins at the center of everything we do.

12         MS. CORNELL:  So would it be fair to say that your

13    testimony today is that PayPal, right now, is working on the

14    contractual relationship with the Debtors prior to

15    confirmation or the effective date?

16         MR. FERRARO:  Contractual and operations.

17         MS. CORNELL:  Okay, thank you. To the best of your

18    knowledge, what consideration, valuable consideration, do

19    you believe that PayPal is providing to the Debtors' estate

20    in exchange for its releases?

21         MR. FERRARO:  They're returning a lot of

22    cryptocurrency to creditors who need it.

23         MS. CORNELL:  Is PayPal receiving a fee for that

24    role?

25         MR. FERRARO:  No, they're actually paying the

Page 39

1    estate.

2              MS. CORNELL:  I'm going to move on to the plan

3    administrator. Are you familiar with the plan administrator

4    in this case?

5              MR. FERRARO:  Yes.

6              MS. CORNELL:  Or the plan administrator's role?

7              MR. FERRARO:  Yes, I am.

8              MS. CORNELL:  To the best of your knowledge, what

9    valuable consideration do you believe the plan administrator

10   is providing to the estate in exchange for releases?

11             MR. FERRARO:  Overseeing the distribution is a --

12   again, it ties back to the distribution agents. We're

13   returning $2 billion of crypto. So that's kind of job one

14   and two for the plan administrator right out of the gates.

15             MS. CORNELL:  Is the plan administrator going to

16   be compensated for its role?

17             MR. FERRARO:  Is the plan administrator -- yes,

18   yes.

19             MS. CORNELL:  Okay. I'm going to move on to

20   Paragraph 15 of your Declaration.

21             MR. FERRARO:  Okay.

22             THE COURT:  Let me ask a question. What does the -

23   - what's the scope of the release that they're getting? What

24   is it that's released, what's not released?

25             MR. FERRARO:  Specifically for PayPal?

1           THE COURT:  Well, we went through BRIC, PayPal and

2     plan administrator. You can go through them one at a time,

3     but what conduct is not being protected by the -- what

4     potential conduct is not being protected by the releases

5     that they're receiving? For example, is there a gross, you

6     know, misconduct, fraud --

7           MR. FERRARO:  Oh, yes.  Yeah, yeah.

8           THE COURT:  -- what's the scope -- what's the

9     limitations on the release that each -- that BRIC, PayPal

10    and the plan administrator would be receiving if the plan's

11    approved?

12          MR. FERRARO:  Okay, perfect. Sorry, I'm not, I'm

13    not a lawyer and this is my first time, so some of this

14    stuff is a learning curve for me. There's a carveout for, of

15    course, negligence, fraud, willful misconduct, yes.

16          THE COURT:  Go ahead.

17          MS. CORNELL:  Absolutely. So I'm going to turn to

18    Paragraph 15. And with respect to Paragraph 15 of your

19    Declaration, I want to turn specifically to the ad hoc

20    Committees. Are you familiar with the ad hoc Committees in

21    this case?

22          MR. FERRARO:  Yes, I am.

23          MS. CORNELL:  Various ad hoc Committees.

24          MR. FERRARO:  Yes, I am.

25          MS. CORNELL:  Again, I don't want to belabor

Page 41

1    things or go through all of the different Committees and

2    what have you. But let's just -- we'll focus on one, just as

3    an example. We'll talk about Earn Ad Hoc, just because

4    they're a larger group. To the best of your knowledge, what

5    consideration has the Earn Ad Hoc group provided in exchange

6    for releases?

7            MR. FERRARO:  I mean, the contributions of the ad

8    hoc groups to where we are today cannot be understated by

9    any, any means whatsoever. They support the plan, that was

10   an important element of the consideration. I mean, they've

11   been here along the way. We would not be here without the ad

12   hoc groups, all of them.

13           MS. CORNELL:  To the best of your knowledge, have

14   you or the Debtors agreed to not object to any substantial

15   contribution claims made by any ad hoc groups as part of

16   those settlements?

17           MR. FERRARO:  I do not know.

18           MS. CORNELL:  Okay. Do you know who would know

19   that information?

20           MR. FERRARO:  I would probably have to turn over

21   to my legal advisors.

22           MS. CORNELL:  Okay. Thank you. To the best of your

23   knowledge, are you providing these releases in exchange for

24   support of the plan?

25           MR. FERRARO:  It's a consideration to support the

Page 42

1    plan. I don't think it's the only consideration.

2         MS. CORNELL:  Okay. In the last sentence of

3    Paragraph 15, you state that without these releases -- and

4    I'm paraphrasing, I'm sorry -- without these releases, it

5    would threaten the ability to make in-kind distributions.

6    Can you please elaborate?

7         MR. FERRARO:  Yeah, ma'am. The simplest way to

8    think about it is, if we didn't kind of come to settlements

9    with the various groups, we'd be litigating a lot of these

10   items. We would still be litigating these items. And that

11   would obviously slow down, not only slow down the return of

12   liquid crypto, but it would decrease the amount that we have

13   available. We continue to burn 20 million a month.

14        MS. CORNELL:  I'm going to go back to Paragraph

15   17, if you don't mind. And again, I apologize if I'm

16   repeating earlier things, but they're -- try to go in the

17   order of the Declaration to make it as easy as possible. In

18   Paragraph 17, the Declaration states that you know full well

19   the contributions that the Debtors will need the release

20   parties to continue to make. Do you think you could help us

21   unpack that sentence? Again, it says that you know full well

22   the contributions that the Debtors will need the release

23   parties to continue to make.

24        MR. FERRARO:  Think of the employees getting this

25   distribution done. Think -- we talked about PayPal,

Page 43

1    Coinbase. These are Herculean efforts to do this.

2           MS. CORNELL:  What about the ad hoc groups, what

3    kind of contributions will they continue to make?

4           MR. FERRARO:  I mean, the ad hoc groups continue

5    to support the plan. The ad hoc groups, you know, we got to

6    the settlements. And, you know, there's Board observers, et

7    cetera. So --

8           MS. CORNELL:  Okay. I'm going to move on to

9    Paragraph 20. Paragraph 20 states that third-party releases

10   are wholly consensual. Can you explain for the record what

11   that means to you?

12          MR. FERRARO:  It means that in the ballots, you

13   can opt out of the releases.

14          MS. CORNELL:  So --

15          MR. FERRARO:  So people had a vote.

16          MS. CORNELL:  So it's your opinion, based on the

17   balloting and the receipt of those ballots, that the third-

18   party releases were wholly consensual.

19          MR. FERRARO:  Yes.

20          MS. CORNELL:  I'm going to move on to Paragraph

21   21, please. Are you familiar with the voting process and

22   tabulation?

23          MR. FERRARO:  Somewhat. Not, not intimately, but

24   somewhat.

25          MS. CORNELL:  And if you don't know the answer to

Page 44

1    my question, that's acceptable. But do you know the number

2    of opt-out forms that were received by the Debtors?

3                MR. FERRARO:  I do not.

4                MS. CORNELL:  Okay. Who would be the best person

5    to ask that information?

6                MR. FERRARO:  I would probably ask the legal

7    advisors, who are very close to this.

8                MS. CORNELL:  I'm going to go to Paragraph 22,

9    please. And again, in Paragraph 22, you discuss the release

10   parties' substantial contributions. I'd like to go through

11   some of the post-effective date entities here. Are you

12   familiar with what I mean when I say post-effective date

13   entities?

14               MR. FERRARO:  I think so, yes.

15               MS. CORNELL:  Okay. I won't -- again, I won't go

16   through them all, but just, just a few. The first one I'd

17   like to go through is the plan administrator. I know we

18   spoke about that role a little bit earlier. But would you

19   agree that the plan administrator is not currently in

20   existence?

21               MR. FERRARO:  Yeah.

22               MS. CORNELL:  To the best of your knowledge, when

23   will the plan administrator role come into existence?

24               MR. FERRARO:  At the effective date.

25               MS. CORNELL:  The effective date. Okay. What about

1    NewCo, is NewCo currently in existence?

2            MR. FERRARO:  There might be entities related to

3    NewCo that have been opened, but the assets have not vested.

4    So I wouldn't say that it exists at the moment.

5            MS. CORNELL:  So would it be your testimony that

6    NewCo will not exist until post-confirmation, post-effective

7    date?

8            MR. FERRARO:  In a meaningful way, yes.

9            MS. CORNELL:  Okay. And without going through all

10    the parties, would it be your understanding that there are

11    some parties listed in the release and exculpation

12    provisions that will not be in existence? And I know that's

13    a weird turn of phrase, but be in existence until after the

14    plan is confirmed and the plan goes effective?

15            MR. FERRARO:  Yeah, I think we went through the

16    two good examples of that.

17            THE COURT:  I'm sorry, I didn't hear the last

18    part.

19            MR. FERRARO:  I'm sorry, I think we went through

20    two good examples of that, yeah.

21            MS. CORNELL:  Thank you. So now I'm going to move

22    onto some of the exculpation provisions in the plan and in

23    your Declaration. The first one is Paragraph 26. You state

24    your belief that these provisions are appropriate. Can you

25    please confirm that for the record, that you believe that?

1            MR. FERRARO:  Yeah, I, I do, and I can confirm

2      that this is a situation in which this industry does not

3      have a clear regulatory kind of understanding. And, you

4      know, distributing crypto is, is -- doesn't come without

5      risk.

6            MS. CORNELL:  Sure. In Paragraph 27, you state

7      that these exculpation provisions are critical to ensure

8      that funds can be returned to creditors. Is that your

9      belief?

10            MR. FERRARO:  Yeah, absolutely.

11            MS. CORNELL:  Can you explain just a little bit

12      for the record how these exculpation provisions will impact

13      distributions in this case, and the return of funds to

14      creditors?

15            MR. FERRARO:  Well I think it's a key component of

16      the distribution partners getting comfortable with the

17      situation.

18            MS. CORNELL:  Okay.

19            THE COURT:  Is there a list that specifically

20      names who will receive releases or exculpation?

21            MR. FERRARO:  Exculpations, releases are --

22      there's a black list of people who are excluded.

23            THE COURT:  I understand -- that part I

24      understand. But is there a list identifying the parties who

25      will receive releases or exculpation?

Page 47

1          MR. FERRARO:  To my knowledge, we have not gone

2     back and included every single person that was -- and

3     created a list, that was ever an employee, that's not on the

4     excluded list and things like that. So I'm not sure that

5     there's a master list.

6          THE COURT:  How is a court supposed to know who is

7     receiving a release or exculpation? I can look at a list of

8     excluded parties, but you've acknowledged there's no list of

9     who's receiving releases or exculpations. How -- whether

10    it's this Court or a non-bankruptcy court or some other

11    court, how -- if issue arises, if someone sues someone who

12    is involved, how is a court supposed to know whether they

13    received a release or exculpation?

14         MR. FERRARO:  I'll do my best. Again, not a

15    lawyer, first time. I think it's pretty clear who's

16    excluded, and I --

17         THE COURT:  I think I understand who's excluded.

18         MR. FERRARO:  Okay.

19         MS. CORNELL:  Mm-hmm.

20         THE COURT:  My question is, who is included.

21         MR. FERRARO:  I think the way it's written, it's

22    everybody who's not excluded.

23         THE COURT:  Is that everybody in the universe?

24         THE COURT:  Well, it's, it's labeled -- sorry,

25    it's qualified employee, you know, Debtors, employees,

Page 48

1      special Committee, et cetera.

2              MS. CORNELL:  And I think the release parties also

3      are included.

4              MR. FERRARO:  Yeah, it's the [indiscernible]

5      release parties, I apologize for --

6              THE COURT:  Right. That, just for the benefit of

7      the Committee and the Debtors, that is something that's

8      bothering me, is I think I know who the excluded parties

9      are. They're identified. It's that who's receiving a release

10     or exculpation is not. I understand Ms. Cornell has made the

11     point that the plan administrator is not selected yet, but

12     that will be easily identified. Go ahead.

13             MS. CORNELL:  Thank you, Your Honor. So we just

14     spoke about it's your belief in the Declaration that these

15     exculpation provisions are critical to insuring funds are

16     distributed to creditors. Are you aware of the Voyager

17     bankruptcy case and the Voyager bankruptcy plan? Generally

18     speaking.

19             MR. FERRARO:  Generally. Not in any details. I've

20     been focused on this one.

21             MS. CORNELL:  Absolutely. So, as of right now, the

22     plan, as I understand, in Voyager, was confirmed. But the

23     exculpation provision was held in abeyance. What is your

24     opinion about how those exculpation provisions in this case

25     are required for distribution? Or are those some -- are

1     those something that can be seen as a separate issue?

2             THE COURT:  I'm going to object, stating the

3     objection.

4             MS. CORNELL:  Sure.

5             THE COURT:  I mean, if you've got -- I don't think

6     it's proper to ask him about what's in the Voyager --

7             MS. CORNELL:  Sorry.

8             THE COURT:  -- plan or exculpations, or in Judge

9     Wiles' opinions when he addressed the issues.

10             MS. CORNELL:  Right.

11             THE COURT:  He obviously was very troubled.

12             MS. CORNELL:  Yes.

13             THE COURT:  By some of the objections to

14     exculpation and releases. So I'm ruling that out.

15             MS. CORNELL:  Understood, Your Honor. So moving on

16     to Paragraph 28. And I'd like to specifically discuss the

17     BRIC as they relate to the exculpation provisions. Are you

18     aware that the BRIC were given an option to be retained by

19     the estate in these cases, but declined?

20             MR. FERRARO:  Referencing the consulting

21     arrangement?

22             MS. CORNELL:  Yes. Exactly. I'm sorry, yes.

23             MR. FERRARO:  Yes.

24             MS. CORNELL:  With respect to their consulting,

25     that they had originally desired.

Page 50

1          MR. FERRARO:  Yeah, the 500,000 a month, yes.

2          MS. CORNELL:  Mm-hmm.

3          MR. FERRARO:  I am.

4          MS. CORNELL:  Why should the BRIC receive the same

5    type of benefits that retained professionals receive, when

6    they made a choice not to be retained by the estate?

7          THE COURT:  I don't think that's a fair question.

8    When the issue about their retention arose, it was a

9    question of whether provisions of the code regarding

10   retention arose. We had a whole colloquy about it. I

11   supported the position of the US Trustee that they could not

12   be retained at that point, and it didn't get pressed. So I

13   think the question is an unfair question because it really

14   excludes what the whole background and colloquy about

15   whether or not they're retained. Here they are, the backup

16   bidder, and the issue of whether they're -- whether they

17   should also be provided with releases or exculpations is

18   very much an issue.

19          MS. CORNELL:  Mm-hmm.

20          THE COURT:  But I don't think it's fair to ask

21   about what your -- the basis for your objection or my

22   agreement with it.

23          MS. CORNELL:  Mm-hmm. Okay. That's fair. Moving on

24   to Paragraph 28, and this deals with PayPal and Coinbase.

25   Would you agree that both PayPal and Coinbase have and will

Page 51

1    be included in very discreet acts with respect to this case?

2              MR. FERRARO:  The main purpose will be to return

3    crypto and value to customers, yes.

4              MS. CORNELL:  For the record, could you explain a

5    little bit about each Coinbase and PayPal's specific acts

6    within this bankruptcy case, and what their -- what the

7    Debtors' expectations are for them?

8              MR. FERRARO:  Yeah. We'll start with PayPal. Think

9    of PayPal predominantly as the distribution agent. They'll

10   return BTC and ETH to US customers. We also will use Paxos

11   as a custodian. It's not PayPal specifically, but Paxos as a

12   custodian for the amounts that we're going to distribute

13   vis-à-vis PayPal.

14             MS. CORNELL:  Mm-hmm.

15             MR. FERRARO:  And then Coinbase is doing the

16   distribution and they're also the custodian for the assets

17   that are related to international distribution. So it is

18   narrow distribution agent and custodian.

19             MS. CORNELL:  So with that in mind, with these

20   narrow roles in mind, why, in your belief, should they

21   receive the same type of broad exculpations as, say,

22   Kirkland & Ellis?

23             MR. FERRARO:  I mean, simply stated, there's no

24   knowledge of any issues with either of these. They're a key

25   partner in the distribution, and we feel that, you know,

Page 52

1       this is something that helps get us to that point.

2               MS. CORNELL:  But you do agree that their role is

3       limited to distribution and not the entirety of the

4       bankruptcy case.

5               MR. FERRARO:  Yeah, distribution and for Coinbase

6       as well, custody, yes.

7               MS. CORNELL:  Okay. Is it your understanding that

8       no post-effective date entity will be exculpated?

9               MR. FERRARO:  Yeah, I mean, I think the

10      exculpations are all for -- yeah.

11              MS. CORNELL:  And I bring that up because there

12      was a temporal scope added to the exculpation provision. Are

13      you familiar with that?

14              MR. FERRARO:  No, I don't -- I'm not sure that I -

15      - I don't want to get into that [indiscernible]

16              MS. CORNELL:  That's okay.

17              THE COURT:  That's something that was negotiated

18      between your office and the Debtors and the Committee, and

19      it was added to narrow the scope of release or exculpation.

20              MS. CORNELL:  During a specific time period pre-

21      effective date. Just as -- by way of background.

22              THE COURT:  Yeah. I'm not sure, what's the -- why

23      is that a proper question here?

24              MS. CORNELL:  Well, I was --

25              THE COURT:  They negotiated -- you raised an

Page 53

1    objection to --

2         MS. CORNELL:  I just wanted to know if he had --

3    if he knew -- I just wanted to know if he was familiar with

4    it.

5         THE COURT:  Let me -- you raised an objection to

6    scope of releases and exculpation. You still have some

7    objections.

8         MS. CORNELL:  Mm-hmm.

9         THE COURT:  But you negotiated modifications to

10   the language to have a temporal limitation. But that was

11   between the lawyers. I mean --

12        MS. CORNELL:  I just wanted to know if he was

13   familiar with it. The limitation that was provided.

14        THE COURT:  Next question.

15        MS. CORNELL:  Okay.

16        MR. FERRARO:  I know that we went -- I'm sorry.

17        THE COURT:  Go ahead.

18        MS. CORNELL:  With respect to the plan

19   administrator, are you familiar with the Plan Administration

20   Agreement?

21        MR. FERRARO:  I've been through the agreement,

22   I've read through it a few times, yes.

23        MS. CORNELL:  I don't believe it's listed on one

24   of the Debtors' exhibits. So if Your Honor would allow us to

25   approach to provide an excerpt from the Plan Administration

Page 54

1    Agreement. It was in a plan supplement.

2            THE COURT:  If there's no objection, go ahead.

3    We'll see if we have any objections.

4            MS. CORNELL:  [indiscernible] do you have a copy?

5            MR. COLODNY:  Your Honor, can she admit the whole

6    exhibit, just so we have everything?

7            THE COURT:  Ask your questions, agree with the

8    Debtors and the Committee, you can introduce the exhibit. It

9    doesn't have to be right now. You can go ahead with your

10   question.

11           MS. CORNELL:   Yes, that's fine, I, yeah.

12           THE COURT:  Go ahead.

13           MS. CORNELL:  Absolutely fine.  The Plan

14   Administrator Agreement provides for different standards for

15   exculpation than the plan itself and the confirmation order.

16   Are you familiar with those distinctions?

17           MR. FERRARO:  I believe so.

18           MS. CORNELL:  Would you mind explaining for the

19   record why there's a difference in the exculpation provided

20   in the plan and in the Plan Administrator Agreement?

21           MR. FERRARO:  Yeah, I think the Plan Administrator

22   Agreement, the exculpation is more like a -- and I'm sort of

23   venturing outside my comfort zone here. But it's sort of

24   more of a contract type of situation, not a bankruptcy

25   situation. This is like a limitation of liability clause, to

Page 55

1    my understanding. So effectively, you know, it shields the

2    plan administrator unless it's negligent, willful

3    misconduct, bad acts, et cetera. That's my understanding.

4              MS. CORNELL:  I think that's all that I have for

5    now, Your Honor. Thank you.

6              THE COURT:  Thank you very much. Anybody else wish

7    to cross-examine?

8              MR. KIRSANOV:  I do, Your Honor. Dimitry Kirsanov.

9              THE COURT:  All right.  Go ahead.

10             MR. KIRSANOV:  Good morning, Mr. Ferraro. You

11   mentioned your gross maximized value to [indiscernible] so

12   let's talk about the CEL Token matter. Were you aware that

13   about 750,000 of my CEL Tokens in custody were unable to be

14   moved months ahead of the freeze of bankruptcy?

15             MR. FERRARO:  I'm not aware of that specific

16   situation.

17             MR. KIRSANOV:  Did Celsius have enough CEL Token

18   to move my funds?

19             MR. FERRARO:  Celsius has enough CEL Tokens to

20   satisfy any obligations.

21             MR. KIRSANOV:  Did Celsius have enough CEL Tokens

22   to move my funds when I had requested them to be moved?

23             MR. FERRARO:  I can't speak to your specific

24   situation, but we had ample amount of CEL Token.

25             MR. KIRSANOV:  Are you familiar with the Blunsine

Page 56

1     [ph] Declaration?

2              MR. FERRARO:  Generally. It's been a while ago,

3     but yes.

4              MR. KIRSANOV:  Were you aware that the custody and

5     withhold liabilities where CEL exceeded the assets available

6     on Fireblocks ahead of the freeze and filing date?

7              MR. FERRARO:  Not, not sure I'm following or

8     knowledgeable about those details.

9              THE COURT:  You can ask questions, but you can't

10    testify as to facts, whether they're facts or not. But I'll

11    permit you to ask the witness questions. But you're making

12    statements of fact that are not in the record.

13             MR. KIRSANOV:  All right, thank you, Your Honor.

14    Did CEL Token have a market value ahead of the asset pause?

15             MR. FERRARO:  Yeah, I mean, ahead of the pause it

16    was traded. It was traded on exchanges, traded on Celsius

17    OTC. So there was a market pre-pause, yes.

18             MR. KIRSANOV:  Did the CEL Token have a market

19    value ahead of the bankruptcy filing day?

20             MR. FERRARO:  Yeah, I think we just talked about

21    that, that there was value at the pause, there was value

22    thinly traded post the pause. Most of the coins were -- it

23    had --

24             THE COURT:  We had a price, but what is -- value

25    may be different than the price.

Page 57

1           MR. FERRARO:  Value might be different from price.

2     There's a price that we could see on the screen.

3           MR. KIRSANOV:  So the CEL Token did have a market

4     value after bankruptcy as well.

5           MR. COLODNY:  Objection, Your Honor. He's

6     [indiscernible] referring to price.

7           THE COURT:  Sustained. You can ask whether it had

8     a price, but not a value.

9           MR. KIRSANOV:  Did the CEL Token have a price

10    after bankruptcy?

11          MR. FERRARO:  Yes, you could see it on, you could

12    see the price on the screen, yes. It had a price.

13          MR. KIRSANOV:  Could an individual acquire CEL or

14    transact with CEL Token even today?

15          MR. FERRARO:  Yes, there's about 5 percent of the

16    circulating supply that is tradable at this moment.

17          MR. KIRSANOV:  Did the price of CEL Token exceed

18    .81 cents after bankruptcy?

19          MR. FERRARO:  It might have, for a moment in time.

20    I think it precipitously declined to this point, largely.

21          MR. KIRSANOV:  Did it exceed one dollar after

22    bankruptcy?

23          MR. FERRARO:  I don't know the specifics, sir. It

24    might have.

25          MR. KIRSANOV:  Okay. Were you aware that the

Page 58

1    majority of CEL Token holders in the custody class voted to

2    reject the CEL Token settlement? [indiscernible]

3              MR. FERRARO:  No, I was not aware.

4              MR. KIRSANOV:  Accepting the custody settlement

5    transfers the ownership of tokens to the creditor. Is that

6    correct?

7              MR. COLODNY:  Objection, Your Honor. Calls for a

8    legal conclusion.

9              THE COURT:  Sustained.

10             MR. FERRARO:  Can you ask again?

11             THE COURT:  No, objection sustained.  Ask the next

12   question.

13             MR. FERRARO:  Okay.

14             MR. KIRSANOV:  If a custody holder has not

15   accepted the custody settlement and rejected the plan, can

16   Debtors retain control of the CEL Token settlement, is that

17   correct?

18             MR. COLODNY:  Objection, Your Honor. Calls for a

19   legal conclusion.

20             THE COURT:  Sustained.

21             MR. KIRSANOV:  Does the CEL Token settlement apply

22   to the CEL Tokens held in the custody class?

23             MR. COLODNY:  Objection, Your Honor.

24             THE COURT:  Sustained.

25             MR. KIRSANOV:  CEL Tokens were not able to be

Page 59

1    distributed immediately upon the initial custody settlement

2    on disbursement day. Why is this?

3            MR. FERRARO:   CEL Tokens were not able to be

4    distributed -- we distributed CEL Tokens to custody holders.

5            MR. KIRSANOV:   But they were not able to be

6    distributed immediately on disbursement day. Why was this?

7            MR. FERRARO:   I'm not following. We were able to

8    distribute CEL Token back to custody customers.

9            MR. KIRSANOV:   You were, but not in the platform

10   immediately open. Why was it unavailable to be distributed

11   for up to two weeks?

12           MR. COLODNY:   Objection, Your Honor.  Asked and

13   answered.

14           THE COURT:   Sustained.

15           MR. KIRSANOV:   Is there a reason why CEL Token may

16   have not been able to be distributed?

17           MR. COLODNY:   Objection.

18           THE COURT:   Overruled.  Do you know the answer to

19   that?

20           MR. FERRARO:   We have -- I mean, there -- for

21   custody specifically, sir?

22           MR. KIRSANOV:   Yes, for the custody settlement.

23           MR. FERRARO:   Yeah, we can distribute CEL Token. I

24   think there's areas that we are still going through the

25   details on whether or not we can distribute coin back given

Page 60

1       MTL laws, et cetera. But the plan is to --

2                THE COURT:  It's a jurisdictional issue.

3                MR. FERRARO:  Jurisdictional issue, the plan is to

4       distribute CEL back to custody holders.

5                MR. KIRSANOV:  When did Celsius obtain the CEL

6       Tokens to pay out the initial custody claims?

7                MR. FERRARO:  We had them on our balance sheet.

8                MR. KIRSANOV:  Where will Celsius obtain the CEL

9       to distribute to --  the rest of the CEL Tokens to the

10      custody groups?

11               MR. FERRARO:  We have ample supply on our balance

12      sheet.

13               MR. KIRSANOV:  Why was the .21 cent CEL Token

14      valuation decided for the custody class on the plan vote

15      when the custody class, in a monetary majority, rejected the

16      CEL Token plan?

17               MR. COLODNY:  Objection, Your Honor.

18               THE COURT:  Sustained.

19               MR. KIRSANOV:  How can Celsius distribute custody

20      assets aside from Bitcoin and Ethereum, to non-settling

21      custody class residents of Hawaii that voted no to the plan?

22               MR. BROWN:  Objection, Your Honor.

23               THE COURT:  Sustained.

24               MR. KIRSANOV:  Can Celsius distribute custody

25      assets aside from Bitcoin and Ethereum, to Hawaii residents?

Page 61

1

2              MR. BROWN:  Objection calls for --

3              THE COURT:  Sustained.

4              MR. BROWN:  Calls for legal conclusion.

5              MR. KIRSANOV:  Can Celsius -- what value are CEL

6     Token holders provided to the non-settling custody class, to

7     residents of Hawaii?

8              MR. FERRARO:  We plan to distribute CEL in kind to

9     the custody class. We are hoping that we can achieve that in

10    Hawaii. The system will be open for 90 -- the plan is for

11    the system to open, be open for 90 days post the effective

12    date, so that customers can get their in-kind distribution.

13    After 90 days, we have to shut the system down. We have to

14    reduce the employees. You know, so the distribution is

15    timebound. If folks come and get their in-kind distribution

16    within those 90 days, that, you know, they will be able to

17    leave the platform. Otherwise, that would be converted to

18    BTC and ETH and distributed by PayPal.

19             MR. KIRSANOV:  The CEL Token valuation and

20    bankruptcy valuations is .81 cents. Is that true?

21             MR. BROWN:  Objection.

22             THE COURT:  Sustained.

23             MR. KIRSANOV:  What is the CEL Token valuation and

24    bankruptcy valuation?

25             MR. BROWN:  Objection.

Page 62

```
 1                 THE COURT:  Sustained.

 2                 MR. KIRSANOV:  The valuation that was provided to

 3      CEL Token claims and the custody class at deactivation date

 4      is .25 cents. Is that true?

 5                 MR. FERRARO:  That's the proposed settlement for

 6      the CEL Token, yes.

 7                 MR. KIRSANOV:  Chapter 7 liquidation values for

 8      the custody class is 72 1/2 percent and 100 percent for pure

 9      custody. Is this true?

10                 MR. FERRARO:  Can you say that again? I'm sorry.

11                 MR. KIRSANOV:  Certainly. In a Chapter 7

12      liquidation matter, the liquidation values for the custody

13      class are 72 1/2 percent, and 100 percent for pure custody.

14      Is that true?

15                 MR. FERRARO:  Yeah, but the custody coins will be

16      returned in kind. This is only --

17                 MR. KIRSANOV:  If, if the --

18                 THE COURT:  No, don't interrupt. Go ahead.

19                 MR. KIRSANOV:  All right.

20                 MR. FERRARO:  This is only the .25 cents as it

21      pertains to custody, is only in case they don't come within

22      the 90 days or we can't distribute and we have to convert it

23      to BTC or ETH, in which it's proposed to do at the

24      settlement price, is my understanding.

25                 MR. KIRSANOV:  If someone rejects the custody
```

Page 63

1   agreement, what is the procedure with their custody

2   holdings?

3            MR. FERRARO:  If somebody rejects -- I, I didn't

4   pick up the end. If somebody rejects -- can you say -- ask

5   again?

6            MR. KIRSANOV:  Yes, certainly. If someone -- if a

7   class holder in the custody section rejects the plan, what

8   is the procedures of their assets?

9            MR. BROWN:  Objection.

10           THE COURT:  Sustained.

11           MR. KIRSANOV:  If somebody in the custody class

12   rejects the plan, what happens?

13           MR. BROWN:  Objection.

14           MR. COLODNY:  Objection.

15           THE COURT:  Sustained.

16           MR. KIRSANOV:  Why does a Chapter 11 plan give

17   less to a CEL custody creditor than a Chapter 7 plan?

18           MR. BROWN:  Objection.

19           MR. COLODNY:  Objection.

20           THE COURT:  Sustained.

21           MR. KIRSANOV:  Is it in the best interest of the

22   CEL custody holder that does not accept the plan to prefer

23   Chapter 7 versus Chapter 11?

24           MR. BROWN:  Objection.

25           MR. COLODNY:  Objection.

1          THE COURT:  Sustained.

2          MR. KIRSANOV:  Do you think it is fair that a

3    creditor who could not move his custody funds ahead of the

4    freeze and bankruptcy filing date be subject to the .25 cent

5    deactivation valuation?

6          MR. FERRARO:  I think we went through that, sir.

7    You have 90 days to come to the platform and take the coins

8    off in kind.

9          MR. KIRSANOV:  After 90 days, it goes to the

10   deactivation date, is that correct?

11         MR. FERRARO:  After 90 days it would be converted

12   to BTC and ETH at the settlement price, is my understanding,

13   yes.

14         MR. KIRSANOV:  And the settlement price is less

15   than the bankruptcy date price, is that correct?

16         MR. FERRARO:  I think the contested point is that

17   price and whether that was a real front value, given the

18   manipulation and the lack of trading volume. 95 percent is

19   locked on the platform.

20         MR. KIRSANOV:  But the price is less, ultimately,

21   is that correct?

22         MR. FERRARO:  I, I don't know, I mean --

23         THE COURT:  .25 cents is less than .81 cents. Yes.

24   Ask your next question.

25         MR. KIRSANOV:  That's it for now, Your Honor.

Page 65

1    Thank you.

2                THE COURT:  Thank you very much. Any other

3    questions? Any other cross-examination?

4                MR. DAVIS:  Yeah, I have a cross-examination, Your

5    Honor.

6                THE COURT:  All right, Mr. Davis.

7                MR. DAVIS: Sure, thank you. Mr. Ferraro, good

8    morning. My name's Otis Davis. I'm a Pro Se Creditor.

9                MR. FERRARO:  Good morning. Sorry, I'm taking a

10   drink of water. Good morning, Mr. Davis.

11               MR. DAVIS:  Now I'd like to turn to Docket 3532,

12   my Motion, page 6 of 29. Mr. Ferraro, are you aware of the

13   conversation that you had with Jason Perman, which were

14   included with my Motion filed with the Court at Docket 3532,

15   wherein you speak about creating a presentation

16   [indiscernible] financial information of Celsius?

17               MR. BROWN:  Your Honor, I'm going to object. I

18   don't have exhibit lists, I don't --

19               THE COURT:  Sustained. I ordered that any

20   documents that any party wished to use in cross-examination

21   had to be filed on the docket by 5:00 p.m. yesterday. My

22   desk is --

23               MR. DAVIS:  Your Honor, we were --

24               THE COURT:  Just a second. Don't interrupt. My

25   desk is piled with documents. There are thousands of

Page 66

1    exhibits, there are thousands of entries on the docket. You

2    can ask questions, but unless you provided documents you

3    wish to use in cross-examination by last night, you can't

4    use anything. Go ahead.

5              MR. DAVIS:  Mr. Ferraro, are you aware about

6    [indiscernible]

7              THE COURT:  I'm sorry, you cut out.

8              MR. DAVIS:  Mr. Ferraro, are --

9              THE COURT:  Could you ask your question again?

10             MR. DAVIS:  Sure. Mr. Ferraro, are you aware at

11   the moment of the pause on June 12th, 2022, the amount of

12   open short positions against CEL Token on FTX exploded from

13   8 million short positions to over 20 million short

14   positions?

15             MR. FERRARO:  I've, I've read about it, I've been

16   in conversations about it. I haven't studied it uniquely.

17   I'm aware of the general discussion of this topic.

18             MR. DAVIS:  Are you aware there were only about 5

19   million CEL Tokens on the FTX platform at the time of the

20   pause, and that 15 million of those 20 million short

21   positions were illegal [indiscernible] shorts?

22             MR. BROWN:  Objection, Your Honor.

23             THE COURT:  Sustained.

24             MR. DAVIS:  Are you also aware that from the pause

25   to the petition date, over 17 million --

Page 67

1          THE COURT:  I sustained the objection to the last

2    question, so you can't ask whether he's also aware. If you

3    want to ask a question, ask a question.

4          MR. DAVIS:  One second, Your Honor. Mr. Ferraro,

5    was the price of CEL Token at any time higher than .81 cents

6    from the pause, the petition date?

7          MR. FERRARO:  My understanding is it went above

8    .81 cents at, at periods of time in that time period.

9          MR. DAVIS:  Is it fair to state it went to $1.60

10   as reflected in Mr. [Indiscernible] report?

11         MR. FERRARO:  I don't have all the numbers in

12   front of me, but doesn't sound unreasonable that it could

13   hit that for a point in time, yes.

14         MR. DAVIS:  Mr. Ferraro, is it your testimony that

15   you are aware of no other factors that could have moved the

16   price of CEL Token from the .28 cent closing price on the

17   date of the pause, to the $1.60 price on June 22nd, to the

18   .81 cent price on the petition date?

19         MR. BROWN:  Objection.

20         THE COURT:  Sustained.

21         MR. DAVIS:  Do you have any idea or explanation

22   why the price of CEL Token moved up to $1.60 on June 22nd,

23   2022?

24         MR. BROWN:  Objection.

25         THE COURT:  Do you know, Mr. Ferraro, whether it

1    moved to that price or not?

2              MR. FERRARO:  I don't know the exact price, no.

3              THE COURT:  Sustained.

4              MR. DAVIS:  Can you describe the extent and nature

5    of the contract that you or anyone were in Celsius that you

6    are aware of had with FTX or  Alameda Research 3 months

7    prior to the pause?

8              MR. FERRARO:  I'm only aware of interactions with

9    FTX and Alameda Research that went through our bankers. At

10   the time that was Citibank.

11             MR. DAVIS:  Mr. Ferraro, do you know about how

12   many CEL Tokens Celsius purchased from the market between

13   the pause and the petition date?

14             MR. FERRARO:  Zero.

15             MR. DAVIS:  Thank you. Mr. Ferraro, would you be

16   surprised to know that Celsius did not -- sorry.

17   Mr. Ferraro, do you know how many CEL Tokens Celsius was a

18   net seller of for the combined months of June 2022 and July

19   2022, which included the entirety of the pause?

20             MR. FERRARO:  I do not know the amount that you're

21   referencing, no.

22             MR. DAVIS:  One second, Your Honor. Thank you,

23   Judge. I'm finished.

24              THE COURT:  Thank you. Anyone else wish to cross-

25   examine?

1            MR. IOVINE:  Yes.  Jason Iovine, Pro Se Creditor.

2            THE COURT:  Go ahead, Mr. IOVINE.

3            MR. IOVINE:  I -- please excuse me, I'm not a

4    lawyer, so bear with me. Mr. Ferraro, can you tell us who

5    has control over the CEL Token contract, the administrator

6    rights of it?

7            MR. FERRARO:  I, I'm not in technology so I'm not

8    a native crypto person. I believe the smart contract governs

9    it, but I don't have those details.

10            MR. IOVINE:  So you don't know if Celsius has the

11    ability to freeze the CEL Token contract where the CEL Token

12    cannot interact with the contract?

13            THE COURT:  I don't understand your question.

14            MR. IOVINE:  How can I explain it. The contracts

15    have -- some contracts have the ability to freeze so they

16    cannot interact with the contract. It's kind of like

17    removing a stock from trading.

18            MR. BROWN:  Your Honor, can he ask the question

19    again?

20            THE COURT:  Ask the question and we'll see what

21    we, what -- go ahead.

22            MR. IOVINE:  Okay, go ahead. Sorry. You said you

23    don't know if Celsius, or who has control over the contract.

24    So let me ask, as in, like, any equity that's traded when a

25    company goes into bankruptcy, it should -- it gets delisted

1    or a Q put on the end of it. Why wasn't that done with CEL

2    Token?

3              MR. FERRARO:  I mean, CEL Token is traded on

4    exchanges. There was a supply outside of what was on the

5    platform that was locked.

6              MR. IOVINE:  Okay. Now, with what was being said

7    is that CEL Token is dependent on Celsius. Was there any

8    other financial institutions that used CEL Token?

9              MR. FERRARO:  I'm not sure I understand the

10   question.

11             MR. IOVINE:  As I know as BP Finance, Chedal [ph],

12   DeFi protocols that used it for lending and borrowing, yield

13   farming. Is that correct?

14             MR. FERRARO:  I, I --

15             MR. IOVINE:  Good swap also.

16             MR. FERRARO:  I'm -- CEL Token was widely held, so

17   it was held by many people in different entities. And there

18   was some use of CEL in yield farming on exchanges, et

19   cetera. But I don't know the depths of it, and I don't think

20   it was that deep of a market, to my understanding.

21             MR. IOVINE:  Okay, so it had been solely

22   independent of Celsius.

23             MR. FERRARO:  Um --

24             THE COURT:  I don't understand your question.

25             MR. IOVINE:  It goes to --

Page 71

```
 1                THE COURT:  Just ask, just ask questions.

 2                MR. IOVINE:  CEL Token was --

 3                THE COURT:  Just ask questions.

 4                MR. IOVINE:  Okay.

 5                MR. BROWN:  Your Honor, I just want to note for

 6      the record, our notes indicate that Mr. IOVINE actually

 7      voted to accept the plan.

 8                THE COURT:  I'm going to let -- Mr. Brown, sit

 9      down.

10                MR. BROWN:  I understand.

11                THE COURT:  Mr. Brown. Mr. IOVINE, go ahead.

12                MR. IOVINE:  Thank you, sir. Is it not reasonable

13      to think that CEL Token could've had a future with Celsius

14      during the pause time, because Celsius was lacking

15      communications and they were still paying out rewards to the

16      accounts?

17                MR. BROWN:  Objection, Your Honor.

18                THE COURT:  Sustained.

19                MR. IOVINE:  Okay, Your Honor, that's about all.

20                THE COURT:  All right. Anybody else wish to cross-

21      examine?

22                MR. PHILLIPS:  Yes, Your Honor.  Yes.

23                THE COURT:  All right, it was Mr. Phillips.

24                MR. PHILLIPS:  Thank you, Your Honor.

25                MR. IOVINE:  I don't care if I accept it.
```

1            THE COURT:  Excuse me. Mr. Phillips, you wish to

2    question?

3            MR. PHILLIPS:  Yes, I do.

4            THE COURT:  Go ahead.

5            MR. PHILLIPS:  Thank you. Mr. Ferraro, I'm going

6    to follow, essentially, the order of your Declaration. And

7    so I'd like to turn to Paragraph Number 9.

8            THE COURT:  Which of the Declarations? Because

9    there are several that have been admitted into evidence.

10           MR. PHILLIPS:  3581. Mr. Ferraro's got it up

11   there.

12           THE COURT:  Okay, what paragraph? I have it open

13   in front of me as well.

14           MR. PHILLIPS:  It's A, Section of Officers and

15   Directors, Number 9.

16           MR. FERRARO:  Yes, I'm there.

17           THE COURT:  Go ahead.

18           MR. PHILLIPS:  Okay. The sentence that says 'I

19   discussed the selection process with the Committee and the

20   Plan Sponsor and understand that it was, is, and will be

21   consistent with the . . . Holders of Claims, the Claims and

22   Interests and public policy.'  Why do you say that?

23           MR. FERRARO:  I did discuss the selection of the

24   Board with the cochairs of the Committee, and Steve Kokinos

25   of Fahrenheit. And I think that their selection process was

Page 73

1    robust, and I think they picked a really good Board.

2              MR. PHILLIPS:  And why do you believe it's

3    consistent with the interests of the holders of the claims

4    and interests?

5              MR. FERRARO:  I think that there's representation.

6    the UCC was able to -- the creditors picked the vast

7    majority, the majority of the Board seats. So -- and there's

8    representation from the creditors, there's also Board

9    observers. I think the interests are aligned.

10             MR. PHILLIPS:  Okay. On Paragraph Number 20

11   discussing the Third-Party Release. You state that 'the

12   Third-Party Release is a wholly consensual release and that

13   all Holders of Claims entitled to vote had the opportunity

14   to opt out of the Third-Party Release.' Do you think that

15   there is a difference between a wholly consensual and a

16   coercive release?

17             MR. BROWN:  Objection.

18             THE COURT:  Sustained.

19             MR. PHILLIPS:  Why do you believe that the release

20   was wholly consensual?

21             MR. FERRARO:  It was on the ballot. Folks could

22   opt out.

23             MR. PHILLIPS:  Could you opt out of it if you

24   voted yes?

25             MR. FERRARO:  My understanding is, yes.

 1              MR. PHILLIPS:  I don't believe that's correct.

 2              MR. FERRARO:  Maybe I'm confused, I'm sorry. You

 3       vote for the plan, then, yeah, you're, you're supporting the

 4       releases.

 5              MR. PHILLIPS:  All right. And if you wanted to

 6       avail yourself of the preference avoidance settlement, could

 7       you opt out of the release?

 8              THE COURT:  If you know the answer, go ahead.

 9              MR. FERRARO:  I don't. I'm, I'm stalling, I

10       apologize, sir.

11              THE COURT:  No, it's not stalling. The Plan is a

12       lengthy document. The Ballot was a lengthy document. If you

13       know the answer, you can answer it.

14              MR. FERRARO:  I do not know the answer.

15              THE COURT:  Otherwise, it's okay.

16              MR. FERRARO:  Yeah, I do not know the answer.

17              THE COURT:  Go ahead, Mr. Phillips.

18              MR. PHILLIPS:  Okay. So, are you still concluding

19       that the release was wholly consensual.

20              MR. FERRARO:  Yes.

21              MR. PHILLIPS:  On Paragraph 21, you mention

22       receiving informal comments from the SEC. What were those

23       comments?

24              MR. FERRARO:  My understanding is, if a class was

25       deemed to reject, that they would have -- they would not --

Page 75

1    they would need to opt into the release.

2              MR. PHILLIPS:  That was the comment from the SEC?

3              MR. FERRARO:  That's my understanding.

4              MR. PHILLIPS:  Okay. And when you said

5    'exculpation,' which I know Ms. Cornell covered extensively,

6    Paragraph 26, how many exculpation provisions have you

7    previously applied upon?

8              MR. BROWN:  Objection.

9              THE COURT:  Sustained.

10             MR. PHILLIPS:  On what basis do you believe that

11   the exculpation provision in the plan is appropriate?

12             MR. FERRARO:  I think I testified to this earlier.

13   I think it's a critical component, and it was arms-length

14   transaction with these parties. They're supporters of the

15   plan and they've contributed to the plan.

16             MR. PHILLIPS:  And Ms. Cornell dug into this in

17   Paragraph 27 a little bit. But you stated that 'The

18   exculpation provision is critical to ensuring that funds

19   could be returned to creditors as promptly as possible

20   through the transactions that are approved by the Bankruptcy

21   Court . . .' Is it critical to all the exculpated parties,

22   or are there only certain parties that are exculpated that's

23   critical so that funds can be returned?

24             MR. FERRARO:  We went through some examples on

25   exculpations. I think that they're critical.

1          MR. PHILLIPS:  So why, for example, is it critical

2    that the Debtors' attorneys, K & E, be exculpated for the

3    funds to be returned?

4          MR. FERRARO:  I mean, they're part of that, they

5    are part of that process. They are part of contract

6    negotiations, they are part of setting up the way in which

7    the different counter-parties --  Celsius, the Debtor and

8    PayPal and Coinbase -- interact.

9          MR. PHILLIPS:  But why do they need the protection

10   of the exculpation? They're highly sophisticated lawyers and

11   been paid significant fees to set this up appropriately. Why

12   do they need the additional protection of the exculpation to

13   shield them from any potential liability from how the

14   distribution [indiscernible]

15         MR. FERRARO:  We're not really -- there's, there's

16   -- we're not really giving up anything, we know of no issues

17   where there's any potential claims, causes of action against

18   any of these folks. So, I mean, we -- these -- we've gotten

19   to a good place in this case with the contribution of all

20   these parties, and I think that's the reason why we're

21   comfortable giving these exculpations.

22         MR. PHILLIPS:  Doesn't exculpation cover known and

23   unknown claims?

24         MR. FERRARO:  That's my understanding. And as I

25   said, we -- there is nothing that we know that would, you

1    know, prevent us. There's been tons of investigations that

2    have gone into this, from the examiner to the special

3    Committee, to the UCC. And all of these parties have come

4    out clean on this.

5              MR. PHILLIPS:  I'm not saying that they did

6    anything wrong, but I'm saying that they should stand up for

7    their work on their own two feet, not be shielded by

8    exculpation. I don't understand that.

9              THE COURT:  That may be your position, but ask

10   questions.

11             MR. PHILLIPS:  So why do you think that the

12   professionals who advise both the Debtor and the Committee

13   are in need of exculpation for the distributions to actually

14   be -- to have effect, to actually take place and have

15   effect?

16             MR. FERRARO:  I mean, I think we've gone through

17   some of these details. Both parties have reviewed the

18   contracts. Both parties, UCC advisors as well as the

19   Debtors' legal advisors, helped negotiate the contract, set

20   up the processes for the distribution with the Debtors'

21   internal team. So significant contributions have been made.

22             MR. PHILLIPS:  That's all I have.

23             THE COURT:  Thank you very much, Mr. Phillips.

24   Anybody else wish to cross-examine?

25             MR. BRONGE:  Your Honor, yes. This is Johan

1   Bronge, Pro Se Creditor.

2         THE COURT:  Okay, Mr. Bronge, go ahead.

3         MR. BRONGE:  Yes.  Good morning, Mr. Ferraro.

4         MR. FERRARO:  Good morning.

5         MR. BRONGE:  I'm a [indiscernible] and a CEL

6   accountholder on the CEL platform. I want to ask you a

7   little bit about ownership at the, of the collateral. And to

8   do that, I would like to refer to the Terms of Service

9   Version 7 that is Docket 393, and it starts on Page 858.

10        THE COURT:  Mr. Bronge, Mr. Bronge?

11        MR. BRONGE:  Yes.

12        THE COURT:  I ordered that anybody wishing to use

13  a document in cross-examination had to post it on the docket

14  by 5:00 p.m. yesterday.  I can't magically -- I'm sorry, I

15  can't magically make it appear for purposes of cross-

16  examination. If you wish to ask --

17        MR. BRONGE:  But I think this is --

18        THE COURT:  Don't, don't interrupt me. If you wish

19  to ask questions without the use of documents, if the

20  witness knows about it, he can. But, you know, I'm

21  permitting people to cross-examine by using Zoom, but it was

22  essential that everyone know what documents anybody wishing

23  to cross-examine is using, they be made available on the

24  docket last night. So I'll permit you to continue with your

25  questioning, but not referring to documents that have not

Page 79

1    been provided for cross-examination.

2            MR. BRONGE:  This is under exhibit list of the

3    Debtor. So it's in the, the docket as well.

4            THE COURT:   Mr. Bronge, if you wish to cross-

5    examine on a document, you have to post it by 5:00

6    yesterday. If you wish to --

7            MR. BRONGE:  Okay.

8            THE COURT:  -- ask questions without regard to

9    documents, go ahead and do that.

10           MR. BRONGE:  All right.  Mr. Ferraro, could you

11   explain what rationale the Debtor has to consider the

12   collateral property of the estate?

13           MR. FERRARO:  I mean, somewhat of a legal

14   question. But in reviewing the Terms of Use, I mean, there's

15   language that says you can pledge, repledge, lend out, et

16   cetera. It's pretty consistent with the Terms of Use there.

17           MR. BRONGE:  So in reference to your answer, there

18   is a -- we could agree that there is a distinction between

19   ownership title and pledging or using an asset.

20           MR. BROWN:  Objection, Your Honor.

21           THE COURT:  Sustained.

22           MR. BRONGE:  So, is it possible to use an asset

23   without owning an asset?

24           MR. BROWN:  Objection.

25           THE COURT:  Sustained.

Page 80

1          MR. BRONGE:  Can you explain how you define

2     ownership from the Debtor in relation to assets?

3          MR. BROWN:  Objection, Your Honor.

4          THE COURT:  I'm going to permit the witness to

5     answer. It's not, he's not a lawyer and he's not giving a

6     legal opinion. If you're able to answer that, go ahead.

7     Otherwise, please say.

8          MR. FERRARO:  Can you please restate the question?

9          MR. BRONGE:  Yes. I want to understand how the

10    Debtor determines the ownership status of an asset. What

11    they base those on.

12          MR. FERRARO:  I'm not a lawyer. I think that's

13    clear in the Terms of Use.

14          MR. BRONGE:  Okay. So may I ask a procedure

15    question to the Judge?

16          THE COURT:  Go ahead.

17          MR. BRONGE:  Yes. If I want to examine the

18    conditions in the TOS that is listed on that Debtors'

19    exhibit list, how should I do that?

20          THE COURT:  If it's listed on the Debtors' exhibit

21    list, I have all of those documents in front of me. I'll

22    permit you to use the exhibits that the Debtor marked.

23    They're all before the Court. They're all before any

24    parties. So yes, you can go ahead and do that. Just identify

25    the exhibit and give everyone a chance to pull it out, okay?

Page 81

1            MR. BRONGE:  Yes. Okay. I think what I tried to do

2    originally is the exhibitor list, I think it was 44 on the

3    Debtor, on the Debtor list presented, and it's reference to

4    the Terms of Service.

5            THE COURT:  Well, Exhibit 44 is the Declaration of

6    Mr. Ferraro. It was marked and admitted in evidence this

7    morning.

8            MR. BRONGE:  Exactly.

9            THE COURT:  But it does not have Terms of Service

10   or --

11           MR. BRONGE:  Yes it --

12           THE COURT:  Terms of Use attached.

13           MR. BRONGE:  It does, it does have it as a

14   reference.

15           THE COURT:  Well, it does not have the exhibit.

16   Hold on, I think the, the Debtors' counsel is going to help

17   you out on this one.

18           MR. BROWN:  Going to try to, Your Honor.

19           THE COURT:  Yeah.

20           MR. BROWN:  The Terms of Service were admitted

21   into evidence as Exhibit 38. They're not in the binder,

22   they're -- that's the paragraph that was referenced in

23   Exhibit 44 that we went through. I have a binder with

24   Exhibit 38. I can bring it to Your Honor and Mr. Ferraro so

25   everybody has a copy.

Page 82

1              THE COURT:  Please. Thank you.

2              MR. FERRARO:  Could he also bring me another

3     water? It's a lot of talking, sorry.

4              THE COURT:  There probably is water in that

5     pitcher.

6              MR. FERRARO:  Oh, oh, even better. Thank you.

7              THE COURT:  There should. If not, my apologies.

8              MR. FERRARO:  Yeah, yeah, I think you're right. I

9     assumed that was just there for aesthetics.

10             THE COURT:  No, no. Aesthetics and for your use.

11             MR. FERRARO:  Okay, thank you, thank you. Okay.

12             THE COURT:  Exhibit 38 has been placed in front of

13    the witness. It's Terms of Use --

14             MR. BROWN:  And Your Honor --

15             MR. BRONGE:  Thank you. So may I --

16             THE COURT:  Hold on just a second.

17             MR. BROWN:  I just want to clarify before

18    Mr. Bronge gets going here. Exhibit 38, as I stated

19    previously, is a compilation of all Terms of Service that

20    were filed on the docket previously. I can get that docket

21    entry. I don't know what page, which version of the Terms of

22    Service, what he's interested in. So Exhibit 38 is

23    approximately 11, 1,200 pages.

24             THE COURT:  Okay, so Mr. Bronge, you're not here,

25    so you don't see it. But the --

1          MR. BRONGE:  I have it here, so --

2          THE COURT:  Just a second.

3          MR. BRONGE:  -- I will be fine.

4          THE COURT:  -- 38 is 1,026 pages long. It has a

5    compilation of all of the versions of the Terms of Use,

6    starting with Terms of Use 1. So you need to be more

7    specific as to which version of the Terms of Use --

8          MR. BRONGE:  I will --

9          THE COURT:  -- you're referring to.

10         MR. BRONGE:  -- I will be extremely specific, Your

11   Honor. I would like to go to Page 858.

12         THE COURT:  All right, just a second. All right, I

13   have it open in front of me. Mr. Ferraro, when you have Page

14   858 of 1,026 open, just please tell me that.

15         MR. FERRARO:  I'm there.

16         THE COURT:  Go ahead, Mr. Bronge.

17         MR. BRONGE:  Thank you. So this page is Celsius

18   Loan Terms and Condition, and this is in reference to

19   Version 7. Version 7 is the conditions under which I took my

20   first loan. So that's why I refer to this one. Because also

21   in this document it states that the loan is controlled by

22   the version of the TOS that was in force when the loan was

23   taken. So if we move on to definitions, Number 3, I would

24   like to understand -- I would like to know your

25   understanding of that sentence's definitions Number 3. If

Page 84

1    you could read it, please.

2              MR. FERRARO:  Number 3. Collateral means the

3    amount in eligible digital assets as provided by the

4    Borrower to the Lender as security for the loan.

5              MR. BRONGE:  Okay. Is there anything in that

6    statement that indicates that I have transferred ownership

7    in your opinion?

8              MR. BROWN:  Objection. Calls for legal conclusion.

9              THE COURT:  Overruled. It says what it says,

10   Mr. Bronge.

11             MR. BRONGE:  Yes, and I'm trying to understand how

12   the Debtor can consider the collateral his property, and

13   that's why I want to understand, what in this sentence

14   indicates that this is the Debtor's property.

15             MR. FERRARO:  I don't think that that's the

16   sentence that refers to the property. That's talking about

17   the collateral that's provided by the borrower as security

18   for the loan.

19             MR. BRONGE:  Okay, so, that's fine, so we

20   understand, from this sentence, the collateral has no --

21             THE COURT:  Just ask your question, Mr. Bronge.

22             MR. BRONGE:  Okay, next -- all right. Next, I

23   would like to go to Page 859 under ineligibility and

24   Application [indiscernible] D. So can you see what that

25   says?

1          MR. FERRARO:  Celsius receives the collateral from

2    you and.

3          MR. BRONGE:  Yeah, so, just want to state that

4    this collateral comes from the borrowers there, is that

5    correct?

6          MR. FERRARO:  You broke up a little bit. That

7    collateral comes from what?

8          MR. BRONGE:  It's the collateral -- my

9    understanding, and I want to understand if the Debtor has

10   the same, is that the collateral comes from the borrower.

11         MR. FERRARO:  For security on the loan, yes.

12         MR. BRONGE:  Thank you. Then we move to Page 860,

13   Item 1. So I can read the relevant part here. It's in --

14   from the sentence after what is called deferred event. It

15   says Celsius may immediately liquidate the corresponding

16   amount from your collateral. Would you consider that meaning

17   the borrower's collateral, or is this somehow the Debtor's

18   collateral?

19         MR. FERRARO:  I think it's referring to the

20   collateral that was posted to secure the loan.

21         MR. BRONGE:  So, but 'your' in this sentence,

22   doesn't that refer to the borrowers, the owner of the

23   collateral?

24         MR. FERRARO:  No, I think it's referring to the

25   one that provided the collateral for the loan. At least,

1      that's my reading. Not a lawyer, again.

2             MR. BRONGE:  So 'your collateral' in your mind is

3      not the borrower's, it is somebody else's. Even though it

4      states to the borrower.

5             MR. FERRARO:  Provided by the borrower as security

6      for the loan, security interest for the loan.

7             MR. BRONGE:  I'm just reading -- I cannot put in

8      any words there, I'm just reading the sentence as it is. So

9      'your collateral' do you consider that be 'your' referring

10     to the Debtor in this case or the borrower?

11            MR. FERRARO:  I think it's referring to the

12     borrower who provided collateral as security for the loan.

13            MR. BRONGE:  All right. So there is a number of

14     sentences where it always refers to 'your collateral.' And

15     since 'your' in this, in this context would be the borrower

16     who provided the collateral, is that your understanding?

17            MR. FERRARO:  I think, I think we went over this a

18     couple times. My understanding is it's referring to that the

19     borrower provided collateral as security interest for the

20     loan.

21            MR. BRONGE:  Okay, so we continue here. If we go

22     to Page 862, under Collateral Item C. So here, I can read

23     the sentence. It says 'Collateral shall be subject to a

24     pledge for Celsius' benefit in accordance with the terms

25     herein.' Can you explain how that sentence transfers

1    ownership and title of the collateral?

2           MR. BROWN:  Objection, Your Owner. Calls for a

3    legal conclusion.

4           THE COURT:  Overruled. If you know.

5           MR. FERRARO:  So, I'll do my best.

6           THE COURT:  You're not testifying as a lawyer.

7           MR. FERRARO:  I'm not testifying as a lawyer, I

8    will do my best. I think what it says here is subject to a

9    pledge for Celsius' benefit. And if I may, on Page 869 of

10   1,126, Section B --

11          MR. BRONGE:  Excuse me, I --

12          THE COURT:  Yes.

13          MR. BRONGE:  You broke up, so --

14          THE COURT:  Okay, [indiscernible] go ahead. Just

15   read it loudly.

16          MR. FERRARO:  Sorry. Page -- I have this huge

17   binder on my lap and it's hard to get too close, so --

18          THE COURT:  Me, too.

19          MR. FERRARO:  -- on Page 869 of 1,126, Conditions

20   to the Lender Obligation, D, this kind of refers to how the,

21   how the borrower agrees that the lender may, for its own

22   account, pledge and repledge.

23          MR. BRONGE:  Okay. I understand. Now, in your

24   review, is pledging an asset the same as transferring title

25   of an asset?

1          MR. BROWN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. BRONGE:  Okay. What -- if, if you contrast the

4     statements in this section with the statements of the UK

5     Lending where there is a sale and repurchase agreement,

6     which is -- you can find much later in this. I can refer to

7     the exact pages. That -- the statements are very different

8     where they explicitly state you transfer title. I would like

9     to understand where in this Terms of Service Version 7 there

10    is a statement that I transfer ownership title. Do you have

11    that? Do you know about any such statement in this version?

12         THE COURT:  I'm going to sustain an objection to

13    the questions. I will permit a question as to whether, you

14    know, there is anything in this version of the Terms that

15    you believe transfers ownership.

16         MR. FERRARO:  From my reading of this, it implies

17    transfer of ownership, right to pledge. Not a lawyer, again.

18    Lender may do so without retaining, retaining its possession

19    to control for delivery. Borrower agrees that it can do it

20    for its own account. So it's obviously transferring a lot of

21    rights to Celsius.

22         THE COURT:  Ask your next question, Mr. Bronge.

23         MR. BRONGE:  Yes. So you consider transferring

24    rights as the same as transferring, as the same as

25    transferring title?

Page 89

 1              MR. BROWN:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3              MR. BRONGE:  Okay, so can I maybe ask him a

 4      different way, if --

 5              THE COURT:  Let me --

 6              MR. BRONGE:  Yes.

 7              THE COURT:  Go ahead, Mr. Bronge.

 8              MR. BRONGE:  Yeah, I'm trying to get the Debtor to

 9      explain the way they interpret this section. I don't know if

10      I should ask --

11              THE COURT:  Mr. Bronge, I'm not asking questions

12      of the witness, but this is a long document. If you look on

13      Page 870 under Consent to Celsius' use of your Digital

14      Assets --

15              MR. BRONGE:  Yes, that is --

16              THE COURT:  -- transferring with all, transferring

17      with all attendant rights of ownership. So I think --

18              MR. BRONGE:  Yes, let me --

19              THE COURT:  -- you're asking a non-lawyer

20      questions about a lengthy document.

21              MR. BRONGE:  How in proceedings shall I ask these

22      questions? Should it be at a later date?

23              THE COURT:  I'll let you continue with questions,

24      but you can't ask for legal opinions. This is a lengthy

25      document.

1              MR. BRONGE:  So how can I ask --

2              THE COURT:  -- paragraph on Page 870, under

3     Consent to Celsius' use of your digital assets, where it

4     says --

5              MR. BRONGE:  May I address that question?

6              THE COURT:  -- it says with all right, attendant

7     rights of ownership.

8              MR. BRONGE:  It says, first of all, that --

9              THE COURT:  I'm not going to have a legal argument

10    about this.

11             MR. BRONGE:  No.

12             THE COURT:  If you want to ask a question, ask,

13    questions --

14             MR. BRONGE:  I understand.

15             THE COURT:  -- of the witness, I'm going to permit

16    you to do that.

17             MR. BRONGE:  Yes. I understand. But I will not

18    continue these questions because obviously I cannot answer,

19    ask them to the right person. So is there any time in the

20    hearing I can ask these legal questions regarding this Terms

21    of Service?

22             THE COURT:  You can't ask the lawyers about it.

23    You'll, you know, when we get to closing argument and you

24    wish to argue that a document in evidence means what you say

25    it means, you can argue that. But that's pure argument, not

Page 91

1    evidence. The document itself is in evidence. And you can --

2    when we get to the conclusion of the case, if you wish to

3    file a memorandum of law, I'll permit you to do that. But

4    this is not a proper subject for a question of this non-

5    lawyer.

6            MR. BRONGE:  Okay. So in that case, I --

7            THE COURT:  Do you have any other questions,

8    Mr. Bronge?

9            MR. BRONGE:  Just one quick question on the

10   valuation of the CEL Token, if I May.

11           THE COURT:  Go ahead.

12           MR. BRONGE:  I would like to understand the reason

13   why the Debtor are distinguishing the CEL Token as different

14   from all the other tokens except Bitcoin, that it has been

15   on the Celsius platform, and why this is singled out for

16   some kind of reasoning for that rather than all the other

17   coins taken the value at the bankruptcy.

18           MR. FERRARO:  I mean, I think CEL Token, there's a

19   few things. One, the manipulation of the token. And two, the

20   fact that 95 percent of it was locked on the platform and

21   there was limited trading volume. It was kind of a

22   dislocated market at that point. Those are just two things

23   that are top of mind.

24           MR. BRONGE:  So do you know that that does not

25   apply to any of the other tokens? Because they are all the

Page 92

1    same except Bitcoin. They have a central entity and they

2    have treasuries and they have companies in charge of them.

3             THE COURT:  Mr. Bronge, the CEL Token is a native

4    token of the Celsius platform.

5             MR. BRONGE:  Let me make [indiscernible]

6             THE COURT:  Do you have a question for the

7    witness?

8             MR. BRONGE:  No, I have no more questions.

9             THE COURT:  All right. Anybody else wish to cross-

10   examine?

11            MR. ABREU:  Your Honor, Artur Abreu

12   [indiscernible] I want to be very brief and I just want to

13   ask question to the witness.

14            THE COURT:  Go ahead, Mr. Abreu.

15            MR. ABREU:  Thank you. I am Pro Se Creditor and I

16   actually bought CEL outside, outside, outside

17   [indiscernible] just so, just a disclosure. So, Chris

18   Ferrera, you mentioned that in this hearing that mining has

19   had significant hurdles, but it has been successful

20   considering the circumstances. You also refer that you had

21   implemented or were successful in hedging strategies. As I

22   am aware, you have significant experience in banking. Is it

23   fair to also argue that hedging in banking is a essential

24   strategy to mitigate risk?

25            MR. BROWN:  Objection, Your Honor, relevance.

1              THE COURT:  overruled.

2              MR. FERRARO:  I think any manager of a business

3    should understand the risks and try to mitigate them to a

4    residual level that's acceptable. So when we look at the

5    mining business, we think about what our main kind of

6    components of risk, BTC -- that we can hedge, BTC price and

7    energy. When we think about banking, there's many different

8    types of market and credit risk in which you do the same

9    type of exam--, you know, you cascade risk and you do the

10   same type of analytics related to.

11             MR. ABREU:  Thank you, thank you. Could you

12   explain your understanding of hedging, in the basic form.

13             MR. FERRARO:  With regards to?

14             THE COURT:  Keep it, you know, focused on Celsius

15   and --

16             MR. ABREU:  Yeah, okay, so let's imagine this.

17             THE COURT:  This is not an educational course in

18   hedging. Go ahead.

19             MR. FERRARO:  Okay.

20             MR. ABREU:  Well let me rephrase it, then.

21             THE COURT:  He's going to answer your question. Go

22   ahead.

23             MR. ABREU:  Okay.

24             MR. FERRARO:  Yeah, I think there's two things.

25   One first comes to mind, and I think that's predominantly

Page 94

1    what we're discussing here, is the hedging out of the power

2    costs related to running the mining rigs.

3              MR. ABREU:  Okay, if you were to hedge CEL Token,

4    what will the company do? I'm sure you probably had the

5    discussions internally or you see some of the strategies.

6    Can you share to the Court what type of strategies in the

7    case of hedging CEL Token would imply?

8              MR. FERRARO:  I joined Celsius in March of 2022.

9    You know, we froze in mid-June. I was involved in a lot of

10   conversations, did a lot of work during that time period. I

11   do not remember talking about macro hedges on CEL Token. And

12   I'm not even sure there's market depth to do it at the scale

13   that you're implying.

14             MR. ABREU:  Okay, let me then tell you this. Do

15   you think shorting is an important tool to do an hedge of an

16   asset?

17             MR. BROWN:  Objection.

18             THE COURT:  Overruled. Focus on Celsius. If you

19   have an answer, go ahead. If you haven't, you don't have an

20   answer, just say that.

21             MR. FERRARO:  I think hedging depends on the risk,

22   the specific risk you're trying to hedge out and the cost of

23   hedging out that risk versus the tail you're trying to

24   protect against.

25             THE COURT:  Next question, Mr. Abreu.

1                    MR. ABREU:  Let me say this. Do --

2                    THE COURT:  Just ask questions. I don't want any

3      statements.

4                    MR. ABREU:  Okay, yeah, yeah, yeah.

5                    THE COURT:  Just ask questions.

6                    MR. ABREU:  Are you familiar with shorting? Do you

7      understand shorting an asset?

8                    MR. FERRARO:  I'm not a shorter. In my investment

9      --

10                   MR. ABREU:  But you understand, you understand?

11                   MR. FERRARO:  I understand it generally, yes.

12                   THE COURT:  You understand, it's one of the things

13     that's said, that certainly an allegation that insiders

14     manipulated the price of the CEL Token certainly near the

15     end, correct?

16                   MR. FERRARO:  Yeah, my understanding is that the

17     CEL Token was manipulated, really, throughout its existence,

18     yeah.

19                   THE COURT:  Okay.

20                   MR. ABREU:  Okay, so as you said, that you have

21     some basic understanding of short. Do you think shorting can

22     add market value to an asset, even if the underlying

23     business is bankrupt? I'm sure with your experience in

24     financials that you have seen companies on the market that

25     went bankrupt but still their underlying stock spikes in

1    price, even when the company is bankrupt. Do you think

2    shorting can add some value to a bankrupt company or asset

3    tied to this company?

4            MR. BROWN:  Objection.

5            THE COURT:  Sustained.

6            MR. ABREU:  Okay. Just do you also believe that

7    faced with the level of misrepresentation that has been said

8    in court by officers and the company itself, do you think

9    it's fair to say that the market was not completely aware of

10   the level of risk and leverage that the company was in at

11   the pause and at the petition date?

12           MR. FERRARO:  Yeah, I think the general financial

13   conditions of Celsius leading up to the pause were very

14   poor. And I'm not sure that that was reflected in the

15   disclosures to the marketplace.

16           MR. ABREU:  There were many instances in this

17   process that I believe the company itself was trying to come

18   with a reorg. Which, let's say previous [indiscernible] was

19   putting CEL as maybe a way to reorg it around it. When was

20   this completely taken out of the discussion and it was then

21   pursued the current framework reorg plan?

22           MR. FERRARO:  CEL has never been taken out of the

23   discussion. We've always thought about CEL in an equitable

24   way to solve this issue from the beginning.

25           MR. ABREU:  When were the employees and the

Page 97

1    company -- when did the previous leadership and their

2    associated reorg [indiscernible] removal from the company?

3              MR. FERRARO:  It was never removed. This whole

4    process has been iterative and learning and organic. As I

5    mentioned earlier in my testimony, we spent a lot of time

6    developing an internal standalone plan. We determined that

7    the NovaWulf sponsor plan as a stalking horse bid was the

8    right route and went into the auction accordingly.

9              MR. ABREU:  About company compensation. Are you

10   aware of whether your former insiders and former officers,

11   former officers of the company who received CEL as

12   compensation? If any of former officer are not included in

13   the excluded parties from this plan. So are former officers

14   with significant compensations of CEL not an excluded party?

15             MR. FERRARO:  There are people who have

16   concentrations of CEL who through the investigations was not

17   determined that they were not bad actors. And because of

18   that, they're not on the excluded party list. That's my

19   understanding.

20             MR. ABREU:  In the matter of compensation to those

21   officers I'm -- this former officers, was this compensation

22   given at a zero bust or the employee, former employee,

23   meaning they just received a zero balance and had to pay

24   taxes?

25             MR. FERRARO:  It was part of the compensation

1    structure. Employees were rewarded in salary, discretionary

2    bonuses, equity up front and CEL Tokens. So this was one of

3    the key components of it.

4            MR. ABREU:  So you are saying that former officers

5    and employees were both compensation in terms of equity and

6    CEL Token at zero value for -- at zero cost for them, but at

7    cost for the company and for the investors were potentially

8    being diluted by more market supply. Is that a fair

9    assessment?

10           MR. FERRARO:  I look at it as total compensation

11   in which CEL Token equity and salary and discretionary

12   bonuses are different components of compensation. So it was

13   included for numerous employees.

14           MR. ABREU:  So it's fair to say that at some

15   point, an officer could just receive both CEL as

16   compensation at zero cost and equity on the company at zero

17   cost, is that right?

18           MR. FERRARO:  They're working for --

19           MR. ABREU:  There was, mm-hmm, so there were two

20   vehicles for compensation, correct?

21           MR. FERRARO:  It's a full compensation structure

22   in which employees committed their time and effort in return

23   for compensation. In which, I just named four main

24   components of that compensation.

25           MR. ABREU:  Yeah, and they will also receive a

1   salary and then compensation on top of that, what could be

2   CEL or equity, correct? So that's what you're saying?

3          MR. FERRARO:  I said it four, four times. There's

4   four components of compensation, and employees were largely

5   eligible for those four components.

6          THE COURT:  Ask your next question.

7          MR. ABREU:  Yeah, so is it fair to say that

8   according to [indiscernible] Declaration by the Debtors,

9   that 94 percent of the CEL supply was locked.

10          MR. FERRARO:  That's my understanding --

11          MR. ABREU:  Yeah, that's, that's around --

12          MR. FERRARO:  In reading -- sorry, sir. In

13   reading, in reading that Declaration you're referring to,

14   that's my understanding.

15          MR. ABREU:  Yeah, but I think you have previously

16   mentioned --

17          THE COURT:  Let's not argue, ask questions.

18          MR. ABREU:  Yeah, so my point here, and final

19   question, is that I -- let me just give a follow up for the

20   next question. When you were shorting, you have to put

21   collateral. So imagine that I'm going to short CEL Token,

22   which is at $1. I use $10,000 to take a loan of CEL at $1,

23   and then I, then I sell into the market. I receive $1,000 of

24   CEL. So now I have $2,000 of CEL but a debt of $1,000.

25          MR. FERRARO:  Mm-hmm.

Page 100

1          MR. ABREU:  If the price of CEL, because I have a

2    liability, a debt to the exchange, which is 1,000 CEL

3    Tokens, if the price increases by 100 percent, which means

4    it doubles, it's your understanding that I will be

5    liquidated and the previous collateral that I use to take

6    that short position or take that loan on CEL will be

7    liquidated and used, and will be transferred to the market.

8    Is that a clear, a correct assessment of shorting?

9          MR. BROWN:  Objection.

10          THE COURT:  Sustained.

11          MR. ABREU:  I just, just to finalize, what is the

12    percentage of loans, of international loans in terms of

13    users? Is that 50 percent, 51 percent? Can you give a round

14    number?

15          MR. FERRARO:  I don't have the statistics in front

16    of me, but I think generally it's about half. Generally.

17          MR. ABREU:  Do you understand that there was a

18    difference between the loans international and domestic, and

19    US-based loans? Do -- are you aware of any differences?

20          MR. FERRARO:  The UK comes to mind in terms.

21          MR. ABREU:  Let me give you an example. I was an

22    international creditor, and I took a loan. I could pay with

23    CEL, right? Because I was international. There were a few

24    options that I got in discount on my interest because I was

25    paying with CEL. Was that a product that Celsius had just

Page 101

1    for international users, but US users were not -- this

2    product was not available?

3              MR. FERRARO:  I -- sorry, I didn't run product and

4    while this product was active I had a very short amount of

5    time with the company, so I'm not knowledgeable of all the

6    details. So I don't want to answer that question because I

7    don't -- I'm not --

8              MR. ABREU:  That's your, I believe it's your

9    Declaration --

10             THE COURT:  Ask the next question.

11             MR. ABREU:  Okay. You -- was CEL creditors -- did

12   US users got the same products available to them in terms of

13   CEL? Was there an incentive to purchase CEL as international

14   users?

15             MR. FERRARO:  I'm sorry, I'm not following the

16   question. Was there an incentive --

17             MR. ABREU:  Was there, was there an incentive for

18   US users to purchase CEL [indiscernible]

19             MR. FERRARO:  My understanding is there's a tiered

20   reward system, loyalty system, in which if people hold CEL

21   they would be entitled to discounts in certain products, et

22   cetera. So if that's what you're referring to as an

23   incentive, I mean, that sounds reasonable.

24             MR. ABREU:  I believe US users were not --

25             THE COURT:  You're not testifying. If you have a

Page 102

1    question, ask your question.

2              MR. ABREU:  Judge, that's it. That's all I wanted.

3              THE COURT:  Okay. Thank you. Anybody else have any

4    other questions?

5              MR. UBIERNA:  Yes, Your Honor.

6              THE COURT:  Mr. Ubierna.

7              MR. UBIERNA:  Okay. Good morning, Ferraro. Before

8    you have talk about Emergence Incentive Plan [indiscernible]

9    are you aware that if the plan is approved, you are going to

10   receive a bonus or award?

11             MR. FERRARO:  If certain targets are hit, yes,

12   that's the way it is written in the plan, yes.

13             MR. UBIERNA:  What are your, your responsibilities

14   as Interim CEO?

15             MR. FERRARO:  I'm sorry, I didn't hear that.

16             MR. UBIERNA:  What are your, your responsibilities

17   as Interim CEO?

18             MR. FERRARO:  Oh, thank you. Yeah, it's managing

19   the, the company through the bankruptcy process. Think

20   working with the legal and financial advisors, reporting

21   monthly operating reports to the Court. Obviously mining is

22   an operational business in which we've been deploying rigs,

23   we talked about hedging and managing that business, et

24   cetera. Those are the general qualifications. We've also

25   obviously had to reduce the workforce quite a bit, going

Page 103

1    from, I think it was 950 plus in early 2022 to the 150 we

2    have today.

3            MR. UBIERNA:  Would that responsibilities include

4    getting a plan confirmed?

5            MR. FERRARO:  I think the goal is to get out of

6    bankruptcy. The, you know, the responsibility that I feel

7    personally that I have is to maximize value and do that as

8    fast as possible. But there are threshold and target dates

9    in which I hope we hit and we can return crypto to

10   customers. But, I mean, they're definitely in jeopardy.

11   These are pretty aggressive targets.

12           MR. UBIERNA:  Are you familiar with the Emergence

13   Incentive Plan performance targets?

14           MR. FERRARO:  Yes.

15           MR. UBIERNA:  What was your involvement in

16   drafting the target performance for the work?

17           MR. FERRARO:  This was, I think, the compensation

18   consultant from Alvarez & Marsal will come up and talk about

19   that in detail. My understanding is that these were drafted

20   and negotiated between Alvarez & Marsal and M3 on the UCC

21   side, and then approved by the Special Committee.

22           MR. UBIERNA:  Okay. Are you aware that you are

23   getting a bonus if this Court approves the plan before the

24   end of October?

25           MR. FERRARO:  That is one of the, that is one of

Page 104

1    the metrics, yes.

2              MR. UBIERNA:  Would you say that getting a plan

3    approved is already in your responsibilities and in your

4    salary?

5              MR. FERRARO:  Getting a plan approved is the goal

6    of my work. Getting a plan approved by October 31st takes a

7    lot of weekends and nights.

8              MR. UBIERNA:  Why should you get a bonus on top of

9    your salary for getting the plan confirmed?

10             MR. FERRARO:  I'll give you an example. We spent a

11   tremendous amount of time, tens of hours in negotiating, me

12   and my executive team, in setting up these agreements with

13   the distribution partners. The rate and the speed at which

14   we're doing this is, to me, really impressive, and we're

15   trying to do it in order to hit those goals.

16             MR. UBIERNA:  Okay. Nothing more, Your Honor.

17   Thank you.

18             THE COURT:  Thank you very much, Mr. Ubierna.

19   Anybody else wish to cross-examine?

20             MR. SHEIK:  Yes, Your Honor. I have some questions

21   that are just general questions, if I may.

22             THE COURT:  Go ahead.

23             MR. SHEIK:  Okay. And, all right, so my first

24   question. Was Simon Dixon ever officially or unofficially

25   brought in as a consultant or liaison to the Debtor during

Page 105

1    the audit, and was there ever -- was he ever put under an

2    NDA for any other reason through the course of this

3    bankruptcy?

4              MR. FERRARO:  My understanding is Simon was

5    involved in the bidding process with Bank to the Future and

6    there was an NDA related to that. He's, to me, been very

7    helpful in educating the community and being part of those

8    conversations. So I think there was an NDA on --

9              MR. SHEIK:  Thank you. That's good to hear. Second

10   question. Was a formal process for the selection of the

11   Special Committee of the NewCo followed, can you describe

12   that process to us?

13             MR. COLODNY:  Objection, Your Honor.

14             THE COURT:  Overruled.

15             MR. SHEIK:  Okay --

16             THE COURT:  He can answer the question. I

17   overruled the objection.

18             MR. FERRARO:  Yeah. So --

19             THE COURT:  Go ahead, Mr. Ferraro, if you know the

20   answer, go ahead and answer.

21             MR. FERRARO:  I'll do my best. I wasn't in the

22   driver seat on this, the Committee was on the driver seat of

23   this. As I mentioned earlier in my testimony, I did discuss

24   it with the co-chairs as well as the proposed CEO of

25   Fahrenheit. So that's kind of my level of knowledge. I, as I

Page 106

1   said, I'm impressed with the people that they've selected.

2   I think there's a large amount of creditor support and

3   creditors on the Board and on the Board observer roles.

4           MR. SHEIK:  Okay, great. And Mr. Ferraro, I

5   understand that you have a financial services background.

6   The reason why I'm asking you these questions is because,

7   you know, there's a specific process that is followed in

8   hiring or selecting of, you know, Board members, or any kind

9   of position in the financial services realm. And, and

10  especially when it comes to having fiduciary responsibility

11  or any financial oversight in, you know, in a manner such as

12  ours. And I'm an Earn creditor, by the way, just for

13  everybody to know.

14          But my question is, so when the process was rolled

15  out, you know, was there any specific job description or a

16  criteria of selection for, you know, these Board members to

17  be appointed to the select -- to the Board Committee?

18          MR. FERRARO:  I don't -- with all respect, I don't

19  think I'm the right person to answer that question. I was

20  not involved in setting up the details of the selection.

21  I've had conversations around --

22          MR. SHEIK:  Okay, okay, not a problem. So then,

23  I'll just ask you a very general question in that sense.

24  When it -- so in the financial services realm, would anyone

25  ever hire or appoint somebody in a position like this that

Page 107

1    has -- well, first of all, there would be a credit report

2    check that would be done as part of the background check, if

3    I'm not mistaken.

4              MR. BROWN:  Objection.

5              THE COURT:  Sustained.

6              MR. SHEIK:  Okay. Would anybody be appointed to

7    this position that has a negative financial -- like, let's

8    say owes back taxes, for a lien imposed by the federal

9    government over the last few years.

10             THE COURT:  He did not select the Board.

11             MR. SHEIK:  I understand.  I was just asking

12   because of his financial services background, that's the

13   only reason.

14             THE COURT:  Objection sustained.

15             MR. SHEIK:  Okay.

16             THE COURT:  Whoever has a phone in the courtroom

17   better shut it off. Go ahead, Mr. Sheik.

18             MR. SHEIK:  Thank you. You know, my next question

19   -- and please feel free to object. Again, it was -- I just

20   wrote these down very quickly because I didn't know I was

21   going to be able to attend this. But we were told that there

22   was a special investigator that was hired to look at the

23   backgrounds of all these that were selected. Why was a

24   special investigator hired, instead of just doing a standard

25   background check?

Page 108

1            MR. BROWN:  Objection.

2            THE COURT:  Sustained.

3            MR. SHEIK:  Okay. Now, I'm going to skip ahead,

4     then. Okay, so, so when it came to the selection of the

5     Board and the observers, was it necessary to increase the

6     number of members from seven appointees on the Board to

7     nine? Given the true revenue streams for NewCo are A,

8     staking, which is pretty much set on autopilot. B, mining,

9     which no one other than USBTC, which is US Bitcoin, mining,

10    who has the subject matter expertise to add any value to

11    this process.

12            THE COURT:  Mr. Sheik, I'm going to cut you off in

13    the middle of that question, because it clearly is not a

14    proper question. If you have more questions to ask, go

15    ahead.

16            MR. SHEIK:  Okay, then. So, why was it necessary

17    to increase the number of members from seven to nine?

18            MR. FERRARO:  I was not part of the selection

19    Committee, I --

20            THE COURT:  Next question.

21            MR. SHEIK:  Okay. Now, USBTC was the only company

22    that brings value to this process. And I believe USBTC -- I

23    mean, Fahrenheit allowed us to go directly to USBTC. So, as

24    part of their plan, they gave us an out.  So, or, you know

25    if --

Page 109

1              THE COURT:  Mr. Sheik, Mr. Sheik, okay --

2              MR. SHEIK:  Yes.

3              THE COURT:  -- you're able to ask questions,

4     you're not testifying. So if you have questions you wish to

5     ask, I'm trying to give you some latitude. I understand

6     you're not a lawyer.

7              MR. SHEIK:  Yes.

8              THE COURT:  But you can't testify, okay? You can't

9     testify about facts that are not in the record.

10             MR. SHEIK:  Sure, I understand. And thank you, and

11    be as harsh as possible, it only motivates me to do better

12    next time.

13             THE COURT:  I'm not trying to be harsh.

14             MR. SHEIK:  I appreciate.

15             THE COURT:  Just try to follow the rules, okay?

16             MR. SHEIK:  No, no, not at all. I'm just saying,

17    I'm just letting you know, you can. I appreciate it. Thank

18    you very much, Judge. Your Honor. Okay, so, so basically,

19    you know, if USBTC is the only party that adds value to this

20    process, why not go to USBTC directly?

21             MR. FERRARO:  I, I --

22             MR. BROWN:  Objection.

23             THE COURT:  Sustained.

24             MR. SHEIK:  Okay. Were you physically present

25    during the mediation between Earn and the Board members?

1           MR. FERRARO:  No, I was in Ecuador at my, in my

2     home office working on the Celsius case. I was not at the

3     mediation.

4           MR. SHEIK:  Did you -- so you did not attend,

5     whether by Zoom or, you know, electronically somehow?

6           THE COURT:  Whatever was said in the mediation is

7     subject to mediation privilege, and I will not let you

8     inquire about -- he wasn't there, but whatever happened in

9     the mediation stays in the mediation.

10          MR. SHEIK:  I understand, okay. Well, now that the

11    mediation was complete, I guess my last question is, you

12    know, you know, did this -- since I come from the Earn group

13    and, you know, I feel -- I just wanted to ask, did this

14    negotiation, according to you, between Earn and the Board

15    members, really help the Earn in the end, and do you think

16    that the mediation was necessary?

17          MR. BROWN:  Objection.

18          THE COURT:  Sustained.

19          MR. SHEIK:  Those are all the questions I had,

20    Your Honor. Thank you very much.

21          THE COURT:  Anybody else wish to cross-examine?

22          UNIDENTIFIED SPEAKER:  Yes, Your Honor, I have one

23    additional set of questions.

24          THE COURT:  You already had your chance. I'll only

25    hear anybody who hasn't questioned yet.

1              MR. PATTON:  Your Honor, Jeff Patton, Pro Se

2     Creditor.

3              THE COURT:  Go ahead, Mr. Patton.

4              MR. PATTON:  Good morning, Mr. Ferraro.

5              MR. FERRARO:  Good morning.

6              MR. PATTON:  I understood you mentioned earlier

7     that you joined the company shortly before the pause and or

8     the bankruptcy filing.

9              UNIDENTIFIED SPEAKER:  Great timing.

10             MR. FERRARO:  Yeah.

11             MR. PATTON:  Is that correct?

12             MR. FERRARO:  Yes, that's correct. Both of you are

13     correct.

14             MR. PATTON:  Okay, I just want to touch on a

15     couple things regarding the plan and the vote and the

16     ballot.  The -- after the filing and prior to voting, the

17     creditors were divided into, into groups, we've heard there

18     was classes. Did you take part in that activity?

19             MR. FERRARO:  It's, I think that's largely a legal

20     question, class definition. I understand the classes, I

21     understand the plan. But the actual -- your question is, I

22     think, more of a legal question.

23             MR. PATTON:  Okay, so you didn't do any work or

24     participate in any meetings or discussions of how the

25     classes were determined?

Page 112

1           MR. FERRARO:  No, I think we had general

2     discussions in formulating the plan. And I think I have a

3     general understanding of how the classes were formed.

4           MR. PATTON:  All right, thank you, thank you. Now

5     that activity in dividing creditors into classes, you

6     mentioned was taken on by legal teams prior to, prior to the

7     development of the plan itself, is that correct?

8           MR. FERRARO:  I think they're kind of, in my

9     opinion, they're kind of aligned and organically done around

10    the same time, throughout the case. You know, you're always

11    thinking about kind of your creditors and their needs and

12    their contractual rights and all that throughout. And I

13    think that formulates a lot of this.

14          MR. PATTON:  All right. Terrific. Do you happen to

15    have any opinion as far as the principle difference between

16    creditor classes versus the difference between creditor

17    classes four and five?

18          MR. BROWN:  Objection.

19          THE COURT:  Sustained.

20          MR. PATTON:  Thank you. Sorry. In terms of the

21    ballot, under the plan, to your knowledge, was it possible

22    for a class five creditor to elect to take a lesser

23    distribution and join class four?

24          THE COURT:  These are really legal questions, so I

25    really -- they're not proper subject for the examination of

Page 113

```
 1    this witness, Mr. Patton. Any other questions?

 2              MR. PATTON:  I, I have nothing. I would say

 3    nothing further, but I have nothing. Thank you, Your Honor.

 4              THE COURT:  Thank you, Mr. Patton. Anybody else

 5    wish to cross-examine?  I have some questions.

 6              THE CLERK:  Judge, there is a Sharon Dow that

 7    raised her hand.

 8              THE COURT:  Oh, I couldn't see it. So, who is

 9    that, Deanna?

10              THE CLERK:  Sharon Dow, last name is spelled

11    D-O-W.

12              THE COURT:  Okay. Ms. Dow, go ahead if you wish to

13    ask questions.

14              MS. DOW:  Yes, good day, Your Honor. Thank you

15    very much. I'm Sharon Dow, I am a creditor, and Earn

16    Creditor. I have a few questions for Mr. Ferraro around the

17    business plan that he's sponsoring, putting forward.

18              THE COURT:  Yes, go ahead.

19              MS. DOW:  Yeah, and the reference in exhibits

20    would be Exhibits 32 in the Mining Business Plan, and 35 in

21    the Disclosure Statement, Exhibit E.

22              THE COURT:  We don't have the exhibits in front of

23    us, but go ahead and ask your questions. We'll see whether

24    the witness can answer.

25              MS. DOW:  Yes, thank you. My questions are, are
```

Page 114

1    more general. First of all, in any business plan in general,

2    the -- how do you determine -- how do you do a determination

3    of quality of revenue analysis?

4            MR. FERRARO:  Well, you project the revenue. It's

5    a bottoms-up exercise. You do it by site. It's based upon --

6    I'm talking specifically mining here. It's based upon site

7    level. There's a full review of the power costs. We have a

8    model that kind of predicts the network size, so you can

9    calculate your kind of market share. So, it's -- and then

10   there's operational costs, there's profit shares, so the

11   revenue elements are all loaded and the expense elements are

12   all loaded and they're done at a site level.

13           MS. DOW:  So, what are the key drivers in your

14   determination of the revenue going forward and its

15   reliability?

16           MR. FERRARO:  What was the last part? And the true

17   liability?

18           MS. DOW:  The revenues going forward and the

19   reliability of those revenues.

20           MR. FERRARO:  Oh, okay, sorry. I mean, it's a

21   forecast, right? So it's uncertain. So you try to do your

22   best to take into account a reasonable view of the

23   marketplace. So we have a view of, kind of, Bitcoin price,

24   and as I mentioned before, network growth. That gives you a

25   good view of kind of how much computational power,

1   computational power you have versus the total universe of

2   Bitcoin miners, which effectively determines what your share

3   of the rewards awards will be, the block awards. So it's,

4   it's -- there's many different, as I would say in my old

5   job, there's many different kind of seeds to the forecast

6   that are all assumptions. And you do your best to come up,

7   come up with the right assumptions.

8           MS. DOW:  And do you stand by the revenues and the

9   compute power hash rates in the plan that you've presented?

10          MR. FERRARO:  Yeah, I think the deployment

11  schedules are generally reasonable. I think with the Core

12  Scientific settlement and the 250 megawatt site in West

13  Texas, I -- just one man's view, I believe NewCo will beat

14  those projections, holding constant the Bitcoin price in the

15  network. The vertical integration should drive wider through

16  the, through cycle spreads and decrease counterparty

17  reliance, which are both good things for the support of the

18  business.

19          MS. DOW:  Mr. Ferraro, thank you for that.

20  Mr. Ferraro, do you happen to know the approximate current

21  hash rate?

22          MR. FERRARO:  We have total miners equate to about

23  12, 12 exa hash. I think right in production right now it's

24  probably around 7 exa hash.

25          MS. DOW:  And what is the current hash rate and

Page 116

1    difficulty rating in the market?

2              MR. FERRARO:  I don't know off the top of my head,

3    but I think we're around, somewhere around 3 percent of the

4    network.

5              MS. DOW:  Okay.

6              MR. FERRARO:  A little over 3 percent.

7              MS. DOW:  Sure. And at what rate does hash rate

8    and difficulty escalate through a cycle?

9              MR. FERRARO:  It depends on --

10             MS. DOW:  Are you familiar with that?

11             MR. FERRARO:  Yeah, it depends on many different

12   things. It's quite complex. I think hash rate will be

13   determined based upon Bitcoin price, energy prices and the

14   age of the machines and the efficiency of the machines. And

15   those are key components that go into the forecast.

16             MS. DOW:  So one of the key line items in your

17   forecast is actually hash rate. It's down, Line 7 or 8. It -

18   - can you share with me what are the underlying assumptions

19   to the beginning point of that hash rate and how that grows

20   or adjusts over the five periods in your plan?

21             MR. FERRARO:  Yeah, so we're starting from a point

22   where, you know, as of, as of the end of August we had

23   80,000, 85,000 miners deployed and hashing. As I mentioned,

24   you know, we are going through some counterparty

25   difficulties. So, you know, I actually expect that number to

Page 117

1    potentially drop. But, with the Core Scientific settlement

2    and the site in West Texas, I think we're going to have a

3    plan to deploy -- NewCo has a plan to deploy 40 megawatts

4    worth of machines very rapidly, I think within 90 days of

5    that deal closing. We plan to work on that before the

6    effective date, just to make sure that NewCo has all -- as

7    many rigs deployed as possible.

8         And then within the forecast there's other

9    deployment assumptions that are largely done at similar

10   economics for existing hosting contracts.

11        MS. DOW:  Yeah, understood. I actually would like

12   to explore where the assumptions on the productivity, hash

13   rate and share of global network, where those assumptions

14   lie versus current state of the business environment. So are

15   you aware of what the first period hash rate number is?

16   'Cause this, this is in your calculation that is a key

17   driver to the revenue and the number of Bitcoin.

18        MR. FERRARO:  I've tried my best to -- sorry if

19   you were -- I didn't mean to cut you off.

20        MS. DOW:  No, you're fine. Please, go ahead.

21        MR. FERRARO:  Okay. I've tried my best to memorize

22   as much as I can. That's not one of them, I apologize. I

23   think it's -- off of memory, I believe our, our share of the

24   hash rate was trending flat to down-ish throughout the 5-

25   year projection. Off of memory, and I could be wrong.

1              MS. DOW:  Okay, so let me help you a little bit.

2              THE COURT:  Ms. Dow, I'm --

3              MS. DOW:  I'm actually referring --

4              THE COURT:  Ms. Dow, I'm going to stop you.

5              MS. DOW:  -- I'm actually referring --

6              THE COURT:  Ms. Dow, stop. I'm permitting you to

7    examine with respect to documents that you didn't post last

8    night for cross-examination. The witness is generally

9    familiar with it. I'm trying to provide some leeway. So

10   don't expect him to be able to pull numbers from a document

11   that you have not put in front of the witness for cross-

12   examination. Go ahead with your questions.

13             MS. DOW:  Sure. May I try to state this way, and

14   this is my first time ever doing this. I apologize, Your

15   Honor. So, it appears to me in the chart that there is a

16   hash rate number of 307, sizing the entire Bitcoin network,

17   that your comparing this production to. So the 307 exa hash

18   per second, are you familiar with what that correlating

19   number in reality today is?

20             MR. FERRARO:  I don't have it off the top --

21             MS. DOW:  The size of the Bitcoin venture.

22             MR. FERRARO:  I don't have it off the top of my

23   head, but the launch -- that change, it goes up and down.

24   You know, so it is a volatile kind of metric that you're

25   trying to compare to. But I think it's generally off -- I

Page 119

1    think it was -- off of memory I have, like, a 270 in my mind

2    or something like that. So I think it's pretty consistent.

3            MS. DOW:  Would it surprise you to know that it's

4    481 today and it's been in the 400s in the latter part of

5    the month of September? Would that surprise you?

6            MR. FERRARO:  It's volatile, it moves up and down,

7    you know.

8            MS. DOW:  Sure.

9            MR. FERRARO:  The launch point, you can't -- with

10   this type of asset it's very hard to kind of true up the

11   launch point at all points, 'cause it moves so much.

12           MS. DOW:  Sure. But, so a plan, would you say that

13   you're comfortable with a plan that states a starting year

14   period, end-of-period value, in, as being 30 percent lower

15   than what reality is? And so that kind of difficulty rating

16   -- so, so when hash rate is high, once --

17           THE COURT:  Ms. Dow, you're saying what reality

18   is. Reality would be evidence. It's not before the witness,

19   it's an improper question.

20           MS. DOW:  Okay. I'm sorry. So, if the plan -- if

21   in fact the plan is 30 percent off of what current

22   difficulty is, do you feel that there are enough resources

23   in the plan to make up the difference to maintain the

24   revenue you're projecting?

25           MR. FERRARO:  Yeah, I think it's quite volatile,

Page 120

1    the hash rate, it moves back and forth. I think the key

2    assumption is kind of what happens around [indiscernible]

3            MS. DOW:  [indiscernible]

4            MR. FERRARO:  Well, I mean, that's, that's

5    occurring in 2024, it's right around the corner, and that's

6    going to impact your 5-year projection. So --

7            MS. DOW:  Sure. And how are you seeing that rate

8    to -- be impacted by having [indiscernible] and what does

9    that mean for resources needing to be applied by the, the

10   NewCo? To maintain revenue.

11           MR. FERRARO:  As the rewards get cut in half, you

12   would expect people with less efficient rigs and maybe less

13   desirable power markets would have to shut off and curtail.

14   Now, this is why it's volatile. They can turn back on at any

15   point in time. If Bitcoin prices rise, energy prices fall,

16   or the network shrinks, these coins or the machines can be

17   turned right back on. And that's why it's so volatile and

18   elastic.

19           THE COURT:  Let's wrap up the questions, Ms. Dow.

20           MS. DOW:  Sure. Last cycle -- so you're talking

21   about the beginning of a new cycle we're coming into. Last

22   cycle, what was the range of hash rate? What was the, the

23   variance from the low to the high?

24           MR. FERRARO:  I don't know that information, I

25   don't have it in front of me. I apologize.

1          MS. DOW:  Okay. All right. So you're not -- are

2     you familiar with it went from 100 to 400, does that seem

3     similar to the assumptions that drove into your plan?

4          THE COURT:  I'm going to object to that and

5     sustain the objection. Wrap up your questioning, please.

6          MS. DOW:  How did you anticipate remaining

7     profitable if, by chance, the plan starting point is

8     significantly off to the low side from what it really takes

9     to mine in this current competitive environment?

10         MR. FERRARO:  Yeah, it's a great question. Thank

11    you for that. I think it's important to note that this

12    business has a lot of intrinsic defensive capabilities. So

13    you talk about profitability and you talk about losses. The

14    ability to curtail, to economically curtail when the

15    marginal cost is higher than marginal revenue is something

16    that is decided on a minute-by-minute basis. I think it's 5-

17    minute intervals. This greatly reduces the risk of loss if

18    managed appropriately.

19         So I think, you know, it comes down to having a

20    lean operational kind of shop, in which you're going to eat

21    some operational expenses when your machines are shut off,

22    but it's important to note that you do have that natural

23    kind of defensive mechanism in this business.

24         THE COURT:  Last question, Ms. Dow.

25         MS. DOW:  So can I --

Page 122

1           THE COURT:  Ms. Dow --

2           MS. DOW:  Sure.

3           THE COURT:  -- one, one more question.

4           MS. DOW:  Yes, so to, to follow up on that,

5    Mr. Ferraro, that curtailment strategy, how often has it,

6    and do you see the curtailment which impacts your variable

7    cost, how do -- how often do you see that covering and

8    making up for, and covering the fixed cost portion in the

9    operation?

10          MR. FERRARO:  Yes, great question. We experience

11   this quite a bit in West Texas over the summer. The heat

12   index was off the charts, the power spikes were dramatic.

13   And because of that, we economic curtailed a significant

14   portion of the time. And that's one of the driving reasons

15   why the EBITDA was so high over the summer months, almost

16   $10 million.

17          THE COURT:  All right. Anybody else wish to cross-

18   examine?

19          MS. DOW:  Thank you, Your Honor.

20          THE CLERK: I don't see any hands, Judge.

21          THE COURT:  All right. I have a few questions for

22   Mr. Ferraro. So I'm looking at Exhibit 37, which was your

23   Declaration in Support of CEL Token Settlement. And among

24   the things attached to it was what's described as Exhibit A,

25   the White Paper. Just tell me what that was and why it was

Page 123

1    prepared.

2            MR. FERRARO:  Yeah, I'll do my best. I think the

3    White Paper was prepared right before the ICO, which I think

4    was around circa 2018. And this White Paper effectively

5    describes how the CEL Token will be issued, what its value

6    and contributions are, and kind of, you know, you know, the

7    utility components of it.

8            THE COURT:  All right, so your, your Declaration

9    and the Disclosure Statement describe this as the CEL as a

10   utility token. Can you explain what that means, as a utility

11   token?

12           MR. FERRARO:  Yeah, you can -- I think there's

13   three key components to it. Let's see if I can remember all

14   three after a couple hours of testimony. One is kind of --

15           THE COURT:  Time to finish this up.

16           MR. FERRARO:  I know. Discounted loan rates, you

17   can pay your loan with it. The other one is enhanced --

18           THE COURT:  Higher interest rate on deposits.

19           MR. FERRARO:  Higher on, on deposits and the third

20   piece was --

21           THE COURT:  Lower interest rate on loans.

22           MR. FERRARO:  Lower interest rates, and the third

23   piece is product and services.

24           THE COURT:  Reduced transaction fees.

25           MR. FERRARO:  Yep.

Page 124

```
 1                THE COURT:  Could the CEL Token be used to pay for
 2    goods or services within the Celsius network ecosystem?
 3                MR. FERRARO:  You could trade it in for other
 4    currencies, and you could pay that --
 5                THE COURT:  Through the Celsius Network.
 6                MR. FERRARO:  Through the Celsius Network.
 7                THE COURT:  So the platform shut down, and the
 8    plan doesn't resume it, correct?
 9                MR. FERRARO:  That's correct.
10                THE COURT:  All right. So do utility tokens have
11    any value if the platform on which they're used ceases to
12    function?
13                MR. FERRARO:  I personally do not believe so,
14    outside of being speculative meme coin.
15                THE COURT:  So whenever market trading, you would
16    consider that to mean speculative trading.
17                MR. FERRARO:  That's what I - yes. Correct.
18                THE COURT:  Perhaps subject to the manipulation
19    that happened before between around the pause date.
20                MR. FERRARO:  And the disconnects in the
21    marketplace, and all the locked tokens, yes.
22                THE COURT:  I don't have any other questions. Do
23    you have any more? You know what, we're going to take a
24    break, but we will finish with the witness.
25                MR. BROWN:  Nothing further, no, Your Honor.
```

Page 125

```
 1              THE COURT:  Committee?

 2              MR. COLODNY:  I have one, Your Honor. Mr. Ferraro,

 3    you answered a number of questions about exculpation

 4    regarding the distributions. Is it your understanding that

 5    the exculpations in the plan only apply to the

 6    distributions?

 7              MR. FERRARO:  My understanding is the exculpations

 8    for the distribution part -- are you asking specifically --

 9              MR. COLODNY:  No, the exculpation as a whole for

10    the Debtors, for the Committee, for the Committee Advisors.

11              MR. FERRARO:  It's broader than just the

12    distribution, correct.

13              MR. COLODNY:  It covers all actions between the

14    petition date to the effective date.

15              MR. FERRARO:  Throughout the bankruptcy, yes.

16              MR. COLODNY:  No further questions, your Honor.

17              THE COURT:  Thank you. Ms. Cornell?

18              MS. CORNELL:  Nothing further, Your Honor.

19              THE COURT:  You're excused.

20              MR. FERRARO:  Thank you.

21              THE COURT:  Thank you for your testimony. What's

22    next?

23              MR. BROWN:  Your Honor, we're next going to call

24    Mr. Kokinos to the stand. Maybe probably a good time for

25    morning break.
```

Page 126

```
 1              THE COURT:  It is.

 2              MR. BROWN:  We can --

 3              THE COURT:  It is.

 4              MR. BROWN:  -- shift around if necessary.

 5              THE COURT:  Sure. Let's take a break until noon.

 6   And do you have an idea about how long you're going to be

 7   with Mr. Kokinos?

 8              MR. BROWN:  I'll defer to Mr. McCarrick.

 9              MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

10   on behalf of the Debtors. I don't expect at least the direct

11   examination to go more than 10 minutes.

12              THE COURT:  Okay. All right, let's take a break

13   until noon and we'll resume at noon. Thank you very much,

14   everyone. Please be seated.

15              MR. MCCARRICK:  T.J. McCarrick, Kirkland & Ellis,

16   on behalf of the Debtors. We call Steven Kokinos to the

17   stand.

18              THE COURT:  Okay.

19              MR. MCCARRICK:  And, Your Honor, like my partner,

20   I have some witness binders that I can hand up to the bench,

21   the witness and the clerks in turn.

22              THE CLERK: Do you solemnly swear and affirm all

23   the testimony you're about to give before this Court is the

24   truth and the whole truth?

25              MR. KOKINOS:  I do.
```

Page 127

1            THE COURT:  Thank you. Please have a seat. And

2     there are cups and there is water there, if you --

3            MR. KOKINOS:  Thank you.

4            THE COURT:  Please go ahead.

5            MR. MCCARRICK:  Good afternoon, Mr. Kokinos. Could

6     you introduce yourself?

7            MR. KOKINOS:  I'm Steven Kokinos, and I'm the

8     proposed CEO of NewCo.

9            MR. MCCARRICK:  What do you do for a living,

10    Mr. Kokinos?

11           MR. KOKINOS:  I'm a tech investor. But I's say

12    principally I've spent the majority of my life building tech

13    companies, starting with internet infrastructure, software,

14    telecommunications and crypto most recently.

15           MR. MCCARRICK:  How did you become involved in

16    these Chapter 11 cases?

17           MR. KOKINOS:  I was introduced to Celsius by Mike

18    Arrington, who runs Arrington Capital. He's one of the

19    Fahrenheit principals and he brought a group of us together

20    to take a look at the opportunity.

21           MR. MCCARRICK:  When you say 'Fahrenheit,' what is

22    the Fahrenheit Group?

23           MR. KOKINOS:  Fahrenheit Group is a team of five

24    principals, a US Bitcoin Proof Group, or US Bitcoin of which

25    Asher Genoot is a founder and involved personally here.

Page 128

1    Proof Group, which is run by Noah Jessop, is a staking

2    service, or staking service provider and venture capitol.

3    Ravi Kaza, who is a risk management expert and has a lot of

4    experience in both managing both public and private hedge

5    funds, along with myself.

6            MR. MCCARRICK:  And is Arrington the fifth?

7            MR. KOKINOS:  I'm sorry, yes. I'm sorry. And last

8    but not least, Arrington Capital, which is founded and run

9    by Mike Arrington, is a longtime investor in the tech space

10   and crypto space.

11           MR. MCCARRICK:  Mr. Kokinos, are you generally

12   familiar with the sales and auction process for the Debtors'

13   assets?

14           MR. KOKINOS:  Yes, I am.

15           MR. MCCARRICK:  How would you describe that

16   process based on your participation in it?

17           MR. KOKINOS:  Well, it was a very competitive

18   process. It went much longer than we anticipated it might.

19   You know, but I think from our standpoint, you know, it

20   yielded, you know, a much better deal for the creditors

21   than, than the stalking horse bid was, certainly.

22           MR. MCCARRICK:  What is Fahrenheit's role in

23   restructuring the Debtors today?

24           MR. KOKINOS:  Fahrenheit will be the manager of

25   the new entity and providing, you know, much of the

1    executive team. And is also in particular responsible for

2    managing the three core business lines. One being Bitcoin

3    mining, the second being staking, especially self-staking

4    Ethereum, and the third is managing a portfolio of illiquid

5    venture investments and other assets.

6            MR. MCCARRICK:  You refer to the management team

7    of NewCo. Who is that management team or the anticipated

8    management team?

9            MR. KOKINOS:  Today the confirmed members of

10   Fahrenheit that will be involved in NewCo full time are

11   myself as CEO, Joel Block, who's in the audience, will be

12   the CFO, and then Ravi Kaza will be on the Board as well as

13   Asher Genoot. And US Bitcoin as a firm will also be

14   responsible for managing Bitcoin mining and has a separate

15   management agreement specific to those services they'll be

16   providing.

17           MR. MCCARRICK:  Is Fahrenheit committed to making

18   any investments in NewCo?

19           MR. KOKINOS:  Yes, the Fahrenheit members have

20   committed up to $50 million of our own money to go into

21   NewCo and purchasing that at net asset value at the time of

22   emergence.

23           MR. MCCARRICK:  What, if anything, does that

24   investment say about Fahrenheit's incentives to make NewCo

25   successful on a going-forward basis?

1            MR. KOKINOS:  You know, we think that us owning

2    equity is important because it -- the creditors will be the

3    majority owners of this new business. And it incents us in

4    the same way that the creditors are incented, i.e., the

5    lines are incentives to grow the business and grow

6    enterprise value.

7            THE COURT:  You said that Fahrenheit will invest

8    up to 50 million. How and when will the precise amount be

9    determined?

10           MR. KOKINOS:  So approximately 30 million will go

11   in at emergence, and then the Board will have two one-year

12   options in year four and year five to extend the deal.

13   Should they choose to, approximately another 10 million is

14   committed to be invested in those years, should they elect

15   to continue the agreement. If they terminate the agreement

16   at the end of three years, then those additional investments

17   wouldn't happen.

18           MR. MCCARRICK:  You testified earlier about

19   NewCo's primary business lines. Could you remind the Court

20   what those are?

21           MR. KOKINOS:  Yes, I think I mentioned a little

22   bit earlier, but just to reiterate. Bitcoin mining will be

23   the largest business line at emergence. The second is

24   Ethereum staking, and obviously we'll need the Board to

25   approve the business plan, but we think that we're likely to

Page 131

1    want to stake a portion of the Ethereum, so that we can earn

2    yield. One of the points I think that's important on the

3    Ethereum side is that Proof Group is contributing

4    intellectual property into NewCo that will enhance the

5    ability to get -- obtain higher yields on Ethereum staking

6    than would be possible by someone doing it themselves. So

7    that, we think, is a key, a key point.

8              And then the third, you know, there are many

9    different kind of illiquid assets that are on the balance

10   sheet. The Arrington team in particular is very skilled at

11   managing those and looking at ways to both get them

12   ultimately liquid, but also be able to, you know, manage the

13   value of those assets.

14             THE COURT:  What's the approximate value of

15   Ethereum that's being seeded into NewCo?

16             MR. KOKINOS:  So it's approximately 450 million

17   with one modifier. I know the Cedarvale deal is being

18   discussed here. If the Cedarvale deal does happen, then I

19   believe it would be reduced to approximately 420 million.

20             MR. MCCARRICK:  Turning to the mining business

21   which you were just discussing a little bit, what steps is

22   Fahrenheit taking to set the NewCo mining business up for

23   success, or what's the business case for mining on a go-

24   forward basis?

25             MR. KOKINOS:  Sure. I mean, I think this is an

Page 132

1    important one. I think one of the things that excites us

2    about US Bitcoin as a partner is that, you know, their focus

3    has really been on vertical integration. Owning property,

4    being able to build that infrastructure, that we -- that

5    NewCo will ultimately own, and then enable us to be more

6    efficient than, you know, others in a competitive situation.

7    Which mining is. And so if you look at, you know, whether

8    it's a property like Cedarvale or potentially other

9    opportunities, should the Board, you know, be open to

10   further investments, we think that US Bitcoin is

11   particularly well situated to help us both build out those -

12   - that new infrastructure, but also manage it in a very

13   efficient way. And I think our belief is that moving away

14   from third-party hosted contracts as quickly as possible

15   will yield economic benefit to NewCo.

16          MR. MCCARRICK:  All right, Mr. Kokinos, can you

17   open the binder in front of you at Celsius Exhibit 61.

18          MR. KOKINOS:  Exhibit 61

19          THE COURT:  Is it his Declaration?

20          MR. KOKINOS:  Yes.

21          MR. MCCARRICK:  Yes. Celsius Exhibit 61 is a copy

22   of Mr. Kokinos' Declaration, which is filed at Docket Number

23   3591. Is that a true and accurate copy of your Declaration,

24   sir?

25          MR. KOKINOS:  yes, it is.

Page 133

1          MR. MCCARRICK:  Do you adopt the statements in

2     your Declaration as your testimony under oath here today?

3          MR. KOKINOS:  I do.

4          MR. MCCARRICK:  All right, this next exhibit I'd

5     like to -- the Debtors offer Exhibit Celsius Exhibit 61 into

6     evidence.

7          THE COURT:  Any objections? Exhibit 61 is admitted

8     into evidence.

9          (Debtors' Exhibit 61 Received into Evidence)

10          MR. MCCARRICK:  All right, I'd like to now turn to

11     Exhibit 3 in your binder.

12          MR. KOKINOS:  Okay.

13          MR. MCCARRICK:  Celsius Exhibit 3 is the Debtors'

14     Disclosure Statement filed at Docket 2902.

15          MR. KOKINOS:  Okay.

16          MR. MCCARRICK:  And this is an excerpt of that

17     Disclosure Statement, Pages 296 to 324 of the Disclosure

18     Stmt. What are Pages 296 to 394 of Celsius Exhibit 3?

19          MR. KOKINOS:  I just wanna make sure --

20          THE COURT:  The copy says to 332.

21          MR. MCCARRICK:  332.

22          MR. KOKINOS:  I have Page 301 to 332, is what it

23     shows on mine, is that right?

24          THE COURT:  I have 296 to 332.

25          MR. MCCARRICK:  One second.

Page 134

1            MR. KOKINOS:  Oh, I apologize. There we are. You

2    guys are right, I missed the cover pages. 296 to 332, yes.

3            MR. MCCARRICK:  296 to 332?

4            MR. KOKINOS:  You got it.

5            MR. MCCARRICK:  Okay. What are Pages 296 to 332 of

6    Celsius Exhibit 3?

7            MR. KOKINOS:  This is a presentation that we

8    provided outlining some of the highlights of Fahrenheit's

9    approach to NewCo.

10           MR. MCCARRICK:  Is it a fair description and

11   summary of the highlights of Fahrenheit's approach?

12           MR. KOKINOS:  Yes.

13           MR. MCCARRICK:  And do you stand by --

14           MR. KOKINOS:  Yes.

15           MR. MCCARRICK:  -- that business plan?

16           MR. KOKINOS:  Yeah, we do.

17           MR. MCCARRICK:  Your Honor, at this time we admit

18   that excerpt of Exhibit 3 into evidence.

19           THE COURT:  Any objections to the Court admitting

20   in evidence Celsius Exhibit 3? All right, it's admitted into

21   evidence.

22           (Celsius Exhibit 3 Received into Evidence)

23           MR. MCCARRICK:  Okay. Your Honor, I have nothing

24   further for this witness, happy to pass.

25           THE COURT:  Thank you. All right, cross-

Page 135

1    examination. First does Committee wish to examine?

2              MR. COLODNY:  No.

3              THE COURT:  US Trustee?

4              MS. CORNELL:  Just one question, Your Honor.

5              THE COURT:  Go ahead, Ms. Cornell.

6              MS. CORNELL:  Good morning, Your Honor.

7              THE COURT:  I've rarely heard somebody say they

8    only have one question and then stick by it.

9              MS. CORNELL:  I only have one, I swear it, one.

10             MR. KOKINOS:  Morning.

11             MS. CORNELL:  Shara Cornell, I'm here for the

12   Office of the United States Trustee. I just wanted to ask

13   one clarifying question from your testimony earlier. You

14   indicated that a $30 million, $30 million would be paid into

15   NewCo upon emergence. Could you just explain a little bit

16   better for the record what emergence means to you?

17             MR. KOKINOS:  Sure. You know, I guess upon the

18   plan effective date is what I should've chosen for words.

19             MS. CORNELL:  Thank you. That's all I have, Your

20   Honor.

21             THE COURT:  Congratulations. All right. Any other

22   cross-examination of Mr. Kokinos?

23             MR. DIXON: Yes, Your Honor.

24             THE COURT:  Mr. Dixon, I see you on the screen.

25   You wish to examine?

Page 136

1          MR. DIXON:  Yes, hello, hello, Mr. Kokinos.

2          MR. KOKINOS:  [indiscernible]

3          MR. DIXON:  How are you doing. If you've -- I

4     didn't see in the Disclosure Statement any disclosure on who

5     the ultimate beneficial owners of Fahrenheit are. Would you

6     mind sharing the relative UBOs for Fahrenheit?

7          MR. KOKINOS:  Of who the ultimate beneficial

8     owners of Fahrenheit are?

9          MR. DIXON:  Yeah, and, like, the relative

10    percentages, and, like, the makeup of the shareholding.

11         MR. KOKINOS:  Sure. The five partners that I --

12    five principals that I mentioned before are the beneficial

13    owners. Arrington Capital, US Bitcoin, or I believe it's a

14    designee from US Bitcoin, Sonic Boom Capital, which is my

15    family office, Ravi Kaza in his individual capacity in Proof

16    Group.

17         MR. DIXON:  And are they --

18         THE COURT:  Excuse me. He also asked about the

19    relative percentage of each -- ownership of each of those

20    five.

21         MR. KOKINOS:  Yeah, I don't know the exact

22    percentages, but US Bitcoin and Arrington Capital are

23    larger, the two larger investors. And then the other three

24    are somewhat smaller.

25         MR. DIXON:  Excellent. And could you help us --

Page 137

1    could you tell us what the source of funds are for the 30

2    million, where are the funds coming from?

3                MR. KOKINOS:  Sure. Well, you know, I can't speak

4    for the others, I can speak for myself. It's coming from,

5    you know, personal family money that's going in. But it is

6    our money and for the other investors it's, you know, funds

7    coming from their funds or themselves.

8                MR. DIXON:  Okay. So this is an external capital

9    from [indiscernible] or is it all just the principals?

10               MR. KOKINOS:  I don't, you know, I'm not aware of

11   what the specifics of how Proof Group is investing. You

12   know, so I can only speak for myself. The others are

13   investing through their funds.

14               MR. DIXON:  Okay. And then, do we know the breakup

15   of, like, the 33 million, like, relative? Is it, is, like,

16   the larger percentage coming from US Bitcoin or Michael

17   Arrington?

18               MR. KOKINOS:  Yeah, I believe I already answered

19   that.

20               THE COURT:  Answer it again.

21               MR. KOKINOS:  Okay. US Bitcoin and Arrington

22   Capital are the largest investors of the group, and the

23   remaining three are somewhat smaller. But it's not the case

24   that if there's any, you know, disproportionate.

25               MR. DIXON:  Okay. Do you -- are you aware of

Page 138

1    anything that would prevent NewCo being able to invest in

2    Fahrenheit if it ever wanted additional capital so that

3    NewCo and Fahrenheit could align interests, given it's going

4    to be the manager?

5           MR. KOKINOS:  I'm not sure I really -- maybe you

6    could restate. I don't completely understand what you're --

7           MR. DIXON:  Yeah, sure. Because, you know,

8    Fahrenheit is going to be the beneficial of most of the

9    management contracts, are you aware of anything, like, where

10   NewCo might be able to invest in Fahrenheit, to become an

11   equity holder in Fahrenheit so that they would have complete

12   alignment of interests?

13          THE COURT:  Let me ask this question. Are there

14   any restrictions on NewCo investing in Fahrenheit?

15          MR. KOKINOS:  Not that I'm aware.

16          THE COURT:  Okay, ask your next question.

17          MR. DIXON:  That's all. Thank you, Your Honor.

18   Thank you, Mr. Kokinos.

19          THE COURT:  All right, anybody else wish to cross-

20   examine?

21          MR. SHEIK:  Yes, Your Honor.

22          THE COURT:  Mr. Sheik, go ahead.

23          MR. SHEIK:  Okay. So, Mr. Kokinos, I wanted to

24   ask, was there a reason why you guys decided to increase the

25   number of Board Committee members from seven to nine?

Page 139

1          MR. KOKINOS:  Well, we -- this wasn't a decision

2    that we made. We had discussions with the Committee just to

3    --

4          THE COURT:  With the Creditors Committee?

5          MR. KOKINOS:  With the Creditors Committee around

6    Board composition. The original Board composition was a

7    seven-person board, of which we would have two seats and

8    consent rights over two additional seats. The Committee

9    approached us about the possibility of increasing the Board

10   size from seven to nine, where we would get three seats and

11   maintain consent rights over two of the seats as we had had

12   previously. We didn't have any objection to that, and so,

13   you know, that's where that went.

14         MR. SHEIK:  Is it correct that during the two

15   Spaces that you guys held via Zoom and on Twitter Spaces,

16   with the creditors, you had mentioned -- well, not

17   specifically you, but, you know, Fahrenheit had mentioned

18   that there would be -- that the creditors would be able to

19   sit on this Board and have maximum representation. Is that

20   correct?

21         MR. KOKINOS:  I don't have the recording of that,

22   but my recollection is somewhat different. I believe what we

23   -- my recollection was from Spaces, was that the creditors

24   would be the majority shareholders of this new business, and

25   would also have the majority of seats on the Board. And as a

Page 140

1   result, would have, you know, by nature, you know, a control

2   position over what goes on in the new company?

3           MR. SHIEK:    So then, if that is the case, then

4   why would there be a change in courts with, you know, an

5   increase from seven to nine and zero representation of

6   committee members to the board other than having observer

7   spots. That was a bit of a surprise to us.

8           MR. KOKINOS:   I wasn't, so first of all, you

9   know, the selection of the board wasn't our, you know, we

10  were not the ones constructing the board. It was the

11  committee so I think it's worth being clear there. And to

12  our, you know, to my knowledge there are two UCC members who

13  are on the board and that there also board observers that

14  are creditors as well.

15          MR. SHIEK:    Okay. And when it came to the

16  selection of notable, you know, members of this committee,

17  Emanual Idu [ph] and Ms. La Palma [ph], I believe that's her

18  last name. Was that a decision that was made by Fahrenheit?

19          MR. KOKINOS:   As, you know, I stated previously,

20  the committee as the right to select their board members. We

21  had consent rights over two of those seats. Irrespective of

22  that, the committee presented the names of their candidates

23  to us, Fahrenheit members both spoke with them and reviewed

24  their backgrounds and CVs. And we had no objections to the

25  members who were chosen to the board.

Page 141

1              MR. SHIEK:     So there was not a selection by

2      Fahrenheit?

3              MR. KOKINOS:    No.

4              MR. SHIEK:     Okay.

5              MR. KOKINOS:    Other than --

6              MR. SHIEK:     Who were the two selected by --

7              THE COURT:     Hold on. Hold on.

8              MR. SHIEK:     Sorry, go ahead.

9              MR. KOKINOS:    I was just going to say --

10             THE COURT:     Go ahead.

11             MR. KOKINOS:    -- to be perfectly clear, other

12     than to the extent that for the two seats that we had

13     consent rights to, but we did not object to those seats.

14             THE COURT:     Go ahead, Mr. Shiek.

15             MR. SHIEK:     Thank you. So when it came to the

16     selection, the last minute change of, let's say, Mr.

17     Arrington bowing out of the selection committee, I'm sorry,

18     the board, was there a reason why that, you know, that

19     change was made in the last minute?

20             MR. KOKINOS:    Mike Arrington had, you know,

21     personal thoughts on the composition of the board.

22     Fahrenheit, as a group, is comfortable with the composition

23     of the board and board observers and felt, you know, it was

24     best to appoint Robbie as a new board member as Mr.

25     Arrington wasn't comfortable.

Page 142

1          MR. SHIEK:    Okay. Now when it comes to the

2     composition of the board, I had asked a previous question to

3     Mr. Ferraro, which I'll ask you as well. When it comes to

4     the true revenue streams which are basically the mining

5     company and the staked Eth, I believe Mr. Asher Genoot has

6     been brought onto the board as the representative from

7     USBTC, is that correct?

8          MR. KOKINOS:   Yes, that's right. Asher will be

9     one of the board members.

10         MR. SHIEK:    Great. Now Asher is currently in a

11    position where he is both, or at least in three positions,

12    he's the CEO of US Bitcoin, he's the CEO of Hut 8, he's also

13    in the middle of a merger, and he's also responsible for

14    managing this mining company for NewCo. Do you think that

15    that is a bit of a large undertaking as in he may be spread

16    a little too thin?

17         THE COURT:    Mr. Shiek --

18         MR. KOKINOS:   [indiscernible]

19         THE COURT:    Hold on. Mr. Shiek included various

20    assumptions that are in evidence before the court. Do you

21    know those to be true?

22         MR. KOKINOS:   No.

23         MR. SHIEK:    Yes, Your Honor, I do.

24         THE COURT:    I'm sorry, your --

25         MR. SHIEK:    Oh, I'm sorry.

1          THE COURT:      -- your objection is sustained to

2     your question.

3          MR. SHIEK:     Okay, no worries. Thank you. I'll

4     proceed then. So when it comes to, you know, the makeup of

5     this board, it seems like NewCo is largely, well this plan

6     sponsor will largely be, you know, responsible for

7     overseeing the mining company since staked Eth is kind of

8     set to autopilot. So why add more members to the board when,

9     you know, the bulk of the responsibility will lie on USBTC

10    and Asher Genoot as CEO.

11         UNIDENTIFIED SPEAKER #1: Objection.

12         THE COURT:     Objection sustained.

13         MR. SHIEK:     Okay. Your Honor, I think that's

14    all I have.

15         THE COURT:     All right. Thank you --

16         MR. SHIEK:     I appreciate it, thank you.

17

18         THE COURT:     Thank you very much, Mr. Shiek.

19    Anybody else have any questions?

20         MR. PHILLIPS:  Yes, Your Honor.

21         THE COURT:     Mr. Phillips?

22         MR. PHILLIPS:  Thank you, Your Honor. Mr. Kokinos,

23    I wanted to go back to the issue of Fahrenheit's overall

24    investment in NewCo. What the portion of the 50 and of the

25    33 million are you responsible for?

Page 144

1          MR. KOKINOS:   Approximately 6 million.

2          MR. PHILLIPS:  Thank you. Is that of the 50 or of

3     the 33?

4          MR. KOKINOS:   I honestly, I can't recall right

5     now because the numbers have moved around. But I believe out

6     of the 30.

7          MR. PHILLIPS:  You think of the 33? I'm sorry, I

8     didn't hear.

9          MR. KOKINOS:   Yeah, I believe of the 33.

10         MR. PHILLIPS:  Can you help us understand why that

11    being upfront was reduced from 50 million to 33 as opposed

12    to, you know, structuring it maybe with all 50 up front and

13    then giving back the 33 if you exit off [indiscernible]?

14         MR. KOKINOS:   Our understanding coming out of the

15    option was that there was a five year deal and that that's

16    what we were contributing into. You know, subsequent

17    discussions that were productive with the committee and the

18    debtors suggested that the committee would like to have, to

19    turn years four and five into their option rather than a

20    commitment to have us manage the company for those five

21    years. And pursuant to those discussions we arrived at a

22    different formula.

23         MR. PHILLIPS:  And why, do you think that the

24    structure using a termination fee as opposed to an increase

25    fee for the additional year would have been beneficial to

Page 145

1    the NewCo shareholder?

2            MR. KOKINOS:    This was all of the structure that

3    all the parties felt comfortable with and agreed to.

4            MR. PHILLIPS:  Okay. All right. In your

5    declaration, in paragraph 14, you talk about the NewCo

6    mining [indiscernible] and Exhibit E to the disclosure

7    statement, so that Exhibit E to the disclosure statement,

8    which I believe are incorporated into three of the debtors.

9    And I also, Your Honor, did submit some exhibits for cross

10   exam which, albeit, past the 5:00 p.m. deadline because,

11   like that caught me by surprise yesterday. But if I could

12   refer you to --

13           MR. KOKINOS:    I'm not sure which exhibit or page

14   you're looking at.

15           THE COURT:    If you'll hold on Mr. Phillips --

16           MR. PHILLIPS:  Well --

17           THE COURT:    -- Mr. McCarrick is going to bring

18   him the position exhibits. Okay? Just hold on.

19           MR. PHILLIPS:  Sure. I'd like to start with

20   Exhibit E if that's possible.

21           MR. MCCARRICK: Mr. Phillips, for the record, are

22   these the excerpts that you submitted on the docket last

23   night? That's the filing that I gave him.

24           MR. PHILLIPS:  Yes, they are. I believe that

25   they're also contained, Mr. McCarrick, within your exhibits

1    as well.

2          MR. KOKINOS:   So this is from Exhibit E of

3    disclosure statement and there's a chart, that's what you're

4    looking at?

5          MR. PHILLIPS:  Correct.

6          MR. KOKINOS:   Okay.

7          MR. PHILLIPS:  That is the one I'd like to start

8    with. Thank you.

9          Mr. MCCARRICK: [indiscernible]

10         MR. KOKINOS:   Thank you.

11         THE COURT:     What's the question?

12         MR. PHILLIPS:  Okay, so are you responsible or is

13   the Fahrenheit team responsible for this exhibit?

14         THE COURT:     You're referring to Exhibit E of

15   the disclosure statement?

16         MR. PHILLIPS:  Correct.

17         MR. KOKINOS:   I believe, I just need to

18   understand where this chart came from. Is this the debtors'

19   financial projections in the disclosure statements? Okay. So

20   what I would say is no, we were not responsible for these.

21   However, Fahrenheit did provide input into certain aspects

22   of this principally around the network hash rate assumptions

23   and BTC price over time.

24         MR. PHILLIPS:  Okay, so let's focus on those two

25   elements. So you said Fahrenheit did provide input into the

1   network hash rate, again, which starts at 307, September

2   '24. Correct?

3            MR. KOKINOS:    Mm-hmm.

4            THE COURT:    You have to answer yes or no.

5            MR. KOKINOS:    I'm sorry, yes.

6            MR. PHILLIPS:  Do you know what the actual hash

7   rate in September of 2024 was?

8            MR. KOKINOS:    I know what the hash rate is today,

9   I do not know what it was in September '24.

10           MR. PHILLIPS:  What is it today?

11           MR. KOKINOS:    Approximately 480.

12           MR. PHILLIPS:  Okay, so if the hash rate is

13   approximately 480, which if I look here is not going to

                                        th
14   exceed again until September 26 , what does that imply as to

15   the profitability and cash flow you've dealt with netcap,

16   CapEx that are shown on this chart?

17           MR. KOKINOS:    Well, first of all, I don't have

18   the details of this financial projection so it's hard for me

19   to speculate on, you know, what that would, you know, how it

20   would change the numbers. I think it's impossible for me to

21   say in isolation, you know, what impact that would have

22   without, you know, having a spreadsheet and deeper data

23   here. And I wasn't a party --

24           MR. PHILLIPS:  Would it be --

25           THE COURT:    [indiscernible]

1          MR. KOKINOS:    -- to the calculation.

2          MR. PHILLIPS:  Would it be fair to say that the

3     network share would drop from three and a half to a lower

4     number more in accordance to about, you know, two and a

5     half?

6          MR. KOKINOS:   I mean, I think it is a fair

7     assumption that if your hash rate, if the network hash rate

8     is going up then, you know, you would have a smaller share

9     of it. I agree. I think in reality it's likely not that

10    simple, which is why, you know, I would need to defer to

11    look at these. And again, I would just say that the specific

12    calculations here were done by the debtor. We gave input as

13    to the reasonableness on, you know, certain aspects here

14    which, you know, we felt were reasonable at the time and

15    stand by, you know, that. Obviously, you know, Bitcoin is a

16    volatile asset and network hash rates are a volatile thing

17    as well so they go up and they go down.

18          MR. PHILLIPS:  So you think that now that hash

19    rates are 60 percent higher, in actuality than has been

20    illustrated on this chart, that this number is still

21    feasible?

22          MR. KOKINOS:   What was in my testimony --

23          MR. PHILLIPS:  [indiscernible]

24          MR. KOKINOS:    -- and what I am reiterating here,

25    is that, you know, the numbers as presented with the

1   information that we had at the time, was reasonable and we

2   stand behind that.

3            MR. PHILLIPS:  And you agree that if the network

4   hash rate is substantially higher than was illustrated here,

5   the profitability would be lower? Not saying a particular

6   number but that it would actually be lower for sure.

7            MR. KOKINOS:   I'm not sure I agree with that part

8   of your statement. I think we, you know, as all things in

9   business and forecasting, you know, you have to look at the

10  totality of it. I don't have the levers in front of me to

11  understand, you know, how that might change or what other

12  decisions might go along with, you know, changes in a

13  dynamic environment. I think that's part of capital

14  allocation and risk management and those are the sorts of

15  things that we would look at. But I think the assertion

16  you're trying to make is that we would just leave the

17  business alone in the face of changing dynamics and I don't,

18  you know, I'm not suggesting that's true. That's something

19  we'll work with the board on to determine kind of the

20  appropriate course forward. And, again, the numbers that,

21  you know, as presented and the projects at the time, they

22  were reasonable and we stand behind that.

23            MR. PHILLIPS:  Okay, I understand you had reason

24  with this at the time presented but would you agree that as

25  your percentage of network hash rate goes down that the

Page 150

 1   revenue holding Bitcoin plays constant that your revenues

 2   would go down?

 3           MR. KOKINOS:   I'm not sure I agree with that

 4   because you have other variables such as price and, you

 5   know, other elements that --

 6           MR. PHILLIPS:  I said when Bitcoin price --

 7           THE COURT:    Don't interrupt. Mr. Phillips,

 8   don't interrupt the witness.

 9           MR. PHILLIPS:  Sorry.

10           THE COURT:    Go ahead.

11           MR. KOKINOS:   Yeah, what I was saying is, you

12   know, you're taking one variable in isolation and in a

13   complex business there are many different variables that

14   could offset and you have to look at those things

15   holistically.

16           MR. PHILLIPS:  Okay, but assuming Bitcoin price is

17   constant, if your share of the network hash rate decreases,

18   would you agree that revenues decrease?

19           MR. KOKINOS:   All things being equal, yes.

20           MR. PHILLIPS:  Thank you. And if those revenues

21   decrease, all other elements being equal, profitability and

22   cash flow, also decrease.

23           MR. KOKINOS:   What was the, could you repeat

24   that?

25           MR. PHILLIPS:  I was saying that if revenues

Page 151

1    decrease, and all clear things being equal, that

2    profitability and cash flow also decrease.

3            MR. KOKINOS:    I mean, yes --

4            MR. PHILLIPS:  Do you agree?

5            MR. KOKINOS:    -- what you said makes logical

6    sense. What I'm saying is as, you know, a business person

7    and somebody's going to be running the business, we would

8    not look at things in such a static way. We would, you know,

9    look at what different elements of the business need to be

10   adjusted as market conditions change.

11           MR. PHILLIPS:  But in general, if hash rate,

12   network hash rate increased, in order to be competitive and

13   produce the same amount of profits that really you would

14   incur to increase costs then.

15           MR. KOKINOS:    Could you rephrase what you're

16   saying? I'm trying to follow you here.

17           MR. PHILLIPS:  Would you agree then, you know, you

18   mentioned that as a business operator that you would make

19   adjustments. And that if the operating conditions were such,

20   your network hash rate was low, or your overall share of the

21   network hash rate was lower, Bitcoin price was constant,

22   let's assume that for now, that, you know, that the

23   adjustments that you would have to make in order to maintain

24   or exceed this level of profitability would then, or to

25   achieve it. I don't know how you would. But maybe you have a

1    magic dial, but you would have to increase your --

2            THE COURT:     You're rambling on with the

3    question. And start the question again. Ask a quick, crisp

4    question if you wish the witness to answer.

5            MR. PHILLIPS:  In order to maintain --

6            THE COURT:     You're not testifying, Mr.

7    Phillips. Ask simple direct questions.

8            MR. PHILLIPS:  Okay. Assuming Bitcoin price is

9    constant, and the network hash rate is higher than

10   illustrated here, in order to achieve the same level of

11   revenue then, you would have to increase your direct cost in

12   order to achieve that revenue level as one of your business

13   operation adjustments.

14           MR. KOKINOS:   I agree, that's one possibility.

15   What I would say though is our focus, you know, in that, you

16   know, if you look at a market which was going in that

17   direction would be where are there efficiency improvements,

18   you know, that could be employed to better manage the

19   business. How do we drive cost out and/or, you know, are

20   there, as an example, are there certain locations that are

21   higher cost versus lower cost. You would turn of the higher

22   cost locations and run the lower more optimized ones. So I

23   hear what you're saying, I'm not sure that it follows

24   logically the profitability would decline simple as a result

25   of one of these numbers being held constant or going in a

1    different direction. And that's part of the nuance of, you

2    know, managing a Bitcoin mining business. Is you have to

3    look at all these variables together to come up with the

4    right answer and, you know, that's what we will seek to do

5    at NewCo with the board's consent.

6              MR. PHILLIPS:  Okay. So knowing what you now know

7    today about the network in its current state, do you believe

8    these projections to still be accurate and conservative or -

9    -

10             THE COURT:    I don't know what accurate means.

11   Projections can be reasonable, they could be not reasonable.

12   Finish up your --

13             MR. PHILLIPS:  Do you --

14             THE COURT:    -- finish up your question, Mr.

15   Phillips, let's go.

16             MR. PHILLIPS:  Okay. Do you believe that these

17   projections are reasonable?

18             MR. KOKINOS:   I, you know, previously answered

19   this.

20             THE COURT:    Do you believe the projections are

21   reasonable?

22             MR. KOKINOS:   Yes.

23             THE COURT:    Okay. One more question, Mr.

24   Phillips.

25             MR. PHILLIPS:  Okay. One moment, please, Your

```
 1    Honor. So, as the previous question Mr. Sheik was mentioning

 2    about Asher Genoot being brought onto the board when the

 3    board was expanded from seven to nine. Why was Asher Genoot

 4    appointed to the Fahrenheit board?

 5              MR. MCCARRICK: Asked and answered.

 6              THE COURT:    Sustained. You've asked your

 7    questions. Next person. Anybody else wish to cross examine?

 8              THE CLERK:    I don't see any additional hands

 9    raised, Judge.

10              THE COURT:    All right, any redirect?

11              MR. MCCARRICK: No, Your Honor.

12              THE COURT:    All right, you're excused. Thank

13    you very much.

14              MR. KOKINOS:   Thank you.

15              THE COURT:    All right, we're going to take a

16    lunch break. It is 12:38. We'll resume, who's

17    [indiscernible]?

18              MR. MCCARRICK: The next witness would be Ryan

19    Kielty.

20              THE COURT:    Try it again.

21              MR. MCCARRICK: Ryan Kielty of Centerview.

22              THE COURT:    Okay. 2:00. Everybody can leave

23    things in the courtroom.

24              MR. MCCARRICK: Thank you, Your Honor.

25              (Whereupon the proceedings were paused at 12:38
```

Page 155

1    for a lunch break.)

2            (Whereupon proceedings were resumed at 2:01 p.m.)

3            THE CLERK:    All rise.

4            THE COURT:    Please be seated. Mr. McCarrick.

5            MR. MCCARRICK: T.J. McCarrick, Kirkland and Ellis

6    on behalf of the debtors. The debtors call Ryan Kielty to

7    the stand.

8            THE COURT:    You'll raise your right hand,

9    you'll be sworn in.

10           UNIDENTIFIED SPEAKER:    Do you solemnly swear

11   that [indiscernible] today before the [indiscernible]?

12           MR. KIELTY    I do.

13           THE COURT:    All right.

14           MR. MCCARRICK: Permission to approach the witness

15   in the [indiscernible] --

16           THE COURT:    Yes, please.

17           MR. MCCARRICK: -- copy of the binder.

18           THE COURT:    Absolutely.

19           MR. KIELTY:    Thank you.

20           THE COURT:    Just for everyone's guidance, we

21   will need to break at about 4:50, 4:55, I have another, I

22   have a 5:00 here. I have another matter. So --

23           MR. MCCARRICK: May I proceed?

24           THE COURT:    Please.

25           MR. MCCARRICK: Can you introduce yourself to the

1    court?

2          MR. KIELTY:    Sure, my name is Ryan Kielty. I'm a

3    partner with Centerview Partners in the debt advisory and

4    structure and practice.

5          MR. MCCARRICK: What kind of firm is Centerview,

6    Mr. Kielty? What sort of work does Centerview do?

7          MR. KIELTY:    Centerview is an investment banking

8    advisory firm. We provide companies and occasionally

9    creditors with advice on mergers and acquisitions, on

10   restructuring matters, on financing processes, on liability

11   management, a full range of corporate finance advisory help.

12         MR. MCCARRICK: What, if any, experience do you

13   personally have in restructuring matters?

14         MR. KIELTY:    For approximately 17 years I've

15   been working in the debt advisory infrastructure industry,

16   initially with Noah Bruckfire [ph]. And then starting in

17   2011 with Centerview Partners. Both consistent roles

18   advising companies and creditors in restructuring matters.

19         MR. MCCARRICK: How did Centerview become involved

20   in these Chapter 11 cases?

21         MR. KIELTY:    Centerview was retained by the

22   debtors in June of 2022 to provide advice on a full range of

23   financing, structuring alternatives. And sale alternatives.

24         MR. MCCARRICK: I'm going to talk about two areas

25   and your involvement in these cases. The first is the sales

1    process for the debtors. And the second is the valuation of

2    the debtors mining business.

3              MR. KIELTY:     Okay.

4              MR. MCCARRICK: Are you familiar with the marketing

5    sales and auction process that the debtors participated in

6    for their assets?

7              MR. KIELTY:     Yes, I am.

8              MR. MCCARRICK: Let's start with fall of 2022. Can

9    you describe the initial sales process?

10             MR. KIELTY:     Sure, so I think just for

11   organization, I'll start with the mining sale process even

12   though the kickoff of that lagged the, what I'll call the

13   platform sale process by a few months. So we initiated a

14   mining sale process in November of 2022. We contacted over

15   70 potential acquirers. I think the exact number was 78. We

16   signed about 15 nondisclosure agreements for parties of that

17   78 that were interested in participating in the process. And

18   the sale process mandate was quite broad. At that point we

19   did not know exactly what the shape of the case, ultimate

20   plan or sale would take. And so we were open and flexible to

21   bids in all forms. Bids for individual mining assets, bids

22   for the mining business as a whole co, bids for parties that

23   wished to reorganize the mining business and leave an equity

24   stake behind for creditors. Sort of the broad structure.

25   After a month of providing diligence information, including

Page 158

1    a business plan, structural information about all the

2    assets, diligence you'd expect to include in a sale process.

3    In December we received seven bids. Three of those bids were

4    for the mining business in its entirety. And then four bids

5    were for individual assets of the mining business. Of the

6    three holistic bids for mining, one of them was for $10

7    million plus a very small earn out. One of them was for an

8    enterprise value of approximately 175 million but that

9    enterprise value was contingent upon those proceeds being

10   financed in the marketplace. The buyer was not coming to the

11   table with any cash proceeds for the assets and financing at

12   that time was very difficult and we do not believe that

13   financing could be raised to fund that purchase. And then

14   the third whole co-bid was for an enterprise value of

15   approximately $300 million but that bid would have left the

16   creditors of the debtors with a very small equity stake

17   sitting behind a tranche of debt, large tranche of debt that

18   the buyer was proposing to put in and own which had punitive

19   terms.

20          MR. MCCARRICK: All right, you just talked about

21   the mining bids. You had also mentioned some platform bids.

22   Can you describe the platform bids that the debtors received

23   in connection with the sales process?

24          MR. KIELTY:    Sure. I guess before I get there,

25   the other four bids for mining were bids for individual

1    assets, primarily bids for small selections of rigs, eight

2    to ten thousand rigs with prices in the 350 to 550 dollars

3    per rig level. For the platform bid process, we started that

4    process earlier in September of 2022. We reached out to a

5    similar number of parties for the mining business, over 70,

6    signed a similar quantum of NDA's, 15. So an aggregate

7    between the two processes there was a little bit of overlap

8    but we reached out to about 135 total bidders for the two

9    asset buckets. Similar to the mining process, we were

10   flexible on the bids that we would consider. We would

11   consider all structures. We would also consider bids that

12   included mining, bids that excluded mining, again, because

13   we weren't sure exactly what that value maximizing

14   formulation of sale would be. We did extensive diligence

15   with those bidders. Ultimately at the end of November we

16   received three bids for the non-mining assets as a whole and

17   then two bids for specific assets of non-mining, mostly

18   focused on the company's large staked ETH position, which

19   brought substantial discounts. So of the three bids that

20   were total company bids, we received a NovaWulf bid, which

21   we ultimately selected as the stalking horse. And we

22   received two other bids, one of them was from a party that

23   was seeking to take the non-mining assets of Celsius, a

24   subset of them actually not even all of them, put them onto

25   their platform, open accounts for Celsius creditors and then

1    allow Celsius creditors access to those assets with trading

2    fees and other economics for the acquirer. And that bidder

3    had had regulatory issues in other Chapter 11 cases that

4    were going on at the time so we didn't feel that bid was one

5    we could pursue. And then the second bid, other than the

6    NovaWulf bid was from a party that had a relatively small

7    platform at the time and was looking to set up individual

8    SPV's for Celsius' non-mining assets that would be

9    individually traded on that platform. And that was just,

10   that platform was not tested at the quantum of what that

11   transaction would be. It had only transacted a small

12   fraction of the total asset size of what the Celsius bid

13   would mean for that company. And also because the assets

14   would be individually traded, we thought liquidity would be

15   at issue. And so at that point the NovaWulf bid which

16   provided a comprehensive solution for the vast majority of

17   Celsius' assets, including mining, we thought was the best

18   bid and we thought it was important to have a floor for the

19   sale process going forward. And so we moved to make that

20   bid, the stalking horse. So I think the, one of the factors

21   we've learned from the mining process that sort of informed

22   our selection when it came to the platform-winning-bidder

23   was that the mining bids were very, very low for the total

24   company and/or inexecutable. And so it was, we thought it

25   was important that there be a solution for mining to

Page 161

1    effectively delivery the equity of mining back to the

2    creditors because selling it at that time didn't make sense.

3    And so that was sort of further rational for why the

4    NovaWulf we viewed at the time is the best path forward.

5            MR. MCCARRICK: When you describe the NovaWulf as a

6    stalking Horse, what exactly do you mean by that?

7            MR. KIELTY:    I mean that what we intended was

8    that NovaWulf there would be a floor and that it would

9    provide certainty to the estates of an exit at a time in the

10   future and that we would use that floor as a springboard to

11   further market the assets in the hopes that we could have a

12   competitive process which we ended up, which we did.

13           MR. MCCARRICK: Okay.

14           THE COURT:    What was the Bitcoin price at the

15   time of the NovaWulf bid?

16           MR. KIELTY:   So the Bitcoin price in November, I

17   don't remember off the top of my head, Your Honor, I

18   apologize.

19           MR. MCCARRICK: You describe the --

20           MR. KIELTY:   I think I remember it being 24-ish,

21   perhaps, something like that.

22           MR. MCCARRICK: You describe the competitive

23   process that followed selection of NovaWulf as the stalking

24   horse bid, was that processed in the auction?

25           MR. KIELTY:   I'm sorry, can you repeat that

Page 162

1   question?

2          MR. MCCARRICK: Yeah, sure. Following the selection

3   of the NovaWulf bid you testified that there was a

4   competitive process, was that the auction process?

5          MR. KIELTY:   So after the stalking horse bid was

6   selected, we made calls to parties that had declined in the

7   sale process that had let up to that point. We also got

8   inbounds from other parties like the Fahrenheit Group that

9   had not participated previously in the sale process. And so

10  we conducted diligence with those bidders and set a

11  qualified bid deadline in this spring of 2023. And we

12  collected additional bids from Fahrenheit and BRICK and one

13  other at that point. So that's the process that came after

14  the selection of the Stalking Horse. And then at that point

15  we selected Fahrenheit and BRICK and we qualified those

16  bidders and together with NovaWulf they participated in the

17  auction. The other bid that I mentioned that we received at

18  that time, there were significant financing contingencies

19  and from a diligence perspective they were months and months

20  behind the other bidders and so we didn't feel that that was

21  actionable.

22          THE COURT:   Had you reached out to BRICK and

23  Fahrenheit during the initial round of assessing interest in

24  this?

25          MR. KIELTY:   So Fahrenheit as an investor group

Page 163

1   was not composed yet and so we did not reach out to the

2   members of Fahrenheit because I think on their own, given

3   the size of the assets we were marketing, they wouldn't have

4   been actional bidders and we didn't think to call them up at

5   that time. With BRICK we got an inbound from Global X

6   Digital in the fall around the September, October timeframe.

7   We had sent them an NDA, they didn't come back to us but

8   then they re-engaged after the stalking horse bid was put on

9   the record and so we engaged with them at that time.

10          MR. MCCARRICK: I guess, what group was ultimately

11  successful in their bid and why?

12          MR. KIELTY:   So we, together with the creditors

13  committee ultimately selected Fahrenheit as the winning

14  bidder. As it's described in the disclosure statement, at

15  the outset of the auction we had selected the BRICK which

16  was a winddown bid as the highest and best. Because at that

17  time with what had happened to Bitcoin prices and the other

18  factors around the industry, the fees in the NovaWulf bid

19  were entirely too high. And at that point a winddown made

20  the most sense given that a fee structure that was contained

21  in that bid. In, I'm not sure if it was the second or third

22  round of the auction, both platform NewCo bidders,

23  Fahrenheit and NovaWulf significantly improved their fee

24  structures by hundreds of millions of dollars. And at that

25  point it became clear, given the businesses that they were

1    to create and the potential return profile there and their

2    expertise, that a NewCo bid was better than a winddown bid.

3    And so the NewCo bidders went back and forth over multiple

4    rounds, ultimately the fee structures for the NovaWulf bid

5    and Fahrenheit bid were very similar. Minor differences

6    between the two of them. And so what it really came down to

7    is the collective you between the debtors and the creditors

8    committee as to which of the management teams we were

9    selecting was going to drive the greatest value for

10   creditors, who was going to build, manage the mining

11   business most successfully, most profitably, monetize the

12   illiquid assets in a very value maximizing way and run a

13   staking business and build a staking business relatively

14   quickly. The committee members felt very strongly that the

15   Fahrenheit Group met those more qualitative factors and the

16   debtors, we supported them in that distinction. From the

17   debtors' perspective, we think it was quite close but I

18   would say on mining we really were incredibly impressed with

19   the US Bitcoin Group and we thought that that would be the

20   best choice for mining. And as it relates to the other

21   business lines, again, we thought it was close but

22   ultimately, you know, agreed with the committee.

23            MR. MCCARRICK: Okay, I want to switch gears to

24   valuation. Was Centerview asked to value the debtors' mining

25   assets?

Page 165

1             MR. KIELTY:    Yes, we were.

2             MR. MCCARRICK: And what sort of valuation were you

3       asked to perfom?

4             MR. KIELTY:    We were asked to value the

5       enterprise value of the mining business.

6             MR. MCCARRICK: And what is enterprise value

7       measure?

8             MR. KIELTY:    The total value of the company and

9       all of it's assets.

10            MR. MCCARRICK: What methodology or methodologies

11      did you and Centerview team use to generate that enterprise

12      value for the debtors' mining assets?

13            MR. KIELTY:    So we used two methodologies to

14      value mining business. We used a discounted cash flow

15      methodology using the on lever free cash flow forecast that

16      we received from the debtors in consultation with

17      Fahrenheit. And then we also used a public company multiples

18      analysis and we used two variants of that. We measured

19      enterprise value as a multiple of the current, meaning May

20      2023 when we performed the valuation. The current hash rate

21      of the enterprise. And then we also measured enterprise

22      value based on the projected end of 2023 hash rate for the

23      enterprise. Mining companies are valued based upon a

24      multiple of their computing power and so that's why we used

25      those multiples. So we took the lows of those three data

Page 166

1    points and the highs of the range of those three data

2    points, the average of those lows and highs is the 410 to

3    720 million valuation disclosure statement of which 565 is

4    the midpoint.

5              MR. MCCARRICK: All right, Mr. Kielty, can you open

6    up the binder in front of you?

7              MR. KIELTY:    Sure.

8              MR. MCCARRICK: This is Celsius Exhibit 45. For the

9    record, Exhibit 45 is a copy of Mr. Kielty's declaration. Is

10   that a true and accurate copy of your declaration?

11             MR. KIELTY:    Yes, it is.

12             MR. MCCARRICK: Do you adopt the statements in your

13   declaration and the analysis in the attached valuation

14   report as your, excuse me, do you adopt the statements in

15   your declaration as your testimony under oath here today?

16             MR. KIELTY:    I do.

17             MR. MCCARRICK: Your Honor, we move that Celsius

18   Exhibit 45 be entered into evidence.

19             THE COURT:    Any objections? All right, Celsius

20   Exhibit 45 is admitted into evidence.

21             MR. MCCARRICK: Mr. Kielty, can you now turn to

22   debtors Exhibit 8 in your binder? For the record, Exhibit 8

23   is a copy of the mining valuation analysis, attaches and

24   exhibit to the debtors disclosure statement. [indiscernible]

25   that document, sir?

Page 167

1              MR. KIELTY:    Yes, I am.

2              MR. MCCARRICK: Does that fairly describe the

3     mining valuation analysis that Centerview performed?

4              MR. KIELTY:    It does.

5              MR. MCCARRICK: Your Honor, we would move that

6     Celsius Exhibit 8, which has not been objected to, be

7     entered into evidence.

8              THE COURT:    Any obstruction? Admitted into

9     evidence.

10             MR. MCCARRICK: All right, thank you for your time,

11    Mr. Kielty. We'll pass the lens.

12             THE COURT:    Thank you very much. All right,

13    cross examination. [indiscernible] Yes, Trustee?

14             MS. Cornell:   No, thank you.

15             THE COURT:    All right, anyone on Zoom or in the

16    courtroom, anyone else with to wish to examine Mr. Kielty?

17             MR. SHEIK:    Yes, Your Honor, if I may.

18             THE COURT:    Please, go ahead, Mr. Sheik.

19             MR. SHEIK:    Mr. Kielty, I do have a question,

20    in regards to, now, when you guys did perform, you were one

21    of the first auditing firms that did a full review and audit

22    of the CNL and the value of the contents or the, as they

23    say, illiquid assets, or illiquid crypt in CNL,is that

24    correct?

25             MR. KIELTY:    No, we're not an auditing firm and

Page 168

1    didn't perform any such audit.

2          MR. SHEIK:    Okay, so to your knowledge, do you

3    know what the valuation of CNL was at that time or is that

4    something that you were not privy to or do not have any

5    oversight on?

6          MR. KIELTY:    I do not.

7          MR. SHEIK:    Okay, never mind then. Thank you, I

8    appreciate the, those are all the questions I have.

9          THE COURT:    Thank you very much, Mr. Sheik.

10   Anybody else wish to cross examine?

11         MR. PHILLIPS:  Yes, Your Honor.

12         THE COURT:    Mr. Phillips, go ahead.

13         MR. PHILLIPS:  Hi, Mr. Kielty. Let me start with

14   the auction process which is, you just testified to and is

15   paragraph 9 of your declaration. In your experience, what's

16   the typical length of a formal bankruptcy auction?

17         MR. KIELTY:    I would say that there's no typical

18   length but I would agree typical bankruptcy auctions are

19   shorter than the auction here for the debtors.

20         MR. PHILLIPS:  And what would you tribute the

21   extended length of this particular auction to?

22         MR. KIELTY:    Well I think there were a number of

23   factors, one, this was a very complex transaction. Both the

24   winddown transaction proposed by BRICK as well as the NewCo

25   style transactions proposed by NovaWulf and Fahrenheit, both

1    had intricate regulatory frameworks. They both had, they all

2    had business lines that are quite complicated to understand.

3    And I think more important than the complexity, regardless

4    of which of those three bidders we ultimately went with,

5    there was some degree, meaningful degree of ongoing

6    management of these assets going forward that the creditors

7    would be relying upon to generate meaningful value and

8    recovery. And so a significant part of the auction was

9    spending time with each of the bidders hearing, it had to be

10   hundreds of pages around business planning, bios, prior

11   experience and getting that familiarity with each of the

12   bidder groups so that in addition to just the economic

13   proposals around management fees the debtors and the

14   creditors committee could make a determination based on the

15   very important qualitative factors that, you know, weighed

16   heavy on the decision as to who the winning bidder would be.

17   And that took a lot of time.

18          MR. PHILLIPS:  Fair enough. And getting up to the

19   end of the auction when the decision essentially was, I

20   believe, by the debtor that the two business economically

21   equivalent and you deferred to the UCC and their advisors in

22   determining which was the best bid at that time.

23          MR. MCCARRICK: Objection, Your Honor.

24          MR. PHILLIPS:  And make sure the --

25          THE COURT:    Sustained.

1           MR. PHILLIPS:  Can I get to the end of the auction

2     and can you describe the role that Perella Weinberg

3     Partners and in particular that Mr. Aidoo in aiding the

4     committee and the debtor in selecting Fahrenheit as the

5     winning bidder.

6           MR. KIELTY:   I know that Mr. Aidoo was a part of

7     the Perella team that at times was at the auction. But I,

8     you know, the creditor's committee had their own room. I'm

9     not privy to the advice or activity of Mr. Aidoo in the

10    committee's deliberations.

11          MR. PHILLIPS:  Were there any other distinct

12    members of the Perella team present at the auction?

13          MR. KIELTY:   Yes, Perella had a large team at

14    the auction.

15          MR. PHILLIPS:  Thank you. Moving onto the

16    valuation. And you admitted, I forget the number on the

17    debtor advise, but Exhibit D, which is the valuation

18    analysis, and I submitted that as an exhibit for cross

19    examination as well.

20          MR. MCCARRICK: It's Exhibit 8. 8.

21          MR. PHILLIPS:  Exhibit 8 in the debtors in the

22    [indiscernible], the first part of that.

23          MR. KIELTY:   I have it in front of me, Mr.

24    Phillips.

25          MR. PHILLIPS:  You did, okay. And you mentioned in

1    your testimonial the range of [indiscernible] was, I believe

2    the lows and highs of three different valuations, did you

3    see that? And market value comparable is based on both the

4    current EVA [ph] hash rate and EVA hash rate and SCN [ph] at

5    the end of 2023.

6              MR. KIELTY:    That's correct.

7              MR. PHILLIPS:  In your experience, is a range of

8    75 percent typically of a valuation computed?

9              MR. KIELTY:    I think that every valuation is

10   unique and different to the situation. And I think that

11   range is appropriate under the circumstances.

12             MR. PHILLIPS:  How many past valuations

13   approximately is a fraction of the ones that you've done in

14   your career that have a range of equal to or greater than 75

15   percent?

16             MR. KIELTY:    I don't know that data point off

17   the top of my head.

18             MR. PHILLIPS:  Can you list the market comparable

19   companies that were used as your comparable in the

20   valuation.

21             MR. KIELTY:    I don't have it in front of me, Mr.

22   Phillips, but I know that we used eight companies in our

23   public companies analysis. There's no perfect comparable, as

24   in many situations. Within that public company set we had

25   Riot, Marathon, Hut 8, Adjusted, Proforma for the US Bitcoin

Page 172

1    merger. Clean Spark, Irish Energy, Tarawolf, I'm forgetting

2    one or two off the top of my head.

3            MR. PHILLIPS:  And did you use all eight data

4    points or did you elect to save the one, you know, sometimes

5    in these market comparables people disregard one because

6    they say it's too far out of the range with the others?

7            MR. KIELTY:    We took the metrics for all of the

8    public companies that we chose into consideration in

9    selecting the ranges. Then ultimately informed the ultimate

10   range that's in the disclosure statement. We did not

11   disqualify any one data point. We interpreted what we saw

12   and assessed, each of those companies as relative to the

13   Celsius mining assets where they are in their lifecycle. You

14   know, what portion is hosted versus proprietary among many,

15   many other factors. And then we chose a range based on that

16   analysis.

17           MR. PHILLIPS:  Were you and Centerview involved in

18   the preparation of the disclosure statement, in particular

19   the section regarding the waited distributional action?

20           MR. KIELTY:    No, we were not.

21           MR. PHILLIPS:  Okay, that's the end of my

22   questions.

23           THE COURT:    Thank you very much, Mr. Phillips.

24   Anybody else wish to cross examine? Any redirect?

25           MR. MCCARRICK: No, Your Honor.

Page 173

```
 1              THE COURT:     Anybody else? You're excused. Thank
 2    you very much for your testimony.
 3              MR. KIELTY:     Thank you.
 4              MR. MCCARRICK: T.J. McCarrick, Kirkland and Ellis
 5    on behalf of the debtors. The debtors call Joel Cohen to the
 6    stand.
 7              THE COURT:     Mr. Cohen, come on up.
 8              (Whereupon the Witness was sworn in.)
 9              THE COURT:     Thank you very much. Mr. Cohen.
10              MR. MCCARRICK: Your Honor, permission to approach
11    the witness box.
12              THE COURT:     Please.
13              MR. COHEN:     Thank you.
14              MR. MCCARRICK: Good afternoon, could you introduce
15    yourself to the court?
16              MR. COHEN:     Joel Cohen.
17              MR. MCCARRICK: What do you do for a living, Mr.
18    Cohen?
19              MR. COHEN:     Forensic account, valuation, and
20    restructuring consulting.
21              MR. MCCARRICK: Where do you do that?
22              MR. COHEN:     At Stout.
23              MR. MCCARRICK: What kind of firm is Stout?
24              MR. COHEN:     Stout's a professional services
25    form that focuses in this space as well investment banking,
```

Page 174

1    accounting advisory.

2            MR. MCCARRICK: What kind of experience do you

3    personally have in restructuring reorganization.

4            MR. COHEN:    I've been doing this type of work

5    for almost 20 years. So I'm focused in sort of as an FA of

6    being a consulting expert or providing evidence.

7            MR. MCCARRICK: How did Stout become involved in

8    these Chapter 11 cases?

9            MR. COHEN:    The interim management of the

10   company reached out for a consultation on valuation.

11           MR. MCCARRICK: What valuation analysis was Stout

12   asked to perform?

13           MR. COHEN:    We were asked to take a select

14   listing of assets that the company held and perform a fair

15   value.

16           MR. MCCARRICK: What's a fair value analysis?

17           MR. COHEN:    The receipt of a price for an asset

18   or payment of consideration for a liability at a particular

19   time.

20           MR. MCCARRICK: And what markets of the debtors'

21   assets did you perform an evaluation analysis for?

22           MR. COHEN:    There were three assets classes.

23   The first was cryptocurrency or digital assets. The next was

24   loans or the lending platform. And then the final were

25   alternative assets.

Page 175

1          MR. MCCARRICK: I'm going to start with the first

2     bucket. How did you value debtors' cryptocurrency assets?

3          MR. COHEN:     We needed to come up with a

4     principle market. They were liquid coins that were traded

5     over a number of different block chains and so we performed

6     an analysis to obtain the best or what we felt was the

7     principle market. And then we received a price for the

8     assets and given that there wasn't a stoppage of trading at

9     this, you know, for these types of assets, we performed an

10    average. We would have a cut off at 4:00 p.m. on a

11    particular date and then average over the prior 24 hours.

12         MR. MCCARRICK: Did you make any adjustments for

13    the valuation of liquid cryptocurrency assets versus liquid

14    assets?

15         MR. COHEN:     Yeah, for those that were liquid we

16    had what's typical discount for lack of marketability. The

17    inability to trade freely.

18         MR. MCCARRICK: The second bucket of assets. How

19    did Stout go about valuing he debtors institutional loans?

20         MR. COHEN:     For the loans we looked to see

21    which of the loans were performing and which might not be.

22    And for the ones that were performing it was principle

23    interest plus the coupon and just performed a market

24    approach for that. And then for the nonperforming we worked

25    with management to understand what the situation was and how

Page 176

1    best to put a discount rate on it.

2            MR. MCCARRICK: And the third bucket of assets, how

3    did Stout value the debtors' alternative investments?

4            MR. COHEN:    Similar, we looked at the

5    agreements that were provided to us by management to

6    understand the assets and provide the right discount for

7    those assets.

8            MR. MCCARRICK: All right, could you open the

9    binder in front of you to Celsius Exhibit 51?

10           MR. COHEN:    Sure.

11           MR. MCCARRICK: And for the record, that's a copy

12   of Mr. Cohen's declaration with attached exhibits which was

13   filed as docket number 3588. Is Exhibit 51 a true and

14   accurate copy of your declaration?

15           MR. COHEN:    It is.

16           MR. MCCARRICK: And is the attachment a true and

17   accurate of Stout's evaluation reports?

18           MR. COHEN:    It is.

19           MR. MCCARRICK: Your Honor, at this time, the

20   debtors would move Exhibit 51 into evidence.

21           THE COURT:    Any obstruction? Green on submitted

22   into evidence.

23           MR. MCCARRICK: All right, Mr. Cohen, did you

24   prepare any visual showing the upshot of your analysis for

25   these three asset classes?

Page 177

1            MR. COHEN:     Yeah, for help today we had one

2     slide just to have a summary.

3            MR. MCCARRICK: All right, and if Mr. Young could

4     made a cohost so he could share what we'll mark as Debtors'

5     Demonstrative 1. Permission to approach.

6            THE COURT:     Yes, please, go ahead.

7            THE CLERK:     Mr. Young is a cohost.

8            MR. MCCARRICK: Mr. Cohen, can you describe what's

9     reflected in this demonstrative?

10           MR. COHEN:     This is a summary or the total

11    value attributed to the three categories of assets that we

12    just described.

13           MR. MCCARRICK: And what was the total?

14           MR. COHEN:     3.2 billion.

15           MR. MCCARRICK: And was that conclusion reached to

16    a sufficient degree of certainty?

17           MR. COHEN:     Yes.

18           MR. MCCARRICK: Your Honor, pass the witness.

19           THE COURT:     All right, cross examination. But

20    first, does the committee have any examination

21    [indiscernible].

22           MR. MCCARRICK: No, Your Honor.

23           THE COURT:     Yes, Trustee. Anyone else in the

24    courtroom. Anyone on Zoom?

25           MR. SHEIK:     Yes, Your Honor.

Page 178

```
 1              THE COURT:     Go ahead, Mr. Sheik.

 2              MR. SHEIK:     Mr. Kielty, could you, for the

 3      record, state what the valuation of the CNL assets were at
                                              th
 4      the beginning of Chapter 11 which is dated 14  of July 2022.

 5              MR. COHEN:     This is Mr. Cohen, and we were not

 6      asked to value the CEO, is that's, if I heard you correctly.

 7              MR. SHEIK:     No, no, was it valued at 9.8

 8      billion?

 9              MR. COHEN:     I'm --

10              THE COURT:     I don't understand your question,

11      Mr. Sheik.

12              MR. COHEN:     I don't either.

13              MR. SHEIK:     I was just looking to see what the

14      valuation of CNL, what assets, you know, the liquid assets

15      were at the time as you entered Chapter 11.
                                              st
16              MR. COHEN:     So our report was as of May 31 .

17              MR. SHEIK:     Of '23.

18              MR. COHEN:     Yeah, 2023.

19              MR. SHEIK:     Got it, okay. And per the previous

20      slide, I believe, that the final conclusion was 3 point, I

21      believe, point 5 billion dollars was the amount that it was

22      valued at after adjustments, correct?

23              MR. COHEN:     It was 3.2 billion for the select

24      assets that were provided to us.

25              MR. SHEIK:     I apologize, that's what I saw, I
```

Page 179

1    just got a quick glimpse of it. That's all I needed to know.

2    Thank you very much.

3              THE COURT:    Thank you, Mr. Sheik. Anyone else

4    with to cross examine?

5              MR. PHILLIPS:  Yes, Your Honor.

6              THE COURT:    Mr. Phillips.

7              MR. PHILLIPS:  Thank you, Your Honor. Let's see, I

8    submitted amended sort of exhibits and if I could ask you

9    about one of them. It's entitled disclosure statement

10   weighted distribution election example.

11             THE COURT:    If you would hold on, please, Mr.

12   Phillips, I think Mr. McCarrick is going to bring that to

13   the court and to the witness, all right?

14             MR. COHEN:    Thank you.

15             THE COURT:    All right, Mr. Phillips.

16             MR. PHILLIPS:  Do you recognize this?

17             THE COURT:    You're talking about the last page,

18   the weight of distribution?

19             MR. COHEN:    The --

20             MR. PHILLIPS:  It says disclosure statement

21   weighted distribution example, it's a screenshot of the

22   [indiscernible] the bottom of page 24 and the top of page 55

23   from the disclosure statement.

24             MR. COHEN:    I don't recognize it but I

25   understand what it is.

Page 180

```
 1              MR. PHILLIPS:  Okay, do you know who prepared
 2    this?
 3              MR. COHEN:     I don't.
 4              MR. PHILLIPS:  Okay. Do you believe, what is your
 5    belief that a reasonable creditor who was billing on the
 6    plan would infer that it would receive if they elected the
 7    liquid cryptocurrency weighted distribution as compared to
 8    the default election.
 9              MR. PHILLIPS:  Objection, Your Honor.
10              THE COURT:     Sustained.
11              MR. PHILLIPS:  Okay. In your fair value analysis,
12    did you estimate the overall enterprise value of the company
13    or, including the mining company or did it exclude the
14    mining company?
15              MR. COHEN:     We did not perform a fair value, or
16    enterprise value for the entire company. And we did not
17    value the mining company.
18              MR. PHILLIPS:  So you had the assets, other than
19    the mining company and Centerview valued the mining company
20    but nobody, to your knowledge, valued the entire enterprise?
21              MR. COHEN:     I don't believe so.
22              MR. PHILLIPS:  Thank you, no further questions.
23              THE COURT:     Thank you, Mr. Phillips. Anyone
24    else wish to cross examine?
25              MR. KIRSANOV:  Yes, Your Honor. Dimitry Kirsanov
```

Page 181

1    with Perasonia [ph].

2              THE COURT:     All right, go ahead.

3              MR. KIRSANOV:  Were all digital currency assets

4    categorized based on their valuation at the time of

5    bankruptcy?

6              MR. COHEN:     I'm sorry, can you repeat the

7    question?

8              MR. KIRSANOV:  Certainly. Were all digital

9    currency assets categorized based on their valuation at the

10   time of bankruptcy?

11             MR. COHEN:     I'm not sure if they were all

12   categorized at the time of bankruptcy.

13             MR. KIRSANOV:  Does the analysis encompass the

14   cell token?

15             MR. COHEN:     This analysis does not encompass

16   the cell token.

17             MR. KIRSANOV:  Thank you, I have no further

18   questions.

19             THE COURT:     Thank you. Anyone else wish to

20   cross examine?

21             THE CLERK: I don't see any raised hands, judge.

22             THE COURT:     You're excused. Well, let me ask,

23   any redirect?

24             MR. MCCARRICK: No, Your Honor.

25             THE COURT:     Anyone else? You're excused. Thank

Page 182

```
 1    you very much for your testimony.

 2               MR. COHEN:     Thank you.

 3               MR. MCCARRICK: Your Honor, my watch has ended.

 4               THE COURT:     You're passing the baton.

 5               MR. MCCARRICK: My, I'm passing baton to my

 6    colleague Hannah Simson.

 7               THE COURT:     Oh, Ms. Simson, okay. Who are you

 8    calling as your witness, Ms. Simson?

 9               MS. SIMSON:    Mr. Karpuk.

10               THE COURT:     Can you say it again, I couldn't

11    hear you.

12               MS. SIMSON:    Mr. Brian Karpuk, Your Honor.

13               THE COURT:     Okay, thank you very much.

14               MS. SIMSON:    Your Honor, Hannah Simson with

15    Kirkland and Ellis, debtors call Mr. Karpuk to the stand. I

16    also have some exhibit binder to the witness, permission to

17    approach the stand.

18               THE COURT:     Please, absolutely.

19               THE CLERK:     [indiscernible]

20               MR. KARPUK:    I do.

21               THE COURT: Thank you, Karen. Good afternoon, Mr.

22    Karpuk.

23               MR. KARPUK:    Good afternoon, Your Honor.

24               THE COURT:     Ms. Simson.

25               MS. SIMSON:    May I proceed, Your Honor?
```

Page 183

```
 1              THE COURT:     Please.

 2              MS. SIMSON:     Can you please introduce yourself

 3      to the court?

 4              MR. KARPUK:     My name is Brian Karpuk and I'm

 5      Managing Director with Streto. Streto was retained as the

 6      official claims and noticing agent and administrative

 7      advisor in these cases.

 8              MS. SIMSON:     How long have you worked for

 9      Streto?

10              MR. KARPUK:     I've worked for Streto for

11      approximately four years.

12              MS. SIMSON:     And how did you get involved in the

13      Celsius Chapter 11 cases?

14              MR. KARPUK:     Streto was retained approximately a

15      month prior to the petition date and we have been engaged

16      with the debtors as both a claims and noticing agent and

17      administrator advisor throughout the case.

18              MS. SIMSON:     I'd like to spend a couple minutes

19      on this solicitation and tabulation process. What have your

20      roles and responsibilities been in connection with the

21      Chapter 11 cases here?

22              MR. KARPUK:     Strato's engaged as a claims and

23      noticing agent and then with respect to solicitation and

24      tabulation, Strato worked with the debtors legal advisors

25      and financial advisors to classify claims pursuant to the
```

Page 184

1   courts order approving disclosure statement and solicitation

2   and voting procedures to identify parties that were entitled

3   to vote and receive solicitation packages and then to ballot

4   and send ballots or solicitation packages to all parties and

5   interest.

6           MS. SIMSON:   What informed procedures you used

7   when soliciting and tabulating the votes?

8           MR. KARPUK:   Strato used, in connection with our

9   discussions with the debtors' counsel we used the courts

10  order approving the disclosure statement and solicitation

11  and tabulation procedures.

12          MS. SIMSON:   Do you have experience in ballot

13  restructuring?

14          MR. KARPUK:   I've been in the restructuring

15  industry for approximately 20 years. For the last 15 I've

16  been a claims and noticing agent and prior to that I was an

17  attorney practicing court restructuring.

18          MS. SIMSON:    I had handed you your amended

19  declaration at docket number 3574. Your Honor, debtors

20  premarked this as Exhibit 60. I will review to it as exhibit

21  60.

22          THE COURT:    Okay.

23          MS. SIMSON:    Is this a true and accurate copy of

                                      th
24  the declaration that you signed on September 27 , 2023?

25          MR. KARPUK:    It is.

Page 185

1              MS. SIMSON:    Do you adopt the declaration that

2    you submitted as exhibit 60 as your sworn testimony under

3    oath today?

4              MR. KARPUK:    I do.

5              MS. SIMSON:    Can you describe the process you

6    and your team followed in soliciting and tabulating the

7    votes?

8              MR. KARPUK:    Once the disclosure statement was

9    filed and the disclosure statement hearing was noticed, the

10   debtors worked with the, Strato worked with the debtors

11   legal advisors and financial advisors to identify all claims

12   entitled to vote, to classify those claims into each of the

13   individual classes. Strato also worked in connection with

14   the debtors to ensure that it had the most up to date

15   contact information that the debtors had one file,

16   specifically the email address that was tied to each and

17   every account. Which would then allow that account holder to

18   log into a custom ballot portal that Strato had created. And

19   when they logged in there that party's balloting information

20   was available to them.

21             MS. SIMSON:    Throughout the balloting process

22   were there any material irregularities outside the norm you

23   usually see in this process?

24             MR. KARPUK:    There were not.

25             MS. SIMSON:    What was the response rate for the

Page 186

1    votes overall?

2        MR. KARPUK:    We balloted approximately just over

3    400,000 parties and we received just under 80,000 votes. I

4    believe that's about 20 percent which is, you know, a

5    relatively high percentage response rate. And I believe

6    that, you know, over 50 percent of parties of account holder

7    claims voted during the process.

8        MS. SIMSON:    And can you summarize for the court

9    how the classes voted?

10        MR. KARPUK:    There were three classes which

11    voted to reject and, but beyond that all other classes

12    accepted and specifically with respect to the account holder

13    classes, many of those classes accepted in the high 90

14    percentile both by count and by dollar.

15        MS. SIMSON:    And can you  summarize for the

16    court how the parties and interest voted for the cell token

17    settlement?

18        MR. KARPUK:    Voting for the cell token was very

19    similar to, overall to the account holder classes. I believe

20    --

21        THE COURT:    Cell tokens were not in a separate

22    class.

23        MR. KARPUK:    That's correct. They were --

24        THE COURT:    The holders of cell tokens were in

25    multiple classes.

Page 187

1          MR. KARPUK:     That's correct.

2          THE COURT:     And, am I correct, Strato broke

3     out, was able to break out how cell token holders voted in

4     the classes of which they voted for.

5          MR. KARPUK:     That's correct, Your Honor.

6          THE COURT:     Okay.

7          MS. SIMSON:     And I would also like to admit

8     exhibit number 60 through declaration into evidence today.

9     Thank you for your . . .

10         THE COURT:     Any objections? All right, exhibit

11    60 is admitted into evidence.

12         MS. SIMSON:     Thank you very much for your time,

13    nothing further. Pass the witness.

14         THE COURT:     All right, cross examination. Does

15    committee with to examine?

16         MR. COLODNY:    No, Your Honor.

17         THE COURT:     Ms. Trustee, Ms. Cornell?

18         MS. CORNELL:    Good afternoon. Shara Cornell on

19    behalf of the Office of the United States Trustee. I only

20    have a few questions and they have been already answered but

21    I'm just gonna ask them a little bit of a different way

22    because sometimes it can be a little confusing with the

23    voting tabulation. As part of your declaration you submitted

24    several charts, are you familiar with them?

25         MR. KARPUK:     I am.

Page 188

1          MS. CORNELL:   The charts reference accept or

2   reject. Can you tell us how many ballots were actually sent

3   out?

4          MR. KARPUK:    I guess there was just over 400,000

5   in the account holder classes plus, you know, a few hundred

6   in the other classes. So probably just over 400,000.

7          MS. CORNELL:   Do you know how many of those

8   ballots that were sent out were undeliverable or not

9   received by account holders?

10          MR. KARPUK:    Strato worked ahead of time,

11   because we had, we'd been doing email campaigns throughout

12   the process and we preidentified approximately 20,000

13   account holders that we expected to be undeliverable. And so

14   during, currently with the email campaign, we also mailed

15   physical solicitation packages to those 20,000. I believe

16   when we then reanalyzed that the email campaign against what

17   was expected, there were another maybe 500 parties that we

18   mailed physical solicitation packages to.

19          MS. CORNELL:   Okay. Also in the tabulation

20   summaries provided, for example on page two of exhibit A,

21   you know, you used the term all ballots, all ballots total.

22   When you use that term in these charts, and again, I'm

23   referring to page two of exhibit A to your declaration.

24          MR. KARPUK:    Mm-hmm.

25          MS. CORNELL:   Could you just explain what you

Page 189

1    mean in that context? All ballots total. Is it all ballots,

2    is it that 400,000 number that you referenced earlier?

3              THE COURT:    Just orient me. I turned to that

4    page but --

5              MS. CORNELL:   Oh, I'm sorry.

6              THE COURT:    No, that's okay. Just tell me where

7    to look.

8              MS. CORNELL:   Sure, page two of Exhibit A --

9              THE COURT:    Yes.

10             MS. CORNELL:   -- the declaration.

11             THE COURT:    Yes. All right, I see it.

12             MS. CORNELL:   Sure.

13             THE COURT:    Thank you.

14             MS. CORNELL:   And so my question is, you used the

15   phrase all ballots total. Does that refer to that 400,000

16   number you spoke of earlier or does that refer to the amount

17   of ballots that were actually received in response by

18   debtors?

19             MR. KARPUK:    That is all ballots received in

20   response. Whether that ballot was tabulated, whether it

21   abstained or whether it was amended or late filed.

22             MS. CORNELL:   And that leads me actually to my

23   next question. Can you explain for the record what abstained

24   means in this context, please?

25             MR. KARPUK:    Abstained means that the voting

Page 190

1    party came into the balloting portal. They may or may not

2    have made an election, but they did not vote on the plan and

3    they did click submit. The submit, they completed submission

4    of their ballot but they did not vote to accept or reject

5    the plan.

6              THE COURT:    They electronically accessed the

7    portal.

8              MR. KARPUK:    All the way through the process to

9    hit submit.

10             THE COURT:    And they returned, but they hit

11   submit, but it was a blank ballot.

12             MR. KARPUK:    Although they may have made an

13   election.

14             MS. CORNELL:  And in that context, the election

15   would've gone through?

16             MR. KARPUK:  Yes.

17             THE COURT:  Election for what?

18             MR. KARPUK:  Third-party release or opt out of the

19   class claim settlement. Any election that that particular

20   ballot was entitled to make.

21             THE COURT:  Thank you.

22             MS. CORNELL:  And in conclusion, just for the

23   record one more time, what percentage of accountholders

24   actually voted?

25             MR. KARPUK:  I --

1              THE COURT:  When you say 'actually voted' --

2              MS. CORNELL:  Not including the abstention number

3     that we --

4              THE COURT:  Leaving the abstentions out, how many

5     that were returned actually had votes to count.

6              MS. CORNELL:  Yes, Your Honor.

7              MR. KARPUK:  I'd have to add it up here. I know we

8     received about 79,500 ballots tied to, you know, unique

9     accountholders, right? So they may have voted in more than

10    one class. But if, you know, here there were -- I mean, it

11    looks like there was probably 2 to 3,000 accountholders that

12    submitted a ballot but did not vote, they abstained.

13             MS. CORNELL:  Thank you. That's all I have for

14    today.

15             THE COURT:  Anybody else wish to examine?

16             MR. KIRSAKOV:  Hi, Dimitry Kirsakov, pro se.

17             THE COURT:  Yes, please go ahead.

18             MR. KIRSAKOV:  Hi, Mr. Karpuk. A few questions.

19    Was the valuation of CEL Token the sum of .25 cents for

20    building leverage throughout the ballot vote, is that

21    correct?

22             MS. SIMSON:  Objection.

23             THE COURT:  Sustained.

24             MR. KIRSAKOV:  Who provided the directive to

25    modify the bankruptcy date valuations of the CEL Token?

Page 192

1          MS. SIMSON:  Objection.

2          THE COURT:  Sustained.

3          MR. KIRSAKOV:  I will ask the witness to open Page

4    2 to review the General Custody Claims. It appears that a

5    significant portion of the CEL custody class have rejected

6    the CEL Token settlement. Can you confirm that's accurate?

7          MR. KARPUK:  By dollar amount, yes, 64 percent of

8    the CEL Token holders in Class A voted to reject. Although

9    by count, 97 percent voted to accept.

10          MR. KIRSAKOV:  Can you confirm just the majority

11    of CEL Token holders did in fact reject the plan?

12          MR. KARPUK:  That is not correct.

13          MR. KIRSAKOV:  CEL Token holders did not reject

14    the plan?

15          MS. SIMSON:  Objection.

16          THE COURT:  Sustained.

17          MR. KARPUK:  What percentage of CEL Token custody

18    holders rejected the plan?

19          MS. SIMSON:  Objection.

20          THE COURT:  Are you able to answer that question?

21          MR. KARPUK:  I mean, looking -- in general, the

22    numbers for CEL Token holders mirrored overall. I think I --

23    we received approximately 36,000 ballots from CEL Token

24    holders, and they, in general, voted in the high 90 percent

25    to accept the plan.

Page 193

1              MR. KIRSAKOV:  So you ventured that the outcomes

2    for the CEL Tokens were comparable to other classes.

3    However, is it accurate to state the monetary majority of

4    the custody class holding CEL Tokens rejected the CEL Token

5    class?

6              MS. SIMSON:  Objection.

7              THE COURT:  Sustained.

8              MR. KIRSAKOV:  Is it accurate to state the

9    monetary majority of voters in the custody class rejected

10   the plan?

11             MS. SIMSON:  Objected.

12             THE COURT:  Sustained. Mr. Kirsakov, the

13   tabulation is in evidence. When we get to the closing

14   argument, you're certainly free to argue from the exhibit.

15   But I don't understand your questions. I mean, the documents

16   say what they say.

17             MR. KIRSAKOV:  Thank you, Your Honor. I have no

18   further questions.

19             THE COURT:  Thank you. All right. Mr. Sabin, did

20   you want -- anybody else wish to examine?

21             MR. PHILLIPS:  Yes, Your Honor, yes.

22             THE COURT:  Mr. Phillips.

23             MR. PHILLIPS:  Thank you, Your Honor. And I, once

24   again, I did submit an exhibit which is part of the Amended

25   Declaration, and specifically Row 7 and 8 of the Amended

Page 194

1    Declaration with regards to weighted distribution election.

2            THE COURT:  All right, I have that opened in front

3    of me. That's the last page of what you submitted, is that

4    correct?

5            MR. PHILLIPS:  I'm sorry?

6            THE COURT:  Is that the last page of what you

7    submitted? Weighted distribution election?

8            MR. PHILLIPS:  Yes, yes.

9            THE COURT:  Okay. Do you have it?

10           MR. KARPUK:  I have the, my -- I don't have that,

11   but I do have my thing here which is the -- I think that's

12   what he's excerpting.

13           MR. COLODNY:  Let me hand -- this is exactly what

14   we're showing here. I want to be sure you have the same

15   thing. Go ahead, Mr. Phillips.

16           MR. PHILLIPS:  Okay. So, so in reviewing the

17   results of the weighted distribution election, is it

18   accurate to say that a total of $112,131,300.78 in claims

19   elected more crypto?

20           MR. COLODNY:  Objection, Your Honor. This is a

21   document that has totals on the bottom that apparently

22   Mr. Phillips calculated by himself. Mr. Karpuk, if you gave

23   him a calculator, might be able to do it, but there's no way

24   to tell if these totals are accurate.

25           THE COURT:  Sustained.

Page 195

1          MR. PHILLIPS:  Would you agree that that total,

2    though, is approximate given that in Paragraph 16, you know,

3    there's 960 million plus -- in holders of Class 5, then

4    approximately, it's approximately accurate. And there's 163

5    million in, in Paragraph 15 that elected that.

6          MS. SIMSON:  Objection, Your Honor.

7          MR. COLODNY:  Objection, Your Honor. The document

8    speaks for itself.

9          THE COURT:  Overruled.

10         MR. KARPUK:  The numbers that I put forth within

11   my Certification are accurate.

12         THE COURT:  Okay.

13         MR. PHILLIPS:  Would -- do you have any reason to

14   doubt that if I told you that those numbers indicated that

15   6.19 times as many claims were voted in favor of more crypto

16   than more equity?

17         MS. SIMSON:  Objection.

18         THE COURT:  Overruled. You can -- if you're able

19   to answer that, go ahead.

20         MR. KARPUK:  Sure. Without doing the math, I do

21   know that the cryptocurrency weighted election came in

22   significantly higher than the share weighted election.

23         MR. PHILLIPS:  Okay, thank you. Does that enable

24   you to then -- to make any inference with regards to the 30

25   percent discount that was offered on the price of the more

Page 196

1    equity election?

2            THE COURT:  I'm going to sustain an objection to

3    that. The documents -- look, the vote was the vote. You cold

4    interpret it the way you want to interpret it, you can argue

5    what you want to argue from it, but not with this witness.

6            MR. PHILLIPS:  Your Honor, I guess I'm still

7    puzzled as to who was responsible for the weighted

8    distribution election and the Disclosure Statement given --

9            THE COURT:  Mr. Phillips, your uncertainty is not

10   relevant to questioning of this witness. If you want to

11   submit a brief later on in this case, you can, but this

12   witness is testifying about the ballots that were received,

13   how they were counted, and I don't think you're asking him

14   about that. Do you have any other questions?

15           MR. PHILLIPS:  I have no further questions for

16   this witness, Your Honor.

17           THE COURT:  All right. Anybody else wish to

18   question the witness?

19           MR. UBIERNA:  Yes, Your Honor, if I May.

20           THE COURT:  Who is that?

21           MR. UBIERNA:  Victor Ubierna de las Heras, Pro Se

22   Creditor.

23           THE COURT:  Please, go ahead.

24           MR. UBIERNA:  Was there -- okay, thank you. Was

25   there an item on the ballot to opt out of the third-party

Page 197

```
1    releases?
2              MS. SIMSON:  Objection.
3              THE COURT:  Overruled. Do you know -- in ballots,
4    what opt-outs were provided?
5              MR. KARPUK:  I believe that the -- each of the
6    ballots contained -- each of the ballots in the voting
7    classes contained an option to opt out of the third-party
8    release.
9              THE COURT:  And could people who voted in favor of
10   the plan opt out of the releases?
11             MR. KARPUK:  They could not.
12             THE COURT:  Any other questions?
13             MR. UBIERNA:  Do you have the -- yes, do you have
14   the number of creditors that tried to opt out of the third-
15   party releases but were not able to do so because they
16   accepted the plan?
17             MR. KARPUK:  As set forth in my Certification,
18   5,160 holders attempted to opt out of those third-party
19   releases but did accept the plan.
20             MR. UBIERNA:  Okay. And do you have a total amount
21   of that number of creditors?
22             MR. KARPUK:  That is not a calculation that's in
23   the Certification.
24             MR. UBIERNA:  Okay, thank you. I have no more
25   questions.
```

1           THE COURT:  Thank you very much. Any additional

2    cross-examination? You're excused. Thank you very much for

3    your testimony. Well actually, is there any redirect?

4           MS. SIMSON:  Nothing, Your Honor.

5           THE COURT:  Deanna, is there somebody else? 'Cause

6    I don't see any hands raised in my --

7           CLERK:  Yeah, Mr. Patton, his hand was raised. Now

8    it's back.

9           THE COURT:  Mr. Patton, did you want to question

10   the witness?

11          MR. PATTON:  Yes, Your Honor. One question,

12   please.

13          THE COURT:  Okay, go ahead.

14          MR. PATTON:  Sir, are you aware of any items that

15   were not settled on the ballot or any elections for any

16   creditors that had to be extended past the closure of

17   voting?

18          MR. KARPUK:  That is correct. During the process,

19   we determined that parties within the convenience class were

20   unable to make the election to opt out of the class claim

21   settlement. We did open that ability for them to do that

22   during the process. Subsequent to that in connection with

23   Debtors' Counsel asked us after the voting period had

24   completed to then e-mail each of the holders in those

25   classes, and they have now until October 9th to return an e-

 1    mail that says they'd like to opt out of that -- the class

 2    claim settlement.

 3              MR. PATTON:  Thank you very kindly. I have no

 4    further questions.

 5              THE COURT:  Thank you, Mr. Patton. Anybody else

 6    wish to examine? Mr. Adler?

 7              MS. DOW:  Sharon Dow.

 8              THE COURT:  Hold on, Mr. Adler is to the podium

 9    first.

10              MS. DOW:  Oh, sorry.

11              MR. ADLER: Hello, I'm David Adler from McCarter &

12    English, on behalf of the ad hoc group of borrowers. I just

13    want to clarify, with respect to the Class 2 ballot, the

14    retail borrowers. There was not a box there that allowed the

15    borrowers to make an election as to whether they wished to

16    repay their loans or not, is that correct?

17              MR. KARPUK:  I believe the box for -- you're

18    talking for the avoidance action settlement?

19              MR. ADLER:  I'm talking about under Class 2, the

20    borrowers are given an option to repay their outstanding

21    loans.

22              MR. KARPUK:  I believe there was an election for

23    them to request more information.

24              THE COURT:  Mr. Adler, I think you raised this

25    issue, this was discussed earlier in the hearing. And I

Page 200

1    believe that the Committee agreed to work with you to

2    provide the opportunity for people to repay their loan.

3              MR. ADLER:  Your Honor, I have no further

4    questions. I just want to clarify the record because there

5    was a question asked about balloting issues.

6              THE COURT:  Okay.

7              MR. COLODNY:  Your Honor, I'll clarify. Within the

8    modified plan that we filed, we said we'd file -- we'd send

9    an additional notice, and we fixed this kind of confusion in

10   the --

11             THE COURT:  Ms. Jones, do you want to be heard?

12             MS. JONES:  Your Honor, Elizabeth Jones with

13   Kirkland & Ellis. There is a footnote in the ballot when

14   explaining Class 2 that says we will send out a notice, and

15   if you would like to elect to either repay or set off, then

16   we will follow up with that information. So it was clarified

17   on the ballot.

18             THE COURT:  So that's in the process of being

19   done.

20             MS. JONES:  Correct.

21             THE COURT:  Okay. Thanks very much. All right.

22   Ms. Dow, you wanted to question?

23             CLERK:  She's no longer raising her hand, Judge.

24             THE COURT:  All right.

25             MS. DOW:  Hi. Sorry, I'm in a tropical storm, so

Page 201

1    things are going in and out here. I apologize. I do have one

2    question.

3              THE COURT:  Go ahead.

4              MS. DOW:  About, about the voting process and how

5    much -- how many votes were changed during the voting

6    process. And people were able to change their votes, we know

7    that there were disclosure statements rolling out through

8    the voting period. How many people -- how many votes were,

9    were changed?

10             MR. KARPUK:  I don't have information as to how

11   many votes were changed. Although if you look at Exhibit C

12   to the -- my Certification, you can see that -- the list of

13   amended ballots. So there are 834 amended ballots in Class

14   2, 2,026 in Class 4, 5,126 in Class 5, 513 in 6 A and 64 in

15   Class 7. Those are not unique counts because there were --

16   you know, many accountholders would go through the ballot

17   process over and over, so . . .

18             MS. DOW:  Thank you.

19             THE COURT:  Any other questions, Ms. Dow?

20             MS. DOW:  Yes, thank you. The question was of

21   those 834, were they flipping to vote for versus not for the

22   plan, or were most of the changes the other attributes in

23   the vote?

24             MR. KARPUK:  I did not examine that information.

25             MS. DOW:  Thank you very much.

Page 202

1          THE COURT:  Thank you. Anybody else wish to cross-

2     examine? You're excused.

3          MR. KARPUK:  Thank you, Your Honor.

4          MS. SIMSON:  I'm going to pass the time to my

5     colleague.

6          THE COURT:  Thank you, Ms. Simson.

7          MS. BRIER:  Good afternoon, Your Honor. Grace

8     Brier, Kirkland & Ellis on behalf of Debtors. At this time,

9     Debtors call Allison Hoeinghaus to the stand.

10          THE COURT:  Thank you very much.

11          MS. BRIER:  And Your Honor, may I approach with

12     the exhibits that we will use with Ms. Hoeinghaus? Thank

13     you.

14          CLERK: Please raise your right hand. Do you

15     solemnly swear and affirm that all the testimony you're

16     about to give before this Court is the truth, the whole

17     truth and nothing but the truth?

18          MS. HOEINGHAUS:  Yes, I do.

19          MS. BRIER:  Good afternoon. Can you please

20     introduce yourself to the Court?

21          MS. HOEINGHAUS:  Hi, I'm Allison Hoeinghaus, I'm a

22     Managing Director at Alvarez & Marsal.

23          MS. BRIER:  And Ms. Hoeinghaus, how did you first

24     become involved in the matters before the Court today?

25          MS. HOEINGHAUS:  I was asked to be involved in

Page 203

1    these cases back in January of this year to advise around

2    incentive programs for executives and other key employees of

3    the Debtors.

4           MS. BRIER:  And as part of your work on this case,

5    can you describe the tasks that you performed?

6           MS. HOEINGHAUS:  Sure. We were tasked with helping

7    develop the incentive program, determining what might be

8    reasonable amounts relative to other Chapter 11 cases, and

9    what's typical in the Debtors' industry.

10          MS. BRIER:  And have you developed incentive

11   programs before?

12          MS. HOEINGHAUS:  Yes, I have.

13          MS. BRIER:  Now, were you asked to do anything

14   else in addition to developing incentive programs?

15          MS. HOEINGHAUS:  At this debtor or are you talking

16   about in general?

17          MS. BRIER:  Were you asked to analyze that

18   incentive program after you developed it?

19          MS. HOEINGHAUS:  Yes, it was a collaborative

20   process where we were actually using the other cases and the

21   facts and other comparables to actually help develop the

22   program along the way.

23          MS. BRIER:  Now, have you previously analyzed and

24   offered opinions on incentive programs in other

25   restructuring cases and in other restructuring contexts?

Page 204

1           MS. HOEINGHAUS:  Yes, I have. For incentive

2    programs, retention programs, severance and other

3    compensation matters.

4           MS. BRIER:  Now, I'd like to turn to the document

5    that I handed you earlier. Can you tell us what that

6    document is?

7           MS. HOEINGHAUS:  It's a Declaration I filed on

8    behalf of the Debtors.

9           MS. BRIER:  And for the purposes of the record,

10   this is Document 3586, previously marked Exhibit 68 by

11   Debtors. Now, Ms. Hoeinghaus, can you please turn to the

12   last page of this document? Is that your signature there?

13          MS. HOEINGHAUS:  Yes, it is.

14          MS. BRIER:  And is this a true and accurate copy

15   of the Declaration submitted in this case?

16          MS. HOEINGHAUS:  Yes, it is.

17          MS. BRIER:  Your Honor, at this time, Debtors move

18   to admit Exhibit 68 into evidence.

19          THE COURT:  Any objections? All right, Exhibit 68

20   is admitted into evidence.

21          (Debtors' Exhibit 68 Received into Evidence)

22          MS. BRIER:  Now, Ms. Hoeinghaus, are your

23   conclusions that you reached about the EIP contained in this

24   Declaration?

25          MS. HOEINGHAUS:  Yes, they are.

1              MS. BRIER:  I'd like to discuss a couple of those

2      today. Do you adopt this Declaration under oath as your

3      sworn testimony?

4              MS. HOEINGHAUS:  Yes, I do.

5              MS. BRIER:  Now, at a high level, what is an EIP?

6              MS. HOEINGHAUS:  It is an incentive program that's

7      intended to align the --

8              THE COURT:  Just speak a little slower.

9              MS. HOEINGHAUS:  Oh, sorry. It is an incentive

10     program that is intended to align the key executives, their

11     interests with those of the various stakeholders in this

12     case. And to really motivate them to perform certain goals

13     and objectives in this case to get to the best possible

14     outcome as part of these Chapter 11 cases.

15             MS. BRIER:  And what were you asked to analyze in

16     the EIP in this case?

17             MS. HOEINGHAUS:  I was specifically asked to

18     analyze how it compared to similar other distress

19     situations. Some particular other cases that have been

20     approved in Chapter 11 cases. And then also, how it compares

21     to the Debtors' market where they're competing for talent.

22             MS. BRIER:  And did you summarize the results of

23     those analyses in your Declaration?

24             MS. HOEINGHAUS:  Yes, I did.

25             MS. BRIER:  Now, to be clear, Ms. Hoeinghaus, did

Page 206

1   you analyze the performance metrics that are under the EIP?

2           MS. HOEINGHAUS:  I did not. My colleague,

3   Mr. Campagna, who I believe will be testifying later, he is

4   who actually weighed in on the metrics and where those

5   performance levels were set.

6           MS. BRIER:  So what specifically did you look at?

7           MS. HOEINGHAUS:  I specifically looked at the

8   amounts that were being proposed, how level the number of

9   participants that were being included, and the overarching

10  structure of the program.

11          MS. BRIER:  Mr. Young, if you could please pull up

12  our Exhibit 68 and turn to Page 11. I'd like to take a look

13  at one of the charts on that page. And if you could zoom in

14  on that chart, that'd be excellent. Ms. Hoeinghaus, does

15  this summarize one of the analyses that you did in this

16  matter?

17          MS. HOEINGHAUS:  Yes, this analyzes the first

18  test, the distressed compensation test.

19          MS. BRIER:  And in the distressed --

20          THE COURT:  This is on Page 11 of her Declaration.

21          MS. BRIER:  Yes. Yes, Your Honor. This is Page 11

22  of Exhibit 68, Docket Number 3586. And can you tell us what

23  this analysis is showing us?

24          MS. HOEINGHAUS:  Sure. It's showing that the

25  amount being proposed here for the Debtors is very

Page 207

1    reasonable relative to the peer group of Chapter 11 cases

2    that have also approved similar type incentive programs. And

3    specifically you can see here, this analysis we did here is

4    on an annualized basis. So you can see Debtors are proposing

5    just shy of 3.5 million, again, on an annualized basis,

6    which was actually at the 1 percent tile of this peer group

7    based on target cost.

8          And then we also looked at it to be assured it was

9    appropriate in terms of the number of participants. So we

10   looked at the average cost per participant, and you can see

11   here that the proposal for the Debtors is actually the

12   lowest at just over $388,000. And similarly, as we looked at

13   it as a percent of the total assets, and it was also below

14   the tenth percentile.

15         MS. BRIER:  And just to drill down a bit into what

16   you are comparing the Debtors to, can you describe what the

17   comparison is here?

18         MS. HOEINGHAUS:  Sure. So my team and I prepared a

19   peer group of other Chapter 11 cases that had incentive

20   plans approved in 2017 or later. We focused on non-energy

21   companies, and then limited those that had prepetition

22   assets greater than a billion but fewer than 25 executives

23   to ensure that we were looking at ones that were focused at

24   the executive level and not rank and file incentive plans.

25         MS. BRIER:  You earlier described another analysis

1      that you did, a market rate analysis. Did you summarize that

2      analysis in your Declaration?

3              MS. HOEINGHAUS:  Yes, I did.

4              MS. BRIER:  Mr. Young, can you please turn to Page

5      12 of the Declaration and display the first table there?

6      Ms. Hoeinghaus, can you tell us what you did in the market

7      rate comparison that you are showing in this table?

8              MS. HOEINGHAUS:  Sure. So my team and I pulled

9      compensation survey data for the various EIP participants

10     and the various specific roles and responsibilities that

11     they are fulfilling to the Debtors. And we compared that to

12     these compensation surveys to provide the market level of

13     compensation. So essentially the going rate for these

14     positions at similar sized companies. And you can see here

15     at the bottom, the -- this is showing currently where the

16     executives are only working for their base salary. And with

17     only base salary, since such a large component of executive

18     compensation is around incentives, absent those incentives,

19     the base salaries are significantly below market.

20             Under P 25 there, you can see that they're 31

21     percent below the 25th percentile of the market peer group.

22     They're approximately 50 percent below the median, and

23     almost 70 percent below the market P 75.

24             MS. BRIER:  Now, based on your finding that these

25     base salaries are significantly below market, what did you

1    conclude about the EIP?

2           MS. HOEINGHAUS:  Concluded that an incentive

3    program was very much necessary here to ensure that market

4    levels of compensation would be offered to key executives.

5           MS. BRIER:  Finally, I'd like to look at the

6    analysis you did of market rate, including the incentive

7    program. And Mr. Young, if you could pull up the last chart

8    there on Page 12, please. Ms. Hoeinghaus, can you explain to

9    us what the difference is between the chart we just looked

10   at and this one?

11          MS. HOEINGHAUS:  Sure. So this now includes the

12   proposed EIP amount, to wit, the total for all of the

13   executives included here is almost $6 million. So it's in

14   addition to the base salary that we just discovered -- or

15   just discussed. And you can see that with the inclusion of

16   the EIP, now the market levels of compensation are on

17   average between the P 25 and P 50 of market, and no

18   individual is above P 75.

19          MS. BRIER:  And can you break that down for us?

20   What does that mean in kind of plain English?

21          MS. HOEINGHAUS:  Sure. So it shows that now

22   including an EIP, the executives are more in line with

23   market and within a healthy range of what would be

24   considered competitive with on average being between, you

25   know, the 25th percentile of a peer group of different types

Page 210

1    of companies where they're competing for talent.

2            MS. BRIER:  And taking into account those results,

3    what did you conclude about the EIP overall?

4            MS. HOEINGHAUS:  I concluded both on, based on the

5    distressed analysis of other Chapter 11, as well as the

6    industry market analysis here that the EIP was very

7    reasonable in terms of the amounts and the opportunities

8    that are being offered to the executives here.

9            MS. BRIER:  Thank you, Ms. Hoeinghaus. I'll pass

10   the witness for cross, Your Honor.

11           THE COURT:  Debtors' Committee?

12           MR. COLODNY:  I have nothing.

13           THE COURT:  Ms. Cornell?

14           MS. CORNELL:  Good afternoon, Shara Cornell again

15   on behalf of the Office of the United States Trustee. For

16   the record, under the EIP, who makes -- strike that. Under

17   the EIP, are the awards discretionary as to when they will

18   be received?

19           MS. HOEINGHAUS:  No, they're not. They're very

20   specific metrics that are outlined in the program and in the

21   Motion before the Court today, that it lays out exactly how

22   the executives can earn these. And if those metrics are not

23   satisfied, then the amounts will not be earned under the

24   program.

25           MS. CORNELL:  Under the EIP, is there a discretion

Page 211

1    as to -- is there any discretion as to how much each award

2    can be?

3              MS. HOEINGHAUS:  No, there's set amounts by

4    individual.

5              MS. CORNELL:  Under the EIP, are the awards

6    discretionary or mandatory?

7              MS. HOEINGHAUS:  They are not discretionary, they

8    are -- if approved, there are set targets for each

9    individual.

10             THE COURT:   If metrics are met, at measurement

11   dates, they're entitled to the amounts provided in the

12   program.

13             MS. HOEINGHAUS:  Correct.

14             MS. CORNELL:  Are you certain that that is the way

15   the EIP is currently set up under the revised plan and its

16   amendments?

17             MS. HOEINGHAUS:  Assuming it gets approved, yes.

18   The structure is already set.

19             MS. CORNELL:  Okay. Then that will be something we

20   will discuss with Debtors, because I believe there's been a

21   revision to reflect that the --

22             THE COURT:  Let's not get into a discussion about

23   it, okay?

24             MS. CORNELL:  Okay. So it's your testimony here

25   today that if the benchmarks are met, that the EIP awards

Page 212

1    are mandatory upon the Plan Administrator to be paid out.

2           MS. HOEINGHAUS:  I think maybe this might be

3    better for my colleague, Mr. Campagna, maybe, to weigh in on

4    the details on that. But that was my understanding.

5           MS. CORNELL:  Okay. Thank you.

6           THE COURT:  Thank you. Anyone else in the

7    courtroom? All right. On Zoom, anybody wish to cross-examine

8    who's on Zoom?

9           MR. VITHANI:  Yes, Your Honor. This is Imran

10   Vithani speaking. How are you?

11          THE COURT:  Okay.

12          MR. VITHANI:  Ms. Allison, just a quick question

13   for you. Are you able to share the companies that you were

14   actually able to do the comparison with? Are there any

15   examples of companies that you're able to share right now?

16          MS. HOEINGHAUS:  Yes. In my Declaration, I can get

17   the exact paragraph, Paragraph 15 on Page 10 of my

18   Declaration outlines the specific criteria which we did to

19   use to develop the peer group and the specific companies are

20   also listed there.

21          MR. VITHANI:  Thank you, ma'am.

22          MS. HOEINGHAUS:  Of course.

23          THE COURT:  Just give me a second, I'm a little

24   crowded. All right, any further questions, Mr. Vithani?

25          MR. VITHANI:  No, sir. Thank you so much, Judge.

1            THE COURT:  All right. Anybody else on Zoom who

2    wishes to cross-examine?

3            MR. SHEIK:  Yes, Your Honor. Just a quick question

4    for the -- thank you. So, for [indiscernible] I just wanted

5    to make, you know, a clarification, if you could clarify.

6    What was the post-petition valuation of CNL illiquid assets

7    as we enter Chapter 11?

8            MS. BRIER:  Objection.

9            THE COURT:  Sustained.

10           MR. SHEIK:  My questions were really about just

11   that. So if that's sustained, then I do not --

12           THE COURT:  -- for that, Mr. Sheik.

13           MR. SHEIK:  Okay. I apologize for that.

14           THE COURT:  It's okay. Any other cross-

15   examination?

16           MR. SHEIK:  Thank you.

17           CLERK:  Judge, Mr. Cruz has his hand up.

18           THE COURT:  Mr. Cruz, go ahead.

19           MR. CRUZ:  Yes. Cameron Cruz, Pro Se Creditor.

20   Three questions. First off, under comparators, how many, if

21   any, involved financial fraud?

22           MS. HOEINGHAUS:  I don't specifically know in

23   these particular cases.

24           MR. CRUZ:  Next question. In establishing your

25   baseline for Celsius, if you were to subtract out customer

Page 214

```
 1   deposits, what would the baseline become?

 2              MS. BRIER:  Objection.

 3              THE COURT:  Sustained.

 4              MR. CRUZ:  Finally, in the initial submission for

 5   the incentive program, there was a recommendation for

 6   $239,000 for Mr. Roni Cohen-Pavon. Could you explain why

 7   he's been taken out and how he initially was included?

 8              THE COURT:  That's pretty easy, Mr. Cruz. Can you

 9   answer the question?

10              MS. HOEINGHAUS:  My understanding is that if

11   anyone was thought to be having done wrong things, they were

12   going to be removed from this program.

13              THE COURT:  Mr. Pavon was indicted, I believe, did

14   he plead guilty? Yes, he pled guilty.

15              MR. CRUZ:  It was the act -- yes, so it was the

16   act of him being criminally charged that prompted him being

17   removed. Was there any --

18              MR. MCCARRICK:  Objection.

19              THE COURT:  Sustained.

20              MR. CRUZ:  All right. That's it for now. Thank

21   you.

22              THE COURT:  Thank you, Mr. Cruz. Anybody else wish

23   to cross-examine?

24              CLERK:  I don't see any hands raised, Judge.

25              THE COURT:  All right. Any redirect?
```

Page 215

1          MS. BRIER:  No, Your Honor.

2          THE COURT:  All right. You're excused. Thank you

3    very much for your testimony.

4          MS. HOEINGHAUS:  Thank you.

5          MS. BRIER:  Your Honor, Grace Brier, Kirkland &

6    Ellis on behalf of the Debtors. That concludes the witnesses

7    we disclosed for today on the docket. We can ask the Court's

8    preference whether you'd like us to continue or wrap for

9    today and disclose new witnesses at 5:00 p.m.

10         THE COURT:  Let me understand what witnesses --

11   assuming we're finished for the day, I haven't yet decided -

12   - who are the witnesses for tomorrow?

13         MS. BRIER:  Yes, Your Honor. I believe the UCC has

14   two witnesses that will be called tomorrow.

15         THE COURT:  Well let me ask this. Has the Debtor

16   put on its case at this point?

17         MS. BRIER:  We have one more witness that our --

18         THE COURT:  Mr. Campagna.

19         MS. BRIER:  Mr. Campagna. And our current plan is

20   for him to follow the two UCC witnesses.

21         THE COURT:  Okay.

22         MS. BRIER:  We can reorder that if Your Honor

23   prefers, but we were going to start with the UCC witnesses.

24         THE COURT:  All right. Mr. Colodny?

25         MR. COLODNY:  Good afternoon, Your Honor. Aaron

Page 216

1    Colodny from White & Case on behalf of the Official

2    Committee. We've exceeded the notice witness. We have

3    Mr. Robinson, Mr. Delco and Mr. Campagna. Mr. Robinson, I

4    believe --

5              THE COURT:  Is testifying by Zoom.

6              MR. COLODNY:  Is testifying by Zoom, and I believe

7    he could be available this afternoon. But we did not notice

8    him yesterday.

9              THE COURT:  Right.

10              MR. COLODNY:  And we would be okay calling him

11   this afternoon if it fits with Your Honor, if we're not

12   going to hang over. We can get him done between -- I think

13   he could be ready by 4:00 p.m., if we can get him on your

14   window at 4:00 p.m., that would work. Or we would prefer if

15   he's going to hang over the time, to do it --

16              THE COURT:  Sure, sure. Mr. Robinson was

17   testifying about the selection of the Board members, if I'm

18   not mistaken.

19              MR. COLODNY:  That's correct, Your Honor.

20              THE COURT:  And who -- I know there was someone

21   who wanted to cross-examine him.

22              MR. COLODNY:  Mr. Phillips, Your Honor.

23              THE COURT:  Mr. Phillips. Mr. Phillips, would you

24   be prepared to cross-examine this afternoon?

25              MR. PHILLIPS:  Your Honor, I would be, provided

Page 217

1   that you accept the exhibits that I just filed on the docket

2   now as part of that cross-examination.

3            THE COURT:  Sure. Why don't we take a break until

4   4:00. And I'll get copies of what you filed on the docket.

5   And I appreciate your willingness to cross-examine this

6   afternoon, because that was not one of the witnesses who was

7   noticed for today. Mr. Colodny --

8            MR. PHILLIPS:  Should I e-mail a copy of -- I'm

9   sorry.

10           MR. COLODNY:  That's fine with us, Your Honor, as

11  long as we finish, can finish Mr. Robinson.

12           THE COURT:  I can't imagine that we're not going

13  to finish Mr. Robinson.

14           MR. COLODNY:  Okay.

15           THE COURT:  And again, I have another hearing at

16  5:00, so we'll -- I'd be very -- I've read his direct

17  examination, his written direct, and so you can put in

18  whatever background quickly you want to do for him, and then

19  we'll turn him over for cross.

20           MR. COLODNY:  Sounds great.

21           THE COURT:  Okay. All right, so we'll -- go ahead.

22           MR. PHILLIPS:  Mr. Colodny, would you like me to

23  e-mail you those exhibits?

24           MR. COLODNY:  If they're on the docket I can get

25  them from there.

Page 218

```
 1              THE COURT:  It's on the docket, Mr. Phillips?

 2              MR. PHILLIPS:  I used the pro se uploader tool

 3     which doesn't immediately publish onto the docket, unlike

 4     the [indecipherable]

 5              THE COURT:  If you could, why don't you e-mail it

 6     to Mr. Colodny. Okay?

 7              MR. PHILLIPS:  I'll be happy to, thank you.

 8              THE COURT:  All right.

 9              MR. COLODNY:  Thank you, Your Honor.

10              THE COURT:   So we'll be in recess until 4:00.

11              MR. COLODNY:  Okay.

12              (Whereupon the proceedings were paused for a

13     break.)

14              THE COURT:    All right. I believe we're going to

15     begin with the testimony of Major Robinson. Is that correct?

16              MR. WEEDMAN:  Correct, Your Honor. Good afternoon.

17     This is Joshua Weedman of White & Case, LLP on behalf of the

18     committee.

19              THE COURT:  Okay.

20              MR. WEEDMAN:  The committee calls Mark Robinson.

21              THE COURT:  All right, Mr. Robinson. If you would

22     raise your right hand, you will be sworn.

23              (Whereupon the witness was sworn in.)

24              THE COURT:  All right. Please have a seat.

25              MR. WEEDMAN:  And, Your Honor, before we begin,
```

1    Mr. Robinson would just like me to note he is currently on

2    active duty, and therefore, in his fatigues. But he is only

3    appearing in his personal capacity --

4              THE COURT:  I understand that.

5              MR. WEEDMAN:  -- and not representing the United

6    States Army today.

7              THE COURT:  Thank you.

8              MR. WEEDMAN:  And Your Honor, for the witness

9    kits, I have a copy of his declaration. May I approach,

10   please?

11             THE COURT:  Yes, please. And I think I indicated

12   before that I have read it already.

13             MR. WEEDMAN: And, Mr. Robinson, could you please

14   state your name for the record?

15             MR. ROBINSON: Yes. My name is Mark Robinson.

16             MR. WEEDMAN:  And is it okay if I call you Mr.

17   Robinson today, or do you prefer to be called something

18   else?

19             MR. ROBINSON:  Certainly, yeah. You can call me

20   Mark, Mr. Robinson, whatever works for you.

21             MR. WEEDMAN:  And, Mr. Robinson, where are you

22   located right now?

23             MR. ROBINSON:  I'm currently located in my office

24   at Fort Knox, Kentucky.

25             MR. WEEDMAN:   And, sir, can you please confirm

Page 220

1    that there is no other person in the room with you right

2    now?

3            MR. ROBINSON: I am by myself.

4            MR. WEEDMAN: And, Mr. Robinson, what's your

5    current job?

6            MR. ROBINSON: Yeah. I'm currently a Chief of

7    Military Justice at the Fort Knox Consolidated Military

8    Justice office.

9            MR. WEEDMAN:   And, Mr. Robinson, are you a member

10   of the UCC in these proceedings?

11           MR. ROBINSON:  I am.

12           MR. WEEDMAN:   And since when have you had that

13   role?

14           MR. ROBINSON:  Since July 2022.

15           MR. WEEDMAN:   As part of your role in the UCC,

16   did you have any role in the board selection process for the

17   NewCo?

18           MR. ROBINSON:  I did.

19           MR. WEEDMAN:   All right. And, sir, could you

20   please generally describe what your role was in that board

21   selection process?

22           MR. ROBINSON:  Yeah. So my role as a UCC member

23   was to review applicants, material, CVs, conducted

24   interviews. We had discussions with and without our advisors

25   to vote on and to select board members for the NewCo.

1              MR. WEEDMAN:   And, sir, do you have your

2      declaration that you provided in this case in front of you?

3              MR. ROBINSON:   I do.

4              MR. WEEDMAN:   And is that document 3584?

5              MR. ROBINSON:   Yes.

6              MR. WEEDMAN:   And can you please turn to page 9

7      of that document? And are you there, sir?

8              MR. ROBINSON:   Yes.

9              MR. WEEDMAN:   And is that your signature on this

10     page?

11             MR. ROBINSON:   Yes.

12             MR. WEEDMAN:   And do you understand that this is

13     your testimony that you are providing in this confirmation

14     hearing under oath?

15             MR. ROBINSON:   Yes.

16             MR. WEEDMAN:   And finally, sir, do you have a

17     copy of a limited objection and reservations of rights of

18     Rick Phillips that was filed in these proceedings?

19             MR. ROBINSON:   Yes, sir.

20             MR. WEEDMAN:   And do you have that with you

21     today?

22             MR. ROBINSON:   I do.

23             MR. WEEDMAN:   Thank you, Your Honor. I pass the

24     witness.

25             THE COURT:   All right. Mr. Phillips, do you wish

Page 222

1    to examine?

2              MR. PHILLIPS:  Yes, Your Honor, I do. Major

3    Robinson, how are you doing today? I wanted to first thank

4    you for your service on the UCC, which I know it has been a

5    volunteer job and entails many hours, as well as thank you

6    for your service to our country.

7              MR. ROBINSON:  Thank you, sir.

8              MR. PHILLIPS:  As I looked over your declaration,

9    in paragraph 4, you state that you, you know, your

10   participation in the UCC included participating in

11   comparative [indiscernible] due process that occurred during

12   the course of the bankruptcy, correct?

13             MR. ROBINSON:  Yes.

14             MR. PHILLIPS:  Were you involved, and did you

15   actually personally attend the auction that took place over

16   April and May in New York, I believe?

17             MR. ROBINSON:  No, sir. I was not there in person,

18   but I had a lot of meetings about it.

19             MR. PHILLIPS:  So you participated in Zooms or

20   conference calls regarding with the proceedings in real

21   time?

22             MR. ROBINSON:  Yes, sir. Well, I didn't, as it was

23   going on, yes, sir, we had meetings throughout the auction

24   process.

25             MR. PHILLIPS:  Thank you. Did you participate in

Page 223

1    the decision to select Fahrenheit as the ultimate winner of

2    that auction?

3          MR. ROBINSON:  I did.

4          MR. PHILLIPS:  Okay. Can you describe who was

5    involved in that decision?

6          MR. ROBINSON:  The members of the UCC were.

7          MR. PHILLIPS:  Were there any advisors involved in

8    that decision?

9          MR. ROBINSON:  They advised us, but we were the

10   ones who voted and made the decision. So, certainly yes, we

11   had plenty of meetings with our advisors. We discussed it

12   numerous times throughout the process. And then we had lots

13   of external meetings as well. Ultimately, the members of the

14   UCC decided to select Fahrenheit.

15         MR. PHILLIPS:  Were there any particular advisors

16   who were vocal in their recommendations in that process?

17         MR. WEEDMAN:  Objection, Your Honor.

18         THE COURT:  Overruled.

19         MR. ROBINSON:  I apologize. It was a, no, there

20   wasn't any particular, anything that stood out. There were

21   splits among the advisors and there were diverse opinions,

22   which was very helpful for us to balance and weigh our

23   options.

24         MR. PHILLIPS:  Do you remember or recall if any

25   particular advisors were strongly in favor of Fahrenheit?

```
 1              THE COURT:  Let me just, before he answers that,

 2     can you tell me who the advisors were? I'm particularly

 3     interested whether there were any lawyers and whether you

 4     received legal advice, because, in which case, there may

 5     well be attorney-client privilege involved. So before you

 6     get into who said what to whom, could you tell me who were

 7     the advisors that you refer to, Major Robinson?

 8              MR. ROBINSON:  Yes, sir. The advisors we are

 9     referring to are a mix of lawyers from White & Case, and

10     some advisors from Sparello [ph], but they were all, or had

11     many meetings where there were joint parties'

12     representatives.

13              THE COURT:  All right. So we'll go ahead with the

14     questioning and when the questions are asked, we'll see

15     whether the committee has any attorney-client privilege

16     objections to make. Not saying that there would be a valid

17     one, but I want to be sure you don't answer before they have

18     a chance to say whatever they're going to say, OK? Go ahead.

19              MR. ROBINSON:  Yes, Your Honor.

20              MR. PHILLIPS:  To help on that, Your Honor, may I

21     just request that , the witness his response to any advisors

22     from the financial advisory side as opposed to the --

23              THE COURT:  Well, let him answer the question, Mr.

24     Phillips. If the lawyers --

25              MR. PHILLIPS:  Okay.
```

Page 225

1          THE COURT:  -- were present, it may well be that

2    attorney-client privilege applies. Attorney-client privilege

3    would not be waived because the committee had its financial

4    advisors present as well. So ask your questions. We'll see

5    whether the committee has any objections.

6          MR.PHILLIPS:   Okay. I believe I asked it. So

7    basically, were there any particular advisors who were

8    strongly in favor of selecting Fahrenheit or NovaWulf at the

9    end of the auction?

10         MR. WEEDMAN:   Objection, Your Honor. The question

11   calls for privileged communications between White & Case and

12   its financial advisors.

13         THE COURT:  Well, it may or may not --

14         MR. WEEDMAN:   It also reflects [indiscernible]

15         THE COURT:     -- because if it's business advice

16   it wouldn't. If it's legal advice that was being given, it

17   may well. So, Major Robinson, can you separate out whether

18   the advice you received, whether you consider it to be legal

19   advice or discussion of the business issues?

20         MR. ROBINSON:  Yes, Your Honor.

21         THE COURT:  Go ahead.

22         MR. ROBINSON:  Yeah. So to answer Mr. Phillips'

23   question, I don't recall any particular financial advisors

24   that were particularly strong for Fahrenheit. I know that I

25   did have conversations with lawyers present, without the

Page 226

1    lawyers present, with our financial advisors. I had numerous

2    conversations with advisors in the process. But I don't

3    recall one like really pushing Fahrenheit specifically. It

4    was a very challenging and tough decision. The reason why

5    the auction took so long is both bidders were very good and

6    the process, through the bidding process, the bids changed

7    and we got better. And so, it was a, it was not a

8    necessarily easy decision. And I don't recall a particularly

9    strong push by financial advisors for Fahrenheit.

10            MR. PHILLIPS:  Thank you. And you had also

11   mentioned here that you were involved in the selection of

12   the Litigation Oversight Committee.

13            MR. ROBINSON:  Yes.

14            MR. PHILLIPS:  In paragraph 4.

15            MR. ROBINSON:  Yes.

16            MR. PHILLIPS:  I believe that you were one of the

17   appointees?

18            MR. ROBINSON:  Yes, sir.

19            MR. PHILLIPS:  Did that, does that mean that you

20   recused yourself from the selection of the other members?

21            MR. ROBINSON:  No, sir. I recused myself from the

22   selection for my selection, whether or not I would get a

23   seat on the Litigation Oversight Committee.

24   MR. PHILLIPS:  And what exactly do you mean that you recused

25   yourself from your selection as opposed to the other

Page 227

1    members?

2              MR. ROBINSON:  Well, sir, I didn't vote on whether

3    or not I would be one of them or not. The rest of the

4    committee made a decision to put me on it. So I did not have

5    a vote in whether or not, I, I raised my hand, I volunteered

6    to be on it. I submitted my name for consideration. But I

7    did not, I did not get a vote on myself.

8              MR. PHILLIPS:  All right so you didn't vote but

9    you were involved in discussions of the, of the Litigation

10   Oversight Committee members?

11             MR. ROBINSON:  Yes, sir, I, and yes.

12             MR. PHILLIPS:  Okay. And can you, were you

13   involved in discussions to appoint Keith Noyes?

14             MR. ROBINSON:  I was.

15             MR. PHILLIPS:  What was your knowledge of the

16   status of Keith Noyes at the time he was appointed to

17   Litigation Oversight Committee?

18             MR. ROBINSON:  At the time that we selected him

19   for a position on the Litigation Oversight Committee, my

20   understanding is that he is a member of the UCC.

21             MR. PHILLIPS:  Were you, was it your understanding

22   that he was a member of the UCC as a representative of

23   Covario?

24             MR. ROBINSON:  Yes.

25             MR. PHILLIPS:  Were you aware that Covario had

Page 228

1    filed for insolvency?

2              MR. ROBINSON:  I was.

3              MR. PHILLIPS:  Were you aware that Covario had not

4    been in contact with the UCC apparently for nine months per

5    what I learned at the emergency hearing last Friday?

6              MR. WEEDMAN:   Objection, Your Honor.

7              THE COURT:     Sustained.

8              MR. PHILLIPS:  What, what was your knowledge of

9    the relationship between Covario and Keith Noyes at the

10   time, at that time that he was appointed to Litigation

11   Oversight Committee?

12             MR. ROBINSON:  My knowledge was that they're still

13   in contact with them or creditors to some extent. But I

14   don't have, I don't have any personal knowledge of, of it. I

15   don't recall any conversations that we had about it.

16             MR. PHILLIPS:  When did you first become aware of

17   this issue of Covario, its insolvency, and Keith Noyes

18   eventual removal from UCC?

19             MR. ROBINSON:  Well --

20             THE COURT: I ask what relevance this has, Mr.

21   Phillips, anything that we're considering?

22             MR. PHILLIPS:  Well, I, I think it goes to this

23   issue of, you know, whether, you know, honestly, White &

24   Case was hiding the ball on some issues, because it seemed

25   like from the hearing on Friday that Mr. Pesce was aware of

1    these things. But I'm trying to understand whether the UCC

2    members were aware of these things when these decisions were

3    made.

4              THE COURT: I still don't understand what relevance

5    that has to the issues that you're, you want, that are

6    properly before the court.

7              MR. PHILLIPS:  Well, I guess the issue that I'm

8    probing at is, you know, the UCC's independence in, in

9    actually acting on its own versus acting at the behest of

10   White & Case.

11             THE COURT:    Go on with your questions for now.

12             MR. PHILLIPS:  Okay. And, and were you aware of

13   the other members of the Litigation Oversight Committee; I

14   believe there are two [indiscernible], I forget the other

15   person's name, that they were former law partners of White &

16   Case when you appointed them to Litigation Oversight

17   Committee?

18             MR. WEEDMAN:   Objection, Your Honor, it seems

19   that's not in the record.

20             THE COURT:    Sustained.

21             MR. PHILLIPS:  I thought that was in Mr. Pesce's

22   Declaration of Disinterestedness that was filed on the

23   docket.

24             THE COURT:    I don't know.

25             MR. COLODNY:  Mr. Pesce's Declaration 9 that is,

Page 230

1    Your Honor.

2          THE COURT:    I'm going to permit the question.

3    Go ahead, let's get this, let's get on with this. I'm not

4    sure what relevance this has to any of it, but go ahead.

5    What is your challenge, Mr. Phillips?

6          MR. PHILLIPS:  Like I said, I, I'm trying to probe

7    this issue of whether the –

8          THE COURT:    Just tell, tell me what your

9    objection is. I want to know why we're going through this

10   exercise.

11         MR. PHILLIPS:  Because I want, I want the UCC

12   selections of the Litigation Oversight Committee and the

13   board to be, you know, the issue in whether it was their

14   selection or White & Case's. Because, you know, my objection

15   whether it is potential malpractice on the part of White &

16   Case.

17         THE COURT:    Ask your next question.

18         MR. PHILLIPS:  Thank you. So in paragraph seven,

19   you, you say the board you had an open process to identify

20   potential new board committee members. And then you had

21   approximately 45 candidates that were considered in that

22   process. Do you remember approximately or approximately what

23   fraction were, you know, from corporate open process versus

24   were recommended by White & Case, versus were recommended by

25   Perella Weinberg?

1           MR. ROBINSON:  I don't recall off the top of my

2      head what fraction it was. I know we had some recommended to

3      us from our financial advisors, our legal advisors, from

4      Fahrenheit themselves. But I don't, I don't recall the

5      percentage breakdown.

6           MR. PHILLIPS:  Okay, and do you remember how many

7      candidates were actually interviewed of those 45?

8           MR. ROBINSON:  I want to say we interviewed 19,

9      18. That's in my declaration, I believe. What paragraph was

10     it? I believe it was 19 that we interviewed.

11          MR. PHILLIPS:  Okay. And did you participate in

12     all 19 of those interviews? I realize they were all

13     recorded, but did you participate in those?

14          MR. ROBINSON:  No, sir. I participated in as many

15     as I could but I was not able to make all 19.

16          MR. PHILLIPS:  And approximately how many was

17     that?

18          MR. ROBINSON:  I want to say nine to twelve or so.

19          MR. PHILLIPS:  Okay.

20          MR. ROBINSON:  And when --

21          MR. PHILLIPS:  I'm sorry.

22          MR. ROBINSON:  Yeah, in person, like on Zoom where

23     I was asking questions.

24          MR. PHILLIPS:  In paragraph eight you mention that

25     there were there committee candidates, and we know that Mr.

Page 232

1     DiFiore and Mr. Duffy were two of them. Who was the third?

2              MR. ROBINSON:  I believe Keith Noyes.

3              MR. PHILLIPS:  Okay. And you also say here in your

4     declaration that they recused themselves from the

5     deliberation. So does that mean they did, that they did not

6     participate in the interviews or the seconds, or that, did

7     they solely recuse themself from the vote?

8              MR. ROBINSON:  They recused themselves from the

9     discussions of, of their positions and, but they were

10    participating in the other, the other independent or other

11    board positions. But they did not vote on themselves. And we

12    kind of, so first, the way the process works, we first

13    selected how many creditors who really wanted, wanted onto

14    the board. And then they did not participate in those votes.

15             MR. PHILLIPS:  Okay, well you're, you're going to

16    make me jump now to that process, which I think you, you had

17    in paragraph 14 of your declaration. And I guess before we

18    get to 14, what was the paragraph 13, which discusses the

19    increase of the size of the board from seven to nine. Why

20    did you choose to increase the size of the board from seven

21    to nine?

22             MR. ROBINSON:  We chose to increase the size of

23    the board to nine based on further consideration of the

24    amount of work and that the board would be asked to do,

25    getting NewCo out of bankruptcy on its feet and then going

Page 233

1    public. And just the kind of experience and skill sets of

2    what we wanted on the board, we figured, we decided it's in

3    the best interest to increase the size of the board,

4    primarily because of the workload.

5            MR. PHILLIPS:   Okay. And when you did that

6    increase you realized that the ratio of UCC appointees to

7    Fahrenheit appointees decreased from 2.5 to 1 to 2 to 1?

8            MR. ROBINSON:   Yes, we were very aware of that.

9            MR. PHILLIPS:   So, so why in increasing the size

10   of the board and you know desiring to have more bandwidth,

11   didn't you increase it to 11 so that you could maintain that

12   ratio? And again, I mean I'm looking at it from the UCC side

13   to the one appointee from the Fahrenheit side.

14           MR. ROBINSON:   Right. No, I think that the, the

15   board size of nine was appropriate. We decided it was

16   appropriate for the amount of work. We discussed the voice,

17   I mean the ratio. We felt that the board members that we

18   appointed, that they would be able to provide the necessary

19   oversight and voice for creditors and future shareholders to

20   kind of balance and oversight, provide oversight for

21   Fahrenheit. So we didn't think that it was necessary to go

22   to 11.

23           MR. PHILLIPS:   And the balance, any concern?

24           MR. ROBINSON:   It was definitely something we

25   considered, but it ultimately we felt like nine was the

Page 234

1    right fit.

2            MR. PHILLIPS:  Were you expecting Fahrenheit to

3    appoint any particular person to their third additional seat

4    in expansion to nine?

5            MR. ROBINSON:  No.

6            MR. PHILLIPS:  Okay. Now, now you had mentioned

7    and  also it's, it's in the plan supplement. I think it's

8    exhibit E, and supplement D it might have been amended set

9    of exhibits that when you look at this new, new board

10   structure of having six UCC appointees that you determined

11   that only two should be prepetition creditors including

12   committee members. Correct?

13           MR. ROBINSON:  Yes, sir.

14           MR. PHILLIPS:  Okay, and I think that's in

15   paragraph 14 of your declaration.

16           MR. ROBINSON:  Yes, sir.

17           MR. PHILLIPS:  And then you have four that are,

18   and I have to read the wording here so hang on a second

19   while I look for it. But you had four that were, were

20   independent direct is what it was characterized as. So, so

21   help me understand this because I really don't.

22           THE COURT:    Leave your editorial comments out

23   of this, please. Ask your questions.

24           MR. PHILLIPS:  Okay. So, as I understand it, the

25   agreement with Fahrenheit allowed you to make four

Page 235

1    unilateral selections to the NewCo Board of Directors.

2    Correct?

3              MR. ROBINSON:  Yes, sir.

4              MR. PHILLIPS:  And only two that were subject to

5    the mutual consent of Fahrenheit?

6              MR. ROBINSON:  Yes.

7              MR. PHILLIPS:  And why did you then choose to have

8    only two prepetition creditors including UCC members and

9    "four independent directors?"

10             MR. ROBINSON:  Yeah, so we had a lot of discussion

11   about this. And we were trying to complete the balance

12   competing interests. We knew that it was important for

13   creditors to have a voice. And the experience that creditors

14   brought to the, to the new board would be very important for

15   applying oversight to the [indiscernible]. At the same time,

16   we wanted creditors with previous experience and on public

17   boards and we wanted to balance the necessary for outside

18   professional experience with experience with Celsius or with

19   creditor experience. And so balancing those and competing

20   interests, we decided that having two creditor, reserved

21   just for creditors, was important, so the creditors still

22   making a very important voice in NewCo going forward. And at

23   the same time with the independent creditors or independent

24   board members we selected. All of our, our interview process

25   was questioning each of them on their capabilities and

Page 236

1   ability to advocate for soon-to-be shareholders, creditors,

2   that they would provide an outside oversight necessary for

3   Fahrenheit and for NewCo to be successful. We wanted to make

4   NewCo have the best chance at success, and so that's why we

5   kind of just settled on that balance.

6           MR. PHILLIPS:  Did you believe that no, um,

7   creditors other than the two UCC members could fill those

8   roles?

9           MR. ROBINSON:  We felt that those two were the

10  best for the two roles. Other people could, but they weren't

11  the best for it.

12          MR. PHILLIPS:  Okay, but that wasn't my question.

13  My question was, were there any other creditors who were

14  qualified to fill that role on the NewCo board besides the

15  two UCC members?

16          MR. ROBINSON:  Yeah, I would say we interviewed a

17  lot of really qualified candidates.

18          MR. PHILLIPS:  Were they all, were there any

19  creditors --

20          MR. ROBINSON:  Yeah, there were other qualified --

21          MR. PHILLIPS:  Okay, and were there any creditors

22  that had more world experience that Mr. Duffy or Mr.

23  DiFiore?

24          MR. ROBINSON:  I'm trying to recall candidates

25  right now. I think there may have been.

Page 237

1          MR. PHILLIPS:  And why weren't they selected?

2          MR. ROBINSON:  Well, in the review of all the

3     materials that each applicant submitted along with their

4     interviews, resumes, certainly we had a lot of experience

5     with Tom and Scott, right. We've been on UCC for a long time

6     with them. There is a fair amount of trust. And we, the four

7     of us, we voted on it. We're cognizant of the fact that we

8     did not want to have a subconscious bias just because we had

9     worked with them. And so we had a very deliberative process

10    of speaking with advisors and discussing amongst ourselves

11    which of the creditor candidates were the best qualified.

12    And ultimately, we decided that Tom and Scott would be best

13    qualified.

14          MR. PHILLIPS:  And why weren't any of those

15    creditors qualified any of the "four independent director

16    slots?"

17          MR. ROBINSON:  I never said they weren't

18    qualified.

19          MR. PHILLIPS:  So there were, there were some

20    creditors that would qualify for the independent director

21    slots?

22          MR. WEEDMAN:   Objection, that's been answered

23    three times now.

24          THE COURT:    Sustained.

25          MR. PHILLIPS:  Okay.

```
 1              THE COURT:    Wrap it up --

 2              MR. PHILLIPS:  So again, okay. Well, I got a

 3    couple of pieces of evidence or exhibits that I, I wanted to

 4    ask you about regarding my own candidacy. --

 5              THE COURT:    Now, Mr. Phillips, this is not a

 6    hearing for a disgruntled person not selected for a

 7    committee. If you have any more questions, ask them. Let's

 8    get it over with, because I view everything you're asking as

 9    a disgruntled person who was not selected. That's not the

10    purpose of this hearing.

11              MR. PHILLIPS:  Your Honor, I'm merely asking why

12    creditors --

13              THE COURT:    Ask your next question, Mr.

14    Phillips, or you're over.

15              MR. PHILLIPS:  Okay. So in selecting Mr. Aidoo for

16    the committee, did he have any prior board experience?

17              MR. ROBINSON:  I don't recall the specifics of his

18    prior board experience.

19              MR. PHILLIPS:  In selecting Mr. Aidoo for the

20    committee, you said you were aware of his tax issues. What

21    impact did you think his tax issues would have on the

22    confidence of NewCo equity investors in the future when they

23    were evaluating whether or not to purchase stock?

24              MR. WEEDMAN:   Objection, Your Honor.

25              THE COURT:    Sustained.
```

Page 239

1            MR. PHILLIPS:  What impact did you think Mr.

2    Aidoo's tax issues would have?

3            MR. WEEDMAN:   Objection, Your Honor.

4            THE COURT:    Sustained.

5            MR. PHILLIPS:  Are you familiar with NASDAQ Rule

6    5605 (a)(2) regarding independent directors?

7            MR. ROBINSON:  Can you, can you refresh my

8    recollection? I may have heard it in a discussion but I

9    don't want to misspeak.

10           MR. PHILLIPS:  Sure. NASDAQ Rule 5605, uh, defines

11   board of directors and (a)(2) essentially deals with who is

12   an independent director. And so you said in your declaration

13   that you considered independence and diversity as part of

14   the qualifications for directors, correct?

15           MR. ROBINSON:  Yes, sir.

16           MR. PHILLIPS:  Okay. NASDAG Rule 5605(a)(2)(B)says

17   a director who accepted or has a family member who has

18   accepted any --

19           THE COURT:    Mr. Robinson, did you consider that

20   NASDAQ release in your deliberations, yes or no?

21           MR. ROBINSON:  I believe so. Yes, Your Honor.

22           THE COURT:    All right go ahead.

23           MR. PHILLIPS:  Okay in paragraph 9 I believe you

24   stated that. It's and so it, in 5605(a)(2)(B) it says a

25   director who accepted or who has a family member who accepts

Page 240

1    any compensation from a company in excess of $120,000 during

2    any period of 12 consecutive months within the three years

3    preceding a determination of independence, that is involved

4    which has the three minor exceptions. Did you consider

5    whether or not Mr. Aidoo met the requirements including

6    NASDAQ Rule 5605(a)(2)(B) for being an independent director?

7            MR. WEEDMAN:   I'm going to object to the question

8    to the extent he's asking about a NASDAQ regulation that's

9    not before the witness and we can't verify.

10           THE COURT:    Sustained.

11           MR. PHILLIPS:  Did you consider whether or not Mr.

12   Aidoo met the requirements, as we stated here the NASDAQ

13   requirements, for boards of directors including in respects

14   to independency and diversity?

15           MR. ROBINSON:  Yes, sir.

16           MR. PHILLIPS:  And you determined that he did?

17           MR. ROBINSON:  Yes, sir.

18           MR. PHILLIPS:  Do you believe that all six

19   directors selected by the UCC met the requirements of

20   independence?

21           MR. ROBINSON:  Yes, sir.

22           MR. PHILLIPS:  Okay. So why did you make the

23   distinguishment between prepetition creditors and

24   independence directors if all six met the requirement of

25   independence?

Page 241

1          MR. ROBINSON:  I'm confused. Can you, can you

2     re --

3          MR. PHILLIPS:  Yeah, so, so, so your testimony is

4     that the UCC decided to have two prepetition creditors and

5     four independent creditors. And then you just said that all

6     six met the requirements of the independent creditors. So,

7     why did you split the requirement between two prepetition

8     creditors and four independent directors when all six were

9     actually independent directors?

10          MR. WEEDMAN:   Objection, Your Honor, he, I think

11     he's misstating the witness's testimony.

12          THE COURT:    Overruled. Are you able to answer

13     that question?

14          MR. ROBINSON:  I'm sorry?

15          THE COURT:    Are you able to answer that

16     question, Mr. Robinson, Major Robinson?

17          MR. ROBINSON:  I, I think that I may be, so when

18     we were discussing the NASDAQ requirements, I wasn't

19     necessarily reading the, like the by-number statute of what

20     the NASDAQ required. We were advised on what the NASDAQ

21     required and whether or not we, we discussed whether or not

22     what candidate meet that, met those requirements. We

23     certainly asked questions. We relied on legal advice. And

24     the, my understanding is that, that nobody would be

25     prohibited from serving on, my, no one would be prohibited

Page 242

1    on the NASDAQ requirements. I'm sorry to [indiscernible] for

2    it. So maybe I'm just misunderstanding what Mr. Phillips was

3    asking.

4            MR. PHILLIPS:  I'm asking why you split between

5    the two prepetitioned and four independent and all six were

6    actually independent?

7            MR. ROBINSON:  Maybe I'm misspeaking when I'm

8    saying independent because I'm not sure if I'm using the

9    word independent properly there. So I, I would say that all

10   six are, one of the, when I say independents but met

11   requirements for that. And at that point I'm [indiscernible]

12   I'm not aware of anything from the NASDAQ requirements that

13   would prohibit any of the candidates from serving.

14           MR. PHILLIPS:  In paragraph 11 of your declaration

15   you talk about Mr. Aidoo's relationship with, relationship

16   with Perella Weinberg. Do you have personal knowledge of his

17   current status as an employee or not an employee for Perella

18   Weinberg?

19           MR. ROBINSON:  Not personal knowledge in terms of

20   that. I haven't called his company and asked them.

21           MR. PHILLIPS:  So, the statement that he'll be

22   stepping down from his executive director position at

23   Perella Weinberg is based on what?

24           MR. ROBINSON:  Information I was told.

25           MR. PHILLIPS:  So it's kind of hearsay?

Page 243

```
 1              MR. WEEDMAN:   Objection. Form.

 2              THE COURT:     Sustained.

 3              MR. PHILLIPS:  So who told you that information?

 4              MR. ROBINSON:  My advisors. Our, our advisors.

 5              MR. PHILLIPS:  Okay.

 6              MR. ROBINSON:  Yes.

 7              MR. PHILLIPS:  And then, um, with regards to the

 8    background investigation. Let me go back, back here just for

 9    a second to allow me, I'll be finishing up quickly here,

10    Your Honor. Um, you, you mentioned in here that in paragraph

11    ten that the committee authorized counsel on prior

12    independent investigator to conduct comprehensive background

13    checks on certain candidates. Do you know how many

14    candidates that, that was, the background checks were

15    conducted on?

16              MR. ROBINSON:  I think it was around ten.

17              MR. PHILLIPS:  Okay. And then if I could direct

18    you to the amendment that, which is from the plan supplement

19    on Page 51 of 170, Docket Number ECCF 3444, the new board of

20    directors?

21              MR. WEEDMAN:   Your Honor, if I may, uh, Mr.

22    Phillips had indicated he was going to circulate this

23    information and he, we didn't receive it prior to, to this

24    hearing.

25              THE COURT:     I did.
```

Page 244

1              MR. WEEDMAN:   Oh, I don't think that we did, and

2        the witness doesn't have it in front of him.

3              MR. PHILLIPS:  I did send it to Aaron, Aaron

4        Colodny's email prior to the, this beginning.

5              MR. COLODNY:   I think I got it three minutes

6        before, Your Honor. And it's Exhibit B from Docket

7        [indiscernible]. But I am not sure if Mr. Robinson knows.

8              THE COURT:     Well, there is specific language in

9        it, Mr. Phillips that you want to ask him about, just read

10       it to him slowly.

11             MR. PHILLIPS:  Sure. I'm going to read you the

12       third paragraph of it. And it says to facilitate the

13       committee's final selection, the committee's legal and

14       financial advisors assembled recommended elected board

15       questionnaires, conducted interviews with perspective board

16       members along with the committee members and hired an

17       independent investigator to conduct comprehensive background

18       checks on candidates who all agreed to the investigation. So

19       I'm a little confused because this seems to me that saying

20       that there were --

21             THE COURT:     I don't care whether you're

22       confused. If you have a question, ask him a question.

23             MR. PHILLIPS:  Okay, so it's, were the background

24       checks conducted on all candidates who agreed to the

25       investigations or on only nine candidates?

Page 245

1          MR. ROBINSON:  I'm --

2          MR. COLODNY:   Your Honor, objection, Your Honor.

3          THE COURT:    Overruled.

4          MR. ROBINSON:  I believe every candidate we did

5    the background check on agreed to it. I don't think we did

6    any that were, but I, I could be mistaken.

7          MR. PHILLIPS:  Do you know the identities of what

8    candidates had background checks on, and can you, can you

9    state which ones you remember?

10         MR. ROBINSON:  I don't recall all ten off the top

11   of my head. Uh, I know that everybody was selected or, had a

12   background check and I know there were several others. But I

13   can name a few if you want me to.

14         MR. PHILLIPS:  Yes, please do.

15         THE COURT:    I don't want you to name any of

16   them.

17         MR. PHILLIPS:  All right, thank you, Your Honor.

18   I have no further questions.

19         THE COURT:    Any, redirect?

20         MR. WEEDMAN:   One, one question here.

21         THE COURT:    Go ahead.

22         MR. WEEDMAN:   So if there are any, are there any

23   other cross examiners? I need, need to --

24         THE COURT:    Does anybody else wish to cross

25   examine?

Page 246

```
 1              THE CLERK:     Sam-, Sami Sheik is on the line,

 2     Judge.

 3              THE COURT:     Go ahead, Mr. Sheik.

 4              MR. SHEIK:     Can you hear me? Thank you, Your

 5     Honor. Sir, if, would you, when it comes to Asher

 6     Jenoot, were you aware that there was a SEC fine that was

 7     levied on him and his organization, USBTC before his

 8     addition to the board or the, you know to the board?

 9              MR. WEEDMAN:    Objection, assumes facts not in

10     record.

11              THE COURT:     I'm sorry?

12              MR. WEEDMAN:    Assumes facts in record.

13              THE COURT:     Well, do you know whether that's

14     the case or not, Major Robinson? Don't, don't assume the,

15     that the question is correct, but do you have knowledge

16     about that alleged fact?

17              MR. ROBINSON:   No, Your Honor.

18              THE COURT:     Okay. Sustained.

19              MR. SHEIK:     Okay. Thank you. And final

20     question, when, when deciding to go from seven to nine

21     individuals on this board, or this committee, rather, and in

22     assessing the value of that let's say Fahrenheit would be

23     bringing into this, you had mentioned earlier that, you

24     know, that you needed to increase that number because there

25     was that much work to be done. How did you go about
```

Page 247

1    determining, you know, that assessing their value and, and

2    you know coming to the conclusion that you would need to

3    increase the number of positions to nine board members as

4    opposed to seven, given that there is a bunch of people will

5    be introduced into this board that will all come with a

6    heavy cost to the estate?

7            MR. WEEDMAN:    Objection Your Honor.

8            THE COURT:    Sustained.

9            MR. SHEIKH:    And how --

10           THE COURT:    One more question.

11           MR. SHEIKH:    Sure, I, I'm trying to gather my

12   thoughts on this one, Your Honor. Please bear with me. How

13   is the, uh, the, okay so was there a job description or a

14   process formally rolled out to the creditors to apply for a

15   position on the board?

16           MR. ROBINSON:    I'm not sure if there was like a

17   formal rollout [indiscernible] votes, something to be

18   posted. I know that we expected at least, we expected

19   applicants to come from many different [indiscernible]. And

20   we also asked and requested our advisors to compile a list.

21   So they, they were tasked with, you know, helping us solicit

22   and gather applicants from many sources, from some they

23   knew, and from outside sources.

24           MR. SHEIKH:    So this was not officially rolled

25   out as a requisition, uh, as such as a normal job would, you

Page 248

1    know a requisition would be rolled out. This was more, I

2    guess it was just mentioned over a town hall or through some

3    other informal means?

4             MR. WEEDMAN:    Objection, Your Honor.

5             THE COURT:     Sustained. All right that's your

6    questions.

7             MR. SHEIKH:    Those are all the questions I had.

8    Thank you, Your Honor. I appreciate it.

9             The COURT:     Thank you very much. Anybody else

10   wish to examine? All right, Mr. Weedman.

11            MR. WEEDMAN:    Just one question Your Honor. Mr.

12   Robinson, were all creditors other than Mr. DeFiore[ph] and

13   Mr. Duffey considered for all spots in the NewCo board?

14            MR. ROBINSON:  Yes.

15            MR. WEEDMAN:    Okay, thank you Mr. Robinson. And

16   Your Honor, I realize when I was up there before I

17   authenticated and introduced the affidavit but I didn't move

18   it into evidence and so I'd like to move --

19            THE COURT:     All right any objections to Major

20   Robinson's affidavit, it's declaration, it's UCC Exhibit

21   230, ECF3584? If there is no objection, it's in evidence.

22        (UCC Exhibit 230, ECF3784, received into evidence)

23            MR. WEEDMAN:    Thank you, Your Honor.

24            THE COURT:     All right. All right that's the end

25   of the evidence for today. Let's just talk briefly about

```
 1      what witnesses will be called tomorrow, Mr. Colodny?

 2             MR. COLODNY:   Yes, Your Honor, I think we'll

 3      begin tomorrow with Mr. Galpo[ph] our expert witness. And

 4      then I believe that Mr. Kampanya[ph] will be the next

 5      witness which will conclude the case-in-chief.

 6             THE COURT:    Okay.

 7             MR. PHILLIPS:  Your, Your Honor?

 8             THE COURT:    No, just a second. Go ahead, Mr.

 9      Colodny.

10             MR. COLODNY:   We have a, a few evidentiary issues

11      about the video clips and other things that we intend to

12      address with Your Honor tomorrow.

13             THE COURT:    Okay. All right that's our day for

14      tomorrow. Let me, is there anything that's intended to fill

15      Thursday and Friday, and we'll have completed the witnesses

16      as part of Debtor and Committees case-in-chief?

17             MR. KOENIG:    Your Honor, Chris Koenig, Kirkland

18      & Ellis for Celsius. We don't have any other witnesses.  We

19      do have an omnibus hearing on Thursday at 10:00 a.m.

20             THE COURT:    Yeah.

21             MR. KOENIG:    Nothing else for this trial.

22             THE COURT:    Okay. All right. All right I see

23      you all tomorrow. I would ask that, because I have another

24      hearing at, you need to move your materials off of the

25      counsel table. You can keep them, the court room is going to
```

Page 250

1    be locked. So if you want to put them on the side you don't

2    have, anything you want to leave, you can do that. Mr.

3    Phillips, you wanted to be heard?

4          MR. PHILLIPS:  Yes, Your Honor. I would just

5    request that, that I be given remote access to the

6    transcript from today's hearing --

7          THE COURT:     There is no transcript to the,

8    there is no transcript from today's hearing. A transcript

9    can only be, there, there is a voice recording system. The

10   transcript needs to be ordered. There is no transcript

11   ready.

12         MR. PHILLIPS:  Can I be given access to that voice

13   recording?

14         THE COURT:     You, no, not tonight. If you want

15   to order the transcript, you can order the transcript. There

16   will not be a transcript tomorrow. We are adjourned for the

17   day.

18     (Whereupon the proceedings were concluded at 4:43 PM)

19

20

21

22

23

24

25

Page 251

1                    C E R T I F I C A T I O N

2

3        I, Dani Rossean, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8

9    Dani Rossean

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[& - 22]

Page 1

**&**

**&**   3:3,11 6:22
8:1 51:22 76:2
103:18,20
126:9,15
199:11 200:13
202:8,22 215:5
216:1 218:17
224:9 225:11
228:23 229:10
229:15 230:14
230:15,24
249:18

**0**

**09:00**   1:17

**1**

**1**   83:6 85:13
99:22,22
143:11 177:5
207:6 233:7,7
**1,000**   99:23,24
100:2
**1,026**   83:4,14
**1,126**   87:10,19
**1,200**   82:23
**1.25**   16:14
**1.60**   67:9,17,22
**1/2**   62:8,13
**10**   16:19 17:16
20:22,24 21:11
21:14,15,18
122:16 126:11
130:13 158:6
212:17
**10,000**   99:22

**100**   27:24 62:8
62:13 100:3
121:2
**10004**   1:14
**10020**   3:14
**10022**   3:6
**10:00**   24:11
25:8 249:19
**11**   63:16,23
82:23 127:16
156:20 160:3
174:8 178:4,15
183:13,21
203:8 205:14
205:20 206:12
206:20,21
207:1,19 210:5
213:7 233:11
233:22 242:14
**112,131,300....**
194:18
**12**   34:11
115:23,23
208:5 209:8
240:2
**120,000**   240:1
**121**   29:2,4,17
29:20
**1221**   3:13
**125,000**   16:21
**12:00**   19:2
**12th**   19:7
66:11
**13**   13:8 34:19
232:18
**135**   159:8

**14**   145:5 178:4
232:17,18
234:15
**147**   13:6,8
**15**   17:2,6 24:12
25:9 28:25
29:15,19 39:20
40:18,18 42:3
66:20 157:16
159:6 184:15
195:5 212:17
**150**   27:23
103:1
**16**   195:2
**163**   195:4
**17**   42:15,18
66:25 156:14
**170**   243:19
**175**   158:8
**177**   29:24 30:1
30:3
**178**   29:24 30:1
30:3
**18**   231:9
**181**   29:24 30:1
30:3
**183**   29:6,17
**184**   29:20
**19**   231:8,10,12
231:15
**195**   22:11,12
22:24 23:13,14
23:16

**2**

**2**   15:19 39:13
191:11 192:4
199:13,19

**200**:14 201:14
233:7 239:6,11
239:16,24
240:6
**2,000**   99:24
**2,026**   201:14
**2.5**   233:7
**20**   16:19 17:5
17:14 23:25
27:1 42:13
43:9,9 66:13
66:20 73:10
174:5 184:15
186:4
**20,000**   188:12
188:15
**2011**   156:17
**2017**   207:20
**2018**   123:4
**2022**   9:2 17:5
19:7 66:11
67:23 68:18,19
94:8 103:1
156:22 157:8
157:14 159:4
178:4 220:14
**2023**   1:16 2:2,6
33:8 162:11
165:20,22
171:5 178:18
184:24
**2024**   120:5
147:7
**21**   30:16 43:21
60:13 74:21
**22**   44:8,9

**22-10964**  1:3
**22nd**  67:17,22
**230**  248:21,22
**233**  20:13,22
20:24 21:16
**239,000**  214:6
**24**  161:20
175:11 179:22
**25**  24:11,16,24
25:4,5,9 62:4
62:20 64:4,23
191:19 207:22
208:20 209:17
**250**  115:12
**250,000**  17:4
**25th**  208:21
209:25
**26**  45:23 75:6
147:14
**27**  28:25 29:15
29:19 46:6
75:17 184:24
**270**  119:1
**27th**  33:8
**28**  19:3,13 24:8
24:13,14,25
25:1,5,10,11
49:16 50:24
67:16
**28369**  251:8
**29**  65:12
**2902**  133:14
**296**  133:17,18
133:24 134:2,3
134:5
**2:00**  154:22

**2:01**  155:2

**3**

**3**  1:16 2:2,6
28:25 29:15,19
68:6 83:23,25
84:2 116:3,6
133:11,13,18
134:6,18,20,22
178:20
**3,000**  191:11
**3.2**  177:14
178:23
**3.5**  207:5
**30**  29:1,16,19
119:14,21
130:10 135:14
135:14 137:1
144:6 195:24
**300**  158:15
**301**  133:22
**307**  118:16,17
147:1
**31**  178:16
208:20
**31st**  104:6
**32**  113:20
**324**  133:17
**3293**  21:16
**33**  137:15
143:25 144:3,7
144:9,11,13
**332**  133:20,21
133:22,24
134:2,3,5
**34**  11:22 12:15
12:18

**3444**  243:19
**35**  113:20
**350**  159:2
**3532**  65:11,14
**3574**  184:19
**3577**  2:3,6
**3581**  33:7,16
72:10
**3584**  221:4
**3586**  204:10
206:22
**3588**  176:13
**3589**  5:8
**3591**  132:23
**36**  24:7 25:7
**36,000**  192:23
**3609**  2:3,6
**3667**  2:1
**3668**  2:5
**37**  12:21 13:18
13:21 122:22
**38**  30:19,19,21
31:8,12 81:21
81:24 82:12,18
82:22 83:4
**388,000**  207:12
**393**  30:17,20
78:9
**394**  133:18

**4**

**4**  201:14 222:9
226:14
**40**  117:3
**400**  121:2
**400,000**  186:3
188:4,6 189:2
189:15

**400s**  119:4
**410**  166:2
**420**  131:19
**43**  5:17
**44**  10:21 11:16
11:17,19 30:14
30:23 31:1,6
31:12 33:8
81:2,5,23
**45**  166:8,9,18
166:20 230:21
231:7
**450**  16:18
131:16
**480**  147:11,13
**481**  119:4
**4:00**  175:10
216:13,14
217:4 218:10
**4:43**  250:18
**4:50**  155:21
**4:55**  155:21

**5**

**5**  38:1 57:15
66:18 117:24
120:6 121:16
178:21 195:3
201:14
**5,126**  201:14
**5,160**  197:18
**50**  17:5 27:23
100:13 129:20
130:8 143:24
144:2,11,12
186:6 208:22
209:17

**500**  188:17
**500,000**  50:1
**51**  28:25 29:16
 29:19 100:13
 176:9,13,20
 243:19
**513**  201:14
**53**  30:15 31:6
 31:12
**54**  29:1,16,20
**55**  179:22
**550**  159:2
**56**  29:1,16,20
**5605**  239:6,10
 239:16,24
 240:6
**565**  166:3

**6**

**6**  20:7,13,22
 21:11,14,15,18
 65:12 144:1
 201:14 209:13
**6.19**  195:15
**60**  148:19
 184:20,21
 185:2 187:8,11
**601**  3:5
**61**  132:17,18
 132:21 133:5,7
 133:9
**64**  192:7
 201:14
**68**  204:10,18
 204:19,21
 206:12,22
**69**  19:17,24
 21:11,18 22:21

**7**

**7**  62:7,11 63:17
 63:23 78:9
 83:19,19 88:9
 115:24 116:17
 193:25 201:15
**70**  157:15
 159:5 208:23
**72**  62:8,13
**720**  166:3
**75**  171:8,14
 208:23 209:18
**750,000**  55:13
**78**  157:15,17
**79,500**  191:8

**8**

**8**  26:9 34:4,6
 66:13 116:17
 142:12 166:22
 166:22 167:6
 170:20,20,21
 171:25 193:25
**80,000**  116:23
 186:3
**81**  24:14,24,25
 25:1,5,11
 57:18 61:20
 64:23 67:5,8
 67:18
**834**  201:13,21
**85,000**  116:23
**858**  78:9 83:11
 83:14
**859**  84:23
**860**  85:12

**862**  86:22
**869**  87:9,19
**870**  89:13 90:2
**88**  29:1,16,20
**89**  29:1,17,20

**9**

**9**  72:7,15
 168:15 221:6
 229:25 239:23
**9.8**  178:7
**90**  61:10,11,13
 61:16 62:22
 64:7,9,11
 117:4 186:13
 192:24
**91**  29:1,4,17,20
**94**  99:9
**95**  64:18 91:20
**950**  103:1
**960**  195:3
**97**  192:9
**9th**  198:25

**a**

**a.m.**  249:19
**aaron**  3:16
 215:25 244:3,3
**abeyance**
 48:23
**ability**  10:7
 17:24 42:5
 69:11,15
 121:14 131:5
 198:21 236:1
**able**  5:7 7:13
 9:16 10:5
 58:25 59:3,5,7

59:16 61:16
73:6 80:6
107:21 109:3
118:10 131:12
132:4 138:1,10
139:18 187:3
192:20 194:23
195:18 197:15
201:6 212:13
212:14,15
231:15 233:18
241:12,15
**above**  67:7
 209:18
**abreu**  4:10
 92:11,11,14,15
 93:11,16,20,23
 94:3,14,25
 95:1,4,6,10,20
 96:6,16,25
 97:9,20 98:4
 98:14,19,25
 99:7,11,15,18
 100:1,11,17,21
 101:8,11,17,24
 102:2
**absent**  208:18
**absolutely**  16:3
 31:21 40:17
 46:10 48:21
 54:13 155:18
 182:18
**abstained**
 189:21,23,25
 191:12
**abstention**
 191:2

**abstentions**
191:4
**accept** 63:22
71:7,25 188:1
190:4 192:9,25
197:19 217:1
**acceptable**
44:1 93:4
**accepted** 58:15
186:12,13
197:16 239:17
239:18,25
**accepting** 58:4
**accepts** 239:25
**access** 160:1
250:5,12
**accessed** 190:6
**accordance**
86:24 148:4
**account** 87:22
88:20 114:22
173:19 185:17
185:17 186:6
186:12,19
188:5,9,13
210:2
**accountholder**
78:6
**accountholders**
190:23 191:9
191:11 201:16
**accounting**
174:1
**accounts** 29:24
71:16 159:25
**accurate** 11:9
12:9 13:12

21:5 23:8
31:16 34:9,10
34:13,17
132:23 153:8
153:10 166:10
176:14,17
184:23 192:6
193:3,8 194:18
194:24 195:4
195:11 204:14
251:4
**achieve** 61:9
151:25 152:10
152:12
**achieved** 28:6
**acknowledged**
47:8
**acquire** 57:13
**acquirer** 160:2
**acquirers**
157:15
**acquisitions**
156:9
**act** 214:15,16
**acting** 8:25 9:5
14:9 27:18
229:9,9
**action** 9:25
76:17 172:19
199:18
**actionable**
162:21
**actional** 163:4
**actions** 15:10
125:13
**active** 101:4
219:2

**activity** 111:18
112:5 170:9
**actors** 97:17
**acts** 15:15 51:1
51:5 55:3
**actual** 38:5
111:21 147:6
**actuality**
148:19
**actually** 38:25
71:6 77:13,14
92:16 116:17
116:25 117:11
118:3,5 149:6
159:24 188:2
189:17,22
190:24 191:1,5
198:3 203:20
203:21 206:4
207:6,11
212:14 222:15
229:9 231:7
241:9 242:6
**ad** 40:19,20,23
41:3,5,7,11,15
43:2,4,5
199:12
**add** 95:22 96:2
108:10 143:8
191:7
**added** 19:18
52:12,19
**addition**
169:12 203:14
209:14 246:8
**additional**
12:11 13:14

14:15 37:5
76:12 110:23
130:16 138:2
139:8 144:25
154:8 162:12
198:1 200:9
234:3
**address** 7:16
30:6 90:5
185:16 249:12
**addressed** 49:9
**adds** 109:19
**adjourned**
250:16
**adjusted** 17:3
17:13 151:10
171:25
**adjustments**
151:19,23
152:13 175:12
178:22
**adjusts** 116:20
**adler** 199:6,8
199:11,11,19
199:24 200:3
**administration**
53:19,25
**administrative**
183:6
**administrator**
39:3,3,9,14,15
39:17 40:2,10
44:17,19,23
48:11 53:19
54:14,20,21
55:2 69:5
183:17 212:1

administrator's
39:6
admit  28:22
30:6 54:5
134:17 187:7
204:18
admitted  12:16
13:20,23 18:23
21:16 22:21
23:15 29:18
30:2 31:19
72:9 81:6,20
133:7 134:20
166:20 167:8
170:16 187:11
204:20
admitting
29:15 30:1
134:19
adopt  11:12
12:11 13:14
133:1 166:12
166:14 185:1
205:2
advice  156:9
156:22 170:9
224:4 225:15
225:16,18,19
241:23
advise  77:12
170:17 203:1
advised  223:9
241:20
advising
156:18
advisor  183:7
183:17

advisors  14:3
33:20 41:21
44:7 77:18,19
102:20 125:10
169:21 183:24
183:25 185:11
185:11 220:24
223:7,11,15,21
223:25 224:2,7
224:8,10,21
225:4,7,12,23
226:1,2,9
231:3,3 237:10
243:4,4 244:14
247:20
advisory  156:3
156:8,11,15
174:1 224:22
advocate  236:1
aesthetics  82:9
82:10
affidavit
248:17,20
affirm  8:13
126:22 202:15
afternoon
127:5 173:14
182:21,23
187:18 202:7
202:19 210:14
215:25 216:7
216:11,24
217:6 218:16
age  116:14
agent  36:3
37:19 38:4
51:9,18 183:6

183:16,23
184:16
agents  39:12
aggregate
159:6
aggressive
103:11
ago  14:6 16:7
28:9 30:18
56:2
agree  6:6,9
7:15 44:19
50:25 52:2
54:7 79:18
148:9 149:3,7
149:24 150:3
150:18 151:4
151:17 152:14
168:18 195:1
agreed  41:14
145:3 164:22
200:1 244:18
244:24 245:5
agreement
10:11 15:10
20:19,21 21:3
21:6,22,23
22:18,20,25
23:6,10 50:22
53:20,21 54:1
54:14,20,22
63:1 88:5
129:15 130:15
130:15 234:25
agreements
27:13,14
104:12 157:16

176:5
agrees  87:21
88:19
ahead  6:20
40:16 48:12
53:17 54:2,9
54:12 55:9,14
56:6,14,15,19
62:18 64:3
66:4 69:2,21
69:22 71:11
72:4,17 74:8
74:17 78:2
79:9 80:6,16
80:24 83:16
87:14 89:7
91:11 92:14
93:18,22 94:19
104:22 105:19
105:20 107:17
108:3,15 111:3
113:12,18,23
117:20 118:12
127:4 135:5
138:22 141:8
141:10,14
150:10 167:18
168:12 177:6
178:1 181:2
188:10 191:17
194:15 195:19
196:23 198:13
201:3 213:18
217:21 224:13
224:18 225:21
230:3,4 239:22
245:21 246:3

249:8
aiding 170:3
aidoo 170:3,6,9
  238:15,19
  240:5,12
aidoo's 239:2
  242:15
alameda 68:6,9
albeit 145:10
align 138:3
  205:7,10
aligned 9:15
  14:10 73:9
  112:9
alignment
  138:12
allegation
  95:13
alleged 246:16
allison 202:9
  202:21 212:12
allocation
  149:14
allow 53:24
  160:1 185:17
  243:9
allowed 108:23
  199:14 234:25
alternative
  18:8 174:25
  176:3
alternatives
  156:23,23
alvarez 28:7
  103:18,20
  202:22

ama's 30:5
amended 19:19
  33:1 179:8
  184:18 189:21
  193:24,25
  201:13,13
  234:8
amendment
  243:18
amendments
  211:16
americas 3:13
amount 27:19
  36:13 42:12
  55:24 66:11
  68:20 84:3
  85:16 101:4
  104:11 106:2
  130:8 151:13
  178:21 189:16
  192:7 197:20
  206:25 209:12
  232:24 233:16
  237:6
amounts 51:12
  203:8 206:8
  210:7,23 211:3
  211:11
ample 55:24
  60:11
analyses
  205:23 206:15
analysis 9:3,8
  114:3 165:18
  166:13,23
  167:3 170:18
  171:23 172:16

174:11,16,21
175:6 176:24
180:11 181:13
181:15 206:23
207:3,25 208:1
208:2 209:6
210:5,6
analytics 93:10
analyze 203:17
  205:15,18
  206:1
analyzed
  203:23
analyzes
  206:17
annualized
  207:4,5
answer 43:25
  59:18 74:8,13
  74:13,14,16
  79:17 80:5,6
  90:18 93:21
  94:19,20 101:6
  105:16,20,20
  106:19 113:24
  137:20 147:4
  152:4 153:4
  192:20 195:19
  214:9 224:17
  224:23 225:22
  241:12,15
answered
  59:13 125:3
  137:18 153:18
  154:5 187:20
  237:22

answers 224:1
anticipate
  121:6
anticipated
  128:18 129:7
anybody 55:6
  71:20 77:24
  78:12,22 92:9
  102:3 104:19
  107:6 110:21
  110:25 113:4
  122:17 138:19
  143:19 154:7
  168:10 172:24
  173:1 191:15
  193:20 196:17
  199:5 202:1
  212:7 213:1
  214:22 245:24
  248:9
apologies 31:1
  31:10 82:7
apologize
  30:10 42:15
  48:5 74:10
  117:22 118:14
  120:25 134:1
  161:18 178:25
  201:1 213:13
  223:19
apparently
  194:21 228:4
appear 5:18
  78:15
appearing 4:1
  219:3

appears
118:15 192:4
applicable
5:17
applicant
237:3
applicants
220:23 247:19
247:22
application
84:24
applied 75:7
120:9
applies 225:2
apply 7:3
58:21 91:25
125:5 247:14
applying
235:15
appoint 106:25
141:24 227:13
234:3
appointed
106:17 107:6
154:4 227:16
228:10 229:16
233:18
appointee
233:13
appointees
108:6 226:17
233:6,7 234:10
appreciate
109:14,17
143:16 168:8
217:5 248:8

approach
19:21 53:25
134:9,11
155:14 173:10
175:24 177:5
182:17 202:11
219:9
approached
139:9
appropriate
16:2 28:3
45:24 75:11
149:20 171:11
207:9 233:15
233:16
appropriately
76:11 121:18
approval 28:9
approve
130:25
approved
40:11 75:20
102:9 103:21
104:3,5,6
205:20 207:2
207:20 211:8
211:17
approves
103:23
approving
184:1,10
approximate
115:20 131:14
195:2
approximately
17:5,14,16,17
82:23 130:10

130:13 131:16
131:19 144:1
147:11,13
156:14 158:8
158:15 171:13
183:11,14
184:15 186:2
188:12 192:23
195:4,4 208:22
230:21,22,22
231:16
april 222:16
areas 59:24
156:24
argue 90:24,25
92:23 99:17
193:14 196:4,5
argument 90:9
90:23,25
193:14
arises 47:11
arms 15:22
75:13
army 219:6
arose 50:8,10
arrangement
49:21
arrangements
5:16
arrington
127:18,18
128:6,8,9
131:10 136:13
136:22 137:17
137:21 141:17
141:20,25

arrived 144:21
arthur 4:10
artur 92:11
asher 127:25
129:13 142:5,8
142:10 143:10
154:2,3 246:5
aside 60:20,25
asked 59:12
136:18 142:2
154:5,6 164:24
165:3,4 174:12
174:13 178:6
198:23 200:5
202:25 203:13
203:17 205:15
205:17 224:14
225:6 232:24
241:23 242:20
247:20
asking 89:11
89:19 106:6
107:11 125:8
196:13 231:23
238:8,11 240:8
242:3,4
aspect 16:6
aspects 13:25
146:21 148:13
assembled
244:14
assertion
149:15
assessed
172:12
assessing
162:23 246:22

247:1
**assessment**
98:9 100:8
**asset** 18:12
27:4 56:14
79:19,22,23
80:10 87:24,25
94:16 95:7,22
96:2 119:10
129:21 148:16
159:9 160:12
174:17 176:25
**assets** 17:9
35:16 36:1
45:3 51:16
56:5 60:20,25
63:8 80:2 84:3
89:14 90:3
128:13 129:5
131:9,13 157:6
157:21 158:2,5
158:11 159:1
159:16,17,23
160:1,8,13,17
161:11 163:3
164:12,25
165:9,12
167:23 169:6
172:13 174:14
174:21,22,23
174:25 175:2,8
175:9,13,14,18
176:2,6,7
177:11 178:3
178:14,14,24
180:18 181:3,9
207:13,22

213:6
**assisted** 36:25
**associated** 97:2
**assume** 151:22
246:14
**assumed** 82:9
**assumes** 246:9
246:12
**assuming** 5:11
6:2 150:16
152:8 211:17
215:11
**assumption**
120:2 148:7
**assumptions**
115:6,7 116:18
117:9,12,13
121:3 142:20
146:22
**assured** 207:8
**attached** 5:9
22:25 23:9
81:12 122:24
166:13 176:12
**attaches**
166:23
**attachment**
22:22 176:16
**attempted**
197:18
**attend** 107:21
110:4 222:15
**attendant**
89:17 90:6
**attorney**
184:17 224:5
224:15 225:2,2

**attorneys** 3:4
3:12 76:2
**attributed**
177:11
**attributes**
201:22
**auction** 10:2,2
14:8,9,22
36:12 97:8
128:12 157:5
161:24 162:4
162:17 163:15
163:22 168:14
168:16,19,21
169:8,19 170:1
170:7,12,14
222:15,23
223:2 225:9
226:5
**auctions** 14:8
168:18
**audience**
129:11
**audit** 105:1
167:21 168:1
**auditing**
167:21,25
**august** 116:22
**authenticated**
248:17
**authorized**
36:20 243:11
**autopilot** 108:8
143:8
**avail** 74:6
**available** 37:2
42:13 56:5

78:23 101:2,12
185:20 216:7
**avenue** 3:5,13
**average** 166:2
175:10,11
207:10 209:17
209:24
**avoidance** 74:6
199:18
**award** 102:10
211:1
**awards** 115:3,3
210:17 211:5
211:25
**aware** 23:21
48:16 49:18
55:12,15 56:4
57:25 58:3
65:12 66:5,10
66:17,18,24
67:2,15 68:6,8
92:22 96:9
97:10 100:19
102:9 103:22
117:15 137:10
137:25 138:9
138:15 198:14
227:25 228:3
228:16,25
229:2,12 233:8
238:20 242:12
246:6

| **b** |
| --- |

**b** 1:21 87:10
108:8 239:16
239:24 240:6
244:6

[back - believe]

**back** 9:24 10:3
16:12 20:7
21:21 24:13,14
25:10 32:2,3
35:14 39:12
42:14 47:2
59:8,25 60:4
107:8 120:1,14
120:17 143:23
144:13 161:1
163:7 164:3
198:8 203:1
243:8,8
**background**
50:14 52:21
106:5 107:2,12
107:25 217:18
243:8,12,14
244:17,23
245:5,8,12
**backgrounds**
107:23 140:24
**backup** 12:4
14:13 18:10,10
18:13,15 35:11
36:11,17 37:21
50:15
**bad** 15:15 55:3
97:17
**balance** 16:15
18:4 60:7,11
97:23 131:9
223:22 233:20
233:23 235:11
235:17 236:5
**balancing**
235:19

**ball** 228:24
**ballot** 15:17
73:21 74:12
111:16 112:21
184:3,12
185:18 189:20
190:4,11,20
191:12,20
196:25 198:15
199:13 200:13
200:17 201:16
**balloted** 186:2
**balloting** 43:17
185:19,21
190:1 200:5
**ballots** 43:12
43:17 184:4
188:2,8,21,21
189:1,1,15,17
189:19 191:8
192:23 196:12
197:3,6,6
201:13,13
**bandwidth**
233:10
**bank** 23:25
105:5
**bankers** 68:9
**banking** 92:22
92:23 93:7
156:7 173:25
**bankrupt**
95:23,25 96:1
96:2
**bankruptcy**
1:1,12,23
14:11 25:15

26:21,25 27:2
27:10 47:10
48:17,17 51:6
52:4 54:24
55:14 56:19
57:4,10,18,22
61:20,24 64:4
64:15 69:25
75:20 91:17
102:19 103:6
105:3 111:8
125:15 168:16
168:18 181:5
181:10,12
191:25 222:12
232:25
**bankruptcy's**
18:20
**base** 36:1
80:11 208:16
208:17,19,25
209:14
**based** 43:16
100:19 114:5,6
116:13 128:16
165:22,23
169:14 171:3
172:15 181:4,9
207:7 208:24
210:4 232:23
242:23
**baseline**
213:25 214:1
**basic** 93:12
95:21
**basically**
109:18 142:4

225:7
**basis** 50:21
75:10 121:16
129:25 131:24
207:4,5
**bates** 28:25
**baton** 182:4,5
**bear** 69:4
247:12
**beat** 115:13
**beginning** 9:13
96:24 116:19
120:21 178:4
244:4
**begins** 20:8
**behalf** 8:1 21:3
126:10,16
155:6 173:5
187:19 199:12
202:8 204:8
210:15 215:6
216:1 218:17
**behest** 229:9
**belabor** 40:25
**belief** 24:2
45:24 46:9
48:14 51:20
132:13 180:5
**believe** 7:1
19:20 24:21
38:3,19 39:9
45:25 53:23
54:17 69:8
73:2,19 74:1
75:10 88:15
96:6,17 101:8
101:24 108:22

[believe - block]                                                          Page 10

115:13 117:23
124:13 131:19
136:13 137:18
139:22 140:17
142:5 144:5,9
145:8,24
146:17 153:7
153:16,20
158:12 169:20
171:1 178:20
178:21 180:4
180:21 186:4,5
186:19 188:15
197:5 199:17
199:22 200:1
206:3 211:20
214:13 215:13
216:4,6 218:14
222:16 225:6
226:16 229:14
231:9,10 232:2
236:6 239:21
239:23 240:18
245:4 249:4
**bench**  126:20
**benchmarks**
211:25
**beneficial**
136:5,7,12
138:8 144:25
**benefit**  28:10
48:6 86:24
87:9 132:15
**benefits**  50:5
**best**  9:25 10:9
10:10 11:9
12:9 13:12

21:8 32:5,8
33:3 35:5 36:6
38:17 39:8
41:4,13,22
44:4,22 47:14
63:21 87:5,8
105:21 114:22
115:6 117:18
117:21 123:2
141:24 160:17
161:4 163:16
164:20 169:22
175:6 176:1
205:13 233:3
236:4,10,11
237:11,12
**better**  16:21
82:6 107:17
109:11 128:20
135:16 152:18
164:2 212:3
226:7
**beyond**  186:11
**bias**  237:8
**bid**  18:10,13
18:15 36:12
97:7 128:21
158:14,15
159:3,20 160:4
160:5,6,12,15
160:18,20
161:15,24
162:3,5,11,17
163:8,11,16,18
163:21 164:2,2
164:4,5 169:22

**bidder**  50:16
160:2,22
163:14 169:12
169:16 170:5
**bidders**  14:8
159:8,15
162:10,16,20
163:4,22 164:3
169:4,9 226:5
**bidding**  105:5
226:6
**bids**  9:24
157:21,21,21
157:22 158:3,3
158:4,6,21,21
158:22,25,25
159:1,10,11,12
159:16,17,19
159:20,22
160:23 162:12
226:6
**billing**  180:5
**billion**  15:20
16:15 39:13
177:14 178:8
178:21,23
207:22
**binder**  8:5
10:20 11:22
12:21 19:16,20
19:24 22:10
81:21,23 87:17
132:17 133:11
155:17 166:6
166:22 176:9
182:16

**binders**  126:20
**bios**  169:10
**bit**  10:13 24:6
37:4,16 44:18
46:11 51:5
75:17 78:7
85:6 102:25
118:1 122:11
130:22 131:21
135:15 140:7
142:15 159:7
187:21 207:15
**bitcoin**  16:22
24:16 60:20,25
91:14 92:1
108:9 114:23
115:2,14
116:13 117:17
118:16,21
120:15 127:24
127:24 129:2
129:13,14
130:22 132:2
132:10 136:13
136:14,22
137:16,21
142:12 148:15
150:1,6,16
151:21 152:8
153:2 161:14
161:16 163:17
164:19 171:25
**black**  46:22
**blank**  29:1,16
29:20 190:11
**block**  115:3
129:11 175:5

**blog** 29:23
**blunsine** 55:25
**board** 43:6
  72:24 73:1,7,8
  106:3,3,8,16
  106:17 107:10
  108:5,6 109:25
  110:14 129:12
  130:11,24
  132:9 138:25
  139:6,6,7,9,19
  139:25 140:6,9
  140:10,13,13
  140:20,25
  141:18,21,23
  141:23,24
  142:2,6,9
  143:5,8 149:19
  154:2,3,4
  216:17 220:16
  220:20,25
  230:13,19,20
  232:11,14,19
  232:20,23,24
  233:2,3,10,15
  233:17 234:9
  235:1,14,24
  236:14 238:16
  238:18 239:11
  243:19 244:14
  244:15 246:8,8
  246:21 247:3,5
  247:15 248:13
**boards** 235:17
  240:13
**board's** 153:5

**bonus** 102:10
  103:23 104:8
**bonuses** 98:2
  98:12
**boom** 136:14
**borrower** 84:4
  84:17 85:10
  86:4,5,10,12
  86:15,19 87:21
  88:19
**borrower's**
  85:17 86:3
**borrowers**
  85:4,22 199:12
  199:14,15,20
**borrowing**
  70:12
**bothering** 48:8
**bottom** 20:10
  179:22 194:21
  208:15
**bottoms** 114:5
**bought** 92:16
**bounced** 24:13
  25:10
**bowing** 141:17
**bowling** 1:13
**box** 173:11
  199:14,17
**bp** 70:11
**brah** 4:3
**break** 124:24
  125:25 126:5
  126:12 154:16
  155:1,21 187:3
  209:19 217:3
  218:13

**breakdown**
  231:5
**breakup** 36:18
  36:22 37:3,6
  37:11 137:14
**brian** 4:3
  182:12 183:4
**bric** 18:10 35:7
  35:9,11,20,21
  35:23 36:7,10
  36:14,20 40:1
  40:9 49:17,18
  50:4
**bric's** 37:8
**brick** 162:12
  162:15,22
  163:5,15
  168:24
**brief** 92:12
  196:11
**briefly** 9:10
  14:2 26:17
  248:25
**brier** 202:7,8
  202:11,19,23
  203:4,10,13,17
  203:23 204:4,9
  204:14,17,22
  205:1,5,15,22
  205:25 206:6
  206:11,19,21
  207:15,25
  208:4,24 209:5
  209:19 210:2,9
  213:8 214:2
  215:1,5,5,13
  215:17,19,22

**bring** 52:11
  81:24 82:2
  145:17 179:12
**bringing**
  246:23
**brings** 15:10
  108:22
**broad** 51:21
  157:18,24
**broader**
  125:11
**broke** 85:6
  87:13 187:2
**bronge** 4:9
  77:25 78:1,2,3
  78:5,10,10,11
  78:17 79:2,4,7
  79:10,17,22
  80:1,9,14,17
  81:1,8,11,13
  82:15,18,24
  83:1,3,8,10,16
  83:17 84:5,10
  84:11,19,21,22
  85:3,8,12,21
  86:2,7,13,21
  87:11,13,23
  88:3,22,23
  89:3,6,7,8,11
  89:15,18,21
  90:1,5,8,11,14
  90:17 91:6,8,9
  91:12,24 92:3
  92:5,8
**brought**
  104:25 127:19
  142:6 154:2

[brought - can't]                                                    Page 12

159:19 235:14
**brown**  3:8 7:23
7:25 8:1,4,10
8:18,20 9:10
10:13,19,24
11:2,5,8,12,15
11:20,25 12:2
12:5,8,11,14
12:19,24 13:1
13:4,8,11,14
13:17,22 14:17
14:24 15:4,24
16:6 17:11,16
17:20 18:6,22
19:4,8,11,14
19:23 20:1,6
20:11,15,18,21
20:24 21:2,5
21:10,20 22:1
22:4,9,14,16
22:19,24 23:2
23:5,8,12,17
24:22 25:1,3
25:12,19,23
26:3,12,17
27:7,22 28:1
28:12,15 30:8
30:9,14,24
31:1,4,6,10,14
31:21,23 60:22
61:2,4,21,25
63:9,13,18,24
65:17 66:22
67:19,24 69:18
71:5,8,10,11
71:17 73:17
75:8 79:20,24

80:3 81:18,20
82:14,17 84:8
87:2 88:1 89:1
92:25 94:17
96:4 100:9
107:4 108:1
109:22 110:17
112:18 124:25
125:23 126:2,4
126:8
**bruckfire**
156:16
**btc**  37:20 51:10
61:18 62:23
64:12 93:6,6
146:23
**bucket**  175:2
175:18 176:2
**buckets**  159:9
**build**  132:4,11
164:10,13
**building**
127:12 191:20
**bulk**  143:9
**bunch**  26:24
28:8 247:4
**burn**  42:13
**burning**  27:1
**business**  16:20
17:13,21 18:4
27:17 93:2,5
95:23 102:22
102:23 113:17
113:20 114:1
115:18 117:14
121:12,23
129:2 130:3,5

130:19,23,25
131:20,22,23
134:15 139:24
149:9,17
150:13 151:6,7
151:9,18
152:12,19
153:2 157:2,22
157:23 158:1,4
158:5 159:5
164:11,13,13
164:21 165:5
165:14 169:2
169:10,20
225:15,19
**businesses**
163:25
**bust**  97:22
**buyer**  158:10
158:18

| c |
| --- |

**c**  3:1 5:1 86:22
201:11 251:1,1
**calculate**  114:9
**calculated**
194:22
**calculation**
117:16 148:1
197:22
**calculations**
148:12
**calculator**
194:23
**call**  7:21
125:23 126:16
155:6 157:12
163:4 173:5

182:15 202:9
219:16,19
**called**  85:14
215:14 219:17
242:20 249:1
**calling**  182:8
216:10
**calls**  58:7,18
61:2,4 84:8
87:2 162:6
218:20 222:20
225:11
**cameron**
213:19
**campagna**
206:3 212:3
215:18,19
216:3
**campaign**
188:14,16
**campaigns**
188:11
**candidacy**
238:4
**candidate**
241:22 245:4
**candidates**
140:22 230:21
231:7,25
236:17,24
237:11 242:13
243:13,14
244:18,24,25
245:8
**can't**  144:4
240:9

**capabilities**
37:22 121:12
235:25
**capacity**
136:15 219:3
**capex** 147:16
**capital** 127:18
128:8 136:13
136:14,22
137:8,22 138:2
149:13
**capitol** 128:2
**caption** 20:2
**care** 71:25
244:21
**career** 9:6 24:2
171:14
**carrie** 8:11
**carveout** 40:14
**cascade** 93:9
**case** 1:3 3:11
6:2 9:17 11:21
12:20 16:5
20:2 36:9,24
37:14,18,25
38:4 39:4
40:21 46:13
48:17,24 51:1
51:6 52:4
62:21 76:19
86:10 91:2,6
94:7 110:2
112:10 131:23
137:23 140:3
157:19 183:17
196:11 203:4
204:15 205:12

205:13,16
215:16 216:1
218:17 221:2
224:4,9 225:11
228:24 229:10
229:16 230:16
230:24 246:14
249:5,16
**cases** 49:19
127:16 156:20
156:25 160:3
174:8 183:7,13
183:21 203:1,8
203:20,25
205:14,19,20
207:1,19
213:23
**case's** 230:14
**cash** 147:15
150:22 151:2
158:11 165:14
165:15
**categories**
177:11
**categorized**
181:4,9,12
**caught** 145:11
**cause** 16:13
117:16 119:11
198:5
**causes** 76:17
**cease** 24:19
**ceased** 25:21
**ceases** 124:11
**cedarvale**
131:17,18
132:8

**cel** 13:3 18:23
18:25 19:11
22:7 23:19,19
23:22,22 24:5
24:24 25:14
26:2 55:12,13
55:17,19,21,24
56:5,14,18
57:3,9,13,14
57:17 58:1,2
58:16,21,22,25
59:3,4,8,15,23
60:4,5,8,9,13
60:16 61:5,8
61:19,23 62:3
62:6 63:17,22
66:12,19 67:5
67:16,22 68:12
68:17 69:5,11
69:11 70:1,3,7
70:8,16,18
71:2,13 78:5,6
91:10,13,18
92:3,16 94:3,7
94:11 95:14,17
96:19,22,23
97:11,14,16
98:2,6,11,15
99:2,9,21,22
99:24,24 100:1
100:2,6,23,25
101:11,13,13
101:18,20
122:23 123:5,9
124:1 191:19
191:25 192:5,6
192:8,11,13,17

192:22,23
193:2,4,4
**cell** 181:14,16
186:16,18,21
186:24 187:3
**celsius** 1:7 9:2
10:21 11:16,22
12:15,21 13:18
19:23 20:20
21:3 22:2
23:20 24:3,15
27:8,21 28:21
29:24 55:17,19
55:21 56:16
60:5,8,19,24
61:5 65:16
68:5,12,16,17
69:10,23 70:7
70:22 71:13,14
76:7 83:17
85:1,15 86:24
87:9 88:21
89:13 90:3
91:15 92:4
93:14 94:8,18
96:13 100:25
110:2 124:2,5
124:6 127:17
132:17,21
133:5,13,18
134:6,20,22
159:23,25
160:1,12 166:8
166:17,19
167:6 172:13
176:9 183:13
213:25 235:18

249:18
celsius' 160:8
  160:17
cent 60:13 64:4
  67:16,18
center 38:11
centerview
  154:21 156:3,5
  156:6,7,17,19
  156:21 164:24
  165:11 167:3
  172:17 180:19
central 92:1
cents 19:3,13
  24:7,11,12,13
  25:9 57:18
  61:20 62:4,20
  64:23,23 67:5
  67:8 191:19
ceo 8:25 9:5,5
  9:11 27:17,18
  102:14,17
  105:24 127:8
  129:11 142:12
  142:12 143:10
  178:6
cerberus 9:9
certain 34:22
  75:22 101:21
  102:11 146:21
  148:13 152:20
  205:12 211:14
  243:13
certainly 7:9
  7:15 62:11
  63:6 95:13,14
  128:21 181:8

193:14 219:19
  223:10 237:4
  241:23
certainty 161:9
  177:16
certification
  195:11 197:17
  197:23 201:12
certified 251:3
cetera 10:11
  17:8 18:12
  19:10 36:3
  43:7 48:1 55:3
  60:1 70:19
  79:16 101:22
  102:24
cfo 9:4 129:12
chains 175:5
chairs 9:16
  105:24
challenge
  230:5
challenging
  226:4
chance 80:25
  110:24 121:7
  224:18 236:4
change 118:23
  140:4 141:16
  141:19 147:20
  149:11 151:10
  201:6
changed 201:5
  201:9,11 226:6
changes
  149:12 201:22

changing
  149:17
chapter 62:7
  62:11 63:16,17
  63:23,23
  127:16 156:20
  160:3 174:8
  178:4,15
  183:13,21
  203:8 205:14
  205:20 207:1
  207:19 210:5
  213:7
characterized
  234:20
charge 92:2
charged
  214:16
chart 118:15
  146:3,18
  147:16 148:20
  206:14 209:7,9
charts 122:12
  187:24 188:1
  188:22 206:13
check 107:2,2
  107:25 245:5
  245:12
checks 243:13
  243:14 244:18
  244:24 245:8
chedal 70:11
chief 8:25 9:1
  220:6 249:5,16
choice 50:6
  164:20

choose 130:13
  232:20 235:7
chose 172:8,15
  232:22
chosen 135:18
  140:25
chris 3:8 6:21
  8:2 92:17
  249:17
christopher
  3:21 8:25
circa 123:4
circulate
  243:22
circulating
  57:16
circumstance
  25:22
circumstances
  92:20 171:11
citibank 68:10
civil 5:17
claim 190:19
  198:20 199:2
claims 41:15
  60:6 62:3
  72:21,21 73:3
  73:13 76:17,23
  183:6,16,22,25
  184:16 185:11
  185:12 186:7
  192:4 194:18
  195:15
clarification
  213:5
clarified
  200:16

**clarify** 20:12
82:17 199:13
200:4,7 213:5
**clarifying**
135:13
**class** 58:1,22
60:14,15,21
61:6,9 62:3,8
62:13 63:7,11
74:24 111:20
112:22,23
186:22 190:19
191:10 192:5,8
193:4,5,9
195:3 198:19
198:20 199:1
199:13,19
200:14 201:13
201:14,14,15
**classes** 111:18
111:20,25
112:3,5,16,17
174:22 176:25
185:13 186:9
186:10,11,13
186:13,19,25
187:4 188:5,6
193:2 197:7
198:25
**classify** 183:25
185:12
**clause** 54:25
**clean** 77:4
172:1
**clear** 5:24 7:11
15:20 19:4
22:19 46:3

47:15 80:13
100:8 140:11
141:11 151:1
163:25 205:25
**clearly** 108:13
**clerk** 8:13
113:6,10
122:20 126:22
154:8 155:3
177:7 181:21
182:19 198:7
200:23 202:14
213:17 214:24
246:1
**clerks** 126:21
**click** 190:3
**client** 224:5,15
225:2,2
**clips** 249:11
**close** 34:12
44:7 87:17
164:17,21
**closed** 24:8
25:10
**closing** 67:16
90:23 117:5
193:13
**closure** 15:11
198:16
**cnl** 167:22,23
168:3 178:3,14
213:6
**cochairs** 72:24
**code** 50:9
**coercive** 73:16
**cognizant**
237:7

**cohen** 16:15
173:5,7,9,13
173:16,16,18
173:19,22,24
174:4,9,13,17
174:22 175:3
175:15,20
176:4,10,15,18
176:23 177:1,8
177:10,14,17
178:5,5,9,12
178:16,18,23
179:14,19,24
180:3,15,21
181:6,11,15
182:2 214:6
**cohen's** 176:12
**cohost** 177:4,7
**coin** 59:25
124:14
**coinbase** 27:14
37:23 43:1
50:24,25 51:5
51:15 52:5
76:8
**coins** 38:11
56:22 62:15
64:7 91:17
120:16 175:4
**cold** 196:3
**collaborative**
203:19
**collaboratively**
6:23
**collateral** 78:7
79:12 84:2,12
84:17,20 85:1

85:4,7,8,10,16
85:17,18,20,23
85:25 86:2,9
86:12,14,16,19
86:22,23 87:1
99:21 100:5
**colleague**
182:6 202:5
206:2 212:3
**collected**
162:12
**collective**
164:7
**colloquy** 50:10
50:14
**colodny** 3:16
28:18,19,24
29:4,6,9,22
30:4,8 54:5
57:5 58:7,18
58:23 59:12,17
60:17 63:14,19
63:25 105:13
125:2,9,13,16
135:2 187:16
194:13,20
195:7 200:7
210:12 215:24
215:25 216:1,6
216:10,19,22
217:7,10,14,20
217:22,24
218:6,9,11
229:25 244:5
245:2 249:1,2
249:9,10

**colodny's**
244:4
**combined**
31:18 68:18
**come** 5:23 6:4
6:5,11 8:3 9:6
16:16 32:2
42:8 44:23
46:4 61:15
62:21 64:7
77:3 96:17
103:18 110:12
115:6,7 153:3
163:7 173:7
175:3 247:5,19
**comes** 85:4,7
85:10 93:25
100:20 106:10
121:19 142:1,3
143:4 246:5
**comfort** 15:11
54:23
**comfortable**
46:16 76:21
119:13 141:22
141:25 145:3
**coming** 120:21
137:2,4,7,16
144:14 158:10
247:2
**comment** 75:2
**comments**
74:22,23
234:22
**commit** 15:15
**commitment**
144:20

**committed**
98:22 129:17
129:20 130:14
**committee**
3:12 5:5,15,20
5:25 6:8 9:15
9:16 14:14
22:11 28:9,15
36:15 48:1,7
52:18 54:8
72:19,24 77:3
77:12 103:21
105:11,22
106:17 108:19
125:1,10,10
135:1 138:25
139:2,4,5,8
140:6,11,16,20
140:22 141:17
144:17,18
163:13 164:8
164:14,22
169:14 170:4,8
177:20 187:15
200:1 210:11
216:2 218:18
218:20 224:15
225:3,5 226:12
226:23 227:4
227:10,17,19
228:11 229:13
229:17 230:12
230:20 231:25
234:12 238:7
238:16,20
243:11 244:16
246:21

**committees**
40:20,20,23
41:1 249:16
**committee's**
170:10 244:13
244:13
**communicated**
25:8
**communicati...**
71:15 225:11
**community**
105:7
**companies**
92:2 95:24
127:13 156:8
156:18 165:23
171:19,22,23
172:8,12
207:21 208:14
210:1 212:13
212:15,19
**company** 9:2
16:9,14,17
17:10 23:20
27:9 28:21
35:14,25 69:25
94:4 96:1,2,3,8
96:10,17 97:1
97:2,9,11 98:7
98:16 101:5
102:19 108:21
111:7 140:2
142:5,14 143:7
144:20 159:20
160:13,24
165:8,17
171:24 174:10

174:14 180:12
180:13,14,16
180:17,19,19
240:1 242:20
**company's**
159:18
**comparable**
171:3,18,19,23
193:2
**comparables**
172:5 203:21
**comparative**
222:11
**comparators**
213:20
**compare**
118:25
**compared**
180:7 205:18
208:11
**compares**
205:20
**comparing**
118:17 207:16
**comparison**
207:17 208:7
212:14
**compensated**
39:16
**compensation**
97:9,12,20,21
97:25 98:5,10
98:12,16,20,21
98:23,24 99:1
99:4 103:17
204:3 206:18
208:9,12,13,18

209:4,16 240:1

**compensations**
97:14

**competing**
205:21 210:1
235:12,19

**competitive**
121:9 128:17
132:6 151:12
161:12,22
162:4 209:24

**compilation**
30:19 82:19
83:5

**compile**  247:20

**complete**
110:11 138:11
235:11

**completed**
190:3 198:24
249:15

**completely**
96:9,20 138:6

**complex**
116:12 150:13
168:23

**complexity**
169:3

**complicated**
169:2

**component**
46:15 75:13
208:17

**components**
93:6 98:3,12
98:24 99:4,5
116:15 123:7

123:13

**composed**
163:1

**composition**
139:6,6 141:21
141:22 142:2

**comprehensive**
160:16 243:12
244:17

**computational**
114:25 115:1

**compute**  115:9

**computed**
171:8

**computing**
165:24

**concentrations**
97:16

**concern**  18:7
233:23

**concerning**
18:23

**conclude**  209:1
210:3 249:5

**concluded**
209:2 210:4
250:18

**concludes**
31:17 215:6

**concluding**
74:18

**conclusion**
58:8,19 61:4
84:8 87:3 91:2
177:15 178:20
190:22 247:2

**conclusions**
204:23

**condition**
83:18

**conditions**
80:18 83:19
87:19 96:13
151:10,19

**conduct**  40:3,4
243:12 244:17

**conducted**
162:10 220:23
243:15 244:15
244:24

**confer**  31:17

**conference**
222:20

**confidence**
238:22

**confirm**  34:8
34:13,17 45:25
46:1 192:6,10
219:25

**confirmation**
2:2,5 6:25 11:3
14:1,4 30:15
31:2 38:15
45:6 54:15
221:13

**confirmed**
27:10 45:14
48:22 103:4
104:9 129:9

**conflict**  14:20

**confused**  30:25
74:2 241:1
244:19,22

**confusing**
187:22

**confusion**
200:9

**congratulatio...**
135:21

**conjunction**
23:5

**connection**
158:23 183:20
184:8 185:13
198:22

**consecutive**
240:2

**consensual**
15:16 20:3
43:10,18 73:12
73:15,20 74:19

**consent**  89:13
90:3 139:8,11
140:21 141:13
153:5 235:5

**conservative**
153:8

**consider**  79:11
84:12 85:16
86:9 88:23
124:16 159:10
159:11,11
225:18 239:19
240:4,11

**consideration**
15:7 34:20
35:2 36:7,23
37:5 38:18,18
39:9 41:5,10
41:25 42:1

172:8 174:18
227:6 232:23
**considered**
209:24 230:21
233:25 239:13
248:13
**considering**
92:20 228:21
**consistent**
72:21 73:3
79:16 119:2
156:17
**consolidated**
220:7
**consortium**
35:21 36:7
**constant**
115:14 150:1
150:17 151:21
152:9,25
**constructing**
140:10
**consultant**
103:18 104:25
**consultation**
165:16 174:10
**consulting**
49:20,24
173:20 174:6
**consumer**   5:6
**contact**   185:15
228:4,13
**contacted**
157:14
**contained**
145:25 163:20
197:6,7 204:23

**contents**   13:11
167:22
**contested**
64:16
**context**   86:15
189:1,24
190:14
**contexts**
203:25
**contingencies**
162:18
**contingent**
158:9
**continue**   20:21
42:13,20,23
43:3,4 78:24
86:21 89:23
90:18 130:15
215:8
**continued**
14:12
**continuing**
5:14
**contract**   54:24
68:5 69:5,8,11
69:12,16,23
76:5 77:19
**contracts**
14:14 69:14,15
77:18 117:10
132:14 138:9
**contractual**
38:14,16
112:12
**contrast**   88:3
**contributed**
36:11 75:15

**contributing**
131:3 144:16
**contribution**
41:15 76:19
**contributions**
41:7 42:19,22
43:3 44:10
77:21 123:6
**control**   24:1
58:16 69:5,23
88:19 140:1
**controlled**
83:21
**convenience**
198:19
**conversation**
65:13
**conversations**
9:15 66:16
94:10 105:8
106:21 225:25
226:2 228:15
**convert**   62:22
**converted**
35:16 61:17
64:11
**copies**   29:7
217:4
**copy**   5:10
19:20 21:5
23:8 33:11
54:4 81:25
132:21,23
133:20 155:17
166:9,10,23
176:11,14
184:23 204:14

217:8 219:9
221:17
**core**   115:11
117:1 129:2
**cornell**   4:3
31:24 32:3,4,4
32:8,11,17,22
33:1,4,6,11,14
33:18,22 34:3
34:6,11,15,19
34:25 35:6,20
36:6,18,22
37:13,17,24
38:2,12,17,23
39:2,6,8,15,19
40:17,23,25
41:13,18,22
42:2,14 43:2,8
43:14,16,20,25
44:4,8,15,22
44:25 45:5,9
45:21 46:6,11
46:18 47:19
48:2,10,13,21
49:4,7,10,12
49:15,22,24
50:2,4,19,23
51:4,14,19
52:2,7,11,16
52:20,24 53:2
53:8,12,15,18
53:23 54:4,11
54:13,18 55:4
75:5,16 125:17
125:18 135:4,5
135:6,9,11,11
135:19 167:14

187:17,18,18
188:1,7,19,25
189:5,8,10,12
189:14,22
190:14,22
191:2,6,13
210:13,14,14
210:25 211:5
211:14,19,24
212:5
**corner** 120:5
**corporate**
156:11 230:23
**correct** 6:3
10:17 17:15,19
34:14,18 58:6
58:17 64:10,15
64:21 70:13
74:1 85:5
95:15 98:20
99:2 100:8
111:11,12,13
112:7 124:8,9
124:17 125:12
139:14,20
142:7 146:5,16
147:2 167:24
171:6 178:22
186:23 187:1,2
187:5 191:21
192:12 194:4
198:18 199:16
200:20 211:13
216:19 218:15
218:16 222:12
234:12 235:2
239:14 246:15

**correctly** 36:4
178:6
**correlating**
118:18
**corresponding**
85:15
**cost** 94:22 98:6
98:7,16,17
121:15 122:7,8
152:11,19,21
152:21,22
207:7,10 247:6
**costs** 17:25
18:3 27:2 94:2
114:7,10
151:14
**could've** 71:13
**counsel** 81:16
184:9 198:23
243:11 249:25
**count** 186:14
191:5 192:9
**counted**
196:13
**counter** 76:7
**counterparty**
115:16 116:24
**country** 222:6
**counts** 201:15
**couple** 10:19
13:24 19:16
24:8 32:14
86:18 111:15
123:14 183:18
205:1 238:3
**coupon** 175:23

**course** 9:12,25
10:14 17:14
40:15 93:17
105:2 149:20
212:22 222:12
**court** 1:1,12
5:3 6:16,19 7:4
7:7,10,19,24
8:3,7,9,11,14
8:17,19,21
10:17 11:17
12:16 13:19
14:1,2,4,25
15:5 19:22
20:9 21:12,15
23:14 25:4
26:8,18 27:21
28:14,18,23
29:3,5,7,14,15
29:25 30:1,7
30:13,22,25
31:3,5,9,11,15
31:23 32:7,9
32:19 36:19
39:22 40:1,8
40:16 45:17
46:19,23 47:6
47:6,10,10,11
47:12,17,20,23
47:24 48:6
49:2,5,8,11,13
50:7,20 52:17
52:22,25 53:5
53:9,14,17
54:2,7,12 55:6
55:9 56:9,24
57:7 58:9,11

58:20,24 59:14
59:18 60:2,18
60:23 61:3,22
62:1,18 63:10
63:15,20 64:1
64:23 65:2,6
65:14,19,24
66:7,9,23 67:1
67:20,25 68:3
68:24 69:2,13
69:20 70:24
71:1,3,8,11,18
71:20,23 72:1
72:4,8,12,17
73:18 74:8,11
74:15,17 75:9
75:21 77:9,23
78:2,10,12,18
79:4,8,21,25
80:4,16,20,23
81:5,9,12,15
81:19 82:1,4,7
82:10,12,16,24
83:2,4,9,12,16
84:9,21 87:4,6
87:12,14,18
88:2,12,22
89:2,5,7,11,16
89:19,23 90:2
90:6,9,12,15
90:22 91:7,11
92:3,6,9,14
93:1,14,17,21
94:6,18,25
95:2,5,12,19
96:5,8 99:6,17
100:10 101:10

| | | | |
|---|---|---|---|
| 101:25 102:3,6 | 145:17 146:11 | 195:9,12,18 | 240:10 241:12 |
| 102:21 103:23 | 146:14 147:4 | 196:2,9,17,20 | 241:15 243:2 |
| 104:18,22 | 147:25 150:7 | 196:23 197:3,9 | 243:25 244:8 |
| 105:14,16,19 | 150:10 152:2,6 | 197:12 198:1,5 | 244:21 245:3 |
| 107:5,10,14,16 | 153:10,14,20 | 198:9,13 199:5 | 245:15,19,21 |
| 108:2,12,20 | 153:23 154:6 | 199:8,24 200:6 | 245:24 246:3 |
| 109:1,3,8,13 | 154:10,12,15 | 200:11,18,21 | 246:11,13,18 |
| 109:15,23 | 154:20,22 | 200:24 201:3 | 247:8,10 248:5 |
| 110:6,18,21,24 | 155:4,8,13,16 | 201:19 202:1,6 | 248:9,19,24 |
| 111:3 112:19 | 155:18,20,24 | 202:10,16,20 | 249:6,8,13,20 |
| 112:24 113:4,8 | 156:1 161:14 | 202:24 204:19 | 249:22,25 |
| 113:12,18,22 | 162:22 166:19 | 205:8 206:20 | 250:7,14 |
| 118:2,4,6 | 167:8,12,15,18 | 210:11,13,21 | **court's**  215:7 |
| 119:17 120:19 | 168:9,12 | 211:10,22 | **courtroom** |
| 121:4,24 122:1 | 169:25 172:23 | 212:6,11,23 | 107:16 154:23 |
| 122:3,17,21 | 173:1,7,9,12 | 213:1,9,12,14 | 167:16 177:24 |
| 123:8,15,18,21 | 173:15 176:21 | 213:18 214:3,8 | 212:7 |
| 123:24 124:1,5 | 177:6,19,23 | 214:13,19,22 | **courts**  140:4 |
| 124:7,10,15,18 | 178:1,10 179:3 | 214:25 215:2 | 184:1,9 |
| 124:22 125:1 | 179:6,11,13,15 | 215:10,15,18 | **covario**  227:23 |
| 125:17,19,21 | 179:17 180:10 | 215:21,24 | 227:25 228:3,9 |
| 126:1,3,5,12 | 180:23 181:2 | 216:5,9,16,20 | 228:17 |
| 126:18,23 | 181:19,22,25 | 216:23 217:3 | **cover**  76:22 |
| 127:1,4 130:7 | 182:4,7,10,13 | 217:12,15,21 | 134:2 |
| 130:19 131:14 | 182:18,21,24 | 218:1,5,8,10 | **covered**  75:5 |
| 132:19 133:7 | 183:1,3 184:17 | 218:14,19,21 | **covering**  122:7 |
| 133:20,24 | 184:22 186:8 | 218:24 219:4,7 | 122:8 |
| 134:19,19,25 | 186:16,21,24 | 219:11 221:25 | **covers**  125:13 |
| 135:3,5,7,21 | 187:2,6,10,14 | 223:18 224:1 | **create**  164:1 |
| 135:24 136:18 | 187:17 189:3,6 | 224:13,23 | **created**  47:3 |
| 137:20 138:13 | 189:9,11,13 | 225:1,13,15,21 | 185:18 |
| 138:16,19,22 | 190:6,10,17,21 | 228:7,20 229:4 | **creating**  16:19 |
| 139:4 141:7,10 | 191:1,4,15,17 | 229:6,11,20,24 | 65:15 |
| 141:14 142:17 | 191:23 192:2 | 230:2,8,17 | **credit**  93:8 |
| 142:19,20,24 | 192:16,20 | 234:22 237:24 | 107:1 |
| 143:1,12,15,18 | 193:7,12,19,22 | 238:1,5,13,25 | **creditor**  22:11 |
| 143:21 145:15 | 194:2,6,9,25 | 239:4,19,22 | 58:5 63:17 |

64:3 65:8 69:1
78:1 92:15
100:22 106:2
106:12 111:2
112:16,16,22
113:15,16
180:5 196:22
213:19 235:19
235:20 237:11
**creditors**   10:6
14:10 28:11
37:20 38:22
46:8,14 48:16
73:6,8 75:19
101:11 106:3
111:17 112:5
112:11 128:20
130:2,4 139:4
139:5,16,18,23
140:14 156:9
156:18 157:24
158:16 159:25
160:1 161:2
163:12 164:7
164:10 169:6
169:14 197:14
197:21 198:16
228:13 232:13
233:19 234:11
235:8,13,13,16
235:21,21,23
236:1,7,13,19
236:21 237:15
237:20 238:12
240:23 241:4,5
241:6,8 247:14
248:12

**creditor's**
170:8
**criminally**
214:16
**crisp**   152:3
**criteria**   106:16
212:18
**critical**   36:16
46:7 48:15
75:13,18,21,23
75:25 76:1
**cro**   9:11
**cross**   5:8,25
6:1,4,7,10 7:12
28:14,16 55:7
65:3,4,20 66:3
68:24 71:20
77:24 78:13,15
78:21,23 79:1
79:4 92:9
104:19 110:21
113:5 118:8,11
122:17 134:25
135:22 138:19
145:9 154:7
167:13 168:10
170:18 172:24
177:19 179:4
180:24 181:20
187:14 198:2
202:1 210:10
212:7 213:2,14
214:23 216:21
216:24 217:2,5
217:19 245:23
245:24

**crowded**
212:24
**crown**   27:4
**cruz**   213:17,18
213:19,19,24
214:4,8,15,20
214:22
**crypt**   167:23
**crypto**   15:20
16:18 24:4
35:13 39:13
42:12 46:4
51:3 69:8
103:9 127:14
128:10 194:19
195:15
**cryptocurrency**
10:8 38:22
174:23 175:2
175:13 180:7
195:21
**cups**   127:2
**currencies**
124:4
**currency**   181:3
181:9
**current**   96:21
115:20,25
117:14 119:21
121:9 153:7
165:19,20
171:4 215:19
220:5 242:17
**currently**
27:22 44:19
45:1 142:10
188:14 208:15

211:15 219:1
219:23 220:6
**curtail**   18:1
120:13 121:14
121:14
**curtailed**
122:13
**curtailment**
122:5,6
**curve**   40:14
**custodian**
51:11,12,16,18
**custody**   27:14
52:6 55:13
56:4 58:1,4,14
58:15,22 59:1
59:4,8,21,22
60:4,6,10,14
60:15,19,21,24
61:6,9 62:3,8,9
62:12,13,15,21
62:25 63:1,7
63:11,17,22
64:3 192:4,5
192:17 193:4,9
**custom**   185:18
**customer**
213:25
**customers**
18:14 38:11
51:3,10 59:8
61:12 103:10
**cut**   66:7 108:12
117:19 120:11
175:10
**cvs**   140:24
220:23

**cycle**  115:16
116:8 120:20
120:21,22

**d**

**d**  5:1 84:24
87:20 113:11
170:17 234:8
**dani**  2:24
251:3,9
**data**  147:22
165:25 166:1
171:16 172:3
172:11 208:9
**date**  19:1,3,6
23:19,23,23
24:5 25:7,15
25:15,15 26:22
27:24 38:6,15
44:11,12,24,25
45:7 52:8,21
56:6 61:12
62:3 64:4,10
64:15 66:25
67:6,17,18
68:13 89:22
96:11 117:6
124:19 125:14
125:14 135:18
175:11 183:15
185:14 191:25
**dated**  178:4
**dates**  103:8
211:11
**david**  199:11
**davis**  4:6 65:4
65:6,7,8,10,11
65:23 66:5,8

66:10,18,24
67:4,9,14,21
68:4,11,15,22
**day**  6:19 9:4
16:21 17:1
19:12 24:9
25:10 56:19
59:2,6 113:14
215:11 249:13
250:17
**days**  61:11,13
61:16 62:22
64:7,9,11
117:4
**de**  4:11 196:21
**deactivation**
62:3 64:5,10
**deadline**
145:10 162:11
**deal**  117:5
128:20 130:12
131:17,18
144:15
**deals**  50:24
239:11
**dealt**  147:15
**deanna**  113:9
198:5
**debt**  16:22
17:23 99:24
100:2 156:3,15
158:17,17
**debtor**  5:5,19
5:24 6:8 15:25
34:21 76:7
77:12 79:3,11
80:2,10,22

81:3,3 84:12
85:9 86:10
89:8 91:13
104:25 148:12
169:20 170:4
170:17 203:15
215:15 249:16
**debtor's**  84:14
85:17
**debtors**  1:9 2:1
2:5 3:4 5:15
6:22 8:1 9:12
10:15,17 11:15
11:19 12:14,18
13:17,21 14:3
14:13 15:8,8
18:8 19:18
21:10,18 23:12
23:16 26:13
30:17,18,21
31:8,12 33:8
34:21 35:3
36:8,8,25
38:14,19 41:14
42:19,22 44:2
47:25 48:7
51:7 52:18
53:24 54:8
58:16 76:2
77:19,20 80:18
80:20 81:16
99:8 125:10
126:10,16
128:12,23
133:5,9,13
144:18 145:8
155:6,6 156:22

157:1,2,5
158:16,22
164:7,16
165:16 166:22
166:24 168:19
169:13 170:21
173:5,5 175:19
176:20 182:15
183:16,24
184:19 185:10
185:10,14,15
189:18 198:23
202:8,9 203:3
203:9 204:8,11
204:17,21
205:21 206:25
207:4,11,16
208:11 210:11
211:20 215:6
**debtors'**
146:18 164:17
164:24 165:12
174:20 175:2
176:3 177:4
184:9
**decade**  9:6
**december**  17:4
158:3
**decided**  60:14
121:16 138:24
215:11 223:14
233:2,15
235:20 237:12
241:4
**deciding**
246:20

**decision** 139:1
140:18 169:16
169:19 223:1,5
223:8,10 226:4
226:8 227:4
**decisions**
149:12 229:2
**declaration**
10:24 11:2,8
11:21 12:3,8
12:20,24 13:2
13:12 18:23,25
30:11,13,15,16
31:2 33:7,15
33:18,24 34:20
39:20 40:19
42:17,18 45:23
48:14 56:1
72:6 81:5 99:8
99:13 101:9
122:23 123:8
132:19,22,23
133:2 145:5
166:9,10,13,15
168:15 176:12
176:14 184:19
184:24 185:1
187:8,23
188:23 189:10
193:25 194:1
204:7,15,24
205:2,23
206:20 208:2,5
212:16,18
219:9 221:2
222:8 229:22
229:25 231:9

232:4,17
234:15 239:12
242:14 248:20
**declarations**
8:6 10:16
13:23,25 72:8
**decline** 152:24
**declined** 49:19
57:20 162:6
**decrease** 42:12
115:16 150:18
150:21,22
151:1,2
**decreased**
233:7
**decreases**
150:17
**deemed** 74:25
**deep** 70:20
**deeper** 147:22
**default** 180:8
**defensive**
121:12,23
**defer** 126:8
148:10
**deferred** 85:14
169:21
**defi** 70:12
**define** 80:1
**defines** 239:10
**definitely**
103:10 233:24
**definition**
111:20
**definitions**
83:23,25

**defiore** 248:12
**defraud** 22:2,5
**degree** 169:5,5
177:16
**delco** 216:3
**deliberation**
232:5
**deliberations**
170:10 239:20
**deliberative**
237:9
**delisted** 69:25
**delivering** 17:9
**delivery** 88:19
161:1
**demonstrative**
177:5,9
**demonstratives**
2:2
**dependent**
70:7
**depends** 94:21
116:9,11
**deploy** 117:3,3
**deployed**
116:23 117:7
**deploying**
102:22
**deployment**
115:10 117:9
**deposits**
123:18,19
214:1
**depth** 94:12
**depths** 70:19
**describe** 9:10
14:2,17 15:4

16:9 19:5 22:5
26:17 68:4
105:11 123:9
128:15 157:9
158:22 161:5
161:19,22
167:2 170:2
177:8 185:5
203:5 207:16
220:20 223:4
**described**
14:19 122:24
163:14 177:12
207:25
**describes**
123:5
**description**
106:15 134:10
247:13
**designee**
136:14
**desirable**
120:13
**desired** 49:25
**desiring**
233:10
**desk** 32:1
65:22,25
**detail** 103:19
**details** 10:14
48:19 56:8
59:25 69:9
77:17 101:6
106:20 147:18
212:4
**determination**
114:2,14

169:14 240:3

**determine**
114:2 149:19

**determined**
9:25 97:6,17
111:25 116:13
130:9 198:19
234:10 240:16

**determines**
80:10 115:2

**determining**
169:22 203:7
247:1

**develop** 9:23
203:7,21
212:19

**developed**
203:10,18

**developing**
97:6 203:14

**development**
112:7

**dial** 152:1

**didn't** 222:22
227:2,8 233:11
233:21 243:23
248:17

**difference**
54:19 73:15
100:18 112:15
112:16 119:23
209:9

**differences**
35:15 100:19
164:5

**different** 13:24
18:18,18 26:22

35:12 41:1
54:14 56:25
57:1 70:17
76:7 88:7 89:4
91:13 93:7
98:12 115:4,5
116:11 131:9
139:22 144:22
150:13 151:9
153:1 171:2,10
175:5 187:21
209:25 247:19

**difficult** 17:2
158:12

**difficulties**
116:25

**difficulty**
116:1,8 119:15
119:22

**difiore** 232:1
236:23

**digital** 35:25
84:3 89:13
90:3 163:6
174:23 181:3,8

**diligence**
157:25 158:2
159:14 162:10
162:19

**diluted** 98:8

**dimitry** 4:5
55:8 180:25
191:16

**direct** 5:10 6:2
6:10 13:15
34:3 126:10
152:7,11

217:16,17
234:20 243:17

**direction**
152:17 153:1

**directive**
191:24

**directly** 108:23
109:20

**director** 9:7,8
183:5 202:22
237:15,20
239:12,17,25
240:6 242:22

**directors** 72:15
235:1,9 239:6
239:11,14
240:13,19,24
241:8,9 243:20

**disagreements**
31:20

**disbursement**
59:2,6

**disclose** 215:9

**disclosed** 215:7

**disclosure**
24:18 25:21,23
26:1,2,3 92:17
113:21 123:9
133:14,17,17
136:4,4 145:6
145:7 146:3,15
146:19 163:14
166:3,24
172:10,18
179:9,20,23
184:1,10 185:8
185:9 196:8

201:7

**disclosures**
96:15

**disconnects**
124:20

**discount**
100:24 175:16
176:1,6 195:25

**discounted**
123:16 165:14

**discounts**
101:21 159:19

**discovered**
209:14

**discreet** 51:1

**discretion**
210:25 211:1

**discretionary**
98:1,11 210:17
211:6,7

**discuss** 35:2,6
44:9 49:16
72:23 105:23
205:1 211:20

**discussed** 35:7
36:24 37:4
72:19 131:18
199:25 209:15
223:11 233:16
241:21

**discusses**
232:18

**discussing** 33:9
73:11 94:1
131:21 237:10
241:18

**discussion**
66:17 96:20,23
211:22 225:19
235:10 239:8
**discussions**
14:12 94:5
111:24 112:2
139:2 144:17
144:21 184:9
220:24 227:9
227:13 232:9
**disgruntled**
238:6,9
**disinterested...**
229:22
**dislocated**
91:22
**display** 208:5
**disproportio...**
137:24
**disqualify**
172:11
**disregard**
172:5
**distinct** 170:11
**distinction**
79:18 164:16
**distinctions**
54:16
**distinguishing**
91:13
**distinguishm...**
240:23
**distress** 205:18
**distressed**
206:18,19
210:5

**distribute** 10:7
51:12 59:8,23
59:25 60:4,9
60:19,24 61:8
62:22
**distributed**
10:6 37:22
48:16 59:1,4,4
59:6,10,16
61:18
**distributing**
15:19 46:4
**distribution**
26:23 27:13,25
35:13 36:3
37:19,20 38:4
38:5 39:11,12
42:25 46:16
48:25 51:9,16
51:17,18,25
52:3,5 61:12
61:14,15 76:14
77:20 104:13
112:23 125:8
125:12 179:10
179:18,21
180:7 194:1,7
194:17 196:8
**distributional**
172:19
**distributions**
42:5 46:13
77:13 125:4,6
**district** 1:2
**diverse** 223:21
**diversity**
239:13 240:14

**divided** 111:17
**dividing** 112:5
**dixon** 4:15
104:24 135:23
135:24 136:1,3
136:9,17,25
137:8,14,25
138:7,17
**doc** 2:1,5
**docket** 20:2
29:10 30:17,18
30:20 33:7,16
65:11,14,21
66:1 78:9,13
78:24 79:3
82:20,20
132:22 133:14
145:22 176:13
184:19 206:22
215:7 217:1,4
217:24 218:1,3
229:23 243:19
244:6
**document** 2:3
2:6 5:8,8 11:25
20:15 21:16
22:11,12 74:12
74:12 78:13
79:5 83:21
89:12,20,25
90:24 91:1
118:10 166:25
194:21 195:7
204:4,6,10,12
221:4,7
**documents**
28:20 65:20,25

66:2 78:19,22
78:25 79:9
80:21 118:7
193:15 196:3
**doesn't** 244:2
**doing** 27:8
51:15 104:14
107:24 118:14
131:6 136:3
174:4 188:11
195:20 222:3
**dollar** 57:21
186:14 192:7
**dollars** 16:19
159:2 163:24
178:21
**domestic**
100:18
**don't** 149:17
150:7,8 154:8
171:16 178:12
179:24 180:3
181:21 224:17
225:23 226:2,8
228:14,14,15
229:4,24 231:1
231:4,4 234:21
238:17 239:9
244:1,21 245:5
245:10,15
246:14,14
249:18 250:1
**doubles** 100:4
**doubt** 195:14
**dow** 4:14 113:6
113:10,12,14
113:15,19,25

114:13,18
115:8,19,25
116:5,7,10,16
117:11,20
118:1,2,3,4,5,6
118:13,21
119:3,8,12,17
119:20 120:3,7
120:19,20
121:1,6,24,25
122:1,2,4,19
199:7,7,10
200:22,25
201:4,18,19,20
201:25
**downside**
17:24 18:2
**drafted** 33:19
103:19
**drafting** 34:8
103:16
**dramatic**
122:12
**drill** 207:15
**drink** 65:10
**drive** 10:5
115:15 152:19
164:9
**driver** 105:22
105:22 117:17
**drivers** 114:13
**driving** 37:9,9
122:14
**drop** 117:1
148:3
**drove** 36:13
121:3

**due** 222:11
**duffey** 248:13
**duffy** 232:1
236:22
**dug** 75:16
**duty** 219:2
**dynamic**
149:13
**dynamics**
149:17

**e**

**e** 1:21,21 3:1,1
5:1,1 76:2
113:21 145:6,7
145:20 146:2
146:14 198:24
198:25 217:8
217:23 218:5
234:8 251:1
**earlier** 42:16
44:18 75:12
97:5 105:23
111:6 130:18
130:22 135:13
159:4 189:2,16
199:25 204:5
207:25 246:23
**early** 37:9
103:1
**earn** 26:10
41:3,5 106:12
109:25 110:12
110:14,15
113:15 131:1
158:7 210:22
**earned** 210:23

**earnings** 17:23
**easily** 48:12
**eastern** 19:2
**easy** 15:20
42:17 214:8
226:8
**eat** 121:20
**ebitda** 17:3,3,5
17:13 122:15
**eccf** 243:19
**ecf** 5:8 21:16
33:16
**ecf3584** 248:21
**ecf3784** 248:22
**economic**
25:13 122:13
132:15 169:12
**economically**
121:14 169:20
**economics**
117:10 160:2
**ecosystem**
124:2
**ecro** 1:24
**ecuador** 110:1
**editorial**
234:22
**educating**
105:7
**educational**
93:17
**effect** 77:14,15
**effective** 26:22
27:24 38:6,15
44:11,12,24,25
45:6,14 52:8
52:21 61:11

117:6 125:14
135:18
**effectively** 26:5
26:25 55:1
115:2 123:4
161:1
**efficiency**
116:14 152:17
**efficient**
120:12 132:6
132:13
**effort** 16:3
17:7 27:11
98:22
**efforts** 6:13
43:1
**eight** 10:4
159:1 171:22
172:3 231:24
**eip** 204:23
205:5,16 206:1
208:9 209:1,12
209:16,22
210:3,6,16,17
210:25 211:5
211:15,25
**either** 37:22
51:24 178:12
200:15
**elaborate** 42:6
**elastic** 120:18
**elect** 112:22
130:14 172:4
200:15
**elected** 180:6
194:19 195:5
244:14

**election** 179:10
180:8 190:2,13
190:14,17,19
194:1,7,17
195:21,22
196:1,8 198:20
199:15,22
**elections**
198:15
**electronically**
110:5 190:6
**element** 41:10
**elements**
114:11,11
146:25 150:5
150:21 151:9
**eligible** 84:3
99:5
**elizabeth** 3:8
200:12
**ellis** 3:3 6:22
8:1 51:22
126:9,15 155:5
173:4 182:15
200:13 202:8
215:6 249:18
**else's** 86:3
**email** 185:16
188:11,14,16
244:4
**emanual**
140:17
**emergence**
16:8 27:9
102:8 103:12
129:22 130:11
130:23 135:15

135:16
**emergency**
228:5
**employed**
152:18
**employee**
26:14 28:2
47:3,25 97:22
97:22 242:17
242:17
**employees**
15:12 27:21
42:24 47:25
61:14 96:25
98:1,5,13,22
99:4 203:2
**enable** 132:5
195:23
**encompass**
181:13,15
**encompasses**
26:21
**ended** 161:12
182:3
**energy** 93:7
116:13 120:15
172:1 207:20
**engaged** 163:8
163:9 183:15
183:22
**english** 199:12
209:20
**enhance** 131:4
**enhanced**
123:17
**ensure** 46:7
185:14 207:23

209:3
**ensuring** 75:18
**entails** 222:5
**enter** 213:7
**entered** 166:18
167:7 178:15
**enterprise**
130:6 158:8,9
158:14 165:5,6
165:11,19,21
165:21,23
180:12,16,20
**entire** 17:3
118:16 180:16
180:20
**entirely** 163:19
**entirety** 52:3
68:19 158:4
**entities** 44:11
44:13 45:2
70:17
**entitled** 73:13
101:21 179:9
184:2 185:12
190:20 211:11
**entity** 35:21
52:8 92:1
128:25
**entries** 66:1
**entry** 82:21
**environment**
15:19 117:14
121:9 149:13
**equal** 150:19
150:21 151:1
171:14

**equate** 115:22
**equitable**
96:23
**equity** 35:14
35:17 69:24
98:2,5,11,16
99:2 130:2
138:11 157:23
158:16 161:1
195:16 196:1
238:22
**equivalent**
169:21
**escalate** 116:8
**especially**
106:10 129:3
**essential** 78:22
92:23
**essentially**
72:6 169:19
208:13 239:11
**establishing**
213:24
**estate** 37:10
38:19 39:1,10
49:19 50:6
79:12 247:6
**estates** 34:21
35:3 36:8
161:9
**estimate**
180:12
**et** 10:11 17:8
18:12 19:10
36:2 43:6 48:1
55:3 60:1
70:18 79:15

101:21 102:23
**eth** 37:20 51:10
  61:18 62:23
  64:12 142:5
  143:7 159:18
**ethereum**
  60:20,25 129:4
  130:24 131:1,3
  131:5,15
**eva** 171:4,4
**evaluating**
  238:23
**evaluation**
  174:21 176:17
**event** 85:14
**events** 19:15
**eventual**
  228:18
**everybody**
  8:24 17:24
  32:9,12 47:22
  47:23 81:25
  106:13 154:22
  245:11
**everyone's**
  155:20
**evidence** 11:16
  11:18,19 12:15
  12:17,18 13:18
  13:20,21 21:12
  21:14,17,19
  22:21 23:13,15
  23:16,21 29:15
  29:18,21 30:1
  30:2,3,11,21
  31:4,11,13,16
  31:17,19 72:9

81:6,21 90:24
91:1,1 119:18
133:6,8,9
134:18,20,21
134:22 142:20
166:18,20
167:7,9 174:6
176:20,22
187:8,11
193:13 204:18
204:20,21
238:3 248:18
248:21,22,25
**evidentiary**
  249:10
**exa** 115:23,24
  118:17
**exact** 68:2 88:7
  136:21 157:15
  212:17
**exactly** 49:22
  81:8 157:19
  159:13 161:6
  194:13 210:21
  226:24
**exam** 93:9
  145:10
**examination**
  5:8 6:2,4,10
  7:12 28:14
  65:3,4,20 66:3
  78:13,16 79:1
  112:25 118:8
  118:12 126:11
  135:1,22
  167:13 170:19
  177:19,20

187:14 198:2
213:15 217:2
217:17
**examine** 5:25
  31:25 32:2
  55:7 68:25
  71:21 77:24
  78:21,23 79:5
  80:17 92:10
  104:19 110:21
  113:5 118:7
  122:18 135:1
  135:25 138:20
  154:7 167:16
  168:10 172:24
  179:4 180:24
  181:20 187:15
  191:15 193:20
  199:6 201:24
  202:2 212:7
  213:2 214:23
  216:21,24
  217:5 222:1
  245:25 248:10
**examined** 6:7
**examiner** 77:2
**examiners**
  245:23
**example** 27:12
  40:5 41:3 76:1
  100:21 104:10
  152:20 179:10
  179:21 188:20
**examples**
  45:16,20 75:24
  212:15

**exceed** 57:17
  57:21 147:14
  151:24
**exceeded** 56:5
  216:2
**excellent** 16:22
  136:25 206:14
**except** 91:14
  92:1
**exceptions**
  240:4
**excerpt** 53:25
  133:16 134:18
**excerpting**
  194:12
**excerpts**
  145:22
**excess** 240:1
**exchange**
  38:20 39:10
  41:5,23 100:2
**exchanged**
  15:8
**exchanges**
  56:16 70:4,18
**excites** 132:1
**exclude** 180:13
**excluded** 46:22
  47:4,8,16,17
  47:22 48:8
  97:13,14,18
  159:12
**excludes** 50:14
**exculpated**
  52:8 75:21,22
  76:2

exculpation
15:23 16:1
32:23 34:17
45:11,22 46:7
46:12,20,25
47:7,13 48:10
48:15,23,24
49:14,17 52:12
52:19 53:6
54:15,19,22
75:5,6,11,18
76:10,12,22
77:8,13 125:3
125:9
exculpations
14:25 15:18
46:21 47:9
49:8 50:17
51:21 52:10
75:25 76:21
125:5,7
excuse  69:3
72:1 87:11
136:18 166:14
excused  125:19
154:12 173:1
181:22,25
198:2 202:2
215:2
executable
16:11 18:7
executed  15:23
21:6
executing  23:6
executive
23:20 104:12
129:1 207:24

208:17 242:22
executives
26:20 27:8
203:2 205:10
207:22 208:16
209:4,13,22
210:8,22
exercise  6:19
114:5 230:10
exhibit  10:21
11:16,17,19,22
12:15,18,21
13:18,21 19:17
19:18,19,19,24
20:7 21:11,18
22:10,12,21
23:13,16 29:9
30:10,14,19,19
30:19,21,22
31:1,6,8,8,12
31:12 33:8
54:6,8 65:18
79:2 80:19,20
80:25 81:5,15
81:21,23,24
82:12,18,22
113:21 122:22
122:24 132:17
132:18,21
133:4,5,5,7,9
133:11,13,18
134:6,18,20,22
145:6,7,13,20
146:2,13,14
166:8,9,18,20
166:22,22,24
167:6 170:17

170:18,20,21
176:9,13,20
182:16 184:20
184:20 185:2
187:8,10
188:20,23
189:8 193:14
193:24 201:11
204:10,18,19
204:21 206:12
206:22 234:8
244:6 248:20
248:22
exhibitor  81:2
exhibits  8:5
19:16 28:20,22
29:15,19,23
30:1,3,5,16,20
31:18 53:24
66:1 80:22
113:19,20,22
145:9,18,25
176:12 179:8
202:12 217:1
217:23 234:9
238:3
exist  45:6
existence  44:20
44:23 45:1,12
45:13 95:17
existing  117:10
exists  45:4
exit  144:13
161:9
expanded
154:3

expansion
234:4
expect  27:23
116:25 118:10
120:12 126:10
158:2
expectations
51:7
expected
188:13,17
247:18,18
expecting
234:2
expense  36:19
36:23 37:3,7
37:12 114:11
expenses
121:21
expensive
18:21
experience
92:22 95:23
122:10 128:4
156:12 168:15
169:11 171:7
174:2 184:12
233:1 235:13
235:16,18,18
235:19 236:22
237:4 238:16
238:18
expert  23:25
128:3 174:6
249:3
expertise
108:10 164:2

explain 35:21
37:4,17 43:10
46:11 51:4
69:14 79:11
80:1 86:25
89:9 93:12
123:10 135:15
188:25 189:23
209:8 214:6
explaining
35:9 54:18
200:14
explanation
67:21
explicitly 88:8
exploded 66:12
explore 117:12
extend 130:12
extended
168:21 198:16
extensive
159:14
extensively
75:5
extent 68:4
141:12 228:13
240:8
external 137:8
223:13
extremely
83:10

**f**

f 1:21 251:1
fa 174:5
face 149:17
faced 96:7

facilitate
244:12
facing 24:3,4
fact 18:20
56:12 91:20
119:21 192:11
237:7 246:16
factors 67:15
160:20 163:18
164:15 168:23
169:15 172:15
facts 22:17,22
22:24 23:3,9
56:10,10 109:9
203:21 246:9
246:12
fahrenheit
10:9 16:8,10
16:13 18:6
72:25 105:25
108:23 127:19
127:21,22,23
128:24 129:10
129:17,19
130:7 131:22
136:5,6,8
138:2,3,8,10
138:11,14
139:17 140:18
140:23 141:2
141:22 146:13
146:21,25
154:4 162:8,12
162:15,23,25
163:2,13,23
164:5,15
165:17 168:25

170:4 223:1,14
223:25 225:8
225:24 226:3,9
231:4 233:7,13
233:21 234:2
234:25 235:5
236:3 246:22
fahrenheit's
17:22 128:22
129:24 134:8
134:11
fahrenheit's
143:23
fair 21:5 23:8
38:12 50:7,20
50:23 64:2
67:9 92:23
96:9 98:8,14
99:7 134:10
148:2,6 169:18
174:14,16
180:11,15
237:6
fairly 167:2
faith 14:9
fall 120:15
157:8 163:6
false 22:6
familiar 15:1
23:2 26:14
32:14,22 33:6
35:3 36:18
37:14,24 39:3
40:20 43:21
44:12 52:13
53:3,13,19
54:16 55:25

95:6 103:12
116:10 118:9
118:18 121:2
128:12 157:4
187:24 239:5
familiarity
169:11
family 136:15
137:5 239:17
239:25
far 112:15
172:6
farming 70:13
70:18
fast 14:11
26:21 33:25
103:8
fatigues 219:2
favor 195:15
197:9 223:25
225:8
feasible 16:11
148:21
federal 5:17
107:8
fee 36:19 37:3
37:6,12 38:23
144:24,25
163:20,23
164:4
feel 51:25
103:6 107:19
110:13 119:22
160:4 162:20
fees 10:8 36:22
76:11 123:24
160:2 163:18

[fees - filed]                                                                      Page 31

| | | | |
|---|---|---|---|
| 169:13 | 28:1,4,21 | 65:9,12 66:5,8 | 110:1 111:4,5 |
| **feet**  77:7 | 32:14,16,18,21 | 66:10,15 67:4 | 111:10,12,19 |
| 232:25 | 32:25 33:3,5 | 67:7,11,14,25 | 112:1,8 113:16 |
| **felt**  10:9 | 33:10,13,17,19 | 68:2,8,11,14 | 114:4,16,20 |
| 141:23 145:3 | 34:2,5,10,14 | 68:15,17,20 | 115:10,19,20 |
| 148:14 164:14 | 34:18,24 35:5 | 69:4,7 70:3,9 | 115:22 116:2,6 |
| 175:6 233:17 | 35:11,23 36:10 | 70:14,16,23 | 116:9,11,21 |
| 233:25 236:9 | 36:21 37:6,15 | 72:5,16,23 | 117:18,21 |
| **ferrao**  24:23 | 37:19 38:1,5 | 73:5,21,25 | 118:20,22 |
| **ferraro**  3:21 | 38:16,21,25 | 74:2,9,14,16 | 119:6,9,25 |
| 8:2,3,7,11,16 | 39:5,7,11,17 | 74:20,24 75:3 | 120:4,11,24 |
| 8:20,24,25 | 39:21,25 40:7 | 75:12,24 76:4 | 121:10 122:5 |
| 9:13 10:18,22 | 40:12,22,24 | 76:15,24 77:16 | 122:10,22 |
| 10:23 11:1,4,6 | 41:7,17,20,25 | 78:3,4 79:10 | 123:2,12,16,19 |
| 11:7,10,11,14 | 42:7,24 43:4 | 79:13 80:8,12 | 123:22,25 |
| 11:20,24 12:1 | 43:12,15,19,23 | 81:6,24 82:2,6 | 124:3,6,9,13 |
| 12:3,7,10,13 | 44:3,6,14,21 | 82:8,11 83:13 | 124:17,20 |
| 12:19,23,25 | 44:24 45:2,8 | 83:15 84:2,15 | 125:2,7,11,15 |
| 13:2,7,10,13 | 45:15,19 46:1 | 85:1,6,11,19 | 125:20 142:3 |
| 13:16,22 14:5 | 46:10,15,21 | 85:24 86:5,11 | **ferraro's**  8:4,6 |
| 14:20 15:2,3,6 | 47:1,14,18,21 | 86:17 87:5,7 | 30:11,15 31:2 |
| 15:24 16:3,11 | 48:4,19 49:20 | 87:16,19 88:16 | 72:10 |
| 16:12 17:12,15 | 49:23 50:1,3 | 91:18 93:2,13 | **ferrera**  92:18 |
| 17:19,23 18:8 | 51:2,8,15,23 | 93:19,24 94:8 | **fewer**  207:22 |
| 18:9 19:2,7,9 | 52:5,9,14 | 94:21 95:8,11 | **fiat**  37:21,23 |
| 19:12,13,23,25 | 53:16,21 54:17 | 95:16 96:12,22 | **fiduciary** |
| 20:5,12,14,17 | 54:21 55:10,15 | 97:3,15,25 | 106:10 |
| 20:19,23,25 | 55:19,23 56:2 | 98:10,18,21 | **fifth**  128:6 |
| 21:1,4,7,8,21 | 56:7,15,20 | 99:3,10,12,25 | **figured**  233:2 |
| 21:25 22:3,6 | 57:1,11,15,19 | 100:15,20 | **file**  91:3 185:15 |
| 22:10,13,15,17 | 57:23 58:3,10 | 101:3,15,19 | 200:8 207:24 |
| 22:23 23:1,3,4 | 58:13 59:3,7 | 102:7,11,15,18 | **filed**  5:7 19:19 |
| 23:7,11,17,24 | 59:20,23 60:3 | 103:5,14,17,25 | 20:1 29:10 |
| 24:25 25:2,6 | 60:7,11 61:8 | 104:5,10 105:4 | 30:18,20 32:15 |
| 25:17,20,25 | 62:5,10,15,20 | 105:18,19,21 | 32:17 33:7 |
| 26:4,5,10,12 | 63:3 64:6,11 | 106:4,18 | 65:14,21 82:20 |
| 26:16,19 27:11 | 64:16,22 65:7 | 108:18 109:21 | 132:22 133:14 |

[filed - formed]                                                    Page 32

176:13 185:9
189:21 200:8
204:7 217:1,4
221:18 228:1
229:22
**filing** 25:16
56:6,19 64:4
111:8,16
145:23
**fill** 236:7,14
249:14
**final** 99:18
174:24 178:20
244:13 246:19
**finalize** 5:16
100:11
**finally** 209:5
214:4 221:16
**finance** 70:11
156:11
**financed**
158:10
**financial** 9:1,8
65:16 70:8
96:12 102:20
106:5,9,11,24
107:7,12
146:19 147:18
183:25 185:11
213:21 224:22
225:3,12,23
226:1,9 231:3
244:14
**financials**
95:24
**financing**
156:10,23

158:11,13
162:18
**find** 9:16 88:6
**finding** 208:24
**fine** 28:18
54:11,13 83:3
84:19 117:20
217:10 246:6
**finish** 123:15
124:24 153:12
153:14 217:11
217:11,13
**finished** 68:23
215:11
**finishing** 243:9
**fireblocks** 56:6
**firm** 129:13
156:5,8 167:25
173:23
**firms** 167:21
**first** 7:21 21:21
21:23 34:3
35:6 40:13
44:16 45:23
47:15 83:20
90:8 93:25
104:23 107:1
114:1 117:15
118:14 135:1
140:8 147:17
156:25 167:21
170:22 174:23
175:1 177:20
199:9 202:23
206:17 208:5
213:20 222:3
228:16 232:12

232:12
**firsthand**
34:16
**fit** 234:1
**fits** 216:11
**five** 21:14
22:20 112:17
112:22 116:20
127:23 130:12
136:11,12,20
144:15,19,20
**fix** 6:12
**fixed** 18:3
122:8 200:9
**flat** 117:24
**flexible** 157:20
159:10
**flip** 10:21 11:5
11:23 12:5,21
13:4,8
**flipping** 201:21
**floor** 160:18
161:8,10
**flow** 147:15
150:22 151:2
165:14,15
**focus** 41:2
94:18 132:2
146:24 152:15
**focused** 48:20
93:14 159:18
174:5 207:20
207:23
**focuses** 173:25
**folks** 61:15
73:21 76:18

**follow** 72:6
99:19 109:15
122:4 151:16
200:16 215:20
**followed**
105:11 106:7
161:23 185:6
**following** 56:7
59:7 101:15
162:2
**follows** 152:23
**footnote**
200:13
**force** 83:22
**forecast**
114:21 115:5
116:15,17
117:8 165:15
**forecasting**
149:9
**foregoing**
251:3
**forensic**
173:19
**forget** 170:16
229:14
**forgetting**
172:1
**form** 93:12
173:25 243:1
**formal** 7:2
105:10 168:16
247:17
**formally** 8:22
247:14
**formed** 112:3

**former** 97:10
97:10,11,12,13
97:21,22 98:4
229:15
**forms** 44:2
157:21
**formula**
144:22
**formulates**
112:13
**formulating**
112:2
**formulation**
159:14
**fort** 219:24
220:7
**forth** 120:1
164:3 195:10
197:17
**forward** 17:21
113:17 114:14
114:18 129:25
131:24 149:20
160:19 161:4
169:6 235:22
**fought** 15:7
16:5
**found** 32:23
33:16
**founded** 128:8
**founder**
127:25
**four** 10:4 98:23
99:3,3,4,5
112:17,23
130:12 144:19
158:4,25

183:11 234:17
234:19,25
235:9 237:6,15
241:5,8 242:5
**fraction**
160:12 171:13
230:23 231:2
**framework**
96:21
**frameworks**
169:1
**frankly** 28:4
**fraud** 40:6,15
213:21
**free** 107:19
165:15 193:14
**freely** 175:17
**freeze** 55:14
56:6 64:4
69:11,15
**friday** 228:5,25
249:15
**front** 8:21
33:11 64:17
67:12 72:13
80:21 82:12
83:13 98:2
100:15 113:22
118:11 120:25
132:17 144:12
149:10 166:6
170:23 171:21
176:9 194:2
221:2 244:2
**froze** 94:9
**fruitful** 14:22

**ftp** 29:11
**ftx** 66:12,19
68:6,9
**fulfill** 7:17,17
**fulfilling**
208:11
**full** 42:18,21
98:21 114:7
129:10 156:11
156:22 167:21
**fun** 14:21
**function**
124:12
**fund** 158:13
**funds** 46:8,13
48:15 55:18,22
64:3 75:18,23
76:3 128:5
137:1,2,6,7,13
**further** 28:12
113:3 124:25
125:16,18
132:10 134:24
161:3,11
180:22 181:17
187:13 193:18
196:15 199:4
200:3 212:24
232:23 245:18
**future** 17:10
17:21 71:13
105:5 161:10
233:19 238:22

**g**

**g** 5:1
**galpo** 249:3

**gate** 16:20
**gates** 39:14
**gather** 247:11
247:22
**gears** 18:22
26:13 164:23
**gemini** 36:3
**general** 25:25
26:1,11 27:5
66:17 96:12
102:24 104:21
106:23 112:1,3
114:1,1 151:11
192:4,21,24
203:16
**generally**
48:17,19 56:2
95:11 100:16
100:16 115:11
118:8,25
128:11 220:20
**generate**
165:11 169:7
**generated**
17:13,18
**genoot** 127:25
129:13 142:5
143:10 154:2,3
**getting** 8:5,8
16:21 27:5,5
39:23 42:24
46:16 103:4,23
104:2,5,6,9
169:11,18
232:25
**give** 8:14 27:12
29:3 63:16

80:25 99:19
100:13,21
104:10 109:5
126:23 202:16
212:23
**given**  18:11,20
49:18 59:25
64:17 97:22
108:7 138:3
163:2,20,25
175:8 195:2
196:8 199:20
225:16 247:4
250:5,12
**gives**  114:24
**giving**  76:16,21
80:5 144:13
**glenn**  1:22
**glimpse**  179:1
**global**  9:7
117:13 163:5
**go**  6:20 20:13
21:21 24:21
34:25 35:1
40:2,16 41:1
42:14,16 44:8
44:10,15,17
48:12 53:17
54:2,9,12 55:9
62:18 66:4
69:2,21,22
71:11 72:4,17
74:8,17 78:2
79:9 80:6,16
80:24 83:11,16
84:23 86:21
87:14 89:7

91:11 92:14
93:18,21 94:19
104:22 105:19
105:20 107:17
108:14,23
109:20 111:3
113:12,18,23
116:15 117:20
118:12 126:11
127:4 129:20
130:10 131:23
135:5 138:22
141:8,10,14
143:23 148:17
148:17 149:12
150:2,10
153:15 167:18
168:12 175:19
177:6 178:1
181:2 191:17
194:15 195:19
196:23 198:13
201:3,16
213:18 217:21
224:13,18
225:21 229:11
230:3,4 233:21
239:22 243:8
245:21 246:3
246:20,25
249:8
**goal**  14:10
26:25 103:5
104:5
**goals**  104:15
205:12

**goes**  16:17
45:14 64:9
69:25 70:25
118:23 140:2
149:25 228:22
**going**  6:1,4,5,7
6:10,11 9:23
17:21 27:8
28:5 31:24,25
33:22,23 34:25
37:13 38:7
39:2,15,19
40:17 42:14
43:8,20 44:8
45:9,21 49:2
51:12 59:24
65:17 71:8
72:5 80:4
81:16,18 82:18
88:12 90:9,15
93:21 99:21
102:9,25
107:21 108:3
108:12 114:14
114:18 116:24
117:2 118:4
120:6 121:4,20
124:23 125:23
126:6 129:25
137:5 138:3,8
141:9 145:17
147:13 148:8
151:7 152:16
152:25 154:15
156:24 160:4
160:19 164:9
164:10 169:6

175:1 179:12
196:2 201:1
202:4 208:13
214:12 215:23
216:12,15
217:12 218:14
222:23 224:18
230:2,9 232:15
232:25 235:22
240:7 243:22
244:11 249:25
**gonna**  187:21
**good**  5:3 6:15
6:18,20,21
7:25 8:20,24
14:9 45:16,20
55:10 65:7,9
65:10 70:15
73:1 76:19
78:3,4 102:7
105:9 111:4,5
113:14 114:25
115:17 125:24
127:5 135:6
173:14 182:21
182:23 187:18
202:7,19
210:14 215:25
218:16 226:5
**goods**  124:2
**gotten**  76:18
**government**
20:3,20 107:9
**governs**  69:8
**grace**  202:7
215:5

**great** 17:9,10
  106:4 111:9
  121:10 122:10
  142:10 217:20
**greater** 171:14
  207:22
**greatest** 164:9
**greatly** 121:17
**green** 1:13
  176:21
**gross** 40:5
  55:11
**ground** 9:14
**group** 41:4,5
  110:12 127:19
  127:22,23,24
  128:1 131:3
  136:16 137:11
  137:22 141:22
  162:8,25
  163:10 164:15
  164:19 199:12
  207:1,6,19
  208:21 209:25
  212:19
**groups** 41:8,12
  41:15 42:9
  43:2,4,5 60:10
  111:17 169:12
**grow** 130:5,5
**grows** 116:19
**growth** 114:24
**guess** 5:15
  110:11 135:17
  158:24 163:10
  188:4 196:6
  229:7 232:17

248:2
**guidance**
  155:20
**guilty** 214:14
  214:14
**guy** 14:20
**guys** 134:2
  138:24 139:15
  167:20
**gxd** 35:25

**h**

**half** 17:17
  100:16 120:11
  148:3,5
**hall** 248:2
**hand** 8:7,12
  34:1 113:7
  126:20 155:8
  194:13 198:7
  200:23 202:14
  213:17 218:22
  227:5
**handed** 184:18
  204:5
**handoff** 27:6
  27:20 38:10
**hands** 122:20
  154:8 181:21
  198:6 214:24
**hang** 216:12,15
  234:18
**hannah** 182:6
  182:14
**happen** 112:14
  115:20 130:17
  131:18

**happened**
  110:8 124:19
  163:17
**happens** 19:8
  63:12 120:2
**happy** 31:21
  134:24 218:7
**hard** 15:7 16:5
  19:20 24:17,20
  87:17 119:10
  147:18
**harsh** 109:11
  109:13
**hash** 115:9,21
  115:23,24,25
  116:7,12,17,19
  117:12,15,24
  118:16,17
  119:16 120:1
  120:22 146:22
  147:1,6,8,12
  148:7,7,16,18
  149:4,25
  150:17 151:11
  151:12,20,21
  152:9 165:20
  165:22 171:4,4
**hashing** 116:23
**hasn't** 110:25
**haven't** 242:20
**hawaii** 60:21
  60:25 61:7,10
**head** 9:3 116:2
  118:23 161:17
  171:17 172:2
  231:2 245:11

**healing** 16:21
**healthy** 209:23
**hear** 45:17
  102:15 105:9
  110:25 144:8
  152:23 182:11
  246:4
**heard** 111:17
  135:7 178:6
  200:11 239:8
  250:3
**hearing** 2:1,2,5
  29:17 90:20
  92:18 169:9
  185:9 199:25
  217:15 221:14
  228:5,25 238:6
  238:10 243:24
  249:19,24
  250:6,8
**hearsay** 242:25
**heat** 122:11
**heavy** 169:16
  247:6
**hedge** 93:6
  94:3,15,22
  128:4
**hedges** 94:11
**hedging** 17:8
  92:21,23 93:12
  93:18 94:1,7
  94:21,23
  102:23
**held** 48:23
  58:22 70:16,17
  139:15 152:25
  174:14

hell 28:10
hello 136:1,1
 199:11
help 18:17
 42:20 81:16
 110:15 118:1
 132:11 136:25
 144:10 156:11
 177:1 203:21
 224:20 234:21
helped 77:19
helpful 36:24
 105:7 223:22
helping 203:6
 247:21
helps 52:1
heras 4:11
 196:21
herculean
 27:11 43:1
he'll 242:21
he's 142:12,12
 142:12,13
 240:8 241:11
hi 168:13
 191:16,18
 200:25 202:21
hiding 228:24
high 15:4
 119:16 120:23
 122:15 163:19
 186:5,13
 192:24 205:5
higher 18:1
 35:13 67:5
 121:15 123:18
 123:19 131:5

148:19 149:4
 152:9,21,21
 195:22
highest 163:16
highlight 13:25
highlights 36:5
 134:8,11
highly 16:5
 76:10
highs 166:1,2
 171:2
hire 106:25
hired 107:22
 107:24 244:16
hiring 106:8
hit 9:13 16:12
 28:10 67:13
 102:11 103:9
 104:15 190:9
 190:10
hmm 47:19
 50:2,19,23
 51:14 53:8
 98:19 99:25
 147:3 188:24
hoc 40:19,20
 40:23 41:3,5,8
 41:12,15 43:2
 43:4,5 199:12
hoeinghaus
 202:9,12,18,21
 202:21,23,25
 203:6,12,15,19
 204:1,7,11,13
 204:16,22,25
 205:4,6,9,17
 205:24,25

206:2,7,14,17
 206:24 207:18
 208:3,6,8
 209:2,8,11,21
 210:4,9,19
 211:3,7,13,17
 212:2,16,22
 213:22 214:10
 215:4
hold 29:3 34:1
 81:16 82:16
 101:20 141:7,7
 142:19 145:15
 145:18 179:11
 199:8
holder 58:14
 63:7,22 138:11
 185:17 186:6
 186:12,19
 188:5
holders 58:1
 59:4 60:4 61:6
 72:21 73:3,13
 186:24 187:3
 188:9,13 192:8
 192:11,13,18
 192:22,24
 195:3 197:18
 198:24
holding 115:14
 150:1 193:4
holdings 63:2
holistic 158:6
holistically
 150:15
home 110:2

hon 1:22
honestly 144:4
 228:23
honor 6:15,18
 6:21 7:18,23
 7:25 8:4,18
 11:15 12:14
 13:17 19:17
 20:11 21:10,20
 23:12 28:13,15
 28:19 30:4,9
 31:14,22 48:13
 49:15 53:24
 54:5 55:5,8
 56:13 57:5
 58:7,18,23
 59:12 60:17,22
 64:25 65:5,17
 65:23 66:22
 67:4 68:22
 69:18 71:5,17
 71:19,22,24
 77:25 79:20
 80:3 81:18,24
 82:14 83:11
 88:1 89:1
 92:11,25 102:5
 104:16,20
 105:13 109:18
 110:20,22
 111:1 113:3,14
 118:15 122:19
 124:25 125:2
 125:16,18,23
 126:19 134:17
 134:23 135:4,6
 135:20,23

138:17,21
142:23 143:13
143:20,22
145:9 154:1,11
154:24 161:17
166:17 167:5
167:17 168:11
169:23 172:25
173:10 176:19
177:18,22,25
179:5,7 180:9
180:25 181:24
182:3,12,14,23
182:25 184:19
187:5,16 191:6
193:17,21,23
194:20 195:6,7
196:6,16,19
198:4,11 200:3
200:7,12 202:3
202:7,11
204:17 206:21
210:10 212:9
213:3 215:1,5
215:13,22,25
216:11,19,22
216:25 217:10
218:9,16,25
219:8 221:23
222:2 223:17
224:19,20
225:10,20
228:6 229:18
230:1 238:11
238:24 239:3
239:21 241:10
243:10,21

244:6 245:2,2
245:17 246:5
246:17 247:7
247:12 248:4,8
248:11,16,23
249:2,7,12,17
250:4
**honor's** 29:10
**hope** 103:9
**hopefully** 7:12
**hopes** 161:11
**hoping** 61:9
**horse** 10:1 97:7
128:21 159:21
160:20 161:6
161:24 162:5
162:14 163:8
**hosted** 132:14
172:14
**hosting** 117:10
**hours** 104:11
123:14 175:11
222:5
**housekeeping**
28:17 30:9
**huge** 87:16
**hundred** 10:6
188:5
**hundreds** 10:7
163:24 169:10
**hurdles** 92:19
**hut** 142:12
171:25

**i**

**i.e.** 130:4
**ico** 123:3

**idea** 67:21
126:6
**identified**
23:18 48:9,12
**identify** 7:24
18:25 80:24
184:2 185:11
230:19
**identifying**
46:24
**identities**
245:7
**idu** 140:17
**illegal** 66:21
**illiquid** 35:16
129:4 131:9
164:12 167:23
167:23 213:6
**illiquids** 35:14
**illustrated**
148:20 149:4
152:10
**imagine** 93:16
99:21 217:12
**immediately**
59:1,6,10
85:15 218:3
**immense** 36:13
**impact** 46:12
120:6 147:21
238:21 239:1
**impacted**
120:8
**impacts** 122:6
**implemented**
92:21

**implies** 88:16
**imply** 94:7
147:14
**implying** 94:13
**importance**
34:16
**important** 9:14
15:11,14,21
16:14 17:24
18:13 27:3,6
41:10 94:15
121:11,22
130:2 131:2
132:1 160:18
160:25 169:3
169:15 235:12
235:14,21,22
**imposed** 107:8
**impossible**
147:20
**impressed**
16:23 106:1
164:18
**impressive**
104:14
**improper**
119:19
**improved**
163:23
**improvements**
152:17
**imran** 212:9
**inability**
175:17
**inbound** 163:5
**inbounds**
162:8

**incent** 26:20
**incented** 130:4
**incentive** 26:14
  26:19 28:2
  101:13,16,17
  101:23 102:8
  103:13 203:2,7
  203:10,14,18
  203:24 204:1
  205:6,9 207:2
  207:19,24
  209:2,6 214:5
**incentives**
  129:24 130:5
  208:18,18
**incents** 130:3
**include** 103:3
  158:2
**included** 6:24
  47:2,20 48:3
  51:1 65:14
  68:19 97:12
  98:13 142:19
  159:12 206:9
  209:13 214:7
  222:10
**includes** 14:25
  209:11
**including** 8:6
  32:10,10
  157:25 160:17
  180:13 191:2
  209:6,22
  234:11 235:8
  240:5,13
**inclusion**
  209:15

**inconvenience**
  6:5
**inconvenient**
  5:22
**incorporated**
  145:8
**increase** 23:22
  25:14 108:5,17
  138:24 140:5
  144:24 151:14
  152:1,11
  232:19,20,22
  233:3,6,11
  246:24 247:3
**increased**
  25:18 151:12
**increases** 100:3
**increasing**
  139:9 233:9
**incredible**
  27:19
**incredibly**
  18:13 27:3
  164:18
**incur** 151:14
**indecipherable**
  218:4
**independence**
  229:8 239:13
  240:3,20,24,25
**independency**
  240:14
**independent**
  70:22 232:10
  234:20 235:9
  235:23,23
  237:15,20

  239:6,12 240:6
  241:5,6,8,9
  242:5,6,8,9
  243:12 244:17
**independents**
  242:10
**index** 122:12
**indicate** 71:6
**indicated**
  135:14 195:14
  219:11 243:22
**indicates** 84:6
  84:14
**indicted**
  214:13
**indiscernible**
  29:13 31:24
  32:6 48:4
  52:15 54:4
  55:11 57:6
  58:2 65:16
  66:6,21 67:10
  76:14 78:5
  84:24 87:14
  92:5,12,17
  96:18 97:2
  99:8 101:18
  102:8 120:2,3
  120:8 136:2
  137:9 142:18
  144:13 145:6
  146:9 147:25
  148:23 154:17
  155:11,11,15
  166:24 167:13
  170:22 171:1
  177:21 179:22

  182:19 213:4
  222:11 225:14
  229:14 235:15
  242:1,11 244:7
  247:17,19
**individual**
  57:13 136:15
  157:21 158:5
  158:25 160:7
  185:13 209:18
  211:4,9
**individually**
  160:9,14
**individuals**
  246:21
**industry** 24:4
  24:16 46:2
  156:15 163:18
  184:15 203:9
  210:6
**ineligibility**
  84:23
**inexecutable**
  160:24
**infer** 180:6
**inference**
  195:24
**informal** 74:22
  248:3
**informally**
  8:22
**information**
  35:4 41:19
  44:5 65:16
  120:24 149:1
  157:25 158:1
  185:15,19

199:23 200:16
201:10,24
242:24 243:3
243:23
**informed**
160:21 172:9
184:6
**infrastructure**
127:13 132:4
132:12 156:15
**initial** 35:13
59:1 60:6
157:9 162:23
214:4
**initially** 29:12
156:16 214:7
**initiated**
157:13
**injunction**
15:1,22 16:1
**input** 146:21
146:25 148:12
**inquire** 110:8
**insiders** 95:13
97:10
**insolvency**
228:1,17
**instances**
96:16
**institutional**
175:19
**institutions**
70:8
**instruction**
29:11
**insuring** 48:15

**integration**
115:15 132:3
**intellectual**
131:4
**intend** 249:11
**intended** 161:7
205:7,10
249:14
**intends** 5:25
**interact** 69:12
69:16 76:8
**interactions**
68:8
**interest** 9:24
63:21 86:6,19
100:24 123:18
123:21,22
162:23 175:23
184:5 186:16
233:3
**interested**
82:22 157:17
224:3
**interests** 6:8
72:22 73:3,4,9
138:3,12
205:11 235:12
235:20
**interim** 9:11
102:14,17
174:9
**internal** 77:21
97:6
**internally** 9:21
94:5
**international**
51:17 100:12

100:18,22,23
101:1,13
**internet**
127:13
**interpret** 89:9
196:4,4
**interpreted**
172:11
**interrupt**
62:18 65:24
78:18 150:7,8
**intervals**
121:17
**interview**
235:24
**interviewed**
231:7,8,10
236:16
**interviews**
220:24 231:12
232:6 237:4
244:15
**intimately**
43:23
**intricate** 169:1
**intrinsic**
121:12
**introduce** 8:22
54:8 127:6
155:25 173:14
183:2 202:20
**introduced**
127:17 247:5
248:17
**invest** 130:7
138:1,10

**invested**
130:14
**investigation**
243:8 244:18
**investigations**
16:4 20:3 77:1
97:16 244:25
**investigator**
107:22,24
243:12 244:17
**investing**
137:11,13
138:14
**investment**
36:2 95:8
129:24 143:24
156:7 173:25
**investments**
129:5,18
130:16 132:10
176:3
**investor** 9:4
127:11 128:9
162:25
**investors** 22:2
22:5 98:7
136:23 137:6
137:22 238:22
**involved** 35:25
37:25 47:12
94:9 105:5
106:20 127:15
127:25 129:10
156:19 172:17
174:7 183:12
202:24,25
213:21 222:14

223:5,7 224:5
226:11 227:9
227:13 240:3
**involvement**
34:7,12 103:15
156:25
**iovine** 69:1,1,2
69:3,10,14,22
70:6,11,15,21
70:25 71:2,4,6
71:11,12,19,25
**irish** 172:1
**irregularities**
185:22
**irrespective**
140:21
**ish** 117:24
161:20
**isolation**
147:21 150:12
**issue** 7:13
29:12 47:11
49:1 50:8,16
50:18 60:2,3
96:24 143:23
160:15 199:25
228:17,23
229:7 230:7,13
**issued** 123:5
**issues** 7:14,16
49:9 51:24
76:16 160:3
200:5 225:19
228:24 229:5
238:20,21
239:2 249:10

**item** 85:13
86:22 196:25
**items** 42:10,10
116:16 198:14
**iterated** 33:20
**iterative** 97:4
**it's** 6:19 12:21
140:11 147:18
147:20 148:9
163:14 165:9
170:20 172:6
179:9,21
225:15,16
233:2 234:7,7
234:7 239:24
242:25 244:6
244:23 248:20
248:20,21
**i'd** 145:19
146:7 183:18
248:18
**i'll** 142:3 143:3
157:11,12
243:9
**i'm** 145:13
149:7,18 150:3
151:6,16
152:23 156:2
156:24 163:21
170:8 172:1
174:5 175:1
178:9 181:11
182:5 183:4
187:21 188:22
219:23 220:6
224:2 229:1,7
230:2,3,6

231:21 233:12
236:24 238:11
240:7 241:1,14
242:1,2,4,7,8
242:8,11,12
244:11,19
245:1 246:11
247:11,16
**i've** 156:14
174:4 183:10
184:14,15

**j**

**january** 203:1
**jason** 4:7 65:13
69:1
**jeff** 4:13 111:1
**jeffrey** 3:17
**jenoot** 246:6
**jeopardy**
103:10
**jeremy** 3:9
**jessop** 128:1
**jewel** 27:4
**job** 39:13
106:15 115:5
220:5 222:5
247:13,25
**joel** 16:15
129:11 173:5
173:16
**johan** 4:9
77:25
**join** 112:23
**joined** 94:8
111:7
**joint** 224:11

**jones** 3:9
200:11,12,12
200:20
**joshua** 3:16
218:17
**jp** 9:6
**judge** 1:23
49:8 68:23
80:15 102:2
109:18 113:6
122:20 154:9
181:21 200:23
212:25 213:17
214:24 246:2
**judson** 3:8
7:25
**july** 68:18
178:4 220:14
**jump** 232:16
**june** 19:7
66:11 67:17,22
68:18 94:9
156:22
**jurisdictional**
60:2,3
**justice** 220:7,8

**k**

**k** 76:2
**kampanya**
249:4
**karen** 1:24
182:21
**karpuk** 182:9
182:12,15,20
182:22,23
183:4,4,10,14
183:22 184:8

| | | | |
|---|---|---|---|
| 184:14,25 | **kielty** 9:20 | 123:14 131:9 | **kits** 219:9 |
| 185:4,8,24 | 154:19,21 | 143:7 149:19 | **knew** 53:3 |
| 186:2,10,18,23 | 155:6,12,19 | 156:5 173:23 | 235:12 247:23 |
| 187:1,5,25 | 156:2,2,6,7,14 | 174:2 200:9 | **know** 5:13 6:13 |
| 188:4,10,24 | 156:21 157:3,7 | 209:20 232:12 | 6:17 7:10,16 |
| 189:19,25 | 157:10 158:24 | 233:1,20 236:5 | 8:20 9:18,24 |
| 190:8,12,16,18 | 161:7,16,20,25 | 242:25 | 11:23 14:14 |
| 190:25 191:7 | 162:5,25 | **kindly** 199:3 | 15:9,13,13,18 |
| 191:18 192:7 | 163:12 165:1,4 | **kirkland** 3:3 | 15:23 16:25 |
| 192:12,17,21 | 165:8,13 166:5 | 6:22 8:1 51:22 | 18:3,3,4,20 |
| 194:10,22 | 166:7,11,16,21 | 126:9,15 155:5 | 19:5 21:23 |
| 195:10,20 | 167:1,4,11,16 | 173:4 182:15 | 26:20 27:14,17 |
| 197:5,11,17,22 | 167:19,25 | 200:13 202:8 | 28:5,6 29:12 |
| 198:18 199:17 | 168:6,13,17,22 | 215:5 249:17 | 33:14 36:2 |
| 199:22 201:10 | 170:6,13,23 | **kirsakov** | 37:9 38:10 |
| 201:24 202:3 | 171:6,9,16,21 | 191:16,16,18 | 40:6 41:17,18 |
| **kaza** 128:3 | 172:7,20 173:3 | 191:24 192:3 | 41:18 42:18,21 |
| 129:12 136:15 | 178:2 | 192:10,13 | 43:5,6,25 44:1 |
| **keep** 31:15 | **kielty's** 166:9 | 193:1,8,12,17 | 44:17 45:12 |
| 32:9,19 93:14 | **kind** 9:16 10:9 | **kirsanov** 4:5 | 46:4 47:6,12 |
| 249:25 | 10:11 14:7 | 55:8,8,10,17 | 47:25 48:8 |
| **keith** 3:16 | 18:2,17,19 | 55:21,25 56:4 | 51:25 53:2,3 |
| 227:13,16 | 35:13 36:4 | 56:13,18 57:3 | 53:12,16 55:1 |
| 228:9,17 232:2 | 38:7 39:13 | 57:9,13,17,21 | 57:23 59:18 |
| **kentucky** | 42:5,8 43:3 | 57:25 58:4,14 | 61:14,16 64:22 |
| 219:24 | 46:3 61:8,12 | 58:21,25 59:5 | 67:25 68:2,11 |
| **key** 46:15 | 61:15 62:16 | 59:9,15,22 | 68:16,17,20 |
| 51:24 98:3 | 64:8 69:16 | 60:5,8,13,19 | 69:10,23 70:11 |
| 114:13 116:15 | 87:20 91:16,21 | 60:24 61:5,19 | 70:19 74:8,13 |
| 116:16 117:16 | 93:5 105:25 | 61:23 62:2,7 | 74:14,16 75:5 |
| 120:1 123:13 | 106:8 112:8,9 | 62:11,17,19,25 | 76:16,25 77:1 |
| 131:7,7 203:2 | 112:11 114:8,9 | 63:6,11,16,21 | 78:20,22 82:21 |
| 205:10 209:4 | 114:23,25 | 64:2,9,14,20 | 83:24 87:4 |
| **kicking** 9:19 | 115:5 118:24 | 64:25 180:25 | 88:11,14 89:9 |
| 9:20 | 119:10,15 | 180:25 181:3,8 | 90:23 91:24 |
| **kickoff** 157:12 | 120:2 121:20 | 181:13,17 | 93:9,14 94:9 |
| | 121:23 123:6 | | 103:6 105:19 |

106:7,8,11,13
106:15,16
107:18,20
108:24 109:17
109:19 110:5
110:12,12,13
112:10 115:20
116:2,22,24,25
118:24 119:3,7
120:24 121:19
123:6,6,16
124:23 128:19
128:19,20,25
130:1 131:8,12
131:17 132:2,6
132:7,9 135:17
136:21 137:3,5
137:6,10,12,14
137:24 138:7
139:13,17
140:1,1,4,9,9
140:12,16,19
141:18,20,23
142:21 143:4,6
143:9 144:12
144:16 147:6,8
147:9,19,19,21
147:22 148:4,8
148:10,13,14
148:15,15,25
149:8,9,11,12
149:18,21
150:5,12 151:6
151:8,17,22,25
152:15,16,18
152:19 153:2,4
153:6,10,18

157:19 164:22
168:3 169:15
170:6,8 171:16
171:22 172:4
172:14 175:9
178:14 179:1
180:1 186:4,6
188:5,7,21
191:7,8,10
195:2,21 197:3
201:6,16
209:25 213:5
213:22 216:20
222:4,9 225:24
228:23,23
229:8,24 230:9
230:13,14,23
231:2,25
233:10 243:13
245:7,11,12
246:8,13,24
247:1,2,18,21
248:1
**knowing** 153:6
**knowledge**
11:9 12:9
13:12 21:8
33:3 34:16
36:6 38:18
39:8 41:4,13
41:23 44:22
47:1 51:24
105:25 112:21
140:12 168:2
180:20 227:15
228:8,12,14
242:16,19

246:15
**knowledgeable**
56:8 101:5
**known** 76:22
**knows** 78:20
244:7
**knox** 219:24
220:7
**koenig** 3:8 6:13
6:15,18,21,22
7:5,9,15
249:17,17,21
**kokinos** 3:22
72:24 125:24
126:7,16,25
127:3,5,7,7,10
127:11,17,23
128:7,11,14,17
128:24 129:9
129:19 130:1
130:10,21
131:16,25
132:16,18,20
132:22,25
133:3,12,15,19
133:22 134:1,4
134:7,12,14,16
135:10,17,22
136:1,2,7,11
136:21 137:3
137:10,18,21
138:5,15,18,23
139:1,5,21
140:8,19 141:3
141:5,9,11,20
142:8,18,22
143:22 144:1,4

144:9,14 145:2
145:13 146:2,6
146:10,17
147:3,5,8,11
147:17 148:1,6
148:22,24
149:7 150:3,11
150:19,23
151:3,5,15
152:14 153:18
153:22 154:14
**kyc** 26:23

**l**

**la** 140:17
**labeled** 47:24
**lack** 64:18
175:16
**lacking** 71:14
**lagged** 157:12
**landscape**
18:11
**language** 6:24
53:10 79:15
244:8
**lap** 87:17
**large** 24:5
106:2 142:15
158:17 159:18
170:13 208:17
**largely** 57:20
99:4 111:19
117:9 143:5,6
**larger** 41:4
136:23,23
137:16
**largest** 130:23
137:22

las  4:11 196:21
lasted  10:3
lastly  12:19
late  9:5 189:21
latitude  109:5
launch  118:23
  119:9,11
law  91:3
  229:15
laws  60:1
lawyer  5:11
  40:13 47:15
  69:4 80:5,12
  86:1 87:6,7
  88:17 89:19
  91:5 109:6
lawyers  53:11
  76:10 90:22
  224:3,9,24
  225:25 226:1
lays  210:21
leadership
  97:1
leading  10:12
  24:5 96:13
leads  189:22
lean  121:20
learned  160:21
  228:5
learning  40:14
  97:4
leave  61:17
  149:16 154:22
  157:23 234:22
  250:2
leaving  191:4

led  10:1,8 14:7
  19:15 23:21
leeway  118:9
left  158:15
legal  22:6
  33:19 41:21
  44:6 58:8,19
  61:4 77:19
  79:13 80:6
  84:8 87:3
  89:24 90:9,20
  102:20 111:19
  111:22 112:6
  112:24 183:24
  185:11 224:4
  225:16,18
  231:3 241:23
  244:13
legs  15:22
lend  79:15
lender  84:4
  87:20,21 88:18
lending  70:12
  88:5 174:24
length  35:7
  75:13 168:16
  168:18,21
lengthy  74:12
  74:12 89:20,24
lens  167:11
lesser  112:22
letter  5:9,21
letting  109:17
let's  141:16
  146:24 151:22
  153:15 157:8
  230:3,3 238:7

246:22 248:25
level  15:5 93:4
  96:7,10 105:25
  114:7,12
  151:24 152:10
  152:12 159:3
  205:5 206:8
  207:24 208:12
levels  206:5
  209:4,16
lever  165:15
leverage  96:10
  191:20
levers  149:10
levied  246:7
lexington  3:5
liabilities  56:5
liability  54:25
  76:13 100:2
  114:17 156:10
  174:18
liaison  104:25
lie  117:14
  143:9
lien  107:8
life  127:12
lifecycle
  172:13
likely  130:25
  148:9
limitation
  53:10,13 54:25
limitations
  40:9
limited  18:2
  21:13 52:3
  91:21 207:21

221:17
line  116:16,17
  130:23 209:22
  246:1
lines  129:2
  130:5,19
  164:21 169:2
liquid  15:20
  16:18 35:13,16
  42:12 131:12
  175:4,13,13,15
  178:14 180:7
liquidate  85:15
liquidated
  100:5,7
liquidation
  62:7,12,12
liquidity  18:15
  160:14
list  19:19,19
  22:12 29:10
  30:19 31:8,16
  31:18 46:19,22
  46:24 47:3,4,5
  47:7,8 79:2
  80:19,21 81:2
  81:3 97:18
  171:18 201:12
  247:20
listed  45:11
  53:23 80:18,20
  212:20
listing  174:14
lists  65:18
litigating  42:9
  42:10

**litigation**
226:12,23
227:9,17,19
228:10 229:13
229:16 230:12
**little** 10:13
32:11 37:4
44:18 46:11
51:5 75:17
78:7 85:6
116:6 118:1
130:21 131:21
135:15 142:16
159:7 187:21
187:22 205:8
212:23 244:19
**living** 127:9
173:17
**llc** 1:7
**llp** 3:3,11
218:17
**loaded** 114:11
114:12
**loan** 83:18,20
83:21,22 84:4
84:18 85:11,20
85:25 86:6,6
86:12,20 99:22
100:6,22
123:16,17
200:2
**loans** 100:12
100:12,18,19
123:21 174:24
175:19,20,21
199:16,21

**located** 219:22
219:23
**locations**
152:20,22
**locked** 64:19
70:5 91:20
99:9 124:21
250:1
**log** 185:18
**logged** 185:19
**logical** 151:5
**logically**
152:24
**long** 10:3 24:2
36:2 37:16
83:4 89:12
126:6 183:8
217:11 226:5
237:5
**longer** 128:18
200:23
**longtime** 128:9
**look** 10:19
11:21 12:20
17:1 19:16
20:6 22:9 24:8
32:1 36:10
47:7 89:12
93:4 98:10
107:22 127:20
132:7 147:13
148:11 149:9
149:15 150:14
151:8,9 152:16
153:3 189:7
196:3 201:11
206:6,12 209:5

234:9,19
**looked** 175:20
176:4 206:7
207:8,10,12
209:9 222:8
**looking** 9:21
18:17 122:22
131:11 145:14
146:4 160:7
178:13 192:21
207:23 233:12
**looks** 191:11
**loss** 121:17
**losses** 18:5
121:13
**lot** 6:7 10:5,5
15:10,13,18
16:3 17:7
18:20 24:3,4
33:4 37:10
38:21 42:9
82:3 88:20
94:9,10 97:5
104:7 112:13
121:12 128:3
169:17 222:18
235:10 236:17
237:4
**lots** 223:12
**loudly** 87:15
**lovine** 4:7
**low** 17:4 25:9
120:23 121:8
151:20 160:23
**lower** 10:8
32:6 35:18
119:14 123:21

123:22 148:3
149:5,6 151:21
152:21,22
**lowest** 207:12
**lows** 165:25
166:2 171:2
**loyalty** 101:20
**lucy** 5:6
**lunch** 154:16
155:1

**m**

**m3** 28:7 103:20
**ma'am** 42:7
212:21
**machines**
116:14,14
117:4 120:16
121:21
**macro** 94:11
**made** 17:6
18:19 29:11
35:23,24 36:1
41:15 48:10
50:6 77:21
78:23 139:2
140:18 141:19
162:6 163:19
177:4 190:2,12
223:10 227:4
229:3
**magic** 152:1
**magically**
78:14,15
**mail** 198:24
199:1 217:8,23
218:5

mailed  188:14
  188:18
main  51:2 93:5
  98:23
maintain
  119:23 120:10
  139:11 151:23
  152:5 233:11
major  218:15
  222:2 224:7
  225:17 241:16
  246:14 248:19
majority  58:1
  60:15 73:7,7
  127:12 130:3
  139:24,25
  160:16 192:10
  193:3,9
make  7:17
  15:22 27:20
  36:15 38:9
  42:5,17,20,23
  43:3 78:15
  92:5 117:6
  119:23 129:24
  133:19 149:16
  151:18,23
  160:19 161:2
  169:14,24
  175:12 190:20
  195:24 198:20
  199:15 213:5
  224:16 231:15
  232:16 234:25
  236:3 240:22
makes  35:17
  35:21 151:5

210:16
makeup
  136:10 143:4
making  22:6
  56:11 122:8
  129:17 235:22
malpractice
  230:15
man's  115:13
manage  131:12
  132:12 144:20
  152:18 164:10
managed
  121:18
management
  10:8,10 17:8
  27:6 128:3
  129:6,7,8,15
  138:9 149:14
  156:11 164:8
  169:6,13 174:9
  175:25 176:5
manager  16:22
  93:2 128:24
  138:4
managing  9:7
  9:8 102:18,23
  128:4 129:2,4
  129:14 131:11
  142:14 153:2
  183:5 202:22
mandate  7:17
  157:18
mandatory
  211:6 212:1
manipulated
  95:14,17

manipulating
  22:7
manipulation
  64:18 91:19
  124:18
manner  106:11
marathon
  171:25
march  9:2 94:8
marginal  17:25
  18:1 121:15,15
margins  27:5
mark  4:3 177:4
  218:20 219:15
  219:20
marked  80:22
  81:6 204:10
market  18:25
  19:11 23:18
  56:14,17,18
  57:3 68:12
  70:20 91:22
  93:8 94:12
  95:22,24 96:9
  98:8 99:23
  100:7 114:9
  116:1 124:15
  151:10 152:16
  161:11 171:3
  171:18 172:5
  175:4,7,23
  205:21 208:1,6
  208:12,19,21
  208:23,25
  209:3,6,16,17
  209:23 210:6

marketability
  175:16
marketed
  24:18
marketing
  9:19 10:4
  34:12 37:9
  157:4 163:3
marketplace
  96:15 114:23
  124:21 158:10
markets
  120:13 174:20
marsal  28:7
  103:18,20
  202:22
martin  1:22
master  47:5
masumoto  4:3
material
  185:22 220:23
materials
  237:3 249:24
math  195:20
matter  1:5
  30:10 55:12
  62:12 97:20
  108:10 155:22
  206:16
matters  6:14
  6:24 14:15
  28:17 156:10
  156:13,18
  202:24 204:3
maximize
  14:11 26:20
  27:6 103:7

**maximized**
55:11
**maximizing**
35:19 159:13
164:12
**maximum**
139:19
**mccarrick** 3:8
126:8,9,9,15
126:15,19
127:5,9,15,21
128:6,11,15,22
129:6,17,23
130:18 131:20
132:16,21
133:1,4,10,13
133:16,21,25
134:3,5,10,13
134:15,17,23
145:17,21,25
146:9 154:5,11
154:18,21,24
155:4,5,5,14
155:17,23,25
156:5,12,19,24
157:4,8 158:20
161:5,13,19,22
162:2 163:10
164:23 165:2,6
165:10 166:5,8
166:12,17,21
167:2,5,10
169:23 170:20
172:25 173:4,4
173:10,14,17
173:21,23
174:2,7,11,16

174:20 175:1
175:12,18
176:2,8,11,16
176:19,23
177:3,8,13,15
177:18,22
179:12 181:24
182:3,5 214:18
**mccarrick's**
6:16
**mccarter**
199:11
**mean** 6:5,6
7:13 10:3 14:5
15:6 27:12
38:6 41:7,10
43:4 44:12
49:5 51:23
52:9 53:11
56:15 59:20
64:22 70:3
76:4,18 77:16
79:13,14 91:18
101:23 103:10
108:23 114:20
117:19 120:4,9
124:16 131:25
148:6 151:3
160:13 161:6,7
189:1 191:10
192:21 193:15
209:20 226:19
226:24 232:5
233:12,17
**meaning** 85:16
97:23 165:19

**meaningful**
45:8 169:5,7
**means** 35:9
41:9 43:11,12
84:2 90:24,25
100:3 123:10
135:16 153:10
189:24,25
248:3
**measure** 165:7
**measured**
165:18,21
**measurement**
211:10
**mechanism**
121:23
**median** 208:22
**mediation**
109:25 110:3,6
110:7,9,9,11
110:16
**meet** 27:19
36:14 241:22
**meetings**
111:24 222:18
222:23 223:11
223:13 224:11
**megawatt**
115:12
**megawatts**
117:3
**member**
141:24 220:9
220:22 227:20
227:22 239:17
239:25

**members**
106:8,16 108:6
108:17 109:25
110:15 129:9
129:19 138:25
140:6,12,16,20
140:23,25
142:9 143:8
163:2 164:14
170:12 216:17
220:25 223:6
223:13 226:20
227:1,10 229:2
229:13 230:20
233:17 234:12
235:8,24 236:7
236:15 244:16
244:16 247:3
**meme** 124:14
**memorandum**
91:3
**memorize**
117:21
**memory**
117:23,25
119:1
**mention** 74:21
231:24
**mentioned**
55:11 92:18
97:5 99:16
105:23 111:6
112:6 114:24
116:23 130:21
136:12 139:16
139:17 151:18
158:21 162:17

170:25 226:11
234:6 243:10
246:23 248:2
**mentioning**
154:1
**merely** 238:11
**merger** 142:13
172:1
**mergers** 156:9
**met** 164:15
211:10,25
240:5,12,19,24
241:6,22
242:10
**methodologies**
165:10,13
**methodology**
165:10,15
**metric** 118:24
**metrics** 104:1
172:7 206:1,4
210:20,22
211:10
**mg** 1:3
**michael** 137:16
**mid** 94:9
**middle** 108:13
142:13
**midpoint**
166:4
**might've** 28:16
**mike** 127:17
128:9 141:20
**military** 220:7
220:7
**million** 16:19
17:5,14,17

27:1 42:13
66:13,13,19,20
66:20,25
122:16 129:20
130:8,10,13
131:16,19
135:14,14
137:2,15
143:25 144:1
144:11 158:7,8
158:15 166:3
195:3,5 207:5
209:13
**millions** 10:7
163:24
**mind** 35:8
42:15 51:19,20
54:18 86:2
91:23 93:25
100:20 119:1
136:6 168:7
**mine** 121:9
133:23
**miners** 115:2
115:22 116:23
**minimizing**
18:5
**mining** 16:20
16:22 17:2,13
17:21,25 26:24
27:2,4,17,18
27:18,20 35:14
36:1 92:18
93:5 94:2
102:21 108:8,9
113:20 114:6
129:3,14

130:22 131:20
131:22,23
132:7 142:4,14
143:7 145:6
153:2 157:2,11
157:14,21,22
157:23 158:4,5
158:6,21,25
159:5,9,12,12
159:16,17,23
160:8,17,21,23
160:25 161:1
164:10,18,20
164:24 165:5
165:12,14,23
166:23 167:3
172:13 180:13
180:14,17,19
180:19
**minor** 164:5
240:4
**minute** 10:14
13:24 34:1
121:16,16,17
141:16,19
**minutes** 126:11
183:18 244:5
**mirrored**
192:22
**mis** 24:24
**misconduct**
40:6,15 55:3
**misheard**
24:22
**misrepresent...**
96:7

**misrepresent...**
22:7
**missed** 134:2
**misspeak**
239:9
**misspeaking**
242:7
**misstating**
241:11
**mistaken** 107:3
216:18 245:6
**misundersta...**
242:2
**mitigate** 92:24
93:3
**mix** 224:9
**mm** 47:19 50:2
50:19,23 51:14
53:8 98:19
99:25 147:3
188:24
**model** 114:8
**modifications**
53:9
**modified** 200:8
**modifier**
131:17
**modify** 191:25
**moment** 16:7
45:4 57:16,19
66:11 153:25
**monetary**
60:15 193:3,9
**monetize**
164:11
**money** 129:20
137:5,6

| | | | |
|---|---|---|---|
| **month** 10:4 | 21:13 23:12 | **name's** 65:8 | 245:23,23 |
| 24:15 27:1 | 30:10,21 37:13 | **named** 98:23 | 247:2 249:24 |
| 42:13 50:1 | 39:2,19 43:8 | **names** 46:20 | **needed** 30:10 |
| 119:5 157:25 | 43:20 45:21 | 140:22 | 175:3 179:1 |
| 183:15 | 55:18,22 64:3 | **naming** 10:9 | 246:24 |
| **monthly** | 83:23 85:12 | **narrow** 32:10 | **needing** 120:9 |
| 102:21 | 166:17 167:5 | 51:18,20 52:19 | **needs** 7:11 |
| **months** 14:6 | 176:20 204:17 | **nasdag** 239:16 | 112:11 250:10 |
| 14:19 15:14 | 248:17,18 | **nasdaq** 239:5 | **negative** 24:15 |
| 17:2,6,6,7,18 | 249:24 | 239:10,20 | 107:7 |
| 18:16 27:15,15 | **moved** 55:14 | 240:6,8,12 | **negligence** |
| 28:9 55:14 | 55:22 67:15,22 | 241:18,20,20 | 40:15 |
| 68:6,18 122:15 | 68:1 144:5 | 242:1,12 | **negligent** 55:2 |
| 157:13 162:19 | 160:19 | **native** 69:8 | **negotiate** |
| 162:19 228:4 | **moves** 119:6 | 92:3 | 77:19 |
| 240:2 | 119:11 120:1 | **natural** 121:22 | **negotiated** |
| **morgan** 9:7 | **moving** 33:25 | **nature** 68:4 | 15:7 16:5 28:8 |
| **morning** 5:4 | 49:15 50:23 | 140:1 | 52:17,25 53:9 |
| 6:15,18,20,21 | 132:13 170:15 | **nda** 105:2,6,8 | 103:20 |
| 7:25 8:2,20,24 | **mr.phillips** | 163:7 | **negotiating** |
| 10:20 55:10 | 225:6 | **nda's** 159:6 | 14:14 27:13 |
| 65:8,9,10 78:3 | **mtl** 60:1 | **near** 95:14 | 104:11 |
| 78:4 81:7 | **multiple** 164:3 | **necessarily** | **negotiation** |
| 102:7 111:4,5 | 165:19,24 | 226:8 241:19 | 27:16 28:7 |
| 125:25 135:6 | 186:25 | **necessary** 16:2 | 110:14 |
| 135:10 | **multiples** | 108:5,16 | **negotiations** |
| **motion** 7:3,5 | 165:17,25 | 110:16 126:4 | 14:18 34:7,13 |
| 65:12,14 | **mutual** 34:22 | 209:3 233:18 | 37:16 76:6 |
| 210:21 | 235:5 | 233:21 235:17 | **net** 68:18 |
| **motions** 10:16 | | 236:2 | 129:21 |
| **motivate** | **n** | **need** 6:3 18:14 | **netcap** 147:15 |
| 205:12 | | 33:25 38:22 | **network** 1:7 |
| **motivates** | **n** 3:1 5:1 251:1 | 42:19,22 75:1 | 29:24 114:8,24 |
| 109:11 | **name** 8:25 32:4 | 76:9,12 77:13 | 115:15 116:4 |
| **move** 11:15 | 113:10 140:18 | 83:6 130:24 | 117:13 118:16 |
| 12:14 13:17 | 156:2 183:4 | 146:17 148:10 | 120:16 124:2,5 |
| 14:15 21:10,11 | 219:14,15 | 151:9 155:21 | 124:6 146:22 |
| | 227:6 229:15 | | |
| | 245:13,15 | | |

147:1 148:3,7
148:16 149:3
149:25 150:17
151:12,20,21
152:9 153:7
**never**  96:22
97:3 168:7
237:17
**new**  1:2,14 3:6
3:14 6:11
120:21 128:25
130:3 132:12
139:24 140:2
141:24 215:9
222:16 230:20
234:9,9 235:14
243:19
**newco**  5:16 7:3
16:17 17:9
27:3,4 35:15
35:18 45:1,1,3
45:6 105:11
108:7 115:13
117:3,6 120:10
127:8 129:7,10
129:18,21,24
131:4,15,22
132:5,15 134:9
135:15 138:1,3
138:10,14
142:14 143:5
143:24 145:1,5
153:5 163:22
164:2,3 168:24
220:17,25
232:25 235:1
235:22 236:3,4

236:14 238:22
248:13
**newco's**  130:19
**news**  24:15
**night**  19:19
24:11 25:8
66:3 78:24
118:8 145:23
**nights**  104:7
**nine**  108:7,17
138:25 139:10
140:5 154:3
228:4 231:18
232:19,21,23
233:15,25
234:4 244:25
246:20 247:3
**noah**  128:1
156:16
**non**  20:19 21:2
21:6,21 22:4,6
22:18,19,25
23:6,9 47:10
60:20 61:6
89:19 91:4
159:16,17,23
160:8 207:20
**nondisclosure**
157:16
**nonperforming**
175:24
**noon**  126:5,13
126:13
**norm**  185:22
**normal**  247:25
**normally**  27:15

**notable**  140:16
**note**  19:18 71:5
121:11,22
219:1
**notes**  16:13
32:1 71:6
**notice**  2:1,5
20:2 200:9,14
216:2,7
**noticed**  27:23
185:9 217:7
**noticing**  183:6
183:16,23
184:16
**novawulf**  10:2
97:7 159:20
160:6,15 161:4
161:5,8,15,23
162:3,16
163:18,23
164:4 168:25
225:8
**november**
157:14 159:15
161:16
**noyes**  227:13
227:16 228:9
228:17 232:2
**nuance**  153:1
**number**  13:5
13:23 28:19
29:1 30:5 33:7
33:16 44:1
72:7,15 73:10
83:23,25 84:2
86:13 100:14
108:6,17

116:25 117:15
117:17 118:16
118:19 125:3
132:22 138:25
148:4,20 149:6
157:15 159:5
168:22 170:16
175:5 176:13
184:19 187:8
189:2,16 191:2
197:14,21
206:8,22 207:9
241:19 243:19
246:24 247:3
**numbers**  16:17
20:9,10 25:12
67:11 118:10
144:5 147:20
148:25 149:20
152:25 192:22
195:10,14
**numerous**
98:13 223:12
226:1
**ny**  1:14 3:6,14

**o**

**o**  1:21 5:1
113:11 251:1
**oath**  5:13 6:3
6:12 133:2
166:15 185:3
205:2 221:14
**object**  41:14
49:2 65:17
107:19 121:4
141:13 240:7

objected 167:6
193:11
objection
29:17 49:3
50:21 53:1,5
54:2 57:5 58:7
58:11,18,23
59:12,17 60:17
60:22 61:2,21
61:25 63:9,13
63:14,18,19,24
63:25 66:22
67:1,19,24
71:17 73:17
75:8 79:20,24
80:3 84:8 87:2
88:1,12 89:1
92:25 94:17
96:4 100:9
105:13,17
107:4,14 108:1
109:22 110:17
112:18 121:5
139:12 143:1
143:11,12
169:23 180:9
191:22 192:1
192:15,19
193:6 194:20
195:6,7,17
196:2 197:2
213:8 214:2,18
221:17 223:17
225:10 228:6
229:18 230:9
230:14 237:22
238:24 239:3

241:10 243:1
245:2 246:9
247:7 248:4,21
objections
11:17 12:16
13:19 21:15
23:14 29:14,25
31:11 49:13
53:7 54:3
133:7 134:19
140:24 166:19
187:10 204:19
224:16 225:5
248:19
objectives
205:13
obligation
87:20
obligations
55:20
observer 106:3
140:6
observers 43:6
73:9 108:5
140:13 141:23
obstruction
167:8 176:21
obtain 60:5,8
131:5 175:6
obviously
42:11 49:11
88:20 90:18
102:21,25
130:24 148:15
occasionally
156:8

occur 38:6
occurred
222:11
occurring
120:5
october 1:16
2:2,6 9:18
103:24 104:6
163:6 198:25
offer 133:5
offered 195:25
203:24 209:4
210:8
office 4:2 32:5
52:18 110:2
135:12 136:15
187:19 210:15
219:23 220:8
officer 9:1,1
97:12 98:15
officers 72:14
96:8 97:10,11
97:13,21,21
98:4
official 29:23
183:6 216:1
officially
104:24 247:24
offset 150:14
oh 40:7 82:6,6
102:18 113:8
114:20 134:1
142:25 182:7
189:5 199:10
205:9 244:1
ok 224:18

okay 7:4,19 8:3
19:14 25:12
28:18 29:5,14
30:7 31:3,9,23
33:22 34:2,19
35:20 37:13
38:17 39:19,21
40:12 41:18,22
42:2 43:8 44:4
44:15,25 45:9
46:18 47:18
50:23 52:7,16
53:15 57:25
58:13 69:22
70:6,21 71:4
71:19 72:12,18
73:10 74:15,18
75:4 78:2 79:7
80:14,25 81:1
82:11,11,24
84:5,19,22
86:21 87:14,23
88:3 89:3 91:6
93:16,19,23
94:3,14 95:4
95:19,20 96:6
101:11 102:3,7
103:22 104:16
104:23 105:15
106:4,22,22
107:6,15 108:3
108:4,16,21
109:1,8,15,18
109:24 110:10
111:14,23
113:12 114:20
116:5 117:21

118:1 119:20
121:1 126:12
126:18 133:12
133:15 134:5
134:23 137:8
137:14,21,25
138:16,23
140:15 141:4
142:1 143:3,13
145:4,18 146:6
146:12,19,24
147:12 149:23
150:16 152:8
153:6,16,23,25
154:22 157:3
161:13 164:23
168:2,7 170:25
172:21 178:19
180:1,4,11
182:7,13
184:22 187:6
188:19 189:6
194:9,16
195:12,23
196:24 197:20
197:24 198:13
200:6,21
211:19,23,24
212:5,11
213:13,14
215:21 216:10
217:14,21
218:6,11,19
219:16 223:4
224:25 225:6
227:12 229:12
231:6,11,19

232:3,15 233:5
234:6,14,24
236:12,21
237:25 238:2
238:15 239:16
239:23 240:22
243:5,17
244:23 246:18
246:19 247:13
248:15 249:6
249:13,22
**old** 115:4
**ombudsman**
5:6
**omnibus**
249:19
**once** 119:16
185:8 193:23
**ones** 15:14
28:25 140:10
152:22 171:13
175:22 207:23
223:10 245:9
**ongoing** 169:5
**open** 29:11
59:10 61:10,11
61:11 66:12
72:12 83:13,14
132:9,17
157:20 159:25
166:5 176:8
192:3 198:21
230:19,23
**opened** 24:7
25:6 45:3
194:2

**operate** 15:23
24:20
**operating** 17:1
102:21 151:19
**operation**
17:22 122:9
152:13
**operational**
26:24 38:9
102:22 114:10
121:20,21
**operations**
38:16
**operator**
151:18
**opex** 18:2
**opinion** 43:16
48:24 80:6
84:7 112:9,15
**opinions** 49:9
89:24 203:24
223:21
**opportunities**
132:9 210:7
**opportunity**
73:13 127:20
200:2
**opposed**
144:11,24
224:22 226:25
247:4
**opt** 43:13 44:2
73:14,22,23
74:7 75:1
190:18 196:25
197:4,7,10,14
197:18 198:20

199:1
**optimized**
152:22
**option** 49:18
144:15,19
197:7 199:20
**options** 14:7
100:24 130:12
223:23
**order** 6:25
7:11 42:17
54:15 72:6
104:15 151:12
151:23 152:5
152:10,12
184:1,10
250:15,15
**ordered** 65:19
78:12 250:10
**organic** 97:4
**organically**
112:9
**organization**
157:11 246:7
**orient** 189:3
**original** 139:6
**originally** 9:3
49:25 81:2
**otc** 56:17
**otis** 4:6 65:8
**outcome**
205:14
**outcomes**
193:1
**outlined**
210:20

outlines 212:18
outlining 134:8
outs 197:4
outset 163:15
outside 54:23
70:4 92:16,16
92:16 124:14
185:22 235:17
236:2 247:23
outstanding
199:20
overall 35:17
143:23 151:20
180:12 186:1
186:19 192:22
210:3
overarching
206:9
overlap 159:7
overruled
59:18 84:9
87:4 93:1
94:18 105:14
105:17 195:9
195:18 197:3
223:18 241:12
245:3
overseeing
39:11 143:7
oversight
106:11 168:5
226:12,23
227:10,17,19
228:11 229:13
229:16 230:12
233:19,20,20
235:15 236:2

owes 107:8
own 31:16 77:7
87:21 88:20
129:20 132:5
158:18 163:2
170:8 229:9
238:4
owner 85:22
87:2
owners 130:3
136:5,8,13
ownership
58:5 78:7
79:19 80:2,10
84:6 87:1
88:10,15,17
89:17 90:7
136:19
owning 79:23
130:1 132:3

**p**

p 3:1,1 5:1
208:20,23
209:17,17,18
p.m. 19:2 25:8
65:21 78:14
145:10 155:2
175:10 215:9
216:13,14
pack 27:16
packages 184:3
184:4 188:15
188:18
page 11:5 12:5
12:6 13:5,8
20:7,9,10,10
20:10,13,22,22

20:24 21:16,21
30:16 65:12
78:9 82:21
83:11,13,17
84:23 85:12
86:22 87:9,16
87:19 89:13
90:2 133:22
145:13 179:17
179:22,22
188:20,23
189:4,8 192:3
194:3,6 204:12
206:12,13,20
206:21 208:4
209:8 212:17
221:6,10
243:19
pages 21:11,13
21:14,15,18
22:20 82:23
83:4 88:7
133:17,18
134:2,5 169:10
paid 76:11
135:14 212:1
palma 140:17
paper 122:25
123:3,4
paragraph
21:23 30:15
31:6,12 34:4,6
34:11,19 39:20
40:18,18 42:3
42:14,18 43:9
43:9,20 44:8,9
45:23 46:6

49:16 50:24
72:7,12 73:10
74:21 75:6,17
81:22 90:2
145:5 168:15
195:2,5 212:17
212:17 222:9
226:14 230:18
231:9,24
232:17,18
234:15 239:23
242:14 243:10
244:12
paraphrasing
42:4
part 15:17
18:15 24:2
35:15 41:15
45:18 46:23
76:4,5,5,6
85:13 97:25
105:7 107:2
108:18,24
111:18 114:16
119:4 125:8
149:7,13 153:1
169:8 170:6,22
187:23 193:24
203:4 205:14
217:2 220:15
230:15 239:13
249:16
participant
207:10
participants
206:9 207:9
208:9

participate
  111:24 222:25
  231:11,13
  232:6,14
participated
  14:18 157:5
  162:9,16
  222:19 231:14
participating
  157:17 222:10
  232:10
participation
  128:16 222:10
particular  7:10
  20:6 129:1
  131:10 149:5
  168:21 170:3
  172:18 174:18
  175:11 190:19
  205:19 213:23
  223:15,20,25
  225:7,23 234:3
particularly
  132:11 224:2
  225:24 226:8
parties  6:8 7:7
  14:13,18 29:8
  31:17 34:23
  35:2 42:20,23
  44:10 45:10,11
  46:24 47:8
  48:2,5,8 75:14
  75:21,22 76:7
  76:20 77:3,17
  77:18 80:24
  97:13 145:3
  157:16,22

159:5 162:6,8
184:2,4 186:3
186:6,16
188:17 198:19
parties'  224:11
partner  51:25
  126:19 132:2
  156:3
partners  46:16
  104:13 136:11
  156:3,17 170:3
  229:15
party  15:16,25
  35:6 43:9,18
  65:20 73:11,12
  73:14 97:14,18
  109:19 132:14
  147:23 159:22
  160:6 190:1,18
  196:25 197:7
  197:15,18
party's  185:19
pass  134:24
  167:11 177:18
  187:13 202:4
  210:9 221:23
passing  182:4
  182:5
past  145:10
  171:12 198:16
path  16:8,10
  18:6 32:10
  161:4
patton  4:13
  111:1,1,3,4,6
  111:11,14,23
  112:4,14,20

113:1,2,4
198:7,9,11,14
199:3,5
pause  19:1,2,6
19:9,12,15,17
23:19,23 24:5
24:10,13,23
25:7,10,15
56:14,15,17,21
56:22 66:11,20
66:24 67:6,17
68:7,13,19
71:14 96:11,13
111:7 124:19
paused  25:21
154:25 218:12
pavon  214:6,13
paxos  51:10,11
pay  60:6 97:23
100:22 123:17
124:1,4
paying  38:25
71:15 100:25
payment
174:18
paypal  27:13
37:14,23,23,25
38:3,6,13,19
38:23 39:25
40:1,9 42:25
50:24,25 51:8
51:9,11,13
61:18 76:8
paypal's  37:14
37:18 51:5
payroll  27:22

peer  207:1,6,19
208:21 209:25
212:19
people  15:11
43:15 46:22
70:17 78:21
97:15 101:20
106:1 120:12
172:5 197:9
200:2 201:6,8
236:10 247:4
perasonia
181:1
percent  17:5
24:16 57:15
62:8,8,13,13
64:18 91:20
99:9 100:3,13
100:13 116:3,6
119:14,21
148:19 171:8
171:15 186:4,6
192:7,9,24
195:25 207:6
207:13 208:21
208:22,23
percentage
100:12 136:19
137:16 149:25
186:5 190:23
192:17 231:5
percentages
136:10,22
percentile
186:14 207:14
208:21 209:25

| | | | |
|---|---|---|---|
| **perella** 170:2,7 | 88:13 90:15 | **ph** 56:1 70:11 | 179:5,6,7,12 |
| 170:12,13 | 91:3 230:2 | 140:17,17 | 179:15,16,20 |
| 230:25 242:16 | **permitting** | 156:16 171:4,4 | 180:1,4,9,11 |
| 242:17,23 | 78:21 118:6 | 181:1 224:10 | 180:18,22,23 |
| **perfect** 40:12 | **person** 44:4 | 248:12 249:3,4 | 193:21,22,23 |
| 171:23 | 47:2 69:8 | **phillipos** 4:8 | 194:5,8,15,16 |
| **perfectly** | 90:19 106:19 | **phillips** 71:22 | 194:22 195:1 |
| 141:11 | 139:7 151:6 | 71:23,24 72:1 | 195:13,23 |
| **perfom** 165:3 | 154:7 220:1 | 72:3,5,10,14 | 196:6,9,15 |
| **perform** | 222:17 231:22 | 72:18 73:2,10 | 216:22,23,23 |
| 167:20 168:1 | 234:3 238:6,9 | 73:19,23 74:1 | 216:25 217:8 |
| 174:12,14,21 | **personal** 34:7 | 74:5,17,18,21 | 217:22 218:1,2 |
| 180:15 205:12 | 137:5 141:21 | 75:2,4,10,16 | 218:7 221:18 |
| **performance** | 219:3 228:14 | 76:1,9,22 77:5 | 221:25 222:2,8 |
| 103:13,16 | 242:16,19 | 77:11,22,23 | 222:14,19,25 |
| 206:1,5 | **personally** | 143:20,21,22 | 223:4,7,15,24 |
| **performed** | 103:7 124:13 | 144:2,7,10,23 | 224:20,24,25 |
| 165:20 167:3 | 127:25 156:13 | 145:4,15,16,19 | 226:10,14,16 |
| 175:5,9,23 | 174:3 222:15 | 145:21,24 | 226:19,24 |
| 203:5 | **person's** | 146:5,7,12,16 | 227:8,12,15,21 |
| **performing** | 229:15 | 146:24 147:6 | 227:25 228:3,8 |
| 175:21,22 | **perspective** | 147:10,12,24 | 228:16,21,22 |
| **period** 24:16 | 15:24 16:10 | 148:2,18,23 | 229:7,12,21 |
| 27:16 52:20 | 23:20 25:13 | 149:3,23 150:6 | 230:5,6,11,18 |
| 67:8 94:10 | 28:1 162:19 | 150:7,9,16,20 | 231:6,11,16,19 |
| 117:15 119:14 | 164:17 244:15 | 150:25 151:4 | 231:21,24 |
| 119:14 198:23 | **pertains** 62:21 | 151:11,17 | 232:3,15 233:5 |
| 201:8 240:2 | **pesce** 228:25 | 152:5,7,8 | 233:9,23 234:2 |
| **periods** 67:8 | **pesce's** 229:21 | 153:6,13,15,16 | 234:6,14,17,24 |
| 116:20 | 229:25 | 153:24,25 | 235:4,7 236:6 |
| **perman** 65:13 | **petition** 9:5 | 168:11,12,13 | 236:12,18,21 |
| **permission** | 23:23 24:14,23 | 168:20 169:18 | 237:1,14,19,25 |
| 5:10 155:14 | 25:11,15 66:25 | 169:24 170:1 | 238:2,5,11,14 |
| 173:10 177:5 | 67:6,18 68:13 | 170:11,15,21 | 238:15,19 |
| 182:16 | 96:11 125:14 | 170:24,25 | 239:1,5,10,16 |
| **permit** 56:11 | 183:15 213:6 | 171:7,12,18,22 | 239:23 240:11 |
| 78:24 80:4,22 | | 172:3,17,21,23 | 240:16,18,22 |

241:3 242:2,4
242:14,21,25
243:3,5,7,17
243:22 244:3,9
244:11,23
245:7,14,17
249:7 250:3,4
250:12
**phillips'**
225:22
**phone** 107:16
**phrase** 45:13
189:15
**physical**
188:15,18
**physically**
109:24
**pick** 63:4
**picked** 73:1,6
**piece** 15:8
123:20,23
**pieces** 238:3
**piled** 65:25
**pitcher** 82:5
**pivot** 36:16
**place** 76:19
77:14 222:15
**placed** 82:12
**plain** 10:11
209:20
**plan** 9:22,23
10:1,10 12:4
14:4,24,24
15:2 16:2,7,13
18:9 26:13
27:10 28:2
30:6 32:15,17

32:23,23 33:2
34:7 35:10,11
35:12,16,18
36:16 39:2,3,6
39:9,14,15,17
40:2,10 41:9
41:24 42:1
43:5 44:17,19
44:23 45:14,14
45:22 48:11,17
48:22 49:8
53:18,19,25
54:1,13,15,20
54:20,21 55:2
58:15 60:1,3
60:14,16,21
61:8,10 63:7
63:12,16,17,22
71:7 72:20
74:3,11 75:11
75:15,15 96:21
97:6,7,13
102:8,9,12
103:4,13,23
104:2,5,6,9
108:24 111:15
111:21 112:2,7
112:21 113:17
113:20 114:1
115:9 116:20
117:3,3,5
119:12,13,20
119:21,23
121:3,7 124:8
125:5 130:25
134:15 135:18
143:5 157:20

158:1 180:6
190:2,5 192:11
192:14,18,25
193:10 197:10
197:16,19
200:8 201:22
211:15 212:1
215:19 234:7
243:18
**plan's** 40:10
**planning** 9:3
169:10
**plans** 33:2
207:20,24
**platform** 24:19
25:20 26:6
59:9 61:17
64:7,19 66:19
70:5 78:6
91:15,20 92:4
124:7,11
157:13 158:21
158:22 159:3
159:25 160:7,9
160:10,22
163:22 174:24
**played** 36:17
**player** 36:2
**plays** 150:1
**plead** 214:14
**pleading** 20:1
20:7
**please** 5:3 8:9
8:19,22 10:21
19:22 21:22
34:8,13 35:22
42:6 43:21

44:9 45:25
69:3 80:7,8
82:1 83:14
84:1 107:19
117:20 121:5
126:14 127:1,4
153:25 155:4
155:16,24
167:18 173:12
177:6 179:11
182:18 183:1,2
189:24 191:17
196:23 198:12
202:14,19
204:11 206:11
208:4 209:8
218:24 219:10
219:11,13,25
220:20 221:6
234:23 245:14
247:12
**pled** 214:14
**pledge** 79:15
86:24 87:9,22
88:17
**pledging** 79:19
87:24
**plenty** 223:11
**plugged** 27:5
**plummeted**
24:6
**plus** 9:12 103:1
158:7 175:23
188:5 195:3
**pm** 250:18
**podium** 199:8

**point** 17:4 24:6
25:7 33:21
48:11 50:12
52:1 57:20
64:16 67:13
91:22 98:15
99:18 116:19
116:21 119:9
119:11 120:15
121:7 131:7
157:18 160:15
162:7,13,14
163:19,25
171:16 172:11
178:20,21
215:16 242:11
**points** 24:8
119:11 131:2
166:1,2 172:4
**policy** 7:2
72:22
**poor** 96:14
**portal** 185:18
190:1,7
**portfolio** 129:4
**portion** 122:8
122:14 131:1
143:24 172:14
192:5
**portions** 12:12
13:15
**position** 50:11
77:9 100:6
106:9,25 107:7
140:2 142:11
145:18 159:18
227:19 242:22

247:15
**positions** 66:12
66:13,14,21
142:11 208:14
232:9,11 247:3
**positive** 17:3
**possession**
88:18
**possibility**
139:9 152:14
**possible** 14:12
18:14 26:21
27:1 35:2
42:17 75:19
79:22 103:8
109:11 112:21
117:7 131:6
132:14 145:20
205:13
**post** 44:11,12
45:6,6 52:8
56:22 61:11
78:13 79:5
118:7 213:6
**posted** 29:13
85:20 247:18
**posts** 29:23
**potential** 27:9
40:4 76:13,17
157:15 164:1
230:15,20
**potentially**
98:7 117:1
132:8
**power** 17:23
94:1 114:7,25
115:1,9 120:13

122:12 165:24
**practice** 156:4
**practicing**
184:17
**pre** 52:20
56:17
**preceding**
240:3
**precipitously**
57:20
**precise** 130:8
**predicts** 114:8
**predominantly**
51:9 93:25
**prefer** 63:22
216:14 219:17
**preference**
15:10 74:6
215:8
**prefers** 215:23
**preidentified**
188:12
**premarked**
184:20
**preparation**
172:18
**prepare** 33:18
176:24
**prepared**
123:1,3 180:1
207:18 216:24
**prepetition**
207:21 234:11
235:8 240:23
241:4,7
**prepetitioned**
242:5

**present** 109:24
170:12 225:1,4
225:25 226:1
**presentation**
65:15 134:7
**presented** 81:3
115:9 140:22
148:25 149:21
149:24
**preserve** 10:5
**preserved**
36:13
**pressed** 50:12
**pressures** 24:3
24:4
**pretty** 47:15
79:16 103:11
108:8 119:2
214:8
**prevent** 77:1
138:1
**previous** 96:18
97:1 100:5
142:2 154:1
178:19 235:16
**previously**
36:19 75:7
82:19,20 99:15
139:12 140:19
153:18 162:9
203:23 204:10
**price** 18:25
19:11 22:8
23:18,22 24:8
24:11,12 25:11
25:18 56:24,25
57:1,2,6,8,9,12

57:12,17 62:24
64:12,14,15,17
64:20 67:5,16
67:16,17,18,22
68:1,2 93:6
95:14 96:1
100:1,3 114:23
115:14 116:13
146:23 150:4,6
150:16 151:21
152:8 161:14
161:16 174:17
175:7 195:25
**prices**  116:13
120:15,15
159:2 163:17
**primarily**  5:16
159:1 233:4
**primary**  28:21
130:19
**principally**
127:12 146:22
**principals**
127:19,24
136:12 137:9
**principle**
112:15 175:4,7
175:22
**prior**  38:14
68:7 111:16
112:6,6 169:10
175:11 183:15
184:16 238:16
238:18 243:11
243:23 244:4
**privacy**  5:6,16
7:2

**private**  128:4
**privilege**  110:7
224:5,15 225:2
225:2
**privileged**
225:11
**privy**  168:4
170:9
**pro**  65:8 69:1
78:1 92:15
111:1 191:16
196:21 213:19
218:2
**probably**  28:5
35:24,24 41:20
44:6 82:4 94:4
115:24 125:24
188:6 191:11
**probe**  230:6
**probing**  229:8
**problem**
106:22
**procedure**  5:17
63:1 80:14
**procedures**
63:8 184:2,6
184:11
**proceed**  7:23
8:18 143:4
155:23 182:25
**proceedings**
89:21 154:25
155:2 218:12
220:10 221:18
222:20 250:18
251:4

**proceeds**  158:9
158:11
**process**  9:19
9:23 10:4 14:2
14:19 15:17
34:8,12 37:9
43:21 72:19,25
76:5 96:17
97:4 102:19
105:5,10,12
106:7,14
108:11,22
109:20 128:12
128:16,18
157:1,5,9,11
157:13,14,17
157:18 158:2
158:23 159:3,4
159:9 160:19
160:21 161:12
161:23 162:4,4
162:7,9,13
168:14 183:19
185:5,21,23
186:7 188:12
190:8 198:18
198:22 200:18
201:4,6,17
203:20 220:16
220:21 222:11
222:24 223:12
223:16 226:2,6
226:6 230:19
230:22,23
232:12,16
235:24 237:9
247:14

**processed**
161:24
**processes**  24:2
77:20 156:10
159:7
**produce**
151:13
**produced**
28:20
**product**
100:25 101:2,3
101:4 123:23
**production**
115:23 118:17
**productive**
144:17
**productivity**
117:12
**products**
101:12,21
**professional**
27:2 173:24
235:18
**professionals**
50:5 77:12
**profile**  164:1
**profit**  114:10
**profitability**
121:13 147:15
149:5 150:21
151:2,24
152:24
**profitable**
121:7
**profitably**
164:11

[profits - pursued]                                                          Page 58

| | | | |
|---|---|---|---|
| **profits** 151:13 | 136:15 137:11 | **protocols** | 32:23 33:24 |
| **proforma** | **proper** 49:6 | 70:12 | 45:12,22,24 |
| 171:25 | 52:23 91:4 | **provide** 31:18 | 46:7,12 48:15 |
| **program** 26:15 | 108:14 112:25 | 34:22 35:3 | 48:24 49:17 |
| 26:19 28:2 | **properly** 229:6 | 37:20 53:25 | 50:9 75:6 |
| 203:7,18,22 | 242:9 | 118:9 146:21 | **public** 29:12 |
| 205:6,10 | **property** 79:12 | 146:25 156:8 | 72:22 128:4 |
| 206:10 209:3,7 | 84:12,14,16 | 156:22 161:9 | 165:17 171:23 |
| 210:20,24 | 131:4 132:3,8 | 176:6 200:2 | 171:24 172:8 |
| 211:12 214:5 | **proposal** | 208:12 233:18 | 233:1 235:16 |
| 214:12 | 207:11 | 233:20 236:2 | **publish** 218:3 |
| **programs** | **proposals** | **provided** 29:7 | **pull** 80:25 |
| 203:2,11,14,24 | 169:13 | 36:7 37:5,10 | 118:10 206:11 |
| 204:2,2 207:2 | **proposed** 6:24 | 41:5 50:17 | 209:7 |
| **prohibit** | 6:25 13:3 14:4 | 53:13 54:19 | **pulled** 208:8 |
| 242:13 | 14:24 16:8 | 61:6 62:2 66:2 | **punitive** |
| **prohibited** | 26:13 28:2 | 79:1 84:3,17 | 158:18 |
| 241:25,25 | 62:5,23 105:24 | 85:25 86:5,12 | **purchase** |
| **project** 114:4 | 127:8 168:24 | 86:16,19 134:8 | 101:13,18 |
| **projected** | 168:25 206:8 | 160:16 176:5 | 158:13 238:23 |
| 165:22 | 206:25 209:12 | 178:24 188:20 | **purchased** |
| **projecting** | **proposing** | 191:24 197:4 | 68:12 |
| 119:24 | 158:18 207:4 | 211:11 216:25 | **purchasing** |
| **projection** | **proprietary** | 221:2 | 129:21 |
| 117:25 120:6 | 172:14 | **provider** 128:2 | **pure** 62:8,13 |
| 147:18 | **prosecution** | **provides** 54:14 | 90:25 |
| **projections** | 20:19 21:2,6 | **providing** | **purported** |
| 115:14 146:19 | 21:22 22:4,18 | 14:15 38:19 | 5:10,13 |
| 153:8,11,17,20 | 22:20,25 23:6 | 39:10 41:23 | **purpose** 51:2 |
| **projects** | 23:9 | 128:25 129:16 | 238:10 |
| 149:21 | **protect** 94:24 | 157:25 174:6 | **purposes** 78:15 |
| **prompted** | **protected** 40:3 | 221:13 | 204:9 |
| 214:16 | 40:4 | **provision** | **pursuant** |
| **promptly** | **protection** | 48:23 52:12 | 144:21 183:25 |
| 75:19 | 15:21 17:24 | 75:11,18 | **pursue** 160:5 |
| **proof** 127:24 | 18:2 76:9,12 | **provisions** | **pursued** 96:21 |
| 128:1 131:3 | | 15:1 16:2 | |

push 226:9
pushing 226:3
put 6:12 10:17
  32:13 33:25
  70:1 86:7
  99:20 105:1
  118:11 158:18
  159:24 163:8
  176:1 195:10
  215:16 217:17
  227:4 250:1
putting 96:19
  113:17
puzzled 196:7

q

qualifications
  102:24 239:14
qualified 14:8
  47:25 162:11
  162:15 236:14
  236:17,20
  237:11,13,15
  237:18
qualify 237:20
qualitative
  164:15 169:15
quality 114:3
quantum
  159:6 160:10
question 39:22
  44:1 47:20
  50:7,9,13,13
  52:23 53:14
  54:10 58:12
  64:24 66:9
  67:2,3,3 69:13
  69:18,20 70:10

70:24 72:2
79:14 80:8,15
84:21 88:13,22
90:5,12 91:4,9
92:6,13 93:21
94:25 99:6,19
99:20 101:6,10
101:16 102:1,1
104:24 105:10
105:16 106:14
106:19,23
107:18 108:13
108:14,20
110:11 111:20
111:21,22
119:19 121:10
121:24 122:3
122:10 135:4,8
135:13 138:13
138:16 142:2
143:2 146:11
152:3,3,4
153:14,23
154:1 162:1
167:19 178:10
181:7 189:14
189:23 192:20
196:18 198:9
198:11 200:5
200:22 201:2
201:20 212:12
213:3,24 214:9
224:23 225:10
225:23 230:2
230:17 236:12
236:13 238:13
240:7 241:13

241:16 244:22
244:22 245:20
246:15,20
247:10 248:11
questioned
  110:25
questioning
  7:14 78:25
  121:5 196:10
  224:14 235:25
questionnaires
  244:15
questions
  32:14 33:23
  54:7 56:9,11
  65:3 66:2 71:1
  71:3 77:10
  78:19 79:8
  88:13 89:11,20
  89:22,23 90:13
  90:18,20 91:7
  92:8 95:2,5
  99:17 102:4
  104:20,21
  106:6 108:14
  109:3,4 110:19
  110:23 112:24
  113:1,5,13,16
  113:23,25
  118:12 120:19
  122:21 124:22
  125:3,16
  143:19 152:7
  154:7 168:8
  172:22 180:22
  181:18 187:20
  191:18 193:15

193:18 196:14
196:15 197:12
197:25 199:4
200:4 201:19
212:24 213:10
213:20 224:14
225:4 229:11
231:23 234:23
238:7 241:23
245:18 248:6,7
quick 27:1
  91:9 152:3
  179:1 212:12
  213:3
quickly 107:20
  132:14 164:14
  217:18 243:9
quite 7:6 24:6
  28:4 37:16
  102:25 116:12
  119:25 122:11
  157:18 164:17
  169:2

r

r 1:21 3:1 5:1
  251:1
raise 5:5 7:21
  8:12 155:8
  202:14 218:22
raised 52:25
  53:5 113:7
  154:9 158:13
  181:21 198:6,7
  199:24 214:24
  227:5
raises 7:13

raising  200:23
rambling
  152:2
ran  9:7
range  120:22
  156:11,22
  166:1 171:1,7
  171:11,14
  172:6,10,15
  209:23
ranges  172:9
rank  207:24
rapidly  117:4
rarely  135:7
rate  104:13
  115:21,25
  116:7,7,12,17
  116:19 117:13
  117:15,24
  118:16 119:16
  120:1,7,22
  123:18,21
  146:22 147:1,7
  147:8,12 148:7
  148:7 149:4,25
  150:17 151:11
  151:12,20,21
  152:9 165:20
  165:22 171:4,4
  176:1 185:25
  186:5 208:1,7
  208:13 209:6
rates  35:17
  115:9 123:16
  123:22 148:16
  148:19

rather  91:16
  144:19 246:21
rating  116:1
  119:15
ratio  233:6,12
  233:17
rational  161:3
rationale  25:13
  79:11
ravi  128:3
  129:12 136:15
reach  5:20
  6:12 163:1
reached  159:4
  159:8 162:22
  174:10 177:15
  204:23
read  21:25
  33:25 53:22
  66:15 84:1
  85:13 86:22
  87:15 217:16
  219:12 234:18
  244:9,11
reading  86:1,7
  86:8 88:16
  99:12,13,13
  241:19
ready  7:23
  32:2 216:13
  250:11
real  64:17
  222:20
reality  118:19
  119:15,17,18
  148:9

realize  231:12
  248:16
realized  233:6
really  9:18
  21:11 38:10
  50:13 73:1
  76:15,16 95:17
  104:14 110:15
  112:24,25
  121:8 132:3
  138:5 151:13
  164:6,18
  205:12 213:10
  226:3 232:13
  234:21 236:17
realm  106:9,24
reanalyzed
  188:16
reason  18:7,15
  25:17 37:11
  59:15 76:20
  91:12 105:2
  106:6 107:13
  138:24 141:18
  149:23 195:13
  226:4
reasonable
  28:3 71:12
  101:23 114:22
  115:11 148:14
  149:1,22
  153:11,11,17
  153:21 180:5
  203:8 207:1
  210:7
reasonableness
  148:13

reasoning
  91:16
reasons  16:23
  122:14
recall  144:4
  223:24 225:23
  226:3,8 228:15
  231:1,4 236:24
  238:17 245:10
receipt  43:17
  174:17
receive  36:8
  46:20,25 50:4
  50:5 51:21
  98:15,25 99:23
  102:10 180:6
  184:3 243:23
received  11:19
  12:18 13:21
  21:18 23:16
  29:20 30:3
  31:13 44:2
  47:13 97:11,23
  133:9 134:22
  158:3,22
  159:16,20,22
  162:17 165:16
  175:7 186:3
  188:9 189:17
  189:19 191:8
  192:23 196:12
  204:21 210:18
  224:4 225:18
  248:22
receives  85:1
receiving  38:23
  40:5,10 47:7,9

48:9 74:22
**recently**
127:14
**recess** 218:10
**recognize**
10:24 11:25
12:24 20:15
22:14 179:16
179:24
**recollection**
139:22,23
239:8
**recommenda...**
214:5
**recommenda...**
223:16
**recommended**
230:24,24
231:2 244:14
**record** 8:23
20:12 33:14
35:8,8 37:17
43:10 45:25
46:12 51:4
54:19 56:12
71:6 109:9
135:16 145:21
163:9 166:9,22
176:11 178:3
189:23 190:23
200:4 204:9
210:16 219:14
229:19 246:10
246:12 251:4
**record's** 19:4
**recorded**
231:13

**recording**
139:21 250:9
250:13
**recovery** 35:17
169:8
**recuse** 232:7
**recused** 226:20
226:21,24
232:4,8
**redirect** 154:10
172:24 181:23
198:3 214:25
245:19
**reduce** 61:14
102:25
**reduced**
123:24 131:19
144:11
**reduces** 121:17
**refer** 78:8
83:20 85:22
88:6 92:20
129:6 145:12
189:15,16
224:7
**reference**
79:17 81:3,14
83:18 113:19
188:1
**referenced**
30:11 81:22
189:2
**references**
30:16 31:7
**referencing**
49:20 68:21

**referring** 26:9
30:22 57:6
78:25 83:9
85:19,24 86:9
86:11,18 99:13
101:22 118:3,5
146:14 188:23
224:9
**refers** 84:16
86:14 87:20
**reflect** 211:21
**reflected** 67:10
96:14 177:9
**reflects** 225:14
**refresh** 239:7
**regard** 79:8
**regarding** 50:9
90:20 111:15
125:4 172:19
222:20 238:4
239:6
**regardless**
169:3
**regards** 93:13
167:20 194:1
195:24 243:7
**regulation**
240:8
**regulatory**
15:19 18:7,11
18:19 46:3
160:3 169:1
**reimbursement**
36:19 37:3,7
37:12
**reimburseme...**
36:23

**reiterate**
130:22
**reiterating**
148:24
**reject** 58:2
74:25 186:11
188:2 190:4
192:8,11,13
**rejected** 58:15
60:15 192:5,18
193:4,9
**rejects** 62:25
63:3,4,7,12
**relate** 33:23
36:23 49:17
**related** 2:3,6
22:18 37:3,7
45:2 51:17
93:10 94:2
105:6
**relates** 164:20
**relation** 35:9
80:2
**relations** 9:4
**relationship**
38:14 228:9
242:15,15
**relative** 136:6
136:9,19
137:15 172:12
203:8 207:1
**relatively**
160:6 164:13
186:5
**release** 15:9,12
15:25 16:1
39:23 40:9

42:19,22 44:9
45:11 47:7,13
48:2,5,9 52:19
73:11,12,12,14
73:16,19 74:7
74:19 75:1
190:18 197:8
239:20
**released**   15:15
39:24,24
**releases**   14:25
15:16,23,25
32:22 34:16,21
34:22 36:8
38:20 39:10
40:4 41:6,23
42:3,4 43:9,13
43:18 46:20,21
46:25 47:9
49:14 50:17
53:6 74:4
197:1,10,15,19
**releasing**   34:22
35:1
**relevance**
92:25 228:20
229:4 230:4
**relevant**   85:13
196:10
**reliability**
114:15,19
**reliance**   115:17
**relied**   241:23
**relying**   169:7
**remain**   27:21
**remaining**   27:8
121:6 137:23

**remember**   36:4
94:11 123:13
161:17,20
223:24 230:22
231:6 245:9
**remind**   130:19
**remote**   250:5
**remotely**   5:7
5:18
**removal**   97:2
228:18
**removed**   97:3
214:12,17
**removing**
69:17
**reorder**   215:22
**reorg**   96:18,19
96:21 97:2
**reorganization**
16:9 26:14
174:3
**reorganize**
157:23
**repay**   199:16
199:20 200:2
200:15
**repeat**   32:12
150:23 161:25
181:6
**repeating**
42:16
**rephrase**   38:2
93:20 151:15
**repledge**   79:15
87:22
**report**   67:10
107:1 166:14

178:16
**reporting**
102:20
**reports**   102:21
176:17
**representation**
73:5,8 139:19
140:5
**representative**
142:6 227:22
**representatives**
224:12
**represented**
24:17
**representing**
219:5
**repurchase**
88:5
**request**   5:7,21
199:23 224:21
250:5
**requested**
55:22 247:20
**requesting**   5:9
**requests**   10:16
**require**   6:11
**required**   48:25
241:20,21
**requirement**
240:24 241:7
**requirements**
5:21 240:5,12
240:13,19
241:6,18,22
242:1,11,12
**requisition**
247:25 248:1

**research**   68:6
68:9
**reservations**
221:17
**reserved**
235:20
**residents**   60:21
60:25 61:7
**residual**   93:4
**resolution**   20:3
**resolve**   6:14,23
7:13
**resolved**   7:8
**resources**
119:22 120:9
**respect**   5:18
40:18 49:24
51:1 53:18
106:18 118:7
183:23 186:12
199:13
**respects**
240:13
**response**
185:25 186:5
189:17,20
224:21
**responsibiliti...**
9:11 102:13,16
103:3 104:3
183:20 208:10
**responsibility**
103:6 106:10
143:9
**responsible**
129:1,14
142:13 143:6

143:25 146:12
146:13,20
196:7
**rest** 60:9 227:3
**restate** 80:8
138:6
**restrictions**
138:14
**restructuring**
9:1 10:15
17:14 128:23
156:10,13,18
173:20 174:3
184:13,14,17
203:25,25
**result** 140:1
152:24
**results** 194:17
205:22 210:2
**resume** 124:8
126:13 154:16
**resumed** 155:2
**resumes** 237:4
**retail** 199:14
**retain** 58:16
**retained** 49:18
50:5,6,12,15
156:21 183:5
183:14
**retaining**
88:18,18
**retention** 50:8
50:10 204:2
**return** 18:13
18:21 42:11
46:13 51:2,10
98:22 103:9

164:1 198:25
**returned** 46:8
62:16 75:19,23
76:3 190:10
191:5
**returning**
38:21 39:13
**revenue** 18:1
108:7 114:3,4
114:11,14
117:17 119:24
120:10 121:15
142:4 150:1
152:11,12
**revenues**
114:18,19
115:8 150:1,18
150:20,25
**review** 21:22
23:5 87:24
114:7 167:21
184:20 192:4
220:23 237:2
**reviewed** 33:20
77:17 140:23
**reviewing**
79:14 194:16
**revised** 211:15
**revision**
211:21
**reward** 101:20
**rewarded** 98:1
**rewards** 71:15
115:3 120:11
**ribbon** 20:12
**richard** 4:8

**rick** 221:18
**rig** 159:3
**right** 5:3 7:19
8:12 13:19
16:20 23:14
25:21 27:24
28:14,24 29:25
30:7 32:3,7
33:24 38:7,13
39:14 48:6,21
49:10 54:9
55:9 56:13
62:19 65:6
71:20,23 74:5
79:10 82:8
83:12,12 84:22
86:13 88:17
90:6,19 92:9
97:8 98:17
100:23 104:23
106:19 112:4
112:14 114:21
115:7,23,23
120:5,17 121:1
122:17,21
123:3,8 124:10
126:12 132:16
133:4,10,23
134:2,20,25
135:21 138:19
140:20 142:8
143:15 144:4
145:4 153:4
154:10,12,15
155:8,13
158:20 166:5
166:19 167:10

167:12,15
176:6,8,23
177:3,19
179:13,15
181:2 187:10
187:14 189:11
191:9 193:19
194:2 196:17
200:21,24
202:14 204:19
212:7,15,24
213:1 214:20
214:25 215:2
215:24 216:9
217:21 218:8
218:14,21,22
218:24 219:22
220:1,19
221:25 224:13
227:8 233:14
234:1 236:25
237:5 239:22
245:17 248:5
248:10,19,24
248:24 249:13
249:22,22
**rights** 69:6
88:21,24 89:17
90:7 112:12
139:8,11
140:21 141:13
221:17
**rigs** 16:21 27:5
94:2 102:22
117:7 120:12
159:1,2

riot   171:25
rise   120:15
  155:3
risk   17:8 18:19
  26:2,2 27:5
  46:5 92:24
  93:6,8,9 94:21
  94:22,23 96:10
  121:17 128:3
  149:14
risks   26:2 93:3
robbie   141:24
robinson   216:3
  216:3,16
  217:11,13
  218:15,20,21
  219:1,13,15,15
  219:17,19,20
  219:21,23
  220:3,4,6,9,11
  220:14,18,22
  221:3,5,8,11
  221:15,19,22
  222:3,7,13,17
  222:22 223:3,6
  223:9,19 224:7
  224:8,19
  225:17,20,22
  226:13,15,18
  226:21 227:2
  227:11,14,18
  227:24 228:2
  228:12,19
  231:1,8,14,18
  231:20,22
  232:2,8,22
  233:8,14,24

234:5,13,16
235:3,6,10
236:9,16,20,24
237:2,17
238:17 239:7
239:15,19,21
240:15,17,21
241:1,14,16,16
241:17 242:7
242:19,24
243:4,6,16
244:7 245:1,4
245:10 246:14
246:17 247:16
248:12,14,15
robinson's
  248:20
robust   73:1
role   36:17
  37:14,18 38:3
  38:24 39:6,16
  44:18,23 52:2
  128:22 170:2
  220:13,15,16
  220:20,22
  236:14
roles   51:20
  106:3 156:17
  183:20 208:10
  236:8,10
rolled   106:14
  247:14,24
  248:1
rolling   201:7
rollout   247:17
roni   214:6

room   170:8
  220:1 249:25
rossean   2:24
  251:3,9
round   100:13
  162:23 163:22
rounds   164:4
route   97:8
row   193:25
rule   5:16 239:5
  239:10,16
  240:6
rules   5:17
  109:15
ruling   49:14
run   101:3
  128:1,8 152:22
  164:12
running   6:16
  9:14 94:2
  151:7
runs   127:18
ryan   9:20
  154:18,21
  155:6 156:2

**s**

s   2:3,6 3:1 5:1
sabin   3:17
  193:19
salaries   208:19
  208:25
salary   98:1,11
  99:1 104:4,9
  208:16,17
  209:14
sale   88:5
  156:23 157:11

157:13,14,18
157:20 158:2
159:14 160:19
162:7,9
sales   9:19 10:4
  34:12 37:8
  128:12 156:25
  157:5,9 158:23
sam   246:1
sami   4:12
  246:1
satisfied
  210:23
satisfy   5:21
  55:20
save   172:4
saw   172:11
  178:25
saying   17:12
  23:24 77:5,6
  98:4 99:2
  109:16 119:17
  149:5 150:11
  150:25 151:6
  151:16 152:23
  224:16 242:8
  244:19
says   20:2 25:21
  26:5 42:21
  72:18 79:15
  84:9,9,25
  85:15 86:23
  87:8 90:4,6,8
  133:20 179:20
  199:1 200:14
  239:16,24
  244:12

scale 94:12
schedules
115:11
scheme 22:2,5
scientific
115:12 117:1
scn 171:4
scope 39:23
40:8 52:12,19
53:6
scott 237:5,12
screen 57:2,12
135:24
screenshot
179:21
se 65:8 69:1
78:1 92:15
111:1 191:16
196:21 213:19
218:2
seat 105:22,22
127:1 218:24
226:23 234:3
seated 5:3
126:14 155:4
seats 73:7
139:7,8,10,11
139:25 140:21
141:12,13
sec 74:22 75:2
246:6
second 17:12
18:23,24 65:24
67:4 68:22
82:16 83:2,12
105:9 118:18
129:3 130:23

133:25 157:1
160:5 163:21
175:18 212:23
234:18 243:9
249:8
seconds 232:6
section 63:7
72:14 87:10
88:4 89:9
172:19
secure 85:20
security 38:9
38:10 84:4,17
85:11 86:5,6
86:12,19
see 6:12 7:8
13:4,6 20:4,12
22:1 25:17
54:3 57:2,11
57:12 69:20
82:25 84:24
94:5 113:8,23
122:6,7,20
123:13 135:24
136:4 154:8
171:3 175:20
178:13 179:7
181:21 185:23
189:11 198:6
201:12 207:3,4
207:10 208:14
208:20 209:15
214:24 224:14
225:4 249:22
seeded 131:15
seeds 115:5

seeing 120:7
seek 31:17
153:4
seeking 159:23
seem 121:2
seemed 228:24
seems 143:5
229:18 244:19
seen 49:1 95:24
select 106:17
107:10 140:20
174:13 178:23
220:25 223:1
223:14
selected 16:7
16:24 48:11
106:1 107:23
141:6 159:21
162:6,15
163:13,15
227:18 232:13
235:24 237:1
238:6,9 240:19
245:11
selecting 106:8
164:9 170:4
172:9 225:8
238:15,19
selection 72:19
72:23,25
105:10 106:16
106:20 108:4
108:18 140:9
140:16 141:1
141:16,17
160:22 161:23
162:2,14

216:17 220:16
220:21 226:11
226:20,22,22
226:25 230:14
244:13
selections
159:1 230:12
235:1
self 129:3
sell 99:23
seller 68:18
selling 161:2
selloff 24:5
send 184:4
200:8,14 244:3
senior 9:8
sense 18:20
35:17 106:23
151:6 161:2
163:20
sent 163:7
188:2,8
sentence 42:2
42:21 72:18
84:13,16,20
85:14,21 86:8
86:23,25
sentence's
83:25
sentences
86:14
separate 49:1
129:14 186:21
225:17
september 9:6
33:8 119:5
147:1,7,9,14

159:4 163:6
184:24
**serious** 7:13
**service** 78:8
81:4,9,20
82:19,22 88:9
90:21 128:2,2
222:4,6
**services** 106:5
106:9,24
107:12 123:23
124:2 129:15
173:24
**serving** 241:25
242:13
**set** 17:9 76:11
77:19 108:8
110:23 131:22
143:8 160:7
162:10 171:24
197:17 200:15
206:5 211:3,8
211:15,18
234:8
**sets** 233:1
**setting** 76:6
104:12 106:20
**settled** 198:15
236:5
**settlement** 13:3
15:9 58:2,4,15
58:16,21 59:1
59:22 62:5,24
64:12,14 74:6
115:12 117:1
122:23 186:17
190:19 192:6

198:21 199:2
199:18
**settlements**
10:11 14:15
41:16 42:8
43:6
**settling** 60:20
61:6
**seven** 10:4
108:6,17
138:25 139:7
139:10 140:5
154:3 158:3
230:18 232:19
232:20 246:20
247:4
**several** 72:9
187:24 245:12
**severance**
204:2
**shana** 4:3
**shape** 157:19
**shara** 32:4,9
135:11 187:18
210:14
**share** 94:6
114:9 115:2
116:18 117:13
117:23 148:3,8
150:17 151:20
177:4 195:22
212:13,15
**shareholder**
145:1
**shareholders**
139:24 233:19
236:1

**shareholding**
136:10
**shares** 114:10
**sharing** 136:6
**sharon** 4:14
113:6,10,15
199:7
**she'll** 6:3
**sheet** 16:15
18:4 60:7,12
131:10
**sheik** 4:12
104:20,23
105:9,15 106:4
106:22 107:6
107:11,15,17
107:18 108:3
108:12,16,21
109:1,1,2,7,10
109:14,16,24
110:4,10,19
138:21,22,23
139:14 154:1
167:17,18,19
168:2,7,9
177:25 178:1,2
178:7,11,13,17
178:19,25
179:3 213:3,10
213:12,13,16
246:1,3,4,19
**sheikh** 247:9
247:11,24
248:7
**shiek** 140:3,15
141:1,4,6,8,14
141:15 142:1

142:10,17,19
142:23,25
143:3,13,16,18
**shield** 76:13
**shielded** 77:7
**shields** 55:1
**shift** 26:12
126:4
**shop** 121:20
**short** 27:16
66:12,13,13,20
95:21 99:21
100:6 101:4
**shorter** 32:11
95:8 168:19
**shorting** 94:15
95:6,7,21 96:2
99:20 100:8
**shortly** 24:12
25:9 111:7
**shorts** 66:21
**should've**
135:18
**showing**
176:24 194:14
206:23,24
208:7,15
**shown** 147:16
**shows** 133:23
209:21
**shrinks** 120:16
**shut** 26:6 61:13
107:17 120:13
121:21 124:7
**shy** 207:5
**side** 15:22 27:3
103:21 121:8

| | | | |
|---|---|---|---|
| 131:3 224:22 | simplest 42:7 | site 29:11 | smaller 136:24 |
| 233:12,13 | simply 51:23 | 114:5,6,12 | 137:23 148:8 |
| 250:1 | simson 182:6,7 | 115:12 117:2 | smart 69:8 |
| sides 15:12 | 182:8,9,12,14 | sitting 158:17 | smooth 27:20 |
| sign 21:2 32:17 | 182:14,24,25 | situated 8:5,8 | 38:10 |
| 33:15 | 183:2,8,12,18 | 132:11 | software |
| signature 11:6 | 184:6,12,18,23 | situation 46:2 | 127:13 |
| 12:6 13:9 | 185:1,5,21,25 | 46:17 54:24,25 | sold 24:16 |
| 20:25 204:12 | 186:8,15 187:7 | 55:16,24 132:6 | solely 70:21 |
| 221:9 251:8 | 187:12 191:22 | 171:10 175:25 | 232:7 |
| signed 7:1 | 192:1,15,19 | situations | solemnly 8:13 |
| 157:16 159:6 | 193:6,11 195:6 | 171:24 205:19 | 126:22 155:10 |
| 184:24 | 195:17 197:2 | six 234:10 | 202:15 |
| significant | 198:4 202:4,6 | 240:18,24 | solicit 247:21 |
| 17:23 76:11 | single 47:2 | 241:6,8 242:5 | solicitation |
| 77:21 92:19,22 | singled 91:15 | 242:10 | 15:17 183:19 |
| 97:14 122:13 | sir 10:25 11:25 | size 114:8 | 183:23 184:1,3 |
| 162:18 169:8 | 12:6,12 13:15 | 118:21 139:10 | 184:4,10 |
| 192:5 | 20:16 22:5 | 160:12 163:3 | 188:15,18 |
| significantly | 28:3 57:23 | 232:19,20,22 | soliciting 184:7 |
| 121:8 163:23 | 59:21 64:6 | 233:3,9,15 | 185:6 |
| 195:22 208:19 | 71:12 74:10 | sized 208:14 | solution |
| 208:25 | 99:12 132:24 | sizing 118:16 | 160:16,25 |
| similar 117:9 | 166:25 198:14 | skill 233:1 | solve 96:24 |
| 121:3 159:5,6 | 212:25 219:25 | skilled 131:10 | somebody |
| 159:9 164:5 | 220:19 221:1,7 | skip 108:3 | 18:17 63:3,4 |
| 176:4 186:19 | 221:16,19 | slide 177:2 | 63:11 86:3 |
| 205:18 207:2 | 222:7,17,22,23 | 178:20 | 106:25 135:7 |
| 208:14 | 224:8 226:18 | slightly 35:12 | 198:5 |
| similarly | 226:21 227:2 | 35:18 | somebody's |
| 207:12 | 227:11 231:14 | slots 237:16,21 | 151:7 |
| simon 4:15 | 234:13,16 | slow 14:21 | somewhat |
| 104:24 105:4 | 235:3 239:15 | 42:11,11 | 43:23,24 79:13 |
| simple 24:2 | 240:15,17,21 | slower 205:8 | 136:24 137:23 |
| 148:10 152:7 | 246:5 | slowly 244:10 | 139:22 |
| 152:24 | sit 71:8 139:19 | small 158:7,16 | sonic 136:14 |
| | | 159:1 160:6,11 | |

soon   18:14
  32:2 236:1
sophisticated
  76:10
sorry   25:25
  32:21 38:2
  40:12 42:4
  45:17,19 47:24
  49:7,22 53:16
  62:10 65:9
  66:7 68:16
  69:22 74:2
  78:14 82:3
  87:16 99:12
  101:3,15
  102:15 112:20
  114:20 117:18
  119:20 128:7,7
  141:8,17
  142:24,25
  144:7 147:5
  150:9 161:25
  181:6 189:5
  194:5 199:10
  200:25 205:9
  217:9 231:21
  241:14 242:1
  246:11
sort   31:20
  36:15 54:22,23
  156:6 157:24
  160:21 161:3
  165:2 174:5
  179:8
sorts   149:14
sound   67:12

sounds   101:23
  217:20
source   137:1
sources   247:22
  247:23
southern   1:2
space   36:2
  128:9,10
  173:25
spaces   139:15
  139:15,23
sparello
  224:10
spark   172:1
speak   55:23
  65:15 137:3,4
  137:12 205:8
speaker   110:22
  111:9 143:11
  155:10
speaking   48:18
  212:10 237:10
speaks   195:8
special   28:8
  36:14 48:1
  77:2 103:21
  105:11 107:22
  107:24
specific   33:23
  51:5 52:20
  55:15,23 83:7
  83:10 94:22
  106:7,15
  129:15 148:11
  159:17 208:10
  210:20 212:18
  212:19 244:8

specifically
  39:25 40:19
  46:19 49:16
  51:11 59:21
  114:6 125:8
  139:17 185:16
  186:12 193:25
  205:17 206:6,7
  207:3 213:22
  226:3
specifics   57:23
  137:11 238:17
speculate
  147:19
speculative
  124:14,16
speed   36:15
  104:13
spelled   113:10
spend   18:16
  183:18
spending   9:22
  169:9
spent   97:5
  104:10 127:12
spikes   95:25
  122:12
split   241:7
  242:4
splits   223:21
spoke   33:15
  44:18 48:14
  140:23 189:16
sponsor   10:1
  10:11 12:4
  14:13,13 18:10
  35:12 36:17

  72:20 97:7
  143:6
sponsoring
  113:17
spots   140:7
  248:13
spread   142:15
spreads   115:16
spreadsheet
  147:22
spring   162:11
springboard
  161:10
springtime
  24:3
spv's   160:8
st   178:15
stable   18:4
stake   131:1
  157:24 158:16
staked   142:5
  143:7 159:18
stakeholders
  205:11
staking   16:19
  108:8 128:1,2
  129:3,3 130:24
  131:5 164:13
  164:13
stalking   10:1
  97:7 128:21
  159:21 160:20
  161:6,23 162:5
  162:14 163:8
stalling   74:9,11
stamped   28:25

**stand** 77:6
115:8 125:24
126:17 134:13
148:15 149:2
149:22 155:7
173:6 182:15
182:17 202:9
**standalone**
9:22,23 97:6
**standard**
107:24
**standards**
54:14
**standby** 37:1
**standpoint**
18:5 128:19
**start** 5:4 10:20
14:1 19:17
23:24 25:6
51:8 145:19
146:7 152:3
157:8,11
168:13 175:1
215:23
**started** 9:3,18
14:6,6 30:22
159:3
**starting** 83:6
116:21 119:13
121:7 127:13
156:16
**starts** 78:9
147:1
**state** 34:6,11
34:15,19 42:3
45:23 46:6
67:9 73:11

85:3 88:8
117:14 118:13
153:7 178:3
193:3,8 219:14
222:9 245:9
**stated** 51:23
75:17 82:18
140:19 239:24
240:12
**statement** 2:1
2:5 5:14 22:17
22:22,24 23:3
23:9 25:22,23
26:1 84:6
88:10,11
113:21 123:9
133:14,17
136:4 145:7,7
146:3,15 149:8
163:14 166:3
166:24 172:10
172:18 179:9
179:20,23
184:1,10 185:8
185:9 196:8
242:21
**statements**
22:7 24:19
56:12 88:4,4,7
95:3 133:1
146:19 166:12
166:14 201:7
**states** 1:1,12
32:5 34:20
37:21 42:18
43:9 83:21
86:4 119:13

135:12 187:19
210:15 219:6
**static** 151:8
**stating** 49:2
**statistics**
100:15
**status** 6:13
80:10 227:16
242:17
**statute** 241:19
**stay** 35:14
**stays** 110:9
**step** 16:12
31:25
**stepping**
242:22
**steps** 131:21
**steve** 72:24
**steven** 3:22
126:16 127:7
**stick** 135:8
**stmt** 133:18
**stock** 69:17
95:25 238:23
**stood** 223:20
**stop** 118:4,6
**stoppage** 175:8
**storm** 200:25
**stout** 16:15
173:22,23
174:7,11
175:19 176:3
**stout's** 173:24
176:17
**straight** 32:10
**strategies**
92:21 94:5,6

**strategy** 92:24
122:5
**strato** 183:24
184:8 185:10
185:13,18
187:2 188:10
**strato's** 183:22
**streams** 108:7
142:4
**stretch** 28:6
**streto** 183:5,5
183:9,10,14
**strike** 210:16
**strong** 18:3
225:24 226:9
**strongly**
164:14 223:25
225:8
**structural**
158:1
**structure**
18:18 35:12
98:1,21 144:24
145:2 156:4
157:24 163:20
206:10 211:18
234:10
**structures**
159:11 163:24
164:4
**structuring**
144:12 156:23
**studied** 66:16
**stuff** 40:14
**style** 168:25
**subconscious**
237:8

**subject**  64:4
  86:23 87:8
  91:4 108:10
  110:7 112:25
  124:18 235:4
**submission**
  190:3 214:4
**submit**  6:9
  145:9 190:3,3
  190:9,11
  193:24 196:11
**submitted**  5:12
  10:15 11:3,21
  12:20 13:23
  145:22 170:18
  176:21 179:8
  185:2 187:23
  191:12 194:3,7
  204:15 227:6
  237:3
**subsequent**
  144:16 198:22
**subset**  159:24
**substantial**
  41:14 44:10
  159:19
**substantially**
  149:4
**substantive**
  12:6
**subtract**
  213:25
**success**  27:4
  36:16 131:23
  236:4
**successful**
  92:19,21

  129:25 163:11
  236:3
**successfully**
  164:11
**sues**  47:11
**sufficient**  6:6
  177:16
**suggest**  17:20
**suggested**  7:8
  144:18
**suggesting**
  149:18
**sum**  191:19
**summaries**
  188:20
**summarize**
  186:8,15
  205:22 206:15
  208:1
**summary**
  134:11 177:2
  177:10
**summer**  17:6,7
  17:18 122:11
  122:15
**supplement**
  32:24 54:1
  234:7,8 243:18
**supplemental**
  33:2
**supplements**
  33:2
**supply**  21:12
  57:16 60:11
  70:4 98:8 99:9
**support**  10:16
  11:3 12:4 13:2

  25:14 41:9,24
  41:25 43:5
  106:2 115:17
  122:23
**supported**
  50:11 164:16
**supporters**
  75:14
**supporting**
  74:3
**supposed**  47:6
  47:12
**sure**  7:17 8:9
  15:22 27:20
  28:11 36:15
  38:9 46:6 47:4
  49:4 52:14,22
  56:7 65:7
  66:10 70:9
  94:4,12 95:23
  96:14 109:10
  116:7 117:6
  118:13 119:8
  119:12 120:7
  120:20 122:2
  126:5 131:25
  133:19 135:17
  136:11 137:3
  138:5,7 145:13
  145:19 149:6,7
  150:3 152:23
  156:2 157:10
  158:24 159:13
  162:2 163:21
  166:7 169:24
  176:10 181:11
  189:8,12

  194:14 195:20
  203:6 206:24
  207:18 208:8
  209:11,21
  216:16,16
  217:3 224:17
  230:4 239:10
  242:8 244:7,11
  247:11,16
**surprise**  119:3
  119:5 140:7
  145:11
**surprised**
  68:16
**survey**  208:9
**surveys**  208:12
**sustain**  88:12
  121:5 196:2
**sustained**  57:7
  58:9,11,20,24
  59:14 60:18,23
  61:3,22 62:1
  63:10,15,20
  64:1 65:19
  66:23 67:1,20
  68:3 71:18
  73:18 75:9
  79:21,25 88:2
  89:2 96:5
  100:10 107:5
  107:14 108:2
  109:23 110:18
  112:19 143:1
  143:12 154:6
  169:25 180:10
  191:23 192:2
  192:16 193:7

193:12 194:25
213:9,11 214:3
214:19 228:7
229:20 237:24
238:25 239:4
240:10 243:2
246:18 247:8
248:5
**swap** 70:15
**swaps** 19:9
**swear** 8:13
126:22 135:9
155:10 202:15
**switch** 18:22
164:23
**sworn** 155:9
173:8 185:2
205:3 218:22
218:23
**system** 61:10
61:11,13
101:20,20
250:9

**t**

**t** 251:1,1
**t.j.** 3:8 126:9
126:15 155:5
173:4
**tab** 22:10
**table** 158:11
208:5,7 249:25
**tabulated**
189:20
**tabulating**
184:7 185:6
**tabulation**
43:22 183:19

183:24 184:11
187:23 188:19
193:13
**tail** 94:23
**take** 10:14,19
11:20 13:24
64:7 77:14
99:22 100:5,6
111:18 112:22
114:22 124:23
126:5,12
127:20 154:15
157:20 159:23
174:13 206:12
217:3
**taken** 83:23
91:17 96:20,22
112:6 214:7
**takes** 27:18
104:6 121:8
**talent** 205:21
210:1
**talk** 9:20 13:24
16:6,16 18:24
19:14 41:3
55:12 102:8
103:18 121:13
121:13 145:5
156:24 242:15
248:25
**talked** 23:18
24:7 42:25
56:20 102:23
158:20
**talking** 25:24
82:3 84:16
94:11 114:6

120:20 179:17
199:18,19
203:15
**talks** 22:1
**tarawolf** 172:1
**target** 26:22,23
103:8,16 207:7
**targets** 26:23
26:24 28:5
102:11 103:11
103:13 211:8
**tasked** 203:6
247:21
**tasks** 203:5
**tax** 238:20,21
239:2
**taxes** 97:24
107:8
**team** 10:10
27:12 77:21
104:12 127:23
129:1,6,7,8
131:10 146:13
165:11 170:7
170:12,13
185:6 207:18
208:8
**teams** 38:8,8,9
38:9 112:6
164:8
**tease** 17:11
**tech** 127:11,12
128:9
**technical** 38:8
**technology**
38:8 69:7

**telecommuni...**
127:14
**telephonically**
4:1
**tell** 28:23 69:4
83:14 94:14
122:25 137:1
188:2 189:6
194:24 204:5
206:22 208:6
224:2,6 230:8
230:8
**temporal** 52:12
53:10
**ten** 159:2
243:11,16
245:10
**tens** 104:11
**tenth** 207:14
**tenure** 9:18
**term** 36:2
188:21,22
**terminate**
130:15
**termination**
144:24
**terms** 22:6
26:1,8,10
30:17 31:7
78:8 79:14,16
80:13 81:4,9
81:12,20 82:13
82:19,21 83:5
83:6,7,18
86:24 88:9,14
90:20 98:5
100:12,20

101:12 112:20
158:19 207:9
210:7 242:19
**terrific**  112:14
**test**  206:18,18
**tested**  160:10
**testified**  8:21
16:7 75:12
130:18 162:3
168:14
**testify**  5:7 7:11
56:10 109:8,9
**testifying**  87:6
87:7 101:25
109:4 152:6
196:12 206:3
216:5,6,17
**testimonial**
171:1
**testimony**  5:4
5:11,12,19 6:9
6:10 8:14
11:12 12:12
13:15 32:13
38:13 45:5
67:14 97:5
105:23 123:14
125:21 126:23
133:2 135:13
148:22 166:15
173:2 182:1
185:2 198:3
202:15 205:3
211:24 215:3
218:15 221:13
241:3,11

**texas**  115:13
117:2 122:11
**th**  147:13
178:3 184:23
**thank**  7:17,19
8:10,17 13:22
19:22 21:20
30:7 31:14,23
38:17 41:22
45:21 48:13
55:5,6 56:13
65:1,2,7 68:15
68:22,24 71:12
71:24 72:5
77:23 82:1,6
82:11,11,15
83:17 85:12
92:15 93:11,11
102:3,18
104:17,18
105:9 107:18
109:10,17
110:20 112:4,4
112:20 113:3,4
113:14,25
115:19 121:10
122:19 125:17
125:20,21
126:13 127:1,3
134:25 135:19
138:17,18
141:15 143:3
143:15,16,18
143:22 144:2
146:8,10
150:20 154:12
154:14,24

155:19 167:10
167:12,14
168:7,9 170:15
172:23 173:1,3
173:9,13 179:2
179:3,7,14
180:22,23
181:17,19,25
182:2,13,21
187:9,12
189:13 190:21
191:13 193:17
193:19,23
195:23 196:24
197:24 198:1,2
199:3,5 201:18
201:20,25
202:1,3,6,10
202:12 210:9
212:5,6,21,25
213:4,16
214:20,22
215:2,4 218:7
218:9 219:7
221:23 222:3,5
222:7,25
226:10 230:18
245:17 246:4
246:19 248:8,9
248:15,23
**thanks**  200:21
**that'd**  206:14
**that's**  140:17
142:8 143:13
144:15 145:20
145:23 146:3
149:13,18,18

152:14 153:1,4
162:13 165:24
171:6 172:10
172:21 176:11
178:6,25 179:1
186:4,23 187:1
187:5 189:6
229:19 231:9
234:14 236:4
237:22 238:9
240:8 246:13
248:5,24
249:13,14
**themself**  232:7
**there's**  146:3
168:17 171:23
**they're**  145:25
224:18 228:12
**thin**  142:16
**thing**  5:5 28:16
148:16 194:11
194:15
**things**  7:8 15:7
26:22 41:1
42:16 47:4
91:19,22 93:24
95:12 111:15
115:17 116:12
122:24 132:1
149:8,15
150:14,19
151:1,8 154:23
201:1 214:11
229:1,2 249:11
**think**  9:14,24
10:4,6 15:8,10
15:14,21 16:13

| | | | |
|---|---|---|---|
| 16:15,25 17:4 | 112:8,13 | **thinly** 56:22 | 169:4 171:2 |
| 17:8 18:18 | 115:10,11,23 | **third** 15:16,25 | 174:22 176:25 |
| 19:5 24:6,10 | 116:3,12 117:2 | 43:9,17 73:11 | 177:11 186:10 |
| 28:4,7,15 | 117:4,23 | 73:12,14 | 213:20 237:23 |
| 31:16 33:6 | 118:25 119:1,2 | 123:19,22 | 240:2,4 244:5 |
| 35:7,18 37:6 | 119:25 120:1 | 129:4 131:8 | **threshold** |
| 37:10 42:1,8 | 121:11,16,19 | 132:14 158:14 | 103:8 |
| 42:20,24,25 | 123:2,3,12 | 163:21 176:2 | **thrust** 5:13 |
| 44:14 45:15,19 | 128:19 130:1 | 190:18 196:25 | **thursday** |
| 46:15 47:15,17 | 130:21,25 | 197:7,14,18 | 249:15,19 |
| 47:21 48:2,8 | 131:2,7,25 | 232:1 234:3 | **tied** 96:3 |
| 49:5 50:7,13 | 132:1,10,13 | 244:12 | 185:16 191:8 |
| 50:20 51:8 | 140:11 142:14 | **thomson** 5:7 | **tiered** 101:19 |
| 52:9 54:21 | 143:13 144:7 | 5:20 6:14,23 | **ties** 39:12 |
| 55:4 56:20 | 144:23 147:20 | **thought** 18:12 | **tile** 207:6 |
| 57:20 59:24 | 148:6,9,18 | 18:19 96:23 | **time** 9:22 10:3 |
| 64:2,6,16 | 149:8,13,15 | 160:14,17,18 | 17:2,4 24:16 |
| 70:19 71:13 | 157:10,15 | 160:24 164:19 | 27:17,19 28:12 |
| 72:25 73:1,5,9 | 160:20 161:20 | 164:21 214:11 | 33:25 40:2,13 |
| 73:14 75:12,13 | 163:2,4 164:17 | 229:21 | 47:15 52:20 |
| 75:25 76:20 | 168:22 169:3 | **thoughts** | 57:19 66:19 |
| 77:11,16 78:17 | 171:9,10 | 141:21 247:12 | 67:5,8,8,13 |
| 80:12 81:1,2 | 179:12 192:22 | **thousand** | 68:10 71:14 |
| 81:16 82:8 | 194:11 196:13 | 159:2 | 90:19 94:10 |
| 84:15 85:19,24 | 199:24 212:2 | **thousands** | 97:5 98:22 |
| 86:11,17,17 | 216:12 219:11 | 65:25 66:1 | 101:5 104:11 |
| 87:8 89:17 | 228:22 232:16 | **threaten** 42:5 | 109:12 112:10 |
| 91:18 93:2,5,7 | 233:14,21 | **three** 7:7 14:8 | 118:14 120:15 |
| 93:24,25 94:15 | 234:7,14 | 15:14 17:7 | 122:14 123:15 |
| 94:21 95:21 | 236:25 238:21 | 29:22 123:13 | 125:24 129:10 |
| 96:1,8,12 | 239:1 241:10 | 123:14 129:2 | 129:21 134:17 |
| 99:15 100:16 | 241:17 243:16 | 130:16 136:23 | 146:23 148:14 |
| 102:19 103:1,5 | 244:1,5 245:5 | 137:23 139:10 | 149:1,21,24 |
| 103:17 105:8 | 249:2 | 142:11 145:8 | 158:12 160:4,7 |
| 106:2,19 | **thinking** | 148:3 158:3,6 | 161:2,4,9,15 |
| 110:15 111:19 | 112:11 | 159:16,19 | 162:18 163:5,9 |
| 111:22 112:1,2 | | 165:25 166:1 | 163:17 167:10 |

168:3 169:9,17
169:22 174:19
176:19 178:15
181:4,10,12
187:12 188:10
190:23 202:4,8
204:17 216:15
222:21 227:16
227:18 228:10
228:10 235:15
235:23 237:5
**timebound**
61:15
**timeframe**
163:6
**times** 8:21
53:22 86:18
99:3 170:7
195:15 223:12
237:23
**timing** 37:24
111:9
**tip** 18:16
**tires** 9:19
**title** 79:19 87:1
87:24 88:8,10
88:25
**today** 10:12
11:13 12:12
13:15 14:4,16
30:6 32:13
35:8 38:13
41:8 57:14
103:2 118:19
119:4 128:23
129:9 133:2
147:8,10 153:7

155:11 166:15
177:1 185:3
187:8 191:14
202:24 205:2
210:21 211:25
215:7,9 217:7
219:6,17
221:21 222:3
248:25
**today's** 250:6,8
**together**
127:19 153:3
162:16 163:12
**token** 13:3
18:24,25 19:11
22:7 23:19,22
24:5,17,18,24
25:14,18,20
26:2,6,7 55:12
55:17,24 56:14
56:18 57:3,9
57:14,17 58:1
58:2,16,21
59:8,15,23
60:13,16 61:6
61:19,23 62:3
62:6 66:12
67:5,16,22
69:5,11,11
70:2,3,7,8,16
71:2,13 91:10
91:13,18,19
92:3,4 94:3,7
94:11 95:14,17
98:6,11 99:21
122:23 123:5
123:10,11

124:1 181:14
181:16 186:16
186:18 187:3
191:19,25
192:6,8,11,13
192:17,22,23
193:4
**tokens** 55:13
55:19,21 58:5
58:22,25 59:3
59:4 60:6,9
66:19 68:12,17
91:14,25 98:2
100:3 124:10
124:21 186:21
186:24 193:2,4
**told** 107:21
195:14 242:24
243:3
**tom** 237:5,12
**tomorrow**
215:12,14
249:1,3,12,14
249:23 250:16
**ton** 9:22
**tonight** 250:14
**tons** 38:7 77:1
**took** 83:19
100:22 165:25
169:17 172:7
222:15 226:5
**tool** 94:15
218:2
**top** 13:5 20:11
20:13 91:23
99:1 104:8
116:2 118:20

118:22 161:17
171:17 172:2
179:22 231:1
245:10
**topic** 26:13
66:17
**tos** 80:18 83:22
**total** 98:10
115:1,22 159:8
159:20 160:12
160:23 165:8
177:10,13
188:21 189:1
189:15 194:18
195:1 197:20
207:13 209:12
**totality** 149:10
**totals** 194:21
194:24
**touch** 111:14
**tough** 226:4
**town** 248:2
**tradable** 57:16
**trade** 124:3
175:17
**traded** 56:16
56:16,16,22
69:24 70:3
160:9,14 175:4
**trading** 64:18
69:17 91:21
124:15,16
160:1 175:8
**trajectory** 9:17
**tranche** 158:17
158:17

| | | | |
|---|---|---|---|
| **transact** 57:14 | **tropical** 200:25 | 151:16 229:1 | 234:11 235:4,8 |
| **transacted** | **troubled** 49:11 | 230:6 235:11 | 235:20 236:7,9 |
| 160:11 | **true** 11:9 12:9 | 236:24 247:11 | 236:10,15 |
| **transaction** | 13:12 34:23 | **turn** 40:17,19 | 241:4,7 242:5 |
| 37:7,11 75:14 | 61:20 62:4,9 | 41:20 45:13 | **type** 35:2 50:5 |
| 123:24 160:11 | 62:14 108:7 | 65:11 72:7 | 51:21 54:24 |
| 168:23,24 | 114:16 119:10 | 120:14 126:21 | 93:9,10 94:6 |
| **transactions** | 132:23 142:4 | 133:10 144:19 | 119:10 174:4 |
| 36:11 75:20 | 142:21 149:18 | 152:21 166:21 | 207:2 |
| 168:25 | 166:10 176:13 | 204:4,11 | **types** 93:8 |
| **transcribed** | 176:16 184:23 | 206:12 208:4 | 175:9 209:25 |
| 2:24 | 204:14 251:4 | 217:19 221:6 | **typical** 168:16 |
| **transcript** | **truly** 16:23 | **turned** 120:17 | 168:17,18 |
| 250:6,7,8,8,10 | **trust** 237:6 | 189:3 | 175:16 203:9 |
| 250:10,15,15 | **trustee** 4:2 5:6 | **turning** 131:20 | **typically** 171:8 |
| 250:16 251:4 | 5:15,20,25 6:9 | **tweet** 24:10 | |

| | | | |
|---|---|---|---|
| **transfer** 88:8 | 32:5 50:11 | **tweets** 29:23 | **u** |
| 88:10,17 | 135:3,12 | **twelve** 231:18 | **u.s.** 1:23 |
| **transferred** | 167:13 177:23 | **twitter** 139:15 | **ubierna** 4:11 |
| 84:6 100:7 | 187:17,19 | **two** 9:6 27:13 | 102:5,6,7,13 |
| **transferring** | 210:15 | 39:14 45:16,20 | 102:16 103:3 |
| 87:24 88:20,23 | **truth** 8:15,15 | 59:11 77:7 | 103:12,15,22 |
| 88:24,25 89:16 | 126:24,24 | 91:19,22 93:24 | 104:2,8,16,18 |
| 89:16 | 202:16,17,17 | 98:19 130:11 | 196:19,21,21 |
| **transfers** 19:10 | **try** 6:23 7:16 | 136:23 139:7,8 | 196:24 197:13 |
| 58:5 86:25 | 31:15 32:5,12 | 139:11,14 | 197:20,24 |
| 88:15 | 42:16 81:18 | 140:12,21 | **ubos** 136:6 |
| **treasuries** 92:2 | 93:3 109:15 | 141:6,12 | **ucc** 22:10,24 |
| **tremendous** | 114:21 118:13 | 146:24 148:4 | 23:12,14,16 |
| 104:11 | 154:20 | 156:24 159:7,8 | 27:19 28:25 |
| **trending** | **trying** 5:15 | 159:17,22 | 29:19 73:6 |
| 117:24 | 9:22 27:16 | 164:6 165:13 | 77:3,18 103:20 |
| **trial** 249:21 | 28:10 84:11 | 165:18 169:20 | 140:12 169:21 |
| **tribute** 168:20 | 89:8 94:22,23 | 172:2 188:20 | 215:13,20,23 |
| **tried** 81:1 | 96:17 104:15 | 188:23 189:8 | 220:10,15,22 |
| 117:18,21 | 109:5,13 118:9 | 215:14,20 | 222:4,10 223:6 |
| 197:14 | 118:25 149:16 | 229:14 232:1 | 223:14 227:20 |
| | | | 227:22 228:4 |

228:18 229:1
230:11 233:6
233:12 234:10
235:8 236:7,15
237:5 240:19
241:4 248:20
248:22
**ucc's** 229:8
**uh** 29:22
239:10 243:21
245:11 247:13
247:25
**uk** 88:4 100:20
**ultimate** 136:5
136:7 157:19
172:9 223:1
**ultimately**
64:20 131:12
132:5 159:15
159:21 163:10
163:13 164:4
164:22 169:4
172:9 223:13
233:25 237:12
**um** 70:23
236:6 243:7,10
**unable** 55:13
198:20
**unavailable**
59:10
**uncertain**
114:21
**uncertainties**
18:11
**uncertainty**
15:19 196:9

**undeliverable**
188:8,13
**under** 5:12 6:3
6:12 17:21
27:23 79:2
83:19 84:23
86:22 89:13
90:2 105:1
112:21 133:2
166:15 171:11
185:2 186:3
199:19 205:2
206:1 208:20
210:16,16,23
210:25 211:5
211:15 213:20
221:14
**underlying**
95:22,25
116:18
**understand**
5:23 6:7 17:25
24:17 46:23,24
47:17 48:10,22
69:13 70:9,24
71:10 72:20
77:8 80:9
83:24 84:11,13
84:20 85:9
87:23 88:9
90:14,17 91:12
93:3 95:7,10
95:10,11,12
100:17 106:5
107:11 109:5
109:10 110:10
111:20,21

138:6 144:10
146:18 149:11
149:23 169:2
175:25 176:6
178:10 179:25
193:15 215:10
219:4 221:12
229:1,4 234:21
234:24
**understanding**
15:5 37:2
45:10 46:3
52:7 55:1,3
62:24 64:12
67:7 70:20
73:25 74:24
75:3 76:24
83:25 85:9
86:16,18 93:12
95:16,21 97:19
99:10,14 100:4
101:19 103:19
105:4 112:3
125:4,7 144:14
212:4 214:10
227:20,21
241:24
**understated**
41:8
**understood**
49:15 111:6
117:11
**undertaking**
142:15
**undertook**
14:3

**unfair** 50:13
**unidentified**
110:22 111:9
143:11 155:10
**unilateral**
235:1
**unique** 36:17
171:10 191:8
201:15
**uniquely** 66:16
**united** 1:1,12
32:5 37:21
135:12 187:19
210:15 219:5
**universe** 47:23
115:1
**unknown**
76:23
**unofficially**
104:24
**unpack** 42:21
**unreasonable**
67:12
**unsecured**
22:11
**upfront** 144:11
**uploader** 218:2
**upshot** 176:24
**usbtc** 108:9,21
108:22,23
109:19,20
142:7 143:9
246:7
**use** 8:6 26:1,8
26:10 30:17
31:7 37:23
51:10 65:20

66:3,4 70:18
78:12,19 79:14
79:16,22 80:13
80:22 81:12
82:10,13 83:5
83:6,7 89:13
90:3 99:22
100:5 161:10
165:11 172:3
188:22 202:12
212:19
**used** 70:8,12
100:7 124:1,11
165:13,14,17
165:18,24
171:19,22
184:6,8,9
188:21 189:14
218:2
**users** 100:13
101:1,1,12,14
101:18,24
**using** 20:9
78:21,23 79:19
144:24 165:15
203:20 242:8
**usually** 185:23
**utility** 24:18
25:20 26:7
123:7,10,10
124:10

**v**

**valid** 224:16
**valuable** 38:18
39:9
**valuation**
23:25 24:1

60:14 61:19,23
61:24 62:2
64:5 91:10
157:1 164:24
165:2,20 166:3
166:13,23
167:3 168:3
170:16,17
171:8,9,20
173:19 174:10
174:11 175:13
178:3,14 181:4
181:9 191:19
213:6
**valuations**
61:20 171:2,12
191:25
**value** 10:5
14:11 18:14,21
23:22 24:6
25:14 26:20
27:6 35:19
36:14 37:9
51:3 55:11
56:14,19,21,21
56:24 57:1,4,8
61:5 64:17
91:17 95:22
96:2 98:6
103:7 108:10
108:22 109:19
119:14 123:5
124:11 129:21
130:6 131:13
131:14 158:8,9
158:14 159:13
164:9,12,24

165:4,5,6,8,12
165:14,19,22
167:22 169:7
171:3 174:15
174:16 175:2
176:3 177:11
178:6 180:11
180:12,15,16
180:17 246:22
247:1
**valued** 165:23
178:7,22
180:19,20
**values** 62:7,12
**valuing** 175:19
**vaneck** 36:1
**variable** 122:6
150:12
**variables**
150:4,13 153:3
**variance**
120:23
**variants**
165:18
**various** 8:5
10:15,16 14:18
14:25 30:16
40:23 42:9
142:19 205:11
208:9,10
**vast** 73:6
160:16
**vehicles** 98:20
**venture** 118:21
128:2 129:5
**ventured** 193:1

**venturing**
54:23
**verify** 240:9
**version** 26:8,9
78:9 82:21
83:7,19,19,22
88:9,11,14
**versions** 33:2
83:5
**versus** 63:23
94:23 112:16
115:1 117:14
152:21 172:14
175:13 201:21
229:9 230:23
230:24
**vertical** 115:15
132:3
**vest** 16:18
**vested** 45:3
**victor** 4:11
196:21
**video** 249:11
**videos** 30:5
**view** 16:11
36:22 114:22
114:23,25
115:13 238:8
**viewed** 161:4
**vis** 51:13,13
**visual** 176:24
**vithani** 212:9
212:10,12,21
212:24,25
**vocal** 223:16
**voice** 32:19
233:16,19

235:13,22
250:9,12
**volatile** 118:24
119:6,25
120:14,17
148:16,16
**volatility** 18:12
**volume** 64:18
91:21
**volunteer**
222:5
**volunteered**
227:5
**vote** 43:15
60:14 73:13
74:3 111:15
184:3 185:12
190:2,4 191:12
191:20 196:3,3
201:21,23
220:25 227:2,5
227:7,8 232:7
232:11
**voted** 58:1
60:21 71:7
73:24 186:7,9
186:11,16
187:3,4 190:24
191:1,9 192:8
192:9,24
195:15 197:9
223:10 237:7
**voters** 193:9
**votes** 184:7
185:7 186:1,3
191:5 201:5,6
201:8,11

232:14 247:17
**voting** 43:21
111:16 184:2
186:18 187:23
189:25 197:6
198:17,23
201:4,5,8
**voyager** 48:16
48:17,22 49:6

**w**

**w** 113:11
**waited** 172:19
**waived** 225:3
**wanna** 133:19
**want** 10:14,19
10:20 11:20
12:19 13:23
14:1 16:6
17:11 18:13,21
18:22,24 19:14
19:16,16,17
20:6 21:11,13
22:9 23:17
26:12 30:12
34:3 37:1
40:19,25 52:15
67:3 71:5 78:6
80:9,17 82:17
84:13 85:3,9
90:12 92:12,12
95:2 101:6
111:14 131:1
164:23 193:20
194:14 196:4,5
196:10 198:9
199:13 200:4
200:11 217:18

224:17 229:5
230:9,11,11
231:8,18 237:8
239:9 244:9
245:13,15
250:1,2,14
**wanted** 5:5
28:16 53:2,3
53:12 74:5
102:2 110:13
135:12 138:2
138:23 143:23
200:22 213:4
216:21 222:3
232:13,13
233:2 235:16
235:17 236:3
238:3 250:3
**washington**
5:22
**wasn't** 140:8,9
141:25 147:23
175:8 223:20
236:12 241:18
**watch** 182:3
**water** 65:10
82:3,4 127:2
**way** 41:11 42:7
45:8 47:21
52:21 76:6
89:4,9 96:19
96:24 102:12
106:12 118:13
130:4 132:13
151:8 164:12
187:21 190:8
194:23 196:4

203:22 211:14
232:12
**ways** 131:11
**we've** 6:22,25
7:15 17:1
27:12,23 33:8
37:15 76:18
77:16 96:23
102:22,24
111:17 216:2
**weedman** 3:16
218:16,17,20
218:25 219:5,8
219:13,16,21
219:25 220:4,9
220:12,15,19
221:1,4,6,9,12
221:16,20,23
223:17 225:10
225:14 228:6
229:18 237:22
238:24 239:3
240:7 241:10
243:1,21 244:1
245:20,22
246:9,12 247:7
248:4,10,11,15
248:23
**weekends**
104:7
**weekly** 27:19
36:14
**weeks** 10:5
28:6,7 59:11
**weigh** 212:3
223:22

| | | | |
|---|---|---|---|
| **weighed** | **we're** 154:15 | **window** 216:14 | 90:15 92:7,13 |
| 169:15 206:4 | 167:25 218:14 | **winner** 223:1 | 113:1,24 118:8 |
| **weight** 179:18 | 228:21 230:9 | **winning** | 118:11 119:18 |
| **weighted** | 237:7 | 160:22 163:13 | 124:24 126:20 |
| 179:10,21 | **we've** 160:21 | 169:16 170:5 | 126:21 134:24 |
| 180:7 194:1,7 | 237:5 | **wish** 7:21 55:6 | 150:8 152:4 |
| 194:17 195:21 | **whatsoever** | 66:3 68:24 | 154:18 155:14 |
| 195:22 196:7 | 41:9 | 71:20 72:1 | 173:8,11 |
| **weinberg** | **what's** 146:11 | 77:24 78:16,18 | 177:18 179:13 |
| 170:2 230:25 | 168:15 174:16 | 79:4,6 90:24 | 182:8,16 |
| 242:16,18,23 | 175:16 177:8 | 91:2 92:9 | 187:13 192:3 |
| **weird** 45:13 | 220:4 | 104:19 109:4 | 196:5,10,12,16 |
| **went** 10:2,10 | **white** 3:11 | 110:21 113:5 | 196:18 198:10 |
| 14:21 16:4 | 122:25 123:3,4 | 113:12 122:17 | 210:10 215:17 |
| 17:7 24:10,12 | 216:1 218:17 | 135:1,25 | 216:2 218:23 |
| 24:14,24 25:4 | 224:9 225:11 | 138:19 152:4 | 219:8 221:24 |
| 25:4,8,9 28:8 | 228:23 229:10 | 154:7 167:16 | 224:21 240:9 |
| 40:1 45:15,19 | 229:15 230:14 | 168:10 172:24 | 244:2 249:3,5 |
| 53:16 64:6 | 230:15,24 | 180:24 181:19 | **witnesses** 2:6 |
| 67:7,9 68:9 | **whittle** 14:7 | 191:15 193:20 | 3:19 215:6,9 |
| 75:24 81:23 | **wholly** 43:10 | 196:17 199:6 | 215:10,12,14 |
| 86:17 95:25 | 43:18 73:12,15 | 202:1 212:7 | 215:20,23 |
| 97:8 121:2 | 73:20 74:19 | 214:22 221:25 | 217:6 249:1,15 |
| 128:18 139:13 | **who's** 154:16 | 245:24 248:10 | 249:18 |
| 164:3 169:4 | **widely** 70:16 | **wished** 65:20 | **witness's** |
| **weren't** 159:13 | **wider** 115:15 | 157:23 199:15 | 241:11 |
| 236:10 237:1 | **wiles** 49:9 | **wishes** 213:2 | **woffard** 3:16 |
| 237:14,17 | **willful** 40:15 | **wishing** 78:12 | **wondering** |
| **west** 115:12 | 55:2 | 78:22 | 28:22 |
| 117:2 122:11 | **willingness** | **wit** 209:12 | **word** 242:9 |
| **we'd** 188:11 | 217:5 | **withdrawals** | **wording** |
| **we'll** 149:19 | **wind** 14:6 | 19:9 | 234:18 |
| 154:16 167:11 | 27:25 | **withhold** 56:5 | **words** 86:8 |
| 177:4 224:13 | **winddown** | **witness** 7:22 | 135:18 |
| 224:14 225:4 | 163:16,19 | 28:21 56:11 | **work** 5:14 |
| 249:2,15 | 164:2 168:24 | 78:20 80:4 | 16:16 38:7,8 |
| | | 82:13 89:12 | 77:7 94:10 |

103:16 104:6
111:23 117:5
149:19 156:6
174:4 200:1
203:4 216:14
232:24 233:16
246:25
**worked** 14:22
23:25 175:24
183:8,10,24
185:10,10,13
188:10 237:9
**workforce**
102:25
**working** 6:23
7:1,2,16 37:15
38:13 98:18
102:20 110:2
156:15 208:16
**workload**
233:4
**works** 219:20
232:12
**world** 236:22
**worries** 143:3
**worth** 117:4
140:11
**worthless**
24:20 25:22
26:7
**would've** 25:18
190:15
**wouldn't**
225:16
**wrap** 120:19
121:5 215:8
238:1

**written** 13:5
47:21 102:12
217:17
**wrong** 77:6
117:25 214:11
**wrote** 107:20

| **x** |
|---|

**x** 1:4,10 163:5

| **y** |
|---|

**yeah** 8:24 9:13
13:7 14:5 15:6
16:12 17:15
18:9 21:25
25:2 26:19
27:11 28:19
30:14 31:1
33:5 34:18
35:11,23 36:4
37:6,15,16
38:1 40:7,7
42:7 44:21
45:15,20 46:1
46:10 48:4
50:1 51:8 52:5
52:9,10,22
54:11,21 56:15
56:20 59:23
62:15 65:4
74:3,16 81:19
82:8,8 85:3
89:8 93:16,24
95:4,4,4,16,18
96:12 98:25
99:7,11,15,18
102:18 105:18
111:10 113:19

115:10 116:11
116:21 117:11
119:25 121:10
123:2,12
134:16 136:9
136:21 137:18
138:7 144:9
150:11 162:2
175:15 177:1
178:18 198:7
219:19 220:6
220:22 225:22
231:22 235:10
236:16,20
241:3 249:20
**year** 9:12
15:13 16:20
30:18 37:8
117:25 119:13
120:6 130:11
130:12,12
144:15,25
203:1
**years** 23:25
38:1 107:9
130:14,16
144:19,21
156:14 174:5
183:11 184:15
240:2
**yep** 123:25
**yesterday**
65:21 78:14
79:6 145:11
216:8
**yield** 70:12,18
131:2 132:15

**yielded** 128:20
**yields** 131:5
**york** 1:2,14 3:6
3:14 6:11
222:16
**young** 3:9
177:3,7 206:11
208:4 209:7
**youtube** 30:5
**you'd** 158:2
**you'll** 145:15
155:8,9
**you're** 145:14
146:3,14
149:16 150:12
151:15 152:2,6
152:23 173:1
179:17 181:22
182:4 229:5
232:15,15
238:8,14
244:21
**you've** 147:15
154:6 171:13

| **z** |
|---|

**zero** 68:14
97:22,23 98:6
98:6,16,16
140:5
**zone** 54:23
**zoom** 78:21
110:5 139:15
167:15 177:24
206:13 212:7,8
213:1 216:5,6
231:22

| | |
|---|---|
| **zooms** | 222:19 |
| **'** | |
| **'23** | 178:17 |
| **'24** | 147:2,9 |
| **à** | |
| **à** | 51:13 |