Joshua A. Sussberg, P.C.  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022  
Telephone:     (212) 446-4800  
Facsimile:      (212) 446-4900  

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)  
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)  
Christopher S. Koenig  
Dan Latona (admitted *pro hac vice*)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle Street  
Chicago, Illinois 60654  
Telephone:     (312) 862-2000  
Facsimile:      (312) 862-2200  

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' RESPONSE TO MR. KIRSANOV'S MOTION FOR CLARIFICATION**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this response to *Mr. Kirsanov's Motion for Clarification* [Docket No. 3998] (the "Clarification Request")[2] filed by Dimitry Kirsanov ("Mr. Kirsanov") and at the request of the Bankruptcy Court

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), the *Order (I) Approving the Adequacy of the Debtors' Disclosure Statement, (II) Approving the Solicitation and Voting Procedures with Respect to the Confirmation of the Debtors' Joint Plan of Reorganization, (III) Approving the Form of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, (V) Authorizing and Approving Reimbursement of Certain of the Plan Sponsor's Fees and Expenses, and (VI) Granting Related Relief* [Docket No. 3337] (the "Disclosure Statement Order"), the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtors Affiliates* [Docket No. 3972, Exhibit A], or the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3972] (the "Confirmation Order"), as applicable.

as set forth in the *Order Requiring Response from Debtors* [Docket No. 4005] (the "Order") and state the following.

**Response**

1.    On November 10, 2023, Mr. Kirsanov filed the Clarification Request seeking, among other things, clarification with respect to how his acceptance of the Custody Settlement during the Election Period in spring 2023 affected his vote on the Plan and how certain Cryptocurrency associated with Custody Claims will be valued and distributed to Holders of Custody Claims in Hawaii. *See generally* Clarification Request. On November 14, 2023, the Bankruptcy Court issued the Order directing the Debtors to respond by 5:00 p.m., prevailing Eastern Time, on November 20, 2023. *See generally* Order. Given the complexity of the Custody Settlement, the Debtors have provided a robust history of the treatment of Custody Claims during these chapter 11 cases and then responded directly to Mr. Kirsanov's questions at the conclusion of this response.[3]

**I.    History of the Custody Settlement**[4]

2.    On December 7, 2022, in a bench ruling, the Bankruptcy Court found that digital assets in the Custody Wallets (as defined in the Custody Settlement Motion), among other things, and digital assets transferred to Celsius' platform that were not supported on the platform (the "Ineligible Withhold Assets") were not property of the Debtors' estates.[5] On

---

[3]    The Debtors' response to the Clarification Request is based on the Debtors' understanding of Mr. Kirsanov's questions. To the extent the Debtors misunderstood what Mr. Kirsanov is asking, they will further supplement the record upon the Court's request.

[4]    For a history of the Custody Settlement prior to the Bankruptcy Court's first ruling, please see Article VII.L.2 of the Disclosure Statement. *See* Disclosure Statement at 212–14. For the avoidance of doubt, to the extent there are any inconsistencies between this response and the Disclosure Statement, the Disclosure Statement shall control.

[5]    Dec. 7, 2022 Hr'g Tr. 209:2–10, 217:24–218:1 [Docket No. 1684].

2

December 20, 2022, the Bankruptcy Court entered the *Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief* [Docket No. 1767] (the "Custody Withdrawal Order") permitting the Debtors to release to customers (i) digital assets that were only ever in the Custody Program, (ii) transfers of digital assets to the Custody Program made in the ninety days before the Petition Date when such transfers were, in the aggregate, less than $7,575 at the time of the transfers, and (iii) Ineligible Withhold Assets. As further set forth in the Custody Withdrawal Order, the Debtors were not authorized "to permit withdrawals of any digital assets (a) other than digital assets held in the Custody Program and/or associated with Withhold Accounts that is a Distributable Asset, (b) by (1) any current or former employee or insider or (2) any affiliate of any current or former employee or insider, or (c) to any customer with an outstanding loan owed to the Debtors through the Debtors' Borrow Program." Custody Withdrawal Order ¶ 9.

