*Jason Amerson*

*Pro Se Creditor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, et al., | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

------------------------------------------------------------

# JASON AMERSONS' [1] OBJECTION TO MOTION FOR (I) ALLOWANCE AND PAYMENT OF PROFESSIONAL FEES AND EXPENSES INCURRED IN MAKING A SUBSTANTIAL CONTRIBUTION (II) GRANTING RELATED RELIEF

Jason Amerson ("Mr. Amerson") files this objection (The "Objection") to BNK to the Future (BF) motion for payment of administrative expenses *(I) Allowance and Payment of Professional Fees and Expenses Incurred in Making Substantial Contribution (II) Granting Related Relief (*Docket No. 3672 & 3799*, the "Motion") (ref. Exhibit A)*. In support of his

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 121 River Street, PH05, Hoboken, New Jersey 07030

**EXHIBIT A :** https://www.kirkland.com/siteFiles/Publications/80B362CAB9C91AFCD3EE7B3C88F79187.pdf

objection, *Mr. Amerson* respectfully states the following:

## Pro Se Relief

*Mr. Amerson asks and requests pro se relief with this objection.*

## Introduction

These bankruptcy cases have been proven extremely costly for the Celsius Network creditors estate. Unfortunately, there has been several creditors who have taken advantage of the process and are seeking unreasonable and unjustified compensation of expenses from the estate. Of these creditors, Simon Dixon, co-founder and CEO of BNK to the Future (BF) has submitted the most egregious request by far totaling $506,722.50. Through his extensive use of social media, Mr. Dixon has been a Celsius Network community agitator and taken actions that are arguably intended to solely advance his own personal interests and those of his company, BNK to the Future (BF). After ultimately failing to win a predatory bid for Celsius Network's assets in December 2022, and subsequently failing to secure a compensated NewCo board position, Mr. Dixon filed Motion against the estate for reimbursement of his personal legal expenses for actions he voluntarily took *at his own risk*. Furthermore, Mr. Dixon's voluntary actions do NOT qualify as a "substantial contribution" according to the Debtor's own legal counsel's published understanding of "substantial contribution" that a creditor (claimant) requires intent in taking "*extraordinary actions*" that led to an *actual* and *demonstrable* (or, as some courts say, a "direct and material") benefit to the debtor's estate (ref. Exhibit A). BNK to the Future and Simon Dixon's Motion should be **DENIED** and Mr. Amerson's objection be **SUSTAINED.**

## **Argument**

1. In or around 2020, Simon Dixon partnered with former CEO Alex Mashinsky of Celsius Network to promote investment into the Series A equity round of Celsius Network. BNK to the Future (BF) gathered approximately 1,000 of Celsius's accredited customers and BF's investors, who invested just under $10 million into the shares of Celsius Network Ltd. As such Mr. Dixon should be considered by the Debtor to be in the same class as other promoters who profited financially from their direct involvement in Celsius Network promotions for which legal actions could still be forthcoming. Mr. Dixon's standing as a large creditor does not absolve him from his culpability in promoting and profiting from the Celsius Network series A equity round where he helped bring in millions of dollars from investors. As such, I would assert Mr. Dixon contributed, in a substantial and meaningful manner, to draw in more customers and investors to Celsius Network without performing the required due diligence expected of a CEO serving in a financial advisor capacity. Any claims by Mr. Dixon that he is not licensed to provide financial advice do not change the fact that he encouraged investors to invest in Celsius Network through his, now deleted, YouTube videos and numerous posts on social media.

2. In 2022 and just a few months before the petition date, Mr. Dixon made an unsolicited offer to Celsius Network's CEO Alex Mashinsky to sell his company, BNK to the Future, for $500 million. Evidence that Mr. Dixon's relationship with Celsius Network tilted more towards that of a partnership rather than solely that of a customer. The offer was rejected in any case.

3. Following the Celsius Network petition filing on or about July 13, 2022, Mr. Dixon spent months communicating publicly through social media that he had no intention to bid on Celsius Network's assets only to subsequently submit a failed bid on December 12, 2022 for such assets, through his company BNK to the Future.

