**Hearing Date: November 30, 2023**
**Hearing Time: 10:00 a.m. EST**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

In re

CELSIUS NETWORK LLC, *et al.*,[1]

                                            Debtors.

-------------------------------------------------------- x

: Chapter 11
:
: Case No. 22-10964 (MG)
:
: Jointly Administered
:
:
:
:

## OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO SUBSTANTIAL CONTRIBUTION APPLICATIONS

**WILLIAM K, HARRINGTON**
**UNITED STATES TRUSTEE, REGION 2**
**U.S. Department of Justice**
**Office of the U.S. Trustee**
**One Bowling Green, Rm. 534**
**New York, N.Y. 10004**
**(212) 510-0500**
**By:     Shara Cornell, Esq.**
**           Trial Attorney**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND .................................................................................................................... 4

   A.   The Plan and Disclosure Statement ................................................................ 7

   B.   The Custody and Withhold Disputes and Resolution ................................... 8

   C.   The Earn/Stablecoin Dispute and Resolution ............................................. 12

   D.   The Borrower Dispute ................................................................................... 14

   E.   The Withdrawal Dispute ............................................................................... 16

   F.   The Class Claim Motion ............................................................................... 16

   G.   The Individual Creditor Applicants' Activities in these Cases ................... 18

     i.   Mr. Frishberg ............................................................................................. 18

     ii.   Mr. Herrmann ........................................................................................... 19

     iii.   Mr. Tuganov .............................................................................................. 20

   H.   The Mediation ............................................................................................... 21

ARGUMENT ....................................................................................................................... 21

   A.   Legal Standards ............................................................................................. 21

     1.   Substantial Contribution Statute is Narrowly Construed and Only Available in Rare and Exceptional Circumstances ............................................................... 21

     2.   Activities that Do Not Lead to Measurable Monetary Benefit or Increase Estate Costs Are Not Compensable. ................................................................... 25

     3.   Professionals' Fees Are Not Allowable Under Section 503(b)(4) Unless the Applicant Demonstrates they Are "Reasonable" Based On the Time, Nature, Extent, and Value of the Professional Services and the Cost of Comparable Services. ............ 26

   B.   Objection ....................................................................................................... 28

     1)   Ad Hoc Applications ................................................................................... 29

     i.   The Earn Ad Hoc Group. ECF Dkt. No. 3654 .......................................... 31

     a)   11 U.S.C. § 503(b) ..................................................................................... 31

     b)   The Reasonableness Standard ................................................................... 34

     ii.   Custody Ad Hoc Group. ECF Dkt. No. 3660 ........................................... 36

     a)   11 U.S.C. § 503(b) ..................................................................................... 37

     b)   The Reasonableness Standard ................................................................... 38

     iii.   Withhold Group. ECF Dkt. No. 3663 ...................................................... 40

**a) 11 U.S.C. § 503(b)** ................................................................ 41

**b) Reasonable Standard** ........................................................ 41

**iv. Borrower Ad Hoc Group. ECF Dkt. No. 3671** ................. 44

**a) 11 U.S.C. § 503(b)** ................................................................ 44

**b) The Reasonableness Standard** ........................................ 44

**v. Withdrawal Ad Hoc Group. ECF Dkt. No. 3673** ............. 45

**a) 11 U.S.C. § 503(b)** ................................................................ 45

**b) The Reasonableness Standard** ........................................ 46

**2) The Individual Applications** ............................................. 46

**i. The Zachary Wildes Application. ECF Dkt. No. 3615** ...... 46

**a) 11 U.S.C. § 503(b)** ................................................................ 46

**b) The Reasonableness Standard** ........................................ 47

**ii. The Tuganov Application. ECF Dkt. No. 3665, 3686, 4010** ....... 48

**a) 11 U.S.C. § 503(b)** ................................................................ 48

**b) The Reasonableness Standard** ........................................ 50

**iii. The Dixon Application. ECF Dkt. Nos. 3670, 3672, 3799** ....... 54

**a) 11 U.S.C. § 503(b)** ................................................................ 55

**b) The Reasonableness Standard** ........................................ 57

**iv. Frishberg, Herrmann, and Gallagher Applications. ECF Dkt. Nos. 3675, 3674, 3662** ....... 57

**a) 11 U.S.C. § 503(b)** ................................................................ 57

**b) Reasonableness Standard** ................................................ 60

**CONCLUSION** ........................................................................ 61

iii

# TABLE OF AUTHORITIES

*Case Authorities*

*Baker Botts L.L.P. v ASARCO LLC,*
576 U.S. 121 (2015) …………………………………………………………….. 22

*Bedford JV, LLC v. Sky Lofts, LLC,* No.
12 Civ. 5850(DLI), 2013 WL 4735643 (E.D.N.Y. Sept. 3, 2013) ………………. 23

*Ex parte Roberts,*
93 B.R. 442 (D.S.C.1988) ……………………………………………………. 24

*In re Alert Holdings Inc.,*
157 B.R. 753 (Bankr. S.D.N.Y. 1993)……………………………………… 2, 24, 59

*In re Alumni Hotel Corp.,*
203 B.R. 624 (Bankr. E. D. Mich. 1996) ………………………………………... 24, 33

*In re Am. Ctr. for Civ. Just., Inc.,*
No. 22-1016, 2022 WL 17884119 (3d Cir. Dec. 23, 2022) …………………………… 30, 41

*In re American Plumbing & Mechanical, Inc.,*
327 B.R. 273 (Bankr. W.D.Tex. 2005) ………………………………………….. 25

*In re Ames Dep't. Stores, Inc.,*
76 F.3d 66 (2d Cir.1996) …………………....................................................... 25

*In re AmFin Fin. Corp.,*
468 B.R. 827 (Bankr. N.D. Ohio 2012) ………………………………………… 2

*In re AM Int'l, Inc.,*
203 B.R. 898 (D. Del. 1996) …………………………....................................... 23

*In re Baldwin-United Corp.,*
79 B.R. 321 (Bankr. S. D. Ohio 1987) ………………………………………... 24, 32, 47

*In re Bennett Funding Group, Inc.,*
213 B.R. 234 (Bankr. N.D.N.Y. 1997) …................................................... 27

*In re Best Prod. Co., Inc.,*
173 B.R. 862 (Bankr. S.D.N.Y. 1994) …………….......................................... 23

*In re Busy Beaver Bldg. Ctrs., Inc.,*
19 F.3d 833 (3d Cir. 1994) …………….................................................    27

*In re Canton Jubilee, Inc.,*
253 B.R. 770 (Bankr. E.D.Tex. 2000) …………………………………………...    25, 34

*In re Dana Corp.,*
390 B.R. 100 (Bankr. S.D.N.Y. 2008) …………………....................................    22, 23

*In re Drexel Burnham Lambert Group, Inc.,*
133 B.R. 13 (Bankr. S.D.N.Y. 1991)………………………………………………….    27

*In re Fibermark, Inc.,*
349 B.R. 385 (Bankr. D. Vt. 2006) …………………………………………………    27

*In re Granite Partners,*
213 B.R. 440 (Bankr. S.D.N.Y. 1997) ……………………………………………...    Passim

*In re Keene Corp.,*
208 B.R. 112 (Bankr. S.D.N.Y. 1997) …………………………………………...    27, 47

*In re Korea Chosun Daily Times, Inc.,*
337 B.R. 758 (Bankr. E.D.N.Y. 2005) …………………………………………...    28

*Lebron v. Mechem Financial Inc.,*
27 F.3d 937 (3d Cir.1994) …………………….....................................................    22, 28

*In re Lehman Bros. Holdings Inc.,*
508 B.R. 283 (S.D.N.Y. 2014) …………………………………………………..    22

*In re Mariner Post-Acute Network, Inc.,*
267 B.R. 46 (Bankr. D. Del. 2001) ..........................................................................    25

*In re McLean Industries, Inc.,*
88 B.R. 36 (Bankr.S.D.N.Y.1988) …………………………………………………    22

*In re Richton Int'l Corp.,*
15 B.R. 854 (Bankr. S.D.N.Y. 1981) …………………………………………………    26

*In re S & Y Enterprises, LLC,*
480 B.R. 452 (Bankr. E.D.N.Y. 2012) …………………………………………...    23

*In re Taxman Clothing Co.,*
49 F.3d 310 (7th Cir. 1995) …………………………………………………………...    27

*In re Texaco, Inc.*,
90 B.R. 622 (Bankr. S.D.N.Y. 1988) ……………………….................................   24, 59

*In re United Merchants & Mfrs., Inc.*,
No. 97 Civ. 5437(DC), 1999 WL 4929 (S.D.N.Y. Jan. 5, 1999) ……………………   23

*In re U.S. Lines, Inc.*,
103 B.R. 427 (Bankr. S.D.N.Y. 1989) ………………………………………………...   22, 23, 24,
                                                                                                      25, 56

*In the Matter of Columbia Gas Syst., Inc.*,
224 B.R. 540 (Bankr. D. Del. 1998) ………………………………………………   24, 30, 33,
                                                                                                      59

*In the Matter of Multiponics Inc.*,
436 F.Supp. 1072 (E.D.La.1977) …………...................................................   25

*Surface Transit, Inc. v. Sax*e (*In re Estate of Third Avenue Transit Corporation*),
266 F.2d 862 (2d Cir. 1959) …………………………………………………...   25

### **Statutory Authorities**

11 U.S.C. § 330 ……………………………………………………………….   26, 27

11 U.S.C. § 330(a)(1) ………………………………………………………………   26, 27, 40
                                                                                                      Fn. 17

11 U.S.C. § 330(a)(3)………………………………………………………………   26

11 U.S.C. § 330(a)(4) ………………………………………………………………   26, 27

11 U.S.C. § 330(a)(6) ………………………………………………………………   27

11 U.S.C. § 503 ………………………………………………………………………   *Passim*

11 U.S.C. § 503(b) ………………………………………………………………   *Passim*

11 U.S.C. § 503(b)(3)(D) ………………………………………………….........   *Passim*

11 U.S.C. § 503(b)(4) ………………………………………………………………   *Passim*

11 U.S.C. § 1129 ……………………………………………………………………...   45

***Other Authorities***

*Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases* (General Order M-447) …………………    28

*United States Trustee Fee Guidelines* …………………............................................    28, 38, 41,
47, 50

TO:    **THE HONORABLE MARTIN GLENN,**
        **CHIEF UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 ("United States Trustee"), hereby submits this omnibus objection (the "Objection") to the substantial contribution applications (collectively, the "Applications, and each an "Application") filed in the case of Celsius Network, LLC and its Debtor Affiliates (collectively, the "Debtors") by the following applicants (collectively, the "Applicants", each, "Applicant"):

- Zachary Wildes [ECF Dkt. No. 3615] (the "Wildes Application");

- Ad Hoc Group of Earn Account Holders (the "Earn Ad Hoc Group") and Miscellaneous Members [ECF Dkt. No. 3654] (the "Earn Application");

- Ad Hoc Group of Custody Account Holders (the "Custody Ad Hoc Group") [ECF Dkt. No. 3660] (the "Custody Application");

- Rebecca Gallagher [ECF Dkt. No. 3662] (the "Gallagher Application");

- Ad Hoc Group of Withhold Account Holders (the "Withhold Ad Hoc Group") [ECF Dkt. No. 3663] (the "Withold Application");

- Ignat Tuganov [ECF Dkt. Nos. 3665, 3686, 4010] (the "Tuganov Application");

- Simon Dixon and BNK to the Future [ECF Dkt. Nos. 3670, 3672, 3799] (the "Dixon Application");

- Ad Hoc Group of Borrowers (the "Borrower Ad Hoc Group") [ECF Dkt. No. 3671] (the "Borrower Application");

- Ad Hoc Group of Withdrawal Borrowers (the "Withdrawal Ad Hoc Group") [ECF Dkt. No. 3673] (the "Withdrawal Application");

- Immanual Herrmann [ECF Dkt. No. 3674] (the "Herrmann Application"); and

- Daniel Frishberg [ECF Dkt. No. 3675] (the "Frishberg Application").

In support thereof, the United States Trustee respectfully submits as follows:

1

## PRELIMINARY STATEMENT

The United States Trustee objects to the request of each of the eleven applicants who state, pursuant to Section 503(b)(3)(D) and (4), that they have made a substantial contribution to these cases and therefore, are entitled to administrative expense status on each of their respective claims for actual and necessary expenses, including the reasonable fees and expenses of their respective professionals. As recognized by the courts, these Bankruptcy Code provisions are "intended to promote meaningful . . . participation in the reorganization process, but not to encourage mushrooming administrative expenses." *In re Alert Holdings Inc.,* 157 B.R. 753, 757 (Bankr. S.D.N.Y. 1993).[2] As shown below, the actions taken by these eleven applicants were taken in their own self-interest, did not inure to the benefit of any creditors other than their own type of account holders, and in most cases, would have been taken by the Debtors and/or the Committee without the interjection of the Applicant.

The Debtors recognized early on in these cases that they lacked sufficient crypto assets to pay all creditor claims in full. As such, an important decision to be made was how the assets that were available would be distributed. It was apparent on the day that these cases were filed that cryptocurrency creditors could be categorized into different constituencies: namely, the Earn, Withhold, Custody, and Borrower account holders. And early on, the Debtors made clear that in order to craft a feasible plan of reorganization it would be important to determine how each category of creditors would be treated. Naturally, each type of account holder wanted to maximize

---

[2] *See also In re AmFin Fin. Corp.*, 468 B.R. 827, 831 (Bankr. N.D. Ohio 2012) (one of the intents of Section 503(b) is the "accommodation between the two objectives of encouraging meaningful creditor participation in the reorganization process and keeping administrative expenses and fees at a minimum to maximize the estate for creditors.").

2

the distribution made for the types of accounts it held. Thus, various ad hoc groups and individual creditors advocated for an increased distribution for the types of accounts they held.

The eleven applicants consist of five ad hoc groups and six individual parties in interest. Each of these applicants contends that its respective efforts made a substantial contribution to these chapter 11 cases and as such, their necessary expenses, including professional fees, in the aggregate sum of approximately $5 million should be given an administrative expense priority, pursuant to Section 503(b)(3)(D) and (b)(4). The United States Trustee disagrees. As shown below, each Applicant acted *solely* in their self-interest. Any benefit that flowed to the estates was merely incidental. In fact, many, if not all, of the services which various Applicants' claim made a substantial contribution in these cases were duplicative of the services provided to all creditors by the Official Committee of Unsecured Creditors or were already in process by the Debtors.

