Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) ) | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) ) ) | Case No. 22-10964 (MG) |
| Debtors. | ) ) | (Jointly Administered) |
| CELSIUS MINING LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | Adversary Proceeding No. [●]_(MG) |
| v. | ) ) | |
| MAWSON INFRASTRUCTURE GROUP INC., LUNA SQUARES LLC, and COSMOS INFRASTRUCTURE LLC; | ) ) ) ) | |
| Defendants. | ) ) ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks

## ADVERSARY COMPLAINT

Debtor Celsius Mining LLC ("Celsius," "Celsius Mining," or "Plaintiff"), by and through its undersigned counsel, hereby files this adversary complaint (the "Complaint") against Defendants Mawson Infrastructure Group Inc. ("Mawson"), Luna Squares LLC ("Luna"), and Cosmos Infrastructure LLC ("Cosmos," and together with Mawson and Luna, "Defendants" or the "Mawson Entities"). In support of the Complaint, Celsius states the following:

## NATURE OF THE CASE

1. This dispute arises out of the Mawson Entities' flagrant disregard of their obligations under a series of agreements with Celsius. In February 2022, Celsius and the Mawson Entities executed multiple agreements whereby Celsius loaned Luna $20 million to assist Luna in purchasing certain equipment necessary to meet its obligations under Celsius and Luna's customer Co-Location Agreement. In exchange, Celsius received a security interest in specific property of Cosmos and Luna, including property and equipment purchased with the proceeds of the loan.

2. Almost immediately, however, Luna defaulted on its obligations under the Co-Location Agreement. First, Luna failed to provide the hosting services necessary to deploy Celsius's mining rigs in accordance with the parties' agreed-upon deployment schedule. More recently—and contrary to statements made in public securities filings—Luna also has improperly refused to apply advance deposits paid by Celsius to offset the latter's outstanding invoices, in contravention of the terms of the Co-Location Agreement and Luna's duties thereunder. Instead, Luna baselessly claims that Celsius has forfeited its right under the Co-Location Agreement to apply those deposits to amounts owed by allegedly failing to deliver rigs in accordance with the

---

Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

parties' schedule—ignoring the fact that Luna itself *requested* that Celsius delay such deliveries because of Luna's own inability to deploy Celsius's mining rigs on time. Luna acknowledges that this interpretation of the contract—which contradicts its own public and private statements—was devised only after it hired counsel.

3.      Worse still, in violation of the parties' Promissory Note and Security Agreement, the Mawson Entities misrepresented and wholly failed to remedy the improper ownership and titling of the collateral in which Luna granted Celsius a security interest in exchange for the $20 million loan. Only recently, after repeated informal requests from Celsius and a subsequent an order from the Bankruptcy Court requiring the Mawson Entities to sit for a Rule 30(b)(6) deposition, did the Mawson Entities admit that Luna has never possessed, owned, or held any right or title to that collateral.

4.      To vindicate its rights under the various agreements, Celsius files this Complaint seeking monetary damages and related relief.

## THE PARTIES

5.      Plaintiff Celsius Mining LLC is a Delaware limited liability company with a principal place of business in Hoboken, New Jersey. Celsius Mining engages in cryptocurrency "mining," which involves the use of sophisticated hardware devices ("mining rigs") to verify new blockchain transactions and allow new cryptocurrency assets to enter the market. Celsius Mining owns and deploys mining rigs for the purpose of generating cryptocurrency assets. In order to deploy certain of its mining rigs, Celsius Mining engages with third-party hosting companies that provide services, including facilities, power, and operational management, necessary to operate mining rigs. Celsius Mining, along with the other above-captioned debtors (collectively, the "Debtors"), filed a voluntary petition for bankruptcy relief under chapter 11 of the Bankruptcy Code on July 13, 2022 (the "Petition Date") and are operating as debtors-in-possession.

6.      Defendant Mawson Infrastructure Group Inc. is a publicly traded digital infrastructure provider that owns and operates modular data centers in the United States. Mawson is incorporated under the laws of the state of Delaware with principal executive offices in Sharon, Pennsylvania. Mawson Infrastructure Group Inc. is the parent company of Defendants Luna Squares LLC and Cosmos Infrastructure LLC.

7.      Defendant Luna Squares LLC is a subsidiary of Mawson incorporated under the laws of the state of Delaware. Luna develops and operates hosting facilities designed for digital asset mining. Luna Squares LLC has no board of directors and shares its executive team with Mawson Infrastructure Group Inc.

8.      Defendant Cosmos Infrastructure LLC is a subsidiary of Mawson incorporated under the laws of the state of Delaware. Cosmos owns and operates digital asset mining equipment and infrastructure. Cosmos Infrastructure LLC has no board of directors and shares its executive team with Mawson Infrastructure Group Inc.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York (the "Southern District of New York"), entered February 1, 2012.

10.      This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (b)(2)(E). In the event this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiff consents to the entry of final orders and judgments by the Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

11.      Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with cases commenced

under the Bankruptcy Code, and pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

<strong><u>FACTUAL ALLEGATIONS</u></strong>

**I.**    **<u>Celsius Partners with the Mawson Entities to Host Mining Rigs</u>.**

    **A.**    **The Co-Location Agreement**

12.    On February 23, 2022, Celsius and Luna entered into a customer equipment co-location agreement (the "<u>Co-Location Agreement</u>"), attached hereto as **Exhibit A**. Pursuant to the Co-Location Agreement, Luna agreed to provide, in accordance with certain deployment dates specified in Addendum A to the Agreement, hosting facilities, electrical power, and internet access to Celsius's mining rigs for an initial term of one year. Ex. A § 1.1. The Co-Location Agreement also contemplated that Celsius may be required to pay deposits to Luna to "reserve[] both space in the Facility and an allocation of power for [Celsius's] expected power consumption." *Id.* § 3.1. The Agreement provided that any applicable deposit would be forfeited if Celsius failed to deliver equipment within 60 days of the Deployment Date specified in Addendum A of the Agreement. *Id.* The language of the Agreement thus ties specific "applicable" deposits to specific deployment dates. *See id.*

13.    Addendum A to the Co-Location Agreement set out a schedule for the deployment of Celsius mining rigs at Luna's Midland and Sharon hosting facilities. *See id.*, Add. A. Pursuant to the schedule, Luna agreed to deploy a total of 30,000 Celsius mining rigs, delivered in monthly batches between March and July 2022. *Id.* The Addendum also provided that Celsius would prepay deposits fourteen days prior to the commissioning of any mining rigs for the first five batches of rig deliveries. *Id.* The Agreement specified that each deposit amount would be equal to a two-month power-cost forecast bill. *Id.* In other words, prior to the deployment of any mining rigs, Celsius was required to prepay two months of expected power costs for those rigs.

5

14.     Addendum A further stated that Luna would provide the first 50 megawatts of power ("MW") at a rate of $41 per megawatt hour ("MWH"), with "the balance of the power" being at "spot price," meaning the price that Luna paid the power supplier. *Id.* Luna agreed to make at least 90MW of power available to Celsius under the Agreement. *Id.*

15.     On July 7, 2022, Celsius and Luna revised Addendum A to the Co-Location Agreement (the "Revised Addendum A"), attached hereto as **Exhibit B**. The Revised Addendum A added a third hosting facility site in Georgia and specified that prepaid deposits for Celsius's sixth rig delivery batch, to be deployed at Luna's Georgia site in July 2022, were to be paid 21 days prior to commissioning of any mining rigs and would amount to three months of expected power consumption. Ex. B. Celsius and Luna also added a provision to Revised Addendum A stating that Luna would "work with [Celsius] to coordinate hours of curtailment to target the desired market energy cost and avoid peak energy charges to reduce the overall Power Costs for [Celsius]" and that Luna would "implement the curtailment strategy determined by [Celsius] following coordination with Luna Squares." *Id.* The parties further agreed that the first 50% of power consumption by Celsius at the Midland hosting site would be at $41 per MWH, with the balance being "at spot price." *Id.*

16.     Between April 4, 2022, and July 1, 2022, Celsius prepaid six deposits to Luna—totaling approximately $15.3 million—pursuant to the Co-Location Agreement and Revised Addendum A.

