# EXHIBIT D

# GUARANTY AND SECURITY AGREEMENT

This Guarantee and Security Agreement (as it may be amended, restated, supplemented or modified from time to time, this "Agreement") is entered into as of February 23, 2022, by and among Celsius Mining LLC, a Delaware limited liability company (the "Holder"), Mawson Infrastructure Group Inc., a Delaware corporation ("Maker Parent"), Luna Squares LLC, a Delaware limited liability company ("Maker") and Cosmos Infrastructure LLC, a Delaware limited liability company ("Cosmos" and, together with Maker, the "Grantors" and each a "Grantor").

## PRELIMINARY STATEMENT

Reference is hereby made to that certain Secured Promissory Note, dated as of the date hereof (as amended, restated, supplemented, waived or otherwise modified from time to time, the "Secured Note"), by and among the Maker and Holder. Holder has agreed to extend credit to the Maker on the terms and subject to the conditions set forth in the Secured Note, and the obligation of Holder to extend such credit is conditioned upon, among other things, the execution and delivery of this Agreement by Grantors. Accordingly, the parties hereto agree as follows:

## ARTICLE I

### Definitions

1.1    Terms Defined in the Secured Note.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Secured Note.

1.2    Terms Defined in the UCC.  Terms defined in the UCC (as defined below) used herein and not otherwise defined in the Term Loan Agreement or in this Agreement shall have the meanings assigned to such terms in the UCC.

1.3    Definitions of Certain Terms Used Herein.  As used in this Agreement, in addition to the terms defined in the preamble hereto and the Preliminary Statement, the following terms shall have the following meanings:

"Article" means a numbered article of this Agreement, unless another document is specifically referenced.

"Collateral" shall have the meaning set forth in Article II.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Exhibit" refers to a specific exhibit to this Agreement, unless another document is specifically referenced.

"Grantor" shall have the meaning set forth in the preamble hereto.

"Guaranteed Obligations" shall have the meaning set forth in Section 7.1.

"Maker" shall have the meaning set forth in the preamble hereto.

"Maker Parent" shall have the meaning set forth in the preamble hereto.

"Miners" shall mean the Temporary Collateral Miners and the Permanent Collateral Miners, collectively.

"Permanent Collateral Miners" shall mean the miners set out in Exhibit B-2.

"Permitted Lien" shall mean any Liens: (i) for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being contested in good faith, provided provision is made to the reasonable satisfaction of Holder for the eventual payment thereof if subsequently found payable; and (ii) Liens in favor of Holder.

"Section" means a numbered section of this Agreement, unless another document is specifically referenced.

"Secured Note" has the meaning set forth in the Preliminary Statement hereto.

"Security Interest" shall have the meaning set forth in Article II.

"Temporary Collateral Miners" shall mean the miners set out in Exhibit B-1.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

The foregoing definitions shall be equally applicable to both the singular and plural forms of the defined terms.

1.4    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.5    Timing of Payment of Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day.

1.6    Certifications.  All certifications to be made hereunder by an officer or representative of any Grantor shall be made by such Person in his or her capacity solely as an officer or a representative of such Grantor, on such Grantor's behalf, and not in such Person's individual capacity.

**ARTICLE II**

Grant of Security Interest

2.1    Grant of Security Interest.  As security for the prompt and complete payment or performance when due by each of Maker and Maker Parent of all of its present and future Note Obligations:

(a)     Maker hereby pledges, collaterally assigns and grants to Holder, and its successors and assigns, a continuing security interest (the "Maker Security Interest") in all of such Grantor's right in, title and interest to and under, (i) all of the personal property, Equipment, and Fixtures purchased with the proceeds of the Secured Note, and (ii) to the extent not included in (i), 50 modular data centers and 50 transformers located at the Pennsylvania Facility or the Sharon Facility for the purposes of hosting Bitcoin miners, including those owned by Holder., in each case whether now owned by or owing to, or hereafter acquired by or arising in favor of, Maker (including under any trade name or derivations thereof), and regardless of where located and, to the extent not otherwise included, all accessions to, substitutions for, replacements of, renewals of, proceeds, insurance proceeds, condemnation proceeds and products of the foregoing, together with all books and records, and other materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing  (all of which will be collectively referred to as the "Maker Collateral"); and

(b)     Cosmos hereby pledges, collaterally assigns and grants to Holder, and its successors and assigns, a continuing security interest (the "Miners Security Interest" and, together with the Maker Security Interest, the "Security Interest") in all of Cosmos' right in, title and interest to and under, the Miners, whether now owned by or owing to, or hereafter acquired by or arising in favor of, Cosmos (including under any trade name or derivations thereof), and regardless of where located and, to the extent not otherwise included, all accessions to, substitutions for, replacements of, renewals of, proceeds, insurance proceeds, condemnation proceeds and products of the foregoing, together with all books and records, and other materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing (all of which will be collectively referred to as the "Miner Collateral" and, together with the Maker Collateral, the "Collateral").

