# EXHIBIT G

113

1

2  UNITED STATES BANKRUPTCY COURT
   SOUTHERN DISTRICT OF NEW YORK
3  ----------------------------------------X
   In re:
4
   CELSIUS NETWORK LLC, et al.,
5
   Debtor.
6  ----------------------------------------X
              ***CONFIDENTIAL***
7

8

9       REMOTE DEPOSITION OF TIM BROADFOOT

10             Friday, September 1, 2023

11

12

13

14

15  Reported by:

16  Rebecca Schaumloffel, RPR, CLR

17  JOB #:  2023-909836

18  TIME:  6:594 a.m. Eastern

19

20

21

22

23

24

25

147

|         |    |                                         |
|---------|----|-----------------------------------------|
|         | 1  | T. BROADFOOT                            |
| 07:48AM | 2  | that Celsius didn't just pay one deposit, |
| 07:48AM | 3  | right?                                   |
| 07:48AM | 4  | A.   Celsius to pay -- previously paid  |
| 07:49AM | 5  | and multiple transactions, a deposit.   |
| 07:49AM | 6  | Q.   So wait a second.  Is it your      |
| 07:49AM | 7  | position that Celsius only paid one deposit? |
| 07:49AM | 8  | A.   Without drawing to a legal         |
| 07:49AM | 9  | conclusion, the contract here refers to a |
| 07:49AM | 10 | deposit amount, and that would encompass all |
| 07:49AM | 11 | payments for that purpose.              |
| 07:49AM | 12 | Q.   So it's your position -- well,     |
| 07:49AM | 13 | withdrawn.                              |
| 07:49AM | 14 | It says, "The amount of any             |
| 07:49AM | 15 | deposit...shall be set out in Addendum A as |
| 07:49AM | 16 | 'Deposit Amount'."                      |
| 07:49AM | 17 | Do you see that?                        |
| 07:49AM | 18 | A.   Yes.                               |
| 07:49AM | 19 | Q.   And then it says, a customer will  |
| 07:49AM | 20 | "forfeit the applicable deposit," correct? |
| 07:49AM | 21 | A.   Correct.                           |
| 07:49AM | 22 | Q.   So I just want to make this very   |
| 07:50AM | 23 | clear for the record.                   |
| 07:50AM | 24 | Is it Mawson's position that            |
| 07:50AM | 25 | Celsius paid one deposit under the      |

148

1          T. BROADFOOT

07:50AM  2    Co-Location Agreement or multiple deposits

07:50AM  3    under the Co-Location Agreement?

07:50AM  4          MR. MARTOS:  Object to form.

07:50AM  5       A.    Mawson's theory is that there is a

07:50AM  6    single contract and a single deposit.

07:50AM  7       Q.    Okay.  Let's turn to Addendum A,

07:50AM  8    and that's page 17 of the PDF, it's Luna

07:50AM  9    '1230.

07:50AM  10         You just testified that there is a

07:50AM  11   single deposit.  Let's look at the deposit

07:50AM  12   amount section.

07:50AM  13         Do you see the contract date

07:50AM  14   column?

07:50AM  15      A.    Yes.

07:50AM  16      Q.    It says, "Deposits," plural, "to

07:50AM  17   be paid 14 days prior to commissioning of any

07:50AM  18   units," correct?

07:50AM  19      A.    Correct.

07:51AM  20      Q.    So there is actually multiple

07:51AM  21   deposits that Celsius paid under the

07:51AM  22   contract, correct?

07:51AM  23         MR. MARTOS:  Object to form.

07:51AM  24      Calls for a legal conclusion.

07:51AM  25      A.    Without drawing a legal

Confidential        Tim Broadfoot - September 01, 2023

                                                                158

        1              T. BROADFOOT

08:03AM  2   language under the "Monthly Power Rate"

08:03AM  3   piece, it says, "The first 50MW will be at

08:03AM  4   $41/MWH," right?

08:03AM  5        A.    It does, but that differs -- the

08:03AM  6   wording changes in the Addendum -- the

08:03AM  7   amendment.

08:03AM  8        Q.    Okay.  All right.  So let's look

08:03AM  9   at the --

08:03AM  10       A.    It's not --

08:03AM  11       Q.    Got it.

08:03AM  12             All right.  Let's look at the

08:03AM  13  right-hand column.  It says, "Cost to

08:04AM  14  comprise of the total of."

