# EXHIBIT O

| | |
|---|---|
| **Message** | |
| **From:** | Adrian Frankum [Adrian.Frankum@ankura.com] |
| **Sent:** | 8/6/2022 5:06:34 PM |
| **To:** | James Manning [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ed35c1179cec4641bcb89fddfaff9c46-james] |
| **CC:** | Quentin Olde [quentin.olde@ankura.com]; Luke Pittorino [luke.pittorino@ankura.com] |
| **Subject:** | Co-Location Agreement Deposits and Agreement Considerations in Light of Celsius Bankruptcy |

James –

You have requested that we comment on the ability for Mawson (and/or its affiliates) to offset invoices against deposits. We have reviewed the Customer Equipment Co-Location Agreement between Luna Squares LLC ("Maker") and Celsius Mining LLC, as well as the related Co-Location Addendum and Cooperation Agreement. As mentioned previously, we have also reviewed the Secured Promissory Note and the related Guaranty and Security Agreement. To reiterate, <u>we are not lawyers, so this is not a legal opinion, nor should be construed as legal advice</u>. Rather, we are providing our commercial views as restructuring financial advisors who routinely represent debtors and creditors in chapter 11 bankruptcies in the U.S.

By way of background, it is our understanding that Luna Squares entered into a Co-Location Agreement with Celsius Mining LLC ("Customer") to provide a hosting facility, electrical power and internet access to Celsius for crypto mining purposes. This agreement, as modified by the Co-Location Addendum (together, the "Agreement") provides for deposits that can be applied against unpaid amounts due "hereunder," which presumably refers to the Agreement. Celsius also lent Luna $20M, the proceeds of which could only be used for the purchase and installation of modular data centers and transformers related to the company's obligations under the Agreement. The Note is secured by equipment purchased with the proceeds of the Note (the "Customer Equipment") and certain rights, interest in and title to miners. The Customer Equipment Co-Location Agreement and the Secured Promissory Note (the "Note") are both dated February 23, 2022. The Cooperation Agreement also seems to tie the Note, Agreement and Guaranty and Security Agreement together. The Guaranty and Security Agreement provides that the Maker Parent's (Mawson Infrastructure Group) guaranty is in full effect even if the Maker has counter claims or set-offs. If the Agreement is terminated and Celsius has not paid all amounts due under the Agreement, Luna has the right to reconfigure and use the Customer Equipment.

Celsius has filed for chapter 11 under the bankruptcy code. Pursuant to the code, Celsius can assume or reject executory contracts but it cannot unilaterally modify them. Contracts that are assumed must be cured (all prepetition amounts must be paid, and the non-Debtor counterparty has the right to adequate assurance that the debtor can perform under the contract). Contracts that are rejected generally have unsecured damage claims against the Debtor. There are a number of mitigations and defenses to claims of the Debtor (in this case, Celsius) against its creditors. As discussed previously, upon filing for bankruptcy, the automatic stay goes into effect which prevents creditors from pursuing prepetition claims and the debtor from paying such claims without a court order.

The Agreement clearly states that deposits under the Agreement can be applied against amounts that the Customer fails to pay. U.S. bankruptcy law does not generally change the stated provisions of contracts and prepetition deposits can almost always be applied against related prepetition claims. We believe this is the case with Luna based upon the information reviewed. Note that Addendum A describes these deposits as "Power Security Deposits" and the deposit language in the Co-Location Agreement is a little vague, saying the deposits can be applied against amounts due "hereunder." As such, there is the possibility that Celsius could argue that deposits should only be applied to power related amounts, but this seems unlikely in our experience given the cost of litigating in bankruptcy and the risk of not prevailing in the argument.

There are generally three possible outcomes for the Agreement in this bankruptcy process. It can be assumed (or assumed and assigned to a new party), modified and assumed, or rejected. If the agreement is assumed, it will have to be cured and then performance under the agreement by both parties will continue as if Celsius never went bankrupt. Modified and assumed agreements are renegotiated between the parties and both parties must agree to any

modifications for the modified agreement to be assumed. In either of these cases, the result should be acceptable to Mawson.

