**Hearing Date:  November 30, 2023, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  November 23, 2023, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |
| | **Re Docket Nos.: 3615, 3662, 3672, 3673** |

### DEBTORS' OMNIBUS OBJECTION TO CERTAIN APPLICATIONS FOR SUBSTANTIAL CONTRIBUTION TO THE DEBTORS' ESTATES

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and together with their non-debtor affiliates, collectively, "Celsius") file this omnibus objection (the "Objection") to certain applications for payment of fees and expenses pursuant to

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

section 503(b) of the Bankruptcy Code (collectively, the "Unsupported Applications").[2] In support of this Objection, the Debtors state the following.

## Introduction

1.      Creditor participation in these Chapter 11 Cases has been robust.  At least five formal *ad hoc* groups were formed, and many *pro se* creditors have filed numerous motions and letters on the docket expressing their views on these Chapter 11 Cases.  In certain instances, this active participation has had a positive effect.  In March 2023, the Debtors, the Committee, and the Custody Ad Hoc Group successfully negotiated a full and final settlement and resolution of all disputes regarding the Custody Program[3] and treatment of Custody Claims under the Plan (the "Custody Settlement").  Shortly thereafter, in April 2023, the Debtors, the Committee, and the Withhold Ad Hoc Group successfully negotiated a full and final settlement and resolution of all disputes regarding treatment of Withhold Claims under the Plan (the "Withhold Settlement").  Finally, in July 2023, the Debtors, the Committee, the Ad Hoc Group of Earn Account Holders, the Ad Hoc Group of Borrowers, and certain individual Earn Account Holders successfully

---

[2]     The Unsupported Applications to which the Debtors are objecting are:  (a) *Substantial Contribution application for Zachary Wildes* [Docket No. 3615] (the "Wildes Application"); (b) *Substantial Contribution Claim of Rebecca Gallagher, Lead Plaintiff in Committee Class Claim Action* [Docket No. 3662] (the "Gallagher Application"); (c) *Application of BNK to the Future (BNK to the Future) Pursuant to 11 U.S.C. §§503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Professional Fees and Expenses Incurred in Making a Substantial Contribution* [Docket No. 3672] (the "BNK to the Future Application"); and (d) *Application of the Pending Withdrawal Ad Hoc Group Pursuant to 11 U.S.C. §§503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Professional Fees and Expenses Incurred in Making a Substantial Contribution* [Docket No. 3673] (the "Pending Withdrawal Ad Hoc Group Application").

The Debtors are separately negotiating a witness cooperation agreement with Connor Nolan ("Mr. Nolan") and believe the professional fees and expenses requested in the *Application of Connor Nolan Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Professional Fees and Expenses Incurred in Making a Substantial Contribution* [Docket No. 2045] will be addressed as part of that agreement.  For the avoidance of doubt, the Debtors reserve all rights with respect to Mr. Nolan's Application.

[3]     Capitalized terms otherwise not defined in the Objection shall have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as modified, amended, or supplemented from time to time, the "Plan").

mediated a full and final settlement regarding the treatment of Retail Borrower Deposit Claims and Earn Claims and resolving several pending adversary proceedings (the "Retail Borrower Settlement," and together with the Custody Settlement and Withhold Settlement, the "Settlements")[4] Each of these Settlements helped foster a broad consensus and framework that served as the foundation for the Plan, which has been confirmed.[5]

2.     Because of the significant benefits to the Debtors' estates and their creditors resulting from the Settlements, the Debtors are not objecting to certain substantial contribution applications with certain parties that were instrumental in those negotiations (collectively, the "Supported Applications").[6] Each of the applicants who brought the Supported Applications have been actively involved in these Chapter 11 Cases and were key participants in the Settlements, all of which resolved critical legal issues regarding the treatment of certain classes contained within the Plan and further propelled the Chapter 11 Cases forward to a successful resolution.   Such

---

[4]   *Memorandum Opinion Approving the Settlement Among the Debtors, the Committee, and the Initial Consenting Series B Preferred Holders* [Docket No. 3074].

[5]   *See Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3972] (the "Confirmation Order").

