Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF FILING OF REVISED**
**PROPOSED ORDER (I) APPROVING**
**THE SETTLEMENT BY AND BETWEEN THE DEBTORS AND**
**EZ BLOCKCHAIN SERVICES, LLC AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on November 9, 2023, the above-captioned debtors and

debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of an Order*

*(I) Approving the Settlement By and Between the Debtors and EZ Blockchain Services, LLC, and*

*(II) Granting Related Relief* [Docket No. 3983] (the "Motion").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby submit a revised proposed *Order (I) Approving the Settlement By and Between the Debtors and EZ Blockchain Services, LLC, and (II) Granting Related Relief* , attached hereto as **Exhibit A** (the "Revised Proposed Order").  Attached as Exhibit 1 to the Revised Order is the Settlement Agreement (including the new hosting services agreement attached thereto), entered by and between the Debtors and EZ Blockchain Services, LLC.

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised Order and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: November 22, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        patrick.nash@kirkland.com
              ross.kwasteniet@kirkland.com
              chris.koenig@kirkland.com
              dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Revised Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## ORDER (I) APPROVING
## THE SETTLEMENT BY AND BETWEEN THE DEBTORS AND
## EZ BLOCKCHAIN SERVICES, LLC AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (i) approving the Settlement, as embodied in the Settlement Agreement attached hereto as **Exhibit 1**, by and between the Debtors and EZ Blockchain Services, LLC and (ii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Settlement (as embodied in the Settlement Agreement attached hereto as **Exhibit 1**) and the Settlement Agreement are approved in their entirety including, without limitation, the releases contained therein.

3.      Pursuant to Bankruptcy Rule 9019, the Parties are authorized to enter into and perform under the Settlement as embodied in the Settlement Agreement, and perform, execute, and deliver all documents, and take all actions necessary, to immediately continue and fully implement the Settlement in accordance with the terms, conditions, and agreements set forth or provided for in the Settlement Agreement.  For the avoidance of doubt, the Parties are authorized to enter into the New Agreement as contemplated by the Settlement Agreement.

4.      Notwithstanding anything to the contrary in the Motion, this Order, or any findings announced at the Hearing, nothing in the Motion, this Order, or announced at the Hearing constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the United States Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis are expressly reserved.

2

5.     Nothing contained in any chapter 11 plan confirmed or confirmation order entered in these chapter 11 cases shall prejudice, impair, alter, or modify the New Hosting Agreement or the Settlement Agreement.

6.     The notice requirements under Bankruptcy Rule 6004(a) are hereby waived.

7.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

8.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.  Solely for purposes of the Settlement and Settlement Agreement, the automatic stay of section 362(a) of the Bankruptcy Code shall not apply to nor prevent the exercise or performance by any Party of its rights or obligations under the Settlement and Settlement Agreement.

9.     This Order shall bind the Parties, their estates and any successors or assigns, including without limitation any trustee, liquidating trustee, the Post-Effective Date Debtors, Plan Administrator, Litigation Administrator, or any other estate representative.

10.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY
JUDGE

3

# EXHIBIT 1

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (including all exhibits hereto, and as may be amended, supplemented, or otherwise modified from time to time, this "Settlement Agreement") is made and entered into as of November 22, 2023, by and among the following parties: [1]

(i)        Celsius Network LLC and its debtor affiliates (collectively, the "Debtors"); [2] and

(ii)       EZ Blockchain Services, LLC ("EZ Blockchain" and, together with the Debtors, the "Parties").

## RECITALS

A.      **WHEREAS**, on July 13, 2022, certain of the Debtors [3] filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Case No. 22-10964 (MG) (the "Chapter 11 Cases");

B.      **WHEREAS**, prior to the Petition Date, Debtor Celsius Mining LLC ("Mining") and EZ Blockchain executed three hosting services agreements dated (i) January 27, 2022, (ii) February 22, 2022, and (iii) March 15, 2022 (collectively, the "Prepetition Agreements");

C.      **WHEREAS**, the Parties subsequently engaged in settlement negotiations and discussions regarding disputes relating to the Prepetition Agreements, including Mining's entitlement to the return of uncredited Prepayments;

D.      **WHEREAS**, the Parties desire to continue their contractual relationship on the terms set forth herein, including the hosting agreement attached hereto as **Exhibit A** (the "New Hosting Agreement"); and

E.      **WHEREAS**, following good-faith and arm's-length negotiations, the Parties reached agreement on a settlement resolving all matters relating to the Prepetition Agreements, on the terms set forth in this Settlement Agreement.

---

[1]    Capitalized terms used but not otherwise defined in this Settlement Agreement shall have the meanings ascribed to them in the New Hosting Agreement attached hereto as **Exhibit A**, the *Debtors' Motion for Entry of an Order (I) Approving the Settlement by and between the Debtors and EZ Blockchain Services, LLC and (II) Granting Related Relief* (the "Settlement Motion") filed substantially contemporaneously herewith, or the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Docket No. 3577] (as may be modified, amended, or supplemented from time to time, the "Plan"), as applicable.

[2]    The Debtors are:  Celsius Network LLC; Celsius KeyFi LLC; Celsius Lending LLC; Celsius Mining LLC; Celsius Network Inc.; Celsius Network Limited; Celsius Networks Lending LLC; Celsius US Holding LLC; GK8 Ltd.; GK8 UK Limited; and GK8 USA LLC.

[3]    Debtors GK8 Ltd., GK8 USA LLC, and GK8 UK Limited filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on December 7, 2022.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1. **For Settlement Purposes Only**. This Settlement Agreement is for settlement purposes only. Except as explicitly set forth in this Settlement Agreement, the fact of this Settlement Agreement or any provision herein, the negotiations or proceedings related hereto, and any actions taken hereunder shall not constitute or be construed as (a) any admission of the validity of any claim or any fact alleged by any of the Parties, (b) any admission of any wrongdoing, fault, violation of law, breach of contract, or liability of any kind on the part of any of the Parties, (c) any admission as to any claim or allegation made in any demand of, action against, or proceeding against any of the Parties, and/or (d) a waiver of any applicable defense by any of the Parties. This Settlement Agreement shall not be offered or admissible as evidence against any Party in any action or proceeding in any forum for any purpose whatsoever, except as evidence of its existence or terms or in any action or proceeding brought to enforce its terms.

2. **Approval**. This Settlement Agreement shall be effective on the date the Bankruptcy Court enters an order approving the Settlement Motion, in form and substance reasonably acceptable to each of the Parties, authorizing the parties to enter into the Settlement Agreement and such order has become final and non-appealable (the "Settlement Approval Order"). Although the Parties shall sign this Settlement Agreement prior to the entry of the Settlement Approval Order, this Settlement Agreement shall not be effective or binding on the Parties if the Settlement Approval Order is not entered by the Bankruptcy Court.

3. **Hosting Agreement**. In consideration for the terms and conditions set forth herein, upon entry of the Settlement Approval Order, the Debtors and EZ Blockchain hereby agree:

   a. To enter into and perform their respective obligations under the New Hosting Agreement and further acknowledge and agree that all prior performance, including the Interim Services (as defined in the New Hosting Agreement) is approved and ratified.

   b. The Plan will not prejudice, impair, alter or modify the New Hosting Agreement or this Settlement Agreement. The Parties will work in good faith to include a paragraph in future orders confirming the Plan to confirm the foregoing.

   c. The New Hosting Agreement will re-vest in and be fully enforceable by EZ Blockchain against the applicable contracting Post-Effective Date Debtor according to its terms.

   d. Notwithstanding the re-vesting of the New Hosting Agreement, EZ Blockchain will retain all rights under the New Hosting Agreement regardless of whether amounts due accrued before or after the re-vesting in the Post-Effective Date Debtor.

    e.   Except for their obligations hereunder and under the New Hosting Agreement, the Parties will exchange the releases set forth below.

