Hearing Date:  December 21, 2023 at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline:  December 14, 2023 at 4:00 p.m. (prevailing Eastern Time)

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:     (312) 881-5400
Facsimile:     (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Facsimile:     (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Facsimile:     (305) 358-5744

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

### NOTICE OF HEARING ON
### JOINT MOTION OF THE DEBTORS AND THE COMMITTEE
### FOR ENTRY OF AN ORDER (I) APPROVING THE IMPLEMENTATION
### OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that a hearing on the *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* (the "Motion") will be held on **December 21, 2023, at 10:00 a.m., prevailing Eastern Time** (the "Hearing") before the Honorable Martin Glenn, Chief United States Bankruptcy Judge.

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will be held on December 21, 2023, at 10:00 a.m., prevailing Eastern Time. The hearing will be held in person before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, in Courtroom No. 523, located at One Bowling Green, New York, New York 10004-1408. With the permission of the Court, only parties in interest, their attorneys and witnesses may attend hearings by Zoom at which evidence is expected to be presented. Any person or entity that is permitted to attend the hearing by Zoom must certify that they are appearing in a permitted capacity by registering their appearance in the Electronic Appearance portal located on the Court's website at: http://www.nysb.uscourts.gov/ecourt-appearances. Appearances must be entered no later than 4:00 p.m., the business day before the hearing, prevailing Eastern Time.

The public, including members of the media, may only attend evidentiary hearings in the courthouse, not remotely. This change in practice regarding evidentiary hearings reflects the policies of the Judicial Conference of the United States that became effective on September 22, 2023.

**PLEASE TAKE FURTHER NOTICE** that due to the large number of expected participants in the Hearing and the Court's security requirements for participating in a Zoom for

2

Government audio and video hearing, all persons seeking to attend the Hearing at 10:00 a.m., prevailing Eastern Time on December 21, 2023, must connect to the Hearing beginning at 9:00 a.m., prevailing Eastern Time on December 21, 2023.  When parties sign in to Zoom for Government and add their names, they must type in the first and last name that will be used to identify them at the Hearing.  Parties that type in only their first name, a nickname or initials will not be admitted into the Hearing.  When seeking to connect for either audio or video participation in a Zoom for Government Hearing, you will first enter a "Waiting Room" in the order in which you seek to connect.  Court personnel will admit each person to the Hearing from the Waiting Room after confirming the person's name (and telephone number, if a telephone is used to connect) with their eCourtAppearance.  Because of the large number of expected participants, you may experience a delay in the Waiting Room before you are admitted to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the relief requested in the Motion shall:  (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; (c) be filed electronically with the Court on the docket of *In re Celsius Network LLC*, No. 22-10964 (MG) by registered users of the Court's electronic filing system and in accordance with all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York (which are available on the Court's website at http://www.nysb.uscourts.gov); and (d) be served in accordance with the *Second Amended Final Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [Docket No. 2560] (the "Case Management Order") by **December 14, 2023, at 4:00 p.m., prevailing Eastern Time**, to (i) the entities on the Master

Service List (as defined in the Case Management Order and available on the case website of the Debtors at https://cases.stretto.com/celsius) and (ii) any person or entity with a particularized interest in the subject matter of the Motion.

**PLEASE TAKE FURTHER NOTICE** that only those responses or objections that are timely filed, served, and received will be considered at the Hearing.  Failure to file a timely objection may result in entry of a final order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and other pleadings filed in these chapter 11 cases may be obtained free of charge by visiting the website of Stretto at https://cases.stretto.com/celsius.  You may also obtain copies of the Motion and other pleadings filed in these chapter 11 cases by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank.]*

New York, New York
Dated: November 30, 2023

/s/ Joshua A. Sussberg
_____
Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

/s/ Aaron Colodny
_____
David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Facsimile:      (212) 354-8113

Michael C. Andolina (admitted *pro hac vice*)
Gregory F. Pesce (admitted *pro hac vice*)
Carolyn P. Gurland
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:     (312) 881-5400
Facsimile:      (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Facsimile:      (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Facsimile:      (305) 358-5744

*Counsel to the Official Committee of*
*Unsecured Creditors*

**Hearing Date:  December 21, at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline:  December 14, at 4:00 p.m. (prevailing Eastern Time)**

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:    (312) 881-5400
Facsimile:    (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:    (213) 620-7700
Facsimile:    (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:    (305) 371-2700
Facsimile:    (305) 358-5744

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**JOINT MOTION OF THE DEBTORS AND THE COMMITTEE
FOR ENTRY OF AN ORDER (I) APPROVING THE IMPLEMENTATION
OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and the official committee of unsecured creditors (the "Committee") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") respectfully state the following in support of this joint motion (this "Motion"):

**Preliminary Statement**[2]

1.      During closing arguments regarding confirmation of the Plan, the Debtors explained that their discussions with the SEC remained ongoing regarding the "pre-clearance" of NewCo's financial statements to be filed with the SEC as part of the registration process, completion of which was a condition to the effectiveness of the NewCo Transaction. The Court requested that the SEC facilitate a speedy resolution "so if there are any bumps in the road, we can try to work those out along the way." Oct. 30 Hr'g Tr. at 82:6–17. On November 9, the Court entered the Confirmation Order. Just hours later, the SEC informed the Debtors that it would not approve the pre-clearance letter for the NewCo Transaction, but that the SEC would not require pre-clearance for the Debtors to pursue registration of a mining-only company. This guidance paves the way for the Debtors' bitcoin mining operations to emerge as a new,

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

publicly traded company owned by the Debtors' Account Holders (subject to successful completion of an SEC review process of a completed Form 10).[3]

2.     Fortunately, the confirmed Plan already contemplated this scenario.  The Plan provided two ways to exit chapter 11—the Debtors could implement the NewCo Transaction or toggle to an alternate transaction that would create a stand-alone bitcoin mining company (the "MiningCo Transaction").[4]  Confirmation of the Plan approved both exit paths, giving the Debtors the flexibility to file this Motion to effectuate the "toggle" to the MiningCo Transaction and promptly exit from bankruptcy without resoliciting another chapter 11 plan.  Compared to the NewCo Transaction, the MiningCo Transaction requires less capitalization (and features significantly lower management fees), which will allow for more cryptocurrency to be distributed to creditors.  Further, the Debtors have negotiated favorable changes to the mining management agreement with US Bitcoin as compared to the backup transactions described in the Plan and Disclosure Statement—which were already overwhelmingly approved.

3.     To achieve this result, following receipt of the SEC's guidance, the Debtors reopened negotiations with prior bidders to market test terms for a MiningCo Transaction.  Following these negotiations, the Debtors terminated the Fahrenheit Plan Sponsor Agreement, and the Debtors and the Committee selected US Bitcoin as the sponsor for the MiningCo Transaction.  In this capacity, US Bitcoin will serve as the mining manager, operate MiningCo's

---

[3]    *See Notice of Press Release* [Docket No. 4017] ("Following confirmation, Celsius received feedback from the Securities and Exchange Commission (the "SEC") on certain aspects of the Plan, which has resulted in Celsius now intending to begin the process to apply to register the shares in a new publicly traded Bitcoin mining company that will be owned by Celsius customers (the "Mining NewCo").").

[4]    For the avoidance of any doubt, the MiningCo Transaction is referred to in the Plan as the "Orderly Wind Down."  By this Motion, the Debtors and the Committee are exercising their right under the Plan to toggle to the Orderly Wind Down.

business and report to the board of directors of the MiningCo, and make a significant equity investment at the same value as creditors, as previously contemplated.

4.      US Bitcoin was the proposed mining manager under the NewCo Transaction, and is one of the largest and most successful Bitcoin mining operators in the country, specializing in the design, construction, and management of data centers for third parties with access to low-cost and sustainable sources of energy, and has particular familiarity with the Texas energy market, including ERCOT's unique ancillary services, which the Debtors intend to leverage for their mining business.  Fahrenheit won the auction last spring in large part due to US Bitcoin's proven track record as an operator and expertise managing bitcoin mining operations owned by third parties and maximizing the value of bitcoin miners.  Since the auction, US Bitcoin has already rolled up its sleeves and helped optimize the Debtors' operations.  For example, US Bitcoin is actively working to build out the Debtors' Cedarvale location, and the US Bitcoin team and proposed management team for MiningCo have done substantial work preparing the new MiningCo to be listed as a publicly traded company.  Based on this experience, the Debtors and the Committee are confident that US Bitcoin will optimize MiningCo's business and drive equity value for its shareholders—the Debtors' current creditors.

5.      Before selecting US Bitcoin to lead the MiningCo Transaction, the Debtors and the Committee engaged with both the Backup Plan Sponsor and another party who had previously submitted a backup bid regarding the terms on which these parties would sponsor a MiningCo Transaction.  Following discussions with all three potential mining managers, the Debtors and the Committee determined that the MiningCo Transaction proposed by US Bitcoin was the best available under the circumstances.

