

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   Adv. Case No. 23-01010-mg

5   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6   In the Matter of:

7

8   CELSIUS NETWORK LLC,

9

10            Debtor.

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12  SHANKS,

13                  Plaintiff,

14          v.

15  CELSIUS NETWORK LLC, et al.,

16                  Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18                  United States Bankruptcy Court

19                  One Bowling Green

20                  New York, NY  10004

21

22                  November 30, 2023

23                  10:03 AM

24

25

1    B E F O R E :

2    HON MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO:   KS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re Hybrid Hearing RE: Second Application of Stout

2    Risius Ross, LLC as Valuation Advisors for the Debtors, for

3    Interim Allowance of Compensation for Professional Services

4    Rendered and Reimbursement of Actual and Necessary Expenses

5    Incurred from March 1, 2023 Through June 30, 2023 for Stout

6    Risius Ross, LLC, Other Professional, period: 3/1/2023 to

7    6/30/2023, fee:$727,005.00, expenses:$. (Docket Number:

8    3305, 3410).

9

10   HEARING re Hybrid Hearing RE: Third Interim Fee Application

11   of Centerview Partners LLC, as Investment Banker to the

12   Debtors for Allowance of Compensation and Reimbursement of

13   Expenses for the Period March 1, 2023 Through June 30, 2023

14   for Centerview Partners LLC, Other Professional, period:

15   3/1/2023 to 6/30/2023, fee:$1,000,000.00, expenses:

16   $1,000.20. (Docket Number: 3303, 3338).

17

18   HEARING re Hybrid Hearing RE: Third Application of Alvarez &

19   Marsal North America, LLC as Financial Advisors for the

20   Debtors, for Interim Allowance of Compensation for

21   Professional Services Rendered and Reimbursement of Actual

22   and Necessary Expenses Incurred from March 1, 2023 Through

23   and Including June 30, 2023 for Alvarez & Marsal North

24   America, LLC, Other Professional, period: 3/1/2023 to

25   6/30/2023, fee:$7,229,896.00, expenses: $ 12,458.59.

Page 4

1    (Docket Number: 3302, 3338).

2

3    HEARING re Hybrid Hearing RE: First Interim Fee Application

4    of KE Andrews as Property Tax Service Providers for the

5    Debtors and Debtors in Possession, for Interim Allowance of

6    Compensation for Professional Services Rendered from March

7    6, 2023 Through and Including June 30, 2023 for KE Andrews,

8    Other Professional, period: 3/6/2023 to 6/30/2023,

9    fee:$187,500.00, expenses: $0. (Docket Number: 3301, 3338).

10

11   HEARING re Hybrid Hearing RE: Third Application for Interim

12   Professional Compensation for Latham & Watkins LLP, Special

13   Counsel, period: 3/1/2023 to 5/31/2023, fee:$207,593.50,

14   expenses: $97.61. (Docket Number: 3292, 3338).

15

16   HEARING re Hybrid Hearing RE: Third Application for Interim

17   Professional Compensation of Akin Gump Strauss Hauer & Feld

18   LLP as Special Litigation Counsel to the Debtors and Debtors

19   in Possession for Allowance of Compensation for Services

20   Rendered and Reimbursement of Expenses for the Period March

21   1, 2023 through and Including June 30, 2023 for Akin Gump

22   Strauss Hauer & Feld LLP, Special Counsel, period: 3/1/2023

23   to 6/30/2023, fee:$3,276,242.10, expenses: $91,832.77.

24   (Docket Number: 3291, 333 8).

25

1    HEARING re Hybrid Hearing RE: Third Application for Interim

2    Professional Compensation for Ernst & Young LLP, Other

3    Professional, period: 3/1/2023 to 6/30/2023, fee:

4    $254,941.00, expenses: $0.00. filed by Joshua Sussberg.

5    (Docket Number: 3280, 3338).

6

7    HEARING re Hybrid Hearing RE: Third Application for Interim

8    Professional Compensation for Gregory F Pesce, Creditor

9    Comm. Aty, period: 3/1/2023 to 6/30/2023, fee:$14,428,718.5,

10   expenses: $117,845.96. filed by Gregory F Pesce. (Docket

11   Number: 3296, 3379).

12

13   HEARING re Hybrid Hearing RE: Second Application for Interim

14   Professional Compensation of Selendy Gay Elsberg PLLC for

15   Services Rendered and Reimbursement of Expenses as

16   Co-Counsel to the Official Committee of Unsecured Creditors

17   for the Period of March 1, 2023, through June 30, 2023, for

18   Selendy Gay Elsberg PLLC, fee: $2,638,540.50, expenses:

19   $189,579.89, filed by Selendy Gay Elsberg PLLC.

20   (Docket Number: 3298, 3358).

21

22   HEARING re Hybrid Hearing RE: Amended Third Interim Fee

23   Application of Kirkland & Ellis LLP and Kirkland & Ellis

24   International LLP, Attorneys for the Debtors and Debtors in

25   Possession, for the Interim Fee Period from March 1, 2023,

Page 6

1    Through and Including June 30, 2023 for Kirkland & Ellis LLP

2    and Kirkland & Ellis International LLP, Debtor's Attorney,

3    period: 3/1/2023 to 6/30/2023, fee:$19,139,094.5, expenses:

4    $317,264.53. (Docket Number: 3318, 3306)

5

6    HEARING re Hybrid Hearing RE: Third Interim Fee Application

7    for Perella Weinberg Partners LP, Other Professional,

8    period: 3/1/2023 to 6/30/2023, fee:$400,000, expenses:

9    $49,719.49. filed by Perella Weinberg Partners LP. (Docket

10   Numbers: 3287, 3390)

11

12   HEARING re Hybrid Hearing RE: First Interim Fee Application

13   of Lucy L. Thomson, Consumer Privacy Ombudsman, Pursuant to

14   Bankruptcy Code Section 330 for Allowance of Compensation

15   and Reimbursement of Expenses for Lucy L. Thomson, Ombudsman

16   Consumer, period: 10/25/2022 to 6/30/2023, fee:$127,270.00,

17   expenses: $200.00. (Doc## 3470, 1208,3503,3504,3836)

18   Hybrid Hearing RE: Third Application for Interim

19   Professional Compensation for M3 Advisory Partners, LP,

20   Other Professional, period: 3/1/2023 to 6/30/2023,

21   fee:$4,368,928.00, expenses: $10,857.40.

22   (Docket Numbers: 3300, 3379).

23

24   HEARING re Hybrid Hearing RE: Second Application for Interim

25   Professional Compensation for Gomitzky & Co., Other

Page 7

1   Professional, period: 3/1/2023 to 6/30/2023, fee:$7,309.58,

2   expenses: $0.00. (Docket Numbers: 3295, 3379).

3

4   HEARING re Hybrid Hearing RE: Third Interim Application of

5   Elementus Inc. for Compensation for Services Rendered and

6   Reimbursement of Expenses as Blockchain Forensics Advisor to

7   The Official Committee of Unsecured Creditors of Celsius

8   Network, LLC, et al., for the Period from March 1, 2023

9   through June 30, 2023 for Elementus Inc., Other

10  Professional, period: 3/1/2023 to 6/30/2023, fee:$343,

11  785.00, expenses: $151,326.80.

12  (Docket Numbers: 3294, 33 79).

13

14  HEARING re Hybrid Hearing RE: Third Interim Fee Application

15  of Huron Consulting Services LLC as Financial Advisor to the

16  Examiner for the Period from March 1, 2023 through and

17  including March 31, 2023 for Huron Consulting Services LLC,

18  Other Professional, period: 3/1/2023 to 3/31/2023,

19  fee:$52,093.00, expenses: $607.07.

20  (Docket Number: 3309, 3342).

