**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>CELSIUS NETWORK LLC, *et al.*,<br><br>Debtors. | **FOR PUBLICATION**<br><br>Case No. 22-10964 (MG) |

## CORRECTED MEMORANDUM OPINION APPROVING THE CEL TOKEN SETTLEMENT AND RESOLVING ISSUE OF COLLATERAL OWNERSHIP IN THE MODIFIED JOINT CHAPTER 11 PLAN OF CELSIUS NETWORK AND ITS DEBTOR <u>AFFILIATES</u>

*A P P E A R A N C E S:*

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors in Possession*
601 Lexington Avenue
New York, New York 10022
By:     Joshua A. Sussberg, Esq.

300 North LaSalle Street
Chicago, Illinois, 60654
By:     Patrick J. Nash Jr., Esq.
           Ross M. Kwasteniet, Esq.
           Christopher S. Koenig, Esq.
           Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1221 Avenue of the Americas
New York, NY 10020
By:     David M. Turetsky, Esq.
           Samuel P. Hersey, Esq.
           Joshua D. Weedman, Esq.

111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
By:     Michael C. Andolina, Esq.
           Gregory F. Pesce, Esq.
           Gabriela Z. Hensley, Esq.

555 South Flower Street
Suite 2700
Los Angeles, CA 90071
By:    Aaron Colodny, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
1 Bowling Green, Room 534
New York, NY 10004
By:    Shara Cornell, Esq.
       Mark Bruh, Esq.

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
By:    Therese A. Scheuer, Esq.

950 East Paces Ferry Rd., N.E.
Suite 900
Atlanta, GA 30326
By:    William M. Uptegrove, Esq.
       Alan Maza, Esq.

VENABLE LLP
*Attorneys for Ignat Tuganov*
151 West 42nd St. New York, New York 10036
By:    Jeffrey S. Sabin, Esq.

600 Massachusetts Avenue, NW Washington, DC 20001
By:    Andrew Currie, Esq.

MCARTER & ENGLISH, LLP
*Attorneys for the Ad Hoc Borrowers Group*
Worldwide Plaza
825 Eighth Avenue, 31st Floor
New York, NY 10019
By:    David Adler, Esq.

OFFIT KURMAN, P.A.
*Attorneys for the Ad Hoc Group of Earn Account Holders*
590 Madison Avenue, 6th Floor
New York, NY 10022
By:    Jason A. Nagi, Esq.

1954 Greenspring Drive, Suite 605
Timonium, Maryland 21093
By:    Joyce A. Kuhns, Esq.

TROUTMAN PEPPER HAMILTON SANDERS LLP
*Attorneys for the Ad Hoc Group of Withhold Account Holders*
4000 Town Center, Suite 1800
Southfield, MI 48075
By:    Deborah Kovsky Apap, Esq.

WEINBERG ZAREH MALKIN PRICE LLP
*Attorneys for the Pending Withdrawal Ad Hoc Group*
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
By:    Adrienne Woods, Esq.
        Omid Zareh, Esq.

*Pro Se* Creditor Daniel Frishberg

*Pro se* Creditor Immanuel Herrmann

*Pro se* Creditor Richard Phillips

*Pro se* Creditor Otis Davis

*Pro se* Creditor Dimitry Kirsanov

*Pro se* Creditor Artur Abreu

*Pro se* Creditor Johan Bronge

*Pro se* Creditor David Schneider

*Pro se* Creditor Cathy Lau

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

        The Court has entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order," ECF Doc. # 3972) and incorporates the Confirmation Order herein by reference.[1]  As part of the Confirmation Order, the Court (1) APPROVED the CEL Token

---

[1]    All terms not otherwise defined herein have the definitions set forth in the Confirmation Order.

settlement (the "CEL Settlement") valuing the CEL Token at $0.25, and (2) found that the digital

assets transferred to the Debtors as collateral under Version 7 of the retail Loan Terms and

Conditions by Retail Borrowers who objected to the Plan, including Johan Bronge, were

property of the Debtors' Estates.

The Court writes here separately to explain its reasoning.[2]

## I.    THE CEL TOKEN SETTLEMENT

### A.  Background on the CEL Token

The CEL Token ("CEL" or "CEL Token") was a utility token native to the Celsius

Network.  A utility token is a "form of cryptographic token[] whose primary purpose is to allow

users to consume the platform's (smart contract) services."  (CEL Token Brief ¶ 25, citing

Samuel Häfner, *Blockchain Platform Design under Market Frictions: Decentralization, Service

Provision, and Block Rewards* (September 4, 2023).)  The CEL Token provided its owners with

various benefits on the Celsius network, most notably discounts on loan interest rates and

increased rewards in Celsius' Earn Program.  (CEL Token Brief ¶ 6.)  Celsius launched the CEL

Token in Q4 2017, and commenced a private presale for its initial coin offering (including

presale, the "ICO"), offering CEL at $0.20/Token.  (*Id.* ¶ 7.)  In Q1 2018, Celsius conducted the

crowdsale portion of the ICO, offering CEL at $0.30/Token.  (*Id.*)

