WILLIAM K. HARRINGTON            **Hearing Date: December 21, 2023**
UNITED STATES TRUSTEE, REGION 2      **Hearing Time: 10:00 a.m.**
U.S. Department of Justice              **Related ECF Dkt. Nos. 4050**
Office of the U.S. Trustee
One Bowling Green, Rm. 534
New York, N.Y. 10004
(212) 510-0500
By:     Shara Cornell, Esq.
        Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x   Chapter 11
                                             :
In re                                      :   Case No. 22-10964 (MG)
                                               :
CELSIUS NETWORK LLC, *et al.*,[1]        :   Jointly Administered
                                               :
                                               :
                              Debtors.   :
------------------------------------------------------- x

**TO:   THE HONORABLE MARTIN GLENN,**
          **CHIEF UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 ("United States Trustee"),

hereby submits this objection (the "Objection") to the joint motion (the "Motion") filed on behalf

of Celsius Network, LLC and its Debtor Affiliates (collectively, the "Debtors") and the Official

Committee of Unsecured Creditors (the "Committee") (the Debtors and the Committee together,

the "Movants") for entry of an Order (I) Approving the Implementation of the MiningCo

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450). The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

Transaction and (II) Granting Related Relief [ECF Dkt. No. 4050]. In support of his Objection, the United States Trustee respectfully alleges and avers as follows:

## INTRODUCTION

The Plan (defined below), which was confirmed one month ago, contained a primary transaction, the Fahrenheit Transaction, which was entirely dependent on SEC approval. However, in light of the significant hurdles required to obtain such approval, the Plan also contained a toggle transaction, The BRIC Transaction (defined below), which would focus solely on the Debtors' mining business going forward and would initiate an orderly winddown of the Debtors' remaining assets. Despite having two different paths, each with its own Court approved sponsor – Fahrenheit and The BRIC, respectively – the Movants seek to approve and implement a completely different transaction (the "New Transaction").[2]

The New Transaction involves new parties, requires different capital contributions, and will change recoveries for creditors. The Movants claim that the Plan, which was confirmed less than a month ago, contemplated such a "pivot," in light of the high level of insecurity[3] regarding the SEC's approval of a NewCo. But the New Transaction is not the toggle feature contained in the Plan that was solicited, voted for, and ultimately confirmed. The Plan did contain a toggle feature, complete with a backup bidder that, upon information and belief, is ready and able to facilitate its commitment under the Plan. However, the Debtors and the Committee determined, at

---

[2] During the December 13, 2023 Discovery Conference, the United States Trustee learned for the first time that a new agreement had been made with The BRIC that would modify the Motion and further modify the Plan. The United States Trustee reserves his right to further supplement or amend this Objection to include details of the unknown agreement with The BRIC.

[3] All parties have acknowledged the insecurity regarding the SEC's willingness to allow a NewCo to avoid critical reporting requirements via a waiver. In this case, a waiver was necessary in light of the Debtors' prepetition accounting practices and prepetition fraud. *See, e.g.,* Declaration of Chrisopher Ferraro in Support of Backup Bid (the "Backup Bid Declaration"), ECF Dkt. No. 2984 at ¶ 10; *see also* Oct. 30, 2023 Transcript 81:20-82:5.

a date unknown, that the Debtors would no longer honor such backup commitments, despite having argued strongly for the imposition of a breakup fee of $1.5 million (which has already been paid) and reimbursement of all reasonable fees and expenses[4] (up to $300,000 per month) (which have already been reimbursed on a rolling basis) for the backup bidder on the grounds that it was necessary to "preserve the Debtors optionality to quickly pivot to an Orderly Wind Down without further costs and delay." Backup Bid Declaration, at ¶ 19.

Through the Motion, the Movants seek the New Transaction with US Bitcoin (defined below) on what the Movants have unilaterally deemed to be "favorable changes to the mining management agreement . . . as compared to the backup transactions described in the Plan and Disclosure Statement." Motion at ¶ 2. Thus, by the Movants' own admission, the New Transaction includes "changes." But these changes that the Movants have disclosed deviate so far from any acceptable post-confirmation modification of a plan, that there can be no other choice but to implement re-solicitation and a revote. Absent such, the Court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment.[5] The relief requested, if granted, would be tantamount to confirmation of a plan that is different than the one that was proposed by the Debtors, approved by creditors, and confirmed by this Court. Accordingly, the

---

[4] The original motion seeking approval of the fees and expenses of the Backup Plan Sponsor [ECF Dkt. No. 2774] contemplated a $1.5 million Commitment Fee, a $500,000 per month Expense Reimbursement Monthly Cap, and a $500,000 monthly Consultation Services Fee. The current reduced arrangement [ECF Dkt. No. 2978] was proposed only after the Court denied the original motion.

