**Hearing Date: December 21, 2023**
**Hearing Time: 10:00 a.m.**

David J. Adler
Lisa S. Bonsall
McCARTER & ENGLISH, LLP
825 8th Avenue
Worldwide Plaza
New York, New York 10019
Telephone: (212) 609-6847
Facsimile: (212) 609-6921
E-mail:dadler@mccarter.com
*Attorneys for Ad Hoc Group of Borrowers*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.,*[1] | Case No. 22-10964 (MG) |
| Debtors. | Jointly Administered |

**PRELIMINARY OPPOSITION OF THE AD HOC GROUP OF BORROWERS
TO THE JOINT MOTION OF THE DEBTORS AND THE COMMITTEE FOR ENTRY
OF AN ORDER (I) APPROVING THE IMPLEMENTATION OF THE MININGCO
TRANSACTION AND (II) GRANTING RELATED RELIEF (ECF DOC. #4050)**

The Ad Hoc Group of Borrowers (the "**Ad Hoc Group**"),[2] by and through its attorneys,

McCarter & English, LLP, hereby files this Preliminary Opposition ("**Opposition**")[3] to the Joint

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); and Celsius US Holding LLC (7956). The location of Debtor Celsius Network LLC's principal place of business is 121 River Street, PH05, Hoboken, New Jersey 07030.

[2] The members of the Ad Hoc Group (collectively, the "**Borrowers**") are set forth in certain statements (the "**Rule 2019 Statements**") filed by McCarter & English, LLP (the "**McCarter Firm**") from time to time pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). On or about January 23, 2023, the McCarter Firm filed the *First Supplemental Verified Statement Pursuant to Bankruptcy Rule 2019* [ECF Doc. # 1920], which is the most recent Rule 2019 Statement identifying the members of the Ad Hoc Group. Additional members continue to join the Ad Hoc Group on an ongoing basis, and the McCarter Firm will file additional Rule 2019 Statements as necessary to comply with Bankruptcy Rule 2019.

[3] The Debtors have advised that they will be filing a new wind down proposal which includes BRIC. The Borrowers reserve all rights to object to the yet-to-be filed proposal.

Motion of the Debtors and the Committee for Entry of An Order (I) Approving the Implementation

of the MiningCo Transaction and (II) Granting Related Relief (the "**Joint Motion**"; ECF Doc.

#4050) and respectfully states as follows:

## PRELIMINARY STATEMENT

The Joint Motion fails to inform the Court – or the creditors – of the significant material

changes in the proposed "MiningCo Transaction" (the "**Mining Co. Transaction**" or the "**New**

**OWD Plan**") compared to the Orderly Wind Down Plan [4] described in the Disclosure Statement

(the "**Original OWD Plan**").  Not once in the Joint Motion do the Debtors or the Official

Committee of Unsecured Creditors (the "**Movants**") mention that their new proposed transaction

more than trebles the capitalization of MiningCo. from the $50 Million identified in the

Disclosure Statement to $225 Million.  This additional capital comes from the diversion of $175

Million in Liquid Cryptocurrency, without any suggestion anywhere in the Disclosure Statement

that this was something that could or would be done in the event of an Orderly Wind Down. To

the contrary: the Disclosure Statement presents the Orderly Wind Down as an alternative to a fire

sale liquidation of assets, a wind down that will maximize the return of cryptocurrency to the

creditors of the estate.  Disclosure Statement, p. 127.  It was not presented to creditors as a

revised NewCo transaction with the primary purpose of operating a business.  Disclosure

Statement, p. 256 ("Further, the Orderly Wind Down does not include any go-forward business,

thus terminating any potential for future upside."). Yet if the additional $175 Million they seek to

use as capital were made available for distribution, creditors would receive an additional 4% in

Liquid Cryptocurrency.[5]  For the Borrowers in particular, many of whom will be refinancing

their loans with third-parties, this reduction in Liquid Cryptocurrency is material and will likely

---

[4] Capitalized terms not defined herein shall have such meanings ascribed to such terms in the Joint Motion.
[5] *See infra* ¶ 19.

negatively impact their ability to obtain refinancing.  The changes that Movants seek to

unilaterally impose as approved within their discretion as fiduciaries were never discussed or

disclosed and were not what creditors voted on.

In short, the Debtors should be required to move forward with the Original OWD Plan

(with the $50MM capitalization described in the Disclosure Statement); or, if they want to move

forward with the New OWD Plan (with $225 MM capitalization) they should provide additional

disclosure and resolicitation.

The Joint Motion should be denied for three reasons.

First, the changes it proposes, and in particular the trebling of capital, are material,

undisclosed, and unanticipated modifications to a confirmed Plan.  While the Movants seek

approval of their amendments under the guise of "implementation" under Section 105 of the

Bankruptcy Code, proposals that divert estate assets and change the distribution mix are in

actuality "modifications" of the Plan under Section 1127.  The Movants take the position that the

New OWD Plan is better because it projects an increased Liquid Cryptocurrency Distribution of

51% (compared to the 44% Liquid Cryptocurrency under the Original OWD Plan), but this

increase is a function of the market increase in the value of the asset, not because of anything

they did or propose.  The Debtors should not be permitted to use the increase in cryptocurrency

value as an excuse to divert funds to an investment project when this was never discussed or

disclosed to creditors.

