Case No. 22-10964 (MG)

Re. Objection to the Mining Plan

Dear Chief Judge Glenn,

I have only just (2 days away from the deadline) been made aware through a YouTube video about objections to the mining plan open for submission until Dec. 14. I must have missed the dockets regarding this deadline, but am going to do my best to put together an objection despite having to put it together last-minute, as I feel it is urgent to bring to your attention the perspective of the creditor community as a whole, which has not been properly represented by the Debtors, the UCC, or any of those who have been given special powers and authority to represent creditors in devising a restructuring plan made to aid creditor recovery, but have instead used/abused their positions to create a plan that only benefits themselves -- motives that can now no longer be hidden, with conflicts of interest blaringly visible in a plan that, by creditor vote, should have gone into an orderly wind-down, but has instead since been transformed by plan creators, in a bid to cling on to the structures they had put in place in the plan and plan supplements to continue to allow them to profit from the benefits they procured through their insider positions, post-bankruptcy.

I apologize for the lack of legal formatting (which I still haven't been able to figure out), any typos, disorganization, or potentially missing hyperlinks, as I am pulling all-nighters to get this in on time. I have, in last two months, been scouring the web for deeper and deeper insights as to what has been going on (and what has been going wrong) in the backdrop of these court proceedings, and, as I learn more, I only find more to uncover and investigate. I have no legal training, but I feel like I have to try my best to try to craft something anyway, to represent the creditors' interests before it is too late, and the Debtors, lawyers, UCC, and "plan consultants" get away with stealing more from creditors than even Alex Mashinsky was claimed to have done.

I wrote and delivered my objection to the initial disclosure plan in a state of desperation, as, I saw just from the sneaky insertions of terms and conditions that the plan was rigged to allow plan creators to exhort the restructuring to benefit themselves, while actually harming creditors, but allowing them to convince those NOT involved in the plan's creation that the plan and results of the plan were something creditors were happy with and were in their interests.

Where we are at now was my greatest fear when I submitted my initial objection and made my closing statement, where, among other things, I warned that there was too much freedom for plan creators to change the plan after the fact, with no limitations and no requirements to stick to what was already put forth to vote on, and I also objected to the unfair protection of plan creators from litigation, as it was clear to me from the way that the plan was worded and presented that whoever was behind the plan was planning to take advantage of all the holes they had left in the plan to turn it into whatever they wanted, with nothing stopping them from doing so, with the unfair third party release they forced creditors to sign if they opted into an oftentimes coerced "yes" vote to the plan.

## 5. TOO MUCH FREEDOM FOR PLAN CREATORS TO CHANGE THE PLAN AFTER-THE-FACT, WITH NO LIMITATIONS AND NO REQUIREMENTS TO STICK TO WHAT WAS ALREADY PUT FORTH TO VOTE ON

Particularly concerning is Article 6 of the Disclosure Statement Disclaimer, which states "Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update. The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Furthermore, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court."

## 6. UNFAIR PROTECTION OF PLAN CREATORS FROM LITIGATION

The Third Party Release included as part of the ballot is essentially a forced waiver of ability to hold plan creators culpable for the creation of a poor plan, through forced acceptance of the Third Party Release attached to the acceptance of the plan.

I think is very unfair that the Third Party Release is forced upon anyone who votes to accept the plan. This means that, among other things, if it is discovered that the holes mentioned in the plan that allow plan creators to make changes are abused in favour of the plan's creators, these cannot be litigated against. This allows the plan's creators to make self-serving changes that could potentially bait-and-switch and completely screw over Account Holders, knowing that they are protected from litigation, thanks to the terms of the release that was forced upon those who accept the plan.

*Proposed Modification: Make the Third Party Release opt-out separate from the acceptance/rejection of the plan, and allow Account Holders the right to litigate, even upon acceptance of the plan.*

In this final hour, with the majority of voters having accepted the plan the way that the plan creators have rigged them to, and we see the amended plan and amended back-up plan, it has become clear that the parties that were supposed to represent our interests and look out for us have altered the plan that creditors already weren't happy with to one that you even recognized as "not the deal the creditors voted on":



https://twitter.com/otisa502/status/1730265152971255829



https://twitter.com/search?q=judge%20glenn%20voted&src=typed_query&f=live



https://twitter.com/MectinMd/status/1734272739031023975

I have been delving into the broader picture of the special interests influencing the Celsius proceedings internally and externally, and what I continue to uncover shocks me as to the conflicts of interest that are allowed/ignored even when pointed out and broken down by those most wanting to produce the fairest results (re. pro se creditors who have already been robbed and are now being robbed again, in paying the fees of those abusing their positions of counsel to extract as much benefits for themselves as possible), just because their allegations are the majority of time denied by    those in positions of authority (whether they are true or false).

It is clear that creditors are now united in agreeing that the plan creators have rug pulled us, LEGALLY, abusing their roles to drag out court proceedings to maximize their billed-to-our-creditor-funded-Estate fees and expenses, while obtaining positions and special privileges for themselves and their clients/former clients and employees/anyone who will represent them, to ensure that they continue to

profit from continued employment and business, and maintain controlling power post-bankruptcy.



https://twitter.com/tribe_leader/status/1734052455346741347



As one creditor showed, the plan that Alex Mashinsky already had in the works, that creditors wouldn't have been charged any money for, was what plan creators now propose, to try to pivot to something that still retains all the deals they made with each other to secure positions and continued paydays for themselves at the expense of creditors.



**Otis** 🐕 🐴 💜 🔵 ✓
@otisa502                                                          ...

We paid $300 million, when all is said and done, to tell us that we will
have a #Bitcoin ₿ mining-only NewCo and that we would need to pony
up an additional $225 million to get it off the ground, for a grand total of
$525 million. That's what the @CelsiusUcc accomplished for creditors,
something Celsius already did in May 2022 for free, which was taking
Celsius Mining LLC public on the NASDAQ.

That $30 million you stole from us CEL token creditors may have tasted
good initially but it now tastes like gravel, gravel that must now be
regurgitated as it was stolen from us. Better is a dish of vegetables
where there's love than a fattened bull where there's greed and
corruption. Your NewCo fattened bull has slimmed down to a skinny calf
as a result of your salacious greed and corruption. Your own greed has
deprived you of what is good.

The entire @CelsiusUcc has been polluted by @SimonDixonTwitt, his
Simontologists and its own @CelsiusUcc members, especially the now-
ousted Keith Noyse, as they have abandoned their fiduciary duty to us
creditors, more specifically CEL token creditors, ignored the truth, lied
and did whatever was necessary to deprive CEL token holders of their
$0.81 petition date price, which was a promise that they broke. And that
broken promise did not go unpunished, as their beloved NewCo came
crashing down in spectacular fashion.

Even though they made their beloved NewCo dwelling place as high as
the stars, saying we won and no one can stop us now, the mighty hand
of the @SECGov brought that NewCo down to the ground, shattering it
into pieces, with only a #Bitcoin ₿ mining-only NewCo now
salvageable.  Greediness chocked the puppy.

> 🔘 Robert Padgett @RobertP75415189 · 8h
> Replying to @otisa502 and @CelsiusUcc
> How much are the operatives at Celcius UCC receiving as kickbacks from the
> bankruptcy attorneys dragging out the process and racking up more billable
> hours?

4:50 PM · Dec 2, 2023 · **1,504** Views

https://twitter.com/otisa502/status/1731113647349366907?s=20t



https://twitter.com/jamers2012/status/1731137394563297689?s=20



https://twitter.com/LauraLy88/status/1731145655039750155?s=20





https://twitter.com/jamers2012/status/1731486918678806915

As a creditor explained, the lawyers lied about the financial state of Celsius to divide the community and remove Alex Mashinsky, so that no one would be in the way to keep lawyers and employees' billing in check, or protect CEL token holders from having their coins devalued, so that plan creators could steal from what wasn't given back to them:



**Otis** 🌕 🐭💜 🛡️ ✔️
@otiss502

Remember, the @CelsiusUcc's narrative, along with their lawyers at
@WhiteCase and the Debtors' lawyers at @Kirkland_Ellis, is that
@Mashinsky stole all our money. That's what they told Judge Glenn, the
creditors and the world.

The stage was set when they got up in court and told Judge Glenn in
August 2022 that the company (@CelsiusNetwork) will run out of money
in 3 months, by November 2022, and its lawyers and advisors will have
to withdraw themselves from the case and no longer represent
@CelsiusNetwork, which sent a shockwave through the
@CelsiusNetwork community. This was a massive lie that was
orchestrated by the lawyers and the @CelsiusUcc to divide us and
remove @Mashinsky; to get him out of the way, as he wouldn't agree to
pay lawyers $300 million or steal from CEL token holders.

People's thoughts were, if Celsius doesn't have enough money to pay its
lawyers and advisors, then they surely have no money to give back to
me. That was the first massive lie that brings us to where we are today.
Most of these dumb-ass creditors, including @SimonDixonTwitt and his
Simontologist clan, believed the lawyers, even though I told them the
numbers say otherwise and numbers don't lie. But they didn't listen and
continued to follow them down this hellish path to destroy creditors'
recovery and piss away $300 million of our money to TradFi lawyers and
their cronies, the same TradFi lawyers who stood up in court and lied,
saying the company will run out of money in 3 months. Please see
Stretto links and screenshots below.

Docket 1167:
cases.stretto.com/public/x191/11...

Docket 1325:
cases.stretto.com/public/x191/11...

Docket 1328:
cases.stretto.com/public/x191/11...

You can get away with a boldface lie like that in a deep crypto bear
market that we just went through where all the assets are undervalued
as they are crypto-related assets, and you can talk and say words to
convince people of your lies and divert people's attention away from the
math, but you damn sure can't get away with that boldface lie once
#Bitcoin ₿ gets above $40,000.

Now that #Bitcoin ₿ is above $40,000, more and more creditors are
starting to see what I saw over a year ago: That all the money is indeed
here, it's just the assets were undervalued, and that we can all be paid
back fully in-kind and not paid back using some scam petition date
prices where our claims are dollarized.

The petition date price for #Bitcoin ₿ is $19,881. And remember, all alts
were sold for #Bitcoin ₿ over 6 months ago. So now that my
#Bitcoin ₿ is at $40,000, I only get $19,881 and they keep the rest of
my #Bitcoin ₿ to pay $300 million in legal fees to lawyers and their
cronies and God knows what else.

