| | |
|---|---|
| Joshua A. Sussberg, P.C.<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:    (212) 446-4900 | Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)<br>Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)<br>Christopher S. Koenig<br>Dan Latona (admitted *pro hac vice*)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:    (312) 862-2200 |

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF**
**JOINT MOTION OF THE DEBTORS AND THE COMMITTEE**
**FOR ENTRY OF AN ORDER (I) APPROVING THE IMPLEMENTATION**
**OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

I, Marc D. Puntus, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

1.    I am a Partner and Co-Head of the Debt Advisory and Restructuring Practice of Centerview Partners LLC ("Centerview"), a full-service independent investment banking firm with its principal offices at 31 West 52nd Street, New York, New York 10019. Centerview has been engaged as the investment banker for the above-captioned debtors and debtors in

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

possession (collectively, the "Debtors"), which appointment was approved pursuant to the *Order (I) Authorizing the Employment and Retention of Centerview Partners LLC as Investment Banker for the Debtors Effective as of July 13, 2022, (II) Approving the Terms of Centerview Agreement, (III) Waiving Certain Reporting Requirement Pursuant to Local Rule 2016-2, and (IV) Granting Related Relief* [Docket No. 846].

2.  I submit this declaration (the "Declaration") in support of approval of the *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* (the "Wind Down Motion") [Docket No. 4050].[2] Unless otherwise indicated, all facts set forth in this Declaration are based upon (a) my oversight of the Centerview team as the Debtors' investment banker, (b) information learned from my review of relevant documents, (c) information I received from members of the Debtors' management, or (d) my past experience advising both distressed and non-distressed businesses and companies and their stakeholders. I am not being specifically compensated for this testimony, and Centerview is receiving compensation only as a professional retained by the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein on that basis.

### Qualifications

3.  I am a Partner and Co-Head of the Debt Advisory and Restructuring Practice of Centerview. Centerview is a full-service independent investment banking firm providing financial advisory services, including mergers and acquisitions and restructuring advice, across a

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Wind Down Motion, the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

2

broad range of industries. Centerview and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.

4. Prior to and since joining Centerview in 2011, I have advised companies and other stakeholders in numerous in-court and out-of-court restructurings, recapitalizations, and reorganizations, and I have experience in structuring, negotiating, and executing sale transactions, including under section 363 of the Bankruptcy Code and pursuant to chapter 11 plans. Before joining Centerview, I was a Managing Director and founder of Miller Buckfire & Co., an investment bank that provided financial advisory services to constituents in a broad range of restructuring and corporate transactions. Prior to that, I was a member of the financial restructuring group of Dresdner Kleinwort Wasserstein ("DrKW"). Prior to joining DrKW, I was a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP. I received my B.S.B.A. *magna cum laude* from Georgetown University and my J.D. *cum laude* from Boston University School of Law.

5. Centerview was engaged by the Debtors in June 2022 to serve as their investment banker to evaluate various strategic alternatives to maximize recoveries for the Debtors' stakeholders. Centerview advised the Debtors throughout the sale and marketing process, the auction process, and the development of the Plan. I have been involved as a senior member of the Centerview team throughout our engagement.

### The Mining Sale and Marketing Process

6. Early in the chapter 11 cases, the Debtors pursued a dual-track marketing process for the Debtors' retail platform and mining business, while simultaneously evaluating a potential stand-alone reorganization. As part of this dual track process, beginning in September 2022,

3

Centerview, at the direction of the Debtors, commenced a sale and marketing process designed to identify parties interested in purchasing the Debtors' retail platform, mining business, Cryptocurrency and related assets, loan portfolio, and/or other assets pursuant to section 363 of the Bankruptcy Code or under a chapter 11 plan. As part of such process, the Debtors executed over 40 confidentiality agreements with prospective bidders. With respect to Mining, the Debtors (and the Committee) were open to considering bids for individual Mining assets, bids for the Mining business as a whole, and bids providing for the sale/reorganization of the Mining business under a chapter 11 plan.

7. Pursuant to this process, the Debtors received three non-binding bids for the Debtors' Mining business as a whole and four bids for individual assets of the Mining business. The individual asset bids effectively contemplated liquidating the Debtors' mining equipment and, if executed, would have resulted in a significant destruction of value. As to "going concern" bids for the Debtors' Mining business, one bid contemplated a $300 million valuation, but would have left creditors with a minority equity stake in the resulting business behind a large tranche of expensive and dilutive debt. The second bid contemplated an enterprise value of approximately $175 million, but such value was contingent upon the bidder obtaining financing at a time when financing for bitcoin miners was very difficult to obtain (and it remains difficult to obtain today). The final bidder offered $10 million plus a very small earn out for the Debtors' Mining business. Each of these bids, if executed, including the liquidation bids, would have resulted in significantly reduced recoveries for creditors as compared to the sale/reorganization of the Debtors' Mining business as contemplated in the MiningCo Transaction.

