Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:    (312) 881-5400
Facsimile:    (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:    (213) 620-7700
Facsimile:    (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:    (305) 371-2700
Facsimile:    (305) 358-5744

*Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**JOINT OMNIBUS REPLY OF
THE DEBTORS AND THE COMMITTEE IN SUPPORT
OF THE JOINT MOTION OF THE DEBTORS AND THE COMMITTEE
FOR ENTRY OF AN ORDER (I) APPROVING THE IMPLEMENTATION
OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") and

the official committee of unsecured creditors (the "Committee") appointed in the

above-captioned chapter 11 cases (the "Chapter 11 Cases") submit this joint reply (the "Reply")

in support of the *Joint Motion of the Debtors and the Committee for Entry of an Order*

*(I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief*

[Docket No. 4050] (as supplemented by the *Supplemental Statement Regarding the Joint Motion*

*of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the*

*MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4115], the "Wind Down

Motion")[2] and in response to the Objections,[3] and submit as follows:

**Preliminary Statement**

1.      The confirmed Plan contemplated two paths forward:   ***first*** the NewCo

Transaction, and ***second***, the implementation of the Plan through an Orderly Wind Down, which

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Wind Down Motion, the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

[3]    As used herein, "Objections" means, collectively:   the *Objection of the United States Trustee to the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4097] (the "U.S. Trustee Objection"); the *Preliminary Opposition of the Ad Hoc Group of Borrowers to the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4100] (the "Borrow AHG Objection"); *Objection to the Mining Plan* [Docket No. 4101] (the "Lau Objection"); and *Supplemental Objection of the Ad Hoc Group of Borrowers to the Supplemental Joint Statement Regarding the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief (ECF Doc. # 4115)* [Docket No. 4122] (the "Supplemental Borrow AHG Objection").

would involve the creation of a new stand-alone bitcoin mining company. The Plan also explains that the details of the Orderly Wind Down, including the identity of the Mining manager, the budget, fees, and disbursements associated with the Orderly Wind Down, and the mechanics and procedures to effectuate the Orderly Wind Down, would all be set forth in the Wind Down Motion to be filed on 10 days' notice to creditors. The Orderly Wind Down was always to be implemented by issuing stock in a reorganized bitcoin mining company in the event the NewCo Transaction could not be consummated for any reason, including a negative regulatory determination. The SEC's denial of the relief required to implement the NewCo Transaction is the exact situation that the Debtors envisioned when they built the Orderly Wind Down option into the Plan. Toggling to an Orderly Wind Down allows the Debtors to promptly seek approval of the Wind Down Motion, implement the Plan through the MiningCo Transaction, and emerge from bankruptcy without the attendant cost and delay of soliciting a new plan.

2.      The Plan provides that creditors will receive four types of distributions in an Orderly Wind Down:    (a) Liquid Cryptocurrency; (b) Backup MiningCo Common Stock; (c) Illiquid Recovery Rights; and (d) Litigation Proceeds. Plan, Art IV.E. That is exactly what the MiningCo Transaction provides. The Plan and the Orderly Wind Down toggle were clear that the Debtors would include the details of the Orderly Wind Down, based on the facts and circumstances leading to the decision to toggle, in a "Wind Down Motion," which would be filed on ten days' notice to creditors. Plan Art. IV.E (providing, in the "Means of Implementation" section of the Plan that the Wind Down Motion "shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, the identity of the Mining manager, and any revisions to the Wind-Down Procedures"). The identity of the Plan Administrator and mining

manager were among those items expressly left to be determined in the Wind Down Motion, although the Plan contemplated that US Bitcoin could be the mining manager. *Id.* (explaining that the US Bitcoin Agreements would not be operative in an Orderly Wind Down "unless US Bitcoin is selected as the Mining manager in connection with the Orderly Wind Down").

3.      The flexibility provided by the Orderly Wind Down was necessary.   The Disclosure Statement plainly described that there was a risk the SEC would prevent the Debtors from consummating the NewCo Transaction. *See* Disclosure Statement, Art. VIII.B.12.  At the time the Disclosure Statement was approved and the Plan was solicited, however, it was not possible for anyone to know exactly what, if any, regulatory impediment may arise that would prevent consummation of the Plan, and what the resulting terms of the Orderly Wind Down transaction would be.

4.      As described in the Wind Down Motion and the Ehrler Declaration, submitted in support thereof, it became necessary for the Debtors to exercise the toggle after the SEC denied the NewCo pre-clearance letter.  The Debtors solicited and received revised bids from three interested bidders and determined to pursue the MiningCo Transaction as described in the Wind Down Motion.  The Debtors and the Committee also subsequently reached an agreement with the BRIC, a potential Backup Plan Administrator contemplated in the Plan, to liquidate the Debtors' illiquid assets and pursue other claims and causes of action on better terms than were described in the Plan.

5.      All creditors were provided notice of the Wind Down Motion and each and every creditor had the opportunity to object to the implementation and terms of the MiningCo Transaction.  No Holders of Earn, Custody, Withhold, Unsecured Loans, or General Unsecured

Claims objected.  The U.S. Trustee and the Retail Borrower Ad Hoc Group, however, argue that the MiningCo Transaction is a modification of the Plan that requires resolicitation.

6.      The MiningCo Transaction is not a modification of the Plan.  Rather, it implements the pivot described in Plan in the manner that was specifically disclosed to creditors. But even if the MiningCo Transaction is a modification to the Plan, it does not require resolicitation.  Resolicitation is only required if a modification is material **and** adverse to the recoveries of creditors.  That is plainly not the case here.  As described in the declaration of Robert Campagna, the MiningCo Transaction would result in **increased** recoveries to creditors as compared to the Orderly Wind Down described in the Plan and Disclosure Statement (the "Baseline Orderly Wind Down").  Campagna Decl. ¶ 13.

7.      The objectors mainly argue that resolicitation is required because the MiningCo Transaction seeks to capitalize MiningCo with $225 million, rather than the $50 million amount used to project estimated creditor recoveries in the Baseline Orderly Wind Down.  This argument is unpersuasive.  First, as noted above, the Debtors and the Committee have discretion under the Plan to specify the terms of an Orderly Wind Down, including budgets and disbursements, in the Wind Down Motion.  As the Plan has been confirmed, it is the law of the case that the detailed terms of an Orderly Wind Down can be approved by motion on 10 days' notice, without resolicitation.  The capitalization of MiningCo is unquestionably a "budget and disbursement" detail related to the Orderly Wind Down, contemplated to be set forth in the Wind Down Motion. Second, under the MiningCo Transaction, the Debtors' creditors will receive 100% of the available Liquid Cryptocurrency and the pre-investment equity value of MiningCo.  There is no meaningful economic difference to creditors between a dollar of Liquid Cryptocurrency distribution and a dollar added to the balance sheet of MiningCo when creditors get the value

either way.  The economic equivalence is demonstrated by the fact that the valuation used for MiningCo in the Disclosure Statement was $565 million, but the value at which US Bitcoin is investing its own money is $740 million ($565 million + $175 million).  The result of the increase in capitalization is economically equivalent for creditors, and their recoveries would be neutral, not materially and adversely affected by the capitalization.

