Joshua A. Sussberg, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

David M. Turetsky
Samuel P. Hershey
Joshua D. Weedman
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 819-8200
Facsimile:    (212) 354-8113

Gregory F. Pesce (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone:    (312) 881-5400
Facsimile:    (312) 881-5450

Aaron Colodny (admitted *pro hac vice*)
**WHITE & CASE LLP**
555 South Flower Street, Suite 2700
Los Angeles, California 90071
Telephone:    (213) 620-7700
Facsimile:    (213) 452-2329

Keith H. Wofford
**WHITE & CASE LLP**
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:    (305) 371-2700
Facsimile:    (305) 358-5744

*Counsel to the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

**NOTICE OF FILING OF REVISED PROPOSED
ORDER (I) APPROVING THE IMPLEMENTATION OF
THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that on November 30, 2023, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and the official committee of unsecured creditors (the "Committee") appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") filed the *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "Wind Down Motion").

**PLEASE TAKE FURTHER NOTICE** that the Debtors and the Committee hereby file a revised *Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief*, attached hereto as **Exhibit A** (the "Revised Proposed Order"), which includes revisions to certain of the exhibits attached thereto.

**PLEASE TAKE FURTHER NOTICE** that a comparison between the proposed order (and relevant exhibits) filed as Exhibit A to the Motion (the "Proposed Order") and the Revised Proposed Order (and relevant exhibits) is attached hereto as **Exhibit B**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Wind Down Motion, the Proposed Order, the Revised Proposed Order, and other pleadings filed in the above-captioned chapter 11 cases may be obtained free of charge by visiting the website of Stretto at http://www.cases.stretto.com/Celsius.  You may also obtain copies of any pleadings by visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

*[Remainder of page intentionally left blank]*

New York, New York
Dated: December 20, 2023

| | |
|---|---|
| /s/ Joshua A. Sussberg | /s/ Aaron Colodny |
| Joshua A. Sussberg, P.C. | David M. Turetsky |
| **KIRKLAND & ELLIS LLP** | Samuel P. Hershey |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Joshua D. Weedman |
| 601 Lexington Avenue | **WHITE & CASE LLP** |
| New York, New York 10022 | 1221 Avenue of the Americas |
| Telephone:    (212) 446-4800 | New York, New York 10020 |
| Facsimile:     (212) 446-4900 | Telephone:    (212) 819-8200 |
| | Facsimile:     (212) 354-8113 |
| Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*) | |
| Ross M. Kwasteniet, P.C. (admitted *pro hac vice*) | Gregory F. Pesce (admitted *pro hac vice*) |
| Christopher S. Koenig | **WHITE & CASE LLP** |
| Dan Latona (admitted *pro hac vice*) | 111 South Wacker Drive, Suite 5100 |
| **KIRKLAND & ELLIS LLP** | Chicago, Illinois 60606 |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | Telephone:    (312) 881-5400 |
| 300 North LaSalle Street | Facsimile:     (312) 881-5450 |
| Chicago, Illinois 60654 | |
| Telephone:    (312) 862-2000 | Aaron Colodny (admitted *pro hac vice*) |
| Facsimile:     (312) 862-2200 | **WHITE & CASE LLP** |
| | 555 South Flower Street, Suite 2700 |
| *Counsel to the Debtors and Debtors in Possession* | Los Angeles, California 90071 |
| | Telephone:    (213) 620-7700 |
| | Facsimile:     (213) 452-2329 |
| | |
| | Keith H. Wofford |
| | **WHITE & CASE LLP** |
| | Southeast Financial Center |
| | 200 South Biscayne Blvd., Suite 4900 |
| | Miami, Florida 33131 |
| | Telephone:    (305) 371-2700 |
| | Facsimile:     (305) 358-5744 |
| | |
| | *Counsel to the Official Committee of* |
| | *Unsecured Creditors* |

## Exhibit A

## Revised Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER (I) APPROVING THE IMPLEMENTATION**
**OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

Upon the motion (as supplemented by the *Supplemental Statement Regarding the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4115] (the "Supplement")) (the "Motion")[2] of the Debtors for entry of an order (this "Order") (a) implementing the Plan toggle to the MiningCo Transaction on the terms attached hereto as **Exhibit 1** and **Exhibit 2**, (b) approving the Wind-Down Budget and Wind-Down Procedures, attached hereto as **Exhibit 3** and **Exhibit 4**, respectively, (c) approving the amount proposed to be reserved for the Disputed and Contingent Claim Reserve, as reflected on **Exhibit 5** hereto, and (d) granting related relief, all as more fully set forth in the Motion; and upon the Campagna Declaration, the Ehrler Declaration, and the Puntus Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York, entered

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Supplement, as applicable.

February 1, 2012; and this Court having the power to enter a final order consistent with Article III

of the United States Constitution; and this Court having found that venue of these cases in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for a hearing thereon were appropriate under the circumstances and no other notice

need be provided; and this Court having reviewed the Motion and the Supplement and having

heard the statements in support of the relief requested therein at a hearing before this Court

(the "Hearing"); and this Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The MiningCo Transaction, and the terms thereof as described in the Motion and

the Supplement, are approved.  The disclosure of the MiningCo Transaction in the Motion and the

Supplement is reasonable and adequate under the circumstances, and the Debtors are not required

to provide further disclosure in respect of the implementation of the MiningCo Transaction or to

resolicit the votes of any creditors or equity security holders as a result thereof, or to obtain

confirmation of a modified Plan.

2.      The Debtors' and the Committee's election to toggle to the Orderly Wind Down

pursuant to Article IV.E of the Plan and paragraph 354 of the Confirmation Order is approved and

effective.

3.      The Confirmation Order remains in full force and effect, and shall apply to the

Plan, as such document is changed by the toggle to the Orderly Wind Down, the terms of the

MiningCo Transaction, and this Order.

4.       All prior Unsecured Claim Distribution Mix Elections previously solicited are null and void.

5.       The Wind-Down Budget and Wind-Down Procedures are approved, and the reserves provided therein are reasonable.

6.       The Plan Administrator shall file quarterly updates to the Court and provide monthly updates (e-mail being sufficient when there is no material update) to the Litigation Oversight Committee.  The Bankruptcy Court shall retain jurisdiction over the Plan Administrator, Litigation Administrators, Litigation Oversight Committee, and any issue relating to the implementation of the Plan, and the Plan Administrator, Litigation Administrators, and Litigation Oversight Committee shall have standing to raise any such issue with the Court.

7.       The Debtors shall file on the docket a conformed Plan and revised Plan Supplement documents reflecting the toggle to the MiningCo Transaction, which shall not constitute a modification or amendment of the Plan requiring resolicitation or any further Court order to be effective.

8.       Notwithstanding anything to the contrary in this Order, or any findings announced at the Hearing, nothing in this Order, or announced at the Hearing, constitutes a finding under the federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

9.       All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

10.      The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the Supplement.

11.     The terms and conditions of this Order shall be immediately effective and enforceable upon entry of the Order.

12.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

13.     Notice of the Motion as provided therein is good and sufficient and the requirements of the Local Rules are satisfied by such notice.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**MiningCo Transaction Term Sheet**

## CELSIUS NETWORK LLC, ET AL.
## MINING NEWCO TRANSACTION TERM SHEET

**THIS MINING NEWCO TRANSACTION TERM SHEET (THE "TERM SHEET") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED MINING NEWCO TRANSACTION, CONTEMPLATED IN THE CONFIRMED CHAPTER 11 PLAN OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED IN RE CELSIUS NETWORK LLC, ET AL., CASE NO 22-10964 (MG) (THE "DEBTORS" AND, TOGETHER WITH THER NON-DEBTOR AFFILIATES, "CELSIUS"). THIS TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS TERM SHEET. THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICTATIONS OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAW AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET CONTEMPLATES THAT THE DEBTORS, THE COMMITTEE, AND U.S BITCOIN SHALL ENTER INTO AN AGREEMENT AND THAT THIS TERM SHEET SHALL BE BINDING TO THE EXTENT PROVIDED IN SUCH AGREEMENT.**

Reference is hereby made to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (the "**Plan**") [Docket No. 3577] and the *Eighth Notice of Plan Supplement* (the "**Plan Supplement**") [Docket No. 3935], which were approved by the Court in the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972]. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Plan and Plan Supplement. All current denominations herein are in U.S. Dollars.

| GENERAL PROVISIONS | |
|---|---|
| *Board Composition* | The board of NewCo (the "**Board**") will consist of eight representatives, six of which will be the Committee representatives previously approved in the Confirmation Order, and two of which will be representatives of US Bitcoin (one of which will be Asher Genoot and the other of which may, at US Bitcoin's discretion, be Jordan Levy). |

| | |
|---|---|
| *Transaction Documents* | The documents identified in this filing (the "**Transaction Documents**") will be amended in accordance with this summary of terms. |
| *Capitalization Amount* | NewCo shall be capitalized with $225 million in fiat. |
| *Contributed Assets* | Mining Assets; for the avoidance of doubt, the Core, Rhodium, Mawson, and Luxor assets shall not be assets required to be contributed to NewCo. |
| **Document** | **Modifications to Approved Transaction Document** |
| **US Bitcoin Management Agreement** | *Term and Termination; Effect of Termination*<br><br>The Initial Term shall remain the same four year term, subject to the following: (i) if the (owned and not hosted) mining capacity of Mining NewCo has not increased by at least 20 EH/s, from [3] EH/s to [23] EH/s (the "**Exahash Target**") during the initial (3) years of the Mining Management Agreement (the "**Management Agreement**"), then, at the conclusion of the third year of the Management Agreement, NewCo may terminate the Management Agreement without triggering any early termination fee, so long as NewCo provides Manager with a minimum six (6) month transition period (commencing no earlier than the conclusion of the third year of the Management Agreement), during which transition period Manager shall be paid the cash portion of the Mining Management Fee; but (ii) if at any point during the initial (3) years of the Management Agreement, the mining capacity of NewCo increases to at least the Exahash Target, the Management Agreement shall automatically be extended one additional year (i.e., through the fifth year).<br>• The Management Agreement shall be executed and effective by no later than February 15, 2024.<br>• The Term will be subject to certain changes, including termination rights of each of NewCo and Manager, upon the occurrence of certain events that were not in the prior Management Agreement:<br>    o *NewCo Change of Control*: If NewCo undergoes a Change of Control, NewCo may terminate the Management Agreement (the "**Change of Control Termination Right**").<br>        ▪ If NewCo terminates pursuant to its Change of Control Termination Right, NewCo shall pay Manager 100% of its Management Fee that would have been payable during the |

remainder of the applicable Term (the "**Termination Fee**"), but such cash Termination Fee may, at NewCo's or the purchaser's option, be paid in equity in connection with the change of control transaction, and Manager's unvested incentive equity and warrants shall immediately accelerate and vest.

o *Form 10 Effectiveness*: NewCo Mining shall use best efforts to obtain effectiveness of the Form 10. If the Board determines, in accordance with its fiduciary duties, on or before May 1, 2024 (the "**Liquidity Deadline**"), that there is not a reasonable likelihood that NewCo will achieve effectiveness of its Form 10 filing, NewCo may terminate the Management Agreement (the "**Form 10 Termination Right**") by providing Manager with written notice of termination (a "**Notice of Termination**") by no later than the Liquidity Deadline, with the termination of Management Agreement to be effective as of 14 calendar days following receipt by the Manager of the notice of termination.

