**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CELSIUS NETWORK LLC, *et al.*,[1] | ) | Case No. 22-10964 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NINTH NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on July 28, 2023, Celsius Network LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the *Notice of Filing of Plan Supplement* [Docket No. 3115] (the "First Plan Supplement") to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3577] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"),[2] as set forth in the Plan and in accordance with the terms and conditions in the Plan Sponsor Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** on August 13, 2023, the Debtors filed the *Second Notice of Filing of Plan Supplement* [Docket No. 3273] (the "Second Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 8, 2023, the Debtors filed the *Third Notice of Filing of Plan Supplement* [Docket No. 3444] (the "Third Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fourth Notice of Filing of Plan Supplement* [Docket No. 3483] (the "Fourth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on September 15, 2023, the Debtors filed the *Fifth Notice of Filing of Plan Supplement* [Docket No. 3550] (the "Fifth Plan Supplement").

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd. (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

[2]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Plan or the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 3332] (as modified, amended, or supplemented from time to time, the "Disclosure Statement"), as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on September 27, 2023, the Debtors filed the *Sixth Notice of Filing of Plan Supplement* [Docket No. 3583] (the "Sixth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on October 20, 2023, the Debtors filed the *Seventh Notice of Filing of Plan Supplement* [Docket No. 3869] (the "Seventh Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** on October 30, 2023, the Debtors filed the *Eighth Notice of Filing of Plan Supplement* [Docket No. 3935] (the "Eighth Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file an addendum to the Plan Supplement (the "Ninth Plan Supplement" and, together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, and the Eighth Plan Supplement, the "Plan Supplement")[3], which includes the following documents:

| Exhibit | Document |
| --- | --- |
| A | MiningCo Management Agreement |
| B | U.S. Bitcoin Cedarvale Interim Services Agreement |
| B-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |

**PLEASE TAKE FURTHER NOTICE THAT** certain documents or portions thereof contained in the Plan Supplement remain subject to ongoing negotiations among the Debtors and interested parties with respect thereto. The Debtors reserve all rights, subject to the terms and conditions set forth in the Plan and the Plan Sponsor Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained therein, at any time before the Effective Date of the Plan, or any such other date as may be provided for in the Plan or an order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement or its amendments are subject to certain consent and approval rights, including those provided in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT**, if you would like to obtain a copy of the Disclosure Statement, the Plan, or related documents, you should contact Stretto, Inc., the Claims, Noticing, and Solicitation Agent retained by the Debtors in these chapter 11 cases (the "Claims, Noticing, and Solicitation Agent"), by: (a) calling the Debtors' restructuring hotline at (855) 423-1530 (Toll Free) or +1 (949) 669-5873 (International); (b) e-mailing the Claims, Noticing, and Solicitation Agent at CelsiusInquiries@Stretto.com with a reference to "In re: Celsius - Solicitation Inquiry" in the subject line; or (c) writing to the Claims, Noticing, and

---

[3]   **Annex 1** contains a listing of all documents filed in the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, the Fifth Plan Supplement, the Sixth Plan Supplement, the Seventh Plan Supplement, and the Eighth Plan Supplement.

Solicitation Agent at Celsius Inquiries, c/o Stretto 410 Exchange, Suite 100 Irvine, CA 92602. You may also obtain copies of any pleadings filed with the Court for free by visiting the Debtors' restructuring website, https://cases.stretto.com/Celsius/, or for a fee via PACER at: http://pacer.psc.uscourts.gov.

[*Rest of page intentionally left blank*]

New York, New York
Dated: December 20, 2023

*/s/ Joshua A. Sussberg*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:            joshua.sussberg@kirkland.com

- and -

Patrick J. Nash, Jr., P.C. (admitted *pro hac vice*)
Ross M. Kwasteniet, P.C. (admitted *pro hac vice*)
Christopher S. Koenig
Dan Latona (admitted *pro hac vice*)
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:            patrick.nash@kirkland.com
                      ross.kwasteniet@kirkland.com
                      chris.koenig@kirkland.com
                      dan.latona@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

## Annex 1

I.     ***Notice of Filing of Plan Supplement*** **[Docket No. 3115].**

    <u>Exhibit</u>    <u>Document</u>

    A    Schedule of Released and Exculpated Parties

    B    ADR Procedures

II.     ***Second Notice of Filing of Plan Supplement*** **[Docket No. 3273].**

    <u>Exhibit</u>    <u>Document</u>

    A    Schedule of Retained Causes of Action

    B    Schedule of Equitably Subordinated Claims

    C    Schedule of Excluded Parties

III.     ***Third Notice of Filing of Plan Supplement*** **[Docket No. 3444].**

    <u>Exhibit</u>    <u>Document</u>

    A    New Organizational Documents

    B    Identities of the members of the New Board of NewCo

    C    Schedule of Rejected Executory Contracts and Unexpired Leases

    D    Schedule of Assumed Executory Contracts and Unexpired Leases

    E    Litigation Administrator Agreements

    F    Identity of Litigation Administrator

    G    Identities of Litigation Oversight Committee Members

    H    Employee Transition Services Agreement

    I    Plan Administrator Budget

    J    ADR Procedures (Redline at Exhibit J-1)

    K    Schedule of Retained Causes of Action (Redline at Exhibit K-1)

IV.    ***Fourth Notice of Filing of Plan Supplement*** **[Docket No. 3483].**

| Exhibit | Document |
|---|---|
| A | Fahrenheit Management Agreement |
| B | Transaction Steps Memorandum |
| C | U.S. Bitcoin Agreements |
| D | Proof Group IP License |
| E | Plan Sponsor Contribution Agreement |
| F | Paxos Custodial Agreement |
| G | Coinbase Agreements |
| H | PayPal Agreement |
| I | Plan Administrator Agreement |
| J | Figure Lending, LLC Refinancing Term Sheet |
| K | NewCo Organizational Documents |
| K-1 | (Redline) NewCo Organizational Documents |

V.    ***Fifth Notice of Filing of Plan Supplement*** **[Docket No. 3550].**

| Exhibit | Document |
|---|---|
| A | Identities of the members of the New Board of NewCo |
| A-1 | (Redline) Identities of the members of the New Board of NewCo |

VI.    ***Sixth Notice of Filing of Plan Supplement*** [Docket No. 3583].

| **Exhibit** | **Document** |
|:---:|:---|
| A | Identities of Litigation Oversight Committee Members |
| A-1 | (Redline) Identities of Litigation Oversight Committee Members |
| B | Coinbase Prime Brokerage Agreement |
| B-1 | (Redline) Coinbase Prime Brokerage Agreement |
| C | Litigation Administrator Agreement |
| C-1 | (Redline) Litigation Administrator Agreement |
| D | Plan Administrator Agreement |
| D-1 | (Redline) Plan Administrator Agreement |
| E | Schedule of Excluded Parties |
| E-1 | (Redline) Schedule of Excluded Parties |
| F | Board Observer Agreement |
| G | Identities of the Board Observers |
| H | NewCo Board Terms |

VII.    ***Seventh Notice of Filing of Plan Supplement*** [Docket No. 3869].

| **Exhibit** | **Document** |
|:---:|:---|
| A | Schedule of Retained Causes of Action |
| A-1 | (Redline) Schedule of Retained Causes of Action |
| B | ADR Procedures |
| B-1 | (Redline) ADR Procedures |
| C | ADR Valuation Form |
| D | Litigation Administrator Agreement |
| D-1 | (Redline) Litigation Administrator Agreement |
| E | Plan Administrator Agreement |

| E-1 | (Redline) Plan Administrator Agreement |
|-----|----------------------------------------|
| F   | Paxos Agreement |
| F-1 | (Redline) Paxos Agreement |
| G   | Coinbase Agreement |
| G-1 | (Redline) Coinbase Agreement |
| H   | Schedule of Released and Exculpated Parties |
| H-1 | (Redline) Schedule of Released and Exculpated Parties |
| I   | Registration Rights Agreement |
| J   | U.S. Bitcoin Management Agreement |
| J-1 | (Redline) U.S. Bitcoin Management Agreement |
| K   | Proof Group IP License |
| K-1 | (Redline) Proof Group IP License |
| L   | U.S. Bitcoin Cedarvale Interim Services Agreement |
| L-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |
| M   | PayPal Distribution Services Agreement |

**VIII.** ***Eighth Notice of Filing of Plan Supplement*** **[Docket No. 3935].**

| **Exhibit** | **Document** |
|-------------|--------------|
| A   | Paxos Agreement |
| A-1 | (Redline) Paxos Agreement |
| B   | Litigation Administrator Agreement |
| B-1 | (Redline) Litigation Administrator Agreement |
| C   | U.S. Bitcoin Management Agreement |
| C-1 | (Redline) U.S. Bitcoin Management Agreement |
| D   | U.S. Bitcoin Cedarvale Interim Services Agreement |
| D-1 | (Redline) U.S. Bitcoin Cedarvale Interim Services Agreement |

## **Exhibit A**

**MiningCo Management Agreement**

*DRAFT*

# MANAGEMENT SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## [MiningCo, Inc.]

This Management Services Agreement (this "**Agreement**"), is made and entered as of [●], by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company ("**Manager**"), and (ii) [MiningCo, Inc.], a Delaware corporation (the "**Company**"). Any capitalized term used but not otherwise defined herein shall have the meaning set forth in the Plan (as defined below).

**WHEREAS**, on July 13, 2022 and December 7, 2022, as applicable, Celsius Network LLC, a Delaware corporation and certain of its debtor affiliates (collectively, the "**Debtors**") commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on May 25, 2023, the Debtors filed the *Notice of Successful Bidder and Backup Bidder* [Docket No. 2713], which announced that, pursuant to Sections XII and XIII of the *Order (I) Approving the Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Scheduling Certain Dates with Respect Thereto, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Docket No. 1272] (the "**Bidding Procedures Order**"), the Debtors, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), selected the Manager as the Successful Bidder (as defined in the Bidding Procedures Order) in connection with the Debtors' auction to select a sponsor for the Debtors' chapter 11 plan;

**WHEREAS**, on June 6, 2023, the Debtors, the Committee, and the Manager entered into that certain plan sponsor agreement (the "**Plan Sponsor Agreement**"), which sets forth the terms of the restructuring transactions contemplated by the Successful Bid, including the chapter 11 plan term sheet (the "**Plan Term Sheet**") annexed to the Plan Sponsor Agreement [Docket No. 2759];

**WHEREAS**, on June 15, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (as may be amended, modified, or supplemented, in each case consistent with its terms, from time to time, the "**Plan**"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "**MiningCo Implementation Motion**," and together with the Plan, the "**MiningCo Plan**");

**WHEREAS**, on [●], the Manager and Celsius Mining LLC entered into that certain Interim Services Agreement (the "**Cedarvale Agreement**") whereby the Manager agreed to undertake the management of development and construction of that certain bitcoin mining facility located in Ward County, Texas (the "**Cedarvale Site**"); and

**WHEREAS**, the Bankruptcy Court entered its Order confirming the Plan (the "**Confirmation Order**") on [●], and its Order granting the MiningCo Implementation Motion on [●];

**WHEREAS**, on [●] (the "**Effective Date**"), contemporaneously with the execution of this Agreement, the MiningCo Plan went effective pursuant to its terms and the terms of the Confirmation Order and the order granting the MiningCo Implementation Order;

**WHEREAS**, on the Effective Date, the [MiningCo Assets] (as defined in the Mining Plan), including the Mining (as defined in the MiningCo Plan) assets, were transferred to the Company and its subsidiaries pursuant to and in accordance with the terms of the MiningCo Plan;

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein, and the Manager is willing to undertake such obligations; and

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.      Appointment. The Company hereby engages the Manager on a non-exclusive basis, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described in Exhibit A of this Agreement and complete and deliver the Projects described in Exhibit B of this Agreement; provided, however, that if the Company elects to have any Person other than the Company provide any portion of the Services or work on the Projects (an "**Outside Service Provider**"), the Company and its Affiliates shall have no liability for such services delivered or work performed by such Person and shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the action or inaction of an Outside Service Provider. The Manager shall be permitted to use an Affiliate or, subject to prior written approval of the Company, (it being understood that such approval shall be deemed given if the expenditure is specifically contemplated in, and made in accordance with, (i) any Budget approved by the board of directors of the Company (the "**New Board**"); or (ii) in written resolutions promulgated by the New Board), (1) with an aggregate value greater than $250,000 during any rolling twelve-month period, or, (2) that are indicated as "Fixed" as set forth on Exhibit A, a third-party contractor (a "**Third-Party Contractor**"), the costs of which will be borne by (A) the Manager to the extent the Third-Party Contractor is performing Services indicated as "Fixed Fee" on Exhibit A and (B) the Company to the extent the Third-Party Contractor is performing Services indicated as "Pass-Through", in each case as set forth on Exhibit A; provided, however, that the Manager shall in all cases remain ultimately responsible for the performance of the Services by any of its Affiliates or any Third-Party Contractor and for compliance with all of the terms of this Agreement, as if such Services had been performed by the Manager itself; provided, further, that the Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent primarily caused by the Company's failures or delays in providing such approval. Nothing contained in this Agreement shall create any contractual relationship between the Company, on the one hand, and such Affiliate of the Manager or Third-Party Contractor, on the other hand. For purposes of this Agreement, any reference to a consent or approval of the Company shall be construed to mean the consent or approval of the New Board or authorized persons of the New Board acting on behalf of the Company. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.      Term and Termination.

(a)      Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall be for an initial term expiring four years after the date hereof (the "**Initial Term**"). The Initial Term shall be automatically extended by one one-year term (the "**Term Extension**"), unless the Company provides a written notice to the Manager notifying its intention to not renew this Agreement (a "**Non-Renewal Notice**"). In order for the Company to not renew this Agreement for the Term Extension, it must provide the Manager with a Non-Renewal Notice on or prior to the third anniversary of

2

this Agreement. If a Non-Renewal Notice is provided, the Term shall expire on the fourth anniversary of this Agreement; provided, that the Manager shall continue to be compensated through any Transition Period (if the Company elects to enter into a Transition Period) as set forth in Section 2(d)(ii) hereof. Notwithstanding the foregoing, the Initial Term shall be automatically extended by the Term Extension in the event that the Company EH/s is equal to or greater than 23 EH/s (the "**EH/s Target**") at any point on or prior to the third anniversary of this Agreement (taking into account any period that the Term was tolled pursuant to Section 2(b)(iii)(H) and Section 2(d)(v)(D)) (such third anniversary or deemed third anniversary of the Agreement, the "**EH/s Target Deadline**") and, for the avoidance doubt, the Company may not provide a Non-Renewal Notice if such EH/s Target has been achieved at any point on or prior to the EH/s Target Deadline. For purposes of this Agreement, "**Company EH/s**" means, for a given time, the number of exahash per second (EH/s) of Bitcoin mining capacity calculated as the sum of the name plate hashrate of Company owned Bitcoin mining rigs installed and operating at facilities owned and operated by the Company at such time. Exhibit E shows the method of calculation used in calculating the EH/s Target.

(b)    Termination. This Agreement may be terminated only as follows:

(i)    By mutual agreement, in writing, of both the Manager and the Company during the Initial Term or any Term Extension;

(ii)    By the Manager:

(A)    in the event that the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $500,000 (except for amounts disputed in good faith accordance with Section 5(c), which shall not be deemed outstanding until such amounts are finally determined to be due and owing pursuant to Section 5(c)), during the Initial Term or any Term Extension; provided, however, that the Manager shall not be entitled to exercise the termination right pursuant to this Section 2(b)(ii) if the Company has made payment of such consideration at a time when the Manager has not yet exercised the termination right pursuant to this Section 2(b)(ii); or

(B)    in the event that Matt Prusak ("**Prusak**") is terminated without cause by the Company from his role as interim Chief Executive Officer of the Company during the six month period following the execution of this Agreement ("**Interim CEO Period**"); or

(iii)    By the Company, during the Initial Term or the Term Extension:

(A)    in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)    in the event of the Manager's persistent and material failure to competently manage, operate, and oversee on behalf of the Company and its subsidiaries, the Bitcoin mining assets of the Company and all Bitcoin mining projects under the Agreement; provided, however, that any such breach by the Manager caused by or resulting from the Company's breach of, or delay in performing, any of its obligations under this Agreement shall not be deemed a breach by the Manager;

(C)    if Asher Genoot ("**Genoot**") (1) ceases to be employed by U.S. Data Mining Group, Inc. ("**USBTC**") in his role as President or in a role of greater or substantially similar responsibility for any reason or (2) is indicted of any act

3

which is a felony involving financial crimes or theft of corporate property; *provided* that if such cessation of employment or indictment takes place on or after the first anniversary of the date of this Agreement, the Company shall only have the right to terminate this Agreement if, within six months following such cessation of employment or indictment, the Manager has not terminated Genoot's employment (to the extent applicable) and appointed a Qualified Replacement. "**Qualified Replacement**" means an individual, or individuals, who, in aggregate if applicable, have comparative and demonstrated experience in bitcoin mining operations and the ability to provide services substantially similar in the aggregate to the Services;

(D)    in the event that the Manager consummates a Prohibited Change of Control without the Company's prior written consent;

(E)    if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business;

(F)    in the event that the EH/s Target has not been achieved on or prior to the EH/s Target Deadline; provided that the Company may terminate this Agreement pursuant to this Section 2(b)(iii)(F) only after the EH/s Target Deadline; provided further that if the Company terminates this Agreement pursuant to this Section 2(b)(iii)(F), the Company shall be deemed to have elected to enter into a Transition Period of at least six months (commencing no earlier than the EH/s Target Deadline) in accordance with Section 2(d)(ii) hereof;

(G)    in the event of a Change of Control of the Company; or

(H)    in the event that the New Board, acting in its fiduciary capacity, determines by no later than May 1, 2024 (the "**Liquidity Deadline**") that there is not a reasonable likelihood that the Form 10 filing for the registration of securities in the Company will achieve effectiveness.

