**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>　　　CELSIUS NETWORK LLC, et al.,<br><br>　　　　　　　　　　　　Debtors. | FOR PUBLICATION<br><br>Chapter 11<br><br>Case No. 22-10964 (MG) |

**MEMORANDUM OPINION GRANTING THE WIND-DOWN MOTION
OF DEBTORS AND THE COMMITTEE FOR ENTRY OF AN ORDER
(I) APPROVING THE IMPLEMENTATION OF THE MININGCO
TRANSACTION AND (II) RELATED RELIEF**

*A P P E A R A N C E S:*

KIRKLAND & ELLIS LLP
*Attorneys for the Debtors and Debtors in Possession*
601 Lexington Avenue
New York, New York 10022
By:　　Joshua A. Sussberg, Esq.

300 North LaSalle Street
Chicago, Illinois, 60654
By:　　Patrick J. Nash Jr., Esq.
　　　　Ross M. Kwasteniet, Esq.
　　　　Christopher S. Koenig, Esq.
　　　　Dan Latona, Esq.

WHITE & CASE LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1221 Avenue of the Americas
New York, NY 10020
By:　　David M. Turetsky, Esq.
　　　　Samuel P. Hersey, Esq.
　　　　Joshua D. Weedman, Esq.

111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
By:　　Michael C. Andolina, Esq.
　　　　Gregory F. Pesce, Esq.

555 South Flower Street
Suite 2700
Los Angeles, CA 90071
By:   Aaron Colodny, Esq.

Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131
By:   Keith H. Wofford, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
1 Bowling Green, Room 534
New York, NY 10004
By:   Shara Cornell, Esq.
      Mark Bruh, Esq.

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC 20549
By:   Therese A. Scheuer, Esq.

950 East Paces Ferry Rd., N.E.
Suite 900
Atlanta, GA 30326
By:   William M. Uptegrove, Esq.

600 Massachusetts Avenue, NW
Washington, DC 20001
By:   Andrew Currie, Esq.

MCARTER & ENGLISH, LLP
*Attorneys for the Ad Hoc Borrowers Group*
Worldwide Plaza
825 Eighth Avenue, 31st Floor
New York, NY 10019
By:   David J. Adler, Esq.
      Lisa S. Bonsall, Esq.

OFFIT KURMAN, P.A.
*Attorneys for the Ad Hoc Group of Earn Account Holders*
590 Madison Avenue, 6th Floor
New York, NY 10022
By:   Jason A. Nagi, Esq.

1954 Greenspring Drive
Suite 605
Timonium, Maryland 21093
By:    Joyce A. Kuhns, Esq.

VENABLE LLP
*Attorneys for Ignat Tuganov*
151 West 42nd Street
New York, New York 10036
By:    Jeffrey S. Sabin, Esq.

WILLKIE FARR & GALLAGHER LLP
*Attorneys for the Blockchain Recovery Investment Consortium*
787 Seventh Avenue
New York, NY 10019
By:    Brian S. Lennon, Esq.
       Yara Kass-Gergi, Esq.

ERVIN COHEN & JESSUP LLP
*Attorneys for Simon Dixon and BNK to the Future*
9401 Wilshire Boulevard, 12th Floor
Beverly Hills, CA 90212
By:    Chase Stone, Esq.

*Pro se* Creditor Anne Yeilding

*Pro se* Creditor Cathy Lau

*Pro se* Creditor Courtney Burks Steadman

*Pro Se* Creditor Daniel Frishberg

*Pro se* Creditor Georges Georgiou

*Pro se* Creditor Immanuel Herrmann

*Pro se* Creditor Jason Amerson

*Pro se* Creditor Kulpreet Khanuja

*Pro se* Creditor Lucas Holcomb

*Pro se* Creditor Mela Stewart

*Pro se* Creditor Rebecca Gallagher

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRPTCY JUDGE**

Celsius Network LLC *et al*. (the "Debtors") and the Official Committee of Unsecured

Creditors (the "Committee") filed the *Joint Motion of the Debtors and the Committee for Entry*

*of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting*

*Related Relief* (the "Wind-Down Motion," ECF Doc. # 4050) (supplemented by the declarations

of Robert Campagna ("Campagna Declaration," ECF Doc. # 4051), Kenneth Ehrler ("Ehrler

Declaration," ECF Doc. # 4052) and Marc D. Puntus ("Puntus Declaration," ECF Doc. # 4128),

and the *Supplemental Joint Statement Regarding the Joint Motion of the Debtors and the*

*Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction*

*and (II) Granting Related Relief* (the "BRIC Supplement," ECF Doc. # 4115)).  Objections to the

Wind-Down Motion were filed by the United States Trustee (the "UST"), who filed the

*Objection of the United States Trustee to the Joint Motion of the Debtors and the Committee for*

*Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II)*

*Granting Related Relief* (the "UST Objection," ECF Doc. # 4097), and the Ad Hoc Group of

Borrowers (the "Borrower Group"), which filed the *Preliminary Opposition of the Ad Hoc*

*Group of Borrowers to the Joint Motion of the Debtors and the Committee for Entry of an Order*

*(I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief*

("Borrower Objection," ECF Doc. # 4100) (supplemented by the declaration of Christopher

Villinger (the "Villinger Declaration," ECF Doc. # 4123)).  *Pro se* creditor Cathy Lau filed her

*Objection to the Mining Plan* (ECF Doc. # 4101) and *pro se* creditor Anne Yeilding filed a letter

in support of the Borrower Objection (the "Yeilding Letter," ECF Doc. # 4135).

In response, the Debtors and Committee filed the *Joint Omnibus Reply of the Debtors and the Committee in Support of the Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* (the "Reply," ECF Doc. # 4129).  Other creditors likewise filed responses to the objections, supporting approval of the Wind-Down Motion.[1]

The UST argues that the Wind-Down Motion is a modification to the Plan (as defined below) that requires a new solicitation and vote by all impaired creditors.  Meanwhile, the Debtors and Committee argue that the Plan, which was overwhelmingly approved by Celsius' creditors, expressly included a "toggle" alternative to the Orderly Wind Down.[2]  The Debtors assert that they have activated that toggle through the Wind-Down Motion, which proposes the creation of a mining-only public company to be managed by US Bitcoin (the "MiningCo Transaction").  The Debtors represent that under the MiningCo Transaction, creditors will now receive increased distributions compared to the previously approved Orderly Wind Down, which the Debtor and Committee argue makes a new solicitation and vote unnecessary.

Alternatively, the Debtors and Committee argue that even if the Wind-Down Motion is determined to be a "modification," because no impaired creditors' recoveries are materially

---

[1]    *See Ad Hoc Group of Earn Account Holders' Statement of Position in Support of Exit and Reservation of Rights Regarding Joint Motion of the Debtors and the Committee for Entry Of An Order (1) Approving The Implementation Of The MiningCo Transaction; and (II) Granting Related Relief* (the "Earn Statement," ECF Doc # 4096), to which *pro se* creditors Daniel A. Frishberg, Courtney Burks Steadman, Immanuel J. Herrmann, Rebecca Gallagher, Georges Georgiou, and Mela Stewart filed a joinder (ECF Doc. # 4154); the *Statement of Ignat Tuganov in Support of the Debtors' and Committee's Joint Motion for Entry of an Order Approving Implementation of the MiningCo Transaction* (ECF Doc. # 4136); the *Letter In Support Of: Joint Motion Of The Debtors And The Committee For Entry Of An Order (1) Approving The Implementation Of The MiningCo Transaction And (II) Granting Related Relief* filed by Simon Dixon and David Kahn on behalf of BNK To the Future (ECF Doc. # 4124); and the *Reservation of Rights of the U.S. Securities and Exchange Commission to Joint Motion of the Debtors and the Committee for Entry of an Order (I) Approving the Implementation of the MiningCo Transaction and (II) Granting Related Relief* (ECF Doc. # 4099).

[2]    All capitalized terms not otherwise defined have the definitions set forth in the Plan or the Disclosure Statement (the "Disclosure Statement," ECF Doc. # 3332).

adversely affected, applicable law does not require a new disclosure statement, solicitation, or vote.