3. On January 19, 2023, the Bankruptcy Court entered an order directing the parties to meet and confer regarding the distribution of "assets that all Parties agree are Custody Assets, setting aside for later determination, on a coin-by-coin basis, any shortfall as to which a further determination by the Bankruptcy Court is necessary before such shortfall can be allocated." *Order Directing Certain Parties to Confer Regarding Custody Assets Shortfall Issue* [Docket No. 1880]. On January 31, 2023, the Debtors filed the *Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 1958] (the "Custody Withdrawal Notice") detailing the eligibility requirements for withdrawal of certain assets in the Custody Program, identifying the Account Holders eligible to withdraw such assets, and explaining the process for withdrawal. The Custody Withdrawal Notice permitted eligible users to withdraw 94% of their assets eligible for

3

withdrawal in light of the 6% shortfall between the aggregate liabilities of the Custody Program and the digital assets actually held in Custody Wallets (the "Shortfall Issue"). Custody Withdrawal Notice ¶ 4. On February 28, 2023, the Debtors Filed the *Notice of Potential Increase to Amount of Distributable Custody Assets* [Docket No. 2149] alerting Account Holders that certain users may receive a greater distribution than anticipated by the Custody Withdrawal Notice pursuant to the pending settlement agreement between the Debtors, the Committee, and the Custody Ad Hoc Group (the "Custody Settlement"), as further explained below.[6] Withdrawals pursuant to the Custody Withdrawal Notice opened on March 2, 2023, as described in the *Notice of Withdrawals Opening for Eligible Custody Users* [Docket No. 2176], and were processed thereafter.

4. On February 28, 2023, the Debtors filed the Custody Settlement Motion seeking approval of the Custody Settlement. Pursuant to the Custody Settlement, among other things,

> all Custody Account Holders will have thirty days to elect to participate in the [Custody] Settlement to receive 72.5% of their Custody Distribution Claims in exchange for certain mutual releases, including the estates' release of all claims and causes of action (including avoidance actions) against such Settling Custody Account Holder on account of such holders' Custody distribution. The payments will be made in two stages— Settling Custody Account Holders will receive half of such settlement (36.25%) after the expiration of the thirty-day Election Period. The second half (another 36.25%) will be distributed on the effective date of the Debtors' Plan. The Settlement provides that if the effective date does not occur, the distributions will still be made by a number of alternative dates, including a prescribed outside date. Custody Account Holders who choose not to participate in the Settlement during the Election Period may still opt-in to such Settlement by voting to accept the Plan and such holders will receive the entirety of 72.5% of their eligible Custody Assets on the effective date of the Debtors' Plan. The balance of Settling Custody Account Holders' accounts (27.5%) will become the Debtors' property upon the occurrence of the effective date of the Plan. Settling Custody

---

[6] On April 17, 2023, the Debtors Filed the *Notice of Revised Schedule of Custody Users Entitled to Withdraw Certain Assets* [Docket No. 2491], informing all Custody users eligible for withdrawal that they were now entitled to withdraw the full 100% of their assets eligible for withdrawal.

4

>       Account Holders will benefit from a most favored nations clause and
>       receive the benefit of any settlement of avoidance actions offered to
>       other Custody Account Holders under the Plan.

Custody Settlement Mot. ¶ 3.  Importantly, the Custody Settlement also resolved the Shortfall Issue and authorized the Debtors to distribute 100% of any Eligible User's Withdrawable Custody Assets instead of the originally agreed upon 94%.  *See id*. ¶¶ 20–22.[7]

5.    On March 20, 2023, the Debtors filed the *Notice of Filing of Custody Settlement Agreement and Custody Ad Hoc Group Letter* [Docket No. 2271], which contained a copy of the Custody Settlement agreement (the "Custody Settlement Agreement") attached as Exhibit A.  The Custody Settlement Agreement explained that the Custody Settlement was available to ***all*** Custody Account Holders (as defined in the Custody Settlement Agreement), including those that were previously unable to withdraw any assets in the Custody Program from the Debtors' platform under the Custody Withdrawal Order.  *See* Custody Settlement Agreement, Section 4 ("The settlement set forth in this Settlement Agreement will be offered to all Custody Account Holders with Custody Account Balances that are not authorized to fully withdraw Custody Assets from Celsius' platform pursuant to the Withdrawal Order, including any holders with both (1) a Custody Account and (2) an outstanding obligation owed to the Debtors through the Debtors' Borrow Program.").  Moreover, the Custody Settlement Agreement explained how a "Custody Distribution Claim" would be calculated.  *See id*. Definitions, l. "Custody Distribution Claim."[8]  In other

---

[7]   Capitalized terms used in this paragraph not otherwise defined herein shall have the meanings ascribed to them in the Custody Settlement Motion.