4. Although BNK to the Future and the Debtor entered into a "Plan Consultation Agreement" on March 10, 2023, a full 3 months after Mr. Dixon's failed bid was submitted, paragraph 4 of this Agreement as referenced in Exhibit C of Docket # 3799, expressly states **"Plan Consultation Party shall not be eligible to receive compensation or benefits for any of the services provided hereunder"**. In other words, Mr. Dixon expressly agreed in writing that he was NOT entitled to compensation for his participation as a Plan Consultation Party. Moreover, Mr. Dixon's voluntary participation in this agreement does not warrant reimbursement of any legal expenses incurred in the months preceding the Agreement related to research, preparation and submission of his December 12, 2022 failed bid on Celsius Network's assets. In other words, the estate is clearly under no obligation to reimburse Mr. Dixon for past legal expenses not directly related to the subsequent March 10, 2023 agreement with the Debtor. Additionally, Mr. Dixon has not provided any quantifiable or direct supporting evidence that his participation as Plan Consultation Party led to an actual and demonstrable benefit to the debtor's estate. BNK to the Future did not include detailed legal invoices in its Motion to clarify specifically for what and when these legal expenses actually occurred which demonstrates a lack of transparency to the court.

5. Mr. Dixon's assertion that he and his company incurred "necessary expenses" by way of making a "substantial contribution" to the Debtor's estate, as defined under 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), is UNSUPPORTED by the evidence and also by the Debtor's own legal counsel's published understanding that a creditor (or claimant) requires INTENT in taking "*extraordinary actions*" that led to an *actual* and *demonstrable* (or, as some courts say, a "direct and material") benefit to the debtor's estate (ref. Exhibit A). Even if the Debtor may have benefited in any way, the INTENT by Mr. Dixon was purely self-serving and not an effort at the behest of the Debtor to benefit the estate. Any such benefit would have been purely coincidental

and not by design. Mr. Dixon provided no MEASURABLE or QUANTIFIABLE evidence that his actions, whether intentionally or unintentionally, resulted in a direct and material benefit to the estate. Instead, as stated in paragraphs 6, 50 and 74 of Docket # 3672, Mr. Dixon puts forth the argument that he was hugely influential in garnering overwhelming public support for the Debtor's plan. Mr. Dixon's claim is not only purely based on his subjective perception and not supported by any measurable evidence in his Motion, but also irrelevant to his reimbursement request for legal fees in connection with his failed bid for Celsius Network's assets *or* his activities while voluntarily serving as a Plan Consultation Party. Equating these events suggests a quid pro quo arrangement.

    6. Simon Dixon's motivations have been self-serving and the evidence provided in Mr. Dixon's Motion requesting to be reimbursed for allowance and payment of professional fees and expenses, do NOT constitute an ACTUAL and DEMONSTRABLE BENEFIT to the Debtor's estate. BNK to the Future and Mr. Dixon have only presented evidence that legal expenses were incurred as a result of a failed bid for Celsius Network's assets. Mr. Dixon presented no quantifiable, definitive, or meaningful evidence that his actions resulted in a direct and material benefit to the Debtor's estate.

    7. In paragraph 73 of Docket # 3672 where the following statement "The fees sought through this Application have been voluntarily reduced in light of the fact that unsecured creditors of the Estate have already been victimized through significant loss of their investments.", only serves to support the notion that Mr. Dixon does not have a strong legal foundation to argue for recovery of his voluntarily incurred legal expenses. Instead, Mr. Dixon is making a subtle, yet clear, claim to Your Honor that his request should be received as a token of generosity to the estate and to creditors. It defies credulity that Mr. Dixon would not submit for the maximum dollar amount allowed under the bankruptcy code if he truly believed he had

solid legal standing to do so. Rather than an act of genuine altruism, Mr. Dixon is engaging in a gratuitous effort to extract funds from the estate in hopes that no one will object. As the co-founder of BNK to the Future, Mr. Dixon's priorities remain fully tied to the success of his own business and are not necessarily aligned with creditor's interests. It is reasonable to believe that any responsible CEO would request the maximum allowable under the law to ensure the success of their business. In paragraph 73 of Docket # 3672, Mr. Dixon's any good will expressed regarding not victimizing creditors further by voluntarily reducing his legal fees sought by 50%, is completely negated by the fact that he is nevertheless continuing to victimize creditors through his request for reimbursement from the estate for the staggering amount of $506,722.50 plus up to an additional $50,000 in anticipation of legal fees (paragraph 5 & 7 of Docket # 3799) in connection with his application to the court for reimbursement.