With respect to the requests for administrative expense priority for the necessary and reasonable fees of attorneys and accountants, all eleven Applicants fail to satisfy their respective burden with regard to the narrow strictures for compensation under section 503(b)(3)(D). Additionally, many of the expenses for which the Applicants seek administrative priority as part of their substantial contribution claims are not even compensable. For example, several of the Applicants seek to be awarded expenses for the future fees of their respective counsel in the aggregate sum of almost $500,000. There are also shocking requests for reimbursement for a variety of expenses, including deodorant, monitoring Twitter, and lavish dinners exceeding more than $400 for an unknown number of people. It cannot be persuasively claimed that these expenses were reasonable or necessary.

3

Finally, the fact that the Applicants entered into agreements with the Debtors and the Committee in which the Debtors agreed not to object to requests for substantial contribution should be given no weight. These agreements were clearly bargains made by the Debtors (and the Committee) in order to gain the votes and support of the Applicants, many of whom have been vocal during these cases. An advance agreement for unknown reimbursements of fees and expenses to secure votes does not meet the strict statutory requirements for substantial contribution and sets a negative precedent for Debtors to "silence" ad hoc groups and vocal *pro se* creditors with blank checks.

For these reasons, each Application seeking administrative priority status for expenses and professional fees filed in these cases must be denied.

## BACKGROUND

1.      On July 13, 2022 ("Petition Date"), certain of the Debtors filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code. ECF Dkt. No. 1. On December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC  each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By Order, dated July 20, 2023, the estates of Celsius Network Limited and Celsius Network LLC were substantively consolidated. ECF Dkt. No. 3058. Since the Petition Date, the Debtors have continued in possession and operated and managed their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On July 27, 2022, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"). ECF Dkt. No. 241. Subsequently, with the support of both the Debtors and the Committee, on September 14, 2022, the Court entered an order directing the

4

appointment of an examiner (the "Examiner"). ECF Dkt. No. 820. On September 29, 2022, the

United States Trustee appointed the Examiner. ECF Dkt. No. 920. On April 5, 2023, the Court

entered an order discharging the Examiner. ECF Dkt. No. 2364.

3.     Additionally, although there were no other formal requests for additional

committees of creditors, other than by the Series B Preferred Shareholders,[3] several ad hoc

committees were formed. First, on August 19, 2022, the Custody Ad Hoc Group filed its Verified

Statement Pursuant to Bankruptcy Rule 2019. ECF Dkt. No. 547. Then, on August 30, 2022, the

Withhold Ad Hoc Group filed its Verified Statement Pursuant to Bankruptcy Rule 2019.[4] ECF

Dkt. No. 633.  On March 1, 2023, the Withdrawal Group filed its Verified Statement Pursuant to

Bankruptcy Rule 2019. ECF Dkt. No. 2155. On April 28, 2023, the Earn Group filed its Verified

Statement Pursuant to Rule 2019.[5] ECF Dkt. No. 2553. A fourth group, labeled as the Withdrawal

Borrowers, filed its Verified Statement Pursuant to Rule 2019 on March 1, 2023. *See* ECF Dkt.

No. 2155.

4.     The dispute with the Series B Preferred Shareholders and the Debtors (the "Series

B Dispute") had a significant impact over these bankruptcy proceedings. The Series B Dispute

---

[3] On September 22, 2022, Community First Partners, LLC, Celsius SPV Investors, LP, Celsius New SPV Investors, LP, and CDP Investissements Inc. (together, the "Series B Preferred Shareholders") filed its motion for the appointment of a preferred equity committee (the "Preferred Equity Committee Motion"). ECF Dkt. No. 880. The Preferred Equity Committee Motion was subsequently denied by order of the Court on October 24, 2022. ECF Dkt. No. 1166.

[4] On November 5, 2022, the Withhold Ad Hoc Group filed its Second Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019. ECF Dkt. No. 1288. On December 2, 2022, the Withhold Ad Hoc Group filed its Third Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019. ECF Dkt. No. 1576.  On January 19, 2023, the Withhold Ad Hoc Group filed its Fourth Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019. ECF Dkt. No. 1886.

[5] On September 29, 2023, the Earn Group filed its Second Verified Statement Pursuant to Rule 2019. ECF Dkt. No. 3638.

would determine, among other things, whether the value derived from Debtors' mining business – its only currently operating business – would flow to the Series B Preferred Shareholders instead of to the Debtors, and ultimately to the Debtors' creditors. The Debtors and the Committee both argued its various account holders had both contractual and noncontractual claims against all Debtor entities that would supersede any of the Series B Preferred Equity Holders' claims. The Bankruptcy Court ruled in favor of the Series B Holders and determined that customers could only assert contractual claims against Network LLC (as defined by the Plan) and not all Celsius entities. Importantly, however, the Bankruptcy Court noted that there may be non-contractual claims against other Celsius entities. The Debtors and the Committee then commenced a series of related litigations, including an estimation proceeding on the value of an intercompany claim held by Network LLC against CNL (as defined by the Plan) and motions to substantively consolidate Network LLC and CNL. The Committee also filed a class claim on behalf of all account holders. Ultimately, the Debtors, the Committee, and the Series B Holders – without any of the various Ad Hoc Groups - reached a global settlement (the "Series B Settlement") of these issues and the Bankruptcy Court entered an order approving the settlement. ECF Dkt. No. 3074. The Series B Settlement, which was approved by the Bankruptcy Court, provided for a $25 million cash payment to the Series B Preferred Equity Holders in exchange for a release of all claims between the participating Series B Preferred Equity Holders and the Debtors and the Committee. Critically, none of the Applicants were involved in the Series B Settlement. Moreover, none of the Series B Preferred Equity Holders or their counsel filed an application seeking substantial contribution in these cases.

6

A. **The Plan and Disclosure Statement**

5.      On July 29, 2023, the Debtors filed the Revised Disclosure Statement (the "Disclosure Statement"). ECF Dkt. No. 3117. The Disclosure statement was approved on August 17, 2023. ECF Dkt. No. 3337. On September 27, 2023, the Debtors filed their Amended Plan/Revised Joint Chapter 11 Plan of Reorganization (the "Plan"). ECF Dkt. No. 3577.  On November 9, 2023, the Court entered the order confirming the Plan. ECF Dkt. No. 3972.

6.      On September 21, 2023, the Debtors filed a Notice of Entry of Plan Support Agreement (the "Earn Plan Support Agreement"). ECF Dkt. No. 3516. The Earn Plan Support Agreement entered into between and among the Debtors, the Committee, the Earn Ad Hoc Group, the Consenting Earn Account Holders, the Consenting Individual Earn Account Holders, Simon Dixon,[6] and BNK To The Future[7] contained the following provision on pages 24 and 25 of 55:

> Section 13. Expenses.
> The Debtors and the Committee shall support the request for reimbursement of the reasonable and documented out-of-pocket fees and expenses as set forth in the Plan so long as commercially reasonable.  For the avoidance of any doubt, the Debtors and the Committee are not obligated to support any Party's application for reimbursement of fees and expenses incurred in connection with the Debtors' sale and marketing process.
>
> The Debtors and the Committee will support any substantial contribution application or portion thereof submitted by the Consenting Dixon Parties for the payment of legal fees and expenses pursuant to section 503(b)(3)(D) of the Bankruptcy Code relating to the negotiation and execution of this Agreement.  Any payment of such fees and expenses shall be subject to Bankruptcy Court approval.  Nothing in this Agreement shall prevent the Consenting Dixon Parties from filing an application for substantial contribution for other fees or expenses pursuant to section 503(b)(3)(D).

---

[6] Upon information and belief, Simon Dixon is a creditor in these chapter 11 cases. A search of the claim registry does not identify a proof of claim filed by Mr. Dixon in his personal capacity.

[7] BNK to the Future is a creditor in these chapter 11 cases. See Proof of Claim No. 32183, 31846, 31847, and 32184 (collectively, the "BNK POCs"). The BNK POCs were all filed as unliquidated.

The Earn Ad Hoc Group, the Consenting Individual Earn Account Holders, and the
Consenting Dixon Parties shall file motions for "substantial contribution" to these
Chapter 11 Cases (as defined under section 503(b)(3)(D) of the Bankruptcy Code)
(collectively, the "Substantial Contribution Motions") on or before the deadline
approved by the Bankruptcy court, and such Substantial Contribution Motions shall
be heard by the Bankruptcy Court as part of the Confirmation Hearing.

### B. <u>The Custody and Withhold Disputes and Resolution</u>

7.      On June 12, 2022, the Debtors "paused" all withdrawals, swaps, and transfers of

any cryptocurrency on any of the Debtors' platforms (the "<u>Pause</u>"). As a result of the Pause, all

customers with cryptocurrency held on the Debtors' platform as of June 12, 2022, were not able

to withdraw or access any cryptocurrency on the Debtors' platforms. Each group of account

holders, as well as each individual account holder, wanted return, or at least access, to the assets

on the Debtors' platforms. However, each group of customer accounts had different relationships

with the Debtors and the assets held by the Debtors.

8.      On August 31, 2022, the Custody Ad Hoc Group filed its Complaint against the

Debtors for Declaratory Judgment that the custody assets were not property of the estate under

section 541 (the "<u>Custody Complaint</u>"). *See* Adversary Proceeding No. 22-01142. The Custody

Ad Hoc Group believed that the Debtors' Terms of Use clearly established that cryptocurrency in

the Custody accounts were not property of the Debtors' estates, and therefore demanded that the

Debtors return those coins to all Custody users immediately. On September 1, 2022 at 12:49 a.m.,

mere hours after the filing of the Custody Complaint, the Debtors filed its Motion Seeking Entry

Of An Order Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect

to Assets Held in the Custody Program (the "<u>Debtors' Custody Motion</u>"). ECF Dkt. No. 670.[8] The

---

[8] Even earlier than the filing of the Debtors' Custody Motion, during the First Day Hearing, the Debtors first stated
for the Court the importance of the Custody legal questions. *See, e.g.,* Jul. 18, 2023 H'rg Tr. 20:17:23 ("we think,
Your Honor, that it is a legal question as to whether or not it is, you know, truly a custodial account, truly in trust, or

Debtors' Custody Motion distinguished between different types of Custody accounts and sought return of some, but not all, Custody assets. The Debtors' Custody Motion was different from the Custody Complaint in that it sought to limit return of Custody assets for customers that had the potential preference exposure because of pre-pause transfers of assets between the Earn and Custody accounts.

9.    On September 7, 2022, the Withhold Ad Hoc Group filed its Motion for Relief from the Automatic Stay (the "Withhold Motion"). ECF Dkt. No. 737.[9] The Withhold Motion sought relief from the automatic stay with respect to Withhold accounts and an order directing the Debtors to unfreeze Withhold accounts to enable Withhold Ad Hoc Group Members to withdraw, what they considered their property, from those accounts. *Id*. at p. 9.

10.    Following the filing of the Custody Complaint, the Debtors' Custody Motion, and the Withhold Motion, various parties entered into a "Phase 1" and "Phase 2" briefing schedule to determine whether assets in the Custody and/or Withhold accounts were property of the estate and whether the Debtors were required to return those assets immediately. *See* Joint Stipulation and Agreed Scheduling Order By and Among the Debtors, the Committee, and the Ad Hoc Groups with Respect to the Custody and Withhold Issues, entered on October 13, 2022 (the "Briefing Stipulation"). ECF Dkt. No. 1044. Thereafter, the Court held an evidentiary hearing beginning on December 7, 2022. The Court agreed with the Debtors and concluded that the Custody assets in the Debtors' segregated Custody wallets were property of the Debtors' Custody customers, not the

---

despite that having been people's intentions, is that the legal effect? I anticipate almost for sure that that is a question that Your Honor is going to have to answer at some point in the case."); *Id*. at 22:6-8 ("So we [the Debtors] are acutely aware of the issue and have thought on our side about how to bring it to a head sooner rather than later."). ECF Dkt. No. 77.

[9] On April 20, 2023, the Withhold Ad Hoc Group withdrew the Withhold Motion.

Debtors. *See* Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers with Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief, entered on December 20, 2022 (the "Initial Custody Withdrawal Order"). ECF Dkt. No. 1767. As a result, Custody Assets, other than "Pure" Custody Assets and "Transferred" Custody Assets, would not be returned to Custody users absent further litigation pursuant to the "Phase II" briefing schedule or a resolution among the parties. Issues remained as to how and when distributions would be made and what impact potential preference exposure would have on Custody account holders.

11.     The Initial Custody Withdrawal Order did not determine who owned the assets associated with the Withhold accounts. However, the Bankruptcy Court further found that, regardless of who owns the assets associated with the Custody accounts and the Withhold accounts, the Debtors could maintain possession of those assets pending resolution of any avoidance actions. *Id*. The Bankruptcy Court subsequently entered an order permitting the Debtors to release to customers (i) digital assets that were only ever in the Custody Program, (ii) transfers of digital assets to the Custody Program made in the ninety days before the Petition Date when such transfers were, in the aggregate, less than $7,575 at the time of the transfers, and (iii) the Ineligible Withhold Assets in the Order (I) Authorizing the Debtors to Reopen Withdrawals for Certain Customers With Respect to Certain Assets Held in the Custody Program and Withhold Accounts and (II) Granting Related Relief (the "Custody Withdrawal Order"). ECF Dkt. No. 1767.

12.     The parties were then directed by the Court to meet and confer regarding the distribution of the Custody Assets. On January 31, 2023, the Debtors Filed the Notice of Schedule of Custody Users Entitled to Withdraw Certain Assets (the "Custody Withdrawal Notice")

10

detailing the eligibility requirements for withdrawal, identifying the Custody users eligible to withdraw, and explaining the process for withdrawal. ECF Dkt. No. 1958. In light of the six percent shortfall between the aggregate liabilities of the Custody Program and the digital assets actually held in Custody Wallets (the "Shortfall Issue"), the Custody Withdrawal Notice permitted eligible users to withdraw 94% of their assets eligible for withdrawal.

13.    To resolve the Phase II litigation and the Shortfall Issue, the Custody Ad Hoc Group, the Debtors, and the Committee agreed to the terms of a settlement (the "Custody Settlement"). The Custody Settlement allowed Custody users to voluntarily "opt in" to receive 72.5% of their Custody Assets in kind in two distributions and forfeit 27.5% of their Custody Assets to the Debtors' estates in exchange for a release of all claims and causes of action with respect to their Custody account. Custody users that opted into the Custody Settlement were required to vote their Custody claims favor of the Debtors' forthcoming chapter 11 plan. The Custody Settlement also resolved the Shortfall Issue by allowing withdrawal of 100% of Pure Custody Assets and Transferred Custody Assets. On March 21, 2023, the Court entered an order approving the Custody Settlement (the "Custody Settlement Approval Order"). ECF Dkt. No. 2291.