**B.     The Promissory Note and Security Agreement**

17.     Concurrently with the execution of the Co-Location Agreement, Celsius loaned Luna $20 million to purchase and install modular data centers and transformers to assist Luna with satisfying its obligations under that Agreement. In exchange, Luna executed and delivered to

Celsius a $20 million secured promissory note (the "Promissory Note"), attached hereto as **Exhibit C**. The Promissory Note had a maturity date of August 23, 2023, requiring Luna to pay "the entire unpaid Principal Balance, together with all accrued but unpaid interest, including default interest," on that date. Ex. C § (i). Under the Note, Luna was required to pay all accrued interest at the end of each fiscal quarter and, beginning six months after the closing date, to make quarterly amortization payments equal to 15% of the original principal loan amount. *Id.* §§ (i)–(ii).

18.     At the same time, Celsius, Mawson, Luna, and Cosmos executed a guaranty and security agreement (the "Security Agreement" and, together with the Promissory Note, the "Loan Documents"), attached hereto as **Exhibit D**. The Security Agreement granted Celsius continuing security interests in (a) Cosmos's temporary and permanent collateral miners (the "Miners") and (b) Luna's "right in, title and interest to and under, (i) all of the personal property, Equipment, and Fixtures purchased with the proceeds of the Secured Note, and (ii) to the extent not included in (i), 50 modular data centers and 50 transformers located at the Pennsylvania Facility or the Sharon Facility" (the "Collateral"). *See* Ex. D §§ 2.1(a)–(b). Under the Security Agreement, both Luna and Cosmos represented and warranted that they each had "good and valid rights in or the power to transfer" the Miners and the Collateral, respectively. *Id.* § 3.1. Luna and Cosmos further covenanted that they would not sell, lease, or otherwise dispose of the same, except as authorized under the Promissory Note. *Id.* § 4.1(d). Thus, under the clear terms of the Security Agreement, Luna was the entity obligated to acquire title to the Collateral purchased with the proceeds of the Promissory Note.

19.     Additionally, under the Security Agreement, Mawson irrevocably and unconditionally guaranteed the full and punctual payment of Luna's $20 million obligation under Promissory Note when such obligation became due. *Id.* § 7.1.

7

20.     Pursuant to the Promissory Note, Luna agreed to maintain good and unencumbered title to the Collateral and not to "create, grant, incur or suffer to exist any Lien on any Collateral, other than the Liens securing the Note Obligations and Permitted Liens." Ex. C § (xiii). Luna was obligated to pay Celsius the net cash proceeds from any asset sales of the Collateral that had a fair market value in excess of $100,000, provided that Luna was permitted to reinvest such proceeds in assets that are useful to Luna within 180 days of receipt of the proceeds. *Id.* § (iii). Luna was also required to notify Celsius if a default or event of default occurred. *Id.* § (ix). Events of default included, among other things, failure to make any payment under the Note and failure to comply with any covenant in either of the Loan Documents. *Id.* §§ (xviii), (xx).

21.     Thus, under the clear terms of the Loan Documents, Luna was obligated to obtain and maintain title to the Collateral purchased with the proceeds of the Promissory Note. Both at the time of execution as well as afterwards, the Mawson Entities understood these obligations. Indeed, a memorandum on the Co-Location Agreement and Promissory Note prepared for Mawson's board of directors on or about February 2022 in connection with the board's approval of the agreements, attached hereto as **Exhibit E**, acknowledged that *Luna's* assets would securitize the Promissory Note. *See* Ex. E at LUNA006570–71. Moreover, Tim Broadfoot, the Mawson Entities' corporate representative, testified under oath on behalf of the Mawson Entities that the Collateral was meant to be acquired into Luna.[2] Ex. F, T. Broadfoot 8/31/2023 Dep. Tr. 87:12–20 ("Q. Understood. So it's just fair to say that your working understanding, sitting here today, is that

---

[2]     In connection with the main case, the Bankruptcy Court issued an order permitting the Debtors to issue Rule 2004 subpoenas to the Mawson Entities. *See Order (I) Authorizing the Debtors to Issue Subpoenas Under Federal Rules of Bankruptcy Procedure 2004 and 9016 to Mawson Infrastructure Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC and (II) Granting Related Relief* [Case No. 22-10964 (MG), Dkt. No. 3091] (the "Rule 2004 Order"). In connection with the Court's Rule 2004 Order, the Debtors also conducted a Rule 30(b)(6) deposition of the Mawson Entities on August 31 and September 1, 2023. *See infra* Section III.B. Excerpts from the deposition testimony are cited throughout the Complaint and attached hereto as **Exhibits F** and **G.**

based on your review of the Promissory Note and recognizing that you don't have every paragraph in front of you, the Collateral, the asset collateral under the Promissory Note was meant to be purchased into Luna Squares, correct? A. Correct.").

22.    At the time that the Loan Documents were executed, Celsius explicitly requested from the Mawson Entities further details regarding the acquisition of Collateral with the Promissory Note proceeds. Specifically, Celsius requested assurances that the payment for the Collateral would come from the account into which Celsius deposited the loan amount (*i.e.*, Luna's account). Celsius made clear that acquisition of collateral using funds from the account that Celsius was funding was important to ensure proper perfection of Celsius's security interests. In email correspondence dated February 24, 2022, attached hereto as **Exhibit H**, Mawson's CEO, James Manning, represented that payments for the new Collateral would come from Luna's funded account, that other existing Mawson equipment would be acquired by Luna to become Collateral, and that such transfers would be memorialized through internal, inter-entity invoices. *See* Ex. H at LUNA0005450–51. The Mawson Entities never provided Celsius with proof of such invoices and later acknowledged that no such inter-entity invoices were ever created. *See* Ex. G, T. Broadfoot 9/1/2023 Dep. Tr. 267:9–269:17 ("Q. Okay. So when Mr. Manning says, 'some of these will be internal, inter-group invoices,' are you aware of any efforts that Mawson took after this e-mail was sent to make those kinds of internal, inter-group invoices? A. I'm not aware of any. Q. All right. Do you see when it says, a few sentences later, 'We will in due course get the full details of this and raise an inter-group invoice for the MDC'? A. I do. Q. Did that ever happen? A. No."). Instead, contrary to Manning's representations, funds loaned to Luna's account were transferred to Mawson and Cosmos for acquisition of the Collateral into those entities. *See infra* Section III.B.