## ARTICLE III

### Representations and Warranties

Each Grantor, jointly and severally, represents and warrants to Holder:

3.1     <u>Title, Perfection and Priority.</u>  Such Grantor has good and valid rights in or the power to transfer the Collateral and title to the Collateral with respect to which it has purported to grant a security interest hereunder, free and clear of all Liens, and has full organizational power and authority to grant to Holder the Security Interest in such Collateral pursuant hereto.  When financing statements have been filed in the appropriate offices against such Grantor in the locations listed on Exhibit A-2, and all filing and recordation fees associated therewith have been paid, Holder will have a fully perfected first priority security interest in that Collateral of the Grantor in which a security interest may be perfected by such filings.

3.2     <u>Type and Jurisdiction of Organization, Organizational and Identification Numbers.</u> The type of entity of such Grantor, its state of organization, the organizational identification number issued to such Grantor by its state of organization and its federal employer identification number as of the date hereof are set forth on Exhibit A-1.

3.3     <u>Principal Location.</u>  Such Grantor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business) as of the date hereof is set forth on Exhibit A-1.

3.4    Collateral Locations.    All of such Grantor's locations where Equipment or Inventory or other Collateral is held or stored  as of the date hereof are set forth on Exhibit A-2 (excluding Inventory and Equipment in transit, Equipment out for repair or refurbishment, Inventory and Equipment maintained at a customer location and Inventory and Equipment in the possession of employees or subsidiaries in the ordinary course of business).  All of said locations are leased by the Grantor as lessee or sublessee.

3.5    Exact Names.  Such Grantor's name in which it has executed this Agreement is the exact name as it appears in such Grantor's organizational documents, as amended, as filed with the Office of the Secretary of State (or similar department or agency) of such Grantor's jurisdiction of organization.  Except as set forth on Exhibit A-3, as of the date hereof, such Grantor has not, during the past five years, been known by or used any other legal name, and currently is not known by or does not use any other corporate or fictitious name.

3.6    No Financing Statements; Security Agreements.    No financing statement or security agreement describing all or any portion of the Collateral which has not lapsed or been terminated naming such Grantor as debtor has been filed or is of record in any jurisdiction except (a) for financing statements or security agreements naming Holder as the secured party; or (b) as to which a duly authorized termination statement relating to such financing statement or other instrument has been delivered to Holder on the date hereof.

**ARTICLE IV**

Covenants

From the date of this Agreement, and thereafter until this Agreement is terminated in accordance with Section 8.12, each Grantor agrees that:

4.1    General.  (a) Collateral Records.  Such Grantor will maintain complete and accurate books and records with respect to the Collateral owned by it.

(b)    Authorization to File Financing Statements; Ratification.  Such Grantor hereby irrevocably authorizes Holder or its representatives to file at any time and from time to time, and if requested will promptly deliver to Holder, all financing statements and amendments thereto and other documents and take such other actions as may from time to time be requested Holder in order to maintain a perfected, first priority security interest in the Collateral owned by such Grantor. Any financing statement filed by Holder may be filed in any filing office in any applicable UCC jurisdiction and may (i) indicate such Grantor's Collateral by any description which reasonably describes the Collateral, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and any organization identification number issued to such Grantor, and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  Such Grantor also agrees to furnish any such information to Holder promptly upon its reasonable request therefor.  Such Grantor also ratifies its authorization for Holder or its representatives to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)    Further Assurances.  Such Grantor will, promptly following Holder's reasonable request, furnish to Holder, as often as Holder reasonably requests, statements and schedules further identifying and describing the Collateral owned by it and such other reports and

4

information in connection with such Grantor's Collateral as Holder may reasonably request, all in such detail as Holder may specify. Such Grantor also agrees to take any and all actions reasonably necessary to defend title to the Collateral against all Persons and to defend the Security Interest of Holder in its Collateral and the priority thereof against any Lien (other than Permitted Liens).