08:04AM  15             Do you see that?

08:04AM  16       A.    I do.

08:04AM  17       Q.    And it says, "Luna Power Cost."

08:04AM  18             Do you see that?

08:04AM  19       A.    I do.

08:04AM  20       Q.    And that's effectively a

08:04AM  21  passthrough of the cost that Luna is paying

08:04AM  22  for power, right?

08:04AM  23       A.    Correct.

08:04AM  24       Q.    And so that's net power costs,

08:04AM  25  correct?

159

1                           T. BROADFOOT

08:04AM   2        A.    Correct.

08:04AM   3        Q.    That accounts for, for example,

08:04AM   4    credits that Luna would receive under its

08:04AM   5    power arrangements, right?

08:04AM   6        A.    No, that is not correct.

08:04AM   7        Q.    Why not?

08:04AM   8        A.    That's a separate mechanism.

08:04AM   9        Q.    So it's Luna's testimony that --

08:04AM   10   or it's Mawson's testimony that the deal they

08:04AM   11   struck was that you get to pass through the

08:04AM   12   power costs, we have to pay a margin, but

08:04AM   13   Mawson keeps all of the upside for credits

08:04AM   14   and other incentives?

08:04AM   15       A.    If Mawson takes out strategic

08:05AM   16   strategies to be able to hedge its position,

08:05AM   17   yes.

08:05AM   18       Q.    Okay.

08:05AM   19            MR. MCCARRICK:  We can take that

08:05AM   20       document down.

08:05AM   21            We would like to introduce

08:05AM   22       Mawson Exhibit 4, which is going to be

08:05AM   23       tab 3 in the Zip, Mr. Young.  It's a

08:05AM   24       February 23, 2022, Addendum.

08:05AM   25            MR. MARTOS:  If we are going to

169

1              T. BROADFOOT

08:19AM  2        Q.    Yeah, and I'm not trying to

08:19AM  3    exclude that.  Obviously there's greater or

08:19AM  4    less amounts owed.  There's interests.

08:19AM  5    There's all those bells and whistles.

08:19AM  6              But the principal amount of the

08:19AM  7    loan that Luna received under the Secured

08:19AM  8    Promissory Note was $20 million, right?

08:19AM  9        A.    That's correct.

08:19AM 10        Q.    Was that $20 million received into

08:19AM 11    Luna Squares or a different Mawson entity?

08:19AM 12        A.    It was paid to Luna Squares.

08:19AM 13        Q.    Okay.  After it was paid to Luna

08:19AM 14    Squares, did it -- was that money ever

08:19AM 15    transferred to Mawson or Cosmos?

08:19AM 16        A.    I believe it was for the purchase

08:20AM 17    of assets.

08:20AM 18        Q.    Okay.  When would that have

08:20AM 19    occurred?

08:20AM 20        A.    In the end of Q1 and Q2 2022.

08:20AM 21              MR. MCCARRICK:  Now let's go to

08:20AM 22        page 4.

08:20AM 23        Q.    Do you see the "Negative

08:20AM 24    Covenants" section?  And we're going to be

08:20AM 25    looking at Romanette 13, just the first one

183

1                    T. BROADFOOT

08:38AM  2        A.    Sorry, can you just say that

08:38AM  3    question again?  I lost my train of thought

08:38AM  4    with the objection.

08:38AM  5        Q.    Yeah, sure.  Yeah, sure.  Yeah.

08:38AM  6              The question is, what's the

08:38AM  7    relationship between the asset collateral,

08:38AM  8    that is, Celsius' under the Promissory Note,

08:38AM  9    and the debt obligations that you referenced

08:39AM 10    yesterday at Mawson and Cosmos?

08:39AM 11              MR. MARTOS:  Object to form.

08:39AM 12        A.    Without speaking to any specific

08:39AM 13    privileged conversation, it was to do with

08:39AM 14    the movement of assets whilst potentially in

08:39AM 15    a default situation.

08:39AM 16        Q.    So fraudulent transfer concern?

08:39AM 17              MR. MARTOS:  Object to form.

08:39AM 18        A.    I can't speak to the legal

08:39AM 19    terminology or reasoning, sorry.

08:39AM 20        Q.    Okay.  Okay.  Let's go to the

08:39AM 21    "ARTICLE III," "Representations and

08:39AM 22    Warranties," and let's look at section 3.1,

08:39AM 23    which is titled "Title, Perfection and

08:39AM 24    Priority."