A rejection of the Agreement would create concerns for Luna/Mawson relating to the amounts due to Celsius under the Note and how such amounts would be treated relative Luna's contract damage claims and other amounts due Luna under the Agreement. It would likely also terminate Luna's ability to reconfigure and use the Customer Equipment to recover amounts owed to it. The determination of options available to Luna/Mawson would require substantial legal analysis and would be highly dependent upon the precise wording in the Agreement and Note, as well as case law precedent. It is highly unusual that a chapter 11 debtor is also a secured creditor to a claimant, thus precedent may be limited. The following discussion is provided to highlight initial thoughts regarding potential options that may be applicable under these circumstances and some related considerations. This discussion is not intended to be exhaustive and presents ideas and topics at a high level for informational purposes only. <u>These are highly nuanced legal issues and appropriate legal counsel would be required to determine whether/how they apply to the specifics of this matter. Ankura is not providing and does not provide legal advice.</u>

Luna has a $20M obligation to Celsius under the Note, which is secured by the Customer Equipment and, possibly, Cosmos Infrastructure Group's title and interest in the minors, as well as the proceeds and products of the foregoing. Mawson guaranteed the full obligation even if Luna has set-offs or counterclaims. If the Agreement is rejected, Luna would have contract rejection damage claims and possibly claims for unpaid prepetition amounts, both of which would normally be general unsecured claims in a bankruptcy. There appears to be mutuality between the parties (Luna owes Celsius under the Note and Celsius and Luna are counterparties under the Agreement), leading to the possibility of Luna having valid set-off rights between amounts it owes and its damages. In addition, there is an argument that the Note and the Agreement are all part of one transaction, which may open up an avenue for Luna to apply recoupment.

Set-off allows two parties that directly owe one and other to net these amounts. It is not necessary for the obligations to have arisen from the same transaction but they must both be either prepetition or post petition (i.e., one cannot set-off prepetition obligations against post petition items). This can benefit a creditor of a bankrupt entity in that full dollar prepetition obligations of the creditor to the bankrupt entity can be reduced by its general unsecured claims against the entity (the recoveries of which are likely to be significantly compromised). Set-offs are subject to the automatic stay, so would require court approval. In the Luna/Mawson situation, a gating item requiring evaluation is whether unsecured claims against Celsius can be set-off against Celsius' secured claims. In addition, even if set-off was granted, the Mawson guaranty might remain in place, negating the benefits of this.

Recoupment is a defense to the obligation to pay the other party and, as such, is not subject to the automatic stay. Mutuality between the same parties and obligations arising from the same transaction are two of the requirements for recoupment. Mutuality between parties was discussed in the proceeding paragraph. The question of whether the obligations all arose from the same transaction would require legal review. There are arguments that appear to be in favor, including the use of proceeds, the dates of the documents and the tying of the documents together in the Cooperation Agreement. On the other hand, the Note and the Agreement are separate documents which might be construed to imply that they are not part of the same transaction. It might also be worth considering whether recoupment, since this is a defense against an obligation to pay, could mitigate the Mawson guaranty (also a legal question).

If the Agreement was rejected and Luna/Mawson desired to pursue strategies to mitigate its exposure under the Note, this would require expensive legal work and likely substantial litigation. There does not appear to be a reason to begin such work absent there being a belief that it is likely that the Agreement will be rejected. Note that if the debtor seeks to reject the Agreement, there will be a notice period prior to the actual rejection and Luna would have an opportunity to respond. Celsius will likely seek to reorganize or sell its business. In either of these scenarios, the likelihood of assumption of the Agreement is improved. In addition, if the Agreement is rejected, it might still be possible for Mawson and Celsius to reach a negotiated solution, such as Luna using or retaining the equipment to mine crypto and repaying the Note with the proceeds. At this juncture, monitoring the situation and delaying legal analysis seems fiscally prudent.

Finally, as discussed earlier this week, it remains our recommendation that Mawson issue the monthly invoice to Celsius for both the pre-petition period (1 July 2022 – 12 July 2022) and the post-petition period (being 13 July 2022 to 31 July 2022) if this has not occurred already.   At this juncture, we do not recommend that Mawson apply the deposits to unpaid invoices as there may be other strategies that can be implemented with respect to the deposits should the Agreement be rejected (such as applying them to damage claims) and there is no need to lose optionality at this time.

We will send you an information request and thoughts on next steps in a separate email.  Please do not hesitate to reach out if you have any questions.

Regards,

Adrian


**Adrian Frankum**
Senior Managing Director

485 Lexington Avenue, 10th Floor, New York, NY 10017
+1.212.818.1555 Main +1.646.968.3655 Direct
+1.917.601.0224 Mobile


ankura.com

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. This communication is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s), be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.