[6]   The Supported Applications include:  (a) *Application of Ad Hoc Group of Earn Account Holders Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4) for Allowance and Payment of Professional Fees and Expenses Incurred in Making a Substantial Contribution* [Docket No. 3654] (the "Earn Ad Hoc Group Application"); (b) *Application of the Custody Ad Hoc Group, Pursuant to Sections 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, for Allowance and Payment of Professional Fees and Expenses* [Docket No. 3660] (the "Custody Ad Hoc Group Application"); (c) *Application of the Ad Hoc Group of Withhold Account Holders for Allowance and Payment of Fees Under Bankruptcy Code Sections 503(b)(3)(D) and 503(b)(4)* [Docket No. 3663] (the "Withhold Application"); (d) *Application of Ignat Tuganov for Entry of an Order, Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), for Allowance and Reimbursement of Reasonable Professional Fees and Actual, Necessary Expenses in Making a Substantial Contribution to These Cases* [Docket No. 3666] (the "Tuganov Application"); (e) *Application of the Borrower Ad Hoc Group for Entry of an Order Pursuant to 11 U.S.C. §§ 503(b)(3)(D) and 503(b)(4), for Allowance and Reimbursement of Professional Fees and Actual, Necessary Expenses in Making a Substantial Contribution to These Cases* [Docket No. 3671] (the "Borrower Ad Hoc Group Application"); (f) *Application of Immanuel Herrmann Pursuant to 11 U.S.C. § 503 for Allowance and Payment of Expenses Incurred in Making a Substantial Contribution* [Docket No. 3674] (the "Herrmann Application"); and (g) *Daniel A. Frishberg'[s] Motion for Expenses and Fees to Be Paid for a Substantial Contribution to the Estate* [Docket No. 3675] (the "Frishberg Application").

3

applicants brought creative solutions and unique perspectives to complex issues requiring bespoke solutions. Their support for the Settlements and the Plan likely built additional consensus and votes for the Plan, and thereby helped the Debtors exit chapter 11 quicker than without such support. Furthermore, certain Supported Applications consist of actual out of pocket fees and expenses from *pro se* creditors to participate in these Chapter 11 Cases in good faith. In particular, counsel to Ignat Tuganov ("Mr. Tuganov") went above and beyond merely advocating for his client—his actions had a demonstrable impact on the Debtors' Estates and as such, his efforts constitute a substantial contribution within the meaning of section 503 of the Bankruptcy Code. Moreover, Mr. Tuganov's counsel's voluntary reduced its fees by 15 percent, which will result in more funds being available for creditor recoveries. In light of such reduction and Mr. Tuganov's continued involvement and support in these Chapter 11 Cases, the Debtors therefore support the Tuganov Application.

3.      Certain parties, including Mr. Zachary Wildes, Ms. Rebecca Gallagher, Mr. Simon Dixon, BNK to the Future, and the Pending Withdrawal Ad Hoc Group (each, a "Movant" and collectively, the "Movants"), however, assert that the Debtors' Estates should reimburse costs they incurred for alleged "substantial contributions" to these Chapter 11 Cases. While section 503(b)(3)(D) of the Bankruptcy Code allows for administrative expense status for reasonable professional fees or expenses incurred by certain parties in making a substantial contribution to chapter 11 cases, such relief is inappropriate to the extent requested in the Unsupported Applications for the reasons set forth herein.

4.      ***The Wildes Application***.  On September 27, 2023, Zachary Wildes filed a one-paragraph letter requesting reimbursement of (a) $17,550.00 in data analysis and consulting fees and (b) $18,475.00 in legal fees. It is unclear whether the invoices attached to the Wildes

Application are related to CEL Token settlement negotiations.[7]  Notably, Mr. Wildes requests reimbursement while failing to provide any details to justify administrative expense status under section 503(b)(3)(D) of the Bankruptcy Code.  Because Mr. Wildes offers no evidence that the fees and expenses he incurred are reasonable and therefore rise to the level of a "substantial contribution" to the Chapter 11 Cases, the Wildes Application should be denied in full.

5.      *The Gallagher Application*.  On October 2, 2023, Rebecca Gallagher filed the Gallagher Application, requesting an "additional recovery" of 20 ETH as compensation for her contribution of "time, effort and energy in preparing for the Committee Class Claim" and her role as one of the lead plaintiffs in such action.  Ms. Gallagher asserts that her participation as a lead plaintiff benefitted the Debtors' Estates because (a) the eventual settlement of the class action complaint prevented the "lengthy and costly litigation" of over 30,000 claims and (b) benefitted all creditors outside the Custody Class with an additional 5 percent recovery.  Putting aside the question of the actual effect that Ms. Gallagher's participation as a proposed lead plaintiff had on such class claim settlement, the Bankruptcy Code only allows for reimbursement of actual expenses, not the 20 ETH "additional recovery" Ms. Gallagher seeks.  Specifically, section 503(b)(3)(D) of the Bankruptcy Code allows for the reimbursement of professional fees and expenses—not "additional recovery"—and because it was Estate professionals who negotiated the class action settlement for the benefit of the Debtors' Estates—and not Ms. Gallagher—the Gallagher Application should be denied in full.