4.    **Termination**.  Each Party may serve written notice of the termination of this Settlement Agreement to the other Party, in accordance with <u>Section 6</u> hereof, solely upon the occurrence of any of the following events:

    (a)    the entry of an order by the Bankruptcy Court denying approval of the Settlement Motion;

    (b)    the entry of an order by the Bankruptcy Court purporting to modify the terms of this Settlement Agreement, including the terms of the New Hosting Agreement, or which otherwise materially impact the terms of this Settlement Agreement or the transactions contemplated herein; or

    (c)    if the Settlement Approval Order is not entered by December 1;

5.    **Release**.  Subject to the last sentence of this paragraph, except for obligations arising under this Agreement or the New Hosting Agreement, effective as of the entry of the Settlement Approval Order, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, the Debtors and their estates on the one hand, and EZ Blockchain on the other, each on behalf of themselves, their successors and assigns (including, without limitation, the Post-Effective Date Debtors, Plan Administrator, Litigation Administrator, NewCo, any creditors' trust and any trustee under the Plan), shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever mutually released and discharged EZ Blockchain on the one hand and the Debtors on the other, and each of their parents, subsidiaries, representatives and agents, from any and all past or present claims, actions, demands, causes of action (including, without limitation, those under section 362 and chapter 5 of the Bankruptcy Code), obligations, rights, suits, damages, remedies, penalties, costs, attorneys' and other professional fees and liabilities, of every kind and nature (if any there be), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, existing in law (or any applicable rule, statute, regulation, treaty, right, duty, or requirement), equity, contract, tort, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors and their estates or EZ Blockchain, or such other entity or person who would have been legally entitled to assert in their own right or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Prepetition Agreements, the transactions or events giving rise thereto, and each of the parties performance thereunder, the Chapter 11 Cases, any continued use of the Debtors' property, any deposits or Prepayments, and EZ Blockchain's use of Debtors' equipment prior to commencing performance of Interim Services. For the avoidance of doubt, this <u>Section 5</u> does not release any obligations arising under this Settlement Agreement (including the New Hosting Agreement) or in connection with the Interim Services (as described in the New Hosting Agreement).

6.    **Notice**.  All notices, demands, instructions, and other communications required or permitted under the Settlement Agreement to any Party (a "<u>Notice</u>") must be in writing, shall be effective upon receipt, and must be delivered by hand delivery, overnight courier, or e-mail.

**If to the Debtors, to:**

Celsius Network LLC
50 Harrison Street
Suite 209F
Hoboken, NJ 07030
Attn: Ron Deutsch, General Counsel
E-mail: ron.deutsch@celsius.network

**with copies to**:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn: Joshua A. Sussberg, P.C.
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
E-mail: joshua.sussberg@kirkland.com

and

Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, Illinois 60654
Attn: Patrick J. Nash, Jr. P.C., Ross M. Kwasteniet, P.C., Christopher S. Koenig, Dan Latona
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-mail: patrick.nash@kirkland.com, ross.kwasteniet@kirkland.com, chris.koenig@kirkland.com, dan.latona@kirkland.com

and

4

White & Case LLP
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Attn:  Aaron E. Colodny
Telephone:  (213) 620-7700
Facsimile: (213) 452-2329
Email:  aaron.colodny@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Attn:  Gregory F. Pesce
Telephone:  (312) 881-5400
Facsimile:  (312) 881-5450
Email:  gregory.pesce@whitecase.com

**If to EZ Blockchain, to:**

EZ Blockchain Services, LLC
311 S. Wacker Drive Suite 1410
Chicago, Illinois 606060606
Attn:  Sergii Gerasymovych
E-mail: sergii@ezblockchain.net

**with a copy to**:

Esbrook P.C
321 N. Clark Street Suite 1930
Chicago, Illinois 60654
Attn: Michael Kozlowski
Telephone: (312) 319-7682

E-mail: michael.kozlowski@esbrook.com

7.    **Retained Jurisdiction.**  The Parties agree that the Bankruptcy Court shall retain jurisdiction to interpret and enforce the terms of this Settlement Agreement.

8.    **Conflict with Orders**.  To the extent there is any conflict between the terms of this Settlement Agreement and the terms of the Settlement Approval Order, the terms of the Settlement Approval Order shall control, subject to each Party's termination rights under <u>Section 4(b)</u> above.

9.    **Governing Law**.  This Settlement Agreement, and any disputes related thereto, shall be governed by and construed in accordance with (a) applicable federal law, or (b) to the extent federal law does not apply, the laws of the state of New York without regard to the rules of conflict of laws of the state of New York or any other jurisdiction that would require the application of the law of another jurisdiction.  The Parties hereto submit to the jurisdiction of the Bankruptcy Court for any litigation relating to this Settlement Agreement and, for so long as the Chapter 11

Cases remain pending, agree not to commence any litigation relating to this Settlement Agreement except in the Bankruptcy Court.  For the avoidance of any doubt, during the pendency of the Chapter 11 Cases, all proceedings shall be brought in the Bankruptcy Court.

10.     **Authority**.  Each of the Parties hereto represents and warrants that (a) it has full power, right, and authority to enter into this Settlement Agreement and to take all steps necessary to implement its terms and conditions and take the actions contemplated hereby, (b) this Settlement Agreement has been duly and validly executed and delivered by it and constitutes the legal, valid, and binding obligation of such Party enforceable against such Party in accordance with its terms, and (c) other than from the Bankruptcy Court, no consent of any person or entity not a party to this Settlement Agreement is necessary for this Settlement Agreement to be fully and completely binding upon each of the Parties.

11.     **Successors and Assigns; Third Parties**.  The rights and obligations of each of the Parties under this Settlement Agreement shall be binding upon, and inure to the benefit of, any successor or assign of each such Party, including, for the avoidance of doubt, the Litigation Administrator contemplated under the Debtors' chapter 11 plan of reorganization.

12.     **Non-Severability**.  Each of the terms of this Settlement Agreement is a material and integral part hereof.  Except as otherwise provided herein, should any provision of this Settlement Agreement be held to be unenforceable or contrary to law, the entire Settlement Agreement shall be deemed null and void.

13.     **Nonadmission of Wrongdoing**.  The Parties agree that neither this Settlement Agreement nor the furnishing of the consideration described in this Settlement Agreement shall be deemed or construed at any time for any purpose as an admission by any of the Parties of wrongdoing or evidence of any liability or unlawful conduct of any kind.

14.     **Amendment**.  This Settlement Agreement may not be modified, altered or changed except in writing and signed by both Parties wherein specific reference is made to this Settlement Agreement.

15.     **Entire Understanding**.   This Settlement Agreement constitutes the entire understanding of the Parties hereto in connection with the matters covered herein, and may not be amended, modified, or altered except by an agreement in writing signed by each of the Parties.

16.     **No Party Deemed Drafter**.  The signatories to this Settlement Agreement are competent persons, each of whom is experienced in business and represented by counsel. Therefore, any ambiguous language in this Settlement Agreement shall not be construed against any particular Party as the drafter of such language.