6.      The Debtors and the Committee further believe that a MiningCo Transaction with US Bitcoin is the quickest and most certain path to promptly exiting bankruptcy and making distributions to creditors—all of the definitive documentation necessary for the US Bitcoin MiningCo Transaction has been negotiated for several months and can be readily amended for the necessary changes to the deal, but these documents would need to be negotiated with any other bidder.  Proceeding with US Bitcoin also avoids a disruptive and costly transition of the construction of the Cedarvale facility.

7.      Importantly, there are no further SEC actions or approvals needed for the Plan to become effective, to implement the MiningCo Transaction, and to begin distributions of Liquid Cryptocurrency.  Specifically, the SEC has indicated that no pre-clearance process is needed before the Form 10 registration statement for the MiningCo business can be filed.  To be clear, the Form 10 will be subject to completion of a review process with the SEC and must otherwise become effective prior to the MiningCo Common Stock becoming tradeable, but effectiveness of the Form 10 is not a condition precedent to the Debtors' emergence from bankruptcy and the commencement of distributions to creditors.  The Debtors expect to file the Form 10 for the MiningCo Transaction imminently.

8.      In a heavily contested confirmation hearing, it was undisputed that the Debtors' mining assets were the core of NewCo and that the Debtors' mining assets should be reorganized as a going concern to avoid a value-destructive piecemeal liquidation of the mining rigs. The MiningCo Transaction led by US Bitcoin provides the opportunity to preserve the equity value of the Debtors' substantial mining operations while distributing as much Liquid Cryptocurrency as possible, as soon as possible.  Specifically, the proposed MiningCo Transaction contemplates the capitalization of MiningCo with $225 million, as compared to the

$450 million of Liquid Cryptocurrency that would have been used to capitalize NewCo. Therefore, an additional $225 million of Liquid Cryptocurrency will now be available for distribution to creditors.

9.    A summary of the key terms of the MiningCo Transaction compared to the NewCo Transaction is set forth below:[5]

| Term | NewCo Transaction | MiningCo Transaction |
|---|---|---|
| Contributed Assets | Mining Assets, DeFi Cryptocurrency Assets, Institutional Loan Portfolio, and PE & VC Investments | Mining Assets (remainder of assets to be monetized by Plan Administrator and Litigation Administrator)[6] |
| Capitalization Amount | $450 million of Liquid Cryptocurrency | $225 million in fiat |
| Initial Business Lines | Bitcoin Mining, Ethereum Staking, Monetizing Illiquid Assets | Bitcoin Mining |
| Equity Investment (*i.e.*, Plan Sponsor Contribution) | $33,188,119 initially; total of $50 million if management agreement is extended to five years | $12,752,400 initially; total of $15,940,500 if management agreement is extended to five years[7] |
| Management Fee and Mining Management Fee | Total of $35 million per year<br><br>• Management Fee to Fahrenheit: $20 million per year (one third of which would be paid to US Bitcoin)<br><br>• Mining Management Fee to US Bitcoin: $15 million per year | Total of $20,376,200 per year to US Bitcoin, inclusive of both management and mining management services |

---

[5]    This summary is provided for convenience and is qualified in its entirety by the terms contained in <u>Exhibit 1</u> to the proposed Order.  To the extent there are any conflicts between this summary and <u>Exhibit 1</u> to the proposed Order, the terms in <u>Exhibit 1</u> shall govern.

[6]    Certain Mining-related assets, including loans to Core Scientific, Mawson, Rhodium, and Luxor Technology, may also be contributed to MiningCo if the Debtors determine that doing so will not cause regulatory complications.

[7]    The new equity investment will be made utilizing the midpoint valuation for the Mining business in the Disclosure Statement, assuming a capitalization amount of $225 million (*i.e.*, $740 million), and is consistent with the *pro rata* equity investment US Bitcoin would have made under the NewCo Transaction.

| Equity Fee | 5% of NewCo Common Stock on a fully diluted basis | 1.28% of MiningCo Common Stock in both restricted stock units and warrants on a fully diluted basis (equivalent to US Bitcoin's share of the equity fee owed under the NewCo Transaction) |
| --- | --- | --- |
| Estimated Liquid Cryptocurrency Distributions | Approximately $2.03 billion (using cryptocurrency prices as of May 31, 2023) | Approximately $2.6 billion (consisting of changes in cryptocurrency prices from May 31, 2023 through November 17, 2023, plus additional Liquid Cryptocurrency available for distribution pursuant to the MiningCo Transaction) |
| Composition of Board of Directors | Nine members:<br><br>• three of whom will be appointed by the Plan Sponsor;<br><br>• four of whom will be appointed by the Committee, in its sole discretion; and<br><br>• two of whom will be appointed by the Committee and consented to by the Plan Sponsor.<br><br>Identities of the New Board were set forth in the Plan Supplement and approved by the Court.<br><br>Three Board Observers | Eight members:<br><br>• the six members previously appointed by the Committee and approved by the Court; and<br><br>• two members to be appointed by US Bitcoin, who are expected to be Asher Genoot and Jordan Levy.<br><br>Three Board Observers (same as previously approved by the Court) |

10.    The Plan previously contemplated that the Unsecured Claim Distribution Mix Election—which allowed Account Holders who voted for the Plan to elect to receive more Liquid Cryptocurrency or more NewCo Common Stock for a 30% discount or premium, as the case may be—would ***not*** be effective in the event of a MiningCo Transaction. This remains the case: all prior Unsecured Claim Distribution Mix Elections are void. However, after receiving feedback from certain creditors, the Debtors and Committee are discussing whether to resolicit distribution mix elections for the MiningCo Transaction and expect to make a determination prior to the hearing on this Motion. Any election would be optional, and this change would have

no effect on any party that has not affirmatively opted to receive more equity or more liquid cryptocurrency.

11.     The proposed MiningCo Transaction is the quickest path out of chapter 11 and is expected to provide creditors with a greater overall recovery than they would have received under the originally contemplated Orderly Wind Down.  While there is still work to do before the Plan can become effective and distributions can begin, the Debtors and the Committee currently believe that the Effective Date can occur by the end of January if the Motion is approved.  For the reasons set forth herein, the Debtors and the Committee request that the Court approve the Motion.

## **Relief Requested**

12.     The Debtors seek entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, (a) implementing the Plan toggle to the MiningCo Transaction on the terms attached to the proposed Order as Exhibit 1, (b) approving the Wind-Down Budget and Wind-Down Procedures, attached to the proposed Order as Exhibit 2 and Exhibit 3, respectively, (c) approving the amount proposed to be reserved for the Disputed and Contingent Claim Reserve, as reflected on Exhibit 4 to the proposed Order, and (d) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Robert Campagna in Support of the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II)  Granting Related Relief* (the "Campagna Declaration"), and the Committee submits the *Declaration of Kenneth Ehrler in Support of the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II)  Granting Related Relief* (the "Ehrler Declaration"), each of which is being filed contemporaneously herewith.

8

## Jurisdiction and Venue

13.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012.  The Debtors and the Committee confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15.     The bases for the relief requested herein are section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and the Confirmation Order.

## Background

### A.     The Marketing and Auction Process for the Plan.

16.     In October 2022, the Debtors commenced a robust marketing and sale process for all or substantially all of their assets.  Through this process, the Debtors received six non-binding bids for their retail platform business (including any digital assets held by the Debtors), three non-binding bids for their mining business, and additional bids for individual assets.  After reviewing the bids, it became apparent that a traditional sale (in which a buyer simply purchased some or all of the Debtors' assets) was likely not available on attractive terms, and the Debtors determined that a transaction with a plan sponsor serving as the manager for the reorganized business was the best way to maximize value.

17.     On February 15, 2023, the Debtors announced that, in consultation with the Committee, they had reached an agreement in principle with NovaWulf Digital Management, LP ("NovaWulf") for NovaWulf to manage the Debtors' reorganized business.  In the wake of that

announcement, other bidders expressed interest in a similar management structure, and NovaWulf served as the stalking horse bidder for a plan sponsor transaction. Following engagement with interested third parties, the Debtors determined to hold an auction in accordance with the Bidding Procedures. Ahead of the auction, the Debtors and the Committee identified Fahrenheit, of which US Bitcoin is a member, and the BRIC as qualified bidders, in addition to NovaWulf. The auction commenced on April 25, 2023 and continued for a month, during which the Debtors and the Committee worked with NovaWulf, Fahrenheit, and the BRIC to obtain value for the Debtors' creditors. As a result of the auction process, the Debtors and the Committee were able to significantly reduce management fees, and the Debtors negotiated a plan that would provide for distributions of hundreds of millions of dollars' worth of additional Liquid Cryptocurrency to Account Holders as compared to the NovaWulf transaction. Before and during that period, the Debtors and the Committee also extensively vetted the proposed management teams and bitcoin mining management capabilities of each bidder and conducted thorough operational diligence.