21

22  HEARING re Hybrid Hearing re: Third Application for Interim

23  Professional Compensation for Fee Examiner Sontchi, Other

24  Professional, period: 7/1/2023 to 1 0/31/2023,

25  fee:$48,375.00, expenses: $1,332.35. (Doc# 3978, 3981)

1   HEARING re Hybrid Hearing re: Third Application for Interim

2   Professional Compensation as Attorneys for the Fee Examiner

3   for Godfrey & Kahn, S.C., Other Professional, period:

4   7/1/2023 to 10/31/2023, fee:$316,906.00, expenses:

5   $11,694.83. (Doc# 3979, 3981)

6

7   HEARING re Hybrid Hearing re: Motion for Entry of an Order

8   (I) Approving the Settlement By and Between the Debtors and

9   EZ Blockchain Services, LLC and (II) Granting Related

10   Relief. (Doc# 3983, 4004, 4028, 4029)

11

12   HEARING re Adversary proceeding: 23-01010-mg Shanks v.

13   Celsius Network LLC et al

14   Hybrid Hearing RE: Motion to Dismiss (Dkt. Nos. 9, 10, 18)

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 9

```
 1   A P P E A R A N C E S :

 2

 3   KIRKLAND & ELLIS LLP

 4        Attorneys for the Debtors

 5        300 North LaSalle

 6        Chicago, IL 60654

 7

 8   BY:  CHRIS KOENIG

 9

10   QUINN EMANUEL URQUHART & SULLIVAN, LLP

11        Attorneys for Blockchain Recovery

12        Investment Consortium

13        51 Madison Avenue, 22nd Floor

14        New York, NY 10010

15

16   BY:  BENJAMIN FINESTONE

17

18   UNITED STATES DEPARTMENT OF JUSTICE

19        Attorneys for the U.S. Trustee

20        One Bowling Green

21        New York, NY 10004

22

23   BY:  SHARA CLAIRE CORNELL

24        MARK BRUH

25
```

```
 1   GODFREY KAHN, S.C.

 2         Fee Examiner

 3         One East Main Street

 4         Madison, WI 53703

 5

 6   BY:  KATHERINE STADLER

 7

 8   LUCY L. THOMSON

 9         The Willard; Suite 400

10         1455 Pennsylvania Ave. NW

11         Washington, D.C. 20004

12

13   KIRKLAND & ELLIS LLP

14         Attorneys for the Debtors

15         1301 Pennsylvania Avenue NW

16         Washington, DC 20004

17

18   BY:  GRACE BRIER

19

20   MCCARTER ENGLISH, LLP

21         Attorneys for Ad Hoc Group of Borrowers

22         245 Park Avenue

23         New York, NY 10167

24

25   BY:  DAVID ADLER
```

1   ALSO PRESENT TELEPHONICALLY:

2   ARTUR ABREU

3   TEMIDAYO AGANGA-WILLIAMS

4   KATHERINE AIZPURU

5   ANDREA AMULIC

6   JASMINE ARMAND

7   BRIAN BARNES

8   CHRIS BECIN

9   ANDREW BEHLMANN

10  INGO BEUTLER

11  ED G. BIRCH

12  JOEL BLOCK

13  KYLE BRAY

14  PAUL BREUDER

15  JOHAN BRONGE

16  VITOR CUNHA

17  SANTOS CACERES

18  ANDREW CARTY

19  RICKIE CHANG

20  DEAN CHAPMAN

21  KAYLA CHEN

22  CHRISTINA CIANCARELLI

23  GEOFFREY CIRKEL

24  JOSHUA CLARK

25  CHRISTOPHER COCO

```
 1   AARON COLODNY

 2   LAFAYETTE A. COOK

 3   CARL J. COTE

 4   CAMERON CREWS

 5   OONA E. CRUSELL

 6   DAVID J. DALHART

 7   STEFFAN DAVIES

 8   OTIS DAVIS

 9   THOMAS DIFIORE

10   TRISTAN DIZA

11   SIMON DIXON

12   SHARON DOW

13   SCOTT DUFFY

14   JOHN PETER DZARAN

15   BEN EADES

16   JANELL ECKHARDT

17   JAMES ENGEL

18   MICHAEL S. ETKIN

19   DAVID AVERY FAHEY

20   FLORENCE FLANNIGAN

21   DEBORAH FRANKEL

22   DANIEL FRISHBERG

23   REBECCA GALLAGHER

24   JOHN GALLEGO

25   JASLEIGH GEARY
```

1    JOANNE GELFAND

2    DARIUS GHEORGHE

3    BARDLEY GIARDIELLO

4    MICHAEL GRAUBERT

5    CAMERON GUTHRIE

6    MIRA HAQQANI

7    ROBERT HERNANDEZ

8    IMMANUEL HERMANN

9    SAMUEL P. HERSHEY

10   KAITLYN A. HITTELMAN

11   LUCAS HOLCOMB

12   MITCHELL MURLEY

13   JASON IOVINE

14   ALI JAMSHID FAR

15   JANK JANKOVIC

16   DAVID JOHNSON

17   MIKE JOHNSON

18   ELIZABETH HELEN JONES

19   GREG KACZKOWSKI

20   DAVID KAHN

21   DAN KAPLAN

22   YARA KASS-GERGI

23   RAVI KAZA

24   ANNE S. KEASEY

25   MARTIN E. KEDZIOR

1   TRAVIS KEENEY

2   PHILLIP KHERZI

3   DMITRY L. KIRSANOV

4   LEA KLORANE

5   BRYAN KOTLIAR

6   RIKI KOULY

7   MICHAEL KOZLOWSKI

8   JOYCE A. KUHNS

9   ROSS M. KWASTENIET

10   JOSHEPH LALIA

11   DAN LATONA

12   JEAN-PHILIPPE LATREILLE

13   CATHY LAU

14   JOSEPH LEHRFELD

15   BRIAN S. LENNON

16   MARK S. LEONARD

17   DAVID LOS ARCOS CARCAMO

18   JASON LU

19   DAVE K. MALHOTRA

20   KEVIN M. MANUS

21   JEREMY MARONPOT

22   CHASE MARSH

23   JERRY MASSEY

24   KEITH MCCORMACK

25   ERIK MENDELSON

1    TOM MERCURI

2    ALEX MICHAELS

3    LAYLA MILLIGAN

4    JASON A. NAGI

5    KEITH NOYES

6    KYLE J. ORTIZ

7    RICHARD E. OSWALD

8    DONALD L. PYNTER

9    MILIN PATEL

10   JEFF PATTON

11   BRETT PERRY

12   RICHARD R. PHILLIPS

13   MACIEJ PORCZEK

14   LALANA PUNDISTO

15   ANNEMARIE V. REILLY

16   MARK ROBINSON

17   SHAYA ROCHESTER

18   JONATHAN RODRIGUEZ

19   MICHAEL ROSELLA

20   WAYNE P. ROTHENBERGER

21   MIKE SARKISSIAN

22   DAVID SCHNEIDER

23   NOAH M. SCHOTTENSTEIN

24   SAMUEL SCHREIBER

25   WILLIAM D. SCHROEDER

Page 16

1   DAVID SENES

2   RAFFAELE SENESE

3   EZRA SERRUR

4   MATTHEW W. SILVERMAN

5   DON SMITH

6   CHRISTOPHER S. SONTCHI

7   LUKE SPANGLER

8   COURTNEY BRUKS STEADMAN

9   CHASE A. STONE

10   NIK SURI

11   KEYAN TAJI

12   DAVID TURETSKY

13   ELVIN TURNER

14   VICTOR UBIERNA DE LAS HERAS

15   EZRA VAZQUEZ-D'AMICO

16   VETON VEJSELI

17   KEVIN WALDRON

18   CAROLINE WARREN

19   JOSHUA WEEDMAN

20   ZACH WILDES

21   MARTIN WILLIAMS

22   KEITH WOFFORD

23   TAKE YEUNG

24   ANDREW YOON

25   KAILA ZAHARIS

1    DAVID BARSE

2    JARNO BERG

3    ROBERT M. KAUFMANN

4    RAKESH PATEL

5    HEIN VAN DER WIELEN

6    ANDREA AMULIC

7    CHRIS BECIN

8    RICKIE CHANG

9    CHRISTOPHER COCO

10   LAFAYETTE COOK

11   BRITTANY SUZANNE BIAS

12   SOMA BISWAS

13   BEN CLARKE

14   MIA COOPER

15   DREW DUFFY

16   SCOTT FLAHERTY

17   RAMON GONZALES

18   SANDALI HANDAGAMA

19   DIETRICH KNAUTH

20   MIKE LEGGE

21   SERBAN LUPU

22   TIMOTHY REILLY

23   PETER J. SPROFERA

24   VINCE SULLIVAN

25   CATHY TA

Page 18

1    KATE THOMAS

2    MAUDE TIPTON

3    ZACHARY ZABIB

4    DREW DUFFY

5    UDAY GORREPATI

6    DIMITRY KIRSANOV

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  All rise.