Though its rewards and utilities were tied to the Celsius Network, it was an "ERC-20"

token, meaning it could be deployed on the Ethereum blockchain and thus sent to any address,

wallet, exchange, or other software compatible with this form of token.  (Initial Galka Declaration

¶ 32.)  Users could thus buy and sell CEL Tokens via decentralized exchanges, which faciliate

---

[2]    Mr. Bronge filed a letter on the docket (ECF Doc. # 3954, amended by ECF Doc. ## 3955, 3961) that
proposed modifications to paragraph 269 of the Confirmation Order.  In the alternative, he requested that the Court
explain its reasons for overruling his objection.  The Court rejects the proposed modification.  This Opinion explains
the reasons.

direct peer-to-peer transactions; centralized exchanges, where an entity (similar to a broker) settles transactions on an internal ledger; and over-the-counter ("OTC") desks, where the desk acts as an intermediary between the parties.  (*Id.* ¶ 26.)

Users could acquire CEL by opting to receive interest on their Earn Account balances in CEL, by purchasing it from the Celsius OTC desk, or by purchasing it on a number of other centralized and decentralized exchanges.  (Initial Galka Declaration ¶¶ 39, 49, 51.)  On June 12, 2022 (the "Pause Date"), Celsius paused all trading activity on its platform.  (*Id.* ¶¶ 127, 137). As a result, approximately 95% of CEL Tokens in circulation were locked on the platform, while the remaining 5% continued trading on third-party platforms.  (*Id.* ¶¶ 67, 137.)  On the Pause Date, CEL traded at $0.28.  (Committee CEL Brief ¶ 34.)  Between the Pause Date and the Petition Date (July 13, 2022), CEL rose in price to $0.81.  (*Id.* ¶ 35.)

In July 2023, various regulatory authorities made allegations of securities fraud, commodities fraud, wire fraud, conspiracy to manipulate the price of the CEL Token against certain of the Debtors and the former Chief Executive Officer, Alexander Mashinsky, and Chief Revenue Officer, Roni Cohen-Pavon.  (CEL Token Brief ¶ 16.)  The Debtors reached settlements with the regulatory authorities.  (*Id.* ¶ 17.)  The Debtors did not agree that CEL Token was an unregistered security, but did stipulate to "facts that could reasonably lead a fact finder to determine that CEL Token [was a security]."  (*Id.*, citing July 18, 2023 Hr'g Tr. 32:11–13 (Debtors' counsel describing the terms of their agreement with the SEC).)

1.   The Valuation Dispute

One of the most contentious issues throughout these chapter 11 cases has been the valuation of the CEL Token.  Some creditors immediately rallied against any return for CEL holders, describing the token as "destined-to-be-worthless."  (*See, e.g.*, July 21, 2022 Letter from

Jonathan Rabroker (ECF Doc. # 154); July 20, 2022 Letter from Immanuel Herrmann (ECF Doc. # 75) (arguing that the value of CEL Token Deposit Claims should be "either entirely zeroed out" or "reduced in value by 90-95%.")  Debtors initially filed a Plan proposing a value of $0.20 per CEL Token.  (*See* ECF Doc. # 2358.)

Many other creditors vigorously opposed this proposal, arguing for a valuation of at *least* $0.81, the Petition Date price.  (*See*, *e.g.*, June 26, 2023 Letter from Otis Davis (ECF Doc. # 2872) (arguing that a lower valuation was "outright theft"); June 26, 2023 Letter from Marlowe Bennett (ECF Doc. # 2874) (outlining reasons CEL Token Deposit Claims should not be subordinated); June 26, 2023 Letter from Madhu Kutty (ECF Doc. # 2895) (same).)

In response to these letters and many others, Debtors engaged in negotiations with the Committee and certain *pro se* parties, which culminated in the CEL Settlement.  (CEL Token Brief ¶ 18).

### 2.  The Terms of the CEL Settlement and the Voting Results

Pursuant to the CEL Settlement, which is incorporated into the Plan, Claims and Causes of Action arising out of or related to the CEL Token for, among other things, recharacterization and subordination, are settled according to the following terms: (i) first, except as provided in Article III.B.17 of the Plan, all CEL Token Deposit Claims, other than Custody Claims that are CEL Token Deposit Claims, shall be valued at $0.25/CEL Token, and shall otherwise receive the treatment associated with the program in which they were deployed; and (ii) second, all Claims on account of CEL Token identified in the Schedule of Equitably Subordinated Claims will be subordinated without distribution as provided in Article III.B.16 or Article III.B.17 of the Plan, as applicable.  (Confirmation Brief ¶ 95.)  All Other CEL Token Claims are classified as Class 15 Section 510(b) Claims (which will not receive any distribution under the Plan).  (*Id.*)

The CEL Settlement does not release Account Holders' claims against third parties that manipulated the price of CEL Token. (CEL Token Brief ¶ 18.) Lastly, the Confirmation Order provides that Account Holders who (1) timely opted out of the Class Claim Settlement and (2) voted to reject the Plan or abstained from voting on the Plan retain their rights to resolve their claims through the Claims allowance process. (Confirmation Order ¶ 262.)