[5] *See In re Hudson & Manhattan R.R. Co.*, 332 F.Supp. 718, 721 (S.D.N.Y.1971) (court is not provided "with a clean slate upon which it may make alterations inconsistent with the plan itself"); *see also Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206–07, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code ... and the Code provides that it is up to the creditors—not the courts—to accept or reject a reorganization plan").

Motion and the New Transaction must be denied, absent further solicitation, voting, and confirmation of a new plan.

## BACKGROUND

1.      On July 13, 2022 ("Petition Date"), certain of the Debtors filed voluntary petitions for relief in this Court under chapter 11 of the Bankruptcy Code. ECF Dkt. No. 1. On December 7, 2022, Debtors GK8 Ltd., GK8 UK Limited, and GK8 USA LLC each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. By Order, dated July 20, 2023, the estates of Celsius Network Limited and Celsius Network LLC were substantively consolidated. ECF Dkt. No. 3058. Since the Petition Date, the Debtors have continued in possession and operated and managed their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On July 27, 2022, the United States Trustee appointed an official committee of unsecured creditors (the "Committee"). ECF Dkt. No. 241.

*a. The Auction*

3.      On September 29, 2022, the Debtors filed the Sale Motion seeking *inter alia* the authority to sell all or some of the Debtors' unidentified assets. ECF Dkt. No. 929.

4.      On March 1, 2023, the Debtors' filed its Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief (the "Bid Protection Motion"). ECF Doc. No. 2151. The Motion sought bid protections (the "Bid Protections") for the Plan Sponsor and stalking horse bidder, NovaWulf Digital Management, LP ("NovaWulf" or "Stalking Horse").

4

5.      As a condition of the Stalking Horse's entry into the Plan Support Agreement, the

Debtors sought to provide NovaWulf with Bid Protections – a break-up fee of $5 million and an

expense reimbursement of up to a maximum of $15 million (the "Stalking Horse Break-Up Fees").

Bid Protection Motion, p. 6, ¶ 7.

6.    The Stalking Horse Break-Up Fee is payable:

> In the event that the Plan Sponsor Agreement is (x) terminated by the Debtors
> pursuant to (i) Section 12.02(b) **(other than to pursue an Orderly Wind Down)**
> or (ii) pursuant to any other provision of Section 12.02 if, as of the Termination
> Date, the Debtors are in material breach of the Plan Sponsor Agreement or (y)
> terminated by the Plan Sponsor pursuant to Sections 12.01(a) (solely on account of
> a breach of the Plan Sponsor Agreement by the Debtors), 12.01(c) **(unless the
> Debtors provide notice of their intention to pursue an Orderly Wind Down),**
> or 12.01(d) (unless the Plan Sponsor unreasonably withholds consent to a waiver
> or extension of the Milestones) pursuant to the Bid Protections Order, in addition
> to any Fees owed pursuant to Section 13.01, the Debtors shall pay the Plan Sponsor
> an amount equal to $5,000,000, which shall be an administrative expense of the
> Debtors (the "Break Up Fee") and shall be paid on the Termination Date; provided,
> that, notwithstanding the foregoing, in the event that Plan Sponsor Agreement is
> terminated (A) by the Debtors pursuant to Section 12.02(b) to pursue an Orderly
> Wind Down or (B) by the Plan Sponsor upon receiving notice from the Debtors of
> their intention to pursue an Orderly Wind Down, the Debtors shall remain obligated
> to pay the Plan Sponsor the Break-Up Fee **unless an Orderly Wind Down is
> actually consummated within six (6) months of the Termination Date;
> provided, that any sale or disposition of the Mining assets must be
> consummated within eighteen (18) months of the Termination Date**.

Bid Protection Motion at ¶ 26 (emphasis added).

7.      Following the notice of the Stalking Horse and prior to the final bid deadline, the

Debtors received two additional qualified bids from: (1) Fahrenheit, LLC ("Fahrenheit"), whose

equity is owned, directly or indirectly, by Arrington Capital, U.S. Data Mining Group, Inc. (d/b/a

U.S. Bitcoin Corp.) ("US Bitcoin"), Proof Group Capital Management LLC, Steven Kokinos, and

Ravi Kaza; and (2) the Blockchain Recovery Investment Committee ("The BRIC"), which

includes Van Eck Absolute Return Advisers Corporation, Global X Digital, LLC, or an affiliate

5

thereof including GXD Labs LLC, Plutus Lending LLC d/b/a Abra, and Gemini Trust Company, LLC. Notice of Auction, ECF Doc. No. 2519, p. 2 of 5.

8.      An auction was scheduled for April 25, 2023 at 2:00 p.m. EST at the offices of the Debtors' counsel (the "Auction"). *Id*. at p. 3 of 5. The Auction was adjourned from time to time and ultimately concluded on May 24, 2023. ECF Doc. No. 2748, p. 3 of 256. The Auction was apparently conducted in accordance with the Bidding Procedures and Auction Rules. Proceedings in the main room of the Auction were recorded by a court reporter. *Id*. On May 25, 2023, the Debtors, in consultation with the Committee, identified Fahrenheit as the Successful Bidder and The BRIC as the Backup Bidder. ECF Dkt. No 2713.