Second, the Movants have made no effort to comply with Section 1127(b) or (c)  in terms

of disclosure.  While they enthusiastically assert "[the SEC] guidance paves the way for the

Debtors' bitcoin mining operations to emerge as a new, publicly traded company owned by the

Debtors' Account Holders (subject to successful completion of an SEC review process of a

completed Form 10)," they have provided nothing to show that there is any likelihood of MiningCo being approved as a public company. Joint Motion, pp 2-3. Nonetheless the package presented to creditors in the Joint Motion justifies the changes requested and the huge creditor investment in MiningCo based on future prospects of a publicly traded company. Worse, there is literally no discussion of future risks. This is particularly troubling in light of the SEC's recent refusal to approve NewCo as a public company on grounds never discussed or disclosed in the Disclosure Statement. If the Movants want to triple the previously disclosed funding for the mining company in an Orderly Wind Down, they should be required to provide full and fair disclosure to creditors.

Third, the estate fiduciaries assert that approval of the New OWD Plan will allow an Effective Date in early January. This timeframe conveniently ignores many items that need to be addressed. The manner in which the Debtors seek to establish the Disputed and Contingent Claims Reserve, without any disclosure to impacted creditors, raises serious questions of due process. The Debtors have not indicated which claims are being estimated, how the estimates were established and apparently seek to establish these reserves without providing any notice to affected claimants. This case has been pending for over a year and a half and, given the number of professionals and the millions of dollar spent, there is simply no excuse for seeking to by-pass all protections in the Bankruptcy Code to limit creditor claim distributions to undisclosed, unexplained reserves. It is time for the bankruptcy to conclude but process should not be completely disregarded in the interest of speed. *See In the Matter of Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966)("[t]he conduct of bankruptcy proceedings not only should be right but must seem right").

Finally, the proposed changes materially modify a confirmed plan that is currently on appeal. The Debtors' public statements acknowledge they are requesting plan amendments, and the order requested expressly modifies the confirmation order. The court lacks jurisdiction to make such wholesale revisions to an order currently on appeal.

There is a clear answer to the dilemma created by the Motion: implement the Original OWD Plan. The last minute, undisclosed plan revisions provide millions to the co-chairs of the Committee that should be made to creditors under the Plan. The estate fiduciaries should be bound by the Plan they proposed and confirmed. The Movants should either implement the Original OWD Plan or, if the New OWD Plan really is for the benefit of the estate's creditors, Movants should properly and fairly present their proposed changes with full and fair amended disclosures that allow creditors to make their own decisions as to whether they want this new plan.

## **BACKGROUND**

1.      As the Court is aware, the Ad Hoc Group of Borrowers consists of certain Retail Borrower customers of the Debtors who used their cryptocurrency as collateral in exchange for a fiat loan from the Debtors. Under the loan program, borrowers were required to make interest payments on their loans (and were not entitled to earn interest or rewards on their cryptocurrency that was in the Debtors' Borrow Program).

2.      With respect to the borrower/earn issues, a three-day mediation took place before Bankruptcy Judge Wiles in July of 2023. At the conclusion of the mediation, an agreement was reached between the parties as reflected in the Retail Borrower Settlement in the Plan.

3.      On August 17, 2023 the Debtors filed the Disclosure Statement [ECF Doc. #

3332] (the "**<u>Disclosure Statement</u>**") and their Fourth Amended Plan (the "**<u>Joint Plan</u>**") [ECF

Doc. # 3319].  On that date, the Court entered an Order approving the Disclosure Statement.

4.      The Disclosure Statement was 313 pages with 12 exhibits.  The cornerstone of the

Joint Plan was the formation of a new company that would be publicly traded ("**<u>NewCo</u>**"), that

would: (i) operate the mining assets of the Debtors; (ii) liquidate the illiquid assets of the

Debtors; and (iii) stake Ethereum (ETH).

5.      Nowhere in the 313 page Disclosure Statement is there any discussion relating to

the facts set forth in paragraph 21 of the Joint Motion with respect to the risk that the SEC would

reject the Registration Statement on the basis of that audited financial statements might be

required from all Debtor entities that were contribution assets to Newco.

6.      The Joint Plan provides that if NewCo Transaction could not be implemented, the

Debtors would toggle or pivot to the Original OWD.

7.      Under the heading "The Debtors May 'Toggle' to the Orderly Wind Down,

Which is Estimated to Result in Lower Recoveries," the Debtors explain: "Further, the Orderly

Wind Down does not include any go-forward business, thus terminating any potential for future

upside."  Disclosure Statement, p. 256.