But you all signed up for this the minute you all listened to @SimonDixonTwitt and his wicked followers, including the @CelsiusUcc listening to @SimonDixonTwitt, and ousted @Mashinsky. Only he had all the right motives to navigate us through this bankruptcy, which is why the lawyers and the @CelsiusUcc had to force him to resign, because he would stand in the way of their theft of $300 million and also stealing $128 million of value and $30 million in liquid crypto distributions from CEL token holders.

Now you all see the truth and it's nothing but a massive heist of our assets, which was all here to begin with. No Celsius executive stole any of it. Now you're seeing that the lawyers took $300 million of our money under the guise of helping us to form a NewCo with ETH staking and going public on the NASDAQ, which NewCo blew up in their faces spectacularly; only to tell us for the $300 million in legal fees, plus @SimonDixonTwitt $500K cash grab, we can take ONLY the #Bitcoin ₿ mining facility public, something Celsius and @Mashinsky already did in early 20222 and had a press release about in May 2022.

Here's the truth in the PR Newswire article. So let them justify that $300 million in legal fees otherwise, because it can't cost us $300 million to take something public that was already going public.

prnewswire.com/news-releases/...

October 2022; the Debtors will run out of money by then." — Greg Pesce (August 2022)

"The Court is also mindful of the need to push this case to a prompt conclusion if that is possible. Time is not on the side of maximizing recovery by all stakeholders. The "melting ice cube" analogy is sometimes misused, but the reality here is that the Debtors will have significant liquidity issues to continue operating in 2023." (Doc 1167 10/24/22 ~ Doc 1325 11/11/22)"
Doc 1167- https://cases.stretto.com/public/x191/11749/PLEADINGS/11749102422B0000000010.pdf
Doc 1325- https://cases.stretto.com/public/x191/11749/PLEADINGS/

"Significant Liquidity Issues

8.
Based on the A&M team's analysis following discussions with management, my experience in restructuring, and my familiarity with the Debtors and their operations, I believe that, on a consolidated basis, the Debtors may require additional liquidity as soon as the first quarter of 2023. Further, certain segments of the business may require additional liquidity as soon as January 2023. Robert Campagna - Doc 1328    Filed 11/11/22    Entered 11/11/22"

Doc 1328- https://cases.stretto.com/public/x191/11749/PLEADINGS/11749111122B0000000048.pdf
11749102422B000000001

9:04 AM · Dec 6, 2023 · **4,290** Views

"Your Honor (Judge Martin Glenn) we don't have enough money to make it to October 2022; the Debtors will run out of money by then." — Greg Pesce (August 2022)

"The Court is also mindful of the need to push this case to a prompt conclusion if that is possible. Time is not on the side of maximizing recovery by all stakeholders. The "melting ice cube" analogy is sometimes misused, but the reality here is that the Debtors will have significant liquidity issues to continue operating in 2023." (Doc 1167 10/24/22 ~ Doc 1325 11/11/22)"
Doc 1167– https://cases.stretto.com/public/x191/11749/PLEADINGS/117491024228000000010.pdf
Doc 1325– https://cases.stretto.com/public/x191/11749/PLEADINGS/117491111228000000043.pdf

○ 5      ⇄ 13      ♡ 38      ᵢₗᵢ 4.2K      ⬆



"Significant Liquidity Issues

8.
Based on the A&M team's analysis following discussions with management, my experience in restructuring, and my familiarity with the Debtors and their operations, I believe that, on a consolidated basis, the Debtors may require additional liquidity as soon as the first quarter of 2023.  Further, certain segments of the business may require additional liquidity as soon as January 2023.  Robert Campagna - Doc 1328   Filed 11/11/22   Entered 11/11/22"

Doc 1328– https://cases.stretto.com/public/x191/11749/PLEADINGS/117491111228000000048.pdf

1174910242280000000010.pdf
568.2 KB

As one creditor commented in response:



https://twitter.com/otisa502/status/1732446008846512363

Creditors wonder if you understand the creditor dilemma, and how external events affect the price of Bitcoin and other cryptos, and how such things as the Bitcoin halving cycle (A Bitcoin halving cuts the rate at which new bitcoins are released into circulation in half, with the rewards system expected to continue until the year 2140 when the proposed limit of 21 million bitcoin is theoretically reached, which has major implications for its network -- in terms of miners, the halving event may result in consolidation in their ranks as individual miners and small outfits drop out of the mining ecosystem or are taken over by larger players (https://www.investopedia.com/bitcoin-halving-4843769)), and the acceptance of certain crypto ETFs to    enter the market affect creditor recovery. It is possible that plan creators are taking advantage of the complexities surrounding cryptocurrencies to misrepresent how cryptocurrencies work, to obtain results that benefit themselves.





https://twitter.com/EricEricmergen/status/1732861551936147922



https://twitter.com/MectinMd/status/1731818376513610060

Many creditors believe that the UCC is selfishly delaying the process to retain the paid positions they have copped for themselves.





**Ruppi Macho** 🔵 @realrephy · Dec 9

Well, if resolicitation is in the cards then I say we rally together for a NO vote and we also vote NO to letting the professional thieves off the hook with their exculpations.  F them if that's what they are thinking!

@Silkee_D @CelsiusUcc Do you guys want to press your luck?

ONE MORE TIME

II GIF ALT

4        2        13        349

Show replies

**Dexter The Duck** ✓ @DexterTheDuck3 · Dec 8

We voted for a mining, staking and loan company. SEC said only mining. It's not like we pivoted to opening an Italian restaurant. I agree the UCC has been very disingenuous and frankly looking out for their best interest. Which I expected. I hope we get an approval. What we want...
Show more

3        1        11        553

**J≡ff 8** @Jeff_9989 · Dec 9

@CelsiusUcc you are taking a big gamble that could end up delaying things a LOT. Give up your quod pro quo board seats and support pivoting to a solution that fits within the OWD plan creditors approved. 😡

3                25        282

**Clarence Thomas** @hiringcrypto · Dec 8

Yes, the UCC is CLEARLY holding up the show... I have a real distain for these people.

1                18        339

**AJ** @Abitcoinholder · Dec 9

Wise words. Even with full understanding of the situation, judge Glenn must follow the path of new solicitation.. Also, the ucc has a web of agreements in between each other and with the debtors. Process delayed for sure. Just wondering what will be the final outcome.

3        176



**M N M** @mnschwarz · Dec 9

Because this absurd system allows the UCC members to prioritise themselves over the creditors they're supposed to represent. I don't see how it's not a huge conflict that they can profit while others suffer. 😔

1                1        44



https://twitter.com/ChazzonKe/status/1733270800260624732

It is in examining what the Debtors, UCC, and lawyers are fighting so hard to retain that one can clearly see how infused with their own self-interests the plan creators have altered the plan we voted on to become.

When one takes a look at the UCC and its chosen advisors, one can see how each have secured for themselves positions that allow them to benefit themselves and the companies and special interests they represent.

**4. What is White & Case's role in these cases? Can White & Case represent me?**

White & Case is counsel to the Committee, and the Committee represents the interests of account holders and unsecured creditors as a whole. As a result, White & Case is not in a position to represent individual account holders and unsecured creditors in their personal or institutional capacities or to advise them on their specific situation. However, White & Case, as legal counsel to the Committee, is working with the Committee to address a number of issues in connection with the interests of unsecured creditors and account holders on the whole, including maximizing value for account holders and unsecured creditors in the Debtors' chapter 11 cases. White & Case can also answer general questions that you might have about the process and provide information about the cases. Any questions or comments should be submitted to the Committee by emailing CelsiusCommitteeInquiries@ra.kroll.com.

**5. Does the Committee have other advisors? If yes, what are their roles?**

The Committee has retained Kroll as its noticing and information agent, Perella Weinberg Partners LP as its investment banker ("**Perella**"), M3 Advisory Partners, LP ("**M3**") as its financial advisor, and Elementus Inc. ("**Elementus**") as its blockchain forensics advisor. Kroll, White & Case, Perella, M3, and Elementus each play an essential role in the Committee's communication with its constituency, involvement in the Debtors' development of a chapter 11 plan, interest in reducing the Debtors' operational costs, and investigation into the Debtors.

https://cases.ra.kroll.com/CelsiusCommittee/FAQ-Index

## 7. What is exclusivity? Will exclusivity be extended or terminated?

Section 1121(b) of the Bankruptcy Code states that a debtor has the exclusive right to file a chapter 11 plan in the first 120 days of the case (the "**Exclusivity Period**"). On November 9, 2022, the Debtors filed a *Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* (the "**Exclusivity Motion**") (available here). Through this Exclusivity Motion, the Debtors sought an extension of the deadline to file a chapter 11 plan through and including March 31, 2023.

The final composition of the various committees and administrator roles apparently representing the interest of creditors is wholly skewed to benefit the Plan Creators, as each party involved has appeared to name and vote themselves into such positions -- each acknowledging and qualifying one another's value, despite the fact that they each selected themselves for positions of power and control, assuring that they can continue to drain creditor funds by filling their own pockets, and acting in the own best interests.

EVERY group involved in counselling the UCC has appeared to have secured for itself future positions of power that will allow them to continue their pilfering from the Celsius estate.

This is not limited to them, as Debtors have profited greatly themselves, through self-appointments.

As I had warned about in my previous objections, looking at the final compositions of NewCo and the Litigation Committee, and at the positions of Litigation Administrator and Plan Administrator, it is clear that the Plan Creators have appointed themselves to flll EVERY key position, to benefit themselves with continued employment, self-selected salaries, and continued power to influence what should have been made in creditors' best interests. How can creditors expect such parties to represent their interests following a Chapter 11 exit, when each representative basically selected and voted for themselves, despite their already proven drain on the creditors' funds, without even being able to produce a viable, SEC-approved plan?

Below, I will attempt to break down the various conflicts of interest of the various Plan Creators involved (although their interests often blend into others and are difficult to untangle because they are so extensive) to show why the UCC, its counsel, and the Debtors are so desperate to hang onto what they have so sneakily stolen for themselves:

To start, the NewCo board and Litigation Oversight Committee, as well as the Plan Administrator and Litigation Administrator roles, appear to be filled largely by Plan Creators and parties affiliated with them, who would give the Plan Creators who landed them such roles preferential treatment in the selection of advisors to the said committees and roles. That this has in fact happened is evidenced by the fact that the NewCo Board (with one current and one former Perella employee, Emanuel Aidoo and Elizabeth LaPuma) chose Perella Weinberg to be its financial advisor, and the plan's Litigation Administrator, an M3 Partners employee, choosing to retain M3 Partners as its financial advisor.