8. Following this initial marketing process, and the disappointing bids for the Mining company that were received, the Debtors, in consultation with the Committee, negotiated

4

and executed a plan sponsor agreement with NovaWulf and designate NovaWulf as the Stalking Horse Bidder for a broader "newco" transaction including Mining. The NovaWulf structure contemplated a new company that would be an externally managed and reorganized company, with several lines of business, including bitcoin mining. After extending the final bid deadline to April 17, 2023, the Debtors and Centerview continued to solicit offers for the Debtors' assets and businesses, with the NovaWulf transaction serving as a Court-approved "stalking horse" in that process. Prior to the final bid deadline, the Debtors received two qualified bids from Fahrenheit and the BRIC. As a result, the Debtors conducted the Auction, which began on April 25, 2023, and concluded on May 24, 2023. NovaWulf, Fahrenheit, and the BRIC all participated in the Auction. Ultimately, at the conclusion of the Auction, the Debtors, in consultation with the Committee, selected Fahrenheit as the Successful Bidder with respect to the NewCo Transaction, and the BRIC as the Backup Bidder.

## The MiningCo Transaction

9.    In light of the uncertain regulatory environment surrounding Cryptocurrency-based companies and other risks associated with the NewCo Transaction, the Debtors and the Committee were determined to ensure that the going concern value of the Debtors' mining operations would be preserved in the event the NewCo Transaction could not be implemented for regulatory reasons or otherwise. To that end, the Debtors built a toggle into the Plan, which would allow the Debtors to transition to an Orderly Wind Down. Specifically, the Plan contemplates that, if the NewCo Transaction cannot be consummated, the Debtors, the Committee, and their respective advisors, are charged with determining whether a toggle to an Orderly Wind Down, which would likely include a going-concern reorganization of the mining operations with the equity distributed to creditors, is in the best interests of the Estates. Plan Art. IV.E.1. The Debtors considered this optionality essential in that it provided them with a

viable option to return value to creditors in the form of Cryptocurrency and equity without incurring the time and expense of Plan re-solicitation. While the Plan and Disclosure Statement provided a high-level overview of the Orderly Wind Down, certain details were left to be finalized in the event the toggle was executed, including, as it relates to the Mining business, the identity of the Mining manager and specific plans to distribute its equity to creditors and expeditiously take the Mining business public, providing value and liquidity to the creditors in the form of public equity. The Plan required the Debtors to provide notice of such details to creditors through the Wind Down Motion. Furthermore, the toggle provides the Debtors with the opportunity to make necessary adjustments to the Orderly Wind Down to ensure the Orderly Wind Down is regulatorily compliant.

10.    In addition, in recognition of the fact that the markets may have shifted and the Debtors' circumstances and assets may have changed at a point in time when the Debtors were compelled to pivot to implementing an Orderly Wind Down, the Plan contemplated a market check of the Backup Plan Sponsor Administrator Term Sheet to ensure the terms of the Orderly Wind Down reflected the latest market conditions and the current status of the Debtors' assets. After learning of the SEC's determination regarding the Debtors' pre-clearance request for the NewCo Transaction, the Debtors, in partnership with the Committee, did just that.

11.    The Debtors, together with the Committee solicited and received bids for MiningCo. The Debtors also considered one additional indication of interest received post-confirmation. At the end of this process, the Debtors and the Committee selected US Bitcoin as the Mining manager based on its valued mining expertise, the direct value to be contributed by US Bitcoin to the MiningCo ($141 million per the Disclosure Statement), US Bitcoin's commitment to invest approximately $12.75 million, on an initial basis, and

6

$15.6 million if the US Bitcoin Agreement is extended to five years, in equity into MiningCo at Plan value, and the competitive fee structure US Bitcoin ultimately agreed to. The Debtors' and the Committee's selection of US Bitcoin reflects a logical reaffirmation of the parties' prior decision to select US Bitcoin as the mining manager as part of the NewCo Transaction.