8.    This is not to say the Debtors and the Committee have carte blanche when proposing Wind-Down Procedures.  Any variations must be within reason.  For example, it would be unreasonable for the Debtors and the Committee to modify distributions such that creditors received no Liquid Cryptocurrency or no stake in the reorganized mining company, liquidate the mining company, or to propose the new business engage in new, high risk business lines not otherwise contemplated in the Plan.  The objectors, however, cannot credibly argue that the terms of the MiningCo Transaction are not squarely within what was contemplated by the "pure play, publicly traded mining business" creditors voted to accept.  Plan Art. I.A.15 (definition of "Backup MiningCo").  The Debtors are pivoting away from the NewCo Transaction, which required a capitalization of $450 million, to the proposed MiningCo Transaction, which requires a capitalization of $225 million.  As a result of this pivot, creditors will receive more Liquid Cryptocurrency than under the NewCo Transaction, while still receiving 100% of the pre-investment equity in MiningCo.[4]  Furthermore, creditors will receive a higher overall recovery under the MiningCo Transaction than under the Baseline Orderly Wind Down.

9.    Moreover, due to the rise in cryptocurrency prices between the date used to calculate the estimated recoveries in the Disclosure Statement (May 31, 2023) and the date the

---

[4]    US Bitcoin has agreed to purchase a small amount of equity in the MiningCo at Plan value adjusted for capitalization.

Wind Down Motion was filed, if the Plan is promptly consummated and current cryptocurrency prices are maintained, all creditors will receive more Liquid Cryptocurrency than they were projected to receive under the Baseline Orderly Wind Down.  The reason for the increase in recoveries here is not legally relevant.  Although, it is not accurate to state that the Debtors had no role in the increased recoveries to creditors.  If the Debtors had not committed to retain cryptocurrency for their creditors to be able to make distributions in-kind, the Debtors' Estates and its creditors would not have benefited from the rise in prices.

10.     Under the MiningCo Transaction, Holders of Allowed Retail Borrower Deposit Claims will receive an estimated 89% recovery[5]—6% greater than the projected recovery in the Baseline Orderly Wind Down.  Although that group bargained to receive priority with respect to making elections to receive more Cryptocurrency than NewCo Common Stock in the NewCo Transaction, the Plan explicitly provides that those elections would be void in the event of an Orderly Wind Down.  *See* Plan, Art. III.B.2.  The "removal" of those elections is not a modification to the Plan—it is an implementation of the Plan as written.

11.     The Retail Borrower Ad Hoc Group's preference to now receive a greater recovery in Liquid Cryptocurrency and impair the equity value of the reorganized mining company to the detriment of all of the Debtors' other creditors is not relevant—the relevant standard regarding whether the Debtors are required to resolicit is whether the modifications to the Plan, if any, are material ***and*** adverse to creditors.  To the extent the Court concludes the Plan has been modified, the Debtors have demonstrated through the Wind Down Motion and the declarations filed therewith that any modifications are not.  The Retail Borrower Ad Hoc Group provides no credible evidence to the contrary.  The Retail Borrower Ad Hoc Group has a

---

[5]   Based on cryptocurrency prices as of November 17, 2023, the date used for values in the Campagna Declaration.

single-minded focus on maximizing Liquid Cryptocurrency distributions for its members' own tax purposes (and so they can try to refinance their loans to avoid negative tax consequences) and is willing to destroy the value of the MiningCo to the detriment of all creditors for even a slight increase in Liquid Cryptocurrency. The self-serving nature of their objection is readily apparent.

12.    The MiningCo Transaction results in hundreds of millions of dollars more in distributable value when compared to the viable alternatives. It provides all creditors with improved recoveries as compared to the Baseline Orderly Wind Down. It is the only viable path forward to maximize value to creditors and promptly emerge from bankruptcy. The objectors' attempts to obtain holdup value and cause the further dissipation of Estate assets through an unnecessary resolicitation should not be rewarded. The Court should overrule the Objections, approve the Wind Down Motion, and enforce the expectations of the over 80,000 creditors who voted to accept the Plan, so that the Debtors can emerge from chapter 11 and begin the process of returning value to their creditors.

## **Reply**

### I.    **The Debtors Disclosed the Regulatory Risks and that the Specifics of the Orderly Wind Down Would Be Defined in the Wind Down Motion**.

13.    The Debtors conspicuously and repeatedly disclosed the potential regulatory risks related to the NewCo Transaction. *E.g.*, Disclosure Statement Arts. III.N,[6] VIII.B.12.[7] The Debtors and the Committee diligently pursued pre-clearance, repeatedly asking the SEC for

---

[6]    "Q: Are any regulatory approvals required to consummate the Plan? A: Yes, there are a number of regulatory approvals required to consummate the Plan, including obtaining pre-clearance from the SEC confirming the financial statement presentation or the registration statement on Form 10 pursuant to the Securities and Exchange Act of 1934 (as amended) to be filed by NewCo."

[7]    "Consummation of the Restructuring Transactions may depend on obtaining Regulatory Approvals. Failure by any governmental authority, including the SEC, to grant a necessary or advisable Regulatory Approval could prevent or impose limitations or restrictions on Consummation of the Restructuring Transactions and Confirmation of the Plan."

guidance prior to confirmation. The Court also asked the SEC for updates on numerous occasions, and the SEC filed statements saying the SEC would, as it received additional information, "immediately communicate to the Court any issues or concerns as they may arise" and "consider regulatory implications and raise them with the Court and the Debtors as appropriate."[8] Though the timing of the SEC's decision is unfortunate, the Plan provides for the ability to implement the Plan through an Orderly Wind Down so that the Debtors can emerge without further delay and the expense and risk that accompany that delay.

14.     The regulatory risk identified in the Disclosure Statement, although reduced based on the recent guidance received from the SEC, still remains. The SEC must still approve a Form 10 for the MiningCo Transaction before the stock may be listed on NASDAQ and traded. *See* Wind Down Motion ¶ 1 ("The guidance paves the way for the Debtors' bitcoin mining operation to emerge as a new, publicly traded company owned by the Debtors' Account Holders (subject to successful completion of an SEC review process of a completed Form 10)."). The Committee asked the SEC to state in its response to the Wind Down Motion whether the MiningCo Transaction fits within the guidance it provided the Debtors; however, the SEC once again simply reserved its rights.[9]

15.     The effectiveness of a Form 10 registration statement is not a condition precedent to the Effective Date of the MiningCo Transaction. *See* Plan, Art. IV.E. ("Those conditions to the Effective Date . . . shall be removed or revised, including the condition in Section 12 which

---

[8]     *Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Bid Protections for the Proposed Plan Sponsor and (II) Granting Related Relief* [Docket No. 2322]; *Statement Regarding Debtors' Motion for Entry of an Order (I) Authorizing and Approving Certain Fees and Expenses for the Backup Plan Sponsor, and (II) Granting Related Relief* [Docket No. 2831].

[9]     *Reservation of Rights of the U.S. Securities and Exchange Commission to Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4099].

requires a Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective.").  If the MiningCo Transaction is approved, the Debtors intend to go effective at the end of January prior to the effectiveness of the Form 10.