▪ For the avoidance of doubt, Manager shall continue to provide services to NewCo and shall continue to be compensated under the Management Agreement through the effective date of termination.

▪ Following termination, Manager may continue providing services to NewCo subject to the mutual agreement of NewCo and Manager, including as it relates to the terms of any such agreement.

▪ If NewCo terminates pursuant to its Form 10 Termination Right, Manager shall receive, as liquidated damages, one year of the cash portion of the Mining Management Fee, and one year worth of incentive equity and warrants which shall immediately accelerate and vest, plus any accrued and unpaid amounts as of the date of the notice of termination. NewCo shall pay Manager the foregoing amounts within 30 days of Manager's receipt of a notice of termination.

| | |
|---|---|
| | ▪ If NewCo files a subsequent Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the Liquidity Deadline, NewCo shall, at its election (i) enter into a reinstatement of Management Agreement with Manager for the remainder of the Initial Term existing on the date of [such reinstatement/termination], on the same terms and conditions as the original agreement, or (ii) pay to Manager its otherwise applicable termination fee under the Management Agreement (taking into account the portion of the Management Agreement that elapsed prior to the prior termination), *minus* the Termination Fee.<br><br>*Executive Management Team*:  A CEO will be named, and Joel Block will serve as the initial CFO. Each member of the executive management team shall serve at the pleasure of the NewCo Board.<br><br>*Mining Management Fee*:   The cash portion of the Mining Management Fee will be $20,376,200 annually. The issuance of incentive equity and warrants that comprise the remainder of the Mining Management Fee are governed by the Restricted Stock Purchase Agreement and Warrant Agreement discussed below. |
| **Cedarvale Interim Services Agreement** | There will be no modifications from the terms approved by Court in the Confirmation Order, other than (i) reducing the monthly fee applicable from January 1, 2024 to $734,000, (ii) providing for adjustments of the timelines and dates in the version filed in the Plan Supplement to account for the time elapsed between the October 30, 2023 and the date of signing of the Interim Services Agreement, (iii) providing a termination right in favor of US Bitcoin if the Management Agreement has not been executed by February 15th, 2024, and (iv) as otherwise set forth herein. |
| **Restricted Stock Purchase Agreement** | The Restricted Stock Purchase Agreement ("**RSPA**") will provide for (i) US Bitcoin's purchase of NewCo equity, as well as (ii) annual issuance of incentive equity of 31.89% of the 1.00% of NewCo equity originally to be issued to Fahrenheit. |

| | |
|---|---|
| | *US Bitcoin Equity Purchase*<br><br>• Manager will purchase [$12,756,000] of NewCo stock, calculated on a pre-money basis using NewCo's NAV as of the Effective Date of the Plan (which shall have been adjusted for the capitalization set forth in the Mining NewCo Transaction Motion). Effectiveness of the Management Agreement is conditioned upon NewCo's receipt of cash from Manager for such purchase of stock pursuant to the terms of the Restricted Stock Purchase Agreement discussed below.<br>• (a) 50% of the initial NewCo equity contribution will be funded on the Effective Date, and (b) the remaining 50% will be funded on the earlier of (i) promptly following the effectiveness of the Form 10; and (ii) provided that NewCo has not exercised the Form 10 Termination right, May 1, 2024.<br><br>*US Bitcoin Incentive Units*<br><br>• US Bitcoin will receive 31.89% of the incentive units previously allocated to Fahrenheit each year of the term of the Management Agreement.<br>• Other changes to the RSPA will provide for the applicable acceleration and cancellation of incentive units upon the various termination provisions in the Management Agreement:<br>    ○ If NewCo terminates the Management Agreement pursuant to its Change of Control Termination Right, Manager's remaining unvested incentive units will immediately accelerate and vest.<br>    ○ If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, twelve months' worth of unvested incentive equity will immediately accelerate and vest. |
| **Warrant Agreement** | The strike price of the warrants will be set at the end of each year of the term, based on the equity trading price as of the last trading day of each year.<br><br>Additional changes to the Warrant Agreement will provide for the applicable vesting, acceleration of vesting and cancellation of incentive units upon the various termination provisions in the Management Agreement identified above.<br>    ○ If NewCo terminates the Management Agreement pursuant to its Change of Control Termination |

| | |
|---|---|
| | Right, the exercise period commencement date for Manager's remaining unvested warrants will be deemed to be such effective date of termination.<br>o  If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, the exercise period commencement date for one year's worth of Manager's remaining unvested warrants will be deemed to be such effective date of termination. |
| **Charter and By-Laws** | The Charter and By-Laws will be modified to account for the substitution of USBTC for Fahrenheit as equity purchaser, and to appoint two USBTC appointees in lieu of the prior three Fahrenheit appointees, one of which will be Asher Genoot. |
| **Deposit and Escrow Agreement** | The Deposit and Escrow Agreement will be modified to substitute USBTC for Fahrenheit, reduce the escrowed amount to $3.189 million, and make conforming changes in the escrow release provisions. |

## Exhibit 2

**BRIC Agreement – Material Terms**

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Plan Administrator | Christopher Ferraro will serve as the Plan Administrator as set forth in further detail below. |
| ARM | BRIC or its designee will serve as a Litigation Administrator (Complex Asset Recovery Manager or "ARM"). |
| Oversight of ARM | The Litigation Oversight Committee will oversee the ARM. The composition of the Litigation Oversight Committee shall remain as contemplated in the Plan and Confirmation Order.

BRIC shall propose candidates to be considered by the Litigation Oversight Committee for the final spot on the Litigation Oversight Committee, among any other candidates the Litigation Oversight Committee may elect to consider.

The ARM shall be overseen by an "ARM Oversight Sub-Committee" which shall be comprised of Gerard Uzzi and two other members of the Litigation Oversight Committee to be determined by the Litigation Oversight Committee in consultation with the BRIC.

The ARM Oversight Sub-Committee shall oversee the ARM and its management of the Illiquid Assets and BRIC Litigation Assets, and shall provide regular reports to the Litigation Oversight Committee. |
| Access to Resources | The Litigation Oversight Committee shall ensure that the ARM has reasonable and timely access to the Company's books, records, accounts, and other resources as contemplated herein to facilitate the administration of its duties.  Any requests for information by the ARM to the Plan Administrator shall be made through Robert Campagna, Samuel Schreiber, or another person designated by the Debtors or the Plan Administrator prior to or on the Effective Date (such person, the "Gatekeeper").  The Gatekeeper will use reasonable efforts to respond to such information requests, including providing reasonable access to employees, as appropriate, to facilitate an efficient complex assets recovery process and litigation recovery process.  Any dispute regarding access set forth in this paragraph shall be resolved by the Litigation Oversight Committee, excluding any member proposed by the BRIC for the final spot on the Litigation Oversight Committee. The Plan Administrator shall select any successor Gatekeeper.

The Plan Administrator shall have direct and sole management and oversight of Wind Down Estate employment and retention matters.  Interested parties (including the Litigation Oversight Committee and each Litigation Administrator) shall receive notice of any proposed terminations of employees and consultants.  For the avoidance of doubt, any Celsius employee who is employed by the estates post-emergence shall report to the Plan Administrator, provided that the Litigation Oversight Committee shall have the ability to resolve disputes regarding the ARM's or other Litigation Administrator's reasonable access to employees.