(iv)    For the purposes of this Agreement, (A) "**Change of Control**" means the Company's consummation of a sale, exchange or other transfer to third party, whether by merger, acquisition or otherwise, whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Company, (ii) of more than 50% of the voting power of the outstanding securities of the Company by a third party or (iii) any reorganization, merger or consolidation in which the Company is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party and (B) "**Prohibited Change of Control**" means the Manager's consummation of a sale, exchange or other transfer to a party set forth on Exhibit D hereto, including any Affiliate of such party or any successors to such party, whether by merger, acquisition or otherwise (each a "**Prohibited Party**"), whether directly or indirectly, in one transaction or a series of related transactions, (i) of all or substantially all of the assets of the Manager, (ii) of the acquisition of more than 50% of the voting power of the outstanding securities of the Manager by a Prohibited Party by means of any

4

transaction or series of related transactions (including, without limitation, reorganization, merger or consolidation) or (iii) any reorganization, merger or consolidation in which the Manager is not the surviving entity, excluding any merger effected exclusively for the purpose of changing the domicile of the party.

(c)    Termination Event Procedures. Termination of this Agreement sought pursuant to Section 2(b)(ii) (by the Manager) or 2(b)(iii) (by the Company) (each a "**Potential Termination Event**") shall comply with the following procedures:

(i)    The party asserting that a Potential Termination Event has occurred (the "**Terminating Party**") shall provide the other party (the "**Non-Terminating Party**") with written notice of such Potential Termination Event (the "**Termination Notice**").

(ii)    Such Termination Notice shall include the facts and circumstances forming the basis for the Terminating Party's belief that a Potential Termination Event has occurred.

(iii)    Following the Non-Terminating Party's receipt of a Termination Notice for termination pursuant to Section 2(b)(ii) or Section 2(b)(iii)(A) or (B), the Non-Terminating Party shall have 45 days to cure the breach that gives rise to the Potential Termination Event (if such breach that gives rise to the Potential Termination Event is curable).

(iv)    Termination pursuant to Section 2(b)(iii)(H) shall be effective 14 calendar days following the Non-Terminating Party's receipt of the applicable Termination Notice; provided that during such 14 days, Manager shall perform Transition Services (as defined below) to the Company; provided, however that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services.

(d)    Effect of Termination.

(i)    Upon the termination of this Agreement, there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each party hereto for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth in Sections 2(d)(ii). Any Definitive Agreements shall survive in accordance with their own terms. For clarity, after the termination of this Agreement and subject to the obligation to pay the compensation during any Transition Period as set forth herein, the Company shall have no obligation to pay any compensation under Section 5 of this Agreement (other than for Services rendered, or Pass-Through Expenses incurred, prior to such termination or as provided in Sections 2(d)(ii) – (iv)).

(ii)    Upon the termination of this Agreement pursuant to Sections 2(b)(iii)(A) – (G) (by the Company), at least three months prior to such termination date, the Company may elect at its sole discretion to require the Manager to continue to perform (in whole or part) the Services in accordance with Section 4, for a period up to six months from the effective date of termination (the "**Transition Period**"). During the Transition Period, the Manager shall use commercially reasonable efforts to provide all necessary cooperation and assistance required by the Company to enable the Company to transition the Services to the Company's nominated successors, including but not limited to assistance with ancillary activities that may be required as part of such transition (collectively, the

"**Transition Services**"); provided, that Manager shall not be obligated to incur any out of pocket costs in connection with such Transition Services. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period, the Company may require the Manager to work with one or more successors to transfer the Services in an orderly manner. During the Transition Period the Manager shall: (A) use commercially reasonable efforts to complete any Projects that remain partially complete or in-progress on the effective date of termination; and (B) perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement. During such Transition Period, the Company shall pay to the Manager the Mining Management Fee, on the schedule described in, and if applicable as adjusted in accordance with, Section 5(a).

(iii)    If this Agreement is terminated other than pursuant to Section 2(b)(ii), Section 2(b)(iii)(G) or Section 2(b)(iii)(H) or if the Company elects not to renew this Agreement through the Term Extension, then:

(A)    the Company shall have no obligation to pay any further compensation, payment or fees under this Agreement;

(B)    any Unvested Shares (as defined in the Restricted Stock Purchase Agreement) and/or any Unvested Warrants (as defined in the Warrant Agreements) (such agreements together, the "**Equity Agreements**" and such securities, together, the "**Unvested Securities**"), shall be, immediately and without any action on the part of the Company, New Board, the Manager or any other person, cancelled for no consideration in accordance with the terms of the respective Equity Agreements and the Manager shall cease to have any rights with respect thereto; and

(C)    the Manager shall pay to the Company by wire transfer of immediately available cash (i) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such effective date of termination occurs, a prorated amount of such Mining Management Fee based on the number of days left in such quarter from the effective date of termination, and (ii) for any Pass Through fees owed to the Manager pursuant to this Agreement, any amounts that have been paid to the Manager in advance for the quarter in which such effective date of termination occurs, less any amounts actually spent or required to be paid by the Manager in furtherance of its performance hereunder prior to the effective date of termination.

(iv)    If this Agreement is terminated pursuant to Section 2(b)(ii), or Section 2(b)(iii)(G), then:

(A)    the Company will pay to the Manager, as liquidated damages, an amount equal to (i) 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for the remainder of the then current Initial Term or Term Extension (as applicable) (the "**Termination Payment Amount**"), and (ii) all consideration owed to the Manager as set forth in Section 5 and accrued up to the effective date of such expiration or termination, in one lump-sum, due upon the effective date of such expiration or termination; provided that if this Agreement is terminated pursuant to Section 2(b)(iii)(G), at the election of the Company or any third party acquiror

6

of the Company involved in such Change of Control, the Termination Payment Amount shall be converted to equity in the Company at a price per share equal to, (x) the market trading price per share if such shares are traded on a publicly recognized securities exchange at the time of such Change of Control, or (y) the price per share of the Company in such Change of Control transaction, if such shares are not traded on a publicly recognized securities exchange at the time of such Change of Control; and

(B)    all Unvested Securities which would have vested after the date of termination had the Services been performed for the remainder of the then-current Initial Term or Term Extension (as applicable) shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest, in accordance with the terms of the respective Equity Agreement; provided, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements).

(v)    If this Agreement is terminated pursuant to Section 2(b)(iii)(H), then:

(A)    the Manager shall continue to perform (in whole or part) the Services, and shall continue to be compensated, in accordance with the terms of this Agreement through the effective date of termination; provided, however, that except as expressly provided for in such agreement, the Manager shall not be obligated to incur any out of pocket costs in connection with the performance of such Services;

(B)    the Company will pay to the Manager, as liquidated damages, an amount equal to 100% of the aggregate Mining Management Fee that would have become due and payable had the Services been performed for a further twelve months past the effective date of such termination in one lump-sum, due upon the effective date of such termination (the "**Form 10 LDs**"); and

(C)    all Unvested Securities which would have vested in accordance with the terms of the respective Equity Agreement in the twelve month period after the effective date of such termination had the Services been performed during such period shall immediately and without any action on the part of the Company, New Board, the Manager or any other person, vest; provided, that in respect of any Unvested Warrants (as defined in the Warrant Agreements), to the extent the exercise price has not been set, the exercise price shall be deemed to be equal to (x) the exercise price of the latest tranche of warrants issued under the Warrant Agreements for which the exercise price has been set, or (y) if termination occurs prior to the first anniversary of the Agreement, the Company's net asset value as of the Effective Date divided by the Common Stock Deemed Outstanding (as defined in the Warrant Agreements); provided, however, that

(D)    in the event that the Company files a Form 10 or submits an application to any securities exchange or alternative trading system for a public listing on a securities exchange or alternative trading system within one year of the

Liquidity Deadline, the Company shall, at its election (i) enter into a reinstatement of this Agreement with Manager for the remainder of the Initial Term existing on the effective date of the Agreement's termination, on the same terms and conditions as this Agreement, except as may be required to document the reinstatement and modifications to the Term and the EH/s Target Deadline, or (ii) promptly pay to the Manager an amount equal to the Termination Payment Amount *minus* any Form 10 LDs already actually paid to the Manager, plus all consideration that would have been owed to the Manager under Section 5 had the Agreement remained in effect through the Initial Term (less the consideration paid to the Manager under Section 2(d)(v)(C)). In no event shall the foregoing amount be a negative amount.

(vi)      Notwithstanding anything to the contrary in this Agreement, to the extent that the Manager (x) receives all amounts payable pursuant to Sections 2(d)(i) – (v) and (y) all of the Unvested Securities are vested pursuant to Section 2(d)(iv)(B) or Section 2(d)(v)(B) (as applicable), such payment and receipt of Unvested Securities shall be the sole and exclusive remedy of the Manager against the Company or any of its Affiliates in respect of this Agreement, the termination of this Agreement, the failure to perform this Agreement or any claims or actions under applicable laws arising out of any such breach, termination or failure, in each case, other than to (a) lower any amounts owed pursuant to Section 2(d)(iii)(B), (b) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement under Section 5, (c) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (d) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board, including termination or other breakage payments, (e) obligations of the Company to indemnify the Manager under Section 9 (*Indemnification*), (f) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), or Section 10 (*Non-Solicitation*) and (g) claims arising under Definitive Agreements or related to obligations of the Company with respect to Projects. For clarity, this Section 2(d)(vi) shall not result in any double payment by the Company for the same underlying obligation.

(vii)      The provisions of this Section 2(d), Sections 6 and 7, and Sections 10 through 24 shall survive the termination of this Agreement.

3.      <u>Services</u>.

(a)      <u>Services</u>. The Manager or any of its Affiliates shall manage, supervise, and oversee, on behalf of the Company and its subsidiaries, the Bitcoin mining business operations including all Bitcoin mining assets (the "**Purchased Assets**") and all Bitcoin mining projects, and provide such other services as set forth on <u>Exhibit A</u> hereto (collectively, the "**Services**") and shall complete and deliver the projects set forth on <u>Exhibit B</u> hereto (collectively, the "**Projects**").

4.      <u>Performance Standards; Modification of Services; Obligations of the Manager; Obligations of the Company</u>.

(a)      The Manager shall perform the Services, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional and workmanlike manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall complete and deliver the Projects in accordance with the milestones and other specifications set forth on <u>Exhibit B</u> hereto.

(b)    Within 15 days following the end of each calendar month, the Manager shall provide a monthly report to the Company setting forth the Manager's performance and compliance with Exhibit A for such month. The Manager shall also provide the Company with a quarterly report no later than 60 days of the following quarter setting forth the Manager's performance and compliance with Exhibit A for the prior quarter.

(c)    Modification of Services. The Company may from time to time request that the Services be amended as the Company in good faith deems necessary for the management of the Purchased Assets. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the parties agree to the terms of such amendment, such amendment will be adopted in accordance with Section 19 and attached to this Agreement.

(d)    Executive Management Team. Subject to the written approval of the New Board and the terms of the applicable employment agreements to be entered into between the Company and the applicable individuals, (1) Prusak will serve as the interim Chief Executive Officer of the Company for no less than the Interim CEO Period; provided that (A) Company shall have the right to terminate Prusak "for cause" during such Interim Period, (B) Company shall promptly disclose to Prusak any retention of a search firm or similar advisor to seek his potential replacement during such Interim CEO Period, and (C) upon the expiration of such Interim CEO Period, the Company shall have the right to terminate Prusak in its sole discretion; and (2) Joel Block will serve as the initial Chief Financial Officer of the Company; provided that, any action taken by the New Board with respect to Joel Block's employment agreement shall not create any breach of any obligations by Company towards, or rights with respect to, USBTC hereunder (Prusak and Joel Block, together with their respective successors or replacements, the "**Executive Management Team**"). Subject to the foregoing and Section 2(b)(ii)(B), each member of the Executive Management Team shall serve at the pleasure of the New Board.

(e)    Obligations of the Manager. The Manager will:

(i)    Prior to the date on which the Services or the Projects are to commence, obtain, and at all times during the Term of this Agreement maintain, all necessary licenses and consents; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)    Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**");

(iii)    Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services or Projects to fulfill Manager's obligations under Sections 4(a) and (b). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)    At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that the Company provides the Manager with credible and sufficient evidence of willful misconduct on the part of such Project Manager or applicable Manager Personnel;

9

(v)     Prior to any Manager Personnel performing any Services or Projects hereunder: (1) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (2) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (3) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates ("**Manager Employees**"), which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law and which background checks for Manager Employees providing Services off site shall be paid for by the Manager (the cost of on-site Manager Employees shall be a Pass Through Expense in accordance with Exhibit A);

(vi)     Comply with all laws applicable to the provision of the Services or performance of the Projects, including but not limited to any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (v) for any failure or delay in fulfilling or performing under this subsection (v) that is caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)     Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company and the New Board that are communicated to the Manager in writing, if applicable;

(viii)     Require all Manager Personnel to be bound in writing by confidentiality and intellectual property provisions reasonably equivalent to those contained in this Agreement;

(ix)     At all times during the Term of this Agreement, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(e)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement); and

(x)     (i) Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement, and (ii) during the Term and for a period of one year thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, that such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

In the event that there has not been Substantial Completion (as defined in the Cedarvale Agreement) by the Effective Date, then with respect to the Cedarvale Site, the Manager shall perform the Services (as defined in the Cedarvale Agreement) in accordance with Section 3 and Section 4 of the Cedarvale Agreement which shall apply to this Agreement *mutatis mutandis*

(f)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including but not limited to:

(i)    Grant the Manager, its Affiliates, any Third-Party Contractor and their respective employees, agents, contractors, and representatives who are performing the Services or Projects (the "**Manager Personnel**"), access to the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, other than any records subject to attorney-client privilege or confidentiality obligation or reasonably deemed commercially sensitive by the Company) during reasonable business hours with reasonable advance notice solely for the purpose of the facilitating the Manager Personnel to deliver the Services and Projects;

(ii)    Timely pay all amounts owed by the Company in accordance with Section 5; and

(iii)    At all times during the Term, use commercially reasonable efforts to procure and maintain, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C hereto. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C, and shall not do anything to invalidate such insurance. This Section 4(f)(iii) shall not be construed in any manner as waiving, restricting, or limiting the liability of either party for any obligations imposed under this Agreement (including but not limited to, any provisions requiring a party hereto to indemnify and hold the other harmless under this Agreement).

The Manager shall not be responsible or liable for any failures or delays, including failures or delays in the performance of Services, to the extent caused by the Company's failures or delays in performing under this Section 4(f), failure to make, execute, sign, acknowledge or deliver any agreements reasonably necessary for the Manager's performance of the Services or the Company's unreasonable delay in approving any Budget. In the event that the Manager's performance of a Service or completion of a Project requires funds in excess of those approved in the most recent Budget, the Manager shall not be responsible or liable for any failures or delays in the performance of such Service or completion of such Project, solely to the extent that such failures or delays are caused by such funding shortfall.

5.    Compensation for Services and Expense Reimbursement.

(a)    Cash Compensation for Services. As consideration for providing the Services to the Company, during the Term and any Transition Period (in accordance with Section 2(d)), the Company shall pay to the Manager (or one or more Affiliates designated by the Manager) an annual fee of $20,376,200, which shall be paid in quarterly installments each in an amount equal to $5,094,050 ("**Base Mining Management Fee**") in advance on the first Business Day of each January, April, July, and October (each, a "**Fee Payment Date**") of each year for the quarterly period commencing in such month, less any Mining Management Fee adjustments set forth on Exhibit B (the "**Project Based Mining Management Fee Adjustments**") for all prior quarterly periods (without double counting) (the amount as calculated in accordance with the foregoing, the "**Mining Management Fee**");provided, however, that, (i) any Project Based Mining Management Fee Adjustment caused primarily by the action or inaction of an Outside Service Provider shall not result in such Project Based Mining Management Fee Adjustment being deducted from the Base Mining Management Fee (ii) during any Term Extension, the Base Mining Management Fee payable to the Manager shall be an amount equal to the Base Mining Management Fee multiplied by the CPI Increase as of the first day of such Term Extension; provided, further, that the first payment of the Mining Management Fee shall be made on the date hereof, and such first payment and the last Fee Payment

11

Date shall be a pro rata payment equal to the Mining Management Fee multiplied by a fraction, the numerator of which is the number of days Services are to be performed for such period and the denominator for which is 92. For the avoidance of doubt, it is clarified that, there shall be no duplications of payments or adjustments made under this Agreement. For purposes of this Agreement, (A) "**Business Day**" means any day except Saturday, Sunday, or any other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state of New York, (B) "**CPI Increase**" means an amount that shall initially be equal to one and shall be adjusted, as of the date of calculation, to an amount equal to the greater of (a) one (1) or (b) a fraction, the numerator of which is the Price Index most recently published prior to the date of calculation and the denominator of which is the Price Index most recently published prior to the date hereof, and (C) "**Price Index**" means the "Consumer Price Index for All Urban Consumers, All Items (1982-1984=100), U.S. Cities Average (CPI-U)," issued by the Bureau of Labor Statistics of the United States Department of Labor (or its successor Index) ) (https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindexhistorical_us_table.htm). In no event shall the Project Based Mining Management Fee Adjustments or the Mining Management Fee be a negative amount. Notwithstanding anything herein to the contrary, to the extent that there are any Project Based Mining Management Fee Adjustments, any such Project Based Mining Management Fee Adjustments shall be deducted solely from the Mining Management Fee and shall not be deducted from, or set off against, any other Company payments or obligations.