On December 21, 2023, the Court held a hearing on the Wind-Down Motion (the "Hearing"). For the reasons explained below, the Court agrees with the Debtors and the Committee. Therefore, the Wind Down Motion is **GRANTED**, and all objections are **OVERRULED.**

## I.    BACKGROUND

The confirmed Plan and Disclosure Statement (ECF Doc. #3332), overwhelmingly approved by creditors, provides two alternative paths forward, depending on regulatory and other approvals: *First*, the NewCo Transaction (as defined below), which included the creation of a public company with multiple lines of business, and *second*, the Orderly Wind Down, which included the creation of a public company focused solely on bitcoin mining. In either scenario, creditors would receive part of their recovery through stock in the newly created company.

The Orderly Wind Down was to be implemented in the event the NewCo Transaction could not be consummated for any reason, including a negative regulatory determination. As it has turned out, the SEC denied relief required to implement the NewCo Transaction. For that reason, the Debtors, with the Committee's support, have switched to the second path approved by creditors: the Orderly Wind Down. Toggling to the Orderly Wind Down requires the Debtors to obtain approval of the Wind-Down Motion, which seeks implementation of the MiningCo Transaction, so the Debtors can emerge from bankruptcy without the attendant cost and delay of soliciting a new plan. (*See* Confirmation Order ¶ 354.)

The Plan also explains that the details of the Orderly Wind Down, including the identity of the mining manager, the budget, fees, and disbursements associated with the Orderly Wind

Down, and the mechanics and procedures to effectuate it, would be included in the Wind-Down

Motion, to be filed on 10 days' notice to creditors, as has been done here.  (Plan Art. I.A.270.)

### A.    The Marketing and Auction Process

In October 2022, the Debtors commenced a robust marketing and sale process for all or

substantially all of their assets.  (Wind-Down Motion ¶ 16.)  On February 15, 2023, the Debtors

announced that they had reached an agreement in principle with NovaWulf Digital Management,

LP ("NovaWulf") for NovaWulf to manage the Debtors' reorganized business.  (*Id.* ¶ 17.)  In the

wake of that announcement, other bidders expressed interest in a similar management structure,

and NovaWulf served as the stalking horse bidder for a plan sponsor transaction.  (*Id.*)

Following an auction, on May 25, 2023, the Debtors filed a *Notice of Successful Bidder and*

*Backup Bidder* (ECF Doc. # 2713), identifying Fahrenheit LLC ("Fahrenheit") as the successful

bidder and the Blockchain Recovery Investment Consortium (the "BRIC") as the backup bidder.

(*Id.* ¶ 18.)

### B.    Plan Confirmation and the SEC Pre-clearance Denial

On November 9, 2023, the Court entered an order confirming the Debtors' chapter 11

plan (the "Confirmation Order," ECF Doc. # 3972, and the chapter 11 plan, the "Plan," Exhibit

A thereto).  The Plan contemplated a primary transaction whereby the Debtors would make an

initial distribution of liquid cryptocurrency, and Fahrenheit as Plan Sponsor would manage and

monetize the Debtors' illiquid assets, including the Bitcoin mining and cryptocurrency staking

operations, as a public company (the "NewCo Transaction").  (Wind-Down Motion ¶ 19.)

Creditors would receive distributions of the NewCo stock in addition to the liquid

cryptocurrency.  (*Id.*)  The NewCo Transaction included $450 million of liquid cryptocurrency

as seed funding.  (Plan Art. I.A.165.)  The NewCo Transaction also included an initial funding of

$39.5 million by US Bitcoin to fund the buildout and energization of mining facilities. (Plan. Art. I.A.161.) Fahrenheit would also be obligated to fund $50 million as its "Plan Sponsor Contribution." (Plan Art. I.A.185.)

The Plan also contemplated a secondary transaction, the Orderly Wind Down ("OWD"), to which the Debtors could "toggle" if the NewCo Transaction was not feasible. (Wind-Down Motion ¶ 23.) If activated, the OWD would eliminate certain provisions related to the NewCo Transaction and substitute provisions for a mining-only public company. (*Id.*) During this time, it was understood that the BRIC would serve as the backup bidder if the Debtors pursued the OWD.

Shortly after the Confirmation Order was entered, the SEC informed the Debtors that it would not approve the pre-clearance letter for the NewCo Transaction, but that it would not require pre-clearance for the Debtors to pursue registration of a mining-only company.[3] (*Id.* ¶ 1.) On November 30, 2023, the Debtors filed the Wind-Down Motion.

## C.    Post-Confirmation Developments

Debtors submit that, since execution of the Backup Plan Sponsor Agreement (entered into with the BRIC), they have made substantial progress preparing for the implementation of the Plan under either the NewCo Transaction or the MiningCo Transaction, which reduces the need for many of the services initially envisioned under the Backup Plan Administration Agreement Term Sheet. (Wind-Down Motion ¶ 29.) These include (1) Christopher Ferraro agreeing to serve as the plan administrator for at least a year (*id.*); (2) negotiating the Litigation

---

[3]      To obtain pre-clearance from the SEC, the Debtors were required to submit audited financial statements to the SEC. While the Debtors' historical Mining business had audited financial statements, the "staking" business that was operated by a different Celsius entity did not have audited financial statements. (Wind-Down Motion ¶ 20.) The SEC was unwilling to waive the requirement. Without pre-clearance, the Debtors concluded it was not feasible to pursue the NewCo Transaction.

Administrator Agreement and distribution agreements with Coinbase and PayPal, which together provide for substantially all the non-mining services contemplated under the Backup Plan Administration Agreement Term Sheet at a major discount (*id*. ¶ 30); (3) eliminating or significantly reducing the need for a number of services by converting altcoins to BTC, ETH, and cash, streamlining the Claims resolution process through the Class Claim Settlement, and monetizing certain illiquid assets (*id.* ¶ 31); (4) acquiring the Cedarvale site through the Core Scientific settlement (*id.* ¶ 32); and (5) retaining RSM US LLP to audit the mining business' financial statements (*id.* ¶ 33).

Accordingly, the Backup Plan Sponsor Agreement with BRIC, which contemplated, *inter alia*, distribution agents, management of illiquid assets, and a separate litigation administrator, is obsolete and non-executable. (*Id.* ¶¶ 27–28; 35.)

### D.    The Wind-Down Motion

The Debtors submit that the decision to toggle to the OWD with US Bitcoin rather than the BRIC fits squarely within the Plan and the Confirmation Order. Though the BRIC was initially identified as the Backup Plan Sponsor on the terms set forth in the Backup Plan Sponsor Agreement, the Plan and Disclosure Statement contemplated that the Debtors "may select a different Backup Plan Sponsor if a different party provides terms superior to those offered by [the] BRIC," and that such other party may be US Bitcoin. (Wind-Down Motion ¶ 25 (quoting Disclosure Statement Art. III.I). *See also id.* Art. II.B.2; Plan Art. IV.E.1 ("Concept eliminated, unless US Bitcoin is selected as the mining manager in connection with the Orderly Wind Down.").) The Backup Plan Sponsor Agreement (with the BRIC) would become operative "subject to a market test." (Wind-Down Motion ¶ 25 (citing Plan Art. IV.E.1).) The Confirmation Order authorizes this process. (*Id.* ¶ 45 (citing Confirmation Order ¶ 354).)

Following news of the SEC pre-clearance denial, the Debtors performed the market check, and determined that US Bitcoin offered terms superior to those the BRIC had offered. (*Id.* ¶¶ 35, 37.)  Accordingly, they argue that the MiningCo Transaction is squarely within the terms of the Plan.  (*Id.* ¶ 45.)