[8]   A "Custody Distribution Claim" means the balance of the Custody Account of a Custody Account Holder (such balance, the "Custody Account Balance") minus (a) any Withdrawable Custody Assets and (b) any further amounts for which such Custody Account Holder is alleged to be obligated or indebted to the Debtors, except on account of (1) Avoidance Actions or (2) an obligation with respect to an outstanding retail loan to the extent such loan obligation is supported by an allowed Borrow Claim (as defined in the Plan) in an amount that results in a loan to value ratio of equal to or less than 80% on the date of the entry of the Order (it is expected that no such claims exist).  With respect to (b)(2), the Debtors shall be authorized to subtract from the Custody Account

5

words, Account Holders with an outstanding obligation owed to the Debtors through the Debtors' Borrow Program would be eligible to participate in the Custody Settlement and receive 72.5% of *all* of their assets in the Custody Program. In comparison, Account Holders that were eligible to withdraw both their Pure Custody Assets and their Transferred Custody Assets pursuant to the Custody Withdrawal Order, and now elected to participate in the Custody Settlement, would still receive 100% of their Pure Custody Assets and their Transferred Custody Assets *plus* 72.5% of the remaining balance of their assets in the Custody Program, at the times provided in the Custody Settlement.

6. The Custody Settlement Agreement explained that those Holders of Custody Claims that participated in the Custody Settlement would be *required* to vote their Custody Claims to accept the Plan. *See* Custody Settlement Agreement, Section 5. Because of this, the Custody Settlement Agreement also included a "most favored nations clause." Pursuant to Section 5 of the Custody Settlement Agreement, "if any sale or chapter 11 plan provides any holders, or subset thereof, of Allowed Custody Claims with treatment on terms better than those set forth in this Settlement Agreement, including as a result of a release of claims against holders of Allowed Custody Claims (including avoidance actions), then any Settling Custody Account Holder shall be entitled to receive the difference between such holder's Custody Settlement Payments and the treatment set forth in the sale or chapter 11 plan, as applicable, on the same terms set forth in such sale or chapter 11 plan, as applicable." *See id*. Finally, the Custody Settlement Agreement clarified that those Holders of Pure Custody Assets and/or Transferred Custody Assets (both as defined in the Custody Settlement Agreement) that did not wish to accept the Custody Settlement

---

Balance any amounts necessary to make any such outstanding retail loan's loan to value ratio equal 80%, which shall be calculated as of the date such Custody Account Holder's Custody Distribution Claim is calculated.

6

at this time would receive the applicable treatment under the Plan with respect to those claims. *See id.*

7.     On March 21, 2023, the Bankruptcy Court entered the Custody Settlement Order. In accordance with the Custody Settlement Order, the Debtors distributed Election Forms to Account Holders with assets in the Custody Program and allowed such holders to opt-in to the Custody Settlement from March 21, 2023 through April 24, 2023. *See* Disclosure Statement, Art. III.TT.1 at 84. Withdrawals of Cryptocurrency off the Debtors' platform by participants in the Custody Settlement began on or around May 9, 2023. *See Notice of Filing of May 17, 2023 Hearing Presentation*, Slide 2 [Docket No. 2655].

## II.    The Treatment of Custody Claims Under the Plan

8.     On August 17, 2023, the Bankruptcy Court entered the Disclosure Statement Order that, among other things, approved the Disclosure Statement and authorized the Debtors to commence solicitation on the Plan. *See generally* Disclosure Statement Order. Pursuant to the Plan, Holders of Custody Claims would receive the following treatment depending on how they voted for the Plan and their previous involvement, if any, in the Custody Settlement:

- Class 6A — General Custody Claims.[9]

    - [. . .]