## Conclusion

There is no evidence to support that the Debtor's legal counsel, Kirkland & Ellis, who are widely known to be among the top experts in bankruptcy litigation, modeled the Debtor's plan based on advice or information received from Mr. Dixon as a Plan Consultant Party, *and* that such advice or information led to an *actual* and *demonstrable benefit* to the Debtor's estate. In his Motion, Mr. Dixon failed to provide any *quantifiable* or *direct supporting evidence* that his actions resulted in an *actual* and *demonstrable benefit* to the Debtor's estate, and by not including detailed legal invoices to clarify specifically for what and when these legal expenses actually occurred, Mr. Dixon demonstrates a serious lack of transparency with the court. Mr. Dixon's subjective claim that he personally garnered overwhelming public support for the Debtor's plan, which is solely based on his perception and not fact based, still does NOT entitle him to reimbursement of legal fees in connection with his failed bid for Celsius Network's assets "*or*" any legal fees he may have incurred while voluntarily serving as a Plan Consultant Party. To equate these separate events suggests a quid pro quo. The staggering figure of $506,772.50 in fees for which Mr. Dixon is requesting reimbursement is the result of self-serving actions which he entered into *at his own risk* during the Celsius Network bankruptcy process. I submit to the court that Your Honor should NOT reward BNK to the Future and its CEO Simon Dixon, on the grounds that its Motion submitted is unreasonable, unsupported by the evidence, and falls short of the standards pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), which require a high bar be met before such a request for reimbursement is granted. For all the reasons above, the Motion filed by Applicants, BNK to the Future and its CEO Simon Dixon, should be **DENIED** and this objection should be **SUSTAINED** as to preserve as much of the estate as possible for creditors.

Respectfully Signed,

Jason Amerson, *Pro Se*

11/20/2023

*/s/ Jason Amerson*

## CERTIFICATE OF SERVICE

I certify that of Sunday November 19th, 2023, a true and correct copy of Jason Amersons' objection (The "Objection") to BNK to the Future (BF) motion for payment of administrative expenses *(I) Allowance and Payment of Professional Fees and Expenses Incurred in Making Substantial Contribution (II) Granting Related Relief (*Docket No. 3672 & 3799*, the "Motion")*.

Respectfully Signed,

Jason Amerson, *Pro Se*

11/20/2023

*/s/ Jason Amerson*

**EXHIBIT A :**

https://www.kirkland.com/siteFiles/Publications/80B362CAB9C91AFCD3EE7B3C88F79187.pdf

KIRKLAND & ELLIS LLP

# KIRKLAND ALERT

October 2009

## Substantial Contribution Claims Require Intent to Benefit Estate

*Introduction*

A bankruptcy court may reward a party that makes a "substantial contribution" to a chapter 11 case by ordering the debtor to pay the party's fees and expenses incurred in making that contribution under Section 503(b)(3)(D) of the Bankruptcy Code. Section 503(b)(3)(D) reflects a policy of encouraging meaningful participation in a reorganization case, while "keeping fees and administrative expenses to a minimum so as to preserve as much of the estate as possible for the creditors."[1]

The Bankruptcy Code does not define "substantial contribution." Courts generally have required that the claimant show that it took "extraordinary actions" that led to an actual and demonstrable (or, as some courts say, a "direct and material") benefit to the debtor's estate.[2] The courts are divided, however, regarding whether the claimant's intent to benefit the estate is relevant. Bankruptcy courts in the District of Delaware and the Southern District of New York, among others, generally require a claimant to show that its actions were intended to benefit the estate and will not allow a substantial contribution claim where the benefit was incidental to the claimant's pursuit of its own self interest.[3] As parties in a bankruptcy proceeding are generally presumed to act in their own self interest, this standard sets a high bar to proving a substantial contribution claim.

A recent ruling by the Delaware bankruptcy court overseeing Tropicana Entertainment's chapter 11 cases illustrates the difficulty of obtaining a substantial contribution claim when the claimant's intent to benefit the estate is at issue.

*The Tropicana Case*

Tropicana Entertainment and 33 of its affiliates filed for chapter 11 after the New Jersey Casino Control Commission denied Tropicana's state gaming license applications and appointed a conservator to operate Tropicana's Atlantic City casino. The day after Tropicana filed for bankruptcy, a consortium of Tropicana's unsecured bondholders sought the appointment of a chapter 11 trustee. The consortium alleged that an individual who was Tropicana's owner, CEO, and board chairman had mismanaged Tropicana, resulting in the gaming license denials and loss of control of the Atlantic City casino, and that this mismanagement constituted "cause" to appoint a trustee.