14.    While the Custody Withdrawal Order provided that ineligible Withhold assets could be withdrawn from the platform, it did not provide for the withdrawal of transferred Withhold assets. Accordingly, the Initial Custody Withdrawal Order, the Debtors agreed to the terms of a settlement (the "Withhold Settlement") with the Withhold Ad Hoc Group that provided for the right to withdraw an in-kind distribution equal to fifteen (15) percent of the value, as of the Petition Date, of a Withhold claim (calculated according to a specified procedure), plus the

treatment of the remaining eighty-five (85) percent of the Withhold claim to be treated as a General Earn Claim. Additionally, the Withhold Settlement provided that with respect to the Withhold Settlement, holders of allowed Withhold claims that participated in the Withhold Settlement were released by the Debtors from all avoidance actions that the Debtors may have had against them. At the same time, holders of allowed Withhold claims who participated in the Withhold Settlement agreed not to pursue any litigation against the Debtors, including seeking relief from the automatic stay. Following a hearing on April 18, 2023, the Bankruptcy Court approved the Withhold Settlement (the "Withhold Settlement Order"). ECF Dkt. No. 2509.

**C.    The Earn/Stablecoin Dispute and Resolution**

15.    On September 15, 2022, the Debtors filed the Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary Course and (II) Granting Related Relief (the "Stablecoin Motion") seeking authority to sell stablecoins held by the Debtors to, among other things, fund operating expenses for the Debtors' estates. ECF Dkt. No. 832. The Debtors asserted that the sale of stablecoins was consistent with prepetition practice, was an efficient way to generate liquidity to help fund the Debtors' operations, and was a reasonable exercise of the Debtors' business judgment. Following further analysis and review, and as a result of the Debtors receiving a significant number of formal and informal responses and objections, the Debtors proactively recognized that any sale of stablecoins in the Earn Program required the Debtors to establish title to those stablecoins, which also required a determination as to who holds title to Cryptocurrency in the Debtors' Earn Program——the Debtors or Earn account holders. *See* Debtors' Motion Seeking Entry of an Order (I) Permitting the Sale of Stablecoin in the Ordinary

Course and (II) Granting Related Relief (the "Statement on the Original Stablecoin Motion"), ¶ 1.

ECF Dkt. No. 1228.

16.     Then, on November 11, 2022, the Debtors again proactively filed an amended

motion (the "Amended Earn/Stablecoin Motion") seeking entry of an order (i) establishing

ownership of assets in the Earn Program, (ii) permitting the sale of stablecoins consistent with past

practice and in the ordinary course of business, and (iii) granting related relief. The Debtors argued

that the question of whether Earn Assets constituted property of the Debtors' estate was a question

of contract law that could be resolved by analysis of the Terms of Use, which all Celsius customers

had to accept in order to use the Earn Program. ECF Dkt. No. 1325. The Amended Earn/Stablecoin

Motion did not seek a determination as to whether any Account Holders in the Earn Program held

valid defenses to the purported contract between them and the Debtors under the Terms of Use,

and reserved the rights of all parties with respect to the foregoing.

17.     Contemporaneously with the Filing of the Amended Earn/Stablecoin Motion, the

Debtors Filed the Notice of Filing of Proposed Scheduling Order Regarding Title to Earn Program

Assets and the Sale of Certain Stablecoins (the "Earn Scheduling Order") [ECF Dkt. No. 1324],

which established the following objectives: (a) a determination of ownership rights to assets

transferred by Account Holders and designated to be part of the Earn Program based on the

unambiguous plain language of each version of the Terms of Use; (b) a determination as to whether

each applicable version of the Terms of Use forms a binding contract with users who transferred

assets to the Debtors while such Terms of Use were in effect; (c) a determination as to whether

subsequent amendments to the Terms of Use were binding on users who transferred their assets to

the Debtors prior to the effectiveness of the subsequently amended Terms of Use; and (d) a

13

determination as to whether the specific stablecoin sought to be sold is property of the Debtors' estates (if not covered by the previous three issues) (collectively, the "Earn/Stablecoin Issues").

18.    Pursuant to the Earn/Stablecoin Scheduling Order, written and oral depositions were conducted. Questions were posted by the Committee, the United States Trustee, state regulators, and certain *pro se* creditors. No ad hoc groups asked questions at the depositions. *See* Deposition of Christopher Ferraro, November 21, 2022; Deposition of Oren Blonstein, November 22, 2022; Deposition of Robert Campagna, November 22, 2023 [copies filed at ECF Dkt. No. 1489-2]. On December 5, 2022, the Bankruptcy Court held an in-person trial on the Amended Earn/Stablecoin Motion. The Debtors and the Committee argued that the Terms of Use unambiguously granted the Debtors ownership of the Earn Assets. On January 4, 2023, the Bankruptcy Court issued its Memorandum Opinion and Order Regarding Ownership of Earn Account Assets (the "Earn Ruling"), holding that the "Terms of Use formed a valid, enforceable contract between the Debtors and Account Holders, and that the Terms unambiguously transfer title and ownership of Earn Assets deposited into Earn Accounts from Account Holders to the Debtors," and authorizing the Debtors to sell stablecoins to provide liquidity for these Chapter 11 Cases. ECF Dkt. No. 1822. "The Earn Ruling answered the gating question of whether the Terms of Use granted the Debtors' ownership of the Earn Assets." *See* Disclosure Statement, pg. 227 of 830.

### D.  **The Borrower Dispute**

19.    On February 7, 2023, a group of Celsius customers who participated in the Borrow Program (the "Borrower Ad Hoc Group") filed a complaint and initiated an adversary proceeding against the Debtors  (the "Borrower Complaint"). ECF Dkt. No. 2001; Adversary Proceeding No.

14

23-01007, Dkt. No. 1. The Borrower Complaint requested a declaratory judgment that the Borrower Ad Hoc Group members' cryptocurrency was not property of the estate and that loans in the Borrow Program were entitled to the protections of Section 363(o) of the Bankruptcy Code, that the loan agreements are not enforceable, and that the loans are void and unenforceable due to fraudulent inducement.

20.    As a result of the Mediation (defined below) and as a part of the Class Claim Settlement, the Borrower Ad Hoc Group agreed to execute a restructuring support agreement to support the Plan, not to take any actions inconsistent with such support, and to stay all deadlines in the adversary proceeding, which would be dismissed with prejudice on the effective date of the Plan.

21.    Specifically, the settlement resulting from the Mediation (the "Mediation Settlement") provided that Borrowers would have the option to repay the principal balance of their loans in exchange for an equivalent amount of cryptocurrency. In addition, Borrowers will have priority compared to other creditors when electing to exchange the NewCo Common Stock for liquid cryptocurrency at a 30% discount for their distributions under the Plan. This priority, while beneficial to the Borrower Ad Hoc Group, was detrimental to other groups, as the Debtors' finite pool of crypto was less than the total obligations the Debtors owed to its various customer groups.

22.    Additionally, pursuant to the Mediation Settlement, the Earn Ad Hoc Group and the Borrower Ad Hoc Group would have the right to appoint one member of the Litigation Oversight Committee, subject to the consent of the Committee. The Mediation Settlement is reflected in the Plan.

15

### E.  **The Withdrawal Dispute**

23.    On February 28, 2023, the Georges Georgiou, Philip Harris Stewart, and Gilbert Castillo (together, the "<u>Withdrawal Plaintiffs</u>") filed their complaint against the Debtors for declaratory judgment (the "<u>Withdrawal Complaint</u>") that the property of the Withdrawal Plaintiffs held by the Debtors was not property of the estates and must be returned. ECF Dkt. No. 2143; Adversary Proceeding No. 23-01016, ECF Dkt. No. 1. On May 17, 2023, the Debtors filed its Motion to Dismiss the Withdrawal Complaint (the "<u>Withdrawal Dismissal Motion</u>"). Adversary Case No. 23-01016, ECF Dkt. No. 9. The Withdrawal Complaint did not request return of any property belonging to anyone other than the Withdrawal Plaintiffs. The Withdrawal Complaint only discussed and alleged facts pertaining to the situations of the Withdrawal Plaintiffs, not to any other party to the Debtors' bankruptcy estates. The Court did not adjudicate the Withdrawal Dismissal Motion. No discrete settlement was proposed by the Debtors in response to the Withdrawal Complaint nor did counsel for Withdrawal Plaintiffs (also identified as the members of the Withdrawal Ad Hoc Group) attend the Meditation (defined below).

### F.  **The Class Claim Motion**

24.    On April 10, 2023, the Committee filed the Motion of the Official Committee of Unsecured Creditors (I) for Authority to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to Appoint a Third-Party Fiduciary to Assert a Class Claim on Behalf of Account Holders (the "<u>Class Claim Motion</u>") seeking authority to file a class claim or other collective action on behalf of all Account Holders and assert fraud, misrepresentation, and other statutory claims against each Debtor entity to solve the "unprecedented collective action problem" of "hundreds of thousands" of the Debtors' creditors asserting individual non-contract

16

claims against the Debtors. ECF Dkt. No. 2399. On April 18, 2023, the Bankruptcy Court entered

the Order Granting the Motion of the Official Committee of Unsecured Creditors (I) for Authority

to File a Class Claim Asserting Non-Contract Claims on Behalf of Account Holders or (II) to

Appoint a Third-Party Fiduciary to Assert Non-Contract Claims on Behalf of Account Holders

(the "Class Claim Order"). ECF Dkt. No. 2496.

       25.      On April 28, 2023, in accordance with the Class Claim Order, the Committee filed

a class proof of claim (Claim No. 29046) (the "Class Claim") on behalf of Thomas DiFiore, Ignat

Tuganov, and Rebecca Gallagher, in their individual capacities and as proposed Class

Representatives (the "Class Representatives") which asserted damages against each of the Debtors

in an amount not less than $5,217,524,781.00 arising out of non-contractual claims, including:

(a) violation of the New York Deceptive Practices Act; (b) violation of the New York False

Advertising Act; (c) violation of the New Jersey Consumer Fraud Act; (d) fraudulent

misrepresentation; (e) negligent misrepresentation; (f) fraudulent concealment; (g) unjust

enrichment; (h) breach of the implied duty of good faith and fair dealing; and (i) violation of

Section 2 of the Misrepresentation Act 1967 under English law. *Id*. On May 17, 2023, the

Committee filed the Motion of the Official Committee of Unsecured Creditors to (I) Certify the

Class of Account Holders Asserting Non-Contract Claims Against the Debtors, (II) Appoint

Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov as the Class Representatives, and (III)

Appoint White & Case LLP as Class Counsel, in Each Case Pursuant to Bankruptcy Rule 7023

(the "Class Certification Motion"), which sought entry of an order (i) certifying the proposed class

of all Account Holders, (ii) appointing Thomas DiFiore, Rebecca Gallagher, and Ignat Tuganov

17

as the Class Representatives, and (iii) appointing White & Case LLP as class counsel. ECF Dkt. No. 2670.

26.     On July 20, 2023, the Debtors filed its Joint Motion for Entry of an Order (I) Approving the Settlement (the "Class Claim Settlement") By and Among the Debtors and the Committee with Respect to the Committee's Class Claim (the "Class Claim Settlement Motion"). ECF Dkt. No. 3064. As a result of the Mediation and as a part of the Class Claim Settlement, the Borrower Ad Hoc Group agreed to execute a restructuring support agreement to support the Plan and not to take any actions inconsistent with such support.

27.     Further, pursuant to the Term Sheet attached to the Class Claim Motion [pg. 44 of 162],

> The Plan shall be amended to provide for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, the participating pro se claimants in their individual capacities, and Ignat Tuganov, under Section 503(b)(3)(D) of the Bankruptcy Code as consideration, in part, for the settlement of the relevant adversary proceedings and the appeal as provided herein, participation in the mediation, their role as class representative, and other contributions to the case as applicable.

On August 14, 2023, the Court entered an Order approving the Class Settlement. ECF Dkt. No. 3288.

### G.  The Individual Creditor Applicants' Activities in these Cases

### i.    Mr. Frishberg

28.     A quick search of the electronic case docket, shoes at least 120 docket entries attributed to Mr. Frishberg. *See* Court's Docket. For example, on December 9, 2022, Mr. Frishberg filed a complaint and initiated an adversary proceeding against the Debtors arguing that because

he requested that the Debtors close his Earn Account on July 5, 2022, before the Debtors filed for chapter 11 protection, title to the cryptocurrency in his Earn Account transferred to him.

29.     Mr. Frishberg filed the following proofs of claims: Proof of Claim 29602 for $10,000 against GK8 USA LLC, Proof of Claim 29601 against GK8 UK Limited for $10,000, Proof of Claim 29600 against GK8 Ltd. For $10,000, Proof of Claim 24480 against all Debtor entities for an unliquidated value, and Proof of Claim 1 for $3,500 against Celsius Network LLC.

**ii.    Mr. Herrmann**

30.     On March 21, 2023, Mr. Herrmann Filed a complaint and initiated an adversary proceeding against the Debtors (the "Herrmann Complaint"). Adversary Proceeding No. 23-01025, ECF Dkt. No. 1. Mr. Herrmann sought declaratory judgments that certain crypto assets in the Borrower program was not property of the estate, that a constructive trust existed, that the Terms of Use and the Loan Terms of Use Version 9 were not enforceable, and that the Terms of Use and Loan Terms of Use Version 9 were void and unenforceable due to fraudulent inducement and securities fraud. Mr. Herrmann also alleged claims of conversion of such loan Cryptocurrency, failure of contract regarding the Terms of Use, unjust enrichment, deceptive trade practices, consumer fraud, unlawful provision of money services, fraudulent misrepresentation, and conversion of collateral into unregistered securities and securities fraud.

31.     On February 19, 2023, the Debtors Filed the Debtors' Objection to Proof of Claim No. 24604 of Immanuel Herrmann. ECF Dkt. No. 2105. Therein, the Debtors explained that the Bankruptcy Court's decision with respect to the question of who owns assets in Earn Accounts, issued on January 4, 2023, was instructive to Mr. Herrmann's circumstances.