### C.        The Cooperation Agreement

23.        In conjunction with the Co-Location Agreement and Loan Documents, Celsius and Mawson entered into a cooperation agreement (the "Cooperation Agreement"), attached hereto as **Exhibit I**. Pursuant to that Agreement, the parties agreed to cooperate on future projects as strategic partners. *See* Ex. I. The Cooperation Agreement also required the Mawson Entities to offer any additional availability to host additional mining rigs at its facilities to Celsius prior to offering such availability to third parties. *Id.*

## II.    **The Mawson Entities Breach the Agreements.**

### A.        Deployment Delays

24.        Luna failed to meet its obligations under the Co-Location Agreement almost immediately. Addendum A to the Co-Location Agreement provided a deployment schedule establishing the number of Celsius mining rigs that Luna was obligated to deploy each month between March and July 2022. *See* Ex. A, Add. A; Ex. B. Section 1.1 of the Co-Location Agreement required Luna to provide hosting facilities, electrical power, and internet access (the "Services") for purposes of "installing, maintaining, and operating" (*i.e.*, deploying) Celsius's mining rigs in accordance with the deployment schedule. Ex. A § 1.1. But by the end of April 2022—only the second month of the contemplated deployment schedule—Luna already had failed to provide the required Services and to deploy approximately 4,500 mining rigs that Celsius had delivered pursuant to the Agreement. Over time, that backlog only grew larger, ballooning to over 15,000 undeployed Celsius mining rigs in May 2023.

25.        Over the course of several months, Celsius repeatedly inquired about Luna's deployment delays. Such correspondence is attached hereto as **Exhibits J** and **K**. *See* Ex. J at LUNA0004281–82; Ex. K at LUNA0001592. Though Luna repeatedly advised Celsius that it had

10

the capacity to deploy all of Celsius's mining rigs, Luna continued to suffer significant deployment

delays. In fact, Luna *never* met its deployment obligations under the Co-Location Agreement in

any month of the parties' relationship. A table of Luna's deployment deficiencies is detailed below:

| Date | Addendum A Expected Cumulative Rigs Deployed | Actual Cumulative Rigs Hashing | Deficit of Rigs Hashing vs Delivered | Deficit of Rigs Hashing vs Addendum A |
|---|---|---|---|---|
| 4/30/2022 | 6,000 | 901 | -4,499 | -5,099 |
| 5/31/2022 | 12,000 | 3,504 | -9,996 | -8,496 |
| 6/30/2022 | 21,180 | 8,653 | -4,847 | -12,527 |
| 6/30/2022 (Sharon) | 30,000 | 8,653 | -4,847 | -21,347 |
| 7/31/2022 | 30,000 | 9,488 | -12,652 | -20,512 |
| 8/31/2022 | 30,000 | 15,371 | -6,769 | -14,629 |
| 9/30/2022 | 30,000 | 9,150 | -10,596 | -20,850 |
| 10/31/2022 | 30,000 | 9,092 | -10,654 | -20,908 |
| 11/30/2022 | 30,000 | 8,460 | -11,286 | -21,540 |
| 12/31/2022 | 30,000 | 8,202 | -11,544 | -21,798 |
| 1/31/2023 | 30,000 | 9,467 | -10,279 | -20,533 |
| 2/28/2023 | 30,000 | 9,450 | -10,296 | -20,550 |
| 3/31/2023 | 30,000 | 9,417 | -10,329 | -20,583 |
| 4/30/2023 | 30,000 | 10,276 | -9,470 | -19,724 |
| 5/31/2023 | 30,000 | 4,089 | -15,657 | -25,911 |
| 6/30/2023 | 30,000 | 16,651 | -3,095 | -13,349 |

26.    Luna's internal documents, produced to Celsius pursuant to the Bankruptcy Court's

Rule 2004 Order, further acknowledge and discuss Luna's deployment delays and failure to meet

its contractual deployment deadlines. For example, attached hereto as **Exhibit L** is a May 23, 2022,

email from Liam Wilson, then-Chief Operating Officer of Mawson, to a group of Mawson

employees, including then-Chief Executive Officer James Manning, regarding rig deployment

scheduling. *See* Ex. L at LUNA0004226–27. In the email, Wilson noted "a number of issues in

front of [the Mawson Entities]," including deployment of Celsius mining rigs. *Id.* Wilson

acknowledged that only 6,468 Celsius units had been deployed and suggested deploying an

additional 2,352 units. *Id.* According to the parties' deployment schedule, however, Luna was

11

obligated to deploy 12,000 Celsius mining rigs by May 2022. *See* Ex. B. Seemingly acknowledging this deficit of over 3,000 rigs, Wilson advised that all "extra [Celsius] units" for Luna's Pennsylvania hosting sites would be put on hold. Ex. L at LUNA0004226.

27.     The Mawson Entities further admitted under oath that Luna was unable to deploy rigs according to the requirements of the Co-Location Agreement and that prior to June 2022, the Mawson Entities had indicated to Celsius that they would not be able to meet their scheduled deployment obligations. Ex. F at 52:7–13 ("Q. June or July of '22, okay. At any point before June or July of '22, did Mawson indicate to Celsius that it would not be able to host at the Pennsylvania sites all of the rigs that were scheduled under the Co-Location Agreement? A. Yes, it did."); *id.* at 100:10–14 ("Q. Okay. Was Mawson able, at all times during the parties' agreement, to deploy rigs according to the parties' schedule? A. No.").

28.     According to Revised Addendum A, Luna was obligated to provide Celsius space to deploy 30,000 mining rigs by July 2022. *See* Ex. B. Luna did not meet that schedule. In fact, Luna did not offer Celsius the ability to deploy the full 30,000 mining rigs until May or June 2023, nearly a full year after it was obligated to do so. *See* Ex. G at 279:7–16 ("Q. So just to be clear, under the deployment schedule, Mawson was supposed to be able to deploy 30,000 Celsius units by July of 2022, correct? A. Correct. Q. And Mawson did not offer Celsius the ability to deploy the full balance of those 30,000 units until May or June of 2023, correct? A. That's correct. Q. So it took Mawson nearly a year to offer Celsius the full hosting capacity it was supposed to provide Celsius as of July 2022? A. That's correct.").

29.     During this same period—as Luna failed to meet its obligations to Celsius—the Mawson Entities continued to deploy thousands of their own mining rigs for their own economic benefit. *Id.* at 282:20–283:2 ("Q. Okay. So between July 2022 and April 2023, did Mawson ever

offer to unhook its thousands of rigs that it was using for self mining to put additional Celsius rigs online in accordance with the schedule provided for in the Co-Location Agreement? A. No, it did not.").

30.     At times, Luna's deployment deficiencies were so significant that it told Celsius to delay sending mining rigs in accordance with the contemplated deployment schedule. For example, attached hereto as **Exhibit M** is a June 13, 2022, email thread in which Patrick Holert, then-Chief Operating Officer at Celsius Mining, inquired about the current deployment of Celsius mining rigs and delivery of new rigs pursuant to Addendum A's schedule. *See* Ex. M at LUNA0004283–84. Liam Wilson, then-Chief Operating Officer at Mawson, responded to Holert and told Celsius not to deliver additional rigs to Luna. *Id.* Wilson advised Holert that Luna had "plenty of stock on hand" for current deployments (*i.e.*, rigs Mawson had not yet deployed in accordance with the schedule) and ostensibly could not handle the full delivery amount provided for in Addendum A. *Id.* The Mawson Entities also acknowledged in testimony that Luna asked Celsius to delay shipments of additional mining rigs. Ex. G at 286:19–23. ("Q. Well, there were times when Mawson asked Celsius not to send rigs, correct? A. There is communication for scheduling deliveries that asked them to delay some.").

31.     Each day that Luna failed to deploy Celsius's mining rigs in accordance with the Co-Location Agreement resulted in lost revenue for Celsius.