(d)     Disposition of Collateral. Such Grantor will not sell, lease or otherwise dispose of the Collateral owned by it except for dispositions permitted pursuant to Section 5(c) of the Secured Note and subject to compliance with Section 2(b) of the Secured Note.

(e)     Liens. Such Grantor will not create, incur, or suffer to exist any Lien on the Collateral owned by it except the Security Interest created by this Agreement and other Permitted Liens.

(f)     Other Financing Statements. Such Grantor will not authorize the filing of any financing statement naming such Grantor as debtor covering all or any portion of the Collateral owned by it. Such Grantor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of Holder, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

(g)     Locations. Such Grantor will not maintain any Equipment, Inventory or other Collateral at any location other than those locations listed on Exhibit A-2 or otherwise disclosed to Holder in accordance with Section 4.4.

4.2     No Interference. Such Grantor agrees that it will not interfere with any right, power and remedy of Holder provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Holder of any one or more of such rights, powers or remedies.

4.3     Insurance.

(a)     Such Grantor shall, at its own expense, maintain or cause to be maintained insurance on the Collateral consistent with similarly situated Persons in the same industry of established reputation and of such types and in such amounts, and with such coverages and deductibles as are customary for companies similarly situated. Such insurance shall (w) provide for not less than 30 days' prior notice to Holder of termination, lapse or cancellation thereof, (x) name Holder on the policy, (y) if reasonably requested by Holder, request the insurer include a breach of warranty clause and (z) [Reserved].

(b)     Each Grantor irrevocably makes, constitutes and appoints Holder (and its designees) as such Grantor's true and lawful agent (and attorney-in-fact) for the purpose, upon the occurrence and during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto.

(c)     In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required pursuant to Section 4.3(a), or to pay any premium in whole or part relating thereto, Holder may, without waiving or releasing any obligation or liability of any Grantor hereunder or any Event of Default, in its sole discretion, obtain and maintain

DocuSign Envelope ID: CDS42402-F3A6-4500-987A-7C16A998F5A

such policies of insurance and pay such premium and take any other actions with respect thereto as Holder deems advisable. All sums disbursed by Holder connection with this paragraph, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable upon demand by Grantors to Holder and shall be additional Note Obligations secured hereby.

4.4    Change of Name or Location; Change of Fiscal Year. Each Grantor shall provide Holder with no less than ten (10) Business Day's prior written notice if such Grantor changes its (i) chief executive office, principal place of business, mailing address, or corporate offices; provided that any such location shall be in the United States, (ii) warehouses or other locations at which Equipment, Inventory or other Collateral is held or stored; provided that any such location shall be in the continental United States, (iii) name as it appears in official filings in the state of its incorporation or organization, (iv) the type of entity that it is, (v) its organization identification number, if any, issued by its state of incorporation or other organization, or (vi) its state of incorporation or organization.

## ARTICLE V

## Events of Default and Remedies

5.1    Remedies. (a) Upon the occurrence and during the continuance of an Event of Default, Holder may, subject to the terms, conditions and provisions of the Secured Note, exercise any or all of the following rights and remedies:

(A)    those rights and remedies provided in this Agreement and the Secured Note; provided that this Section 5.1(a) shall not be understood to limit any rights or remedies available to Holder prior to an Event of Default;

(B)    those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable law when a debtor is in default under a security agreement;

(C)    without notice, demand of performance or other demand or advertisement of any kind to any Grantor or any other Person, peaceably enter the premises of any Grantor where any Collateral is located (through self-help and without judicial process) to collect, receive, assemble, process, appropriate, sell, lease, assign, grant an option or options to purchase or otherwise dispose of, deliver, or realize upon, the Collateral or any part thereof in one or more parcels at a public or private sale or sales (which sales may be adjourned or continued from time to time with or without notice and may take place at any Grantor's premises or elsewhere), for cash, on credit or for future delivery without assumption of any credit risk, and upon such other terms as Holder may deem commercially reasonable, but always subject to applicable laws including workplace health and safety laws; and

(b)    Holder may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

(c)    Holder shall have the right upon any such public sale or sales and, to the extent permitted by applicable law, upon any such private sale or sales, to purchase, the whole or

any part of the Collateral so sold, free of any right of equity redemption, which right of equity redemption each Grantor hereby expressly releases.

(d)    Holder is able to effect a sale, lease, or other disposition of Collateral, Holder shall have the right to hold or use Collateral, or any part thereof, to the extent that it deems appropriate for the purpose of preserving Collateral or its value or for any other purpose deemed appropriate by Holder. Holder may, if it so elects, seek the appointment of a receiver or keeper to take possession of Collateral and to enforce any of Holder's remedies, without prior notice or hearing with respect to such appointment.