08:39AM 25              Take a minute to review that and

184

|         |    |                                    |
|---------|----|------------------------------------|
|         | 1  | T. BROADFOOT                       |
| 08:39AM | 2  | give me the "hi" sign when you're done. |
| 08:40AM | 3  | A.    I've read it.                 |
| 08:40AM | 4  | Q.    Okay.  It says, "Each Grantor, |
| 08:40AM | 5  | jointly and severally, represents and |
| 08:40AM | 6  | warrants to Holder."               |
| 08:40AM | 7  | Do you see that?                   |
| 08:40AM | 8  | A.    I do.                        |
| 08:40AM | 9  | Q.    And "Grantor" refers to, at a |
| 08:40AM | 10 | minimum, Luna, right?              |
| 08:40AM | 11 | A.    Refers to the three entities. |
| 08:40AM | 12 | Q.    Okay.  So just to be clear, "Each |
| 08:40AM | 13 | Grantor" means Mawson, Luna, and Cosmos, |
| 08:40AM | 14 | "jointly and severally, represents and |
| 08:40AM | 15 | warrant," right, to Celsius?       |
| 08:40AM | 16 | MR. MARTOS:  Object to form.       |
| 08:41AM | 17 | A.    That's what it says, yes.    |
| 08:41AM | 18 | Q.    Okay.  It says, "Such Grantor has |
| 08:41AM | 19 | good and valid rights in or the power to |
| 08:41AM | 20 | transfer the Collateral and title to the |
| 08:41AM | 21 | Collateral with respect to which it has |
| 08:41AM | 22 | purported to grant a security interest |
| 08:41AM | 23 | hereunder."                        |
| 08:41AM | 24 | Do you see that?                   |
| 08:41AM | 25 | A.    I do.                        |

185

1                   T. BROADFOOT

08:41AM   2        Q.    So Luna is representing here that

08:41AM   3   it had "good and valid rights in or the power

08:41AM   4   to transfer the Collateral and title to the

08:41AM   5   Collateral" in which it granted a security

08:41AM   6   interest, correct?

08:41AM   7        A.    Correct.

08:41AM   8        Q.    Is that a true representation or a

08:41AM   9   false representation?

08:41AM  10        A.    It's a true representation.

08:41AM  11        Q.    So it's your testimony that Luna

08:41AM  12   had a "good and valid" right "in or the power

08:41AM  13   to transfer the Collateral and title to the

08:41AM  14   Collateral" in which it granted a security

08:42AM  15   interest in the preceding paragraph -- in

08:42AM  16   section 2.1, I should say?

08:42AM  17        A.    It had the power to transfer.

08:42AM  18        Q.    How did it have the power to

08:42AM  19   transfer collateral that it never owned?

08:42AM  20        A.    There is a subsequent movement of

08:42AM  21   funds which would have a receivable, would

08:42AM  22   allow it to transfer that collateral.

08:42AM  23        Q.    What was the subsequent movement

08:42AM  24   of funds?

08:42AM  25        A.    To pay for the Collateral.

192

|  |  |  |
|---|---|---|
|  | 1 | T. BROADFOOT |
| 08:50AM | 2 | Collateral did Luna have -- withdrawn. |
| 08:50AM | 3 | What power did Luna have to |
| 08:50AM | 4 | transfer the asset Collateral under the |
| 08:50AM | 5 | Promissory Note without the involvement of |
| 08:50AM | 6 | any of the Grantors? |
| 08:51AM | 7 | A.   Without involving the other party, |
| 08:51AM | 8 | it -- |
| 08:51AM | 9 | THE COURT REPORTER:  I'm sorry. |
| 08:51AM | 10 | I'm sorry.  Counsel, I think I lost a |
| 08:51AM | 11 | word. |
| 08:51AM | 12 | MR. MARTOS:  There was an object |
| 08:51AM | 13 | to form. |
| 08:51AM | 14 | THE COURT REPORTER:  And I'm not |
| 08:51AM | 15 | sure I have a complete answer. |
| 08:51AM | 16 | BY MR. MCCARRICK: |
| 08:51AM | 17 | Q.   Could you repeat your answer, |
| 08:51AM | 18 | Mr. Broadfoot? |
| 08:51AM | 19 | A.   Can you ask the question again? |
| 08:51AM | 20 | Sorry. |
| 08:51AM | 21 | Q.   Yeah, yeah.  That's fine.  It will |
| 08:51AM | 22 | be cleaner that way. |
| 08:51AM | 23 | A.   I forgot what I said. |
| 08:51AM | 24 | Q.   Without the involvement of Mawson |
| 08:51AM | 25 | or Cosmos, what power did Luna have to |