6.      *The BNK to the Future Application*.  On October 2, 2023, BNK to the Future and its chief executive officer, Simon Dixon, filed the BNK to the Future Application requesting entry

---

[7]     Mr. Wildes' letter states, "I also appreciate the UCC and the Debtors working out a settlement with me in regards to CEL token (Document 3486).  I respectfully submit my invoices for reimbursement…."

of an order allowing as administrative expense claims in the amount of $571,028.50 in professional

fees plus $20,859.65 in expenses, including (a) 50 percent of $222,688.50 for the fees and

expenses of Brown Rudnick LLP, which advised BNK to the Future during the Debtors' sale

process, (b) 50 percent of $59,034.00 for the fees and expenses of DBK Financial Services, which

served as BNK to the Future's investment banker and advised BNK to the Future on the feasibility

of Mr. Dixon's proposed plan structure, and (c) $239,306.00 for the fees and expenses of Ervin

Cohen & Jessup LLP, plus an additional amount of up to $50,000 for fees associated with work

not yet done.

7.      While the Debtors agreed in the Plan Sponsor Agreement to support any substantial

contribution application filed by Mr. Dixon or BNK to the Future "for the payment of legal fees

and expenses pursuant to section 503(b)(3)(D) of the Bankruptcy Code *relating to the negotiation

and execution of [the Plan Sponsor Agreement]*,"[8] the BNK to the Future Application does not

identify or distinguish what portion of the $591,888.15 in requested fees and expenses relate to the

negotiation and execution of the Plan Sponsor Agreement—certainly not the approximately

$50,000 requested for "anticipated fees in connection with the future appearance and preparation

of responses to objections to the [BNK to the Future Application]."  Accordingly, the BNK to the

Future Application should be denied to the extent it requests fees not relating to the negotiation

and execution of the Plan Sponsor Agreement.

8.      ***The Pending Withdrawal Ad Hoc Group Application***.  The Pending Withdrawal

Ad Hoc Group argues that it substantially contributed to these Chapter 11 Cases by supporting the

Debtors' Plan and, as such, furthered the likelihood of Plan confirmation.  Its participation

included, namely, participating in numerous calls with counsel to other ad hoc groups and the

---

[8]      *Notice of Entry into Plan Support Agreement*, § 13 [Docket No. 3516] (emphasis added).

Committee, filing a complaint that led to the settlement of the Committee's Class Claim, and promoting the Debtors' Plan to other creditors. The Pending Withdrawal Ad Hoc Group requests administrative expenses in the amount of (a) $28,927.50 in legal fees and (b) $350.00 in expenses.

9.      Ultimately, while the Debtors acknowledge that the Pending Withdrawal Ad Hoc Group participated in these Chapter 11 Cases, that participation alone does not rise to the level of a "substantial contribution" as contemplated under section 503(b)(3)(D) of the Bankruptcy Code. Moreover, the alleged results of any such participation benefitted only a small portion of the Debtors' vast creditor base.

10.     Accordingly, the Pending Withdrawal Ad Hoc Group Application should be denied.

11.     For these reasons, and as more fully set forth herein, the Unsupported Applications should be denied.

## **Background**

12.     On July 13, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

13.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These Chapter 11 Cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket No. 53]. On July 27, 2022, the U.S. Trustee appointed an official committee of unsecured creditors [Docket No. 241] (the "Committee"). On September 14, 2022, the Court entered an order authorizing the appointment of an examiner [Docket No. 820]. On April 4, 2023, the Court entered the *Order Discharging Examiner* [Docket No. 2364].

14.    On September 27, 2023, the Debtors filed the latest version of the Plan, and on October 2, 2023, the hearings to consider confirmation of the Plan (the "Confirmation Hearing") commenced.  On November 9, 2023, the Court entered the Confirmation Order.

15.    Pursuant to the Confirmation Schedule filed on September 19, 2023,[9] the Movants filed their Unsupported Applications on or prior to October 2, 2023.

16.    Pursuant to the Confirmation Schedule,[10] the Debtors file this Objection to the Unsupported Applications.

## Objection

17.    Section 503(b)(4) of the Bankruptcy Code provides for the payment of "reasonable compensation for professional services rendered by an attorney or an accountant of any entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection[.]"  11 U.S.C. § 503(b)(4).  Accordingly, the Court need not consider whether an entity is entitled to administrative expense treatment of its professional fees until the entity is deemed to have an administrative expense claim under the applicable subparagraph of section 503(b)(3) of the Bankruptcy Code.

18.    Section 503(b)(3)(D) of the Bankruptcy Code provides, in relevant part, for the administrative expense treatment of:

> the actual, necessary expenses, . . . incurred by a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders . . . in making a *substantial contribution* in a case under chapter 9 or 11 of this title.

11 U.S.C. § 503(b)(3)(D) (emphasis added).

---

[9]    *See Notice of Further Revised Schedule for Substantive Contribution Applications* [Docket No. 3498].

[10]   The hearing on the Applications was adjourned to November 30, 2023, and the objection deadline was extended for all parties to November 23, 2023.  *See Notice of Adjournment Regarding the Hearing to Consider the Substantial Contribution Applications* [Docket No. 3836].