17.     **Failure to Enforce; Waiver**.  The failure of any Party to enforce a provision of this Settlement Agreement shall not constitute a waiver of such Party's right to enforce that provision.  No provision of this Settlement Agreement may be waived except by a writing signed by the Parties that expressly refers to this <u>Section 17</u> of this Settlement Agreement and makes such waiver, and such waiver shall be limited to the terms of such writing.  Waiver of any one breach

shall not be deemed to be a waiver of any other breach of the same or of any other provision hereof, nor shall any such waiver by any Party be deemed to be a continuing waiver.  No delay or omission by any Party in exercising any right hereunder, at law, in equity, or otherwise, shall impair any such right or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any right preclude other or further exercise of such right or the exercise of any other right.

18.    **Counterparts**.  This Settlement Agreement may be executed in any number of counterparts and by the Parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same document.  Delivery of an executed counterpart of this Settlement Agreement by electronic mail to the contacts listed in Section 6 of this Settlement Agreement shall be equally effective as delivery of an original executed counterpart.

19.    **Expenses**.  Each Party shall bear its own attorney's fees and costs in connection with the claims asserted in this matter and the negotiation of this Settlement Agreement.  Notwithstanding the foregoing, if EZ Blockchain and/or any related party of EZ Blockchain is sued by the Debtors or their successors (including, without limitation, Post-Effective Date Debtors, Plan Administrator, Litigation Administrator, NewCo, any creditors' trust and any trustee under the Plan) for any matter released by this Settlement Agreement, they shall be entitled to recover their reasonable attorney fees incurred to enforce this Settlement Agreement.  For the avoidance of doubt, this Section 19 shall not apply to the New Hosting Agreement.

20.    **Binding Effect**.  This Settlement Agreement shall be binding on any successors or assigns of the parties hereto including, without limitation, the Post-Effective Date Debtors, Plan Administrator, Litigation Administrator, NewCo, any creditors' trust, trustee under the Plan, or any chapter 7 trustee or similar entities.

*[Signature pages follow]*

7

[*Signature page omitted.*]

## <u>EXHIBIT A</u>

**New Hosting Agreement**

*EXECUTION*

# HOSTING AGREEMENT

This Hosting Agreement (the "Agreement") is entered into as of the Effective Date by and between EZ Blockchain Services ("EZB") and Celsius Mining LLC ("Celsius") (each a "Party" and collectively the "Parties")

WHEREAS, the Parties entered into certain Prior Hosting Agreements, defined below.

WHEREAS, EZB is currently providing Interim Services to Celsius pursuant to the Term Sheet, defined below.

WHEREAS, the Parties desire to continue their contractual relationship on the terms set forth herein and in accordance with the Settlement Agreement, defined below.

NOW THEREFORE, in consideration of the promises and covenants set forth herein and other good and valuable consideration, the receipt and sufficient of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows.

# ARTICLE 1: DEFINITIONS

As used herein, the following words and phrases shall have the meanings ascribed below or as otherwise defined herein.

1.1.    **Base Monthly Price** means the price paid by Celsius to EZB in any given month, exclusive of the Incentive Payment.

1.2.    **BTC** means Bitcoin.

1.3.    **Celsius** means Celsius Mining LLC or any of its successors and/or assigns as part of a plan of reorganization in the Chapter 11 Cases.

1.4.    **Celsius Equipment** means the ASIC hardware provided by Celsius to EZB, whether before or after the Effective Date.

1.5.    **Chapter 11 Cases** means the jointly administered chapter 11 cases captioned *In re Celsius Network LLC*, Case No. 22-10964 (MG), pending in the United States Bankruptcy Court for the Southern District of New York.

1.6.    **Deposit** means the amount transferred from Celsius to EZB in connection with the Prior Hosting Agreement equaling $5,060,000.00.

1.7.    **Default Rate** means a per annum rate equal the lesser of (i) the Highest Lawful Rate and (ii) sixteen percent (16%).

1.8.    **Effective Date** means the date upon which this Agreement is duly executed by the Parties and Finally Approved.

1.9.    **Event of Default** has the meaning assigned to it in Section 7.1

1.10.    **EZB** means EZ Blockchain Services LLC.

1

*EXECUTION*

1.11.    **Fair Market Value** means with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined in good faith by Celsius.

1.12.    **Finally Approved** or **Final Approval** means a final order has been entered by the United States Bankruptcy Court for the Southern District of New York approving this Agreement and all periods for objections and/or appeal thereof have expired.

1.13.    **Highest Lawful Rate** means the maximum non-usurious rate of interest, as in effect from time to time, which may be charged, contracted for, reserved, received or collected by Celsius in connection with this Agreement under applicable law.

1.14.    **Interim Services** means those certain interim services as defined in the Term Sheet.

1.15.    **Kwh** means kilowatt-hour.

1.16.    **Net Deposit** means the Deposit less any amounts deducted in accordance with this Agreement whether for curtailment or otherwise.

1.17.    **Prior Hosting Agreements** means, collectively, the following contracts entered into between the Parties:

    a.    Hosting Agreement dated January 27, 2022;

    b.    Hosting Agreement dated February 22, 2022; and

    c.    Hosting Agreement dated March 15, 2022.

1.18.    **Term Sheet** means the term sheet executed by the Parties on June 1, 2023, as supplemented on August 18, 2023 and November 7, 2023.

1.19.    **USD** means United States dollars.

## ARTICLE 2:  HOSTING AND MONITORING SERVICES

2.1.    <u>Interim Services</u>.  The Parties acknowledge and agree that EZB is providing certain Interim Services as set forth in the Term Sheet.  Upon the Effective Date, EZB shall cease providing Interim Services, unless otherwise previously terminated in accordance with the Term Sheet.

2.2.    <u>Hosting</u>.  Beginning on the Effective Date, EZB will provide power and internet access to allow Celsius Equipment to mine cryptocurrency ("Hosting") at EZB's facilities located in West Point, Georgia and Douglas, Georgia (the "Facility").  Hosting capacity for Celsius at the Facility shall initially be capped at eighteen (18) megawatts, with an additional fourteen (14) megawatts deployed within thirty-days following the Effective Date of this Agreement, provided that Celsius provides sufficient Celsius Equipment to receive such capacity promptly following the Effective Date.  Celsius is solely responsible for managing its wallet and ensuring that any cryptocurrency generated by the Celsius Equipment is properly accounted for.

2

*EXECUTION*

2.3.  <u>Monitoring</u>.  In addition to Hosting, EZB will monitor and manage the Celsius Equipment in accordance with the guidelines attached hereto as Schedule A (collectively "Monitoring") in a professional and workmanlike manner consistent with the terms and conditions of this Agreement, industry standards and operating requirements of the Celsius Equipment.  As more fully set forth in Schedule A, EZB will monitor the Celsius Equipment and provide Basic Troubleshooting at no additional cost.  If EZB determines that Celsius Equipment requires Advanced Troubleshooting or repair, it will notify Celsius in accordance with this Agreement and may provide Advanced Troubleshooting and/or repair services, as approved in writing by Celsius, at Celsius's expense.