18.    On May 25, 2023, the Debtors, in consultation with the Committee, identified Fahrenheit as the Successful Bidder and the BRIC as the Backup Bidder [Docket No. 2713].

**B.    The NewCo Transaction and SEC Registration Process**.

19.    The confirmed Plan contemplates two paths to emergence. The primary path was the effectuation of the Fahrenheit "NewCo Transaction," whereby the Debtors would make an initial distribution of Liquid Cryptocurrency to Account Holders and Fahrenheit, as Plan Sponsor, would manage and monetize the Debtors' illiquid assets, including the Debtors' bitcoin mining operations, for the benefit of the Debtors' creditors. Fahrenheit would also stake its own ethereum and develop new businesses within NewCo. Under the NewCo Transaction, creditors were to receive NewCo Common Stock, which was intended to be publicly traded on NASDAQ

to allow creditors to capture the upside of the Debtors' illiquid assets with maximum flexibility to manage their distributions as they saw fit in a liquid market.[8]  A condition precedent to the Effective Date and the trading of NewCo Common Stock was successful completion of the SEC review process for a registration statement on Form 10 for NewCo (the "NewCo Form 10").

20.    To file a registration statement on Form 10, a company must submit audited financial statements for the requisite time periods for itself and/or a "predecessor entity." The Debtors have substantially completed the audit process related to their mining business, which operated as a standalone business.   However, due to the condition of the Debtors' historical financial records, it is impossible to audit the rest of the Debtors' business. Importantly, Fahrenheit did not propose to operate any of the historical businesses of the Debtors other than the mining business.  See Disclosure Statement, Exhibit F.  As a result, the Debtors sought pre-clearance from the SEC to only provide audited financials for the mining business— NewCo's primary operating asset.  See Oct. 30, 2023 Hr'g Tr. 38:6–12 ("We've been discussing a pre-clearance letter with the SEC and the other parties, which if the SEC approved, would pre-clear one of the key issues for the Form 10, which is the fact that Celsius will not have audited financials for the historic customer facing businesses, other than the mining business."). The Disclosure Statement disclosed the existence of the pre-clearance condition and the risk that it posed to the effectiveness of the Plan.[9]

---

[8]    See Disclosure Statement at 6 ("An equity listing on a public exchange such as NASDAQ is intended to provide creditors with maximum flexibility to decide for themselves whether they want to (a) hold their shares in NewCo and remain investors in NewCo's long-term vision, or (b) sell their shares in NewCo and thereby immediately monetize their share of the Debtors' illiquid assets and the other assets held by NewCo.").

[9]    See also Disclosure Statement at 43 (Q:  "Are any regulatory approvals required to consummate the Plan?" A:  "Yes, there are a number of regulatory approvals required to consummate the Plan, including:  obtaining pre-clearance from the SEC confirming the financial statement presentation for the registration statement on Form 10 . . . to be filed by NewCo[.]" (footnote omitted)).

21.    The Debtors officially requested pre-clearance of their financial statement presentation on July 25, 2023, through a letter to the SEC, and sent written responses to the SEC staff's follow-up requests on September 27, 2023 and October 25, 2023.    During this time period, representatives of the Debtors, the Committee, and Fahrenheit all engaged in discussions with the SEC regarding the NewCo Form 10 and pre-clearance request.

22.    On October 30, 2023, the Debtors provided the Court with an update on the NewCo Form 10 process in connection with closing arguments, and the Court requested that the SEC make its determination expeditiously.[10]    On November 9, 2023, the Court entered the Confirmation Order.  [Docket No. 3972].  That same day, the SEC notified the Debtors that it would require historical financial statements for all of the Debtors' assets to be contributed to NewCo in the NewCo Form 10.  Because the Debtors do not have, and are not able to produce, audited financial statements relating to any assets other than their mining business, the SEC's decision effectively ended the NewCo registration process.  The SEC informed the Debtors, however, that it would not object to the Debtors presenting audited historical financials of only the Celsius mining company in connection with the Form 10 to be filed for the MiningCo Transaction and that the Debtors did not need to seek pre-clearance of the financial statement presentation for a Form 10 relating to just the MiningCo Transaction.  *See Notice of Press Release* [Docket No. 4017].

---

[10]    Oct. 30 Hr'g Tr. at 82:6–17 ("[M]y only request—and only a request—is that the [SEC] staff do all it can to facilitate this process going forward.  The SEC will make the determination it believes [is] required [by] the fact and circumstances.  All I'm asking is . . . I think the Debtors and the Committee[,] certainly from the Court's standpoint[,] have been doing all [they] can to facilitate [a] speedy process.  I would appreciate it if the SEC would do likewise.  The SEC will make whatever decision it believes is the correct one.  I just hope the process will move forward.").

C.    **The Plan Toggle and Backup Plan Sponsor Transaction**.

23.    Though the Debtors and the Committee were in frequent discussions with state and federal regulators and took careful efforts to make sure that the Plan complied with all applicable regulations (often taking the conservative approach to reorganize the Debtors' businesses when creditors or bidders advocated for more aggressive approaches), the Debtors and the Committee understood that it was not certain that regulators would approve the Fahrenheit NewCo Transaction.[11]    That uncertainty was in large part due to the lack of clarity regarding the rules of the road with respect to cryptocurrency businesses.    To provide the Debtors with flexibility in the face of regulatory uncertainty and to guard against material delays in returning Liquid Cryptocurrency to Account Holders, the Plan contains a toggle feature, which, if activated, eliminates certain provisions related to the NewCo Transaction and substitutes them with provisions for a mining-only transaction, which is referred to in the Plan as an "Orderly Wind Down."

24.    As was described at the Disclosure Statement Hearing:

[The toggle feature] is a break in case of emergency transaction that was put into place due to the regulatory uncertainties that surround the cryptocurrency industry and the Committee and Debtors' firsthand experience watching the [Voyager Digital Holdings, Inc.] case where the backup transaction that they had put into place was actually executed and allowed for the return of money to creditors as quickly as possible.

Aug. 14, 2023 Hr'g Tr. 23:12–19.

25.    In the Disclosure Statement, the Debtors notified creditors that a vote to accept the Plan would be a vote "to accept both the NewCo Transaction and the Orderly Wind Down."

---

[11]    In response to the Court's request for regulatory agencies to provide statements regarding the proposed break-up fee with respect to the NovaWulf transaction, the SEC informed the Court that as it "obtain[ed] additional information, [it would] consider regulatory implications and immediately communicate to the Court any issues or concerns that may arise." *Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2322].

Disclosure Statement Art. III.I and III.HHH.   The Plan identified a potential Backup Plan Sponsor, the BRIC, and Backup Plan Sponsor Transaction that was subject to a market test. *See* Plan Art. IV.E.1.   Creditors were also informed that the Debtors "may select a different Backup Plan Sponsor if a different party provides terms superior to those offered by BRIC," Disclosure Statement Art. III.I; *see also* Disclosure Statement Art. II.B.2, and that such other party may be US Bitcoin.  Plan Art. IV.E.1 ("Concept eliminated, unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down.").

26.      The terms of the BRIC Backup Plan Sponsor Transaction were included in a term sheet that was attached to the Backup Plan Sponsor Agreement with the BRIC.   *Notice of Amended and Restated Backup Plan Sponsor Agreement and Deadline to Submit Backup Bids* [Docket No. 2983].  The Backup Plan Administration Agreement Term Sheet contemplated that the BRIC would:

- manage the Wind Down Estate's day-to-day business and operations, including managing its liquidity and capital resources;

- evaluate, manage, negotiate and oversee the disposition of all or any part of the property or assets of the Wind Down Estate; and

- perform any other services for and on behalf of Wind Down Estate to the extent necessary or appropriate

in exchange for the fees contained in the Backup Plan Administration Agreement Term Sheet, which consisted of both flat fees (*e.g.*, general administration, initial distributions) and percentage fees (*e.g.*, based on subsequent distributions, incentives for performance improvements to budget).  Before accounting for any percentage fees, the baseline flat fees under the Backup Plan Administration Agreement Term Sheet were $46 million over five years for

general administration and an additional $12 million for the initial distribution, with additional fees to be paid as a percent of future distributions.

27.     At that time, the BRIC proposed to use Gemini Trust Company, LLC as its partner to distribute Liquid Cryptocurrency to creditors.[12]  VanEck was included to provide investment advice to manage the Debtors' portfolio of coins other than bitcoin and ethereum. Additionally, the Backup Plan Sponsor Agreement envisioned the appointment of a separate Litigation Administrator to handle the administration of the Debtors' valuable claims and causes of action.