3              AUTOMATED VOICE:  Recording in progress.

4              THE COURT:  Please be seated.  Good morning,

5    everyone.  All right.  We have a long agenda.

6              MR. KOENIG:  We do, Your Honor.  Good morning.  We

7    hope you had a wonderful Thanksgiving.

8              THE COURT:  I did.  And you?

9              MR. KOENIG:  Thank you.  Thank you.  We are joined

10   in the courtroom by Mr. David Boesch, who is one of the

11   members of our special committee, so I'd be remiss if I

12   didn't introduce him.

13             THE COURT:  Welcome.

14             MR. KOENIG:  We do have a long agenda, but I think

15   it will actually be pretty brief, despite the number of

16   matters.  Most of them are uncontested fee applications that

17   will be spoken to.

18             Before beginning with our brief agenda, I wanted

19   to provide Your Honor and the parties a brief update on two

20   important issues.  First, the simpler one, perhaps.

21             So, custody withdrawals under the plan opened

22   yesterday.  Pleased to report that they are off to a great

23   start.  Almost 45 percent of the amount eligible to be

24   withdrawn off the system.  Transactions were begun

25   yesterday.  We were able to process over $10 million of the

Page 20

1    hundred million dollars available for distribution.

2          Five thousand creditors yesterday how login and

3    tried to withdraw.  We processed 3,000 creditor withdrawals.

4    There's still 2,000 that are in the queue.  Just for folks

5    on the line, we know that there are plenty of folks in the

6    queue.  We know that there are folks with tickets.  We are

7    working through them as expeditiously as possible.

8          We processed an awful lot of withdrawals in the

9    last 10 hours, frankly.  And there's log-in issues and we're

10   aware that all of that is happening.  So please, you know,

11   obviously, continue to send in the tickets.  But rest

12   assured that we're working through the process.  The process

13   is working.  It's just there's an awful lot of people trying

14   to withdraw money, which we certainly understand.

15         MR. KOENIG:  Second, we and the Committee filed a

16   joint motion last night.  I don't know if Your Honor has had

17   a chance to --

18         THE COURT:  I heard it was filed overnight.

19         MR. KOENIG:  So, we filed a joint motion last

20   night to implement a toggle option under the plan's pivot to

21   a mining only transaction.  That motion won't be heard until

22   our next omnibus hearing on December 21st, but I wanted to

23   just give a little bit of context for that motion.

24         So, as we explained during closing arguments at

25   confirmation, one of the conditions precedent to the NewCo

Page 21

1    claim of Fahrenheit was the approval of a pre-clearance

2    letter with the SEC for the NewCo financials that would've

3    been filed.  And we disclosed in a press release on November

4    20th that the SEC indicated to us a few weeks ago that the

5    SEC would not be approving the preclearance letter.

6            But the SEC did give us guidance that we would not

7    need to submit another preclearance letter to pursue SEC

8    registration of a mining only business.  And of course, our

9    confirmed Chapter 11 plan contemplated this exact scenario,

10   in large part because of this regulatory uncertainty around

11   crypto currency companies.

12           More specifically, the plan included two options

13   to exit Chapter 11.  The main option of Fahrenheit NewCo, or

14   a standalone mining only transaction, which is referred to

15   in the plan as an orderly winddown.

16           So, after the SEC provided us with this guidance,

17   the Debtors and the Committee promptly met with all the

18   bidders that have been active in our marketing process to

19   provide mining management are to take a break services, so

20   that we could promptly determine which mining manager we

21   would move forward with.  And we need to do that for two

22   reasons.

23           First, US Bitcoin was the mining manager under the

24   Fahrenheit deal.  And US Bitcoin has already done

25   significant work to help the company optimize our mining

Page 22

1    assets, including preparing a comprehensive business plan of

2    how they were going to run those assets under the Fahrenheit

3    deal.  And US Bitcoin is also already helping us build on

4    our Cedarville facility that we obtained through the

5    settlement for Core Scientific.  So, of course, we wanted to

6    hear whether US Bitcoin was interested in being a mining

7    manager, now that the broader Fahrenheit transaction was no

8    longer feasible.

9           And while the Fahrenheit deal was obsolete, the

10   existing backup deal that we also had with the BRIC was also

11   obsolete.  That deal contemplated a robust suite of services

12   to be provided and corresponding management fees for those

13   services.  Those services included resolving claims

14   bringing, bringing estate litigation, and making

15   distributions through their own distribution partner.

16          So that deal was also stale because of all the

17   progress that we've made since that deal was struck in May.

18   All that progress obviated the need for most of those

19   services.  Specifically, we've resolved nearly all of the

20   account holder claims through the class claims settlement.

21          We have a litigation administrator who will be

22   bringing these estate claims and reporting to a litigation

23   oversight board.  And we have our own crypto distribution

24   partners in PayPal and Coinbase.  And all of this was built

25   into the plan and approved as part of the confirmation

Page 23

1    order.

2            So, for these reasons, we needed to promptly work

3    with our existing bidders to determine the best money

4    management deal and move forward.  The most important thing

5    from our perspective is to get out of bankruptcy promptly

6    with an executable deal that maximizes value.

7            We ran a month-long auction process already.  We

8    have no intention of doing that again.  We need to get out

9    of bankruptcy and cut off the administrative burn that comes

10   with running a large Chapter 11 case like this one.

11           So we went back to the existing bidders to

12   determine the best deal available to move forward on this

13   MiningCo transaction.  Following these negotiations, the

14   Debtors and the Committee jointly selected US Bitcoin as the

15   mining manager for this MiningCo.  This should come as no

16   surprise.

17           Fahrenheit won the auction in large part because

18   the Debtors and the Committee determined that US Bitcoin was

19   the best mining manager available and that they presented us

20   with terms for a mining company that would best maximize the

21   value of that new business.  And now that the new company

22   will be only mining, the identity of the mining manager is

23   that much more important.

24           We are confident that US Bitcoin will be able to

25   lead out this MiningCo and maximize value for Celsius

Page 24

1    creditors, who will be the MiningCo's shareholders.  And we

2    also believe that this is the cleanest and fastest path to

3    exiting bankruptcy.  The  definitive documents with US

4    Bitcoin were already fully negotiated as part of the

5    Fahrenheit transaction, which took quite a long time to

6    negotiate.  But the adjustments to those documents to

7    account for this narrower transaction should not take a long

8    time, now that we've agreed to the term sheet that we

9    attached to the motion.

10              So, to be candid, this was obviously not the

11   feedback we were hoping for from the SEC.  But we've quickly

12   pivoted to an option that was already built into the plan

13   that will maximize the value of the mining business and

14   allow us to promptly exit from bankruptcy within the

15   confines of our already confirmed plan.

16              We were able to, over the last couple of weeks,

17   negotiate lower management fees with US Bitcoin and we

18   improved the terms of the deal in several ways that will

19   benefit creditors.  This will allow $225 million in more

20   liquid crypto to be distributed to creditors, compared to

21   the earlier Fahrenheit deal.

22              The motion will be heard in December.  And while

23   there's still work to do before we could emerge, we think

24   that if the motion is approved, we could still exit

25   bankruptcy in January.  That emergence from bankruptcy would

1    not require additional approvals from the SEC.  But just to

2    be clear, before the stock can be traded, the SEC would

3    post-bankruptcy have to approve the Form 10.  It's not a

4    crypto-specific approval.  It's a requirement for any new

5    company that registers stock to comply with state blue sky

6    laws and other securities regulations.

7            We're pleased with the constructive dialogue we've

8    had with the SEC so far and we're grateful for their

9    guidance that we can submit the Form 10 without any further

10   preclearance.