The CEL claims were not segmented as a separate class under the plan; rather, every vote in favor of the plan was counted as a vote for the CEL Settlement. (Confirmation Brief ¶ 109.) Debtors tabulated the votes of CEL Token Holders within each Class to evaluate support for the CEL Settlement. (*Id*.) The acceptance rate of the Plan/CEL Settlement is 98.71% in number and 95.93% in amount. (Amended Declaration of Brian Karpuk, ECF Doc. # 3574.)

### B.  Debtors and Committee Support of the CEL Settlement

The Debtors briefed the basis for approving the CEL Settlement and the application of the *Iridium* factors thereto in the CEL Token Brief (ECF Doc. # 3431) which relied on the Ferraro Declaration (ECF Doc. # 3435). Debtors further addressed the CEL Settlement in the Confirmation Brief and the Supplemental Memo (Confirmation Brief ¶¶ 91–109; Supplemental Memo ¶¶ 26–29).

In support of the CEL Settlement, the Committee submitted the Committee CEL Brief (ECF Doc. # 3432). During the Confirmation Hearing, the Debtors and the Committee further relied on the expert testimony of Maxwell Galka and Robert Campagna. (*See* Initial Galka Declaration, ECF Doc. # 3580; Supplemental Galka Declaration, ECF Doc. # 3659; (and together, the "Galka Reports"); *see also* Initial Campagna Declaration, ECF Doc. # 3582; Supplemental Campagna Declaration, ECF Doc. # 3653.)

The Debtors and the Committee argue that the CEL Settlement satisfies the *Iridium* factors as fair, reasonable, and in the best interests of the estate because it (a) was overwhelmingly accepted by creditors, and (b) avoids value-destructive litigation on (1) whether the CEL Token a security, which could result in its complete subordination, and (2) the intrinsic value of CEL, an issue which is "notoriously time-intensive and expensive to litigate even under straightforward circumstances." (CEL Token Brief ¶¶ 2–3.) They argue that in the first case, CEL was likely a security, and should be subordinated under Section 510(b) of the Bankruptcy Code; and if it was not, it was a worthless utility token of a defunct network. (*Id.* ¶¶ 25–28.) They submit that a fair value is thus likely $0.00, but are "willing to compromise with the CEL holders to provide them with a $0.25 recovery[]." (Committee CEL Brief ¶ 39.)

Specifically, Mr. Galka's testimony establishes that at the Petition Date, the market for CEL was dislocated, and thus (1) the market price at the Petition Date was an unreliable indicator of value, and (2) it would be impossible to ascribe a specific value to CEL on the Petition Date. (*See* Galka Reports.) Mr. Campagna's testimony establishes that the value of CEL must be at or under $0.34 to satisfy the "best interests" test under section 1129(a), which the CEL Settlement satisfies. (*See* Celsius Ex. 70 at 4–5; *see also* October 4, 2023 Hr'g Tr. 123:7–24 (Campagna).)

### C. Objections to the CEL Settlement

Spearheading the objections to the CEL Settlement was *pro se* creditor Otis Davis, who objected to the Galka Reports and maintained that the CEL Token should be valued at the Petition Date price of $0.81, or some higher amount. (*See* "Davis Objection," ECF Docket # 3532; "Davis Opposition," ECF Doc. # 3639; "Davis Statement," ECF Doc. # 3769.) He advanced three main arguments: (1) that price of CEL was heavily influenced by "naked shorts"

made by FTX; (2) that the market price of CEL on the Petition Date was fair, and the best indicator of its value; and (3) that the market price of CEL prior to the collapse of the TerraLuna coin, a major dislocation event in the crypto market, was the best indicator of CEL's value.

Mr. Davis argued first that the "upwards price action" of CEL between the Pause and Petition Date was due to "illegal naked shorts" executed by FTX. (Davis Objection at 1.) In the same paragraph, Mr. Davis then avers that "'naked shorts' are the purest form of downward price manipulation." (*Id.* at 2.) Despite his extensive arguments that the price of CEL was influenced by this "purest form of price manipulation," (*id.* at 2), and without disputing the fact that 95% of the volume of CEL Token was locked following the Pause, Davis argues that the "free market activity in such high volume is the best expert witness of all as to what the pegged price should be." (Davis Opposition ¶ 7.) Following Mr. Galka's testimony, Mr. Davis appeared to concede that "a dislocation in the market can affect what would be a fair market value," but argues that the best data from which to measure the price of CEL was prior to the TerraLuna dislocation event, when CEL was priced at $2.01. (Davis Statement at 6.)

In support of his objections, Mr. Davis proffered his own valuation expert, Hussein Faraj, with a corresponding expert report (the "Report" or "Faraj Report," ECF Doc. # 3752). Debtors and Committee moved to exclude Mr. Faraj as an expert witness, including his Report. (*See* ECF Doc. # 3817.)