9.      On May 25, 2023, the Debtors' filed the Notice of Successful Bidder and Backup Bidder [ECF Doc. No. 2713] (the "Notice of Successful and Backup Bidder"), which announced that, pursuant to Sections XII and XIII of the Bid Protections, the Debtors, in consultation with the Committee, selected Fahrenheit as the successful bidder and The BRIC as the backup bidder. *Id*.

10.     On June 7, 2023, the Debtors filed the motion (the "BRIC Motion") requesting entry of an order authorizing and approving certain fees and expenses to the backup plan sponsor, The BRIC. ECF Dkt. No. 2774.

11.     The BRIC Motion *inter alia* requested authority to pay The BRIC an Expense Reimbursement, Commitment Fee, and Consultation Services Fees in addition to all other compensation awarded to The BRIC. Other compensation to be paid to BRIC included a $50 million administration fee, a percentage of any distribution fees, a value creation incentive fee, and an efficiency incentive fee.

6

12.    The Motion further provided that "[i]n consideration for the BRIC's agreement to serve as the Backup Plan Sponsor, the substantial time, effort, and resources the BRIC has expended, and will continue to expend, regarding the Auction and Backup Transactions, and in exchange for the Consultation Services, the Debtors agreed to provide the BRIC the Fees." *Id*. at ¶ 31.

13.    The United States Trustee filed his objection (the "UST BRIC Objection") to the BRIC Motion on June 21, 2023, which objection *inter alia* argued that the extraordinary relief sought in court approval of the BRIC Fees for a backup bidder was not acceptable. ECF Dkt. No. 2847.

14.    In response to the UST BRIC Objection and the Court's rejection of the BRIC Motion, the Debtors filed an amended motion requesting amended fees for The BRIC. ECF Dkt. No. 2978. The Debtors amended the request to include a $1.5 million breakup fee, a capped monthly reimbursement for expenses of up to $300,000, and removed the ongoing consulting fees.

15.    On July 20, 2023, the Court entered the order authorizing and approving the expense reimbursement of $1.5 million and a monthly expense reimbursement of up to $300,000 to The BRIC. ECF Dkt. No. 3057.

*b.  The Plan and Disclosure Statement*

16.    On July 29, 2023, the Debtors filed the Revised Disclosure Statement (the "Disclosure Statement"). ECF Dkt. No. 3117. The Disclosure Statement was approved on August 17, 2023. ECF Dkt. No. 3337. On September 27, 2023, the Debtors filed their Amended Plan/Revised Joint Chapter 11 Plan of Reorganization (the "Plan"). ECF Dkt. No. 3577.  On

November 9, 2023, after a multi-day confirmation trial (the "Confirmation Hearing"), the Court
entered the order confirming the Plan (the "Confirmation Order"). ECF Dkt. No. 3972.

17.     The Plan provided for two alternative paths to emergence from bankruptcy. The
primary path contemplated a Fahrenheit led NewCo Transaction where the Debtors would
distribute the liquid crypto held by the Debtors to account holders. Fahrenheit would manage and
monetize the Debtors' other assets, which included the Debtors' mining operations. Fahrenheit
would also stake its own Ethereum with NewCo.

18.     The Fahrenheit Transaction included $450 million of liquid crypto currency (valued
as of the effective date of the Plan) to be transferred from the Debtors to NewCo and/or its
subsidiaries. Plan, Article I, § A.165.[6] The Fahrenheit Transaction also included an initial funding
of $39,500,000 by US Bitcoin to fund the buildout and energization of mining facilities. Plan,
Article I, § A.161. Fahrenheit would also be obligated to fund $50 million as its "Plan Sponsor
Contribution." Plan, Article I, § A.185.

19.     Because the Debtors did not have enough liquid crypto to pay its creditors under
the Plan, the remaining amount owed to creditors would be paid in common stock of NewCo. To
that end, NewCo was intended to be a publicly traded NASDAQ company. Among the conditions
precedent to the Plan going effective was the successful completion of the SEC review process for
a registration statement on Form 10[7] for NewCo.

20.     Allegedly, on November 9, 2023, the same date the Court entered the order
confirming the Plan, the SEC notified the Debtors for the first time that it would require historical

---

[6] Citations to the Plan are from ECF Dkt. No. 3972.