8.      The Disclosure Statement describes the Plan Orderly Wind Down as follows:

At a high level, in the Orderly Wind Down: (1) the Debtors will seek to distribute Liquid
Cryptocurrency in a manner designed to minimize the cost of such distribution to
creditors; (2) the Debtors' illiquid assets will be liquidated and proceeds will be returned
to creditors; and (3) the Debtors will pursue the Backup MiningCo, a pure play, publicly
traded mining business in which creditors will receive 100% of the equity interests. . . .

If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in
the Backup Plan Sponsor Agreement that they have negotiated with the [BRIC] or on
terms that provide a better recovery to the Debtors' creditors than the Backup Plan

Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC.

Disclosure Statement, pp. 39-40.

9.      Page 12 of the Disclosure Statement disclosed that under the Original OWD Plan

$50 Million of Liquid Cryptocurrency would be used to capitalize MiningCo.

Cryptocurrency under the NewCo Transaction, Orderly Wind Down, and chapter 7 liquidation:

**Celsius Network Inc.**
**Recovery and Distribution Comparison**
*$ in millions*

| | | NewCo Plan | | Orderly Wind Down | | Liquidation (Mid-Point) |
|---|---|---|---|---|---|---|
| **Liquid Cryptocurrency** | | | | | | |
| Gross Liquid Cryptocurrency[1] | | $ 2,679 | $ | 2,657 | $ | 2,604 |
| Operating & Professional Expenses | | (55) | | (91) | | (75) |
| Plan Administration / Distribution Costs | | (20) | | (72) | | (84) |
| Litigation Trust[2] | | (50) | | (50) | | - |
| Mining Business Capitalization[3] | | - | | (50) | | - |
| Liquid Cryptocurrency Holdback for NewCo | | (450) | | - | | - |
| **Total Reductions to Liquid Cryptocurrency** | | $ (575) | $ | (263) | $ | (159) |
| **Net Liquid Cryptocurrency Assets** | | $ 2,104 | $ | 2,394 | $ | 2,444 |
| **Distribution to Claims** | | | | | | |
| Administrative Claims | | (70) | | (85) | | (85) |
| Convenience Claims | | (242) | | (242) | | - |
| General Custody Claims | | (158) | | (158) | | (158) |
| Withdrawable Custody Claims | | (48) | | (48) | | (48) |
| Withhold Claims (Eligible 15% Distribution) | | (2) | | (2) | | - |
| Liquid Cryptocurrency Available for Unsecured Claims[4][5] | a | $ 1,584 | $ | 1,859 | $ | 2,153 |
| NewCo Cryptocurrency | | 450 | | - | | - |
| Mining[6] | b | 515 | | 424 | | 88 |
| Illiquid Assets[1] | c | 283 | | 306 | | 184 |
| NewCo NAV / Wind Down Period Distributable Assets[7] | d | $ 1,248 | $ | 729 | $ | 272 |
| **Total Assets Available for Unsecured Claims** | e | $ 2,832 | $ | 2,588 | $ | 2,425 |
| **Total Unsecured Claims[4]** | f | $ 4,225 | $ | 4,225 | $ | 5,117 |
| Initial Liquid Cryptocurrency Distribution % | a/f | 37.5% | | 44.0% | | N/A |
| NewCo Common Stock Recovery % | d/f | 29.5% | | N/A | | N/A |
| Wind Down Period Mining Business Equity Recovery % | b/f | N/A | | 10.0% | | N/A |
| Wind Down Period Illiquid Asset Recovery % | c/f | N/A | | 7.2% | | N/A |
| Chapter 7 Liquidation Cash Recovery %[5] | e/f | N/A | | N/A | | 47.4% |
| Total Recovery % | e/f | 67.0% | | 61.2% | | 47.4% |

(1) In the Orderly Wind Down, Liquid Cryptocurrency is reduced by approximately $22 million relative to the Liquid Cryptocurrency in NewCo. There is a corresponding increase in the value of illiquid assets in the Orderly Wind Down related to collateral held on behalf of institutional loan counterparties
(2) Funding amount is still under discussion. Amount not to exceed $50 million
(3) In NewCo, funds to capitalize the NewCo mining business are included in the Liquid Cryptocurrency Holdback for NewCo
(4) Unsecured Claims includes Retail Borrower Post-Set Off Claim, General Earn Claims, Unsecured Loan Claims, General Unsecured Claim

Disclosure Statement, p. 12.

10.     The $50 million in Mining Business Capitalization is referenced again in the

Orderly Wind Down Analysis (Exhibit C to the Disclosure Statement):

Mining Capitalization: *Contribution of $50 million from the Estate* for the capitalization of the publicly traded mining business that the Backup Plan Sponsor will seek to establish.  This contribution is included in the Mining Equity Recovery value.

Disclosure Statement, Exhibit C, p. 8.