## Conflicted Board Appointments, Must be Reversed

| Name | Conflict | Role |
|------|----------|------|
| Elizabeth LaPuma | Ex-Perella Weinberg Partners White & Case Client | Board |
| Emanuel Aidoo | Tax Judgements Perella Weinberg Employee | Board |
| Vik Jindal | White & Case Client | Litigation Oversight |
| Gerard Uzzi | Ex White & Case Partner White & Case Client | Litigation Oversight |
| Chris Ferraro | Oversee & 25% beneficiary Celsius EIP | Plan Admin |

*Only conflict-free people were supported by Earn and Loans AdHoc.*

Board Observers: Joe Lehrfeld, Brett Perry

LOC: David Adler, Cam Crews

Closing Argument, Richard Phillips, Creditor, Pro Se                                    3

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174910262380000000064.pdf

(i)        If to the Litigation Administrator, to:

M3 Advisory Partners, LP
1700 Broadway, 19th Floor
New York, New York 10019
Attn: Celsius Litigation Administrator, Mohsin Y. Meghji
Email: Celsius_Litigation_Admin@m3-partners.com

With a copy to:

31

The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].

Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action. Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

Three UCC members were able to gain spots on numerous boards and committees -- Mark Robinson on Litigation Oversight Committee, and Thomas DiFiore and Scott Duffy on the NewCo Board.

**EXHIBIT A**

**Initial Members of the Litigation Oversight Committee**

1. Mark Robinson

2. Gerard Uzzi

3. Vik Jindal

4. Deirdre O'Connor

5. Cameron Crews, designated by the Earn Ad Hoc Group

6. David Adler, designated by the Retail Borrower Ad Hoc Group

7. A Person or Entity selected in accordance with the Confirmation Order.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174910302380000000024.pdf

As a creditor pointed out,



https://twitter.com/magick_wolf/status/1703086182282965242

And as a creditor asked,



https://twitter.com/fire_medic129/status/1619514664865640448

Indeed a further conflict of interest has been discovered by pro se creditors that prompted them to submit a motion for order directing immediate commencement of orderly wind-down, where they highlighted how UCC members "have been promised NewCo Common Stock totalling 1.5% of the total shares as part of the Employee and NewCo Board Equity Compensation," "which directly links the UCC members' personal financial gain to the outcome of the reorganization," which "raises serious questions about the impartiality of their decisions and actions within the committee." This would help explain the UCC's willingness to compromise by giving Simon his desired position within the board, in looking after their own interests in receiving the stock they would receive.

> **3) Conflict of Interest Concerns**
> - There is a troubling potential conflict of interest concerning certain members of the Unsecured Creditors Committee. According to the plan, members have been promised NewCo Common Stock totaling 1.5% of the total shares as part of the Employee and NewCo Board Equity Compensation (Section 102 of the plan).
> - This offer, which directly links the UCC members' personal financial gain to the outcome of the reorganization, raises serious questions about the impartiality of their decisions and actions within the committee. Such a scenario could compromise the equitable treatment of all creditors and undermine the integrity of the bankruptcy proceedings.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174911292380000000072.pdf

Further preferential terms for UCC members and those with close relations to its advisors have been uncovered by creditors, included extended board terms:



https://twitter.com/booklilifee/status/1715698491303870492

As I stated, it is difficult to break down all the conflicts of interest that exist in the Celsius case, but I will attempt to break them down party by party.

**White and Case**

White and Case had, not one, but two of its clients appointed to the Litigation Oversight Committee (Vik Jindal and Gerard Uzzi (who was also an ex-partner of White and Case), and one ex-client on the NewCo Board (Elizabeth LaPuma).



https://www.ghuassociates.com/

White and Case's favoured treatment of its current and past clients is evident. As a creditor discovered, the approved plan included White and Case client Figure Technologies and Figure Lending as a potential source of third party financing.



https://twitter.com/LegalDey/status/1400276059573178371



https://twitter.com/Candy644159/status/1626279496188928000

**Overview of Refinancing Proposal from Figure**

Article IV.B.7 of the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* [Dkt. No. 3319] (the "**Plan**")[1] states that "[t]o the extent the Retail Borrower Ad Hoc Group, the Debtors, or the Committee identify a source of third-party financing reasonably acceptable to the Debtors, the Debtors shall take commercially reasonable efforts to facilitate such party in refinancing applicable Retail Advance Obligations with the consideration provided to Retail Borrowers under the Plan."

The Debtors, the Committee, and the Retail Borrower Ad Hoc Group have identified Figure Technologies, Inc. and its affiliates, including Figure Lending, LLC, a licensed consumer lender ("**Figure**"), as a potential source of third-party financing that has offered to refinance applicable Retail Advance Obligations of eligible, electing Retail Borrowers.  Indicative terms of the proposed loans are attached hereto as Annex 1.  Any refinancing is optional and Retail Borrowers are not required to take any action.

To the extent a Holder of a Retail Borrower Claim elects to refinance its Retail Advance Obligation, any post-Effective Date obligation will be between such Holder and Figure. The Debtors will facilitate the repayment by Figure of the Retail Advance Obligation (that would otherwise be paid by the applicable Holder) and the delivery to Figure of the distribution that would otherwise have been paid by the Debtors to such Holder under the Plan.  The Debtors will have no other involvement in any loan issued by Figure to a Holder of Retail Borrower Claim.

Creditors commented on the value maximizing for White and Case, with one identifying how it was definitely a value-maximizing transaction for White and Case, comparing the situation to a "real estate transaction where one agent represents both the buyer and seller and gets both hal[ve]s of the commission."



https://twitter.com/Candy644159/status/1626279496188928000

White and Case showed evidence of making the same kind of transaction in the Novawulf pitch.



Home / People / Keith H. Wofford

# Keith H. Wofford

Partner, Miami

**T** +1 212 819 7595
**E** kwofford@whitecase.com

## Biography

Financial Restructuring and Insolvency

Power

Aviation

Counsel to the Official Creditors Committee of Celsius Network, LLC.

Counsel to the secured lenders of cryptocurrency miner TeraWulf, Inc.

https://www.whitecase.com/people/keith-wofford#experience

One White and Case employee represented both Celsius and Novawulf's sister company Terawulf, and the Novawulf bid that was initially selected and announced by Greg Pesche of White and Case was headed by two of the company's clients (Novawulf and Figure Technologies) and used the system that White and Case had helped build. This bid was introduced as the sponsoring company under false pretences that no better bid had been put forth, and was also given a large break-up fee of up to $18 million. White and Case likely profitted from the two clients it brought together to offer preferential treatment to, likely securing them despite not selecting their bid in the end by exploiting its ability to allocate creditor funds by giving it a large break-up fee of up to $18 million, to ensure their clients still got their money's worth for participating, in the end.

### 8. What is NovaWulf and what are the NovaWulf bid protections?

NovaWulf Digital Management, L.P. is the sponsor of the Debtors' proposed plan. On March 1, 2023, the Debtors filed the *Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* (available here) (the "**Bid Protections Motion**"). On March 23, 2023, the Court held a hearing on the Bid Protections Motion and directed state and federal regulators to file statements with respect to the Bid Protections Motion by March 28, 2023.

On March 30, 2023, after receiving statements from certain state and federal regulators, the Court entered the *Order Granting the Debtors' Motion for Bid Protections as Modified* (available here) (the "**Bid Protections Order**"). The Bid Protections Order provides that NovaWulf may receive a Break-Up Fee of $5 million and Expense Reimbursement up to $8 million, with an additional $5 million of Expense Reimbursement to be subject to further Court approval following the approval of the disclosure statement.

Further information regarding the terms of the NovaWulf bid protections can be found in the Bid Protections Motion.

The bid was questioned by creditors in its ability to return nothing to creditors if the bidding companies so chose, and one even questioned how much Novawulf had paid White and Case to be the preferential bidder.



https://imgur.com/u3YTCxj



https://www.reddit.com/r/CelsiusNetwork/comments/11b7gym/novawulf_town_hall_22723_celsius_discussion_with/

On an even larger note, creditors recognized the wider implications of the bid, in placing creditors right back into the TradFi system, and in showing that the options presented to creditors were rigged:







https://twitter.com/celhodl/status/1628852202356854784

Creditors already spotted something fishy with the Novawulf bid early on:



https://twitter.com/ChazzonKe/status/1648532785466884096



https://twitter.com/Jeff_9989/status/1648596919663448066

**Elementus**

The retained counsel of Elementus has been disputed on multiple fronts by multiple creditors.



It has ties to Alameda Research (and through it, FTX), Cherokee Acquisitions (which was aggressively buying up creditors' claims on the cheap), Jason Stone of KeyFi (who stole millions of dollars of crypto and NFTs from Celsius and was being sued by Celsius), and Badger Dao (through ParaFi Capital) , of whom Celsius was the largest victim of a hacking attack to the company.

Elementus: connections with Alameda Research, Jason Stone of KeyFi who stole from Celsius and is being sued by Celsius, and is linked with Cherokee Acquisitions

Max Galka provided testimony as to CEL's price

Apollo Global Management has ties to Figure Technologies

Numerous creditors have found multiple conflicts of interest within Elementus's employee makeup and relationships with other companies, that to this day are still ignored.

Most notable was its ties to Alameda Research, which seeded some of Elementus's capital.





https://twitter.com/jamers2012/status/1707512400855900610





https://twitter.com/search?q=max%20galka%20conflict%20of%20nterest&src=typed_query

Alameda Research was the sister company to FTX, which was being sued by Celsius for shorting CEL token. That Max Galka of Elementus was chosen to provide testimony and expertise as to CEL token's price was compromised because of this, given the goal of shorting to bring CEL's value to 0, and Max's assessment that CEL token should be valued at 0.



In the October 4, 2023 Confirmation Hearing, starting on page 61, line 4 I asked

Mr. Galka a series of questions and they are as follows, along with his answers:

Q        "You have stated prior here today about Alameda Research invested in your company.  How
much was that investment?

 A        " I don't recall the dollar figure.  It was less than 1 percent of the company at the time.  We were
raising our Series A which was about a $12 million fundraise.  They put in about $200,000.  To date,
we've raised about close to $27 million, so it's a fairly small portion of the investment.  I said $200,000; I
don't know that that's necessarily the exact number, but something in that ballpark."

That testimony by Mr. Galka clearly establishes that he has a blatant

conflict of interest.  Max Galka makes no mention in his report about Alameda

Research or FTX using "God mode" to naked short CEL token as was reported

by John Ray III, the CEO of FTX.  The reason is that Elementus, the CEO of

which is Mr. Galka, raised capital from Alameda Research/FTX in its Series A

Funding round, and he simply left out anything having to do with Alameda

Research or FTX.  Mr. Galka simply cannot render a fair and unbiased opinion in

his report against a company which he raised capital from and which Celsius filed

a claim for $2 billion against, because Mr. Galka knows full well that Alameda

Research, along with Sam Bankman-Fried and FTX, illegally naked shorted CEL

token in order to cripple the company and send it into bankruptcy.