### MiningCo Capitalization

12. The Orderly Wind Down described in the Disclosure Statement assumed that the Backup MiningCo would be capitalized with $50 million in cash, which, in my opinion, is entirely inadequate under these circumstances. As described in the Disclosure Statement, $50 million represents the absolute bare minimum cash necessary for MiningCo to operate. Notably, during the broader "newco" sale process and the post-confirmation market check, all bidders proposed a capitalization amount for MiningCo consistent with or higher than the $225 million capitalization amount ultimately agreed to with US Bitcoin. Indeed, US Bitcoin initially requested a $300 million capitalization. Pursuant to the NewCo Transaction, now abandoned, a significant portion of the $450 million capitalization would have been used to fund and build out MiningCo. The $225 million capitalization amount will: (i) enable the build-out of the Cedarvale site, the purchase of which had not been consummated at the time the Disclosure Statement was approved; (ii) provide working capital for MiningCo, including as needed to put on power hedges; (iii) provide liquidity needed to replace older and less efficient mining rigs, a needed exercise for a bitcoin miner; and (iv) ensure that MiningCo has an acceptable cash cushion to operate in a historically turbulent industry. This capitalization level is necessary to ensure MiningCo can execute on its business plan without reliance on raising debt or outside capital in the near term, a very challenging exercise in the current market that would dilute creditor recoveries.

13. As compared to the NewCo Transaction, which capitalized NewCo with $450 million of Liquid Cryptocurrency, the MiningCo Transaction will make $225 million more Liquid Cryptocurrency available for direct distribution to creditors, a significant improvement for creditors who prefer Liquid Cryptocurrency. In addition, the Debtors' alternative investments, valued at approximately $306 million in the Disclosure Statement, will now be monetized by the Litigation Administrators (including the BRIC), with proceeds of such investments to be directly distributed to creditors. Again, this represents a significant improvement for creditors who prefer Liquid Cryptocurrency.

14. As compared to the capitalization in the Orderly Wind Down described in the Plan and Disclosure Statement, the $175 million increase in capitalization should not impact creditors' overall recoveries in these cases. Specifically, pursuant to the Plan, creditors will receive 100% of available Liquid Cryptocurrency as well as 100% of the equity of MiningCo (subject to modest dilution from equity to be purchased by US Bitcoin and equity to be provided to US Bitcoin as Mining manager). Capitalizing MiningCo with an incremental $175 million of fiat should, at a minimum, result in a dollar-for-dollar increase in the MiningCo equity value, in the form of incremental cash on the balance sheet and improvement in future operational performance and cash flow to be generated by, among other initiatives, the buildout of the Cedarvale site, which buildout was not specifically contemplated at the time of the Disclosure Statement. The enterprise valuation analysis Centerview prepared for MiningCo included in the Disclosure Statement, based on projections prepared at the time, was $565 million. As part of the post-confirmation negotiations, US Bitcoin has agreed to invest up to $15.6 million in MiningCo equity at a $740 million valuation ($565 million plus the incremental $175 million), reflecting US Bitcoin's view that the incremental $175 million in fiat will result in an increase in

MiningCo equity value of at least $175 million.  US Bitcoin's investment demonstrates that it believes that the value of MiningCo, over time, will be significantly higher.  Creditors will ratably benefit from the incremental cash at MiningCo and the buildout of Cedarvale through their distribution of MiningCo equity under the Plan.  While individual creditors may prefer more or less MiningCo equity or Liquid Cryptocurrency, when viewed from the perspective of creditors generally, adding $175 million of fiat to MiningCo represents at least an economically equivalent result for creditors under the circumstances.

15.   Bitcoin mining is an extremely volatile business due to, among other things, volatility associated with swings in the price of bitcoin as well as the price of power used to energize mining rigs.  In the wake of the demise of Terra and Luna, the subsequent rapid fall in the price of bitcoin and the chapter 11 filings of Celsius, FTX and other similarly situated businesses, bitcoin miners with low or no leverage and sufficient liquidity were able to avoid chapter 11 and survive the downturn.  Marathon Digital Holdings, for example, which survived the downturn due to low leverage, liquidity and significant scale, has seen its share price increase by over 400% in the past year.  Certain other bitcoin miners, including Core Scientific, with significant leverage and the inability to raise incremental capital during the downturn, were not able to avoid chapter 11.  While bitcoin prices have increased by over 150% in the past year, prices very well may decrease by the same amount or more next year or thereafter.  As well, the network hash rate, reflecting the number of miners hashing (mining for bitcoin) at any given time, will remain volatile depending on bitcoin prices and other factors.  The Debtors and the Committee, and US Bitcoin, are determined to ensure that MiningCo is appropriately and conservatively capitalized so that it may operate and grow in a manner that maximizes value for creditors, and in all circumstances avoid a return trip to chapter 11.

9

## Conclusion

16.     For the foregoing reasons, I believe that the MiningCo Transaction is authorized by the Plan and will maximize value for the Debtors' creditors.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  December 20, 2023

/s/  Marc D. Puntus
Name:  Marc D. Puntus
Title:   Partner and Co-Head of the Debt Advisory and Restructuring Practice
Centerview Partners LLC