16.     In light of the continued risk that the SEC will deny the proposed Form 10, the MiningCo Transaction includes a right for the New Board to terminate its management agreement with US Bitcoin and pay limited damages if it determines on or before May 1, 2024, that there is not a reasonable likelihood that MiningCo will achieve the effectiveness of its Form 10 filing.  That provision (which is incorrectly described and misconstrued by the U.S. Trustee as providing US Bitcoin, the proposed Mining manager, with a termination right) preserves MiningCo's ability to address regulatory issues that may arise and limit the effects of any such regulatory issues on creditors' recoveries.  Wind Down Mot., Ex. 1, at p. 3 "Form 10 Termination Right"; UST Obj. ¶ 30.

## II.     The Plan Contemplated the MiningCo Transaction and US Bitcoin as Mining Manager.

17.     The Orderly Wind Down toggle always contemplated the issuance of equity in a reorganized mining company, contrary to the statements of the Retail Borrower Ad Hoc Group. *See, e.g.*, Disclosure Statement at 111 ("As explained throughout this Disclosure Statement . . . the Orderly Wind Down is a standalone reorganization of the Debtors' mining business and an orderly liquidation of the Debtors' other assets").

18.     The Plan provides that such a transaction in connection with an Orderly Wind Down may be consummated with a party other than the Backup Plan Sponsor (the BRIC), and expressly contemplates that the mining manager could be US Bitcoin.  At the time the Disclosure Statement was approved in August 2023, the Debtors and the BRIC had not agreed on the terms

of a backup mining management contract, and it was unclear whether US Bitcoin would be willing or able to serve as mining manager in the event of an adverse regulatory event. Accordingly, the Back Up Plan Sponsor Agreement and Plan did not specify the identity of the mining manager in the Baseline Orderly Wind Down, leaving such decision for the Wind Down Motion.  *See* Plan Arts. IV.E, I.A.15 (defining "Backup MiningCo" to mean "under the Orderly Wind Down, a pure play, publicly traded mining business . . . with a potential management contract with GXD Labs LLC or other manager identified by the Debtors and the Committee pursuant to the Wind-Down Procedures.").  Accordingly, the U.S. Trustee's assertion that the Debtors were compelled to choose the BRIC is simply false.

19.    A table summarizing the applicable provisions of the Orderly Wind Down as set forth in Article IV.E of the Plan is set forth below (emphasis added):

| Provision/Concept | Change |
|---|---|
| NewCo Common Stock | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable |
| Unsecured Claim Distribution Mix Elections | Concept eliminated, all Holders of Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections |
| Wind-Down Procedures | Concept to become operative.  As provided herein, the Debtors shall file the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind-Down Motion.  Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind-Down Budget, ***the identity of the Mining manager, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion***.  Related concepts shall similarly become operative. |

| Provision/Concept | Change |
|---|---|
| Backup Plan Sponsor & Backup Plan Sponsor Transaction | Concept to become operative, **subject to a market test** of the fees contained in the Backup Plan Administrator Term Sheet; provided that (i) Liquid Cryptocurrency, (ii) the Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down |
| US Bitcoin Agreements | Concept eliminated, **unless US Bitcoin is selected as the Mining manager** in connection with the Orderly Wind Down. |
| Article X Conditions to the Effective Date | Those conditions to the Effective Date specific to the NewCo Transaction shall be removed or revised, including the condition in Section 12 which requires a Registration Statement respecting the NewCo Common Stock shall have been filed and such Registration Statement shall have become effective |

20.     Although the Disclosure Statement provided that Backup MiningCo would be capitalized with $50 million for purposes of projecting the illustrative percentage recoveries for creditors in the event of an Orderly Wind Down, the Plan does not proscribe the level of capitalization for Backup MiningCo in the event of an Orderly Wind Down.   *See, e.g.*, Disclosure Statement at 12, Ex. C.  In fact, the Plan provides that the Wind-Down Budget will be part of, and approved by the Court through, the Wind Down Motion.  The Wind-Down Budget would necessarily include the amounts to be distributed to creditors and the amount to be contributed to the MiningCo.  The Plan is silent on this point—and it makes sense that the capitalization amount of the MiningCo would be one of the terms of the transaction included in the Wind-Down Budget.

### III.     The MiningCo Transaction Provides All Creditors with Better Recoveries Than Projected Under the Baseline Orderly Wind Down.

21.     The plain language of the Plan and Confirmation Order provides the Debtors with the option to implement the Plan through a "Backup MiningCo" and "Orderly Wind Down" as long as the resulting transaction is on terms "no worse than those contained in the Backup Plan

Administrator Term Sheet." Confirmation Order ¶ 356; Plan Art. IV.E.1. The Disclosure Statement clarifies what it means for the terms of the MiningCo Transaction to be "no worse" than the Backup Plan Administrator Agreement Term Sheet:

> If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the BRIC — or on terms that provide *a better recovery to the Debtors' creditors* than the Backup Plan Sponsor Agreement, which terms may be with a different Backup Plan Sponsor than the BRIC.

Disclosure Statement, Art. II.B.2 (emphasis added).

22.    The MiningCo Transaction fits squarely within the framework set forth in the Plan. It was selected following a market check that is described in detail in the Ehrler Declaration and will result in higher recoveries for the Debtors' creditors as compared to the illustrative recoveries projected under the Baseline Orderly Wind Down. *See* Ehrler Decl. ¶¶ 18–24; Campagna Decl. ¶¶ 11–13, Ex. A (reflecting a 67% recovery for the MiningCo Transaction (based on Disclosure Statement asset valuations) compared to the 61.2% recovery in the Baseline Orderly Wind Down transaction).[10] Moreover, the Debtors and the Committee have been able to secure plan administrative functions from parties at costs that are significantly lower than those contemplated in the Backup Plan Administrator Agreement Term Sheet. Campagna Decl., Ex. A.

23.    The Retail Borrower Ad Hoc Group provides a flawed analysis to support its narrative that the MiningCo Transaction will lead to less value and lower Liquid Cryptocurrency distributions when compared to the projected recoveries for the Baseline Orderly Wind Down.

---

[10]    Notably, since the approval of the Disclosure Statement, the Debtors settled certain of their claims against Core Scientific in exchange for the Cedarvale facility, a cornerstone of the go-forward mining business which is proposed to be constructed by MiningCo. And, since filing the Wind Down Motion, the Debtors reached a settlement with StakeHound which, if approved, will result in approximately $105 million worth of Liquid Cryptocurrency being returned to the Debtors' Estates for distribution to creditors. *See Motion to Approve Settlement Agreement with StakeHound S.A. and Related Transfers Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363(B) of the Bankruptcy Code* [Adv. No. 23-01138, Docket No. 105].