The Litigation Oversight Committee will approve a comprehensive budget for BRIC, as Litigation Administrator (ARM), to engage counsel and experts, and manage the Illiquid Assets.  For the avoidance of doubt, the budget shall exclude Financial Advisors retained for the purpose of assisting in the complex asset recovery process or litigation to be overseen by the BRIC.  If such Financial Advisors are retained for the purpose of assisting in the complex asset recovery process or litigation to be overseen by BRIC, such costs shall be borne solely by the BRIC and not the Debtors' estates. |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Illiquid Assets | The BRIC, in its capacity as ARM, will manage the monetization of all of the illiquid assets listed in the attached schedule, including the "Illiquid Assets Subject to Incentive Fees" and the "Illiquid Assets Not Subject to Incentive Fees." The value of the Mawson asset to be allocated to the ARM shall include only the Mawson note and not the claims arising under the Mawson Co-Location Agreement (including for return of the deposit), which agreement and deposit rights are property of MiningCo. The litigation with respect to Mawson shall be overseen by the ARM. The Litigation Oversight Committee and the MiningCo Board shall have joint authority to direct the litigation and resolution of such litigation. The ARM shall only earn its incentive fee on the portion of any recovery associated with the Mawson note and not rights asserted under the Co-Location Agreement, and any dispute as to allocation of litigation proceeds shall be resolved by the Bankruptcy Court.<br><br>The Litigation Oversight Committee shall have the sole authority to designate Illiquid Assets as subject to Incentive Fees in addition to those set forth as "Illiquid Assets Subject to Incentive Fees."<br><br>For the avoidance of doubt, those assets currently identified as "Illiquid Assets Subject to Incentive Fees" shall not be changed.<br><br>All illiquid assets within the Estates (but not causes of actions other than the causes of action identified as "Litigation Assets" in the section immediately below this one) not identified on the attached schedule will be discussed in good faith between the Litigation Oversight Committee and the ARM to determine whether they should be designated as additional "Illiquid Assets Subject to Incentive Fees" or "Illiquid Assets Not Subject to Incentive Fees," all subject to the sole discretion of the Litigation Oversight Committee.<br><br>Furthermore, to the extent that an asset designated as "Illiquid Assets Not Subject to Incentive Fees" requires active management and workout activities more akin to the Illiquid Assets Subject to Incentive Fees, the Litigation Oversight Committee shall have the authority to change such designation to be subject to Incentive Fees.<br><br>The ARM shall be required to consult with the ARM Oversight Sub-Committee on a periodic basis regarding whether to monetize Illiquid Assets Subject to Incentive Fees that would result in a recovery below the market "pro forma" value in the attached schedule. |
| Litigation Assets | As part of its role as ARM, BRIC will be designated as a Litigation Administrator under the Plan solely with respect to (a) potential claims and causes of action related to the Debtors' pre-bankruptcy activities against the Debtors' professionals who are Excluded Parties under the Plan (those claims will be set forth on a schedule to BRIC's agreement and are envisioned to include, but not be limited to potential claims and causes of action against accountants, attorneys, and other advisors, such as Chainalysis, that were not released under the Plan) and (b) Retained Causes of Action solely as follows:<br><br>  i.  BRIC shall be the Litigation Administrator for all Causes of Action related to Illiquid Assets (*e.g.* loan defaults related to illiquid assets, illiquid mining assets, etc., <u>but</u> not all claims related to counterparties with institutional loans, whereby such claims are not related to such institutional loans).<br>  ii  Additionally, BRIC shall be the Litigation Administrator for the BitMEX and Tether Claims.<br><br>The Litigation Oversight Committee will approve a budget for BRIC, as a Litigation Administrator, to engage counsel and experts (but not financial advisors) and manage the above-described litigation. |
| Liquid Distributions | The Debtors will appoint Christopher Ferraro as the Plan Administrator for a five-year term. Mr. Ferraro will work with the Distribution Agents to make initial and subsequent distributions under the Plan to creditors (including liquid cryptocurrency) and be compensated as agreed between the Debtors, the Committee, and Mr. Ferraro.<br><br>If Mr. Ferraro resigns as Plan Administrator prior to the completion of his duties (including all distributions under the Plan), the Litigation Oversight Committee shall select the successor Plan Administrator. |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Exculpation | BRIC shall be exculpated with respect to any potential liability in connection with any actions taken, including distributions, by the Plan Administrator and the other Litigation Administrator. The Plan Administrator and the Litigation Administrator shall be exculpated with respect to any potential liability in connection with actions taken by the BRIC in the course of their duties as Litigation Administrator (ARM). |
| Mutual Non-Disparagement | The Debtors, the Committee, the Plan Administrator, the BRIC/Litigation Administrator (ARM), the other Litigation Administrator, and the Litigation Oversight Committee (collectively, the "Parties") shall agree to mutual non-disparagement clauses as follows:<br><br>Beginning immediately upon agreement to this term sheet and through the date on which the Litigation Administrator Agreement terminates, the Parties shall not, and shall cause their respective directors, officers, employees, agents, representatives, professionals, and controlled affiliates to not, whether directly or indirectly, (i) make any public statement or any statement to any third party, in each case that is negative or disparaging and is related to Celsius or these Chapter 11 Cases regarding the Debtors, the Debtors' professionals, the Debtors' current directors or employees, the Committee, the Committee's members, the Committee's professionals, the other Parties, the professionals or employees of the other Parties, the Plan, the bidding process, or the wind down (including any actions taken by the Parties as part of the wind down); or (ii) knowingly encourage or induce others to make any statement prohibited in (i); provided that the foregoing shall not prevent the Parties from making any truthful statement to the extent required by Law or a Governmental Authority to disclose or make accessible such information. These mutual non-disparagement provisions shall not apply to any Excluded Party under the Plan. |
| Tax Filings | The Plan Administrator shall be responsible for all pre-Effective Date tax filings, including, for the avoidance of doubt, all 2023, stub 2024 and prior tax filings.<br><br>The Plan Administrator shall be responsible for all regulatory filings and financial reporting for the Estates post-Effective Date; provided that the Plan Administrator shall first present such filings and reports to the Litigation Oversight Committee and consult with the Litigation Oversight Committee with respect to such filings and reports; provided that the ARM shall make regular reports to the Court as set forth in the agreement governing its services. |
| Governing Documentation | There will be one agreement that governs the BRIC's role as Litigation Administrator (ARM), that will be substantially consistent with the Litigation Administrator Agreement included in the Plan Supplement except as otherwise expressly modified by this term sheet (e.g., to include the monetization of Illiquid Assets, fee structure, oversight by Litigation Oversight Committee, *etc.*), provided that the following clarifications shall be made:<br><br>• the Litigation Oversight Committee shall provide the BRIC at least 90 days' notice if it determines to terminate the BRIC's role as Litigation Administrator (ARM) without cause;<br><br>• the Litigation Oversight Committee shall not be able to terminate the BRIC without cause until the date that is 18 months following the Effective Date (it being understood that notice of such termination without cause may be provided to the BRIC as early as the date that is the 15 month anniversary of the Effective Date); and<br><br>• if the BRIC is terminated without cause, on the date of termination (90 days after notice of termination without cause is provided), the BRIC shall be entitled to immediate payment of all unpaid accrued fees through the date of termination, plus a $1 million termination fee; and<br><br>• if the BRIC is no longer engaged as Litigation Administrator (ARM) (unless terminated for cause), the BRIC shall be entitled to prompt payment of the Recovery Incentive Fee and Litigation Incentive Fee that would otherwise have been owed to the BRIC from the monetization of an illiquid asset or cause of action previously managed by BRIC if a Resolution Event with respect to such asset or cause of action occurs prior to the BRIC's termination, other than a termination for cause. "Resolution Event" means, as applicable, a settlement agreement, an agreement in principle to settle or otherwise resolve a matter, a judgment or similar court resolution, or substantial completion of a litigation or resolution process that has not yet led to a judgment, similar court resolution, or other resolution. Any dispute regarding such right to payment will be resolved in the first instance by the Litigation Oversight Committee, and if a dispute remains, it will be resolved by the Bankruptcy Court. Notwithstanding the above, if a Resolution Event with respect to an asset or cause of action has not occurred prior to the BRIC's termination (other than for cause), but the BRIC has expended substantial efforts towards the monetization or resolution of such asset or cause of action and such asset or cause of action is subsequently monetized or resolved, the BRIC shall be entitled to request that the Litigation Oversight Committee authorize a payment, in full or in part, of a Recovery Incentive Fee or Litigation Incentive Fee to the BRIC in connection with the monetization or resolution of such asset or cause of action that is the result of the BRIC's |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| | substantial efforts. The Litigation Oversight Committee will have sole and absolute discretion regarding the approval of any such request for payment of a Recovery Incentive Fee or Litigation Incentive Fee, including a determination that no such fee is appropriate.<br><br>• Following any termination of the BRIC without cause, the Litigation Oversight Committee and any successor Litigation Administrator (Complex Asset Recovery Manager or "ARM") shall provide the BRIC with reasonable access to information regarding the status of the monetization of any asset that would result in payment of a Recovery Incentive Fee or Litigation Incentive Fee to the BRIC. |
| Mining NewCo | BRIC to support the modified Joint Motion and not support the objections of any other party. |
| Economics | *Fixed Fee:* Commencing on the Effective Date, a cash fee of $5,000,000 per year for 3 years (to be paid monthly in equal installments beginning on the Effective Date), subject to any extension that may be approved by the Litigation Oversight Committee on compensation set by the Litigation Oversight Committee at the time of such extension.<br><br>The justification for the ARM's fixed fee is in part that the ARM will use its own team to do much of the work that would be outsourced by the other Litigation Administrator, including the hiring of financial advisors on an hourly basis. When the Litigation Oversight Committee sets a budget for the ARM, as set forth above, this will be taken into account and such budget will not include line items for financial advisors (and if a financial advisor is hired by the ARM, it will be paid for solely by the ARM).<br><br>*Recovery Incentive Fees:* Commencing on the Effective Date, a cash fee equal to 10% of value realized in respect of each asset designated as among the Illiquid Assets Subject to Incentive Fees in excess of the current marked value on the attached schedule in the column labeled "pro forma" value, paid promptly to the ARM upon such monetization event from the proceeds of such monetization event.<br><br>*Litigation Incentive Fees:* Commencing on the Effective Date, a cash fee equal to 5% of value realized (*i.e.* Net Recovered Proceeds)[1] in respect of litigation actions managed by BRIC as Litigation Administrator, paid promptly to the ARM upon such monetization event and from the proceeds of such monetization event; and, for the avoidance of doubt, excluding any Illiquid Assets Subject to Incentive Fees.<br><br>At any meeting of the Litigation Oversight Committee, the ARM may present a progress report and the Litigation Oversight Committee may determine, in its sole and absolute discretion, that substantial efforts have been expended by BRIC towards the monetization or resolution of any particular asset or cause of action, and authorize the vesting of a partial Recovery Incentive Fee or Litigation Incentive Fee to be paid promptly to the ARM upon a monetization event of such asset or cause of action, from the proceeds of such monetization event, notwithstanding whether the BRIC is subsequently terminated without cause.<br><br>The net effect to the proposed Plan Administration Budget will be neutral with the Plan Administrator and Litigation Administrator Budgets reduced as follows, and such amounts budgeted to account for the $15 million in flat fees to be paid to the BRIC:<br>• The initial Plan Administrator Budget reduced to $70 million (from $75 million)<br>• The initial Litigation Trust Funding Amount shall be reduced to $40 million (from $50 million) |
| Releases | The parties will exchange mutual releases as part of the settlement and the parties agree that the agreements contained herein shall supersede and replace all prior contractual arrangements between the BRIC, the Debtors and the Committee.<br><br>There shall be no representations and warranties as to the assets to be managed by BRIC which shall vest in the estates and monetized by BRIC on "as is, where is" basis. |
| Process | Subject to execution of this term sheet, the Debtors and the UCC shall promptly supplement the *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* to reflect the modified and clarified terms herein. |

---

[1] "Net Recovered Proceeds" means recoveries from causes of action overseen by the BRIC as Litigation Administrator, net of (1) contingency or similar payments to law firms or other professionals retained by BRIC as Litigation Administrator on each such cause of action and (2) any other fees and expenses incurred in the prosecution, management, or settlement of each respective cause of action by BRIC as Litigation Administrator.