(b)     <u>Equity Compensation for Services</u>. As additional consideration for providing the Services to the Company, the Company shall, simultaneously with the execution hereof (the "**Equity Fee**"):

(i)     execute and deliver to the Manager that certain Restricted Stock Purchase Agreement between the Company and the Manager, dated as of the date hereof (the "**Restricted Stock Purchase Agreement**") which shall include the issuance of certain Incentive Units (as defined therein) to Manager;

(ii)     execute and deliver to the Manager those certain Warrant Agreements between the Company and the Manager, dated as of the date hereof (the "**Warrant Agreement**"); and

(iii)     execute and deliver to Manager that certain Contribution Agreement between the Company and the Manager, dated as of the date hereof (the "**Contribution Agreement**").

The Manager shall, simultaneously with the execution hereof, (x) execute and deliver to the Company each of the Restricted Stock Purchase Agreement, the Warrant Agreement and the Contribution Agreement, and (y) pay to Company in immediately available funds all amounts due under the Contribution Agreement for the Acquired Shares (as such term is defined therein). Notwithstanding anything to the contrary herein, the Company's obligations under this Agreement are conditional, and shall only become effective, upon the Closing (as such term is defined in the Contribution Agreement).

(c)     <u>Interest on Unpaid Amounts</u>. Interest at a rate per annum equal to the Prime Rate plus 7.5% shall accrue and be payable by the Company on any unpaid Mining Management Fee (except that for disputed amounts, which are subsequently determined to be owed by the Independent Accountant under Section 5(c), shall accrue interest retroactively from the date such amounts were determined to be owed), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u>, <u>however</u>, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(d)     Review and Objections.

(i)     During the Term and for 12 months following the end of the Term, but no more than once per year, (A) the Company shall have the right to inspect the Manager's books, upon reasonable prior notice, solely in order to determine the Project Based Mining Fee Adjustments, and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months, and (B) the Manager shall have the right to inspect the Company's books, upon reasonable prior notice solely in order to review the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date in respect of the prior 12 months.

(ii)     The Manager may object to the Company's determination of the Project Based Mining Management Fee Adjustments and the resulting Mining Management Fees paid on any prior Fee Payment Date by delivering a written notice of objection to the Company (an "**Objection Notice**"). Any Objection Notice shall specify the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees disputed by the Manager and shall describe in reasonable detail the basis for such objection, as well as the amount in dispute. The Manager and Company shall negotiate in good faith to resolve the disputed items and agree upon the Project Based Mining Management Fee Adjustments and resulting Mining Management Fees for the applicable period, provided, that any such negotiations shall not be admissible into evidence in any proceeding in accordance with Federal Rule of Evidence 408 and any other applicable rules of evidence, and nothing in this Agreement shall be construed as a waiver of rights under Federal Rule of Evidence 408 and any other applicable rules of evidence. If the Manager and the Company are unable to reach agreement within 30 days after such an Objection Notice has been given, all unresolved disputed items shall be promptly referred to Kroll, or if Kroll is unavailable or declines engagement, a nationally or regionally recognized accounting, valuation, or similar firm appointed by mutual agreement of the Manager and the Company (the "**Independent Accountant**"). The Independent Accountant shall be directed to render a written report on the unresolved disputed items as promptly as practicable, but in no event greater than 30 days after such submission to the Independent Accountant, and to resolve only those unresolved disputed items set forth in the Objection Notice. If unresolved disputed items are submitted to the Independent Accountant, Company and Manager shall each furnish to the Independent Accountant such work papers, schedules and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant shall resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and the presentations by the Company and Manager, and not by independent review, acting as an expert and not as an arbitrator. The resolution of the dispute and the calculation of the Mining Management Fees that is the subject of the applicable Objection Notice by the Independent Accountant shall be final and binding on the parties hereto. The fees and expenses of the Independent Accountant shall be borne by the parties hereto as apportioned by the Independent Accountant based upon the outcome of the dispute.

(e)     Expenses.

(i)     The Company shall (A) pay Manager for all fees, costs and expenses incurred or to be incurred by or on behalf of Manager or its Affiliates in connection with performing the Services labeled as "Pass-Through" on Exhibit A, that are consistent with a Budget or otherwise approved by Company in writing (including by email) ("**Pass-Through Expenses**") and (B) reimburse the Manager for any reasonable and documented out-of-pocket travel and related costs and expenses incurred by the Manager, its Affiliates or Third-Party Contractors in connection with the performance of the Services, to the extent such expenses are not included as Pass-Through

13

Expenses and are consistent with a Budget or otherwise approved by the Company (the "**T&E Expenses**"). "**Budget**" means a budget covering all Bitcoin mining facilities or projects for which Services will be provided, all Pass Through Expenses and T&E Expenses for an applicable calendar quarter, including line items for (A) day-to-day operations, including any capital expenditures for repair and maintenance, of the applicable facility or project, and (B) any capital expenditures for additions or improvements to the applicable facility or project; provided, however, that such budget shall not include any site development costs and expenses, which shall be mutually agreed between the Manager and the New Board as and when such costs and expenses arise. The following fees shall be considered Pass-Through Expenses for purposes of Section 2(d)(iv): any early termination fees, liquidated damages incurred as a result of early termination, or fees accelerated as a result of early termination, in any case, as incurred by the Manager or its Affiliates as a result of early termination of agreements between the Manager and/or an Affiliate of the Manager, on one hand, and a Third-Party Contractor, on the other hand, that have been specifically approved in advance in writing by the New Board.

(ii)     The Manager shall prepare a proposed Budget for each quarter and provide the Company with such Budget (with a copy provided to the New Board) reasonably in advance of such calendar quarter (in any case at least 30 days prior to the beginning of the applicable calendar quarter), which proposed Budget shall indicate the estimated Pass-Through Expenses and T&E Expenses expected to be incurred in such calendar quarter. The Company shall promptly, but in no case later than 15 days after the delivery of such proposed Budget to the Company, review and approve or disapprove of such Budget by providing written notice to the Manager (and any disapproval shall include reasonable details describing the reasons that such Budget has been rejected). In the event that the Company reasonably disapproves of all or any portion of the Budget, the Manager and the Company shall meet in good faith (which may be in-person, telephonically, by video conference, or by other method mutually agreed to by the Manager and the Company) to resolve any issues with the proposed Budget. In the event that the Manager and Company are unable to agree on a Budget for a calendar quarter at least 10 days prior to the start of a calendar quarter, the last approved Budget shall be deemed the Budget for such calendar quarter. In the event that the Company has not delivered a written approval or disapproval of a Budget on the date that is 10 days prior to the beginning of the applicable quarter, such Budget shall be deemed approved by the Company.

(iii)     The Manager shall provide the Company with an invoice for estimated Pass-Through Expenses and T&E Expenses included in a Budget for each applicable calendar quarter, (a) after such Budget is approved, and (b) in advance of, and in any case at least 15 days prior to, the beginning of the applicable calendar quarter (the "**Estimated Invoice**"). The Company shall pay each Estimated Invoice on the first Business Day of the applicable calendar quarter. Promptly following the end of each calendar quarter, the Manager shall provide the Company with an invoice in an amount equal to (A) the aggregate amount of Pass-Through Expenses and T&E Expenses actually incurred for the applicable month, minus (B) the aggregate amount of any payments made by the Company towards the Estimated Invoice for the applicable month ("**True-Up Invoice**"). The Company shall pay any True-Up Invoice that is in a positive amount (i.e., indicating underpayment by the Company) within 10 days of receipt. The Manager shall issue a credit to the Company for the amount of any True-Up Invoice that is in a negative amount ("**True-Up Credit**"). Any True-Up Credit issued shall be applied to the Company's payment of any currently due, or future, Estimated Invoices or True-Up Invoices. The Manager shall not be responsible for any failures or delays, including failures or delays in the performance of Services, caused directly or indirectly by the Company's failure to pay Estimated Invoices as provided in the foregoing. At the end of the Term (as extended from time to time) and any Transition Period, subject to Section 2(d), (1) to the extent there are any Project Based Mining Management Fee Adjustments

not previously deducted from the Mining Management Fee, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to any such Project Based Mining Management Fee Adjustments; and (2) to the extent there are any True-Up Credits not previously applied to Estimated Invoices or True-Up Invoices, the Manager shall pay to the Company by wire transfer of immediately available funds amounts equal to such True-Up Credits.

6.  <u>Confidentiality.</u>

(a)    During the Term of this Agreement and thereafter, the parties hereto shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including, without limitation, customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each party hereto shall use the same degree of care, but no less than reasonable care, to protect the other party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the parties, any party receiving any Confidential Information of the other party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (A) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction, and (B) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) except in the case of Manager-Developed IP, was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; <u>provided</u>, <u>however</u>, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving

15

practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

      7.    <u>Intellectual Property</u>.

      (a)    Each of the Manager and its Affiliates has, independent of the Services, developed, created, conceived, reduced to practice, or acquired, and shall continue to develop, create, conceive, reduce to practice, and acquire, Intellectual Property Rights that the Manager may use or access for purposes of providing the Services, and including all customizations, enhancements, improvements and other modifications thereof developed by or on behalf of the Manager ("**Manager Background IP**"). The Company acknowledges that nothing contained in this Agreement shall transfer or assign any ownership interest in or to any Manager Background IP to the Company. Nothing in this Agreement shall be deemed to grant either Party or any third party acting on behalf of either Party any implied license to, or right under or to, any Manager Background IP. Subject to the foregoing, the Manager hereby grants the Company a worldwide, fully paid up, royalty-free, non-transferable (except to the successors and assigns of the Company as permitted by this Agreement), sublicensable (through multiple tiers), non-exclusive and irrevocable (except that if this Agreement is terminated before the end of the Term such license will survive until the end of any Transition Period, notwithstanding termination of this Agreement) license during the Term and any Transition Period to use the Manager Background IP provided in the course of the Services solely for internal business purposes of the Company or its Affiliates. The Company shall not, and shall not permit any third party to, reverse engineer, disassemble or decompile Manager Background IP for any purpose. For the purposes of this Agreement, "**Intellectual Property Rights**" means, all of the following and all rights therein, in all jurisdictions worldwide, (i) patents, utility models, inventions and discoveries, statutory invention registrations, invention disclosures, and industrial designs, (ii) trademarks, service marks, domain names, trade dress, trade names, website and social media user names, metatags, keywords and other website search terms, uniform resource locators, geographical indications, and other identifiers of source or goodwill, including the goodwill connected with the use thereof and symbolized thereby, (iii) copyrights, moral rights, works of authorship (including software) and rights in data and databases, (iv) registrations, applications, renewals, extensions, reissues, divisions, continuations, continuations in- part and reexaminations for any of the foregoing in (i)-(iii), and (v) confidential and proprietary information, including trade secrets, know-how and invention rights.

      (b)    All Intellectual Property Rights developed, created, conceived, or reduced to practice by employees or consultants of the Manager or its Affiliates in providing Services ("**Manager-Developed IP**"), shall be owned by the Manager. The Manager hereby grants the Company and its Affiliates and representatives a worldwide, royalty-free, fully paid-up, perpetual, irrevocable, sublicensable (through multiple tiers) license to use any Manager-Developed IP provided to the Company as part of the Services (and, for the avoidance of doubt, such license shall be automatically assigned to any successor or acquiror of the Company without any consent or notice being required from the Manager).

      (c)    Ownership and licensing of any Intellectual Property Rights developed, created, conceived, or reduced to practice by Manager Personnel, whether solely or jointly with employees or consultants of the Company, in connection with a Company-commissioned research and development effort that the Company has acknowledged in writing and that is not Manager-Developed IP, shall be established pursuant to a separate written agreement between the Company and the Manager.

      (d)    The Manager hereby represents and warrants that it has and will maintain all necessary rights, authorizations and consents to grant or assign the rights and licenses granted or assigned under this Section 7.

      (e)    "**Software**" means both of (i) the miner management software referred to as the "Operator" and (ii) curtailment management software referred to as the "Reactor." The Manager shall

provide reasonable support and assistance for the implementation and use of the Software, as reasonably requested by the Company, including all updates thereto as they are released or implemented. The Software constitutes "Manager Background IP"; provided, however, that the license granted hereunder shall not be sublicensable with respect to the Software. For clarity, the Software and any updates, modifications or improvements thereto, do not constitute Manager-Developed IP or materials or work product contemplated by Section 7(b). Upon receiving or providing notice of the termination or non-renewal of this Agreement, the Manager shall use commercially reasonable efforts to enable, support, and facilitate the Company's transition to alternative software or services to replace the functionality of the US Bitcoin IP, including the Company's development and installation of such alternative software and related data and systems migration, in accordance with Section 2(d)(ii) (at Company's expense); provided, however, that Manager shall not be obligated to incur any out of pocket costs in connection with such transition.

8.      Limitation of Liability. Neither the Manager nor the Company nor any of their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other party or any of their respective Affiliates for any Losses or expense arising out of or in connection with the performance of any obligations contemplated by this Agreement, in excess of $10,000,000 in the aggregate (the "**Liability Cap**"), unless such Losses, or expense shall be proven to result directly from the gross negligence, willful misconduct, fraud, knowing violation of law or breach of Section 6 by such person, or such person's indemnification obligations pursuant to Section 9 (the "**Liability Exceptions**"), subject to the last sentence of this Section 8. Except for the Liability Exceptions, in no event will either party be liable to the other for special, indirect, punitive, or consequential damages, including, without limitation, loss of profits or lost business. In addition, the Liability Cap shall not apply to: (1) with respect to the Company's liability, (i) lower any amounts owed pursuant to Section 2(d), (ii) any termination payment due under this Agreement, (iii) any accrued and unpaid amounts prior to the termination and/or expiration of this Agreement, (iv) any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (v) any costs and/or expenses due under contracts or agreements with third-parties which have been approved by the New Board (including Losses arising from termination or other breakage payments), (vi) damages resulting from the Company's breach of Section 6 (*Confidentiality*), Section 7 (*Intellectual Property*), (vii) amounts due pursuant to, or damages arising under, Definitive Agreements, and (viii) reasonable expenses incurred by the Manager in enforcing its rights under this Agreement against the Company; and (2) with respect to the Manager's liability, (i) damages resulting from the Manager's breach of Section 6 (*Confidentiality*) or Section 7 (*Intellectual Property*) and (ii) amounts due pursuant to, or damages arising under, Definitive Agreements.

9.      Indemnification.

(a)      Except in connection with matters contemplated by Section 9(b) and subject to Section 9(c), the Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all losses, actions, damages, and liabilities, joint or several ("**Losses**") to the extent arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct fraud or knowing violation of law, and the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 9(a) to the extent that the Loss is determined by a court to have resulted from the gross negligence, willful misconduct or fraud, by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 9 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be

17

binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Manager Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the scope of the indemnity provided by the Company in this Section 9 shall not extent to any matters for which the Company is entitled to be indemnified pursuant to the Lancium Agreement.

(b)     Except in connection with matters contemplated by Section 9(a) and subject to Section 9(c), the Manager shall indemnify and hold harmless the Company and each of its officers, directors, managers, principals, stockholders, partners, members, employees, agents, representatives, and Affiliates (as applicable, a "**Company Indemnified Party**" or for the purposes of Section 9(c), an "**Indemnified Party**") from and against any and all Losses to the extent arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, knowing violation of law or alleging that any Manager-Developed IP, the Services, or any Company Indemnified Party's use of either of the foregoing in accordance with this Agreement infringes, misappropriates, or otherwise violates any Intellectual Property Rights, except to the extent such alleged infringement, misappropriation, or other violation arises out of the performance of the Services pursuant to the Company's instructions regarding the performance of such Services, where the infringement, misappropriation, or other violation could not have been avoided while following the Company's instructions. The Manager will reimburse any Company Indemnified Party for costs and expenses subject to, and in accordance with, Section 9(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 9(b) to the extent that any Loss is determined by a court to have resulted from the breach of this Agreement, gross negligence, willful misconduct, fraud or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 9(b) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the parties hereto and any Company Indemnified Party. Notwithstanding anything to the contrary in this Agreement, the Company may, in its sole discretion, offset all or any portion of any amounts owed to the Manager under this Agreement (including the Management Mining Fee) against any amounts that are determined by a court of competent jurisdiction, or another person mutually agreed in writing by the parties, to be payable or owing to a Company Indemnified Party.