     1. The Campagna Declaration

The Wind-Down Motion is supplemented by the Campagna Declaration.  Campagna is a managing director of Alvarez & Marsal, restructuring advisor to the Debtors.  (Campagna Declaration ¶ 1.)  Attached as Exhibit A to the Campagna Declaration is an illustrative waterfall ("Recovery Waterfall," Campagna Declaration at Ex. A) that illustrates initial cryptocurrency distributions and final recovery to creditors under three scenarios: (1) the original OWD projections, which used prices as of May 31, 2023; (2) the MiningCo Transaction with prices as of May 31, 2023; and (3) MiningCo Transaction with prices as of November 17, 2023. (Recovery Waterfall.)  The full Recovery Waterfall is as follows:

| | Filed Disclosure Statement | | | |
|---|---|---|---|---|
| | Orderly Wind Down (as of 5/31 pricing) | MiningCo (as of 5/31 pricing) | | MiningCo (as of 11/17 pricing) |
| Liquid Cryptocurrency | $ 2,657 | $ 2,657 | | $ 2,941 |
| Less: Post Emergence Costs to the Estate | (163) | (75) | | (75) |
| Less: Litigation Administration Funding | (50) | (50) | | (50) |
| Less: Mining Business Capitalization | (50) | (225) | | (225) |
| **Net Liquid Cryptocurrency** | **$ 2,394** | **$ 2,307** | | **$ 2,591** |
| Less: Distribution to Claims | | | | |
| Administrative Claims | $ (85) | $ (70) | | $ (70) |
| Convenience Class Claims | (242) | (242) | | (242) |
| Custody Claims | (206) | (206) | | (124) |
| Withhold Claims (Eligible 15% Distribution) | (2) | (2) | | (2) |
| **Liquid Crypto Available for Unsecured Claims** | **$ 1,859** | **$ 1,787** | | **$ 2,153** |
| **Illiquid Assets** | **$ 306** | **$ 306** | | **$ 305** |
| Mining Business Valuation | $ 424 | $ 565 | | $ 565 |
| Less: Capitalization presumed in Mining Valuation | (50) | (50) | | (50) |
| Plus: Mining Business Capitalization | 50 | 225 | | 225 |
| **MiningCo Net Asset Value** | **$ 424** | **$ 740** | | **$ 740** |
| **Remaining Distributable Value** | **$ 2,588** | **$ 2,832** | | **$ 3,198** |
| **Total Remaining Claims** | **$ 4,225** | **$ 4,225** | | **$ 4,225** |
| Initial Liquid Cryptocurrency Distribution % | 44.0% | 42.3% | | 51.0% |
| Wind Down Period Illiquid Asset Recovery % | 7.2% | 7.2% | | 7.2% |
| MiningCo Common Stock Recovery % | 10.0% | 17.5% | | 17.5% |
| **Total Recovery %** | **61.2%** | **67.0%** | | **75.7%** |

2.   The BRIC Supplement

The BRIC was originally the Backup Plan Sponsor in the event of the OWD and

following the Debtors' filing of the Wind-Down Motion, indicated that it would seek to enforce

its status as such.  (Wind-Down Motion ¶ 36.)  However, the Debtors and the BRIC came to an

agreement which resolved the BRIC's objection, as outlined in the BRIC Supplement.  Annexed

as Exhibit A to the BRIC Supplement are the material terms of the agreement (the "BRIC Term

Sheet," BRIC Supplement at Ex. A).  The BRIC Term Sheet provides that the final governing

agreement (the "BRIC Agreement") will be substantially similar to the Litigation Administrator

Agreement in the Plan Supplement, except as modified by the BRIC Term Sheet.  (BRIC

Supplement at 10.)  The Debtors have filed a pending motion to file under seal certain portions

of the BRIC Agreement.  (*See* ECF Doc. # 4116.)

Under the BRIC Agreement, the BRIC will serve as Litigation Administrator and will be

responsible for monetizing certain of the Debtors' illiquid assets and certain claims and causes of

action of the Debtors' Estates.  (BRIC Supplement ¶ 3.)  This outcome is expressly contemplated

by the Plan, which permits the Committee to appoint "one or more Litigation Administrators to

prosecute, settle, or otherwise resolve any remaining Disputed Claims."  (*Id.* (quoting Plan Art.

IV.G) (internal quotation marks omitted).)

The Debtors clarify that the resolution with the BRIC does not modify the agreement

with US Bitcoin described in the Wind-Down Motion.  (*Id*. ¶ 4.)  Rather, it is a separate

agreement under which the BRIC will monetize certain illiquid assets for the benefit of the

Debtors' creditors.  (*Id*.)  The fees in the BRIC Agreement will be funded by reductions in the

Plan Administrator and Litigation Oversight Board's initial budgets.  (*Id*. ¶ 5.)  The below table

compares the reallocation of the Wind-Down Budget among the Plan Administrator, the BRIC,

and the Litigation Administrator under each of the NewCo and MiningCo Transactions:

|  | NewCo Transaction | MiningCo Transaction |
|---|---|---|
| **Litigation Administrator Budget** | $50 million | $40 million |
| **Plan Administrator Budget** | $75 million | $70 million |
| **BRIC Litigation Administrator Cash Fee** | $0 | $15 million |
| **TOTAL** | $125 million | $125 million |

(*Id.*)

The BRIC Term Sheet provides that BRIC will be paid $5 million per year, plus a 5%

recovery incentive fee for assets recovered, and 10% of litigation recoveries.  (*Id.* at 11.)

The Debtors add that as a Litigation Administrator, the BRIC will be subject to oversight

by a sub-committee of the Litigation Oversight Committee.  (*Id.* ¶ 6.)  Furthermore, the

Litigation Oversight Committee will approve the BRIC's budget (which will not result in

additional incremental costs to the Debtors' Estates), and the BRIC will bear the cost of any

financial advisors retained for the purpose of assisting it in its role as a Litigation Administrator,

which is the primary justification for the reduction in the applicable budgets and BRIC's cash

fee.  (*Id.*)

     **E.**    **Objections**

The two salient objections are from the UST and the Borrower Group.

     1.  <u>UST Objection</u>

The UST argues that the MiningCo Transaction is a modification to the Plan that requires

a new disclosure statement and vote.

*First*, the UST argues that the MiningCo Transaction is a material and substantial

modification of the Plan as it changes the legal relationships between and among the Debtors,

unsecured creditors, and MiningCo. (UST Objection at 17.) Specifically, the UST asserts that

the MiningCo Transaction changes the mining manager originally contemplated under the Plan

from the BRIC to US Bitcoin. (*Id*. at 18.) The UST indicates that the Debtors have already paid

the BRIC $1.5 million attributable to its breakup fee and reimbursement for its expenses. (*Id*.)

Until the November 30, 2023 hearing, the Debtors supported a pivot to the OWD as proposed

and disclosed in the Plan and Disclosure Statement (the "Original OWD") with the BRIC as the

Backup Plan Sponsor. (*Id*.)

*Second*, the UST argues that the MiningCo Transaction alters substantive rights of

creditors, as it will change the amounts and type of funds recoverable, which will also likely

impact the timing and rate of payments. (*Id*. at 19–20.) Specifically, the UST asserts that the

Plan's current distribution structure required a technical mechanism for determining the

percentage and type of account holders receiving crypto assets versus stock in the proposed

public NewCo. (*Id*. at 20.) In contrast, the UST states that the MiningCo Transaction does not

provide finality regarding the valuation of the stock to be distributed. (*Id*.) The UST thus

concludes that this change materially alters the Plan and the distributions thereunder. (*Id*.)

*Third*, the UST argues that the proposed funding under the MiningCo Transaction is

dramatically different than that proposed under the Plan. (*Id*. at 20.) The UST argues that the

Disclosure Statement, the Plan, the BRIC Term Sheet, the various declarations, and the Wind-

Down Motion use different comparative charts and terminology, making comparison difficult.

(*Id*. at 20–21.) Moreover, the NewCo Transaction included a $450 million contribution from the

Debtors in liquid cryptocurrency as opposed to the Wind-Down Motion's proposal of a $225

million in fiat contribution from the Debtors. (*Id*. at 21.) In contrast, the Original OWD did not

contemplate funding the mining facility over and above the initial $50 million contribution. (*Id*.)

The UST thus argues that if customer cryptocurrency will be used to fund the mining facilities under the MiningCo Transaction, creditors should be allowed to vote on whether to reinvest or distribute it.  (*Id*. at 21.)

*Fourth*, the UST argues that the MiningCo Transaction is missing critical details that would be required by an amended disclosure statement.  (*Id*.)  Specifically, the UST argues that the Wind-Down Motion failed to disclose critical details such as board member compensation of the proposed MiningCo.  (*Id*. at 22.)  The UST thus concludes that a new disclosure statement should be required, and absent such, the Wind-Down Motion should be denied.  (*Id*.)