    - (b) *Treatment*:

        - (i) <u>For Holders of General Custody Claims that did not elect to be Custody Settlement Participants in accordance with the Custody Settlement Order</u>: Each such Holder of a General Custody Claim shall have the opportunity to elect, through its Ballot in accordance with the procedures set forth in <u>Article IX</u> of the Disclosure Statement, one of two treatments:

---

[9]   The treatment set forth below is based on the confirmed Plan filed at Docket No. 3577, which was the operative Plan during the confirmation hearings.

7

- a. **Treatment A**: (a) a distribution of Cryptocurrency equal to 72.5% of the amount of such Allowed General Custody Claim on the Effective Date in-kind and (b) a full and final release of all Causes of Action, including Avoidance Actions, with respect to such Allowed General Custody Claim; *provided* that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery under Treatment A, as provided in Article IV.B.3 of the Plan.

- b. **Treatment B**: The Cryptocurrency associated with the applicable Allowed General Custody Claim will be transferred to a segregated wallet held by the Post-Effective Date Debtors and shall be subject to all Avoidance Actions and other claims with respect to such Allowed General Custody Claim. The Litigation Administrator(s) shall have 180 days to bring any Avoidance Action or other claim against such Account Holder with respect to such assets, such time period subject to extension by the Bankruptcy Court following notice and a hearing. To the extent no such action is brought and no settlement is reached in the time period set forth in the immediately preceding sentence (as extended), such assets shall be released to the Holder of the applicable Allowed General Custody Claim. Any such Allowed General Custody Claim will be subject to the ADR Procedures.

- (ii) <u>For Custody Settlement Participants</u>: Each such Holder of an Allowed General Custody Claim shall receive a distribution on the Effective Date equal to the amount set forth in Treatment A, above, minus any amounts already received under such settlement; provided that any votes cast by such Holder on account of such General Custody Claim, whether to accept or reject the Plan, shall be deemed votes to accept the Plan consistent with the terms of the Custody Settlement Motion and any such Holder that abstains from voting on the Plan shall also be deemed to accept the Plan on account of such General Custody Claim consistent with the terms of the Custody Settlement Motion; *provided*, *further*, that Custody Settlement Participants that (1) are not Excluded Parties and (2) have Withdrawal Preference Exposure less than or equal to $100,000 shall receive a 100% recovery, as provided in Article IV.B.3 of the Plan.

- Class 6B — Withdrawable Custody Claims.

- [. . .]

- (b) *Treatment*: Each Holder of an Allowed Withdrawable Custody Claim that is not an Equitably Subordinated Claim shall be permitted to withdraw such Holder's Cryptocurrency in accordance with the Custody Withdrawal

8

Order. For the avoidance of doubt, any Holder of an Allowed Withdrawable Custody Claim that also has an outstanding Retail Advance Obligation is also eligible to withdraw such Holder's Cryptocurrency associated with the applicable Allowed Withdrawable Custody Claim commencing on the Confirmation Date.

9. Consistent with the "most favored nations" clause of the Custody Settlement, Holders of Custody Claims that had previously accepted the Custody Settlement during the Election Period would be eligible to participate in the Avoidance Action Settlement, which could potentially result in a 100% recovery of behalf of such Holder's Class 6A General Custody Claim, and receive 100% of their Class 6B Withdrawable Custody Claim, so long as they complied with the requirements set forth in the Plan. *See* Plan, Art. III.A.6B.

10. In the Preliminary Statement of the Disclosure Statement, the Debtors highlighted key parts of the Disclosure Statement that Holders of General Custody Claims should review in considering whether to vote on the Plan. *See* Disclosure Statement, Art. II.B at 20–22. Moreover, Article III.TT of the Disclosure Statement explained the Custody Settlement in detail and provided answers to several questions related to how the Custody Settlement would affect Holders of General Custody Claims and their participation in the Plan and solicitation process. *See id*. Art. III.TT at 84–88. Article III.TTT.4 explicitly noted, without exceptions, that "[a]ny Settling Custody Account Holder who attempts to votes her General Custody Claim to reject the Plan or does not vote her General Custody Claim will nonetheless be deemed to have voted her General Custody Claim to accept the Plan." *Id*. at 85–86.