The parties settled during trial. Under the settlement, the owner agreed to resign from the Tropicana board, give up his officer position, and grant Tropicana's remaining board members a limited, irrevocable proxy. The settlement also required Tropicana to support the consortium's claim that its attorney's fees and expenses incurred in bringing the trustee motion constituted a "substantial contribution" to Tropicana.

*The Substantial Contribution Application*

After the bankruptcy court confirmed Tropicana's plans of reorganization, the consortium filed a substantial contribution application for allowance of approximately $2.4 million in attorney's fees and expenses. Tropicana's secured lenders opposed the application. The lenders argued that the consortium was motivated by a de-

Attorney Advertising

EXHIBIT A : (continued)

KIRKLAND **ALERT** | 2

sire to protect its own self interest because, at that time, it appeared that the bondholders would be the fulcrum constituency and would own reorganized Tropicana. The lenders also argued that any incidental benefit to the estate that may have resulted from the settlement was insufficient to demonstrate the consortium's intent to benefit all creditors, as required by the controlling Third Circuit precedent on the issue, *Lebron v. Mechem Financial, Inc.*[4]

The bankruptcy court agreed with the lenders and denied the application. While acknowledging that removing the owner had benefited the estate, the bankruptcy court stated that this benefit alone was not enough to warrant a substantial contribution claim under the *Lebron* intent standard. "The exercise here," the judge stated in ruling from the bench, "is to separate out the self-interest and to see what else might warrant an award for a substantial contribution. . . . [A]nd I'm not convinced [with respect to] that element laid out by the [Third] Circuit in *Lebron* relating to whether the movants would have moved forward absent an expectation of reimbursement from the estate or not, they just haven't met that burden."[5]

In particular, the bankruptcy court noted the consortium's failure to offer any evidence that it acted out of anything other than self interest and observed that the consortium "had such a bloodlust for [the owner], that it would have [proceeded] to do what [it] did regardless of whether there was a benefit shared by others who were constituents in the estate." The bankruptcy court also refused to grant any weight to Tropicana's "support" for the application under the terms of the settlement, saying "[i]t was part of a settlement, which I will tell you it's my impression was wrested from the debtor and its owner."[6]

*Potential Impact on Parties Seeking Substantial Contribution Awards*

The consortium has appealed the bankruptcy court's ruling, and while the decision does not signal a change in the law, it does demonstrate the difficulties a party faces in seeking a substantial contribution award in a jurisdiction where the party's intent is relevant. It also illustrates the importance of building a record demonstrating that the party's actions were intended to benefit the debtor's estate, and not merely to advance its own interests, and that the claimant would not have acted without an expectation of reimbursement from the estate.

Kirkland & Ellis LLP represents the Tropicana debtors in possession in their chapter 11 cases.

---

[1] *Otte v. United States*, 419 U.S. 43, 53 (1974).

[2] *See, e.g., Lister v. United States*, 846 F.2d 55 (10th Cir. 1988).

[3] *See, e.g., In re Granite Partners, L.P.*, 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997).

[4] *Lebron v. Mechem Fin., Inc.*, 27 F.3d 937 (3d Cir. 1994).

[5] Transcript of Proceedings Before the Honorable Kevin J. Carey, United States Bankruptcy Court Judge at 29-39 and 56, *In re Tropicana Entermn't, LLC*, Case. No. 08-10856 (KJC) (Bankr. D. Del. Sept. 10, 2009).

[6] *Id.* at 46.

---

If you have any questions about the matters addressed in this *Kirkland Alert*, please contact the following Kirkland authors or your regular Kirkland contact.

David R. Seligman
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
www.kirkland.com/dseligman
+1 (312) 862-2463

Phillip W. Nelson
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
www.kirkland.com/pnelson
+1 (312) 862-2028

This communication is distributed with the understanding that the author, publisher and distributor of this communication are not rendering legal, accounting, or other professional advice or opinions on specific facts or matters and, accordingly, assume no liability whatsoever in connection with its use. Pursuant to applicable rules of professional conduct, this communication may constitute Attorney Advertising. Prior results do not guarantee a similar outcome. © 2009 KIRKLAND & ELLIS LLP. All rights reserved.

www.kirkland.com