19

### iii.   Mr. Tuganov

32.    On March 20, 2023, Mr. Tuganov filed a complaint and initiated an adversary proceeding against the Debtors  (the "Tuganov Complaint"). Adversary Proceeding No. 23-01024, ECF Dkt. No. 1. Mr. Tuganov sought declaratory judgments that prepetition the Debtors operated as a Ponzi scheme, the Debtors should be substantively consolidated in the chapter 11 cases, and that all contracts with the Debtors, including the Terms of Use, are null and void due to the Debtors' operation as a Ponzi scheme. On April 21, 2023, Mr. Tuganov, the Committee, and the Debtors Filed the Stipulation and Agreed Order Between the Official Committee of Unsecured Creditors, the Debtors, and Ignat Tuganov with Respect to Certain Deadlines agreeing to hold in abeyance all responsive deadlines related to the Tuganov Complaint. The Bankruptcy Court approved the joint stipulation on April 27, 2023. *Id*. at Dkt. No. 6

### iv.   Mr. Wildes

33.    The Debtors, having valued CEL tokens at $0.25, *see* Plan, Art. IV.B.2., engendered opposition from certain *pro se* creditors. Moreover, certain creditors were identified by the Committee in its efforts to conduct discovery regarding potential market manipulation of the CEL token. Among those creditors that were identified was Mr. Wildes, no doubt because he holds a large amount of CEL tokens. According to his filed proof of claim, Mr. Wildes holds, among other coins, "111606.410746595" of CEL tokens within his Earn Account and "422377" CEL tokens within his Custody Account. *See* Proof of Claim 22853.

34.    Accordingly, to settle the discovery dispute between Mr. Wildes and the Committee on the issue of CEL token manipulation as it related to discovery, the Debtors filed a Notice of Filing of Settlement Agreement Regarding CEL Token Valuation Dispute (the "CEL Settlement

20

Agreement"). ECF Dkt No. 3486. The CEL Settlement Agreement provided that Mr. Wildes would

not "contest, dispute, object, vote against, or otherwise challenge the Plan, including, without

limitation, the CEL Token Settlement and the valuation of the CEL Token at $0.25." *Id*. at ¶ 1.

35.　　Paragraph 4 of the CEL Settlement Agreement further provided that,

> **Substantial Contribution Application.** The Committee and the Debtors agree,
> from the date hereof, not to oppose an application for the payment of reasonable
> and documented expenses and legal fees incurred by either Wildes or Caceres under
> Section 503(b) of the Bankruptcy Code, as consideration for substantial
> contributions to the case as applicable, subject to Wiles and Caceres providing the
> requisite support and documentation.

## H.　**The Mediation**

36.　　On July 20, 2023, following a three-day mediation before the Honorable Judge

Michael E. Wiles, the Debtors, the Committee, the Earn Ad Hoc Group, the Borrower Ad Hoc

Group, and certain individual creditors – including Mr. Frishberg, Mr. Tuganov, and Mr.

Herrmann, but not including Ms. Gallagher or Mr. Wildes – (together, the "Mediation

Participants") executed a term sheet reflecting the terms of an amended Plan that would resolve

the treatment of the Earn creditors and Borrower creditors. Mr. Frishberg, Mr. Tuganov, and Mr.

Herrmann all participated in the Mediation at their *own* request.[10] As a result of the Mediation,

Mr. Frishberg, Mr. Tuganov, and Mr. Herrman each agreed to execute a restructuring support

agreement to support the Plan and not take any actions inconsistent with such support.

## ARGUMENT

### A.　Legal Standards

### 1.　**Substantial Contribution Statute is Narrowly Construed and Only Available in Rare and Exceptional Circumstances**

---

[10] Disclosure Statement at pg. 217 of 830 (Mr. Frishberg participated in the Mediation "[a]t his own request."); pg. 221 of 830. (Mr. Tuganov participated in the Mediation "[a]t his own request."); pg. 221 of 830. (Mr. Herrman participated in the Mediation "[a]t his own request.").

Section 503(b)(3)(D) and (b)(4) allow administrative expense for the *actual* and *necessary* expenses incurred by a creditor in making a substantial contribution in a Chapter 11 case, and reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3)(A) through (E), based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant. 11 U.S.C §§ 503(b)(3)(D)-(b)(4); *In re Lehman Bros. Holdings Inc*., 508 B.R. 283, 289 (S.D.N.Y. 2014) (holding that individual creditors serving on an official committee are not entitled to substantial contribution under the language of the statute).

"The substantial contribution test is intended to promote meaningful creditor participation in the reorganization process, but not to encourage mushrooming administrative expenses." *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); *see also Lehman Bros.*, 508 B.R. at 293. ("Indeed, allowing payments under the plan beyond claims and expenses could lead to serious mischief."). "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Dana Corp.*, 390 B.R. 108 (citing *Lebron v. Mechem Financial Inc.,* 27 F.3d 937, 944 (3d Cir.1994)).

"Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily in their own interests." *In re U.S. Lines, Inc*., 103 B.R. 427, 430 (Bankr. S.D.N.Y. 1989), *aff'd* 1991 WL 67464 (S.D.N.Y.1991). Services calculated primarily to benefit the client do not justify an award even if they also confer an indirect benefit on the estate. *Id.* "In order to avoid the liberal granting of compensation to the many creditors who

22

necessarily must take an active role in bankruptcy proceedings, it is given that extensive participation in a case alone is insufficient to compel compensation." *Id.*

The general rule remains that attorneys must look to their own clients for payment. *In re McLean Industries, Inc.,* 88 B.R. 36, 38 (Bankr. S.D.N.Y. 1988); *Baker Botts L.L.P. v ASARCO LLC*, 576 U.S. 121, 126 (2015) (Under the "bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."). It is a well-settled rule that these statutory provisions are to be narrowly construed. *In re U.S. Lines, Inc.,* 103 B.R. at 429. The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor, or estate. *Dana Corp.,* 390 B.R. at 108 (citing *In re Best Prod. Co., Inc.,* 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994)). "Thus, compensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate." *Id.*; *see also In re United Merchants & Mfrs., Inc.,* No. 97 Civ. 5437(DC), 1999 WL 4929, at *2 (S.D.N.Y. Jan. 5, 1999) ("A substantial contribution award is made only for extraordinary creditor actions, on those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." (internal quotation marks omitted), *aff'd,* 198 F.3d 235 (2d Cir.1999); *see also Bedford JV, LLC v. Sky Lofts, LLC,* No. 12 Civ. 5850(DLI), 2013 WL 4735643, at *4 (E.D.N.Y. Sept. 3, 2013) (requiring "extraordinary creditor actions"); *In re S & Y Enterprises, LLC,* 480 B.R. 452, 459 (Bankr. E.D.N.Y. 2012) (same).

The handful of cases awarding substantial contribution have generally done so in one of two situations: (i) the creditor took an active role in facilitating the negotiation and successful

23

confirmation of the plan; or (ii) the creditor opposed an earlier plan and as a result, the court ultimately confirmed a more favorable plan that resulted in substantially more distribution to all constituencies and that protects public interest. *In re Granite Partners,* 213 B.R. 440, 446-447 (Bankr. S.D.N.Y. 1997) (citing *In re AM Int'l, Inc.*, 203 B.R. 898, 904-05 (D. Del. 1996); *Ex parte Roberts,* 93 B.R. 442, 444–46 (D.S.C.1988); *In re Texaco, Inc.,* 90 B.R. 622, 627-629 (Bankr. S.D.N.Y. 1988).

Active participation alone is insufficient to give rise to a substantial contribution claim. *Granite Partners*, 213 B.R. at 446. This includes involvement in negotiation, drafting, and confirming a plan of reorganization. *In re Baldwin-United Corp.*, 79 B.R. 321, 340-41 (Bankr. S. D. Ohio 1987). In addition, requests for compensation for insubstantial or duplicative services or services that deplete rather than increase the size of estate assets should be denied. *U.S. Lines*, 103 B.R. at 429-430. An applicant cannot recover fees related to case administration, monitoring and education, including attending hearings, reviewing documents and consulting with clients because these services are performed for the client, not the estate. *Granite Partners*, 213 B.R. at 453-454.

Settlement negotiations require the participation of many parties-in-interest and do not give rise to substantial contribution claims. *See Matter of Columbia Gas Syst., Inc.*, 224 B.R. 540, 549 (Bankr. D. Del. 1998) (creditor's Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to effectuate a settlement); and *In re Alumni Hotel Corp.*, 203 B.R. 624, 632 (Bankr. E. D. Mich. 1996) (successful reorganizations require consensual activity and if one applicant's fees are approved, others might argue they also made a substantial contribution). Encouraging compromise, participating in settlement negotiations, and proposing settlement terms are the professional obligation of a creditor's counsel. *Alumni Hotel*,

224 B.R. at 630. Creditors have strong economic self-interest in settlements that may or may not coincide with the interests of creditors as a whole. *Columbia Gas*, 224 B.R. at 549.

Under Section 503(b), a creditor who makes a substantial contribution is entitled to reasonable fees and necessary expenses. *Alert Holdings*, 157 B.R. at 757 (denying substantial contribution application). Under Section 503(b)(4), the Court retains the right to review professional fees for reasonableness, but the professional must first establish that it made a substantial contribution. *In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 61 (Bankr. D. Del. 2001). The Applicant must prove by a preponderance of the evidence that he rendered a substantial contribution. *See Granite Partners*, 213 B.R. at 447 and 452 (the court is not obligated "to pick apart the fee application to explain which services are not compensable; the [applicant must] prove, by a preponderance of the evidence, which services are."); *In re Canton Jubilee, Inc.*, 253 B.R. 770, 775 (Bankr. E.D.Tex. 2000); *In re American Plumbing & Mechanical, Inc.*, 327 B.R. 273 (Bankr. W.D.Tex. 2005).

## 2. Activities that Do Not Lead to Measurable Monetary Benefit or Increase Estate Costs Are Not Compensable.

Insubstantial services include those that do not actually increase the size of the estate. *Granite Partners*, 213 B.R. at 446; *see also U.S. Lines, Inc.*, 103 B.R. at 429 (services that do not actually increase the size of the estate may be denied compensation.). "A court may also consider whether the applicant's non-compensable activities increased the administrative costs to the estate." *Id.*

"Most importantly, compensation for services which potentially pass the 'substantial contribution' test might nevertheless be found to retard the reorganization process if recovery by creditors is materially diminished." *In re U.S. Lines, Inc.*, 103 B.R. at 429 (citing *Surface Transit,*

25

*Inc. v. Saxe* (*In re Estate of Third Avenue Transit Corporation*), 266 F.2d 862, 856 (2d Cir.1959)

(economy of administration and the burden the estate can safely bear are factors to consider)); *see*

*also In the Matter of Multiponics Inc*., 436 F.Supp. 1072, 1074–75 (E.D.La.1977), *aff'd,* 622 F.2d

731 (5th Cir.1980) (funds on hand being able to satisfy only a fraction of the unsecured claims

requires court to approve only a fraction of sum sought as a charge against the estate); *In re Richton*

*Int'l Corp.*, 15 B.R. 854, 855-56 (Bankr. S.D.N.Y. 1981) (finding that the burden that the estate

can safely bear, and impairment of other creditors is a factor in the granting of allowances).

3. **Professionals' Fees Are Not Allowable Under Section 503(b)(4) Unless the Applicant Demonstrates they Are "Reasonable" Based On the Time, Nature, Extent, and Value of the Professional Services and the Cost of Comparable Services.**

The reasonableness standard is set forth in 11 U.S.C. § 330, which provides in part that:

(a)(1) After notice ... and a hearing ... the court may award to a ... professional person employed under section 327 or 1103 -
> (A) reasonable compensation for actual, necessary services rendered by the ... professional person or attorney and by any paraprofessional employed by any such person; and
> (B) reimbursement for actual and necessary expenses.

11 U.S.C. § 330(a)(1).

Factors that courts consider in determining reasonableness include the nature, the extent,

and the value of such services, taking into account all relevant factors, including:

> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F) whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

Under Section 330(a)(4), the court shall not allow compensation for (a) unnecessary duplication of services; or (b) services that were not (i) reasonably likely to benefit the debtor's estate; or (ii) necessary to the administration of the case. 11 U.S.C. § 330(a)(4). Finally, Section 330(a)(6) states that "[a]ny compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application." 11 U.S.C. §330(a)(6).

The Court has an independent burden to review fee applications "lest overreaching ... professionals drain it of wealth which by right should inure to the benefit of unsecured creditors." *In re Keene Corp.,* 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997) (quoting *In re Busy Beaver Bldg. Ctrs., Inc.,* 19 F.3d 833, 844 (3d Cir. 1994)). The applicant has the burden of proving that the services rendered were actual and necessary, and that the compensation sought was reasonable. *In re Bennett Funding Group, Inc.,* 213 B.R. 234, 244 (Bankr. N.D.N.Y. 1997). The services must be both necessary and reasonable. *Keene Corp.,* 205 B.R. at 696. Services are necessary if they benefit the estate. *Id.* The determination of reasonableness is an objective test that considers what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't. Stores, Inc.,* 76 F.3d 66, 72 (2d Cir.1996) (citing *In re Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir. 1995)); *accord In re Drexel Burnham Lambert Group, Inc.,* 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).

Applicants must support their requests for fees and expenses with specific, detailed, and itemized documentation to meet their burden of proof. *Bennett Funding,* 213 B.R. at 244-245. Under Section 330(a)(1)(B), a professional seeking an expense reimbursement from the estate

27

"must furnish enough specificity for the Court to establish whether a given expense was both actual and necessary." *In re Fibermark, Inc.,* 349 B.R. 385, 399 (Bankr. D. Vt. 2006). Expenses are actual if they are actually incurred and necessary if "reasonably needed to accomplish proper representation of the client." *In re Korea Chosun Daily Times, Inc.,* 337 B.R. 758, 769 (Bankr. E.D.N.Y. 2005).

In the Southern District of New York, applicants for professional compensation must comply with *United States Trustee Fee Guidelines* (the "United States Trustee Guidelines"), and the *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases* (General Order M-447). General Order M-447 of January 29, 2013 imposes additional requirements for fee applications in the United States Bankruptcy Court for the Southern District of New York which include, among other things, project categories (together with a narrative summary), identification of each person providing the services on the project, a statement of the number of hours spent and the amount of compensation requested for each professional and paraprofessional. Gen. Order M-447 § A(4). Additionally, time entries should be kept contemporaneously with services rendered in periods of tenths of an hour, and each service must be a separate time entry and not combined or "lumped" together. *Id.* Also, applicants must file a certification with their applications. *Id.* at 4, §(1).