**B.     Refusal to Apply Prepaid Deposits to Invoices**

32.     The Co-Location Agreement provided for Celsius's prepayment of deposit amounts to Luna to "reserve[] both space in the Facility and an allocation of power for [Celsius's] expected power consumption." Ex. A § 3.1. Pursuant to Section 3.1, titled "Deposits / Bonds; Deposit and Power Allocation Forfeiture," should Celsius "fail[] to pay any amount to Luna Squares" under

the Agreement, Luna was entitled to "apply the funds held as deposit against the outstanding amounts." *Id.* Section 3.1 also provided that if Celsius failed to deliver equipment within sixty days of a deployment date specified in Addendum A, Celsius would forfeit only "the applicable deposit" and its power allocation thereunder. Upon termination of the Co-Location Agreement, Luna was required to return all unused deposits to Celsius.

33.     Pursuant to the deposit schedule specified in Addendum A, Celsius paid Luna an aggregate of over $15.3 million in deposit amounts to secure its space and power allocation in Luna facilities. Specifically, Celsius paid the following deposits to Luna:

| Date | Invoice Number | Memo Line | Amount |
|---|---|---|---|
| 3/31/2022 | INV275 | Celsius Long Term Deposit - March | $541,952 |
| 4/13/2022 | INV292 | Celsius Long Term Deposit – April 2022 | $1,083,904 |
| 4/21/2022 | INV293 | Celsius Long Term Deposit – May 2022 | $1,625,856 |
| 5/17/2022 | INV312 | Celsius Long Term Deposit – June 2022 | $3,522,688 |
| 6/17/2022 | INV331 | Celsius Additional Power Deposit – Mar – June 2022 | $4,931,322 |
| 7/5/2022 | INV335 | Celsius Power Deposit – GA Site – July 2022 | $3,622,712.10 |

34.     Prior to July 1, 2022, Celsius paid over $11.7 million in deposits to Luna. At the time of each of these deposits, Celsius was in full compliance with its obligations under the Co-Location Agreement, including the delivery schedule.

35.     On July 5, 2022, Celsius paid its final deposit of $3,622,712.10 to Luna. As of that date, Celsius had not delivered the approximately 9,000 mining rigs contemplated for delivery in June 2022 by Addendum A. *See* Ex. B. At this time, however, Luna already had approximately 4,800 Celsius mining rigs in its possession that it had failed to deploy, and Luna employees had instructed Celsius not to deliver additional rigs. Moreover, by the end of July, Celsius delivered

14

an additional 8,600 mining rigs to Luna, increasing Luna's backlog of delivered-but-undeployed Celsius rigs to approximately 12,000.

36.    Until recently, the Mawson Entities' consistent view has been that Celsius's deposits could be used to offset any outstanding amounts under the Co-Location Agreement and that any unused amounts should be returned to Celsius at the conclusion of the Agreement. Attached hereto as **Exhibit N** is a May 4, 2022, email from Lauren Schmidt, a finance manager at Mawson, to Jenny Fan, Vice President at Celsius Mining, referencing multiple power deposits to be paid by Celsius for multiple invoices pursuant to the Co-Location Agreement. *See* Ex. N at LUNA0003404. In that same email, Schmidt also stated that Luna would "refund the full deposit amount at the end of the [Co-Location Agreement]." *Id.* Internal discussions between Mawson employees further demonstrate an understanding that Luna was obligated to return any unused deposit amounts to Celsius at the end of the Co-Location Agreement.

37.    The Mawson Entities' external advisors and auditors took the same view. Attached as **Exhibit O** is an August 6, 2022, email from Ankura, the Mawson Entities' restructuring financial advisors, regarding Luna's ability to offset unpaid Celsius invoices against Celsius's prepaid deposits under the Co-Location Agreement. *See* Ex. O at LUNA0003879–81. Ankura opined that the Co-Location Agreement clearly permitted deposits under the Co-Location Agreement to be applied against unpaid invoice amounts. *Id.* Importantly, the Mawson Entities sought this opinion after Celsius purportedly forfeited its deposits by allegedly not delivering rigs in accordance with Addendum A's deployment schedule.

38.    Similarly, attached hereto as **Exhibit P** is an October 24, 2022, email from LNP Audit and Assurance, Mawson's financial advisors, to Celsius as part of LNP's quarterly review of Mawson's financial statements. *See* Ex. P at LUNA0006607–08. In that email, LNP requests

confirmation from Celsius that Luna owed Celsius $15,328,444.60 in deposits. *Id.* Attached hereto as **Exhibit Q** is another January 31, 2023, email from LNP to Celsius requesting confirmation that Luna held a balance of $15,328,444.60 in deposits that was "refundable to Celsius." *See* Ex. Q at LUNA0006595.

39.     The Mawson Entities confirmed that at least between April 2022 and May 2023, they understood that their obligation to refund the full deposit amounts paid by Celsius at the end of the Co-Location Agreement. *See* Ex. G at 238:12–23 ("Q. Right. So sitting here in April 2022, Mawson's COO was correct that at the end of the contract, all things as they were, at least as of that date, Mawson is obligated to refund Celsius' deposits at the end of the contract, correct? A. That is his view, yes. Q. And that was the same view that Mawson took in its May 2023 10-Q securities filing that we just reviewed a little earlier, correct? A. Correct."); *id.* at 241: 3-6 ("Q. In May of 2022, Mawson was obligated to refund the full deposit amount at the end of the contract, correct? A. Correct.").

40.     Beginning in 2022 and continuing into 2023, however, Mawson's financial position deteriorated, and its ongoing viability was in jeopardy. Indeed, Mawson's Form 10-K for 2022, filed on or about March 23, 2023, with the Securities and Exchange Commission, disclosed that Mawson expected to incur net losses for the foreseeable future and advised that its ability to continue as a going concern relied on its ability to raise additional capital.

41.     On May 15, 2023, Mawson Infrastructure Group Inc. filed its Form 10-Q for the first quarter of 2023, attached hereto as **Exhibit R**. In that filing, Mawson disclosed $15,328,445 in "Customer deposits" as current liabilities on its balance sheet and described "15.33 million of customer deposits that is required to be repaid within eleven months." Ex. R at LUNA0000644, -0671. The Mawson Entities admitted that the $15.33 million in customer deposits referred to

Celsius's prepaid deposits. Ex. G at 211:21–24 ("Q. That $15.33 million of customer deposits is referring to the Celsius deposits, correct? A. It is."). Mawson never represented in this filing that it disputed or otherwise challenged its obligation to return the $15.33 million in deposits.

42.    On or about July 13, 2023, Luna sent Celsius an invoice for amounts allegedly due pursuant to the Co-Location Agreement.

43.    On or about July 20, 2023, Celsius responded, requesting that Luna use deposits Celsius had previously paid—totaling over $15 million—to offset the amounts due in the invoice pursuant to Section 3.1 of the Co-Location Agreement. Celsius also provided notice that it would not renew the Co-Location Agreement, which expired on August 23, 2023.

44.    On or about July 21, 2023, counsel to the Mawson Entities informed Celsius that Luna refused to apply any of the previously paid deposits to satisfy the July 13 invoice. Instead, the Mawson Entities asserted that Celsius forfeited all of its deposits by allegedly failing to deliver certain mining rigs within sixty days of their specified deployment date. In other words, Luna sought to keep Celsius's entire $15.33 million in deposits because it had allegedly not delivered some rigs in accordance with the Co-Location Agreement, despite the fact that (a) Luna had instructed Celsius not to deliver rigs in accordance with the schedule, (b) Luna at no point prior to May 2023 had indicated its capacity to deploy all 30,000 rigs called for under the Co-Location Agreement, and (c) the significant majority of Celsius's deposits occurred at a time when it was fully compliant with the delivery schedule in Addendum A.