(e)    Notwithstanding the foregoing, except as required by applicable law, Holder shall not be required to (i) make any demand upon, or pursue or exhaust any of their rights or remedies against, any Grantor, any other obligor, guarantor, pledgor or any other Person with respect to the payment of the Note Obligations or to pursue or exhaust any of their rights or remedies with respect to any Collateral therefor or any direct or indirect guarantee thereof, (ii) marshal the Collateral or any guarantee of the Note Obligations or resort to the Collateral or any such guarantee in any particular order, or (iii) effect a public sale of any Collateral.

5.2    <u>Grantors' Obligations Upon Default.</u>    Upon the request of Holder after the occurrence and during the continuance of an Event of Default, each Grantor shall:

(i)    assemble and make available to Holder the tangible Collateral and all books and records relating thereto at any place or places specified by Holder, whether at a Grantor's premises or elsewhere; and

(ii)    permit Holder, by Holder's representatives and agents, to enter, occupy and use any premises where all or any part of the Collateral, or the books and records relating thereto, or both, are located, to take possession of all or any part of the Collateral or the books and records relating thereto, or both, to remove all or any part of the Collateral or the books and records relating thereto, or both, and to conduct sales of the Collateral, without any obligation to pay any Grantor for such use and occupancy, but always subject to applicable laws including workplace health and safety laws.

5.3    <u>Waivers.</u>  Each Grantor hereby waives any and all rights that it may otherwise have (whether any such right is contractual or exists pursuant to the articles of incorporation or bylaws of any relevant entity or under applicable law) that would interfere with this Agreement or the exercise by Holder of any rights or remedies granted to it pursuant to this Agreement.

**ARTICLE VI**

<u>Attorney-In-Fact</u>

6.1    <u>Authorization for Holder to Take Certain Actions.</u>  (a) Each Grantor irrevocably authorizes Holder any time and from time to time in the sole discretion of Holder, and appoints Holder as its attorney-in-fact, subject to clause (b) of this <u>Section 6.1</u>, (i) to execute on behalf of such Grantor as debtor and to file financing statements necessary or desirable in Holder's sole discretion to perfect and to maintain the perfection and priority of Holder's Security Interest in the Collateral, (ii) to endorse and collect any cash proceeds of the Collateral, (iii) to file a carbon, photographic or other reproduction of this Agreement or any financing statement with respect to the Collateral as a financing statement and to file any other financing statement or amendment of a financing statement (which does not add new collateral or add a debtor) in such offices as Holder

in its sole discretion deems necessary or desirable to perfect) and to maintain the perfection and priority of Holder's Security Interest in the Collateral, (iv) to apply the proceeds of any Collateral received by Holder to the Note Obligations, (v) upon five (5) Business Days' prior notice, to discharge past due taxes, assessments, charges, fees or Liens on the Collateral, and (vi) to do all other acts and things necessary to carry out this Agreement; and such Grantor agrees to reimburse Holder promptly following written demand (including documentation reasonably supporting such request) for any reasonable payment made or any reasonable out-of-pocket expense incurred by Holder in connection with any of the foregoing; provided that, this authorization shall not relieve such Grantor of any of its obligations under this Agreement or under the Secured Note.

(b)    All acts of said attorney or designee are hereby ratified and approved.  The powers conferred on Holder under this Section 6.1 are solely to protect Holder's interests in the Collateral and shall not impose any duty upon Holder to exercise any such powers. Holder will use commercially reasonable efforts to provide notice to the Grantor (which need not be prior notice) of any exercise of this power of attorney in this clause 6.1; provided that any failure to give such notice to the Grantor will not in any circumstances invalidate any exercise of the power of attorney.