193

|          |    |                                          |
|----------|----|------------------------------------------|
|          | 1  | T. BROADFOOT                             |
| 08:51AM  | 2  | transfer the asset Collateral under the  |
| 08:51AM  | 3  | Promissory Note in which it purported to |
| 08:51AM  | 4  | grant Celsius a security interest?       |
| 08:51AM  | 5  | A.   Without involving another party,    |
| 08:51AM  | 6  | it could not.                            |
| 08:51AM  | 7  | Q.   Without involving Cosmos or         |
| 08:52AM  | 8  | Mawson, Luna had no power to transfer the|
| 08:52AM  | 9  | asset Collateral under the Promissory Note in |
| 08:52AM  | 10 | which it purported to grant Celsius a    |
| 08:52AM  | 11 | security interest, true?                 |
| 08:52AM  | 12 | A.   Without involving them, it could    |
| 08:52AM  | 13 | not have feigned that.  However, it would|
| 08:52AM  | 14 | have had the power to cause them to be    |
| 08:52AM  | 15 | involved and transferred.                |
| 08:52AM  | 16 | MR. MCCARRICK:  Jeremy, can you          |
| 08:52AM  | 17 | stop striking through.  Thank you.       |
| 08:52AM  | 18 | Q.   Well, let's talk about the power,   |
| 08:52AM  | 19 | right?                                    |
| 08:52AM  | 20 | Mawson -- excuse me, withdrawn.          |
| 08:52AM  | 21 | Celsius has made a request to Luna       |
| 08:52AM  | 22 | to make sure that the asset Collateral is|
| 08:52AM  | 23 | held by Luna, correct?                    |
| 08:53AM  | 24 | A.   Yes.                                 |
| 08:53AM  | 25 | Q.   That hasn't happened, correct?      |

Confidential         Tim Broadfoot - September 01, 2023

194

1                          T. BROADFOOT

08:53AM   2       A.    That's correct.

08:53AM   3       Q.    The reason is because Mawson and

08:53AM   4   Cosmos aren't letting it happen, correct?

08:53AM   5       A.    I'm not sure that we can draw a

08:53AM   6   distinction on --

08:53AM   7       Q.    Okay.  So just to be clear,

08:53AM   8   you're --

08:53AM   9       A.    -- what's stopping it.

08:53AM  10       Q.    Well, fair to say that if Luna

08:53AM  11   were to ask for the asset Collateral under

08:53AM  12   the Promissory Note in which it grants

08:53AM  13   Celsius' security interest to be held by Luna

08:53AM  14   and not by Mawson and Cosmos, would that

08:54AM  15   occur or would that not occur?

08:54AM  16            MR. MARTOS:  Object to the form.

08:54AM  17       A.    That's a forward-looking

08:54AM  18   hypothetical and we would take advice on the

08:54AM  19   matter.

08:54AM  20       Q.    That's not really a hypothetical,

08:54AM  21   though, right?  I mean, Celsius already has

08:54AM  22   asked Luna to put the Collateral in the right

08:54AM  23   box, correct?

08:54AM  24       A.    Yes.  Your question asked if it

08:54AM  25   asked them to.

Confidential        Tim Broadfoot - September 01, 2023

206

```
          1              T. BROADFOOT

09:10AM   2    happening.  And so you are asking for a

09:10AM   3    judgment that I don't have.

09:10AM   4         Q.    Sure.

09:10AM   5              The reason I'm asking is because

09:10AM   6    it speaks to whether or not Mawson's reason

09:10AM   7    -- understanding of the contract and when and

09:10AM   8    how deposits are refundable is a sensible

09:10AM   9    reading of the contract.  And so I am asking

09:10AM  10    for Mawson's judgments.

09:10AM  11         A.    Okay.  That's a different

09:10AM  12    question.  And if we are going to go to the

09:10AM  13    contract and it's nondelivery and

09:10AM  14    nonperformance, then our reading of the

09:10AM  15    contract would be that it is forfeitable

09:10AM  16    under the analysis.

09:10AM  17         Q.    Right.  So under Mawson's reading

09:10AM  18    of the contract, if Celsius fell short by one

09:10AM  19    rig, the entire deposit is forfeitable?

09:11AM  20         A.    In that hypothetical situation,

09:11AM  21    yes.

09:11AM  22         Q.    Do you think that's a just result?

09:11AM  23              MR. MARTOS:  Object to form.

09:11AM  24              MR. MCCARRICK:  Only a lawyer

09:11AM  25         would object to that question.
```