19.    The term "substantial contribution" is not defined in the Bankruptcy Code.  In determining whether a party has made a "substantial contribution" within the meaning of section 503(b)(3)(D) of the Bankruptcy Code, however, courts have found that "the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors."  *In re Lebron v. Mecham Fin. Inc.*, 27 F.3d 937, 944 (3d. Cir. 1994) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)).

20.    To be entitled to a payment as a substantial contribution, the applicant must "demonstrate by a preponderance of the evidence that it has made a substantial contribution in the case."  *In re Dana Corp.*, 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008).  Compensation for substantial contribution is "designed to promote meaningful participation in the reorganization process, but at the same time, discourage mushrooming administrative expenses."  *In re Synergy Pharms. Inc.*, 621 B.R. 588, 609 (Bankr. S.D.N.Y. 2020) (quoting *In re Granite Partners*, 213 B.R. 440, 445 (Bankr. S.D.N.Y. 1997).  As such, courts in the Second Circuit narrowly construe section 503 of the Bankruptcy Code.  *See Granite Partners*, 213 B.R. at 445 ("[T]he substantial contribution provisions must be narrowly construed and do not change the basic rule that the attorney must look to his own client for payment.") (internal citations omitted); *see also In re Best Prod. Co., Inc.*, 173 B.R. 862, 866 (Bankr. S.D.N.Y. 1994) ("[E]xtensive participation in a case, without more, is insufficient to compel compensation . . . The integrity of § 503(b) can only be maintained by strictly limiting compensation to extraordinary creditor actions which lead directly to tangible benefits to the creditors, debtor or estate."); *In re Bayou Grp., LLC*, 431 B.R. 549, 558 (Bankr. S.D.N.Y. 2010) ("[P]riorities must be narrowly construed in light of the presumption in bankruptcy cases that the debtor's limited resources will be equally distributed among all unsecured creditors.").

I.      **The Movants Have Not Satisfied the Burden of Demonstrating That They Made a Substantial Contribution to the Debtors' Estates.**

21.     When analyzing a request for substantial contribution, courts in the Second Circuit consider various factors, including "(i) whether the services benefited a creditor, the estate itself, or all interested parties; (ii) whether the services resulted in an actual significant and demonstrable benefit to the estate; and (iii) whether the services were duplicated by the efforts of others involved in the case." *In re AMR Corp.*, No. 11-15463 (SHL), 2014 WL 3855320, at *1 (Bankr. S.D.N.Y. Aug. 5, 2014) (citing *Trade Creditor Grp. v. L.J. Hooker Corp., Inc.* (*In re Hooker Invs., Inc.*), 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd*, 109 F.3d 349 (2d. Cir. 1996); *In re Best Prods. Co., Inc.*, 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994)).   Analyzing these factors demonstrates that the Movants' actions were self-interested and that the respective acts and services the Movants allege benefitted the Debtors' Estates were duplicative of services rendered by Estate professionals.

A.      **The Movants Acted Primarily in Their Own Self Interest, and Any Benefit to the Debtors' Estates Is Incidental.**

22.     For a creditor's services to be considered a substantial contribution, "the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Dana Corp.*, 390 B.R. at 108. "Creditors face an especially difficult burden in passing the 'substantial contribution' test since they are presumed to act primarily for their own interests." *Id.*   A creditor's self-interested act does not justify a substantial contribution award even if it indirectly benefitted the debtor's estate. *Id.*; *see also In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW), 2019 WL 4555990, at *12 (Bankr. S.D.N.Y. Sept. 19, 2019) ("A creditor does not need to be completely altruistic, but where a creditor's actions have been performed primarily to protect the creditor's own interests no 'substantial contribution' claim is appropriate."); *Granite Partners*, 213 B.R. at 446 ("[S]ervices

calculated primarily to benefit the client do not justify an award even if they also conferred an indirect benefit on the estate.").

23.    Courts in the Second Circuit have noted that a creditor's motive in contributing to the estate is not outcome determinative.  *See Bayou Grp.*, 431 B.R. at 561 (noting that a creditor's mere motive should not determine the outcome) (citing *In re DP Partners Ltd. Pshp,* 106 F.3d 667, 673 (5th Cir. 1997); *In re Pow Wow River Campground, Inc.*, 296 B.R. 81, 86 (Bankr. D.N.H. 2003)).  Rather, the analysis "focuses on process as much as on contribution, on the movant's substantial contribution in *the case*—that is, the entire chapter 11 case—and, generally speaking, the proper administration of the case as a whole rarely contemplates individual creditors or even unofficial committees contributing to *the case*."  *Bayou Grp.*, 431 B.R. at 561. "Third parties, who generally represent only their clients' interests and only indirectly contribute to the case's administration, therefore normally would not be compensated by the estate on an administrative priority basis."  *Id.*