2.4.  <u>Uptime</u>.

a.  Except for periods of curtailment, as defined below, Celsius equipment failure, and downtime caused by a Force Majeure Event or Relocation, EZB shall provide Hosting with ninety-five percent (95%) uptime in accordance with the formula ("Minimum Service Level"):

$$Minimum\ Service\ Level\ (\%) = \left(\frac{Average\ \#\ of\ ASICs\ hashing\ (24\ hr\ period)}{Total\ \#\ of\ ASICs\ deployed}\right) \times 100$$

b.  The source for the average # of ASIC's hashing will be calculated using data from ASIC management software used by EZB at the Facility and reasonably consented to by Celsius (e.g., Foreman) using 5-minute periods, with 288 periods averaged over each 24-hour period.  Broken ASIC miners shall not be included in the calculation of the Minimum Service Level.

c.  In the event that EZB fails (or is on track to fail) to meet the 95% uptime requirement in any ninety-day period, EZB will dynamically or retroactively (through a true-up) redirect EZB's share of hashrate attributable to the Incentive Payment (or, to the extent done retroactively, the mined BTC attributable to the Incentive Payment) to Celsius in the amount required for the resulting hashrate (or mined BTC) going to Celsius being equal to the amount that would have gone to Celsius had the Minimum Service Level been achieved.  The "Redirected Hashrate" to be used in determining the dynamic redirection  or true-up, as applicable, shall be the percentage (not to exceed 12%) calculated based on the following formula, where "U" shall be the percentage uptime expressed as a number between 0 and 1 less than 95% (.95) actually realized during such period (in the event U is 0 for such period, no hashrate will be redirected and Section 2.4(d) shall apply):

$$Redirected\ Hashrate\ \ (\%\ up\ to\ 12.5\%) = \left(\frac{83.125 - 87.5U}{U}\right) * 100$$

d.  Solely to the extent that the redirection of hashrate (or the BTC proceeds thereof) pursuant to Section 2.4(c) is insufficient to cure the failure to meet the Minimum Service Level, EZB will issue the Service Level Credit.  The Service Level Credit

**EXECUTION**

is the amount equal to Base Monthly Price paid over that 90-day period multiplied by the ratio that is the difference between 95 and the average Minimum Service Level (after factoring in the hashrate redirection) provided over the 90-day period divided by 95, in accordance with the following formula:

$$Service\ Level\ Credit\ = (Base\ Monthly\ Price\ \times 3) \times \left(\frac{95 - Uptime\ provided\ (expressed\ as\ a\ whole\ number)}{95}\right)$$

    e.  The Service Level Credit shall be applied to the monthly invoice following EZB's failure to maintain the Minimum Service Level.

    2.5.  <u>Compliance</u>.  Celsius will comply with EZB's reasonable instructions, policies, and procedures regarding Hosting, Monitoring, and receipt of equipment.

    2.6.  <u>Access</u>.  Celsius may have reasonable access to the Celsius Equipment within the data centers during normal business hours with advanced notice to EZB, provided that, to the extent reasonable, Celsius agrees to EZB's standard on-premises waiver.  The Parties will use reasonable efforts to facilitate after-hours access in the event of an emergency.

    2.7.  <u>Relocation</u>.  Upon thirty-days advanced written notice, EZB may relocate Celsius' equipment to a new or different facility provided that the facility is substantially similar to or superior to the then-current facility, including with respect to operating conditions and economics, and EZB shall bear all costs associated with such relocation (a "Relocation").  Any downtime associated with a Relocation shall not count against the uptime required hereunder, unless Celsius provides additional Customer Equipment for the new facility.  EZB may only relocate Celsius' equipment once during the Term. Nothing herein prohibits the Parties from agreeing to relocate the Celsius Equipment.

## <u>ARTICLE 3:  CURTAILMENT</u>

    3.1.  <u>Celsius Curtailment</u>.  If the revenue measured in USD/kwh of BTC mining at the Facility for Celsius Equipment falls below $0.0675 per kwh, Celsius may curtail by providing written notice to EZB, during which time Celsius shall not be responsible for the costs of operating the Celsius Equipment at the Facility pursuant to this Agreement and, at its discretion, EZB may use Celsius Equipment to generate cryptocurrency for EZB's own account.  Celsius may not curtail more than once per day.

    3.2.  <u>EZB Curtailment</u>.  If the revenue measured in USD/kwh of BTC mining at the Facility for Celsius Equipment falls below $0.05 per kwh, EZB may curtail by providing written notice of Celsius, at which time EZB may shut down the Celsius Equipment.  EZB may not curtail more than once per day.

    3.3.  <u>Curtailment Extension</u>.  The initial term of this Agreement shall be automatically extended for each day of curtailment, whether curtailed by EZB or Celsius, up to three additional months.  For the avoidance of doubt, the Parties acknowledge and agree that the maximum length of term for this Agreement is twenty-one (21) months from the Effective Date.

**EXECUTION**

3.4.    <u>Curtailment Days</u>.  The number of days of curtailment shall be calculated each month by dividing the number of hours curtailed in such month by twenty-four (24) and rounding down to the nearest whole number of days.

3.5.    <u>EZB Curtailment Payment</u>.  In the event that EZB curtails during any month during the Term, Celsius shall pay to EZB the amount equal to 87.5% of EZB's Net Losses incurred in such month as a result of such curtailment ("EZB Curtailment Credit").  For purposes of this section, Net Losses means the reasonable and documented amount of losses actually incurred by EZB after taking into account any offsetting revenue from mining using Celsius Equipment, energy sales, liquidation of hedges or otherwise.  Notwithstanding the foregoing, the EZB Curtailment Credit for a month shall be capped at a maximum amount equal to the Deposit Credit for such month.  EZB shall deduct the EZB Curtailment Credit from the Deposit in lieu of requiring cash payment from Celsius.

<u>**ARTICLE 4:  PRICE, PAYMENT, AND RETURN OF DEPOSITS**</u>

4.1.    <u>Prepayment of Monthly Fees</u>.  During the Term, within five (5) business days of the delivery of the Final Monthly Invoice (as defined below) for the preceding month, Celsius shall prepay to EZB the amount of $1,379,700.00 (the "Prepayment Amount") which shall be subject to adjustment for any credits/off-sets and to true-up at the end of each month pursuant to the terms of this Agreement. The Prepayment Amount for the first month of the term shall be paid by Celsius within three (3) business days of the Effective Date.

4.2.    <u>Hashrate Split</u>.  The "Hashrate Split" is defined by the proportion of the daily mining output generated by the Celsius Equipment, which is 87.5% to Celsius and 12.5% to EZB. Celsius shall remit EZB's 12.5% share (the "Incentive Payment") directly to EZB in real time through a direction of hashrate to EZB's designated mining pool.

4.3.    <u>Return of Deposit</u>.  On the condition that Celsius has fully performed its payment obligations under this Agreement and is not in default, EZB shall, to the extent there remains a balance on the Net Deposit, each month pay or credit to Celsius an amount equal to $172,707.78, after any deductions pursuant to this Agreement ("Deposit Credit").  To the extent there remains a balance on the Deposit, EZB shall apply such amount to the payment of the Prepayment Amount payable for the last month of the Term and to the payment of all Ancillary Charges (as defined below) pursuant to this Agreement. Any amount remaining under the Deposit at the end of the Term shall be returned to Celsius within thirty days after the end of the Term.  For the avoidance of doubt, the Parties acknowledge and agree that EZB's obligation to issue a Deposit Credit is expressly conditioned on Celsius' performance of its payment obligations hereunder such that if Celsius fails to perform its payment obligations, EZB is not required to issue the Deposit Credit unless and until Celsius has cured its default.

4.4.    <u>Monthly True-Up</u>.  No later than fifteen (15) days after the end of each month, EZB shall provide Celsius with the final invoice (the "Final Monthly Invoice") for the immediately preceding month reflecting (i) $67.50 per MWH used in mining by Celsius calculated as 87.5% of the total MWH for operation of the Celsius Equipment, as verified by the meter ("Actual Usage Amount"); minus (ii) the Prepayment Amount; minus (iii) the Deposit Credit; plus (iv) the EZB

**EXECUTION**

Curtailment Credit, if any; plus (v) amounts due for Ancillary Services, to the extent not already deducted from the Deposit, if any. If the amount of the Final Monthly Invoice is positive, Celsius shall pay 100% of such excess amount in USD to EZB within five (5) business days of receipt of the Final Monthly Invoice.  If the amount of the Final Monthly Invoice is negative, EZB shall apply such amount (expressed as a positive number) as a credit towards Celsius' payment of the Prepayment Amount for the following month.  To the extent the Final Monthly Invoice of the Term is negative, EZB shall pay such amount to Celsius within five (5) business days following the issuance of such invoice.  To the extent the Final Monthly Invoice of Term is positive, Celsius shall pay such amount to EZB within five (5) business days following the issuance of such invoice.  If, at any time, accumulated credits for a particular month exceed the Prepayment Amount, EZB shall pay the full amount of such excess to Celsius in USD within five (5) business days.