28.     Though the Orderly Wind Down back up plan envisioned the creation of a pure play, public stand-alone mining company, the Backup Plan Administration Agreement Term Sheet did not contain details regarding the back-up mining manager or the terms on which such a transaction may occur as part of the Plan, and the BRIC did not provide such details for inclusion in the Plan.[13]

**D.    Transaction Developments Following Execution of the Backup Plan Sponsor Agreement.**

29.     Since execution of the Backup Plan Sponsor Agreement, the Debtors have made substantial progress preparing for the implementation of the Plan under either the NewCo Transaction or the MiningCo Transaction (which reduces the need for many of the services initially envisioned under the Backup Plan Administration Agreement Term Sheet). For example, Chris Ferraro, Chief Executive Officer, Chief Restructuring Officer, and Chief Financial Officer of the Debtors, has agreed to serve as Plan Administrator for at least the first

---

[12]   On October 19, 2023, the New York Attorney General filed a lawsuit against Gemini Trust Company alleging that it defrauded its investors.  *People v. Gemini Tr. Co., et al.*, No. 452784/2023 (N.Y. Sup. Ct. Oct. 19, 2023).

[13]   In August 2023, the BRIC submitted a non-binding presentation to the Debtors and the Committee that outlined the terms of a potential agreement with Global[X]Digital as mining manager for MiningCo, but the BRIC never provided related documentation, and such information was not included in any binding agreement.

year following emergence, whether as part of a NewCo Transaction or the MiningCo Transaction.[14] Mr. Ferraro has a deep understanding of both the Debtors' "illiquid" assets and the distribution process, which Mr. Ferraro has already overseen in connection with the successful return of cryptocurrency on account of Custody Claims. The Plan Administrator Agreement provides that Mr. Ferraro will provide his services for a monthly fee of $200,000 for three months and $100,000 thereafter, as well as a $1,000,000 substantial completion bonus if certain conditions regarding administration of the Estates are satisfied. Despite having more assets to manage under the MiningCo Transaction, Mr. Ferraro has not requested any increase in compensation.

30.    The Debtors have also negotiated the Litigation Administrator Agreement (which provides for a monthly fee of $50,000 for the first three months and $25,000 thereafter) and agreements with PayPal and Coinbase regarding distributions of Liquid Cryptocurrency.[15] Together, these three agreements provide for substantially all of the non-mining services contemplated under the Backup Plan Administration Agreement Term Sheet at a major discount to the minimum of $58 million of fees contemplated thereunder.

31.    In addition to negotiating lower fees, the Debtors also eliminated or significantly reduced their need for a number of services. For example, the Debtors made substantial progress in converting their altcoins to BTC, ETH, or Cash in preparation for distributions, and the Debtors and the Committee have streamlined the Claims resolution process through the Class Claim Settlement, which resolved over 25,000 non-custody Account Holder Claims, with a

---

[14]    The majority of the Liquid Cryptocurrency distributions are expected to be made within the first year, following resolution of preference litigation.

[15]    The pricing terms of the Coinbase agreements are sealed to protect commercially sensitive information. The PayPal agreement provides that PayPal will pay the Estates.

books and records amount of approximately $1.36 billion in the aggregate, leaving only approximately 1,700 non-custody Account Holder Claims, with a books and records amount of approximately $270 million, to be resolved post-emergence. The Debtors have also monetized certain of their illiquid assets that were to be liquidated over time by the Backup Plan Sponsor, including their shares in the Osprey Bitcoin Trust. Certain of the Debtors' other largest illiquid assets which were initially envisioned to be monetized by the Backup Plan Sponsor have either been resolved or will be directed by the Litigation Administrator, including assets related to StakeHound, EFH, and Mawson.[16]

32.     One of the biggest developments relates to the approximately $31 million of litigation claims with Core Scientific, which were resolved through the Cedarvale asset purchase.[17] The Cedarvale asset purchase not only resolved major claims that the Backup Plan Sponsor was contemplated to manage, but it will also shape the Debtors' go-forward mining business (and mining partner needs). Once construction is finished, the Cedarvale facility will be one of the cornerstone assets of MiningCo, with a total power capacity of 215MW, adding to the 87MW of self-mining assets already deployed in Midland, Texas, and providing considerable growth potential for MiningCo. The development of the Cedarvale site, which will require approximately $80 million to complete, will position the Debtors' mining business to be self-sufficient and fits squarely within the Debtors' goal of vertically integrating their mining operations and, over time, becoming less reliant on third party servicers.[18] In preparation for the

---

[16]    *Celsius Network Limited v. StakeHound SA*, Docket No. 1:23-ap-01138 (Bankr. S.D.N.Y. Jul. 11, 2023); *Celsius Network Limited v. Equities First Holdings, LLC et al*, Docket No. 1:23-ap-01167 (Bankr. S.D.N.Y. Sept. 6, 2023); *In re Core Scientific*, 22-90341(CML) (Bankr. S.D. Tex. 2022); *Celsius Mining LLC v. Mawson Infrastructure Group Inc. et al*, Docket No. 1:23-ap-01202 (Bankr. S.D.N.Y. Nov. 21, 2023).

[17]    Under the terms of the settlement, the Debtors retain their approximately $59.6 million of convertible notes and convertible note claims, which have already separately been mediated as part of Core Scientific's bankruptcy and are expected to be resolved through a plan of reorganization in the Core Scientific bankruptcy proceeding.

NewCo Transaction, the Debtors negotiated an interim agreement under which US Bitcoin agreed to assist in the build out and management of the Cedarvale site, but the Debtors delayed execution of this agreement pending selection of a Backup Plan Sponsor to avoid prejudicing MiningCo Transaction negotiations with other potential partners who could provide similar services.

33.     The Debtors have also made material progress towards listing the pure-play bitcoin mining company envisioned in the "Orderly Wind Down" transaction. Specifically, the Debtors retained RSM US LLP ("RSM") to assist Celsius Mining and NewCo by performing a financial statement audit pursuant to the auditing standards generally accepted in the United States (the "GAAS Standards") and those of the Public Company Accounting Oversight Board (PCAOB) (United States) (the "PCAOB Standards") to express an opinion on the fairness of the presentation of Celsius Mining's financial statements for the years ending December 31, 2020, December 31, 2021, and December 31, 2022 and NewCo's opening balance sheet in conformity with accounting principles generally accepted in the United States. RSM is also performing a review of Celsius Mining's interim financial information in accordance with PCAOB Standards for the requisite quarters in the years ending December 31, 2022 and December 31, 2023. Those audits are now complete, and this work will largely transfer to the MiningCo Form 10 process. The Debtors, with the help of Fahrenheit and Joel Block, the proposed CFO for both the Fahrenheit NewCo and the MiningCo, have also drafted the Form 10 filing and are preparing to submit that filing imminently, once the latest quarterly financials are included and the document is revised to reflect the MiningCo Transaction.

---

[18]    Additionally, the Cedarvale facility is located in close proximity to the Debtors' existing mining sites, providing economies of scale with respect to operational support and supply chain, and, because Cedarvale operates in ERCOT load zone west, it enables energy management and hedging strategies that can offset risks of bitcoin and energy price volatility.

34.     Through all of the foregoing developments, the Debtors have steadily decreased their total headcount, right-sizing the number of employees based on the reduced scope of services provided.  Specifically, over the course of these Chapter 11 Cases, the Debtors have reduced their workforce from approximately 600 employees on the Petition Date to approximately 115 employees as of the date of this filing.  These remaining employees are necessary to the Debtors' current and future operations, including safeguarding account holders' cryptocurrency, operating a bitcoin mining business, facilitating distributions contemplated under the Plan, and providing reports to the Court regarding the Debtors' progress.

**E.     Negotiation and Development of the MiningCo Transaction**.

35.     After the SEC determined not to grant the pre-clearance request for the financial statement presentation in the NewCo Form 10, the Debtors evaluated next steps with the Committee and ultimately jointly determined to activate the Plan toggle and implement the MiningCo Transaction.  While US Bitcoin was the preferred partner to operate MiningCo, the Debtors' agreement with US Bitcoin was embedded in a broader agreement with Fahrenheit, and it was not clear whether the Debtors would be able to successfully negotiate a stand-alone agreement with US Bitcoin on acceptable economic terms after the Fahrenheit transaction could not be completed.  The Debtors and the Committee, therefore, determined to conduct a quick market check and to explore the viability of the other bidders that had previously participated in the process for a mining-only transaction, including the BRIC and one other bidder.  The Debtors, in consultation with the Committee, requested that each of the BRIC and US Bitcoin parties submit a revised proposal to reflect the case developments described in the preceding section, because each of their prior proposals was obsolete and not executable.  Specifically, Fahrenheit's NewCo proposal was not feasible given that NewCo's pre-clearance request was not granted, and the BRIC's prior proposal was obsolete in light of the progress the Debtors and

the Committee made in resolving Plan issues as described above, and it had never included a binding detailed proposal to manage the mining business. Accordingly, the Debtors and the Committee requested proposals for a MiningCo Transaction, without the other services included in the prior Fahrenheit and BRIC proposals. The Debtors and the Committee stressed that time was of the essence and that they were focused on selecting a sponsor for the MiningCo Transaction and making distributions quickly.