11           One last item in particular we wanted to flag for

12   Your Honor.  You may recall that the plan had an election

13   for account holders who could select more neutral equity at

14   a premium or more liquid crypto at a discount.  The plan

15   provided that those elections would not be in place for a

16   backup transaction, and that was in part because the backup

17   transaction might be different.  How could somebody elect

18   for something, the exact terms of which had not yet been

19   decided.

20           But based on the initial feedback that we've

21   received from creditors, folks want to be able to make that

22   election in the case of this MiningCo transaction.  We

23   haven't finalized our plans there, but we're strongly

24   considering whether and how to send new notices out to

25   people that would allow them to make that election for this

Page 26

1    transaction as well.  We'd have to void out the old

2    elections; that was for a different transaction structure.

3    We just wanted to flag that for Your Honor so you're not

4    surprised if we show up on December 21st and we have sent

5    out notices requesting that people make that election again.

6            THE COURT:  What's the authority for doing that?

7            MR. KOENIG:  I would say we can get it -- I can

8    make an oral motion right now --

9            THE COURT:  No.  I'm not --

10           MR. KOENIG:  -- if Your Honor would like it, or we

11   would have it approved retroactively in the order.

12           THE COURT:  I read that the notice that the notice

13   that was filed, about what happened with the SEC.  And I

14   understood that the transaction structure was changing.

15   Other than those top headlines, I don't know anything

16   further.

17           MR. KOENIG:  Understood.

18           THE COURT:  So, don't take any of my comments

19   today as an indication one way or the other, whether what is

20   being proposed can be accomplished without re-solicitation,

21   re-vote, all of that.  I'm not saying it has to be.  I'm

22   just saying I won't be surprised if what you're proposing is

23   that with substantial objections, because there were

24   substantial objections before.  No reason to think that

25   won't happen again.

Page 27

1              MR. KOENIG:  Sure.

2              THE COURT:  Take them up on the merits, if and

3     when this comes on before me.  But you raced through a lot

4     in the statement you made.  And it will raise real questions

5     whether the transactions -- the exit plan that is now being

6     put forward is what was described in a disclosure statement,

7     what is the basis of what people voted on.

8              Just the last point you made about whether or not

9     people given an option -- given a new option to elect as to

10    what percentage of -- what percentage of shares of the new

11    mining company they'll take, et cetera.

12             Let me ask this question.  Have you conferred yet

13    with the U.S. Trustee -- see two people form the U.S.

14    Trustee sitting in the back -- about the new proposed

15    structure?

16             MR. KOENIG:  We spoke to the U.S. Trustee -- I

17    forget whether it was a week or two weeks ago -- and let

18    them know that we were going to be exercising the option, as

19    is --

20             THE COURT:  Well, this is not the option that was

21    in the plan.

22             MR. KOENIG:  Well, Your Honor --

23             THE COURT:  This is different.

24             MR. KOENIG:  The option --

25             THE COURT:  Are you telling me this is the option

1     that was in the plan?

2              MR. KOENIG:  Your Honor, the plan provided for

3     either the backup option or that was disclosed or --

4              THE COURT:  It wasn't this deal, though.

5              MR. KOENIG:  It wasn't this deal.  But the plan

6     did provide that it could be this deal --

7              THE COURT:  It wasn't this deal.

8              MR. KOENIG:  -- or different deal with another

9     mining manager on terms that were at least as good for

10    creditors.

11             THE COURT:  Is that in there?  Is that in the

12    plan?

13             MR. KOENIG:  Those exact words are in the plan,

14    Your Honor.

15             THE COURT:  Okay.

16             MR. KOENIG:  And in the disclosure statement.

17             THE COURT:  I'm not -- you know, I'm pushing back

18    now because I'm trying -- I haven't read -- I've heard from

19    my clerks that it was filed overnight.  I haven't read it.

20    I saw the press release that -- you know, after the SEC said

21    what it said.  Why that couldn't have been further

22    ascertained before the plan was confirmed, I don't know.

23    The one thing I was like a broken record about, the

24    importance of conferring with State and Federal regulators

25    throughout, so we didn't get to a point of some bad

1    surprises, which I put this in the category of.

2              MR. KOENIG:  And we agree with that, Your Honor.

3              THE COURT:  Exactly what I wanted to avoid has

4    happened.  And now, the question is what gets done about it?

5    And it may be that exactly -- this may be a perfectly good

6    plan structure that's contemplated now, but the question is,

7    is it the one that was disclosed and people voted on?  Okay.

8    I don't know.  I haven't read any of this yet.

9              MR. KOENIG:  Understood, Your Honor.

10             THE COURT:  Don't assume that you're getting g a

11   gimme on  this.  It isn't happening.  Okay?

12             MR. KOENIG:  Understood.  What I'll --

13             THE COURT:  The last thing I want is to have to do

14   a do over, have (indiscernible) new plan, disclosure

15   statement, voting, et cetera.  That's not what I want.  But

16   that may be what happens.  I can't -- you know...

17             MR. KOENIG:  Understood, Your Honor.  I'll just

18   repeat that in the plan and disclosure statement we included

19   that it could be the deal or it could be a deal that is on

20   better terms.  And I mean, frankly, it is -- you know, the

21   distribution partners that we selected for the Fahrenheit

22   plan is just sort of pouring over to the back-up.  And you

23   know, the US Bitcoin was already the mining manager for the

24   NewCo.

25             THE COURT:  Mr. Koenig, it sounds nice.

Page 30

1           MR. KOENIG:  I understand.

2           THE COURT:  We'll see.  But that's -- you know,

3    just because it sounds nice doesn't mean that it can be done

4    easily.  Okay?  We'll see.

5           MR. KOENIG:  Understood.  We've been focused on it

6    and, of course, will carry our burdens that convince you of

7    that in December.

8           Do you have anything else for me, Your Honor?  I

9    don't know if the Committee had preliminary comments, or if

10   you'd like to get on with the agenda?

11          THE COURT:  Somebody else want to be heard on

12   this?

13          MR. FINESTONE:  I'd like to be heard.

14          THE COURT:  Please come up to the microphone.

15          MR. FINESTONE:  Thank you, Your Honor.  Ben

16   Finestone, from Quinn Emanuel, on behalf of the Blockchain

17   Recovery Investment Consortium, referred to in these cases,

18   Your Honor, as the BRIC, and defined in the plan as the B-R-

19   I-C.

20          Your Honor, we are the title option that was

21   provided for in the plan.  There is really no -- in my

22   experience, there is really no room in bankruptcy for I told

23   you so, or self-credit --

24          THE COURT:  We don't have to get into that.

25          MR. FINESTONE:  Yeah, I --

1          THE COURT:  Today is not the point to --

2          MR. FINESTONE:  It's not the point, Your Honor,

3    and that's why I'm not going to do that.  But we do want --

4    what we do want, Your Honor, here -- and similarly, we

5    understand it's on a non-evidentiary basis.

6          But in terms of Your Honor hearing the other side

7    of the story, when we heard the news about the SEC's

8    position, we expected the Debtor to realize upon the value

9    that it paid us by keeping us locked and loaded as a backup

10   plan, at the factory, toggle to us, engage with us, and move

11   forward.  That would have caused the least delay and that

12   would have triggered the least incremental administrative

13   expenses, which is good for the estate, and of course

14   derivatively good for all of the account holders.  It hasn't

15   happened, Your Honor.  And I just want to give to preview

16   comments in terms of price and process.

17         In terms of price, the Debtors told us what they

18   told Your Honor, that our deal was stale.  We're not sure we

19   agreed with that, but we didn't have the time or the luxury,

20   Your Honor, of sitting around and fighting with them about

21   whether our deal was stale.  So we moved our deal.  We've

22   modified our deal .

23         We've looked at the papers they filed last night,

24   because I don't have the docket that Your Honor has, so I

25   was able to get up early and read these papers.  That's why

Page 32

1   I'm saying I've had the opportunity to look at them, Your

2   Honor, and I can just say on behalf of the BRIC there are

3   three buckets.  Debtors' counsel only spoke about one

4   bucket.

5           But of course, the way math works, you have to

6   speak about three buckets.  Plan administration and

7   employment fees.  We're $23 million cheaper to the estate.