For the reasons explained below, the Court **GRANTS** the motion to exclude the Faraj Report, but **DENIES** the motion to exclude Mr. Faraj's testimony, which it will give such weight as the Court deems appropriate.

1.   The Faraj Report is Excluded

Rule 702 of the Federal Rules of Evidence ("Rule 702"), made applicable to these

proceedings by Rule 9017 of the Federal Rules of Bankruptcy Procedure, provides that expert

testimony may be given by a qualified witness if: "(a) the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the experts opinion reflects a reliable application of the

principles and methods to the facts of the case." FED. R. EVID. 702.   A properly submitted expert

report is a reflection of the expert's own knowledge, experience, expertise and methods used.   It

embodies their testimony, and communicates technical and detailed explanations to the finder of

fact.

The Faraj Report was not written by Mr. Faraj.   Although Mr. Faraj directed and guided

its creation, the 172-page Report, which was generated within 72 hours, was written by artificial

intelligence at the instruction of Mr. Faraj.   By his own testimony, a comprehensive human-

authored report would have taken over 1,000 hours to complete.   (*See* October 17, 2023 Hr'g Tr.

47:24–48:2 (Faraj); Celsius Ex. 113 ("We completed the entire assessment within 72 hours.   In

reality, this is usually a 6-to-8 week job."); October 17, 2023 Hr'g Tr. 48:3–5 (Faraj) ("Q. So you

did a 1,000-plus hour job in 72 in this case.   Is that your testimony?   A. That's 100 percent

correct."); October 17, 2023 Hr'g Tr. 51:7–9 (Faraj) ("Q. Mr. Faraj, if it was going to be

comprehensive, 72 hours was not enough to generate this report, true?   A. Correct.").)   In fact, it

took Mr. Faraj longer to read report than to generate it.   (*See* October 17, 2023 Hr'g Tr. 46:4–6

(Faraj).)   The Court therefore separately evaluates the Faraj Report and the testimony of Mr.

Faraj.   As discussed below, the Court will admit Mr. Faraj's oral testimony, giving it such weight

as is appropriate.  However, the Court finds that the Faraj Report is unreliable and fails to meet the standard for admission.

The Faraj Report was not based on sufficient facts or data.  The Report contains almost no citations to facts or data underlying the majority of the methods, facts, and opinions set forth therein.  (*See* Faraj Dep. Tr. at 239:11–20.)  In preparing the report, Mr. Faraj did not review the underlying source material for any sources cited, nor does he know what his team did (or did not do) to review and summarize those materials.  (*See* October 17, 2023 Hr'g Tr. 83:16–84:22 (Faraj).)  The Report contains no citations to the information on the CEL Token itself, at times suggesting that it is important to consider features that CEL Token never had, such as governance rights.  (*See* Faraj Report at 103–104.)

There were no standards controlling the operation of the artificial intelligence that generated the Report.  The Report contained numerous errors, ranging from duplicated paragraphs to mistakes in its description of the trading window selected for evaluation.  (*See* October 17, 2023 Hr'g Tr. 51:17–19 (Faraj) ("Q. Do you agree with me, sir, that there are errors in your report, true?  A. I agree."); October 17, 2023 Hr'g Tr. 51:20–22 (Faraj) ("Q. And in your view, it would be impossible to prepare a report in 72 hours without introducing errors, correct? A. That's true."); October 17, 2023 Hr'g Tr. 51:23–53:11 (Faraj) (discussing the inclusion of a duplicated 92-word paragraph); October 17, 2023 Hr'g Tr. 57:12–14 (Faraj) (describing incorrect trade dates).)

The Faraj Report was not the product of reliable or peer-reviewed principles and methods.  Mr. Faraj used a "fair value" method that he personally developed.  (*See* October 17, 2023 Hr'g Tr. 67:17–19 (Faraj) ("Q. And that's a method that you personally developed, correct? A. Correct.").)  That method is not widely accepted in valuing cryptocurrency; it has not been

11

peer tested; and no investment bank today publicly reports the "fair value" of any platform-specific cryptocurrency token.  (*See* October 17, 2023 Hr'g Tr. 67:20–69:5 (Faraj).)  It does not cite to any academic papers or sources for its descriptions of valuation methodologies or in support of its chosen methodology.  (*See* Faraj Report at 103–104.)

The Court finds and concludes that the Report does not meet the standard set forth under Rule 702.  Accordingly, the Faraj Report is excluded.

2.   Faraj's Live Testimony is Admitted

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) charges trial judges with the responsibility of evaluating expert testimony to "protect juries from being bamboozled by technical evidence of dubious merit."  *New York v. Solvent Chem. Co.*, No. 83–CV–1401, 2006 U.S. Dist. LEXIS 65595, at *3 (W.D.N.Y. Sept. 12, 2006).  Where the expert will opine on a relevant issue, and "the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it."  *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).  Thus, in a bench trial, the court may admit expert testimony, subject to cross-examination, and determine how much weight, if any, to give to the expert's conclusions.  *Victoria's Secret Stores Brand Mgmt. v. Sexy Hair Concepts, LLC*, No. 07 Civ. 5804, 2009 U.S. Dist. LEXIS 30458, at *17 n.3, (S.D.N.Y. Apr. 8, 2009) (stating that "where a bench trial is in prospect, resolving Daubert questions at a pretrial stage is generally less efficient than simply hearing the evidence").