[7] To file a registration statement on Form 10, a company must submit audited financial statements for the requisite
time periods for itself and/or a "predecessor entity."

financial statements for all of the Debtors' assets to be included in any NewCo. Motion at ¶ 22. However, the Debtors maintain that they are not able to produce such financial statements as a result of its prepetition activities. *Id.*

21.    "To provide the Debtors with flexibility in the face of regulatory uncertainty and to guard against material delays in returning Liquid Cryptocurrency to Account Holders," the Plan also provided for a pivot if such regulatory approval could not be obtained. Motion at ¶ 23. This pivot provided that the backup sponsor, The BRIC, would manage the Debtors' mining assets and would initiate an orderly winddown of all remaining assets. The BRIC would also serve as plan administrator for illiquid assets. Notice of Amended and Restated Backup Plan Sponsor Agreement and Deadline to Submit Backup Bids (the "Backup Bid Term Sheet"). ECF Dkt. No. 2983. In exchange for these services, The BRIC would receive fees for general administration, initial distribution, and percentage fees based on subsequent distributions as well as incentives for future performance. The BRIC Transaction would provide for $50 million capitalization.[8] Disclosure Statement, pg. 28 of 830.

22.    The Backup Bid Term Sheet also provided that:

- An oversight committee of seven members would be appointed five initial members of which shall be selected by the Committee and two initial members of which shall be appointed by the BRIC. Each member of the Oversight Committee shall be compensated on an annual basis in an amount to be agreed upon with the Debtors and the Committee, in consultation with the BRIC. *Id.* at pgs. 51 of 52.

- An expense reimbursement would be provided of up to $300,000 per month in the aggregate. § 13.01.

- A breakup fee of $1.5 million would be paid as an administrative expense. § 13.02.

---

[8] The comparative chart contained in the Disclosure Statement provides that between the Fahrenheit Transaction, The BRIC Transaction, and a chapter 7 liquidation, the only mining business capitalization would be under The BRIC Transaction. This included a $50 million contribution. However, the chart is silent as to the source of this contribution. *See* Disclosure Statement, pg. 28 of 830.

9

- The term of the agreement would be for five years, with an option to renew. *Id*. at pg. 48 of 52.

- The role of The BRIC as backup plan administrator included the following services:

  o manage the Wind Down Estate's day-to-day business and operations, including managing its liquidity and capital resources;

  o evaluate, manage, negotiate, and oversee the disposition of all or any part of the property or assets of the Wind Down Estate; and

  o perform any other services for and on behalf of Wind Down Estate to the extent necessary or appropriate.

  *Id*. at pg. 49 of 52.

- The BRIC would receive a $46 million administration fee, a $12 million flat fee for the initial distribution, plus a percentage of distribution fees. Additional fees for value creation as well as discretionary management bonuses were also included. *Id*. at pg. 50 of 52.

23.     In support of the fees to paid to The BRIC, the Debtors stated:

The Debtors maintained that payment of the[sic] BRIC Fees constitutes a sound exercise of the Debtors' business judgment that **would ensure that the Debtors could quickly and seamlessly pivot to the Backup Plan Sponsor Transaction** . . .

Disclosure Statement, pg. 250 of 830 (emphasis added).

24.     The Disclosure Statement notified creditors that a vote to accept the Plan would be a vote "to accept both the NewCo Transaction and the Orderly Wind Down." Disclosure Statement Art. III.I and III.HHH.

25.     The Plan also provided that,

NewCo is hereby authorized to issue, or cause to be issued, and shall issue the Employee and NewCo Board Equity Compensation on or as soon as reasonably practicable following the Effective Date and thereafter, in accordance with the terms of the Plan without the need for any further corporate action.

10

Confirmation Order at ¶ 364. NewCo Board Equity Compensation is defined by the Plan as

> NewCo Common Stock (or warrants or similar interests) in an amount not to exceed an aggregate total of one and one half (1.5%) percent of the sum of: (i) all outstanding shares of NewCo Common Stock issued on the Effective Date plus (ii) any NewCo Common Stock anticipated to be issued pursuant to reserves and holdbacks under this Plan following the Effective Date (but in all cases excluding any shares of NewCo Common Stock issued or anticipated to be issued to the Plan Sponsor if the Plan Sponsor Contribution takes the form of a primary equity purchase). The Employee and NewCo Board Equity Compensation may be issued to members of management and employees of NewCo (other than the NewCo Management Team, which for the avoidance of doubt may be compensated from the Management Equity Compensation) and to persons serving on the New Board.

Plan, Article I, § A.105.

26.     The Disclosure Statement further provided that,

> Pursuant to the Plan, 100 percent of the NewCo Common Stock representing all of NewCo's common equity will be distributed to eligible Holders of Claims as part of their recoveries under the Plan (subject to dilution by the Management Equity Compensation and the Employee and NewCo Board Equity Compensation provided and any stock purchased by the Plan Sponsor for cash through a primary purchase).

Disclosure Statement, pg. 66 of 830.

c.  *The New Transaction*

27.     At an unknown date for unknown reasons during an unknown time period using unknown marketing techniques, the Movants resolicited bids for the Debtors' assets and specifically a new mining company ("MiningCo"). *See* Motion at ¶ 25 ("The Debtors and the Committee, therefore, determined to conduct a quick market check and to explore the viability of the other bidders that had previously participated in the process for a mining-only transaction, including the[*sic*] BRIC and one other bidder.").