11.     The Joint Plan provides that Retail Borrowers were to be given a priority in the Liquid Cryptocurrency Weighted Distributed Election.  The Liquid Cryptocurrency Weighted Distribution was an extremely important feature to borrowers who wanted all crypto distributions in connection with potentially refinancing their loans.  As reflected in the Disclosure Statement, the projected payout under the "all crypto" distribution was 63%.  Disclosure Statement, p. 55. With this projected recovery, most Borrowers were in the range of 60-75% loan to value ("**LTV**") which placed them in a position of just being able to obtain refinancing with a third party.[6]

12.     The Solicitation Process revealed that creditors elected by a margin of 6.20 to 1 (the "**Recovery Elections**") to receive the Liquid Cryptocurrency Weighted Distribution over the NewCo Common Stock Weighted Distribution:[7]

NewCo Common Stock Weighted Distribution (all equity):

| | |
|---|---|
| Class 2 (Retail Borrower Deposit Claims) | $15,683,669.91 |
| Class 5 (General Earn Claims) | $163,851,968.75 |
| Class 7 (Withhold Claims) | $153,960.34 |
| **Total** | **$179,689,599.00** |

Liquid Cryptocurrency Weighted Distribution Election (all crypto):

| | |
|---|---|
| Class 2 (Retail Borrower Deposit Claims) | $148,938,980.87 |
| Class 5 (General Earn Claims) | $960,018,704.02 |
| Class 7 (Withhold Claims) | $3,173,615.89 |
| **Total** | **$1,112,131,300.78** |

---

[6] In the cryptocurrency lending world, a 70% LTV typically generates a Margin Call and a 80-90% LTV will result in an automatic liquidation.

[7] *See Declaration Of Brian Karpuk Regarding The Solicitation And Tabulation Of Votes On The Joint Chapter 11 Plan Of Reorganization Of Celsius Network LLC And Its Debtor Affiliates* (ECF Doc. # 3560).

13.     Numerous objections were filed to the Joint Plan, and the Court held a six day

trial on confirmation in October.  On November 9, 2023 this Court entered an order overruling

all objections, and setting forth *Findings of Fact, Conclusions of Law and Order Confirming the*

*Modified Joint Chapter 11 Plan of Celsius Network LLC and Its Debtor Affiliates* (the

"**Confirmation Order**"; ECF Doc. #3972). The docket reflects that three parties appealed the

Confirmation Order. *See Notice of Appeal of Johan Bronge*, (ECF Doc. # 4032); *Notice of*

*Appeal of Otis Davis* (ECF Doc. #4023) and *Notice of Appeal of Richard Phillips* (ECF Doc. #

4037).

14.     According to the Movants, "[j]ust hours [after the Confirmation Order was

entered, the SEC informed the Debtors that it would not approve the pre-clearance letter for the

NewCo Transaction, but that the SEC would not require pre-clearance for the Debtors to pursue

registration of a mining-only company." Joint Motion, p. 2.

15.     On November 20, 2023, the Debtors filed a Press Release which stated in relevant

part:

> Following confirmation, Celsius received feedback from the Securities and Exchange
> Commission (the "SEC") on certain aspects of the Plan … based on the SEC's feedback,
> the Debtors, in consultation with the Official Committee of Unsecured Creditors (the
> "Committee"), have determined that certain of the assets that were to be transferred to the
> Fahrenheit NewCo must, for regulatory reasons, be retained by Celsius's estates to be
> administered and monetized by the Plan Administrator and/or Litigation Administrator for
> the benefit of creditors….
>
> In the coming weeks, the Debtors intend to file a motion with the Bankruptcy Court *to*
> *approve modifications to the Plan* to reflect the new Mining NewCo transaction. The
> Debtors do not believe that *these modifications* will require resolicitation of the Plan. The
> Debtors still anticipate that distributions to creditors will commence in January of 2024.

ECF Doc. # 4017 (emphasis supplied).

16.     On November 30, 2023, the Joint Motion was filed.  In support of the Joint

Motion, the movants have submitted the *Declaration of Robert Campagna* (the "**Campagna**

**Declaration**"; ECF Doc. # 4051) and the *Declaration of Kenneth Ehrler* (the "**Ehrler**

**Declaration**"; ECF Doc. #4052).

17.    The Movants advise that the New OWD provides a greater recovery than the

Original OWD, and therefore the creditors provided them with *carte blanche* to pursue it.  To

support their assertion that the New OWD is better than the Original OWD, the Movants rely on

Exhibit A to the Campagna Declaration, which purports to reflect "illustrative" recoveries under

the following three scenarios: 1) the Original OWD Plan (as of 5/31 crypto pricing); 2) the New

OWD Plan (as of 5/31 crypto pricing); and 3) the New OWD (as of 11/17 crypto pricing)

(collectively, the "**Waterfall**").