**Failure To Disclose Conflicts**

The only expert witness brought to testify on the value of CEL token,
was Max Galka, whose testimony should be stricken and report
excluded from consideration due to the fact that Galka and the

attorneys along with the UCC failed to disclose the severe conflict of
interest that Galka's company has with these proceedings.
Galka's company Elementus is funded by Alameda Research, a
wholly owned subsidiary and controlled company of Sam
Bankman-Fried and FTX, who is currently being sued for $2 billion by
this Celsius bankruptcy estate.

As if this was not a glaring omission of conflict, one of the board
members of Elementus is the founder of a company called Cherokee
Acquisitions, which has been systematically buying up claims in this
estate for well below market value and has reportedly done over $300
million dollars in Celsius claims transactions.  If these conflicts of
interest were disclosed to the UCC or to the attorneys for this matter
and not further disclosed to the Court or other parties, then this would
amount to a fraud on the Court for which the party should be held
accountable.

Galka did testify that he was not able to come up with the value of the
CEL Token on the Petition date.  So basically the $1,000 an hour

spent on this report, which should never have been proffered, was
not only a waste of money, since there was no conclusion, but also
should amount to the funds being returned to the bankruptcy estate
because of the undisclosed conflicts of interest.

billion filing, that FTX is responsible for more than the $1.2 billion hole in

Celsius's balance sheet by filing this $2 billion claim. If that's not what they

are claiming, they need to simply tell this Court why they filed the $2 billion

claim in the FTX bankruptcy on behalf of all creditors.


By filing this $2 billion claim in the FTX bankruptcy against FTX, et al., the

Debtors themselves have already assessed the value of CEL token;

**Celsius and the UCC have assessed CEL token's value at $2.88 per**

**CEL token when taking into consideration the 693 million CEL token**

**supply.** They are effectively agreeing that the damages caused by

Alameda Research (which I remind the court funded the expert report by

Elementus and Max Galka) and FTX through their manipulation of CEL

token on the FTX exchange was $2 billion, which equates to **$2.88 per**

**CEL token**. Celsius DOES NOT have any significant outstanding balances

or claims against FTX besides the manipulation of CEL token. I have

attached these pictures with links as Exhibits D and E showing the $2

billion claim that Celsius filed against FTX, et al.

However, the lawyers refused to acknowledge this blatant conflict of interest, as well as Elementus's further conflicting tie with Cherokee Acquisitions, whose Founder and CEO, Vladimir Jelisavcic, was a board member of Elementus. Cherokee Acquisitions was DMing and following Celsius creditors to try to buy their claims, and when a creditor suggested that part of Galka's 0 valuation of CEL token was to make Celsus look bad to creditors and help Cherokee scoop up their claims for less because of this, he was chastised for doing so, rather than having the relationship further looked into.

It would seem that the Plan Creators choose to protect each other, rather than the creditors they were supposed to be bound to help.





https://twitter.com/HellsiusNetwork/status/1709581129936736395

**REQUESTING THE PURGING OF THE EXPERT REPORT DUE TO THE**

**UNDISCLOSED CONFLICTS OF INTEREST:  CHEROKEE ACQUISITIONS**

Cherokee Acquisitions has been buying a significant amount of claims in this
Celsius Chapter 11 bankruptcy case.  When I questioned Mr. Galka about his
relationship to Cherokee Acquisitions, he stated that Vladimir Jelisavcic, the
founder and CEO of Cherokee Acquisitions, was a board member of Elementus,
but that he can't remember when Vladimir Jelisavcic was on the Elementus
board.  I asked Max Galka the following question and he gave me the following
answer on page 60 at the October 4, 2023 hearing when I cross-examined him:

**"Q. Would you say that when preparing your expert report, it was created and submitted in a
professional manner, free of any bias, undue influence, or undisclosed conflicts?"  And his
answer was:  "A. Yes, I would."**

That under-oath testimony was not true, because there's a clear conflict of
interest here between Max Galka, the CEO and founder of Elementus, and
Vladimir Jelisavcic, the CEO and founder of Cherokee Acquisitions, who is
buying up claims left and right in the Celsius Chapter 11 bankruptcy.

As if this was not a glaring omission of conflict, one of the board
members of Elementus is the founder of a company called Cherokee
Acquisitions, which has been systematically buying up claims in this
estate for well below market value and has reportedly done over $300
million dollars in Celsius claims transactions.  If these conflicts of
interest were disclosed to the UCC or to the attorneys for this matter
and not further disclosed to the Court or other parties, then this would
amount to a fraud on the Court for which the party should be held
accountable.

Galka did testify that he was not able to come up with the value of the
CEL Token on the Petition date.  So basically the $1,000 an hour

spent on this report, which should never have been proffered, was
not only a waste of money, since there was no conclusion, but also
should amount to the funds being returned to the bankruptcy estate
because of the undisclosed conflicts of interest.

should be discarded.  Failure to notify the Court of this conflict is fraud on the
Court, and if Mr. Glka notified the UCC, as he indicated in his testimony on
October 4, 2023 of his conflict and the UCC and their attorneys White & Case did
not notify the Court, then the UCC and their attorneys White & Case are also
complicit in this fraud on the Court.

You cannot file a $2 billion claim in the FTX bankruptcy on behalf of all

Celsius creditors, allege in that $2 billion claim that FTX manipulated CEL

token by naked shorting it using "God mode," and then on the other hand

say CEL token is worth $0.00 (zero) in this Celsius Chapter 11 because

you're hellbent on screwing over retail CEL token holders and asking this

Court to accept your frivolous, flip-flop arguments.  Additionally, all FTX and

Alameda Research has to do to kill their lawsuit is to use the attorneys'

positions here that the CEL token is worthless and the suit against FTX can

be extinguished, which is clearly legal malpractice.


We creditors, through our seven elected representatives on the UCC, now

six elected representatives, hired White & Case to represent the best

interests of creditors.  In this instance, the UCC and White & Case are

going against 36,000 CEL token creditors because they want 2% more

Bitcoin and Ethereum in their wallets, which is a a betrayal and malpractice.

**The Debtors, along with the UCC, decided that this $2 billion claim**

**against FTX for naked shorting CEL token is valid, while at the same**

**time the UCC and the Debtors are attempting to subordinate the basis**

**of that very same $2 billion claim.**

As the creditor suggested, the lawyers' refusal to value CEL token fairly destroys customer's ability to

win the $2 billion case Celsius has against FTX, as their refusal to value it as they did in the FTX case (where CEL token had a valuation of $2.88) could result in those involved in the FTX case using the $0.25 CEL valuation to revalue the FTX claim downward, resulting in a substantial loss of return for creditors. The fact that lawyers have failed to disclose this to creditors further calls into question where their loyalties really lie.

Elementus's ties were questioned further, linking it to Jason Stone, who was being sued by Celsius for stealing millions of dollars' worth of crypto and NFTs, and Badger Dao, through which Celsius was the biggest victim of a hack. Each of these groups were involved in weakening Celsius through contributing to it loss of assets.



**Oxb2**
@2023globe

Meltem of Coinshares w/santiago of Parafi & Jason stone of 0xb1 emerge as "Elementus" w/Max Galka. Now– certainly we can put Sam in the room or is it Barry toots?

Thanks @fafaf0f0 ♥

Meltem Demirors ✓
@Melt_Dem

hey babe ⚫⚫ 🐐

Christine Moy
Apollo Global Management
Partner & Head of Digital Asset
Strategy

Santiago Roel Santos
ex-ParaFi Capital
Web3 investor

repeat a summit of some sort every quarter, and organize for a larger day-long conference later this year.

Lastly, this group is working on a more comprehensive industry effort around advocacy, education, and standards, which will be launched in the coming weeks. If you are interested in being involved, supporting, or

**Oxb2** @2023globe · Sep 28
💻 New Filing in Celsius Bankruptcy case by @elementus_io
Daniel & Aliza living it up in NH on that farm next to "LT" & @Melt_Dem
Keep digging @crypto @isreali_times keep digging
twitter.com/Holmes_Crypto_...

$10^{43}$

| Equitable Subordination Candidates - OTC Buy | | |
|---|---|---|
| | OTC Buys ($) | OTC |
| **2020 Transactions** | | |
| Nuke Goldstein | $1,320,000 | |
| Daniel Leon | 957,500 | |
| Johannes Treutler | 950,000 | |
| Alex Mashinsky | 500,000 | |
| Aliza Landes | – | |
| Harumi Urata-Thompson | – | |
| Roni Cohen-Pavon | – | |
| **2020 Transactions Total** | **$3,727,500** | |
| | | |
| **2021 Transactions** | | |
| Daniel Leon | $10,563,750 | |
| Johannes Treutler | 7,922,941 | |
| Nuke Goldstein | 2,817,500 | |
| Aliza Landes | 1,767,000 | |
| Harumi Urata-Thompson | 1,343,859 | |
| Roni Cohen-Pavon | 899,330 | |
| Alex Mashinsky | – | |
| **2021 Transactions Total** | **$25,314,380** | |
| | | |
| **2022 Transactions** | | |
| Roni Cohen-Pavon | $175,270 | |
| Daniel Leon | – | |
| Johannes Treutler | – | |
| Nuke Goldstein | – | |
| Aliza Landes | – | |
| Harumi Urata-Thompson | | |

9:26 AM · Sep 30, 2023 · **1,550** Views



**Christine Moy**
Apollo Global Management
Partner & Head of Digital Asset
Strategy



**Santiago Roel Santos**
ex-ParaFi Capital
Web3 Investor



**Kevin Owocki**
Gitcoin.co
Founder



**Meltem Demirors**
CoinShares
Head of Strategy





https://twitter.com/otisa502/status/1707519800593854572

*"Over the past year, close to 1% of circulating Bitcoin has migrated to Ethereum's DeFi ecosystem and made productive in various yield generating opportunities. As more Bitcoin holders wake up to the potential of DeFi, we believe Badger is uniquely positioned to capture that growing share. We're excited to back the Badger team and help them further entrench their position as the primary home for Bitcoin in DeFi." — Santiago R Santos, Partner @ ParaFi Capital*

https://twitter.com/2023globe/status/1722337909771030663/photo/1



https://twitter.com/2023globe/status/1722337909771030663/photo/2

Elementus appears to be composed of various interests that have separately, and perhaps collectively, helped bring about Celsius's downfall, which was why the post showing certain key ties asked why Elementus was allowed to provide its testimony and proof in court.