*See* Borrow AHG Obj. ¶ 18. Specifically, the Retail Borrower Ad Hoc Group ignores $88 million of cost savings realized through the current Plan Administration Agreement as compared to the Baseline Orderly Wind Down. *Compare* Campagna Decl. Ex. A (listing "Post Emergence Costs to the Estate" in the Baseline Orderly Wind Down as $163 million as compared to $75 million in the MiningCo Transaction) *with* Borrow AHG Obj. ¶ 18 (listing the Post Emergence Costs to Estate as the same in the "New OWD" (MiningCo Transaction) and "Original OWD" (Baseline Orderly Wind Down) scenarios). The Retail Borrower Ad Hoc Group also ignores the increased value of MiningCo, instead solely focusing on the percentage of Liquid Cryptocurrency unsecured creditors are slated to recover. *See* Borrow AHG Obj. at ¶ 18. Correcting for these errors, unsecured creditors as a whole would receive a 1.7% greater Liquid Cryptocurrency recovery if the MiningCo were capitalized with $50 million, but a 7.5% reduction in the recovery received from their allocation of MiningCo Common Stock, as compared to the proposed MiningCo Transaction. *See* MiningCo Transaction Comparison, attached hereto as **Exhibit A**. On the whole, the MiningCo Transaction results in an approximately 5.8% (or $244 million) greater recovery for creditors than the Baseline Orderly Wind Down, controlling for changes in Cryptocurrency prices. *Id.*

24.    Additionally, in part due to the increase in Cryptocurrency prices between May 31, 2023 and November 17, 2023 (the Liquid Cryptocurrency pricing date in the Campagna Declaration), the proposed distribution of Liquid Cryptocurrency to all unsecured creditors is in fact *7% greater* ($294 million) than the projected recoveries under the Baseline Orderly Wind Down.[11] Although the Retail Borrower Ad Hoc Group correctly states that the Debtors did not cause the increase in cryptocurrency prices, it is not legally relevant what caused creditors to

---

[11]    Bitcoin prices have continued to increase, rising 13.3% from November 17, 2023 to December 17, 2023, according to https://charts.coinmetrics.io/crypto-data.

receive higher recoveries.  Moreover, it is not correct that the Debtors and Committee had no role in the estates' ability to benefit from the increases in cryptocurrency prices.  Indeed, unlike other similar debtors, the Debtors and the Committee made a commitment to hold cryptocurrency to provide distributions in-kind and not converting the Debtors' cryptocurrency holdings into fiat currency.  The cryptocurrency price increases would have imparted no benefit to the Debtors' Estates had the Debtors been required to hold all digital assets in cash, as the U.S. Trustee insisted at the outset of these cases.  *See Limited Objection to Cash Management* [Docket No. 592].

25.    The effect to Retail Borrowers' recoveries from reducing the capitalization of MiningCo is much less when compared to Earn creditors specifically because Retail Borrowers will receive a 100% recovery in the amount of their Retail Advance Obligations outstanding as of the Petition Date.  To put the Retail Borrower Ad Hoc Group's objection in real dollar figures, the total amount of additional Liquid Cryptocurrency that would be distributed to the entire class of Retail Borrower Deposit Claims in their preferred $50 million capitalization scenario as compared to the $225 million capitalization proposed in the MiningCo Transaction is less than $6 million.[12]   In return, the Retail Borrowers' class would be sacrificing approximately $24 million in value the class would otherwise receive if the MiningCo Transaction were implemented from the increase in the equity of MiningCo—and $316 million total equity value for all creditors.

26.    Finally, even if the Debtors and Committee ignored the better recoveries available under the MiningCo Transaction, the Baseline Orderly Wind Down is still not a viable option, despite the Retail Borrower Ad Hoc Group's urging.  First, the Baseline Orderly Wind Down

---

[12]   This amount if calculated by multiplying the 1.7% incremental Liquid Cryptocurrency recovery by the approximately $323 million aggregate Retail Borrower Post-Set Off Claim.

had numerous placeholders that needed to be filled in, which is exactly what the Wind Down Motion does.  These do not currently exist for the Baseline Orderly Wind Down.  Second, the Baseline Orderly Wind Down is obsolete and includes the services initially envisioned under the Backup Plan Administration Agreement Term Sheet that are no longer needed given the agreements signed with the Plan Administrator, Litigation Administrator, PayPal, and Coinbase. Together these agreements provide for substantially all of the non-mining services contemplated under the Backup Plan Administration Agreement Term Sheet.  That leaves the mining services, and the Baseline Orderly Wind Down did not have an actionable mining-only business plan included with a $50 million capitalization, particularly given the recent acquisition of the Cedarvale site, the additional capital funding needed, and other significant updates to the Debtors' mining business.  Furthermore, the New York Attorney General has filed a lawsuit against Gemini Trust Company, the distribution agent under the Baseline Orderly Wind Down, for allegedly offering unregistered securities.  The Baseline Orderly Wind Down is not actionable and any argument that the Debtors should instead pursue that path ignores reality.

## IV. The Plan Contemplated That Unsecured Claim Distribution Mix Elections Would Be Void in the Event of an Orderly Wind Down.

27.     Both the Retail Borrower Ad Hoc Group and the U.S. Trustee argue that the elimination of the Unsecured Claim Distribution Mix Election is detrimental to creditors and violates the Bankruptcy Code.  *See* Borrow AHG Obj. ¶ 11 ("The Liquid Cryptocurrency Weighted Distribution was an extremely important feature to borrowers who wanted all crypto distributions in connection with potentially refinancing their loans."); Supplemental Borrow AHG Obj. at n.9 (describing the Unsecured Claim Distribution Mix Elections as "ignored"); U.S. Trustee Obj. at ¶¶ 16–17 ("Unless the [Retail Borrower Ad Hoc Group] consent[s], the

16

modified plan must 'provided the same treatment for each claim or interest of a particular class.'") (citing 11 U.S.C. § 1123(a)(4)).

28.     The Plan, however, expressly contemplates that the Unsecured Claim Distribution Mix Election—which allowed Account Holders who voted for the Plan to elect to receive more Liquid Cryptocurrency or more NewCo Common Stock for a 30% discount or premium, as the case may be—would be eliminated in the event of an Orderly Wind Down. *See* Plan Art. IV.E.1 (providing that, under the Plan, the Unsecured Claim Distribution Mix Elections were "eliminated, [and] all Holders of Claims receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections."). That change applies to all creditors who made the elections in the same manner. The operation of the Plan to uniformly remove the effect of the elections does not cause the Plan to provide different treatment to similarly situated creditors in violation of section 1123(a)(4) of the Bankruptcy Code.

## V.     The MiningCo Transaction Is Not a Modification of the Plan.

29.     While certain Objectors argue that the Wind Down Motion seeks to modify the confirmed Plan, the Plan explicitly contemplated the implementation of the MiningCo Transaction and provided that the Debtors would disclose the details of the MiningCo Transaction through the Wind Down Motion. The Plan provides what creditors would receive in the event of an Orderly Wind Down, which is what they will receive through the implementation of the MiningCo Transaction. The Debtors plainly disclosed that a vote for the Plan was a vote for the Orderly Wind Down.[13] Creditors' substantive rights will not be affected by

---

[13] "If you vote to accept the Plan, you are voting to accept **both** the NewCo Transaction and the Orderly Wind Down. To be clear, you cannot vote to accept **only** the NewCo Transaction or **only** the Orderly Wind Down." Disclosure Statement Art. III.HHH.

consummation of the MiningCo Transaction. Accordingly, the Wind Down Motion implements the terms of the already-confirmed Plan, and does not modify it.