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Fees & Expenses | The revised motion shall seek court approval for the Debtors to reimburse the BRIC's reasonable and documented out-of-pocket expenses, including the fees and expenses incurred by Willkie Farr & Gallagher LLP and Quinn Emmanuel LLP ("QE"), provided that QE's reimbursable amount shall not exceed $500,000.  To the extent such reimbursement is not approved, the Debtors and Committee shall not object to any motion filed by the BRIC's professionals seeking an allowed administrative expense for such fees and expenses. |

## **Schedule**

**Illiquid Assets**

**Summary of Estimated Remaining Illiquid Assets at Emergence**
*($ in 000s)*

**Illiquid Assets Subject to Incentive Fees**

| Assets | 4th DS Value | Pro Forma Adjustments | Pro Forma Value | Subject to Incentive Fees |
|---|---|---|---|---|
| EFH Loans (Dollarized and BTC) | | | | Yes |
| Rhodium | | | | Yes |
| Spartan | | | | Yes |
| QRDO Investment | | | | Yes |
| Institutional Loans[1] | | | | Yes |
| Mawson | | | | Yes |
| CoinRoutes | | | | Yes |
| Luxor | | | | Yes |
| Sarson Funds | | | | Yes |
| Avantgarde Finance | | | | Yes |
| Orgenesis | | | | Yes |
| CegaPte | | | | Yes |
| Pythagoras | | | | Yes |
| **Subtotal** | | | | |

**Illiquid Assets Not Subject to Incentive Fees**

| Assets | 4th DS Value | Pro Forma Adjustments | Pro Forma Value |
|---|---|---|---|
| Core Scientific | | | |
| MATIC | | | |
| Other - DOT | | | |
| Other - Various AltCoins | | | |
| 1Inch | | | |
| QRDO | | | |
| Other - ETH | | | |
| Stakehound | | | |
| **Subtotal** | | | |
| **TOTAL** | | | |

**Footnote (1): Institutional Loan Detail**

| Loan Counterparty | Principal Value | Collateral Value | Net Loan Value |
|---|---|---|---|
| 168 Trading Limited | | | |
| B2C2 LTD | | | |
| B-Brick Inc | | | |
| Blockchain Access UK Ltd | | | |
| Liquidity Technologies LTD | | | |
| Onchain Custodian Pte Ltd | | | |
| OPTIMAL ALPHA MASTER FUND LTD | | | |
| Profluent Trading Inc | | | |
| Reliz LTD | | | |
| Symbolic Capital Partners Ltd | | | |
| Tower BC Ltd | | | |
| Alameda Research Ltd[a] | | | |
| Iterative OTC LLC[b] | | | |
| Three Arrows Capital Ltd[c] | | | |
| **Total** | | | |
| **Total (rounded)** | | | |

(a) As of May 31, 2023, Alameda Research Ltd. had four outstanding loans owed to Celsius, denominated in various cryptocurrencies, worth approximately $15.3 million. Celsius has fully reserved against this receivable on its balance sheet.

(b) Iterative OTC LLC has two outstanding loans owed to Celsius. Iterative OTC LLC borrowed 450 BTC worth approximately $12.3 million as of May 31, 2023. Celsius has fully reserved against this receivable on its balance sheet. Iterative OTC LLC has filed for Chapter 7 liquidation in the Bankruptcy Court for the District of Delaware and any payments from such loan shall not be subject to incentive fees.

(c) As of May 31, 2023, Three Arrows Capital Ltd had two outstanding loans owed to Celsius, denominated in USDC, worth approximately $40.6 million. Celsius has fully reserved against this receivable on its balance sheet.

**Exhibit 3**

**Wind Down Budget**

**Celsius Network Inc.**
**Wind-Down Budget**

*$ in millions*

| | MiningCo[1][2] | Notes to Wind-Down Budget |
|---|---|---|
| **Plan Administration Fees** | | |
| Plan Administration Fees | $ 5.0 | |
| Distribution Costs and Related Expenses | 10.0 | Expenses associated with third-party distribution agents and distribution infrastructure/vendors |
| **Subtotal - Plan Administration Fees** | **$ 15.0** | |
| | | |
| **Professional Fees** | | Professional fees for legal counsel and financial advisors to support distribution, asset sale and administration of the estate |
| Legal Counsel | 10.0 | |
| Financial Advisor | 7.5 | |
| **Subtotal - Professional Fees** | **$ 17.5** | |
| | | |
| **Operating Expenses and Other** | | |
| Employee Costs | 27.5 | Includes wages, benefits, payroll taxes and other compensation-related items |
| SG&A | 10.0 | Expenses associated with estate accounting, legal, HR, and other administrative activities |
| **Subtotal - Operating Expenses and Other** | **$ 37.5** | |
| | | |
| **Total** | **$ 70.0** | |

(1) Represents estimated costs to be incurred by the estate in effectuating the MiningCo Plan. These estimates are subject to material change
(2) Total costs under the Wind-Down Budget are assumed to be escrowed upon Emergence. Any amounts not spent will be returned to creditors in subsequent distributions

## Exhibit 4

**Wind Down Procedure**s

## **Wind-Down Procedures**[1]

*The following chart summarizes the reallocation of responsibilities previously contemplated to be provided by Fahrenheit under the NewCo Transaction among the Litigation Administrator, the Plan Administrator, and US Bitcoin under the MiningCo Transaction. Such additional responsibilities shall, in each case, be performed in accordance with the Litigation Administrator Agreement, the Plan Administrator Agreement, or the US Bitcoin Agreements, as applicable.*

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| **Fahrenheit** | Fahrenheit shall:<br><br>• file the NewCo Form 10;<br><br>• manage, supervise, oversee, and monetize the NewCo Assets (including the illiquid assets); and<br><br>• set strategy and capital allocation for the bitcoin mining business. | Responsibilities reallocated as follows:<br><br>• MiningCo to file Form 10.<br><br>• NewCo Assets to be managed, supervised, overseen, and monetized as follows: | |
| | | DeFi Cryptocurrency Assets | Stakehound assets are now subject of pending litigation, to be directed by Litigation Administrator. All DeFi Cryptocurrency Assets not subject to litigation to be monetized by Plan Administrator. |
| | | Institutional Loan Portfolio | Agreements related to Institutional Loans to be monetized by Plan Administrator. Litigation regarding Institutional Loans to be directed by Litigation Administrator. |
| | | PE & VC Investments | Any PE & VC Investments to be monetized by Plan Administrator. |
| | | Mining | US Bitcoin to manage Mining.[2] |

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

[2] For the avoidance of doubt, certain illiquid assets, including those related to Core, Mawson, Rhodium and Luxor, may also be contributed to MiningCo if the Debtors determine that doing so will not cause regulatory complications.

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| | | NewCo Capitalization Amount | Concept eliminated.  MiningCo to be capitalized with $225 million as provided in the Motion. |
| **Litigation Administrators** | The Litigation Administrator shall:<br><br>• prosecute, settle, or otherwise resolve any remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan;<br><br>• manage the rights to the D&O Liability Insurance Policies;<br><br>• determine, along with the Litigation Oversight Committee, the frequency and timing of distributions of Litigation Proceeds to creditors; and<br><br>• enter into, with the consent of the Plan Administrator, agreements with Account Holders to settle such Holder's Withdrawal Preference Exposure. | In addition to the Litigation Administrators' responsibilities under the NewCo Transaction, the Litigation Administrators shall prosecute litigation associated with illiquid assets previously contemplated to be "NewCo Assets," as described above.  The Litigation Administrators' compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction. | |
| **Plan Administrator** | The Plan Administrator shall, among other things:<br><br>• administer the Post-Effective Date Debtors;<br><br>• maintain the Disputed and Contingent Claims Reserve and Professional Fee Escrow Account;<br><br>• implement the Transition Services Agreement and Emergence;<br><br>• assist in making any distributions contemplated under the Plan;<br><br>• marshal, market for sale, recover, compel the turnover of, and wind down the Debtors' assets (other than the NewCo Assets), to the extent not duplicative of the responsibilities of the Litigation Administrator;<br><br>• administer the Special Committee D&O Insurance Policies; | In addition to the Plan Administrator's responsibilities under the NewCo Transaction, the Plan Administrator shall have all responsibilities previously contemplated to be provided by Fahrenheit and not otherwise allocated to the Litigation Administrator or US Bitcoin herein, including monetizing illiquid assets that are not subject to litigation.  The Plan Administrator's compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction.<br><br>The Plan Administrator will file quarterly updates with the Court and provide monthly updates to the Litigation Oversight Committee regarding cryptocurrency distributions and the monetization of the illiquid assets to ensure progress is being made. | |

| Entity | NewCo Transaction | MiningCo Transaction |
|---|---|---|
|  | • manage the Plan Administrator Budget; and <br><br> • prepare and file post-Effective Date operating reports and appropriate tax returns. |  |
| **US Bitcoin** | US Bitcoin shall manage NewCo's mining business, including the buildout and management of the Cedarvale site. | US Bitcoin will manage MiningCo's mining business, including interim services regarding the buildout and management of the Cedarvale site. |

## **Exhibit 5**

**Proposed Disputed and Contingent Claims Reserve**

**Celsius Network**
Claim Reserves

---

*Exhibit 1*
*($ in 000s)*

| Reserve Grouping | Claims Subject to Reserve | Reserve Amount (as of 11/17 pricing) | % of Distributable Value |
|---|---|---|---|
| Class 0 - Administrative Claims | $100 | $74 | 0% |
| Class 1 - Other Secured Claims | $3,900 | $2,882 | 0% |
| Class 3 - Other Priority Claims | $5,200 | $3,842 | 0% |
| Class 8 - Unsecured Loan Claims & Class 9 - GUCs | $138,200 | $102,114 | 3% |
| Unliquidated Equitable Subordinated Claims | $25,600 | $18,915 | 1% |
| Class Claim Settlement Opt-Outs | $24,800 | $18,324 | 1% |
| Withdrawal Preference Exposure > $100K | $429,700 | $317,498 | 10% |
| **Subtotal** | **$627,500** | **$463,649** | **14%** |
| Unliquidated Litigation, Indemnification, and Other Claims | *Unliquidated* | $150,000 | 3% |
| **Total** | **$627,500** | **$613,649** | **18%** |