(c)     <u>Third Party Claims Indemnification Procedure</u>. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 9, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; <u>provided</u>, <u>however</u>, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in

18

connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

10.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 2 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates (the "**Restricted Employees**"); provided, that, from and after the expiration or termination of this Agreement (the "**Non-Solicit Fallaway Date**"), nothing in this Section 10 shall apply to any site level employees (including any site level management employees but excluding any officers, executives and management employees of the Manager or its Affiliates) that have worked at a Company site for fewer than twelve months ("**Unrestricted Employees**"); provided further that at the Company's request, the Manager shall reasonably facilitate communications between an Unrestricted Employee and the Company during the six month period prior to the Non-Solicit Fallaway Date for such Unrestricted Employee to be transferred to the Company.

11.    Force Majeure.

(a)    Subject to Section 11(b) below, the Manager shall not be liable or responsible to the Company (including for any applicable indemnification obligations of the Manager), nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing pursuant to Sections 4(c)(i) or 4(c)(vi), or performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means the following events: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (in each case of the foregoing, to the extent that the rules, regulations, or orders of this organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

(b)    Within 10 days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. If the Excluded Event lasts for more than 90 days, (i) for a period of 90 days after the occurrence of an Excluded Event, no reduction shall be made to the Mining Management Fee payable to the Manager under Section 5; and (ii) after such 90 day period (the "**Force Majeure Period**"), if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below 200 megawatts, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced by, at the Company's election, up to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is 200 megawatts; provided, however, that in the event the Company elects to use any Outside Service Provider to manage the Company's mining assets, as a result of which the average aggregate nameplate capacity (in megawatts) of Miners under Use for the 90-day period immediately prior to any Excluded Event (the "**Revised Capacity**") is below 200 megawatts, then after the Force Majeure Period, if the Excluded Event has resulted in the aggregate nameplate capacity (in megawatts) of Miners under Use below the Revised

Capacity, then in the duration of such Excluded Event, the Mining Management Fee payable to the Manager pursuant to this Agreement shall be reduced to a fraction of the Mining Management Fee, the numerator of which is the actual aggregate nameplate capacity (in megawatts) of the Miners under Use and the denominator of which is the Revised Capacity (the "**Fee Reduction**"). In the event that an Excluded Event affects all or substantially all of the Company's Bitcoin mining assets, and such Excluded Event is in effect in excess of six months, then the Company shall not be required to pay any amounts that would otherwise be payable to the Manager under this Agreement and the Manager shall not be required to provide the Services hereunder for the duration of the time in excess of such six month period until such time that the Excluded Event is resolved or the Company's Bitcoin mining assets otherwise resume operation, at which point the payment and provision of Services obligations under the Agreement shall resume. The Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized. In the event that there is a reduction in the Mining Management Fee payable to the Manager under this Section 11(b) with respect to Mining Management Fee that has been paid to the Manager in advance for the quarter in which such reduction occurs, at the Company's election, the Company may offset the amount of such Mining Management Fee reduction against the next payment due to Manager under this Agreement or require the Manager to pay to the Company by wire transfer of immediately available cash the amount of such Mining Management Fee reduction. In the event that a Fee Reduction results in the Mining Management Fee on an annualized basis dropping below the Minimum Fee, then the Manager may elect not to perform the Services or complete or deliver the Projects under this Agreement, and if the Manager so elects the Company shall not be obligated to pay the Mining Management Fee, until such time that the Mining Management Fee on an annualized basis is at least equal to the Minimum Fee. "**Miners under Use**" shall refer to the miners and/or other computing power used to secure and validate digital asset networks managed by Manager or leased to (or otherwise made available to) the Manager from a third party, in each case of such miners or computing power, that are used in providing the Services. "**Minimum Fee**" shall mean an amount equal to $5,376,200.

(c)        During the Term, the Manager shall maintain a business continuity and disaster recovery plan for the Services (the "**BCP/DR Plan**"). The Manager shall provide the Company with a written summary of the BCP/DR Plan upon the reasonable written request of the Company. The Manager's performance shall only be excused pursuant to this Section 11 to the extent that the Manager executes such BCP/DR Plan in the event of any Excluded Event, if applicable.

12.        Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the parties hereto or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither party hereto shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties, including without limitation in any of their respective capacities as stockholders or directors of the Company.

13.        Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including, without limitation, companies which may be in competition with the business conducted by the Company or any of its Affiliates.

14.        Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally

recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses indicated below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 14).

| | |
|---|---|
| If to the Company: | [COMPANY ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | [COMPANY LAW FIRM]<br>Email: [EMAIL ADDRESS]<br>Attention: [ATTORNEY NAME] |
| If to the Manager: | [MANAGER ADDRESS]<br>Email: [EMAIL ADDRESS]<br>Attention: [TITLE OF OFFICER TO RECEIVE NOTICES] |
| with a copy to: | Brown Rudnick LLP<br>7 Times Square,<br>New York, NY 10036<br>Email: jfitzsimons@brownrudnick.com<br>Attention: Jonathan Fitzsimons |

15.    <u>Entire Agreement</u>. This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

16.    <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the parties hereunder may be transferred or assigned by any party hereto, without the written consent of the other party, except that (a) the Manager may assign its rights and obligations hereunder to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

17.    <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

18.    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

21

19.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

20.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

21.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

22.    <u>Waiver of Jury Trial</u>. Each party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each party to this Agreement certifies and acknowledges that (a) no representative of the other party has represented, expressly or otherwise, that such other party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such party has considered the implications of this waiver; (c) such party makes this waiver voluntarily; and (d) such party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 22.

23.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

24.    <u>No Strict Construction</u>. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

25.    <u>Fees and Expense</u>. Except as otherwise set forth in this Agreement, each of the parties hereto shall be solely responsible for and shall bear all of his, her or its own costs and expenses incident to

its obligations under and in respect of this Agreement and the transactions contemplated hereby, including any such costs and expenses incurred by any party hereto in connection with the negotiation and preparation of this Agreement (including the fees and expenses of legal counsel, accountants, consultants or other representatives).

26.     <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the parties hereto have executed this Management Services Agreement on the date first written above.

[COMPANY NAME]

By_____
Name:
Title:

U.S. Data Management Group, LLC

By_____
Name:
Title:

SIGNATURE PAGE
MANAGEMENT AGREEMENT

Error! Unknown document property name.

*PRIVILEGED AND CONFIDENTIAL*

**W&C Draft: December 15, 2023**

## Exhibit A

### Services

| No. | Description of Service / Activity | Fee Structure |
|-----|-----------------------------------|---------------|
| 1. | Management, oversight, and strategy for the Company's Bitcoin mining assets. | Fixed fee |
| 2. | Use and integration of Manager's proprietary miner management software and report generation software which includes repair ticket generation, total site parameter viewing portal, and automated site infrastructure monitoring for Bitcoin mining. | Fixed fee |
| 3. | Managing all Bitcoin mining facilities owned by the Company as of the Effective Date. | Fixed fee |
| 4. | Managing strategy and management of all Bitcoin mining equipment located at the mining facility owned by the Company. | Fixed fee |
| 5. | Managing subcontractors including on-site supervision as well as contract oversight and compliance. Subcontractors include but not limited to: security services, maintenance vendors, auditors, tax consultants. | Fixed fee |
| 6. | Customer contract management will be performed by the Manager through its hosting team except for customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Fixed fee |
| 7. | Send material adverse effect notifications for any Customer defaults, litigation or threatened litigation, casualty, condemnation, violation of Laws, denial of a permit, or notice of violation or noncompliance received from a Governmental Authority. | Fixed fee |
| 8. | Maintain GAAP-compliant books and records for each Bitcoin mining facility. Keep such records for at least 5 years, provide audited and unaudited financial | Fixed fee |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| | statements in accordance with any upstream financing docs (external tax advisors and/or audits are a pass-through cost). | |
| 9. | Monthly and quarterly operating reports from Bitcoin mining facilities using Manager's template. | Fixed fee |
| 10. | Maintaining and training staff in accordance with all applicable standards at Bitcoin mining facilities. | Fixed fee |
| 11. | Creating standard operating procedures for safety standards herein and requiring subcontractors to do the same at Bitcoin mining facilities. | Fixed fee |
| 12. | Managing strategy and management of all Bitcoin mining equipment owned by the Company and located at Bitcoin mining facilities owned by third parties. | Fixed fee |
| 13. | Overseeing strategy and development of new Bitcoin mining facilities owned by, or to be owned by the Company. | Fixed fee |
| 14. | The Manager will provide the Debtors and the Company with access to energy trading desks, as well as its energy management team, at no additional cost above the Mining Management Fee. | Fixed fee |
| 15. | Start-up costs (e.g., network servers, vehicles, forklift, etc.) and customization of software specifically requested and pre-approved by the Company and development of upgrades, updates, modifications, enhancements or improvements to such software. For example, custom user interfaces or features requested by the Company, or any other dedicated services or resources that are needed solely for the Company's operations, other than use and integration of the Manager's proprietary miner management software and report generation software referred to in #2 above. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|-----|----------------------------------|---------------|
| 16. | Site operations labor and recruitment costs (e.g., facility/maintenance technicians, miner/hashrate technicians, security, and supervisors). | Pass-Through Expenses |
| 17. | Maintenance capital expenditures, consumable/non-consumable infrastructure, electrical maintenance, container maintenance, office and building maintenance, preventative maintenance and operations and maintenance activities (i.e., replacement of filters, fuses, breakers, technician tools, ongoing electrical operations and maintenance activities, site vehicle maintenance, etc.) | Pass-Through Expenses |
| 18. | Maintain spare parts inventory. To be stored on-site and as needed for replacement of broken mining equipment, filters, fuses, breakers, and technician tools, ongoing electrical operations and maintenance activities (excluding transformers) and site vehicle maintenance. | Pass-Through Expenses |
| 19. | Third party contractors (e.g., electrical engineers, network engineers, security, safety, etc.). | Pass-Through Expenses |
| 20. | Office supplies, job supplies & other business expenses. | Pass-Through Expenses |
| 21. | Site utilities expenses (e.g., electricity, water, internet, trash). | Pass-Through Expenses |
| 22. | Customer success team to interface with customer on contract, operational and billing matters. Customer care systems processes and response infrastructure costs related to third-parties. This includes any obligations owed to the customer as well as revenue collection. This also includes dispute resolution to the point where an issue rises to the level of litigation, wherein the contractor should use reasonable efforts to support litigation or collections agency. | Pass-Through Expenses |
| 23. | Hours dedicated to customer reporting and site monitoring from the Nucleus (Network Operations Center) or software teams. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|---|---|---|
| 24. | Accounting and reporting (dedicated hires to maintain accounting books, reporting requirements, budget proposals under the Agreement, provide audit support, management or support of external parties such as auditors or tax teams, billing/collections of customers, etc.). Costs of external firms for audits or taxes. | Pass-Through Expenses |
| 25. | Insurance related expenses. | Pass-Through Expenses |
| 26. | Additional technology services related to third parties needed to properly execute the obligations under the Agreement. | Pass-Through Expenses |
| 27. | Allocated compensation hours for dedicated corporate supervision for maintenance and operations including per diem rates for time, transportation, housing, and food. | Pass-Through Expenses |
| 28. | Any legal support or fees required in servicing the obligations under the Agreement. | Pass-Through Expenses |
| 29. | Any other obligations required by the Manager under the Agreement or reasonable requests such as response to legal inquiries, response to tax matters, due diligence arising from any sale process, etc. | Pass-Through Expenses |
| 30. | Any contractors, engineers, or hired personnel dedicated to site builds. | Pass-Through Expenses |
| 31. | Any costs related to working with third party energy companies or dedicated asset management personnel. | Pass-Through Expenses |
| 32. | Any additional staff hired by the Manager with the Company's prior written approval for the purposes of the Manager providing the Company with customer contract management services related to a substantial expansion in the number of contract relationships and the Company's business model which requires the Manager to make additional dedicated hires. | Pass-Through Expenses |

| No. | Description of Service / Activity | Fee Structure |
|-----|----------------------------------|---------------|
| 33. | Effort or resources requested by the Company in order to maintain GAAP-compliant books and records for each Bitcoin mining facility that are dedicated resources to operate software or processes that are different to what the Manager would otherwise provide for itself or its other customers. | Pass-Through Expenses |
| 34. | Specialized training of staff beyond what training otherwise conducted by the Manager in its own business or that would otherwise be required to run site operations. | Pass-Through Expenses |
| 35. | Discretionary advisory or implementation projects that are beyond the scope of base management services. For example, the base management services shall include monthly/quarterly reporting and reviews on items such as financial and operational performance, market outlook, competitive landscape, etc., whereas staff that the Company requests be seconded to the Company shall constitute a pass-through expense. | Pass-Through Expenses |

## Exhibit B

### Projects

The Manager and the Company acknowledge that the covenants and targets/milestones in this Exhibit B, and the transactions contemplated thereby, may be documented in one or more agreements by and among the Manager, the Company, and/or their Affiliates, and any third parties thereto, that are separate from this Agreement ("**Definitive Agreements**"). To the extent that the provisions of a Definitive Agreement directly conflict with those contained in this Exhibit B, the terms of the applicable obligation or condition herein shall be deemed modified or waived, in whole or in part, to reflect the applicable provisions of the Definitive Agreement; provided, that any silence on an obligation or condition in such Definitive Agreement shall not be construed as an intention to waive such obligation or condition.

1. The Manager shall use its commercially reasonable efforts to contribute to the Company the leasehold and development rights to a 240 MW behind-the-meter site on economic terms no worse than those available to the Manager identified to the Debtors and the Committee during the bid process, subject to KYC, approval, and commercial discussions with the independent power producer jointly developing such site. To the extent that the Manager is unable to contribute such 240 MW site, it shall use commercially reasonable efforts to contribute a site (or sites) of substantially similar economics.

2. To the extent that the Debtors or the Company, as applicable, elect not to purchase the Alpha facility, the Manager will offer the Debtors 8,500 rack spaces at the Alpha facility for a 5-year term at substantially similar terms to the machines hosted at the Beowulf facility.

3. The Manager will offer up to 50 MW of immediately available containers and transformers currently owned by the Manager, and other supplies to the Debtors or the Company, as applicable, at the lower of its cost to obtain such items or market prices.

4. In the event that the Company elects to build the Barber Lake facility, and in an effort to save lead times in connection therewith, the Manager will offer the Company a three-month option to purchase the substation materials that the Manager currently has on its balance sheet for cost.

5. The Manager will offer 20,000 rack spaces to the Debtors or the Company, as applicable, for a 5-year term, or a period to be negotiated between the Manager, the Manager's partner, the Debtors and the Committee.

6. The Manager, in partnership with a strategic partner, will offer the Company an additional up to 15,000 rack spaces at various facilities located in the U.S. on competitive market terms.

7. The Manager will contribute to the Company a strategic partnership agreement with an ASIC manufacturer that will give the Company the option to scale up to 180,000 machines and ultimately own up to 90,000 new machines (at the Company's option) on the terms set forth in the accompanying letter agreement.

8.  The Manager will contribute to the Company $100,000,000 in coupons from a leading ASIC manufacturer, which coupons have no expiration and can be applied to future machine purchases by the Company on the terms set forth in the accompanying letter agreement.

9.  The Manager will use commercially reasonable efforts to maximize the value of the Debtors' credits and coupons with Bitmain for the benefit of the Debtors and the Company, including by seeking extension of expiration deadlines currently applicable to such credits.

**Projects; Project Based Mining Management Fee Adjustments**

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| *100MW Energized Milestone*:<br><br>The Manager shall build and energize 100 megawatts ("MW") of Bitcoin mining facilities which shall be housed in one or more standalone "cathedral design" buildings consistent with drawings or plans shown to the Debtors and Committee during the bid process (or such other design as the Debtors, the Committee, and Manager reasonably agree upon) which shall be energized within 12 months of the Effective Date, as long as the funding of $39,500,000 is approved by the New Board with respect to low and medium voltage infrastructure (the "100 MW Facility"). To the extent such mining facility is not energized within 12 months of the Effective Date (or the approval and funding of construction, if such construction is approved by the Bankruptcy Court prior to the effective date), the following year's Mining Management Fee shall be reduced by $1 million per month that the energization is delayed, subject to a $6 million total reduction. | $1,000,000 per month that the milestone is delayed, up to a maximum of $6,000,000<br><br>Applicable to the Mining Management Fee for the year following the year during which such delays occurred |
| *400MW Infrastructure Construction Cap*:<br><br>The construction of medium voltage to plug ready forced-air infrastructure with respect to the 100 MW Facility referenced above, shall be capped at $395,000 per MW for a period of 24 months after the Effective Date; any costs in excess of the cap shall be offset against future Mining Management Fees. The same capped construction and allocation of costs in excess shall apply to additional developments for medium voltage to plug ready infrastructure up to an additional 300 MW in excess of the 100 MW for the 100 MW Facility (for a total of 400 MW). These capped construction costs shall also apply for | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

| Target / Milestone | Project Based Mining Management Fee Adjustment |
|---|---|
| the period after 24 months from the Effective Date to the end of the Term, but shall be subject to adjustment for material changes to the CPI, underlying commodity prices of raw materials, or Bitcoin prices during such later period.<br><br>In respect of the Cedarville facility, the $395,000 per MW cap described above shall be reduced accordingly to reflect the actual construction costs contributed by the Company prior to the date of this Agreement. | |
| *Site Employee Milestone*:<br><br>Manager shall provide all site level employees (excluding security) for all existing Company self-mining facilities and any facilities developed by the Company for cost, but in any event subject to an annual cost cap calculated at $2 million per 100 MW; to the extent the cost exceeds the annual $2 million per 100 MW cap, any excess shall be deducted from the Mining Management Fee; provided, that to the extent there are existing obligations of the Debtors with respect to existing Company self-mining facilities that are not replaced by Manager the annual $2 million cap shall not apply to such obligations. | Costs in excess of the cap<br><br>Applicable to the Mining Management Fee for the year during which the excess costs are incurred |

**[Exhibit C]**[1]

**Insurance Requirements**

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   b) <u>Worker's Compensation and Employer's Liability</u>.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.*

      Employer's Liability with limits no less than:*

      i)   $1,000,000 Bodily Injury by Accident (Each Accident)

      ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

      iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate;

   c) <u>Worker's Compensation and Employer's Liability</u>.