2.  The Borrower Objection

The Borrower Group argues that the MiningCo Transaction is a material modification as a matter of fact and law, and that this Court lacks jurisdiction to hear the proposed MiningCo Transaction pending appeal of the Confirmation Order.  Counsel for the Borrower Group filed the Villinger Declaration in support of the Borrower Objection.  *Pro se* creditor Anne Yeilding filed the Yeilding Letter in support of the Borrower Objection.

The Borrower Group argues that the MiningCo Transaction has "material impact" on creditors and thus requires new disclosures, re-solicitation, and a new vote.  (Borrower Objection ¶¶ 32, 37.)  Specifically, the Borrower Group argues, the MiningCo Transaction is "materially different from the [Original OWD] because it trebles the previously disclosed capital requirements . . . and diverts $175 million of liquid cryptocurrency from creditors to an equity investment in MiningCo."  (*Id*. ¶ 27.)  There is "nothing in the Disclosure Statement notifying creditors" about a potential diversion of cryptocurrency to an investment in MiningCo.  (*Id*. ¶ 32.)  The Borrower Group argues that the under the Original OWD, but with prices calculated as of November 17, 2023 (rather than May 31, 2023), the initial liquid cryptocurrency distribution

percentage is 4% greater than the MiningCo Transaction as of November 17, 2023 prices.  (*Id.* ¶ 19.)  Further, the Borrower Group argues that the Wind-Down Motion and accompanying declarations failed to recalculate the Recovery Mix (defined below).  By its calculation, the new Recovery Mix reflects a 9% decrease in liquid cryptocurrency.  (*Id.* ¶ 21.)

The Borrower Group also argues that the MiningCo Transaction is a modification of the Plan as a matter of law.  Specifically, the Borrower Group argues that in support of the Wind-Down Motion, the Debtors cite *In re Johns-Manville Corp.*, 920 F.2d 121, 128 (2d Cir. 1990), to justify their position that "changes contemplated by the confirmed plan were not 'modifications.'"  (*Id.* ¶ 33 (citing Wind-Down Motion ¶ 45).)  However, they argue, the Debtors' own press release expressly states they would seek to have the Court "approve modifications to the Plan to reflect the [MiningCo Transaction]," contradicting their current statements.  (*Id.* (citing Notice of Press Release, ECF Doc. # 4017 at Ex. A).)  The Borrower Group further argues that the Plan provided an alternative to the NewCo Transaction in the form of the Original OWD.  (*Id.* ¶ 37.)  Accordingly, the Borrower Group emphasizes that the most expeditious way forward is to implement the Original OWD, and anything else would require a re-solicitation.  (*Id.* ¶¶ 37, 39.)  The Villinger Declaration supports the Borrower Objection, arguing that the terms of the MiningCo Transaction were not adequately disclosed, and seeks leave for Mr. Villinger to change his vote on the Plan.  (Villinger Declaration ¶ 11.)

Finally, the Borrower Group argues that this Court lacks jurisdiction to decide the Wind-Down Motion because the requested relief seeks to revise the Confirmation Order, which is currently on appeal.  (Borrower Objection ¶¶ 40–42.)

### F.      The Joint Reply

The Debtors firmly maintain that the MiningCo Transaction is not a modification, but even if it were, it would only require re-solicitation if the modification was material *and* adverse, which is not the case here, as creditors will receive increased recoveries—specifically, $294 million more than under the Original OWD.  (Reply ¶¶ 6, 24.)

They argue that the change from $50 million to $225 million is a "budget and disbursement" detail of the OWD over which they had discretion.  (*Id.* ¶ 7; *see also id.* ¶ 20 (citing Disclosure Statement at 12).)  Furthermore, there is "no meaningful economic difference to creditors between a dollar of Liquid Cryptocurrency distribution and a dollar added to the balance sheet of MiningCo when creditors get the value either way."  (*Id.* ¶ 7.)  They point out that both the rise in cryptocurrency prices and the progress made since the Disclosure Statement was filed results in more liquid cryptocurrency recovery than projected under the Original OWD. (*Id.* ¶ 9.)  They also take issue with the Borrower Group's calculations which ignore the "$88 million of cost savings" realized through the current agreement, as well as the increased value of MiningCo.  (*Id.* ¶ 23.)

Debtors maintain that the Court retains jurisdiction because Wind-Down Motion relates to *implementation* of a plan.  (*Id.* ¶ 46.)  And even if the MiningCo Transaction was a modification, the issues on appeal are unrelated, and the Court retains jurisdiction over the issues relevant to the Wind-Down Motion (*i.e.*, the terms of the OWD).  (*Id.* ¶¶ 47–48.)

## II.   <u>LEGAL STANDARD</u>

### A.      Modification of a Plan

Section 1127(b) of the Bankruptcy Code provides, in relevant part:

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such

16

plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

11 U.S.C. § 1127(b).

Modification of a confirmed plan is thus only permitted if: (a) it is done by a "proponent of a plan or the reorganized debtor," (b) it occurs before "substantial consummation" of the plan; (c) the plan as modified meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; (d) the proponent complies with the disclosure requirements of section 1125; (e) circumstances warrant such modification; and (f) the court, after notice and a hearing, confirms the modified plan under section 1129 of the Bankruptcy Code.  11 U.S.C. § 1127(b).

Accordingly, any modification must comply with section 1122's restrictions on the classification of claims and interests and section 1123's requirements for the contents of a reorganization plan.  *Id*.  Thus, unless the disfavored class members consent, a modified plan must "provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).  There are also procedural constraints.  A modification must comply with section 1125's requirement that claim and interest holders be given adequate information about the contents of a plan.  11 U.S.C. § 1127(c).

Modification is not defined in section 1127 of the Bankruptcy Code.  *See, e.g., State Government Creditors' Committee for Property Damage Claims v. McKay* (*In re Johns-Manville Corp.*) ("*Johns-Manville I*"), 920 F.2d 121, 128 (2d Cir. 1990); *Cohen v. Tic Fin. Sys.* (*In re Ampace Corp.*), 279 B.R. 145, 152 (Bankr. D. Del. 2002).  Courts generally determine whether a modification has been proposed on a case-by-case basis.  *See In re Boylan*, 452 B.R. 43, 47 (Bankr. S.D.N.Y. 2011) (citing 7 COLLIER ON BANKRUPTCY, ¶ 1127.03 (16th ed. Rev. 2011)).

One consideration is the distinction between a "modification" and a "clarification" of a plan.  If the change is simply a clarification, then the requirements of section 1127 of the Bankruptcy Code do not apply.  If the change is a modification, however, then the requirements of section 1127 must be met.  *See, e.g., In re Oakhurst Lodge, Inc.*, 582 B.R. 784, 798 (Bankr. E.D. Cal. 2018) ("A settlement that 'alters the legal relationships among the debtor and its creditors' under the confirmed plan constitutes a plan modification."); *see also Matter of Highland Capital Management, L.P.*, 57 F.4th 494, 503 (5th Cir. 2023) (holding that a change that "alters the parties' rights, obligations, and expectations" constitutes a plan modification).

The Second Circuit has delineated between "procedural" modifications, which may be permitted to the extent the Bankruptcy Court's authority to order such procedural modifications is reserved by the plan and such modification does not impact the "substantive rights" of claimants.  *See, e.g., Johns-Manville I*, 920 F.2d 121, 128 (2d Cir. 1990) (finding that because the proposed modification was sought pre-consummation and the class members' substantive rights would not be altered, it was permissible); *Findly v. Blinken (In re Johns-Manville Corp.)* ("*Johns-Manville II*"), 982 F.2d 721 (2d Cir. 1992) (holding, in part, that plan modification violated section 1127(b) because it would modify the rights of health claimants under the confirmed plan by changing the rights as to amounts recoverable and as to timing and rate of payments).