11. Furthermore, the Account Holder Ballot approved in the Disclosure Statement Order included the following reminder: "Please note, if you previously accepted the Custody Settlement in accordance with the terms of the Custody Settlement Order, your Claims in Class 6A will automatically be counted as votes to accept the Plan." *See* Disclosure Statement Order, Exhibit 3A, Item 7.

**III.     Distributions to Holders of Custody Claims**

   **A.     *Distributions to Holders of Custody Claims pursuant to the Custody Withdrawal Order and the Custody Settlement.***

12.     As noted above, on January 31, 2023, the Debtors filed the Custody Withdrawal Notice detailing the eligibility requirements for withdrawal of certain assets in the Custody Program, identifying the Account Holders eligible to withdraw such assets, and explaining the process for withdrawal. Distributions of certain assets in the Custody Program to eligible Account Holders began shortly thereafter and were made from the Debtors' platform through the Celsius App. *See generally* Custody Withdrawal Notice.

13.     Following approval of the Custody Settlement, Custody Account Holders that opted in to the Custody Settlement during the Election Period were eligible to withdraw 36.25% of their Custody Distribution Claims once the Election Period expired and withdrawals commenced. *See* Custody Settlement Agreement, Section 5. The remaining 36.25% of their Custody Distribution Claims would be distributed upon "the earliest of (i) the effective date of the Plan . . . (ii) the occurrence of a Rejection Event [(as defined in the Custody Settlement Agreement)], (iii) June 11, 2023 if the Debtors do not file a chapter 11 plan by such date, and (iv) December 31, 2023[.]" *Id*.

14.     Section 8 of the Custody Settlement Agreement set forth the process for distributions of Custody Settlement Payments, including the process for converting any Cryptocurrency to alternative Cryptocurrency if necessary:

> **Distribution Procedures**. The Custody Settlement Payments shall be made in-kind and the Debtors may make such payments using any combination of digital assets currently held in Custody Wallets or Aggregator Wallets (each as defined in the Blonstein Declaration), respectively, in an amount sufficient to satisfy such in-kind distribution. In the event there are insufficient in-kind digital assets to satisfy the Custody Settlement Payments, the remainder of such payments shall be made in cryptocurrency based on a manner that is

10

> tax-efficient. Any distribution made in alternative cryptocurrency shall be converted using the value of the original digital asset as of the Petition Date in U.S. dollars, which will then be converted into alternative cryptocurrency using the value of such digital asset as of the date of entry of the Settlement Approval Order.

*See* Custody Settlement Agreement, Section 8 (pertinent part).

15. As noted above, the Debtors were permitted to make payments in alternative Cryptocurrency only to the extent there were ***insufficient in-kind digital assets*** to satisfy the Custody Settlement Payments. The Custody Settlement Agreement was silent with respect to any other type of conversion process. As noted above, these distributions pursuant to the Custody Settlement Order began on or around May 9, 2023. In addition, as explained in the Supplemental Memo, distributions of Custody Settlement Payments were made to Holders of Custody Claims in Hawaii. *See* Supplemental Memo ¶¶ 10–12.

16. On May 17, 2023, the Debtors filed the *Notice of Conversion of LUNC and UST to Alternative Cryptocurrency* [Docket No. 2666] (the "LUNC/UST Notice") explaining that on June 4, 2023, the software produced by Fireblocks, Inc. ("Fireblocks"), which the Debtors use to store their Cryptocurrency, would no longer support TerraLunaClass ("LUNC") or TerraUSD ("UST"). As a result, the Debtors would no longer be able to trade and/or transfer any LUNC or UST off the Fireblocks platform. As a result, the Debtors, in consultation with the advisors to the Committee, intended to convert all or most of their LUNC and UST to other types of Cryptocurrencies on or before June 2, 2023. *See generally* LUNC/UST Notice.

17. The Debtors further explained that as permitted by Section 8 of the Custody Settlement Agreement, on or after June 1, 2023, the Debtors would make any in-kind distributions of Custody Settlement Payments that would have otherwise been made in LUNC or UST in an alternative Cryptocurrency. Any distribution made in alternative Cryptocurrency would be converted using the value of the original digital asset as of the Petition Date in U.S. dollars, which

11

will then be converted into alternative Cryptocurrency using the value of such digital asset as of the date of entry of the Custody Settlement Order. *See generally* LUNC/UST Notice.