### B. Objection

Eleven Applications for substantial contribution were filed, five from various ad hoc groups (the "Ad Hoc Applications"), four from *pro se* creditors, and two from law firms representing individual and/or corporate creditors, as summarized and defined in the Application chart attached hereto as **Exhibit A** (the "Application Tracker"). Not one of these Applications

28

demonstrates that its Applicant's efforts "resulted in an actual demonstrable benefit to the debtor's estate and the creditors," or that (ii) the benefit to the estate was not "incidental" to the work" and therefore all ten fail to meet the standard for substantial contribution. *See Lebron*, 27 F.3d at 946). A detailed response to each of the outstanding Applications is set forth below.

### 1) Ad Hoc Applications

The Ad Hoc Applications seek fees in the aggregate approximate amount of $2,354,228.93 (exclusive of improper prospective fees) and costs in the aggregate approximate amount of $18,581.06.

A Committee was appointed in these cases to represent all unsecured creditors. The Debtors and the Committee have fiduciary duties to maximize estate assets. There have been no allegations by any of the Applicants that the Debtors or the Committee failed to fulfill these duties, thus requiring the services of these Applicants. In light of the actions and positions taken by the Committee and the Debtors, the actions of the Ad Hoc Groups were not only duplicative and unnecessary, but did not result in any demonstrable benefit to the Debtors' estate and creditors. The estate should not bear the costs of the Ad Hoc Applicants acting in their own self interests.

Moreover, from the beginning of these cases, the Debtors have conceded that treatment of *each* type of borrower would need to be determined and asset distribution for each class would need to be allocated – just as is done in every case. However, here, the Debtors had a finite pool of resources for distribution and did not have current or future revenue to pay claims.[11]

---

[11] The only ongoing revenue the Debtors had was the mining business, which was actively being marketed as a going concern and as a result, the mining business would only provide equity interests to claimants.

Each of the Ad Hoc Applicants were unwilling to wait for the Debtors to make the critical determination as to what each type of customer account would receive under a plan and instead each sought a judicial determination early in the case[12] – both costing the estate funds and possibly derailing other more time sensitive issues from litigation. Nevertheless, the Debtors and the Committee engaged with each Ad Hoc Group throughout these cases, which ultimately culminated in a Mediation on July 17, 2023 through July 19, 2023.

Advocating for a larger distribution at the Mediation, through the Plan, or otherwise does not entitle these Applicants to reimbursement. *Granite Partners*, 213 B.R. at 446 (participation in the plan process does not give rise to a substantial contribution claim); *see also Columbia Gas*, 224 B.R. at 549 (Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to effectuate a settlement). Critically, and it cannot be understated, the Debtors would have had to make this asset allocation *regardless*, but because of their participation, whether it was through the mediation process or otherwise, each Ad Hoc Group was able to advocate for a more beneficial recovery for its members. However, the advocacy of each Ad Hoc Group did not increase the Debtors' estate. Rather, each Ad Hoc Group merely increased the recovery for the members of its group. *See In re Am. Ctr. for Civ. Just., Inc.*, No. 22-1016, 2022 WL 17884119, at *2 (3d Cir. Dec. 23, 2022) ("Creditors are presumed to act in their own self-interest until they demonstrate otherwise.").[13]

---

[12] *See, e.g.,* the Custody Complaint filed mere hours prior to the Debtor's Custody Motion just 49 days into the case and prior to the Debtors' schedules being filed on October 5, 2022; the Withold Motion for relief from the automatic stay was filed just 56 days into the case and again, prior to the Debtors' schedules even being filed. As seen by the Debtors' ability to act proactively with the Stablecoin Motion, the Earn issues were still considered and determined.
[13] In *In re American Center for Civil Justice, Inc*., the Third Circuit affirmed the Bankruptcy Court's findings that any benefit created by the applicant was merely "incidental" and was a product of "significant self-interest." *Id.* at *3.

### i.    **The Earn Ad Hoc Group. ECF Dkt. No. 3654**

The Earn Ad Hoc Group filed an Application seeking fees in the amount of $326,262.00

incurred through September 28, 2023, expenses in the amount of $6,774.55, and future fees of up

to $100,000 through the effective date of the Plan for its attorneys Offit Kurman, P.A. ("Offit

Kurman"). The Earn Application also seeks reimbursement for expenses incurred by individual

members of $4,830.82 in the aggregate. The Earn Ad Hoc Group states that it made a substantial

contribution because its efforts allegedly "substantially contributed to the overwhelming vote in

support of Debtor's Plan to pave the way to confirmation." The Earn Application, ¶ 1.

Additionally, the Earn Application alleges the following facts in favor of receiving substantial

contribution reimbursement: "(i) the Ad Hoc Earn Group's selection of three board observers to

the NewCo Board each of whom is a significant Earn account holder; (ii) the appointment of an

Earn claimant to the Litigation Oversight Committee ("LOC") under the Plan; and (iii) the Ad Hoc

Earn Group's further negotiation and signing of a Plan Support Agreement (the "PSA")." *Id*. at

¶ 8.

### a)  **11 U.S.C. § 503(b)**

As the basis for relief, the Earn Application lists all of the purported benefits it obtained

for Earn account holders, but it does not provide a list of the benefits its efforts created for the

bankruptcy estates. For example, the Earn Application lauds its efforts in obtaining the authority

to select board members for NewCo or the Litigation Oversight Committee.  Yet, since the selected

board member was an Earn account holder – a member of the Ad Hoc Earn Group – it seems that

their efforts benefited its own interest as opposed to the bankruptcy estates.

31

The Ad Hoc Earn Group further argues that by "[p]romoting Plan acceptance actively and extensively through social and other media, contributing to an unprecedented level of support for a plan in a Chapter 11 cryptocurrency case", it should receive payment." ECF Dkt. No. 3654 at ¶ 16.[14] Negotiating and signing the Plan Support Agreement and thereafter promoting the Plan, does not equate to a substantial contribution claim either.[15] Presumably, the Earn Ad Hoc Group was satisfied with the treatment it negotiated for itself and therefore made a concerted effort to persuade others to vote in favor of the Plan so that the negotiated treatment would be approved for Earn account holders. *See, e.g., Baldwin*-United, 79 B.R. at 340-41. This does not equate to a claim for substantial contribution.

As to Ms. Gallagher's request within the Earn Ad Hoc Application of $4,830.82 for expenses incurred as lead plaintiff in connection with the Class Complaint, there is no substantiation for this request. Exhibit A states that Ms. Gallagher requests mileage reimbursement of $509.60 for travel from North Carolina to the District of Columbia for a pre-mediation meeting with Mr. Herrmann, and $15 for lunch. It is unclear how this meeting was a substantial benefit to the Debtors' bankruptcy estate. Exhibit A also itemizes certain requests from Mr. Herrmann totaling reimbursement of $1,481.48. There are ten entries devoted to "Earncommittee.org hosting/Google Workspace." There is no explanation as to what this is or how this benefited the

---

[14] There is no basis in the Code that provides substantial contribution claims should be granted solely because of an agreement with the Debtors to support the Plan. Here, both the Debtors and the Committee agreed in advance, without review of the Applications, to not object to the Applications in exchange for support of the proposed Plan. *See, e.g., Earn Support Agreement.*

[15] The Term Sheet provided for the Plan to provide "for the payment of expense reimbursement for reasonable and documented expenses and legal fees incurred by the Ad Hoc Group of Earn Account Holders," among others, "as consideration, in part for.... *participation* in the Mediation, their role as Class representative, and other contributions to the case as appliable." *See* Earn Application, ¶ 4 (emphasis added). Such a *quid pro quo* is unacceptable and is not the basis for substantial contribution. A debtor should not be able to broker support for a plan by blindly paying expenses for any would-be objecting party.

Debtors' estates. There are also Amtrack tickets, parking, mileage, hotels, and several meals, none

of which should be reimbursed under a substantial contribution standard. Presumably, many of the

travel related charges relate to the Mediation, but as discussed earlier, Mr. Herrmann and Mr.

Frishberg requested to be present at the Mediation, and counsel to the Earn Ad Hoc Group was

present. Why his in-person participation made a substantial contribution is unknown from the

Application. Exhibit A also requests reimbursement for Mr. Frishberg for airfare from San

Francisco to New York for the Mediation. Again, no information is provided as to why Mr.

Frishberg's in person attendance provided a demonstrable substantial contribution to these estates.

Additionally, Exhibit A details fees requested by Brett Perry of $2,108.49, which also include

Amtrack rides, Ubers, meals, and hotels.[16] The Earn Application is replete of any other reference

of Mr. Perry, other than his summary request for reimbursement of $2,108.49. The Earn Ad Hoc

Application is devoid of any basis as to why any of Mr. Perry's costs should be reimbursed, or

what contribution Mr. Perry made to the Mediation (or to these cases) that would qualify as a

substantial contribution to these cases.

Further, with respect to the Mediation and all the Applicants seeking reimbursement for

their alleged role in and presence at the Mediation, reimbursement should be denied. *See, e.g.,*

*Alumni* Hotel, 203 B.R. at 632; *Columbia Gas*, 224 B.R. at 549. The Mediation dealt with how the

Debtors' finite pool of assets would be distributed to each group of account holders. The Mediation

did not structure the Plan, find the stalking horse bidder, nor did it establish and conclude an

auction for the sale of the Debtors' entire business. The Committee and the Debtors' professionals

---

[16] Mr. Perry's requested reimbursement for a hotel for in person attendance at the Mediation is $1,128.94, but Mr. Herrmann's request reimbursement for lodging also for the Mediation was merely $719.58, and Mr. Frishberg's was only $364.75. It is unclear why there is such a large discrepancy.

spent a tremendous amount of time and money crafting solutions and concluding these critical issues, that ultimately formed the Plan. Indeed, none of the Applicants contend they contributed to these essential elements of the reorganization. The Mediation also did not conclude the Series B Preferred Shareholder Dispute which directly enlarged the pool of assets by not only concluding costly litigation but deciding a $600 million dispute regarding claims to those same assets for only $25 million. Instead, the purpose of the Mediation was to determine allocation of resources to the satisfaction of each group of account holders, which is a clearly self-interested pursuit. None of the Applicants, including the Earn Ad *Hoc* Group, have established by a preponderance of the evidence that their contribution to the Mediation would overwhelm this presumption. *See Granite Partners*, 213 B.R. at 447; *Canton Jubilee*, 253 B.R. at 775.

### b) The Reasonableness Standard

Even if the Earn Ad Hoc Application satisfied the "difficult burden" under the  substantial contribution test – which it has not – with respect to reasonableness review, Offit Kurman has not established its fees were reasonable. Critically, Offit Kurman did not file any time detail with the Court. A copy was provided to the United States Trustee via e-mail. However, the detail provided is unreasonable as it provides for lumped details, block billing details, and vague fee entries. The fee details also include many requests for reimbursement for administrative work, such as docket monitoring and preparing and filing 2019 statements are also included.  Examples of unreasonable fee details are:

34

| Basis | Date | Detail | Hours | Billed Amount |
|---|---|---|---|---|
| Lumping[17]; Improper Administrative Billing for 2019 Statement | 4/11/2023 | Call with I. Hermann and Steering Committee (1.0); further revise NDA and bylaws (1.0); confirm wiring instructions and steering committee members and addresses for Rule 2019 (1.0) | 2 | 1,060.00 |
| Lumping; Improper Administrative Billing | 4/13/2023 | Call with I. Hermann re NDA, bylaws, timing of entry of appearance; discuss 4/18 docket (1.2); review docket re same (.3); review case management | 1.5 | 795.00 |
| Lumping | 4/14/2023 | Call with I. Hermann; call with Ad Hoc re organizational issues and goals and connecting with UCC and K&E (1.5); review items on omni agenda (.5) | 2 | 1,060.00 |
| Improper Administrative Billing | 4/17/2023 | File entry of appearance (.2); draft and edit Rule 2019 statement (1.0); review bid objections (.8) | 2 | 1,060.00 |

Furthermore, the Earn Application seeks a variety of different expenses, but does not break down what was charged or at what price, nor is any substantiating evidence provided. For example, the Earn Application requests expenses for certain individual Earn account holders: Rebecca Gallagher: $524.60, Immanuel Herrmann: $1,481.48, Brett Perry: $2,108.49, Daniel Frishberg: $1,240.85, in addition to Offit Kurman Attorneys, Joyce Kuhns: $1,984.43 and Jason Nagi: $1,164.95, Miscellaneous Group Expenses of $6,974.55, and Third Party Vendor Expenses for Docket Monitoring of $6,774.55. Ms. Gallagher, Mr. Herrmann, and Mr. Frishberg all submitted applications on their own behalf, making review of the Application confusing.

Moreover, docket monitoring is an administrative activity and is therefore not compensable. The same applies to the  administrative expenses for "Twitter monitoring." How monitoring Twitter benefited the estate is not evidenced by the Application.

---

[17] General Order M-447 prohibits lumping.

Additionally, the Application attaches no receipts or substantiation for any expenses sought and no explanation as to why in person participation was necessary by these individuals at the mediation. Moreover, the requested expense reimbursements for Offit Kurman are also unreasonable on their face. There are at least four meals charged for "Earn Mediation Group" without identifying how many people were present or where the meal took place. Accordingly, there is no way to evaluate the reasonability of these requests.

There is no support in the Bankruptcy Code or caselaw for that portion of the Application to pay for future legal fees of this Applicant. Specifically, Offit Kurman to seeks authority to receive an additional $100,000 in fees and expenses through the effective date without further order of this Court or review of its fee detail. [18] Accordingly, all prospective relief must be denied. Simply put, Section 503(b)(4) does not permit prospective relief – substantial contribution claims are *only* for "actual, necessary expenses." 11 U.S.C. § 503(b)(3). Accordingly, any and all requests for prospective relief by any party must also be denied.

## ii.    Custody Ad Hoc Group. ECF Dkt. No. 3660

The Custody Ad Hoc Group filed an Application seeking reimbursement of fees and expenses in the aggregate amount of $786,649.66 for its counsel, Togut, Segal & Segal LLP ("Togut"). The Custody Ad Hoc Group argues it is entitled to substantial contribution because it "led the negotiation and consensual resolution of issues affecting Custody accounts—issues identified by both the Debtors and the Court as significant from the outset of these Chapter 11 Cases—in a manner that substantially benefitted the Debtors' estates and benefitted all Custody users as well as the Debtors' creditors." The Custody Application, ¶ 2. Moreover, the Custody

---

[18] Section 330(a)(1) allows for compensation only for "services rendered" not future fees and expenses.