45.    On September 1, 2023, the Mawson Entities testified under oath that Celsius's multiple deposit payments paid over the course of several months in fact represented a single deposit and that a purported failure to deliver according to *any* of Addendum A's deployment dates constituted a forfeiture of all deposits. *See* Ex. G at 147:22–148:6; *see also id.* at 206:17–21 ("Q.

Right. So under Mawson's reading of the contract, if Celsius fell short by one rig, the entire deposit is forfeitable? A. In that hypothetical situation, yes").

46.     Mawson's public filings similarly changed tune. On August 21, 2023, Mawson filed its Form 10-Q for the second quarter of 2023 that once again listed $15,328,445 in "Customer deposits" as a current liability on its balance sheet. However, Mawson now noted a "risk of a dispute or litigation" involving the Celsius deposits and stated that Luna "claims, among other things, that the deposit, in full or in part, has been forfeited due to Celsius Mining LLC's breaches and its other actions or inactions under the Co-Location Agreement." Mawson did not acknowledge its May 2023 designation of the deposits as "required to be repaid," nor did it explain why its analysis of the deposits changed from May 2023 to August 2023. Indeed, the Mawson Entities testified that only their legal position—not the facts—had changed between May and August 2023. *Id.* at 218:9–219:6 ("Q. … Mawson's legal view, as of the time of the [May 2023] securities filing, was that it does owe this money, right? … A. The document -- the sentence highlighted says that the amount is to be repaid. Q. And Mawson's position has changed since then? A. Yes. Q. The facts haven't changed, right? A. No.").

### C.     Failure to Repay the Promissory Note on Maturity

47.     Pursuant to the terms of the Promissory Note, Celsius's loan to Luna matured on August 23, 2023 (the "Maturity Date"). Ex. C § (i). By that date, Luna was required to pay the entire unpaid principal loan amount, plus any accrued but unpaid interest. *Id.*

48.     Luna has not paid the outstanding principal loan amount plus interest. As of the date of this Complaint, approximately $8 million plus interest remains outstanding under the Promissory Note.

49.     Indeed, in its third quarter Form 10-Q filed on November 13, 2023, attached hereto as **Exhibit S**, Mawson disclosed that the $20 million loan under the Promissory Note had matured on August 23, 2023, and identified an outstanding balance of $8.24 million owed to Celsius. *See* Ex. S at 11. Mawson further admitted that it "ha[d] not fulfilled specific payment obligations to the Celsius Promissory Note," among other debt obligations to other parties, and advised that Celsius may be entitled to initiate actions against the Mawson Entities, including "opting to expedite the repayment of the principal debt [or] pursuing legal action against the Company for payment default." *Id.*

### III.    The Mawson Entities Improperly Title the Collateral.

#### A.    The Rule 2004 Examination Request

50.     On July 25, 2023, Celsius and its Debtor affiliates (the "Debtors") filed *Debtors' Ex Parte Motion for an Order Under Federal Rules of Bankruptcy Procedure 2004 and 9016 for Subpoenas Examination of, and Production of Documents From, Mawson Infrastructure Group Inc., Luna Squares LLC, and Cosmos Infrastructure LLC* [Case No. 22-10964, Dkt. No. 3088] (the "Rule 2004 Motion"). Through a Rule 2004 examination, the Debtors sought to examine, among other things, materials related to the ownership and titling of the Collateral and the disposition of Celsius's deposits under the Co-Location Agreement, including the status of Celsius's liens against the Collateral. The Rule 2004 Motion requested entry of an order authorizing the Debtors to serve certain document requests and directing the Mawson Entities to produce documents in response to those requests.

51.     The Court granted the Debtors' Rule 2004 Motion on July 26, 2023, and subsequently approved a Rule 30(b)(6) of a corporate representative of the Mawson Entities. In

August 2023, the Mawson Entities produced documents in response to the Debtors' document requests.

### B.    Rule 30(b)(6) Deposition of the Mawson Entities

52.    On August 31 and September 1, 2023, the Debtors took the Rule 30(b)(6) deposition of the Mawson Entities' corporate representative, Tim Broadfoot. Through deposition, Celsius inquired into, among other things, the status and disposition of the Collateral that Luna was purported to have purchased with the $20 million loan from Celsius.

53.    That deposition confirmed what Celsius had long suspected: the Mawson Entities intentionally breached their representations in the Loan Documents and failed to acquire the Collateral into Luna, instead acquiring it into Mawson and Cosmos. The Mawson Entities acknowledged that although the funds from the Promissory Note were originally paid to Luna, they were then transferred to Mawson or Cosmos for actual purchase of the Collateral. Ex. G at 169:10–17 ("Q. Was that $20 million received into Luna Squares or a different Mawson entity? A. It was paid to Luna Squares. Q. Okay. After it was paid to Luna Squares, did it -- was that money ever transferred to Mawson or Cosmos? A. I believe it was for the purchase of assets."). The Mawson Entities testified that the transfer was necessary because the purchase of Collateral was part of existing orders between suppliers and Mawson entities other than Luna. *See* Ex. F at 87:21–25 ("A. The assets that were to be purchased were under -- they were part of larger, longer-term orders, and contracts that were held by the other entities.").

54.    Moreover, despite knowing that the Loan Documents required Luna to be the entity acquiring the Collateral, the Mawson Entities admitted that the rights and title to the Collateral were instead acquired by Cosmos and Mawson. *Id.* at 85:20-24 ("Q. All right. What Mawson entity was that collateral acquired into? A. It was acquired into Cosmos Infrastructure, LLC, and Mawson

Infrastructure Group, Incorporated."). Indeed, the Mawson Entities testified that Luna only ever obtained a receivable for transferring the loan proceeds to Mawson and Cosmos for purchase of the Collateral and never owned, possessed, or otherwise held rights or title to the Collateral. Ex. G at 185:18-22 ("Q. How did it have the power to transfer collateral that it never owned? A. There is a subsequent movement of funds which would have a receivable, would allow it to transfer that collateral."); Ex. F at 90:21–91:9. Luna has no independent power to transfer the Collateral. Ex. G at 192:24–193:6 ("Q. Without the involvement of Mawson or Cosmos, what power did Luna have to transfer the asset Collateral under the Promissory Note in which it purported to grant Celsius a security interest? A. Without involving another party, it could not.").

55.     Although Celsius has requested for months that the Collateral be transferred to Luna in accordance with the Agreements, the Mawson Entities admitted that this has never happened. *Id.* at 193:21–194:2 ("Celsius has made a request to Luna to make sure that the asset Collateral is held by Luna, correct? A. Yes. Q. That hasn't happened, correct? A. That's correct."). As of the date of this Complaint, Celsius has received no representation or evidence that Luna owns, possesses, or otherwise holds valid right or title to any of the Collateral in which Celsius holds a security interest.

56.     When Celsius inquired as to why the Mawson Entities have not transferred the Collateral to Luna, the Mawson Entities represented that Mawson and Cosmos's debt obligations prohibited them from effectuating a transfer of collateral. Ex. F at 89:10–19 ("Q. So the reason that Mawson has not placed the asset collateral under the Promissory Note with Luna, the right Mawson entity, is because of the debt obligations of Cosmos and Mawson Infrastructure Group? MR. MARTOS: Object to form. Misstates prior testimony. A. When requested by Celsius, which was in July 2023, that is the reason. But no transfers were completed."); Ex. G at 183:5–15 ("Q.