6.2    Nature of Appointment; Limitation of Duty.  THE APPOINTMENT OF HOLDER AS ATTORNEY-IN-FACT IN THIS ARTICLE VI IS COUPLED WITH AN INTEREST AND SHALL BE IRREVOCABLE UNTIL THE DATE ON WHICH THIS AGREEMENT IS TERMINATED IN ACCORDANCE WITH SECTION 8.12.    NOTWITHSTANDING ANYTHING CONTAINED HEREIN, NEITHER HOLDER NOR ANY OF ITS AFFILIATES SHALL HAVE ANY DUTY TO EXERCISE ANY RIGHT OR POWER GRANTED HEREUNDER OR OTHERWISE OR TO PRESERVE THE SAME AND SHALL NOT BE LIABLE FOR ANY FAILURE TO DO SO OR FOR ANY DELAY IN DOING SO, EXCEPT IN RESPECT OF DAMAGES ATTRIBUTABLE TO THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS FINALLY DETERMINED BY A COURT OF COMPETENT JURISDICTION; PROVIDED THAT, IN NO EVENT SHALL THEY BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, OR IN CONNECTION WITH, OR AS A RESULT OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER HOLDER HAS BEEN ADVISED OF THE LIKELIHOOD OF SUCH LOSS OR DAMAGE AND REGARDLESS OF THE FORM OF ACTION.

**ARTICLE VII**

Guaranty

7.1    Guaranty of the Note Obligations.  Maker Parent hereby irrevocably and unconditionally guarantees to Holder the due and punctual payment in full of all Note Obligations, when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any equivalent provision in any applicable jurisdiction) (collectively, the "Guaranteed Obligations"). Maker Parent and Holder hereby confirms that it is the intention of all such Persons that this Guaranty and the Note Obligations of Maker Parent under this ARTICLE VII not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal, state or provincial law to the extent applicable to this Guaranty and the Note Obligations of Maker Parent.  Maker Parent further agrees that its guarantee hereunder constitutes a guarantee of payment when due (whether at the stated

maturity, by acceleration or otherwise) and not of collection, and waives any right to require that any resort be had by Holder to any security held for the payment of the Note Obligation.

7.2     <u>Payment by Maker Parent</u>.

(a)     Maker Parent Agrees, in furtherance of the foregoing and not in limitation of any other right which Holder may have at law or in equity against Maker Parent by virtue hereof, that upon the failure of Maker to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any equivalent provision in any applicable jurisdiction), Maker Parent will upon demand pay, or cause to be paid, in cash, to Holder an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for the Maker's becoming the subject of a case under the Bankruptcy Code or other similar legislation in any jurisdiction, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against the Maker for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Holder as aforesaid.

7.3     <u>Liability of Maker Parent Absolute</u>.   Maker Parent agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations.  In furtherance of the foregoing and without limiting the generality thereof, Maker Parent agrees as follows:

(a)     this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of Maker Parent and not merely a contract of surety;

(b)     Holder may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Maker and Holder with respect to the existence of such Event of Default;

(c)     the obligations of Maker Parent hereunder are independent of the obligations of Maker and the obligations of any other guarantor of the obligations of Maker, and a separate action or actions may be brought and prosecuted against Maker Parent whether or not any action is brought against Maker or any of such other guarantors and whether or not Maker is joined in any such action or actions;

(d)     payment by Maker Parent of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge Maker Parent's liability for any portion of the Guaranteed Obligations which has not been paid.  Without limiting the generality of the foregoing, if Holder is awarded a judgment in any suit brought to enforce Maker Parent's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release Maker Parent from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit;

(e)     Holder, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of Maker Parent's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or

discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of Holder in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Holder may have against any such security, in each case as Holder in its discretion may determine consistent herewith, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Maker Parent against Maker or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Note Documents; and

(f)    this Guaranty and the obligations of Maker Parent hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not Maker Parent shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Note Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Note Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Note Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Note Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though Holder might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) Holder's consent to the change, reorganization or termination of the corporate structure or existence of Maker or any of its subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Maker may allege or assert against Holder in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of Maker Parent as a guarantor in respect of the Guaranteed Obligations.

7.4    Waivers by Maker Parent. Maker Parent hereby waives, for the benefit of Holder: (a) any right to require Holder, as a condition of payment or performance by Maker Parent, to

(i) proceed against Maker, any other guarantor of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Maker, any such other guarantor or any other Person, or (iii) pursue any other remedy in the power of Holder whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Maker, including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Maker from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon Holder's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of Maker Parent's obligations hereunder, (ii) the benefit of any statute of limitations affecting Maker Parent's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that Holder protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Maker and notices of any of the matters referred to in <u>Section 7.3</u> and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof other than Payment in Full.