211

|          |    |                                      |
|----------|----|--------------------------------------|
|          | 1  |              T. BROADFOOT            |
| 09:16AM  | 2  | the Company will continue as a going |
| 09:16AM  | 3  | concern"?                            |
| 09:16AM  | 4  |      A.   I do.                      |
| 09:16AM  | 5  |      Q.   Was that accurate or inaccurate? |
| 09:16AM  | 6  |      A.   The analysis included that, yes. |
| 09:17AM  | 7  |      Q.   Okay.  Then, ultimately, ended up |
| 09:17AM  | 8  | not being the case, fair?            |
| 09:17AM  | 9  |           MR. MARTOS:  Object to form. |
| 09:17AM  | 10 |      A.   I don't agree with that, but... |
| 09:17AM  | 11 |           MR. MCCARRICK:  Let's go to page |
| 09:17AM  | 12 |      30 of the PDF, Luna '671.  And I would |
| 09:17AM  | 13 |      like to blow up the last paragraph. |
| 09:17AM  | 14 |      Q.   Do you see the last sentence that |
| 09:17AM  | 15 | says, "We have an aggregate of $22.94 million |
| 09:17AM  | 16 | of debt and 15.33 million of customer |
| 09:17AM  | 17 | deposits that is required to be repaid within |
| 09:17AM  | 18 | eleven months unless we refinance or |
| 09:17AM  | 19 | renegotiate the terms"?               |
| 09:17AM  | 20 |      A.   Yes, I see that.            |
| 09:17AM  | 21 |      Q.   That $15.33 million of customer |
| 09:17AM  | 22 | deposits is referring to the Celsius |
| 09:17AM  | 23 | deposits, correct?                   |
| 09:17AM  | 24 |      A.   It is.                      |
| 09:17AM  | 25 |      Q.   And as of May 2023, Mawson is |

Confidential        Tim Broadfoot - September 01, 2023

218

| | | |
|---|---|---|
| | 1 | T. BROADFOOT |
| 09:25AM | 2 | right? |
| 09:25AM | 3 | MR. MARTOS:  Object to form. |
| 09:25AM | 4 | A.   So the -- there are an awful lot |
| 09:25AM | 5 | of factors in this to consider.  But the |
| 09:25AM | 6 | legal view at the time was to disclose, as |
| 09:25AM | 7 | has been, to the SEC.  If the legal view is |
| 09:26AM | 8 | changed, that happens. |
| 09:26AM | 9 | Q.   Okay.  Just -- that's a fair and a |
| 09:26AM | 10 | fine answer.  But let's just all be upfront |
| 09:26AM | 11 | about it. |
| 09:26AM | 12 | The difference is that Mawson's |
| 09:26AM | 13 | legal view changed between when it made this |
| 09:26AM | 14 | securities filing and when it -- I guess, |
| 09:26AM | 15 | withdrawn. |
| 09:26AM | 16 | Mawson's legal view, as of the |
| 09:26AM | 17 | time of the securities filing, was that it |
| 09:26AM | 18 | does owe this money, right? |
| 09:26AM | 19 | MR. MARTOS:  Object to form. |
| 09:26AM | 20 | To the extent that you can |
| 09:26AM | 21 | answer the question without disclosing |
| 09:26AM | 22 | privileged information, please do. |
| 09:26AM | 23 | A.   The document -- the sentence |
| 09:26AM | 24 | highlighted says that the amount is to be |
| 09:26AM | 25 | repaid. |

219

|   |   |
|---|---|
| | 1 |

1            T. BROADFOOT

09:27AM   2      Q.    And Mawson's position has changed

09:27AM   3   since then?

09:27AM   4      A.    Yes.

09:27AM   5      Q.    The facts haven't changed, right?

09:27AM   6      A.    No.