24.    Here, Movants' respective participation in these Chapter 11 Cases was intended to benefit the Movants themselves.  None of the Unsupported Applications indicate that the Debtors' and the Committee's counsel ineffectively represented the interests of the Movants and the Debtors' Estates or that the Movants performed services that were not performed by Estate professionals.  Rather, each of the Movants voluntarily interjected themselves into the Debtors' reorganization process to further their respective self-interests and ensure that each Movant would obtain the largest recovery possible in these Chapter 11 Cases.  The Debtors' Estates should not be burdened by the Movants' fees and expenses incurred on account of their self-interested participation in these Chapter 11 Cases.  Such participation stands in stark contrast to the Supported Applications, which demonstrate meaningful participation in these Chapter 11 Cases and whose

actions conferred a demonstrable and meaningful benefit on the Debtors' Estates, including negotiating and entering into the Settlements that led to a faster exit from chapter 11.

25.    Each of the Movants have failed to meet their burden showing that they are entitled to a substantial contribution award.

26.    ***The Wildes Application***.    Mr. Wildes introduces no evidence or arguments to support the Wildes Application.    While his letter alludes to negotiating and executing the CEL Token settlement agreement with the Debtors and the Committee,[11] noting that he "appreciate[ed] the UCC and the Debtors working out a settlement with [him] in regards to CEL token (Document 3486)" and "respectfully submit[s] [his] invoices for reimbursement," Mr. Wildes makes no effort to suggest that he made a substantial contribution to these Chapter 11 Cases.    In fact, the few sentences Mr. Wildes writes suggest that his primary focus was negotiating a settlement for his own benefit.    Mr. Wildes did not negotiate any settlement on behalf of a broader creditor constituency—the CEL Token settlement agreement to which Mr. Wildes was a party was an agreement solely between the Debtors, the Committee, Santos Caceres ("Mr. Caceres"), and Mr. Wildes.[12]    The only claims the Debtors settled under such settlement were those of Mr. Wildes and Mr. Caceres.

27.    Furthermore, although the Debtors agreed to not "oppose an application for the payment of reasonable and documented expenses and legal fees incurred by Wildes . . . under Section 503(b) of the Bankruptcy Code,"[13] such agreement was limited to "reasonable" expenses and legal fees.    Nowhere in the Wildes Application does Mr. Wildes attempt to argue that his

---

[11]    *See Notice of Filing of Settlement Agreement Regarding CEL Token Valuation Dispute* [Docket No. 3486].

[12]    *See id.*

[13]    *See id.*

expenses and legal fees are "reasonable," nor does Mr. Wildes provide evidence that such fees and expenses were incurred as part of the CEL token settlement negotiations.

28.     Accordingly, the Wildes Application should be denied.

29.     ***The Gallagher Application***.    Similarly, Ms. Gallagher does not introduce any evidence demonstrating that her participation in these Chapter 11 Cases was anything more than an act of self-interest to ensure a greater recovery.  The expenses requested by Ms. Gallagher do not fall within the ambit of section 503 of the Bankruptcy Code, as it was the Debtors and the Committee who negotiated the Class Claim Settlement and selected Ms. Gallagher as a proposed Class Claim Representative—neither action requiring extensive participation on behalf of Ms. Gallagher.  Ms. Gallagher makes no plausible arguments that her role as a Class Claim Representative provided anything more than an incidental benefit to the Debtors' Estates entitling her to an administrative priority claim.

30.     ***The BNK to the Future Application***.    Mr. Dixon and BNK to the Future put forth insufficient evidence to meet their burden of proof to justify being compensated by the Debtors' Estates.[14]    Contrary to Mr. Dixon's assertion that his acts, such as posting informative videos regarding the Debtors' reorganization, connecting constituencies of creditors, hosting Q&A sessions on X spaces (formerly Twitter), and proposing various frameworks for reorganization were substantial contributions to the Debtors' Estates, such services were pursued in protecting

---

[14]    For the avoidance of doubt, the Debtors do not object to the BNK to the Future Application with respect to fees and expenses incurred as part of negotiating the Plan Support Agreement.  *See Notice of Entry into Plan Support Agreement* [Docket No. 3516] ("The Debtors and the Committee will support any substantial contribution application or portion thereof submitted by the Consenting Dixon Parties for the payment of legal fees and expenses pursuant to section 503(b)(3)(D) of the Bankruptcy Code relating to the negotiation and execution of this Agreement.  Any payment of such fees and expenses shall be subject to Bankruptcy Court approval.  Nothing in this Agreement shall prevent the Consenting Dixon Parties from filing an application for substantial contribution for other fees or expenses pursuant to section 503(b)(3)(D).").  Neither Mr. Dixon nor BNK to the Future, however, attempt to distinguish which fees were incurred in negotiating the Plan Support Agreement.