4.5.    Taxes.  All amounts billed to Celsius under this Agreement are exclusive of any applicable taxes, duties and fees Celsius is solely responsible for, including federal, state and local taxes on manufacture, sales, gross income, receipts, occupation, personal property and use of the Celsius Equipment.  EZB is responsible for any taxes imposed on or with respect to EZB's income, revenues, gross receipts, personnel, or real property arising out of this Agreement.  EZB represents and warrants that it is not subject to backup withholdings as of the Effective Date.

4.6.    Ancillary Charges.  In addition to any amounts due as set forth elsewhere in this Agreement, Celsius shall pay to EZB the following (each an "Ancillary Charge"), which in each case shall be deducted from the Deposit to the extent possible:

a.    In the event that any Celsius Equipment is unracked, except in the case of Relocation, $30.00 per piece of equipment, whether the equipment is unracked before or after the Effective Date;

b.    In the event that any Celsius Equipment is racked, except in the case of Relocation, $30.00 per piece of equipment, whether the equipment is racked before or after the Effective Date;[1]

c.    All reasonable and documented costs for transportation, pick up, and delivery, of Customer Equipment incurred by EZB and authorized by Celsius other than in connection with a Relocation;

d.    In the event that any Celsius Equipment is not deployed in a data center, reasonable and documented storage costs incurred by EZB to the extent request by Celsius or in the event that Celsius fails to remove the Celsius Equipment from the Facility; and

e.    Amounts due for repair and/or Advanced Troubleshooting, in accordance with Schedule A, whether or not performed before or after the Effective Date.

4.7.    Deduction Authorized.  The Parties acknowledge and agree that EZB may, in its sole discretion unless otherwise set forth herein, deduct any undisputed amounts due under this Agreement from Celsius from the Deposit in lieu of requiring cash payment from Celsius and such

---

[1] EZB to advise charge for racking and unracking that would apply prior to effective date.

**EXECUTION**

deduction shall satisfy in full Celsius's payment obligations with respect to the amounts so deducted.

## ARTICLE 5: WARRANTIES

5.1.    <u>By Celsius</u>.  Celsius represents and warrants as follows:

a.  When provided to EZB (which may be prior to the Effective Date), the Celsius Equipment is clean and materially in good working order. Celsius shall be responsible for any and all costs associated with the troubleshooting and repair of the Celsius Equipment provided in non-conforming condition;

b.  Celsius owns the Celsius Equipment and it is capable of being installed in EZB's data centers;

c.  When provided to EZB (which may be prior to the Effective Date), the Celsius Equipment is free from material defects including without limitation malware, spyware, viruses, and trojan horses. Celsius shall be responsible for any and all costs associated with the troubleshooting and repair of the Celsius Equipment provided with such material defects;

d.  Celsius has the authority to enter into this Agreement and entering into this Agreement and performing hereunder will not breach or violate any other obligation of Celsius.

e.  Celsius is and will remain in compliance with all applicable laws throughout the Term; and

f.  The individual identified in the signature block below has the authority to enter into this Agreement on behalf of Celsius, including the power and authority to bind Celsius to the terms and conditions set forth herein.

5.2.    <u>By EZB</u>.  EZB represents and warrants as follows:

a.  EZB owns the real property at the Facility located in Douglas, Georgia and all material tools, assets and equipment necessary for EZB to provide the Hosting and Monitoring services at the Facility and EZB leases the real property at the Facility located in West Point, Georgia;

b.  EZB is and will remain in compliance with all applicable laws throughout the Term;

c.  EZB has the authority to enter into this Agreement and entering into and performing hereunder will not breach or violate any other obligation of EZB; and

d.  The individual identified in the signature block below has the authority to enter into this Agreement on behalf of EZB, including the power and authority to bind EZB to the terms and conditions set forth herein.

5.3.    <u>BSA/AML and OFAC</u>. Each of the Parties represents and warrants that it is in material compliance with all applicable laws, rules, and regulations in each jurisdiction in which

7

**EXECUTION**

the Parties, as applicable, operates, including U.S. securities laws and regulations, as well as any applicable state and federal laws, including, but not limited to the Bank Secrecy Act/Anti- Money Laundering ("BSA/AML") and Office of Foreign Assets Control ("OFAC") compliance programs. Each of the Parties will at all times comply with the laws, regulations and rules of any applicable governmental or regulatory authority, including, without limitation, Money Service Business regulations under the Financial Crimes Enforcement Network ("FinCen"); state money transmission laws; laws, regulations, and rules of relevant tax authorities; applicable regulations and guidance set forth by FinCEN; the Bank Secrecy Act of 1970; the USA PATRIOT Act of 2001; AML/CTF provisions as mandated by U.S. federal law and any other rules and regulations regarding AML/CTF; issuances from the Office of Foreign Assets Control ("OFAC"); the National Futures Association; the Financial Industry Regulatory Authority; and the Commodity Exchange Act. Each Party further agrees that any fines or penalties imposed on a Party directly as a result of other Party's breach of the representations and warranties in this Agreement may, at in their discretion, be passed on to the breaching Party and the breaching Party acknowledges and represents that it will be responsible for payment to the non-breaching Party of such fines.

5.4.    <u>Disclaimer</u>.    EXCEPT FOR THOSE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AND HERBEY DISCLAIMS ANY AND ALL SUCH WARRANTIES, INCLUDING ANY WARRANTIES IMPLIED BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, OR OTHERWISE.

## **ARTICLE 6:  SECURITY**

6.1    <u>Grant of Security</u>.  To secure the full payment and performance of the obligations under this Agreement, EZB hereby assigns to Celsius and grants to Celsius a continuing security interest and lien upon all of EZB's right, title and interest, in and to the property listed on Schedule C and all books and records related thereto (collectively referred to as the "**Collateral**"):

6.2    <u>Title and Location of Collateral</u>. Except as set forth in this Section 6.2, EZB (i) shall not directly or indirectly, sell, assign, license, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Collateral, or enter into any agreement to do any of the foregoing, and (ii) shall not move, convey, transfer, or allow any Collateral to be moved, transferred or conveyed from the Facility, and EZB shall otherwise ensure that all of the Collateral remains at the Facility for the term of this Agreement. Notwithstanding anything to the contrary, EZB shall be permitted to:

a.    temporarily transfer Collateral solely for the purposes of repair or refurbishment in the ordinary course of business; and

b.    sell, assign, license, lease, convey, transfer or otherwise dispose of Collateral and other tangible assets subject to Celsius's consent (not to be unreasonably withheld).

6.3    <u>Further Assurances</u>.

8

***EXECUTION***

    a.  EZB shall maintain the security interest created by this Agreement as a perfected first priority perfected security interest and defend such security interest and such priority against the claims and demands of all persons and shall further take all action that may be reasonably necessary or that Celsius may reasonably request, so as at all times to maintain the perfection, enforceability, and priority of Celsius's security interests in and lien on the Collateral or to enable Celsius to exercise or enforce its rights hereunder in respect of Collateral.

    b.  EZB shall, at Celsius's request, at any time and from time to time, authenticate, execute and deliver to Celsius, or file with third parties, such financing statements, mortgages, documents and other agreements and instruments and do such other acts and things as Celsius may deem necessary or desirable in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Celsius. EZB authorizes Celsius to file financing statements and amendments reasonably describing the Collateral in order to perfect Celsius's security interest in the Collateral without EZB's signature.