36.    Another bidder submitted a revised bid prior to the Debtors' solicitation of revised bids from the BRIC and US Bitcoin. US Bitcoin submitted a revised proposal in response to the Debtors' request. The BRIC, on the other hand, did not submit a revised proposal and instead sent the Debtors a letter threatening litigation to compel the Debtors to designate the BRIC as the Backup Plan Sponsor. The BRIC's letter did not address the Debtors' concerns that the Backup Plan Administration Agreement Term Sheet contemplated the BRIC providing services that the Debtors no longer required from them and did not provide requested details regarding the BRIC's mining plan.[19] Instead, the BRIC stated that its mining manager "proposal" was contingent on it being selected as the Plan Administrator on the same terms outlined in the Backup Plan Administration Term Sheet, except the $12 million initial distribution fee, which it agreed to "waive." A week later, over the Thanksgiving holiday, the BRIC sent a second letter including some revised terms, but the letter was still not fully responsive to the Debtors' request.[20]

---

[19]    The BRIC's Backup Plan Sponsor Transaction contemplated provision of a mining manager, but the BRIC did not provide documentation for that transaction at the time. The BRIC submitted a draft mining manager agreement for the first time two days before this Motion was filed. *Id.*

[20]    The BRIC subsequently sent additional materials but, as of the filing of this Motion, had not disaggregated its proposal or provided a complete response to the Debtors' requests.

37.     After careful deliberation, the Debtors and the Committee jointly selected US Bitcoin to serve as the manager for the MiningCo Transaction based on, among other things, (a) their view that US Bitcoin is the best mining manager available and will maximize the value of the MiningCo, (b) the favorable terms of US Bitcoin's proposal, which includes vertical integration of the Debtors' mining assets and reduces the reliance on third party service providers, including the build out of the Debtors' Cedarvale site, and (c) the certainty and speed of execution of the MiningCo Transaction with US Bitcoin, given that the parties have been negotiating the definitive documentation for months as part of the Plan, which will allow the Debtors to promptly emerge from bankruptcy without extensive delays.   The terms and economics of the proposed US Bitcoin-led MiningCo Transaction, while substantively similar to the terms agreed to as part of the broader Fahrenheit NewCo Transition, are now meaningfully improved from an economic and qualitative perspective.   It remains the business judgment of the Debtors and the Committee that, under the circumstances, US Bitcoin is the appropriate institution to invest in, operate, and preside over MiningCo, with the goal of maximizing value for the benefit of the Debtors' creditors.

38.     Under US Bitcoin's business plan, US Bitcoin will serve as the mining manager for MiningCo with Joel Block as Chief Financial Officer.   US Bitcoin will work with the Debtors to execute the Cedarvale Interim Services Agreement expeditiously and will provide interim hosting services during the buildout of the Cedarvale mining facility.   US Bitcoin has also provided competitive hosting services to the Debtors at its Alpha mining site, facilitating the Debtors' exit from an underperforming contract.   Other key components of the US Bitcoin business plan include providing rig coupons to extract additional value from capital expenditures, developing site designs for Cedarvale, and reducing vendor costs.   In addition,

US Bitcoin's knowledge of the power market in Texas, where the majority of the Debtors'
mining rigs will ultimately be deployed when the development of the Cedarvale facility is
complete, will assist the Debtors in taking advantage of ERCOT's unique ancillary services
market to maximize value for the Debtors' creditors.

39.     The US Bitcoin MiningCo Transaction provides for profit maximization while
minimizing costs.  US Bitcoin intends to provide a market-pioneering, capex-light growth model
through its strategic partnership with application-specific integrated circuit rigs ("ASIC") and
deploy its proprietary miner management and energy curtailment software with the goal of
maximizing miner uptime, protecting against downside during periods of high energy pricing,
and optimizing revenue generated by MiningCo's rig fleet.  US Bitcoin will also facilitate faster,
more cost-effective site buildout, backed by its buildout cost cap of $395K/MW and commitment
to build 100 MW of capacity for MiningCo within 12 months.  The US Bitcoin MiningCo
Transaction will also minimize costs by providing access to US Bitcoin's in-house energy team
at no cost to MiningCo, unlocking market-leading expertise and experience in energy markets
and hedging, while also committing to a labor cost cap for all MiningCo sites.  US Bitcoin's
experience and portfolio of assets, including that US Bitcoin is an experienced provider of site
management services to Marathon, NextEra, Generate, and NYDIG, and other clients with
similarly sophisticated needs, will provide significant advantages to MiningCo.  In fact,
US Bitcoin currently manages multiple sites in Texas with over 600MW of total capacity.
US Bitcoin's ongoing work with the Debtors on their existing mining operations, including
leadership and contributions on work to date at the Cedarvale facility, a strategic partnership
with a leading miner manufacturer, 240MW site, rig coupons and other project initiatives, further
emphasize the positive aspects and potential upside to its bid.  Both the Debtors and the

Committee have first-hand experience with US Bitcoin's team and work which has, thus far, vindicated their initial selection at the auction.

40.     The Debtors and the Committee have determined to capitalize MiningCo with $225 million of cash. This determination was made after considering potential cash needs and expected operating earnings of MiningCo in 2024 and discussions with each of the bidders. These cash needs include: (i) the build-out costs with respect to Cedarvale, (ii) working capital needs to manage day-to-day operations and collateral for potential power hedges at MiningCo's proprietary mining sites, (iii) the replacement of the Debtors' older and less efficient rigs, and (iv) an acceptable level of minimum cash ($50 million) to protect against unexpected events and expenses.

41.     When determining the proper amount of capital to contribute to the MiningCo, the Debtors and Committee considered both maximizing the value of the equity in NewCo as well as the level of cryptocurrency available for immediate distribution to creditors. The proposed level of capitalization will enable MiningCo to execute on its business plan without reliance on debt or outside capital. Based on the bids provided and discussions with the bidders, the proposed capitalization amount is generally consistent with the capitalization requirements communicated by each bidder. In other words, accepting another bid would not result in a lower capitalization requirement for MiningCo.

**F.      The Wind-Down Budget and Wind-Down Procedures.**

42.     The Plan provides that the Debtors must file a Wind-Down Budget and Wind-Down Procedures in the event of a toggle. The Plan also provides for a Disputed and Contingent Claims Reserve, which will hold Liquid Cryptocurrency and MiningCo Common

23

Stock that would otherwise have been distributed on account of Claims not Allowed as of the Effective Date or which may be subject to Withdrawal Preference Exposure.[21]

43.    As detailed in the Wind-Down Budget, the Debtors expect it may cost as much as $75 million to wind down the Wind-Down Debtors' Estates.  Additionally, based on the Debtors' Claims register (including Claims resolved through the Class Claims Settlement) and the provisions in the Plan and Confirmation Order allowing for the resolution of certain Claims, the Debtors believe it is necessary to establish reserves of Liquid Cryptocurrency and MiningCo Common Stock valued at approximately $613 million as of November 17, 2023, pending resolution of Disputed Claims and Avoidance Actions.  A significant portion of that reserve is on account of distributions where the Claim is subject to Withdrawal Preference Exposure of over $100,000, which will be released if the claimant elects to participate in the Account Holder Avoidance Action Settlement.

44.    Attached to the Campagna Declaration is an illustrative waterfall showing anticipated initial Liquid Cryptocurrency distributions, the funding of the Wind-Down Budget, and the disbursements associated with MiningCo.  Wind Down Procedures reflecting the proposed allocation of responsibilities formerly contemplated to be provided by Fahrenheit between US Bitcoin, the Plan Administrator, and the Litigation Administrator are attached to the proposed Order as Exhibit 3.[22]

---

[21]    The Plan Administrator is charged with maintaining the Disputed and Contingent Claims Reserve, including determining whether, in its business judgment, it is advisable to convert such Liquid Cryptocurrency to fiat.

[22]    Pursuant to the Confirmation Order, the Debtors provided written notice of their intent to toggle to the MiningCo Transaction to the Plan Sponsor on November 29, 2023 and to the U.S. Trustee on November 22, 2023.  Further, the Debtors consulted with the Earn Ad Hoc Group, Retail Borrower Ad Hoc Group, Immanuel Herrmann, Daniel Frishberg, Cameron Crews, and Ignat Tuganov regarding the Debtors' intent to toggle to the MiningCo Transaction.