8   Litigation trust --

9           THE COURT:  This is really not the time to get

10  into this.

11          MR. FINESTONE:  Okay.  Can I just give --

12          THE COURT:  It's just not.

13          MR. FINESTONE:  I understand, Your Honor.

14          THE COURT:  You'll have plenty of opportunity.

15  You can file what you want and --

16          MR. FINESTONE:  Okay.  Let me just --

17          THE COURT:  We have to have an evidentiary

18  hearing, will have an evidentiary hearing.

19          MR. FINESTONE:  Appreciate the Court's patience.

20  I want all the creditors to know, and all the account

21  holders to know that the deal -- the toggle deal that was

22  described in the disclosure statement --

23          MR. FINESTONE:  Mr. Finestone, stop.

24          MR. FINESTONE:  Thank you, Your Honor.  Thank you.

25          THE COURT:  Mr. Bruh or Ms. Cornell, do you want

Page 33

1   to be heard at all?  You're walking much better, Ms.

2   Cornell.

3           MS. CORNELL:  Good morning, again, Your Honor.

4   It's Shara Cornell, of the office of the United States

5   Trustee.  The United States Trustee received the papers at

6   the same time as Your Honor.  We have only had a preliminary

7   chance to review, but obviously, as Your Honor expressed, we

8   may have our own concerns and look forward to reviewing them

9   more thoroughly in the future.  If you have any questions

10  for me right now, I don't have any.  Thank you.

11          THE COURT:  Thank you.  Mr. Koenig?

12          MR. KOENIG:  Thank you, Your Honor.  Again, for

13  the record, Chris Koenig.  So, first up on our agenda is an

14  uncontested settlement motion with EZ Blockchain.  We filed

15  a motion at Docket Number 3983.  We filed a revised proposed

16  order at Docket Number 4028.  In support of the motion, we

17  filed the declaration of Mr. Ferraro at Docket Number 4029.

18  Mr. Ferraro is here on Zoom and available for questions.

19  And at this time, I would move his declaration into

20  evidence.

21          THE COURT:  Any objections?  All right.  Ferraro

22  declaration is admitted into evidence.

23          (Declaration of Christopher Ferraro Admitted into

24  Evidence)

25          MR. KOENIG:  Thank you, Your Honor.  The Debtors

Page 34

```
 1    consulted with the Committee prior to entering into the
 2    settle- --
 3                THE COURT:  That was just before -- that
 4    declaration is ECF 4029?
 5                MR. KOENIG:  Correct.
 6                THE COURT:  Great.
 7                MR. KOENIG:  Yes.  The Debtors consulted with the
 8    Committee prior to entering into the settlement.  We
 9    received no objections prior to the objection deadline,
10    which was last week, November 23, 2023.
11                Just very briefly, the settlement agreement
12    resolves disputes arising from prepetition hosting services
13    agreements entered into between Celsius Mining and EZ
14    Blockchain back in 2022.  EZ Blockchain was to provide
15    hosting capacity to Celsius Mining.  Due to high energy
16    prices, Celsius asked EZ Blockchain to shut off all of our
17    rigs around the time of the bankruptcy filing.
18                From the outset of these cases, we've sought to
19    resolve contractual disputes against each other arising from
20    these agreements, including our demand that they return a $5
21    million deposit that we made and claims that we had against
22    each other.
23                So, under the settlement, they're going to return
24    the deposit to us over time.  We're going to enter into a
25    new hosting agreement and we're going to release claims
```

1     against each other.  We think that this is an appropriate

2     settlement under the Iridium factors, and we respectfully

3     request that the Court enter the order.

4             THE COURT:  Does anybody else wish to be heard

5     with respect to the Blockchain -- EZ Blockchain settlement?

6     All right, it's approved.

7             MR. KOENIG:  Thank you, Your Honor.  The next

8     matters are the fee applications.  I'll turn the lectern

9     over to Ms. Stadler and Judge Sontchi.  Mr. Sontchi.

10            MS. STADLER:  I make that mistake all the time.

11    Good morning, Your Honor.  Katherine Stadler, of Godfrey &

12    Kahn, appearing for the fee examiner, Chris Sontchi, who is

13    also in the courtroom today.

14            We are here on Agenda Items 2 through 19, 3 and 4

15    being our own third interim fee applications, and the

16    remainder being second and third interim the applications of

17    retained professionals.  The fee examiner's summary report

18    appears at Docket 4013 and summarizes the applications

19    recommended for Court approval today.

20            As is expected as the case progresses, fee issues

21    of concern have become less prevalent as the professionals

22    acclimate to and adapt their practices to the examiner's

23    standards and guidelines.  We're happy to answer any

24    questions Your Honor may have about any of the fee

25    applications or the fee examiner process more generally.

Page 36

1              THE COURT:  Let me first ask, does the  U.S.

2    Trustee want to be heard on this?  No?

3              MS. CORNELL:  Not at this time.  Thank you.

4              THE COURT:  Okay.  So you don't have any

5    objections to the fees that are being sought as modified by

6    agreement with the fee examiner?

7              MS. CORNELL:  No, Your Honor.

8              THE COURT:  Okay.  All right.  For the record,

9    that was Ms. Cornell speaking from the back of the

10   courtroom.  Okay.

11             So, let me just briefly review for the record,

12   bottom line is I'm going to approve all of the fees as set

13   forth, as adjusted by agreement, with all parties.  Just so

14   we have a complete record, I'll just try to briefly sort of

15   describe from the Court's standpoint what has been happening

16   and what's happened with this fee application.

17             So, the Court appointed that the examiner on

18   October 20, 2022, and with each of the fee -- every time we

19   got a fee hearing, the examiner, with his counsel, has

20   presented the Court held report that has set forth -- has

21   gone through each of the applications, reflects the

22   discussions and agreed revisions.  In the event there was a

23   dispute, obviously, it could be brought back here along the

24   way.

25             And so, with respect to the hearing today, the fee

1    examiner submitted its report, which is ECF Docket Number

2    4013, filed on November 20, 2023.  And it's very

3    comprehensive.  It explains in detail each -- it doesn't go

4    through the negotiations with each of the changes, but it

5    reflects the changes that were made.  And the examiner

6    states that the applications now are uncontested.

7            They've reached agreement with the fee examiner,

8    subject to the Court's approval to resolve with respect to

9    the applications for fees and expenses primarily incurred

10   during the third interim fee period.  And the interim fees

11   and expenses are presented in Exhibit A to the report.  And

12   the fee examiner states that the negotiated adjustments,

13   "satisfy the fee examiner that that fees and expenses of Mr.

14   (indiscernible) are both reasonable and necessary."

15           So, Godfrey & Kahn, the counsel to the fee

16   examiner, reviewed the applications, using the process

17   outlined in detail in the first fee examiner's summary

18   report; went back to the applicants, many of the applicants,

19   and through discussions resolved issues that had arisen.

20   And all of the fee requests that are before me today are

21   consensual.

22           In the discussions with the applicants, the fee

23   examiner's counsel summarized each professional's response,

24   conducted additional analysis where necessary, and presented

25   all retained professional responses to the fee examiner, Mr.

1    Sontchi, with explanations, summaries and recommendations

2    for each uncontested applicant.

3              The fee examiner, Mr. Sontchi, reviewed and

4    retained the retained professional's responses and counsel's

5    recommendations, conducted additional investigation where

6    necessary, and ultimately approved each of the resolutions

7    outlined in what is Exhibit A to the report.  And as part of

8    his review, the VA examiner continued to identify and

9    quantify the issues outlined during the prior interim fee

10   period, including non-compensable time, detailed review,

11   possible duplication of efforts, multiple attendance at

12   hearings and meetings, and fee guideline noncompliance.

13             So it's been a very comprehensive process, which

14   certainly has been of enormous assistance to the Court and

15   hopefully to the U.S. Trustee as well.

16             The Exhibit A to the report shows for each of the

17   applicants the interim fees requested, the fee examiner's

18   recommended fee adjustment, the interim expenses requested,

19   the fee examiner's recommended expense adjustment, the

20   interim fees recommended for approval and the interim

21   expenses recommended for approval.  So it's all quite

22   clearly set out for everyone to see.  It's on the public

23   record.