The Confirmation Hearing was a bench trial, so admitting Faraj's testimony did not run the risk of confusing a jury.  In determining whether an expert has sufficient qualifications to testify, courts in the Second Circuit look at "the totality of the witness" qualifications to ensure that the expert is proffering opinions within the confines of his or her expertise.  *Napolitano v.*

*Synthes, Inc.*, 2014 U.S. Dist. LEXIS 204087, at *3 (D. Conn. Apr. 9, 2014). Rule 702 permits

testimony of experts qualified not only by education, but by knowledge, skill and experience.

Although Mr. Faraj does not have formal degrees, he has years of experience in preparing

research and development documents regarding various cryptocurrencies and blockchain

technologies and was able to speak knowledgably on these topics. (*See* October 17, 2023 Hr'g

Tr. 40:4–19; ; *id.* at 41:20–25.) The Court finds that Faraj has demonstrated sufficient

knowledge in the field of cryptocurrency for the Court to consider his opinion.

Notably, on all the relevant questions before the Court—namely, those which shed light

on the value of the CEL on the Petition Date—*Faraj agrees with Galka*. Both experts agree that

the value of CEL decreased between the Pause Date and the Petition Date. (*See* October 17,

2023 Hr'g Tr. 70:5–8 (Faraj) ("Q. All right. You would agree with me that the fair value of CEL

Token decreased between the pause date, June 12th and the petition date July 13th, correct? A.

As a value, myself, I would agree with you."); Supplemental Galka Declaration ¶ 15.) Both

experts agree that the market for CEL was dislocated during that period. (*See* October 17, 2023

Hr'g Tr. 70:17–22 (Faraj) ("Q. And you didn't look at how much [the value of CEL] decreased,

correct? A. No, because I looked at that area and it was a dislocated market"); Initial Galka

Declaration ¶ 139.)

Both experts agree that the CEL Token had no intrinsic value on the Petition Date. (*See*

October 17, 2023 Hr'g Tr. 71:3–5 (Faraj) ("Q. As of the petition date, CEL also had no intrinsic

value, correct? A. I agree with you."); Supplemental Galka Declaration ¶ 19.) Both experts

agree that on the Petition Date, CEL retained only speculative value. (*See* October 17, 2023

Hr'g Tr. 71:11–14 (Faraj) ("Q. And the only remaining value for the CEL Token as of the

Petition date is speculative value, correct? A. I agree a hundred percent with that");

Supplemental Galka Declaration ¶ 13.)  And neither expert proffered an opinion on what that speculative value was.  (*See* October 17, 2023 Hr'g Tr. 74:25–75:2 (Faraj) ("Q. You didn't put a price on the speculative value for CEL Token here, did you?  A. No, I didn't."); Supplemental Galka Declaration ¶ 19.)

Admitting Mr. Faraj's testimony would not result in any unfair prejudice to any parties. The Debtors and the Committee had the opportunity to depose Mr. Faraj prior to his live testimony.  (*See generally* Faraj Dep. Tr.)  Any party who wished to cross-examine Mr. Faraj was given the opportunity to do so during the Confirmation Hearing, and many *pro se* parties did so.  Accordingly, Mr. Faraj's live testimony is admitted, and considered to the extent it sheds light on the relevant questions outlined above.

### D.  The CEL Settlement is Approved

The Court, in considering the expert testimony of Mr. Galka and Mr. Faraj, finds that (1) the CEL Token had only speculative value as of the petition date, and (2) a valuation of $0.25 is within (and indeed, likely on the higher end of) the range of reasonableness of that speculative value.  For these reasons, explained in more detail below, the CEL Settlement as embodied in the Plan is **APPROVED**.

#### 1.  CEL had Only Speculative Value as of the Petition Date

The Court finds that the $0.81 Petition Date price was not indicative of CEL's value.  The Debtors have presented ample evidence that the market for CEL was severely dislocated on the Petition Date, and both experts have testified convincingly to that effect.  The market price was untethered from the underlying value, and thus cannot serve as a reliable indicator therefor.

CEL was a utility token.  Its underlying value was based on the utilities it offered on the Celsius Network.  The *price* of CEL at any given time reflected (1) the value it possessed by

virtue of any utility it offered its user, (2) the speculative value that any crypto asset on the blockchain possesses, and (3) the influence of market fluctuations, whether from intentional price manipulation or other forces. Upon the event of the Pause—rendering Account Holders unable to make use of any of CEL's utilities—any *utility value* evaporated. Thus, only *speculative value* remained, buffeted by the chaotic market forces at play.