28.     It was at this time that the Movants determined that The BRIC's prior proposal was "obsolete and not executable." *Id*. at ¶ 35.

11

29.    On November 30, 2023, the Debtors filed the Motion. The Motion *inter alia* provides:

- US Bitcoin will serve as manager of MiningCo with Joel Block as Chief Financial Officer. *Id*. at ¶ 38.

- MiningCo will be capitalized with $225 million of fiat. *Id.* at ¶ 40.

- Mr. Ferraro will serve as plan administrator. Motion at ¶ 29. Under the Plan, the appointed plan administrator is accompanied by a monthly fee of $200,000 for three months and $100,000 thereafter, as well as a $1 million substantial completion bonus. *Id.*

- The cash portion of the Mining Management Fee will be $20,376,200 annually. *Id.* at ¶ 9.

- The board of the proposed NewCo will consist of eight representatives. The Committee is entitled to select six of those members and US Bitcoin will select the remaining two – one of which will be Asher Genoot. *Id*. at ¶ 9. The Motion does not state what compensation the board will receive.

- The Management Agreement will be a four-year term. *Id*. at pg. 42 of 54.

-  The Restricted Stock Purchase Agreement will provide for (i) US Bitcoin's purchase of NewCo equity, as well as (ii) annual issuance of incentive equity of 31.89% of the 1.00% of NewCo equity originally to be issued to Fahrenheit. *Id*. at pg. 44 of 54.

- US Bitcoin will receive 31.89% of the incentive units previously allocated to Fahrenheit each year of the term of the Management Agreement. *Id*. at pg. 45 of 54.

- The Debtors anticipate a winddown budget of $75 million. *Id*. at ¶ 43.

30.    The Motion also gives MiningCo (a/k/a US Bitcoin) the ability to forgo the pursuit of becoming a public company. MiningCo has until May 1, 2024 to make that determination. If MiningCo terminates pursuant to its Form 10 Termination Right, US Bitcoin shall receive, as liquidated damages, one year of the cash portion of the Mining Management Fee (defined by the Motion), and one year worth of incentive equity and warrants which shall immediately accelerate

12

and vest, plus any accrued and unpaid amounts as of the date of the notice of termination.[9] Motion at pg. 43 of 54 and ¶ 50.m.

## ARGUMENT

A. **Section 1127(b) of the Bankruptcy Code Prohibits Plan Modifications that Materially Alters the Plan and Adversely Affects a Claimant's Treatment.**

Section 1127 of the Bankruptcy Code is the sole basis for modifying a chapter 11 plan that already has been confirmed but has not been substantially consummated. 11 U.S.C. § 1127(b); *see, e.g., In re Doral Center, Inc. v. Ionosphere Clubs (In re Ionosphere Clubs)*, 208 B.R. 812, 816 (S.D.N.Y. 1997); *Rickel &Assoc., Inc.*, 260 B.R. 673, 677 (Bankr. S.D.N.Y. 2001). Courts may not modify a plan under section 105 of the Bankruptcy Code, because that would produce a result at odds with the specific provisions of section 1127 of the Bankruptcy Code. *See Rickel*, 260 B.R. at 678.

Section 1127(b) provides in relevant part "[t]he proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan ..." 11 U.S.C. § 1127(b). Modification of a confirmed plan is permitted if: (a) it is done by a "proponent of a plan or the reorganized debtor," (b) it occurs before "substantial consummation" of the plan; (c) the plan as modified meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; (d) the proponent complies with section 1125; (e) circumstances warrant such modification; and (f) the court, after notice and a hearing, confirms the modified plan under section 1129 of the Bankruptcy Code.

---

[9] No similar right to terminate was provided in The BRIC Transaction.

13

The requirements of section 1127 of the Bankruptcy Code apply not only to amendments to a plan itself, but also to amendments to plan-related documents. *See, e.g., Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.)*, 982 F.2d 721, 748 (2d Cir. 1992) (stating that statutory limitations on modifying a substantially consummated plan cannot be circumvented by modifying a plan-related document); *Ionosphere Clubs*, 208 B.R. at 816; *Rickel & Assoc.*, 260 B.R. at 677.

Section 1127(b) reinforces the principle of finality by preserving the rights bought and paid for under the plan. *Rickel & Assoc.*, 260 B.R. at 676; *see also Resolution Trust Corp. v. Best Prods. Co., Inc. (In re Best Prods. Co., Inc.)*, 177 B.R. 791, 802 (S.D.N.Y. 1995) ("The Court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment."). Moreover, "[t]he equity power of 11 U.S.C. ¶ [sic]105(a) cannot be used to produce a result contrary to the specific provisions of 11 U.S.C. ¶ [sic]1127(b)." *In re Ionosphere Clubs*, 208 B.R. 812, 817 (S.D.N.Y. 1997), citing LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 1127.04 (15th ed.); *Rickel & Assocs.*, 260 B.R. at 678 (holding that objections prevented plan from being modified to provide distributions to equity where plan had extinguished equity holders' interests, despite fact that unexpected solvency of the Debtors might have permitted such distributions).