18.    However, the Waterfall is missing a key column – what would the recovery look

like if the Original OWD Plan were implemented using 11/17 pricing?  Below is a comparison of

both the New OWD Plan and the Original OWD Plan, using the same 11/17 pricing that inflates

the recovery in Campagna's waterfall:

|  | New OWD (as of 11/17 pricing) | Original OWD (as of 11/17 pricing) |
|---|---|---|
| Liquid Cryptocurrency | $2,941 | $2,941 |
| Less Post Emergence Costs to the Estate | -$75 | -$75 |
| Less Litigation Administration Funding | -$50 | -$50 |
| Less Mining Business Capitalization | -$225 | -$50 |
| **Net Liquid Cryptocurrency** | $2,591 | $2,766 |
|  |  |  |
| Less Distribution to Claims |  |  |
| Administrative Claims | -$70 | -$85 |
| Convenience Class Claims | -$242 | -$242 |
| Custody Claims | -$124 | -$124 |
| Withhold Claims | -$2 | -$2 |
| **Liquid Crypto Available for Unsecured Claims** | $2,153 | $2,313 |
|  |  |  |
| **Illiquid Assets** | $305 | $305 |
|  |  |  |
| **Mining Business Valuation** | $565 | $424 |
| Less Capitalization presumed in Mining Valuation | -$50 | -$50 |
| Plus Mining Business Capitalization | $225 | $50 |
| **MiningCo Net Asset Value** | $740 | $424 |
|  |  |  |
| **Remaining Distributable Value** | $3,198 | $3,042 |
|  |  |  |
| Total Remaining Claims | 4,225 | 4,225 |
|  |  |  |
| Initial Liquid Cryptocurrency Distribution % | 50.96% | 54.75% |
| Wind Down Period Illiquid Asset Recovery | 7.22% | 7.22% |
| MiningCo Common Stock Recovery % | 17.51% | 10.04% |
| Total Recovery % | 75.69% | 72.00% |

19.    By comparing apples to apples, it is apparent that the New OWD Plan does **not** provide a greater Initial Liquid Cryptocurrency Distribution than the Original OWD Plan.  Under the Original OWD Plan, the Initial Liquid Cryptocurrency Distribution percentage is **4%** greater than the New OWD Plan.  Without any discussion or disclosure of this result, it is unclear whether the Committee or the Debtors considered this impact on the creditors in unilaterally declaring that there proposal was not a modification to the Plan, a *de facto* determination that a 4% reduction in distribution is not material.  It is, however, material to the Borrowers.  And there is no doubt that the Borrowers who made the Liquid Cryptocurrency Weighted Distribution Election (and expected to receive an all-crypto distribution) consider the reduction from 54.75% to 50.96% of Liquid Cryptocurrency to be material.

20.    Also missing from the Waterfall is an analysis of the percentage of the recovery by type of consideration ("**Recovery Mix**").  From the figures set forth in the Disclosure Statement, the Recovery Mix under the Original OWD Plan is as follows:

|  | Original OWD (as of 5/31 pricing) |
|---|---|
| Initial Liquid Cryptocurrency Distribution % | 44.00% |
| Wind Down Period Illiquid Asset Recovery | 7.24% |
| MiningCo Common Stock Recovery % | 10.04% |
| Total Recovery % | 61.28% |
| **Recovery Mix** | |
| Liquid Cryptocurrency Distribution as % of Recovery | 71.80% |
| Wind Down Period Illiquid Asset Distribution as % of Recovery | 11.82% |
| MiningCo Common Stock Recovery as % of Recovery | 16.38% |

Disclosure Statement at 12.  As reflected above, approximately 71.80% of a Borrower's total recovery was in Initial Liquid Cryptocurrency Distribution under the Original OWD Plan.

21.    If a Recovery Mix were calculated for the New OWD Plan, it would reflect a *substantial* decrease in Liquid Cryptocurrency:

|  | New OWD (as of 11/17 pricing) | Original OWD (as of 11/17 pricing) |
|---|---|---|
| Initial Liquid Cryptocurrency Distribution % | 50.96% | **54.75%** |
| Wind Down Period Illiquid Asset Recovery | 7.22% | **7.22%** |
| MiningCo Common Stock Recovery % | 17.51% | **10.04%** |
| Total Recovery % | 75.69% | **72.00%** |

| Recovery Mix | | |
|---|---|---|
| Liquid Cryptocurrency Distribution as % of Recovery | 67.32% | **76.04%** |
| Wind Down Period Illiquid Asset Distribution as % of Recovery | 9.54% | **10.03%** |
| MiningCo Common Stock Recovery as % of Recovery | 23.14% | **13.94%** |

22.     Using the updated information supplied by the Movants and plugging it into the original Disclosure Statement chart, the Liquid Cryptocurrency Distribution as a percentage of the total distribution is **9%** higher in the Original OWD Plan than the New OWD Plan. Creditors have already expressed their strong preference (by a 6.2 to 1 margin) that they would relinquish equity at a steep discount for a greater distribution of Initial Liquid Cryptocurrency. Given the consequences of the New OWD Plan, the benefits of a higher Liquid Cryptocurrency distribution, and the uncertainty surrounding MiningCo. (*e.g.* whether the SEC will approve the Form 10, whether the equity will be publicly traded and in what manner), there is every reason to believe that demand for Liquid Cryptocurrency over equity in MiningCo. would be significantly greater if creditors were given the opportunity to be heard.