That Max Galka's testimony has still been upheld and used as the sole measure to determine the price of CEL token, despite all evidence pointing to the group's interest in taking down Celsius and stealing as much value as it can from it really makes one hope that the US Trustee will step in to intervene and prevent this group from getting away with its complete ravaging of Celsius, down to even attacking the common creditor, in helping its investors buy creditor claims for pennies on the dollar.

**Chris Ferraro**

Chris Ferraro's TradFi background made him an interesting selection for Alex's replacement as Celsius's CEO, as he represented interests that were directly counter to the views of those who had invested their money in Celsius in the first place. Joining Celsius only three months before the bankruptcy, he did not share the same vision of Celsius customers, who went into crypto to get away from traditional banking,

and in fact represented banking interests, hailing from JPMorgan Chase and Co.

 Bloomberg
https://www.bloomberg.com › news › articles › celsius...    ⋮

Celsius CEO Chris Ferraro Guides Crypto Lender Through ...

Sep 27, 2023 — **Ferraro** joined **Celsius** a little more than three months before it went bankrupt, in March 2022, as head of financial planning, analysis and ...

Ferraro was previously appointed Chief Financial Officer of Celsius. Before Celsius, Ferraro spent nearly 18 years at JPMorgan Chase & Co, serving in various roles including Global Head of FP&A and Treasurer of the Retail Bank. Ferraro's leadership and expertise spans all areas of corporate finance as well as asset and liability management.

https://www.businesswire.com/news/home/20220927005796/en/Celsius-Appoints-Chris-Ferraro-to-the-Role-of-Chief-Restructuring-Officer-Interim-Chief-Executive-Officer-as-Alex-Mashinsky-Steps-Down

As a creditor tried to bring to the open, FOIA Confidential communication documents showed that FTX was in fact planning a hostile takeover of Celsius, and certain executives and employees of Celsius conspired with FTX and Alameda Research executives to short the CEL token and de-peg other assets such as stETH, WBTC, and GBTC, to enable the hostile acquisition of Celsius by FTX, Alameda Research, and an unnamed investor. Through a document mistakenly sent to the creditor by a White and Case employee, Chris Ferraro, Rod Bolger, Dean Tapren, and Jason Perman were identified as being at the heart of this scheme, and as "attempting to profit from their wrongdoings by taking leadership positions in the new entity after besmirching Mashinsky and setting him up as the fall guy."

FTX in the end submitted a written offer to purchase Celsius for $1.5 billion. Mashinsky allegedly rebuked this offer, which set in play a series of events which brought the company to this court. FTX and Alameda Research then allegedly hatched a plan to injure and reduce the liquidity of Celsius so that they could then come in as the savior and acquire the company for pennies on the dollar.

Certain executives and employees of Celsius conspired with FTX and Alameda Research executives along with a now unnamed investor/co-conspirator who we shall refer to as "CC1 John Doe" to short the CEL token, and de-peg other assets such as stETH, WBTC and GBTC, to enable the hostile acquisition of Celsius by FTX, Alameda Research and "CC1 John Doe."

We do now know that the information to enable this conspiracy and hostile takeover was seen in the FOIA Confidential communication (note that we are making requests for discovery of all FOIA Confidential documents supposedly purposely hidden by the law firms White & Case and Kirkland & Ellis to protect these Celsius executives) that was mistakenly sent to me by Carolyn Gurland, an attorney at White & Case, and which was the basis for the original motion and objection at Docket 3532.

We can say with high confidence that Chris Ferraro, Rod Boldger, Dean Tapren, and Jason Perman were at the heart of this scheme and are now attempting to profit from their wrongdoings by taking leadership positions in the new entity after besmirching Mashinky and setting him up as the fall guy. It will be interesting to see the U.S. Attorney's take on these facts and whether the Celsius executives have perjured themselves to the U.S. Attorney in wrongfully implicating Mashinsky for the illegal and

fraudulent actions that they themselves allegedly took.  Irony at its best.

The big question now and that will come to light once the full bevy of hidden documents from the attorneys White & Case and Kirkland & Ellis, for which is evidence, not only of the nature and extent of the betrayal of these four executives from Celsius, but also whether or not the attorneys themselves should be considered as conspirators in the scheme to injure Celsius and allow for the hostile and fraudulent transfer away from Mashinsky.  We do know that the law firms and professionals aforementioned have gained tremendously from the play, in that they have to date earned and been paid at least an estimated $150 Million for their services thus far in the past 14 months. The math in the billing, which will be the subject of an additional motion against the firms, just does not add up and the potential for fraudulent billing practices of these behemoth firms is in play as a serious possibility.

These facts which have recently come to light as a result of the inadvertently shared document by the White & Case attorney Carolyn Gurland that was hidden from the court, the creditors and the debtors for the benefit of those at Celsius looking to perpetrate a fraud on the court and all concerned, may in fact lead to the exoneration of Mashinsky himself and the future indictment of the Celsius executives for their alleged actions.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174909282380000000197.pdf

Indeed, despite requests by other creditors that the other FOIA documents be shared by White and Case and Kirkland and Ellis through discovery, the requests were ignored – favouring protecting those in power over those they were supposedly under fiduciary duty to act in the interest of. If there was no wrongdoing going on, then why have such documents not been allowed to be reviewed by creditors? Why are the lawyers so set on hiding such information, and why have they been allowed to continue to keep it for themselves?

Chris Ferraro has appeared to have taken advantage of his appointed position to introduce measures to allow himself to increase his current salary (through the introduction of the Employee Incentive Program), and reserve the position with the most power and highest salary for himself. Creditors already

balked at the $50,000 for the first three months of work salary that had been proposed in earlier iterations of the plan, and the fact that Chris has now raised his salary to $200,000 a month for the first three months and $100,000 a month thereafter, along with a $1,000,000 dollar bonus if certain conditions are satisfied shows how Chris has continued to raise his own returns from his participation in the Celsius proceedings, while doing nothing to protect the creditor that he is stealing to get his raised salaries from – not from himself nor any other party involved in the proceedings.

year following emergence, whether as part of a NewCo Transaction or the MiningCo Transaction.[14] Mr. Ferraro has a deep understanding of both the Debtors' "illiquid" assets and the distribution process, which Mr. Ferraro has already overseen in connection with the successful return of cryptocurrency on account of Custody Claims. The Plan Administrator Agreement provides that Mr. Ferraro will provide his services for a monthly fee of $200,000 for three months and $100,000 thereafter, as well as a $1,000,000 substantial completion bonus if certain conditions regarding administration of the Estates are satisfied. Despite having more assets to manage under the MiningCo Transaction, Mr. Ferraro has not requested any increase in compensation.

30.    The Debtors have also negotiated the Litigation Administrator Agreement (which provides for a monthly fee of $50,000 for the first three months and $25,000 thereafter) and agreements with PayPal and Coinbase regarding distributions of Liquid Cryptocurrency.[15] Together, these three agreements provide for substantially all of the non-mining services contemplated under the Backup Plan Administration Agreement Term Sheet at a major discount to the minimum of $58 million of fees contemplated thereunder.

Indeed, the whole bankruptcy process, with Alex removed and no one to truly care for the creditor left, really does appear, as one creditor put it, "to be made up with backdoor deals between entities with conflicts of interest."



https://twitter.com/jamers2012/status/1707512400855900610

**M3 Partners**

M3 Partners was able to have its employee Mohsin Y. Meghji named as Litigation Administrator, and also, pending approval, have M3 Partners retained as the financial advisor to the Litigation Administrator and Oversight Committee, including hourly fees and incentive compensation.

> The Litigation Administrator shall be entitled to compensation of [a monthly fee of $50,000 for the first three months following appointment and a monthly fee of $25,000 thereafter for professional services rendered in connection with the Litigation Administrator Agreement, plus reimbursement of reasonable and documented out-of-pocket fees, costs, and expenses].
>
> Mr. Meghji intends to retain M3 Partners, subject to the approval of the Litigation Oversight Committee, as financial advisor to support the prosecution, settlement, or resolution of Claims and Causes of Action. Such compensation may include a combination of hourly fees for professional services rendered as well as incentive compensation tied to specific targets as ultimately agreed between the Litigation Oversight Committee and the Litigation Administrator.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174910302380000000024.pdf

**Alvarez and Marsal**

Alvarez and Marsal was able to appoint Elizabeth La Puma, its former Managing Director, to the NewCo board.



**Daniel Frishberg**
@DanielFCelsius

A&M filed another declaration of disinterestedness

cases.stretto.com/public/x191/11...

A director of NewCo is a former managing director of A&M (left in 2020).

A A&M employee who has NOT worked on the Celsius case (and will not) has ~158k preference exposure and is accepting the

7.    In addition, I note that Liz LaPuma is a Potential Party in Interest who was selected to be an independent director of Newco. Ms. LaPuma is a former A&M Managing Director who departed A&M in January 2020. Ms. LaPuma is still involved as a witness in ongoing litigation regarding a prior client matter she worked on while at A&M that is wholly unrelated to this engagement. Consistent with our customary practices, we have agreed to reimburse Ms. LaPuma for her time and expenses incurred in connection with those matters.

8.    An A&M employee who is not (and has not been) involved in providing services to the Debtors, Christopher Sullivan, had an account with the Debtors containing approximately $8,000. It has come to my attention that Mr. Sullivan had also moved approximately $158,000 out of his account in the ninety days pre-petition. Out of an abundance of caution, A&M has

3

22-10964-mg    Doc 3962    Filed 11/03/23    Entered 11/03/23 16:18:15    Main Document
Pg 4 of 9

instituted formal screening measures to screen Mr. Sullivan from all aspects of A&M's provision of services to the Debtors. Mr. Sullivan has agreed to waive any defenses he may have related to the preference period withdrawals and will participate in the *"Account Holder Avoidance Action Release"* program set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332]. His claims as an account holder will be used to set off his Withdrawal Preference Exposure. I do not believe that Mr. Sullivan's claims as an account holder preclude A&M from meeting the disinterestedness standard under the Bankruptcy Code.

9.    To the extent any information disclosed herein requires amendment or modification upon A&M's completion of further review or as additional party-in-interest information becomes available to it, a further supplemental declaration reflecting such amended or modified information will be submitted to the Court.