30. "Modification" is not defined in the Bankruptcy Code, and courts determine whether a modification has been proposed on a case-by-case basis. *See In re Boylan*, 452 B.R. 43, 47 (Glenn, J) (Bankr. S.D.N.Y. 2011) (citing 7 Collier on Bankruptcy, ¶ 1127.03 (16th ed. rev. 2011)). Generally, "modifications" are changes that alter "the legal relationships among the debtor and its creditors and other parties in interest." *See id.* (quoting *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 815 (S.D.N.Y. 1997)). In *Johns-Manville*, the Second Circuit looked to the plan on file for guidance, finding it clear that "when the plan was adopted[,] the parties were embarking into unknown territory and [] the operation of the Manville claims facility might require adjustments and changes as additional knowledge and experience was gained," and that "the bankruptcy court order [authorizing the implementation of a change to the terms of the trust] is entirely consistent with and pursuant to the provisions in the reorganization plan." *In re Johns-Manville Corp.*, 920 F.2d 121, 129 (2d Cir. 1990). There, the Second Circuit recognized that, where envisioned and allowed by the applicable documents, even a seemingly significant change may not be a "modification." *Id.* (finding that the decision to suspend operation of a claims trust was contemplated to be within the discretion of the administrator and was "more properly deemed . . . to be 'a variation . . . with respect to the timing and intensity of claim processing [rather than a section 1127 modification.]'"); *see also Hawkins v. Ch. 11 Tr.*, 2009 U.S. Dist. LEXIS 23710, *7-8 (N.D.N.Y. Mar. 13, 2009) (finding that the two provisions at issue did not involve substantive changes but "accomplished the very objectives established in the plan"); *In re Reserve Capital Corp.*, 2007 Bankr. LEXIS 2305,

at *23 (Bankr. N.D.N.Y. July 6, 2007) (actions may not rise to the level of plan modifications if they are not in contravention of a confirmed plan).

31.    By implementing the Plan through the Orderly Wind Down, the Debtors have not modified the legal relationship among the Debtors and their creditors.[14]    As described in Sections II and IV above, the MiningCo Transaction is permitted by, and fits squarely within the parameters of, the confirmed Plan.    The Debtors have done exactly what the Plan contemplated—filed and served a Wind Down Motion containing the integral terms of the Orderly Wind Down and provided all creditors with more than 10 days' notice to object. Moreover, creditors' substantive rights will not be affected by the MiningCo Transaction.    The Plan provides that, in the event of an Orderly Wind Down, the Debtors will distribute the following on account of unsecured claims: (1) the Liquid Cryptocurrency Distribution Amount, (2) Backup MiningCo Common Stock, (3) Litigation Proceeds, and (4) the Illiquid Recovery Rights, without regard to Unsecured Claim Distribution Mix Elections.    *See generally* Plan Art. III.B.    Creditors will receive that consideration under the MiningCo Transaction.

32.    The cases cited by the U.S. Trustee and the Retail Borrower Ad Hoc Group in support of their arguments that the Wind Down Motion seeks to modify the Plan are distinguishable.    While the U.S. Trustee cites *In re Joint Eastern and Southern District Asbestos Litigation* to support its argument that "changes in the amount and type of funds recoverable" alter the substantive rights of creditors, the issue in that case was not the amount and type of recovery but rather whether the debtor had the ability under the applicable plan documents to modify provisions regarding the timing of distributions and the preservation of the creditors' jury

---

[14]    *See In re Boylan*, 452 B.R. 43, 47 (Glenn, J) (Bankr. S.D.N.Y. 2011) (a "modification" occur[s] when there [is] an alteration of "the legal relationships among the debtor and its creditors and other parties in interest") (quoting *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 815 (S.D.N.Y. 1997)).

trial rights. 982 F.2d at 749 (holding that, unlike in *Johns-Manville*, "[n]o comparable authority in the Plan documents or in pre-consummation Court approval existed for the Settlement's changes in the PI Trust modifying the rights of Class-4 claimants.").[15]    By contrast, in *Johns-Manville* the Second Circuit noted that the total suspension of the PD Trust, while "appear[ing] to be a substantive modification of the most serious sort," was expressly authorized by the plan and "left the substantive rights of the PD claimants unchanged" such that no modification had occurred. *Id.* at 748–49.  Here, like in *Johns-Manville*, the Plan explicitly envisions the Debtors may seek Court approval of the specifics of the Backup MiningCo in the Wind Down Motion.

33.     *In re Frontier Airlines, Inc.*, upon which the Retail Borrower Ad Hoc Group relies, is similarly inapt.  There, the change that was identified by the Court as a modification to a plan that had been solicited but not yet confirmed was not the decision to provide notes to creditors in addition to cash, but rather that creditors "electing to take cash and notes will receive a larger allocation of the assets of the estate" as compared to those who did not so elect.  93 B.R. 1014, 1024 (Bankr. D. Colo. 1988).  This meant that creditors who did not elect to receive both notes and cash "suffer[ed] a shrinkage in their proportionate interest in the remaining pool of assets available to assure the payment of their claims." *Id.*

34.     Here, as described in further detail in Section I, the risk that regulators would not approve the NewCo Transaction was disclosed.  The Orderly Wind Down toggle provides the Debtors with the ability to define the specifics of the Backup MiningCo in the Wind Down Motion.  The MiningCo Transaction will provide unsecured creditors with their Pro Rata portion

---

[15]   Most of the other cases cited by the U.S. Trustee concern plans that had already been substantially consummated, which is not the case here. *In re Rickel & Assocs., Inc.*, 260 B.R. 673, 674 (Bankr. S.D.N.Y. 2001); *In re Best Prod. Co., Inc.*, 177 B.R. 791, 796 (S.D.N.Y.), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *In re Hudson & M. R. Co.*, 332 F. Supp. 718, 719 (S.D.N.Y. 1971).

of the same four types of distributions to creditors set forth in the Baseline Orderly Wind Down. Unlike in *Frontier*, creditors' recoveries will not be reduced or augmented disproportionately with respect to other creditors as a result of the implementation of the Plan through an Orderly Wind Down.  Each unsecured creditor will receive its Pro Rata portion of the four types of recoveries to be distributed under the Plan.  And, as set forth above, the amounts of those distributions will be equal to or greater than the amounts set forth under the Baseline Orderly Wind Down.[16]  Furthermore, the Retail Borrower Ad Hoc Group relies on the more stringent standard followed in some circuits, which consider any non-ministerial change to be material. By contrast, the Second Circuit has adopted a less rigid standard, as highlighted by *Johns-Manville*, where even the total suspension of a trust created by the plan did not amount to a modification.

36. The amount of MiningCo capitalization does not disproportionately affect any creditor.  The Plan does not specify the amount of capitalization of MiningCo in the event of an Orderly Wind Down.  And although MiningCo is proposed to be capitalized with an additional $175 million when compared with the $50 million estimate used to calculate projected recoveries under the Baseline Orderly Wind Down, that increase does not modify creditors' substantive rights because they will receive their Pro Rata amount of the available Liquid Cryptocurrency and Backup MiningCo Common Stock, as set forth in the Plan.