**Disclosures**

*Reserve Amounts shown reflect a combination of Liquid Cryptocurrency and MiningCo Common Stock*

*Assumed contracts for Institutional Customers are reserved at $0*

*Preferred Equity Claims are reserved at $0*

*Intercompany Claims are reserved at $0*

*Employee claims with CEL token component are converted to CEL priced at $0.25*

**<u>Exhibit B</u>**

**Redline**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*,[1] | Case No. 22-10964 (MG) |
| Debtors. | (Jointly Administered) |

**ORDER (I) APPROVING THE IMPLEMENTATION**
**OF THE MININGCO TRANSACTION AND (II) GRANTING RELATED RELIEF**

Upon the motion (as supplemented by the *Supplemental Statement Regarding the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4115] (the "Supplement")) (the "Motion")[2] of the Debtors for entry of an order (this "Order") (a) implementing the Plan toggle to the MiningCo Transaction on the terms attached hereto as **Exhibit 1** and **Exhibit 2**, (b) approving the Wind-Down Budget and Wind-Down Procedures, attached hereto as **Exhibit 2̶3** and **Exhibit 3̶4**, respectively, (c) approving the amount proposed to be reserved for the Disputed and Contingent Claim Reserve, as reflected on **Exhibit 4̶5** hereto, and (d) granting related relief, all as more fully set forth in the Motion; and upon the Campagna Declaration̶ ̶a̶n̶d̶, the Ehrler Declaration, and the Puntus Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these Chapter 11 Cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or Supplement, as applicable.

*Order of Reference* from the United States District Court for the Southern District of New York, entered February 1, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of these cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing thereon were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and the Supplement and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The MiningCo Transaction, and the terms thereof as described in the Motion and the Supplement, are approved.  The disclosure of the MiningCo Transaction in the Motion and the Supplement is reasonable and adequate under the circumstances, and the Debtors are not required to provide further disclosure in respect of the implementation of the MiningCo Transaction or to resolicit the votes of any creditors or equity security holders as a result thereof, or to obtain confirmation of a modified Plan.

2.      The Debtors' and the Committee's election to toggle to the Orderly Wind Down pursuant to Article IV.E of the Plan and paragraph 354 of the Confirmation Order is approved and effective.

3.      The Confirmation Order remains in full force and effect, and shall apply to the Plan, as such document is changed by the toggle to the Orderly Wind Down, the terms of the

MiningCo Transaction, and this Order; *provided, however*, that notwithstanding anything to the contrary in the Plan or Confirmation Order, the Debtors and the Committee may jointly determine to preserve the concept of Unsecured Claim Distribution Mix Elections, including the priority of such election for those creditors in Class 2, subject to the receipt of updated elections..

4.      All prior Unsecured Claim Distribution Mix Elections previously solicited are null and void.

5. The Debtors and the Committee may, but shall not be required to, jointly determine to solicit revised Unsecured Claim Distribution Mix Elections in connection with the MiningCo Transaction.

5.      6. The Wind-Down Budget and Wind-Down Procedures are approved, and the reserves provided therein are reasonable.

6.      7. The Plan Administrator shall file quarterly updates to the Court and provide monthly updates (e-mail being sufficient when there is no material update) to the Litigation Oversight Committee.  The Bankruptcy Court shall retain jurisdiction over the Plan Administrator, Litigation Administrators, Litigation Oversight Committee, and any issue relating to the implementation of the Plan, and the Plan Administrator, Litigation Administrators, and Litigation Oversight Committee shall have standing to raise any such issue with the Court.

7.      8. As provided in the Confirmation Order, theThe Debtors are authorized, but not required, toshall file on the docket a conformed Plan and revised Plan Supplement documents reflecting the toggle to the MiningCo Transaction, which shall not constitute a modification or amendment of the Plan requiring resolicitation or any further Court order to be effective.

8.      Notwithstanding anything to the contrary in this Order, or any findings announced at the Hearing, nothing in this Order, or announced at the Hearing, constitutes a finding under the

federal securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the Securities and Exchange Commission to challenge transactions involving crypto tokens on any basis is expressly reserved.

9.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the Supplement.

11.     The terms and conditions of this Order shall be immediately effective and enforceable upon entry of the Order.

12.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

13.     Notice of the Motion as provided therein is good and sufficient and the requirements of the Local Rules are satisfied by such notice.

New York, New York
Dated: _____, 2023

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**MiningCo Transaction Term Sheet**

## CELSIUS NETWORK LLC, ET AL.
### MINING NEWCO TRANSACTION TERM SHEET

**THIS MINING NEWCO TRANSACTION TERM SHEET (THE "<u>TERM SHEET</u>") CONTAINS CERTAIN MATERIAL TERMS AND CONDITIONS OF THE PROPOSED MINING NEWCO TRANSACTION, CONTEMPLATED IN THE CONFIRMED CHAPTER 11 PLAN OF THE DEBTORS IN THE JOINTLY-ADMINISTERED CASES CAPTIONED IN RE CELSIUS NETWORK LLC, ET AL., CASE NO 22-10964 (MG) (THE "<u>DEBTORS</u>" AND, TOGETHER WITH THER NON-DEBTOR AFFILIATES, "<u>CELSIUS</u>"). THIS TERM SHEET DOES NOT ADDRESS ALL TERMS, CONDITIONS, OR OTHER PROVISIONS THAT WOULD BE REQUIRED IN CONNECTION WITH THE DEFINITIVE DOCUMENTS, WHICH ARE SUBJECT TO AGREEMENT IN ACCORDANCE WITH THIS TERM SHEET. THIS TERM SHEET IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICTATIONS OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE, OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAW, INCLUDING SECURITIES LAW AND/OR PROVISIONS OF THE BANKRUPTCY CODE TO THE EXTENT APPLICABLE. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY. THIS TERM SHEET CONTEMPLATES THAT THE DEBTORS, THE COMMITTEE, AND U.S BITCOIN SHALL ENTER INTO AN AGREEMENT AND THAT THIS TERM SHEET SHALL BE BINDING TO THE EXTENT PROVIDED IN SUCH AGREEMENT.**

Reference is hereby made to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates* (the "**Plan**") [Docket No. 3577] and the *Eighth Notice of Plan Supplement* (the "**Plan Supplement**") [Docket No. 3935], which were approved by the Court in the *Findings of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "**Confirmation Order**") [Docket No. 3972]. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Plan and Plan Supplement. All current denominations herein are in U.S. Dollars.

| GENERAL PROVISIONS | |
| --- | --- |
| *Board Composition* | The board of NewCo (the "**Board**") will consist of eight representatives, six of which will be the Committee representatives previously approved in the Confirmation Order, and two of which will be representatives of US Bitcoin (one of which will be Asher Genoot and the other of which may, at US Bitcoin's discretion, be Jordan Levy). |

| | |
|---|---|
| *Transaction Documents* | The documents identified in this filing (the "**Transaction Documents**") will be amended in accordance with this summary of terms. |
| *Capitalization Amount* | NewCo shall be capitalized with $225 million in fiat. |
| *Contributed Assets* | Mining Assets; for the avoidance of doubt, the Core, Rhodium, Mawson, and Luxor assets shall not be assets required to be contributed to NewCo. |
| **Document** | **Modifications to Approved Transaction Document** |
| **US Bitcoin Management Agreement** | *Term and Termination; Effect of Termination* <br><br> The Initial Term shall remain the same four year term, subject to the following: (i) if the (owned and not hosted) mining capacity of Mining NewCo has not increased by at least 20 EH/s, from [3] EH/s to [23] EH/s (the "**Exahash Target**") during the initial (3) years of the Mining Management Agreement (the "**Management Agreement**"), then, at the conclusion of the third year of the Management Agreement, NewCo may terminate the Management Agreement without triggering any early termination fee, so long as NewCo provides Manager with a minimum six (6) month transition period (commencing no earlier than the conclusion of the third year of the Management Agreement), during which transition period Manager shall be paid the cash portion of the Mining Management Fee; but (ii) if at any point during the initial (3) years of the Management Agreement, the mining capacity of NewCo increases to at least the Exahash Target, the Management Agreement shall automatically be extended one additional year (i.e., through the fifth year). <br>• The Management Agreement shall be executed and effective by no later than February 15, 2024. <br>• The Term will be subject to certain changes, including termination rights of each of NewCo and Manager, upon the occurrence of certain events that were not in the prior Management Agreement: <br>   o *NewCo Change of Control*: If NewCo undergoes a Change of Control, NewCo may terminate the Management Agreement (the "**Change of Control Termination Right**"). <br>      ▪ If NewCo terminates pursuant to its Change of Control Termination Right, NewCo shall pay Manager 100% of its Management Fee that would have been payable during the |

remainder of the applicable Term (the "**Termination Fee**"), but such cash Termination Fee may, at NewCo's or the purchaser's option, be paid in equity in connection with the change of control transaction, and Manager's unvested incentive equity and warrants shall immediately accelerate and vest.