      Worker's Compensation with limits no less than the minimum amount required by applicable law.

---

[1] **W&C Note to Draft:** Subject to further review against insurance package proposal being prepared by Fahrenheit.

Employer's Liability with limits no less than:

   i)  $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## Exhibit D

### Prohibited Change of Control Parties

Any party listed below, including any Affiliate of such party, or any of their respective successors by way of reorganization, merger, acquisition or otherwise.

1. Core Scientific
2. Mawson Infrastructure Group
3. Riot Platforms
4. Marathon Digital Holdings
5. Iris Energy
6. Cleanspark
7. Galaxy Digital
8. TeraWulf
9. Argo Blockchain
10. Greenidge Generation
11. Stronghold
12. HIVE Blockchain
13. Bit Digital
14. Frontier
15. Bitdeer
16. Global[X]Digital
17. EZ Blockchain

**Exhibit E**

**Calculation of EH/s Target**

| Site | Site MW | Exahash |
|---|---|---|
| Garden | 12 | 0.35 |
| Rebel | 25 | 0.76 |
| Stiles | 20 | 0.65 |
| East Stiles | 30 | 1.01 |
| **Total** | 87 | 2.77 |

37

**Exhibit B**

**U.S. Bitcoin Cedarvale Interim Services Agreement**

*DRAFT*

# INTERIM SERVICES AGREEMENT

## By and between

## U.S. Data Management Group, LLC, as Manager

## And

## Celsius Mining LLC, as Company

This Interim Services Agreement (this "**Agreement**") is made and entered as of December _____, 2023 (the "**Effective Date**"), by and between (i) U.S. Data Management Group, LLC, a Delaware limited liability company (the "**Manager**"), and (ii) Celsius Mining LLC, a Delaware limited liability company (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1. <u>Appointment</u>. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on <u>Exhibit A</u> of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2. <u>Term and Termination</u>.

(a) <u>Term</u>. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i) the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "**MiningCo Implementation Motion**," and, together with the Plan, the "**MiningCo Plan**"), becomes effective in accordance with its terms and the terms of the order confirming the Plan and granting the MiningCo Implementation Motion, each as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

(ii) Substantial Completion of the Project.

(b)    <u>Termination</u>. This Agreement may be terminated only as follows:

(i)    by mutual agreement, in writing, of both the Manager and the Company;

(ii)    by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 30 days after receipt by the Company of written notice of such failure by the Manager; <u>provided</u>, <u>however</u>, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if the Company cures such failure within such 30-day cure period;

(iii)    by the Company, with an effective date as set forth in Section 2(c):

(A)   in the event of the Manager's fraud, willful misconduct or gross negligence;

(B)   if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company;

(C)   if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

(D)   in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days; and

(iv)    by the Manager if: (a) the USBTC Management Agreement has not been executed by MiningCo and the Manager on or before February 15, 2024; (b) the Plan Effective Date with respect to the MiningCo Plan has not occurred on or before February 15, 2024; or (c) if, prior to the Plan Effective Date, the MiningCo Plan or the Mining Transaction described in the MiningCo Implementation Motion is modified in any material manner as it relates to MiningCo that is materially adverse to Manager (including, without limitation, as it relates to the Mining Assets and the minimum funding amount of $225 million in fiat to be transferred to MiningCo on the Plan Effective Date) without Manager's consent (not to be unreasonably withheld).

(c)    <u>Effect of Termination.</u>

(i)    Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; <u>provided</u>, <u>however</u>, that termination or expiration of this Agreement shall not affect the liabilities of each Party for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii)      Upon notice of termination of this Agreement by either Party pursuant to (x) Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the Term shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the Term continues pursuant to Section 2(c)(ii)(x)(A), if applicable) or (y) Section 2(b)(iv), at the written request of the Company the Term shall continue for a period of no longer than 14 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) (as applicable, the "**Transition Period**"), and during such Transition Period, the Manager shall provide reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (the "**Transition Services**"). During any Transition Period, in addition to amounts due to Manager under this Agreement during the Term pursuant to Section 2(c)(ii)(A), if applicable, the Manager shall be entitled to prompt reimbursement of any actual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services during the Transition Period. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iii)      Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c), Section 6, Section 7, Section 8, and Sections 10 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant to Section 2(b), this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive.

(iv)      If this Agreement is terminated and the Parties have entered into the USBTC Management Agreement (as defined herein), the provisions of Section 3 and Section 4 shall apply to the USBTC Management Agreement *mutatis mutandis* with full effect thereto, as if such provisions were originally part of the USBTC Management Agreement.

3.      <u>Duties of the Manager</u>. The Manager or any of its Affiliates shall (a) perform the services set forth on <u>Exhibit A</u> (collectively, the "**Services**") and (b) use commercially reasonable efforts to achieve Substantial Completion.

4.      <u>Performance Standards</u>.

(a)      The Manager shall perform the Services set forth on <u>Exhibit A</u>, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional, workmanlike and timely manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on <u>Exhibit B</u>; and (z) the designs, plans, drawings, specifications, materials and intellectual property purchased licensed from Core Scientific Operating Company ("**Core**") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023

3

by and between Core and the Company, except (1) to the extent waived in writing by the Company (such waiver not to be unreasonably withheld); (2) to the extent of any deviations from such plans, specifications and intellectual property by Manager's designs, plans, drawings, specifications, materials or intellectual property that Company agrees to in writing as part of the Services hereunder; or (3) to the extent of any immaterial deviations from such plans, specifications and intellectual property by Manager during the performance of the Services hereunder.

(b)     Every two weeks, the Manager shall provide a report to the Company setting forth (i) the Manager's performance and progress towards Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii) any other information reasonably requested by the Company from time to time relating to the performance of the Services hereunder. In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.

(c)     <u>Modification of Services</u>. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the Parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the Parties agree to the terms of such amendment, then such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)     <u>Obligations of the Manager</u>. The Manager will:

(i)     Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; <u>provided</u>, <u>however</u>, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)     Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the performance of the Services (the "**Project Manager**"); <u>provided</u>, <u>however</u>, that Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)     Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)     At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for

4

their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)    Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)    Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)    Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)    Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)    Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)    Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)    Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice, (B) drawings, designs and intellectual property relating to the Site or otherwise

5

acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

(ii)     Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)     Creating a working group which, as of the Effective Date, will comprise of Emmanuel Aidoo and Michael Deeg, and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)     Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)     Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify and hold harmless the other under this Agreement).

5.     Compensation.

(a)     Compensation for Development Services.

(i)     As consideration payable to Manager for providing the Services to Company, Company shall pay Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between December 1, 2023 and December 31, 2024:

| Item | $/Month |
|---|---|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |

6

| | |
|---|---|
| Construction Management | $222,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| **Total** | **$734,000** |

(ii)    On the Effective Date, the Company shall pay Manager: (A) $734,000 as compensation for the completion of Milestone 1, (B) $734,000 as compensation for the substantial completion of Milestone 2, and (C) $169,666.70 as compensation for services provided between November 1, 2023 and November 10, 2023.

(iii)    The Company shall pay the Manager the Development Costs on the third Business Day of each month during the Term for such month's Services. Manager shall provide Company with invoices and detailed information relating to such month's Development Costs on or before the third Business Day following such month.

(b)    <u>Compensation for Operational Services</u>. To the extent that any mining units are energized and hashing at the Project during the Term ("**Operational Units**"), (i) the Manager shall perform the Services as such term is defined in that certain Managed Services Agreement dated February 9, 2022 by and between Frontier Outpost 13, LLC and Company (the "**Frontier Agreement**") and in accordance in all respects with Exhibit A thereof, and (ii) the Company shall pay to the Manager the Operational Costs applicable to such Operational Units on the third Business Day of each month during the Term.

"**Gross Revenue**" means the revenue realized by Company from BTC mined from Operational Units in the immediately preceding month.

"**Mining Expenses**" means costs of power to run the Operational Units during the immediately preceding month *plus* direct operating costs attributable to such Operational Units (including without limitation costs associated with labor and repair) *plus* $2,920 per MW under management for such prior month *plus* any other direct costs incurred by Company that are applicable to such Operational Units.

"**Mining Proceeds**" means Gross Revenue from any Operational Units *minus* Mining Expenses.

"**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of such Mining Proceeds from the immediately preceding month.

(c)    <u>Reimbursement for Vertical Exhaust Units</u>.

(i)    As of the Effective Date, the Manager is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW, as further described in <u>Exhibit D</u> (the "**VEUs**").

(ii)    Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information

in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)     Within 15 Business Days (as defined in the Plan) of the later of (A) the receipt by Company of all information and documentation provided pursuant to Section 5(c)(ii), and (B) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, subject to Section 5(c)(iv), Company shall notify Manager in writing whether or not Company wants to purchase either (X) all of the VEUs or (Y) a single VEU for testing purposes. If the Company elects to purchase a single VEU, Manager shall promptly ship such VEU to the Site, and shall promptly install and test such VEU upon arrival to the Site. Company may elect to purchase any or all of the remaining VEUs by providing Manager written notice of such election within 60 days of the initial date of testing such initial VEU and, if Company so elects, Manager shall promptly ship such additional VEUs to the Site, and shall promptly install and test such VEUs upon arrival to the Site.

(iv)     Company shall pay Manager an amount equal to (A) $450,193.45 per VEU acquired by Company *plus* (B) all shipping, handling and storage costs incurred by Manager, and sales, use and other excise taxes, in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.

(v)     In the event that following delivery to the Site of the VEUs, any VEU requires repairs (a "**Required Repair**"), the Company will promptly deliver notice of such determination to the Manager (a "**Required Repair Determination**"). Following the delivery of such Required Repair Determination, the Company and Manager will consult in good faith to determine any further repairs necessary to any of the VEUs (the "**Further Repairs**"). The Company shall be responsible for any such Required Repairs up to an aggregate cost of $1,000,000 across all VEUs ("**Required Repair Threshold**") and, in the event that the Company and Manager agree in writing on any Further Repairs, the Company and Manger will split the costs of such Further Repairs. Notwithstanding the foregoing, with respect to any VEU, the Manager's obligations under this Section 5(c)(v) will fall away and be of no further force and effect 60 days following the date such VEU is first energized.

(vi)     Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU, and (B) such VEU is free of all liens and encumbrances. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(C), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vii)     Without limiting the foregoing, at Company's option, Manager shall (A) to the extent transferable, transfer to Company any warranties provided by the

8

manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or, at Company's election (B) diligently pursue and enforce such warranties on Company's behalf. Any monetary relief from the VEU manufacturers pursuant to such warranties shall be taken into account with respect to the amounts set forth in Section 5(c)(v).

(d)     Reimbursement for Budgeted Expenses. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with Exhibit E within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; provided, however, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("**Breakage Fees**"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of any Manager Service Agreements. For the purposes of this Agreement, "**Manager Service Agreements**" means any agreements entered into by the Manager or its Affiliates in furtherance of the provision of Services that are approved in advance by the Company in writing.

(e)     Interest on Unpaid Amounts. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the Parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)     To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between the Manager and [Newco] dated on or about the Plan Effective Date (the "**USBTC Management Agreement**").

(g)     Effect of Substantial Completion. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means that all networking and electrical components necessary to support no less than 200 MWs of power

9

in aggregate to plugs at the Project have been installed to permit the prompt installation and operation thereafter of ASICS using 200MWs of power.

(h)    This Section 5 describes the sole consideration due to the Manager for the Manager's performance of the Services.

6.    Confidentiality.

(a)    During the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; provided, however, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)    Notwithstanding the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)    Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; provided, however, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

7.    Limitation of Liability.

10

(a)    Neither Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other Party or any of its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement in excess of the Liability Cap, except (i) to the extent such loss, liability, damage, or expense shall be proven to arise from the gross negligence, willful misconduct (which in the case of the Manager shall be deemed to include the knowing and continuing failure to provide the Services that are essential or required to complete the Project), fraud or knowing violation of law (the "**Liability Exceptions**"), (ii) to the extent such loss, liability, damage or expense arises out of Company's breach of Section 5 (*Compensation*), Section 6 (*Confidentiality*), (iii) for any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (iv) to the extent such loss, liability, damage or expense arises out of Manager's breach of Section 6 (*Confidentiality*), or (v) for any of the Parties' indemnification obligations under Section 8 (*Indemnification*).

(b)    Except to the extent arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business.

(c)    For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

8.    Indemnification.

(a)    The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, damages, and liabilities, joint or several ("**Losses**") and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or knowing violation of law. In addition, the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take, to have result from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Manager Indemnified Party.

(b)    The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or knowing violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this Section 8(a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and

11

inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees promptly upon request of the Company.

10.    Force Majeure.

(a)    The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would include the following: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority,

or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or tribunal of competent jurisdiction.

(b)    Within five business days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. Within five business days of receiving such notice, Company shall notify Manager whether it elects for Manager to suspend all Services during the occurrence of such Excluded Event, in which case (i) Company shall not be required to pay any amounts that would otherwise be payable to the Manger under this Agreement, and (ii) the Manager shall not be required to provide the Service hereunder until such time that the Excluded Event is resolved or the Manager resumes performance of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. If the Company does not elect to suspend all Services pursuant to this Section 10(b), the Company shall be obligated to pay Manager for the Services during such Excluded Event. Notwithstanding anything to the contrary in this Section 10, Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

If to the Company:                    [COMPANY ADDRESS]
                                      Email: [EMAIL ADDRESS]
                                      Attention: [TITLE OF OFFICER TO RECEIVE
                                      NOTICES]

with a copy to:                    [COMPANY LAW FIRM]
                                   Email: [EMAIL ADDRESS]
                                   Attention: [ATTORNEY NAME]


If to the Manager:                 U.S. Data Management Group, LLC
                                   Attention: Legal
                                   1101 Brickell Ave
                                   Suite N-1500
                                   Miami, FL 33131
                                   Email: legal@usbitcoin.com


with a copy to:                    Brown Rudnick LLP
                                   7 Times Square,
                                   New York, NY 10036
                                   Email: jfitzsimons@brownrudnick.com
                                   Attention: Jonathan Fitzsimons

14.   <u>Entire Agreement</u>. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.   <u>Successor and Assigns; Assignment</u>. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party without the written consent of the other Party, except that (a) the Manager may assign its rights and obligations hereunder (i) to any of its Affiliates that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, (ii) in connection with any sale of all or substantially all of the mining operations services business of the Manager, or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.   <u>No Third-Party Beneficiaries</u>. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.   <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

14

18.    <u>Amendment and Modification; Waiver</u>. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    <u>Severability</u>. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    <u>Governing Law; Submission to Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.    <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.    <u>Remedies Cumulative</u>. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

24.    <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement

will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

      25.    <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit to this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the

date first written above.

[Celsius Mining LLC]

By:_____

Name:

Title:


U.S. Data Management Group, LLC

By:_____

Name:

Title:

## Exhibit A

### Services

The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

   a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

   b. confirm reusability of existing equipment; and

   c. identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

7. Modify plans and designs as necessary for:

   a. civil scope;

   b. mechanical scope;

18

    c.  electrical scope; and

    d.  networking scope.

8. Source and procure all necessary equipment in accordance with plans and as identified in prior diligence and planning efforts.

9. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

    a.  civil contractor;

    b.  mechanical contractor;

    c.  electrical contractor; and

    d.  network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1. Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3. Initiate handoff of existing ISP service.*

4. Assist as necessary for the handoff of property ownership including existing and required easements.*

5. Engage a general contractor to:

19

    a.   outline full project scope (to be used in division of responsibilities matrix);

    b.   clearly identify work that is already complete;

    c.   clearly identify previously completed work that needs to be revisited and/or repaired; and

    d.   clearly identify work that is not yet complete.

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7. Coordinate and lead the effort to modify plans and design sets as necessary for:

    a.   civil scope;

    b.   mechanical scope;

    c.   MV electrical scope;

    d.   LV electrical scope;

    e.   networking scope; and

    f.   security scope.

8. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9. Facilitate RFP process for:

    a.   general contractor;

    b.   civil contractor(s);

    c.   mechanical contractor(s);

    d.   electrical contractor(s); and

    e.   network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance with plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

## Exhibit B

### Milestones

#### Milestone 1 ("Milestone 1"):

**Step 1:** Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.

**Step 2:** Engage Vendors:

    (a) Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.