Only when a modification is substantive—*i.e.*, it materially and adversely affects claimants—are they entitled to a new disclosure statement and another opportunity to vote.  *In re Sentinel Management Group, Inc.*, 398 B.R. 281, 301 (Bankr. N.D. Ill. 2008) (stating that "a new disclosures statement is not required in every instance where a modification is made"); *In re American Solar King Corp.*, 90 B.R. 808, 825 (Bankr. W.D. Tex. 1988) (citing S. Rep. No. 989,

18

95th Cong, 2d Sess. 124 (1978), U.S. Code Cong. & Admin. News 1978, p. 5910) (stating that if a "modification materially and adversely affects any of [the voting parties'] interests, they must be afforded an opportunity to change their vote"). *See also In re Am.-CV Station Grp., Inc.*, 56 F.4th 1302, 1309 (11th Cir. 2023) (holding that debtor must provide a new disclosure statement and call for another round of voting if "after a hearing, the bankruptcy court finds that the modification 'materially and adversely changes the way that claim or interest holder is treated'").

Moreover, the requirements of section 1127 apply even when the plan documents in question contemplate the possibility of amendments. *In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 816 (S.D.N.Y 1997) ("The fact that the lease in this case . . . contemplated consensual modifications by the parties is of no consequence, as the surrender of the right of first refusal was an integral part of the reorganization plan and confirmation order.").

### III.    DISCUSSION

The Plan and Disclosure Statement explicitly provide for the possibility of an alternate Backup Plan Sponsor on terms superior to those negotiated with the BRIC. The Confirmation Order authorizes this toggle if "the Debtors, the Committee, and their respective advisors determine in good faith that, consistent with their fiduciary duties, an Orderly Wind Down is in the best interest of the Estates." (Confirmation Order ¶ 354.) Thus, the inquiry is (1) whether the terms of the US Bitcoin deal are better than those of the BRIC deal, and (2) if so, whether any of the modified terms are materially adverse to creditors such that the change (although contemplated) nevertheless constitutes a modification requiring re-solicitation.

The Court finds that the MiningCo Transaction falls within the terms of the Plan and is thus not a modification. However, even if it were a modification, the Court finds that it would not be materially adverse to creditors, and thus would not require re-solicitation.

The Borrower Group's argument is that the Court should order the Debtors to pursue the Original OWD. This is not possible. Given the many outdated and obsolete terms, the two paths available to the Debtors are the MiningCo Transaction, or a re-solicitation and re-voting on the MiningCo transaction that would drain significant value from the Debtors' Estates and further delay recoveries. The UST and Borrower Group's argument that the MiningCo Transaction is a modification is flatly contradicted by the language of the Plan and Disclosure Statement.

A. **The Plan and Disclosure Statement Contemplate an Alternate Backup Sponsor**

Article I.A of the Plan contains the following relevant definitions:

17. "*Backup Plan Administration Agreement Term Sheet*" means the term sheet attached to the Backup Plan Sponsor Agreement as Exhibit A that contains the terms and conditions under which the BRIC has agreed to serve as the Plan Administrator in the event that the Orderly Wind Down is consummated.

18. "*Backup Plan Sponsor*" means the BRIC.

19. "*Backup Plan Sponsor Agreement*" means that certain agreement, dated June 7, 2023, by and among the Debtors, the Committee, and the BRIC, including all exhibits, annexes, and schedules thereto, as such agreement may be amended, restated, amended and restated, modified, or otherwise supplemented from time to time in accordance with its terms.

20. "*Backup Plan Sponsor Transaction*" means, as contemplated by the Backup Plan Sponsor Agreement, an Orderly Wind Down, including: (a) the creation of the Backup MiningCo; (b) a Liquid Cryptocurrency distribution to creditors on or as soon as practicable after the Effective Date; and (c) a timely monetization of the remaining assets of the Debtors' estates and subsequent Liquid Cryptocurrency distributions to creditors from the proceeds thereof.

(Plan Art. I.A.17–20.)

Section IV.E.1 of the Plan describes the process by which the Debtors could elect to

toggle to the OWD.  It contains a chart summarizing the changes between the NewCo

Transaction and the OWD.  Selected relevant entries are as follows:

| Orderly Wind-Down Plan Changes | |
| --- | --- |
| **Provision/Concept** | **Change** |
| **NewCo** | Concept eliminated, replaced in certain places with "Post-Effective Date Debtors" and "Plan Administrator," as further described herein and as applicable. Related concepts, such as "NewCo Capitalization Amount" will similarly be eliminated. |
| **Plan Sponsor Contribution** | Concept eliminated.  Related concepts, such as "Management Compensation" (and its component concepts) will similarly be eliminated. |
| **NewCo Common Stock** | Concept eliminated, replaced with "Backup MiningCo Common Stock" and "Illiquid Recovery Rights," as applicable. |
| **Unsecured Claim Distribution Mix Elections** | Concept eliminated, all Holders of Claims to receive Pro Rata share of consideration without adjustment for Unsecured Claim Distribution Mix Elections. |
| **Wind-Down Procedures** | Concept to become operative.  As provided herein, the Debtors shall file the Wind-Down Procedures within fourteen (14) days of the decision to implement an Orderly Wind Down, in connection with the Wind- Down Motion.  Such procedures shall provide additional details regarding the Wind-Down Assets, the Wind- Down Budget, the identity of the Mining manager, and any revisions to the Wind-Down Procedures and shall be subject to approval by the Bankruptcy Court in connection with Wind-Down Motion.  Related concepts shall similarly become operative. |
| **Backup Plan Sponsor & Backup Plan Sponsor Transaction** | Concept becomes operative, *subject to a market test of the fees contained in the Backup Plan Administrator Term Sheet*; *provided* that (i) Liquid Cryptocurrency, (ii) the Backup MiningCo Common Stock, (iii) Illiquid Recovery Rights, and (iv) Litigation Proceeds shall be distributed according to this Plan, as revised to reflect the toggle to the Orderly Wind Down. |
| **US Bitcoin Agreements** | Concept eliminated, *unless US Bitcoin is selected as the Mining manager* in connection with the Orderly Wind Down. |

(Plan Art. IV.E.1 (emphasis added).)

The "Backup Plan Sponsor" is defined as the BRIC in Article I.A.18 of the Plan, but as

set forth in Article IV.E.1, that definition (and the related definition of "Backup Plan Sponsor

Transaction") become operative "subject to a market test of the fees." (Plan Art. IV.E.1.)  The

language of the Plan clearly thus provides for the possibility of an alternate Backup Plan

Sponsor: specifically, it contemplates the selection of US Bitcoin, whose agreements are

terminated "unless [it] is selected as the Mining manager." (*Id.*)

> The Disclosure Statement clearly describes this possibility as well:

> If the Debtors pivot to the Orderly Wind Down, they will do so on the terms set
> forth in the Backup Plan Sponsor Agreement that they have negotiated with the
> Backup Plan Sponsor, [the BRIC] . . . *or on terms that provide a better recovery* to
> the Debtors' creditors than the Backup Plan Sponsor Agreement, which terms *may
> be with a different Backup Plan Sponsor* than the BRIC . . . . *The Debtors may
> select a different Backup Plan Sponsor if a different party provides terms superior
> to those offered by BRIC.*

(Disclosure Statement Art. III.I. (emphasis added); *see also id.* Art. II.B.2 (same).)

Because the Disclosure Statement and Plan explicitly contemplate and allow for the

introduction of an alternate Plan Sponsor, the Borrower Group and UST's argument that it is a

*per se* modification under the Plan fails.

> **B.     The Debtors Meet the Plan's Requirements to Switch Backup Plan Sponsors**

Under the terms of the Plan, the Backup Plan Sponsor Transaction becomes operative

"subject to a market test of the fees" in the Backup Plan Administrator Term Sheet. (Plan Art.

IV.E.1.)  The Disclosure Statement echoes this, providing that Debtors may select "a different

Backup Plan Sponsor if a different party provides terms superior to those offered by BRIC."

(Disclosure Statement Art. III.I.)  The "terms" of an agreement with a backup bidder would

include, *inter alia*, items such as management fees, disbursement timelines, and control

provisions.  Debtors must thus demonstrate that the terms of the agreement with US Bitcoin are

superior.