### B. Distributions to Holders of Custody Claims pursuant to the Plan.

18. For Holders of Custody Claims that did not previously elect the Custody Settlement and/or had not yet collected their assets in the Custody Program from the Debtors' platform, the Plan and the Disclosure Statement set forth a detailed description of how distributions would be made to Holders of Custody Claims that voted to accept the Plan upon confirmation of the Plan.[10]

19. Pursuant to the Confirmation Order, the Debtors are authorized to commence distributions on account of Custody Claims on or after the Confirmation Date. *See* Confirmation Order ¶¶ 259, 371. The current process for distributions to Holders of Custody Claims under the Plan is outlined below:[11]

- Holders of Custody Claims that are individuals and live in the United States will receive "in-kind" distributions from the Debtors during the first 90 days that such distributions are made or distributions in BTC/ETH only from another Distribution Agent. *See* Disclosure Statement at 47; Supplemental Memo ¶¶ 10–12.[12] The Debtors are currently contemplating making these distributions for the first 90 days from the Celsius App and not through another Distribution Agent. Distributions on behalf of Custody Claims are expected to commence in the upcoming weeks. After the Deactivation Date,[13] approximately 91 days after the distribution process begins, Holders of Custody Claims that are individuals and live in the United States that did

---

[10] As further set forth in the Plan, and as noted above, Holders of General Custody Claims that did not vote to accept the Plan by either abstaining or voting to reject the Plan will receive Treatment B under the Plan and will not receive an immediate distribution. *See* Plan, Art. III.A.6A.

[11] Based on the Debtors' books and records, there are less than 175 Holders of Custody Claims living in Hawaii. This number is subject to change as Holders of Custody Claims submit current KYC documents.

[12] The Disclosure Statement originally noted that the Debtors would be unable to make "in-kind" distributions to individuals living in Hawaii on behalf of such individuals' Custody Claims. As further clarified in the Supplemental Memo, the Debtors confirmed that they *can* make "in-kind" distributions to individuals living in Hawaii on behalf of such individuals' Custody Claims.

[13] "Deactivation Date" means the date after which the Post-Effective Date Debtors will no longer make Plan distributions through the Celsius platform, which date the Debtors or Post-Effective Date Debtors (as applicable) will announce in a notice filed on the docket at least seven (7) days in advance thereof, which is expected to be approximately ninety (90) days after the Confirmation Date.

not collect their distributions in the first 90 days will receive distributions from PayPal (BTC/ETH) or another Distribution Agent (Cash or BTC/ETH).

- To the extent there are an insufficient number of certain types of Cryptocurrencies in the Custody Wallets to satisfy all "in-kind" distributions during the first 90 days, the Confirmation Order now authorizes the Debtors sell or trade any such Cryptocurrency as necessary to rectify any shortfalls. *See* Confirmation Order ¶ 305. Currently, the only types of Cryptocurrencies that the Debtors will be unable to distribute from the Celsius App are LUNC and UST. The Debtors will need to convert these assets to alternative Cryptocurrencies before distributing them. The Debtors will convert LUNC and UST in accordance with the LUNC/UST Notice. *See generally* LUNC/UST Notice.

- After the Deactivation Date, when the Cryptocurrency is transferred to PayPal or another Distribution Agent for distribution, the Debtors will convert the remaining Custody Assets to Cash, BTC, or ETH using the Deactivation Date and the Deactivation Date Cryptocurrency Conversion Table.[14]

20. To the extent any of the conversion procedures set forth in the Plan conflict with the conversion procedures set forth in the Custody Settlement Order, the conversion procedures in the Plan control. *See* Confirmation Order ¶ 373 ("This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order; provided that, unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in the Chapter 11 Cases pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 9019 unless specifically stated otherwise.").