36

Application states that "[a]s a result of the Custody Ad Hoc Group's actions, the Debtors were able to reach their first major customer settlement, applicable to all Custody users (not just the members of the Custody Ad Hoc Group), that formed a key building block of consensus around a chapter 11 plan of reorganization." *Id*. at ¶ 3.

### a) 11 U.S.C. § 503(b)

The Debtors admitted early in these cases that resolving distribution issues related to all of its assets, including custody assets, was critical. Indeed, at the top of the Debtors' list of "Key Legal Questions" in their first-day hearing presentation, the Debtors identified the property of the estate question, and specifically, "crypto assets held under the Custody [program]" as a "[l]egal issue[] critical to the outcome of this case . . . " *See* ECF Dkt. No. 45. At several hearings, the Court noted that Custody issues needed to be resolved "sooner than later." *See, e.g*., Dec. 7, 2023 Hr'g Tr. 182:15-19 ("[I]f it's not the Debtors' and it should go back to somebody else; it's got to go back sooner rather than later."). These issues would have been dealt with by the Debtors and resolved by the Court, regardless of the Custody Ad Hoc Group's efforts.[19]

For example, on August 31, 2022, the Custody Ad Hoc Group commenced its adversary proceeding seeking the Court's determination that Custody assets belong to Custody account users and requiring the Debtors to return them to Custody account users. But, just hours later, the Debtors filed their own motion for Court approval to return certain Custody assets. Both the Debtors and the Custody Ad Hoc Group supported return of at least some of the Custody assets, the only distinction was the Debtors' nuanced view regarding potential preference exposure. Furthermore, at the evidentiary hearing on the Custody asset dispute and the Terms of Use, no professional from

---

[19]The Debtors expressly stated so during the very first hearing in these cases. *See supra* FN 6.

Togut made any argument or submission of evidence, and instead relied exclusively on the Debtors and the Committee in supporting their position. The Court found, and the Debtors did not disagree, that the Custody assets were not property of the estate, and therefore would need to be returned. Once the Court made this finding, it was inevitable that the Debtors would have to devise a structure to return some or all of the Custody crypto assets, regardless of whether or not the Custody Ad Hoc Group participated in negotiating that schematic.

The Custody Application further asserts that it benefited the Debtors' estate by adding value through the Custody Settlement. There is no evidentiary basis that the treatment proposed in the Custody Settlement benefited the estate more than if the Debtors and the Committee were permitted to work through these issues on their own timeline. The true impact of the Custody Ad Hoc Group's participation in these proceedings is that they determined only when Custody issues were to be resolved – not the claims of any other creditor group. But, because the Custody issues would have been made regardless, as evidenced by the Debtors' own filing (*see, e.g.,* the Debtors' Custody Motion filed just hours after the Custody Complaint), there is no evidence of a demonstrable substantial benefit to the estates.

### b)  The Reasonableness Standard

Even assuming *arguendo* that the Application meets the difficult standard for substantial contribution, the Application fails under the reasonableness standard. The Application seeks payment from August 1, 2022 through and including August 31, 2023 in the amount of $786,649.66, which consists of legal fees of $778,953 and expenses of $7,696.66. While fee details are provided, there is no breakdown of categories of work, and instead, everything is within the "Asset Analysis and Recovery" matter identification, making it difficult to ascertain which fees

38

are reasonable. For this reason, the Trustee Guidelines requires categories to be provided for analysis.

Moreover, the Custody Application is replete with vague time entries and general bankruptcy matters for which the Applicant is not entitled compensation. *See Granite Partners,* 213 B.R. at 454-455 (fees incurred for client-related expenses and case administration are not compensable under Section 503(b)). For illustrative purposes only, the following are examples of unreasonable time entries:

| Basis | Date | Description | Hours | Billed |
|---|---|---|---|---|
| Vague | 8/5/2022 | Review and revise memorandum for distribution to K&E. | 0.5 | 405.00 |
| Vague; Client Based Time | 8/15/2022 | Participate in client update call. | 1.0 | 810.00 |
| Vague | 8/19/2022 | Discuss research and strategy issues with KO. | 0.3 | 243.00 |
| Improper Administrative Billing for 2019 Statement | 8/15/2022 | Emails with AG regarding 2019 statement and joinder. | 0.2 | 162.00 |
| Improper Administrative Billing for 2019 Statement | 8/15/2022 | Emails with KO and BK re celsius joinder and rule 2019 report and review re same. | 0.3 | 201.00 |
| Improper Administrative Billing for 2019 Statement | 8/16/2022 | Review and comment on Rule 2019 statement and exhibit | 0.2 | 162.00 |
| Vague; Client Based Time | 8/19/22 | Communicate with steering committee group regarding status discussions and pending legal issues | 0.8 | 648.00 |
| Vague; Client Based Time | 8/22/22 | Call with Steering Committee regarding update and next steps | 1.0 | 810.00 |
| Administrative; Client Based Time | 8/31/22 | Compiled service list for email and FCM recipients of 2019 statement and joinder to debtors' motion | 2.1 | 546.00 |

| Client Based Time | 9/9/22 | Call with Steering Committee regarding summary judgment, scheduling and case update | 1.2 | 972.00 |
|---|---|---|---|---|
| Administrative; Client Based Time | 9/15/22 | Call with Steering Committee regarding scheduling issues following hearing | 0.8 | 648.00 |
| Administrative; Client Based Time | 11/7/22 | Compile AOS for Service of Rule 2019 Statement and Phase 1 Opening Brief | 2.4 | 624.00 |
| Administrative; Client Based Time | 11/14/22 | Draft and revise next client update email to be dent following hearing including review of docket and hearing prep. | 0.8 | 648.00 |

With respect to expenses, there is no indication as to the cost for each expense, and instead, a summary total is provided. For example, for photocopies in June 2023, the Togut firm charged $68.40 for photocopies, but does not indicate how many copies were made or the cost of each copy. All expenses should be accompanied by receipts, where appropriate, as well as a description of the service provided and the necessity for such service in order to establish the reasonableness of such cost to the estates. Accordingly, because no basis is provided for any of the requested expenses, all expenses should all be denied.

### iii.    Withhold Group. ECF Dkt. No. 3663

The Withhold Group filed an Application seeking $191,696 in fees and $3,745.61 in expenses for counsel Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"). The Withhold Application alleges it is entitled to substantial contribution because it purportedly "yielded a settlement that will provide an enhanced recovery not only to members of the Group but to all holders of assets in Withhold accounts, while preserving millions of dollars' worth of cryptocurrency for the Debtors' estates and their general unsecured creditors." Withhold Application, ¶ 3.

a) **11 U.S.C. § 503(b)**

The Withhold Ad Hoc Group admittedly acted for the benefit of Withhold account holders, not for the bankruptcy estates. *Id*. at ¶ 29 ("Here, the fifteen members of the Withhold Ad Hoc Group acted not only for their own benefit, but for the benefit of all Withhold account holders."). Indeed, the Withhold Ad Hoc Group does not even try to argue that it benefited other creditors, but merely stated it efforts "were aimed at 'sev[ing] the more general good." *Id*. at ¶ 31. This is not the standard for a creditor seeking reimbursement for its actual and necessary expenses by virtue of having made a substantial contribution in a Chapter 11 case.

Just as with the Custody and Earn Ad Hoc Groups, the Debtors acknowledged early in the case that determinations regarding what assets, including assets of Withhold account holders, were available and how they would distribute would be gating issues for the formulation of a confirmable plan. Because these issues would have been considered by the Debtors and the Court regardless of the efforts of the Withhold Ad Hoc Group, the benefit of the Withhold Ad Hoc Group's actions was to enhance their *own* recovery through its negotiations with the Debtors. This is a clear example of self-dealing, which is not compensable as a substantial contribution. *See Am. Ctr. for Civ. Just., Inc.*, No. 22-1016, 2022 WL 17884119, at *3 (3d Cir. Dec. 23, 2022) ("Creditors are presumed to act in their own self-interest until they demonstrate otherwise"). An Applicant must demonstrate more than just benefiting their own interests in order to receive reimbursement and no such showing has been made here. *Id*.

b) **Reasonable Standard**

With respect to reasonableness review, Troutman Pepper has failed to comply with the United States Trustee Guidelines in preparing its Application. First, Troutman Pepper states that

41

at the beginning of this case, before it had an agreement with the Debtors and the Committee that

no objection to substantial contribution applications would be lodged, charged a reduced rate of

$760 per hour. Withhold Application, ¶ 38; Declaration in Support of Withhold Application at ¶ 4,

ECF Dkt. No. 3663-1. But what the Application does not state -- and which is imbedded in the fee

detail -- is that on January 1, 2023, without explanation, Troutman Pepper began charging its

standard rate which includes $1,090 per hour for Deb Kovsky-App. Nothing is attached to account

for this or to explain whether members of the Ad Hoc Group of Withhold account holders were

aware of this change.

Second, Troutman Pepper seeks reimbursement for $15,071 for "Case Administration."

This is not compensable. *See Granite Partners,* 213 B.R. at 454-455 (fees incurred for client-

related expenses and case administration are not compensable under Section 503(b)). Here,

Troutman is seeking time for such routine tasks as preparing and filing notices of appearances,

preparation of service lists, researching local rules, and other clearly administrative tasks.

Examples include, but are not limited to:

| Basis | Date | Description | Hours | Amount Billed |
|---|---|---|---|---|
| Client Based Time | 12/2/2022 | Update call with new ad hoc member | 0.5 | 380.00 |
| Client Based Time | 1/29/2023 | Conference call with ad hoc group re exclusivity, cramdown and other plan issues and potential impact on Withhold claims | 2.3 | 2,507.00 |
| Client Based Time | 1/30/2023 | Confer with ad hoc group re timing of Phase II and plan | 0.6 | 654.00 |
| Administrative | 11/5/2022 | Supplement Core 2002 service list | 1.2 | 456.00 |
| Administrative | 11/7/2022 | Revise master mailing list | 0.7 | 266.00 |
| Administrative | 4/27/2023 | Update service list | 0.8 | 312.00 |

Troutman Pepper also seeks fees of $17,428.00 for "Meetings of and Communications with Creditors." This includes preparation and filing of the Withold Ad Hoc Group's 2019 Statement. Preparing and filing 2019 Statement does not benefit the estate, improve recovery for creditors, or help towards reorganization is not explained in the Application.

In addition to the specific categories cited above, the Withhold Application is replete with vague time entries and general bankruptcy matters for which the Applicant is not entitled compensation. For illustrative purposes, here are some examples of improper time entries:

| Basis | Date | Description | Hours | Billed |
|---|---|---|---|---|
| Vague; Client Based | 8/17/2022 | Update call with new members of ad hoc group | 0.6 | 456.00 |
| Vague; Client Based | 8/25/2022 | Update call with ad hoc group re strategy | 0.9 | 684.00 |
| Vague | 3/2/2022 | Confer with Debtors' counsel re potential settlement | 0.4 | 436.00 |
| Improper Administrative Billing for 2019 Statement; Client Based | 8/11/2022 | Correspond with ad hoc group members re information needed for Rule 2019 statement | 0.1 | 76.00 |
| Improper Administrative Billing for 2019 Statement | 8/26/2022 | Draft Rule 2019 statement | .6 | 380.00 |
| Improper Administrative Billing | 8/29/2022 | Prepare COS for verified statement re Rule 2019 | .2 | 76.00 |
| Improper Administrative Billing | 4/27/2023 | Update e-mail block per request of service list member | .1 | 39.00 |

Further, Troutman Pepper seeks reimbursement for expenses without providing substantiation for the requests. No receipts or invoices are provided. Accordingly, all expenses should be denied.

    iv.    **Borrower Ad Hoc Group. ECF Dkt. No. 3671**

    The Borrower Ad Hoc Group requests allowance and reimbursement of professional fees and expenses in the aggregate amount of $1,020,223.47 for its legal counsel, McCarter & English, LLP ("McCarter English"). The Application alleges that the Borrower Ad Hoc Group "has been an active participant and the 'voice' of the Borrowers throughout these Chapter 11 Cases." Borrower Application, p. 1. The Borrower Application further states that, "The Borrower Ad Hoc Group efforts' at the Mediation resulted in a settlement that will provide an enhanced recovery not only to members of the Borrower Ad Hoc Group but to all Borrowers, while preserving significant amounts of cryptocurrency and Newco Equity for the other major constituencies." *Id*. at p. 4.

    a)  **11 U.S.C. § 503(b)**

    By its Application, the Borrower Ad Hoc Group seeks reimbursement of $1,020,223.47 in fees and expenses. Similar to the other Ad Hoc Applications, the Borrower Ad Hoc Group baldly argues that because it represented its *own members* in getting a better deal from the Debtors, that the Debtors' estates benefited and therefore are entitled to substantial contribution. *See* Borrower Ad Hoc Group Application at ¶ 11. There is no basis in case law or the Code for this reasoning, and none is cited to by the Applicant.

    Again, the issues being litigated were issues that were going to be resolved regardless of the Borrower Ad Hoc Group's participation. The Debtors had to allocate what percentage of its resources would be distributed to whom under a plan whether or not the Borrower Ad Hoc Group participated in these cases.

    b)  **The Reasonableness Standard**

44

The Borrower Ad Hoc Group failed to provide time records and therefore should be denied in its entirety. Even if the Borrower Ad Hoc Group had conferred a substantial contribution on the estates, which the United States Trustee contests it did, interested parties are unable to assess the reasonableness of the fees and expenses. Therefore, the Court should deny the request in its entirety.

v.    **Withdrawal Ad Hoc Group. ECF Dkt. No. 3673**

The Withdrawal Ad Hoc Group seeks reimbursements of legal fees of $28,927.50 and expenses of $350.00 for its counsel, Weinberg Zareh Malkin Price LLP ("Weinberg"). The Withdrawal Ad Hoc Group was created because "[t]he Pending Withdrawal Ad Hoc Group determined that not just they, but other creditors like them, would benefit from raising issues related to concerns specific to those who attempted to withdraw assets from their Earn Accounts and were inaccurately advised that such transactions were effectuated." Withdrawal Borrower Application, ¶ 2. Further, the Withdrawal Ad Hoc Group "believed that these issues, which raised noncontractual claims, were not being fairly recognized, considered and addressed." *Id*. With these goals in mind, the Application seeks reimbursement on the basis that "[b]y raising issues that contributed to [the] Settlement . . . [the Withdrawal Ad Hoc Group] contributed to support of Debtor's Plan by similarly situated creditors." *Id*. at ¶ 3.

a)    **11 U.S.C. § 503(b)**

Like all of the other Ad Hoc Groups, the Pending Withdrawal Ad Hoc Group was formed because they felt that their claims "were not being fairly recognized, considered and addressed." *Id*. at ¶ 2.   There is no explanation in the Application what would have happened had the Withdrawal Ad Hoc Group not actively participated in these cases. Because again, the Debtors

45

and Committee would have had to allocate resources to all Withdrawal account holders regardless of participation by an ad hoc committee. As creditors of the Debtors, they would have been entitled to treatment under a plan that passed all of the requirements of § 1129, including the absolutely priority rule and the best interest test (assuming there would continue to be the need for a cramdown).