… The question is, what's the relationship between the asset collateral, that is, Celsius' under the Promissory Note, and the debt obligations that you referenced yesterday at Mawson and Cosmos? MR. MARTOS: Object to form. A. Without speaking to any specific privileged conversation, it was to do with the movement of assets whilst potentially in a default situation."). In other words, the financial condition of Mawson and Cosmos prevented them from rectifying the flagrant breach of the Loan Documents.

57.    Celsius also inquired into the Mawson Entities' corporate structure and ability to satisfy judgments against them. That inquiry revealed that the Mawson Entities lack almost any distinct corporate functions. The Mawson Entities are operated by a single board of directors, which directs the activities of Mawson and all its subsidiaries, including Luna and Cosmos. Ex. F at 105:9–20 ("Q. Let's do it this way: Are the board members across the three Mawson entities the same? A. There is no board for the subsidiaries. Q. So there is only a board for Mawson Infrastructure Group? A. Correct. Q. And that board directs the activity of the subsidiaries through Mawson Infrastructure Group? A. It does."). The Mawson Entities also share the same executive team and accounting functions. *See id.* at 106:23–107:9. The Mawson Entities further admitted that neither Luna nor any of the Mawson Entities, separately or together, can pay a judgment for the $15 million owed in deposits. *Id.* at 82:20–25 ("Q. So none of the three Mawson entities, separately or together, today could satisfy a $15.3 million judgment, correct? MR. MARTOS: Object to form. Q. You can answer. A. That's correct."). The Mawson Entities also acknowledged that for unspecified periods between 2022 and present, Luna may have been—and may remain— an undercapitalized entity. *Id.* at 81:3–12 ("Q. Sure. Recognizing that you haven't independently done an analysis, do you have any understanding one way or the other as to whether Luna was undercapitalized at any point from 2022 to the present? MR. MARTOS: Same objections as before.

A. Pending during the analysis, there is potential that it was at times."). Upon information and belief, Luna remains an undercapitalized entity as of the date of the Complaint.

### COUNT I
### DECLARATORY JUDGMENT (28 U.S.C. §§ 2201, 2202)
(Against All Defendants)

58.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

59.    Celsius seeks a declaration of Celsius's right to immediate and full payment of the outstanding principal amount plus interest owed by the Mawson Entities to Celsius under the Loan Documents.

60.    A justiciable controversy exists between Celsius and the Mawson Entities as to whether the Mawson Entities are obligated to pay immediately the outstanding loan principal amount plus interest owed under the Loan Documents.

61.    The Promissory Note constitutes a valid, enforceable contract between Celsius and Luna.

62.    The Security Agreement constitutes a valid, enforceable contract between Celsius and the Mawson Entities.

63.    Pursuant to the Promissory Note, Celsius's $20 million loan to Luna matured on August 23, 2023, and any outstanding loan principal amount, plus any accrued but unpaid interest, became due and payable on that date.

64.    Pursuant to the Security Agreement, Mawson "irrevocably and unconditionally guarantee[d] to [Celsius] the due and punctual payment in full of all [Promissory] Note Obligations, when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise." Ex. D § 7.1.

65.    As of the date of this filing, approximately $8 million plus interest is due and payable under the Promissory Note and remains unpaid.

66.    Celsius is entitled to a judgment declaring the approximately $8 million plus interest immediately due and payable to Celsius by the Mawson Entities.

**COUNT II**
**TURNOVER OF PROPERTY OF THE ESTATE (11 U.S.C. § 542)**
(Against All Defendants)

67.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

68.    The Promissory Note constitutes a valid, enforceable contract between Celsius and Luna.

69.    The Security Agreement constitutes a valid, enforceable contract between Celsius and the Mawson Entities.

70.    Celsius is a debtor in chapter 11 proceedings in the Bankruptcy Court for the Southern District of New York.

71.    As a debtor in chapter 11 proceedings, Celsius has a right under section 542 of the Bankruptcy Code to demand turnover of "a debt that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b).

72.    Pursuant to the Promissory Note, Celsius's $20 million loan to Luna matured on August 23, 2023, and any outstanding loan principal amount, plus any accrued but unpaid interest, became due and payable on that date.

73.    Pursuant to the Security Agreement, Mawson "irrevocably and unconditionally guarantee[d] to [Celsius] the due and punctual payment in full of all [Promissory] Note Obligations, when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise." Ex. D § 7.1.

74.    As of the date of this filing, approximately $8 million plus interest is due and payable under the Promissory Note and remains unpaid.

75.    Pursuant to Section 542(b), Celsius is entitled to turnover of the entire unpaid principal amount, plus any accrued but unpaid interest, from the Mawson Entities.

**COUNT III**
**TURNOVER OF PROPERTY OF THE ESTATE (11 U.S.C. § 542)**
(Against All Defendants)

76.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

77.    The Co-Location Agreement and Revised Addendum A constitute valid, enforceable contracts between Celsius and Luna.

78.    Celsius is a debtor in chapter 11 proceedings in the Bankruptcy Court for the Southern District of New York.

79.    As a debtor in chapter 11 proceedings, Celsius has a right under section 542 of the Bankruptcy Code to demand turnover of "a debt that is property of the estate and that is matured, payable on demand, or payable on order." 11 U.S.C. § 542(b).

80.    Pursuant to the Co-Location Agreement and the Revised Addendum A, Celsius paid six deposits, totaling approximately $15.3 million, to Luna between March 2022 and July 2022 to "reserve[] both space in the Facility and an allocation of power for [Celsius's] expected power consumption." Ex. A § 3.1. Section 3.1 of the Co-Location Agreement further provided that should Celsius "fail[] to pay any amount to Luna Squares" under the Agreement, Luna could "apply the funds held as deposit against the outstanding amounts." *Id.* At the termination of the Agreement, Luna is obligated to return to Celsius any unused deposit amounts.

81.    Luna has refused to apply any of the $15.3 million to offset current outstanding invoice balances owed by Celsius. Therefore, the entire $15.3 million in advance deposits remains unused and returnable to Celsius.

82.    The Co-Location Agreement provides that the minimum term of the Agreement is specified in Addendum A. *Id.* § 2.1. Revised Addendum A provides that the initial term of the contract lasts until August 23, 2023. Ex. B. The parties did not negotiate an extension of the Co-Location Agreement. Therefore, the Agreement expired by its terms on August 23, 2023.

83.    When the Co-Location Agreement expired on August 23, 2023, Luna became obligated to return any unused advance deposits to Celsius. Therefore, the $15.3 million in unused advance deposits became due and payable on that date and remains unpaid.

84.    Pursuant to Section 542(b), Celsius is entitled to turnover of the entire $15.3 million in unused advanced deposits from Luna.

<u>**COUNT IV**</u>
<u>**BREACH OF CONTRACT**</u>
(Against All Defendants)

85.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

86.    The Co-Location Agreement and Revised Addendum A constitute valid, enforceable contracts between Celsius and Luna.

87.    Celsius has satisfied all relevant obligations under the Co-Location Agreement and Revised Addendum A.

88.    Pursuant to the Co-Location Agreement and the Revised Addendum A, Celsius paid six deposits, totaling approximately $15.3 million, to Luna between March 2022 and July 2022 to "reserve[] both space in the Facility and an allocation of power for [Celsius's] expected power consumption." Ex. A § 3.1. Section 3.1 of the Co-Location Agreement further provided that

26

should Celsius "fail[] to pay any amount to Luna Squares" under the Agreement, Luna could "apply the funds held as deposit against the outstanding amounts." *Id.* At the termination of the Agreement, Luna is obligated to return to Celsius any unused deposit amounts.