7.5    <u>Maker Parent's Rights of Subrogation, Contribution, etc</u>.  Until the Guaranteed Obligations shall have been indefeasibly paid in full, Maker Parent hereby waives any claim, right or remedy, direct or indirect, that it now has or may hereafter have against Maker or any of its assets in connection with this Guaranty or the performance by Maker Parent of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that Maker Parent now has or may hereafter have against Maker with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that Holder now has or may hereafter have against Maker, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Holder. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full, Maker Parent shall withhold exercise of any right of contribution it may have against any other guarantor of the Guaranteed Obligations. Maker Parent further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification Maker Parent may have against Maker or against any collateral or security, and any rights of contribution Maker Parent may have against any such other guarantor, shall be junior and subordinate to any rights Holder may have against Maker, to all right, title and interest Holder may have in any such collateral or security, and to any right Holder may have against such other guarantor.  If any amount shall be paid to Maker Parent on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Holder and shall promptly be paid over to Holder to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

7.6    <u>Subordination of Other Obligations</u>.  Any indebtedness now or hereafter held by Maker or Maker Parent (the "<u>Obligee Guarantor</u>") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Holder and shall forthwith be paid over to Holder to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

7.7    <u>Continuing Guaranty</u>.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Maker Parent hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

7.8    <u>Authority of Maker or Maker Parent</u>.  It is not necessary for Holder to inquire into the capacity or powers of Maker or Maker Parent or any officers, directors or any agents acting or purporting to act on behalf of any of them.

7.9    <u>Financial Condition of Maker</u>.  Any advances under the Secured Note may be made to Maker or continued from time to time, without notice to or authorization from Maker Parent regardless of the financial or other condition of Maker at the time of any such grant or continuation.  Holder shall not have any obligation to disclose or discuss with Maker Parent its assessment of the financial condition of Maker.  Maker Parent has adequate means to obtain information from Maker on a continuing basis concerning the financial condition of Maker and its ability to perform its obligations under the Note Documents, and Maker Parent assumes the responsibility for being and keeping informed of the financial condition of Maker and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Maker Parent hereby waives and relinquishes any duty on the part of Holder to disclose any matter, fact or thing relating to the business, operations or conditions of Maker now known or hereafter known by Holder.

7.10    <u>Bankruptcy, etc.</u> (a) So long as any Guaranteed Obligations remain outstanding, Maker Parent shall not, without the prior written consent of Holder, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Maker.

(b)    The obligations of Maker Parent hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Maker or by any defense which Maker may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(c)    Maker Parent acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in <u>Section 7.10(b)</u> above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Maker, Maker Parent and Holder that the Guaranteed Obligations which are guaranteed by Maker Parent pursuant hereto should be determined without regard to any rule of law or order which may relieve Maker of any portion of such Guaranteed Obligations.  Maker Parent will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit

of creditors or similar person to pay Holder, or allow the claim of Holder in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(d)     In the event that all or any portion of the Guaranteed Obligations are paid by Maker, the obligations of Maker Parent hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from Holder as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

## ARTICLE VIII

### General Provisions

8.1     <u>Waivers.</u>  To the extent permitted by applicable law, each Grantor hereby waives notice of the time and place of any public sale or the time after which any private sale or other disposition of all or any part of the Collateral may be made.  To the extent such notice may not be waived under applicable law, any notice made shall be deemed reasonable if sent to the Maker, addressed as set forth in <u>Article IX</u>, at least ten (10) days prior to (a) the date of any such public sale or (b) the time after which any such private sale or other disposition may be made.  To the maximum extent permitted by applicable law, each Grantor waives all claims, damages, and demands against Holder arising out of the repossession, retention or sale of the Collateral, except to the extent such claims, damages or demands arise out of the gross negligence or willful misconduct of Holder as finally determined by a court of competent jurisdiction.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against Holder, any valuation, stay, appraisal, extension, moratorium, redemption or similar laws and any and all rights or defenses it may have as a surety now or hereafter existing which, but for this provision, might be applicable to the sale of any of the Collateral made under the judgment, order or decree of any court, or privately under the power of sale conferred by this Agreement, or otherwise.  Except as otherwise specifically provided herein, each Grantor hereby waives presentment, demand, protest or any notice (to the maximum extent permitted by applicable law) of any kind in connection with this Agreement or any Collateral.