09:27AM   7          MR. MCCARRICK:   Okay.   We can

09:27AM   8      set that document aside.

09:27AM   9          Is this a good time for a break?

09:27AM  10          MR. MARTOS:   Up to you.   We can

09:27AM  11      keep going.   I want to just flag that

09:27AM  12      Mr. Broadfoot is now at 11:30 p.m. in

09:27AM  13      the evening.   So I'm not sure how much

09:27AM  14      you have left, but if there's a way to

09:27AM  15      push through with limited breaks,

09:27AM  16      we're happy to do that.

09:27AM  17          If we need to take a different

09:27AM  18      approach, then we understand that as

09:27AM  19      well.   But it will be limited by the

09:27AM  20      witness's capacity to continue going

09:27AM  21      late into the evening.

09:27AM  22          MR. MCCARRICK:   Yeah.   Yeah.

09:27AM  23      Just two points to make on that.

09:28AM  24          The first thing I would say is,

09:28AM  25      you've taken two breaks so far.   This

238

1                    T. BROADFOOT

09:58AM  2   has to be paid back to Celsius at the end of

09:58AM  3   the contract?

09:58AM  4        A.    Any deposits.

09:58AM  5        Q.    Okay.  And it's your testimony

09:58AM  6   that Mr. -- that Mawson's COO got that wrong,

09:58AM  7   correct?

09:58AM  8        A.    At the time of that conversation,

09:58AM  9   his understanding would not have been

09:59AM 10   incorrect, that deposits were planning to be

09:59AM 11   repaid at the end of the contract.

09:59AM 12        Q.    Right.  So sitting here in

09:59AM 13   April 2022, Mawson's COO was correct that at

09:59AM 14   the end of the contract, all things as they

09:59AM 15   were, at least as of that date, Mawson is

09:59AM 16   obligated to refund Celsius' deposits at the

09:59AM 17   end of the contract, correct?

09:59AM 18        A.    That is his view, yes.

09:59AM 19        Q.    And that was the same view that

09:59AM 20   Mawson took in its May 2023 10-Q securities

09:59AM 21   filing that we just reviewed a little

09:59AM 22   earlier, correct?

09:59AM 23        A.    Correct.

09:59AM 24        Q.    Okay.  Let's --

09:59AM 25              MR. MCCARRICK:  You can take

241

|       |    | T. BROADFOOT |
|-------|----|--------------|

10:02AM  2       A.    That's correct.

10:02AM  3       Q.    In May of 2022, Mawson was

10:02AM  4   obligated to refund the full deposit amount

10:02AM  5   at the end of the contract, correct?

10:02AM  6       A.    Correct.

10:02AM  7       Q.    Let's look at the next e-mail up

10:02AM  8   in the chain, which starts on page 2 and

10:02AM  9   continues on page 3.  It's from Jenny Fan at

10:02AM 10   Celsius to Ms. Schmidt and the rest of the

10:02AM 11   e-mail chain.

10:02AM 12            Do you see that?

10:02AM 13       A.    I do.

10:02AM 14       Q.    Do you see where it says, "Please

10:02AM 15   send us the actual hosting bill for April.

10:02AM 16   We'd like to see the actual amount and should

10:02AM 17   also apple to the deposits that we made."

10:02AM 18            Do you see that?

10:02AM 19       A.    I do.

10:02AM 20       Q.    So here in May of 2022, Celsius is

10:03AM 21   asking to offset the actual power cost bill

10:03AM 22   against the deposits it's already paid,

10:03AM 23   correct?

10:03AM 24       A.    I believe it's confirming how it

10:03AM 25   should treat invoices between the two finance

Confidential        Tim Broadfoot - September 01, 2023

267

1                      T. BROADFOOT

10:34AM  2        A.    It could have.  I'd need to

10:34AM  3    confirm.

10:34AM  4        Q.    Do you not know, sitting here

10:34AM  5    today?

10:34AM  6        A.    Not with confidence to say under

10:34AM  7    oath on that.  We can provide proof of the

10:34AM  8    payments.

10:34AM  9        Q.    Okay.  Let's look at the first

10:34AM  10   e-mail in the chain.

10:34AM  11            Mr. Manning writes, "Joseph Just

10:34AM  12   further to our conversation.  To make this

10:34AM  13   work in the timeframes we have, we will be

10:34AM  14   using proceeds against existing orders...in

10:34AM  15   the system."