Mr. Dixon and BNK to the Future's respective interests and boosting his social-media celebrity. Indeed, Mr. Dixon was likely acting in his capacity as an investor while undertaking such tasks, as BNK to the Future submitted two bids during the Debtors' sale process.

31.    Mr. Dixon's proposed plan frameworks were part of BNK to the Future's bids, and Mr. Dixon's social media posts and videos describing such frameworks served to boost his own profile and business.  For example, Mr. Dixon's proposal whereby BNK to the Future would issue the Debtors' customer coins to the BNK to the Future platform for customers to invest in a new company was substantially similar to the feature on the BNK to the Future platform whereby the Debtors' customers could import their claims and use such claims to pledge support for specific plans or bidders.[15]  The launch and promotion of such feature likely increased Mr. Dixon and BNK to the Future's customer base and was likely undertaken in hopes of profiting off the business of Celsius's creditors and other potential bidders, as withdrawals and other actions on the BNK to the Future platform would be subject to fees.[16]

32.    Moreover, Mr. Dixon and BNK to the Future are not entitled to fees as part of their unsuccessful bid—doing so would set a dangerous precedent in future chapter 11 cases for jilted bidders to seek payment from a debtor's estate for a failed bid.[17]

---

[15]   *See, e.g.*, Simon Dixon, *Equitable Haircut Strategy: Making Celsius Creditors Whole* (livestreamed Oct. 10, 2022), https://www.youtube.com/watch?v=ZFwjTlyq2PQ (proposing such plan); Simon Dixon, *Exiting Chapter 11* (livestreamed Nov. 25, 2022), https://www.youtube.com/watch?v=NTm6lwKTJzk at 27:20 (demonstrating the BNK to the Future platform feature whereby customers could import their Celsius claims).

[16]   *See Fees*, Bnk to the Future (accessed Oct. 31, 2023 at 3:28 PM), https://bnktothefuture.com/fees/ (charging 5% and upwards of $2,000 for raising finance).

[17]   *See In re S.N.A. Nut Company*, 186 B.R. 98, 105 (N.D. Ill. 1995) (stating that break-up fees in bankruptcy auction sales are inappropriate "absent compelling circumstances which clearly indicate the payment of the fee would be in the interest of the estate."); *Calpine Corp. v. O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (denying payment of break-up fee where the bidder failed to show the fees were actually necessary to preserve estate value).

33.     As two of the largest creditors in these Chapter 11 Cases, Mr. Dixon and BNK to the Future fail to distinguish how their respective actions rise to any level beyond self-interested acts to maximize their recoveries.  As such, Mr. Dixon and BNK to the Future are not entitled to an allowed administrative expense claim pursuant to section 503(b) of the Bankruptcy Code with respect to any fees and expenses incurred for services other than those relating to the negotiation and execution of the Plan Support Agreement.

34.     ***The Pending Withdrawal Ad Hoc Group Application***.  Finally, the Pending Withdrawal Ad Hoc Group fails to demonstrate that its services were pursued for the benefit of the Debtors' Chapter 11 Cases that would entitle it to a substantial contribution award.  Rather, the services performed by counsel to the Pending Withdrawal Ad Hoc Group were self-interested and only inured to the benefit of a small number of similarly situated creditors.[18]  It is inappropriate under the facts and circumstances of these Chapter 11 Cases to award this three-person ad hoc group for its efforts, as section 503(b) of the Bankruptcy Code cannot "be relied on to reward creditors and unofficial committees who merely furthered their own or their constituents' interests, the Code having established other claims and priorities for such expenses." *Bayou Grp.*, 431 B.R. at 561–62.

**B.     The Movants Failed to Demonstrate Actual, Significant Benefits Conferred to the Debtors' Estates.**

35.     Substantial contribution awards under section 503 of the Bankruptcy Code are "reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate." *Dana Corp.*, 390 B.R. at 108.   Services that

---

[18]    The Pending Withdrawal Ad Hoc Group consists of Celsius creditors Georges Georgiou, Philip H. Stewart, and Gilbert Castillo. *See Verified Statement Pursuant to Bankruptcy Rule 2019* [Docket No. 2155], Ex. A (listing the members of the Pending Withdrawal Ad Hoc Group).  Approximately 3,200 Account Holders in total unsuccessfully attempted to withdraw funds leading up to the Pause, representing less than 1% of Account Holders.

substantially contribute to a chapter 11 case are those which foster and enhance, rather than retard or interrupt the progress of reorganization." *In re Richton Int'l Corp.*, 15 B.R. 854, 856 (Bankr. S.D.N.Y. 1981.

36.    Here, the Movants fail to demonstrate that their services rendered during these Chapter 11 Cases conferred an actual, significant benefit to the Estates.