    6.4    <u>Release of Lien</u>. The Fair Market Value of the Collateral is intended to be equivalent to the amount of the Deposit at such time. Celsius shall use commercially reasonable efforts to cooperate with EZB to release Celsius's security interest in and lien(s) on that portion of the Collateral such that the Fair Market Value (as reasonably determined by Celsius) of the Collateral is reasonably equivalent to the value of the Deposit.

    6.5    <u>Condition Precedent and Waiver</u>. Notwithstanding anything to contrary, Celsius material compliance with the terms of this Agreement is a condition precedent to the exercise of any rights with respect to the Collateral, including but not limited to any rights arising under any applicable law, such that Celsius may not exercise any rights with respect to the Collateral unless it has paid all undisputed amounts due under this Agreement. Further, Celsius waives any and all rights with respect to the Collateral if Celsius is in default under this Agreement.

## <u>ARTICLE 7: DEFAULT</u>

    7.1.    <u>Event of Default</u>. The occurrence of any of the following shall constitute an Event of Default (an "Event of Default") with respect to Party:

    a.  Celsius' failure to pay the Prepayment Amount when due hereunder;

    b.  Except with respect to the Prepayment Amount, a Party's failure to pay any amount when due hereunder provided that the amount remains unpaid for five (5) business days after written notice of such failure;

    c.  A Party's material breach of any provision of this Agreement provided the breach remains uncured thirty (30) days after written notice of such material breach is provided by the non-breaching party;

    d.  Other than pursuant to Celsius' pending bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York as of the Effective

*EXECUTION*

Date, a Party's insolvency, bankruptcy, general assignment for the benefit of creditors, liquidation, dissolution, appointment of a receiver, or similar arrangement which is not thoroughly resolved or dismissed within sixty (60) days.

    e.   Any breach or failure by EZB of, or with respect to, Section 6.2 and/or Section 6.3.

    7.2.   <u>EZB Remedies</u>.  In any Event of Default with respect to Celsius, EZB shall be entitled to exercise any of the following remedies:

    a.   Shut down all or part of the Celsius Equipment;

    b.   Solely to the extent necessary to recoup amounts payable pursuant to this Agreement, use the Celsius Equipment to mine cryptocurrency for EZB's benefit, without further liability to Celsius, until the Event of Default is cured; and

    c.   Solely to the extent necessary to recoup amounts payable pursuant to this Agreement, deduct such amounts from the Deposit.

    7.3.   <u>Celsius Remedies</u>.  In any Event of Default with respect to EZB, Celsius shall be entitled to exercise any of the following remedies:

    a.   Direct the shut down of all or part of the Celsius Equipment;

    b.   Solely to the extent necessary to recoup amounts payable pursuant to this Agreement, retain all or part of the Incentive Payment, without further liability to EZB, until the Event of Default is cured;

    c.   Solely to the extent necessary to recoup amounts payable pursuant to this Agreement, withhold any payment otherwise due to EZB under this Agreement without further liability to EZB, until the Event of Default is cured; and

    d.   Provided that Celsius is not in default, take possession of the Collateral, and for that purpose Celsius may, to the full extent that EZB can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom; and

    e.   Avail itself of its rights as a secured party pursuant to Article 7.4 of this Agreement, below.

    7.4.   <u>Celsius Security Remedies</u>.  Upon (A) (1) the occurrence of any Event of Default under Section 7.1(d) or 7.1(e) above, or (2) Celsius' request following the occurrence of an Event of Default under Section 7.1(b) above and EZB's failure to cure and (B) provided that Celsius is not in default under this Agreement, (i) the amount of the Deposit outstanding shall automatically become immediately due and payable to Celsius in full without further notice or demand by Celsius (ii) interest on the Deposit at the Default Rate shall begin and continue to accrue as provided herein and (iii) Celsius shall be entitled to enforce this Agreement by exercise of the rights and remedies granted to it by applicable law, including without limitation, the Uniform Commercial Code.

7.5.     <u>Remedies Cumulative</u>.  The foregoing remedies are not exclusive but instead or cumulative in addition to any and all remedies available to a Party.  Pursuit of any of the foregoing remedies does not constitute an election of remedies nor preclude pursuit of any other remedy available to such Party.  Nor does forbearance to enforce one or more of the remedies set forth herein constitute a waiver of the right to exercise such remedy at a later date.

## ARTICLE 8:  TERM AND TERMINATION

8.1.     <u>Term</u>.  The term of this Agreement shall begin upon the Effective Date and continue for a period of eighteen (18) months, subject to curtailment extensions or other extension or termination of this Agreement ("Term"). Without limiting any Party's rights pursuant to Article 7 of this Agreement, a Party shall be entitled to terminate this Agreement in the event of material breach of this Agreement by the other Party upon thirty (30) days written notice to the breaching Party informing them of the nature of such breach and the non-breaching Party's intent to terminate if such breach is not cured within the notice period, provided that, for the avoidance of doubt, the Agreement shall not terminate if the non-breaching Party successfully cures such breach during the thirty (30) day notice period.

## ARTICLE 9:  INSURANCE

9.1     <u>Insurance Obligations</u>.  Each Party shall, at its own cost and expense, procure and maintain in effect at all times during this term of this Agreement, insurance policies in accordance with this Article and sufficient to cover liability and losses arising out of this Agreement and the Celsius Equipment, including but not limited to any liability, damage, or losses suffered by EZB or Celsius, as applicable, arising out of or related to the Celsius Equipment or the Facility, as well as Celsius' and EZB's obligations under this Agreement, as applicable.  Each Party is responsible for and shall pay all premiums and deductibles associated with the insurance required by this Article and shall provide the other Party with certificates of insurance along with required endorsements and other documentation reasonably necessary to ensure compliance with these insurance requirements, upon request.  Each Party shall at all times comply with its obligations under the insurance policies and shall cooperate with the insurer and the other Party in the event of an actual or potential claim.  Each party shall deliver to the other a Certificate of Insurance evidencing such insurance including the other party as additional insured.

9.1.     <u>Additional Insured</u>.  All policies must name the other Party as an additional insured, have policy limits of at least $1,000,000 per occurrence and $2,000,000 in the aggregate (which may be achieved through primary and umbrella policies), and, to the maximum extent permitted by law, be endorsed to waive all rights of subrogation against the other Party.

9.2.     <u>No Limitation</u>.  Neither Party represents that the types of coverage and limits required by this Article will be adequate to protect the other Party and such coverage and limits shall not be deemed as a limitation on a Party's liability under other provisions of this Agreement. For the avoidance of doubt, the Parties acknowledge and agree that nothing in this Article is intended to nor should be construed as limiting the Parties' obligations set forth in Article 10 which are separate and independent obligations of the Parties.

*EXECUTION*

## ARTICLE 10:  RISK ALLOCATION

10.1    <u>Indemnity</u>.    Each Party (the "Indemnifier") shall release, protect, Defend, indemnify and hold harmless the other Party (the "Indemnified") from and against all third party Claims/Losses to the extent caused by any act or omission of Indemnifier (including any person acting or refusing to act on its behalf) except to the extent caused by the Indemnified's fraud, willful misconduct, negligence, breach of this Agreement or violation of applicable law.