**Basis for Relief**

45.      By this Motion, the Debtors seek to implement the Plan in accordance with its terms (and the terms of the Confirmation Order), which require the filing of a motion to provide all parties with notice of the toggle and related key documents, such as the Wind-Down Budget and the Wind-Down Procedures.    Confirmation Order ¶ 354; *see also* 11 U.S.C § 105(a) (granting the Court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title").    No other statue or rule is applicable because the Court already confirmed the Plan, including the MiningCo Transaction. *See In re Johns-Manville Corp.*, 920 F.2d 121, 128 (2d Cir. 1990) (affirming determination that changes contemplated by the confirmed plan were not "modifications").    This Motion seeks approval of the MiningCo Transaction, the Wind-Down Budget, and the Wind-Down Procedures.

46.      The requested relief falls squarely within the terms of the Plan.  The Plan's plain language provides the Debtors with the option to toggle to the MiningCo Transaction on terms that result in the best available outcome for creditors.   The Plan also provides that such a transaction may be consummated with a party other than the Backup Plan Sponsor (*i.e.*, the BRIC), if the transaction is subject to a market test and superior to the Orderly Wind Down.    *See* Confirmation Order ¶ 356 ("In the event that the Debtors elect to toggle to the Orderly Wind Down, the terms of the Orderly Wind Down shall be no worse than those contained in the Backup Plan Administrator Term Sheet.").    The MiningCo Transaction sponsored by US Bitcoin satisfies this requirement—it is a value-maximizing transaction that will result in a superior outcome for the Debtors' creditors compared to the Orderly Wind Down contemplated in the Backup Plan Administrator Term Sheet.

47.     As described herein, following the Debtors' decision to toggle to the MiningCo Transaction, the Debtors solicited revised bids from the BRIC (the potential Backup Plan Sponsor identified in the Plan) and US Bitcoin (the proposed mining manager under the NewCo Transaction) and evaluated a revised bid from a third party.  Following the negotiation process described above, the Debtors and the Committee jointly selected US Bitcoin to serve as the manager of the MiningCo.  As compared to the BRIC's aggregated proposal, which the BRIC refused to disaggregate, the terms of US Bitcoin's proposal (combined with the existing Plan Administrator Agreement, Litigation Administrator Agreement, and Distribution Agent agreements) were superior, more cost-effective, provided a quicker and more certain path to exit, and addressed the services that the Debtors actually need under the MiningCo Transaction.

48.     Finally, given the extensive working relationship between the Debtors, the Committee, and US Bitcoin on the NewCo Transaction and the ability to leverage US Bitcoin's knowledge of and involvement in the various agreements and other preparations for the NewCo Transaction, including the audit of the Debtors' mining company and Form 10 process, the Debtors anticipate effectuating the MiningCo Transaction with US Bitcoin while maintaining pace to return value to their creditors as soon as January 2024, as described during the Confirmation Hearing.

49.     Though there is a lot of work to be done, the Debtors and the Committee intend to keep working towards making distributions as soon as possible.  The Debtors expect that the Form 10 for the MiningCo Transaction will be filed in short order, initiating the SEC's review process for the MiningCo Common Stock to be issued to creditors.  Finally, the Debtors and the Committee expect to send notices to creditors regarding loan refinancing options and Withdrawal Preference Exposure settlements by early January.  Even though the Debtors are toggling to the

MiningCo Transaction, the Debtors and the Committee are committed to finalizing preparations for and minimizing delays to distributions to creditors.

50.    Critically, the MiningCo Transaction requires no further action or approvals by the SEC to go effective and allow Liquid Cryptocurrency distributions to begin.  The Debtors currently envision that the equity in MiningCo will be distributed to creditors on the Effective Date of the Plan, although it will not be able to be traded until the completion of the Form 10 review process for the MiningCo common stock.  Plan Art. IV.E.1.  That plan, however, remains subject to change.  The Debtors and the Committee remain committed to providing liquidity to holders as soon as possible.

51.    The remaining items addressed in this Motion—the Wind-Down Budget and the Wind-Down Procedures—are technical requirements in light of the activation of the Plan toggle, which requires that they be filed.  *See* Confirmation Order ¶ 355 ("To toggle to an Orderly Wind Down, the Debtors shall . . . file the Wind-Down Motion, which shall include the Wind-Down Procedures.").  As set forth in the Campagna Declaration, the allocation of responsibilities set forth in the Wind-Down Procedures, and the associated Wind-Down Budget, are reasonable and should be approved.

52.    For the foregoing reasons, it is appropriate and necessary under section 105(a) of the Bankruptcy Code to permit the Debtors to implement the MiningCo Transaction and to approve the Wind-Down Budget and Wind-Down Procedures.

## **Notice**

53.    The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (d) the United States

Attorney's Office for the Southern District of New York; (e) the Internal Revenue Service; (f) the offices of the attorneys general in the states in which the Debtors operate; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

54.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

New York, New York
Dated: November 30, 2023

| | |
|---|---|
| /s/ Joshua A. Sussberg | /s/ Aaron Colodny |
| Joshua A. Sussberg, P.C. | David M. Turetsky |
| **KIRKLAND & ELLIS LLP** | Samuel P. Hershey |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Joshua D. Weedman |
| 601 Lexington Avenue | **WHITE & CASE LLP** |
| New York, New York 10022 | 1221 Avenue of the Americas |
| Telephone:    (212) 446-4800 | New York, New York 10020 |
| Facsimile:     (212) 446-4900 | Telephone:    (212) 819-8200 |
| | Facsimile:     (212) 354-8113 |
| Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) | |
| Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) | Michael C. Andolina (admitted *pro hac vice*) |
| Christopher S. Koenig | Gregory F. Pesce (admitted *pro hac vice*) |
| Dan Latona (admitted *pro hac vice*) | Carolyn P. Gurland |
| **KIRKLAND & ELLIS LLP** | **WHITE & CASE LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | 111 South Wacker Drive, Suite 5100 |
| 300 North LaSalle Street | Chicago, Illinois 60606 |
| Chicago, Illinois 60654 | Telephone:    (312) 881-5400 |
| Telephone:    (312) 862-2000 | Facsimile:     (312) 881-5450 |
| Facsimile:     (312) 862-2200 | |
| | Aaron Colodny (admitted *pro hac vice*) |
| *Counsel to the Debtors and Debtors in Possession* | **WHITE & CASE LLP** |
| | 555 South Flower Street, Suite 2700 |
| | Los Angeles, California 90071 |
| | Telephone:    (213) 620-7700 |
| | Facsimile:     (213) 452-2329 |
| | |
| | Keith H. Wofford |
| | **WHITE & CASE LLP** |
| | Southeast Financial Center |
| | 200 South Biscayne Blvd., Suite 4900 |
| | Miami, Florida 33131 |
| | Telephone:    (305) 371-2700 |
| | Facsimile:     (305) 358-5744 |
| | |
| | *Counsel to the Official Committee of Unsecured Creditors* |

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

### ORDER (I) APPROVING THE IMPLEMENTATION OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order")
(a) implementing the Plan toggle to the MiningCo Transaction on the terms attached hereto as
**Exhibit 1**, (b) approving the Wind-Down Budget and Wind-Down Procedures, attached hereto as
**Exhibit 2** and **Exhibit 3**, respectively, (c) approving the amount proposed to be reserved for the
Disputed and Contingent Claim Reserve, as reflected on **Exhibit 4** hereto, and (d) granting related
relief, all as more fully set forth in the Motion; and upon the Campagna Declaration and the Ehrler
Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334 and the *Amended Standing Order of Reference* from the United States District Court for the
Southern District of New York, entered February 1, 2012; and this Court having the power to
enter a final order consistent with Article III of the United States Constitution; and this Court
having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and
1409; and this Court having found that the relief requested in the Motion is in the best interests of

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The MiningCo Transaction, and the terms thereof as described in the Motion, are approved.  The disclosure of the MiningCo Transaction in the Motion is reasonable and adequate under the circumstances, and the Debtors are not required to provide further disclosure in respect of the implementation of the MiningCo Transaction or to resolicit the votes of any creditors or equity security holders as a result thereof, or to obtain confirmation of a modified Plan.

2.      The Debtors' and the Committee's election to toggle to the Orderly Wind Down pursuant to Article IV.E of the Plan and paragraph 354 of the Confirmation Order is approved and effective.

3.      The Confirmation Order remains in full force and effect, and shall apply to the Plan, as such document is changed by the toggle to the Orderly Wind Down, the terms of the MiningCo Transaction, and this Order; *provided*, *however*, that notwithstanding anything to the contrary in the Plan or Confirmation Order, the Debtors and the Committee may jointly determine to preserve the concept of Unsecured Claim Distribution Mix Elections, including the priority of such election for those creditors in Class 2, subject to the receipt of updated elections.