24             So all constituents in the case are able to see

25   precisely what was sought by the professionals, the

Page 39

1    compensation period, fees, expenses, the adjustments that

2    were recommended and that the Court is being asked to

3    approve today.

4            Obviously, this has been a very expensive case.

5    There are a lot of professional applications that are -- so

6    there are 18, I think, that are before the Court today.  And

7    really, the bottom line, having reviewed the fee examiner's

8    report, obviously being familiar with what the process has

9    been after the first fee period and this fee period, I

10   believe that -- well, I am approving all of the fees and

11   expenses as set forth in the adjusted amounts in the table.

12   I think it reflects very careful work by the fee examiner

13   and his counsel, which in my view have done a really

14   excellent job throughout the case.

15           So I'm pleased to be able to approve.  You know, I

16   always -- one of the points I always try to make is -- and

17   whether it's the U.S. Trustee that's done the detailed

18   review or in this case, the fee examiner -- when I and my

19   clerks and interns review fee applications, we may see

20   issues that raise questions in our mind.

21           And what I never want to be doing, where there has

22   been an agreed adjustment, or there is some adjustment

23   initially with the U.S. Trustee, or in this case with the

24   fee examiner, I'm always very cautious about sort of

25   nitpicking about, well, you know, this item seems

Page 40

1   questionable to me.  What I look at more is the big picture.

2   In my satisfied that the adjustments that have been agreed

3   upon would resolve -- you know, significantly resolve all of

4   the issues that I might have.  And given the volume of the

5   fee applications here, it just -- it's very difficult for

6   the Court to go through each of these and make its own

7   judgments about it.

8           So I'm very appreciative of the efforts of Mr.

9   Sontchi and his counsel in the case.  And so I'm quite

10  pleased to be able to approve the fee applications in the

11  amounts -- approving the amounts set forth in Exhibit A, as

12  the adjusted amounts.

13          Just give me another moment here.

14          So, I think the last thing other than approving

15  that is to go through your request for fees and Mr.

16  Sontchi's request for fees.  Let's deal with all of them

17  right now.  Do you want to just address that briefly?

18          MS. STADLER:  Certainly.  As the professionals'

19  applications have become somewhat more straightforward, so

20  have ours.  Both Mr. Sontchi's and our firm's fees have gone

21  down relative to the prior interim fee periods.

22          With respect to Mr. Sontchi's application, we took

23  Your Honor's suggestion from the last fee hearing and broke

24  his time down into sub-matter categories.

25          THE COURT:  Seven categories you've broken it down

Page 41

1    into?

2              MS. STADLER:  Correct.  So, hopefully, that

3    satisfies the Court's concern about the timekeeping

4    practices there.  Otherwise, I think the applications are

5    straightforward.

6              THE COURT:  So is it -- for Mr. Sontchi, the

7    request is for $48,375 in compensation and $1,332.35 in

8    expense reimbursement.  Is that correct?  Sometimes I get

9    this wrong, so...

10             MS. STADLER:  What?

11             THE COURT:  Sometimes I get this wrong.

12             MS. STADLER:  Oh.  Yeah, me too.

13             THE COURT:  I just want to be sure, okay?

14             MS. STADLER:  $48,375 --

15             THE COURT:  Seventy-five dollars, right.  And

16   $1,332.35 in expenses?

17             MS. STADLER:  Correct.

18             THE COURT:  Okay.  So it reflected 38.1 hours of

19   time for the fee examiner.  And I guess it's still subject

20   to the 20 percent holdback.  Am I correct about that?

21             MS. STADLER:  It has been subject to --

22             THE COURT:  Subject.

23             MS. STADLER:  -- the 20 percent holdback.  Upon

24   approval of the interims, the holdback is to be released

25   pursuant to the order.

Page 42

1          THE COURT:  I just note that the fees incurred in

2     October included $50 that were actually incurred in

3     September that you inadvertently omitted from the September

4     statement were added in.  And it's completely appropriate.

5          The fee examiner's application provides that

6     during the compensation period, the fee examiner performed

7     the following duties with the assistance of his counsel.

8     Completed the review and reporting process of professional

9     the applications filed by retained professionals for the

10    period November 1, 2022 through February 28, 2023, and made

11    substantial progress on reporting on professional fee

12    applications for the period of March 1, 2023 through June

13    30, 2023.  I don't think I really need to go through it

14    further than that.  I've reviewed it carefully.  The math is

15    all correct.  And so the examiner -- Mr. Sontchi's fees and

16    expenses are approved.

17         With respect to your firm, Godfrey & Kahn, seeks

18    an allowance of $316,906 in compensation, and $11,694.83 in

19    expense reimbursement.  Is that correct?

20         MS. STADLER:  That's correct.

21         THE COURT:  Okay.  And that reflects a blended

22    hourly rate for all attorneys of $578.28 and for all

23    timekeepers, $587.56.  You know, the application properly

24    lists the professionals, the breakdown of compensation by

25    project category, expense summary, detailed time records,

1   detailed expense records, customary comparable hourly rate

2   disclosures, budget and staffing plan, all of the things I

3   would expect to see are shown here.

4           So, having reviewed it all, both fees and expenses

5   are approved.

6           MS. STADLER:  Thank you, Judge.

7           THE COURT:  Okay.  Let me -- one thing before we

8   move on.  There is one fee application that is not covered

9   in your analysis report.  I'm not sure if it was supposed to

10  be or not.  It's the Consumer Privacy Ombudsman.

11          MS. STADLER:  Yes.

12          THE COURT:  I don't know whether you've had an

13  opportunity to look at that --

14          MS. STADLER:  We --

15          THE COURT:  -- and I think -- I see Lucy Thomson

16  is on the screen.  I certainly -- it wasn't covered in your

17  report.  My chambers and my myself have gone through it.  I

18  don't know whether you have any comments about that.

19          MS. STADLER:  The only comment I have is that we

20  are  aware of it.  We consulted with the Debtors and

21  Creditors' Committee about whether that application was

22  included in the fee examiner charge.

23          THE COURT:  It wasn't clear to me.

24          MS. STADLER:  Given her unique retention, the

25  conclusion was that it is not.

```
 1                THE COURT:  Okay.  That was --

 2                MS. STADLER:  So we did not review it.

 3                THE COURT:  It was something that wasn't clear.  I

 4     wanted to raise it today.

 5                MS. STADLER:  Yes.  Correct.

 6                THE COURT:  And to see whether you have any

 7     comments about it or not.

 8                MS. STADLER:  We have not reviewed --

 9                THE COURT:  Not -- wouldn't expect --

10                MS. STADLER:  -- it substantively.

11                THE COURT:  Okay.  All right.  Thank you very

12     much.  Thank you, Mr. Sontchi.

13                MS. STADLER:  Judge, the orders have both been

14     submitted this morning by email to the chamber's email

15     address.  And I would ask that Judge Sontchi and I be

16     excused from the remainder of the hearing.

17                THE COURT:  You're excused.

18                MS. STADLER:  Thank you.

19                THE COURT:  Absolutely.  All right.  Ms. Thomson,

20     do you want to go ahead and I'll deal with your fee

21     application.  It's uncontested.  The first interim fee

22     applications, it's ECF 3470.  Ms. Thomson was appointed as

23     the Consumer Privacy Ombudsman.  And it seeks compensation

24     in the amount of $127,270 and expenses of $200.  Is there

25     anything you want to add, Ms. Thomson?
```

1        MS. THOMSON:  Oh, Lucy Thomson, Consumer Privacy

2   Ombudsman.  Thank you, Your Honor.  I consulted with the fee

3   examiner's office and they told me I should submit my fee

4   application to the U.S. Trustee for review, which I did.

5        THE COURT:  Okay.  Ms. Cornell or Mr. Bruh, have

6   you any comment -- anything you want to add about Ms.

7   Thomson's application?

8        MS. CORNELL:  Shara Cornell, on behalf of the U.S.

9   Trustee.  I don't have anything to add at this point, Your

10  Honor.

11       THE COURT:  You have no objections?

12       MS. CORNELL:  No objections (indiscernible).

13       THE COURT:  All right.  So, the Court -- I take --

14  you know, I took your charge as Consumer Privacy Ombudsman

15  very seriously.  And I believe that issues that you had

16  raised got resolved prior to the confirmation of the plan.