The speculative value encompassed possibilities that a holder of Celsius may have considered *at the time*: namely, "the prospect of Celsius restarting its business and utilizing the CEL Token in that restarted business," or even a second life as a "memecoin." (Supplemental Galka Declaration ¶ 13.) Galka opines that any estimate thereof would be "pure conjecture" given the "severe" dislocation of the market. (*Id.* ¶¶ 13–14.) He believes that on Petition Date— roughly a month after the Pause Date—CEL was "likely worthless." (*Id.* ¶¶ 13–14, 19.) Faraj concurs on both points. (*See* October 17, 2023 Hr'g Tr. 78:14–17 (Faraj) ("Q. In your view, it's close to impossible to differentiate between organic, legitimate price movements for a digital asset and movements based on manipulation, correct? A. That's correct"); *id.* at 71:3–5 (Faraj) ("Q. As of the petition date, CEL also had no intrinsic value, correct? A. I agree with you.").) Accordingly, the question before the Court is whether $0.25 is a reasonable settlement for any remaining value that CEL possessed on the Petition Date.

## 2. The CEL Settlement is Reasonable

Given that on the Petition Date CEL only possessed speculative value, the Court finds $0.25 to be an eminently reasonable, even generous, settlement.

Two main sources of speculative value were (1) Account Holders' hope that CEL would successfully reorganize and redeploy CEL, restoring its previous utilities, and (2) its value as deployed on other blockchains, as a "memecoin" or otherwise. Neither Galka nor Faraj was

willing to opine on an exact estimate of that value.  (*See* October 17, 2023 Hr'g Tr. 74:25–75:2

(Faraj); Supplemental Galka Declaration ¶ 19.)  No objecting party presented evidence that any

source of speculative value, alone or in conjunction, could even approach, much less exceed,

$0.25.  The post-petition history of the Debtors and of these cases, including the extensive

evidence of fraud allegedly perpetrated by Alex Mashinsky and others (leading to a criminal

indictment of Mashinsky, and SEC, CFTC and FTC enforcement actions against Celsius and

Mashinsky) demonstrates that attempting to place any speculative value on CEL on the Petition

Date is completely unwarranted.  If the Celsius platform could not operate in the future, as in fact

is the case, the CEL Token as a utility token on that platform would have no value.  Under the

Plan overwhelming supported by Celsius creditors, the Celsius platform will not operate again.

Accordingly, the Court finds that the $0.25 valuation of the CEL Token to be eminently fair and

reasonable.

### B.  The Settlement Does Not Violate Section 1129(a) of the Bankruptcy Code

Many creditors objected to the CEL Settlement on the grounds that it violated section

1129(a) of the Bankruptcy Code, the so-called "best interests of the creditors" test.  Section

1129(a) provides that a dissenting creditor of an accepting class must "receive or retain under the

plan on account of such claim or interest property of a value, as of the effective date of the plan,

that is not less than the amount that such holder would so receive or retain if the debtor were

liquidated under chapter 7 of this title on such date."  11 U.S.C. § 1129(a)(7)(A)(ii).  In other

words, such creditor is entitled to *at least* the amount they would receive in liquidation.

A&M's liquidation analysis shows approximate recoveries of 67.0% under the NewCo

Transaction, 61.2% under the Orderly Wind Down ("OWD"), and 47.4% under liquidation.  (*See*

Celsius Ex. 70 at 4.)  Certain dissenting[3] creditors argued that under liquidation, they would be entitled to 47.4% of CEL's Petition Date price of $0.81, for a recovery of approximately $0.38 per CEL Token.  (*See, e.g.*, Objection Letter from Dimitry Kirsanov, ECF Doc. # 3772, at 3.)

This is a mistaken assumption.  Whether under a chapter 11 plan or liquidation, creditors are entitled to their share of the *value* of the Debtors' Estates on the Petition Date.  That remains true even when, as seen here, the value cannot be readily ascertained from the price.

The relevant comparison is thus *not* between 47.4% of $0.81 and 61.2% of $0.25. Rather, the Court must find that 61.2% of $0.25 (the OWD recovery, $0.1530) is greater than 47.4% of the *value of CEL* on the Petition Date.  The Court finds by a preponderance of the evidence that the value on the Petition Date did not exceed $0.25, and the CEL Settlement agrees to value each CEL Token at that amount.  47.4% of $0.25 is $0.1185.  $0.1185 is less than $0.1530.  The best interests test is satisfied.

The Debtors further presented evidence regarding the "break-even point" at which the best interests test would no longer be met.  For the NewCo Transaction, CEL would have to be worth 36 cents, and for the Orderly Wind Down, CEL would have to be worth 34 cents.[4] (*See* Celsius Ex. 70 ¶ 9; *see also* October 4. 2023 Hr'g Tr. 123:7–24 (Campagna).)  This analysis is illustrated in Celsius Exhibit 70:

---

[3]    Some *non*-dissenting creditors raised this objecting, maintaining that they were dissenting creditors who had voted to reject the Plan (*see, e.g.*, ECF Doc. # 3877), despite having accepted the Custody Settlement were thus deemed to accept the Plan. The Court will nevertheless consider the objection.