Modification is not defined in section 1127 of the Bankruptcy Code. *See, e.g., State Government Creditors' Committee For Property Damage Claims v. McKay (In re Johns-Manville Corp.) ("Johns-Manville I")*, 920 F.2d 121, 128 (2d Cir. 1990); *Cohen v. Tic Fin. Sys. (In re Ampace Corp.)*, 279 B.R. 145 (Bankr. D. Del. 2002). In the absence of a definition, courts have focused on the distinction between a "modification" and a "clarification" of a plan. If the change is simply a clarification, then the requirements of section 1127 of the Bankruptcy Code do not

apply. If the change is a modification, however, then the requirements of section 1127 must be met. *See, e.g., SCH Corp. v. CFI Class Action Claimant*s, 597 Fed. Appx. 143 (3d Cir. 2015) (reversing bankruptcy court's approval of a settlement after finding that the agreement was really a proposed modification of a confirmed plan); *In re Oakhurst Lodge, Inc*., 582 B.R. 784, 65 Bankr. Ct. Dec. (CRR) 130 (Bankr. E.D. Cal. 2018) ("A settlement that 'alters the legal relationships among the debtor and its creditors' under the confirmed plan constitutes a plan modification."); *Matter of Highland Capital Management, L.P.*, 57 F.4th 494, 503 (5th Cir. 2023) (holding that only something that "alters the parties' rights, obligations, and expectations" constitutes a plan modification).

When a modification materially and adversely effects claimants, they are entitled to a new disclosure statement and another opportunity to vote. *In re Sentinel Management Group, Inc*., 398 B.R. 281 (Bankr. N.D. Ill. 2008); *In re American Solar King Corp*., 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988) (citing S.Rep. No. 989, 95th Cong, 2d Sess. 124 (1978), U.S. Code Cong. & Admin. News 1978, p. 5910) (If a "modification materially and adversely affects any of [the voting parties'] interests, they must be afforded an opportunity to change their vote"). *In re Am.-CV Station Grp., Inc*., 56 F.4th 1302, 1305 (11th Cir. 2023) (holding that debtor must provide a new disclosure statement and call for another round of voting if "after a hearing, the bankruptcy court finds that the modification 'materially and adversely changes the way that claim or interest holder is treated").

The Second Circuit has delineated between "procedural modifications," which may be permitted to the extent the Bankruptcy Court's authority to order such procedural modifications is reserved by the plan and such modification does not impact the "substantive rights" of claimants.

15

*See, e.g., Johns-Manville I*, 920 F.2d 121, 128 (2d Cir. 1990)[10] (finding that because the proposed modification was sought pre-consummation and the class members' substantive rights would not be altered, it was permissible); *Findly v. Blinken (In re Johns-Manville Corp.)* ("*Johns-Manville II*"), 982 F.2d 721 (2d Cir. 1992) (holding, in part, that plan modification violated section 1127(b) would modify the rights of health claimants under the confirmed plan by changing the rights as to amounts recoverable and as to timing and rate of payments); *In re Ionosphere Clubs, Inc.*, 208 B.R. at 816 (reversing court's approval of settlement that would modify plan to give debtor additional time to assume or reject lease because permitting parties "to modify a provision that explicitly was incorporated into a reorganization plan ... would permit circumvention of the bankruptcy process").

A modified plan must still comply with the Code's substantive requirements for any reorganization plan. 11 U.S.C. § 1127(a). This means that the modification must comply with § 1122's restrictions on the classification of claims and interests and § 1123's requirements for the contents of a reorganization plan. *Id*. An important substantive requirement for this Objection is found in § 1123(a)(4). Unless the disfavored class members consent,[11] the modified plan must

---

[10] The Court of Appeals held that a temporary suspension of the operation of a trust established to resolve asbestos-related property damage claims was not an impermissible modification. In that case, prior to consummation of the confirmed plan, the trustees anticipated a possible "drought" period during which the trust would incur $35.25 million in administrative expenses but would lack the wherewithal to pay claims. The trustees therefore applied to the Bankruptcy Court for an order permitting them to suspend the operations of the trust. The Court of Appeals noted that the language of the confirmed plan contemplated amendments of the trust post-consummation and held that to do so would not negatively impact any party's substantive rights.

[11] By the plain language of the Plan, the Ad Hoc Group of Borrowers' treatment will change upon imposition of a winddown where the value of stock changes:

> In the event that the Debtors pursue the Orderly Wind Down, each Holder of an Allowed Retail Borrower Post-Set Off Claim shall receive its Pro Rata share of (a) the Liquid Cryptocurrency Distribution Amount, (b) the Backup MiningCo Common Stock, (c) Litigation Proceeds, and (d) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.

Plan, Article III, B.2.b.ii.

"provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4). There are also procedural constraints. A modification must comply with § 1125's requirement that claim and interest holders be given "adequate information" about the contents of a plan. 11 U.S.C. § 1127(c).

Moreover, the requirements of section 1127 apply even where, as the Movants assert is the case here, the plan documents in question expressly contemplate the possibility of amendments. *Ionosphere Clubs, Inc.*, 208 B.R. at 816 ("The fact that the lease in this case ... contemplated consensual modifications by the parties is of no consequence, as the surrender of the right of first refusal was an integral part of the reorganization plan and confirmation order.").

## B. **The Plan Cannot be Amended by Motion to "Pivot" to the New Transaction**

### 1. **The New Transaction is Not the Pivot Proposed Under the Plan.**

The New Transaction is a material and substantial modification of the Plan as it changes the legal relationships between and among Debtors, unsecured creditors, and any new company – now deemed MiningCo. Because of this, the New Transaction is a modification to the Plan. *See, e.g., Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d at 748; *Ionosphere Clubs*, 208 B.R. at 816. Moreover, the Debtors have provided no evidence, other than declarations from potentially problematic declarants,[12] that the New Transaction meets the standards set forth under 11 U.S.C § 1127.

---

[12] Under the New Transaction, Christopher Ferraro will serve as Plan Administrator, a role he was not given under The BRIC Transaction. Motion at ¶ 29. The Plan Administrator role is accompanied by a monthly fee of $200,000 for three months and $100,000 thereafter, as well as a $1 million substantial completion bonus. *Id*. Alvarez & Marsal, the Debtors' investment bankers, also have an incentive to support the New Transaction as it is possible that the firm will serve as a professional for Mr. Ferraro. Under the Plan, if the pivot to The BRIC transaction occurred, The BRIC would manage both the mining company as well as it would serve as the Plan Administrator. M3 Advisory Partners, LP ("M3") serves the Committee as its financial advisors, but also has a disclosed preexisting relationship with US Bitcoin.

i.    <u>The New Transaction Changes the Mining Manager.</u>

Under the New Transaction, the Debtors' post-bankruptcy business will be limited to only the mining business and will be managed by US Bitcoin, not The BRIC. US Bitcoin was previously part of the broader consortium that made up the Fahrenheit Transaction. Under the Plan, if the Debtors were to pivot from the Fahrenheit Transaction, the Debtors would transition to a mining only business which would be managed by The BRIC. The BRIC, which has no affiliation with Fahrenheit or the Fahrenheit consortium, entered these bankruptcy cases as an official backup bidder at the conclusion of over a month-long auction. At such time, the Debtors adamantly requested expense reimbursements, breakup fees, and ongoing consulting fees for The BRIC.[13] Ultimately, the Court approved, over the United States Trustee's objection, the requested expense reimbursement of up to $300,000 per month and a breakup fee of $1.5 million. As of the date of filing this Motion, The BRIC has received $1.5 million[14] attributable to its breakup fee and reimbursement[15] for its expenses.[16] All fees paid, due, and owing to The BRIC should be identified by the Movants before any adjudication of the New Transaction.

Up until the November 30, 2023 Hearing, the Debtors vehemently and publicly supported a pivot to The BRIC Transaction. For example, during closing arguments at the Confirmation

---

[13] During the Confirmation Hearing, the Debtors also argued strongly for the imposition of broad exculpation for The BRIC, despite the United States Trustee's objections.

[14] The Debtors' July 2023 bank statements indicate that the $1.5 million breakup fee has already been paid. The July 2023 bank statement for the account ending in *8569 is attached as **Exhibit A**.

[15] For example, counsel to the BRIC received $981,214.14 on July 21, 2023 on account of an expense reimbursement. *See* Ex. A.

[16] These fees and expenses are in addition to the fees and expenses payable to or on behalf of NovaWulf, the original stalking horse bidder. For example, NovaWulf received $1,092,738.58 on July 18, 2023 and its counsel received $2,933,515.44 on July 18, 2023, both for expense reimbursements. *See* Ex. A.

Hearing, the Debtors in response to the United States Trustee's arguments against providing broad exculpation to The BRIC under the Plan, stated "The Bric [*sic*] participated in these cases in a variety of different ways, from the auction to the backup plan itself, to preparing to go forward with the backup 11 plan." Oct. 30 Hearing Transcript, 145:8-11. During the October 3, 2023 Hearing, Mr. Ferraro stated explicitly he "meet[s] with the BRIC weekly, with the special Committee, to make sure that they're up to speed on any sort of pivot. They were critical to the success of this plan and play a unique role as a backup sponsor." October 3, 2023 Hearing Transcript at 36:14-17. Accordingly, until November 30, 2023, not only was there no indication from the Debtors that there were any issues with The BRIC as back-up bidder, but the Debtors affirmatively stated to the Court that The BRIC was actively involved in these cases and deserved both its fees and expenses as well as broad exculpation under the Plan. Despite these affirmations by the Debtors, the Motion seeks to implement the New Transaction that does not involve The BRIC.