23.     In light of the above, it is evident that the Movants are seeking changes to the Plan that was confirmed, that these changes are material, and the Motion seeks to incorporate such changes into the Plan without providing any of the disclosures required under the Bankruptcy Code. In short, the Movants' request to approve the New OWD Plan without "provid[ing] further disclosure in respect of the implementation of the MiningCo Transaction or to resolicit the votes of any creditors or equity security holders as a result thereof, or to obtain confirmation of a modified Plan" should be denied. *See Proposed Order to the Joint Motion*, ¶1, ECF Doc. #4050.

24.     The modifications in the New OWD Plan materially adversely impact the Borrowers. Therefore, as more fully explained herein, the Borrowers respectfully request the Joint Motion be denied, and the Movants be required to implement the Plan as confirmed.

## OPPOSITION

### A. **The New OWD Plan Is A Modification to the Confirmed Plan**

*The New OWD Plan is a Modification as a Matter of Fact*

25.     As reflected above, the New OWD Plan is not the same plan that was presented in the Disclosure Statement.  While the Debtors were permitted to negotiate a better deal than the Backup Plan Sponsor Agreement, the Debtors were not authorized to throw an additional $175 million into MiningCo.

26.     Section 1127(b) of the Bankruptcy Code governs modifications to chapter 11 plans which have already been confirmed by a court. Section 1127(b) provides:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

27.     As reflected above, the New OWD Plan is materially different from the Original OWD Plan because it trebles the previously disclosed capital requirements of the Original OWD Plan and diverts $175 Million of Liquid Cryptocurrency from creditors to an equity investment in MiningCo.  The New OWD Plan is a modification to the Plan.

28.     Section 1127(c) states that "[t]he proponent of a modification shall comply with section 1125 of this title with respect to the plan as modified." 11 U.S.C. § 1127(c). Section 1125, in turn, mandates particular post-petition disclosure and solicitation requirements by the plan proponent. *See* 11 U.S.C. § 1125.

29.     The filing of additional disclosure and resolicitation is necessary if the plan is materially modified.  If a modification would "upset the expectations of creditors," the court

should require additional disclosure and resolicitation. 7 COLLIER ON BANKRUPTCY ¶

1127.03 [4]; *see also Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 177 B.R.

791, 802 (S.D.N.Y.1995) ("The court cannot adopt any modification that materially alters the

plan and adversely affects a claimant's treatment."); *In re Enron Corp.*, 2004 Bankr. LEXIS

2549, *259 ("[t]he best test is whether the modification so affects any creditor or interest holder

who accepted the plan that such entity, if it knew of the modification, would be likely to

reconsider its acceptance.") (internal quotes omitted); *see also In re Boylan Intern., Ltd.*, 452

B.R. 43 (2011).

30.     The Disclosure Statement advised that in the event the Debtors toggled to the

Original OWD Plan, the Borrowers could expect to receive an Initial Liquid Cryptocurrency

Distribution in the amount of approximately 54.75%.

| Distributions | Original OWD (as of 11/17 pricing) |
|---|---|
| Initial Liquid Cryptocurrency Distribution % | 54.75% |
| Wind Down Period Illiquid Asset Recovery | 7.22% |
| MiningCo Common Stock Recovery % | 10.04% |
| Total Recovery % | 72.00% |

31.     Moreover, based on the figures set forth in the Disclosure Statement, Borrowers

could expect to receive 76% of their total recovery in Liquid Cryptocurrency.  As set forth

therein, the Recovery Mix would have been as follows:

| Recovery Mix | Original OWD (as of 11/17 pricing) |
|---|---|
| Liquid Cryptocurrency Distribution as % of Recovery | 76.04% |
| Wind Down Period Illiquid Asset Distribution as % of Recovery | 10.03% |
| MiningCo Common Stock Recovery as % of Recovery | 13.94% |

32.     The changes proposed have a material impact that is not disclosed or discussed in

the Joint Motion.  There is nothing in the Disclosure Statement that notified creditors that the

fiduciaries representing them were reserving the right to take crypto currency that would

otherwise be available for distribution to creditors and invest it in MiningCo.  It is not the

provenance of the estate fiduciaries to unilaterally determine that a 4%  reduction in Liquid

Cryptocurrency for the purpose of investing in a future venture (but labeled as an "Orderly Wind

Down") is in the best interests of creditors.  If Movants want to move forward with the New

OWD Plan, they must be required to provide additional disclosure in compliance with 1127(c)

and allow creditors to determine for themselves what is in their best interest in accordance with

1127(d) . With respect to the Borrowers who made the Liquid Cryptocurrency Weighted

Distribution Election and need every coin in connection with a potential refinance, the reduction

in Liquid Cryptocurrency is particularly detrimental.

*The New OWD is a Modification as a Matter of Law*

33.    In support of their relief, the Debtors cite to *In re Johns-Manville Corp.*, 920 F.2d

121, 128 (2d Cir. 1990), to justify their position that "changes contemplated by the confirmed

plan were not 'modifications'." *Joint Motion*, p. 25, ¶45, ECF Doc. #4050.  However, the

Debtors' own press release expressly states they would seek to have the Court "approve

***modifications*** to the Plan to reflect the New Mining NewCo Transaction," flatly contradicting

their current statements. *Press Release*, Ex. A, ECF Doc. #4017 (emphasis added).