2:48 PM · Nov 3, 2023 · **476** Views

https://twitter.com/DanielFCelsius/status/1720558567705489614



https://twitter.com/mawworn/status/1722416607249703267

**Perella Weinberg**

Perella Weinberg Partners had a $5 million success fee and was appointed a board seat through

Emmanuel Aidoo, its Head of Digital Assets Markets, and through former employee Elizabeth A. LaPuma.



**ELIZABETH A. LAPUMA**

Elizabeth A. LaPuma brings over two decades of financial advisory and board expertise across diverse industries. With a strong background in originating and structuring complex financial transactions, she is a trusted advisor to numerous business leaders.

Ms. LaPuma currently chairs the Audit Committee and is on the Compensation and Governance Committees at WeWork. Additionally, Ms. LaPuma is a board member for other businesses within the fintech, artificial intelligence, healthcare, consumer, and real estate sectors.

Prior to these roles, Ms. LaPuma was a Managing Director and Head of Balance Sheet Advisory at UBS. Prior to UBS, she was a Managing Director and head of Asset Management Services at Alvarez & Marsal, advising governments and financial institutions on diverse assets. Ms. LaPuma's earlier career includes roles at BlackRock, Lazard Frères & Co. LLC, Credit Suisse and Perella Weinberg

2

Partners L.P.

Ms. LaPuma received her Master of Business Administration in Finance as a Palmer Scholar, Bachelor of Science in Finance and Bachelor of Arts in International Relations (Magna Cum Laude) from the Wharton School and The School of Arts and Sciences at the University of Pennsylvania.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174909242380000000001.pdf

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174910302380000000024.pdf



**Otis** @otisa502

I have a simple question. Why did this guy Emmanuel Aidoo get appointed to the NewCo board? He currently works for Perella Weinberg, who are the advisers to the @CelsiusUcc. Perella Weinberg is getting a $5 million success fee, so now on top of that they're awarded with a board seat, while the community has zero representation on that NewCo board. Seriously, what the fuck is going on here? This smells fishy as fuck.

It's time to liquidate this shit and wind it down. Too many dirty games. The chicanery continues and never stops. The backup BRIC @Gemini plan may be the best plan right now, more liquid crypto to creditors.

## Emmanuel Aidoo

Head of Digital Asset Markets

## Perella Weinberg Partners 🔗

P / W / P
/ PERELLA WEINBERG
/ PARTNERS

10:15 AM · Sep 14, 2023 · **4,779** Views

https://twitter.com/otisa502/status/1702370385784705455

Emmanuel Aidoo was not as he was presented to creditors, as creditors discovered that he had a big connection to FTX:



**CateWebbBot1234** @WebbCate · Sep 18

Why did the UCC & Debtors fail to disclose Emmanuel Aidoo is the Executive Director working on the FTX bankruptcy when they said he worked at Perrella? They're on at least their 9th invoice as FTX's investment banker. They disclosed what LaPuma & Arnold were doing. WTF. AGAIN

8        22        57        8.5K

**Doug Stringer** ✓ @shinnosuke1959 · Sep 18

At this point we should only be genuinely surprised when there is some favorable decision made or, even less likely, when additional funds are unexpectedly returned to us. Things not going well are assumed and normal. There is no longer any truth or justice in the system.

1        2        11        408

**CateWebbBot1234**
@WebbCate

The UCC has failed in its fiduciary duty on this and it's highly suspect they are not pursuing this matter

2:09 PM · Sep 18, 2023 · **653** Views



https://twitter.com/BreuderPaul/status/1703846927958520105



https://twitter.com/WebbCate/status/1703845474250502567



**EMMANUEL AIDOO**

Emmanuel Aidoo is a recognized leader in digital assets advisory, private capital, and restructuring banking. With a strong track record in navigating complex financial landscapes, he specializes in digital assets, blockchain technology, and innovative investment solutions. At Perella Weinberg Partners, Emmanuel leads the digital assets advisory division, driving growth and positioning the firm as a market leader in blockchain and cryptocurrencies. Previously at Credit Suisse AG for over two decades, he played key roles, including Head of Digital Assets Markets, where he advanced the firm's blockchain strategy. Emmanuel's achievements include pioneering proof-of-concepts, strategic investments in blockchain projects, and thought leadership in the global blockchain community. Aidoo has been recognized by Forbes on their Blockchain 50 list (2020), Business Insider's list of Top 10 Transforming Finance (2019) and American Banker (2018). He has served as a member of the World Economic Forum (WEF) Digital Asset Steering Committee and as the Chair of SIFMA's Blockchain Roundtable.

Emmanuel studied Computer Science at Brunel University in Uxbridge, England.

**FTX**
Emmanuel Aidoo (Executive Director)

| Emmanuel Aidoo (Executive Director) - Case Hours Summary (Jul-23) | |
| --- | --- |
| Categories | Hours |
| Correspondence with Debtor Advisors and Principals | 7.5 |
| Correspondence with Creditors, UCC, and Advisors | - |
| Correspondence with Third-Parties | 11.0 |
| Due Diligence and Restructuring Strategy | 5.0 |
| Sale Process Matters | 27.5 |
| Financing Matters | - |
| Court Hearings | - |
| Other Administrative Processes and Analysis | 12.0 |
| **Total** | **63.0** |

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: October 4, 2023 at 4:00 p.m. ET** |

**NINTH MONTHLY FEE STATEMENT OF PERELLA WEINBERG PARTNERS LP AS
INVESTMENT BANKER TO THE DEBTORS AND DEBTORS-IN-POSSESSION FOR
COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND
REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD
FROM JULY 1, 2023 THROUGH AND INCLUDING JULY 31, 2023**

| | |
|---|---|
| **Name of Applicant** | *Perella Weinberg Partners LP* |
| Authorized to Provide Professional Services to: | Debtors and Debtors-in-Possession |
| Date of Retention: | *nunc pro tunc* to November 16, 2022 |
| Period for which compensation and reimbursement is sought: | July 1, 2023 through July 31, 2023 |
| Amount of Compensation sought as actual, reasonable and necessary: | $450,000 (Monthly Fee) |
| 80% of Compensation sought as actual, reasonable and necessary: | n/a |
| Amount of Expense Reimbursement sought as actual, reasonable, and necessary: | $243,243.30 |

**SUMMARY OF BILLING BY PROFESSIONAL**
**JULY 1, 2023 THROUGH AND INCLUDING JULY 31, 2023**

| Timekeeper Name | Position | Total Hours Billed |
|---|---|---|
| Bruce Mendelsohn | Partner | 72.5 |
| Kevin Cofsky | Partner | 70 |
| Michael Grace | Partner | 23 |
| Max Mesny | Partner | 8 |
| Timm Schipporeit | Partner | 7 |
| **Partner Total** | | **180.5** |
| Laura Klaassen | Managing Director | 10 |
| Ema Betts | Managing Director | 9 |
| **Managing Director Total** | | **19** |
| Matt Rahmani | Executive Director | 89.5 |
| Emmanuel Aidoo | Executive Director | 63 |
| Nathaniel Nussbaum | Executive Director | 65 |
| **Executive Director Total** | | **217.5** |
| Geoff Posess | Director | 48 |
| Wasif Syed | Director | 50 |
| **Director Total** | | **98** |

⟳ 8    ⟲ 21    ♡ 56    ᴵᴵᴵ 8.5K    ⬆

https://twitter.com/WebbCate/status/1703845474250502567

That someone with FTX connections was snuck onto Celsius's NewCo board with no disclosure shows another instance of FTX being given power over the Celsius bankruptcy case – and being given that power by Plan Creators not revealing the hidden agenda that creditors were trying to uncover when they requested discovery for the FOIA documents HIDDEN by the Plan creators that would allow creditors to discover what's really been driving the bankruptcy proceedings.


Simon Dixon

Simon was able to gain influence for himself among insiders by injecting himself into the Celsius creditor community and falsely portraying himself as an expert in what was going on with Celsius, identified by many as a grifter who was using the Celsius bankruptcy as an opportunity to gain new customers for his company BNK to the Future. Through providing commentary about Alex and what was going on and appearing to know more about what was happening than anyone else (though he later admitted that he did not), he was able to gain a large following for himself in the Celsius community and attract the attention of the lawyers and the UCC, and make enough of an impression on the process that he was

able to influence the ousting of Alex from the court proceedings before he was able to finish constructing his new plan for Celsius. It was in large part through the negative portrayal of Alex he continued to push daily on his followers and in the media that Alex was forced to step down, which allowed all the Plan Creators to really become vultures, with no one to police the amount being spent on the fees and expenses they were charging.

In fact, In an article covering where Alex suggested suing FTX to pay for the Celsius hole, it's clear that Alex didn't like how much money lawyers' fees were eating up, and had suggested suing FTX to recover the money lost to lawyers.



The Celsius saga may have taken a back seat due to the recent collapse of major crypto exchange FTX. But former Celsius CEO Alex Mashinsky is dragging himself back into the limelight with pronouncements suggesting that Celsius and UCC lawyers sue FTX to help cover the gaping hole in Celsius Network's books.

## Mashinsky worried about money spent on lawyers

In a recent Twitter Space recording, Mashinsky was warming up to getting Celsius' battery of lawyers to team up with their Unsecured Creditors Committee (UCC) counterparts and sue the collapsed crypto exchange.

Mashinsky believed that with as much as $30 million of Celsius' limited funds already spent on lawyers, they needed to take appropriate action to help recoup some of it.

"*I love this idea of getting FTX to pay for the hole. Since the lawyers have already spent 20 to 30 million dollars of our money, let's make sure they actually focus on this instead of all of the BS they're working on,*" Mashinsky said.

It's no surprise that Mashinsky is getting agitated about the money Celsius has spent on lawyers. According to recent court filings, the now-bankrupt crypto lender paid its lawyers Kirkland and Ellis more than $5.6 million in legal fees in August alone. A month earlier, there had been reports that Celsius had paid the same lawyers $2.6 million plus an additional $750K to another firm, Akin and Gump.

These revelations caused great consternation in social media circles, with many Celsians questioning the wisdom of the cash-strapped crypto lender spending so much on legal fees with little indication of whether its creditors will ever get their money back.

### Critics call idea a waste of creditors' money

However, Mashinsky's idea has faced criticism, particularly from Bank to the Future founder Simon Dixon. Dixon, a longtime critic of Mashinsky, described suing FTX as "a waste of creditors' money." He instead suggested that suing Mashinsky would be more valuable for Celsius creditors. Others have also accused Mashinsky of using the FTX issue to deflect from his own culpability in Celsius Network's demise. The former Celsius CEO has been accused of extracting significant wealth from bankrupt company's estate.