36. Finally, changes to the Plan Supplement do not constitute modifications to the Confirmed Plan as asserted by the Retail Borrower Ad Hoc Group.  Supplemental Borrow AHG

---

[16]  The Retail Borrower Ad Hoc Group's other cases do not support its argument.  As noted, *In re Best Prod. Co, Inc.*, 177 B.R. at 796, addressed a substantially consummated plan.  And *In re Enron Corp.* addressed pre-confirmation modifications that the court determined did not require resolicitation because they had "no material adverse impact on the treatment of any claims and interests."  2004 Bankr. LEXIS 2549, at *259 (Bankr. S.D.N.Y. July 15, 2004).

Obj. at 2 ("The estate fiduciaries refuse to acknowledge that these proposed changes [to the Plan Supplement documents] sought to be approved in the Joint Motion and the Supplemental Statement have modified the Confirmed Plan.").  In fact, the Confirmation Order provides that "the Debtors' right to alter, amend, update, or modify the Plan Supplement *before the Effective Date* is reserved" and that "[i]n the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control." Confirmation Order ¶¶ 37, 266, 376.  These provisions contemplate that in implementing the Plan, terms contained in the Plan Supplement may need to change, as is the case here.

**VI.    Even If the MiningCo Transaction Is a "Modification" to the Plan, the Modifications Are Not Materially Adverse to Creditors and Do Not Require Additional Disclosure or Solicitation**.

37.    If the Court determines that implementing the MiningCo Transaction requires modifying the confirmed Plan within the meaning of section 1127 of the Bankruptcy Code, such "modifications" are not material or adverse to creditors.  The MiningCo Transaction can therefore be approved without additional disclosure or resolicitation.[17]

38.    Section 1127(b) of the Bankruptcy Code provides that a plan's proponent may modify a plan prior to substantial consummation of the plan if the as-modified plan does not violate section 1122 or 1123 of the Bankruptcy Code.   11 U.S.C § 1127(b).[18]   Such plan as

---

[17]    The U.S. Trustee acknowledges that resolicitation is only warranted if modifications are material *and* adverse, but makes no attempt to show that any of the purported changes are adverse.  UST Obj. at 15.  At best, the UST Objection refers in a footnote to changes to the Unsecured Claim Distribution Mix Elections, which were expressly contemplated to be void and removed in the Orderly Wind Down option described in the Plan.  *Id.* at p. 15 n.11.

[18]    For the avoidance of any doubt, the Plan has not been "substantially consummated" within the meaning of section 1101(2) of the Bankruptcy Code, which states that "substantial consummation" occurs upon the "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C § 1101(2).  Section 1101(2) of the Bankruptcy Code is written in the conjunctive, so while (C) has occurred with the commencement of custody distributions, (A) and (B) have not occurred with respect to any Debtor or any property of the Debtors' Estates.

modified becomes the plan if "circumstances warrant such modification" and the Court confirms

such plan as modified. *Id.* Section 1127(c) of the Bankruptcy Code further provides that "[t]he

proponent of a modification shall comply with section 1125 of this title with respect to the plan

as modified." 11 U.S.C. § 1127(c). Complying with section 1125 of the Bankruptcy Code does

not, however, mandate additional disclosure and resolicitation of a chapter 11 plan. *See Boylan*,

452 B.R. at 51 ("The filing of additional disclosure and re-solicitation is necessary if the plan is

materially modified.").

39.    A proposed plan modification is material "if it so affects a creditor or interest

holder who accepted the plan that such entity, if it knew of the modification, would be likely to

reconsider its acceptance." *In re Am. Solar Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)

(citing 8 Collier on Bankruptcy, ¶ 3019.03 (15th ed. 1987)).    Courts have interpreted

"materiality" to mean that resolicitation is only required where a proposed plan modification

adversely affects a creditor's treatment. *See Boylan*, 452 B.R. at 51–52 ("Courts have also held

that additional disclosure is unnecessary where a modification did not adversely affect the plan

treatment of any creditor."); *see also Am. Solar King*, 90 B.R. at 823, n.27 ("The modified plan

need not be resubmitted to creditors and interest holders if the court finds that they are not

adversely affected."). This reading of section 1127(c) of the Bankruptcy Code is consistent with

the purpose of the disclosure requirements in section 1125, because a modification that is not

material is "by definition one which will not affect an investor's voting decision[,]" such that

"[a]dditional disclosure would serve no purpose . . . ." *Boylan*, 452 B.R. at 51 (citing *Am. Solar

Corp.*, 90 B.R. at 824 n.28).

40.    Here, the implementation of the Plan through the MiningCo Transaction is

warranted by the SEC's decision to deny the Debtors' pre-clearance request with respect to the

NewCo Transaction.    And even if implementing the MiningCo Transaction constitutes a modification to the Plan—it does not—such modification is not material or adverse with respect to creditors.    When creditors voted on the Plan, they were informed what consideration they would receive under an Orderly Wind Down.    That consideration was composed of their Pro Rata amount of Liquid Cryptocurrency, Backup MiningCo Stock, Illiquid Recovery Rights, and Litigation Proceeds.    That is exactly what creditors will receive under the MiningCo Transaction. Creditors were informed that the terms of the implemented Orderly Wind Down may differ from, but would not be worse than, those contained in the Plan and Disclosure Statement.    Disclosure Statement Art. II.B.2 ("If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set forth in the Backup Plan Sponsor Agreement that they have negotiated with the Backup Plan Sponsor, the BRIC—or *on terms that provide a better recovery* to the Debtors' creditors than the Backup Plan Sponsor Agreement, *which terms may be with a different Backup Plan Sponsor than the BRIC*.") (emphasis added).    And, importantly, creditors were informed that they would have the opportunity to object to those terms contained in the Wind Down Motion.

41.    When the SEC determined that it would not approve the NewCo pre-clearance letter, the Debtors and the Committee immediately moved to negotiate the terms of the Orderly Wind Down.    Ehrler Decl. ¶¶ 18–31.    As a result of these negotiations, the parties were able to improve the terms when compared to the Baseline Orderly Wind Down and increase creditor recoveries.    Specifically, the MiningCo Transaction secures the services of the Debtors' and the Committee's preferred Mining manager on better terms when compared to the two other competing proposals.    *Id.* ¶¶ 25–31.    The MiningCo Transaction also preserves all of the cost-caps and other benefits offered by US Bitcoin as part of the NewCo Transaction, on better economic terms.    *Id.* ¶ 27.    The Debtors and Committee were also able to secure nearly

$90 million in administrative savings when compared to the estimated Plan administrative costs contemplated under the Baseline Orderly Wind Down. Campagna Decl., Ex. A. And the parties have since reached an agreement with the BRIC to serve as a Litigation Administrator to liquidate the Debtors' illiquid assets and pursue certain litigations, ultimately providing creditors with proceeds related to the Illiquid Recovery Rights and Litigation Proceeds described in the Plan. The MiningCo Transaction therefore provides better terms than the Baseline Orderly Wind Down, both quantitatively and qualitatively.