- o *Form 10 Effectiveness*: NewCo Mining shall use best efforts to obtain effectiveness of the Form 10. If the Board determines, in accordance with its fiduciary duties, on or before May 1, 2024 (the "**Liquidity Deadline**"), that there is not a reasonable likelihood that NewCo will achieve effectiveness of its Form 10 filing, NewCo may terminate the Management Agreement (the "**Form 10 Termination Right**") by providing Manager with written notice of termination (a "**Notice of Termination**") by no later than the Liquidity Deadline, with the termination of Management Agreement to be effective as of 14 calendar days following receipt by the Manager of the notice of termination.
  - ▪ For the avoidance of doubt, Manager shall continue to provide services to NewCo and shall continue to be compensated under the Management Agreement through the effective date of termination.
  - ▪ Following termination, Manager may continue providing services to NewCo subject to the mutual agreement of NewCo and Manager, including as it relates to the terms of any such agreement.
  - ▪ If NewCo terminates pursuant to its Form 10 Termination Right, Manager shall receive, as liquidated damages, one year of the cash portion of the Mining Management Fee, and one year worth of incentive equity and warrants which shall immediately accelerate and vest, plus any accrued and unpaid amounts as of the date of the notice of termination. NewCo shall pay Manager the foregoing amounts within 30 days of Manager's receipt of a notice of termination.

|  | ▪ If NewCo files a subsequent Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the Liquidity Deadline, NewCo shall, at its election (i) enter into a reinstatement of Management Agreement with Manager for the remainder of the Initial Term existing on the date of [such reinstatement/termination], on the same terms and conditions as the original agreement, or (ii) pay to Manager its otherwise applicable termination fee under the Management Agreement (taking into account the portion of the Management Agreement that elapsed prior to the prior termination), *minus* the Termination Fee. |
|  | <u>*Executive Management Team*</u>:  A CEO will be named, and Joel Block will serve as the initial CFO. Each member of the executive management team shall serve at the pleasure of the NewCo Board. |
|  | <u>*Mining Management Fee*</u>:   The cash portion of the Mining Management Fee will be $20,376,200 annually. The issuance of incentive equity and warrants that comprise the remainder of the Mining Management Fee are governed by the Restricted Stock Purchase Agreement and Warrant Agreement discussed below. |
| **Cedarvale Interim Services Agreement** | There will be no modifications from the terms approved by Court in the Confirmation Order, other than (i) reducing the monthly fee applicable from January 1, 2024 to $734,000, (ii) providing for adjustments of the timelines and dates in the version filed in the Plan Supplement to account for the time elapsed between the October 30, 2023 and the date of signing of the Interim Services Agreement, (iii) providing a termination right in favor of US Bitcoin if the Management Agreement has not been executed by February 15th, 2024, and (iv) as otherwise set forth herein. |
| **Restricted Stock Purchase Agreement** | The Restricted Stock Purchase Agreement ("**RSPA**") will provide for (i) US Bitcoin's purchase of NewCo equity, as well as (ii) annual issuance of incentive equity of 31.89% of the 1.00% of NewCo equity originally to be issued to Fahrenheit. |

|  | *US Bitcoin Equity Purchase* |
|---|---|
|  | • Manager will purchase [$12,756,000] of NewCo stock, calculated on a pre-money basis using NewCo's NAV as of the Effective Date of the Plan (which shall have been adjusted for the capitalization set forth in the Mining NewCo Transaction Motion). Effectiveness of the Management Agreement is conditioned upon NewCo's receipt of cash from Manager for such purchase of stock pursuant to the terms of the Restricted Stock Purchase Agreement discussed below.<br>• (a) 50% of the initial NewCo equity contribution will be funded on the Effective Date, and (b) the remaining 50% will be funded on the earlier of (i) promptly following the effectiveness of the Form 10; and (ii) provided that NewCo has not exercised the Form 10 Termination right, May 1, 2024.<br><br>*US Bitcoin Incentive Units*<br><br>• US Bitcoin will receive 31.89% of the incentive units previously allocated to Fahrenheit each year of the term of the Management Agreement.<br>• Other changes to the RSPA will provide for the applicable acceleration and cancellation of incentive units upon the various termination provisions in the Management Agreement:<br>   o If NewCo terminates the Management Agreement pursuant to its Change of Control Termination Right, Manager's remaining unvested incentive units will immediately accelerate and vest.<br>   o If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, twelve months' worth of unvested incentive equity will immediately accelerate and vest. |
| **Warrant Agreement** | The strike price of the warrants will be set at the end of each year of the term, based on the equity trading price as of the last trading day of each year.<br><br>Additional changes to the Warrant Agreement will provide for the applicable vesting, acceleration of vesting and cancellation of incentive units upon the various termination provisions in the Management Agreement identified above.<br>   o If NewCo terminates the Management Agreement pursuant to its Change of Control Termination |

| | |
|---|---|
| | Right, the exercise period commencement date for Manager's remaining unvested warrants will be deemed to be such effective date of termination.<br>○ If NewCo terminates the Management Agreement pursuant to its Form 10 Termination Right, the exercise period commencement date for one year's worth of Manager's remaining unvested warrants will be deemed to be such effective date of termination. |
| **Charter and By-Laws** | The Charter and By-Laws will be modified to account for the substitution of USBTC for Fahrenheit as equity purchaser, and to appoint two USBTC appointees in lieu of the prior three Fahrenheit appointees, one of which will be Asher Genoot. |
| **Deposit and Escrow Agreement** | The Deposit and Escrow Agreement will be modified to substitute USBTC for Fahrenheit, reduce the escrowed amount to $3.189 million, and make conforming changes in the escrow release provisions. |

*[Different first page link-to-previous setting changed from off in original to on in modified.].*

**Exhibit 2**

~~Wind Down Budget~~**BRIC Agreement – Material Terms**

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Plan Administrator | Christopher Ferraro will serve as the Plan Administrator as set forth in further detail below. |
| ARM | BRIC or its designee will serve as a Litigation Administrator (Complex Asset Recovery Manager or "ARM"). |
| Oversight of ARM | The Litigation Oversight Committee will oversee the ARM. The composition of the Litigation Oversight Committee shall remain as contemplated in the Plan and Confirmation Order.<br><br>BRIC shall propose candidates to be considered by the Litigation Oversight Committee for the final spot on the Litigation Oversight Committee, among any other candidates the Litigation Oversight Committee may elect to consider.<br><br>The ARM shall be overseen by an "ARM Oversight Sub-Committee" which shall be comprised of Gerard Uzzi and two other members of the Litigation Oversight Committee to be determined by the Litigation Oversight Committee in consultation with the BRIC.<br><br>The ARM Oversight Sub-Committee shall oversee the ARM and its management of the Illiquid Assets and BRIC Litigation Assets, and shall provide regular reports to the Litigation Oversight Committee. |
| Access to Resources | The Litigation Oversight Committee shall ensure that the ARM has reasonable and timely access to the Company's books, records, accounts, and other resources as contemplated herein to facilitate the administration of its duties. Any requests for information by the ARM to the Plan Administrator shall be made through Robert Campagna, Samuel Schreiber, or another person designated by the Debtors or the Plan Administrator prior to or on the Effective Date (such person, the "Gatekeeper"). The Gatekeeper will use reasonable efforts to respond to such information requests, including providing reasonable access to employees, as appropriate, to facilitate an efficient complex assets recovery process and litigation recovery process. Any dispute regarding access set forth in this paragraph shall be resolved by the Litigation Oversight Committee, excluding any member proposed by the BRIC for the final spot on the Litigation Oversight Committee. The Plan Administrator shall select any successor Gatekeeper.<br><br>The Plan Administrator shall have direct and sole management and oversight of Wind Down Estate employment and retention matters. Interested parties (including the Litigation Oversight Committee and each Litigation Administrator) shall receive notice of any proposed terminations of employees and consultants. For the avoidance of doubt, any Celsius employee who is employed by the estates post-emergence shall report to the Plan Administrator, provided that the Litigation Oversight Committee shall have the ability to resolve disputes regarding the ARM's or other Litigation Administrator's reasonable access to employees.<br><br>The Litigation Oversight Committee will approve a comprehensive budget for BRIC, as Litigation Administrator (ARM), to engage counsel and experts, and manage the Illiquid Assets. For the avoidance of doubt, the budget shall exclude Financial Advisors retained for the purpose of assisting in the complex asset recovery process or litigation to be overseen by the BRIC. If such Financial Advisors are retained for the purpose of assisting in the complex asset recovery process or litigation to be overseen by BRIC, such costs shall be borne solely by the BRIC and not the Debtors' estates. |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Illiquid Assets | The BRIC, in its capacity as ARM, will manage the monetization of all of the illiquid assets listed in the attached schedule, including the "Illiquid Assets Subject to Incentive Fees" and the "Illiquid Assets Not Subject to Incentive Fees." The value of the Mawson asset to be allocated to the ARM shall include only the Mawson note and not the claims arising under the Mawson Co-Location Agreement (including for return of the deposit), which agreement and deposit rights are property of MiningCo. The litigation with respect to Mawson shall be overseen by the ARM. The Litigation Oversight Committee and the MiningCo Board shall have joint authority to direct the litigation and resolution of such litigation. The ARM shall only earn its incentive fee on the portion of any recovery associated with the Mawson note and not rights asserted under the Co-Location Agreement, and any dispute as to allocation of litigation proceeds shall be resolved by the Bankruptcy Court.<br><br>The Litigation Oversight Committee shall have the sole authority to designate Illiquid Assets as subject to Incentive Fees in addition to those set forth as "Illiquid Assets Subject to Incentive Fees."<br><br>For the avoidance of doubt, those assets currently identified as "Illiquid Assets Subject to Incentive Fees" shall not be changed.<br><br>All illiquid assets within the Estates (but not causes of actions other than the causes of action identified as "Litigation Assets" in the section immediately below this one) not identified on the attached schedule will be discussed in good faith between the Litigation Oversight Committee and the ARM to determine whether they should be designated as additional "Illiquid Assets Subject to Incentive Fees" or "Illiquid Assets Not Subject to Incentive Fees," all subject to the sole discretion of the Litigation Oversight Committee.<br><br>Furthermore, to the extent that an asset designated as "Illiquid Assets Not Subject to Incentive Fees" requires active management and workout activities more akin to the Illiquid Assets Subject to Incentive Fees, the Litigation Oversight Committee shall have the authority to change such designation to be subject to Incentive Fees.<br><br>The ARM shall be required to consult with the ARM Oversight Sub-Committee on a periodic basis regarding whether to monetize Illiquid Assets Subject to Incentive Fees that would result in a recovery below the market "pro forma" value in the attached schedule. |
| Litigation Assets | As part of its role as ARM, BRIC will be designated as a Litigation Administrator under the Plan solely with respect to (a) potential claims and causes of action related to the Debtors' pre-bankruptcy activities against the Debtors' professionals who are Excluded Parties under the Plan (those claims will be set forth on a schedule to BRIC's agreement and are envisioned to include, but not be limited to potential claims and causes of action against accountants, attorneys, and other advisors, such as Chainalysis, that were not released under the Plan) and (b) Retained Causes of Action solely as follows:<br><br>   i.   BRIC shall be the Litigation Administrator for all Causes of Action related to Illiquid Assets (e.g. loan defaults related to illiquid assets, illiquid mining assets, etc., but not all claims related to counterparties with institutional loans, whereby such claims are not related to such institutional loans).<br>   ii   Additionally, BRIC shall be the Litigation Administrator for the BitMEX and Tether Claims.<br><br>The Litigation Oversight Committee will approve a budget for BRIC, as a Litigation Administrator, to engage counsel and experts (but not financial advisors) and manage the above-described litigation. |
| Liquid Distributions | The Debtors will appoint Christopher Ferraro as the Plan Administrator for a five-year term. Mr. Ferraro will work with the Distribution Agents to make initial and subsequent distributions under the Plan to creditors (including liquid cryptocurrency) and be compensated as agreed between the Debtors, the Committee, and Mr. Ferraro.<br><br>If Mr. Ferraro resigns as Plan Administrator prior to the completion of his duties (including all distributions under the Plan), the Litigation Oversight Committee shall select the successor Plan Administrator. |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Exculpation | BRIC shall be exculpated with respect to any potential liability in connection with any actions taken, including distributions, by the Plan Administrator and the other Litigation Administrator. The Plan Administrator and the Litigation Administrator shall be exculpated with respect to any potential liability in connection with actions taken by the BRIC in the course of their duties as Litigation Administrator (ARM). |
| Mutual Non-Disparagement | The Debtors, the Committee, the Plan Administrator, the BRIC/Litigation Administrator (ARM), the other Litigation Administrator, and the Litigation Oversight Committee (collectively, the "Parties") shall agree to mutual non-disparagement clauses as follows:

Beginning immediately upon agreement to this term sheet and through the date on which the Litigation Administrator Agreement terminates, the Parties shall not, and shall cause their respective directors, officers, employees, agents, representatives, professionals, and controlled affiliates to not, whether directly or indirectly, (i) make any public statement or any statement to any third party, in each case that is negative or disparaging and is related to Celsius or these Chapter 11 Cases regarding the Debtors, the Debtors' professionals, the Debtors' current directors or employees, the Committee, the Committee's members, the Committee's professionals, the other Parties, the professionals or employees of the other Parties, the Plan, the bidding process, or the wind down (including any actions taken by the Parties as part of the wind down); or (ii) knowingly encourage or induce others to make any statement prohibited in (i); provided that the foregoing shall not prevent the Parties from making any truthful statement to the extent required by Law or a Governmental Authority to disclose or make accessible such information. These mutual non-disparagement provisions shall not apply to any Excluded Party under the Plan. |
| Tax Filings | The Plan Administrator shall be responsible for all pre-Effective Date tax filings, including, for the avoidance of doubt, all 2023, stub 2024 and prior tax filings.

The Plan Administrator shall be responsible for all regulatory filings and financial reporting for the Estates post-Effective Date; provided that the Plan Administrator shall first present such filings and reports to the Litigation Oversight Committee and consult with the Litigation Oversight Committee with respect to such filings and reports; provided that the ARM shall make regular reports to the Court as set forth in the agreement governing its services. |
| Governing Documentation | There will be one agreement that governs the BRIC's role as Litigation Administrator (ARM), that will be substantially consistent with the Litigation Administrator Agreement included in the Plan Supplement except as otherwise expressly modified by this term sheet (e.g., to include the monetization of Illiquid Assets, fee structure, oversight by Litigation Oversight Committee, *etc.*), provided that the following clarifications shall be made:

• the Litigation Oversight Committee shall provide the BRIC at least 90 days' notice if it determines to terminate the BRIC's role as Litigation Administrator (ARM) without cause;

• the Litigation Oversight Committee shall not be able to terminate the BRIC without cause until the date that is 18 months following the Effective Date (it being understood that notice of such termination without cause may be provided to the BRIC as early as the date that is the 15 month anniversary of the Effective Date); and

• if the BRIC is terminated without cause, on the date of termination (90 days after notice of termination without cause is provided), the BRIC shall be entitled to immediate payment of all unpaid accrued fees through the date of termination, plus a $1 million termination fee; and

• if the BRIC is no longer engaged as Litigation Administrator (ARM) (unless terminated for cause), the BRIC shall be entitled to prompt payment of the Recovery Incentive Fee and Litigation Incentive Fee that would otherwise have been owed to the BRIC from the monetization of an illiquid asset or cause of action previously managed by BRIC if a Resolution Event with respect to such asset or cause of action occurs prior to the BRIC's termination, other than a termination for cause. "Resolution Event" means, as applicable, a settlement agreement, an agreement in principle to settle or otherwise resolve a matter, a judgment or similar court resolution, or substantial completion of a litigation or resolution process that has not yet led to a judgment, similar court resolution, or other resolution. Any dispute regarding such right to payment will be resolved in the first instance by the Litigation Oversight Committee, and if a dispute remains, it will be resolved by the Bankruptcy Court. Notwithstanding the above, if a Resolution Event with respect to an asset or cause of action has not occurred prior to the BRIC's termination (other than for cause), but the BRIC has expended substantial efforts towards the monetization or resolution of such asset or cause of action and such asset or cause of action is subsequently monetized or resolved, the BRIC shall be entitled to request that the Litigation Oversight Committee authorize a payment, in full or in part, of a Recovery Incentive Fee or Litigation Incentive Fee to the BRIC in connection with the monetization or resolution of such asset or cause of action that is the result of the BRIC's |

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| | substantial efforts. The Litigation Oversight Committee will have sole and absolute discretion regarding the approval of any such request for payment of a Recovery Incentive Fee or Litigation Incentive Fee, including a determination that no such fee is appropriate.<br><br>• Following any termination of the BRIC without cause, the Litigation Oversight Committee and any successor Litigation Administrator (Complex Asset Recovery Manager or "ARM") shall provide the BRIC with reasonable access to information regarding the status of the monetization of any asset that would result in payment of a Recovery Incentive Fee or Litigation Incentive Fee to the BRIC. |
| Mining NewCo | BRIC to support the modified Joint Motion and not support the objections of any other party. |
| Economics | *Fixed Fee:* Commencing on the Effective Date, a cash fee of $5,000,000 per year for 3 years (to be paid monthly in equal installments beginning on the Effective Date), subject to any extension that may be approved by the Litigation Oversight Committee on compensation set by the Litigation Oversight Committee at the time of such extension.<br><br>The justification for the ARM's fixed fee is in part that the ARM will use its own team to do much of the work that would be outsourced by the other Litigation Administrator, including the hiring of financial advisors on an hourly basis. When the Litigation Oversight Committee sets a budget for the ARM, as set forth above, this will be taken into account and such budget will not include line items for financial advisors (and if a financial advisor is hired by the ARM, it will be paid for solely by the ARM).<br><br>*Recovery Incentive Fees:* Commencing on the Effective Date, a cash fee equal to 10% of value realized in respect of each asset designated as among the Illiquid Assets Subject to Incentive Fees in excess of the current marked value on the attached schedule in the column labeled "pro forma" value, paid promptly to the ARM upon such monetization event from the proceeds of such monetization event.<br><br>*Litigation Incentive Fees:* Commencing on the Effective Date, a cash fee equal to 5% of value realized (*i.e.* Net Recovered Proceeds)[1] in respect of litigation actions managed by BRIC as Litigation Administrator, paid promptly to the ARM upon such monetization event and from the proceeds of such monetization event; and, for the avoidance of doubt, excluding any Illiquid Assets Subject to Incentive Fees.<br><br>At any meeting of the Litigation Oversight Committee, the ARM may present a progress report and the Litigation Oversight Committee may determine, in its sole and absolute discretion, that substantial efforts have been expended by BRIC towards the monetization or resolution of any particular asset or cause of action, and authorize the vesting of a partial Recovery Incentive Fee or Litigation Incentive Fee to be paid promptly to the ARM upon a monetization event of such asset or cause of action, from the proceeds of such monetization event, notwithstanding whether the BRIC is subsequently terminated without cause.<br><br>The net effect to the proposed Plan Administration Budget will be neutral with the Plan Administrator and Litigation Administrator Budgets reduced as follows, and such amounts budgeted to account for the $15 million in flat fees to be paid to the BRIC:<br>• The initial Plan Administrator Budget reduced to $70 million (from $75 million)<br>• The initial Litigation Trust Funding Amount shall be reduced to $40 million (from $50 million) |
| Releases | The parties will exchange mutual releases as part of the settlement and the parties agree that the agreements contained herein shall supersede and replace all prior contractual arrangements between the BRIC, the Debtors and the Committee.<br><br>There shall be no representations and warranties as to the assets to be managed by BRIC which shall vest in the estates and monetized by BRIC on "as is, where is" basis. |
| Process | Subject to execution of this term sheet, the Debtors and the UCC shall promptly supplement the *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* to reflect the modified and clarified terms herein. |

---

[1] "Net Recovered Proceeds" means recoveries from causes of action overseen by the BRIC as Litigation Administrator, net of (1) contingency or similar payments to law firms or other professionals retained by BRIC as Litigation Administrator on each such cause of action and (2) any other fees and expenses incurred in the prosecution, management, or settlement of each respective cause of action by BRIC as Litigation Administrator.

| Issue | Debtors, Committee & BRIC Final Terms |
|---|---|
| Fees & Expenses | The revised motion shall seek court approval for the Debtors to reimburse the BRIC's reasonable and documented out-of-pocket expenses, including the fees and expenses incurred by Willkie Farr & Gallagher LLP and Quinn Emmanuel LLP ("QE"), provided that QE's reimbursable amount shall not exceed $500,000. To the extent such reimbursement is not approved, the Debtors and Committee shall not object to any motion filed by the BRIC's professionals seeking an allowed administrative expense for such fees and expenses. |

**Schedule**

**Illiquid Assets**

**Summary of Estimated Remaining Illiquid Assets at Emergence**
*($ in 000s)*

**Illiquid Assets Subject to Incentive Fees**

| Assets | 4/30/23 Value | Pro Forma Adjustments | Pro Forma Value | Subject to Incentive Fees |
|---|---|---|---|---|
| EFH Loans (Dollarized and BTC) | | | | Yes |
| Rhodium | | | | Yes |
| Spartan | | | | Yes |
| QRDO Investment | | | | Yes |
| Institutional Loans⁽ʷ⁾ | | | | Yes |
| Mawson | | | | Yes |
| CoinRoutes | | | | Yes |
| Luxor | | | | Yes |
| Sarson Funds | | | | Yes |
| Avantgarde Finance | | | | Yes |
| Orgenesis | | | | Yes |
| CegaPte | | | | Yes |
| Pythagoras | | | | Yes |
| **Subtotal** | | | | |