    (b) PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.

    (c) PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.

       ***Note***: No purchase orders or capital commitments will be submitted in Step 2.

**Step 3:** Engage HMC to:

    (a) Outline full project scope (to be used in Division of Responsibilities Matrix);

    (b) Clearly identify work that is already complete;

    (c) Clearly identify previously completed work that needs to be revisited and/or repaired; and

    (d) Clearly identify work that is not yet complete.

**Step 4:** Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

**Step 5:** Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.

#### Milestone 2 ("Milestone 2"):

**Step 1:** Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.

**Step 2:**       Coordinate and lead the effort to modify plans and design sets for:

    (a) Civil Scope;

    (b) Mechanical Scope;

    (c) MV Electrical Scope;

(d) LV Electrical Scope;

(e) Networking Scope;

(f) Security Scope; and

> _**Note**_: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** Initiate RFP process for:
(a) HMC;

(b) Civil contractor(s);

(c) Mechanical contractor(s); and

(d) Network and cabling contractor(s).

> _**Note**_: Conducting the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

**Step 4:** Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.
**Step 5:** Develop project schedule and provide recommendations based on RFP process and negotiations.

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

## <u>Exhibit C</u>

### Insurance Requirements

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.*

   Employer's Liability with limits no less than:*

   i)  $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) <u>Worker's Compensation and Employer's Liability</u>.

   Worker's Compensation with limits no less than the minimum amount required by applicable law.

   Employer's Liability with limits no less than:

    i)  $1,000,000 Bodily Injury by Accident (Each Accident)

    ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

    iii) $1,000,000 Bodily Injury by Disease (Each Employee)

  d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

  e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3)  All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4)  The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

## Exhibit D

### VEUs

<u>VEU Description</u>: VEUs consist of five high-volume VFD-controlled upblast fans, wind-driven rain louvers, and actuated dampers for intake control, in addition to telemetry equipment for monitoring temperature, humidity, and water intrusion providing environmental control. Each VEU is furnished with a 4000A 415V NEMA 3R rated switchgear, equipped with a current transformer and power meter to optimize and monitor power consumption.

**<u>Exhibit E</u>**

**Project Budgets**

**<u>Exhibit B-1</u>**

**(Redline) U.S. Bitcoin Cedarvale Interim Services Agreement**

# INTERIM SERVICES AGREEMENT

## By and between

## [U.S. Data Management Group, LLC], as Manager

## And

## [Celsius Mining LLC], as Company[‡]

This Interim Services Agreement (this "**Agreement**") is made and entered as of ~~October~~ [●]December   , 2023 (the "**Effective Date**"), by and between (i) [U.S. Data Management Group, LLC], a [Delaware limited liability company] (the "**Manager**"), and (ii) [Celsius Mining LLC], a [Delaware limited liability company] (the "**Company**"). The Manager and the Company are collectively referred to herein as the "**Parties**" and each individually, as a "**Party**".

**WHEREAS**, Company is undertaking the management of development and construction of a bitcoin mining facility ("**Plant**"), at a site ("**Site**") located in Ward County, Texas ("**Project**"); and

**WHEREAS**, the Company desires to retain the Manager to provide certain services as set forth herein on a short-term basis on the conditions and terms set forth herein, and the Manager is willing to undertake such obligations.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the Parties agree as follows:

1.      Appointment. The Company hereby engages the Manager, and the Manager hereby agrees, upon the terms and subject to the conditions set forth herein, to provide, or cause any of its Affiliates to provide, to the Company the Services described on Exhibit A of this Agreement. For purposes of this Agreement, an "**Affiliate**" of any specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified.

2.      Term and Termination.

(a)      Term. Unless otherwise terminated pursuant to Section 2(b), the term of this Agreement (the "**Term**") shall commence on the Effective Date and shall expire on the earlier of:

(i)      the date on which the *Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and Its Debtor Affiliates* [Docket No. 2807] (the "**Plan**"), as implemented pursuant to that certain *Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* [Docket No. 4050] (the "**MiningCo Implementation Motion**," and, together with the Plan, the "**MiningCo Plan**"), becomes effective in accordance with its terms and the terms of the order confirming the Plan and granting the MiningCo Implementation Motion, each as issued by the United States Bankruptcy Court for the Southern District of New York (the "**Plan Effective Date**"); and

---

[‡] ~~**Note to Draft**: To confirm parties to this Agreement.~~

(ii)    Substantial Completion of the Project.

(b)    <u>Termination</u>. This Agreement may be terminated only as follows:

(i)    by mutual agreement, in writing, of both the Manager and the Company;

(ii)    by the Manager, in the event that (A) the Company fails to pay the consideration set forth in Section 5 in an amount, individually or in aggregate, of at least $150,000 and (B) such failure continues without cure for a period of 30 days after receipt by the Company of written notice of such failure by the Manager; <u>provided</u>, <u>however</u>, that the Manager may not terminate this Agreement pursuant to this Section 2(b)(ii) if the Company cures such failure within such 30-day cure period; ~~and~~

(iii)    by the Company, with an effective date as set forth in Section 2(c):

~~(A) within 30 days after (1) the date on which the Debtors (as defined in the Plan) elect to pursue the Orderly Wind Down (as defined in the Plan) or otherwise elect not to proceed with the Plan (each, a "**Wind Down Termination Event**") or (2) December 31, 2023;~~

<u>(A)</u>    ~~(B)~~ in the event of the Manager's fraud, willful misconduct or gross negligence;

<u>(B)</u>    ~~(C)~~ if the Manager materially breaches this Agreement or its obligation to perform any of the Services identified in Section 3, and such breach has not been cured within 45 days after receipt by the Manager of written notice of such failure by the Company;

<u>(C)</u>    ~~(D)~~ if the Manager: (1) becomes insolvent or admits its inability to pay its debts generally as they become due; (2) becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (3) is dissolved or liquidated or takes any corporate action for such purpose; (4) makes a general assignment for the benefit of creditors; or (5) has a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business; or

<u>(D)</u>    ~~(E)~~ in the event that an Excluded Event prevents the performance by the Manager of its obligations under this Agreement for a period greater than 60 consecutive days<u>.</u>~~; and~~

<u>(iv)    by the Manager if: (a) the USBTC Management Agreement has not been executed by MiningCo and the Manager on or before February 15, 2024; (b) the Plan Effective Date with respect to the MiningCo Plan has not occurred on or before February 15, 2024; or (c) if, prior to the Plan Effective Date, the MiningCo Plan or the Mining Transaction described in the MiningCo Implementation Motion is modified in any material manner as it relates to MiningCo that is materially adverse to Manager (including, without limitation, as it relates to the Mining Assets and the minimum funding amount of $225 million in fiat to be transferred to MiningCo on the Plan Effective Date) without Manager's consent (not to be unreasonably withheld).</u>

2

(c)    Effect of Termination.

(i)    Upon the effective date of termination of this Agreement pursuant to Section 2(b), there shall be no liability or obligation on the part of the Manager or the Company other than as stated herein; provided, however, that termination or expiration of this Agreement shall not affect the liabilities of each Party for any breach of this Agreement occurring prior to such termination or expiration or any payment obligation set forth herein.

(ii) Upon the occurrence of a Wind Down Termination Event, the Company may request that the Manager provide the information set forth in Exhibit [●] with respect to transition of the Services to a successor.

(ii)    (iii) Upon notice of termination of this Agreement by either Party pursuant to (x) Sections 2(b)(i) or 2(b)(iii), at the written request of the Company (A) the Term shall continue for a period of no longer than 60 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) and/or (B) for a period of no longer than 60 days (which shall include any period during which the Term continues pursuant to Section 2(c)(iii)(x)(A), if applicable) (or (y) Section 2(b)(iv), at the written request of the Company the Term shall continue for a period of no longer than 14 days following such notice (during which, for the avoidance of doubt, Manager shall be obligated to continue the Services and Company shall be obligated to continue to compensate Manager for such Services in accordance with Section 5) (as applicable, the "**Transition Period**"), and during such Transition Period, the Manager shall provide reasonable cooperation and assistance to the Company to enable the Company to transition the Services to Company's nominated successors, including assistance with ancillary activities that may be required as part of such transition (the "**Transition Services**"). During any Transition Period, in addition to amounts due to Manager under this Agreement during the Term pursuant to Section 2(c)(iii)(A), if applicable, the Manager shall be entitled to prompt reimbursement of any actual reasonable and documented costs incurred by the Manager in connection with the performance of the Transition Services during the Transition Period. The Manager shall use commercially reasonable efforts to minimize any interruption to the Company's operations due to the Transition Services. During the Transition Period the Manager shall perform the Transition Services in a diligent, professional and workmanlike manner in accordance with the terms and conditions of this Agreement.

(iii)    (iv) Following (A) expiration of this Agreement pursuant to Section 2(a)(i), this Section 2(c), Section 5(c), Section 6, Section 7, Section 8, and Sections 10 through 25 shall survive, and (B) expiration of this Agreement pursuant to Section 2(a)(ii) or termination of this Agreement pursuant to Section 2(b), this Section 2(c), Section 5(c) and Sections 6 through 25 shall survive.

(iv)    (v) If this Agreement is terminated and the Parties have entered into the USBTC Management Agreement (as defined herein), the provisions of Section 3 and Section 4 shall apply to the USBTC Management Agreement *mutatis mutandis* with full effect thereto, as if such provisions were originally part of the USBTC Management Agreement.

3

3.      Duties of the Manager. The Manager or any of its Affiliates shall (a) perform the services set forth on Exhibit A (collectively, the "**Services**") and (b) use commercially reasonable efforts to achieve Substantial Completion.

4.      Performance Standards.

(a)      The Manager shall perform the Services set forth on Exhibit A, and shall cause the Services to be performed, in all material respects: (i) by qualified personnel (as to training, skill and experience); (ii) in a good, professional, workmanlike and timely manner; (iii) consistent with applicable industry standards and best practices; and (iv) with the experience and expertise necessary to provide the Services in accordance with this Agreement. The Manager shall perform the Services in accordance with (y) the milestones and other specifications set forth on Exhibit B; and (z) the designs, plans, drawings, specifications, materials and intellectual property purchased licensed from Core Scientific Operating Company ("**Core**") pursuant to that certain Purchase and Sale Agreement made as of September 14, 2023 by and between Core and the Company, except (1) to the extent waived in writing by the Company (such waiver not to be unreasonably withheld); (2) to the extent of any deviations from such plans, specifications and intellectual property by Manager's designs, plans, drawings, specifications, materials or intellectual property that Company agrees to in writing as part of the Services hereunder; or (3) to the extent of any immaterial deviations from such plans, specifications and intellectual property by Manager during the performance of the Services hereunder.

(b)      Every two weeks, the Manager shall provide a report to the Company setting forth (i) the Manager's performance and progress towards Substantial Completion of the Project, including any progress made by any Affiliates or subcontractors , and (ii) any other information reasonably requested by the Company from time to time relating to the performance of the Services hereunder. In addition, every two weeks, the Manager shall provide a report to the Company setting forth (x) progress of the Services relative to the agreed project budgets, (y) any variances from the agreed project budgets, and (z) the rationale for variances against such budgets.

(c)      Modification of Services. The Company may from time-to-time request that the Services be amended as the Company in good faith deems necessary. The Manager shall consider each such request in good faith. If the Manager is willing to amend the Services, the Parties will negotiate in good faith any such amendment, including any change in the compensation of the Manager related thereto. In the event the Parties agree to the terms of such amendment, then such amendment will be adopted in accordance with Section 18 and attached to this Agreement.

(d)      Obligations of the Manager. The Manager will:

(i)      Prior to the date on which the Services are to commence, obtain, and at all times during the Term of this Agreement maintain, all licenses and consents necessary for the performance of its obligations under this Agreement; provided, however, that the Manager shall not be deemed to have breached this subsection (i) for any failure or delay in fulfilling or performing under this subsection (i), caused by or resulting from any change to requirements imposed by law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(ii)      Nominate an employee to serve as a primary contact with respect to this Agreement and who will have authority to represent the Manager in connection with matters pertaining to this Agreement including the organization and control of the

4

performance of the Services (the "**Project Manager**"); provided, however, that Manager shall not unreasonably replace the Project Manager during the term of this Agreement;

(iii)     Allocate Manager Personnel who are suitably skilled, experienced, trained, and qualified to perform the Services in a professional and workmanlike manner in compliance with Manager's obligations under Section 4(a). The Manager represents and warrants to the Company that the Manager shall provide ongoing training to Manager Personnel;

(iv)     At the reasonable request of the Company (which shall be made in writing), replace the Project Manager or any other Manager Personnel to the extent that there is any willful misconduct or fraud (or reasonable suspicion thereof) on the part of such Project Manager or applicable Manager Personnel;

(v)     Prior to any Manager Personnel performing any Services: (A) ensure that such Manager Personnel have the legal right to work in the United States as necessary for their performance; (B) ensure that such Manager Personnel hold and continue to maintain, appropriate training and qualifications as required to perform the Services during the Term; and (C) conduct background checks on each such Manager Personnel that is an employee of the Manager or its Affiliates, which background checks shall comprise, at a minimum, references and criminal record, in accordance with state, federal, and local law;

(vi)     Comply with all laws applicable to the provision of the Services, including any applicable labor and employment laws; provided, however, that the Manager shall not be deemed to have breached this subsection (vi) for any failure or delay in fulfilling or performing under this subsection (vi) that is caused by or resulting from any change in applicable law after the date of this Agreement as long as the Manager continues to use commercially reasonable efforts to comply with applicable law;

(vii)     Comply with, and ensure that all Manager Personnel comply with, all rules, regulations, and policies of the Company that are communicated to the Manager in writing, if applicable;

(viii)     Require all Manager Personnel to be bound in writing by confidentiality provisions reasonably equivalent to those contained in this Agreement;

(ix)     Maintain at all times during the Term of this Agreement, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C, to the extent that such insurance coverage is available from more than one provider on commercially reasonable terms. Upon the written request of the Company, the Manager shall provide the Company with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Manager under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(d)(ix) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any provisions requiring a Party to indemnify, defend, and hold harmless the other under this Agreement); and

(x)     Maintain complete, detailed, and accurate records relating to the provision of the Services under this Agreement and, during the Term and for a period of

two years thereafter, upon the Company's written request, allow the Company or the Company's representative to inspect and make copies of all such records and, during business hours, interview the Manager's personnel in connection with the provision of the Services and the Manager's compliance with this Agreement; provided, however, that following the end of such two-year period, such records shall be subject to, and may be deleted in accordance with, the Manager's reasonable internal policies on customer record retention and deletion.

(e)      Obligations of the Company. The Company shall, and shall cause its subsidiaries to, take all action reasonably necessary for the Manager to provide the Services and fulfill its obligations under this Agreement, including:

(i)      Granting the Manager, its Affiliates, and their respective employees, agents, contractors, and representatives who are performing the Services (the "**Manager Personnel**"), access to (A) the facilities, assets (including Bitcoin mining assets) and books and records of the Company and its subsidiaries (in each case, except as otherwise prohibited by applicable law) during reasonable business hours with reasonable advance notice, (B) drawings, designs and intellectual property relating to the Site or otherwise acquired from Core and (C) the Site, in each case, solely as reasonably necessary for Manager's or Manager Personnel's performance of the Services;

(ii)     Nominating an individual who, as of the Effective Date, shall be Michael Deeg, to serve as a primary contact with Manager with respect to this Agreement (the "**Company Representative**") and who, subject to Section 4(e)(iii), will have the authority to act on behalf of the Company following consultation with the Working Group in connection with matters pertaining to this Agreement; provided, however, that the Company may replace the Company Representative by giving written notice of the same to Manager, following consultation with the Manager and the Working Group;

(iii)    Creating a working group which, as of the Effective Date, will comprise of [●], [●],Emmanuel Aidoo and [●]Michael Deeg, and which will work with the Company Representative in connection with information sharing, communication, coordination, alignment, consultation and similar matters with Manager pertaining to the Services carried out pursuant to this Agreement (the "**Working Group**"). The Working Group shall work with the Company Representative and Manager to effectuate the Services as Company deems necessary; provided, however, that the Company may elect to replace all or any individual member of the Working Group at any time following consultation with the Manager;

(iv)     Timely paying all undisputed amounts owed by the Company in accordance with Section 5; and

(v)      [Maintaining, at its sole cost and expense, at least the types and amounts of insurance coverage on the terms set forth on Exhibit C. Upon the written request of the Manager, the Company shall provide the Manager with copies of the certificates of insurance and policy endorsements for all insurance coverage required of the Company under Exhibit C and shall not do anything to invalidate such insurance. This Section 4(e)(v) shall not be construed in any manner as waiving, restricting, or limiting the liability of either Party for any obligations imposed under this Agreement (including any

6

provisions requiring a Party to indemnify and hold harmless the other under this Agreement).]²

5.  <u>Compensation</u>.

(a)  <u>Compensation for Development Services</u>.