22

The Disclosure Statement further requires that the pivot "provide a *better recovery* to the Debtors' creditors than the Backup Plan Sponsor Agreement." (Disclosure Statement Art. III.I (emphasis added); *id.* II.B.2 (stating the same).) Thus, the MiningCo Transaction must provide creditors with a higher recovery as compared to the Original OWD, the recoveries for which were calculated as of May 31, 2023 (the "Original OWD Recoveries").

The MiningCo Transaction must meet the requirements of the Plan and Disclosure Statement, such that (1) the terms negotiated with US Bitcoin must be superior to those negotiated with the BRIC, and (2) recoveries under the MiningCo Transaction must be better than the Original OWD Recoveries. The Court finds that both conditions are met.

       1.   <u>Comparison of Terms</u>

Although the relevant inquiry is between the US Bitcoin transaction and the BRIC transaction, in many places the Debtors frame the comparison as between the MiningCo Transaction and the NewCo Transaction. Debtors submit that "[t]he terms and economics of the proposed US Bitcoin-led MiningCo Transaction, while substantively similar to the terms agreed to as part of the broader Fahrenheit NewCo Transition, are now meaningfully improved from an economic and qualitative perspective." (Wind-Down Motion ¶ 37.) Included in the Wind-Down Motion is the following comparison of the terms of NewCo versus the MiningCo:

| Term | NewCo Transaction | MiningCo Transaction |
|---|---|---|
| **Contributed Assets** | Mining Assets, DeFi Cryptocurrency Assets, Institutional Loan Portfolio, and PE & VC Investments | Mining Assets (remainder of assets to be monetized by Plan Administrator and Litigation Administrator) |
| **Capitalization Amount** | $450 million of Liquid Cryptocurrency | $225 million in fiat |
| **Initial Business Lines** | Bitcoin Mining, Ethereum Staking, Monetizing Illiquid Assets | Bitcoin Mining |

| | | |
|---|---|---|
| **Equity Investment (*i.e.*, Plan Sponsor Contribution)** | $33,188,119 initially; total of $50 million if management agreement is extended to five years | $12,752,400 initially; total of $15,940,500 if management agreement is extended to five years |
| **Management Fee and Mining Management Fee** | Total of $35 million per year<br><br>• Management Fee to Fahrenheit: $20 million per year (one third of which would be paid to US Bitcoin)<br><br>• Management Fee to US Bitcoin: $15 million per year | Total of $20,376,200 per year to US Bitcoin, inclusive of both management and mining management services |
| **Equity Fee** | 5% of Newco Common Stock on a fully diluted basis | 1.28% of MiningCo Common Stock in both restricted stock units and warrants on a fully diluted basis (equivalent to US Bitcoin's share of the equity fee owed under the NewCo Transaction) |
| **Estimated Liquid Cryptocurrency Distributions** | Approximately $2.03 billion (using cryptocurrency prices as of May 31, 2023). | Approximately $2.6 billion (consisting of changes in cryptocurrency prices from May 31, 2023 through November 17, 2023, plus additional Liquid Cryptocurrency available for distribution pursuant to the MiningCo Transaction) |
| **Composition of Board of Directors** | Nine members:<br>• three of whom will be appointed by the Plan Sponsor;<br>• four of whom will be appointed by the Committee in its sole discretion; and<br>• two of whom will be appointed by the Committee and consented to by the Plan Sponsor.<br><br>Identities of the New Board were set forth in the Plan Supplement and approved by the Court.<br><br>Three Board Observers. | Eight members:<br>• the six members previously appointed by the Committee and approved by the Court; and<br>• two members to be appointed by US Bitcoin, expected to be Asher Genoot and Jordan Levy.<br><br>Three Board Observers (same as previously approved by the Court). |

(*Id.* ¶ 9.)

24

However, as stated above, the relevant comparison is between the terms of the *BRIC* transaction and the US Bitcoin transaction, which they do not provide as explicitly. The UST raises this concern as well: "[t]he Disclosure Statement, the Plan, [t]he BRIC Term Sheet, the various declarations, and the [Wind-Down] Motion, all use different comparative charts and, in some instances, different terminology, making comparison difficult." (UST Objection at 20.)

Because of the many developments in the case between the BRIC Agreement and now, many of the terms in that agreement are now obsolete, so it is not a direct apples-to-apples comparison. Indeed, many of those terms are now filled in by an array of other agreements, including agreements with crypto distribution agents, the BRIC Agreement, and, of course, the terms of the MiningCo Transaction. These terms span a variety of dimensions, including management fees, services to be provided, board composition, control provisions, and the like. Many of these are within the business judgment of the Debtors. Accordingly, the Court focuses on the more measurable and more salient impact on the *creditors*: namely, the recoveries they receive.

### 2.   Borrower Group Objection

The Borrower Group's chief objection is that the Wind-Down Motion provides (1) less initial cryptocurrency recovery and (2) an overall smaller portion of the total recovery in liquid cryptocurrency, when comparing to the Original OWD calculated with cryptocurrency prices as of November 17, 2023.

The Borrower Group is the only creditor constituency that has objected, and indeed, only objected after its five-person steering committee resolved to do so on behalf of its approximately 70-member constituency, which was not asked to vote on filing an objection. (*See* December 21, 2023 Hr'g Tr. 112:12–20, 113:6–12 (Adler) (conceding the foregoing).) Every other

constituency and creditor that spoke in connection with the Wind-Down Motion, with the

exception of *pro se* creditors Cathy Lau and Anne Yeilding, were in support: the Earn Group

filed the Earn Statement, to which Ignat Tuganov and *pro se* creditors Daniel A. Frishberg,

Courtney Burks Steadman, Immanuel J. Herrmann, Rebecca Gallagher, Georges Georgiou, and

Mela Stewart filed joinders (ECF Doc. ## 4136, 4154); Simon Dixon and David Kahn, on behalf

of BNK to the Future, also filed a letter in support (ECF Doc. # 4124). Many of those parties re-

voiced their support at the Hearing, to which other *pro se* creditors joined.[4]

For the members of the Borrower Group who are seeking to refinance loans, the amount

of liquid cryptocurrency that makes up the total distribution is particularly important. (*See*

Borrower Objection ¶ 32 (noting that certain borrowers "need every coin in connection with a

potential refinance").) Accordingly, the Borrower Group (or, at least, its steering committee) is a

single-issue voter: it cares only about the absolute amount of liquid cryptocurrency distribution.

It recognizes the higher absolute distributions available under the MiningCo Transaction but is

prepared to forego that higher recovery—not only for itself, but on behalf of the entire creditor

body—in single-minded pursuit of its goal.

The Borrower Group argues for implementation of the Original OWD, which, at 11/17/23

prices, it argues offers marginally more liquid cryptocurrency than the MiningCo Transaction.

(*Id.* at 2.) However, the plan it proposes is not on the table: the Original OWD depended on a

now-obsolete agreement that is not ready to spring into action. In no world would pursuing it be

the "most expeditious way forward." (*Id.* ¶ 39.) Attempting to pursue it would mean reviving it

piecemeal and incurring additional expenses through the delay, and ultimately likely re-

solicitation of the very MiningCo Transaction currently before the Court, or an even more

---

[4]   *See e.g.*, December 21, 2023 Hr'g Tr. 123:22–22 (Holcomb); *id.* 126:10–13 (Khanjula).

expensive version.  (*See* December 21, 2023 Hr'g Tr. 128:22–23 (Koenig) (stating that if the Wind-Down Motion was denied, the Debtors would need to resolicit the MiningCo Transaction at its current price or higher).)

The Borrower Group asserts that "[t]here is no reason why the Original OWD Plan with its $50 million capitalization should not be implemented."  (*Id.* ¶ 37.)  But there is a good reason.  In fact, there are many good reasons.  (*See* Wind-Down Motion ¶¶ 29–34 (detailing progress made on negotiating Litigation Administrator agreements, negotiating lower fees, engaging crypto distribution agents, streamlining the Claims resolutions process, monetizing illiquid assets, acquisition of the Cedarvale site, engaging auditing agents, and reducing headcount).)  The BRIC, which was contemplated under the Original OWD to serve as Plan Sponsor, has entered into a separate agreement with the Debtors.  (*See generally* BRIC Supplement.)  Further, as the Puntus Declaration explains, the Debtors do not face a choice between capitalizing a mining company with $50 million or capitalizing it with $225 million: during the post-confirmation market check "all bidders proposed a capitalization amount for MiningCo consistent with or higher than the $225 million capitalization amount ultimately agreed to with US Bitcoin."  (Puntus Declaration ¶ 12.)  This reflects both the increase in value of the mining company ($740 million, the value at which US Bitcoin is investing) and the build-out cost for the Cedarvale site, which Debtors had not yet acquired when the initial calculations were made.[5]  (*Id.* ¶¶ 12, 14.)