---

[14] "Deactivation Date Cryptocurrency Conversion Table" means the conversion table the Distribution Agent shall use to calculate the Claims of Holders of Allowed Custody Claims that did not retrieve their Plan distribution from the Celsius platform by the Deactivation Date in Cash and Liquid Cryptocurrency, which table shall contain applicable Cryptocurrency prices as of a date agreed by the Debtors and the Committee, which date is expected to be approximately fifteen (15) days prior to the Deactivation Date. Notwithstanding anything to the contrary herein excepting Custody Claims from the CEL Token Settlement, the Deactivation Date Cryptocurrency Conversion Table shall provide that CEL Token is priced at $0.25 if the Bankruptcy Court approves the CEL Token Settlement, or such other amount as ordered by the Bankruptcy Court. For the avoidance of doubt, following the Deactivation Date, such Claims shall be subject to further conversion pursuant to any applicable Distribution Cryptocurrency Conversion Table in connection with subsequent distributions.

13

**IV.    Mr. Kirsanov's Custody Claims**

21.    Mr. Kirsanov has Custody Claims, a Class 2 Retail Borrower Deposit Claim, and a Class 5 General Earn Claim. *See generally* Clarification Request and Schedules.

22.    ***Custody Withdrawal Order***. As noted above, pursuant to the Custody Withdrawal Order, Holders of Custody Claims "with an outstanding loan owed to the Debtors through the Debtors' Borrow Program" were not eligible to withdraw ***any*** Pure Custody Assets or Transferred Custody Assets on the Debtors' platform. Custody Withdrawal Order ¶ 9. Because Mr. Kirsanov has an open loan owed to the Debtors, he was ineligible to withdraw any of his Pure Custody Assets or Transferred Custody Assets pursuant to the Custody Withdrawal Order.

23.    ***Custody Settlement***. Once the Custody Settlement was approved, however, Mr. Kirsanov was eligible to participate in that settlement, regardless of his open loan, and could elect to receive 72.5% of his Custody Distribution Claim in exchange for mutual releases of all claims and causes of action related to his Allowed Custody Claim. *See* Custody Settlement Agreement, Section 5 and Section 6. The Custody Settlement Agreement was clear that if Mr. Kirsanov participated in the Custody Settlement, then he would have his Custody Claim counted as a vote to accept the Plan. *See id*., Section 5. Mr. Kirsanov (a) opted into the Custody Settlement, and (b) withdrew all of his CEL Tokens that were eligible to be withdrawn pursuant to the Custody Settlement. *See* Supplemental Memo ¶ 7.[15]

24.    ***Mr. Kirsanov's Account Holder Ballot***. Mr. Kirsanov (1) voted to accept the Plan with respect to his Class 2 and Class 5 Claims, (2) voted to reject the Plan with respect to his Class 6A Claim, and (3) did not opt out of the Class Claim Settlement. Because he had previously

---

[15]    On May 11, 2023, Mr. Kirsanov withdrew 25,000 CEL Token. On May 24, 2023, Mr. Kirsanov withdrew his remaining 246,585 withdrawal-eligible CEL Token. Mr. Kirsanov has approximately 477,000 CEL Tokens remaining in his Custody account. *See* Supplemental Memo ¶ 7 n.5.

14

accepted the Custody Settlement, his Class 6A Claim was deemed a vote to accept the Plan, regardless of whether it was shown as an accept or reject on the *Amended Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LL and Its Debtor Affiliates* [Docket No. 3574]. As noted above, this was explained and disclosed in multiple documents provided to Mr. Kirsanov, including the Custody Settlement Agreement, the Disclosure Statement, and the Account Holder Ballot.

25. In the Clarification Request, Mr. Kirsanov mistakenly believes that he had the right to vote to reject the Plan because he also has a Class 2 Claim. *See* Clarification Request at 1–2 ("In the Custody Settlement ('Custody Settlement', ECF Doc. #2291), on page 9&10 (Docket page 10&11), it indicates rights to vote to reject below, resultant of having an outstanding obligation owed to the debtor, which Mr. Kirsanov has."). The provision that Mr. Kirsanov relies on for this argument, however, was merely clarifying how Holders of an Allowed Custody Claim would be treated under the Plan if the ***only*** reason they could not withdraw their Pure Custody Assets or Transferred Custody Assets under the Custody Withdrawal Order was because of a Class 2 Claim.[16] Importantly, this provision was not referring to **Settling Custody Account Holders** (*i.e.*, those that accepted the Custody Settlement) and was not preserving any such Settling Custody Account Holder's right to vote to reject the Plan with respect to any of such Holder's Custody Claim. If Mr. Kirsanov did not want to be bound to vote for the Plan during the Election