Furthermore, and unlike all of the other Ad Hoc Applicants, the Withdrawal Ad Hoc Group did not even participate in the Mediation. Thus, the connection between the actions of the Withdrawal Ad Hoc Group and any benefit to the Debtors or the Debtors' estate is tenuous, at best. In fact, there is no explanation as to how the filing of the Withdrawal Complaint benefited the estate.

**b) The Reasonableness Standard**

Moreover, even if the Withdrawal Ad Hoc Group is found to have made a substantial contribution to the estates – which it did not – its attorney failed to submit any time records. There is no information upon which interested parties or the Court would be able to conduct a reasonableness review. Therefore, the Court should deny the request to pay the Withdrawal Ad Hoc Group's legal expenses in their entirety.

**2) The Individual Applications**

**i.   The Zachary Wildes Application. ECF Dkt. No. 3615**

**a) 11 U.S.C. § 503(b)**

Mr. Wildes requests reimbursement of $22,050, of which a deposit of $4,500 has already been paid presumably by the Applicant, for consulting services performed by Sanbar Performance Corp. The invoice was issued on September 1, 2023 for services performed between June 2023 to

46

September 2023. The services of financial advisors are not compensable by Section 503(b)(4), by its terms, which applies only to attorneys and accountants. *Granite Partners*, 213 B.R. at 454; *Baldwin–United Corp.,* 79 B.R. at 341; *see also Keene Corp.,* 208 B.R. at 116 n. 8 (*dicta*). An applicant cannot circumvent this prohibition by claiming the fees of a financial advisor as an expense. *Id*. Accordingly, the requested reimbursement for consulting services must be denied.

Mr. Wildes also requests reimbursement for $20,475 in legal services, of which $2,000 has already been paid, to RJG Law PLLC ("RJG Law"), for services performed from June 21, 2023 through September 20, 2023. Other than attaching the summary invoice, no other information is provided as to a basis for a substantial contribution claim or how Mr. Wildes contributed to these bankruptcy cases. Mr. Wildes' participation in the CEL Settlement was a result of the Committee's investigation into potential CEL manipulation. His acquiescence was with respect to his own compliance with the Committee's ongoing discovery requests. An alleged wrongdoer's compliance does not equate to substantial contribution. Clearly, Mr. Wildes has failed to meet the difficult burden of substantial contribution. Accordingly, the Application should be denied.

### b) The Reasonableness Standard

The Application does not provide any fee details, nor does it describe what work was performed by Sanbar Performance Corp. or by RJG Law. Moreover, even if it were accepted that the invoice from RJG Law was a fee detail, it violates several United States Trustee Guidelines, including lumping, block billing, and others, not to mention it does not even provide information with respect to the date that the work was performed or who performed the work. Without proper time records, the United States Trustee, the Court, and  parties-in-interest are unable to assess the reasonableness of the fees. Therefore, the Court should deny the request in its entirety.

47

ii.   **The Tuganov Application. ECF Dkt. No. 3665, 3686, 4010**

Mr. Tuganov seeks reimbursement for attorneys' fees in the amount of $1,707,396.30 and

expenses in the amount of $6,803.46 for his counsel, Venable LLP ("Venable"). The Tuganov

Application asserts entitlement to substantial contribution because Mr. Tuganov "[has] been

actively involved in adding significant value to these cases, not only by helping to settle disputes

among various stakeholders that were instrumental for a consensual plan term sheet, but also by

advancing strategic solutions to these cases that estate-paid professionals were either initially

reluctant to follow (only to be persuaded that Mr. Tuganov's suggestions were beneficial to the

reorganization process) or were rightfully so busy with the myriad of other demands on their

attention in these cases that they were unable to focus on issues Mr. Tuganov insightfully identified

as posing obstacles to resolution of the cases." Tuganov Application at p. 2-3. The Tuganov

Application references actions of Mr. Tuganov to expand the scope of the court-appointed

Examiner to investigate Ponzi Schemes and the Tuganov Complaint which commenced an

adversary proceeding seeking a declaratory judgment that, among other things, (i) the Debtors'

businesses were operated as a Ponzi scheme from at least as early as the spring of 2021, (ii) the

Debtors' businesses were operated as a single, hopelessly intertwined enterprise such that their

estates should be substantively consolidated, and (iii) all contracts entered into after the Debtors

began operating as a Ponzi scheme, including Terms of Use, should be deemed null and void." *Id*.

a)  **11 U.S.C. § 503(b)**

It is unclear from the Application how any actions taken or not taken by or on behalf of

Mr. Tuganov made a substantial contribution to these cases. An "applicant must show that his

'actions were designed to benefit *others* who would foreseeably be interested in the estate.'"
*Lebron*, 27 F. 3d at 946.

More specifically, Mr. Tuganov's objection to the Examiner's work plan, filed by Venable, is not compensable as a substantial contribution. On October 17, 2022, Counsel spent 9.2 hours (which also violates block billing prohibitions) on phone calls regarding the Examiner's work plan and researching and drafting an objection, totaling $6,729.06 just for one entry. And again, on October 18, 2022, another 9.3 hours was expended by counsel to Mr. Tuganov to continue drafting responses to the Examiner's work plan, totaling $6,802.21. Just these two entries alone totaled more than $13,000. The United States Trustee, the Debtors, and the Committee were already in active negotiations regarding the Examiner and the Examiner's scope. Any objection lodged by Mr. Tuganov was on his own behalf and not for the benefit of the Debtors or the Debtors' estate.

Time spent attending the depositions of Mr. Ferraro and Mr. Blonstein should also not be compensable. Counsel for Mr. Tuganov charged $6,020 for attending these depositions on November 22, 2022 and another $2,325 for attendance on November 21, 2022. It is unclear what benefit counsel's attendance conferred, considering that no questions were lodged by Counsel during either deposition. *See* Deposition of Christopher Ferraro, November 21, 2022; Deposition of Oren Blonstein, November 22, 2022; Deposition of Robert Campagna, November 22, 2023 [filed at ECF Dkt. No. 1489-2].

Compensation is also sought in connection with the Debtors' Stablecoin Motion. Counsel requests compensation for 7.1 hours spent preparing for and attending the hearing on the Debtors' Motion (and extension of exclusivity period, but because this is a lumped entry, it is impossible to parse), totaling one request of $5,325.00. It is not clear how Counsel for Mr. Tuganov's appearance

at this hearing benefited the Debtors or the Debtors' estate. Mr. Tuganov was protecting his own interests, not adding value to the estate.

Furthermore, compensation is sought for preparing and filing Mr. Tuganov's personal proof of claim is likewise not compensable. There could not be a more clear-cut example of an action that *solely* benefits the Applicant than preparing and filing a personal proof of claim.

There are also numerous time entries related to the New York Attorney General's complaint filed against Mashinsky and related Ponzi Schemes. There is no explanation as to how actions related to these activities rise to the level of substantial contribution to these bankruptcy estates. For example, on January 5, 2023, there are four separate time entries were spent reviewing DOJ charges against Mashinsky and working on Ponzi Scheme issues, for a total of $9,630. The Applicant fails to explain what benefit this conferred on the estates.

### b) The Reasonableness Standard

Even if a basis for substantial contribution was established in the Application, the time records submitted in support of Mr. Tuganov's Application are not reasonable and do not comply with the United States Trustee Guidelines. The records, which were filed with the Court two months after the Application was filed, are redacted. No corresponding motion to redact has been filed or approved by this Court.[20]

Moreover, the fee detail provided does not comport with acceptable standards. The Tuganov Application is replete with lumped and vague time entries for which the Applicant is not entitled compensation. Examples of vague and lumping time entries which do not provide adequate information to determine a benefit to the estate include, without limitation:

---

[20] *See, generally,* 11 U.S.C. § 107. Public access to papers.

| Basis | Date | Description | Time | Amount Billed |
|---|---|---|---|---|
| Vague; Lumping | 11/18/2022 | Review new filings on the docket; confer with A. Currie regarding depositions; review and analyze confidentiality agreement | 1.6 | 750.00 |
| Lumping | 11/28/2022 | Research and draft objection to debtors' motion to establish ownership over earn assets and sell stablecoins; review and analyze transcripts of depositions of debtors' CEO, CCO, and financial advisor | 11.8 | 8,850.00 |
| Vague; Lumping | 3/14/2023 | Email to and from A. Currie regarding Voyager documents; review and revise documents | 1.3 | 1,170.00 |
| Vague; Lumping | 4/14/2023 | Review and revise responses to UCC's motions; conduct additional research in connection with same; exchange emails with J. Sabin and A. Currie regarding same; prepare for and participate in call with UCC counsel regarding pending motions, adversary proceeding, and plan issues; draft email to client regarding reliance issues; conduct research in connection with same | 4.6 | 3,910.00 |
| Vague; Lumping; Administrative | 8/10/2023 | Review of emails and pleadings | .9 | 900.00 |

Even if Mr. Tuganov was found by this Court to have made a substantial contribution to these cases -- which he could not be -- the expenses requested by his counsel are also inappropriate. The food expenses and transportation to and from the courthouse are exorbitant and did not benefit the estate. For example, on August 3, 2023, Mr. Sabin spent $77.32 on dinner where he allegedly "work[ed] on Plan Amendments and PSA." Even if such an expense was compensable, no other

individual is identified as present at this dinner, and it is unclear how it would rise to the level of substantial contribution. On July 16, 2023, Mr. Sabin charged $380 for a dinner to prepare for Mediation.[21] No one else is identified as attending this dinner, and even if other parties were present, it is beyond the pale why such a charge should be compensable by the estate. There are dozens of charges for taxi cabs, Amtrak rides, as well as hotel accommodations. No receipts or evidence is provided as to why these charges should be included in this Application.

Counsel's fees for his *pro hac* application are also charged to the estate for $200. This is clearly administrative, and it is unclear how this rises to the level of substantial contribution. There are also at least 27 distinct time entries related to the preparation and filing of Mr. Tuganov's proof of claim. Not only is this administrative, but there is no better example of a self-serving action of a creditor than a preparing his own proof of claim. Many of these fee details are included with Counsel's otherwise lumped fee detail, making it further difficult to determine how much was attributed to each activity.  Some examples of the proof of claim related activities are:

| Basis | Date | Description | Time | Amount Billed |
|---|---|---|---|---|
| Administrative; Proof of Claim; Lumping | 12/21/2022 | Prepare proof of claim; conduct research in connection with same | 4.8 | 3,508.89 |
| Administrative; Proof of Claim; Lumping | 12/22/2022 | Call with J. Sabin regarding proof of claim; revise proof of claim | 1.2 | 877.22 |
| Administrative; Proof of Claim; Lumping | 2/7/2023 | Review of revised draft memo to client and amended proof of claim; telephone conference with A. Currie regarding possible direct claim issues | 0.7 | 1,113.94 |

---

[21] *See* General Order M-447, ¶ F(3)(ii): ". . . The reasonable expenses of a professional required to work on the case after 8:00 p.m. are reimbursable provided that, if the professional dines before 8:00 p.m., the expense is reimbursable only if the professional returns to the office to work for at least one- and one-half hours. In any event, the expense for an individual's meal may not exceed $20.00."

| Administrative; Proof of Claim | 2/9/2023 | Attend to filing of amended proof of claim | 0.8 | 694.00 |
| Administrative; Proof of Claim; Lumping | 2/9/2023 | (2) objections to exclusivity extension, (3) notices regarding Bid Sales; telephone conference with A. Currie regarding next steps/open issues for clients; review of amended proof of claim | 1.6 | 2,546.14 |

Moreover, many of the actions performed by counsel to Mr. Tuganov categorically are not reasonable under the strict standard for substantial contribution. For example, there are many time entries for administrative items such as checking and reviewing the docket, updating memorandums to clients, and reviewing filed pleadings. Administrative acts are not compensable under 11 U.S.C. § 503(b). *See Granite Partners,* 213 B.R. at 454-455. Some examples of such administrative tasks are:

| Basis | Date | Description | Time | Amount Billed |
|-------|------|-------------|------|---------------|
| Administrative; Lumping; Client based | 1/3/2023 | Confer with C. Weiner Levy regarding Ponzi declaration; review and analyze filings on bankruptcy docket; exchange emails with A. Currie regarding same; email client regarding same | 2.2 | 1,870.00 |
| Administrative; Lumping | 1/4/2023 | Review and analyze filings on bankruptcy docket; confer with A. Currie regarding same; draft email to client summarizing court's decision on ownership of earn assets and the sale of stablecoins | 1.7 | 1,445.00 |
| Administrative; Lumping | 1/6/2023 | Continue review of docket, pleadings and issues related to potential Ponzi argument | .7 | 630.00 |
| Administrative; Lumping | 1/26/2023 | Review filings on bankruptcy docket; order transcript; draft email analyzing debtors' second motion to extend exclusivity | 2.8 | 2,380.00 |

Additionally, Venable seeks authority to be paid an additional $300,000 in fees and expenses.[22] No basis, case law, or otherwise is offered to support this unconscionable request. Section 503(b)(4) does not permit prospective relief. Accordingly, all prospective relief must also be denied.

### iii.    The Dixon Application. ECF Dkt. Nos. 3670, 3672, 3799

Simon Dixon, representing BNK to the Future ("BNK") seek reimbursement for activities done representing BNK, as a creditor, and himself, in the amount of $506,722.50 in expenses already incurred and paid. Of those fees, $225,000 is requested in already incurred attorney's fees and $50,000 for future fees for Ervin Cohen Jessup ("ECJ"), $59,034.00 in requested fees for DBK Financial Services, Ltd ("DBK"), and $222,688.50 in fees and expenses incurred by Brown Rudnick LLP ("Brown Rudnick").