89.    Under the terms of the Co-Location Agreement, Celsius requested in July 2023 that Luna use Celsius's prepaid deposits to offset amounts due in its July 2023 invoice from Luna. Luna refused to apply the prepaid deposits to satisfy the July invoice and instead asserted that Celsius had forfeited the entirety of its deposit amounts by allegedly failing to deliver all mining rigs in accordance with the parties' deployment schedule.

90.    Luna's unwarranted seizure of Celsius's entire $15.3 million in deposits and refusal to apply such funds to offset amounts owed by Celsius under the July invoice constitute breaches of Luna's obligations under the Co-Location Agreement.

91.    Luna's breaches of the Co-Location Agreement have injured Celsius, and Celsius is entitled to the return of its entire $15.3 million in deposits, as well as payment of any additional damages, in an amount to be proved at trial, resulting from the breaches.

### COUNT V
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against All Defendants)

92.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

93.    The Co-Location Agreement constitutes a valid, enforceable contract between Celsius and Luna.

94.    Celsius has satisfied all relevant obligations under the Co-Location Agreement and Revised Addendum A.

95.    Pursuant to the Co-Location Agreement, Luna is entitled to "apply the funds held as deposit against the outstanding amounts" that Celsius owes under the Agreement. Ex. A § 3.1.

96.     Luna has a duty to act fairly and in good faith with respect to the Co-Location Agreement and is obligated not to do anything that would have the effect of interfering with or injuring Celsius's rights to receive the benefits of the Co-Location Agreement, including with respect to Celsius's ability to offset amounts owed under the Agreement by amounts previously paid as deposits. As a party to the Co-Location Agreement, Luna is aware that it is entitled to apply amounts previously paid as deposits by Celsius to satisfy any outstanding obligations owed by Celsius under the Agreement. Nevertheless, Luna has refused to do so, instead asserting that such deposits have been entirely forfeited by Celsius and cannot be applied to satisfy the current invoice.

97.     Luna has breached the implied covenant of good faith and fair dealing by engaging in a course of conduct designed to deprive Celsius of its rights and benefits under the Co-Location Agreement, including by denying Celsius the right to apply funds previously paid as deposits to satisfy current amounts owed to Luna under the Agreement.

98.     As a direct and proximate result of Luna's breach of the implied covenant of good faith and fair dealing under the Co-Location Agreement, Celsius has suffered harm and is entitled to the return of its $15.3 million in paid deposits, as well as payment of any additional damages, in an amount to be proved at trial.

## COUNT VI
## BREACH OF CONTRACT
### (Against All Defendants)

99.     Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

100.     The Promissory Note constitutes a valid, enforceable contract between Celsius and Luna.

101.     The Security Agreement constitutes a valid, enforceable contact between Celsius and the Mawson Entities.

102.    Celsius has satisfied all relevant obligations under the Promissory Note and Security Agreement.

103.    Pursuant to the Security Agreement, in exchange for the proceeds of the Promissory Note, Luna granted Celsius the former's "right in, title and interest to and under," the Collateral. Ex. D § 2.1(a).

104.    Furthermore, under the Security Agreement, Luna represented and warranted that it had "good and valid rights in or the power to transfer the Collateral and title to the Collateral." *Id.* § 3.1.

105.    Finally, Luna covenanted that it would not "sell, lease, or otherwise dispose of the Collateral," except as authorized under the Promissory Note. *Id.* § 4.1(d).

106.    Moreover, pursuant to the Promissory Note, Luna agreed to maintain good and unencumbered title to the Collateral and to not "create, grant, incur or suffer to exist any Lien on any Collateral, other than the Liens securing the Note Obligations and Permitted Liens." Ex. C § (xiii).

107.    Luna breached the Security Agreement and the Promissory Note. Luna never acquired any right, title, or ownership interest in the Collateral purchased with the Promissory Note proceeds, nor did it acquire any good or valid rights in the Collateral or the ability to transfer such Collateral to others.

108.    Luna's failure to acquire good or valid rights in the Collateral, or the power to transfer such Collateral, constitutes a breach of the representations and warranties in Section 3.1 of the Security Agreement, as well as the negative covenants in Section 4.1. Luna's failure also constitutes a breach of the negative covenants in Section (xiii) of the Promissory Note.

109.     Luna's breaches of the Loan Documents have injured Celsius's business, resulting in damages in an amount to be proved at trial.

## COUNT VII
## ACTUAL FRAUDULENT TRANSFER (N.Y. DEBT. & CRED. LAW §§ 273, 276)
(Against All Defendants)

110.     Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

111.     Celsius is a creditor of Luna within the meaning of Section 270 of New York's Debtor and Creditor Law that holds a claim against Luna.

112.     Luna is a debtor within the meaning of Section 270 of New York's Debtor and Creditor Law that is liable on a claim to Celsius.

113.     Through the direct transfer of funds from the Promissory Note to Mawson or Cosmos, improper titling of the Collateral, or some other mechanism, Luna transferred the proceeds of the Promissory Note to Mawson or Cosmos, or arranged for the Collateral to be owned, possessed, and titled by Mawson and Cosmos, with the actual intent to hinder, delay, or defraud Celsius.

114.     The transfers of funds or assets from Luna to Mawson or Cosmos are therefore voidable transfers under Sections 273(a)(1) and 276 of New York's Debtor and Creditor Law.

## COUNT VIII
## CONSTRUCTIVE FRAUDULENT TRANSFER (N.Y. DEBT. & CRED. LAW §§ 273, 276)
(Against All Defendants)

115.     Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

116.     Celsius is a creditor of Luna within the meaning of Section 270 of New York's Debtor and Creditor Law that holds a claim against Luna.

117.    Luna is a debtor within the meaning of Section 270 of New York's Debtor and Creditor Law that is liable on a claim to Celsius.

118.    Through the direct transfer of funds from the Promissory Note to Mawson and Cosmos, improper titling of the Collateral, or some other mechanism, Luna transferred the proceeds of the Promissory Note to Mawson and Cosmos or arranged for the Collateral to be owned, possessed, and titled by Mawson and Cosmos.

119.    Luna never acquired any right, title, or ownership interest in the Collateral purchased with those proceeds, nor did it receive any other payment or assets from Mawson and Cosmos in exchange for the transfer of the funds or assets. Luna therefore received no value in exchange for these transfers to Mawson and Cosmos.

120.    Upon information and belief, Luna was insolvent at the time it transferred the Promissory Note proceeds or the assets from those proceeds to Mawson and Cosmos, or became insolvent as a result of such transfers. Furthermore, under New York law, Luna's transfer of funds or assets without receiving fair consideration in return creates a presumption of insolvency.

121.    The transfer of funds or property from Luna to Mawson and Cosmos are therefore voidable transfers under Sections 273(a)(2) and 276 of New York's Debtor and Creditor Law.

## COUNT IX
## BREACH OF CONTRACT
(Against All Defendants)

122.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

123.    The Co-Location Agreement and Revised Addendum A constitute valid, enforceable contracts between Celsius and Luna.