8.2     <u>Limitation on Holder's Duty with Respect to the Collateral.</u>  Holder shall not have any obligation to clean-up or otherwise prepare the Collateral for sale.  Holder shall use reasonable care with respect to the Collateral in its possession or under its control.  Holder shall not have any other duty as to any Collateral in its possession or control or in the possession or control of any agent or nominee of Holder other than to account for money received, or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.  To the extent that any applicable law imposes duties on Holder to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is commercially reasonable for Holder, among other things, (a) to fail to incur expenses deemed significant by Holder to prepare Collateral for disposition or otherwise to transform raw material or work in process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (d) to exercise collection remedies against other Persons obligated on Collateral directly or through the use of collection

agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as such Grantor, for expressions of interest in acquiring all or any portion of such Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (k) to purchase insurance or credit enhancements to insure Holder against risks of loss, collection or disposition of Collateral or to provide to Holder a guaranteed return from the collection or disposition of Collateral, or (l) to the extent deemed appropriate by Holder, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Holder in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this <u>Section 8.2</u> is to provide non-exhaustive indications of what actions or omissions by Holder would be commercially reasonable in Holder's exercise of remedies against the Collateral and that other actions or omissions by Holder shall not be deemed commercially unreasonable solely on account of not being indicated in this <u>Section 8.2</u>. Without limitation upon the foregoing, nothing contained in this <u>Section 8.2</u> shall be construed to grant any rights to Maker or to impose any duties on Holder that would not have been granted or imposed by this Agreement or by applicable law in the absence of this <u>Section 8.2</u>.

8.3     <u>Holder Performance of Debtor Obligations.</u>  Without having any obligation to do so, upon the occurrence and during the continuance of an Event of Default, and upon prior notice to the extent required under this Agreement, Holder may perform or pay any obligation which any Grantor has agreed to perform or pay in this Agreement or the Secured Note and each Grantor shall reimburse Holder for any amounts paid by Holder pursuant to this <u>Section 8.3</u>.  The Grantors' obligation to reimburse Holder pursuant to the preceding sentence shall be a Note Obligation payable promptly upon written demand (including documentation reasonably supporting such request).

8.4     <u>Specific Performance of Certain Covenants.</u>  Each Grantor acknowledges and agrees that a breach of any of the covenants of the Maker contained in <u>Section 4.1(d)</u>, <u>Section 4.1(e)</u>, <u>Section 4.3</u>, <u>Section 4.4</u>, <u>Section 5.2</u>, or <u>Section 8.6</u> will cause irreparable injury to Holder, that Holder has no adequate remedy at law in respect of such breaches and therefore agrees, without limiting the right of Holder to seek and obtain specific performance of other obligations of any Grantor contained in this Agreement, that the covenants of the Grantors contained in this Agreement shall be specifically enforceable against the Grantors.

8.5     <u>Dispositions Not Authorized.</u>  No Grantor is authorized to sell or otherwise dispose of the Collateral except as set forth in <u>Section 4.1(d)</u>.

8.6     <u>No Waiver; Amendments; Cumulative Remedies.</u>  No delay or omission of Holder to exercise any right or remedy granted under this Agreement shall impair such right or remedy or be construed to be a waiver of any Default or an acquiescence therein, and any single or partial exercise of any such right or remedy shall not preclude any other or further exercise thereof or the exercise of any other right or remedy.  No waiver, amendment or other variation of the terms, conditions or provisions of this Agreement whatsoever shall be valid unless in writing signed by Holder and then only to the extent in such writing specifically set forth.  All rights and remedies contained in this Agreement or by law afforded shall be cumulative and all shall be available to Holder until Payment in Full.

8.7    <u>Severability.</u>  If any provision of this Agreement is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.8    <u>Reinstatement.</u>  This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Note Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Note Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Note Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

8.9    <u>Benefit of Agreement.</u>  The terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Grantor, Holder, and their respective successors and permitted assigns (including all persons who become bound as a debtor to this Agreement), except that, except as expressly permitted by the Secured Note, no Grantor shall have the right to assign its rights or delegate its obligations under this Agreement or any interest herein, without the prior written consent of Holder.  No sales of participations, assignments, transfers, or other dispositions of any agreement governing the Note Obligations or any portion thereof or interest therein shall in any manner impair the Security Interest granted Holder hereunder.

8.10    <u>Survival of Representations.</u>  All representations and warranties of the Grantors contained in this Agreement shall survive the execution and delivery of this Agreement. Such representations and warranties have been or will be relied upon by Holder, regardless of any investigation made by Holder or on its behalf and notwithstanding that Holder may have had notice or knowledge of any Default at the time of extending credit under the Secured Note.

8.11    <u>Taxes and Expenses.</u>

(a)    Any taxes (including income taxes) payable or ruled payable by Federal or State authority in respect of this Agreement shall be paid by Grantors, together with interest and penalties, if any.

(b)    The Grantors jointly and severally agree to reimburse Holder for its fees and expenses incurred hereunder.