10:34AM  16            Do you see that?

10:34AM  17        A.    I do.

10:34AM  18        Q.    And that's consistent with what

10:34AM  19   you testified earlier, right?  Which is that

10:34AM  20   the equipment was going to be subject to

10:35AM  21   existing orders that Mawson and Cosmos had

10:35AM  22   already placed, correct?

10:35AM  23        A.    Correct.

10:35AM  24        Q.    And it says, "using proceeds

10:35AM  25   against" those "existing orders."

268

| | | |
|---|---|---|
| | 1 | T. BROADFOOT |
| 10:35AM | 2 | Do you see that? |
| 10:35AM | 3 | A.   I do. |
| 10:35AM | 4 | Q.   And it's your testimony that |
| 10:35AM | 5 | Mawson, sitting here today, can't say one way |
| 10:35AM | 6 | or the other whether or not those proceeds |
| 10:35AM | 7 | came from a Luna bank account, correct? |
| 10:35AM | 8 | A.   I can't recall at this time. |
| 10:35AM | 9 | Q.   All right.  Do you see where it |
| 10:35AM | 10 | says, "I" -- I think that's supposed to be an |
| 10:35AM | 11 | "it" -- "will be the case that some of these |
| 10:35AM | 12 | will be internal, inter-group invoices that |
| 10:35AM | 13 | existing equipment that will be located in |
| 10:35AM | 14 | PA." |
| 10:35AM | 15 | Do you see that? |
| 10:35AM | 16 | A.   I do. |
| 10:35AM | 17 | Q.   Are you aware of a single |
| 10:35AM | 18 | internal, inter-group invoice between Mawson, |
| 10:35AM | 19 | Cosmos, and/or Luna for equipment located in |
| 10:35AM | 20 | PA? |
| 10:35AM | 21 | A.   No. |
| 10:35AM | 22 | Q.   Right.  Because your testimony was |
| 10:36AM | 23 | that based on your review of the asset |
| 10:36AM | 24 | registers, at no point did Luna ever own any |
| 10:36AM | 25 | of the equipment or MDCs located in PA, |

Confidential        Tim Broadfoot - September 01, 2023

269

1              T. BROADFOOT

10:36AM   2   correct?

10:36AM   3        A.    Correct.

10:36AM   4        Q.    Okay.  So when Mr. Manning says,

10:36AM   5   "some of these will be internal, inter-group

10:36AM   6   invoices," are you aware of any efforts that

10:36AM   7   Mawson took after this e-mail was sent to

10:36AM   8   make those kinds of internal, inter-group

10:36AM   9   invoices?

10:36AM   10        A.    I'm not aware of any.

10:36AM   11        Q.    All right.  Do you see when it

10:36AM   12   says, a few sentences later, "We will in due

10:36AM   13   course get the full details of this and raise

10:36AM   14   an inter-group invoice for the MDC"?

10:36AM   15        A.    I do.

10:36AM   16        Q.    Did that ever happen?

10:36AM   17        A.    No.

10:36AM   18        Q.    Why not?

10:37AM   19        A.    I don't have an answer to that.

10:37AM   20        Q.    Do you know if Celsius was ever

10:37AM   21   informed that this didn't happen?

10:37AM   22        A.    I know that they've been informed

10:37AM   23   because they are not in the correct entities.

10:37AM   24   I do not know the earliest date at which they

10:37AM   25   were informed.

279

1                           T. BROADFOOT

10:50AM  2    supposed to, under the deployment schedule,

10:50AM  3    be able to host 30,000 units in June of 2022,

10:50AM  4    correct?

10:50AM  5          A.    I believe it was July, but the

10:50AM  6    point is the same.

10:50AM  7          Q.    So just to be clear, under the

10:50AM  8    deployment schedule, Mawson was supposed to

10:50AM  9    be able to deploy 30,000 Celsius units by

10:50AM 10    July of 2022, correct?

10:50AM 11          A.    Correct.

10:51AM 12          Q.    And Mawson did not offer Celsius

10:51AM 13    the ability to deploy the full balance of

10:51AM 14    those 30,000 units until May or June of 2023,

10:51AM 15    correct?

10:51AM 16          A.    That's correct.

10:51AM 17          Q.    So it took Mawson nearly a year to

10:51AM 18    offer Celsius the full hosting capacity it

10:51AM 19    was supposed to provide Celsius as of

10:51AM 20    July 2022?