37.    ***The Wildes Application***.  As stated above, Mr. Wildes makes no effort in his Unsupported Application to suggest that he has made a substantial contribution to these Chapter 11 Cases—to the contrary, his Unsupported Application mentions his appreciation for "the UCC and the Debtors working out a settlement ***with [him]*** in regards to CEL Token (Document 3486)." Wildes Application at 1.  As such, he has failed to demonstrate that his services conferred a demonstratable benefit to the Debtors' Estates.

38.    ***The Gallagher Application***.  While Ms. Gallagher was selected as one of three Class Claim Representatives in the class action lawsuit that resulted in the Class Claim Settlement, this role does not constitute a substantial contribution to the Debtors' Estates.  Estate professionals litigated such action in this Court—not Ms. Gallagher.  The Debtors' and Committee's professionals, not Ms. Gallagher, negotiated the additional five percent recovery for the Class Claim Settlement Participants.  As such, the Class Claim Settlement as a whole—prosecuted and negotiated by Estate professionals—directly benefitted the administration of the Debtors' Estates, not any unique or extraordinary work performed by Ms. Gallagher.  Because "compensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate," Ms. Gallagher is not entitled to an administrative expense claim for her participation in these Chapter 11 Cases.  *In re Synergy Pharms. Inc.*, 621 B.R. 588, 609 (Bankr. S.D.N.Y. 2020).

39.    ***The BNK to the Future Application***.    Mr. Dixon and BNK to the Future fail to demonstrate that their services throughout these Chapter 11 Cases provided an actual, tangible benefit to the administration of the Debtors' Estates.    As stated above, their acts, such as posting educational videos regarding the Chapter 11 Cases and connecting constituencies, had no clear benefit to the administration of these Chapter 11 Cases as a whole.    While Mr. Dixon and BNK to the Future claim that Mr. Dixon substantially contributed to these Chapter 11 Cases by posting educational videos regarding these Chapter 11 Cases, Mr. Dixon's proposed chapter 11 plan framework, and cryptocurrency generally, Mr. Dixon and BNK to the Future have failed to show that their followers on X (formerly Twitter) and viewers of their educational videos posted to X Spaces are representative of the broader Celsius creditor constituency.    Indeed, even assuming that all followers were Celsius creditors, their follower counts do not account for even a majority of such constituency.    Furthermore, Mr. Dixon and BNK to the Future's comparisons of these Chapter 11 Cases to those of BlockFi, Inc. ("BlockFi") and Voyager Digital Holdings, Inc. ("Voyager") are unavailing because, unlike BlockFi and Voyager, the Debtors have a functioning mining business—a key asset that was leveraged in plan negotiations that will form the basis of the Debtors' go-forward business.[19]    Mr. Dixon's proposal of various frameworks for reorganization were merely services pursued in protecting Mr. Dixon and BNK to the Future's respective interests, and such services only provided an incidental benefit, if any, to the administration of these Chapter 11 Cases as a whole.

40.    ***The Pending Withdrawal Ad Hoc Group Application***.    Finally, the Pending Withdrawal Ad Hoc Group also fails to demonstrate that its services directly benefited the Debtors'

---

[19]    *See* Bnk to the Future Application, ¶ 4 ("*But-for* Mr. Dixon's efforts, there is ample reason to believe that this case would be no different from the proceedings of cryptocurrency restructurings that have resulted in vastly inferior outcomes.").

Estates that rises to a substantial contribution.  While the Pending Withdrawal Ad Hoc Group's actions such as participating in negotiations and settlements with Estate professionals furthered the interests of a small group of similarly-situated creditors, it has failed to demonstrate how its actions provided a substantial, demonstrable benefit to the Debtors' Estates and these Chapter 11 Cases as a whole.  As such, the Pending Withdrawal Ad Hoc Group has not met its burden demonstrating anything more than an incidental benefit to the Debtors' Estates through its services in these Chapter 11 Cases.

### C. Even If the Movants' Services Benefitted the Debtors' Estates, Such Services Were Duplicative of Services Rendered by Estate Professionals.

41.    Even assuming Movants' services rise to the level of "substantial contribution," many of those services were duplicative of services already provided by Estate professionals.

42.    In a majority of cases where courts have allowed a creditor's substantial contribution claim, courts have "found that the creditor played a leadership role that normally would be expected of an estate-compensated professional *but was not so performed*."  *In re Bayou Grp., LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010).  For example, such cases "involved a creditor who actively facilitated the negotiation and successful confirmation of the chapter 11 plan or, in opposing a plan, brought about the confirmation of a more favorable plan." *Id.*  Outside of the plan confirmation process, courts have allowed a substantial contribution claim "because the creditor's efforts led to a concrete, measurably monetary benefit for the estate" and such creditor "performed functions that normally would have been undertaken by estate-compensated professionals, or that had to be performed because estate compensated professionals were not doing their job." *Id.*