10.2    <u>Definitions</u>.    As used in this Article, the following terms have the following meaning:

> A.    "Claim/Loss" or "Claims/Losses" means all claims and losses of all kinds and descriptions regardless of how such claims and/or losses may be characterized including, without limitation, claims, causes of action, demands, damages of all kinds and descriptions, liabilities, debts, liens, privileges, and other encumbrances, obligations, judgments, interests, costs, expenses, and awards whether created by law, contract, tort, arbitration, or voluntary settlement.

> B.    "Defend" includes the obligation to pay reasonable and documented attorneys' fees, court costs, expert fees, and other reasonable costs incurred in connection with defending against a Claim/Loss.

10.3    <u>Notice</u>.  Each Party will promptly give notice to the other Party in writing upon actual knowledge of any Claim/Loss.  Notwithstanding the foregoing, lack of prompt notice shall not reduce or eliminate Indemnifier's' obligations hereunder except and only to the extent that Indemnifier has suffered actual prejudice as a result of such lack of prompt notice.  Indemnified shall confer with Indemnifier concerning the Defense of any Claim/Loss.   In the event that Indemnifier and/or its insurer has assumed the full Defense of the Claim/Loss without reservation or qualification of any kind, Indemnifier and/or its insurer shall retain full control over the Defense. If Indemnifier or its insurer has assumed the Defense with reservation or qualification, Indemnified shall control the Defense including the right to select counsel of its choosing with Indemnifier's consent, not to be unreasonably withheld, conditioned or delayed, at the expense of Indemnifier. All Parties agree to cooperate in the Defense of any Claim/Loss. Indemnified will not enter into any settlement or resolution without Indemnifier's prior written consent, not to be unreasonably withheld, conditioned or delayed.

10.4    <u>Insurance</u>.  Each Party shall support its obligations in this Article with the insurance as required by Article 9.  Unless otherwise mandated by applicable law, all obligations set out in this Article shall be without monetary limit, are independent of any insurance requirements and such obligations set forth in this Article shall not be limited or reduced by any insurance requirements nor shall they be lessened by reason of Indemnifier's failure to obtain the required insurance or by any defenses asserted by Indemnifier's insurers.

10.5    <u>Limitation of Liability</u>.  To the maximum extent permitted by law and except to the extent arising from a Party's fraud, gross negligence or willful misconduct, in no event shall either Party be liable to the other Party for any loss of profit, or for any consequential, indirect, incidental,

**EXECUTION**

special, exemplary, or punitive damages, whether arising out of breach of contract, tort or otherwise, regardless of whether such damages were foreseeable and whether or not a Party has been advised of the possibility of such damages, and notwithstanding the failure of any agreed or other remedy of its essential purpose; each Party hereby waives any Claims/Losses with respect to such damages. To the extent permitted by law, each Party hereby waivers any statutory remedies that are inconsistent with this section. Notwithstanding the foregoing, nothing herein prevents either Party from collecting amounts due under this Agreement from the other Party.

10.6    <u>Damages Cap</u>.  TO THE MAXIMUM EXTEND PERMITTED BY LAW AND EXCEPT AS A RESULT OF FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, IN NO EVENT SHALL A PARTY'S AGGREGATE LIABLITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT OR OTHERWISE, EXCEED THE TOTAL AMOUNT DUE FROM CELSIUS TO EZB HEREUNDER IN THE TWELVE (12) MONTHS PRIOR TO THE DATE OF THE EVENT GIVING RISE TO THE CLAIM (OR IF SUCH EVENT OCCURS PRIOR TO THE ELAPSING OF TWELVE (12) MONTHS FROM THE EFFECTIVE DATE, AN ANNUALIZED AMOUNT BASED ON THE DAYS ELAPSED FROM THE EFFECTIVE DATE UNTIL THE OCCURRENCE OF SUCH EVENT); PROVIDED THAT, THIS DAMAGES CAP SHALL NOT APPLY TO EZB'S OBLIGATIONS FOR THE RETURN OF THE DEPOSIT TO CELSIUS .

10.7    <u>Assumption of Risk</u>.  Celsius understands and acknowledges that the business of cryptocurrency mining poses certain risks, that returns are not guaranteed, and that the Celsius Equipment consists of depreciating assets. Any rewards associated with mining activities involving the Celsius Equipment come directly from the pool and EZB is not responsible for any pool fees. Celsius is solely responsible for such fees and expenses.

## ARTICLE 11: RELEASES AND SETTLEMENT OF CLAIMS

11.1.    <u>Settlement Agreement</u>.  In consideration for the mutual promises and covenants set forth herein, the Parties shall execute the Settlement and Release of Claims attached hereto as Schedule B ("Settlement Agreement"). The Parties acknowledge and agree that this Agreement and the Settlement Agreement are mutually dependent and that, until such time as the Settlement Agreement is finally approved, either Party may terminate this Agreement upon thirty (30) days written notice to the other Party; provided that this Agreement shall not terminate if the Settlement Agreement is Finally Approved during such thirty (30) day notice period. In the event of termination of this Agreement pursuant to this Article 11, the Parties agree and acknowledge that neither Party shall have any continuing payment obligations, including with respect to the Deposit, hereunder but that the Parties shall retain and reserve all rights under the Prior Hosting Agreements, including to the amounts of any deposits or prepayments thereunder and any claims that EZB has or may have against Celsius.

## ARTICLE 12:  MISCELLANEOUS

12.1.    <u>Incorporation</u>.  The above recitals are incorporated as if fully set forth herein.

13

**EXECUTION**

12.2.  <u>Entire Agreement</u>.  Subject to Article 11, this Agreement and the Settlement Agreement is the entire agreement of the Parties regarding the subject matter hereof and supersedes and replaces any and all prior or contemporaneous agreements, promises, and understandings, between or among them, whether written or oral, including the Prior Hosting Agreements and Term Sheet.  Neither Party is relying on any statement, representation, or promise except those expressly set forth in this Agreement and the Settlement Agreement.

12.3.  <u>Choice of Law</u>.  This Agreement, including performance hereunder, shall be governed by the laws of the state of New York without regard to its conflict of laws rules.

12.4.  <u>Dispute Resolution</u>.  Any and all disputes between the Parties arising out of or related to (i) this Agreement, including without limitation performance, interpretation, termination, (in)validity and/or breach thereof; (ii) Customer Equipment; and/or (iii) Hosting or Monitoring, shall, while the Chapter 11 Cases are pending, be exclusively resolved in the United States Bankruptcy Court for the Southern District of New York, and after the effective date of the Chapter 11 Cases, be resolved in the state or federal courts, as applicable, located in New York.  The Parties each hereby consent to the jurisdiction of such courts and waive any objection to such venue, including any objection based on *forum non conveniens* grounds.

12.5.  <u>Attorneys' Fees</u>.  In any dispute between the Parties arising out of or related to this Agreement, the prevailing party shall recover its reasonable and documented attorneys' fees from the other party.  Notwithstanding the foregoing, this provision shall not apply to any attorneys' fees incurred in connection with negotiation or approval (including requests for approval) of this Agreement or the Settlement Agreement.

12.6.  <u>Assignment Prohibited</u>.  Other than as part of the Chapter 11 Cases, neither Party may assign its rights or obligations hereunder, in whole or in part, without the advanced written consent of the other Party, which shall not be unreasonably withheld, conditioned, or delayed.  Any purported assignment in violation of this section shall be void *ab initio* and without effect.

12.7.  <u>Binding Effect</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties, their legal representatives, successors, heirs, and permitted assigns.

12.8.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, with all counterpart signatures combined constituting a single executed Agreement.  Electronic, scanned, faxed, or photocopied signatures shall be treated as original.