4.    All prior Unsecured Claim Distribution Mix Elections previously solicited are null and void.

5.    The Debtors and the Committee may, but shall not be required to, jointly determine to solicit revised Unsecured Claim Distribution Mix Elections in connection with the MiningCo Transaction.

6.    The Wind-Down Budget and Wind-Down Procedures are approved, and the reserves provided therein are reasonable.

7.    The Plan Administrator shall file quarterly updates to the Court and provide monthly updates (e-mail being sufficient when there is no material update) to the Litigation Oversight Committee.  The Bankruptcy Court shall retain jurisdiction over the Plan Administrator, Litigation Administrator, Litigation Oversight Committee, and any issue relating to the implementation of the Plan, and the Plan Administrator, Litigation Administrator, and Litigation Oversight Committee shall have standing to raise any such issue with the Court.

8.    As provided in the Confirmation Order, the Debtors are authorized, but not required, to file on the docket a conformed Plan reflecting the toggle to the MiningCo Transaction, which shall not constitute a modification or amendment of the Plan requiring resolicitation.

9.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

10.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

11.    The terms and conditions of this Order shall be immediately effective and enforceable upon entry of the Order.

12.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

13.     Notice of the Motion as provided therein is good and sufficient and the requirements of the Local Rules are satisfied by such notice.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**MiningCo Transaction Term Sheet**

## CELSIUS NETWORK LLC, ET AL.
## MINING NEWCO TRANSACTION TERM SHEET

**THIS MINING NEWCO TRANSACTION TERM SHEET (THE "<u>TERM SHEET</u>") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED MINING NEWCO TRANSACTION, CONTEMPLATED IN THE CONFIRMED CHAPTER 11 PLAN OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED IN RE CELSIUS NETWORK LLC, ET AL., CASE NO 22-10964 (MG) (THE "<u>DEBTORS</u>" AND, TOGETHER WITH THER NON-DEBTOR AFFILIATES, "<u>CELSIUS</u>"). THIS TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS TERM SHEET. THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICTATIONS OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAW AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET CONTEMPLATES THAT THE DEBTORS, THE COMMITTEE, AND U.S BITCOIN SHALL ENTER INTO AN AGREEMENT AND THAT THIS TERM SHEET SHALL BE BINDING TO THE EXTENT PROVIDED IN SUCH AGREEMENT.**

Reference is hereby made to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (the "**Plan**") [Docket No. 3577] and the *Eighth Notice of Plan Supplement* (the "**Plan Supplement**") [Docket No. 3935], which were approved by the Court in the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972]. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Plan and Plan Supplement. All current denominations herein are in U.S. Dollars.

| GENERAL PROVISIONS | |
|---|---|
| *Board Composition* | The board of NewCo (the "**Board**") will consist of eight representatives, six of which will be the Committee representatives previously approved in the Confirmation Order, and two of which will be representatives of US Bitcoin (one of which will be Asher Genoot and the other of which may, at US Bitcoin's discretion, be Jordan Levy). |

| | |
|---|---|
| *Transaction Documents* | The documents identified in this filing (the "**Transaction Documents**") will be amended in accordance with this summary of terms. |
| *Capitalization Amount* | NewCo shall be capitalized with $225 million in fiat. |
| *Contributed Assets* | Mining Assets; for the avoidance of doubt, the Core, Rhodium, Mawson, and Luxor assets shall not be assets required to be contributed to NewCo. |

| Document | Modifications to Approved Transaction Document |
|---|---|
| **US Bitcoin Management Agreement** | *Term and Termination; Effect of Termination*<br><br>The Initial Term shall remain the same four year term, subject to the following: (i) if the (owned and not hosted) mining capacity of Mining NewCo has not increased by at least 20 EH/s, from [3] EH/s to [23] EH/s (the "**Exahash Target**") during the initial (3) years of the Mining Management Agreement (the "**Management Agreement**"), then, at the conclusion of the third year of the Management Agreement, NewCo may terminate the Management Agreement without triggering any early termination fee, so long as NewCo provides Manager with a minimum six (6) month transition period (commencing no earlier than the conclusion of the third year of the Management Agreement), during which transition period Manager shall be paid the cash portion of the Mining Management Fee; but (ii) if at any point during the initial (3) years of the Management Agreement, the mining capacity of NewCo increases to at least the Exahash Target, the Management Agreement shall automatically be extended one additional year (i.e., through the fifth year).<br>• The Management Agreement shall be executed and effective by no later than February 15, 2024.<br>• The Term will be subject to certain changes, including termination rights of each of NewCo and Manager, upon the occurrence of certain events that were not in the prior Management Agreement:<br>   o *NewCo Change of Control*: If NewCo undergoes a Change of Control, NewCo may terminate the Management Agreement (the "**Change of Control Termination Right**").<br>      ■ If NewCo terminates pursuant to its Change of Control Termination Right, NewCo shall pay Manager 100% of its Management Fee that would have been payable during the |

remainder of the applicable Term (the "**Termination Fee**"), but such cash Termination Fee may, at NewCo's or the purchaser's option, be paid in equity in connection with the change of control transaction, and Manager's unvested incentive equity and warrants shall immediately accelerate and vest.

o  *Form 10 Effectiveness*: NewCo Mining shall use best efforts to obtain effectiveness of the Form 10. If the Board determines, in accordance with its fiduciary duties, on or before May 1, 2024 (the "**Liquidity Deadline**"), that there is not a reasonable likelihood that NewCo will achieve effectiveness of its Form 10 filing, NewCo may terminate the Management Agreement (the "**Form 10 Termination Right**") by providing Manager with written notice of termination (a "**Notice of Termination**") by no later than the Liquidity Deadline, with the termination of Management Agreement to be effective as of 14 calendar days following receipt by the Manager of the notice of termination.

▪  For the avoidance of doubt, Manager shall continue to provide services to NewCo and shall continue to be compensated under the Management Agreement through the effective date of termination.

▪  Following termination, Manager may continue providing services to NewCo subject to the mutual agreement of NewCo and Manager, including as it relates to the terms of any such agreement.

▪  If NewCo terminates pursuant to its Form 10 Termination Right, Manager shall receive, as liquidated damages, one year of the cash portion of the Mining Management Fee, and one year worth of incentive equity and warrants which shall immediately accelerate and vest, plus any accrued and unpaid amounts as of the date of the notice of termination. NewCo shall pay Manager the foregoing amounts within 30 days of Manager's receipt of a notice of termination.

| | |
|---|---|
| | ▪ If NewCo files a subsequent Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the Liquidity Deadline, NewCo shall, at its election (i) enter into a reinstatement of Management Agreement with Manager for the remainder of the Initial Term existing on the date of [such reinstatement/termination], on the same terms and conditions as the original agreement, or (ii) pay to Manager its otherwise applicable termination fee under the Management Agreement (taking into account the portion of the Management Agreement that elapsed prior to the prior termination), *minus* the Termination Fee.<br><br>*Executive Management Team*: A CEO will be named, and Joel Block will serve as the initial CFO. Each member of the executive management team shall serve at the pleasure of the NewCo Board.<br><br>*Mining Management Fee*: The cash portion of the Mining Management Fee will be $20,376,200 annually. The issuance of incentive equity and warrants that comprise the remainder of the Mining Management Fee are governed by the Restricted Stock Purchase Agreement and Warrant Agreement discussed below. |
| **Cedarvale Interim Services Agreement** | There will be no modifications from the terms approved by Court in the Confirmation Order, other than (i) reducing the monthly fee applicable from January 1, 2024 to $734,000, (ii) providing for adjustments of the timelines and dates in the version filed in the Plan Supplement to account for the time elapsed between the October 30, 2023 and the date of signing of the Interim Services Agreement, (iii) providing a termination right in favor of US Bitcoin if the Management Agreement has not been executed by February 15th, 2024, and (iv) as otherwise set forth herein. |
| **Restricted Stock Purchase Agreement** | The Restricted Stock Purchase Agreement ("**RSPA**") will provide for (i) US Bitcoin's purchase of NewCo equity, as well as (ii) annual issuance of incentive equity of 31.89% of the 1.00% of NewCo equity originally to be issued to Fahrenheit. |