17  I viewed it as very important that that be done.  And I

18  appreciate all of the work that you've done.  And your

19  application is approved.

20       MS. THOMSON:  Thank you, Your Honor.

21       THE COURT:  Okay.  All right.  Mr. Koenig?

22       MR. KOENIG:  Your Honor, the only matter that

23  remains is there is a motion to dismiss in one of the

24  adversary proceedings, which my partner, Ms. Brier, will be

25  arguing.

Page 46

1              THE COURT:  Okay.

2              MS. BRIER:  Good morning, Your Honor.  Grace

3    Brier, Kirkland & Ellis, on behalf of the Debtors.  Your

4    Honor, And Mr. Shanks filed an adversary complaint in this

5    matter back in February.  We moved to dismiss.  And that's

6    at Docket Number 9.  Mr. Shanks has not responded to our

7    motion to dismiss, so we --

8              THE COURT:  Let me be clear.  Mr. Shanks'

9    adversary proceeding is Case Number 22-10964.

10             MS. BRIER:  Thank you, Your Honor.

11             THE COURT:  And within that docket, your motion to

12   -- the motion to dismiss is amended complaint.  Your motion

13   is filed as ECF Docket Number 9, and no response to the

14   motion was ever (indiscernible).  Mr. Shanks is pro se.  Go

15   ahead.

16             MS. BRIER:  Thank you, Your Honor.  And thank you

17   for clarifying that.  So, as Your Honor noted, Mr. Shanks

18   has not responded to our motion, so we've largely addressed

19   arguments that we made in our motion.  I'd just like to

20   highlight a couple of things for the Court today, based on

21   some recent developments

22             So, first, as we stated in our motion to dismiss,

23   Mr. Shanks had an Earn account and a custody account as of

24   the petition date.  As we stated in our motion, in the Earn

25   order, Your Honor contemplated a process for Earn account

Page 47

1    first to waive claims in the claims resolution process.  So,

2    for that reason, we'd move to dismiss Mr. Shanks' complaint.

3              We'd also note, Your Honor, that he raised a few

4    declaratory judgment claims.  Some of those declaratory

5    judgment claims rely on language in the loan terms of use

6    and since --

7              THE COURT:  But he -- his amended complaint

8    alleges 11 separate causes of action.

9              MS. BRIER:  Yes, Your Honor.  His amended

10   complaint alleges 11 separate causes of action, that

11   (indiscernible) breach of contract, declaratory judgment and

12   fraud claims.  We moved to dismiss for the procedural

13   reasons under the Earn order, and the substantive reasons

14   are laid out in our motion.

15             This -- the procedural reasons, one of them is the

16   Earn order, which I just discussed.  Another under two of

17   his declaratory judgment claims rely on lending terms of use

18   arguments.  Since we've moved to discuss, Your Honor has

19   ruled in the confirmation order that those terms

20   unambiguously state that the terms transmit ownership title

21   of collateral to the Debtors.  So a number of his claims

22   have been dispositively resolved by Your Honor's

23   confirmation order.

24             And then, Your Honor, since filing the motion to

25   dismiss (indiscernible).  Mr. Shanks did not vote in the

1    plan confirmation process.  By virtue of abstaining from

2    voting he's deemed to have not opted out of the class claim

3    settlement and the third-party release.  That is he's deemed

4    bound by those agreements.

5           Under the third-party release, he has released

6    Debtors from any claims related to the Chapter 11 cases

7    (indiscernible) to remedies against the Debtors.  And that

8    at least includes the (indiscernible) for declaratory

9    judgment, breach of contract, unjust enrichment, and

10   turnover of collateral.  So he's opted into the release by

11   virtue of abstaining from voting.

12           THE COURT:  Just say that again?  I missed -- I'm

13   having a little trouble hearing you over the Zoom.  Just say

14   it again.

15           MS. BRIER:  Of course.  The release -- the third-

16   party release that he is deemed to have accepted means that

17   his claims for declaratory judgment, breach of contract,

18   unjust enrichment, and turnover of collateral, they're

19   included in the release.  So he's opted into the release by

20   virtue of abstaining from voting.

21           And then the (indiscernible) claim settlement

22   waives Mr. Shanks' rights to assert his fraud and willful

23   misconduct claims.  So we submit that since the motion to

24   dismiss, the voting has also impacted our motion, and we

25   move to dismiss his claims for that reason as well.

Page 49

1           THE COURT:   (indiscernible)

2           MS. BRIER:   Your Honor, if -- go ahead.

3           THE COURT:   So you filed your motion to dismiss

4    some time ago.

5           MS. BRIER:   Yes, Your Honor.   In April.

6           THE COURT:   Did you file anything further?

7    Because you're now arguing what the effect of the

8    confirmation of the plan and his failure to opt out has

9    been.   Is that set forth in any -- I didn't see it.   I

10   looked through the docket again this morning and I --

11          MS. BRIER:   Your Honor, we have it.

12          THE COURT:   Let me finish my statement.   I'm

13   trying to understand -- this -- I'm not saying it's

14   incorrect or that you shouldn't be making your argument, but

15   effectively, it's a new argument that wasn't made in the

16   motion to dismiss itself.   Would you agree with that?

17          MS. BRIER:   Yes, Your Honor.   And apologies for

18   speaking over you.   I'm trying to capture the Zoom lag, but

19   there's a little lag here.   We would rest on our papers and

20   we would note that it should be dismissed for the reasons

21   stated in our motion.

22          We just wanted to note that since our motion was

23   filed, as you mentioned, a long time ago, some additional

24   developments have occurred.   We're happy to file on the

25   docket some additional grounds for dismissal, based on what

1    I just raised.  But because there was no response, there has

2    been no responsive pleading in this case, we have not filed

3    anything additional at this time.

4              THE COURT:  Have you had any communication with

5    Mr. Shanks?

6              MS. BRIER:  Yes, Your Honor.

7              THE COURT:  What --

8              MS. BRIER:  My understanding is that he was

9    involved in some of the ongoing discusions with similar

10   claims, that many of which have since settled, if he has

11   wanted to advance and proceed with his motion to dismiss

12   here.  We asked him to dismiss his case during those

13   discussions and he asked that we proceed with this argument.

14             THE COURT:  So, please understand, I'm not going

15   to grant your motion on grounds that haven't been argued.

16   You may be -- all of each of those -- it may that it's

17   dismissed on the grounds you did argue.  But I'm not going

18   to dismiss it on grounds that subsequent events indicate

19   that, you know, he's agreed to dismiss or discharge, or

20   release certain claims.  Mr. Shanks is entitled to -- you

21   know, if you were going to make new arguments, he was

22   entitled to know what they are before I had this hearing

23   today.

24             MS. BRIER:  Understood, Your Honor.  And we would

25   rest on the arguments we did make as in our motion, and

Page 51

1    wanted to state for the record and put on the record what

2    has happened since, given the passage of time.  But

3    absolutely understand that what is before Your Honor is what

4    we put in our actual motion to dismiss, and that's what he's

5    had a chance to look at and respond to it.

6          THE COURT:  So, one of the things that your motion

7    papers as a (indiscernible), Mr. Shanks alleged in Count 4,

8    deceptive trade practice claims, but doesn't say what State

9    law.  And you have a long footnote that -- I don't have it

10   open in front of me -- I looked at it this morning again --

11   which I fundamentally agree with that, you know, if he's

12   going to argue that some state's law other than New York law

13   applies, or he's going to argue for application of something

14   other than forum state law, he has to indicate what law, and

15   further, he'd have to show that there's some material

16   difference between New York law and Colorado law, was one of

17   the states.

18          And your brief, I think, did a good job of noting

19   that, well, it could be one of these other states, New

20   Jersey, Colorado and New York, obviously, the forum state.

21   Just address that briefly.  I'm going to rule on the motion

22   and I'll rule on it not on the grounds you're raising for

23   the first time today.  It may be well taken.  But on the

24   grounds that you asserted in your papers as to which he did

25   not respond, as a pro se plaintiff.