[4]    Using the recovery percentages set forth in Celsius Ex. 70, to reach the NewCo recovery of $0.1675, CEL would have to be worth $0.3554 ($0.3554*0.474 = $0.1675), which rounds to $0.36 at the nearest cent.  However, to reach the OWD recovery of $0.1530, CEL would have to be worth only $0.3228 ($0.3228*0.612 = $0.1530), which rounds to $0.32 at the nearest cent, not $0.34.  The Court assumes that this is the result of truncating the number of significant figures in the recovery percentages illustrated by Exhibit 70.



(Celsius Ex. 70 at 5.)

Since the Court has found that value of CEL was at or below $0.25 as of the Petition

Date, which is below the "break-even point," the Plan satisfies the best interests test.

### C.  The Court Need Not Decide Whether CEL is a Security

For the avoidance of doubt, the Court needs not make a finding on whether CEL is a

security in order to decide whether the CEL Settlement satisfies the best interests test.  Creditors

overwhelmingly accepted the Plan, and with it, the CEL Settlement.  To those accepting

creditors, the CEL Settlement treatment is consensual.  To the extent that any *dissenting* creditor

has raised the best interests test, the Court has found that the CEL Settlement is reasonable and

satisfies the test without reaching the issue of CEL's status as a security.

Nevertheless, the Confirmation Order preserves the rights of  "any Account Holder that

(1) timely opted out of the Class Claim Settlement and (2) voted to reject the Plan or abstained

from voting on the Plan" to litigate these issues through the Claims allowance process.

(Confirmation Order ¶ 262.)

The Court thus need not make a finding on whether CEL is a security, as that issue is not

before the Court, and is preserved for any claimant who wishes to argue it.

## II.   THE COLLATERAL OWNERSHIP ISSUE

### A.  The Retail Borrower Settlement

Debtors also seek to effectuate, through the Plan, the settlement of the adversary

proceeding brought by the Retail Borrower Ad Hoc Group and participating *pro se* creditors as

well as claims held by Retail Borrowers (the "Retail Borrower Settlement").  (Plan, Art. I.126;

Confirmation Brief ¶ 50(g).)

The Retail Borrower Settlement provides for, among other things, (i) in addition to any

Set Off Treatment as provided for in the Plan, the option for holders of Retail Borrower Deposit

Claims to elect to repay any obligations to Debtors in connection with advances made by

Debtors relating to the Borrow Program prior to the Effective Date in exchange for an equivalent

amount of BTC or ETH and (ii) priority in electing a preference to exchange equity in NewCo

for cryptocurrency to be distributed to holders of claims under the at a 30% discount.  (Plan, Art.

IV.B.7.)

### B.  The Bronge Objection

One of the principal objectors to the treatment of Retail Borrower Deposit Claims under

the Plan is Johan Bronge.  (*See* "Bronge Response," ECF Doc. # 3641, and "Bronge Objection,"

ECF Doc. # 3908.)  Mr. Bronge believes that version seven of the retain Loan Terms and

Conditions ("Version 7," and subsequent Versions, "Version 8" and "Version 9") did not transfer

ownership of his digital assets to the Debtors.  (Bronge Response at 2; *see also* Oct. 16, 2023

19

Hr'g Tr. 48:12–16.)  Mr. Bronge objects to the Plan principally on these grounds.  (*See* Bronge

Response at 2.)

The Debtors do not dispute that Mr. Bronge's $62,000 retail loan made in April 2021 (the

"Bronge Loan") was governed under Version 7.[5]  (Supplemental Brief ¶ 16.)  However, the

Debtors argue that Version 7 unambiguously transferred to the Debtors title of the digital assets

that a Retail Borrower transferred to the Borrow Program as collateral for a retail loan.  (*Id.*)

They cite to the following operative language:

> In consideration for the Loan, you grant Celsius *the right*, subject to applicable law,
> without further notice to you, to hold the Digital Assets provided as Collateral *in
> Celsius' name* or in another name, and *to pledge, re-pledge, hypothecate,
> rehypothecate, sell, lend, or otherwise transfer or use any amount of such Digital
> Assets*, separately or together with other property, *with all attendant rights of
> ownership*, and for any period of time, and without retaining in Celsius' possession
> and/or control a like amount of Digital Assets or any other monies or assets, and to
> use or invest such Digital Assets at Celsius' own risk.

(*Id.*, citing Version 7 at 14, "Consent to Celsius' Use of Your Digital Assets" (emphasis added)
(the "Grant of Ownership Clause").)

Version 5 of the General Terms of Use, which was the operative General Terms of Use at

the time Mr. Bronge agreed to Version 7 and was explicitly incorporated by reference,[6] provides:

> [N]otwithstanding the use of expressions such as "borrow," "loan," and "collateral"
> etc., which are used to reflect terminology adopted in the market for transactions of
> the kind provided for pursuant to the Loan Agreement, *title to the Digital Assets
> shall pass from you to CNL on the basis of an outright sale*, subject to your right to
> request at a later date the delivery of equivalent (but not identical) Digital Assets to
> those sold to CNL.