      ii.    <u>The New Transaction Alters Substantive Rights of Creditors.</u>

In contrast to *Johns-Manville I*, the New Transaction would have the effect of altering the substantive rights of all of the Debtors' creditors. And just as in *Johns-Manville II*, the New Transaction will change the rights of creditors as it will change the amounts and type of funds recoverable, which will also likely impact timing and rate of payments. Indeed, the Debtors admit that the distributions to creditors will be so different that they are "strongly considering whether and how to send new notices out to people that would allow them to make [a new] election for this transaction as well. We'd have to *void out* the old elections; that was for a different transaction structure." Nov. 30, 2023 Hearing Transcript, 25:23-26:2.

19

The Plan's current distribution structure required a very technical mechanism for determining what percentage of and what type of account holders would receive crypto assets versus stock in the proposed public NewCo. Under the voting structure for the Plan, creditors were permitted to opt into a crypto distribution or equity distribution, to be weighted accordingly to a mathematical formula also approved under the Plan.

Whether or not a company is public, would inherently impact the valuation of stock, and therefore, would impact the nuanced distribution of crypto assets versus stock. But the New Transaction does not provide finality regarding valuation of the stock/equity to be distributed. The New Transaction provides that US Bitcoin may terminate the proposed transaction at any time prior to and including May 1, 2024. Motion, pg. 45 of 54. If this does happen, the proposed equity shares, that would have to be reallocated under the New Transaction could have many different valuations. This clearly materially alters the Plan and the distributions thereunder. A similar further "pivot" was not identified by The BRIC Transaction. Creditors must be provided additional information in the form of a disclosure statement and an opportunity to vote on these critical issues.

    iii.    <u>The Proposed Funding Under the New Transaction is Dramatically Different Than Proposed Under the Plan.</u>

Additionally, the Motion makes it difficult to assess the varying degrees of contributions and from what parties it is derived. The Disclosure Statement, the Plan, The BRIC Term Sheet, the various declarations, and the Motion, all use different comparative charts and, in some instances, different terminology, making comparison difficult. For example, the Disclosure Statement includes a chart that provides for a $50 million mining capitalization only for The BRIC Transaction, but this figure is not included in the charts attached to the Motion or the declarations in support thereof. Where this $50 million would be derived is also unclear from the documents,

although upon information and belief, it is made up of estate funds. The Plan provides for a $39,5000 initial funding by US Bitcoin to buildout and energize mining facilities, but this number is not found on the comparative charts attached to the Motion, so the assumption is that this funding is no longer applicable. Information regarding US Bitcoin's funding contributions under the New Transaction must be disclosed.

The Fahrenheit Transaction included a $450 million contribution from the Debtors in "liquid crypto currency." The Motion refers to a $225 million in fiat contribution from the Debtors. There is no explanation as to how or when the Debtors converted $225 million worth of crypto to cash, where such cash has been held (it is not accounted for in the monthly operating reports), what impact timing will have on this liquidation, or why the Debtors pivoted to a fiat contribution as opposed to a crypto currency contribution. The BRIC Transaction, on the other hand, did not identify funding the mining facility over and above the initial $50 million contribution. If customer crypto is going to be used to fund the mining facilities under the New Transaction, creditors should be given an opportunity to vote on whether or not they want to have crypto reinvested versus having it immediately distributed.

    iv.    <u>The New Transaction Is Missing Critical Details That Would Be Required by An Amended Disclosure Statement.</u>

It is clear that Movants are not only controlling the narrative but are also controlling which details of which transaction they want to highlight in each document. Even assuming *arguendo* that the Debtors have provided any evidence (which they have not) in support of modifying the Plan via Motion instead of by a new plan, it is difficult to assess the actual substance of the varying deals. For example, while the Motion states that the board of the proposed MiningCo will consist of eight representatives, six of whom are chosen by the Committee and two of whom are

Committee members, it does not disclose what compensation these members will receive. Motion at ¶ 9. This issue is important, as the current Disclosure Statement expressly provides that the stock to be issued as part of creditor distribution will be diluted by the NewCo compensation of equity shares. Disclosure Statement, pg. 66 of 830. A new disclosure statement could provide clarification and details to these critical open-ended questions. The Movants should be required to be transparent as to each detail that will be changed in each of the transactions in order to allow interested parties and the Court to assess the substantial changes contained in the New Transaction.

For all of these reasons, the proposed New Transaction via Motion should be denied.

## CONCLUSION

**WHEREFORE,** the United States Trustee respectfully requests the United States Trustee's Objection be sustained and grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      December 14, 2023

Respectfully submitted,

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: */s/ Shara Cornell*

Shara Cornell, Esq.
Trial Attorney
Alexander Hamilton Custom House
One Bowling Green
New York, New York 10004
Shara.Cornell@usdoj.gov