34.    The Debtors' own public admissions establish that the MiningCo Transaction is a

modification under 11 USC§ 1127, such that if the Committee and the Debtors want to pursue

this path, they must properly present it to creditors.  Not surprisingly, the law requires that

modifications to a confirmed plan require the proponent to re-solicit acceptances.

35.    One of the early cases this question is *In re Frontier Airlines, Inc.,* 93 B.R. 1014

(Bankr. D. Colo. 1988). In that case the Court was confronted with a proposed post-solicitation

pre-confirmation amended plan which sought to change the distribution mix from all cash to an

option for cash and notes, a change which could impact the ultimate distribution to creditors. The

proponents argued that the acceptances should stand unless the Court found that the final

modifications were materially adverse to the interests of the accepting creditors.  The Court

rejected that position on the grounds that creditors were entitled to make that decision, stating:

> This Court does not agree with such an expansive reading of B.R. 3019. The
> Court notes that subsection (f) of Section 1127, as proposed in the original Senate
> bill, provided that a proponent of a modification to a plan did not have to resolicit
> unless the court found the modification made a "materially" adverse change in the
> treatment of the creditors. *See,* S.2266, Calendar No. 1026, page 533, 95th Cong.
> 2nd Sess. (1977). The language included in the Senate bill was not enacted. Both
> the change in the legislative proposal and the express language of B.R. 3019
> indicate that the Court should not disenfranchise creditors from having an
> opportunity to vote on plan modifications based on the degree of the hurt. If the
> modification adversely affects the interests of a creditor who has previously
> accepted the plan, in more than a purely ministerial de minimis manner, that
> creditor should have the opportunity to reconsider and change his or her vote.

*Id.* at 1023.  The Court rejected an expansive analysis which deprived creditors of the right to

make a decision as to the degree of materiality of impact:

> This Court is not willing to place itself in a position of weighing whether the
> modification is so adverse that a creditor would be apt to reconsider acceptance.
> In this Court's view it is the creditors' inherent right to make that baseline decision
> if the modification to the plan results in a change which is adverse to the creditors'
> interests.

*Id* at fn 3.  The proponents in *Frontier* argued that the proposed amendments gave creditors an

option for an even better recovery, but the fact that these revisions ran the risk of changing the

economics of the distribution led the Court to find that the creditors had a right to determine for

themselves whether to accept them. There was an adverse impact, and resolicitation was

therefore required.

36.     This is not a case where the impact is on a small group of sophisticated creditors

in a purely administrative fashion.  *Compare In re Mesa Air Group, Inc.*, No. 10-10018, 2011

Bankr. LEXIS 3855, at *14 (Bankr. S.D.N.Y. Jan. 20, 2011) (modifications were not material

"because the change only affect[ed] a small number of sophisticated creditors in an

administrative fashion.").  To the contrary, the hidden impact of the proposed changes affects an

entire class of thousands of creditors with varying sophistication levels who depend entirely on the disclosure requirements of the Bankruptcy Code to make decisions.  In distinguishing *Frontier Airlines,* in the Court in *Mesa* stated: "In *Frontier*, "[t]he modifications to the plan were significant — the modified plan altered the treatment of creditors to provide for a distribution of a combination of cash and notes if the creditor did not elect to receive payment in cash for their claims, whereas initially creditors were to receive cash in the amount of their allowed claim." *Id*. Here, the Movants are requesting a similar change, one that trebles an equity investment by taking cryptocurrency that would otherwise be available for distribution to creditors.  Under the circumstances, "if the modification adversely affects the interests of a creditor who has previously voted to accept the plan, in more than a purely ministerial de *minimis* manner, that creditor should have the opportunity to change his or her vote." *In re Mesa Air Group, Inc.*, No. 10-10018, 2011 Bankr. LEXIS 3855, at *15-16.  The Movants' proposed new plan affect the interests of an entire class of creditors in a manner that is substantial and significant, and those creditors should have the opportunity to change their votes.

37.     As the Movants repeatedly state, the Plan actually provided an alternative to the NewCo Transaction in the form of the Original OWD Plan.  No good reason has been presented as to why that plan needs to be revised in such a significant and detrimental way.  There is no reason why the Original OWD Plan with its $50 million capitalization should not be implemented as it was approved by creditors.  If the Movants want to pursue a new plan, they need to comply with the disclosure and solicitation requirements of the Bankruptcy Code.  The New OWD Plan is not what was presented to creditors and it is the right of creditors to determine whether to accept or reject it.

38.     If the Court does not deny the Joint Motion outright, it should provide creditors the opportunity under 11 U.S.C. §1127(d) to change their vote.  At a minimum, the Court should provide the Borrowers with a time period within which to withdraw any prior acceptances or rejections in light of the material impact on that class.