## Celsius exposure to FTX amounts to $14.3 million

In a November 11 tweet, Celsius confirmed its exposure to FTX and its sister hedge fund, Alameda Research. In the tweet, Celsius stated it had about 3.5 million Serum tokens (SRM) valued at $1.3 million, locked on FTX, and had extended a $13 million loan to Alameda, which, according to the crypto lender, was undercollateralized by FTT tokens.

FTX considered buying Celsius after the crypto lender froze withdrawals in June, but canceled the deal after learning about the company's finances. Ironically, FTX suffered the same fate when Binance reversed its own plans to save the exchange after seeing the extent of its losses.

FTX had also considered bidding on Celsius' assets, which were auctioned off in August. The auction has been postponed until December, and no winner has been named.

In contrast, Simon said that going after FTX was a waste of time, despite it potentially returning $2 billion to fill the hole for creditors with, instead encouraging the litigation team to focus on going after Alex and Celsius insiders, despite the numerous other entities that Celsius had already started lawsuits against for owing money to Celsius for the committee to go after.

It was through Simon that all the various groups that were supposed to act as fiduciaries to Celsius and Celsians were able to use the bankruptcy to pursue their own agendas, as, without the company's true leader, who had created the company and had the greatest interest in creating a plan that would allow Celsius and its creditors to come out of the situation in the best possible way (with his reputation on the line, and under the total scrutiny of the bankruptcy process), the UCC, its counsel, the Debtors, and various outside parties looking to grift from the vulnerable position Celsians now found themselves in, were able to make their own bottom lines their priority, and extend their roles in the process as long as possible, in order to make as much profit as they could for themselves and their companies.

Indeed, Simon switched his stances numerous times before and during the bankruptcy, initially telling depositors that he could make them whole where Alex couldn't, even when Alex was supposed to be given a period of exclusivity for the consideration of his plan -- making big promises like telling people that they would be able to receive their cryptos in kind, and get everything back, if they followed and bet on him.

His false promises stole supporters away from Alex and turned them on him for not being able to make the same impossible promises that Simon was making, turning to death threats on Alex and his wife, even supported by Simon, who, with his friends/acquaintances Max Galka, Mike Alfred, and Corey Klippenstein (referred to by some as the Three Amigos) had been fudding Celsius for weeks (causing fear, uncertainty, and doubt about it among creditors), to cause the bank run on Celsius that forced it to pause its withdrawals to ensure that the company's funds were not drained by those who withdrew first. It was said that part of their plan was to set up and dominate the crypto market in El Salvador, where BTC was declared tax-free, and investors were welcomed, and that part of the coordinated takedown of Celsius was to allow them to purchase Celsius's mining rigs on the cheap for their own mining projects in El Salvador, and indeed, Simon's own talk over twitter and in his Substantial Contribution motion suggest that he attempted to do this, showing how he contacted Asher Genoot of USBTC to see if he could partner with BNK to the Future in a bid to take over Celsius and its rigs, and with conversations showing that the company was thinking of expanding its business into Latin America and Africa.

84.    Thereafter, we submitted our sponsorship proposal, which was called a bid to meet process requirements, without specifying the particulars of our mining partner as we were still in the process of finalizing an agreement on the proposal's structure.

85.    On or around December 8, 2022, we initiated contact with U.S. Bitcoin Group ("USBTC") through Matt Uretsky at BR. This engagement aimed to explore the possibility of structuring a joint bid in alignment with our proposed sponsorship structure, with the overarching objective of ensuring that assets would not be sold but instead managed for the benefit of creditors. USBTC, ultimately emerged as the successful bidder (sponsor), facilitated through a newly formed company named Fahrenheit LLC ("FH"). FH's approach closely mirrored the structure initially proposed by BF. FH also later retained BR as their counsel.

89.    On the same day, December 23, 2022, direct communication with USCTC, an established U.S. Bitcoin miner, specifically with Asher Genoot and Jake Palmer, commenced independently of BR.  This engagement took place during the holiday period and was driven by BF's objective of structuring a deal that optimized the mining assets for the benefit of creditors.  The proposed structure aimed to involve an equity distribution and a proposed management contract.

90.    On or around January 2, 2023, we received feedback from the UCC in an email sent by Aaron Colodny.  The email outlined several questions that the UCC had regarding our bid and compliance matters needed to issue shares to creditors.  These

27

11038465.1

inquiries were subsequently addressed during a conference call held on January 6, 2023, during which we disclosed our intended mining partner, USBTC.







https://twitter.com/search?q=max%20keiser%20celsius&src=typed_query



# TEXAS

Abundant access to renewable solar and wind energy sources in the expansive, sunny plains of West and Central Texas makes it possible for US Bitcoin Corp to sustainably mine Bitcoin in a way that benefits both the environment and the community.

The Electric Reliability Council of Texas (ERCOT) provides more than one-fifth of all domestically-produced energy in the United States. Through an environmentally-responsible and efficient use of its power, our computing facilities work to stabilize the ERCOT grid.

Lastly, our mining operations recruit talented and hard-working West Texans, creating sustainable job opportunities and lasting economic benefits within our local community.





# NEBRASKA

Nebraska has a well-developed power grid with a mix of energy sources, including coal, natural gas, nuclear, and renewable sources such as wind and solar. This diversity helps to keep electricity prices stable and affordable, which is important for the energy-intensive process of mining bitcoin.

Another reason for locating a bitcoin mine in Nebraska is its dynamic local workforce. Nebraska has a strong tradition of innovation and entrepreneurship, and its residents are known for their work ethic and problem-solving skills. These qualities make Nebraska an attractive place for US Bitcoin Corp to run a best-in-class operation.



# NIAGARA FALLS

This facility is located in New York Independent System Operator (NYISO) Zone A only a short distance from Niagara Falls. This is a grid powered by ample renewable energy generation sources, ensuring that US BTC has ~80% zero-emissions electricity at the facility.

US Bitcoin Corp continues a long line of industrial tradition on the site, breathing economic life back into a former sodium plant that operated on this location from 1896 to 2015.



https://usbitcoin.com/our-campuses/

Asher has been identified by numerous creditors as having huge conflicts of interest that would prevent him from acting in creditors' best interests in his position on the NewCo board, citing the facts that he is already on the board of the new mining company "New Hut," as well as being a 30% shareholder in USBTC, thus making it "impossible for him to make impartial decisions while having controlling interests in New Hut/USBTC and managing daily affairs of both companies."



https://twitter.com/ChazzonKe/status/1701282481209561557





https://twitter.com/ChazzonKe/status/1701225317363261806

The lawyers argue that the plan should be passed because fees for resolicitation will be borne by creditors. It's funny how everyone cites the creditors interests when they want something to happen in their favour, while not producing a plan that is viable and in the creditors' interests that wouldn't have needed resolicitation in the first place.

The issues before the Court are narrow and, as indicated by the Court at the November 30, 2023 hearing, may include (1) does the Wind Down Motion comply with the Plan, (2) does the MiningCo transaction result in a modification of the Plan, and (3) if so, does that modification adversely affect a creditor who voted to accept the Plan and require re-solicitation. The Committee has significant concern that the vindictive squabbles of disgruntled bidders could lead to excessive legal expenses regarding questions that are not relevant to the decision before the Court. Again, all such fees will be borne by the Debtors' unsecured creditors.

Creditors hope that you will "kick these [imposters] to the curb," and "go after the excessive fees charged also."



https://twitter.com/barrymerritt/status/1733890949024026827



https://twitter.com/MectinMd/status/1734218527245046229

These proceedings have been an embarrassment to the justice system, allowing those who purport to represent the interests of those most harmed to flagrantly and consistently abuse their positions of authority and counsel to benefit themselves, no matter how obvious their crimes, and no matter how much those most affected recognize the absoluteness of their pursuit of self-interest and protest.

Every person of authority has long ago abandoned any semblance of fiduciary loyalty and duty, apart from to their own companies and other represented companies, taking advantage of the lack of ability of the individual creditor to be heard, and instead negotiating back room deals with those who purport to represent them, to push their own agendas, in return for favours granted to disloyal creditor representatives.

All is not lost, however. These bad actors should not be rewarded for their pilfering, and should be clawed back the amounts paid for services not rendered in their client (the creditors)' interest, and no substantial contribution payments should be paid out to those who abused their positions to extract gains for themselves, while tricking others into believing that such behaviours were done for their benefit.

Helping the creditor has been abandoned in favour of lawyers putting their current and former clients and employees first, in creating positions of power and inserting their own representatives into them. Creditors have been abandoned by the committees and leaders purporting to represent them, in return for incontestable, high-paid seats they have not earned the right to inhabit, but qualify themselves for.

The framing of Alex Mashinsky as the criminal has allowed everyone to merely pretend to exercise fiduciary loyalty to cloak their own self-interested motives and continue to find new ways to steal from creditors, with no one to keep anyone in check.

Chapter 11 is supposed to give a company the ability to restructure itself to make it better able to come out a company that allows creditors to feel confident. Instead, the company has been restructured in the image of its plan creators, none of whom had any true interest in crafting a plan geared toward helping anyone other than themselves.

The Novawulf bid was a predatory bid consisting of a company that makes its money hunting for cases like Celsius's, where they are take advantage of their plight to buy claims on the cheap. It is a bunch of companies who are clients of White and Case presenting a plan that represents White and Case's best interest. It is a metaphor for the bankruptcy proceedings – headed by groups of people disguised as creditors' loyal counsels, but actually wolves looking to rob creditors and leave them with the bare minimum.

Celsius creditors should not have to settle for scraps. The only reason creditors are pushing for this plan to be approved is that they don't want more money stolen from lawyers, and the only way to make it a fair trial is to claw back all the money made by those in power who have made the plan and NewCo board to benefit themselves.

Each time Celsians uncover important connections and potential conflicts of interest that would benefit the whole estate to uncover, their discoveries, inquiries, and attempts to remove bad actors from seats of power are quickly shut down, through gaslighting and ridicule, deflecting attention away from what was being covered up, and to personal attacks on creditors designed to remove their credibility, through their overconfidence in their own positions of esteem and power.

All of this has been done to hide and protect the real culprits behind Celsius's downfall: those who worked on behalf of FTX to take Celsius down:

# Celsius: Where is the $558m?

Per the Examiner Report, Celsius has spent $558m to buy its own token, and that allegation is often repeated by certain detractors seeking to subordinate CEL creditors. However, one glaring omission from such analysis is any attempt to trace where that money actually went. Such an obvious question critically important to creditor recovery is never asked.