42.    The increased recovery is not, as the Retail Borrower Ad Hoc Group contends, the sole result of the "market increase in the value of" Cryptocurrency prices. Borrow AHG Obj. at 3. Rather, it is also the result of the significant administrative savings secured by the Debtors and the Committee throughout these cases and the increase in the value of the Mining business as a result of US Bitcoin serving as Mining manager. The analysis included in the Wind Down Motion controlled for Cryptocurrency price increases by showing the projected value based on Liquid Cryptocurrency prices on May 31, 2023—the date used to value Liquid Cryptocurrency in the Disclosure Statement. *See* Campagna Decl., Ex A.[19] Even at such values, the MiningCo Transaction results in a higher total recovery for unsecured creditors—providing a 67% total recovery as compared to a 61.2% total recovery under the Baseline Orderly Wind Down. *Id.*

---

[19]    The Retail Borrower Ad Hoc Group's bungled analysis bringing prices forward to take advantage of the benefits obtained by the Debtors without acknowledging the costs of pursuing the "Original OWD" ignore reality. Borrow AHG Obj. ¶ 18.

$ in millions

| | Filed Disclosure Statement | |
| | Orderly Wind Down (as of 5/31 pricing) | MiningCo (as of 5/31 pricing) |
|---|---|---|
| Liquid Cryptocurrency | $ 2,657 | $ 2,657 |
| Less: Post Emergence Costs to the Estate | (163) | (75) |
| Less: Litigation Administration Funding | (50) | (50) |
| Less: Mining Business Capitalization | (50) | (225) |
| **Net Liquid Cryptocurrency** | **$ 2,394** | **$ 2,307** |
| | | |
| Less: Distribution to Claims | | |
| Administrative Claims | $ (85) | $ (70) |
| Convenience Class Claims | (242) | (242) |
| Custody Claims | (206) | (206) |
| Withhold Claims (Eligible 15% Distribution) | (2) | (2) |
| **Liquid Crypto Available for Unsecured Claims** | **$ 1,859** | **$ 1,787** |
| | | |
| **Illiquid Assets** | **$ 306** | **$ 306** |
| | | |
| Mining Business Valuation | $ 424 | $ 565 |
| Less: Capitalization presumed in Mining Valuation | (50) | (50) |
| Plus: Mining Business Capitalization | 50 | 225 |
| **MiningCo Net Asset Value** | **$ 424** | **$ 740** |
| | | |
| **Remaining Distributable Value** | **$ 2,588** | **$ 2,832** |
| | | |
| **Total Remaining Claims** | $ 4,225 | $ 4,225 |
| | | |
| Initial Liquid Cryptocurrency Distribution % | 44.0% | 42.3% |
| Wind Down Period Illiquid Asset Recovery % | 7.2% | 7.2% |
| MiningCo Common Stock Recovery % | 10.0% | 17.5% |
| **Total Recovery %** | **61.2%** | **67.0%** |

Campagna Decl., Ex A.

43.     All things held constant, the Liquid Cryptocurrency distribution percentage under

the MiningCo Transaction is reduced by approximately 1.7% when compared to the projected

distributions for the Baseline Orderly Wind Down.  All things, however, have not been held

constant, and the prices of bitcoin and ethereum have increased dramatically between May 31,

2023 and today.  If current Cryptocurrency prices are taken into effect, Liquid Cryptocurrency

recoveries are demonstrably higher under the MiningCo Transaction than were projected under

the Baseline Orderly Wind Down.  In fact, on average, Retail Borrowers currently stand to

receive approximately 89% of their claims under the MiningCo Transaction (based on

November 17, 2023 prices)—a 6% increase when compared with the projected recoveries for

Class 2 (Retail Borrower Deposit Claims) under the "Original OWD" in the Disclosure

Statement.  See Disclosure Statement at 12.

44.     The MiningCo Transaction does not alter the distribution of assets approved

under the Plan among the classes of creditors.  It provides for greater distributions than would

otherwise be provided to creditors in a hypothetical chapter 7 liquidation. *Compare* Campagna Decl., Ex. A to Disclosure Statement at 12. It has been proposed in good faith to effectuate a value-maximizing reorganization of the Debtors for the benefit of their creditors. For the same reasons the Court identified in its Confirmation Order and will be established at the hearing, the Plan, even if it is determined to have been modified, fully complies with sections 1122, 1123, and 1129 of the Bankruptcy Code.

45.     Finally, a time-consuming and expensive resolicitation would only further reduce value when compared to the MiningCo Transaction. For these reasons, the Debtors and Committee believe that, beyond what has already been described in the Wind Down Motion, further disclosure and solicitation is not required, and any benefit would be far outweighed by the cost and confusion to creditors.

**VII.    This Court May Rule on Issues Related to a Plan that are Unrelated to a Pending Appeal**.

46.     Bankruptcy courts commonly implement unstayed, confirmed plans while an appeal of the plan is pending. *See In re Roman Catholic Diocese of Rockville Centre*, 652 B.R. 226, 234 (Bankr. S.D.N.Y. 2023) ("Debtor cites authority for the uncontroversial assertion that confirmed and unstayed plans are routinely enforced pending appeal."); *In re Prudential Lines, Inc.*, 170 B.R. 222, 244 (S.D.N.Y. 1994) ("[I]t has long been held that in the absence of a stay pending appeal of the plan confirmation, the bankruptcy court is entitled to implement the plan."). Nor are bankruptcy courts "divested of jurisdiction 'to decide issues and proceeds different from and collateral to those involved in the appeal.'" *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 679 (Bankr. S.D.N.Y. 2016) (citing *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (S.D.N.Y. 2001)). This court has noted that if an appeal "divested bankruptcy courts of jurisdiction over all issues relevant to confirmation" it "would lead to an

absurd result" such that "[the Bankruptcy Court] would effectively cede control of the conduct of a chapter 11 case to disappointed litigants." *Id.* at 681. Therefore, to the extent the Court determines that the Wind Down Motion implements the terms of the confirmed Plan, it has jurisdiction to enter the proposed order approving the Wind Down Motion.

47. The Court also has jurisdiction even if it believes the Wind Down Motion would result in a modification to the Plan and Confirmation Order. Certain courts that have considered the effect of the divestiture of a bankruptcy court's jurisdiction to modify a confirmation order that has been appealed have held that a bankruptcy court may enter an order modifying a plan where such modifications do not impact the issues on appeal. *See In re Commodore Corp.*, 87 B.R. 62, 64 (Bankr. N.D. Ind. 1987) (approving a technical modification to change the effective date of the plan finding the modification did "not impact those issues on appeal"); *In re Brown*, No. 6:07-CV-316-ORL-31, 2007 WL 3326684, at *1 (M.D. Fla. Nov. 6, 2007) (affirming the bankruptcy court's entry of a modified confirmation order that withheld a portion of plan distributions finding the modification had no impact on an appeal that raised issues of "good faith (or lack thereof) in filing . . . and ability to make [] payments").