**Illiquid Assets Not Subject to Incentive Fees**

| Assets | 4/30/23 Value | Pro Forma Adjustments | Pro Forma Value |
|---|---|---|---|
| Core Scientific | | | |
| MATIC | | | |
| Other - DOT | | | |
| Other - Various AltCoins | | | |
| 1Inch | | | |
| QRDO | | | |
| Other - ETH | | | |
| Stakehound | | | |
| **Subtotal** | | | |
| **TOTAL** | | | |

*Footnote (1): Institutional Loan Detail*

| Loan Counterparts | Principal Value | Collateral Value | Net Loan Value |
|---|---|---|---|
| 168 Trading Limited | | | |
| B2C2 LTD | | | |
| B-Brick Inc | | | |
| Blockchain Access UK Ltd | | | |
| Liquidity Technologies LTD | | | |
| Onchain Custodian Pte Ltd | | | |
| OPTIMAL ALPHA MASTER FUND LTD | | | |
| Profluent Trading Inc | | | |
| Reliz LTD | | | |
| Symbolic Capital Partners Ltd | | | |
| Tower BC Ltd | | | |
| Alameda Research Ltd⁽ᵃ⁾ | | | |
| Iterative OTC LLC⁽ᵇ⁾ | | | |
| Three Arrows Capital Ltd⁽ᶜ⁾ | | | |
| **Total** | | | |
| **Total (rounded)** | | | |

(a) As of May 31, 2023, Alameda Research Ltd. had four outstanding loans owed to Celsius, denominated in various cryptocurrencies, worth approximately $15.3 million. Celsius has fully reserved against this receivable on its balance sheet.

(b) Iterative OTC LLC has two outstanding loans owed to Celsius. Iterative OTC LLC borrowed 450 BTC worth approximately $12.3 million as of May 31, 2023. Celsius has fully reserved against this receivable on its balance sheet. Iterative OTC LLC has filed for Chapter 7 liquidation in the Bankruptcy Court for the District of Delaware and any payments from such loan shall not be subject to incentive fees.

(c) As of May 31, 2023, Three Arrows Capital Ltd had two outstanding loans owed to Celsius, denominated in USDC, worth approximately $40.6 million. Celsius has fully reserved against this receivable on its balance sheet.

**Exhibit 3**

**Wind Down Budget**

**Celsius Network Inc.**
**Wind-Down Budget**

*$ in millions*

Notes to Wind-Down Budget

| | | | |
|---|---|---:|---|
| **Plan Administration Fees** | | | |
| Plan Administration Fees | $ | 5.0 | |
| Distribution Costs and Related Expenses | | 10.0 | Expenses associated with third-party distribution agents and distribution infrastructure/vendors |
| **Subtotal - Plan Administration Fees** | $ | **15.0** | |
| **Professional Fees** | | | Professional fees for legal counsel and financial advisors to support distribution, asset sale and administration of the estate |
| Legal Counsel | | 10.0 | |
| Financial Advisor | | ~~10~~7.5 | |
| **Subtotal - Professional Fees** | $ | **~~20~~17.5** | |
| | | | |
| **Operating Expenses and Other** | | | |
| Employee Costs | | ~~30~~27.5 | Includes wages, benefits, payroll taxes and other compensation-related items |
| SG&A | | 10.0 | Expenses associated with estate accounting, legal, HR, and other administrative activities |
| **Subtotal - Operating Expenses and Other** | $ | **~~40~~37.5** | |
| | | | |
| **Total** | $ | **~~75~~70.0** | |

*(1) Represents estimated costs to be incurred by the estate in effectuating the MiningCo Plan. These estimates are subject to material change*
*(2) Total costs under the Wind-Down Budget are assumed to be escrowed upon Emergence. Any amounts not spent will be returned to creditors in subsequent distributions*

## Exhibit 4

**Wind Down Procedure**s

# **Wind-Down Procedures**[1]

*The following chart summarizes the reallocation of responsibilities previously contemplated to be provided by Fahrenheit under the NewCo Transaction among the Litigation Administrator, the Plan Administrator, and US Bitcoin under the MiningCo Transaction.  Such additional responsibilities shall, in each case, be performed in accordance with the Litigation Administrator Agreement, the Plan Administrator Agreement, or the US Bitcoin Agreements, as applicable.*

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| **Fahrenheit** | Fahrenheit shall:<br><br>• file the NewCo Form 10;<br><br>• manage, supervise, oversee, and monetize the NewCo Assets (including the illiquid assets); and<br><br>• set strategy and capital allocation for the bitcoin mining business. | Responsibilities reallocated as follows:<br><br>• ~~US Bitcoin~~MiningCo to file Form 10 ~~for MiningCo~~.<br><br>• NewCo Assets to be managed, supervised, overseen, and monetized as follows: | |
| | | DeFi Cryptocurrency Assets | Stakehound assets are now subject of pending litigation, to be directed by Litigation Administrator.  All DeFi Cryptocurrency Assets not subject to litigation to be monetized by Plan Administrator. |
| | | Institutional Loan Portfolio | Agreements related to Institutional Loans to be monetized by Plan Administrator.  Litigation regarding Institutional Loans to be directed by Litigation Administrator. |

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Plan"), attached as Exhibit A to the *Finding of Fact, Conclusions of Law, and Order Confirming the Modified Joint Chapter 11 Plan of Celsius Network LLC and its Debtor Affiliates* (the "Confirmation Order") [Docket No. 3972], or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (the "Disclosure Statement"), as applicable.

| Entity | NewCo Transaction | MiningCo Transaction | |
|---|---|---|---|
| | | PE & VC Investments | Any PE & VC Investments to be monetized by Plan Administrator. |
| | | Mining | US Bitcoin to manage Mining.[2] |
| | | NewCo Capitalization Amount | Concept eliminated.  MiningCo to be capitalized with $225 million as provided in the Motion. |
| **Litigation Administrators** | The Litigation Administrator shall:<br><br>• prosecute, settle, or otherwise resolve any remaining Disputed Claims, the Recovery Causes of Action, and the Contributed Claims and collect the Goldstein Loan, the Leon Loan, and any other CEL Insider Loan;<br><br>• manage the rights to the D&O Liability Insurance Policies;<br><br>• determine, along with the Litigation Oversight Committee, the frequency and timing of distributions of Litigation Proceeds to creditors; and<br><br>• enter into, with the consent of the Plan Administrator, agreements with Account Holders to settle such Holder's Withdrawal Preference Exposure. | In addition to the Litigation Administrator's responsibilities under the NewCo Transaction, the Litigation Administrators shall prosecute litigation associated with illiquid assets previously contemplated to be "NewCo Assets," as described above. The Litigation Administrator's compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction. | |
| **Plan Administrator** | The Plan Administrator shall, among other things:<br><br>• administer the Post-Effective Date Debtors; | In addition to the Plan Administrator's responsibilities under the NewCo Transaction, the Plan Administrator shall have all responsibilities previously contemplated to be provided by Fahrenheit and not otherwise allocated to the Litigation Administrator or US Bitcoin herein, including monetizing illiquid assets that are not subject to litigation. The Plan Administrator's compensation will **not** be increased to account for the increased responsibilities under the MiningCo Transaction. | |

---

[2]   For the avoidance of doubt, certain illiquid assets, including those related to Core, Mawson, Rhodium and Luxor, may also be contributed to MiningCo if the Debtors determine that doing so will not cause regulatory complications.

2

| Entity | NewCo Transaction | MiningCo Transaction |
|---|---|---|
| | <ul><li>maintain the Disputed and Contingent Claims Reserve and Professional Fee Escrow Account;</li><li>implement the Transition Services Agreement and Emergence;</li><li>assist in making any distributions contemplated under the Plan;</li><li>marshal, market for sale, recover, compel the turnover of, and wind down the Debtors' assets (other than the NewCo Assets), to the extent not duplicative of the responsibilities of the Litigation Administrator;</li><li>administer the Special Committee D&O Insurance Policies;</li><li>manage the Plan Administrator Budget; and</li><li>prepare and file post-Effective Date operating reports and appropriate tax returns.</li></ul> | The Plan Administrator will file quarterly updates with the Court and provide monthly updates to the Litigation Oversight Committee regarding cryptocurrency distributions and the monetization of the illiquid assets to ensure progress is being made. |
| **US Bitcoin** | US Bitcoin shall manage NewCo's mining business, including the buildout and management of the Cedarvale site. | US Bitcoin will manage MiningCo's mining business, including interim services regarding the buildout and management of the Cedarvale site. |

3

## Exhibit 4<u>5</u>

**Proposed Disputed and Contingent Claims Reserve**

**Celsius Network**
Claim Reserves

*Exhibit 1*
*($ in 000s)*

| Reserve Grouping | Claims Subject to Reserve | Reserve Amount (as of 11/17 pricing) | % of Distributable Value |
|---|---|---|---|
| Class 0 - Administrative Claims | $100 | $74 | 0% |
| Class 1 - Other Secured Claims | $3,900 | $2,882 | 0% |
| Class 3 - Other Priority Claims | $5,200 | $3,842 | 0% |
| Class 8 - Unsecured Loan Claims & Class 9 - GUCs | $138,200 | $102,114 | 3% |
| Unliquidated Equitable Subordinated Claims | $25,600 | $18,915 | 1% |
| Class Claim Settlement Opt-Outs | $24,800 | $18,324 | 1% |
| Withdrawal Preference Exposure > $100K | $429,700 | $317,498 | 10% |
| **Subtotal** | **$627,500** | **$463,649** | **14%** |
| Unliquidated Litigation, Indemnification, and Other Claims | *Unliquidated* | $150,000 | 3% |
| **Total** | **$627,500** | **$613,649** | **18%** |

**Disclosures**

*Reserve Amounts shown reflect a combination of Liquid Cryptocurrency and MiningCo Common Stock*

*Assumed contracts for Institutional Customers are reserved at $0*

*Preferred Equity Claims are reserved at $0*

*Intercompany Claims are reserved at $0*

*Employee claims with CEL token component are converted to CEL priced at $0.25*