(i)  As consideration payable to Manager for providing the Services to Company, Company shall pay Manager's development costs on a monthly basis, for the applicable period, as follows (collectively, the "**Development Costs**"):

For the period between ~~the Effective Date~~December 1, 2023 and December 31, 202~~3~~4:

| Item | $/Month |
|------|---------|
| Project Management Costs & Labor | $220,000 |
| Site Design & Engineer Management | $99,000 |
| Site Budgeting, FP&A, & Accounting | $103,000 |
| Construction Management | $222,000 |
| Procurement, Logistics, & RFP Coordination | $90,000 |
| **Total** | **$734,000** |

~~For the period between the January 1, 2024 through August 31, 2024:~~

| ~~Item~~ | ~~$/Month~~ |
|------|---------|
| ~~Project Management Costs & Labor~~ | ~~$330,000~~ |
| ~~Site Design & Engineer Management~~ | ~~$148,500~~ |
| ~~Site Budgeting, FP&A, & Accounting~~ | ~~$156,500~~ |
| ~~Construction Management~~ | ~~$330,000~~ |
| ~~Procurement, Logistics, & RFP Coordination~~ | ~~$135,000~~ |

---

² ~~**Note to Draft**: Parties to discuss Company's insurance obligations relative to Company's anticipated activities during buildout.~~

7

| | |
|---|---|
| **Total** | **$1,100,000** |

(ii)    On the Effective Date, the Company shall pay Manager: (A) $734,000 as compensation for the completion of Milestone 1 ~~and~~, (B) $734,000 as compensation for the substantial completion of Milestone 2, and (C) $169,666.70 as compensation for services provided between November 1, 2023 and November 10, 2023.

(iii)    The Company shall pay the Manager the Development Costs on the ~~[third]~~ Business Day of each month during the Term for such month's Services. Manager shall provide Company with invoices and detailed information relating to such month's Development Costs on or before the ~~[third Business Day]~~ following such month.

(b)    <u>Compensation for Operational Services</u>. To the extent that any mining units are energized and hashing at the Project during the Term ("**Operational Units**"), (i) the Manager shall perform the Services as such term is defined in that certain Managed Services Agreement dated February 9, 2022 by and between Frontier Outpost 13, LLC and Company (the "**Frontier Agreement**") and in accordance in all respects with Exhibit A thereof, and (ii) the Company shall pay to the Manager the Operational Costs applicable to such Operational Units on the ~~[third]~~ Business Day of each month during the Term.

"**Gross Revenue**" means the revenue realized by Company from BTC mined from Operational Units in the immediately preceding month.

"**Mining Expenses**" means costs of power to run the Operational Units during the immediately preceding month *plus* direct operating costs attributable to such Operational Units (including without limitation costs associated with labor and repair) *plus* $2,920 per MW under management for such prior month *plus* any other direct costs incurred by Company that are applicable to such Operational Units.

"**Mining Proceeds**" means Gross Revenue from any Operational Units *minus* Mining Expenses.

"**Operational Costs**" means an amount equal to (i) $2,920 per month per MW under management, which shall be calculated by determining the weighted average of the nameplate MW of Operational Units for an applicable month, with daily nameplate MW weighted based on the number of days in the applicable month that such nameplate MW is measured *plus* (ii) five percent of such Mining Proceeds from the immediately preceding month.

(c)    <u>Reimbursement for Vertical Exhaust Units</u>.

(i)    As of the Effective Date, the Manager is in possession of sixteen (16) vertical exhaust units owned by Manager, each of which has a nameplate capacity of 2.8MW, as further described in <u>Exhibit ~~E~~D</u> (the "**VEUs**").

(ii)    Within five Business Days (as defined in the Plan) of the Effective Date, the Manager shall provide to the Company all drawings and any other technical information in its possession relating to the VEUs for certification by a Company-appointed consultant, together with all warranty documents, and any other

information, that is in possession of Manager and that relates to the VEUs. Manager shall also promptly facilitate the inspection of the VEUs by Company or representatives of Company during normal business hours at the premises at which the VEUs are stored.

(iii)    Within 15 Business Days (as defined in the Plan) of the later of (A) the receipt by Company of all information and documentation provided pursuant to Section 5(c)(ii), and (B) the receipt by Company of a report prepared by the Company-appointed consultant regarding the VEUs, subject to Section 5(c)(iv)5(c)(iv), Company shall notify Manager in writing whether or not Company wants to purchase either (X) all of the VEUs or (Y) a single VEU for testing purposes. If the Company elects to purchase a single VEU, Manager shall promptly ship such VEU to the Site, and shall promptly install and test such VEU upon arrival to the Site. Company may elect to purchase any or all of the remaining VEUs by providing Manager written notice of such election within 60 days of the initial date of testing such initial VEU and, if Company so elects, Manager shall promptly ship such additional VEUs to the Site, and shall promptly install and test such VEUs upon arrival to the Site.

(iv)    Company shall pay Manager an amount equal to (A) $[•]450,193.45 per VEU acquired by Company *plus* (B) all shipping, handling and storage costs incurred by Manager, and sales, use and other excise taxes, in each case, as related to the purchase and sale of such VEUs. The foregoing shall be Manager's sole and exclusive consideration for such VEUs.

(v)    In the event that following delivery to the Site of the VEUs, any VEU requires repairs (a "**Required Repair**"), the Company will promptly deliver notice of such determination to the Manager (a "**Required Repair Determination**"). Following the delivery of such Required Repair Determination, the Company and Manager will consult in good faith to determine any further repairs necessary to any of the VEUs (the "**Further Repairs**"). The Company shall be responsible for any such Required Repairs up to an aggregate cost of $1,000,000 across all VEUs ("**Required Repair Threshold**") and, in the event that the Company and Manager agree in writing on any Further Repairs, the Company and Manger will split the costs of such Further Repairs. Notwithstanding the foregoing, with respect to any VEU, the Manager's obligations under this Section 5(c)(v) will fall away and be of no further force and effect 60 days following the date such VEU is first energized.

(vi)    Manager represents and warrants with respect to each VEU as of the Effective Date and the date on which any purchase by Company is consummated: (A) such VEU has not been moved, used or otherwise tampered with since delivery from the original manufacturer to the location at which such VEU is currently stored; (B) Manager has good title to such VEU, and (B) such VEU is free of all liens and encumbrances. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5(C), (I) ALL VEUs ARE PROVIDED "AS IS", AND (II) MANAGER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE VEUs INCLUDING ANY WARRANTY OF MERCHANTABILITY, MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(vii)    Without limiting the foregoing, at Company's option, Manager shall (A) to the extent transferable, transfer to Company any warranties provided by the manufacturers of the VEUs at the time the purchase of the VEUs by Company is consummated or, at Company's election (B) diligently pursue and enforce such

9

warranties on Company's behalf. Any monetary relief from the VEU manufacturers pursuant to such warranties shall be taken into account with respect to the amounts set forth in Section 5(c)(v)5(c)(v).

(d)    _Reimbursement for Budgeted Expenses_. In addition to the foregoing, the Company shall reimburse the Manager for any out of pocket expenses actually incurred and provided for in the Project budgets established pursuant to and in accordance with Exhibit FE within ten (10) days of receipt by the Company of Manager's invoices associated therewith and reasonable supporting documentation; provided, however, that (i) Manager shall not be entitled to issue invoices pursuant to this Section 5(c) more frequently than every two weeks, and (ii) each such invoice shall include Manager's reasonable estimate of the out of pocket expenses to be incurred during the upcoming two week period. In the event that this Agreement is terminated in accordance with Section 2(b), the Company shall reimburse the Manager for any early termination fees, liquidated damages actually incurred as a result of such early termination, or fees accelerated as a result of early termination ("**Breakage Fees**"), in any case, as actually incurred by the Manager or its Affiliates as a result of early the termination of any Manager Service Agreements. For the purposes of this Agreement, "**Manager Service Agreements**" means any agreements entered into by the Manager or its Affiliates in furtherance of the provision of Services that are approved in advance by the Company in writing.

(e)    _Interest on Unpaid Amounts_. Interest at a rate per annum equal to the Prime Rate plus 7.5% (or, if lower, the maximum rate permitted by applicable law) shall accrue and be payable by the Company on any unpaid amounts owed hereunder (except for disputed amounts, which shall not accrue interest until such amounts are determined as owed by a court of competent jurisdiction or by resolution of the Parties), until such amounts are paid. "**Prime Rate**" shall mean the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided, however, that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate.

(f)    To the extent that, upon expiration of the Term, the Manager has invoiced, and the Company has paid, amounts in connection with the performance of Services that have yet to be rendered (the "**Rollover Amounts**"), such Rollover Amounts shall be applied as a credit to invoice(s) issued by the Manager pursuant to and in accordance with that certain Management Services Agreement, by and between the Manager and [NewCco, Inc.], dated on or about the Plan Effective Date (the "**USBTC Management Agreement**").

(g)    _Effect of Substantial Completion_. In the event that Substantial Completion occurs on or before the 12 month anniversary of the Effective Date (the "**Target Substantial Completion Date**"), then Manager shall be entitled to an early completion bonus ("**Early Completion Payment**") in an amount equal to (i) all Development Costs that have accrued and have not yet been paid, and (ii) all Development Costs that would have become due is the Services had been performed through the Target Substantial Completion Date. In the event that Substantial Completion has not occurred on or before the Target Substantial Completion Date, Development Costs shall be no longer accrue from the day following the Target Substantial Completion Date through the expiration or termination of this Agreement. For the avoidance of doubt, (I) if Substantial Completion occurs after the Target Substantial Completion Date then Manager shall not be entitled to the Early Completion Payment, and (II) if Substantial Completion has not occurred on or before the Target Substantial Completion Date any Development Costs that have already accrued on or before the Target Substantial Completion Date shall remain due. "**Substantial Completion**" means that all networking and electrical components

10

necessary to support no less than 200 MWs of power in aggregate to plugs at the Project have been installed to permit the prompt installation and operation thereafter of ASICS using 200MWs of power.

(h)      This Section 5 describes the sole consideration due to the Manager for the Manager's performance of the Services.

6.      <u>Confidentiality.</u>

(a)      <u>During</u> the Term of this Agreement and thereafter, the Parties shall, and shall instruct their respective Representatives to, maintain in confidence and not disclose the other Party's financial, technical, sales, marketing, development, personnel, and other information, records, or data, including customer lists, supplier lists, trade secrets, designs, product formulations, product specifications or any other proprietary or confidential information, however recorded or preserved, whether written or oral (any such information, "**Confidential Information**"). Each Party shall use the same degree of care, but no less than reasonable care, to protect the other Party's Confidential Information as it uses to protect its own confidential or proprietary information of like nature. Unless otherwise authorized in any other agreement between the Parties, any Party receiving any Confidential Information of the other Party (the "**Receiving Party**") may use Confidential Information only for the purposes of fulfilling its obligations under this Agreement (the "**Permitted Purpose**"). Any Receiving Party may disclose such Confidential Information only to its Representatives who have a need to know such information for the Permitted Purpose and who have been advised of the terms of this Section 6 and the Receiving Party shall be liable for any breach of these confidentiality provisions by such persons; <u>provided</u>, <u>however</u>, that any Receiving Party may disclose such Confidential Information to the extent such Confidential Information is required to be disclosed by a Governmental Order, in which case the Receiving Party shall promptly notify, to the extent possible, the disclosing Party (the "**Disclosing Party**"), and take reasonable steps to assist in contesting such Governmental Order or in protecting the Disclosing Party's rights prior to disclosure, and in which case the Receiving Party shall only disclose such portion of Confidential Information that it is advised by its counsel in writing that it is legally bound to disclose under such Governmental Order. For the purposes of this Agreement, (i) "**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, award, or determination entered by or with any Governmental Authority, and (ii) a "**Representative**" of any specified person is such person's officers, directors, partners, trustees, executors, employees, agents, attorneys, accountants and advisors, and for purposes of the Manager, includes Affiliates engaged by the Manager in the performance of all or any part of the Services.

(b)      <u>Notwithstanding</u> the foregoing, "**Confidential Information**" shall not include any information that the Receiving Party can demonstrate: (i) was publicly known at the time of disclosure to it, or has become publicly known through no act of the Receiving Party or its Representatives in breach of this Section 6; (ii) was received from a third party without a duty of confidentiality; or (iii) was developed by it independently without any reliance on, use of or reference to the Confidential Information.

(c)      Upon demand by the Disclosing Party at any time, or upon expiration or termination of this Agreement with respect to any Service, the Receiving Party agrees promptly to return or destroy, at the Receiving Party's option, all Confidential Information. If such Confidential Information is destroyed, an authorized officer of the Receiving Party shall certify to such destruction in writing; <u>provided</u>, <u>however</u>, that Receiving Party or its Representatives may retain copies of such materials to the extent necessary to comply with applicable law or regulation or in connection with electronic archiving practices (provided any information so maintained will remain subject to the confidentiality obligations of this Agreement).

11

7.      <u>Limitation of Liability</u>.

(a)      Neither Party nor any of its Affiliates, nor its or their respective officers, directors, managers, principals, stockholders, partners, members, employees, agents, or representatives (each a "**Related Party**" and, collectively, the "**Related Parties**") shall be liable to the other Party or any of its respective Affiliates for any loss, liability, damage, or expense arising out of or in connection with this Agreement in excess of the Liability Cap, except (i) to the extent such loss, liability, damage, or expense shall be proven to arise from the gross negligence, willful misconduct (which in the case of the Manager shall be deemed to include the knowing and continuing failure to provide the Services that are essential or required to complete the Project), fraud or knowing violation of law (the "**Liability Exceptions**"), (ii) to the extent such loss, liability, damage or expense arises out of Company's breach of Section 5 (*Compensation*), Section 6 (*Confidentiality*), (iii) for any amounts payable to the Manager that are disputed but are subsequently determined to be due and payable in accordance with this Agreement, (iv) to the extent such loss, liability, damage or expense arises out of Manager's breach of Section 6 (*Confidentiality*), or (v) for any of the Parties' indemnification obligations under Section 8 (*Indemnification*).

(b)      Except to the extent arising from the Liability Exceptions, in no event shall either Party be liable to the other or any of its related Parties, for any special, indirect, punitive, or consequential damages, including loss of profits or lost business.

(c)      For purposes of this Agreement, "**Liability Cap**" shall mean an amount equal to the lesser of (x) the aggregate amount of Development Costs actually received by the Manager from Company, or (y) $5,800,000.

8.      <u>Indemnification</u>.

(a)      The Company shall indemnify and hold harmless the Manager and each of its Related Parties (each, a "**Manager Indemnified Party**") from and against any and all losses, damages, and liabilities, joint or several ("**Losses**") and relating to or arising from any claim, action or demand brought by any third party and relating to or arising out of the Company's gross negligence, willful misconduct, fraud, or knowing violation of law. In addition, the Company will reimburse any Manager Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Company will not be required to indemnify any Manager Indemnified Party under this Section 8(a) to the extent that the Loss is determined by a court, in a final judgment from which no further appeal may be take, to have result from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Manager Indemnified Party. The reimbursement and indemnity obligations of the Company under this Section 8 shall be in addition to any liability which the Company may otherwise have, shall extend upon the same terms and conditions to any Manager Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Manager Indemnified Party.

(b)      The Manager shall indemnify and hold harmless the Company and each of its Related Parties (as applicable, a "**Company Indemnified Party**") from and against any and all Losses arising from any claim, action, or demand brought by any third party and relating to or arising out of the Manager's gross negligence, willful misconduct, fraud, or knowing violation of law, and the Manager will reimburse any Company Indemnified Party for costs and expenses incurred in defending such third party claims, actions or demands subject to, and in accordance with, Section 8(c). Notwithstanding the foregoing, the Manager will not be required to indemnify any Company Indemnified Party under this

12

Section 8(a) to the extent that any Loss is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted from the gross negligence, willful misconduct, fraud, or knowing violation of law by such Company Indemnified Party. The reimbursement and indemnity obligations of the Manager under this Section 8(a) shall be in addition to any liability which the Manager may otherwise have, shall extend upon the same terms and conditions to any Company Indemnified Party, and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Parties and any Company Indemnified Party.

(c)    Third Party Claims Indemnification Procedure. An Indemnified Party shall promptly notify the Company or the Manager, as applicable (each, an "**Indemnitor**") in writing as to any claim, action or demand for which indemnity may be sought under this Section 8, but the omission to so notify the Indemnitor will not relieve the Indemnitor from any liability which it may have to any Indemnified Party hereunder to the extent that the Indemnitor is not materially prejudiced as a result of such failure. After such notice to the Indemnitor, the Indemnitor shall be entitled to participate in and assume the defense thereof (subject to the limitations set forth in the next sentence, if applicable) with counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party in such action and shall pay as incurred the fees and expenses of such counsel related to such action. In any action, any Indemnified Party shall have the right to retain its own separate counsel at such Indemnified Party's own expense and not subject to reimbursement by the Indemnitor; provided, however, that the Indemnitor shall pay as incurred the fees and expenses of such counsel incurred in connection with investigating, preparing, defending, paying, settling or compromising any action if (i) to the extent that the parties to such action include both the Indemnified Party and the Indemnitor and there may be legal defenses available to such Indemnified Party which are different from or additional to those available to the Indemnitor; (ii) the use of counsel chosen by the Indemnitor to represent both the Indemnitor and such Indemnified Party would present such counsel with an actual or potential conflict of interest; (iii) the Indemnitor shall not have employed satisfactory counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such action; or (iv) the Indemnitor shall authorize the Indemnified Party to employ separate counsel (in addition to any local counsel) at the expense of the Indemnitor. The Indemnitor shall not, in connection with any action, be liable for the fees and expenses of more than one separate counsel (in addition to any local counsel) for all Indemnified Parties, except to the extent the use of one counsel to represent all Indemnified Parties would present such counsel with an actual or potential conflict of interest.