Accordingly, the Borrower Group's numbers valuing the Original OWD at 11/17/23 prices, which they argue offer better liquid cryptocurrency recovery, would need to be steeply

---

[5]     Cedarvale was acquired by Celsius as part of a Rule 9019 settlement approved by the Court without any objections.  (*See* ECF Doc. # 3725.)  The build-out of Cedarvale was going to require a capital investment by Celsius.

discounted, as they take none of the above into account.[6]  Further, the *Original OWD at 11/17/23*

*prices is not the relevant point of comparison:* the Debtors only need to provide better recoveries

than the OWD that was disclosed and voted on, the Original OWD Recoveries, which were

based on the May 31, 2023 prices.

### a.   Less Initial Cryptocurrency Recovery

The Borrower Group argues first that the Recovery Waterfall is missing a column,

namely the Original OWD with pricing as of November 17, 2023, which provides ~4% greater

liquid cryptocurrency recoveries than the MiningCo Transaction with November 17, 2023

pricing.  (Borrower Objection ¶ 19.)  The relevant numbers are compared below, with the

Borrower Group's calculation in bold:

| | OWD | | MiningCo | |
|---|---|---|---|---|
| **Pricing Date** | 5/31/23 | **11/17/23** | 5/31/23 | 11/17/23 |
| **Initial Crypto Distribution** | 44% | **54.75%** | 42.3% | 51.0% |
| **Total Recovery %** | 61.2% | **72.0%** | 67.0% | 75.7% |

(Recovery Waterfall; Borrower Objection ¶ 18.)

The Borrower Group argues that because the Original OWD at 11/17/23 prices provide

more liquid cryptocurrency than MiningCo recoveries at 11/17/23 prices, the MiningCo

Transaction is a material modification.  (Borrower Objection ¶ 19.)  However, this argument fails

for at least two reasons.

*First*, although cryptocurrency prices have changed, under the terms of the Plan and

Disclosure Statement, the Debtors are only required to secure better terms than in the Plan *as*

---

[6]    During the Hearing, Simon Dixon estimated that the attendant costs of pursuing the Borrower Group's
proposal would result in $48 million *less* in cryptocurrency distributions.  (*See* December 21, 2023 Hr'g Tr. 109:6–
10 (Dixon).)

*proposed and approved*—namely, as of the 5/31/23 pricing, the Original OWD Recoveries. That

provides a liquid cryptocurrency recovery of 44%. If the MiningCo Transaction were

implemented at those prices, it would result in the lower initial distribution of 42.3%; however,

at current prices, and with the other cost savings and progress the Debtors have made, the initial

cryptocurrency distribution is 51%. Fifty-one percent is greater than 44%—the Debtors thus

clear the threshold of providing "better recovery" on this metric.

### b.  Different Recovery Mix

Borrower Group also argues that the Original OWD at 11/17/23 prices provide for 9%

more liquid cryptocurrency as a portion of the overall mix (the "Recovery Mix") than the

MiningCo Transaction. (*Id.* ¶ 21.) The Borrower Group calculates the Recovery Mix as follows:

| | OWD | | MiningCo | |
|---|---|---|---|---|
| **Pricing date** | 5/31/23 | 11/17/23 | 5/31/23 | 11/17/23 |
| **Liquid Crypto %** | 71.8% | 76.04% | - | 67.32% |
| **Asset Distribution %** | 11.82% | 10.03% | - | 9.54% |
| **MiningCo Stock %** | 16.38% | 13.94% | - | 23.14% |

(*Id.* ¶ 21.)

Similar to the above, the Borrower Group's figure of 9% is a result of comparison to the

pie-in-the-sky Original OWD at 11/17/23 prices, which is not the relevant comparison.

However, even comparison to the relevant number—the Original OWD Recovery of 71.8%—the

point remains that the mix of liquid cryptocurrency is still 4.48% higher under the Original OWD

than the MiningCo Transaction at 11/17/23 prices. As stated above, the Borrower Group is

particularly concerned with the portion of the total recovery received in liquid cryptocurrency.

While the Debtors argue that the capitalization of MiningCo is "at least an economically

equivalent result for creditors," a reduction of even a few percentage points in liquid

cryptocurrency distribution is material to the Borrower Group, and it is not for the Debtors to unilaterally decide that a dollar worth of cryptocurrency is equivalent to a dollar worth of equity. (Puntus Declaration ¶ 14; Borrower Objection ¶ 19; December 21, 2023 Hr'g Tr. 76:6–15 (Bonsall).)

The Court is mindful of this fact. If the MiningCo Transaction would provide for the exact same *amount* of recovery while redistributing the Recovery Mix—*i.e.*, changing the amounts of each "ingredient" in the recovery "salad"—this 4.48% difference could potentially raise a significant concern. However, as the Debtors' uncontroverted papers show, this is not the situation at hand. The Debtors are giving each creditor a *bigger* salad, which contains different proportions of each original ingredient; but crucially, the new salad contains *at least as much* of each ingredient as the original salad did.

The Debtors thus clear the hurdle of providing a better recovery to creditors. The MiningCo Transaction at 11/17/23 prices still provides a higher *absolute* amount of liquid cryptocurrency than the Original OWD Recovery, as set forth below:[7]

|  | OWD | MiningCo |
|---|---|---|
| Pricing date | 5/31/23 | 11/17/23 |
| Total Recovery % of Claim | 61.28% | 75.69% |
| Liquid Crypto as % of Recovery | 71.80% | 67.32% |

(Borrower Objection ¶¶ 20–21.)

---

[7]    This illustration use the average numbers provided in the Campagna Declaration and Borrower Objection, but the Reply singles out the Class 2 Retail Borrower Claims as follows: "Retail Borrowers currently stand to receive approximately 89% of their claims under the MiningCo Transaction (based on November 17, 2023 prices)— a 6% increase when compared with the projected recoveries for Class 2 (Retail Borrower Deposit Claims) under the [Original OWD]." (Reply ¶ 44.) Thus, the recovery in absolute terms of liquid cryptocurrency for the Class 2 Retail Borrowers would accordingly be even higher.

Taking an illustrative claim of $100, under the Original OWD, a creditor would receive 71.8% of $61.28 in cryptocurrency, which equals $43.99 worth of cryptocurrency. That same $100 claim under the MiningCo Transaction would receive 67.32% of $75.69 in cryptocurrency, which equals *$59.95* worth of cryptocurrency. Thus, when comparing the amount of cryptocurrency in the original "salad" to the new "salad," although the overall proportion is lower, the MiningCo "salad" still results in a higher absolute amount of cryptocurrency distributed to each creditor. The MiningCo Transaction thus satisfies condition of better recovery than the Original OWD.

Accordingly, the Court is not in the position of "weighing whether the modification is so adverse that a creditor would be apt to reconsider acceptance." *In re Frontier Airlines, Inc.,* 93 B.R. 1014, 1023 n.3 (Bankr. D. Colo. 1988). When considering the numbers that the MiningCo Transaction needs to beat (the Original OWD Recoveries), as opposed to the Borrower Group's infeasible proposal of the OWD at 11/17/23 prices (even before discounting for delay), the numbers clearly show that the MiningCo Transaction provides better recoveries.

### C.      Section 1127(b) Is Not Triggered

In the Disclosure Statement, the Debtors notified creditors that a vote to accept the Plan would be a vote "to accept both the NewCo Transaction and the Orderly Wind Down." (Wind-Down Motion ¶ 25 (citing Disclosure Statement Art. III.I, III.HHH).) Creditors voted on the Plan and the recoveries described thereunder, and on an OWD that allowed for the selection of an alternate Backup Plan Sponsor so long as the terms of the deal were no worse than set forth in the Backup Plan Sponsor Agreement. The selection of US Bitcoin is therefore not a modification of the plan, and section 1127(b) is not *per se* triggered.