---

[16] "For the avoidance of any doubt, any Holder of an Allowed Custody Claim that abstains from voting or votes to reject the Plan and has only Pure Custody Assets or Transferred Custody Assets, but was prevented from receiving his or her Custody Assets under the Withdrawal Order as a result of an outstanding obligation owed to the Debtors through the Debtors' Borrow Program, shall receive his or her Custody Assets in accordance with the treatment of allowed Deposit Claims under the Plan and otherwise consistent with the Court's findings in the Withdrawal Order." *See* Custody Settlement Agreement, Section 5.

15

Period, he should not have accepted the Custody Settlement and subsequently withdrawn assets off the Debtors' platform.

26. In any event, Holders of Class 6B Withdrawable Custody Claims were unimpaired under the Plan and deemed to accept the Plan. *See* Plan, Art. III.A.6B. Thus, even if Mr. Kirsanov had not accepted the Custody Settlement during the Election Period, he still would have been ineligible to vote to reject the Plan with respect to his Class 6B Claim. Finally, because of the Custody Settlement Agreement's "most favored nations" clause, Mr. Kirsanov will receive 100% of his Class 6B Claim notwithstanding his Class 2 Claim and his previous election into the Custody Settlement.

27. Thus, with respect to Mr. Kirsanov's first request for clarification, as explained herein, once he accepted the Custody Settlement, he was deemed to accept the Plan with respect to his General Custody Claims and he was no longer eligible to vote any of his Custody Claims to reject the Plan.

28. ***Distributions on behalf of Mr. Kirsanov's Custody Claims***. The Debtors anticipate commencing distributions on behalf of all Custody Claims in the coming weeks. At that time, to the extent Mr. Kirsanov complies with all applicable KYC requests and any and all other requirements necessary to receive distributions under the Plan or Confirmation Order, he will be eligible to withdraw his applicable Cryptocurrency on account of his Custody Claims from the Debtors' platform over the span of an approximately 90-day period. The distributions will be made "in-kind" except for any LUNC or UST that Mr. Kirsanov may have, which will be converted to alternative Cryptocurrency in accordance with the LUNC/UST Notice. In other words, Mr. Kirsanov will soon be able to withdraw all of his CEL Token associated with his Custody Claims.

29. Following the Deactivation Date, any Cryptocurrency remaining on the Debtors' platform associated with Mr. Kirsanov's Custody Claims will be converted to Cash, BTC, or ETH using the Deactivation Date Cryptocurrency Conversion Table. On the Deactivation Date Cryptocurrency Conversion Table, CEL Token will be priced at $0.25/CEL Token. *See* Plan, Art. I, "Deactivation Date Cryptocurrency Conversion Table."

30. Thus, with respect to Mr. Kirsanov's second request for clarification, Holders of Custody Claims in Hawaii entitled to distributions prior to the Deactivation Date will likely receive their distributions "in-kind," except for with respect to any LUNC and UST, from the Debtors' platform. After the Deactivation Date, Holders of Custody Claims in Hawaii will receive distributions in Cash, BTC, or ETH using the conversion prices set forth on the Deactivation Date Cryptocurrency Conversion Table. In the Deactivation Date Cryptocurrency Conversion Table, CEL Token will be priced at $0.25/CEL Token as set forth in the Plan and the Confirmation Order.

[*Remainder of page intentionally left blank*]

| | |
|---|---|
| New York, New York<br>Dated:  November 20, 2023 | */s/ Joshua A. Sussberg*<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>Joshua A. Sussberg, P.C.<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:     (212) 446-4800<br>Facsimile:      (212) 446-4900<br>Email:             joshua.sussberg@kirkland.com<br><br> - and -<br><br>Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:     (312) 862-2000<br>Facsimile:      (312) 862-2200<br>Email:             patrick.nash@kirkland.com<br>                       ross.kwasteniet@kirkland.com<br>                       chris.koenig@kirkland.com<br>                       dan.latona@kirkland.com<br><br>*Counsel to the Debtors and Debtors in Possession* |