Mr. Dixon alleges that he has held various positions with and related to Celsius since the Petition Date, including as an unpaid (which he now wants to be retroactively paid, but still not retained) Plan consultant, an unpaid (which he now wants to be retroactively paid) consultant to the Earn Ad Hoc Committee, and a signatory to the Plan Support Agreement. Mr. Dixon alleges that he helped "negotiate better outcomes for creditors, as well as to provide specific information (not merely gathering facts) regarding the events of the case, including details about the development of the Plan, and answering questions about the Plan, together with consulting with respect to plan features, that significantly enhanced the reorganization process as a whole." Dixon

---

[22] On November 16, 2023, Venable filed its Supplement to the Applicant. ECF Dkt. No. 4010 which included time through September 11, 2023.

Application, ¶ 2. Mr. Dixon further alleges that the Debtors and the Committee formally sought

from Mr. Dixon,

> among other things: (1) critical outreach and communication directed specifically
> to unsecured creditors (designed to enhance their understanding of the Chapter 11
> plan process overall); (2) guidance and support to Plan proponents during the bid
> process to investigate, develop, and eventually advocate for key features of the
> reorganization, which are now critical parts of the Plan; (3) consulting services to
> the Ad Hoc committees, including strategic planning advice, as well as working as
> a formal Plan Consultant on behalf of the Debtor; and (4) above all, leverage his
> influence, unique knowledge, and qualifications to facilitate the Plan confirmation
> process with the intention of maximizing value to the Estate for all unsecured
> creditors, and, where possible, save significant costs. Mr. Dixon has done all that,
> and, in doing so, has conferred substantial benefit to the Estate and unsecured
> creditors, and helped avoid costly conflict and waste of Estate resources."

*Id*. at ¶ 3. Furthermore, Mr. Dixon alleges that he "was the communicator and leader that the

creditors and the Estate needed, which would typically be expected of an estate-compensated

professional." *Id*. at ¶7.


### a) 11 U.S.C. § 503(b)

The Dixon Application fails to evidence why Mr. Dixon or BNK should be entitled to

reimbursement from the bankruptcy estates for making a substantial contribution to these cases. In

these cases, there is not one substantive or affirmative filing on the docket on behalf of Mr. Dixon

or BNK. Instead, the crux of the Dixon Application is that he reached creditors and parties-in-

interest outside of the traditional paradigm in order to provide information about the cases and

garner support for the proposed Plan. Providing information about the creditors and garnering

support for the proposed Plan were affirmative actions taken by the Debtors and the Committee

using both traditional and nontraditional measures to reach creditors. For example, the

Committee's Information Protocol Motion specifically identified the use of social media to reach

creditors in these cases. And upon information and belief, the Committee frequently "tweeted" information regarding these cases, as well as held regular town hall meetings to discuss the cases and the proposed Plan. Accordingly, the majority of the requested reimbursements are for duplicative actions of the Committee and the Debtors and are therefore not compensable under section 503(b). *See U.S. Lines*, 103 B.R. at 429-430. Furthermore, allowing compensation for such creditor outreach on social media that was neither Court sanctioned or approved, would open the floodgates to future requests for creditors acting on their own behalf.[23]

Moreover, the Dixon Application alleges that he is responsible for the proposed Plan structure as well as the backup bid structure. There are no affidavits attached from representatives of the Debtors or the Committee that substantiate this bald assertion. Nevertheless, even if this was accurate, it does not follow that outlining the structure of a plan should entitle a party to reimbursement. Mr. Dixon was not retained by the estate as a consultant and it seems unlikely that as one of the Debtors' largest creditors could he have been retained as such. Both the Debtors and the Committee have employed several types of professionals to investigate the type of structure the proposed Plan should be in these cases. Tens of millions of dollars  have already been spent through retained professional fee applications on negotiating and designing these plans. At best, Mr. Dixon's alleged work is duplicative of these efforts, and at worst, his work may have derailed the work of the Committee and the Debtors from other successful plans. Reimbursing creditors for postings on social media, which is a free service, to promote a plan that the creditor personally endorses, is not an appropriate expense of bankruptcy estates.

---

[23] It is also possible that, to avoid liability, individual creditors could do the "bidding" of others to either promote acceptance or rejection of Debtor sponsored plans and then try to receive compensation for doing so.

Also, it is unclear what DBK Financials Services is. Financial services are not compensable expenses for substantial contribution. *Granite Partners*, 213 B.R. at 454.

**b) The Reasonableness Standard**

Mr. Dixon failed to provide time records and proof of expenses and therefore the Application should be denied in its entirety. Without time records, the United States Trustee, the Court, and parties-in-interest are unable to assess the reasonableness of the fees and expenses. Therefore, the Court should deny the request in its entirety.

More specifically, the Application requests $15,642.01 in service and postage of the Application alone. This is not only not reasonable, but is also not a substantial contribution to the estate. Moreover, the Application estimates that in additional $4,257.99 of expenses should be reimbursed to ECJ. It is unreasonable to request future and unsubstantiated expenses for unknown matters.

Additionally, Mr. Dixon seeks authority to be paid an additional $50,000 in fees and expenses through the effective date without further order of this Court or review of its fee detail. No basis, case law, or otherwise is offered to support this request. Section 503(b)(4) does not permit prospective relief. Accordingly, all prospective relief must also be denied.

**iv.   Frishberg, Herrmann, and Gallagher Applications. ECF Dkt. Nos. 3675, 3674, 3662**

Mr. Frishberg, Mr. Herrmann, and Ms. Gallagher seek an award of expenses of approximately $437,065.38 in the aggregate for dates beginning prepetition through the filing of the Applications. All three of these Applicants also seek separate reimbursement through the Earn Ad Hoc Application.

**a) 11 U.S.C. § 503(b)**

Mr. Frishberg, Mr. Herrmann, and Ms. Gallagher are not entitled to expenses under Section 503(b). It is undisputed that Mr. Frishberg and Mr. Herrmann have been active participants in these cases. They have filed multiple letters and motions, have appeared and actively participated in hearings, and have voiced their interests directly to the Debtors, the Committee, the United States Trustee, and the Court. However, these activities do not rise to the level of substantial contribution to these cases. Moreover, the record shows their efforts have been costly to the estate,[24] and the rest simply represent the active participation of *pro se* creditors.

For example, Mr. Frishberg and Mr. Hermann filed motions to compel insider clawbacks, appoint chapter 11 trustee, compel discovery, and many others, all of which were denied and cost the estate tens thousands of dollars in legal fees to defend.

Importantly, and as previously stated with respect to all of the filed Applications, just because Mr. Herrmann and Mr. Frishberg were present at the Mediation that may or may not have led to the filing of the Plan, Mr. Herrmann and Mr. Frishberg's participation does not give rise to a substantial contribution claim. *See Granite Partners,* 213 B.R. at 446 (participation in the plan process is not a substantial contribution under Section 503(b)) and *Columbia Gas System, Inc.,*

---

[24] By way of illustration, counsel for the Debtors, Kirkland & Ellis LLP ("Kirkland"), billed the Debtors estate $15,290.00 for 15 hours' worth of time, solely in responding to actions and communications of Mr. Frishberg from the time period of December 1, 2022 through December 31, 2022. *See* Fifth Monthly Fee Statement of Kirkland . ECF Dkt. No. 2249. Kirkland again billed the estate $63,247 for 52.10 hours' worth of time, solely in responding to actions and communications of Mr. Frishberg from the time period of January 1, 2023 through January 31, 2023. *See* Sixth Monthly Fee Statement of Kirkland. ECF Dkt. No. 2424. And then again, in its Seventh Monthly Fee Statement, Kirkland billed the estate $1,909.50 for 1.90 hours' worth of time solely in responding to actions and communications of Mr. Frishberg from the time period of February 1, 2023 through February 28, 2023. *See* Sixth Monthly Fee Statement of Kirkland. ECF Dkt. No. 2815.

During the same time period Kirkland was billing the estate for work done in responding to Mr. Frishberg's actions and communications, the Committee's counsel White & Case LLP ("White & Case") was also billing for responding to Mr. Frishberg. By way of example, in the White & Case's Seventh Monthly Fee Application, there are 12 time entries dedicated to Mr. Frishberg, totaling 15.2 hours from February 1, 2023 through February 28, 2023 alone. ECF Dkt. No. 2368.

224 B.R. at 549 (creditor's Section 503(b) claims were rejected where the evidence showed that the participation of many parties was needed to effectuate a settlement). Any benefit from Mr. Herrmann or Mr. Frishberg's attendance at the mediation was for their own personal benefit and any benefit that flowed to the Debtors' estates was incidental. Even if Mr. Herrmann and Mr. Frishberg were entitled to compensation for their participation in the Mediation, their failure to substantiate expenses and show the actual benefit of their participation precludes any award of fees and expenses.

Mr. Frishberg also seeks reimbursement for activities that occurred prepetition. While there is no bright line rule regarding services performed prepetition, *see Alert Holdings*, 157 B.R. at 758, the activities at minimum should be "intended to result, and ultimately do result in a substantial and demonstrable benefit to the estate." *Id*.; *see also Texaco,* 90 B.R. at 630 (expenses incurred prepetition are compensable under section 503(b) if they resulted in a substantial, demonstrable benefit to the estate). Here, Mr. Frishberg's prepetition activities in no way fostered the reorganization. Not only was the litigation still pending prior to the Petition Date, but Mr. Frishberg moved to lift the automatic stay to pursue the litigation, which was opposed by the Debtors and ultimately denied by the Court. Moreover, Mr. Frishberg was urging for his claim to be dealt with outside of the bankruptcy. Neither the filing of his prepetition litigation, his alleged assistance in forming the Earn Ad Hoc Committee, nor his participation in the Mediation, demonstrates an intent to substantially benefit the Debtors' estates, and any benefit that may have otherwise inured to the estates was both unintentional and incidental.

Ms. Gallagher seeks compensation in the form of 20 ETH "to compensate for the contribution of my time, effort and energy in preparing for the Committee Class Claim, and my

role in serving as a Lead Plaintiff in the Committee Class Claim Action." Gallagher Application, p. 1. No basis for reimbursement for voluntarily serving as class representative is provided. There is no detail provided as to what time, effort, or "energy" was expended by Ms. Gallagher. If Ms. Gallagher did not wish to be such a class representative, then the Debtors are free to establish another candidate. Serving as such candidate does not require compensation, and no case law is provided to that effect. Moreover, Ms. Gallagher provides no basis for the payment of her alleged substantial contribution in anything other than traditional fiat currency and, in any event, she is not entitled to any payment.

### b) Reasonableness Standard

First, expenses for Mr. Frishberg, Mr. Herrmann, and Ms. Gallagher appear in the Ad Hoc Earn Group's Application as well, which creates confusion as to why and what compensation is being sought. However, more specifically, many of the requested reimbursements are objectionable on their face. The Applications request reimbursement for fees incurred before the bankruptcy filing (*see* Mr. Frishberg's request for his own personal filing fee on 7/11/22), personal effects (deodorant, breath mints, etc.), filing fees for personal complaints, personal transportation, and more. No receipts are provided for any of these requested reimbursements.[25] Ms. Gallagher on the other hand, does not identify any expense for reimbursement. Instead, she merely states that she should receive an additional 5% recovery (or 20 ETH) for serving as class claimant. This does not establish the reasonability of the requested fees.

---

[25] Ms. Gallagher's Application does not provide itemized expenses and instead seeks a sum of 20 ETH to compensate for serving as class claim representative. There is no description as to what expenses she has incurred through this role or how the sum of 20 ETH was derived.

Additionally, both Mr. Herrmann and Mr. Frishberg request up to $1,000 for future expenses, totaling $2,000 in estate resources for unknown and substantiated future expenses without further review or order of the Court. Section 503(b) does not permit prospective relief. Accordingly, any and all prospective expenses should be denied in their entirety.

The following chart serves as an example of certain objectionable charges:

| Basis for Objection | Description of Expense | Date of Expense | Value Sought |
|---|---|---|---|
| Noncompensable Expense | Frishberg - Duane Reade #14131 (pharmacy deodorant) | 7/17/2023 | $3.58 |
| Noncompensable Expense | Frishberg - Duane Reade #14131 (pharmacy breath mints for Earn mediation participants) | 7/19/2023 | $1.40 |
| Prepetition Court Filing Fees | Frishberg - Court filing fee Hillsborough County | 7/11/2022 | $342.47 |
| Prepetition Expense | Frishberg - Uber to Court | 7/11/2022 | $18.92 |
| Prepetition Expense | Frishberg - Uber from Court | 7/11/2022 | $18.92 |
| Filing of actions are not compensable | Herrmann - Filing fee for *Herrmann vs. Celsius Network LLC, et al.* Adversary Proceeding | 3/1/2023 | $350 |

## CONCLUSION

**WHEREFORE,** the United States Trustee respectfully requests the Objection be sustained and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
　　　　November 21, 2023

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　WILLIAM K. HARRINGTON
　　　　　　　　　　　　　　　　　UNITED STATES TRUSTEE, Region 2

　　　　　　　　　　　　　　　　　By: */s/ Shara Cornell*

　　　　　　　　　　　　　　　　　Shara Cornell, Esq.
　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　Alexander Hamilton Custom House
　　　　　　　　　　　　　　　　　One Bowling Green
　　　　　　　　　　　　　　　　　New York, New York 10004

61

**EXHIBIT A**

| ECF Dkt. No. | Applicant | Total Fees Requested | Total Expenses Requested | Future Requests |
|---|---|---|---|---|
| 3615 | Wildes Application | $0.00 | $42,525.00 | |
| 3654 | The Earn Application | $336,385.93 | $4,830.82 | $100,000.00 |
| 3660 | The Custody Application | $778,953.00 | $7,696.66 | |
| 3662 | Gallagher Application | $437,065.38 | $0.00 | |
| 3663 | Withhold Application | $191,697.00 | $3,745.61 | |
| 3666 | Tuganov Application | $1,383,089.00 | $6,803.46 | $300,000.00 |
| 3672 | Dixon Application | $571,028.50 | $20,859.65 | $50,000.00 |
| 3671 | Borrower Application | $1,018,265.50 | $1,957.97 | |
| 3673 | Withdrawal Application | $28,927.50 | $350.00 | |
| 3674 | Herrmann Application | $0.00 | $1,143.90 | $1,000.00 |
| 3675 | Frishberg Application | $0.00 | $626.98 | $1,000.00 |

1