124.    Celsius has satisfied all relevant obligations under the Co-Location Agreement and Revised Addendum A.

125.    The Co-Location Agreement and Revised Addendum A provided a deployment schedule establishing Luna's required monthly deployment targets for Celsius mining rigs. *See* Ex. A, Add. A; Ex. B. Under Section 1.1 of the Co-Location Agreement, Luna was required to provide the Services and deploy Celsius's mining rigs in accordance with that deployment schedule. Ex. A § 1.1.

126.    Luna failed to provide the Services and deploy Celsius's mining rigs in accordance with the deployment schedule set out in Addendum A and Revised Addendum A.

127.    Luna's failure to provide the Services and deploy Celsius's mining rigs in accordance with the deployment schedule set out in Addendum A and Revised Addendum A constitutes breaches of the Co-Location Agreement and Revised Addendum A.

128.    Luna's breaches of the Co-Location Agreement and Revised Addendum A have injured Celsius's business, including through lost profits from the inability to operate its mining rigs, resulting in damages in an amount to be proved at trial.

**COUNT X**
**COMMON LAW FRAUD**
(Against All Defendants)

129.    Celsius re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

130.    On or about February 23, 2022, Celsius loaned Luna $20 million for the purposes of assisting Luna in the buildout of certain facilities and infrastructure needed to meet its obligations under the Co-Location Agreement.

131.    In exchange for that loan, Luna provided Celsius a Promissory Note for the loan amount as well as interest. Pursuant to the Security Agreement, Luna further granted Celsius a security interest in Luna's right, title, and interest to the Collateral purchased with the proceeds of the Promissory Note.

132.    In accordance with the contracts and Luna's representations, Celsius issued the $20 million loan to Luna with the understanding the Luna would use the proceeds of the loan to purchase the Collateral in which Celsius was granted a security interest.

133.    On or about February 24, 2022, following the execution of the Promissory Note and Security Agreement, Celsius sought assurances from the Mawson Entities that the payments for the Collateral acquired with the proceeds from the Promissory Note would come from the bank account into which Celsius had transferred the loan proceeds. Celsius advised that payment from the same account that it had funded was important to ensure proper perfection of its security interests in the Collateral granted by the Security Agreement.

134.    On or about February 24, 2022, Mawson's CEO, James Manning, acting on behalf of Mawson, Luna, and Cosmos, made material misrepresentations to Celsius regarding Luna's acquisition of the Collateral and Celsius's perfection of its security interests. Specifically, Manning responded to Celsius's requests by assuring Celsius that payments for Collateral would originate from Luna's account. Manning further advised that certain Collateral would be acquired via internal, inter-entity invoices for existing collateral owned by Cosmos. Manning assured Celsius those inter-entity invoices would include the required detail to properly perfect Celsius's security interests in the Collateral.

135.    Manning's representations to Celsius were false. In reality, Luna did not acquire the Collateral through the account into which the loan proceeds were deposited. Indeed, Luna did not acquire the Collateral at all. Rather, upon Celsius's transfer of the loan proceeds, Luna further transferred the proceeds to Mawson and Cosmos for purchase of the Collateral. Luna never directly purchased or acquired the Collateral with the proceeds of the Promissory Note, nor did it ever acquire any right, title, or ownership interest in the Collateral.

33

136.    Moreover, contrary to Manning's representations, the Mawson Entities never created any inter-entity invoices representing the transfer of any Collateral from any Mawson Entity to Luna.

137.    Manning made these misrepresentations with consciousness of or reckless disregard for their falsity. Manning knew at the time of his misrepresentations that the Collateral would be purchased pursuant to existing orders between suppliers and Mawson entities other than Luna. Indeed, Manning represented to Celsius on or about February 24, 2022, that the proceeds of the Promissory Note would be used against existing orders. As CEO of Mawson, Manning also knew that payments for existing orders would need to come from the entity that had the relationship with the supplier, rather than a third-party, such as Luna. Manning therefore knew, at the time he represented to Celsius that payments for Collateral would originate from the Luna account into which Celsius had deposited funds, that such Collateral would in fact be purchased by—and acquired for—entities other than Luna and that payments for that Collateral would originate from those entities' accounts, not Luna's account. Manning therefore acted with scienter in making these false representations to Celsius.

138.    As CEO of Mawson, Manning also had familiarity with the Mawson Entities' intercompany business practices and therefore knew that they would not create inter-entity invoices memorializing the transfer of Collateral from other Mawson entities to Luna. Manning therefore made knowingly false representations to Celsius that such intercompany invoices would be created.

139.    Alternatively, Manning's scienter can be inferred from his motive and opportunity to defraud Celsius. Manning knew that his representations regarding the acquisition and transfer of Collateral would lead Celsius to believe its security interests would be properly perfected,

thereby inducing Celsius to loan Luna $20 million. Manning also knew that without such assurances, Celsius was unlikely to complete the transfer of the funds. At the time of the misrepresentations, the Mawson Entities were experiencing financial difficulty and needed funds to ensure they could meet their obligations, including Luna's obligations under the Co-Location Agreement. Manning, as CEO of Mawson, had the motive and opportunity to engage in fraudulent conduct that resulted in an immediate cash infusion for his struggling business.

140.    Celsius relied on these misrepresentations to its detriment. Specifically, in transferring the $20 million loan to Luna, Celsius relied on representations that the Collateral would be purchased by the Luna account into which it deposited funds and that inter-entity invoices would detail the transfer and proper titling of Collateral at the Luna entity. These representations formed the basis for Celsius's belief that it could achieve proper perfection of its security interests in the Collateral. Without these representations, Celsius would not have transferred the loan amount to Luna.

141.    As a direct and proximate cause of Manning's misrepresentations, Celsius has been injured in its business and property. Among other things, Manning's misrepresentations induced Celsius to issue a $20 million loan to Luna, believing that its security interests granted pursuant to the Security Agreement would be properly perfected.

## **RELIEF OR REMEDY SOUGHT**

142.    Celsius seeks an order:

a.    Declaring the outstanding loan principal amount under the Promissory Note, plus any accrued but unpaid interest, matured and immediately due and payable by the Mawson Entities to Celsius;

b.  Disregarding the separate corporate forms of Defendants Mawson and Cosmos and declaring Mawson and Cosmos to be alter egos of Luna that are jointly and severally liable for all damages alleged herein;

c.  Requiring the turnover to Celsius of the outstanding loan principal amount, plus any accrued but unpaid interest, that has matured under the Promissory Note;

d.  Requiring the turnover to Celsius of any unused deposit amounts paid to Luna under the Co-Location Agreement;

e.  Awarding damages for breach of the Promissory Note and Security Agreement in an amount to be provide at trial;

f.  Avoiding the transfers made to the Mawson Entities under the Promissory Note and awarding recovery to Celsius in the amount of the transfers;

g.  Awarding damages for breach of the Co-Location Agreements in an amount to be proved at trial;

h.  Awarding damages for the Mawson Entities' fraudulent misrepresentations in an amount to be proved at trial;

i.  Awarding costs, including but not limited to reasonable attorneys' fees, to the extent appropriate;

j.  Awarding prejudgment and postjudgment interest; and

k.  Granting such other and further relief that the Court deems just and equitable.

Washington, D.C.
Dated: November 21, 2023

/s/ T.J. McCarrick

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Judson Brown, P.C. (admitted *pro hac vice*)
T.J. McCarrick (admitted *pro hac vice*)
Grace C. Brier (admitted *pro hac vice*)
1301 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone:    (202) 389-5000
Facsimile:    (202) 389-5200
Email:        judson.brown@kirkland.com
              tj.mccarrick@kirkland.com
              grace.brier@kirkland.com

- and -

Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*