(c)    Any amounts payable hereunder shall be additional Note Obligations secured hereby.  All amounts due under <u>Section 8.11(a)</u> or <u>8.11(b)</u> shall be payable promptly after written demand therefor.

8.12    Headings.  The title of and section headings in this Agreement are for convenience of reference only, and shall not govern the interpretation of any of the terms and provisions of this Agreement.

8.13    Termination and Release.

(a)    This Agreement, the Security Interest and all other security interests granted hereby shall, subject to Section 8.8, automatically terminate and be released upon Payment in Full.

(b)    The Security Interest and the other security interests granted hereby shall automatically terminate and be released (in whole or in part) at the time or times and in the manner set forth in Section 21 of the Secured Note.

(c)    Upon the termination or release of the Security Interest or any other security interest created hereunder or release of Collateral as permitted hereunder and the other Note Documents, Holder will, upon the request of any applicable Grantor and at such Grantor's expense, execute and deliver to such Grantor such documents as such Grantor may reasonably request to evidence the termination of the Security Interest and the release of such item of Collateral.

8.14    Governing Law; Wavier of Jury Trial; Cost of Collection; Indemnification. Sections 16, 17 and 18 of the Secured Note are incorporated herein by reference, *mutatis mutandis*.

8.15    Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.   This Agreement shall become effective when it shall have been executed by Holder and when Holder shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Any signature to this Agreement may be delivered by facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law.

8.16    Force Majeure.  In no event shall Holder be responsible or liable for any failure of delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunction of utilities, communication, or computer (software or hardware) services.

## ARTICLE IX

### Notices

9.1    Sending Notices.  Any notice required or permitted to be given under this Agreement shall be delivered in accordance with Section 13 of the Secured Note.

DocuSign Envelope ID: CDC42402-F3A6-4F00-9874-7C16A99B8E5A

9.2 <u>Change in Address for Notices.</u>  Each Grantor and Holder may change the address for service of notice upon it by a notice to the other parties in accordance with <u>Section 9.1</u>.

[*Signature Page Follows*]

IN WITNESS WHEREOF, Grantors and Holder have executed this Agreement as of the date first above written.

**GRANTORS**:

LUNA SQUARES LLC

By:
Name:  James Manning
Its:    CEO

MAWSON INFRASTRUCTURE GROUP INC.

By:
Name:  James Manning
Its:    CEO

COSMOS INFRASTRUCTURE LLC

By:
Name:  James Manning
Its:    CEO

**HOLDER**

CELSIUS MINING LLC

by

Name:   Roni Cohen Pavon
Title:    Chief Revenue Officer

DocuSign Envelope ID: CD6A2402-F3A6-4F00-987A-7C16A9969E5A

Exhibit A-1

| Luna Squares LLC | |
|---|---|
| The type of entity | Limited liability Company |
| State of organization | Delaware |
| Organizational identification number issued by state of organization | 3459859 |
| Federal employer identification number | ████████ |
| Mailing address and the location of its chief executive office | Level 5 97 Pacific Highway North Sydney NSW 2066 |

| Mawson Infrastructure Group Inc. | |
|---|---|
| The type of entity | Corporation |
| State of organization | Delaware |
| Organizational identification number issued by state of organization | 5081043 |
| Federal employer identification number | ████████ |
| Mailing address and the location of its chief executive office | Level 5 97 Pacific Highway North Sydney NSW 2066 |

| Cosmos Infrastructure LLC | |
|---|---|
| The type of entity | Limited liability Company |
| State of organization | Delaware |
| Organizational identification number issued by state of organization | 7512353 |

| | |
|---|---|
| Federal employer identification number | ███████ |
| Mailing address and the location of its chief executive office | Level 5 97 Pacific Highway North Sydney NSW 2066 |

<u>Exhibit A-2</u>

<u>Location of Modular Data Centers and other Maker Collateral:</u> Tenth St, Midland, PA 15059, 200 Clark Street in the City of Sharon, Mercer County, Pennsylvania

<u>Location of Miners:</u> 2015 George Lyons Parkway, Sandersville, GA 31082

<u>Exhibit A-3 – Previous Names</u>

<u>Cosmos Infrastructure LLC:</u>

    Nil

<u>Mawson Infrastructure Group Inc.:</u>

    Wize Pharma, Inc., OphthaliX, Inc., Denali Concrete Management Inc.

<u>Luna Squares LLC:</u>

    Innovative Property Management, LLC

<u>Exhibit B</u>

[<u>Attached</u>]