10:51AM 21          A.    That's correct.

10:51AM 22          Q.    And it's -- and in May and June of

10:51AM 23    2023, Mawson offered to unhook 10,000 of its

10:51AM 24    rigs to put 10,000 more of Celsius rigs

10:51AM 25    online, correct?

282

1                     T. BROADFOOT

10:55AM   2        A.    I don't have the monthly figures

10:55AM   3   at hand of the self-miners deployed.

10:55AM   4        Q.    We are talking thousands?

10:55AM   5        A.    Yes.

10:55AM   6        Q.    Okay.  So at any point between

10:55AM   7   July -- yeah, go ahead.

10:55AM   8        A.    The figures are publicly available

10:55AM   9   in the monthly updates to check.  I just

10:55AM  10   could not recall a specific month on hand to

10:55AM  11   get the number correct.  I'm not avoiding.

10:55AM  12        Q.    Okay.  Yeah, no, I understand

10:56AM  13   that.  And I'm just asking for a rough order

10:56AM  14   of magnitude.  So we can do the questioning

10:56AM  15   in the abstract, right, as long as we agree

10:56AM  16   that they were numbering in the thousands and

10:56AM  17   that the numbering varied over time, that's

10:56AM  18   fair?

10:56AM  19        A.    Yes, that's correct.

10:56AM  20        Q.    Okay.  So between July 2022 and

10:56AM  21   April 2023, did Mawson ever offer to unhook

10:56AM  22   its thousands of rigs that it was using for

10:56AM  23   self mining to put additional Celsius rigs

10:56AM  24   online in accordance with the schedule

10:56AM  25   provided for in the Co-Location Agreement?

283

1                    T. BROADFOOT

10:56AM   2        A.    No, it did not.

10:56AM   3        Q.    Why?

10:56AM   4        A.    It needed to maintain some self

10:56AM   5    mining to be able to make enough money to

10:56AM   6    continue to operate.

10:56AM   7        Q.    Okay.  And so the commercial

10:56AM   8    decision that Mawson made was that it was

10:56AM   9    more economical to self mine than to offer

10:57AM  10    Celsius the number of spots it was owed under

10:57AM  11    the Co-Location Agreement, correct?

10:57AM  12        A.    The agreement for co-location was

10:57AM  13    to build out facilities and host them, not to

10:57AM  14    remove from existing operations to replace

10:57AM  15    with Celsius.

10:57AM  16        Q.    So I understand that.  I was just

10:57AM  17    talking about why your generous offer of

10:57AM  18    unhooking 10,000 rigs didn't come sooner.

10:57AM  19             And so my question is:  At any

10:57AM  20    point during the parties' agreement, Mawson

10:57AM  21    could have offered to unhook its thousands of

10:57AM  22    rigs to offer Celsius the number of spaces

10:57AM  23    that it otherwise would be entitled to under

10:57AM  24    the Co-Location Agreement if the facilities

10:57AM  25    had not been behind, in terms of

Confidential        Tim Broadfoot - September 01, 2023

286

1              T. BROADFOOT

11:01AM   2   number of rig spaces at its Pennsylvania

11:01AM   3   facilities that were called for under the

11:01AM   4   schedule in the Co-Location Agreement?

11:01AM   5        A.    Correct.

11:01AM   6        Q.    I -- would you agree with me that

11:01AM   7   it would make little commercial sense for

11:01AM   8   Celsius to send rigs when there was not

11:01AM   9   capacity to host them?

11:01AM   10       A.    No.  It -- Celsius did not have

11:02AM   11  them deployed elsewhere.  There is no

11:02AM   12  commercial reason to not deliver them.

11:02AM   13       Q.    So it's Mawson's view that Celsius

11:02AM   14  should undertake the expense of shipping rigs

11:02AM   15  that will sit idle?

11:02AM   16       A.    At the time that it was due to

11:02AM   17  ship, it could not have said with certainty

11:02AM   18  that they were going to sit idle.

11:02AM   19       Q.    Well, there were times when Mawson

11:02AM   20  asked Celsius not to send rigs, correct?

11:02AM   21       A.    There is communication for

11:02AM   22  scheduling deliveries that asked them to

11:02AM   23  delay some.

11:02AM   24       Q.    And there were communications

11:03AM   25  where Mawson asked Celsius to delay rig