43.    As reflected by the progress of these Chapter 11 Cases, it is clear that counsel to both the Debtors and Committee undertook substantial efforts to maximize Estate value and bring

these Chapter 11 Cases closer to a successful resolution.  While the Movants participated in various ways—such as negotiating various settlements, forming creditor constituencies, posting updates to social media, or working to garner support for the Plan—the ultimate success of these Chapter 11 Cases is overwhelmingly due to the work of Estate professionals who have a fiduciary duty to maximize the value of the Debtors' Estates.  None of the Unsupported Applications allege that counsel to the Debtors or the Committee are incompetent such that the Movants or their professionals were required to intervene for the successful administration of these Chapter 11 Cases.  As such, it cannot be said that the Movants' professionals provided any contributions to the Debtors' Estates not already provided for by the Debtors' and Committee's retained professionals.

44.     Based on the foregoing, the Applicants have failed to show that they are entitled to a substantial contribution award because, even if the Movants' services benefitted the Debtors' Estates, such services were duplicative of those rendered by the Debtors' and the Committee's retained professionals.

## II.     The Movants Have Not Demonstrated that the Services Rendered Are Reasonable.

45.     In addition to requesting administrative expense priority under section 503(b)(3)(D) of the Bankruptcy Code, Mr. Dixon, BNK to the Future, and the Pending Withdrawal Ad Hoc Group request payment of their professional fees and expenses under section 503(b)(4) of the Bankruptcy Code.

46.     Under section 503(b)(4) of the Bankruptcy Code, an entity may request payment of an administrative expense for:

> reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other

than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant.

11 U.S.C. § 503(b)(3)(4).

47.    Even if the Court determines that one or more of the Movants made a substantial contribution to the Debtors' Estates, none of the Movants have satisfied their burden to demonstrate that the compensation requested for services rendered by their professionals is reasonable as required under section 503(b)(4) of the Bankruptcy Code.

48.    The Wildes Application does not address the reasonableness of the fees or expenses requested and simply attaches two one-page invoices. Offering little to no information, the Wildes Application fails to carry its burden and should be denied.

49.    The Gallagher Application, as noted, does not request reimbursement for expenses or costs related to "professional services rendered by an attorney or an accountant," but rather requests "additional recovery" to personally compensate Ms. Gallagher. Ms. Gallagher does not claim to be an attorney or an accountant and does not describe her contribution to the Chapter 11 Cases beyond stating that she "prepare[d] for the Committee Class Claim" and "serv[ed] as a Lead Plaintiff in the Committee Class Claim Action." For these reasons, and for the other reasons stated herein, the Gallagher Application fails to show that her requested compensation is reasonable and should be denied.

50.    With respect to the services performed by the Pending Withdrawal Ad Hoc Group, such as the negotiation of the Class Claim Settlement, negotiations and conversations regarding the Earn Program, and promotion of the Plan, such services duplicated those of counsel to both the Debtors and Committee. No explanation is advanced for the necessity of the Pending Withdrawal Ad Hoc Group's participation in such negotiations given that Estate professionals

20

were present in ongoing negotiations and adequately represented the interests of the Estates and the Debtors' creditors.

51.     Likewise, with respect to the services performed by Mr. Dixon, his counsel, and counsel to BNK to the Future, no explanation is advanced as to why the services performed were critical to the successful administration of these Chapter 11 Cases.  Despite Mr. Dixon's claims that his contributions to the Plan structure, participation in negotiations, and dissemination of information to creditors were not duplicative, each of these services were also adequately rendered by counsel to both the Debtors and Committee and, as such, it is not reasonable to burden the Debtors' Estates with such costs.  While the Debtors agreed under the Plan Support Agreement to support the Consenting Dixon Parties' substantial contribution applications with respect to fees and expenses relating to the Plan Support Agreement, the BNK to the Future Application fails to distinguish what portion of the requested fees are associated with negotiating of the Plan Support Agreement, and a significant portion of their fees are plainly related to the development of their bids.

52.     Based on the foregoing, the Movants have not met their burden to establish that fees of their professionals were reasonable as required under section 503(b)(4) of the Bankruptcy Code.  Therefore, the Unsupported Applications must be denied.

## Conclusion

53.     For the reasons set forth herein, the Debtors request that the Court deny the Unsupported Applications.


*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors request that the Court enter an order denying the Applications.

New York, New York
Dated: November 22, 2023

_/s/ Joshua A. Sussberg_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com

 - and -

Patrick J. Nash, Jr., P.C. (admitted _pro hac vice_)
Ross M. Kwasteniet, P.C. (admitted _pro hac vice_)
Christopher S. Koenig
Dan Latona (admitted _pro hac vice_)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               ross.kwasteniet@kirkland.com
               chris.koenig@kirkland.com
               dan.latona@kirkland.com

_Counsel to the Debtors and Debtors in Possession_