12.9.  <u>Amendment</u>.  This Agreement may not be amended except in writing duly executed by the Parties.

12.10.  <u>Survival</u>.  Those obligations that expressly or by their nature survive or extend beyond this Agreement, including any termination or expiration thereof, shall so survive.  Such obligations include, without limitation, all payment, indemnity, warranty, confidentiality, insurance, and risk allocation provisions.  This section applies irrespective of which Party terminates this Agreement.

**EXECUTION**

12.11.  Notice.  Whenever a written communication, notice, or confirmation is required or permitted by this Agreement, the same shall be made via e-mail to the individuals listed below and shall be deemed sent on the date sent, unless sender receives indicia of a failure of transmission.

| If to EZB | | If to Celsius |
|---|---|---|
| Sergii Gerasymovych<br>311 S. Wacker Drive Suite 1410<br>Chicago, IL 60606<br>sergii@ezblockchain.net | | Celsius Mining LLC<br>50 Harrison Street<br>Suite 209F<br>Hoboken, NJ 07030<br>Attn: Legal<br>E-mail: legal@celsius.network |
| | | |
| With a copy to | | With a copy to |
| Michael Kozlowski<br>Esbrook P.C.<br>321 N. Clark Street Suite 1930<br>Chicago, IL 60654<br>michael.kozlowski@esbrook.com | | Kirkland &amp; Ellis LLP<br>300 N. LaSalle Street<br>Chicago, Illinois 60654<br>Attn: Patrick J. Nash, Jr. P.C., Ross M. Kwasteniet, P.C., Christopher S. Koenig, Dan Latona<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>E-mail: patrick.nash@kirkland.com, ross.kwasteniet@kirkland.com, chris.koenig@kirkland.com, dan.latona@kirkland.com |

12.12.  No Waiver.  None of the requirements of this Agreement will be considered as waived by either Party unless the same is done in writing duly executed by the waiving Party. Failure by either Party to enforce any rights will not waive those or other rights hereunder.

12.13.  No Third-Party Beneficiaries.  Nothing in this Agreement is intended, nor shall anything herein be construed to confer any rights, legal or equitable, in any person or entity other than the Parties hereto and their respective successors and permitted assigns.

12.14.  Force Majeure.  A Party shall not be liable for any delay or failure of performance to the extent caused by or resulting from a Force Majeure Event.  Upon the occurrence of a Force Majeure Event, the impacted Party shall give prompt notice thereof to the other Party and shall use commercially reasonable efforts to remove or mitigate the effects of the Force Majeure Event.  A "Force Majeure Event" means any event beyond the reasonable control of the impacted Party including without limitation acts of Gods, storms, mudslides, earthquakes, avalanches, , war, fire, flood, nation of industry wide strikes, acts of the public enemy, terrorism, insurrections, riots, epidemic or pandemic (other than COVID-19), interruptions or reductions in the flow of power to the Facility, interruptions or reductions in internet connectivity or speeds to or at the Facility, problems with the blockchain or network, and laws, rules, or regulations of any governmental authority asserting jurisdiction or control, compliance with which makes performance impossible

**EXECUTION**

or impracticable.  Notwithstanding the foregoing, a Force Majeure Event does not include events caused by the negligence, intentional, or willful misconduct of a Party nor a failure to make any payment due hereunder.

12.15.  <u>Mutual Drafting</u>.  This Agreement was jointly negotiated and drafted by the Parties. In the event any ambiguities should arise in the construction or interpretation of this Agreement, such ambiguities shall not be construed against either Party solely on account of authorship. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation and construction of this Agreement, and this Agreement shall be construed as having been jointly drafted by the Parties.

12.16.  <u>Interpretation</u>.    Each article of this Agreement contains provision that are sometimes referred to as section(s) of an article.  Unless context requires otherwise, a general reference to any article includes the entire article and a reference to any specific section(s) of an article refers only to the identified section(s) inclusive of any subsections.  Headings are used for reference only.

12.17.  <u>Relationship of the Parties</u>.  The relationship of the Parties is that of independent contractors.  Neither party is the agent, partner, joint-venturer or employee of the other, and neither shall have any authority to make any agreements or representations on the other's behalf. Each Party shall be solely responsible for the payment of compensation, insurance and taxes of its own personnel, and such personnel are not entitled to the provisions of any employee benefits from the other Party.  Neither Party has the power or authority to bind the other.

[signatures to follow]

16

[*Signature page omitted.*]

*EXECUTION*

## Schedule A

Monitoring Guidelines

This Schedule A forms part of the Hosting Agreement to which it is attached.

EZ Blockchain will perform the following services to monitor and manage the Customer Equipment while in EZ Blockchain's possession, in accordance with this Schedule A.

EZ Blockchain will monitor the status of Customer Equipment using its data center integrated management (DCIM) tool.

If the DCIM reports a problem with Customer Equipment, EZ Blockchain will perform Basic Troubleshooting, as determined by EZ Blockchain in its sole discretion, which consists of one or more of the following:

- o Regular walk-through and visual inspection for alerts
- o Network scan of ASIC Miner
- o Configuration / Reconfiguration of ASIC Miner
- o Factory Reset of ASIC Miner
- o Firmware Update / Reprogramming of ASIC Miner
- o Complete power drain (Flea Drain) of ASIC Miner and restart
- o "Soft Reset" via Remote software such as Foreman or ASIC Application
- o Changing power supply source with known, good working source,
- o Changing network cable with known, good working source.
- o Swapping out with a miner in a location different from the current failing location.
- o Visual & olfactory inspection of miner in search of any abnormal or obvious signs of distress

EZ Blockchain does not charge additional fees for Basic Troubleshooting. If Basic Troubleshooting does not solve the issue, EZ Blockchain will inform Customer and may perform Advanced Troubleshooting, which consist of one or more of the following, as needed:

- o Re-performing one or more Basic Troubleshooting processes
- o Power cycling
- o Diagnostic testing, which may include replacement of components for testing purposes only including but not limited to the following components:
  - ▪ Controller cards
  - ▪ Power Supplies
  - ▪ Fans
  - ▪ Hash Boards

18

EZ Blockchain will not perform Advanced Troubleshooting unless approved in writing (email is sufficient) by Customer.  Unless otherwise agreed in writing by the Parties, fees for Advanced Troubleshooting will be billed to the Customer at $75 per hour plus the cost of materials.

*EXECUTION*

SCHEDULE B

[Settlement Agreement omitted]

*EXECUTION*

SCHEDULE C

| Description | Serial No. | Location |
|---|---|---|
| Mobile Data Center | 13L032261 | 1797 O G Skinner Dr, West Point, GA 31833 |
| Mobile Data Center | 13R022255 | 1797 O G Skinner Dr, West Point, GA 31833 |
| Mobile Data Center | 13R042262 | 1797 O G Skinner Dr, West Point, GA 31833 |
| Mobile Data Center | 13R102123 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 23L112122 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 13R102122 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 23L112123 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 13R102125 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 23L072110 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 13R082112 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 13R092119 | 745 Brantley Blvd. Douglas, GA 31533 |
| Mobile Data Center | 13L032260 | 2131 Old West Point Rd, West Point, GA 31833 |
| Mobile Data Center | 13R112133 | 2131 Old West Point Rd, West Point, GA 31833 |
| Mobile Data Center | 23L112121 | 2131 Old West Point Rd, West Point, GA 31833 |
| Mobile Data Center | 12R112135 | 2131 Old West Point Rd, West Point, GA 31833 |
| Mobile Data Center | 11.5I052165 | 882 Wilson Rd, Newberry, SC 29108 |