| | |
|---|---|
| | *US Bitcoin Equity Purchase*<br><br>• Manager will purchase [$12,756,000] of NewCo stock, calculated on a pre-money basis using NewCo's NAV as of the Effective Date of the Plan (which shall have been adjusted for the capitalization set forth in the Mining NewCo Transaction Motion). Effectiveness of the Management Agreement is conditioned upon NewCo's receipt of cash from Manager for such purchase of stock pursuant to the terms of the Restricted Stock Purchase Agreement discussed below.<br>• (a) 50% of the initial NewCo equity contribution will be funded on the Effective Date, and (b) the remaining 50% will be funded on the earlier of (i) promptly following the effectiveness of the Form 10; and (ii) provided that NewCo has not exercised the Form 10 Termination right, May 1, 2024.<br><br>*US Bitcoin Incentive Units*<br><br>• US Bitcoin will receive 31.89% of the incentive units previously allocated to Fahrenheit each year of the term of the Management Agreement.<br>• Other changes to the RSPA will provide for the applicable acceleration and cancellation of incentive units upon the various termination provisions in the Management Agreement:<br>   ○ If NewCo terminates the Management Agreement pursuant to its Change of Control Termination Right, Manager's remaining unvested incentive units will immediately accelerate and vest.<br>   ○ If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, twelve months' worth of unvested incentive equity will immediately accelerate and vest. |
| **Warrant Agreement** | The strike price of the warrants will be set at the end of each year of the term, based on the equity trading price as of the last trading day of each year.<br><br>Additional changes to the Warrant Agreement will provide for the applicable vesting, acceleration of vesting and cancellation of incentive units upon the various termination provisions in the Management Agreement identified above.<br>   ○ If NewCo terminates the Management Agreement pursuant to its Change of Control Termination |

| | |
|---|---|
| | Right, the exercise period commencement date for Manager's remaining unvested warrants will be deemed to be such effective date of termination.<br>o  If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, the exercise period commencement date for one year's worth of Manager's remaining unvested warrants will be deemed to be such effective date of termination. |
| **Charter and By-Laws** | The Charter and By-Laws will be modified to account for the substitution of USBTC for Fahrenheit as equity purchaser, and to appoint two USBTC appointees in lieu of the prior three Fahrenheit appointees, one of which will be Asher Genoot. |
| **Deposit and Escrow Agreement** | The Deposit and Escrow Agreement will be modified to substitute USBTC for Fahrenheit, reduce the escrowed amount to $3.189 million, and make conforming changes in the escrow release provisions. |

## **Exhibit 2**

### **Wind Down Budget**

**Celsius Network Inc.**
**Wind-Down Budget**

*$ in millions*

| | MiningCo[1][2] | Notes to Wind-Down Budget |
|---|---|---|
| **Plan Administration Fees** | | |
| Plan Administration Fees | 5 | |
| Distribution Costs and Related Expenses | 10 | Expenses associated with third-party distribution agents and distribution infrastructure/vendors |
| **Subtotal - Plan Administration Fees** | $ 15 | |
| | | |
| **Professional Fees** | | Professional fees for legal counsel and financial advisors to support distribution, asset sale and administration of the estate |
| Legal Counsel | 10 | |
| Financial Advisor | 10 | |
| **Subtotal - Professional Fees** | $ 20 | |
| | | |
| **Operating Expenses and Other** | | |
| Employee Costs | 30 | Includes wages, benefits, payroll taxes and other compensation-related items |
| SG&A | 10 | Expenses associated with estate accounting, legal, HR, and other administrative activities |
| **Subtotal - Operating Expenses and Other** | $ 40 | |
| | | |
| **Total** | $ 75 | |

*(1) Represents estimated costs to be incurred by the estate in effectuating the MiningCo Plan. These estimates are subject to material change*
*(2) Total costs under the Wind-Down Budget are assumed to be escrowed upon Emergence. Any amounts not spent will be returned to creditors in subsequent distributions*

## **Exhibit 3**

## **Wind Down Procedures**

## **Wind-Down Procedures**[1]

*The following chart summarizes the reallocation of responsibilities previously contemplated to be provided by Fahrenheit under the NewCo Transaction among the Litigation Administrator, the Plan Administrator, and US Bitcoin under the MiningCo Transaction.  Such additional responsibilities shall, in each case, be performed in accordance with the Litigation Administrator Agreement, the Plan Administrator Agreement, or the US Bitcoin Agreements, as applicable.*

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| **Fahrenheit** | Fahrenheit shall:<br><br>• file the NewCo Form 10;<br><br>• manage, supervise, oversee, and monetize the NewCo Assets (including the illiquid assets); and<br><br>• set strategy and capital allocation for the bitcoin mining business. | Responsibilities reallocated as follows:<br><br>• US Bitcoin to file Form 10 for MiningCo.<br><br>• NewCo Assets to be managed, supervised, overseen, and monetized as follows: | |
| | | DeFi Cryptocurrency Assets | Stakehound assets are now subject of pending litigation, to be directed by Litigation Administrator.  All DeFi Cryptocurrency Assets not subject to litigation to be monetized by Plan Administrator. |
| | | Institutional Loan Portfolio | Agreements related to Institutional Loans to be monetized by Plan Administrator.  Litigation regarding Institutional Loans to be directed by Litigation Administrator. |
| | | PE & VC Investments | Any PE & VC Investments to be monetized by Plan Administrator. |
| | | Mining | US Bitcoin to manage Mining.[2] |

---

[1]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

[2]   For the avoidance of doubt, certain illiquid assets, including those related to Core, Mawson, Rhodium and Luxor, may also be contributed to MiningCo if the Debtors determine that doing so will not cause regulatory complications.

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| | | NewCo Capitalization Amount | Concept eliminated.  MiningCo to be capitalized with $225 million as provided in the Motion. |
| **Litigation Administrator** | The Litigation Administrator shall:<br><br>• prosecute, settle, or otherwise resolve any remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan;<br><br>• manage the rights to the D&O Liability Insurance Policies;<br><br>• determine, along with the Litigation Oversight Committee, the frequency and timing of distributions of Litigation Proceeds to creditors; and<br><br>• enter into, with the consent of the Plan Administrator, agreements with Account Holders to settle such Holder's Withdrawal Preference Exposure. | In addition to the Litigation Administrator's responsibilities under the NewCo Transaction, the Litigation Administrator shall prosecute litigation associated with illiquid assets previously contemplated to be "NewCo Assets," as described above. The Litigation Administrator's compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction. | |
| **Plan Administrator** | The Plan Administrator shall, among other things:<br><br>• administer the Post-Effective Date Debtors;<br><br>• maintain the Disputed and Contingent Claims Reserve and Professional Fee Escrow Account;<br><br>• implement the Transition Services Agreement and Emergence;<br><br>• assist in making any distributions contemplated under the Plan;<br><br>• marshal, market for sale, recover, compel the turnover of, and wind down the Debtors' assets (other than the NewCo Assets), to the extent not duplicative of the responsibilities of the Litigation Administrator;<br><br>• administer the Special Committee D&O Insurance Policies; | In addition to the Plan Administrator's responsibilities under the NewCo Transaction, the Plan Administrator shall have all responsibilities previously contemplated to be provided by Fahrenheit and not otherwise allocated to the Litigation Administrator or US Bitcoin herein, including monetizing illiquid assets that are not subject to litigation.  The Plan Administrator's compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction.<br><br>The Plan Administrator will file quarterly updates with the Court and provide monthly updates to the Litigation Oversight Committee regarding cryptocurrency distributions and the monetization of the illiquid assets to ensure progress is being made. | |

| Entity | NewCo Transaction | MiningCo Transaction |
|---|---|---|
| | • manage the Plan Administrator Budget; and<br><br>• prepare and file post-Effective Date operating reports and appropriate tax returns. | |
| **US Bitcoin** | US Bitcoin shall manage NewCo's mining business, including the buildout and management of the Cedarvale site. | US Bitcoin will manage MiningCo, including interim services regarding the buildout and management of the Cedarvale site. |

## **Exhibit 4**

**Proposed Disputed and Contingent Claims Reserve**

**Celsius Network**
Claim Reserves

*Exhibit 1*
*($ in 000s)*

| Reserve Grouping | Claims Subject to Reserve | Reserve Amount (as of 11/17 pricing) | % of Distributable Value |
|---|---|---|---|
| Class 0 - Administrative Claims | $100 | $74 | 0% |
| Class 1 - Other Secured Claims | $3,900 | $2,882 | 0% |
| Class 3 - Other Priority Claims | $5,200 | $3,842 | 0% |
| Class 8 - Unsecured Loan Claims & Class 9 - GUCs | $138,200 | $102,114 | 3% |
| Unliquidated Equitable Subordinated Claims | $25,600 | $18,915 | 1% |
| Class Claim Settlement Opt-Outs | $24,800 | $18,324 | 1% |
| Withdrawal Preference Exposure > $100K | $429,700 | $317,498 | 10% |
| **Subtotal** | **$627,500** | **$463,649** | **14%** |
| Unliquidated Litigation, Indemnification, and Other Claims | *Unliquidated* | $150,000 | 3% |
| **Total** | **$627,500** | **$613,649** | **18%** |

**Disclosures**

*Reserve Amounts shown reflect a combination of Liquid Cryptocurrency and MiningCo Common Stock*

*Assumed contracts for Institutional Customers are reserved at $0*

*Preferred Equity Claims are reserved at $0*

*Intercompany Claims are reserved at $0*

*Employee claims with CEL token component are converted to CEL priced at $0.25*