Page 52

```
 1              Just briefly, what what's your position with

 2    respect to his failure to indicate what state law he's

 3    seeking to apply?

 4              MS. BRIER:  Yes, Your Honor.  As we stated in the

 5    footnote, where there's no conflict between the

 6    (indiscernible) laws and New York (indiscernible) so we

 7    argued under New York law in our motion.

 8              THE COURT:  All right.  I'm going to take it under

 9    submission.  I'm going to -- I'll issue something.  Thak you

10    very much, Ms. Brier.  Okay.

11              MS. BRIER:  Thank you, Your Honor.

12              THE COURT:  Anything else, Mr. Koenig?

13              MR. KOENIG:  Your Honor, that takes us to the

14    conclusion of our agenda.  Thank you.

15              CLERK:  Judge, Mr. Adler has his hand up.

16              THE COURT:  Okay.  Mr. Adler?

17              MR. ADLER:  Good morning, Your Honor.  David

18    Adler, from McCarter English, on the --

19              THE COURT:  Let me just say, Mr. Adler, and for

20    anybody who raises their hands, because of the setup in the

21    courtroom, I can't see it until -- now I can see it, now

22    that you've come on the screen, but my courtroom Deputy,

23    Deanna Anderson, is very good about making sure I know when

24    someone has raised their hand.  So, go ahead, Mr. Adler.

25              MR. ADLER:  I apologize, Your Honor.  I'm
```

Page 53

1   (indiscernible) and I did not wish to come to court tonight

2   without the (indiscernible) today.  So I had raised my hand

3   earlier at the beginning of the presentation.  And then I

4   raised my hand during the Shanks motion.  And my

5   recollection is that Shanks' motion basically copied the

6   complaint that was filed by the ad hoc group of retail

7   borrowers.

8          I have not seen that on the agenda, but from our

9   perspective, given everything that we went through in the

10  confirmation to avoid ruling on certain (indiscernible)

11  respect to voting, a creditor voted yes or did not vote to

12  object to the plan, my own view is that the Court should not

13  delve into the merits of that because it's a lot of time

14  discussing that.

15         So, you know, I understand the argument that he

16  did not vote and as such he's deemed to accept and that's an

17  easy way to deal with the issues that have been raised.

18         THE COURT:  Well, that's not -- that has not been

19  argued in any papers before me.  Okay?  I'm not going to

20  rule on -- I'm not going to dismiss his complaint on grounds

21  that are not set forth in any motion papers before me.  I

22  understand he didn't respond to the initial motion to

23  dismiss.  This has been carried multiple times.  I think he

24  may have appeared at various hearings and spoken briefly.

25         This is still on the docket.  It needs to be

1    resolved.  I am not going to rule on grounds that are not

2    properly before the Court.  I understand your arguments and

3    concerns, Mr. Adler.  All I can deal with is what's in the

4    papers on the motion to dismiss.

5              MR. ADLER:  Would Your Honor allow us to put in a

6    short --

7              THE COURT:  No.  I don't want another piece of

8    paper relating to this case.  Okay.

9              MR. ADLER:  Okay.  The second point that I wanted

10   to raise, which was at the beginning of the hearing, is

11   having looked at the motion papers that were filed this

12   morning -- and I'm not going to go into the merit, but it

13   would be very useful if as part of this winddown procedure

14   that the Debtors wish to (indiscernible) that there be some

15   type of (indiscernible) put together of what creditors could

16   actually expect to receive in terms of distribution.  And

17   specifically, I fall back to Page 12 of the disclosure

18   statement, which had a chart that showed what distributions

19   were, what the reserves were, what the (indiscernible)

20   secured creditors were.  And (indiscernible) frankly what's

21   being reserved -- or maybe I missed that part.

22              You know, it would -- the question coming from my

23   constituency is what am I going to be receiving, what

24   percentage is in crypto.  So that's the only point I wanted

25   to make, Your Honor.  I don't want to go into the merits

Page 55

1    today, because I heard you loud and clear.

2            THE COURT:  You know, the 20,000 foot headlines

3    are that because the staking in business is not going to be

4    part of NewCo, they're not going to have to make the same

5    allocation of crypto to Newco, and consequently, there'll be

6    greater distribution -- assuming this works -- there's

7    greater distributions more immediately to creditors.  That

8    was sort of the 20,000 foot statement that I read.  Whether

9    it works, I don't know.  We'll see.  That's not today's

10   issue, Mr. Adler.

11           I'm not -- it's not my intention to be a roadblock

12   to the completion of this case and, hopefully, the prompt

13   distributions to creditors for their recovery.  But I've got

14   to be satisfied that the law permits me to do that.  Okay?

15           You know, again, from the 20,000 foot level, this

16   is not the deal that the creditors voted on.  Maybe, you

17   know, I'll be persuaded it is and this was an option.  This

18   didn't seem to need to be one of the, you know, either the

19   preferred plane or the fault of the orderly winddown

20   precisely.  We'll see.

21           I'm not making any rulings about it.  My comments

22   are not intended to suggest what the outcome will be.  I

23   think, like in all of the things in this case, that the

24   views of the creditors are very important to me throughout.

25   Okay?  And it may well be that this is a (indiscernible)

1     they're proposing the Debtor, with the Committee's support,

2     I gather, is proposing a modification to the plan, that does

3     not have a material adverse effect on creditors.

4              I've only had -- I've dealt with modifications to

5     plans a couple of times where the resolicitation was

6     required.  And I just -- I'll obviously have to go look at

7     the law again when it's briefed.  But typically, again from

8     the high level vantage, it does not have a material -- if no

9     one's adversely affected by the change, ordinarily it isn't

10    necessary to have a resolicitation and re-vote.

11             But obviously, this area of the law is more

12    complicated.  Yes, I've approved modifications of plans

13    before without requiring a new disclosure statement,

14    resolicitation and voting.  It's an expensive process, time

15    consuming process.  It may well be that the showing will be

16    that no one is materially adversely affected by it.  The

17    plan obviously had toggle provisions in it.  So it wasn't --

18    you know, it was either Plan A or nothing.  And so we'll

19    see.  But it's not today's issue.  Okay?  All right.

20             MR. KOENIG:  Your Honor, just really briefly.

21    What I'll say to Mr. Adler is we filed a declaration of

22    Robert Compagna and there's exhibits that are attached to

23    that that includes some more details about the distribution.

24    I think it's 51 percent in liquid cryptocurrency and the

25    total headline number is actually 74 percent; 74 percent

Page 57

1    recovery in part due to the run-up of crypto prices since.

2    So we would argue -- obviously it's not for today -- that

3    the recovery is better than it was under the prior plan.

4              MR. ADLER:  Thank you.

5              THE COURT:  I don't want -- not today, Mr.

6    (indiscernible).  That wasn't an invitation, but that was

7    just a comment that's obvious to me that you and your client

8    are going to be heard loud and clear.  Okay?

9              MR. KOENIG:  Thank you, Your Honor.

10             MR. ADLER:  And Your Honor, my only point is that

11   --

12             THE COURT:  Mr. Adler.  Mr. Adler, it's enough,

13   enough for today.  Okay?

14             MR. ADLER:  Thank you, Your Honor.

15             THE COURT:  All right.  Thank you.  Feel better,

16   Mr. Adler.

17             MR. ADLER:  Thank you.

18             THE COURT:  All right.  Does anybody else wish to

19   be heard today?

20             We are adjourned.  Thank you very much.

21             (Whereupon these proceedings were concluded at

22   10:58 AM)

23

24

25

Page 58

```
  1                        I N D E X

  2

  3                        RULINGS

  4                                           Page     Line

  5   EZ Blockchain Settlement Agreement, Approved    25      6

  6   Fee Application of Christopher Sontchi, Approved  42    16

  7   Fee Applications 2 through 19, Approved          43      4

  8   Fee Application of Godfrey & Kahn, Approved      43      5

  9   Fee Application of Consumer Privacy Ombudsman,   45     19

 10        Approved

 11   Motion to Dismiss, Under Submission              52      8

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 59

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  December 4, 2023