(*Id.* ¶ 17, citing General Terms of Use, Version 5 at 8, "4. Nature of e-Services – B. Loans.")

This language became more explicit in subsequent versions of the General Terms of Use.

Specifically, Version 8 of the General Terms of Use provides:

---

[5]    Mr. Bronge has four outstanding retail loans as of the Petition Date.  Excluding the Bronge Loan, the other
three are all governed by Version 9.

[6]    *See, e.g.*, Version 7 at 1 ("In addition, our Network Terms and Conditions . . . are incorporated into these
Loan Conditions by reference."); *see also* Docket No. 393, ¶¶ 10, 21; Ex. B-7 at 858.

> In consideration for . . . [Celsius] entering into any Loan agreement . . . you grant Celsius, subject to applicable law and for the duration of the period during which you elect to utilize the Eligible Digital Assets. . . as collateral under the Borrow Service . . . ***all right and title to such Eligible Digital Assets***, including ownership rights.

(*Id*. ¶ 18, citing General Terms of Use, Version 8 at 35, "13. Consent to Celsius' Use of Digital Assets") (emphasis added).)

### C.  The Bronge Objection is Overruled

The Court finds that the contract is clear and unambiguous, and therefore will give effect to the plain meaning of the contract's terms and provisions.  For the avoidance of doubt, with respect to any Account Holder who accepted the Plan and the Retail Borrower Settlement, the issue of their collateral ownership is not before the Court and therefore need not be decided. (*See* Confirmation Order ¶ 269.)  The Court finds that the digital assets pledged as collateral under the Bronge Loan governed under Version 7 were property of the Debtors' Estates. Accordingly, for reasons set forth in more detail below, the Bronge Objection is **OVERRULED**.

The contract clearly and unambiguously transferred ownership title of collateral to Debtors.  (*See* General Terms of Use Version 5, "Consent to Celsius' Use of Your Digital Assets" (including substantially similar language that Account Holders grant Debtors "all attendant rights of ownership" and that Account Holders "may not be able to exercise certain rights of ownership").)  The substantially similar Grant of Ownership Clause in Version 7 provides, in equally unambiguous terms, that Debtors may exercise "all attendant rights" in collateral transferred to Debtors.  (*See* Version 7 at 14, "Consent to Celsius' Use of Your Digital Assets" (emphasis added) (the "Grant of Ownership Clause").)

Mr. Bronge erroneously relies on both Version 7's inclusion of "Your" in the title "Consent to Celsius' Use of Your Digital Assets" and "certain" in the clause "you may not be able to exercise ***certain*** rights of ownership" as evidence that he "still hold ownership title" (sic)

but simply "may not exercise some [as opposed to all] property rights." (Bronge Response at 2.)
Interpreting the phrase "you may not be able to exercise *certain* rights of ownership" as
overriding the grant of ownership rights in the collateral renders the Grant of Ownership Clause
superfluous. The Court has previously recognized in the Earn Opinion that "it is a bedrock
principle of contract interpretation that courts should not adopt an interpretation of a contract that
has the effect of rendering at least one clause superfluous or meaningless, but rather, to the extent
possible, should seek to read contractual provisions in harmony." ("Earn Opinion," ECF Doc. #
1822 at 42.) Accordingly, the Court applies the plain meaning of the Grant of Ownership Clause
to find that ownership of the collateral unambiguously transferred to Debtors.

The additional language in Version 8 and Version 9 pertaining to the transfer of
ownership in collateral is not evidence that the applicable language used in Version 7 is
ambiguous. *See Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995)
(holding that subsequent forms of a franchise agreement that "expressly set forth violation of the
tax laws a reason for default" is not admissible as evidence to show that the previous form,
which only requires compliance with "all applicable laws," is ambiguous). The Grant of
Ownership Clause is substantially consistent across Versions 7, 8, and 9 in granting Debtors all
attendant rights of ownership.

When adding that "Digital Assets posted as Collateral shall be the exclusive property of
Celsius," Version 8 and Version 9 also made specific reference to the section containing the
Grant of Ownership Clause, making clear that the new language was meant to reinforce and
supplement the Grant of Ownership Clause, not replace or otherwise render such clause
ambiguous. (*See* Version 9 at 6, "Collateral" ("[Y]ou grant Celsius your explicit consent to use
such Digital Assets in accordance with Section 20 below.").)

Neither the revised nor additional language in Version 8 and Version 9 are evidence that Version 7 is ambiguous or leads to a different result.  Accordingly, Mr. Bronge's assets transferred to the Borrow Program under Version 7 are property of the Debtors' Estates.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that (1) the CEL Settlement satisfies the best interests test, and (2) Mr. Bronge's collateral pledged under Bronge Loan are assets of the Debtors' Estates.

A separate Order confirming the MODIFIED JOINT CHAPTER 11 PLAN OF CELSIUS NETWORK LLC AND ITS DEBTOR AFFILIATES has been entered.

Dated:    November 9, 2023
          New York, New York

_Martin Glenn_

MARTIN GLENN
Chief United States Bankruptcy Judge