### B.   Timing: Compliance with the Bankruptcy Code Will Not Unduly Delay Distributions

39.     The most expeditious way forward is to implement the Original OWD Plan that was accepted by creditors and confirmed by the Court.  If the Movants nonetheless seek to pursue the New OWD Plan, compliance with the Bankruptcy Code (including providing appropriate notice concerning the establishment of the Reserves) will not significantly delay the process.

### C.   The Court lacks jurisdiction over the Joint Motion

40.     Finally, there is a serious question as to whether this Court has jurisdiction over the changes proposed by the Movants because the confirmation order is currently on appeal.  It is well established that the filing of an appeal divests the lower court of its control over matters on appeal, *see Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 401–02, 74 L.Ed.2d 225 (1982) (per curiam), and that the same legal principle applies to appeals of bankruptcy court orders. *In re Prudential Lines Inc.*, 170 B.R. 222 (S.D.N.Y 1994), *citing In re Bialac*, 694 F.2d 625, 627 (9th Cir.1982); *In re Neuman*, 67 B.R. 99, 101 (S.D.N.Y.1986); *In the Matter of the Commodore Corp.*, 87 B.R. 62, 63–64 (Bankr. N.D. Ind.1987) (A bankruptcy court has no jurisdiction "to do anything that impacts on any issue or matters under appeal.") And while it is equally established that the bankruptcy court retains jurisdiction to *implement* or *enforce* an order or judgment on appeal, courts have "recognized a

distinction in the divestment of jurisdiction between acts undertaken to enforce the judgment and

acts which expand upon or alter it; the former being permissible and the latter prohibited." *In re*

*Prudential Lines Inc.,* 170 B.R. at 225, 243.  In short, absent a stay pending appeal, the

bankruptcy court is entitled to implement the plan. *Id., citing In re Roberts Farms, Inc*., 652 F.2d

793, 798 (9th Cir. 1981); *Matter of Commodore Corp*., 87 B.R. at 63 (in absence of stay pending

appeal of plan, notice of appeal did not deprive bankruptcy court of jurisdiction to make

technical modification to plan to permit it to go into effect only if no stay was subsequently

issued); *In re AOV Industries, Inc*., 46 B.R. 190 (D.D.C.1984) (in absence of stay pending appeal

of confirmed plan, bankruptcy judge entitled to implement plan)."

41.     An appeal of the confirmation order, however, divests the bankruptcy court of

jurisdiction to enter a subsequent order that modifies, supplements, or is inconsistent with, an

confirmation order pending on appeal. See, e.g. *In re Acis Capital Management, L.P*., 604 B.R.

404 (N.D. TX. 2019); *In re Transtexas Gas Corp.*, 303 F.3d 571, 574, 582 (5th Cir. 2002)

(bankruptcy court divested of jurisdiction to supplement plan confirmation order that was then

pending on appeal); *Whispering Pines Estates, Inc*., 369 B.R. 752, 760 (1st Cir. BAP 2007)

(bankruptcy court could not issue stay relief order that essentially modified confirmed plan while

plan confirmation order was pending on appeal); *In re Southold Dev. Corp.*, 129 B.R. 18, 19, 21

(E.D.N.Y. 1991) (invalidating order that modified reorganization plan, where plan confirmation

order was already pending on appeal); *In re 710 Long Ridge Rd. Operating Co*., II, LLC, 2014

WL 1648725, at *1, *3-6 (Bankr. D.N.J. Apr. 24, 2014) (refusing to consider motion to "clarify"

plan confirmation order pending on appeal, because a court "cannot take action that will alter or

modify its prior order while that order is pending on appeal").

42.    The Movants' requested relief by its terms seeks to revise the Confirmation Order, "as such document is changed by the toggle to the Orderly Wind Down, the terms of the MiningCo Transaction, and this Order…"  The reference in their proposed order to "this Order" expressly incorporates new terms for the Orderly Wind Down that was approved in the Confirmation Order, "the MiningCo Transaction, and the terms thereof described in the Motion." The attached new 6 page single-spaced term sheet for the new MiningCo Transaction explicitly increases the capitalization to "$225 million in fiat".  Other changes include a $20,376,200 payment in the event of a change of control, and liquidated damages in the event the new Board determines NewCo is unlikely to "obtain effectiveness of the Form 10 and terminates the Management Agreement." These are new terms that directly impact creditors and can only be imposed by entry of an order revising the Confirmation Order, and as a result the Court lacks jurisdiction to do so..

## <u>CONCLUSION</u>

**WHEREFORE,** for the reasons stated in this Opposition, the Ad Hoc Group of Borrowers respectfully requests that this Court deny the Joint Motion and grant such other relief as is just and appropriate.

Dated: December 14, 2023

**McCARTER & ENGLISH, LLP**

B y :   /s/ David J. Adler
      David J. Adler
      Lisa S. Bonsall
      Email: dadler@mccarter.com
      825 8th Avenue
      Worldwide Plaza
      New York, New York 10019
      Telephone: (212) 609-6847
      Facsimile: (212) 609-6921
      *Attorneys for Ad Hoc Group of Borrowers*