Before proceeding to the inconvenient answer, let us first provide a brief overview of the interaction between token price and token quantity, as well as the effects of money inflows and outflows on a token.

As the bitcoin maximalist Michael Saylor likes to often say, scarce digital assets behave like closed thermodynamic systems. Except, his analysis does not apply just to BTC, but to any asset, digital or physical, whose quantity is capped, including CEL Token with a hard limit set at 700m.

Taking the analogy further, money flowing into a token is akin to heat flowing into a thermodynamic system, leading to an increase of price and temperature respectively. Alternatively, if heat leaks out we see the opposite effect. Just like temperature is dependent on the balance between heat entering and leaving the system, the money inflows and outflows determine the price of a token.

So how is it possible for so much money to have flown into CEL and yet for it to have been on a sustained downtrend? Simple. It is because even more money was flowing out. If Celsius was buying on the one side, then someone else was selling even more on the other. But who? Who was it that was selling and thereby benefiting from the monetary inflows?

It certainly was not Mashinsky, for if he was, why would the UCC go after him for a meager $2.8m rather than the full amount of the misused creditor funds?

It certainly was not the CEL market cap either, for if the $558m had stayed within the token, the fully diluted capitalization would have remained elevated rather than crashing to the current levels.

The real beneficiaries were the SHORT SELLERS on FTX. The $558m went right out of the pockets of Celsius creditors and straight into the pockets of the CEL shorters. FTX was the place where the real fraud was happening because value that properly belonged to Celsius creditors was siphoned off through the selling of counterfeit tokens, otherwise known as naked shorting.

Despite all the hubris about his financial knowledge, Mashinsky was frankly an idiot for not realizing that any value he placed in CEL was not safe, and that perpetual swaps could be weaponized as a tool to extract and steal, especially through fraudulent activity like naked shorting.

And hundreds of thousands of creditors have paid for his mistake with their life savings. While he may have underestimated the risks, and failed critically in securing his customers' funds, he was however not the main beneficiary of the fraud.

The real beneficiaries were the individuals or entities that were engaged in short selling on FTX. While their identities have been recorded via the KYC/AML procedures of that exchange, they are yet to be released to the public. Will they ever?

And how does this story end if they are not? Sadly, like so many such high profile cases, the outcome seems predetermined.

Creditors are left holding the bag. Share holders wiped out.

Mashinsky becomes the fall guy who is framed as the thief and fraudster that spends the rest of his life in prison.

Meanwhile the real beneficiaries behind the actual fraud get to sail quietly into the sunset with all their illicit gains intact.

https://twitter.com/crypto__btc/status/1720075780712214873/photo/2

It is known that there were bad actors within Celsius working outside of Alex's instruction -- and indeed, actively working against him.

It is highly suspect that no one has seriously gone after the person leaking information within Celsius, who specifically showed themselves to be acting against the interests of Alex being able to put out a plan when ready. And the fact that Tiffany Fong was chosen as the receiver of the leak does not feel like

an arbitrary decision, as, despite Tiffany actively framing herself as a random addition and a "Reluctant Crypto Content Creator," it feels as though she was chosen for the way she would help frame what was going on to the public:



https://twitter.com/TiffanyFong

In her interviews, she downplays her Communications, public relations, and marketing education and experience, when her education history shows that she studied Communications at USC Annenberg School for Communications and Journalism at University of Southern California, and Human Resource Management, Marketing, and Related Support Services, at the same university; and her work history shows that she was a Marketing Intern at Purdue Marion & Associates (a public relations firm), was a Creative Executive intern at Ramos Law PC, and a Public Relations intern at The Narrative Group, as well as working as an Artist Management Assistant and Social Media Manager at Red Light Management, showing that she spent a good deal of time cultivating the experience that would make her the ideal candidate to leak information, get attention, and frame issues in a certain narrative. Whether that happened by chance or by design, it is clear that the leaker chose Tiffany to get the maximum coverage possible for the material sent, and it is suspicious that Tiffany's output always frames Alex as bad, and Sam Bankman-Fried as good, despite Sam already having been found guilty.



Tiffany says she reached out to Sam to ask him to tell his side of the story, and one wonders why she did not give Alex Mashinsky the same chance to tell her and her audience his side, instead choosing to create a black-and-white narrative with Alex and Celsius, while humanizing Sam and presenting things in shades of grey that feel almost designed to influence public perception to improve Sam's reception by the public. Tiffany's former experience in Artist Management and Public Relations would have given her the know-how to help Sam with his public image, and the fact that Sam is framed so positively by her despite the verdict being out that he scammed more people than Alex makes one wonder if it might have been part of the greater overall plan to demonize Alex, take down Celsius, and ensure it would have no hope of ever resurrecting itself, while paving the way for Sam to be given a second chance, and perhaps allow FTX to make a future recovery.

It is clear that White and Case, Kirkland and Ellis, and the UCC have been hiding information from creditors regarding the relationship between Celsius insiders, FTX, and the fall of Celsius, and also clear that the lawyers have once again used their positions of authority to enforce what is in their best

interest, bullying creditors, while presenting themselves as having the right to do so in their powerful positions as lawyers and representing the committees of power in this case.

The documents must be uncovered to reveal how big a role FTX has had in the Celsius case and might still continue to have:

---

22-10964-mg    Doc 3532    Filed 09/22/23    Entered 09/22/23 15:28:12    Main Document
Pg 9 of 29

enlighten this court as to how I became in possession of it. Yesterday, September 21, 2023 at 6:51 PM Eastern Time, I was sent an email with an attached document that had the words "FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS | HIGHLY CONFIDENTIAL." The email was sent from Carolyn Gurland, an attorney at White & Case, to T.J. McCarrick of Kirkland & Ellis and myself, Otis Davis, with CC's to Kathryn Kuethman, Samuel Hershey, Aaron Colodny, Joshua Weedman, Michael Jaoude and the White & Case SPAC Team, all of White & Case; also CC'ing Judson Brown, Ross M. Kwasteniet, Chris Koenig, Grace C. Brier, and Hannah C. Simson, all of Kirkland & Ellis.

Let me make it clear to this court what the document says, since White & Case and Kirkland & Ellis are claiming that they don't know what this "FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS | HIGHLY CONFIDENTIAL" document says. What this document says is that there is no doubt that FTX/Alameda Research enabled naked shorting of CEL to the tune of over 20 million CEL tokens, and Chris Ferraro along with others gave FTX the critical data on the debtor's active positions to force them into a liquidity crisis.

### SETTLEMENT NEGOTIATIONS

Judge, during our settlement negotiations, Chris Koenig of Kirkland & Ellis threatened me, once again bullying me, telling me that I could go out there and violate confidentiality and they will bring me in front of the court, saying you, Otis Davis, knew it was confidential and you released it, stating that the court can hold me in contempt. In addition, Aaron Colody also tried to intimidate me by lying and telling me that I have to file this document under seal.

**CONCLUSION**

Your Honor, I filed an objection at Docket 3084 regarding CEL token subordination, and your

Honor indicated this is not the time for that objection and you're not ruling on it now and will

table the objection for the confirmation hearing. Judge, I renew that objection to subordinate

CEL token creditors from $0.81 to $0.25 based on the insufficient evidence presented by the

UCC or the Debtors. I presented the court today with numerous pieces of evidence, proving that

the vast majority of the upwards price movement from the pause date to the petition date was

caused by illegal naked shorts closing their positions and thus buying back tokens that

increased the price of CEL. I also proved, based on the "FOIA CONFIDENTIAL TREATMENT

REQUESTED BY CELSIUS | HIGHLY CONFIDENTIAL" document that was sent to me by Carolyn

Gurland of White & Case through her negligent error, that Chris Ferraro, Jason Perman, Rod

Bolger and others were sharing sensitive company financial information with outside parties,

namely FTX, that then used that information to attack Celsius and the CEL token. Lastly, I

proved that the UCC and the Debtors' counsel are withholding sensitive information that

completely refutes the narrative that has been used to argue for the subordination of CEL token,

hurting creditors like myself.

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174909222380000000174.pdf

The Examiner herself wrote in her report (Docket 1956) on page 325 of

426, **"Mr. Bolger recalled that the FTX team 'drilled into' Celsius's**

**balance sheet.** A follow-up meeting with Mr. Bankman-Fried was

scheduled, but the meeting never took place. Ultimately, no deal was

finalized." **After the FTX team 'drilled into' the Celsius balance sheet**

**after receiving the company's private financial information illegally**

**without board approval or the approval of the then-CEO, then the FTX**

**team used that illegally obtained private company financial**

**information to illegally naked short CEL token, which is why the**

**Debtors and the UCC have filed a claim in the FTX bankruptcy for $2**

**billion. If that's incorrect, the Debtors are free to state the reason for**

**their filed $2 billion claim in the FTX bankruptcy.**

https://cases.stretto.com/public/x191/11749/PLEADINGS/1174910112380000000038.pdf

FTX must be gone after to retrieve the $2 billion claim owed to creditors and reveal and expose FTX's
role in Celsius's current state.

Capital markets · News

# Kroll publishes FTX list of banks, counterparties, relationships

November 18, 2022 · by Ledger Insights



Kroll has been appointed as the claims agent for the FTX/Alameda bankruptcy and published a preliminary list of interested parties, including banks, counterparties and suppliers.

https://www.ledgerinsights.com/kroll-ftx-list-banks-counterparties/

**Professionals**
Alvarez & Marsal North America, LLC
Bahamian Counsel
Chainalysis
Covington & Burling LLP
Joele Frank
Kroll Restructuring Administration
Landis Rath & Cobb LLP
Nardello & Co. LLC
Perella Weinberg Partners
Quinn Emanuel Urquhart & Sullivan, LLP
Robert Lee & Associates, LLP
Simpson Thacher & Bartlett LLP
Sullivan & Cromwell LLP
Walkers

https://www.ledgerinsights.com/wp-content/uploads/2022/11/FTX-Kroll-list.pdf.

Pretty much the same people who were responsible for taking Celsius down seem to be the ones who have all the say in the bankruptcy.

It is vital that we clean house and get rid of all individuals with conflicts of interest, and clawback the gains they have stolen, if we are to have a successful restructuring that is truly in the creditors' interests.

If that is not allowed to happen, then clawbacks of fees and expenses should happen for all parties, and a wind=down returning these funds to creditors should be undertaken.

The bankruptcy proceedings have not been fair, and this is the only way to make them fair.

Please help us creditors and act in our interest, Judge Glenn.

Sincerely,

Cathy Lau
Pro Se Creditor

December 14, 2023