48. Here, three creditors have appealed the Confirmation Order. *Notice of Appeal* [Docket No. 4032]; *Notice of Appeal and Statement of Election* [Docket No. 4033]; *Notice of Appeal* [Docket No. 4039]. These appeals do not, however, prevent this Court from approving the Wind Down Motion. Based on the statements of issues that have been filed with respect to two of the three appeals, the appeals relate to discrete issues, including the ownership of loan collateral and the scope of the releases and exculpation in the Plan. *Statement of Issues and Designations of Items to Be Included in the Record for Johan Bronge's Appeal in Celsius Case 22-10964 (MG)* [Docket No. 4065]; *Appellant's Designation of the Record and Statement of*

*Issues to be Presented on Appeal* [Docket No. 4083]. While the Court has previously found that it "does not have jurisdiction to *reconsider* the Confirmation Order and the Confirmation Opinion," in that instance the movant sought relief that potentially related to those issues on appeal—specifically, Dmitry Kirsanov sought relief regarding his CEL Token Custody Claims. *Order Denying Kirsanov's Motion for Reconsideration* [Docket No. 4046] (emphasis added).[20] The identity of the Mining manager is not on appeal, nor do the changes to the Baseline Orderly Wind Down implicate issues currently on appeal. Rather, the changes are discrete changes to the terms of the Baseline Orderly Wind Down. For these reasons, the Court has jurisdiction to enter an order regarding the Wind Down Motion.

## VIII.  The Proposed Disputed and Contingent Claims Reserve Included in the Wind Down Motion Is Appropriate and Consistent with the Plan.

49.     The Retail Borrower Ad Hoc Group argues that insufficient notice regarding the Disputed and Contingent Claims Reserve has been provided to creditors. No such notice, however, is required under the Plan and Confirmation Order. In fact, the Confirmation Order provides that the Debtors:

> may establish one or more reserves or accounts or funds for Claims that are Disputed, contingent, have not yet been Allowed, or where the Holder is or may be subject to an Avoidance Action, in an amount or amounts as reasonably determined by the applicable Debtors or Post-Effective Date Debtors, as applicable, in consultation with the Committee . . . consistent with the Proofs of Claim Filed by the applicable Holder of such Disputed Claims and/or the Withdrawal Preference Exposure amount associated with such Claim.

Confirmation Order ¶ 312. The Debtors worked with their advisors to develop reasonable and appropriate reserve amounts based on the amounts and nature of the claims submitted in these Chapter 11 Cases. The Retail Borrower Ad Hoc Group argues without any authority that a

---

[20]  As of the filing of this Reply, Mr. Davis has not filed his designation of the record and statement of issues to be presented on appeal.

calculated reserve amount for each affected claimant is required and the Debtors are required to provide notice to those claimants of the amount of the reserve for their specific claim. But the Plan allows the Debtors to set a reserve and does not require this level of line-item detail, which would be highly unusual in a case of this size. The Retail Borrower Ad Hoc Group's desire to harangue the Debtors for the amount of professional fees expended while advocating for a more expensive and cumbersome process is inconsistent and hypocritical. Furthermore, that kind of reserve detail is particular unnecessary here, as the Class Claim Settlement resolved the vast majority of Account Holder Claims with only 2,017 Account Holders opted out of the Class Claim Settlement.[21] The Disputed and Contingent Claims Reserve included in the Wind Down Motion is consistent with the Plan and appropriate under the circumstances.

### IX.    The Other Objections Should Be Overruled.

50.    To the extent not otherwise addressed, the remaining objections should be overruled. In particular, both the Lau Objection and the UST Objection misinterpret the fees to be paid to Mr. Ferraro, the Plan Administrator, as different than what was disclosed in the Plan. Lau Obj. at 52; UST Obj. ¶ 29. The Wind Down Motion makes clear, however, that the total amount reserved for Plan administration fees have not changed from those previously disclosed—other than certain *reductions* to the budgets related to the agreement with the BRIC. These budgets were disclosed in September, prior to the Confirmation Hearing and entry of the Confirmation Order. *See Sixth Notice of Filing of Plan Supplement*, Ex. D [Docket No. 3583]. The Lau Objection should therefore be overruled as an attempt to relitigate issues resolved by the Confirmation Order. *See* Confirmation Order ¶ 261 ("The terms of the Plan (including the Plan

---

[21]    *See Amended Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates [Docket No. 3574]* ¶ 19; *Supplemental Declaration of Brian Karpuk Regarding the Solicitation and Tabulation of Votes on the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3857] ¶ 9.

Supplement) are incorporated herein by reference and are an integral part of this Confirmation Order."); Plan Art. IV.F ("Regardless of whether the NewCo Transaction or the Orderly Wind Down is consummated, a Plan Administrator will be appointed to administer the Post-Effective Date Debtors' estates in accordance with the Plan Administrator Agreement.")

51.    Accordingly, the Debtors and the Committee request that the Court overrule the Objections and grant the relief requested in the Wind Down Motion.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: December 20, 2023

/s/ Joshua A. Sussberg

Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

/s/ Aaron Colodny

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 819-8200
Facsimile:     (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:     (312) 881-5400
Facsimile:     (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:     (213) 620-7700
Facsimile:     (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:     (305) 371-2700
Facsimile:     (305) 358-5744

*Counsel to the Official Committee of*
*Unsecured Creditors*

## Exhibit A

**MiningCo Transaction Comparison**

**Celsius Network Inc.**
**Illustrative Plan Recovery Waterfall**

*($ in millions)*

| | MiningCo (as of 11/17 pricing) | | Original OWD (as of 11/17 pricing) | | Ad Hoc Group Of Borrowers Objection (Docket #4100) | |
|---|---|---|---|---|---|---|
| Liquid Cryptocurrency | $ | 2,941 | $ | 2,941 | $ | 2,941 |
| Less: Post Emergence Costs to the Estate | | (75) | | (163) | | (75) |
| Less: Litigation Administration Funding | | (50) | | (50) | | (50) |
| Less: Mining Business Capitalization | | (225) | | (50) | | (50) |
| **Net Liquid Cryptocurrency** | **$** | **2,591** | **$** | **2,678** | **$** | **2,766** |
| | | | | | | |
| Less: Distribution to Claims | | | | | | |
| Administrative Claims | $ | (70) | $ | (85) | $ | (85) |
| Convenience Class Claims | | (242) | | (242) | | (242) |
| Custody Claims | | (124) | | (124) | | (124) |
| Withhold Claims (Eligible 15% Distribution) | | (2) | | (2) | | (2) |
| **Liquid Crypto Available for Unsecured Claims** | **$** | **2,153** | **$** | **2,225** | **$** | **2,313** |
| | | | | | | |
| **Illiquid Assets** | **$** | **305** | **$** | **305** | **$** | **305** |
| | | | | | | |
| Mining Business Valuation | $ | 565 | $ | 424 | $ | 424 |
| Less: Capitalization presumed in Mining Valuation | | (50) | | (50) | | (50) |
| Plus: Mining Business Capitalization | | 225 | | 50 | | 50 |
| **MiningCo Net Asset Value** | **$** | **740** | **$** | **424** | **$** | **424** |
| | | | | | | |
| **Remaining Distributable Value** | **$** | **3,198** | **$** | **2,954** | **$** | **3,042** |
| | | | | | | |
| **Total Remaining Claims** | **$** | **4,225** | **$** | **4,225** | **$** | **4,225** |
| | | | | | | |
| Initial Liquid Cryptocurrency Distribution % | | 51.0% | | 52.7% | | 54.7% |
| Wind Down Period Illiquid Asset Recovery % | | 7.2% | | 7.2% | | 7.2% |
| MiningCo Common Stock Recovery % | | 17.5% | | 10.0% | | 10.0% |
| **Total Recovery %** | | **75.7%** | | **69.9%** | | **72.0%** |