9.    Non-Solicitation. The Company, on behalf of itself and its Affiliates, hereby covenants and agrees that, for the period beginning on the date of expiration or termination of this Agreement and ending on the 1 year anniversary of such date, it shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit for employment any of the employees of the Manager or its Affiliates to the extent that such employees performed Services or otherwise worked on the Project ("**Restricted Employees**"). The Manager shall provide a list of Restricted Employees promptly upon request of the Company.

10.    Force Majeure.

(a)    The Manager shall not be liable or responsible to the Company, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in performing the Services, when and to the extent the failure or delay is caused by or results from Excluded Events. "**Excluded Events**" means all acts or occurrences beyond the Manager's reasonable control, which by the exercise of due diligence Manager is unable to prevent and overcome and, provided that the foregoing conditions are satisfied, would include the following: (i) acts of God; (ii) flood, fire, earthquake, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (iv) embargoes, or blockades in effect on or after the date of this Agreement that relate to the subject of this Agreement; (v) national or regional emergency; (vi) changes to requirements imposed by applicable law; and (vii) action by any Governmental Authority. The failure or inability of the Manager to perform its Services and obligations under this Agreement due to an Excluded Event shall be excused for the duration of the Excluded Event. "**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of the government or political subdivision, or any arbitrator, court, or any self-regulated organization or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of this organization or authority have the force of Law), or tribunal of competent jurisdiction.

(b)    Within five business days of the occurrence of an Excluded Event, the Manager shall provide written notice to the Company of such occurrence, explaining the nature or cause of the delay and stating the period of time the delay is expected to continue. Within five business days of receiving such notice, Company shall notify Manager whether it elects for Manager to suspend all Services during the occurrence of such Excluded Event, in which case (i) Company shall not be required to pay any amounts that would otherwise be payable to the Manger under this Agreement, and (ii) the Manager shall not be required to provide the Service hereunder until such time that the Excluded Event is resolved or the Manager resumes performance of the Services, at which point the payment and provision of Services obligations under the Agreement shall resume. If the Company does not elect to suspend all Services pursuant to this Section 10(b)10(b), the Company shall be obligated to pay Manager for the Services during such Excluded Event. Notwithstanding anything to the contrary in this Section 1010, Manager shall use commercially reasonable efforts to end the failure or delay and ensure the impact of an Excluded Event on the Manager's performance are minimized.

11.    Independent Contractor. Nothing herein shall be construed to create a joint venture or partnership between the Parties or an employee/employer relationship. The Manager shall be an independent contractor pursuant to this Agreement. Neither Party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement, or undertaking with any third party. Nothing in this Agreement shall be deemed or construed to create or enlarge any fiduciary duties and responsibilities of the Manager or any of its Related Parties.

12.    Permissible Activities. Subject to the foregoing and the obligation not to disclose or use any information of the Company (which disclosure or use shall constitute a breach of this Agreement), nothing herein shall in any way preclude the Manager or its Affiliates or their respective Related Parties from engaging in any business activities or from performing services for its or their own account or for the account of others, including companies which may be in competition with the business conducted by the Company or any of its Affiliates.

13.    Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day (as defined in the Plan) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses indicated below (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 13).

If to the Company:                                   [COMPANY ADDRESS]
                                                    Email: [EMAIL ADDRESS]
                                                    Attention: [TITLE OF OFFICER TO RECEIVE
                                                    NOTICES]

with a copy to:                                     [COMPANY LAW FIRM]
                                                    Email: [EMAIL ADDRESS]
                                                    Attention: [ATTORNEY NAME]

If to the Manager:                                  [MANAGER ADDRESS]
                                                    Email: [EMAIL ADDRESS]U.S. Data Management
                                                    Group, LLC
                                                    Attention: [TITLE OF OFFICER TO RECEIVE
                                                    NOTICES]Legal
                                                    1101 Brickell Ave
                                                    Suite N-1500
                                                    Miami, FL 33131
                                                    Email: legal@usbitcoin.com

with a copy to:                                     Brown Rudnick LLP
                                                    7 Times Square,
                                                    New York, NY 10036
                                                    Email: jfitzsimons@brownrudnick.com
                                                    Attention: Jonathan Fitzsimons

14.    Entire Agreement. This Agreement and the USBTC Management Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

15.    Successor and Assigns; Assignment. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns. However, neither this Agreement nor any of the rights or obligations of the Parties may be transferred or assigned by any Party without the written consent of the other Party, except that (a) the Manager may assign its rights and

15

obligations hereunder (i) to any of its Affiliates that, in Company's commercially reasonable discretion has the financial and operational ability to fulfill Manager's obligations hereunder, or a successor entity, in part or in full, as part of a sale of the Manager or substantially all of its assets, or a separation of the Manager into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, (ii) in connection with any sale of all or substantially all of the mining operations services business of the Manager, or (iii) pursuant to the transactions contemplated by that certain Business Combination Agreement dated February 6, 2023, by and among Hut 8 Mining Corp., a corporation existing under the laws of British Columbia, USBTC and Hut 8 Corp., a Delaware corporation, and (b) the Company may assign its rights and obligations to any of its Affiliates, a successor entity, in part or in full, as part of a separation of any portion or division of the Company into one or more entities, whether existing or newly formed, including by way of spin-off, split-off, carve-out, demerger, recapitalization, reorganization or similar transaction, or in connection with any sale of the Company or any sale of all or substantially all of the business of the Company.

16.    No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit, or remedy of any nature whatsoever, under or by reason of this Agreement.

17.    Headings. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

18.    Amendment and Modification; Waiver. This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each Party. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

19.    Severability. If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

20.    Governing Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of New York. Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York and County of New York (including the United States Bankruptcy Court for the Southern District of New York), and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding. Service of process, summons, notice, or other document by mail to such Party's address set forth herein

16

shall be effective service of process for any suit, action, or other proceeding brought in any such court. The Parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action, or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action, or proceeding brought in such court has been brought in an inconvenient forum.

21.  <u>Waiver of Jury Trial</u>. Each Party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby. Each Party certifies and acknowledges that (a) no representative of the other Party has represented, expressly or otherwise, that such other Party would not seek to enforce the foregoing waiver in the event of a legal action; (b) such Party has considered the implications of this waiver; (c) such Party makes this waiver voluntarily; and (d) such Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 21.

22.  <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

23.  <u>Remedies Cumulative</u>. Except as expressly provided herein to the contrary, the rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise.

24.  <u>No Strict Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

25.  <u>Interpretation</u>. Section and Exhibit references in this Agreement are references to the corresponding Section or Exhibit in this Agreement, unless otherwise specified. All Exhibits to this Agreement are hereby incorporated and made a part hereof as if set forth in full herein and are an integral part of this Agreement. All references to instruments, documents, contracts and agreements are references to such instruments, documents, contracts and agreements as the same may be amended, supplemented and otherwise modified from time to time, unless otherwise specified. Unless expressly provided to the contrary herein, the word "or" has the inclusive meaning "and/or," and the word "including" shall mean "including but not limited to" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Any reference in this Agreement to "$" shall mean U.S. dollars. Any words imparting the singular number only shall include the plural and vice versa. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.

[SIGNATURE PAGES FOLLOW]

**IN WITNESS WHEREOF**, the Parties have executed this Interim Services Agreement on the date first written above.

[Celsius Mining LLC]

By:_____

Name:

Title:

[U.S. Data Management Group, LLC]

By:_____

Name:

Title:

18

## Exhibit A

### Services

The Project is comprised of two parts identified as Project 1 and Project 2. Project 1 is a 40MW modular container project which will allow for the expedited deployment of offline mining rigs at the Site. Project 2 is a 200MW project involving the design and development of four mining buildings at the Site. Services for Project 1 and Project 2 will proceed concurrently. The Services to be provided for Project 1 and Project 2 are set forth below.

The Services set forth below provide an outline of key Services to be provided by Manager. The Services, however, may include other similar or related Services which will be provided by Manager to further the development of the Project, including Services related to design reviews, contract negotiations, construction management, oversight of equipment installation, project commissioning and other design and development activities. The list of Services included in this Exhibit A is not an exhaustive list.

### A. Project 1 Services

The following list outlines the Services that Manager will provide for Project 1:

1. Engage an appropriate party for all design sets and plans for the Project. Manager will use these design sets to value engineer the Project and validate assumptions about the Project 1 design and development process.

2. Initiate handoff of existing ISP service.

3. Assist as necessary for the handoff of property ownership including existing and required easements.

4. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.

5. Conduct site visits with key contractors to:

    a. refine scope for the installation of sixteen (16) USBTC supplied container modules for a total capacity of 40MW;

    b. confirm reusability of existing equipment; and

    c. identify additional equipment to be sourced (if required).

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility.

7. Modify ~~and/or finalize engineered~~ plans and designs as necessary for:

    a. civil scope;

  b. mechanical scope;

  c. electrical scope; and

  d. networking scope.

8. Source and procure all necessary equipment in accordance with ~~engineered~~ plans and as identified in prior diligence and planning efforts.

9. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

10. Facilitate request for proposal (RFP) process as necessary for:

  a. civil contractor;

  b. mechanical contractor;

  c. electrical contractor; and

  d. network and cabling contractor.

11. Facilitating the RFP process includes creating detailed RFPs, fielding questions from bidders and negotiating project timelines and cost.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

## B. Project 2 Services

The following list outlines the Services that Manager will provide for Project 2 (note that Services marked with an * are Services that overlap with Project 1 Services):

1. Engage an appropriate party for all design sets and plans for the Project. USBTC will use these design sets to value engineer the Project and validate assumptions about Project 2 design and development process.*

2. Engage an appropriate party on final commissioning of the substation and interconnect to determine equipment needs, commissioning timeline, and final cost to complete.*

3. Initiate handoff of existing ISP service.*

4. Assist as necessary for the handoff of property ownership including existing and required easements.*

5. Engage a general contractor to:

   a. outline full project scope (to be used in division of responsibilities matrix);

   b. clearly identify work that is already complete;

   c. clearly identify previously completed work that needs to be revisited and/or repaired; and

   d. clearly identify work that is not yet complete.

6. Develop a division of responsibilities matrix to align all parties on scope and responsibility for the installation of four (4) mining buildings for a total capacity of 200MW (50MW per building). This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.

7. Coordinate and lead the effort to modify ~~and/or finalize engineered~~ plans and design sets as necessary for:

   a. civil scope;

   b. mechanical scope;

   c. MV electrical scope;

   d. LV electrical scope;

   e. networking scope; and

   f. security scope.

8. Develop preliminary project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates.

9. Facilitate RFP process for:

   a. general contractor;

   b. civil contractor(s);

   c. mechanical contractor(s);

21

      d.  electrical contractor(s); and

      e.  network and cabling contractor(s).

10. Facilitating the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

11. Source and procure all necessary equipment in accordance ~~to engineered~~<u>with</u> plans and as identified in prior diligence and planning efforts.

12. Finalize project budget based on the defined project scope, finalized plans, and equipment costs in accordance with current market rates and equipment availability.

13. Finalize project schedule and award contracts based on RFP responses and final negotiations.

14. Management of the Project to achieve Substantial Completion.

## Exhibit B

## Milestones

**Milestone 1 ("Milestone 1"):**

**Step 1:** Utilize Core Scientific's non-proprietary design sets and plans for the Cedarvale facility. USBTC will use these design sets to value engineer the project.
**Step 2:** Engage Vendors:
    (a) Padmounts and Switchgear: A substantial allocation of approximately $15 million is planned for these critical electrical components.

    (b) PDUs, Fans, Racks, Networking: An additional $10 million is estimated for these elements, crucial for the technical infrastructure and operational efficiency of the Data Center.

    (c) PEMB Buildings: While HMC handles some construction elements, the actual buildings of $3 million are not within HMC's purview.

    *Note*: No purchase orders or capital commitments will be submitted in Step 2.

**Step 3:** Engage HMC to:
    (a) Outline full project scope (to be used in Division of Responsibilities Matrix);

    (b) Clearly identify work that is already complete;

    (c) Clearly identify previously completed work that needs to be revisited and/or repaired; and

    (d) Clearly identify work that is not yet complete.

**Step 4:** Develop a *Division of Responsibilities Matrix* to align all parties on scope and responsibility for the installation of four mining buildings and modular sections for a total capacity of 240MW. This includes all activities related to equipment and material sourcing, design and engineering, pre-construction, and installation and commissioning.
**Step 5:** Develop preliminary project budget based on the defined project scope, preliminary plans, and equipment costs in accordance with current market rates.

**Milestone 2 ("Milestone 2"):**

**Step 1:** Engage Core Scientific for all proprietary design sets and plans for the Cedarvale facility and validate assumptions about design and development process.
**Step 2:**      Coordinate and lead the effort to modify ~~and/or finalize engineered~~ plans and design sets for:
    (a) Civil Scope;

    (b) Mechanical Scope;

(c)  MV Electrical Scope;

(d)  LV Electrical Scope;

(e)  Networking Scope;

(f)  Security Scope; and

(g) USBTC containers: Complete engineering reports, review of warranty documents, and complete physical inspection of all containers.

*Note*: Includes O&M, Substation, Modular Buildings and Mining Buildings.

**Step 3:** Conduct Initiate RFP process for:
(a)  HMC;

(b)  Civil contractor(s);

(c)  Mechanical contractor(s); and

(d)  Network and cabling contractor(s).

*Note*: Conducting the RFP process includes creating detailed RFPs, coordinating site visits with key counterparties, fielding questions from bidders, and negotiating project timelines and cost.

**Step 4:** Finalize project budget based on the defined project scope, plans and equipment costs in accordance with current market rates and equipment availability.

**Step 5:** Develop project schedule and provide recommendations based on RFP process and negotiations.

Following final approvals on design, schedule, and budget for each project, Manager will provide Company a combined email update once every two weeks to align on progress. Manager will schedule a meeting with Company if requested by Company to talk through the update.

24

## Exhibit C

**[Insurance Requirements]³**

1) <u>Manager's Minimum Insurance Requirements</u>:

   a) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   b) <u>Worker's Compensation and Employer's Liability</u>.

     Worker's Compensation with limits no less than the minimum amount required by applicable law.*

     Employer's Liability with limits no less than:*

     i)  $1,000,000 Bodily Injury by Accident (Each Accident)

     ii) $1,000,000 Bodily Injury by Disease (Policy Limit)

     iii) $1,000,000 Bodily Injury by Disease (Each Employee)

   c) Employment Practices Liability insurance in an amount not less than $1,000,000.*

   d) Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

   e) Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability.

*As long as the Manager's employees are part of a Professional Employer Organization ("**PEO**"), the insurance under (b) and (c) may be provided through such PEO.

2) <u>Company's Minimum Insurance Requirements</u>:

   a) Property Asset Coverage of $500,000 deductible per occurrence up to the total replacement cost for each facility.

   b) Commercial General Liability with limits no less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

   c) <u>Worker's Compensation and Employer's Liability</u>.

---

³ **Note to Draft**: To be updated as applicable relative to the scope of Services agreed and set forth in Exhibit A.

Worker's Compensation with limits no less than the minimum amount required by applicable law.

Employer's Liability with limits no less than:

   i)  $1,000,000 Bodily Injury by Accident (Each Accident)

   ii)  $1,000,000 Bodily Injury by Disease (Policy Limit)

   iii) $1,000,000 Bodily Injury by Disease (Each Employee)

d)  Automobile – Bodily Injury and Property Damage with no less than $1,000,000 combined single limit per occurrence.

e)  Umbrella Form Excess Liability Insurance in excess of the limited provided by the commercial general liability,

3) All insurance policies required of a party (the "**Insured Party**") pursuant to this <u>Exhibit C</u> shall be issued by insurance companies or a PEO, as applicable, reasonably acceptable to the Company (in the case where the Insured Party is the Manager) or the Manager (in the case where the Insured Party is the Company) (the "**Other Party**").

4) The Insured Party shall furnish certificates of insurance at the time of the execution of this Agreement evidence insurance coverage as required hereunder. Upon the Other Party's request, the Insured Party will provide copies of policies with applicable exclusions and endorsements. The Insured Party must provide the Other Party with at least 30 days' prior written notice of cancellation or material change in coverage. The Other Party shall be named as additional insured (subject to applicable law and any required insurance company or PEO consent) a waiver of subrogation in favor of the Other Party shall be provided in connection with the Workers' Compensation insurance policies specified above.

**Exhibit D**

~~Transition Information~~VEUs

VEU Description: VEUs consist of five high-volume VFD-controlled upblast fans, wind-driven rain louvers, and actuated dampers for intake control, in addition to telemetry equipment for monitoring temperature, humidity, and water intrusion providing environmental control. Each VEU is furnished with a 4000A 415V NEMA 3R rated switchgear, equipped with a current transformer and power meter to optimize and monitor power consumption.

27

## Exhibit E

~~VEUs~~

## Exhibit F

**Project Budgets**