However, even a change contemplated by the Plan cannot run afoul of section 1127(b). *Ionosphere Clubs, Inc.*, 208 B.R. at 816. Any change that "materially and adversely changes the way that a claim or interest holder is treated" qualifies as a modification and entitles claimants to new disclosure and an opportunity to change their vote. *In re Am.-CV Station Grp., Inc.*, 56 F.4th at 1305; *see also In re American Solar King Corp.*, 90 B.R. at 825. The UST and Borrower Group both argue that the MiningCo transaction is a such modification. For the reasons below, their arguments are without merit.

The UST argues that the MiningCo Transaction is a modification because it changes the mining manager: "[u]nder the Plan, if the Debtors were to pivot from the [NewCo] Transaction, the Debtors would transition to a mining only business which would be managed by [t]he BRIC." (UST Objection at 18.) However, as explained above, the Plan explicitly allows for the possibility of an alternate Backup Plan Sponsor. Accordingly, this is not a "modification," and does not require additional disclosure. This also renders moot the Borrower Group's concern that this Court does not have jurisdiction over the Wind-Down Motion because there are appeals pending, which is discussed further below.

The UST further argues that the MiningCo Transaction "[alters] the substantive rights of all of the Debtors' creditors" because it "will change the amounts and type of funds recoverable, which will also likely impact timing and rate of payments." (UST Objection at 19.) This concern is echoed by the Borrower Group, for which the toggle to receive more liquid cryptocurrency was especially important, and which is concerned about the change in Recovery Mix. (Borrower Objection ¶¶ 11, 22.)

To the first point, because the MiningCo Transaction is within the letter of the Plan, creditors have not modified their legal relationships. (Reply ¶ 31.) Further, their substantive

rights are not affected, as the MiningCo Transaction will "provide unsecured creditors with their Pro Rata portion of the same four types of distributions to creditors set forth in the [Original OWD]" and no creditor's recovery will be "reduced or augmented disproportionately with respect to other creditors." (*Id.* ¶ 34.)

Although the Borrower Group had bargained for the Unsecured Claim Distribution Mix Election (to receive more or less liquid cryptocurrency or stock, the "Mix Election"), the Mix Election was only valid for the NewCo Transaction. The Plan provides that the concept is eliminated in the event of an Orderly Wind Down. (*Id.* ¶ 28.) Under the Plan, the Mix Elections are "eliminated, [and] all Holders of Claims receive Pro Rata share of consideration without adjustment for [Mix Elections]." (Plan Art. IV.E.1.) Because the Plan uniformly removes the effect of the elections, it does not provide different treatment to similarly situated creditors, it does not violate section 1123(a)(4) of the Bankruptcy Code.

The Debtors have carried their burden of showing that creditors are not materially or adversely harmed—on the contrary, they are receiving better distributions. The only creditor constituency to object, the Borrower Group, has put forth an entirely unrealistic third option. Its arguments that its rights or recoveries are harmed do not hold up: it uses an impossible third option, inflated with today's prices (when the Original OWD Recoveries are the relevant comparison point), fails to account for the costs of the additional months in bankruptcy of attempting to pursue that option (estimated during the hearing as $20 million *per month* of delay),[8] and laments the marginal reduction in the proportion (but not absolute amount, the relevant comparison point) of liquid cryptocurrency in their Recovery Mix. But this does not amount to a material adverse change. Creditors, including the Borrower Group, receive

---

[8]    *See* December 21, 2023 Hr'g Tr. 99:15 (Kuhns); *id.* 108:18–20 (Dixon).

increased overall recoveries that provide for increased absolute recovery of liquid cryptocurrency.  Thus, Section 1127(b) (and the attendant sections it implicates) are not triggered.

### D.    The Pending Appeal Does Not Divest the Bankruptcy Court of Jurisdiction to Rule on the Motion

Bankruptcy courts commonly implement unstayed, confirmed plans while an appeal of the plan is pending.  *See In re Roman Catholic Diocese of Rockville Centre*, 652 B.R. 226, 234 (Bankr. S.D.N.Y. 2023) ("Debtor cites authority for the uncontroversial assertion that confirmed and unstayed plans are routinely enforced pending appeal."); *In re Prudential Lines, Inc.*, 170 B.R. 222, 244 (S.D.N.Y. 1994) ("[I]t has long been held that in the absence of a stay pending appeal of the plan confirmation, the bankruptcy court is entitled to implement the plan.").

Bankruptcy courts are not "divested of jurisdiction 'to decide issues and proceeds different from and collateral to those involved in the appeal.'"  *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 679 (Bankr. S.D.N.Y. 2016) (citing *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (S.D.N.Y. 2001)).  If an appeal "divested bankruptcy courts of jurisdiction over all issues relevant to confirmation," it "would lead to an absurd result" such that "[the Bankruptcy Court] would effectively cede control of the conduct of a chapter 11 case to disappointed litigants."  *Id*. at 681.  Therefore, to the extent the Court determines that the Wind-Down Motion implements the terms of the confirmed Plan, it has jurisdiction to enter the proposed order approving the Wind-Down Motion.

The Court also has jurisdiction even if the Wind-Down Motion results in a modification to the Plan and Confirmation Order.  Courts that have considered the effect of the divestiture of a bankruptcy court's jurisdiction to modify a confirmation order that has been appealed have held that a bankruptcy court may enter an order modifying a plan where such modifications do not

impact the issues on appeal. *See In re Commodore Corp.*, 87 B.R. 62, 64 (Bankr. N.D. Ind. 1987) (approving a technical modification to change the effective date of the plan finding the modification did "not impact those issues on appeal"); *In re Brown*, No. 6:07-CV-316-ORL-31, 2007 WL 3326684, at *1 (M.D. Fla. November 6, 2007) (affirming the bankruptcy court's entry of a modified confirmation order that withheld a portion of plan distributions finding the modification had no impact on an appeal that raised issues of "good faith (or lack thereof) in filing . . . and ability to make [] payments").

Three creditors have appealed the Confirmation Order. (*See Notice of Appeal*, ECF Doc. # 4032; *Notice of Appeal and Statement of Election*, ECF Doc. # 4033; *Notice of Appeal*, ECF Doc. # 4039). These appeals do not prevent this Court from approving the Wind-Down Motion.

The statements of issues filed with respect to two of the three appeals raise discrete issues, including the ownership of loan collateral and the scope of the releases and exculpation in the Plan. (*See Statement of Issues and Designations of Items to Be Included in the Record for Johan Bronge's Appeal in Celsius Case 22-10964*, ECF Doc. # 4065; *Appellant's Designation of the Record and Statement of Issues to be Presented on Appeal*, ECF Doc. # 4083). While the Court has previously found that it "does not have jurisdiction to *reconsider* the Confirmation Order," in that instance the movant sought relief that related to the issues on appeal—specifically, Dmitry Kirsanov sought relief regarding his CEL Token Custody Claims. (*Order Denying Kirsanov's Motion for Reconsideration*, ECF Doc. # 4046 (emphasis added).) The identity of the Mining manager is not on appeal, nor do the changes to the Original OWD implicate issues currently on appeal. These changes are discrete changes under the terms of the Original OWD. Therefore, the Court has not been divested of jurisdiction to rule on the Wind-Down Motion.

35

## IV. <u>CONCLUSION</u>

The Plan, Disclosure Statement and Confirmation Order allow for the selection of an alternate Backup Plan Sponsor, so long as it provides better terms, and the Court may permit this "toggle" so long as it does not amount to a material adverse change such that it constitutes a modification under 1127(b).

For the reasons explained above, the Court finds that the MiningCo Transaction falls squarely within the terms of the confirmed Plan, and does not constitute a modification. But even if it were a modification, there is no material adverse effect on creditors, so re-solicitation would not be required. Accordingly, the Wind-Down Motion is **GRANTED**.

The Debtors have submitted an Order consistent with this Opinion that will be entered.

Dated:    December 27, 2023
          New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge